UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| | .    Case No. 09-50026-reg |
| IN RE: | .    Chapter 11 |
| | . |
| MOTORS LIQUIDATION COMPANY, | .    (Jointly administered) |
| et al., f/k/a GENERAL | . |
| MOTORS CORP., et al, | .    One Bowling Green |
| | .    New York, NY 10004 |
| Debtors. | . |
| | .    Tuesday, September 22, 2015 |
| . . . . . . . . . . . . . . . | .    9:50 a.m. |


TRANSCRIPT OF EVIDENTIARY HEARING RE: IGNITION SWITCH
PLAINTIFFS AND NON-IGNITION SWITCH PLAINTIFFS'
REQUEST FOR STAY PENDING APPEAL [13246];
JOINDER OF IGNITION SWITCH PRE-CLOSING ACCIDENT PLAINTIFFS
TO THE IGNITION SWITCH PLAINTIFFS AND CERTAIN NON-IGNITION
SWITCH PLAINTIFFS REQUEST FOR A STAY OF DISTRIBUTIONS OF
GUC TRUST ASSETS AND RESPONSE TO MOTION OF WILMINGTON TRUST
COMPANY, AS GUC TRUST ADMINISTRATOR, FOR AN ORDER GRANTING
AUTHORITY TO (A) EXERCISE NEW GM WARRANTS AND LIQUIDATE
NEW GM COMMON STOCK, AND (B) MAKE CORRESPONDING
AMENDMENTS TO THE GUC TRUST AGREEMENT [13248];
OMNIBUS REPLY OF WILMINGTON TRUST COMPANY, AS GUC TRUST
ADMINISTRATOR, TO RESPONSES RECEIVED IN RESPECT OF
GUC TRUST MOTION FOR AN ORDER GRANTING AUTHORITY TO
(A) EXERCISE NEW GM WARRANTS AND LIQUIDATE NEW GM
COMMON STOCK, AND (B) MAKE CORRESPONDING AMENDMENTS
TO THE GUC TRUST AGREEMENT [13256];
THE PARTICIPATING UNITHOLDERS' JOINDER TO THE OMNIBUS REPLY OF
WILMINGTON TRUST COMPANY, AS GUC TRUST ADMINISTRATOR, TO
RESPONSES RECEIVED IN RESPECT OF GUC TRUST MOTION FOR AN ORDER
GRANTING AUTHORITY TO (A) EXERCISE NEW GM WARRANTS AND
LIQUIDATE NEW GM COMMON STOCK, AND (B) MAKE CORRESPONDING
AMENDMENTS TO THE GUC TRUST AGREEMENT [13257];
**BEFORE THE HONORABLE ROBERT E. GERBER**
**UNITED STATES BANKRUPTCY COURT JUDGE**


APPEARANCES CONTINUED.

Audio Operator:            Karen/Julio, ECR


Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46038
                           (855) 873-2223
                           www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES (Continued):

For the Debtor:             King & Spalding LLP
                           By:  ARTHUR J. STEINBERG, ESQ.
                           1185 Avenue of the Americas
                           New York, New York 10036-4003
                           (212) 556-2158

For the GUC Trust
Administrator:             Gibson, Dunn & Crutcher LLP
                           By:  LISA H. RUBIN, ESQ.
                                ADAM H. OFFENHARTZ, ESQ.
                                KEITH R. MARTORANA, ESQ.
                           200 Park Avenue
                           New York, New York 10166-0193
                           (212) 351-4000

For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs:                Brown Rudnick LLP
                           By:  EDWARD S. WEISFELNER, ESQ.
                                HOWARD S. STEEL, ESQ.
                           7 Times Square
                           New York, New York 10036
                           (212) 209-4917

                           Stutzman, Bromberg, Esserman & Plifka
                           By:  SANDER L. ESSERMAN, ESQ.
                           2323 Bryan Street
                           Suite 2200
                           Dallas, Texas 75201-2689
                           (214)969-4900

For the Ignition Switch
Pre-closing Accident
plaintiffs:                Goodwin Procter LLP
                           By:  GREGORY FOX, ESQ.
                           620 Eighth Avenue
                           New York, New York 10018
                           (212) 459-7348

For Participating
Unit Holders:              Akin Gump Strauss Hauer & Feld LLP
                           By:  DANIEL H. GOLDEN, ESQ.
                           One Bryant Park
                           New York, NY 10036-6745
                           (212) 827-8010



I N D E X
9/22/15

|                                           | PAGE |
|-------------------------------------------|------|
| OPENING STATEMENT BY MR. WEISFELNER        | 19   |
| OPENING STATEMENT BY MS. RUBIN             | 27   |
| OPENING STATEMENT BY MS. NEWMAN            | 37   |

| WITNESS          | DIRECT | CROSS | REDIRECT      | RECROSS  |
|------------------|--------|-------|---------------|----------|
| FOR GUC TRUST:   |        |       |               |          |
| Andrew Scruton   | --     | 44    | 132,169,182   | 156,180  |

EXHIBITS:

| FOR THE PLAINTIFF:        | Marked | Admitted |
|---------------------------|--------|----------|
| Exhibit A                 | 44     | 127      |
| Exhibits B through F      |        | 129      |

4

1       (Proceedings commence at 9:50 a.m.)

2              THE COURT:  Good morning.  Have a seat.

3              Mr. Weisfelner, I see you've risen.  Do you have some

4   preliminary remarks because I had a game plan for approaching

5   things, unless you have something that's going to moot all of

6   that out.

7              MR. WEISFELNER:  Well, not knowing what Your Honor

8   had in mind, I doubt I'll be in a position to moot things out.

9   I did have some housekeeping remarks, which I'm happy to defer.

10  I'll let Your Honor --

11             THE COURT:  Well, you're up.  If you want to do it

12  now, I'm agreeable --

13             MR. WEISFELNER:  Sure.

14             THE COURT:  -- unless there is an objection by anyone

15  else.  Go ahead.

16             MR. WEISFELNER:  Your Honor, very quickly -- and just

17  for the record, this is obviously an evidentiary hearing on our

18  request that the GUC Trust be enjoined from making any further

19  distributions to the GUC Trust unitholders pending the appeal

20  of Your Honor's equitable mootness determination, as reflected

21  in Your Honor's April 15th decision and ultimate June 1st

22  judgment.

23             The housekeeping issue I wanted to call to Your

24  Honor's attention had to do with discovery.  We had sought

25  discovery from the GUC Trust, represented by Gibson Dunn, and

5

1  from the GUC Trust unitholders, represented by Akin Gump.  Now,

2  the stipulation that Your Honor has received, in fact, resolved

3  most of our discovery issues with the GUC Trust, at least as it

4  relates to the GUC Trust administrator, that being Wilmington,

5  and it obviated both discovery and testimony from that one

6  witness.  And it also curtailed both the deposition and the

7  trial testimony from the other witness, that being the FTI

8  witness, Mr. Scruton.  I will tell you that --

9      THE COURT:  You say it obviated it.  By that you mean

10 it obviates your need to cross or --

11     MR. WEISFELNER:  Your Honor, let me make sure I'm

12 clear.  It didn't obviate either the discovery or the trial

13 testimony, but it truncated it.

14     THE COURT:  Oh, it should.

15     MR. WEISFELNER:  It shortened it.  Last night at

16 about a little after seven o'clock, I guess, Ms. Rubin sent out

17 and we received, but it wasn't until closer to ten o'clock last

18 night, all new exhibits or schedules to the Scruton

19 declaration.  And, Your Honor, in her cover email to us, she

20 indicated that the new exhibits were necessitated based on

21 issues that were raised during Mr. Scruton's deposition and

22 based on certain requests that I had made of Mr. Scruton during

23 his deposition.

24     And, Your Honor, with one request of the Court, I'm

25 prepared to utilize all of the revised schedules that came in

6

1  late last night.  The only request I have is that I get to

2  question the witness from the desk so that I could lay out both

3  the old schedules and the new schedules.  I haven't had much

4  time, if at all, to work with those schedules and just to

5  understand how they interplay with each other.  So if I could

6  be allowed to question the witness, not from the podium, but

7  instead from the desk, I'd appreciate it.  I'll keep my voice

8  up.  As Your Honor knows, I have a tendency to do that

9  generally anyway.

10         THE COURT:  Okay.  Ms. Rubin, I assume you have no

11 objection.

12         MS. RUBIN:  No objection, Your Honor.

13         THE COURT:  Okay.  That would be fine.

14         MR. WEISFELNER:  I want to turn to the discovery that

15 we sought from Akin Gump.  Your Honor, I think there's a couple

16 of important points to be made here.  First of all, Akin has

17 never, during the course of proceedings that involve our

18 plaintiffs, to my knowledge, ever filed a 2019 statement.  They

19 represented to the Court and to us back in I guess it was April

20 that they represented five specific hedge funds that held GUC

21 Trust units.

22         Subsequently, in September of this month -- of this

23 year, Akin, by email, advised all of us that its client base

24 had risen from five specifically named hedge funds to nine in

25 total, the same five old ones and four brand-new ones.

7

1        Now, Your Honor, again we still haven't seen a 2019

2  statement, but we got a representation from Akin that we have

3  no reason to doubt that their nine unitholders hold 47 percent

4  of the outstanding GUC Trust units.  We had asked in this part

5  of discovery to tell us what the profit or loss was for those

6  unitholders, either individually or, quite frankly, we're

7  prepared to accept it in the aggregate, and we were told we

8  weren't going to get that information.

9        We asked for profit or loss, either on an individual

10 basis or collectively, for all of the hedge funds in terms of

11 what their rates of return were on the marketplace over

12 different periods of time.  I think we asked for the last three

13 months, the last six months, the last year, and were told again

14 that that information was not going to be forthcoming.

15       Your Honor, we had concluded that rather than spend

16 the time and money -- when I say we, I mean we and Akin agree

17 that rather than spend the money, us seeking to compel their

18 discovery or their seeking to quash discovery on those

19 particular issues, that their refusal to provide the

20 information we sought would be called to Your Honor's attention

21 and you would make whatever conclusions Your Honor saw fit.

22       And as part of our closing, we'll argue for what sort

23 of presumptions we think we're entitled to in light of Akin's

24 failure to make information that we requested available.

25 You'll also hear from the witness, Your Honor, that in

8

1  calculating lost opportunity costs, FTI, or Mr. Scruton,

2  likewise made inquiry of Akin Gump's unitholders to know that.

3         So, Your Honor, again, I think it would probably be

4  most efficient, after obviously we hear Your Honor's

5  preliminaries, for us to call Mr. Scruton to the stand, go

6  through the cross and whatever redirect counsel feels

7  appropriate, and then move on to closing arguments.  I have no

8  other preliminary remarks.

9         THE COURT:  Anybody on behalf of Akin want to be

10 heard?

11        MS. NEWMAN:  Yes, Your Honor.

12        THE COURT:  Ms. Newman, come on up, please.  I know

13 you, but for the transcript, give us a full appearance, please.

14        MS. NEWMAN:  Yes, of course.  Deborah Newman from

15 Akin Gump Strauss Hauer & Feld on behalf of the participating

16 unitholders.

17        Your Honor, Mr. Weisfelner's recitation of the facts

18 is not entirely correct in the sense that we did have a

19 conversation about the discovery requests, the plaintiff's

20 discovery requests upon the participating unitholders.

21 Mr. Golden and I notified Mr. Weisfelner that the information

22 that he requested -- and I have the email here -- they had

23 actually reduced their request to profit-and-loss statements of

24 the participating unitholders over the last six months, so it

25 did not go back a full year, and we told Mr. Weisfelner that

9

1   our clients view that information as not relevant to the

2   question of opportunity costs to the entire unitholder universe

3   as the result of an indefinite -- potentially indefinite stay

4   pending an appeal and a potential adjudication of claims by

5   plaintiffs.

6          And Mr. Weisfelner informed us that he was not going

7   to seek judicial assistance and that he was going to request

8   from the Court an adverse interest.  That's his choice.  We did

9   not agree that the protocol would be no one would seek judicial

10  assistance and that the result would be Mr. Weisfelner's

11  request for an adverse inference.  He told us that that was his

12  plan, and we accepted that.

13         The law on an adverse inference, Your Honor, as I'm

14  sure you're aware, is a very high standard.  Courts hold that

15  it's an extreme sanction that should not be given lightly.  And

16  it's only appropriate where a party had an obligation to timely

17  produce the information, fail to do so with a culpable state of

18  mind, and in missing information that's relevant to the other

19  party's claim or defense.  None of those factors are here.

20         The participating unitholders did not have an

21  obligation to produce the information.  We responded to

22  Mr. Weisfelner's request.  We objected to the request on the

23  grounds that the information is not relevant and that it seeks

24  commercially sensitive and proprietary information.  And

25  Mr. Weisfelner chose not to seek judicial assistance in moving

10

1  to compel that information.

2         There certainly was no culpable state of mind on

3  behalf of the participating unitholders.  And our position,

4  Your Honor, and I think it's the right one, is that the

5  individual returns or profit-and-loss statements for the

6  participating unitholders over the past six months has

7  absolutely no bearing on the harm that could result to all of

8  the unitholders for the period during which a stay would be

9  necessary -- excuse me, the stay that is being requested, the

10  period for which the stay would be applied that's being

11  requested by the plaintiffs.

12         I would just call to the Court's attention that the

13  Court in Pall Corp. v. 3M Purification, Inc., and the citation

14  is 279 F.R.D. 279, was faced with a very similar situation

15  where a party chose not to move to compel information, but

16  instead sought an adverse interest, and the Court stated that

17  it could not endorse that position and refused to grant that

18  adverse inference, and there's certainly no basis for an

19  adverse interest here -- adverse inference, excuse me.

20         THE COURT:  All right.  Folks, the issue that has

21  arisen does not surprise me.  I had anticipated it in doing my

22  prep.  And the fact that you reached the resolution that you

23  did, which is a decision not to ask me to make a hedge fund

24  disclose its profit-and-loss information, also does not

25  surprise me, especially since I know your opponent, Ms. Newman,

11

1  and who he represents, and he probably cares about many of the

2  same considerations that you do.

3       Given that and the fact that on a motion that's

4  largely one of discretion as this one is where I'm allowed to

5  use my judicial experience, I would not require and am not

6  requiring hedge fund holders to reveal their profit and loss of

7  cost-basis information, or will not, at least, if you're

8  prepared to stipulate that they're not par investors.  I don't

9  think I've ever seen a hedge fund that was a par investor, but

10 you can let me know whether that assumption is one upon which

11 you want to rely, if you want to rely on the fact that they're

12 going to be par investors.

13      Assuming you don't stipulate to that, I am not going

14 to decide now the extent to which I regard the failure to

15 provide that information as an adverse interest, on the one

16 hand, or merely a failure to prove on the other.  Each of you

17 is going to have a reservation of rights to make such arguments

18 as you see fit on that issue.  I'll let you think in caucus

19 with your colleagues, if you need to, before you decide whether

20 you're prepared to stip that your guys aren't par investors.

21 But you'll need to tell me at the conclusion of evidence.  The

22 remainder of that I'm going to defer until the issue comes up

23 in an argument.

24      MS. NEWMAN:  Okay.

25      THE COURT:  Okay.

12

1          MS. NEWMAN:  Thank you, Your Honor.

2          THE COURT:  Ms. Rubin.

3          MS. RUBIN:  Your Honor, just briefly, Mr. Weisfelner,

4 as part of his housekeeping -- I'm sorry, Your Honor.  I'm Lisa

5 Rubin of Gibson, Dunn & Crutcher.  I represent the Motors

6 Liquidation Company GUC Trust.

7          And, Your Honor, this morning in his housekeeping

8 remarks, Mr. Weisfelner posed that we go straight to an

9 examination of the witness.  Your Honor, that was not the

10 agreement of the parties leading up to today's hearing, nor do

11 I believe it makes sense today, and I just want to briefly

12 explain to Your Honor why not.

13          Your Honor, as you know from our papers as -- and as

14 I'm prepared to more fully illuminate for Your Honor this

15 morning, there are a number of reasons why we feel a stay is

16 inappropriate here.  Those include the fact that the relief

17 that Mr. Weisfelner is requesting would be a violation, in our

18 view, of Sections 1127 and 1144 of the code, but also that it's

19 not warranted on the factors that the Second Circuit dictates

20 that this court and others consider when faced with a request

21 for a stay pending appeal.

22          It's not our view that Mr. Scruton's testimony this

23 morning, Your Honor, is necessary.  Certainly helpful in

24 certain regards, but we believe that Mr. Weisfelner, who bears

25 the burden of proof and is required to show evidence on each of

13

1  the four stay factors, can't overcome those hurdles, even

2  before we get to what harm exists to the unitholders if a stay

3  is imposed or the consideration of a bond amount if Your Honor

4  decides that a stay should be granted.  So for those reasons,

5  Your Honor, we don't believe it's appropriate to continue

6  straight to an examination of the witness.  We believe that we

7  should honor the agreement among the parties to have

8  preliminary remarks before Your Honor, subject to Your Honor's

9  own view and game plan.  Thank you, Your Honor.

10         THE COURT:  Ms. Rubin, this is the matter upon which

11  I was going to comment if you guys didn't have your

12  housekeeping remarks.

13         The threshold issues you raised in your brief,

14  vis-à-vis the ability to provide the requested relief given the

15  contents of the plan and the confirmation order, your

16  contention and substance that I'm constrained in granting the

17  relief is one that I will want parties to address in oral

18  argument.  Your point that you just made is a different one,

19  that your opinion doesn't even get to the evidentiary stage

20  because of failures to allege four horsemen of a preliminary

21  injunction application isn't persuasive to me.

22         What we are going to do, as I said we would do before

23  Mr. Weisfelner got up, is I'm going to identify how I see the

24  issues and what each party needs to address.  Then, I will give

25  each side up to, but not exceeding, five minutes for an

ACCESS TRANSCRIPTS, LLC       1-855-USE-ACCESS (873-2223)

14

opening, if desired.  Then, I'm going to take the entirety of

the evidentiary record, and then I'm going to take argument

based upon it.  But to the extent you're saying that I cannot

or should not even hear evidence until I conclude that the

evidence which would be coming forward or which is, at least

seemingly, undisputed by reason of stipulations and other

matter, how that evidence can be foreclosed is unpersuasive to

me.  So we're going to do it my way.

MS. RUBIN:  I understand, Your Honor.  Thank you.

THE COURT:  Okay.  All right.  So let's focus on what

we need to get done and what I see the issues are, ladies and

gentlemen.

Mr. Weisfelner, I don't have anything from you

enlightening on a couple of the threshold issues that Ms. Rubin

raises in generally discussing constraints and my ability to

grant the relief you're looking for because she says you're

trying to modify the plan or revoke the confirmation order, so

I need you to address that.

Assuming we can get past that -- and I will

understand that these raise threshold issues of a type somewhat

different than the ones that Ms. Rubin was just discussing, but

are nevertheless threshold issues -- it seems to me that the

controversy today is mainly about the bond.  But before we get

there, Ms. Rubin, assuming you're right that potential mootness

alone doesn't constitute irreparable injury, which is a

1  contention that I'm inclined to agree with you on, it still

2  seems to me that there's plainly irreparable injury here when

3  money goes out the door to many, many different people and it's

4  difficult or impossible to get the money back.  And I was a

5  little puzzled by your preliminary comment because it seems to

6  me that that being what we're talking about is stipulated to or

7  is implicit in everything we're talking about today.  And it

8  seems to me that your main prejudice, which is opportunity

9  cost, is compensable by means of the bond and thus the

10 remaining balance of hardships favors a stay.

11       Turning back to you, though, Mr. Weisfelner, on the

12 likelihood of success, though, I don't know if the analysis has

13 been nuanced enough.  I understand your argument that the

14 accordion feature should be held to provide an avenue for

15 potential relief, but that doesn't go to the 244 million bucks

16 that's the subject of the stay obligation.  That goes to the

17 incremental 922 million that you want to access.  That seems to

18 me, subject to your right to be heard, to be a different

19 (indiscernible).  How is the disbursement of the 135 million in

20 November and the 109 million thereafter related to your desire

21 to get the 922 million, which is the real part of the goal that

22 you seemingly want to get access to after an appeal?

23       I don't think I need help from either of you on the

24 public interest.  I would, however, like help from you all,

25 even though it may not be before me today, on the number of

16

1  pre-sale accident cases as contrasted to economic loss cases

2  that are now on the table.  I understand they can proceed now

3  under the judgment, but I want to know what the figure is if

4  anybody knows.

5       Now, back to the bond, which I think is likely to be

6  the most important issue today, Mr. Weisfelner, there was a

7  reference in on the letters I received to your desire to rely

8  on market information stuff, which I might be able to take

9  judicial notice of, might be admissible under applicable

10 hearsay doctrine, but I didn't see any of it.  What evidentiary

11 basis do I have to work with, other than what the GUC Trust got

12 me by means of its expert affidavit?

13      And the prepared notes overlap with something which

14 came up in the so-called housekeeping matter.  As I mentioned a

15 moment ago, in my professional life, which admittedly was as a

16 bankruptcy litigator and not as a bankruptcy deal lawyer, I

17 don't know if I ever saw a hedge fund invested par.  And I'll

18 need to get help from both sides, but especially from you,

19 Ms. Rubin, as to how I can rely on hedge fund yields when I

20 don't know what they buy it.  It would seem to me that the buy

21 price might be relevant for the units already acquired and

22 would be especially relevant for alternative investments they

23 might invest in under an opportunity cost analysis, but I don't

24 see how I can rely on considerations of that character without

25 more data.  Ms. Rubin, you may have to address -- strike that.

17

1  You will have to address, when we get to argument, how you can

2  analyze invest hedge fund yields without knowing the cost basis

3  upon which those yields are premised.

4       Now, again, those are related to alternative

5  investments and the universe of that, and as most of you know

6  from other cases, I do care about 2019 compliance.  And I'm

7  well aware that 2019 provides the Court with remedies for

8  noncompliance, but those issues are of sufficient subtlety that

9  deciding them with due process can't be done in the middle of

10 an evidentiary hearing five minutes after the issue has first

11 been grazed.  So I don't think I can or should penalize the GUC

12 Trust unitholders for noncompliance with 2019, except insofar

13 as arguments might be made on the failure to provide

14 information of the character the 2019 would have revealed.

15      The most obvious thing that 2019 would have revealed,

16 since even in the dialogue on the amendment of 2019, matters to

17 which I had some involvement, nobody, including me, had argued

18 that there should ever be cost-basis information included under

19 2019.  And that, to the extent it was otherwise discoverable,

20 would come only through discovery and not by 2019 compliance.

21 The one hole that 2019 would have plugged is simply what people

22 hold.  But if there were constraints on considering hedge fund

23 yields, as distinct from the remainder of the investment

24 community, that issue becomes one of lesser importance, subject

25 to your right to be heard.

1        But I need your help because it seems to me that the

2    original holders of claims and perhaps units, depending on when

3    original claim holders would have sold their claims to hedge

4    funds, if they did, wouldn't be hedge funds.  So we'd be

5    talking about vendors, environmental claimants, many of whom

6    might be governmental entities, bondholders and tort victims.

7    What data do I have as to how many of them sold their claims to

8    hedge funds?  And to what extent can I assume that they did or

9    didn't or do I have to simply throw up my arms and say that's

10   something that I don't know and that we have to proceed without

11   knowing?

12       Okay.  Five minutes each or up to five minutes each

13   for opening, starting with you, Mr. Weisfelner.

14       MR. WEISFELNER:  Your Honor, thank you.  I neglected

15   to mention that we're here together with Sander Esserman as

16   designated co-counsel for the economic loss plaintiffs.

17       Your Honor, I want to address the issues that you

18   raised, hopefully in the order that you raised them, with one

19   exception.

20       First is the extent to which the relief that we're

21   requesting somehow violates the plan or the order confirming

22   the plan.  And here, Your Honor, I believe it's critically

23   important that we take a step back and realize what it is that

24   we're talking about.

25       Back in 2009, when Your Honor approved the sale, and

19

1  subsequently -- I can't remember the exact year -- when Your

2  Honor approved the plan and signed the order confirming the

3  plan, our clients were known creditors.  Your Honor has already

4  determined that we're deprived of due process in two

5  fundamental ways, one in terms of being able to file proofs of

6  claim in a timely fashion -- and, frankly, I think that's the

7  more important denial for purposes of today's hearing -- but

8  were also fundamentally denied their due process rights with

9  regard to the ability to argue, for lack of a better term, the

10 overbreadth of Your Honor's sale order.

11         Your Honor, for an entity, that being the GUC Trust,

12 whose obligation is to look out for the best interest of

13 creditors of Old GM, we are among, if not the largest single

14 constituency deserving of the fiduciary duty of the GUC Trust,

15 but for the fact that we didn't file timely proofs of claim,

16 which but for the fact that we were denied due process,

17 wouldn't be an issue.  There is nothing in the plan as it was

18 approved by the Court without knowledge of our existence or Old

19 GM's fraudulent concealment of our claims, and as we allege

20 then ultimately New GM's fraudulent concealment of our claims,

21 which suggests that our effort to get relief from our denial of

22 due process, either from the Old GM estate or from New GM --

23 but here we're talking about from Old GM's estate -- in any

24 way, shape or form violates the plan or the order, both of

25 which were considered and ultimately entered without our

20

1    participation, notwithstanding the fact that we were known

2    creditors.  In other words, they were considered and approved

3    without constitutional due process.

4          We talk about the likelihood of success -- and Your

5    Honor may note that I've skipped over the bond.  I want to get

6    to that last, even though I recognize it's fundamentally the

7    critical issue for today.  The likelihood of success, in our

8    view, turns on a couple of critical issues, one that relates

9    specifically to the housekeeping debate that we've been having.

10          Your Honor determined, in connection with your

11    decision, determining that equitable mootness applies, based in

12    no small measure on the reasonable anticipation of the

13    unitholders, what they anticipated was going to happen with

14    regard to claims.

15          And, Your Honor, even assuming that reasonable

16    anticipation is relevant in a scenario where the other parties

17    were denied due process and no one could have anticipated that

18    their rights were going to be denied in a constitutionally

19    infirmed fashion, the other critical aspect of our argument

20    with Your Honor's decision is you had no evidentiary basis to

21    determine which of the hedge funds that are affected by

22    equitable mootness, in fact, were around when the order was

23    approved such that they had reasonable expectations that were

24    dashed.

25          You will hear from the witness today that he doesn't

1  know how many of the unitholders bought their units before the

2  2014 recall.  He doesn't know how many of the current

3  unitholders hold their claims as of the time Your Honor

4  identified the four threshold issues.  He doesn't know how many

5  of the unitholders were around when Your Honor decided the four

6  threshold issues.  Our point is simple:  That the unitholders,

7  as represented by the hedge funds, could not have had a

8  reasonable expectation that they wouldn't be diluted by

9  plaintiffs whose due process rights were violated, depending on

10  when they acquired their units.

11        Your Honor, 2019 does something other than tell us

12  the identity of the unitholders and the amount of units they

13  hold.  The other interesting thing that 2019 would have told us

14  is when did they acquire their position, and --

15        THE COURT:  I thought that was something I lost on in

16  the lobbying process in 2019.

17        MR. WEISFELNER:  Your Honor, I'm not sure that you

18  needed --

19        THE COURT:  My memory is that SIFMA and I think it's

20  the ISDA had argued that if 2019 had required when stuff was

21  acquired, shrewd investors, which most would stipulate hedge

22  funds are --

23        MR. WEISFELNER:  Right.

24        THE COURT:  -- could figure out when the claims and

25  bonds were purchased.

22

1            MR. WEISFELNER:  Yeah.  Your Honor, I would invite

2    Your Honor's attention to Rule 2019(c)(2)(C), which reads in

3    relevant part, "With respect" --

4            THE COURT:  By quarter and year of each disclosable

5    interest.  I guess that was the compromise --

6            MR. WEISFELNER:  Right.

7            THE COURT:  -- rather than actually when it was

8    acquired.

9            MR. WEISFELNER:  Okay.  But, Your Honor, if we got

10   the date of acquisition by quarter and year of each disclosable

11   economic interest --

12           THE COURT:  Unless acquired more than one year before

13   the petition was filed.

14           MR. WEISFELNER:  Right.  But again, Your Honor, it's

15   not relevant to one year before the petition was filed since --

16   and you'll hear from the witness himself that his supposition

17   is that most of the units are held by hedge funds and most of

18   them acquired those units, not as original creditors of General

19   Motors, affecting employees or vendors, but rather hedge funds

20   that bought the claims and ultimately underlying units after

21   the fact.

22           Your Honor -- and I think that issue bears on

23   likelihood of success.  It's not just the accordion feature.

24   It's are we likely to be successful on appeal, in part because

25   the trial court had no evidentiary record upon which to rule

23

1   that there were, in fact, dashed expectations.

2           But beyond that, Your Honor asked us to focus on the

3   difference between the dollar amounts at issue today, and Your

4   Honor, the evidence will demonstrate to you that the dollar

5   amount at issue as of today is $12 million.  That's the amount

6   that's available for distribution, but it's below the threshold

7   of what the GUC Trust can distribute.  You'll hear evidence

8   today that they believe it's likely that sometime in

9   mid-November of this year, they'll be able to release more

10  money from a tax holdback such that the amount for distribution

11  will be $135 million.  Any further distributions aren't

12  anticipated until November of next year.

13          So, Your Honor, at best, from our perspective, we're

14  talking about less than $12 million.  At worst, from our

15  perspective, we're looking at $135 million.  And why is that

16  amount of money relevant as opposed to our concerns regarding

17  the accordion feature?  And frankly, Your Honor put your finger

18  on it.  Once that money is disbursed to god knows how many

19  hedge funds -- we know that nine hedge funds, as of a couple of

20  weeks ago, claim they represented 47 percent of all the units.

21  I don't know how many hedge funds, or non-hedge funds for that

22  matter, make up the other 53 percent.  But once the money, be

23  it 135 million or less, gets distributed, I don't know how to

24  get it back.

25          And I think on appeal, one of the things that the

24

1  appellate court is likely to take into consideration is the

2  fact that as of today, it appears that unitholders -- or said a

3  different way, creditors or Old GM -- realized through the

4  trust approximately 30 cents on the dollar.  That was the

5  totality of their ultimate distributions.

6          Well, Your Honor, if we got 100 percent of the

7  accordion and 100 percent of the amount of money that's

8  available for distribution and subject to today's hearing,

9  given what we think are the likely damages that our clients --

10  and when I say "our clients," I mean not only economic loss,

11  but the personal injury claims collectively we'll be able to

12  demonstrate, would not allow us to get back to parity or

13  anywhere close to parity to the 30 cents that other creditors

14  have already received.  That's why we think it's important to

15  hold up this distribution and not just focus on the accordion.

16          THE COURT:  If you were to shoot the moon on your

17  $10 billion claim --

18          MR. WEISFELNER:  Right.

19          THE COURT:  -- and if you were to shoot the moon on

20  getting the accordion feature decided in your favor, that would

21  mean roughly nine or ten cents on the dollar?

22          MR. WEISFELNER:  That's roughly the calculation, Your

23  Honor, and you don't move the needle beyond that very much with

24  regard to the 135 million that's the subject of today's

25  hearing.  But for people who were denied due process, the

ability to realize 10 cents, or even 12 cents when everybody

else got 30 cents, is the rough justice that we're looking for

and the kind of remedy we think a court could fashion for us,

notwithstanding elements of and policy reasons behind equitable

mootness as we currently understand it.

Your Honor, let me then turn, in whatever remaining

time I might have left, I wasn't keeping track --

THE COURT:  Which is minimal --

MR. WEISFELNER:  -- to the bond.  And I agree with

you that I think a lot of what you're being asked to consider

here is the bond.  And, Your Honor, I can only preview for you

that the witness that's being proffered in order to demonstrate

the bond is not going to be able to convince Your Honor that

the bonding amount it seeks is warranted.  I think we'll be

able to demonstrate, through examination of this witness and

with reference to other cases that I'm sure Your Honor is aware

of, that there is an appropriate rate of return to utilize if

one is attempting to estimate what the return would be to hedge

funds -- or for that matter, non-hedge funds -- in the context

of calculating lost opportunity costs.

And I think when Your Honor gets through the

evidence, you are going to determine one of two things.  Either

no bond is required, and I recognize it's my burden to

demonstrate a deviation within your discretion from the normal

rules of security, or that if a bond is appropriate in this

26

1   circumstance, it's a fraction of the $18 million amount that

2   Mr. Scruton put in his declaration.

3          I have nothing else, Your Honor, unless you have any

4   questions.

5          THE COURT:  Okay.  Thank you.

6          Ms. Rubin.

7          MS. RUBIN:  Your Honor, mindful of your time

8   restrictions, I want to make sure that I'm being responsive to

9   your questions.  So if I haven't hit anything that you've asked

10  us to address, please feel free to interrupt me.

11         I want to start with Mr. Weisfelner's assertion that

12  the biggest creditor that my client had were the economic loss

13  claimants that he represents, because I have to tell you, that

14  does not comport with my understanding from my client of who

15  their fiduciary duty is owed to.

16         Your Honor, just for the record, Mr. Weisfelner has

17  known that his clients have a claim in respect of the ignition

18  switch defect since February or March of 2014.  And, Your

19  Honor, as we sit here today, Mr. Weisfelner and his clients

20  have not filed a single proof of claim before Your Honor, not a

21  contingent claim, not an individual claim, not a putative class

22  proof of claim.  And that should matter, Your Honor, because in

23  terms of the fiduciary duty to whom the GUC Trust owes that to,

24  it owes it to existing GUC Trust beneficiaries.  It owes no

25  fiduciary duty to someone like Mr. Weisfelner's clients, who

27

1  haven't even taken the steps to have a disputed general

2  unsecured claim.

3         So when we talk about, Your Honor, the plan

4  modification and the revocation issues that I raised in our

5  brief, respectfully, Your Honor, the plan at Paragraph 6.2 in

6  the GUC Trust agreement at Section 5.4, they require the trust

7  to make quarterly distributions to existing GUC Trust

8  beneficiaries when certain facts present themselves.  And, Your

9  Honor, in Paragraph 14 and 15 of the stipulated facts, the

10 parties stipulated -- that includes Mr. Weisfelner and his

11 clients -- to the existence of certain things.

12        One of the things that we said was, although the

13 books haven't closed for the quarter yet, based on the net sale

14 price that we received from the liquidation of stock over the

15 summer, a motion that we made before Your Honor with Your

16 Honor's approval, based on that, the GUC Trust anticipates that

17 we're going to be in a position to make an excess distribution

18 pursuant to the requirement of the plan, pursuant to the

19 requirement of the confirmation order, of approximately $135

20 million to holders of units.

21        And then we said in the second sentence, again to

22 which Mr. Weisfelner agreed, that based on prior excess

23 distributions, that anticipated distribution would likely be

24 made to holders of units in mid-November 2015.

25        We view those things to be our fiduciary duty as

28

1  required by the plan and the confirmation order.  Similarly, we

2  view that any effort to mount a collateral attack on that

3  required distribution is an attempt to enjoin us from making

4  that required distribution.  That's a plan modification under

5  Section 1127(b), Your Honor.  Your Honor knows that under

6  Section 1127(b), a confirmed Chapter 11 plan can only be

7  modified by the plan proponent -- that does not include

8  Mr. Weisfelner and his clients -- or reorganized debtor before

9  substantial consummation.

10       Your Honor, the parties stipulated as part of the

11  threshold issues briefing that the plan was substantially

12  consummated years ago.  Similarly, under Section 1144 of the

13  Code, any motion to modify or revoke the confirmation order has

14  to be made within 180 days of that order, and only to the

15  extent, Your Honor, that the order was procured by fraud.  This

16  situation is not different or distinct from the one that Judge

17  Glenn analyzed in the BGI case, where staying the required

18  distribution here would interfere with the GUC Trust duties to

19  make required distributions to existing beneficiaries.

20       THE COURT:  When Marty Glenn had the Borders Books

21  case, the BGI case, he had already determined that he was

22  disallowing the claim of those --

23       MS. RUBIN:  Of the gift card holders, Your Honor?

24       THE COURT:  -- certificate holders, wasn't he?

25       MS. RUBIN:  Yes.  Yes.  But you know what, Your

29

1  Honor?  That's an important distinction, and I'm glad that Your

2  Honor raised that because the gift card holders in Judge

3  Glenn's case did.  They made a claim.  They sought to file late

4  proofs of claim in their individual capacity, and then they

5  sought to file a putative class claim that Judge Glenn denied.

6         Here, Your Honor, that's an important distinction.

7  Mr. Weisfelner has never sought to perfect his clients' rights

8  in this court vis-à-vis the GUC Trust.  And, Your Honor, that

9  plays into the calculation of irreparable harm, so I want to go

10 and pivot to that next.

11        Your Honor said earlier in his introductory comments

12 that he believed that while it is true that mootness in and of

13 itself is not irreparable harm, that on balance you believe

14 Mr. Weisfelner and his clients have shown irreparable harm.

15 Respectfully, Your Honor, I want to encourage you to question

16 that.  There are cases in this court, including the BGI

17 decision authored by Judge Scheindlin of the district court in

18 2014, that state very clearly there is no irreparable harm

19 where the party seeking the stay pending appeal has not acted

20 with appropriate diligence to protect their rights throughout

21 the proceeding.

22        And, Your Honor, I would respectfully submit to you

23 that Mr. Weisfelner's clients have failed to exercise that

24 diligence in two meaningful ways, the first of which I've

25 already touched upon.  They haven't filed a claim.  It is hard

30

1 to understand -- whether you call it standing, whether you call

2 it lack of irreparable harm, I have a very hard time wrapping

3 my head around how we are supposed to find that there is

4 irreparable harm to people who are not claimants in this

5 proceeding.  They -- Mr. Weisfelner himself said they are our

6 biggest creditors, and yet there is a fundamental disconnect.

7 They are not claimants.

8         Your Honor, the more important thing that I would add

9 is Your Honor will recall last October, the trust made an

10 announcement that they were anticipating the same sort of

11 excess distribution as required by the plan and the

12 confirmation order that we are now anticipating making in

13 November of 2015.  Mr. Weisfelner sent my client a letter and

14 said, don't do that because my clients are aware of the

15 ignition switch defect and we might have a claim against you.

16        And my client wrote back and said, Mr. Weisfelner,

17 respectfully, you believe that you have rights against us, go

18 to the court, seek to enjoin that distribution.  And what did

19 Mr. Weisfelner do?  Your Honor said it best.  He made a

20 tactical choice that the pocket he wanted to pick was not ours.

21 He made a tactical choice that he wanted to pursue those exact

22 claims against New GM and not the trust.

23        And so what did the trustee do?  The trustee, in the

24 exercise of its fiduciary duty, released 264 million

25 approximately in GUC Trust securities and made that

1  distribution with no formal objection from Mr. Weisfelner, with

2  no formal objection from any of the other designated counsel,

3  with no formal objection from anybody representing the pre-sale

4  closing accident victims of either the ignition switch or the

5  non-ignition switch variety.

6          Now, Mr. Weisfelner, having lost on the threshold

7  issues decision and with an appeal, comes before Your Honor in

8  June after we file a motion to liquidate securities, and that

9  motion says, we're doing this because we want to perfect

10  certain tax issues and we anticipate that doing so will enable

11  us to make an excess distribution.  Mr. Weisfelner sweeps in

12  and, for the first time in 15, 16 months, seeks to prevent the

13  GUC Trust from doing something.

14          And respectfully, Your Honor, I would say where

15  irreparable harm is concerned, it's too little, too late.  Just

16  as in BGI, where the Court found that the parties who were

17  seeking to enjoin the distribution hadn't done anything to make

18  that happen for a year, so too here.

19          Mr. Weisfelner and his clients have to live with

20  their choice.  It's okay with them that last year, we pushed

21  out approximately $265 million in securities, but when we're

22  about to make a cash distribution of $135 million to a similar

23  population, they have a problem with that.  That's hard for me

24  to understand.

25          Now, Your Honor, I want to go back to some questions

32

1 that you had about hedge fund yields, and I want to be clear

2 about what the trust's role is here.  And I know Ms. Newman may

3 want to be heard from because she's in a somewhat separate

4 position than we are, but let me just make clear, under the

5 terms of an SEC no-action letter --

6       THE COURT:  Pause because it had seemed to me that

7 the GUC Trust, technically speaking, is a stakeholder and that

8 the real parties in interest and the real parties whose ox

9 would be gored if I were to be granting the stay would be

10 unitholders.  Am I mistaken in that regard?

11       MS. RUBIN:  You know, Your Honor, you're not mistaken

12 in that regard with two caveats.  One is Mr. Golden and

13 Ms. Newman represent only the participating unitholders.  As

14 for the representation that they made to Mr. Weisfelner, that

15 -- those are a series of, I believe, nine funds that own, as of

16 two weeks ago, approximately 47 percent of the units.

17       Now, from the perspective of the GUC Trustee and

18 administrator, let me tell you what I know about the rest, Your

19 Honor, because it isn't much and it can't be much, and I want

20 to underscore that.  The GUC Trust is prohibited by the terms

21 of an SEC no-action letter from collecting information in the

22 trading of GUC Trust units.  We don't know who trades them.  We

23 don't know when they trade them.  We don't know in what

24 increment they trade them.

25       So while it is true, Your Honor, that we are here as

33

1  a stakeholder and as a representative of unitholders, I have to

2  be here for the folks who are not.  I don't know what

3  proportion of the universe of unitholders is comprised by hedge

4  funds, on one hand, or conversely, as Your Honor put it, by

5  economic claimants, by tort victims, by governmental entities,

6  by vendors.  And someone has to stand up for their rights, too.

7          Now, Mr. Scruton will testify --

8          THE COURT:  I understand that.  And your point is

9  that each of them is prejudiced by delay.  The only question is

10 how each of them might reinvest his, her or its distribution in

11 the next investment.

12         MS. RUBIN:  Which brings me to the bond, Your Honor,

13 if I may.

14         THE COURT:  I beg your pardon?

15         MS. RUBIN:  Which brings me to the bond, if I may.

16 Your Honor, Mr. Scruton was faced with what I think we would

17 all say, even for someone of his background and training, is a

18 difficult task.  How do you assess what the maximum potential

19 harm is to the universe of unitholders if a stay is imposed?

20 Because that's what the bond is supposed to measure.  Your

21 Honor is mindful that Judge Scheindlin and others have said the

22 appropriate amount of the bond should be at or near the full

23 amount of the potential harm.  And so to that point,

24 Mr. Scruton did some calculations based on what I think are

25 fairly conservative assumptions.  He first assumed that the

34

1  unitholder population is comprised 47 percent of hedge funds.

2  We asked him not to assume more than that.  Second, he assumed

3  a stay period of a year.

4          And, Your Honor, I'm mindful of the fact that Judge

5  Furman has directed the parties to the MDL proceeding to seek

6  expedited treatment of the appeal, but the truth of the matter

7  is, Your Honor, A, the parties have not done so yet, and B,

8  more importantly, we don't know how the circuit is going to

9  react to that.  And I'm mindful also that in this very

10  contested matter, the appeal of the term loan avoidance action

11  took 22 months, and if you back out of that, the time taken by

12  the certification of the questions of the Delaware Supreme

13  Court, you're still at 18 months.  So 12 months is a

14  conservative estimate, I think, of the time for an appeal.

15          I would add to that, Your Honor, if Mr. Weisfelner

16  wins on appeal, he's not done.  In fact, he reserves in his

17  motion the ability to come back and ask Your Honor for a

18  further stay.  And why is that?  Because, Your Honor, if he

19  wins on equitable mootness, that's just the beginning for him.

20  He still, as Your Honor is well aware, has to seek an allowance

21  of claims that still haven't been filed.  That's going to take

22  some time, Your Honor.

23          So even if, in the best case scenario, the Second

24  Circuit could decide the threshold issues appeals, which as

25  Your Honor knows are multi-party, multiple issues, a very

35

1  complex appeal even in an expedited scenario, even if they

2  could do that in a matter of months, he's going to be back here

3  before Your Honor saying, now, Your Honor, I need you to stay

4  the distributions so we can determine whether to have allowed

5  claims.

6          It's the beginning, not the end, Your Honor.  So the

7  bond that Mr. Scruton estimates -- and again, he'll testify to

8  this later -- is $18.4 million based on an assessment of lost

9  opportunity costs to a population of unitholders that,

10 conservatively estimated, have 47 percent hedge funds in them.

11         Now, you asked why the index that he uses is

12 appropriate, given that we don't know when people buy, and I

13 have two responses to that, Your Honor, and then I'll close.

14 One is the rest of the indices that Mr. Scruton considers as

15 proxies for other investors, they too don't consider when

16 people here may have come into the population of unitholders.

17 We didn't view that as a relevant consideration, Your Honor,

18 because it's our understanding that in assessing lost

19 opportunity costs, what you're looking at is what would people

20 do with this cash distribution, not how much profit or loss did

21 they have overall on the horizon of the investment.  That's how

22 we asked Mr. Scruton to measure it, and we believe that's the

23 appropriate measurement.

24         But the second thing that I'll say, Your Honor, in

25 terms of that -- Your Honor, I'll scratch that.  I'd like to --

36

1  with the Court's permission, I believe that Ms. Newman has some

2  things to say about the funds and their yields and the

3  population of unitholders that I, from the position of

4  representing the GUC Trust, couldn't possibly be in a position

5  to know, and I'll rest.

6      THE COURT:  Okay.  By way of opening, I'll allow it.

7  Remember, this is just opening.  I'm going to give you a chance

8  to argue later if we can get up to that point.

9      So again, Ms. Newman, if you want to say something

10  now in the way of opening, you can.  I'm also telling you that

11  I'll let you be heard in closing.

12      MS. NEWMAN:  Thank you, Your Honor.  I appreciate

13  that.  For the record, Deborah Newman, Akin Gump, on behalf of

14  the participating unitholders.

15      Your Honor, Mr. Weisfelner used the term "due

16  process" a lot, and he said something like if his clients had

17  not been deprived of due process in the bankruptcy action, we

18  wouldn't be here.  That doesn't ring true to me, Your Honor,

19  because as Ms. Rubin points out, Mr. Weisfelner's clients did

20  not file a proof of claim against the GUC Trust when they

21  became aware of their plans.  They filed claims against New GM,

22  but they filed nothing against the GUC Trust.  And that was

23  true the day that we appeared before Your Honor on the

24  threshold issues, and it's true still today.  And so they are

25  not a constituency of the GUC Trust.

37

1          And, Your Honor, we stipulated in the facts -- the

2    stipulated facts that the parties agreed to in connection with

3    the threshold issues that as of the date of the stipulated

4    facts, more than 25 million units had traded and the start date

5    for that period was the time that the plaintiffs filed their

6    claims against New GM.  So during that period, 25 million GUC

7    Trust units traded, and the parties that traded those units had

8    no reason to believe that the disclosures that had been made by

9    the GUC Trust, that the disclosures made in the plan and

10   confirmation order about GUC Trust unitholders' rights to GUC

11   Trust assets would be challenged or threatened by claims of

12   more than $10 billion from this plaintiff class.

13          THE COURT:  Pause for a second.  I think you said

14   million.  I assume you mean billion.

15          MS. NEWMAN:  Ten billion claims --

16          THE COURT:  Yeah.

17          MS. NEWMAN:  -- more than 25 million units.

18          THE COURT:  The 25 million GUC Trust units that

19   traded, that was between when and when?

20          MS. NEWMAN:  That was, I believe, and I will confirm

21   this for Your Honor before I get up for closing, but it's

22   certainly -- the start date was the date on which plaintiffs

23   became aware of their claims.  I believe we used --

24          THE COURT:  Which would have been February or

25   thereabouts of 2014?

38

1           MS. NEWMAN:  Of 2014, yes, Your Honor.

2           THE COURT:  And what closing date?

3           MS. NEWMAN:  And I believe that the closing date was

4   the date that we agreed to the stipulated facts because that

5   was the data point that was in the stipulated facts.

6           THE COURT:  Okay.  Roughly September 1st?

7           MS. NEWMAN:  No, Your Honor.  I'm sorry, I'm talking

8   about the stipulated facts that we agreed to in connection with

9   the threshold issues, so now we're going back, I think, to

10  August 8th, 2014.  So since that time, I expect that that

11  number has grown exponentially.

12          THE COURT:  Okay.

13          MS. NEWMAN:  And so Mr. Weisfelner's point that

14  unitholders had every reason to believe that their

15  distributions would be affected by plaintiffs' claims is belied

16  by the record, and it's simply not the case.

17          Your Honor, Mr. Weisfelner also spent quite a bit of

18  time talking about Rule 2019, but when a creditor purchases its

19  claim does not affect its right to a distribution in a

20  bankruptcy case, as Your Honor well knows.  I would also point

21  out that Mr. Weisfelner has known of our existence since the

22  inception -- known of our group's existence since the inception

23  of the threshold issues and has not contacted us to ask for the

24  information of when our clients purchased their claims.  He has

25  asked for information respecting their aggregate ownership and

39

1  their identities, but he never asked us for that information.

2  The first time we're hearing of this is today.

3          THE COURT:  Uh-huh.

4          MS. NEWMAN:  Your Honor, Mr. Weisfelner's appeal is

5  really and truly about the accordion feature funds.  Now, our

6  view is that those funds -- allowing those funds to be accessed

7  for the plaintiffs would cause significant harm to the existing

8  unitholders because it would require the GUC Trust to remain

9  open for an indefinite period of time, which would, of course,

10  require funding for administrative costs and GUC Trust

11  professionals, and that is not what was anticipated by the plan

12  and confirmation order.

13          But putting that aside, I think the true issue here

14  is that Mr. Weisfelner's appeal is about the accordion feature

15  funds, and there is no need, as Your Honor noted at the outset,

16  for a stay to protect those funds.  And as Mr. Scruton will

17  testify, there will be significant harm to unitholders as a

18  result of a stay of distributions of existing assets.  The

19  unitholders are entitled to receive their distributions

20  regardless of when they bought their claims, and as Mr. Scruton

21  will testify, the returns that they could receive and obtain if

22  they had the funds from the distribution of the existing assets

23  in hand are significant and amount to serious harm for

24  unitholders as a result of the stay.

25          And I would just note that those returns do

40

1   incorporate the cost basis of the unitholders on a going-

2   forward basis for the investments that they could make with the

3   distributions.

4            THE COURT:  Okay.  Thank you.

5            MS. NEWMAN:  Thank you, Your Honor.

6            THE COURT:  This is openings.  I wasn't contemplating

7   any replies on openings.  People have a chance to be heard in

8   closings.

9            MR. WEISFELNER:  Your Honor, I was just looking for

10  30 seconds on the critical essential point that both Ms. Newman

11  and Ms. Rubin articulated.  Thirty seconds.

12           THE COURT:  Does everybody understand that the

13  purpose of an opening is to give the judge a preview of the

14  evidence he's going to hear, or she's going to hear?  It isn't

15  to make the arguments that you guys are going to make at the

16  end.

17           MR. WEISFELNER:  Your Honor, I clearly understood

18  that.  So much of the argument had to do with the fact that we

19  never filed proofs of claim.  And their contention about us

20  never filing proofs of claim is contrary to and in direct

21  violation of an order that Your Honor entered in this case,

22  which I wanted to call to Your Honor's attention.

23           Your Honor ordered that our failure to file a claim

24  during the interval, which doesn't end until the appeal is

25  final, would not be raised by the GUC Trust.  Your Honor

41

1  entered that order when we were doing the scheduling on the

2  threshold units, that we weren't going to be filing a claim and

3  that they were never going to raise the failure to file a

4  claim.  That's in an order.  That's all I had to say.

5           THE COURT:  Is Mr. Scruton here?

6           MR. WEISFELNER:  Yes.

7           THE COURT:  Put him up.  I'm going to deem his

8  affidavit to be admitted into evidence unless there are any

9  evidentiary objections, and then we're going to take cross.

10  Let me go by the book.  Are there any evidentiary objections to

11  Mr. Scruton's affidavit?

12           Hearing none, we'll go -- you're putting him forward

13  as the witness?

14           MR. OFFENHARTZ:  Yes, Your Honor.

15           THE COURT:  Okay.  You can tell me who you are, but

16  then I would have thought that you would sit down and whoever

17  is going to cross him is going to come up.

18           MR. OFFENHARTZ:  Your Honor, thank you.  Adam

19  Offenhartz.  I'm with Gibson, Dunn & Crutcher on behalf of the

20  GUC Trust.  Your Honor, with Your Honor's indulgence, I would

21  like to do a very, very short direct focused solely on

22  supplemental material that was provided to my esteemed

23  adversary yesterday that flowed, at least in part, from

24  questions that my friend across the caption raised during

25  Friday's deposition when he handed Mr. Scruton a calculator and

1  asked Mr. Scruton -- and basically said, at Pages 117 of his

2  deposition, you can do the calculations now, you can do the

3  calculations later.

4      THE COURT:  Mr. Offenhartz, I don't know if you were

5  on the conference call that we had.  I'm going to let you get

6  that in, but the concept under which you were going to get it

7  in was as rebuttal.  So after Mr. Weisfelner or his designee

8  asks whatever questions that side has in cross, then I'm going

9  to let you ask those questions in redirect or you can call

10 those questions rebuttal.  Either way, you can lead the witness

11 and either way you can get them in, and since I'm not going to

12 be non-suiting anybody for failure to have said something in

13 the declaration anyway, I want to get on to the

14 cross-examination of him.

15     MR. OFFENHARTZ:  Thank you, Your Honor.

16     THE COURT:  Okay.  Mr. Weisfelner, is it going to be

17 you asking the questions?

18     MR. WEISFELNER:  Yeah, I drew the short straw.

19 Judge, just to ease everyone's burden, I want to hand the

20 witness a couple of documents and maybe even provide the same

21 to the Court.  I think it would ease the cross if Mr. Scruton

22 had his declaration, had the stipulation of facts, and had the

23 supplemental exhibits that were delivered to us last night.

24     THE COURT:  Sure.  But whatever is shown other than

25 the stip and the declaration needs to be marked for

43

1   identification, and remember that at this point, it's only for

2   identification and it's not yet in evidence.

3           MR. WEISFELNER:  Thank you, Judge.  Can I approach?

4           THE COURT:  Yes.

5           MR. WEISFELNER:  Can we get this marked as

6   Plaintiff's Exhibit A?

7           And Your Honor, I'm otherwise going to hand the

8   witness a copy of his declaration and a copy of the

9   stipulation.  And, Your Honor, let me see if I can't grab --

10          THE COURT:  Remember, you've got to speak into a

11  microphone, Mr. Weisfelner.  Also, remember we need to swear

12  the witness at some point before he says anything.

13          MR. WEISFELNER:  Understood, Judge.  And, Your Honor,

14  with your permission, I'd like to provide the Court with a copy

15  of the declaration if you need it, the stipulations if you need

16  it --

17          THE COURT:  I have them both.

18          MR. WEISFELNER:  Okay.  Then let me just provide you

19  -- because I don't know if you have the supplemental exhibits

20  that came in last night.

21          THE COURT:  Well, of course I don't.  Maybe of course

22  is the wrong word.  I don't.

23          MR. WEISFELNER:  Okay.  May I approach and --

24          THE COURT:  Yes.

25          MR. WEISFELNER:  -- hand them to Your Honor?  And,

Scruton - Cross                          44

1  Your Honor, this is in the process of being marked as

2  Exhibit A.

3       (Plaintiff's Exhibit A marked for identification.)

4          MR. WEISFELNER:  Your Honor, now would be an

5  appropriate time, I think, to swear the witness.

6          THE COURT:  Okay.  Karen?

7          MR. SCRUTON:  I don't have a copy of the supplemental

8  exhibits in front of me.  Should I have those?

9          THE COURT:  Mr. Weisfelner, you want to give --

10          MR. WEISFELNER:  My understanding was it was in the

11  process of being marked, and once marked, would be handed to

12  the witness.

13          MR. SCRUTON:  Sorry.

14          THE COURT:  Thank you.

15          ANDREW SCRUTON, PLAINTIFF'S WITNESS, SWORN.

16                          CROSS-EXAMINATION

17  BY MR. WEISFELNER:

18  Q    Mr. Scruton, I want you to turn to Exhibit B of your

19  declaration.  And I think for the Court's benefit, and probably

20  your own, it probably makes sense for you to have Exhibit B

21  from your original declaration and Exhibit B-1 from your

22  supplemental exhibits laid side by side.  Have you done that?

23  A    Yes, I have.

24  Q    Okay.  Now, if I'm reading the exhibits correctly, this

25  reflects your opinion, does it not, that the size of a

Scruton - Cross                                          45

1   supersedeas bond should be $18.4 million.  That's what I read

2   if I look at Exhibit B, correct?

3   A    The Declaration Exhibit B reflects my opinion that a

4   supersedeas bond, based upon lost opportunity costs, would be

5   $18.4 million, yes.

6   Q    Okay.  And the only changes that were made between

7   Exhibit B and Exhibit B-1 is that you've -- instead of using a

8   12-month stay period, you're now reflecting a 10-month lost

9   opportunity cost.  Is that right?

10  A    The only changes that affect the numbers or affect the

11  calculation of lost opportunity costs are the one change to

12  assume a 10-month lost opportunity cost rather than a 12-month.

13          THE COURT:  Pause, please, Mr. Weisfelner.  Do you

14  have a copy of Plaintiff's Exhibit A for my law clerks?

15  Another one?  Just hand it over to the law clerk table, please.

16  They can share one.

17          MR. WEISFELNER:  Approach?

18          THE COURT:  Yes.

19  BY MR. WEISFELNER:

20  Q    By the way, just so that the record is crystal clear,

21  there's at least one other set of changes, and that is the

22  percentage of unitholders in your original Exhibit B, you had

23  rounded the numbers to 18, 18, 47 and 18, and in B-1 you seemed

24  to have taken the numbers out to two decimal points.  Is that

25  correct?

Scruton - Cross                              46

1  A      The numbers are shown to two decimal points in Exhibit A,

2  the numbers you refer to, essentially unitholders, yes, but I

3  believe they are the same numbers used for the calculation.

4  Q      Okay.  And just so I understand how the math is supposed

5  to work, and here I'm just focused on Exhibit B, if I take the

6  135 million, that being the anticipated November 2015

7  distribution, and I multiply it by the weighted average

8  protection rate of return and then I subtract the trust return

9  using the 12 bps return, that's how I get to the 18.4, correct?

10 A      That's one way of getting to the 18.4, yes.

11 Q      Okay.  Well, you know what, I don't think the math works,

12 so let me have you do the math.  If you multiply 135 by 12.96,

13 what number do you get?

14 A      Well, I believe I said it's one way of getting to the

15 calculation.  The calculation incorporates the compounding in

16 the numbers, so it may be that the -- it's a model that

17 reflects the returns you get when you compound the numbers

18 through the 12-month period.

19 Q      Well, but what's the weighted average protection return

20 rate supposed to reflect then?

21 A      It's an annual return rate for -- that protects -- that

22 represents the calculation of the returns that the investor

23 would obtain if they were to invest in the proportions as

24 assumed for the percentage holders, 18 percent equity, 18

25 percent fixed income, 47 percent hedge fund investor, and

1  18 percent money market investor.

2  Q    Okay.  Try and listen to me and answer yes or no.  If I

3  multiply 135 million by the weighted average protection return

4  rate and then subtract out the projected trust rate of return

5  of 0.12 percent against that 135, I get to 18.4, yes or no?

6  A    I'm not -- I don't know that that calculation works.  What

7  I do know is that if you take the 12.96 percent weighted

8  average protection rate of return, apply that to the $135

9  million of distribution, then you'll get the investor returns

10 of $18.6 million.  And then if you deduct the trust return

11 calculation of -- which is $1.2 million, which is the assumed

12 return of the trust based upon a 0.12 percent rate of return,

13 then you would get the math I showed on the bottom of the

14 sheet, $18.4 million of lost opportunity costs.

15 Q    And my point to you is you're wrong on the math, so I'm

16 going to have you do the math.  Here's a calculator to help you

17 out.  Now, you said if you multiply 135 by 12.96, you're going

18 to get to 18.6.  Do the math.  Multiply 135 by 12.96.  What

19 number do you, in fact, get?

20 A    The simple math on the calculation --

21 Q    Just tell me the number.  Don't give me an explanation.

22 What's the number you get when you do the math?

23        MR. OFFENHARTZ:  Your Honor, objection.

24        THE COURT:  Overruled.  If your question is, as I

25 understand it, what is the product of 135 million and 12.96

Scruton - Cross                                            48

1  percent, I'm going to allow the witness to answer that and give

2  him the numeric product, after which you, Mr. Offencrantz

3  [sic], when it's your turn, can ask him whether that's simple

4  or compounded or whether that means something different.

5         So as I said, the objection's overruled.  And do you

6  remember the question, Mr. Scruton?

7         THE WITNESS:  Yes, I remember the question.

8         THE COURT:  Go ahead and answer it, please.

9         THE WITNESS:  It's approximately $17.5 million.

10 BY MR. WEISFELNER:

11 Q    So when you testified just a moment ago that the number

12 was 18.6, you were wrong.

13 A    I don't believe so because I didn't -- I interpreted -- I

14 may have misunderstood your question, but I had interpreted

15 your question to be just to calculate $135 million multiplied

16 by 12.96.  What I interpreted your question to be is if you

17 apply a return rate of 12.96 to the $135 million, then you

18 would get an answer of $18.6 million, which you don't.  You get

19 $17.5 million.

20 Q    Okay.  But I don't understand.  When you apply the

21 weighted average protection rate of return to the amount at

22 issue, how does one go about applying that number other than

23 multiplying the amount of cash by that number?

24 A    In order to calculate the lost opportunity cost, I and my

25 team created a model that took into account the time periods

Scruton - Cross                                    49

1  that it involved, three-month, six-month, nine-month,

2  12-month --

3  Q    Stop, that's not my question.  My question is the

4  following:  You told me that if I apply 12.96 to the 135, I get

5  to 18.6.  Well, we know that the word "apply" doesn't mean

6  multiply because when I multiply 12.96, I get to a different

7  number, so what did you mean when you said you apply the

8  weighted average protection rate to 135?  What does that mean?

9  A    What that means is that I am applying the percentage

10 return rates for the -- each individual classification of

11 unitholders in the financial model based upon the original

12 amount to be invested and then in a subsequent reinvestment of

13 that money through the period, and when you apply that for a

14 12-month period, you end up with an $18.6 million calculation

15 of investor return.  That's what I meant.

16 Q    Okay.  Take a look now, if you will, at Exhibit B-1, and

17 I'm wondering if review of Exhibit B-1, the new exhibit, helps

18 us understand why applying 12.96 in a straight multiple of 135

19 doesn't, in fact, yield the 18.6 that you wrote down here, but

20 instead yields 17.5.  And, in particular, I want you to focus

21 on a brand-new footnote that you have in B-1 that you didn't

22 have in B.  Do you see that footnote?

23 A    I see the footnote, yes.

24 Q    Okay.  And what the footnote tells us is that in applying

25 the hedge fund investor rate, the protection return rate of

Scruton - Cross                                    50

1   16.38 percent, you took out, or you claim to have taken out,

2   two percent representing management fees, correct?

3   A    I excluded those in the calculations both in the original

4   Exhibit B and in Exhibit B-1.

5   Q    Okay.

6   A    They are consistent, yes.  The footnote --

7   Q    And why did you exclude them?

8            THE COURT:  Mr. Weisfelner, I'm going to let you move

9   to strike.  Let him finish his answers before you interrupt

10  him.

11           MR. WEISFELNER:  I'm sorry, go ahead.

12           THE COURT:  Mr. Scruton, did you finish your answer?

13           THE WITNESS:  I don't think I did.

14           THE COURT:  Then finish it, please.

15           THE WITNESS:  I was going to explain what I was doing

16  by adding the footnote, and that consistent with --

17           THE COURT:  I'm not sure that was the question.

18           THE WITNESS:  Okay.

19           THE COURT:  Certainly that's an appropriate question

20  to answer when redirect time comes.

21           THE WITNESS:  Okay.

22           THE COURT:  What was Mr. Weisfelner's question as you

23  understood it?

24           THE WITNESS:  Do you mind repeating it and I can

25  rethink that?  I believe it was to ask about the -- whether or

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Scruton - Cross                                51

1  not the two-percent figure, in respect of incentive and

2  management fees, had adjusted my calculations in Exhibit B-1.

3           THE COURT:  Yeah, that was what I understood it to

4  be, so answer that question.

5           THE WITNESS:  The answer, it doesn't affect it

6  because my calculations originally in the declaration on this

7  point were exactly the same as my calculations in the

8  supplemental exhibit, and I was about to explain that the

9  footnote was just an additional information.  It was not to

10 change the calculations.

11 BY MR. WEISFELNER:

12 Q    Okay.  So let me just make sure I'm level set before we

13 move on to a different topic.  So what you're saying is that

14 when you take a look at the Credit Suisse index, there's a

15 two-percent management fee that impacts adversely creditor

16 recoveries, correct?

17 A    What I'm saying is that the -- when you look at the index,

18 the index is reflective net of incentive and management fees,

19 which are estimated to be two percent, and that that

20 information tells me that that index is two percent,

21 approximately, lower than the returns a hedge fund would yield

22 when looking at that index as a measure for hedge fund yield

23 because a hedge fund wouldn't -- in its investments, they would

24 deduct that from its opportunity costs.  Its opportunity costs

25 should be gross of that figure.

Scruton - Cross                              52

1  Q    You're saying that because the hedge fund index calculates

2  returns less a management fee, that a hedge fund should get the

3  benefit in calculating lost opportunities of the management fee

4  that's otherwise reflected in the index, yes or no?

5  A    Yes.

6  Q    Okay.  Doesn't a hedge fund, before it makes a return to

7  its investors, charge them a management fee?

8  A    Yes, that's right.

9  Q    Okay.  So why doesn't those two numbers wash themselves?

10 Why does the hedge fund get the benefit of the two percent

11 added on to what their returns would be, but in calculating

12 lost opportunity costs, you're not charging the hedge fund

13 client with the management fee?  How is that fair?

14 A    It's not a question of fairness.

15 Q    Okay.  Good enough.  Now let me ask you a different

16 question, because I think what you did in Exhibit D was you

17 added the two percent back into your calculation.  That's why

18 135 times 12.96 equals 17.5 and not the 18.6.  I think what you

19 did was when you say weighted average protection return rate of

20 12.96, in fact, the weighted average protection rate that you

21 used was 13.9.  Isn't that true?

22 A    Not at all.

23 Q    Really?  Take 13.9 percent and multiply that against the

24 135 and what number do you get?

25 A    So basically I've got what you asked me to do correctly --

Scruton - Cross                          53

1  Q    Yes, multiply 135 by the 13.90 that's in footnote one of

2  B-1.

3       THE COURT:  You're asking him to perform a straight

4  multiplication or were you asking him to do some rate of return

5  analysis?

6       MR. WEISFELNER:  No.  I'm asking him to do a straight

7  multiplication in order to demonstrate that, notwithstanding

8  what Exhibit B says, and in fact what Exhibit B-1 says, he

9  didn't use the weighted average protection return rate of 12.96

10 percent.  Instead, he used a weighted average protection return

11 rate of 13.9 because he gave himself the benefit of the

12 two-percent management fee that he told us he took out.  He

13 didn't take it out, he left it in.

14      MR. OFFENHARTZ:  Objection, Your Honor.

15 Mischaracterizes the record.

16      THE COURT:  I'm going to sustain that because the

17 witness testified previously that his computation wasn't a

18 straight multiplication, but was a weighted return analysis

19 based upon the reinvestment of a fixed sum, which involves

20 compounding, and now you've shifted back to a straight

21 multiplication.  I'm not sure what the relevance of a straight

22 multiplication is, but if you ask your questions clearly

23 enough, I'm going to let you ask him to make straight

24 multiplications.  But that is, as Mr. Offencrantz [sic] stated

25 in his objection, a misstatement of the witness's earlier

Scruton - Cross                    54

1  testimony.

2  BY MR. WEISFELNER:

3  Q    All right.  Let's move on to a different topic, shall we?

4  We start off with the premise that 135 million is available for

5  distribution in November of this year, right?

6  A    We do, yes.

7  Q    And, in fact -- and I'm referring to Paragraphs 15 and 16

8  of the stipulation.  Those paragraphs, when read together,

9  inform us, do they not, that in fact, as of today, there's less

10  than $12 million available for distribution.  Isn't that right?

11  A    I would have to refresh my memory quickly of Paragraph 15

12  and 16, which I'm doing.  I believe that's correct, yes.

13  Q    Okay.  Now, the balance, in order to get the 12 million up

14  to the 135 million, is some estimated $123 million that you

15  need to add to the cash that's currently available in order to

16  get to the 135, correct?

17  A    Yes.  I believe there's -- to get to the $135 million

18  that's available in -- expected to be available in November,

19  yes.

20  Q    And that additional 123 million you assume has to come out

21  of the, quote, "taxes on distribution holdback" that's

22  reflected in Paragraph 15 of the stipulation.  Is that right?

23  A    I'd like to rephrase your description.  It was in a --

24  Q    Why don't you just answer my question?

25  A    Well, the answer is no to your question, but I could be

Scruton - Cross                                  55

1  helpful in rephrasing your description of what I was --

2  Q    Go ahead.

3  A    -- the assumption.  The assumption that I was provided in

4  order to prepare my analysis of lost opportunity cost was that

5  there would be $135 million available to holders end of

6  November.  That was an assumption that was provided as part of

7  my work.

8  Q    Okay.  And that -- what I'm asking you is do you now

9  understand that in order for the assumption that you'd been

10 given to be accurate, there has to be some $123 million

11 released from the taxes on distribution holdback, yes or no?

12 A    I believe that's to be the case, based upon the

13 stipulation, yes.

14 Q    Okay.  And in Paragraph 16, we learn that the GUC Trust

15 anticipates a release of funds from the taxes on distribution

16 holdback, correct?

17 A    I believe that's what paragraph 16 says, yes.

18 Q    But sitting here today, you don't know what, if anything,

19 the GUC Trust has to do to secure that release, do you?

20 A    That was not part of the work that I've been asked to

21 perform, correct.

22 Q    So you don't know then, correct?

23 A    Correct.

24 Q    And you don't know if the monitor, that being FTI itself,

25 has to approve that release, do you?  You don't know one way or

Scruton - Cross                          56

1  the other?

2  A    That's correct.

3  Q    You don't know one way or the other if the relevant taxing

4  authorities have to approve the release from that reserve, do

5  you?

6  A    That's correct.

7  Q    And as to timing, you don't know what's meant by the

8  phrase -- and I'm quoting now -- "The anticipated distribution

9  would likely be made to holders of units in mid-November 2015."

10 You don't know what that likely refers to, do you?

11 A    That's correct, and I've made an assumption in my

12 calculations of a mid-November distribution, correct.

13 Q    And by mid-November, do you have any better specification

14 or assurance as to when mid-November takes place on the

15 calendar?

16 A    My model assumes the 15th of November.

17 Q    Okay.  Let's turn our focus back to Exhibits B and B-1.

18 Now, the period of time you assumed for your calculations is 12

19 months.  Is that right?  Twelve months in B and then ten months

20 in B-1.  Is that correct?

21 A    It's correct because that's one of the items that is a

22 difference between Exhibit B and Exhibit B-1.

23 Q    But I'm asking you, in terms of your expert testimony that

24 you're offering here today, that the appropriate size of a

25 supersedeas bond is $18.4 million, the period of time that you

Scruton - Cross                              57

1   assume the appeal will take or that the stay would be imposed

2   is one year, correct?

3             MR. OFFENHARTZ:  Objection.  Objection, Your Honor.

4             THE COURT:  Overruled.

5             THE WITNESS:  I think I can clarify if I explain that

6   at the time I wrote my declaration, an assumption that I was

7   provided was that the distribution would occur in mid-November

8   and that I should consider a 12-month stay period from in

9   November.  After the deposition that you conducted on Friday, I

10  believed that it was appropriate to adjust my declaration or

11  adjust my opinion on the size of a supersedeas bond on that --

12  for that particular scenario because I believe it was an

13  incorrect assumption that I was provided.

14            And so Exhibit B-1 reflects that correction, and it's

15  my view that based upon a -- the fact that there is a two-month

16  period for which a distribution cannot be made during the 12-

17  month period, if 12 months is the right amount of time, that

18  the calculation should be adjusted for that.  And the

19  calculation I've shown on Exhibit 1 results in a $15.2 million

20  bond amount to take into account that period of time.

21            MR. WEISFELNER:  Okay.

22            THE COURT:  Pause before you ask him the next

23  question --

24            MR. WEISFELNER:  Yes.

25            THE COURT:  -- Mr. Weisfelner.

Scruton - Cross                          58

1           Folks, under Rule 614 of the Federal Rules of

2    Evidence, I have the right to question.  Most of my questions

3    are going to be at the end, but sometimes it helps to ask

4    questions as we go along so I keep up with the testimony.  I'm

5    going to remind you all that you have the right to object to my

6    questions either way.  And for the questioning that I might ask

7    at the end, you have the right to ask follow-up questions that

8    flow from mine.

9           Did you just mean to tell Mr. Weisfelner and the rest

10   of the people in the courtroom that the reason for changing the

11   12-month duration of your computation to ten wasn't a change in

12   the estimate of how long it would take to get distributions out

13   the door if there were a stay after an appeal, but simply

14   because mid-November is two months from now rather than now?

15          THE WITNESS:  It's the best estimate, yes, two months

16   from now rather than now.

17          THE COURT:  Okay.  Continue, please, Mr. Weisfelner.

18   BY MR. WEISFELNER:

19   Q    You're aware, are you not, that parties were directed by

20   Judge Furman to seek to expedite the appeal?

21   A    I'm aware of that, yes.

22   Q    And sitting here today, you don't know the length of time

23   the parties believe will be necessary to fully brief the

24   appeal, do you?

25   A    That's not an area that I have specific knowledge of,

Scruton - Cross                                    59

1  correct.

2  Q    Sitting here today, you're not aware of the fact that our

3  clients have suggested that the other parties of the appeal can

4  and should be fully briefed within 90 days of today?

5  A    Correct.

6  Q    And last point on the timing, your 12-month assumption --

7  or now 10 months since we've got 10 months to wait before

8  distribution in any event, your assumption assumes that

9  unitholders will be able to invest their entire distribution,

10 absent a stay, on the same day that they receive the

11 distribution, correct?

12 A    It's not a fair way to reflect my assumption.

13 Q    Well, do your calculations assume that an investor will

14 invest the entirety of its distribution on the day it receives

15 it, yes or no?

16 A    No.

17 Q    What does it assume, by way of timing of investment of

18 distribution?

19 A    It assumes that the funds are available immediately in

20 mid-November to the investors to invest.  They may choose to

21 invest immediately or they may choose to time their investments

22 when it suits them.  The funds would be under their -- at their

23 discretion to be used as they see fit.  And some investors may

24 not choose to invest that money straightaway.

25 Q    Okay.  If one were to compare those to investors, one that

Scruton - Cross                                         60

1 chooses to invest right away and one that chooses to invest

2 over a period of time, if we're only talking about a single

3 investor to protect, would your expert opinion as to the amount

4 of supersedeas bond be the same for either investor?

5 A    My calculation of a supersedeas bond is based upon trying

6 to seek an estimate of what the overall returns would be for

7 the different investor classes, and it takes into account the

8 timing of an investor's returns.  So, for example, an investor

9 in fixed income.  When I looked at the best index I have for

10 that investor, it allows for whether that investor is going to

11 invest it immediately on day one or investor is going to wait

12 and determine to invest at a later point in time.

13 Q    Okay.  I'm --

14 A    And the index --

15 Q    -- I'm really confused.  Let me interrupt you.

16 A    Well, I haven't finished.

17          MR. OFFENHARTZ:  Objection, Your Honor.  Mr. --

18          THE COURT:  Well, if your objection is to not letting

19 him finish, that objection is sustained.

20          MR. OFFENHARTZ:  Thank you, Your Honor.

21          THE COURT:  If it's to the original question, it's

22 too late.

23          MR. OFFENHARTZ:  It was to the interruption, Your

24 Honor.

25          THE COURT:  You may answer the remainder of what you

1  were saying.

2         THE WITNESS:  What I was -- I think I was trying to

3  say was that when I'm trying to estimate the returns that an

4  investor would gain and I'm looking at an index as a proxy for

5  that, it takes into account the investor class.  Some investors

6  may invest immediately and some investors may defer, but the

7  overall index takes that into account.

8  BY MR. WEISFELNER:

9  Q    Are you finished?

10  A    I'm finished.  Thank you.

11  Q    Okay.  But for an individual investor, you would agree,

12  would you not, that the return they're going to realize is a

13  function of when they invest, correct?

14  A    I would agree, yes.

15  Q    But your analysis doesn't distinguish, does it, between an

16  investor that invests on the day it receives its cash versus an

17  investor who doesn't invest their cash on the day they receive

18  it.  Isn't that correct?

19  A    No.  I would say my analysis takes it into account, but it

20  doesn't need to distinguish.

21  Q    In your experience, does a reasonably prudent investor

22  make its investment decisions on the same day it gets funds

23  available for investment?

24  A    A reasonably prudent investor will usually have an

25  investment strategy, so he wouldn't necessarily do it on the

Scruton - Cross                                                      62

1  same day, correct.

2  Q    And in your experience, does the amount of time it takes

3  for a reasonably prudent investor to make its investment

4  decisions change with reference to the volatility of the

5  markets in which it typically invests?

6  A    It could change.  It depends on the circumstances.

7  Q    Okay.  I want to now focus on the projected trust rate of

8  return that you've utilized.  That's the 12 bps or 0.12 percent

9  return.  You assumed that number, isn't that correct, for

10 purposes of your analysis?

11 A    Yes.  I assumed that the trust rate of return for this

12 analysis would be 0.12 percent, yes.

13 Q    And you made that assumption based on being told that the

14 trust cash was being invested in a mix of short-term

15 treasuries, correct?

16 A    It was based upon being told that, yes.

17 Q    Okay.  But you're aware, are you not, that there are

18 other, quote, "permitted investments" that the trust can invest

19 in, aren't you?

20 A    I'm aware that the permitted investment definition that

21 the trust has to adhere to includes other investments, in

22 addition to the investments I assumed would be -- it would be

23 invested -- the funds would be invested in during the stay

24 period.

25 Q    And, in fact, you're aware that the trust can invest in

Scruton - Cross                                   63

1  permitted investments that have higher rates of return than the

2  0.12 percent you assumed for purposes of your calculation,

3  correct?

4  A    Yes.

5  Q    Indeed, during your deposition, we identified other

6  permitted investments, as that term is defined in the GUC Trust

7  agreement, that would have returned approximately three or ten

8  times the amount you assumed for your calculations, correct?

9  A    Yes.  The investment -- the projected rate of return for

10 the trust of 0.12 percent is a very small rate of return, so

11 looking at some of the other permitted investments that could

12 be available to the trust if it was able to invest in this

13 period at that level could easily be bigger than this number,

14 yes.

15 Q    And, in fact, we looked at examples that were three to ten

16 times bigger than the number you chose to use.

17 A    When you're using 0.12 percent and do multiples, it can

18 easily get what appears to be high multiples of that number,

19 yes.

20 Q    Let's try my question one more time.  During your

21 deposition, you, in fact, identified permitted investments that

22 would return ten times the assumed rate of return that you used

23 in your calculation, yes or no?

24 A    Yes.

25          MR. OFFENHARTZ:  Object to the --

Scruton - Cross                                                      64

1            THE COURT:  If that was supposed to be an objection,

2     it's overruled.  Try to make your objections timely.

3            When you see Mr. Offencrantz [sic] getting up, why

4     don't you pause and see if he has something that might affect

5     whether I want the question to be answered or not.

6            THE WITNESS:  Sure.

7            THE COURT:  Have you testified as a witness before?

8            THE WITNESS:  I have, yes.

9            THE COURT:  Okay.  So proceed.  Go ahead.

10           MR. OFFENHARTZ:  Thank you, Your Honor.

11           MR. WEISFELNER:  Thank you.

12     BY MR. WEISFELNER:

13     Q    I want to focus now on the weighted average protection

14     rate of return, the 12.96 number.  That's a number that you

15     calculated, right?  It wasn't an assumption that you were

16     given?

17     A    It's a number that I calculated, yes.

18     Q    Okay.  So unlike the 135 million, that's a number you

19     assumed, correct?

20     A    The 135 --

21     Q    The 135 is the number you assumed?

22     A    Correct.

23     Q    The 0.12-percent rate of return for the trust is something

24     that you assumed, correct?

25     A    Correct.

Scruton - Cross                           65

1  Q    The timing of distribution was something that you assumed,

2  correct?

3  A    Yes, the timing --

4  Q    So --

5  A    I was provided with that assumption, yes.

6  Q    And that reflects your judgment as to the protection rate

7  of return to use for each investor class, correct?

8  A    When you say that reflects my judgment --

9  Q    The weighted average --

10 A    Yes.

11 Q    -- protection rate.

12 A    Yes, that's correct.

13 Q    Okay.  And by the way, the 47 percent you used for the

14 hedge fund investor, I think we've already established that

15 figure came from information supplied regarding Akin's clients

16 in this matter, correct?

17 A    That's correct.

18 Q    The other numbers that you assumed, either in B-1 or D,

19 you assumed taking the other 53 percent and, in effect, even

20 re-dividing them among equity investors, fixed income investors

21 and money market investors, correct?

22 A    For --

23 Q    For the B-1 analysis.

24 A    For my analysis in -- on this issue, I had to make an

25 assumption because the information was not known, and I made

Scruton - Cross                                    66

1  this assumption and I made other assumptions to look at

2  different scenarios, and this is one scenario.

3  Q     And let me see if I can rephrase what you just said, and

4  tell me if you agree or disagree.  In effect, what you did was

5  you sensitized your ultimate number by changing the percentage

6  of unitholders figures to reflect different levels of

7  investments by different type of investors, correct?

8  A     That's correct.

9  Q     Okay.  Now, I want you to see if you can't get in front of

10 you Exhibit C, and then in addition, the new Exhibit C-1.  Do

11 you have those two charts in front of you?  Are you there, sir?

12 A     Yes.

13 Q     You have --

14 A     I am now.

15 Q     -- two charts in front of you, okay.  And I just want to

16 sort of level set and, for the Court's benefit, describe

17 Exhibit C.  And just so I make sure, you've taken the four

18 categories of hypothetical investors, and for each, you've

19 selected an index, and then you show annual rates of return for

20 each index for the ten years from 2005 through 2014, correct?

21 A     On Exhibit C, yes, that's correct.

22 Q     And then, in the next set of columns, you show the top

23 three returns for each index, first, second and third highest

24 rate of return.  Is that what you did?

25 A     Yes.

Scruton - Cross                                    67

1  Q    And you drew a box around the third highest rate of return

2  because, in effect, those were the returns that you chose to

3  utilize for purposes of calculating the protection rate and,

4  therefore, your estimate for what the supersedeas bond ought to

5  be, correct?

6  A    That's correct, yes.

7  Q    And the bottom line is -- when I say "bottom line," going

8  back to the right-hand column, you have an average line.  Do

9  you see that?  And running across it, it has averages for the

10 rates of return for each year for each asset class, right?

11 A    It does, yes.

12 Q    So that, for example, back in 2005, the average annual

13 rate of return across the four indexes that you used was 4.6

14 percent, correct?

15 A    Yes, I believe that's a simple average of the four

16 different asset classes.

17 Q    Okay.  Now --

18         THE COURT:  Pause, Mr. Weisfelner.

19         MR. WEISFELNER:  Sure.

20         THE COURT:  I don't see the 4.6 when I look at the

21 averages of the four asset classes.  I see either 647 or 584.

22 What am I reading wrong?

23         MR. WEISFELNER:  Your Honor, you're focused on the

24 mean column.

25         THE COURT:  Isn't that an average?

Scruton - Cross                          68

1           MR. WEISFELNER:  It is, but it's not the number we

2     were just referring to.  We were referring back to the left-

3     hand columns, below -- in the heading of "asset class," below

4     Money Market U.S. Treasury, there's the word "average."

5           THE COURT:  I see.  Okay.

6           MR. WEISFELNER:  And there, the witness has told us

7     that the number 4.60 represents the straight average of the

8     four numbers reflected right above it.

9           THE COURT:  For the year 2005.

10          MR. WEISFELNER:  For the year 2005, correct.

11          THE COURT:  Okay.  Now I'm with you.

12    BY MR. WEISFELNER:

13    Q    Jumping now to Your Honor's focus, which was the mean for

14    '05 through '14 as reflected in C-1, that's a straight average

15    of all ten years, correct?

16    A    So I clarify, which number are you focusing on?  The six

17    point --

18    Q    I'm now looking at the mean, '05 through '14.

19    A    Are you looking -- the whole column?

20    Q    Yeah.

21    A    The whole -- yeah, the whole -- I just want to make sure

22    that you're focusing on the column, not the number.

23    Q    Let's do it one row at a time.  So if I see a number of

24    9.49 percent under the mean column for the S&P 500 Index, that

25    represents the average annual returns over the past 10 years

Scruton - Cross                              69

1  for that index, correct?

2  A     Correct.

3  Q     And then if I go down to the very bottom of that column so

4  that the average under mean is 6.47 percent, that serves the

5  simple average of those four mean averages, correct?

6  A     That's correct.

7  Q     Okay.  And just so we get all of our definitions done at

8  one time, let's look at trend mean.  Do I understand that one

9  calculates the trend mean by looking at the ten years' worth of

10 returns, throwing out the high, throwing out the low, and then

11 averaging the eight remaining numbers?

12 A     That's correct.

13 Q     Okay.  And then fundamentally, just so that I understand

14 it, in calculating what the right number is to use when trying

15 to determine the rate of return that would be realized by an

16 equity investor using the S&P 500 Index, it's your expert

17 opinion that rather than use the simple average over the last

18 ten years, which would be 9.49 percent, it's more predictive of

19 the rate of return to go to the year 2012 because it reflects

20 the third best year in the last ten years, yes or no?

21 A     It -- the rates of return that I've chosen is more

22 predictive of what would protect investors, and for reasons I

23 can get into if you'd like, the -- and I covered it in my

24 declaration and in the deposition -- the -- my approach results

25 in 15.99 percent, which happens to be the performance of the

Scruton - Cross                                     70

1  S&P in 2012.

2           MR. WEISFELNER:  Your Honor, I'm going to move to

3  strike.  I asked the witness whether his selection of the

4  return for calendar year '12 was more reflective of the likely

5  rate of return for an equity investor than using the mean

6  return over the last ten years, and he told us something about

7  protected.  I asked for --

8           THE COURT:  Granted.  Repeat your question.

9  BY MR. WEISFELNER:

10 Q    Is it your expert testimony, sir, that utilizing 2002

11 [sic] returns is more predictive of the rate of return that a

12 hypothetical investor in the S&P 500 Index would realize and

13 more reflective than the mean of the last ten years?

14          MR. OFFENHARTZ:  Objection.

15          THE COURT:  That's compound.

16          MR. OFFENHARTZ:  Objection.

17          THE COURT:  You can ask each of those individually,

18 but one at a time.

19          MR. WEISFELNER:  Okay.

20 BY MR. WEISFELNER:

21 Q    As between utilizing the 2012 rate and utilizing the mean

22 over the last ten years, which, in your expert opinion, is more

23 reflective of the likely rate of return for a typical investor

24 in the S&P 500 Index?

25 A    The likely rate of return more likely to happen would be

Scruton - Cross                              71

1  best reflected by the mean for the last ten years rather than

2  just that one year you selected, I agree.

3  Q    Okay.  But you selected the 2012 year because you thought

4  it would be more protective, correct?

5  A    That's correct.  I wanted to -- that's why I wanted to

6  clarify.  I wasn't --

7  Q    We'll get into -- or someone might very well get into with

8  you what you mean by more protective.

9          MR. OFFENHARTZ:  Your Honor, if I may, it would be

10 fair for the witness to have an opportunity to finish his

11 answers.  Mr. Weisfelner's free to move to strike.

12         THE COURT:  You're talking about two separate things,

13 Mr. Offencrantz [sic].  One is finishing an answer when it's

14 responsive to the question that was asked, and the next thing

15 is saying things that are traditionally stated on redirect.  I

16 listen to the questions and listen for your objections to

17 consider whether the questions are misleading or unfair.  Once

18 they pass that threshold, the witness answers that question,

19 but is allowed to give a complete answer.  Those are the ground

20 rules upon which I rule on evidentiary things.

21         Mr. Weisfelner's last question was fair.  It was a

22 question that I expected you'd follow up on redirect.

23         MR. OFFENHARTZ:  And I will.

24         THE COURT:  But the witness can appropriately be held

25 to answering only Mr. Weisfelner's question.  That's the ground

Scruton - Cross                              72

1   rules upon which I'm running this trial.  Now, I think the

2   question was relatively modest in asking for an answer, so

3   beyond that, it's redirect territory.

4          So ask your next question, Mr. Weisfelner.

5          MR. WEISFELNER:  Thank you, Your Honor.

6   BY MR. WEISFELNER:

7   Q    Moving down to fixed income, which is supposed to capture

8   the hypothetical high grade bond investor, correct?

9   A    That's correct.

10  Q    And in order to get information for the hypothetical high

11  grade bond investor, you chose to utilize the Bank of America

12  Merrill Lynch U.S. High Grade Master Index, correct?

13  A    I did, yes.

14  Q    And again, you've reflected the annual rates of return for

15  each year from 2005 to 2014, correct?

16  A    Correct.

17         THE COURT:  Forgive me, Mr. Weisfelner.  I have to

18  interrupt again.

19         Do you understand, Mr. Scruton, High Grade Master

20  Index to be high grade in the sense of high level of repayment

21  assurance, like AA or higher, or is that a high yield, which

22  would mean low-grade investments which tends to generate higher

23  yields?

24         THE WITNESS:  I intend it to be, and I believe it is,

25  the former.  It's investment-grade, which is AAA or higher.

Scruton - Cross                                73

1              THE COURT:  AAA or higher?

2              THE WITNESS:  Typically, I believe, yes.

3              THE COURT:  Okay.

4   BY MR. WEISFELNER:

5   Q    Now, in order for you to calculate your protection rate of

6   return, you chose to utilize the third-highest annual rate of

7   return for that particular index, which would take us to the

8   year 2010, correct?

9   A    Could I just hold and retract my last statement?  I meant

10  to say BBB or higher.  It was a misstatement.

11             THE COURT:  Well, that's a pretty big difference.

12             THE WITNESS:  No, it is, and I apologize.  Investment

13  grade is typically BBB or higher.  I misspoke.

14             THE COURT:  Okay.

15  BY MR. WEISFELNER:

16  Q    Okay.  So again, getting back to my question, the rate of

17  return that you chose to utilize for purposes of calculating

18  what you refer to as the protection rate of return turns out to

19  be the year 2010.  Is that correct?

20  A    Correct.

21  Q    Now, notwithstanding the fact that you used 9.52 percent,

22  as between that figure and the 5.74 figure, which represents

23  the average rate of return over the last ten years, which is

24  more predictive of the likely return on investment for the

25  hypothetical investor that chose to represent -- chose to

Scruton - Cross                    74

1  invest in high grade bonds?

2  A    The one that's more predictive or likely is using the mean

3  rather than the third highest, correct.

4  Q    And you rejected the mean and chose the third highest,

5  which happens to be calendar year 2010, because what you were

6  solving for was a protection rate of return, correct?

7  A    There's a long description as to why I did it, but that's

8  one of the elements, yes, protective rate of return.

9  Q    And just to try and get through the balance of this as

10 quickly as we can, for the prototypical hedge fund investor, an

11 event-driven investor, you chose to utilize the Credit Suisse

12 Event-Driven Multi-Strategy Hedge Fund Index, correct?

13 A    Correct.

14 Q    And the average return over the last ten years was some

15 7.31 percent?  Is that correct?

16 A    7.31 percent, you said?

17 Q    Yes.

18 A    Yes, I found that, yes.

19 Q    Okay.  And you didn't utilize that number for purposes of

20 your protection rate calculations, did you?

21 A    That's correct, yes.

22 Q    Instead, you went all the way back to 2006 in order to

23 select the third-highest return, correct?

24 A    I chose the third-highest return, which was 2006.

25 Q    And you did that because rather than calculate a rate of

Scruton - Cross                          75

1  return, you're calculating a protection rate, correct?

2  A    Again, there's a long description as to why, but that's

3  one element.

4  Q    Okay.  And then again, if I were to ask you those same

5  questions with regard to the money market investor and the

6  ten-year index that you used, rather than use the 3.3 percent,

7  you chose to utilize a rate of return that takes us all the way

8  back to 2005, right?

9  A    That's correct.

10  Q    And you did that not because you thought 2005 returns were

11  more reflective of the likely rate of return, you're -- isn't

12  that right?

13  A    It was not because it was the more likely rate of return,

14  that's correct.

15  Q    Okay.  Rather, you chose it because you believe it gives

16  us the right protection rate of return, correct?

17  A    That's correct.

18  Q    Okay.  By the way, during your deposition, you told us

19  that you rejected using the straight average, in other words,

20  the mean figures, as opposed to using the different rates of

21  return that would take us from 2005, 2006, 2010, 2012,

22  depending on the index.  You rejected using the mean because it

23  was just as likely that the return on investments would be

24  lower than the mean figure would ultimately suggest.  Isn't

25  that right?

Scruton - Cross                           76

1          MR. OFFENHARTZ:  Objection.  Mischaracterization.

2          THE COURT:  Overruled.

3          THE WITNESS:  I testified that one of the elements

4   that's a problem using the mean figure when you're seeking to

5   calculate a rate of return that would adequately protect the

6   unitholders here if they didn't have the funds distributed to

7   them, the mean would be limited because if the bond was set at

8   the mean level, there would be an equal chance that the actual

9   harm that they suffered, the actual return that they would

10  otherwise get would be higher, the equal chance would be lower.

11  See, on any 50 percent of the occasions, would the bond be

12  sufficient to cover the actual harm which is measured later

13  that the unitholders would suffer, and so therefore, in my

14  view, it would be insufficiently protective because half the

15  time, you'd be wrong, you'd have not enough protection for the

16  holders.

17  BY MR. WEISFELNER:

18  Q    But am I to assume, therefore, that half the time, you'd

19  be overcompensating the holders?  Because, in fact, their

20  returns would be less than what the mean would predict.  Isn't

21  that right?

22  A    I wouldn't say overcompensation.  I think that's the wrong

23  characterization.  I think they would be adequately protected

24  half the time, yes, but recognizing that this was a bond that

25  has to be put up and then only used in the event that the harm

Scruton - Cross                                      77

1  is actually up to that level.  If the holders happen to not

2  suffer that harm because they'd lost money in a period of time,

3  the bond would be returned, so they wouldn't be

4  overcompensated.

5  Q    But from the perspective of the person posting the bond,

6  surely you acknowledge that the size of the bond that you're

7  required to post, whether ultimately the bond is drawn upon or

8  not, has a financial consequence to the individual posting the

9  bond.  You recognize that, don't you?

10 A    I totally recognize that, yes.

11 Q    You didn't take that into account in distinguishing

12 between what's the likely rate of return versus what you

13 computed as being the protection rate, did you?

14 A    Absolutely.  I calculated a protection rate of return that

15 was a conservative estimate of the high end of the range.  If

16 I'd have -- I could have been much more aggressive in that

17 calculation, and that would have been punitive, I believe, to

18 the party putting the bond up.

19 Q    And when you say you could have been a lot more

20 aggressive, you mean you could have taken a look at ten years'

21 worth of returns and instead of arbitrarily selecting the third

22 highest, you could have selected the first highest.  Is that

23 what you mean by being conservative?

24          MR. OFFENHARTZ:  Objection.

25          THE COURT:  Overruled.

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

Scruton - Cross                          78

1          THE WITNESS:  I could have been more aggressive in a

2   number of areas.  I would have --

3   BY MR. WEISFELNER:

4   Q    Other than selecting a --

5          THE COURT:  No, let him finish.

6          MR. WEISFELNER:  Sorry.  Sorry.

7          THE COURT:  Let him finish.

8          MR. WEISFELNER:  You're right.  Sorry.  Go ahead,

9   sir.

10         THE COURT:  I know I'm right, but it's not your role

11  to tell me that, Mr. Weisfelner.

12         MR. WEISFELNER:  You're right.

13         THE COURT:  Go ahead.

14         THE WITNESS:  The example that you cited, I believe,

15  would be incredibly aggressive.  I could have also chosen the

16  second highest, but I chose the third highest for various

17  reasons.

18  BY MR. WEISFELNER:

19  Q    Okay.  But when we're talking about elements of

20  aggressiveness, other than switching from the third-highest

21  rate of return, in what other ways could you have been any more

22  aggressive other than selecting the second highest or the first

23  highest?

24  A    There are multiple I can give you.  First of all, I did

25  not -- irrespective of the data in front of us on Exhibit C, I

Scruton - Cross                               79

1  did not make an adjustment for what we discussed previously,

2  the two-percent fees that a hedge fund would -- I didn't make

3  an adjustment for that in these numbers.  And then, at separate

4  parts of the calculation in arriving at the value of lost

5  opportunity costs, I also made what I believe to be very

6  conservative assumptions regarding the population of

7  unitholders.  And I can get into those issues, as well, but in

8  those areas, I was very conservative.

9  Q    Yeah, I'm afraid that either I misspoke or you

10 misunderstood.  What I was asking was conservatism as it

11 related to the calculations and decisions that you made that

12 are reflected on Exhibit C as opposed to anywhere else in your

13 analysis.  In Exhibit C, you give us an array of annual

14 returns, and then you selected the third highest.  And I'm

15 asking you, in terms of selecting which rate of return to

16 utilize, how could you have been any more aggressive, except

17 for having selected the second or first-highest return?  Was

18 there any other way for you to be more aggressive on Exhibit C?

19 A    Sure.

20 Q    Tell us how.

21 A    I think I've already testified just a minute ago regarding

22 the two-percent adjustment I could have made with respect to

23 hedge funds.  That would have been an adjustment.  And there's

24 another way, you know, just on Exhibit C.  For example, if you

25 look at the final column, the final column represents the mean

Scruton - Cross                                    80

1  results plus one standard deviation from the mean, and I

2  considered this as an approach, as well.  And if you look at

3  the mean and one standard deviation higher than the mean, the

4  average -- simple average is 16.36-percent return.

5       Now, that would be a measure that captures probably 85

6  percent of the currencies, making some statistical assumptions

7  regarding population.  I could have used that.  I decided to

8  just use that as a gut check to determine that my calculation

9  of using the third highest was well within that one standard

10 deviation from the mean, and I went with, in my judgment, the

11 third highest as opposed to this higher, more aggressive

12 approach that you just -- that you asked me to identify.

13 Q   Okay.  So let's take those one at a time.  You didn't

14 build in the two percent figure, which had you done, would have

15 shown a more aggressive and higher protection rate, correct?

16 A   Correct.

17 Q   Is it still your testimony that utilizing that two percent

18 would be inappropriate?

19 A   In my calculation I did not include it, because I thought

20 that there would be a question as to whether or not that could

21 be assumed in the index.  So I decided, for conservatism, not

22 to include it.  But I believe that it is something you well

23 could include in a calculation if you were going to be more

24 aggressive.

25 Q   But you chose not to, in an effort not to be overly

Scruton - Cross                                81

1  aggressive.  Is that correct?

2  A    That's correct.

3  Q    Now in looking at Exhibit C, the cutoff year that you used

4  was 2014, correct?

5  A    Correct.

6  Q    Now compare Exhibit C-1.  C-1 now has year-to-date figures

7  for 2015, doesn't it?

8  A    It does.

9  Q    And in fact, is it fair to say that you performed those

10 calculations and extended the index based in part on some of

11 the issues that were raised during your Friday deposition?

12 A    That's correct.

13 Q    Okay.  Now you originally chose not to use year-to-date

14 figures because for most of those indexes, with the exception

15 of the money market ten-year rate, all of those numbers would

16 have demonstrated negative figures year-to-date.

17 A    That's not correct.

18 Q    Well, including them now, are you suggesting that in order

19 to adequately predict a rate of return as opposed to a

20 protection rate, utilizing year-to-date figures for 2015 is, in

21 fact, appropriate?

22 A    No, I believe and I can explain why it is I --

23 Q    I was just sort of asking you yes or no.  Do you believe

24 that including year-to-date figures, in estimating what a

25 reasonable rate of return would be, is appropriate, yes or no?

Scruton - Cross                              82

1   A    I think it's a matter of judgment.  And I believe both my

2   original calculations and approach I used, excluding 2015, has

3   some benefits and has some appropriateness to it and reasons

4   for it.  And I believe the subsequent analysis could be argued

5   to be appropriate as well.  And each has advantages and each

6   has disadvantages.  I wanted to include them for completeness,

7   because I don't believe that any one approach is better or

8   worse necessarily.

9   Q    Well, but I need to sort of try and wrap my mind around

10  this.  You were first approached to prepare your declaration

11  some time in late August or early September of this year,

12  correct?

13  A    Correct.

14  Q    So the time frame for your work effort is about three or

15  four weeks, correct?

16  A    Correct.

17  Q    And by the way, just so that the record is clear, you work

18  for FTI?

19  A    I do.

20  Q    And everything else about your CV that was attached as

21  Exhibit A is accurate, correct?

22  A    I believe so, yes.

23  Q    And you've been with FTI for approximately nine years,

24  right?

25  A    Yes.

Scruton - Cross                                    83

1  Q    In the -- I'm going to forget the exact name, but it's the

2  Corporate Finance and Restructuring Group?

3  A    That's correct.

4  Q    Okay.  And you know that FTI was the financial advisor to

5  the official creditors committee during the pendency of the

6  General Motors Chapter 11 case, correct?

7  A    I did, yes.

8  Q    But you didn't work on that project while at FTI, did you?

9  A    That's correct.

10 Q    And subsequently FTI became the monitor for the GUC Trust,

11 correct?

12 A    Yes, they did.

13 Q    And in that capacity as the monitor, FTI oversees the

14 operations of the GUC Trust administrator, correct?

15 A    That's right.  Yes.

16 Q    Okay.  But you had no role in FTI's performance of any of

17 its duties as monitor for the GUC Trust, correct?

18 A    That's correct.

19 Q    Your sole involvement in this case was in connection with

20 the preparation of the declaration, your deposition, and

21 today's testimony, right?

22 A    That's correct.  Yes.

23          MR. WEISFELNER:  Bear with me one second, please,

24 Your Honor?

25          THE COURT:  Sure.

Scruton - Cross                                    84

BY MR. WEISFELNER:

Q    And do you remember the date on which your declaration was
submitted to the Court?

A    I don't recall the date, but I believe it was last
Thursday, whichever day that is.

Q    When you submitted the original declaration to the Court,
with the original Exhibit C, which reflected a cutoff of the
index returns as of 2014, what, if anything, were you
representing to the Court and the parties as to the
reasonableness of looking at year-to-date figures for 2015?

A    I'm trying to understand your question, representing as to
the reasonableness.  I think as I testified in my deposition, I
can explain that -- I did explain that I was looking to seek as
many data points as I could get regarding the annual or 12-
month period performance of certain indices.  And because we
don't have a full year, 2015, I did not include that data in my
analysis.

Q    Let me ask you this question.  If you take a look at the
mean calculations in Exhibit C-1, and you compare them to the
mean calculations in Exhibit C, all the numbers on C-1 are
lower than the numbers -- I'm sorry, all the numbers on C-1 are
lower than the numbers reflected on Exhibit C.  Is that
correct?

A    That's correct.

Q    Isn't that why you chose not to use year-to-date 2015

Scruton - Cross                        85

1 figures in your original declaration?

2 A    Not at all.  I was not affected in any of my analysis by

3 trying to keep, to get, or show a level or highest level of

4 value of the returns, and therefore the bond.  I was just

5 trying to get what I believe to be the best estimate in all

6 cases.  And just because 2015 was lower than the average so

7 that it reduces the mean was not a factor in my assessment.  It

8 was purely a factor -- what was driving my decision to exclude

9 2015, and I testified to this previously, before I subsequently

10 included it on Exhibit C-1, what was driving it was to try and

11 get the most representative data that would allow me to best

12 predict the protection needed.  And I was looking for annual

13 rates of return.  And because we don't have a full year of

14 2012, that's why I excluded it.

15 Q    And point of fact, whether you include 2015 or you exclude

16 2015, the benchmarks you selected for money market, hedge fund,

17 fixed income and large cap equities didn't change a wit, did

18 they?

19 A    So what didn't change between what period and what period?

20 I missed the start of the question, sorry.

21 Q    In other words, notwithstanding the fact that Exhibit C-1

22 currently reflects year-to-date figures for 2015, and

23 notwithstanding the fact that the mean average has dropped, you

24 continue to utilize the exact same returns in C-1 that you used

25 in C, correct?

Scruton - Cross                                    86

1   A    Yes.  My calculation of protection rates return is the

2   same, correct.

3   Q    Hasn't changed, notwithstanding the fact that we're now

4   taking into account year-to-date figures for 2015?

5   A    That's correct.

6   Q    Okay.  I want to show you an exhibit, and ask if you can

7   identify it.

8          MR. WEISFELNER:  I was going to have it marked as

9   Plaintiff's Exhibit I guess it would be B.  May I approach?

10         THE COURT:  Yes.  Did you say B, "bravo"?

11         MR. WEISFELNER:  B as in "bravo."  Yes, sir.

12     (Counsel confer)

13         MR. OFFENHARTZ:  Your Honor, may I approach the

14  witness and provide --

15         THE COURT:  Yes, you may.

16         MR. OFFENHARTZ:  -- him some water?

17     (Counsel confer)

18         MR. OFFENHARTZ:  Thank you, Your Honor.

19  BY MR. WEISFELNER:

20  Q    You've been handed what's been marked as Exhibit B.

21  A    Yes, I have.

22  Q    Okay.  Do you recognize this document?  Can you tell us

23  what it is?

24  A    I've not seen this document before.

25  Q    No, I know.  I'm just asking if you know what it is.

Scruton - Cross                              87

1   A    I'm reading it to try and familiarize myself with what it

2   might be.

3   Q    Have you ever used Morningstar in your almost 18 year

4   career?

5   A    Not myself personally, no.

6   Q    Okay.  Do you have any reason to believe that this is not

7   a chart that was generated through the Morningstar service

8   through the 18th of this month?  Do you see where it says

9   "total returns, data through 9/18/15"?

10  A    I see where it says that, yes.

11  Q    Okay.  And my question is, do you have a reason to believe

12  that this is not information that was culled from the

13  Morningstar service as of Friday of this week?

14  A    I don't have any reason to believe either way.  I'm

15  looking at the data and I'm trying to digest it.

16  Q    Okay.  Do you see where it says "trailing total return"?

17  A    I see that, yes.

18  Q    And this is for the S&P 500 Index?

19  A    It looks as that's what it's doing, yes.

20  Q    Okay.

21  A    Or showing so.

22  Q    And do you see the figure for the ten-year average?

23  A    I see a ten-year average, yes.

24  Q    Okay.  Okay.  And that is 6.93 percent?

25  A    I see 6.93 percent, correct.

Scruton - Cross                        88

1  Q    Okay.  Assuming that all the numbers on Exhibit B are

2  accurate and, in fact, represent Morningstar's analysis of the

3  S&P 500 Index total returns through Friday of this past week,

4  are you able to explain to us why the ten-year average

5  reflected in Morningstar at 6.93 percent is different than the

6  mean you used for the ten-year average of 9.49 percent?  Or,

7  for that matter, the mean you used in your Exhibit C-1,

8  reflecting year-to-date figures, which is at 8.29 percent.

9  A    I've have to investigate and understand why that's the

10 case.  I can only, at this point, come up with possible

11 reasons.

12 Q    Well, just so the record is clear, sitting here today, you

13 can't tell us why, assuming these Morningstar figures are

14 accurate, you can't tell us why their calculated ten-year

15 average is less than the average you set forth, either on

16 Exhibit C or Exhibit C-1.  Isn't that right?

17 A    I can give you possible reasons.  One that -- I'll give

18 you one reason that's certainly a -- the reason for the

19 difference.

20 Q    Go ahead.

21 A    The ten-year average, if this is the correct ten-year

22 average, that looks back ten years from mid-September to mid-

23 September 2005, then my calculations are not calculating that

24 period of time.  The Exhibit C is a period from January the 1st

25 2005 to December the 31st 2014.  And the mean that I reflect on

Scruton - Cross                                89

1   Exhibit C-1 is a period of January the 1st, 2005 through year-

2   to-date 2015, which I'm -- my assumption is is 9/14.  So again,

3   it's a ten-years-plus-nine-months period of -- it's the mean

4   for that.  So that's -- so that will account for some of the

5   difference.

6   Q    Okay.  Now let me ask you this question.  Assuming that

7   you're right, and that's what accounts for some, if not all, of

8   the differences, which do you believe is more predictive of

9   rates of return for a hypothetical investor, the mean of the

10  ten years that you reflect in Exhibit C or the ten-year average

11  as reflected in Morningstar?  Which is more predictive of

12  likely rates of return?

13  A    Of the three measures that you mentioned, clearly taking

14  into account ten-year-inside-current-year information, I would

15  argue that what I've included in C-1 is more predictive,

16  because it's -- looks at the average over a greater period of

17  time.  It's ten years plus nine months, looking at that

18  average, as opposed to the other two methods which only look at

19  the ten-year -- you know, a ten-year period.

20  Q    And the difference between the ten-year period reflected

21  in Morningstar and the ten year and nine months reflected in

22  what you say is a better predictor, that being C-1, is I get a

23  lot more of calendar year 2005 return information, right?

24  A    Yes.  I'm basing my comment just on the fact that we've

25  got more information.  I'd have to look at the data and make an

Scruton - Cross                                    90

1  assessment, in more cases, to determine what's the best to use.

2  And there is an element of judgment on it, but on an apples-to-

3  apples basis, the more data you have, the better and that's

4  why, of the three methods, just using that approach, Exhibit C-

5  1 has got more detail included in it.

6  Q    Now let me try it this way.  For the hypothetical large

7  cap investor who invests in the S&P 500 Index, which is more

8  predictive of their likely rate of return, the ten-year average

9  6.93 from Morningstar or the 15.99 percent you chose from

10 calendar year 2012?  Which is more predictive of their likely

11 rate of return?

12 A    More predictive of likely rate returning, comparing those

13 two, I would use the ten-year average.

14 Q    You would use 6.93 --

15 A    Six --

16 Q    -- as opposed to your chosen rate of 15.99, correct?

17 A    That's correct.  Yes.

18 Q    And just so that we're all clear, you rejected the more

19 likely rate in favor of 15.99 because you're looking for what's

20 most protective in a conservative fashion.  You could have

21 gotten even more protective.

22 A    Could I -- I believe I said more predictive of what's

23 protective, that's why I think we're getting confused.  I've

24 been trying to answer the questions as --

25 Q    Let me write that down.

Scruton - Cross                                        91

1    A     -- closely -- as clearly as I can.

2    Q     More predictive of what's protective, so I don't forget

3    it.   Okay.   Let me move on to the next item.   I want to go to

4    the money market investor.   And for that investor, in order to

5    predict what's more protective, you went to the return from ten

6    years ago, 4.29 percent, correct?

7    A     Again, I think you've rephrased my -- what was said.   I --

8    in simple terms, I'm trying to be as predictive as I can, of

9    what's protective.   And when I say "predictive," it's the most

10   predictive, the best prediction I can come up with.

11            MR. WEISFELNER:   Your Honor, may I have this marked

12   as Exhibit C?

13            THE COURT:   Sure.

14            MR. WEISFELNER:   And if I can approach Your Honor

15   with a copy of what's being marked as Exhibit C?

16            THE COURT:   You got a copy for Mr. Offen [sic],

17   correct?

18            MR. WEISFELNER:   I have a copy for --

19            THE COURT:   And my clerks.

20            MR. WEISFELNER:   -- and I even have one left for you.

21   BY MR. WEISFELNER:

22   Q     Have you been shown what's been pre-marked as Exhibit C?

23   A     I have it now, yes.

24   Q     Okay.   Can you identify this document?

25   A     It looks like a printout from the Treasury website.

Scruton - Cross                                      92

1   Q    Okay.  Have you had opportunities to go to the Daily

2   Treasury Yield Curve in the past?

3   A    Yes.

4   Q    Okay.  I want to refer you to the Treasury numbers, next-

5   to-the-last one, because I want to be as consistent as I can,

6   the ones that were printed out for Friday.  That being 9/18/15.

7   Do you see that?

8   A    Nine -- which date?  It's always --

9   Q    9/18/15, the penultimate line.

10  A    Yes, I see that.

11  Q    Okay.  And the ten-year average money market return as

12  reflected on the Treasury web is what percentage, sir?

13  A    This document, I'd have to study it, it looks as if it's

14  looking at yield curve rates.

15  Q    Uh-huh.

16  A    I'm not sure that that's what you described it as, which I

17  -- you asked me to look at that line ten year, which is -- you

18  have -- I think you described it as returns.  I don't believe

19  it's necessarily the returns, it's the yield curve rates.

20  Q    The yield curve rates?  Okay.  Well, let me ask you a

21  question.  You chose, in coming up with your protective rate,

22  to go back to the annual rates of return for U.S. Treasuries

23  back in 2005, correct?

24  A    That's right.

25  Q    And you used that figure rather than a straight average of

Scruton - Cross                                    93

1  3.33 percent, correct, as reflected in Exhibit 1?

2  A    In Exhibit C --

3  Q    C.  I'm sorry.

4  A    -- it's 3.33 percent.

5  Q    Right.

6  A    Exhibit C-1 it's 3.22 percent.

7  Q    And you rejected both of those numbers --

8  A    Yeah.

9  Q    -- in favor of the same 4.29 percent, correct?

10 A    That's correct.  Yes.

11 Q    Did you have available to you information regarding

12 Treasury yields before you set forth or concluded that 4.29

13 percent from back in '05 was the right number to use?

14 A    Yes.  I have yield curve rates available to me, yes.  This

15 is --

16 Q    Okay.

17 A    Well, this is forward looking yield curves.

18 Q    I understand that.  By the way, forward looking, in terms

19 of what we can anticipate the rate of returns to be, correct?

20 A    It's a effective price of the treasury, based upon -- it's

21 a calculation of what the assumed yield is, baked into the

22 price --

23 Q    Okay.

24 A    -- or derived from the price.

25 Q    Which do you think is more predictive of likely rates of

Scruton - Cross                              94

1  return for money market investors, the 4.29 percent you used or

2  the 2.13 percent ten-year curve number reported as of last

3  Friday?  Which is more likely?

4  A    Neither are very -- neither are good estimates of likely

5  rates of return.

6  Q    Okay.  So your number is not a very good estimate of

7  likely rates of return.  Is that correct?

8  A    I'm not trying to predict -- well, we have to use my

9  number as I've described, I'm not trying to achieve the likely

10  rate of return.  The more like -- the better likely rate of

11  return would be to use one of the mean type approaches.

12  Q    All right.  What should be the last exhibit I want to show

13  you, I'm going to have marked as Exhibit D.

14          MR. WEISFELNER:  Your Honor, with your permission,

15  I'd like to approach?

16          THE COURT:  Yes.

17          MR. WEISFELNER:  (Indiscernible) this would be D.

18  Your Honor, may I hand one up to you?

19          THE COURT:  Yes.

20          MR. WEISFELNER:  I have one for the clerks and one

21  for my adversary.

22  BY MR. WEISFELNER:

23  Q    Do you have Exhibit D available?

24  A    I have it in front of me, yes.

25  Q    And can you identify what it is?

Scruton - Cross                                    95

1   A    I don't know for sure.

2   Q    What do you think it is?

3   A    It looks like a printout of a Bloomberg or -- screen or

4   something like that.

5   Q    Okay.  You've had occasion to use Bloomberg in the past,

6   haven't you?

7   A    Absolutely, yes.

8   Q    So you'd have every reason to recognize this as a printout

9   from a Bloomberg screen?

10          MR. OFFENHARTZ:  Objection.

11          THE COURT:  Sustained as formulated.  Better ask it

12   in nibbles, in what precisely, Mr. Weisfelner.

13          MR. WEISFELNER:  Certainly.

14   BY MR. WEISFELNER:

15   Q    Take a look, if you would, on the lower right-hand portion

16   of the document.  Do you recognize the Bloomberg copyright

17   there?

18   A    I do.

19   Q    Okay.  Do you have reason to believe that this is anything

20   other than a printout of a Bloomberg screen, as of the end of

21   this month?

22   A    I have no reason to believe it's a printout other than a

23   printout of Bloomberg, but it says as of 8/31/15, so last

24   month.

25   Q    I'm sorry.  What month are we in?

Scruton - Cross                                         96

1  A     September.

2  Q     As of the end of last month, correct?

3  A     Yeah.  You said this month.  I want to make --

4  Q     No, I meant as of the end of last month --

5  A     Okay.  Well, you said -- anyway.

6  Q     -- of August.  I apologize.  Now, can you tell us what you

7  understand the 119-month holding period to mean, as it

8  reflected in the right side of the piece of paper.

9          THE COURT:  Forgive me, Mr. Weisfelner, I don't see

10  that.

11          MR. WEISFELNER:  Certainly.  Your Honor, under the

12  currency, which is a drop-down screen, and this is reflected in

13  U.S. dollars, immediately below the currency indication is the

14  holding period reflected as 119 months.

15          THE COURT:  I see the 119-month holding period now.

16          MR. WEISFELNER:  Okay.

17  BY MR. WEISFELNER:

18  Q     And Mr. Scruton, you'd agree with me, would you not, that

19  ten years, at 12 months a year, would bring us up to 120

20  months, correct?

21  A     That's correct.

22  Q     So this is reflecting annual returns for a month short of

23  a ten-year period, correct?

24  A     It would appear to, if that's what 119-month holding

25  period represented, yes.

Scruton - Cross                    97

1  Q    Okay.  And by the way, the index that we are looking at is

2  the same index that you selected for the prototypical hedge

3  fund Event Driven.  That being the Credit Suisse, pardon me,

4  Event Driven Multi-Strategy Index, correct?

5  A    It's, yes, the same title on the page, yes.

6  Q    Okay.  And by the way, when you performed your analysis,

7  did you have opportunity to go on to Bloomberg to derive any

8  numbers that Bloomberg may have reported with regard to the

9  Credit Suisse Event Driven Multi-Strategy Index?

10 A    Yeah, I had the opportunity.  Certainly.

11           THE COURT:  What is the answer?

12           THE WITNESS:  Sorry.  I had that opportunity,

13 certainly.  This is publicly available.

14 BY MR. WEISFELNER:

15 Q    Okay.  And did you, in fact, go on to Bloomberg in order

16 to determine what the ten-year annual return was for that index

17 over an approximate ten-year period?  Yes or no?  Did you look

18 for that number?

19 A    I don't believe -- one of my colleagues performed this

20 exercise.  I don't believe that they used Bloomberg to obtain

21 the information, it was possible to get it from elsewhere.

22 Q    Okay.  But --

23           THE COURT:  I'm sorry, I didn't understand that

24 answer.

25           THE WITNESS:  I believe it was possible to get the

Scruton - Cross                                      98

1  return rates that I was looking for from other sources, other

2  than Bloomberg.

3              THE COURT:  Okay.

4  BY MR. WEISFELNER:

5  Q    And I might -- I guess my question is, did you, in fact,

6  in connection with the preparation of your declaration, have

7  available to you the ten-year average return for the Credit

8  Suisse Events Driven Multi-Strategy Index, yes or no?

9  A    I believe I may have had -- I certainly was -- had

10 available to me ten years annual performance for each of the

11 indices, that's what I obtained.  If that's -- is that -- that

12 -- is that the question?

13 Q    Well, let me move on to a better question, or at least a

14 different question.  I apologize.  Sir, the Bloomberg Report

15 shows the ten-year return at 5.8 percent.  Is there a reason

16 why your Exhibit C and C-1 reflect considerably higher returns

17 for that same index?

18 A    Again, I don't -- I would have to investigate, but I can

19 -- I expect there to be at least one reason.  One reason I

20 think is similar to the reason I gave when we were looking at

21 the S&P 500 Index, which is it's different periods of time that

22 you're looking at.

23 Q    And would I be correct in assuming that looking at the

24 ten-year average and the range that's being asked for runs

25 through 8/31/2015 -- strike that.

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

Scruton - Cross                                99

1        In your expert opinion, in trying to derive a likely rate

2   of return for a prototypical hedge fund investor, which would

3   be more predictive of likely rates of return, the 5.8 percent

4   reflected in Exhibit D or the 16.38 percent figure reflected in

5   your Exhibit C and C-1?

6   A    The more likely rates of return would be reflected in a

7   more -- in a mean or a ten-year average type calculation, which

8   is -- Exhibit D therefore would be more predictive of the

9   likely rate of return.

10            THE COURT:  Mr. Weisfelner --

11            MR. WEISFELNER:  Yes?

12            THE COURT:  -- I have to interrupt.

13            When you did your affidavit, Mr. Scruton, were you

14   focusing when you used the Credit Suisse Event Driven Multi-

15   Strategy Hedge Fund Index, is that the index for the yields

16   obtained by an investor who chooses to invest in a hedge fund

17   or was it the yield return obtained by the hedge fund or hedge

18   funds used in the index investing in something else, or was it

19   a third possibility?

20            THE WITNESS:  I was seeking to obtain a return -- an

21   estimate or a proxy for the returns to be obtained by the hedge

22   funds themselves.

23            THE COURT:  So if, by way of example, California

24   Retirement System decides to put some of its money into a hedge

25   fund and then that hedge fund invests it, what you were talking

Scruton - Cross                    100

1  about is what the hedge fund gets, not what California

2  Retirement System gets?

3              THE WITNESS:  I was seeking to try and find a measure

4  of what the hedge fund would get, yes.

5              THE COURT:  Okay.  Thank you.

6              Mr. Weisfelner.  Continue, please.

7  BY MR. WEISFELNER:

8  Q    And by the way, the difference between what the hedge fund

9  would realize and what the underlying investor in that hedge

10 fund would realize, as reflected in His Honor's question, is

11 reflected in the costs, in other words, the management fee the

12 hypothetical investor would have to pay to the hedge fund

13 itself, correct?

14 A    That's correct.

15 Q    And when you did your calculations, you -- when you look

16 at the information that's reflected in your charts, we're

17 looking at the return to the hedge fund before deduction for

18 any management fee, correct?

19 A    When I did -- in my charts the numbers reflect the returns

20 net of those fees.  I did not gross them up in the calculations

21 of my return rates.  And that's the point of conservatism that

22 I made.

23 Q    Because when you reflect the numbers, net of the fee,

24 you're trying your best to demonstrate what the actual return

25 to the underlying investor would be, correct?

Scruton - Cross                    101

1  A    I think I would have had a basis, given the investors here

2  are hedge funds, to gross up the index for the two percent, but

3  because that included an eliminate of judgment that could be

4  criticized as being aggressive, I determined that it would be

5  conservative not to gross up.  And I used the -- just used the

6  index without adjustment, and that, arguably, is lower than the

7  investments returns that a hedge fund could obtain.

8  Q    But getting back again to this analysis, in your judgment,

9  if one is trying to predict the likely rate of return for a

10 typical hedge fund investor utilizing the Credit Suisse Index,

11 one has a number of different choices of what assumed rate of

12 return to use, correct?

13 A    Yes.

14 Q    For example, one could use the ten-year rate of return

15 that's reported on Bloomberg for the period 8/31 of 5.8

16 percent, right?  One could use that?

17 A    It does look low.  I'd need to investigate why it is low,

18 but if it is a correct assessment of the last ten years, it's a

19 -- it is a rate that could be used as an estimate of the likely

20 rate of return, which is different from my -- the protection

21 rate that I've been calculating --

22 Q    Right.

23 A    -- just to be clear.

24 Q    And by the way, your protection rate for the hedge fund

25 investor is how many times higher than the ten-year rate of

Scruton - Cross                    102

1  return reflected in Exhibit D?

2  A    Well, without using a calculating, but at 16.38 percent is

3  the protection rate of return compared to the mean or the

4  trending or the Exhibit D, which is more than two times each of

5  those numbers.

6  Q    Well, in fact 5.8 compared to 16.3, without getting out

7  the calculator, is almost three times, isn't it?

8  A    I don't believe they're apples-to-apples comparisons of

9  data, but yes, it's mathematically three times, approximately.

10 Less -- just less than, probably.

11        MR. WEISFELNER:  Your Honor, I don't know what your

12 preference is.  I have about another hour to go, but I'm at a

13 -- at least what I perceive to be a reasonable break point.  I

14 didn't know how long Your Honor was planning on going.

15        THE COURT:  I -- we have a pretty important holiday

16 to a lot of people tonight.  I need to know what time people

17 think we need to pack it in.  I'm prepared to go without a

18 lunch break, but I -- we need to have at least some break for

19 the folks in the room.  And I need to know whether, even if I

20 were to do without the lunch break, we could be done today.

21 I'm not sure if we could be done with the direct and redirect

22 and so forth today before the time that you guys would tell me

23 that you want to pack it in.

24        Can I just poll the folks on when they think we've

25 got to done in some way, and then I'll figure out how to use

Scruton - Cross                                103

1  the time?  What are we talking about four --

2          MR. WEISFELNER:  Your Honor if I go --

3          THE COURT:  -- four o'clock or is that too late?

4          MR. WEISFELNER:  -- between four and 4:30 is my sort

5  of maximum.

6          THE COURT:  I see people nodding negatively. If they

7  have to visit families and the like they may have to leave

8  earlier.

9          MR. STEINBERG:  Your Honor, according to my wife,

10 6:15 is when the holiday really starts, which means that you

11 can actually have a meal before you fast.  You need to get home

12 around five o'clock.  I think you live in the suburbs, it does

13 take a little while, especially because everybody's exiting.  I

14 actually think 3:30, 3:45 in the right time.

15         THE COURT:  Is that the consensus or do people have

16 different views?  All right.  You're talking about an extra

17 hour, Mr. Weisfelner.  And Mr. Offenheim [sic], what do you

18 think?

19         MR. OFFENHARTZ:  Your Honor, it's Mr. Offenhartz.

20         THE COURT:  I'm sorry.

21         MR. OFFENHARTZ:  That's all right.  I've been called

22 far worse.  Your Honor, I would imagine an hour would be my

23 estimate.  It could be less, it could be a little bit more.

24         THE COURT:  Am I correct that you guys are going to

25 eat a big meal tonight so you can eat a little one at lunch

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

Scruton - Cross                              104

1  time, or just have a snack?

2          MR. OFFENHARTZ:  Your Honor, I'm certainly prepared

3  to have a very light lunch.

4          THE COURT:  All right.  Let's take ten minutes and

5  then we'll see if we can get you finished up, Mr. Weisfelner

6  and then see if Mr. Offenhartz can finish his redirect as well.

7  Then we can at least finish the evidentiary phase today before

8  we've got to break.

9          MR. WEISFELNER:  Sure.  Thank you, Judge.

10          MR. OFFENHARTZ:  Thank you, Your Honor.

11          THE COURT:  All right.  So we'll take ten minutes

12  now.  Let's resume at 20 of one on the clock there.

13      (Recess taken at 12:30 p.m.)

14      (Proceedings resume at 12:47 p.m.)

15          THE COURT:  Okay.  Go ahead.

16  BY MR. WEISFELNER:

17  Q    Mr. Scruton, at this point I'd like to compare and

18  contrast Exhibit E to your original declaration and Exhibit E-1

19  to your supplemental.  Do you have those two documents in front

20  of you, please?

21  A    I do now, yes.

22  Q    Say again?

23  A    I do now, yes.

24  Q    Okay.  Then am I right that the only difference between

25  these two documents has to do with the number of months of lost

Scruton - Cross                        105

1  opportunity costs?

2  A    I believe that's correct, yes.

3  Q    So that in Exhibit E-1, you've taken the range down to

4  four months, and you've added a couple of intermediary ranges,

5  including ten months, correct?

6  A    That's correct, yes.

7  Q    And you've now circled the ten-month set of numbers such

8  that your conclusion is $15.2 million, correct?

9  A    Yes, based upon the ten-month calculation.  Yes.

10 Q    But in performing E-1 you still haven't changed the $135

11 million establish, have you?

12 A    That remains the same, yes.

13 Q    You haven't changed the projected trust rate of return, in

14 other words what the trust is earning on its cash on hand,

15 correct?

16 A    Correct.

17 Q    And you chose not to change that number, despite your

18 testimony that you've seen rates of return for permitted

19 investments that are as much as ten times higher, correct?

20           MR. OFFENHARTZ:  Objection, Your Honor.  Assumes --

21           THE COURT:  Oh, I'll hear the speaking objection.  Go

22 ahead.  Go ahead.

23           MR. OFFENHARTZ:  Your Honor, during the deposition

24 Mr. Weisfelner provided the witness with a series of rates that

25 technically speaking are or could be, perhaps, permitted

Scruton - Cross                    106

1  investments.  But Mr. Weisfelner did not provide the witness or

2  now the Court is the simple fact that in the witness's

3  declaration he indicated that it was -- he was informed that

4  there were certain investments the trust would not make,

5  because of a concern of becoming an investment management

6  company.

7         THE COURT:  Okay.

8         MR. OFFENHARTZ:  This has something for argument.

9         THE COURT:  That's a little more than I expected as

10 an objection.  You can get that out by redirect.  Objection

11 overruled.

12        Continue, Mr. Weisfelner.

13 BY MR. WEISFELNER:

14 Q   You didn't make any change to the projected trust rate of

15 returns in Exhibit 1, did you?

16 A   Correct.

17 Q   And that's notwithstanding the fact that during the course

18 of your deposition, you testified that there were permitted

19 investments that returned as much as ten times the .12 percent.

20 Isn't that correct?

21 A   That's correct.

22 Q   Okay.  Now -- and by the way, when we look at E-1, the

23 heading to the chart used to say number of months, now it says

24 "number of months of lost opportunity costs."  Do you see that?

25 A   That's correct.

Scruton - Cross                    107

1  Q    But I think you told us that the projection return rate

2  that you use is not your estimate of likely lost investment,

3  but rather is your estimate of a reasonable protection rate.

4  Isn't that what you said?

5  A    I can't recall precisely, but it sounds the correct way to

6  characterize it.  It's a reasonable protection rate.

7  Q    So to the extent that the chart says "lost opportunity

8  costs" but it's calculated based on a protective rate, did you

9  intend to be misleading or was it accidental?

10         THE COURT:  Sustained.

11         MR. OFFENHARTZ:  Thank you, Your Honor.

12 BY MR. WEISFELNER:

13 Q    Do you think a more accurate heading for E-1 would be

14 number of months of protection required, as opposed to number

15 of months of lost opportunity costs?

16 A    No.

17 Q    Okay.  Let's turn to what I hope is the last exhibit, and

18 that's Exhibit F.  And before I get there, I want to ask a

19 couple of foundation questions.  You've been at FTI for a

20 little over nine years, correct?

21 A    Yeah, that's correct.

22 Q    And today represents the first expert opinion you've ever

23 given to any court anywhere while you've been at FTI, correct?

24 A    That's correct.

25 Q    In fact, in your entire career, you've been proffered as

Scruton - Cross                          108

1  an expert, I think what you told us was "less than six times,"

2  correct?

3  A    Correct.

4  Q    And by definition, since that would have been before FTI,

5  we're talking about some ten years ago was the last time you

6  were proffered as an expert.  Is that fair?

7  A    That's fair.

8  Q    And this is the first time in your entire professional

9  career you've been proffered as an expert on lost opportunity

10 costs, correct?

11 A    Correct.

12 Q    And the first time in our entire professional career

13 you've ever testified regarding the appropriate protective rate

14 of an interest.  Isn't that correct?

15 A    That's correct, yes.

16 Q    When you began your analysis, you wanted to ID who the

17 hedge funds were that Akin was representing.  Is that correct?

18 A    I thought it would be potentially helpful to my analysis

19 to get as much information regarding the identity of the

20 unitholder population.  Yes, that's correct.

21 Q    And ideally you wanted to know what they were going to do

22 with the money once they got it, right?

23        MR. OFFENHARTZ:  Objection.  Mischaracterization.

24        THE COURT:  Overruled.

25 BY MR. WEISFELNER:

Scruton - Cross                    109

1  Q    Did you want to know what the hedge fund represented by

2  Akin would do with the money once they were given the

3  opportunity to invest?

4  A    I would have liked to get as much information, as I

5  testified previously, as possible.  More data is better than

6  less data.  I wasn't expecting to get that information, but I

7  would have liked to have obtained information regarding the

8  identity of the hedge funds that Akin Gump represents.

9           MR. WEISFELNER:  Move to strike.

10          THE COURT:  Overruled or denied.

11  BY MR. WEISFELNER:

12  Q    Well, you would have felt that information regarding what

13  the hedge funds rates of return on their investments over a

14  one-, five- or ten-year period would have been relevant to your

15  analysis.  Isn't that right?

16          MR. OFFENHARTZ:  Objection.  Mischaracterization.

17          THE COURT:  Overruled.

18          THE WITNESS:  Consistently would desire to get as

19  much information as possible.  If I had also had information

20  from the Akin Gump hedge fund clients regarding their

21  historical performance over a longer period of time, I could

22  have used that information potentially as part of my analysis,

23  yes.

24  BY MR. WEISFELNER:

25  Q    Now you know the difference between information about

Scruton - Cross                                    110

1  hedge funds and their investments fall into two general

2  categories, what's publicly available and what's not publicly

3  available.  Is that a fair characterization?

4  A    I think it's a fair characterization of all information.

5  It's either one or the other.

6  Q    And for example, the information that we garner from

7  looking at the Credit Suisse or any other index falls into the

8  category of publicly available information, correct?

9  A    That's correct.

10  Q    You did, in fact, try to obtain non-public information

11  early on during your analysis, from the Akin Gump hedge funds,

12  correct?

13  A    I tried to obtain information through my counsel, right.

14  Q    You went to your lawyers at Gibson Dunn and you asked them

15  to obtain information regarding what the Akin Gump hedge funds

16  had invested in and what their rates of return had been over

17  different periods of time.  Yes or no?

18  A    I asked them whether they thought it would be possible to

19  obtain such information.

20  Q    So -- and ultimately you were informed that that

21  information was not going to be made available to you, correct?

22  A    Correct.

23  Q    So let's categorize what you told us you don't know, that

24  you thought might have otherwise been relevant.  You don't know

25  the rates of return for any of the individual hedge funds

Scruton - Cross                          111

1  represented by Akin Gump, do you?

2  A    Correct.

3  Q    You don't know them over a short term period, over a

4  medium term period or over a long term period, right?

5  A    Correct.

6  Q    You don't even know what the rates of return are for the

7  Akin Gump hedge funds on an aggregate basis, where the

8  individual hedge funds wouldn't have to expose to the public

9  information about their own rates of return, but only on an

10  aggregate basis.  You didn't get any of that aggregate

11  information either, did you?

12  A    Correct.

13  Q    Sitting here today and you don't know when any of the Akin

14  Gump hedge funds first acquired their GUC Trust units, do you?

15  A    I don't.  And it was totally not relevant to my analysis.

16  Q    Okay.  But you never asked when did they acquire their

17  units?

18  A    I didn't ask because it's not relevant.

19  Q    And you never considered looking at trading volumes for

20  the units?

21  A    Correct.  The same answer, because it's not relevant.

22  Q    Okay.  Putting aside, and so that we don't waste time

23  about whether it was relevant to your analysis or not, I just

24  want to know whether or not you ever obtained information about

25  whether any of the Akin Gump hedge funds acquired their units

Scruton - Cross                    112

1  before or after the 2014 recall notice.  Do you know?

2  A    I don't know.

3  Q    Okay.  Let's now -- well, let me ask you this question.  I

4  think you told us that when you first got this assignment you

5  looked or you had someone on your behalf look to see if there

6  were any treaties or other authorities that would assist you in

7  developing the methodologies for completing your computations.

8  Do you recall that?

9  A    Yes.

10  Q    And I believe you told us that despite efforts to find

11  anything, indeed, there was no treaties or other authorities

12  that you could find that would support the methodology to be

13  used.

14  A    There was nothing specifically that I could use for this

15  situation.

16  Q    And nothing that would support your methodology of

17  utilizing the third best return over a ten-year period,

18  correct?

19  A    That's correct.

20  Q    And no authorities that told you to cut off 2015 negative

21  numbers when you first performed your analysis, correct?

22  A    That's correct.

23  Q    And nothing that told you to ignore other permitted

24  investments that would yield more than the return on

25  investments that you assumed, correct?

Scruton - Cross                    113

1  A    I'm not sure I follow that question.

2  Q    Prior to your deposition, were you ever told to ignore

3  other permitted investments that could yield a higher return,

4  than the .12 percent that you assumed or were told to assume?

5  A    I wasn't told to ignore anything.  I was asked to assume

6  certain things and one of the things was to assume, in respect

7  of the trust, that it would invest similarly -- in a similar

8  way that it currently was investing and that there were reasons

9  why it could not invest in all of the array of permitted

10 investments that were available under the trust and it would be

11 able to -- for -- I should assume that it would only invest in

12 similar securities that it currently was investing.

13 Q    When did you first obtain knowledge about the trust's

14 inability to invest in other permitted investments?

15 A    I first obtained that knowledge as part of my -- writing

16 my declaration.

17 Q    Okay.  When we asked you about other permitted

18 investments, isn't it true that during your deposition you

19 never volunteered any information about why the trust isn't

20 invested in higher yielding permitted investments, right?

21 A    I couldn't articulate why that was the case, because I

22 didn't recall at that time why that was the case.  I did, I

23 believe in my deposition, state that I believe there are

24 reasons why the assumption that I was asked to use in this

25 calculation should be assuming 0.12 percent, but I got -- I

Scruton - Cross                        114

1  couldn't recall at that time specifically why I believe --

2  because I -- after the deposition I reviewed the stipulation

3  again and it's actually contained in the stipulation.  And I

4  have not -- was not able to recall it when -- at the

5  deposition.

6  Q    Okay.  And can you turn to the stipulation and tell us

7  where in that document your recollection was refreshed as to

8  the trust's inability to invest in other permitted investments?

9  A    So on Page 11, Paragraph 21, I believe I'm correct if I

10 identify the fourth line where it says:

11            "Subsequent to the stock sale, in order to avoid any

12            argument that the GUC Trust is an investment company

13            under applicable securities laws, the GUC Trust

14            administrator has invested all of the GUC Trust's

15            cash in a mix of short-term U.S. Treasury securities.

16            The GUC Trust administrator anticipates that from the

17            date of the stock sale through the year end, the

18            average rate of return on these permissible

19            investments will be approximately 0.12 percent per

20            annum."

21 Q    And do you know anything about the GUC Trust's

22 determination that in order to avoid an investment company

23 under applicable securities, the trust was limited to short-

24 term investments opposed to any other of the permitted

25 investments that are contained in the GUC Trust agreement,

Scruton - Cross                    115

1  which was incorporated as part of the plan of reorganization?

2  A    The details surrounding this investment company

3  restriction are not details that I'm familiar with.  It's not

4  part of the scope of my declaration.

5  Q    Okay.  Getting back to your inability to identify any

6  treaties or other authorities that support the methodology that

7  you employed, you told us that you've never done this before,

8  in calculating rates of return.  You've never looked at ten-

9  year averages and selected the third highest average, correct?

10  A    I think I've said, and I believe, that I've not done this

11  specific exercise with this specific set of circumstances, but

12  I've done similar types of exercises that involve the same

13  principles that were involved in performing this exercise.

14  Q    When you say "same principle," I thought you told us that

15  you'd never done it before, and that the approach you used,

16  selecting the third highest, was a "unique approach."  Did you

17  not tell us that at your depos2ition?

18          MR. OFFENHARTZ:  Object to the form.

19  Mischaracterization.

20          THE COURT:  Sustained.

21  BY MR. WEISFELNER:

22  Q    All right.  Let's turn to --

23          THE COURT:  There's a drill, there's a traditional

24  way of doing this if you want to get him on his deposition.

25          MR. WEISFELNER:  Sure.  For counsel's reference, I'm

1  looking at Page 102 of Mr. Scruton's deposition.

2  BY MR. WEISFELNER:

3  Q    I'll ask you -- I'll read you the question that you were

4  asked at that time.

5  "Q   Can you think of any situation in your professional career

6  when an assessment of a group of numbers representing results

7  for a given period of years, your conclusions were predicated

8  on taking either the first, second or third best performing

9  years?"

10     Do you remember being asked that question at your

11  deposition?

12  A    I believe so, yeah.  I believe I remember that question.

13  Q    And can you recall giving this answer:

14  "A   I can't recall a specific example where I used this.  This

15  was an approach that I used for this situation."

16     Is that the answer that you gave at your deposition?

17  A    It sounds right.

18  Q    Well, do you stand by that answer?

19  A    I stand by that answer.

20  Q    Okay.  And then your answer went on to say:

21  "As I mentioned, I looked at the data and attempted to

22  initially look at the trimmed mean and I could have used the

23  second best.  I could have used the best.  But it was a

24  particular approach that I determined would be appropriate for

25  this exercise, because of the requests being made to calculate

Scruton - Cross                          117

1  what would be protective, based upon the maximum potential harm

2  that would exist."

3       Do you recall that being part of the answer to your

4  question -- to the question?

5  A    Yes.

6  Q    And then you went on to say:

7  "So I was looking for that, to evaluate a reasonable range and

8  come up with a conservative view of what that range would be.

9  So it was sort of a unique approach to these particular -- for

10 this particular set of unique circumstances."

11      Was --

12          MR. OFFENHARTZ:  Objection.  What?

13          THE COURT:  If you're trying to impeach him, you have

14 to first lay a predicate for something he disagrees with you

15 on, or that you're going to use the deposition to impeach him

16 with, so I'm sustaining that objection, which is what I

17 understand Mr. Offenhartz is driving at.

18          MR. WEISFELNER:  Let me move on then.

19          THE COURT:  You can make a statement.  Ask him if he

20 disagrees and if he said something consistent with what you

21 asked and denies it up here, have at him.

22          MR. WEISFELNER:  Okay.  Well, I think I got the

23 witness to say those were the questions and answers that he was

24 giving at his deposition.

25          THE COURT:  That you did.  But then you were moving

1  on beyond that.

2          MR. WEISFELNER:  Okay.  Well, I will retreat from

3  looking beyond that and move on to my next set of questions.

4          THE COURT:  Okay.

5  BY MR. WEISFELNER:

6  Q    I think you told us -- or isn't it the case that in

7  preparing your declaration that you became aware of the issues

8  in the Tribune case, and in particular, the efforts by the

9  parties in that case to determine what lost opportunities costs

10 would be in connection with the stay pending appeal that was

11 sought in that case?

12 A    I forgot what the question is now.  But yes, I'm familiar

13 with that case.

14 Q    Do you know who David Kurtz is?

15 A    I do.

16 Q    Do you respect David Kurtz's opinion?

17 A    I do.

18 Q    Do you recognize him as an expert that's got approximately

19 30 years worth of experience in this area?

20 A    I understand that to be the case and he's been accepted by

21 courts, yes.

22 Q    And did you review Mr. Kurtz's declaration in connection

23 with the preparation of your declaration?

24 A    I recall reviewing parts of his declaration.

25          MR. WEISFELNER:  Okay.  May I approach, Your Honor?

Scruton - Cross                         119

1            THE COURT:  Yes.

2            MR. WEISFELNER:  I don't know what we're up to, I

3 think we're up to E?  If we could have this marked as an

4 exhibit.  May I approach, Your Honor?

5            THE COURT:  Yes.

6 BY MR. WEISFELNER:

7 Q    Did you understand, having reviewed portions of Mr.

8 Kurtz's that part of what he was attempting to establish was

9 the opportunity costs from the delay in investing cash?

10 A    Yes.

11 Q    And in particular, you understood, did you not, in

12 reviewing his declaration, beginning at Page 5, Paragraph 2, he

13 was trying to calculate the opportunity costs from a delay in

14 investing roughly $2 billion worth of cash, correct?

15 A    I'd have to look at Paragraph 5.

16 Q    Paragraph 9.

17 A    I'm sorry.  Yeah, Paragraph 9 looks as if it's entitled

18 opportunity costs from delay in reinvesting distributable cash.

19 Q    And first of all, do you recall having reviewed this

20 portion of the Kurtz declaration in connection with the

21 preparation of your declaration?

22 A    I recall having reviewed it.  I can't recall exactly --

23 precisely the words used, but I do recall I reviewed it, yes.

24 Q    I'm going to invite your attention to the second full

25 sentence that begins:

Scruton - Cross                          120

1  "The amount of lost opportunity costs associated with these

2  funds can be calculated -- can be estimated by calculating the

3  difference between, one, the investment income currently

4  generated by the debtors with respect to its cash on hand and,

5  two, the anticipated rates of return that could reasonably

6  earned by the non-moving creditors, assuming they were able to

7  invest the distributable cash during the stay period without

8  any significant restrictions."

9      Do you see that?

10 A   I see that, yes.

11 Q   Do you agree or disagree that the amount of lost

12 opportunity costs associated with a stay pending appeal can

13 usually be estimated by calculating the difference between

14 investment income generated versus anticipated rates of return

15 that could be earned were they able to invest the cash?

16         MR. OFFENHARTZ:  Objection, Your Honor.

17         THE COURT:  Overruled.

18         THE WITNESS:  I believe that's a definition that's

19 appropriate.

20 BY MR. WEISFELNER:

21 Q   Okay.  Now in determining the second part of that

22 equation, the anticipated rates of return that could be

23 reasonably earned, if you turn to Page 6, you were aware, were

24 you not, that Mr. Kurtz had opined that given the sophisticated

25 nature of the debtor's creditors and their investment

Scruton - Cross                    121

1  opportunities, he believed that a conservative and reasonable

2  estimate of their potential investment rate of return is

3  approximately 6.89 percent based on a commonly used high yield

4  index.  Do you see that?

5  A    I see that, yes.

6  Q    And in the footnote Mr. Kurtz indicates that the rate he

7  used is based on the Merrill Lynch U.S. High Yield Master II

8  Index.  Do you see that?

9  A    I see that, yes.

10 Q    And would you agree with Mr. Kurtz when he concluded that

11 that index is a commonly used index to analyze the high yield

12 market?

13 A    I would agree with the -- to reference that index as

14 commonly used.

15 Q    And you see that -- I'm sorry.  Did you finish?  I

16 apologize.

17 A    I did.  I have, yes.

18 Q    Okay.  And you see that in order to perform his

19 calculation, as of the time frames being referenced, he looked

20 to the yield to worse for that index?

21 A    I see that, yes.

22 Q    I'm going to show you the next exhibit, which demonstrates

23 the current --

24     (Counsel confer)

25         MR. WEISFELNER:  I'm going to approach the witness,


ACCESS TRANSCRIPTS, LLC    ⚖    1-855-USE-ACCESS (873-2223)

Scruton - Cross                          122

1  if I can, Your Honor, in order to show him current information

2  from that particular index.  If we can mark it?

3          THE COURT:  Sure.  Come up, give it to him and then

4  return to where you were.

5          MR. WEISFELNER:  I think the next one is F.

6          THE WITNESS:  Thank you very much.

7  BY MR. WEISFELNER:

8  Q    The document I've just handed you as Exhibit F, can you

9  identify that document?

10  A    It's not a document I've seen before.  It looks like a

11  printout from a research website and it's entitled "B of A

12  Merrill Lynch U.S. High Yield Master II Semi-Annual Yield to

13  Worst."

14  Q    And this was as of yesterday, correct?  Updated as of

15  yesterday.

16  A    Well, the date of the page is 9/21.  The data within it,

17  the first line suggests the data within it is dated September

18  the 18th.

19  Q    And it's for a five-year period going back to September

20  2010, correct?

21  A    I'd have to study the chart.  The chart seems to go back

22  to 2011, but the title seems to go back to 2010, so --

23  Q    Well, let me ask you this.  Did you search for the yield

24  to worst for this particular index?

25  A    I believe that one of my team members was asked to obtain

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Scruton - Cross                                        123

1  that information (indiscernible) to obtain, yes.

2  Q    And the number that your team member derived was what?

3  A    I believe it was 7.17 percent.

4  Q    Which is a little bit lower than the yield to worst that's

5  reflected on Exhibit F, correct?

6  A    That's correct.

7  Q    Okay.  So now when I take a look at Exhibit F, you had

8  originally compared the third highest historical return, which

9  is what you used in your calculation, correct?

10 A    Correct.

11 Q    And then you compared that to the yield to worst at 7.17

12 percent, correct?

13 A    Correct.

14 Q    And if one were to utilize your figure for a six-month

15 stay, you calculated $10.5 million, correct?

16 A    Assuming six months of lost opportunity costs --

17 Q    Right.

18 A    -- it would -- 10.5 million, yes.

19 Q    But if one were to utilize, for example, the methodology

20 that Mr. Kurtz utilized in the Tribune case, that being yield

21 to worst, and again, assuming a six-month stay, the number

22 would be 4.8 percent -- I mean $4.8 million, correct?

23 A    That's correct.  If you used the precise calculation

24 methodology that Mr. Kurtz used, it would be $4.8 million,

25 correct.

Scruton - Cross                    124

1          THE COURT:  $4.8 million as what?

2          THE WITNESS:  As the six months calculation of lost

3  -- of number of lost opportunity costs.

4          THE COURT:  Continue, please, Mr. Weisfelner.

5  BY MR. WEISFELNER:

6  Q    And if you go now to Exhibit F-1, you changed the

7  sensitivity so we now see four months, which we didn't see

8  before, and we see ten months, which we didn't see before.  And

9  I think you previously testified that you dropped the lowest

10 number to four months in realization that there's still another

11 two months before any distribution could be made, correct?

12 A    Correct.

13 Q    So the four months is now the low end of your scale.  On

14 the basis of utilizing your metrics, that being the third

15 highest historical return, you'd calculate the amount of

16 supersedeas bond necessary at $6.9 million, correct?

17 A    Applying the third highest approach to this metric, yes,

18 $6.9 million for four months.

19 Q    Whereas utilizing the yield to worst methodology employed

20 by Mr. Kurtz in the Tribune case, updated to today's yield to

21 worst figures, the amount of the bond would drop to $3.2

22 million, correct?

23 A    Correct.

24 Q    And you believe that your methodology is a better

25 methodology for the Court to employ than the methodology that

Scruton - Cross                    125

1   was utilized by Mr. Kurtz and accepted by the bankruptcy court

2   in <u>Tribune</u>, correct?

3   A    For various reasons, yes.

4            MR. WEISFELNER:  Okay.  Your Honor, if I could have

5   two minutes, I think I might even beat my one hour estimate.

6            THE COURT:  Sure.

7            MR. WEISFELNER:  Thank you, sir.  Your Honor, at this

8   point I'd like to move Exhibits A through F into evidence.  Let

9   me start there.

10            THE COURT:  Okay.  Mr. Offenhartz, objections?

11            MR. OFFENHARTZ:  Your Honor, we don't think an

12   appropriate foundation is laid for any of those exhibits.  We

13   think they're documents that were printed out and put in front

14   of the witness so we do object --

15            THE COURT:  Go ahead and speak --

16            MR. OFFENHARTZ:  on the other hand --

17            THE COURT:  -- into a microphone, please.

18            MR. OFFENHARTZ:  Certainly, Your Honor.  I was going

19   to say, we do object Your Honor.  These were printouts put in

20   front of the witness with no foundation whatsoever as to the

21   where, what, why or when.  On the other hand, we're also

22   mindful of the need to move forward and we don't have any basis

23   from -- to believe that Mr. Weisfelner in any way did anything

24   inappropriate with that information.

25            THE COURT:  All right.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Scruton - Cross                    126

1           MR. OFFENHARTZ:  But we -- I would have appreciated,

2   and thought it appropriate, had he taken even a few minutes to

3   lay the most basic of foundations as to what was included what

4   was not included.  For instance, one of the exhibits was Page 1

5   of 9, it's not even a complete document.  And it does seem,

6   frankly, inappropriate to admit them into evidence.

7           THE COURT:  I think we all would have, but the

8   question is, are you objecting, and if you are, I need you to

9   slice and dice the different purposes for which foundations are

10  laid.  It can be laid for authenticity, they can be laid for

11  hearsay exceptions, they can be laid for distortion as in

12  photographs or possibly in graphs.

13          You want to tell me, exhibit by exhibit, if need be,

14  what your objecting to and on which of those grounds, if any.

15  Or have you basically said, given the realities of the

16  situation, and you know that -- or you suspect that Mr.

17  Weisfelner isn't fabricating documents, you just are interested

18  in moving on?

19          MR. OFFENHARTZ:  Your Honor, if we could reserve our

20  right to simply confirm this information and if it turns out

21  that there are any inaccuracies.  For instance, if the exhibit

22  that is Page 1 of 9, if Pages 2 through 9 convey very different

23  information, then we would like to lodge an objection.

24          THE COURT:  I agree that's a fair way of proceeding.

25  I will tell you guys that my tentative would be that no further

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Scruton - Cross                          127

1  foundation needs to be made from a hearsay perspective, because

2  I regard this as market information.  If any of these documents

3  were faked, they wouldn't past muster as a matter of

4  authentication, but somehow I suspect that Mr. Weisfelner

5  hasn't done that.  And you just raised your arms and you're not

6  accusing him of that either.

7           MR. OFFENHARTZ:  Your Honor, I'm certainly not.

8           THE COURT:  So let's go by your approach.  I'll give

9  you a reservation and some closing arguments on that.

10          It seems to me that Plaintiff's Exhibit A is just

11  submitting for my convenience exhibits that were themselves

12  generated by Mr. Scruton.

13          MR. OFFENHARTZ:  Yes.  We have --

14          THE COURT:  So you have --

15          MR. OFFENHARTZ:  -- no objection to --

16          THE COURT:  -- no objection to that?

17          MR. OFFENHARTZ:  None whatsoever, Your Honor.

18          THE COURT:  All right.  So Plaintiff's A is in

19  evidence.

20      (Plaintiff's Exhibit A admitted into evidence)

21          THE COURT:  Plaintiff's B is, to my understanding a

22  printout from a Morningstar report.  So let's go with your

23  recommendation on that one.

24          MR. OFFENHARTZ:  Thank you, Your Honor.

25          THE COURT:  C appears to be a yield curve printout

Scruton - Cross                              128

1  from the Treasury.  And of course if it's from the Treasury

2  there's an additional aspect to it, although I suppose somebody

3  could put snow pake [sic] over a number.  Now I think -- I

4  understood this to be a forward looking yield curve.  And I'll

5  give you the same reservation on that one.

6            MR. OFFENHARTZ:  Thank you, Your Honor.

7            THE COURT:  Although that one has greater ability to

8  be self-authenticating.

9            D is a Credit Suisse printout -- excuse me, a

10 Bloomberg Finance printout or presumably from a Bloomberg

11 screen, of data originally -- a Credit Suisse Return Index, so

12 you got the reservation on that.

13           I might have misplaced E.  What is E?

14           MR. WEISFELNER:  Your Honor, that's David Kurtz's

15 declaration from --

16           THE COURT:  Oh, the Kurtz declaration.  Well, I

17 thought the Kurtz declaration had its printout from the

18 Delaware Bankruptcy Court, from Kevin Carey's court, didn't it?

19           MR. WEISFELNER:  It -- the document number and case

20 number and the date --

21           THE COURT:  From his ECF?

22           MR. WEISFELNER:  -- filed is across the top of the

23 page, yes.

24           THE COURT:  All right.  On this one I'm going to take

25 it as self-authenticating as a matter for which I can take

Scruton - Cross                        129

1    judicial notice under 201.  But I'll give you a reservation of

2    rights on hearsay and relevancy.

3            MR. OFFENHARTZ:  All right.  Thank you, Your Honor.

4            THE COURT:  Okay.

5            MR. OFFENHARTZ:  That's what I was going to mention.

6            THE COURT:  And --

7            MR. WEISFELNER:  The final one was the Fred printout

8    of the B of A Merrill Lynch U.S. High Yield Master II Semi-

9    Annual Yield to Worst, just updated to the current date.

10           THE COURT:  Right.  And it seems to me that that

11   should be another one in which Mr. Offenhartz will use the

12   protocol that he recommended.

13           MR. WEISFELNER:  We agree.

14           THE COURT:  That he'd look at it and satisfy himself.

15           MR. WEISFELNER:  We agree.

16           THE COURT:  Okay.

17      (Plaintiff's Exhibits B through F admitted into evidence)

18           MR. OFFENHARTZ:  Your Honor, a housekeeping matter.

19   I believe that the supplemental exhibits were also placed in

20   front of the witness and marked.

21           MR. WEISFELNER:  Yes, they were marked as --

22           THE COURT:  Exhibit A, I think, Plaintiff's A.

23           MR. WEISFELNER:  -- an amalgam and they were --

24           THE COURT:  Yeah.

25           MR. OFFENHARTZ:  Oh, okay.  Your Honor, if they were

Scruton - Cross                        130

1  already captured, my apologies.

2          THE COURT:  Okay.  And the supplemental exhibits that

3  are part of A will be called Plaintiff's Exhibit A and each of

4  you can rely on them as you see fit.

5          MR. WEISFELNER:  And Your Honor, I apologize, I don't

6  know about the need to move either the original declaration

7  with its original exhibits, or for that matter, the

8  stipulation, but just so that the record is clear, we'd like

9  both of those documents in evidence.

10         THE COURT:  And I assume you agree with that, Mr.

11 Offenhartz.

12         MR. OFFENHARTZ:  Yes, Your Honor, we do.  Both are --

13         THE COURT:  Sure.  Over the years when I've taken so

14 much by declaration, we've done it both ways, either by a

15 formal motion or without it.  I did give you, as best I recall,

16 an opportunity to make any evidentiary objections to what was

17 inside the declaration.  And I'll let you argue what's the

18 relevance of what's been stipulated to as you see fit.  But

19 it's all going to be considered in evidence, subject to your

20 rights to telling me that I shouldn't care about it.

21         MR. WEISFELNER:  Thank you, Your Honor.  Your Honor,

22 in that event, we pass the witness.

23         THE COURT:  Okay.  Thanks.

24         Do you need any time, Mr. Offenhartz?

25         MR. OFFENHARTZ:  Your Honor, could we take a five-

Scruton - Cross                          131

1  minute break?

2            THE COURT:  Sure.

3            MR. OFFENHARTZ:  Would that work?

4            THE COURT:  In fact I'll give you seven.  Why don't

5  we reserve at 25 to twp.

6            MR. OFFENHARTZ:  Thank you very much.

7            THE COURT:  Okay.  We're in recess.  However, we're

8  going to turn into pumpkins, for people's legitimate needs, at

9  3:30.  And if you're -- think you're not going to be done by

10 then, or if you're not going to give any -- enough time to Mr.

11 Weisfelner for recross, then we need you to finish ten minutes

12 early so we can talk logistics for continuing.

13           Also, Ms. Newman, are you going to want to follow Mr.

14 Offenhartz in any way?

15           MS. NEWMAN:  I don't expect so, Your Honor, but I

16 would reserve.

17           THE COURT:  You'd like to reserve the right to do so

18 in case --

19           MS. NEWMAN:  Yes, I would.

20           THE COURT:  -- he doesn't do it to your satisfaction.

21           MS. NEWMAN:  I expect he will do just fine.

22           THE COURT:  All right.  We'll resume at 25 to two.

23 We're in recess.

24     (Recess taken at 1:27 p.m.)

25     (Proceedings resume at 1:44 p.m.)

Scruton - Redirect                    132

1          THE BAILIFF:  Have seats, please.

2          THE COURT:  Oh, Mr. Offenhartz, yeah, come on up.

3          MR. OFFENHARTZ:  Your Honor, may I?

4          THE COURT:  Yes.

5          MR. OFFENHARTZ: Thank you.

6                    REDIRECT EXAMINATION

7  BY MR. OFFENHARTZ:

8  Q    Good afternoon, Mr. Scruton.

9  A    Afternoon.

10 Q    By the way, how exactly does one pronounce your name?  I

11 want to make sure --

12 A    Scruton.  Sorry, Scruton.

13 Q    Okay.  Thank you, sir.  My esteemed colleague across the

14 caption spent some time right before the break discussing the

15 Tribune case, you may recall, and the methodology used by

16 Mr. Kurtz.  Do you recall that, sir?

17 A    I do, yes.

18 Q    Can you explain to the Court why you -- how you -- strike

19 that.  Can you explain to the Court the advantages of the

20 approach you ultimately decided to use as against the Kurtz

21 approach?

22 A    Sure.  My approach is I believe a more refined approach

23 for this -- and for this situation is more appropriate.  The

24 parts of the declaration that I was asked to review were parts

25 that I reviewed when I considered the approach that I should

Scruton - Redirect                                     133

1   use.  In particular, the definition of lost opportunity costs,

2   which focused on the anticipated rates of return that could

3   reasonably be earned.  And my -- I -- that focused on the

4   anticipated rates of return that could reasonably be earned by

5   the non-leading creditors, analogy here to the unitholders.

6       I was focusing my analysis to come up with similar rates

7   of return that could be achieved, could reasonably be earned,

8   so I'm consistent in that in the approach I used versus

9   Mr. Kurtz.  However, I departed from him in respect of how I

10  arrived at that rate.  He arrived at the rate based upon a

11  simple use of the high-yield index, yield to worst.  My

12  approach was more refined than that.  In arriving at my

13  approach, I noted, and it's shown in one of the exhibits, that

14  Mr. Kurtz in his calculation of his total financial harm, the

15  distributable cash portion of his work was a relatively small

16  portion.  It's roughly 272 million out of 1.5 billion.  He was

17  not -- this was not a very critical element of his analysis.

18      And further, in the notes to his return -- notes to how he

19  arrived at the rates of return, he commented on the higher

20  rates such as hedge funds, productive funds, often target

21  returns about 20 percent, and commented about his choice of

22  this return being for this purpose.  For the purposes of this

23  analysis, he was focusing on a number which I believe was

24  overly conservative if used here.  He says and he acknowledges

25  we have conservatively used a yield from commonly quoted high-

Scruton - Redirect                               134

1  yield bonds which is less -- sorry, which is likely less than

2  many of the creditors' cost of capitals, also less than the

3  company's weighted average cost of capital, so he was

4  reinforcing its conservatism.

5       In my view, and I think I've already testified to this,

6  the yield-to-worst measure, which is similar to using some of

7  the mean or trimmed mean measures, they are more predictors of

8  what's likely going to happen, and I believe the task in front

9  of me was to look at the funds in the hands of investors who

10  have a range, they have an infinite range of possibilities as

11  to where they should put those funds.

12       And when you're looking at trying to evaluate the range,

13  it is inappropriate to look at just the most likely or the

14  median or the mean or any midpoint measure because that's not

15  protective because, as I've said, that will only protect you

16  half the time.  And I believe a more appropriate measure of

17  protective is to go for more than half.  And how do you arrive

18  at that?  Well, that's where I came up with an approach which I

19  believe is based upon statistical principles, and it's also

20  based on my experience in other situations, to arrive at a high

21  end of the range, bearing in mind that you want to be

22  conservative and not be overly punitive to the parties putting

23  up the bond.

24            THE COURT:  Let me make sure I understood that last

25  answer.  You believe that yield-to-worst is the most likely to

Scruton - Redirect                          135

1  happen but suffers from the failing that it's not protective

2  enough?

3            THE WITNESS: Yes.  I believe it's a category -- a

4  measure of an index that is reflective of a midpoint or a more

5  likely to happen -- most likely to happen measure as opposed to

6  a measure that could happen.

7            THE COURT:  Okay.  Go on, please, Mr. Offenhartz.

8  BY MR. OFFENHARTZ:

9  Q    Mr. Scruton, Mr. Kurtz used one index, correct?

10 A    That's correct.

11 Q    How many indices did you use?

12 A    I used four indices.

13 Q    And can you provide the Court with a numerical -- with

14 numbers as to how protective a mean would be under your

15 methodology.

16 A    As I think I've testified, I think that the way to think

17 of a midpoint or mean sort of most expected outcome measure in

18 terms of how protective that would be, you'd be right 50

19 percent of the time.  You're equally likely to have the gain be

20 higher or lower than that amount.  And in the amount that the

21 gain is higher, then it would be insufficient protection.

22 Q    So -- but when you use -- strike that.  Using the

23 methodology you decided upon, the third best year, what number,

24 what percentage does that bring you to?

25 A    I would estimate that, using my approach, the third best,

Scruton - Redirect                                                136

1    you're getting closer to 80 percent of all scenarios, so four

2    out of five occasions you'd be protecting the investor.  And I

3    arrive at that estimate using statistical principles.

4    Q    Mr. Scruton, what statistical principles were you relying

5    upon in reaching those numbers and in doing your work.

6    A    In formulating this approach and considering the data

7    points I had, you have to look at the data, look -- evaluate

8    whether or not you have outliers, look at the standard

9    deviation or the variability or the variance in the data.  And

10   I arrived at that estimate based upon comparing the historical

11   data -- I'm sorry, analyzing the historical data, coming up

12   with an evaluation of standard deviation and the mean, and

13   comparing that to the third highest.

14        And as I mentioned, I chose the third highest rather than

15   use a measure that affected the standard deviation.  And

16   statistical principles suggest that if you use a standard

17   deviation approach, then you would be getting 80, 85 percent of

18   the population.  However, I was short of that.  I came up with

19   the more conservative which is closer to 80 percent of the

20   potential outcomes.  So I was giving effectively 80 percent

21   protection to the investors.

22   Q    That would be in effect that, of all of the various

23   outcomes that could occur, your approach provides for

24   protection for 80 percent of those contemplated possible

25   outcomes.

Scruton - Redirect                    137

1  A    Right.  And --

2            MR. WEISFELNER:  Objection.

3            THE WITNESS:  And instead another --

4            THE COURT:  Sustained.  Yielding -- leading.

5  BY MR. OFFENHARTZ:

6  Q    Mr. Scruton, can you please explain to the Court the

7  significance of providing 80 percent protection versus 50

8  percent protection?

9  A    Fifty percent has a one-in-two chance of being sufficient

10  protection.  Eighty percent has a four-in-five chance of being

11  protected.  There is obviously the chance, a one-in-five

12  chance, that the bond will be insufficient under this basis,

13  but I deem that to be an appropriate number regardless because

14  you'll be potentially over punitive to the parties having to

15  put the bond up, to cover for all eventualities.

16  Q    Mr. Scruton, are there other advantages of using the third

17  best that come to mind?

18  A    I think I've addressed the advantages that are

19  appropriate.

20  Q    What are some other statistical principles that

21  undergirded your work?

22  A    A couple of -- the main principles were that the more data

23  that you have, more like-for-like data that you have in respect

24  of the historical performance, would be the better and would be

25  -- better able me to predict the future.  That's one principle.

Scruton - Redirect                                138

1  The second principle would be that when looking at data, it's

2  important to review any aspects that may skew your predictions,

3  any issues that may mean that certain data won't be so

4  predictive of the future.  For example, looking at outlier

5  information, looking at highest, looking at lowest, looking at

6  particular reasons why those data points may be inappropriate

7  to use as part of your predictions going forward.

8  Q    And how did the outliers fit into the third best -- your

9  third -- how did outliers fit into your choice of using third

10 best results within your methodology?

11 A    I mean, I could have use -- I could have chosen the best.

12 I could have chosen the second best out of the ten-year period.

13 I believe that the combination of being overly protective and

14 the fact that particularly the first year could be viewed as an

15 outlier was a reason to not use that approach.

16 Q    Mr. Scruton, would you please look at Exhibit C-1, which

17 is part of your supplemental exhibits.  And if anyone needs an

18 extra copy, I'd be happy to provide it.  Do you have that

19 handy, sir?

20 A    I do, yes.

21 Q    Mr. Scruton, the -- what is the annual rate of return for

22 large cap equities S&P 500 Index in 2008?

23 A    The S&P in 2008 returned negative 37 percent.

24 Q    And what was the return for that same index in 2009?

25 A    That indexed return was plus or positive 26.45 percent.

Scruton - Redirect                          139

1  Q    Very roughly speaking, what kind of change was that?

2  A    Are you asking me in amounts?

3  Q    Well, I'm asking as a layman litigator, was that a small

4  change, big change?

5            MR. WEISFELNER:  Objection, Your Honor.

6            THE COURT:  I'll overrule that.

7            THE WITNESS: I think it's fair to say just in

8  layperson's terms that everyone has recognized what happened in

9  2008 and 2009.  The market crashed, created significant

10 volatility, unseen in recent times reductions in S&P in 2008,

11 and then a rebound in 2009.  And clearly, when considering

12 things like the projections going forward, it's reasonable to

13 assume -- I'm sorry, reasonable to remove those as outliers

14 when considering the last ten years as a basis upon which to

15 perform projections going forward.

16 BY MR. OFFENHARTZ:

17 Q    And that indeed was one of the advantages of using third

18 year, third-to-best.

19            MR. WEISFELNER:  Objection.

20            THE COURT:  Sustained.  You can't lead him.

21 BY MR. OFFENHARTZ:

22 Q    Let me move on.  Let's look at the fixed-income high grade

23 bond line.  In 2013, what was the annual rate of return?

24 A    For high grade bonds, the rate of return in 2013 was

25 negative 1.46 percent.

Scruton - Redirect                                   140

1   Q     And what was it in 2014?

2   A     Positive 7.51 percent.

3   Q     A significant increase would you say, sir?

4   A     This -- it shows signification volatility between the two

5   years, correct.

6   Q     In 2008, hedge fund event-driven returns, what is the

7   number?  What is the annual rate of return, please?

8   A     Negative 16.25 percent.

9   Q     And what is the return in 2009?

10  A     Positive 19.94 percent.

11  Q     Fixed-income high grade bond 2008, what is the annual rate

12  of return?

13  A     Negative 6.82 percent.

14  Q     And what is the number -- the annual rate of return for

15  2009?

16  A     19.76 percent.

17  Q     Mr. Scruton, let's look -- hedge fund event-driven 2011,

18  what is the annual rate of return?

19         MR. WEISFELNER:  Your Honor, I object.  This has gone

20  on for an awfully long time.  I don't know what the relevance

21  is of picking numbers out of a chart and saying what is it.  I

22  don't get it.

23         THE COURT:  Well, if that's the only objection, it's

24  overruled.  I'm just going to rely on Mr. Offenhartz' sense of

25  his own self-interest in asking repetitive questions.  But it's

Scruton - Redirect                                    141

1   proper as an evidentiary matter.  Go on.

2            MR. OFFENHARTZ:  Thank you, Your Honor.

3   BY MR. OFFENHARTZ:

4   Q    So the number in 2011 for the hedge fund event-driven

5   annual rate of return was 11.9 -- negative 11.96 percent,

6   correct?

7   A    Correct.

8   Q    And in 2012, what was that number?

9   A    Positive 10.14 percent.

10  Q    As you look over the data from 2005 to 2014, do you see

11  any year periods where there are two negative years in a row?

12  A    I don't.

13  Q    Mr. Scruton, both in your deposition and earlier today, a

14  fair amount of time was spent talking about investments the GUC

15  Trust could theoretically make.  Do you recall that?

16  A    Yes.

17  Q    And you were asked both at your deposition and during your

18  earlier testimony about investments that could have been made

19  that, at least hypothetically, would have been higher than the

20  .12 percent you were informed was the case, correct?

21  A    Correct.

22  Q    And then, indeed, you pointed out that I believe it was

23  paragraph 21 of the stipulated facts indicated that the parties

24  had stipulated the return the GUC Trust was earning was 1.2

25  percent, correct?

Scruton - Redirect                                    142

1  A    I believe so, yes.  Correct.

2  Q    Do you have that stipulation in front of you?  And this is

3  a very quick question, sir.  Among the lawyers who signed that,

4  was Mr. Weisfelner one of the attorneys who signed that

5  stipulation of facts?

6  A    Yes.

7  Q    Mr. Scruton, you were asked at your deposition several

8  times whether certain information was relevant.  Do you recall?

9  A    I do, yes.

10  Q    And in response to a number of those questions, you said

11  it was relevant, but I would need to weight it, correct?

12  A    Correct.

13  Q    Today you were asked if certain information with respect

14  to Akin Gump clients would be relevant, correct?

15  A    Correct.

16  Q    Had you been able to receive said information, would you

17  have needed to weight it?

18  A    Absolutely, yes.

19  Q    What -- how would it have served had it been available?

20  A    First of all, I think I've -- as I think I've said, I

21  didn't expect to receive it.  I was planning my analysis not

22  receiving such information, but I explored the possibility.  In

23  considering the information that I might have been able to get

24  if it was possible, it would be in the form of some

25  historically -- it would have to be in the form of some

Scruton - Redirect                                    143

1  historic information concerning the seven hedge funds.  I think

2  it would be fair to say that that information could have

3  assisted me -- it would have assisted me in performing a GUC

4  check because when I'm looking at the hedge fund -- sorry, I'm

5  looking at the unitholder community and I'm trying to model

6  what the possible returns that that unitholder population could

7  achieve, this particular seven hedge funds is 47 percent of the

8  population.  Its identity is important to confirm what kind of

9  hedge funds they are and looking at their information,

10 confirmation with the historic performance as to how it

11 compares to the index.

12     However, the index that I used is reflective of many more,

13 many more -- I think 400 hedge funds go into that index -- and

14 when considering how to measure the potential performance of

15 not just the 47 percent who in themselves, they may perform

16 differently going forward than historically.  The index is a

17 much better measure of that potential than just a period of

18 time for seven hedge funds.

19         So I would have used it as a GUC check to compare to

20 the work that I did.  I would have been helpful in confirming

21 the identity of the hedge funds, the type of hedge funds, and

22 looking at their historic returns would have helped verify that

23 as to -- it would not have replaced, I don't believe, using the

24 index as a measure for the hedge fund investor population that

25 is contained within the unitholder population.  So that's my

Scruton - Redirect                                    144

1  feeling about the -- clearly I would need to look at the

2  information and determine what it told me, and it may have

3  affected me in certain ways, but that's my assessment of what

4  it would have told me.

5  Q    Mr. Scruton, do you know if there was any overlap between

6  hedge funds represented by Akin Gump and hedge funds in the

7  index, the hedge fund index that you looked at?

8  A    I know from the list of hedge funds that comprise the

9  index that I -- the majority of those hedge funds in the Akin

10 Gump group are included in the index, and that's another reason

11 the index itself reflects their performance within it

12 because --

13         THE COURT:  The majority of which are in which?

14         THE WITNESS: The majority -- sir, I believe there are

15 nine hedge funds.  Six or seven of those hedge funds are in the

16 list of hedge funds that comprise the 400 or so of the Credit

17 Suisse hedge funds.

18         THE COURT:  Go ahead.

19 BY MR. OFFENHARTZ:

20 Q    Mr. Scruton, how often do you find yourself addressing

21 issues of lost opportunity costs?

22 A    All the time.  It's something I look at constantly as part

23 of my work.

24 Q    When you say as part of your work, can you amplify that,

25 please.

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Scruton - Redirect                    145

1  A    Well, my business is in restructuring and bankruptcy and

2  as a financial advisor, and frequently we're looking at

3  situations -- the simple definition of opportunity cost is to

4  look at the opportunity under one scenario versus scenario and

5  looking at the difference between them.  And that's what I'm

6  doing all the time.  When you're looking at a company in a

7  restructuring, you're always looking at outcomes for creditors.

8  You're looking at whether we should sell the business, whether

9  we should reorganize the business, liquidate the business, and

10 in each case looking at the opportunity cost between those

11 scenarios to determine which way to go.

12 Q    Mr. Scruton, as you sit here today, is there any

13 information that you believe is necessary to your analysis of

14 what the appropriate bond should be that you do not have?

15 A    No.  I believe that I have everything that's necessary

16 that I could obtain to prepare my analysis.  It's the best

17 analysis I could provide based upon that.

18 Q    Mr. Scruton, upon what data set did you run your

19 methodology with respect to the exhibits in your declaration of

20 this past Thursday?

21 A    The data set I --

22 Q    By that, just to clarify, what calendar -- what time

23 period?

24 A    The return rates I used for the indices were from 2005 to

25 2014.

Scruton - Redirect                                146

1   Q     And those were ten individual one-year periods?

2   A     Correct.

3   Q     And you were comfortable with that approach, sir?

4   A     Oh, absolutely, yeah.  I was looking -- because this

5   situation is about trying to mirror what would happen for the

6   stay period of approximately one year, looking at annual

7   returns.  And so I wanted to match the time arising and match

8   the data that I -- I wanted to get data that matched the time

9   arising that I was looking to project.  And I wanted to get as

10  many data points as I could of that type.

11  Q     And following your deposition, did you make a decision

12  with respect to the data set?

13  A     In response to the questions that I was being asked

14  regarding 2015, I wanted to explore whether it would be

15  possible to include some 2015 data in my analysis because of

16  the -- to try to and address the challenges and the concerns

17  that I had -- potentially may have tried to skew the

18  information because 2015 was -- performance has not been as

19  strong as say 2014 or '13.  So I went back and thought of ways

20  to include it and did so, and to see what that would do.  There

21  are some benefits from doing so in the sense that it includes

22  2015, which is another data set.  However, 2015 is still not a

23  full year, so there are some risks in including it, that you

24  include data that may not be so representative because, for

25  example, the rest of the year might be a good -- may have some

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Scruton - Redirect                                  147

1  good performance, so 2015 in itself may be better than has

2  happened up to now.  But on balance I thought that it would be

3  good to include it and see what it said.  And I did so and

4  provided the supplemental exhibits based upon it.

5  Q    And just to level set everyone, Exhibit C-1 reflects the

6  annual periods from 2005 through 2014, then year-to-date 2015?

7  A    Yes.

8  Q    Yes?  And how did your addition of that 11th partial year

9  period of information impact your analysis of the lost

10 opportunity cost that would be suffered by unitholders?

11 A    It didn't.  It didn't impact it one way or the other.

12 Q    Mr. Scruton, you ran numbers for various scenarios.  Is

13 that correct?  Or let me -- strike that.  You took your

14 methodology and applied it to a couple of different scenarios.

15 Is that correct?

16 A    I applied it to three scenarios which had different

17 assumptions regarding how the distribution of unitholders was

18 spread amongst different investor classes, yes.

19 Q    And where is that represented in your -- in the exhibits

20 to your declaration as well as in the supplemental exhibits?

21 A    Exhibit D to the declaration and Exhibit D-1 in the

22 supplemental Exhibit A.

23 Q    What does Exhibit -- I'm sorry, strike that.  What does

24 Scenario 1 reflect?  And again let me be more specific to save

25 time.  What does Scenario 1 reflect with respect to the

Scruton - Redirect                                    148

1  breakdown of asset holders?

2  A    It reflects a simple 25 percent in each of the asset

3  classes, so equally spread across the asset classes.

4  Q    And what does Scenario 2 reflect with respect to the asset

5  classes?

6  A    Scenario 2 reflects 47 percent hedge fund type investors

7  and then the remaining asset classes represent the 53 percent

8  of remaining holders spread equally across the three other

9  types of asset classes.

10 Q    And what does Scenario 3 reflect with respect to asset

11 classes?

12 A    Scenario 3 reflects the -- it's a blend in the sense that

13 it takes the 47 percent of hedge fund investors per the

14 assumption regarding -- based upon, sorry, the holdings of the

15 Akin Gump clients, and then the 53 percent spreads it equally

16 across all four classes.  So, for example, the hedge funds, it

17 would go from 47 percent plus 13 percent to get you about

18 approximately 60 percent, and then the other classes would be

19 13 percent each approximately.

20 Q    And again, to level set us, looking at Scenario 2, third

21 highest return weighted average protection return rate, can you

22 tell me what that is for Scenario 2?

23 A    12.96 percent.

24 Q    And that's the same weighted average protection rate that

25 is on -- listed on Exhibit B-1, correct?

Scruton - Redirect                          149

1  A     Correct.

2  Q     Now, if one wanted to determine the lost opportunity cost

3  with respect to Scenario 3, how would one use -- and we'll use

4  the supplemental exhibits for ease of reference.  How would one

5  go about determining that, if you understand my question?

6  A     I think the question is, and correct me if I'm wrong, that

7  what is the equivalent of 12.96 percent if you include -- if

8  you assume Scenario 3 rather than Scenario 2.  In other words,

9  if you assume 60 percent of the population of unitholders are

10 hedge funds and the rest of the classes are split equally, what

11 does that mean my calculations show in respect to the

12 protection return rate.

13 Q     Said much better than I could.  Thank you, sir.

14 A     And the answer is 13.82 percent.

15 Q     And based on the exhibits that we have before us today, do

16 you have an exhibit that allows -- affords you the opportunity

17 to provide the Court with an estimate of what that lost

18 opportunity cost is?

19 A     In dollar amounts?

20 Q     Yes, sir.

21 A     So 13.82 percent, if you apply that calculation, on

22 Exhibit F-1, I don't believe I have exactly the right -- the

23 same number, but if you look at Exhibit F-1, I was asked to

24 show different sensitivities using different assumed protection

25 return rates.  And so there's a chart.  The left-hand side

Scruton - Redirect                                        150

1  shows the protection return rates.  So 13.82 I think it was --

2  sorry, 13.82 percent is just below 14 percent, so I would -- on

3  a ten-month basis for lost opportunity costs, that would

4  approximate $16 million or so, somewhere around that number.

5  Q    So if I'm understanding you correctly, sir, the increase

6  in the amount of hedge fund ownership from Scenario 2 -- strike

7  that.  What is the effect on your analysis of lost opportunity

8  cost by increasing hedge fund ownership?

9  A    To the extent the population of unitholders are hedge

10 funds and it's reasonably expected, as the evidence shows that

11 hedge funds' potential returns are higher as a class, then to

12 the extent the population is more -- represents more hedge

13 funds, then the amount of the bond should increase.

14 Q    You were asked earlier, I believe by Mr. Weisfelner, and

15 if I have it wrong I have no doubt that I'll be correct,

16 whether you had some familiarity with who are likely investors

17 in securities such as these units.  Is that a fair

18 approximation?

19 A    I believe so, yes.

20 Q    Do you feel that you have a reasonable sense of likely

21 investors in securities such as the unitholders based on your

22 years working in restructuring?

23 A    Yes, sir.

24 Q    Sir, what would be your estimate of the likely percentage

25 of hedge fund ownership of the units as you sit here today?

Scruton - Redirect                    151

1  A    Recognizing that this is -- that these units are units

2  that represent the residual part of a bankruptcy estate that

3  involved litigation claims and estimates of claims against the

4  estate, and any investor in that asset is typically an investor

5  that looks -- who has expertise in this relatively niche play,

6  and therefore I would expect most of the original holders who

7  received these units when the company emerged from bankruptcy

8  to have largely sold, and I would expect 80, 80-plus percent of

9  the population now to be in the hands of alternative investors

10 or hedge funds or parties that view their investment strategy

11 as one way they want to take a position in this type of

12 investment.

13 Q    Sir, I missed the number you mentioned.  Could you repeat

14 that, please?

15 A    Eighty plus percent.

16        THE COURT:  Eighty, eight-zero?

17        THE WITNESS: Sorry, eight-zero plus percent.

18 BY MR. OFFENHARTZ:

19 Q    Thank you, sir.  Again, at the risk of lapsing into

20 Offenhartz in the obvious, of which I'm often accused, assuming

21 -- given what we just talked about with respect to the impact

22 of returns from Scenario 2 to Scenario 3, what is your sense of

23 what the lost opportunity cost would be as the hedge funds --

24 as the percentage of hedge fund holders went from 60 percent to

25 80 percent plus?

                              Scruton - Redirect                        152

1   A    Well, based upon the -- as I've said, the calculation of

2   the protection rates of return for hedge funds being higher,

3   then you'd have to recalculate and it would go up.  I could do

4   the math, but it's probably going to raise the bond.  It was

5   16 million or so before.  It's probably going to be 17,

6   $18 million.  I could do the math.

7   Q    Mr. Scruton, after you deposition this past Friday, when

8   you were addressing, among other things, questions from --

9   raised by my esteemed adversary, did you have the chance to

10  reflect further upon your methodology?

11  A    Yes.

12  Q    Are there other changes in the supplemental exhibits that

13  you care to elaborate on?

14  A    Most -- if there were any other changes, they were purely

15  additional information so that it would be helpful to clarify.

16  I noticed that certain of exhibits I had footnotes and certain

17  other exhibits I didn't have footnotes I added.  So one of the

18  things that I did as part of the initial exhibits --

19  supplemental exhibits is make -- is put the footnotes on

20  exhibits where there -- on foot -- on exhibits where they

21  weren't previously.

22  Q    Sir, let me direct you to your declaration.  For instance,

23  on Exhibit C of your declaration -- not the supplemental C-1,

24  the actual Exhibit C -- there is a footnote that reads,

25  "Indexed amounts are net of incentive and management fees."  Do

Scruton - Redirect                               153

1  you see that?

2  A    Yes.

3  Q    Is that one of the items that you tried to provide

4  additional information on, your supplemental exhibits?

5  A    I mean, it was in the original declaration.  Reference to

6  that footnote was not included on all exhibits.  It was only

7  included on certain exhibits, and so that's one of the things

8  where in the supplemental we included the additional footnotes.

9  Q    Sir, did you also include a calculation of what including

10 that gross number would be?

11 A    Yes.  I believe on Exhibit B-1.

12 Q    And including that additional information, how does that

13 impact your analysis of the lost opportunity cost?

14 A    It increases the calculation from 15.2 million to

15 16.3 million.  I didn't change my conclusion that 15.2 was the

16 number, but I wanted to identify the potential conservatism

17 that I had included in that number.

18 Q    You were providing additional information the Court?

19 A    Correct.

20 Q    You provide that additional information in other places in

21 your report, as well, don't you, sir?

22 A    I believe so.  I can't recall.

23 Q    Can I direct your attention, please, to Exhibit D-1.

24 A    Yes.  So in each of the cases where I calculated the

25 weighted average protection return rate, as a sort of memo or

Scruton - Redirect                    154

1  information item, I also included the corresponding rate that

2  would be the case if you were to include this 2 percent fee

3  applicable to the hedge fund category of investor.  So each of

4  the numbers, the italics below the bold numbers represent the

5  results of that calculation.

6  Q    Mr. Scruton, from your declaration of Thursday until the

7  supplemental exhibits you provided last -- that were provided

8  last night, did your methodology change?

9  A    Not at all.

10 Q    Did you expand your database?

11 A    I did expand the database in respect of the 2015 data as a

12 data point to use, but the methodology used and applied to that

13 data was the same.

14        MR. OFFENHARTZ:  Your Honor, may I take one moment

15 to --

16        THE COURT:  Yes.

17    (Pause in proceedings)

18        MR. OFFENHARTZ:  Thank you, Your Honor.

19        THE COURT:  Okay.

20 BY MR. OFFENHARTZ:

21 Q    Mr. Scruton, let me bring your attention back to Exhibit

22 B-1.  I'm sorry, B-1, the supplement B-1.  Do you have that

23 handy, sir?  Does everyone?

24 A    Exhibit A?

25 Q    Exhibit A.



Scruton - Redirect                    155

1  A     Page B-1?

2  Q     Exhibit B-1.

3  A     Correct.  I have that.

4  Q     You'll recall, sir, that earlier today, in fact, early on

5  in your testimony, you were asked to do a simple math question

6  or a simple math formula of 135 million times 12.96 percent,

7  correct?

8  A     Correct.

9  Q     Can you further explain to the Court why such a simple

10 math calculation was inaccurate and misleading as to what you

11 were trying to accomplish on this page?

12 A     Yes.  In simple terms, this calculation to arrive at the

13 investor returns includes the compounding that would occur when

14 monies are reinvested over a period of time.  And so you can't

15 just multiply the entire amount by the return rate to arrive at

16 that because you have to -- there is an assumption with respect

17 to investment -- reinvestment of the proceeds.

18         MR. OFFENHARTZ:  Your Honor, nothing further at this

19 point in time.

20         THE COURT:  Okay.  Ms. Newman, are you following?

21         MS. NEWMAN:  No, Your Honor.

22         THE COURT:  Okay.  Mr. Weisfelner, your turn, limited

23 to new stuff that we heard --

24         MR. WEISFELNER:  Understood.

25         THE COURT:  -- on redirect.

Scruton - Recross                    156

1                          RECROSS-EXAMINATION

2  BY MR. WEISFELNER:

3  Q    Mr. Scruton, on your redirect, you testified that you

4  thought that, assuming that the unitholders -- the current

5  universe of unitholders was 80 percent hedge funds was a

6  reasonable assumption.  Did I get that right?

7  A    I didn't -- it was my estimate.  I didn't use it as an

8  assumption in any of my analyses.

9  Q    No, I know that, but you currently, sitting here today,

10 have testified to this Court that you believe that an

11 assumption that 80 percent of the unitholders are hedge funds

12 is reasonable.

13 A    Correct.

14 Q    Okay.  But you told us at your deposition, didn't you,

15 that you didn't have any information regarding the other 53

16 percent, and you don't believe that that information is

17 knowable, and therefore you were required to make an

18 assumption.  Isn't that true?

19 A    That's true.

20 Q    In fact, when you were asked at your deposition whether

21 sitting there on Friday what percentage of the GUC Trust units,

22 the missing 53 percent, were held by non-event driven

23 (indiscernible) hedge funds, you told us you have no way to

24 answer that question.  Isn't that true?

25 A    I don't believe I have a way to answer that question,

Scruton - Recross                                157

1  correct.  Yes, that's true.

2  Q    And the estimate you just gave the Court is just based on

3  your years of experience as opposed to any specific knowledge.

4  Isn't that right?

5  A    Yeah.  I believe, and I was careful in qualifying my

6  basis, yes.

7  Q    You were asked on redirect about the statements contained

8  in the stipulated facts at paragraph 21.  Do you recall?

9  A    I recall, yes.

10 Q    Okay.  And basically I think what you said was that you

11 now understand -- you may not have recalled it during your

12 deposition, but you now understand that the reason why the GUC

13 Trust is invested in short-term low-yield securities has

14 something to do with I think you said the GUC Trust wanting to

15 avoid an argument that it was an investment company.  Do you

16 recall that testimony?

17 A    I recall.  I think it was part of your cross-examination

18 that you asked me to read out the -- convey my understanding of

19 the issue, and I read out the paragraph in paragraph 21, and

20 then I recall that in the redirect I was asked about who signed

21 the document.  I wasn't asked about paragraph 21.

22 Q    Can you help us understand which permitted investments

23 that would yield ten times what the current yield is would

24 cause the GUC Trust to be determined to be an investment

25 company?  Do you know?

Scruton - Recross                              158

1  A    I don't know which, no.

2  Q    Okay.  Do you know the extent to which -- I thought you

3  told us at your deposition that you were very familiar with the

4  tax status of these kinds of trusts.  Isn't that what you told

5  us?

6  A    I think I -- the deposition transcript you have, but I

7  recall mentioning that I had experience in tax issues related

8  to trusts.  I have been liquidating trustee for a number of

9  different trusts.  I've acted as a financial advisor for

10 liquidating trustees.  I've been on (indiscernible) oversight

11 boards and a number of these cases each involve tax issues

12 relating to trusts, so that's the extent of my familiarity.

13 Q    Understood.  And in your experience, have you ever been

14 concerned about being treated as an investment company?

15 A    Yes.

16 Q    And does the treatment as an investment company impact tax

17 status?

18         MR. OFFENHARTZ:  Objection.

19         THE COURT:  Are you asking for his opinion as a

20 financial guy or as a lawyer or both?

21         MR. WEISFELNER:  As -- he's not a lawyer.  I'm asking

22 him his opinion based upon his testified familiarity with tax

23 issues relating to trusts similar in nature to the ones we have

24 here.

25         THE COURT:  All right.  Objection sustained to the

Scruton - Recross                                    159

1  extent it asks for a legal opinion, but overruled to the extent

2  that it relies on his non-legal opinion.

3  BY MR. WEISFELNER:

4  Q    Go ahead, sir.

5           MR. OFFENHARTZ:  Your Honor, may I just add, it is

6  beyond the scope of his testimony and it does relate to facts

7  that have been stipulated.

8           THE COURT:  I don't think it is beyond the scope.

9           MR. OFFENHARTZ:  All right.  Thank you, Your Honor.

10          THE WITNESS:  Given the back and forth, can you

11 repeat the question so I make sure I understood?

12 BY MR. WEISFELNER:

13 Q    Sure.  I'm trying to understand.  A trust is interested in

14 avoiding being deemed an investment company why?  Why would

15 that be of a concern to a trust?  Who cares?  Call them an

16 investment company.  Call them a cow.  Call them a sheep.  Who

17 cares what you call them?  Why is that significant?

18          MR. OFFENHARTZ:  Objection, Your Honor.

19          THE COURT:  Overruled.  Let's just move it on.

20          Answer the question, please, if you know.

21          THE WITNESS:  Certainly.  My -- from my experience, a

22 trust seeks to avoid being an investment company because

23 there's typically very significant costs associated with being

24 an investment company as opposed to not being investment

25 company.  And I can't recall, as I sit here today, the precise

Scruton - Recross                                        160

1  tax aspects of that, but I do know from my experience that

2  trusts typically are set up in a way to be passed through in

3  respect to tax, and so the taxes that -- is the tax of the

4  beneficiary as opposed to the trust itself so you don't get

5  double taxed, really.  I can't recall if the two issues are

6  related, but those are my general understandings of investment

7  company issues and tax issues related to trusts that may apply

8  here.

9  BY MR. WEISFELNER:

10 Q    Okay.  So let's break it down.  So you're talking about

11 two possibilities.  You want to avoid becoming an investment

12 company.  One thing you said is to avoid reporting

13 requirements, correct?

14 A    I didn't say that.  I thought I said they're to avoid the

15 costs associated with --

16 Q    Reporting.

17 A    Did I say reporting?  It included reporting, I believe,

18 but it's one of the issues, but it's -- the costs associated

19 with being a public --

20 Q    Well, you know, do you not, that the GUC Trust files Forms

21 AK and 10Q with the Securities and Exchange Commission on a

22 periodic basis, correct?

23 A    I believe that to be the case.  I'm not familiar -- I'm

24 not involved in the details of the case.

25 Q    Are you aware of any reason why the GUC Trust, in an

Scruton - Recross                          161

1  effort to avoid being an investment company, which is what's

2  keeping it from making current investments that could yield ten

3  times what its current investments yield, are you aware of any

4  restrictions preventing them from seeking a no-action letter,

5  either from the IRS or from the Securities and Exchange

6  Commission?

7           MR. OFFENHARTZ:  Objection.

8           THE COURT:  It's not irrelevant, but it's cumulative

9  as hell.  I got the point the first time you make it.  I also

10 know something about the 34 and 40(x) and I'm going to start

11 sustaining objections on cumulative, starting with this one.

12 BY MR. WEISFELNER:

13 Q    Moving on, in redirect, if I understood the question and

14 answer, you said that you believe that your analysis was more

15 significant than Mr. Kurtz's, in part because you used four

16 indexes.  Did I understand that correctly?

17 A    I used --

18           MR. OFFENHARTZ:  Objection.

19           THE COURT:  Overruled.

20           MR. OFFENHARTZ:  I don't believe the word

21 "significant" was used.

22           THE COURT:  All right.  Sustained on the use of

23 "significant."  Rephrase the question.  Let's move on.

24           Gentlemen, I really am capable of understanding the

25 testimony without help from either of you.  Let's just move on.

Scruton - Recross                                      162

1              Go ahead, Mr. Weisfelner.

2    BY MR. WEISFELNER:

3    Q    You used four indexes, correct?

4    A    Correct.

5    Q    Notwithstanding the fact that it's your testimony that you

6    believe that the majority of investors whom we're trying to

7    solve for are hedge funds, correct?

8    A    I used full indices notwithstanding that fact because I

9    felt it would be a better analysis and I could be more

10   conservative to include scenarios, assessed likelihoods the

11   significant portion of the (indiscernible) population were non-

12   hedge funds.

13   Q    Okay.  You would agree with me, would you not, that if we

14   limited our entire analysis to hedge funds as being the most

15   likely owners of the units, and limited your entire analysis on

16   rates of return that hedge funds could use, that would be most

17   beneficial from the unitholders' perspective and least

18   advantageous when viewed from my perspective, correct?

19   A    It would create a calculation that would require a greater

20   bond, so I was not trying to look at it from advantageous

21   perspective, I was looking at what the best estimate would be.

22   And it would be greater bond required to protect the

23   unitholders, yes.

24   Q    Okay.  So turning back to C-1, and with that testimony in

25   mind, and just focusing on Credit Suisse, it's your testimony

Scruton - Recross                    163

1  that the annual rate of return going back to 2006, that being

2  16.38 percent, is more predictive of the protection rate that

3  high-yield bond holders need than driven hedge funds than is,

4  for example -- and I'll pick them off, you tell me, yes, that's

5  better than what I'm about to say -- is, going back to 2006 for

6  16.38 percent annualized return in that year, in your judgment,

7  more predictive than what those hedge funds are likely to earn

8  during the term of a stay than is the year-to-date figures for

9  this calendar year?  Which is more predictive?

10 A    It's difficult to assess which is more predictive.  As

11 I've said, the -- when you look -- take a trained mean or a

12 mean type of approach or a midpoint type of approach, that is

13 more predictive in the sense that it's the most likely outcome.

14 But the two --

15 Q    But I guess what I'm asking is you can't tell me as

16 between those two numbers which is more predictive of the

17 likely return on investment that hedge funds are likely to

18 realize over the next six, eight, ten, or twelve months.

19 A    I think neither are very good predictors.  So it's a

20 choice between two very unpredictive approaches in terms of

21 trying to -- we are trying to achieve the most likely.  They're

22 two data points that I wouldn't use in trying to -- if I was

23 asked to assess what the most likely return would be.

24 Q    Okay.  But you are telling us, I guess, by dint of just,

25 you know, pure numbers, 16 is a lot higher than negative one,

Scruton - Recross                                    164

1  right?

2  A    Correct.

3  Q    So if I wanted to be the most protective I could be to the

4  bond holders based on possible returns, not likely returns, but

5  possible returns, you'd rather the bond be based on the 16.38

6  percent return from back in '06 than use anything approximating

7  the year-to-date figures for 2015.  Is that right?

8  A    You used the word "possible returns."  I'm trying to come

9  up with something that's a reasonable estimate of the potential

10  returns.  I mean, whether that's possible or not, I mean, I

11  don't want to -- I don't want that to be lost in understanding

12  that that's what I was trying to achieve in selecting the 16.38

13  percent.

14  Q    Okay.  And I apologize to the Court and to the witness,

15  but I just want to make sure I get this point straight in my

16  own mind.  You'd use the 16.38 percent figure -- and I'm trying

17  to understand why you chose that figure.  And I'm trying to

18  understand if you believe that that 16 percent figure is the

19  likely rate of return that a hedge fund is going to realize

20  with regard to the cash it would otherwise get but for our

21  request for a stay.  Yes or no?

22  A    As I've said, I don't believe it's a true reflect -- if

23  like -- as you define "likely," and "likely" should be defined

24  as the most likely outcome, the best guess as to what the

25  returns would be, the best estimate, it's not -- I'm not trying

Scruton - Recross                                      165

1  to -- I'm not use -- and I'm not trying to use the most likely,

2  I'm trying to use a measure that represents the returns that

3  are probably -- they represent a potential return to investors.

4  And the measure I've chosen, if you just take this particular

5  invest, 16.38 percent, that is less than the -- if you take the

6  final number on the column, 18.50 percent, is the mean upon

7  standard deviation from the mean.

8      What that's telling me is that I've taken a very

9  conservative estimate of the range of outcomes because if you

10 look once at a deviation from the mean of a range of outcomes

11 going forward, you capture, essentially, that 80 percent number

12 that I mentioned.  And so I've taken conservative estimate of

13 what -- of the range of what might happen as an estimate of the

14 rates used when calculating the protective rate of return.

15 Q    You told my esteemed colleague on the other side of the

16 caption, during your redirect, that you look at opportunity

17 cost analysis "all of the time."  Remember that?

18 A    Yes.

19 Q    And in exercising your professional judgment in

20 anticipating opportunity costs "all of the time," are you ever

21 asked to inform a client as to what you think the likely return

22 on investment is going to be?

23 A    I've often looked at likely return on investment, yes.

24 Q    Okay.  If I were your client and I was going to write you

25 a check because I wanted to find out what a certain dollar

Scruton - Recross                    166

1  amount was going to earn for me over the next six months, and

2  you know I'm a hedge fund, which do you think reflects the most

3  likely rate of return I'm going to realize on this cash, the

4  mean figure of 6.4, the year-to-date figure of negative oh one

5  percent, the yield-to-worst figure that you could pull off of

6  the computer, or 16.38 percent?  Of all of those four choices,

7  which do you think, if I'm paying you for the information, is

8  your best guess as to the most likely rate of return I'm going

9  to realize?

10 A    Of the four, the most likely, most likely to occur would

11 -- I would use one of the mean measures.  I would use the 6.64

12 percent because that's the -- that's an estimate.  I would

13 refine it.  I would -- you didn't give me that option, true

14 mean, but in absence of that, I would use the 6.64 percent.

15 Q    Okay.  And is there anything -- well, turn to F-1, please.

16 Your exhibit F-1.

17 A    (Witness complies.)

18 Q    If I turn to F-1 and I looked at a rate -- a return rate

19 between six and seven percent, and I looked at the number of

20 months, if what you're telling me -- if -- what I think I can

21 assume from what you just told me, if I were paying you to tell

22 me what the likely investment was that I'd get from being able

23 to utilize my distribution over the next four to six months

24 would be a box where the loan number was $2.7 million and the

25 high number was $4.7 million.  Isn't that correct?

Scruton - Recross                                    167

1  A    I'm trying to figure out which numbers you're choosing on

2  this chart, on F-1.

3  Q    Yeah, F-1.  You just told us that of the numbers I gave

4  you before, the number that you'd be most comfortable using for

5  a hedge fund investor was the mean number of 6.64 percent.  Now

6  I go to F-1.  I can't find 6.64 percent, but I can get close to

7  it by looking at the intersection between six and seven

8  percent.  And if I told you to assume the length of the stay

9  was four to six months, the box I would draw in order to give

10 myself a high/low would be somewhere between $2.7 million for

11 the bond on the low side and $4.7 million for the bond on the

12 high side, correct?

13 A    Now I know what you did.  Thank you.

14 Q    Am I correct?

15 A    You're correct in identifying the four numbers on this box

16 that represent somewhere -- the range for -- between six and

17 seven percent and four to six months of lost opportunity cost.

18 Q    Were you here during -- this is the last question, just so

19 you can get all situated and comfortable.

20      Were you here during Ms. Rubin's opening remarks?

21 A    I was.

22 Q    Okay.  And you remember her talking about the length of

23 the stay that ought to be assumed going beyond the appeal

24 period, because then we talked about how much more time does it

25 take to file proofs of claim and have those claims analyzed and

Scruton - Recross                          168

1  determined?  Remember all that?

2  A    Not clearly, but I remember the topics were discussed.

3  Q    Okay.  Well, then let me ask you a different question.  If

4  the Court were to sustain our request for a stay, with or

5  without a bond, and the appeal were to be finally determined in

6  six months, and the claims weren't adjudicated by then, do you

7  see any reason why any renewed request for a stay couldn't then

8  be opposed by the GUC Trust?

9           MR. OFFENHARTZ:  Objection.

10           THE COURT:  Overruled.

11           THE WITNESS:  I -- it's not an area that I'm familiar

12 with in terms of the timing.

13 BY MR. WEISFELNER:

14 Q    Okay.  But six months from now, after the bond market

15 collapses, after the stock market collapses, after the money

16 market funds collapse, you'd have a different set of data

17 points with which to calculate potential lost opportunity costs

18 or, the way you phrase it, best protection rates, right?  You'd

19 have no opportunity to do that.

20 A    You -- clearly, you could look at that information again

21 at that point in time.  Whether that would be relevant to the

22 protection that's afforded in the mean time is the question.

23           MR. WEISFELNER:  Sure.

24           Your Honor, I'm done.  Thank you.

25           THE COURT:  All right.

Scruton - Further Redirect                    169

1          MR. OFFENHARTZ:  Just a few questions, Your Honor.

2          THE COURT:  All right.

3               FURTHER REDIRECT EXAMINATION

4  BY MR. OFFENHARTZ:

5  Q    Mr. Scruton, can you please tell us again what is the

6  difference between a likely return and the protection return

7  rate?

8          THE COURT:  I'm going to sustain that on cumulative.

9  I've heard that.  I understand the difference.  This is exactly

10  the point I was trying to make to both sides.

11          MR. OFFENHARTZ:  Well, my adversary just spent 15

12  minutes on it, Your Honor.

13          THE COURT:  And well --

14          MR. OFFENHARTZ:  But I understand completely.

15          THE COURT:  And that is what he did that got me so

16  annoyed, too, Mr. Offenhartz.

17          MR. OFFENHARTZ:  Understood, Your Honor.

18          THE COURT:  Because he didn't do it doesn't mean that

19  -- appropriate and doesn't mean that I'm going to give you

20  license to do what I already complained about.

21          MR. OFFENHARTZ:  Your Honor, thank you very much.  I

22  --

23          THE COURT:  I get it the first time, folks.  Anything

24  else?  Okay.

25          MR. OFFENHARTZ:  Oh, one other question, Your Honor.

Scruton - Examination by Court                    170

1          THE COURT:  Go ahead.

2   BY MR. OFFENHARTZ:

3   Q    Mr. Weisfelner gave you four options for addressing a

4   hypothetical hedge fund investor asking you about what returns

5   they might receive in one of his previous questions.  Do you

6   recall that?

7   A    Yes.

8   Q    Did he give -- afford you the opportunity to provide any

9   alternatives that would have looked back, say, for the sake of

10  argument, over ten years and used averages over ten years and

11  the third highest rate?

12  A    I don't believe so.

13          MR. OFFENHARTZ:  Nothing further.

14          THE COURT:  Okay.  Mr. Weisfelner, I understand

15  you're done?

16          MR. WEISFELNER:  We are.  Yes, Your Honor.

17          THE COURT:  All right.  I have my questioning under

18  614.

19  EXAMINATION BY THE COURT:

20  Q    Mr. Scruton, you recall the debate you had with -- first

21  with Mr. Weisfelner and then clarified by Mr. Offenhartz on the

22  distinction between multiplying the assumed yield on an

23  alternative investment or blend of investments and the money

24  market equivalents rate now being obtained.  You remember that

25  testimony, generally?

Scruton - Examination by Court                    171

1  A    Yes.

2  Q    Okay.  You said in substance in response to question by

3  Mr. Weisfelner that, in your view, it was inappropriate to

4  merely multiply the principal, say $135 million, and the deemed

5  alternative yield because of your view that compounding needs

6  to be taken into account in that analysis.  Do you remember

7  that generally?

8  A    I believe so, yes.

9  Q    At what rate did you believe that the cash flow stream

10  should be compounded?

11  A    At what frequency?

12  Q    Yes.

13  A    I believe -- I'd have to check the model, but I believe

14  quarterly.

15  Q    Quarterly?

16  A    I think so.

17  Q    Now, if a judge were to determine what he or she believed

18  to be an appropriate substitute investment rate and merely

19  multiplied it the way Mr. Weisfelner had done, to what degree

20  over a four-month or up to 12-month period would the difference

21  between compounding and getting a straight product -- "product"

22  meaning elementary school math sense, multiplying sense --

23  result in material difference?

24  A    I think it would work out, based on the (indiscernible) of

25  the numbers, it would work out to probably be a ten -- make it

Scruton - Examination by Court                    172

1  ten percent lower than it would otherwise be.

2  Q     Ten percent based upon -- ten percent of what?

3  A     So if you took the adversary, it would be -- multiply the

4  amount -- I'd have to check, but if you multiply the amount by

5  the stated rate, you'd be maybe ten percent below the rate

6  you'd otherwise get if you were to compound quarterly.  That's

7  what I mean.

8  Q     So obviously by compounding you get a higher alternative.

9  A     Correct.

10 Q     And are you saying it would be ten percent higher than

11 getting the straight product?

12 A     I'm estimating in my head.  I mean, with math.

13 Q     The alternative for a judge would have to be to either

14 determine the rate and then send the parties back to compute

15 what the compounded result would be, or for the judge to do it

16 himself or herself on a calculator or Excel spreadsheet or

17 computer?

18 A     Or, based upon these in the grid on Exhibit F-1, you could

19 come up with the appropriate rate you determine and then work

20 out what the bond would be.

21 Q     Assuming the judge agreed with any number that had been

22 put forward by either of the two sides.

23 A     Correct.

24 Q     Your figures on the bond are for the sum of a hundred

25 thirty-five to be disbursed, under present plans, in November

Scruton - Examination by Court                    173

1   and the 109 million to disbursed down the road?

2   A    Yes, the $109 million bond, the assumption for that piece

3   of the distribution would be in November 2016.

4   Q    So if the judge were to consider it appropriate to require

5   a bond for the one thirty-five and to leave the remainder of

6   the two forty-four for another day, you would compute the bond

7   to be one thirty-five over two forty-four times the amount that

8   the judge otherwise regards is appropriate?

9   A    No, I don't think it could work that simply.

10  Q    Because of the factor of compounding?

11  A    No, because, as evidenced on one of the exhibits, the

12  calculations for the first 12 months don't include any amount

13  in respect to the second distribution.  There's no lost

14  opportunity cost in respect to the second distribution.

15  Q    I see.

16  A    And then when you get -- and on the table on page --

17  Exhibit E-1 shows how -- it's only the second distribution that

18  would start to contribute to the bond in periods 15 months or

19  18 months.

20  Q    Uh-huh.  And what was the exhibit to which you were just

21  making reference to?

22  A    I was just making reference just now talking about Exhibit

23  E-1, which shows --

24  Q    E-1?

25  A    Yeah.



Scruton - Examination by Court                    174

1  Q    Okay.  Now, if you look at Exhibit C-1, it makes reference

2  to the U.S. High Grade Master Index.  If you look at D-1, it

3  does the same thing.  If you look at E-1, it's silent, but if

4  you look at F-1, there is a shift to the High Yield Index.

5  Which index do you regard as more appropriate for measuring the

6  alternative use of proceeds vis-a-vis investments on the bond

7  side?

8  A    I believe the High Grade Bond was the appropriate index to

9  use when considering the range of potential investors because I

10 wanted to arrange -- I'd already included the Hedge Fund Index

11 as one.  If I used the High Yield I'd be somewhere relatively

12 close to hedge funds.  I wanted to include an investment grade

13 type index as one of equity as well as money markets.  So I was

14 coming up with a blend that went across the risk spectrum and

15 determined that it would be more appropriate to choose the high

16 grade bond in that instance when I already had the Hedge Fund

17 Index as part of the -- of that basket.

18 Q    So you're telling me, in substance, that if you use a

19 blend approach, you want to use a high quality bond, but if

20 you're using a single index, you would then turn to the High

21 Yield Index?

22 A    And I'm only including the High Yield Index because I

23 wanted to show the methodology if you used the same methodology

24 exactly as David Kurtz.  I don't subscribe to just picking one

25 index because I don't believe that that is, as I've said, as --

Scruton - Examination by Court                    175

1  it's only -- in this instance, it's not as helpful or as

2  predictive as trying to look at the various different asset

3  classes and different in season.

4      The main reason why I -- I considered using the High Yield

5  Index as part of my basket, but I believe it would inflate the

6  number because the high yield returns would be higher.  I

7  wanted to be more conservative and include an investment grade

8  bond in my basket of asset classes.

9  Q    Is there a difference, to your understanding, between the

10 use of a word "high yield bond index" and "junk bond index"?

11 A    It -- they're commonly used for the same.

12 Q    Okay.

13 A    The junkier ones are the higher risk in that sort of set

14 of -- in that class.

15 Q    Now, before Judge Carey, Kurtz, in the <u>Tribune</u> case, used

16 the High Yield Index, didn't he?

17 A    He did.

18 Q    We've talked about the yields that hedge funds get.  In

19 your experience, are there some hedge funds that invest in

20 distressed debt situations on a passive basis and others on a

21 more active basis?

22 A    Yes.

23 Q    And do some of those who invest on a more active basis

24 hire counsel to protect their interests in those situations?

25 A    Yes.

Scruton - Examination by Court                    176

1  Q   To what extent did you take into account, as part of your

2  analysis, the costs that active investors would incur by reason

3  of hiring counsel to advance their interests?

4  A   I didn't consider the costs of hiring counsel.  I view

5  similar to the way I looked at some of the -- I thought about

6  and considered some of the issues that -- some of the costs

7  that a hedge fund might bear.  They may bear those costs

8  irrespective of the gains that they may achieve, so they -- so

9  the lost opportunity to them may be measured before you deduct

10 those costs.  They may incur -- or said another way, those

11 costs may be incurred anyway.

12 Q   Did you consider the extent, if any, to which investing in

13 a distressed debt situation involves more due diligence and

14 analysis and work than investing in, say, a mutual fund or a

15 bond index?

16 A   I considered that in the sense that it's captured within

17 -- I believe it's captured within the index.  The index

18 reflects that because the index I used to mirror a hedge fund

19 returns takes into account the returns of a party that wants to

20 invest in a hedge fund, they have to essentially bear the --

21 the -- will bear the costs associated with -- that you just

22 described.

23 Q   Do you understand those indices to refer to the yields to

24 the hedge funds after their costs for lawyers, due diligence,

25 and everything else, or before that?

Scruton - Examination by Court                    177

1  A    The index that I use as a proxy for hedge fund returns is

2  net of the costs, those costs that you --

3  Q    All of their costs?

4  A    I believe so.

5  Q    Uh-huh.  In your experience, have you learned that, from

6  time to time, some hedge funds trade in and out of positions in

7  distressed debt situations and others acquire them and hold for

8  the conclusion of the case?

9  A    Yes.

10  Q    To what extent did you take into account the trading in

11  and out on the one hand, or the holding on the other, or loan-

12  to-own only gains as a third possibility, or any further

13  possibility?

14  A    I don't believe any of those aspects were relevant to my

15  analysis because what I was trying to evaluate was a

16  distribution in November to the hedge funds and then consider

17  the possibilities that they have to invest.  And the specifics

18  on whether or not they were loan-to-own or passive or inactive

19  investor, the specifics for any -- in terms of how they get

20  their returns were not something that I needed to look at

21  specifically, I believe, or in respect to this particular

22  unitholder population.

23      I believe I captured that by looking at the index because

24  the index essentially reflects all of those types of hedge

25  funds and what -- and their performance.

Scruton - Examination by Court                178

1  Q    Uh-huh.  Can you turn to Exhibit D-1, the projection --

2  protection return rate estimates?

3  A    Sure.

4  Q    And my questions are in that context.  If you looked at

5  the mean for the U.S. Treasury 10-year, you come up -- we'll

6  use the 3.22 percent rate, right?

7  A    Yes.

8  Q    What are current Treasury rates?

9  A    For a 10-year --

10  Q    Oh, that's a 10-year Treasury?

11  A    So I think there may have been some misunderstanding with

12  --

13  Q    Okay.

14  A    I was provided with some yield data.  This is the average

15  performance of the -- the annual performance of Treasuries for

16  a 10-year period.

17  Q    But you described it as money market.

18  A    It's a --

19  Q    You're not talking about the 10-year Treasury, you're

20  talking about the average yield for a short-term money market

21  treasuries over the last 10 years, aren't you?

22  A    No.  Maybe there's a misunderstanding.  I don't intend

23  there to be.

24      In the asset class of money market, the -- what I've

25  looked at here, I've looked at 10-year Treasuries and I've

Scruton - Examination by Court                179

1  looked at the returns that you would get if you invest in 10-

2  year treasures for each of the last 10 years.

3  Q    Okay.  That's a Treasury of 10-year maturity --

4  A    That's correct.

5  Q    -- that the government has to pay you back in 10 years.

6  A    Correct.

7  Q    Do you regard that the same as a money market?

8  A    Well, it's under the asset classes, investing in -- it's

9  investing in -- it's a term of class.

10 Q    You mean it as a safe investment because the Treasury

11 doesn't default on this obligation under general circumstances.

12 A    That's correct.  It's a lower risk -- an example of a low-

13 risk index.

14 Q    I see.

15 A    And it's no different from the yield.  I know there was a

16 misunderstanding of the yield concept as well.

17 Q    Okay.  And what is the 10-year Treasury now?

18 A    Well, I believe the yield on the 10-year Treasury is about

19 two percentage points.

20 Q    Two percent?

21 A    Yes.

22 Q    You believe that over the four months to 12 months that we

23 have coming up there's a material likelihood that the yield on

24 the 10-year Treasury is going to get as high as 3.22 percent?

25 A    I believe that the return potentially for this -- based

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Scruton - Further Recross                    180

1  upon this analysis is reasonably like -- is reasonable to

2  assume 3.22 percent, but it's an estimate based upon the

3  analysis.  It's -- I don't know how to say it otherwise --

4  other than saying I wanted to use the same methodology approach

5  for each of the predictions and this is what the data was

6  telling me.

7      The market right now has obviously a lower view, and

8  that's why the yield is low.

9  Q    Uh-huh.  Do you believe that the yield on debt instruments

10 over the next four months to 12 months is going to get as high

11 as 5.20 percent for quality obligations?

12 A    Again, I believe that -- this is just a mean calculation

13 based upon historical information.  It's not necessarily

14 predictive of what's going to happen the next few months.

15 Q    Uh-huh.

16 A    I mean, if I was to guess, I would suggest that the mean

17 is an overstatement of what's going to happen on a most likely

18 basis, but it's one of the measures -- it's -- remember, it's

19 not a measure I use to calculate my analysis, it was just

20 another measure.

21        THE COURT:  Okay.  I have no further questions.

22 Anybody have a desire to follow up on anything I asked?

23        MR. WEISFELNER:  Two questions.

24              FURTHER RECROSS-EXAMINATION

25 BY MR. WEISFELNER:

1  Q    Sir, staying with Exhibit D-1, and let's use the scenario

2  2, which is the one that you based your calculations on.  The

3  judge asked you, with regard to the U.S. Treasury 10-year

4  notes, whether you thought it likely that that class was going

5  to yield as much as 3.22 percent and you told the judge that

6  the likely recovery is closer to the yield of two percent,

7  correct?

8  A    I can't recall exactly what I said, but I believe that --

9  to clarify, I believe that the market is certainly indicating,

10 based upon the yield calculations, a two-percent return.

11 Q    Okay.  And unlike the market, which is assuming a two-

12 percent return, for purposes of your computations of the size

13 of the supersedeas bond, you didn't use two, you didn't use

14 3.2, you used 4.29 percent, correct?

15 A    Correct.

16 Q    And then you were asked some questions about high grade

17 bonds and we determined that high grade bonds, the mean is 5.2

18 percent, correct?

19 A    Correct.

20 Q    And I think the Court asked you wether or not, in your

21 estimation over a short-term period of time, investments in

22 high grade bonds were likely to get up as high as 5.2 percent.

23 Do you recall that?

24 A    Yes.

25 Q    But in point of fact, whether investments ever raise to

Scruton - Further Redirect                    182

1   that level, for purposes of calculating a bond here, a

2   supersedeas bond, you didn't use 5.2 percent, you went all the

3   way to 9.5 percent, correct?

4   A    Correct.

5

6          MR. WEISFELNER:  And then lastly -- well, I don't

7   think I need to go there.  That's all I have.

8          THE COURT:  Okay.  Mr. Offenhartz, any followup?

9          MR. OFFENHARTZ:  May we have one minute, Your Honor?

10         THE COURT:  Yes.

11     (Counsel confer)

12                FURTHER REDIRECT EXAMINATION

13  BY MR. OFFENHARTZ:

14  Q    Mr. Scruton, why did you use the third-highest numbers in

15  your methodology as opposed to the numbers Mr. Weisfelner --

16         MR. WEISFELNER:  Your Honor, I -- asked and answered.

17  He milked it.  Way beyond the scope of Your Honor's questions

18  and way beyond the scope of my two questions that --

19         THE COURT:  Sustained.  You can follow up on anything

20  that either I asked or Mr. Weisfelner asked, but that's the

21  constraint.

22  BY MR. OFFENHARTZ:

23  Q    Mr. Scruton, why didn't you use the numbers that Mr.

24  Weisfelner raised with you just moments ago?

25  A    Well, I think the simple answer is that I wanted to follow

Scruton - Further Redirect                    183

1   a methodology and approach on an overall basis yielding what I

2   believe to be a conservative estimate, and it has a number of

3   conservative elements within it.  And clearly, when you look at

4   the data and you look at the way it was comprised, there are

5   elements where you say, is the underlying assumption, is that

6   high or is that low.  And I acknowledge that the assumptions in

7   respect to the U.S. Treasury and Bank of America High Grade

8   Index may, on -- based upon a comparison of where you sit today

9   in the market prices, those could be considered high, but in an

10  overall -- from an overall perspective, rather than just adjust

11  for those items in a way that was individual and speculative on

12  those particular items and then adjust for the other areas in

13  an aggressive way, I decided to remain true to the methodology

14  and then, on an overall basis, determine whether or not the

15  rate of return made sense.

16      And so 12.96 percent, when you look at the blend of

17  potential returns, taking into account conservatism in terms of

18  the unitholder population, taking into account the potential

19  volatility in the measures as shown by standard deviations of

20  the mean, on an overall basis, it's very supportable and I feel

21  -- I fear for a bond put up at six, seven, eight percent as a

22  rate of return because I believe -- and this is supported by,

23  on an overall basis, the returns that the unitholders could

24  achieve, that's at or around their expected returns.

25      If you only go with that bond, you have a 50/50 chance, as

Scruton - Further Redirect                    184

1  I say, of being under protected, whereas a 12.96 percent rate,

2  because of the -- and it's -- which is supported by the

3  analysis without trying to play with or skew the analysis in

4  any way that was results driven, is a -- still is only a few

5  percentage points higher than the expected return.  And that,

6  as a result, can provide the protection.

7  Q    And further to Mr. Weisfelner's question, in your exhibits

8  it does indicate that even high grade bond indices can change

9  sharply, correct?

10 A    Correct.

11 Q    And I'm referring to 2013 and 2014 in Exhibit C-1.

12 A    That's correct.

13         MR. WEISFELNER:  Your Honor, I object.

14         THE COURT:  Sustained on leading.

15         MR. WEISFELNER:  Well, I'd also object on the basis

16 of cumulative and beyond the scope of either Your Honor's or my

17 last examination.

18         THE COURT:  Since he's got to rephrase anyway, I'll

19 decide on the next question whether it's cumulative or not.

20         MR. OFFENHARTZ:  Thank you, Your Honor.

21 BY MR. OFFENHARTZ:

22 Q    Would you look at Exhibit C-1, please, sir?

23         THE COURT:  That letter was Supp. Charlie 1?

24 BY MR. OFFENHARTZ:

25 Q    I'm sorry.  Would you look at supplemental exhibit C-1?

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

Scruton - Further Redirect                     185

1  A     Yes, I have it.

2  Q     Mr. Weisfelner asked you questions -- or you were recently

3  asked questions about whether or not you thought there would be

4  changes in high grade bonds.  Is that fair?

5  A     That's fair.

6  Q     When you look at 2014 for fixed-income high grade bonds

7  annual rates of return for 2013 and 2014, what conclusions do

8  you draw?

9  A     It reflects the volatility, so 2012, '13, '14, you have

10  swings as high as 10 percent and down as low as losses of 1.46

11  percent.  So it evidences the volatility of the index, which is

12  reflective of the volatility of the investment.  So I'm not --

13  I don't profess to have a crystal ball for the -- to determine

14  what the next six, nine, 12 months will be, but -- which is why

15  I believe it's more appropriate to look at the historical

16  volatility to make the assessment as to what the rate should be

17  going forward to protect the holders.

18  Q     Mr. Scruton, you were recently shown yield curves.  Do you

19  recall that, sir?

20  A     I was shown some yield curves later, yes.

21  Q     Where do you fit yield curves, if at all, into your

22  methodology?

23  A     I wouldn't use yield curves because, unfortunately, the --

24  what -- a yield curve typically uses information that we have

25  today and is usually an extrapolation of the current yield and

186

1  it doesn't adjust and doesn't take into account the volatility.

2  Q    Mr. Scruton, I just want -- I think one last question,

3  really mostly of a housekeeping nature.  Supplemental Exhibit

4  B-1, do you have that in front of you, sir?

5  A    B for "boy"?

6  Q    B for "boy" 1.

7  A    Yes.

8  Q    And I know it's been a long day.  Your -- on what

9  anticipated amount of distribution did you determine lost

10 opportunity costs in Exhibit B-1?

11 A    Hundred and thirty-five million.

12          MR. OFFENHARTZ:  Nothing further, Your Honor.

13          THE COURT:  All right.  Followup on the questioning

14 of Mr. Offenhartz?

15          MR. WEISFELNER:  No, thank you, Your Honor.

16          THE COURT:  All right.  We're completed with the

17 evidentiary portion.

18          I can take closing arguments at 2:30 on Thursday and

19 each of the sides can have 45 minutes to argue, close,

20 everything, with 10 minutes each to reply and surreply.  And I

21 wish you all a happy holiday and I'll see you -- yes?

22          MR. FOX:  Your Honor, just one minute.  Greg Fox,

23 Goodwin Procter.  I just wanted to respond to Your Honor's

24 question earlier in the preliminaries.

25          THE COURT:  Oh, yes.  Thank you, Mr. Fox.

1          MR. FOX:  Yes.  So just for the record, we represent

2     the Ignition Switch Pre-closing Accident plaintiffs.   I

3     understand from the Hilliard firm, which is the co-lead that

4     focuses on the injury plaintiffs, that there are approximately

5     200 pre-sale accident claims.

6          THE COURT:  Which are a combination of debt and

7     injury.

8          MR. FOX:  Yes, both --

9          THE COURT:  Thank you.

10          MR. FOX:  -- wrongful death and --

11          THE COURT:  Appreciate that, Mr. Fox.

12          Okay.  Thank you very much.  Have a good holiday.

13     We're adjourned.

14          MR. OFFENHARTZ:  Thank you, Your Honor.

15          MR. WEISFELNER:  Thank you, Your Honor.

16        (Concluded at 3:16 p.m.)

17                         *  *  *  *  *

18

19

20

21

22

23

24

25

188

# C E R T I F I C A T I O N

We, Alicia Jarrett, Ilene Watson, and Lisa Luciano, court-approved transcribers, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


ALICIA JARRETT, AAERT NO. 428      DATE:   September 24, 2015
ACCESS TRANSCRIPTS, LLC


ILENE WATSON, AAERT NO. 447      DATE:   September 24, 2015
ACCESS TRANSCRIPTS, LLC


LISA LUCIANO, AAERT NO. 327      DATE:   September 24, 2015
ACCESS TRANSCRIPTS, LLC