UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | . | Case No. 09-50026-reg |
| IN RE: | . | Chapter 11 |
| | . | |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| et al., f/k/a GENERAL | . | |
| MOTORS CORP., et al, | . | One Bowling Green |
| | . | New York, NY 10004 |
| Debtors. | . | |
| | . | Tuesday, September 24, 2015 |
| . . . . . . . . . . . . . . . | . | 2:36 p.m. |

TRANSCRIPT OF EVIDENTIARY HEARING RE: REQUEST FOR
STAY PENDING APPEAL RELATED TO MOTION FILED BY WILMINGTON
TRUST COMPANY, AS GUC TRUST ADMINISTRATOR AND TRUSTEE,
FOR AN ORDER GRANTING AUTHORITY (A) TO EXERCISE NEW GM
WARRANTS AND LIQUIDATE NEW GM COMMON STOCK AND (B) TO MAKE
CORRESPONDING AMENDMENTS TO THE GUC TRUST AGREEMENT
**BEFORE THE HONORABLE ROBERT E. GERBER**
**UNITED STATES BANKRUPTCY COURT JUDGE**

For the Debtor:               King & Spalding LLP
                              By:  ARTHUR J. STEINBERG, ESQ.
                              1185 Avenue of the Americas
                              New York, New York 10036-4003
                              (212) 556-2158

For the GUC Trust
Administrator:                Gibson, Dunn & Crutcher LLP
                              By:  LISA H. RUBIN, ESQ.
                                   ADAM H. OFFENHARTZ, ESQ.
                              200 Park Avenue
                              New York, New York 10166-0193
                              (212) 351-4000

APPEARANCES CONTINUED.

Audio Operator:               Karen/Julio, ECR

Transcription Company:        Access Transcripts, LLC
                              10110 Youngwood Lane
                              Fishers, IN 46038
                              (855) 873-2223
                              www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES (Continued):

For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs:                    Brown Rudnick LLP
                               By:  EDWARD S. WEISFELNER, ESQ.
                                    HOWARD S. STEEL, ESQ.
                               7 Times Square
                               New York, New York 10036
                               (212) 209-4917

                               Stutzman, Bromberg, Esserman & Plifka
                               By:  SANDER L. ESSERMAN, ESQ.
                               2323 Bryan Street
                               Suite 2200
                               Dallas, Texas 75201-2689
                               (214)969-4900

For Participating
Unit Holders:                  Akin Gump Strauss Hauer & Feld LLP
                               By:  DANIEL H. GOLDEN, ESQ.
                               One Bryant Park
                               New York, NY 10036-6745
                               (212) 827-8010

3

1        (Proceedings commence at 2:36 p.m.)

2        (Equipment malfunction - indiscernible)

3        (Recess taken at 2:42 p.m.)

4        (Proceedings resume at 2:57 p.m.)

5        THE COURT:  Have seats, please.  Okay, Mr. Rubin.

6   Before we took the recess, you were going to look at the

7   proposed demonstrative.  And I don't know if you're continuing

8   to object to it or not.  Why don't you tell me what your

9   thinking is with respect to it?

10       MS. RUBIN:  Your Honor, we do not wish to continue an

11  objection to the use of Mr. Weisfelner's demonstratives.  We've

12  had an opportunity to consult with Mr. Weisfelner and

13  understand the basis for it, and we withdraw the objection.  We

14  thank Your Honor for giving us the time to consider what went

15  into this demonstrative.

16       THE COURT:  Okay.  Good enough.  All right, then.

17  Back to you, please, Mr. Weisfelner.

18       MR. WEISFELNER:  Your Honor, thank you.  And Your

19  Honor, I want to make sure that the Court and the parties

20  understand what our demonstrative indicates.  And again, I

21  promise to walk through the Court through the derivation of all

22  the numbers based on the evidence.  But our point is that the

23  calculations contained herein would show a supersedeas bond

24  depending on the length of the appeal, from a low of $2.2

25  million for a four-month appeal to a maximum of $6.6 million

4

1  for a 12-month appeal.

2        Your Honor, we perceive these as being the maximum

3  bond that one could possibly calculate based on the evidence

4  that Your Honor has heard.  And for the reasons I'll

5  articulate, we believe the bond ought to be substantially less,

6  if there is a bonding requirement at all.  And let me tell you

7  now how we got to our numbers.  If Your Honor has -- and if you

8  don't, we'll supply it to you, a copy of the Supplemental

9  Exhibit C-1 that was used during Mr. Scruton's testimony.

10        THE COURT:  Uh-huh.

11        MR. WEISFELNER:  And if Your Honor has it, you'll see

12 that for the S&P 500 Index, which was the index utilized by the

13 witness to represent potential investments in large cap asset

14 class.  While Mr. Scruton used the 2012 numbers, the 15.99

15 percent return, he acknowledged that the mean of the years, but

16 only the ten years -- I'm sorry, I think he took into account

17 yield to date 2015 as well, came up to 8.29 percent, which is

18 reflected in the Scruton Supplemental Declaration mean column.

19        We then asked him some questions about that return,

20 and in particular on page 70 of the transcript, you'll see that

21 we were talking about returns for the S&P.  And what we asked

22 was:

23 "Q   Is it your expert testimony, sir, that utilizing 2002

24 returns is more predictive of the rate of return that a

25 hypothetical investor in the S&P Index would realize and more

5

1  reflective than the mean of the last ten years?"

2          It was a compound question, so I went down and then

3  said:

4  "Q   As between utilizing the 2012 rate and utilizing the mean

5  over the last ten years, which in your expert opinion is more

6  reflective of the likely rate of return for a typical investor

7  in the S&P 500 Index?"

8          The answer at the bottom of 70 through the top of 71

9  is:

10 "A   The likelihood of return more likely to happen would be

11 best reflected by the mean for the last ten years rather than

12 just that one year you selected.  I agree."

13         Your Honor, subsequently we showed the witness our

14 Exhibit B, which is also in evidence, or I think it was

15 evidence subject to a reservation of rights --

16         THE COURT:  Was that B, Bravo?

17         MR. WEISFELNER:  B, Bravo, correct.  Where we

18 demonstrated that the current or more current ten-year average

19 for the S&P 500 Index was 6.93 percent.  And what the witness

20 told us was that he thought the difference between 6.93, that

21 reflected in our Exhibit B, and 8.29 reflected in his Exhibit

22 C-1 was a function of timing, that our Exhibit B reflected more

23 current numbers than his numbers.

24         THE COURT:  Which was more current?  Forgive me.

25         MR. WEISFELNER:  Our number reflected in Exhibit B

6

1   showing a mean for the S&P 500 Index, for the most current

2   available data, at 6.93 percent as opposed to his 8.29 percent.

3   Your Honor, we couldn't find recent examples of the Bank of

4   America Merrill Lynch high grade master index used as a proxy

5   for fixed income investors, so we stuck with the 5.2 percent

6   mean number reflected in the Scruton supplemental Exhibit C-1.

7         As to the Credit Suisse event driven index, and Your

8   Honor, I would submit this is the most critical index, as

9   neither side contests the likelihood that the majority of units

10  are currently held by hedge funds, and that the Credit Suisse

11  event-driven master hedge index was probably best reflective of

12  the current investor group.

13        Well, Scruton told us during his testimony as

14  reflected in C-1 that the ten-year mean, straight average, was

15  6.64 percent.  But then we showed him in our Exhibit D as in

16  dog, a printout from Bloomberg which reflected that the ten-

17  year average, taking into account the most current information

18  available, including year-to-date figures for 2015, was not the

19  6.64 figure he used, but rather than 5.8 figure reflected in

20  our document.

21        Your Honor, I would invite your attention to -- I

22  think it's page 163 of the transcript.  And on 163 -- beginning

23  at the bottom, I'm sorry, of 162.  My question:

24  "Q   So turning back to C-1, with that testimony in mind, and

25  just focusing on Credit Suisse, it's your testimony that the

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1  annual rate of return going back to 2006, that being 16.38

2  percent, is more predictive of the protection rate that high-

3  yield bond holders need than" -- it says "driven hedge funds

4  than is, for example -- and I'll pick them off, you tell me,

5  yes, that's better than what I'm about to say -- is, going back

6  to 2006 for 16.38 percent annualized return in that year, in

7  your judgment, more predictive than what those hedge funds are

8  likely to earn during the term of a stay than is the year-to-

9  date figures for this calendar year?  Which is more

10  predictive?"

11         His answer:

12  "A   It's difficult to assess which is more predictive.  As

13  I've said, the -- when you look -- take a" -- it says "trained"

14  mean," I think it should read "trimmed mean" -- "or a mean type

15  of approach or a midpoint type of approach, that is more

16  predictive in the sense that it's the most likely outcome."

17         Your Honor, finally, for the ten-year U.S. Treasury

18  yield curve, C-1 has a 3.22 figure.  We showed the witness, you

19  may recall, Exhibit C, the yield curve for ten-year treasuries,

20  showing a mean of 2.2 percent, or showing a current yield on

21  the curve at 2.2 percent.  And again, the testimony from the

22  witness is that he thought that was more reflective of the

23  likely returns than was the number he chose, which dates back

24  to 2005.  Perhaps the most critical testimony that we heard on

25  these topics came in response to Your Honor's question.  This

8

1  is at page -- I believe it's 180 of the transcript, where Your

2  Honor asked, and I quote:

3  "Do you believe that the yield on debt instruments over the

4  next four months to 12 months is going to get as high as 5.20

5  percent for quality obligations?"

6          Your Honor, that's the one index for which we didn't

7  have current information, so I left it at the 5.2 percent mean

8  that Scruton indicated on his own exhibit.

9          The answer to Your Honor's question was:

10 "Again, I believe that -- this is just a mean calculation based

11 upon historical information.  It's not necessarily predictive

12 of what's going to happen the next few months."

13 "Uh-huh."

14 "A   I mean, if I was to guess, I would suggest that the mean

15 is an overstatement of what's going to happen on a most likely

16 basis, but it's one of the measures -- it's -- remember, it's

17 not a measure I use to calculate my analysis, it was just

18 another measure."

19         Your Honor, there are any number of problems with the

20 opinion that was offered.  The record reflects that this was

21 the first expert opinion proffered by this witness over the

22 last ten years.  Importantly, it's not FTI's opinion.  It's Mr.

23 Scruton's personal opinion.  He never used this methodology

24 before, methodology being "let's pick the third highest return

25 over the last ten years, leaving out this year's year-to-date

9

1  returns," and he's not aware of that methodology ever being

2  used before.

3          Now, Your Honor, I indicated that we thought that the

4  numbers reflected on our demonstrative were high, and they're

5  high for at least the following reasons:

6          The numbers used here ignore the fact that in today's

7  volatile market investors may choose not to invest either all

8  of the money they receive at once or within the indices that

9  are reflected on this chart.

10         Your Honor, it's also I think an overstatement of

11 what the proper bond should be, if any bond, because it

12 reflects a difference between what could be earned and the GUC

13 Trust current investment, which we know to be assumed at .12

14 percent.

15         We also know from the witness's own testimony that

16 under the terms of the GUC Trust agreement approved as part of

17 the plan, there are other permitted investments that, as the

18 witness has testified, could return as much as ten times the

19 return that's currently being realized.

20         Your Honor, the GUC Trust has put forward no evidence

21 as to why it's sitting earning .12 percent, which I think is

22 interesting, because while you're being told that a protective

23 rate is some 12 percent, and I'm suggesting to you that the

24 rate really can't be any higher than 1.65 percent, 1.65

25 percent, they're currently earning .12 percent.  Which is more

10

1  reflective of future earnings than what they're currently

2  investing in?  .12 percent returns.  And, Your Honor,

3  interestingly --

4          THE COURT:  Pause, please, Mr. Weisfelner.  How does

5  that .12 percent correspond to what Kurtz found when he made a

6  similar analysis in Tribune?  My memory is that in Tribune, the

7  debtor -- this is Judge Carey's case, --

8          MR. WEISFELNER:  Right.

9          THE COURT:  -- of course, not mine -- was getting

10  comparably low yields.

11          MR. WEISFELNER:  Sure.  And Your Honor, again, you're

12  absolutely right.  What Kurtz did was he took what he presumed

13  to be the right return on investment assumption, which he took

14  out of the Credit Suisse high-yield index, yield to worst, what

15  a bond was expected to pay, including prepayment but not

16  anticipating defaults on the bond, and used that as the

17  appropriate rate, which Mr. Scruton rejected in this case.

18          And yes, Your Honor's right, that Kurtz then did a

19  subtraction based on what was currently being earned.

20          My point is, and it goes to Your Honor's question, at

21  the very end of the testimony, if you look at the four indices

22  that we have here and you look at the S&P 500 Index, I don't

23  know about Your Honor, but I've got a bunch of money in a 401K

24  and a retirement program.  And I've got to tell you, while the

25  mean over the last ten years was 8.29 percent, that's not what

11

1  I earned last year and it's not likely to be what I'm going to

2  earn this coming year.  8.29 percent in this stock market?

3         Likewise, if I go down to the high grade bonds, Your

4  Honor asked, "Are we likely to see 5.2 percent returns on high-

5  yield bonds?"  The witness said, "No."

6         Likewise, if I look at Credit Suisse high-yield junk

7  bond index, given that the year-to-date returns was negative,

8  is it reasonable to expect that over the next 12 months they're

9  going to earn six percent?  Same for the money market or

10 Treasury yield.

11        You know, Your Honor, it occurs to me -- and if you

12 give me a second, I think I'm formulating a position that maybe

13 resolves this whole case.

14        I'll make an offer.  Deny our request for a stay.

15 Let them make their distribution in November.  If I'm

16 successful on appeal, I want to make sure I can get my money

17 back.  And I want to be able to get my money back with a

18 reasonable rate of return.  I'm telling you that the lowest

19 rate of return is five percent.  Cut that in half.  Make them

20 return the money to me at two and a half percent.

21        It's like a reverse mortgage.  I'm a class action.  I

22 represent thousands of innocent parties that were damaged by

23 GM's fraudulent concealment and knew GM's continued fraudulent

24 concealment, which has now been admitted as a matter of the

25 record.

12

1    I'm contending that on appeal, in order to get me to

2    ten cents, if I hit a home run on proving up our damages, the

3    best I'm ever going to do if I suck up all the cash that's in

4    the bank and all the money that's in the accordion is ten cents

5    on a dollar, compared to the 30 cents they've already

6    recovered.

7    Let them take their money in November, when it's

8    otherwise supposed to be ready to be taken.  But if I succeed

9    on appeal, I want an undertaking that I'm going to get the

10   money back, and I'll take the money back at a ridiculously low

11   -- based on their own testimony -- two and a half percent

12   interest, because I think that's a great investment for us.

13   You show me an investment that you can make a two and

14   a half percent guaranteed and I'll take it every day.  But Your

15   Honor, I don't want to seem facetious.  I'm thinking about it

16   as I'm standing here.  Your Honor is being asked to assume what

17   the right rate of return is.  I call their bluff.  They can

18   keep every dime of recovery over two and a half percent.  Keep

19   it.  They earned it; keep it.

20   Return the money to me with an undertaking from these

21   hedge funds that if I'm successful on appeal they'll return the

22   money.  I won't have to chase it.  I won't have to trace it.

23   It will be simply a matter of calling on a letter of credit

24   with a two and a half percent interest.

25   And Your Honor, I suggest to you that that offer --

13

1  and I apologize for not thinking of it earlier, but that offer

2  and its ultimate refusal by either the GUC Trust administrator

3  or by the hedge fund themselves, is indicative of what they

4  think they're going to be able to earn on this money.

5          Understand something else, Judge.  If you let them

6  take the $135 million, that represents a four-cent -- I'm

7  sorry, four-tenths-of-one-cent return.  And what distinguishes

8  I think our case from _Tribune_, for example, is this is not a

9  zero sum game.  In other words, a bunch of creditors who are

10 looking for recovery, either they're going to get the recovery

11 out of the Trust or the recovery is going to get stayed.

12         These investors hold an underlying investment piece

13 of paper called a "unit."  Now just think about it logically.

14 You have the unit.  It trades in the open market at some price.

15         Well, Your Honor, if they take the interest payment

16 or they take the distribution in November, what should that do

17 to the trading value of that unit?  Theoretically, if you'd

18 gotten money off the top, then the ultimate trading value of

19 that unit ought to go down, because in effect you've clipped a

20 coupon, you've taken a dividend.

21         If instead Your Honor directs no distribution out of

22 the Trust, then one would suspect, all other things being

23 equal, that the market value of those units will remain the

24 same or go up.  That's what distinguishes our case from the

25 _Tribune_ case, where it was all or nothing.  Either you get it

14

1  or you don't get it.  There's no underlying security that

2  synthetically represents the totality of your entitlements over

3  time.

4         Your Honor, you know before the GUC Trust decided

5  voluntarily, on its own application, to convert all of the GM

6  stock and warrants into cash, and then sometime in August, I

7  guess, invest the cash at .12 percent, they were holding on to

8  GM securities.  And we would have had a much easier time trying

9  to predict what the return on GM securities were.

10        They chose to convert into cash.  They chose to

11 invest it in a mix of short-term securities.  You got no

12 evidence, based again on the original GUC Trust agreement, as

13 to why they can't take that money, some $800 million, most of

14 it in reserves, and put it into a different permissible

15 investment.

16        They say, well, we don't want to trip over, be an

17 investment company.  Really?  Why not go to the SEC and ask for

18 a no-action letter, if you're so concerned?  And by the way,

19 there's nothing that says you will be an investment company.

20 The documents merely reflect their concern that they might be

21 treated as an investment company.  Their choice not to seek a

22 higher return.

23        Your Honor, I want to deal with a couple of other

24 issues that have been raised time and time again.  And the most

25 important one, from my perspective, is two things.  Number one,

15

1  we failed to hold up last November's distribution, a

2  distribution that Your Honor indicated on the record had I come

3  to ask you for it, that being a stay, you would have granted

4  it, quote, "in a heartbeat."

5          Now, Your Honor, I think in your own equitable

6  mootness determination, you determined that it was a close

7  call.  But what you perceived to be our strategic decision not

8  to pursue a stay  tipped you over the edge.  To add to that

9  both of my adversaries the day before yesterday argued that we

10  don't have any claims, we never filed claims in this case, and

11  we ought to be held to an understanding and determination that

12  we're not creditors because we chose not to file a claim.

13          Your Honor, in the scheduling order regarding the

14  motion of General Motors to enforce the sale order, there was a

15  stipulation that was entered into because we were concerned

16  about just this implication.  And by order dated May 16th,

17  2014, Your Honor ordered that:

18          "The GUC Trust agrees that it shall not assert a

19          timeliness objection to any claim that the Plaintiffs

20          may attempt to assert against the old GM bankruptcy

21          estate and/or the GUC Trust based directly or

22          indirectly on the ignition switch issue as a result

23          of the Plaintiff's delay in asserting such claims

24          during the interval."

25          Interval was defined as "the date of this order,"

16

1  which again I think was May, May of 2014, "and the entry of a

2  final order," final order meaning the entry of an order by a

3  court of competent jurisdiction, and there are no pending

4  appeals, and the time period to file an appeal has expired.

5        They agreed and were ordered not to raise the no

6  filing of a claim.  The chutzpah of both of them to keep

7  telling Your Honor that I ought to be prejudiced or Your Honor

8  ought to draw negative inference from the fact that I haven't

9  filed a claim.

10        We anticipated this, and we thought we had an

11  agreement that it wouldn't be raised, going back to May.  But

12  because they have nothing else to argue, they tell you that

13  that's an important criteria.

14        Your Honor, there should be no bond in this

15  situation, for the following reasons:  The highest possible

16  percentage based on a mean, which their own witness testified

17  is a better indication of likely recoveries than the third

18  highest number for the four indices, indicates that the right

19  percentage is 5.03 percent.

20        And that again takes into account giving them the

21  benefit of the doubt on the lowest possible earnings they could

22  get from their own investments.

23        It takes into account, or assumes, that an investor

24  gets the money and invests it all at one time, in today's

25  volatile market.

17

1      And it assumes across all four indexes -- and I don't

2  care if you're a hedge fund or you invest in Bolivian bonds, if

3  I thought I could get five percent over the next six months in

4  today's market, please show me where I can invest my money at

5  five percent.  You can't.  Which is what gave rise to my offer.

6  Give them the money, but make sure they account to me for who

7  got the money, and return it to me if my appeal is successful

8  at half that rate, two and a half percent.

9      They won't take that offer because they know they're

10  not likely to make any money on that bet.  Hedge funds who want

11  to make money and profit on their investments, not the

12  customers of GM, not the employees of GM, not the innocent

13  creditors that were injured because -- or who suffered because

14  GM went through a bankruptcy and a 363 sale.  Hedge funds who

15  made a wide open investment after the fact.

16      In every GUC Trust report since May of 2014, the GUC

17  Trust had advised unit holders that because of the recall, your

18  ultimate distributions may well suffer significant dilution.

19  It wasn't a surprise to these sophisticated investors that

20  could happen.  It was a known, reported fact.  They could have

21  traded out of their units.  Many of them, I think, doubled down

22  on their investments, but we don't know.  Which gets me to

23  negative inferences.

24      There are three bases upon which we ask Your Honor to

25  make a negative inference.  One is no compliance with 2019.

18

1   Number two is because of the discovery dispute we had with Akin

2   Gump -- and Your Honor is right, that I have occasion every

3   once in a while when I'm lucky to represent hedge funds.

4              THE COURT:  On occasion?

5              MR. WEISFELNER:  On occasion.  And I tend to know

6   what they will or won't do.  And sometimes we work these things

7   out by having them report in the aggregate.  In this case, we

8   were told, you're getting none of the information, ask the

9   judge to make whatever inference you think you can get him to

10  make.

11             But more significantly, Your Honor, the expert told

12  you that getting some basic information from the hedge funds

13  would have been relevant to his calculation.  He went to the

14  hedge funds and asked them -- well, he kind of asked them

15  because he says he knew in advance he wasn't going to get any

16  information, even though it was relevant.  And they told him

17  no.

18             The hedge funds are the real parties in interest

19  here.  And the hedge funds have done nothing to facilitate the

20  finding of fact in this court of equity.  Instead they say,

21  we're not telling you, too bad.

22             Well, think about what happens in this ultimate chess

23  game.  Let's say Your Honor denies the stay.  We go forward on

24  our appeal and we're successful.  Won't a court of competent

25  jurisdiction want to understand where the money went to that we

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

19

1   were supposed to get, instead of them getting the distribution,

2   in order to half -- not even halfway, one third of the way even

3   us up?  Don't the hedge funds then have to report to you what

4   they made on their investment?

5        THE COURT:  Pause please, Mr. Weisfelner.  Everything

6   that you've told me at least -- I don't know what you've told

7   the Circuit or will tell the Circuit -- is focused on availing

8   yourself of the accordion feature, which would put new value

9   into the GUC Trust.

10       And your contention, at least in what I saw, was that

11  I had insufficiently taken the accordion feature into account.

12  But what you're trying to access with the 135 million, and then

13  the downstream cash payment -- I think in aggregate they

14  totaled up to about two forty-four -- isn't vis-a-vis funds

15  that could be obtained by reason of the accordion feature stuff

16  that was already within what I'll call the GUC Trust and

17  investor mix.  It's old money, not new money.

18       What is your legal theory for getting the old money

19  back, given what I said about the reasonable expectations of

20  GUC Trust investors with which I thought in openings you were

21  generally in agreement with?

22       MR. WEISFELNER:  Your Honor, to quote one of my

23  adversaries, "I'm glad you asked that."  Because, Your Honor,

24  there is a clear distinction between the accordion feature,

25  where I think we stand on very solid ground that no one could

1   trip the accordion feature but for our claims, and therefore we

2   should be entitled to a right to trip that accordion feature

3   and then realize the entire distribution.

4         My point is that if you took all the money in the

5   accordion feature, and I think the maximum amount we could ever

6   get in the accordion feature is something shy of a billion

7   dollars, and you look to what's cash on hand, it's just shy of

8   a billion dollars.

9         If I put both packages together, I'm not going to

10  realize if I shoot the moon, to use Your Honor's expression, on

11  all of our potential claims.  I'm not going to get ten cents on

12  the dollar.  Whereas the existing GUC Trust unit holders have

13  already recovered 30 cents on the dollar.  So on a theory of

14  can a court of competent jurisdiction fashion a remedy, if I'm

15  just left to the accordion feature, I get half the remedy I

16  think I'm otherwise entitled to.

17        And as to your point that this is "old money," Your

18  Honor, I would make the following points.  When we did the

19  equitable mootness statement of facts, Paragraph 11 of that

20  statement of facts, that stipulation of facts, provided that

21  late-filed proofs of claim may be subsequently adjudicated as

22  allowed  general unsecured claims.

23        The late claims order that Your Honor entered at

24  Paragraph 2 provides that "Claimants with late claims can seek

25  to have them adjudicated as timely filed."  Your Honor's

21

1  opinion said the remedy for a due process violation is the

2  filing of late claims, or the request to file late claims.  And

3  the judgment that Your Honor entered said we can in fact file

4  late claims, but there's not pot to glom onto.

5          Now, under the plan, plaintiffs can become allowed

6  late GUC claims and obtain a distribution.  That's Section 1.79

7  of the plan.  Any claim against any of the debtors as otherwise

8  determined by the bankruptcy court to be a general unsecured

9  claim.

10          Section 1.4 means that allowed means any claim

11  expressly allowed by a final order pursuant to the claims

12  settlement procedure or under the plan.

13          Section 1.75 says, "A final order means an order

14  which has not been reversed, vacated or stayed."

15          There's no limitation on a late-filed claim becoming

16  an allowed claim, and getting catch-up distributions.  The same

17  as in every other Chapter 11 plan of reorganization.

18          So, Your Honor, we believe it's wrong that

19  expectations regarding late claims are impossible and shouldn't

20  be allowed to eat into the remaining pot.  In fact, on appeal

21  it's our contention that the 30 cents that's already been

22  distributed needs to be reallocated, and we need to get money

23  back from the unit holders that have already received

24  distributions.  And it's wrong that granting us relief would

25  anyhow violate the plan or the confirmation order.

22

1        Your Honor, again, I think it serves repeating that

2   but for Your Honor's having already found that our clients were

3   denied due process, we would have been in a position to file

4   claims on a timely basis together with everyone else, and we

5   would have lined up with all of the other GUC Trust

6   beneficiaries and been entitled to a recovery.  And we too

7   would have shared in the 30 cents that's already gone out the

8   door.

9        There ain't that much left to go out the door, and we

10  think we're entitled to our fair share.  And Your Honor, again,

11  I understand the bonding issue and I understand the burden that

12  we have, and I understand that this is against the weight of

13  authority in terms of providing security.  But we do have truly

14  a unique set of facts.

15       You have no evidence that could possibly support a

16  percentage above five percent, and every reason to believe that

17  that percentage ought to be discounted.  And think about it,

18  Your Honor.  You're asking a bunch of class action plaintiffs

19  to find the money to post the bond.  That's an extreme

20  undertaking when you look at the other side of the coin with

21  protecting hedge funds that made a voluntary investment, in my

22  view knowing full well what the risks were of having their

23  claims diluted by virtue of the fact that a whole bunch of

24  people were denied due process.

25       THE COURT:  Isn't making moral judgments on my part

23

1  on the relative entitlements to sharing pies in the Chapter 11

2  cases on my watch exactly antithetical to the practices we've

3  had in managing large 11's with distressed investors over the

4  last 15 years?

5          MR. WEISFELNER:  Absolutely, Your Honor.  And least I

6  be accused of being Trump-like, I would submit, Your Honor,

7  that you're not entitled to make moral distinctions.  And I'm

8  not asking you to make moral distinctions.  I don't know that

9  there is anything better or worse about a hedge fund investor

10 versus a personal injury or economic loss plaintiffs, except to

11 the following extent; and it's not a moral issue, it's a legal

12 and factual distinction.

13         Unlike the folks that filed claims in a timely

14 fashion, my clients were denied due process and the opportunity

15 to get in line with everybody else.  Unlike my clients, the

16 opposition here are hedge funds, and we know how much we love

17 hedge funds, and in particular how much I love hedge funds, but

18 the fact of the matter is they bought and sold the underlying

19 security with full knowledge of the potential for diminution of

20 value and dilution in their ultimate recoveries.

21         And what I'm suggesting, Your Honor, is I can protect

22 them, and I can protect them way better than they've asked me

23 to protect them.  Give them the money.  But give them the money

24 on condition that they give me an undertaking to return the

25 money.  And they can return the money at half the interest rate

24

1  than the five percent, which is the mean of all the indexes

2  over time.

3          And Your Honor, the money is not scheduled, cannot

4  physically go out the door until, quote, "mid-November."  It's

5  now the end of September.

6          Your Honor, I know Mr. Golden.  I've worked with him

7  for years.  And I know the folks at Gibson Dunn and I've worked

8  with them on numerous occasions.  Give me a week and we can

9  come up with an appropriate undertaking that will satisfy us

10 and give them all their money, and give them all their money in

11 November and you don't have to come back.  We'll give them all

12 their money next November.

13         If my appeals take that long, which it won't -- and

14 by the way, when you look at what the appropriate time frames

15 are, Your Honor, we've asked the Second Circuit, or will be

16 asking the Second Circuit, to set a 90-day briefing schedule.

17 Three months.  Three months from today.  Which means one month

18 into the calculation of interest.

19         THE COURT:  Is there anything in any document that I

20 can look at to ascertain that, or is that simply your

21 aspiration, in terms of implementing what Jesse Furman had

22 directed you to do?

23         MR. WEISFELNER:  Your Honor, I'm told that there's

24 nothing I can show you.  I can represent to you as an officer

25 of the Court that there is a draft motion to expedite that's

25

1   circulating among all of the parties.  That includes new GM.

2   It includes the GUC Trust.  It includes the GUC Trust unit

3   holders.  It includes the Grumman plaintiffs.  It includes Gary

4   Peller.  And the bid, which I understand is unopposed by

5   anybody, is 30/30/15/15 for briefs, which would take it to 90

6   days before the entire matter is fully briefed.

7         Your Honor, sitting here today, I can't tell you

8   whether or not every single one of the parties that we had to

9   represent to the Second Circuit was on board are in fact on

10  board.  It's my understanding that they are.  But I can tell

11  you the Second Circuit certainly hasn't ruled on that.  And

12  even if it is a 90-day briefing schedule, there's nothing that

13  the parties could do, stand on their head and spit nickels,

14  that cuffs the Second Circuit into how much time it takes to

15  resolve those issues.

16        But I think the thing can be fully briefed in three

17  months.  And all I'm saying, Your Honor, is I think we can call

18  the hedge fund's bluff on this.  Give them the money.  But make

19  it easy enough for me, if I'm successful on the appeal, to claw

20  the money back at a reasonable rate of return, which they

21  wanted 16 percent as their protected rate.  I'm saying give me

22  back the money at two and a half percent, keep the balance for

23  yourself as a gift.

24        For all of those reasons, Your Honor, I'd

25  respectfully submit that the evidence demonstrates that the

1  most a bond could possibly be is as reflected in our

2  illustrative example, there are numerous discounts that are

3  appropriate.  And I think our offer to the hedge fund sort of

4  proves it up, that this is really an equitable search for what

5  the right protected rate is.  I think my offer obviates that,

6  with all due respect.  And for that reason, when the hedge

7  funds reject my suggestion, there ought to be no bond.  Thank

8  you, Judge.

9       THE COURT:  Okay.  I'll hear from you, Ms. Rubin and

10  Ms. Newman, or as you may choose to divide up the same amount

11  of time.

12       MS. RUBIN:  Thank you, Your Honor.  There's a lot

13  that Mr. Weisfelner said today to respond to, so I hope that

14  Your Honor grants me a little bit of latitude in responding to

15  that.

16       Let me start by saying, Your Honor, I'm mindful of

17  your admonition at the beginning not to spend too much time on

18  the stay factors, and I will try my very best, Your Honor, to

19  adhere to that, but I do want to talk about two elements of the

20  four horsemen very quickly, Your Honor, if I can, before

21  turning to the bond, and that is starting with the irreparable

22  harm factor.

23       Your Honor suggested, during his opening remarks the

24  other day, there's plainly irreparable injury here where money

25  goes out the door to many, many different people and it's

27

1  difficult, if not impossible, to get the money back.  The

2  problem is, Your Honor, on the law of this circuit, the

3  plaintiffs have not shown irreparable harm.  Your Honor knows,

4  because I mentioned the other day and Your Honor stated his

5  agreement with this general principle, that most courts in the

6  Second Circuit have held that the risk that an appeal will be

7  moot absent a stay without more does not constitute irreparable

8  harm.

9       But even those courts that acknowledge that there

10 could be irreparable harm from the mooting of appeal consider

11 that mootness can satisfy the irreparable harm prong only where

12 the denial of a stay risks mooting an appeal of significant of

13 claims of error.  And that's where I want to start, Your Honor,

14 this morning.  I want to talk about whether or not there is a

15 significant claim of error here, which is an analysis that

16 dovetails quite nicely with the likelihood-of-success-on-the-

17 merits prong.

18      And indeed, Your Honor I'm sure is also mindful that,

19 as in the BGI decision, there are a number of courts in this

20 circuit that have held that there is an inverse

21 proportionality, if you will, between the irreparable harm

22 prong on one hand, and the likelihood of success of the merits

23 on the other.  Respectfully, Your Honor, I will submit to you

24 today that the risk of irreparable harm to the clients Mr.

25 Weisfelner represents is minimal and, accordingly, the burden

28

1  on him to demonstrate the likelihood of success on the merits

2  is very high.

3         And let me start there, because I don't think Mr.

4  Weisfelner is ever going to get there.  Your Honor, in the

5  Second Circuit, a finding of equitable mootness can be reversed

6  only on an abuse-of-discretion standard that comes from the BGI

7  case, that's 772 F.3d 102, and the pin cite there is 107.

8  That's the Second Circuit's decision in 2014 in BGI.

9         THE COURT:  What was the jump cite, Ms. Rubin?

10        MS. RUBIN:  107, Your Honor.

11        THE COURT:  Okay.

12        MS. RUBIN:  Your Honor is also mindful that under

13  Second Circuit precedent -- this is the Chateaugay decision,

14  and I'm again quoting from BGI decision:

15             "Only if all five Chateaugay factors are met, and if

16             the appellant prevails on the merits of its legal

17             claims, can relief be granted."

18        That's to overcome the presumption of equitable

19  mootness on the first place.

20        So in order for Mr. Weisfelner to succeed on appeal,

21  he has to convince the Second Circuit that Your Honor abused

22  his discretion in determining that three of the five Chateaugay

23  factors went against the plaintiff.  And that is the import of

24  Your Honor's ruling in the threshold issues decision.  It was

25  not a close call, as Mr. Weisfelner said here today and as he

 1  says in his brief.

 2        The five <u>Chateaugay</u> factors include that the Court

 3  can still order some effective relief; that that relief will

 4  not unravel intricate transactions so as to knock the props out

 5  from under the authorization for every transaction that has

 6  taken place and create an unmanageable, uncontrollable

 7  situation for the Court.  And, third, that the appellants

 8  pursued with diligence all available remedies to obtain a stay

 9  of execution of the objectionable order if the failure to do so

10  creates a situation rendering it inequitable to reverse the

11  orders appealed from.

12        Each of those three factors were ones that Your Honor

13  squarely held in his April 15th, 2015 decision went against the

14  plaintiffs.

15        So let's talk about each of those factors, because

16  the one I'm most interested in, Your Honor, is the last one.

17  Did the plaintiffs pursue with diligence all available remedies

18  to obtain a stay?  And the answer is no.  In fact, as Your

19  Honor put it in the decision, Mr. Weisfelner made a tactical

20  choice, and I'm quoting from Your Honor's decision, "to pursue

21  claims against New GM first and resort to the GUC Trust only if

22  necessary."  That's 529 B.R.  The jump cite is 591.  That's

23  Your Honor's April 15th, 2015 decision.

24        And the Court saw this -- Your Honor saw this as

25  analogous to the plaintiff's lack of diligence in the <u>BGI</u>

30

1  proceeding and how that plaintiff's -- and again I'm quoting --

2  "failure to diligently pursue claims against the GUC Trust

3  prevents them from doing so now."

4         Your Honor, Mr. Weisfelner is going to have to

5  convince the court of appeals that it was an abuse of Your

6  Honor's discretion to make that decision, and I'm not sure how

7  he's going to do that.

8         Mr. Weisfelner, the other day, also focused on the

9  first Chateaugay factor, arguing that his claim should prevail

10 because the Court can still order some effective relief for his

11 clients that won't disturb the unitholders' expectations.  This

12 is a fiction, Your Honor.  First of all, the Court did consider

13 the accordion feature.  That's true at 529 B.R. 538, that's

14 where you considered the accordion feature in Your Honor's

15 decision.  Again, in the decision on form of judgment, that's

16 Docket Number 13162 at Pages 9 and 10 where the Court explains

17 that the unitholders knew that there was an accordion feature,

18 but then also knew that claims exposure would result with

19 exceptions exceedingly difficult to show only from previously-

20 filed claims.

21        But the most important factor is that the accordion

22 feature has not been triggered, so let's talk about the reality

23 of where we stand now, which is discussed in our stipulated

24 facts.  As it stands now, Your Honor, the allowed claims tally

25 is about 31.8 billion in allowed claims.  To even trigger the

31

1  accordion feature, we're going to have to get to a point where

2  the Trust has $35 billion in allowed general unsecured claims.

3  We don't even trigger the first share of New GM common stock

4  available through the accordion feature until that allowed

5  general unsecured claims pool reaches over $35 billion.

6          So any ruling that this Court could fashion effective

7  relief based on the accordion feature would be pure conjecture.

8  Why is that?  Because Mr. Weisfelner has never filed a claim;

9  not an individual claim, not a contingent claim, and certainly

10 not a putative class group claim.  And Your Honor, Mr.

11 Weisfelner told you today that I have some chutzpah raising

12 this; that Ms. Newman and I are both really on thin ice in

13 raising this.  But, Your Honor, I've spent a bunch of time with

14 the same order that Mr. Weisfelner raised before you and I'd

15 like to hand a copy up to the Court as well.  May I?

16         THE COURT:  Sure.  Which order we talking about

17 though?

18         MS. RUBIN:  We're talking about -- and I don't think

19 the microphone is picking me up right now, Your Honor.

20         THE COURT:  Well, the microphone's picking me up.

21 This is the scheduling order of May 16th, 2014, ECF 12697.

22         MS. RUBIN:  So let's start on the front page, Your

23 Honor, because I was involved in negotiation of this order, as

24 was Ms. Newman and Mr. Golden and others at the Gibson Dunn

25 firm.

32

1              When this order was negotiated, Mr. Weisfelner, on

2    behalf of seven individual plaintiffs who he represented in an

3    objection filed on April 24th, 2014, there was no MDL

4    proceeding at that time, there was no federal class action, to

5    the best of my knowledge.  Certainly Judge Furman was not

6    involved at that time.  On the first page it says that upon the

7    court's order scheduling a conference for a particular date to

8    address procedural issues respecting the motion seeking to

9    enforce the sale order injunction, that's referring to the

10   motion by New GM, the objection dated April 22nd, 2014 to the

11   motion filed by certain plaintiffs, referencing Docket Number

12   12629, that's the objection filed by Mr. Weisfelner.

13             For the rest of this order, there's a reference to

14   Plaintiffs that is never defined, but it refers to the clients

15   represented then by Mr. Weisfelner, seven individuals who had

16   between them five putative class actions in which they sought

17   to represent individuals affected by the ignition switch defect

18   and owners of certain cars that, to this date, have not been

19   recalled, and then it refers to the Grumman plaintiffs, which

20   refers represented by Mr. Boxer, who is in the courtroom today.

21             Now, the paragraph that Mr. Weisfelner is referring

22   to appears on Page 3.  It says:

23             "Ordered that the GUC Trust agrees that it shall not

24             assert a timeliness objection to any claims that the

25             Plaintiffs may attempt to assert against the Old GM

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

33

1            bankruptcy estate and/or the GUC Trust, based

2            directly or indirectly on the ignition switch issue,

3            as a result of the Plaintiffs' delay in asserting

4            such claims during the 'interval.'"

5       Let me pause there, Your Honor, to explain the import

6  of this, at least as far as I understand it.

7       There has never been an amendment of this order to

8  expand the import of this paragraph for any plaintiffs other

9  than those defined in this order.  Never at the time of this

10 order did Mr. Weisfelner, or anyone else for that matter,

11 represent clients who putatively had non-ignition-switch-

12 related claims.  Nor did they represent people who were

13 involved in pre-closing accidents.

14      To the extent that I have any chutzpah at all, it's

15 because I stand up here and are trying to, in violation of this

16 order, according to Mr. Weisfelner, draw some conclusions about

17 it.  But the import of this order is not nearly as broad as he

18 would have it.  Nobody has ever sought to amend this order.

19      Now, he also says that I agree not to assert a

20 timeliness objection, but, Your Honor, whether or not Mr.

21 Weisfelner can establish irreparable harm is entirely separate

22 and apart from whether he can assert -- whether I can assert a

23 timeliness objection.  And I'll submit to Your Honor that,

24 again, from the BGI case and others, the plaintiffs have to

25 show that there would be an actual and imminent injury to them

34

1  to establish irreparable harm under the law of this circuit.

2  BGI case tells us where a party who seeks a stay pending appeal

3  has not acted with diligence throughout the course of that

4  appeal, that party cannot establish irreparable harm.

5        So whether or not this says what Mr. Weisfelner says

6  it does, even for some group of plaintiffs, I'm not sure that

7  it has any effect on what it is that we're talking about here

8  today.  It's not a timeliness objection that we're talking

9  about, it's whether or not they've been injured at all.

10        Your Honor, I want to return now to the topic of the

11  bond and some of the things that Mr. Weisfelner said in terms

12  of presenting Your Honor with his demonstrative, and then talk

13  about why Mr. Scruton's calculations, and really the only

14  expert supported calculations that Your Honor has before him,

15  are the ones that make sense here.

16        Let's take a look, Your Honor, first at what the law

17  is in this circuit about the point of the bond, because Mr.

18  Weisfelner likes to make a lot out of the difference between

19  likely and predictive on one hand, and what Mr. Scruton said he

20  was doing, which was to try and calculate a protective rate of

21  return that would result in an appropriate bond.

22        Again, Your Honor, the law in this circuit is that

23  where a stay pending appeal should be granted, the court should

24  set the bond -- I'm quoting from Judge Scheindlin's opinion in

25  the Adelphia matter at 361 B.R., the pin cite is at Page 368:

1         "The court should set the bond at or near the full

2         amount of the potential harm to the non-moving

3         parties.  The appellants must post a substantial bond

4         that is commensurate with the threatened loss to the

5         non-moving parties.  Not the most likely return to

6         them.  Not the one you can predict on the basis of

7         recent market activity.  It is the full amount of the

8         potential harm to the non-moving parties."

9        And then she goes on to continue:

10        "In distinguishing the amount of that bond from what

11        the harm might be to the non-moving party, the

12        purpose of the supersedeas bond is not to act as

13        liquidity damages to the appellees; rather, if the

14        appellants ultimately lost the appeal, in order for

15        the appellees to recover any portion of the bond,

16        they will be required to prove up the amount of

17        damages."

18        In other words, Judge Scheindlin is, of course,

19 understanding and recognizing that the amount that the moving

20 party should post for the bond is inherently distinct from the

21 amount that might be suffered from them as damages.  The notion

22 that the bond should be set at or near the full amount of the

23 potential harm has been repeated by multiple courts in this

24 circuit, including the last couple of years.  Let me just cite

25 a couple of them to you.  That standard was recited by Judge

1  Glenn in <u>In re Grubb & Ellis Company</u>.  That's 212 Westlaw

2  1036071.  The pin cite is at 11.  That's an opinion of the

3  bankruptcy court of this district on March 27th, 2012.

4          And again, Your Honor, in the <u>Cantour</u> (phonetic)

5  case, while Your Honor did not cite that exact language, Your

6  Honor talked, in calculating what the appropriate bond might

7  be, Your Honor ultimately did not require the parties to post

8  the bond because you found that the parties who wanted the stay

9  weren't prepared to post any bond.  But Your Honor calculated

10  what bond would be required based on the need for "protection

11  for a 40-percent stock drop," and then you -- then considered

12  that with respect to the amounts due to be distributed, that

13  you'd have to think about the lost opportunity cost to the

14  stockholders there.  And you then used eight percent as the

15  appropriate rate to get to a rate of $1.6 million per year on

16  those components of the distribution.  You also noted that it

17  was very possibly considerably higher, given the length of the

18  appeal here at issue.

19          THE COURT:  What are we talking about, my ruling on

20  <u>Contour</u>?

21          MS. RUBIN:  Yes, we are, Your Honor.

22          Now, I also note that during the evidentiary portion

23  of the hearing, Mr. Weisfelner asked Mr. Scruton some questions

24  about how Mr. Kurtz calculated the bond, but if you look at the

25  entirety of his declaration, again and again and again he talks

37

1 about the fact that the task before him is to calculate a bond

2 that would fully protect the non-moving parties in the event

3 that the stay pending appeal were granted.

4        So now let's talk about, Your Honor, if we can, why

5 the calculations Mr. Weisfelner has put before you are not a

6 reasonable or even borderline acceptable alternative for the

7 declaration that Mr. Scruton gave and the hours of testimony

8 that he supported as well.  Not only is it not supported by an

9 expert, not only was there no affirmative evidentiary showing

10 by Mr. Weisfelner during the evidentiary portion of the

11 hearing, but there are a lot of assumptions in this

12 demonstrative that are just flat out wrong based on concessions

13 that even Mr. Weisfelner had made, the first of which is

14 probably the most important.

15        Your Honor, the plaintiff's name in the column of Mr.

16 Weisfelner's demonstrative and the Scruton supplemental

17 declaration mean are both averages that assume an equal

18 weighting of the population among asset classes.  In other

19 words, 25 percent of investors in the S&P, 25 percent of

20 investors in the High Grade Master Index by B of A and Merrill

21 Lynch, 25 percent of the hedge fund index, and another 25

22 percent in a 10-year Treasury yield curve.

23        Mr. Weisfelner stood up here before you though

24 earlier this afternoon and said, neither side contests that the

25 majority of the units here are held by hedge funds.  In fact,

38

1  Mr. Scruton testified that while he was asked to assume, based

2  on a representation by the participating unitholders, that 47

3  percent of the units were held by hedge funds, that in his

4  experience in the restructuring and reorganization sector, it

5  was likely more true, in his estimation, that 80-plus percent

6  of the units were owned by those people.  That was one of the

7  bases, Your Honor, on which Mr. Scruton told you repeatedly,

8  and in his declaration, that his assumptions were, in fact,

9  conservative, not aggressive.

10          Let's return to --

11          THE COURT:  Pause, please.  A couple of questions

12  there.

13          I take it everybody agrees that I don't have any

14  actual eminence of who, besides the 47 percent in the Akin Gump

15  group, are hedge funds.  And I take it you agree with that as

16  well?

17          MS. RUBIN:  I do, Your Honor.

18          THE COURT:  I have a hole in the proof on -- and

19  sometimes with burdens we have ways of dealing with the hole in

20  the proof, but I don't know, other than Scruton's affidavit,

21  anything about the others.  And although Scruton has the

22  expertise to give me a view on how you compute opportunity

23  cost, the classic thing for which expert testimony is offered,

24  he hasn't been qualified as an expert on who buys units in

25  reorganized debtors, has he?

1           MS. RUBIN:  Your Honor, Mr. Scruton offered that

2    opinion based on his series -- I'm sorry, based on his years of

3    experience in this.  That testimony, as far as I know, was not

4    challenged by Mr. Weisfelner, it appears in his declaration.

5           To the extent that you've got a failure of proof

6    here, Your Honor, I would submit that the failure of proof lies

7    particular on the plaintiffs' side.  The plaintiffs put forward

8    before Your Honor a demonstrative that's based on an equal

9    distribution of asset classes in the unitholder population when

10   even Mr. Weisfelner says that that assumption is untrue by

11   almost double.

12          In other words, Mr. Weisfelner has put forward

13   calculations before Your Honor on the assumption that 25

14   percent of the units are owned by hedge fund investors.  We all

15   know, Your Honor, because Mr. Scruton was asked to assume,

16   because Ms. Newman made a representation to Mr. Weisfelner in

17   lieu of further discovery, that 47 percent, approximately, of

18   those units are held by the participating unitholders.  That's

19   to say nothing of other hedge fund investors, those are just

20   the hedge funds represented by Mr. Golden.

21          So you're right to say, Your Honor, we don't have any

22   other information and certainly I, as counsel for the GUC

23   Trust, don't have that information.  But what we do have is an

24   expert, whose qualifications weren't questioned on that front,

25   telling me that on the basis of his 20-plus years of experience

40

1  working in the reorganization and restructuring sector, during

2  which he has held many assignments on behalf of hedge funds, he

3  was asked that question by Mr. Weisfelner at his deposition, he

4  answered it affirmatively and said he's worked for him many

5  times, that his supposition, based on his understanding of a

6  security of this nature, is that 80-plus percent of them are

7  owned by hedge funds.

8           THE COURT:  Uh-huh.  Well, I have a little experience

9  too, but I wasn't sworn as a witness or as an expert.  Do you

10  think it's right or wrong for me to use my experience in the

11  matter of that current?  I may have been in a bunch of

12  bankruptcy cases longer than Mr. Scruton has, but I haven't

13  been sworn as a witness.

14           MS. RUBIN:  I believe that Your Honor is empowered to

15  consider evidentiary holes as Your Honor sees fit.  Certainly

16  in the Cantour case, where Your Honor was not presented with

17  evidence by either side as to how to come to the appropriate

18  calculation of the bond, Your Honor relied on market evidence

19  available to him and came up with what he believed was a

20  reasonable way to get there.

21           THE COURT:  One thing that's bugging me, Ms. Rubin.

22  I don't know which way it cuts, but it bugs me, whoever gets

23  gored by this, I had believed that at the outset of this case

24  there were a lot of creditors of Old GM who weren't in hedge

25  funds.  I think it's likely, because I've been doing this for a

41

1  while, that mom-and-pop creditors, bondholders, possibly tort

2  litigants sold their claims and they wound up in the hands of

3  hedge funds.  It's a lot harder for me to go from the fact that

4  I guess some of them to any given number have, and I don't know

5  when they did it, whether they did it before or after the plan.

6           Assuming they didn't, how is a guy like me supposed

7  to deal with that possibility when he doesn't have anything

8  more certain to work off?

9           MS. RUBIN:  Your Honor, I wish that I could supply

10  you with more.  I believe that I've presented Your Honor with

11  argument before about why the GUC Trust isn't permitted to

12  present you with more.

13           What I would say on instance, Your Honor, is that

14  what Your Honor has to rely upon that's in evidence is Mr.

15  Scruton's expert testimony.  It hasn't been challenged by the

16  party moving for the stay.  Mr. Weisfelner stood up before you

17  several moments ago and said that he thought that -- I want to

18  make sure that I'm quoting him accurately:

19  "Neither side contests that a majority of the units are held by

20  hedge funds here."

21           That's an important concession, Your Honor, and one

22  that, most importantly, to return to my first point, makes

23  everything that he's presented to you in this demonstrative

24  inherently unreliable.

25           But, Your Honor, if I can continue about the

42

1  unreliability of the demonstrative presented to you by Mr.

2  Weisfelner, there are other reasons why this shouldn't be

3  credited.  In addition to the equal weighting problem, which is

4  probably its biggest defect, Mr. Weisfelner's calculations are

5  also based on a simple mean.  Now you heard testimony from Mr.

6  Scruton the other day about why the simple mean is not

7  appropriately protected, because he told you in those

8  circumstances 50 percent of the time you're going to be wrong,

9  you're going to post a bond that is insufficiently protective

10 for the circumstances.

11       The methodology that he used, conversely, the third

12 best, he acknowledged was not one that he's used in the past to

13 calculate lost opportunity costs, but he also acknowledged the

14 uniqueness of this particular fact circumstances and that he

15 wanted to calculate, as he put it in his declaration, a

16 conservative estimate of the maximum potential harm.  He took

17 comfort, Your Honor, in the statistical principle that the

18 third highest return for each asset class was within one

19 standard deviation.

20       The simple mean, according to Mr. Scruton's expert

21 testimony, was insufficiently protective.  In fact, on one

22 occasion he was asked, which was more predictive of returns,

23 the simple mean or the trimmed mean.  And Mr. Scruton's

24 testimony and -- Your Honor, you'll forgive me, I'm looking for

25 the pages right now where he says this -- is that neither one

43

1  was predictive, that neither one --

2          THE COURT:  Neither one was predictive or protective.

3          MS. RUBIN:  Neither one was a very good predictor.

4  I'll quote to you, Your Honor, from Page 163 of the transcript

5  from Tuesday's hearing.

6          THE COURT:  163?

7          MS. RUBIN:  163 at Line 19 said:

8  "I think neither are very good predictors.  So it's a choice

9  between two very unpredictive approaches in terms of trying to

10 -- we are trying to achieve the most likely.  They're two data

11 points that I wouldn't use in trying to -- if I was asked to

12 assess what the most likely return would be."

13         And then Mr. Scruton, a couple of pages later said:

14 "I'm not trying to use the most likely, I'm trying to use a

15 measure that represents the returns that are probably -- they

16 represent a potential return to investors.  And the measure

17 I've chosen" --

18         I'm sorry, Your Honor, let me go to Page -- I'm

19 sorry, the same page, 165 at Line 8.

20         THE COURT:  165?

21         MS. RUBIN:  At Line 8, and after commenting that the

22 measure that he's chosen is within one standard deviation from

23 the mean, in fact, "is the mean upon the standard deviation

24 from the mean," and he's talking about the Credit Suisse index,

25 Your Honor, here.

44

1 "What that's telling me is that I've taken a very conservative

2 estimate of the range of outcomes, because if you look once at

3 a deviation from the mean of a range of outcomes going forward,

4 you capture essentially that 80 percent number that I've

5 mentioned.  And so I've taken a conservative estimate of the

6 range of what might happen as an estimate of the rates used

7 when calculating the protective rate of return."

8           Now Your Honor, let me return now to Mr. Weisfelner's

9 exhibit.  The third problem with it is that it's a simple

10 multiplication, there's no compounding here, which Mr. Scruton

11 has further testified is not the appropriate way of calculating

12 a likely or potential rate of return.

13           And the fourth problem with it --

14           THE COURT:  Pause, please, Ms. Rubin.  Let's stick

15 with that for a second --

16           MS. RUBIN:  Yes.

17           THE COURT:  -- because during the break you were

18 reviewing, and I noticed that, too.  If I recall correctly, Mr.

19 Scruton said that without doing it by a calculator or computer,

20 the compounded rate would be about 10 percent higher, if I

21 recall his testimony.  I think it was in response to my

22 questioning toward the end.

23           MS. RUBIN:  That's correct, Your Honor.  But of

24 course that's --

25           THE COURT:  Yeah, but time out for a second.

45

1          MS. RUBIN:  Sure.

2          THE COURT:  Do you -- is it mathematically possible,

3  as a mater of compounding arithmetic, to take what he perceives

4  to be the appropriate bond and to adjust for the compounding by

5  adding 10 percent or multiplying it by 1.10 percent, or do you

6  need to do it separately for each of the present investments at

7  .12 percent and then the alternative deemed investment at

8  whatever percent I determine is the appropriate yield?

9          MS. RUBIN:  Your Honor, if I understand your question

10 correctly, and I'm not sure that I do, I'm not sure that that,

11 in fact, would be appropriate.  Part of the reason that that

12 would be inappropriate is that the calculations presented to

13 you by Mr. Weisfelner are suffused with other errors and

14 therefore trying to up them by 10 percent wouldn't correct for

15 the compounding error, given that they incorporate other faulty

16 assumptions with which we take serious and significant issue.

17         Did I respond to Your Honor's question or did I

18 misunderstand it?

19         THE COURT:  I understand the bottom line, but I don't

20 know, from what you just told me, the process.  I mean I drew,

21 from what you just said, that I can't use Mr. Weisfelner's,

22 what was it, 5.03 percent and that I -- in your view I need to

23 use a number that's materially higher.

24         MS. RUBIN:  I believe that's true, Your Honor,

25 because baked into Mr. Weisfelner's calculation of the 5.03 is

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

46

1  the supposition that each of the four asset classes are equally

2  distributed throughout --

3          THE COURT:  I understood that.  But based upon your

4  arguments and Mr. Weisfelner's responses were all done, I might

5  come up with a number that's, say, higher than 5.03 percent,

6  that's still lower than yours.

7          MS. RUBIN:  I understand, Your Honor.

8          THE COURT:  Then I have what I'll call the

9  multiplication issue.  Are you telling me that you think that

10  once I get my deemed interest rate, which might be 5.03 or it

11  might be higher, I'm still making a material error by simply

12  not adding 10 percent to that?

13          MS. RUBIN:  It's my understanding, Your Honor, that

14  the correct way to compound would be to take each component

15  rate of return, from the separate indices, and multiply those

16  by the 10 percent before coming to the composite rate.

17          THE COURT:  Okay.

18          MS. RUBIN:  Okay.

19          THE COURT:  I mean I was trained to do that in

20  college.  It's a burdensome exercise for a judge to do.

21          MS. RUBIN:  I understand.

22          THE COURT:  And most people don't like judges to go

23  off on their own kind of independent inquiries to do that kind

24  of stuff.  But I understand what you're saying as a matter of

25  discount arithmetic.

1          MS. RUBIN:  I understand.  Your Honor, for your ease,

2    I would refer Your Honor, in the event that Your Honor would

3    like to look at various sensitivities, I would encourage Your

4    Honor to look at Exhibits D-1 and F-1.

5          THE COURT:  Yeah, that's what your witness did.  But

6    the problem is, Ms. Rubin, that I may not agree with you

7    anymore than I agree with Mr. Weisfelner.

8          MS. RUBIN:  That may be true, Your Honor, but at

9    least in terms of scenario two in Mr. Scruton's -- both his

10   original declaration and in his supplemental exhibits, for

11   example, starts with the supposition of a population of

12   unitholders that is distributed with 47 percent in hedge funds

13   and the remaining asset classes evenly divided.  It then takes

14   those to come up with rates of return, based on the third

15   highest return for each index, which is Mr. Scruton's preferred

16   method, as you know, but also offers rates of return based on

17   the trimmed mean and the mean, as well as an adjusted weighted

18   average protection rate of return that adds in the two percent

19   in management fees that hedge funds are -- which he testified

20   he believed was appropriate.

21         Your Honor, if I can return to the calculation of the

22   bond and what we believe is appropriate.  Your Honor, the

23   bottom line, in terms of what we believe is appropriate, is

24   reflected in Footnote 1 of Exhibit D-1, that's Mr. Scruton's

25   supplemental exhibits.  Mr. Scruton testified that if one were

48

1  to calculate the bond, based on a ten-month lost opportunity

2  cost, that assumes the stay, for example, would begin tomorrow,

3  but the lost opportunity calculation would not begin until mid-

4  November, when the distribution is scheduled to be made, he

5  arrives at a number of 15.2 million.

6          And then he told Your Honor, on his testimony, that

7  he believed it would be appropriate to adjust that amount to

8  reflect the two percent and incentive and management fees that

9  hedge funds earn that are not incorporated in the Credit Suisse

10  index.  It's our position, Your Honor, that the appropriate

11  amount of the bond here is 16.3 million, as reflected in

12  Footnote 1 to Page 1 of Exhibit D-1.

13          And let me talk about some of Mr. Weisfelner's other

14  criticisms before I return to Mr. Scruton's methodology.  Mr.

15  Weisfelner is very keen to say that nobody has used Mr.

16  Scruton's methodology before.  Your Honor is mindful, I'm sure,

17  of the fact that there isn't a whole lot of case law out there

18  on any methodology for the calculation of lost opportunity

19  costs, let alone --

20          THE COURT:  Well, there's tons of it, Ms. Rubin.  It

21  may not come up in the context of bonds.  I tried cases like

22  that as a civil litigator back in the '90s.  I had an insurer

23  that was stiffed on a loan and I put on an expert to talk about

24  what teacher's insurance could get on its alternative loan

25  after the borrower had (indiscernible).

49

1              MS. RUBIN:  And, Your Honor --

2              THE COURT:  And, you know, there was cross-

3  examination of the expert on whether you had to use a ten-year

4  treasury or whether you would use a ten-year double-A because

5  that was the credit rating of the alternate investment.  That

6  stuff gets done all the time.  And under Erie County, you know,

7  those kinds of damages computations are done both in state and

8  federal court all the time.

9              MS. RUBIN:  I understand, Your Honor.  And what I

10 meant to refer to is the lost opportunity costs associated with

11 a distribution of cash in a situation such as this, where

12 putting aside the calculation of damages, you're trying to come

13 up with the -- what a conservative estimate is of a full

14 protection needed for the protection of the non-moving party.

15             Your Honor, my point was that in the same way that

16 this is maybe uncharted territory for Mr. Scruton, I don't see

17 Mr. Weisfelner saying to you that there was a lot of precedent

18 for this either.  And part of that is both sides, I believe,

19 are a little bit in uncharted territory, at least where the

20 specific facts of this case are concerned.

21             Let me talk now, Your Honor, about the issue of

22 permitted investments, because Mr. Weisfelner is motivated to,

23 and he has talked extensively about, trying to narrow the delta

24 between the lost opportunity costs to the unitholders on one

25 hand and the rate of return that he believes it would be

50

1  appropriate for the GUC Trust to earn.

2          He said that there was no evidence that the GUC Trust

3  couldn't invest in a variety of other investments that are

4  classified as permitted investments under the plan.  And, Your

5  Honor, that's simply not true.  So let me start with our

6  stipulations of fact, Your Honor, at Paragraph 21.

7          Why Mr. Weisfelner continues and perseverates on this

8  point is a little bit baffling to me when he stipulated to the

9  follow representation, quote:

10         "That subsequent to  stock sale, in order to avoid

11         any argument that the trust is an investment company,

12         the GUC Trust has invested all of the GUC Trust cash

13         in a mix of short-term U.S. Treasury securities."

14         Now, Your Honor, in the preamble to these stipulated

15  facts, and I invite Your Honor to take a look at them, on

16  Page 2 of these stipulated facts it says as follows, middle of

17  the page:

18         "The stipulation of facts are agreed by the parties

19         and are provided in lieu of and in full satisfaction

20         of any deposition testimony or document production

21         requests with respect to deposition topics," and then

22         it enumerates them.

23         Topic four is one of them.  Your Honor will notice

24  that topic four, as reflected in Exhibit 1 to the stipulated

25  facts is the following:  Capital P, "Permissible," Capital I

1   "Investments," and rates of return.  Mr. Weisfelner never asked

2   whether or not the stipulation had any basis.  He didn't ask

3   for any evidence.  He accepted that stipulation in full

4   satisfaction of the deposition testimony, so for him to make an

5   issue of it here now is a little bit rich.

6          But let me put Your Honor's mind to rest about

7   permissible investments and the Investment Company Act concern,

8   if I can.  The GUC Trust did, in fact, seek the no-action

9   letter that Mr. Weisfelner has talked about.  We were told by

10  the SEC that no no-action letter would be forthcoming, that the

11  facts that -- with which we presented to SEC were not

12  sufficiently novel to merit a new no-action letter, and

13  therefore, if the GUC Trust wanted to do more than invest in

14  securities from the U.S. Treasury, the GUC Trust was going to

15  have to take that risk for itself.

16         And, Your Honor, you know as well as I do that the

17  GUC Trust is a fiduciary.  To expose ourselves to Securities

18  Act claims in order to make a minimal return for what we fully

19  expect will be a short period of time, pending our ability to

20  make the November 15 distribution, was not worth it.  It was

21  not worth that risk.  And so the GUC Trust determined that the

22  appropriate thing to do was between July and August, when the

23  stock sale occurred, and November 15, when it anticipates fully

24  making that distribution, was to invest in a mix of short-term

25  securities.  We don't believe that there should be any further

52

1  controversy about this or any inference drawn that the GUC

2  Trust is not acting fully in its fiduciary capacity there.

3         Now, Mr. Weisfelner has also suggested that our

4  conversion of the stock to cash was somehow improper, and let

5  me address that.  Your Honor, we moved for --

6         THE COURT:  I don't want you to do that for two

7  reasons, Ms. Rubin.  One, because I don't see it as a big

8  enough issue.  And secondly, I think you're very close to the

9  end of your time, if you're not over it.

10        MS. RUBIN:  Thank you, Your Honor.  Let me try and

11 sum up as quickly as I can.  The calculations made by

12 Mr. Scruton are reasonable ones, Your Honor.  They're

13 reasonable on a whole host of measures, and they are

14 conservative, Your Honor.

15        The stay period is conservative for the following

16 reasons:  Mr. Weisfelner told you that there was a proposal

17 that he believes no one has objected to for a three-month

18 briefing schedule.  That proposal was made on the evening of

19 September 21st, the evening before this hearing.  It has been

20 objected to by New GM.  I expect that it will be objected to by

21 others, were it not for the Jewish holiday and for the time

22 consumed in preparing for this hearing.

23        Even if that three-month briefing schedule were

24 accepted, Your Honor, however, that would assume for a four-

25 month to six-month stay that we could get through oral argument

53

1  and a decision in the Second Circuit in a period of one to

2  three months.  Your Honor, I don't believe that's realistic and

3  I'll tell you why.

4         Earlier this week the parties to the appeal of the

5  threshold issues decision and judgment filed their Form C with

6  the Court of Appeals.  Seven different groups filed Form C.  I

7  brought with me today, Your Honor, the Form C filed by the

8  ignition switch plaintiffs, the ignition switch pre-closing

9  accident plaintiffs, the GUC Trust and New GM so that Your

10 Honor could see the constellation of issues that have emerged

11 from Your Honor's decision on the four threshold issues.

12        Because let me assure Your Honor, this is no simple

13 binary appeal with one winner and one loser.  There are a

14 variety of issues that the parties attack in a bunch of

15 different ways.  There are mixed questions of law and fact.  A

16 12-month stay here is conservative.

17        The other reason that a 12-month stay here is

18 conservative is I understand, and although the GUC Trust is not

19 a party to this, that Mr. Weisfelner's clients and New GM are

20 in the process of briefing before Your Honor two important

21 issues.  One is the permissibility of punitive damages.  The

22 second is the question of imputation.  It has been suggested to

23 me that Your Honor's decisions on those issues may be presented

24 to the circuit, with the suggestion from one of the affected

25 parties that the appeals should just be conjoined.  And if that

54

1    happens, Your Honor, 12 months would certainly be a

2    conservative period of time.  Twelve months, we believe, is the

3    right period.

4           The population distribution and Mr. Scruton's

5    calculations are conservative.  Mr. Scruton testified that the

6    hedge fund's cost bases for future investments were also baked

7    into the return rate reflected by the Credit Suisse event-

8    driven multi-strategy hedge fund.  He said that at Page 166 and

9    167 of his testimony.  And as Your Honor knows, from my earlier

10   statements, he testified that he felt the real distribution in

11   the population was closer to 80 plus percent.

12          And most importantly, the rate of return calculation

13   that he made was conservative.  Nobody on the plaintiff's side,

14   Your Honor, is quibbling with the indices that we chose.  What

15   they're saying is there's something wrong with Mr. Scruton's

16   choice of the third highest for each index across ten years of

17   annual index returns.  But the point of the bond, Your Honor,

18   is protection.  This is meant to be insurance.  I've never met

19   a homeowner, Your Honor, who buys insurance to only cover half

20   the value of his home.  Similarly here, the point of the bond

21   is to offer protection to those in the unitholder's situation.

22          Your Honor, there's been lots of discussion about

23   David Kurtz's declaration and the Tribune matter, and his use

24   of the yield-to-worst of the Bank of America Merrill Lynch U.S.

25   High Yield Master II index.  But even Judge Carey referred to

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

55

1   the use of that index, in his opinion, as conservative.  That's

2   the Tribune decision at 477 B.R. 465 at 481 (2012).

3          Your Honor, finally what I would say is

4   Mr. Weisfelner has put a lot of emphasis on recent data and

5   what recent market performance shows, and again I would submit

6   to Your Honor that you shouldn't be tempted by recent data.

7   Mr. Scruton testified that the use of very recent short-term

8   indices don't approach the statistical significance in terms of

9   an amount of robust data.  He further testified that there is

10  volatility in the markets, as Your Honor well knows.

11         I would draw your attention to Exhibit C-1 of the

12  revised calculations which show that in every year with

13  negative returns, there is a substantial rebound and a positive

14  return that corresponds to it.  That would suggest to me, and

15  hopefully to Your Honor, as well, that to draw too much from

16  recent performance of the market would be a mistake here.

17         And to that point, Your Honor, I'll just draw your

18  attention to, for example, in the hedge fund index, looking at

19  Exhibit C-1 to Mr. Scruton's supplemental exhibits, the rate of

20  return in 2011 of negative 11.96 percent is followed in the

21  immediate next year by a positive return of 10.14 percent.  The

22  return to the S&P in 2011 of 2.11 percent, still positive, is

23  followed the following year by an annualized return of 15.99

24  percent.

25         The reason Mr. Scruton used ten years' worth of data

1 here is because he understands that there is inherent

2 volatility of the markets and that drawing conclusions from

3 what has happened in the very recent past, as Mr. Weisfelner

4 might do, is inappropriate here.

5          Your Honor, with that, I want to make one more

6 comment, and that's about the accordion feature.  Your Honor,

7 if all this was about was the accordion feature, we wouldn't

8 need to be here.  There wouldn't need to be any stay of the

9 distribution.  Mr. Weisfelner would not have come to court in

10 June and sought to enjoin future distributions based on our

11 motion to liquidate.  It's because he has a view that his

12 clients need to enjoin this distribution to get at current GUC

13 Trust assets.

14          And to his proposal that we should let the money go

15 out and then we'll just repay him, respectfully, Your Honor,

16 that's not a real proposal.  Not only does it not comport with

17 any law that I've seen, but it ignores the fact that the

18 prevailing parties and the threshold issues decision, at least

19 insofar as the current GUC Trust assets and the future GUC

20 trust assets are concerned, are the unitholders and GUC Trust.

21          As a prevailing party, we are entitled to make the

22 required distribution under the plan and the GUC Trust

23 agreement, and we're entitled to be fairly compensated for the

24 full quantum of the potential harm done to the unitholders.

25 And with that, Your Honor, I'll rest, and thank you for your

57

1  indulgence.

2              THE COURT:  All right.  Thank you.

3              Mr. Weisfelner, you've got ten minutes to reply.

4              MR. WEISFELNER:  Sure.  Your Honor, I want to take

5  some of what I think were some unfortunate misrepresentations.

6  First of all, with regard to holes in the proof, Your Honor,

7  Page 156 of the trial transcript, my question:

8  "Q   But you told us at your deposition, didn't you, that you

9  didn't have any information regarding the other 53 percent, and

10  you don't believe that that information is knowable, and

11  therefore you were required to make an assumption.  Isn't that

12  true?

13  "A   That's true.

14  "Q   In fact, when you were asked at your deposition whether

15  sitting there on Friday what percentage of the GUC Trust units,

16  the missing 53 percent, were held by non-event driven hedge

17  funds, you told us you have no way to answer that question.

18  Isn't that true?

19  "A   I don't believe I have a way to answer that question,

20  correct.  That's true.

21  "Q   And the estimate you just gave the Court is just based on

22  your years of experience as opposed to any specific knowledge.

23  Isn't that right?

24  "A   Yeah.  I believe, and I was careful in qualifying my

25  basis, yes."

58

1          So, Your Honor, with all due respect, you do have a

2    hole in the proof.

3          As to another misrepresentation, Your Honor, Page 101

4    of the trial transcript.

5          THE COURT:  Was the 156 you were just making

6    reference to from the deposition transcript?

7          MR. WEISFELNER:  No, from the trial.

8          THE COURT:  Oh, from the trial transcript of you

9    repeating to him in the trial what had been said at deposition?

10         MR. WEISFELNER:  It's the trial transcript, both what

11   I repeated to him that was in the deposition and then I asked

12   him, having no reference to the deposition.

13         THE COURT:  Okay.

14         MR. WEISFELNER:  That's 156 to 157.

15         THE COURT:  And the second page reference you made

16   just as I was interrupting you was what?

17         MR. WEISFELNER:  Oh, I was about to refer Your Honor

18   or invite Your Honor's attention rather to Page 100.

19         THE COURT:  Also of the trial transcript of two days

20   ago?

21         MR. WEISFELNER:  Of the trial transcript.  That's

22   right.  I'm sorry.

23         THE COURT:  Okay.

24         MR. WEISFELNER:  And this goes to the question or the

25   issue that Ms. Rubin represented to you that if you looked at

1    Exhibit B-1 -- B as in boy one -- that you aren't to assume

2    that the box that Mr. Scruton drew around 15.2 meant that that

3    was his opinion.  What she told you was that his true opinion

4    is in Footnote Number 1, and that the right number is 16.3.

5    Well, that's directly refuted by Mr. Scruton's testimony at

6    Page 100:

7    "Q    Because when you reflect the numbers, net of the fee,

8    you're trying your best to demonstrate what the actual return

9    to the underlying investor would be, correct?"

10           Actually, go back a question and answer:

11   "Q    And when you did your calculations, you -- when you look

12   at the information that's reflected in your charts, we're

13   looking at the return to the hedge fund before deduction for

14   any management fee, correct?

15   "A    When I did -- in my charts the numbers reflect the returns

16   net of those fees.  I did not gross them up in the calculations

17   of my return rates.  That's the point of conservatism I made."

18           In terms of 101, he goes on to say:

19   "A    I think I would have had a basis, given the investors here

20   are hedge funds, to gross up the index for the two percent, but

21   because that included an element of judgment that could be

22   criticized as being aggressive, I determined it would be

23   conservative not to gross up."

24           That's the testimony, and you heard her represent it

25   that the right number is use the less conservative number and

60

1   go ahead and gross it up even though the witness told you

2   that's not what he did.

3        Your Honor, now I'm going to talk about the

4   stipulation because Ms. Rubin told you that the stipulation

5   doesn't govern because I only represented seven plaintiffs.

6   Well, Your Honor, read the definitions.  I represented seven

7   purported class representatives.  The Grumman plaintiffs

8   represented purported class representatives.  There's no

9   difference between the plaintiffs that she stipulated she

10  wouldn't argue about the timing of our proofs of claim then as

11  compared to the deposition of plaintiffs today, and any

12  suggestion to the contrary is ludicrous.

13       Your Honor, next point.  Ms. Rubin told you that

14  there is no -- or she told you there was scant authority for

15  the proposition or the methodology for determining lost

16  opportunity costs, and therein lays the conundrum that we have.

17  What we presented through cross-examination of the witness was

18  standard lost opportunity cost, calculations, and methodologies

19  that we've experienced for years, in my case 30 years, in Your

20  Honor's case I'm sure a longer period of time.

21       The problem we have is that Mr. Scruton wasn't asked

22  to calculate lost opportunity costs no matter what his

23  demonstrative says by way of title.  By his own testimony,

24  Mr. Scruton was asked to testify to and calculate protective

25  rates, whatever that means.  What Mr. Scruton told you in no

1  uncertain terms as part of his testimony was if you focus on

2  the mean, he rejects that as being the right calculation of

3  protective rate of return because the mean is likely to be

4  predictive of lost opportunity costs 50 percent of the time.

5       Half the time using the mean will give you too high

6  of a bond, if the bond is supposed to represent lost

7  opportunity costs.  Fifty percent of the time the bond will

8  give you too low of a protection.  That's what a mean is

9  defined as.  It's the average of either being too high of a

10  protection or too low of a protection if what you're looking to

11  protect is lost opportunity costs.  That's not what Scruton was

12  asked to calculate.  That's why we have stick my finger up in

13  the air and come up with third highest rate of return that no

14  one's heard of before.

15       THE COURT:  Well, I think the comments you just made

16  very satisfactorily describes the philosophical distinction

17  between an alternative return that's wrong 50 percent and right

18  50 percent, by definition exactly what you said, and that which

19  is higher than that to give new unitholders protection higher

20  than with a 50 percent probability of being wrong.

21       So I don't think there's -- even if your guise is

22  hiding the ball in terms of what you're asking me to find.  But

23  can you help me understand your position as to why a so-called

24  protective rate of return that gets the likelihood of getting

25  right up to the 80 percent range as contrasted to what

62

1   Ms. Rubin would say, glass half empty rather than half full, a

2   50 percent chance of being wrong isn't -- is better from your

3   perspective and satisfactory to her side on the other?

4          MR. WEISFELNER:  Certainly.  Certainly, Your Honor.

5   Look, I think the distinction is the cases that the unitholders

6   and the trust relied on throughout their brief and throughout

7   their oral argument are stays of confirmation orders and

8   situations where people were being asked to stay confirmation

9   pending appeal out of concern that the equitable mootness would

10  be equitable mootness as it relates to a plan.

11         And, Your Honor, in the context of potentially,

12  quote, "knocking the props out" from under a plan and taking a

13  look at the multitude of transactions that occur in the context

14  of consummation of a plan, we're talking about all sorts of

15  stuff, as was true, for example, in <u>Tribune</u> in the Kurtz

16  affidavit.  We focused on one section.  Kurtz then went on to

17  talk about the potential harm associated with making

18  distributions of stock to shareholders.  Mr. Kurtz then went on

19  to talk about the difficulty associated with free cash flow and

20  free cash flow sweeps that would openly go out the door or for

21  the benefit of shareholders.

22         Mr. Kurtz talked about opportunities in the business

23  itself for being able to use free cash flow as part of

24  reforming and resuscitating the business.  Mr. Kurtz talked

25  about the impact on competition in the industry where Tribune's

1 restructuring was to be held in place and forced to tread water

2 while other competitors in the market advanced on <u>Tribune</u>.

3        That's not this case.  This plan was confirmed.  This

4 plan was consummated.  People got their distributions.  The

5 government owned most of the equity.  The government sold out

6 of its equity.  The unitholders were entitled to the GUC

7 distribution.  Hedge funds poured into the units as a decent

8 investment and took some would either say advantage of or

9 assisted general unsecured creditors in being able to get out

10 of their investments quickly at a discount.

11        This is not plan of reorganization appeals where

12 we're looking to stay all of the implications of a confirmed

13 plan.  This is a GUC Trust, set up years ago, with

14 approximately thirty -- $10 billion worth of value on account

15 of what then we understood to be $30 billion worth of claims.

16 That's how we all compute the 30 cents on the dollar

17 distribution.

18        So when we look at situations where bonds were being

19 contemplated in the context of an appeal of a plan, and

20 consummation and avoiding irreparable injury in connection with

21 equitable mootness, the kinds of damages that people were

22 concerned about, the level of unscrambling the egg was really a

23 lot different than what we're talking about here.

24        And, Your Honor, with all due respect to Ms. Rubin

25 and her client and Ms. Newman and her client, what I don't

64

understand is what was wrong with my supposition.  Take the

money when the trust is ready to make a distribution sometime

in mid-November.  It's $135 million.  What's wrong with telling

me which hedge fund got how much of that 135, and getting and

undertaking from them that if my appeal is successful and a

court of competent jurisdiction finally directs them to return

the money, I'm not banging my head against the wall, but I have

an opportunity to present to that fund a letter of credit that

says turn back the money.

And to take the wind out of everyone's sail on

computing interest rates, which is by no small measure a

difficult computation, what's wrong with saying whatever

interest you earn, you keep?  All this lost opportunity doesn't

become theoretical anymore, it becomes actual.  Earn what

you're going to earn.  All I want is a reasonable return on the

money that you got that you weren't by court order supposed to

have had.  If a court determines ultimately on appeal you

shouldn't have gotten the money, then you shouldn't have gotten

the money, but you had the benefit of earning potential on that

money.  All I want back is two percent, which is dramatically

lower than any figure they've ever presented.

And I think, Your Honor, the last point I want to

make, and by the way, other than telling you, Your Honor, to

assist Your Honor in preparing your decision, there are any

number of pages I think Your Honor may want to look to.  But

65

1  Your Honor has already indicated that we've each of us made our

2  positions fairly well-known.  I think the exercise here is take

3  a look at what's a lost opportunity cost.

4          Their position is no, no, no, no, you need to

5  determine what the best protective rate of interest is supposed

6  to be.  I don't see any authority for that proposition other

7  than their inapposite cite to, for example, <u>Adelphia</u>, which

8  Your Honor again knows very well is in the context of a stay

9  pending appeal from a confirmation order where the Court quite

10 correctly says that what we're looking for is a bond that will

11 properly do justice to the potential damages that are going to

12 be realized because the potential damages in unwinding a plan

13 are hard to compute.

14         The damages from these hedge funds not getting their

15 hands on $135 million, Your Honor, is a different exercise.

16 Tell me what you're going to do with the money over what period

17 of time, and either before the fact we'll try and guess what

18 you earn, or after the fact we'll know what you earn.

19         My offer to them today is let's figure it out after

20 the fact.  Take the money.  Invest it in whatever you want to

21 invest in.  I said Bolivian bonds.  You know, there could be

22 some really smart hedge fund guys out there that think that all

23 of these four indices are nuts, that what we really ought to be

24 investing in is going down to Atlantic City and betting on

25 Trump being the Republican nominee.  That's got great odds.

66

1  God bless them, they run hedge funds, they're worth billions.
2  Let them make whatever investment they want.  Let them make
3  whatever returns they want.  Give me the money back when a
4  judge says give me the money back, and give it to me back with
5  a very, very low rate of return.  What's wrong with that?

6         The last point I thought I wanted to make, but I'm
7  sort of losing my place here.  Oh, we keep coming back to 240
8  some odd million dollars went out the door because of a
9  strategic decision, and that's part of a <u>Chateaugay</u> factor and
10 it's prejudicial.

11        I'm guessing that on appeal a Court may look at the
12 244 out of the ten billion that's already been distributed, or
13 the 244 out of the 890 million of cash they currently have, or
14 the 244 out of the accordion feature and say, you know,
15 Weisfelner, you screwed up and you're never getting your hands
16 on that money again.  But how does that relate to the next
17 distribution they want to make?  And how do they overcome Your
18 Honor's determination that had I spent the time and money
19 arguing on that $240 million distribution, Your Honor would
20 have held it up, quote, "in a heartbeat."

21        THE COURT:  Well, Mr. Weisfelner, when I said what I
22 said back then, I did not have the benefit of the evidence that
23 I have now, nor the articulation of the legal issues.

24        MR. WEISFELNER:  All of --

25        THE COURT:  The law of the case doctrine is quite

1 clear that facts that later become known to the Court make

2 arguments that might otherwise be said to be law of the case go

3 out the window.

4        MR. WEISFELNER:  And, Your Honor, you don't need me

5 to say that, but that's absolutely true and I wasn't suggesting

6 otherwise.  My only point in raising it is I'm to be damned for

7 having made that strategic decision way back when on the theory

8 that had I moved for the relief, I would have been successful.

9 I don't know that.  My adversary certainly doesn't know that.

10 We have Your Honor's commentary, but you're right, it was

11 without the benefit of --

12        THE COURT:  If you had moved to that relief, then

13 Ms. Rubin or Ms. Newman might have said -- probably would have

14 said -- matters very similar to what they've been telling me

15 over the last couple of days.

16        MR. WEISFELNER:  Correct.  And, Your Honor, with all

17 due respect to their position, and for the reasons I've

18 historically articulated, if we ever get back to the notion of

19 likelihood of success on the merits, I think I've explained to

20 you, and I don't know that Your Honor needs to hear it again,

21 why I think I'm going to be successful as to the accordion, as

22 to the amount of cash currently on hand, and for that matter as

23 to the 30-cent distribution that's already been made.  And I

24 can articulate those rationales independently.

25        As to the accordion feature, because there is no

68

1  possibility that the GUC Trust unitholders as currently

2  situated will ever trigger the accordion.  Therefore, our

3  getting it, and our getting it exclusively, is a remedy that

4  could have been fashioned and we believe will be fashioned by

5  an appellate court, that has no adverse implications on the GUC

6  Trust beneficiaries.  But for the argument you heard that, you

7  know what, it's going to require the GUC Trust to stay in

8  existence longer than they want to because they're going to

9  have to spend the time and the money making the distribution to

10  these poor jerks that filed late claims because their due

11  process rights were violated.  Shame on them for keeping our

12  doors open in our candy store for that much longer.

13          The argument with regard to the money that's

14  currently on hand, Your Honor, I think I'd prevail on an appeal

15  because Your Honor's equitable mootness determination was

16  predicated on reasonable expectations.  And it gets back to the

17  hole in the evidence.

18          Your Honor, I had no basis to determine that the

19  unitholders then or the unitholders now had any reasonable

20  expectations about not being deluded by our plaintiffs.  In

21  fact, to the contrary, the record, every single statement in

22  every one of the GUC reports from May of 2014 forward clearly

23  articulated the risk -- or was it 2015 forward; '14 forward --

24  the risk of potential dilution from the recall.

25          And, Your Honor, I will tell you something that's

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

69

1  totally unsupported by the record or any evidence, it's just

2  within my knowledge base and you can accept it reject it.

3  Hedge funds --

4          THE COURT:  Why would you tell me something in

5  argument, especially on reply, that's wholly unsupported by the

6  record?

7          MR. WEISFELNER:  Well, because, Your Honor, I just

8  think we can almost all of us take notice of it or I can call

9  any hedge fund guy in the room to take the stand, and that is

10  when the recall got noticed, guys who had hedge fund units

11  started running their calculations all over again and sweating

12  bullets about whether or not they'd have umteen billion dollars

13  worth of additional competing claims.

14          And, Your Honor, as to the money that's already been

15  paid out, again --

16          THE COURT:  Well, if you're asking me to strike that

17  remark, Ms. Rubin, to the extent it's necessary, I'm granting

18  it.

19          MS. RUBIN:  Thank you, Your Honor.

20          MR. WEISFELNER:  And, Your Honor, the last point I

21  want to make because I heard all these criticisms about our

22  calculations that we handed up as part of our demonstrative --

23  and you want to know what?  Ms. Rubin is absolutely correct,

24  absolutely correct.  This demonstrative did something unfair.

25  When we presented the Plaintiff's mean we did it on a weighted

70

1  average, meaning each index got the same weight.  Whereas the

2  testimony you did get was that at a minimum you had to weight

3  the Credit Suisse 47 percent, and because we didn't know any

4  better, we divided the other three indices equally.

5          Well, Your Honor, only because he's that good at math

6  and that fast at math, Mr. Steel recalculated the mean on a

7  weighted average.  And I'll represent to the Court that on a

8  weighted average, the way Ms. Rubin wants me to weight it,

9  47/18/18, my 5.0325 percent jumps up to 5.09 percent.

10          Your Honor, with that, I have no further --

11          THE COURT:  Okay.  Thank you.

12          Ms. Rubin, you've got the same amount of time.

13          MS. RUBIN:  Thank you, Your Honor.  The first thing

14  I'll say, Your Honor, is while I don't distrust Mr. Steel's

15  mathematical abilities, he certainly is not been proffered here

16  as an expert.  We've had no basis to check those mathematical

17  calculations on and I ask that Your Honor strike that from the

18  record.

19          Let's return to some of the points that

20  Mr. Weisfelner just made.  Mr. Weisfelner made a point that the

21  cases that we rely upon in terms of the calculations of lost

22  opportunity costs or the appropriate amount of the bond are all

23  about confirmation orders, and I want to challenge that on two

24  fronts.

25          One, the cases that I rely upon the most in my brief

71

1   and throughout my argument is actually the <u>BGI</u> case.  And there

2   are three decisions in <u>BGI</u> on which I rely.  One is Judge

3   Glenn's 2012 opinion denying the first application for a stay

4   pending appeal.   The second is Judge Scheindlin's 2014

5   District Court opinion denying the second application for a

6   stay of distributions pending appeal.  And the third is the

7   Second Circuit's opinion in 2014 in which it affirms the

8   applicable mootness decision that Judge Glenn had made.

9         Now, it's fair to say those are not about the

10  calculation a bond because in each of those instances, the

11  courts found that the stay was not appropriate.  But it's

12  unfair to say that the cases on which we rely the most are

13  about a confirmation order.

14        The <u>BGI</u> case is actually quite similar to this one.

15  It's about a stay of distributions pending an appeal in a

16  situation where the plan had already been substantially

17  consummated.  Your Honor, I can't think of a case that's more

18  factually on all fours, at least within this circuit, than that

19  one is.  And I would encourage Your Honor to give that case a

20  second look in terms of the stay here.

21        Now, Mr. Weisfelner then went on to talk about the --

22        THE COURT:  That case being Marty Glenn's decision at

23  the Bankruptcy Court level in Borders Books?

24        MS. RUBIN:  Yes.  And actually the second decision by

25  Judge Scheindlin.  So Your Honor may recall that there were two

72

1   distributions that the gift card holders sought to enjoin.  The

2   first one in 2012 was the first interim distribution and there

3   were two gift card holders that sought to file late claims,

4   first in their individual capacity and, second, on behalf of

5   the putative class.  Judge Glenn denied those motions to file

6   late claims and for certification of a class.  They then sought

7   to stay the first interim distribution pending appeal of those

8   orders.

9         THE COURT:  Tell me, I thought their claims were

10  disallowed.

11        MR. RUBIN:  Those claims were disallowed, so they

12  sought to file late claims both for themselves as individuals

13  and again on behalf of the putative class.  Those claims were

14  disallowed.  During their appeal of the disallowance of those

15  claims, or rather the denial of their motions, they sought a

16  stay of the first interim distribution pending that appeal.

17  Judge Glenn denied that.

18        Judge Scheindlin's 2014 opinion deals, Your Honor,

19  with the second interim distribution.  And there was again a

20  request for a stay pending appeal.  Judge Scheindlin in a very

21  -- in a much lengthier opinion goes through the factors why a

22  stay was not warranted there, as well.

23        I rely on both of those opinions.  I think

24  particularly Judge Scheindlin's opinion offers some very

25  helpful guidance on the weighting of the four preliminary

1    injunction factors and how they interrelate to one another, in

2    particular the relationship between the irreparable harm factor

3    and the likelihood of success on the merits.  That's the

4    decision in which Judge Scheindlin says:

5              "Where you don't act with all diligence to protect

6              your rights throughout a proceeding, you can't

7              establish irreparable harm.  There's no actual or

8              imminent injury to you."

9         And that's the point I was trying to make about

10   Mr. Weisfelner's claims.  I accept that we agreed not to assert

11   a timeliness objection.  To me, what that meant was we weren't

12   going to say that Mr. Weisfelner's clients couldn't meet the

13   doctrine of excusable neglect for claims filed during what's

14   defined as the interval.

15        I also didn't say that those seven people that Mr.

16   Weisfelner represented at the time didn't have putative class

17   claims.  What I said was their putative class claims were in

18   respect very strictly of the ignition switch defect and with

19   respect to three particularly mentioned vehicles that had never

20   been recalled.

21        I know this, Your Honor, because my firm went and

22   tracked down each one of the five putative class complaints

23   that was the subject of the objection that Mr. Weisfelner filed

24   on April 22nd, 2014 because we wanted to understand what was

25   the import of what we agreed to in terms of who the plaintiffs

74

1  were, what did we actually say we would or would not do.

2          This is not the first time that Mr. Weisfelner has

3  accused me of having chutzpah in terms of my interpretation of

4  that order.  I took that accusation fairly seriously.  I sought

5  to educate myself.  I don't believe there's anything wrong with

6  what I've said today about the lack of irreparable harm to Mr.

7  Weisfelner's clients.

8          But even if there is, my point was, Your Honor,

9  Mr. Weisfelner seeks to represent millions and millions of

10 plaintiffs.  He's told you that, Your Honor.  Those plaintiffs

11 have economic loss claims predicated on the ignition switch

12 defect that has been strictly defined in this Court to mean

13 those people affected by the February and March 2014 recall.

14         He also represents leagues more in millions of

15 plaintiffs who have technical what are called non-ignition

16 switch defect claims.  And my point was the folks that he

17 represented at the time of the objection, they were only folks

18 whose individual standing was based on the first two defects,

19 not the tens of millions of additional people he now

20 represents.  I don't believe we have any agreement between us

21 with respect to failure to assert a timeliness objection on

22 behalf of those folks.

23         Let me go on, Your Honor.  With respect to the

24 likelihood of success on the merits, Mr. Weisfelner says that

25 he expects to win with respect to the accordion feature because

1  the unit holders couldn't have possibly had an expectation that

2  they would tap those assets.

3        And I think Mr. Weisfelner is missing the point.  The

4  expectation, as Your Honor put it in his decision, is that

5  liquidating trusts are not meant to survive forever during the

6  administration and distribution of money pending massive class

7  actions.  And that was the unit holders' expectations here.

8        And you shouldn't take my word for it, Your Honor.

9  Exhibit FF to Ms. Newman's declaration in support of the unit

10  holder and the GUC Trust's threshold issues brief -- and I'd be

11  happy to cite the docket number to Your Honor -- is an

12  analyst's report.  And that analyst's report talks about the

13  fact that in recommending that folks should buy the GUC Trust

14  units, is an analysis predicated on an understanding of what

15  reserves the GUC Trust has, administrative reserves, tax

16  reserves, life of the trust.  Those were all factors that GUC

17  Trust unit holders considered in making their investment

18  decisions.

19        So for Mr. Weisfelner to say, "Oh, they knew that

20  there would be a list to them," well, they also knew that there

21  was limited universal claims.  They had certain expectations

22  about how long the trust would last.

23        Those expectations would be upended if Mr. Weisfelner

24  and his clients suddenly filed putative class claim that have

25  to be decided by Your Honor whether they should be allowed,

76

1  whether the excusable neglect factors have been met, whether or

2  not any of them are even known creditors.

3       We know that the ignition switch plaintiffs have

4  qualified under Your Honor's ruling as non-creditors.  We don't

5  know that with respect to the non-ignition switch plaintiffs.

6  Those are all things that are going to have to be determined in

7  due course if they want to access this accordion feature based

8  on the ruling by the Second Circuit.

9       Now, Your Honor, Mr. Weisfelner made an argument

10  about the Tribune case, and I want to say a couple of things

11  about that.

12       First, that's not a case on which the GUC Trust is

13  principally relying.  It's one fact that Mr. Weisfelner has

14  made a lot out of in terms of examining our witness both at his

15  deposition and at the evidentiary hearing.

16       And I would just point out that the rate of return

17  here based on the same index that David Kurtz used as

18  demonstrated by Exhibit F-1 to Mr. Scruton's declaration, the

19  yield to worst for that same index used by David Kurtz, here

20  would get you a rate of return of 7.17.  That's still two plus

21  points higher than the rate of return that Mr. Weisfelner has

22  submitted to you as the appropriate one.  And that's a rate of

23  return that Judge Carey in his decision in Tribune called

24  conservative.

25       THE COURT:  And that's using the junk bond index?

77

1              MS. RUBIN:  Yes, that's using the Bank of America,

2    Merrill Lynch U.S. High Yield Master 2 Index, Your Honor.

3              Your Honor, you noted the philosophical difference

4    between my position and Mr. Weisfelner's position.  And I

5    certainly don't disagree with that.  And then you challenged

6    Mr. Weisfelner to tell you why it's okay that they should post

7    a bond that has the risk of being 50 percent wrong, or being

8    wrong 50 percent of the time.  And I note, Your Honor, he still

9    hasn't cited any case before Your Honor that supports that

10   position.

11             He's trying to shift the burden further, Your Honor,

12   with a proposal that he's making that you should let the money

13   go out and then it should be recaptured from the unit holders.

14   That's an effort to distract from the law.  There's no case

15   that I know of that supports the proposal that he's making.

16   There's certainly no case that I know of that supports posting

17   a bond that has the real material risk of being wrong 50

18   percent of the time.  And he goes on to talk about the fact

19   that the hedge funds here are best equipped to bear the risk.

20   Well, if the hedge funds really are the only investors in GUC

21   Trust units, Mr. Weisfelner's prepared to accept that.  And I'm

22   not saying that they are or they aren't, Your Honor.  You know

23   that the GUC Trust has no way of knowing that.

24             But even if it's Mr. Weisfelner's own supposition

25   that hedge funds represent the majority or the super-majority

78

1  of unit holders here, then the rate of return should go up, not

2  down.  The credits -- the proportion of the bond reflective of

3  that Credit Suisse index, Mr. Weisfelner doesn't challenge that

4  as a reasonable proxy, by the way, for the hedge funds.  The

5  proportion of the rate of return attributable to that index

6  should go way up as well.

7          The final thing that I would say, Your Honor, is

8  Mr. Weisfelner talks a big game about what his claims are, and

9  the millions if not billions of dollars that his clients are

10 entitled to get back.

11         Your Honor, I have no idea as I sit here today,

12 nearly 18 months after I first made an appearance in this

13 action, what the quantum of his claims even are.  He dropped a

14 footnote in his objection to our motion for liquidation.

15 That's a brief that he filed on June 24th, Footnote 4, says

16 that, quote, "In the near term, he's going to file a putative

17 class proof of claim alongside a motion to withdraw the

18 reference."

19         Well, he did the second, filed the motion to withdraw

20 the reference.  We know how that turned out.  But he never did

21 the other thing.  I don't know why.  But I'm still left here,

22 as are the unit holders, --

23         THE COURT:  Well, you and I and probably everybody in

24 this room read Jesse Furman's decision on the withdrawal of the

25 reference.  I would have thought that most people agreed that

1   Jesse Furman ruled the way he did because on the issues that

2   are going to be addressed in the next couple of weeks,

3   principally putatives based on old GM conduct, imputation based

4   on old GM conduct, or knowledge gathered by new GM, some or all

5   of which may have come from old GM, and certain kinds of claims

6   that allege things like -- whatever Plaintiff stuck in their

7   complaints outside of those categories, relying on old GM

8   conduct, were subject to my gatekeeper role because I knew what

9   I had ordered back in 2009 and what I've been trying to

10  accomplish in the judgment, you're saying something different

11  here on a different kind of withdrawal of the reference.

12          You're saying whether I or my successor should be the

13  guy who liquidates and fixes the amount of class proofs of

14  claim here, or whether somebody who has other aspects of the

15  MDL should be doing that.  Isn't that a different withdrawal of

16  the reference type of issue?

17          MS. RUBIN:  I'm actually not saying that at all, Your

18  Honor.  So, let me be perfectly clear about what I'm saying.

19  All I meant to suggest, Your Honor, is that Mr. Weisfelner made

20  the representation to the Court that he was going to

21  simultaneously file two things, a motion to withdraw the

22  reference and putative class proofs of claim.

23          All I meant to suggest to Your Honor had nothing to

24  do with the substance or the outcome.  All I meant to say to

25  Your Honor is Mr. Weisfelner did go ahead and file the motion

80

1   to withdraw the reference.  Judge Furman decided it, as Your

2   Honor just stated.  He didn't file his class proof of claim.

3   That is the part of it that I'm scratching my head about, and

4   that is the part that leaves Ms. Newman and I sort of in a

5   position of we don't know what the quantums of the claims are

6   here.

7          How can the GUC Trust be expected to protect folks

8   that aren't even contingent claimants, aren't even contingent

9   beneficiaries, particularly when Your Honor has ruled that the

10  equitable mootness doctrine inhibits those in the plaintiffs'

11  position from ever accessing the past, present or future assets

12  of the GUC trust?  I represent the trustee fiduciary duties,

13  Your Honor.  That trustee is required under the terms of the

14  plan and confirmation order to make required distributions on a

15  quarterly basis.  The burden is not respectfully on my client

16  or on the unit holders.  The burden was on Mr. Weisfelner to

17  come before the Court and give evidence as to:  one, the

18  necessity of the stay; two, the lack of necessity for a bond.

19  And he hasn't done either.

20         So respectfully, Your Honor, what we would submit the

21  appropriate amount of the bond is -- and again, I didn't

22  represent that this is Mr. Scruton's exact testimony.

23  Mr. Scruton said that the $15.2 million in Exhibit B-1 of the

24  supplemental exhibits was conservative based on the fact that

25  he did not take account in his calculation of the weighted

81

1   average protection rate of two percent incentive and management

2   fees for the hedge fund.  We believe that that $15.2 million is

3   the right place to start, and that an adjustment is necessary

4   upward to account for those management fees.

5          And with that, Your Honor, I'll rest and thank you

6   for your time.

7          THE COURT:  All right.  Although at one time I

8   naively thought that I could give you a dictated ruling at the

9   conclusion of legal argument, I don't think that's feasible.

10  And I don't know if I can even give it to you tomorrow,

11  although I do know that if I can't give it to you tomorrow I

12  can't give it to you for a while thereafter.  Am I correct that

13  the date by which the rust contemplates its next distribution

14  is November 15th, Ms. Rubin?

15         MS. RUBIN:  Yes, Your Honor.

16         THE COURT:  Am I also correct in my assumption that

17  there's no material likelihood that you're going to make a

18  distribution before November 15th?

19         MS. RUBIN:  That's also correct, Your Honor.

20         THE COURT:  Can I get that as an undertaking from the

21  Trust?

22         MS. RUBIN:  I believe you can, Your Honor.

23         THE COURT:  All right.

24         MS. RUBIN:  Subject to, of course, discussions with

25  my client, who's not present in the courtroom today.

82

1          THE COURT:  Well, you better confirm that --

2          MS. RUBIN:  Very quickly.

3          THE COURT:  I can easily give you guys comfort that

4   you'll have plenty of time from me before November 15th, but it

5   would distress me, to put it mildly, that if I delayed in

6   issuing what's in substance a preliminary injunction based on a

7   belief that there was no urgency in issuing the injunction,

8   that my own reasonable expectations were dashed.

9          MS. RUBIN:  I understand, Your Honor.  One caveat I

10  would raise is that certain preparations would need to be made.

11  It's no small undertaking for the Trust to distribute $135

12  million in cash.  We will make an undertaking to Your Honor

13  that we will not distribute the cash prior to November 15th.

14         THE COURT:  I don't care what preparations you take,

15  as long as they can be put on hold without frustrating the

16  Plaintiffs' desires until I've ruled.

17         MS. RUBIN:  I understand, Your Honor.

18         THE COURT:  Okay.  Then we're adjourned for the day.

19         MR. WEISFELNER:  Your Honor, I'm sorry to raise this.

20  Just by way of question, Your Honor had asked counsel --

21         THE COURT:  Come to a mike, please.

22         MR. WEISFELNER:  -- the day before yesterday for --

23         THE COURT:  Come to a mike, Mr. Weisfelner.  You're

24  usually more than loud enough.

25         MR. WEISFELNER:  I was just wondering what happened

83

 1    to Your Honor's inquiry.  You asked for counsel at Akin to

 2    confirm to you that the hedge funds they represent are not par

 3    creditors.  And I don't know that any of us have even gotten a

 4    response.

 5              THE COURT:  Ms. Newman.

 6              MS. NEWMAN:  Yes, Your Honor.  We did discuss this

 7    with our client.  The term "par investor" is not a term that's

 8    applicable to the GUC Trust units because they trade like an

 9    equity.  There's no stated redemption for the units.  They just

10    trade based on the market price.  So, there's no concept of a

11    PARR or discount to PARR investor for the GUC Trust units.  I

12    can tell you that our clients were not creditors in the GM

13    bankruptcy.

14              THE COURT:  They were not initial creditors in

15    initial privity with old GM, which caused them to become

16    creditors.

17              MS. NEWMAN:  That's correct.

18              THE COURT:  Okay.  That's sufficient for my purposes

19    here.

20              MS. NEWMAN:  Thank you, Your Honor.

21              THE COURT:  Thank you.

22        (Concluded at 5:05 p.m.)

23                          *  *  *  *  *

24

25

84

# C E R T I F I C A T I O N

     We, Michelle Costantino, Ilene Watson, and Lisa
Luciano, court-approved transcribers, hereby certify that the
foregoing is a correct transcript from the official electronic
sound recording of the proceedings in the above-entitled
matter.

_Michelle Costantino_

_____
MICHELLE COSTANTINO, AAERT NO. 589   DATE:  September 29, 2015
ACCESS TRANSCRIPTS, LLC



_____
ILENE WATSON, AAERT NO. 447       DATE:  September 29, 2015
ACCESS TRANSCRIPTS, LLC



_____
LISA LUCIANO, AAERT NO. 327       DATE:  September 29, 2015
ACCESS TRANSCRIPTS, LLC