# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: | **MDL NO. 2543** |
| | **1:14-MD-2543-JMF** |
| **GENERAL MOTORS LLC IGNITION** | |
| **SWITCH LITIGATION** | **HON. JESSE M. FURMAN** |
| _____ | |
| | Case No. 15-CV-02033-JMF |
| **THIS DOCUMENT RELATES TO:** | |
| | |
| JAMIE LEE DOWLING individually and as | |
| surviving mother of RAYLEE KAY | |
| DOWLING and LANDYN SCOTT | |
| DOWLING, | |
| Plaintiff, | |
| | |
| -V- | |
| | |
| GENERAL MOTORS LLC and KEY | |
| SAFETY SYSTEMS, INC., | |
| | |
| Defendants. | |
| _____ | |

## SECOND MOTION FOR LEAVE TO AMEND COMPLAINT

Pursuant to Fed. R. Civ. P. 15, Plaintiff hereby moves for leave of court to amend her

complaint in order to make clear that her claim for punitive damages in this action is premised

solely on the acts or omissions of General Motors, LLC (i.e., "New GM," the Defendant in this

case) after it was created, and to confirm that Plaintiff is not seeking to obtain punitive damages

against New GM that arise from the conduct of General Motors Corporation ("Old GM").   This

Motion for Leave is specifically filed after counsel for New GM sent Plaintiff's counsel a letter

(on August 31, 2015) contending that an attempt by Plaintiff to seek punitive damages "from

New GM that arise from the conduct of Old GM (and not New GM)" would be "a violation of

the Sale Order and Injunction….entered by the Bankruptcy Court" in the Southern District of

New York, citing *Decision on Motion to Enforce Sale Order*, *In Re Motors Liquidation*

*Company*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015).

While Plaintiff in filing this Motion for Leave does not concede GM's contention

(Plaintiff understands that the above-referenced June 1, 2015 Bankruptcy Order is presently or

soon will be the subject of an appeal and protracted litigation), she nonetheless asserts and agrees

that her punitive damages claims against New GM in this action are premised solely upon the

conduct of New GM since it was created in July 2009, not the conduct of Old GM, as appears to

be required by currently existing orders of the Bankruptcy Court.

Plaintiff attaches hereto as **Exhibit A** the redlined version of the Amended Complaint

that she wishes to file making this clarification in several places.

WHEREFORE, Plaintiff respectfully requests this Court enter an order granting her

Motion for Leave to Amend Complaint.

DATED:   September 30, 2015.


*/s/ Lance A. Cooper*
Lance A. Cooper
Georgia Bar No. 186100
**THE COOPER FIRM**
531 Roselane Street
Suite 200
Marietta, GA 30060
Tel.:  770-427-5588
Fax:  770-427-0010
lance@thecooperfirm.com

2

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that the foregoing was filed electronically with the

Clerk of the Court using the CM/ECF system on September 30, 2015, and served electronically

on all counsel of record.


/s/ Lance A. Cooper
**LANCE A. COOPER**

**IN THE UNITED STATES DISTRICT COURT**

~~IN AND FOR THE~~ SOUTHERN DISTRICT OF ~~COLORADO~~ NEW YORK

~~Civil Action No.~~

~~JAMIE LEE DOWLING, Individually; as surviving mother of RAYLEE KAY DOWLING; and as surviving mother of LANDYN SCOTT DOWLING,~~

~~Plaintiffs,~~

~~v.~~

~~GENERAL MOTORS LLC and KEY SAFETY SYSTEMS, INC.,~~

~~Defendants~~

| | |
|---|---|
| **IN RE:** ) | **MDL NO. 2543** |
| ) | **1:14-MD-2543-JMF** |
| **GENERAL MOTORS LLC IGNITION** ) | |
| **SWITCH LITIGATION** ) | **HON. JESSE M. FURMAN** |
| ) | |
| ) | Case No.  15-CV-02033-JMF |
| **THIS DOCUMENT RELATES TO:** ) | |
| ) | |
| JAMIE LEE DOWLING individually and as ) | |
| surviving mother of RAYLEE KAY ) | |
| DOWLING and LANDYN SCOTT ) | |
| DOWLING, ) | |
| Plaintiff, ) | |
| ) | |
| -V- ) | |
| ) | |
| GENERAL MOTORS LLC and KEY ) | |
| SAFETY SYSTEMS, INC., ) | |
| ) | |
| Defendants. ) | |

Formatted: Justified, Space Before:  0 pt, After:  0 pt, Tab stops:  3.25", Centered

Formatted: Different first page header

Formatted: Not All caps

Formatted: Not All caps

Formatted: Font: Bold, Not All caps

Formatted: Justified, Space Before:  0 pt, After:  0 pt

### **AMENDED COMPLAINT FOR DAMAGES AND JURY DEMAND**

> **Formatted:** Centered

Plaintiff Jamie Lee Dowling, by and through her attorneys of record, Ollanik Law LLC,
Fleishman & Shapiro, P.C., and The Cooper Firm, files her Amended Complaint for Damages
and Jury Demand, and states and alleges as follows:

### **GENERAL ALLEGATIONS**

1.17.   This is an action to recover damages for the wrongful deaths of Raylee Kay

> **Formatted:** Bullets and Numbering

Dowling, also known as Raylee Kay Dowling-Sells, and Landyn Scott Dowling, who were killed
in an automobile accident that occurred on March 9, 2013 in Gunnison County, Colorado
(hereinafter "the accident"), and for personal injuries sustained by Jamie Lee Dowling.

2.18.   Plaintiff Jamie Lee Dowling is a citizen of Nebraska and the surviving mother of
the deceased, Raylee Kay Dowling and Landyn Scott Dowling.  She brings this action
individually, and as surviving mother of Raylee Kay Dowling and Landyn Scott Dowling.  Jamie
Lee Dowling brings this wrongful death action in her representative capacity on behalf of and for
the benefit of the statutory heirs of Raylee Kay Dowling and Landyn Scott Dowling.

3.19.   Defendant General Motors LLC ("GM") is a Delaware corporation headquartered
and with its principal place of business in Michigan and doing business in Colorado and
elsewhere throughout the U.S. GM maintains its registered agent for service in Denver,
Colorado.

3.1   General Motors LLC is a limited liability corporation with one member: General
Motors Holding, LLC. General Motors Holding, LLC is a citizen of Delaware and Michigan, and
is a holding company and direct parent of General Motors LLC. General Motors Holding, LLC is
a limited liability corporation with one member: General Motors Company. General Motors
Company is a citizen of Delaware and Michigan and is publicly traded

3.2   General Motors Corporation ("Old GM") was a Delaware corporation with its headquarters in Detroit, Michigan. General Motors Corporation, through its various entities, designed, manufactured, marketed, distributed, and sold Chevrolet, Pontiac, Saturn, and other brand automobiles in Michigan, elsewhere in the United States, and worldwide.

3.3   In June of 2009, General Motors Corporation ("Old GM") filed for bankruptcy. On July 9, 2009, the United States Bankruptcy Court approved the sale of substantially all of Old GM's assets pursuant to a Master Sales and Purchase Agreement ("Agreement"). The Agreement became effective on July 10, 2009. The Agreement approved the sale of Old GM to Defendant General Motors LLC ("GM" or "New GM").

3.4   The Agreement defines Defendant's "Purchased Assets" as:

(xiv) all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

(xv) all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities; . . .

AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT at Section 2.2.

3.5   Along with the Purchased Assets, New GM also expressly took on a range of liabilities. "Liabilities" is defined in the Agreement as "any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent,

3

determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise."

3.6   Among many others, the Liabilities assumed by New GM under the Agreement include:

(vii) (A) all Liabilities arising under express written warranties of Sellers [i.e., old GM] that are specifically identified as warranties and delivered in connection with sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser [i.e., new GM] prior to or after the Closing and (B) all obligations under Lemon Laws; . . .

(ix) all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents, or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance; . . .[1]

(xi) all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing; . . .

Plaintiff does not concede that New GM did not assume Old GM's liabilities for punitive damages.   But, as that question is sure to be taken up in ongoing and continued litigation and on appeal, Plaintiff amends her Complaint to confirm that in this Action she is only seeking punitive damages for the conduct of New GM after July 2009.

3.7   New GM also assumed responsibility for compliance with a wide range of laws and other regulations, including:

(a)   From and after the Closing, Purchaser [Defendant GM] shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and

---

[1] Pursuant to an order of the bankruptcy court, this particular category of assumed liabilities is "regardless of when the product was purchased."

4

Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [Old GM].

(b) From and after the Closing, Purchaser [Defendant GM] shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [Old GM] . . . (ii) Lemon Laws.

3.8  Moreover, the Bankruptcy Court order approving the Agreement made clear that New GM assumed "the warranty and recall obligations of both Old GM and [New GM]."

3.9  Pursuant to the Agreement and other orders of the Bankruptcy Court, New GM emerged out of bankruptcy and continued the business of Old GM with many, if not most, of Old GM's employees and, on information and belief, with most of the same senior-level management, officers, and directors, as well as its records, tests, and documents generated in the creation of the defective ignition switches.

4.  The allegations pertaining to Old GM above are included for purposes of background and historical context, and to set forth the scope of New GM's liabilities and responsibilities under the Agreement. This Complaint does not assert any causes of action against Old GM; all causes of action and attributions of liability are directed solely against New GM for its own conduct and misconduct.

4.   5.  Defendant Key Safety Systems, Inc. ("KSS") is a Delaware corporation headquartered and with its principal place of business in Michigan and doing business in Colorado and elsewhere throughout the U.S.  KSS maintains its registered agent for service in Denver, Colorado.

5. 6.  Each Plaintiff claims damages in excess of $75,000 in this action.

6.   7.  Jurisdiction and venue in this Court are proper pursuant to 28 U.S.C. §1332 and 28 U.S.C. §1391.

5

7.   8.   On March 9, 2013, Jamie Lee Dowling, was driving her 2008 Chevrolet Cobalt, vehicle identification number 1G1AL58F987302433 (hereinafter "the Cobalt") westbound on Colorado Highway 50. Raylee Kay Dowling was seated in the backseat of the vehicle properly restrained in a child safety seat. Landyn Scott Dowling was seated in the backseat of the vehicle property restrained with the lap/shoulder belt.

8.   9.   Known safety defects in the Cobalt caused the key in Jamie Lee Dowling's car to turn from the run to accessory/off position as she was driving on Colorado Highway 50. Once the key turned, the engine shut off. As a result of the engine shutting off, the Cobalt went out of control, traveled into the eastbound lane of Colorado Highway 50 and the right rear of her vehicle was struck by a 1994 Chevrolet Beretta.

9.10.   Despite the force and magnitude of the impact, the safety-related defects in the Cobalt caused the airbags in Jamie Lee Dowling's car not to deploy.

10.11.   Despite being properly secured in a child seat, Raylee Kay Dowling suffered fatal injuries during the accident.

11.12.   Despite being properly seat-belted, Landyn Scott Dowling suffered fatal injuries during the accident.

12.13.   The conduct of each of the Defendants, which was a cause of the deaths of Raylee Kay Dowling and Landyn Scott Dowling and injuries and damages to Plaintiff, constitutes felonious killing in violation of C.R.S. 18-3-104, in which case there is no limitation on the recovery of damages for the deaths of Kay Dowling and Landyn Scott Dowling and injuries and damages to Plaintiff.

13.14.   Jamie Lee Dowling sustained injuries in the accident.

6

### New GM's Knowledge of Safety-Related Defects
### In The Chevrolet Cobalt and Its Concealment of Them

14. 15.        The 2008 Chevrolet Cobalt has safety-related design defects.  First, a low-

torque detent in the ignition switch allows the key to be inadvertently turned from the run to

accessory/off position.  Second, because of the low position of the key lock module on the

steering column, a driver can inadvertently bump the key fob or chain which results in the key

turning from run to the accessory/off position.  Third, the key sold with the Cobalt has a slot

design which allows the key fob or chain to hang lower on the key and increases the chance of

the key inadvertently moving from the run to accessory/off position during ordinary driving

maneuvers.  The design of the ignition switch, position of the key lock module, and slot design

of the key are hereinafter referred to as the "Key System."

15. 16.  In the late 1990's/early 2000's, Old GM and a supplier, Eaton Mechatronics

("Eaton"), completed the specifications for the ignition switch for the 2003 Saturn Ion.   Eaton

sold its vehicle switch/electronic division to Delphi Automotive Systems ("Delphi") on March

31, 2001.

16. 17.  A pre-production report for the 2003 Saturn Ion identified issues with the ignition

switch.  In a section entitled "Root Cause Summary"  the report states that the "two causes of

failure" were "[l]ow contact force and low detent plunger force."  Although the report states that

a design change resolved the problem, any purported design change did not resolve the problem.

17. 18.  In 2001, during developmental testing of the 2003 Saturn Ion, Old GM learned

that the engines in those cars were stalling due to defects in the Key System.  Old GM chose not

to fix these defects.

18. 19.  In February 2002, Delphi submitted a Production Part Procedure Process

("PPAP") document for the ignition switch in the 2003 Saturn Ion.  According to Delphi officials, Old GM approved the PPAP even though testing of the ignition switch torque was below Old GM's and New GM's performance specifications.

19.20.  In 2002, Old GM began manufacturing and selling 2003 Saturn Ions with the defective Key System.

20.21.  In 2004, Old GM engineers reported that the ignition switch on the Saturn Ion was so weak and so low on the steering column that the driver's knee could easily bump the key and turn off the car.

21.22.  This defect was sufficiently serious for aan Old GM engineer, in January 2004, as part of Old GM's vehicle evaluation program, to affirmatively conclude, in writing, that "[t]his is a basic design flaw and should be corrected if we want repeat sales."

22.23.  In 2004, Old GM began manufacturing and selling the 2005 Chevrolet Cobalt. The Cobalt was a sister vehicle (essentially the same car with a different badge or name) to the Saturn Ion.  Old GM installed the same Key System on the 2005 Cobalt as it did on the Saturn Ion.

23.24.  On October 29, 2004, around the time of GM's market launch of the 2005 Cobalt, Gary Altman – Old GM's program-engineering manager for the Cobalt – test drove the Cobalt with the standard key and key fob.  During the test drive, when Altman's knee bumped the key, the engine turned off, causing the engine to stall.  Altman reported this incident to Old GM.

24.25.  In response to Altman's report, Old GM launched an engineering inquiry to investigate the potential for the key to move from the "run" to the "accessory/off" position during ordinary driving conditions.  This inquiry is known within Old GM as a Problem Resolution Tracking System Inquiry ("PRTS").    The specific complaint which resulted in the

8

PRTS was that the "the vehicle can be keyed off with knee while driving."

25.26.    On February 1, 2005, as part of the PRTS, Old GM engineers concluded:

> There are two main reasons that [sic] we believe can cause a lower
> effort in turning the key:  1.  A low torque detent in the ignition
> switch.  2. A low position of the lock module in the column.
> (PRTS – Complete Report N172404).

26.27.    On February 18, 2005, Old GM engineers presented several possible solutions to

the Cockpit Program Integration Team ("CPIT").   Old GM engineers determined the only "sure

solution" to fixing the problem of the key inadvertently moving from the "run" to the

"accessory/off" position required changing from a low mount to a high mount lock module,

which would considerably reduce the possibility of the key/key fob being impacted by a driver.

27.28.   According to Old GM engineers, this change in the key position on the lock

module, **combined with** increasing the detent in the ignition switch, would be a "sure solution."

Old GM, however, through Altman, rejected this "sure solution," in part, because the cost to

implement the solution would be too high.

28.29.   During this PRTS, Old GM also considered changing the key from a slot to a hole

as a way to attempt to contain this problem, but not as a solution to the problem.

29.30.   Changing the key from a slot to a hole would reduce the lever arm of the key and

the key chain.  With the slot design, the key chain would hang lower on the key, which would

increase the torque force on the ignition switch when the chain was contacted or moved in any

way.  Old GM engineers determined this key change would significantly reduce the chance of

the key inadvertently moving from the "run" to the "accessory/off" position during ordinary

driving maneuvers.

9

> **Formatted:** Indent: Left:  0", First line:  0.5",
> Numbered + Level: 1 + Numbering Style: 1, 2,
> 3, ... + Start at: 16 + Alignment: Left + Aligned
> at:  0.69" + Indent at:  0.94"

> **Formatted:** Bullets and Numbering

30.31.   A̶An Old GM engineer conducted a cost analysis of this key change and determined that the cost to make this change would be less than one dollar per vehicle.

31.32.   Old GM, however, rejected this proposed key change and, on March 9, 2005, GM closed the PRTS without taking any steps to fix the defective Key System in Ions and Cobalts. The PRTS detailed the reasons why Old GM and, later, New GM, took no action.

> "Per GMX001 PEM's [Gary Altman] directive we are closing this PRTS with no action.  The main reasons are as following:  All possible solutions were presented to CPIT and VAPIR:  a. The lead-time for all the solutions is too long.  b.  The tooling cost and piece price are too high.  c. None of the solutions seem to fully countermeasure the possibility of the key being turned (ignition turn off) during driving.  Thus **none of the solutions represents an acceptable business case**." (emphasis added)

32.33.   On February 28, 2005, Old GM issued a bulletin to its dealers regarding engine-stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5).

33.34.   The February 28, 2005, bulletin addressed the potential for drivers of these vehicles to inadvertently turn off the ignition due to low key ignition cylinder torque/effort.  The Saturn Ion had the same safety-related defects.

34.35.   In the February 28, 2005, bulletin, Old GM provided the following recommendations/instructions to its dealers – **but not to Plaintiffs or the public in general:**

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort.  The concern is more likely to occur if the driver is short and has a large heavy key chain.

> In the cases this condition was documented, the driver's knee would contact the key chain while the vehicle was turning.  The steering column was adjusted all the way down.  This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.

10

Case 1:14-md-02543-JMF    Document 1518    Filed 09/30/15    Page 11 of 50

        In cases that fit this profile, question the customer
thoroughly to determine if this may the cause.  The customer
should be advised of this potential and to take steps, such as
removing unessential items from their key chains, to prevent it.

        Please follow this diagnosis process thoroughly and
complete each step.  If the condition exhibited is resolved without
completing every step, the remaining steps do not need to be
performed.

35.36.   At that time, however, Old GM knew that the inadvertent turning off of the

ignition in the vehicles was due to design defects in the Key System in those vehicles, including

the Cobalt, and **was not** limited to short drivers using large heavy key chains.  New GM learned

this information when it took over Old GM in July 2009.

36.37.  Old GM failed to disclose and, in fact, concealed the February 28, 2005 bulletin –

and/or the information contained therein, from Cobalt owners,  including Jamie Lee Dowling,

and sent affirmative representations to dealers that did not accurately describe the nature of the

problem, the multiple design steps needed for a "sure solution" to the problem, and GM's

knowledge of it.

37.38.  Indeed, rather than disclosing this serious safety problem that uniformly affected

all Cobalts, Old GM, instead, concealed and obscured the problems, electing to wait until

customers brought their cars to a dealership after an engine-stalling incident, and offered even its

own dealers only an incomplete, incorrect, and insufficient description of the defects and the

manner in which to actually remedy them.

38.39.  As of February 2005, Old GM engineers knew that the Saturn Ion and Chevrolet

Cobalt vehicles had the Key System safety-related defects discussed in this Complaint.

11

39. 40. Pursuant to 49 C.F.R. § 573.6, which requires an automobile manufacturer to "furnish a report to the NHTSA for each defect…related to motor vehicle safety," GM had a duty, no later than February 2005 to disclose the safety-related defects in the Saturn Ion and Chevrolet Cobalt vehicles. When New GM took over Old GM in July 2009, it too had the same duty.

40. 41. Instead of complying with its legal obligations, however, Old GM and later New GM fraudulently concealed the Key System defect from the public – including Jamie Lee Dowling – and continued to manufacture and sell Ions and Cobalts with these known safety defects, causing Jamie Lee Dowling to continue to own a vehicle that contained a defective and dangerous Key System.

41. 42. In March 2005, following its receipt of a customer complaint that his/her Cobalt vehicle ignition turned off while driving, GM opened another PRTS – Complete Report (0793/2005-US). Steve Oakley, the brand quality manager for the Cobalt, originated the PRTS. As part of the PRTS, Mr. Oakley reviewed an email dated March 9, 2005 from Jack Weber, a an Old GM engineer. The subject of the email was "Cobalt SS Ignition Turn Off." In the email Mr. Weber stated:

> I've had a chance to drive a Cobalt SS and attempt to turn off the ignition during heel/toe down shifting. Much to my surprise, the first time I turned off the ignition switch was during a normal traffic brake application on I-96. After that I was able to do a static reproduction of the condition in a parking lot. I've attached photos of the condition with comments. My Anthropometric Measurements are attached below:
>
> Static view of keys, fob and registration hitting knee.
>
> Position of RKE fob during normal driving. Dynamic evaluation.

12

View of steering column cover and Pass Key 3+"lump" under the key slot.

Key in run position, knee contacting the fob and the split ring is pulling on the key to move it to the "off" position. Static evaluation.

Fob has levered around the steering column cover and turned the ignition off.

Unobstructed view of the fob and column cover.

Attached below is documentation of a RAMSIS study performed to attempt to duplicate the real world condition.

Please call at (586) 986-0622 with questions.

Jack Weber

Mr. Weber clearly identified the defects in the Key System while he was driving the Cobalt.

42.43.  Despite the clear evidence of the safety-related defects with the Key System, during the March 2005 PRTS, Old GM engineers decided not to reconsider any of the proposed solutions discussed during the February 2005 PRTS.  Instead, the Old GM engineers leading the PRTS recommended that sole corrective action Old GM should recommend would be to advise customers to remove excess material from their key rings, **even though Old GM knew that the inadvertent turning off of the ignition in these vehicles was due to design defects in the Key System in those vehicles, and was not limited to drivers having excess key ring materials**. New GM later continued this approach.

43.44.  In May 2005, Old GM, following its receipt of another customer complaint that his/her Cobalt vehicle ignition turned off while driving, it opened another PRTS.

13

44.45.  During the May 2005 PRTS, Old GM decided to redesign the key in order to reduce the possibility that a driver may inadvertently turn the key from the "run" to the "accessory/off" position during ordinary driving.

45.46.  Despite this initial safety/redesign commitment, however, Old GM ultimately failed to follow through on its own decision and closed this PRTS without any action, further concealing what it knew from the public and continuing to subject the public – including Jamie Lee Dowling – to the defective vehicles' serious safety risks.

46.47.  At or about this same time, Old GM, through Alan Adler, GM's Manager, Product Safety Communications, issued the following statement on with respect to the Chevrolet Cobalt's inadvertent shut-off problems, affirmatively representing in its "Statement on Chevrolet Cobalt Inadvertent Shut-offs" that:

> In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running.
>
> When this happens, the Cobalt is still controllable.  The engine can be restarted after shifting to neutral.
>
> GM has analyzed this condition and believes it may occur when a driver overloads a key ring, or when the driver's leg moves amid factors such as steering column position, seat height and placement.  Depending on these factors, a driver can unintentionally turn the vehicle off.
>
> Service advisers are telling customers they can virtually eliminate this possibility by taking several steps, including removing non-essential material from their key rings.
>
> Ignition systems are designed to have "on" and "off" positions, and practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition from the run to accessory or off position.

Old GM's statement, however, was demonstrably false and misleading.

47.48.  Contrary to Old GM's above-referenced statement, Old GM's internal testing documents showed that these incidents occurred when drivers were using keys with the standard key fob.  Old GM knew that these incidents were not caused by heavy key chains or a driver's size and seating position.  Old GM knew that removing the non-essential material from key rings would not "virtually eliminate" the possibility of inadvertent bumping of the ignition key from the "run" to the "accessory/off" position while the car is running.

48.49.  Old GM's above-referenced statement was further demonstrably false and misleading because Old GM knew that these incidents were ultimately caused by the safety-related defects in the Key System identified in the February 2005 PRTS.  New GM knew this too when it became New GM in July 2009.

49.50.  But Old GM's affirmative concealment of the problems with the defective vehicles, including the Cobalt, did not end there.

50.51.  On July 29, 2005, Amber Marie Rose, a 16 year old Clinton, Maryland resident, was driving a 2005 Cobalt when she drove off the road and struck a tree head-on.  Amber's driver's side frontal airbag did not deploy and she died as a result of the injuries she sustained in the crash.

51.52.  GMOld GM, and later New GM, received notice of Amber's incident in September 2005 and opened an internal investigation file pertaining to this incident shortly thereafter.

52.53.  During its investigation of the incident, GMOld GM, and later new GM, learned that the key in Amber's Cobalt was in the "accessory/off" position at the time of the crash.

15

53.54.  During its investigation of the incident in which Amber was killed in her Cobalt

vehicle, GMOld GM, and later New GM, also knew that the driver's side frontal airbag should

have deployed given the circumstances of the crash.  Upon information and belief, Old GM

subsequently entered into a confidential settlement agreement with Amber's mother.

54.55.  In a September 28, 2005 email, John Hendler, another old GM engineer, wrote:

> "I wanted to close the loop on the Electrical SMT's attempt to
> bring a new ignition switch design to the Delta/Kappa vehicles for
> MY 08.  As the VSE for the Cobalt launch I am very aware of an
> issue with "inadvertent ignition offs" due to the low mounted
> ignition in the steering column and the low efforts required to
> rotate the ignition.
>
> A new, more robust, increased effort design is currently being
> implemented on the GMT 191 program for MY 07.  My intention
> was to bring this part number common design to the Delta/Kappa
> vehicles for MY08.  I attended an X Vapir with the Delta team to
> review the pros/cons of this change.  The con of the change is that
> the piece cost of the ignition switch went up around $0.90 and
> would require $400K in tooling to add the almost 500K in volume.
>
> At the X Vapir my team was challenged to offset the piece cost
> with warranty savings and/or reduced PC/Inv.  I worked through
> Purchasing with Stoneridge Poliak to gain the reductions.
> Stoneridge Poliak was unwilling to budge on their PC/Inv.  The
> warranty offset for the new switch is in the $0.10-0.15 range.
>
> It was felt by the Delta team that the revision of the slot in the
> ignition key to a hole would significantly reduce the inadvertent
> offs and make any additional changes.
>
> Consequently, the ignition switch for the Deltas and Kappas will
> remain the carryover single detent switch until the piece cost hit
> can be eliminated or significantly reduced.  My plan is to resource
> this switch design for MY 09 and make it available for the Deltas,
> Kappas, and the 19X families."

Ray DeGiorgio, the lead design engineer for the Cobalt and Ion ignition switch, was among the

Old GM employees copied on this email.

16

55. 56.  Mr. Hendler's email shows that, as of September 28, 2005, Old GM engineers continued to recognize that the "inadvertent ignition offs" were due to both the low mounted ignition switch in the steering column and the low effort required to rotate the ignition.  It also shows that, even as Old GM was implementing an improved ignition switch on another vehicle line, it rejected implementing this ignition switch on Ions and Cobalts solely for cost reasons even though the piece cost of the ignition switch was less than a dollar.

56. 57.  In December 2005, shortly after it commenced its internal investigation into the incident leading to Amber's death, Old GM issued a Technical Service Bulletin (05-02-35-007) (the "TSB").

57. 58.  The TSB, which GM affirmatively represented applied to 2005–2006 Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005–2006 Pontiac Pursuit, 2006 Pontiac Solstices, and 2003–2006 Saturn Ions, provided, "Information on inadvertent Turning of Key Cylinder, Loss of Electrical System and no DTCs," provided the following service information:

> There is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort.
>
> The concern is more likely to occur if the driver is short and has a large and/or heavy key chain.  In these cases, this condition was documents and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down.  This is more likely to happen to a person who is short, as they have the seat positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to determine if this may the cause.  The customer should be advised of this potential and should take steps to prevent it - such as removing unessential items from their key chain.
>
> Engineering has come up with an insert for the key ring so that it goes from a "slot" design to a hole design.  As a result, the key ring cannot move up and down in the slot any longer - it can

[Formatted: Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 16 + Alignment: Left + Aligned at: 0.69" + Indent at: 0.94"]

[Formatted: Bullets and Numbering]

only rotate on the hole.  In addition, the previous key ring has been replaced with a smaller, 13 mm (0.5 in) design. This will result in the keys not hanging as low as in the past.

58.59.  An image of the insert changing the "slot" design to a "hole" design appears as follows:



59.60.  As with its prior statement regarding the defective vehicles (see above), the information Old GM provided in this TSB was also false and misleading.

60.61.  In the two PRTSs Old GM issued before it issued the TSB, Old GM engineers never represented that short drivers or heavy key chains were the reasons why these incidents were happening.

61.62.  Indeed, at the time it issued the TSB, Old GM knew that these incidents were happening to drivers of all sizes using keys with the standard key fobs.

62.63.  In other words, GMOld GM, and later New GM, knew these incidents were not caused by short drivers with heavy key chains, but because of the safety-related defects in the Key System of its defective vehicles, including the Cobalt.

Formatted: Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 16 + Alignment: Left + Aligned at: 0.69" + Indent at: 0.94"

Formatted: Bullets and Numbering

Formatted: Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 16 + Alignment: Left + Aligned at: 0.69" + Indent at: 0.94"

Formatted: Bullets and Numbering

63.64.  In 2005, Old GM began buying back Cobalts from certain customers who were experiencing engine stalling incidents.  GM never told the public – including Jamie Lee Dowling – that it was buying back Cobalts under these circumstances.  Old GM refused to buy back Cobalts from other customers who had also experienced engine stalling incidents.  In fact, for many of the customers who complained about experiencing engine-stalling incidents, Old GM never informed these customers of the TSB and/or the availability of the key insert.

64.65.  On November 17, 2005 – shortly after Amber's death and immediately before Old GM's issuance of the TSB – there was **another** incident involving a 2005 Cobalt in Baldwin, Louisiana.  In that incident, the Cobalt went off the road and hit a tree.  The frontal airbags did not deploy in this accident.  GMOld GM, and later New GM, received notice of this accident, opened a file, and referred to it as the "Colbert" incident.

65.66.  On February 10, 2006, in Lanexa, Virginia – shortly after Old GM issued the TSB – a 2005 Cobalt flew off of the road and hit a light pole.  As with the Colbert incident (above), the frontal airbags failed to deploy in this incident as well.  The download of the SDM  (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash.  GM received notice of this accident, opened a file, and referred to it as the "Carroll" incident.

66.67.  On March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road and struck a utility pole.  The frontal airbags did not deploy in this incident.  The download of the SDM showed the key was in the "accessory/off" position at the time of the crash.  GMOld GM, and later New GM, received notice of this accident, opened a file, and referred to it as the "Oakley" incident.

68.    On or about July 10, 2009, New GM took over Old GM, assuming almost all of its employees, officers, attorneys, data, testing, documents, and knowledge. What Old GM knew on July 9, 2009, New GM knew on July 10, 2009.

67.69.  In its February 24, 2014, letter to NHTSA regarding Recall No. 13454, New GM, **for the first time**, acknowledged that changes were made to the ignition switches in the Defective Vehicles during the 2007 model year.

68.70.  Specifically, in its letter of February 24, 2014, New GM represented that "[o]n April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics. The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch." Ray DeGiorgio was the GM design engineer identified by New GM in the letter. In fact, Mr. DeGiorgio signed a "General Motors Commodity Validation Sign-Off" confirming that he approved the ignition switch with the new detent plunger to increase torque force. At no time before February 24, 2014 did New GM disclose this fact.

69.71.  On August 1, 2006, following its receipt of a customer complaint about a Cobalt stalling while driving, Old GM opened yet another PRTS relating to this issue. GM closed this PRTS on October 2, 2006 however, without taking any action.

70.72.  In October 2006, Old GM updated the TSB (05-02-35-007) to include additional model years:  the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, 2007 Cobalt and 2007 Pontiac Solstice and G5. These vehicles had the same safety-related defects in the Key System as the vehicles in the original TSB. All of the vehicles identified in the original TSB, as well as the 2008 Cobalt, are hereinafter referred to as the "Defective Vehicles."

71.73.   On December 29, 2006, in Sellenville, Pennsylvania, a 2005 Cobalt drove off the
road and hit a tree.  The frontal airbags failed to deploy in this incident.  GMOld GM, and later
New GM, received notice of this incident, opened a file, and referred to it as the "Frei" incident.

72.74.   On February 6, 2007, in Shaker Township, Pennsylvania, a 2006 Cobalt sailed off
the road and struck a truck.  Despite there being a frontal impact in this incident, the frontal
airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off"
position.  GMOld GM, and later New GM, received notice of this incident, opened a file, and
referred to it as the "White" incident.

73.75.   In August 2007, Old GM's employees met with its Sensing and Diagnostic
Module ("SDM") supplier, Continental, to review SDM data from a crash of a 2005 Chevrolet
Cobalt where the airbags failed to deploy.

74.76.   On August 6, 2007, in Cross Lanes, West Virginia, a 2006 Cobalt rear-ended a
truck.  The frontal airbags failed to deploy.  GMOld GM, and later New GM, received notice of
this incident, opened a file, and referred to it as the "McCormick" incident.

75.77.   In September 2007, the Chief of the Defect Assessment Division within the
Office of Defects Investigation ("ODI") of the National Highway Traffic Safety Administration
("NHTSA") emailed other ODI officials and proposed an investigation of -"frontal airbag non-
deployment [sic] in the 2003-2006 Chevrolet Cobalt/Saturn Ion."  This email went on to state
that the:

> ". . . issue was promoted by a pattern of reported non-deployments in
> VOQ [Vehicle Owners' Questionnaire] complaints that was first observed
> in early 2005.  Since that time, [the Defects Assessment Division] has
> followed up on the complaints, enlisted the support of NCSA's Special
> Crash Investigations (SCI) team, discussed the matter with GM, and
> received a related EWD Referral.  Notwithstanding GM's indications that

21

they see no specific problem pattern, DAD perceives a pattern of non-deployments in these vehicles that does not exist in their peers . . . ."

76.78.  This email from the Chief of the Defect Assessment Division at NHTSA shows that, as of September 2007, Old GM was deliberately misleading NHTSA and concealing the defects in the Key Systems in the Defective Vehicles from NHTSA in violation of federal law. After July 6, 2009, New GM continue misleading NHTSA and failed to correct what it knew to be prior misrepresentations and failures to disclose information to NHTSA, the public, and owners of GM vehicles.

77.79.  On September 25, 2007, in New Orleans, Louisiana, a 2007 Cobalt lost control and struck a guardrail.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  GMOld GM, and later New GM, received notice of this incident, opened a file, and referred to it as the "Gathe" incident.

78.80.  On October 16, 2007, in Lyndhurst, Ohio, a 2005 Cobalt traveled off road and hit a tree.  The frontal airbags failed to deploy.  GMOld GM, and later New GM, received notice of this incident, opened a file, and referred to it as the "Breen" incident.

79.81.  On April 5, 2008, in Sommerville, Tennessee, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position. GMOld GM, and later New GM, received notice of this incident, opened a file, and referred to it as the "Freeman" incident.

80.82.  On May 21, 2008, in Argyle, Wisconsin, a 2007 G5 traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  GMOld

22

GM , and later New GM, received notice of this incident, opened a file, and referred to it as the "Wild" incident.

81.83.  On May 28, 2008, in Lufkin, Texas, a 2007 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  GMOld GM, and later New GM, received notice of this incident, opened a file, and referred to it as the "McDonald" incident.

82.84.  On September 13, 2008, in Lincoln Township, Michigan, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  GMOld GM, and later New GM, received notice of this incident, opened a file, and referred to it as the "Harding" incident.

83.85.  On November 29, 2008, in Rolling Hills Estates, California, a 2008 Cobalt traveled off the road and hit a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  GMOld GM, and later New GM, received notice of this incident, opened a file, and referred to it as the "Dunn" incident.

84.86.  On December 6, 2008, in Lake Placid, Florida, a 2007 Cobalt traveled off the road and hit a utility pole.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  GMOld GM, and later New GM, received notice of this incident, opened a file, and referred to it as the "Grondona" incident.

85.87.  In February 2009, Old GM opened yet another PRTS with respect to the Defective Vehicles – this time to investigate why the slot in the key in Cobalts allowed the key chain to hang too low in the vehicles, as well as the inadvertent shutting off of the vehicles.

86.88.   Through this PRTS, Old GM determined that changing the key from a slot to a hole would significantly reduce the likelihood of inadvertent turning off the ignition switch.

87.89.   In March 2009, Old GM approved of the design change in the key from the slot to a hole.  According to GM, this redesigned change was implemented in model year 2010 Cobalts. Old GM, however, chose not to provide these redesigned keys the owners or lessees of any of the vehicles implicated in the TSB, including the 2003 Ion.   New GM continued Old GM's conduct after July 2009.

88.90.   This timeline gives a short overview of some key points between 2004 and the present, as discussed above:

**2005-2009**
GM learns of
hundreds of field
reports of Key
System failures
and multiple
fatalities.

**2001-2004**
GM learns
Key Systems
are defective.

**2010-2014**
GM learns of more
field reports of
Key System
failures and
additional fatalities.

**2005**
GM engineers'
proposed fix
rejected; Amber
Rose dies after
airbag in Cobalt
fails to deploy.

**2009**
GM declares and
emerges from
bankruptcy.

**2014**
GM issues inadequate
recall over 10 years
after learning its
Key Systems are
defective.

89.91.   Throughout this entire time period, Old GM wasand New GM were selling the Defective Vehicles to consumers for full price, and consumers were purchasing them believing that the vehicles were non-defective, but all the while GM In these respective time periods, Old and New GM were concealing the extent and nature of the defects in the Defective Vehicles.

Per the MPSA, New GM assumed liability for the sale of these defective GM cars.

**Old GM's Marketing Represented**

---

Formatted: Indent: Left:  0", First line:  0.5",
Numbered + Level: 1 + Numbering Style: 1, 2,
3, ... + Start at: 16 + Alignment: Left + Aligned
at:  0.69" + Indent at:  0.94"

Formatted: Bullets and Numbering

**to the Public that the Defective Vehicles Were Safe**

90.92.  In a section called "safety," Old GM's Chevrolet website stated:

> **OUR COMMITMENT**
> Your family's safety is important to us. Whether it's a short errand
> around town or a cross-country road trip, Chevrolet is committed
> to keeping you and your family safe — from the start of your
> journey to your destination.
> That's why every Chevrolet is designed with a comprehensive list
> of safety and security features to help give you peace of mind.
> Choose from the safety features below to learn more about how
> they work, and which Chevy vehicles offer them.

91.93.  Similarly, oldOld GM promoted its Saturn vehicle line on television with

statements like "Putting people first," and "Saturn. People First."

92.94.  Saturn's print ad campaign featured advertisements like the following, which

stated, among other things, "Need is where you begin. In cars, it's about things like reliability,

durability and, of course, safety. That's where we started when developing our new line of cars":

25



93.95.  In sum, in order to increase sales, ~~old~~Old GM touted the safety of its vehicles.

94.96.  But, when the time came for the company to stay true to its words, both Old GM and New GM did not timely disclose its knowledge about the dangerous Key System defects to its customers.

**Meet the New GM, Same as the Old GM**

95.97.  In 2009, Old GM declared bankruptcy, and, weeks later, it emerged from bankruptcy.  Both before and after Old GM's bankruptcy, the Key Systems in the Defective Vehicles continued to fail and Old New and New GM, in ~~all iterations~~turn, continued to conceal the truth.

96.98.  On May 15, 2009, Old GM again met with Continental and requested that Continental download SDM data from a 2006 Chevrolet Cobalt accident where the airbags failed to deploy.

97.99.   On March 10, 2010, Brooke Melton was driving her 2005 Cobalt on a two-lane highway in Paulding County, Georgia.  While she was driving, her key turned from the "run" to the "accessory/off" position causing her engine to shut off.  After her engine shut off, she lost control of her Cobalt, which traveled into an oncoming traffic lane, where it collided with an oncoming car.  Brooke was killed in the crash.

98.100.      On March 22, 2011, Ryan Jahr, a GM engineer, downloaded the SDM from Brooke's Cobalt.  The information from the SDM download showed that the key in Brooke's Cobalt turned from the "run" to the "accessory/off" position 3-4 seconds before the crash.  On June 24, 2011, Brooke Melton's parents, Ken and Beth Melton, filed a lawsuit against New GM.

99.101.      On December 31, 2010, in Rutherford County Tennessee, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  New GM received notice of this incident, opened a file, and referred to it as the "Chansuthus" incident.

100.102.      On December 31, 2010, in Harlingen, Texas, a 2006 Cobalt traveled off the road and struck a curb.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  New GM received notice of this incident, opened a file, and referred to it as the "Najera" incident.

101.103.      On December 18, 2011, in Parksville, South Carolina, a 2007 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the

27

"accessory/off" position.  New GM received notice of this incident, opened a file, and referred to

it as the "Sullivan" incident.

102.104.    These incidents are not limited to vehicles of model year 2007 and before.

According to Old GM's and New GM's own investigation, there have been over 250 crashes

involving 2008-2010 Chevrolet Cobalts in which the airbags failed to deploy.

**New GM Investigates Further, butBut Continues to Conceal the Defect**

103.105.    In 2010, New GM began a formal investigation of the frontal airbag non-

deployment incidents in Chevrolet Cobalts and Pontiac G5s.  GM subsequently elevated the

investigation to a Field Performance Evaluation ("FPE").

104.106.    In August 2011, New GM assigned Engineering Group Manager, Brian

Stouffer as the Field Performance Assessment Engineer ("FPAE") to assist with the FPE

investigation.

105.107.    In Spring 2012, Stouffer asked Jim Federico, a high level executive and

chief engineer at New GM, to oversee the FPE investigation.  Federico was the "executive

champion" for the investigation to help coordinate resources for the FPE investigation.

106.108.    In May 2012, New GM engineers tested the torque on the ignition

switches for 2005-2009 Cobalt, 2007, 2009 Pontiac G5, 2006-2009 HHR, and 2003-2007 Ion

vehicles in a junkyard.  The results of these tests showed that the torque required to turn the

ignition switches in most of these vehicles from the "run" to the "accessory/off" position did not

meet Old and New GM's minimum torque specification requirements, including the 2008-2009

vehicles.  These results were reported to Stouffer and other members of the FPE.

107.109.    In September 2012, Stouffer requested assistance from a "Red X Team" as

part of the FPE investigation.  The Red X Team was a group of engineers within New GM

assigned to find the root cause of the airbag non-deployments in frontal accidents involving Chevrolet Cobalts and Pontiac G5s.  By that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the frontal accidents was the defective Key System. The Red X Team became involved in the investigation shortly after Mr. Stouffer's request.

108.110.      During the field-performance-evaluation process, New GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key would inadvertently move from the "run" to the "accessory/off" position, it would not be a total solution to the problem.

109.111.      Indeed, the New GM engineers identified several additional ways to actually fix the problem.  These ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position, and adding a push button to the lock cylinder to prevent it from slipping out of run.  New GM rejected each of these ideas.

110.112.      The photographs below are of a GM engineer in the driver's seat of a Cobalt during the investigation of Cobalt engine stalling incidents.



111.113.    These photographs show the dangerous condition of the position of the key in the lock module on the steering column, as well as the key with the slot, which allow the key fob to hang too low off of the steering column. New GM engineers understood that the key fob may be impacted and pinched between the driver's knee and the steering column which causes the key to be inadvertently turned from the run to accessory/off position. The photographs show why the New GM engineers understood that increasing the detent in the ignition switch would not be a total solution to the problem. It also shows why New GM engineers believed that the additional changes to the Key System (such as the shroud) were necessary to fix the defects with the Key System.

112.114.    The New GM engineers clearly understood that increasing the detent in the ignition switch alone was not a solution to the problem but GM concealed – and continued to conceal – from the public, the nature and extent of the defects.

113.115.    By 2012, Federico, Stouffer, and the remaining members of the Red X Team knew that the Key System in the Ion, the Cobalt, and the G5 vehicles had safety-related defects that would cause the key to move from the "run" to the "accessory/off" position while

30

driving these vehicles.  They also knew that when this happened the airbags would no longer

work in frontal crashes.

114.116.    Federico, Stouffer, and the other members of the Red X Team also

understood that these safety-related defects had caused or contributed to numerous accidents and

multiple fatalities.  Despite this knowledge, New GM chose to conceal this information from the

public, NHTSA, and Plaintiffs.

115.117.    Under 49 C.F.R. ¶ 573.6, New GM had a duty in 2012 to disclose the

safety-related defects in the Ion, Cobalt, and G5 vehicles, as had Old GM.  Rather than comply

with their legal obligations, New GM continued to fraudulently conceal these defects from the

public and the U.S. government.

116.118.    In December 2012, in Pensacola, Florida, Ebram Handy, a New GM

engineer, participated in an inspection of components from Brooke Melton's Cobalt, including

the ignition switch.  At that inspection, Handy, along with Mark Hood, a mechanical engineer

retained by the Meltons, conducted testing on the ignition switch from Brooke Melton's vehicle,

as well as a replacement ignition switch for the 2005 Cobalt.

117.119.    At that inspection, Handy observed that the results of the testing showed

that the torque performance on the ignition switch from Brooke Melton's Cobalt was well below

Old GM's and New GM's minimum torque performance specifications.  Handy also observed

that the torque performance on the replacement ignition switch was significantly higher than the

torque performance on the ignition switch in Brooke Melton's Cobalt.

118.120.    In January 2013, Handy, in preparation for his Rule 30(b)(6) deposition in

the *Melton* case, spoke with several New GM engineers, including DeGiorgio and Stouffer.  At

that time, Handy knew that, based on the testing he had observed, the original ignition switch in

the 2005 Cobalt failed to meet Old GM's and New GM's minimum torque performance

specifications and that Old GM had redesigned the ignition switches that were being sold as

replacement switches.  New GM knew that an ignition switch that did not meet its minimum

torque performance requirements was a safety-related defect.

119.121.        New GM engineers integrally involved with this situation have admitted

that Old GM and New GM never should have sold the Defective Vehicles with ignition switches

that did not meet its minimum torque performance requirements.

120.122.        On June 12, 2013, Mr. Altman, the Cobalt program engineering manager,

testified as follows during his deposition in *Melton v. GM*:

> Q.   And the vehicle never should have been sold if it didn't meet
> GM's minimum torque specific – performance requirements,
> should it?
>
> MR. FRANKLIN:  Object to form.
>
> THE WITNESS:  That's correct.
>
> Q.   And the reason is is [sic] because that could be dangerous
> under certain situations, because the key can move from run to
> accessory?
>
> MR. FRANKLIN:  Object to form.
>
> THE WITNESS:  Yes.

**New GM Issues a Recall TenMany Years Too Late**

121.123.        On February 7, 2014, New GM, in a letter from Carmen Benavides,

Director – Product Investigations and Safety Regulations for New GM, informed NHTSA that it

was conducting Recall No. 13454 for certain 2005-2007 model year Chevrolet Cobalts and 2007

model year Pontiac G5 vehicles.

32

122.124.     In its February 7, 2014, letter to NHTSA, New GM represented that as

replacement ignition switches became available, New GM would replace the ignition switches

on the Defective Vehicles.

123.125.     On February 19, 2014, a request for timeliness query of General Motors'

Safety Recall 13454 was sent to NHTSA.  The timeliness query pointed out that New GM had

failed to recall all of the vehicles with the defective ignition switches in a timely manner.

124.126.     The February 19, 2014, request for timeliness query also asked NHTSA to

investigate New GM's failure to fulfill its legal obligation to report the safety-related defects in

the Defective Vehicles to NHTSA within five days of discovering the defect.

125.127.     On February 24, 2014, New GM sent a letter to Ms. Benavides and

informed NHTSA it was expanding the recall to include 2006-2007 model year (MY) Chevrolet

HHR and Pontiac Solstice, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky vehicles.

126.128.     On March 17, 2014, Mary T. Barra, General Motors'New GM's chief

executive officer issued an internal video, which was broadcast to employees.  In the video, Ms.

Barra admitted:

> Scrutiny of the recall has expanded beyond the review by the
> federal regulators at NHTSA, the National Highway Traffic Safety
> Administration.  As of now, two congressional committees have
> announced that they will examine the issue.  And it's been reported
> that the Department of Justice is looking into this matter. . . .
> **These are serious developments that shouldn't surprise
> anyone.**  After all, **something went wrong with our process in
> this instance and terrible things happened.** . . .  The bottom line
> is, **we will be better because of this tragic situation,** if we seize
> the opportunity. . . .  I ask everyone to stay focused on making
> today's GM the best it can be.

127.129.     On March 28, 2014, New GM again expanded the ignition switch recall to

cover all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice and the

33

Saturn Ion and Sky in the United States.  According to reports, this second expansion of the ignition switch recall covers an additional 824,000 vehicles in the U.S., bringing the number of recalled vehicles to 2,191,146.

128.130.    Not only is New GM's recall tenmany years too late, especially for the Plaintiff, it remains completely insufficient to correct the safety-related defects in the Defective Vehicles.

129.131.    Since at least 2005, GM has Old GM, and later New GM, have known that simply replacing the ignition switches on the Defective Vehicles is not a complete solution to the potential for the key to inadvertently turn from the "run" to the "accessory/off" position in these vehicles.

130.132.    Additionally, New GM's recall fails to address the design defect that causes the key fob/chain to hang too low on the steering column.

131.133.    Thus, even when the ignition switches are replaced, this defective condition would still exist in the Defective Vehicles and there continues to be the potential for a driver to contact the key chain and inadvertently turn the key from the "run" to the "accessory/off" position.

132.134.    The recall is further insufficient because, through this recall, New GM is not replacing all of the keys in the Defective Vehicles with the redesigned key with a hole instead of a slot.  New GM provided these keys to owners/lessees of the 2010 Cobalt with the understanding that the redesigned key would reduce the chance that the key could be inadvertently turned from the "run" to the "accessory/off" position.

133.135.    The recall also fails to address the design defects in the Defective Vehicles that disables the airbag immediately upon the engine shutting off.

34

134.136.        Although New GM contends that it changed the ignition switch in some 2007 Cobalts and all of the 2008-2010 Cobalts, there continue to be non-deployment events in the later model Cobalts.   Undermining GM's position isNew GM's own investigation into the non-deployment events in Cobalts identifies over 250 non-deploy crashes involving 2008-2010 Cobalts.  This refutes New GM's contention that its new design, present in all 250 vehicles, fixed the problem.

135.137.        New GM's engineers understood that increasing the detent in the ignition switch alone was not a solution to the problem, but New GM concealed – and continues to conceal from the public, including Plaintiffs, the nature and extent of the Key System and non-deployment defects, which the current recall will not cure.

136.138.        Old GM and later New GM designed, tested, engineered, approved, manufactured, marketed, licensed, distributed, and sold the Cobalt and all of its components, including all the components alleged to be defective herein.

137.139.        KSS designed, tested, engineered, approved, manufactured, marketed, licensed, distributed and sold the side airbag system in the Cobalt and all of its components, including all the components alleged to be defective herein.

138.140.        The conduct of New GM and KSS was such that it constituted a gross deviation from the standard of reasonable care.

139.141.        The conduct of New GM and KSS, which was a cause of the deaths of Raylee Kay Dowling and Landyn Scott Dowling and injuries and damages to Plaintiff, constitutes felonious killings in violation of C.R.S. §18-3-104 in which case there is no limitation on the recovery of damages for the deaths of Raylee Kay Dowling and Landyn Scott Dowling.

**COUNT I: STRICT LIABILITY**

140.142.     All preceding statements and allegations of Plaintiff's Complaint are

incorporated herein and realleged as if expressly set forth herein.

141.143.     At all times material to this action, GMOld GM and New GM were was in

the business of designing, testing, approving, manufacturing, marketing, distributing and selling

motor vehicles, including the Cobalt, for use in Colorado and elsewhere throughout the United

States.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the

Cobalt.

142.144.     At all times material to this action, KSS was in the business of designing,

testing, approving, manufacturing, marketing, distributing and selling airbag and other restraint

systems, including the side airbag system in the Cobalt, for use in Colorado and elsewhere

throughout the United States.

143.145.     Old GM designed, selected, inspected, tested, manufactured, assembled,

equipped, marketed, distributed and sold the Cobalt, and its components, including but not

limited to, equipping it with the Key System and side airbag system.

144.146.     Old GM designed, selected, inspected, tested, manufactured, assembled,

equipped, marketed, distributed and sold the Key System and side airbag system which were

selected and installed in the Cobalt.  Per the MPSA of July 2009, New GM assumed Old GM's

liabilities for defects in the Cobalt.

145.147.     KSS designed, selected, inspected, tested, manufactured, assembled,

equipped, marketed, distributed and sold the side airbag system, and its components.

146.148.     KSS designed, selected, inspected, tested, manufactured, assembled,

equipped, marketed, distributed and sold the side airbag system, which was selected and installed

in the Cobalt.

36

147.149.        Old GM and KSS had a legal duty to design, inspect, test, manufacture
and assemble the Cobalt and the Key System and side airbag system so that they would be
reasonably crashworthy and provide a reasonable degree of occupant safety in foreseeable
collisions occurring in the highway environment of its expected use.  Per the MPSA of July
2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

148.150.        At the time the Cobalt and the Key System and the side airbag system left
the control of Old GM, they were defective and unreasonably dangerous to a person who might
reasonably be expected to use it.  Per the MPSA of July 2009, New GM assumed Old GM's
liabilities for defects in the Cobalt.

149.151.        At the time the side airbag system left the control of KSS, it was defective
and unreasonably dangerous to a person who might reasonably be expected to use it.  Per the
MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

150.152.        The Cobalt, the Key System, and the side airbag system were defective,
unreasonably dangerous, and uncrashworthy in their design and manufacture.  Per the MPSA of
July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

151.153.        The Cobalt, the Key System, and the side airbag system lacked adequate
and sufficient warnings and instructions about the risks, dangers, and harms presented by the
Cobalt, the Key System, and the side airbag system and reasonable means to reduce such risks,
dangers, and harms.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for
defects in the Cobalt.

152.154.        Among other things, the Cobalt, the Key System, and the side airbag
system are not crashworthy, are defective, and are unreasonably dangerous and unsafe for
foreseeable users and occupants in each of the following particulars:

(a) having a Key System that is inadequately designed and constructed, and located, which may result in the key moving from the run to accessory/off position during normal driving maneuvers;

(b) having a Key System that allows the Cobalt to stall or lose engine power, and steering and/or full braking ability while driving;

(c) having side airbags that do not deploy in a side impact accident;

(d) failing to provide reasonable safety devices to prevent the vehicle from losing control and leaving the road, including electronic stability control, or similar devices, even though such modifications were feasible, economical, and would prevent catastrophic injuries and deaths;

(e) failing to adequately warn Jamie Lee Dowling, other consumers, or the public in general, about the unsafe and defective condition and design of the vehicle known to Old GM and New GM, so that individuals like Jamie Lee Dowling could make informed and prudent decisions regarding traveling or riding in such vehicles.

153.155.    The defective nature of the Cobalt, the Key System, and the side airbag system were proximate causes of the damages sustained by Plaintiff, as set forth herein, thus rendering GM and KSS strictly liable. Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

## COUNT II:  NEGLIGENCE

154.156.    All preceding statements and allegations of Plaintiff's Complaint are incorporated herein and realleged as if expressly set forth herein.

155.157.    Old GM was negligent in designing, inspecting, testing, manufacturing, assembling, marketing, selling and providing warnings for the Cobalt, the Key System, and side airbag system as set out in the paragraphs above. Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

156.158.   KSS was negligent in designing, inspecting, testing, manufacturing, assembling, marketing, selling and providing warnings for the side airbag system for the Cobalt, as set out in the paragraphs above.

157.159.   Old GM, New GM, and KSS knew and understood the dangers presented to consumers and users of their products including the plaintiff and the decedents by a Key System that fails to operate safely and reliably, a vehicle that is susceptible to loss of power and control, and a side airbag system that fails to operate safely and reliably.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

158.160.   Old GM and KSS' negligence proximately caused the damages sustained by Plaintiff, as set forth herein.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

## COUNT III:  BREACH OF IMPLIED WARRANTY

159.161.   All preceding statements and allegations of Plaintiff's Complaint are incorporated herein and realleged as if expressly set forth herein.

160.162.   Old GM breached its implied warranty of merchantability by selling the Cobalt when it was not fit for the ordinary purpose for which such goods are sold.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.   New GM breached its implied warranty of merchantability by failing to recall and repair the Cobalt when it was not fit for the ordinary purpose for which such goods are sold.

161.163.   This breach of warranty proximately caused the damages sustained by Plaintiff, as set forth herein.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

## COUNT IV:  FRAUD AND FRAUDULENT CONCEALMENT

39

162.164.      All preceding statements and allegations of Plaintiff's Complaint are incorporated herein and realleged as if expressly set forth herein.

163.165.      Old GM and New GM intentionally concealed material facts from Jamie Lee Dowling, the public, and NHTSA.  New GM knew that the Defective Vehicles were designed and manufactured with Key System defects, but New GM concealed those material facts.  Although the Defective Vehicles contain safety-related defects that Old GM and New GM knew of, or should have known of, at the time of distribution, and up until the time of the Dowling crash, that Old GM recklessly manufactured and distributed those vehicles to consumers in the United States.  Those consumers and that New GM recklessly permitted those vehicles to stay in use in their unsafe condition.   Consumers had no knowledge of the safety-related defects.        Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

164.166.      Old GM and New GM had a duty to disclose the facts to Jamie Lee Dowling, the public who owned defective GM cars, and to NHTSA, but failed to do so.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

165.167.      Old GM and New GM knew that Jamie Lee Dowling had no knowledge of those facts and that Jamie Lee Dowling had an equal opportunity to discover the facts.  Old GM wasand New GM were in a position superior to Jamie Lee Dowling to have knowledge of these facts.  Indeed, Jamie Lee Dowling trusted Old GM not to sell a vehicle that was defective or that violated federal law governing motor vehicle safety.  Jamie Lee Dowling further trusted Old GM and New GM to warn of defects and to recall and repair the defective vehicles.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

**Formatted:** Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 16 + Alignment: Left + Aligned at: 0.69" + Indent at: 0.94"

**Formatted:** Bullets and Numbering

166.168.        By failing to disclose these material facts, Old GM and New GM intended to induce Jamie Lee Dowling to purchase the Cobalt and/or to continue to use and drive it. Old GM and New GM further intended to induce NHTSA not to require a recall of the Cobalt, as well as the other defective vehicles in order to reduce its eventual financial exposure.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

167.169.        Jamie Lee Dowling reasonably relied on Old GM's nondisclosureand New GM's nondisclosures and misrepresentations, and reasonably but unknowingly continued to use the Cobalt until the date of the wreck.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

168.170.        Jamie Lee Dowling would not have purchased the Cobalt had they known of the Key System defects, and certainly would not have continued to drive it if she had learned of these defects.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

169.171.        GMOld GM, and later New GM, reaped the benefit of the sales and leases of Defective Vehicles as a result of its nondisclosure to the public and to NHTSA.   Additionally, in not disclosing the Key System defects, Old GM and New GM helped prevent any meaningful investigation of many wrecks and collisions that were likely the result of those defects.  Further, because Old GM and New GM had not placed this matter before NHTSA or the public, cars and components in those other similar wrecks were disposed of without the appropriate and adequate investigation.

170.172.        As a direct and proximate result of New GM's wrongful conduct and fraudulent concealment of defect, Jamie Lee Dowling suffered the damages described herein.

41

171. 173.    New GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Jamie Lee Dowling, such that punitive damages are appropriate.

**COUNT V: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

172. 174.    All preceding statements and allegations of Plaintiff's Complaint are incorporated herein and realleged as if expressly set forth herein.

173. 175.    At the time of the accident giving rise to this complaint and all other relevant times, Jamie Lee Dowling enjoyed a mother-child relationship with Raylee Kay Dowling and Landyn Scott Dowling. Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

174. 176.    As a proximate result of the acts and omissions of GM, Jamie Lee Dowling witnessed and experienced the subject accident and contemporaneously observed immediate resulting harm and catastrophic injuries to Raylee Kay Dowling and Landyn Scott Dowling. Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

175. 177.    Jamie Lee Dowling was physically injured in the subject accident. Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

176. 178.    Jamie Lee Dowling suffered severe emotional shock and distress as a result of witnessing and experiencing the accident and contemporaneously observing the immediate serious injuries to her children. Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

177.179.    New GM and KSS are liable to Jamie Lee Dowling for the emotional shock and distress she suffered as a result of witnessing and experiencing the accident and observing the immediate serious injuries that resulted in the death of her children. Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

**COUNT VI: LOSS OF CONSORTIUM**

~~178.~~180.     All preceding statements and allegations of Plaintiff's Complaint are incorporated herein and realleged as if expressly set forth herein.

~~179.~~181.     As a proximate result of the Defendants' acts and omissions, Jamie Lee Dowling has lost the love, care, comfort, companionship, society, support, affection, household services, aid, and consortium of her daughter Raylee Kay Dowling and son Landyn Scott Dowling. Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

~~180.~~182.     New GM and KSS are liable to Jamie Lee Dowling for damages as a result of these losses. Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

**COUNT VII: COLORADO CONSUMER PROTECTION ACT**

~~181.~~183.     All preceding statements and allegations of Plaintiff's Complaint are incorporated herein and realleged as if expressly set forth herein.

~~182.~~184.     In the course of their business, the ~~Defendants~~Old GM and KSS made false representations about the characteristics, benefits and qualities of the Cobalt, the Key System and the side airbag system. Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

~~183.~~185.     In the course of their business, ~~the Defendants~~Old GM and KSS made false representations to the effect that their products were of a particular standard and quality, at

a time when ~~the Defendants~~Old GM and KSS knew these representations were false.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

~~184.~~186.      In the course of their business, ~~the Defendants~~Old GM and KSS failed to disclose material information concerning their respective products, which were known at the time they advertised and sold them, and such failure to disclose was intended to induce consumers to buy the Defendants' products.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

~~185.~~187.      In particular, in marketing, distributing and selling the Cobalt, the Key System, and the side airbag system, Old GM and KSS failed to disclose material information relating to the safety of the Cobalt, the Key System, and the side airbag system, and thereby intended to induce consumers to purchase vehicles they otherwise would not have purchased had this information been disclosed.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

~~186.~~188.      The failure to disclose material information relating to the safety of the Cobalt, the Key System, and the side airbag system, tended to deceive and mislead consumers.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

~~187.~~189.      The activities described in this Count and described in this Complaint were undertaken in the course of the ~~Defendants' businesses.~~Old GM's and KSS's businesses.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

~~188.~~190.      The activities described in this Count and described in this Complaint were undertaken in bad faith.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

189.191.        Such representations and activities took place in, among other places, the State of Colorado.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

190.192.        Plaintiff Jamie Lee Dowling was an actual and potential user and consumer of the Defendants' goodOld GM's and KSS's goods, services, and products.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

191.193.        The Plaintiff was injured as a result of the Defendants'Old GM's and KSS's deceptive trade practices. Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

192.194.        The Defendants'Old GM's and KSS's deceptive trade practices were a direct and proximate cause of the death of the decedents and injuries to the Plaintiff.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

193.195.        The actions described in this Count constitute deceptive trade practices pursuant to Colorado Revised Statues § 6-1-105.  Pursuant to Colorado Revised Statutes § 6-1-113, Plaintiffs are entitled to treble damages, costs, and attorney fees from Defendants.  Per the MPSA of July 2009, New GM assumed Old GM's liabilities for defects in the Cobalt.

## COUNT VIII: CAUSATION AND DAMAGES

194.196.        All preceding statements and allegations of Plaintiff's Complaint are incorporated herein and realleged as if expressly set forth herein.

195.197.        As a direct and proximate result of the acts and omissions of New GM and KSS set forth herein, Plaintiff has incurred and seeks the following general and special damages.

196.198.        As a direct and proximate result of the acts and omissions of New GM and KSS, Plaintiff, as surviving mother of the deceased Raylee Kay Dowling, has suffered and

46

incurred damages and also seeks the following damage on behalf of and for the benefit of the

statutory heirs of Raylee Kay Dowling, including without limitation:

      a.     Loss of earnings and loss of future earning capacity, lost household services and other pecuniary losses arising out of the wrongful death of her daughter;

      b.     Burial and funeral expenses;

      c.     Physical and emotional pain and suffering of Raylee Kay Dowling between the time of her injury and the time of her death;

      d.     The value of Raylee Kay Dowling's guidance and counseling to her family and similar such pecuniary losses arising out of the death of Raylee Kay Dowling;

      e.     Grief, loss of companionship, pain and suffering, emotional stress, loss of affection, society, companionship, aid, comfort, services, benefits, consortium and counsel of Raylee Kay Dowling;

      f.     Any other losses and damages sustained by Jamie Lee Dowling and to which she is legally entitled; and/or

      g.     Any other losses and damages sustained by other statutory heirs or beneficiaries of Raylee Kay Dowling, including Jamie Lee Dowling, and to which such heirs are entitled either pursuant to statute or the common law, including costs and attorneys' fees.

~~197.~~199.      As a direct and proximate result of the acts and omissions of New GM and KSS, Plaintiff, as surviving mother of the deceased Landyn Scott Dowling, has suffered and incurred damages and also seeks the following damage on behalf of and for the benefit of the statutory heirs of Landyn Scott Dowling, including without limitation:

      a.     Loss of earnings and loss of future earning capacity, lost household services and other pecuniary losses arising out of the wrongful death of her son;

      b.     Burial and funeral expenses;

      c.     Physical and emotional pain and suffering of Landyn Scott Dowling between the time of his injury and the time of his death;

**Formatted:** Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 16 + Alignment: Left + Aligned at: 0.69" + Indent at: 0.94"

**Formatted:** Bullets and Numbering

      d.      The value of Landyn Scott Dowling's guidance and counseling to her family and similar such pecuniary losses arising out of the death of Landyn Scott Dowling;

      e.      Grief, loss of companionship, pain and suffering, emotional stress, loss of affection, society, companionship, aid, comfort, services, benefits, consortium and counsel of Landyn Scott Dowling;

      f.      Any other losses and damages sustained by Jamie Lee Dowling and to which she is legally entitled; and/or

      g.      Any other losses and damages sustained by other statutory heirs or beneficiaries of Landyn Scott Dowling, including Jamie Lee Dowling, and to which such heirs are entitled either pursuant to statute or the common law, including costs and attorneys' fees.

~~198.~~200.      As a direct and proximate result of the acts and omissions of New GM and KSS, Plaintiff Jamie Lee Dowling, individually, has incurred and seeks the following damages:

      a.      Extreme mental and physical pain and suffering and emotional distress, past and future;

      b.      Loss of affection, society, companionship, aid, comfort, services, benefits, consortium and counsel of her children and impairment of the quality of her life, resulting from the wrongful death of her children;

      c.      Reasonable and necessary medical, hospital and rehabilitation care and services, nursing care and services, medication, therapy and other expenses, past and future, including special medical damages;

      d.      Any other losses and damages sustained by Jamie Lee Dowling and to which she is legally entitled either pursuant to statute or the common law, including costs and attorneys' fees.

WHEREFORE, Plaintiff prays for and demands an award of damages to be fixed by the trier of fact in a reasonable amount.  Additionally Plaintiff asks for the costs of this action, reasonable attorney fees, all pre-judgment interest and post-judgment interest as provided by law, and for all such other relief to which they are legally entitled and as the Court deems appropriate.

> **Formatted:** Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 16 + Alignment: Left + Aligned at: 0.69" + Indent at: 0.94"
>
> **Formatted:** Bullets and Numbering

For the reasons stated above in this Complaint, Plaintiff does not seek any punitive damages from New GM based on Old GM's conduct.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

Respectfully submitted this _____ day of _____, 2015.

By:_____
        **Stuart Ollanik**
        OLLANIK LAW, LLC
        1439 Wildwood Lane
        Boulder, CO 80305
        Telephone: (303) 579-9322
        E-mail: stuart@ollanik-law.com

        and

Steven A. Shapiro
**Adrian A. Sak**
FLEISHMAN & SHAPIRO, PC
2000 S. Colorado Boulevard
Tower One, Suite 9000
Denver, CO 80232
Telephone: (303) 861-1000
E-mail:    sshapiro@colorado-law.net;  asak@colorado-law.net

        and

DATED:   September 22, 2015.

/s/ Lance A. Cooper_____
**Lance A. Cooper**
THE COOPER FIRM
531 Roselane Street
Suite 200
Marietta, GA 30060
Telephone: (770) 655-0598
E-mail: lance@thecooperfirm.com

49

ATTORNEYS FOR PLAINTIFF

Plaintiff's Address:
P.O. Box 608
Rushville, NE 69360