# EXHIBIT 7

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: | ) | **MDL NO. 2543** |
| | ) | **1:14-MD-2543-JMF** |
| **GENERAL MOTORS LLC IGNITION** | ) | |
| **SWITCH LITIGATION** | ) | **HON. JESSE M. FURMAN** |
| _____ | ) | |
| | ) | Case No. 1:15-cv-06233 |
| **THIS DOCUMENT RELATES TO:** | ) | |
| | ) | Complaint |
| KARINA K. KEELER n/k/a KARINA | ) | |
| CRAWFORD, as Personal Representative of | ) | Jury Trial Demanded |
| the ESTATE OF EDWARD WILLIAM | ) | |
| KEELER, and JAMES ROBERT BOWIE, as | ) | |
| Personal Representative of the ESTATE OF | ) | |
| JOSIE MARIE KEELER, Deceased, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -V- | ) | |
| | ) | |
| GENERAL MOTORS LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | | |

## SECOND MOTION FOR LEAVE TO AMEND COMPLAINT

Pursuant to Fed. R. Civ. P. 15, Plaintiffs hereby move for leave of court to amend

their complaint in order to make clear that their claim for punitive damages in this action is

premised solely on the acts or omissions of General Motors, LLC (i.e., "New GM," the

Defendant in this case) after it was created, and to confirm that Plaintiffs are not seeking to

obtain punitive damages against New GM that arise from the conduct of General Motors

Corporation ("Old GM").   This Motion for Leave is specifically filed after counsel for New GM

sent Plaintiffs' counsel a letter (on August 31, 2015) contending that an attempt by Plaintiffs to

seek punitive damages "from New GM that arise from the conduct of Old GM (and not New

GM)" would be "a violation of the Sale Order and Injunction….entered by the Bankruptcy

Court" in the Southern District of New York, citing *Decision on Motion to Enforce Sale Order*,

*In Re Motors Liquidation Company*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015).

   While Plaintiffs in filing this Motion for Leave do not concede GM's contention

(Plaintiffs understand that the above-referenced June 1, 2015 Bankruptcy Order is presently or

soon will be the subject of an appeal and protracted litigation), they nonetheless assert and agree

that their punitive damages claims against New GM in this action are premised solely upon the

conduct of New GM since it was created in July 2009, not the conduct of Old GM, as appears to

be required by currently existing orders of the Bankruptcy Court.

  Plaintiffs attach hereto as **Exhibit A** the redlined version of the Amended Complaint that

they wish to file making this clarification in several places.

   WHEREFORE, Plaintiffs respectfully request this Court enter an order granting

their Motion for Leave to Amend Complaint.

  DATED: September 30, 2015.

      */s/ Lance A. Cooper*   
      Lance A. Cooper
      Georgia Bar No. 186100
      **THE COOPER FIRM**
      531 Roselane Street
      Suite 200
      Marietta, GA 30060
      Tel.:  770-427-5588
      Fax:  770-427-0010
      lance@thecooperfirm.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that the foregoing was filed electronically with the

Clerk of the Court using the CM/ECF system on September 30, 2015, and served electronically

on all counsel of record.


*/s/ Lance A. Cooper*    _____
**LANCE A. COOPER**

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: | ) |
| | ) |
| **GENERAL MOTORS LLC IGNITION** | ) |
| **SWITCH LITIGATION** | ) |
| ——————————————————— | ) |
| | ) |
| **THIS DOCUMENT RELATES TO:** | ) |
| | ) |
| KARINA K. KEELER n/k/a KARINA | ) |
| CRAWFORD, as Personal Representative of | ) |
| the ESTATE OF EDWARD WILLIAM | ) |
| KEELER, and JAMES ROBERT BOWIE, as | ) |
| Personal Representative of the ESTATE OF | ) |
| JOSIE MARIE KEELER, Deceased, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| -V- | ) |
| | ) |
| GENERAL MOTORS LLC, | ) |
| | ) |
| Defendant. | ) |
| ——————————————————— | |

**MDL NO. 2543**
**1:14-MD-2543-JMF**

**HON. JESSE M. FURMAN**

Case No. 1:15-cv-06233

Complaint

Jury Trial Demanded

### AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

COME NOW Plaintiffs, Karina K. Keeler n/k/a Karina Crawford, as Personal
Representative of the Estate of Edward William Keeler, Deceased, and James Robert Bowie, as
Personal Representative of the Estate of Josie Marie Keeler, by and through counsel, and file this
Complaint for Damages and Demand for Jury Trial, and states as follows:

I.    **INTRODUCTION**

1.       This is an action to recover damages for the wrongful death of Edward William Keeler and Josie Marie Keeler, who were killed in an automobile ~~accident~~wreck that occurred on September 24, 2011 in Grant County, Washington (hereinafter "the ~~accident~~wreck").

II.    **PARTIES**

2.       Plaintiff Karina K. Keeler n/k/a Karina Crawford is the Personal Representative of the Estate of Edward William Keeler, who sustained fatal injuries as a result of the automobile accident described below.

3.       Plaintiff James Robert Bowie is the Personal Representative of the Estate of Josie Marie Keeler, who sustained fatal injuries as a result of the automobile accident described below.

4.       Defendant General Motors LLC ("New GM") is a citizen of Delaware and Michigan, and does business in all fifty states, including the State of Washington.  General Motors LLC's principal place of business is in Detroit, Michigan.

5.       ~~General Motors LLC~~New GM is a limited liability corporation with one member: General Motors Holding, LLC. General Motors Holding, LLC is a citizen of Delaware and Michigan, and is a holding company and direct parent of General Motors LLC. General Motors Holding, LLC is a limited liability corporation with one member: General Motors Company. General Motors Company is a citizen of Delaware and Michigan and is publicly traded.

6.       General Motors Corporation ("Old GM") was a Delaware corporation with its headquarters in Detroit, Michigan. General Motors Corporation, through its various entities, designed, manufactured, marketed, distributed, and sold Chevrolet, Pontiac, Saturn, and other brand automobiles in Pennsylvania, elsewhere in the United States, and worldwide.

2

7. In June of 2009, ~~General Motors Corporation ("~~Old GM~~")~~ filed for bankruptcy. On July 9, 2009, the United States Bankruptcy Court approved the sale of substantially all of Old GM's assets pursuant to a Master Sales and Purchase Agreement ("Agreement"). The Agreement became effective on July 10, 2009. The Agreement approved the sale of Old GM to ~~Defendant General Motors LLC (hereinafter "Defendant," "GM," or "New GM").~~New GM.

8. The Agreement defines ~~Defendant's~~New GM's "Purchased Assets" as:

(xiv) all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

(xv) all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities; . . .

AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT at Section 2.2.

9. Along with the Purchased Assets, New GM also expressly took on a range of liabilities. "Liabilities" is defined in the Agreement as "any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise."

3

10.    Among many others, the Liabilities assumed by New GM under the Agreement include:

(vii) (A) all Liabilities arising under express written warranties of Sellers [i.e., old GM] that are specifically identified as warranties and delivered in connection with sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser [i.e., new GM] prior to or after the Closing and (B) all obligations under Lemon Laws; . . .

(ix) all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents, or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance; . . . [1]

(xi) all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing; . . .

Plaintiff does not concede that New GM did not assume Old GM's liabilities for punitive damages.   But, as that question is sure to be taken up in ongoing and protracted litigation and on appeal, Plaintiff amends their Complaint to confirm that in this Action they are only seeking punitive damages for the conduct of New GM after July 2009.

Formatted: Right: 0.5"

11.    GM also assumed responsibility for compliance with a wide range of laws and other regulations, including:

(a) From and after the Closing, Purchaser [Defendant New GM] shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [Old GM].

---

[1] Pursuant to an order of the bankruptcy court, this particular category of assumed liabilities is "regardless of when the product was purchased."

(b) From and after the Closing, Purchaser [Defendant New GM] shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [Old GM] . . . (ii) Lemon Laws.

12.     Moreover, the Bankruptcy Court order approving the Agreement made clear that DefendantNew GM assumed "the warranty and recall obligations of both Old GM and [Defendant New GM]."

13.     Pursuant to the Agreement and other orders of the Bankruptcy Court, Defendant New GM emerged out of bankruptcy and continued the business of Old GM with many, if not most, of Old GM's employees and, on information and belief, with most of the same senior-level management, officers, and directors.

14.     The allegations pertaining to Old GM above are included for purposes of background and context, and to set forth the scope of Defendant GM's liabilities and responsibilities under the Agreement. This Complaint does not assert any causes of action against Old GM; all causes of action and attributions of liability are directed solely against Defendant General Motors LLC.New GM.

### III.  **JURISDICTION**

15.     Jurisdiction is proper in this Court pursuant to Case Management Order No. 8 in *In re General Motors LLC Ignition Switch Litigation*, [14-MC-2543, Dkt. No. 36]. By filing this Complaint in this district, however, Plaintiffs do not waive their right to transfer this case to the district in which they reside at the conclusion of pretrial proceedings.

16.     This Court also has jurisdiction over this matter under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiffs are citizens of a different state than Defendant.

Formatted: Font: Italic

## IV.    STATEMENT OF FACTS

### A.    The September 24, 2011 ~~Accident~~Wreck

~~19.~~17.  On September 24, 2011, Edward William Keeler, who was properly belted with a lap/shoulder belt, was driving his 2008 Cadillac DTS, vehicle identification number 1G6KD57Y08UI93487 (hereinafter the "DTS") eastbound on I-90 in Grant County, Washington. Josie Marie Keeler was seated in the passenger seat of the vehicle and was properly restrained with a lap/shoulder belt.

~~20.~~18.  Because of the nature of the crash, the known safety defects in the DTS caused the key in Edward William Keeler's car to turn from the run to accessory/off position as he was driving on I-90.  Once the key turned, the engine shut off.  As a result of the engine shutting off, Edward William Keeler lost control of the DTS, traveled off the roadway and hit a rock embankment.

~~21.~~19.  Despite the force and magnitude of the impact, the safety-related defects in the DTS caused the airbags in the DTS not to deploy.

~~22.~~20.  Despite being properly seat-belted, Edward William Keeler, suffered fatal injuries during the ~~accident.~~wreck.

~~23.~~21.  Despite being properly seat-belted, Josie Marie Keeler, suffered fatal injuries during the ~~accident~~wreck.

6

**New GM Fraudulently Concealed the Ignition Switch Defect**

    *1.    The Defective Vehicles Manufactured by Old and New GM*

25.26.       On June 23, 2014, New GM conducted a safety related recall for its 2005-2009 Buick LaCrosse, 2006-2011 Buick Lucerne, 2000-2005 Cadillac DeVille, 2006-2011 Cadillac DTS, 2006-2014 Chevrolet Impala and 2006-2007 Chevrolet Monte Carlo vehicles.  In these vehicles, the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine. If the key is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury to the vehicle occupants.

26.27.  As used in this Complaint, the "Subject Vehicles" refer to the aforementioned GM vehicles which were subject to the June 23, 2014 recall.

27.28.  The Keeler's DTS falls within this group of Subject Vehicles.

28.29.  The ignition switches in the Subject Vehicles contain several common switch points, including "run" (or "on"), "off," and "accessory." At the "run" position, the vehicle's motor engine is running and electrical systems have been activated; at the "accessory" position the motor is off, and electrical power is generally only supplied to the vehicle's entertainment system; and at the "off" position, both the vehicle's engine and electrical systems are turned off. In most vehicles, a driver must intentionally and manually turn the key in the ignition to move to these various positions.

29.30.  In the Subject Vehicles, when a slotted key is carrying added weight, the torque performance of the ignition system may be insufficient to resist energy generated when a vehicle

goes off road or experiences some jarring event, potentially resulting in the unintentional movement of the key away from the "run" position.

30.31.  The ignition switch on the Subject Vehicles is prone to fail during ordinary and foreseeable driving situations (such as traveling across bumpy or uneven roadways). When the ignition switch "fails," and the ignition switch moves from the "run" to the "accessory" or "off" position during ordinary operation of the vehicle, the power to the vehicle is terminated (even at highway speeds), and the vehicle loses power steering and power brakes, among other things.

31.32.  Each of the Subject Vehicles also contains a uniformly designed airbag system that is disabled when the ignition switch on the vehicles fails during ordinary and foreseeable driving situations. Thus, as a result of the defective design of the Subject Vehicles, a driver whose ignition switch fails may suddenly and without warning experience a vehicular power failure that also disables the vehicle's airbags, steering, and brakes. Such a failure may occur unexpectedly and during normal operation of the vehicle.

32.33.  The DTS purchased by the Keelers contained the defective ignition switch and airbag system described in this Complaint.

33.34.  The ignition switch defect precludes drivers and owners of the Subject Vehicles, such as the Keelers, from proper and safe use of their vehicles, reduces vehicle occupant protection, and endangers Subject Vehicle occupants as well as those in vehicles around them. Further, because New GM concealed the existence of the ignition switch defect, no driver or owner of the Subject Vehicles, including the Keelers, knew, or could reasonably have discovered, the ignition switch defect.

8

2.    *New GM Learned of the Ignition Switch Defect Shortly After the Bankruptcy Sale, but Concealed the Defect for Years, as Old GM Had Done*

34.35.  In 2009, Old GM declared bankruptcy in the United States Bankruptcy Court in the Southern District of New York.

35.36.  On July 9, 2009, the United States Bankruptcy Court approved the sale of Old GM, which was converted into Defendant New GM. From its inception, New GM, which retained the vast majority of Old GM's senior and management level executives and engineers, knew that its predecessor had manufactured and sold millions of vehicles afflicted with the ignition switch defect. Some of the Old GM employees retained by New GM include current CEO Mary T. Barra; designer of the ignition switch and engineer Ray DeGiorgio; director of product investigations Carmen Benavides; engineer Gary Altman; engineer Jim Federico; vice presidents for product safety John Calabrese and Alicia Boler-Davis; vice president of regulatory affairs Michael Robinson; director of product investigations Gay Kent; general counsel and vice president Michael P. Milliken; and in-house product liability lawyer William Kemp.

36.37.  On or around the day of its formation as an entity, New GM also acquired, inter alia, the knowledge of the contents of Old GM's "files" and company "documents." To that end, New GM acquired notice of the safety-related defects contained in Old GM's files, including numerous engineering reports, investigative reports, failure analyses, technical service bulletins, and other documentation concerning the defective ignition switch and airbag system described herein.

a.    *New GM Learns of the Ignition Switch Defect*

9

37.38.  From the day of its formation as a corporate entity, New GM acquired notice and

full knowledge of the following:

> a.    In 2005, Old GM was preparing to launch two models of the GM W
> platform, the 2006 Impala and the 2006 Monte Carlo.

> b.    In August 2006, aan Old GM employee assigned a 2006 Impala CTF
> vehicle reported a potential safety issue through the GM CTF reporting system.

> c.    The employee reported that the vehicle stalled after hitting a large bump
> when going from gravel road to pavement while driving at about 45 mph.

> d.    In August of 2005, Old GM technicians checked the vehicle and test drove
> the vehicle and were not able to duplicate the condition.

> e.    In 2005, Old GM began manufacturing and selling 2008 Cadillac DTS
> vehicles with the defective ignition switches and defective airbag systems.

> f.    On February 7, 2014, New GM conducted a safety related recall for its
> 2005-2007 Chevrolet Cobalt and its 2007 Pontiac G5. In these vehicles, the weight on the
> key ring and/or road conditions or some other jarring event may cause the ignition switch
> to move out of the run position, turning off the engine. If the key is not in the run
> position, the air bags may not deploy if the vehicle is involved in a crash, increasing the
> risk of injury to the vehicle occupants.

> g.    On February 25, 2014, New GM expanded its initial recall to include the
> 2006-2007 Chevrolet HHR, 2006-2007 Pontiac Solstice, 2003-2007 Saturn Ion and 2007
> Saturn Sky for the same ignition switch defect.

**Formatted:** Indent: Left:  0", First line:  0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 26 + Alignment: Left + Aligned at:  0.5" + Indent at:  0.75"

**h.**      On March 28, 2014, New GM again expanded its recall to include the 2008-2010 Chevrolet Cobalt, 2008-2011 Chevrolet HHR, 2008-2010 Pontiac G5, 2008-2010 Pontiac Solstice, and 2008-2010 Saturn Sky for the same ignition switch defect.

i.      On April 30, 2014, an August 2005 relating to the prior investigation was brought to the attention of the Product Investigation Group and an investigator was assigned to investigate the issues from August 2005.

j.      On June 6, 2014, the investigator made a presentation regarding the ignition switch investigation at an Open Investigation Review Meeting.  Following the meeting New GM personnel conducted road testing of the Impala and other vehicles using the ignition switches under review to analyze the performance of the subject ignition systems under various driving conditions.

k.      On June 13, 2014, an investigator presented to the Safety and Field Action Decision Authority ("SFADA") a review of the data that he had completed AT THEat the Milford Proving Grounds.  The SFADA directed the investigator to work with other New GM personnel to further refine the potential population so that it accurately included the vehicles using the identified ignition switches.

l.      On June 15, 2014, the SFADA met and decided to conduct a Safety Recall of that population of vehicles.

m.      On June 20, 2014, New GM submitted a Section 573 letter to NHTSA advising NHTSA of SFADA's decision to conduct a Safety Recall.  New GM's letter to NHTSA states that, until the recall has been performed, it is very important that

11

customers remove all items from their key ring, leaving only the vehicle key; the key fob (if applicable) should also be removed from the key ring.

n.      On June 23, 2014, New GM announced the Safety Recall which would have dealers insert two 13 mm key rings and key insert into all involved vehicle's ignition keys.

*b.      New GM Continues to Fraudulently Conceal the Ignition Switch Defect After the Bankruptcy Sale*

38.39.  New GM continued its business with full knowledge of Old GM's awareness and concealment of the defects with the ignition switch and airbag system, and with knowledge of Old GM's failure to disclose those defects to the public—or, for that matter, to the Bankruptcy Court. Had New GM acted when it acquired knowledge of the ignition switch defect, the Keeler's would likely not have been involved in an accident on September 24, 2011.

39.40.  Rather than promptly recalling the Subject Vehicles, however, New GM fraudulently concealed the existence of the safety defects in the Subject Vehicles. Moreover, New GM continued to manufacture vehicles with the ignition switch defect after it emerged from bankruptcy. Indeed, hundreds of thousands of the vehicles manufactured by New GM have since been recalled for defective ignition switches.

40.41.  Moreover, throughout the entirety of its corporate existence, Old GM and New GM received numerous and repeated complaints of moving engine stalls and/or power failures in the Subject Vehicles. These complaints are yet more evidence that New GM was fully aware of the ignition switch defect and should have timely announced a recall much sooner than it did.

12

**Formatted:** Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 26 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.75"

41.42. New GM was aware of these problems year after year and nationwide, as reflected not only by the internal documents reflecting knowledge and cover-up at high levels, but also in thousands of customer complaints recorded in GM's internal complaint logs and documents. New GM received and reviewed complaints of safety issues from customers with Subject Vehicles in nearly every state nationwide. Documents produced by New GM pursuant to Order No. 12 in *In re General Motors LLC Ignition Switch Litigation* (14-MC-2543, Dkt. No. 46) show that Old GM was and New GM were aware of customer complaints of stalling Subject Vehicles in many of these states and ultimately did nothing about them. These complaints, of course, are in addition to the multiple non-deploy fatalities of which New GM became aware and even investigated from July 2009 to the present.

**B.    New GM Issues a Recall—Ten Years Too Late**

42.43.  As pressure from the Melton litigation mounted, New GM executives finally felt compelled to act. On January 31, 2014, New GM's Field Performance Review Committee and Executive Field Action Decision Committee ("EFADC") finally ordered a recall of some Subject Vehicles.

43.44.  On February 7, 2014, New GM, in a letter from Director of Product Investigations and Safety Regulations Carmen Benavides, informed NHTSA that it was conducting a recall of 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles.

44.45. New GM knew that this recall was insufficient in scope. Indeed, New GM knew that the same defective ignition switches installed in the Cobalt and G5 vehicles were installed in Chevrolet HHR, Pontiac Solstice, Saturn Ion, and Saturn Sky vehicles. But New GM did not recall these vehicles on February 7.

13

45.46.  On February 19, 2014, a request for timeliness query of New GM's recall was sent to NHTSA by The Cooper Firm.  The timeliness query pointed out that New GM had failed to recall all of the vehicles with the defective ignition switches.

46.47.  The February 19, 2014 timeliness query also asked NHTSA to investigate New GM's failure to fulfill its legal obligation to report the safety defects in the Subject Vehicles within five days of discovering the defect—a requirement of applicable federal law.

47.48.  On February 24, 2014, New GM informed NHTSA it was expanding the recall to include 2006-2007 model year Chevrolet HHR and Pontiac Solstice, 2003-2007 model year Saturn Ion, and 2007 model year Saturn Sky vehicles.

48.49.  New GM included an Attachment to the February 24, 2014 letter. In the Attachment, GM, for the first time, admitted that it authorized a change in the ignition switch in 2006. Specifically, New GM stated:

> On April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics. The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch. This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch. GM believes that the supplier began providing the re-designed ignition switch to GM at some point during the 2007 model year.

49.50.  Public criticism in the wake of New GM's piecemeal recalls was withering. On March 17, 2014, Mary Barra issued an internal video, which was broadcast to employees. In the video, Ms. Barra acknowledged:

> Scrutiny of the recall has expanded beyond the review by the federal regulators at NHTSA, the National Highway Traffic Safety

Formatted: Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, ... + Start at: 26 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.75"

Administration. As of now, two congressional committees have announced that they will examine the issue. And it's been reported that the Department of Justice is looking into this matter. . . . These are serious developments that shouldn't surprise anyone. After all, something went wrong with our process in this instance and terrible things happened.

50.51.  The public backlash continued and intensified. On March 28, 2014, New GM again expanded the ignition switch recall to cover all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice, and the Saturn Ion and Sky in the United States. This third expansion of the ignition switch recall covered an additional 824,000 vehicles in the United States and raised the number of recalled vehicles to 2,191,146.

51.52.  On June 23, 2014, New GM issued Recall No. 14-V-355 which related to 2005-2009 Buick LaCrosse, 2006-2011 Buick Lucerne, 2000-2005 Cadillac DeVille, 2006-2011 Cadillac DTS, 2006-2014 Chevrolet Impala and 2006-2007 Chevrolet Monte Carlo vehicles for the same ignition switch defect.

52.53.  Unfortunately for Plaintiffs, the Keeler's DTS' ignition switch failed prior to New GM's recall of the 2008 Cadillac DTS.

53.54.  New GM's recalls of the Subject Vehicles were not only untimely, they are completely insufficient to correct the safety-related defects in the Subject Vehicles.

54.55.  To address the safety defect, New GM is inserting two 13 mm key inserts into the vehicle's keys.

**C.    New GM Creates an Inadequate Settlement Fund**

15

55.56.  New GM has acknowledged that the ignition switch defect has caused at least

thirteen deaths and over 50 accidents. Independent safety groups put this number far higher: the

Center for Auto Safety, for example, estimates that there have been 303 deaths associated with

the Saturn Ion and Chevrolet Cobalt vehicles alone. The actual number of deaths and accidents

for all Subject Vehicle models is expected to be significantly higher than GM's estimate, ranging

to somewhere over 100 deaths.

56.57.  In April 2014, under intense scrutiny from Congress and the Department of

Justice, Mary Barra announced that New GM would retain attorney Kenneth Feinberg to

implement a claims facility to amicably resolve personal injury and wrongful death claims

associated with the ignition switch defect. Ms. Barra's announcement was greeted with much

fanfare on Capitol Hill and in the press.

57.58.  On June 30, 2014, Mr. Feinberg unveiled the GM Ignition Compensation Claims

Resolution Facility (hereinafter the "GM Claims Facility" or "Facility"). The GM Claims

Facility offers compensation to three categories of victims:

- Those who were killed in an accident involving certain Subject Vehicles;

- Those who suffered a "Category One" injury in an accident involving certain
  Subject Vehicles. A Category One injury is defined as a "quadriplegic injury,
  paraplegic injury, double amputation, permanent brain damage requiring
  continuous home medical assistance, or pervasive burns encompassing a
  substantial part of the body"; and

- Those who suffered a "Category Two" injury in an accident involving certain
  Subject Vehicles. A Category Two injury is generally defined as an injury
  requiring one or more nights of hospitalization within 48 hours of the
  accident.

16

58.59.  In addition to these injury thresholds, the GM Claims Facility does not treat all Subject Vehicles equally. The Fund was limited to vehicles included in the first group of recalls and did not include the vehicles in the June 23, 2014 recall such as the Keeler's DTS.

59.60.  Thus, New GM refuses to acknowledge what GM's engineers have long known—the defect in the ignition switches is not limited to inadequate torque performance, but also includes the low placement of the ignition on the steering cylinder as well as the airbag system that is disabled when the ignition is in the "accessory" or "off" position. GM's FPE team recognized these essential aspects of the safety defect as recently as 2012 when they proposed placing a shroud over the ignition and/or moving the ignition higher on the steering column.

60.61.  Even if the ignition switch defect were purely an issue of inadequate torque performance, however, the evidence shows that the ignition switches were defective even after DeGiorgio's 2006 redesign. In May of 2012, New GM's FPE team tested the ignition switches in dozens of Subject Vehicles, many of them model years 2008 and 2009. In these tests, New GM engineers found that the ignition switches for these 2008 and 2009 model year Subject Vehicles by and large failed to meet Old GM and New GM's torque specifications for the ignition switch.

61.62.  Further, New GM's own investigation into airbag non-deployment events in Chevrolet Cobalt vehicles identified over 250 non-deploy crashes involving 2008-2010 Cobalts. Upon information and belief, New GM has knowledge of numerous non-deploy incidents in Subject Vehicles of model year 2008 and later in which the ignition switch was not replaced prior to the relevant incident. Although these vehicles have thus exhibited evidence of the ignition switch defect, they are not eligible for compensation from the Claims Facility.

17

62.63.  What is more, until New GM recalled 2008 and later model year Subject Vehicles, it had never notified the owners of those vehicles that they should remove all items from their key chains and/or avoid jarring road conditions or contacting the ignition key with one's knee. GM knew that any of these scenarios could cause the ignition switches in later model year Subject Vehicles to fail, but it did nothing to notify its customers of these facts.

63.64.  In truth, the problems in earlier model year Subject Vehicles and later model year Subject Vehicles are the same. The ignitions are placed dangerously low on the steering column, and the torque required to hold the ignition key in place under normal driving conditions is insufficient.

64.65.  This was certainly the case in the Keeler's DTS.  On September 24, 2011, at the time of the accident, the Keeler's key chain contained numerous keys in addition to their DTS ignition key. At this time, however, New GM had not recalled the DTS vehicles.

65.66.  The ignition switch in the Keeler's DTS is defective. It is incapable of withstanding ordinary and normal movement and/or pressure. When the Keeler's ignition switch inadvertently turned to the "accessory" or "off" position on September 24, 2011, it was because their switch was unable to hold the "run" position, either because the torque performance was inadequate or because the switch inadvertently and unexpectedly moved while the vehicle traveled over rough or uneven roadway.

66.67.  New GM's arbitrary exclusion of these vehicles is simply an attempt to contain its liability—a tactic that contradicts New GM CEO Mary Barra's public statements. In her April 1, 2014 testimony before Congress, Ms. Barra assured legislators and the public that

18

> General Motors want[s] to do the right thing for our customers, and
> that's why we feel this is an extraordinary situation. . . . [W]e will
> make the best decisions for our customers, recognizing that we
> have legal obligations and responsibilities as well as moral
> obligations. We are committed to our customers, and we are going
> to work very hard to do the right thing for our customers.

Ten weeks later, Ms. Barra continued with her public assurances, telling Congress that New GM
"want[s] to capture [in the Facility] every single person who has suffered serious physical injury
or lost a loved one" as a result of the defective ignition switches.

## V.    Tolling of the Statute of Limitation

67.68.  Old GM sold the 2008 Cadillac DTS at issue in this case over seven years prior to
the filing of this action. Any statutes of repose or limitation are tolled, however, because of New
GM's fraudulent concealment of the ignition switch defect, and conduct equivalent to that
required for a finding of willful and wanton conduct against New GM.

68.69.  The accident wreck occurred in Washington.  Washington's Statute of Limitations
7.72.060 addresses the length of time product sellers are subject to liability.  Plaintiffs'
decedents' accident occurred on September 24, 2011.  However, it was not until New GM
recalled the DTS in 2014 that Plaintiffs discovered the harm and its cause.

69.70.  Further, New GM was under a continuous duty to disclose to Plaintiffs the true
character, quality, and nature of the Subject Vehicles. New GM actively concealed the true
character, quality, and nature of the vehicles and knowingly made misrepresentations about the
quality, reliability, characteristics, and performance of the vehicles. Plaintiffs reasonably relied
upon New GM's knowing and affirmative representations that its vehicles—including the

19

Subject Vehicles—were safe. Based on the foregoing, New GM is estopped from relying on any statutes of limitations in defense of this action.

70.71.  Further, Plaintiffs had no realistic ability to discern that the Keeler's DTS was defective until—at the earliest—the ignition switch defect caused a sudden unintended power failure. Even then, Plaintiffs had no reason to know the sudden loss of power was caused by a defect in the ignition switch because of New GM's active concealment of the ignition switch defect.

## VI.  Claims for Relief

### *Claim I: Negligence*

71.72.  Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

72.    This Claim is brought under Washington law.

73.    At all times herein relevant, GM was and is engaged in the business of, including but not limited to, selling, designing, manufacturing, fabricating, distributing, retailing, wholesaling, recommending, testing, modifying, controlling, advertising, creating, processing, preparing, constructing, packaging, utilizing, providing, warranting, servicing, repairing, maintaining, marketing, leasing, renting, vending, installing, handling, labeling, promoting, advertising, furnishing, retailing, analyzing, inspecting, supplying warnings and placing into the stream of commerce the Subject Vehicles, including the 2008 Cadillac DTS. To the extent that Old GM designed, inspected, tested, manufactured, assembled, marketed, sold, and provided warnings for the 2008 Cadillac DTS, New GM assumed liability for Old GM's negligence and therefore stands in Old GM's shoes for purposes of negligence liability.

20

74.    New GM, including its employees, agents, directors, officers, stockholders, partners and associates knew or should have known that the 2008 Cadillac DTS was defectively designed and inherently dangerous and had a propensity to suddenly shut off due to the ignition switch defect.

75.    New GM had a duty to ensure that its vehicles, and those for which it had assumed liability, were reasonably safe to operate and did not contain defective components. When New GM learned that the 2008 Cadillac DTS contained a defective component, it had a duty to warn Plaintiffs of the existence of the defect.

76.    GM was negligent in designing, inspecting, testing, manufacturing, assembling, marketing, selling, and providing warnings for the 2008 Cadillac DTS, as set forth in the paragraphs above. To the extent that Old GM designed, inspected, tested, manufactured, assembled, marketed, sold, and provided warnings for the 2008 Cadillac DTS, New GM assumed liability for Old GM's negligence and therefore stands in Old GM's shoes for purposes of negligence liability.

77.    New GM's negligence proximately caused the damages sustained by Plaintiffs, as set forth herein, thus rendering New GM liable for compensatory and punitive damages. New GM is further liable for fair and reasonable damages for pain and suffering, medical expenses, and/or damages as may be determined by the Court or the jury, as well as costs, expenses, and reasonable attorneys' fees.

*Claim II: Strict Liability*

78.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

21

**Formatted:** Indent: Left:  0", First line:  0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 26 + Alignment: Left + Aligned at:  0.5" + Indent at:  0.75"

79. This Claim is brought under Washington law.

80.79. Old GM and New GM knew that the Subject Vehicles, including the 2008 Cadillac DTS, would be purchased and used without inspection for defects in the design of the vehicle.

81.80. Old GM designed, inspected, selected, tested, manufactured, assembled, equipped, marketed, distributed, and sold the 2008 Cadillac DTS, and its components. To the extent Old GM designed, inspected, selected, tested, manufactured, assembled, equipped, marketed, distributed, and sold the 2008 Cadillac DTS, however, GM assumed liability for Old GM's conduct and therefore stands in Old GM's shoes for purposes of strict liability.

82.81. Old GM designed, inspected, selected, tested, manufactured, assembled, equipped, marketed, distributed, and sold the ignition switch system that was selected and installed in the 2008 Cadillac DTS. To the extent Old GM designed, inspected, selected, tested, manufactured, assembled, equipped, marketed, distributed, and sold the ignition switch system that was selected and installed in the 2008 Cadillac DTS, New GM assumed liability for Old GM's conduct and therefore stands in Old GM's shoes for purposes of strict liability.

83.82. The 2008 Cadillac DTS was defective when it left the control of Old GM.

84.83. Old GM had a legal duty to design, inspect, test, manufacture, and assemble the 2008 Cadillac DTS so that it would be reasonably crashworthy and provide a reasonable degree of occupant safety in foreseeable collisions occurring in the highway environment of its expected use. To the extent Old GM had a legal duty to design, inspect, test, manufacture, and assemble the 2008 Cadillac DTS so that it would be reasonably crashworthy and provide a reasonable

22

Formatted: Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 26 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.75"

degree of occupant safety in foreseeable collisions occurring in the highway environment of its expected use, New GM assumed liability for Old GM's conduct and therefore stands in Old GM's shoes for purposes of strict liability.

85.84.  At the time of the 2008 Cadillac DTS' design, manufacture, and sale, and continuing up to the time of Edward William Keeler and Jose Marie Keeler's fatal injuries, New GM knew or should have known of the substantial dangers involved in the reasonably foreseeable use of these vehicles, whose defective design, manufacturing, and lack of sufficient warnings caused them to have an unreasonably dangerous propensity to suffer from sudden loss of power and thereby cause injuries.

86.85.  Among other things, the 2008 Cadillac DTS is not crashworthy, is defective, and is unreasonably dangerous and unsafe for foreseeable users and occupants in each of the following particulars:

(a) it has an ignition switch that allows the 2008 Cadillac DTS to stall or lose engine power, power steering, and/or power braking while in normal and foreseeable operation;

(b) it has an ignition that is placed in a position so that it is common and foreseeable for a driver to impact the ignition with his or her knee, thereby moving the ignition switch from the "run" to the "accessory" or "off" position; and

(c) it has front and side airbags that do not deploy when the ignition is in the "accessory" or "off" position.

23

87.86.  Old GM designed the 2008 Cadillac DTS defectively, causing it to fail to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.  To the extent that Old GM designed, inspected, tested, manufactured, assembled, marketed, sold, and provided warnings for the 2008 Cadillac DTS, GM assumed liability for Old GM's negligence and therefore stands in Old GM's shoes for purposes of strict liability.

88.87.  The risks inherent in the design of the 2008 Cadillac DTS outweigh significantly any benefits of such design.

89.88.  New GM knew that these substantial dangers are not readily recognizable to an ordinary consumer and that consumers would purchase and use these products without inspection.

90.89.  At all relevant times, New GM failed to provide adequate warnings, instructions, guidelines or admonitions to members of the consuming public, including Edward William Keeler and Josie Marie Keeler, of the defects, which GM knew, or in the exercise of reasonable care should have known, to have existed in the 2008 Cadillac DTS.

91.90.  At the time of Edward William Keeler and Josie Marie Keeler's fatal injuries, the 2008 Cadillac DTS was being used in the manner intended by Old GM and in a manner that was reasonably foreseeable by Old GM and New GM as involving substantial danger that was not readily apparent to its users.

92.91.  The defective nature of the 2008 Cadillac DTS was the proximate cause of Plaintiffs' damages, as set forth herein, thus rendering New GM strictly liable for compensatory

24

and punitive damages, fair and reasonable damages, and damages as may be determined by the Court or jury, as well as for costs, expenses, and reasonable attorneys' fees.

**Claim III:**  *New GM's* **Fraud and Fraudulent Concealment**

93.92.  Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

94.    This Claim is brought under Washington law.

95.93.  As alleged herein, Old GM knew, as early as 2001, that certain of the vehicles it designed, manufactured, marketed, distributed, sold or leased were defective in that these vehicles have an unreasonably dangerous propensity to suddenly lose power, due to the ignition switch defect, and thereby injure the users of these vehicles and others. To the extent that Old GM designed, inspected, tested, manufactured, assembled, marketed, sold, and provided warnings for the 2008 Cadillac DTS, New GM assumed liability for Old GM's negligence and therefore stands in Old GM's shoes for purposes of negligence liability.

96.94.  New GM intentionally concealed material facts from the Plaintiffs, NHTSA, and the public in general, and it continues to do so today. New GM knew that the Subject Vehicles, including the 2008 Cadillac DTS, were designed and manufactured with ignition switch defects, but New GM concealed those material facts. Although the Subject Vehicles contain safety-related defects about which New GM knew, or should have known, New GM recklessly concealed that information from consumers in the United States. Those consumers, including Edward William Keeler and Josie Marie Keeler had no knowledge of the safety-related defects.

25

97.95.  New GM knew that Edward William Keeler and Josie Marie Keeler had no knowledge of the concealed facts, and that they did not have an equal opportunity to discover the concealed facts. New GM was in a position of superiority over Edward William Keeler and Josie Marie Keeler. Indeed, Edward William Keeler and Josie Marie Keeler trusted New GM not to allow defective vehicles for which it was responsible to remain in the marketplace. Edward William Keeler and Josie Marie Keeler further trusted New GM to warn of defects and to recall defective vehicles.

98.96.  New GM had a duty to disclose the facts to Edward William Keeler and Josie Marie Keeler, the public who owned defective GM vehicles, and NHTSA, but failed to do so.

99.97.  By failing to disclose these material facts, New GM intended to hide information regarding the defect, mislead, avoid suspicion, or prevent further inquiry into the matter by NHTSA, Edward William Keeler and Josie Marie Keeler, and the public in general. GM further intended to induce NHTSA not to recall Edward William Keeler and Josie Marie Keeler's 2008 Cadillac DTS, as well as other Subject Vehicles, in order to reduce its eventual financial exposure.

100.98.    Edward William Keeler and Josie Marie Keeler reasonably relied on New GM's nondisclosure, and reasonably but unknowingly continued to use the 2008 Cadillac DTS until the date of the accident.

101.99.    Edward William Keeler and Josie Marie Keeler would not have purchased the 2008 Cadillac DTS had they known of the ignition switch defect.

26

102.100.     Old GM and New GM reaped the benefit of the sales and leases from the Subject Vehicles because it did not disclose the defects to the public and to NHTSA. Additionally, in not disclosing the Subject Vehicles' defects, New GM prevented any meaningful investigation of numerous accidents that were likely the result of those defects. Further, because New GM had not placed this matter before NHTSA or the public, cars and components in those other similar accidents were disposed of without the appropriate and adequate investigation.

103.101.     As a direct and proximate result of New GM's wrongful conduct and fraudulent concealment, Edward William Keeler and Josie Marie Keeler suffered damages described herein.

104.102.     New GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Edward William Keeler and Josie Marie Keeler, such that punitive damages are appropriate.  Plaintiffs in this Action do not seek punitive damages for the conduct of Old GM, but also do not concede that New GM did not assume liability for punitive damages from Old GM.

**VII.   Damages**

105.103.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

106.104.     Edward William Keeler's fatal injuries were proximately caused by Defendant'sNreew GM's conduct. Accordingly, Plaintiffs are entitled to reasonable and proper compensation for the following legal damages:

    a.      past medical expenses and;

27

**Formatted:** Indent: Left:  0", First line:  0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 26 + Alignment: Left + Aligned at:  0.5" + Indent at:  0.75"

      b.     past pain and suffering;

      c.     past loss of earnings;

      d.     loss of enjoyment of life;

      e.     the full value of the life of Edward William Keeler; and

      f.     funeral and burial expenses.

~~107.~~105.    Josie Marie Keeler's fatal injuries were proximately caused by ~~Defendant's~~New GM's conduct. Accordingly, Plaintiffs are entitled to reasonable and proper compensation for the following legal damages:

      a.     past medical expenses and;

      b.     past pain and suffering;

      c.     past loss of earnings;

      d.     loss of enjoyment of life;

      e.     the full value of the life of Josie Marie Keeler; and

      f.     funeral and burial expenses.

~~108.~~106.    Against New GM only, Plaintiffs seek actual and punitive damages to be awarded by the jury in an amount in excess of the minimum jurisdictional limits of this Court.

**VIII.    Punitive Damages**

~~109.~~107.    Plaintiffs hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

28

110.108.     Plaintiffs would further show that the clear and convincing evidence in this case will show that New GM consciously or deliberately engaged in oppression, fraud, wantonness, and/or malice in concealing the defect in the Subject Vehicles and failing to recall the vehicle in a timely manner. New GM had actual, subjective awareness of the risk involved but nevertheless proceeded with indifference to the rights, safety, or welfare of others, including Plaintiffs. Therefore, punitive damages are sought and should be assessed against the Defendant.New GM.

**WHEREFORE**, Plaintiffs respectfully demand as follows:

1.     For judgment against Defendant General Motors LLC.New GM.

2.     For compensatory damages against DefendantNew GM in such amounts as the trier of fact shall deem just, fair and equitable, including but not limited to:

a.     Past medical expenses for Edward William Keeler and Josie Marie Keeler;

b.     Loss of enjoyment of life;

c.     Past and prospective pain and suffering;

d.     Loss of function;

e.     Prospective medical care and medication costs;

f.     The full value of the life of Edward William Keeler;

g.     The full value of the life of Josie Marie Keeler;

h.     Funeral and burial expenses for Edward William Keeler; and

i.     Funeral and burial expenses for Josie Marie Keeler.

29

> **Formatted:** Indent: Hanging:  1", Tab stops: 1.5", List tab + Not at  2"

3.      For punitive damages against ~~Defendant~~New GM for its willful and wanton conduct, gross negligence, and fraudulent concealment of the ignition switch defect.  The Plaintiffs do not seek punitive damages against Old GM for its conduct, reprehensible though it was.

4.      For pre-judgment and post-judgment interest;

5.      For their costs expended herein, including reasonable attorneys' fees;

6.      Leave to amend this Complaint to conform to the evidence produced at trial; and

7.      Any and all other relief to which Plaintiffs may appear entitled.

30

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Respectfully submitted,

Dated: ~~August 7~~September 22, 2015

*/s/ Lance A. Cooper.*
Lance A. Cooper
GA Bar No. 186100
THE COOPER FIRM
531 Roselane Street
Suite 200
Marietta, GA 30060
Tel.:  770-427-5588
Fax:  770-427-0010
lance@thecooperfirm.com

31