# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------------------X

IN RE:
**GENERAL MOTORS LLC IGNITION SWITCH LITIGATION**          **14-MD-2543 (JMF)**

*This Document Relates to:*                                                     **Case No.**
                                                                               **1:15-cv-02089-JMF**
-----------------------------------------------------------------------------------X

**PAUL PATTERSON, ET AL**
        **PLAINTIFFS,**
**V.**

**GENERAL MOTORS, LLC,**
        **DEFENDANT**
-----------------------------------------------------------------------------------X

## MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

COME NOW Plaintiffs, by counsel, and hereby move the Court for leave to file First Amended
Complaint in order to comply with rulings of the Bankruptcy Court. As grounds for this Motion,
Plaintiffs state as follows:

1. Plaintiffs' original Complaint, included claims for damages potentially related to pre-
   bankruptcy conduct of "Old GM," among other claims.

2. On June 1, 2015, and as amended by a September 3, 2015 scheduling order, the United
   States Bankruptcy Court for the Southern District of New York has determined that certain
   claims, related to vehicles manufactured by Motors Liquidation Company (Old GM),
   cannot be maintained against General Motors LLC (New GM). *See, In re: MOTORS
   LIQUIDATION COMPANY, et al., f/k/a General Motors Corp., et al.,* Case No. 09-50026
   (REG)

3. On September 24, 2015, this Court entered Order No. 81 to streamline the amendment
   process. In accordance with this order, Plaintiffs have attached hereto a redline version of
   the original complaint as Exhibit A and a Proposed Amended Petition as Exhibit B.

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order directing the filing of
tendered Proposed Amended Petition.

Respectfully submitted,

Dated:  September 30, 2015

**THE POTTS LAW FIRM, LLP**

By: */s/ Eric G. Jensen* _____

    Eric G. Jensen    MO# 43094
    Derek H. Potts    NY #44882
    The Potts Law Firm, LLP
    1901 W. 47th Place, Suite 210
    Westwood, KS 66205
    (816) 931-2230 (telephone)
    (816) 817-0478 (facsimile)

**ATTORNEYS FOR PLAINTIFFS**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------------------X

IN RE:
**GENERAL MOTORS LLC IGNITION SWITCH LITIGATION**       **14-MD-2543 (JMF)**

***This Document Relates to:***                                                      **Case No.**
-----------------------------------------------------------------------------------X

**PAUL PATTERSON, ET AL**                              **Complaint**
     **PLAINTIFFS,**                                                   **Jury Trial Demanded**

**V.**

**GENERAL MOTORS, LLC,**
     **DEFENDANT**
-----------------------------------------------------------------------------------X

<u>**ORIGINAL COMPLAINT**</u>

     COME NOW Plaintiffs, through undersigned counsel, and for cause of action respectfully

shows as follows:

## I.     PRELIMINARY STATEMENT

     1.     Plaintiffs were involved in accidents, and received injuries, in GM vehicles that

have been recalled because of defective ignition switches.  Each incident, explained below, was

proximately caused by the failure of each Plaintiff's ignition switch and/or their injuries were

exacerbated because the defective ignition switch prevented their airbag from deploying.  All

Plaintiffs were damaged and received personal injuries as a result of the defective ignition switch

in their GM vehicles.

     2.     Plaintiffs' causes of action are brought against GENERAL MOTORS LLC ("New

GM").  Plaintiffs do not assert any causes of action against General Motors Corporation ("Old

GM"), although, in some cases, Old GM manufactured Plaintiffs' vehicles. The incidents at issue

in this case occurred after the Old GM bankruptcy, which is discussed briefly below. The subject

Case 1:14-md-02543-JMF    Document 1436    Filed 09/30/15    Page 2 of 23

vehicles have been recalled by General Motors LLC, and New GM is strictly liable for the incident.

3.      While at times this Complaint references acts and omissions by Old GM, these references are for background purposes only. Old GM arguably ceased to exist pursuant to the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets.   That Amended and Restated Master Sale and Purchase Agreement was approved on July 10, 2009.   In that Agreement, New GM expressly agreed to accept responsibility for product liability claims that arose from accidents or incidents occurring on or after July 10, 2009.

4.      While New GM expressly accepted responsibility for accidents occurring on or after July 10, 2009, it also acquired knowledge of Old GM's activities generally, and the existence of the defective ignition switches in place in millions of vehicles specifically. New GM acquired personnel from Old GM, including but not limited to, top leadership personnel, executives, members of the Board of Directors, internal legal counsel, engineers and quality control personnel. Most importantly, New GM retained the engineer in charge of designing and approving the manufacturing specifications of the defective ignition switch.   The employees retained by New GM carried with them the knowledge they gained at Old GM.   New GM also acquired knowledge about the issues with the ignition switch, moving stalls and airbag non-deployment through the chief engineer, design and manufacturing documents, internal memorandum, and reports to the Board of Directors.   New GM continued to service – and to receive complaints about – vehicles manufactured on Old GM's watch.   While the change from Old GM to New GM arguably had some legal effect with regard to creditors who received notice of their rights, it had little practical effect relative to the problems with, and knowledge of, the ignition-switch defect.

5.      New GM also acquired certain duties with regard to vehicles in production and on

*Patterson et. al.  v. GM*                               2

the road at the time of the Sale and Purchase Agreement – duties it breached egregiously – as has been well-publicized and for which it has been justifiably criticized. These duties included, but are not limited to, those arising under the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30101 *et. seq.* and the Transportation Recall Enhancement, Accountability and Documentation Act, 49 U.S.C. §§ 30101 – 30170. GM was fined $35 Million by NTSHA for its delayed reporting of the ignition switch problem and violating federal safety laws. New GM's liability for damages is attributable to its own post-sale conduct and failure to timely remedy and/or recall vehicles it knew had deadly defects, even with regard to vehicles manufactured and sold prior to the Sale and Purchase Agreement. Plaintiffs' cases are a prime example of liability and gross negligence that is inarguably attributable solely to New GM, as is shown below.

## II.    INTRODUCTION

6.    At the time of this filing, more than 12,000,000 GM vehicles have been recalled because of a defective ignition switch. Hundreds, if not thousands, of accidents are now known to have been caused by vehicles losing power and control because the defective ignition switch turned from "on" to "off" during normal and foreseeable operation. When the ignition switch fails, drivers are unable to use their steering and brakes in an effective manner. The resulting loss of control, or "moving stall," and subsequent accidents are exacerbated by the fact that the defective ignition switch also prevents life-saving airbags from deploying. So, in addition to causing accidents, the defective part makes the resulting damages even greater. As used in this Complaint, the "Subject Vehicles" refers to the GM vehicles manufactured, upon information and belief, on the Delta Platform, sold in the United States, equipped at the time of sale with ignition switches (the "Ignition Switches"), and sharing a common defective design, including the following makes and model years:

**Buick:**
- Lacrosse (2005 – 2009)
- Lucerne (2006 – 2011)

**Cadillac:**
- CTS (2003 – 2014)
- Deville (2000 – 2005)
- DTS (2006 – 2011)
- SRX (2004 – 2006)

**Chevrolet:**
- Camaro (2010 – 2014)
- Cobalt (2005 – 2010)
- HHR (2006 – 2011)
- Impala (2000 – 2014)
- Malibu (1997 – 2005)
- Monte Carlo (2000 – 2007)

**Oldsmobile:**
- Alero (1999 – 2004)
- Intrigue (1998 – 2002)

**Pontiac:**
- G5 (2007 – 2010)
- Grand Am (1999 – 2005)
- Grand Prix (2004 – 2008)
- Solstice (2006 – 2010)

**Saturn:**
- Ion (2003 – 2007)
- Sky (2007 – 2010)

7.      Each of the vehicles driven by Plaintiffs is included in the above-listed "Subject Vehicles" and contained the defective Ignition Switch that is the subject of the 2014 GM ignition switch recalls.  Plaintiffs' vehicles were in substantially the same condition as when each left the manufacturer and contained a defective ignition switch that, upon information and belief was the proximate and producing cause of the incident at issue and Plaintiffs' resulting injuries and damages.

8.      The Ignition Switch that was approved by GM and installed in the GM Subject Vehicles identified above, was one of several switches manufactured at GM's direction in 2001. Each type of switch was manufactured, tested and evaluated by GM engineers prior to production. The switch that was ultimately selected by GM (the "Delta Switch") had a shorter spring in the detent plunger that gave it a smoother, more "European" feel.  Another switch was identical to the Delta Switch in every respect except that it used a longer spring in the detent plunger.  The longer spring increased the torque required to engage and disengage the ignition switch – it made it hard to turn the key in both directions.  The longer spring also sacrificed the smooth feel that was so

*Patterson et. al.  v. GM*                                    4

important to GM.

9.   According to the recently published "Report to the Board of Directors of General Motors Company Regarding Ignition Switch Recalls" authored by Anton R. Valukas ("The Valukas Report"), GM made a conscious decision, in the fall of 2002, to use the Delta Switch in the Subject Vehicles "that was so far below GM's own specifications that it failed to keep the car powered on in circumstances that drivers would encounter." GM knew of, and approved, the final version of the Ignition Switch that was installed in millions of cars despite knowing that the force required to disengage the ignition switch was far below minimum specifications.

10.   According to documents obtained by a United States House of Representatives committee during an investigation into the Defective Ignition Switches, GM opened an engineering inquiry about the defective Ignition Switch in 2004 after customers complained that the Subject Vehicles could be turned off while driving.  Also according to those documents, the Cobalt program engineer rejected a proposal to change the Ignition Switch claiming that the part was too expensive and the change would take too much time – after he experienced the same problem while performing a test drive of a Cobalt.  The cost that the project engineer found intolerably high was less than one dollar per vehicle.

11.   The switch was eventually redesigned in 2006, although using the same part number as the Delta Switch.  Remarkably, the solution to the torqueing problem had been present since 2001; all that needed to be done was use the longer spring that had already been tested in the design phase.  No other changes were made to the switch and, aside from affecting the "European" feel of the switch, the new switch with the longer spring functioned capably.  The longer spring also brought the ignition switch into spec with regard to torque force.

12.   The decision to use the same part number meant that already-produced Delta

*Patterson et. al.  v. GM*                                    5

Switches continued to be installed in GM vehicles even after the attempted design correction was implemented.  Apparently GM's chief design engineer "forgot" the change had been made to correct the torque issue.  This additional blunder exacerbated the problem with the GM vehicles; GM had no idea what cars had the Delta Switch and which had the switch with the new, longer spring.

13.    Although the switch's inability to keep the car powered on during normal and foreseeable use of the subject vehicles "were known within GM's engineering ranks at the earliest stages of its [the switch's] production," GM ignored the safety risks attendant to these "moving stalls." These risks include, but are not limited to, sudden failure of: power steering, anti-lock brakes, electronic stability control, lane departure warnings, navigation systems, and airbag deployment.  These sudden system failures made the Subject Vehicles impossible to control and, once the inevitable accident occurred, left the driver and passengers without life-saving airbags.

14.    Apparently, GM viewed the defective ignition switches as a convenience and comfort and looked everywhere but at the design to determine the problem.  GM failed to focus on the safety problems with the ignition switch turning a vehicle off during normal operation and, inexplicably, failed to link the power failure with a failure to allow airbags to deploy in a resulting accident.

15.    Also according to The Valukas Report:

"While GM heard over and over from various quarters – including customers, dealers, the press and their own employees – that the car's ignition switch led to moving stalls, group after group and committee after committee within GM that reviewed the issue failed to take action or acted too slowly. Although everyone had responsibility to fix the problem, nobody took responsibility. It was an example of what one top executive described as the "GM nod," when everyone nods in agreement to a proposed plan of action, but then leave the room and does nothing."

Case 1:14-md-02543-JMF   Document 1436   Filed 09/30/15   Page 7 of 25

16.     Although GM was aware (after the Purchase and Sale Agreement with Old GM) of the problem with the switches, the link between the defect and airbag non-deployment, hundreds of accidents, and dozens of acknowledged deaths attributable to the defective ignition switches, GM did not even begin recalling the Subject Vehicles until 2014.  Not even the solution is attributable to GM – it was a plaintiff attorney's investigator that finally disassembled the defective part and discovered the problem that GM had been incapable of discovering for a dozen years.

17.     Instead of accepting the defects in the Subject Vehicles and Ignition Switches as real safety issues, GM publically denied that either was a problem.  Instead of working to identify and correct the problem, GM, its directors, engineers and counsel devoted their efforts to minimizing the perceived frequency and pervasiveness of the problems.  Instead of accepting responsibility for the incidents and tragedies they caused, Defendant focused on "defending the brand" and public relations.  Defendant knew, or in the exercise of the most basic diligence, should have known that a defect that causes system-wide failure of key components presented a significant safety risk to the public.

18.     As a result of GM's negligent, reckless, and malicious conduct, Plaintiffs' owned and operated a vehicle with a defective ignition switch, described by the designing engineer as "the switch from hell."  The defective ignition switch is believed to be the cause of Plaintiffs' accidents and resulting catastrophic injuries, which are explained more fully below.


### III.     PARTIES

19.     Plaintiff Paul Patterson is a resident of the State of Kentucky.

20.     Plaintiff Anthony Bellows is a resident of the State of Kentucky.

21.     Plaintiff Tabitha Young is a resident of the State of Kentucky.

~~22.     Plaintiff Gelisa Hayes is a resident of the State of Louisiana.~~

~~23.     Plaintiff Gelisa Hayes, Individually and on Behalf of LH, A Minor,~~

reside in the State of Louisiana.

24.     Plaintiff Natasha Davis is a resident of the State of Louisiana.

25.     Plaintiff Shawn Barnes, Individually and on Behalf of CD, A Minor, reside in the State of Louisiana.

26.     Plaintiff Shawn Barnes, Individually and on Behalf of JD, A Minor, reside in the State of Louisiana.

27.     Plaintiff Shawn Barnes, Individually and on Behalf of MS, A Minor, reside in the State of Louisiana.

28.     Plaintiff Andrea Clark is a resident of the State of Louisiana.

~~29.     Plaintiff Crystal King is a resident of the State of Louisiana.~~

30.     Plaintiff Frank Palmer, Sr. is a resident of the State of Louisiana.

31.     Plaintiff Beatrice Webb-Palmer is a resident of the State of Louisiana.

32.     Plaintiff Neda Parandian is a resident of the State of Louisiana.

33.     Plaintiff Amanda Snelson is a resident of the State of Louisiana.

34.     Plaintiff Jacqueline Perry is a resident of the State of Tennessee.

35.     Plaintiff Debby Branham is a resident of the State of Tennessee.

36.     Plaintiff Scott Michael Chastain is a resident of the State of Kentucky.

37.     Plaintiff Marty Devos is a resident of the State of Kentucky.

38.     Plaintiff Anthony Jones is a resident of the State of Tennessee.

39.     Defendant General Motors LLC ("New GM") is a Delaware limited liability

company with its principal place of business at 300 Renaissance Center, MC: 482-C14-C66, Detroit, Michigan 48265 and may be served with process through service on its designated agent for service of process, CSC-Lawyers Incorporating Service, 80 State Street, Albany, New York, 12207-2543.  At all times relevant herein, General Motors Corporation and its successor in interest GENERAL MOTORS LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Subject Vehicle, as described in this Complaint, and other motor vehicles and motor vehicle components throughout the United States. General Motors LLC has sufficient contacts with New York, such that under the New York Long Arm Statute it is subject to, and has submitted to, the jurisdiction of this Court.

## IV.    JURISDICTION AND VENUE

40.    Jurisdiction is proper in this Court pursuant to Case Management Order No. 8 in *In re General Motors LLC Ignition Switch Litigation*, [14-MC-2543, Dkt. No. 36].  By filing this Complaint in this district, however, Plaintiffs do not waive their rights to transfer this case to the district in which they reside at the conclusion of pretrial proceedings.  Moreover, Plaintiffs do not waive their rights or consent with regard to choice of law by filing directly into the MDL Court pursuant to the Court's Case Management Order No. 8 and specifically rely on representations by GM to the Court that Plaintiffs will not be prejudiced by their decision to file directly into the MDL Court in the interest of convenience and judicial economy.

41.    This Court also has jurisdiction over this matter under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiffs are each and every one a citizen of a different state than Defendant.

## V.    FACTUAL BACKGROUND

42.    On October 1, 2010, Plaintiff Paul Patterson was operating a 2007 Chevrolet HHR, Vehicle Identification Number 3GNDA33P57S539409.   While traveling south bound on KY121 North in Coldwater, Calloway County, Kentucky, Plaintiff's vehicle traveled off the right shoulder of the roadway.  Plaintiff attempted to correct said vehicle, however, the steering would not respond due to the defective ignition switch, and traveled down the ditch, striking a culvert.

43.    Plaintiff Paul Patterson was injured in the incident. He suffered injuries to his left shoulder and tail bone that caused him impairment and for which he was required to seek medical attention.

44.    On March 5, 2014, Plaintiff Anthony Bellows was a passenger in a 2003 Saturn Ion, Vehicle Identification Number 1G8AJ52F632102607.  The driver was attempting to turn at the intersection of Shepherdsville Road and Famous Way, in Louisville, Jefferson County, Kentucky, when the vehicle died due to the defective ignition switch.  The vehicle lost its power steering and brakes, causing the vehicle to collide with another vehicle.

45.    Plaintiff Anthony Bellows was injured in the incident.  He suffered injuries to his back and neck that caused him impairment and for which he was required to seek medical attention.

46.    On March 5, 2014, Plaintiff Tabitha Young was operating a 2003 Saturn Ion, Vehicle Identification Number 1G8AJ52F632102607.  Plaintiff was attempting to turn at the intersection of Shepherdsville Road and Famous Way, in Louisville, Jefferson County, Kentucky, when the vehicle she was operating, died due to the defective ignition switch.  The vehicle lost its power steering and brakes, causing her vehicle to collide with another vehicle.

47.    Plaintiff Tabitha Young was injured in the incident.  She suffered injuries to her low back that caused her impairment and for which she was required to seek medical attention.

48.    ~~On March 10, 2010, Plaintiff Gelisa Hayes was operating a 2007 Chevrolet Cobalt, Vehicle Identification Number 1G1AK157577372218.  While traveling West on Airline Highway in East Baton Rouge Parish, in Baton Rouge, Louisiana, another vehicle cut across Plaintiff's lane. Plaintiff attempted to swerve around the other vehicle, when Plaintiff's steering locked up due to the defective ignition switch.  Plaintiff's vehicle lost its power steering, causing her vehicle to collide with the other vehicle.~~

49.    ~~Plaintiff Gelisa Hayes was injured in the incident.  She suffered injuries to her neck and back that caused her impairment and for which she was required to seek medical attention.~~

50.    On March 10, 2010, Minor Plaintiff, LH, was a passenger in a 2007 Chevrolet Cobalt, Vehicle Identification Number 1G1AK157577372218.   While traveling West on Airline Highway in East Baton Rouge Parish, in Baton Rouge, Louisiana, another vehicle cut across Plaintiff's lane.  The driver of Plaintiff's vehicle attempted to swerve around the other vehicle, when Plaintiff's steering locked up due to the defective ignition switch.  Plaintiff's vehicle lost its power steering, causing the vehicle he was riding in to collide with the other vehicle.

51.    Minor Plaintiff LH was injured in the incident.  She suffered injuries to her face and right eyebrow that caused impairment and for which she was required to seek medical attention.

52.    On June 8, 2012, Plaintiff Natasha Davis was operating a 2006 Chevrolet Cobalt, Vehicle Identification Number 1G1AL58F267695270.  While traveling South on Glen Della Drive, attempting to turn left onto U.S. Highway 90 in Jefferson Parish, Avondale, Louisiana, when Plaintiff's vehicle lost power due to the defective ignition switch.  The vehicle also lost its power steering and its ability to accelerate, causing another vehicle to collide with Plaintiff's vehicle.

53.     Plaintiff Natasha Davis was injured in the incident.  She suffered injuries to her head, chest, neck and back that caused impairment and for which she was required to seek medical attention.

54.     On June 8, 2012, Minor Plaintiff JD was a passenger in a 2006 Chevrolet Cobalt, Vehicle Identification Number 1G1AL58F267695270.  While the driver was traveling South on Glen Della Drive, attempting to turn left onto U.S. Highway 90 in Jefferson Parish, Avondale, Louisiana, when Plaintiff's vehicle lost power due to the defective ignition switch.  The vehicle also lost its power steering and ability to accelerate, causing another vehicle to collide with Plaintiff's vehicle.

55.     Minor Plaintiff JD was injured in the incident.  She suffered injuries to her right elbow and had glass in her eyes that caused impairment and for which she was required to seek medical attention.

56.     On June 8, 2012, Minor Plaintiff MS was a passenger in a 2006 Chevrolet Cobalt, Vehicle Identification Number 1G1AL58F267695270.  While the driver was traveling South on Glen Della Drive, attempting to turn left onto U.S. Highway 90, in Jefferson Parish, Avondale, Louisiana, when Plaintiff's vehicle lost power due to the defective ignition switch.  The vehicle also lost its power steering and ability to accelerate, causing another vehicle to collide with Plaintiff's vehicle.

57.     Minor Plaintiff MS was injured in the incident.  She suffered injuries to her head and back that caused impairment and for which she was required to seek medical attention.

58.     On June 8, 2012, Minor Plaintiff CD was a passenger in a 2006 Chevrolet Cobalt, Vehicle Identification Number 1G1AL58F267695270.  While the driver was traveling South on Glen Della Drive, attempting to turn left onto U.S. Highway 90, in Jefferson Parish, Avondale,

Louisiana, when Plaintiff's vehicle lost power due to the defective ignition switch. The vehicle also lost its power steering and ability to accelerate, causing another vehicle to collide with Plaintiff's vehicle.

59.    Minor Plaintiff CD was injured in the incident. He suffered injuries to his head that caused impairment and for which he was required to seek medical attention.

60.    On May 15, 2014, Plaintiff Andrea Clark was a passenger in a 2007 Pontiac G5, Vehicle Identification Number 1GAK15F377164159. Plaintiff's vehicle was proceeding East on the I 10 Service Road in Orleans Parish, New Orleans, Louisiana, when the driver of Plaintiff's vehicle was preparing to make a left turn, Plaintiff's vehicle lost power due to the defective ignition switch. The vehicle also lost its power steering and the driver of Plaintiff's vehicle could not navigate away a passing vehicle.

61.    Plaintiff Andrea Clark was injured in the incident. She suffered injuries to her neck and back that caused impairment and for which she was required to seek medical attention.

62.    On August 5, 2014, Plaintiff Crystal King was a passenger in a 2005 Chevrolet Cobalt, Vehicle Identification Number 1G1AL52F657655572. While the driver of Plaintiff's vehicle was preparing to make a right turn onto Canal Boulevard in Caddo Parish, Shreveport, Louisiana, when Plaintiff's vehicle lost power due to the defective ignition switch. The vehicle also lost its power steering and the driver of Plaintiff's vehicle could not navigate away from an approaching vehicle, colliding in the intersection.

63.    On September 3, 2014, Plaintiff Frank Palmer, Sr. was operating a 2007 Saturn Ion, Vehicle Identification Number 1G8AJ55F47Z179803. Plaintiff's vehicle was traveling south bound on LA 45 in Jefferson Parish, Marrero, Louisiana, when his vehicle lost power due to the defective ignition switch. Plaintiff's vehicle also lost its power steering and brakes and Plaintiff

was unable to avoid colliding with a vehicle in the intersection at LA 45 and Westbank Expressway in Jefferson Parish, Marrero, Louisiana.

64.     Plaintiff Frank Palmer, Sr. was injured in the incident.  He suffered injuries to his neck, back and left side that caused impairment and for which he was required to seek medical attention.

65.     On September 3, 2014, Plaintiff Beatrice Webb-Palmer was a passenger in a 2007 Saturn Ion, Vehicle Identification Number 1 G8AJ55F47Z179803.   The driver of Plaintiff's vehicle was traveling south bound on LA 45 in Jefferson Parish, Marrero, Louisiana, when their vehicle lost power due to the defective ignition switch.  Plaintiff's vehicle also lost its power steering and brakes and Plaintiff was unable to avoid colliding with a vehicle in the intersection of LA 45 and Westbank Expressway in Jefferson Parish, Marrero, Louisiana.

66.     Plaintiff Beatrice Webb-Palmer was injured in the incident.  She suffered injuries to her neck and back that caused impairment and for which she was required to seek medical attention.

67.     On June 11, 2014, Plaintiff Neda Parandian was operating a 2006 Saturn Ion, Vehicle Identification Number 1G8AJ55F36Z154339.  Plaintiff was stopped at a red light in Baton Rouge, Louisiana, when a vehicle slammed in to the front of her vehicle and her airbags did not deploy due to the defective ignition switch.

68.     Plaintiff Neda Parandian was injured in the incident.  She suffered injuries to her jaw, mouth and back that caused impairment and for which she was required to seek medical attention.

69.     On September 27, 2009, Plaintiff Amanda Snelson was operating a 2007 Saturn Ion, Vehicle Identification Number 1B8AJ557872167637.  While traveling East on Highway I-

20, in Caddo Parish, Shreveport, Louisiana, Plaintiff's was attempting to change lanes when her vehicle lost power due to the defective ignition switch. The vehicle also lost its power steering and brakes and Plaintiff's vehicle hit a concrete traffic barrier, trapping Plaintiff inside her vehicle.

70.     Plaintiff Amanda Snelson was injured in the incident. She suffered injuries to her back and left knee that caused impairment and for which she was required to seek medical attention.

71.     On May 17, 2012, Plaintiff Jacqueline Perry was a passenger in a 2005 Chevrolet Cobalt. Plaintiff's vehicle was proceeding on Germantown Road attempting to turn left on to Farmington Road in Germantown, Tennessee, when the vehicle was hit broadside by an oncoming vehicle. Plaintiff's airbags did not deploy upon impact due to the defective ignition switch.

72.     Plaintiff Jacqueline Perry was injured in the incident. She suffered injuries to her right shoulder and left clavicle that caused impairment and for which she was required to seek medical attention.

73.     On February 17, 2012, Plaintiff Debby Branham was operating a 2010 Chevrolet HHR, Vehicle Identification Number 3GNBACDB6AS561320. Plaintiff was proceeding eastbound on Oliver Springs Highway, near Cutter Lane in Clinton, Tennessee, when her steering locked up due to the defective ignition switch and she lost her power steering and brakes causing her vehicle to leave the roadway, striking a mailbox, then coming to rest in a ditch, catching on fire.

74.     Plaintiff Debby Branham was injured in the incident. She suffered injuries to her right hand, forearm, left hand and knees that caused impairment and for which she was required to seek medical attention.

75.     On March 12, 2012, Plaintiff Scott Chastain was a passenger in a 2009 Chevrolet

*Patterson et. al.  v. GM*                    15

Cobalt.  While the driver was operating said vehicle at the intersection of Hurstbourne Parkway and Whipps Mill Road, in Hurstbourne, Kentucky, a truck struck Plaintiff's vehicle and the airbags did not deploy due to the defective ignition switch.

76.     Plaintiff Scott Chastain was injured in the incident.  He suffered injuries to his shoulders and back that caused impairment and for which he was required to seek medical attention.

77.     On August 28, 2013, Plaintiff Marty Devos was operating a 2005 Chevrolet Malibu. Plaintiff was operating her vehicle in Louisville, Kentucky and while she was stopped at a red light, another vehicle ran a red light striking Plaintiff's vehicle and her airbags did not deploy due to the defective ignition switch.

78.     Plaintiff Marty Devos was injured in the incident.  She suffered injuries to her face, mouth, teeth, neck, back, left foot, left ankle, left hand and wrist and right elbow that caused impairment and for which she was required to seek medical attention.

79.     On October 3, 2014, Plaintiff Anthony Jones was operating a 2004 Chevrolet Malibu, Vehicle Identification Number IG1ZUS4844F115169.  While attempting to maneuver a curve on Florance Road in Smyrna, Tennessee, Plaintiff's vehicle lost power due to the defective ignition switch.  The vehicle also lost its power steering and brakes and Plaintiff was unable to steer the vehicle causing Plaintiff to crash into a tree.

80.     Plaintiff Anthony Jones was injured in the incident.  He suffered injuries to his right forearm and hand that caused impairment and for which he was required to seek medical attention.

## VI.    CAUSES OF ACTION

### A.    Strict Product Liability

81.     The preceding paragraphs are hereby incorporated by reference as if set forth in full

here.

82.     GM manufactured Plaintiffs' vehicles. GM has admitted publicly, through its recall of the Subject Vehicles that Plaintiffs vehicles contained a defect – namely the faulty ignition switch described above. In addition to GM's admission (through the recall and elsewhere) of the existence of the defective Ignition Switch, several studies have concluded that the Ignition Switch at issue is defective, results in "moving stalls," and airbag non-deployment in crashes.[1]

83.     The ignition switch was a substantial factor in bringing about Plaintiffs accidents and resulting injuries; the defective switch also prevented the airbags from deploying.

84.     At all times relevant to this action, Plaintiffs were using their vehicles in a proper and foreseeable manner and as it was intended by Defendant to be used when Defendant designed, manufactured, marketed, warranted, and sold the vehicle. Plaintiffs vehicles had not been substantially modified or altered from the condition in which he bought it until the time of the incident that forms the basis of this suit.

85.     Plaintiffs could not, through the exercise of reasonable care, have discovered the defect in the Ignition Switch and perceived its danger, nor could they have, through the exercise of reasonable care, avoided the incidents that caused their injuries.

86.     Upon information and belief, the defective component was manufactured as it was designed – a design that relied exclusively on GM's approval of the component's performance. According to the Valukas Report, the design itself was so far below GM's specifications that it failed to keep Plaintiffs vehicles powered on during the normal conditions they encountered on the dates of the incidents.

---

[1]     *See, e.g.*  Indiana Transportation Research Center Report, April 25, 2007, GMNTHSA000223985; Keith A. Young, Technical Reconstruction Unit, Wisconsin State Patrol Academy, Collision Analysis & Reconstruction Report Feb. 14, 2007 at GMNTHSA000284395; Erin Shipp's Engineer Report at GMNHTSA000309665.

Case 1:14-md-02543-JMF   Document 1536   Filed 09/30/15   Page 18 of 25

87.    GM marketed Plaintiffs vehicles, the Subject Vehicles, and Ignition Switches that were designed so that they were not reasonably safe in that they rendered the Subject Vehicles uncontrollable and prevented airbag deployment in a crash. The design of the Ignition Switches and Subject Vehicles was such that the utility of those products did not outweigh the danger of their introduction into the stream of commerce.

88.    At the time the Subject Vehicles and the Ignition Switches were produced, there existed, and GM was aware of, cost-effective safer alternative designs that were both feasible and would have made the Subject Vehicles and Ignition Switches safer.  Moreover, the safer alternative design would not have impaired the usefulness of the Ignition Switches and Subject Vehicle.  In fact, the solution was as simple as using a longer spring, which GM ultimately did in 2006.

89.    These design defects were the producing and proximate cause of Plaintiffs accidents and resulting injuries.

90.    Defendant also failed to warn the public and Plaintiffs specifically, of the inherent defects in the Subject Vehicles, the Ignition Switches, and Plaintiffs cars specifically.  Defendant did not inform the public of these life-threatening defects until 2014.  Had Defendant warned Plaintiffs that their vehicles they were driving could experience a "moving stall" during normal operations and/or that the airbags would not deploy in a crash, Plaintiffs would not have bought or continued to operate their vehicles in that defective condition.  Defendant's failure to warn Plaintiffs regarding the true capabilities, defects, and limitations of their vehicles were the producing and proximate cause of Plaintiffs incidents and resulting injuries.

91.    Defendant knew, or through the exercise of reasonable care, should have known of the defects, capabilities, and limitations of the Subject Vehicles and the Ignition Switches during intended and foreseeable use. This fact has been borne out in the Valukas Report and will

doubtlessly be bolstered during discovery in this case. The mounting evidence makes it clear that, not only was Defendant aware of these defects, they were consciously indifferent to the high risk of grievous harm attendant to the "ignition switch from hell." Defendant gave no warning, much less an adequate warning, that the Subject Vehicles could experience a "moving stall" or that the airbags would fail to deploy as they should. The only adequate warning Defendant could have possibly given would have been to direct consumers to immediately cease to operate the Subject Vehicles.  Defendant eventually recalled the Subject Vehicles, but much too late to be of any help to Plaintiffs.

**B.    Negligence**

92.    The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

93.    Defendant owed a duty of care to the public and to Plaintiffs specifically, to design, manufacture, market, warrant, and sell vehicles that were free from dangerous defects and that were capable of being operated safely during normal and foreseeable use.

94.    Moreover, Defendant was required by a host of state and federal regulations to design, manufacture, market, warrant, and sell vehicles that were free from dangerous defects and that were capable of being operated safely during normal and foreseeable use.

95.    Defendant had a duty to timely discover and remedy defects in the Subject Vehicles, and in Plaintiffs vehicles specifically, that rendered them abnormally dangerous during normal and foreseeable use.

96.    Defendant breached the above-cited duties in at least the following respects:

    a.    Failing to design an ignition switch that maintained a vehicle in an operational condition during normal and foreseeable use of the vehicles;

b.    Failing to discover defects in the Subject Vehicles, and in Plaintiffs vehicles specifically, in a timely manner;

c.    Marketing and selling vehicles that could, and did, experience "moving stalls" during normal and foreseeable use;

d.    Failing to warn the public, and Plaintiffs specifically, that the Subject Vehicles could and did experience "moving stalls" during normal and foreseeable use of the vehicles;

e.    Failing to warn the public, and Plaintiffs specifically, that the Subject Vehicles could and did experience airbag non-deployment during crashes in which the airbags should deploy;

f.    Failing to implement proper surveillance procedures to identify, track, and account for incidents related to the failure of the Ignition Switches;

g.    Ignoring incidents and reports that would have led a reasonable manufacturer of vehicles and components to recall and/or remedy defects in the Subject Vehicles;

h.    Allowing vehicles to be placed in the stream of commerce that Defendant knew or should have known suffered from potentially deadly defects; and

i.    Failing to timely recall the Subject Vehicles when it became apparent, or should have been apparent through the exercise of reasonable care and/or diligence, that crashes were being caused and exacerbated by the faulty Ignition Switches.

97.    Defendant's breaches of duty in both common law and statute were the producing and proximate cause of the incident at issue and Plaintiffs damages. Plaintiffs belonged to the class

of persons meant to be protected by the state and federal regulations breached by Defendant.

**C.    Breach of Express and Implied Warranties; Deceptive Trade Practices**

98.    The preceding paragraphs are hereby incorporated by reference as if set forth in full here.  Plaintiffs who are residents of Kentucky hereby bring this suit pursuant, but not limited, to the Kentucky Revised Code § 367.110, *et. seq.*  "The Kentucky Deceptive Trade Practices Act."

99.    The preceding paragraphs are hereby incorporated by reference as if set forth in full here.  Plaintiffs who are residents of Louisiana hereby bring suit pursuant, but not limited, to the Louisiana Revised Code § 51.1401, *et. seq.*  "The Louisiana Deceptive Trade Practices Act."

100.    The preceding paragraphs are hereby incorporated by reference as if set forth in full here.  Plaintiffs who are residents of Tennessee hereby bring suit pursuant, but not limited, to the Tennessee Consumer Protection Act  § 47-18-109.  "The Tennessee Consumer Protection Act."

101.    The incident in which Plaintiffs were injured was caused by the defective Subject Vehicle and Ignition Switch as described herein. Plaintiffs were consumers who did, and reasonably could have been expected to, use and/or be affected by the Subject Vehicles.  Plaintiffs purchased the vehicles at issue in this case, and there existed a privity of contract as that term is known at law.

102.    The incident at issue occurred, and Plaintiffs were injured, because their vehicles and ignition switches were defective, as described herein, in that they were not safe for normal and foreseeable use.

103.    Defendant expressly and impliedly warranted that the Subject Vehicles would not shut off during normal and foreseeable use, that the Subject Vehicles could be safely operated during normal use, that the essential functions of the Subject Vehicles would remain operable during foreseeable use, and that the airbags would deploy in the case of a crash in which one would

normally expect the airbags to deploy.

104.    Because of the defects described herein, in various public reports, and as admitted by Defendant itself, these (and other) express and implied warranties were breached by Defendant. The Subject Vehicles and Plaintiffs vehicles specifically, were not fit for the ordinary purposes for which such vehicles are used nor were they fit for the specific purpose Defendant represented them to be useful for.

105.    Defendant's acts and omissions were deceptive in that the Subject Vehicles and Ignition Switches were advertised and warranted to possess qualities, characteristics and protections that they did not, in fact, possess.  The Subject Vehicles and Ignition Switches were represented to be of a particular standard, quality and grade free from defects, of merchantable quality and fit for the purpose for which they were sold and they were not.

106.    Defendant's breaches of warranty were the producing and proximate cause of the incident at issue and Plaintiffs damages.

## D.    Gross Negligence

107.    The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

108.    The evidence referenced in this Complaint and the mounting evidence regarding the recent recalls of millions of defective GM vehicles makes it clear that Defendant is guilty of exceptional misconduct. GM was issued, and agreed to, a record fine by the U.S. Department of Transportation's National Highway Traffic Safety Administration.  Defendant has been aware for more than a dozen years that the ignition switches in the Subject Vehicles were grossly inadequate and subjected the driving public to a grave risk of grievous harm. Producing and marketing vehicles that are subject to complete system failures at highway speeds is akin to launching

*Patterson et. al.  v. GM*                    22

millions of torpedoes onto American streets and highways – with unsuspecting consumers inside. Defendant knew about the problem for years and, because of greed and/or gross ineptitude, refused to act on the problem. Instead, Defendant gave the issue the "GM nod." The "GM nod" demonstrates that more than one of Defendant's superior officers in the course of employment ordered, ratified, and/or participated in the malicious conduct. These officers acted maliciously, wantonly, and/or recklessly, and clearly the Defendant is guilty of exceptional misconduct and gross negligence. Plaintiffs demand punitive damages for this conduct.

## VII.    DAMAGES

109.    The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

~~110.~~    Plaintiffs, as a result of the liability of Defendant described above, have suffered and makes claims for reasonable and necessary medical expenses incurred as a result of the incident made basis of these suits in the past and future, past and future pain and suffering, lost wages and earning capacity in the past, disfigurement in the past and future, impairment in the past and future and exemplary damages. ~~Plaintiffs also demands statutory penalties be imposed pursuant to the Kentucky Deceptive Trade Practices Act and attorney's fees, the Louisiana Deceptive Trade Practices Act and attorney's fees, and The Tennessee Consumer Protection Act and attorney's fees.~~

## VIII.    CONCLUSION AND PRAYER

111.    Defendant has only recently admitted publically its wrongdoing – albeit not to the full extent and not in time to prevent Plaintiffs injuries – but it admitted wrongdoing nonetheless. As the evidence mounts about what was known and when, it is becoming inescapably clear that Defendant needs to be punished and the victims they have injured need to be compensated. The

law is powerless to remedy the harms Defendant has caused through its negligent, reckless, and malicious conduct – we cannot restore life or limb.  However, justice must be done to the extent we are able, and Plaintiffs demand that Defendant answer for its acts and omissions that led to Plaintiffs damages and be required to pay compensatory and exemplary damages to the full extent allowed by law.

112.    WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request Defendant be cited, tried by jury, and, upon verdict in Plaintiffs favor, Judgment be entered against Defendant for:

a.    Actual damages within the jurisdictional limits of this Court;

b.    Property damage and loss;

c.    Exemplary damages to the full extent permitted by law;

d.    Attorney's fees;

e.    Costs of suit;

f.    Pre- and Post-Judgment Interest at the maximum recoverable level; and

g.    All other relief to which the Plaintiffs show themselves justifiably entitled.

**Dated:**    March 18, 2015

Respectfully Submitted,

**HEARD ROBINS CLOUD LLP**

_____ _____

Jason Dunahoe
Sean Teare
2000 West Loop South, 22nd Floor
Houston, Texas 77027
713.650.1200 Voice
713.650.1400 Facsimile
*Attorneys for Plaintiffs, Pro Hac Vice Pending\**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------------------X

IN RE:
**GENERAL MOTORS LLC IGNITION SWITCH LITIGATION**    **14-MD-2543 (JMF)**

***This Document Relates to:***    **Case No.**
    **1:15-cv-02089-JMF**

-----------------------------------------------------------------------------------X

**PAUL PATTERSON, ET AL**    **Complaint**
    **PLAINTIFFS,**    **Jury Trial Demanded**

**V.**

**GENERAL MOTORS, LLC,**
    **DEFENDANT**

-----------------------------------------------------------------------------------X

## AMENDED COMPLAINT

COME NOW Plaintiffs, through undersigned counsel, and for cause of action respectfully shows as follows:

### I.    PRELIMINARY STATEMENT

1.    Plaintiffs were involved in accidents, and received injuries, in GM vehicles that have been recalled because of defective ignition switches.  Each incident, explained below, was proximately caused by the failure of each Plaintiff's ignition switch and/or their injuries were exacerbated because the defective ignition switch prevented their airbag from deploying.  All Plaintiffs were damaged and received personal injuries as a result of the defective ignition switch in their GM vehicles.

2.    Plaintiffs' causes of action are brought against GENERAL MOTORS LLC ("New GM").  Plaintiffs do not assert any causes of action against General Motors Corporation ("Old GM"), although, in some cases, Old GM manufactured Plaintiffs' vehicles. The incidents at issue in this case occurred after the Old GM bankruptcy, which is discussed briefly below. The subject

vehicles have been recalled by General Motors LLC, and New GM is strictly liable for the incident.

3.      While at times this Complaint references acts and omissions by Old GM, these references are for background purposes only. Old GM arguably ceased to exist pursuant to the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets.   That Amended and Restated Master Sale and Purchase Agreement was approved on July 10, 2009.  In that Agreement, New GM expressly agreed to accept responsibility for product liability claims that arose from accidents or incidents occurring on or after July 10, 2009.

4.      While New GM expressly accepted responsibility for accidents occurring on or after July 10, 2009, it also acquired knowledge of Old GM's activities generally, and the existence of the defective ignition switches in place in millions of vehicles specifically. New GM acquired personnel from Old GM, including but not limited to, top leadership personnel, executives, members of the Board of Directors, internal legal counsel, engineers and quality control personnel. Most importantly, New GM retained the engineer in charge of designing and approving the manufacturing specifications of the defective ignition switch.  The employees retained by New GM carried with them the knowledge they gained at Old GM.  New GM also acquired knowledge about the issues with the ignition switch, moving stalls and airbag non-deployment through the chief engineer, design and manufacturing documents, internal memorandum, and reports to the Board of Directors.  New GM continued to service – and to receive complaints about – vehicles manufactured on Old GM's watch.  While the change from Old GM to New GM arguably had some legal effect with regard to creditors who received notice of their rights, it had little practical effect relative to the problems with, and knowledge of, the ignition-switch defect.

5.      New GM also acquired certain duties with regard to vehicles in production and on

the road at the time of the Sale and Purchase Agreement – duties it breached egregiously – as has been well-publicized and for which it has been justifiably criticized. These duties included, but are not limited to, those arising under the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30101 *et. seq.* and the Transportation Recall Enhancement, Accountability and Documentation Act, 49 U.S.C. §§ 30101 – 30170.  GM was fined $35 Million by NTSHA for its delayed reporting of the ignition switch problem and violating federal safety laws.  New GM's liability for damages is attributable to its own post-sale conduct and failure to timely remedy and/or recall vehicles it knew had deadly defects, even with regard to vehicles manufactured and sold prior to the Sale and Purchase Agreement. Plaintiffs' cases are a prime example of liability and gross negligence that is inarguably attributable solely to New GM, as is shown below.

## II.    INTRODUCTION

6.       At the time of this filing, more than 12,000,000 GM vehicles have been recalled because of a defective ignition switch.  Hundreds, if not thousands, of accidents are now known to have been caused by vehicles losing power and control because the defective ignition switch turned from "on" to "off" during normal and foreseeable operation. When the ignition switch fails, drivers are unable to use their steering and brakes in an effective manner. The resulting loss of control, or "moving stall," and subsequent accidents are exacerbated by the fact that the defective ignition switch also prevents life-saving airbags from deploying. So, in addition to causing accidents, the defective part makes the resulting damages even greater. As used in this Complaint, the "Subject Vehicles" refers to the GM vehicles manufactured, upon information and belief, on the Delta Platform, sold in the United States, equipped at the time of sale with ignition switches (the "Ignition Switches"), and sharing a common defective design, including the following makes and model years:

**Buick:**
- Lacrosse (2005 – 2009)
- Lucerne (2006 – 2011)

**Cadillac:**
- CTS (2003 – 2014)
- Deville (2000 – 2005)
- DTS (2006 – 2011)
- SRX (2004 – 2006)

**Chevrolet:**
- Camaro (2010 – 2014)
- Cobalt (2005 – 2010)
- HHR (2006 – 2011)
- Impala (2000 – 2014)
- Malibu (1997 – 2005)
- Monte Carlo (2000 – 2007)

**Oldsmobile:**
- Alero (1999 – 2004)
- Intrigue (1998 – 2002)

**Pontiac:**
- G5 (2007 – 2010)
- Grand Am (1999 – 2005)
- Grand Prix (2004 – 2008)
- Solstice (2006 – 2010)

**Saturn:**
- Ion (2003 – 2007)
- Sky (2007 – 2010)

7.      Each of the vehicles driven by Plaintiffs is included in the above-listed "Subject Vehicles" and contained the defective Ignition Switch that is the subject of the 2014 GM ignition switch recalls. Plaintiffs' vehicles were in substantially the same condition as when each left the manufacturer and contained a defective ignition switch that, upon information and belief was the proximate and producing cause of the incident at issue and Plaintiffs' resulting injuries and damages.

8.      The Ignition Switch that was approved by GM and installed in the GM Subject Vehicles identified above, was one of several switches manufactured at GM's direction in 2001. Each type of switch was manufactured, tested and evaluated by GM engineers prior to production. The switch that was ultimately selected by GM (the "Delta Switch") had a shorter spring in the detent plunger that gave it a smoother, more "European" feel. Another switch was identical to the Delta Switch in every respect except that it used a longer spring in the detent plunger. The longer spring increased the torque required to engage and disengage the ignition switch – it made it hard to turn the key in both directions. The longer spring also sacrificed the smooth feel that was so

*Patterson et. al. v. GM*                    4

important to GM.

9.     According to the recently published "Report to the Board of Directors of General Motors Company Regarding Ignition Switch Recalls" authored by Anton R. Valukas ("The Valukas Report"), GM made a conscious decision, in the fall of 2002, to use the Delta Switch in the Subject Vehicles "that was so far below GM's own specifications that it failed to keep the car powered on in circumstances that drivers would encounter." GM knew of, and approved, the final version of the Ignition Switch that was installed in millions of cars despite knowing that the force required to disengage the ignition switch was far below minimum specifications.

10.     According to documents obtained by a United States House of Representatives committee during an investigation into the Defective Ignition Switches, GM opened an engineering inquiry about the defective Ignition Switch in 2004 after customers complained that the Subject Vehicles could be turned off while driving.  Also according to those documents, the Cobalt program engineer rejected a proposal to change the Ignition Switch claiming that the part was too expensive and the change would take too much time – after he experienced the same problem while performing a test drive of a Cobalt.  The cost that the project engineer found intolerably high was less than one dollar per vehicle.

11.     The switch was eventually redesigned in 2006, although using the same part number as the Delta Switch.  Remarkably, the solution to the torqueing problem had been present since 2001; all that needed to be done was use the longer spring that had already been tested in the design phase.  No other changes were made to the switch and, aside from affecting the "European" feel of the switch, the new switch with the longer spring functioned capably.  The longer spring also brought the ignition switch into spec with regard to torque force.

12.     The decision to use the same part number meant that already-produced Delta

Switches continued to be installed in GM vehicles even after the attempted design correction was

implemented.  Apparently GM's chief design engineer "forgot" the change had been made to

correct the torque issue.  This additional blunder exacerbated the problem with the GM vehicles;

GM had no idea what cars had the Delta Switch and which had the switch with the new, longer

spring.

13.    Although the switch's inability to keep the car powered on during normal and

foreseeable use of the subject vehicles "were known within GM's engineering ranks at the earliest

stages of its [the switch's] production," GM ignored the safety risks attendant to these "moving

stalls." These risks include, but are not limited to, sudden failure of: power steering, anti-lock

brakes, electronic stability control, lane departure warnings, navigation systems, and airbag

deployment.  These sudden system failures made the Subject Vehicles impossible to control and,

once the inevitable accident occurred, left the driver and passengers without life-saving airbags.

14.    Apparently, GM viewed the defective ignition switches as a convenience and

comfort and looked everywhere but at the design to determine the problem.  GM failed to focus

on the safety problems with the ignition switch turning a vehicle off during normal operation and,

inexplicably, failed to link the power failure with a failure to allow airbags to deploy in a resulting

accident.

15.    Also according to The Valukas Report:

"While GM heard over and over from various quarters – including
customers, dealers, the press and their own employees – that the
car's ignition switch led to moving stalls, group after group and
committee after committee within GM that reviewed the issue failed
to take action or acted too slowly. Although everyone had
responsibility to fix the problem, nobody took responsibility. It was
an example of what one top executive described as the "GM nod,"
when everyone nods in agreement to a proposed plan of action, but
then leave the room and does nothing."

16.     Although GM was aware (after the Purchase and Sale Agreement with Old GM) of the problem with the switches, the link between the defect and airbag non-deployment, hundreds of accidents, and dozens of acknowledged deaths attributable to the defective ignition switches, GM did not even begin recalling the Subject Vehicles until 2014.  Not even the solution is attributable to GM – it was a plaintiff attorney's investigator that finally disassembled the defective part and discovered the problem that GM had been incapable of discovering for a dozen years.

17.     Instead of accepting the defects in the Subject Vehicles and Ignition Switches as real safety issues, GM publically denied that either was a problem.  Instead of working to identify and correct the problem, GM, its directors, engineers and counsel devoted their efforts to minimizing the perceived frequency and pervasiveness of the problems.  Instead of accepting responsibility for the incidents and tragedies they caused, Defendant focused on "defending the brand" and public relations.  Defendant knew, or in the exercise of the most basic diligence, should have known that a defect that causes system-wide failure of key components presented a significant safety risk to the public.

18.     As a result of GM's negligent, reckless, and malicious conduct, Plaintiffs' owned and operated a vehicle with a defective ignition switch, described by the designing engineer as "the switch from hell."  The defective ignition switch is believed to be the cause of Plaintiffs' accidents and resulting catastrophic injuries, which are explained more fully below.

### III.     PARTIES

19.     Plaintiff Paul Patterson is a resident of the State of Kentucky.

20.     Plaintiff Anthony Bellows is a resident of the State of Kentucky.

21.     Plaintiff Tabitha Young is a resident of the State of Kentucky.

22.     Plaintiff Natasha Davis is a resident of the State of Louisiana.

23.     Plaintiff Shawn Barnes, Individually and on Behalf of CD, A Minor, reside in the State of Louisiana.

24.     Plaintiff Shawn Barnes, Individually and on Behalf of JD, A Minor, reside in the State of Louisiana.

25.     Plaintiff Shawn Barnes, Individually and on Behalf of MS, A Minor, reside in the State of Louisiana.

26.     Plaintiff Andrea Clark is a resident of the State of Louisiana.

27.     Plaintiff Frank Palmer, Sr. is a resident of the State of Louisiana.

28.     Plaintiff Beatrice Webb-Palmer is a resident of the State of Louisiana.

29.     Plaintiff Neda Parandian is a resident of the State of Louisiana.

30.     Plaintiff Amanda Snelson is a resident of the State of Louisiana.

31.     Plaintiff Jacqueline Perry is a resident of the State of Tennessee.

32.     Plaintiff Debby Branham is a resident of the State of Tennessee.

33.     Plaintiff Scott Michael Chastain is a resident of the State of Kentucky.

34.     Plaintiff Marty Devos is a resident of the State of Kentucky.

35.     Plaintiff Anthony Jones is a resident of the State of Tennessee.

36.     Defendant General Motors LLC ("New GM") is a Delaware limited liability company with its principal place of business at 300 Renaissance Center, MC: 482-C14-C66, Detroit, Michigan 48265 and may be served with process through service on its designated agent for service of process, CSC-Lawyers Incorporating Service, 80 State Street, Albany, New York, 12207-2543.  At all times relevant herein, General Motors Corporation and its successor in interest GENERAL MOTORS LLC were engaged in the business of designing, manufacturing,

constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Subject Vehicle, as described in this Complaint, and other motor vehicles and motor vehicle components throughout the United States. General Motors LLC has sufficient contacts with New York, such that under the New York Long Arm Statute it is subject to, and has submitted to, the jurisdiction of this Court.

## IV. JURISDICTION AND VENUE

37.     Jurisdiction is proper in this Court pursuant to Case Management Order No. 8 in *In re General Motors LLC Ignition Switch Litigation*, [14-MC-2543, Dkt. No. 36]. By filing this Complaint in this district, however, Plaintiffs do not waive their rights to transfer this case to the district in which they reside at the conclusion of pretrial proceedings. Moreover, Plaintiffs do not waive their rights or consent with regard to choice of law by filing directly into the MDL Court pursuant to the Court's Case Management Order No. 8 and specifically rely on representations by GM to the Court that Plaintiffs will not be prejudiced by their decision to file directly into the MDL Court in the interest of convenience and judicial economy.

38.     This Court also has jurisdiction over this matter under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiffs are each and every one a citizen of a different state than Defendant.

## V. FACTUAL BACKGROUND

39.     On October 1, 2010, Plaintiff Paul Patterson was operating a 2007 Chevrolet HHR, Vehicle Identification Number 3GNDA33P57S539409.   While traveling south bound on KY121 North in Coldwater, Calloway County, Kentucky, Plaintiff's vehicle traveled off the right shoulder of the roadway.  Plaintiff attempted to correct said vehicle, however, the steering would not respond due to the defective ignition switch, and traveled down the ditch, striking a culvert.

40.     Plaintiff Paul Patterson was injured in the incident. He suffered injuries to his left shoulder and tail bone that caused him impairment and for which he was required to seek medical attention.

41.     On March 5, 2014, Plaintiff Anthony Bellows was a passenger in a 2003 Saturn Ion, Vehicle Identification Number 1G8AJ52F632102607.  The driver was attempting to turn at the intersection of Shepherdsville Road and Famous Way, in Louisville, Jefferson County, Kentucky, when the vehicle died due to the defective ignition switch.  The vehicle lost its power steering and brakes, causing the vehicle to collide with another vehicle.

42.     Plaintiff Anthony Bellows was injured in the incident.  He suffered injuries to his back and neck that caused him impairment and for which he was required to seek medical attention.

43.     On March 5, 2014, Plaintiff Tabitha Young was operating a 2003 Saturn Ion, Vehicle Identification Number 1G8AJ52F632102607.  Plaintiff was attempting to turn at the intersection of Shepherdsville Road and Famous Way, in Louisville, Jefferson County, Kentucky, when the vehicle she was operating, died due to the defective ignition switch.  The vehicle lost its power steering and brakes, causing her vehicle to collide with another vehicle.

44.     Plaintiff Tabitha Young was injured in the incident.  She suffered injuries to her low back that caused her impairment and for which she was required to seek medical attention.

45.     On March 10, 2010, Minor Plaintiff, LH, was a passenger in a 2007 Chevrolet Cobalt, Vehicle Identification Number 1G1AK157577372218.   While traveling West on Airline Highway in East Baton Rouge Parish, in Baton Rouge, Louisiana, another vehicle cut across Plaintiff's lane.  The driver of Plaintiff's vehicle attempted to swerve around the other vehicle, when Plaintiff's steering locked up due to the defective ignition switch.  Plaintiff's vehicle lost its power steering, causing the vehicle he was riding in to collide with the other vehicle.

46.     Minor Plaintiff LH was injured in the incident.  She suffered injuries to her face and right eyebrow that caused impairment and for which she was required to seek medical attention.

47.     On June 8, 2012, Plaintiff Natasha Davis was operating a 2006 Chevrolet Cobalt, Vehicle Identification Number 1G1AL58F267695270.  While traveling South on Glen Della Drive, attempting to turn left onto U.S. Highway 90 in Jefferson Parish, Avondale, Louisiana, when Plaintiff's vehicle lost power due to the defective ignition switch.  The vehicle also lost its power steering and its ability to accelerate, causing another vehicle to collide with Plaintiff's vehicle.

48.     Plaintiff Natasha Davis was injured in the incident.  She suffered injuries to her head, chest, neck and back that caused impairment and for which she was required to seek medical attention.

49.     On June 8, 2012, Minor Plaintiff JD was a passenger in a 2006 Chevrolet Cobalt, Vehicle Identification Number 1G1AL58F267695270.  While the driver was traveling South on Glen Della Drive, attempting to turn left onto U.S. Highway 90 in Jefferson Parish, Avondale, Louisiana, when Plaintiff's vehicle lost power due to the defective ignition switch.  The vehicle also lost its power steering and ability to accelerate, causing another vehicle to collide with Plaintiff's vehicle.

50.     Minor Plaintiff JD was injured in the incident.  She suffered injuries to her right elbow and had glass in her eyes that caused impairment and for which she was required to seek medical attention.

51.     On June 8, 2012, Minor Plaintiff MS was a passenger in a 2006 Chevrolet Cobalt, Vehicle Identification Number 1G1AL58F267695270.  While the driver was traveling South on

*Patterson et. al.  v. GM*                    11

Glen Della Drive, attempting to turn left onto U.S. Highway 90, in Jefferson Parish, Avondale, Louisiana, when Plaintiff's vehicle lost power due to the defective ignition switch. The vehicle also lost its power steering and ability to accelerate, causing another vehicle to collide with Plaintiff's vehicle.

52.    Minor Plaintiff MS was injured in the incident. She suffered injuries to her head and back that caused impairment and for which she was required to seek medical attention.

53.    On June 8, 2012, Minor Plaintiff CD was a passenger in a 2006 Chevrolet Cobalt, Vehicle Identification Number 1G1AL58F267695270. While the driver was traveling South on Glen Della Drive, attempting to turn left onto U.S. Highway 90, in Jefferson Parish, Avondale, Louisiana, when Plaintiff's vehicle lost power due to the defective ignition switch. The vehicle also lost its power steering and ability to accelerate, causing another vehicle to collide with Plaintiff's vehicle.

54.    Minor Plaintiff CD was injured in the incident. He suffered injuries to his head that caused impairment and for which he was required to seek medical attention.

55.    On May 15, 2014, Plaintiff Andrea Clark was a passenger in a 2007 Pontiac G5, Vehicle Identification Number 1GAK15F377164159. Plaintiff's vehicle was proceeding East on the I 10 Service Road in Orleans Parish, New Orleans, Louisiana, when the driver of Plaintiff's vehicle was preparing to make a left turn, Plaintiff's vehicle lost power due to the defective ignition switch. The vehicle also lost its power steering and the driver of Plaintiff's vehicle could not navigate away a passing vehicle.

56.    Plaintiff Andrea Clark was injured in the incident. She suffered injuries to her neck and back that caused impairment and for which she was required to seek medical attention.

57.    On September 3, 2014, Plaintiff Frank Palmer, Sr. was operating a 2007 Saturn Ion,

Case 1:14-md-02543-JMF   Document 1436   Filed 09/30/15   Page 13 of 22

Vehicle Identification Number 1G8AJ55F47Z179803.  Plaintiff's vehicle was traveling south bound on LA 45 in Jefferson Parish, Marrero, Louisiana, when his vehicle lost power due to the defective ignition switch.  Plaintiff's vehicle also lost its power steering and brakes and Plaintiff was unable to avoid colliding with a vehicle in the intersection at LA 45 and Westbank Expressway in Jefferson Parish, Marrero, Louisiana.

58.     Plaintiff Frank Palmer, Sr. was injured in the incident.  He suffered injuries to his neck, back and left side that caused impairment and for which he was required to seek medical attention.

59.     On September 3, 2014, Plaintiff Beatrice Webb-Palmer was a passenger in a 2007 Saturn Ion, Vehicle Identification Number 1 G8AJ55F47Z179803.  The driver of Plaintiff's vehicle was traveling south bound on LA 45 in Jefferson Parish, Marrero, Louisiana, when their vehicle lost power due to the defective ignition switch.  Plaintiff's vehicle also lost its power steering and brakes and Plaintiff was unable to avoid colliding with a vehicle in the intersection of LA 45 and Westbank Expressway in Jefferson Parish, Marrero, Louisiana.

60.     Plaintiff Beatrice Webb-Palmer was injured in the incident.  She suffered injuries to her neck and back that caused impairment and for which she was required to seek medical attention.

61.     On June 11, 2014, Plaintiff Neda Parandian was operating a 2006 Saturn Ion, Vehicle Identification Number 1G8AJ55F36Z154339.  Plaintiff was stopped at a red light in Baton Rouge, Louisiana, when a vehicle slammed in to the front of her vehicle and her airbags did not deploy due to the defective ignition switch.

62.     Plaintiff Neda Parandian was injured in the incident.  She suffered injuries to her jaw, mouth and back that caused impairment and for which she was required to seek medical

attention.

63.     On September 27, 2009, Plaintiff Amanda Snelson was operating a 2007 Saturn Ion, Vehicle Identification Number 1B8AJ557872167637.  While traveling East on Highway I-20, in Caddo Parish, Shreveport, Louisiana, Plaintiff's was attempting to change lanes when her vehicle lost power due to the defective ignition switch.  The vehicle also lost its power steering and brakes and Plaintiff's vehicle hit a concrete traffic barrier, trapping Plaintiff inside her vehicle.

64.     Plaintiff Amanda Snelson was injured in the incident.  She suffered injuries to her back and left knee that caused impairment and for which she was required to seek medical attention.

65.     On May 17, 2012, Plaintiff Jacqueline Perry was a passenger in a 2005 Chevrolet Cobalt.  Plaintiff's vehicle was proceeding on Germantown Road attempting to turn left on to Farmington Road in Germantown, Tennessee, when the vehicle was hit broadside by an oncoming vehicle.  Plaintiff's airbags did not deploy upon impact due to the defective ignition switch.

66.     Plaintiff Jacqueline Perry was injured in the incident.  She suffered injuries to her right shoulder and left clavicle that caused impairment and for which she was required to seek medical attention.

67.     On February 17, 2012, Plaintiff Debby Branham was operating a 2010 Chevrolet HHR, Vehicle Identification Number 3GNBACDB6AS561320.  Plaintiff was proceeding eastbound on Oliver Springs Highway, near Cutter Lane in Clinton, Tennessee, when her steering locked up due to the defective ignition switch and she lost her power steering and brakes causing her vehicle to leave the roadway, striking a mailbox, then coming to rest in a ditch, catching on fire.

68.     Plaintiff Debby Branham was injured in the incident.  She suffered injuries to her

*Patterson et. al.  v. GM*                    14

right hand, forearm, left hand and knees that caused impairment and for which she was required to seek medical attention.

69.     On March 12, 2012, Plaintiff Scott Chastain was a passenger in a 2009 Chevrolet Cobalt.  While the driver was operating said vehicle at the intersection of Hurstbourne Parkway and Whipps Mill Road, in Hurstbourne, Kentucky, a truck struck Plaintiff's vehicle and the airbags did not deploy due to the defective ignition switch.

70.     Plaintiff Scott Chastain was injured in the incident.  He suffered injuries to his shoulders and back that caused impairment and for which he was required to seek medical attention.

71.     On August 28, 2013, Plaintiff Marty Devos was operating a 2005 Chevrolet Malibu. Plaintiff was operating her vehicle in Louisville, Kentucky and while she was stopped at a red light, another vehicle ran a red light striking Plaintiff's vehicle and her airbags did not deploy due to the defective ignition switch.

72.     Plaintiff Marty Devos was injured in the incident.  She suffered injuries to her face, mouth, teeth, neck, back, left foot, left ankle, left hand and wrist and right elbow that caused impairment and for which she was required to seek medical attention.

73.     On October 3, 2014, Plaintiff Anthony Jones was operating a 2004 Chevrolet Malibu, Vehicle Identification Number IG1ZUS4844F115169.  While attempting to maneuver a curve on Florance Road in Smyrna, Tennessee, Plaintiff's vehicle lost power due to the defective ignition switch.  The vehicle also lost its power steering and brakes and Plaintiff was unable to steer the vehicle causing Plaintiff to crash into a tree.

74.     Plaintiff Anthony Jones was injured in the incident.  He suffered injuries to his right forearm and hand that caused impairment and for which he was required to seek medical attention.

## VI.    CAUSES OF ACTION

### A.    Strict Product Liability

75.    The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

76.    GM manufactured Plaintiffs' vehicles. GM has admitted publicly, through its recall of the Subject Vehicles that Plaintiffs vehicles contained a defect – namely the faulty ignition switch described above. In addition to GM's admission (through the recall and elsewhere) of the existence of the defective Ignition Switch, several studies have concluded that the Ignition Switch at issue is defective, results in "moving stalls," and airbag non-deployment in crashes.[1]

77.    The ignition switch was a substantial factor in bringing about Plaintiffs accidents and resulting injuries; the defective switch also prevented the airbags from deploying.

78.    At all times relevant to this action, Plaintiffs were using their vehicles in a proper and foreseeable manner and as it was intended by Defendant to be used when Defendant designed, manufactured, marketed, warranted, and sold the vehicle. Plaintiffs vehicles had not been substantially modified or altered from the condition in which he bought it until the time of the incident that forms the basis of this suit.

79.    Plaintiffs could not, through the exercise of reasonable care, have discovered the defect in the Ignition Switch and perceived its danger, nor could they have, through the exercise of reasonable care, avoided the incidents that caused their injuries.

80.    Upon information and belief, the defective component was manufactured as it was designed – a design that relied exclusively on GM's approval of the component's performance.

---

[1]    *See, e.g.*    Indiana Transportation Research Center Report, April 25, 2007, GMNTHSA000223985; Keith A. Young, Technical Reconstruction Unit, Wisconsin State Patrol Academy, Collision Analysis & Reconstruction Report Feb. 14, 2007 at GMNTHSA000284395; Erin Shipp's Engineer Report at GMNHTSA000309665.

According to the Valukas Report, the design itself was so far below GM's specifications that it failed to keep Plaintiffs vehicles powered on during the normal conditions they encountered on the dates of the incidents.

81.    GM marketed Plaintiffs vehicles, the Subject Vehicles, and Ignition Switches that were designed so that they were not reasonably safe in that they rendered the Subject Vehicles uncontrollable and prevented airbag deployment in a crash. The design of the Ignition Switches and Subject Vehicles was such that the utility of those products did not outweigh the danger of their introduction into the stream of commerce.

82.    At the time the Subject Vehicles and the Ignition Switches were produced, there existed, and GM was aware of, cost-effective safer alternative designs that were both feasible and would have made the Subject Vehicles and Ignition Switches safer.  Moreover, the safer alternative design would not have impaired the usefulness of the Ignition Switches and Subject Vehicle.  In fact, the solution was as simple as using a longer spring, which GM ultimately did in 2006.

83.    These design defects were the producing and proximate cause of Plaintiffs accidents and resulting injuries.

84.    Defendant also failed to warn the public and Plaintiffs specifically, of the inherent defects in the Subject Vehicles, the Ignition Switches, and Plaintiffs cars specifically.  Defendant did not inform the public of these life-threatening defects until 2014.  Had Defendant warned Plaintiffs that their vehicles they were driving could experience a "moving stall" during normal operations and/or that the airbags would not deploy in a crash, Plaintiffs would not have bought or continued to operate their vehicles in that defective condition.  Defendant's failure to warn Plaintiffs regarding the true capabilities, defects, and limitations of their vehicles were the producing and proximate cause of Plaintiffs incidents and resulting injuries.

85.     Defendant knew, or through the exercise of reasonable care, should have known of the defects, capabilities, and limitations of the Subject Vehicles and the Ignition Switches during intended and foreseeable use. This fact has been borne out in the Valukas Report and will doubtlessly be bolstered during discovery in this case. The mounting evidence makes it clear that, not only was Defendant aware of these defects, they were consciously indifferent to the high risk of grievous harm attendant to the "ignition switch from hell." Defendant gave no warning, much less an adequate warning, that the Subject Vehicles could experience a "moving stall" or that the airbags would fail to deploy as they should. The only adequate warning Defendant could have possibly given would have been to direct consumers to immediately cease to operate the Subject Vehicles.  Defendant eventually recalled the Subject Vehicles, but much too late to be of any help to Plaintiffs.

**B.     Negligence**

86.     The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

87.     Defendant owed a duty of care to the public and to Plaintiffs specifically, to design, manufacture, market, warrant, and sell vehicles that were free from dangerous defects and that were capable of being operated safely during normal and foreseeable use.

88.     Moreover, Defendant was required by a host of state and federal regulations to design, manufacture, market, warrant, and sell vehicles that were free from dangerous defects and that were capable of being operated safely during normal and foreseeable use.

89.     Defendant had a duty to timely discover and remedy defects in the Subject Vehicles, and in Plaintiffs vehicles specifically, that rendered them abnormally dangerous during normal and foreseeable use.

90.     Defendant breached the above-cited duties in at least the following respects:

    a.    Failing to design an ignition switch that maintained a vehicle in an operational condition during normal and foreseeable use of the vehicles;

    b.    Failing to discover defects in the Subject Vehicles, and in Plaintiffs vehicles specifically, in a timely manner;

    c.    Marketing and selling vehicles that could, and did, experience "moving stalls" during normal and foreseeable use;

    d.    Failing to warn the public, and Plaintiffs specifically, that the Subject Vehicles could and did experience "moving stalls" during normal and foreseeable use of the vehicles;

    e.    Failing to warn the public, and Plaintiffs specifically, that the Subject Vehicles could and did experience airbag non-deployment during crashes in which the airbags should deploy;

    f.    Failing to implement proper surveillance procedures to identify, track, and account for incidents related to the failure of the Ignition Switches;

    g.    Ignoring incidents and reports that would have led a reasonable manufacturer of vehicles and components to recall and/or remedy defects in the Subject Vehicles;

    h.    Allowing vehicles to be placed in the stream of commerce that Defendant knew or should have known suffered from potentially deadly defects; and

    i.    Failing to timely recall the Subject Vehicles when it became apparent, or should have been apparent through the exercise of reasonable care and/or diligence, that crashes were being caused and exacerbated by the faulty

Ignition Switches.

91.    Defendant's breaches of duty in both common law and statute were the producing and proximate cause of the incident at issue and Plaintiffs damages. Plaintiffs belonged to the class of persons meant to be protected by the state and federal regulations breached by Defendant.

## C.    Gross Negligence

92.    The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

93.    The evidence referenced in this Complaint and the mounting evidence regarding the recent recalls of millions of defective GM vehicles makes it clear that Defendant is guilty of exceptional misconduct. GM was issued, and agreed to, a record fine by the U.S. Department of Transportation's National Highway Traffic Safety Administration.  Defendant has been aware for more than a dozen years that the ignition switches in the Subject Vehicles were grossly inadequate and subjected the driving public to a grave risk of grievous harm. Producing and marketing vehicles that are subject to complete system failures at highway speeds is akin to launching millions of torpedoes onto American streets and highways – with unsuspecting consumers inside. Defendant knew about the problem for years and, because of greed and/or gross ineptitude, refused to act on the problem.   Instead, Defendant gave the issue the "GM nod."   The "GM nod" demonstrates that more than one of Defendant's superior officers in the course of employment ordered, ratified, and/or participated in the malicious conduct.  These officers acted maliciously, wantonly, and/or recklessly, and clearly the Defendant is guilty of exceptional misconduct and gross negligence.  Plaintiffs demand punitive damages for this conduct.

## VII.   DAMAGES

94.    The preceding paragraphs are hereby incorporated by reference as if set forth in full

here.

95.     Plaintiffs, as a result of the liability of Defendant described above, have suffered and makes claims for reasonable and necessary medical expenses incurred as a result of the incident made basis of these suits in the past and future, past and future pain and suffering, lost wages and earning capacity in the past, disfigurement in the past and future, impairment in the past and future and exemplary damages.

## VIII.   CONCLUSION AND PRAYER

96.     Defendant has only recently admitted publically its wrongdoing – albeit not to the full extent and not in time to prevent Plaintiffs injuries – but it admitted wrongdoing nonetheless. As the evidence mounts about what was known and when, it is becoming inescapably clear that Defendant needs to be punished and the victims they have injured need to be compensated. The law is powerless to remedy the harms Defendant has caused through its negligent, reckless, and malicious conduct – we cannot restore life or limb.  However, justice must be done to the extent we are able, and Plaintiffs demand that Defendant answer for its acts and omissions that led to Plaintiffs damages and be required to pay compensatory and exemplary damages to the full extent allowed by law.

97.     WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request Defendant be cited, tried by jury, and, upon verdict in Plaintiffs favor, Judgment be entered against Defendant for:

> a.     Actual damages within the jurisdictional limits of this Court;
>
> b.     Property damage and loss;
>
> c.     Exemplary damages to the full extent permitted by law;
>
> d.     Attorney's fees;

    e.      Costs of suit;

    f.      Pre- and Post-Judgment Interest at the maximum recoverable level; and

    g.      All other relief to which the Plaintiffs show themselves justifiably entitled.

Respectfully submitted,

Dated: September 30, 2015

**THE POTTS LAW FIRM, LLP**

By: */s/ Eric G. Jensen*
        Eric G. Jensen      MO# 43094
        Derek H. Potts      NY #44882
        The Potts Law Firm, LLP
        1901 W. 47th Place, Suite 210
        Westwood, KS 66205
        (816) 931-2230 (telephone)
        (816) 817-0478 (facsimile)

**ATTORNEYS FOR PLAINTIFFS**