# EXHIBIT 8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------------X

IN RE:
**GENERAL MOTORS LLC IGNITION SWITCH LITIGATION**       **14-MD-2543 (JMF)**

*This Document Relates to:*                                   **Case No.**
                                                             **1:15-cv-04088-JMF**
-------------------------------------------------------------------------------X

**LATANYA BRADFORD, ET AL**
        **PLAINTIFFS,**
**V.**

**GENERAL MOTORS, LLC,**
        **DEFENDANT**
-------------------------------------------------------------------------------X

## MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

COME NOW Plaintiffs, by counsel, and hereby move the Court for leave to file First Amended Complaint in order to comply with rulings of the Bankruptcy Court. As grounds for this Motion, Plaintiffs state as follows:

1. Plaintiffs' original Complaint, included claims for damages potentially related to pre-bankruptcy conduct of "Old GM," among other claims.

2. On June 1, 2015, and as amended by a September 3, 2015 scheduling order, the United States Bankruptcy Court for the Southern District of New York has determined that certain claims, related to vehicles manufactured by Motors Liquidation Company (Old GM), cannot be maintained against General Motors LLC (New GM). *See, In re: MOTORS LIQUIDATION COMPANY, et al., f/k/a General Motors Corp., et al.,* Case No. 09-50026 (REG)

3. On September 24, 2015, this Court entered Order No. 81 to streamline the amendment process. In accordance with this order, Plaintiffs have attached hereto a redline version of the original complaint as Exhibit A and a Proposed Amended Petition as Exhibit B.

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order directing the filing of tendered Proposed Amended Petition.

Respectfully submitted,

Dated: September 30, 2015

**THE POTTS LAW FIRM, LLP**

By: */s/ Eric G. Jensen*_____

    Eric G. Jensen      MO# 43094
    Derek H. Potts      NY #44882
    The Potts Law Firm, LLP
    1901 W. 47th Place, Suite 210
    Westwood, KS 66205
    (816) 931-2230 (telephone)
    (816) 817-0478 (facsimile)

**ATTORNEYS FOR PLAINTIFFS**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------------X

IN RE:
**GENERAL MOTORS LLC IGNITION SWITCH LITIGATION**          14-MD-2543 (JMF)

***This Document Relates to:***                                             Case No.
-------------------------------------------------------------------------------X

**LATANYA BRADFORD, ET AL**                    **Complaint**
    **PLAINTIFFS,**                                                  **Jury Trial Demanded**

**V.**

**GENERAL MOTORS, LLC,**
    **DEFENDANT**
-------------------------------------------------------------------------------X

<u>**ORIGINAL COMPLAINT**</u>

COME NOW Plaintiffs, through undersigned counsel, and for cause of action respectfully

shows as follows:

### I.    PRELIMINARY STATEMENT

1.    Plaintiffs were involved in accidents, and received injuries, in GM vehicles that

have been recalled because of defective ignition switches. Each incident, explained below, was

proximately caused by the failure of each Plaintiff's ignition switch and/or their injuries were

exacerbated because the defective ignition switch prevented their airbag from deploying. All

Plaintiffs were damaged and received personal injuries as a result of the defective ignition switch

in their GM vehicles.

2.    Plaintiffs' causes of action are brought against GENERAL MOTORS LLC ("New

GM"). Plaintiffs do not assert any causes of action against General Motors Corporation ("Old

GM"), although, in some cases, Old GM manufactured Plaintiffs' vehicles. The incidents at issue

in this case occurred after the Old GM bankruptcy, which is discussed briefly below. The subject

vehicles have been recalled by General Motors LLC, and New GM is strictly liable for the incident.

3.     While at times this Complaint references acts and omissions by Old GM, these references are for background purposes only. Old GM arguably ceased to exist pursuant to the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets. That Amended and Restated Master Sale and Purchase Agreement was approved on July 10, 2009. In that Agreement, New GM expressly agreed to accept responsibility for product liability claims that arose from accidents or incidents occurring on or after July 10, 2009.

4.     While New GM expressly accepted responsibility for accidents occurring on or after July 10, 2009, it also acquired knowledge of Old GM's activities generally, and the existence of the defective ignition switches in place in millions of vehicles specifically. New GM acquired personnel from Old GM, including but not limited to, top leadership personnel, executives, members of the Board of Directors, internal legal counsel, engineers and quality control personnel. Most importantly, New GM retained the engineer in charge of designing and approving the manufacturing specifications of the defective ignition switch. The employees retained by New GM carried with them the knowledge they gained at Old GM. New GM also acquired knowledge about the issues with the ignition switch, moving stalls and airbag non-deployment through the chief engineer, design and manufacturing documents, internal memorandum, and reports to the Board of Directors. New GM continued to service – and to receive complaints about – vehicles manufactured on Old GM's watch. While the change from Old GM to New GM arguably had some legal effect with regard to creditors who received notice of their rights, it had little practical effect relative to the problems with, and knowledge of, the ignition-switch defect.

5.     New GM also acquired certain duties with regard to vehicles in production and on

the road at the time of the Sale and Purchase Agreement – duties it breached egregiously – as has been well-publicized and for which it has been justifiably criticized. These duties included, but are not limited to, those arising under the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30101 *et. seq.* and the Transportation Recall Enhancement, Accountability and Documentation Act, 49 U.S.C. §§ 30101 – 30170. GM was fined $35 Million by NTSHA for its delayed reporting of the ignition switch problem and violating federal safety laws. New GM's liability for damages is attributable to its own post-sale conduct and failure to timely remedy and/or recall vehicles it knew had deadly defects, even with regard to vehicles manufactured and sold prior to the Sale and Purchase Agreement. Plaintiffs' cases are a prime example of liability and gross negligence that is inarguably attributable solely to New GM, as is shown below.

## II.    INTRODUCTION

6.      At the time of this filing, more than 12,000,000 GM vehicles have been recalled because of a defective ignition switch. Hundreds, if not thousands, of accidents are now known to have been caused by vehicles losing power and control because the defective ignition switch turned from "on" to "off" during normal and foreseeable operation. When the ignition switch fails, drivers are unable to use their steering and brakes in an effective manner. The resulting loss of control, or "moving stall," and subsequent accidents are exacerbated by the fact that the defective ignition switch also prevents life-saving airbags from deploying. So, in addition to causing accidents, the defective part makes the resulting damages even greater. As used in this Complaint, the "Subject Vehicles" refers to the GM vehicles manufactured, upon information and belief, on the Delta Platform, sold in the United States, equipped at the time of sale with ignition switches (the "Ignition Switches"), and sharing a common defective design, including the following makes and model years:

**Buick:**
- Lacrosse (2005 – 2009)
- Lucerne (2006 – 2011)

**Cadillac:**
- CTS (2003 – 2014)
- Deville (2000 – 2005)
- DTS (2006 – 2011)
- SRX (2004 – 2006)

**Chevrolet:**
- Camaro (2010 – 2014)
- Cobalt (2005 – 2010)
- HHR (2006 – 2011)
- Impala (2000 – 2014)
- Malibu (1997 – 2005)
- Monte Carlo (2000 – 2007)

**Oldsmobile:**
- Alero (1999 – 2004)
- Intrigue (1998 – 2002)

**Pontiac:**
- G5 (2007 – 2010)
- Grand Am (1999 – 2005)
- Grand Prix (2004 – 2008)
- Solstice (2006 – 2010)

**Saturn:**
- Ion (2003 – 2007)
- Sky (2007 – 2010)

7.     Each of the vehicles driven by Plaintiffs is included in the above-listed "Subject Vehicles" and contained the defective Ignition Switch that is the subject of the 2014 GM ignition switch recalls. Plaintiffs' vehicles were in substantially the same condition as when each left the manufacturer and contained a defective ignition switch that, upon information and belief was the proximate and producing cause of the incident at issue and Plaintiffs' resulting injuries and damages.

8.     The Ignition Switch that was approved by GM and installed in the GM Subject Vehicles identified above, was one of several switches manufactured at GM's direction in 2001. Each type of switch was manufactured, tested and evaluated by GM engineers prior to production. The switch that was ultimately selected by GM (the "Delta Switch") had a shorter spring in the detent plunger that gave it a smoother, more "European" feel. Another switch was identical to the Delta Switch in every respect except that it used a longer spring in the detent plunger. The longer spring increased the torque required to engage and disengage the ignition switch – it made it hard to turn the key in both directions. The longer spring also sacrificed the smooth feel that was so

important to GM.

9.      According to the recently published "Report to the Board of Directors of General
Motors Company Regarding Ignition Switch Recalls" authored by Anton R. Valukas ("The
Valukas Report"), GM made a conscious decision, in the fall of 2002, to use the Delta Switch in
the Subject Vehicles "that was so far below GM's own specifications that it failed to keep the car
powered on in circumstances that drivers would encounter." GM knew of, and approved, the final
version of the Ignition Switch that was installed in millions of cars despite knowing that the force
required to disengage the ignition switch was far below minimum specifications.

10.     According to documents obtained by a United States House of Representatives
committee during an investigation into the Defective Ignition Switches, GM opened an
engineering inquiry about the defective Ignition Switch in 2004 after customers complained that
the Subject Vehicles could be turned off while driving. Also according to those documents, the
Cobalt program engineer rejected a proposal to change the Ignition Switch claiming that the part
was too expensive and the change would take too much time – after he experienced the same
problem while performing a test drive of a Cobalt. The cost that the project engineer found
intolerably high was less than one dollar per vehicle.

11.     The switch was eventually redesigned in 2006, although using the same part
number as the Delta Switch. Remarkably, the solution to the torqueing problem had been present
since 2001; all that needed to be done was use the longer spring that had already been tested in
the design phase. No other changes were made to the switch and, aside from affecting the
"European" feel of the switch, the new switch with the longer spring functioned capably.  The
longer spring also brought the ignition switch into spec with regard to torque force.

12.     The decision to use the same part number meant that already-produced Delta

Case 1:14-md-02543-JMF Document 1438 Filed 09/30/15 Page 6 of 27

Switches continued to be installed in GM vehicles even after the attempted design correction was implemented. Apparently GM's chief design engineer "forgot" the change had been made to correct the torque issue. This additional blunder exacerbated the problem with the GM vehicles; GM had no idea what cars had the Delta Switch and which had the switch with the new, longer spring.

13.    Although the switch's inability to keep the car powered on during normal and foreseeable use of the subject vehicles "were known within GM's engineering ranks at the earliest stages of its [the switch's] production," GM ignored the safety risks attendant to these "moving stalls." These risks include, but are not limited to, sudden failure of: power steering, anti-lock brakes, electronic stability control, lane departure warnings, navigation systems, and airbag deployment. These sudden system failures made the Subject Vehicles impossible to control and, once the inevitable accident occurred, left the driver and passengers without life-saving airbags.

14.    Apparently, GM viewed the defective ignition switches as a convenience and comfort and looked everywhere but at the design to determine the problem. GM failed to focus on the safety problems with the ignition switch turning a vehicle off during normal operation and, inexplicably, failed to link the power failure with a failure to allow airbags to deploy in a resulting accident.

15.    Also according to The Valukas Report:

> "While GM heard over and over from various quarters – including customers, dealers, the press and their own employees – that the car's ignition switch led to moving stalls, group after group and committee after committee within GM that reviewed the issue failed to take action or acted too slowly. Although everyone had responsibility to fix the problem, nobody took responsibility. It was an example of what one top executive described as the "GM nod," when everyone nods in agreement to a proposed plan of action, but then leave the room and does nothing."

16.     Although GM was aware (after the Purchase and Sale Agreement with Old GM) of the problem with the switches, the link between the defect and airbag non-deployment, hundreds of accidents, and dozens of acknowledged deaths attributable to the defective ignition switches, GM did not even begin recalling the Subject Vehicles until 2014. Not even the solution is attributable to GM – it was a plaintiff attorney's investigator that finally disassembled the defective part and discovered the problem that GM had been incapable of discovering for a dozen years.

17.     Instead of accepting the defects in the Subject Vehicles and Ignition Switches as real safety issues, GM publically denied that either was a problem. Instead of working to identify and correct the problem, GM, its directors, engineers and counsel devoted their efforts to minimizing the perceived frequency and pervasiveness of the problems. Instead of accepting responsibility for the incidents and tragedies they caused, Defendant focused on "defending the brand" and public relations. Defendant knew, or in the exercise of the most basic diligence, should have known that a defect that causes system-wide failure of key components presented a significant safety risk to the public.

18.     As a result of GM's negligent, reckless, and malicious conduct, Plaintiffs' owned and operated a vehicle with a defective ignition switch, described by the designing engineer as "the switch from hell." The defective ignition switch is believed to be the cause of Plaintiffs' accidents and resulting catastrophic injuries, which are explained more fully below.


### III.     PARTIES

19.     Plaintiff Latanya Bradford is a resident of the State of Louisiana.

20.     Johnathan Anderson is a resident of the State of Louisiana.

21.     Plaintiff Stephanie Burrow is a resident of the State of Louisiana.

22.     Plaintiff Kieara Cain is a resident of the State of Louisiana.

23.     Plaintiff Gary Caldwell is a resident of the State of Kentucky.

24.     Plaintiff Gary Caldwell, Individually and on behalf of IC, A Minor,

        resides in the State of Kentucky.

25.     Plaintiff Joseph Claywell is a resident of the State of Kentucky.

26.     Plaintiff Oswald Crespo is a resident of the State of Tennessee.

27.     Plaintiff Freddie Davis is a resident of the State of Tennessee.

28.     Plaintiff Michael Dixon is a resident of the State of Kentucky.

29.     Plaintiff Clorine Edwards is a resident of the State of Tennessee.

30.     Plaintiff Nicole Clay is a resident of the State of Kentucky.

31.     Plaintiff Agnes Evans is a resident of the State of Tennessee.

32.     Plaintiff Deanna Gooden is a resident of the State of Tennessee.

33.     Plaintiff Shawnda Green is a resident of the State of Louisiana.

34.     Plaintiff Ricky Jackson is a resident of the State of Kentucky.

35.     Plaintiff Cory Johnson is a resident of the State of Tennessee.

36.     Plaintiff Tiffany Leiby is a resident of the State of Louisiana.

37.     Plaintiff Darius St. Amant is a resident of the State of Louisiana.

38.     Plaintiff Rebecca Meadows is a resident of the State of Kentucky.

39.     Plaintiff Rex Moore is a resident of the State of Tennessee.

40.     Plaintiff Dominic Noyas-Jones is a resident of the State of Kentucky.

41.     Plaintiff Brittany Taylor is a resident of the State of Tennessee.

42.     Plaintiff Joyce Thompson is a resident of the State of Kentucky.

43.     Plaintiff Sandy Tupper is a resident of the State of Louisiana.

44.     Plaintiff Melissa Whitehead is a resident of the State of Kentucky.

45.     Plaintiff Anthony Flanery, as Administrator of the Estate of Rickie Flanery,

is a resident of Kentucky.

46.     Plaintiff Marilyn Wilson, on behalf of the estate of Shon Wilson, and Individually

is a resident of Tennessee.

47.     Defendant General Motors LLC ("New GM") is a Delaware limited liability company with its principal place of business at 300 Renaissance Center, MC: 482-C14-C66, Detroit, Michigan 48265 and may be served with process through service on its designated agent for service of process, CSC-Lawyers Incorporating Service, 80 State Street, Albany, New York, 12207-2543. At all times relevant herein, General Motors Corporation and its successor in interest GENERAL MOTORS LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Subject Vehicle, as described in this Complaint, and other motor vehicles and motor vehicle components throughout the United States. General Motors LLC has sufficient contacts with New York, such that under the New York Long Arm Statute it is subject to, and has submitted to, the jurisdiction of this Court.

## IV.    JURISDICTION AND VENUE

48.     Jurisdiction is proper in this Court pursuant to Case Management Order No. 8 in *In re General Motors LLC Ignition Switch Litigation*, [14-MC-2543, Dkt. No. 36]. By filing this Complaint in this district, however, Plaintiffs do not waive their rights to transfer this case to the district in which they reside at the conclusion of pretrial proceedings. Moreover, Plaintiffs do not waive their rights or consent with regard to choice of law by filing directly into the MDL Court

pursuant to the Court's Case Management Order No. 8 and specifically rely on representations by GM to the Court that Plaintiffs will not be prejudiced by their decision to file directly into the MDL Court in the interest of convenience and judicial economy.

49.    This Court also has jurisdiction over this matter under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiffs are each and every one a citizen of a different state than Defendant.

V.    FACTUAL BACKGROUND

50.    On August 20, 2010, Plaintiff Latanya Bradford was operating a 2008 Chevrolet Impala, Vehicle Identification Number 2G1WB58N889127655. While traveling northbound on Loyola Drive in Kenner, Jefferson Parish, Louisiana, Plaintiff's vehicle was struck in the front, passenger side by another vehicle making an illegal U-turn. Plaintiff attempted to correct her vehicle, however, the steering would not respond due to the defective ignition switch.

51.    Plaintiff Latanya Bradford was injured in the incident. She suffered injuries to her neck and back that caused her to begin to have labor contractions and for which she was required to seek medical attention.

52.    On July 28, 2014 Plaintiff Johnathan Anderson was operating a 2000 Chevrolet Impala. Plaintiff's vehicle was approaching a curve in Acadia Parish, Crowley, Louisiana, when the vehicle lost power and would not respond, causing Plaintiff to go head first into a ditch. Plaintiff's airbags did not deploy upon impact due to the defective ignition switch.

53.    Plaintiff Johnathan Anderson was injured in the incident. He suffered injuries to his spine and back and for which he was required to seek medical attention.

54.    On April 3, 2014, Plaintiff Stephanie Burrow was operating a 2012 Chevrolet Camaro, Vehicle Identification Number 2G1FC1E39C9135796. Plaintiff Stephanie Burrow was

10

driving eastbound on Interstate 10 in Calcasieu Parish, Louisiana when her vehicle went right onto the shoulder of the road. Plaintiff's vehicle lost its power steering due to the defective ignition switch, causing her vehicle to collide with a fence, followed by a ditch, finally coming to a stop after colliding with a second fence.

55.     Plaintiff Stephanie Burrow was injured in the incident. She suffered injuries to her right leg, ribs, and a broken back that caused her impairment and for which she was required to seek extended medical attention.

56.     On August 22, 2013, Plaintiff Keiara Cain was operating a 2011 Chevrolet Impala, Vehicle Identification Number 2G1WG5EK5B1126335. Plaintiff was stopped at the intersection of LA 327 Spur and GSRI Avenue, in Baton Rouge, East Baton Rouge Parish, Louisiana, when her traffic signal changed to green; she proceeded forward into the intersection, as she was in the intersection she was impacted on the front right corner by another vehicle. The vehicle lost its power steering and brakes due to defective ignition switch, causing her to be unable to avoid the collision with another vehicle. Plaintiff's airbags did not deploy upon impact due to the defective ignition switch.

57.     Plaintiff Keiara Cain was injured in the incident. She suffered a knee contusion and back sprain that caused her impairment and for which she was required to seek medical attention.

58.     On October 6, 2010, Plaintiff Gary Caldwell was operating a 2004 Chevrolet Impala, Vehicle Identification Number 2G1WH52K249430454. While traveling North on Kentucky 359 in Henderson County, Smith Mills, Kentucky, the vehicle began to swerve. Plaintiff attempted to correct the vehicle, when Plaintiff's steering locked up due to the defective ignition switch. Plaintiff's vehicle lost its power steering, causing his vehicle to collide with a mailbox, followed by a ditch, finally coming to a stop and catching on fire.

11

59.     Plaintiff Gary Caldwell was injured in the incident. He suffered injuries to his ribs and back that caused his impairment and for which he was required to seek medical attention.

60.     On October 6, 2010, Minor Plaintiff, IC, was a passenger in a 2004 Chevrolet Impala, Vehicle Identification Number 2G1WH52K249430454. While traveling North on Kentucky 359 in Smith Mills, Henderson County, Kentucky, the vehicle began to swerve. Plaintiff Gary Caldwell attempted to correct the vehicle, when Plaintiff's steering locked up due to the defective ignition switch. Plaintiff's vehicle lost its power steering, causing his vehicle to collide with a mailbox, followed by a ditch, finally coming to a stop and catching on fire.

61.     Minor Plaintiff IC was injured in the incident. He suffered injuries to his head that caused impairment and for which he was required to seek medical attention.

62.     On August 4, 2014, Plaintiff Joseph Claywell was operating a 2014 Chevrolet Camaro, Vehicle Identification Number 2G1FK1EJ8E9234968. While the driver was traveling on Peg Garmon Road, Cumberland County, Burkesville, Kentucky, Plaintiff was traveling around a curve the vehicle left the roadway and went up an embankment, Plaintiff's vehicle lost power due to the defective ignition switch. The vehicle lost its power steering causing the vehicle to rollover and hit a guy wire for an electrical pole and ejecting the driver.

63.     Plaintiff Joseph Claywell was injured in the incident. He suffered injuries to his lower back, right hand, left elbow, ribs, hip, and ankle that caused impairment. He was transported via life-flight to an area hospital medical attention.

64.     On February 27, 2014, Plaintiff Oswald Crespo was operating a 2002 Cadillac DeVille, Vehicle Identification Number 1G6K054Y02U283914. Plaintiff was traveling eastbound on State Route 127 towards the intersection of US 41 and State Route 127 Coffee County, Tennessee, when a vehicle went off the roadway and stuck Plaintiff's vehicle. The vehicle lost its

power steering and the Plaintiff's vehicle could not navigate away from an approaching vehicle, colliding just before the intersection due to the defective ignition switch. The airbags in the Plaintiff's vehicle failed to deploy.

65.    Plaintiff Oswald Crespo was injured in the accident. He suffered injuries to his left shoulder, severe concussion, ankle and ear damage that caused impairment for which he was required to seek medical attention.

66.    On December 24, 2012, Plaintiff Freddie Davis was operating a 2002 Cadillac Deville, Vehicle Identification Number 1G6KD54Y12U107499. While traveling South on Elvis Presley, in Shelby County, Memphis, Tennessee, Plaintiff's vehicle lost power due to the defective ignition switch. The vehicle also lost its power steering and the Plaintiff could not navigate his vehicle away from an approaching vehicle, colliding in the intersection.

67.    Plaintiff Freddie Davis was injured in the incident. He suffered injuries to his head and back that caused impairment and for which he was required to seek medical attention.

68.    On June 8, 2012, Plaintiff Michael Dixon was operating a 2012 Chevrolet Impala, Vehicle Identification Number 2G1WG5E39C1292985. While traveling on Highway 7, in Letcher County, Blackey, Kentucky, Plaintiff's vehicle lost power due to the defective ignition switch. The vehicle also lost its power steering and Plaintiff was unable to control the vehicle to avoid going head first into a ditch.

69.    Plaintiff Michael Dixon was injured in the incident. He suffered injuries to his chest, neck, back, and legs that caused impairment and for which he was required to seek medical attention.

70.    On September 10, 2012, Plaintiff Clorine Edwards was operating a 2008 Chevrolet Impala, Vehicle Identification Number 2G1WB58K289215803. Plaintiff's vehicle was proceeding

on the 385 Expressway in Shelby County, Memphis, Tennessee, when the Plaintiff's vehicle lost power due to the defective ignition switch. The vehicle also lost its power steering and brakes. Plaintiff was unable to stop her vehicle which then impacted the vehicle in front of her.

71.     Plaintiff Clorine Edwards was injured in the incident. She suffered injuries relating to her pregnancy that caused impairment and for which she was required to seek medical attention.

72.     On September 20, 2012, Plaintiff Nicole Clay was operating a 2004 Cadillac Deville, Vehicle Identification Number 1G6KD54Y34U255978. Plaintiff's vehicle was preparing to make a right turn onto Newtown Pike in Fayette County, Lexington, Kentucky, when Plaintiff's vehicle lost power due to the defective ignition switch.  The vehicle also lost its power steering and Plaintiff could not navigate away from an approaching vehicle, colliding in the intersection.

73.     Plaintiff Nicole Clay was injured in the incident. She suffered injuries to her lower back and head that caused impairment and for which she was required to seek medical attention.

74.     On November 27, 2013, Plaintiff Agnes Evans was operating a 2005 Cadillac Deville, Vehicle Identification Number 1G6KD54Y75U114087. The Plaintiff's vehicle was exiting a private parking lot in Ouachita Parish, Monroe, Louisiana, when her vehicle lost power due to the defective ignition switch.  Plaintiff's vehicle also lost its power steering and brakes and Plaintiff was unable to avoid colliding with a vehicle traveling down Louisville Avenue.

75.     Plaintiff Agnes Evans was injured in the incident. She suffered injuries to her head and hip that caused impairment and for which she was required to seek medical attention.

76.     On May 31, 2014, Plaintiff Deanna Gooden was operating a 2001 Chevrolet Impala. The Plaintiff's vehicle lost power due to the defective ignition switch when she swerved to miss a semi crossing over into her lane. The vehicle also lost power steering and brakes, the Plaintiff was unable to avoid hitting a median head on.

77.     Plaintiff Deanna Gooden was injured in the incident. She suffered injuries to her back, and neck that caused impairment and for which she was required to seek medical attention.

78.     On March 5, 2012 Plaintiff Shawnda Greene was a passenger in a 2011 Chevrolet Impala. Plaintiff was coming around a curve in Acadia Parish, near Crowley, Louisiana when her vehicle went over some gravel. Plaintiff attempted to correct the vehicle, it lost power due to the defective ignition switch causing the vehicle to hit a canal head on.

79.     Plaintiff Shawnda Greene was injured in the incident. She suffered injuries to the left side of her skull and spine that caused impairment and for which she was required to seek medical attention.

80.     On May 16, 2012 Plaintiff Ricky Jackson was a passenger in a 2011 Chevrolet Impala, Vehicle Identification Number 2G1WG5EK9B1121445. Plaintiff was traveling in Jefferson County, Louisville, Kentucky when the vehicle lost power due to the defective ignition switch. Plaintiff's vehicle also lost power steering and brakes and the Plaintiff was unable to avoid hitting a parked vehicle. The airbags did not deploy due to the defective ignition switch.

81.     Plaintiff Ricky Jackson was injured in the incident. He suffered injuries to his neck and back that caused impairment and for which he was required to seek medical attention.

82.     On February 15, 2014 Plaintiff Cory Johnson was a passenger in a 2006 Pontiac Grand Prix. Plaintiff was traveling northbound on Highway 224, McNairy County, Tennessee when the vehicle he was in lost power steering due to the effective ignition switch, crossed the center line and struck another vehicle head on.

83.     Plaintiff Cory Johnson was injured in the incident. He suffered injuries that include a broken C5 vertebrae, fractured sternum, and a collapsed carotid artery that caused impairment and for which he was required to seek medical attention.

15

Case 1:14-md-02543-JMF    Document 1438    Filed 09/30/15    Page 16 of 27

84.    On September 8, 2014, Plaintiff Tiffany Leiby was a passenger in a 2000 Chevrolet Impala, Vehicle Identification Number 2G1WH55K8Y9154735. While traveling south on Highway 3, passing over a bridge in Baton Rouge, Louisiana, the vehicle lost power. The front of the vehicle struck the bridge railing and her airbags did not deploy due to the defective ignition switch.

85.    Plaintiff Tiffany Leiby was injured in the incident. She suffered injuries to her head, neck and shoulder that caused impairment and for which she was required to seek medical attention.

86.    On September 25, 2014, Plaintiff Darius St. Amant was operating a 2008 Chevrolet Impala, Vehicle Identification Number 2G1WT58KX89233723. While traveling north on N. Bertrand, Lafayette Parish, Lafayette, Louisiana, Plaintiff's vehicle was struck in the front, passenger side by an oncoming vehicle, the air bags failed to deploy due to the defective ignition switch.

87.    Plaintiff Darius St. Amant was injured in the incident. He suffered injuries to his back and head that caused impairment and for which he was required to seek medical attention.

88.    On May 16, 2013, Plaintiff Rebecca Meadows was operating a 2003 Pontiac Grand Prix, Vehicle Identification Number 1G2WK52J13F177038. Plaintiff was traveling in near Whitley County, Williamsburg, Kentucky when her vehicle went slightly on the shoulder of the road. The vehicle lost power due to the defective ignition switch and the Plaintiff was unable to avoid a head on collision with a tree.

89.    Plaintiff Rebecca Meadows was injured in the incident. She suffered injuries to her face, lungs, ribs, and nose that caused impairment and for which she was required to seek medical attention.

90.     On October 20, 20012, Plaintiff Rex Moore was operating a 2002 Cadillac DeVille, Vehicle Identification Number 1G6KD54YX2U173808.  While traveling East on Bethel Avenue, near Knox County, Knoxville, Tennessee, Plaintiff was passing another vehicle when his vehicle lost power due to the defective ignition switch.  The vehicle also lost power steering and brakes and Plaintiff was unable to avoid being struck by another vehicle.

91.     Plaintiff Rex Moore was injured in the incident. He suffered injuries to his back and knee that caused impairment and for which he was required to seek medical attention.

92.     On August 6, 2014, Plaintiff Dominic Noyas-Jones was operating a 2004 Pontiac Grand Prix, Vehicle Identification Number 2G2WP522241273439. Plaintiff was coming over a hill, traveling westbound on Old Bowling Green Road, in Barren County, Kentucky, when he noticed the vehicle in front of him was stopped. Plaintiff attempted to avoid a collision, but lost power steering due to the defective ignition switch and struck the vehicle directly in front of his vehicle, causing his vehicle to turn slightly. Plaintiff was then struck by a vehicle traveling eastbound on Old Bowling Green Road before coming to a complete stop.

93.     Plaintiff Dominc Noyas-Jones was injured in the incident. He suffered a broken nose and whiplash that caused impairment and for which he was required to seek medical attention.

94.     On May 31, 2014, Plaintiff Brittany Taylor was a passenger in a 2001 Chevrolet Impala. The Plaintiff's vehicle lost power due to the defective ignition switch when she swerved to miss a semi crossing over into her lane. The vehicle also lost power steering and brakes and the Plaintiff was unable to avoid hitting a median head on.

95.     Plaintiff Brittany Taylor was injured in the incident. She suffered neck, back and head injury that caused impairment and for which she was required to seek medical attention.

96.     On October 13, 2010, Plaintiff Joyce Thompson was operating a 2006 Chevrolet

17

Monte Carlo. Plaintiff's vehicle was proceeding on Taylor Road at the intersection of Sale Avenue in near Jefferson County, Louisville, Kentucky, when the vehicle was hit by an oncoming vehicle. Plaintiff's airbags did not deploy upon impact due to the defective ignition switch.

97.    Plaintiff Joyce Thompson was injured in the incident. She suffered injuries to her head, left knee and back that caused impairment and for which she was required to seek medical attention.

98.    On March 5, 2012, Plaintiff Sandie Tupper was operating a 2011 Chevrolet Impala. Plaintiff was coming around a curve near Acadia Parish, Crowley, Louisiana when her vehicle went over some gravel. Plaintiff attempted to correct the vehicle; it lost power due to the defective ignition switch causing the vehicle to hit a canal head on.

99.    Plaintiff Sandie Tupper was injured in the incident. She suffered injuries to her skull and spine that caused impairment and for which she was required to seek medical attention.

100.    On May 16, 2012, Plaintiff Melissa Whitehead was operating a 2011 Chevrolet Impala, Vehicle Identification Number 2G1WG5EK9B1121445. Plaintiff was traveling in Jefferson County, near Louisville, Kentucky when the vehicle lost power due to the defective ignition switch. Plaintiff's vehicle also lost power steering and brakes and the Plaintiff was unable to avoid hitting a parked vehicle.

101.    Plaintiff Melissa Whitehead was injured in the incident. She suffered injuries to her head, mouth, back, and shoulder that caused impairment and for which she was required to seek medical attention.

102.    On March 28, 2012, Rickie Flanery was operating a 2002 Chevrolet Impala, Vehicle Identification Number 2G1WF52E329191137. Mr. Flanery swerved to avoid an animal while traveling westbound on Kentucky – 8, Lewis County, Garrison, Kentucky. His vehicle shut

off due to the defective ignition switch causing the driver to lose control in turn causing the vehicle
to flip three times and eject the driver.

103.    Rickie Flanery suffered a fatal injury in the accident.

104.    Plaintiff Anthony Flanery, as Administrator of the Estate of Richie Flanery
respectfully brings this action on behalf of the Estate of his late brother.

105.    On October 25, 2013 Shon Wilson was a passenger in a 2004 Monte Carlo, Vehicle
identification Number 2G1WX12KX49283683. The vehicle in which Mr. Wilson was riding was
traveling northbound on Coleman when the vehicle veered off the roadway hitting a dirt
embankment and rolling into a tree. The vehicle in which Mr. Wilson was riding in lost power
steering and brakes due to the defective ignition switch.

106.    Shon Wilson suffered a fatal injury in the accident.

107.    Plaintiff Marilyn Wilson, the mother of Shon Wilson respectfully brings this action
on behalf of the estate of Shon Wilson, and individually as a wrongful death beneficiary.


## VI.    CAUSES OF ACTION

### A.    Strict Product Liability

108.    The preceding paragraphs are hereby incorporated by reference as if set forth in full
here.

109.    GM manufactured Plaintiffs' vehicles. GM has admitted publicly, through its recall
of the Subject Vehicles that Plaintiffs' vehicles contained a defect – namely the faulty ignition
switch described above. In addition to GM's admission (through the recall and elsewhere) of the
existence of the defective Ignition Switch, several studies have concluded that the Ignition Switch

at issue is defective, results in "moving stalls," and airbag non-deployment in crashes.[1]

110.    The ignition switch was a substantial factor in bringing about Plaintiffs accidents and resulting injuries; the defective switch also prevented the airbags from deploying.

111.    At all times relevant to this action, Plaintiffs were using their vehicles in a proper and foreseeable manner and as it was intended by Defendant to be used when Defendant designed, manufactured, marketed, warranted, and sold the vehicle. Plaintiffs' vehicles had not been substantially modified or altered from the condition in which he bought it until the time of the incident that forms the basis of this suit.

112.    Plaintiffs could not, through the exercise of reasonable care, have discovered the defect in the Ignition Switch and perceived its danger, nor could they have, through the exercise of reasonable care, avoided the incidents that caused their injuries.

113.    Upon information and belief, the defective component was manufactured as it was designed – a design that relied exclusively on GM's approval of the component's performance. According to the Valukas Report, the design itself was so far below GM's specifications that it failed to keep Plaintiff's vehicles powered on during the normal conditions they encountered on the dates of the incidents.

114.    GM marketed Plaintiff's vehicles, the Subject Vehicles, and Ignition Switches that were designed so that they were not reasonably safe in that they rendered the Subject Vehicles uncontrollable and prevented airbag deployment in a crash. The design of the Ignition Switches and Subject Vehicles was such that the utility of those products did not outweigh the danger of their introduction into the stream of commerce.

---

[1]    *See, e.g.* Indiana Transportation Research Center Report, April 25, 2007, GMNTHSA000223985; Keith A. Young, Technical Reconstruction Unit, Wisconsin State Patrol Academy, Collision Analysis & Reconstruction Report Feb. 14, 2007 at GMNTHSA000284395; Erin Shipp's Engineer Report at GMNHTSA000309665.

115.     At the time the Subject Vehicles and the Ignition Switches were produced, there existed, and GM was aware of, cost-effective safer alternative designs that were both feasible and would have made the Subject Vehicles and Ignition Switches safer.  Moreover, the safer alternative design would not have impaired the usefulness of the Ignition Switches and Subject Vehicle.  In fact, the solution was as simple as using a longer spring, which GM ultimately did in 2006.

116.     These design defects were the producing and proximate cause of Plaintiff's accidents and resulting injuries.

117.     Defendant also failed to warn the public and Plaintiffs specifically, of the inherent defects in the Subject Vehicles, the Ignition Switches, and Plaintiffs cars specifically.  Defendant did not inform the public of these life-threatening defects until 2014.  Had Defendant warned Plaintiffs that their vehicles they were driving could experience a "moving stall" during normal operations and/or that the airbags would not deploy in a crash, Plaintiffs would not have bought or continued to operate their vehicles in that defective condition.  Defendant's failure to warn Plaintiffs regarding the true capabilities, defects, and limitations of their vehicles were the producing and proximate cause of Plaintiffs incidents and resulting injuries.

118.     Defendant knew, or through the exercise of reasonable care, should have known of the defects, capabilities, and limitations of the Subject Vehicles and the Ignition Switches during intended and foreseeable use. This fact has been borne out in the Valukas Report and will doubtlessly be bolstered during discovery in this case. The mounting evidence makes it clear that, not only was Defendant aware of these defects, they were consciously indifferent to the high risk of grievous harm attendant to the "ignition switch from hell." Defendant gave no warning, much less an adequate warning, that the Subject Vehicles could experience a "moving stall" or that the airbags would fail to deploy as they should. The only adequate warning Defendant could have

21

possibly given would have been to direct consumers to immediately cease to operate the Subject
Vehicles. Defendant eventually recalled the Subject Vehicles, but much too late to be of any help
to Plaintiffs.

**B.     Negligence**

119.     The preceding paragraphs are hereby incorporated by reference as if set forth in full
here.

120.     Defendant owed a duty of care to the public and to Plaintiffs specifically, to design,
manufacture, market, warrant, and sell vehicles that were free from dangerous defects and that
were capable of being operated safely during normal and foreseeable use.

121.     Moreover, Defendant was required by a host of state and federal regulations to
design, manufacture, market, warrant, and sell vehicles that were free from dangerous defects and
that were capable of being operated safely during normal and foreseeable use.

122.     Defendant had a duty to timely discover and remedy defects in the Subject
Vehicles, and in Plaintiff's vehicles specifically, that rendered them abnormally dangerous during
normal and foreseeable use.

123.     Defendant breached the above-cited duties in at least the following respects:

    a.     Failing to design an ignition switch that maintained a vehicle in an operational
condition during normal and foreseeable use of the vehicles;

    b.     Failing to discover defects in the Subject Vehicles, and in Plaintiff's vehicles
specifically, in a timely manner;

    c.     Marketing and selling vehicles that could, and did, experience "moving stalls"
during normal and foreseeable use;

    d.     Failing to warn the public, and Plaintiffs specifically, that the Subject

Vehicles could and did experience "moving stalls" during normal and foreseeable use of the vehicles;

e.   Failing to warn the public, and Plaintiffs specifically, that the Subject Vehicles could and did experience airbag non-deployment during crashes in which the airbags should deploy;

f.   Failing to implement proper surveillance procedures to identify, track, and account for incidents related to the failure of the Ignition Switches;

g.   Ignoring incidents and reports that would have led a reasonable manufacturer of vehicles and components to recall and/or remedy defects in the Subject Vehicles;

h.   Allowing vehicles to be placed in the stream of commerce that Defendant knew or should have known suffered from potentially deadly defects; and

i.   Failing to timely recall the Subject Vehicles when it became apparent, or should have been apparent through the exercise of reasonable care and/or diligence, that crashes were being caused and exacerbated by the faulty Ignition Switches.

124.   Defendant's breaches of duty in both common law and statute were the producing and proximate cause of the incident at issue and Plaintiff's damages. Plaintiffs belonged to the class of persons meant to be protected by the state and federal regulations breached by Defendant.

**C.    ~~Breach of Express and Implied Warranties; Deceptive Trade Practices~~**

~~125.    The preceding paragraphs are hereby incorporated by reference as if set forth in full here. Plaintiff's hereby bring suit pursuant, but not limited, to the N.Y. GBS. LAW § 349 *et. seq.* "The New York Deceptive Trade Practices Act".~~

126.    The incident in which Plaintiffs were injured was caused by the defective Subject Vehicle and Ignition Switch as described herein. Plaintiffs were consumers who did, and reasonably could have been expected to, use and/or be affected by the Subject Vehicles. Plaintiffs purchased the vehicles at issue in this case, and there existed a privity of contract as that term is known at law.

127.    The incident at issue occurred, and Plaintiffs were injured, because their vehicles and ignition switches were defective, as described herein, in that they were not safe for normal and foreseeable use.

128.    Defendant expressly and impliedly warranted that the Subject Vehicles would not shut off during normal and foreseeable use, that the Subject Vehicles could be safely operated during normal use, that the essential functions of the Subject Vehicles would remain operable during foreseeable use, and that the airbags would deploy in the case of a crash in which one would normally expect the airbags to deploy.

129.    Because of the defects described herein, in various public reports, and as admitted by Defendant itself, these (and other) express and implied warranties were breached by Defendant. The Subject Vehicles and Plaintiff's vehicles specifically, were not fit for the ordinary purposes for which such vehicles are used nor were they fit for the specific purpose Defendant represented them to be useful for.

130.    Defendant's acts and omissions were deceptive in that the Subject Vehicles and Ignition Switches were advertised and warranted to possess qualities, characteristics and protections that they did not, in fact, possess. The Subject Vehicles and Ignition Switches were represented to be of a particular standard, quality and grade free from defects, of merchantable quality and fit for the purpose for which they were sold and they were not.

24

131.   Defendant's breaches of warranty were the producing and proximate cause of the incident at issue and Plaintiff's damages.

**D.      Gross Negligence**

132.    The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

133.    The evidence referenced in this Complaint and the mounting evidence regarding the recent recalls of millions of defective GM vehicles makes it clear that Defendant is guilty of exceptional misconduct. GM was issued, and agreed to, a record fine by the U.S. Department of Transportation's National Highway Traffic Safety Administration. Defendant has been aware for more than a dozen years that the ignition switches in the Subject Vehicles were grossly inadequate and subjected the driving public to a grave risk of grievous harm. Producing and marketing vehicles that are subject to complete system failures at highway speeds is akin to launching millions of torpedoes onto American streets and highways – with unsuspecting consumers inside. Defendant knew about the problem for years and, because of greed and/or gross ineptitude, refused to act on the problem. Instead, Defendant gave the issue the "GM nod." The "GM nod" demonstrates that more than one of Defendant's superior officers in the course of employment ordered, ratified, and/or participated in the malicious conduct. These officers acted maliciously, wantonly, and/or recklessly, and clearly the Defendant is guilty of exceptional misconduct and gross negligence. Plaintiffs demand punitive damages for this conduct.

### VII.     DAMAGES

134.    The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

135.    Plaintiffs, as a result of the liability of Defendant described above, have suffered

and make claims for reasonable and necessary medical expenses incurred as a result of the incident made basis of these suits in the past and future, past and future pain and suffering, lost wages and earning capacity in the past, disfigurement in the past and future, impairment in the past and future and exemplary damages. ~~Plaintiffs also demands statutory penalties be imposed pursuant to the applicable Deceptive Trade Practices Act and attorney's fees.~~

## VIII.   CONCLUSION AND PRAYER

136.   Defendant has only recently admitted publically its wrongdoing – albeit not to the full extent and not in time to prevent Plaintiff's injuries – but it admitted wrongdoing nonetheless. As the evidence mounts about what was known and when, it is becoming inescapably clear that Defendant needs to be punished and the victims they have injured need to be compensated. The law is powerless to remedy the harms Defendant has caused through its negligent, reckless, and malicious conduct – we cannot restore life or limb.  However, justice must be done to the extent we are able, and Plaintiffs demand that Defendant answer for its acts and omissions that led to Plaintiffs damages and be required to pay compensatory and exemplary damages to the full extent allowed by law.

137.   WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request Defendant be cited, tried by jury, and, upon verdict in Plaintiffs favor, Judgment be entered against Defendant for:

a.   Actual damages within the jurisdictional limits of this Court;

b.   Property damage and loss;

c.   Exemplary damages to the full extent permitted by law;

d.   Attorney's fees;

e.   Costs of suit;

      f.     Pre- and Post-Judgment Interest at the maximum recoverable level; and

      g.    All other relief to which the Plaintiff's show themselves justifiably entitled.

**Dated:**   May 27, 2015

                            Respectfully Submitted,

                            _____

                            Jason E. Dunahoe, *Pro Hac*
                            Texas State Bar No. 24048440
                            *Attorneys for Plaintiffs*

Of Counsel:

Sean Teare, *Pro Hac*
**HEARD ROBINS CLOUD LLP**
2000 West Loop South, 22nd Floor
Houston, T 77027
713.650.1200 Voice
713.650.1400 Facsimile
jdunahoe@heardrobins.com
steare@heardrobins.com