# EXHIBIT 9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------------X

IN RE:
**GENERAL MOTORS LLC IGNITION SWITCH LITIGATION**      **14-MD-2543 (JMF)**

*This Document Relates to:*                             **Case No.**
                                                        **1:14-cv-10006-JMF**
-------------------------------------------------------------------------------X

**MEGHAN DUNN, INDIVIDUALLY AND**
**ON BEHALF OF ADIN DE LA CRUZ, a minor**
     **PLAINTIFF,**
**V.**

**GENERAL MOTORS, LLC,**
     **DEFENDANT**
-------------------------------------------------------------------------------X

## MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

COMES NOW Plaintiff, by counsel, and hereby moves the Court for leave to file her First Amended Complaint in order to comply with rulings of the Bankruptcy Court. As grounds for this Motion, Plaintiff states as follows:

1. Plaintiff's original Complaint, included claims for damages potentially related to pre-bankruptcy conduct of "Old GM," among other claims.

2. On June 1, 2015, and as amended by a September 3, 2015 scheduling order, the United States Bankruptcy Court for the Southern District of New York has determined that certain claims, related to vehicles manufactured by Motors Liquidation Company (Old GM), cannot be maintained against General Motors LLC (New GM). *See, In re: MOTORS LIQUIDATION COMPANY, et al., f/k/a General Motors Corp., et al.,* Case No. 09-50026 (REG)

3. On September 24, 2015, this Court entered Order No. 81 to streamline the amendment process. In accordance with this order, Plaintiff has attached hereto a redline version of the original complaint as Exhibit A and a Proposed Amended Petition as Exhibit B.

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order directing the filing of tendered Proposed Amended Petition.

Dated: September 30, 2015

Respectfully submitted,

**THE POTTS LAW FIRM, LLP**

By: */s/ Eric G. Jensen*_____
     Eric G. Jensen     MO# 43094
     Derek H. Potts     NY #44882
     The Potts Law Firm, LLP
     1901 W. 47th Place, Suite 210
     Westwood, KS 66205
     (816) 931-2230 (telephone)
     (816) 817-0478 (facsimile)

**ATTORNEYS FOR PLAINTIFFS**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------------------X

IN RE:
**GENERAL MOTORS LLC IGNITION SWITCH LITIGATION**          **14-MD-2543 (JMF)**

***This Document Relates to:***                                                  **Case No.**
------------------------------------------------------------------------------------X

**MEGHAN DUNN, INDIVIDUALLY AND**                                  **Complaint**
**ON BEHALF OF ADIN DE LA CRUZ, a minor**
         **PLAINTIFF,**                                                          **Jury Trial Demanded**

**V.**

**GENERAL MOTORS, LLC,**
         **DEFENDANT**
------------------------------------------------------------------------------------X

<u>**ORIGINAL COMPLAINT**</u>

COMES NOW Plaintiff, through undersigned counsel, and for cause of action respectfully

shows as follows:

## I.        PRELIMINARY STATEMENT

1.        Plaintiff was involved in a motor vehicle incident with her son, Adin, on December

27, 2012 in her 2005 Chevy Impala.  The incident occurred on U.S. 224 around 1 p.m. near Ottawa,

Putnam County, Ohio.  Upon information and belief, Plaintiff's car lost power, causing her to lose

control and enter the lane of oncoming traffic.  Further, upon information and belief, the loss of

power was caused by a defective ignition switch installed in her Impala.  Plaintiff's car was struck

on the side causing catastrophic damage to her vehicle and body.  Plaintiff has been functionally

incapacitated since the day of the incident.  Her son also suffered physical and severe emotional

injuries in the incident.

2.        Plaintiff's causes of action are brought against GENERAL MOTORS LLC ("New

GM").  Plaintiff does not assert any causes of action against General Motors Corporation ("Old

GM"), although Old GM manufactured Plaintiff's 2005 Chevy Impala. The incident at issue in this case occurred after the Old GM bankruptcy, which is discussed briefly below. The subject vehicle has been recalled by General Motors LLC, and New GM is strictly liable for the incident.

3.        While at times this Complaint references acts and omissions by Old GM, these references are for background purposes only. Old GM arguably ceased to exist pursuant to the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets.   That Amended and Restated Master Sale and Purchase Agreement was approved on July 10, 2009.  In that Agreement, New GM expressly agreed to accept responsibility for product liability claims that arose from accidents or incidents occurring on or after July 10, 2009.  The incident that forms the basis of Plaintiff's claims occurred after July 10, 2009.

4.        While New GM expressly accepted responsibility for accidents occurring on or after July 10, 2009,  it also acquired knowledge of Old GM's activities generally, and the existence of the defective ignition switch in place in millions of vehicles specifically. New GM acquired personnel from Old GM, including but not limited to, top leadership personnel, executives, members of the Board of Directors, internal legal counsel, engineers and quality control personnel. Most importantly, New GM retained the engineer in charge of designing and approving the manufacturing specifications of the defective ignition switch.  The employees retained by New GM carried with them the knowledge they gained at Old GM.  New GM also acquired knowledge about the issues with the ignition switch, moving stalls and airbag non-deployment through the chief engineer, design and manufacturing documents, internal memorandum, and reports to the Board of Directors.  New GM continued to service – and receive complaints about – vehicles manufactured on Old GM's watch.  While the change from Old GM to New GM arguably had

some legal effect with regard to creditors who received notice of their rights, it had little practical effect relative to the problems with, and knowledge of, the ignition-switch defect.

5.       New GM also acquired certain duties with regard to vehicles in production and on the road at the time of the Sale and Purchase Agreement – duties it breached egregiously – as has been well-publicized and for which it has been justifiably criticized. These duties included, but are not limited to, those arising under the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30101 *et. seq.* and the Transportation Recall Enhancement, Accountability and Documentation Act, 49 U.S.C. §§ 30101 – 30170.  GM was fined $35 Million by NTSHA for its delayed reporting of the ignition switch problem and violating federal safety laws.  New GM's liability for damages is attributable to its own post-sale conduct and failure to timely remedy and/or recall vehicles it knew had deadly defects, even with regard to vehicles manufactured and sold prior to the Sale and Purchase Agreement. Plaintiff's case is a prime example of liability and gross negligence that is inarguably attributable solely to New GM, as is shown below.

## II.       INTRODUCTION

6.       At the time of this filing, more than 12,000,000 GM vehicles have been recalled because of a defective ignition switch.  Hundreds, if not thousands, of accidents are now known to have been caused by vehicles losing power and control because the defective ignition switch turned from "on" to "off" during normal and foreseeable operation. When the ignition switch fails, drivers are unable to use their steering and brakes in an effective manner. The resulting loss of control, or "moving stall," and subsequent accidents are exacerbated by the fact that the defective ignition switch also prevents life-saving airbags from deploying. So, in addition to causing accidents, the defective part makes the resulting damages even greater. As used in this Complaint, the "Subject Vehicles" refers to the GM vehicles manufactured, upon information and belief, on

the Delta Platform, sold in the United States, equipped at the time of sale with ignition switches (the "Ignition Switches"), and sharing a common defective design, including the following makes and model years:

**Buick:**
- Lacrosse (2005 – 2009)
- Lucerne (2006 – 2011)

**Cadillac:**
- CTS (2003 – 2014)
- Deville (2000 – 2005)
- DTS (2006 – 2011)
- SRX (2004 – 2006)

**Chevrolet:**
- Camaro (2010 – 2014)
- Cobalt (2005 – 2010)
- HHR (2006 – 2011)
- Impala (2000 – 2014)
- Malibu (1997 – 2005)
- Monte Carlo (2000 – 2007)

**Oldsmobile:**
- Alero (1999 – 2004)
- Intrigue (1998 – 2002)

**Pontiac:**
- G5 (2007 – 2010)
- Grand Am (1999 – 2005)
- Grand Prix (2004 – 2008)
- Solstice (2006 – 2010)

**Saturn:**
- Ion (2003 – 2007)
- Sky (2007 – 2010)

7.     Plaintiff's 2005 Chevrolet Impala is included in the above-listed "Subject Vehicles" and contained the defective Ignition Switch that is the subject of the 2014 GM ignition switch recalls.  Plaintiff's vehicle, which bears the VIN number 2G1WF52EX59114690, was in substantially the same condition as when it left the manufacturer and contained a defective ignition switch that, upon information and belief was the proximate and producing cause of the incident at issue and Plaintiff's resulting injuries and damages.

8.     The Ignition Switch that was approved by GM and installed in the GM Subject Vehicles identified above, was one of several switches manufactured at GM's direction in 2001. Each type of switch was manufactured, tested and evaluated by GM engineers prior to production. The switch that was ultimately selected by GM (the "Delta Switch") had a shorter spring in the detent plunger that gave it a smoother, more "European" feel.  Another switch was identical to the

Delta Switch in every respect except that it used a longer spring in the detent plunger.  The longer spring increased the torque required to engage and disengage the ignition switch – it made it hard to turn the key in both directions.  The longer spring also sacrificed the smooth feel that was so important to GM.

9.      According to the recently published "Report to the Board of Directors of General Motors Company Regarding Ignition Switch Recalls" authored by Anton R. Valukas ("The Valukas Report"), GM made a conscious decision, in the fall of 2002, to use the Delta Switch in the Subject Vehicles "that was so far below GM's own specifications that it failed to keep the car powered on in circumstances that drivers would encounter." GM knew of, and approved, the final version of the Ignition Switch that was installed in millions of cars despite knowing that the force required to disengage the ignition switch was far below minimum specifications.

10.      According to documents obtained by a House of Representatives Committee during an investigation into the Defective Ignition Switches, GM opened an engineering inquiry about the defective Ignition Switch in 2004 after customers complained that the Subject Vehicles could be turned off while driving.  Also according to those documents, the Cobalt program engineer rejected a proposal to change the Ignition Switch claiming that the part was too expensive and the change would take too much time – after he experienced the same problem while performing a test drive of a Cobalt.  The cost that the project engineer found intolerably high was less than one dollar per vehicle.

11.      The switch was eventually redesigned in 2006, although using the same part number as the Delta Switch.  Remarkably, the solution to the torqueing problem had been present since 2001; all that needed to be done was use the longer spring that had already been tested in the design phase.  No other changes were made to the switch and, aside from affecting the

"European" feel of the switch, the new switch with the longer spring functioned capably. The longer spring also brought the ignition switch into spec with regard to torque force.

12.    The decision to use the same part number meant that already-produced Delta Switches continued to be installed in GM vehicles even after the attempted design correction was implemented. Apparently GM's chief design engineer "forgot" the change had been made to correct the torque issue. This additional blunder exacerbated the problem with the GM vehicles; GM had no idea what cars had the Delta Switch and which had the switch with the new, longer spring.

13.    Although the switch's inability to keep the car powered on during normal and foreseeable use of the subject vehicles "were known within GM's engineering ranks at the earliest stages of its [the switch's] production," GM ignored the safety risks attendant to these "moving stalls." These risks include, but are not limited to, sudden failure of: power steering, anti-lock brakes, electronic stability control, lane departure warnings, navigation systems, and airbag deployment. These sudden system failures made the Subject Vehicles impossible to control and, once the inevitable accident occurred, left the driver and passengers without life-saving airbags.

14.    Apparently, GM viewed the defective ignition switches as a convenience and comfort and looked everywhere but at the design to determine the problem. GM failed to focus on the safety problems with the ignition switch turning a vehicle off during normal operation and, inexplicably, failed to link the power failure with a failure to allow airbags to deploy in a resulting accident.

15.     Also according to The Valukas Report:

"While GM heard over and over from various quarters – including customers, dealers, the press and their own employees – that the car's ignition switch led to moving stalls, group after group and committee after committee within GM that reviewed the issue failed to take action or acted too slowly. Although everyone had responsibility to fix the problem, nobody took responsibility. It was an example of what one top executive described as the "GM nod," when everyone nods in agreement to a proposed plan of action, but then leave the room and does nothing."

16.     Although GM was aware (after the Purchase and Sale Agreement with Old GM) of the problem with the switches, the link between the defect and airbag non-deployment, hundreds of accidents, and dozens of acknowledged deaths attributable to the defective ignition switches, GM did not even begin recalling the Subject Vehicles until 2014.  Not even the solution is attributable to GM – it was a plaintiff attorney's investigator that finally disassembled the defective part and discovered the problem that GM had been incapable of discovering for a dozen years.

17.     Instead of accepting the defects in the Subject Vehicles and Ignition Switches as real safety issues, GM publically denied that either was a problem.  Instead of working to identify and correct the problem, GM, its directors, engineers and counsel devoted their efforts to minimizing the perceived frequency and pervasiveness of the problems.  Instead of accepting responsibility for the incidents and tragedy it caused, Defendant focused on "defending the brand" and public relations.  Defendant knew, or in the exercise of the most basic diligence, should have known that a defect that causes system-wide failure of key components presented a significant safety risk to the public.

18.     As a result of GM's negligent, reckless, and malicious conduct, Plaintiff owned and operated a vehicle with a defective ignition switch, described by the designing engineer as

"the switch from hell." This defective ignition switch is believed to be the cause of Plaintiff's accident and resulting catastrophic injuries, which are explained more fully below.

### III.    PARTIES

19.    Plaintiff Meghan Dunn, Individually and on behalf of Adin De La Cruz, a Minor, is a resident of Findlay, Ohio.

20.    Defendant General Motors LLC ("New GM") is a Delaware limited liability company with its principal place of business at 300 Renaissance Center, MC: 482-C14-C66, Detroit, Michigan 48265 and may be served with process through service on its designated agent for service of process, CSC-Lawyers Incorporating Service, 50 W. Broad Street, Ste. 1800, Columbus, Ohio 43215. At all times relevant herein, General Motors Corporation and its successor in interest GENERAL MOTORS LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Subject Vehicle, as described in this Complaint, and other motor vehicles and motor vehicle components throughout the United States. General Motors LLC has sufficient contacts with Ohio, such that under the Ohio Long Arm Statute it is subject to, and has submitted to, the jurisdiction of this Court.

### IV.    JURISDICTION AND VENUE

21.    Jurisdiction is proper in this Court pursuant to Case Management Order No. 8 in *In re General Motors LLC Ignition Switch Litigation*, [14-MC-2543, Dkt. No. 36]. By filing this Complaint in this district, however, Plaintiff does not waive her right to transfer this case to the district in which she resides at the conclusion of pretrial proceedings. Moreover, Plaintiff does not waive her rights or consent with regard to choice of law by filing directly into the MDL Court pursuant to the Court's Case Management Order No. 8 and specifically relies on representations

by GM to the Court that she will not be prejudiced by her decision to file directly into the MDL
Court in the interest of convenience and judicial economy.

22.     This Court also has jurisdiction over this matter under 28 U.S.C. § 1332(a)
because the amount in controversy exceeds $75,000 and Plaintiff is a citizen of a different state
than Defendant.

## V.    FACTUAL BACKGROUND

23.     The day after Christmas 2012, Meghan Dunn was an able-bodied mother and fully-
employed nurse's assistant living and working normally near Defiance, Ohio.  Two days after
Christmas, on December 27, 2012, she was driving her son, Adin, to her mother's house.  Adin's
grandmother was going to babysit him while Meghan went to a job interview.  As Meghan and
Adin were traveling down U.S. 224 Mehgan lost control of her 2005 Chevy Impala and entered
the oncoming lane of traffic.  Upon information and belief, the incident occurred because the
defective ignition switch installed in the Chevy Impala created a moving stall that caused the
incident and prevented Mehgan from regaining control of the vehicle; if the ignition switch in
Meghan's car had operated as it was supposed to, the incident would not have occurred and
Meghan and Adin would not have been injured.

24.     Meghan was seriously injured in the incident. She suffered a skull fracture with
subarachnoid hemorrhage, the resulting edema in her brain caused her to be paralyzed on her right
side.  She also suffered a non-displaced fracture of her C2 vertebrae, a broken leg, several broken
ribs, severed her carotid artery in two places, severed her left and right vertebral artery.  She had
to be resuscitated several times at the scene.  And her little boy, Adin, witnessed the full extent of
her injuries as he unsuccessfully attempted to wake her up before EMS arrived.  Meghan's
breathing was agonal and she likely expired in front of her son, although she was subsequently

revived.

25.     Meghan continues to suffer significantly from the injuries she received in the
incident.  She has regained some movement in her right leg but the upper right side of her body
remains completely paralyzed.  She suffers from significant cognitive deficits as a result of her
traumatic brain injury.  Meghan will never again lead the life she had prior to her devastating
injuries.  Her physical injuries, coupled with the emotion injuries Adin continues to suffer, will
affect the pair for the remainder of their lives.

## VI.     CAUSES OF ACTION

### A.     Strict Product Liability

26.     The preceding paragraphs are hereby incorporated by reference as if set forth in full
here.

27.     GM manufactured Plaintiff's vehicle. GM has admitted publically, through its
recall of the Subject Vehicles that Plaintiff's vehicle contained a defect – namely the faulty ignition
switch described above. In addition to GM's admission (through the recall and elsewhere) of the
existence of the defective Ignition Switch, several studies have concluded that the Ignition Switch
at issue is defective, results in "moving stalls," and airbag non-deployment in crashes.[1]

28.     The ignition switch was a substantial factor in bringing about Plaintiff's accident
and resulting injuries. Not only did the ignition switch render the car uncontrollable and cause the
incident, but the defective switch also prevented the airbags from deploying.

29.     At all times relevant to this action, Plaintiff was using her vehicle in a proper and
foreseeable manner and as it was intended by Defendant to be used when Defendant designed,

---

[1]     *See, e.g.*  Indiana Transportation Research Center Report, April 25, 2007, GMNTHSA000223985; Keith A.
Young, Technical Reconstruction Unit, Wisconsin State Patrol Academy, Collision Analysis & Reconstruction
Report Feb. 14, 2007 at GMNTHSA000284395; Erin Shipp's Engineer Report at GMNHTSA000309665.

manufactured, marketed, warranted, and sold the vehicle. Plaintiff's vehicle had not been substantially modified or altered from the condition in which she bought it until the time of the incident that forms the basis of this suit.

30.    Plaintiff could not, through the exercise of reasonable care, have discovered the defect in the Ignition Switch and perceived its danger, nor could she have, through the exercise of reasonable care, avoided the incident that caused her injuries.

31.    Upon information and belief, the defective component was manufactured as it was designed – a design that relied exclusively on GM's approval of the component's performance. According to the Valukas Report, the design itself was so far below GM's specifications that it failed to keep Plaintiff's vehicle powered on during the normal conditions she encountered on the day of the incident.

32.    GM marketed Plaintiff's vehicle, the Subject Vehicles, and Ignition Switches that were designed so that they were not reasonably safe in that they rendered the Subject Vehicles uncontrollable and prevented airbag deployment in a crash. The design of the Ignition Switches and Subject Vehicles was such that the utility of those products did not outweigh the danger of their introduction into the stream of commerce.

33.    At the time the Subject Vehicles and the Ignition Switches were produced, there existed, and GM was aware of, cost-effective safer alternative designs that were both feasible and would have made the Subject Vehicles and Ignition Switches safer.  Moreover, the safer alternative design would not have impaired the usefulness of the Ignition Switches and Subject Vehicle.  In fact, the solution was as simple as using a longer spring, which GM ultimately did in 2006.

34.    These design defects were the producing and proximate cause of Plaintiff's accident and resulting injuries.

35.     Defendant also failed to warn the public, and Plaintiff specifically, of the inherent defects in the Subject Vehicles, the Ignition Switches, and Plaintiff's car specifically.  Defendant did not inform the public of these life-threatening defects until 2014 – after Plaintiff's accident. Had Defendant warned Plaintiff that the vehicle she was driving could experience a "moving stall" during normal operations and/or that the airbags would not deploy in a crash, Plaintiff would not have bought or continued to operate her vehicle in that defective condition.  Defendant's failure to warn Plaintiff regarding the true capabilities, defects, and limitations of her vehicle was the producing and proximate cause of Plaintiff's incident and resulting injuries.

36.     Defendant knew, or through the exercise of reasonable care, should have known of the defects, capabilities, and limitations of the Subject Vehicles and the Ignition Switches during intended and foreseeable use. This fact has been borne out in the Valukas Report and will doubtlessly be bolstered during discovery in this case. The mounting evidence makes it clear that, not only was Defendant aware of these defects, they were consciously indifferent to the high risk of grievous harm intendant to the "ignition switch from hell." Defendant gave no warning, much less an adequate warning, that the Subject Vehicles could experience a "moving stall" or that the airbags would fail to deploy as they should. The only adequate warning Defendant could have possibly given would have been to direct consumers to immediately cease to operate the Subject Vehicles. Defendant eventually recalled the Subject Vehicles, but much too late to be of any help to Plaintiff.

**B.     Negligence**

37.     The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

38.     Defendant owed a duty of care to the public, and to Plaintiff specifically, to design,

manufacture, market, warrant, and sell vehicles that were free from dangerous defects and that were capable of being operated safely during normal and foreseeable use.

39.     Moreover, Defendant was required by a host of state and federal regulations to design, manufacture, market, warrant, and sell vehicles that were free from dangerous defects and that were capable of being operated safely during normal and foreseeable use.

40.     Defendant had a duty to timely discover and remedy defects in the Subject Vehicles, and in Plaintiff's vehicle specifically, that rendered them abnormally dangerous during normal and foreseeable use.

41.     Defendant breached the above-cited duties in at least the following respects:

    a.    Failing to design an ignition switch that maintained a vehicle in an operational condition during normal and foreseeable use of the vehicle;

    b.    Failing to discover defects in the Subject Vehicles, and in Plaintiff's vehicle specifically, in a timely manner;

    c.    Marketing and selling vehicles that could, and did, experience "moving stalls" during normal and foreseeable use;

    d.    Failing to warn the public, and Plaintiff specifically, that the Subject Vehicles could and did experience "moving stalls" during normal and foreseeable use of the vehicles;

    e.    Failing to warn the public, and Plaintiff specifically, that the Subject Vehicles could and did experience airbag non-deployment during crashes in which the airbags should deploy;

    f.    Failing to implement proper surveillance procedures to identify, track, and account for incidents related to the failure of the Ignition Switches;

g.    Ignoring incidents and reports that would have led a reasonable manufacturer of vehicles and components to recall and/or remedy defects in the Subject Vehicles;

h.    Allowing vehicles to be placed in the stream of commerce that Defendant knew or should have known suffered from potentially deadly defects; and

i.    Failing to timely recall the Subject Vehicles when it became apparent, or should have been apparent through the exercise of reasonable care and/or diligence, that crashes were being caused and exacerbated by the faulty Ignition Switches.

42.    Defendant's breaches of duty in both common law and statute were the producing and proximate cause of the incident at issue and Plaintiff's damages. Plaintiff belonged to the class of persons meant to be protected by the state and federal regulations breached by Defendant.

**C.**    ~~**Breach of Express and Implied Warranties; Deceptive Trade Practices**~~

~~43.    The preceding paragraphs are hereby incorporated by reference as if set forth in full here.  Plaintiff hereby brings suit pursuant, but not limited, to the Ohio Revised Code § 4165 et. seq. "The Ohio Deceptive Trade Practices Act."~~

~~44.    The incident in which Plaintiff was injured was caused by the defective Subject Vehicle and Ignition Switch as described herein. Plaintiff was a consumer who did, and reasonably could have been expected to, use and/or be affected by the Subject Vehicles.  Plaintiff purchased the vehicle at issue in this case, and there existed privity of contract as that term is known at law.~~

~~45.    The incident at issue occurred, and Plaintiff was injured, because her vehicle and ignition switch were defective, as described herein, in that they were not safe for normal and foreseeable use.~~

46.   ~~Defendant expressly and impliedly warranted that the Subject Vehicles would not shut off during normal and foreseeable use, that the Subject Vehicles could be safely operated during normal use, that the essential functions of the Subject Vehicles would remain operable during foreseeable use, and that the airbags would deploy in the case of a crash in which one would normally expect the airbags to deploy.~~

47.   ~~Because of the defects described herein, in various public reports, and as admitted by Defendant itself, these (and other) express and implied warranties were breached by Defendant. The Subject Vehicles, and Plaintiff's vehicle specifically, were not fit for the ordinary purposes for which such vehicles are used nor were they fit for the specific purpose Defendant represented them to be useful for.~~

48.   ~~Defendant's acts and omissions were deceptive in that the Subject Vehicles and Ignition Switches were advertised and warranted to possess qualities, characteristics and protections that they did not, in fact, possess. The Subject Vehicles and Ignition Switches were represented to be of a particular standard, quality and grade, free from defects, of merchantable quality and fit for the purpose for which they were sold and they were not.~~

49.   ~~Defendant's breaches of warranty were the producing and proximate cause of the incident at issue and Plaintiff's damages.~~

## D.   Gross Negligence

50.   The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

51.   The evidence referenced in this Complaint and the mounting evidence regarding the recent recalls of millions of defective GM vehicles makes it clear that Defendant is guilty of exceptional misconduct. GM was issued, and agreed to, a record fine by the U.S. Department of

Transportation's National Highway Traffic Safety Administration.  Defendant has been aware for more than a dozen years that the ignition switches in the Subject Vehicles were grossly inadequate and subjected the driving public to a grave risk of grievous harm. Producing and marketing vehicles that are subject to complete system failures at highway speeds is akin to launching millions of torpedoes onto American streets and highways – with unsuspecting consumers inside. Defendant knew about the problem for years and, because of greed and/or gross ineptitude, refused to act on the problem.   Instead, Defendant gave the issue the "GM nod."  The "GM nod" demonstrates that more than one of Defendant's superior officers in the course of employment ordered, ratified, and/or participated in the malicious conduct.  These officers acted maliciously, wantonly, and/or recklessly, and clearly the Defendant is guilty of exceptional misconduct and gross negligence.  Plaintiff demands punitive damages for this conduct.

## VII.    DAMAGES

52.    The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

53.    Plaintiff, as a result of the liability of Defendant described above, has suffered and makes claim for reasonable and necessary medical expenses incurred as a result of the incident made basis of this suit in the past and future, past and future pain and suffering, lost wages and earning capacity in the past, disfigurement in the past and future, impairment in the past and future and exemplary damages.  ~~Plaintiff also demands statutory penalties be imposed pursuant to the Ohio Deceptive Trade Practices Act and attorney's fees.~~  Ward Adin de la Cruz has suffered and demands past and future medical expenses, impairment, mental anguish, pain and suffering and loss of consortium, in addition to exemplary damages.

## VIII.   CONCLUSION AND PRAYER

54.     Defendant has only recently admitted publically its wrongdoing – albeit not to the full extent and not in time to prevent Plaintiff's injuries – but it admitted wrongdoing nonetheless. As the evidence mounts about what was known and when, it is becoming inescapably clear that Defendant needs to be punished and the victims they have injured need to be compensated. The law is powerless to remedy the harms Defendant has caused through its negligent, reckless, and malicious conduct – we cannot restore life or limb.  However, justice must be done to the extent we are able, and Plaintiff demands that Defendant answer for its acts and omissions that led to Plaintiff's and be required to pay compensatory and exemplary damages to the full extent allowed by law.

55.     WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests Defendant be cited, tried by jury, and, upon verdict in Plaintiff's favor, Judgment be entered against Defendant for:

a.     Actual damages within the jurisdictional limits of this Court;

b.     Property damage and loss;

c.     Exemplary damages to the full extent permitted by law;

d.     Attorney's fees;

e.     Costs of suit;

f.     Pre- and Post-Judgment Interest at the maximum recoverable level; and

g.     All other relief to which the Plaintiff shows herself justifiably entitled.

**Dated:**    December 18, 2014

Respectfully Submitted,

**HEARD ROBINS CLOUD LLP**

_____

Derek S. Merman
2000 West Loop South, 22nd Floor
Houston, Texas 77027
713.650.1200 Voice
713.650.1400 Facsimile
*Attorneys for Plaintiff, admitted Pro Hac Vice*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------------X

IN RE:
**GENERAL MOTORS LLC IGNITION SWITCH LITIGATION**          **14-MD-2543 (JMF)**

***This Document Relates to:***          **Case No.**
                                          **1:14-cv-10006-JMF**
-------------------------------------------------------------------------------X

**MEGHAN DUNN, INDIVIDUALLY AND**          **Complaint**
**ON BEHALF OF ADIN DE LA CRUZ, a minor**
    **PLAINTIFF,**          **Jury  Trial  Demanded**

**V.**

**GENERAL MOTORS, LLC,**
    **DEFENDANT**
-------------------------------------------------------------------------------X

<u>**AMENDED COMPLAINT**</u>

    COMES NOW Plaintiff, through undersigned counsel, and for cause of action respectfully

shows as follows:

**I.      PRELIMINARY STATEMENT**

    1.    Plaintiff was involved in a motor vehicle incident with her son, Adin, on December

27, 2012 in her 2005 Chevy Impala.  The incident occurred on U.S. 224 around 1 p.m. near Ottawa,

Putnam County, Ohio.  Upon information and belief, Plaintiff's car lost power, causing her to lose

control and enter the lane of oncoming traffic.  Further, upon information and belief, the loss of

power was caused by a defective ignition switch installed in her Impala.  Plaintiff's car was struck

on the side causing catastrophic damage to her vehicle and body.  Plaintiff has been functionally

incapacitated since the day of the incident.  Her son also suffered physical and severe emotional

injuries in the incident.

    2.    Plaintiff's causes of action are brought against GENERAL MOTORS LLC ("New

Case 1:14-mc-02543-JMF   Document 1439-2   Filed 09/30/15   Page 2 of 10

GM"). Plaintiff does not assert any causes of action against General Motors Corporation ("Old GM"), although Old GM manufactured Plaintiff's 2005 Chevy Impala. The incident at issue in this case occurred after the Old GM bankruptcy, which is discussed briefly below. The subject vehicle has been recalled by General Motors LLC, and New GM is strictly liable for the incident.

3.       While at times this Complaint references acts and omissions by Old GM, these references are for background purposes only. Old GM arguably ceased to exist pursuant to the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets. That Amended and Restated Master Sale and Purchase Agreement was approved on July 10, 2009. In that Agreement, New GM expressly agreed to accept responsibility for product liability claims that arose from accidents or incidents occurring on or after July 10, 2009. The incident that forms the basis of Plaintiff's claims occurred after July 10, 2009.

4.       While New GM expressly accepted responsibility for accidents occurring on or after July 10, 2009, it also acquired knowledge of Old GM's activities generally, and the existence of the defective ignition switch in place in millions of vehicles specifically. New GM acquired personnel from Old GM, including but not limited to, top leadership personnel, executives, members of the Board of Directors, internal legal counsel, engineers and quality control personnel. Most importantly, New GM retained the engineer in charge of designing and approving the manufacturing specifications of the defective ignition switch. The employees retained by New GM carried with them the knowledge they gained at Old GM. New GM also acquired knowledge about the issues with the ignition switch, moving stalls and airbag non-deployment through the chief engineer, design and manufacturing documents, internal memorandum, and reports to the Board of Directors. New GM continued to service – and receive complaints about – vehicles

*Dunn v. GM*                                        2

manufactured on Old GM's watch. While the change from Old GM to New GM arguably had some legal effect with regard to creditors who received notice of their rights, it had little practical effect relative to the problems with, and knowledge of, the ignition-switch defect.

5.     New GM also acquired certain duties with regard to vehicles in production and on the road at the time of the Sale and Purchase Agreement – duties it breached egregiously – as has been well-publicized and for which it has been justifiably criticized. These duties included, but are not limited to, those arising under the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30101 *et. seq.* and the Transportation Recall Enhancement, Accountability and Documentation Act, 49 U.S.C. §§ 30101 – 30170. GM was fined $35 Million by NTSHA for its delayed reporting of the ignition switch problem and violating federal safety laws. New GM's liability for damages is attributable to its own post-sale conduct and failure to timely remedy and/or recall vehicles it knew had deadly defects, even with regard to vehicles manufactured and sold prior to the Sale and Purchase Agreement. Plaintiff's case is a prime example of liability and gross negligence that is inarguably attributable solely to New GM, as is shown below.

## II.     INTRODUCTION

6.     At the time of this filing, more than 12,000,000 GM vehicles have been recalled because of a defective ignition switch. Hundreds, if not thousands, of accidents are now known to have been caused by vehicles losing power and control because the defective ignition switch turned from "on" to "off" during normal and foreseeable operation. When the ignition switch fails, drivers are unable to use their steering and brakes in an effective manner. The resulting loss of control, or "moving stall," and subsequent accidents are exacerbated by the fact that the defective ignition switch also prevents life-saving airbags from deploying. So, in addition to causing accidents, the defective part makes the resulting damages even greater. As used in this Complaint,

the "Subject Vehicles" refers to the GM vehicles manufactured, upon information and belief, on the Delta Platform, sold in the United States, equipped at the time of sale with ignition switches (the "Ignition Switches"), and sharing a common defective design, including the following makes and model years:

**Buick:**
- Lacrosse (2005 – 2009)
- Lucerne (2006 – 2011)

**Cadillac:**
- CTS (2003 – 2014)
- Deville (2000 – 2005)
- DTS (2006 – 2011)
- SRX (2004 – 2006)

**Chevrolet:**
- Camaro (2010 – 2014)
- Cobalt (2005 – 2010)
- HHR (2006 – 2011)
- Impala (2000 – 2014)
- Malibu (1997 – 2005)
- Monte Carlo (2000 – 2007)

**Oldsmobile:**
- Alero (1999 – 2004)
- Intrigue (1998 – 2002)

**Pontiac:**
- G5 (2007 – 2010)
- Grand Am (1999 – 2005)
- Grand Prix (2004 – 2008)
- Solstice (2006 – 2010)

**Saturn:**
- Ion (2003 – 2007)
- Sky (2007 – 2010)

7.      Plaintiff's 2005 Chevrolet Impala is included in the above-listed "Subject Vehicles" and contained the defective Ignition Switch that is the subject of the 2014 GM ignition switch recalls.  Plaintiff's vehicle, which bears the VIN number 2G1WF52EX59114690, was in substantially the same condition as when it left the manufacturer and contained a defective ignition switch that, upon information and belief was the proximate and producing cause of the incident at issue and Plaintiff's resulting injuries and damages.

8.      The Ignition Switch that was approved by GM and installed in the GM Subject Vehicles identified above, was one of several switches manufactured at GM's direction in 2001. Each type of switch was manufactured, tested and evaluated by GM engineers prior to production. The switch that was ultimately selected by GM (the "Delta Switch") had a shorter spring in the

detent plunger that gave it a smoother, more "European" feel. Another switch was identical to the Delta Switch in every respect except that it used a longer spring in the detent plunger. The longer spring increased the torque required to engage and disengage the ignition switch – it made it hard to turn the key in both directions. The longer spring also sacrificed the smooth feel that was so important to GM.

9.     According to the recently published "Report to the Board of Directors of General Motors Company Regarding Ignition Switch Recalls" authored by Anton R. Valukas ("The Valukas Report"), GM made a conscious decision, in the fall of 2002, to use the Delta Switch in the Subject Vehicles "that was so far below GM's own specifications that it failed to keep the car powered on in circumstances that drivers would encounter." GM knew of, and approved, the final version of the Ignition Switch that was installed in millions of cars despite knowing that the force required to disengage the ignition switch was far below minimum specifications.

10.     According to documents obtained by a House of Representatives Committee during an investigation into the Defective Ignition Switches, GM opened an engineering inquiry about the defective Ignition Switch in 2004 after customers complained that the Subject Vehicles could be turned off while driving. Also according to those documents, the Cobalt program engineer rejected a proposal to change the Ignition Switch claiming that the part was too expensive and the change would take too much time – after he experienced the same problem while performing a test drive of a Cobalt. The cost that the project engineer found intolerably high was less than one dollar per vehicle.

11.     The switch was eventually redesigned in 2006, although using the same part number as the Delta Switch. Remarkably, the solution to the torqueing problem had been present since 2001; all that needed to be done was use the longer spring that had already been tested in

the design phase.  No other changes were made to the switch and, aside from affecting the "European" feel of the switch, the new switch with the longer spring functioned capably.  The longer spring also brought the ignition switch into spec with regard to torque force.

12.    The decision to use the same part number meant that already-produced Delta Switches continued to be installed in GM vehicles even after the attempted design correction was implemented.  Apparently GM's chief design engineer "forgot" the change had been made to correct the torque issue.  This additional blunder exacerbated the problem with the GM vehicles; GM had no idea what cars had the Delta Switch and which had the switch with the new, longer spring.

13.    Although the switch's inability to keep the car powered on during normal and foreseeable use of the subject vehicles "were known within GM's engineering ranks at the earliest stages of its [the switch's] production," GM ignored the safety risks attendant to these "moving stalls." These risks include, but are not limited to, sudden failure of: power steering, anti-lock brakes, electronic stability control, lane departure warnings, navigation systems, and airbag deployment.  These sudden system failures made the Subject Vehicles impossible to control and, once the inevitable accident occurred, left the driver and passengers without life-saving airbags.

14.    Apparently, GM viewed the defective ignition switches as a convenience and comfort and looked everywhere but at the design to determine the problem.  GM failed to focus on the safety problems with the ignition switch turning a vehicle off during normal operation and, inexplicably, failed to link the power failure with a failure to allow airbags to deploy in a resulting accident.

15.     Also according to The Valukas Report:

"While GM heard over and over from various quarters – including
customers, dealers, the press and their own employees – that the
car's ignition switch led to moving stalls, group after group and
committee after committee within GM that reviewed the issue failed
to take action or acted too slowly. Although everyone had
responsibility to fix the problem, nobody took responsibility. It was
an example of what one top executive described as the "GM nod,"
when everyone nods in agreement to a proposed plan of action, but
then leave the room and does nothing."

16.     Although GM was aware (after the Purchase and Sale Agreement with Old GM)
of the problem with the switches, the link between the defect and airbag non-deployment,
hundreds of accidents, and dozens of acknowledged deaths attributable to the defective ignition
switches, GM did not even begin recalling the Subject Vehicles until 2014.  Not even the solution
is attributable to GM – it was a plaintiff attorney's investigator that finally disassembled the
defective part and discovered the problem that GM had been incapable of discovering for a dozen
years.

17.     Instead of accepting the defects in the Subject Vehicles and Ignition Switches as
real safety issues, GM publically denied that either was a problem.  Instead of working to identify
and correct the problem, GM, its directors, engineers and counsel devoted their efforts to
minimizing the perceived frequency and pervasiveness of the problems.  Instead of accepting
responsibility for the incidents and tragedy it caused, Defendant focused on "defending the brand"
and public relations.  Defendant knew, or in the exercise of the most basic diligence, should have
known that a defect that causes system-wide failure of key components presented a significant
safety risk to the public.

18.     As a result of GM's negligent, reckless, and malicious conduct, Plaintiff owned
and operated a vehicle with a defective ignition switch, described by the designing engineer as

"the switch from hell." This defective ignition switch is believed to be the cause of Plaintiff's accident and resulting catastrophic injuries, which are explained more fully below.

### III. PARTIES

19.    Plaintiff Meghan Dunn, Individually and on behalf of Adin De La Cruz, a Minor, is a resident of Findlay, Ohio.

20.    Defendant General Motors LLC ("New GM") is a Delaware limited liability company with its principal place of business at 300 Renaissance Center, MC: 482-C14-C66, Detroit, Michigan 48265 and may be served with process through service on its designated agent for service of process, CSC-Lawyers Incorporating Service, 50 W. Broad Street, Ste. 1800, Columbus, Ohio 43215. At all times relevant herein, General Motors Corporation and its successor in interest GENERAL MOTORS LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Subject Vehicle, as described in this Complaint, and other motor vehicles and motor vehicle components throughout the United States. General Motors LLC has sufficient contacts with Ohio, such that under the Ohio Long Arm Statute it is subject to, and has submitted to, the jurisdiction of this Court.

### IV. JURISDICTION AND VENUE

21.    Jurisdiction is proper in this Court pursuant to Case Management Order No. 8 in *In re General Motors LLC Ignition Switch Litigation*, [14-MC-2543, Dkt. No. 36]. By filing this Complaint in this district, however, Plaintiff does not waive her right to transfer this case to the district in which she resides at the conclusion of pretrial proceedings. Moreover, Plaintiff does not waive her rights or consent with regard to choice of law by filing directly into the MDL Court pursuant to the Court's Case Management Order No. 8 and specifically relies on representations

by GM to the Court that she will not be prejudiced by her decision to file directly into the MDL Court in the interest of convenience and judicial economy.

22.    This Court also has jurisdiction over this matter under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff is a citizen of a different state than Defendant.

## V.    FACTUAL BACKGROUND

23.    The day after Christmas 2012, Meghan Dunn was an able-bodied mother and fully-employed nurse's assistant living and working normally near Defiance, Ohio.  Two days after Christmas, on December 27, 2012, she was driving her son, Adin, to her mother's house.  Adin's grandmother was going to babysit him while Meghan went to a job interview.  As Meghan and Adin were traveling down U.S. 224 Mehgan lost control of her 2005 Chevy Impala and entered the oncoming lane of traffic.  Upon information and belief, the incident occurred because the defective ignition switch installed in the Chevy Impala created a moving stall that caused the incident and prevented Mehgan from regaining control of the vehicle; if the ignition switch in Meghan's car had operated as it was supposed to, the incident would not have occurred and Meghan and Adin would not have been injured.

24.    Meghan was seriously injured in the incident. She suffered a skull fracture with subarachnoid hemorrhage, the resulting edema in her brain caused her to be paralyzed on her right side.  She also suffered a non-displaced fracture of her C2 vertebrae, a broken leg, several broken ribs, severed her carotid artery in two places, severed her left and right vertebral artery.  She had to be resuscitated several times at the scene.  And her little boy, Adin, witnessed the full extent of her injuries as he unsuccessfully attempted to wake her up before EMS arrived.  Meghan's breathing was agonal and she likely expired in front of her son, although she was subsequently

revived.

25.     Meghan continues to suffer significantly from the injuries she received in the incident.  She has regained some movement in her right leg but the upper right side of her body remains completely paralyzed.  She suffers from significant cognitive deficits as a result of her traumatic brain injury.  Meghan will never again lead the life she had prior to her devastating injuries.  Her physical injuries, coupled with the emotion injuries Adin continues to suffer, will affect the pair for the remainder of their lives.

## VI.    CAUSES OF ACTION

### A.    Strict Product Liability

26.     The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

27.     GM manufactured Plaintiff's vehicle. GM has admitted publically, through its recall of the Subject Vehicles that Plaintiff's vehicle contained a defect – namely the faulty ignition switch described above. In addition to GM's admission (through the recall and elsewhere) of the existence of the defective Ignition Switch, several studies have concluded that the Ignition Switch at issue is defective, results in "moving stalls," and airbag non-deployment in crashes.[1]

28.     The ignition switch was a substantial factor in bringing about Plaintiff's accident and resulting injuries. Not only did the ignition switch render the car uncontrollable and cause the incident, but the defective switch also prevented the airbags from deploying.

29.     At all times relevant to this action, Plaintiff was using her vehicle in a proper and foreseeable manner and as it was intended by Defendant to be used when Defendant designed,

---

[1]    *See, e.g.*  Indiana Transportation Research Center Report, April 25, 2007, GMNTHSA000223985; Keith A. Young, Technical Reconstruction Unit, Wisconsin State Patrol Academy, Collision Analysis & Reconstruction Report Feb. 14, 2007 at GMNTHSA000284395; Erin Shipp's Engineer Report at GMNHTSA000309665.

*Dunn v. GM*                                    10

Case 1:14-mc-02543-JMF    Document 1339    Filed 09/30/15    Page 11 of 16

manufactured, marketed, warranted, and sold the vehicle. Plaintiff's vehicle had not been substantially modified or altered from the condition in which she bought it until the time of the incident that forms the basis of this suit.

30.    Plaintiff could not, through the exercise of reasonable care, have discovered the defect in the Ignition Switch and perceived its danger, nor could she have, through the exercise of reasonable care, avoided the incident that caused her injuries.

31.    Upon information and belief, the defective component was manufactured as it was designed – a design that relied exclusively on GM's approval of the component's performance. According to the Valukas Report, the design itself was so far below GM's specifications that it failed to keep Plaintiff's vehicle powered on during the normal conditions she encountered on the day of the incident.

32.    GM marketed Plaintiff's vehicle, the Subject Vehicles, and Ignition Switches that were designed so that they were not reasonably safe in that they rendered the Subject Vehicles uncontrollable and prevented airbag deployment in a crash. The design of the Ignition Switches and Subject Vehicles was such that the utility of those products did not outweigh the danger of their introduction into the stream of commerce.

33.    At the time the Subject Vehicles and the Ignition Switches were produced, there existed, and GM was aware of, cost-effective safer alternative designs that were both feasible and would have made the Subject Vehicles and Ignition Switches safer.  Moreover, the safer alternative design would not have impaired the usefulness of the Ignition Switches and Subject Vehicle.  In fact, the solution was as simple as using a longer spring, which GM ultimately did in 2006.

34.    These design defects were the producing and proximate cause of Plaintiff's accident and resulting injuries.

35.     Defendant also failed to warn the public, and Plaintiff specifically, of the inherent
defects in the Subject Vehicles, the Ignition Switches, and Plaintiff's car specifically.  Defendant
did not inform the public of these life-threatening defects until 2014 – after Plaintiff's accident.
Had Defendant warned Plaintiff that the vehicle she was driving could experience a "moving stall"
during normal operations and/or that the airbags would not deploy in a crash, Plaintiff would not
have bought or continued to operate her vehicle in that defective condition.  Defendant's failure to
warn Plaintiff regarding the true capabilities, defects, and limitations of her vehicle was the
producing and proximate cause of Plaintiff's incident and resulting injuries.

36.     Defendant knew, or through the exercise of reasonable care, should have known of
the defects, capabilities, and limitations of the Subject Vehicles and the Ignition Switches during
intended and foreseeable use. This fact has been borne out in the Valukas Report and will
doubtlessly be bolstered during discovery in this case. The mounting evidence makes it clear that,
not only was Defendant aware of these defects, they were consciously indifferent to the high risk
of grievous harm intendant to the "ignition switch from hell." Defendant gave no warning, much
less an adequate warning, that the Subject Vehicles could experience a "moving stall" or that the
airbags would fail to deploy as they should. The only adequate warning Defendant could have
possibly given would have been to direct consumers to immediately cease to operate the Subject
Vehicles. Defendant eventually recalled the Subject Vehicles, but much too late to be of any help
to Plaintiff.

**B.     Negligence**

37.     The preceding paragraphs are hereby incorporated by reference as if set forth in full
here.

38.     Defendant owed a duty of care to the public, and to Plaintiff specifically, to design,

manufacture, market, warrant, and sell vehicles that were free from dangerous defects and that were capable of being operated safely during normal and foreseeable use.

39.     Moreover, Defendant was required by a host of state and federal regulations to design, manufacture, market, warrant, and sell vehicles that were free from dangerous defects and that were capable of being operated safely during normal and foreseeable use.

40.     Defendant had a duty to timely discover and remedy defects in the Subject Vehicles, and in Plaintiff's vehicle specifically, that rendered them abnormally dangerous during normal and foreseeable use.

41.     Defendant breached the above-cited duties in at least the following respects:

   a.     Failing to design an ignition switch that maintained a vehicle in an operational condition during normal and foreseeable use of the vehicle;

   b.     Failing to discover defects in the Subject Vehicles, and in Plaintiff's vehicle specifically, in a timely manner;

   c.     Marketing and selling vehicles that could, and did, experience "moving stalls" during normal and foreseeable use;

   d.     Failing to warn the public, and Plaintiff specifically, that the Subject Vehicles could and did experience "moving stalls" during normal and foreseeable use of the vehicles;

   e.     Failing to warn the public, and Plaintiff specifically, that the Subject Vehicles could and did experience airbag non-deployment during crashes in which the airbags should deploy;

   f.     Failing to implement proper surveillance procedures to identify, track, and account for incidents related to the failure of the Ignition Switches;

*Dunn v. GM*                                    13

g.    Ignoring incidents and reports that would have led a reasonable manufacturer of vehicles and components to recall and/or remedy defects in the Subject Vehicles;

h.    Allowing vehicles to be placed in the stream of commerce that Defendant knew or should have known suffered from potentially deadly defects; and

i.    Failing to timely recall the Subject Vehicles when it became apparent, or should have been apparent through the exercise of reasonable care and/or diligence, that crashes were being caused and exacerbated by the faulty Ignition Switches.

42.    Defendant's breaches of duty in both common law and statute were the producing and proximate cause of the incident at issue and Plaintiff's damages. Plaintiff belonged to the class of persons meant to be protected by the state and federal regulations breached by Defendant.

## C.    Gross Negligence

43.    The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

44.    The evidence referenced in this Complaint and the mounting evidence regarding the recent recalls of millions of defective GM vehicles makes it clear that Defendant is guilty of exceptional misconduct. GM was issued, and agreed to, a record fine by the U.S. Department of Transportation's National Highway Traffic Safety Administration.  Defendant has been aware for more than a dozen years that the ignition switches in the Subject Vehicles were grossly inadequate and subjected the driving public to a grave risk of grievous harm. Producing and marketing vehicles that are subject to complete system failures at highway speeds is akin to launching millions of torpedoes onto American streets and highways – with unsuspecting consumers inside.

*Dunn v. GM*                                    14

Defendant knew about the problem for years and, because of greed and/or gross ineptitude, refused to act on the problem.   Instead, Defendant gave the issue the "GM nod."   The "GM nod" demonstrates that more than one of Defendant's superior officers in the course of employment ordered, ratified, and/or participated in the malicious conduct.   These officers acted maliciously, wantonly, and/or recklessly, and clearly the Defendant is guilty of exceptional misconduct and gross negligence.   Plaintiff demands punitive damages for this conduct.

## VII.   DAMAGES

45.     The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

46.     Plaintiff, as a result of the liability of Defendant described above, has suffered and makes claim for reasonable and necessary medical expenses incurred as a result of the incident made basis of this suit in the past and future, past and future pain and suffering, lost wages and earning capacity in the past, disfigurement in the past and future, impairment in the past and future and exemplary damages.   Ward Adin de la Cruz has suffered and demands past and future medical expenses, impairment, mental anguish, pain and suffering and loss of consortium, in addition to exemplary damages.

## VIII.   CONCLUSION AND PRAYER

47.     Defendant has only recently admitted publically its wrongdoing – albeit not to the full extent and not in time to prevent Plaintiff's injuries – but it admitted wrongdoing nonetheless. As the evidence mounts about what was known and when, it is becoming inescapably clear that Defendant needs to be punished and the victims they have injured need to be compensated. The law is powerless to remedy the harms Defendant has caused through its negligent, reckless, and malicious conduct – we cannot restore life or limb.   However, justice must be done to the extent

we are able, and Plaintiff demands that Defendant answer for its acts and omissions that led to Plaintiff's and be required to pay compensatory and exemplary damages to the full extent allowed by law.

48.    WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests Defendant be cited, tried by jury, and, upon verdict in Plaintiff's favor, Judgment be entered against Defendant for:

a.    Actual damages within the jurisdictional limits of this Court;

b.    Property damage and loss;

c.    Exemplary damages to the full extent permitted by law;

d.    Attorney's fees;

e.    Costs of suit;

f.    Pre- and Post-Judgment Interest at the maximum recoverable level; and

g.    All other relief to which the Plaintiff shows herself justifiably entitled.

Respectfully submitted,

Dated: September 30, 2015

**THE POTTS LAW FIRM, LLP**

By: */s/ Eric G. Jensen*
    Eric G. Jensen     MO# 43094
    Derek H. Potts     NY #44882
    The Potts Law Firm, LLP
    1901 W. 47th Place, Suite 210
    Westwood, KS 66205
    (816) 931-2230 (telephone)
    (816) 817-0478 (facsimile)

**ATTORNEYS FOR PLAINTIFFS**