UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE: | . | Case No. 09-50026-reg |
| | . | Chapter 11 |
| | . | |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| et al., f/k/a GENERAL | . | |
| MOTORS CORP., et al, | . | One Bowling Green |
| | . | New York, NY 10004 |
| Debtors. | . | |
| | . | Wednesday, October 14, 2015 |
| . . . . . . . . . . . . . . . . | . | 9:46 a.m. |

TRANSCRIPT OF ORAL ARGUMENT RE: SCHEDULING ORDER SIGNED ON
9/3/15 REGARDING CASE MANAGEMENT ORDER RE: NO-STRIKE, NO
STAY, OBJECTION, AND GUC TRUST ASSET PLEADING [13416];
MEMORANDUM ENDORSED ORDER SIGNED ON 9/3/15
REGARDING SCHEDULING ORDER [13417];
LETTER REGARDING PUNITIVE DAMAGES ISSUE, DATED 9/13/15, FILED
BY GARY PELLER ON BEHALF OF SHARON BLEDSOE [13432];
POST-CLOSING IGNITION SWITCH ACCIDENT PLAINTIFF'S MEMORANDUM
OF LAW WITH RESPECT TO PUNITIVE DAMAGES ISSUE, DATED 9/13/15,
FILED BY WILLIAM P. WEINTRAUB ON BEHALF OF HILLIARD MUNOZ
GONZALEZ LLP AND THOMAS J. HENRY INJURY ATTORNEY [13434];
JOINDER OF THE IGNITION SWITCH PLAINTIFFS AND NON-IGNITION
SWITCH PLAINTIFFS TO THE POST-CLOSING IGNITION SWITCH
ACCIDENT PLAINTIFFS' MEMORANDUM OF LAW WITH RESPECT TO
PUNITIVE DAMAGES, DATED SEPTEMBER 13, 2015, FILED BY STEVE
BERMAN ON BEHALF OF IGNITION SWITCH PLAINTIFFS,
NON-IGNITION SWITCH PLAINTIFFS [13436];
OPENING BRIEF BY GENERAL MOTORS LLC WITH RESPECT TO
WHETHER PLAINTIFFS MAY SEEK PUNITIVE DAMAGES FROM
GENERAL MOTORS LLC BASED ON THE CONDUCT OF GENERAL MOTORS
CORPORATION, DATED SEPTEMBER 13,2015, FILED BY
ARTHUR JAY STEINBERG ON BEHALF OF GENERAL MOTORS LLC [13437];
(CONTINUED)
**BEFORE THE HONORABLE ROBERT E. GERBER**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES CONTINUED.

| | |
|---|---|
| Audio Operator: | Karen/Julio, ECR |
| | |
| Transcription Company: | Access Transcripts, LLC |
| | 10110 Youngwood Lane |
| | Fishers, IN 46038 |
| | (855) 873-2223 |
| | www.accesstranscripts.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

TRANSCRIPT OF: (CONTINUED)
POST-CLOSING IGNITION SWITCH ACCIDENT PLAINTIFFS' REPLY WITH
RESPECT TO PUNITIVE DAMAGES ISSUE, DATED 9/22/15, FILED BY
WILLIAM P. WEINTRAUB ON BEHALF OF POST-CLOSING
IGNITION SWITCH ACCIDENT PLAINTIFFS [13459];
REPLY BRIEF BY GENERAL MOTORS LLC WITH RESPECT TO WHETHER
PLAINTIFFS MAY SEEK PUNITIVE DAMAGES FROM GENERAL MOTORS LLC
BASED ON THE CONDUCT OF GENERAL MOTORS CORPORATION, DATED
SEPTEMBER 22, 2015, FILED BY ARTHUR JAY STEINBERG
ON BEHALF OF GENERAL MOTORS LLC [13460];
JOINDER OF THE IGNITION SWITCH PLAINTIFFS AND NON-IGNITION
SWITCH PLAINTIFFS TO THE POST-CLOSING IGNITION SWITCH ACCIDENT
PLAINTIFFS' REPLY WITH RESPECT TO PUNITIVE DAMAGES ISSUE, DATED
SEPTEMBER 22,2015, FILED BY STEVE BERMAN ON BEHALF OF IGNITION
SWITCH PLAINTIFFS, NON-IGNITION SWITCH PLAINTIFFS [13461];
BRIEF OF MOORE PLAINTIFFS REGARDING PUNITIVE
DAMAGES ISSUE, DATED 9/13/15;
LETTER ELLIOTT, SESAY, AND BLEDSOE PLAINTIFFS JOINING
THE BRIEF OF OTHER PARTIES ON IMPUTATION ISSUE, DATED 9/18/15,
FILED BY GARY PELLER ON BEHALF OF SHARON BLEDSOE [13448];
OPENING BRIEF BY GENERAL MOTORS LLC WITH RESPECT TO WHETHER
PLAINTIFFS CAN AUTOMATICALLY IMPUTE TO NEW GM KNOWLEDGE OF
THE EVENTS THAT TOOK PLACE AT OLD GM AND/OR AS REFLECTED IN
OLD GM'S BOOKS AND RECORDS, DATED 9/18/15, FILED BY
ARTHUR JAY STEINBERG ON BEHALF OF GENERAL MOTORS LLC [13451];
OPENING BRIEF ON IMPUTATION ISSUE, 9/18/15, FILED BY STEVE
BERMAN ON BEHALF OF IGNITION SWITCH PLAINTIFFS, NON-IGNITION
SWITCH PLAINTIFFS, STATE OF ARIZONA EX REL. MARK BRNOVICH,
THE ATTORNEY GENERAL, THE ADAMS PLAINTIFFS, THE PEOPLE OF
THE STATE OF CALIFORNIA, ACTING BY AND THROUGH ORANGE COUNTY
DISTRICT ATTORNEY TONY RACKAUCKAS, THE POST-CLOSING
IGNITION SWITCH ACCIDENT PLAINTIFFS [13452];
DOCUMENT FILED UNDER SEAL OPENING BRIEF ON IMPUTATION ISSUE
ON BEHALF OF THE IGNITION SWITCH PLAINTIFFS, THE NON-IGNITION
SWITCH PLAINTIFFS, THE STATE OF ARIZONA, THE PEOPLE OF THE
STATE OF CALIFORNIA, THE POST-CLOSING IGNITION SWITCH
ACCIDENT PLAINTIFFS AND THE ADAMS PLAINTIFFS, DATED 9/21/15,
FILED BY STEVE BERMAN ON BEHALF OF THE ADAMS PLAINTIFFS, THE
POST-CLOSING IGNITION SWITCH ACCIDENT PLAINTIFFS, IGNITION
SWITCH PLAINTIFFS, NON-IGNITION SWITCH PLAINTIFFS, STATE OF
ARIZONA EX REL. MARK BRNOVICH, THE ATTORNEY GENERAL, THE PEOPLE
OF THE STATE OF CALIFORNIA, ACTING BY AND THROUGH
ORANGE COUNTY DISTRICT ATTORNEY TONY RACKAUCKAS [13454];

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

3

TRANSCRIPT OF: (CONTINUED)
REPLY BRIEF BY GENERAL MOTORS LLC WITH RESPECT TO WHETHER
PLAINTIFFS CAN AUTOMATICALLY IMPUTE TO NEW GM KNOWLEDGE OF THE
EVENTS THAT TOOK PLACE AT OLD GM AND/OR AS REFLECTED IN OLD
GM'S BOOKS AND RECORDS, DATED SEPTEMBER 30, 2015, FILED BY
ARTHUR JAY STEINBERG ON BEHALF OF GENERAL MOTORS LLC [13482];
REPLY BRIEF ON IMPUTATION ISSUE ON BEHALF OF THE IGNITION
SWITCH PLAINTIFFS, THE NON-IGNITION SWITCH PLAINTIFFS, THE
STATE OF ARIZONA, THE PEOPLE OF THE STATE OF CALIFORNIA, THE
POST-CLOSING IGNITION SWITCH ACCIDENT PLAINTIFFS AND THE ADAMS
PLAINTIFFS, DATED 9/30/15, FILED BY STEVE BERMAN ON BEHALF OF
IGNITION SWITCH PLAINTIFFS, NON-IGNITION SWITCH PLAINTIFFS,
STATE OF ARIZONA EX REL. MARK BRNOVICH, THE ATTORNEY GENERAL,
THE PEOPLE OF THE STATE OF CALIFORNIA, ACTING BY AND THROUGH
ORANGE COUNTY DISTRICT ATTORNEY TONY RACKAUCKAS [13483];
NEW GM BELLWETHER LETTER, WITH MARKED BELLWETHER COMPLAINTS,
PURSUANT TO SCHEDULING ORDER DATED 9/3/15, DATED 9/21/15,
FILED BY ARTHUR JAY STEINBERG ON BEHALF OF
GENERAL MOTORS LLC [13456];
LETTER FILED ON BEHALF OF GENERAL MOTORS LLC REGARDING OTHER
PLAINTIFFS' COMPLAINTS, DATED 9/23/15, FILED BY ARTHUR JAY
STEINBERG ON BEHALF OF GENERAL MOTORS LLC [13466];
NEW GM MDL COMPLAINT LETTER, WITH MARKED MDL COMPLAINT,
PURSUANT TO SCHEDULING ORDER DATED 9/3/15, DATED 9/25/15,
FILED BY ARTHUR JAY STEINBERG ON BEHALF OF
GENERAL MOTORS LLC [13469];
NEW GM STATES COMPLAINTS LETTER, WITH MARKED STATES
COMPLAINTS, PURSUANT TO SCHEDULING ORDER DATED 9/3/15,
DATED 9/25/15, FILED BY ARTHUR JAY STEINBERG
ON BEHALF OF GENERAL MOTORS LLC [13470];
LETTER DATED 9/28/15 TO JUDGE GERBER FROM WILLIAM P. WEINTRAUB
RE: RESPONSE TO NEW GM BELLWETHER LETTER AND MARKED BELLWETHER
COMPLAINTS, DATED 9/28/15, FILED BY WILLIAM P. WEINTRAUB ON
BEHALF OF HILLIARD MUNOZ GONZALES LLP AND
THOMAS J. HENRY INJURY ATTORNEY [13475];
LETTER ON BEHALF OF CAROLYN RICKARD, ADM'X. OF THE
ESTATE OF WILLIAM RICKARD, DECEASED, IN RESPONSE TO
GENERAL MOTORS, LLC'S LETTER REGARDING OTHER PLAINTIFFS'
COMPLAINTS, DATED 9/29/15, FILED BY JULIANNE CUTRUZZULA
BEIL ON BEHALF OF CAROLYN RICKARD [13478];
LETTER ON BEHALF OF THE ELLIOTT, SESAY AND BLEDSOE PLAINTIFFS
REGARDING NEW GM'S MARKED PLEADINGS LETTER, DATED 9/29/15,
FILED BY GARY PELLER ON BEHALF OF SHARON BLEDSOE [13479];
RESPONSIVE LETTER FROM MOORE PLAINTIFFS REGARDING
OTHER PLAINTIFFS' COMPLAINT, DATED 9/30/15;
LETTER RESPONSE TO NEW GM MARKED STATE COMPLAINTS [13470];

ACCESS TRANSCRIPTS, LLC         1-855-USE-ACCESS (873-2223)

4

TRANSCRIPT OF: (CONTINUED)
EXPLANATORY LETTER, DATED 10/9/15, FILED BY STEVE BERMAN ON
BEHALF OF STATE OF ARIZONA EX REI. MARK BRNOVICH, THE
ATTORNEY GENERAL, THE PEOPLE OF THE STATE OF CALIFORNIA,
ACTING BY AND THROUGH ORANGE COUNTY DISTRICT
ATTORNEY TONY RACKAUCKAS [13494];
LETTER RESPONSE TO NEW GM'S MARKED MDL COMPLAINT [13469];
EXPLANATORY LETTER, DATED OCTOBER 9, 2015, FILED BY STEVE
BERMAN ON BEHALF OF IGNITION SWITCH PLAINTIFFS,
NON-IGNITION SWITCH PLAINTIFFS [13495];
PEOPLE OF THE STATE OF CALIFORNIA'S "NO STRIKE" PLEADING,
DATED JUNE 16, 2015, FILED BY STEVE BERMAN ON BEHALF OF
THE PEOPLE OF THE STATE OF CALIFORNIA, ACTING BY
AND THROUGH ORANGE COUNTY DISTRICT ATTORNEY
TONY RACKAUCKAS [13210];
STATE OF ARIZONA'S "NO STRIKE" PLEADING, DATED 6/16/15,
FILED BY STEVE BERMAN ON BEHALF OF STATE OF ARIZONA EX REL.
MARK BRNOVICH, THE ATTORNEY GENERAL [13211];
THE IGNITION SWITCH PLAINTIFFS' NO STRIKE PLEADING WITH
REGARD TO THE SECOND AMENDED CONSOLIDATED COMPLAINT; AND THE
NON-IGNITION SWITCH PLAINTIFFS' (I) OBJECTION PLEADING WITH
REGARD TO THE SECOND AMENDED CONSOLIDATED COMPLAINT
AND (II) GUC TRUST ASSET PLEADING, DATED 6/24/15, FILED BY
EDWARD WEISFELNER ON BEHALF OF DESIGNATED COUNSEL
FOR THE IGNITION SWITCH PLAINTIFFS & CERTAIN
NON-IGNITION SWITCH PLAINTIFFS [13247];
OMNIBUS RESPONSE BY GENERAL MOTORS LLC TO THE NO STRIKE
PLEADINGS FILED BY THE STATES OF ARIZONA AND CALIFORNIA,
DATED 7/10/15, FILED BY ARTHUR JAY STEINBERG
ON BEHALF OF GENERAL MOTORS LLC [13286];
RESPONSE BY GENERAL MOTORS LLC TO THE IGNITION SWITCH
PLAINTIFFS' NO STRIKE PLEADING WITH REGARD TO THE SECOND
AMENDED CONSOLIDATED COMPLAINT; AND THE NON-IGNITION SWITCH
PLAINTIFFS' OBJECTION PLEADING WITH REGARD TO THE SECOND
AMENDED CONSOLIDATED COMPLAINT, DATED 7/23/15, FILED BY
ARTHUR JAY STEINBERG ON BEHALF OF GENERAL MOTORS LLC [13316];
ADAMS PLAINTIFFS' NO DISMISSAL PLEADING, DATED 8/11/15,
FILED BY GREGORY W. FOX ON BEHALF OF HILLIARD MUNOZ GONZALES
LLP AND THOMAS J. HENRY INJURY ATTORNEY [13359];
RESPONSE BY GENERAL MOTORS LLC TO ADAMS PLAINTIFFS'
NO DISMISSAL PLEADING, DATED 9/30/15, FILED BY ARTHUR
JAY STEINBERG ON BEHALF OF GENERAL MOTORS LLC [13422];
STATEMENT OF GOOD FAITH FILING, DATED 9/4/15,
FILED BY JULIANNE CUTRUZZULA BEIL
ON BEHALF OF CAROLYN RICKARD [13423]

5

```
APPEARANCES:

For the Debtor:            King & Spalding LLP
                           By:  ARTHUR STEINBERG, ESQ.
                           1185 Avenue of the Americas
                           New York, New York 10036-4003
                           (212) 556-2158


For the Ignition Switch
Pre-closing Accident
plaintiffs:                Goodwin Procter LLP
                           By:  GREGORY FOX, ESQ.
                           By:  WILLIAM P. WEINTRAUB, ESQ.
                           The New York Times Building
                           620 Eighth Avenue
                           New York, New York 10018
                           (212) 459-7348


For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs:                Brown Rudnick LLP
                           By:  EDWARD S. WEISFELNER, ESQ.
                           By:  HOWARD S. STEEL, ESQ.
                           7 Times Square
                           New York, New York 10036
                           (212) 209-4917
For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs and states
of California and
Arizona:                   Hagens Berman Sobol Shapiro LLP
                           By:  STEVE W. BERMAN, ESQ.
                           1918 Eighth Ave.
                           Suite 3300
                           Seattle, Washington 98101
                           (206) 623-7292
```

TELEPHONIC APPEARANCES:

For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs and states
of California and
Arizona:                      Hagens Berman Sobol Shapiro LLP
                              By:  ANDREW M. VOLK, ESQ.
                              1918 Eighth Ave.
                              Suite 3300
                              Seattle, Washington 98101
                              (206) 623-7292


For Law Debenture Trust
Company of New York:          Kelley Drye & Warren LLP
                              BY:  BENJAMIN D. FEDER, ESQ.
                              101 Park Avenue
                              New York, NY 10178
                              (212) 808-7800

7

1    (Proceedings commence at 9:46 a.m.)

2         THE COURT:  Good morning.  Have seats, please.  I

3    think I know most of the people who've been speaking before.

4    If anybody else expects to be heard, I'll provide that

5    opportunity.  I do have some preliminary remarks.

6         First, I heard just as I was walking in, quite to my

7    surprise, that there had been some request for breakout loans

8    and contemplation that we'd be here all day.  That's not my

9    concept of what we're here for today.  We're going to focus on

10   some just gradations, and I would expect that we'd be done by

11   11:30 or something in that range.

12        I want you folks to spend most of your time on

13   punitives, and in particular whether punitives are going to

14   assume liability or not.  I don't need much help on imputation,

15   and although I'm not going to put a sock in your mouth on that,

16   I think the briefs are pretty clear and I understand the issues

17   on imputation.

18        On the matter of punitive damages, I want you to talk

19   principally about whether there is assumed liability for

20   punitives under the sale agreement, and if not, whether

21   plaintiffs can still rely on Old GM conduct as either a

22   predicate for punitives or for increasing punitives that are

23   otherwise awarded.  I'm not sure why there might be a

24   distinction on the latter issue, but if you think there is, you

25   can tell me.

8

1              The plaintiffs' side, particularly Mr. Weintraub,

2     speak in terms of my gatekeeper role, which subject to your

3     rights to be heard is the same way that I see my role on this.

4     It seems to me that my job is to construe the sale order, the

5     sale agreement, my opinions and the judgment, and based upon

6     those things, to determine whether claims get past the

7     bankruptcy gate.

8              There is a lot of discussion in the briefs about the

9     extent to which particular claims principally under state law

10    are within my domain to rule upon.  Many of those, perhaps all

11    of those, turn on whether, as a matter of non-bankruptcy law,

12    there is a duty on the part of New GM to do various things.  It

13    seems to me, subject to your rights to be heard, that with one

14    possible exception, those are matters for Jesse Furman to

15    address or, to the extent applicable, judges here in the

16    primary litigation, vis-à-vis anything that's gotten through

17    the gate.  But if somebody believes that that's an

18    inappropriate way to look at it, I'll certainly allow

19    discussion of that.

20             One area where I do welcome that discussion, though,

21    is that the law is clear, I think, that we can't tolerate

22    successor liability claims dressed up to look like something

23    else, and it may be that that's still my job to decide.  I

24    would like help from both sides on what is at issue besides the

25    matter of punitives, imputation, and in terms of the pleadings.

9

1    There's a lot of stuff thrown in on plaintiffs under the rubric

2    of background, which is problematic to me.  But to the extent

3    there are other conceptual things as evidenced in your

4    pleadings, they may have gotten past me, and I need you to

5    bring those to my attention.

6            I don't know if Mr. Berman is in the court today.

7    Oh, are you, Mr. Berman?  First time for you.  Okay.

8            MR. BERMAN:  Yes.  First time in a bankruptcy court,

9    Your Honor, so I hope you'll be kind.

10           THE COURT:  That's fine.  Mr. Berman, your joinder in

11   paragraph one joined in part two of your allies' submissions,

12   but not part one.  It would be helpful for me, before we moved

13   on, if I -- if you'd tell me whether I should draw some

14   significance from that, what exactly that means.

15           Mr. Weintraub, in your supplemental letter in the

16   marked pleadings, I'd like you to clarify for me what you meant

17   by the last sentence of paragraph one, which I didn't follow,

18   and also paragraph two.  It wasn't clear to me whether you were

19   trying to reserve rights that I'd already -- on issues that

20   I've already ruled on.  I think it's less likely that you

21   intended to relitigate those or whether you were pointing out

22   or trying to point out that there was something else that I

23   needed to focus on, but I need your help on that.

24           I don't see Mr. Peller here today.  Okay.

25   Mr. Peller, in a letter sent, commented on New GM's failure to

10

1  address his Elliott, Bledsoe and Sesay pleadings the same way

2  that New GM has addressed anybody else's, and he estimated

3  default New GM on that.  I'm not going to default New GM on

4  that given everything else that's gone on here.

5          Mr. Steinberg, not this minute, but after the

6  arguments, I want you to call up Mr. Peller and ask him if he

7  really wants you to repeat the process for his clients like you

8  did for everybody else.  And if he does -- and I'm going to

9  have to make you do a similar response like you did for

10  everybody else -- that will be decided on the papers.

11          Okay.  With that, I'll allow each of you to be heard.

12  Go ahead and deal with the principal discussion on punitives,

13  not on imputation.

14          MR. WEINTRAUB:  Do you care --

15          MR. WEISFELNER:  Who would you like to hear first?

16  I'll give you both a chance to reply and surreply.

17          MR. WEINTRAUB:  You called my name first.

18          THE COURT:  Go ahead, Mr. Weintraub.

19          MR. WEINTRAUB:  Thank you, Your Honor.

20          MR. WEISFELNER:  The only thing is that I'll be

21  speaking on all the issues.  I don't think Mr. Weintraub is

22  going to be speaking on all the issues.

23          THE COURT:  Well, you can hand off to your allies,

24  Mr. Weintraub.  I just want to get it all done.

25          MR. WEINTRAUB:  Sure.  Believe me, Your Honor, so do

11

1  I.  With respect, Your Honor, I'll begin with the Court's

2  questions to me, and then I'll go into my presentation.

3        We do believe that punitive damages are an assumed

4  liability.  In terms of the Court's gatekeeping role, I think

5  if -- what I heard the Court say is that the gatekeeping role

6  is not to decide the underlying merits of issues, but rather

7  whether issues can pass through the gate to be decided by the

8  trial court, and we agree with that.  And I think what I heard

9  you --

10       THE COURT:  Oh, I assumed that you would agree with

11 that.  That was the exact point you were making in your briefs.

12       MR. WEINTRAUB:  Yes, Your Honor.

13       THE COURT:  It's Mr. Steinberg that's going to want

14 to be heard on that much more than you will, I suspect.

15       MR. WEINTRAUB:  If we have time, Your Honor,

16 Mr. Steinberg will.  And we also agree, Your Honor, that the --

17 whether there is a duty, the existence of the duty is a matter

18 for the trial court, and opposing the existence of duty is a

19 matter of defending against the action.

20       We believe, Your Honor, that if the liability for

21 punitive damages is an assumed liability, that all of Old GM's

22 conduct is fair game because you do not get to punitive damages

23 unless you get to compensatory damages, which would require a

24 showing of causation and fault.  And because punitive damages

25 are parasitic to compensatory damages and there is no

12

1  limitation in the sale agreement to just compensatory damages,

2  we believe that punitive damages would flow if elements of the

3  injury sustained by the plaintiff are as a result of what we

4  would call reprehensible conduct by New GM.

5          THE COURT:  You said repeatedly, Mr. Weintraub, that

6  the sale agreement, and possibly the sale order, as well, in

7  your view, are unambiguous and are unambiguous in your favor.

8  I had some difficulty with that, particular in light of

9  something that Mr. Steinberg pointed out in one of his briefs,

10 where he points out that except for those liabilities that are

11 assumed, everything else is a retained liability.  And his

12 recognition of the fairly fundamental principle that we read

13 contractual agreements as a whole so that everything has a

14 meaning, that would lead me to conclude not that it's

15 unambiguous in Mr. Steinberg's favor, but that it isn't

16 unambiguous and that I have to look at the totality of the

17 language and the relevant documents and divine the intention of

18 the parties back in 2009.

19         Help me understand better, if you're still pressing

20 the point, why you think it's unambiguous in your favor.

21         MR. WEINTRAUB:  Your Honor, we are pressing the

22 point.  We think that under the plan and unambiguous language

23 of the sale agreement, New GM assumed liability for punitive

24 damages.  If you look at Section 2.3(a)(9), the section begins

25 with all Liabilities -- capital L, all Liabilities -- is a very

13

1  broad term, and there is -- as we cited in our papers, there is

2  no more clear word in the English language than the word "all."

3  All is --

4          THE COURT:  You don't think that "all" is fleshed out

5  by the four, five, or six words that follow it?

6          MR. WEINTRAUB:  I think that "all" is fleshed out by

7  the word "liabilities."  And if you look at the definition of

8  liabilities, and I will read it to the Court, liabilities

9  means:

10          "Any and all liabilities and obligations of every

11          kind and description whatsoever, whether such

12          liabilities or obligations are known or unknown,

13          disclosed or undisclosed, matured or unmatured,

14          accrued, fixed, absolute, contingent, determined or

15          undeterminable, on or off balance sheet or otherwise,

16          or due or to become due, including indebtedness and

17          those obligations arising under any law, claim,

18          order, contract or otherwise.

19          That is a very, very expansive definition, Your

20  Honor, and there is nothing in the language of Section

21  2.3(a)(9) that indicates an intention to curtail the operation

22  of the word "liabilities," the defined term "liabilities."

23          The word "Damage" is used elsewhere in the agreement,

24  with a capital D, and damages excludes punitive damages.

25  Notably, the word "Damage" with a capital D is not used in

14

1   Section 2.3(a)(9), and it is not used in the defined term

2   "liabilities."  If the parties wanted to exclude punitive

3   damages, they could have used the word "damages" in Section

4   2.3(a)(9), but they did not.

5          The other thing the parties could have done in

6   Section 2.3(a)(9), but did not, was include a parenthetical

7   exclusion for punitive damages.  If you look at Section

8   2.3(a)(9), there is a parenthetical exclusion for asbestos

9   claims.  We also know, Your Honor, that Section 2.3(a)(9) was

10  amended before the sale agreement closed.  So it shows that

11  that section of the purchase agreement was under some level of

12  scrutiny, and even though they went back for a second time to

13  amend Section 2.3(a)(9), it was not amended to exclude the word

14  "punitive damages."  If the parties wanted to exclude punitive

15  damages, there was a very easy way to do that.  They could have

16  said "and not punitive damages."  They didn't do that.

17         As I said, Your Honor, the case law in the Second

18  Circuit is that punitive damages are parasitic to compensatory

19  damages.  There is nothing in Section 2.3(a)(9) that limits

20  damages to compensatory damages.  Once you have compensatory

21  damages, if appropriate under the law, the punitive damages may

22  follow based upon the reprehensible conduct of the actor.

23         In terms of whether or not the word "direct" detracts

24  from that, we don't think that it does.  The way Section

25  2.3(a)(9) works and the way punitive damages works is that it's

15

1 specific to the injured party.  And the cases that limit the

2 ability to recover punitive damages, and we cite them in our

3 briefs, are basically based upon the <u>Gore</u> factors, and the <u>Gore</u>

4 factors include not charging the bad actor with liability for

5 other people, only charging them with liability to the injured

6 person.  They require a proportionality between the actual

7 damages suffered and the punitive damages that are assessed.

8         But for the reprehensible conduct of Old GM, but for

9 the accident that occurred, but for the compensatory damages,

10 there wouldn't be punitive damages.  If these were not

11 post-sale accident victims, there would be no basis for

12 punitive damages.  What gives the basis for punitive damages is

13 the fact that there is compensatory damages based upon fault

14 and causation.  Once you've got fault and causation, the

15 punitive damages are appropriate to compensate for

16 reprehensible conduct.

17         Now, one of the things that New GM says in their

18 papers is that punitive damages are intended to detract third

19 parties, to deter repeat offenses by the offender and therefore

20 makes no sense in the context of this case because Old GM has

21 been liquidated, there's nothing to deter.  What New GM leaves

22 out of its argument, and frankly leaves out of the quote from

23 the <u>State Farm</u> case, which is a case cited by both parties, is

24 that one of the purposes of punitive damages is retribution.

25 And retribution is a very direct and very personal remedy for

1  someone who has been harmed by reprehensible conduct.  It's

2  almost biblical, Your Honor.  It's in the nature of an eye for

3  an eye.  So it is about as direct as you can get with respect

4  to whether there needs to be a direct relationship between the

5  accident, the injury, the causation and the punitive damages.

6        So I don't think that the word "directly" is imbued

7  with the magical powers that New GM is saying that it's imbued

8  with and would take it out of -- use the word "directly" as a

9  springboard to say that there is an exclusion for punitive

10  damages.

11        We also think, Your Honor, that there are two other

12  paths to punitive damages through independent claims.  Our view

13  is that there is a difference between Old GM conduct and New GM

14  conduct based upon information that was available to and known

15  by New GM, no matter what the source of that information.  So

16  with respect to the first path to punitive damages through

17  independent claims based upon inherited information, which

18  would be information that came to New GM when the employees

19  were transferred, that came to New GM when the books, records,

20  databases, reports, investigations were transferred, that

21  information is fair game because that informs what New GM knew

22  when it acted or didn't act in --

23        THE COURT:  Pause, please, Mr. Weintraub.  Under

24  theory number two or your leg number two, to what extent is

25  that the same or different than any other independent claim?

17

1           MR. WEINTRAUB:  I think that we have two species of

2  independent claims.  One independent claim would be based upon

3  what we believe is inherited knowledge, and we think that

4  that's fair game.  We think that the Court essentially ruled

5  that way in the <u>Bledsoe</u> decision.  We also say that even if the

6  Court decides that you cannot use inherited information,

7  information developed by New GM after the date of closing of

8  the sale would be sufficient to present a claim for punitive

9  damages.

10          We know that the -- that New GM just entered into a

11  $900 million settlement with the federal government based upon

12  a stipulated set of facts and based upon a deferred prosecution

13  agreement.  The gravamen of that agreement was an

14  acknowledgment by New GM in the statement of facts that

15  according to it, it first was able to determine the

16  relationship between air bags not deploying in cars with the

17  ignition switch defect and the electronics of the vehicle such

18  that when the ignition was in the off or auxiliary position,

19  the sensor on the air bag would be disengaged and would not

20  engage the air bag when there was an accident.

21          And what the stipulated set of facts in that -- what

22  the government concedes is that that connection was first made

23  by New GM in 2012.  We don't concede that that is true.  We

24  think the connection was made earlier, but for purposes of what

25  they have admitted to with the government, they first realized

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1  a connection in 2012, yet they delayed the recall for two

2  years.  Five of the six bellwether plaintiffs were injured

3  within that two-year period from 2012 to 2014.  So our view is

4  even if you ignore all of the inherited and accumulated

5  information, based upon GM's admission that it realized the

6  connection between the ignition switch defect, the electronics

7  and the non-deployment of the air bags in 2012, that's well

8  after the closing of the sale.

9         Now, notably, Your Honor, New GM did not say to the

10  federal government, you know, hey, that's really a retained

11  liability, that's not our liability, so what you need to do is

12  go to the bankruptcy court, make a motion for leave to file a

13  late $900 million claim, and assuming the Court even would have

14  let you file your late $900 million claim, it's likely going to

15  be equitably moot based upon the April 2015 decision.

16         But, of course, I'm being facetious.  They didn't say

17  or do that.  They knew that it was their liability.  It's an

18  independent liability, and the claims by the post-sale accident

19  victims in five of the six bellwethers are during the same time

20  period and basically for the same thing.  We had an accident,

21  our air bags didn't deploy, we were injured grievously, some of

22  us were killed during the same time period.  It's clearly an

23  independent claim as acknowledged by New GM, Your Honor.

24         So we think that whether as an assumed liability

25  because the word "direct" doesn't take them out of the penalty

1  box and because anything that arose from the causation, the

2  injury to the defendant and the facts and circumstances

3  surrounding Old GM's conduct with respect to that is fair game

4  with respect to punitive damages.  That's pathway number one to

5  punitive damages.

6           Pathway number two to punitive damages is separate

7  and apart from whether or not you ever need to get into the

8  2.3(a)(9) argument that it's an independent claim based upon

9  information that was inherited by New GM.  New GM knew about

10  the ignition switch defect based upon that inherited

11  information and knew about all of the problems.  Just like this

12  Court said that Old GM should have recalled the vehicles at the

13  time of the sale, New GM should have recalled the vehicles

14  immediately after the sale, but it didn't do that.  It didn't

15  do that until 2014.

16           The third path to punitive damages would be what we

17  call the information developed solely by New GM post-sale, the

18  thing that I was just talking about.  In addition, Your Honor,

19  we think there are two due process issues with respect to the

20  ability to assert successor liability claims against New GM.

21  These are post-sale accident victims.  What was briefed with

22  respect to the four threshold issues were pre-sale accidents.

23           With respect to post-sale accidents, you have people

24  falling into two categories, people that already owned their

25  vehicle at the time of the sale and people that acquired their

1  vehicle after the sale.  With respect to the people that

2  acquired their vehicle before the sale, at the time of the

3  sale, they were known creditors.  They didn't get

4  constitutionally sufficient notice.  They were not told about

5  the ignition switch defect in their vehicles.  There is a

6  fundamental difference between these particular plaintiffs who

7  subsequently had an accident and people who objected to the

8  sale at the time of the sale on general principles of successor

9  liability.

10         And the difference is that people who had post-sale

11 accidents did not know that they had much higher odds than any

12 other objector of having an accident because they were driving

13 in a defective vehicle, unknown to them, but known to New GM --

14 I'm sorry, Old GM -- known to Old GM at the very time that it

15 was asking this Court to sell the assets free and clear.  We

16 think that because these post-sale accident victims were not

17 told that they were riding in defective vehicles at the time of

18 the sale and didn't have an opportunity to raise the objection

19 to successor liability based upon an unknown defect that would

20 cause a future accident, that they were prejudiced.  And that

21 would fall within the Court's analytics for what you need to

22 show to not have the sale order apply to you.  They were

23 clearly prejudiced, Your Honor.

24         THE COURT:  Let's make sure we're on the same page on

25 that.  New GM had expressly assumed personal injury and death

21

1   liability for people of the character you just described --

2           MR. WEINTRAUB:  Yes.

3           THE COURT:  -- who were in post-sale accidents.  And

4   your point is that New GM should not be immune from punitives

5   to people who were injured or killed or the survivors of such

6   for those post-sale accidents.

7           MR. WEINTRAUB:  Exactly, Your Honor.

8           THE COURT:  That much I understand, but I'm less

9   clear on whether you're saying that the premise for the

10  punitives for the post-sale accident victim should be pre-sale

11  conduct as well as post-sale knowledge and conduct.

12          MR. WEINTRAUB:  I think it could be both, Your Honor,

13  but with respect to this particular argument, the point of this

14  argument is if the Court rules that 2.3(a)(9) bars punitive

15  damages with respect to these post-sale accident victims, with

16  respect to this subcategory of post-sale accident victims,

17  those who owned the vehicle at the time of the sale,

18  notwithstanding the fact that 2.3(a)(9) might bar punitive

19  damages, which we dispute, this due process issue would say

20  that New GM can be a successor for purposes of punitive damages

21  based upon the pre-sale conduct of Old GM.  We also think that

22  because New GM delayed the recall, as admitted, up until past

23  the time that these people were injured, that its conduct,

24  independently would give it liability for punitive damages.  So

25  it's both, Your Honor, as this --

22

1           THE COURT:  Okay.

2           MR. WEINTRAUB:  Now, with respect to the second

3    category of claimant, those who did not own their vehicles at

4    the time of the sale but acquired them later, we think that

5    those are the archetypal future claimants talked about in

6    Grumman Olson.  Those are the people that could not possibly

7    have been given meaningful notice because they had no

8    connection with the debtor at the time of the sale.  And just

9    like in Grumman Olson, we believe that there should be

10   successor liability for these purely future claimants, and

11   there would be no bar on punitive damages by those claimants if

12   they can demonstrate that the conduct to them was

13   reprehensible.

14          THE COURT:  Uh-huh, okay.

15          MR. WEINTRAUB:  If I could just take a minute, Your

16   Honor.  As usual, you took me right out of my presentation, and

17   I want to make sure --

18          THE COURT:  Check your notes.  Sure, go ahead.

19          MR. WEINTRAUB:  -- make sure that I hit everything

20   that I did -- I wanted to hit.  Yeah, there are a couple things

21   I -- a couple points I'd like to make, Your Honor.

22          One of the cases that we cite is the Virgilio (ph)

23   case, and we think that that's a highly instructive case.  In

24   the Virgilio case, the statute enacting the 9/11 victims fund

25   provided that by opting into the fund, the claimant waived all

23

1   claims for recovery of damages against anyone other than the

2   terrorists.  The estates of certain firefighters in that case

3   that died in the Twin Towers when they collapsed who had opted

4   into the victims' fund wanted to sue Motorola and the City of

5   New York for providing defective radios that didn't work within

6   the concrete structure of the tower, and therefore those

7   firefighters couldn't be told to evacuate the tower because it

8   was collapsing.

9        The plaintiffs argued that, per the statute, when

10  they opted into the fund, they only waived compensatory

11  damages, but could still sue for punitive damages.  In other

12  words, their position was we could sue for just punitive

13  damages.  The Second Circuit rejected the plaintiffs' argument

14  and affirmed the district court's ruling that the claim was

15  barred.  The Second Circuit held that because of the parasitic

16  relationship between compensatory damages and punitive damages,

17  once the compensatory damages were waived, there was no path

18  for punitive damages, so those were effectively waived, too.

19        In this case, Your Honor, we've got the converse

20  which would also be true.  There is no limitation in this

21  agreement to just compensatory damages.  Because of the

22  parasitic relationship between compensatory damages and

23  punitive damages, if there's a claim for compensatory damages,

24  then the parasite, punitive damages travels along with it and

25  would only be barred if expressly excluded.  And as we said

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

24

1  earlier, Your Honor, we don't believe that it was expressly

2  excluded.

3          THE COURT:  On that 9/11 radios case, can you give me

4  the cite on that case?

5          MR. WEINTRAUB:  Yeah.  That's 407 F.3d 105 (2nd Cir.

6  2005).

7          THE COURT:  Thanks.

8          MR. WEINTRAUB:  The other case we wanted to talk

9  about, Your Honor, also cited in our brief, is the Maverick

10  Tube case, which I think is an excellent example of contract

11  interpretation.  In Maverick Tube, the issue was whether the

12  buyer was a public acquirer as defined in the indenture.  The

13  definition in the indenture of a public acquirer was an entity

14  whose common stock traded on a national U.S. exchange.  The

15  nature of the dispute was whether or not the particular buyer

16  in that instance was a public acquirer.

17          That buyer's ordinary common stock did not trade on a

18  national U.S. exchange, and therefore would not be considered a

19  public acquirer, and then certain rights would not be triggered

20  for the bondholders.  But the indentured trustee argued that

21  certain depository shares that were not common stock did trade

22  on a national U.S. exchange, so the issue was whether, as a

23  matter of commercial reasonableness, the contract could be

24  interpreted to provide that common stock could include these

25  depository shares and therefore come to the conclusion that

1   this was a public acquirer.

2           And the Court refused to read the contract the way

3   the indentured trustee wanted it read.  And what the Court said

4   in connection with that, I think, is very instructive for what

5   we're dealing with here.  The Second Circuit says, at Pages 464

6   and 472 -- and the cite for this case I will give you, Your

7   Honor, is 50 -- no, that's the wrong case.  Let me read the

8   quote and then I'll find you the citation, Your Honor.

9           THE COURT:  Sure.

10          MR. WEISFELNER:  Your Honor, the citation is 595 F.3d

11  458.  It's a 2010 decision.

12          THE COURT:  Okay, thanks.

13          MR. WEINTRAUB:  What the Second Circuit said, Your

14  Honor, is:

15          "The parties could easily have included in the

16          indenture a definition of common stock in general

17          with a parenthetical phrase expressly including ADSs,

18          such as the parenthetical in the definition of

19          'capital stock,' or they could have included such a

20          parenthetical after common stock in the 'a class of

21          common stock traded on a United States national

22          securities exchange' clause in the public acquirer

23          definition.  They did neither.  Given that the

24          parties defined more than 100 terms in the indenture

25          and made explicit reference to ADSs in the 'capital

1           stock' definition that informs the rights of

2           noteholders to require Maverick to purchase their

3           notes, the indenture as a whole does not suggest that

4           the undefined term 'capital stock,' in the public

5           acquirer definition that informs noteholders'

6           conversion rights, includes ADSs implicitly."

7           The Court -- Second Circuit goes on to say:

8           "Any suggestion that the indenture should be read to

9           accomplish what the trustee views as 'commercially

10          reasonable' essentially asks us to rewrite the

11          indenture's public acquirer definition.  Instead, we

12          are required to give effect to the intentions

13          expressed in the agreement's own language.  Given the

14          pains taken by the parties to have the indenture set

15          out detailed definitions of numerous terms and to

16          have its definition of capital stock make explicit

17          reference to ADSs -- a reference we are not entitled

18          to regard as superfluous -- we conclude that the

19          district court properly declined to read ADSs into

20          the undefined term 'common stock,' as used in the

21          clause 'common stock traded on a United States

22          national securities exchange' without elaboration."

23          I would note, Your Honor, that New GM cites both the

24   Trusky and Castillo cases in their brief.  Both the Trusky and

25   Castillo cases had to do with contract interpretation, what

1  were assumed liabilities.  And the issue there was whether or

2  not the claims being pursued by those claimants fell within the

3  four corners of the definition of Glove Box Warranty.  And the

4  plaintiffs in those cases tried to strain the language of the

5  assumption of the Glove Box Warranty beyond the natural meaning

6  of the words in the agreement, and they did not prevail.

7        New GM is trying to do the same thing here.  They're

8  trying to strain the words of Section 2.3(a)(9) to include an

9  exclusion that is not in there.  Everyone in this courtroom

10  knows how to exclude punitive damages.  You write the words

11  "excluding punitive damages."  That was not done.

12        Your Honor, we also believe that punitive damages are

13  not a retained liability.  It's a circular argument to say

14  punitive damages are retained liability because retained

15  liabilities, by definition, exclude assumed liabilities.  So

16  you're in a logic loop.  But what you can do is look at the

17  categories of excluded liabilities in the excluded liability --

18  in the retained -- I'm sorry, you could look at the category of

19  retained liabilities in the retained liabilities section of the

20  purchase agreement.

21        There are 16 categories, none of which are punitive

22  damages.  And any notion that punitive damages that would be

23  independent claims as opposed to punitive damages that would be

24  part of assumed liabilities are also retained liabilities makes

25  no sense whatsoever, Your Honor.

1          There is no way that, I think, that this Court would

2  have let it -- permitted this debtor to assume -- because if

3  it's a retained liability, it's essentially assuming liability

4  for New GM's post-sale conduct.  There was no notice to anyone

5  that any kind of assumption of liability on behalf of New GM

6  was being undertaken when the Court approved the sale

7  agreement.  There is simply just no logical or sensible way to

8  say that the post-closing misconduct of New GM could ever be a

9  retained liability.  In fact, the lead-in to the retained

10 liability section says that they are liabilities of the seller.

11 There is no basis to say that the liabilities of the buyer

12 would ever become liabilities of the seller --

13          THE COURT:  I'm having trouble keeping up with you on

14 this aspect, Mr. Weintraub, because if I heard you right just

15 now, you were saying that it would have been ready for me or

16 anybody else to have Old GM assume liability for New GM

17 conduct.  I would think that even Mr. --

18          MR. WEINTRAUB:  Steinberg?

19          THE COURT:  -- Steinberg -- yeah, I know his name

20 after this long -- would agree with that, but what you and he

21 are arguing about isn't New GM's post-sale conduct, which

22 you're ahead on in several respects, going back to April 15th.

23 But where you and he are arguing is about whether New GM is

24 liable not for its own conduct and its own knowledge, but

25 pre-sale conduct by Old GM.  That's the subset of the

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

1    intersecting circles that is encompassed by what you just said.

2         MR. WEINTRAUB:  Well, and I apologize, Your Honor,

3    because I was talking about both assumed liabilities and

4    independent claims, and the first part of what I was talking

5    about, maybe my transition was less than clear.  The first part

6    of what I was talking about would be we don't believe that

7    punitive damages that we think are an assumed liability can be

8    characterized as a retained liability.  We think that that

9    would be circular.  Now, we're just talking about Old GM

10   conduct.  So we're talking about 2.3(a)(9), not independent

11   claims.

12        And my argument for that is if you look at the

13   construct of the retained liabilities section, it excludes

14   assumed liabilities.  So the argument that an assumed liability

15   is a retained liability becomes circular, so the Court really

16   has to address the issue head on.  You can't state the result

17   and say that punitive damages were not an assumed liability,

18   therefore it's a retained liability, because we're arguing it

19   was an assumed liability based upon the clear language of

20   2.3(a)(9).

21        And in support of that argument I made two points,

22   one that the lead-in to retain liabilities expressly excludes

23   assumed liabilities as a retained liability.  The second point

24   I made was if you look at the categories of what are retained

25   liabilities, nowhere in those categories is there a category

30

1  for punitive damages.  And this Court in I think it was

2  Castillo said that it is informative to look at what was

3  assumed to look at the categories of what were retained in the

4  retained liabilities section.  So picking up on Your Honor's

5  point in Castillo, if you look at the 16 subparts of the

6  retained liabilities section, nowhere does it say punitive

7  damages.  It would have been very easy to say that.

8           THE COURT:  Didn't I decide Castillo on a parol

9  evidence analysis after concluding that the agreement was

10 ambiguous?  It was the one that the settlement of the --

11          MR. WEINTRAUB:  Yes, you may have done it.  That was

12 the settlement.  That's right.

13          THE COURT:  -- class action, wasn't it?

14          MR. WEINTRAUB:  That's right.  Maybe I'm getting --

15          THE COURT:  And just confirming on -- affirmed in

16 part on that, although he thought different aspects were

17 ambiguous, if I'm not mistaken.

18          MR. WEINTRAUB:  Right.  And we would argue that this

19 agreement is not ambiguous as to punitive damages and the

20 integration clause would prevent any evidence of -- any parol

21 evidence of -- to the contrary of what the plain language of

22 the agreement states.  Nowhere in the agreement, nowhere in the

23 sale order is there any mention of commercially necessary

24 obligations or assumption being limited to commercially

25 necessary obligations, and that's a very dangerous, slippery

31

1  slope, Your Honor, because it becomes convenient and

2  situational for parties to say what was commercially reasonable

3  then, what was commercially reasonable now.  It's not a

4  creditable standard, especially in the context of this dispute.

5  And arguments could be made on both sides as to why and what

6  would be commercially reasonable, given the scrutiny that GM is

7  under and given the public approbation, frankly, of its conduct

8  here.

9       But we're not saying that we need to even get into

10  what is commercially reasonable because it's not in the

11  agreement -- commercially necessary.  It's not in the

12  agreement.  It's not in the sale order.  The agreement is

13  unambiguous, in our view, and there's an integration clause.

14       Now, the second point I was making earlier with

15  respect to retained liabilities -- and this is where maybe I

16  didn't make a good transition -- is New GM also argues that any

17  independent claims against New GM for its post-sale conduct,

18  whether based upon inherited information or presumably even

19  information developed without the benefit of inherited

20  information, would also be a retained liability.  And that's

21  what I said would be nonsensical.

22       The notion that this agreement could be interpreted

23  to say that New GM's post-sale conduct would give rise to

24  retained liability, in my view, is essentially the same thing

25  as saying Old GM assumed that liability because that liability

32

1  didn't exist on the closing date because New GM hadn't done

2  anything yet.  So if the argument is the actions and inactions

3  that New GM took after the closing date created retained

4  liabilities, that's the same thing as saying that the debtor

5  agreed to assume those liabilities, and that was what I said

6  made no sense, would be nonsensical, and there was no

7  indication in the order or in any of the proceedings that that

8  was going to be the case.

9       And if this Court was giving the equivalent of a

10 prospective third-party release that would release New GM of

11 any liability to people that had no connection with the case,

12 these would be the future claimants, after the sale closes,

13 there was absolutely no notice of that, and frankly that would

14 likely be beyond the subject matter jurisdiction of any court,

15 not just this court.

16      I think I've more or less in a haphazard way covered

17 everything I wanted to cover.  The Court had two questions for

18 me concerning our supplemental letter, if I could just pull

19 that out and take a look at that.  You're asking about the last

20 sentence in paragraph one?

21      THE COURT:  Yeah, the part that says New GM can be

22 the successor to Old GM if the bellwether plaintiffs' due

23 process rights were violated at the time of the 363 sale.

24      MR. WEINTRAUB:  I think I --

25      THE COURT:  And they were prejudiced as a result,

33

1  which means the free and clear barrier to successor liability

2  would not be applicable to those plaintiffs.

3          MR. WEINTRAUB:  I think I addressed that, Your Honor,

4  already.

5          THE COURT:  Well, if you're talking about the person

6  who's injured after 2012, I understand --

7          MR. WEINTRAUB:  And --

8          THE COURT:  -- what you're saying there.

9          MR. WEINTRAUB:  And frankly, people -- remember I had

10  the two categories, people who owned their vehicles at the time

11  of the sale, and I argued that they were known creditors, they

12  should have been given notice.  New GM should have recalled

13  those vehicles immediately after the sale.  They did not.

14  Those people were eventually injured.  I said that they were

15  prejudiced because they were not told at the time of the sale

16  that they were riding in a vehicle that was defective, which

17  greatly enhanced their odds of being -- having an accident and

18  being injured.  I said based upon that due process violation

19  and the prejudice that they should not be --

20          THE COURT:  Okay.  You did explain that before, and

21  if this is the same thing, you don't need to repeat it.

22          MR. WEINTRAUB:  Yeah, same thing.  Yeah.

23          THE COURT:  And --

24          MR. WEINTRAUB:  What was the other one, Your Honor?

25          THE COURT:  -- in paragraph two, did you mean for

34

1  post-sale conduct or for something else?

2            MR. WEINTRAUB:  In paragraph two?

3            THE COURT:  Yeah.

4            MR. WEINTRAUB:  No, I --

5            THE COURT:  So if New GM has acted in a grossly

6  negligent fashion, reckless fashion and willful fashion after

7  the sale, I'm not sure why you preceded by, quote, "if punitive

8  damages are an assumed liability."  I would have thought that

9  you would say that whatever New GM has done after the sale was

10 fair game for you to argue.

11           MR. WEINTRAUB:  I think that's right, but we're also

12 saying that, consistent with the position we took with respect

13 to assumed liabilities, that you look at with respect to

14 assumed liabilities, you are looking at what Old GM's conduct

15 was and the reprehensible nature of their conduct to the extent

16 it contributed to the accident is fair game.  The contact --

17 I'm sorry, the conduct triggering the liability is an element

18 of whether punitive damages would be appropriate.  This would

19 be the concealment of the existence of the ignition switch

20 defect, the due process violation in terms of not getting

21 people appropriate notice.

22           Now, remember, again, we're talking about post-sale

23 accident victims.  So we're talking about Old GM's conduct up

24 until the time of the sale and whether that reprehensible

25 conduct is conduct that Old GM can be liable for punitive

35

1  damages for.  If it is --

2           THE COURT:  Ultimately, the issue is whether you can

3  pile on to your post-sale allegedly wrongful conduct, pre-sale

4  allegedly wrongful conduct.

5           MR. WEINTRAUB:  I wouldn't consider it piling on,

6  Your Honor, in the sense that these paths are not necessarily

7  exclusive.  What -- our view is what New GM assumed

8  responsibility for would be Old GM's liability.  A component of

9  Old GM's liability would be punitive damages.  Call it

10 compensatory damages of $100 and punitive damages of $10, our

11 argument is New GM assumed liability for $110.  Independent of

12 that, New GM may have been breach of duty to warn, be reckless,

13 have been reckless, and that also could be culpable because

14 remember these people were not injured until after the sale.

15 So in terms of who had the last clear chance to warn these

16 people that they were riding in a defective vehicle, it was New

17 GM.

18          THE COURT:  Okay.

19          MR. WEINTRAUB:  I guess I would like to respond to

20 whatever I heard next.

21          THE COURT:  Yeah.

22          MR. WEINTRAUB:  Thank you, Your Honor.

23          THE COURT:  As usual.  Mr. Weisfelner.

24          MR. WEISFELNER:  Judge, good morning.  And for the

25 record, Edward Weisfelner, together with Howard Steel, at Brown

1 Rudnick, here with our co-counsel, Steven Berman, who's here in

2 a dual capacity, both as co-lead counsel in the MDL as well as

3 counsel representing the states of Arizona and California.

4         And, Your Honor, because of his relative newness in

5 the bankruptcy proceedings, I'm going to answer the question

6 that Your Honor posed to Mr. Berman about our position with

7 regard to the brief that was primarily offered by and submitted

8 by Mr. Weintraub on punitive damages first.

9         Your Honor, the reason why we joined the second part

10 of the brief, as opposed to the first and second part of the

11 brief, is first part of the brief really dealt with an argument

12 that's unique to the post-sale accident victims, and that is

13 that all of their claims, including any claims for punitive

14 damages that may ultimately be established, were assumed

15 liabilities consistent with their interpretation of the sale

16 agreement, which we coincidentally happen to agree with, but

17 it's not part of our argument.  I hope that answers Your

18 Honor's question --

19         THE COURT:  Okay.

20         MR. WEISFELNER:  -- as originally posed.

21         Your Honor, I just want to -- and I'm cognizant of

22 Your Honor's admonition in the beginning that you want time

23 spent on punitive damages as opposed to imputation.  I am aware

24 that Your Honor was troubled by the amount of background facts

25 that are contained in the operative complaints, that being the

1  second amended consolidated complaint, as well as the states'

2  actions, but I want to make one thing crystal clear at the very

3  beginning of my comments, and that is that neither of those

4  complaints seek to hold New GM liable for Old GM conduct, Old

5  GM actions or Old GM's failure to act.  Rather, those

6  complaints seek to hold New GM, and only New GM, liable for its

7  own independent acts and failures.  Frankly, Your Honor, New

8  GM's position, in our view, is simply a re-argument of

9  positions that it's previously asserted before this Court and

10  lost on and that it's currently on appeal with respect to

11  before the Second Circuit.

12         Your Honor, I think it's worth identifying those

13  portions of Your Honor's prior decisions that I think are

14  binding.  Your Honor noted that the economic loss plaintiffs

15  were prejudiced in one respect.  Nobody else had argued a point

16  that they argue now, that the proposed sale order was overly

17  broad and that it should have allowed them to assert claims

18  involving old GM vehicles and parts, so long as they were

19  basing their claims solely on New GM conduct and not based on

20  any kind of successor liability or other act by Old GM.

21         In the <u>Bledsoe</u> decision, footnote 16, Your Honor held

22  or determined that things New GM did or knowledge New GM

23  personnel had when acting for New GM, even if those personnel

24  acquired that knowledge while acting for Old GM, would be fair

25  game and New GM would have to live with the knowledge its

1  personnel had from the earliest days they began to serve New

2  GM.

3          Your Honor, I want to focus on two interrelated

4  points that are all over New GM's arguments, both with respect

5  to imputation, punitive damages.  The first point it makes --

6  and this sort of goes to the markups that you were treated with

7  and the various letters dealing with the markups, but it seems

8  to me that you can boil down their first position to the

9  following.  Background facts, and I acknowledge there are a lot

10 of them, dating back to 2000/2001 are somehow per se improper

11 and represent a violation of the sale order, the decision, the

12 judgment.

13         The second argument that GM makes throughout its

14 papers is that our efforts to impute knowledge to New GM

15 derived from some source, either from employees that switch

16 from Old GM to New GM or from books and records.  And I think

17 it's important in the context of books and records to emphasize

18 that this is a car manufacturer.  It's not a widget

19 manufacturer.  It's not a zipper manufacturer.  It's not even a

20 radio manufacturer.  It's a car manufacturer.  And they're

21 under a statutory federal duty to maintain certain books and

22 records, and they're maintaining those books and records for

23 specified purpose such that if they determine that there's a

24 safety defect, they have five days, five days to report it and

25 conduct a recall.

39

1       It was those books and records that New GM is charged
2  with knowledge of, even if those records were originally kept
3  by Old GM.  Beyond that, we allege knowledge acquired by New GM
4  post-sale.  Well, somehow our efforts to impute knowledge --
5  not conduct knowledge -- from Old GM to New GM, we're being
6  told is improper and somehow violates the sale order, the
7  decision, the judgment, notwithstanding Your Honor's prior
8  direction that the knowledge that New GM garnered from Old GM
9  employees was fair game.
10      Now, I want you to keep those two contentions that I
11 think suffuse all of GM's arguments that somehow imputing
12 knowledge is inappropriate or talking about what happened
13 before the sale in terms of knowledge as opposed to conduct is
14 somehow improper.  And I want you to keep those in mind, if at
15 all possible, Your Honor, in the context of what New GM just
16 admitted this past month in connection with this deferred
17 prosecution agreement.
18      And, Your Honor, I know that the document was
19 submitted as an exhibit to our reply brief, or I think it was
20 actually our original brief on the imputation issues, but if it
21 would assist the Court, I have a copy of the deferred
22 prosecution agreement which I'd like to hand up because I think
23 it'd be useful.  May I?
24      THE COURT:  Yeah.
25      MR. WEISFELNER:  Your Honor, if we can find another

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

40

1  copy for the clerks, we'll get that done, as well.

2          Your Honor, if one were to turn to Count I of the

3  deferred prosecution agreement, Count I is headed as scheme to

4  conceal material facts from a government regulator.  And what

5  we see in the second paragraph of Count I -- and I'm going down

6  to the bottom of the page -- we're told that from the earliest

7  date relevant to this information -- now, the earliest date

8  relative to this information could clearly predate the sale

9  order, but I'm focused instead on the rest of the sentence,

10 which goes on to read, "Until in or about the spring of 2013,

11 way beyond the sale order, GM," which in this context can only

12 mean New GM, "promoted the sale of" --

13         THE COURT:  Timeout, Mr. Weisfelner.  I'm --

14         MR. WEISFELNER:  Sure.

15         THE COURT:  -- losing you.  I see a forfeiture

16 complaint.  Is the same or different?

17         MR. WEISFELNER:  Your Honor, if you look at Exhibit B

18 to the deferred prosecution agreement --

19         THE COURT:  D, delta?

20         MR. WEISFELNER:  B, boy.  And in particular, if you

21 look at what in my version is Page 17 of 52, looking at the top

22 of the document.  I don't know if you have the same

23 designations in yours.

24         THE COURT:  My problem is that my copy runs -- oh, I

25 have it now, I think.  Yes, okay.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

41

1              MR. WEISFELNER:  It's cited Information --

2              THE COURT:  Right.

3              MR. WEISFELNER:  -- 15-CR- --

4              THE COURT:  Okay.

5              MR. WEISFELNER:  And I'm --

6              THE COURT:  And the paragraph to which you were

7    making reference?

8              MR. WEISFELNER:  Paragraph 2, at the very bottom of

9    the page, the sentence reads, "And from the earliest date

10   relevant to this information."  And obviously, that would refer

11   Your Honor to pre-sale order dates.  But then it goes on to

12   read, "Until in or about the spring of 2013."  That obviously

13   being post-sale.  "GM promoted," now here we're talking about

14   both old, but in particular, New GM, promoted sales of pre-

15   owned, i.e., used cars, by GM dealerships nationwide.

16             In Paragraph 4, the information says, "From in or

17   about the spring of 2012 to in or about February of 2014, GM,"

18   meaning New GM, "through its agents and employees, concealed a

19   potentially deadly safety defect from NHTSA and the public."

20   Now it goes down, skipping over the next sentence, "As GM knew

21   by no later than 2005," that's obviously a reference to Old GM,

22   "the defective switch was prone to too easy movement from their

23   on accessory or off position.  And as GM personnel well knew no

24   later than the spring of 2012," they're talking about New GM,

25   "when that movement occurred, the driver would lose not only

42

1  the assistance of power steering and power brakes, but also the

2  protection afforded by the vehicle's frontal air bags in the

3  event of a crash."

4          Now Your Honor, if you then peruse the rest of the

5  information, and I'm going to skip over the next section, which

6  is statutory allegations, other than to point out that what the

7  government is complaining about, and this is in the period of

8  2012 to 2014, is that New GM, quote:

9          "Willfully and knowingly did falsify, conceal, and

10          cover up, by trick, scheme and device, material

11          facts, and made materially false, fictitious and

12          fraudulent statements and representations.  To wit,

13          GM engaged in a scheme to conceal from its federal

14          U.S. regulator, NHTSA, a potentially deadly safety

15          defect that GM was required to disclose within five

16          business days of its discovery."

17          These are informations and facts that GM conceded as

18  part of the deferred prosecution agreement.  Count II for wire

19  fraud, and I'll skip over the statutory allegations again,

20  other than to note that in Paragraph 13 it's New GM admitting

21  that it's defrauded U.S. consumers into purchasing its products

22  by concealing information and making misleading statements

23  about the safety of vehicles.

24          And Your Honor, perhaps even more importantly for the

25  purposes of today's undertaking, where we're being criticized

43

1   for including a lot of background information about what Old GM

2   knew, and then attempting to impute what Old GM knew to New GM.

3   I think one needs to focus specifically on Exhibit C, the

4   deferred prosecution agreement, beginning on Page 25 of 52.  We

5   have statement of facts and an overview.

6           Now, Your Honor, I think it's extremely interesting,

7   if you start counting the paragraphs.  Everything in the

8   overview section, Paragraphs 1 through 11, everything in their

9   regulatory framework, and GM's formal recall process, starting

10  at Paragraph 12 and running through Paragraph 18, but in

11  particular, starting at Paragraph 19, where we get the

12  background, GM equipped cars with a defective switch.  This is

13  all pre-sale knowledge, or from the government's perspective,

14  pre-sale conduct, Paragraphs 19, 20, 21, 22, 23, 24, 25, 26,

15  27, 28.

16          Then we get to the next section.  GM, meaning Old GM,

17  considers a fix, and we get a recitation of facts and

18  circumstances, knowledge that Old GM had, that runs from

19  Paragraph 29 through and including Paragraph 29.  Then we're

20  told about the changes to the switch and the key slot.  Those

21  allegations run from Paragraph 40 to 43.  The defective

22  switches' deadly consequences runs Paragraph 44 through and

23  including Paragraph 56.  It's not until Paragraph 67 that we

24  start talking about New GM.

25          Your Honor, I recognize the difference between the

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

1  police and regulatory authorities and powers of the U.S.

2  Attorney's Office, as compared to plaintiffs in prior

3  litigation.  But Your Honor, this is the same entity,

4  non-debtor entity, that complains viciously about the extent to

5  which we talk about what happened pre-sale.  Not in terms of

6  trying to hold New GM liable for Old GM conduct, but rather in

7  order to elucidate what New GM knew, and when it knew it.

8  We're criticized when our complaint goes through a lot of the

9  background facts, and alleges Old GM knew, or New GM knew,

10 based on Old GM employees or Old GM books and records.  Well,

11 it was good enough for the U.S. Attorney to go through those

12 background facts in a deferred prosecution agreement, but it's

13 somehow improper for us to do it as part of a complaint.

14         New GM acknowledges that the background facts are

15 relevant to a claim against New GM in connection with a

16 forfeiture of nearly a billion dollars, on account of New GM's

17 liability for a scheme to conceal and defraud, but it doesn't

18 concede that those background facts are appropriate in our

19 complaint.

20         Nowhere in this deferred prosecution agreement does

21 GM take a position on the impropriety of imputing to New GM the

22 knowledge of Old GM employees.  And throughout its papers, what

23 it tells you is you can't do a wholesale imputation, and it's

24 like there's some wacko case named Weisfelner v. Fund 1 that I

25 seem to know a little bit about, but I don't think it's

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1   relevant.  They say there's no automatic imputation.  They

2   don't talk about automatic imputation when they enter into the

3   deferred prosecution agreement, and they don't do it because

4   they acknowledge throughout the course of this document exactly

5   which Old GM employees had what knowledge in connection with

6   these issues.  So we're told in Paragraph 70 that it was the PI

7   senior managers' knowledge that is important, both derived

8   while he was working for New GM, and while he was working for

9   Old GM's Safety Attorney.  And these are all capital or defined

10  terms, they use the office as opposed to the name of the

11  individual.

12          But we're told that a GM Safety Attorney consulted

13  with a GM vice-president to act as an executive champion in

14  order to propel the matter of the defective ignition switch

15  forward.  We are told about a GM electrical engineer, or GM

16  Safety Director, or PI's Senior Manager.  And Your Honor will

17  note that in our papers, we name very many of these people by

18  name, especially in the sealed portion of our brief.  And it

19  goes on and on, to talk about a GM Safety Attorney, and an

20  airbag FDA engineer.

21          GM didn't say to the U.S. Attorney, well, wait a

22  second, you can't determine this individual's knowledge based

23  on what he used to do at Old GM, that would be improper; we're

24  going to take you to bankruptcy court and take the position

25  that your imputation of knowledge is somehow inappropriate.

46

1    They didn't do that with the U.S. Attorney under fear of

2    criminal prosecution in order to get a $900 million deferred

3    prosecution agreement, and they shouldn't be allowed to do it

4    here.

5         And again, I think it's terribly important to

6    remember that we are talking about a car manufacturer, and at

7    times, the largest car manufacturer in the world.  Car

8    manufacturers have a statutory obligation to maintain certain

9    books and records consistent with their --

10        THE COURT:  Mr. Weisfelner, I got these points the

11   first two times you made them.

12        MR. WEISFELNER:  My point being that, when you have a

13   trade database, which New GM was required to maintain up until

14   the time that it got sold, and New GM is obligated to retain,

15   maintain, and continue to add to the trade database and its

16   field performance evaluation reports, documents that have to be

17   maintained on a daily basis, consistent with statutory

18   authority.  The employees that manage those databases and those

19   records can't have wiped them clean or burned them up on the

20   day that they became New GM employees. In fact, they were

21   obligated to maintain and continue to update those records for

22   one purpose and one purpose only, and that was to identify

23   safety defects.

24        And I -- Your Honor, the reason why I harp on this

25   point is I think, to a very large extent, acknowledging GM's

1  obligations as a car manufacturer with regard to what books and

2  records it was required to maintain, and the fact that old

3  employees became new employees, in particular the 24 critical

4  mass of employees that Your Honor's previously identified, I

5  think elevates this beyond the policy issues that GM keeps

6  harping on in terms of 363 sales.  We acknowledge and agree

7  with the proposition that except in extraordinary

8  circumstances, you can't eviscerate free and clear orders,

9  because it puts the bankruptcy court and the parties out of

10  business in terms of trying to obtain value in a necessary

11  sale.

12        We don't want to eviscerate the free and clear

13  provision, except as it relates to the issues that we have

14  pending on appeal.  But what we do want, consistent with Second

15  Circuit authority under <u>Manville III</u> and its progeny, is, New

16  GM is not entitled to a get-out-of-jail-free card with respect

17  to its own independent post-sale acts and failures to act, and

18  that's what the second amended consolidated complaint and the

19  state actions seek.

20        New GM had an independent legal obligation to recall

21  these cars, which it didn't do for years.  We think it didn't

22  do it for years from 2009 forward.  They have now admitted that

23  at least as soon as 2012 they had an obligation to recall,

24  which they failed to do, purposefully failed to do.  New GM had

25  a legal obligation to correct misleading statements regarding

1 the safety of the subject vehicles.  New GM had that

2 obligation.  New GM failed to correct the record with regard to

3 its prior misleading statements regarding the safety of these

4 vehicles that New GM published.  And we believe that New GM's

5 conduct gives rise to claims under various consumer protection

6 statutes for its acts, failures, deception, and as the

7 information suggests, defrauding consumers.

8         Your Honor, the fact of the matter is, New GM didn't

9 like this Court's decision with regard to independent claims

10 and has appealed that much of Your Honor's ruling to the Second

11 Circuit.  Now it seems to us it just wants to re-litigate that

12 same issue and those same findings.  There is no notion of a

13 consent or an acknowledgment by New GM that there's any such

14 thing as an independent claim pled in the volume of material

15 that consists of the second amended consolidated complaint, or

16 the two states' complaints.  Rather, they said any effort to

17 articulate an independent claim has been destroyed because we

18 make reference to Old GM, either contextually, or to

19 demonstrate knowledge acquired by Old GM employees that they

20 retained when they became New GM employees.  Not by some fancy,

21 automatic imputation, but by specific individuals named in the

22 information and it's been named in our pleadings.

23         And Your Honor, that sort of puts aside the issue of

24 whether or not -- there's two points.  Can we prove imputation

25 to the extent necessary to prevail?  That, I think as Your

49

1  Honor recognizes, is up to the courts adjudicating those

2  complaints.  The gatekeeping function, and it's an important

3  function, is whether we're allowed to make the allegation, and

4  in making the allegation of imputation, somehow we've destroyed

5  the independent nature of our independent claims.

6       Your Honor, I acknowledge again that we've gotten a

7  little bit far afield of punitive damages, and I know that that

8  was Your Honor's focus.  It is our contention that if you start

9  with an appropriate, independent claim, a claim by a non-debtor

10 against a non-debtor that deals exclusively with the misconduct

11 of the non-debtor, and doesn't rely on or incorporate the

12 misconduct of the debtor in possession, the settlement, that we

13 are entitled to punitive damages if a court competent in

14 jurisdiction determines we are, which as Mr. Weintraub

15 correctly indicated, first requires that you're entitled to

16 compensatory damages.  Without the former, compensatory, there

17 is no punitive.

18      And I think to the extent that the debtor is looking

19 for a merit-based finding, it's inappropriate, but it would be

20 inappropriate for us to be looking for a merits based finding,

21 either on the level of punitive damages, or on the level of

22 imputation, or at the level of are we entitled to refer to Old

23 GM's knowledge as opposed to Old GM's conduct.  What I could

24 never understand is why we have gone through this process of

25 marked pleadings, color-coded, and the arguments that ensued.

50

1  I don't know why it wouldn't have been sufficient for this

2  Court, as a gatekeeper, to address itself to all other courts

3  of competent jurisdiction, or for that matter, the parties

4  adjudicating matters before other courts, and indicate that a

5  trier of fact would be obligated to get an appropriate charge.

6  And that is that you can't find New GM liable for pre-sale

7  conduct of Old GM.  We agreed with that, subject to our rights

8  on the field.

9        Liability against New GM must be based on the acts or

10  failures to act by New GM that violated the duty to the

11  plaintiff and caused damages.  That's what the trier of fact

12  would be asked to do.  And frankly, Your Honor, we see nothing

13  in our pleadings that crosses the line and seeks to find New GM

14  liable for Old GM acts.  And Your Honor, unless you've got any

15  questions for me, I will tell you that, you know, we've looked

16  through the cases that were cited by New GM, in particular,

17  Judge Bernstein's decision in Burton, which doesn't contain the

18  phrase "imputation" anywhere in it.  That New GM argues is its

19  leading case on the claims and causative action that we've

20  asserted.

21        Your Honor will recall that Judge Bernstein's

22  decision in Burton was fundamentally a due process issue, where

23  the plaintiffs in that action were seeking to confine

24  themselves, or put themselves into a Grumman Olson category,

25  the claim that their due process rights were violated, and as a

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

51

1  consequence, the sale order and Chrysler ought not bar their

2  pursuit of claims.  And what Judge Bernstein found was, you

3  don't fall in the rubric of Grumman Olsen as a future claimant,

4  in part because there were multiple technical services

5  bulletins issued with respect to -- that was a fuel spit-back

6  problem, if I recall.  And as a consequence, the plaintiffs

7  were contingent claimants and should have filed claims and were

8  otherwise not deprived of due process.

9       Again, the case is being cited as rejecting a duty to

10  warn.  But Your Honor, Judge Bernstein goes on extensively to

11  talk about situations in which a duty to warn would exist.  And

12  perhaps it's worthwhile quoting from Burton on the duty to warn

13  because it's so heavily relied on by my adversaries.

14       What the Court said is, first of all, that the sales

15  order does not bar claims concerning vehicles manufactured or

16  sold by New GM -- I'm sorry, by New Chrysler after the closing,

17  for injuries resulting from the breach of any duties that arose

18  under non-bankruptcy law after the closing.  The Court leaves

19  the determination of the legal sufficiency of those claims to

20  the trial court.  In that case, it was a Delaware court.

21       On the duty to warn, what the judge indicated was

22  that the duty to warn raises a more difficult quest.  New

23  Chrysler did not assume Old Parko's (phonetic) duty to warn its

24  customers about the fuel spit-back problem, and any claim based

25  on the breach of Old Parko's duty to warn is barred by the sale

52

1  order.  Well, again, we're not talking about Old GM's duty to

2  warn, we're talking about New GM's duty to warn.  Judge

3  Bernstein goes on to say, nevertheless, the law may impose a

4  second duty to warn on New Chrysler.  Here, New Chrysler

5  purchased Old Parko's assets.

6          "While succession alone does not impose duty to warn

7          or predecess its customers of preexisting defects,

8          but a duty may arise where the successor succeeds to

9          the predecessive service contracts that cover the

10         machine, actually services the machine, is aware of

11         the defect, and knows the location of the machines'

12         owner.  In these circumstances, the law imposes a

13         duty to warn, because the successor has entered into

14         a relationship with the customer and derives an

15         actual or potential economic benefit."

16         Beyond that, Judge Bernstein noticed that a plaintiff

17 who suffers a personal injury because someone failed to warn

18 him about a dangerous product, and the failure to warn

19 proximately caused a substantive injury, that there is a

20 resulting duty to warn.  And while my adversaries sought to

21 rely on this Old Chrysler case, they failed to call Your

22 Honor's attention to the subsequent decision in the Holland

23 case that was decided in the Northern District of Ohio.  And in

24 that case, Your Honor, the issue before the court was again the

25 plaintiff's ability to pursue claims against the buyer in the

53

1  sale.  The judge cited to and distinguished <u>Burton</u> to the

2  extent necessary, but then followed <u>Burton</u> for the proposition

3  that the sale order did not prevent New Chrysler from assuming

4  obligations that it did not have, such as extending lifetime

5  warranty to repair or replace the defective fuel assembly.

6          Plaintiffs raised claims for failure to warn, failure

7  to address defect, negligent misrepresentation, and fraud.  An

8  important component of plaintiff's case is the fact that, in

9  essence, New Chrysler issued TSVs regarding the rusting on the

10  Chrysler Pacificas.  They acknowledged there was an issue, they

11  limited warranty coverage to only a small portion of the

12  vehicles.  As explained in <u>Burton</u>, such claims cannot be barred

13  by the sale order, and under the same logic, citing to their

14  leading case, there's nothing about our independent claims that

15  are somehow converted into being inappropriate claims in

16  violation of either the sale order or Your Honor's decision and

17  judgment as a consequence.

18          Your Honor, I can go on and distinguish each and

19  every one of the other cases that has been cited, in

20  particular, the <u>Conmar Products Corp. v. Universal</u>, the zipper

21  case.  We believe it was woefully mis-cited as standing for the

22  proposition that a buyer is not liable for the trade secret

23  violation, or a trade secret violation, despite knowledge of an

24  employee regarding that trade secret hired from the seller.

25  That wasn't Judge Hand's ruling at all.  Judge Hand pointed out

54

1  that there was no obligation of the employee to disclose the

2  fact that there was a trade secret, or that the trade secret

3  was a subject of a separate confidentiality agreement.  That

4  there was nothing customary in those sorts of transactions to

5  require secrecy contracts from factory workers.

6       That's not our case.  Our case involves a whole bunch

7  of very senior level Old GM employees that became New GM

8  employees, continued to act in their same scope of authority

9  and conduct, who had a statutory federal law obligation to

10 bring issues that it carried over from Old GM, or realized anew

11 at New GM, and report them, and they didn't.

12      Likewise, Nassimi doesn't support their proposition.

13 Nassimi tried to defend against fraud in a sale of its business

14 to Chamberlain, and Chamberlain sought recision.  Nassimi

15 argued waiver, along the line of laches, on the theory that

16 you've known about this fraud by imputation since you've hired

17 one of my prior employees who knew all about the fraud.  And

18 what the Court said in that case is, we're not going to allow

19 Nassimi, who's guilty of fraud, to argue waiver because one of

20 his former employees who knew about the fraud didn't tell the

21 new employee about the fraud, because it wasn't part of his

22 business, and because we weren't going to allow Nassimi to use

23 his ex-employee's knowledge of the fraud to avoid recision.

24      Again, it doesn't stand for the proposition that it

25 was cited for.  This individual had no reason to disclose the

1  fraud, no duty to disclose the fraud.  Not our case at all.

2  And Your Honor, I'm sure you've read, and I don't need to go

3  through unless you have any questions about it, the KCP&L case

4  where KCP&L sold the business to IPC.  The issue is whether or

5  not there were tar pits that were known or disclosed, and

6  whether or not there was an indemnity obligation that flowed.

7          And there again, the court in dealing with imputation

8  issues said that, quote, "the seller and IPC knew that it was

9  taking on liability for coal tar pits."  And what the Court

10 said was, no, read the contract.  And the fact that one of the

11 employees that used to work for the seller came to work for the

12 buyer, and knew about these coal tar pits is not determinative,

13 because again, you have to focus on whether or not that

14 individual had a duty to disclose to its new employee, and

15 whether the knowledge of the tar pits had to be disclosed, or

16 has knowledge that it had within the scope of its employment

17 with the new employer such that you could impute knowledge from

18 the agent to its principal.

19         Your Honor, I fear that I've taken up more time than

20 Your Honor was prepared to give to these issues, so unless Your

21 Honor has any questions, I would just end by going back to the

22 beginning.  Section 6.15 of the sale agreement.  New GM agreed

23 to abide by all of the Safety Act obligations with respect to

24 vehicles and parts manufactured by Old GM.  It is admitted

25 knowledge of the defect, it's admitted it concealed that

56

1  knowledge, it's admitted that it made false and misleading

2  statements to the public.  New GM's knowledge, regardless of

3  the source of that knowledge, is what puts it in the scope of

4  liability.  That's an independent claim.  And Your Honor,

5  unless you have any questions, I have no further comment.

6          THE COURT:  No, I don't.

7          All right.  Mr. Steinberg, they went way beyond what

8  I had envisioned.  Can you give me a time before you go right

9  up?

10         MR. STEINBERG:  Your Honor, if I could just have five

11 minutes?  If I might --

12         THE COURT:  You've got five minutes.  We'll resume at

13 11:25 on the clock up there.  We're in recess.

14     (Recess taken at 11:16 a.m.)

15     (Proceedings resume at 11:27 a.m.)

16         THE COURT:  Mr. Steinberg, whenever you're ready.

17         MR. STEINBERG:  Good morning, Your Honor.  I want to

18 talk about first the punitive damages you've claimed to sort of

19 highlight that it comes up, as Mr. Weintraub said, in three

20 ways.  I want to spend my first time talking about punitive

21 damages in the context of the liability, product liability was

22 assumed under section 2.389 of the sale agreement.

23         The three ways, just to put it on the table, is

24 whether this was an assumed liability, meaning whether we

25 assumed punitive damages under Section 2.389.

1        The second way that Mr. Weintraub said it comes up,

2  he framed it as in terms of independent claims.  We frame it as

3  whether there was an independent claim, or retained liability.

4  I think they will concede that if it was a retained liability,

5  they're not entitled to punitive damages.  So the issue in that

6  second context is whether the claims that they're asserting are

7  retained liabilities versus independent claims.

8        And then the third, which is a relatively small

9  category, is that to the extent that we recognize that there's

10  an independent claim, if the basis upon which they will seek

11  punitive damages in that case was based on Old GM conduct,

12  well, that's just another form of successor liability claim.

13        But Your Honor I think wants me to talk about section

14  2.389, and whether we believe that that section provides for an

15  assumption of punitive damages, and that's where I'd like to

16  turn to now.  And Your Honor was correct, and I don't think

17  that they really quarrel with this, is that even under contract

18  interpretation law, you'd have to look at the entire integrated

19  agreement, and terms must be read consistently and

20  harmoniously.

21        And in this particular case, where the contract was

22  amended to address a specific objection raised to the Court,

23  you need to look at the section and the context of the

24  objection that was raised.  And the relevant section of 2.389

25  can't be viewed in isolation.  It needs to be construed in the

58

1   context of that entire sale agreement, and the objections made

2   to the sale motion.

3          Now, some of this, Your Honor, I know that you know,

4   but I think it helps frame the argument that at the time of the

5   363 sale, there were 70 million vehicles, or Old GM vehicles,

6   on the road.  And they have a divide, who is responsible for

7   the vehicles that had been sold by Old GM?  And the purpose of

8   the assumed liabilities, retained liabilities section of the

9   sale agreement was to divide up that responsibility.  And so

10  the general rule, as Your Honor had recognized, is that

11  retained -- everything was a retained liability, unless it was

12  listed as an assumed liability.

13         Retained liabilities was the catch-all.  Retained

14  liabilities in Section 2.3, had a list of 16 potential retained

15  liabilities, but it wasn't clearly set forth as not being an

16  exclusive list.  And the retained liabilities section says that

17  a retained liability that accrues or may, in effect, arise

18  after the closing of the sale, is still going to be retained

19  liability.  The thrust of the agreement was that New GM was

20  going to be responsible for assumed liabilities, and everything

21  else was Old GM.  If it was Old GM's responsibility, by

22  definition, it could not be New GM's liability.

23         And that, I think, is the context that you have to

24  look at section 2.389.  Because when the sale agreement was

25  filed, the only responsibility that New GM had on the diversion

59

1   that was filed with the sale agreement was to assume,

2   effectively, the glove box warranty, which was not a damage

3   claim, it was a repair-type obligation for a limited duration.

4   There were objections that were filed to the sale motion based

5   on that, as it relates to Old GM vehicle owners, there were two

6   things that were added.  One was the lemon law claims, which no

7   one is quarreling about is effective here, and the second was

8   the product liability section, Section 2.389.

9           Now, when you look at Section 2.389, you have to look

10  at it in the context of what was originally filed under Section

11  2.389, and how the section had changed.  And Your Honor, I had

12  given my opponents a one-page sheet, which I'd like to hand up

13  to Your Honor, before the hearing, which just highlights what

14  the 2.389 looked at when the sale motion was filed, and then

15  what the final version was of 2.389 as approved by Your Honor,

16  just so you can have the language in front of you as I go

17  through the language.  So if it's okay, if I may approach?

18          THE COURT:  Yes.

19          MR. STEINBERG:  Now, the first thing I'd like to

20  point out is I want to focus on the final approved version of

21  Section 2.389.  And I want to point out that on the word

22  "liabilities."  And if you notice, Your Honor, and I think my

23  adversary would like to use the word "all liabilities."  If you

24  actually go to the sale agreement, most of the retained

25  liabilities start off with all liabilities as well, too.  Most

60

1   of the assumed liabilities start off all liabilities as well.

2        But liabilities, in the final version, is not a

3   stand-alone term.  That is, it's a term that was used as part

4   of the overall definition of product liabilities, and that's

5   what Section 2.389 is about.  And if you look at what was the

6   original version of 2.389 versus the final version, you see the

7   addition of the words "caused by the motor vehicle."

8        THE COURT:  That being the bold, italicized --

9        MR. STEINBERG:  That's correct.

10        THE COURT:  -- language in that middle paragraph?

11        MR. STEINBERG:  That's correct.  And so that -- there

12   was a purposeful change.  Now, understand that the original

13   version was intended for something different than what the

14   final version was.  The original version said that with regard

15   to a vehicle that New GM sold after proposing you would have

16   these -- and got into an accident, there would be a product

17   liability claim.  And the purpose of the amendment was to now

18   pick up liabilities for New GM with respect to vehicles sold by

19   Old GM prior to the sale, so it's trying to cover something

20   different.

21        It was a much broader concept, and therefore when

22   someone defined product liabilities, they changed the

23   definition by inserting different words because they didn't

24   want to assume anything that someone could throw at them for a

25   product liability accident.  They want to confine it to damages

1 relating to the accident itself.  And so you see the language

2 that was added of "caused by the motor vehicle," which is

3 different.

4        The next words that were different were the words

5 "directly."  Now Your Honor will see that the language of 2.389

6 is somewhat cumbersome, cumbersome in that the phrase caused by

7 -- that the phrase "arising directly out of death, personal

8 injury, or other injury to the persons or damaged the property"

9 is repeated twice in the agreement.  It's repeated first in the

10 context of the definition of product liability, and then after

11 you're outside the definition of product liability, they're

12 repeated again.  And the only reason to repeat it again,

13 because the word "directly" is not there before, it's a

14 modification because you needed to add the word "directly."

15 And "directly" was a word of limitation.

16        It was to limit the injury that it had to be direct.

17 It had to be caused by the motor vehicle, and it had to be

18 direct.  That language has to be given a purpose and a meaning.

19 The word was inserted to imply something that was limiting what

20 the overall definition of product liabilities were.  And that

21 has to be read also in a context of the other words that were

22 added into the agreement, and those other words were "arising

23 from the motor vehicle's performance" and "directly caused by

24 the accident," "caused by the accident."

25        Now, my adversary talks about it in terms of, you

62

1   know, causally connected, Your Honor, and uses that word, the

2   "causally connected."  But causally connected to an accident is

3   different than caused by the accident, caused by the defect.

4   And my adversary says, no, cars don't cause -- you don't sue

5   cars, you sue people.  Well, that's true.  I agree with that.

6   You sue people, you sue -- here, you sue the person for the

7   claim that he agreed to assume, which is limited by the words

8   of 2.389, because of the word "directly caused by accidents."

9        When you read the section together, it reads that an

10  assumed product liability claim is limited to the circumstance

11  when an injury to be compensated is, A, directly caused by the

12  motor vehicle; B, directly caused by the accident; and C,

13  directly arises from the motor vehicle's performance.  And

14  that's the essence of compensatory damages, and not punitive

15  damages, which are discretionary and designed to punish

16  reprehensible conduct of the wrongdoer, and to deter future

17  violations by the wrongdoer.

18       Now, the interpretation of 2.389 must be made within

19  the context of why the section was amended.  The language that

20  was there was to pick up for a particular objection that was

21  made by the Creditors Committee and the States Attorney

22  Generals, including the States Attorney Generals of Arizona and

23  California, and no one suggested in their objections that they

24  should assume the word "assume punitive damages."  It was to

25  make people whole for the injuries that they suffered, and

63

1  punitive damages are a windfall to the plaintiff.  They bring

2  it as sort of a private attorney general, but it's a windfall.

3  And once you've got your compensatory damages, you've been made

4  whole.

5        Now, the plaintiffs make a lot to the argument that

6  the word "punitive damages" is not in section 2.389.  That's

7  true.  I don't know where you go from that, both sides are

8  arguing the opposite inference, right?  We argue that if you

9  wanted us to assume punitive damages, you know how to write

10 that.  You didn't put it in, and then we assert that the

11 contract interpretation that assumed liabilities with the

12 exception to the general rule, so if you didn't expressly

13 provide for the exception, then the general rule would apply.

14       They opt -- they argue the opposite inference, and

15 the best that you can say is that when you don't have the

16 outcome-determinative term "punitive damages" in what we're

17 arguing about here, you have ambiguity.  It's hard to argue

18 that something is unambiguous when the provision doesn't

19 address it one way or another.  So they say that you don't have

20 the word "damages" there.  But you know what?  The word

21 "liability" is the defined term, that broad term liabilities?

22 That doesn't have the word "damages," either.

23       Section 2.389 actually does have "damages" in there.

24 Not capital "D," lower "d."  What's the term the damage is used

25 for?  It's damage by property, property damage.  So did we --

64

1  do we take our position that because they referenced the word

2  "damage" and it's just property damage, that that's the limit

3  of our liability?  That's not what they said.  So you have an

4  ambiguity here, because the words "punitive damages" were not

5  included.  But the language of limitation that were put in

6  subsume punitive damages.

7          The language of limitation was directed not only to

8  eliminate punitive damages, but to eliminate those types of

9  product -- those types of causes of action that are sometimes

10 brought in connection with a -- an accident case that aren't

11 related specifically to the accident.  And if you look at the

12 original definition of "product liabilities" under the first

13 version, there's a parenthetical there:  Negligence, strict

14 liability, design defect, manufacturing defect, failure to

15 warn, breach of the express implied warranties and merchant

16 ability, or fitness for particular purpose.  Duty to warn there

17 being the duty to warn at the time of the vehicle sale.

18         That is what New GM believed that they were assuming.

19 They didn't repeat the litany when we got the final version,

20 because they had to address something broader than that.  They

21 wanted to eliminate consumer action type claims, false

22 advertising claims, they wanted to eliminate fraud type claims,

23 and therefore, they put in those words of limitation that

24 narrow what was actually assumed, and those words of limitation

25 subsume the prohibition on the assumption of punitive damages.

65

1        THE COURT:  I'm having a little trouble following the

2   latter argument.  If New GM didn't want to be held liable for

3   false advertising, by way of example, that would seem to be

4   covered by both the old and the new language.  No, because the

5   old language still said to third parties for death, personal

6   injury, or other injury to persons, or damage to property.  And

7   the new language talks about directly out of death, personal

8   injury, or other injury to persons, or damage to property

9   caused by accidents or incidents, and arising from such motor

10  vehicle's operation or performance.  It seems to me to be

11  saying the same thing in different ways.

12        MR. STEINBERG:  Except that --

13        THE COURT:  And in each case, if you were closing

14  something like false advertising.

15        MR. STEINBERG:  Well, Your Honor, I think that in the

16  first case, the original version, that if New GM was the one

17  that sold the vehicle, that -- and there was an accident, I'm

18  not sure what they were precluding.  It says "including

19  liabilities for" and it doesn't specifically take that away.

20  And this relates to when, in fact, the New GM conduct action

21  after the sale, where New GM actually sold the vehicle.  So

22  it's not particularly clear whether they were carving that out,

23  but when they got to the final version, they knew they had to

24  carve it out, and that's what they did here.

25        We said that there's -- we also argued in our papers

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1   that there's an overarching reason why there was not an

2   assignment of punitive damages, and that's because New York law

3   that applies to the sale agreement does not provide for the

4   assignment of punitive damages.  And we cited two cases that

5   established there have been fairly well recognized law that

6   punitive damages are a form of retribution for reprehensible

7   conduct towards the plaintiff, and as a matter of public

8   policy, that exposure to reprehensible conduct and the need to

9   punish the wrongdoer itself cannot be offloaded by the alleged

10  wrongdoer.  And we cited to <u>Fabiano v. Philip Morris</u>, 54 AD 3d

11  985 (2008); <u>Home Insurance v. American Home Products</u>, 75 N.Y.2d

12  196; <u>Soto v. State Farm,</u> 83 N.Y.2d 718.

13          They all stand for the proposition that you can

14  insure for punitive damages, but an insured can't look to its

15  insurance company to indemnify them because the purpose of

16  punitive damages is to allow -- is to punish the wrongdoer and

17  deter them from acting again, and allowing coverage that serves

18  no useful purpose, since damages are a windfall for the

19  plaintiff.  That's the way that the language is written.  And

20  in <u>Soto</u>, they said, punitive damages are intended to punish and

21  deter.  Its goal is condemnation and retribution, and that goal

22  cannot be reconciled with allowing the wrongdoer to avert the

23  economic punishment, you know.  So you couldn't assign the

24  punitive damage claim anyway, as a matter of public policy.

25          Old GM did something wrong, and Old GM was

67

1  responsible for its actions, and if that were egregious that it

2  required a punishment and to deter Old GM from acting again,

3  that liability remained with Old GM.

4          There's another contractual interpretation principle

5  that we cite in our papers, which is that when there is a

6  requirement to assume a -- when there is a contractual

7  obligation to assume a liability, and it's not typically

8  assumed, then the failure to specifically identify that

9  liability as being assumed means that it wasn't assumed.  And

10  so we try to give Your Honor some analogous cases in the

11  indemnity context and the guaranteed context and the

12  subordination context, where people said that unless you were

13  explicit as to the assumption of an obligation, you have not

14  assumed the obligation.

15          And most, Your Honor, we think that when you go

16  through this all, you're back where I think Your Honor had

17  said, which is that you have an ambiguous position, not

18  unambiguous like the plaintiffs have argued, and that you need

19  to resort to the extrinsic evidence.  And when you get to the

20  extrinsic evidence, I think it's clear that they lose.

21  Punitive damages don't serve any compensatory goals, they're a

22  windfall for the plaintiffs, and they're not property rights.

23  We cited the Erquist (phonetic) case, which says that

24  compensatory damages are a property right, entitled to due

25  process protection, but punitive damages are not.  They are

68

1  discretionary moral judgments, and a plaintiff's expectation to

2  receipt of punitives is too speculative to constitute property

3  under the takings clause.

4          And when you need compensatory damages to get to

5  punitive damages, that doesn't mean that punitive damages

6  aren't a separate concept.  Plaintiffs argued that they're

7  inextricably linked, and that's true, in the -- to the extent

8  that you don't get to punitives unless there was compensatory.

9  But that doesn't mean that punitives are not a totally separate

10 category, and when Mr. Weintraub said that the converse is

11 true, one of the few things that I remember from my high school

12 geometry is that the converse is not always true, and it's not

13 true in this case.  You needed to have to specifically assume

14 the liability or not.  Punitive damages were separate.  The

15 cases say in order to have punitive damages, you need to show

16 pervasive and grave misconduct affecting the public in general.

17 In the Fabiano case, punitive damage claims, when asserted in

18 the context of a personal injury actions, do not essentially

19 relate to the individual injury, which is our argument.

20         Punitive damages, while they are somewhat connected,

21 they're not caused by.  These are not situations -- when you go

22 to the New York -- the standard form of New York jury

23 instructions, which we also cited in our papers, they consider

24 the wrongdoer's similar conduct in other situations.  That's

25 irrelevant to compensating someone for damages on a specific

1  accident.  And they also look to the wrongdoer's financial

2  condition in determining the level of punitive damages.  That

3  also is irrelevant to compensating somebody for injury caused

4  by a particular accident.

5          And when Mr. Weintraub says that calling someone a

6  successor is the same thing as saying that their liability was

7  assumed, that's clearly wrong.  New GM is not the successor to

8  Old GM under any of the tests, and the Court found that way.

9  Clearly, we assume the liability of whatever it was that was in

10 the sale agreement, and that was what we assumed.  But that

11 doesn't mean he can -- they can write complaints that say

12 things like, New GM is the successor to Old GM.  They can't

13 write complaints like they've done in the <u>Bellwether</u> cases that

14 say that New GM manufactured a 2005 vehicle.  That's just

15 wrong.

16         And when Mr. Weisfelner and Mr. Weintraub talked

17 about the imputation doctrine, which I'll get to in a couple of

18 minutes, the references to give what happened with Old GM, for

19 purposes of background, I think Your Honor said is relevant,

20 and you could do it in certain instances.  But Your Honor has

21 actually ruled on this subject.  You can't do it in the way

22 that they've done it, because the way they're trying to do it

23 is to essentially assert a successor liability claim without

24 calling it that.  And that is inappropriate.

25         Tying back to the assumption of product liability

70

1 claims, the two elements of why you have punitive damages,

2 punishment and deterrence.  On punishment, the sale order says

3 the New GM is not responsible for Old GM conduct.  And I think

4 I tried to understand what Mr. Weintraub was saying, and let me

5 see if I can repackage it to what I was saying, not what he

6 thought I was saying.

7         If Old GM did something wrong that was a retained

8 liability, that didn't become a liability of the New GM.  New

9 GM is responsible for its own conduct, and if there was a

10 liability that New GM had that was not otherwise cut off by the

11 free-in-sale aspects of the sale order, New GM is responsible

12 for that conduct.  New GM is not asking Old GM to be

13 responsible for its cut.  And what they -- the contortion that

14 he had to get to that conclusion made no sense to me.  But to

15 say it again, Old GM conduct cannot be a source of a New GM

16 liability if the order cut off that type of liability.  It was

17 an Old GM liability, based on Old GM conduct.  The sale free

18 and clear meant that New GM didn't take that liability on

19 unless it was an assumed liability.  And New GM is responsible

20 for its own legal duties, and Your Honor in Bledsoe was

21 correct, that if New GM knowingly installed the defective

22 product, this defective part in a vehicle, even if it was an

23 Old GM vehicle, that would be a claim that they could assert

24 against New GM.

25         And I think, Your Honor, just to take it off the

71

1  table, I think as part of your gatekeeping function, we would

2  say certified pre-owned.  Certified pre-owned vehicles, where

3  the vehicle was sold used after the sale, but came with a New

4  GM warranty, limited warranty, we're taking that off the table.

5  We recognize that that is an independent claim, for whatever

6  it's worth.  We do say in our papers, and you can see it from

7  the deferred prosecution agreement that at least as -- insofar

8  as the ignition switch, the defective ignition switch, was

9  probably about 800 total of the vehicles that have fit with

10 them in the certified pre-owned category.  But whatever it is,

11 it's more or it's less, that is -- we do take that as on its

12 responsibility.

13         But there needs to be a volitional act, a new

14 volitional act, that New GM takes on that creates the

15 liability.  It can't be because there was an inherited duty

16 that was otherwise cut off by the sale order.  And that's where

17 we go to Your Honor on the gatekeeping function, and the

18 significance of the quantitative action that have been asserted

19 against New GM with respect to Old GM vehicles.  The sale order

20 cut off responsibilities for that, except for assumed

21 liabilities.  Your Honor had said, in your April 15th decision,

22 that if they can assert an independent claim that would

23 otherwise be barred by the sale order, but is based on New GM

24 conduct only, they should be able to assert.

25         So one of the things that we tried to do in our

1  papers, through the marked pleadings and through our letters

2  and through our no-strike pleading, was to challenge them on

3  that.  Look at the particular causes of action in the MDL

4  complaint that they're asserting, and tell me which one of

5  those are the independent claims that they're allowed to

6  pursue.  Now, I think Mr. Weisfelner said that the whole of --

7  they're saying the whole MDL complaint can't go forward, and

8  while we may have said that they improperly pled and didn't

9  listen to Your Honor's instructions before, we recognize that

10 both the state's causes of action and the MDL complaint have

11 situations which relate to New GM vehicles sold by New GM.  And

12 we haven't come to Your Honor to try to parse that.

13         What we argued for, Your Honor, is with respect to

14 Old GM sold vehicles prior to the sale, and Old GM vehicles

15 which were sold after the sale by third parties who were

16 unrelated to New GM.  We're saying that those, that category of

17 parties, can't sue New GM unless there's a new independent duty

18 that we took on.  And that new independent duty has to be a

19 volitional act, it can't be something that we inherited from

20 Old GM, because the purpose of the free-and-clear order was not

21 to have those in actions, and the Holland case that

22 Mr. Weisfelner referred to, the thrust of that case was the

23 fact that old -- New Chrysler had extended warranties.  And

24 that was the linchpin for them to assert an independent claim.

25         They actually conceded that they didn't have claims

73

1  against the New Chrysler for liabilities, except for new

2  volitional acts.  And the judge, who at that point was

3  exercising the gatekeeping function that perhaps the bankruptcy

4  court should have exercised, because he was not transferring

5  the case to the bankruptcy court, the judge said, well, I think

6  there's enough here to have independent claims asserted.

7          It so happens, if you look at the document in the

8  Holland case, by the way, Your Honor, is that the day -- within

9  a week of --

10          THE COURT:  Which document?  The complaint in

11 Holland?

12          MR. STEINBERG:  The Holland complaint.  I'm sorry,

13 Your Honor?

14          THE COURT:  No, you said if you look at the document

15 in Holland.  Were you referring to the complaint in Holland, or

16 something else?

17          MR. STEINBERG:  Talking about the docket sheet in

18 Holland.  You'll see that shortly after that was filed, New

19 Chrysler made a motion for judgment on the pleadings, which has

20 not been argued.  But they immediately said to the judge,

21 there's nothing there that has been asserted that there's a new

22 volitional act.  And your whole decision was based on the --

23 whether New Chrysler had a sufficient relationship with the Old

24 Chrysler vehicle owner, based on something that New Chrysler

25 did.  And so they went to attack that particular finding.  But

74

1  there's nothing here that is being alleged against us, New GM,

2  in this context of a volitional act.  It's all predicated on

3  the recall covenant, and the failure to comply with the recall

4  covenant.

5         The policy objectives, going back to punitive damages

6  -- and I took myself on my own tangent.  The policy objectives

7  on punitive damages are not met.  Punitive damages are

8  subordinated in bankruptcy, and based on the sale price that

9  New GM was paying, Old GM was clearly going to be insolvent,

10 and punitive damages would never have been awarded.  New GM

11 would never have assumed a claim that Old GM would never have

12 been required to pay.

13        And that's not speculation, as said by my adversaries

14 in their papers.  That was known at the time of the sale.  They

15 were going to have a finite recovery, it was going to be

16 insolvent, and that new -- Old GM remained insolvent after the

17 sale, and there was not going to be any payment on subordinated

18 claims.

19        The Creditors' Committee who objected to 2.389 were

20 going to be the future equityholders of New GM.  They had an

21 economic interest to make sure that New GM would have value in

22 their shares.  They never would have agreed to an open-ended

23 assumption of punitive damages, which could theoretically

24 affect the equity that they were going to get.  And they

25 certainly wouldn't have done it if it was a reversal of the

75

1  priorities that the Bankruptcy Code gives them, because they

2  were ahead of subordinated claims, and if punitive damages were

3  being assumed, they would have leapfrogged ahead of the

4  unsecured creditors, and they never would have tolerated that,

5  as well.

6            And then on the deterrence factor, it's clear, Old GM

7  was out of business after the 363 sale, so there's no objective

8  served by assuming these liabilities.  So to sum up on the

9  assumption point, punitive damages have a specific purpose.  It

10 is to punish and to deter conduct.  It is not tied to

11 compensating the victim, it's a windfall to the victim.  When

12 this section was amended, it was specifically amended to

13 address how to compensate someone who may get into an accident

14 in the future.  It wasn't meant to have an open-ended windfall

15 go to people, and no one took that obligation on, and the

16 language that they put in 2.389, which is different than what

17 the original version was, was to limit that.  I think the --

18           THE COURT:  I thought an element of the assumption

19 was that with New GM continuing in business, it was

20 commercially necessary to give auto owners, the 70 million you

21 talked about on the road, comfort that if they later got hurt,

22 somebody wouldn't be saying, well, your car was manufactured by

23 Old GM, and therefore you had a contingent claim and you didn't

24 file a proof of claim against Old GM, you were out of luck.

25 And to deal with the tension that you have in products

76

1  liability cases, that some of the acts that result in the cause

2  of action may take place prior to the petition, and other acts

3  may take place -- and the injury may result after the petition.

4      Do you think I should divorce that understanding from

5  my analysis or do you think that's part of this one?

6      MF. STEINBERG:  I think it is part of it.  I think

7  when I said to Your Honor you need to understand the context of

8  why the amendment was made, it happened in front of you and

9  that this was the language that emerged from that and the

10  reasons why people told you this was happening, I think you

11  have to consider it.

12      And I actually don't disagree with a lot of what you

13  said, Your Honor, which is that there was the concern about the

14  due process future creditor issue that was raised as part of

15  the sale.  No one wanted to have the sale bogged down.  There

16  was an urgency to close this within a specific period of time.

17      This was an important issue that had been raised, and

18  it was an issue that they took off the table.  But they took it

19  off the table to pay for compensatory damages.  They didn't --

20  there's nothing that's a property right for punitive damages.

21  They weren't trying to do punitive damages, and no one has

22  raised anything to suggest that this was on the table and they

23  said we should assume it.  I mean, there's no one who said that

24  punitive damages was raised as an issue.  Everything that was

25  raised was in the context of compensatory damages.

1          I mean, what I've tried to articulate to you is that

2    if the creditors committee went to try to put a priority ahead

3    of them, they wouldn't sit there -- Old GM wanted to have

4    necessarily a claim that they never were going to pay be paid

5    by us.  The creditors wouldn't want our equity affected by that

6    and they wouldn't want to have a reversal of priorities.

7          And there was no basis to punish New GM.  And

8    remember, New GM is the government-sponsored entity that was

9    bailing out the auto industry at the height of the industry at

10   a time when the economy needed that type of action, but it was

11   the government.  The government wasn't going to sit there and

12   take punitive damages on.  They wouldn't take pre-sale accident

13   claims on.

14         That was one of the big issues that Your Honor had in

15   front of the sale hearing, which is the pre-sale accident

16   victims saying, you know, you should assume it; you took post-

17   sale accidents, take pre-sale accidents.  And the government

18   said no.  That was the line that they drew.  Certainly there's

19   no suggestion by anybody that anybody thought it was

20   commercially necessary to take a discretionary moral judgment,

21   punitive damages, based on the old entity owned by other

22   people.

23         And I think that that addresses the assumed liability

24   issue.  I think Your Honor was correct, though, on the other

25   two categories.  It really flows from whether it's an

78

1    independent claim or a retained liability.  If it's a retained

2    liability, there's no punitives.  If it's an independent claim,

3    it will be up to the fact finder in some other court to decide

4    whether a meritorious claim has been made.  But it has to be

5    based on whether there's an independent claim.

6          The imputation issue, I think the plaintiffs called

7    it a red-herring issue, and I wouldn't say it was a red-herring

8    issue, but I'm not sure how much we disagree because

9    fundamentally, at the end of the day, it -- to me, it relates

10   to whether the claims that they're asserting are retained

11   liabilities or assumed liabilities, and the imputation issue

12   only has the relevance for that purpose.

13         New GM's argument is that you can't impute knowledge

14   of events that took place at Old GM automatically and on a

15   wholesale basis to New GM as of the 363 sale closing.  And I

16   think, Your Honor, in your April 15th decision actually said

17   that that was true and that you hadn't based your decision on

18   any kind of automatic or mechanical imputation from agency

19   doctrine and which you thought would be a doubtful wisdom.

20         THE COURT:  And what we're talking about, too, or if

21   you can Weisfelner v. Fund 1 to be different kinds of

22   imputation.  Weisfelner v. Fund 1 involved, insofar as it's

23   relevant here, an intentionally fraudulent conveyance claim.

24   And his opponent in that case, or his partner's opponent in

25   that case, had argued that the only way you can decide whether

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

1   to engage in an LBO is by an action of the board, and you can't

2   impute the -- and there was evidence in that case to show that

3   the CEO had enough evil knowledge -- to the board without --

4   automatically.

5           And that was what I addressed there.  What I was

6   talking about in this case was in deciding what's a new claim,

7   which is a matter of federal bankruptcy law, how much knowledge

8   is required to establish the imputation appropriate to make it

9   a known claim.  And I ruled in substance I didn't need to

10  decide whether one person or a factory worker would be enough

11  because of the nature and level of the people who had the

12  knowledge.

13          What we're talking about in the tort context is a

14  third kind of imputation, that which is necessary as a matter

15  of state tort law or maybe some miscellaneous federal law.  And

16  I'm saying -- or I'm asking myself, why do I need to decide

17  that?  Why don't I let Jesse Furman decide that.  And I think

18  that's where I'm still headed.

19          MR. STEINBERG:  Okay.  Well, I think, Your Honor --

20  the reason why I think it's important for you to decide some of

21  this, right -- it doesn't have to be all of this, but some of

22  this -- is that if they're asserting a retained liability, then

23  they are violative of the sale order.  And Your Honor talked

24  about you can't do it as a dressed-up successor liability

25  claim.  Judge Bernstein talked -- used the same kind of concept

80

1  when he -- and Burton when he talked about it, as well, too.

2         And the question is whether they took a retained

3  liability and made it -- and ARE asserting it as an independent

4  claim, but it's really just a retained liability.  And that's

5  the gatekeeping function that you have.  If what they are

6  asserting, based on what they pled and based on the sale order

7  and based on the sale agreement, is a retained liability, then

8  I think they're not allowed to go forward.  We've come to you

9  in past times to say to Your Honor, don't let these actions go

10 forward because they're retained liabilities.

11        If they are asserting something that is purely an

12 independent claim, then I think Judge Furman should decide the

13 merits of that claim.  But if it's not, and I think I can go

14 through each one of the causes of action, and that's why I

15 think it's important to not deal with this on sort of a macro

16 high-up level, but you need to do it on a micro level as to

17 what it is they're actually alleging to see that what they're

18 alleging is improper.

19        And if I can -- if it's helpful to Your Honor, I

20 could talk about -- a little about the marked pleadings and

21 what I was talking about, and then I'll go back to the

22 imputation.

23        The NDL complaint lists 63 individuals who were named

24 as plaintiffs in the pre-sale consolidated complaint.  Your

25 Honor had said that that action, the pre-sale consolidated

1    complaint, was barred by the sale order.  So when they went to

2    amend, they just created a new complaint and kept the same

3    plaintiffs there and basically asserted the same causes of

4    action.  They may have taken out the words "successor

5    liability," but otherwise it's the same fundamental claims that

6    are being asserted there.

7            They asserted 40 additional plaintiffs that are used

8    car purchasers.  Your Honor had decided that used car

9    purchasers who didn't buy from any relation to GM are

10   fundamentally the same as the original purchasers, and

11   therefore they don't have claims, either, and those are barred

12   by the sale.  So when you look at it, there are 130 named --

13           THE COURT:  These are economic loss claims we're

14   talking about.

15           MR. STEINBERG:  That's correct.  That's correct.

16           THE COURT:  I mean, if somebody buys a used car, GM

17   car, and is hurt afterwards, you would agree that that's a

18   different situation.

19           MR. STEINBERG:  That's correct.  That's an assumed

20   liability.  I'm now focused on the NDL complaint, which is the

21   economic loss complaint.

22           THE COURT:  All right.

23           MR. STEINBERG:  So 80 percent of the named plaintiffs

24   in the NDL complaint are either original purchasers of Old GM

25   vehicles or used car purchasers from people unrelated to Old

1  GM.  And I think we cite it in our no-strike pleading, but if

2  you look at the complaint that we marked up on the NDL, you see

3  examples -- and I'm going to give you five or six, but I can

4  literally give you a hundred because that's what we marked.

5          Paragraph 36, Melissa Kay bought a used 2006

6  Chevrolet without a warranty in 2013 from a Toyota dealership.

7  Debra Forge (phonetic) bought a Chevrolet Cobalt in 2007 for

8  $16,000.  Eight years later, she claims the car is now worth

9  $6,000.  She claims that she would not have bought her vehicle

10 if she knew of the problems with the car.  Well, that relates

11 to point-of-sale conduct of Old GM.

12          Aaron Henderson (phonetic), paragraph 39, bought a

13 car in 2007.  Would not have bought the vehicle if he had known

14 about the defects.

15          Paragraph 40, Marian Snow (phonetic), bought a car in

16 2005.  Would not have bought the car if she had known about the

17 defects.

18          Paragraph 41, Grace Bedford (phonetic), purchased a

19 Chevrolet Cobalt in 2005.  She traded it in almost ten years

20 later.  She would not have purchased the car if she knew about

21 the defects.

22          And the last one -- and I said I could go on -- but

23 Patricia Barker bought a Saturn Ion in 2005.  Representations

24 about safety influenced her decision to buy the vehicle in

25 2005.

83

1          Those are the named plaintiffs in these causes of

2   action.  That's what colors the entire NDL complaint.  That's

3   what they're suing about.  And what's their damage theory?

4   Right, specifically what is their damage theory?  You've heard

5   the telephone book numbers that are being asserted as to what

6   their claims are worth, but who are the plaintiffs?  Who is the

7   potential class parties?  Well, it's everybody who owned an Old

8   GM vehicle at any time that is still on the road as of 2014.

9          That covers not just anybody who would have an

10  ignition switch defect.  That covers anybody -- that covers --

11  that doesn't cover just anybody who bought a car that was the

12  subject of a recall; that covers everybody.  They're basically

13  asserting economic loss for 70 million vehicle owners, or

14  whatever it has been reduced to now, even if those vehicle

15  owners didn't have a recalled vehicle.

16          What's the basis of that?  Is it New GM's conduct

17  that they did recalls in 2014, and therefore that alleges

18  damages with respect to someone who bought an Old GM vehicle in

19  2005 who never had a problem with their car?  That's the

20  liability they want to assert on New GM and that's what

21  permeates their seven to $10 billion dollar claim in this case?

22  The majority of those car owners never had their vehicle

23  recalled, and that's the essence of their complaint.

24          It starts with the plaintiffs, who they named, and it

25  starts with the damages of what they're asserting, and that's

84

 1  violative of the sale order.  That's a gatekeeping function.

 2  They're not supposed to sue us for Old GM vehicle owners who

 3  never even had a car recalled.

 4          And if you look at all the causes of action, it all

 5  relates to, in one way or another, a breach of the recall

 6  covenant.  The recall covenant was in the sale agreement in

 7  Section 6.15.  The recall covenant does not use the word

 8  "liabilities" and it does not use the word "obligations."  The

 9  recall covenant says, "Purchaser shall comply with the

10  certification and reporting the part."  That's what it is.

11          And what did they say in their papers?  They're

12  saying, I don't have a private right of action to sue for

13  breach of the -- Section 6.15, and my complaint should not be

14  construed as a private right of action.

15          So instead, what is it that I'm suing for?  And my

16  argument to you, Your Honor, is that having conceded that they

17  don't have a private right of action, everything they're suing

18  for, almost all the claims they're suing for as it relates to

19  Old GM vehicles and used car purchases were unrelated to New

20  GM.  Everything they're suing for relates to that recall

21  covenant.

22          And if they don't have a private right of action,

23  then they don't have a claim, no matter how they try to dress

24  it up.  So when they sue for third-party beneficiary claims,

25  right, they claim to be the third-party beneficiary of the

85

1  recall covenant.  They know they can't sue directly for the

2  breach, but they have an account which would be marked in

3  orange on our marked pleading that said that they're a third-

4  party beneficiary.

5         Well, Section 9.11 of the sale agreement says there's

6  no third-party beneficiaries.  So what is the separate

7  obligation that New GM had after obtaining a free and clear

8  sale order with regard to the covenant that it had with the

9  government, which is not part of the assumed retained liability

10 structure, and was purposefully not put in the assigned assumed

11 retained liability structure?

12        They sue for unjust enrichment.  And there, that

13 claim is brought on behalf of defective ignition switch

14 vehicles in the time period before New GM came into existence.

15 It has other people, as well.  We're not challenging the other

16 people, but vis-à-vis the Old GM vehicle owner with the

17 defective ignition switch, they argued that New GM was unjustly

18 enriched by a vehicle that was sold by Old GM.

19        We didn't assume any kind of obligation at all with

20 regard to that, and that was clearly a retained liability.  And

21 our fundamental argument is if it's a retained liability, it's

22 not our liability.  It's not an ongoing obligation of any.

23        They sued for failure to file a proof of claim, but

24 they said that if we had announced the recall earlier, they

25 would have known they would have had a problem and they should

86

1  be able to file a claim.  Well, what was New GM's obligation

2  with respect to filing a claim?  Who came to Your Honor to get

3  the bar date noticed, that drafted the bar date notice, who

4  served the bar date notice and was responsible for claims

5  resolution?  That was Old GM.  That was for purposes of

6  aggregating and determining retained liabilities.

7      How could that possibly be New GM's claim?  How could

8  there possibly be a duty that New GM had with regard to the

9  claims resolution process?  There was a creditor's committee

10 who was the watchdog to make sure that unsecured creditors were

11 okay.  When the sale was presented to Your Honor, they said the

12 claims process comes after the sale.  New GM is gone by then,

13 New GM moves forward, and the estate will work itself through.

14      That's Old GM conduct.  That's Old GM's

15 responsibility.  It's not New GM's responsibility.  And we're

16 coming to Your Honor to say that that is part of your

17 gatekeeping function.  You should not allow those claims to go

18 forward.  That's the same claim that was in the Adams no-strike

19 pleading, as well, too.  And we have that brief before Your

20 Honor, and that ultimately will be a decision.

21      But failure to file a proof of claim, unjust

22 enrichment, third-party beneficiary claims, consumer protection

23 statutes.  With regard -- not in general, but consumer

24 protection statutes with regard to an Old GM sold vehicle or a

25 consumer protection statute claim with regard to an Old GM sold

87

1  vehicle which doesn't even have a recall attached to it, where

2  did New GM pick up a responsibility when the retained liability

3  section of the sale agreement says New GM is not responsible

4  for -- and it says all liabilities, but it does say third

5  parties.  New GM is not responsible for third parties for

6  claims based on contract, tort, or other.

7        And then I think Subdivision 16 of the Retained

8  Liability Section, as an example, the retained liability says,

9  we're not responsible for implied obligations under statute of

10 common law.

11        The Attorneys General knew what was going on when

12 this sale order was entered.  They knew that if it wasn't

13 covered by the Glove Box Warranty or the lemon law claim, or

14 that someone got into an accident, that was it with regard to

15 Old GM vehicles.  New GM agreed to Section 6.15, the reporting

16 compliance for NHTSA with respect to Old GM vehicles, but that

17 was an obligation it had to the government.  That obligation

18 has a capped liability.  New GM has paid the capped liability.

19 But that was a finite responsibility that New GM took on.

20        New GM did not have a duty -- a post-sale duty to

21 warn.  There's lots of states that don't have post-sale duties

22 to warn if you didn't have the free-and-clear aspect that

23 overrides this case.  But New GM, once the vehicle was sold,

24 had been in the stream of commerce before the sale, was not

25 responsible for anything other than the reporting requirement

88

1  to the government and whatever flowed from that.   To

2  manufacture a duty to them is -- our belief, is contrary to the

3  sale, and all of these are issues relating to retained

4  liabilities.

5         Now, people talked about the deferred prosecution

6  agreement and the information.   I'd like to just say a few

7  things about that.   One is that New GM pleaded not guilty for

8  the information, but did agree to pay a fine and did agree to a

9  statement of facts.   And nothing that I say here today is

10 intended to derogate at all from the statement of facts that

11 New GM agreed to.

12        But in that statement of facts, Footnote 1 says the

13 following:

14            "For the purposes of the statement of facts, to the

15            extent any conduct, statement, actions, or document

16            incurred on or dated before July 10, 2009, references

17            to 'GM' shall mean or intended to mean solely Motors

18            Liquidation Company, previously known as General

19            Motors Corporation, 'Old GM.'"

20        So everything that's in the statement of facts, you

21 have to see when it was being raised because if was before the

22 sale order, when they say "GM," it refers to Old GM.   And then

23 it goes on:

24            "Although New GM in the statement admits certain

25            facts about Old GM's acts, conducts, or knowledge

1                    prior to July 10, 2009, based on New GM's current

2                    knowledge, New GM does not intend those admissions to

3                    imply or suggest that New GM is responsible for any

4                    acts, conduct, or knowledge of Old GM, and that such

5                    acts, conduct, and knowledge of Old GM can be imputed

6                    to New GM."

7          So specifically, in the statements of facts, there is

8  the word "imputed" in that footnote and said that this is not

9  meant to be a admission that it can be imputed.  They can make

10 the argument, if they want, but that was specifically carved

11 out.  And then it says:

12                   "His statement of facts is not intended to alter,

13                   modify, expand, or otherwise affect any provision of

14                   the July 5, 2009 sale order that was issued by the

15                   U.S. Bankruptcy Court for the Southern District of

16                   New York, or the rights, protections, and

17                   responsibilities of New GM under the sale order."

18         So all of the statement of facts had this provision

19 that said that whatever the rights were under the sale order,

20 we're not trying to change those rights under the sale order;

21 whatever the responsibilities were under the sale agreement,

22 we're not modifying that or changing that.

23         And that is what I think is the most relevant aspect

24 of this.  Our argument is focused on the sale agreement and

25 what the sale agreement provided and what the sale agreement

1  didn't provide.

2         Now quickly to touch base on imputation.  We do not

3  argue with the fact that there could be circumstances where the

4  knowledge acquired by a New GM employee while working for Old

5  GM could be relevant to a claim or defense by New GM, it is

6  possible, and that the Court's two examples in Bledsoe we think

7  were fair examples of independent conduct.

8         And I actually think what Mr. Brennan wrote in his

9  paper that if New GM sold a fleet of vehicles and there was a

10 big -- those fleet of vehicles then crashed into an Old GM car,

11 that there might be some responsibility because there's

12 something that tracks them to the New GM side of the equation.

13 I don't think we have a problem with that either.  But it's

14 easy to create examples that are so obvious that don't get to

15 the heart of the issue.

16        Bledsoe, Your Honor had said that importing hundreds

17 of allegations regarding Old GM conduct that was in --

18 importing hundreds of allegations, conduct was not permissible.

19 You can't blur the distinction by saying something is

20 background, and that's the reason why we flagged everything in

21 the marked complaint which we recognized is -- goes way over

22 the line as to what should be pled or not pled as by way of

23 background.

24        We don't quarrel with the fact that some of the

25 knowledge that transferred could have a relevance to whatever

1 the independent claim is that they may have, if they have an

2 independent claim on the areas that we challenged.  But the

3 imputation issue has to be framed as follows:  A, is there a

4 claim based solely on New GM conduct for which New GM can be

5 held liable?  B, should that knowledge -- is there knowledge

6 that is to be imputed as an element of the claim?  Because if

7 the knowledge is not relevant to the claim, then the whole

8 imputation issue is irrelevant.  And third, is the knowledge,

9 if known to the Old GM employee was who was then hired by New

10 GM, can it be imputed to New GM?

11       And I think that's what Your Honor was referring to

12 in Weisfelner I, which is under what circumstances will we

13 impute knowledge from an employee to its agent.  And in

14 presenting this issue, the plaintiffs actually have the burden

15 of showing which particular knowledge is imputed to which

16 particular employee for purposes of which discreet claim, and

17 then demonstrate why the allegations meet the standard for

18 imputed knowledge.  And they've refused to do so because they

19 can't do so.

20       Merely to say that 24 employees, while working for

21 Old GM, had generalized knowledge of ignition switch defect

22 doesn't get them there.  They need to assert what specific

23 knowledge of which Old GM employees being asserted for what

24 independent claim against New GM.  Imputation of knowledge

25 doesn't create a duty on New GM that otherwise did not exist.

92

1          Knowledge can't be imputed based on what someone

2    should have known as compared to what they actually knew.  And

3    the imputation doctrine is based on the presumption that the

4    agent will discharge its knowledge to its principal.  I think,

5    again, that's the <u>Weisfelner I</u> example that you're referring

6    to.  But the assumption breaks down sometimes in the sale

7    context where the buyer and the seller are contractual

8    adversaries, and there's no automatic presumption that the

9    employee's knowledge will -- acquired will automatically be

10   given to the purchaser.

11          And that's all we need to say about that.  When we

12   cite cases in our opinion, we showed specific examples where a

13   court was refusing to impute the knowledge of a seller employee

14   who went to work for the purchaser on an automatic basis.  It

15   didn't withstand scrutiny based on the particular facts.  And

16   when they try to distinguish those facts and distinguish those

17   cases, they actually admit to the relevance of where the

18   information came from, which they say is irrelevant.  It

19   actually is relevant.

20          When they tried to distinguish it, they admit my --

21   the principle that I was advocating, which is that it's not

22   automatic.  They want to say that there was 24 people that, on

23   the aggregate knowledge, had knowledge for purposes of

24   establishing their unjust enrichment claim.  These 24 people

25   had the imputed knowledge for purposes of establishing their

93

1  third-party beneficiary claim, had the knowledge for purposes

2  of saying New GM had a duty when they shouldn't -- that they

3  didn't file a claim which, by the way, they still haven't asked

4  for permission to file a claim.

5        The knowledge has to relate to a claim.  The claim

6  has to relate to a duty that we had --

7        THE COURT:  Well, you are arguing an imputation point

8  or are you arguing a causation point?

9        MR. STEINBERG:  I'm arguing, Your Honor, that

10  imputation, in my mind, only has relevance to the particular

11  claim; that the issue doesn't stand as an isolated point

12  because we concede that there are circumstances where you can

13  impute if knowledge is relevant to the cause of action and if,

14  in that particular circumstances, the cause of action should be

15  imputed to the purchaser entity.

16        But we don't have to deal with this issue as an

17  academic issue.  We actually have an issue -- we've got to deal

18  with this issue in the context of what was filed, and what was

19  filed is not a claim against New GM.  And that's why you see in

20  our letter, we say, on this particular issue, the imputation

21  doesn't really matter because there is no claim.  It doesn't

22  get you anywhere because of it.

23        So that's why, without wanting to say I agreed with

24  Mr. Weintraub when he called it a red herring, it is not a red

25  herring, but it's inextricably linked to whether actually a

94

1  claim, and the claim is whether we had an independent duty or

2  it was a retained liability.

3      And Burton actually is on point.  I know that you

4  could try to say that it's not, but in Burton, the judge

5  actually exercised the gatekeeping function and determined that

6  there was no economic -- there was no duty to warn in an

7  economic loss case.  That's how Judge Bernstein ruled.  He may

8  have decided that there could be circumstances afterward where

9  it may be the case, but he dismissed the economic loss claims

10 on a gatekeeping function, and that was the point that we were

11 trying to make is Burton being applicable.  It was an economic

12 loss case where the judge decided the gatekeeping function

13 required him to dismiss the claims because it was otherwise an

14 assertion of a retained liability.

15      The -- I will also just note that on the deferred

16 prosecution agreement, the government determined that by no

17 later than three years after the sale, that there was an

18 ignition switch defect that New GM knew represented a safety

19 defect.  I agree that it doesn't preclude the plaintiffs from

20 arguing an earlier period of time, but I did want to point out

21 the fact that the government took a more measured approach and

22 didn't say there was an automatic imputation on day one so that

23 we were born with a get-out-of-jail-free card and all that

24 other things that have been asserted against us here.  You

25 actually have to look at the claim, look at the person's

95

1  knowledge, and then make an assessment, and that's a much more

2  disciplined analysis.

3          Just quickly, to deal with the remaining claims that

4  I haven't talked about, the Bellwether complaints, the accident

5  cases, we've argued that certain causes of action, we clearly

6  have responsibility for as an assumed liability, but other

7  causes of action relating to consumer protection, fraud, those

8  were not part of our assumed liabilities, and those were

9  retained liabilities for the same why economic loss complaints

10 are retained liabilities.

11         The states' claims, Arizona and California, first,

12 they were required to amend their complaint.  They had the

13 option to file a no-strike pleading, but -- they filed a no-

14 strike pleading.  They weren't supposed to reargue exactly what

15 they had lost on.  So what they did was -- and let's not

16 forget, what they did was is they filed a no-strike pleading,

17 refused to amend their complaint, and then tried to withdraw

18 the reference in this case, which Judge Furman denied.  And now

19 the matter is before you on the no-strike pleading.

20         But they still haven't done what Your Honor had asked

21 them to do.  And Your Honor said in the judgment that if you

22 didn't do what I asked you to do, the case should be stayed

23 until the Second Circuit decides the issues on appeal, and

24 that's what we think should happen in this case anyway vis-a-

25 vis the states.

1           Now, the states clearly have claims that are not

2    something that are barred by the sale order.  They do talk

3    about New GM vehicles being sold, but the essence of the

4    states' claims also includes used car purchases for five people

5    who bought used cars from people unrelated to GM.  That's why

6    they have all those references to the Old GM vehicles in there,

7    and they're asserting, in effect, claims based on those used

8    car purchaser situations.  And that's the reason why we said

9    the states couldn't go forward.  They just refused to make

10   those changes.

11          And, Your Honor, the other claims that are asserted

12   in our other complaints letter, the Section 42(b)

13   misrepresentation by sellers, which is in Rickard's negligent

14   infliction of economic loss, which was in <u>Elliott</u>, negligent

15   failure to identify defects, which was in <u>Benbow</u>, all of those

16   things are different variations of asserting a dress-up claim

17   for a private right of action for breach of the recall

18   covenant.

19          All of these claims, the fraudulent concealment

20   claims, all relate to the fact, did we have a duty under the

21   sale agreement that we assumed with regard to vehicles sold

22   already by Old GM?  The whole structure of the agreement was to

23   identify which liabilities we had and which we didn't have.

24   And I don't think what we're arguing now is in any way contrary

25   to what Your Honor ruled on April 15th.

1          Actually, the burden is on them.  What is it that
2  they think they won?  You know, they said we lost, okay, we're
3  appealing.  I agree with that.  But what is it that they
4  thought that they won?  What is the independent claim that
5  they're now asserting which they otherwise could have asserted
6  if Your Honor had not modified the sale order?  They'll talk
7  after I come up.  They won't be able to identify anything.
8  Whatever they think they have, they alleged that they had, no
9  matter what you did to the sale order, because it relates to
10 the New GM contract.

11          THE COURT:  Well, they're saying that after cars were
12 sold and after they were on the road, as a function of some
13 non-bankruptcy law, New GM had duties to them.  If they do it
14 properly, and they're not dumb, so I assume they will, they
15 won't rely on anything Old GM did.  And then doesn't the
16 question devolve into whether, as a matter of applicable non-
17 bankruptcy law, such a duty is actionable or not?  And if
18 that's so, it sounds to me like it's a Jesse issue.

19          MR. STEINBERG:  Well, Your Honor, first, you said
20 that they're not dumb in how they pled it, if you look to see
21 how they pled it --

22          THE COURT:  Well, obviously some of them were dumb,
23 but now they're going to be educated and now they're going to
24 know what to do, or after I issue my ruling, they're going to
25 know what they can do.

98

1            MR. STEINBERG:  Well, the only thing I would say to

2    that, Your Honor -- and I'm just responding to your question.

3    And to the extent that Your Honor believes that this was

4    contrary to how you ruled, so be it.  We disagree about this

5    point.  But when you sell free and clear and say that there's

6    no successor liability and there's no other liabilities except

7    for those identified and assumed, then that's a clearly

8    distinguishing fact that takes you out of the other type of

9    cases.  And they could assert whatever duties they think exist

10   as if it was no sale free and clear finding, but I think when

11   you go back to if there was a free and clear finding, which is

12   the basis upon which New GM bought and acted over the last six

13   years, then they don't have a claim.

14            They just -- otherwise you've now resurrected every

15   retained liability, if it was a retained liability.  I don't

16   think Your Honor was trying to say retained liabilities somehow

17   became something different.  You needed to have some New GM

18   conduct.

19            Now, if Old GM's 24 people should have known about

20   the defect so that there were known creditors and this car

21   should have been recalled before, then that was a retained

22   liability.  New GM didn't pick up that liability.  New GM

23   didn't pick up a duty to -- post-sale duty to warn where Old GM

24   hasn't exercised that remedy.

25            New GM did pick up the obligation -- to be clear, it

99

1  picked up the obligation to comply with Section 6.15, and to

2  the extent that it didn't comply with that, it should be liable

3  for that to the person that it obligated itself to be liable

4  for.  It just wasn't the plaintiffs.  And you can't make those

5  claims into new independent claims.  They are retained

6  liabilities.  That is the gatekeeping function.

7       If Your Honor just gives me one second, I just want

8  to see --

9       THE COURT:  Sure.

10      MR. STEINBERG:  The Consumer Protection cases that

11 were cited which said you didn't have to be the person who

12 actually sold the item in order to be violative of the statute,

13 well, that may be as a general proposition in certain cases in

14 certain circumstances.  But in Arizona and in California, and I

15 think we briefed the issue, you do actually have to be the

16 seller for purposes of the circumstance here.  Otherwise, we're

17 responsible for someone else's acts.  We're responsible for the

18 person who sold the used car, the Toyota dealership who sold a

19 used car to somebody.  We didn't pick up that responsibility,

20 and we didn't assume greater responsibilities merely because

21 cars flipped through the resale market which is what Your Honor

22 has said.

23      Other than that, Your Honor, I know you've given us a

24 lot of time.  And although I haven't talked as much as my other

25 adversaries, it's probably still more than you had envisioned,

1  so I appreciate it.

2            THE COURT:  All right.

3            MR. WEISFELNER:  Your Honor, may we have two or three

4  minutes before rebuttal?

5            THE COURT:  For rebuttal?  I'll sit here.  We're

6  going to get the thing done, Mr. Weisfelner.  And part of the

7  problem is the amount by which it's been lengthened up to this

8  point.  So you can caucus for a couple of minutes while I sit

9  here.

10           MR. WEISFELNER:  Thank you, Your Honor.

11       (Pause in proceedings)

12           MR. STEINBERG:  Your Honor, while Mr. Weisfelner is

13 getting his notes, Mr. Davidson said something -- passed me a

14 note.  And I just want to --

15           THE COURT:  Pull the mic closer to you, please.

16           MR. STEINBERG:  Okay.  I just want to make it clear

17 that my presentation should not be construed in any way to say

18 that New GM disavows the 20 -- the stipulation of facts that

19 are in the deferred prosecution agreement.

20           THE COURT:  Well, you said that before and I

21 understood that.

22       (Pause in proceedings)

23           THE COURT:  Mr. Weintraub?

24           MR. WEINTRAUB:  Yes, Your Honor.  There was a lot

25 there.  I'll try to be succinct.  My notes are awful, but so is

1  my handwriting.

2          First, Your Honor, I'd like to respond to New GM's

3  arguments about a duty to warn and the argument there is no

4  private right of action under the Safety Act.  As Mr. Steinberg

5  said, Burton did say that there could be a duty to warn in a

6  personal injury case.  And our cases are personal injury cases.

7  The Bellwethers are personal injury cases.

8          THE COURT:  But the difference is that your guys were

9  actually hurt in car wrecks.  The other plaintiffs are

10 asserting a different kind of duty-to-warn claims.

11         MR. WEINTRAUB:  I understand, Your Honor.  I'm

12 speaking about the duty to warn with respect to my clients.

13         THE COURT:  Okay.

14         MR. WEINTRAUB:  Whether there is a duty to warn or

15 not, we believe, as Your Honor said, as a defense to the

16 plaintiffs' claims, we don't think the gate-keeping function

17 includes determining the merits of underlying claims.

18 Therefore, the duty-to-warn issue is a red herring in this

19 proceeding.

20         I would note that New GM assumed liability for post-

21 sale accidents and it assumed responsibility for compliance

22 with the Safety Act for pre-sale vehicles.  New GM also, within

23 the context of the foregoing, had superior knowledge and moral

24 obligations to not let people be injured or killed riding

25 around in GM cars --

1              THE COURT:  Again, you're making the same

2    distinction, or you're triggering the same distinction I made

3    before.

4              MR. WEISFELNER:  If I --

5              THE COURT:  If there is a duty to warn under the

6    Safety Act, but if the sale agreement said -- and sale orders

7    say in baby talk you're not third-party beneficiaries of that,

8    it may be that as a matter of non-bankruptcy law, somebody

9    who's hurt because of a failure to comply with that duty to

10   warn might have a cause of action against New GM for that

11   additional reason as well.  But that doesn't go to whether

12   somebody who wasn't hurt and the victim of an assumed claim

13   would have that duty.  And that would be something that either

14   Jesse or a State Court judge would decide, right?

15             MR. WEINTRAUB:  I don't disagree with that.  And

16   again, I only represent people who were, in fact, hurt.

17             THE COURT:  Okay.  Go on.

18             MR. WEINTRAUB:  And we cited in our brief, and I

19   didn't talk about it the first time, whether or not there's a

20   private right of action in the Safety Act, the cases recognize

21   that if a statute that is intended to protect people is

22   violated, whether or not there's a private right of action,

23   that violation can be evidence of negligence, gross negligence,

24   or similar misconduct.

25             So our view is GM assumed responsibility for recalls.

1  And the failure to do a recall when it knew that it should have

2  done a recall is either negligent or reckless or worse --

3          THE COURT:  And let's conclude this discussion

4  because I think I understand the distinction.

5          You're saying that that set of facts gives your

6  clients direct rights of action not as third-party

7  beneficiaries.

8          MR. WEINTRAUB:  That's right, Your Honor.

9          THE COURT:  I understand.

10         MR. WEINTRAUB:  Okay.  Again, we don't believe that

11  it is proper to conflate Old GM conduct with New GM knowledge.

12  And this is with respect to independent claims.  And we also

13  believe that conduct that creates knowledge is fair game.  And

14  by that I mean if there's been an investigation by Old GM into

15  whether or not there's a defect in the ignition switch, and

16  that defect -- that investigation reveals that there is or that

17  there likely is, separate from the conduct of the investigation

18  and separate from the failure to initiate the recall, that

19  investigation created knowledge.  And we believe that that

20  knowledge was transferred to New GM.  Now, whether or not that

21  knowledge can be imputed, that's for a different Court to

22  decide.  That's for the Trial Court to decide.  That's for

23  Judge Furman to decide.  But the fact that the parties want to

24  assert that there was knowledge that can be imputed cannot be -

25  - they should not be prevented from making that argument to the

104

1  appropriate Court.

2        Now, Mr. Steinberg said quite a bit about assumed

3  liabilities.  And he had a very convoluted explanation for how

4  you can stare at the words long enough on a page and they can

5  begin to blur and move around and maybe they say something

6  other than what the plain language says.  But the plain

7  language does not exclude punitive damages.  Everything that

8  Mr. Steinberg said about the evolution of the different

9  versions of the Section 2.3(a)(9) was hearsay, was parol

10 evidence.

11       What actually happened was Section 2.3(a)(9) landed

12 in the form of the amendment to the purchase agreement.  That

13 is the language that must be interpreted.  That is the language

14 that must be dealt with.  And there's no way to get around --

15 there's no way to bring in all of this extraneous information

16 about what people are thinking or not thinking, or what the

17 creditors' committee might have done or might not have done

18 into looking at the plain language of the contract.

19       And I would tell Your Honor that if this supposed

20 clarification was done to exclude punitive damages, it failed

21 miserably.  It didn't do that.  And there is no indication that

22 anyone thought that the inclusion or the exclusion of punitive

23 damages in 2.3(a)(9) was an issue that people were objecting to

24 or saying it's got to be taken out or it's got to be clarified.

25 So far as I can tell from the record, punitive damages was not

1  an issue with respect to particular objections.  And, again, if

2  people wanted to exclude punitive damages, you say, "excluding

3  punitive damages."

4         The structure of the retained liabilities is very

5  clear.  Retained liabilities are limited to liabilities of the

6  seller.  They're not post-closing independent claims of New GM.

7  To the extent that there's any language in retained liabilities

8  about claims that arise after the closing date, that has to do

9  with claims that will arise against New -- I'm sorry, Old GM

10 after the closing date.  It cannot be a preemptive get-out-of-

11 jail-free card for whatever New GM might do post-closing.

12 That's just not the way to read retained liabilities.  The only

13 thing retained liabilities retained were liabilities that the

14 seller didn't do anything with respect to the liabilities of

15 New GM.

16        With respect to the words of Section 2.3(a)(9), it

17 uses the defined term "product liabilities."  There's a lot of

18 words leading up to what product liabilities within the meaning

19 of Section 2.3(a)(9) means.  Whether or not the generic

20 lowercase word "product liability" would exclude punitive

21 damages is irrelevant.  The defined term in this agreement is

22 what controls.  They could have called it "pizza."  It's still

23 what the words compiling or composing the definition mean.  And

24 there is nothing in this definition, and there's nothing in the

25 word "direct" and there's nothing in the word -- words "caused

1   by" that would say that an accident that was caused by

2   reprehensible non-disclosure by New GM cannot be subject to a

3   claim for punitive damages.

4          And this is not -- and as we said in our brief and as

5   I said in oral argument earlier, there is not unfettered

6   discretion to punish a wrongdoer for damages done to people

7   other than the specific plaintiff in the specific injury.

8   There has got to be proportionality of the damages to the

9   actual damages, or the compensatory damages.  And one of the

10  recognized and -- we said this in our brief, we said this

11  earlier -- one of the recognized purposes of punitive damages

12  is retribution.  It's not just to discourage third parties.

13  It's not just to discourage repeat offenses by the particular

14  defendant.  It's compensation.  It is an eye-for-an-eye

15  retribution for the wrong that was done to a person in an

16  egregious way.  And there's nothing in 2.3(a)(9) that would

17  limit that way.

18         With respect to the commentary about you can't assign

19  a claim for punitive damages, this is not an assignment of a

20  claim for punitive damages.  This is assumption of liabilities

21  in connection with a purchase agreement that left the seller

22  bereft of any ability to pay for the damages.  And it's a

23  recognized construct outside of bankruptcy law that successors

24  can be successors for liability, including punitive damages

25  because they succeed to all of the liabilities of the

1  predecessor.

2          I talked earlier about commercial necessity.  Again,

3  I think that that is parol evidence and it's hearsay.

4  Commercial necessity is not mentioned in the sale agreement.

5  It's not mentioned in the sale order.  And it is subject to

6  convenient revisionist history.  And, therefore, it's not a

7  credible standard.  And again, the integration clause would

8  prevent any commentary about whether or not something was

9  commercially necessary.  The agreement speaks for itself.

10          Now, with respect to the Adams complaint, as we said,

11 this was a pre-sale.  These are pre-sale accident victims, not

12 post-sale.  These are pre-sale.  In the four threshold issues

13 that were determined in April of 2015, there was an

14 acknowledgment process violation.  New GM, we contend, under

15 the purchase agreement, had a duty to recall.  New GM knew

16 about the ignition switch defect, we contend, because it either

17 developed knowledge or at that point it would have been

18 inherited knowledge because it was so close to the bar date

19 because of inherited knowledge.  And we understand that we

20 would have to prove that, that that's not blanket imputation,

21 but that would be part of our proof in the case.  And we

22 believe that the failure to recall, as I said earlier, is

23 evidence of negligence.  And the negligence proximately caused

24 these claimants not to file a proof of claim because they were

25 unaware of the ignition switch defect.

1          Had New GM complied with its obligation to initiate a

2    recall, these claimants would have known that they should have

3    filed proofs of claim before the bar date.  By New GM not

4    initiating a recall and waiting until 2012, long after the bar

5    date, these people were prevented from the ability to file a

6    proof of claim in a timely manner.  Had they filed a proof of

7    claim in a timely manner, they would have been paid along with

8    all of the other general unsecured creditors the amount of

9    their damages and they wouldn't have been injured.  New GM's

10   negligence is the proximate cause of the damage sustained by

11   these plaintiffs.

12          So we think that that complaint should not be

13   stricken and these plaintiffs should be given the opportunity

14   to prove their case, which would include imputation of

15   negligence.

16          Two last points, Your Honor.  The fact that the claim

17   for punitive damages is subordinated and, in this case, this

18   debtor was insolvent does not mean that it would receive no

19   distributions.  The claim is not a disallowed claim.  It just

20   so happens because this particular debtor was insolvent that

21   the Bankruptcy Code would subordinate those claims to other

22   creditors.  That doesn't mean that you don't assume the

23   liability.

24          The argument that you would equate the assumed

25   liability to the distributions that are received would mean

109

1   that the liability that New GM says it assumed here would be 30

2   cents on the dollar for compensatory damage claims.  And if

3   this was a zero case, it would have been zero for compensatory

4   damage claims.  That can't be the law.  The words of the law

5   that when somebody issues a guaranty, that the guaranty is only

6   of the amount distributable in the Chapter 11 case to the

7   creditor.  The guaranty is of the full amount of the liability.

8   And that's what happened here.  There was an assumption of the

9   full amount of the liability, not the distributable portion of

10  that liability in the Chapter 11 case.  That would have made

11  every guaranty and every assumption of liability vary from

12  case-to-case depending upon the amount of distribution, and

13  that's not the law.

14          THE COURT:  So are you saying that even though

15  creditors, if they had timely filed claims, would have only

16  gotten 30 cents on the dollar, that New GM is liable for 100

17  cents on the dollar for anybody who didn't file a claim?

18          MR. WEINTRAUB:  I'm saying two different things, Your

19  Honor.  With respect to the -- and, again, I made transitions

20  too rapidly.  With respect to the Adams case which has to do

21  with pre-sale accident victims, they would be entitled to

22  recover whatever general unsecured creditors got in this case.

23  So that would be 30 cents on the dollar, or whatever the

24  distribution was.

25          THE COURT:  They'd be entitled to recover from New GM

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1  for what the other creditors got from the Gov Trust?

2          MR. WEINTRAUB:  Right.  Because had they filed timely

3  proofs of claim, they would have shared along with the other

4  creditors.

5          What ended up happening here was they were not aware

6  of the ignition switch defect.  So by the time they got around

7  to filing claims, Your Honor had already ruled that they're

8  equitably moot and they get zero.  So they were clearly damaged

9  as a result of not filing a timely proof of claim.  It's a

10  difference between getting 30 cents and getting zero because of

11  equitable mootness.

12          My point on the subordination and the punitive

13  damages was -- and this goes back to assumed liabilities for

14  post --

15          THE COURT:  Your point on that which you made in your

16  brief was that subordination isn't the same as disallowance.

17          MR. WEINTRAUB:  Yes, sir.

18          THE COURT:  I understood that.

19          MR. WEINTRAUB:  For post-sale.

20          Thank you, Your Honor.

21          THE COURT:  Okay.  Mr. Weisfelner, very briefly.

22          MR. WEISFELNER:  Yes, Your Honor.

23          Mr. Berman is going to address the contentions that

24  Mr. Steinberg made that we asserted no independent claims in

25  any of the second amended consolidated complaint or either of

1  the two State Court lawsuits.  If Your Honor needs that, then

2  that will be addressed on a cause-of-action-by-cause-of-action

3  basis as Mr. Steinberg did in his opening remarks.

4          I get up out of an abundance of fear.  I fully

5  appreciate and recognize what Your Honor has written with

6  regard to due process violations and the necessity for

7  prejudice.  And as Your Honor knows, that portion of Your

8  Honor's decision is subject to our appeal.

9          But what continues to bug me, and I'd ask Your Honor

10 just to keep this in mind, so much of GM's argument is

11 predicated on the distinction between assumed liabilities and

12 retained liabilities.  And understandably so.  And Mr.

13 Steinberg says, listen, if you're suing us now, even if you're

14 asserting a claim against New GM, that claim against New GM may

15 have been cut off as a retained liability, and therefore,

16 you're violating the sale order by going forward.  Well, I

17 think that's nonsense.  I think to the extent that you've

18 articulated an independent claim against New GM based on its

19 own acts or conduct, that you can eventually prove to a trier

20 of fact, then the fact that it imputes knowledge, which you'd

21 have to prove as part of your claim, or refers or relates to

22 conduct -- I'm sorry, knowledge of Old GM is irrelevant.

23         But here's the point I wanted to drive at.  Since

24 there's such a large reliance on what the contract said at the

25 time it was formed, let's remember a couple of undisputed

1  facts.  When Your Honor conducted the hearings in 2009, neither

2  Your Honor knew, nor any of the parties disclosed, and the

3  plaintiff representatives were unaware of the fact that Old GM

4  had manufactured and put into commerce deadly unsafe vehicles.

5  Had Your Honor been aware, first of all, that they had

6  manufactured and put into commerce deadly vehicles, safety

7  concerns that would have required, as Your Honor determined, a

8  recall, query the extent to which the contract would have been

9  modified, query.  Beyond that, Your Honor, what we didn't know

10  in 2009, but we do know now is that post-sale New GM knew there

11  was a known safety defect, it was killing people, it would

12  continue to kill people, and New GM for years concealed that

13  information for cost reasons and failed to disclose it.

14       Your Honor, I suggest that had we known in 2009 what

15  New GM intended to do for the next number of years, it would

16  have changed that dividing line between assumed liabilities and

17  retained liabilities.

18       THE COURT:  Mr. Weisfelner, if you're looking for a

19  reservation of rights for what you might do if the Circuit

20  reverses me, you don't need to say it.  But I'll say it again.

21  You've got a reservation of rights.

22       If you're trying to re-argue something that I ruled

23  on in excruciating detail on April 15th, now is not the time to

24  do it.

25       MR. WEISFELNER:  And, Your Honor, I was attempting to

1    do neither.  All I was attempting to do was to the extent that

2    GM's position today relies as it does on a dividing line

3    between what was and wasn't and assumed versus retained

4    liability, the current state of the record as a matter of law

5    is Your Honor has determined that the sale order was over-

6    broad.

7              THE COURT:  I know that, Mr. Weisfelner.  I know the

8    distinction, and I put it in Part 3 of my April 15th decision

9    that I was not considering that which was assumed and not

10   assumed to be significant to the determination of what might be

11   an independent claim.

12             But please don't test my patience on this.

13             MR. WEISFELNER:  Thank you.

14             THE COURT:  Mr. Berman?

15             MR. BERMAN:  Your Honor, Steve Berman on behalf of

16   the States and the MDL economic loss patients.  And I'll be

17   very brief and try not to test your patience.

18             First, I want to make a point on the State

19   complaints.  Mr. Steinberg said that GM --

20             THE COURT:  Pull the mic a little closer to you,

21   please, Mr. Berman.

22             MR. BERMAN:  Mr. Steinberg said that GM has no issue

23   with claims involving New GM cars and certified cars.  The

24   State of Arizona in Paragraph 496 and 497 defines which claims

25   it's putting in and which cars it's suing on behalf of, and it

1  defines it clearly that the only vehicles at issue are those

2  sold or leased after July 11th, 2009.  So there's no basis to

3  continue the stay in the State of Arizona case because it's not

4  triggering any claims involving Old GM cars.

5         And the same is true for the State of California.

6  The State of California in Paragraph 1 and in Paragraph 255

7  says that its claims seek remedies in connection with three

8  types of vehicles:  New GM vehicles; New GM certified vehicles;

9  and repairs on cars using defective ignition switches.  All

10 three of those are fair game by GM's own admission.  So there

11 is no reason to continue the stay in the State of California

12 case.

13        The fact that this -- that the State of California,

14 for example, is focusing solely on New GM is made clear by the

15 statute of limitations which doesn't allow it to bring claims

16 further back than 2010 after the sale order.

17        THE COURT:  I think what Mr. Steinberg was

18 complaining about was not bringing claims that accrued after

19 the date, but relying upon Old GM conduct as a predicate for

20 those claims.

21        MR. BERMAN:  Well, we -- we did exactly what the

22 Justice Department did in our complaint.

23        THE COURT:  You did exactly what?

24        MR. BERMAN:  What the DOJ did.  The DOJ cited to Old

25 Gm's conduct 64 times.  Sixty-four times.  And then it went and

1  gave examples of New GM conduct furthering the wrongdoing.

2  That's exactly what the States did.  In fact, I think we cited

3  less to Old GM conduct than the DOJ did.

4          THE COURT:  But the distinction is nobody's asking me

5  to rule on what the DOJ did.  And the DOJ action was brought

6  after this matter was before me without opportunity for me to

7  consider that.  And New GM, for reasons that I can well

8  understand, was perfectly willing to let the DOJ do what it

9  needed.

10         You're trying to recover money, and not just

11 injunctive relief, from New GM which you may or may not be

12 entitled to.  Frankly, if you had only asked for injunctive

13 relief, my guess is you would have gotten that in a heartbeat.

14         MR. BERMAN:  Well, we're asking for civil penalties.

15 And the civil penalties are predicated on the wrongdoing that

16 GM did from 2009 forward.  GM knew of the facts that are

17 alleged in the complaint, the Old GM facts.  GM continued to

18 gather information about the ignition switch defect and other

19 defects, and it remained silent to consumers who were

20 purchasing their cars.  That states a claim based on New GM

21 misconduct.  And I don't think it's improper to have set up the

22 claim in part by the Old GM conduct.

23         I referred to the DOJ just because it's another

24 prosecutor looking how to state this by way of example, and I

25 think it shows that we weren't trying to do anything that ran

1  afoul of your order because we were using those old facts to

2  show what GM knew in 2009 when it continued to sell to folks in

3  Arizona and California without telling the truth.

4         With respect to the issue of the various claims in

5  the MDL complaint, I respectfully submit that's an issue for

6  Judge Furman.  For example, Mr. Steinberg says, well, you've

7  got some plaintiffs in there who bought cars before New GM came

8  into existence, and you're claiming that they were injured.

9  And the complaint explains why they were injured.  And I'll

10  give you an example, at Paragraph 1316.

11         So the thrust of the amended complaint in the MDL is

12  not just the ignition switch, but that GM was hiding the fact

13  that its culture, its cost-cutting, its quality control was out

14  of control.  So there were 54 defects that were issued in 2014.

15         When that happened, the value of everyone's car went

16  down, including people who had cars they bought before New GM

17  came into existence.  With respect to those people, we allege

18  that New GM had a duty when it came into existence to have

19  recalled cars far earlier than they did, to have maintained its

20  quality, and when the news came out that they had done none of

21  the above, that they have lied about their quality, everyone's

22  vehicle was hurt, including people that had Old GM cars.  They

23  were hurt by the conduct of New GM.

24         Now, Your Honor, I could be wrong.  Maybe that claim

25  is going to be stricken as a matter of state law by Judge

1  Furman.  But the answer to that question of whether there's a

2  claim is dependent on an analysis of state law.  And it's going

3  to be different by various states and Judge Furman, I submit,

4  has the task of deciding is there a claim stated.

5       And the same goes to the imputation issue.  We gave

6  you cases involving laws in various states interpreting when

7  imputation is proper and when it's not.  That, again, is

8  something that I submit Judge Furman's going to have to do on a

9  state-by-state basis.

10       MR. BERMAN:  And there was no automatic imputation.

11 There's over a hundred pages of very specific allegations of

12 names and dates and people who were involved in hiding the

13 imputation issue.  Those facts are relevant to each of the

14 claims because at the heart of each claim is a concealment of

15 facts that New GM was aware of and New GM's continuing coverup

16 from 2009 to 2014.  So we don't have to sit down and go through

17 each cause of action as to how the imputation facts apply

18 because they apply equally to all.

19       The thing that struck me the most about what Mr.

20 Steinberg said was the following.  He said, there has to be a

21 volitional act of New GM, and if Your Honor wants to look at

22 just one cause of action, it shows that for every person in the

23 class, there was a volitional act of New GM.  Let's take

24 fraudulent concealment, looking at Paragraph 1157 through 1158.

25 It says, "New GM concealed and suppressed material facts

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

118

1   concerning the quality of its vehicles and the GM brand."  158,

2   "New GM concealed and suppressed material facts regarding the

3   culture of the company."  They made -- it was avoiding dealing

4   with safety issues, and it was a cost-cutting company, not a

5   quality company.  And 1159, "New GM concealed and suppressed

6   material facts concerning the serious defects plaguing GM brand

7   of vehicles."  All of the causes of action are very identical

8   in that they focus on the misconduct of New GM.  And because of

9   that, we do not believe that there's a violation of your order.

10          And I'll take one last claim, and that's the unjust

11  enrichment claim.  Mr. Steinberg said, how can be sued for

12  unjust enrichment?  Well, first, at Paragraph 1288, we

13  described that the unjust enrichment claim is brought on behalf

14  of owners who purchased new GM vehicles, he's conceded that's

15  okay, certified pre-owned vehicles, he's conceded that's okay,

16  and those who had purchased a defective ignition switch vehicle

17  before New GM came into existence.  And he says, well, how can

18  we be tagged New GM for unjust enrichment?  Well, in Paragraph

19  1291, we explain how New GM was unjustly enriched by failing to

20  recall these cars and by failing to correct it's improper

21  representations.

22          Now, it could be that Judge Furman says that doesn't

23  state a cause of action under state law, that New GM had no

24  duty or was not unjustly enriched as defined by state unjust

25  enrichment case law, but that, I submit, is for Judge Furman to

1  decide.  We may lose, I don't know, but I think it's another

2  gatekeeper and not this court.  Unless you have any questions

3  of me, Your Honor, that's all I have.

4          THE COURT:  No.  No, thank you.

5          All right.  Mr. Steinberg, limit it to the new stuff

6  that we just heard.

7          MR. STEINBERG:  Right.  Mr. Weintraub said punitive

8  damages were not raised as an issue for any particular

9  objection to the sale.  We agree with that, and we think that's

10  relevant.  With regard to they said that this is retribution,

11  emphasizes the aspect of retribution, an eye for an eye, well,

12  compensatory damages is an eye for an eye.  Punitive damages is

13  something different than an eye for an eye.  And New GM agreed

14  to pay compensatory damages to accident victims.

15          Mr. Weintraub said conduct that creates knowledge --

16  I'm sorry, conduct that creates knowledge must relate to the

17  cause of action.  Knowledge itself can create a duty that was

18  proscribed by the sale order as a retained liability, and

19  that's an argument that we've made that they just don't seem to

20  accept.

21          Successor liability.  The argument against public

22  policy that you can assign a punitive damage exposure, I think

23  he essentially agreed that you couldn't do it, which would then

24  take 2.3(a)(9) out of the picture.  He's saying that he's now

25  resting on the fact that it's a successor liability claim and

1   that if you said that New GM was the successor to Old GM,

2   they're liable for punitive damages.  And that, we say, is

3   barred by the sale order.  But by making -- by saying that --

4   by this being his argument to attack the public policy

5   argument, he's essentially saying that it's not an issue of

6   whether the liability was actually assigned to -- or assumed by

7   New GM.

8           Just to clarify, if I didn't say it before, Your

9   Honor has ruled in a couple of different cases about that New

10  GM is only assuming liabilities that were commercially

11  necessary.  It's commercially necessary, as determined in 2009

12  at the time of the sale order.  It's not a slippery slope.

13  It's not -- doesn't change by what it is now.  It's what the

14  Court found in 2009.

15          The entire gatekeeping issue, we've argued in our

16  papers, is really an element of the Old GM threshold issue,

17  which was that when Your Honor put the Old GM threshold issue

18  on the table, it was to determine whether the claims that were

19  actually being asserted by the plaintiffs here were Old GM

20  claims or New GM claims.  And if they were dressed up claims in

21  some way, they will retain liabilities.  That was the purpose

22  of the gatekeeping function.

23          The Adams case that Mr. Weintraub refers to, these

24  were pre-sale accident cases.  Those plaintiffs knew they were

25  in an accident prior to the bankruptcy.  What they knew about

121

1  why they got into an accident, the one thing they had

2  definitely knew is that they got into an accident, and it's not

3  illogical to think that there could be a claim against the

4  manufacturer.  You may not know what the particular claim is,

5  but Your Honor has ruled in other situations that a pre-sale

6  accident case at least knew that they were in an accident, and

7  therefore, they were aware of the necessity to file a claim by

8  the bar date.

9          The -- to the extent that Mr. --

10          THE COURT:  So are you therefore saying that I don't

11  need to reach the broader issue as to whether any and all other

12  people, other than the Adams plaintiffs, who were deprived of

13  the opportunity, according to the plaintiffs, to file claims by

14  reason of New GM's conduct would have the ability to assert

15  claims against New GM?

16          MR. STEINBERG:  Now, I think that that's the issue

17  that resolves the Adams case, but in the MDL complaint, the

18  same cause of action is raised in the economic loss

19  circumstance, so you need to deal with it in that circumstance.

20          THE COURT:  They're asserting that New GM's liable

21  for their failure to file claims.

22          MR. STEINBERG:  For economic losses.

23          THE COURT:  For economic loss.  All right.

24          MR. STEINBERG:  And to follow Mr. Berman's analogy,

25  that's not also within your gatekeeping function.  Effectively,

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

1  they're allowed to say whatever they want, and if it's clear

2  that it's a retained liability to everyone except them, they're

3  saying, let me take my shot.  And it's not just Judge Furman,

4  right?  Because there are other cases that are not in the MDL,

5  they're all throughout the country, including the Arizona and

6  California actions.  The moment the stay is lifted, that

7  doesn't go before Judge Furman, that goes back into a

8  California judge.

9          THE COURT:  Uh-huh.

10          MR. STEINBERG:  The -- just to say again,

11  Mr. Weisfelner said that I had articulated a proposition that

12  there is nothing in the MDL complaint that is an independent

13  claim, and that's clearly not true.  I've said that New GM sold

14  vehicles, barring independent claim when we weren't coming

15  before Your Honor, I said certified pre-owned was not before

16  Your Honor.  I do think that issues relating to old GM vehicles

17  and used -- old GM vehicles that were sold used after the sale

18  are clearly within your jurisdiction, and that's what we're

19  coming to Your Honor for, with respect to each of the counts

20  that were identified.

21          The argument that we have not set forth a retained

22  liability, we have articulated independent claim actually just

23  assumes the conclusion.  The whole purpose of coming to Your

24  Honor is to challenge that.  They've acted brazenly by suing

25  the four or coming to Your Honor saying, I've asserted an

123

1  independent claim and I don't have to come and deal with Your

2  Honor.  They ultimately agreed that Your Honor could exercise

3  the gatekeeping function, but in order to exercise the

4  gatekeeping function, you actually need to determine whether

5  what they've asserted is a prima facie independent claim.  And

6  merely to say, well, maybe I -- what I asserted just doesn't

7  withstand any scrutiny at all, I don't think New GM exposed

8  itself as part of the sale to those types of claims.

9         The Arizona case, the Arizona state case -- and just

10  to be clear, I don't care what the statute of limitations says,

11  they're suing New GM for violations with regard to used car

12  sales after the sale order which relate to Old GM vehicles.

13  That's what they're alleging, and that's something that we're

14  bringing before Your Honor, that limited aspect of it.

15         To the extent that there are Old GM vehicles that

16  were sold after the sale that they're looking to assess fines

17  and penalties and everything else, where the vehicles were not

18  sold by New GM or a New GM dealer but was sold by an

19  independent third party, a father selling it to a son, a Toyota

20  dealer selling it because it was traded in by somebody else,

21  that's not a New GM liability.  Your Honor, I think, has ruled

22  on that before, and that's what's clearly actionable.

23         And, you know, the fact that they didn't know how to

24  plead correctly, they used GM-branded vehicles, and the fact

25  that they want to say that they did exactly what the DOJ did,

124

1  Your Honor had ruled before that they had done something

2  improper, that they had alleged too many conduct claims, they

3  had alleged too many types of allegations and they needed to

4  clean it up to be specific and not blur what they're really

5  asking for, and they just ignored that.  Now they're coming in

6  as if that never happened before.

7          The -- Mr. Berman said he's not asserting automatic

8  imputation at all, but he wants to be able to prove his case.

9  Everything that they've ever said to Your Honor before that

10 statement was made was that New GM was not born innocent and

11 everything is automatically imputed immediately on day one, so

12 that is a difference in a view that has been articulated now.

13         And finally, this is not a circumstance where you can

14 just ignore the fact that there was a 363 sale order that gave

15 these assets to New GM free and clear of liabilities that Old

16 GM had.  And everything that they're asserting with regard to

17 vehicles that were sold by Old GM is a retained liability,

18 especially in the way they've articulated their claims, the

19 third-party beneficiary claim with regard to an Old GM vehicle

20 that was sold by Old GM.

21         The ability to seek damages as part of a class for

22 people who weren't even subject to a recall, which was an Old

23 GM vehicle, those were clearly barred by the sale order.  That

24 is our position, and that is what we're asking Your Honor to

25 rule upon.  Thank you.

1          MR. WEINTRAUB:  Your Honor, could I just respond to

2   two points that -- where Mr. Steinberg said I conceded

3   something which I did not concede, and then I will sit down.

4          THE COURT:  All right.

5          MR. WEINTRAUB:  Thank you, Your Honor.  With respect

6   to the Adams complaint, Your Honor, that is a pre-sale ignition

7   switch defect accident plaintiff or group of plaintiffs.  This

8   Court ruled that there was a due process violation to this

9   group and that they could seek leave to file late claims.

10  However, the Court also ruled that any late claims, even if

11  allowed, would not receive anything because of equitable

12  mootness.  That is what defines our damages, and it's based

13  upon the due process violation, which the Court found, and the

14  fact that the late claim, per the equitable mootness argument,

15  would be worthless.  So I didn't concede that people knew they

16  had an accident and they can't file claims.  I never said that.

17         With respect to the issue of an assignment of the

18  right to collect punitive damages, to me, Your Honor, that's a

19  champerty issue.  We're not talking about that.  We're talking

20  about assumption of liabilities in connection with a sale

21  agreement, so it's apples and oranges.  Thank you, Your Honor.

22         THE COURT:  All right.

23         MR. STEINBERG:  Just one based on that last point,

24  Your Honor.  I would just ask Your Honor to, if that is an

25  important point for your decision about the public policy about

1  assigning punitive damages, read our cases that we cite in our

2  briefs, and you'll see that none of them are champerty-type

3  cases.  They're in the insurance context where they're saying

4  the insurance carrier shouldn't have to pay for this because

5  she shouldn't be able to assign it.

6         That's the -- the only other thing I would want to

7  mention, if Your Honor is closing this hearing, is that there

8  is something called the Dunsmore matter, and we're asking for

9  Your Honor to give us direction as to when you think we need to

10 respond to that.  That's the guy in California who's in prison,

11 who filed some kind of complaint, and there's some kind of

12 hearing in the beginning of November, and we're just not sure

13 how that relates to it, so --

14        THE COURT:  What is the Dunsmore matter?

15        MR. DAVIDSON:  Sorry, Your Honor.  Scott Davidson

16 from King & Spalding.  These were pleadings that were sent to

17 Your Honor by a pro se plaintiff who is in prison in

18 California.  They were filed yesterday on the docket.  They

19 concern this matter.  They concern this because we sent him a

20 demand letter because his complaint contains a pre-sale

21 accident.  So he did send certain pleadings to Your Honor,

22 which were docketed yesterday, so we're just not sure how to

23 respond to them or when to respond to them.  And the hearing is

24 in the California court at the beginning of November.

25        THE COURT:  He is suing on a pre-petition claim that

1  would be of the type of the other guys that Mr. Weintraub's

2  been representing?

3        MR. DAVIDSON:  It's -- it involves --

4        THE COURT:  But he's bringing it pro se and he's

5  calendared it for a hearing in California?

6        MR. DAVIDSON:  There's a status conference in

7  California on November 3rd, but it's -- the case concerns a

8  pre-sale accident that he was involved in.  But he's appearing

9  pro se.  He's actually in prison in California.

10        THE COURT:  And this was filed yesterday?

11        MR. DAVIDSON:  Well, it was docketed yesterday, yes.

12  I got like three motions with various forms of relief.

13        THE COURT:  On ECF?

14        MR. DAVIDSON:  Yes.

15        THE COURT:  And how or for what purpose was it

16  docketed before me?

17        MR. DAVIDSON:  Well, I believe it was mailed to you

18  by Mr. Dunsmore, and we also actually sent you copies because

19  we got them, as well, and did not see them docketed.

20        THE COURT:  I assume that all would agree that unless

21  and until I take other action, it's stayed under any and all of

22  my earlier rulings.

23        MR. DAVIDSON:  Okay.  Thank you, Your Honor.

24        THE COURT:  Well, no.  I'm asking that as a question.

25        MR. DAVIDSON:  Yeah.  I mean, we believe so, yes.

128

1          THE COURT:  Mr. Weintraub, do you see any reason why

2     he wouldn't be in a different category than any of your other

3     guys?

4          MR. WEINTRAUB:  No, Your Honor.  I was marginally

5     aware of this.  I was called at one point by Mr. Dunsmore's

6     mother.  What I understood from her, and I may have

7     misunderstood it, was this was a post-sale accident case.  It

8     may not be.  So I referred her to Mr. Hilliard, and I don't

9     know what happened after that.  But if it's a pre-sale case, I

10    think that they are in along with everyone else who's in the

11    pre-sale boat.

12         THE COURT:  All right.  Here's what we're going to

13    do, folks.  This may be a grain of sand on the beach of the

14    expenses that's been devoted to litigating issues in this case,

15    but I'm going to issue and endorse an order that says that his

16    action is stayed until the further order of this Court be made

17    and that it's without prejudice for anybody to bring facts to

18    my attention of which I'm not presently aware.  And it's also

19    subject to the effect, if any, of any further rulings that I,

20    my successor, or this circuit issue in this case.

21         And for the time being, until and unless you hear

22    from me to the contrary, nobody needs to do anything else.

23         MR. DAVIDSON:  Thank you, Your Honor.

24         THE COURT:  All right.  Court adjourned.

25       (Concluded at 1:22 p.m.)

129

1                    **C E R T I F I C A T I O N**

2

3              We, Alicia Jarrett, Ilene Watson, and Lisa Luciano,

4    court-approved transcribers, hereby certify that the foregoing

5    is a correct transcript from the official electronic sound

6    recording of the proceedings in the above-entitled matter.

7

8

9

10

11   ALICIA JARRETT, AAERT NO. 428      DATE:  October 15, 2015

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17   ILENE WATSON, AAERT NO. 447       DATE:  October 15, 2015

18   ACCESS TRANSCRIPTS, LLC

19

20

21

22

23   LISA LUCIANO, AAERT NO. 327       DATE:  October 15, 2015

24   ACCESS TRANSCRIPTS, LLC

25

ACCESS TRANSCRIPTS, LLC              1-855-USE-ACCESS (873-2223)