# EXHIBIT F

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
|  | . | Case No. 09-50026-reg |
| IN RE: | . | Chapter 11 |
|  | . |  |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| et al., f/k/a GENERAL | . |  |
| MOTORS CORP., et al, | . | One Bowling Green |
|  | . | New York, NY 10004 |
| Debtors. | . |  |
|  | . | Tuesday, September 24, 2015 |
| . . . . . . . . . . . . . . . . | . | 2:36 p.m. |

TRANSCRIPT OF EVIDENTIARY HEARING RE: REQUEST FOR
STAY PENDING APPEAL RELATED TO MOTION FILED BY WILMINGTON
TRUST COMPANY, AS GUC TRUST ADMINISTRATOR AND TRUSTEE,
FOR AN ORDER GRANTING AUTHORITY (A) TO EXERCISE NEW GM
WARRANTS AND LIQUIDATE NEW GM COMMON STOCK AND (B) TO MAKE
CORRESPONDING AMENDMENTS TO THE GUC TRUST AGREEMENT
**BEFORE THE HONORABLE ROBERT E. GERBER**
**UNITED STATES BANKRUPTCY COURT JUDGE**

For the Debtor:            King & Spalding LLP
                           By:  ARTHUR J. STEINBERG, ESQ.
                           1185 Avenue of the Americas
                           New York, New York 10036-4003
                           (212) 556-2158


For the GUC Trust
Administrator:             Gibson, Dunn & Crutcher LLP
                           By:  LISA H. RUBIN, ESQ.
                                ADAM H. OFFENHARTZ, ESQ.
                           200 Park Avenue
                           New York, New York 10166-0193
                           (212) 351-4000

APPEARANCES CONTINUED.


Audio Operator:            Karen/Julio, ECR


Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46038
                           (855) 873-2223
                           www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (Continued):

```
For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs:              Brown Rudnick LLP
                        By:  EDWARD S. WEISFELNER, ESQ.
                             HOWARD S. STEEL, ESQ.
                        7 Times Square
                        New York, New York 10036
                        (212) 209-4917

                        Stutzman, Bromberg, Esserman & Plifka
                        By:  SANDER L. ESSERMAN, ESQ.
                        2323 Bryan Street
                        Suite 2200
                        Dallas, Texas 75201-2689
                        (214)969-4900

For Participating
Unit Holders:           Akin Gump Strauss Hauer & Feld LLP
                        By:  DANIEL H. GOLDEN, ESQ.
                        One Bryant Park
                        New York, NY 10036-6745
                        (212) 827-8010
```

1 reflective of future earnings than what they're currently

2 investing in?  .12 percent returns.  And, Your Honor,

3 interestingly --

4        THE COURT:  Pause, please, Mr. Weisfelner.  How does

5 that .12 percent correspond to what Kurtz found when he made a

6 similar analysis in Tribune?  My memory is that in Tribune, the

7 debtor -- this is Judge Carey's case, --

8        MR. WEISFELNER:  Right.

9        THE COURT:  -- of course, not mine -- was getting

10 comparably low yields.

11        MR. WEISFELNER:  Sure.  And Your Honor, again, you're

12 absolutely right.  What Kurtz did was he took what he presumed

13 to be the right return on investment assumption, which he took

14 out of the Credit Suisse high-yield index, yield to worst, what

15 a bond was expected to pay, including prepayment but not

16 anticipating defaults on the bond, and used that as the

17 appropriate rate, which Mr. Scruton rejected in this case.

18        And yes, Your Honor's right, that Kurtz then did a

19 subtraction based on what was currently being earned.

20        My point is, and it goes to Your Honor's question, at

21 the very end of the testimony, if you look at the four indices

22 that we have here and you look at the S&P 500 Index, I don't

23 know about Your Honor, but I've got a bunch of money in a 401K

24 and a retirement program.  And I've got to tell you, while the

25 mean over the last ten years was 8.29 percent, that's not what

1  I earned last year and it's not likely to be what I'm going to

2  earn this coming year.  8.29 percent in this stock market?

3        Likewise, if I go down to the high grade bonds, Your

4  Honor asked, "Are we likely to see 5.2 percent returns on high-

5  yield bonds?"  The witness said, "No."

6        Likewise, if I look at Credit Suisse high-yield junk

7  bond index, given that the year-to-date returns was negative,

8  is it reasonable to expect that over the next 12 months they're

9  going to earn six percent?  Same for the money market or

10 Treasury yield.

11       You know, Your Honor, it occurs to me -- and if you

12 give me a second, I think I'm formulating a position that maybe

13 resolves this whole case.

14       I'll make an offer.  Deny our request for a stay.

15 Let them make their distribution in November.  If I'm

16 successful on appeal, I want to make sure I can get my money

17 back.  And I want to be able to get my money back with a

18 reasonable rate of return.  I'm telling you that the lowest

19 rate of return is five percent.  Cut that in half.  Make them

20 return the money to me at two and a half percent.

21       It's like a reverse mortgage.  I'm a class action.  I

22 represent thousands of innocent parties that were damaged by

23 GM's fraudulent concealment and knew GM's continued fraudulent

24 concealment, which has now been admitted as a matter of the

25 record.

1          I'm contending that on appeal, in order to get me to

2    ten cents, if I hit a home run on proving up our damages, the

3    best I'm ever going to do if I suck up all the cash that's in

4    the bank and all the money that's in the accordion is ten cents

5    on a dollar, compared to the 30 cents they've already

6    recovered.

7          Let them take their money in November, when it's

8    otherwise supposed to be ready to be taken.  But if I succeed

9    on appeal, I want an undertaking that I'm going to get the

10   money back, and I'll take the money back at a ridiculously low

11   -- based on their own testimony -- two and a half percent

12   interest, because I think that's a great investment for us.

13         You show me an investment that you can make a two and

14   a half percent guaranteed and I'll take it every day.  But Your

15   Honor, I don't want to seem facetious.  I'm thinking about it

16   as I'm standing here.  Your Honor is being asked to assume what

17   the right rate of return is.  I call their bluff.  They can

18   keep every dime of recovery over two and a half percent.  Keep

19   it.  They earned it; keep it.

20         Return the money to me with an undertaking from these

21   hedge funds that if I'm successful on appeal they'll return the

22   money.  I won't have to chase it.  I won't have to trace it.

23   It will be simply a matter of calling on a letter of credit

24   with a two and a half percent interest.

25         And Your Honor, I suggest to you that that offer --

1 and I apologize for not thinking of it earlier, but that offer

2 and its ultimate refusal by either the GUC Trust administrator

3 or by the hedge fund themselves, is indicative of what they

4 think they're going to be able to earn on this money.

5       Understand something else, Judge.  If you let them

6 take the $135 million, that represents a four-cent -- I'm

7 sorry, four-tenths-of-one-cent return.  And what distinguishes

8 I think our case from _Tribune_, for example, is this is not a

9 zero sum game.  In other words, a bunch of creditors who are

10 looking for recovery, either they're going to get the recovery

11 out of the Trust or the recovery is going to get stayed.

12       These investors hold an underlying investment piece

13 of paper called a "unit."  Now just think about it logically.

14 You have the unit.  It trades in the open market at some price.

15       Well, Your Honor, if they take the interest payment

16 or they take the distribution in November, what should that do

17 to the trading value of that unit?  Theoretically, if you'd

18 gotten money off the top, then the ultimate trading value of

19 that unit ought to go down, because in effect you've clipped a

20 coupon, you've taken a dividend.

21       If instead Your Honor directs no distribution out of

22 the Trust, then one would suspect, all other things being

23 equal, that the market value of those units will remain the

24 same or go up.  That's what distinguishes our case from the

25 _Tribune_ case, where it was all or nothing.  Either you get it

1  or you don't get it.  There's no underlying security that

2  synthetically represents the totality of your entitlements over

3  time.

4          Your Honor, you know before the GUC Trust decided

5  voluntarily, on its own application, to convert all of the GM

6  stock and warrants into cash, and then sometime in August, I

7  guess, invest the cash at .12 percent, they were holding on to

8  GM securities.  And we would have had a much easier time trying

9  to predict what the return on GM securities were.

10          They chose to convert into cash.  They chose to

11  invest it in a mix of short-term securities.  You got no

12  evidence, based again on the original GUC Trust agreement, as

13  to why they can't take that money, some $800 million, most of

14  it in reserves, and put it into a different permissible

15  investment.

16          They say, well, we don't want to trip over, be an

17  investment company.  Really?  Why not go to the SEC and ask for

18  a no-action letter, if you're so concerned?  And by the way,

19  there's nothing that says you will be an investment company.

20  The documents merely reflect their concern that they might be

21  treated as an investment company.  Their choice not to seek a

22  higher return.

23          Your Honor, I want to deal with a couple of other

24  issues that have been raised time and time again.  And the most

25  important one, from my perspective, is two things.  Number one,

1  we failed to hold up last November's distribution, a

2  distribution that Your Honor indicated on the record had I come

3  to ask you for it, that being a stay, you would have granted

4  it, quote, "in a heartbeat."

5          Now, Your Honor, I think in your own equitable

6  mootness determination, you determined that it was a close

7  call.  But what you perceived to be our strategic decision not

8  to pursue a stay  tipped you over the edge.  To add to that

9  both of my adversaries the day before yesterday argued that we

10 don't have any claims, we never filed claims in this case, and

11 we ought to be held to an understanding and determination that

12 we're not creditors because we chose not to file a claim.

13         Your Honor, in the scheduling order regarding the

14 motion of General Motors to enforce the sale order, there was a

15 stipulation that was entered into because we were concerned

16 about just this implication.  And by order dated May 16th,

17 2014, Your Honor ordered that:

18         "The GUC Trust agrees that it shall not assert a

19          timeliness objection to any claim that the Plaintiffs

20          may attempt to assert against the old GM bankruptcy

21          estate and/or the GUC Trust based directly or

22          indirectly on the ignition switch issue as a result

23          of the Plaintiff's delay in asserting such claims

24          during the interval."

25         Interval was defined as "the date of this order,"

16

1  which again I think was May, May of 2014, "and the entry of a

2  final order," final order meaning the entry of an order by a

3  court of competent jurisdiction, and there are no pending

4  appeals, and the time period to file an appeal has expired.

5        They agreed and were ordered not to raise the no

6  filing of a claim.  The chutzpah of both of them to keep

7  telling Your Honor that I ought to be prejudiced or Your Honor

8  ought to draw negative inference from the fact that I haven't

9  filed a claim.

10        We anticipated this, and we thought we had an

11  agreement that it wouldn't be raised, going back to May.  But

12  because they have nothing else to argue, they tell you that

13  that's an important criteria.

14        Your Honor, there should be no bond in this

15  situation, for the following reasons:  The highest possible

16  percentage based on a mean, which their own witness testified

17  is a better indication of likely recoveries than the third

18  highest number for the four indices, indicates that the right

19  percentage is 5.03 percent.

20        And that again takes into account giving them the

21  benefit of the doubt on the lowest possible earnings they could

22  get from their own investments.

23        It takes into account, or assumes, that an investor

24  gets the money and invests it all at one time, in today's

25  volatile market.

1       And it assumes across all four indexes -- and I don't

2   care if you're a hedge fund or you invest in Bolivian bonds, if

3   I thought I could get five percent over the next six months in

4   today's market, please show me where I can invest my money at

5   five percent.  You can't.  Which is what gave rise to my offer.

6   Give them the money, but make sure they account to me for who

7   got the money, and return it to me if my appeal is successful

8   at half that rate, two and a half percent.

9       They won't take that offer because they know they're

10  not likely to make any money on that bet.  Hedge funds who want

11  to make money and profit on their investments, not the

12  customers of GM, not the employees of GM, not the innocent

13  creditors that were injured because -- or who suffered because

14  GM went through a bankruptcy and a 363 sale.  Hedge funds who

15  made a wide open investment after the fact.

16      In every GUC Trust report since May of 2014, the GUC

17  Trust had advised unit holders that because of the recall, your

18  ultimate distributions may well suffer significant dilution.

19  It wasn't a surprise to these sophisticated investors that

20  could happen.  It was a known, reported fact.  They could have

21  traded out of their units.  Many of them, I think, doubled down

22  on their investments, but we don't know.  Which gets me to

23  negative inferences.

24      There are three bases upon which we ask Your Honor to

25  make a negative inference.  One is no compliance with 2019.

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

1   Number two is because of the discovery dispute we had with Akin

2   Gump -- and Your Honor is right, that I have occasion every

3   once in a while when I'm lucky to represent hedge funds.

4           THE COURT:  On occasion?

5           MR. WEISFELNER:  On occasion.  And I tend to know

6   what they will or won't do.  And sometimes we work these things

7   out by having them report in the aggregate.  In this case, we

8   were told, you're getting none of the information, ask the

9   judge to make whatever inference you think you can get him to

10  make.

11          But more significantly, Your Honor, the expert told

12  you that getting some basic information from the hedge funds

13  would have been relevant to his calculation.  He went to the

14  hedge funds and asked them -- well, he kind of asked them

15  because he says he knew in advance he wasn't going to get any

16  information, even though it was relevant.  And they told him

17  no.

18          The hedge funds are the real parties in interest

19  here.  And the hedge funds have done nothing to facilitate the

20  finding of fact in this court of equity.  Instead they say,

21  we're not telling you, too bad.

22          Well, think about what happens in this ultimate chess

23  game.  Let's say Your Honor denies the stay.  We go forward on

24  our appeal and we're successful.  Won't a court of competent

25  jurisdiction want to understand where the money went to that we

22

1          Your Honor, again, I think it serves repeating that

2  but for Your Honor's having already found that our clients were

3  denied due process, we would have been in a position to file

4  claims on a timely basis together with everyone else, and we

5  would have lined up with all of the other GUC Trust

6  beneficiaries and been entitled to a recovery.  And we too

7  would have shared in the 30 cents that's already gone out the

8  door.

9          There ain't that much left to go out the door, and we

10  think we're entitled to our fair share.  And Your Honor, again,

11  I understand the bonding issue and I understand the burden that

12  we have, and I understand that this is against the weight of

13  authority in terms of providing security.  But we do have truly

14  a unique set of facts.

15          You have no evidence that could possibly support a

16  percentage above five percent, and every reason to believe that

17  that percentage ought to be discounted.  And think about it,

18  Your Honor.  You're asking a bunch of class action plaintiffs

19  to find the money to post the bond.  That's an extreme

20  undertaking when you look at the other side of the coin with

21  protecting hedge funds that made a voluntary investment, in my

22  view knowing full well what the risks were of having their

23  claims diluted by virtue of the fact that a whole bunch of

24  people were denied due process.

25          THE COURT:  Isn't making moral judgments on my part

1  on the relative entitlements to sharing pies in the Chapter 11

2  cases on my watch exactly antithetical to the practices we've

3  had in managing large 11's with distressed investors over the

4  last 15 years?

5          MR. WEISFELNER:  Absolutely, Your Honor.  And least I

6  be accused of being Trump-like, I would submit, Your Honor,

7  that you're not entitled to make moral distinctions.  And I'm

8  not asking you to make moral distinctions.  I don't know that

9  there is anything better or worse about a hedge fund investor

10  versus a personal injury or economic loss plaintiffs, except to

11  the following extent; and it's not a moral issue, it's a legal

12  and factual distinction.

13          Unlike the folks that filed claims in a timely

14  fashion, my clients were denied due process and the opportunity

15  to get in line with everybody else.  Unlike my clients, the

16  opposition here are hedge funds, and we know how much we love

17  hedge funds, and in particular how much I love hedge funds, but

18  the fact of the matter is they bought and sold the underlying

19  security with full knowledge of the potential for diminution of

20  value and dilution in their ultimate recoveries.

21          And what I'm suggesting, Your Honor, is I can protect

22  them, and I can protect them way better than they've asked me

23  to protect them.  Give them the money.  But give them the money

24  on condition that they give me an undertaking to return the

25  money.  And they can return the money at half the interest rate

1  than the five percent, which is the mean of all the indexes

2  over time.

3  And Your Honor, the money is not scheduled, cannot

4  physically go out the door until, quote, "mid-November." It's

5  now the end of September.

6  Your Honor, I know Mr. Golden. I've worked with him

7  for years. And I know the folks at Gibson Dunn and I've worked

8  with them on numerous occasions. Give me a week and we can

9  come up with an appropriate undertaking that will satisfy us

10  and give them all their money, and give them all their money in

11  November and you don't have to come back. We'll give them all

12  their money next November.

13  If my appeals take that long, which it won't -- and

14  by the way, when you look at what the appropriate time frames

15  are, Your Honor, we've asked the Second Circuit, or will be

16  asking the Second Circuit, to set a 90-day briefing schedule.

17  Three months. Three months from today. Which means one month

18  into the calculation of interest.

19  THE COURT: Is there anything in any document that I

20  can look at to ascertain that, or is that simply your

21  aspiration, in terms of implementing what Jesse Furman had

22  directed you to do?

23  MR. WEISFELNER: Your Honor, I'm told that there's

24  nothing I can show you. I can represent to you as an officer

25  of the Court that there is a draft motion to expedite that's

25

1  circulating among all of the parties.  That includes new GM.

2  It includes the GUC Trust.  It includes the GUC Trust unit

3  holders.  It includes the Grumman plaintiffs.  It includes Gary

4  Peller.  And the bid, which I understand is unopposed by

5  anybody, is 30/30/15/15 for briefs, which would take it to 90

6  days before the entire matter is fully briefed.

7          Your Honor, sitting here today, I can't tell you

8  whether or not every single one of the parties that we had to

9  represent to the Second Circuit was on board are in fact on

10 board.  It's my understanding that they are.  But I can tell

11 you the Second Circuit certainly hasn't ruled on that.  And

12 even if it is a 90-day briefing schedule, there's nothing that

13 the parties could do, stand on their head and spit nickels,

14 that cuffs the Second Circuit into how much time it takes to

15 resolve those issues.

16         But I think the thing can be fully briefed in three

17 months.  And all I'm saying, Your Honor, is I think we can call

18 the hedge fund's bluff on this.  Give them the money.  But make

19 it easy enough for me, if I'm successful on the appeal, to claw

20 the money back at a reasonable rate of return, which they

21 wanted 16 percent as their protected rate.  I'm saying give me

22 back the money at two and a half percent, keep the balance for

23 yourself as a gift.

24         For all of those reasons, Your Honor, I'd

25 respectfully submit that the evidence demonstrates that the

1    most a bond could possibly be is as reflected in our

2    illustrative example, there are numerous discounts that are

3    appropriate.  And I think our offer to the hedge fund sort of

4    proves it up, that this is really an equitable search for what

5    the right protected rate is.  I think my offer obviates that,

6    with all due respect.  And for that reason, when the hedge

7    funds reject my suggestion, there ought to be no bond.  Thank

8    you, Judge.

9          THE COURT:  Okay.  I'll hear from you, Ms. Rubin and

10    Ms. Newman, or as you may choose to divide up the same amount

11    of time.

12          MS. RUBIN:  Thank you, Your Honor.  There's a lot

13    that Mr. Weisfelner said today to respond to, so I hope that

14    Your Honor grants me a little bit of latitude in responding to

15    that.

16          Let me start by saying, Your Honor, I'm mindful of

17    your admonition at the beginning not to spend too much time on

18    the stay factors, and I will try my very best, Your Honor, to

19    adhere to that, but I do want to talk about two elements of the

20    four horsemen very quickly, Your Honor, if I can, before

21    turning to the bond, and that is starting with the irreparable

22    harm factor.

23          Your Honor suggested, during his opening remarks the

24    other day, there's plainly irreparable injury here where money

25    goes out the door to many, many different people and it's

1  uncertain terms as part of his testimony was if you focus on

2  the mean, he rejects that as being the right calculation of

3  protective rate of return because the mean is likely to be

4  predictive of lost opportunity costs 50 percent of the time.

5       Half the time using the mean will give you too high

6  of a bond, if the bond is supposed to represent lost

7  opportunity costs.  Fifty percent of the time the bond will

8  give you too low of a protection.  That's what a mean is

9  defined as.  It's the average of either being too high of a

10 protection or too low of a protection if what you're looking to

11 protect is lost opportunity costs.  That's not what Scruton was

12 asked to calculate.  That's why we have stick my finger up in

13 the air and come up with third highest rate of return that no

14 one's heard of before.

15      THE COURT:  Well, I think the comments you just made

16 very satisfactorily describes the philosophical distinction

17 between an alternative return that's wrong 50 percent and right

18 50 percent, by definition exactly what you said, and that which

19 is higher than that to give new unitholders protection higher

20 than with a 50 percent probability of being wrong.

21      So I don't think there's -- even if your guise is

22 hiding the ball in terms of what you're asking me to find.  But

23 can you help me understand your position as to why a so-called

24 protective rate of return that gets the likelihood of getting

25 right up to the 80 percent range as contrasted to what

62

1  Ms. Rubin would say, glass half empty rather than half full, a

2  50 percent chance of being wrong isn't -- is better from your

3  perspective and satisfactory to her side on the other?

4       MR. WEISFELNER:  Certainly.  Certainly, Your Honor.

5  Look, I think the distinction is the cases that the unitholders

6  and the trust relied on throughout their brief and throughout

7  their oral argument are stays of confirmation orders and

8  situations where people were being asked to stay confirmation

9  pending appeal out of concern that the equitable mootness would

10 be equitable mootness as it relates to a plan.

11       And, Your Honor, in the context of potentially,

12 quote, "knocking the props out" from under a plan and taking a

13 look at the multitude of transactions that occur in the context

14 of consummation of a plan, we're talking about all sorts of

15 stuff, as was true, for example, in _Tribune_ in the Kurtz

16 affidavit.  We focused on one section.  Kurtz then went on to

17 talk about the potential harm associated with making

18 distributions of stock to shareholders.  Mr. Kurtz then went on

19 to talk about the difficulty associated with free cash flow and

20 free cash flow sweeps that would openly go out the door or for

21 the benefit of shareholders.

22       Mr. Kurtz talked about opportunities in the business

23 itself for being able to use free cash flow as part of

24 reforming and resuscitating the business.  Mr. Kurtz talked

25 about the impact on competition in the industry where Tribune's

1  restructuring was to be held in place and forced to tread water

2  while other competitors in the market advanced on <u>Tribune</u>.

3        That's not this case.  This plan was confirmed.  This

4  plan was consummated.  People got their distributions.  The

5  government owned most of the equity.  The government sold out

6  of its equity.  The unitholders were entitled to the GUC

7  distribution.  Hedge funds poured into the units as a decent

8  investment and took some would either say advantage of or

9  assisted general unsecured creditors in being able to get out

10 of their investments quickly at a discount.

11       This is not plan of reorganization appeals where

12 we're looking to stay all of the implications of a confirmed

13 plan.  This is a GUC Trust, set up years ago, with

14 approximately thirty -- $10 billion worth of value on account

15 of what then we understood to be $30 billion worth of claims.

16 That's how we all compute the 30 cents on the dollar

17 distribution.

18       So when we look at situations where bonds were being

19 contemplated in the context of an appeal of a plan, and

20 consummation and avoiding irreparable injury in connection with

21 equitable mootness, the kinds of damages that people were

22 concerned about, the level of unscrambling the egg was really a

23 lot different than what we're talking about here.

24       And, Your Honor, with all due respect to Ms. Rubin

25 and her client and Ms. Newman and her client, what I don't

1   understand is what was wrong with my supposition.  Take the

2   money when the trust is ready to make a distribution sometime

3   in mid-November.  It's $135 million.  What's wrong with telling

4   me which hedge fund got how much of that 135, and getting and

5   undertaking from them that if my appeal is successful and a

6   court of competent jurisdiction finally directs them to return

7   the money, I'm not banging my head against the wall, but I have

8   an opportunity to present to that fund a letter of credit that

9   says turn back the money.

10          And to take the wind out of everyone's sail on

11  computing interest rates, which is by no small measure a

12  difficult computation, what's wrong with saying whatever

13  interest you earn, you keep?  All this lost opportunity doesn't

14  become theoretical anymore, it becomes actual.  Earn what

15  you're going to earn.  All I want is a reasonable return on the

16  money that you got that you weren't by court order supposed to

17  have had.  If a court determines ultimately on appeal you

18  shouldn't have gotten the money, then you shouldn't have gotten

19  the money, but you had the benefit of earning potential on that

20  money.  All I want back is two percent, which is dramatically

21  lower than any figure they've ever presented.

22          And I think, Your Honor, the last point I want to

23  make, and by the way, other than telling you, Your Honor, to

24  assist Your Honor in preparing your decision, there are any

25  number of pages I think Your Honor may want to look to.  But

1 Your Honor has already indicated that we've each of us made our

2 positions fairly well-known.  I think the exercise here is take

3 a look at what's a lost opportunity cost.

4        Their position is no, no, no, no, you need to

5 determine what the best protective rate of interest is supposed

6 to be.  I don't see any authority for that proposition other

7 than their inapposite cite to, for example, <u>Adelphia</u>, which

8 Your Honor again knows very well is in the context of a stay

9 pending appeal from a confirmation order where the Court quite

10 correctly says that what we're looking for is a bond that will

11 properly do justice to the potential damages that are going to

12 be realized because the potential damages in unwinding a plan

13 are hard to compute.

14        The damages from these hedge funds not getting their

15 hands on $135 million, Your Honor, is a different exercise.

16 Tell me what you're going to do with the money over what period

17 of time, and either before the fact we'll try and guess what

18 you earn, or after the fact we'll know what you earn.

19        My offer to them today is let's figure it out after

20 the fact.  Take the money.  Invest it in whatever you want to

21 invest in.  I said Bolivian bonds.  You know, there could be

22 some really smart hedge fund guys out there that think that all

23 of these four indices are nuts, that what we really ought to be

24 investing in is going down to Atlantic City and betting on

25 Trump being the Republican nominee.  That's got great odds.

1  God bless them, they run hedge funds, they're worth billions.

2  Let them make whatever investment they want.  Let them make

3  whatever returns they want.  Give me the money back when a

4  judge says give me the money back, and give it to me back with

5  a very, very low rate of return.  What's wrong with that?

6          The last point I thought I wanted to make, but I'm

7  sort of losing my place here.  Oh, we keep coming back to 240

8  some odd million dollars went out the door because of a

9  strategic decision, and that's part of a <u>Chateaugay</u> factor and

10 it's prejudicial.

11         I'm guessing that on appeal a Court may look at the

12 244 out of the ten billion that's already been distributed, or

13 the 244 out of the 890 million of cash they currently have, or

14 the 244 out of the accordion feature and say, you know,

15 Weisfelner, you screwed up and you're never getting your hands

16 on that money again.  But how does that relate to the next

17 distribution they want to make?  And how do they overcome Your

18 Honor's determination that had I spent the time and money

19 arguing on that $240 million distribution, Your Honor would

20 have held it up, quote, "in a heartbeat."

21         THE COURT:  Well, Mr. Weisfelner, when I said what I

22 said back then, I did not have the benefit of the evidence that

23 I have now, nor the articulation of the legal issues.

24         MR. WEISFELNER:  All of --

25         THE COURT:  The law of the case doctrine is quite

84

1            **C E R T I F I C A T I O N**

2

3            We, Michelle Costantino, Ilene Watson, and Lisa

4    Luciano, court-approved transcribers, hereby certify that the

5    foregoing is a correct transcript from the official electronic

6    sound recording of the proceedings in the above-entitled

7    matter.

8

9        *Michelle Costantino*

10

11   _____

12   MICHELLE COSTANTINO, AAERT NO. 589   DATE:  September 29, 2015

13   ACCESS TRANSCRIPTS, LLC

14

15

16

17   _____

18   ILENE WATSON, AAERT NO. 447        DATE:  September 29, 2015

19   ACCESS TRANSCRIPTS, LLC

20

21

22

23   _____

24   LISA LUCIANO, AAERT NO. 327        DATE:  September 29, 2015

25   ACCESS TRANSCRIPTS, LLC

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)