# EXHIBIT H

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KAISER ALUMINUM CORPORATION, | ) | Case No. 02-10429 (JKF) |
| A Delaware corporation, et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | **Hearing Date: January 10, 2006** |
| | ) | **Re: Docket No. DI 8008 and 8009** |
| ----------------------------------------------------- | ) | **Agenda No. 3** |

**OBJECTION OF DEBTORS AND DEBTORS IN POSSESSION, U.S. BANK NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE FOR 10-7/8% NOTEHOLDERS, CERTAIN HOLDERS OF SENIOR NOTES, OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND CERTAIN HOLDERS OF, AND THE INDENTURE TRUSTEE FOR, THE 7-3/4% SWD REVENUE BONDS TO LAW DEBENTURE TRUST COMPANY OF NEW YORK'S MOTION FOR STAY PENDING APPEALS**

Debtors and Debtors-in-Possession, U.S. Bank National Association, as Indenture Trustee for the holders of the 10-7/8% Notes (in such capacity, "U.S. Bank"), an ad hoc group of holders of the Senior Notes, the Official Committee of Unsecured Creditors and Certain Holders of, and Indenture Trustee for, the 7-3/4% SWD Revenue Bonds (collectively "Plan Proponents") hereby file this Objection to the Motion of Law Debenture Trust Company of New York's ("LDTC") Motion for Continuance Pending Appeals dated January 3, 2006 (the "Stay Motion").[1]

### PRELIMINARY STATEMENT

Out-of-the-money subordinate creditors who have asserted claims that the Court has now found to have "no merit" are now asking the Court to stay its carefully reasoned December 22, 2005 Order to prevent senior creditors from obtaining distributions that have been duly determined by the Court to belong to them. The Court should deny the motion because LDTC

---

[1]All capitalized terms not otherwise defined herein shall have the meanings given to them in the Third Amended Joint Plan of Liquidation for Kaiser Alumina Australia Corporation and Kaiser Finance Corporation and the Third Amended Joint Plan of Liquidation for Alpart Jamaica Inc. and Kaiser Jamaica Corporation (the "Alumina Subsidiary Plans").

simply cannot meet *any* (much less all) of the required elements to justify the extraordinary remedy of staying the Court's decision pending appeal. First, LDTC cannot establish a strong likelihood of success on appeal. Its interpretation of the Subordinated Note Indenture was, and remains, absurd. Second, LDTC cannot demonstrate that it would suffer irreparable harm if the stay is not granted. Distributions to the Senior Noteholders can be conditioned on each holders' agreement to disgorge such funds and to submit to the Court's jurisdiction to enforce such agreements in the inconceivable event that this Court's Order is overturned on appeal. Third, LDTC cannot demonstrate that other parties would not be substantially prejudiced by a stay. To the contrary, a stay would deprive the holders of the Senior Notes of approximately $200 million in immediate cash distributions and substantial interest income that they would otherwise earn during the appeal. Continued delay in receiving plan distributions and loss of interest thereon is widely recognized as the type of "substantial harm" warranting denial of a stay. Fourth, and finally, LDTC cannot establish that public interest favors a stay. Public interest favors creditors promptly receiving distributions under confirmed chapter 11 plans and disfavors out-of-the-money subordinated noteholders pursuing vexatious theories in an attempt to evade contractually bargained-for subordination provisions and obtain unfair negotiating leverage.

Were the Court inclined to grant a stay, it should be conditioned on LDTC posting a $25 million annual supersedeas bond that would fully compensate the holders of the Senior Notes for all lost interest and delay damages during the two years or more it will take LDTC to litigate its appeal through the court system. The escrow arrangement proposed by LDTC is not sufficient to protect the Senior Noteholders from damages they will incur as a result of being denied access to funds which are rightfully theirs. LDTC itself argued to this Court in the context of discounting the PBGC's claim in these cases that the appropriate interest rate that

2

would be earned by a prudent investor over the long term in the current investment environment
is 10.4%. (Tr. of Hr'g before Hon. Judith K. Fitzgerald, January 18, 2005, at 229.) Senior
Noteholders historically have generated even greater returns. Based on its prior admissions,
LDTC cannot now deny that the holders of the Senior Notes will suffer substantial harm by
reason of their failure to receive and have the opportunity to invest over $200 million in
immediate cash distributions during the two or more years that LDTC pursues meritless appeals.

## BACKGROUND

For over a year, LDTC has delayed the rightful owners of over $200 million in proceeds
relating to indisputably senior notes from receiving distributions on their notes while it advanced
a baseless claim that the subordinated noteholders are *pari passu* with the claims of the Senior
Notes in bankruptcy distributions from the Alumina Subsidiary guarantors. On December 22,
2005, the Court issued a 33-page Memorandum Opinion carefully considering and finding "no
merit" to LDTC's contentions. (Memorandum at pp. 14-15.) In particular, the Court ruled that:

- "Reading the Indenture as a whole, it is abundantly clear that the hybrid financial structure of subordinated treatment of the Subordinated Notes at the parent level and *pari passu* treatment of the subordinated Guarantees at the Subsidiary Guarantor Level . . . was not created by the Indenture." (Memorandum at p. 12.)

- "It is clear from the documents and the Court finds that the purpose of the Indenture was to subordinate all payments with respect to the Subordinated Notes regardless of source, including payments on the Subordinated Guarantees, to any Senior Indebtedness of KACC or the Subsidiary Guarantors outstanding then or in the future." (Memorandum at p. 4.)

- Under both Article Three and Article Sixteen of the 1993 Indenture, "upon reorganization or receivership, holders of Senior Indebtedness of either KACC or the Subsidiary Guarantors are entitled to be paid in full before holders of the Subordinated Notes can be paid directly or indirectly." (Memorandum at pp. 13-14.)

- The issuance of the Notices of Senior Indebtedness was a prerequisite to creating senior indebtedness. (Memorandum at p. 27.) The 1994 and 1996 Notices specifically identified the Senior Notes and Guarantees as Senior Indebtedness of KACC and the Subsidiary Guarantors respectively. (*Id.*, p. 9.)

3

- Clause (ii)(A) defines Senior Indebtedness as any "indebtedness for money borrowed . . . whether issued or assumed by such person," as well as "all other monetary obligations of such person in respect of any Indebtedness, obligation or guarantee." (Memorandum at p. 11.)

- A guarantee is a debt and assumption of debt is a function of a guarantee. (Memorandum at p. 10, n. 13.) LDTC's position that Senior Indebtedness can only be primary indebtedness, as opposed to a guarantee is erroneous. (Memorandum at pp. 10-11, 30-31.)

Consistent with longstanding New York law, the Court properly considered extrinsic evidence regarding the circumstances and purposes of Kaiser's issuance of the Subordinated Notes that did not contradict the Indenture. (Memorandum at pp. 15-17.) The Court found no evidence in the language of the documents or otherwise that supported LDTC's position that the guarantees of the Subordinated Notes were *pari passu* with the guarantees of the Senior Notes Guarantees and specifically found that "[a]ll the evidence, including the 1993 Indenture itself, is in fact, clearly to the contrary." (Memorandum at p. 21.)

The Court considered and properly relied upon the video-taped deposition testimony of Ted Sands, a former executive of Merrill Lynch Capital Markets, who had primary responsibility for due diligence and negotiations of the indenture and marketing of the Subordinated Notes, after LDTC had introduced a portion of it at the confirmation hearing. (Memorandum at pp. 18-23.) His testimony confirmed that the "hybrid security" posited by LDTC did not exist, would not have been accepted by the bond market and confirmed that the Subordinated Notes were, in fact, priced as fully subordinated debt. (Memorandum at pp. 20-21.) All the extrinsic evidence submitted to the Court regarding the facts and circumstances surrounding the issuance of the Senior Subordinated Notes in 1993, including testimony of individuals who negotiated and/or drafted the terms of the Subordinated Notes and Indenture, the prospectuses for the Subordinated Notes and Senior Notes was entirely consistent with Sands' testimony. (Memorandum at pp. 23-27.)

4

Even though it was provided with full opportunities for discovery and the Court held an extensive evidentiary hearing, LDTC offered no evidence at all that any holder of Subordinated Notes had ever formed any economic expectation that its rights were anything less than fully subordinated. Indeed, LDTC's lawyer conceded that not even the Subordinated Noteholders were convinced of the unique position advanced by LDTC. (*See* April 13 Hearing Tr. at 214.) ("They would call and say, we heard about this issue. I'd explain it to them. Call back again, that can't be right. How about this, this and this? Call back a third time, that can't be right.").

Instead of respecting the settled economic expectations of all parties, LDTC advanced a hyper-technical misreading of the Subordinated Note Indenture, arguing that the Court was required both to focus exclusively on a single phrase and then to read that phrase extremely narrowly and at odds with other provisions in the Indenture and related offering documents in order to construe a contract to mean the opposite of its obvious overall intent. In rejecting this approach, the Court applied widely accepted principles of contract interpretation under New York law to give effect to the parties' clear intentions as reflected in the document itself, the unambiguous notices and the surrounding circumstances. (Memorandum at pp. 7-23.)

## LEGAL ARGUMENT

### A.    The Motion Should Be Denied Because LDTC Failed to Satisfy the Necessary Criteria for a Stay Pending Appeal.

Bankruptcy Rule 8005 permits a party to seek a stay of a bankruptcy court order pending appeal.[2] It provides in pertinent part:

---

[2] LDTC's attempt to seek a stay pursuant to Bankruptcy Rule 7062, without posting any bond is a transparent attempt to obtain a stay without having to satisfy the Rule 8005 standards. By its terms, Rule 7062 provides that a stay may be obtained upon posting a bond and is applicable only to adversary proceedings. Rule 7062 is not applicable to LDTC's appeal from the contested matter at issue. *See* 1999 Advisory Comments to Rule 9014 ("This rule is amended to delete Rule 7062 from the list of Part VII rules that automatically apply in a

A motion for a stay of the judgment, order, or decree of a bankruptcy judge, for approval of a supersedes bond, or for other relief pending appeal must ordinarily be presented to the bankruptcy judge in the first instance. Notwithstanding Rule 7062 but subject to the power of the district court and the bankruptcy appellate panel reserved hereinafter, the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest.

To obtain a stay pending appeal pursuant to Rule 8005, the moving party must demonstrate the presence of each of four separate factors: (1) it has a strong likelihood of success on the merits of its appeal; (2) it will suffer irreparable harm if the stay is denied; (3) a stay will not substantially harm other parties in the litigation; and (4) a stay would serve the public interest. *In re VF Brands, Inc.*, 282 B.R. 134 (Bankr. D. Del. 2002); *In Re ANC Rental Corp.*, 2002 WL 1058196 at * 2 (D. Del. May 22, 2002); *In Re Polaroid*, 2004 WL 253477 at *2 (D. Del. Feb. 9, 2004); *In re Delaware & Hudson Ry. Co.*, 90 B.R. 90, 91 (Bankr. D. Del. 1988); *see also Republic of Philippines v. Westinghouse Electric Corp.*, 949 F.2d 653, 658 (3d Cir. 1991) (adopting same standard in stay of district court order). In its Motion, LDTC incorrectly asserts that these factors are to be balanced and that the absence of one factor is not dispositive. (Memorandum at p. 9.)

A movant's failure to establish *any* of the four factors can be grounds to deny the request for stay.[3] *See, e.g., In re Polaroid*, 2004 WL 253477 (D. Del., Feb. 9 2004) ("If a party fails to establish one of the four prongs, a court may deny the requested stay); *In re Sharon Steel,*

---

contested matter. . . . The provisions of Rule 62, including . . . the stay as a matter of right by posting a supersedeas bond provided in Rule 62(d), are not appropriate for most orders granting or denying motions governed by Rule 9014") All the cases relied upon by LDTC for application of Rule 7062 pre-date the 1999 amendment.

[3] The standard for granting a stay pending appeal is the same as the standard for granting a preliminary injunction. *In re Delaware*, 90 B.R. at 91; *Nutrasweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) ("A plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate")

159 B.R. 730, 733 (Bank. W.D. Pa. 1993) ("Each of the four prongs must be satisfied, but all of the conditions need not be given equal weight."); *ANC Rental Corp.*, 2002 WL 1058196 at * 2. (denying motion to stay where movants failed to establish either irreparable harm to themselves or lack of substantial harm to other interested parties); *In Family Kingdom, Inc. v. EMIF New Jersey Ltd. Pshp.*, 225 B.R. 65, 70 n 6 (D.N.J. 1998) (noting rule in Third Circuit is that there is no relaxation of "likelihood of success" element to qualify for stay pending appeal).

Here, LDTC fails to establish any of the four requisite factors to justify a stay so its motion should be denied.

### 1.    LDTC Failed To Establish The Likelihood That Its Appeal Will Succeed On The Merits.

In the Third Circuit, likelihood of success on the merits means that a movant has a "'substantial case,' or a strong case on appeal." *In re Polaroid*, 2004 WL 253477 at *3. The purpose of such a requirement is to ensure that a party's rights and interests to and in property as determined by court order are not impaired or delayed by reason of an appeal that does not have a substantial likelihood of success. We are unaware of any reported case under Rule 8005 where a court has issued a stay where the moving party could not demonstrate likelihood of success.

Here, LDTC simply cannot make a "strong" showing that it is likely to succeed on appeal. LDTC simply relies on the same strained arguments it previously made, which this Court soundly rejected as having "no merit." Therefore, LDTC cannot meet the first requirement for a stay pending appeal. *See, e.g., In re Roth American, Inc.*, 90 B.R. at 96-97 (declining to grant a stay pending appeal in case involving asset sale where appellant relied on arguments previously made and failed to provide the Court with any additional arguments or evidence); *Trans World Airlines, Inc.*, 2001 WL 1820325 (Bankr. D. Del., Mar. 27, 2001) (finding legal arguments previously raised by movant and rejected by Court were unpersuasive and did not

7

raise substantial likelihood of success on appeal); *see also In re Edwards,* 228 B.R. 573, 576

(Bankr. E.D.Pa.1999) (finding that debtor's appeal presented no substantial questions of law that

would cause court to relax application of substantial likelihood of success standard) [4]

    In an attempt to bolster its non-existent likelihood of success on appeal, LDTC repeatedly

asserts (as though doing so would make it true) that this case presents a question of first

impression in the Third Circuit on how public indentures should be interpreted.  But the issue

here is simply a question of New York contract law.  While LDTC might wish that New York

courts disregard fundamental contract law principles and the clear intention of the parties in

interpreting public indentures, under well-settled New York law, controlling here, exactly the

contrary is true.  *Sharon Steel Corp., v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1049

(2nd Cir. 1982) ("Interpretation of indenture provisions is a matter of basic contract law")

(applying New York law), cert. denied, 460 U.S. 1012 (1983); *In re Bank of New England Corp.,*

364 F.3d 355, 368 (1st Cir. 2004) (applying basic New York contract law principle to

interpretation of indenture and remanding to Bankruptcy Court for fact finding on the parties'

intent); *Broad v. Rockwell Intern. Corp.,* 642 F.2d 929, 940 (5th Cir. 1981) ("the construction of

an indenture is basically a question of contract law.") (applying New York Law); *U.S. Trust Co.

v. Alpert,* 10 F. Supp. 290, 299 (S.D.N.Y. 1998) (It is a well-established rule in this Court that

the "interpretation of indenture provisions is a matter of basic contract law.") (applying

New York law.)  Accordingly, there is simply no novel question of law or issue of first

impression that controls the outcome of any appeal.

---

    [4] If LDTC believes that it has meritorious arguments on appeal it is free to seek a stay
pending appeal from an appellate court.  Moreover, a bankruptcy court's authority to issue a stay
pending appeal is limited to a stay pending appeal to the district court only, but not beyond.
*See e.g., In re Texas Equipment Co., Inc.,* 283 B.R. 222, 231 (Bankr. N.D. Tex. 2002); *Linder &
Associates v. Richards,* 241 B.R. 769, 775-76 (Bankr. D. D.C. 1999).

LDTC cannot make a showing of substantial likelihood of success on appeal given the unequivocal language and structure of the Subordinated Note Indenture, which the Court aptly noted mandated rejection of LDTC's position. (Memorandum at p. 9.) Indeed, LDTC admitted in open court that its position was so counterintuitive that even the holders of the Subordinated Notes to whom it was explained rejected it as implausible. *See* p. 5, *supra* Moreover, LDTC has no adequate response to the undisputed contents of the three separate notices received in accordance with the Subordinated Indenture without objection by the Subordinated Note Trustee in 1994 to 1996 Each of the notices expressly and unequivocally indicated that the subsidiary guarantees of the Senior Notes constituted "Senior Indebtedness" of the subsidiary guarantors within the meaning of the Subordinated Note Indenture (Memorandum at p. 25.) A more compelling refutation of LDTC's position would be difficult to imagine.

Additional support for the Court's decision derives from the circumstances surrounding the sale of the Subordinated Notes, including testimony by witnesses directly involved with the issuance.[5] LDTC will also have an extremely difficult task of challenging this Courts' findings concerning the surrounding circumstances of the subordinated note issuance, which are entitled to great deference and subject only to limited appellate review under the "clearly erroneous" standard. LDTC failed to present any countervailing evidence in the record that would undermine, let alone even begin to demonstrate that any of the Court's key findings of fact about the circumstances and purpose of the 1993 Indenture were clearly erroneous or contrary to law. *See* Memorandum at p. 21 ("The Court accepts Mr Sands' testimony and finds that there was no evidence at all that the guarantees of the Subordinated Notes were *pari passu* with guarantees

---

[5]The Court also observed that no document, including the prospectus for the Subordinated Notes, states that the Subordinated Notes were anything other than fully subordinated. (Memorandum at pp. 25-26, n 31.)

of future Senior Notes. All the evidence, including that of the 1993 Indenture itself is, in fact, clearly to the contrary.") The total absence of countervailing evidence and the deferential standard of review of the Court's findings make it nearly impossible for LDTC to demonstrate a substantial likelihood of success on appeal. *See, e.g., In re Public Service Co.*, 116 B.R. 347, 349 (Bankr. D.N.H. 1990) (concluding movant failed to establish a strong case sufficient to establish a "likelihood of success on the merits" because most of the appeal involves factual issues which are subject to the "clearly erroneous" standard of review); *In re Edwards*, 228 B.R. 573, 577 (E.D. Pa. 1999) (in considering whether movant established likelihood of success on appeal it was appropriate to consider that to the extent factual findings were at issue they would only be reviewed for clear error on appeal).

LDTC's predictable argument, that the Court erred by considering any factual evidence outside the four corners of the Subordinated Indenture, including the notices, is simply contrary to longstanding New York law cited in the Court's Memorandum. (See Memorandum at pp. 10-12.) The Court correctly applied basic, black-letter New York law on extrinsic evidence. Accordingly, LDTC cannot begin to establish a substantial likelihood of prevailing on the merits of its objection to such evidence, which is one of two independent bases of the Court's decision.

An appellate court is especially unlikely to reverse this Court's ruling because, in addition to being correct, it is fair. The holders of the Subordinated Notes have known for a decade from the notices, numerous public filings by KACC and the marketplace that the guarantees of the Senior Notes were senior in right of payment. Moreover, in 1994 and 1996, they directly benefited from the investment of $400 million made by the holders of the Senior Notes in KACC. For them now to challenge the subordinated right of payment for which they

were paid a handsome 12-3/4% interest rate based on a distorted, hyper-technical parsing of a single clause contained in a lengthy, complex indenture is grossly inequitable.

## 2. LDTC Failed to Establish that, Absent the Stay, it will Suffer Irreparable Harm.

LDTC argues that, without a stay of the Order, it will suffer irreparable harm because it may not be able to recover funds distributed to Senior Noteholders. This is really a mootness argument in sheep's clothing which has been repeatedly rejected by courts as a basis for demonstrating irreparable harm. *See, e.g., Republic of Philippines v. Westinghouse Electric Corp.*, 949 F.2d 653, 658 (3d Cir 1991). Indeed, this Court has already denied LDTC's motion for a stay of implementation of the PBGC settlement where it argued that distributions under the settlement and plans would moots its appeal. Recasting its argument as one of collectibility, rather than mootness, does change the fact that LDTC cannot establish irreparable harm.

Moreover, to the extent it deems it appropriate, the Court could condition distributions to particular Senior Noteholders on notice to the noteholders of the potential for disgorgement and such noteholders' prior written agreement to disgorge such funds (and to submit to the jurisdiction of this Court for purposes of enforcing such agreement) in the highly remote possibility this Court's Order were to be reversed on appeal. Moreover, noteholders could be given the option of leaving the funds with the Senior Trustees to be invested pursuant to the Senior Note Indentures.

LDTC's reliance on an unreported District of Delaware case, *In re Columbia Gas Sys., Inc.*, No. 92-127-SLR, 1992 U.S. Dist. Lexis 3253, *5 (D. Del. March 19, 2002) granting a stay is clearly misplaced. *Columbia Gas* involved "novel and complex" questions related to the proper handling and distribution of refunds received by the debtor from suppliers in light of the provisions of federal bankruptcy law and relevant federal energy regulations. *In re Columbia*

*Gas Sys., Inc.,* 136 B.R. 930, 934-35 (Bankr. D. Del. 1992). No controlling authority existed to resolve these questions; it was even unclear whether state or federal law governed and the court ultimately applied federal common law. *Id.*, at 935-36. It was on this basis, that the Court determined that the Official Unsecured Creditors Committee had satisfied its showing of a substantial likelihood of success on appeal, given the truly novel and complex issues present. 1992 U.S. Dist. Lexis 3253 at *4. Under the unique facts of that case, the Court found irreparable injury to the Creditors Committee because without a stay, funds would be disbursed to innumerable gas customers many of whom were presumably outside the jurisdiction of the court. The district court was able to minimize harm to the customers by ordering an expedited appeal, something this Court is not empowered to do. Finally, there is no indication that either the customers or the debtors requested a supersedeas bond.

Other than claiming that it might not be able to collect the funds if the Court does not grant a stay, LDTC makes absolutely no showing of any harm, much less irreparable harm, sufficient to justify a stay. Its claim that a stay will help maintain the status quo likewise is insufficient to constitute a showing of irreparable harm. *In re Edwards,* 228 B.R. at 580. LDTC has, therefore, utterly failed to meet its burden on this element as well.

### 3.    The Imposition of a Stay Will Cause Substantial Harm to Other Parties.

Conversely, a stay will substantially harm the holders of the Senior Notes. There is no dispute that a stay would prevent the holders of the Senior Notes from receiving immediate cash distributions of at least $200 million. Courts have repeatedly recognized that the delay to creditors in receiving their payments is a significant harm warranting denial of a stay. *See, e.g., In re Public Service Co.* 116 B.R. 347, 350 (Bankr. D.N.H. 1990) ("delay caused to creditors receiving their payments is also a significant harm warranting denial of the stay"); *In re Kent,*

12

145 B.R. 843, 844 (Bankr. E.D.Va. 1991) (staying foreclosure order not warranted where stay would subject secured creditors, who had already been forced to sit and wait for eighteen months while taxes, interest, penalties and fees accrued, to further delay that would only increase the already substantial harm suffered by them); *In re Great Barrington Fair and Amusement, Inc.*, 53 B.R. 237, 240 (Bankr. D. Mass. 1985) (same); *In re Charter Company, 72 B.R. 70, 72 (M.D. Fla. 1987)* (denying motion for stay where, among other reasons, "the Dioxin Claimants will also suffer substantial harm as a result of a stay because of the resulting delay in their receipt of settlement funds under the Settlement Agreement"); *In re Bob Hamilton Real Estate, Inc.,* 164 B.R. 703, 704 (M.D. Fla. 1994) (stay pending appeal would prevent Trustee from making distributions for several years and therefore create a substantial hardship to the creditors).

LDTC's argument that Senior Noteholders will suffer "no harm" by reason of a stay because "the Disputed Funds would continue to sit in the existing escrow account, fully protected" completely misses the mark. It is not the funds that require protection, but rather the Senior Noteholders' Court-ordered rights to immediate payment of the funds that must be protected. Here, the imposition of a stay will indefinitely deprive the holders of the Senior Notes from receiving at least $200 million in immediate cash distributions and substantial interest income, after more than three years of not receiving any distributions on the notes. *See infra*, p. 13. The holders of the Senior Notes right to those distributions have already been substantially delayed by more than a year as a result of the groundless claims asserted by the LDTC. Any further delay in the distribution of such substantial amounts to the holders of the Senior Notes pending LDTC's pursuit of meritless appeals will cause them significant harm and would be grossly inequitable.

13

### 4.    The Public Interest Does Not Favor A Stay.

The public interest does not favor a stay. At bottom, out-of-the-money subordinate creditors who have asserted claims found by the Court to be without merit, are asking the Court to prevent senior creditors from obtaining distributions that have been duly determined by the Court to belong to them. Public policy strongly discourages promotion of frivolous claims by subordinate creditors. New York cases recognize strong policy reasons for enforcing subordination agreements because any distinction in the way subordination agreements are treated might result in a reduction in senior lenders' willingness to participate in such financing. *In re Kings Falls Power Corp.*, 185 B.R. 431, 443 n. 11 (Bankr. N.D.N.Y. 1995). Since senior debts involve "literally billions of dollars," a reduction in lenders' willingness to participate in such financing would be to "the detriment of the entire business community." *Id.* at 443, n. 11, *quoting In re Credit Indus. Corp.*, 366 F.2d 402, 410 (2d Cir. 1966). Accordingly, New York courts are careful to enforce subordination agreements in a manner that conforms to market expectations. *See generally Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982), *cert. denied*, 460 U.S. 1012 (1983) (refusing to adopt an interpretation of a public indenture that "would decrease the value of all debenture issues and greatly impair the efficient working of capital markets").

A stay pending appeal would necessarily encourage subordinated creditors in the future to routinely challenge bargained-for-subordination agreements and thereby obtain inappropriate leverage against senior creditors by tying up distributions for years, without cost or risk to the subordinated creditors. Such a result contravenes the fundamental public policy of enforcing subordination provisions as required by Section 510 of the Bankruptcy Code and could impair the efficient working of capital markets.

14

In a bankruptcy case, "the public interest" means "the promoting of a successful reorganization." *American Film Technologies, Inc. v. Taritero*, 175 B.R. 847, 849 (Bankr. D. Del. 1994) (quoting *Gathering Restaurant, Inc., v. First Nat'l Bank of Valparaiso*, 79 B.R. 992, 999 (Bankr. N.D. Ind. 1986). Here, a successful reorganization means a timely distribution of the proceeds from the sale of all of the assets of these four estates under the Plans. In addition, this Court must consider the public policy interest in affording finality to bankruptcy judgments. In light of the substantial harm to the Senior Noteholders which would ensue from a stay, and the strong public policy in proceeding with the implementation of Chapter 11 plans, this Court should deny LDTC's request for a stay.

**B.    Any Stay Must Be Conditioned Upon the Posting of an Adequate Supersedeas Bond.**

Federal Rules of Bankruptcy Procedure 8005 provides that the Court may "suspend . . . proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest." Although Rule 8005 does not expressly condition the grant of a stay pending appeal upon the posting of a bond, it is well-settled that a party who desires a stay "is normally required to file a bond in a sum sufficient to protect the rights of the party who prevailed in the bankruptcy court." 10 *Collier on Bankruptcy* (15th ed.) ¶ 8005.08[1], at 8005-8 (2004); *see also Calisoff v. Calisoff (In re Calisoff)*, 92 B.R. 357, 359 (Bankr. N.D. Ill 1988) (noting a "strong policy" against stays pending appeal "without providing security"); *In re Gleasman*, 111 B.R. 595, 602 (Bankr. W.D. Tex. 1990) (citing *Calisoff* for proposition) that there is a strong policy against granting stays without providing some security to the adverse party).

A supersedeas bond is required "to secure the prevailing party against any loss that might be sustained as a result of an ineffectual appeal." *In re Miraj and Sons, Inc.*, 201 B.R. 23, 28

15

(Bankr. D. Mass. 1996) (citing *Quarles v. Miller*, 193 B.R. 779, 782 (D. Va. 1996). The bond is specifically designed to secure costs on appeal, interest and damages for delay. *See Id.* (citing *J. Perez & Cia, Inc. v. United States*, 747 F.2d 813, 815 (1st Cir. 1984); *Poplar Grove Planting and Ref. Co., Inc.*, 600 F.2d 1189, 1190-91 (5th Cir.1979). Here, a stay would cause a substantial delay in the ability of the holders of the Senior Notes to receive in excess of $200 million in immediate cash distributions. At a minimum, any bond would have to protect the rights of the holders of the Senior Notes against the lost interest and other damages, including substantial costs and expenses occasioned by the delay associated with LDTC's appeal.

Without a supersedeas bond, a party injured by the delay from an unsuccessful appeal may have no recourse or source of recompense for its injury. *See, e.g., Edlin v. M/V Truthseeker*, 69 F.3d 392 (9th Cir. 1995) (recovery for damages incurred during pendency of an appeal is limited to the amount of the supersedeas bond); *Burghart v. Frisch's Restaurant, Inc*, 865 F.2d 1162, 1163-64 (10th Cir. 1989) (per curiam) (same); *In Re Ridgemont Apartment Assocs., Ltd*, 1127 B.R. 934, 939 (Bankr N.D. Ga. 1991) ("The Court is therefore forced to conclude that the supersedeas bond is the only mechanism through which AEV can seek relief [for damages caused by stay pending appeal]".) In other words, regardless of whether the Senior Noteholders incur $20 million, $40 million or $60 million in lost interest and delay damages during the appeal, without a supersedeas bond they cannot recover one penny of damages.

Several courts in the Third Circuit have underscored the appropriateness of basing a bond on the rate of return that creditors who are denied use of property would otherwise earn pending the appeal. *See, e.g., In re Oakwood Homes Corp.*, 329 B.R. 19, 22-23 (D. Del 2005) (affirming bankruptcy court's order conditioning a stay on the posting of annual 7.74% interest bond or letter of credit on a disputed $61 million dollar reserve based on testimony of the trustee's own

16

expert that a reasonably prudent investor would earn 7.74% rate of return on money during the appeal); *In re Intermet Realty Partnership*, 27 B.R. 938, 940 (Bankr. E.D. Pa. 1983) (conditioning a stay of a sale of property owned by a bank on the filing of a supersedeas bond calculated at 10% interest per year, based on the bank's evidence that "if the funds were available for lending purposes, a return of ten (10%) per annum would not be unreasonable."), *cf. In re Monroe Park*, 17 B.R. 934 (D. Del. 1982) (affirming grant of relief from automatic stay to pursue foreclosure action where creditor's interest would not have been adequately protected without compensation for loss of use of money at market rates).

The cases cited by LDTC generally involve judgment debtors (not entitlement to a res) and, thus, do not address the issue of compensation for loss of interest while a party pursues an appeal. *See, e.g.*, *Miami International Realty Co. v. Paynter*, 807 F.2d 871 (10th Cir. 1986) (the court found that the lower court had not abused its discretion in granting a stay of a $2.1 million malpractice judgment against an attorney conditioned upon the attorney posting his only asset - $500,000 of insurance coverage - into escrow, where execution of the judgment would force him into insolvency); *Federal Prescription Service, Inc. v. American Pharmaceutical Association*, 636 F.2d 755, 758 (D.C. Cir. 1980) (affirmed stay pending appeal without requiring a supersedeas bond where the damage award was $102,000 and the documented net worth of the judgment debtor was $4.8 million and the judgment debtor was a long-time resident of the District of Columbia with no indication of any intention to leave). Here, similarly, LDTC must, at a minimum, be required to pay into Court a bond for the differential between the interest that the Senior Noteholders would otherwise earn on their funds and the amount it will earn in a court-ordered escrow account.

17

Under these circumstances, if for any reason the Court determines that LDTC is entitled to stay the distributions to the holders of the Senior Notes pursuant to the Order pending appeal, any such relief must be conditioned upon LDTC's posting of an annual supersedeas bond of at least $25 million, to secure damages arising from costs, lost interest and any other damages incurred in connection with the delay caused by the stay. Simple interest alone on $213 million at a rate of 8.81% per annum (the difference between the median rate which LDTC acknowledges is the appropriate rate of return for a prudent investor (10.4%) and the average annualized return (1.59%) for the J.P. Morgan 100% US Treasury Securities Money Market Fund (symbol HTSXX) from 2001 to 2005 (the fund in which the proceeds are currently invested) would amount to approximately $18.8 million during each year of LDTC's pursuit of its meritless appeal. Ultimately, an appeal all the way to the Third Circuit could take years. The majority of the Senior Note Holders are large, institutional investors capable of achieving substantial returns on their invested capital. *See* Declarations of Ross Jonathan Weiner sworn to on January 9, 2006 (funds managed by Trilogy Capital LLC that hold Senior Notes have earned a gross return in excess of 14.0% over from 2001 to 2005) and Mitchell R. Julis sworn to on January 6, 2006 (funds managed by Canyon Capital Advisors LLC that hold Senior Notes have earned a gross return of approximately 16.5% over from 2001 to 2005). Therefore, the only way to protect the interests of the holders of the Senior Notes is to require LDTC to post an initial bond in the amount of $25 million within ten days of any stay order, and every year thereafter during which LDTC's appeal remains pending. Otherwise, the holders of the Senior Notes will have no remedy for the substantial damages incurred by them during the pendency of LDTC's appeal [6]

---

[6] Besides being prejudicial to the Senior Noteholders, it would be highly inequitable to

## CONCLUSION

LDTC's Motion to Stay should be denied because it has failed to establish any of the required legal prerequisites for a stay pending appeal. LDTC cannot demonstrate a likelihood of success on appeal. The imposition of a stay in this matter would substantially harm the holders of the Senior Notes, who have received no distributions of principal or interest on their notes since the inception of these bankruptcy proceedings. The holders of the Senior Notes are entitled to prompt distributions under the terms of the Plans without further delay.

Accordingly, the Plan Proponents request that the Court deny LDTC's motion for a stay. In the alternative, the Plan Proponents requests that any stay granted to LDTC be expressly conditioned upon LDTC posting an appropriate supersedeas bond with the Court in the annual amount of $25 million, within ten days of any order granting a stay, and thereafter on an annual basis during every year in which its appeal remains pending.

[Signature page follows ]

---

stay the appeal without requiring LDTC to post a sizeable bond. Without imposing a substantial bond requirement on the holders of the Subordinated Notes, they will have absolutely no risk of loss while the holders of the Senior Notes will suffer substantial loss every single day of the appeal. *See*, *e.g.*, *In re Public Service Co. of N.H.*, 116 B.R. 347, 350 (Bankr. N.H. 1990) (denying stay pending appeal of confirmation order where the "bond . . . would have to cover massive amounts of accruing interest and other delay costs . . . ").

19

Dated:  January 9, 2006

By: _Kimberly D. Newmarch_

Daniel J. DeFranceschi (DE 2732)
Kimberly D. Newmarch (DE 4340)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
Telephone:  (302) 651-7700
Facsimile (302) 651-7701

-and-

Gregory M. Gordon
Richard A. Cheley
Daniel P. Winikka
JONES DAY
2727 North Harwood Street
Dallas, TX 75201
Telephone:  (214) 220-3939
Facsimile:  (214) 696-5100

**ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION**

Michael B. Joseph
Theodore J. Tacconelli
FERRY, JOSEPH & PEARCE, P.A.
824 Market Street, Suite 904
Wilmington, DE 19899
Telephone: (302) 575-1555
Facsimile: (302) 575-1714

-and-

Clark T. Whitmore
Alain M. Baudry
Christina A. Smith
MASLON EDELMAN BORMAN & BRAND, LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4140
Telephone: (612) 672-8335
Facsimile: (612) 642-8335

**ATTORNEYS FOR U.S. BANK NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE**

20

RLF1-2966835-1

Karen C. Bifferato (DE 3279)
Marc J. Phillips (DE 4445)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801
Telephone: (302) 658-9141
Facsimile: (302) 658-5614

                         -and-

George A. Davis
Diane Harvey
WEIL, GOTSHAL & MANGES, LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

**ATTORNEYS FOR AD HOC GROUP OF SENIOR
NOTEHOLDERS**


William P. Bowden
ASHBY & GEDDES
222 Delaware Avenue
PO Box 1150
Wilmington, DE 19801
Telephone: (302) 654-1888
Facsimile: (302) 654-2067

                         -and-

Lisa G. Beckerman
Brian Kilmer
AKIN, GUMP, STRAUSS, HAUER & FELD
590 Madison Avenue
New York, NY 10022
Telephone: (212) 872-1000
Facsimile: (212) 872-1002


**ATTORNEYS FOR OFFICIAL COMMITTEE OF
UNSECURED CREDITORS**

Duane D. Werb (DE 1042)
Jennifer H. Unhock (DE 4469)
WERB & SULLIVAN
300 Delaware Avenue, 13th Floor
PO Box 25046
Wilmington, DE 19899
Telephone: (302) 652-1100
Facsimile: (302) 652-1111

-and-

E. Evans Wohlforth
Anthony P. Callagham
David N. Crapo
GIBBONS, DELE DEO, DOLAN & GRIFFINGER &
VECCHIONE
One River Front Plaza
Newark, NJ 07102
Telephone: (973) 596-4500

**CO-ATTORNEYS FOR PLAINTIFFS BEAR, STEARNS
& CO., INC., CITADEL EQUITY FUND LTD., AND
CITADEL CREDIT TRADING LTD.**

Elizabeth J. Futrell
Aimee M. Quirk
JONES, WALKER, WAECHTER, POITEVENT, CAREERE
& DENEGRE, LLP
201 St. Charles Avenue
New Orleans, LA 70170
Telephone: (504) 582-8000
Facsimile: (504) 582-8011

**ATTORNEYS FOR J.P. MORGAN TRUST COMPANY,
NATIONAL ASSOCIATION, SUCCESSOR TO BANK
ONE TRUST COMPANY, N.A., AS INDENTURE
TRUSTEE**

**Kaiser Aluminum Corp., et al.**
**Case No. 02-10429 (JKF)**

## SUMMARY SHEET OF EXHIBITS

**EXHIBIT A**
**AFFIDAVITS OF MITCHELL R. JULIS AND ROSS JONATHAN WEINER**

**EXHIBIT B**
**UNREPORTED OPINIONS**

# EXHIBIT A

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In Re:<br><br>KAISER ALUMINUM CORPORATION, et al.,<br><br>Debtors | Jointly Administered<br><br>Chapter 11<br>Case No. 02-10429 (JKF) |

### AFFIDAVIT OF MITCHELL R. JULIS

STATE OF CALIFORNIA     )
                              )   ss.
COUNTY OF LOS ANGELES   )

Mitchell R. Julis, being duly sworn, deposes and says:

       1.       My name is Mitchell R. Julis. My business address is 9665 Wilshire Boulevard, Suite 200, Beverly Hills, CA 90212. I am over the age of 18 years, am of sound mind, and state the following facts of my own personal knowledge. If called upon to testify in court, I would testify consistently with what I state herein.

       2.       I am a Managing Partner of Canyon Capital Advisors LLC, which is an investment advisor to a number of hedge funds and managed accounts. I have been a Managing Partner of Canyon Capital Advisors LLC since 1998, and in this capacity was responsible for the purchase of certain senior notes of Kaiser Aluminum Corporation ("Kaiser") by several of these accounts and funds (collectively the "Accounts"). On April 6, 2004, and on various dates thereafter, I directed the purchase of 9 7/8% Senior Notes due 2002 and 10 7/8% Senior Notes due 2006 issued by Kaiser (together, the "Senior Notes") by the Accounts. The Accounts currently hold an aggregate of $49,227,500 million in Senior Notes.

3.    The Accounts will be substantially and materially prejudiced by the delay occasioned by a stay pending appeal of the Court's Order, dated December 22, 2005, Overruling Objections to Plan Confirmation (the "Order").    As of the date of this affidavit, the holders of Senior Notes have not received any distributions on the notes for more than three years, the last year of such delay resulting largely from the continued prosecution of claims by the subordinated noteholders, many of which have been decided adversely to the subordinated noteholders.    I am informed that the appellate process could take another two years to complete, a fact acknowledged by Law Debenture Trust Company of New York in its motion for a stay pending appeal.    If a stay is granted, during this two-year period, the fee arrangement with J.P. Morgan Chase, as distributor trustee, would require that all funds held in the distribution trust will be invested in a money market account that I am informed would typically earn interest of 1.59% per annum based on the annualized returns of the JP Morgan 100% US Treasury Securities Money Market Fund (symbol HTSXX) (hereinafter referred to as the "JP Morgan Money Market") from 2001 to 2005.    Historically, the Accounts have earned a gross return of approximately 16.5% per annum on its investments over the same time period. Specifically, the largest fund among the Accounts earned a gross rate of return of 17.04% in 2001, 7.59% in 2002, 28.69% in 2003, 18.15% in 2004, and 11.84% in 2005 (unaudited), which is typical of the returns of all the Accounts.    The JP Morgan Money Market returns for those years were 3.46%, 1.18%, 0.54%, 0.69%, and 2.13%, respectively.    Even in 2001, the year in which the JP Morgan Money Market earned its highest rate of return, the largest of the Accounts earned more than 13% more than the rate of interest that was earned by the J.P. Morgan Money Market.    There can be no

doubt that the Accounts will be substantially harmed by the loss of millions of dollars of interest during the appeal period if a stay is granted.

    4.    In contrast, there will be no harm to the appellants if the Court denies the request for a stay pending appeal. Canyon Capital Advisors LLC is an established firm, operating for nearly 8 years. The Accounts that own the Senior Notes have more than $7 Billion of assets under the management of Canyon Capital Advisors LLC. Given the significant asset base, there is no question that, should the Order be reversed on appeal, the Accounts readily will be able to disgorge the distributions to which they are presently entitled pursuant to Kaiser's plan of reorganization.

    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Mitchell R. Julis

SUBSCRIBED AND SWORN TO before me this ℓe day of January, 2005

Notary Public

My commission expires:

Feb. 3, 2009

MICHELLE ANGELA MOORE
Commission # 1549384
Notary Public — California
Los Angeles County
My Comm. Expires Feb 3, 2009

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In Re: | Jointly Administered |
| KAISER ALUMINUM CORPORATION, et al., | Chapter 11 Case No. 02-10429 (JKF) |
| Debtors | |

## AFFIDAVIT OF ROSS JONATHAN WEINER

STATE OF NEW YORK      )
                       )  ss.
COUNTY OF NEW YORK     )

Ross Jonathan Weiner, being duly sworn, deposes and says:

      1.     My name is Ross Jonathan Weiner.   I reside at 35 East 85th Street, New York, New York 10028.   I am over the age of 18 years, am of sound mind, and state the following facts of my own personal knowledge.   If called upon to testify in court, I would testify consistently with what I state herein.

      2.     I am a Senior Analyst of Trilogy Capital LLC ("Trilogy"), which is a hedge fund.   I have been a Senior Analyst of Trilogy since 2004, and in this capacity I am responsible for Trilogy's investments in certain senior notes of Kaiser Aluminum Corporation ("Kaiser").   On January 20, 2003, and on various dates thereafter, my firm purchased 9 7/8% Senior Notes due 2002 and 10 7/8% Senior Notes due 2006 issued by Kaiser (together, the "Senior Notes").   Trilogy currently holds $50.58 million in Senior Notes.

      3.     Trilogy will be substantially and materially prejudiced by the delay occasioned by a stay pending appeal of the Court's Order, dated December 22, 2005,

Overruling Objections to Plan Confirmation (the "Order").   The holders of Senior Notes

have not received any distributions on the notes for more than three years, the last year of

such delay resulting largely from the continued prosecution of meritless claims by the

subordinated noteholders.   The appellate process could take another two years or more

to complete, a fact acknowledged by Law Debenture Trust Company of New York in its

motion for a stay pending appeal.   If a stay is granted, during this two-year period (or

longer), the fee arrangement with J.P. Morgan Chase, as distributor trustee, would require

that all funds held in the distribution trust will be invested in a money market account that

I am informed typically would earn interest of 1.59% per annum based upon the

annualized returns of the J.P. Morgan 100% US Treasury Securities Money Market Fund

(Symbol HTSXX) (hereinafter the "J.P. Morgan Money Market") from 2001 to 2005.

Historically, Trilogy has earned a gross return of approximately 14.6% on its investments.

Specifically, Trilogy earned a gross rate of return of 20.5% in 2001,[1] 7.2% in 2002,

20.8% in 2003, 12.5% in 2004, and 11.9% in 2005.   The J.P. Morgan Money Market

returns for those years were 3.46%, 1.18%, 0.54%, 0.69%, and 2.13%, respectively.

Even in 2001, the year in which the J.P. Morgan Money Market earned its highest rate of

return, Trilogy earned 17% more than the rate of interest that was earned by the J.P.

Morgan Money Market.   There can be no doubt that Trilogy will be substantially

harmed by the loss of million of dollars of interest during the appeal period if a stay is

granted.

---

[1] Trilogy was established in 2001.   The identified gross rate of return for the year 2001
is annualized.

4.    In contrast, there will be no harm to the appellants if the Court denies the request for a stay pending appeal.    Trilogy is an established firm, operating for nearly five years.    Trilogy has approximately $910,000,000 of assets under management in the three funds that own the Senior Notes.    Given the successful operations and significant asset base, there is no question that, should the Order be reversed on appeal, Trilogy readily will be able to disgorge the distributions to which it is presently entitled pursuant to Kaiser's plan of reorganization.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Ross Jonathan Weiner

SUBSCRIBED AND SWORN TO before me this 9 day of January, 2005

Notary Public

My commission expires: 12/31/06

SCOTT J. PAIGE
Notary Public, State of New York
No. 30-4816156
Qualified in Nassau County
Commission Expires
12/31/06

# EXHIBIT B

# Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1058196 (D.Del.)
(Cite as: 2002 WL 1058196 (D.Del.))

Page 1

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
In re: ANC RENTAL CORP., et al. Debtors.
THE HERTZ CORPORATION, et al. Appellants,
v.
ANC RENTAL CORP., et al. Appellees.
Nos. 01-11220(MFW), Civ.A. 02-154, Civ.A. 02-
175, Civ.A. 02-288, Civ.A. 02-299,
Civ.A. 02-360, 02-364-GMS.

May 22, 2002.

*AMENDED MEMORANDUM AND ORDER*

SLEET, J.

**\*1** On February 27, 2002, the Hertz Corporation ("Hertz") and Avis Rent a Car System Inc. ("Avis") filed the first of several expedited appeals from the orders of the Honorable Mary F. Walrath of the United States Bankruptcy Court for the District of Delaware. Several subsequent appeals were filed. (Case Nos. 02-175 and 02-288 though and including 02-299) In particular, the appellants sought review of the January 28, 2002 and March 20, 2002 orders of the bankruptcy court that permitted the debtor to reject certain of their concession contracts and subsequently negotiate more favorable contracts at seven national airports. On March 25, 2002, Hertz filed a motion for a stay pending the appeals (D.I.18-- 02-154), and Avis joined in that motion. (D.I.20-- 02- 154) On May 3, 2002, the bankruptcy court entered another order that permitted the debtor to reject contracts at four more airports. An appeal of this order was filed on May 10, 2002. (D.I.1--02-360.) Hertz filed an emergency motion for a stay pending this appeal on May 13, 2002. (D.I.2--02-360.) Avis also joined in this motion. (D.I.1--02-364.) The court finds that Hertz and Avis have failed to demonstrate the necessary irreparable harm. Moreover, the court finds that a stay will be harmful to the debtor. Therefore, both of the motions to stay will be denied.

The briefly stated facts of this case are as follows: The debtor, ANC Rental Corp ("ANC"), is the parent company of the Alamo Rent-A-Car and National Car Rental System companies. As the name makes obvious, Alamo and National are car rental companies. Hertz and Avis are also engaged in the car rental business.

The rental car industry is particularly active in the nation's airports. According to the parties, the normal procedure for operating at an airport requires that the rental car company first bid for a contract with the local airport authority. If the bid is acceptable, the airport authority will issue a contract to the winning bidder that will permit it to operate a rental car booth, or concession, at the local airport. The parties assert that the terms of such concession contracts usually include terms stating that the concessionaire must earn a certain profit each year. This is called the minimum annual guarantee ("MAG"). Additionally, the appellants contend that the contracts generally prohibit the practice of two concessionaires operating at the same concession booth. This practice is commonly known as "dual branding." The parties do not dispute that the contracts at issue contain MAG requirements, but the debtor disputes that the contracts contain prohibitions on dual branding. [FN1]

> FN1. To the extent that the debtor disputes this contention, for the purposes of this motion only, the court will accept that the contracts contain terms and conditions that prohibit dual branding.

ANC, National, and Alamo filed for Chapter 11 bankruptcy on November 13, 2001. As part of their reorganization plan, National and Alamo sought to reject the concession contracts and have ANC, as the debtor-in-possession, assume the contracts pursuant to § 365 of the bankruptcy code. The bankruptcy court permitted this rejection and assumption in each of its three orders. The appellants assert that the effect of the orders is to permit Alamo and National to operate at the same concession, which effectively permits the dual branding that the appellants contend is prohibited by the concession contracts. The appellees further argue that when the contracts with the airport authorities were renegotiated with ANC, the MAG was also effectively reduced because only one of the companies at the concession would be subject to the MAG requirement. The orders of the bankruptcy court currently affect concession

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1058196 (D.Del.)
(Cite as: 2002 WL 1058196 (D.Del.))

contracts at eleven airports nationwide.

*2 Federal Rule of Bankruptcy Procedure 8005 permits a party to seek a stay pending appeal of an order of the bankruptcy court. *See* Fed. R. Bankr. P. 8005. The court may grant such a stay when the party seeking the stay can demonstrate that: (1) it has a likelihood of success on the merits of the appeal; (2) it will be subject to irreparable harm if the stay is not granted; (3) the granting of the stay will not substantially harm other interested parties; and (4) the granting of the stay would serve the public interest. *See In re Edwards, 228 B.R. 573, 575 (Bankr.E.D.Pa.1999).* If the movant fails to make a showing on any one of these four factors, the court may deny the stay. *See In re Blackwell, 162 B.R. 117, 120 (E.D.Pa.1993).*

Hertz and Avis both assert that they will suffer irreparable harm if the bankruptcy court's orders are not stayed and the debtor's reorganization plan is permitted to continue. The only argument the appellants present in support of this contention is that ANC, National, and Alamo will gain a "competitive advantage" if the reorganization scheme is permitted to continue because they will be able to operate at a lower cost than Hertz and Avis. The court is not persuaded by this argument. First, the amount of money the debtors will save during the consolidation process has been quantified. The fact that the savings can be quantified weighs against a finding of irreparable harm. *See In re Shelly's, Inc., 87 B.R.931, 935 (Bankr.S.D.Ohio 1988)* (indicating that even where there might be some intangible loss to reputation, if injury is "at bottom, financial" and could be calculated, there was no irreparable injury).

Second, where a business is threatened with serious financial harm (i.e. going out of business) as a result of a competitor's actions, irreparable harm may be present. *See Sprint Corp. v. Deangelo, 12 F.Supp.2d 1188, 1194 (D.Kan.1998)* (collecting cases). However, where the sole injury is loss of a competitive advantage, the argument for irreparable harm is less compelling because "revenues and customers lost to competition which can be regained through competition are not irreparable." *Central & Southern Motor Freight Tariff Ass'n v. Household Goods Carrier's Bureau, 757 F.2d 301, 309 (D.C.Cir.1985).* In other words, the marketplace should eventually be able to correct any harm suffered by Hertz and Avis.

Third, although Hertz and Avis claim that they will be irreparably harmed in the absence of a stay, they have failed to adduce evidence of the putative injury on the record before the court. "To constitute irreparable harm, however, an injury cannot be speculative, it must be certain, great, and actual." *Sprint, 12 F.Supp.2d at 1194* (citations and internal quotations omitted). Although the appellants have provided some evidence of the alleged advantage the ANC companies will receive, they have failed to make even a prima facie showing which demonstrates a tangible financial or other loss to Hertz or Avis. In the absence of such evidence, any loss to Hertz or Avis is merely speculative.

*3 Finally, the bankruptcy court orders thus far will only affect ANC operations at eleven airports nationwide. In contrast, there are eighty-seven international airports and over 700 other commercial airports in this country. [FN2] Moreover, the majority of the eleven affected airports are relatively small. Given the small number of airports that are affected at this time versus the large number of airports in this nation, the court is not persuaded that allowing the ANC companies to consolidate operations threatens irreparable harm at present. Additionally, although there is a possibility that the plan may be implemented at many more airports, the court also notes that both the appellants and the appellees have access to markets outside of the nation's airports. For all of the above reasons, the court finds that the appellants have failed to demonstrate irreparable harm.

> FN2. This information was obtained through telephone and electronic-mail communication with the Federal Aviation Administration ("FAA"). *See* E-mail from Ben Castalano, FAA, to Althea Brown, Judicial Administrator to the Honorable Gregory M. Sleet (May 21, 2002) (on file with chambers).

Turning to harm to other interested parties, it is clear that granting a stay would have a substantial and detrimental effect on the debtor's plan of reorganization. According to the debtors, once the plan is fully implemented, savings of $136,000,000 will be achieved. The appellants argue that savings at present, prior to the national implementation of the plan, will only amount to $6,000,000. The court finds that even a savings of $6,000,000 is important to a bankrupt estate. Moreover, a one year delay in implementing the plan might well seriously jeopardize the plan. [FN3] Thus, the court concludes that the granting of the stay would produce substantial harm to other parties.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1058196 (D Del.)
(Cite as: 2002 WL 1058196 (D.Del.))

Page 3

> FN3. One year is the time the parties
> estimate for the appeal in the absence of a
> stay.

Since the appellants have failed to demonstrate
irreparable harm or lack of substantial harm to other
interested parties, the court will deny their motions
for a stay of these proceedings. Therefore, none of
the pending cases will be stayed on appeal. [FN4]

> FN4. Although the motions to stay were
> only filed in case numbers 02- 154, 02-360,
> and 02-364, it is clear that the motions are
> intended to affect all of the pending cases.
> Therefore, the denial of the stay means that
> none of the pending cases will be stayed
> The parties should therefore not attempt,
> absent a showing of good cause, to file
> additional motions to stay in the remaining
> cases.

For the aforementioned reasons, IT IS HEREBY
ORDERED THAT:
1. The appellants' Motion for a Stay Pending
Appeal (D.I.18--02-154) is DENIED.
2. Hertz's Emergency Motion for a Stay Pending
Appeal (D.I 1--02-360) is DENIED.
3. Avis' Emergency Motion for a Stay Pending
Appeal (D.I.1--02-364) is DENIED.
4. None of the cases in this litigation [Case Nos.
02-154, 02-175, 02-288 through and including 02-
299, 02-360, and 02-364] will be stayed pending
this appeal.

Not Reported in F.Supp.2d, 2002 WL 1058196
(D.Del.)

### Motions, Pleadings and Filings (Back to top)

• 1:02CV00364 (Docket) (May 10, 2002)

• 1:02CV00360 (Docket) (May 10, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 253477 (D.Del.)
(Cite as: 2004 WL 253477 (D.Del.))

Page 1

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
In re: POLAROID CORPORATION, et al., Debtors.
Stephen J. MORGAN, Appellant,
v.
POLAROID CORPORATION, et al., Appellees.
No. Civ.A. 02-1353 JJF, 01-10864 PJW.

Feb. 9, 2004.
Stephen J. Morgan, Appellant, pro se.

Gregg M. Galardi, Mark L. Desgrosseilliers, of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, Eric W. Kaup, of Skadden, Arps, Slate, Meagher & Flom LLP, Chicago, Illinois, for Debtors and Debtors-in-Possession, Appellees, of counsel.

Joseph Malfitano, of Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware, Nava Hazan, of Akin Gump Strauss Hauer & Feld, LLP, New York, New York, Co-Counsel to the Plan Administrator, of counsel.

## *MEMORANDUM OPINION*

FARNAN, J.

*1 Presently before the Court is the "Emergency" Motion For Stay Pending Appeal filed by Appellant Stephen J. Morgan. (D.I.31.) For the reasons discussed below, the Court will deny Appellant's request for a stay pending appeal.

## BACKGROUND

The instant action is a bankruptcy appeal arising from the voluntary bankruptcy filing by Polaroid Corporation and certain of its subsidiaries and affiliates (collectively the "Debtors") in October of 2001. By his Motion, the Appellant requests the Court to stay the implementation of the Debtors' plan for reorganization. The Bankruptcy Court denied an identical request for a stay by Appellant on December 16, 2003.

## I. Parties' Contentions

The Appellant contends that the Court should stay the implementation of the reorganization plan because it is not in the best interest of Polaroid shareholders. The Appellant alleges that the auction of Polaroid's assets was fraudulent and that the value of Polaroid's assets far exceeded their sale price. Further, the Appellant contends that his appeal is likely to be successful because there remain unanswered questions about value and damaged shareholder and bondholder interests. The Appellant contends that if the Court denies his request for stay, he and other shareholders will be deprived of their right to appeal and their financial stakes in Polaroid. The Appellant also contends that a stay is in the public interest, because in light of recent corporate scandals, a resolution of the instant appeal is required.

In response, the Appellee contends that the Court should deny Appellant's request for an emergency stay because he has not satisfied the standards for entitlement to a stay pending appeal. Further, the Appellee contends that the Appellant's request is equitably moot. The Appellee also contends that Appellant failed to properly serve it and its counsel as required by the Federal Rules of Civil Procedure.

## DISCUSSION

Federal Bankruptcy Rule 8005 enables a reviewing court to issue a stay pending appeal from a judgment, order, or decree of a bankruptcy judge. Courts interpreting Federal Bankruptcy Rule 8005 have established a four prong test for an appellant to obtain a stay: 1) a strong likelihood of success on the merits of the appeal; 2) the movant will suffer irreparable harm if the stay is denied; 3) substantial harm will not be suffered to non-moving parties if the stay is granted; and 4) issuance of the stay will not harm the public interest. *In re 421 Willow Corp.*, 2003 WL 22318022 at *3 (E.D.Pa. Oct. 9, 2003). If a party fails to establish one of the four prongs, a court may deny the requested stay. *In re ANC Rental Corp.*, 2002 WL 1058196 at *2 (D.Del. May 22, 2002) (citing *In re Blackwell*, 162 B.R. 117, 120 (E.D.Pa.1993)). Because the Court concludes that Appellant has not established a likelihood of success on the merits, the Court will deny the request for stay pending appeal.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 253477 (D.Del.)
(Cite as: 2004 WL 253477 (D.Del.))

Likelihood of success on the merits means that a movant has a " 'substantial case,' or a strong case on appeal." *In re The Columbia Gas Sys., Inc.,* 1992 U.S. Dist. LEXIS 3253 at *4 (D.Del. March 10, 1992) (quoting *In re Public Serv. Co. of N.H.,* 116 BR 347, 349 (Bankr.D.N.H.1990). Appellant contends that "unanswered questions about value ... once answered will favor the appeal." (D.I. 31 at 3.) However, in the instant motion the Appellant does not identify for the Court any order, decree, or judgment by the Bankruptcy Court that was erroneous, and thus, potentially reversible on appeal. Moreover, Appellant has not identified any potentially incorrect factual finding or legal conclusion reached by the Bankruptcy Court.

*2 Absent specific challenges to actions taken by the Bankruptcy Court, the Court must conclude that Appellant has not demonstrated a strong likelihood of success on the merits. The Court will not speculate as to what errors, if any, were committed by the Bankruptcy Court. Therefore, because the Court concludes that Appellant has failed to establish the first prong of the test for entitlement to a stay, the Court will deny Appellant's Motion. [FN1]

> FN1. Based on this conclusion, the Court will not address Appellee's remaining bases for denial.

An appropriate Order will be entered.

### ORDER
At Wilmington, this 9th day of February, 2004, for the reasons discussed in the Memorandum Opinion issued this date;

NOW THEREFORE, IT IS HEREBY ORDERED that the "Emergency" Motion For Stay Pending Appeal filed by Appellant Stephen J. Morgan (D.I.31) is *DENIED*

Not Reported in F.Supp.2d, 2004 WL 253477 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:02CV01353 (Docket) (Aug. 02, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

## Westlaw.

Not Reported in B.R.                                                                Page 1
Not Reported in B.R., 2001 WL 1820325 (Bankr.D.Del.)
**(Cite as: 2001 WL 1820325 (Bankr.D.Del.))**

# H

Only the Westlaw citation is currently available.

United States Bankruptcy Court, D. Delaware.
TRANS WORLD AIRLINES, INC.
**No. 01-0056(PJW).**

March 27, 2001
Gwendolyn Young Reams, James N. Finney, Gerald D. Letwin, Equal Employment Opportunity Commission, Washington, D.C., Counsel for Equal Employment Opportunity Commission

Stuart Schiffer, Carl Schnee, Ellen W. Slights, United States Attorneys Office, Wilmington, J. Christopher Kohn, Tracy J. Whitaker, Ruth A. Harvey, Margaret Newell, Lacey R. Harwell, Jr., United States Attorneys Office, Washington, D.C. Counsel for United States of America.

Laura Davis Jones, Bruce Grohsgal, Pachulski, Stang, Ziehl, Young & Jones, Wilmington, Alexander Dimitrief, P.C., James H.M. Sprayregen, Kirkland & Ellis, Chicago, IL, Counsel for the Debtors Trans World Airlines, Inc.

Mark D. Collins, Michael Merchant, Richards, Layton & Finger, Wilmington, Alan B. Miller, Richard A. Rothman, Greg A. Danilow, Weil, Gotshal & Manges LLP, New York, NY, Counsel for AMR Corp., AMR Finance, Inc. and American Airlines, Inc.

WALSH, Bankruptcy J.

*1 Dear Counsel:

This is my ruling on the Emergency Motion of the United States of America and Equal Employment Opportunity Commission for Stay Pending Appeal (Doc. # 971) and brief in support (Doc. # 972) ("Stay Brief") of the Court's March 12, 2001 order granting the motion of Transworld Airlines, Inc. ("TWA" or "Debtor") for sale of substantially all of its assets to AMR Corporation ("American") The Debtor and American have filed a joint response (Doc. # 1024)("Response"). For the reasons set forth below, I will deny the stay motion.

TWA filed its chapter 11 case on January 10, 2001.

This is TWA's third chapter 11 filing in ten years. Before filing, TWA and American entered into an asset purchase agreement under which TWA agreed to sell substantially all of its assets to American. On January 10, 2001, TWA filed a § 363 [FN1] motion for an order authorizing the sale of substantially all of its assets ("Sale Motion") to American outside the ordinary course of business and prior to filing a plan of reorganization. Even without the asset purchase agreement with American, TWA intended to file its bankruptcy petition in early January, 2001. Transcript [FN2] (vol.I) at 380.

> FN1. Unless otherwise indicated, all references to " § ____ " are to a section of the Bankruptcy Code, 11 U.S.C. § 101 et seq.

> FN2. "Transcript" refers to the transcripts of the March 9, 10 and 12, 2001 hearings.

On March 9, 10 and 12, 2001, I held an evidentiary hearing on the Sale Motion ("Sale Hearing")and a related contract rejection motion. The Equal Employment Opportunity Commission and United States (together the "EEOC") objected to the sale to the extent it permitted TWA to transfer its assets "free and clear" of the EEOC claims.

The EEOC asserts two categories of what it characterizes as "successor liability" claims: (1) those arising from a settlement ("Settlement Agreement") of an EEOC lawsuit and a private class action against TWA based on alleged sexual discrimination; and (2) those based on pending prepetition charges filed with the EEOC against TWA. [FN3] (For convenience of reference I will use the EEOC label of "successor liability" claims). The Settlement Agreement requires TWA to provide ten travel vouchers for covered individuals and provides that the class member or his or her family member may use the vouchers for his or her lifetime ("Travel Voucher Program"). Stay Brief at p. 3. TWA has issued trip vouchers since the program was initiated in the latter half of 1995. *Id*

> FN3. According to the EEOC, as of March 2, 2001, there were 29 charges of employment discrimination against TWA alleging various violations of federal employment discrimination statutes, including Title VII of the Civil Rights Act of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                    Page 2
Not Reported in B.R., 2001 WL 1820325 (Bankr.D.Del.)
(Cite as: 2001 WL 1820325 (Bankr.D.Del.))

1964, the Americans with Disabilities Act of 1990, and the Age Discrimination in Employment Act of 1967 Stay Brief at pp 3-4.

After considering closing arguments on March 12, 2001, I overruled the EEOC's objection based on successor liability and entered an order (Doc. # 887)("Sale Order") authorizing the Sale Motion pursuant to § § 363(f), 105(a) and 106(a).

Section § 363(f) permits a debtor-in-possession to sell property of the estate outside the ordinary course of business

.. free and clear of any interest in such property of an entity other than the estate, only if--
(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
(2) such entity consents;
(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
*2 (4) such interest is in bona fide dispute; or
(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.
11 U.S.C. § 363(f).
Section 105(a) provides that
The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.
11 U.S.C. § 105(a).
The Sale Order states in relevant part:
The sale of the Transferred Assets to Purchaser shall be free and clear of Liens and other claims (other than Liens created by Purchaser) pursuant to section 363(f) of the Bankruptcy Code whatsoever known or unknown including, but not limited to, Liens and claims of any of the Sellers' . employees .. and Purchaser shall not be liable in any way (as a successor to the Debtors or otherwise) for any claims that any of the foregoing or any third party may have against any of the Sellers; provided that, with regard to employees' claims, the free and clear delivery of the Assets shall include, but not be limited to, all asserted or unasserted, known or unknown, employment related claims .... and successorship liability accrued up to the date of closing of such sale.

Sale Order at p. 6, ¶ 4.
The Sale Order also contains the following injunctive provision:
Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, all Persons are enjoined from taking any action against Purchaser or Purchaser's Affiliates including, without limitation, TWA Airlines LLC, to recover any claim which such Person had solely against Sellers or Sellers' Affiliates.
Sale Order at p. 8, ¶ 11.

On March 12, 2001 the EEOC filed a notice of appeal of the Sale Order (Doc. # 890) and on March 15, 2001, it filed the present motion requesting a stay pending appeal. Bankruptcy Rule 8005 governs the issue and provides in relevant part:
[n]otwithstanding Rule 7062 but subject to the power of the district court and the bankruptcy appellate panel reserved hereinafter, the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest. [FN4]

FN4. Fed.R.Bank.P. 7062 incorporates Rule 62 of the Federal Rules of Civil Procedure and lists several specific matters in which the court may issue a stay pending appeal.

The granting of a motion for stay pending appeal is discretionary with the court. The movant must show that: (1) it will likely succeed on the merits of the appeal; (2) it will suffer irreparable injury if the stay is not granted; (3) a stay would not substantially harm other parties in the litigation; and (4) a stay is in the public interest. Family Kingdom, Inc. v. EMIF New Jersey Ltd P'Ship (In re family Kingdom, Inc.), 225 B.R. 65, 69 (D.N.J.1998); In re Roth American, Inc., 90 B.R. 94, 95 (Bankr.M.D.Pa.1988). No factor alone is outcome determinative. In re Roth, 90 B.R. at 95. Proper judgment under Rule 8005 "entails a 'delicate balancing of all elements.' " In re Roth, 90 B.R. at 95 quoting In re Hotel Assocs., Inc., 7 B.R. 130, 132 (Bankr.E.D.Pa.1980).

*3 I find that a balance of the Rule 8005 factors does not favor issuing a stay pending appeal and accordingly, I will deny the stay motion. I review each of the Rule 8005 elements in turn.

I. Likelihood of Success on the Merits.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The EEOC argues it will likely prevail on appeal because neither § 363(f) nor § 105(a) permits the sale by TWA to American of substantially all of TWA's assets free and clear of the EEOC successor liability claims. It also raises the doctrine of sovereign immunity as a bar to the enforceability of the Sale Order. Finally, the EEOC argues that the Sale Order is procedurally defective in that it impermissibly imposes injunctive relief outside the confines of an adversary proceeding.

I am not persuaded by these arguments. I previously concluded, and I reaffirm, that "under § 363(f), [TWA's] assets can be transferred free and clear of [successor liability] claims ... And I find no basis in the statute for requiring that the purchaser assume those liabilities." Transcript (vol III) at p. 816.

Section 363(f) authorizes sales free and clear of interests in the property being sold. 11 U.S.C. § 363(f); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr.N.D.Ohio 1987) *citing* H.REP. NO. 595, 95TH CONG., 1ST SESS. 345 (1977), U.S.C.C.A.N.1978, P. 5787. Even before the enactment of the Bankruptcy Code in 1978, a court sitting in bankruptcy had the authority to authorize the sale of estate assets free and clear based on its general equitable powers and its duty to distribute the debtor's assets and determine controversies relating thereto. *White Motor Credit,* 75 B.R. at 948 *citing Van Huffel v. Harkelrode,* 284 U.S. 225, 52 S.Ct. 115 (1931). In other words, bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f). *Id.*

The authority to sell free and clear is broad. It reflects a compelling policy to encourage bankruptcy sales subject only to claims of a specific and recognized nature in the subject property. *E.g., Rubinstein v Alaska Pac. Consortium (In re New England Fish Co.),* 19 B.R. 323, 329 (Bankr.W.D.Wash.1982).

In this regard, I find the facts and reasoning of *New England Fish Co.* persuasive. In that case, the debtor, a major fish processing company with extensive facilities in Alaska, faced a management and financial crisis which forced it to cease operations. *New England Fish Co.,* 19 B.R. at 325. It filed a chapter 11 petition which converted to a chapter 7 liquidation less than a month later. *Id.* The trustee for the debtor's estate entered into an asset purchase agreement with a buyer under which the trustee agreed to sell the debtor's assets. *Id.* With a new

fishing season rapidly approaching, the Governor for the State of Alaska testified that operation of the debtor's facilities for the season was critical for the economy and that a sale of the debtor's assets was urgent. *Id.*

*4 Prior to filing bankruptcy, the debtor was subject to two class action civil rights suits brought by its employees. *New England Fish Co.,* 19 B.R. at 324. In one suit, the district court found that the debtor had discriminated based on race in the allocation of jobs and in housing its employees. *Id.* The asset purchase agreement obligated the trustee to sell the debtor's assets free and clear of the $15,156,371 civil rights claims. *New England Fish Co.,* 19 B.R. at 325.

The claimants objected to the sale based on the successor liability of the buyer, claiming that the court could not authorize the sale of the debtor's assets free and clear of their civil rights claims. The claimants contended they were entitled to go to trial on the merits of a successor liability theory based on the buyer's substantial continuity of the debtor's business enterprise and continuity in the identity of the work force. *Id.* at 324.

In overruling these objections to the sale, the *New England Fish Co.* court reasoned as follows:

The trustee ... concluded that the operation of the business was not practical. He sold it to Ocean Beauty. The latter would not and will not take the business burdened with civil rights litigation. No purchaser would. Such a prospect would chill or render impossible any sale. Those who would suffer from the uncertainty and delay would be creditors, including the ... claimants themselves....

The apprehension that bankruptcy will become a convenient expedient for avoiding the successorship doctrine is not well founded. The adverse consequences of bankruptcies involving displacement of management, creditor control and liquidation hardly support the argument that employers will use bankruptcy to avoid their responsibilities under the civil rights acts.

Congress has stated relative priorities for various elements of the debtor's creditor constituency in the Code. It is contended there are now two court-created exceptions: NLRA and Title VII claimants. Assuming this is so, if both were present, which of these would be prior to the other? Where is this to end? It is only a question of time before such a priority could and would be extended to other aggregations of claimants. To allow exceptions to be created by extrapolation from one case to another would eventually subvert the specific

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                    Page 4
Not Reported in B.R., 2001 WL 1820325 (Bankr.D.Del.)
**(Cite as: 2001 WL 1820325 (Bankr.D.Del.))**

priorities which define Congressional policy for
bankruptcy distribution to creditors

We conclude that the assets of the [debtor's] estate
being transferred pursuant to the Purchase
Agreement may be transferred free and clear of the
claims of the [civil rights claimants] ...
_New England Fish Co., 19 B.R. at 328-29_
(citations omitted).

I find this reasoning and outcome _a propos_. As in
_New England Fish Co_, many factors weigh in favor
of granting the injunction against the EEOC
successor liability claims. TWA filed a good faith
bankruptcy petition. Pursuant to a court approved
bidding procedure, TWA determined that American's
offer is the highest and best, and in fact, the only
available offer for the purchase of substantially all of
TWA's assets. TWA is unable to consummate the
sale if the EEOC's claims are not extinguished. No
other prospective purchaser exists. If the sale does
not go forward, it is highly likely that TWA will be
liquidated with the resultant material harm to various
creditor constituencies, including its 20,000
employees and a likely significant adverse economic
impact on the St. Louis, Missouri region, the location
of TWA's hub airport.

*5 Authorizing the sale of TWA to American free
and clear of the EEOC's successor liability claims
achieves the purpose of § 363 intended by Congress.
"[T]he purpose behind the 'free-and-clear' language is
to maximize the value of the asset, and thus enhance
the payout made to creditors. Without the 'free-and-
clear' language, prospective buyers would be
unwilling to pay a fair price for the property subject
to sale; instead, the price would have to be
discounted, perhaps quite substantially, to account for
the liabilities that the buyer would face simply as a
result of acquiring the asset." _WBO P'ship v. Virginia
Dep't of Med. Assistance Serv. (In re WBO P'ship),_
189 B.R. 97, 108 (Bankr.E.D.Va.1995)

I also agree with TWA and American that (1) the
prospect of successor liability would deter bidders
and could create a serious impediment to the ability
of debtors to effect going-concern sales under § 363,
_see, e.g., In re Leckie Smokeless Coal Co.,_ 99 F.3d
573, 586-87 (4th Cir.1996); _In re WBO P'ship,_ 189
B.R. at 108-09; _New England Fish Co.,_ 19 B.R. at
329; and that (2) bidders faced with prospective
successor liability claims would lower their offered
purchase price thereby indirectly subverting the
priority scheme of the Bankruptcy Code. _See, e.g.,
White Motor Credit,_ 75 B.R. at 951; _New England
Fish Co.,_ 19 B.R. at 328.

The EEOC argues that the "Settlement Agreement
prohibits TWA from reducing or limiting the benefits
provided by the Travel Voucher Program. _Id._,
Section VII, ¶ A.3, at 8. As such TWA may not
dispose of its assets, by sale or otherwise, without
making appropriate arrangements for continuation of
the voucher program." Stay Brief at p. 3. I find this
statement a classic non sequitur.

The EEOC's conclusion would clearly not pertain in
a TWA liquidation scenario. TWA leases 97% of its
fleet of approximately 180 airplanes. Transcript
(vol.I) at 21. Absent the American transaction it is
highly likely that TWA will not be able to satisfy its
aircraft lease obligations on an ongoing basis.
Pursuant to § 1110 the lessors will simply repossess
their planes. In that situation, how can TWA make
"appropriate arrangements" as the EEOC suggests
TWA is required to do? TWA will have no planes
and accordingly, no ability to continue the Travel
Voucher Program.

For similar reasons, I also reject the EEOC's
argument that the Travel Voucher Program and the
EEOC charges cannot be reduced to a monetary
satisfaction. Stay Brief at p. 11. The EEOC
characterizes the Travel Voucher Program as
injunctive relief for which it cannot be required to
accept a monetary settlement. From this it concludes
that the claims are not subject to § 363(f)(5) and that
the sale to TWA therefore cannot be free and clear of
the EEOC successor liability claims. The EEOC fails
to recognize, however, that if TWA were to liquidate,
the "injunctive" award made to the flight attendants
in the form of travel vouchers would be converted to
a dollar claim and it would be treated like any other
unsecured claim in this bankruptcy case. In fact, it
appears the Settlement Agreement itself establishes a
method for valuing the travel vouchers. Thus, I find
no basis in the statute for requiring the purchaser to
assume these liabilities.

*6 The EEOC next argues that its successor liability
claims are not "interests in property" within the
meaning of § 363(f). I disagree. TWA and American
cite extensive case law which undermines the cases
on which the EEOC relies. The EEOC does not
attempt to refute this contrary precedent. _Compare_
Stay Brief _citing Zerand-Bernal Group, Inc. v. Cox,_
23 F.3d 159 (7th Cir.1994); _Schwinn Cycling &
Fitness, Inc. v. Benonis (In re Schwinn Bicycle, Co.),_
210 B.R. 747 (Bankr.N.D.Ill.1997) _aff'd_ 217 B.R.
790 (N.D.Ill.1997) _with_ Response _citing Leckie
Smokeless,_ 99 F.3d a 582, 585 (section 363(f)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2001 WL 1820325 (Bankr.D.Del.)
(Cite as: 2001 WL 1820325 (Bankr.D.Del.))

authorizes bankruptcy court to extinguish statutory successor liability for employee benefit claims); *P.K.R. Convalescent Ctt. v. Virginia Dep't of Med. Assistance Serv. (In re P.K.R. Convalescent Ctrs., Inc.),* 189 B.R. 90, 96 (Bankr.E.D.Va.1995)(section 363(f) prevents state's statutory tax interest on property from passing to purchaser); *In re WBO P'ship,* 189 B.R. at 107 (same); *White Motor Credit,* 75 B.R. at 949 (section 363 sale was free and clear of prepetition tort claim against asset purchaser); *Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.),* 56 B.R. 186, 190-91 (Bankr.N.D.Ga.1986)(same).

I note that the leading cases which the EEOC cites in support of successor liability are from the Seventh Circuit. *E.g., Zerand-Bernal Group,* 23 F.3d at 163 (bankruptcy court lacks authority to enjoin all possible future lawsuits against a buyer at a bankruptcy sale); *Schwinn Bicycle,* 210 B.R. at 755. As such they are not controlling precedent for this court. Equally important, these cases are factually distinguishable because they involve product liability claims against the debtors' alleged successor-in-interest that arose after the sale transaction or plan confirmation. Thus, these cases hold that a sale free and clear of claims cannot divest a product liability suit that arises after a sale of assets or plan confirmation, not that § 363(f) does not authorize a sale free and clear of successor liability based on prepetition claims against the debtor.

I also am not persuaded by the EEOC's attempt to distinguish the precedent cited by TWA. For example, the EEOC alleges that *Forde v. Kee-Lox Mfg. Co.,* 437 F.Supp. 631 (W.D.N.Y.1977) is no longer good law because it was decided under the Bankruptcy Act which did not have a provision authorizing asset sales free and clear of interests in property. Stay Brief at p. 12. As noted *supra,* it has long been established that bankruptcy courts have the equitable authority to authorize the sale of estate assets free and clear of interests even without § 363. The fact that *Forde* was decided under the Act therefore does not compromise its reasoning. And as TWA and American point out, *Forde* continues to be cited as good law by courts interpreting the Bankruptcy Code. *E.g., Ninth Ave. Remedial Group v. Allis-Chalmers Corp.,* 195 B.R. 716, 731 (N.D.Ind.1996); *All American,* 56 B.R. at 189.

*7 I disagree with the EEOC that *New England Fish Co.* "defies" *Folger Adam Security, Inc. v. DeMatteis/MacGregor, J.V.,* 209 F.3d 252 (3d Cir.2000). Stay Brief at p. 12. As noted above, I find the facts and analysis in *New England Fish Co.* highly relevant to the situation here. Furthermore, the EEOC's conclusion that *Folger Adam* makes a "pronouncement that general unsecured claims not arising from the ownership of property are not within section 363(f)'s ambit" is incorrect. Stay Brief at p. 12.

In *Folger Adam,* the Court of Appeals for the Third Circuit had to "decide whether the affirmative defenses of setoff, recoupment, and other contract defenses, which arose as a consequence of alleged defaults under certain contracts with the debtors, constitute an 'interest' under section 363(f) of the Bankruptcy Code such that a sale of the debtors' assets in a consolidated Bankruptcy Court auction free and clear, extinguished such affirmative defenses and effectively transformed such contract rights into unimpeachable accounts receivable in the hands of the purchaser." 209 F.3d at 253-54. The Third Circuit concluded that "affirmative defenses do not constitute an 'interest' for purposes of section 363(f) and, therefore, were not extinguished by the Bankruptcy sale." *Id.* at 254. The Court did not, however, otherwise define the scope of an "interest" for purposes of § 363(f).

In reaching its conclusion, the Court noted that "any interest" is not defined anywhere in the Bankruptcy Code. *Folger Adam,* 209 F.3d at 257. After reviewing existing case law, the Third Circuit concluded that right of recoupment is a defense and not an interest and is thus not extinguished by a § 363(f) sale. *Id.* at 261. The Court, however, did not otherwise define or surmise what comprises an 'interest' under § 363(f).

Likewise, the Court of Appeals for the Fourth Circuit in *Leckie Smokeless* also refused to provide a full definition of interest, a case which the EEOC incorrectly cites for the proposition that the term "interests in property" is interchangeable with "lien" and that both mean a "charge against or interest in property to secure payment of a debt or performance of an obligation." Stay Brief at p. 7.

In *Leckie Smokeless,* two employer-sponsored benefit plans objected to the extinguishment of their right to payment of plan liabilities from a successor-in-interest by operation of § 363(f). In determining whether the plans had "any interest in property" within the meaning of § 363(f) the Fourth Circuit rejected what it called the District Court's "unduly broad interpretation" of the phrase. The District Court had found that simply the right to demand money from the debtor gave rise to an "interest" in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                      Page 6
Not Reported in B.R., 2001 WL 1820325 (Bankr.D.Del.)
**(Cite as: 2001 WL 1820325 (Bankr.D.Del.))**

debtor's property under § 363(f). *Leckie Smokeless,* 99 F.3d at 581.

Rejecting this definition, the Fourth Circuit noted that

...while the plain meaning of the phrase "interest in such property" suggests that not all general rights to payment are encompassed by the statute, Congress did not expressly indicate that, by employing such language, it intended to limit the scope of section 363(f) to *in rem* interests, strictly defined, and we decline to adopt such a restricted reading of the statute here.

*8 *Leckie Smokeless,* 99 F.2d at 582.

The EEOC maintains that § 105(a) does not support the sale "free and clear" of its successor liability claims. A predicate of this argument is that § 363(f) does not authorize the requested relief. However, because my order authorizing the sale of TWA to American is based on the "free and clear" language of § 363(f) as discussed above, the injunctive relief in the Sale Order is appropriate under § 105(a) because it is necessary to carry out the effect and purpose of § 363(f). 11 U.S.C. § 105(a). It therefore follows that I am not using § 105(a) to create substantive rights or to contravene the Bankruptcy Code as the EEOC suggests.

The EEOC raises two additional arguments in support of its stay request. First, it invokes the doctrine of sovereign immunity because "[i]n this matter, the effect of the Sale Order is tantamount to a suit by American against the United States and EEOC for a declaratory judgment that it has no successor liability as a result of its purchase of substantially all of TWA's assets." Stay Brief at 14. This argument mischaracterizes the facts. TWA is the debtor and moving party. The Sale Order is pursuant to TWA's motion for authority to sell substantially all of its assets in TWA's chapter 11 bankruptcy. I fail to see how the Sale Order can be characterized as a declaratory judgment by American against the EEOC. It clearly is not a suit against the EEOC. Accordingly, I conclude that the Sale Order does not implicate the sovereignty of the EEOC as a government entity.

Furthermore, § 106(a) expressly abrogates the EEOC's sovereign immunity under § 363 to the extent the EEOC could invoke the doctrine against TWA. The EEOC is a federal entity charged with enforcing federal statutes. "Congress has given no indication that bankruptcy courts cannot order property sold free and clear of interests that Congress

has itself created by statute." *Leckie Smokeless,* 99 F.3d at 586.

Although the cases the EEOC cites in support of sovereign immunity do establish that a waiver of sovereign immunity generally must be clear and is narrowly construed, the cases are otherwise inapposite. None of the cases concern a sale under § 363(f), and indeed most do not involve a bankruptcy proceeding. *See* Stay Brief at 14 citing *F.D.I.C. v. Meyer,* 510 U.S. 471, 483, 114 S.Ct. 996, 1003 (1994)(sue-and-be-sued clause of FDIC's statutory predecessor waived FDIC's sovereign immunity from suit by discharged employee of failed savings and loan association); *United States v. Nordic Village, Inc.,* 503 U.S. 30, 38, 112 S.Ct. 1011, 1017 (1992)(§ 106(c) does not waive the sovereign immunity of the United States from chapter 7 trustee's action seeking monetary recovery) *superseded by statute as stated in, e.g., Field v. Montgomery County (In re Anton Motors, Inc.),* 177 B.R. 58, 62 (Bankr.D.Md.1995)(in § 106(a) Congress has stated unequivocally its intention to abrogate sovereign immunity from bankruptcy causes of action for both the United States and the states, as to both nonmonetary and monetary judgments, except punitive damages); *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948 (1976)(nonbankruptcy suit for reclassification of federal civil service positions and for back pay involving issues regarding jurisdiction of Court of Claims and relief available in that tribunal) *criticized by United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961 (1983).

*9 Second, the EEOC argues that the Sale Order may not impose injunctive relief outside the scope of an adversary proceeding. I disagree. An adversary proceeding is not required for an order under § 363(f), even if the order includes injunctive relief necessary to effectuate the sale "free and clear." If what the EEOC argues were true, all § 363(f) sales would have to proceed via an adversary proceeding-- a procedure finding no support in the Bankruptcy Code or twenty plus years of reported decisions interpreting that Code.

Section 363(f) does not contain any "notice and hearing" requirement beyond that set forth in § 363(b). Thus, courts have held that "[t]he Code contemplates that hearings will be held on sales of estate property, including sales of property free and clear of liens, 'only when there is an objection " ' *In re Stogsdill,* 102 B.R. 587, 589 (Bankr.W.D.Tex.1989) *quoting* H.R.REP. NO. 595, 95TH CONG., 1ST SESS. 315 (1977)

Not Reported in B.R.
Not Reported in B.R., 2001 WL 1820325 (Bankr.D Del.)
**(Cite as: 2001 WL 1820325 (Bankr.D.Del.))**

U.S.C.C.A.N.1978, PP. 5787, 6272. This does not relieve the debtor-in-possession from complying with due process to interest holders. Nor may the court execute an order approving the allocation or distribution of sale proceeds in the absence an adversary proceeding. Fed.R.Bank.P. 7001(2); e.g., *In re Collins,* 180 B.R. 447, 449 (Bankr.E.D.Va.1995)(propriety and validity of liens on property were not properly before the court on a motion to sell free and clear).

Current Fed.R.Bank.P. 7001 does not include a provision requiring an adversary proceeding to sell property of the estate free and clear of liens. *See In re J.B. Winchells, Inc.,* 106 B.R. 384, 394 (Bankr.E.D.Pa.1989) *discussing* former Bankr.R. 701(3), which required an adversary proceeding to "sell property free of a lien or other interest for which the holder can be compelled to take a money satisfaction." Fed.R.Bankr.P. 7001(3) includes as an adversary proceeding a request for approval of a sale under § 363(h), but no longer includes approval of a sale free and clear under § 363(f).

The cases on which the EEOC relies are not to the contrary. These cases involve proceedings specified in Fed.R.Bank.P. 7001, not § 363(f) sales. *See* Stay Brief at p. 16 *citing Feld v. Zale Corp. (In re Zale Corp.),* 62 F.3d 746, 763 (5th Cir.1995)(injunctive relief issued as component of settlement agreement between the debtor, three of its former directors and their D & O liability insurer required adversary proceeding); *Haber Oil Co. v. Swinehart (In re Haber Oil Co.),* 12 F.3d 426, 437 (5th Cir.1994)(noting that claim seeking equitable interest in property such as constructive trust required an adversary proceeding because it is proceeding to recover money or property or determine interest in property); *Lyons v. Lyons (In re Lyons),* 995 F.2d 923, 924 (9th Cir.1993)(sale under § 363(h) required adversary proceeding); *In re McKay,* 732 F.2d 44, 45, 48 (3d Cir.1984)(holding that chapter 13 debtor was required to initiate adversary proceeding for lien avoidance action under § 522(f)). Not surprisingly, these cases confirm that an adversary proceeding is required for those actions listed in Fed.R.Bank.P. 7001. But a "free and clear" sale under § 363(f) is simply not such an action

**\*10** In sum, for the reasons discussed above, I conclude that the EEOC is not likely to succeed on the merits of its appeal

II. Irreparable Injury to EEOC.

The EEOC argues it faces irreparable injury because § 363(m) threatens the loss of its appellate rights if the American transaction is consummated. Stay Brief at pp. 17-18. It maintains that "[t]his prospect itself suffices to meet the standard of irreparable harm." *Id* at p. 17.

The EEOC does not provide any basis for concluding that § 363(m) will render its appeal moot. Although the EEOC is appealing the Sale Order *in toto,* its objection is based on an isolated provision of the Sale Order that authorizes the sale free and clear of the EEOC's successor liability claims. If the EEOC is successful on appeal, presumably it may then proceed against American on the merits of its claim.

Even if § 363(m) adversely impacts the EEOC's objection, "[i]t is well settled that an appeal being rendered moot does not itself constitute irreparable harm." *In re 203 North LaSalle Street P'ship,* 190 B.R. 595, 598 (N.D.Ill.1995); *see also Virginia Dep't of Med. Assist. Svs v Shenandoah Realty Partners, LLP (In re Shenandoah Realty Partners),* 248 B.R. 505, 510 (W.D.Va.2000); *In re Kent,* 145 B.R. 843, 844 (Bankr.E.D.Va.1991); *In re Charter Co.,* 72 B.R. 70, 72 (Bankr.M.D.Fla.1987)

More fundamentally, however, the EEOC fails to establish irreparable injury for the simple reason that the EEOC may have no recoverable claims against TWA in the absence of a sale of substantially all of TWA's assets to American. In the likely event that a stay pending appeal aborts the American transaction, the EEOC will be relegated to holding an unsecured claim in what will very likely be a piece-meal liquidation of TWA. In that context, such claims are likely to have little if any value. Issuing a stay pending appeal therefore cannot be said to result in any greater recovery for the EEOC or its constituencies. Consequently, there is no irreparable injury to the EEOC in the absence of a stay.

III. Substantial Harm to TWA and Other Litigants.

The EEOC argues that a stay will not substantially harm either TWA or American. The EEOC claims there is no substantial harm because (1) enforcing the Travel Voucher Program is not a burden on American as successor to TWA because travelers under the program would only use seats that would otherwise be empty; and (2) the value of the EEOC's successor liability claims is not material relative to the value of the entire sale transaction. Stay Brief at p. 19.

The EEOC's argument misses the point. The substantial harm to other litigants inquiry focuses on the harm caused by issuing a stay of the Sale Order pending appeal, not on the harm caused by preserving or enforcing the EEOC's successor liability claims against American. The evidence is overwhelming that TWA cannot be sustained as a viable business enterprise in the face of a material delay in closing the American transaction.

*11 Specifically, the uncontroverted testimony at the Sale Hearing was that TWA has a cash burn rate of $ 3,000,000 per day. If the sale to American is unduly delayed there is a very serious risk of losing a sale transaction which materially benefits substantial and diverse creditor constituencies. At the conclusion of the Sale Hearing, I found that there would be an immediate and precipitous decline in the financial affairs of TWA followed by a very high probability, if not certainty, of liquidation if I were to deny or reject the Sale Motion. Transcript (vol.III) at 810. A stay of the Sale Order poses the same threat.

IV. The Public Interest.

The EEOC argues that I should stay the Sale Order because it is contrary to the strong public interest in the enforcement of the federal statutes prohibiting discrimination in the workplace. Recognizing the compelling objectives of saving financially troubled businesses under the Bankruptcy Code, the EEOC nevertheless maintains that these salutary objectives do not justify the suspension of usual rules of fair employment practices. Stay Brief at p. 20.

I am somewhat puzzled by the EEOC's position in this regard. The testimony at the Sale Hearing established that if the sale of TWA's assets to American does not go forward, TWA will likely liquidate. Given TWA's financial condition, a liquidation would result in severe harm to all TWA's past and current employees because they would lose their jobs and retirement benefits.

Although I concur with the EEOC that there is a strong public interest in the enforcement of federal statutes prohibiting discrimination in the workplace, I do not agree that the public interest favors jeopardizing the job security of 20,000 TWA employees, including those EEOC claimants still employed at TWA, at the expense of preserving successor liability claims which will be rendered unenforceable absent a sale of substantially all of TWA's assets as a going concern. Stay Brief at 19.

Finally, I disagree that the Sale Order prevents the EEOC from enforcing federal statutes prohibiting discrimination in the workplace. It is TWA's failure as a viable standalone airline that prevents the EEOC from enforcing claims against TWA. The Sale Order is simply not the cause of any "suspension of usual rules of fair employment practice" at TWA, as the EEOC alleges. Stay Brief at 20. There is absolutely no evidence to suggest that TWA is availing itself of the provisions of the Bankruptcy Code to circumvent fair employment statutes. The simple fact is that TWA is a failing enterprise whose likely end, in my opinion, will either be a partial survival as a part of American or a liquidation resulting in no enterprise value and a consequent material loss to all non-priority general unsecured creditor classes.

CONCLUSION

The EEOC has not advanced any law or facts which I have not already considered. For the reasons set forth above, I deny the EEOC's motion for stay pending appeal.

*12 SO ORDERED.

Not Reported in B.R., 2001 WL 1820325 (Bankr.D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE

### IN RE: THE COLUMBIA GAS SYSTEM, INC. and COLUMBIA GAS TRANSMISSION CORPORATION, Debtors. THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE COLUMBIA GAS TRANSMISSION CORPORATION, Appellant, THE COLUMBIA GAS SYSTEM, INC. and COLUMBIA GAS TRANSMISSION CORPORATION, Appellees.

Civil Action No. 92-127-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

1992 U.S. Dist. LEXIS 3253

March 10, 1992, Decided

**PRIOR HISTORY:** [*1] Chapter 11, Case Nos. 91-803, 91-804

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The court considered the emergency motion of appellant creditors that sought a stay pending appeal to prevent appellee debtors from excluding certain refunds and prepetition surcharges from the bankruptcy estate.

**OVERVIEW:** The creditors filed an emergency motion for a stay pending appeal pursuant to Fed. R. Bankr. P. 8005. The creditors challenged the retention by the debtors of customer refund monies that the debtor held in trust for the customers. The court granted the creditors' emergency motion for stay pending appeal. The court held that the debtor was not required to place the funds into a trust account to protect the funds against any potential loss as a result of the creditors' appeal. The court held that requirements for such relief were: 1) the party was likely to prevail on the merits of its appeal, 2) the party would suffer irreparable injury absent a stay, 3) a stay would not cause substantial harm to other interest parties, and 4) a stay would not harm the public interest. The court determined that the creditors satisfied all of the requirements and were entitled to a stay pending appeal.

**OUTCOME:** The court granted the creditors' emergency motion for a stay pending appeal on the issue of whether the customer refunds and prepetition charges were part of the bankruptcy estate.

**CORE TERMS:** customer, refund, public interest, expedited, Bankruptcy Rule, stay pending appeal, surcharges, irreparable injury, matter of right, de novo review, discretionary, novel, irreparable harm, likelihood of success, bankruptcy estate, probable, prepetition, emergency, weigh

LexisNexis(R) Headnotes

*Bankruptcy Law > Practice & Proceedings > Appeals*
[HN1] To be entitled to a stay pending appeal pursuant to Fed. R. Bankr. P. 8005, party must demonstrate that: 1) it is likely to prevail on the merits of its appeal; 2) it will suffer irreparable injury absent a stay; 3) a stay will not cause substantial harm to other interested parties, and 4) a stay will not harm the public interest.

**COUNSEL:** James L. Patton, Jr, Esquire, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, attorney for Debtors and for Appellees The Columbia Gas System, Inc and Columbia Gas Transmission Corporation

Kevin Gross, Esquire, of Rosenthal, Monhait & Gross, Wilmington, Delaware, attorney for Appellant The Official Committee of Unsecured Creditors for the Columbia Gas Transmission Corporation.

**JUDGES:** ROBINSON

**OPINIONBY:** SUE L. ROBINSON

**OPINION:**

### MEMORANDUM OPINION

ROBINSON, U S District Judge

1992 U.S. Dist. LEXIS 3253, *

## INTRODUCTION

Pending before the Court is the emergency motion of the Official Unsecured Creditors Committee of the Columbia Gas Transmission Corporation ("the Committee") for stay pending appeal ("the motion"). The Committee has filed an appeal of the February 13, 1992 order of the Bankruptcy Court approving, inter alia, payment of "category one refunds and prepetition GRI surcharges on a pro-rata basis . . . to the extent of $ 3.3 million." Said order is based upon the Bankruptcy Court's conclusion that the "category one refunds and prepetition GRI surcharges" are not property of the Debtor's bankruptcy estate, rather, that said refunds and surcharges when received [*2] are held by the Debtor "in trust" for the benefit of its customers.

The Committee bases its motion on two arguments. First, the Committee contends that, pursuant to Bankruptcy Rule 7062, which incorporates Fed.R.Civ.P. 62(d), it is entitled to a stay as a matter of right so long as suitable means are implemented to protect non-appealing parties from any loss occasioned by a stay. In this case, the Committee argues that the Debtor's retention of customer refund monies in an interest bearing escrow account insures that neither the Debtor nor its customers will be harmed by a stay. Alternatively, the Committee argues that a stay is warranted pursuant to Bankruptcy Rule 8005 because the Committee has satisfied all the requirements for such discretionary relief.

Responses in opposition to the motion have been filed by Columbia Gas Transmission Corporation (the "Debtor"); West Ohio Gas Company; Virginia Natural Gas, Inc. and the Peoples Natural Gas Company; the Columbia Gas Distribution Companies; The Official Committee of Customers; and the Pennsylvania Public Utility Commission. For the reasons that follow, a stay will be granted pending an expedited appeal.

## DISCUSSION [*3]

This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b). I conclude that the issues at bar are primarily legal in nature and, therefore, subject to de novo review. In Re Public Service Co. of New Hampshire, 116 Bankr. 347, 349 n.2 (Bankr. D.N.H. 1990).

With respect to the Committee's first argument for relief, I decline to hold that the Committee is entitled to a stay as a matter of right. The Committee has not posted a bond, as required by Fed.R.Civ.P. 62(d). I find no support for the proposition that the Debtor, the prevailing party below, be required to place into escrow funds judicially determined to belong to its customers, in order to afford the Debtor and its customers protection against any loss as a result of the Committee's appeal.

The Committee submits that it is nevertheless [HN1] entitled to a stay pending appeal pursuant to Bankruptcy Rule 8005. In order to obtain a discretionary stay, the Committee must demonstrate that: 1) it is likely to prevail on the merits of its appeal; 2) it will suffer irreparable injury absent a stay; 3) a stay will not cause substantial harm to other interested parties; and 4) a stay will not harm the public interest. [*4] See, e.g., In the Matter of Delaware & Hudson Rv. Co., 90 Bankr. 90, 91 (Bankr. D.Del. 1988). The Court will examine each of these four factors seriatim.

### Probable Success on the Merits

The Court concludes that the Committee has carried its burden of demonstrating the first factor, probable success on the merits. Probable success on the merits means that "the movant has a 'substantial case,' or a strong case on appeal." In Re Public Service Co. of New Hampshire, 116 Bankr. at 349. There is no dispute that the issues presented are novel and complex. I have concluded that the issues are entitled to de novo review. I, therefore, embrace the observations of the Court in In Re Mader, 100 Bankr. 989, 991 (N.D.Ill. 1989), as follows:

> This Court does not intend to go so far as to actually determine the merits of the legal issues which will be presented on appeal. Suffice it to say, however, that we have not found, nor been cited to, any controlling authority on this precise question, and the novel legal issue presented is not one in which the debtor has no likelihood of success. This case will [*5] likely present an issue of first impression and, on balance, the likelihood of success on the merits does not appear to weigh too heavily in favor of, or against, any of the parties to this proceeding.

See also In Re Gleasman, 111 Bankr. 595, 601-02 (Bankr. W.D.Texas 1990).

### Irreparable Harm

The Court finds that the Committee has carried its burden as well as to the irreparable harm factor. It is apparent that, absent a stay, the funds subject to the Bankruptcy Court's February 13, 1992 order will be disbursed to the Debtor's customers. In dispute is the question whether there is a mechanism in place to recover such funds in the event the Bankruptcy Court's order is reversed. I decline to resolve that question on the record before me. Given the complexity of the question, how-

1992 U.S. Dist. LEXIS 3253, *

ever, I conclude that the irreparable injury factor weighs more heavily in favor of granting the stay pending an expedited appeal.

### Harm to Other Parties

The parties filing in opposition to this stay argue that a stay exposes the Debtor "to the unnecessary risk of diminution of the estate due to interest payments and substantial tax liability that could be easily [*6] avoided if [the Debtor] timely flows through the refunds." (D.I. 6 at 19) Accepting such representations as accurate, I nevertheless conclude that the interests of the Debtor and the bankruptcy estate can be accommodated by an expedited appeal.

### Public Interest

Although the Court acknowledges that the refund of overcharges to individual customers represents a significant public interest, as does the public interest in enforcing the laws promulgated by Congress, I conclude that the public interest will not be adversely affected if the stay is granted pending an expedited appeal.

### CONCLUSION

For the reasons stated, the Court will granted the Committee's emergency motion for stay pending appeal.

An appropriate order will be entered

SUE L. ROBINSON