# Exhibit  B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------------------X

IN RE:
**GENERAL MOTORS LLC IGNITION SWITCH LITIGATION**      **14-MD-2543 (JMF)**

--------------------------------------------------------------------------------X

--------------------------------------------------------------------------------X
ISHMAIL SESAY, and JOANNE YEARWOOD,                            14-cv-06018

for themselves, on behalf of all others similarly situated,      **CLASS ACTION  FOR**
                                                                 **DECLARATORY,**
                                                                 **INJUNCTIVE, AND**
 Plaintiffs,                                                     **MONETARY RELIEF**

v.

**GENERAL MOTORS LLC,**                                          **JURY TRIAL DEMANDED**
**DELPHI AUTOMOTIVE PLC,**
**and DPH-DAS LLC f/k/a DELPHI**
**AUTOMOTIVE SYSTEMS, LLC,**

**Defendants.**
--------------------------------------------------------------------------------X

<u>**FIRST AMENDED COMPLAINT**</u>

**INTRODUCTORY STATEMENT**

Plaintiffs ISHMAIL SESAY and JOANNE YEARWOOD bring this action for

themselves, and on behalf of all persons similarly situated who own or lease or have owned or

leased the substandard and dangerous vehicles identified below at any time since October 2009.

1.      Ishmail Sesay lives with his wife in Maryland. The couple own a single car: a

2007 Chevrolet Impala, purchased from a friend on December 20, 2012. Mr. Sesay and his wife

depend on the car to get to and from work, to run daily errands, and, most importantly, to provide

a safe means of transportation for their one-year-old son.

2.      Mr. Sesay has been alarmed that his car has been shutting off while he has been driving it. This has occurred at the rate of some three times per week for many months. These "moving stalls" are particularly dangerous because the Mr. Sesay loses control over power steering and brakes, and, because the electrical system is off, the airbags would not deploy in the event of a collision.

3.      Mr. Sesay's 2007 Chevrolet Impala has a dangerous ignition switch that could, unexpectedly and without warning, shut down the car's engine and electrical systems while the car is in motion - rendering the power steering, anti-lock brakes and airbags inoperable. This and the related ignition switch hazards in GM vehicles have already helped kill or seriously injure hundreds of people across the United States. Rather than disclose the risk, GM employees, lawyers, and others concealed it.

4.      General Motors LLC ("GM") knew but failed to disclose to him, governmental officials, or putative class members that Mr. Sesay's car was dangerous to operate, until it finally issued a recall for the car on June 23, 2014, NHTSA Campaign No. 14V355000.

5.      On June 20, 2014 GM issued a Stop-Delivery Order to dealers in preparation for an upcoming safety recall.  It instructed dealers to stop delivery in 2006-2014 Chevrolet Impala (Fleet Only) vehicles in new or used vehicle inventory.  It described the problem:  "The ignition switch on these vehicles may inadvertently move out of the "run" position if the key is carrying added weight and the vehicle goes off the road or experiences some other jarring event."

6.      On the same date GM issued notice of its decision to conduct a safety recall to the NHTSA.  However, GM failed to disclose the history of its awareness of the ignition key problem.  Instead, GM simply described the potential for the ignition key to move away from the "run" position should it the vehicle go off-road or experience a "jarring" event.  It warned that

should the key move away from the "run" position, "engine power, power steering and power breaking will be affected, increasing the risk of crash." More over, this could result in "airbags not deploying increasing the potential for occupant injury in certain kinds of crashes."

7.       On June 24, 2014 the NHTSA acknowledged the recall in letter to the Director of Field Product Investigations and Evaluations at General Motors, which carried the subject "Ignition Switch may Turn Off."

8.       The NHTSA described the problem as concerning the "electrical system: ignition." It described the problem: "This defect can affect the safe operation of the airbag system. Until this recall is performed, customers should remove all items from their key rings, leaving only the ignition key… In the affected vehicles, the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine."

9.       In "consequence," according to the recall papers, "if the key is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury. Additionally, a key knocked out of the run position will cause loss of engine power, power steering, and power braking, increasing the risk of a vehicle crash.

10.       The "Remedy" in the recall provides: "GM will notify owners, and dealers will install two 13mm key rings and key insert into the vehicle's ignition keys, free of charge. The manufacturer has not yet provided a notification schedule."

11.       On June 25, 2014 GM issued a notice to GM dealers explaining vehicles involved in three upcoming safety recalls. It listed the following: Recall 14172 – Ignition Switch recall for 2003 – 2014 Cadillac CTS and 2004 -2006 Cadillac SRX, Recall 14299- Ignition Switch for,

among other vehicles, the 2014 Chevrolet Impala Limited (Fleet Only), and Recall 14250-
Ignition Key for, among other vehicles, the 2005 – 2006 Chevrolet Impala.

12.     On July 2, 2014, in a letter meant to supersede its previous correspondence, GM
notified the NHTSA that it had possession of information regarding the ignition key problem
since its inception on July 10, 2009, that consisted of a  reliable report that "the vehicle stalled
after hitting a large bump when going from gravel road to pavement while driving at about 45
mph." Since October 2009, GM did not take appropriate measures to investigate the serious risk
the information it possessed suggested, particularly when considered with other information GM
possessed regarding ignition switch related risks.

13.     In the same July 2 letter, GM claimed that during a document review related to a
Cobalt ignition switch problem in 2014, it discovered information in its possession that led it to
the recall for Mr. Sesay's 2007 Impala and other vehicles with the same hazard.  GM revealed
that the issue was brought to the Product Investigation group on April 30, 2014.  Between May 1,
2014 and June 6, 2014 "the investigator worked with GM subject matter experts to gather and
analyze data relating to the ignition switch used on the 2006 Impala."  GM reported that
"although ignition switches themselves performed below the target specification, the ignition
switch system as a whole as installed in the vehicles' steering columns performed approximately
at the target specification."  GM also reviewed its databases including its TREAD, warranty,
customer satisfaction, and Engineering Analysis database, and NHTSA's Vehicle Owner's
Questionnaire database; after which the investigator made a presentation regarding the ignition
switch at an Open Investigation review meeting.

14.     In the same July 2nd letter, GM then revealed that only after the presentation and
meeting did do road testing of  the Impala using the ignition switches under review.  These tests

revealed that: "when a slotted key is carrying added weight, the torque performance of the ignition system may be insufficient to resist energy generated when a vehicle goes off road or experiences some other jarring event, potentially resulting in the unintentional movement of the key away from the 'run' position." After review of GM and NHTSA data the investigator presented to the SFADA. The SFAHA then "directed the investigator to work with other GM personnel to further refine the potential recall population so that it accurately included the vehicles using the identified ignition switches that were subject to the condition identified in the road tests. On July 15, 2014 the SFASA decided to conduct a recall of that population.

15.     Finally, on June 14, 2014 GM announced its safety recall. GM issued a 572 letter for the NHTSA on June 20, referenced above.

16.     On April 13, 2010, Joanne Yearwood purchased a new 2010 Chevrolet Cobalt from a dealership. Unbeknownst to her, the car contained an "ignition switch defect" that GM knew about but failed to disclose to her, governmental authorities, or putative class members until it began confessing its wrongdoing by bits and pieces since February 2014, issuing an ever expanding series of recalls related to the defective ignition switch like the one that appears to be in Ms. Yearwood's 2010 Cobalt amd Mr. Sesay's 2007 Impala.

17.     GM has recently begun to distinguish between ignition switch defects, such as the one in Mr. Sesay's car, that purportedly can be remedied with a replacement of keys, from ignition switch defects, such as the one in Ms. Yearwood's car, that require replacement of the entire ignition switch cylinder. Plaintiffs do not concede by their description of GM's recall that they agree that such a distinction exists. Plaintiffs believe that the claims that ignition switch issues can be remedied by mere key replacement amy be another attmpt by GM to seek a cheap but ineffective response to the hazards in GM vehicles.

18. GM has issued and failed to close three separate recalls on Ms. Yearwood's 2010 Chevrolet Cobalt. It failed to issue a recall for her car when it first confessed that it had known about the ignition switch defect in other vehicles in February 2014.

19. On April 2, 2014, as part of its expansion of its initial ignition switch recall, NHTSA Recall Campaign 14V04700, GM issued a recall for Ms. Yearwood's car, claiming that defective ignition switches "may have been used as service replacement parts on [her] vehicle," and as a result General Motors is recalling certain model year 2008-2010 Chevrolet Cobalt.

20. On April 10, 2014, however, GM then issued an additional recall for Ms. Yearwood's 2010 Cobalt (and over two million other vehicles), NHTSA Recall Campaign 14V17100, stating that the key could be removed from the ignition while the car remained on and that a new ignition cylinder would be necessary unless the vehicle already had a redesigned part, in which case only new keys would be made.

21. On March 31, 2014, GM recalled Ms. Yearwood's 2010 Chevrolet Cobalt because "the affected vehicles, there may be a sudden loss of electric power steering (EPS) assist that could occur at any time while driving." NHTSA Recall Campaign 14V15300. GM submitted papers in connection with the recall that detail its knowledge of this hazard from its first day of existence on July 10, 2009.

22. In this Season of Shame, GM has publicly admitted, in many cases after years of knowingly false denials and active concealment by its engineers, lawyers, and other employees, that some 28 million GM vehicles are so dangerous that they must be recalled, and that it has, for every single day of its existence as a new entity that came into existence on July 10, 2009, systematically failed to disclose—and its employees and attorneys in fact actively concealed--the

dangers that use of millions of GM vehicles entails to their drivers, passengers, and anyone unlucky enough to be in the vicinity when these risk manifest.

23.     The begrudging admissions began in February 2014, when GM admitted that it had concealed an ignition switch hazard in some 1.6 million vehicles. The danger it concealed was that car could turn off without warning, rendering the brakes and steering and airbags inoperable. GM admits that the ignition switch hazard has killed or seriously injured hundreds while GM knew but failed to disclose its danger. Since purporting to come clean about its wrongdoing, and after promising to transform a culture that let greed trump the dictates of responsible corporate conduct, GM has been forced to admit that its wrongdoing was far more widespread than it initially confessed. The recall number for 2014 is now 28 million vehicles and counting, a boggling tally of corporate irresponsibility, and a frighteningly sharp reflection of how widespread GM's reckless endangerment of the public safety has been.  Now, beyond the some 16 million or so ignition-related recalls GM has begrudgingly finally issued since February 2014, GM has issued recalls for a range of other safety related defects described below.

24.     The National Highway Traffic Safety Administration (NHTSA) fined GM $28,000,000, the maximum permissible under applicable law, for GM's failure to disclose risks related to the ignition switches in Plaintiffs' and class members' cars.

25.     For nearly five years after its inception, GM failed to disclose to, and actively concealed from, Plaintiffs, class members, investors, litigants, courts, law enforcement and other government officials including the NHTSA, the risks of death, personal injury, and property damage posed by its products. Instead, conspiring with Delphi, GM's dealers nationwide, outside lawyers, and various others, GM engaged in, and may still be engaging in, an extensive, aggressive and complex campaign to conceal and minimalize the safety-related risks that exist in

Plaintiffs' and class members' vehicles. That campaign is designed to mislead Plaintiffs, class members, consumers, investors, courts, law enforcement officials, and other governmental officials, including the NHTSA, that the value of the company and the worth and safety of its products are greater than they are. With those same co-conspirators, GM directed an unlawful and continuing enterprise calculated to gain an unfair advantage over competitor automakers conducting their businesses within the bounds of the law. GM's corporate culture has engulfed GM's cost-containment approach to risk issues presented by GM vehicles: deny any hazard exists; if forced to concede the hazard, minimize its significance; and if nevertheless forced to act, insist on cheap rather than appropriate remediation

26.     Defendants first deployed their campaign of deception on the day that GM began operating. The scheme continued at least until its exposure began in early 2014. Through their deception, Defendants recklessly endangered the safety of Plaintiffs, their families, and members of the public. Defendants' wrongful acts and omissions harmed Plaintiffs and class members by exposing them to increased risk of death or serious bodily injury, by depriving them of the full use and enjoyment of their vehicles, and by causing a substantial diminution in the value of the vehicles to Plaintiffs and class members, and a substantial diminution in value of their vehicles on the open automobile market.

27.     The  ("NHTSA") has failed to carry out its statutory mandate to act for the public safety. Its failure to properly regulate GM's conduct with respect to the safety risks its vehicles pose provide reasonable grounds to doubt that the agency can be relied on to act to protect the public safety.

28.     As of the date of the filing of this Complaint, the United States Department of Justice has opened, and is pursuing, a criminal investigation into GM's campaign of deceit.

29.    GM's Chief Executive Officer Mary Barra admitted on behalf of the company that GM employees knew about safety-related risks in millions of vehicles, including Mr. Sesay's 2007 Impala and Ms. Yearwood's 2010 Cobalt, and that GM did not disclose those risks as it was required to do by law. Ms. Barra attributed GM's "failure to disclose critical pieces of information," in her words, to GM's policies and practices that mandated and rewarded the unreasonable elevation of cost concerns over safety risks.

30.    In executing their scheme to conceal the dangerous character of Plaintiffs' vehicles, Defendants violated a multitude of laws:

    a)    In furtherance of their common design to prevent Plaintiffs, class members, other consumers, law enforcement and other governmental officials, litigants, courts, and investors from learning of the safety risks in GM cars, GM, Delphi, and GM's dealers conducted a racketeering enterprise and engaged in a pattern of racketeering activities, including repeated and continuous acts of mail and wire fraud, television and radio fraud, and tampering with witnesses and victims in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, causing the harm to Plaintiffs and class members described above.

    b)    By concealing the material fact of the dangerousness of the Plaintiffs' and class members' vehicles, by failing properly to repair the safety risks in the cars in a timely manner, and by engaging in other unconscionable and/or unlawful behavior, GM and Delphi violated the Maryland Consumer Protection Act,. Md. Code, Com. Law § 13-408 *et seq.*, causing the harm described above to Plaintiffs and class members.

c)      GM and Delphi also violated their duties to warn Plaintiffs and class members about the dangers that their vehicles posed, resulting in economic loss and increased risk of personal injury for which Defendants are liable to Plaintiffs and Class members under the law of negligence common to the District of Columbia and the States of Maryland, California, Florida, Ohio, and New Jersey.

d)      Because they intentionally concealed a material fact from Plaintiffs and Class members, Defendants are liable to Plaintiffs for the harm Plaintiffs and class members have suffered and for punitive damages under the law of fraud common to the several States.

e)      By civilly conspiring to conceal the safety-related risks of GM vehicles, both among themselves and among nonparties to this litigation, and because they acted jointly to harm Plaintiffs and class members, Defendants are jointly and severally liable for all harm they or any co-conspirator caused.

f)      Defendants aided and abetted the conduct of each other and of nonparties in concealing the safety-related risks of GM vehicles.

**PARTIES**

31.    Plaintiffs Ishmail Sesay and Joanne Yearwood are both citizens and residents of Maryland.

32.    Mr. Sesay owns a 2007 Chevrolet Impala he purchased second-hand in December 2010. Although Mr. Sesay is the primary driver of the vehicle, his wife depends upon the car for transportation to and from work, and the couple rely on the car to transport their one-year-old son..

33.    Ms. Yearwood owns a 2010 Chevrolet Cobalt purchased on April 13, 2010.

34.     General Motors LLC is a limited liability corporation. On July 10, 2009, it began conducting the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the vehicles of class members, and other motor vehicles and motor vehicle components throughout the United States. Plaintiffs' claims and allegations against GM refer solely to this entity. In this First Amended Complaint, Plaintiffs are not making any claim against General Motors Corporation ("Defunct GM") whatsoever, and Plaintiffs are not making any claim against GM based on its having purchased assets from Defunct GM or based on its having continued the business or succeeded Defunct GM. Plaintiffs disavow any claim based on the design or sale of vehicles by defunct  GM, or based on any retained liability of Defunct GM. Plaintiffs seek relief from GM solely for claims that have arisen after October 19, 2009, and solely based on actions and omissions of GM, the Non-Debtor entity that began operations on July 10, 2009.

35.     Delphi Automotive PLC is headquartered in Gillingham, Kent, United Kingdom, and is the parent company of Delphi Automotive Systems LLC, headquartered in Troy, Michigan. At all times relevant herein, Delphi, through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the dangerous ignition switches contained in the Cobalts owned by Plaintiffs, and millions of other vehicles.

36.     GM and Delphi are collectively referred to in this Complaint as "Defendants."

## JURISDICTION AND VENUE

37.     Jurisdiction is proper in this Court pursuant to 28 U.S.C § 1331, because the claims under the Racketeer Influenced and Corrupt Organizations Act present a federal question. Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from

Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000,

exclusive of interest and costs.

38.     Venue is proper in this Court pursuant to 28 U.S.C. § 1404, by the consent of both

parties.

## FACTUAL BACKGROUND

### GM's Commitment to Cost-cutting Over Safety

39.     GM has publicly admitted that the ignition switches in Plaintiffs' and class

members' cars are dangerous and pose a safety hazard. It has also admitted that, from its

inception in 2009, various GM engineers, attorneys, and management officials knew of, and took

measures to conceal, the ignition switch risk and/or diminish its significance. GM has been found

guilty of failing to disclose the risk to Plaintiffs, class members, and governmental officials as

required by law, and the NHTSA has fined GM the maximum penalty that agency is authorized

to impose.

40.     Under the Transportation Recall Enhancement, Accountability and

Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, and its accompanying

regulations, when a manufacturer learns that a vehicle contains a safety risk, the manufacturer

must disclose the risk to appropriate government officials and registered owners of the vehicle in

question.

41.     Upon its inception, GM maintained policies and practices intended to conceal

safety related risks in GM products from Plaintiffs, class members, investors, litigants, courts,

law enforcement officials, the NHTSA, and other governmental officials. In furtherance of its

illegal scheme, GM trained and directed its employees and dealers to take various measures to

avoid exposure of safety related product risks:

a)      GM mandated that its personnel avoid exposing GM to the risk of having to recall vehicles with safety-related risks by limiting the action that GM would take with respect to such risks to the issuance of a Technical Service Bulletin or an Information Service Bulletin.

b)      GM directed its engineers and other employees to falsely characterize safety-related risks – including the risks described in this complaint – in their reports, business and technical records as "customer convenience" issues, to avoid being forced to recall vehicles as the relevant law requires.

c)      GM trained its engineers and other employees in the use of euphemisms to avoid disclosure to the NHTSA and others of the safety risks posed by risks in GM products.

d)      GM directed its employees to avoid the word "stall" in describing vehicles experiencing a moving stall, because it was a "hot word" that could alert the NHTSA and others to safety risks associated with GM products, and force GM to incur the costs of a recall.

    i.      A "moving stall" is a particularly dangerous condition because the driver of a moving vehicle in such circumstances no longer has control over key components of steering and/or braking, and air bags will not deploy in any, increasingly likely, serious accident.

e)      GM directed its engineering and other personnel to avoid the word "problem," and instead use a substitute terms, such as "issue," "concern," or "matter," with the intent of deceiving plaintiffs and the public.

f)      GM instructed its engineers and other employees not to use the term "safety" and refer instead to "potential safety implications."

g)      GM instructed its engineers and other employees to avoid the term "defect" and substitute the phrase "does not perform to design."

h)      GM instituted and/or continued managerial practices designed to ensure that its employees and officials would not investigate or respond to safety-related risks, and thereby avoid creating a record that could be detected by governmental officials, litigants or the public. In a practice GM management labeled "the GM nod," GM managers were trained to feign engagement in safety related product risks issues in meetings by nodding in response to suggestions about steps that they company should take. Protocol dictated that, upon leaving the meeting room, the managers would not respond to or follow up on the safety issues raised therein.

i)      GM's lawyers discouraged note-taking at critical product safety meetings to avoid creation of a written record and thus avoid outside detection of safety-related risks and GM's refusal to respond to and/or GM's continuing concealment of those risks. GM employees understood that no notes should be taken during meetings about safety related issues, and existing employees instructed new employees in this policy. GM did not describe the "no-notes policy" in writing to evade detection of their campaign of concealment.

j)      GM would change part design without a corresponding change in part number, in an attempt to conceal the fact that the original part design was risk. GM concealed the fact that it manufactured cars with intentionally mislabeled part numbers, making the parts difficult for GM, Plaintiffs, class members, law enforcement officials, the NHTSA, and other governmental officials to identify. GM knew from its inception that the part

number irregularity was intended to conceal the faulty ignition switches in Plaintiffs' and class members' vehicles.

42.    GM followed a practice and policy of intentionally mischaracterizing safety issues as "customer convenience" issues to avoid recall costs, and it enlisted its dealership network in its campaign of concealment by minimizing the safety aspects of the "technical service bulletins" and "information service bulletins" it sent to dealers. GM directed dealers to misrepresent the safety risks associated with the product risks of its vehicles. GM followed this practice with respect to the dangerous ignition switches from its inception in October 2009 until its campaign of concealment of the ignition switch risk began to unravel in February 2014.

43.    GM followed a practice or policy of minimizing and mischaracterizing safety related risks in its cars in its communications with Plaintiffs, class members, law enforcement officials, the NHTSA, and other governmental officials

44.    Upon the inception of GM in October 2009, GM and Delphi agreed to conceal safety related risks from Plaintiffs, class members, law enforcement officials, other governmental officials, litigants, courts, and investors. Both GM and Delphi knew since October 2009 that the design of the faulty ignition switch in Plaintiffs and class members' cars had been altered without a corresponding change in part number, in gross violation of normal engineering practices and standards. Part labeling fraud is particularly dangerous in vehicle parts potentially related to safety because it makes tracing and identifying faulty parts very difficult, and will delay the detection of critical safety risks.

45.    Since GM's inception in October 2009, both GM and Delphi have known that the faulty ignition switch in the Plaintiffs' Impala and Cobalt and class members' vehicles posed a serious safety and public health hazard because the faulty ignition switch caused moving stalls.

Each Defendant had legal duties to disclose the safety related risks. Rather than notifying the NHTSA, Defendants instead decided that Plaintiffs and class members, and millions of drivers and pedestrians should face imminent risk of injury and death due to the dangerous ignition switches in Plaintiffs' and class members' vehicles. Delphi and GM entered into an agreement to conceal the alteration of the part without simultaneously changing the part number, and concealed the risks associated with the dangerous ignition switches.

46.    In 2012, more GM employees learned that the ignition switches in vehicles from model years 2003, 2004, 2005, 2006, and 2007 exhibited torque performance below the specifications originally established by GM. Rather than notify Plaintiffs, class members, or the NHTSA, GM continued to conceal the nature of the risk.

47.    In April 2013, GM hired an outside engineering-consulting firm to investigate the ignition switch system. The resulting report concluded that the ignition switches in early model Cobalt and Ion vehicles did not meet GM's torque specification. Rather than notify Plaintiffs, class members, or the NHTSA, GM still continued to conceal the nature of the Ignition Switch Risk until 2014.

48.    NHTSA's Fatal Analysis Reporting System (FARS) reveals 303 deaths of front seat occupants in 2005-07 Cobalts and 2003-07 Ions where the airbags failed to deploy in non-rear impact crashes.

49.    GM explicitly directed its lawyers and any outside counsel it engaged to act to avoid disclosure of safety related risks – including the ignition switch risk – in GM products. These actions included settling cases raising safety issues, demanding that GM's victims agree to keep their settlements secret, threatening and intimidating potential litigants into not bringing litigation against GM by falsely claiming such suits are barred by Order of the Bankruptcy Court,

and settling cases for amounts of money that did not require GM managerial approval, so
management officials could maintain their veneer of ignorance concerning the safety related
risks. In one case, GM threatened the family of an accident victim with liability for GM's legal
fees if the family did not withdraw its lawsuit, misrepresenting to the family that their lawsuit
was barred by Order of GM's Bankruptcy Court. In another case, GM communicated by means
of mail and wire to the family of the victim of a fatal accident caused by the faulty ignition
switch that their claim has no basis, even though GM knew that its communication was false and
designed to further GM's campaign of concealment and deceit. In other cases, GM falsely
claimed that accidents or injuries were due to the driver when it knew the accidents were likely
caused by the dangerous product risks GM concealed.

50.    GM led the world and U.S. customers to believe that after bankruptcy it was a
new company.  GM repeatedly proclaimed that it was a company committed to innovation,
safety, and maintaining a strong brand.

51.    GM was successful.  Sales of all of its models went up and GM became
profitable.  Seemingly, a GM was born and the GM brand once again stood strong in the eyes of
consumers.

52.    GM's image was an illusion.  This case arises from GM's concerted and
systematic practice and policy of denying, diminishing, and failing to remediate safety related
hazards that GM vehicles pose. GM has now begun to admit to the egregious failure to disclose,
and the affirmative concealment of, at least 35 separate known defects in GM-brand vehicles.
By concealing the existence of the many known defects plaguing many models and years of GM-
branded vehicles and the fact that GM values cost-cutting over safety, and concurrently
marketing the GM brand as "safe" and "reliable," and claiming that it built the "world's best

vehicles," GM has caused the Plaintiffs' vehicles to diminish in value as the truth about the GM brand emerged, and a stigma has attached to all GM-branded vehicles.

53.    A vehicle made by a reputable manufacturer of safe and reliable products is worth more than an otherwise similar vehicle made by a disreputable manager that is known to devalue safety and conceal defects from consumers and regulators.  GM Vehicle Safety Chief, Jeff Boyer, recently stated that: "Nothing is more important than the safety of our customers in the vehicles they drive." Yet GM failed to live up to this commitment, instead choosing to conceal at least 35 serious defects in over 17 million GM branded vehicles sold in the United States. GM's concealment of those defects, and its seemingly never-ending series of recalls so far this year, evidence the degree of misconduct that passed, and may continue to pass, for standard procedure at the company.

54.    The systematic concealment of known defects was deliberate, as GM followed a consistent pattern of endless "investigation" and delay each time it became aware of a given defect.  Recently revealed documents show that GM valued cost-cutting over safety, trained its personnel to never use the word "defect" or other words suggesting that GM-branded vehicles are defective, routinely chose the cheapest part supplier without regard to safety, and discouraged employees from acting to address safety issues.

55.    GM has recently been forced to disclose that it had been concealing a staggering and unprecedented number of known safety defects in GM-branded vehicles ever since its inception in 2009, and that other defects arose on its watch apparently due in large measure to GM's focus on cost-cutting over safety.  It was further forced to disclose its discouragement of raising safety issues and its training of employees to avoid using language such as "defect" or "safety issue" in order to avoid attracting the attention of regulators.

56.    The array of defects is astounding and includes: (1) ignition switch  defect, (2) power steering defect, (3) airbag defect (4) brake light defect, (5) shift cable defect, (6) safety belt defect, (7) ignition lock cylinder defect, (8) key design defect, (9) ignition key defect, (10) transmission oil cooler line defect, (11) power management mode software defect, (12) substandard front passenger airbags, (13) light control module defect, (14) front axle shaft defect, (15) brake boost defect, (16) low-beam headlight defect, (17) vacuum line brake booster defect, (18) fuel gauge defect, (19) acceleration defect, (20) flexible flat cable airbag defect, (21) windshield wiper defect, (22) brake rotor defect, (23) passenger-side airbag defect, (24) electronic stability control defect, (25) steering tie-rod defect, (26) automatic transmission shift cable adjuster, (27) fuse block defect, (28) diesel transfer pump defect, (29) base radio defect, (30) shorting bar defect, (31) front passenger airbag end cap defect, (32) sensing and diagnostic module ("SDM") defect, (33) sonic turbine shaft, (34) electrical system defect, and (35) seatbelt tensioning system defect.

57.    GM has received reports of crashes and injuries that put GM on notice of the serious safety issues presented by many of these defects. GM was aware of the defects from the very date of its inception on July 10, 2009.

58.    Despite the dangerous nature of many of the defects and their effects on critical safety systems, GM concealed the existence of the defects and failed to remedy the problems in an appropriate or timely manner.

### TOLLING OF THE STATUTE OF LIMITATIONS

37.    Any applicable statute of limitation has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

38.    The causes of action alleged herein did not accrue until Plaintiffs and Class
Members discovered that their vehicles had the safety related risks described herein.

39.    Plaintiffs and Class Members had no reason to know that their products were
dangerous because of Defendants' active concealment.

**CLASS ACTION ALLEGATIONS**

40.    Plaintiffs bring this lawsuit as a class action on their own behalves and on behalf
of all other persons similarly situated as members of the proposed Class pursuant to Federal
Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the
numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of
those provisions. All proposed Class and Subclass periods run from the inception of GM in
October 2009 and continue until judgment or settlement of this case.

41.    Plaintiffs bring this action on behalf of a proposed nationwide class defined as
follows: All persons in the United States who, since the inception of GM in October 2009, hold
or have held a legal or equitable interest in a GM vehicle with a dangerous ignition switch or
steering hazard. As of the time of the filing of this First Amended Complaint, Plaintiffs are aware
that the following GM models contain dangerous ignition switches, ignition related safety
hazards or steering hazards:

- 2005-2011 Chevrolet Cobalt

- 2006-2011 Chevrolet HHR

- 2006-2010 Pontiac Solstice

- 2007-2010 Pontiac G5

- 2005-2006 Pontiac Pursuit

- 2003-2007 Saturn Ion

- 2007-2010 Saturn Sky

- 2005-2009 Buick Lacrosse

- 2006-2011 Buick Lucerne

- 2004-2005 Buick Regal LS & GS

- 2006-2014 Chevrolet Impala

- 2006-2008 Chevrolet Monte Carlo

- 2000-2005 Cadillac Deville

- 2004-2011 Cadillac DTS

- 2004-2006; 2008-2009 Chevrolet Malibu (steering)

- 2004-2—6 Malubu Marx (steering)

- 2009-2010 HHR (non-turbo) (steering)

- 2010 Chevrolet Cobalt (steering and ignition switch and key hazards)

- 2008-2009 Saturn Aura

- 2004-2007 Saturn Ion (steering and ignition switch)

- 2005-2009 Pontiac G6 (steering)

42.    Plaintiffs also bring this action on behalf of the following Subclasses:

a.    Mr. Sesay and Ms. Yearwood bring this action on behalf of all persons in the

State of Maryland who, since October 2009, purchased or hold or have held a

legal or equitable interest in a GM vehicle with a dangerous ignition switch or steering related hazard (the "Maryland Subclass");

b.   Plaintiffs also bring this action on behalf of residents of the District of Columbia and the States of California, Florida, Maryland, New Jersey and Ohio who, since October 2009, hold or have held a legal or equitable interest in a GM vehicle with a dangerous ignition switch or steering related hazard(the "Multi-State Negligence Subclass").

43.   Excluded from the Class are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) governmental entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein.

## NUMEROSITY AND ASCERTAINABILITY

44.   Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder for each Class or Subclass is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in GM's possession, custody, or control, and/or from public vehicular registration records.

## TYPICALITY

45.   The claims of the Plaintiffs are typical of the claims of each member of the class and subclasses in that the representative Plaintiffs, like all class members, legally or equitably own or owned a GM vehicle during the Class Period that contained a dangerous ignition switch

manufactured by Delphi. Plaintiffs, like all class and subclass members, have been damaged by

Defendants' misconduct, namely, in being wrongfully exposed to an increased risk of death or

serious bodily injury, in suffering diminished use and enjoyment of their vehicles, and in

suffering the diminished market value of their vehicles. Furthermore, the factual bases of

Defendants' misconduct are common to all class and subclass members.

## ADEQUATE REPRESENTATION

46.     Plaintiffs will fairly and adequately represent and protect the interests of the class

and subclasses. Plaintiffs have retained counsel with substantial experience in prosecuting

consumer class actions and in prosecuting complex federal litigation. Plaintiffs and their counsel

are committed to vigorously prosecuting this action on behalf of the class and subclasses, and

have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to

those of the class of subclasses.

## PREDOMINANCE OF COMMON ISSUES

47.     There are numerous questions of law and fact common to Plaintiffs and Class

Members that predominate over any question affecting only individual Class Members, the

answers to which will advance resolution of the litigation as to all Class Members. These

common legal and factual issues include:

a.      Whether the vehicles owned by class or subclass members during the class

periods suffer from the dangerous ignition switch or steering related hazard described

herein?

b.      Whether the dangerous ignition switch or steering related hazard posed an

unreasonable danger of death or serious bodily injury?

c.       Whether GM and/or Delphi imposed an increased risk of death or serious bodily injury on Plaintiffs and class and subclass members during the Class period?

d.       Whether GM and/or Delphi caused Plaintiffs and class and subclass members to suffer economic loss during the Class period?

e.       Whether GM and/or Delphi caused Plaintiffs and class and subclass members to suffer the loss of the use and enjoyment of their vehicles during the class period?

f.       Whether GM and Delphi had a legal duty to disclose the ignition switch danger to class and subclass members?

g.       Whether GM and/or Delphi had a legal duty to disclose the ignition switch danger to the NHTSA?

h.       Whether either GM and/or Delphi breached duties to disclose the ignition switch risk?

i.       Whether class and subclass members suffered legally compensable harm?

j.       Whether Defendants violated Maryland's consumer protection statute by concealing the ignition switch and/or steering related hazards from Plaintiffs and governmental officials?

k.       Whether the fact that the ignition switch and/or steering related hazard was dangerous was a material fact?

l.       Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction?

m.       Whether GM should be declared responsible for notifying all Class Members of the risk and ensuring that all GM vehicles with the ignition switch and/or steering related hazards are recalled and repaired?

n.      Whether a mandatory injunction should issue to direct GM to protect the public safety in the interim until is repairs the vehicles described herein, to remove the dangerous vehicles from the roadwats and to provide their owners with suitable substitute transportation?

o.      Whether Defendants conducted a criminal enterprise in violation of RICO?

p.      Whether Defendants engaged in a pattern or practice of racketeering?

q.      Whether Defendants committed mail or wire fraud in connection with their concealment of the dangerous ignition switch.

r.      Whether class members were harmed by Defendants' violations of RICO?

s.      Whether class and subclass members are entitled to recover punitive damages from Defendants, and, if so, what amount would be sufficient to deter Defendants from engaging in such conduct in the future and to punish Defendants for their recklessness regarding the public health and safety and their campaign of concealment?

## SUPERIORITY

48.     Plaintiffs and class and subclass members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, most class and subclass members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual class and subclass member's claims, it is likely that few could afford to seek legal redress for Defendants' misconduct. Absent a class action, class and subclass members will continue to incur damages, and Defendants' misconduct will continue without remedy. Class treatment of common questions of law and fact would also

be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication. The class action is also superior for defendants, who could be forced to litigate thousands of separate actions.

49.    Defendants have acted in a uniform manner with respect to the Plaintiffs and class and subclass members. Class and subclass wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of class and subclass members to protect their interests. Class and subclass wide relief assures fair, consistent, and equitable treatment and protection of all class and subclass members.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF RACKETEER INFLUENCED
### AND CORRUPT ORGANIZATIONS ACT
### (18 U.S.C. § 1962(c) and (d))

50.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth at length herein.

51.    This claim is brought by all Plaintiffs on behalf of the nationwide Class.

52.     Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the "RICO Enterprise" through a "pattern of racketeering activity." Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate § 1962(c).

53.    At all times relevant, GM, Delphi, its associates-in-fact, Plaintiffs, and the Class and Subclass members are each a "person," as that term is defined in 18 U.S.C. § 1961(3).

54.    At all times relevant, Plaintiff and each class and subclass member were and are "a person injured in his or her business or property" by reason of a violation of RICO within the meaning of 18 U.S.C. § 1964(c).

55.    At all times relevant, GM and Delphi are and were each a "person" who participated in or conducted the affairs of the RICO Enterprise through the pattern of racketeering activity described below. While GM and Delphi each participated in the RICO Enterprise, they each exist separately and distinctly from the Enterprise. Further, the RICO Enterprise is separate and distinct from the pattern of racketeering activity in which GM and Delphi have engaged and are engaging.

56.    At all times relevant, GM and Delphi were associated with, operated or controlled, the RICO Enterprise, and participated in the operation and management of the affairs of the RICO Enterprise, through a variety of actions described herein. Defendants' participation in the RICO Enterprise was necessary for the successful operation of its scheme to defraud.

### The RICO Enterprise

57.    Defendants participated in the operation and management of an association-in-fact enterprise whose aim was to conceal safety related risks in Delphi products installed in GM vehicles from Plaintiffs, class members, the NHTSA, litigants, courts, law enforcement officials, consumers, and investors. The Enterprise was motivated by the common design of concealing the true value of the defendant companies and their products, and it constituted an unlawful, continuing enterprise calculated to gain an unfair advantage over competitor automakers who conduct their business within the bounds of the law. The Enterprise was partly embodied in practices and procedures intended to mischaracterize safety related risks – such as the ignition switch – as "customer convenience issues" to avoid incurring the costs of a recall.

58.     The RICO Enterprise began with the inception of GM, on October 19, 2009. The following persons, and others presently unknown, have been members of and constitute the association-in-fact enterprise with the following roles:

a)     GM, which mandated its employees take the various measures, described above at paragraph 26, to conceal safety related risks, including the ignition switch risks.

b)     GM's engineers (including but not limited to Ray DeGiorgio, Gary Altman, a program engineering manager, Michael Robinson, vice president for environmental sustainability and regulatory affairs, Gay Kent, general director of product investigations and safety regulations) who have carried out GM's directives since the inception of GM in October 2009 by minimizing and misrepresenting the safety aspects of the ignition switch risk – enabling GM to avoid its legal obligations to recall vehicles with safety related risks. GM's engineers (including but not limited to Mr. DeGiorgio, Mr. Altman, Mr. Robinson and Ms. Kent) have also concealed the part-number-labeling fraud of which they have known since GM's inception in October 2009.

c)     GM's in-house lawyers (including but not limited to Jaclyn Palmer, Ron Porter, William Kemp, Lawrence Buonomo, and Jennifer Sevigny), who knowingly assisted GM in evading its legal responsibilities by taking measures allowing GM management to claim ignorance about the increasing number of accidents and personal injuries that the ignition switches were causing throughout the Class period. GM's in-house lawyers, as described in Paragraph 36, also took measures to ensure that lawsuits filed by victims of the ignition switch risk and their surviving families were settled confidentially – preventing them from revealing the risk to other Plaintiffs, class members, law

enforcement officials, or other government authorities, including the NHTSA – for amounts below the threshold that would trigger closer scrutiny within GM.

d)       GM's outside lawyers, retained to defend the Company against lawsuits filed by victims with injuries allegedly caused by the ignition switch risk, who were directed to play, and played, the same roles as those of in-house counsel described above – taking analogous measures to help GM conceal the ignition switch risk.

e)       Delphi, who, since the inception of the GM in October 2009, has participated in the Enterprise to conceal the dangerous ignition switch system and its knowledge that ignition switch part numbers on vehicles driven by class members during the class period were misleading or fraudulent and would hinder any attempt to investigate or learn about the ignition switch risk.

f)       GM's Dealers, whom GM instructed, explicitly or implicitly, to present false and misleading information regarding the ignition switch risks to Plaintiffs and Class members, through, *inter alia*, Technical Service Bulletins and Information Service Bulletins, and who did, in fact, present such false and misleading information to Plaintiffs and Class members during the Class period.

58.       GM and Delphi conducted and participated in the affairs of this RICO Enterprise through a continuous pattern of racketeering activity that began with the inception of the GM in October 2009, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, and 18 U.S.C. § 1512 (tampering with witnesses and victims).

**Predicate Acts of Wire and Mail Fraud**

59.     Since its inception in October 2009 and in furtherance of its scheme to defraud, GM, its engineers and its lawyers communicated with Delphi on a regular basis via the mail and/or wires regarding the dangerous ignition switch. Through those communications, GM instructed Delphi to continue concealing the ignition switch risk and to continue to produce ignition mislabeled or fraudulently labeled switches to help GM evade detection of GM's unlawful failure to recall vehicles with dangerous ignition switches by the NHTSA or other law enforcement officials. GM's and Delphi's communications constitute repeated violations of 18 U.S.C. §§ 1341 and 1343.

60.     Since GM's inception in October 2009, in furtherance of its scheme to defraud, GM's lawyers communicated with those claiming injuries caused by the ignition switch risks on a regular basis via the mail and/or wires. Upon information and belief, GM's lawyers utilized the mail and wires to insist that litigants agree to confidentiality agreements forbidding disclosure that the ignition switch risks caused their injuries, and to communicate with supervisors and each other about ensuring that the cases settled below the threshold that would trigger scrutiny that might endanger Defendants' concealment of the ignition switch risks.

61.     Since its inception in October 2009, GM has routinely used the wires and mail to disseminate false and fraudulent advertising about Plaintiffs' and Class members' vehicles, misrepresenting the vehicles as safe and dependable and failing to disclose the ignition switch risks in its advertising.

**Predicate Acts of Tampering With Witnesses and Victims**

62.     GM engaged in an ongoing scheme to tamper with witnesses and victims as described in 18 U.S.C. § 1512(b) by using misleading conduct to influence, delay and prevent the testimony of victims in official proceedings and by entering into a campaign of intimidation

and false statements to discourage victims from pursuing their claims against GM, as described elsewhere in the complaint. GM also corruptly encouraged its employees and engaged in misleading conduct to prevent said employees from reporting safety risks and therefore delay or prevent their testimony about said risks. GM accomplished this by, inter alia, punishing employees who raised red flags about safety risks, thus intentionally intimidating and threatening employees who otherwise could have raised red flags.

63.     Defendants' conduct in furtherance of this scheme to conceal and/or minimize the significance of the ignition switch risk was intentional. Plaintiff, Class and Subclass members were harmed in that they were forced to endure increased risk of death or serious bodily injury, they lost use and enjoyment of their vehicles, and their vehicles' values have diminished because of Defendants' participation in conducting the RICO Enterprise. The predicate acts committed in furtherance of the enterprise each had a significant impact on interstate commerce.

**COUNT II**
**Asserted on Behalf of Plaintiffs and the Nationwide Class**
**(Common Law Fraud)**

64.     Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs of this Complaint.

65.     At the time of GM's inception in 2009, Defendants knew that the ignition switch used or which would be placed in the Plaintiffs' and class members' vehicles could inadvertently move from "run" to "accessory" or "off," under regular driving conditions. This fact was material to Plaintiffs and class members. GM also knew about the steering hazards described herein.

66.     Between October 2009 and February 2014, Defendants actively and intentionally concealed and/or suppressed the existence and true nature of the ignition switch and steering

related hazards, and minimized the extent of the danger they posed in direct and indirect communications with Plaintiffs, class and subclass members, dealers, the NHTSA, and others.

67.   Plaintiffs and class members reasonably relied on GM's communications and material omissions to their detriment. As a result of the concealment and/or suppression of facts, Plaintiffs and Class Members have sustained and will continue to sustain injuries, consisting of the diminished value of their GM vehicles and the lost use and enjoyment of the vehicles that Defendants actions have caused, and exposure to increased risk of death or serious bodily injury.

68.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and with reckless disregard to Plaintiffs' and Class Members' rights and well-being, in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
**Asserted on Behalf of Plaintiffs and on Behalf of the Multi-State Negligence Subclass**
**(Negligent Infliction of Economic Loss and Increased Risk under the Common Law of the District of Columbia and Florida, Maryland, New Jersey, and Ohio)**

69.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

70.   This claim is brought on behalf of Plaintiffs and the District of Columbia, Florida, Maryland, New Jersey and Ohio Classes.

71.   Because the dangerous ignition switch and steering related hazards created a foreseeable risk of severe personal and property injury to drivers, passengers, other motorists, and the public at large, Defendants had a duty to warn consumers about, and fix, the risk as soon as soon as they learned of the problem – upon the inception of GM in October 2009.

72.     Rather than alerting vehicle owners to the danger, Defendants actively concealed and suppressed knowledge of the problem.

73.     Defendants created an unreasonable risk of death or serious bodily injury to Plaintiffs and Subclass members. Plaintiffs and Subclass members were particularly identifiable and foreseeable victims of Defendants' negligence, and their injuries in terms of the diminution in the value of their vehicles and the loss use and enjoyment of the vehicles was particularly foreseeable.

74.     Defendants created an unreasonable risk of death or serious bodily injury through a pattern and practice of negligent hiring and training of its employees, and by creating and allowing to continue a culture at GM which encouraged the minimizing and hiding of safety risks from the public. GM negligently increased this risk by firing or otherwise retaliating against employees who did attempt to convince GM to fix safety problems.

75.     As a result of Defendants' failure to warn them about the risks or repair their vehicles, Plaintiffs and Class Members sustained, and continue to sustain, damages arising from the increased risk of driving vehicles with safety related risks, from the loss of use and enjoyment of their vehicles, and from the diminished value of their vehicles attributable to Defendants' wrongful acts.

76.     Plaintiffs and class members seek compensatory damages in an amount to be proved at trial, including compensation for any pain and suffering they endured.

**COUNT IV**
**Asserted on Behalf of Mr. Sesay, Ms. Yearwood, and the Maryland Subclass**
**(Violation of Maryland's Consumer Protection Act ("MDCPA"),**
**Md. Code, Comm. Law § 13-101 *et seq.*)**

77.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

78.    This Count is brought on behalf of Plaintiffs, the Maryland Class generally with respect to the alleged violations of MDCPA § 13-301(3) and the portion of the Maryland Class who purchased vehicles after October 19, 2009, with respect to violations of MDCPA §§ 13-301(2)(i), 13-301(2)(iv), and 13-301(3).

79.    Plaintiffs are "consumers" within the meaning of MDCPA, § 13-101(c)(1).

80.    Defendants are "merchants" within the meaning of MDCPA, § 13-101(g)(1).

81.    Upon the inception of GM in 2009, Defendants knew the Plaintiffs and Subclass members' vehicles, due to the ignition switch risk, are prone to engine and electrical failure during normal and expected driving conditions. GM also knew since its inception of the steering hazards Plaintiffs' vehicles present. The potential concurrent loss of control of the vehicle and shut down of safety mechanisms such as air bags and anti-lock brakes makes Subclass Vehicles less reliable, less safe, and less suitable for normal driving activities inhibiting their proper and safe use of their vehicles, reducing their protections from injury during reasonably foreseeable driving conditions, and endangering Subclass members, other vehicle occupants, and bystanders. Because of the life threatening nature of the risk, its existence was a material fact that Defendants concealed from plaintiffs and class members in violation of Md. Code, Comm. Laws § 13-301(3).  Plaintiffs were injured thereby having to endure unreasonable risk of death, serious bodily injury, and diminution of the value of each of their vehicles.

82.    At no time during the Class Period did Mr. Sesay, Ms. Yearwood, or Subclass members have access to the pre-release design, manufacturing, and field-testing data, and they had no reason to believe that their vehicles possessed distinctive shortcomings. Throughout the Class Period, they relied on Defendants to identify any latent features that distinguished their

vehicles from similar vehicles without the ignition switch risk, and the Defendants' failure to do so tended to mislead consumers into believing no distinctive risk was present in their vehicles.

83.     With respect to the Subclass, Defendants violated Md. Code, Comm. Laws § 13-301(3) throughout the Class Period by failing to state a material fact, the omission of which tended to mislead consumers, by concealing the ignition switch risk from Plaintiffs and Subclass members.

84.     Plaintiffs seek an order enjoining Defendants' unfair or deceptive acts or practices, and attorney's fees, and any other just and proper relief available under Md. Code, Com. Laws § 13-408.

**COUNT V**
**Asserted on Behalf of Plaintiffs and the Nationwide and all Subclasses**
(**Civil Conspiracy and Joint Action or Aiding and Abetting**)

85.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

86.     This Count is brought on behalf of the nationwide Class and all Subclasses.

87.     Defendants are jointly and severally liable for Plaintiffs' and Class and Subclass members' injuries because they acted in concert to cause those injuries.

88.     Defendants are liable for Plaintiffs' and class and subclass members' injuries because they entered into specific agreement, explicit and implied, with each other and with others, including but not limited to the other defendants, dealers, engineers, accountants and lawyers (the co-conspirators) described in the preceding paragraphs of this First Amended Complaint, to inflict those injuries and to conceal their actions from Plaintiffs, Class and Subclass members and others.  By these agreements, Defendants conspired to violate each of the laws that form the basis for the claims in the preceding Counts of this Complaint.

89.     Defendants each committed overt acts in furtherance of the conspiracy.

90.     Defendants knew that the conduct of the co-conspirators constituted a breach of duties to the plaintiffs.

91.     Defendants gave substantial assistance and encouragement to the co-conspirators in their course of conduct in violation of the rights of the plaintiffs.

92.     Defendants were aware that their assistance and encouragement of the wrongful acts herein complained of substantially assisted the wrongful acts herein complained of.

93.     The wrongful acts herein complained of harmed plaintiffs.

94.     All defendants are therefore liable under civil conspiracy and civil aiding and abetting for all harm to plaintiffs and class members as described in this complaint.

## ALLEGATIONS IN SUPPORT OF PRELIMINARY RELIEF

95.     As of the date of the filing of this Complaint, GM concedes that it knew but did not disclose that some 20 million GM products have safety related risks that create an unreasonable danger of death or serious bodily harm to their drivers, vehicle occupants, nearby drivers, and bystanders.

96.     Despite purporting to come clean about its campaign of concealment and deceit in February 2014, GM has failed to take measures to ensure that these vehicles do not remain on the roads as a source of further death and injury. GM has recklessly endangered the public safety and the safety of Plaintiffs and class members.  GM has not effectively remedied its policies and practices to ensure that this misconduct does not continue, and accordingly its business practices continue to threaten the public safety, warranting that this Court impose preliminary and permanent relief to ensure that all elements of the enterprise alleged in this Complaint are identified and eliminated.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter a judgment against GM and Delphi, and grant the following relief:

A.     Determine that this action may be maintained as a Class action and certify it as such under Fed. R. Civ. P. 23(a) and 23(b)(3) and/or Fed. R. Civ. P. 23(b)(2), and/or Fed. R. Civ. 23(c)(2), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiffs as Class and Subclass Representatives and Plaintiffs' chosen counsel as Class Counsel;

B.     Declare, adjudge and decree that Defendants have recklessly endangered the public safety and order specific steps that Defendants must take to restore public safety, including but not limited to preliminary relief aimed at removing unreasonably dangerous GM vehicles from the public streets and thoroughfares forthwith; providing safe replacement vehicles for Plaintiffs and Class and Subclass members that do not contain safety related risks; and, in light of the nature of GM's wrongdoing, the substantial threat to the public health it has wrongfully caused, its apparent management recalcitrance or incompetence as evidenced by GM's failure to take significant remedial steps for the past six months since it has publicly admitted its years-long campaign of concealment and deceit, providing continuing judicial management over GM through the appointment of a Special Master with expertise in the automobile industry and ethical risk management practices to assist in the judicial supervision of GM's management reforms designed to ensure that the Company does not continue to threaten the public safety in the future; and permanent injunctive relief aimed at ensuring that GM deploys reasonable and responsible management controls with respect to safety or cease its

business of marketing to the public complex products that can so easily be a threat of death or serious bodily injury if not manufactured properly;

       C.      Declare, adjudge and decree that the ignition switches in Plaintiffs' and Class and Subclass Members vehicles are unreasonably dangerous, and/or that the vehicles themselves are unreasonably dangerous;

       D.      .Declare, adjudge and decree that Defendants violated 18 U.S.C. §§ 1962(c) and (d) by conducting the affairs of the RICO Enterprise through a pattern of racketeering activity and conspiring to do so;

       E.      Declare, adjudge and decree the conduct of Defendants as alleged herein to be unlawful, unfair, and/or deceptive, enjoin any such future conduct, and direct Defendants to permanently, expeditiously, and completely repair the Plaintiffs', Class and Subclass Members' vehicles to eliminate the ignition switch danger;

       F.      Declare, adjudge and decree that Defendants are financially responsible for notifying all Class Members about the dangerous nature of the Class Vehicles;

       G.      Declare, adjudge and decree that Defendants must disgorge, for the benefit of Plaintiffs, Class Members, and Subclass Members all or part of the ill-gotten gains it received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

       H.  Award Plaintiffs, Class Members, and Subclass Members the greater of actual compensatory damages or statutory damages as proven at trial;

       I.      Award Plaintiff and the nation-wide Class Members treble damages pursuant to 18 U.S.C. § 1964 (c);

J.      Award Plaintiff, Class Members, and Subclass Members punitive damages in such amount as proven at trial;

K.      Award Plaintiff, Class Members and Subclass Members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest; and

L.      Award Plaintiff, Class Members, and Subclass Members such other further and different relief as the case may require or as determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMAND

Plaintiffs request a trial by jury on all the legal claims alleged in this First Amended Complaint.

Respectfully submitted

_____
 Gary Peller (GP0419)
600 New Jersey Avenue, N.W.
Washington, D.C. 2000
(202) 662-9122 (voice)
(202) 662-9680 (facsimile)
peller@law.georgetown.edu

Attorney for Plaintiffs Ishmail Sesay
 and Joanne Yearwood