# Exhibit E

2013 WL 620281
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
S.D. New York.

In re MOTORS LIQUIDATION COMPANY, et al., f/k/a General Motors Corp., et. al Debtors.
Donna M. Trusky, Gaynell Cole, and Patricia Dickerson, on behalf of themselves and all others similarly situated, Plaintiffs,
v.
General Motors Company, Defendant.

Bankruptcy No. 09–50026 (REG).    |    Adversary No. 12–09803 (REG).    |    Feb. 19, 2013.

**Attorneys and Law Firms**

Milberg LLP by Barry A. Weprin, Esq., New York, NY, Edelson & Associates, LLC by Marc H. Edelson, Esq., Doylestown, PA, Fink + Associates Law by David Fink, Esq., Darryl Bressack, Esq., Bloomfield Hills, Michigan, Spector, Roseman, Kodroff & Willis, PC by Jeffrey L. Kodroff, Esq., John A. Macoretta, Esq., Philadelphia, PA, Ronald Jay Smolow by Ronald Jay Smolow, Esq. (argued), Newton, PA, Attorneys for the Plaintiffs and the Class.

King & Spalding LLP by Arthur Steinberg, Esq. (argued), Scott Davidson, Esq., New York, NY, Attorneys for Defendant General Motors, LLC.

### BENCH DECISION [1] AND ORDER ON MOTION TO DISMISS TRUSKY PLAINTIFFS' CLASS ACTION [2]

[1] I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have fewer citations and other footnotes, and have a more conversational tone.

[2] This written decision confirms and amplifies upon the oral decision that I issued, in summary form, after the close of oral argument. Though I'm not aware of any inconsistencies between the two, if there are any this written decision trumps the orally summarized one.

ROBERT E. GERBER, United States Bankruptcy Judge.

**\*1** In this adversary proceeding, under the umbrella of the Chapter 11 case of reorganized debtor Motors Liquidation Company ("**Old GM**"), defendant General Motors LLC ("**New GM**"), the purchaser of Old GM's assets in Old GM's 363 sale (the "**363 Sale**"), moves to dismiss the complaint filed by plaintiffs Donna Trusky and others (the "**Trusky Plaintiffs**" or "**Plaintiffs**"), on behalf of themselves and all others similarly situated, under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Alternatively, New GM requests that I strike the class action allegations; resolve certain issues related to the liabilities assumed by New GM in the Sale Order and the Sale Agreement; and transfer the remainder of the matter back to the District Court for the Eastern District of Michigan, where it was originally filed.

The Plaintiffs' second amended complaint in this adversary proceeding alleges that New GM breached express warranty obligations New GM assumed from Old GM in the 363 Sale by failing to repair and/or replace defective rear wheel spindle rods in 2007 and 2008 Chevrolet Impalas, and by failing "to compensate plaintiffs who incurred losses for repairs of defective rear spindles, related components and tires due to Old GM's failure to honor its express written warranties." The Plaintiffs also seek injunctive and declaratory relief requiring New GM to continue to provide purchasers of 2007 and 2008 Chevrolet Impalas with replacement rear wheel spindle rods.

In its motion to dismiss, New GM argues that the requested relief can't granted because under the 363 Sale, pursuant to the Sale Order and the Sale Agreement (the "**Sale Agreement**"), the execution of which I authorized under that Order, New GM assumed only certain express written warranties, commonly referred to as the "Glove Box Warranty," offered by Old GM to its customers upon sale of certain vehicles, and that the Plaintiffs' claim and prayer for relief are not cognizable under the terms of the Glove Box Warranty, which affirmatively disclaims any liability for damages or monetary losses of any kind and is limited in time. New GM further argues that the Sale Order and Sale Agreement prevent all other claims based on other breaches of warranty and successor or transferee liability theories.

\* \* \*

I'm ruling, as a jurisdictional and jurisprudential matter, that I should construe my Sale Order (and, to the extent necessary

to do that, the Sale Agreement), implement the intent I had at the time, and then abstain and send the remainder of the controversy back to the Eastern District of Michigan. I do that because while I plainly have jurisdiction to construe my own orders, my jurisdiction to determine a monetary controversy, involving the three named plaintiffs and the class they seek to represent, on the one hand, and New GM, a nondebtor on the other, is much more debatable, and that even if I have that jurisdiction, it's in the interests of justice to allow a district judge to deal with the remainder of the case, and to rule on the issues that might remain once the Sale Order has been construed.

**\*2** On the merits, I'm ruling on aspects of the controversy that involve the construction of the Sale Order, and the Sale Agreement that I approved as follows:

(1) To the extent that the Trusky Plaintiffs are pursuing a claim for design defects in the spindle rods or other components of the 2007 and 2008 Impalas, they may not do so; claims for design defects may not be asserted against New GM, as New GM did not assume liabilities of that character;

(2) New GM is not liable for Old GM's conduct or alleged breaches of warranty;

(3) New GM's warranty obligations are limited to honoring the specific terms of the Glove Box Warranty as to vehicles presented for repair to New GM dealers within the mileage and duration limitations of the Glove Box Warranty— which means that with respect to any plaintiff or class member who presented his or her car to a dealer for repair before the time ran out or the mileage limit was exceeded (or does so going forward, to the extent that the time and mileage limitations haven't run for anybody), the GM dealer needs to keep fixing it, or replacing tires, spindle rods or other components, as the case may be;

(4) New GM is not liable for monetary damages or other economic loss under the terms of the Glove Box Warranties. But

(5) I see nothing in my earlier order that would preclude an injunction requiring New GM to cause its dealers to make repairs or replacements of Impalas or their components that had already been brought in (or that still can be) before any Impala's limits expired. And

(6) Nothing in my order prohibits the district court from fashioning appropriate remedies for cases where consumers brought cars in to New GM dealers when the warranty was still in place but the New GM dealers refused to repair covered defects and the consumer then had to, and did, pay out-of-pocket for repairs. It would, however, be contrary to my order to permit anyone who didn't bring their car in for repairs to get relief or monetary damages.

In other words, I'm holding that New GM—or to be more precise, New GM's dealers' repair shops (with the matter of reimbursement to those dealers to be resolved between New GM and the dealers)—must keep making repairs and replacements for any vehicles timely brought in there, including spindle rod replacement, tire replacement and wheel alignments. But I emphasize that New GM undertook a performance, and not a monetary, obligation. The remedy, in essence, is one of specific performance.

I cannot and will not strike the class action allegations now. I don't have the factual predicate to do that, and this is a job more appropriately handled by the district judge hearing the underlying action. It's at least possible, if not also likely, that my ruling will reduce the size of the prospective class, and raises issues as to whether one or more of the named class representatives are ineligible to recover, or makes one or more of them ineligible to represent those who did bring their cars in for repair when the Glove Box Warranty was still in effect. If there are any in the class whose time limits and mileage units haven't expired yet, my earlier rulings would not foreclose them from bringing their cars in for repair, and a declaratory judgment or injunction requiring the dealers to make the repairs or replacements for them wouldn't violate my earlier order. But I don't know how many people there are in that category, and I couldn't make Rule 23 numerosity, typicality, adequacy of representation, and common issue predominance findings on facts known to me now.

**\*3** Nor do I think that I should make the Rule 23 findings myself (even with further proceedings), or rule on 12(b)(6) issues with respect to the complaint even after ruling on the issues that are my duty to decide. Those are traditional functions of the district judge hearing the plenary action, and I will transfer the adversary proceeding back to the Eastern District of Michigan, under 28 U.S.C. § 1412, and Fed. R. Bankr.P. 7087, in the interests of justice.

My Findings of Fact, Conclusions of Law, and bases for the exercise of my discretion follow.

*Facts*

Under familiar principles, I take the well-pleaded facts from the pleadings, and I also take judicial notice of prior proceedings in Old GM's chapter 11 case. I won't burden my discussion with factual allegations relevant only to the request for class certification, since I won't decide class certification issues now.

*1. Plaintifs' Claims*

The Trusky Plaintiffs are three individuals who purchased Chevrolet Impalas from model years 2007 and 2008. They allege that they purchased their vehicles from Old GM, and that at the time that they did so, Old GM delivered "an express written warranty containing affirmations of fact as to the absence of defects in materials and workmanship, including design, and the durability and longevity of the rear spindle rods."

They also allege that at the time of purchase, Old GM delivered "an express written warranty in which it promised to repair or replace warranted parts that were defective in workmanship and materials including the rear spindle rods, during the applicable warranty period."(This latter warranty is commonly referred to as the "**Glove Box Warranty.**") The Glove Box Warranty "covers repairs to correct any vehicle defect related to materials or workmanship occurring during the warranty period."To obtain the Glove Box Warranty repairs, the customer must "take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs."The Glove Box Warranty further provides, in bold lettering:

> Performance of repairs and needed adjustments is the *exclusive remedy* under this written warranty or any implied warranty. GM shall not be liable for incidental or consequential damages, such as, but not limited to, lost wages or vehicle rental expenses, resulting from breach of this written warranty or any implied warranty.

The Glove Box Warranty for the Impalas provided coverage for three years or 36,000 miles, whichever occurred first.

The Trusky Plaintiffs allege that the 2007 and 2008 Impalas were sold with "common defective rear spindle rods" caused by defective workmanship and material and that this defect caused "direct damage to the rear wheel alignment, and premature tire wear including lower tread depth on the inboard side of the tires."The Trusky Plaintiffs also allege that in 2008, each of the named plaintiffs purchased a 2008 model year Chevrolet Impala and that each had experienced premature tire wear and/or rear wheel misalignment due to the defective rear spindle rods.

**\*4** In particular, Plaintiff Trusky alleges that she "complained to Old GM's dealer, Allen Hornbeck Chevrolet, that the tires on her vehicle were worn on the inside and were unserviceable" within the warranty period. She alleges that she purchased two sets of replacement tires due to the spindle rod defect within the warranty period—the first within the first year after purchase, and the second in 2010. Mr. Hornbeck reimbursed Ms. Trusky for the cost of the first set of replacement tires, and Ms. Trusky paid for the second set herself.

Plaintiff Cole alleges that in June 2011, within the Glove Box Warranty's durational and term limits, she presented her vehicle to Ramey Motors, a New GM dealer, for repair. She alleges that the dealership advised her that the repairs for vehicle alignment, new rear tires, and for a camber kit would not be covered by the warranty, and that she paid for these repairs, which were completed several days thereafter.

Finally, Plaintiff Dickerson alleges that, in July 2010, within the Glove Box Warranty's durational and term limits, she brought her vehicle to Al Serra Chevrolet, a New GM dealer in Grand Blanc, Michigan, because of premature tire wear. She alleges that the dealership would not make the necessary repairs under her warranty.

Additionally, the Trusky Plaintiffs allege that Old GM and New GM knew of the defective rear wheel spindle rods in the Impalas, but took steps to remedy the defect only in Impalas equipped with a police package. The Plaintiffs further allege that the defective rear spindle rods on the police package cars are the same as those in cars that they purchased.

*2. Old GM's Bankruptcy, the Sale Agreement and Sale Order*

Old GM filed for chapter 11 protection on June 1, 2009. As described in detail in other rulings I've issued in Old GM's chapter 11 case, Old GM moved, at the very outset of its chapter 11 case, to sell the bulk of its assets under section 363

of the Code to a newly created entity that thereafter became New GM. The sale was under a so-called "Amended Master Sale and Purchase" Agreement, referred to by some as the MSPA, but which I refer to as the Sale Agreement.

After the 363 Sale, New GM would have to assume at least some of Old GM's liabilities, since taking them on would be important to New GM's ability, going forward, to manufacture and sell vehicles. But if the restructuring were to succeed, and New GM were to be viable, New GM would need to take on only those liabilities that were important to its ability to continue the business. As described in my recent written decision in *Castillo v. General Motors Co. (In re Motors Liquidation Co.),* 2012 Bankr.LEXIS 1688, 2012 WL 1339496 (Bankr.S.D.N.Y. Apr. 17, 2012) ("*Castillo*"), the intent and structure of the 363 Sale was that New GM would start business with as few legacy liabilities as possible, and that presumptively, liabilities would be left behind and not assumed.

To that end, under the Sale Agreement, New GM would take on only certain defined "Assumed Liabilities" as part of the sale. Section 2.3(a)(vii)(A) defined Assumed Liabilities as:

> **\*5** all liabilities arising under express written warranties of Sellers that are specifically identified as warranties and delivered in connection with the sale of new, certified used, or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmission) manufactured or sold by Sellers or Purchaser prior to or after the Closing ...

By contrast, the Sale Agreement defined certain "Retained Liabilities" that would remain with Old GM. Section 2.3(b)(xvi) of the Sale Agreement defined Retained Liabilities as:

> all Liabilities arising out of, related to or in connection with any (A) implied warranty or other implied obligation arising under statutory or common law without the necessity of an express warranty or (b) allegation, statement or writing by or attributable to Sellers.

Then, section 6.15 of the Sale Agreement addressed warranty claims. In relevant part, Section 6.15(b) provided:

> From and after the Closing, Purchaser [New GM] shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment ... manufactured or sold by Sellers or Purchasers prior to or after the Closing ...
>
> ...
>
> [F]or the avoidance of doubt, Purchaser shall not assume Liabilities arising under the law of implied warranty or other analogous provisions of state Law, other than Lemon Laws, that provide customer remedies in addition to or different from those specified in Sellers' express warranties.

On July 5, 2009, I entered a Sale Order allowing the sale to go forward. Section 56 of this order provided:

> The Purchaser is assuming the obligations of the Sellers pursuant to and subject to conditions and limitations contained in their express written warranties, which were delivered in connection with the sale of vehicles and vehicle components prior to the Closing of the 363 Transaction and specifically identified as a "warranty." The Purchaser is not assuming responsibility for Liabilities contended to arise by virtue of other alleged warranties, including implied warranties and statements in materials such as, without limitation, individual customer communications, owner's manuals, advertisements, and other promotional materials, catalogs, and point of purchase materials.

The Sale Order also expressly limited the ability of individuals to pursue successor or transferee liability claims against New GM. For example, Paragraph 7 of the Sale Order provided:

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.    4

> Except for the Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser in accordance with the MPA, and, upon the Closing, shall be free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (other than Permitted Encumbrances [a defined term not applicable here] ), including rights or claims based on any successor or transferee liability ...

**\*6** The Sale Order also limited New GM's liability for claims against Old GM that arose prior to the closing date. For example, paragraph 47 provided:

> Effective upon the Closing ... all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Purchaser, its present or contemplated members or shareholders, its successors and assigns, or the Purchased Assets, with respect to any (i) claim against the Debtors other than Assumed Liabilities, or (ii) successor or transferee liability of the Purchaser for any of the Debtors ...

The 363 Sale closed on July 10, 2009 and New GM was legally formed on that date.

### *3. The Current Controversy*

On June 29, 2011, the Trusky Plaintiffs filed this action in the United States District Court for the Eastern District of Michigan (the "**Michigan Action**"). On February 15, 2012, the case was transferred to the district court in the Southern District of New York and it was subsequently transferred, at New GM's request, to this Court on March 7, 2012. On June 1, 2012, the Trusky Plaintiffs filed their Second Amended Complaint in this court, though it was their fourth amended complaint since commencing the Michigan Action. New GM then filed this motion.

### *Discussion*

### *1. Claims Based on Design Defect*

The Trusky Plaintiffs argue that they aren't asserting a claim against New GM for design defects in the spindle rods or other components of the 2007 and 2008 Impalas, and that their claims are based on defective workmanship and material alone. I'm not at all sure that they are, [3] but that will ultimately be a matter for the district judge to decide. I do have to make clear, however, that to the extent that their claims are in substance based on design defects, New GM did not assume liabilities of that character.

[3] I wonder whether the Trusky Plaintiffs' claims are not based on workmanship or materials in any sense other than the name attached to them. All or the bulk of their claims seem premised on the allegation that Old and New GM "failed to repair or replace the rear spindle rods during the warranty period *so that premature tire wear and misalignment would not occur.*" If putting in new spindle rods or new tires (which meet designer specifications and have no metallurgical, rubber, or other materials flaws) would not solve the problem, that might be indicative of a flaw in the spindle rods' design, rather than in their quality or the manner in which they were welded, bolted or otherwise installed in the vehicles. But I make no finding as to this issue.

The intent of the Sale Agreement was for New GM to assume the ordinary course obligation to repair individual vehicles presented for repair under the Glove Box Warranty —*i.e.,* by fixing the cars or replacing components. In that connection, the Sale Agreement provided that only "specifically identified warranties, delivered in connection with the sale of new, certified used, or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment" would be assumed by New GM. Further, under the Sale Order, New GM assumed only Old GM's obligations "*pursuant to* and *subject to* conditions and limitations contained in their express written warranties, which were delivered in connection with the sale of vehicles and vehicle components prior to the Closing of the 363 Transaction and specifically identified as a "warranty.' " Sale Order at ¶ 56 (emphasis added).

The Sale Order and the Sale Agreement thus limited New GM's liability to compliance with the Glove Box Warranty, subject to its conditions and limitations, which provide only for repair of "any vehicle defect related to *materials or workmanship* occurring during the warranty period." By its plain terms, the Glove Box Warranty does not require New GM to repair defects caused by bad design. Thus, to the extent that the Plaintiffs want New GM to replace the spindle rods in their Impalas with spindle rods of a different design, New GM is not required to do so. In other words, New GM can be required to replace spindle rods that were defective because of materials or workmanship with new spindle rods of the same design within the warranty period, but it cannot be required to change the design of the spindle rods.[4]

[4]  I don't rule out the possibility, though I certainly don't decide the issue now, that if there had been a timely filed claim against Old GM for bad design, and if the claim otherwise passed muster under applicable state products liability law, there could have been a claim against *Old GM* for such. But assuming, *arguendo,* that there otherwise might have been such viable claims, *New GM* did not assume them.

**\*7** Further, under the Glove Box Warranty, New GM is only required to repair or replace defects that have already manifested themselves by the time that the vehicles are brought in for repair, provided that those vehicles are brought in before the warranty period expires. As a general matter, express warranties do not cover repairs made after the applicable time or mileage periods expire, even if latent before that time and even if the warrantor knew of the defect. That is the rule of the Second Circuit's decision in *Abraham v. Volkswagen of America,* 795 F.2d 238 (2d Cir.1986). Thus New GM cannot be required to correct problems arising in the future under its express warranty. This limitation is embodied in the language of the Glove Box Warranty stating that, "The warranty covers repairs to correct any vehicle defect related to materials or workmanship *occurring during the warranty period,*" and "To obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and *request the needed repairs* "—language which presupposes that the covered repairs have already become necessary at the time that the vehicles were brought in for repair.

As such, under the Glove Box Warranty, New GM has no duty to make repairs or replacements that haven't already been shown to be necessary. So to the extent that the Plaintiffs wanted or want New GM dealers to change their vehicles to avoid future problems that may arise, as opposed to repairing problems that have already manifested themselves, those would be design defects (latent or otherwise) and are not liabilities that were assumed by New GM.

But on this record I can't decide which particular repairs would be required based on certain complaints within the Glove Box Warranty. For example, I can't decide if a complaint that the rear tires were worn would be sufficient to require repairs of the rear spindle rods, or if replacement of the rear tires would be sufficient. These issues are too fact-specific and individualized for a determination at this time. The district judge, who might have a fuller evidentiary record, might be able to decide issues of that character, or might have the same problems I do. But either way, he or she could decide issues of that character, to the extent that those issues continue to matter based on my ruling today, without running afoul of my rulings here.

For the avoidance of doubt, I summarize that under the Sale Order, New GM did not assume liability for claims based on design defects.

### 2. Claims Based on Old GM's Failure to Perform under Glove Box Warranty

The Trusky Plaintiffs allege that New GM is liable for economic losses the Plaintiffs suffered due to Old GM's failure to repair defective rear spindle rods or related components that were damaged thereby. They argue that their claims arise from the breach of an express warranty provided to them by Old GM and that under the Sale Agreement, New GM assumed "all liabilities arising under" these express warranties. Therefore, they posit that New GM's "Assumed Liabilities" included those arising from Old GM's refusal to make repairs for covered parts during the warranty period.

**\*8** Like the Castillo Plaintiffs, the Plaintiffs here argue, in substance, that their liabilities "arise under" the express written warranties of Sellers and were therefore assumed by New GM. But, as I said in *Castillo,* 2012 Bankr.LEXIS 1688 at \*19 n. 34, 2012 WL 1339496 at \*6 n. 34, it's the language *that follows* "arising under" that is important (rather than the lead-in words by themselves); the lead-in words, in the absence of more, tell the reader very little.

The Sale Agreement provided that New GM assumed "all liabilities arising under express written warranties of Sellers that are specifically identified as warranties and delivered in connection with the sale" of certain vehicles and

equipment. These written warranties, specifically, the Glove Box Warranties, gave rise only to performance obligations, not monetary ones. Under the Glove Box Warranty, the exclusive remedy available to vehicle owners is repair or replacement of defects related to materials or workmanship occurring during the warranty period. Economic losses are expressly excluded under the Glove Box Warranty. *See* Glove Box Warranty, at 9 ("Performance of repairs and needed adjustments is the exclusive remedy under this written warranty or any implied warranty. GM shall not be liable for incidental or consequential damages, such as, but not limited to, lost wages or vehicle rental expenses, resulting from breach of this written warranty or any implied warranty."). Thus, the only liabilities "arising under" the express written warranties that New GM assumed were the obligations to repair individual vehicles presented to New GM dealers for repair after the sale was consummated.

Nor did New GM assume liability for Old GM's failures under other theories. As I noted in *Castillo,* the intent of the parties was to pass on only those liabilities that were commercially necessary to the success of New GM.

Thus, the parties agreed, in the Sale Agreement, that "all Liabilities arising out of, related to or in connection with any (A) implied warranty or other implied obligation arising under statutory or common law without the necessity of an express warranty or (b) allegation, statement or writing by or attributable to Sellers" were retained by the debtor, Old GM. Similarly, paragraph 7 of the Sale Order provided that the assets acquired by New GM were transferred "free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever ... including rights or claims based on any successor or transferee liability" and paragraph 47 prohibited and enjoined all persons or entities from commencing actions against New GM with respect to any successor or transferee liability of the Debtors.

Under these provisions, the parties to the Sale Agreement, Old and New GM, agreed that only liabilities to continue performance on the Glove Box Warranty would pass on to New GM. Liability for Old GM's failures would remain with Old GM. The Sale Order, by which I approved the Sale Agreement, further ensured that New GM would acquire the assets free and clear of successor or transferee liability. Thus, Plaintiffs' claims based on Old GM's failures to perform on the Glove Box Warranty were not assumed by New GM.

### *3. Claims Based on New GM's Failure to Perform under Glove Box Warranty*

**\*9** The Trusky Plaintiffs also allege that New GM itself failed to perform its obligations under the Glove Box Warranty. Here, there may be some room for the Trusky Plaintiffs to secure relief, though I can't make a finding on this now. As I explained earlier, under the Sale Agreement, New GM assumed the performance obligation to repair vehicles under the terms of the Glove Box Warranty. As such, New GM was and is obligated to repair vehicles to correct defects related to materials or workmanship when presented to New GM dealers during the warranty period. To the extent that any plaintiff or class member presented his or her car to a dealer before the expiration of the warranty period based on either time or mileage (either to Old GM or New GM), and that defect was based on materials or workmanship, the GM dealer should have fixed the vehicle. Similarly, the dealer needs to keep fixing the car until the warranty period expires. To the extent that the repairs weren't done, the consumer is entitled to a "do over." [5]

[5] And if the consumer was entitled to performance, whether a "do over" or otherwise; the dealer didn't provide it; and the consumer then had to pay for new tires, spindle rods or any other necessary repairs by reason of the dealer's refusal, nothing in my order prevents the district judge from fashioning appropriate relief.

But, I emphasize that the terms and conditions of the Glove Box Warranty continue to apply. It remains subject to its duration and mileage limitations, and remains limited in scope to only those defects caused by materials or workmanship. Performance of repairs and needed adjustments is the exclusive remedy under this written warranty. What is recoverable, in substance, is specific performance of the repair or replacement obligation for otherwise qualifying defects.

### *4. Injunctive Relief*

The Plaintiffs also request that I enter injunctive relief requiring New GM to provide the class with "unique repair parts necessary to perform its assumed warranty obligations." I'm puzzled by the words "unique repair parts." If that's a euphemism for *redesigned* parts, that obligation was not undertaken by New GM under the Sale Order. But I see nothing in the Sale Order that would preclude the district court from entering an injunction requiring New GM to cause its

dealers to make repairs or replacements (with new parts of the same design) of vehicles that have already been brought in, or that can still be brought in, within the terms of the warranty limitations. Again, under a proper construction of the Sale Order, this relief must be limited to the terms and conditions of the Glove Box Warranty. It must not require New GM to make repairs to avoid future problems, nor may it require New GM to replace parts with parts of a different design, as these remedies are outside the scope of the liabilities assumed by New GM.

*5. Abstention and Transfer*

Finally, in its motion to dismiss, New GM requests that I transfer this matter back to the Eastern District of Michigan now that I have resolved the issues regarding construction of the Sale Order and the associated Sale Agreement. New GM suggests that there is no particular reason why I need oversee a garden-variety breach of warranty action against it, and that it's debatable that I would even have jurisdiction to do so. On the other hand, the Plaintiffs request that I retain jurisdiction, arguing that New GM is estopped [6] from requesting a transfer of this matter back to Michigan based on its prior request that the matter be transferred here.

[6]    As a threshold matter, I don't see a basis for a judicial estoppel. New GM was entitled, at the least, to a determination from me as to what my order covered and didn't cover, which was the essence of its effort to transfer. It didn't assert that it was essential that I decide the underlying issues, and in any event, I took no actions in reliance on the notion that I had to decide anything other than what my order covered.

 *10  Just as a bankruptcy court can abstain in favor of a state court, it can do likewise in favor of another federal court, when such is in the interest of justice. *See, e.g., In re Portrait Corp. of America, Inc.,* 406 B.R. 637, 639, 643 (Bankr.S.D.N.Y.2009) (Drain, J.) ("**Portrait Corp.**"); *In re Motors Liquidation Co.,* No. 09–50026 (Bankr.S.D.N.Y. Oct. 4, 2009) (Tr. of Hr. of Oct. 4, 2010 re New GM Motion to Enforce 363 Order with respect to Rally Motors).

The standards for discretionary abstention under section 1334 have been articulated in various ways, but in a recent decision, *In re Lyondell Chemical Co.,* 402 B.R. 596, 613 (Bankr.S.D.N.Y.2009), I articulated the relevant factors, with respect to abstention in favor of the *state courts.*In *Portrait Corp.,* Judge Drain, later adapted those factors to a situation, like the one here, where abstention in favor of *another federal court* was under consideration.

Judge Drain articulated the factors as follows:

  1. The effect or lack thereof on the efficient administration of the bankruptcy estate if the court recommends abstention;

  2. The extent to which issues of non-bankruptcy law predominate over bankruptcy issues;

  3. The difficulty or unsettled nature of the applicable non-bankruptcy law;

  4. The presence of a related proceeding commenced in state court or other non-bankruptcy court;

  5. The jurisdictional basis, if any, other than 28 U.S.C. § 1334;

  6. The degree of relatedness or remoteness of the proceeding to the main bankruptcy case;

  7. The substance rather than form of an asserted "core" proceeding;

  8. The feasibility of severing non-bankruptcy law claims from core bankruptcy matters to allow judgments to be entered in non-bankruptcy court with enforcement left to the bankruptcy court;

  9. The burden of the bankruptcy court's docket;

  10. The likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties;

  11. The existence of a right to a jury trial;

  12. The presence in the proceeding of nondebtor parties.

Judge Drain recognized, as I do, that federal courts should be sparing in the exercise of discretionary abstention, but that in appropriate cases they should abstain. Applying these factors, I come to the conclusion that I must here abstain.

*Factors # 1, # 6 and # 12: Effect on Eficient Administration of the Estate, Relatedness to the Main Bankruptcy Case, and the Presence in the Proceeding of Nondebtor Parties*

The dispute here is between nondebtor parties, and Old GM is not a party to this dispute. The controversy has no effect on Old GM's estate, Old GM's reorganization, or the administration of the Old GM chapter 11 case. While this matter is important to give New GM, the purchasers of the debtors' assets, the benefit of its bargain and ensuring that it has indeed acquired its assets under a "free and clear" order, I'm able to sever the bankruptcy issues from the breach of warranty claims, and the remaining issues have little relatedness to the main bankruptcy case. Likewise, the administration of the Old GM estate, whose reorganization plan has long been effective, would be unaffected by my abstention.

### Factors # 2 and # 3: Whether Non-bankruptcy Issues Predominate, and Difficulty of Applicable Nonbankruptcy Law

*11 While the bankruptcy issues are important here, my ability to sever the bankruptcy issues—specifically to construe my Sale Order, and to the extent necessary, the Sale Agreement—reduces the weight this factor should have in my final analysis. When bankruptcy issues are present, there are good reasons why bankruptcy judges should decide them—particularly to utilize their particular expertise, or to implement their intent with respect to earlier orders they entered—but I can do that here by providing the nonbankruptcy court with my rulings on the aspects of the controversy that involve the construction of the Sale Order and the Sale Agreement.

On the other hand, with respect to the nonbankruptcy issues to be addressed, of warranty and class certification, I have no greater skill than a district judge would have. I've dealt with contract issues dozens, if not hundreds, of times, and with class certification several times as well. But a district judge can deal with those issues at least as well as I can, and these issues are traditionally within the ambit of district judges hearing plenary actions. Especially together, these factors tip in favor of abstention.

### Factor # 4: Proceeding in Another Court

The considerations underlying this factor are somewhat convoluted, as the Plaintiffs initially brought the action in Michigan, but now oppose returning the matter there, while New GM requested that I resolve the bankruptcy issues in this Court but now seeks to transfer the matter back to the Michigan court. But I prefer to decide the issues based not on what the parties said and did, but based on what I think is best. Likewise, I think that on a discretionary matter, I'm allowed to utilize my knowledge and experience with respect to the manner in which transfers of proceedings related to bankruptcy proceedings are effected, and the manner in which they're then referred to the bankruptcy court.

Here, when what started as a plenary district court action was initially transferred to the district court in this district, and then to this court (in which it was transformed into an adversary proceeding), it came this way in what is the normal fashion. The New York district court served as a procedural way station for the matter, and was not, in any material way, involved with it. The two forums with adjudicative authority over it were the district court in the Eastern District of Michigan and the bankruptcy court in the Southern District of New York. I don't think this factor can be fairly regarded as tilting in favor of either party, leaving me to decide whether to abstain based on the other factors.

### Factor # 5: Jurisdictional Basis, if any, other than 28 U.S.C. § 1334

I assume, without deciding, that there was subject matter jurisdiction in the Eastern District of Michigan district court as to *the underlying claims* before it came here. There is subject matter jurisdiction in this Court, under the "arising in" prong of 28 U.S.C. § 1334,[7] for me to construe my Sale Order, though I have great difficulty in seeing how I'd have subject matter jurisdiction to decide anything else. The fact that in all probability, any subject matter jurisdiction to decide the underlying claims would exist only in the Michigan district court tilts in favor of abstaining in favor of that court.

[7] The Judicial Code's provision establishing subject matter jurisdiction for district (and hence bankruptcy courts) in bankruptcy proceedings, 28 U.S.C. § 1334 (which immediately follows the provisions covering subject matter jurisdiction in federal question, diversity, and admiralty cases, 28 U.S.C. §§ 1331, 1332 and 1333, respectively) provides, in relevant part, with an exception not relevant here:

> **(b)**... the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

The Trusky Plaintiffs' claims, arising under state law, don't arise under title 11 (the Bankruptcy Code), and as they're asserted against New GM, not Old GM, it's difficult to see, under the *Pacor* and *Cuyahoga Equipment* tests applicable in this Circuit, *see Pacor,*

*Inc. v. Higgins,* 743 F.2d 984 (3d Cir.1984), and *Publicker Industries Inc. v. United States (In re Cuyahoga Equipment Corp.),* 980 F.2d 110 (2d Cir.1992), how they would have sufficient impact on Old GM or the administration of its chapter 11 case to be "related to" that case. But construction of my bankruptcy court Sale Order, which was entered in Old GM's chapter 11 case, and which would not have been entered, or necessary to construe, if there were no bankruptcy case, is a garden-variety example of a proceeding "arising in" a chapter 11 case.

### Factors # 11 and # 7: Jury Trial and Ability of a Bankruptcy Judge to Issue Final Orders

**\*12** The Trusky Plaintiffs asserted a demand for a jury trial in their amended complaint. I can't conduct a jury trial in the absence of consent, but a district judge can. But the remaining claims here are of a type where, at least for the most part, I'm doubtful that there would be a right to trial by jury in any event; the Trusky Plaintiffs wouldn't have a right to a jury trial for injunctive relief.

To the limited extent that the Trusky Plaintiffs or class members might have damages claims after my ruling (*e.g.,* if they timely brought their cars in for parts replacement or repair; the dealer refused to do that; they then had to pay someone else to do it; and the court were to consider damages for what they had to pay to be an appropriate remedy), it's possible that there may be a right to a jury trial in that regard. That tips, albeit very mildly, in favor of abstention.

Also, while I plainly have the constitutional power, even after *Stern v. Marshall,* 131 S.Ct. 2594 (2011), to interpret and enforce my Sale Order, and the underlying agreements which I authorized in connection with that order, it's debatable whether, as a bankruptcy (as contrasted to district) judge, I would have the ability to enter a final order with regard to the nonbankruptcy claims at issue here, especially if any final order were to involve a monetary judgment against a nondebtor party, though in any event I could simply issue my decision as proposed Findings of Fact and Conclusions of Law, subject to de novo review. Again this tips, albeit very mildly, in favor of abstention.

### Factor # 8: The Feasibility of Severing Non-bankruptcy Law Claims from Core Bankruptcy Matters to Allow Judgments to Be Entered in Non-bankruptcy Court with Enforcement Left to the Bankruptcy Court

While it's not always possible to sever the bankruptcy issues from the non-bankruptcy ones, in this particular case, severing the interpretation of the Sale Order and related agreements is very easy to do. The non-bankruptcy matters, including class certification and the breach of warranty claims, can readily be resolved, and for that matter, enforced, by the district court. This factor tips heavily in favor of abstention.

### Remaining Factors

The remaining factors have no material relevance to the controversy here. And while I must also consider certain special considerations applicable in cases where the court has retained jurisdiction to construe and enforce its order, or agreements related to its order, I find that they have little effect here, as I've just done that today. In cases where bankruptcy judges are asked to construe their own orders, the bankruptcy judge knows what he or she wanted to accomplish by the questioned provision and will know what is necessary to clear up any ambiguity. While this factor normally tips against abstention, here, now that I've done that, I can easily sever the remainder.

Overall, the balance tips in favor of abstention. Now that I've ruled on the construction of the Sale Order and Sale Agreement, no useful purpose would be served by retaining jurisdiction here. Therefore, I'm abstaining from hearing the remainder of this matter and am transferring the case back to the Eastern District of Michigan under 28 U.S.C. § 1412 and Fed. R. Bankr.P. 7087, in the interests of justice.

### *Conclusion*

**\*13** The Sale Order and Sale Agreement are construed in accordance with the preceding discussion. For the reasons stated above, I decline to rule on the 12(b)(6) motion or with respect to the class allegations. I transfer the remainder of the case to the United States District Court for the Eastern District of Michigan.

SO ORDERED.