# Exhibit  F

541 B.R. 104
United States Bankruptcy Court,
S.D. New York.

In re Motors Liquidation Company, et al., f/
k/a General Motors Corp., et al., Debtors.

Case No.: 09–50026 (REG) (Jointly Administered)
|
Signed November 9, 2015

**Synopsis**
**Background:** Following court's decision in adversary proceeding in which purchaser of Chapter 11 debtor-automobile manufacturer's assets sought to enforce "free and clear of" language in sale order, 529 B.R. 510, and entry of judgment implementing that decision, 531 B.R. 354, group of creditors with claims arising out of faulty ignition switches in vehicles manufactured by debtor prior to the sale filed motions for post-judgment relief. The Bankruptcy Court, Robert E. Gerber, J., 534 B.R. 538, denied the motions. The court then would determine the extent to which the decision barred particular claims and allegations in complaints in other courts in which claims were asserted against purchaser.


**Holdings:** The Bankruptcy Court, Gerber, J., held that:

[1] knowledge of debtor's personnel could not be imputed to purchaser, except on assumed product liabilities claims or to the extent that it could be shown that purchaser also had such knowledge;

[2] purchaser did not contractually assume liability for punitive damages based on debtor's knowledge or conduct;

[3] documents in purchaser's files could be utilized as a predicate for knowledge, even if the documents first came into being before the sale.


Ordered accordingly.


West Headnotes (3)

**[1]**      **Bankruptcy**
          🖝  Adequate protection; sale free of liens

          **Bankruptcy**
          🖝  Rights and liabilities of purchasers, and right to purchase

Knowledge of Chapter 11 debtor-automobile manufacturer's personnel could not be imputed to purchaser of debtor's assets in free-and-clear sale, for purposes of claims arising out of faulty ignition switches in vehicles manufactured by debtor prior to the sale, except on assumed product liabilities claims or to the extent that it could be shown, such as because it was the knowledge of the same employee or because it was communicated to an employee of purchaser, that purchaser also had such knowledge.

2 Cases that cite this headnote


**[2]**      **Bankruptcy**
          🖝  Manner and Terms

          **Bankruptcy**
          🖝  Rights and liabilities of purchasers, and right to purchase

Purchaser of Chapter 11 debtor-automobile manufacturer's assets in a free-and-clear sale did not contractually assume liability for punitive damages, relating to claims arising out of faulty ignition switches in vehicles manufactured by debtor prior to the sale, based on debtor's knowledge or conduct; to the extent the sale agreement was ambiguous, the indicia of intent strongly came down against purchaser's assumption of punitive damages obligations premised on anything other than its own knowledge and conduct.

2 Cases that cite this headnote


**[3]**      **Bankruptcy**
          🖝  Adequate protection; sale free of liens

          **Bankruptcy**
          🖝  Rights and liabilities of purchasers, and right to purchase

Documents in files of purchaser of Chapter 11 debtor-automobile manufacturer's assets in free-and-clear sale could be utilized as a predicate for knowledge, for purposes of claims arising out of faulty ignition switches in vehicles manufactured

by debtor prior to the sale, even if the documents first came into being before the sale.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*105** KING & SPALDING LLP, Counsel for General Motors LLC (New GM), 1185 Avenue of the Americas, New York, New York 10036, By: Arthur J. Steinberg, Esq. (argued), Scott Davidson, Esq.

KIRKLAND & ELLIS LLP, Counsel for General Motors LLC (New GM), 300 North LaSalle, Chicago, IL 60654, By: Richard C. Godfrey, Esq., Andrew B. Bloomer, Esq.

GOODWIN PROCTER LLP, Counsel for Post-Closing Ignition Switch Accident Plaintiffs, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, By: William P. Weintraub, Esq. (argued), Gregory W. Fox, Esq.

BROWN RUDNICK, Designated Counsel in the Bankruptcy Case for the Ignition Switch Plaintiffs and Certain Non-Ignition Switch Plaintiffs, Seven Times Square, New York, New York 10036, By: Edward S. Weisfelner, Esq. (argued), Howard S. Steel, Esq.

STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C., Designated Counsel in the Bankruptcy Case for the Ignition Switch Plaintiffs and Certain Non-Ignition Switch Plaintiffs, 2323 Bryan Street, Suite 2200, Dallas, Texas 75201, By: Sander L. Esserman, Esq.

HAGENS BERMAN SOBOL SHAPIRO LLP, Co-Lead Counsel in the MDL Proceeding for the Ignition Switch Plaintiffs and Certain Non-Ignition Switch Plaintiffs, 1918 Eighth Avenue, Suite 3300, Seattle, WA 98101, By: Steve W. Berman, Esq. (argued)

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP, Co-Lead Counsel in the MDL Proceeding for the Ignition Switch Plaintiffs and Certain Non-Ignition Switch Plaintiffs, 275 Batter Street, 29th Floor, San Francisco, CA 94111, By: Elizabeth J. Cabraser, Esq.

GARY PELLER, ESQ., Counsel for the Sesay, Elliott and Bledsoe Plaintiffs and Plaintiffs Tina Farmer and Momoh Kanu, 600 New Jersey Avenue, N.W., Washington, DC 20001, By: Gary Peller, Esq.

ANTHONY LAW FIRM, P.A., Counsel for Plaintiffs James and Reda Moore, 250 Magnolia Street, Spartanburg, South Carolina, By: Kenneth C. Anthony, Jr. Esq., K. Jay Anthony, Esq.

CUTRUZZULA & NALDUCCI, Counsel for Estate of William Rickard, 3300 Grant Building, 310 Grant Street, Pittsburgh, PA 15219, By: Julianne Cutruzzula Beil, Esq.

### DECISION ON IMPUTATION, PUNITIVE DAMAGES, AND OTHER NO-STRIKE AND NO-DISMISSAL PLEADINGS ISSUES

ROBERT E. GERBER, UNITED STATES BANKRUPTCY JUDGE:

#### Table of Contents

Findings of Fact...109

**\*106** 1. Background...109

2. Facts Relevant to Imputation...110

3. Facts Relevant to Punitive Damages...111

The Bankruptcy Court's Role on These Motions...113

Discussion...113

I. The Imputation Issue...114

II. The Punitive Damages Issue...116
A. The Post–Closing Accident Plaintiffs' Three Pathways...117

(1) Pathway # 1: Assumption of Claims for Punitive Damages...117

(2) Pathway # 2: Information "Inherited" by New GM...121

(3) Pathway # 3: Information Obtained by New GM after the Sale...122

B. New GM's Four Contexts...122

(1) Personal Injuries in Post-sale Accidents Involving Vehicles Manufactured by Old GM...122

(2) Personal Injuries in Post–Sale Accidents Involving Vehicles Manufactured by New GM...123

(3) Non–Product Liabilities Claims (in both personal injury and economic loss complaints) involving vehicles manufactured by Old GM "and/or" New GM...123

(4) Assertedly Independent Claims that Are In Reality Retained Liabilities of Old GM...125

III. Particular Allegations in Marked Pleadings...126
A. The Bellwether Actions Complaints...126

(1) Pink—"Allegations that wrongly assert New GM is the successor of Old GM"...126

(2) Orange—"Allegations related to punitive damages, which were not assumed by New GM"...127

(3) Blue—"[A]llegations seeking to impute wholesale Old GM's knowledge to New GM"...127

(4) Green—"[A]llegations involving Claims that are Old GM Retained Liabilities"...128

(5) Yellow—"[A]llegations based on New GM's conduct relating to a supposed failure to warn after the vehicle sale"...129

B. The MDL Complaint...129

(1) Blue—"[N]amed plaintiffs and plaintiff classes/ subclasses asserting claims based on Old GM vehicles"...129

(2) Yellow—"[A]llegations based on Old GM conduct that support claims for Retained Liabilities"...132

(3) Pink—"[C]laims alleging that New GM committed fraud in connection with Old GM's bankruptcy"...133

(4) Orange—[C]laims alleging plaintiffs are entitled to contractual damages as third-party beneficiaries of the Sale Agreement."...136

C. The States Complaints...136

(1) Yellow—Allegations based on Old GM conduct...136

(2) Blue—Allegations relating to vehicles manufactured by Old GM...138

D. The Peller Complaints...139

(1) Blue—Allegations Involving Old GM manufactured vehicles...139

(2) Green—Claims Premised on Old GM conduct...140

(3) Yellow—Claims Seeking "to automatically impute Old GM's knowledge to New GM"...141

*107 (4) Pink—Claims Seeking Punitive Damages from New GM with respect to Old GM manufactured vehicles....141

E. Other Complaints...141

(1) "Failure to Recall/Retrofit Vehicles"...141

(2) "Negligent Failure to Identify Defects or Respond to Notice of a Defect"...141

(3) "Negligent Infliction of Economic Loss and Increased Risk"...142

(4) "Civil Conspiracy"...142

(5) "Section 402B—Misrepresentation by Seller"...142

(6) Claims Based on Pre–Sale Accidents...143

Conclusion...143

In this contested matter in the chapter 11 case of Debtor Motors Liquidation Company, previously known as General Motors Corporation ("**Old GM**"), the Court once again has to address litigation brought against General Motors LLC ("**New GM**"), the buyer of Old GM's assets in a free-and-clear sale. After having entered a judgment, dated June 1, 2015 (the "**Judgment**"),[1] implementing its April 2015 decision[2] addressing the litigation flowing from New GM's announcement of a defect (the "**Ignition Switch Defect**") in ignition switches installed in certain GM branded cars, the Court now must determine the extent to which the April Decision and Judgment bar particular claims (and particular allegations) in complaints in other courts in which claims are asserted against New GM.

In particular—and acting in a "gatekeeper" function in which the Court does not decide nonbankruptcy issues involving the merits of plaintiffs' claims[3]—the Court here must decide:

(1) the extent to which knowledge of New GM personnel who came over from Old GM may be imputed to New GM; whether the contents of documents generated by Old GM personnel and delivered to New GM under the 363 Sale may be deemed, for notice purposes, to be documents of which New GM may be found to have notice as a matter of nonbankruptcy (agency or other) law; and related issues with respect to imputation, including, most significantly, where arguments for imputation should be decided (the "**Imputation Issue**");

(2) the extent to which claims for punitive damages may be based on Old GM knowledge or conduct in actions in which the assertion against New GM of compensatory damages claims is permissible (the "**Punitive Damages Issue**"); and

(3) the extent to which (by reason of the first two issues or other matters) allegations in particular complaints run afoul of the April Decision and Judgment, and thus must be stricken before affected actions may proceed.

For reasons described below, the plaintiffs (and especially the States of California and Arizona) read the limitations of the Judgment too narrowly; while most of **\*108** their claims can properly be asserted, a much smaller number of the factual allegations underpinning those claims can't be, at least in the absence of material amendments to those complaints. Conversely, New GM reads the limitations of the Judgment too broadly, and the plaintiffs can assert considerably more in the way of claims and allegations than New GM contends —though the Court expresses no view on the extent to which claims and allegations that pass muster under the April Decision and Judgment are otherwise actionable under nonbankruptcy law.

For reasons set forth below, the Court rules:

 **[1]**  (1) Under the April Decision and Judgment, knowledge of New GM personnel, whenever acquired, may be imputed to New GM. But knowledge of Old GM personnel may not be imputed to New GM except on assumed Product Liabilities Claims or to the extent that it can be shown (*e.g.,* because it is the knowledge of the same employee or because it was communicated to a New GM employee) that New GM had such knowledge too. Likewise, to the extent, as a matter of nonbankruptcy law, that knowledge may be imputed as a consequence of documents in a company's files, documents in New GM's files may be utilized as a predicate for such knowledge,

even if they first came into being before the sale from Old GM to New GM. By reason of the Court's limited "gatekeeper" role, allegations of that knowledge or notice, even if alleged in general terms, can pass through the "gate," with nonbankruptcy courts determining the extent to which they have been alleged sufficiently specifically to warrant findings of imputation.

 **[2]**   **[3]**  (2) The Court cannot agree with the plaintiffs' contentions that the Sale Agreement unambiguously provides that New GM assumed punitive damages obligations. At best, it is ambiguous. And to the extent the Sale Agreement is ambiguous, the indicia of intent strongly come down against New GM's assumption of punitive damages obligations premised on anything other than its own knowledge and conduct. Thus New GM did not contractually assume liability for punitive damages based on Old GM knowledge or conduct. Nor is New GM liable for punitive damages based on Old GM conduct under other theories, such as by operation of law as a result of New GM's assumption of certain liabilities for compensatory damages. Consequently, under the April Decision and Judgment, punitive damages may not be premised on Old GM knowledge or conduct, or anything else that took place at Old GM. Punitive damages may be sought against New GM to the extent—but only the extent —they are based on New GM knowledge and conduct alone. [4]

(3) Though more than a few of the allegations New GM attacks are benign, many other allegations push the envelope way too far—pleading claims based on New GM's status as a "successor"; pleading paragraph after paragraph of Old GM acts as "background"; asserting that New GM was not "born without sin"; and making other allegations of similar character. Allegations of those types are discussed in the detailed discussion in Part III below. [5] Also, the **\*109** claims in the MDL and *Adams* Complaints seeking to hold New GM responsible for Old GM's failure to give plaintiffs notice in the Old GM chapter 11 case cannot proceed under the April Decision and Injunction because they are in substance successor liability claims "dressed up to look like something else", and for lack of the requisite duty under federal bankruptcy law. The prohibited claims and allegations must be stricken before the prosecution of the affected actions may continue.

The specifics of the Court's determinations, and the bases for them, follow.

*In re Motors Liquidation Company, 541 B.R. 104 (2015)*

### *Findings of Fact*

Here the Court does not need to, nor does it, make Findings of Fact in the traditional sense. The Court is not called upon to decide any of the facts in the underlying litigation; for the most part, the facts relevant here are simply that various claims have been asserted, and allegations have been made. The truth of those allegations (many of which are likely to be disputed) is immaterial here; the issue is solely whether they are permissible. Whether claims and allegations can be made under the April Decision and Judgment (or the Sale Agreement and Sale Order preceding them) turns on what each of the Sale Agreement, the Sale Order, the April Decision and the Judgment said, and how (in any instances of ambiguity) each should be construed or, where applicable, clarified.

Nevertheless, discussion of some relevant background, and quotation of language in the Sale Agreement that is further addressed in the Discussion that follows, is helpful. The Court provides it here.

### *1. Background*

For reasons more fully described in the April Decision and its two immediate successors, [6] the Judgment generally prohibits claims against New GM based on Old GM's acts. But the Judgment permits claims to be asserted against New GM to the extent that claims (like Product Liabilities Claims) were contractually assumed under the Sale Agreement, or are "**Independent Claims**"—claims based solely on New GM's alleged wrongful conduct.

As the Court thereafter noted in another decision [7] (in which it ruled that it would not construe the Judgment to enjoin plaintiffs' efforts to seek withdrawal of the reference on the issues addressed in this Decision), [8] that, perhaps inevitably, resulted in a situation in which disputes would arise as to which side of the divide particular allegations in complaints would fall. The Judgment included provisions to adjudicate disputes of that character. It provided for procedures ("**No Strike Pleading Procedures**") to gauge allegations in complaints pending in the MDL and elsewhere against the rules imposed under the April Decision and Judgment. Pursuant to the No Strike Pleading Procedures—with disputes to be heard, at least initially, in the bankruptcy court—litigation elsewhere **\*110** could proceed to the extent, but only the extent, that claims (or allegations supporting claims) weren't violative of the principles set forth in the Decision and Judgment. [9] This Court, in its gatekeeper role, would determine whether disputed allegations would get through the gate.

New GM charges plaintiffs with widespread violations of the principles set forth in the April Decision and Judgment. The plaintiffs disagree. The rulings here determine those issues.

### *2. Facts Relevant to Imputation*

Because the April Decision and the Judgment permitted Economic Loss Plaintiffs to assert Independent Claims against New GM, "based solely on New GM's own, independent, post-Closing acts or conduct" [10] (and also Product Liabilities Claims, with respect to post-Sale accidents, where New GM action or inaction might also be involved), what New GM personnel knew and did after the Sale is of obvious importance.

Under applicable nonbankruptcy law, it's at least arguable that the knowledge of particular New GM employees may be imputed to New GM, or that New GM may be deemed to be on notice of documents in its files. And as admitted by New GM, [11] a great number of Old GM's personnel went over to New GM after the 363 Sale, and many of Old GM's documents did likewise—providing a basis for potential imputation. But because New GM is protected **\*111** under the April Decision and Judgment from claims based on Old GM conduct, the Court must rule on the extent to which those rulings affect the ability to impute to New GM the employees' knowledge carried over from Old GM, or that might result from records that came over from Old GM.

### *3. Facts Relevant to Punitive Damages*

Under the Sale Agreement, New GM contractually assumed only certain liabilities (the "**Assumed Liabilities**") from Old GM. Others (the "**Retained** Liabilities") were not so assumed, and remained liabilities solely of Old GM. The Pre–Closing Accident Plaintiffs (whose claims for Product Liability are already Assumed Liabilities) contend that claims for punitive damages premised on Old GM knowledge or conduct are also among the Assumed Liabilities, and can be asserted along with the compensatory damages that Pre–Closing Accident Plaintiffs have an unquestioned right to seek.

Analysis of that contention requires consideration of what the Sale Agreement said. The section most to the point is Section 2.3, captioned "Assumed and Retained Liabilities." It had two subsections. The first of them, Section 2.3's subsection (a), began:

> The "Assumed Liabilities" shall consist only of the following Liabilities of Sellers: [12]

Section 2.3(a) then went on to list, in individually numbered sub-subparagraphs, 15 kinds of "Liabilities"—a term that likewise was a capitalized defined term, in this case as one of the many defined terms listed (and in many cases defined) in the Sale Agreement's Section 1.1, captioned "Defined Terms." [13]

The 9th of those 15 kinds of Liabilities was:

> all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of death, personal injury or other injury to Persons or damage to property caused by accidents or incidents first occurring on or after the Closing Date and arising from such motor vehicles' operation or performance (for avoidance of doubt, Purchaser shall not assume, or become liable to pay, perform or discharge, any Liability arising or contended to arise by reason of exposure to materials utilized in the assembly or fabrication of motor vehicles manufactured by Sellers and delivered prior to the Closing Date, including asbestos, silicates or fluids, regardless of when such alleged exposure occurs).... [14]

**\*112**   The second of the two subsections of Section 2.3, Section 2.3(b), began, in its first sentence:

> Each Seller acknowledges and agrees that pursuant to the terms of this Agreement, *Purchaser shall not assume,* or become liable to pay, perform or discharge, any Liability of any Seller, whether occurring or accruing before, at or after the Closing, *other than the Assumed Liabilities.* [15]

It then went on to say, in its second sentence:

> In furtherance and not in limitation of the foregoing, and in all cases with the exception of the Assumed Liabilities, *neither Purchaser nor any of its Affiliates shall assume,* or be deemed to have assumed, *any Indebtedness, Claim or other Liability of any Seller* or any predecessor, Subsidiary or Affiliates of any Seller *whatsoever,* whether occurring or accruing before, at or after the Closing, including the following (collectively, the "Retained Liabilities").... [16]

In Section 2.3(b) too, the introductory language was followed by a list. In this instance, it had 16 items, in individually numbered sub-subparagraphs. By reason of the first sentence of Section 2.3(b), all Old GM liabilities that were not Assumed Liabilities, including those not listed, were Retained Liabilities under the Sale Agreement. Among others, the Retained Liabilities listed in the Sale Agreement included "all Liabilities to third parties for Claims based upon Contract, tort or any other basis ..." [17]

Interestingly, neither Section 2.3(a), relating to Assumed Liabilities, nor Section 2.3(b), relating to Retained Liabilities, uses the word "damages" or "Damages" at all. But "Damages" was a defined term in the Sale Agreement, included along with other **\*113** defined terms in Section 1.1. Section 1.1 provided, in relevant part, " 'Damages' means any and all Losses, *other than punitive damages.*" [18] "Losses," in turn, was defined in that same Section 1.1 as:

> any and all Liabilities, losses, damages, fines, amounts paid in settlement, penalties, costs and expenses (including reasonable and

documented attorneys', accountants', consultants', engineers' and experts' fees and expenses). [19]

### The Bankruptcy Court's Role on These Motions

Preliminarily, since arguments made by plaintiffs and New GM tend to understate or overstate the Court's function, the Court needs to clarify its role on these motions, and what it sees as the division of labor between the bankruptcy court and the courts in which the underlying actions are pending.

Here this Court has been called upon to enforce the Sale Order, entered in 2009, and the April Decision and Judgment, issued in April of this year. Those matters, for reasons apparent from the Court's earlier decisions in *Elliott* [20] and *Sesay,* [21] are paradigmatic examples of matters the Court should address itself. And especially when those needs and concerns overlap with issues requiring knowledge of bankruptcy law, [22] those matters are this Court's responsibility. The Court believes that it should not leave for a nonbankruptcy court matters that require interpretation and enforcement of the Court's earlier Sale Order and Judgment (and the Sale Agreement, with which the Court has great familiarity), or call for a bankruptcy court's knowledge of bankruptcy law. But like concerns do not apply to matters of nonbankruptcy law.

The Court's role, then, is a "gatekeeper" role. It should be the court to decide what claims and allegations should get through the "gate," under the Sale Order, April Decision and Judgment. It also should be the court to decide matters of bankruptcy law—especially when bankruptcy law issues are important to deciding what claims can pass through the gate. But the Court will minimize its role beyond that, refraining from deciding issues that are better decided by the MDL court or other nonbankruptcy courts—courts that can (and undoubtedly will) determine whether claims and allegations that get through the gate are otherwise actionable as matters of nonbankruptcy law.

### Discussion

The Court then turns to its rulings on the Imputation and Punitive Damages Issues, *114 and, to the extent not otherwise covered, other aspects of the No–Strike and No–

Dismissal Pleadings whose propriety is raised in the Marked Pleadings.

## I.

### The Imputation Issue

New GM recognizes that it must defend Product Liabilities Claims and Independent Claims on their merits, and that in actions involving each of those, the acts and knowledge of New GM personnel may be imputed to New GM. And New GM also recognizes that in the *Bledsoe Decision*, this Court previously expressed its thinking on imputation (discussed below), in analysis with which New GM doesn't quarrel— which would generally, if not always, permit the imputation of New GM employees' knowledge to New GM, and the use of documents in New GM's files.

But New GM makes a number of other points. New GM argues that there can be no "automatic" imputation, [23] and that any imputation can be found only in the context of individualized allegations, in individualized context. [24] New GM further argues that for imputation to be appropriate, the alleged knowledge to be transferred must relate to a "valid claim" against New GM, [25] and that the Court should determine what is or isn't a valid claim incident to its gatekeeper function.

But while the Court agrees that imputation isn't always warranted in the abstract, and that imputation should be found only in the context of individualized allegations and individualized context, the Court doesn't believe that it is the only court that can properly do that. Disagreeing with New GM in this respect, the Court believes that it is sufficient that this Court state the principles under which imputation is permissible under the Sale Order, the April Decision and the Judgment (which the Court does now, to the extent it hasn't done so before), and that there is nothing wrong with another court applying those principles to particular allegations, in individualized context.

Preliminarily, nobody appears to quarrel with the Court's statements in its *Bledsoe Decision* when speaking of the Court's intent when issuing the April Decision. In the *Bledsoe Decision*, the Court stated:

But what this Court had in mind when it previously ruled as it did should not be in doubt. This Court assumed that things New GM did, or knowledge New GM personnel had when acting for New GM (even if those personnel acquired that knowledge while acting for Old GM) would be fair game. [26]

The Court continued with two examples:

> For example, if such were actionable under applicable nonbankruptcy law, New GM could still be held liable, consistent with this Court's ruling, for **\*115** knowingly installing a part it knew to be defective even if the part had been made by Old GM—just as New GM might be liable for doing that if the part had been manufactured by another manufacturer in the Supplier Chain—and likewise could be held liable for refusing to make a repair that New GM knew had to be made, no matter when its personnel acquired the requisite knowledge. [27]

And the Court further stated that

> New GM would have to live with the knowledge its personnel had from the earliest days they began to serve New GM.... [28]

Those statements described the Court's views when it issued the April Decision and Judgment, and still do.

Perhaps recognizing that, New GM has made the other points described above. The Court cannot agree with New GM's contention that imputation can never be automatic, because under the law of certain states, in certain factual situations, it may be. But New GM is right in its contentions that the propriety of imputation turns on the specifics of the situation. New GM is also right when it argues that imputation must ultimately be found in the context of the imputation of identified individuals or identified documents, for particular purposes. And most importantly, New GM is right when it says that it may not be saddled with imputation of Old GM knowledge to New GM by successorship alone [29] as a

substitute for showing that a fact was actually known to a New GM employee or could be ascertained from New GM's files.

But in actions alleging Product Liabilities Claims and Independent Claims alike, [30] New GM's knowledge may be imputed to it starting with the first day of its existence. The Court's rulings permit allegations in pleadings starting with "New GM knew ..." or "New GM was on notice that...." Plaintiffs asserting such claims may as a matter of this Court's gatekeeper role then complete the sentences as they see fit.

With those principles in mind, the Court then turns to whether it personally (or any successor bankruptcy judge) must be the one to apply the principles laid out earlier and here to particular allegations (or to deal with them as they might come up later in depositions or trial), on the one hand, or whether that appropriately may be done by the judges managing the plenary actions themselves, on the other. The latter is sufficient; there is no need for this Court to micromanage the process **\*116** beyond what it has said previously and in this Decision.

Here the Court has laid out the determinative principles, and in Section III below, speaks of their general application to the most significant pleadings: the Bellwether Actions Complaints, the MDL Complaint, the States Complaint, and the Peller Complaints. The nonbankruptcy courts hearing those claims and allegations will then be free to decide (and this Court assumes they will decide), the remaining issues—the extent to which plaintiffs must identify specific matters alleged to be known, by whom and by what means, and the legal ground rules necessary to establish imputation as a matter of nonbankruptcy law. Having here provided what other judges will need, the Court considers it unnecessary and inappropriate to say anything more. [31]

Undoubtedly, similar issues will arise hereafter, with respect to other complaints, depositions or trials. But especially since the Court agrees with New GM that imputation matters must be decided in context, there is little reason for this Court to try to rule on issues that haven't arisen yet, or to assume that any other judges might not abide by this Court's rulings.

## II.

### The Punitive Damages Issue

The Court then turns to the extent to which claims for punitive damages can rest on conduct by Old GM, or on vehicles manufactured by Old GM. As New GM describes the context in which the punitive damages issues arise, [32] they come up where punitive damages are based in lawsuits:

> (i) for personal injuries from accidents after the 363 Sale involving vehicles manufactured by *Old GM* ;

> (ii) for personal injuries from accidents after the 363 Sale involving vehicles manufactured by *New GM* ;

> (iii) involving non-Product Liabilities Claims (in both personal injury and economic loss complaints) involving vehicles manufactured by *Old GM* "and/or" *New GM* ; and

> (iv) "that purport" to assert Independent Claims that New GM argues "are, in reality," [33] Retained Liabilities of Old GM.

But those four categories are only scenarios in which punitive damages issues *matter* ; they don't necessarily provide the framework for the analysis as to the extent to which punitive damages claims against New GM can rest on Old GM conduct, or otherwise be recoverable. With respect to the latter (and principally in the context of personal injury claims, which are at least largely Product Liabilities Claims), the Post–Closing Accident Plaintiffs argue that punitives can be recovered from New GM based on Old GM conduct by three "pathways"—assertedly because:

> **\*117**  (i) claims for punitive damages were contractually assumed by New GM under the Sale Agreement, and thus that "all of Old GM's conduct is fair game"; [34]

> (ii) even without contractual assumption of liability for punitive damages, punitive damages can be recovered based on Old GM knowledge or conduct in instances where information about such Old GM conduct was "inherited" by New GM; [35] and

> (iii) there could have been "information developed solely by New GM post-sale." [36]

For the reasons discussed below, reliance on the first pathway is unpersuasive. But the Court agrees as to each of the second and the third.

In light of the two sides' different presentations of the issues, the Court turns first to the Post–Closing Accident Plaintiffs'

three "pathways." It then discusses how that analysis affects the claims against New GM in the four contexts listed by New GM.

## A. The Post–Closing Accident Plaintiffs' Three Pathways

### (1) Pathway # 1: Assumption of Claims for Punitive Damages

The Post–Closing Accident Plaintiffs first argue that New GM contractually assumed claims for punitive damages. The Court finds that contention unpersuasive. It can't agree with the Post–Closing Accident Plaintiffs' contention that the Sale Agreement unambiguously so provides. And once it looks at the totality of the contractual language, and extrinsic evidence, and employs common sense, it must agree with New GM's contention that New GM neither agreed to, nor did, contractually take on Old GM's punitive damages liability.

The Post–Closing Accident Plaintiffs make two principal points with respect to their contention that Old GM's punitive damages liability was contractually assumed, and unambiguously so. They argue that New GM agreed, in Section 2.3(a)(ix), to assume "*all* 'Liabilities,' " and that under the Sale Agreement's broad definition of Liabilities, punitive damages were thereby contractually assumed. And as reinforcing that conclusion, they argue further that if New GM wanted punitive damages excluded, it easily could have said so, and New GM's failure to affirmatively exclude punitive damages from its Assumed Liabilities makes New GM liable for them. Neither argument is persuasive.

The starting point for this analysis, not surprisingly, is the language employed in the Sale Agreement—the language that the Post–Closing Accident Plaintiffs argue is unambiguously in their favor. All agree as to the importance of Sale Agreement Section 2.3(a)(ix)—the subsection defining the particular Assumed Liabilities that are at issue here—and Section 1.1, in which "Liabilities" is defined. But that is not the only relevant language. The Court also must focus on the lead-in language at the  **\*118**  beginning of Section 2.3(a), and also, importantly, 2.3(b), to which the Post–Closing Accident Plaintiffs give much less attention. The former says that Assumed Liabilities "shall consist *only* of the following Liabilities of Sellers." [37] And even apart from Section 2.3(a)'s use of the word "only," Section 2.3(a) must be read in conjunction with the subsection that follows it, Section 2.3(b), which importantly says that:

> Purchaser *shall not assume,* or become liable to pay, perform or discharge, *any Liability of any Seller,* whether occurring or accruing before, at or after the Closing, *other than the Assumed Liabilities.* [38]

Thus, under this drafting structure, unless a liability was covered as an Assumed Liability under Section 2.3(b), New GM did *not* assume it. That effectively defeats one of the Post–Closing Accident Plaintiffs' two principal arguments—that punitive damages should be allowed because they easily could have been expressly stated in the Sale Agreement to be excluded. The Court has little doubt that such an exclusion could have been more expressly stated—perhaps easily, and perhaps "for the avoidance of doubt," as lawyers increasingly say—but express mention of punitive damages was unnecessary to foreclose them, because under the structure of the Sale Agreement, Section 2.3(b) effectively established a default result, causing liabilities not to be assumed unless they were included as Assumed Liabilities in Section 2.3(a).

Then, turning back to Section 2.3(a), and its subsection 2.3(a)(ix), one must focus on what the latter says in its entirety. Taking the same language of Section 2.3(a)(ix), but reformatting it for ease of understanding and adding identifiers in the text for easy reference, it provides:

[1] (ix) all Liabilities

[2] to third parties

[3] for death, personal injury, or other injury to Persons or damage to property caused [a] by motor vehicles designed for operation on public roadways or [b] by the component parts of such motor vehicles

[4] and, in each case, manufactured, sold or delivered by Sellers (collectively, "*Product Liabilities*"),

[5] which arise directly out of death, personal injury or other injury to Persons or damage to property [a] caused by accidents or incidents first occurring on or after the Closing Date and [b] arising from such motor vehicles' operation or performance

[6] (for avoidance of doubt, Purchaser shall not assume, or become liable to pay, perform or discharge, any Liability arising or contended to arise by reason of exposure to

materials utilized in the assembly or fabrication of motor vehicles manufactured by Sellers and delivered prior to the Closing Date, including asbestos, silicates or fluids, regardless of when such alleged exposure occurs)....

The Post–Closing Accident Plaintiffs rely on the words "All Liabilities," in Clause [1], but without sufficient regard to the remainder. As with another controversy in this case, [39] in which the Court dealt with a very similar contention, [40] the **\*119** Court must give due recognition to the fact that the phrase "all Liabilities" does not exist alone. And like the words "arising under" that were the subject of the similar analysis in the *Castillo Decision,* "it has no meaning of its own. Its coverage can be discerned only by examining the words that follow it." [41]

Here, as in the *Castillo Decision,* the words "all Liabilities" in Section 2.3(a)(ix) do not exist in isolation. They have meaning only with respect to the words that follow them, and cover only the subset of "all Liabilities" there listed. They cover only those Liabilities that are covered under the words that follow them—those that satisfy each of the requirements of Clauses [2], [3], [4] and [5]. [42] Of particular importance is the requirement of Clause [3]—that the Liabilities be for "death, personal injury, or other injury to Persons or damage to property...." [43] Claims for punitive damages, which are not to compensate for any of those injuries, but rather accomplish other societal goals, fail that test.

Thus the Court cannot conclude that punitive damages are for "death, personal injury, or other injury ....," [44] or, at least, conclude that they are unambiguously so. If one relies on plain meaning alone, punitive damages cannot be said to be covered within the meaning of Section 2.3(a)(ix).

But Section 2.3(a)(ix) doesn't mention punitive damages in express terms. The Court does not believe this fact alone makes Section 2.3(a)(ix) ambiguous. But if one assumes, nevertheless, that Section 2.3(a)(ix) is ambiguous, the extrinsic evidence (well supported in the records of Old GM's chapter 11 case and findings in this Court's earlier opinions which the plaintiffs do not dispute) overwhelmingly weighs against New GM's assumption of Old GM's punitive damages obligations:

- New GM assumed liability for post-Sale Product Liabilities Claims as a response to concerns voiced by states' Attorneys General ("**AGs**") and others as to

In re Motors Liquidation Company, 541 B.R. 104 (2015)

the unfairness of depriving "presently unknown and unknowable future claimants of their rights to bring a future products liability claim." [45] But they never **\*120** asked this Court to require New GM to assume anything more than compensatory damages, and in none of those submissions was punitive damages mentioned.

• Because ridding itself of legacy liabilities was important to its future economic viability, New GM agreed to assume Old GM obligations only to the extent commercially necessary [46]—which liabilities for compensatory damages were, but punitive damages were not. [47]

• Since punitive damages punish past conduct (which, for Liabilities to be assumed, would by definition have been Old GM's, not New GM's), and deter future wrongdoing (which could not occur in the case of a liquidating Old GM), imposing punitives for Old GM conduct would not be consistent with punitive damages' purposes; [48] claims for punitive damages if asserted against Old GM would have been at least subordinated, if not disallowed, as they would only penalize innocent creditors (and, in either event, out of the money, given Old GM's deep insolvency), thus making it implausible to suggest that New GM would ever have intended to assume them anyway.

• Creditors of Old GM, who would receive stock of New GM following the 363 Sale, would not want to receive stock of an entity subject to potentially massive assumed punitive damages exposure.

• In the only place in the Sale Agreement that punitive damages are mentioned, as part of the definition for "Damages" in Section 1.1, "Damages" are defined as "any and all Losses, *other than punitive damages.*" [49] And finally,

• The notion that anyone would choose to assume millions, if not billions, of dollars of punitive damages exposure—especially without mentioning it—is entirely implausible.

**\*121** Thus, both by resort to normal textual analysis and extrinsic evidence, the Court comes to the same conclusion—that New GM did not contractually assume punitive damages claims. [50]

And just as the Court concludes that liability for punitive damages was not contractually assumed by New GM, neither was such liability effectively assumed by New GM as a matter of law as a result of New GM's assumption of certain liabilities for compensatory damages. The two types of damages claims are fundamentally distinct. As New GM properly observes, [51] punitive damages serve a very different purpose than compensatory damages do, [52] and are of a fundamentally different character. [53] "Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor ... and to deter him and others from similar extreme conduct." [54] As the Supreme Court has explained:

> Although compensatory damages and punitive damages are typically awarded at the same time by the same decisionmaker, they serve distinct purposes. The former are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct. The latter ... operate as "private fines" intended to punish the defendant and to deter future wrongdoing. [55]

### (2) Pathway # 2: Information "Inherited" by New GM

As to Pathway # 2, however, Plaintiffs are on considerably stronger ground. For the reasons just discussed, New GM did not assume Product Liabilities Claims. Thus while New GM may be held liable for *compensatory* damages on Product Liabilities Claims based on Old GM conduct, New GM conduct or both, Post–Closing Accident Plaintiffs can base their claims for *punitives* only on New GM conduct or **\*122** knowledge. Similarly, Independent Claims against New GM can't be based, for either compensatory or punitive damages purposes, on Old GM knowledge and conduct, because damages of any character on Independent Claims must be based solely on New GM's knowledge and conduct.

But on Product Liabilities Claims and Independent Claims alike, New GM may be held responsible, on claims for both compensatory and punitive damages, for its *own* knowledge and conduct. Under the Pathway # 2 scenario, New GM might have acquired relevant knowledge when former Old GM employees came over to New GM or New GM took

custody of what previously were Old GM records. Reliance on that, for punitive damages purposes, is permissible.

The Post–Closing Accident Plaintiffs refer to knowledge New GM might have acquired in that fashion as "inherited" information, and the Court finds that shorthand to be as good as any. It is possible that New GM may have inherited information from Old GM very soon after the 363 Sale. The Court does not know that to be the case–because any such knowledge would have to be acquired in fact, and not by operation of law (such as any kind of successorship theory). But to the extent New GM employees actually had knowledge relevant to post-Sale accident claims or Independent Claims (even if it was inherited), plaintiffs in actions asserting such claims are free to base punitive damages claims on evidence of such knowledge to the extent nonbankruptcy law permits.

### (3) Pathway # 3: Information Obtained by New GM after the Sale

Information obtained by New GM after the Sale, argued by the Post–Closing Accident Plaintiffs to be usable under Pathway # 3, may be used for punitive damages purposes as well. Here the analysis is very similar to that with respect to Pathway # 2—the only differences being how and when New GM obtained any information.

The extent to which such after-acquired information is relevant to punitive damages claims is a matter of nonbankruptcy law, as to which the Court expresses no view. The Court rules simply that evidence of information obtained by New GM after the sale "gets through the gate," and may be relied upon, for punitive damages purposes, to the extent otherwise appropriate in the underlying actions. [56]

### B. New GM's Four Contexts

Based on the Court's conclusions in the preceding analysis, it then lays out how those conclusions apply in the four contexts identified by New GM.

### (1) Personal Injuries in Post-sale Accidents Involving Vehicles Manufactured by Old GM

As discussed above, though Product Liabilities *compensatory damages* claims involving vehicles manufactured by Old GM were contractually assumed by New GM  **\*123**  (and thus are permissible under the Sale Order, April Decision, and Judgment), *punitive damages* claims were not. Thus punitive

damages in such actions may not be premised on anything Old GM knew or did.

Nevertheless, as also discussed above, punitive damages may still be sought in actions based on post-Sale accidents involving vehicles manufactured by Old GM to the extent the punitive damages claims are premised on New GM action or inaction after it was on notice of information "inherited" by New GM, or information developed by New GM post-Sale.

### (2) Personal Injuries in Post–Sale Accidents Involving Vehicles Manufactured by New GM

Personal injury compensatory damages claims against New GM involving vehicles manufactured by New GM never were foreclosed under the Sale Order, and remain permissible under the April Decision and Judgment. Claims of this character get past the bankruptcy court gate.

Claims against New GM for punitive damages with respect to vehicles manufactured by New GM were not a focus of the briefing and argument before the Court. Nevertheless, the Court recalls its understandings when it issued the April Decision and Judgment. Claims against New GM for punitive damages involving New GM manufactured vehicles likewise were never foreclosed under the Sale Order, and likewise remain permissible under the April Decision and Judgment. They too get past the bankruptcy court gate.

Though the distinction might not make much of a difference, [57] the underlying allegations, and evidence, used to support punitive damages claims involving New GM manufactured cars can be anything appropriate under nonbankruptcy law—including, if otherwise appropriate, not just information "inherited" by New GM or developed by New GM post-Sale, but also evidence of Old GM pre-Sale knowledge and conduct. That is so because the Sale Order never professed to affect claims against New GM with respect to New GM manufactured cars in any way.

### (3) Non–Product Liabilities Claims (in both personal injury and economic loss complaints) involving vehicles manufactured by Old GM "and/or" New GM

This issue requires four separate answers, with respect to four separate scenarios—involving Non–Product Liabilities Claims in: (a) personal injury actions involving vehicles manufactured by (i) Old GM and (ii) New GM; and (b) Economic Loss and other actions (such as State Cases)

involving vehicles manufactured by (i) Old GM and (ii) New GM. All four scenarios share the common characteristics that none of the claims in any of these scenarios were assumed—though for claims involving vehicles manufactured by New GM, the Court does not see why they would need to be. And for claims involving New GM manufactured cars, they would not need to be assumed whether the claims were for compensatory damages, on the one hand, or punitive damages on the other.

**\*124** Here the focus is on punitive damages claims. The consequences of the Court's rulings in the April Decision and this Section II with respect to punitive damages in each of these four Non–Product Liabilities scenarios follow.

### (a)(i) Personal Injury Actions–Old GM Manufactured Vehicles

Because only Product Liabilities claims were assumed by New GM, other claims involving Old GM manufactured vehicles—including claims for compensatory damages on other causes of action and, as discussed above, for punitive damages—are Retained Liabilities. New GM is not responsible for them except to the extent that they are premised solely on its own conduct.

That means that with respect to post-Sale Non–Product Liabilities claims asserted in actions involving personal injuries suffered in vehicles manufactured by Old GM, punitive damages may be assessed to the extent, but only the extent, they are premised on *New GM* knowledge and conduct. That permits reference to inherited knowledge, as discussed beginning at page 27 above, and to knowledge acquired after the 363 Sale, as discussed beginning at page 28 above. But punitive damages sought as an adjunct to claims in this category may not rely on the conduct of Old GM—and this is true, as always, with respect to both allegations in pleadings and any evidence of such.

### (a)(ii) Personal Injury Actions–New GM Manufactured Vehicles

For claims involving vehicles manufactured by *New GM,* plaintiffs do not need the Court's permission to assert claims for non-Product Liabilities compensatory damages claims any more than they need the Court's permission to assert claims for Product Liabilities; again, the Sale Order did not foreclose claims against New GM involving New GM manufactured vehicles, and compensatory damage claims (on whatever theory) with respect to New GM manufactured

vehicles may proceed against New GM without interference from the bankruptcy court. Nor, for reasons discussed at page 29 above, do plaintiffs need the Court's permission to assert punitive damages claims incident to non-Product Liabilities Claims involving New GM manufactured vehicles.

With respect to the *evidence used to support* punitive damages claims in actions involving New GM manufactured vehicles, the Court's analysis is similar. Evidence of inherited knowledge and knowledge acquired after the 363 Sale gets past the bankruptcy court gate; that is simply knowledge New GM had before the accident took place. And for reasons set forth on page 30, relevant evidence of Old GM knowledge and conduct gets past the bankruptcy court gate as well.

### (b)(i) Economic Loss Actions–Old GM Manufactured Vehicles

As discussed in Section II(B)(3)(a)(i) above, because claims only for Product Liabilities were assumed, other claims involving Old GM manufactured vehicles are Retained Liabilities. New GM is not responsible for them except to the extent that they are premised solely on its own conduct, and hence may be regarded as Independent Claims.

And that is true for punitive damages claims just as it is for compensatory damages claims—and for both the assertion of claims for punitive damages and the evidence that might support them. Thus claims for punitive damages arising from Economic Loss actions involving Old GM manufactured vehicles cannot be asserted except for any that might be recoverable in connection with Independent Claims, **\*125** and then based only on New GM knowledge and conduct. The same is true with respect to the evidence that might be offered to support those punitive damages claims.

New GM then says that it cannot be that for vehicles already manufactured and sold before New GM came into existence, any Independent Claims for Economic Loss can lie. [58] And New GM asks this Court to rule, here and now, that such claims cannot lie, and thus to declare that they cannot pass through the bankruptcy court gate.

The Court well understands New GM's point, but also understands, and ultimately agrees with, the Plaintiffs' contention that determining whether such claims can lie is matter of nonbankruptcy law, and not for this Court to decide. This Court thus agrees that it is better decided by the judge(s)

hearing the nonbankruptcy claims that have passed through the bankruptcy court gate.

### (b)(ii) Economic Loss Actions–New GM Manufactured Vehicles

Here, by contrast, Economic Loss Claims with respect to New GM manufactured vehicles—which by definition were manufactured after New GM came into being—were not proscribed by the Sale Order. Nor did the Sale Order proscribe punitive damages claims sought in actions against New GM for Economic Loss involving New GM vehicles.

The gatekeeping determination for punitive damages in Economic Loss actions involving New GM manufactured vehicles is analytically the same as that applicable to non-Product Liabilities Actions involving vehicles manufactured by New GM. Punitive damages claims may be asserted here too. The evidence used to support such punitive damages claims may include evidence of inherited knowledge; of knowledge acquired after the 363 Sale; and, if the nonbankruptcy court regards such as appropriate, any relevant Old GM knowledge and conduct as well. With respect to any punitive damages claims in Economic Loss actions involving New GM vehicles, everything passes through the bankruptcy court gate.

### (4) Assertedly Independent Claims that Are In Reality Retained Liabilities of Old GM

New GM's fourth scenario, put forward in the context of discussion of punitive damages, applies in actuality to claims for punitive and compensatory damages alike. The focus here is on the punitive damages aspects, but the principles do not differ.

To the extent that any claims against New GM involving *Old GM* manufactured vehicles are for Product Liabilities Claims or genuinely Independent Claims, the rules discussed in Sections II(B)(3)(a)(i) and (b)(i), respectively, apply; punitive damages may be sought in connection with them, but the evidence supporting such claims can be based only on New GM knowledge and acts. That evidence can include inherited knowledge and knowledge acquired after the 363 Sale, but not any acts, or non-inherited knowledge, of Old GM. This issue does not arise in connection with claims against New GM involving vehicles New GM itself manufactured.

It should be self evident, as New GM argues, that plaintiffs cannot proceed with "purportedly Independent Claims" that

really are "Retained Liabilities of Old GM." But the real issue is whether, in light of the rulings here, which reflect more detailed discussion of the Court's earlier **\*126** rulings, claims are or are not independent, and supporting evidence is or is not admissible. [59]

To the extent forbidden claims and allegations have been brought to the Court's attention, the Court addresses them in Section III below. To the extent they haven't yet been brought to this Court's attention, but New GM wishes objections to such to be heard, they can be heard by the judges hearing the nonbankruptcy cases.

### III.

#### Particular Allegations in Marked Pleadings

The Court then turns to the propriety of particular allegations in particular complaints, as objected to by New GM using marked pleadings to identify particular objections by category.

### A. The Bellwether Actions Complaints

New GM identifies five categories of allegations in the Bellwether Marked Complaints, highlighted by color, that New GM contends are violative of the Sale Order, the April Decision, the Judgment, or some combination of them. Taking them by color and by New GM's stated objection to them, the Court rules as follows:

### (1) Pink—"Allegations that wrongly assert New GM is the successor of Old GM"

In its Pink Category, New GM objects to allegations in many complaints stating in words or substance that they assert claims against New GM "as a successor and mere continuation of General Motors Corporation." [60] In some instances (by reason of less blatantly offensive language, or because the underlying context would be the assertion solely of assumed Product Liabilities Claims), [61] New GM's objection would be a technical one, and in the view of some, hyper-technical. [62] But in other instances—such as the language in *Cockram* just quoted—the violation is egregious, and the plaintiffs' counsel should have known better. New GM's objections to allegations of this character (referring to New GM as "successor" and, especially, as a "mere

In re Motors Liquidation Company, 541 B.R. 104 (2015)

continuation," code words for imposing successor liability)
—both the egregious violations (as in *Cockram* ) and those
that are more technical—must be, and are, sustained. Those
allegations do not pass the gate, and the affected complaints
remain stayed unless and until they are amended consistent
with the Court's rulings.

A variant of that—but equally offensive—is the apparently
intentional use by **\*127** many plaintiffs of allegations that
do not distinguish between Old GM and New GM, and that
continue to refer to "General Motors" or "GM," which to
almost anyone would muddy the distinction. In light of the
Sale Order and all of the rulings that have followed it, the
offending counsel, once again, should know better. The Court
sustains New GM's objections to that practice. Complaints
using that formulation will remain stayed unless and until they
are amended to cure violations of that character. [63]

As noted in the April Decision, plaintiffs' complaints may
say, without using code words as euphemisms for imposing
successor liability, or muddying the distinctions between Old
GM and New GM, that New GM purchased the assets of Old
GM; that New GM assumed product liability claims from Old
GM; and that New GM acquired specified knowledge from
Old GM. But allegations of the types discussed above cross
the line—and in some instances go way past the line–and
cannot be made.

### (2) Orange—"Allegations related to punitive damages, which were not assumed by New GM"

In its Orange Category, New GM objects to claims against it
for punitive damages in connection with accidents involving
Old GM manufactured vehicles. For reasons discussed
above, the Court agrees with New GM in part, but only
in part. The Court has ruled that claims for punitive
damages with respect to Old GM manufactured vehicles—
even where compensatory damages might legitimately be
sought for Product Liabilities Claims—were not assumed.
Thus, punitive damages in such cases cannot be based on pre-
Sale Old GM conduct, or evidence of such.

But the Court has also ruled that New GM may still be liable
for punitive damages based on knowledge it inherited from
Old GM, and any knowledge it developed after the 363 Sale.
Punitive damages may be sought in accident cases involving
Old GM manufactured vehicles to the extent the factual
allegations and evidence supporting the punitive damages
claims are consistent with these rulings.

### (3) Blue—"[A]llegations seeking to impute wholesale Old GM's knowledge to New GM"

In its Blue Category, New GM objects to imputation "on
a wholesale basis" of knowledge of events that took place
at Old GM, or information contained in Old GM's books
and records. The Court has addressed these objections above
as well. For reasons discussed above, the Court agrees
that imputation is context specific, but assumes that under
the nonbankruptcy law that will be applied in the actions
pending against New GM, the acts and **\*128** knowledge of
employees will often be imputed to the principal. The Court
assumes that likewise to be true with respect to notice of
documents within a company's files.

But the Court has further held that it considers these
nonbankruptcy law issues inappropriate for its determination.
It has ruled simply that allegations of imputation to New
GM premised on the knowledge of New GM employees, or
documents in New GM's files, get through the bankruptcy
court gate. After that, issues as to the propriety of imputation
in particular contexts in particular cases are up to the judges
hearing those cases.

### (4) Green—"[A]llegations involving Claims that are Old GM Retained Liabilities"

In its Green Category, New GM objects to claims against it
"involving claims that are Old GM Retained Liabilities." [64]
This refers to particular kinds of claims not apparent from the
generalized reference just quoted—aims involving vehicles
manufactured by Old GM *other than Product Liabilities
claims,* such as fraud, negligent representation, duty to warn
after the vehicle's sale, and violation of consumer protection
statutes at the time of sale.

New GM relies on the language of Section 2.3(a)(ix), quoted
on page 21 above, defining Assumed Liabilities. New GM
argues that claims with respect to Old GM manufactured
vehicles other than Product Liabilities claims were not
assumed, and that insofar as Old GM manufactured vehicles
are concerned, New GM is liable for Product Liabilities only.

The correctness of that assertion turns on the definition of
"Product Liabilities," as defined in Section 2.3(a)(ix). Upon
review of that section, the Court agrees with New GM in
material part but not in full. As discussed above, [65] the
language "all Liabilities" in Clause [1] of that subsection

was applicable to particular kinds of liabilities, set forth in the clauses that followed it. Of relevance here is Clause [3], which limits New GM's assumption of Old GM Liabilities to those "for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles ..." Claims based on fraud and consumer protection statutes are not for "death" or "personal injury," and their nexus to any death or personal injury that might thereafter follow is too tangential; many might be victimized by fraud or consumer protection violations without subsequent death or injury. And claims for fraud and violations of consumer protection statutes might somewhat plausibly be argued to be for "other injury to Persons," but they still would not be "caused by motor vehicles." They would be caused by the statements or omissions under which the fraud and consumer protection claims arose. These claims cannot be regarded as Assumed Liabilities, and do not get through the gate.

It should be noted, however, that in listing claims that weren't assumed, the Court did not list claims for alleged breaches of a duty to warn. If there were a duty, under nonbankruptcy law, to warn of the danger of driving a motor vehicle with a known defect, the violation of that duty to warn, when coupled with subsequent death or injury, might reasonably be argued to have had a causal effect on any death or personal injury that could have been avoided by the warning. Violations of any duty to warn could be said to provide further support for any claims for death or personal injury that would be **\*129** actionable even as classic Product Liabilities Claims. The Court expresses no view as whether, as a matter of nonbankruptcy law, failures to warn are actionable, or whether the requisite duties exist. But they pass muster under Clause [3] and get through the bankruptcy court gate.

In addition, some allegations highlighted in green aren't subject to the above analysis [66] because they charge New GM with violations of alleged duties that they assert New GM had to purchasers of earlier purchased vehicles. New GM can argue before other courts that such duties do not exist (or assert any other merits-based defenses to these allegations), but claims of this character that are based on New GM's own conduct and knowledge also get through the bankruptcy court gate.

*(5) Yellow—"[A]llegations based on New GM's conduct relating to a supposed failure to warn after the vehicle sale"*

Finally, in its Yellow Category, New GM objects to allegations underlying a different kind of failure to warn claim—here, alleged failures to warn by *New GM* prior to any accidents, as contrasted with alleged failures by Old GM. Here the Court does not need to determine whether such claims were assumed, as they rest on conduct allegedly on the part of New GM itself. But New GM contends that once it purchased Old GM's assets free and clear of claims and obligations relating to Old GM vehicles, it did not have any ongoing duties to Old GM vehicle owners other than Assumed Liabilities.

The Court doesn't know this to be true, and doesn't believe it to be properly within the Court's province to decide whether it is. The issue is one of nonbankruptcy law—whether New GM, as an entity that did not manufacture or sell the vehicle, had a duty, enforceable in damages to vehicle owners, to notify people who had previously purchased Old GM vehicles of the Ignition Switch Defect. [67] Consistent with its role as a gatekeeper, the Court does not decide this issue of nonbankruptcy law either, and does not block the claim based on predictions as to how another court might decide it. This Court leaves the issue to the court hearing the Bellwether actions.

**B. The MDL Complaint**
The Court then engages in a like analysis of claims alleged in MDL Complaint. That analysis, once more broken down by New GM's color coding, follows.

*(1) Blue—"[N]amed plaintiffs and plaintiff classes/ subclasses asserting claims based on Old GM vehicles"*
In its Blue Category, New GM objects to claims in the MDL Complaint that it says are in fact successor liability claims, notwithstanding assertions to the contrary by plaintiffs asserting those claims. The claims in question, New GM asserts, were asserted in an earlier Economic Loss complaint **\*130** on behalf of Old GM vehicle purchasers called the Pre–Sale Consolidated Complaint (now abandoned), and then carried over, assertedly with little or no modification, into the Second Amended Complaint that now is the MDL Complaint. [68] New GM continues that the plaintiffs "improperly attempted to sidestep the Judgment by including the same proscribed claims of pre–363 Sale plaintiffs in the MDL Complaint." [69]

The plaintiffs don't dispute that the claims in the Pre–Sale Consolidated Complaint effectively moved to the MDL Complaint, but argue that this Court should conclude that those allegations may nevertheless get through the gate as Independent Claims—premised on alleged New GM violations of duty after the vehicles were originally manufactured and sold by Old GM. The Court well understands New GM's frustration, but New GM's request that this Court strike all of the claims of those originally covered under the Pre–Sale Consolidated Complaint is overkill. The Court concludes instead that Economic Loss Claims of Ignition Switch Plaintiffs [70] that once appeared in the Pre–Sale Consolidated Complaint can get through the bankruptcy court gate so long as they are genuinely Independent Claims—and where they then will be subject, of course, to determinations in the MDL as to the nature and extent of New GM duties to purchasers of Old GM manufactured vehicles, and whether MDL plaintiffs state causes of action under the applicable nonbankruptcy law.

With respect to vehicles manufactured by Old GM, the Ignition Switch Plaintiffs recognize that they can't premise their claims on anything done by Old GM.[71] **\*131** Plaintiffs instead allege claims crafted on the premise that New GM still had duties to owners of cars manufactured by Old GM before New GM came into existence, and that there are private rights of action by vehicle owners for violations of any such duties. To the extent New GM had the requisite duties, the claims are in fact Independent Claims, as the plaintiffs argue. So the issue then turns on whether *this Court* should rule on the nature and extent of the duties upon which the prosecution of the assertedly Independent Claims would rest (and, if so, whether there are private rights of action for the violations of any such duties), or whether the MDL Court should do so instead.

For reasons previously discussed, this Court believes those issues are best determined by the MDL Court. Where this Court has been asked to construe its own opinions, orders or judgments that invoke this Court's knowledge of earlier proceedings in this case, or to address matters invoking this Court's knowledge of bankruptcy law, this Court has addressed those issues itself. But on nonbankruptcy matters (and matters involving determination of the existence of duties under state and federal law that are predicates to the imposition of liability in the MDL [72] are paradigmatic **\*132** examples of this), those issues, in this Court's view, should be determined by the MDL Court.[73]

### (2) Yellow—"[A]llegations based on Old GM conduct that support claims for Retained Liabilities"

In its Yellow Category, New GM objects to what it argues is improper allegations of Old GM conduct—objecting to

> (a) allegations of Old GM conduct prefaced by words like "New GM knew that" (arguing that plaintiffs cannot circumvent the Judgment "simply by adding a four-word preface to allegations asserted in prior iterations of the MDL Complaint that were held to be barred by the Sale Order");
>
> (b) allegations by which conduct of Old GM employees is imputed, "automatically and wholesale," into a complaint purportedly brought against New GM"; and
>
> (c) allegations containing references to "GM" alone, that merge references to Old GM and New GM.

These objections are sustained in part and overruled in part.

Flipping the objections in order, the Court easily sustains New GM's objections to the allegations that muddy the distinctions between Old GM and New GM, though it will permit references to "GM-branded vehicles" when the context is clear that they can refer only to New GM—and where they do not, by words or implication, blend the periods during which vehicles were manufactured by Old GM, on the one hand, and New GM, on the other. There is a great potential for abuse in this area, and it was so significant that the Court discussed its objectionable nature in one of the several 2014 decisions [74] preceding the April Decision.

New GM's imputation objection, however, is overruled from a bankruptcy perspective, for the reasons discussed beginning at page 14 above. As there noted, the Court agrees with New GM that imputation matters must be determined in context, and if imputation is to be found, it must be found in the context of the imputation of identified individuals or identified documents for particular purposes. But **\*133** the Court has also concluded that there is nothing wrong with another court deciding imputation matters, and that other courts will have a better sense of imputation's propriety in context than this Court would.

The final area of controversy involves the instances—many in number—where plaintiffs preceded allegations of Old GM knowledge or conduct with statements like "New GM

knew," or "[f]rom the date of inception, New GM knew...." The Court has already dealt with this. [75] It can't agree with New GM's contention that the addition of that "four-word preface" is merely a fig leaf to circumvent the Judgment; those four words are of critical importance, and, if proven, transform the basis for imposing liability from successorship to knowledge that is one of the predicates to imposition of liability. Those four words, which now require a showing of New GM knowledge, are essential to establishing New GM's culpability—all apart, of course, from establishing any necessary duties, private rights of action, and any other requirements for stating causes of action against New GM for cars manufactured by Old GM. As a condition subsequent to getting through the gate, the plaintiffs will have to prove the New GM knowledge they allege, on the part of identified human beings, and by identified documents, to the satisfaction of the MDL court or any other court hearing those claims—and by competent proof, not on theories that New GM was a "successor" to Old GM. But that is a matter best handled by other courts, and this Court will not block those allegations at this time.

### (3) Pink—"[C]laims alleging that New GM committed fraud in connection with Old GM's bankruptcy"

In its Pink Category, New GM objects to claims alleging that New GM committed fraud in connection with *Old GM's* bankruptcy—more specifically, that if New GM had not engaged in fraudulent concealment of ignition switch defects, class members would have filed claims before the Bar Date. [76] The Court cannot allow these claims to proceed. They are barred by the April Decision and Judgment, as they seek to impose liability based, in material part, on Old GM conduct, and assert forbidden "successor liability claim[s] 'dressed up to look like something else.' " [77] And they rest on duties that do not exist under bankruptcy law.

Preliminarily, the Court notes that in both the economic loss and accident contexts, these claims against New GM seek recovery for claims against Old GM that arose prepetition and pre-Sale. New GM did not assume the liabilities for those underlying prepetition and pre-Sale claims, and they are Retained Liabilities under the Sale Order's Section 2.3(b). The MDL plaintiffs' claims here have the effect, if not also the purpose, of circumventing the limitations resulting from that, to effectively convert prepetition claims against Old GM to Independent Claims against New GM.

**\*134** In the April Decision, the Court ruled, among other things, on the Independent Claims it would permit, and claims based in any way on Old GM conduct were excluded. At one point, the Court stated:

> But it is plain that to the extent the Plaintiffs seek to impose successor liability, or to rely, in suits against New GM, *on any wrongful conduct by Old GM,* these are actually claims against Old GM, and not New GM. It is also plain that any court analyzing claims that are supposedly against New GM only must be extraordinarily careful to ensure that they are not in substance successor liability claims, "dressed up to look like something else." *Claims premised in any way on Old GM conduct* are properly proscribed under the Sale Agreement and the Sale Order, and by reason of the Court's other rulings, the prohibitions against the assertion of such claims stand. [78]

And the Court summarized its earlier holdings by saying that plaintiffs could assert otherwise viable claims against New GM for any causes of action that might exist "arising solely out of New GM's own, independent, post-Closing acts, *so long as those plaintiffs' claims do not in any way rely on any acts or conduct by Old GM.* [79] Likewise, the Judgment provided, in relevant part:

> Except for Independent Claims and Assumed Liabilities (if any), all claims and/or causes of action that the Ignition Switch Plaintiffs may have against New GM concerning an Old GM vehicle or part seeking to impose liability or damages *based in whole or in part on Old GM conduct* (including, without limitation, on any successor liability theory of recovery) are barred and enjoined pursuant to the Sale Order.... [80]

While the Court well understands plaintiffs' frustration with their inability to tap GUC Trust assets to collect on claims plaintiffs might have against Old GM, this Court's April Decision and Judgment make clear that they are enjoined from looking for their recovery for that to New GM. These allegations, based heavily on a claims process that was the responsibility of Old GM and handled by Old GM—and, of course, the Old GM conduct that resulted in the underlying bankruptcy claim—are barred by both the express terms of the Judgment and the April Decision. They are in substance

forbidden successor liability claims, "dressed up to look like something else." [81]

Additionally, these claims rest on a premise that does not exist under bankruptcy law. [82] The Court must find the requisite duty to be lacking, at least on the part of a buyer of estate assets that was **\*135** protected under a free and clear order, and thereby free from claims arising from the Debtor's failings.

The claims in both actions are, as the *Adams* Plaintiffs note with respect to theirs, "Fraud by Concealment [by New GM] of the Right to File a Claim Against Old GM in Bankruptcy," [83] charging that New GM caused harm to the various plaintiffs by "concealing from them the existence of the Ignition Switch Defect," [84] with the consequence that some did not file timely claims against Old GM. This "[f]raud by concealment" does not allege misrepresentations; it alleges "concealment"—*i.e.,* failures to disclose–which are actionable if, but only if, there is a duty to speak. But as a matter of bankruptcy law, that duty is lacking under the facts here.

In recognition of the impermissibility of suit against New GM as a successor, the *Adams* Plaintiffs assert that "New GM had an *independent* duty to warn them that their rights vis-à-vis Old GM could be extinguished if they did not timely file a proof of claim." [85] But the source of that duty is unexplained, and not supported by authority, and the Court cannot find that duty in the context of a chapter 11 case.

The Bankruptcy Code imposes duties in chapter 11 cases by statute—by sections 1107, 1106 and 1103 of the Code, and by use of a cross-reference to section 704—doling out duties to different players. Section 1107 of the Code, captioned "Rights, powers, and duties of debtor in possession," imposes duties on a debtor in possession. Section 1106, captioned "duties of trustee and examiner," imposes duties on trustees and examiners in chapter 11 cases in which they are appointed. Section 704 (cross referenced in section 1106), captioned "Duties of trustee," imposes duties on trustees in chapter 7 cases and, by reason of the cross reference in section 1106, in chapter 11 cases. And Section 1103 sets forth the "Powers and duties of committees" (most commonly creditors and equity committees), though the duties of committees are governed principally by caselaw. [86]

It is obvious from this that the drafters of the Code knew how to impose duties when they wanted to. It also is obvious from a reading of the Code that it doesn't impose duties on anyone else. While unlikely, it is conceivable, the Court supposes, that caselaw could impose duties upon the buyers of assets from estates, but neither plaintiff group cites to any such caselaw (nor, so far as the Court is aware, is there any), and given the Code's very considerable express discussion of when and how it imposes duties on the players in a chapter 11 case, the Court cannot and does not find (or create) any such duties here.

**\*136** It is undisputed that it was Old GM, and its retained professionals, who were responsible for preparing and filing the Debtors' bankruptcy schedules, establishing a claims bar date, serving the claims bar date, and thereafter resolving claims filed against the Old GM estate, until the GUC Trust took over from Old GM in that last respect. There is no statutory or caselaw basis for imposing duties with respect to these matters on anyone else—and especially the buyer of assets under a free and clear order. The plaintiffs' request is unprecedented, and cannot be reconciled with the structure of the Bankruptcy Code, which imposes duties by express provision. Additionally, imposing duties of unknown origin on buyers of assets in chapter 11 cases would have the potential (as is apparent here) of impairing—if not rendering nugatory—provisions in sale orders that permit the acquirors of assets to take them free and clear of claims.

Thus the Court must find that efforts to impose liability on New GM for Old GM's failures to give Ignition Switch Plaintiffs notice (and, of course, for Old GM's other alleged wrongful acts, with respect to accidents and alleged drops in vehicle value) are "attempts to paint New GM with Old GM acts," [87] in violation of the April Decision and Judgment, and also fail for a lack of showing of the requisite duty.

### (4) Orange—[C]laims alleging plaintiffs are entitled to contractual damages as third-party beneficiaries of the Sale Agreement."

In its Orange Category, in the context of potential claims under the Safety Act, New GM asserts that the MDL Complaint "identifies claims alleging that plaintiffs are somehow third-party beneficiaries under the Sale Agreement," and then points out that the Sale Agreement expressly disclaims any third-party claims." [88] New GM is plainly right that the Sale Agreement does so. [89] But the plaintiffs, not disputing that, argue that even without third-

party beneficiary status, and even though they "do not assert a private cause of action under the Safety Act," [90] they are not precluded from acting under a (presumably existing) state law cause of action.

Though the plaintiffs have not told this Court the basis for such a cause of action, their contention, if true, once more calls for a determination of nonbankruptcy law. For that reason, the Court once more does not rule on the extent to which claims of this character are actionable as a matter of nonbankruptcy law.

Since the asserted rights of action, if any, in the Orange Claims category are Independent Claims, the Court rules that they pass the bankruptcy court gate. It leaves the determination as to whether claims of this type are otherwise actionable to the MDL court.

### C. The States Complaints

#### (1) Yellow—Allegations based on Old GM conduct
In its Yellow Category, New GM objects to "multiple paragraphs [in the State Complaints] containing improper allegations of Old GM conduct"—premised on two separate matters:

   **\*137**  (a) allegations of pre-Sale conduct, blending allegations relating to both Old GM and New GM without distinction, and referring to "GM-branded vehicles" [91] with the inevitable muddying of the Old GM/New GM distinction in the legal obligations of each; and

   (b) attempts to "impute wholesale" to New GM knowledge, policies and practices of Old GM.

The first objection is well taken, and is sustained. The second is governed by the earlier rulings as to Imputation set forth in this Decision.

Flipping the two objections in order, the Court has already addressed Imputation at length in this Decision, and there is no need to repeat that discussion in comparable length here. The Court's rulings as to Imputation in other actions apply to the States Cases as well. Knowledge of Old GM cannot be imputed to New GM, but New GM knowledge inherited from Old GM may be, as can knowledge developed by New GM, to the extent permissible under nonbankruptcy law.

With respect to New GM's remaining objection, the objection is sustained in considerable part. Turning first to the California complaint, its use of the catch-all "GM-branded vehicles," as the Court has previously held, is impermissible —and emblematic of problems discussed in the Form of Judgment Decision. [92]

So are the allegations in paragraphs 46 (speaking of acts in 2001), 47 (speaking of DeGiorgio's alleged concealment "while working for Old GM"), 48–54, 58–60, 71, 95–96, 112–114, 189–190, and 200–202, [93] all of which allege Old GM conduct. On the other hand, allegations (e.g. in paragraphs 9, 11, 16, 18, and 22, 32, 43, 44, and 45) that New GM knew of safety issues (even if from the time of its inception), acquired inherited knowledge of such, or gained new knowledge of such, are benign.

The Court rules similarly with respect to the Arizona complaint, many of whose allegations appear to be identical or nearly identical to California's. Allegations (e.g., those in paragraphs 19, 81, 135, 137, 138, 139, 335 and 499) that New GM knew of matters (even if from the date of its inception) are benign. [94]  But others (e.g., those in paragraphs 92, 93 and 357) that make reference to what plainly was Old GM conduct are not, and others that make it impossible to tell are not. [95]  So is paragraph **\*138** 136's highly offensive allegation that "[t]he knowledge of Old GM is important and relevant because it is **directly attributable** to New GM." [96] That allegation is not just violative of the Judgment; it is false as a matter of law.

The States Complaints may proceed if, but only if, they are amended to fix the deficiencies in the Yellow Category. They will remain stayed until that happens.

#### (2) Blue—Allegations relating to vehicles manufactured by Old GM
In this Blue Category, New GM also contends that the States "improperly attempt to assert claims and establish damages based on Old GM vehicles manufactured before the 363 Sale ..." New GM further contends that the States "do not explain what purportedly 'Independent Claims' they may have with regard to an Old GM vehicle," and that the States' claims are premised "exclusively on consumer fraud and false advertising statutes, which necessarily concern the time and point of sale." [97]  New GM continues that '[i]t is necessarily impossible for any New GM statement, regardless of its

In re Motors Liquidation Company, 541 B.R. 104 (2015)

content, to influence the decision to purchase an Old GM vehicle before New GM ever existed ..." [98]

The Court understands New GM's point—especially with respect to causes of action that rest on acts or omissions at the time of sale, when sales took place before New GM had come into existence—but the nature and extent of New GM's duties under nonbankruptcy law is a matter that the Court does not believe it should decide.

For example, an apparent continuing source of contention is the extent to which New GM can be held liable under nonbankruptcy law (such as the statutory and common law of the states of California and Arizona) for the protection of consumers for acts or omissions *after* the sale of motor vehicles. That may not matter for vehicles manufactured by New GM after the 363 Sale, but it matters greatly for vehicles manufactured by Old GM. It should be clear from the Court's earlier rulings, but the Court will say again in this context now, that New GM cannot be held to be monetarily liable to the States (any more than it can be held liable to other plaintiffs) for any violations (necessarily by Old GM) that took place before the 363 Sale.

The extent to which New GM can be held liable under that nonbankruptcy law for acts or omissions after the 363 Sale —i.e., after sales of vehicles to consumers—is a matter of nonbankruptcy law that the Court leaves to the courts hearing such cases to decide. The Court can and does say, however, that to the extent nonbankruptcy law imposes duties *at the time of a vehicle's sale only,* and the relevant vehicle sales took place when New GM had not yet been formed and only Old GM was in existence, claims premised on any breaches of such duties are barred by each of the Sale Order, the April Decision, and the Judgment.

**\*139   *D. The Peller Complaints***

***(1) Blue—Allegations Involving Old GM manufactured vehicles***
In its Peller Complaints Blue Category, New GM objects to claims involving Old GM manufactured vehicles. Its objections are of three types: (a) those said to assert what are in substance successor liability claims; (b) those involving plaintiffs (and portions of proposed classes) who purchased used Old GM manufactured vehicles after the closing of the 363 Sale, from third parties with no connection to New GM; and (c) those asserted on behalf of Non–Ignition Switch

Plaintiffs. New GM's Blue Category objections are sustained in part and overruled in part.

With respect to the first type of Blue Category objection, it is plain that the Peller Complaints, to a very substantial degree, assert claims with respect to Old GM manufactured vehicles, [99] on behalf of clients who never dealt with New GM. [100] But in their substantive claims, the Peller Complaints define their "Class" and "Subclass" periods as running from the inception of New GM in 2009, and seemingly base the actual causes of action on alleged duties of New GM and post-Sale events relating to those pre-Sale manufactured cars. While the complaints are hardly a model of clarity, the Court can discern no Blue Category instances in which pre-Sale conduct by Old GM actually is alleged. [101] Thus, to the extent they are actionable as matters of nonbankruptcy law, those claims are, as Peller argues, [102] Independent Claims. The real issue with these complaints is whether as matters of nonbankruptcy law, claims can be asserted against New GM under RICO and consumer protection statutes, or for common law fraud, "negligent infliction of economic loss and increased risk," and "civil conspiracy, joint action and aiding and abetting," with respect to vehicles manufactured by Old GM, before there ever was a New GM. For reasons discussed above, the Court leaves this issue to nonbankruptcy courts after these complaints are amended to address their more egregious violations, discussed below. [103]

**\*140**   The second type of Blue Category objection involves plaintiffs (and portions of proposed classes) who purchased used Old GM manufactured vehicles after the closing of the 363 Sale. New GM is right that this Court held, in the April Decision, that claims brought by this type of plaintiff were not an exception to the Court's holding barring claims with respect to Old GM manufactured vehicles and allegations of Old GM conduct, except where Independent Claims were alleged. [104] But once again, because the Court does not discern any allegations of pre-Sale conduct by Old GM in the Peller Complaints on behalf of such plaintiffs, this objection is resolved in the same fashion as its predecessor.

The third type of Blue Category objection concerns claims asserted on behalf of Non–Ignition Switch Plaintiffs. This objection is sustained, in full, with respect to all assertedly Independent Claims for reasons discussed in n.70 above. And until those deficiencies are cured, the Peller Complaints remain stayed. To the extent those complaints assert claims

against New GM with respect to *New GM manufactured* vehicles based on Non–Ignition Switch matters, the Sale Order, April Decision and Judgment do not forbid them.

#### (2) Green—Claims Premised on Old GM conduct
In its Green Category, New GM objects to claims in the Peller Complaints premised on Old GM conduct. New GM's objections in this category are of two main types: (a) those relying on Old GM conduct as the predicate for claims against New GM, and (b) those referring to "GM" without making distinction between the two, muddying the distinction between them. The objections of both types are sustained.

Peller Complaints allegations of the first type are among the most egregious this Court has ever seen. Emblematic of the problem is an allegation in *Bledsoe* :

> To the extent that any of the allegation [*sic.*] of wrongdoing alleged in this count involve wrongdoing by Old GM, GM is responsible for that conduct because it is a successor in manufacturing to Old GM and liable for Old GM's wrongdoing. [105]

That is the paradigm of a successor liability claim, impermissible under each of the Sale Order, April Decision, and Judgment. And in his letter, [106] Peller did not even try to defend it. The Peller Complaints will remain stayed until they are amended to unambiguously remove any reliance on wrongdoing by Old GM.

Allegations of the second type are almost as bad. Emblematic of these is the allegation in *Elliott* that "[f]or example, GM chose to use and then conceal defective ignition switches in Plaintiffs' and class members' vehicles in order to save approximately $0.99 per vehicle." [107] As noted above, most of the Peller Plaintiffs' vehicles were Old GM manufactured vehicles acquired from a seller other than New GM. The problem is aggravated, not solved, by the Peller Complaints use of alternate defined terms—defining General Motors LLC, which is New GM, as " 'GM' or 'New GM,' " [108] or "GM" alone, [109] thereby camouflaging the distinction between the Old GM and New GM. And here too, in **\*141** his responsive letter, [110] Peller did not even try to defend it. For the reasons discussed above in connection with the States Complaints, this practice is unacceptable, and the

Peller Complaints will remain stayed until they are amended in this respect as well.

#### (3) Yellow—Claims Seeking "to automatically impute Old GM's knowledge to New GM"
In its Yellow Category, New GM objects to claims seeking "to automatically impute Old GM's knowledge to New GM." The Court deals with these as it has in its other discussion of this same issue above.

#### (4) Pink—Claims Seeking Punitive Damages from New GM with respect to Old GM manufactured vehicles.
In its Pink Category, New GM objects to claims seeking punitive damages from New GM with respect to Old GM manufactured vehicles. The Court deals with these as it has in its other discussion of this same issue above.

#### E. Other Complaints
New GM identifies a few other complaints containing allegations it contends are violative of the Sale Order, the April Decision or Judgment (or some combination of them), [111] though its objections overlap in substantial part with those just discussed. For the sake of completeness, the Court addresses them here.

#### (1) "Failure to Recall/Retrofit Vehicles"
In its letter addressing the other complaints, New GM objects to claims, such as those in *Moore v. Ross,* in South Carolina, alleging that "New GM had a duty to recall or retrofit Old GM vehicles." [112] This is effectively the same type of claim previously discussed.

New GM is correct that obligations, if any, that it had to recall or retrofit were not Assumed Liabilities, and that New GM is not responsible for any failures of Old GM to do so. But whether New GM had a duty to recall or retrofit previously sold Old GM vehicles that New GM did not manufacture is a question of nonbankruptcy law.

Consistent with its gatekeeper role, the Court does not decide whether there is the requisite duty under nonbankruptcy law, and allows this claim through the gate, leaving that issue to the court hearing that action.

#### (2) "Negligent Failure to Identify Defects or Respond to Notice of a Defect"

New GM's next issue in that same letter involves allegations "that New GM should have identified the defect earlier and taken some sort of action in response." [113] New GM is correct that claims of this character are the same, for this Court's purposes, as the claims based on an alleged failure to recall or retrofit Old GM vehicles. Here too, whether New GM had a duty to identify or respond to defects in previously sold Old GM vehicles that New GM did not manufacture is a question of nonbankruptcy law.

Thus the Court deals with it with the same way. Consistent with its gatekeeper role, the Court does not decide whether **\*142** there is the requisite duty under nonbankruptcy law, and allows this claims through the gate, leaving that issue to the court hearing that action.

#### (3) "Negligent Infliction of Economic Loss and Increased Risk"

New GM's third issue involves claims that New GM had a duty to warn consumers owning Old GM manufactured vehicles of the Ignition Switch Defect but instead concealed it, and by doing so, the economic value of the plaintiffs' vehicles was diminished. The *Elliott* and *Sesay* complaints, for example, had claims of this type.

Claims of this character are permissible to the extent, but only the extent, that New GM had an independent "duty to warn" owners of Old GM manufactured cars of the defect, as relevant to situations *in which no one is alleged to have been injured* by that failure, but where the vehicles involved are alleged to have lost value as a result. That is a question of nonbankruptcy law, which the Court leaves to the nonbankruptcy court(s) hearing the underlying actions.

#### (4) "Civil Conspiracy"

New GM's fourth issue, said to arise in the case of *De Los Santos v. Ortega,* in Texas state court, and the Peller Complaints in the District of Columbia, involves claims that New GM was involved "in a civil conspiracy with others to conceal the alleged ignition switch defect." [114] New GM asserts that the claims are based on "representations, omissions and other alleged acts relating to the supposed concealment rather than, as set forth in the Sale Agreement, being caused by motor vehicles," "arisi[ing] directly out of"

personal injury or property damages, and being "caused by accidents or incidents." [115]

Because claims of this character were asserted in the Peller Complaints, the Court addressed them above. For the reasons discussed above, the Court rules that claims of this character were not Assumed Liabilities. The extent to which they might constitute Independent Claims requires a determination of nonbankruptcy law, which for reasons previously noted, this Court not decide.

Thus the Court rules that the Civil Conspiracy claims referred to here are not Assumed Liabilities. Beyond that, it leaves the determination of the nonbankruptcy issue as to whether claims of this sort are actionable, with respect to vehicles previously manufactured and sold by a different entity, to the nonbankruptcy court hearing the underlying action.

#### (5) "Section 402B—Misrepresentation by Seller"

New GM's fifth issue involves one of the several claims asserted by the Estate of William Rickard, following his death in an accident involving the decedent's 2002 S–10 pickup —a vehicle manufactured by Old GM. New GM objects to causes of action premised on Section 402B of the *Restatement (Second) of Torts,* [116] which New GM **\*143** argues are misrepresentation claims, not Product Liabilities that were Assumed Liabilities under Sale Agreement Section 2.3(a)(ix).

The Court does not agree. Restatement Section 402B, quoted in the footnote above, makes the defendant subject to liability "for physical harm to a consumer of the chattel ..." That provision has as a condition to liability a misrepresentation of material fact concerning the chattel's character or quality, but ultimately it provides a remedy for the resulting "physical harm." To the extent there was a violation of Section 402B, it was by *Old GM,* of course (because liability under Section 402B is with respect to "a chattel sold by him," *i.e.* by Old GM and not New GM), but any Section 402B liability could nevertheless be an Assumed Liability if it passed muster as such under Section 2.3(a)(ix).

Unlike many other misrepresentation claims, Section 402B claims are expressly based on "physical harm to a consumer ..." When a Section 402B claim is matched up to the requirements of Section 2.3(a)(ix), it satisfies that subsection's Clauses [2], [3], [4] and [5], including, most importantly, the all-critical Clause [3], requiring that the

Liability be "for death, personal injury, or other injury to Persons ..."

Thus the Court disagrees with New GM's contention that 402B claims should be blocked as sounding in misrepresentation. Section 402B claims pass through the gate.

### (6) Claims Based on Pre–Sale Accidents

As its sixth and final issue with respect to the other complaints, New GM objects to claims based on *pre*-Sale accidents, like the *Coleman* action in the Eastern District of Louisiana, involving, by definition, Old GM manufactured vehicles. These actions should have been dismissed, or at least stayed, long ago. They are impermissible under the Sale Order, April Decision and Judgment, and cannot proceed.

### Conclusion

For the reasons stated above:

(1) Any acts by New GM personnel, or knowledge of New GM personnel (including knowledge that any of them might have acquired while previously working at Old GM) may, consistent with the April Decision and Judgment, be imputed to New GM to the extent such is appropriate under applicable nonbankruptcy law. Likewise, to the extent, as a matter of nonbankruptcy law, knowledge may be imputed as a consequence of documents in a company's files, documents in New GM's files may be utilized as a predicate for such knowledge, even if they first came into existence before the sale from Old GM to New GM. Those general principles may be applied in courts other than this one in the context of particular allegations that rely on those principles—without the need for the bankruptcy court to engage in further examination of particular allegations beyond the extent to which it has done so here.

(2) Punitive damages with respect to Product Liabilities Claims or Economic Loss claims involving Old GM manufactured vehicles may be sought against New GM to the extent—but only to the extent—they rely solely on *New GM* knowledge or conduct. Those claims may not be based on Old GM knowledge or conduct. But they may be based on knowledge of New GM employees that was "inherited" from their tenure at Old GM (or documents inherited from Old GM), and may be based on knowledge acquired after the 363 Sale by New GM.

**\*144** (3) Allegations in the Bellwether Actions Complaints, MDL Complaint, Peller Complaints, and the other complaints may proceed to the extent, but only the extent, they are consistent with the rulings above, and their allegations are pruned, to the extent necessary, so as not to include allegations prohibited in that discussion.

The parties are encouraged to agree upon a form of judgment implementing these rulings, without prejudice to anyone's right to appeal or cross-appeal. In the event of an inability to timely agree, anyone may settle a judgment, provided that notice of settlement allows no less than five business days' notice to comment on the form of judgment submitted, or submit a counter-judgment. For the avoidance of doubt, the time to appeal these rulings will run from the time of entry of the resulting judgment, and not from the date of this Decision.

### All Citations

541 B.R. 104

### Footnotes

1    ECF # 13177.

2    *See In re Motors Liquidation Co.,* 529 B.R. 510 (Bankr.S.D.N.Y.2015) ("*April Decision*"). As relevant here, the April Decision was followed by two others–one addressing the form of the Judgment that would implement it, *In re Motors Liquidation Co.,* 531 B.R. 354 (Bankr.S.D.N.Y.2015) ("*Form of Judgment Decision*"), and another addressing post-judgment motions by counsel for plaintiff Sharon Bledsoe and others for post-judgment relief. *See In re Motors Liquidation Co.,* 534 B.R. 538 (Bankr.S.D.N.Y.2015) ("*Bledsoe Decision*"). Familiarity with each is assumed, and their defined terms are for the most part not repeated here.

3    *See* page 12 *infra.*

4    Of course, by reason of the Court's conclusions as to imputation, claims resting on "New GM knowledge and conduct alone" can properly rest, with respect to claims arising after the 363 Sale, on *any* knowledge and conduct after the 363 Sale, including the very earliest days after the sale.

5   Obviously, it would be impractical for the Court to address the many hundreds of affected allegations paragraph by
    paragraph. It has dealt with them by category, making reference to examples of each.

6   *See* n.2 *supra.*

7   *See In re Motors Liquidation Co,* 536 B.R. 54 (Bankr.S.D.N.Y.2015) ("*Withdrawal of Reference Decision*").

8   After the Withdrawal of Reference Decision was issued, Judge Furman of the district court considered the plaintiffs'
    motions asking him to withdraw the reference, but thereafter denied them. *See* Order dated Aug. 17, 2015, docketed in
    each of 15–CV–4685 (JMF) (ECF # 8), and 15–CV–5056 (JMF) (ECF # 23).

9   To facilitate the Court's analysis, the parties submitted briefs on the Punitive Damages Issue and the Imputation
    Issue. With respect to those issues and miscellaneous ones, New GM also submitted marked copies of the Bellwether
    Complaints, the MDL Complaint, the State Complaints and the complaints in the *Elliott, Sesay* and *Bledsoe* actions
    (represented by the same counsel, Gary Peller, Esq., and referred to by New GM and thus the Court as the "**Peller
    Complaints**," and together with the others, the "**Marked Complaints** "), and parties commented on the objections to
    matters in the Marked Complaints by letter. New GM noted its objections by highlighting the pleadings as follows:

    Bellwether Complaints (ECF # 13456): "(1) pink, for allegations that wrongly assert New GM is the successor of
    Old GM; (2) orange, for allegations related to punitive damages, which were not assumed by New GM for Product
    Liability claims; (3) blue, for allegations seeking to impute wholesale Old GM's knowledge to New GM; (4) green, for
    allegations involving claims that are Old GM Retained Liabilities; and (5) yellow, for allegations based on New GM's
    conduct relating to a supposed failure to warn after the vehicle sale." (footnote omitted).

    **MDL Complaint**(ECF # 13469): "(1) blue, for named plaintiffs and plaintiff classes/subclasses asserting claims based
    on Old GM vehicles; (2) yellow, for allegations based on Old GM conduct that support claims for Retained Liabilities;
    (3) pink, for claims alleging that New GM committed fraud in connection with Old GM's bankruptcy; and (4) orange,
    for claims alleging plaintiffs are entitled to contractual damages as third-party beneficiaries of the Sale Agreement."
    (footnote omitted).

    **State Complaints**(ECF # 13470): "(1) yellow, for allegations based on Old GM conduct; and (2) blue, for allegations
    relating to vehicles manufactured by Old GM." (footnote omitted).

    **Peller Complaints**(ECF # 13523): (1) blue, for allegations involving Old GM manufactured vehicles; (2) green, for
    claims premised on Old GM conduct; (3) yellow, for claims seeking "to automatically impute Old GM's knowledge to
    New GM"; and (4) pink, seeking punitive damages from New GM with respect to Old GM manufactured vehicles.

10  Judgment ¶ 4.

11  New GM recognizes that "[t]he 363 Sale contemplated that New GM would offer employment to substantially all of Old
    GM's employees, and the books and records of Old GM (except those concerning Excluded Assets) would be transferred
    to New GM." (footnote omitted) New GM Opening Imputation Br. (ECF # 13451) at 6.

12  Sale Agreement § 2.3(a) (underlining in original). Throughout the Sale Agreement, defined terms were capitalized,
    surrounded in quotes, and underlined when their definitions were first set forth—much the same way as the Court does,
    though the Court bolds defined terms so they can more easily be found.

13  The term "Liabilities" was defined in that Section 1.1 as follows:

    "Liabilities " means any and all liabilities and obligations of every kind and description whatsoever, whether such
    liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed,
    absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due,
    including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise.

14  Sale Agreement § 2.3(a)(ix). The language quoted is as the Sale Agreement was amended to provide under a First
    Amendment, dated as of June 30, 2009. Section 2.3(a)(ix) was materially modified by that First Amendment. Before its
    modification, it read:

    all Liabilities to third parties for death, personal injury or other injury to Persons or damage to property caused by
    motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles, and,
    in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities") which arise directly out
    of accidents, incidents or other distinct and discreet occurrences that happen on or after the Closing Date and arise
    from such motor vehicles' operation or performance (for avoidance of doubt, Purchaser shall not assume, or become
    liable to pay, perform or discharge, any Liability arising or contended to arise by reason of exposure to materials
    utilized in the assembly or fabrication of motor vehicles manufactured by Sellers and delivered prior to the Closing
    Date, including asbestos, silicates or fluids, regardless of when such alleged exposure occurs.

    This too reflected a modification after the original 363 Sale motion was filed on June 1, 2009, the first day of Old GM's
    chapter 11 case. It originally provided:

all Liabilities (including Liabilities for negligence, strict liability, design defect, manufacturing defect, failure to warn or breach of the express or implied warranties of merchantability or fitness for a particular purpose) to third parties for death, personal injury, other injury to Persons or damage to property (collectively, "Product Liabilities") in each case, arising out of products delivered to a consumer, lessee or other purchaser of products at or after the Closing. *See* Original Sale Motion Exh. A, ECF # 92–1. Note that as originally proposed on June 1, New GM assumed responsibility only for products that were *delivered* at or after the Closing, whereas in each of the June 30 and July 5 versions, New GM assumed responsibility for *accidents or incidents* after the Closing, irrespective of when the products were delivered.

15    Sale Agreement § 2.3(b) (emphasis added).

16    *Id.* (underlining in original; emphasis by italics added).

17    Sale Agreement § 2.3(b)(xi).

18    Sale Agreement § 1.1 (Underlining in original; emphasis by italics added).

19    *Id.* Additionally (though this isn't relevant to punitive damages or even what was included among "Assumed Liabilities," and the Court mentions it here only for the sake of completeness), the Sale Agreement also required New GM to comply with recall obligations imposed by federal and state law, even for cars or parts manufactured by Old GM. *See* Sale Agreement § 6.15(a) ("From and after the Closing, Purchaser shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [Old GM].").

20    *In re Motors Liquidation Co.,* 514 B.R. 377, at 379–83 (Bankr.S.D.N.Y.2014) ("*Elliott Decision*").

21    *In re Motors Liquidation Co.,* 522 B.R. 13, 19–21 (Bankr.S.D.N.Y.2014) ("*Sesay Decision* ").

22    *See* n.82 *infra*.

23    *See, e.g.* New GM Opening Imputation Br. at 1.

24    New GM Imputation Reply Br. (ECF # 13482) at 2.

25    *Id.* at 6. "Valid claim," as New GM there uses the expression, seems to refer not just to a claim permissible under the April Decision and Judgment, but also one that states a cause of action under nonbankruptcy law—*e.g.,* meeting any nonbankruptcy law requirements, such as any requiring causation. (As examples, New GM points to allegations in the MDL Complaint that vehicle owners were injured by New GM fraudulent concealment after they had already purchased their cars (which may or may not meet causation requirements), and in States Actions alleging consumer fraud that New GM contends must relate to conduct at the point-of-sale and not thereafter. *See* New GM Imputation Reply Br. at 8–9).

26    534 B.R. at 543 n. 16.

27    *Id.*

28    *Id.*

29    Thus plaintiffs cannot precede allegations with statements like "As the successor to Old GM, New GM knew ...," or do the same by indirection.

30    On Product Liabilities Claims, the analysis is a little different, but the bottom line result is the same. New GM assumed liability for Product Liabilities claims, which (by definition) arose from accidents or incidents taking place *after* the Sale, and thereby became liable for compensatory damages for any Product Liabilities resulting from Old GM's action. And by the time any such accidents or incidents occurred, New GM already was in existence, and allegations that the post-Sale accident could have been avoided (or any resulting injury would have been reduced) if New GM had taken action based on any knowledge its employees had would also pass through the gate. Either way, it would not matter if that knowledge had first come into existence prior to the Sale—because it was still knowledge in fact of employees of New GM, *and* because New GM assumed responsibility for Product Liabilities Claims, which would make it liable for compensatory damages based on anything that even Old GM had done.

31    For that reason, the Court does not need to go into the several cases cited by New GM in which judges shut the door to certain imputation arguments. *See* New GM Opening Imputation Br. at 12–14 (citing *Conmar Prods. Corp. v. Universal Slide Fastener Co.,* 172 F.2d 150, 157 (2d Cir.1949); *Chamberlain Group, Inc. v. Nassimi,* 2010 U.S. Dist. LEXIS 45624, 2010 WL 1875923 (W.D.Wash. May 10, 2010); *Interstate Power Co. v. Kansas City Power & Light Co.,* 909 F.Supp. 1241, 1272 (N.D.Iowa 1993); *Forest Labs., Inc. v. The Pillsbury Co.,* 452 F.2d 621, 626 (7th Cir.1971); *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.),* 503 B.R. 348, 389 (Bankr.S.D.N.Y.2014) (Gerber, J.). Context matters.

32    *See* New GM Punitives Opening Br. (ECF # 13437) at 1.

33    *Id.* at 1, 3.

34  *See* Arg. Tr. at 11, 18–19.

35  *Id.* at 19.

36  *Id.* Their counsel then made some additional due process arguments for those in post-Sale accidents. *See id.* at 19–20. The Court does not follow the argument, and in particular, see the necessary prejudice. New GM assumed Product Liabilities Claims asserted by post-Sale accident victims anyway. If the Post–Closing Accident Plaintiffs' point is that they would be prejudiced by being allowed to rely, as a predicate for punitive damages, on knowledge and conduct by New GM only, that is not meaningful prejudice, since those with pre-Sale accidents, after full opportunity to be heard in 2009, could not bring actions against New GM at all.

37  Sale Agreement § 2.3(a) (emphasis added).

38  Sale Agreement § 2.3(b) (emphasis added).

39  *Castillo v. General Motors Co. (In re Motors Liquidation Co.),* 2012 Bankr.LEXIS 1688, 2012 WL 1339496 (Bankr.S.D.N.Y. Apr. 17, 2012) ("*Castillo Decision* "), *aff'd* 500 B.R. 333 (S.D.N.Y.2013) (Furman, J.), *aff'd by summary order,* 578 Fed.Appx. 43 (2d Cir.2014).

40  The *Castillo Decision* likewise involved a determination as to whether liabilities were Assumed Liabilities within the meaning of Section 2.3(a).

41  *Id.,* 2012 Bankr.LEXIS 1688 at *34, 2012 WL 1339496 at *10.

42  That makes it unnecessary to rely on still another matter—the illogic of relying on Section 1.1's broad definition of Liabilities, which, if it were the only measure of what New GM assumed, would cover nearly anything. Definitions of "Liabilities" of the type appearing in Section 1.1 strike a responsive chord to all in the bankruptcy community—who are familiar with the need to deal with claims that often are only contingent, or not yet known, matured, or liquidated. Section 1.1's definition of Liabilities is best read as evidencing an intent that liabilities of the type listed in Section 1.1 not be *excluded* from coverage because of deficiencies addressed in Section 1.1. In any event, that section cannot reasonably be read as meaning that New GM would assume any "Liabilit[y]" at all.

43  Further, as New GM also observes, *see* New GM Punitives Opening Br. at 7, the words that follow "all Liabilities" narrow the term "Liabilities" to those caused by the motor vehicle itself, *see* Clause [3] [a], as contrasted to liabilities arising from the overall conduct of the Seller.

44  Section 2.3(a)(ix) Clause [3].

45  *See* ECF # 1926 at 6 (limited objection filed by eight states' AGs, complaining of language in the Sale Agreement as originally filed excluding from assumed liabilities "all Product Liabilities arising out of products delivered ... prior to the Closing." *Id.* at 6); *id.* at 14 ("Newco's purchase of substantially all of the operating assets of the Debtors should not include an impenetrable shield which insulates Newco *from all future product liability claims.* To the contrary, public policy dictates that *innocent and not yet injured consumers* cannot and should not be compelled to bear the cost of future injuries caused by defective GM vehicles.") (emphasis added); ECF # 2177 (limited objection filed by tort litigants and the Center for Auto Safety, among others, raising same concern) at 2 ("due process does not permit debtors and purchasers to use a Section 363 sale to extinguish future claims that have not yet accrued because the injuries on which they will be based have not yet occurred"); ECF # 2362 (objection filed by Creditors' Committee) at 19–21 (likewise expressing concerns for those not yet injured).

46  *See Castillo Decision,* 2012 Bankr.LEXIS 1688 at *13, 2012 WL 1339496 at *4–5 (holding, after discussion of four categories of evidence, that "by the end of the 363 Sale hearing it was clear not only to Old GM and Treasury, but also to the Court and to the public, that the goal of the 363 Sale was to pass on to Old GM's purchaser—what thereafter became New GM—only those liabilities that were commercially necessary to the success of New GM"); *Trusky v. General Motors Co. (In re Motors Liquidation Co.),* 2013 Bankr.LEXIS 620 at *23, 2013 WL 620281 at *8 (Bankr.S.D.N.Y. Feb. 19, 2013) (the "*Trusky Decision*") ("As I noted in *Castillo,* the intent of the parties was to pass on only those liabilities that were commercially necessary to the success of New GM.").

47  *See* n.45 above, discussing objections to the 363 Sale focusing on the unfairness to Product Liability plaintiffs whose injuries had not yet occurred.

48  *See* page 26–27 & nn.52–55 below.

49  The Post–Closing Accident Plaintiffs point out that when that term "Damages", as defined in Section 1.1, was later used in the Sale Agreement, it was used only in a different context. Nevertheless, the exclusion of punitive damages in Section 1.1's broadly applicable definition of "Damages" supports New GM's contention that the parties' general intent was that New GM would never assume punitive damages relating to any Old GM liability, or relating to any Old GM conduct.

50  The context in which the three "Pathways" arguments were made was accident cases, rather than Economic Loss actions, in which most, if not all, of the Independent Claims have been asserted. With respect to the latter, the Court does

not understand there to have been an assertion that New GM contractually assumed liability for punitive damages in connection with Economic Loss claims; if one had been made, the Court would reject it for the same reasons.

51  *See* New GM Punitives Opening Br. at 14–15.

52  *See Virgilio v. City of New York,* 407 F.3d 105, 116 (2d Cir.2005) ("While compensatory damages recompense for one's injuries, punitive damages under New York law serve an entirely different purpose. Punitive damages are invoked to punish egregious, reprehensible behavior."); *Cush–Crawford v. Adchem Corp.,* 271 F.3d 352, 359 (2d Cir.2001) ("[T]he objectives of punitive damages by definition differ from the objectives of compensatory damages.").

53  *Molzof v. United States,* 502 U.S. 301, 307, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992) ("As a general rule, the common law recognizes that damages intended to compensate the plaintiff are different in kind from 'punitive damages.' ")

54  *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 266–67, 101 S.Ct. 2748, 69 L.Ed.2d 616. *See also Ross v. Louise Wise Servs., Inc.,* 8 N.Y.3d 478, 489, 868 N.E.2d 189, 196, 836 N.Y.S.2d 509 (2007) ("Punitive damages are not to compensate the injured party but rather to punish the tortfeasor and to deter this wrongdoer and others similarly situated from indulging in the same conduct in the future.").

55  *Cooper Inds., Inc. v. Leatherman Tool Grp., Inc.,* 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (citations omitted). See also *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("[Punitive damages] are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence.").

56  As noted above, *see* n.50 *supra,* the context in which the three "Pathways" arguments were made was accident cases, rather than Economic Loss actions, in which most of the Independent Claims have been asserted. But to the extent Economic Loss plaintiffs (or, for that matter, State Cases Plaintiffs) wish to rely on Pathways # 2 and # 3, the Court sees no reason why a bankruptcy judge should treat them differently for gatekeeping purposes. For actions of each of those types, evidence introduced under Pathway # 2 or # 3 gets through the gate. Once again, it is up to the judges hearing those cases to decide the propriety of reliance on evidence admissible under Pathways # 2 and # 3 to punitive damages claims.

57  That is so because the knowledge that New GM had at the time of any post-Sale events would have been bolstered by the knowledge of former Old GM employees who by this time would have come to New GM; by any documents provided by Old GM; and any information gathered by New GM after the Sale. The distinction would matter only with respect to allegations or evidence relating to events taking place in the Old GM era, as contrasted to New GM's knowledge, after the 363 Sale, of those events.

58  New GM Punitives Opening Br. at 23.

59  *See Bledsoe Decision*, 534 B.R. at 543 ("To the extent the Bledsoe Plaintiffs' claims truly are Independent Claims, they already are carved out from the prohibitions in the Judgment. But the Bledsoe Plaintiffs' *assertions* that claims they wish to bring are in fact Independent Claims do not, without New GM's agreement or a ruling by this or a higher Court, make them so.") (emphasis in original).

60  *See, e.g., Cockram* Cmplt. ¶ 4.

61  *See, e.g., Cockram* Cmplt. ¶ 28 ("New GM is and was the successor corporation to General Motors Corporation and/or General Motors Company.") That is improper (and if New GM cares, as it apparently does, an allegation like that does not get through the gate), but it could be fixed by alleging, in substance, that New GM "assumed product liability claims" of those companies.

62  But even so, pleading references to New GM as successor cannot be justified by contentions that New GM is the "*de facto* 'successor.' " (Pl. 9/28/2015 Ltr. (ECF # 13475) at 2). New GM cannot be faulted for its resistance to efforts by plaintiffs to circumvent what the Court thought were very clear rulings holding that plaintiffs could not play the successor card in any fashion.

63  New GM also objects to yet another variant of that—allegations that New GM engaged in activities that plaintiffs' counsel "well know" were performed by Old GM, since the allegations concern events that took place prior to New GM's existence. As an example, New GM points to allegations in the *Barthelemy* complaint alleging that New GM "defectively designed, manufactured, ... distributed, and sold" a 2007 Saturn Sky, when only Old GM could have done so back in 2007, before New GM had come into existence. *See* New GM 9/21/15 Ltr. (ECF # 13456) at 2. It is possible, as New GM recognizes, that this was unintentional, and that counsel meant that the 2007 Saturn Sky was designed by Old GM, but that New GM assumed liability for Product Liabilities resulting from the Saturn Sky's manufacture or design. If so, the complaint should be amended to say so. Of course, if the allegations were intentional, that is much more serious, as making claims in that fashion would be an easy way to circumvent the Sale Order, April Decision, and Judgment. Either way, the *Barthelemy* action remains stayed until its complaint is fixed.

64  New GM 9/21/2015 Ltr at 2.

65    *See* page 20 above.

66    For example, paragraphs 359 through 363 of the *Barthelemy* complaint, which New GM highlighted in green, include allegations only with respect to New GM.

67    The two sides spar over whether New GM's admitted duty to comply with the Motor Vehicle Safety Act, which it agreed to honor under Sale Agreement § 6.15(a), gave rise to any duties to anyone other than the U.S. Government, and to consumers in particular. New GM notes, properly, that this covenant was not an Assumed Liability, and that vehicle owners were not third party beneficiaries of the Sale Agreement. *See* New GM 9/21/ 2015 Ltr. at 3 n.6. But plaintiffs nevertheless argue, though without any support in this Court, that they have a state law right of action for conduct of that character. Here too the Court leaves this issue to the judge or judges hearing the underlying claims.

68    *See* New GM 9/25/2015 Ltr. (ECF # 13469) at 2.

69    *Id.* at 2–3.

70    Ignition Switch Plaintiffs asserting Economic Loss Claims may assert them, to the extent they are Independent Claims, under the April 15 Decision and Judgment. Non–Ignition Switch Plaintiffs cannot. The latter could have tried to show the Court that they had "known claims" and were denied due process back in 2009, but they have not done so. The Court ruled on this expressly in the Form of Judgment Decision. It then held:

   The Non–Ignition Switch Plaintiffs' claims remain stayed, and properly so; those Plaintiffs have not shown yet, if they ever will, that they were known claimants at the time of the 363 Sale, and that there was any kind of a due process violation with respect to them. And unless and until they do so, the provisions of the Sale Order, including its injunctive provisions, remain in effect.

   531 B.R. at 360. That ruling stands. In the April Decision and resulting Judgment, the Court modified a Sale Order under which the buyer had a justifiable right to rely because a higher priority—a denial of due process, which was of Constitutional dimension—necessitated that. But without a showing of a denial of due process—and the Non–Ignition Switch Plaintiffs have not shown that they were victims of a denial of due process—the critically important interests of finality (in each of the 2009 Sale Order and the 2015 Form of Judgment Decision and Judgment) and predictability must be respected, especially now, more than 6 years after entry of the Sale Order. *See April Decision,* 529 B.R. at 527 ("But New GM's next several points—that purchasers of assets acquire property rights too, and that taking away purchasers' contractually bargained-for rights strikes at the heart of understandings critically important to the bankruptcy system— have great merit. They have so much merit, in fact, that were it not for the fact that the Plaintiffs' claim is a constitutional one, the Court would not deny enforcement of the Sale Order, in whole or in part."); *id.* at 528 ("In the absence of a constitutional violation, the Court suspects that the power to deny full enforcement of a sale order (assuming that such is even permissible) will rarely, if ever, be invoked. The principles underlying the finality of 363 sale orders are much too important.").

71    The States argue that while they can't assert *claims* based on Old GM conduct, they can still assert allegations based on Old GM conduct, and introduce evidence of Old GM conduct. See States Ltr. of 10/9/2015 (ECF # 13494) at 2. Similar contentions are made with respect to the MDL Complaint. See Pl. MDL Ltr. of 10/9/2015 (ECF # 13495) at 4.) ("allegations are directed at facts, not claims.").

   The Court finds these contentions inexplicable, and easily rejects them. They run flatly contrary to the Judgment and three of the Court's earlier holdings. *See* Judgment at 6 ("each Plaintiff in a Hybrid Lawsuit wishing to proceed at this time may amend his or her complaint on or before June 12, 2015, such that any *allegations,* claims or causes of action concerning an Old GM vehicle or part seeking to impose liability or damages based on Old GM conduct ... are stricken") (emphasis added); *April Decision,* 529 B.R. at 528 ("And to the extent, if any, that New GM might be liable on claims based solely on any wrongful conduct on its own part (*and in no way relying on wrongful conduct by Old GM* ), New GM would have such liability not because it had assumed any Old GM liabilities, or was responsible for anything wrong that Old GM did, but only because it had engaged in independently wrongful, and otherwise actionable, conduct on its own.") (emphasis added); *id.* ("But it is plain that to the extent Plaintiffs seek to impose successor liability, *or to rely, in suits against New GM, on any wrongful conduct by Old GM,* these are actually claims against Old GM, and not New GM.") (emphasis added). *See also Form of Judgment Decision,* 531 B.R. at 358 ("The California complaint includes at least 18 paragraphs alleging events that took place prior to the 363 Sale, and the Arizona complaint includes at least 60 paragraphs alleging pre–363 Sale conduct. *Reliance on allegations of that character* was expressly prohibited under the Court's decision.") (emphasis added; footnotes omitted); *Bledsoe Decision,* 534 B.R. at 543 n. 16 ("But what this Court had in mind when it previously ruled as it did should not be in doubt.... [T]his Court further believed that New GM *could not be held liable for anything Old GM did,* and that

claims for either compensatory or punitive damages would have to be *premised solely on New GM's knowledge and conduct.*") (emphasis added).

In support of that contention (made in the States' letter but not with respect to claims in the MDL), the States cite to a decision following Chrysler's chapter 11 case, *Holland v. FCA U.S. LLC,* 2015 U.S. Dist. LEXIS 117643, 2015 WL 5172996 (N.D.Ohio Sept. 3, 2015). But that decision (which did not mention any of the rulings in the *Motors Liquidation* chapter 11 case) said nothing about any distinction between claims and allegations in violation of bankruptcy court rulings or orders, and, importantly, faithfully followed the rulings of the *Chrysler* bankruptcy court.

72    These include, though they may not be limited to, claims for violations of the Safety Act; of other statutory or common law requirements imposing a duty to recall; of consumer protection statutes; for fraud; for breach of implied warranties of merchantability and violations of the Magnuson–Moss Warranty Act; and for unjust enrichment.

73    *See In re Motors Liquidation Co.,* 457 B.R. 276, 279 (Bankr.S.D.N.Y.2011) (the "*UAW Decision*") (deciding issues with respect to construction of the Sale Order, but abstaining with respect to the remainder, leaving those for determination by a Michigan district court: "But the controversy doesn't involve anything as to which I'd have particular knowledge or expertise warranting my exercise of that jurisdiction—such as knowing what I intended to accomplish when I issued an earlier order—and I think that a Michigan federal judge could decide the controversy at least as well as I could ... I think it's better for the New York bankruptcy court ... to act only with respect to matters where the New York Bankruptcy Court has a significant interest, or that truly involve bankruptcy law or policy."). It is true, as many say colloquially, that bankruptcy judges decide issues of state law "all the time." But where a nonbankruptcy court already has many of the nonbankruptcy issues before it, and has the superior knowledge of such matters and their context (just as this Court has with respect to the bankruptcy matters), in this Court's view it is better for the court with greater expertise, and that is closer to the issues in question, to address them.

74    *See In re Motors Liquidation Co.,* 513 B.R. 467, n. 28 (Bankr.S.D.N.Y.2014) (the "*Phaneuf Decision* ") (noting that the Phaneuf Plaintiffs' effort to treat Old GM and New GM as a single entity was inappropriate, and "[t]hat tactic underscore[d] the Phaneuf Plaintiffs' efforts to muddy the distinctions between the two entities, and to impose liability on New GM based on Old GM's conduct.").

75    *See* page 16 above.

76    The Court considers claims of this character in two contexts: (1) as a Pink Category objection to Ignition Switch Plaintiffs' claims of Economic Loss; and (2) in a separate New GM objection to a "No Dismissal" pleading filed by the *Adams* Plaintiffs, asserting a similar claim with respect to accidents involving Old GM manufactured vehicles that took place before the 363 Sale. (*See* ECF # 13359, # 13469). This discussion covers both; a judgment implementing the Court's rulings with respect to the *Adams* action may be entered either separately or by inclusion with the judgment implementing the remainder of these rulings.

77    *Burton v. Chrysler Grp. LLC (In re Old Carco LLC ),* 492 B.R. 392, 405 (Bankr.S.D.N.Y.2013) (Bernstein, C.J.) ("*Old Carco* ")).

78    *April Decision,* 529 B.R. at 528 (emphasis added; footnote omitted).

79    *Id.* at 598 (emphasis added).

80    Judgment ¶ 9 (emphasis added).

81    *See* n.77 above. Recognizing that successor liability claims are barred by the April Decision and Judgment, the *Adams* Plaintiffs assert that the Complaint does not seek to hold New GM liable as a successor to New GM. (*Adams* Plaintiffs' No Dismissal Pleading (ECF # 13359) at 4). But that is exactly the effect. The Adams Complaint (like the MDL Complaint, whose authors dealt with this issue to a considerably lesser degree) imposes liability on New GM in substantial part based on Old GM's alleged transgressions, both in denying the Adams Plaintiffs the opportunity to file proofs of claim in Old GM's chapter 11 case, and in causing the accident in the first place.

82    In other places in this decision, the Court has left for the judges in nonbankruptcy plenary actions issues of nonbankruptcy law, such as those requiring consideration of imputation arguments in context, or determination of duties under nonbankruptcy law to owners of vehicles who acquired their vehicles before the asset purchaser was formed. But the Court believes that it should not leave for a nonbankruptcy court matters that require interpretation and enforcement of the Court's earlier Sale Order and Judgment (or the Sale Agreement, with which the Court has great familiarity), or call for the Court's knowledge of bankruptcy law.

83    *Adams* Plaintiffs' No Dismissal Pleading at 2.

84    *Id.* at 3.

85    *Id.* at 5 (emphasis in original).

86   For example, caselaw makes clear that the duties of committees and their members run to their own constituencies, and not to the estate as a whole, or, indeed, to individual creditors even if they might be members of that constituency. *See, e.g., In re Granite Partners, L.P.,* 210 B.R. 508, 516 (Bankr.S.D.N.Y.1997) (Bernstein, C.J.) (committee and its members owe a fiduciary duty to *the class* of creditors that the committee represents (*i.e.,* its constituency) not to any particular creditor or any other party, including the estate); 7 *Collier* ¶ 1103.05[2] (16th ed.2015) (same). That caselaw does not expand the duties of bankruptcy case players; it narrows it.

87   *Bledsoe Decision,* 534 B.R. at 543 n. 16.

88   New GM 9/25/2015 Ltr. at 5. New GM further argues that a claimed breach of the Safety Act does not provide for an individual consumer cause of action. *See id.* at n.10.

89   *See* Sale Agreement § 9.11.

90   Pl. MDL Ltr. of 10/9/2015 at 5.

91   *See* Arizona Cmplt. ¶ 5 n.1 ("The term 'GM-branded vehicles' refers to vehicles manufactured and sold by both New GM, and its predecessor, 'Old GM' "); California Cmplt. ¶ 2 (same).

92   *See* 531 B.R. at 358. And allegations of that character are doubly impermissible, by reason of their additional characterization of New GM as the "successor" to Old GM.

93   A number of other allegations (in paragraphs 192, 195, 196, 198, 199, 203 through 206, and 211) do not say whether they make reference to Old GM or New GM. The latter would be permissible, and if that is what was intended, they may pass through the gate once clarified. But at this point they appear to be another, impermissible, blending of Old GM and New GM conduct.

94   But not benign—and thus impermissible—is Arizona's allegation (Arizona Cmplt. ¶ 19) that New GM "was not born innocent." In fact (apart from the theatrics of that allegation), New GM *was* born innocent, and the focus must be instead on its own knowledge and acts after it was born.

95   In paragraph 139, the Arizona Complaint alleges that "on or around the day of its formation as an entity, New GM acquired notice and full knowledge of the facts set forth below"—without saying where that list ends. The Arizona Complaint then goes on with about 40 paragraphs speaking of prepetition events (none of which speak of New GM's knowledge), presumably with the thought that the introductory language of paragraph 139 sanitizes them. If more clearly pleaded (and pegged to the arrival of New GM employees), an allegation like paragraph 139 could provide the predicate for permissible allegations—for example, if the facts said to have been learned by New GM were then clearly listed, preferably in subparagraphs as they were in paragraph 139. But for the most part they weren't, as evidenced not just by the 40 paragraphs beginning with paragraph 140, but also by paragraphs 289 (which blended knowledge of Old GM and New GM) and 290–310—some or all of which may have spoken of Old GM alone.

96   Arizona Cmplt. ¶ 136 (bold in original).

97   *See* New GM Ltr. of 9/25/2015 (ECF # 13470) at 3.

98   *Id.*

99   *See, e.g., Elliotts* Cmplt. ¶ 41 ("Plaintiffs are aware that the following GM models contain dangerous ignition switches," with every one of the bulleted cars listed manufactured, at least in some years, by Old GM, though about half were also made by New GM.)

100  *See id.* ¶ 1 (Elliotts bought a 2006 Chevy Cobalt); *Bledsoe* Cmplt. ¶¶ 3–10 (all plaintiffs purchased Old GM manufactured vehicles, most before the 363 Sale but two after the sale); *Sesay* Cmplt. ¶ 1 (The Sesays own a 2007 Chevy Impala, purchased from a friend in 2012). On the other hand, plaintiff Summerville (a plaintiff in *Elliott* ), is alleged to have purchased a 2010 Chevy Cobalt in 2009 after the 363 Sale, and plaintiff Yearwood (one of the plaintiffs in *Sesay* ) is alleged to own a 2010 Chevy Cobalt, purchased in 2010, again after the 363 Sale. The *Bledsoe* complaint also includes a number of post-Sale accident claims (some for personal injury and some for property damage), though it does not say what kind of defect allegedly caused each accident. These might be permissible Product Liabilities Claims. And if they are, these claims (along with the Summerville and Yearwood claims) could proceed if severed from the impermissible ones, or after the remaining issues are remedied. So far as the Court can discern, the three complaints do not distinguish between the various types of plaintiffs' claims.

101  They most definitely *are* in the Green Category, discussed below. Several of the Green Category violations are blatantly violative of the Sale Order and this Court's rulings, and until cured they necessitate the continuing stay of the Peller actions for that reason alone.

102  *See* Peller 11/6/2015 Ltr. (ECF # 13529) at 2.

103  Once again, this is not about "censorship" of pleadings, Peller Ltr. at 2, a mantra repeated by Peller once again. It is about compliance with federal court orders.

| | |
|---|---|
| 104 | *See* *April Decision,* 529 B.R. at 570–72. |
| 105 | *Bledsoe* Cmplt. ¶ 28. |
| 106 | *See* Peller 11/6/2015 Ltr. at 1–2. |
| 107 | *Elliott* Cmplt. ¶ 11. |
| 108 | *See id.* ¶ 6. |
| 109 | *Sesay* Cmplt. ¶ 4 |
| 110 | *See* Peller 11/6/2015 Ltr. at 1–2. |
| 111 | *See* New GM Ltr. of 9/23/2015 (ECF # 13466). |
| 112 | *Id.* at 2. |
| 113 | *Id.* |
| 114 | *Id.* |
| 115 | *Id.* |
| 116 | Section 402B provides: |

One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though

(a) it is not made fraudulently or negligently, and

(b) the consumer has not bought the chattel from or entered into any contractual relation with the seller.

End of Document

© 2016 Thomson Reuters. No claim to original U.S. Government Works.