# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036-4003

Tel:  (212) 556-2100
Fax:  (212) 556-2222
www.kslaw.com
Scott Davidson
Direct Dial:  212-556-2164
sdavidson@kslaw.com

February 4, 2016

**VIA E-MAIL TRANSMISSION**
**AND ECF FILING**
The Honorable Martin Glenn
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
Alexander Hamilton Custom House
One Bowling Green
New York, New York  10004

> Re:    In re Motors Liquidation Company, *et al.*
>        Case No. 09-50026 (MG)
>
>        <u>Letter Regarding Update on Related Proceedings</u>

Dear Judge Glenn:

King & Spalding LLP is co-counsel with Kirkland & Ellis LLP for General Motors LLC ("**New GM**") in the above-referenced matter.  Pursuant to Judge Gerber's Endorsed Order dated May 5, 2015 [Dkt. No. 13131], we write to update the Court regarding developments in proceedings relating to New GM.  Specifically, today, February 4, 2016, the Second Circuit Court of Appeals ("**Second Circuit**") issued an Order ("**February 4 Order**") directing the Ignition Switch Plaintiffs to file a letter within seven (7) days updating the Second Circuit on the status of the motion seeking the removal of co-lead counsel ("**Removal Motion**") in MDL 2543 pending in the Southern District of New York. The February 4 Order also requests that the Ignition Switch Plaintiffs further update the Second Circuit, if needed, prior to oral argument that is currently scheduled for March 15, 2016.  Copies of the February 4 Order and the Removal Motion, are attached hereto as **Exhibits "1"** and "**2**", respectively.

Respectfully submitted,

*/s/ Scott Davidson*
Scott Davidson

DMSLIBRARY01\21600\234022\28185747.v1-2/4/16

Honorable Martin Glenn
February 4, 2016
Page 2

SD/hs
Encl.

cc:    Edward S. Weisfelner
       Howard Steel
       Sander L. Esserman
       Jonathan L. Flaxer
       S. Preston Ricardo
       Matthew J. Williams
       Lisa H. Rubin
       Keith Martorana
       Daniel Golden
       Deborah J. Newman
       Jamison Diehl
       William Weintraub
       Steve W. Berman
       Elizabeth J. Cabraser
       Robert C. Hilliard

# **Exhibit 1**

# United States Court of Appeals

FOR THE
SECOND CIRCUIT

_____

     At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 4th day of February, two thousand sixteen.

_____

IN RE:  MOTORS LIQUIDATION COMPANY,

                     *Debtor.*

**ORDER**

15-2844-bk(L), 15-2847-bk(XAP),
15-2848-bk(XAP)

_____

     The Court is aware that, in the multi-district litigation related to the above-captioned appeal, several plaintiffs have jointly filed a motion requesting removal of co-lead counsel.  *See In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF) (S.D.N.Y.), ECF No. 2179.  Two members of the three co-lead counsel are also counsel for appellant Ignition Switch Plaintiffs in this appeal.

     In light of the foregoing, it is hereby ORDERED that counsel for appellant Ignition Switch Plaintiffs submit a letter within seven days updating the Court on the status of the district court removal proceedings and the effect of those proceedings, if any, on the instant appeal.  In the event that there are further related developments prior to oral argument scheduled for March 15, 2016, it is also ORDERED that appellant Ignition Switch Plaintiffs shall advise the Court forthwith of those developments and their effect, if any, on this appeal.

     For the Court:

     Catherine O'Hagan Wolfe,
     Clerk of Court

# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

IN RE:
GENERAL MOTORS LLC IGNITION SWITCH
LITIGATION                                     14-MD-2543 (JMF)

*This Document Relates to All Actions*

------------------------------------------------------------------x

## PLAINTIFFS' MOTION TO REMOVE THE CO-LEADS AND RECONSIDER THE BELLWETHER TRIAL SCHEDULE

This is no easy motion. But it is the right motion. It has to be made. And it is

made for the benefit of all plaintiffs who are part of this Multidistrict Litigation

("MDL"). It unfortunately comes on the heels of the embarrassing retreat in

Scheuer, a loss that should not have occurred in a case that should never have been

filed, let alone gone to trial. It is also the culmination of a long series of poor

decisions and mismanagement by the MDL Co-Lead Counsel, Robert Hilliard,

Steve Berman, and Elizabeth Cabraser.

The Co-Leads' misconduct as it relates to discovery and the bellwether trial

selection process is detailed in this Motion. As to the bellwether process, the Co-

Leads chose a strong liability wrongful death case, Yingling v GM, to be the first

bellwether trial. The Co-Leads, however, working with GM's lawyers,

subsequently removed Yingling from the first bellwether trial position and inserted

Scheuer, an obviously weak case. The Co-Leads made this decision solely to maintain their control over the litigation and to punish the lawyer who represents the Yingling family because that lawyer refused to agree to Mr. Hilliard's demands that he let them be lead counsel at trial and pay 50 percent of any attorney's fees in the event a jury returned a verdict in favor of the Yingling family. As a result, the Scheuer trial went forward and, predictably, disaster ensued. The Co-Leads violated their fiduciary duty to all MDL plaintiffs by putting their interests over the interests of the MDL plaintiffs by replacing Yingling with Scheuer as the first bellwether trial.

## A.   Preliminary Matter

The following MDL plaintiffs (hereinafter, "Plaintiffs") join in this Motion:

1)   Lisa Allen Fobbs, as Personal Representative of the Estate of Charleston Darae Fobbs, Case No. 1:15-cv-04182.

2)   Karina K. Keeler n/k/a Karina Crawford, as Personal Representative of the Estate of Edward William Keeler, and James Robert Bowie, as Personal Representative of the Estate of Josie Marie Keeler, Deceased, Case No. 1:15-cv-06233.

3)   Robert Joseph Lelonek, as Personal Representative of the Estate of Richard L. Lelonek, Deceased, Case No. 1:15-cv-03641.

4)   Kimberly Rowe and Michael Rowe, Case No. 1:15-cv-04768.

5)   Douglas Brown, as Personal Representative of the Estate of Paige

Brown, Deceased, Case No. 1:15-cv-06452.

6)   Nelson Modeste, as Personal Representative of the Estate of Marcel

O. Modeste, Deceased, Case No. 1:15-cv-05995.

7)   Jamie Lee Dowling, individually and as surviving mother of Raylee

Kay Dowling and Landyn Scott Dowling, Case No. 1:15-cv-02033.

8)   James Gregory, as Personal Representative of the Estate of Jennifer

Louise Gregory, Deceased, Case No. 1:15-cv-06591.

9)   Dena M. Smith, Individually, and as Parent of Lillyana Blackwell, a

Minor and as Personal Representative of the Estate of Agnes C. Smith, Deceased,

Case No. 1:15-cv-02493.

### B.   The Purpose and Goals of an MDL

Congress created the MDL system in 1968 to coordinate complex litigation

filed in multiple federal districts.[1] The goals of the MDL, consistent with Rule 1 of

the Federal Rules of Civil Procedure,[2] are efficiency and economy. It is expected

and hoped that consolidation will save time, money, and judicial resources. As part

of that efficiency, it is expected that MDLs will save judicial time and resources,

---

[1]   See 28 U.S.C. § 1407(a).

[2]   Fed. R. Civ. P 1 ("They should be construed, administered, and employed by the
court and the parties to secure the just, speedy, and inexpensive determination of
every action and proceeding.") (As amended and effective December 1, 2015).

namely, by reducing the involvement of scores of federal judges all over the United States and placing the case in the hands of a single MDL judge. That also promoted consistency in pre-trial rulings.[3] Another expected benefit was the "unique opportunity for the negotiation of a global settlement."[4]

Those are, to be sure, laudable goals and purposes. To assist and see that the MDL meets those goals, the MDL court typically selects Co-Lead Counsel to oversee the MDL for all the plaintiffs in the MDL Action, as this Court did. For pre-trial proceedings, including discovery, those Co-Leads displace the lawyers in each case, and in each coordinated action bound to the MDL, become the MDL lawyers for those many plaintiffs. They stand in the shoes of the many plaintiffs' lawyers representing clients in the coordinated cases, and assume their duties to represent the plaintiffs.

But the expected efficiencies of the MDL should not come at the expense of the plaintiffs. It was never expected that the Co-Lead Counsel would take steps solely to benefit themselves and thus cause harm to the MDL plaintiffs as a whole. It was not the Plaintiffs' expectation that the Co-Leads would set aside their fiduciary duties. But these things have been done here.

---

[3] See generally Weigel, The Judicial Panel on Multidistrict Litigation, 78 F.R.D. 575 (1978).

[4] MANUAL FOR COMPLEX LITIGATION (FOURTH) § 20.132 (2004).

## C.    The Co-Leads Have a Fiduciary Duty to all MDL Plaintiffs

The Co-Leads owe each MDL plaintiff, as well as each plaintiff in a State Court Coordinated Action, a fiduciary duty. This duty requires that they "act for someone else's benefit, while subordinating [their] personal interests to that of the other person. It is the highest standard of duty implied by law."[5]

The Co-Leads have a fiduciary duty to "act fairly, efficiently, and economically in the interests of all parties and parties' counsel."[6] Fairness in the interest of all parties is the hallmark of a fiduciary duty. This duty prohibits an MDL Co-Lead from engaging in self-dealing and self-enriching conduct at the expense of any individual client. Or making a decision that benefits themselves while harming the plaintiffs. Thus, MDL Co-Leads are fiduciaries to all plaintiffs in the MDL.[7] An MDL lawyer with her own cases, who is then appointed as MDL Co-Lead, unequivocally "becomes a **fiduciary to all plaintiffs** and lawyers in the consolidated proceedings and **may not use her position to enrich herself at their**

---

[5] BLACK'S LAW DICTIONARY 625 (6th ed. 1990).

[6] MANUAL FOR COMPLEX LITIGATION (FOURTH) §10.22.

[7] PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 1.04 (2010) ("[c]lass counsel is a [ ] fiduciary to a client[, the named plaintiff,] who is also a fiduciary [to other class members]," and that **"[a] similar relationship obtains between lead attorneys and other lawyers in a multidistrict litigation"**) (emphasis added).

expense."[8] Those duties to avoid unjust enrichment and exploitation extend to all clients whose lawyers the MDL Co-Leads have effectively displaced in the MDL litigation.[9] In this respect, MDL Co-Leads are held to the same high fiduciary standard as mass tort lawyers[10] and class action lawyers[11] who represent plaintiffs and their lawyers.

### D. The Co-Leads Have Mismanaged This Litigation From the Outset

The unraveling of <u>Scheuer</u> allowed this Court to peer—albeit briefly—into the mismanagement that has plagued the MDL Plaintiffs from the outset of this litigation. The following are a few representative examples of the decisions by the Co-Leads that have led to where we are now:

1)      From the very beginning, the Co-Leads have not been interested in coordination with other lawyers in the MDL and other lawyers in state court cases, but rather in position and control.

---

[8] <u>Id.</u> at § 1.05 illus, 4 (emphasis added).

[9] PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 1.05(b), (c)(3).

[10] <u>Huber v. Taylor</u>, 469 F.3d 67, 81 (3d Cir. 2006) (mass tort lawyers act as lawyers for all the plaintiffs and as such have a fiduciary duty).

[11] MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.12 (emphasis added) ("[A]n attorney acting on behalf of a putative class must **act in the best interests of the class as a whole**); <u>In re Pharm. Indus Average Wholesale Price Litig.</u>, 588 F.3d 24, 36, n. 12 (1st Cir. 2009) (citations omitted and emphasis added) ("Class counsel are **fiduciaries** to the class.")

2)      The Co-Leads have not involved most of the Executive Committee ("EC") members in the MDL to discuss the most important issues related to the litigation.

3)      The Co-Leads at times have worked with GM's counsel to ensure that all other law firms are essentially frozen out from the strategic and tactical decisions regarding the discovery process. For example, the Co-Leads scheduled depositions without any EC input whatsoever. Deposition assignments were doled out without any discussion about which law firms would be taking the deposition of which witnesses. There was no rhyme or reason to the deposition assignments. It appears there was little to no tactical or strategic debate about who should be deposed, about what, or who should not be deposed, and why. And so on.

4)      EC members were more or less "siloed" and asked to review documents and take depositions without any real understanding of the big picture.

5)      The depositions were assigned to give certain firms a certain amount of work without any real strategic plan and to increase the billing of the Co-Lead's firms.

6)      When lawyers representing clients in state court cases approached the Co-Leads about having some level of meaningful participation in the process, the Co-Leads accused those lawyers of somehow having a "professional conflict" with the Co-Leads.

7)      Over time it became clear that prosecution of the case was not about obtaining the necessary evidence to present the best case at trial. Rather, it was about billing hours and carving out hours and making sure that the Co-Leads controlled this process. In short, it was about making money for the Co-Leads.

8)      The Co-Leads consistently attempted to thwart efforts by the state court lawyers to coordinate the prosecution of the coordinated actions, and would not even provide the names of all the attorneys with state court cases so that they could communicate regarding the prosecution of the cases.

9)      The Co-Leads wanted to "silo" the state court lawyers because they could more effectively control the litigation if the state court lawyers were not unified in their approach to the litigation.

10)    Incredibly, the Co-Leads suggested that the state court lawyers who advocated on behalf of their clients in state court cases had a conflict if they were already participating in the MDL.

11)    The Co-Leads selected the trials for the bellwether schedule before Mr. Feinberg concluded his work with the GM Ignition Compensation Claims Resolution Facility. This precluded consideration of many cases that were not resolved through that process and were not filed in court until that process was completed. Since Mr. Feinberg concluded his work, many new cases have been

filed and folded into the MDL, some of which may be far better bellwether cases for plaintiffs than those currently selected.

12)    The Co-Leads did not consider state court cases when selecting trials for the bellwether schedule. There are state court cases that deserved, and continue to deserve, strong consideration as bellwether cases.

13)    Five of the six bellwether cases were selected from Mr. Hilliard's personal case inventory, allowing the Co-Leads to remain in control of the bellwether trial process. Of course, <u>Yingling</u> was the sixth bellwether case and likely would not have been chosen had the Co-Leads known the lawyer for the Yingling family would not submit to one of the Co-Leads' improper demands.

Taken in isolation, some of the above may be considered part of the normal give and take of any MDL. The Co-Leads will no doubt chalk it up to disgruntled lawyers and the fact that you simply cannot make everybody happy when trying to control a large and complex litigation such as this. When considered in its totality, however, the Co-Leads' conduct goes far beyond what can be considered normal and acceptable behavior for lawyers in their position.

**E.      The Co-Leads Have Breached Their Fiduciary Duty to all MDL
            Plaintiffs**

1.      **What Should Have Happened with the Bellwether Selection
            Process, But Did Not**

It is axiomatic that plaintiffs' counsel always want to try their best case first

in MDL litigation. A successful result in the first trial often causes the defendant to

reconsider its litigation strategy and to place a higher settlement value on pending

cases. The most recent example is in the Toyota sudden acceleration MDL. After

Toyota lost the first sudden acceleration trial, <u>Bookout v. Toyota</u>, Case No. CJ-

2008-7969, Oklahoma County District Court, State of Oklahoma **(a state court**

**case)**, its "no settlement" litigation strategy changed, resulting in settlements of

almost all of the sudden acceleration personal injury cases.

With this in mind, co-leads in any MDL have a fiduciary duty to all MDL

plaintiffs to ensure that they choose the best cases for the plaintiffs from the

existing pool of cases. This includes both federal and state court cases. The co-

leads should make every effort to cooperate with lawyers who have filed state

court cases since those state court cases may be strong potential bellwether cases.

The Co-Leads refused to follow this routine procedure during the bellwether

selection process. Specifically, the Co-Leads chose not to consider any state court

cases in their continuing efforts to retain control over the litigation. This decision

by the Co-Leads was a breach of the fiduciary duty they owed to all MDL
plaintiffs.

### 2. The <u>Yingling</u> Controversy and the Selection of <u>Scheuer</u>

Plaintiffs presume that the Co-Leads and GM's counsel had discussions
regarding the scheduling of the initial bellwether trials.[12] The parties submitted a
joint letter on July 27, 2015 initially scheduling <u>Yingling v. GM</u> to be the first
bellwether trial set for January 2016.

Victor Pribanic, a trial lawyer from Pittsburg, represents the Yingling
family. <u>Yingling</u> is a strong bellwether case. It involved a single vehicle crash of a
2006 Saturn Ion. The crash resulted in the death of James Yingling, a 35 year old
husband and father of five children. Mr. Yingling's vehicle (a Saturn Ion) was
preserved after the crash. Mr. Pribanic retained well-qualified experts who have
offered opinions that the ignition switch defects in Mr. Yingling's vehicle caused
Mr. Yingling's death. In other words, liability is good and damages are substantial.
It is (or was) a good case for the jury to hear first. Unfortunately, as is made plain
by the description of events set forth below, the selfish interests of the Co-Leads,

---

[12]  Plaintiffs can only presume this happened since the Co-Leads chose not to
involve any of the Executive Committee members or other lawyers representing
MDL and State Court Coordinated Action plaintiffs in the discussions regarding
the scheduling of the bellwether trials. These lawyers made recommendations to
Co-Lead Counsel regarding the bellwether trial schedule. Those recommendations
were ignored.

in violation of their fiduciary duties, resulted in <u>Yingling</u> being put at the back of the line of the bellwether trials.[13]

Before the Co-Leads selected <u>Yingling</u>, a partner of Mr. Hilliard spoke with Victor Pribanic. Mr. Hilliard's partner told Mr. Pribanic that <u>Yingling</u> would have a better chance of being picked as a bellwether case if Mr. Pribanic agreed to pay Mr. Hilliard and his law firm 50 percent of the attorneys' fees generated from the case. Mr. Pribanic politely declined the improper fee-gathering effort.

Shortly before the bellwether trial schedule was set, Mr. Hilliard called Mr. Pribanic and told Mr. Pribanic he was considering selecting <u>Yingling</u> as the first bellwether trial. He also expressed an interest in trying the case with Mr. Pribanic. Mr. Pribanic informed Mr. Hilliard he had not considered trying the case with Mr. Hilliard. Mr. Hilliard then indicated he would come to visit Mr. Pribanic so that they could discuss it.

On Thursday, July 30, 2015, after <u>Yingling</u> had been selected as the first bellwether trial, Mr. Hilliard flew to Pittsburgh where he met Mr. Pribanic for dinner and they discussed the merits of <u>Yingling</u>. During the dinner, Mr. Hilliard never broached the subject of trying the <u>Yingling</u> case together.

---

[13] Plaintiffs are prepared to submit, <u>in camera</u>, documents which support the chronology set forth in this Motion.

On Sunday, August 1, 2015, Mr. Pribanic received a phone call from Mr. Hilliard, who told him he was thinking about how they could handle the attorneys' fee if they tried the case together. He proposed that Mr. Pribanic's firm would retain any attorneys' fee in the event Yingling settled before trial. Mr. Hilliard added that, if Mr. Pribanic tried the case, some arrangements for dividing the fee should be arranged. Mr. Pribanic sent a letter to Mr. Hilliard on August 3, 2015 addressing these issues. Mr. Pribanic politely declined Mr. Hilliard's proposition. Mr. Pribanic received no response to his letter.

Just two days later, on August 5, 2015, without notice to the EC or any other plaintiffs' counsel, the Co-Leads sent a letter to the Court requesting that the bellwether trial schedule be modified.[14] This was the first time Mr. Pribanic had heard from Mr. Hilliard since Mr. Pribanic's letter of August 3, 2015. In their letter, the Co-Leads asked the Court to move the Yingling case from first position to last position.[15] In its stead, the Co-Leads asked the Court to schedule Scheuer v. GM as the first bellwether trial, and Cockram v. GM as the third.[16] Yingling would now be relegated to position number five. Since the schedule change appeared to

---

[14]  Further evidence of the Co-Leads' breach of their fiduciary duty is the Co-Leads' decision not to include any lawyers, including any member of the Executive Committee, in their decision to change the bellwether trial schedule.

[15]  See letter of August 5, 2015.

[16]  Both Scheuer and Cockram were filed by Mr. Hilliard and his firm.

be a mere formality, this Court agreed with it. GM understandably had no

objection to the bellwether trial schedule change given the differences between

Yingling and Scheuer; differences that would—and unfortunately did—provide

GM with a substantial advantage in the litigation.

On August 13, 2015, Mr. Pribanic approached the Co-Leads after they had

cut the secret deal with GM's lawyers to move his case to number five and told

them that he was going to bring this matter to this Court's attention. The Co-Leads

were understandably concerned about what they had done. They justified their

actions, however, by rationalizing and equivocating. They argued that, while

Yingling (a death case with strong evidence) was obviously a better case, Scheuer

(a soft tissue case with questionable liability)[17] was more representative of the

existing cases, and it was therefore in the interests of the MDL and State Court

---

[17] As this Court knows, many of these cases have difficult liability issues to
overcome solely because of GM's cover-up and fraud. Many drivers (or the
families of their survivors) opted to sell or destroy totaled vehicles because they
were unaware that a hidden defect (that was known to GM) caused their injuries.

Coordinated Action plaintiffs to try <u>Scheuer</u> first.[18] They further attempted to

placate Mr. Pribanic by moving <u>Yingling</u> to number three.[19]

### 3.    The <u>Scheuer</u> Disaster

This Court and people worldwide are now well-aware of the merits of

<u>Scheuer</u>. The Co-Leads are now downplaying the loss.[20] No doubt, they will say

they did not know about the plaintiffs' alleged fraud. Even if that were true, they

knew that it was a weak case which anyone who reads the news now knows as

well. <u>Scheuer</u> should have never been tried, let alone selected as the first

bellwether trial in one of the most well-documented deadly vehicle defect cover-up

cases in history. <u>Scheuer</u> is the very definition of an outlier.[21] It was a post-recall

---

[18]  The two other Co-Leads, Ms. Cabraser and Mr. Berman, were also co-leads in
the Toyota sudden acceleration MDL. They certainly knew of the importance of
winning the first personal injury trial given what happened after the plaintiff's
verdict in <u>Bookout v. Toyota</u>. Instead, they agreed that <u>Scheuer</u> should supplant
<u>Yingling</u>.

[19]  On December 1, 2015, this Court entered an Order moving <u>Yingling</u> to position
number 3.

[20]  In fact, one Co-Lead has used the excuse that this Court was involved in
choosing <u>Scheuer</u> for the first bellwether trial. In other words, the spin from at least
one Co-Lead is that it was not all their fault <u>Scheuer</u> was tried first, it was at least
partially the Court's fault.

[21]  To the extent that <u>Scheuer</u> is arguably not an outlier, it is only because Mr.
Hilliard and his firm have flooded the MDL with cases that should never have been
filed. For example, take the case of Lawrence Barthelemy and Dionne Spain,
(hereinafter "<u>Barthelemy</u>"), another case filed by Mr. Hilliard's firm, which was
GM's first bellwether selection and is the next in line to be tried as a bellwether
case. According to media reports, that case involves a loss of control incident on an

incident with no vehicle, no download, and minimal injuries. Moreover, it appears that the vehicle was available during the time Mr. Scheuer realized he had a potential claim against GM but, somehow, the car was not preserved.

As it turned out, Mr. Scheuer was allowed to testify about alleged damages that the Co-Leads obviously did not properly investigate, and which are now the subject of fraud and perjury allegations. GM is now taking full advantage of this gift: painting itself as a victim of fraud, attempting to take the moral high ground, and stealing the momentum – none of which it deserves and all of which it was given by the Co-Leads. And this after GM fraudulently concealed the ignition switch defect for over a decade, which resulted in the deaths and severe injuries of hundreds of consumers.

Everyone is now left wondering the same thing: How could this have happened? There is, frankly, only one possible explanation. The Co-Leads wanted to ensure that at least one of them[22] tried the first bellwether trial, and they wanted to ensure that they maximized their attorneys' fees in the process. This was so important to them that they moved Scheuer ahead of Yingling *after* they had

---

icy bridge in New Orleans. There is no claim that their airbag failed to deploy. There were 38 other accidents on the same bridge that night, but those were chalked up to a "run of black ice" covering the bridge. It is not surprising that every one of GM's bellwether selections were filed by Mr. Hilliard and his firm.

[22] As the Court is aware, Mr. Berman served as co-counsel with Mr. Hilliard in the Scheuer trial.

selected <u>Yingling</u> as number one. This misconduct violated their fiduciary duty to all MDL plaintiffs. No lawyer (other than a lawyer representing GM) would want to try <u>Scheuer</u> before <u>Yingling</u>.[23] But the decision was made, and the plaintiffs are now forced to lie in the bed made by the Co-Leads.

Furthermore, shortly after the Co-Leads moved <u>Scheuer</u> to position number one, Mr. Hilliard settled most, if not all, of his remaining personal injury cases. Why were <u>Scheuer</u> and <u>Cockram</u>, as well as the three cases filed by Mr. Hilliard which GM selected as bellwether cases,[24] not settled as part of the global settlement agreement between Mr. Hilliard and GM? It appears as though Mr. Hilliard "packaged" most of his cases for settlement, but chose not to settle <u>Scheuer</u> or <u>Cockram</u> so that he could be assured of being the lead trial lawyer in the first and third of Plaintiffs' bellwether selections. Moreover, given that every GM bellwether selection was filed by Mr. Hilliard and his firm, Mr. Hilliard is now in the position of being lead counsel in five of the six bellwether trials.

In other words, Mr. Hilliard will be well compensated when settling most of his cases with GM, while he and his team continue to spend billable hours preparing to try the remaining bellwether cases. If he had settled all of his cases,

---

[23] Plaintiffs' counsel cannot recall an automotive defect case with marginal liability and alleged soft tissue injuries ever going to trial, let alone being selected as the first bellwether trial in an MDL.

[24] One of which is the <u>Barthelemy</u> case, which is next in line to be tried.

his role in this MDL litigation would have been significantly diminished. To make matters worse, if Mr. Hilliard had settled Scheuer in September (when he settled the bulk of his GM cases), there would have been sufficient time to move Yingling back to position number one, something Mr. Hilliard has made clear he would not allow to happen.

GM, no doubt, wanted to settle as many cases as possible on their terms. GM also wanted to keep Scheuer in position number one and keep the remaining cases filed by Mr. Hilliard in their respective positions as well, which is likely why it allowed Mr. Hilliard to carve them out of the global settlement. As a result, Mr. Hilliard appears to have, once again, placed his own interests above the interests of the remaining plaintiffs by settling most of his cases, while ensuring he would still be the lead lawyer in two of Plaintiffs' three bellwether selections (and five of the overall six bellwether trials).[25]

### 4.   Trouble Still Ahead?

The next case slated to be tried is Barthelemy. Like four of the other bellwether cases Scheuer, Cockram, Reid, and Norville, it was filed by Mr. Hilliard and his firm. According to media reports, it involves a loss of control incident on an icy bridge in New Orleans. Thirty-eight other vehicles were also involved in

---

[25]   GM also benefited by excluding Scheuer from the global settlement with Mr. Hilliard since it was able to settle over a thousand cases while, at the same time, retaining a soft tissue personal injury case as the first bellwether trial.

- 18 -

loss of control incidents that same night on the same bridge. Those thirty-eight individuals blamed the loss of control on a "run of black ice" that was covering the bridge. Ms. Spain and Mr. Barthelemy blame it on the ignition switch in their GM vehicle.

One may argue that GM chose well in selecting Barthelemy while the Co-Leads chose poorly in selecting Scheuer. Of course, that begs the question: Why did Mr. Hilliard file Barthelemy in the first place? As a Co-Lead, he must have known better than anyone the risk of filing a bad case. GM may select it and may ultimately win at trial. Such a result coming on the heels of the Scheuer loss, would be another blow to the MDL plaintiffs. It is obvious why Mr. Hilliard filed Barthelemy. It was not due to its merits. It was another filed case he could list in his effort to obtain a Co-Lead position.

In fact, Mr. Hilliard likely received his appointment as one of the three Co-Leads in large part because he represented to this Court at the August 11, 2014 hearing that his firm represented over 500 clients who were harmed by the GM ignition switch defects. Mr. Hilliard and his firm signed up whoever they could as clients, regardless of the merits of their cases, in order to convince the Court that he was "the GM defect ignition switch lawyer" and secure himself a spot as a Co-Lead. Proof of this is the Co-Leads' decision to select Scheuer as the first bellwether trial. Scheuer was presumably the best case in Mr. Hilliard's remaining

inventory, which tells this Court all it needs to know about the merits of the remaining cases that Mr. Hilliard filed.

### F.    Conclusion

This motion gets to the heart of the MDL process and what should be the expectations for lead counsel and the MDL actions. The Co-Leads may argue that their actions are "business as usual" in MDLs. If so, "business as usual" in these MDLs must stop. All MDLs ultimately are about the parties – all parties, not just the parties who happen to be the clients of a Co-Lead. There is no excuse for what happened with Yingling and Scheuer. Nor is there any excuse for the mismanagement that has plagued this litigation since the Co-Leads were appointed. The breaches of fiduciary duty outlined above should compel this Court to remove the Co-Leads, appoint new Co-Leads, and examine whether the current bellwether trial schedule is in the best interests of the injured victims – particularly since there are better available cases, other than Yingling,[26] now that the Feinberg protocol has ended and new cases have been filed into the MDL, as well as state courts.

Plaintiffs therefore respectfully request that this Court remove the Co-Leads, appoint new Co-Leads, and provide a process where the bellwether trial schedule can be reevaluated.

---

[26]  Plaintiffs are not asking that the Yingling scheduled trial date be moved.

Respectfully submitted this 25th day of January, 2016.

                                        **THE COOPER FIRM**

                                        */s/ Lance A. Cooper*_____
531 Roselane Street, Suite 200          Lance A. Cooper
Marietta, Georgia 30060                 Georgia Bar No. 186100
Main: (770) 427-5588
Fax:   (770) 427-0010
Lance@TheCooperFirm.com

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that the foregoing was filed

electronically with the Clerk of the Court using the CM/ECF system on January

25, 2016 and served electronically on all counsel of record.

THE COOPER FIRM

/s/ Lance A. Cooper

531 Roselane Street, Suite 200          Lance A. Cooper
Marietta, Georgia 30060                 Georgia Bar No. 186100
Main: (770) 427-5588
Fax:   (770) 427-0010
Lance@TheCooperFirm.com