# Exhibit  W

FILED IN MY OFFICE
DISTRICT COURT CLERK
6/9/2015 2:10:11 PM
James A. Noel
Patricia Serna

**STATE OF NEW MEXICO**
**COUNTY OF BERNALILLO**
**SECOND JUDICIAL DISTRICT**



| | |
|---|---|
| CONSTANCE HAYNES-TIBBETTS, Individually and as Wrongful Death Personal Representative of the Estate of JON TIBBETTS,<br><br>    Plaintiffs,<br><br>vs.<br><br>ARMANDO SAENZ; INTEGRITY AUTOMOTIVE L.L.C.; GENERAL MOTORS, LLC; FORD MOTOR COMPANY; and JOHN DOES 1-3;<br><br>    Defendants. | No.  D-202-CV-2015-04918 |

---

### PLAINTIFF'S COMPLAINT TO RECOVER DAMAGES FOR PERSONAL INJURY AND OTHER DAMAGES PURSUANT TO NEW MEXICO STATUTORY AND COMMON LAW

---

Plaintiff, CONSTANCE HAYNES-TIBBETTS, Individually and as Wrongful Death Personal Representative of the Estate of JON TIBBETTS, submits the following Complaint pursuant to New Mexico law, stating:

### PARTIES

1.

At the time of his death on July 23, 2012, Jon Tibbetts ("Decedent" or "Decedent Jon Tibbetts"), age 59, was a citizen and resident of Bernalillo County, New Mexico. The Decedent was employed full-time as the Fire Chief for Sandoval County, New Mexico.

2.

Plaintiff Constance Hayes-Tibbetts (hereinafter "Plaintiff Connie Tibbetts" or "Plaintiff") is a citizen and resident of Bernalillo, County New Mexico. Plaintiff Connie Tibbetts was the Decedent's spouse and is the duly-appointed Wrongful Death

Personal Representative of Decedent's Estate, which is filed in Bernalillo County, New Mexico.

3.

Defendant Armando Saenz ("Defendant Saenz") is a citizen and resident of Bernalillo County, New Mexico. Defendant Saenz is over the age of majority, not on active duty in any branch of the United States Armed Forces, and is otherwise subject to jurisdiction of the Court.

4.

Defendant Integrity Automotive, L.L.C. d/b/a Integrity Automotive ("Defendant Integrity Automotive"), is a New Mexico for-profit corporation (LLC), with its principal business being the sale of pre-owned automobiles located at 9790 Coors Blvd NW, Albuquerque, New Mexico.

5.

Defendant General Motors, LLC ("GM-LLC") is a Delaware Limited Liability Company ~~and the successor to GM.~~ On July 10, 2009, GM's [Old GM's] continuing operational assets were transferred to "Acquisition Holdings LLC", which assumed the name "General Motors Company LLC". As part of a reorganization plan agreed to with the U.S., Canadian and Ontario governments, and the company's unions, ~~GM~~ [Old GM] filed for Chapter 11 Bankruptcy protection in a Manhattan court in New York on June 1, 2009. ~~GM~~ [Old GM] filed for a government-assisted Chapter 11 bankruptcy protection on June 1, 2009~~, with a plan to re-emerge as a less debt-burdened organization~~. The filing reported $82.29 billion in assets. The "new GM," or "GM-LLC" was formed from the purchase of the desirable assets of "old GM" by an entity called "NGMCO Inc." via the bankruptcy process. NGMCO Inc. was renamed to "General Motors Company" upon purchase of the assets and trade name from "old GM," with the claims of former stakeholders to be handled by the "Motors Liquidation Company." The purchase was supported by $50 billion in U.S. Treasury loans, giving the U.S. government a 60.8% stake in ~~GM.~~ [New GM] The Queen of Canada, in right of both Canada and Ontario, holds 11.7% and the United Auto Workers, through its health-care trust (VEBA), holds a further 17.5%. The remaining 10% is held by unsecured creditors. On July 10, 2009, a new entity, NGMCO Inc. purchased the ongoing operations and trademarks from ~~GM.~~ [Old GM] The purchasing company in turn changed its name from NGMCO Inc. to General Motors Company~~, marking the emergence of a new operation from the "pre-packaged" Chapter~~

~~11 reorganization~~.  Under the reorganization process, termed a 363 sale (for Section 363 which is located in Title 11, Chapter 3, Subchapter IV of the United States Code, a part of the Bankruptcy Code), the purchaser of the assets of a company in bankruptcy proceedings is able to obtain approval for the purchase from the court prior to the submission of a re-organization plan, free of liens and other claims. The U.S. Treasury financed a new company to purchase the operating assets of the old GM in bankruptcy proceedings in the 'pre-packaged' Chapter 11 reorganization in July, 2009.  At all times relevant to the complaint, GM-LLC formally accepted responsibility for the design, manufacture, assembly, marketing and distribution of the subject vehicle, including financial responsibility for damages associated with defects in the subject vehicle.  ~~Prior to June 1, 2009, General Motors Corporation (n/k/a Motors Liquidation Company "MLC"), and now known as~~ GM-LLC~~, was and~~ is authorized to conduct business in New Mexico, owns property in New Mexico, conducts business in New Mexico and derives significant revenue from its activities in New Mexico, and is therefore subject to be sued in New Mexico courts.  Since July 10, 2009, ~~At all times relevant to the complaint,~~ GM-LLC was in the business of designing, developing, testing, manufacturing, marketing and distributing automobiles~~, including the defective truck that forms the subject matter of this litigation~~.  GM-LLC'S authorized agent for service of process is Corporation Service Company, 123 East Marcy Street, Suite 101, Santa Fe, New Mexico 87501.

6.

Defendant FORD MOTOR COMPANY (hereinafter *"Ford"*), is a Delaware corporation with its principal place of business in Dearborn Michigan. *Ford* is authorized to conduct business in New Mexico; conducts business in New Mexico; and derives substantial economic profits from New Mexico. As such, *Ford* is subject to personal jurisdiction in this state. *Ford* is an American multinational automaker headquartered in Dearborn, Michigan, a suburb of Detroit. It was founded by Henry Ford and incorporated on June 16, 1903. The company sells automobiles and commercial vehicles under the Ford brand and luxury cars under the Lincoln brand. In 2011, *Ford* discontinued the Mercury brand, under which it had marketed entry-level luxury cars in the United States, Canada, Mexico, and the Middle East since 1938. In the past it has also produced heavy trucks, tractors and automotive components. *Ford* owns small stakes in Mazda of Japan and Aston Martin of the

United Kingdom. It is listed on the New York Stock Exchange and is controlled by the Ford family, although they have minority ownership. *Ford* is the second-largest U.S.-based automaker and the fifth-largest in the world based on 2010 vehicle sales. At the end of 2010, *Ford* was the fifth largest automaker in Europe. *Ford* is the eighth-ranked overall American-based company in the 2010 Fortune 500 list, based on global revenues in 2009 of $118.3 billion. In 2008, *Ford* produced 5.532 million automobiles and employed about 213,000 employees at around 90 plants and facilities worldwide. *Ford*'s authorized agent for service of process is CT Corporation System, 123 E. Marcy Street, Ste. 201, Santa Fe, NM 87501.

7.

Defendants John Does 1-3 are unidentified people or corporations who were, or may have been, involved in recommending, installing, selling, distributing, or otherwise participating in the service of the Cadillac SRX, including installation of the inappropriate tire, wheels, and attachments on the Saenz vehicle. The information necessary to specifically identify who those people and entities are is in the unique and exclusive possession of Defendants Integrity and Saenz and therefore not obtainable.

## JURISDICTION AND VENUE

8.

This civil action is brought under theories of strict liability, negligence, breach of implied warranty, personal injury, and wrongful death.

9.

This Court has jurisdiction over the subject matter of this action and venue is proper in Bernalillo County because all or part of Plaintiff's cause of action arose in Bernalillo County, Defendants *GM-LLC* and *Ford* do business in Bernalillo County and maintain statutory agents in New Mexico upon which service of process may be had, and Plaintiff Connie Tibbetts and Defendant Armando Saenz are residents of Bernalillo County, State of New Mexico.

## GENERAL ALLEGATIONS

10.

The defective 2005 Cadillac SRX (VIN: 1GYEE63A950117981) which forms the basis for this suit, was designed, tested, manufactured, marketed, assembled, and/or distributed by ~~Defendant GM-LLC~~ Old GM. The Cadillac SRX is a luxury mid-size crossover

SUV produced by the Cadillac division of American automaker General Motors since the 2004 model year. The SRX ~~is~~ was manufactured at ~~GM's~~ Old GM's Lansing Grand River Plant in Lansing, Michigan, as well as assembled overseas in Russia and China. It was designed by ~~GM~~ Old GM from the Cadillac and Cadillac STS platform with the designation GMT-265 (Sigma platform). The SUV ~~is~~ was designed with 116" wheelbase; 195" length; 73" width; and 68" height. The vehicle ~~is~~ was equipped with a five or six-speed automatic transmission. Rear-wheel and four-wheel drive and MagneRide are available. The first generation SRX was available through the 2009 model year. The Insurance Institute for Highway Safety ("IIHS") found the 2005-08 SRX worst in its class for driver fatalities with a death rate of 63 compared to its class average of 23. For the 2010 model year, Cadillac introduced an all-new SRX based on the Provoq concept vehicle. The new version used its own unique platform with ties to Epsilon II.

11.

Defendant Integrity Automotive sold the defective 2005 Cadillac to Defendant Armando Saenz just days before the July 23, 2012, fatal collision.

12.

The defective 2004 Ford Explorer (VIN: 1FMZU73K64ZA14385) which forms the basis of this suit, was designed, tested, manufactured, marketed, assembled, and/or distributed by *Ford*. The Ford Explorer is a mid-size sport utility vehicle produced by Ford since 1990 (as 91 model year). Until 2010, the Explorer was formed from a traditional body-on-frame, mid-size SUV design. For the 2011 model year, Ford moved the Explorer to a more modern unibody, full-size crossover SUV/crossover utility vehicle platform, the same Volvo-derived platform the Ford Flex and Ford Taurus use. For purposes of marketing, the Explorer is slotted between the traditional body-on-frame, full-size Ford Expedition and the mid-size CUV Ford Edge. The fifth generation Explorer shares platforms with the Ford Flex and Lincoln MKT. The Explorer has been involved in controversy, after a spate of fatal rollover accidents throughout the 1990s and early 2000s, including those involving Explorers fitted with Firestone tires. The 4-door Explorer and its companion the Mercury Mountaineer were redesigned in 2001, and entirely for the 2002 model year, losing all design similarity with the Ford Ranger while also gaining a similar appearance to the Ford Expedition. The 2002-2004 models saw introduction of stability control as an option, Ford's *AdvanceTrac* with *Roll Stability Control* system. The stability control system became standard for the 2005

model year. For the third generation, Ford installed fully independent rear suspension in the 4-door Ford Explorer and Mercury Mountaineer - but not in the smaller Sport model. The suspension replaced the non-independent "live axle" rear suspension used in previous model year Explorers. With a fully independent rear suspension, each rear wheel connects to the rear differential via a half-shaft drive axle. The design was intended to offer increased ride comfort, on-road handling, and vehicle stability. One reason for Ford's switch to independent rear suspension in the Explorer was due to the well-publicized rollover problem associated with the design, including resulting fatalities that occurred with the previous generations of Ford Explorer. The 2006 model year brought about an update with the introduction of a new frame produced by *Magna International* rather than *Tower Automotive*. By 2008, Ford added side curtain airbags across the Explorer range. By 2009, the Explorer received a trailer sway control system as standard equipment, and the navigation system received traffic flow monitoring and a gas information system. By 2011, the fifth generation Explorer evolved to a unibody structure based on the D4 platform, a modified version of the D3 platform. The newer Explorer featured blacked-out A, B, and D-pillars to produce a *floating roof* effect similar to Land Rover's floating roof design used on its sport utility vehicles. The fifth generation Explorer (2011), assembly moved to Ford's Chicago Assembly plant, where it is built alongside the Ford Taurus and Lincoln MKS. The Louisville plant, where the previous generation was built, was converted to produce cars based on Ford's global C platform (potentially including the Ford Focus, Ford C-Max, and Ford Kuga). Much like Ford's Escape, the Explorer continues to be marketed as an "SUV" rather than a "crossover SUV". With the discontinuation of the Ford Crown Victoria in 2011, and to compete with police model sport utility vehicles offered by other automobile manufacturers, Ford made the 2012 model year Explorer the basis for a "new" SUV-type Police vehicle. It is only available to law enforcement and other emergency services agencies. Ford calls it the *Utility Police Interceptor*. Major differences between the standard Explorer and the Utility Police Interceptor included provisions for emergency services related equipment such as radios, light bars and sirens. Ford actively marketed the so-called "special service" version of the Explorer as the industry's "first pursuit-rated, all-wheel-drive (AWD) vehicle" with special features such as "bigger brakes, springs and mpg figures for surer stopping, better stability, and greater fuel efficiency." Ford likewise represented and warranted that the Explorer

special service version had "faster, ultra-tenacious acceleration thanks to higher horsepower combined with standard AWD", as well as "higher electrical capability". Ford further marketed and sold the police package as "hailing from the same platform so they share many common maintenance parts (no matter the powertrain), including tires, wheels, brake pads, rotors, calipers, and alternator." Ford likewise represented that the design was made for "officer protection" in that it was certified for protection, including certified for a 75 mph rear-impact crash, so-called "shields of armor" as panels for ballistics protection, steel intrusion plates built into the seat backs, and a "safety cell" construction designed to direct force of a collision around the occupant compartment ("SPACE" meaning Side Protection and Cabin Enhancement), including the use of an architecture made of hydro formed cross-vehicle beams between the door frames designed to solidify the sides along with ultra-high-strength steel reinforcement for added occupant protection. The vehicle was marketed with Ford's canopy system and front seat side airbags as well.

13.

On July 23, 2012, Defendant Armando Saenz was driving the 2005 Cadillac SRX northbound on U.S. Interstate 25, at a speed at or near the posted speed limit. During the course of Saenz' journey, he negligently lost control of his vehicle, struck a center concrete barrier, and then veered back to the right where he struck the left side of the 2004 Ford Explorer being driven northbound by the Decedent. Following impact, the Decedent attempted to control the Explorer, but due to its defective design, he was unable to and the Explorer rolled over multiple times causing Decedent to suffer serious injury and death.

### COUNT I
### NEGLIGENCE
### DEFENDANT ARMANDO SAENZ

14.

Defendant Armando Saenz owed the duty to exercise due care in the operation of the vehicle he was driving, including maintaining appropriate speed for the conditions, maintaining control of his vehicle, and operating the vehicle in a non-negligent manner.

15.

Defendant Armando Saenz breached his duties by failing to exercise the reasonable care necessary to maintain control of the vehicle and, specifically, the

defective 2005 Cadillac SRX involved in the fatal collision that forms the basis of Plaintiff's Complaint.

16.

Defendant Armando Saenz' negligence was a contributing cause of the injuries, death and damages complained of by Plaintiff herein.

## COUNT II
## STRICT LIABILITY/PRODUCT LIABILITY
## DEFENDANT FORD

17.

At all times relevant to the subject Complaint, *Ford* was responsible for designing, developing, testing, assembling, manufacturing, marketing, and distributing the defective 2004 Ford Explorer. Absent ordinary wear and tear, including foreseeable use, the subject vehicle was in substantially the same condition at the time of the crash as it was when it left *Ford's* possession.

18.

The Explorer is defective and unreasonably dangerous by design when used as marketed by *Ford*. The inherent defects in the design were present at the time the vehicle was manufactured, marketed, and distributed. The defects in the vehicle were a proximate and producing cause of the injuries, death and damages alleged by Plaintiff herein. At all times relevant to the Complaint, *Ford* was in the business of designing, manufacturing, assembling, marketing, testing, and otherwise distributing automobiles. The defective nature of the design of the Explorer included defects in design, stability, handling, marketing, instructions, warning, crashworthiness, rollover resistance and controllability. The defective nature of the vehicle includes the following:

18.01 The Explorer is defective in that the design of the "package", which includes the combination of track width and vertical center of gravity height, creates an unreasonable risk of rollover given the uses for which the vehicle was marketed, especially freeway use and special-service use;

18.02 The Explorer is defective from a handling standpoint because it has an unreasonable tendency to get sideways in emergency turning maneuvers, including while attempting to avoid crashes and dealing with impacts, and does not remain controllable under all operating conditions as required by *Ford* guidelines, including the tendency to over-steer and skate;

18.03 The Explorer is unreasonably dangerous from a stability standpoint because it rolls over instead of sliding when loss of directional control occurs on relatively flat level surfaces during foreseeable steering maneuvers;

18.04 The combination of the above factors creates an extreme risk of rollover that is both beyond the reasonable expectations of consumers and creates a risk that far outweighs any benefit associated with the design given the uses for which the vehicle was marketed;

18.05 The vehicle is unreasonably dangerous because it performs in an unsafe manner when operated in foreseeable emergency situations and maneuvers that are consistent with *Ford's* efforts to market the vehicle as a "station wagon" replacement for police use, which *Ford* had both actual and constructive knowledge would lead to rollover crashes. *Ford's* knowledge included both actual knowledge based on its test history with SUVs and its research and knowledge of rollovers in foreseeable turning maneuvers and constructive knowledge given its corporate history with respect to SUV designs, and unique and special knowledge of the dangers posed when operated by aggressive special service public servants;

18.06 The vehicle was defectively marketed in that consumers, including public servants, were led to believe that the vehicle was safe and stable and could be safely used as a passenger-carrying, station-wagon replacement type vehicle when *Ford* knew that this was untrue. In fact, Ford went further by representing that the police package had special or unique qualities that other Explorers did not have that actually enhanced the safety of the vehicles when exposed to emergencies;

18.07 The risk of operating the vehicle as designed outweighed any benefits associated with the design and *Ford* knew of these risks; knew that the risk, if it materialized, would lead to rollover crashes and severe injuries, and knew that rollover crashes were particularly dangerous;

18.08 *Ford* knew that this type vehicle — an SUV — was not reasonably safe for inexperienced and untrained drivers and knew that the vehicle was not sufficiently capable of maneuvering in emergency conditions that consumers would face on freeways at freeway speeds, especially by police officers who oftentimes are presented with dangerous driving situations;

18.09 The Explorer was likewise unreasonably dangerous from a crash protection standpoint in that the vehicle was not equipped with an occupant protection system — roof, occupant compartment, safety cell, safety belt system, anti-ejection design, and glazing design — that would effectively provide reasonable protection in the event of a rollover, with or without pre-roll impact. Similarly, the vehicle was designed in such a manner that unique equipment placement in the vehicle posed unique and unreasonable risk of injury to occupants in all forms of crashes. Despite actual knowledge of the unique dangers posed in rollover

crashes, Ford intentionally marketed the Explorer has having special or unique qualities or characteristics that made it safer than other vehicles for public servants;

18.10   Despite knowledge of these risks, and the availability of alternative safer designs, including safety features tied to roll sensing, such as pre-tensioners and side airbags or curtains, Ford intentionally marketed the vehicle to consumers, including public servants, for use as a freeway, passenger-carrying vehicle, and intentionally led the public to believe that it was safe, stable, and would provide state of the art protection to occupants exposed to extraordinary conditions;

18.11   *Ford* had both actual and constructive knowledge of the existence of safer,
alternative designs from both a stability and crash protection standpoint, including roll sensing, roll curtains, electronic stability control, roll stability control, and other safety features that were technologically feasible and available;

18.12   *Ford* willfully, wantonly, and consciously marketed the Explorer for the aforementioned uses with full knowledge of the risks inherent in the vehicle design, yet misled consumers and withheld critical information about the unsafe nature of the vehicle in conscious disregard for the public.

19.

*Ford's* engineers have known for over 30 years, from the time of the development of the Bronco II, that the most important vehicle characteristic in maintaining control and reducing SUV propensity for rollover is understeer, especially in transient maneuvers.   *FORD* identified understeer as a "first order effect" and the "primary factor influencing rollover propensity."

20.

The problem with an over-steering vehicle, with respect to rollover propensity, is that it can and likely will result in the back end of the vehicle coming around (a loss of control) with the vehicle ending up sideways to its path of travel.   The resulting side forces ("lateral acceleration") contribute to rollover.

21.

Ford also recognized that the rollover stability of a vehicle is affected by its "stability index," or "static stability factor", which is the relationship of center of gravity height and the track width of the vehicle.   In light of these common control and stability principles, *Ford* adopted a "handling strategy" with respect to the Explorer to "increase understeer in all conditions."

22.

*Ford's* engineers recommended major safety changes needed for the Explorer to *Ford* management, yet management ignored and vetoed those changes to increase profits on the vehicle. *Ford* engineers recommended, for example, improvements with regards to the Explorer's suspension, reduction in the engine height to lower the center of gravity, and an increase in the track width of the vehicle to make the Explorer more resistant to rollover than the Bronco II and earlier versions of the Explorer.

23.

*Ford's* knowledge of the critical importance of understeer was not acted upon, however, and *Ford* management rejected the center of gravity and track width recommendations of its engineers that would have made the Explorer more resistant to rollover. *Ford* declined to make the necessary changes so that there would not be any delays in the production of the Explorer, and thus Ford could recoup its $500 million investment as quickly as possible.

24.

*Ford* addressed the rollover stability problem primarily by recommending lower air pressure in the tires. As set forth in a 1989 development report, after noting that they had investigated variations in tire pressure "as a means to achieving the UN46 (Explorer) ride and handling objective," *Ford's* engineers recommended use of "reductions in tire pressure to meet the program objectives" for both ride and handling. Likewise, since *Ford's* marketing department was recommending larger tires (which reduced the vehicle's stability), *Ford* again put dollars in front of safety and recommended the larger tire, but with reduced air pressure. When it came to creating understeer, *Ford's* engineers again turned to lower tire pressure.

25.

By putting profits and public relations image before safety, *Ford* produced a vehicle -- beginning with the Ford Bronco II and continuing with minor changes -- that was prone to over-steer, going out of control in response to simple accident avoidance maneuvers, and rollover when operated by the ordinary driver.

26.

The Explorer also has dangerously weak roof pillars (which support the roof structure), incapable of maintaining integrity of the safety cell in the event of a

rollover, and thereby leading to the collapse of the roof — towards the passengers' heads — in a rollover crash.

27.

In the subject crash, the defectively weak roof collapsed and directly attributed to the injuries that took Jon Tibbett's life. The Explorer lacked adequate design features in the roof and structure that should have been present given the high propensity for rollover. The vehicle also lacked structural foam, which would also have substantially and feasibly increased the roof strength. Ford also failed to equip, as standard equipment, the 2004 Ford Explorer with electronic stability control, a feasible alternative design that would have likely avoided the rollover and injuries in the subject crash.

28.

Ford knew of the propensity of the Ford Explorer to rollover from the mid 1980's when the initial version of the program was approved. Ford was aware of the rollover problems of the Jeep CJ5 in the 1970s and 1980s, which were alleviated by simply lowering and widening the design. Ford had also experienced similar situations concerning rollover incidents dating back to the Bronco II. It is thus obvious that Ford was aware of the rollover issues concerning the Ford Explorer.

29.

Not only did Ford's own testing show that there were unacceptable Explorer rollover problems, but the high number of real world incidents also made Ford aware that attention should be directed to this issue. However, Ford made no significant attempt to correct the problem despite having the capacity and technology to do so.

30.

A safer alternative design was economically and technologically feasible at the time the product left the control of Ford, both with respect to rollover propensity and crash protection.

31.

The defective nature of the vehicle was a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, including his enhanced injuries, and the resulting damages suffered and sought by the Plaintiff herein. Ford is strictly liable for supplying the defective and unreasonably dangerous product.

## COUNT III
## NEGLIGENCE

## DEFENDANT *FORD*

### 32.

At all times relevant to this Complaint, *Ford* was in the business of supplying motor vehicles for use on the public roadways. *Ford* held itself out to the public as having specialized knowledge in the industry. As such, *Ford* owed consumers, including Decedent and Plaintiff, a duty to use reasonable care in the design, manufacture, preparation, testing, instructing, and warnings surrounding the Explorer. *Ford* violated this duty by negligently supplying a vehicle that was defective. The negligent acts include but are not limited to the following acts or omissions:

- Negligently designing the vehicle from a handling and stability standpoint given the manner in which it was marketed;

- Negligently designing the vehicle with poor rollover resistance given the manner in which it was marketed;

- Negligently designing and testing the vehicle from an occupant protection standpoint, and then marketing it for special use by public servants knowing full well that the features it represented did not exist in reality;

- Negligently testing of the vehicle from a handling and stability standpoint;

- Negligently failing to test the vehicle to ensure the design provides reasonable occupant protection in the event of a rollover;

- Failing to adequately train and assist dealers in the dangers associated with the vehicle when used as marketed;

- Failing to disclose known defects, dangers, and problems to both dealers and the public;

- Negligently marketing the vehicle as a safe and stable passenger vehicle given the uses for which it was marketed;

- Failure to meet or exceed internal corporate guidelines;

- Negligently advertising the vehicle as safe and stable family vehicle and one that was ultra-safe for use by public servants;

- Failing to inform the consumer, including the Plaintiff and Decedent, of the information *Ford* knew about rollover risks, and specifically the Explorer, thus depriving the Plaintiff and Decedent of the right to make a conscious and free choice, and also in failing to disclose known problems in foreign countries in an effort to conceal problems that *Ford* knew about the Explorer from U.S. consumers, including the Plaintiff and Decedent;

- Failing to comply with the state of the art in the automotive industry insofar as providing reasonable occupant protection in a rollover, including the use of roll sensing, pre-tensioners, side air bag and curtain technology, and integrated seating technology;

- Failing to comply with applicable and necessary Federal Motor Vehicle Safety Standards with respect to occupant protection and/or failing to test appropriately to ensure compliance;

- Failing to notify consumers, as required by law, that a defect exists in the vehicle that relates to public safety;

- Failing to recall the vehicle or; alternatively, retrofitting the vehicle to enhance safety.

33.

These acts of negligence were a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, his enhanced injuries, including his death, and the resulting damages suffered and sought by the Plaintiff herein. The dangers referenced earlier were reasonably foreseeable or scientifically discoverable at the time of exposure.

## COUNT IV
## BREACH OF WARRANTY
## DEFENDANT FORD

34.

At all times relevant to the complaint, *Ford* was a "merchant" in the business of supplying "goods" and/or "products" sold for consumer usage. As such, Ford breached the warranties of merchantability and fitness for a particular purpose in that the 2004 Explorer was not fit for ordinary use or for the intended use for which it was purchased. These breaches of warranty were a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, enhanced injuries, and the resulting damages suffered and sought by the Plaintiff herein. The product was unfit as previously described in the foregoing accounts. Notice has been provided as required by law.

## COUNT V
## STRICT LIABILITY/PRODUCT LIABILITY
## DEFENDANTS *GM-LLC* AND INTEGRITY AUTOMOTIVE

35.

Old GM

At all times relevant to the present Complaint, ~~*GM-LLC*~~ was responsible for designing, developing, testing, assembling, manufacturing, marketing, and

distributing the defective 2005 Cadillac SRX. Absent foreseeable wear, tear, modifications, and usage, the subject vehicle was in substantially the same condition at the time of the crash as it was when it left ~~GM LLC's~~ Old GM's possession.

### 36.

At all relevant times hereto, Defendant Integrity Automotive was engaged in the business of marketing, distribution, sales and service of motorized vehicles in New Mexico, and held itself out as having special knowledge and expertise. Integrity placed the subject defective vehicle into the stream of commerce in a condition that was defective and unreasonably dangerous, including non-approved, low-profile tires and loose tie rods.

### 37.

Upon information and belief, and at all material times hereto, ~~Defendants GM LLC~~ Old GM and Integrity Automotive marketed, distributed, sold and/or serviced the subject 2005 Cadillac SRX, and the Cadillac was in substantially the same condition, with respect to its steering mechanism, handling, maneuverability and stability, as it was when it was initially placed in the stream of commerce by ~~GM LLC.~~ Old GM

### 38.

The Cadillac SRX is defective and unreasonably dangerous by design when used as marketed. The inherent defects in the design were present at the time the vehicle was manufactured, marketed, and distributed. The defects in the vehicle were a proximate and producing cause of the injuries, including the severity of the injuries, death and damages alleged by Plaintiff herein. At all times relevant to the Complaint, ~~GM LLC~~ Old GM was in the business of designing, manufacturing, assembling, marketing, testing, and otherwise distributing automobiles. The defective nature of the design of the 2005 Cadillac SRX included defects in design, stability, steering, handling, marketing, instructions, warning, and controllability. The defective nature of the vehicle includes the following:

- The Cadillac SRX is defective from a handling standpoint because it does not remain controllable under all operating conditions as required by ~~GM LLC~~ Old GM guidelines;

- The inability to control the vehicle at all times creates an extreme risk of steering and controllability that is both beyond the reasonable expectations of consumers and creates a risk that far outweighs any benefit associated with the design given the uses for which the vehicle was marketed;

- *Old GM*
  ~~GM LLC~~ knew that this type vehicle — an SUV — was not reasonably safe for inexperienced and untrained drivers and knew that the vehicle was not sufficiently capable of maneuvering in emergency conditions that consumers would face on freeways at freeway speeds;

- *Old GM*
  ~~GM LLC~~ had both actual and constructive knowledge of the existence of safer, alternative designs from both a steering and controllability standpoint, including roll sensing, electronic stability control, roll stability control, and other safety features that were technologically feasible and available;

- *Old GM*
  ~~GM LLC~~ ~~willfully, wantonly, and consciously~~ marketed the Cadillac SRX for the aforementioned uses with full knowledge of the risks inherent in the vehicle design, yet misled consumers and withheld critical information about the unsafe nature of the vehicle in ~~conscious~~ disregard for the public.

39.

*Old GM*

By putting profits and public relations image before safety, ~~GM LLC~~ produced a vehicle that was prone to unreasonable steering and controllability, including going out of control in response to simple accident avoidance maneuvers when operated by the ordinary driver in foreseeable circumstances.

*Old GM*                                          40.

~~GM LLC~~ failed to equip, as standard equipment, the 2005 Cadillac SRX with adequate and proper control features that would have likely avoided the uncontrollability of the vehicle which contributed to the collision and injuries in the subject crash.

*Old GM's*                            41.

Not only did ~~GM LLC's~~ own testing show that there were unacceptable Cadillac SRX problems, but the high number of real world incidents also made ~~GM LLC~~ *Old GM's* aware that attention should be directed to this issue. However, ~~GM LLC~~ *Old GM's* made no significant attempt to correct the problem despite having the capacity and technology to do so.

42.

A safer alternative design was economically and technologically feasible at the time the product left the control of ~~GM LLC~~ *Old GM's*, both with respect to steering, controllability, and electronic stability control.

43.

The defective nature of the vehicle was a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, and the resulting damages suffered

and sought by the Plaintiff herein. Defendants *GM-LLC* and Integrity Automotive are strictly liable for supplying the defective and unreasonably dangerous product.

### COUNT VI
### NEGLIGENCE
### DEFENDANT *GM-LLC*

44.

At all times relevant to this Complaint, ~~*GM-LLC*~~ Old GM was in the business of supplying motor vehicles for use on the public roadways. ~~*GM-LLC*~~ Old GM held itself out to the public as having specialized knowledge in the industry. As such, ~~*GM-LLC*~~ Old GM owed a duty to persons using those vehicles, and persons whom ~~*GM-LLC*~~ Old GM reasonably expected to be in the vicinity during the use of those vehicles, including Decedent Jon Tibbetts, to use reasonable care in the design, manufacture, preparation, testing, instructing, and warnings surrounding the 2005 Cadillac SRX. ~~*GM-LLC*~~ Old GM violated this duty by negligently supplying a vehicle that was defective. The negligent acts* include but are not limited to the following acts or omissions:  *insert: of Old GM

- Negligently designing the vehicle from a steering, handling and controllability standpoint given the manner in which it was marketed;

- Negligently designing and testing the vehicle from a steering and controllability standpoint;

- Failing to adequately train and assist dealers in the dangers associated with the vehicle when used as marketed;

- Failing to disclose known defects, dangers, and problems to both dealers and the public;

- Negligently marketing the vehicle as a safe and stable passenger vehicle given the uses for which it was marketed;

- Failing to meet or exceed internal corporate guidelines;

- Negligently advertising the vehicle as safe and stable family vehicle;

- Failing to comply with the state of the art in the automotive industry insofar as providing a reasonable electronic stability control system is concerned;

- Failing to comply with applicable and necessary Federal Motor Vehicle Safety Standards with respect to steering, steering linkages, handling and controllability, and/or failing to test appropriately to ensure compliance;

- ~~Failing to notify consumers, as required by law, that a defect exists in the vehicle that relates to public safety; and~~

- ~~Failing to recall the vehicle or; alternatively, retrofitting the vehicle to enhance safety.~~

45.

These acts of negligence were a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, and the resulting damages suffered and sought by the Plaintiff herein. The dangers referenced earlier were reasonably foreseeable or scientifically discoverable at the time of exposure.

## COUNT VII
## NEGLIGENCE
## DEFENDANT INTEGRITY AUTOMOTIVE

46.

At all relevant times, Defendant Integrity Automotive owed Decedent and Plaintiff a duty of reasonable care. Defendant Integrity Automotive breached that duty of care and was otherwise negligent for the acts complained of herein. The negligence of Defendant Integrity Automotive combined to cause and/or contribute to Decedent's and Plaintiff's resulting injuries, death, losses and damages as set forth more fully herein. The negligence acts of Defendant Integrity Automotive include, but are not limited to the following:

- Negligently marketing the 2005 Cadillac SRX as a safe and stable passenger vehicle given the uses for which it was marketed;

- Failing to adequately inspect, service and equip the vehicle with safe and required equipment;

- Failing to ensure the vehicle was mechanically in good repair before allowing the vehicle to be sold to customers and used upon the roadways and highways open to the general public;

- Failing to disclose known defects, dangers, and problems regarding the vehicle;

- Failing to remove the 22 inch rims and the 265/35R22 tires that were on the vehicle, and then distributing the vehicle in a condition known to be dangerous;

- Failing to retrofit the vehicle with rims and tires specified by the manufacture to ensure and enhance the vehicle's safety; and

- Failing to advise or warn the vehicle's purchasers that size 22 inch rims and 265/35R22 tires were not specified by GM for use on the Cadillac SRX.

47.

These acts of negligence were a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, and the resulting damages suffered and sought by the Plaintiff herein. The dangers referenced earlier were reasonably foreseeable or scientifically discoverable at the time of exposure.

## COUNT VIII
## BREACH OF WARRANTY
## DEFENDANTS *GM-LLC* AND INTEGRITY AUTOMOTIVE

48.

At all times relevant to the complaint, ~~Defendants *GM-LLC*~~ Old GM and Integrity Automotive were "merchants" in the business of supplying "goods" and/or "products" sold for consumer usage. As such, ~~these defendants~~ Old GM and Integrity Automotive breached the warranties of merchantability and fitness for a particular purpose in that the 2005 Cadillac SRX was not fit for ordinary use or for the intended use for which it was purchased. These breaches of warranty were a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, and the resulting damages suffered and sought by the Plaintiff herein. The product was unfit as previously described in the foregoing accounts. Notice has been provided as required by law.

## COUNT IX
## NEGLIGENCE
## JOHN DOES 1-3

49.

At all relevant times, Defendants John Does 1-3 owed Decedent and Plaintiff a duty of reasonable care. Defendant John Does 1-3 breached that duty of care and were otherwise negligent for the acts complained of herein. The negligence of Defendants John Does 1-3 combined to cause and/or contribute to Decedent's and Plaintiff's resulting injuries, death, losses and damages as set forth more fully herein. The negligent acts of Defendants John Does 1-3 include, but are not limited to the following:

- Failing to adequately inspect, service and equip the 2005 Cadillac SRX vehicle with safe and required equipment;

- Failing to install and fit the vehicle with rims and tires specified by the manufacture to ensure and enhance the vehicle's safety;
- Installing inappropriate rims and tires on Defendant Saenz' SRX, including the 22 inch rims and the 265/35R22 tires that were on the vehicle at the time of the collision;
- Failing to ensure the SRX was mechanically in good repair before allowing the vehicle to be used upon the roadways and highways open to the general public; and
- Failing to advise or warn the vehicle's purchasers and users that size 22 inch rims and 265/35R22 tires were not specified by GM for use on the Cadillac SRX.

50.

These acts of negligence were a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, and the resulting damages suffered and sought by the Plaintiff herein. The dangers referenced earlier were reasonably foreseeable or scientifically discoverable at the time of exposure.

**COUNT X**
**BREACH OF WARRANTY**
**DEFENDANTS JOHN DOES 1-3**

51.

At all times relevant to the complaint, Defendants John Does 1-3 were "merchants" in the business of supplying "goods" and/or "products" sold for consumer usage. As such, these defendants breached the warranties of merchantability and fitness for a particular purpose in that the inappropriate 22 inch rims and the 265/35R22 tires that were on the 2005 Cadillac SRX were not fit for ordinary use or for the intended use for which they were purchased. These breaches of warranty were a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, and the resulting damages suffered and sought by the Plaintiff herein. These products were unfit as previously described in the foregoing accounts. Notice has been provided as required by law.

**DAMAGES**
**INCLUDING LOSS OF CONSORTIUM**

52.

The actions and/or inactions of Defendants *Ford*, *GM-LLC*, Integrity Automotive, Armando Saenz, and John Does 1-3, including the aggravating circumstances attending those acts and/or failures to act, caused and/or contributed to Decedent's serious injuries and death, and the resulting damages therefrom include:

* Conscious pain and suffering;
* Mental anguish and distress,
* Medical expenses;
* Disfigurement and death;
* Funeral and burial expenses;
* Property damages;
* Loss of earnings and earning capacity;
* Loss of life and enjoyment of life; and
* Loss of household services; all for which Plaintiff seeks relief pursuant to the New Mexico Wrongful Death Act and other New Mexico law.

53.

Plaintiff Connie Tibbetts enjoyed a very special marital, familial, loving, care-giving and intimate relationship with her husband Jon Tibbetts.

54.

Plaintiff Connie Tibbetts suffered and will continue to suffer from the emotional distress caused by the loss of society, companionship and sexual relations she enjoyed with her husband, Jon Tibbetts, which was wrongfully taken from her as a result of his tragic death.

55.

The actions and/or inactions of ~~Defendants~~ *Ford*, *Old GM* ~~*GM-LLC*~~, Integrity Automotive, Armando Saenz, and John Does 1-3, including the aggravating circumstances attending those acts and/or failures to act, caused and/or contributed to Plaintiff's loss of consortium damages, and Plaintiff is entitled to a recovery against each of the Defendants for these damages in an amount to be awarded by the jury herein.

**PUNITIVE/EXEMPLARY DAMAGES**

56.

In addition to compensatory damages, Plaintiff is seeking punitive damages from Defendants Integrity Automotive, *Ford*, ~~*GM-LLC*~~ and John Does 1-3, because their conduct constitutes reckless, grossly negligent, willful, wanton, malicious

behavior that needs to be punished in order to deter others from participating in similar future misconduct. The acts set forth in this complaint were taken with knowledge of the associated risks to consumers. ~~These defendants~~ Integrity Automotive, Ford and John Does 1-3 took the steps set forth herein in conscious disregard for the potential consequences and under circumstances for which a jury could determine that they willfully, wantonly, recklessly, maliciously, and consciously indifferent to the consequences, endangered human life. ~~These defendants~~ Integrity Automotive, Ford and John Does 1-3 deserve to be punished in a civil forum for the malicious misconduct. The amount of punitive damages to be awarded is within the discretion of the jury.

WHEREFORE, PLAINTIFF prays for judgment for compensatory and punitive damages as set forth in this Complaint, pre- and post-judgment interest, costs and fees in connection with this action, and for any and all other just relief this court may deem appropriate.

Dated this 9th day of June, 2015.


Respectfully submitted,

**WILL FERGUSON & ASSOCIATES**


By:    /s/ Robert M. Ortiz
ROBERT M. ORTIZ
1720 Louisiana Blvd NE, Suite 100
Albuquerque, New Mexico 87110
(505) 243-5566
And

**TURNER & ASSOCIATES, P.A.**
By: TAB TURNER
(*Pro Hac Vice Pending*)
Arkansas Bar No. 85158
4705 Somers Avenue, Suite 100
North Little Rock, Arkansas  72116
(501) 791-2277

***ATTORNEYS FOR PLAINTIFFS***