# Exhibit  X

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x
| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| **MOTORS LIQUIDATION COMPANY,** *et al.*, | : | Case No.: 09-50026 (MG) |
| **f/k/a General Motors Corp.,** *et al.* | : | |
| | : | |
| **Debtors.** | : | (Jointly Administered) |
---------------------------------------------------------------x

### ORDER GRANTING MOTION OF GENERAL MOTORS LLC PURSUANT TO 11 U.S.C. §§ 105 AND 363 TO ENFORCE THE BANKRUPTCY COURT'S JULY 5, 2009 SALE ORDER AND INJUNCTION AND THE RULINGS IN CONNECTION THEREWITH

### VERONICA ALAINE FOX CLAUDIA LEMUS TAMMIE CHAPMAN CONSTANCE HAYNES-TIBBETTS

Upon the Motion, dated June 1, 2016 ("**Motion**"), of General Motors LLC ("**New GM**"),[1] seeking the entry of an order (i) enforcing the Sale Order and Injunction, entered by the Bankruptcy Court on July 5, 2009, and the Bankruptcy Court's rulings in connection therewith, by directing the State Court Plaintiffs to amend their Complaints so that they comply with the Sale Order and Injunction and the other Bankruptcy Court rulings, all as more fully set forth in the Motion; and due and proper notice of the Motion having been provided to counsel for the State Court Plaintiffs, and it appearing that no other or further notice need be given; and a hearing (the "**Hearing**") having been held with respect to the Motion on June 27, 2016; and upon the record of the Hearing, the Court having found and determined that the legal and factual bases

---

[1]   Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, it is therefore:

ORDERED that the Motion is GRANTED as set forth herein; and it is further

ORDERED that the Fox Plaintiff shall file with the Georgia State Court a further amended Complaint ("**Fox Second Amended Complaint**") in the form attached hereto as **Exhibit "1,"** on or before three (3) business days after the entry of this Order, so that the Fox Second Amended Complaint fully complies with the Sale Order and Injunction and the other Bankruptcy Court rulings; and it is further

ORDERED that the Lemus Plaintiff shall file with the New Mexico State Court an amended Complaint ("**Lemus Amended Complaint**") in the form attached hereto as **Exhibit "2,"** on or before three (3) business days after the entry of this Order, so that the Lemus Amended Complaint fully complies with the Sale Order and Injunction and the other Bankruptcy Court rulings; and it is further

Ordered that the Chapman Plaintiff shall file with the Arkansas State Court an amended Complaint ("**Chapman Amended Complaint**") in the form attached hereto as **Exhibit "3,"** on or before three (3) business days after the entry of this Order, so that the Chapman Amended Complaint fully complies with the Sale Order and Injunction and the other Bankruptcy Court rulings; and it is further

ORDERED that the Tibbetts Plaintiff shall file with the New Mexico State Court an amended Complaint ("**Tibbetts Amended Complaint**") in the form attached hereto as **Exhibit "4,"** on or before three (3) business days after the entry of this Order, so that the Tibbetts Amended Complaint fully complies with the Sale Order and Injunction and the other Bankruptcy Court rulings; and it is further

2

ORDERED that within five (5) business days after the entry of this Order, the State Court Plaintiffs shall file with the Clerk of this Court evidence of the filing of their amended complaints with the applicable state courts; and it is further

ORDERED that this Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: _____, 2016
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

DMSLIBRARY01\28979882.v1

# Exhibit 1

IN THE STATE COURT OF COBB COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| VERONICA ALAINE FOX, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CIVIL ACTION FILE |
| | * | |
| | * | NO. 14A 3468-4 |
| GENERAL MOTORS LLC and | * | |
| ATLANTA AUTO BROKERS, INC., | * | |
| | * | |
| Defendants. | * | |

## RECAST & AMENDED COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Veronica Fox and files this Complaint for Damages against

Defendants General Motors LLC ("GM LLC") and Atlanta Auto Brokers, Inc. ("AAB"), and

respectfully shows the following:

### INTRODUCTION

On November 12, 2013, Plaintiff Veronica Fox was rendered quadriplegic in a rollover

wreck in the General Motors 2004 SRX she was driving. She was properly restrained in the

vehicle. When the SRX rolled over, the top of the roof literally came off the vehicle, and the

remaining roof structure buckled and collapsed on top of her. Her injuries were caused by the

resulting roof crush that occurred during the rollover. Her injuries were entirely preventable.

Her injuries would not have happened had General Motors Corporation ("GM Corp.") designed

the 2004 SRX to provide proper protection for the occupants in a foreseeable rollover wreck.

~~They would not have happened if General Motors LLC ("GM LLC") would have warned her of~~

~~the dangers of the roof design.~~

GM Corp. ~~and GM LLC~~ knew and expected that its vehicles *would be* involved in rollovers. GM Corp., like other automakers such as GM LLC, had the resources to design and manufacture automobiles that would provide proper protection to the occupants in a rollover. But GM Corp. designed the 2004 Cadillac SRX with a roof structure that *it knew* would utterly fail to provide such protection: the roof panel was made almost entirely of glass; the roof was secured to the vehicle by nothing but glue, with no welds or other mechanical fasteners; predictably, the entire, glued-on roof came off during the rollover, leaving a gaping hole in the top of the vehicle and depriving the roof system of the support the top of the roof should provide; there was little to no lateral support going across the roof to help support the sides of the vehicle when the roof panel came off during the roll; and the remaining roof structure was so inadequate, it buckled and crushed onto Veronica Fox's head, catastrophically and permanently injuring her. ~~GM LLC knew all these facts. Yet, it chose not to warn Veronica Fox, or anyone else, of the dangerous design of the 2004 SRX.~~

Plaintiff files this action to recover for the injuries caused by GM Corp.'s decision to adopt an unreasonably dangerous roof design, and for ~~GM LLC's and~~ Atlanta Auto Broker Inc.'s ("AAB") election not to warn citizens including Plaintiff Fox of the dangers of the 2004 SRX.

### I. PARTIES, JURISDICTION, VENUE, & SERVICE OF PROCESS

1.

Plaintiff Veronica Fox is a citizen and resident of the State of Georgia. Plaintiff is subject to the jurisdiction of this Court.

2.

Defendant GM LLC is a foreign corporation organized and incorporated under the laws of Delaware, with its principal place of business located at 300 Renaissance Center, Detroit,

2

Michigan 48265. GM LLC, like GM Corp., is engaged in the business of designing, manufacturing, marketing, promoting, advertising, distributing, and selling automobiles, trucks, SUVs, and other types of vehicles in the State of Georgia, throughout the United States, and elsewhere.

3.

GM LLC is subject to the jurisdiction of this Court because it transacts business in this State and maintains a registered agent in this State: CSC of Cobb County, Inc., 192 Anderson Street S.E., Suite 125, Marietta, Georgia 30060. GM LLC may be served with legal process there.

4.

Venue is proper in Cobb County as to Defendant GM LLC under O.C.G.A. § 14-2-510 and GA. CONST. art. VI, § 2, ¶ VI, because Cobb County is where Defendant GM LLC maintains a registered agent.

5.

Defendant AAB is a domestic corporation organized and incorporated under the laws of Georgia, with its principal place of business located at P.O. Box 3262, Alpharetta, Georgia 30023. AAB is engaged in the business of buying, selling, and inspecting used automobiles in the State of Georgia.

6.

Defendant AAB is subject to the jurisdiction of this Court because it is incorporated in this State, it transacts business in this State, and maintains a registered agent in this State: Joe

3

Milligan, 487 Cobb Parkway, SE, Marietta, Georgia 30060.  AAB may be served with legal process there.

7.

Venue is proper in Cobb County as to Defendant AAB under O.C.G.A. § 14-2-510 and GA. CONST. art. VI, § 2, ¶ VI, because Cobb County is where Defendant AAB maintains a registered agent and under GA. CONST. art. 6, § 2, ¶ IV because it is a joint tortfeasor with Defendant GM LLC.

## II. OPERATIVE FACTS

8.

On November 12, 2013, at around 2:00 a.m., Veronica Alaine Fox was the restrained driver of a 2004 Cadillac SRX designed, manufactured, and sold by GM Corp. (VIN: 1GYDE63A740113793) ("the subject SRX" or "subject vehicle").  Carl Coward was a restrained passenger in the front right seat.  The subject SRX was traveling north on I-285, past the intersection with Martin Luther King Dr.

9.

Plaintiff Veronica Fox was properly seated in the driver's seat, wearing her seat belt.

10.

While traveling down the highway, the SRX left the roadway.  The SRX rolled over and came to rest off the shoulder north of Martin Luther King Dr.

11.

GM Corp. manufactured, designed, marketed, and distributed the subject vehicle with a defective roof which was unable to withstand the forces of this foreseeable and survivable event. As the direct and proximate result of the defects in the roof structure of the subject vehicle, the

4

roof panel came completely off during the wreck and the remaining structure crushed down on

Plaintiff Veronica Fox during this incident, rendering her a quadriplegic.

12.

Defendant AAB inspected the vehicle and sold it to Plaintiff shortly before the wreck

occurred. Defendant AAB had a duty to warn Veronica Fox of the danger posed by the SRX

roof. AAB breached that duty.

13.

The defects and failures of the subject vehicle, combined with the acts and omissions of

GM Corp., ~~GM LLC~~, and AAB, caused Veronica Fox's injuries.

14.

As a direct and proximate result of the subject vehicle's defects and failures and the

tortious acts and omissions of GM Corp., ~~GM LLC~~, and AAB, Plaintiff Veronica Fox endured,

continues to endure, and will endure in the future physical and emotional pain and suffering.

15.

GM Corp. designed, tested, manufactured, marketed, distributed, and sold the subject

SRX, thereby placing it into the stream of commerce.

16.

The subject SRX was defective, unreasonably dangerous, and not fit for its ordinary use

when manufactured as well as at the time of the subject incident because (a) the design GM

Corp. chose for the roof structure did not offer proper protection to occupants in foreseeable

crashes; (b) the risks of GM Corp.'s chosen design outweighed the utility of the design; and (c)

GM Corp. did not implement safer, feasible, and practicable alternative designs that would have

prevented Plaintiff Veronica Fox's injuries.

5

17.

GM Corp. could have reasonably foreseen and did, in fact, foresee the occurrence of rollovers such as the one described in this Complaint.

18.

But for GM Corp.'s negligent and defective design of the SRX, and the vehicle's failure to offer proper crash protection to occupants in foreseeable wrecks, Veronica Fox would not have been seriously injured in this wreck.

19.

At the time the subject SRX was manufactured and at all times since then, GM Corp. has had actual knowledge from, among other things, its notice of real-world incidents involving its vehicles, its own testing, and the laws of physics, that when a roof lacks sufficient structural crashworthiness, occupants are highly vulnerable to being injured, paralyzed, or killed in a rollover.

20.

Despite its knowledge set forth above, GM Corp. consciously designed the 2004 SRX, and other GM Corp. vehicles equipped with the same or similar performing roofs, so that occupants would be subject to injury from roof crush.

21.

Despite knowing at the time the subject Cadillac SRX was manufactured that safer alternative designs were technologically feasible, economically practicable, and fundamentally safer, GM Corp. wantonly and recklessly chose not to implement any of those alternative designs in the subject SRX and instead chose a design GM Corp. knew would result in preventable injuries and deaths in foreseeable wrecks.

6

22.

GM Corp.'s reckless and wanton conduct constituted disregard for the life and safety of

Veronica Fox, and the lives and safety of the motoring public generally.  GM Corp.'s reckless

and wanton conduct also manifests a conscious indifference to the foreseeable consequences of

that conduct to motorists like Veronica Fox.

23.

In 2009, after GM Corp. filed for Chapter 11 bankruptcy protection, Defendant GM LLC

purchased ~~the~~ assets of GM Corp., including GM Corp.'s books and records.

24.

As part of its 2009 purchase of GM Corp., Defendant GM LLC expressly assumed

liability for product liability claims against GM Corp. that arose after the bankruptcy sale. *(as set forth in the Sale Agreement and rulings by the Bankruptcy Court)*

25.

After the bankruptcy sale, Defendant GM LLC employed ~~the~~ engineers who designed the

2004 SRX roof, and GM LLC possessed all relevant knowledge, books, and records regarding

the 2004 SRX roof design.  In short, GM LLC acquired all knowledge regarding the 2004 SRX's

defective roof from GM Corp.

26.

~~Defendant GM LLC could have reasonably foreseen and did, in fact, foresee the~~

~~occurrence of rollovers such as the one described in this Complaint.~~

27.

~~Since the bankruptcy sale, Defendant GM LLC, like GM Corp., has had actual~~

~~knowledge from, among other things, the knowledge of its engineers, the records and books it~~

~~acquired from GM Corp., its notice of real-world incidents involving its and GM Corp.'s~~

~~vehicles, its and GM Corp.'s testing,~~ GM LLC's decision to substantially strengthen the roof in ~~the 2010 SRX, and the laws of physics, that when a roof lacks sufficient structural crashworthiness, occupants are highly vulnerable to being injured, paralyzed, or killed in a rollover.~~

28.

~~Since the bankruptcy sale, Defendant GM LLC, like GM Corp., has had actual knowledge from, among other things, the knowledge of its engineers, the records and books it acquired from GM Corp., its notice of real-world incidents involving its and GM Corp.'s vehicles, its and GM Corp.'s testing,~~ GM LLC's decision to substantially strengthen the roof in ~~the 2010 SRX, and the laws of physics, that the 2004 SRX roof was unreasonably dangerous and defective.~~

29.

~~Despite GM LLC's duty to warn and its knowledge of a need to warn the public, Defendant GM LLC failed at the time of the bankruptcy sale—and all times since—to adequately warn the consuming public, and Plaintiff in particular, of the dangers in a reasonably foreseeable wreck presented by the design of the SRX roof.~~

30.

Despite the knowledge set forth in the paragraphs above, ~~Defendant GM LLC and~~ GM Corp. wantonly and recklessly continued to sell the vehicle to the consuming public and maintained it in the stream of commerce without a warning, recall, or remedy of the vehicle's defects.

31.

~~Defendant GM LLC's and~~ GM Corp.'s reckless and wanton conduct constituted

disregard for the life and safety of Veronica Fox, and the lives and safety of the motoring public

generally.  ~~GM LLC's reckless and wanton conduct also manifests a conscious indifference~~ to

~~the foreseeable consequences of that conduct to motorists like Veronica Fox~~.

32.

But for the tortious conduct of GM Corp. ~~and GM LLC,~~ Plaintiff Veronica Fox would not

have been seriously injured in this wreck.

33.

As a direct and proximate result of GM Corp. ~~and GM LLC~~'s tortious conduct, Plaintiff

Veronica Fox endured, continues to endure, and will endure in the future physical and emotional

pain and suffering.

34.

No person other than Defendant GM LLC and Defendant AAB is liable for the injuries

and damages sustained by Veronica Fox.

35.

Plaintiff's injuries and damages were proximately caused by the tortious acts and

omissions of GM Corp. ~~, GM LLC,~~ and AAB.  The tortious acts and omissions of GM Corp. ~~, GM~~

~~LLC,~~ and AAB that caused the personal injuries to Veronica Fox are described more fully and

specifically in the paragraphs below.

9

## III. SPECIFIC COUNTS

### COUNT ONE

### Strict Liability of General Motors LLC

36.

Plaintiff incorporates as if re-alleged herein in full paragraphs 1 through 35 of this Complaint.

37.

GM Corp. is strictly liable to Plaintiff under O.C.G.A. § 51-1-11 and other applicable law because the risks inherent in the design of the roof structure in the 2004 Cadillac SRX outweighed any utility of the chosen design, thereby rendering the vehicle defective, unreasonably dangerous, and not reasonably suited to the use for which it was intended. The defects in the SRX include, but are not limited to, the following:

a. The roof structure in the SRX failed to offer proper protection to occupants like Veronica Fox during foreseeable rollover events;

b. The roof panel was made almost entirely of glass with a narrow rim of fiber glass;

c. The roof panel was attached to the vehicle by nothing but glue;

d. During the rollover, the entire roof panel came completely off the vehicle, leaving a gaping hole in the roof of the vehicle;

e. GM Corp. knew that the glued-on glass roof would not protect occupants in a rollover;

f. Despite this knowledge, GM Corp. did not design the remaining structure to protect occupants in a rollover;

10

g.    GM Corp. designed the 2004 SRX with a strength-to-weight ratio of 1.9,

which earned it the lowest possible rating for roof strength by the

Insurance Institute for Highway Safety. *See* Exhibit A, IIHS Website,

http://www.iihs.org/iihs/ratings/ratings-info/roof-strength-test (last visited

May 19, 2016). According to IIHS, a strength-to-weight ratio of 1.9 is not

"good," "acceptable," or even "marginal"—it is **"poor."** *Id.*;

h.    GM Corp. did not adequately test the performance of the SRX's roof

structure to determine whether prospective owners, users, and occupants

of the 2004 SRX would be exposed to an unreasonable risk of physical

harm during rollover events;

i.    GM Corp. knew, or should have known, from the testing that was

performed on the SRX and other GM Corp. vehicles with the same or

similar roofs, from real world incidents, and from the laws of physics, that

the SRX roof would fail, and GM Corp. knew that serious injury to

vehicle occupants could result;

j.    The SRX does not contain, and is not accompanied by, warnings to

prospective owners, users, or occupants, including Plaintiff, either at the

time of sale or post-sale, of the unreasonable risk of physical harm

associated with the design of the roof structure of the 2004 SRX;

k.    The SRX does not contain, and is not accompanied by, underline adequate warnings

to prospective owners, users, or occupants, including Plaintiff, either at the

time of sale or post sale, of the unreasonable risk of physical harm

associated with the design of the roof structure of the 2004 SRX.

11

*(as set forth in the Sale Agreement and rulings by the Bankruptcy Court).*

38.

Defendant GM LLC assumed liability for product liability claims against GM Corp. that arose after the bankruptcy sale. Plaintiff's strict liability claims against GM Corp. are properly asserted against GM LLC.

39.

The defects in the 2004 Cadillac SRX, in concert with the acts and omissions of ~~Defendants GM LLC and~~ AAB, proximately caused Plaintiff's injuries and damages.

40.

Defendants are liable for the injuries and damages Plaintiff suffered.

## COUNT TWO

### Negligence of General Motors LLC

41.

Plaintiff incorporates as if re-alleged herein in full paragraphs 1 through 40 of this Complaint.

42.

GM Corp. owed a duty to the consuming public in general, and Plaintiff in particular, to exercise reasonable care to design, test, manufacture, inspect, market, and distribute a product free of unreasonable risk of harm to owners, users, and occupants.

43.

At the time GM Corp. manufactured, marketed, distributed, and sold the 2004 SRX, GM Corp. could reasonably have foreseen and did, in fact, foresee the occurrence of rollover events such as the one described in this Complaint.

12

44.

GM Corp. breached its duty to exercise reasonable care as set forth in the paragraphs

above.

45.

In concert with the acts and omissions of Defendant AAB ~~and GM LLC~~, GM Corp.'s

negligence proximately caused Plaintiff's injuries and damages.

46.

Defendant GM LLC assumed liability for product liability claims against GM Corp. that

arose after the bankruptcy sale. Plaintiff's negligence claims against GM Corp. are properly

asserted against GM LLC. *(as set forth in the Sale Agreement and rulings by the Bankruptcy Court).*

47.

Defendants are liable for the injuries and damages suffered by Plaintiff.

~~COUNT THREE~~

~~General Motors LLC's Failure to Warn~~

~~48.~~

~~Plaintiff incorporates as if re-alleged herein in full paragraphs 1 through 47 of this~~

Complaint.

49.

GM LLC could reasonably have foreseen and did, in fact, foresee the occurrence of

rollover events such as the one described in this Complaint.

50.

GM LLC owed a duty to the consuming public in general, and to Plaintiff in particular, to

~~warn of the dangers arising from the design of the SRX.~~

13

51.

~~GM LLC knew after the bankruptcy sale about the danger of the roof of the 2004 SRX,~~
~~but chose not to warn the public or Plaintiff about that danger.~~

52.

~~In concert with the acts and omissions of Defendant AAB and GM Corp., GM LLC's~~
~~failure to warn proximately caused Plaintiff's injuries and damages.~~

53.

~~Defendants are liable for the injuries and damages Plaintiff suffered.~~

## ~~COUNT FOUR~~

**Punitive Damages**

54.

Plaintiff incorporates as if re-alleged herein in full paragraphs 1 through 53 of this
Complaint.

55.

GM LLC acted with conscious indifference to the safety and well-being of the public in
failing to effectively repair or warn about the dangers of the 2004 SRX.  GM LLC knew or
should have known of those dangers.  GM LLC purchased all GM Corp.'s books and records
revealing the defective and dangerous design of the 2004 SRX roof.  GM LLC employed the
same engineers who designed and knew about the defective and dangerous design of the 2004
SRX roof.  Despite knowing of the dangers posed by the 2004 SRX, GM LLC acted wantonly
and with conscious indifference to the safety and well-being of the public, as defined by
~~O.C.G.A. § 51-12-5.1, in failing to repair or warn about the dangers of the 2004 SRX.~~

14

56.

~~Defendant GM LLC's own failure to warn, which occurred after the June 2009
bankruptcy sale, was so egregious that it rises to the level of conscious indifference to the safety
and well-being of the public under O.C.G.A. § 51-12-5.1.~~  Such misconduct warrants the
~~imposition of punitive damages against GM LLC.~~

## COUNT FIVE

### Statute of Repose

57.

Plaintiff incorporates as if re-alleged herein in full paragraphs 1 through 56 of this
Complaint.

58.

The willful and wanton misconduct by GM Corp. ~~and GM LLC~~ referenced in this
Complaint precludes the application of any statute of repose as a defense.  Georgia's statute of
repose does not bar claims when the defendant acted with willful and wanton disregard of the
dangers of its conduct.

59.

~~GM LLC's failure to warn of the dangers referenced in this Complaint precludes the
application of any statute of repose as a defense.  Georgia's statute of repose does not bar claims
when the defendant failed to warn of the dangers which were known to or should have been
known to the defendant.~~

## COUNT SIX

### Atlanta Auto Brokers, Inc.'s Failure to Warn

60.

Plaintiff incorporates as if re-alleged herein in full paragraphs 1 through 59 of this Complaint.

61.

Defendant AAB sold the subject 2004 Cadillac SRX to Plaintiff Veronica Fox on or about September 27, 2013, less than two months before the wreck that is the subject of this Complaint.

62.

AAB is in the business of buying, selling, and inspecting cars. It has been in that business for over 20 years. As a result of this extensive experience, AAB has specialized and superior knowledge about cars, car repair and parts, vehicle safety, and vehicle quality.

63.

Before selling the vehicle to Plaintiff, Defendant AAB undertook to inspect the vehicle for Plaintiff's benefit. It therefore had a duty to conduct its inspection non-negligently.

64.

Plaintiff originally sought to purchase a Chevrolet Suburban at AAB, but AAB's inspection had revealed the Suburban needed repairs. AAB therefore discouraged Plaintiff from purchasing that vehicle. AAB told Plaintiff that the SRX had passed its inspection. AAB therefore encouraged her to choose the SRX instead of the Suburban. Plaintiff relied upon AAB's inspection and its statements about the inspection when she chose to purchase the subject SRX.

16

65.

AAB also detailed the car before selling it Plaintiff. AAB's inspection and detail of the

vehicle either did or should have revealed the dangers of the SRX roof, including but not limited

to the fact that the roof was made almost entirely of glass and was attached by nothing but glue.

A lay person like Plaintiff would not know that the roof was made of glass because the rear

panels of glass were concealed from the inside by the headliner. Plaintiff, in fact, did not know

that the roof was made almost entirely of glass until after the wreck occurred.

66.

Defendant AAB encouraged Plaintiff to purchase the SRX because of the sunroof. AAB

repeatedly emphasized the sunroof as a selling feature because it extended to the second row of

seats. AAB's statements about the sunroof were incomplete and misleading because AAB did

not inform Plaintiff that the glass actually extended almost the entire length of the vehicle and

because the structure of the roof was itself a deadly design defect.

67.

AAB provided safety warnings to Plaintiff about the use of the sunroof, advising her not

to allow passengers to "hang out of the sunroof." AAB's warnings were incomplete and

misleading because they suggested that the only danger associated with the roof was the danger

of passengers being injured as a result of a decision to "hang out of the sunroof."

68.

Defendant AAB knew or should have known that the SRX roof would not protect

occupants in the event of a rollover wreck and therefore had a duty to warn Plaintiff about the

dangers created by the SRX roof. AAB's actual or constructive knowledge was a result of its

superior knowledge of vehicle parts, quality, and safety, generally—and the SRX's parts, quality,

17

and safety, specifically; its inspection of the vehicle; and its knowledge about the SRX roof and sunroof.

69.

Defendant AAB knew or reasonably should have known that the SRX roof was dangerous and could result in serious or catastrophic injury or death in foreseeable rollover wrecks.

70.

Plaintiff would not have purchased the SRX had she been informed of and known about the dangers of the roof.

71.

In concert with the acts and omissions of GM Corp. ~~and GM LLC,~~ AAB's failure to warn proximately caused Plaintiff's injuries and damages.

72.

Defendant AAB is liable for the injuries and damages Plaintiff suffered.

**DAMAGES & PRAYER FOR RELIEF**

73.

Plaintiff incorporates as if re-alleged herein in full paragraphs 1 through 72 of this Complaint.

74.

As a direct result of the defective condition of the 2004 SRX, GM Corp.'s negligence, ~~GM LLC's failure to remedy or give appropriate warnings about the vehicle,~~ and AAB's failure to warn about the vehicle, Plaintiff Veronica Fox has suffered severe and permanent personal injuries, including quadriplegia.

18

75.

Plaintiff Veronica Fox seeks damages from Defendants in an amount to be determined by the enlightened conscience of the jury and as demonstrated by the evidence, for all elements of compensatory damages allowed by Georgia law.  Plaintiff's injuries are permanent, and damages sought include the following:

a.    all components of the mental and physical pain and suffering Veronica Fox endured upon impact and up until the present time;

b.    all components of the mental and physical pain and suffering Veronica Fox will endure in the future;

c.    past and future loss of enjoyment of life; and

d.    all past and future economic losses, including medical bills, medical expenses, other necessary expenses for the care and treatment of Veronica Fox,  including household services.

e.    ~~Punitive damages against Defendant GM LLC, pursuant to O.C.G.A. § 51-12-5.1,~~ in an amount to be determined by the enlightened conscience of the jury to be sufficient to punish GM LLC for the harm caused to them and to deter GM LLC ~~from similar misconduct.~~

76.

WHEREFORE, Plaintiff prays for the following relief:

a.    That summons issue and service be perfected upon Defendants requiring them to appear before this Court and answer this Complaint for Damages;

b.    That judgment be entered against Defendants;

19

c.    That Plaintiff Veronica Fox recovers all elements of compensatory damages,

including general and special damages, against Defendants;

d.    ~~That Plaintiff Veronica Fox recovers punitive damages against Defendant GM~~

~~LLC;~~

e.    That all costs be cast against Defendants; and

f.    That Plaintiff has such other and further relief as this Court deems just and proper.

This 20th day of May, 2016.

Respectfully submitted,

BUTLER WOOTEN & CHEELEY & PEAK LLP

BY: _____
JAMES E. BUTLER, JR.
Georgia Bar No.099625
TEDRA L. CANNELLA
Georgia Bar No. 881085
ROBERT H. SNYDER
Georgia Bar No. 404522

2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700

KENNETH S. NUGENT PC

BY: _____
WILLIAM G. HAMMILL
Georgia Bar No. 943334
*Signed with Express Permission*
*by Tedra C. Hobson*

4227 Pleasant Hill Road
Building 11, Suite 300
Duluth, GA 30096
1.    (404) 885-1983

**ATTORNEYS FOR PLAINTIFF**

20

# EXHIBIT A



**Insurance Institute for Highway Safety**
**Highway Loss Data Institute**

# About our tests

IIHS evaluates a vehicle's crashworthiness with the help of five tests: moderate overlap front, small overlap front, side, roof strength and head restraints & seats. For front crash prevention ratings, the Institute conducts low- and moderate-speed track tests of vehicles with automatic braking systems. IIHS also conducts evaluations of headlight systems and of the child seat attachment hardware known as LATCH. The descriptions below explain how each test is conducted and how the results translate into **ratings**.

Thousands of people are killed each year in rollovers. The best way to prevent these deaths is to keep vehicles from rolling over in the first place. Electronic stability control is significantly reducing rollovers, especially fatal single-vehicle ones. When vehicles do roll, side curtain airbags help protect the people inside, and belt use is essential. However, for these safety technologies to be most effective, the roof must be able to maintain the occupant survival space when it hits the ground during a rollover. Stronger roofs crush less, reducing the risk that people will be injured by contact with the roof itself. Stronger roofs also can prevent occupants, especially those who aren't using safety belts, from being ejected through windows, windshields or doors that have broken or opened because the roof has deformed.

In the test, the strength of the roof is determined by pushing a metal plate against one side of it at a slow but constant speed. The force applied relative to the vehicle's weight is known as the strength-to-weight ratio. This ratio varies as the test progresses. The peak strength-to-weight ratio recorded at any time before the roof is crushed 5 inches is the key measurement of roof strength.

A good rating requires a strength-to-weight ratio of at least 4. In other words, the roof must withstand a force of at least 4 times the vehicle's weight before the plate crushes the roof by 5 inches. For an acceptable rating, the minimum required strength-to-weight ratio is 3.25. For a marginal rating, it is 2.5. Anything lower than that is poor.

The figure below shows sample results for two vehicles — one rated good and one rated poor. Peak force for Vehicle A is 7.26. Since that number is higher than 4, the vehicle is rated good. Peak force for Vehicle B is 2.31. Since that number is lower than 2.5, the vehicle is rated poor.



The following video shows how the roof strength test is conducted. In this test of the 2010 Buick LaCrosse, the peak force is 19,571 pounds for a strength-to-weight ratio of 4.90 and a good rating. The playback speed of this video has been increased. The plate normally crushes at a rate of about 1/8 inch per second.

In every test, the roof is crushed 5 inches. What varies — and can't be seen in a video — is the force used by the machine to achieve that degree of crush. To demonstrate how roof strength can vary and what those differences mean for people inside a vehicle during a rollover, IIHS conducted a demonstration in which two vehicles with different roof strength ratings were subjected to identical force. This video shows what happened when the 2009 Volkswagen Tiguan, rated good for roof strength, and the 2008 Kia Sportage, rated poor, were each subjected to a crush force of 15,000 pounds.

©1996-2016, Insurance Institute for Highway Safety, Highway Loss Data Institute | www.iihs.org

## CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel of record with a copy of the foregoing pleading by depositing it in the United States Mail with adequate postage affixed thereon and addressed as follows:

Kevin J. Malloy, Esq.
Bowman and Brooke LLP
1441 Main Street, Suite 1200
Columbia, SC 29201

Thomas M. Klein, Esq.
C. Megan Fischer, Esq.
Bowman and Brooke LLP
2901 N. Central Avenue, Suite 1600
Phoenix, AZ 85012

C. Bradford Marsh, Esq.
Swift, Currie, McGhee & Hiers, LLP
1355 Peachtree St., N.E., Suite 300
Atlanta, GA 30309

Carrie L. Christie, Esq.
Robert H. Burke, Esq.
Rutherford & Christie LLP
225 Peachtree Street NE
South Tower, Suite 1750
Atlanta, GA 30303

William T. Casey, Jr., Esq.
Erica L. Morton, Esq.
Hicks, Casey & Morton, P.C.
136 North Fairground Street, N.E.
Marietta, GA 30060-1533

This 20th day of May, 2016.

BUTLER WOOTEN CHEELEY & PEAK LLP

BY: _____
JAMES E. BUTLER, JR.
Georgia Bar No. 099625
TEDRA L. CANNELLA
Georgia Bar No. 881085
ROBERT H. SNYDER
Georgia Bar No. 404522

# Exhibit 2

FILED IN MY OFFICE
DISTRICT COURT CLERK
12/30/2013 11:14:36 AM
STEPHEN T. PACHECO
byh

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT


THE WRONGFUL DEATH ESTATE
OF CLAUDIA LEMUS, Deceased,
by and through, DAVID P. GARCIA,
as Personal Representative,

        Plaintiff,

v.                   No.  D-101-CV-2013-03270

GENERAL MOTORS, LLC and
PERFORMANCE CHEVROLET, PERFORMANCE BUICK GMC,
and HI-COUNTRY CHEVROLET, INC.

        Defendants.

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff, by and through her counsel, Carter & Valle Law Firm, P.C., (Richard J. Valle), Emeterio L. Rudolfo, and TURNER & ASSOCIATES, P.A. (*pro hac vice pending*) and bring the following action against Defendants pursuant to applicable New Mexico law:

## PARTIES

1.    Plaintiff David P. Garcia is an appropriate person to serve as personal representative for purposes of presenting the Estate's claims herein. Mr. Garcia is a practicing attorney licensed in the State of New Mexico located in Santa Fe, New Mexico.

2.    Plaintiff requests that the Court appoint David P. Garcia as the wrongful death Personal Representative as provided under New Mexico law.

3.    Defendant General Motors, LLC ("GM-LLC") is a Delaware Limited Liability Company ~~and the successor to GM~~. On July 10, 2009, ~~GM's~~ Old GM's continuing operational assets were

transferred to "Acquisition Holdings LLC", which assumed the name "General Motors Company

LLC".    As part of a reorganization plan agreed to with the U.S., Canadian and Ontario

governments, and the company's unions, ~~GM~~ Old GM filed for Chapter 11 Bankruptcy protection in a

Manhattan court in New York on June 1, 2009.  ~~GM~~ Old GM filed for a government-assisted Chapter 11

bankruptcy protection on June 1, 2009~~, with a plan to re-emerge as a less debt-burdened~~

~~organization~~. The filing reported $82.29 billion in assets.  The "new GM," or "GM-LLC" was

formed from the purchase of the desirable assets of "old GM" by an entity called "NGMCO Inc."

via the bankruptcy process.  NGMCO Inc. was renamed to "General Motors Company" upon

purchase of the assets and trade name from "old GM," with the claims of former stakeholders to

be handled by the "Motors Liquidation Company."  The purchase was supported by $50 billion

in U.S. Treasury loans, giving the U.S. government a 60.8% stake in ~~GM~~. New GM  The Queen of

Canada, in right of both Canada and Ontario, holds 11.7% and the United Auto Workers, through

its health-care trust (VEBA), holds a further 17.5%.  The remaining 10% is held by unsecured

creditors.  On July 10, 2009, a new entity, NGMCO Inc. purchased the ongoing operations and

trademarks from ~~GM~~. Old GM  The purchasing company in turn changed its name from NGMCO Inc. to

General Motors Company~~, marking the emergence of a new operation from the "pre-packaged"~~

~~Chapter 11 reorganization~~.  Under the reorganization process, termed a 363 sale (for Section 363

which is located in Title 11, Chapter 3, Subchapter IV of the United States Code, a part of the

Bankruptcy Code), the purchaser of the assets of a company in bankruptcy proceedings is able to

obtain approval for the purchase from the court prior to the submission of a re-organization plan,

free of liens and other claims.  The U.S. Treasury financed a new company to purchase the

operating assets of the old GM in bankruptcy proceedings in the 'pre-packaged' Chapter 11

reorganization in July, 2009.  At all times relevant to the complaint, GM-LLC formally accepted

responsibility for the design, manufacture, assembly, marketing and distribution of the subject vehicle, including financial responsibility for damages associated with defects in the subject vehicle. ~~Prior to June 1, 2009, General Motors Corporation (n/k/a Motors Liquidation Company "MLC"), and now known as~~ GM-LLC~~, was and~~ is authorized to conduct business in New Mexico, owns property in New Mexico, conducts business in New Mexico and derives significant revenue from its activities in New Mexico, and is therefore subject to be sued in New Mexico courts. Since July 10, 2009, ~~At all times relevant to the complaint,~~ GM-LLC was in the business of designing, developing, testing, manufacturing, marketing and distributing automobiles~~, including the defective truck that forms the subject matter of this litigation~~. The GM agent for service of process resides in New Mexico.

4.      Defendant PERFORMANCE CHEVROLET is a New Mexico corporation that sold the vehicle at issue. Defendants PERFORMANCE BUICK GMC, and HI-COUNTRY CHEVROLET, INC. are on information and belief the successors in interest to PERFORMANCE CHEVROLET and are collectively referred to as "Dealer" or "Dealers."

**JURISDICTION AND VENUE**

5.      All of the material acts and/or omissions complained of herein occurred in San Juan County, State of New Mexico.

6.      This Court has original jurisdiction over Plaintiff's claims pursuant to NMSA 1978 § 41-4-18.

7.      Venue is properly laid in this district pursuant to NMSA 1978 § 38-3-1(F) and § 41-4-18(B).

3

## FACTS COMMON TO ALL CAUSES OF ACTION

8.    At approximately 9:55 p.m. on February 20, 2013, decedent Lemus was driving her 2008 GMC pickup on Highway 550 at a safe and reasonable speed given the surrounding conditions.

9.    As decedent Lemus approached mile marker 115, undetectable icy conditions on the roadway caused the vehicle to begin to skid.  The vehicle crossed over the center median and into other traffic lanes before rolling over and coming to rest on its roof.

10.    As the vehicle rolled, and despite wearing her safety belt at all times, decedent Lemus died as a result of fatal injuries caused and/or enhanced by the crash.

11.    Decedent Lemus endured intense physical pain and suffering, emotional distress and fear during the course of the incident described above until her death.

12.    The defective vehicle which forms the basis for this suit is a 2008 GMC truck designed, tested, manufactured, assembled, and/or distributed by ~~GM-LLC.~~ Old GM

## COUNT I
## STRICT LIABILITY

13.    Plaintiff incorporates all prior allegations as if fully set forth herein.

14.    The subject pickup truck is defective and unreasonably dangerous by design when used as marketed by ~~GM-LLC.~~ Old GM  The inherent defects in the design were present at the time the vehicle was manufactured and distributed.  The defects in the vehicle were a proximate and producing cause of the enhanced injuries, death and damages.  At all times relevant to the Complaint, ~~GM-LLC~~ Old GM was in the business of designing, manufacturing or otherwise distributing automobiles.  The defective nature of the design of the truck included defects in design; stability;

4

handling; marketing; instructions; warning; crashworthiness; rollover resistance and controllability. The defective nature of the vehicle includes the following

A. The truck is defective from a handling standpoint because it has an unreasonable tendency to get sideways in emergency situations, both alone and in towing combinations, and does not remain controllable under all operating conditions as required by ~~GM-LLC~~ Old GM guidelines, including the tendency to oversteer and skate;

B. The combination of the conditions described in subparagraphs (a) through (b) above creates an extreme risk of rollover that is both beyond the reasonable expectations of consumers and creates a risk that far outweighs any benefit associated with the design given the uses for which the vehicle was marketed;

C. The vehicle is unreasonably dangerous because it performs in an unsafe manner when operated in foreseeable emergency situations, including towing situations, and maneuvers, which *replace: Old GM ~~GM-LLC~~ had both actual and constructive knowledge would lead to rollover crashes. ~~GM-LLC~~'s knowledge included both actual knowledge based on its test history with SUVs; its research and knowledge of rollover in foreseeable turning maneuvers; and given its corporate history with respect to truck-type product designs;

D. The risk of operating the vehicle as designed outweighed any benefits associated with the design and *replace: Old GM ~~GM-LLC~~ knew of these risks; knew that the risk, if it materialized, would lead to rollover crashes and severe injuries; and knew that rollover crashes were particularly dangerous;

E. Old GM ~~GM-LLC~~ knew that this type vehicle was not reasonably safe for inexperienced and untrained drivers and knew that the vehicle was not sufficiently capable of maneuvering in emergency conditions that consumers would face on freeways at freeway speeds, including while towing;

F. The truck was likewise unreasonably dangerous from a crash protection standpoint in that the vehicle was not equipped with an occupant protection system – roof, safety belt system, and glazing design – that would effectively *replace: Old GM provide reasonable protection in the event of a rollover. ~~GM-LLC~~ knew that the belt system would not effectively and reasonably restrain occupants involved in freeway-speed rollovers and ~~GM-LLC~~ knew of the risk that the roof was not sufficiently strong to provide a safety cage for the occupants, and that countermeasures for rollover resistance and rollover occupants protection were both technologically and economically feasible at the time of manufacture, and that these features (roll stability control; ESC; pretensioning; safety canopies and integrated belts) were necessary and reasonable features to protect occupants, keep them inside the safety zone, and keep the safety zone from collapsing. Despite knowledge of these risks, and the availability of alternative safer designs,

5

Old GM

~~GM-LLC~~ intentionally marketed the vehicle to consumers for use as a freeway, passenger-carrying vehicle, and intentionally led consumers to believe that it was safe, stable, and would provide state of the art protection to occupants in rollovers despite clear knowledge that key safety technology was not incorporated into the product;

Old GM

G. ~~GM-LLC~~ knew that the vehicle was not sufficiently equipped with restraints (including buckles) that were designed to perform safely in rollovers, despite the fact that GMC marketed the vehicle for freeway use while towing;

Old GM

H. ~~GM-LLC~~ had both actual and constructive knowledge of the existence of safer, alternative designs from both a stability and crash protection standpoint, and that the alternatives were technologically feasible and available;

Old GM

I. ~~GM-LLC~~ ~~willfully, wantonly, and consciously~~ marketed the truck for the aforementioned uses with full knowledge of the risks inherent in the vehicle design, yet misled consumers and withheld critical information about the unsafe nature of the vehicle in conscious disregard for the public.

15.    The defective nature of the vehicle was a proximate and producing cause of the accident, injuries, death of decedent Lemus and damages suffered by the Plaintiffs. GM-LLC is therefore strictly liable for supplying a defective and unreasonably dangerous product that resulted in personal injury, death and property damage.

16.    A safer alternative design was economically and technologically feasible at the time the product left the control of ~~GM-LLC~~, both with respect to handling and rollover propensity and crash protection.

Old GM

17.    Dealers are liable as provided under New Mexico Law for their distribution of the defective vehicle.

## COUNT II
## NEGLIGENCE (GM-LLC)

18.    Plaintiff incorporates all prior allegations as if fully set forth herein.

Old GM

19.    At all times relevant to this Complaint, ~~GM-LLC~~ was in the business of supplying motor vehicles for use on the public roadways. ~~GM-LLC~~ held themselves out to

Old GM

the public as having specialized knowledge in the industry, especially with respect to truck

products with towing capability.    As such, ~~GM-LLC~~ *Old GM* owed consumers, including the

Plaintiff, a duty to use reasonable care in the design, manufacture, preparation, testing,

instructing, and warnings surrounding the truck. ~~GM-LLC~~ *Old GM* violated this duty by negligently

supplying a vehicle that was defective and not reasonably safe for the uses for which it was

marketed.* The negligent acts include but are not limited to the following acts or omissions:

*\*insert: "of Old GM"*

  a.  Negligently designing the vehicle from a handling and stability standpoint given the manner in which it was marketed;

  b.  Negligently designing the vehicle with poor rollover resistance given the manner in which it was marketed;

  c.  Negligently designing and testing the vehicle from an occupant protection standpoint;

  d.  Negligently testing of the vehicle from a handling and stability standpoint when towing;

  e.  Negligently failing to test the vehicle to ensure the design provides reasonable occupant protection in the event of a rollover, and to ensure that towing capability was reasonably safe;

  f.  Failing to adequately train and assist dealers in the dangers associated with the vehicle when used as marketed;

  g.  Failing to disclose known defects, dangers, and problems to both dealers and the public;

  h.  Negligently marketing the vehicle as a safe and stable passenger vehicle given the uses for which it was marketed;

  i.  Failure to meet or exceed internal corporate guidelines;

  j.  Negligently advertising the vehicle as safe and stable towing vehicle;

  k.  Failing to comply with the state of the art in the automotive industry insofar as providing reasonable occupant protection in a rollover, including the use of roll sensing, pretensioners, side air bags (canopies) and curtain technology, including ejection reduction, and integrated seating technology;

7

l.  Failing to comply with applicable and necessary Federal Motor Vehicle Safety Standards with respect to occupant protection and/or failing to test appropriately to ensure compliance;

m.  ~~Failing to notify consumers, as required by law, that a defect exists in the vehicle that relates to public safety;~~

n.  ~~Failing to recall the vehicle or, alternatively, retrofitting the vehicle to enhance safety.~~

20.    These acts of negligence were a proximate and producing cause of the accident, injuries, death and damages suffered by the Plaintiff. The dangers referenced earlier were reasonably foreseeable or scientifically discoverable at the time of exposure.

## COUNT III
## BREACH OF WARRANTY

21.    Plaintiff incorporates all prior allegations as if fully set forth herein.

22.    At all times relevant to the complaint, Defendant ~~GM-LLC~~ *Old GM* was a "merchant" in the business of supplying "goods". The truck was a "good" and/or "product" sold for consumer usage under applicable New Mexico law.

23.    Prior to the sale of the truck, and release of the truck into the marketplace, ~~GM-LLC~~ *Old GM* had reason to know the purpose for which Lemus specifically - and as a general consumer of the products which were designed, manufactured, and marketed by ~~GM-LLC~~ *Old GM*, individually and/or in tandem - bought the truck.

24.    ~~GM-LLC~~ *Old GM* had reason to know that decedent Lemus was relying on GM-LLC's skill or judgment to design, manufacture, market, and select goods suitable for the purpose for which they were sold.

25.    Decedent Lemus relied on ~~GM-LLC~~ *Old GM* to design, manufacture, market, and select the appropriate goods.

8

Old GM

26.     As such, ~~GM-LLC~~ breached the warranties of merchantability and fitness for a

particular purpose in that the truck in question was not fit for ordinary use or for the intended use

for which it was purchased.

Old GM's

27.     ~~GM-LLC~~'s warranties extended to Plaintiff.

28.     These breaches of warranty proximately resulted in the accident, injuries, death

and damages suffered by the Plaintiff.

29.     Notice has been provided as required by law.

## DAMAGES

30.     Plaintiff incorporates all prior allegations as if fully set forth herein.

31.     As a direct and proximate result of negligence of the Defendants as set forth

herein, Plaintiffs incurred and seek the following general and special damages, including

damages for wrongful death:

A.   Wrongful death damages for the Estate of decedent Lemus;
B.   Pain and suffering and emotional distress, past and future;
C.   Funeral and burial expenses;
D.   Reasonable and necessary medical and non-medical care, treatment and services;
E.   The nature, extent, and duration of Plaintiffs' injuries;
F.   Loss of guidance and counseling for the minor children who have survived the death of their mother;
G.   Physical impairment;
H.   The aggravating circumstances attending the wrongful acts and omissions of the Defendant;
I.   Any appropriate punitive damages.    *insert: ", as against Defendants other than New GM,"

32.     ~~As discussed in the aforementioned paragraphs, and pursuant to UJI 13-1827 on~~

~~punitive damages, the conduct of Defendant GM-LLC was willful, reckless, and/or wanton and~~

~~gives rise to punitive damages as outlined above.~~

**WHEREFORE**, Plaintiff requests the following relief:

a.   Awards of general and special compensatory damages as set forth above;

9

b. Their costs of action herein;

c. Interest as allowed by law;

*insert: ", as against Defendants other than New GM."

d. Any appropriate punitive damages*; and,

e. Such other and further relief as the Court may deem appropriate under the circumstances.

Respectfully submitted,

CARTER & VALLE LAW FIRM, P.C.

/s/ Richard J. Valle
Richard J. Valle
8012 Pennsylvania Circle NE
Albuquerque, New Mexico 87110
(505) 888-4357

Emeterio L. Rudolfo, Esq.
2713 East 20th Street, Suite D
Farmington NM  87402
(505) 325-8242

&

Tab Turner
Turner & Associates, P.A.
4705 Somers Avenue
North Little Rock, AR 72116
(501) 791-2277

*Attorneys for Plaintiff*

10

# Exhibit 3

ELECTRONICALLY FILED
2015-Jul-21 15:23:55
60CV-15-3292
C06D17 : 9 Pages

## CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS

| | |
|---|---|
| TAMMIE CHAPMAN, Personal Representative of the Estate of AUBREY CHAPMAN, Deceased,<br><br>     Plaintiff,<br><br>vs.<br><br>GENERAL MOTORS, LLC;<br>NABHOLZ, INC.;<br>RUSSELL CHEVROLET COMPANY<br><br>     Defendants. | Civil Action: _____ |

## ORIGINAL COMPLAINT

Plaintiff, TAMMIE CHAPMAN, Personal Representative of the Estate of AUBREY CHAPMAN, Deceased, submits the following Complaint against Defendants, stating:

1.

This is a products liability, negligence, and wrongful death action brought pursuant to Arkansas law. The single vehicle rollover crash that forms the subject of this litigation occurred on July 26, 2012, while the Decedent was traveling through Colorado. The subject vehicle, including the safety system, was placed into the chain of commerce, distributed, and maintained in Pulaski County, Arkansas.

2.

Plaintiff TAMMIE CHAPMAN is a citizen and resident of Hot Spring County, Arkansas, and the former spouse of the Decedent. She is the duly-appointed Administratrix and Personal Representative of the Estate of AUBREY CHAPMAN, Deceased. AUBREY CHAPMAN was a citizen and resident of Hot Spring County, Arkansas at the time of his death with his residence in Bismarck, Arkansas.

3.

Defendant General Motors, LLC ("GM-LLC") is a Delaware Limited Liability Company and the successor to GM. On July 10, 2009, GM's *(Old GM's)* continuing operational assets were transferred to "Acquisition Holdings LLC", which assumed the name "General Motors Company LLC". As part of a reorganization plan agreed to with the U.S., Canadian and Ontario governments, and the company's unions, GM *(Old GM)* filed for Chapter 11 Bankruptcy protection in a Manhattan court in New York on June 1, 2009. GM *(Old GM)* filed for a government-assisted Chapter 11 bankruptcy protection on June 1, 2009, with a plan to re-emerge as a less debt-burdened organization. The filing reported $82.29 billion in assets. The "new GM," or "GM-LLC" was formed from the purchase of the desirable assets of "old GM" by an entity called "NGMCO Inc." via the bankruptcy process. NGMCO Inc. was renamed to "General Motors Company" upon purchase of the assets and trade name from "old GM," with the claims of former stakeholders to be handled by the "Motors Liquidation Company." The purchase was supported by $50 billion in U.S. Treasury loans, giving the U.S. government a 60.8% stake in GM. *(New GM)* The Queen of Canada, in right of both Canada and Ontario, holds 11.7% and the United Auto Workers, through its health-care trust (VEBA), holds a further 17.5%. The remaining 10% is held by unsecured creditors. On July 10, 2009, a new entity, NGMCO Inc. purchased the ongoing operations and trademarks from GM. *(Old GM)* The purchasing company in turn changed its name from NGMCO Inc. to General Motors Company, marking the emergence of a new operation from the "pre-packaged" Chapter 11 reorganization. Under the reorganization process, termed a 363 sale (for Section 363 which is located in Title 11, Chapter 3, Subchapter IV of the United States Code, a part of the Bankruptcy Code), the purchaser of the assets of a company in bankruptcy proceedings is able to obtain approval for the purchase from the court prior to the submission of a re-organization plan, free of liens and other claims. The U.S. Treasury financed a new company to purchase the operating assets of the old GM in bankruptcy proceedings in the 'pre-packaged' Chapter 11 reorganization in July, 2009. At all times relevant to the complaint, GM-LLC formally accepted responsibility for the design, manufacture, assembly, marketing and distribution of the subject vehicle, including financial responsibility for damages associated with defects in the subject vehicle. Prior to June 1, 2009, General Motors Corporation (n/k/a Motors Liquidation Company "MLC"), and now known as GM-LLC, was and is authorized to conduct business in Arkansas, owns property in Arkansas, conducts business in

Arkansas and derives significant revenue from its activities in Arkansas, and is therefore subject to be sued in Arkansas courts. At all times relevant to the complaint, GM-LLC was in the business of designing, developing, testing, manufacturing, marketing and distributing automobiles, ~~including the defective truck that forms the subject matter of this litigation~~. GM conducts business in Arkansas and is subject to jurisdiction in Arkansas. GM may be served with process through its registered agent, Corporation Service Company, 300 Spring Building, Suite 900, 300 S. Spring Street, Little Rock, Arkansas, 72201.

4.

Since July 10, 2009, GM-LLC ~~At all times relevant to the subject complaint, *GM*~~ was in the business of designing, developing, testing, assembling, manufacturing, marketing, and distributing automobiles, ~~including the subject 2004 model Silverado C1500 pickup truck, worldwide~~.

5.

Defendant NABHOLZ, INC. (hereinafter "*Nabholz*") is an Arkansas for profit corporation whose business address includes offices at 3000 W. 68th Street, Little Rock, Arkansas. *NABHOLZ* was authorized to conduct business in Arkansas, conducted business in Arkansas, had agents in Arkansas, and derived economic profit from Arkansas. As such, *NABHOLZ* is subject to personal jurisdiction in Arkansas and may be served with process through its agent, Greg Williams, 612 Garland, Conway, Arkansas 72032.

6.

RUSSELL CHEVROLET COMPANY (hereinafter *Russell*) is an Arkansas corporation whose primary business is located at 6100 Landers Road, North Little Rock, Pulaski County, Arkansas. *Russell* is an authorized GM dealership, providing inventory of new and used cars and SUVs for the consuming public. *Russell* placed the vehicle in question into the stream of commerce in a defective and unreasonably dangerous condition and provided service and maintenance. *Russell* may be served with process through its registered agent, Bob Russell at 6100 Landers Road, Sherwood, Arkansas, 72120.

7.

**JURISDICTION AND VENUE**

Venue is appropriate in Pulaski County, Arkansas, because this is the county in which all or a substantial part of the events or omissions giving rise to the claim occurred, and the county of defendant's residence. The amount in controversy exceeds the jurisdictional limits of the court.

8.

## FACTUAL BACKGROUND

This is a products liability, negligence, and wrongful death action brought pursuant to Arkansas law. The single vehicle rollover crash that forms the subject of this litigation occurred on July 26, 2012, while the Decedent was traveling through Colorado. The subject vehicle, including the safety system, was placed into the chain of commerce, distributed, and maintained in Pulaski County, Arkansas. At all times relevant to the Complaint, ~~Defendants~~ Old GM, Nabholz, and Russell were in the business of designing, developing, assembling, testing, manufacturing, and distributing vehicles and tires for use by consumers.

9.

The 2004 model ~~GM~~ Old GM pickup was designed, manufactured, marketed, distributed and sold by *GM* Old GM *and Russell*. The truck was designed and marketed for use on the freeways as a safe and stable passenger-carrying vehicle.

10.

The ~~GM~~ Old GM truck was equipped with a safety belt system that was designed, tested, manufactured and distributed, individually and jointly, by *GM* Old GM and suppliers. ~~GM~~ Old GM created all design and performance specifications, including the choice of restraints and safety systems to be designed into the vehicle. At all times relevant to the complaint, the restraint system, including the buckle, were defective and unreasonably dangerous.

11.

## COUNT I
## (Strict Liability/Products Liability – Design Defect)
## GM-RUSSELL

At all times relevant to the complaint, ~~the defendants~~ Old GM and Russell were in the business (for profit) of designing, manufacturing, assembling, marketing, and distributing automobiles and auto components, including tires and safety belt systems. The products in question – the ~~GM~~ Old GM truck, and the occupant safety equipment (belt-roof-glazing), all contained design defects at the time the product was manufactured, all of

which combined to cause, proximately cause, and result in the producing cause of the damage, injuries, enhanced injuries, and damages alleged herein. The referenced design defects in the products are and were conditions of the products that rendered the products unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in use. At all times relevant to the Complaint, "safer alternative designs" existed, other than the ones actually used for the vehicle and tire, that in reasonable probability would have prevented or significantly reduced the risk of the occurrence or injury in question without substantially impairing the product's utility; and were economically and technologically feasible at the time the products left the control of ~~the defendants~~ Old GM and Russell by the application of existing or reasonably achievable scientific knowledge.

12.

The defective nature of the design of the truck included defects in design, stability, handling, marketing, instructions, warning, crashworthiness, rollover resistance and controllability, including the tendency to skate. The defective nature of the vehicle includes the following:

- The truck is defective in that the design of the "package," which includes the combination of track width and vertical center of gravity height, creates an unreasonable risk of loss of control and rollover given the uses for which the vehicle was marketed;

- The truck is defective from a handling standpoint because it has an unreasonable tendency to get sideways in emergency turning maneuvers and does not remain controllable under all operating conditions as required by ~~GM~~ Old GM guidelines, including the tendency to overseer and skate in foreseeable turning maneuvers;

- The truck is unreasonably dangerous from a stability standpoint because it rolls over instead of slides when loss of control does occur on relatively flat level surfaces during foreseeable steering maneuvers;

- The truck is defective from a handling standpoint because it has an unreasonable tendency to get oversteer, skate and get sideways in emergency situations, and does not remain controllable under all operating conditions as required by ~~GM~~ Old GM guidelines;

- The combination of the foregoing creates an extreme risk of rollover that is both beyond the reasonable expectations of consumers and creates a risk that far outweighs any benefit associated with the design given the uses for which the vehicle was marketed;

- The vehicle is unreasonably dangerous because it performs in an unsafe manner when operated in foreseeable turning maneuvers that are consistent with *GM's* effort to market the vehicle as a passenger-carrying vehicle at freeway speeds, which *GM* had both actual and constructive knowledge would lead to rollover crashes. *GM's* knowledge included both actual knowledge based on its test history with trucks and SUVs; its research and knowledge of rollover in foreseeable turning maneuvers;

*replace: "Old GM's" or "Old GM" where applicable*

- The vehicle was defectively marketed in that consumers were led to believe that the vehicle was safe and stable and could be safely used as a passenger-carrying vehicle when *defendants* knew that this was untrue;

*Old GM and Russell*

- The risk of operating the vehicle as designed outweighed any benefits associated with the design and *the defendants* knew of these risks; knew that the risk, if it materialized, would lead to rollover crashes and severe injuries; and knew that rollover crashes were particularly dangerous;

*insert: Old GM and Russell*

- *The defendants* knew that this type vehicle—a light truck —was not reasonably safe for inexperienced and untrained drivers and knew that the vehicle was not sufficiently capable of maneuvering in emergency conditions that consumers would face on freeways at freeway speeds; *insert: Old GM and Russell*

- The truck was likewise unreasonably dangerous from a crash protection standpoint in that the vehicle was not equipped with an occupant protection system—roof, safety belt system, and glazing design—that would effectively provide reasonable protection in the event of a rollover. *GM* knew that the belt system would not effectively and reasonably restrain occupants involved in freeway-speed rollovers, including actual knowledge learned from suppliers in the industry as early as 1996, and *GM* knew of the risk that the roof was not sufficiently strong to provide a safety cage for the occupants. Despite knowledge of these risks, and the availability of alternative safer designs, including safety features tied to roll sensing—such as pretensioners and side airbags or curtains— *GM* intentionally marketed the vehicle to consumers for use as a freeway, passenger-carrying vehicle, and intentionally led consumers to believe that it was safe, stable, and would provide state of the art protection to occupants;

*replace: "Old GM"*

*Old GM and Russell*

- *The defendants* had both actual and constructive knowledge of the existence of safer, alternative designs from both a stability and crash protection standpoint, including roll sensing, roll curtains, electronic stability control, roll stability control, and other safety features that were technologically feasible and available;

*Old GM and Russell*

- *The defendants willfully, wantonly, and consciously* marketed the truck for the aforementioned uses with full knowledge of the risks inherent in the vehicle design, yet misled consumers and withheld critical information about the unsafe nature of the vehicle in conscious disregard for the public, including information about vehicle failures worldwide;

Old GM            *insert: Old GM
- ~~GM~~ failed to act appropriately to take reasonable steps to protect occupants in the event of a rollover. ~~GM's conscious~~ disregard for known facts surrounding available technology and the performance of the truck constitutes malicious conduct under applicable law.

13.

The defective nature of the truck was a proximate and producing cause of the crash and injuries and damages suffered by Plaintiffs. The products were in the substantially the same condition on the date of the crash as they were at the time of manufacture. The Defendants are therefore strictly liable for supplying a defective and unreasonably dangerous product(s) that resulted in plaintiffs' personal injury and property damage.

14.

**COUNT II**
**NEGLIGENCE**

Old GM

At all times relevant to the Complaint, defendant ~~GM~~ was in the business of supplying motor vehicles, components, and safety equipment for use on the public
Old GM, Nabholz and Russell
roadways in Arkansas. ~~The defendant~~ held themselves out to the public as having specialized knowledge in the industry, especially with respect to trucks, SUVs and
Old GM, Nabholz and Russell
safety components. As such, ~~the defendant~~, individually and jointly, owed consumers, including the plaintiffs, a duty to use reasonable care in the design, manufacture, preparation, testing, instructing, and warnings surrounding the truck and safety
Old GM, Nabholz and Russell
equipment. ~~The defendant~~ violated this duty by negligently supplying a vehicle that were defective, unreasonably dangerous, and knowingly harmful to consumers when used as marketed. The negligent acts*include but are not limited to the following acts
or omissions:            *insert: of Old GM, Nabholz and/or Russell

- Negligently designing the vehicle from a handling and stability standpoint given the manner in which it was marketed;

- Negligently designing the vehicle with poor rollover resistance given the manner in which it was marketed;

- Negligently designing and testing the vehicle so as to assure its controllability;

- Negligently testing of the vehicle from a handling and stability standpoint, including negligent failure to appropriately test and evaluate the design approved for use on the truck;

- Negligently failing to test the vehicle to ensure the design provides reasonable occupant protection in the event of a rollover;

- Failing to adequately train and assist dealers in the dangers associated with the vehicle and tires when used as marketed;

- Negligently marketing the vehicle as a safe and stable passenger vehicle given the uses for which it was marketed;

- Failure to meet or exceed internal corporate guidelines;

- Negligently advertising the vehicle as safe and stable family vehicle;

- Failing to inform the consumer, including the plaintiffs, of the information the defendants knew about rollover risk and specifically the truck, thus depriving plaintiffs of the right to make a conscious and free choice, and also in failing to disclose known problems in foreign countries in an effort to conceal problems that the defendants knew about the truck;

- Failing to comply with the state of the art in the automotive industry insofar as providing reasonable occupant protection in a rollover, including the use of safe retractors, latch plates, roll sensing, ESC, pretensioners, side air bag and curtain technology, and integrated seating technology;

- Failing to comply with applicable and necessary Federal Motor Vehicle Safety Standards with respect to occupant protection and/or failing to test appropriately to ensure compliance;

- ~~Failing to notify consumers, as required by law, that a defect exists in the vehicle that relates to public safety;~~

- Negligent failure to warn of aging problems associated with the safety equipment.

*Nabholz* was generally negligent in failing to maintain the vehicle for itself and for permissive users such as Plaintiff, and breaching its legal duty owed to Decedent. *Nabholz* negligence was a proximate cause of the crash, death and damages. These acts of negligence of ~~all defendants~~ Old GM, Nabholz and Russell combined as a proximate and producing cause of the incident in question and the injuries and damages sustained by Plaintiffs.

15.

~~During all relevant time periods, defendants *GM* had actual and constructive knowledge of the dangers associated with the failure of the truck, and in particular the failure of the combination of vehicle and safety equipment. Despite such knowledge, the defendant GM acted in their own interests, with an "evil mind," in a willful, wanton~~

~~and malicious manner, having reason to know, and consciously disregarding, a~~
~~substantial risk that their conduct might significantly injure or kill others. The~~
~~defendant had both objective and subjective knowledge of the dangers and risks~~
~~associated with their products in the hands of consumers and, as such, should be~~
~~punished in the form of punitive or exemplary damages.~~

16.

Plaintiffs are seeking monetary damages from the defendants, jointly and severally, as found to be reasonable by the jury after consideration of all evidence. The plaintiffs are seeking recovery for the following types of injuries and damages:

- Conscious pain and suffering in the past and in the future;
- Past medical and funeral expense;
- Past and future mental and emotional anguish;
- Past and future loss of earnings;
- Loss of life and the value of life;
- Loss of society and companionship;
- Punitive or exemplary damages;    *insert: "against all defendants other than New GM"
- For costs incurred herein, including attorneys fees;
- For pre-judgment interest at the maximum rate allowed by law;
- For post-judgment interest at the maximum rate allowed by law;
- For such other and further relief as the Court may deem just and proper.

DATED this 21st day of July, 2015.

/s/ C. TAB TURNER
Tab Turner
Bar #85158
**TURNER & ASSOCIATES, P.A.**
4705 Somers Ave, Suite 100
North little Rock, AR, 72116
501-791-2277 – Phone
501-791-1251 – Fax
tab@tturner.com

*Attorneys for the Plaintiff*

# Exhibit 4

FILED IN MY OFFICE
DISTRICT COURT CLERK
6/9/2015 2:10:11 PM
James A. Noel
Patricia Serna

**STATE OF NEW MEXICO**
**COUNTY OF BERNALILLO**
**SECOND JUDICIAL DISTRICT**



| | |
|---|---|
| CONSTANCE HAYNES-TIBBETTS, Individually and as Wrongful Death Personal Representative of the Estate of JON TIBBETTS, <br><br>     Plaintiffs, <br><br> vs. <br><br> ARMANDO SAENZ; INTEGRITY AUTOMOTIVE L.L.C.; GENERAL MOTORS, LLC; FORD MOTOR COMPANY; and JOHN DOES 1-3; <br><br>     Defendants. | No.   D-202-CV-2015-04918 |

---

### PLAINTIFF'S COMPLAINT TO RECOVER
### DAMAGES FOR PERSONAL INJURY AND OTHER DAMAGES
### PURSUANT TO NEW MEXICO STATUTORY AND COMMON LAW

---

Plaintiff, CONSTANCE HAYNES-TIBBETTS, Individually and as Wrongful Death Personal Representative of the Estate of JON TIBBETTS, submits the following Complaint pursuant to New Mexico law, stating:

#### PARTIES

1.

At the time of his death on July 23, 2012, Jon Tibbetts ("Decedent" or "Decedent Jon Tibbetts"), age 59, was a citizen and resident of Bernalillo County, New Mexico. The Decedent was employed full-time as the Fire Chief for Sandoval County, New Mexico.

2.

Plaintiff Constance Hayes-Tibbetts (hereinafter "Plaintiff Connie Tibbetts" or "Plaintiff") is a citizen and resident of Bernalillo, County New Mexico. Plaintiff Connie Tibbetts was the Decedent's spouse and is the duly-appointed Wrongful Death

Personal Representative of Decedent's Estate, which is filed in Bernalillo County, New Mexico.

3.

Defendant Armando Saenz ("Defendant Saenz") is a citizen and resident of Bernalillo County, New Mexico. Defendant Saenz is over the age of majority, not on active duty in any branch of the United States Armed Forces, and is otherwise subject to jurisdiction of the Court.

4.

Defendant Integrity Automotive, L.L.C. d/b/a Integrity Automotive ("Defendant Integrity Automotive"), is a New Mexico for-profit corporation (LLC), with its principal business being the sale of pre-owned automobiles located at 9790 Coors Blvd NW, Albuquerque, New Mexico.

5.

Defendant General Motors, LLC ("GM-LLC") is a Delaware Limited Liability Company ~~and the successor to GM.~~ On July 10, 2009, GM's [Old GM's] continuing operational assets were transferred to "Acquisition Holdings LLC", which assumed the name "General Motors Company LLC". As part of a reorganization plan agreed to with the U.S., Canadian and Ontario governments, and the company's unions, ~~GM~~ [Old GM] filed for Chapter 11 Bankruptcy protection in a Manhattan court in New York on June 1, 2009. ~~GM~~ [Old GM] filed for a government-assisted Chapter 11 bankruptcy protection on June 1, 2009~~, with a plan to re-emerge as a less debt-burdened organization~~. The filing reported $82.29 billion in assets. The "new GM," or "GM-LLC" was formed from the purchase of the desirable assets of "old GM" by an entity called "NGMCO Inc." via the bankruptcy process. NGMCO Inc. was renamed to "General Motors Company" upon purchase of the assets and trade name from "old GM," with the claims of former stakeholders to be handled by the "Motors Liquidation Company." The purchase was supported by $50 billion in U.S. Treasury loans, giving the U.S. government a 60.8% stake in ~~GM.~~ [New GM] The Queen of Canada, in right of both Canada and Ontario, holds 11.7% and the United Auto Workers, through its health-care trust (VEBA), holds a further 17.5%. The remaining 10% is held by unsecured creditors. On July 10, 2009, a new entity, NGMCO Inc. purchased the ongoing operations and trademarks from ~~GM.~~ [Old GM] The purchasing company in turn changed its name from NGMCO Inc. to General Motors Company~~, marking the emergence of a new operation from the "pre-packaged" Chapter~~

11 reorganization.  Under the reorganization process, termed a 363 sale (for Section 363 which is located in Title 11, Chapter 3, Subchapter IV of the United States Code, a part of the Bankruptcy Code), the purchaser of the assets of a company in bankruptcy proceedings is able to obtain approval for the purchase from the court prior to the submission of a re-organization plan, free of liens and other claims.  The U.S. Treasury financed a new company to purchase the operating assets of the old GM in bankruptcy proceedings in the 'pre-packaged' Chapter 11 reorganization in July, 2009.  At all times relevant to the complaint, GM-LLC formally accepted responsibility for the design, manufacture, assembly, marketing and distribution of the subject vehicle, including financial responsibility for damages associated with defects in the subject vehicle.  Prior to June 1, 2009, General Motors Corporation (n/k/a Motors Liquidation Company "MLC"), and now known as GM-LLC, was and is authorized to conduct business in New Mexico, owns property in New Mexico, conducts business in New Mexico and derives significant revenue from its activities in New Mexico, and is therefore subject to be sued in New Mexico courts.  Since July 10, 2009, At all times relevant to the complaint, GM-LLC was in the business of designing, developing, testing, manufacturing, marketing and distributing automobiles, including the defective truck that forms the subject matter of this litigation.  GM-LLC'S authorized agent for service of process is Corporation Service Company, 123 East Marcy Street, Suite 101, Santa Fe, New Mexico 87501.

6.

Defendant FORD MOTOR COMPANY (hereinafter "*Ford*"), is a Delaware corporation with its principal place of business in Dearborn Michigan. *Ford* is authorized to conduct business in New Mexico; conducts business in New Mexico; and derives substantial economic profits from New Mexico. As such, *Ford* is subject to personal jurisdiction in this state. *Ford* is an American multinational automaker headquartered in Dearborn, Michigan, a suburb of Detroit. It was founded by Henry Ford and incorporated on June 16, 1903. The company sells automobiles and commercial vehicles under the Ford brand and luxury cars under the Lincoln brand. In 2011, *Ford* discontinued the Mercury brand, under which it had marketed entry-level luxury cars in the United States, Canada, Mexico, and the Middle East since 1938. In the past it has also produced heavy trucks, tractors and automotive components. *Ford* owns small stakes in Mazda of Japan and Aston Martin of the

United Kingdom. It is listed on the New York Stock Exchange and is controlled by the Ford family, although they have minority ownership. *Ford* is the second-largest U.S.-based automaker and the fifth-largest in the world based on 2010 vehicle sales. At the end of 2010, *Ford* was the fifth largest automaker in Europe. *Ford* is the eighth-ranked overall American-based company in the 2010 Fortune 500 list, based on global revenues in 2009 of $118.3 billion. In 2008, *Ford* produced 5.532 million automobiles and employed about 213,000 employees at around 90 plants and facilities worldwide. *Ford*'s authorized agent for service of process is CT Corporation System, 123 E. Marcy Street, Ste. 201, Santa Fe, NM 87501.

7.

Defendants John Does 1-3 are unidentified people or corporations who were, or may have been, involved in recommending, installing, selling, distributing, or otherwise participating in the service of the Cadillac SRX, including installation of the inappropriate tire, wheels, and attachments on the Saenz vehicle. The information necessary to specifically identify who those people and entities are is in the unique and exclusive possession of Defendants Integrity and Saenz and therefore not obtainable.

## JURISDICTION AND VENUE

8.

This civil action is brought under theories of strict liability, negligence, breach of implied warranty, personal injury, and wrongful death.

9.

This Court has jurisdiction over the subject matter of this action and venue is proper in Bernalillo County because all or part of Plaintiff's cause of action arose in Bernalillo County, Defendants *GM-LLC* and *Ford* do business in Bernalillo County and maintain statutory agents in New Mexico upon which service of process may be had, and Plaintiff Connie Tibbetts and Defendant Armando Saenz are residents of Bernalillo County, State of New Mexico.

## GENERAL ALLEGATIONS

10.

The defective 2005 Cadillac SRX (VIN: IGYEE63A950117981) which forms the basis for this suit, was designed, tested, manufactured, marketed, assembled, and/or distributed by ~~Defendant GM-LLC~~ Old GM. The Cadillac SRX is a luxury mid-size crossover

SUV produced by the Cadillac division of American automaker General Motors since the 2004 model year. The SRX ~~is~~ was manufactured at ~~GM's~~ Old GM's Lansing Grand River Plant in Lansing, Michigan, as well as assembled overseas in Russia and China. It was designed by ~~GM~~ Old GM from the Cadillac and Cadillac STS platform with the designation GMT-265 (Sigma platform). The SUV ~~is~~ was designed with 116" wheelbase; 195" length; 73" width; and 68" height. The vehicle ~~is~~ was equipped with a five or six-speed automatic transmission. Rear-wheel and four-wheel drive and MagneRide are available. The first generation SRX was available through the 2009 model year. The Insurance Institute for Highway Safety ("IIHS") found the 2005-08 SRX worst in its class for driver fatalities with a death rate of 63 compared to its class average of 23. For the 2010 model year, Cadillac introduced an all-new SRX based on the Provoq concept vehicle. The new version used its own unique platform with ties to Epsilon II.

11.

Defendant Integrity Automotive sold the defective 2005 Cadillac to Defendant Armando Saenz just days before the July 23, 2012, fatal collision.

12.

The defective 2004 Ford Explorer (VIN: 1FMZU73K64ZA14385) which forms the basis of this suit, was designed, tested, manufactured, marketed, assembled, and/or distributed by *Ford.* The Ford Explorer is a mid-size sport utility vehicle produced by Ford since 1990 (as 91 model year). Until 2010, the Explorer was formed from a traditional body-on-frame, mid-size SUV design. For the 2011 model year, Ford moved the Explorer to a more modern unibody, full-size crossover SUV/crossover utility vehicle platform, the same Volvo-derived platform the Ford Flex and Ford Taurus use. For purposes of marketing, the Explorer is slotted between the traditional body-on-frame, full-size Ford Expedition and the mid-size CUV Ford Edge. The fifth generation Explorer shares platforms with the Ford Flex and Lincoln MKT. The Explorer has been involved in controversy, after a spate of fatal rollover accidents throughout the 1990s and early 2000s, including those involving Explorers fitted with Firestone tires. The 4-door Explorer and its companion the Mercury Mountaineer were redesigned in 2001, and entirely for the 2002 model year, losing all design similarity with the Ford Ranger while also gaining a similar appearance to the Ford Expedition. The 2002-2004 models saw introduction of stability control as an option, Ford's *AdvanceTrac* with *Roll Stability Control* system. The stability control system became standard for the 2005

model year. For the third generation, Ford installed fully independent rear suspension in the 4-door Ford Explorer and Mercury Mountaineer - but not in the smaller Sport model. The suspension replaced the non-independent "live axle" rear suspension used in previous model year Explorers. With a fully independent rear suspension, each rear wheel connects to the rear differential via a half-shaft drive axle. The design was intended to offer increased ride comfort, on-road handling, and vehicle stability. One reason for Ford's switch to independent rear suspension in the Explorer was due to the well-publicized rollover problem associated with the design, including resulting fatalities that occurred with the previous generations of Ford Explorer. The 2006 model year brought about an update with the introduction of a new frame produced by *Magna International* rather than *Tower Automotive*. By 2008, Ford added side curtain airbags across the Explorer range. By 2009, the Explorer received a trailer sway control system as standard equipment, and the navigation system received traffic flow monitoring and a gas information system. By 2011, the fifth generation Explorer evolved to a unibody structure based on the D4 platform, a modified version of the D3 platform. The newer Explorer featured blacked-out A, B, and D-pillars to produce a *floating roof* effect similar to Land Rover's floating roof design used on its sport utility vehicles. The fifth generation Explorer (2011), assembly moved to Ford's Chicago Assembly plant, where it is built alongside the Ford Taurus and Lincoln MKS. The Louisville plant, where the previous generation was built, was converted to produce cars based on Ford's global C platform (potentially including the Ford Focus, Ford C-Max, and Ford Kuga). Much like Ford's Escape, the Explorer continues to be marketed as an "SUV" rather than a "crossover SUV". With the discontinuation of the Ford Crown Victoria in 2011, and to compete with police model sport utility vehicles offered by other automobile manufacturers, Ford made the 2012 model year Explorer the basis for a "new" SUV-type Police vehicle. It is only available to law enforcement and other emergency services agencies. Ford calls it the *Utility Police Interceptor*. Major differences between the standard Explorer and the Utility Police Interceptor included provisions for emergency services related equipment such as radios, light bars and sirens. Ford actively marketed the so-called "special service" version of the Explorer as the industry's "first pursuit-rated, all-wheel-drive (AWD) vehicle" with special features such as "bigger brakes, springs and mpg figures for surer stopping, better stability, and greater fuel efficiency." Ford likewise represented and warranted that the Explorer

special service version had "faster, ultra-tenacious acceleration thanks to higher horsepower combined with standard AWD", as well as "higher electrical capability". Ford further marketed and sold the police package as "hailing from the same platform so they share many common maintenance parts (no matter the powertrain), including tires, wheels, brake pads, rotors, calipers, and alternator." Ford likewise represented that the design was made for "officer protection" in that it was certified for protection, including certified for a 75 mph rear-impact crash, so-called "shields of armor" as panels for ballistics protection, steel intrusion plates built into the seat backs, and a "safety cell" construction designed to direct force of a collision around the occupant compartment ("SPACE" meaning Side Protection and Cabin Enhancement), including the use of an architecture made of hydro formed cross-vehicle beams between the door frames designed to solidify the sides along with ultra-high-strength steel reinforcement for added occupant protection. The vehicle was marketed with Ford's canopy system and front seat side airbags as well.

13.

On July 23, 2012, Defendant Armando Saenz was driving the 2005 Cadillac SRX northbound on U.S. Interstate 25, at a speed at or near the posted speed limit. During the course of Saenz' journey, he negligently lost control of his vehicle, struck a center concrete barrier, and then veered back to the right where he struck the left side of the 2004 Ford Explorer being driven northbound by the Decedent. Following impact, the Decedent attempted to control the Explorer, but due to its defective design, he was unable to and the Explorer rolled over multiple times causing Decedent to suffer serious injury and death.

## COUNT I
## NEGLIGENCE
## DEFENDANT ARMANDO SAENZ

14.

Defendant Armando Saenz owed the duty to exercise due care in the operation of the vehicle he was driving, including maintaining appropriate speed for the conditions, maintaining control of his vehicle, and operating the vehicle in a non-negligent manner.

15.

Defendant Armando Saenz breached his duties by failing to exercise the reasonable care necessary to maintain control of the vehicle and, specifically, the

defective 2005 Cadillac SRX involved in the fatal collision that forms the basis of Plaintiff's Complaint.

### 16.

Defendant Armando Saenz' negligence was a contributing cause of the injuries, death and damages complained of by Plaintiff herein.

## COUNT II
## STRICT LIABILITY/PRODUCT LIABILITY
## DEFENDANT FORD

### 17.

At all times relevant to the subject Complaint, *Ford* was responsible for designing, developing, testing, assembling, manufacturing, marketing, and distributing the defective 2004 Ford Explorer. Absent ordinary wear and tear, including foreseeable use, the subject vehicle was in substantially the same condition at the time of the crash as it was when it left *Ford's* possession.

### 18.

The Explorer is defective and unreasonably dangerous by design when used as marketed by *Ford*. The inherent defects in the design were present at the time the vehicle was manufactured, marketed, and distributed. The defects in the vehicle were a proximate and producing cause of the injuries, death and damages alleged by Plaintiff herein. At all times relevant to the Complaint, *Ford* was in the business of designing, manufacturing, assembling, marketing, testing, and otherwise distributing automobiles. The defective nature of the design of the Explorer included defects in design, stability, handling, marketing, instructions, warning, crashworthiness, rollover resistance and controllability. The defective nature of the vehicle includes the following:

18.01 The Explorer is defective in that the design of the "package", which includes the combination of track width and vertical center of gravity height, creates an unreasonable risk of rollover given the uses for which the vehicle was marketed, especially freeway use and special-service use;

18.02 The Explorer is defective from a handling standpoint because it has an unreasonable tendency to get sideways in emergency turning maneuvers, including while attempting to avoid crashes and dealing with impacts, and does not remain controllable under all operating conditions as required by *Ford* guidelines, including the tendency to over-steer and skate;

18.03 The Explorer is unreasonably dangerous from a stability standpoint because it rolls over instead of sliding when loss of directional control occurs on relatively flat level surfaces during foreseeable steering maneuvers;

18.04 The combination of the above factors creates an extreme risk of rollover that is both beyond the reasonable expectations of consumers and creates a risk that far outweighs any benefit associated with the design given the uses for which the vehicle was marketed;

18.05 The vehicle is unreasonably dangerous because it performs in an unsafe manner when operated in foreseeable emergency situations and maneuvers that are consistent with *Ford's* efforts to market the vehicle as a "station wagon" replacement for police use, which *Ford* had both actual and constructive knowledge would lead to rollover crashes. *Ford's* knowledge included both actual knowledge based on its test history with SUVs and its research and knowledge of rollovers in foreseeable turning maneuvers and constructive knowledge given its corporate history with respect to SUV designs, and unique and special knowledge of the dangers posed when operated by aggressive special service public servants;

18.06 The vehicle was defectively marketed in that consumers, including public servants, were led to believe that the vehicle was safe and stable and could be safely used as a passenger-carrying, station-wagon replacement type vehicle when *Ford* knew that this was untrue. In fact, Ford went further by representing that the police package had special or unique qualities that other Explorers did not have that actually enhanced the safety of the vehicles when exposed to emergencies;

18.07 The risk of operating the vehicle as designed outweighed any benefits associated with the design and *Ford* knew of these risks; knew that the risk, if it materialized, would lead to rollover crashes and severe injuries, and knew that rollover crashes were particularly dangerous;

18.08 *Ford* knew that this type vehicle — an SUV — was not reasonably safe for inexperienced and untrained drivers and knew that the vehicle was not sufficiently capable of maneuvering in emergency conditions that consumers would face on freeways at freeway speeds, especially by police officers who oftentimes are presented with dangerous driving situations;

18.09 The Explorer was likewise unreasonably dangerous from a crash protection standpoint in that the vehicle was not equipped with an occupant protection system — roof, occupant compartment, safety cell, safety belt system, anti-ejection design, and glazing design — that would effectively provide reasonable protection in the event of a rollover, with or without pre-roll impact. Similarly, the vehicle was designed in such a manner that unique equipment placement in the vehicle posed unique and unreasonable risk of injury to occupants in all forms of crashes. Despite actual knowledge of the unique dangers posed in rollover

crashes, Ford intentionally marketed the Explorer has having special or unique qualities or characteristics that made it safer than other vehicles for public servants;

18.10 Despite knowledge of these risks, and the availability of alternative safer designs, including safety features tied to roll sensing, such as pretensioners and side airbags or curtains, Ford intentionally marketed the vehicle to consumers, including public servants, for use as a freeway, passenger-carrying vehicle, and intentionally led the public to believe that it was safe, stable, and would provide state of the art protection to occupants exposed to extraordinary conditions;

18.11 *Ford* had both actual and constructive knowledge of the existence of safer,

alternative designs from both a stability and crash protection standpoint, including roll sensing, roll curtains, electronic stability control, roll stability control, and other safety features that were technologically feasible and available;

18.12 *Ford* willfully, wantonly, and consciously marketed the Explorer for the aforementioned uses with full knowledge of the risks inherent in the vehicle design, yet misled consumers and withheld critical information about the unsafe nature of the vehicle in conscious disregard for the public.

19.

*Ford's* engineers have known for over 30 years, from the time of the development of the Bronco II, that the most important vehicle characteristic in maintaining control and reducing SUV propensity for rollover is understeer, especially in transient maneuvers. *FORD* identified understeer as a "first order effect" and the "primary factor influencing rollover propensity."

20.

The problem with an over-steering vehicle, with respect to rollover propensity, is that it can and likely will result in the back end of the vehicle coming around (a loss of control) with the vehicle ending up sideways to its path of travel. The resulting side forces ("lateral acceleration") contribute to rollover.

21.

Ford also recognized that the rollover stability of a vehicle is affected by its "stability index," or "static stability factor", which is the relationship of center of gravity height and the track width of the vehicle. In light of these common control and stability principles, *Ford* adopted a "handling strategy" with respect to the Explorer to "increase understeer in all conditions."

22.

*Ford's* engineers recommended major safety changes needed for the Explorer to *Ford* management, yet management ignored and vetoed those changes to increase profits on the vehicle. *Ford* engineers recommended, for example, improvements with regards to the Explorer's suspension, reduction in the engine height to lower the center of gravity, and an increase in the track width of the vehicle to make the Explorer more resistant to rollover than the Bronco II and earlier versions of the Explorer.

23.

*Ford's* knowledge of the critical importance of understeer was not acted upon, however, and *Ford* management rejected the center of gravity and track width recommendations of its engineers that would have made the Explorer more resistant to rollover. *Ford* declined to make the necessary changes so that there would not be any delays in the production of the Explorer, and thus Ford could recoup its $500 million investment as quickly as possible.

24.

*Ford* addressed the rollover stability problem primarily by recommending lower air pressure in the tires. As set forth in a 1989 development report, after noting that they had investigated variations in tire pressure "as a means to achieving the UN46 (Explorer) ride and handling objective," *Ford's* engineers recommended use of "reductions in tire pressure to meet the program objectives" for both ride and handling. Likewise, since *Ford's* marketing department was recommending larger tires (which reduced the vehicle's stability), *Ford* again put dollars in front of safety and recommended the larger tire, but with reduced air pressure. When it came to creating understeer, *Ford's* engineers again turned to lower tire pressure.

25.

By putting profits and public relations image before safety, *Ford* produced a vehicle -- beginning with the Ford Bronco II and continuing with minor changes -- that was prone to over-steer, going out of control in response to simple accident avoidance maneuvers, and rollover when operated by the ordinary driver.

26.

The Explorer also has dangerously weak roof pillars (which support the roof structure), incapable of maintaining integrity of the safety cell in the event of a

rollover, and thereby leading to the collapse of the roof — towards the passengers' heads — in a rollover crash.

### 27.

In the subject crash, the defectively weak roof collapsed and directly attributed to the injuries that took Jon Tibbett's life. The Explorer lacked adequate design features in the roof and structure that should have been present given the high propensity for rollover. The vehicle also lacked structural foam, which would also have substantially and feasibly increased the roof strength. *Ford* also failed to equip, as standard equipment, the 2004 Ford Explorer with electronic stability control, a feasible alternative design that would have likely avoided the rollover and injuries in the subject crash.

### 28.

*Ford* knew of the propensity of the Ford Explorer to rollover from the mid 1980's when the initial version of the program was approved. *Ford* was aware of the rollover problems of the Jeep CJ5 in the 1970s and 1980s, which were alleviated by simply lowering and widening the design. *Ford* had also experienced similar situations concerning rollover incidents dating back to the Bronco II. It is thus obvious that Ford was aware of the rollover issues concerning the Ford Explorer.

### 29.

Not only did *Ford's* own testing show that there were unacceptable Explorer rollover problems, but the high number of real world incidents also made *Ford* aware that attention should be directed to this issue. However, *Ford* made no significant attempt to correct the problem despite having the capacity and technology to do so.

### 30.

A safer alternative design was economically and technologically feasible at the time the product left the control of *Ford*, both with respect to rollover propensity and crash protection.

### 31.

The defective nature of the vehicle was a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, including his enhanced injuries, and the resulting damages suffered and sought by the Plaintiff herein. *Ford* is strictly liable for supplying the defective and unreasonably dangerous product.

## COUNT III
## NEGLIGENCE

## DEFENDANT *FORD*

### 32.

At all times relevant to this Complaint, *Ford* was in the business of supplying motor vehicles for use on the public roadways. *Ford* held itself out to the public as having specialized knowledge in the industry. As such, *Ford* owed consumers, including Decedent and Plaintiff, a duty to use reasonable care in the design, manufacture, preparation, testing, instructing, and warnings surrounding the Explorer. *Ford* violated this duty by negligently supplying a vehicle that was defective. The negligent acts include but are not limited to the following acts or omissions:

- Negligently designing the vehicle from a handling and stability standpoint given the manner in which it was marketed;

- Negligently designing the vehicle with poor rollover resistance given the manner in which it was marketed;

- Negligently designing and testing the vehicle from an occupant protection standpoint, and then marketing it for special use by public servants knowing full well that the features it represented did not exist in reality;

- Negligently testing of the vehicle from a handling and stability standpoint;

- Negligently failing to test the vehicle to ensure the design provides reasonable occupant protection in the event of a rollover;

- Failing to adequately train and assist dealers in the dangers associated with the vehicle when used as marketed;

- Failing to disclose known defects, dangers, and problems to both dealers and the public;

- Negligently marketing the vehicle as a safe and stable passenger vehicle given the uses for which it was marketed;

- Failure to meet or exceed internal corporate guidelines;

- Negligently advertising the vehicle as safe and stable family vehicle and one that was ultra-safe for use by public servants;

- Failing to inform the consumer, including the Plaintiff and Decedent, of the information *Ford* knew about rollover risks, and specifically the Explorer, thus depriving the Plaintiff and Decedent of the right to make a conscious and free choice, and also in failing to disclose known problems in foreign countries in an effort to conceal problems that *Ford* knew about the Explorer from U.S. consumers, including the Plaintiff and Decedent;

- Failing to comply with the state of the art in the automotive industry insofar as providing reasonable occupant protection in a rollover, including the use of roll sensing, pre-tensioners, side air bag and curtain technology, and integrated seating technology;

- Failing to comply with applicable and necessary Federal Motor Vehicle Safety Standards with respect to occupant protection and/or failing to test appropriately to ensure compliance;

- Failing to notify consumers, as required by law, that a defect exists in the vehicle that relates to public safety;

- Failing to recall the vehicle or; alternatively, retrofitting the vehicle to enhance safety.

33.

These acts of negligence were a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, his enhanced injuries, including his death, and the resulting damages suffered and sought by the Plaintiff herein. The dangers referenced earlier were reasonably foreseeable or scientifically discoverable at the time of exposure.

## COUNT IV
## BREACH OF WARRANTY
## DEFENDANT FORD

34.

At all times relevant to the complaint, *Ford* was a "merchant" in the business of supplying "goods" and/or "products" sold for consumer usage. As such, Ford breached the warranties of merchantability and fitness for a particular purpose in that the 2004 Explorer was not fit for ordinary use or for the intended use for which it was purchased. These breaches of warranty were a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, enhanced injuries, and the resulting damages suffered and sought by the Plaintiff herein. The product was unfit as previously described in the foregoing accounts. Notice has been provided as required by law.

## COUNT V
## STRICT LIABILITY/PRODUCT LIABILITY
## DEFENDANTS *GM-LLC* AND INTEGRITY AUTOMOTIVE

35.

At all times relevant to the present Complaint, ~~GM-LLC~~ *Old GM* was responsible for designing, developing, testing, assembling, manufacturing, marketing, and

distributing the defective 2005 Cadillac SRX. Absent foreseeable wear, tear, modifications, and usage, the subject vehicle was in substantially the same condition at the time of the crash as it was when it left ~~GM-LLC's~~ Old GM's possession.

36.

At all relevant times hereto, Defendant Integrity Automotive was engaged in the business of marketing, distribution, sales and service of motorized vehicles in New Mexico, and held itself out as having special knowledge and expertise. Integrity placed the subject defective vehicle into the stream of commerce in a condition that was defective and unreasonably dangerous, including non-approved, low-profile tires and loose tie rods.

37.

Upon information and belief, and at all material times hereto, ~~Defendants GM-LLC~~ Old GM and Integrity Automotive marketed, distributed, sold and/or serviced the subject 2005 Cadillac SRX, and the Cadillac was in substantially the same condition, with respect to its steering mechanism, handling, maneuverability and stability, as it was when it was initially placed in the stream of commerce by ~~GM-LLC.~~ Old GM

38.

The Cadillac SRX is defective and unreasonably dangerous by design when used as marketed. The inherent defects in the design were present at the time the vehicle was manufactured, marketed, and distributed. The defects in the vehicle were a proximate and producing cause of the injuries, including the severity of the injuries, death and damages alleged by Plaintiff herein. At all times relevant to the Complaint, ~~GM-LLC~~ Old GM was in the business of designing, manufacturing, assembling, marketing, testing, and otherwise distributing automobiles. The defective nature of the design of the 2005 Cadillac SRX included defects in design, stability, steering, handling, marketing, instructions, warning, and controllability. The defective nature of the vehicle includes the following:

- The Cadillac SRX is defective from a handling standpoint because it does not remain controllable under all operating conditions as required by ~~GM-LLC~~ Old GM guidelines;

- The inability to control the vehicle at all times creates an extreme risk of steering and controllability that is both beyond the reasonable expectations of consumers and creates a risk that far outweighs any benefit associated with the design given the uses for which the vehicle was marketed;

Old GM
- ~~GM LLC~~ knew that this type vehicle — an SUV — was not reasonably safe for inexperienced and untrained drivers and knew that the vehicle was not sufficiently capable of maneuvering in emergency conditions that consumers would face on freeways at freeway speeds;

Old GM
- ~~GM LLC~~ had both actual and constructive knowledge of the existence of safer, alternative designs from both a steering and controllability standpoint, including roll sensing, electronic stability control, roll stability control, and other safety features that were technologically feasible and available;

Old GM
- ~~GM LLC~~ ~~willfully, wantonly, and consciously~~ marketed the Cadillac SRX for the aforementioned uses with full knowledge of the risks inherent in the vehicle design, yet misled consumers and withheld critical information about the unsafe nature of the vehicle in ~~conscious~~ disregard for the public.

39.

Old GM
By putting profits and public relations image before safety, ~~GM LLC~~ produced a vehicle that was prone to unreasonable steering and controllability, including going out of control in response to simple accident avoidance maneuvers when operated by the ordinary driver in foreseeable circumstances.

Old GM
40.

~~GM LLC~~ failed to equip, as standard equipment, the 2005 Cadillac SRX with adequate and proper control features that would have likely avoided the uncontrollability of the vehicle which contributed to the collision and injuries in the subject crash.

Old GM's
41.

Not only did ~~GM LLC's~~ own testing show that there were unacceptable Cadillac SRX problems, but the high number of real world incidents also made ~~GM LLC~~ Old GM's aware that attention should be directed to this issue. However, ~~GM LLC~~ Old GM's made no significant attempt to correct the problem despite having the capacity and technology to do so.

42.

A safer alternative design was economically and technologically feasible at the time the product left the control of ~~GM LLC~~ Old GM's, both with respect to steering, controllability, and electronic stability control.

43.

The defective nature of the vehicle was a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, and the resulting damages suffered

and sought by the Plaintiff herein. Defendants *GM-LLC* and Integrity Automotive are strictly liable for supplying the defective and unreasonably dangerous product.

## COUNT VI
## NEGLIGENCE
## DEFENDANT *GM-LLC*

### 44.

At all times relevant to this Complaint, ~~*GM-LLC*~~ [Old GM] was in the business of supplying motor vehicles for use on the public roadways. ~~*GM-LLC*~~ [Old GM] held itself out to the public as having specialized knowledge in the industry. As such, ~~*GM-LLC*~~ [Old GM] owed a duty to persons using those vehicles, and persons whom ~~*GM-LLC*~~ [Old GM] reasonably expected to be in the vicinity during the use of those vehicles, including Decedent Jon Tibbetts, to use reasonable care in the design, manufacture, preparation, testing, instructing, and warnings surrounding the 2005 Cadillac SRX. ~~*GM-LLC*~~ [Old GM] violated this duty by negligently supplying a vehicle that was defective. The negligent acts[*] include but are not limited to the following acts or omissions:    [*insert: of Old GM]

- Negligently designing the vehicle from a steering, handling and controllability standpoint given the manner in which it was marketed;

- Negligently designing and testing the vehicle from a steering and controllability standpoint;

- Failing to adequately train and assist dealers in the dangers associated with the vehicle when used as marketed;

- Failing to disclose known defects, dangers, and problems to both dealers and the public;

- Negligently marketing the vehicle as a safe and stable passenger vehicle given the uses for which it was marketed;

- Failing to meet or exceed internal corporate guidelines;

- Negligently advertising the vehicle as safe and stable family vehicle;

- Failing to comply with the state of the art in the automotive industry insofar as providing a reasonable electronic stability control system is concerned;

- Failing to comply with applicable and necessary Federal Motor Vehicle Safety Standards with respect to steering, steering linkages, handling and controllability, and/or failing to test appropriately to ensure compliance;

- ~~Failing to notify consumers, as required by law, that a defect exists in the vehicle that relates to public safety; and~~

- ~~Failing to recall the vehicle or; alternatively, retrofitting the vehicle to enhance safety.~~

45.

These acts of negligence were a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, and the resulting damages suffered and sought by the Plaintiff herein. The dangers referenced earlier were reasonably foreseeable or scientifically discoverable at the time of exposure.

## COUNT VII
## NEGLIGENCE
## DEFENDANT INTEGRITY AUTOMOTIVE

46.

At all relevant times, Defendant Integrity Automotive owed Decedent and Plaintiff a duty of reasonable care. Defendant Integrity Automotive breached that duty of care and was otherwise negligent for the acts complained of herein. The negligence of Defendant Integrity Automotive combined to cause and/or contribute to Decedent's and Plaintiff's resulting injuries, death, losses and damages as set forth more fully herein. The negligence acts of Defendant Integrity Automotive include, but are not limited to the following:

- Negligently marketing the 2005 Cadillac SRX as a safe and stable passenger vehicle given the uses for which it was marketed;

- Failing to adequately inspect, service and equip the vehicle with safe and required equipment;

- Failing to ensure the vehicle was mechanically in good repair before allowing the vehicle to be sold to customers and used upon the roadways and highways open to the general public;

- Failing to disclose known defects, dangers, and problems regarding the vehicle;

- Failing to remove the 22 inch rims and the 265/35R22 tires that were on the vehicle, and then distributing the vehicle in a condition known to be dangerous;

- Failing to retrofit the vehicle with rims and tires specified by the manufacture to ensure and enhance the vehicle's safety; and

- Failing to advise or warn the vehicle's purchasers that size 22 inch rims and 265/35R22 tires were not specified by GM for use on the Cadillac SRX.

47.

These acts of negligence were a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, and the resulting damages suffered and sought by the Plaintiff herein. The dangers referenced earlier were reasonably foreseeable or scientifically discoverable at the time of exposure.

## COUNT VIII
## BREACH OF WARRANTY
## DEFENDANTS *GM-LLC* AND INTEGRITY AUTOMOTIVE

48.

At all times relevant to the complaint, ~~Defendants *GM-LLC*~~ and Integrity Automotive were "merchants" in the business of supplying "goods" and/or "products" sold for consumer usage. As such, ~~these defendants~~ breached the warranties of merchantability and fitness for a particular purpose in that the 2005 Cadillac SRX was not fit for ordinary use or for the intended use for which it was purchased. These breaches of warranty were a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, and the resulting damages suffered and sought by the Plaintiff herein. The product was unfit as previously described in the foregoing accounts. Notice has been provided as required by law.

*[Old GM]* (handwritten annotation above "Defendants GM-LLC")

*[Old GM and Integrity Automotive]* (handwritten annotation above "these defendants")

## COUNT IX
## NEGLIGENCE
## JOHN DOES 1-3

49.

At all relevant times, Defendants John Does 1-3 owed Decedent and Plaintiff a duty of reasonable care. Defendant John Does 1-3 breached that duty of care and were otherwise negligent for the acts complained of herein. The negligence of Defendants John Does 1-3 combined to cause and/or contribute to Decedent's and Plaintiff's resulting injuries, death, losses and damages as set forth more fully herein. The negligent acts of Defendants John Does 1-3 include, but are not limited to the following:

- Failing to adequately inspect, service and equip the 2005 Cadillac SRX vehicle with safe and required equipment;

- Failing to install and fit the vehicle with rims and tires specified by the manufacture to ensure and enhance the vehicle's safety;
- Installing inappropriate rims and tires on Defendant Saenz' SRX, including the 22 inch rims and the 265/35R22 tires that were on the vehicle at the time of the collision;

- Failing to ensure the SRX was mechanically in good repair before allowing the vehicle to be used upon the roadways and highways open to the general public; and

- Failing to advise or warn the vehicle's purchasers and users that size 22 inch rims and 265/35R22 tires were not specified by GM for use on the Cadillac SRX.

50.

These acts of negligence were a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, and the resulting damages suffered and sought by the Plaintiff herein. The dangers referenced earlier were reasonably foreseeable or scientifically discoverable at the time of exposure.

**COUNT X**
**BREACH OF WARRANTY**
**DEFENDANTS JOHN DOES 1-3**

51.

At all times relevant to the complaint, Defendants John Does 1-3 were "merchants" in the business of supplying "goods" and/or "products" sold for consumer usage. As such, these defendants breached the warranties of merchantability and fitness for a particular purpose in that the inappropriate 22 inch rims and the 265/35R22 tires that were on the 2005 Cadillac SRX were not fit for ordinary use or for the intended use for which they were purchased. These breaches of warranty were a cause and/or contributing cause of the fatal collision, Jon Tibbett's injuries and death, and the resulting damages suffered and sought by the Plaintiff herein. These products were unfit as previously described in the foregoing accounts. Notice has been provided as required by law.

**DAMAGES**
**INCLUDING LOSS OF CONSORTIUM**

52.

The actions and/or inactions of Defendants *Ford, GM-LLC,* Integrity Automotive, Armando Saenz, and John Does 1-3, including the aggravating circumstances attending those acts and/or failures to act, caused and/or contributed to Decedent's serious injuries and death, and the resulting damages therefrom include:

* Conscious pain and suffering;
* Mental anguish and distress,
* Medical expenses;
* Disfigurement and death;
* Funeral and burial expenses;
* Property damages;
* Loss of earnings and earning capacity;
* Loss of life and enjoyment of life; and
* Loss of household services; all for which Plaintiff seeks relief pursuant to the New Mexico Wrongful Death Act and other New Mexico law.

53.

Plaintiff Connie Tibbetts enjoyed a very special marital, familial, loving, care-giving and intimate relationship with her husband Jon Tibbetts.

54.

Plaintiff Connie Tibbetts suffered and will continue to suffer from the emotional distress caused by the loss of society, companionship and sexual relations she enjoyed with her husband, Jon Tibbetts, which was wrongfully taken from her as a result of his tragic death.

55.

The actions and/or inactions of ~~Defendants~~ *Ford,* Old GM ~~*GM-LLC,*~~ Integrity Automotive, Armando Saenz, and John Does 1-3, including the aggravating circumstances attending those acts and/or failures to act, caused and/or contributed to Plaintiff's loss of consortium damages, and Plaintiff is entitled to a recovery against each of the Defendants for these damages in an amount to be awarded by the jury herein.

**PUNITIVE/EXEMPLARY DAMAGES**

56.

In addition to compensatory damages, Plaintiff is seeking punitive damages from Defendants Integrity Automotive, *Ford,* ~~*GM-LLC*~~ and John Does 1-3, because their conduct constitutes reckless, grossly negligent, willful, wanton, malicious

behavior that needs to be punished in order to deter others from participating in similar future misconduct. The acts set forth in this complaint were taken with knowledge of the associated risks to consumers. ~~These defendants~~ <span style="color:blue">Integrity Automotive, Ford and John Does 1-3</span> took the steps set forth herein in conscious disregard for the potential consequences and under circumstances for which a jury could determine that they willfully, wantonly, recklessly, maliciously, and consciously indifferent to the consequences, endangered human life. ~~These defendants~~ <span style="color:blue">Integrity Automotive, Ford and John Does 1-3</span> deserve to be punished in a civil forum for the malicious misconduct. The amount of punitive damages to be awarded is within the discretion of the jury.

WHEREFORE, PLAINTIFF prays for judgment for compensatory and punitive damages as set forth in this Complaint, pre- and post-judgment interest, costs and fees in connection with this action, and for any and all other just relief this court may deem appropriate.

Dated this 9th day of June, 2015.

Respectfully submitted,

**WILL FERGUSON & ASSOCIATES**

By:    /s/ Robert M. Ortiz
ROBERT M. ORTIZ
1720 Louisiana Blvd NE, Suite 100
Albuquerque, New Mexico 87110
(505) 243-5566
And

**TURNER & ASSOCIATES, P.A.**
By: TAB TURNER
(*Pro Hac Vice Pending*)
Arkansas Bar No. 85158
4705 Somers Avenue, Suite 100
North Little Rock, Arkansas  72116
(501) 791-2277

***ATTORNEYS FOR PLAINTIFFS***