# <u>Exhibit B</u>

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 09-50026-reg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    MOTORS LIQUIDATION COMPANY, et al.,

7    f/k/a General Motors Corp., et al.

8

9          Debtors.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12

13                  U.S. Bankruptcy Court

14                  300 Quarropas Street

15                  White Plains, New York

16

17

18                  February 17, 2015

19                  9:02 AM

20

21   B E F O R E :

22   HON ROBERT E. GERBER

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  K. HARRIS

1    Hearing re:    Oral Argument on Motion to Enforce.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

Page 3

```
 1   A P P E A R A N C E S :

 2

 3   KING & SPALDING, LLP

          Attorneys for General Motors, LLC

 4

          1185 Avenue of the Americas

 5

          New York, New York 10036

 6

 7

     BY:  ARTHUR J. STEINBERG, ESQ.

 8

          SCOTT DAVIDSON, ESQ.

 9

10

     GOODWIN PROCTER, LLP

11

          Attorneys for South Texas Plaintiffs

12

          The New York Times Building

13

          620 Eighth Avenue

14

          New York, New York 10018

15

16   BY:  WILLIAM P. WEINTRAUB, ESQ.

17

18   BROWN RUDNICK

19        Attorneys for Certain Plaintiffs

20        Seven Times Square

21        New York, New York 10036

22

23   BY:  EDWARD WEISFELNER, ESQ.

24

25   GOLENBOCK. EISEMAN, ASSOR, BELL & PESKOE, LLP
```

1        Attorneys for Groman Plaintiffs

2        437 Madison Avenue

3        New York, New York 10022

4

5   BY:  JONATHAN L. FLAXER, ESQ.

6

7   GIBSON, DUNN & CRUTCHER, LLP

8        Attorneys for Wilmington Trust Company as

9        GUC Trust Administrator

10       200 Park Avenue

11       New York, New York 10166

12

13  BY:  LISA H. RUBIN, ESQ.

14       KEITH R. MARTORANA, ESQ.

15       MATTHEW WILLIAMS, ESQ

16

17  AKIN, GUMP, STRAUSS, HAUER & FELD, LLP

18       Attorneys for GUC Trust Unit Trust Holders

19       One Bryant Park

20       New York, New York 10036

21

22  BY:  DEBORAH NEWMAN, ESQ.

23       DANNY GOLDIN

24

25  STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

**Page 5**

1          Attorneys for Barron & Budd & Grant

2          2323 Bryan Street, Suite 2200

3          Dallas, Texas 75201

4

5     BY:  SANDER L. ESSERMAN, ESQ.

6

7     KIRKLAND & ELLIS, LLP

8          Attorneys for General Motors, LLC

9          300 North LaSalle

10         Chicago, Illinois 60654

11

12    BY:  RICHARD C. GODFRY, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  Good morning.  Have seats, please.

3     Well, I know everybody who's likely to speak.  So, let me

4     just get appearances of those who will be heard for the

5     transcript.  And then I want you all to sit down, because

6     I'm going to have some preliminary comments.

7              MR. STEINBERG:  Arthur Steinberg, from King &

8     Spalding, on behalf of New General Motors.

9              THE COURT:  All right, Mr. Steinberg.  Could

10    everybody hear me?  I'm not sure if I have the same volume

11    in my mic that I normally do.  Can you hear me, Mr. Flaxer?

12             MR. FLAXER:  (indiscernible)

13             THE COURT:  Okay.  Thank you.

14             MR. WEISFELNER:  Good morning, Judge.  Edward

15    Weisfelner, Brown Rudnick, on behalf of the designated

16    counsel.

17             THE COURT:  Thank you, Mr. Weisfelner.

18             MR. WEINTRAUB:  So, good morning, your Honor.

19    William Weintraub with Goodwin Procter, also designated

20    counsel.

21             THE COURT:  Right, Mr. Weintraub.

22             MS. RUBIN:  Morning, your Honor.  I'm Lisa Rubin

23    with Gibbs & Dunn on behalf of the GUC Trust.

24             THE COURT:  Okay.  She was kind of far from the

25    mic; that was Ms. Rubin introducing herself for the GUC

Page 7

1   Trust.  I got it this time, Ms. Rubin.

2          MS. NEWMAN:  Good morning, your Honor.  Deborah

3   Newman from Akin Gump on behalf of the participating note

4   holders.

5          THE COURT:  All right, Ms. Newman.

6          MR. ESSERMAN:  Good morning, your Honor.  Sander

7   Esserman, Stutzman, Bromberg, Esserman & Plifka on behalf of

8   designated counsel.

9          THE COURT:  All right.  And I see Mr. Flaxer right

10  next to you, Mr. Esserman.

11          MR. FLAXER:  Yes, your Honor, only to the extent

12  that we feel that it's necessary to speak for -- it could be

13  a minute or two would be it.

14          THE COURT:  All right, very good.  Thank you.  All

15  right, folks.  With one exception, I want you to make your

16  presentations as you see fit.  But before you're done, I'd

17  like you to address a fair number of questions that had

18  occurred to me when I was reading the briefs.  These

19  questions (indiscernible) one or another of you, or, in many

20  cases, both.

21          But first, the exception, mainly Mr. Weisfelner

22  and Mr. Weintraub:  you folks spend many, many pages in your

23  briefs talking about the underlying failures of Old GM and

24  New GM to institute the necessary recalls on the cars and

25  the 24 or 25 people at Old GM who knew enough to justify

Page 8

1    much, much larger recalls.  I get it.  But that's not what's

2    before me now.

3              I'm prepared to assume, for the purposes of this

4    controversy, unless Mr. Steinberg really wants to dispute

5    it, that there was enough to require a recall well before

6    June 2009, and that each of Old GM and New GM acted very

7    badly in connection with the delay.  But I want to focus on

8    the legal issues.  So, let's turn to them.

9              Starting with due process, Mr. Steinberg, one

10   would assume, I think, that a company's books and records,

11   if they're to determine whether a claim is known or unknown,

12   have to be much more broadly construed than in the financial

13   statement sense.  And I take it that you're not arguing that

14   whether or not a creditor is known or unknown turns on

15   whether the company has booked the liability.

16             So, before you're done, I'd like you to tell me:

17   how would you articulate the standard?  I wonder whether the

18   standard should be more than foreseeable but less than

19   probable.  But I would like you to put forward your view as

20   to how I should construe that.  It's debatable whether

21   potential liabilities associated with the ignition switches

22   were wholly (indiscernible) claims, even if Fritz Henderson

23   and Mary Barra didn't know about them.

24             But I take it you'll agree that Old GM knew enough

25   to send out recall notices back in 2009.  Their people would

1    have known that there was something potentially wrong with

2    their cars.  And those who weren't in wrecks could have

3    filed claims or objected, as they're doing now, at the time

4    of the 363 sale.  If recall notices had been issued,

5    wouldn't the publication notice that was given then be more

6    justifiable?

7          Number two:  by the same token, Mr. Weisfelner,

8    would you clarify your position on what notice should have

9    been given?  I gather the parties have stipulated that there

10    were 70 million GM cars then on the road.  I gather also

11    that there were approximately 27 million whose cars, we're

12    learning, later became the subject of pending recalls.

13          It'd be helpful if you would tell me how many of

14    those 27 million cars were then subject to announced recalls

15    and how many would have been subject to recalls if GM, which

16    was then Old GM, of course, had announced them as it should

17    have.  Seemingly, the number would be very, very large.

18          Now, again, Mr. Weisfelner, is it your argument

19    that mailings should have gone out to each owner, each of

20    those 70 million, in the period between the June 1st, 2009,

21    filing of the bankruptcy and the June 30, 2009, date for the

22    start of the sale lien?  Or, for that matter, the June 19

23    date, which was the deadline for objections in the 363 sale?

24    Or are you saying it should have gone out by mail only to

25    cars with the poorly designed ignition switches?

1             Both sides:  what information do I have in the

2     record on how much it would cost to send out mailing notices

3     to all 70 million of the GM cars on the road at the time, or

4     even 27 million cars?  And what information do I have in the

5     record on how much time it would take to send out 27 or 70

6     million notices?

7             Mr. Weisfelner, I made a factual finding back at

8     the hearing on the same issue, that the continued

9     availability of the financing Old GM was using to survive at

10    the time was conditioned on approval of the 363 sale motion

11    by July 10.  And I also rejected an argument that was made

12    by bondholders at the time that the government's July 10

13    deadline was just posturing and that I should have argued --

14    I should have found back then, or assumed back then, that

15    the U.S. government cared so much about GM's survival that

16    the U.S. government would never let GM die.

17            Well, that seems to have a lot of similarities to

18    (indiscernible) you make now.  On that, I know your clients

19    weren't present back then to argue to the contrary, but to

20    challenge -- or to challenge those findings.  But others

21    did.  Are you challenging those findings now?  Do you think

22    there are some facts now to suggest that I should now find

23    that the government was posturing, while you'd rejected that

24    contention back in 2009?

25            I don't know if I'm going to hear from the GUC

Page 11

1   Trust in the first phase of the arguments.  But, at some

2   point, Ms. Rubin, when you do get the chance to be heard,

3   which you will sooner or later, I'd like you to help me with

4   this:  the cost of administration of the Chapter 11 case,

5   which would at least seemingly include the cost of mailing,

6   would come directly out of the pockets of your folks, the

7   unsecured creditor constituency.

8        How do you think a judge should decide what's

9   reasonable in sending out notice of a 363 sale to a universe

10  of potential creditors when it comes out of the pockets of

11  those who you know are creditors for absolutely, positively

12  sure, like your bondholders, like your vendors in the supply

13  chain, and victims of car wrecks, people who were actually

14  in accidents who got injured or killed when cars didn't

15  perform the way they were supposed to?

16       Back to you, Mr. Weisfelner:  what would the

17  notice have said, if GM were to do it right, and you say

18  that GM didn't do it right?  As I think it was Judge

19  Bernstein said in Chrysler -- I think by then it had been

20  named New Car Co., or maybe Old Car Co., "Things can go

21  wrong with cars all the time.  And, while design defects

22  that can cause a loss in cars' value don't happen all the

23  time, or all that often, I don't know if anybody could

24  really say they're infrequent."  So, what do you think would

25  have been reasonable under the circumstances?

1          Both sides:  is it appropriate to be making

2    distinctions, when we're talking about honoring claims --

3    and I'm offering you a view now as to whether there are --

4    these are unknown claims as a (indiscernible) or not --

5    between liquidating 11s and 11s where there is a surviving

6    entity, we all know that there's no discharge in a

7    liquidating 11.  There is, of course, a discharge in the 11

8    where a company survives.

9          A lot, and maybe most, of the case law

10   (indiscernible) you rely on is in the context of expunging

11   claims, either because they're late or because they've been

12   discharged.  But it's a lot easier to say that a claim isn't

13   discharged when we have a debtor that's surviving and you

14   can still go after that debtor by ignoring or blowing away

15   the order that protected the debtor upon the confirmation of

16   the case or otherwise.

17          Both sides:  shouldn't we focus on the

18   distinctions between the notice that's appropriate in a 363

19   sale on the one hand and the notice that's required to give

20   parties a chance to file claims on the other?  Or, to the

21   extent that it's different, the notice that needs to be

22   given before a judge discharges a creditor's claim?  And

23   isn't it necessary or appropriate to take into account the

24   time exigencies inherent in many, perhaps most, 363 sales,

25   especially those, like most of them, where the debtor only

Page 13

1    has the cash to survive for only days or weeks?

2           If reasonableness depends on the facts and

3    circumstances, as the Supreme Court said in (indiscernible),

4    wouldn't it be appropriate to take into account that, in the

5    363 context, you have to hold a hearing on a sale in four

6    weeks, because you're bleeding so badly that you can't

7    survive any longer?

8           Mr. Steinberg:  you point out that New GM didn't

9    yet exist when notice was given, and that it was Old GM that

10   was responsible for the failure to give the creditor

11   community a notice.  But does that matter?  Or should a

12   judge simply focus on whether or not the creditor was given

13   appropriate notice, no matter who's responsible for it or

14   for the failure to provide it, and then the extent to which

15   the outcome would have been different if appropriate notice

16   had been given?

17          Both Mr. Steinberg and Ms. Rubin, back to you.  I

18   haven't forgotten about you, Ms. Rubin.  Let's assume that I

19   agree with Mr. Steinberg that it wasn't practical to send

20   out mailed notice to the 70 million or even 27 million car

21   owners for the 19 days that they'd have to object to the 363

22   sale.  But isn't it inexcusable for Old GM to have denied

23   people whose cars were subject to recalls notice of the bar

24   date for filing claims?

25          And even if Old GM thereto -- that is, in the bar

Page 14

1    date context as in the 363 context -- wasn't going to give

2    the 70 million or 27 million people mailed notice, I have

3    some trouble seeing how they could have responded to the bar

4    date notice and filed claims when Old GM still hadn't sent

5    out the recall notices as of the bar date, when at least

6    seemingly, if not apparently, there wasn't the same degree

7    of urgency.

8            Now, both sides -- and here I mean Mr. Weisfelner

9    and Mr. Steinberg -- on remedy, assuming I find violations

10   of due process, I have problems with aspects of each of your

11   positions.  Mr. Weisfelner, let's turn first to what you're

12   asking for.  I gather -- and I think you said it expressly -

13   - that you're not asking me to vacate the entire sale order.

14   In fact, I gather that you aren't even asking me to vacate

15   it, even in part.

16           It seems to me that you're saying, "Fine, enforce

17   it against everyone else.  Just don't enforce it against me,

18   or me and my guys."  Is that an unfair characterization of

19   your position?

20           Both sides:  finding a due process violation may

21   not by itself require a showing of prejudice.  But isn't the

22   prejudice critical to determining whether there's a remedy

23   for it?  I'm inclined to agree with Mr. Weisfelner that

24   finding a due process violation does not by itself turn on

25   prejudice, but it seems to me that the remedy for it

Page 15

1    necessarily must.  The issue, it seems to me, is:  what

2    should a Court do about the situation when it finds that

3    there's been a violation of due process?

4           And here, I'm going to ask you guys to address

5    when the standards are the same when you have a bipolar

6    dispute, or a modestly polar dispute, which is typical in a

7    (indiscernible) litigation, and when you have a case where

8    hundreds, thousands, or millions of creditors are affected

9    by an order, and a very small subset of the universe of

10   people who were affected by the order want that order blown

11   away or ignored.

12          Mr. Weisfelner, you said in your brief that due

13   process involves the right to be heard, not the right to

14   win.  And because you were denied the right to be heard, it

15   seems to me that you're saying you (indiscernible) the right

16   to win.  Let's go with that for a minute.

17          If you (indiscernible) the right to be heard,

18   wouldn't the appropriate remedy be a do-over, to give you a

19   chance to make the arguments that you didn't get to make the

20   first time, and then to look at the matter ab initio to see

21   whether the result should be the same or should be

22   different?  Because it seems to me that what you're asking

23   for, assuming that you're (indiscernible) due process and

24   you've heard my questions that suggest that -- and I have

25   concerns as to whether you guys were denied due process --

1    you're asking to simply win.

2           Is it speculation or is it totally obvious for me

3    to say now that I wouldn't have denied permission for GM to

4    survive and to conduct its 363 sale so that one group of

5    litigants could get a leg up over another group of

6    litigants?  Or I guess I should say one group of creditors

7    should -- could get a leg up on other creditors.

8           And why in the world would I decide the

9    successive liability issue differently today than I did

10   after talking about it for five or 10 or 15 pages in my

11   first opinion, when I considered the arguments made by

12   people like Mr. Jack (indiscernible), who argued the exact

13   same things that you're arguing now after they had

14   (indiscernible) given the appropriate notice?

15          So, what I need you to do, Mr. Weisfelner, is tell

16   me that, if you had been given notice and an opportunity to

17   be heard back in 2009, how would things be different?  Are

18   you arguing to me that I would have denied permission for

19   the sale, or that I would have granted a free-and-clear

20   order generally but I would have denied it for your favored

21   group?

22          Or do I properly read from your brief that you

23   would have wanted me to give the sale some kind of

24   conditional approval for your benefit, saying I'd approve it

25   if, but only if, New GM were required to assume your claims?

1   And then, if that's your position, would you please tell me

2   whether there would be some reason for me to grant that

3   protection for people who were claiming that their cars were

4   worthless or that they were inconvenienced, when I denied

5   that relief for people who were injured or killed in actual

6   wrecks?

7           Also, Mr. Weisfelner, let's talk about the exact

8   context of 363 sales, and recognize, as I think we need to,

9   that 363 sales are an extraordinarily important part of the

10  bankruptcy (indiscernible), not just in this case but

11  winning in the other 11s, and that whatever I do, for better

12  or worse, is likely to have precedential effect.

13          How can a judge force a buyer of assets in a 363

14  sale to assume liabilities that it doesn't want to assume?

15  Isn't the only real remedy to deny authority for the sale

16  totally, or to say, were I the judge back in 2009, that,

17  "Yeah, the sale can take place, but I, the judge, won't

18  grant a free-and-clear order at all"?

19          And, if that is the choice that's provided to the

20  judge, how helpful is that to the remainder of the creditor

21  community, the thousands of people that Ms. Rubin

22  represents?  And do we want to impose a principle of law

23  that requires judges to frag everyone else with the same

24  grenade?

25          Mr. Steinberg, despite the reservations that I

Page 18

1    just had expressed, I have some in your direction as well.

2    Before I read the briefs and the underlying cases, I'd

3    started with (indiscernible) stint in bankruptcy, orders and

4    agreements rise and fall as a whole, and that you can't

5    enforce them in part and disregard them in part, or cherry-

6    pick the parts that you like and those that you don't, or,

7    as here, say they're enforceable against most of the world

8    but not against this or that favored class.

9           But your opponents have cited five cases that seem

10   to do exactly that.  Three, while they come out of lower

11   courts, one Bankruptcy, two District, involve 363 sales.

12   The other two don't involve 363 sales, but they come from

13   the Second Circuit.  And, while one of the Second Circuit

14   cases is only a summary order, which therefore isn't a

15   binding precedent, it's still a Circuit -- Second Circuit

16   opinion.  And, frankly, I don't like to disregard anything

17   that comes out of the Second Circuit, that the Second

18   Circuit tells me.

19          So, Mr. Steinberg, I need you to talk about

20   Metzger, the 2006 decision by Arthur Weissbrodt, a

21   bankruptcy judge in San Jose; (indiscernible), the 2007

22   decision by District Judge Mary Cooper in Trenton; and

23   (indiscernible), the 2009 decision by Senior District Judge

24   John Grady in Chicago.

25          And I need you to talk about the Circuit's 2010

1    decision in Johns Manville, Travelers v. Chubb, which I

2    think is sometimes referred to -- I believe this is Manville

3    4; and its 2014 decision in Koepp, K-O-E-P-P, the summary

4    order from a panel that included Judge -- Chief Judge

5    Katzmann and Judges Livingston and Hall.

6         Finally, while it may be trumped by the holdings

7    of those five cases that I talked about, I still need some

8    help on whether I should be looking at this in

9    (indiscernible) of 9024 and 60(b) terms, or whether I should

10   just bypass what those rules say and get to the "You're

11   excused from the order or not" kind of (indiscernible) those

12   other decisions did.

13        But I still want both sides to address whether a

14   judge has to look at it in traditional 60(b) terms and

15   either knock it out or live with it, or the third option,

16   which may or may not be permissible under 60(b) doctrine, of

17   living with it in part and validating it in part.

18        Mr. Weisfelner, you can help me by confirming, if

19   it's true, that you're saying I shouldn't be thinking about

20   invalidating the (indiscernible) or validating the rule but

21   simply refusing to enforce it.  But, if that is in fact your

22   position, then help me understand how I can be deciding this

23   without regard to a (indiscernible) bankruptcy procedure in

24   lieu of federal civil procedure.  And that would at least

25   seemingly be telling me how I'm supposed to do my job.

1      Finally, folks, in many ways this is the most

2   important of all the things that I want you to talk about,

3   because I think it's the closest question, in an environment

4   where there are already a bunch of close questions.  If we

5   had a do-over, and it's my instinct that, when somebody is

6   denied due process, he or she is entitled to a do-over, the

7   result of part of what you guys are arguing would be pretty

8   clear.  But part would be highly debatable. And, in each of

9   those two sides, or prongs, one side would have the stronger

10  side and one would have the weaker.

11      If we had a do-over, I think it's quite clear that

12  I'd still grant a free-and-clear order, especially since I

13  heard the same arguments before and I rejected them.  And I

14  gave them a lot of thought before I did.  But if we had a

15  do-over, I'd likely have to consider whether a free-and-

16  clear order in the form that I just issued it was over-

17  broad.  And, in this respect, the economic loss plaintiffs,

18  though not Mr. Weintraub's guys, would have the upper hand.

19      This order, as I read it, not only blocks

20  successor liability, but also blocks claims based on wholly

21  post-sale events that involved Old GM or Old GM parts.  This

22  is one of the issues, if not the issue, that bothers me the

23  most.  And the issue is whether what I should have done, or

24  would have done if the argument had been made to me then,

25  was to add a new order that was narrower and said that

1    people couldn't sue based on anything Old GM had done, but

2    they could sue if it was based on what New GM had done, so

3    long as Old -- as New GM wasn't blamed for Old GM's acts.

4              And if, as I'm inclined to rule, I find that, if

5    there was a due process violation, the economic loss

6    plaintiffs would be entitled to a do-over, and if I also

7    concluded, as I'm inclined to do, that, if they got a do-

8    over on successor liability, the result would be the same,

9    the issue or the conclusion I'd reach would have been

10   different, given New GM protection for events that it did

11   that were not premised on anything old GM had done. And I

12   need both sides to address that scenario.

13             I have only one real question in (indiscernible),

14   so, even though we may not get to it this afternoon, I'm

15   going to get it out anyway.  Mr. Weisfelner, is there a

16   reason that you didn't ask me to stay further distributions

17   to Ms. Rubin's guys, the Old GM creditors, until the issues

18   before me now were sorted out?  Am I right in assuming,

19   since you're a pretty competent lawyer, that you didn't

20   overlook that possibility?

21             And can I properly assume that you did it for

22   tactical reasons, because you'd rather get $100 in a

23   recovery against New GM, as contrasted to the $0.25 or so

24   that you'd get on the dollar if you had to go against Old GM

25   (indiscernible)?

1          Now, with all of that, let's get to work.  And

2     (indiscernible) we hear first from you, Mr. Steinberg?

3          MR. STEINBERG:  Yes, your Honor.

4          THE COURT:  Come up to the main lectern, please.

5          MR. STEINBERG:  Your Honor, good morning.  I'm

6     Arthur Steinberg, for the record.  I'm here with my

7     colleague, Scott Davidson, and my co-counsel from Kirkland &

8     Ellis, Richard Godfrey and Andrew Bloomer.  I want to thank

9     your Honor first of all for accommodating all the lawyers

10    for the rescheduling of this conference.

11         And I'm sure, like my other counsel who will be

12    addressing you today, they're all -- they have a lot of

13    thoughts swirling in their mind as they try to address the

14    multitude of questions that your Honor just went through.

15    But I think I will be able to do it, and I will do it in the

16    order where it was presented itself in the outline.

17         About a year ago, New GM announced a recall with

18    respect to ignition switches in Old GM vehicles.  And

19    shortly thereafter, that started a wave of lawsuits that

20    were commenced against New General Motors, seeking purported

21    economic losses regarding vehicles that were subject to the

22    recall.

23         In the early complaints that were filed, which

24    sought primarily monetary compensation for the alleged

25    decrease in value of the vehicles based on the ignition