# EXHIBIT B

*EXECUTION VERSION*

**FUNDING AGREEMENT**

dated as of

May 19, 2016

among

MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST

("Trust")

THE INVESTORS PARTY HERETO FROM TIME TO TIME

("Investors")

and

U.S. BANK NATIONAL ASSOCIATION

as Administrative Agent and Collateral Agent

# TABLE OF CONTENTS

Page

Article 1 - Definitions ................................................................................................ 1
  1.1    Defined Terms ............................................................................................ 1
  1.2    Terms Generally.......................................................................................... 9
  1.3    Designated Financial Officers..................................................................... 9

Article 2 - The Investments........................................................................................ 9
  2.1    Investments. ................................................................................................ 9
  2.2    Administration of Investments.................................................................. 11
  2.3    Expiration of Commitments...................................................................... 11
  2.4    Payments Generally; Pro Rata Treatment; Sharing of Set-Offs; Collection.............. 11
  2.5    Fees. .......................................................................................................... 12
  2.6    Taxes. ........................................................................................................ 13
  2.7    Investor Acknowledgments and Agreements ........................................... 13

Article 3 - The Collateral ......................................................................................... 13
  3.1    Grant of Security Interest.......................................................................... 13
  3.2    Special Warranties and Covenants of the Trust........................................ 15
  3.3    Remedies................................................................................................... 15
  3.4    Proceeds of Collateral .............................................................................. 16

Article 4 - Representations and Warranties .............................................................. 16
  4.1    Organization; Powers................................................................................ 16
  4.2    Authorization; Enforceability ................................................................... 16
  4.3    Governmental Approvals; No Conflicts ................................................... 16
  4.4    Financial Condition; Current Payables. .................................................... 17
  4.5    Properties.. ................................................................................................ 17
  4.6    Litigation Matters..................................................................................... 17
  4.7    Compliance with Laws and Agreements .................................................. 17
  4.8    Taxes ........................................................................................................ 17
  4.9    Material Indebtedness, Liens and Agreements.......................................... 17
  4.10  Bank Accounts ......................................................................................... 18

Article 5 - Conditions .............................................................................................. 18
  5.1    Effective Time .......................................................................................... 18
  5.2    Each Investment........................................................................................ 19
  5.3    Satisfaction of Conditions ........................................................................ 20

Article 6 - Trust Obligations .................................................................................... 20
  6.1    Financial Statements and Other Reports .................................................. 20
  6.2    Notices of Material Events........................................................................ 20
  6.3    Existence; Conduct of Operations ............................................................ 21
  6.4    Payment of Obligations............................................................................ 21
  6.5    Compliance with Laws ............................................................................. 21
  6.6    Use of Proceeds........................................................................................ 21
  6.7    The Award Account; Priority of Payments............................................... 21
  6.8    Cash Deposits/Bank Accounts ................................................................. 22

01344376

Article 7 - Prohibited Actions .................................................................................... 22
   7.1    Indebtedness ............................................................................................ 22
   7.2    Liens ........................................................................................................ 23
   7.3    Contingent Liabilities ............................................................................. 23
   7.4    Fundamental Changes ............................................................................. 23
   7.5    Third-Party Investments ......................................................................... 23
   7.6    Restrictive Agreements ........................................................................... 24

Article 8 - Termination .............................................................................................. 24
   8.1    Termination Rights ................................................................................. 24
   8.2    Default and Termination Rights .............................................................. 25

Article 9 - The Agent ................................................................................................. 26
   9.1    Appointment and Authorization .............................................................. 26
   9.2    Agent's Rights as Investor ...................................................................... 27
   9.3    Duties As Expressly Stated ..................................................................... 27
   9.4    Reliance By Agent .................................................................................. 27
   9.5    Action Through Sub-Agents .................................................................... 28
   9.6    Resignation of Agent and Appointment of Successor Agent .................. 28
   9.7    Investors' Independent Decisions ............................................................ 28
   9.8    Indemnification ....................................................................................... 29
   9.9    Consents Under Other Transaction Documents ...................................... 29

Article 10 - Miscellaneous ........................................................................................ 29
   10.1   Notices .................................................................................................... 29
   10.2   Waivers; Amendments ............................................................................ 31
   10.3   Successors and Assigns ........................................................................... 32
   10.4   Survival ................................................................................................... 34
   10.5   Counterparts; Integration; References to Agreement; Effectiveness ........ 34
   10.6   Severability ............................................................................................. 34
   10.7   Governing Law; Jurisdiction; Consent to Service of Process .................. 35
   10.8   WAIVER OF JURY TRIAL ................................................................... 35
   10.9   [Reserved] .............................................................................................. 36
   10.10  Headings ................................................................................................. 36
   10.11  Confidentiality ........................................................................................ 36
   10.12  Electronic Execution of Assignments and Certain Other Documents ...... 36

01344376

## FUNDING AGREEMENT

THIS FUNDING AGREEMENT dated as of May 19, 2016 (this "Agreement") is by and among MOTORS LIQUIDATION TRUST AVOIDANCE ACTION TRUST, a Delaware statutory trust ("Trust"), THE INVESTORS PARTY HERETO FROM TIME TO TIME, and U.S. BANK NATIONAL ASSOCIATION, as Administrative Agent and Collateral Agent.

The parties hereto agree as follows:

## Article 1 - Definitions

**1.1** *Defined Terms*. As used in this Agreement, the following terms have the meanings specified below:

"Affiliate" means, with respect to a specified Person, another Person that Controls or is Controlled by or is under common Control with the Person specified.

"Agent" means U.S. Bank National Association, in its capacities as administrative agent and collateral agent for the Investors hereunder.

"Agent Fee" means an annual fee not to exceed $15,000 payable to Agent for Agent's services under this Agreement.

"Applicable Percentage" means when referenced with respect to any Investor, the percentage of the total Commitments represented by such Investor's Commitment.

"Approved Fund" means, with respect to any Investor, a fund that invests in commercial litigation claims funding, securities, or commercial loans, and is managed or advised by the same investment advisor as such Investor or by an Affiliate of such investment advisor.

"Assignment and Acceptance" means an assignment and acceptance entered into by an existing Investor and an assignee (with the consent of any party whose consent is required under Section 10.3), and accepted by the Agent, in the form of Exhibit A annexed hereto or any other form approved by the Agent which complies with the provisions of Section 10.3.

"Availability Period" means the period from and including the Effective Time to but excluding the earlier of (a) the Maturity Date; and (b) the date of termination of Commitments, as terminated by the Agent pursuant to Section 8.1.

"Avoidance Action Trust Administrative Cash" shall have the meaning ascribed thereto in the Trust Agreement.

"Avoidance Action Trust Assets" has the meaning ascribed thereto in the Trust Agreement.

"Avoidance Action Trust SEC Reporting Cash" has the meaning ascribed thereto in the Trust Agreement.

- 1 -

"Award Account" means a deposit account that is subject to a DACA and maintained by the Trust into which the Trust will deposit Proceeds of the Term Loan Avoidance Action in accordance with the provisions of <u>Section 6.7</u>.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York, or any successor thereto with jurisdiction over the Term Loan Avoidance Action.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in Washington, D.C. or New York, New York are authorized or required by law to remain closed.

"Closing Date" means the date on which the Effective Time shall occur.

"Closing Expense Payment" means an amount equal to the lesser of (i) the aggregate amount of the reasonable and documented fees and out-of-pocket expenses incurred by the Agent, the Agent's Affiliates, and the Investors, including the reasonable fees, charges, and disbursements of the their respective counsel, in connection with the preparation of this Agreement, the other Transaction Documents, any amendments, modifications, or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and the closing on the transactions under the Transaction Documents; and (ii) $40,000.

"Collateral" means, collectively, all of the Property in which Liens are granted hereunder and under the other Transaction Documents as security for the Obligations of the Trust, as more particularly described in <u>Article 3</u> hereof.

"Commitment" means, with respect to each Investor, the commitment of such Investor to fund its portion of the Investment hereunder, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Investor pursuant to <u>Section 10.3</u>. The initial maximum amount of the initial Investor's Commitment is set forth on <u>Schedule 2.1</u>. The Commitment of any other Investor shall be as set forth in the Assignment and Acceptance pursuant to which such Investor shall have assumed its Commitment. The aggregate original maximum amount of the Commitments is equal to $15,000,000.

"Contingency Fee" has the meaning assigned to such term in <u>Section 2.1(h)(ii)</u>.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto. A Person who owns or holds capital stock, beneficial interests or other securities representing fifty percent (50%) or more of the Total Voting Power of another Person shall be deemed, for purposes of this Agreement, to "control" such other Person.

"Current Payables" has the meaning assigned to such term in <u>Section 4.4(b)</u>.

"DACA" means a deposit account control agreement in favor of the Agent, for the benefit of the Investors, in form and substance acceptable to the Agent in its sole discretion.

01344376

"Default" means any event or condition that would permit the Investors to terminate this Agreement pursuant to Section 8.1(a) or (b).

"DIP Lenders" has the meanings ascribed thereto in the Trust Agreement.

"Distributable Other Debtor Residual Trust Cash" shall have the meaning ascribed thereto in the Trust Agreement.

"Effective Time" means the time specified in a written notice from the Agent when the conditions specified in Section 5.1 are satisfied (or waived in accordance with Section 10.2).

"Excluded Assets" has the meaning assigned to such term in Section 3.1.

"Excluded Taxes" means, with respect to the Agent, any Investor, or any other recipient of any payment to be made by or on account of any Obligation hereunder, (a) income, net worth or franchise taxes imposed on (or measured by) its net income or net worth by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Investor, in which its office is located or in which it is taxable solely on account of some connection other than the execution, delivery or performance of this Agreement or the receipt of income hereunder, and (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Trust is located.

"Final Recovery Date" means the date of the final settlement or a final judgment in the Term Loan Avoidance Action.

"First Priority" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the most senior Lien (other than Permitted Liens) to which such Collateral is subject.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, including but not limited to the New York State Banking Department.

"Guarantee" means a guarantee, an endorsement, a contingent agreement to purchase or to furnish funds for the payment or maintenance of, or otherwise to be or become contingently liable under or with respect to, the Indebtedness, other obligations, net worth, working capital or earnings of any Person, or a guarantee of the payment of dividends or other distributions upon the stock or equity interests of any Person, or an agreement to purchase, sell or lease (as lessee or lessor) property, products, materials, supplies or services primarily for the purpose of enabling a debtor to make payment of such debtor's obligations or an agreement to assure a creditor against loss, and including, without limitation, causing a bank or other financial institution to issue a letter of credit or other similar instrument for the benefit of another Person, but excluding endorsements for collection or deposit in the ordinary course of business. The terms "Guarantee" and "Guaranteed" used as a verb shall have a correlative meaning. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of

- 3 -

the primary obligations in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder).

"GUC Trust Supplemental Cash" has the meaning ascribed thereto in the Trust Agreement

"Hedging Agreement" means any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"Holdback" shall mean, at any date of a proposed distribution from the Trust pursuant to Section 6.7, an amount to be held in the Award Account equal to the greater of (x) the resultant of (i) the product of the Percentage Return multiplied by the aggregate of all Proceeds of the Term Loan Avoidance Action received up to the date of the contemplated distribution minus (ii) the aggregate amounts actually paid to Investors to that date; and (y) the resultant of (i) 2.25 (or 3.25 in the event of Other Litigation Funding is obtained by the Trust) multiplied by $15,000,000 minus (ii) the aggregate amounts paid to Investors to that date.

"Indebtedness" means, for any Person, without duplication: (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, advance, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services, other than trade accounts payable (other than for borrowed money) arising, and accrued expenses and deferred taxes incurred and paid, in the ordinary course of business; (c) Capital Lease Obligations of such Person; (d) obligations of such Person in respect of Hedging Agreements; and (e) obligations of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such Person. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means all Taxes other than (a) Excluded Taxes and Other Taxes and (b) amounts constituting penalties or interest imposed with respect to Excluded Taxes or Other Taxes.

"Investment" means any amount, other than a Tax Payment, funded from the Investment Account to the Operating Account at the Trust's request pursuant to Section 2.1(b), the proceeds of which are applied in accordance with Section 6.6.

"Investment Account" shall be a deposit account maintained by the Agent in the name and control of the Trust in which the funded Commitments of the Investors will be held until requested by and funded to the Operating Account pursuant to Section 2.1(c).

01344376

"Investment Income" means income from the investment of funds held in the Investment Account.

"Investor Continuing Obligations" means the Investor's obligations under Sections 2.7, 8.2(c), and 10.9.

"Investor Payment" means, with respect to the aggregate of all Investments drawn by and funded to the Trust hereunder, an amount equal to the greater of (i) the Percentage Return; and (ii) the MOIC.

"Investors" means the Persons listed on Schedule 2.1 and any other Person that shall have become a party hereto pursuant to an Assignment and Acceptance, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance.

"Lead Counsel" means Binder & Schwartz LLP, or any successor thereto or replacement thereof made by the Trust, in the Trust's sole discretion.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing), other than an operating lease, relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Material Adverse Effect" means, any event, circumstance, happening or condition, which, in the Agent's sole discretion, has resulted or could result in a material adverse effect on (a) the business, assets, financial condition or prospects of the Trust taken as a whole, (b) the ability of the Trust to pay or perform any of its obligations under this Agreement or the other Transaction Documents or (c) any of the rights of or benefits available to the Investors under this Agreement and the other Transaction Documents.

"Material Indebtedness" means Indebtedness (other than the Investments hereunder and Current Payables) in a principal amount (individually or in the aggregate) exceeding $100,000.

"Maturity Date" means the earlier of: (i) the date three (3) years from the Closing Date; and (ii) the Final Recovery Date.

"MOIC" means the product of (A) 2.25 (or 3.25 in the event Other Litigation Funding is obtained by the Trust) multiplied by (B) the aggregate of all Investments drawn by and funded to the Trust hereunder.

"Oaktree Action" means the action commenced by the Trust in the Court of Chancery of the State of Delaware against Oaktree Loan Fund LP, including any related actions.

"Obligations" means (a) the aggregate Investor Payment owed with respect to the Investments hereunder, and (b) all fees, costs, charges, expenses and other obligations from time to time owing to the Investors or the Agent by the Trust hereunder or under any other Transaction Document.

- 5 -

"Operating Account" means a deposit account that is subject to a DACA and maintained by the Trust from which the Trust will apply proceeds of the Investments in accordance with the provisions of <u>Section 6.6</u>.

"Other Debtor Residual Trust Administrative Cash" shall have the meaning ascribed thereto in the Trust Agreement.

"Other Litigation Funding" has the meaning assigned to such term in <u>Section 7.1(b)</u>.

"Other Supplemental Cash" shall have the meaning ascribed thereto in the Trust Agreement.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement and the other Transaction Documents, *provided* that there shall be excluded from "Other Taxes" all Excluded Taxes.

"Percentage Return" means 4.75% of the aggregate Proceeds of the Term Loan Avoidance Action.

"Permissible Investments" has the meaning ascribed thereto in the Trust Agreement.

"Permitted Liens" has the meaning set forth in <u>Section 7.2</u>.

"Permitted Alternative Funding Event" means the occurrence, on or before the earlier of (x) July 20, 2016; and (y) the originally-scheduled hearing date established by the Bankruptcy Court to consider the motion required pursuant to <u>Section 5.1(f)</u> (without regard to any adjournment thereof), of either: (i) any submission to the Bankruptcy Court of a motion seeking the approval of any agreement or arrangement, including, without limitation, the approval of any stipulation, with one or more DIP Lenders to provide funding for the Trust's prosecution of the Term Loan Avoidance Action, the Oaktree Action, and any other action brought by the Trust; or (ii) the Trust's entry into an agreement or arrangement with one or more DIP Lenders pursuant to which such DIP Lenders will provide funding for the Trust's prosecution of the Term Loan Avoidance Action, the Oaktree Action, and any other action brought by the Trust, in any such case on terms materially more favorable to the Trust than those provided by the Investors under this Agreement.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Proceeds of the Term Loan Avoidance Action" means any and all gross, pre-tax monetary awards, damages, monies, lump-sum payments, up-front payments, settlement amounts (whether from a one defendant or multiple defendants), distribution of property, cash value of equities, or other cash and non-cash amounts paid (which non-cash amounts shall be promptly converted by the Trust to cash), transferred, or inuring to the Trust at any time on or after the date of this Agreement in connection with the Term Loan Avoidance Action, the Oaktree Action, or any other action brought by the Trust, whether by awards or payments of attorney's fees, costs

- 6 -

01344376

and expenses, settlement, judgment or other means, plus any interest awarded or later accruing in connection therewith.

"Property" means any interest of any kind in property or assets, whether real, personal or mixed, and whether tangible or intangible.

"Register" has the meaning assigned to such term in Section 10.3(d).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents, and advisors (including, without limitation, legal counsel) of such Person and such Person's Affiliates.

"Required Investors" means, at any time when there is more than one Investor, Investors having Commitments representing at least a seventy five percent (75%) of the sum of the aggregate Commitments of all Investors at such time, or at any time when there is only one Investor, such Investor.

"Settlement Date" has the meaning assigned to such term in Section 2.2.

"Subordinated Indebtedness" means Other Litigation Funding, which shall be made subordinate and junior in right of payment to the Investor Payment and to the other Obligations of the Trust by provisions in form and substance reasonably satisfactory to Required Investors.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Trust.

"Supplemental Avoidance Action Trust Cash" shall have the meaning ascribed thereto in the Trust Agreement.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Tax Payment" means an amount equal to (x) the aggregate amount of taxable Investment Income, if any, during any taxable year of the Trust multiplied by (y)(i) the highest federal income tax rate applicable to the taxable income of the Trust during such taxable year plus (ii) the highest state income tax rate applicable to taxable income of the Trust during such taxable year.

"Term Loan Avoidance Action" has the meaning ascribed thereto in the Trust Agreement.

"Third-Party Investment" means, for any Person: (a) the acquisition (whether for cash, Property, services or securities or otherwise) of capital stock, bonds, notes, debentures, partnership, limited liability company or other ownership interests or other securities of any other

- 7 -

Person or any agreement to make any such acquisition (including, without limitation, any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale); (b) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit representing the purchase price of inventory or supplies sold by such Person in the ordinary course of business provided that in no event shall the term of any such inventory or supply advance, loan or extension of credit exceed 180 days); or (c) the entering into of any Guarantee of, or other contingent obligation with respect to, Indebtedness or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person. Notwithstanding the foregoing, Capital Expenditures shall not be deemed "Investments" for purposes hereof.

"Total Voting Power" means, with respect to any Person, the total number of votes which holders of securities having the ordinary power to vote, in the absence of contingencies, are entitled to cast in the election of directors of such Person.

"Transaction Documents" means this Agreement, the Investment Certificates, and any other instruments or documents delivered or to be delivered from time to time pursuant to this Agreement, as the same may be supplemented and amended from time to time in accordance with their respective terms.

"Trust" means Motors Liquidation Company Avoidance Action Trust, a Delaware statutory trust.

"Trust Administrator" means Wilmington Trust Company, in its capacity as trust administrator and trustee under the Trust Agreement, and any successor thereto appointed in accordance with the Trust Agreement and approved in accordance with this Agreement.

"Trust Agreement" means that certain Amended and Restated Motors Liquidation Company Avoidance Action Trust Agreement, dated as of May 11, 2012, by and among the Trust Administrator, for the benefit of the Trust Beneficiaries (as defined therein); and the Trust Monitor, as the same may be amended, restated or otherwise modified from time to time.

"Trust Expenses" means the costs and expenses of the Term Loan Avoidance Action, the Oaktree Action, any other action commenced by the Trust, and other costs and expenses of the Trust (including, but not limited to, administrative expenses and any tax liabilities, but expressly excluding distributions to beneficiaries or repayment of amounts owed to DIP Lenders), all as determined by the Trust Administrator in its sole discretion.

"Trust Monitor" means Arthur J. Gonzalez, in his capacity as Trust Monitor under the Trust Agreement, and any successor thereto appointed in accordance with the Trust Agreement and approved in accordance with this Agreement.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

01344376

"Undrawn Amount" means (i) any amount remaining in the Investment Account at any time that has not been drawn as an Investment; and (ii) any income accrued on amounts held in the Investment Account, which income shall be for the account of the Trust, to be treated as an Investment if drawn as an Investment pursuant to <u>Section 2.1</u>.

"U.S. Dollars" or "$" refers to lawful money of the United States of America.

1.2    **_Terms Generally_**.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

1.3    **_Designated Financial Officers_**.  The Trust hereby authorizes each of the Designated Financial Officers listed in <u>Schedule 1.3</u> hereto to act as agent for the Trust and to execute and deliver on behalf of the Trust such notices, requests, waivers, consents, certificates and other documents, and to take any and all actions required or permitted to be delivered or taken by the Trust hereunder.  The Trust may replace any of the Designated Financial Officers listed in <u>Schedule 1.3</u> hereto or add any additional Designated Financial Officers by delivering written notice to the Agent specifying the names of each new Designated Financial Officer and the offices held by each such Person.  The Trust hereby agrees that any such notices, requests, waivers, consents, certificates and other documents executed, delivered or sent by any Designated Financial Officer and any such actions taken by any Designated Financial Officer shall bind the Trust.

## <u>Article 2 - The Investments</u>

2.1    **_Investments._**

(a)    <u>Funding the Investment Account</u>.  Subject to the terms and conditions set forth herein, on the Closing Date, the initial Investor shall fund to the Investment Account an amount of cash equal to its Commitment, by wire transfer of immediately available funds; *provided* that the amount deposited to the Investment Account by all Investors on the Closing Date shall not be less than $15,000,000.  Amounts in the Investment Account shall be deemed to be Other Supplemental Cash.

- 9 -

(b)    Investments.    Subject to the terms and conditions set forth herein, the Trust from time to time during the Availability Period, may request one or more Investments in an aggregate principal amount that will not exceed the total Commitments and any Investment Income (less any Tax Payments made). After the end of each month, the Agent will render to the Trust a statement of each Investment funded to the Trust to such date.  Each statement shall be considered correct and to have been accepted by and be conclusively binding upon the Trust as an account stated, unless the Trust notifies the Agent in writing of any discrepancy within thirty (30) days from the date of any such statement.

(c)    Funding of Investments.    On any Business Day that the Trust is requesting the funding of an Investment, the Trust shall deliver to the Agent not later than 11:00 a.m., New York, New York time, by facsimile or electronic mail transmission, written request for such Investment.  The Agent shall fund each Investment requested by the Trust by wire transfer from the Investment Account to the Operating Account of immediately available funds by 3:00 p.m., New York, New York time.  By making any request for an Investment, the Trust shall be deemed to have represented that the conditions precedent to the funding of such Investment set forth in Section 5.2 have been satisfied and that the proceeds of the Investment will be used in accordance with Section 6.6 hereof.  Amounts in the Operating Account shall be deemed to be Other Supplemental Cash.

(d)    Effect of Requesting an Investment.    Once an Investment is made through the Agent transferring the proceeds thereof from the Investment Account to the Operating Account, that Investment is irrevocable and the Investors shall be entitled to the Investor Payment arising therefrom.  Any Undrawn Amounts remaining in the Investment Account on the Maturity Date will be returned by the Agent to the Investors directly from the Investment Account, pro rata in accordance with the Investors' respective Applicable Percentages.

(e)    Required Minimum Investments.    The Trust hereby agrees that within five (5) Business Days of the Closing Date, the Trust shall request Investments in an amount of not less than five million dollars ($5,000,000).

(f)    Return on Investments.    The Trust unconditionally promises to pay, in accordance with the provisions of Section 6.7, promptly to the Agent for the account of each Investor the Investor Payment from the Proceeds of the Term Loan Avoidance Action or from other Collateral (or the proceeds thereof), as the same may be received from time-to-time.  The Investors and the Agent acknowledge and agree that, except for the payment of the Investor Payment and any other Obligations, the Trust shall have no other obligations to the Investors or the Agent for the payment or return of the Investments.

(g)    Nature of the Investor Payment.    The Trust agrees that the Investor Payment shall be a preferred return on the assets of the Trust entitled to payment from the Proceeds of the Term Loan Avoidance Action ahead of all other obligations and beneficiaries of, or investors in, the Trust or the Term Loan Avoidance Action, except the Contingency Fee, which shall be pari passu with the Investor Payment.

(h)    Contingency Fee.    The Investors acknowledge that the Trust will retain Lead Counsel in the Term Loan Avoidance Action pursuant to an agreement whereby Lead

- 10 -

Counsel will be (i) paid 70% of Lead Counsel's regular hourly rates and 100% of Lead Counsel's expenses, and (ii) be entitled to receive a contingency fee of 1% of the Proceeds of the Term Loan Avoidance Action (the "Contingency Fee") or such other reasonable contingency or partial contingency terms as approved by the Required Investors, such approval not to be unreasonably withheld.

(i)     Agent to Maintain Accounts.  The Agent shall maintain a record of the amount of each Investment funded to the Trust hereunder, the amount of each such Investment allocable to each Investor hereunder and the amount of any sum received by the Agent hereunder for the account of the Investors and each Investor's share thereof.  The entries in the record maintained by the Agent pursuant to this Section 2.1(i) shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein; *provided* that the failure of the Agent to maintain such account or any error therein shall not in any manner affect the obligation of the Trust to repay the Investor Payment in accordance with the terms of this Agreement.

(j)     Tax Payments.  Upon the Trust's delivery to the Agent of a request for a Tax Payment and the calculation of such Tax Payment, the Agent shall fund each Tax Payment requested by the Trust by wire transfer from the Investment Account to the Operating Account of immediately available funds by 3:00 p.m., New York, New York time.   Any Tax Payment shall be payable solely from Investment Income.  For the avoidance of doubt, (i) no Investor Payment shall be payable with respect to any amounts funded as Tax Payment; and (ii) if Investment Income is insufficient to fund any Tax Payment as a result of prior requests for Investments made by the Trust, the Agent shall only be obligated to fund such Tax Payment to the extent of Investment Income, if any, then available in the Investment Account.

**2.2     *Administration of Investments.***  In order to facilitate the administration of the Investments under this Agreement, the Agent and Investors agree (such agreement shall not be for the benefit of or enforceable by the Trust) that settlement among them with respect to the Investments may take place on a periodic basis (but not less than weekly to the extent that the Agent has received any funds with respect to the Investments) on dates determined from time to time by the Agent (each a "Settlement Date"), which may occur before or after the occurrence or during the continuance of any Default.  On each Settlement Date, payment shall be made to each Investor, pro rata based on each Investor's Applicable Percentage of all outstanding Investments, and in accordance with the settlement report delivered by the Agent to the Investors with respect to such Settlement Date**.**

**2.3     *Expiration of Commitments.***  Unless previously terminated pursuant to Section 8.1, the Commitments shall expire at the close of business on the Maturity Date.

**2.4     *Payments Generally; Pro Rata Treatment; Sharing of Set-Offs; Collection.***

(a)     Payments Generally.  The Trust shall be obligated to make each payment required to be made by the Trust hereunder (whether of the Investor Payment or otherwise) prior to 1:00 p.m. New York, New York time, on the date when due, in immediately available funds, in U.S. dollars, without set-off or counterclaim.  All payments shall be made to the Agent at its offices in Minneapolis, MN, except that payments pursuant to Section 2.6 shall be made directly to the Persons entitled thereto.  The Agent shall distribute any such payments received by the

- 11 -

Agent for the account of any other Person to the appropriate recipient promptly following receipt thereof, and the Trust shall have no liability in the event timely or correct distribution of such payments is not so made.  If any payment shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

(b)    Application of Payments.  If at any time insufficient funds are received by and available to the Agent to pay fully all amounts of the Investor Payment and any fees then due hereunder under any circumstances, including, without limitation during, or as a result of the exercise by the Agent or the Investors of remedies hereunder or under any other Transaction Document and applicable law, such funds shall be applied (i) first, to pay fees, costs and expenses then due hereunder ratably among the parties entitled thereto in accordance with the amounts of interest, fees, costs and expenses then due to such parties, (ii) second, to pay the Investor Payment ratably among the parties entitled thereto, and (iii) third, to any other Obligations then due from the Trust to the Agent or the Investors.

(c)    Pro Rata Treatment.  If any Investor shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any amount owed to it by the Trust hereunder (other than pursuant to Section 2.6), resulting in such Investor receiving payment of a greater proportion of the Investor Payment than the proportion of such amounts received by any other Investor, then the Investor receiving such greater proportion shall purchase (for cash at face value) participations in the Investments of the other Investors to the extent necessary so that the benefit of such payments shall be shared by all the Investors ratably in accordance with their respective Applicable Percentages; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest unless the Investor from which such payment is recovered is required to pay interest thereon, in which case each Investor returning funds to such Investor shall pay its pro rata share of such interest, and (ii) the provisions of this Section 2.4(c) shall not be construed to apply to any payment obtained by an Investor as consideration for the assignment of or sale of a participation in any of its Investments to any assignee or participant, other than to the Trust or Affiliate thereof (as to which the provisions of this paragraph shall apply).

**2.5    *Fees.***

(a)    At the Effective Time, or immediately upon the occurrence of a Permitted Alternative Funding Event (to the extent not previously paid), the Trust will pay the Closing Expense Payment to River Birch Capital, LLC for further payment to the parties entitled thereto.

(b)    On the Closing Date and on each anniversary of the Closing Date, the Trust shall pay the Agent Fee to the Agent, for the Agent's own account.

(c)    The Trust agrees to pay to the Agent, for its own account, such other fees payable in the amounts and at the times separately agreed in writing between the Trust and the Agent.

- 12 -

(d)    All fees payable hereunder shall be paid on the dates due, in immediately available funds.  Fees paid shall not be refundable under any circumstances, absent manifest error in the determination thereof.

**2.6**    *Taxes.*

(a)    Any and all payments by or on account of any Obligations of the Trust hereunder shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes.  Each party shall be solely responsible for payment of any Excluded Taxes and the Trust, solely to the extent required by applicable law, shall be entitled to withhold and pay over to the applicable Governmental Authority any Excluded Taxes from any payments to be made by the Trust on account of any Obligations.

(b)    The Trust shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

**2.7**    *Investor Acknowledgments and Agreements*.

(a)    Each Investor hereby acknowledges and agrees that it shall have no rights with respect to: (i) the amounts drawn as Investments under this Agreement (except that $5 million must be drawn within 5 Business Days of the Closing Date) once the same have been funded to the Investment Account on the Closing Date, (ii) the manner in which the Trust utilizes the Investments, so long as utilized to pay the Trust's expenses in accordance with Section 6.6 of this Agreement, (iii) the conduct of the Term Loan Avoidance Action, the Oaktree Action, or any other action brought by the Trust, or (iv) any decision whether or not to settle the Term Loan Avoidance Action, the Oaktree Action or any other action brought by the Trust.  Each Investor further agrees not to assert any claim or initiate any action against any one or more of the Trust, the Trust Administrator,  the Trust Monitor, and their respective Related Parties for any reason related to the use of the Investments so long as such Investments are used for Trust Expenses in accordance with Section 6.6 and each Investor, jointly and severally, will indemnify each of the Trust, Trust Administrator, the Trust Monitor, and their respective Related Parties (including payment of reasonable attorneys' fees and expenses) for any claim brought by any Investor in violation of this Section 2.7.

(b)    Notwithstanding any provisions of this Agreement to the contrary, in no event shall any Person that is a defendant in the Term Loan Avoidance Action, the Oaktree Action, or any other action brought by the Trust or any Affiliate of any Person that is a defendant in the Term Loan Avoidance Action, the Oaktree Action, or any other action brought by the Trust be permitted to be an Investor.  Each Investor hereby represents and warrants to the Trust that such Investor is not, and no Affiliate of such Investor is, a defendant in the Term Loan Avoidance Action, the Oaktree Action, or any other action brought by the Trust.

## Article 3 - The Collateral

**3.1**    *Grant of Security Interest*.  As security for due and punctual payment and performance of the Obligations, as of the Effective Time, the Trust hereby grants to the Agent for the ratable benefit of the Investors a continuing security interest in and Lien on all tangible and intangible property and assets of the Trust, whether now owned or existing or hereafter

- 13 -

acquired or arising, together with any and all additions thereto and replacements therefor and proceeds and products thereof (collectively referred to for purposes of this Article 3 as "Collateral"), including without limitation the property described below:

      (a)    all accounts receivable, including without limitation, all amounts due under premium finance agreements and all accounts, accounts receivable, notes, bills, drafts, acceptances, instruments, documents, chattel paper and all other debts, obligations and liabilities in whatever form owing to the Trust from any Person for money borrowed, goods sold or for services rendered, or however otherwise established or created, all guaranties and security therefore; all deposit accounts including the Award Account, the Investment Account, and the Operating Account, and all sums in such accounts from time to time; all right, title and interest of Trust to premium refunds on cancellation of insurance policies or to the goods or services which gave rise thereto, including rights to reclamation and stoppage in transit and all rights of an unpaid seller of goods or services; all right, title and interest of Trust to all contracts and agreements with independent insurance agents; whether any of the foregoing be now existing or hereafter arising, now or hereafter received by or owing or belonging to the Trust;

      (b)    all rights under judgments, commercial tort claims, claims based on the provisions of the Bankruptcy Code, tort claims, contract claims, and other choses in action;

      (c)    all rights under all present and future authorizations, permits, licenses and franchises issued, granted or licensed to the Trust;

      (d)    the Term Loan Avoidance Action;

      (e)    the Oaktree Action;

      (f)    all rights, title and interest to the Proceeds of the Term Loan Avoidance Action, including without limitation, the Proceeds of the Term Loan Avoidance Action;

      (g)    the Avoidance Action Trust Assets; and

      (h)    all other personal property, including, without limitation, all present and future information stored on any medium, including electronic medium, related to any of the personal property of the Trust, all financial books and records and other books and records relating, in any manner, to the business of the Trust, all proposals and cost estimates and rights to performance, and all letters of credit and other supporting obligations.

Any of the foregoing terms that are defined in the UCC shall have the meaning provided in the UCC, as amended and in effect from time to time, as supplemented and expanded by the foregoing.

Notwithstanding the foregoing, the security interest granted by the Trust hereby shall specifically exclude and neither the Agent nor the Investors shall have any security interest in: (i) the Avoidance Action Trust SEC Reporting Cash; (ii) the GUC Trust Supplemental Cash; (iii) Distributable Other Debtor Residual Trust Cash; (iv) Avoidance Action Trust Administrative Cash and Other Debtor Residual Trust Administrative Cash; and (v) any deposit account into

01344376

which solely any of the foregoing is deposited and maintained (collectively, the "Excluded Assets").

3.2     ***Special Warranties and Covenants of the Trust***.  The Trust hereby warrants and covenants to the Agent and the Investors that:

(a)     The Trust's (i) place of business or, if it has more than one, its chief executive office, (ii) exact organizational name, (iii) the jurisdiction of formation are as set forth on Schedule 3.2.  The Trust will not change its jurisdiction of organization, principal or any other place of business, or the location of any Collateral from the locations set forth on Schedule 3.2, or make any change in its name or conduct its business operations under any fictitious business name or trade name, without, in any such case, at least thirty (30) days' prior written notice to the Agent.

(b)     The Trust will pay promptly when due all Taxes and assessments on the Collateral or for its use or operation, except for Taxes and assessments permitted to be contested as provided in Section 6.5.  Following the occurrence and during the continuance of a Default, the Agent may at its option discharge any Taxes or Liens to which any Collateral is at any time subject (other than Permitted Liens).

(c)     To the extent, if any, that the Trust's signature is required therefor, the Trust will promptly execute and deliver to the Agent such financing statements and amendments thereto, certificates and other documents or instruments as may be necessary to enable the Agent to perfect or from time to time renew the security interest granted hereby, including, without limitation, such financing statements and amendments thereto, certificates and other documents as may be necessary to perfect a security interest in any additional Collateral hereafter acquired by the Trust or in any replacements or proceeds thereof.  The Trust authorizes and appoints the Agent, in case of need, to execute such financing statements, certificates and other documents pertaining to the Agent's security interest in the Collateral in its stead if the Trust's signature is required therefor and the Trust fails to so execute such documents, with full power of substitution, as the Trust's attorney in fact.  The Trust further agrees that a photographic or other reproduction of a security agreement or financing statement is sufficient as a financing statement under this Agreement and the other Transaction Documents.

(d)     The Trust hereby irrevocably authorizes the Agent, at any time and from time to time, to file in any jurisdiction financing statements and amendments thereto that (i) indicate the Collateral (x) as all assets of the Trust or words of similar effect, regardless of whether any particular asset falls within the scope of Article 9 of the UCC or (y) as being of an equal or lesser scope or with greater detail and (ii) that contain any other information required by Article 9 of the UCC (including Part 5 thereof) for the sufficiency or filing office acceptance of any financing statement or amendment, including whether the Trust is an organization, the type of organization and any organization identification number issued to the Trust.

3.3     ***Remedies***.  If the Trust fails to pay or perform any of the Obligations when due to be paid or performed, the failure shall constitute a default under this Agreement for purposes of Part 6 of Article 9 of the UCC and Agent shall have, in addition to all other rights and remedies

- 15 -

granted to it in this Agreement, all rights and remedies of a secured party under the UCC and other applicable law.

  **3.4**  *Proceeds of Collateral*.  After deducting all reasonable costs and expenses of collection, storage, custody, sale or other disposition and delivery (including reasonable legal costs and attorneys' fees) and all other charges against the Collateral, the Agent shall apply the residue of the proceeds of any such sale or disposition to the Obligations in accordance with the terms hereof and any surplus shall be returned to the Trust or to any Person or party lawfully entitled thereto.  In the event the proceeds of any sale, lease or other disposition of the Collateral are insufficient to pay all of the Obligations in full, the Trust will be liable for the deficiency, and the cost and expenses of collection of such deficiency, including (to the extent permitted by law), without limitation, reasonable attorneys' fees, expenses and disbursements.

## Article 4 - Representations and Warranties

  The Trust represents and warrants to the Investors and the Agent that:

  **4.1**  *Organization; Powers*.  The Trust has been duly formed as a Delaware statutory trust and is validly existing and in good standing under the laws of Delaware.  The Trust has all requisite trust power and authority to carry on its business as now conducted and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure to have such power or authority or to be so qualified or in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

  **4.2**  *Authorization; Enforceability*.  The receipt of the Investments, the incurrence of the Obligations, and the grant of security interests pursuant to the Transaction Documents are within the power and authority of the Trust and have been duly authorized by all necessary action on the part of the Trust.  This Agreement and the other Transaction Documents have been duly authorized, executed and delivered by the Trust and constitute legal, valid and binding obligations of the Trust, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

  **4.3**  *Governmental Approvals; No Conflicts*.  The receipt  of the Investments, the incurrence of the Obligations, and the grant of the security interests pursuant to the Transaction Documents (a) except for approval of the Bankruptcy Court, do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority that has not been obtained, (b) will not violate any applicable law, policy or regulation or the organizational documents of the Trust or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Trust, and (d) except for the Liens created by the Transaction Documents, will not result in the creation or imposition of any Lien on any asset of the Trust.

01344376

**4.4**    *Financial Condition; Current Payables.*

(a)    The Trust has heretofore delivered to the Agent the following financial statements:

(i)    the unaudited balance sheets and income statements of the Trust, as of and for the fiscal year-to-date periods ended September 30, 2015, December 31, 2015 and March 31, 2016; and

(ii)    the Trust's 2016 Budget for usage of the Supplemental Avoidance Action Trust Cash.

Such financial statements (except for the budget) were prepared in a cash basis and present fairly, in all material respects, the financial position and results of operations of the Trust as of such respective dates and for such periods.  The budget was prepared by the Trust in good faith and was based on assumptions that were reasonable when made.

(b)    Schedule 4.4(b) sets forth a list of all of the Trust's payables and other expenses owing as of April 30, 2016 (the "Current Payables").  For the avoidance of doubt, Current Payables shall not include any deferred amounts, including any success fees, that are or may become payable to Dickstein Shapiro LLP or Blank Rome LLP by the Trust in connection with the Term Loan Avoidance Action, the Oaktree Action, or any other action brought by the Trust.

**4.5**    *Properties*.  The Trust has good and marketable title to all its Property.

**4.6**    *Litigation Matters*.  There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Trust, threatened against or affecting the Trust.

**4.7**    *Compliance with Laws and Agreements*.  The Trust is in compliance with all laws, regulations, policies, and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**4.8**    *Taxes*.  Except as set forth on Schedule 4.8, the Trust has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which such Trust has set aside on its books adequate reserves with respect thereto, which reserves shall be acceptable to Agent, or (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

**4.9**    *Material Indebtedness, Liens and Agreements.*

(a)    As of the date of this Agreement, the Company has no Material Indebtedness or any extension of credit (or commitment for any extension of credit) to, or

- 17 -

01344376

guarantee by, the Trust the aggregate principal or face amount of which equals or exceeds (or may equal or exceed) $25,000.

(b)    As of the date of this Agreement, no Lien secures any Indebtedness of the Trust or covers any property of the Trust (other than the Liens in favor of the Agent and Permitted Liens).

**4.10    *Bank Accounts*.**  Schedule 4.10 lists all banks and other financial institutions at which the Trust maintains deposits or other accounts as of the Closing Date, and such Schedule correctly identifies the name and address of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number.

## Article 5 - Conditions

**5.1    *Effective Time*.**  Except with respect to the Trust's obligation to make the Closing Expense Payment pursuant to Section 2.5(a) which shall be effective upon the execution and delivery of this Agreement, this Agreement shall not become effective until the date on which each of the following conditions is satisfied (or, with the exception of the condition set forth in Section 5.1(f), waived in accordance with Section 10.2) in form and substance satisfactory to the Agent:

(a)    Counterparts of Agreement.  The Agent shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Agent (which may include telecopy transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(b)    Existence and Good Standing.  The Agent shall have received such documents and certificates as the Agent may reasonably request relating to the formation, existence and good standing of the Trust, the authorization of the transactions contemplated hereby, the incumbency of its officers and any other legal matters relating to the Trust, this Agreement or the other Transaction Documents, all in form and substance reasonably satisfactory to the Agent.

(c)    Security Interests in Personal and Mixed Property.  The Agent shall have received evidence satisfactory to it that the Trust shall have taken or caused to be taken all such actions, executed and delivered or caused to be executed and delivered all such agreements, documents and instruments and made or caused to be made all such filings and recordings (other than filings or recordings to be made by the Agent on or after the Closing Date) that may be necessary or, in the opinion of the Agent, desirable in order to create in favor of the Agent, for the benefit of the Investors, valid and (upon such filing and recording) perfected First Priority security interests in the entire personal and mixed property Collateral, other than the Excluded Assets.

(d)    Bank Accounts.  The Agent shall have established the Investment Account at U.S. Bank National Association, in the name of the Trust, which shall be subject to a DACA. The Trust shall have established the Award Account at U.S. Bank National Association in the name of the Trust, which shall be subject to a DACA.

- 18 -

(e)    Control Agreements.  The Trust shall have delivered to the Agent a fully executed DACA for each of the Investment Account, the Award Account, and the Operating Account.

(f)    Approval of the Bankruptcy Court.  (i) a motion seeking (A) the approval of the Trust's execution, delivery, and consummation of the transactions contemplated by the Transaction Documents shall have been filed with the Bankruptcy Court by the Trust; and (B) that a hearing on such motion be held in the Bankruptcy Court within sixty (60) days of the date of this Agreement or as soon thereafter as the Bankruptcy Court shall be able to schedule such hearing; and (ii) the Trust shall have obtained an Order of the Bankruptcy Court approving the Trust's execution, delivery, and consummation of the transactions contemplated by the Transaction Documents, and such Order shall be in full force and effect.

(g)    Necessary Governmental Permits, Licenses and Authorizations and Consents.  The Trust shall have obtained all other permits, licenses, authorizations and consents from all other Governmental Authorities, in each case that are necessary in connection with the transactions contemplated by the Transaction Documents, and each of the foregoing shall be in full force and effect, in each case other than those the failure to obtain or maintain which, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  No action, request for stay, petition for review or rehearing, reconsideration or appeal with respect to any of the foregoing shall be pending, and the time for any applicable Governmental Authority to take action to set aside its consent on its own motion shall have expired.

(h)    Financial Officer Certificate.  The Agent shall have received a certificate, dated as of the Closing Date and signed by a Designated Financial Officer, confirming compliance with the conditions set forth in paragraphs (a) and (b) of Section 5.2 at the Effective Time;

(i)    Satisfaction of Current Payables.  The Agent shall have received evidence satisfactory to it, in its reasonable discretion, that all of the Current Payables have been paid in full on or prior to the Closing Date.

(j)    Other Documents.  The Agent shall have received all material contracts, instruments, opinions, certificates, assurances and other documents as the Agent or any Investor shall have reasonably requested and the same shall be reasonably satisfactory to each of them.

5.2    *Each Investment*.  The obligation of the Investors to fund the Investment Account, and the obligation of the Agent to fund each Investment from the Investment Account, are each subject to the satisfaction of the following conditions:

(a)    Representations and Warranties.  The representations and warranties of the Trust set forth in this Agreement and the other Transaction Documents shall be true and correct in all material respects on and as of the date of such Investment, both before and after giving effect thereto and to the use of the proceeds thereof (or, if any such representation or warranty is expressly stated to have been made as of a specific date, such representation or warranty shall be or have been true and correct as of such specific date and provided that, to the extent any change

- 19 -

in circumstances expressly permitted by this Agreement causes any representation and warranty set forth herein to no longer be true, such representation and warranty shall be deemed modified to reflect such change in circumstances).

(b)    No Defaults.  At the time of, and immediately after giving effect to, such Investment, no Default shall have occurred and be continuing.

5.3    **Satisfaction of Conditions.**  Each of the Trust and the Investors will use their commercially reasonable efforts, and proceed diligently and in good faith, to satisfy each condition set forth in Section 5.1 hereof.  Upon receipt of the approval of the Bankruptcy Court described in Section 5.1(f) hereof, the Trust and the Investors will proceed expeditiously to consummate the transactions contemplated by this Agreement.

## Article 6 - Trust Obligations

Until the Commitments have expired or been terminated and the Investor Payment and any other Obligations payable hereunder shall have been paid in full, the Trust promises and agrees with the Agent and the Investors that:

6.1    **Financial Statements and Other Reports**.  The Trust will furnish to the Agent for distribution by the Agent to each Investor:

(a)    to the extent, but only to the extent, that the Trust causes such financial statements to be prepared, as soon as available after the end of each fiscal year of the Trust, a true and complete copy of the Trust's balance sheet as at the end of such year and an income statement of the Trust for such year;

(b)    to the extent, but only to the extent, that the Trust causes such financial statements to be prepared, as soon as available after the end of each fiscal quarter of the Trust, a true and complete copy of the Trust's balance sheet as at the end of such fiscal quarter and an income statement of the Trust for such quarter; and

(c)    as soon as available and in any event within fifteen (15) days after the end of each calendar quarter with respect to such calendar quarter, (i) a copy of bank account statements for the Investment Account, the Operating Account, the Award Account and any other deposit account maintained by the Trust, and (ii) the Trust's comparison of budget to actual expenditures, which shall set forth a summary of amounts paid by the Trust during such calendar quarter (*e.g.*, the amounts paid to any counsel, experts, and vendors).

6.2    **Notices of Material Events**.  The Trust will furnish to the Agent and each Investor prompt written notice of the following:

(a)    the occurrence of any event set forth in Section 8.1(a) (without regard to any cure period set forth therein);

(b)    the occurrence of any  settlement or final judgment with respect to all or any portion of the Term Loan Avoidance Action, the Oaktree Action, or any other action

- 20 -

commenced by the Trust, including, without limitation, the occurrence of the Final Recovery Date;

(c)    the imposition or creation of any Lien (other than Permitted Liens) against any asset of the Trust; and

(d)    the institution by the Trust of any legal action after the date of this Agreement.

Each notice delivered under Section 6.2(a) or Section 6.2(c) shall be accompanied by a statement of a Designated Financial Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

**6.3    *Existence; Conduct of Operations*.**  The Trust shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its operations.

**6.4    *Payment of Obligations*.**  The Trust shall pay its obligations, including Tax liabilities, that, if not paid, could result in a Material Adverse Effect before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Trust has set aside on its books adequate reserves with respect thereto, and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**6.5    *Compliance with Laws*.**  The Trust shall comply with (i) all permits, licenses and authorizations issued by a Governmental Authority, (ii) all laws, rules, regulations, and orders of any Governmental Authority, and (iii) all contractual obligations, in each case applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**6.6    *Use of Proceeds*.**

(a)    The proceeds of the Investments will be used only for payment by the Trust of Trust Expenses from the Operating Account.

(b)    Investments will be deemed to be Other Supplemental Cash and shall not be deemed to be (or otherwise used as) Avoidance Action Trust Administrative Cash or any other Excluded Asset.

**6.7    *The Award Account; Priority of Payments*.**  Until payment in full of the Investor Payment:

(a)    The Trust acknowledges and agrees that Proceeds of the Term Loan Avoidance Action shall be paid by the defendant(s) directly into the Award Account.  The Award Account shall be maintained by the Agent in the name of the Trust and will not be moved or changed without the consent of the Agent, such consent not to be unreasonably withheld.  The Award Account shall be subject to the lien and a DACA.

- 21 -

(b)     The Trust shall promptly instruct the Agent to distribute any amounts in the Award Account directly therefrom to be applied in the following priority:

(i)     First, pari passu (A) to the Investors for application to the Investor Payment, and (B) to Lead Counsel for payment of the Contingency Fee;

(ii)     Second, to fund the Holdback; and

(iii)     Third, after payment in full of the Investor Payment and the Contingency Fee, and the funding of the Holdback, the remainder to the Trust for distribution in accordance with the Trust Agreement.

(c)     After applying the funds described in subsection (a) above in accordance with clauses (i) and (ii) of subsection (b) above, to the extent that the Trust is not required by the terms of the Trust Agreement to distribute any such remaining funds, the Trust shall hold such fund in a segregated account in trust for the applicable beneficiaries thereof under the Trust Agreement.

**6.8     *Cash Deposits/Bank Accounts*.**  The Trust shall take all actions necessary to maintain, preserve, and protect the rights and interests of the Agent with respect to all cash deposits of the Trust and all other proceeds of Collateral and shall not, without the Agent's prior written consent, open any deposit or other bank account, or instruct any account debtor to make payment to any account other than to the Investment Account, the Award Account or the Operating Account, each of which shall remain subject to a DACA.

<u>**Article 7 - Prohibited Actions**</u>

Until the Investor Payment has been paid in full in accordance with the terms of this Agreement, the Trust promises and agrees with the Agent and the Investors that:

**7.1     *Indebtedness*; *Exclusivity of Funding*.**

(a)     The Trust will not create, incur, assume or permit to exist any Indebtedness, except: (i) Indebtedness created hereunder; (ii) Subordinated Indebtedness described in Section 7.1(b) below; and (iii) Indebtedness that does not constitute Material Indebtedness.

(b)     With the exception of funds currently available to the Trust, the amount of which has been disclosed to the initial Investor prior to the Closing Date, and provided no Permitted Alternative Funding Event has occurred, the Investments pursuant to this Agreement shall be the exclusive means by which the Trust pays Trust Expenses (all in accordance with <u>Section 6.6</u> hereof), and, subject to <u>Section 8.2(c)</u>, the Trust may not obtain other litigation funding until the earlier of (i) the date on which it has fully drawn all Investments under this facility and (ii) the Maturity Date.  In the event that the Trust seeks other litigation funding ("<u>Other Litigation Funding</u>"), (x) the Investors will be provided a right of last refusal to provide such funding on terms equivalent to those then being offered to the Trust in a bona fide binding offer, which must be exercised by the Investors (acting individually or as a group of all or less than all of the Investors), if at all, in writing within three (3) Business Days after being provided

- 22 -

the opportunity to provide such funding (and any failure of the Investors to deliver notice of the Investors' exercise of such right within such three-Business Day period shall be deemed to be a rejection of the right to so exercise such right), (y) the multiple for purposes of computation of the MOIC will be increased from 2.25 to 3.25 for all Investments as of the Maturity Date, and (z) such Other Litigation Funding will be subordinated to the Obligations on terms reasonably satisfactory to the Required Investors.  For the avoidance of doubt, the Trust shall not incur any funded Indebtedness (other than Other Litigation Funding) or use Proceeds of the Term Loan Avoidance Action to fund the Trust's expenses, except that, to the extent any tax liabilities arise and become due as the result of any litigation recoveries, such liabilities may be paid from those recoveries.

7.2    *Liens*.  The Trust will not create, incur, assume or permit to exist any Lien on any Property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except (the following being called "Permitted Liens"):

(a)    Liens created hereunder, under the other Transaction Documents, or subordinated Liens created in connection with any Other Litigation Funding;

(b)    Liens imposed by any Governmental Authority for taxes, assessments or charges not yet delinquent or which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the Trust; and

(c)    Liens of the DIP Lenders solely in respect of Distributable Other Debtor Residual Trust Cash, Avoidance Action Trust Administrative Cash, and Other Debtor Residual Trust Administrative Cash.

7.3    *Contingent Liabilities*.  The Trust will not Guarantee the Indebtedness or other obligations of any Person, or Guarantee the payment of dividends or other distributions upon the stock of, or the earnings of, any Person, except for endorsements of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

7.4    *Fundamental Changes*.  The Trust will not liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution) or, without the prior written consent of the Agent, which consent shall not be unreasonably withheld, enter into any transaction of merger or consolidation or amalgamation.  The Trust will not form or acquire any Subsidiary.

7.5    *Third-Party Investments*.  The Trust will not make or permit to remain outstanding any Third-Party Investment, except:

(i)    Third-Party Investments consisting of Indebtedness permitted by Section 7.1;

(ii)    Permissible Investments; and

(iii)    Checking and deposit accounts with banks used in the ordinary course of business.

**7.6**   *Restrictive Agreements*.  The Trust will not directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement (other than this Agreement) that prohibits, restricts or imposes any condition upon the ability of the Trust to create, incur or permit to exist any Lien upon any of its property or assets; *provided* that the foregoing shall not apply to restrictions and conditions imposed by law or by this Agreement.

## Article 8 - Termination

**8.1**   *Termination Rights*.

(a)   Investors shall have the right, but not the obligation to terminate their Commitments upon thirty (30) days' written notice by the Agent (immediately without notice in the case of Section 8.1(a)(iv)) and five (5) days' written notice in the case of Section 8.1(a)(vi)) to the Trust from and after the occurrence of any of the following events if, after the expiration of the such thirty-day (or five-day, as applicable) period, such event is continuing or has not otherwise been cured by the Trust:

(i)   Any breach of Sections 6.4, 6.6, 6.7, 6.8, 7.1, 7.2, or 7.4 of this Agreement by the Trust;

(ii)   Lead Counsel withdraws from the prosecution of the Term Loan Avoidance Action prior to the Final Recovery Date and the Trust shall not have appointed a substitute Lead Counsel;

(iii)   An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Trust or its debts, or of a substantial part of its assets, under any federal, state, or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Trust or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(iv)   The Trust shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 8.1(d), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Trust or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(v)   The Trust shall become unable, admit in writing or fail generally to pay its debts as they become due;

01344376

(vi)     The Trust shall fail to pay to the Agent or the Investor, the Investor Payment on any Investment or pay any other Obligation of the Trust to the Agent or the Investors when the same shall become due and payable, whether by demand, at the due date thereof or at a date fixed for prepayment thereof; by acceleration of such due or prepayment date, or otherwise; or

(vii)    Any of the following shall occur: (i) the Liens created hereunder or under the other Transaction Documents shall at any time (other than by reason of the Agent relinquishing such Lien) cease in any material respect to constitute valid and perfected Liens on the Collateral intended to be covered thereby; (ii) except for expiration in accordance with its respective terms, any Transaction Document shall for whatever reason be terminated, or shall cease to be in full force and effect; or (iii) the enforceability of any Transaction Document shall be contested by the Trust.

(b)      Investors shall have the right, but not the obligation, to terminate this Agreement immediately upon written notice by the Agent to the Trust if the Effective Time does not occur by October 31, 2016.

(c)      The Trust shall have the right, but not the obligation, to terminate this Agreement:

(i)      Upon one (1) day's written notice to the Agent from and after the occurrence of a Permitted Alternative Funding Event at any time prior to the funding of any Investments; or

(ii)     Upon thirty (30) days' written notice to the Agent from and after a failure to fund any request for an Investment made by the Trust during the Availability Period that is not in excess of the aggregate Commitments and available Investment Income if there is no Default then existing and such Investment remains unfunded at the end of such thirty-day period.

**8.2    *Default and Termination Rights*.**

(a)      After the occurrence of and during the continuance of any Default, the Trust shall not be permitted to cause any Investment to be funded until such time as such Default is cured or otherwise remedied to the Agent's reasonable satisfaction.

(b)      In the event of a termination of the Agreement pursuant to Section 8.1(a) of the Agreement:

(i)      All obligations of the Investors under the Agreement other than the Investor Continuing Obligations shall cease on the date that such termination is effective; and

(ii)     The Agent shall return any Undrawn Amounts remaining in the Investment Account to the Investors directly from the Investment Account.

01344376

(c)      In the event of a termination of the Agreement pursuant to <u>Section 8.1(b)</u> of the Agreement, all obligations of the Investors and the Trust under the Agreement shall cease on the date that such termination is effective, except for the Trust's obligation to pay the Closing Expense Payment pursuant to <u>Section 2.5(a)</u> in the event of the occurrence of a Permitted Alternative Funding Event.

(d)      In the event of a termination of the Agreement pursuant to <u>Section 8.1(c)</u> of the Agreement:

(i)      The Trust shall be obligated to pay or disburse amounts held in the Award Account in accordance with <u>Section 6.7</u> with respect to any Investments funded prior to such termination;

(ii)      All Investors shall continue to be subject to the Investor Continuing Obligations;

(iii)      The Agent shall return any Undrawn Amounts remaining in the Investment Account to the Investors directly from the Investment Account;

(iv)      The limitations on the Trust's ability to obtain Other Litigation Funding and the requirements for any Other Litigation Funding set forth in clauses (x), (y), and (z) of <u>Section 7.1(b)</u> shall not be applicable from and after the date of such termination; and

(v)      The Trust shall not be entitled to any refund of the Closing Expense Payment or any previously paid Agent Fee

(e)      Notwithstanding any termination of the Agreement pursuant to <u>Section 8.1(a)</u> of this Agreement, all Obligations of the Trust hereunder, including the Obligation to make the Investor Payment on any Investments funded prior to such termination, shall survive.

(f)      Notwithstanding any provisions of the Agreement to the contrary, for so long as this Agreement remains in effect and for any period after the termination of the Agreement, neither Agent nor the Investors shall have any right to direct, in any manner whatsoever, the Trust in the prosecution of the Term Loan Avoidance Action, the Oaktree Action, or any other action brought by the Trust.

## <u>Article 9 - The Agent</u>

**9.1      *Appointment and Authorization*.**  Each of the Investors hereby irrevocably appoints the Agent as its agent and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms of the Agreement and the other Transaction Documents, together with such actions and powers as are reasonably incidental thereto.

- 26 -

**9.2** *Agent's Rights as Investor*. Any Investor that is serving as the Agent hereunder shall have the same rights and powers in its capacity as an Investor hereunder as any other Investor and may exercise the same as though it were not the Agent, and such institution and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Trust or other Affiliates thereof as if it were not the Agent hereunder.

**9.3** *Duties As Expressly Stated*. The Agent shall have no duties or obligations except those expressly set forth in this Agreement and the other Transaction Documents. Without limiting the generality of the foregoing, (a) the Agent shall not be subject to any fiduciary or other implied duties, (b) the Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by this Agreement and the other Transaction Documents that the Agent is required to exercise in writing by the Required Investors (or such other number or percentage of the Investors as is required hereunder with respect to such action), and (c) except as expressly set forth herein and in the other Transaction Documents, the Agent shall have no duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Trust that is communicated to or obtained by the financial institution serving as the Agent or any of its Affiliates in any capacity. The Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Investors (or such other number or percentage of the Investors as is required hereunder with respect to such action) or all of the Investors if expressly required, or in the absence of its own gross negligence or willful misconduct. The Agent shall not be deemed to have knowledge of any of the events specified in <u>Section 8.1(a)</u> unless and until written notice thereof is given to the Agent by the Trust or an Investor, and the Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in, or in connection with, this Agreement or the other Transaction Documents, (ii) the contents of any certificate, report or other document delivered hereunder or under any of the other Transaction Documents or in connection herewith of therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Transaction Document, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, the other Transaction Documents or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 5 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent. The Agent shall not, except to the extent the Agent is expressly instructed by the Required Investors with respect to collateral security hereunder and under the other Transaction Documents, be required to initiate or conduct any litigation or collection proceedings hereunder or under any other Transaction Document; provided, however, that the Agent shall not be required to take any action which exposes the Agent to personal liability or which is contrary to the Transaction Documents or applicable law.

**9.4** *Reliance By Agent*. The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. The Agent may consult with legal counsel (who may be counsel for any of the Investors), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel,

- 27 -

accountants or experts.  The Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Transaction Document unless it shall first receive such advice or concurrence of the Required Investors (or, if so specified by this Agreement, all Investors) as it deems appropriate or it shall first be indemnified to its satisfaction by the Investors against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action (it being understood that this provision shall not release the Agent from performing any action with respect to the Trust expressly required to be performed by it pursuant to the terms hereof) under this Agreement.  The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Transaction Documents in accordance with a request of the Required Investors (or, if so specified by this Agreement, all Investors), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Investors and all future holders of the Investments and the Commitments.

9.5    *Action Through Sub-Agents*.  The Agent may perform any and all of its duties, and exercise its rights and powers, by or through any one or more sub-agents appointed by the Agent.  The Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through its Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent, and shall apply to its activities in connection with all activities of the Agent hereunder.

9.6    *Resignation of Agent and Appointment of Successor Agent*.  Subject to the appointment and acceptance of a successor Agent, as provided in this paragraph, the Agent may resign at any time by notifying the Investors and the Trust.  Upon any such resignation, the Required Investors shall have the right, in consultation with the Trust, to appoint a successor Agent. If no successor shall have been so appointed and shall have accepted such appointment within 30 days after such retiring Agent gives notice of its resignation, then such retiring Agent may, on behalf of the Investors, appoint a successor Agent, which shall be a bank with an office in New York, New York, or an Affiliate of any such bank.  Upon the acceptance of its appointment as Agent hereunder, by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Transaction Documents.  The fees payable by the Trust to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed among the Trust, the Required Investors and such successor.  After an Agent's resignation hereunder, the provisions of this Article shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.

9.7    *Investors' Independent Decisions*.  Each Investor acknowledges that it has, independently and without reliance upon the Agent or any other Investor and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Investor also acknowledges that it will, independently and without reliance upon the Agent or any other Investor and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement and the other Transaction Documents, any related agreement or any document furnished hereunder or

- 28 -

thereunder.  Except as explicitly provided herein, the Agent has no any duty or responsibility, either initially or on a continuing basis, to provide any Investor with any credit or other information with respect to such operations, business, property, condition or creditworthiness, whether such information comes into its possession on or before the occurrence of a Default or at any time thereafter.  The Agent shall not be deemed a trustee or other fiduciary on behalf of any party.

9.8     *Indemnification*.  Each Investor agrees to indemnify and hold harmless the Agent, ratably in accordance with their respective Applicable Percentages, for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, deficiencies, suits, costs, expenses (including reasonable attorney's fees) or disbursements of any kind and nature whatsoever that may be imposed on, incurred by or asserted against the Agent (including by any Investor) arising out of or by reason of any investigation in or in any way relating to or arising out of any Transaction Document or any other documents contemplated by or referred to therein for any action taken or omitted to be taken by the Agent under or in respect of any of the Transaction Documents or other such documents or the transactions contemplated thereby or the enforcement of any of the terms hereof or thereof or of any such other documents; provided, however, that no Investor shall be liable for any of the foregoing to the extent they have resulted from the gross negligence or willful misconduct of the party to be indemnified.  The agreements set forth in this Section 9.8 shall survive the payment of the Investor Payment and other Obligations hereunder and shall be in addition to and not in lieu of any other indemnification agreements contained in any other Transaction Document.

9.9     *Consents Under Other Transaction Documents*.  Except as otherwise provided in this Agreement and the other Transaction Documents, the Agent may, with the prior consent of the Required Investors (but not otherwise), consent to any modification, supplement or waiver under any of the other Transaction Documents.

## Article 10 - Miscellaneous

10.1    *Notices*.  (a) Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telephonic facsimile (fax), as follows:

(i)     if to the Trust, to:

Wilmington Trust Company
1100 N. Market Street
Wilmington, DE 19890
Attention: David A. Vanaskey, Jr.
E-mail: dvanaskey@wilmingtontrust.com
Phone: (302) 636-6019
Facsimile: (302) 636-4140

01344376

with copies (that will not constitute notice) to:

Arthur J. Gonzalez
c/o New York University School of Law
40 Washington Square South, 314A
New York, NY 10012
E-mail: arthur.gonzalez@nyu.edu
Phone: (212) 998-6231

and

Eric B. Fisher, Esq.
Binder & Schwartz LLP
366 Madison Avenue, 6th Floor
New York, NY 10017
E-mail:  efisher@binderschwartz.com
Phone:  (212) 510-7031
Facsimile:  (212) 510-7299

(ii)    if to the Agent:

U.S. Bank National Association
214 N. Tryon Street, 27th Floor
Charlotte, NC 28202
Attention: James A. Hanley
E-mail: Agency.services@usbank.com /
        James.Hanley1@usbank.com
Phone: (302) 576-3714
Facsimile: (302) 576-3717

(iii)    if to any Investor, to it at its address (or facsimile number) set forth on its signature page hereto.

(b)    Electronic Communications.  Notices and other communications to the Agent and the Investors hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, provided that the foregoing shall not apply to notices to the Agent or any Investor that has notified the Agent that it is incapable of receiving notices under such Article by electronic communication.  The Agent or the Trust may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such  procedures may be limited to particular notices or communications.  The Trust acknowledges that the Agent and the Investors shall be relying upon all notices and other communications sent to the Agent and any Investors via electronic mail notwithstanding the lack of a manual signature thereto.  Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement);

- 30 -

provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

   (c) Any party hereto may change its address or fax number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

   **10.2** ***Waivers; Amendments.***

   (a) No failure or delay by the Agent or the Investors in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agent and the Investors hereunder and under the other Transaction Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Trust therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 10.2, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of an Investment shall not be construed as a waiver of any Default, regardless of whether the Agent, or any Investor may have had notice or knowledge of such Default at the time.

   (b) Neither this Agreement nor any other Transaction Document nor any provision hereof or thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Trust and the Required Investors or by the Trust and the Agent with the prior written consent of the Required Investors and the Agent; provided that no such agreement shall:

     (i) increase the Commitment of any Investor without the written consent of each Investor and the Agent;

     (ii) reduce or delay the payment of the Investor Payment without the written consent of each Investor affected thereby;

     (iii) postpone the scheduled date of payment of the Investor Payment, or waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Investor affected thereby;

     (iv) alter or waive the covenant of the Trust in the first clause of Section 1.3;

(v)      change Section 6.7 in a manner that would alter the application of payments thereunder, or change Section 2.4(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without in each case the written consent of each Investor;

(vi)     change any of the provisions of this Section 10.2 or the definition of "Required Investors" or any other provision hereof specifying the number or percentage of Investors required to waive, amend or modify any rights hereunder or under any other Transaction Document or make any determination or grant any consent hereunder or thereunder, without the written consent of each Investor;

(vii)    waive any of the conditions precedent specified in Section 5.1 without the written consent of the Required Investors and the Agent; or

(viii)   subordinate the Investments to any other Indebtedness,

without the written consent of each Investor; *provided further* that no such agreement shall amend, modify, or otherwise affect the rights or duties of the Agent hereunder without the prior written consent of the Agent.

**10.3    *Successors and Assigns.***

(a)      The provisions of the Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Trust may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Investor and the Agent (and any attempted assignment or transfer without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the Agent and the Investors) any legal or equitable right, remedy or claim under or by reason of the Agreement.

(b)      Each Investor may at any time and from time to time assign to one or more assignees all or a portion of its rights and obligations under the Agreement (including all or a portion of the Commitment, any related funded Investments and the right to receive the Investor Payment attributable thereto); provided that for any assignment:

(i)      except in the case of an assignment to an Investor or an Affiliate or Approved Fund of an Investor or an assignment of the entire remaining amount of the assigning Investor's aggregate Commitments (and any related funded Investments and the right to receive the Investor Payment attributable thereto), the aggregate amount of the Commitments (and any related funded Investments and the right to receive the Investor Payment attributable thereto) of the assigning Investor subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Agent) shall not be less than $1,000,000 unless the Trust and the Agent otherwise consent;

- 32 -

(ii)    the parties to each assignment shall execute and deliver to the Agent an Assignment and Acceptance, and, unless such assignment is to an Investor or its Affiliate or Approved Fund, shall pay a processing and recordation fee of $2,000; and

(iii)    such assignment will not increase the cost to the Trust of maintaining any Investment as a result of the operation of Section 2.6 of this Agreement;

*provided* that any consent of the Trust otherwise required under this paragraph shall not be required if a Default has occurred and is continuing or in the event of an assignment to an existing Investor.

(c)    Upon acceptance and recording pursuant to paragraph (e) of this Section 10.3, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of an Investor under this Agreement, and the assigning Investor thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Investor's rights and obligations under this Agreement, such Investor shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.6). Any assignment or transfer by an Investor of rights or obligations under this Agreement that does not comply with paragraph (b) of this Section 10.3 shall be treated for purposes of this Agreement as a sale by such Investor of a participation in such rights and obligations in accordance with paragraph (f) of this Section.

(d)    The Agent, acting for this purpose as an agent of the Trust, shall maintain at one of its offices in Minneapolis, MN a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Investors, and the Commitment of, and the pro rata portion of each Investment and Investor Payment owing to, each Investor pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Trust, the Agent and the Investors may treat each Person whose name is recorded in the Register pursuant to the terms hereof as an Investor hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Trust and any Investor, at any reasonable time and from time to time upon reasonable prior notice.

(e)    Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Investor and an assignee, the processing and recordation fee referred to in paragraph (b)(ii) of this Section 10.3 and any written consent to such assignment required by paragraph (b) of this Section 10.3, the Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(f)    Any Investor may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Investor; *provided* that no such pledge or assignment of a security interest shall release an Investor from any of its obligations hereunder or substitute any such assignee for such Investor as a party hereto.

- 33 -

(g)    Anything in this Section 10.3 to the contrary notwithstanding, no Investor may assign or participate any interest in any Investment held by it hereunder to the Trust or any of its Affiliates without the prior consent of each Investor and the Agent.

(h)    An Investor may furnish any information concerning the Trust in the possession of such Investor from time to time to assignees and participants (including prospective assignees and participants) subject, however, to and so long as the recipient agrees in writing to be bound by, the provisions of Section 10.11.  In addition, the Agent may furnish any information concerning the Trust, any Affiliate in the Agent's possession to any Affiliate of the Agent, subject, however, to the provisions of Section 10.11.  The Trust shall assist any Investor in effectuating any assignment pursuant to this Section 10.3 in whatever manner such Investor reasonably deems necessary, including participation in meetings with prospective transferees.

**10.4    *Survival*.**  All covenants, agreements, representations and warranties made by the Trust herein and in the other Transaction Documents, and in the certificates or other instruments delivered in connection with or pursuant to this Agreement and the other Transaction Documents, shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the other Transaction Documents and the making of any Investments, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agent or any Investor may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect so long as the Investor Payment or any fee or any other Obligation payable under this Agreement or the other Transaction Documents is outstanding and so long as the Commitments have not expired or terminated.  The provisions of Section 2.6 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Investor Payment, the expiration or termination of the Commitments or the termination of this Agreement or any other Transaction Document or any provision hereof or thereof.

**10.5    *Counterparts; Integration; References to Agreement; Effectiveness*.**  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and any separate letter agreements with respect to fees payable to the Agent or its counsel constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Whenever there is a reference in any Transaction Document or UCC Financing Statement to the "Investment Agreement" to which the Agent, the Investors and the Trust are parties, such reference shall be deemed to be made to this Agreement among the parties hereto.  Except as provided in Section 5.1, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

**10.6    *Severability*.**  Any provision of the Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability

01344376

of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**10.7** *Governing Law; Jurisdiction; Consent to Service of Process.*

(a)    **The Agreement shall be construed in accordance with and governed by the law of the State of New York without regard to any conflict of laws provisions thereunder.**

(b)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court, and any appellate court thereto, in any action or proceeding arising out of or relating to this Agreement or the other Transaction Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in the Bankruptcy Court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Agent or any Investor may otherwise have to bring any action or proceeding relating to this Agreement against the Trust or its properties in the courts of any jurisdiction.

(c)    Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Transaction Documents in any court referred to in paragraph (b) of this Section 10.7.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 10.1.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

**10.8** *WAIVER OF JURY TRIAL.*  **EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.8.**

01344376

**10.9**    *[Reserved]*

**10.10**    *Headings*.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of the Agreement and shall not affect the construction of, or be taken into consideration in interpreting, the Agreement.

**10.11**    *Confidentiality*.  Each Investor agrees to keep confidential information obtained by it pursuant hereto and the other Transaction Documents confidential in accordance with such Investor's customary practices and agrees that it will only use such information in connection with the transactions contemplated by this Agreement and not disclose any of such information other than (a) to such Investor's employees, representatives, directors, attorneys, auditors, agents, professional advisors, trustees or Affiliates who are advised of the confidential nature of such information or to any direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section 10.11), (b) to the extent such information presently is or hereafter becomes available to such Investor on a non-confidential basis from any source of such information that is in the public domain at the time of disclosure, (c) to the extent disclosure is required by law (including applicable securities law), regulation, subpoena or judicial order or process (provided that notice of such requirement or order shall be promptly furnished to the Trust unless such notice is legally prohibited) or requested or required by bank, securities, insurance or investment company regulators or auditors or any administrative body or commission to whose jurisdiction such Investor may be subject, (d) to any rating agency to the extent required in connection with any rating to be assigned to such Investor, (e) to assignees or participants or prospective assignees or participants who agree to be bound by the provisions of this Section 10.11, (f) to the extent required in connection with any litigation between the Trust and any Investor with respect to the Investments or this Agreement and the other Transaction Documents, or (g) with the Trust's prior written consent.

**10.12**    *Electronic Execution of Assignments and Certain Other Documents*.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption, the Transaction Documents or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures, the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

[Signature Page Follows]

01344376

IN WITNESS WHEREOF, the parties hereto have caused this Funding Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

TRUST:

MOTORS LIQUIDATION COMPANY
AVOIDANCE ACTION TRUST

By: Wilmington Trust Company,
     as Trust Administrator and Trustee

By: _____
Name: David A. Vanskey, Jr.
Title: Vice President

AGENT:

U.S. BANK, NATIONAL ASSOCIATION

as Administrative Agent and Collateral Agent

By: _____
Name:
Title:

[Signature Page to Funding Agreement; Investor Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Funding Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

TRUST:

MOTORS LIQUIDATION COMPANY
AVOIDANCE ACTION TRUST

By: Wilmington Trust Company,
      as Trust Administrator and Trustee

By: _____
Name: David A. Vanskey, Jr.
Title: Vice President

AGENT:

U.S. BANK NATIONAL ASSOCIATION

as Administrative Agent and Collateral
Agent

By: _____
Name: James A. Hanley
Title: Vice President

[Signature Page to Funding Agreement; Investor Signature Page Follows]

01344376

[Investor Signature Page to Funding Agreement Omitted]

SCHEDULES & EXHIBITS

Schedule 1.3            Designated Financial Officers
Schedule 2.1            Investors and Commitments
Schedule 4.4(d)         Current Payables
Schedule 4.10           Bank Accounts


Exhibit A               Assignment and Acceptance

01344376

## SCHEDULE 1.4

### DESIGNATED FINANCIAL OFFICERS

To be provided by Trust prior to the Effective Time

## **SCHEDULE 2.1**

### **INVESTORS AND COMMITMENTS**

| Name | Commitment |
| --- | --- |
| RIVER BIRCH MASTER FUND, LP | $15,000,000 |
| | |
| Total: | $15,000,000 |

## SCHEDULE 4.4(d)

## CURRENT PAYABLES

To be provided by Trust prior to the Effective Time

## <u>SCHEDULE 4.10</u>

### BANK ACCOUNTS

To be established by Agent and Trust prior to the Effective Time

EXHIBIT A

**FORM OF ASSIGNMENT AND ACCEPTANCE**

*Attached*

01:18702846.1

01344376

**FORM OF**
**ASSIGNMENT AND ACCEPTANCE**

Reference is made to the Funding Agreement, dated as of May __, 2016 (as modified and supplemented and in effect from time to time, the "Funding Agreement"), among Motors Liquidation Company Avoidance Action Trust, a Delaware statutory trust (the "Trust"), the Investors from time to time party thereto, and U.S. Bank, National Association, as Administrative Agent and Collateral Agent (the "Agent"). Terms defined in the Funding Agreement are used herein as defined therein.

_____ (the "Assignor") and _____ (the "Assignee") agree as follows:

1.    The Assignor hereby irrevocably sells and assigns to the Assignee without recourse to the Assignor, and the Assignee hereby irrevocably purchases and assumes from the Assignor without recourse to the Assignor, as of the Effective Date as set forth in Schedule I hereto (the "Effective Date"), an interest (the "Assigned Interest") in and to the Assignor's rights and obligations under the Funding Agreement with respect to the portion of the Commitment (as well as any related funded Investments and the right to receive the Investor Payment attributable thereto) described on Schedule I, in the amount and percentage as set forth on Schedule I.

2.    The Assignor (i) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Funding Agreement, any other Transaction Document or any other instrument or document furnished pursuant thereto, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Funding Agreement, any other Transaction Document or any other instrument or document furnished pursuant thereto, other than that it has not created any adverse claim upon the interest being assigned by it hereunder and that such interest is free and clear of any such adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Trust or any other obligation or the performance or observance by the Trust of its obligations under the Funding Agreement, any other Transaction Document or any other instrument or document furnished pursuant hereto or thereto; and (iii) requests that the Agent update the Register to reflect the assignment and acceptance set forth herein.

3.    The Assignee (i) represents and warrants that it is legally authorized to enter into this Assignment and Acceptance; (ii) confirms that it has received a copy of the Funding Agreement, together with such documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (iii) agrees that it will, independently and without reliance upon the Assignor, the Agent or any other Investor and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Funding Agreement, any other Transaction Document or any other instrument or document furnished pursuant hereto or thereto; (iv) appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Funding Agreement, or any other

instrument or document furnished pursuant hereto or thereto as are delegated to the Agent by the terms thereof, together with such powers as are incidental thereto; and (v) agrees that it will be bound by the provisions of the Funding Agreement and will perform in accordance with its terms all the obligations which by the terms of the Funding Agreement are required to be performed by it as an Investor.

4.      Following the execution of this Assignment and Acceptance, it will be delivered to the Agent for acceptance and recording by the Agent pursuant to <u>Section 10.3</u> of the Funding Agreement, effective as of the Effective Date (which date shall not, unless otherwise agreed to by the Agent, be earlier than five Business Days after the date of such acceptance and recording by the Agent and shall in no event be earlier than the date the information contained herein is recorded in the Register pursuant to <u>Section 10.3</u> of the Funding Agreement).

5.      Upon such acceptance and recording, from and after the Effective Date, the Agent shall make all payments in respect of the Assigned Interest (including payments of Investor Payment, fees and other amounts) to the Assignee that accrue subsequent to the Effective Date.

6.      From and after the Effective Date, (i) the Assignee shall be a party to the Funding Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of an Investor thereunder and shall be bound by the provisions thereof and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Funding Agreement except as provided in <u>Section 10.3</u> of the Funding Agreement.

7.      This Assignment and Acceptance shall be governed by and construed in accordance with the laws of the State of New York.

8.      This Assignment and Acceptance may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Assignment and Acceptance by signing any such counterpart.


[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed as of the date first above written by their respective duly authorized officers on <u>Schedule I</u> annexed hereto.

[ASSIGNEE]                          [ASSIGNOR]

By:_____          By: _____
Name:                               Name:
Title:                              Title:


                                    Consented to and Accepted:

                                    U.S. BANK, NATIONAL ASSOCIATION,
                                    as Administrative Agent and Collateral Agent

                                    By:_____
                                    Name:
                                    Title:

Schedule I to
Assignment and Acceptance

Name of Assignor:

Name of Assignee:

Effective Date of Assignment:

| Amount of Commitment Assigned | Amount of Commitment Retained | Percentage of Commitments Assigned | Percentage of Commitments Retained |
|---|---|---|---|
| $ | $ | % | % |
| | | | |