# EXHBIT A

COBB COUNTY, GA
FILED IN OFFICE
2016 JUN 23 PM 2: 19
ANGIE T. DAVIS
STATE COURT CLERK-07

IN THE STATE COURT OF COBB COUNTY
STATE OF GEORGIA

VERONICA ALAINE FOX,                  *
                                      *
        Plaintiff,                    *
                                      *
v.                                    *        CIVIL ACTION FILE
                                      *
                                      *        NO. 14A 3468-4
GENERAL MOTORS LLC and                *
ATLANTA AUTO BROKERS, INC.,           *
                                      *
        Defendants.                   *

### SECOND RECAST & AMENDED COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Veronica Fox and files this her Second Recast & Amended

Complaint for Damages against Defendants General Motors LLC ("GM LLC") and Atlanta Auto

Brokers, Inc. ("AAB"), to amend the Complaint initially filed in this action as indicated below.

Plaintiff Fox hereby waives jury trial and requests that the trial of this action proceed before this

Honorable Court as fact-finder as presently scheduled, on September 13, 2016.

### INTRODUCTION

a.    On November 12, 2013, Plaintiff Veronica Fox was rendered quadriplegic in a rollover

wreck in the General Motors 2004 Cadillac SRX she was driving.  She was properly

restrained in the vehicle.  When the Cadillac SRX rolled over, the top of the roof literally

came off the vehicle, and the remaining roof structure buckled and collapsed on top of

her.  Her injuries were caused by the resulting roof crush that occurred during the

rollover.  Her injuries were entirely preventable.  Her injuries would not have happened

had General Motors Corporation ("GM Corp.") designed the 2004-2009 Cadillac SRX to provide proper protection for the occupants in a foreseeable rollover wreck.1

b.     GM Corp. knew and expected that its vehicles *would be* involved in rollovers.  Conrad 3/18/16 Dep. at 23/21-24/3.2  GM LLC knew and knows that rollover wrecks can cause injuries and deaths.  Craig 4/20/16 Dep. at 87/17-23.

c.     GM Corp., like other automakers such as GM LLC, had the resources to design and manufacture automobiles that would provide proper protection to the occupants in a rollover.

d.     But GM Corp. designed the 2004-2009 Cadillac SRX with a roof structure that *it knew* would utterly fail to provide such protection:  the roof panel was made almost entirely of glass; the roof was secured to the vehicle by nothing but glue, with no welds or other mechanical fasteners; predictably, the entire, glued-on roof came off during the rollover, leaving a gaping hole in the top of the vehicle and depriving the roof system of the support the top of the roof should provide; there was little to no lateral support going across the roof to help support the sides of the vehicle when the roof panel came off during the roll; and the remaining roof structure was so inadequate, it buckled and crushed onto Veronica Fox's neck and shoulders, catastrophically and permanently injuring her.

---

[1] GM Corp. and GM LLC referred to the subject GM Cadillac SRX design internally as the "GMT 265 program" vehicle.  Conrad 3/18/16 Dep. at 7/23-8/19.
[2] Conrad was lead engineer for upper structure of the GMT 265 vehicle – the 2004-2009 Cadillac SRX.  *Conrad* 3/18/16 Dep. 7/23-8/3.  He was employed by GM Corp. and also by GM LLC after the bankruptcy and government bail-out; nothing about the bankruptcy and bail-out affected his knowledge of the design of the 2004 SRX or his access to GM Corp.'s books and records.  *Id.* 8/4-19.

e.    GM LLC itself knew all the foregoing facts prior to Plaintiff suffering catastrophic

injuries on November 12, 2013.  GM LLC 5/31/16 8th Supplemental Responses to

Plaintiff's First Interrogatories, "Amended Prefatory Statement."[3]  Conrad Dep. 8/12-19.

f.    The roof of the Cadillac SRX remained unchanged from 2004 through 2009.  Craig

4/20/16 Dep. at 9/19-25.

g.    GM LLC *itself also* continued to sell that same subject GM Cadillac SRX design through

2009, *and after* the June 2009 bankruptcy sale.  GM LLC 5/31/16 8th Supplemental

Responses to Plaintiff's First Interrogatories, "Amended Prefatory Statement;"[4] *id.* at

response to Interrogatory 1.[5]  GM LLC itself sold 648 of the subject Cadillac SRX

vehicles (2004-2009 models) in July 2009 – after the bankruptcy sale.[6]  The 2010 model

year Cadillac SRX, which replaced the subject vehicle, did not come to market until after

the bankruptcy sale.[7]  The 2010 model year Cadillac SRX had a roof three times as

strong as the 2004-09 models.

h.    GM Corp. knew precisely the danger that caused Plaintiff's injuries, because a virtually

identical rollover wreck involving the very same Cadillac SRX with glass roof had

occurred at the GM Proving Grounds on December 16, 2004, when the vehicle was

---

[3] "GM LLC did not design, develop, test, manufacture or assemble the subject 2004 Cadillac
SRX. However, GM LLC has acquired documents and other information from Motors
Liquidation Company, f/k/a General Motors Corporation, regarding the design and development
of the subject 2004 Cadillac SRX."
[4] "The roof structure and sunroof glass/glazing that is substantially similar to the 2004 Cadillac
SRX was introduced on the GMT265 platform for the 2004 model year and continued in
production through the 2009 model year."
[5] "In 2010, GM LLC introduced a redesigned new generation of crossover sport utility vehicle
based off the Epsilon and Theta architecture, known internally at GM as the GMT166 program."
[6] *See* Exhibit 1 hereto (GM LLC press release dated 8/03/09).
[7] *See* Exhibit 2 hereto (GM LLC press release dated 8/11/09 stating that the new SRX was
"coming to market this month").

driven by a GM engineer with two other GM engineers as passengers. Craig Dep. at
10/1-12/10, 13/1-3, 60/4-9, 61/19-24. The Cadillac SRX involved in that rollover slid
sideways, rolled several times, the glass roof flew off, and the remaining roof structure
buckled and deformed into the occupant compartment – just as happened to Plaintiff on
November 12, 2013. One GM engineer was taken to the hospital by ambulance. Two of
the GM engineers were admitted to the hospital. Blood splattered all over the inside of
the car. By the Grace of God and good luck, no one was injured as badly as was
Veronica. But GM's Legal Department investigated that wreck at GM's own proving
grounds, and had the wreck professionally reconstructed. That was *nine years* before Ms.
Fox's wreck: a rollover at GM's own proving grounds, the same car, with the same roof,
producing virtually identical damage to the roof and roof structure.

i.    After the bankruptcy sale in June, 2009, all those engineers continued to be employed by
      GM LLC, as did others with knowledge of that December 16, 2004 wreck at GM's own
      Proving Grounds. GM LLC possesses all the knowledge regarding that proving grounds
      wreck previously possessed by GM. Corp., including all the documentary evidence
      previously possessed by GM Corp. GM LLC has, in fact, itself produced some of that
      evidence to Plaintiff in this case.[8]

j.    As early as 2006 GM Corp. was already redesigning the roof to make it stronger – an
      effort that GM LLC continued after the bankruptcy sale, resulting in the 2010 model year

---

[8] There were, in fact, five rollover wrecks involving the subject car at GM's own proving
grounds – the 2004-2009 Cadillac SRX. (GM referred to that car as the "GMT 265" vehicle.)
GM's own engineer, Lou Conrad, who was "lead engineer" for the roof of the GMT 265 car
(Conrad 3/18/16 Dep. at 7/23-8/3), has testified under oath that in his 30 years with GM he'd
never heard of any other GM vehicle that rolled five times at GM's own proving grounds. *Id.* at
28/15-22.

Cadillac SRX roof that was three times stronger.  McLean 5/4/16 Dep. at 12/4-13/25.
That redesign work was completed by GM LLC after the bankruptcy sale, using the same
engineers and other employees who had started that work when employed by GM Corp.
and using the same facilities.

k.  GM LLC concedes that it "assumed liability" for defects in the 2004-2009 Cadillac SRX
as part of the sale agreement it entered in 2009.

l.  The 2004 Cadillac SRX that caused Plaintiff's injuries was first sold more than 10 years
prior to Plaintiff's injuries on November 12, 2013, and so this action is subject to
Georgia's "statute of repose."  *See* O.C.G.A. §51-1-11.

m.  That statute of repose applies to "manufacturers" of an item "sold as new property"
(O.C.G.A. §51-1-11(b)(1)) and provides a "limitation" on the "manufacturer's" liability if
the product is more than ten years old (O.C.G.A. §51-1-11(b)(2)), subject to four explicit
exceptions.  (O.C.G.A. §51-1-11(c)).  The statute of repose is available to GM Corp., as
the "manufacturer."  But GM LLC contends it is not a "manufacturer" with respect to the
subject product.  GM LLC may assert the statute of repose only on behalf of GM Corp.,
in an effort to escape GM LLC's assumption of liability.

n.  Of the four exceptions to the "limitation" to a "manufacturer's" liability for products over
ten years old, three apply to this case.  The statute of repose excepts from the ten-year
"limitation" on liability those actions "arising out of conduct which manifests a . . .
reckless, *or* wanton disregard for life of property"[9] *or* a "manufacturer's" failure "to warn

---

[9] The statute also refers to "willful" conduct.  Plaintiff does not contend that the application of
the statute of repose is defeated by "willful" conduct.

5

of a danger arising from use of the product once that danger becomes known to the

manufacturer." O.C.G.A. §51-1-11(c).

o.      The conduct of GM Corp. in manufacturing the subject product was both "reckless" and

"wanton."

p.      The dangers posed by the subject product were known to GM Corp. Those dangers were

also known to GM LLC. After the bankruptcy, GM LLC continued to employ the same

persons who had knowledge of the dangers of the subject product; GM LLC took

possession of all documents previously possessed by GM Corp. regarding those dangers;

GM LLC continued the work started by GM Corp. to strengthen the roof of the Cadillac

SRX; GM LLC continued to sell the subject Cadillac SRX after the bankruptcy sale. In

sum, at all times from June 26, 2009 until November 12, 2013 when Plaintiff's injuries

were sustained, GM LLC possessed all the same knowledge previously possessed by GM

Corp. Neither GM Corp. nor GM LLC warned of those dangers. That negligent failure

was itself both "reckless" and "wanton."

q.      As to Defendant GM LLC, this lawsuit involves a pre-bankruptcy vehicle that GM LLC

continued to sell post-bankruptcy with knowledge that it had a dangerously weak roof,

and a post-bankruptcy crash. GM LLC is the only "General Motors" defendant being

sued because GM Corp. ("Old GM") no longer exists. Consistent with Bankruptcy Court

rulings, Plaintiffs make no allegations whatsoever that GM LLC is liable as a "successor"

of Old GM.

6

## I.  PARTIES, JURISDICTION, VENUE, & SERVICE OF PROCESS

1.

Plaintiff Veronica Fox is a citizen and resident of the State of Georgia.  Plaintiff is subject to the jurisdiction of this Court.

2.

Defendant GM LLC is a foreign corporation organized and incorporated under the laws of Delaware, with its principal place of business located at 300 Renaissance Center, Detroit, Michigan 48265.  GM LLC, like GM Corp., is engaged in the business of designing, manufacturing, marketing, promoting, advertising, distributing, and selling automobiles, trucks, SUVs, and other types of vehicles in the State of Georgia, throughout the United States, and elsewhere.

3.

GM LLC is subject to the jurisdiction of this Court because it transacts business in this State and maintains a registered agent in this State:  CSC of Cobb County, Inc., 192 Anderson Street S.E., Suite 125, Marietta, Georgia 30060.  GM LLC may be served with legal process there.

4.

Venue is proper in Cobb County as to Defendant GM LLC under O.C.G.A. § 14-2-510 and GA. CONST. art. VI, § 2, ¶ VI, because Cobb County is where Defendant GM LLC maintains a registered agent.

5.

Defendant AAB is a domestic corporation organized and incorporated under the laws of Georgia, with its principal place of business located at P.O. Box 3262, Alpharetta, Georgia

30023.  AAB is engaged in the business of buying, selling, and inspecting used automobiles in the State of Georgia.

6.

Defendant AAB is subject to the jurisdiction of this Court because it is incorporated in this State, it transacts business in this State, and maintains a registered agent in this State:  Joe Milligan, 487 Cobb Parkway, SE, Marietta, Georgia 30060.  AAB may be served with legal process there.

7.

Venue is proper in Cobb County as to Defendant AAB under O.C.G.A. § 14-2-510 and GA. CONST. art. VI, § 2, ¶ VI, because Cobb County is where Defendant AAB maintains a registered agent and under GA. CONST. art. 6, § 2, ¶ IV because it is a joint tortfeasor with Defendant GM LLC.

## II.  OPERATIVE FACTS

8.

On November 12, 2013, at around 2:00 a.m., Veronica Alaine Fox was the restrained driver of a 2004 Cadillac SRX designed, manufactured, and sold by GM Corp. (VIN: 1GYDE63A740113793) ("the subject SRX" or "subject vehicle").  Carl Coward was a restrained passenger in the front right seat.  The subject Cadillac SRX was traveling north on I-285, past the intersection with Martin Luther King Dr.

9.

Plaintiff Veronica Fox was properly seated in the driver's seat, wearing her seat belt.

10.

While traveling down the highway, the Cadillac SRX left the roadway.  The SRX rolled

8

over and came to rest off the shoulder north of Martin Luther King Dr.

11.

GM Corp. manufactured, designed, marketed, and distributed the subject vehicle with a defective roof which was unable to withstand the forces of this foreseeable and survivable event. As the direct and proximate result of the defects in the roof structure of the subject vehicle, the roof panel came completely off during the wreck and the remaining structure crushed down on Plaintiff Veronica Fox during this incident, rendering her a quadriplegic.

12.

Defendant AAB inspected the vehicle and sold it to Plaintiff shortly before the wreck occurred.  Defendant AAB had a duty to warn Veronica Fox of the danger posed by the Cadillac SRX roof.  AAB breached that duty.  That breach was negligence.

13.

The defects and failures of the subject vehicle caused Veronica Fox's injuries.

14.

As a direct and proximate result of the subject vehicle's defects Plaintiff Veronica Fox endured, continues to endure, and will endure in the future physical and emotional pain and suffering.

15.

GM Corp. designed, tested, manufactured, marketed, distributed, and sold the subject Cadillac SRX, thereby placing it into the stream of commerce.

16.

The subject Cadillac SRX was defective, unreasonably dangerous, and not fit for its ordinary use when manufactured as well as at the time of the subject incident because (a) the

9

design GM Corp. chose for the roof structure did not offer proper protection to occupants in foreseeable crashes; (b) the risks of GM Corp.'s chosen design outweighed the utility of the design; and (c) GM Corp. did not implement safer, feasible, and practicable alternative designs that would have prevented Plaintiff Veronica Fox's injuries.

17.

GM Corp. could have reasonably foreseen and did, in fact, foresee the occurrence of rollovers such as the one described in this Complaint.

18.

But for GM Corp.'s negligent and defective design of the Cadillac SRX, and the vehicle's failure to offer proper crash protection to occupants in foreseeable wrecks, Veronica Fox would not have been seriously injured in this wreck.

19.

At the time the subject Cadillac SRX was manufactured GM Corp. had actual knowledge that when a roof lacks sufficient structural crashworthiness, occupants are highly vulnerable to being injured, paralyzed, or killed in a rollover.

20.

Despite its knowledge set forth above, GM Corp. consciously designed the 2004-2009 Cadillac SRX so that occupants would be subject to injury from roof crush.

21.

Despite knowing at the time the subject Cadillac SRX was manufactured that safer alternative designs were technologically feasible, economically practicable, and fundamentally safer, GM Corp. recklessly and wantonly chose not to implement any of those alternative designs in the subject Cadillac SRX and instead chose a design GM Corp. knew would result in

10

preventable injuries and deaths in foreseeable wrecks.

22.

GM Corp.'s reckless and wanton conduct constituted disregard for the life and safety of

Veronica Fox, and the lives and safety of the motoring public generally.

23.

In 2009, after GM Corp. filed for Chapter 11 bankruptcy protection, Defendant GM LLC

purchased assets of GM Corp., including GM Corp.'s books and records.

24.

Defendant GM LLC concedes that as part of its 2009 purchase of GM Corp., GM LLC

expressly assumed liability for product liability claims against GM Corp. that arose after the

bankruptcy sale, as set forth in the Sale Agreement and rulings by the Bankruptcy Court.

25.

After the bankruptcy sale, Defendant GM LLC itself continued to employ engineers who

designed the roof for the 2004-2009 Cadillac SRX and others with knowledge of that design, its

defects, and its dangers.  Conrad 3/18/16 Dep. at 7/18-8/19.  After the bankruptcy sale,

Defendant GM LLC continued to employ those persons with specific knowledge of the very

similar rollover wreck that occurred at GM's own Proving Grounds on December 16, 2004,

including the GM engineer who was driving the same car with glass roof during that wreck, and

others, including those from GM's Legal Department who investigated that wreck. *See, e.g.,*

Craig 4/20/16 Dep. at 7/16-25.  Defendant GM LLC has admitted that after the bankruptcy sale it

possessed all relevant knowledge, books, and records regarding the 2004-2009 Cadillac SRX roof

design. GM LLC 5-31-16 8th Supplemental Responses to Plaintiff's First Interrogatories,

"Amended Prefatory Statement (*see* n.2, *supra*).  In sum, GM LLC acquired all knowledge

regarding the defective roof of the 2004-2009 Cadillac SRX and its dangers previously possessed by GM Corp.  After the 2009 bankruptcy sale Defendant GM LLC itself continued to sell the 2004-2009 Cadillac SRX with the subject defective roof.  GM LLC 5-31-16 8th Supplemental Responses to Plaintiff's First Interrogatories, "Amended Prefatory Statement;" *Id.* Response to Interrogatory 1.

26.

For the foregoing reasons, based on its own knowledge, Defendant GM LLC not only could have reasonably foreseen, but did in fact foresee, the occurrence of rollovers with roof crush such as the one that caused catastrophic injuries to Plaintiff on November 12, 2013.

27.

In addition to the foregoing, Defendant GM LLC has had actual knowledge that when a roof lacks sufficient structural crashworthiness, occupants are highly vulnerable to being injured, paralyzed, or killed in a rollover as a result of its own modification to the Cadillac SRX roof and its own testing and analysis of the Cadillac SRX roof.

28.

In addition to the foregoing, Defendant GM LLC has had actual knowledge that the roof of the 2004-2009 Cadillac SRX was unreasonably dangerous and defective as a result of its own testing and analysis of the Cadillac SRX roof.

28.

GM assumed the responsibility and duty to warn dealers, consumers, and the motoring public regarding defects in vehicles manufactured by GM Corp. In fact, GM LLC sent a letter to Plaintiff Fox warning her that her Cadillac SRX had a defective ignition switch.  Plaintiff Fox did not received that letter until after she was injured on November 12, 2013.

12

29.

Because of its own knowledge, the notice to it described above, and GM's decision to undertake the duty to warn dealers, consumers, and the motoring public regarding defects in vehicles manufactured by GM Corp., GM LLC had a legal duty after the bankruptcy sale to warn *of that danger known to GM LLC* – the danger that the roof of a 2004-2009 Cadillac SRX with glass roof would collapse in a foreseeable rollover and cause injury or death to occupants.

30.

Despite the foregoing knowledge and notice, Defendant GM LLC failed to warn Plaintiff and others of a known danger. That failure was negligent.

31.

Defendant GM LLC's failure to warn of a known danger was itself also reckless and wanton conduct in disregard for the life and safety of the public, including Veronica Fox.

32.

But for the defects in the roof of the 2004 Cadillac SRX and the failures to warn referenced herein, Plaintiff Veronica Fox would not have been seriously injured in this wreck.

33.

As a direct and proximate result of defects in the roof of the 2004 Cadillac SRX and the failures to warn referenced herein, Plaintiff Veronica Fox endured, continues to endure, and will endure physical and emotional pain and suffering and disability for the rest of her life.

34.

No person other than Defendant GM LLC and Defendant AAB is liable for the injuries and damages sustained by Veronica Fox.

35.

## STATUTE OF REPOSE

(a)     The 2004 Cadillac SRX that caused Plaintiff's injuries was first sold more than 10

years prior to Plaintiff's injuries on November 12, 2013, and so this action is

subject to the "limitation" stated in Georgia's "statute of repose. OCGA §51-1-

11(b)(2).

(b)     However, the statute of repose four express exceptions to the "limitation" on

liability provided in that statute. Three of those exceptions apply to this case.

1.     The statute of repose excepts from the ten-year "limitation" on liability

actions "arising out of conduct which manifests a . . . reckless *or* wanton

disregard for life of property."[10]

2.     The statute of repose also excepts from the ten-year "limitation" on

liability a "manufacturer's" failure "to warn of a danger arising from use

of the product once that danger becomes known to the manufacturer."

OCGA §51-1-11(c).

(c)     The conduct of GM Corp. in manufacturing and selling the subject product was

both "reckless" and "wanton."

(d)     The dangers of the weak roof in the 2004-2009 Cadillac SRX vehicles were well

known to GM Corp., for all the reasons stated in the foregoing paragraphs. GM

Corp. breached its duty to warn of those dangers, and that breach renders the

---

[10] The statute also refers to "willful" conduct. Plaintiff does not contend that the application of
the statute of repose is defeated by "willful" conduct.

14

"limitation" stated in the statute of repose unavailable to Defendant GM LLC as a

defense to this action.

(e)   Because GM LLC denies it is a "manufacturer" of the subject product, the statute

of repose is not available to it.

(f)   In the event GM LLC attempts to withdraw its denial that it is the "manufacturer"

of the subject product and attempts to assert the "limitation" provided by the

statute of repose, the dangers of the weak roof in the 2004-2009 Cadillac SRX

were also well known to GM LLC after the bankruptcy sale, for all the reasons

stated in the foregoing paragraphs.  GM LLC also breached its own duty to warn

of those dangers, and that breach renders the statute of repose unavailable to GM

LLC as a defense to this action.

(g)   GM LLC's failure to warn of a known danger, based on knowledge of and notice

to GM LLC after the bankruptcy sale, was itself reckless and wanton.

(h)   For the foregoing reasons, the Georgia statute of repose does not bar Plaintiff's

claims.

(i)   Plaintiff specifically requests that Special Interrogatories be addressed by the

Court as fact-finder, as follows:

1.   "Do you find that GM Corp. acted with reckless or wanton disregard for

human life in the design or sale of the 2004 GM Cadillac SRX and that

such conduct was a proximate cause for which Plaintiff may recover?"

2.   "Do you find that GM Corp. had a duty to warn and failed to warn of a

hazard associated with the use of the 2004 GM Cadillac SRX and that

such failure to warn was a proximate cause for which the Plaintiff may recover?"[11]

3.    Do you find that GM LLC. acted with reckless or wanton disregard for human life in the design or sale of the 2004 GM Cadillac SRX and that such conduct was a proximate cause for which Plaintiff may recover?"

4.    "Do you find that GM LLC. had a duty to warn and failed to warn of a hazard associated with the use of the 2004 GM Cadillac SRX and that such failure to warn was a proximate cause for which the Plaintiff may recover?"

## III. SPECIFIC COUNTS

### COUNT ONE

### Strict Liability of General Motors LLC

36.

Plaintiff incorporates as if re-alleged herein in full paragraphs 1 through 35 of this Complaint.

37.

GM Corp. is strictly liable to Plaintiff under O.C.G.A. § 51-1-11 and other applicable law because the risks inherent in the design of the roof structure in the 2004-2009 Cadillac SRX outweighed any utility of the chosen design, thereby rendering the vehicle defective,

---

[11] Both those special interrogatories were submitted by the trial court to the jury in *Walden v. Chrysler*, a case tried in Decatur Co., Ga., Superior Court resulting in a verdict on April 2, 2015. FCA has appealed the final judgment in that case. FCA has not claimed error with respect to those special interrogatories. FCA has not claimed it is not liable for the breach by its predecessor, Chrysler Group LLC, of a duty to warn.

16

unreasonably dangerous, and not reasonably suited to the use for which it was intended. The defects in the Cadillac SRX include, but are not limited to, the following:

a.    The roof structure in the Cadillac SRX failed to offer proper protection to occupants like Veronica Fox during foreseeable rollover events;

b.    The roof panel was made almost entirely of glass with a narrow rim of fiber glass;

c.    The roof panel was attached to the vehicle by nothing but glue;

d.    During the rollover, the entire roof panel came completely off the vehicle, leaving a gaping hole in the roof of the vehicle;

e.    GM Corp. knew that the glued-on glass roof would not protect occupants in a rollover;

f.    Despite this knowledge, GM Corp. did not design the remaining structure to protect occupants in a rollover;

g.    GM Corp. designed the 2004-2009 Cadillac SRX with a strength-to-weight ratio of 1.9, which earned it the lowest possible rating for roof strength by the Insurance Institute for Highway Safety. *See* Exhibit 3, IIHS Website, http://www.iihs.org/iihs/ratings/ratings-info/roof-strength-test (last visited May 19, 2016). According to IIHS, a strength-to-weight ratio of 1.9 is not "good," "acceptable," or even "marginal"—it is "**poor**." *Id.*;

h.    GM Corp. did not adequately test the performance of the Cadillac SRX's roof structure to determine whether prospective owners, users, and

17

occupants of the 2004-2009. Cadillac SRX would be exposed to an unreasonable risk of physical harm during rollover events;

i.    GM Corp. knew, or should have known, from the testing that was performed on the Cadillac SRX and other GM Corp. vehicles with the same or similar roofs, from real world incidents, and from the laws of physics, that the Cadillac SRX roof would fail, and GM Corp. knew that serious injury to vehicle occupants could result;

j.    The Cadillac SRX does not contain, and is not accompanied by, warnings to prospective owners, users, or occupants, including Plaintiff, either at the time of sale or post-sale, of the unreasonable risk of physical harm associated with the design of the roof structure of the 2004-2009 Cadillac SRX;

k.    The Cadillac SRX does not contain, and is not accompanied by, adequate warnings to prospective owners, users, or occupants, including Plaintiff, either at the time of sale or post sale, of the unreasonable risk of physical harm associated with the design of the roof structure of the 2004-2009 Cadillac SRX; and

l.    At no point did GM Corp. ever notify car dealers (either new or used) of the unreasonable risk of physical harm posed by design of the roof structure of the 2004 - 2009 Cadillac SRX so that information could be conveyed to potential and actual buyers of the 2004 - 2009 Cadillac SRX.

38.

Defendant GM LLC assumed liability for product liability claims against GM Corp. that
arose after the bankruptcy sale, as set forth in the Sale Agreement and rulings by the Bankruptcy
Court.  Plaintiff's strict liability claims against GM Corp. are properly asserted against GM LLC.

39.

The defects in the 2004 Cadillac SRX proximately caused Plaintiff's injuries and
damages.

40.

Defendants are liable for the injuries and damages Plaintiff suffered.

## COUNT TWO

### Negligence of General Motors LLC

41.

Plaintiff incorporates as if re-alleged herein in full paragraphs 1 through 40 of this
Complaint.

42.

GM Corp. owed a duty to the consuming public in general, and Plaintiff in particular, to
exercise reasonable care to design, test, manufacture, inspect, market, and distribute a product
free of unreasonable risk of harm to owners, users, and occupants.

43.

At the time GM Corp. manufactured, marketed, distributed, and sold the 2004 Cadillac
SRX, GM Corp. could reasonably have foreseen and did, in fact, foresee the occurrence of
rollover events such as the one described in this Complaint.

19

44.

GM Corp. breached its duty to exercise reasonable care as set forth in the paragraphs
above.

45.

The negligence of GM Corp. and AAB proximately caused Plaintiff's injuries and
damages.

46.

Defendant GM LLC assumed liability for product liability claims against GM Corp. that
arose after the bankruptcy sale, as set forth in the Sale Agreement and rulings by the Bankruptcy
Court.  Plaintiff's negligence claims against GM Corp. are properly asserted against GM LLC.

47.

Defendants are liable for the injuries and damages suffered by Plaintiff.

## COUNT THREE

### General Motors LLC's Failure to Warn

48.

Plaintiff incorporates as if re-alleged herein in full paragraphs 1 through 47 of this
Complaint.

49.

GM LLC did, in fact, foresee, based upon its own knowledge after the bankruptcy sale,
the occurrence of rollover events such as the one described in this Complaint.

50.

Based upon its own knowledge after the bankruptcy sale, GM LLC owed a duty to the consuming public in general, and to Plaintiff in particular, to warn of the dangers arising from the roof design of the 2004-2009 Cadillac SRX.

51.

GM LLC knew after the bankruptcy sale about the danger of the roof of the 2004-2009 Cadillac SRX, but chose not to warn the public or Plaintiff about that danger.  That failure was negligence.

52.

GM LLC's failure to warn proximately caused Plaintiff's injuries and damages.

53.

Defendant GM LLC is liable for the injuries and damages Plaintiff suffered.

## COUNT FOUR

### GM Corp.'s Failure to Warn

54.

Plaintiff incorporates as if re-alleged herein in full paragraphs 1 through 53 of this Complaint.

55.

GM Corp. did, in fact, foresee the occurrence of rollover events such as the one described in this Complaint.

56.

GM Corp. knew about the danger of the roof of the 2004-2009  Cadillac SRX, but chose not to warn the public or Plaintiff about that danger.

21

57.

GM Corp. owed a duty to the consuming public in general, and to Plaintiff in particular, to warn of the dangers arising from the roof design of the 2004-2009 Cadillac SRX. GM Corp.'s failure to warn was negligence.

58.

GM Corp.'s failure to warn proximately caused Plaintiff's injuries and damages.

59.

Defendant GM LLC assumed the liability for GM Corp.'s failure to warn, and is therefore liable for the injuries and damages Plaintiff suffered.

## COUNT FIVE

### Atlanta Auto Brokers, Inc.'s Failure to Warn

60.

Plaintiff incorporates as if re-alleged herein in full paragraphs 1 through 59 of this Complaint.

61.

Defendant AAB sold the subject 2004 Cadillac SRX to Plaintiff Veronica Fox on or about September 27, 2013, less than two months before the wreck that is the subject of this Complaint.

62.

AAB is in the business of buying, selling, and inspecting cars. It has been in that business for over 20 years. As a result of this extensive experience, AAB has specialized in and has superior knowledge about cars, car repair and parts, vehicle safety, and vehicle quality.

63.

Before selling the vehicle to Plaintiff, Defendant AAB undertook to inspect the vehicle

for Plaintiff's benefit.  It therefore had a duty to conduct its inspection non-negligently.

64.

Plaintiff originally sought to purchase a Chevrolet Suburban at AAB, but AAB's

inspection had revealed the Suburban needed repairs.  AAB therefore discouraged Plaintiff from

purchasing that vehicle.  AAB told Plaintiff that the Cadillac SRX had passed its inspection.

AAB therefore encouraged her to choose the Cadillac SRX instead of the Suburban.  Plaintiff

relied upon AAB's inspection and its statements about the inspection when she chose to purchase

the subject Cadillac SRX.

65.

AAB also detailed the car before selling it Plaintiff.  AAB's inspection and detail of the

vehicle either did or should have revealed the dangers of the Cadillac SRX roof, including but

not limited to the fact that the roof was made almost entirely of glass and was attached by

nothing but glue.  A lay person like Plaintiff would not know that the roof was made almost

entirely of glass because the rear panels of glass were concealed from the inside by the headliner.

Plaintiff, in fact, did not know that the roof was made almost entirely of glass until after the

wreck occurred.

66.

Defendant AAB encouraged Plaintiff to purchase the Cadillac SRX because of the

sunroof.  AAB repeatedly emphasized the sunroof as a selling feature because it extended to the

second row of seats.  AAB's statements about the sunroof were incomplete and misleading

because AAB did not inform Plaintiff that the glass actually extended almost the entire length of
the vehicle and because the structure of the roof was itself a deadly design defect.

67.

AAB provided safety warnings to Plaintiff about the use of the sunroof, advising her not
to allow passengers to "hang out of the sunroof." AAB's warnings were incomplete and
misleading because they suggested that the only danger associated with the roof was the danger
of passengers being injured as a result of a decision to "hang out of the sunroof."

68.

Defendant AAB knew or should have known that the Cadillac SRX roof would not
protect occupants in the event of a rollover wreck and therefore had a duty to warn Plaintiff
about the dangers created by the Cadillac SRX roof. AAB's actual or constructive knowledge
was a result of its superior knowledge of vehicle parts, quality, and safety, generally—and the
Cadillac SRX's parts, quality, and safety, specifically; its inspection of the vehicle; and its
knowledge about the Cadillac SRX roof and sunroof.

69.

Defendant AAB knew or reasonably should have known that the Cadillac SRX roof was
dangerous and could result in serious or catastrophic injury or death in foreseeable rollover
wrecks. Despite that knowledge, AAB failed to warn Plaintiff of the danger. That failure was
negligence.

70.

Plaintiff would not have purchased the Cadillac SRX had she been informed of and
known about the dangers of the roof.

24

71.

Defendant AAB's failure to warn proximately caused Plaintiff's injuries and damages.

72.

Defendant AAB is liable for the injuries and damages Plaintiff suffered.

### DAMAGES & PRAYER FOR RELIEF

73.

Plaintiff incorporates as if re-alleged herein in full paragraphs 1 through 72 of this
Complaint.

74.

As a direct result of the defective condition of the 2004 Cadillac SRX, Plaintiff Veronica
Fox has suffered severe and permanent personal injuries, including quadriplegia.

75.

Plaintiff Veronica Fox seeks damages from Defendants in an amount to be determined by
the enlightened conscience of the Court as fact-finder and as demonstrated by the evidence, for
all elements of compensatory damages allowed by Georgia law. Plaintiff's injuries are
permanent, and damages sought include the following:

a.      all components of the mental and physical pain and suffering Veronica Fox
        endured upon impact and up until the present time;

b.      all components of the mental and physical pain and suffering Veronica Fox will
        endure in the future;

c.      past and future loss of enjoyment of life; and

d.    all past and future economic losses, including lost income, medical bills, medical

expenses, other necessary expenses for the care and treatment of Veronica Fox,

including household services.

76.

WHEREFORE, Plaintiff prays for the following relief:

a.    That summons issue and service be perfected upon Defendants requiring them to

appear before this Court and answer this Complaint for Damages;

b.    That the Special Interrogatories referenced in ¶35(i) be addressed by the Court as

fact-finder;

b.    That final judgment be entered against Defendants;

c.    That Plaintiff Veronica Fox recovers all elements of compensatory damages,

including general and special damages, against Defendants;

e.    That all costs be cast against Defendants; and

f.    That Plaintiff has such other and further relief as this Court deems just and proper.

This 23rd day of June, 2016.

Respectfully submitted,

BUTLER WOOTEN & PEAK LLP

BY:    _____

JAMES E. BUTLER, JR.
Georgia Bar No.099625
TEDRA L. CANNELLA
Georgia Bar No. 881085
ROBERT H. SNYDER
Georgia Bar No. 404522

2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700

26

KENNETH S. NUGENT PC

BY: _____

WILLIAM G. HAMMILL
Georgia Bar No. 943334
*Signed with Express Permission*
*By Robert H. Snyder*

4227 Pleasant Hill Road
Building 11, Suite 300
Duluth, GA 30096
(404) 885-1983

**ATTORNEYS FOR PLAINTIFF**

# EXHIBIT  1

# GM July Sales Total 189,443; Highest Retail Sales in Ten Months; Chevy Retail Up 1 Percent

*2009-08-03*

 Print    Email    Add This

- *July month-over-month retail sales increase led by core brands: Chevrolet, GMC, Buick and Cadillac which were up 12 percent collectively compared with June*
- *Chevrolet led by the Camaro and the all-new Equinox had a year-over-year retail sales improvement*
- *All-new model pushes Chevrolet Equinox sales up 78 percent compared with July 2008*
- *CARS (Cash for Clunkers) program driving showroom traffic to GM's strong portfolio of fuel-efficient new vehicles; Chevrolet Aveo total sales up 124 percent, crossovers Equinox and HHR up 164 and 36 percent respectively, Cobalt up 38 percent. GMC Canyon and Chevrolet Colorado mid-pickup sales climb 38 percent compared with June*

**DETROIT -** General Motors dealers in the United States delivered 189,443 total vehicles in July, results in a month-over-month retail sales increase. The July total, when compared with a strong July last year and lower fleet sales this year, was down 19 percent compared with a year ago. Retail sales were down 9 percent while fleet sales declined 47 percent. However, when comparing GM's strong July retail sales with June, volume was up nearly 12,000 vehicles. Large pickup retail sales began to recover in July with a 16 percent increase compared with June, driving total GM truck retail sales improvements of 12 percent when compared with the prior month.

"Our performance is being driven by the outstanding products in our core Chevrolet, GMC, Cadillac and Buick brands. While still challenging, the market is firming and GM sales are still tracking ahead of what we projected in our reinvention plan," said Mark LaNeve, vice president, U.S. sales. "In July we are projecting our retail market share to exceed our year-ago performance. From great new products, like our Cadillac SRX and CTS Sport Wagon, Chevrolet Camaro and Equinox, to attractive financing and new leasing opportunities and to the Cash-for-Clunkers program that helps reduce the cost to buy a new vehicle - customers have unprecedented opportunities to get into a new GM car or truck. We anticipate an additional sales lift in August if Congress approves more funding for the wildly-popular Cash-For-Clunkers economic recovery program."

Compared with last July, GM overall sales declined 45,741 vehicles driven largely by a planned reduction in fleet sales of 30,423 vehicles (down 47 percent). This drop in fleet sales was a direct result of a strategic decision to tightly control production and inventories that better enable GM dealers to reduce their stock of vehicles to align with market demand. Retail sales of 155,569 vehicles were down 9 percent. GM total truck sales in July were down 18 percent, and car sales of 83,736 were off 21 percent compared with a year ago. However, when compared with a year ago, GM total crossover sales of 39,937 were up 6 percent, driven by the strong performance of Chevrolet Traverse which contributed more than 6,600 sales.

When compared with June's retail performance, there were several product highlights in GM's core brands to note:

- Chevrolet Aveo, Cobalt, Impala and Malibu contributed to a Chevrolet car retail increase of 8 percent. Chevrolet truck sales increased 27 percent, led by increases by Silverado, Suburban, Avalanche, Colorado, HHR and Equinox.
- GMC sales increased 8 percent, led by Sierra, Canyon and Yukon XL.
- Cadillac Escalade ESV sales increased 32 percent while Escalade sales increased 3 percent.

"Assuming the Cash-For-Clunkers program stays in place, we look to continue this positive momentum in August," LaNeve said. "We offer twice as many vehicles that qualify for the Cash-For-Clunkers program than any other manufacturer - vehicles such as Chevrolet Aveo, Cobalt, Malibu, HHR, Silverado and GMC Sierra. Additionally, we have the best selection of crossovers in the industry with Chevrolet Traverse, GMC Acadia, Buick Enclave, and the all-new GMC Terrain, Chevrolet Equinox and Cadillac SRX. Clearly, GM dealers have the cars and trucks that customers demand."

A total of 1,487 GM hybrid vehicles were delivered in the month. So far, in 2009, GM has delivered 9,836 hybrid vehicles.

Non-core brand sales declined when compared with June as Pontiac dipped 7 percent; Saturn was down 21 percent, and HUMMER and Saab declined 26 percent.

GM inventories dropped compared with a year ago, and dipped below the half-million mark as planned, to historically low levels. In July, GM dealers had an average 76 day supply of vehicles. At the end of July, about 466,000 vehicles were in stock, down about 281,000 vehicles (or 38 percent) compared with last year, and down approximately 20 percent compared with June. There were about 202,000 cars and 264,000 trucks (including crossovers) in inventory at the end of July.

**GM Certified Sales**

GM Certified Used Vehicles, Saturn Certified Pre-Owned Vehicles, Cadillac Certified Pre-Owned Vehicles, Saab Certified Pre-Owned Vehicles, and HUMMER Certified Pre-Owned Vehicles, combined sold 29,211 vehicles.

GM Certified Used Vehicles posted July sales of 25,441 vehicles, down 29 percent from July 2008. Saturn Certified Pre-Owned Vehicles sold 829 vehicles, down 29 percent. Cadillac Certified Pre-Owned Vehicles sold 2,383 vehicles, down 35 percent. Saab Certified Pre-Owned Vehicles sold 371 vehicles, down 52 percent. HUMMER Certified Pre-Owned Vehicles posted an increase with 187 vehicles sold, up 16 percent.

"We are confident in the new GM and are committed more than ever to sell our comprehensive line-up of cars, trucks, SUVs and crossovers, whether new or used. Our Certified Used Vehicles offer a worry-free purchasing experience - a tremendous value to our customers," LaNeve said. "GM's national network of dealers will continue to honor warranties on current and future General Motors Certified Used/Pre-Owned vehicles, which demonstrates the durability and reliability of our products. GM Certified offers wide-ranging and long-term warranties such as the 12-month/12,000 mile bumper-to-bumper warranty and the industry-leading 100,000 mile/five-year (whichever comes first) limited powertrain warranty on the largest selection of Certified Used vehicles in the industry."

**GM North America Reports July 2009 Production; Initial Q3 2009 Production Forecast at 535,000 Vehicles, a significant improvement from Q1 and Q2 2009 levels.**

In July, GM North America produced 102,000 vehicles (39,000 cars and 63,000 trucks). This is down 136,000 vehicles or 57 percent compared with July 2008 when the region produced 238,000 vehicles (116,000 cars and 122,000 trucks). (Production totals include joint venture production of 11,000 vehicles in July 2009 and 14,000 vehicles in July 2008.)

The region's 2009 third-quarter production forecast is initially set at 535,000 vehicles (210,000 cars and 325,000 trucks), which is down about 42 percent compared with a year ago. GM North America built 915,000 vehicles (436,000 cars and 479,000 trucks) in the third-quarter of 2008. However, Q3 2009 production volumes have substantially increased versus Q1 and Q2 2009 production volumes of 371,000 (up 44 percent) and 395,000 (up 35 percent), respectively.

**About General Motors:** General Motors Company, one of the world's largest automakers, traces its roots back to 1908. With its global headquarters in Detroit, GM employs 235,000 people in every major region of the world and does business in some 140 countries. GM and its strategic partners produce cars and trucks in 34 countries, and sell and service these vehicles through the following brands: Buick, Cadillac, Chevrolet, GMC, GM Daewoo, Holden, Opel, Vauxhall and Wuling. GM's largest national market is the United States, followed by China, Brazil, the United Kingdom, Canada, Russia and Germany. GM's OnStar subsidiary is the industry leader in vehicle safety, security and information services. General Motors Company acquired operations from General Motors Corporation on July 10, 2009, and references to prior periods in this and other press materials refer to operations of the old General Motors Corporation. More information on the new General Motors Company can be found at www.gm.com.

# # #

| *S/D Curr: 26 *S/D Prev: 26 | July | | | | (Calendar Year-to-Date) January - July | | |
|---|---|---|---|---|---|---|---|
| | 2009 | 2008 | % Chg Volume | %Chg per S/D | 2009 | 2008 | %Chg Volume |
| Vehicle Total | 189,443 | 235,184 | -19.4 | -19.4 | 1,143,799 | 1,840,126 | -37.8 |
| Car Total | 83,376 | 105,335 | -20.8 | -20.8 | 485,906 | 794,842 | -38.9 |
| Light Truck Total | 104,780 | 128,005 | -18.1 | -18.1 | 649,768 | 1,027,733 | -36.8 |
| Light Vehicle Total | 188,156 | 233,340 | -19.4 | -19.4 | 1,135,674 | 1,822,575 | -37.7 |
| Truck Total | 106,067 | 129,849 | -18.3 | -18.3 | 657,893 | 1,045,284 | -37.1 |

**GM Vehicle Deliveries by Marketing Division**

|  | 2009 | 2008 | %Chg Volume | %Chg per S/D | 2009 | 2008 | %Chg Volume |
|---|---|---|---|---|---|---|---|
| Buick Total | 7,099 | 10,013 | -29.1 | -29.1 | 54,322 | 81,176 | -33.1 |
| Cadillac Total | 6,171 | 13,022 | -52.6 | -52.6 | 54,754 | 101,731 | -46.2 |
| Chevrolet Total | 124,948 | 137,823 | -9.3 | -9.3 | 721,880 | 1,102,488 | -34.5 |
| GMC Total | 21,860 | 27,447 | -20.4 | -20.4 | 140,331 | 224,667 | -37.5 |
| HUMMER Total | 799 | 1,877 | -57.4 | -57.4 | 6,990 | 18,035 | -61.2 |
| Pontiac Total | 22,024 | 25,373 | -13.2 | -13.2 | 110,818 | 178,127 | -37.8 |
| Saab Total | 574 | 2,026 | -71.7 | -71.7 | 5,960 | 14,094 | -57.7 |
| Saturn Total | 5,968 | 17,603 | -66.1 | -66.1 | 48,744 | 119,808 | -59.3 |
| GM Vehicle Total | 189,443 | 235,184 | -19.4 | -19.4 | 1,143,799 | 1,840,126 | -37.8 |

**GM Car Deliveries by Marketing Division**

|  | 2009 | 2008 | %Chg Volume | %Chg per S/D | 2009 | 2008 | %Chg Volume |
|---|---|---|---|---|---|---|---|
| Buick Total | 3,302 | 6,086 | -45.7 | -45.7 | 29,603 | 54,911 | -46.1 |
| Cadillac Total | 3,711 | 8,630 | -57.0 | -57.0 | 36,754 | 67,267 | -45.4 |
| Chevrolet Total | 52,463 | 55,506 | -5.5 | -5.5 | 293,442 | 443,422 | -33.8 |
| Pontiac Total | 21,133 | 23,689 | -10.8 | -10.8 | 102,947 | 164,422 | -37.4 |

| | 2009 | 2008 | %Chg Volume | %Chg per S/D | 2009 | 2008 | %Chg Volume |
|---|---|---|---|---|---|---|---|
| Saab Total | 483 | 1,621 | -70.2 | -70.2 | 4,334 | 11,773 | -63.2 |
| Saturn Total | 2,284 | 9,803 | -76.7 | -76.7 | 18,826 | 53,047 | -64.5 |
| GM Car Total | 83,376 | 105,335 | -20.8 | -20.8 | 485,906 | 794,842 | -38.9 |

**GM Light Truck Deliveries by Marketing Division**

| | 2009 | 2008 | %Chg Volume | %Chg per S/D | 2009 | 2008 | %Chg Volume |
|---|---|---|---|---|---|---|---|
| Buick Total | 3,797 | 3,927 | -3.3 | -3.3 | 24,719 | 26,265 | -5.9 |
| Cadillac Total | 2,460 | 4,392 | -44.0 | -44.0 | 18,000 | 34,464 | -47.8 |
| Chevrolet Total | 72,054 | 81,572 | -11.7 | -11.7 | 424,693 | 652,196 | -34.9 |
| GMC Total | 21,004 | 26,348 | -20.3 | -20.3 | 135,951 | 213,986 | -36.5 |
| HUMMER Total | 799 | 1,877 | -57.4 | -57.4 | 6,990 | 18,035 | -61.2 |
| Pontiac Total | 891 | 1,684 | -47.1 | -47.1 | 7,871 | 13,705 | -42.6 |
| Saab Total | 91 | 405 | -77.5 | -77.5 | 1,626 | 2,321 | -29.9 |
| Saturn Total | 3,684 | 7,800 | -52.8 | -52.8 | 29,918 | 66,761 | -55.2 |
| GM Light Truck Total | 104,780 | 128,005 | -18.1 | -18.1 | 649,768 | 1,027,733 | -36.8 |

* Twenty-six selling days (S/D) for the July period this year and twenty-six for last year.

**Effective August 2007, GM includes GMC & Chevrolet dealer deliveries of commercial vehicles distributed by American Isuzu Motors, Inc.

| | July | (Calendar Year-to-Date) January - July |
|---|---|---|

| | 2009 | 2008 | % Chg Volume | %Chg per S/D | 2009 | 2008 | %Chg Volume |
|---|---|---|---|---|---|---|---|
| **Selling Days (S/D)** | 26 | 26 | | | 26 | 26 | |
| LaCrosse | 1,468 | 2,061 | -28.8 | -28.8 | 11,410 | 23,231 | -50.9 |
| Lucerne | 1,834 | 4,025 | -54.4 | -54.4 | 18,193 | 31,680 | -42.6 |
| Buick Total | 3,302 | 6,086 | -45.7 | -45.7 | 29,603 | 54,911 | -46.1 |
| CTS | 2,383 | 5,262 | -54.7 | -54.7 | 22,942 | 37,252 | -38.4 |
| DTS | 901 | 2,179 | -58.7 | -58.7 | 9,011 | 18,387 | -51.0 |
| STS | 358 | 1,079 | -66.8 | -66.8 | 4,272 | 10,790 | -60.4 |
| XLR | 69 | 110 | -37.3 | -37.3 | 529 | 838 | -36.9 |
| Cadillac Total | 3,711 | 8,630 | -57.0 | -57.0 | 36,754 | 67,267 | -45.4 |
| Aveo | 4,961 | 7,215 | -31.2 | -31.2 | 16,847 | 37,697 | -55.3 |
| Camaro | 7,113 | 0 | ***.* | ***.* | 22,510 | 0 | ***.* |
| Cobalt | 9,435 | 16,410 | -42.5 | -42.5 | 61,111 | 130,660 | -53.2 |
| Corvette | 966 | 1,870 | -48.3 | -48.3 | 8,464 | 16,824 | -49.7 |
| Impala | 14,649 | 13,368 | 9.6 | 9.6 | 93,336 | 152,320 | -38.7 |
| Malibu | 15,339 | 16,637 | -7.8 | -7.8 | 91,168 | 105,212 | -13.3 |
| Monte Carlo | 0 | 6 | ***.* | ***.* | 6 | 696 | -99.1 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SSR | 0 | 0 | ***.* | ***.* | 0 | 13 | ***.* |
| Chevrolet Total | 52,463 | 55,506 | -5.5 | -5.5 | 293,442 | 443,422 | -33.8 |
| G3 Wave | 1,100 | 0 | ***.* | ***.* | 2,315 | 0 | ***.* |
| G5 | 2,723 | 2,665 | 2.2 | 2.2 | 7,579 | 15,156 | -50.0 |
| G6 | 8,193 | 13,261 | -38.2 | -38.2 | 47,815 | 98,943 | -51.7 |
| G8 | 2,404 | 1,472 | 63.3 | 63.3 | 18,095 | 7,742 | 133.7 |
| GTO | 0 | 0 | ***.* | ***.* | 0 | 52 | ***.* |
| Grand Prix | 12 | 558 | -97.8 | -97.8 | 247 | 7,505 | -96.7 |
| Solstice | 655 | 1,232 | -46.8 | -46.8 | 3,339 | 8,113 | -58.8 |
| Vibe | 6,046 | 4,501 | 34.3 | 34.3 | 23,557 | 26,911 | -12.5 |
| Pontiac Total | 21,133 | 23,689 | -10.8 | -10.8 | 102,947 | 164,422 | -37.4 |
| 9-2X | 0 | 0 | ***.* | ***.* | 0 | 3 | ***.* |
| 9-3 | 421 | 1,394 | -69.8 | -69.8 | 3,601 | 10,025 | -64.1 |
| 9-5 | 62 | 227 | -72.7 | -72.7 | 733 | 1,745 | -58.0 |
| Saab Total | 483 | 1,621 | -70.2 | -70.2 | 4,334 | 11,773 | -63.2 |
| Astra | 558 | 1,555 | -64.1 | -64.1 | 4,768 | 5,920 | -19.5 |
| Aura | 1,415 | 7,202 | -80.4 | -80.4 | 12,076 | 40,140 | -69.9 |

| ION | 0 | 4 | ***.* | ***.* | 12 | 311 | -96.1 |
|---|---|---|---|---|---|---|---|
| Sky | 311 | 1,042 | -70.2 | -70.2 | 1,970 | 6,676 | -70.5 |
| Saturn Total | 2,284 | 9,803 | -76.7 | -76.7 | 18,826 | 53,047 | -64.5 |
| GM Car Total | 83,376 | 105,335 | -20.8 | -20.8 | 485,906 | 794,842 | -38.9 |

| | July | | | | (Calendar Year-to-Date) January - July | | |
|---|---|---|---|---|---|---|---|
| | 2009 | 2008 | % Chg Volume | %Chg per S/D | 2009 | 2008 | %Chg Volume |
| Selling Days (S/D) | 26 | 26 | | | 26 | 26 | |
| Enclave | 3,797 | 3,894 | -2.5 | -2.5 | 24,673 | 25,651 | -3.8 |
| Rainier | 0 | 3 | ***.* | ***.* | 4 | 108 | -96.3 |
| Rendezvous | 0 | 1 | ***.* | ***.* | 9 | 23 | -60.9 |
| Terraza | 0 | 29 | ***.* | ***.* | 33 | 483 | -93.2 |
| Buick Total | 3,797 | 3,927 | -3.3 | -3.3 | 24,719 | 26,265 | -5.9 |
| Escalade | 1,068 | 1,775 | -39.8 | -39.8 | 8,617 | 14,103 | -38.9 |
| Escalade ESV | 569 | 842 | -32.4 | -32.4 | 3,449 | 6,696 | -48.5 |
| Escalade EXT | 175 | 329 | -46.8 | -46.8 | 1,431 | 2,730 | -47.6 |
| SRX | 648 | 1,446 | -55.2 | -55.2 | 4,503 | 10,935 | -58.8 |
| Cadillac Total | 2,460 | 4,392 | -44.0 | -44.0 | 18,000 | 34,464 | -47.8 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Chevy C/T Series | 0 | 40 | ***.* | ***.* | 31 | 188 | -83.5 |
| Chevy W Series | 71 | 157 | -54.8 | -54.8 | 454 | 1,108 | -59.0 |
| Colorado | 3,911 | 4,989 | -21.6 | -21.6 | 20,819 | 37,340 | -44.2 |
| Equinox | 10,834 | 6,095 | 77.8 | 77.8 | 35,985 | 48,196 | -25.3 |
| Express Cutaway/G Cut | 1,269 | 877 | 44.7 | 44.7 | 6,919 | 7,591 | -8.9 |
| Express Panel/G Van | 3,199 | 3,657 | -12.5 | -12.5 | 17,401 | 30,467 | -42.9 |
| Express/G Sportvan | 254 | 982 | -74.1 | -74.1 | 7,006 | 8,733 | -19.8 |
| HHR | 8,409 | 11,518 | -27.0 | -27.0 | 39,133 | 62,336 | -37.2 |
| Kodiak 4/5 Series | 322 | 479 | -32.8 | -32.8 | 2,503 | 4,529 | -44.7 |
| Kodiak 6/7/8 Series | 38 | 69 | -44.9 | -44.9 | 757 | 1,045 | -27.6 |
| Suburban (Chevy) | 3,281 | 3,989 | -17.7 | -17.7 | 18,002 | 31,910 | -43.6 |
| Tahoe | 4,178 | 7,732 | -46.0 | -46.0 | 36,393 | 59,925 | -39.3 |
| TrailBlazer | 580 | 3,952 | -85.3 | -85.3 | 7,722 | 44,585 | -82.7 |
| Traverse | 6,690 | 0 | ***.* | ***.* | 47,369 | 0 | ***.* |
| Uplander | 111 | 2,258 | -95.1 | -95.1 | 1,527 | 35,969 | -95.8 |
| Avalanche | 1,721 | 2,534 | -32.1 | -32.1 | 8,851 | 20,835 | -57.5 |
| Silverado-C/K Pickup | 27,617 | 32,989 | -16.3 | -16.3 | 177,566 | 264,309 | -32.8 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| *Chevrolet Fullsize Pickups* | 29,338 | 35,523 | -17.4 | -17.4 | 186,417 | 285,144 | -34.6 |
| Chevrolet Total | 72,485 | 82,317 | -11.9 | -11.9 | 428,438 | 659,066 | -35.0 |
| Acadia | 4,974 | 5,397 | -7.8 | -7.8 | 32,334 | 43,666 | -26.0 |
| Canyon | 1,146 | 1,311 | -12.6 | -12.6 | 6,343 | 9,995 | -36.5 |
| Envoy | 410 | 1,070 | -61.7 | -61.7 | 4,055 | 14,029 | -71.1 |
| GMC C/T Series | 66 | 32 | 106.3 | 106.3 | 308 | 319 | -3.4 |
| GMC W Series | 360 | 278 | 29.5 | 29.5 | 1,138 | 1,716 | -33.7 |
| Savana Panel/G Classic | 473 | 710 | -33.4 | -33.4 | 3,264 | 5,931 | -45.0 |
| Savana Special/G Cut | 209 | 1,239 | -83.1 | -83.1 | 4,423 | 7,156 | -38.2 |
| Savana/Rally | 67 | 71 | -5.6 | -5.6 | 576 | 729 | -21.0 |
| Sierra | 10,465 | 11,596 | -9.8 | -9.8 | 60,532 | 94,770 | -36.1 |
| Terrain | 0 | 0 | ***.* | ***.* | 3 | 0 | ***.* |
| Topkick 4/5 Series | 286 | 525 | -45.5 | -45.5 | 1,685 | 6,209 | -72.9 |
| Topkick 6/7/8 Series | 144 | 264 | -45.5 | -45.5 | 1,249 | 2,437 | -48.7 |
| Yukon | 1,636 | 3,087 | -47.0 | -47.0 | 15,989 | 22,942 | -30.3 |
| Yukon XL | 1,624 | 1,867 | -13.0 | -13.0 | 8,432 | 14,768 | -42.9 |
| GMC Total | 21,860 | 27,447 | -20.4 | -20.4 | 140,331 | 224,667 | -37.5 |

| | | | | | | |
|---|---|---|---|---|---|---|
| HUMMER H1 | 0 | 1 | ***.* | ***.* | 0 | 13 | ***.* |
| HUMMER H2 | 133 | 454 | -70.7 | -70.7 | 1,153 | 4,207 | -72.6 |
| HUMMER H3 | 482 | 1,422 | -66.1 | -66.1 | 4,327 | 13,815 | -68.7 |
| HUMMER H3T | 184 | 0 | ***.* | ***.* | 1,510 | 0 | ***.* |
| HUMMER Total | 799 | 1,877 | -57.4 | -57.4 | 6,990 | 18,035 | -61.2 |
| Montana SV6 | 0 | 0 | ***.* | ***.* | 0 | 64 | ***.* |
| Torrent | 891 | 1,684 | -47.1 | -47.1 | 7,871 | 13,641 | -42.3 |
| Pontiac Total | 891 | 1,684 | -47.1 | -47.1 | 7,871 | 13,705 | -42.6 |
| 9-7X | 91 | 405 | -77.5 | -77.5 | 1,626 | 2,321 | -29.9 |
| Saab Total | 91 | 405 | -77.5 | -77.5 | 1,626 | 2,321 | -29.9 |
| Outlook | 926 | 2,368 | -60.9 | -60.9 | 9,163 | 15,428 | -40.6 |
| Relay | 0 | 6 | ***.* | ***.* | 12 | 155 | -92.3 |
| VUE | 2,758 | 5,426 | -49.2 | -49.2 | 20,743 | 51,178 | -59.5 |
| Saturn Total | 3,684 | 7,800 | -52.8 | -52.8 | 29,918 | 66,761 | -55.2 |
| GM Truck Total | 106,067 | 129,849 | -18.3 | -18.3 | 657,893 | 1,045,284 | -37.1 |

You must be logged in to view Media Contacts

Source: http://media.gm.com/media/us/en/gm/home.detail.html/content/Pages/news/us/en/2009/Aug/0808
_JulySales.html

# EXHIBIT  2

# A New GM Kicks Into High Gear at Product and Technology Event

*2009-08-11*

 Print   Email   Add This

- *Chevrolet Volt estimated city fuel economy is 230 mpg / 25 kilowatt hours per 100 miles (press release)*
- *Media and consumers preview 25 new models coming between now and 2011*
- *Cadillac confirms new entry-level luxury sport sedan is under development*
- *GM's four brands launch six all-new 2010 vehicles, including the industry's most fuel-efficient compact crossover SUVs and all-new Buick LaCrosse sedan*
- *GM launches 'The Lab' to gather and incorporate direct consumer feedback to possible future vehicle designs*
- *TRANSCRIPT: GM Product and Technology Showcase - Remarks by Fritz Henderson[.doc]*
- *Descargar en Formato Word en Espanol*

**DETROIT, Mich.** – A revitalized General Motors reintroduced itself today with an array of all-new cars, crossovers and trucks debuting now through 2011. GM also made a historic announcement: When the Chevrolet Volt extended-range electric vehicle rolls off the assembly line late next year, it will be the first mass-production automobile to achieve triple-digit fuel economy, with an expected 230 mpg in the city, or 25 kilowatt hours per 100 miles.

GM President and CEO Fritz Henderson also confirmed that Cadillac is developing an entry luxury sport sedan to capitalize on the growing market for smaller luxury sedans in the U.S. and globally. The rear- and optional all-wheel drive sedan will compete in the segment below the CTS, delivering outstanding performance and driving dynamics.

At GM's Design Center and Milford Proving Ground, GM previewed six all-new 2010 vehicles and a glimpse of what is being introduced through the end of 2011:

- Chevrolet alone is introducing 10 new models, including the 2011 Chevrolet Volt
- Buick and GMC are adding 10 new entries, including a Buick plug-in hybrid compact crossover in 2011
- Cadillac is introducing five new models through 2011

Henderson also announced that as part of GM's commitment to get closer to consumers, GM will use its FastLane blog to gather product research from both fans and critics. One pilot initiative, "The Lab," will involve GM's Advanced Design studio and allow users openly talk with designers about ideas and consumer-friendly technologies that were previously shared only in unbranded clinics.

In addition, Henderson said he and other executives plan to talk with consumers in other Web-based and in-person formats in the coming months. On Monday, the new GM executive committee, led by Henderson, showed off products and technologies to about 75 consumers at the GM Technical Center and the Milford Proving Ground.

"The key to restarting this company lies with GM's customers, cars and culture," Henderson said. "With four focused brands, we are committed to exceeding our current customers' expectations and giving consumers plenty of reasons to choose a Chevy, Buick, GMC or Cadillac car or truck."

**Chevrolet Volt fuel economy achieves triple digits**

Using development testing based on a draft U.S. Environmental Protection Agency (EPA) procedure for plug-in electric vehicles, the Chevrolet Volt is expected to achieve 230 miles per gallon or better in city driving (25 kW hours per 100 miles). The Volt, scheduled to begin production late next year as a 2011 model, can travel up to 40 miles on electricity from a single battery charge and can extend its overall range to more than 300 miles with its flex-fuel engine-generator.

The EPA test procedure for plug-in electric vehicles, which is still being finalized, assumes a single charge each day. According to U.S. Department of Transportation data (http://tinyurl.com/U-S-DOTStudy), nearly eight of 10 Americans commute fewer than 40 miles a day.

"From the data we've seen, most drivers could operate purely on grid electricity in a Chevy Volt," Henderson said. "A car that gets more than 100 miles per gallon is a significant step in the reinvention of the auto industry and GM is and will continue to be a leader in that reinvention."

**Cadillac confirms entry luxury sedan**

With the all-new SRX and CTS Sport Wagon coming to market this month, the brand plans to pursue an even bigger piece of the luxury sport sedan market. Cadillac is developing a sport sedan below the acclaimed CTS that will deliver on the price of entry in this highly competitive segment of the luxury market – driving dynamics. With high-tech engines, rear-wheel drive and optional all-wheel drive, the new sedan will take on the best in the segment.

"We are determined to repeat what CTS has already achieved in design, quality, driving dynamics, performance and fuel economy to grow our presence in this high-volume and highly competitive segment," Henderson said.

**Greater customer engagement**

While GM has organized customer clinics and collected feedback for many years, the Web provides even greater opportunities to connect with consumers. Henderson said executives will use a combination of in-person meetings and online technology to better interact with them.

"Our customers are the reason we're here. It's critical to have their voices help shape our products, and their experience with them," Henderson said. "Their feedback helps us learn and evolve so we can continuously improve our cars and trucks, and our customer relationships."

In addition to "Tell Fritz," a feature on www.gmreinvention.com, in which customers can provide feedback, GM will use its popular FastLane blog (fastlane.gmblogs.com) to launch "The Lab," a microsite featuring future projects by GM's Advanced Design team.

Interacting directly with designers, consumers can share input on designs and technologies being considered for future projects. Those who provide detailed demographic information may be invited to participate at a deeper level in future sessions.

**2010 launch vehicles by Buick, Cadillac, Chevrolet and GMC**

GM's four core brands are launching six all-new vehicles for 2010. Here's a brand-by-brand look at what's new:

**Buick:** The all-new **Buick LaCrosse** continues a brand renaissance begun by the Enclave luxury crossover. The LaCrosse is a completely redesigned luxury sedan that offers a sculpted exterior and luxurious cabin; advanced, intelligent personal technologies and safety features; and a choice of two fuel-saving, direct injected V-6 engines. A 2.4L four-cylinder engine joins the lineup later.

Last week, Buick announced it will introduce a compact crossover SUV next year expected to achieve more than 30 mpg on the highway, followed in 2011 by a plug-in hybrid.

**Cadillac:** GM's luxury brand launches the **SRX** crossover and the **CTS Sport Wagon** into the luxury market, featuring Cadillac's signature design and technology.

The new SRX is designed to make more inroads into the previously conservative luxury crossover category. A new, 3.0L direct injected V-6 engine is standard, and a new, 2.8L turbocharged V-6 is optional. Both feature greater fuel economy and lower emissions.

The CTS Sport Wagon is a progressive take on the classic wagon body style that delivers significant functionality and fuel efficiency, including an estimated 28 mpg highway. Essentially the same size as the acclaimed CTS sport sedan on the outside, it nearly doubles the cargo carrying capacity, with 25 cubic feet (720 liters) of space behind the rear seats and 53.4 cubic feet (1,523 liters) with the rear seat folded.

**Chevrolet:** The new **Chevrolet Camaro** returns after a seven-year hiatus. Its combination of efficient performance, which delivers up to 29 mpg highway and heritage-inspired design exemplify Chevrolet's commitment to great design and fuel-efficiency.

The all-new **Chevrolet Equinox** blends distinctive design and outstanding roominess with class-leading efficiency. Chevrolet expects nearly two-thirds of customers will choose the efficient 2.4L engine – standard on all models – that delivers best-in-class EPA-rated 32 mpg highway (FWD models).

**GMC:** The all-new **GMC Terrain** crossover SUV offers outstanding fuel economy along with the capability, engineering excellence and refinement that have defined GMC for more than a century. Like other GMC vehicles, the Terrain's design is characterized by elements that suggest muscularity, with a prominent front end and squared-off edges.

General Motors Company, one of the world's largest automakers, traces its roots back to 1908. With its global headquarters in Detroit, GM employs 235,000 people in every major region of the world and does business in some 140 countries. GM and its strategic partners produce cars and trucks in 34 countries, and sell and service these vehicles through the following brands: Buick, Cadillac, Chevrolet, GMC, GM Daewoo, Holden, Opel, Vauxhall and Wuling. GM's largest national market is the United States, followed by China, Brazil, the United Kingdom, Canada, Russia and Germany. GM's OnStar subsidiary is the industry leader in vehicle safety, security and information services. General Motors Company acquired operations from General Motors Corporation on July 10, 2009, and references to prior periods in this and other

press materials refer to operations of the old General Motors Corporation. More information on the new General Motors Company can be found at www.gm.com.

Source:
http://media.gm.com/media/us/en/gm/home.detail.html/content/Pages/news/us/en/2009/Aug/0811_NewGMintro.html

# EXHIBIT 3


Insurance Institute for Highway Safety
Highway Loss Data Institute

# About our tests

IIHS evaluates a vehicle's crashworthiness with the help of five tests: moderate overlap front, small overlap front, side, roof strength and head restraints & seats. For front crash prevention ratings, the Institute conducts low- and moderate-speed track tests of vehicles with automatic braking systems. IIHS also conducts evaluations of headlight systems and of the child seat attachment hardware known as LATCH. The descriptions below explain how each test is conducted and how the results translate into **ratings**.

Thousands of people are killed each year in rollovers. The best way to prevent these deaths is to keep vehicles from rolling over in the first place. Electronic stability control is significantly reducing rollovers, especially fatal single-vehicle ones. When vehicles do roll, side curtain airbags help protect the people inside, and belt use is essential. However, for these safety technologies to be most effective, the roof must be able to maintain the occupant survival space when it hits the ground during a rollover. Stronger roofs crush less, reducing the risk that people will be injured by contact with the roof itself. Stronger roofs also can prevent occupants, especially those who aren't using safety belts, from being ejected through windows, windshields or doors that have broken or opened because the roof has deformed.

In the test, the strength of the roof is determined by pushing a metal plate against one side of it at a slow but constant speed. The force applied relative to the vehicle's weight is known as the strength-to-weight ratio. This ratio varies as the test progresses. The peak strength-to-weight ratio recorded at any time before the roof is crushed 5 inches is the key measurement of roof strength.

A good rating requires a strength-to-weight ratio of at least 4. In other words, the roof must withstand a force of at least 4 times the vehicle's weight before the plate crushes the roof by 5 inches. For an acceptable rating, the minimum required strength-to-weight ratio is 3.25. For a marginal rating, it is 2.5. Anything lower than that is poor.

The figure below shows sample results for two vehicles — one rated good and one rated poor. Peak force for Vehicle A is 7.26. Since that number is higher than 4, the vehicle is rated good. Peak force for Vehicle B is 2.31. Since that number is lower than 2.5, the vehicle is rated poor.



The following video shows how the roof strength test is conducted. In this test of the 2010 Buick LaCrosse, the peak force is 19,571 pounds for a strength-to-weight ratio of 4.90 and a good rating. The playback speed of this video has been increased. The plate normally crushes at a rate of about 1/8 inch per second.

In every test, the roof is crushed 5 inches. What varies — and can't be seen in a video — is the force used by the machine to achieve that degree of crush. To demonstrate how roof strength can vary and what those differences mean for people inside a vehicle during a rollover, IIHS conducted a demonstration in which two vehicles with different roof strength ratings were subjected to identical force. This video shows what happened when the 2009 Volkswagen Tiguan, rated good for roof strength, and the 2008 Kia Sportage, rated poor, were each subjected to a crush force of 15,000 pounds.

©1996-2016, Insurance Institute for Highway Safety, Highway Loss Data Institute | www.iihs.org

## CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel of record with a copy of the foregoing pleading by depositing it in the United States Mail with adequate postage affixed thereon and addressed as follows:

Kevin J. Malloy, Esq.
Bowman and Brooke LLP
1441 Main Street, Suite 1200
Columbia, SC 29201

Thomas M. Klein, Esq.
C. Megan Fischer, Esq.
Bowman and Brooke LLP
2901 N. Central Avenue, Suite 1600
Phoenix, AZ 85012

C. Bradford Marsh, Esq.
Swift, Currie, McGhee & Hiers, LLP
1355 Peachtree St., N.E., Suite 300
Atlanta, GA 30309

Carrie L. Christie, Esq.
Robert H. Burke, Esq.
Rutherford & Christie LLP
225 Peachtree Street NE
South Tower, Suite 1750
Atlanta, GA 30303

William T. Casey, Jr., Esq.
Erica L. Morton, Esq.
Hicks, Casey & Morton, P.C.
136 North Fairground Street, N.E.
Marietta, GA 30060-1533

This 23rd day of June, 2016.

BUTLER WOOTEN & PEAK LLP

BY: _____

JAMES E. BUTLER, JR.
Georgia Bar No. 099625
TEDRA L. CANNELLA
Georgia Bar No. 881085
ROBERT H. SNYDER
Georgia Bar No. 404522