# Exhibit  B

FILED

CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LOUISIANA 2015 AUG -3 P 4: 29

CIVIL
DISTRICT COURT

| | |
|---|---|
| JOSHUA BARBOT and | ) |
| FAITH CHOPP | ) |
|     Plaintiffs | ) |
| | ) |
|     versus | ) |
| | ) |
| GENERAL MOTORS LLC, | ) |
|     And | ) |
| TRW AUTOMOTIVE | ) |
| HOLDINGS CORP.; | ) |
|     And | ) |
| TRW AUTOMOTIVE INC.; | ) |
|     And | ) |
| TRW AUTOMOTIVE U.S. LLC. | ) |
|     And | ) |
| TRW VEHICLE SAFETY | ) |
| SYSTEMS INC.; | ) |
|     And | ) |
| DARNELL PETTIES | ) |
|     Defendants. | ) |

**FILED:**                               **CLERK:**

---

## PLAINTIFFS' PETITION FOR DAMAGES

**NOW INTO COURT**, through undersigned counsel, come Plaintiffs, Joshua Barbot and Faith

Chopp, both of whom are a resident and domiciliary of Slidell, St. Tammany Parish, State of Louisiana,

who in support of this, their Petition for Damages, aver and state as follows:

### PARTIES

1.      Plaintiff Joshua Barbot is a Louisiana resident of the full age of majority who resides in

Slidell, St. Tammany Parish, State of Louisiana.

2.      Plaintiff Faith Chopp is a Louisiana resident of the full age of majority who resides in

Slidell, St. Tammany Parish, State of Louisiana.

3.      Defendant, General Motors LLC, is a citizen of Delaware and Michigan, and does

business in all fifty states, including the State of Louisiana. General Motors LLC's principal place of

business is in Detroit, Michigan.

4.      Defendant General Motors LLC does business in the State of Louisiana with its principal

business establishment in Louisiana being located at 320 Somerulos Street, Baton Rouge, Louisiana,

70802.

5.      Defendant General Motors LLC is a limited liability corporation with one member:

General Motors Holding, LLC. General Motors Holding, LLC is a citizen of Delaware and Michigan,

and is a holding company and direct parent of General Motors LLC. General Motors Holding, LLC is a

limited liability corporation with one member: General Motors Company. General Motors Company is a citizen of Delaware and Michigan and is publicly traded.

6.      General Motors Corporation was a Delaware corporation with its headquarters in Detroit, Michigan. General Motors Corporation, through its various entities, designed, manufactured, marketed, distributed, and sold Chevrolet, Pontiac, Impala, and other brand automobiles in Louisiana, elsewhere in the United States, and worldwide.

7.      In June of 2009, General Motors Corporation ("Old GM") filed for bankruptcy. On July 9, 2009, the United States Bankruptcy Court approved the sale of substantially all of Old GM's assets pursuant to a Master Sales and Purchase Agreement ("Agreement"). The Agreement became effective on July 10, 2009. The Agreement approved the sale of Old GM to Defendant General Motors LLC (hereinafter "Defendant," "GM," or "New GM").

8.      The Agreement defines Defendant's "Purchased Assets" as:

(xiv) all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

(xv) all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities; . . .

AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT at Section 2.2.

9.      Along with the Purchased Assets, GM also expressly took on a range of liabilities. "Liabilities" is defined in the Agreement as "any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise."

10.     Among many others, the Liabilities assumed by GM under the Agreement include:

(vii) (A) all Liabilities arising under express written warranties of Sellers [i.e., old GM] that are specifically identified as warranties and delivered in connection with sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser [i.e., new GM] prior to or after the Closing and (B) all obligations under Lemon Laws; . . .

(ix) all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively,

2

"Product Liabilities"), which arise directly out of accidents, incidents, or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance; . . .[1]

(xi) all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing; . . .

11.    GM also assumed responsibility for compliance with a wide range of laws and other regulations, including:

(a)    From and after the Closing, Purchaser [Defendant GM] shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [Old GM].

(b) From and after the Closing, Purchaser [Defendant GM] shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [Old GM] . . . (ii) Lemon Laws.

12.    Moreover, the Bankruptcy Court order approving the Agreement made clear that Defendant GM assumed "the warranty and recall obligations of both Old GM and [Defendant GM]."

13.    Pursuant to the Agreement and other orders of the Bankruptcy Court, Defendant GM emerged out of bankruptcy and continued the business of Old GM with many, if not most, of Old GM's employees and, on information and belief, with most of the same senior-level management, officers, and directors.

14.    The allegations pertaining to Old GM above are included for purposes of background and context, and to set forth the scope of Defendant GM's liabilities and responsibilities under the Agreement. This Complaint does not assert any causes of action against Old GM; all causes of action and attributions of liability are directed solely against Defendant General Motors LLC.

15.    Defendant, General Motors LLC (herein "GM"), is a Michigan for-profit corporation duly licensed to and actively conducting business in the State of Louisiana at all times relevant to this Complaint. GM's registered agent for process in Louisiana is CORPORATION SERVICE COMPANY, 320 Somerulos Street, Baton Rouge, Louisiana, 70802.

16.    Defendant, TRW Automotive Holdings Corp., is a Delaware corporation with its principal place of business at 12001 Tech Center Drive, Livonia, Michigan 48150. TRW Automotive Holdings Corp. is the parent corporation and wholly owns TRW Automotive Inc. and TRW Vehicle Safety Systems Inc.  TRW Automotive Holdings Corp. is without a registered agent for service of process in Louisiana.

---

[1] Pursuant to an order of the bankruptcy court, this particular category of assumed liabilities is "regardless of when the product was purchased."

3

17.    Defendant, TRW Automotive Inc., is a Delaware corporation with its principal place of business also at 12001 Tech Center Drive, Livonia, Michigan 48150. TRW Automotive Inc. is a wholly owned subsidiary of TRW Automotive Holdings Corp. TRW Automotive Inc. is without a registered agent for service of process in Louisiana.

18.    Defendant, TRW Automotive U.S. LLC, is a Delaware corporation with its principal place of business at 12001 Tech Center Drive, #3N, Livonia, MI 48150. TRW Automotive U.S. LLC is a wholly owned subsidiary of TRW Automotive Holdings Corp. TRW Automotive U.S. LLC is without a registered agent for service of process in Louisiana.

19.    Defendant, TRW Vehicle Safety Systems Inc., is a Delaware corporation with its principal place of business at 4505 West 26 Mile Road, Washington, MI 48094. TRW Vehicle Safety Systems Inc. is without a registered agent for service of process in Louisiana.

20.    Hereafter the various TRW entities may be referred to collectively and/or individually as the "TRW Defendants."

21.    Defendant Darnell Petties, is a resident of Orleans Parish, State of Louisiana, residing at 8241 Curran Boulevard, New Orleans, Louisiana, 70126.

## TYPE OF ACTION

22.    This action arises out of Plaintiff, Joshua Barbot suffering extensive and severe physical and mental injuries when the vehicle he was driving, namely a 2003 Chevrolet Malibu (VIN 1G1ND52J23M541375) (the "Malibu" or "Defective Vehicle"), owned by Plaintiff, Faith Chopp, was struck by Defendant Petties and also malfunctioned, on August 4, 2014, resulting in a six (6) vehicle collision, including.

    a)    Pain and suffering, both physical and mental/emotional: past, present and future;

    b)    Bodily disability: past, present and future;

    c)    Loss of use/function of parts of body: past, present and future;

    d)    Impairment of psychological functioning: past, present and future;

    e)    Loss of enjoyment of life: past, present and future;

    f)    Medical expenses: past, present and future;

    g)    Lost wages: past, present and future;

    h)    Disability from working to earn an income: past, present and future;

    i)    Destruction of earning capacity: past, present and future;

4

j)      Disability from engaging in recreation: past, present and future;

k)      All other damage which shall be proven at trial.

23.    This action also arises out of Plaintiff, Faith Chopp's, damages resulting from the physical damage to, and malfunctioning of, the Malibu, which include:

a.      Property damages;

b.      Rental car expenses;

c.      Deductible; and,

d.      All other damage which shall be proven at trial.

### Defective Seatbelts

24.    The seat belt used for driver's seating position in the Malibu was defective and unreasonably dangerous because of the propensity and/or tendency for the buckle's components to separate or otherwise fail during a reasonably foreseeable crash.

25.    As a result of the failure of the driver's seating position's seat belt buckle's components failing and/or separating during the incident, Plaintiff Joshua Barbot sustained permanent and severe injuries.

26.    Plaintiff Joshua Barbot's damages and permanent injuries could have been prevented if a properly designed and manufactured seat belt had been utilized for the driver's seating position in the Malibu.

27.    Plaintiff Faith Chopp's damages could have been prevented if a properly designed and manufactured seat belt had been utilized for the driver's seating position in the Malibu.

### Ignition Switch Defects

28.    Since 2003, GM has sold millions of vehicles throughout the United States and worldwide that have a safety defect in which the vehicle's ignition switch can unintentionally move from the "run" position to the "accessory" or "off" position, resulting in a loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to deploy.

29.    GM began installing these ignition switch systems in models from 2003 through at least 2011 and possibly later. GM promised that these new systems would operate safely and reliably. This promise turned out to be false in several material respects. In reality, GM concealed and did not fix a serious quality and safety problem plaguing its vehicles.

30.    On information and belief, from 2003 to the present, GM received reports of crashes and injuries that put GM on notice of the serious safety issues presented by its ignition switch system.

5

31.   Despite notice of the defect in its vehicles, GM did not disclose to consumers that its vehicle – which GM for years had advertised as "safe" and "reliable" – were in fact not as safe or reliable.

32.   GM's CEO, Mary Barra has admitted in a video message that: "Something went wrong with our process in this instance, and terrible things happened."

33.   This case arises, in part, from GM's breach of its obligations and duties, including GM's failure to disclose that, as a result of defective ignition switch design, at least 1.4 million GM vehicles had the propensity to shut down during normal driving conditions and created an extreme and unreasonable risk of accident, serious bodily harm, and death.

34.   GM's predecessor, General Motors Corporation ("Old GM") also violated these rules by designing and marketing vehicles with defective ignition switches, and then by failing to disclose that defect even after it became aware that the ignition switch defect was causing fatal accidents. In addition to the liability arising out of the statutory obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defects.

35.   The Defective Vehicle, including the subject Malibu, are defective and dangerous for multiple reasons, including the following (collectively, the "ignition switch defects"):

a.   The ignition switches can inadvertently shut off the engine and vehicle electrical system during normal driving conditions;

b.   When the engine and the electrical system shut down, the power steering and power brakes also shut down, creating a serious risk of accident;

c.   When the electrical system shuts down, the vehicle's airbags are disabled, creating a serious risk of serious bodily harm or death if an accident occurs.

36.   The ignition switch defects make the Defective Vehicle, including the subject Malibu, unreasonably dangerous. Because of the defects, the Defective Vehicle, including the subject Malibu, are likely to be involved in accidents, and, if accidents occur, there is an unreasonable and extreme risk of serious bodily harm or death to the vehicle's occupants.

37.   The ignition switch defects present a significant and unreasonable safety risk exposing Defective Vehicle owners and their passengers to a risk of serious injury or death.

38.   For many years, GM has known of the ignition switch defects that exist in millions of Defective Vehicle, including the subject Malibu, sold in the United State. But, to protect its profits and maximize sales, GM concealed the defects and their tragic consequences and allowed unsuspecting

6

vehicle owners to continue driving highly dangerous vehicles.

39.     Plaintiffs have been damaged by GM's misrepresentations, concealment and non-disclosure of the ignition switch defects in the Defective Vehicle, including the subject Malibu, which is now a highly dangerous vehicle whose value has greatly diminished because of GM's failure to timely disclose the serious defect.

40.     Plaintiffs were also damaged by the acts and omissions of Old GM for which GM is liable through successor liability because the Defective Vehicle, including the subject Malibu purchased by Plaintiff Faith Chopp are worth less than they would have been without the ignition switch defects.

41.     Plaintiff Faith Chopp also paid more for the Defective Vehicle than she would have had she known of the ignition defects or she would not have purchased the Defective Vehicle at all.

42.     Plaintiff Joshua Barbot's damages and permanent injuries could have been prevented if a proper ignition switch had been utilized in the Malibu.

43.     Plaintiff Faith Chopp's damages could have been prevented if a proper ignition switch had been utilized in the Malibu.

44.     Defendant General Motors LLC ("GM") is a foreign limited liability company formed under the laws of Delaware and is a resident of the State of Michigan with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. GM was incorporated in 2009 and on July 10, 2009 acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("Old GM.") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

45.     Among the liabilities and obligations expressly retained by GM after the bankruptcy are the following:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

46.     GM also expressly assumed:

> All Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

47.     Because GM Acquired and operated Old GM and ran it as a continuing business

7

enterprise, and because GM was aware from its inception of the ignition switch defects in the Defective

Vehicle, GM is liable through successor liability for the deceptive and unfair acts and omissions of Old

GM, as alleged in this Complaint.

48.    Given the importance that a vehicle and its electrical operating systems remain

operational during ordinary driving conditions, it is imperative that a vehicle manufacturer ensure that

its vehicles remain operational from the time the driver starts the vehicle until the driver intentionally

shuts down the vehicle. With respect to the Defective Vehicle, GM has failed to do so.

49.    In the Defective Vehicle, the ignition switch defects can cause the car's engine and

electrical system to shut off, disabling the power steering and power brakes and causing non-

deployment of the vehicle's airbags in the event of a crash.

50.    The Defective Vehicle are, therefore, unreasonably prone to be involved in accidents,

and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and

passengers of the Defective Vehicle, as well as other vehicle operators and pedestrians.

**GM Knew of the Ignition Switch Defects for Years, but Concealed the Defects**

51.    Alarmingly, both Old GM and GM knew of the deadly ignition switch defects and their

dangerous consequences for many years, but concealed their knowledge from Defective Vehicle

owners.

52.    For example, on July 29, 2005, Amber Marie Rose, age 16, died after her 2005

Chevrolet Cobalt crashed and the airbag failed to deploy. Ms. Rose's death was the first of the

hundreds deaths and injuries attributable to the ignition switch defects. Ms. Rose's death was an early

warning in what would become a decade-long failure by Old GM and GM to address the ignition

switch problems.

53.    Another incident involved sixteen year-old Megan Phillips. Ms. Phillips was driving a

2005 Chevrolet Cobalt that crashed in Wisconsin in 2006, killing two of her teenage friends when the

car left the road and hit a clump of trees. NHTSA investigators found that the key had moved from the "run" to

the "accessory" position, turning off the engine and disabling the vehicle's airbags before impact.

According to Ms. Phillips, the families of her deceased friends blamed her and refused to speak with

her; only after the recall was finally announced did they began communicating. As she stated, "I don't

understand why [GM] would wait 10 years to say something. And I want to understand it but I never will."

54.    Rather than publicly admitting the dangerous safety defects in its vehicles, GM attempted

8

to attribute these and other incidents to "driver error." Every year from 2005 to 2012, first Old GM and then GM received reports of deaths in Cobalts involving steering and/or airbag failures, including:

2005: 26 Cobalt Death and Injury Incidents, including I death citing Airbag as component involved.

2006: 69 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved and 4 deaths citing Unknown component.

2007: 87 Cobalt Death and Injury Incidents, including 3 deaths citing Airbag as component involved.

2008: 106 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved and 2 deaths citing Unknown component.

2009: 133 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved, 1 death citing Service Brake as component involved, 1 death citing Steering as component involved, and 2 deaths citing Unknown component.

2010: 400 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 12 deaths citing steering as component involved, and 1 death citing Unknown component.

2011: 187 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 2 deaths citing Steering as component involved, and 1 Unknown component.

2012: 157 Cobalt Death and Injury Incidents, including 5 deaths citing Airbag as component involved, and 4 deaths citing Steering as component involved.

55.    GM now admits that Old GM learned of the ignition switch defects as early as 2001. During the pre-production development of the Saturn Ion, Old GM engineers learned that the ignition could inadvertently move from the "Run" position to the "Accessory" or "Off' position. Old GM claimed that a switch design change "had resolved the problem."

56.    2003, an internal report documented an instance in which the service technician observed a stall while driving. The service technician noted that the weight of several keys on the key ring had worn out the ignition switch. It was replaced and the matter was closed.

57.    Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue. According to the chronology provided to NHTSA by GM, engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."

58.    According to GM, the PRTS engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions." But after considering cost and the amount of time it would take to develop a fix, Old GM did nothing.

9

59.    As soon the 2005 Cobalt hit the market, Old GM almost immediately started getting complaints about sudden loss of power incidents, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column."

60.    Rather than disclosing the true nature of the defects and correcting them, Old GM gave customers who brought in their vehicle complaining about the issue "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key ring from moving up and down in the slot. "[T]he previous key ring" was "replaced with a smaller" one; this change was supposedly able to keep the keys from hanging as low as they had in the past. According to GM's records, Old GM dealers provided key inserts to 474 customers who brought their vehicles into dealers for service. Yet there was no recall. And, not surprisingly, Old GM continued to get complaints.

61.    In 2006, Old GM approved a design change for the Cobalt's ignition switch supplied by Delphi. The new design included "the use of a new detent plunger and spring that increased torque force in the ignition switch, but the new design was not produced until the 2007 model year.

62.    As alleged above, the airbags in Ms. Rose's 2005 Cobalt did not deploy. Data retrieved from her vehicle's diagnostic system indicated that the ignition was in the "accessory" position. Old GM investigated and tracked similar incidents.

63.    For the next six years, GM continued to get complaints and continued to investigate frontal crashes in which the airbags did not deploy.

64.    In 2014, after numerous assessments and facing increasing scrutiny of its conduct and the defects in its vehicles, GM finally announced a recall for the Cobalt and GS vehicles.

65.    After analysis by GM's Field Performance Review Committee and the Executive Action Decision Committee ("EFADC"), the EFADC finally ordered a recall of *some* of the Defective Vehicle on January 31, 2014.

66.    According to GM, "the dealers are to replace the ignition switch," presumably with one with sufficient torque to prevent the inadvertent shut down of the ignition, power steering, power brakes, and airbags.

67.    In a video message addressed to GM employees on March 17, 2014, C.E.O. Mary Barra admitted that the Company had made mistakes and needed to change its processes.

68.    According to Ms. Barra, "Something went terribly wrong in our processes in this

10

instance, and terrible things happened." Barra continued to promise, "We will be better because of this tragic situation if we seize this opportunity."

69.    GM now faces an investigation by NHTSA, hearings in both the U.S. House and Senate, and a probe by the Department of Justice.

70.    On information and belief, in marketing and advertising materials, Old GM consistently promoted the Defective Vehicle as safe and reliable.

71.    For example, one Cobalt ad promised that "Side curtain airbags coupled with OnStar makes every journey the safest possible to assure that you and your occupants will stay safe at all times."

72.    An ad for the 2006 Solstice promises that the vehicle "[b]rings power and defines performance."

73.    A 2003 television spot for the Saturn vehicle closed with the tagline "Specifically engineered for whatever is next." Another 2003 spot closed with the tagline "Saturn. People first."

74.    A 2001 print ad touting the launch of the Saturn focused on safety:

Need is where you begin. In cars, it's about things like reliability, durability and, of course, safety. That's where we started when developing our new line of cars. And it wasn't until we were satisfied that we added things....

75.    Old GM made these representations to boost vehicle sales and maximize profits while knowing that the ignition switches in the Defective Vehicle were defective.

76.    Throughout the relevant period, Old GM possessed vastly superior knowledge and information to that of consumers – if not exclusive information – about the design and :function of the ignition switches in the Defective Vehicle and the existence of the defects in those vehicles.

77.    Old GM never informed consumers about the ignition switch defects.

78.    The ignition switch defects have caused damage to Plaintiffs

79.    A vehicle purchased, leased or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased or retained without the defect. Additionally as set forth herein Plaintiffs and their Decedents have sustained personal injury and death upon information and belief as a result of the allegations contained herein.

80.    A vehicle purchased, leased or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

11

81.    Purchasers and lessees paid more for the Defective Vehicle, through a higher purchase price or higher lease payments, than they would have had the ignition switch defects been disclosed. Plaintiffs overpaid for their Defective Vehicle because of the concealed ignition switch defects. Plaintiffs did not receive the benefit of the bargain.

82.    Plaintiffs are stuck with unsafe vehicles that are now worth less than they would have been but for GM's failure to disclose the ignition switch defects.

83.    GM admits to at least twelve deaths resulting from accidents linked to the ignition switch defects in the Defective Vehicle. However, Plaintiffs believe that the actual number is much higher, and that there may have been hundreds of deaths and injuries attributable to the ignitions switch defects.

84.    If Old GM or GM had timely disclosed the ignition switch defects vehicles would now be worth more.

### Allegations of Successor Liability

85.    As discussed above, GM is liable for its non-disclosure of the ignition switch defects from the date of its formation on July 10, 2009.

86.    GM also expressly assumed liability for Lemon Law claims in the Master Sale and Purchase Agreement of June 26, 2009.

87.    GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicle because it has continued the business enterprise of Old GM, for the following reasons:

- GM admits that it knew of the ignition system defects from the very date of its formation;
- GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as Old GM;
- GM retained the bulk of the employees of Old GM;
- GM acquired owned and leased real property of Old GM, including all machinery, equipment, tools, information technology, product inventory, and intellectual property;
- GM acquired the contracts, books, and records of Old GM; and
- GM acquired all goodwill and other intangible personal property of Old DGM.

### Tolling Of The Prescriptive Period

88.    All applicable prescriptive periods and/or statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein. Plaintiffs did not discover, and did not know of facts that would have caused a reasonable person to suspect,

12

that Old GM and GM did not report information within their knowledge to federal authorities

(NHTSA) or consumers, nor would a reasonable and diligent investigation have disclosed that Old

GM and GM had information in their possession about the existence and dangerousness of the

defect and opted to conceal that information.

89.    Indeed, Old GM instructed its service shops to provide Defective Vehicle owners with

a new key ring if they complained about unintended shut down, rather than admit what Old GM

knew — that the ignition switches were dangerously defective and warranted replacement with a

properly designed and built ignition system.

90.    Old GM and GM were, and GM remains, under a continuing duty to disclose to

NHTSA and Plaintiffs the true character, quality, and nature of the Defective Vehicle; that this

defect is based on dangerous, inadequate, and defective design and/or substandard materials; and

that it will require repair; poses a severe safety concern, and diminishes the value of the Defective

Vehicle.

91.    Because of the active concealment by Old GM and GM, any and all  limitations periods

otherwise applicable to Plaintiffs claims have been tolled.

92.    The Defective Vehicle include at least the following models: Chevrolet Cobalts (2003-10

model years); Pontiac GS (2007-10 model years); Saturn Ions (2003-07 model years); Chevrolet HHR

(2006-11 model years); Pontiac Solstice (2006-10 model years); and Saturn Sky (2007-10 model years).

93.    The harm and defects foisted upon Plaintiffs include:

- the Defective Vehicle suffer from ignition switch defects;
- Old GM and GM concealed the defects;
- Old GM and GM misrepresented that the Defective Vehicle were safe;
- Old GM and GM engaged in fraudulent concealment;
- Old GM and GM engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Vehicle were designed, manufactured, and sold with defective ignition switches;
- The alleged conduct by GM violated laws as Plaintiffs allege;
- Old GM's and GM's unlawful, unfair and/or deceptive practices harmed Plaintiffs;
- To what extent, GM has successor liability for the acts and omissions of Old GM.

## JURISDICTION

94.    This Court is alleged to have jurisdiction over General Motors LLC because its registered

agent will be served with civil process within the State of Louisiana.  Furthermore, GM has substantial

and continuing contacts with the State of Louisiana sufficient for this Court to exercise general personal

jurisdiction over GM, because, among other things, (a) GM regularly sells its vehicles in Louisiana, (b)

GM has sales/leasing facilities in Louisiana, (c) GM maintains business relationships with automobile

13

dealers in Louisiana, (d) GM regularly advertises its products in Louisiana, (e) GM services its vehicles in Louisiana, (f) GM finances the purchase of its vehicles in Louisiana, (g) GM maintains business offices in Louisiana, (h) GM transports its vehicles on Louisiana highways, and (i) GM has a registered agent in Louisiana. Additionally, Plaintiffs' claims arise out of GM's contacts with the State of Louisiana. In particular, GM's commission of tortious acts in Louisiana, GM's making a contract in Louisiana, and its transaction of business in Louisiana gave rise to Plaintiffs' claims.

95.    This Court is alleged to have jurisdiction over TRW Vehicle Safety Systems Inc. ("TRW VSSI") because, on information and belief, TRW VSSI has substantial and continuing contacts with the State of Louisiana sufficient for this Court to exercise general personal jurisdiction over it, because, among other things, (a) TRW VSSI regularly sells its seat belt products in Louisiana or to entities that sell products with TRW VSSI's seat belts in Louisiana, (b) TRW VSSI regularly advertises its seat belt products in Louisiana, and (c) TRW VSSI distributes its seat belt products in Louisiana. Additionally, Plaintiffs' claims arise out of TRW VSSI's contacts with the State of Louisiana. In particular, TRW VSSI's commission of tortious acts/omissions in Louisiana and its transaction of business in Louisiana gave rise to Plaintiffs' claims.

96.    This Court is alleged to have Court has jurisdiction over TRW Automotive Inc., TRW Automotive U.S. LLC and TRW Automotive Holdings Corp. because each has substantial and continuing contacts with the State of Louisiana sufficient for this Court to exercise general personal jurisdiction over it, because, on information and belief, among other things, (a) they regularly sell products in Louisiana, (b) they regularly advertise their products in Louisiana, and (c) they distribute their products in Louisiana Additionally, Plaintiffs' claims arise out of their contacts with the State of Louisiana. In particular, the commission of tortious acts/omissions by TRW Automotive Inc., TRW Automotive U.S. LLC and TRW Automotive Holdings Corp. in Louisiana and their transaction of business in Louisiana gave rise to Plaintiffs' claims.

97.    This Court is alleged to have jurisdiction over Darnell Petties because he is a resident of the State of Louisiana and he can be served with civil process within the State of Louisiana.

## VENUE

98.    Venue is alleged to be proper in this Court pursuant to La. C Civ. Proc. Arts. 74 and 76, because the occurrence that is the subject of this petition took place in Orleans Parish, Louisiana.

## GENERAL ALLEGATIONS

99.    On August 4, 2014, at approximately 10:45 p.m., Joshua Barbot was driving the Malibu

14

eastbound on Interstate 10 near mile-post 244 in Orleans Parish, Louisiana.

100.   At the same time and in the same general vicinity, Darnell Petties was driving a 2011

Chevrolet Impala (VIN 2G1WG5EK5B1275439) (the "Impala").

101.   Darnell Petties drove the Impala behind the Malibu and followed the Malibu too closely.

102.   On information and belief, the Malibu was impacted by as many as three vehicles,

including the Impala, after which it, the Malibu, came to rest on the right shoulder of I-10

103.   Plaintiff Joshua Barbot was driving the Malibu at the time of the accident.

104.   Plaintiff Joshua Barbot was wearing his seat belt before the Malibu left the roadway;

however, the seat belt malfunctioned and its housing cracked.

105.   Plaintiff Joshua Barbot was damage and injured because the seat belt he was wearing

broke.

106.   Plaintiff Joshua Barbot was also damage and injured because the ignition switch in the

Malibu was defective.

107.   Plaintiff Faith Chopp was also damaged because the seat belt Barbot was wearing broke

and/or because the ignition switch was defective.

108.   The Malibu's driver's side seat belt and its ignition switch were both defective and

unreasonably dangerous at the time they left Defendant GM's control.

109.   The Malibu's driver's side seat belt was defective and unreasonably dangerous at the

time it left TRW's control.

110.   The Malibu's driver's side seat belt was in the same or substantially the same condition

as it was when it left Defendant GM's control.

111.   The Malibu's driver's side seat belt was in the same or substantially the same condition

as it was when it left the TRW Defendants' control.

112.   GM selected and installed the ignition switch and also the seat belt system found in the

driver's side seat of the Malibu.

113.   The TRW Defendants manufactured the seat belt system found in the driver's side seat of

the Malibu.

114.   The Malibu's driver's side seat belt and also the ignition switch were defective and

unreasonably dangerous at the time they left Defendant GM's control.

115.   GM sold the Malibu in the course of its business.

116.   When GM sold the Malibu with the faulty ignition switch and the seat belt system found

in the driver's side seat, GM knew or should have known the uses for which the ignition switch and seat

belt system found in the driver's side seat of the Malibu were purchased.

117. The TRW Defendants sold the seat belt system found in the driver's side seat of the

Malibu in the course of its business.

118. When the TRW Defendants sold the seat belt system found in the driver's side seat of the

Malibu, the TRW Defendants knew or should have known the uses for which the Malibu and seat belt

system found in the driver's side seat of the Malibu were purchased.

119. GM and the TRW Defendants failed to use ordinary care to provide Plaintiffs and the

Malibu's other users with an adequate warning of the dangers associated with the faulty ignition switch

and also the driver's side seat belt system in the Malibu, namely, that the ignition switch was defective

and prone to turning off the vehicle and disabling its safety features without warning or proper

justification, and also that seat belts buckle's components had the propensity to separate during a

reasonably foreseeable crash sequence, thereby causing an occupant to become seriously and

permanently injured.

### COUNT I
### STRICT LIABILITY
### GENERAL MOTORS

**COME NOW the Plaintiffs**, by and through their attorneys, and for Count I of their cause of

action against GM state as follows:

120. Plaintiffs hereby incorporate by reference paragraphs 1 through 119 above as if they were

fully set forth herein.

121. At all times relevant hereto, GM was actively engaged in the business of designing,

manufacturing, and selling automobiles such as the Malibu.

122. Defendant GM is strictly liable to Plaintiffs because it manufactured, sold, warranted and

placed on the market and into the stream of commerce an unreasonably dangerous and defective product

knowing that it would reach consumers without substantial change in the condition in which it was sold

and that, at the time of the sale, the Malibu was defective and in an unreasonably dangerous condition.

123. Defendant GM sold the Malibu in the normal course of its business.

124. Plaintiffs allege that the Malibu was unreasonably dangerous in that the ignition switch

and driver's side seat belt systems of the Malibu were defective. The Malibu was not reasonably

operational nor crashworthy.

125. The ignition switch and the seat belt systems found in the driver's side seat of the Malibu

16

were defective and unreasonably dangerous when they left GM's control because the ignition switch had the propensity to fail without cause of warning, and the seat belt buckle's components had a propensity to separate during reasonably foreseeable crashes causing its occupant to receive enhanced injuries in the crash.

126.    The ignition switch and the seat belt system found in the driver's side seat of the Malibu was defective and unreasonably dangerous when it left GM's control in that, among other things, there is an unreasonable likelihood that the car will stop functioning correctly, and that the occupant restraint system's buckle hardware will permit or allow the belt system to separate during foreseeable collisions occurring in the real world.

127.    On August 4, 2014, the ignition switch and the seat belt system found in the driver's side seat of the Malibu were in the same or substantially the same condition as they were when they left GM's control.

128.    Plaintiffs allege that GM knowingly failed to adequately test the Malibu model before and during the design, production and sale of the vehicles to the public and/or knowingly placed the dangerously designed vehicle model in the stream of commerce.

129.    GM also rendered the Malibu unreasonably dangerous by failing to adequately warn consumers about the hazards of driving its vehicle equipped with a defective ignition switch and seat belt system.

130.    As a direct and proximate result of GM's conduct, Plaintiff Joshua Barbot sustained damages and permanent injuries.

131.    As a direct and proximate result of GM's conduct, Plaintiff Faith Chopp sustained damages.

132.    Defendant GM's conduct showed complete indifference to or conscious disregard for the safety of others, justifying the imposition of punitive damages in an amount sufficient to punish Defendant GM and to deter Defendant GM and others from like conduct.

**WHEREFORE, Plaintiffs pray for judgment** against Defendant GM, joint and severally with other Defendants, under Count I in an amount which this Court deems fair and reasonable; for costs of this action to be assessed against the Defendant; for pre and post-judgment interest as may be allowed by law; for punitive damages in an amount sufficient to punish Defendant and to deter it and others from similar conduct; and for such further and proper relief as this Court deems just and proper.

## COUNT II
## NEGLIGENT MANUFACTURE, DESIGN AND FAILURE TO WARN
## GENERAL MOTORS

**COME NOW the Plaintiffs**, by and through their attorneys, and for Count II of their cause of action against Defendant GM state as follows:

133.    Plaintiffs hereby incorporate by reference paragraphs 1 through 132 above as if they were fully set forth herein.

134.    At all times relevant to this Petition, GM owed to the general public, including the Plaintiffs, the duty to design, manufacture and sell vehicles that were not defective and/or unreasonably dangerous during a foreseeable crash.

135.    GM breached this duty by manufacturing and marketing the Malibu in a defective and/or unreasonably dangerous condition, in that the ignition switch, Occupant Containment System, and the seat belt system, were defective and unreasonably dangerous, as more fully set forth in earlier paragraphs. Additionally, the Malibu was not safely operational nor was it crashworthy.

136.    The Malibu was unreasonably dangerous and defective for normal, foreseeable and reasonably anticipated use by and in the presence of the general public because of its unsafe design, defective construction and lack of safety features as set forth in earlier paragraphs.

137.    GM negligently, recklessly and willfully designed, manufactured and distributed the Malibu which was dangerous and defective as more fully described in earlier paragraphs.

138.    Plaintiffs allege that GM knowingly failed to adequately test the Malibu model before and during the design, production and sale of the vehicles to the public and/or knowingly placed the unreasonably dangerous vehicles in the stream of commerce.

139.    Plaintiffs allege that GM knowingly sold and continued to sell the Malibu model to the public when the testing it performed established that the vehicles were inherently weak and defectively designed.

140.    As a direct and proximate result of the conduct of GM, Plaintiff Joshua Barbot sustained damages and severe and permanent injuries.

141.    As a direct and proximate result of the conduct of GM, Plaintiff Faith Chopp sustained damages.

142.    By reason of the above described negligence of Defendant GM, Defendant GM is liable to Plaintiffs for all damages.

143.    Defendant GM's conduct showed complete indifference to or conscious disregard for the

18

safety of others, justifying the imposition of punitive damages in an amount sufficient to punish

Defendant GM and to deter Defendant GM and others from like conduct.

**WHEREFORE, Plaintiffs pray for judgment** against Defendant GM, joint and severally with

other Defendants, under Count II in an amount which this Court deems fair and reasonable; for costs of

this action to be assessed against the Defendant; for pre and post-judgment interest as may be allowed

by law; for punitive damages in an amount sufficient to punish Defendant and to deter it and others from

similar conduct; and for such further and proper relief as this Court deems just and proper.

### COUNT III
### BREACH OF EXPRESS AND IMPLIED WARRANTIES
### GENERAL MOTORS

**COME NOW the Plaintiffs,** by and through their attorneys, and for Count III of their Petition

for Damages against Defendant GM state as follows:

144.    Plaintiffs hereby incorporate by reference paragraphs 1 through 143 above as if they were

fully set forth herein.

145.    Defendant GM warranted, both expressly and impliedly through their advertisements and

sales representatives, that the Malibu was of merchantable quality, fit for the ordinary purpose for which

it was sold.

146.    Plaintiffs were foreseeable users of the Malibu and the Malibu was being used in a

reasonably anticipated and/or intended manner at the time of the accident.

147.    Plaintiffs relied on Defendant GM to provide a merchantable and suitable vehicle fit for

the purpose for which it was intended.

148.    Because of the defective and unreasonably dangerous design and/or manufacture of the

Malibu, more fully described above, it could be involved in a foreseeable crash sequence and fail to

keep an occupant from suffering injuries in a foreseeable, reasonably anticipated crash, or otherwise

sustaining damages.    Additionally, because the Occupant Containment System was ineffective in

retaining occupants, the Malibu was neither merchantable nor fit for ordinary purposes.

149.    The Malibu was neither of merchantable quality nor reasonably fit to be used for the

purpose for which it was intended, including the foreseeable accident alleged herein, and was

unmerchantable.

150.    The defective and/or unreasonably dangerous condition constituted a breach of Defendant

GM's express and implied warranties.

151.    As a direct and proximate result of Defendants GM's breach of the express and implied

19

warranties of the Malibu, Plaintiffs sustained injuries and damages as more particularly described herein.

152.    Defendant GM is liable for breaching the express and implied warranties, the ensuing injuries to Plaintiffs and the damages sustained by Plaintiffs in an amount to be determined at trial.

**WHEREFORE, Plaintiffs pray for judgment** against Defendant GM, joint and severally with other Defendants, under Count III in an amount which this Court deems fair and reasonable; for costs of this action to be assessed against the Defendant; for pre and post-judgment interest as may be allowed by law; for punitive damages in an amount sufficient to punish Defendant and to deter it and others from similar conduct; and for such further and proper relief as this Court deems just and proper.

**COUNT IV**
**FAILURE TO WARN**
**GENERAL MOTORS**

**COME NOW the Plaintiffs,** by and through their attorneys, and for Count IV of their Petition for Damages against Defendant GM state as follows:

153.    Plaintiffs hereby incorporate by reference paragraphs 1 through 152 above as if they were fully set forth herein.

154.    As more fully described above, GM designed and/or manufactured a defective and unreasonably dangerous vehicle.

155.    The Malibu was further rendered unreasonably dangerous because an adequate warning about the vehicle was not provided to consumers, including the Plaintiffs, either at or after the time that the Malibu left the control of GM.

156.    The Malibu possessed characteristics, as more fully described above, which caused damage to Plaintiffs and GM failed to use reasonable care to provide an adequate warning of such characteristics and its danger to users and handlers of the Malibu.

157.    At the time of the incident that is the subject of this petition, the Malibu was dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics.

158.    Users or handlers of the Malibu, including Plaintiffs, did not know and should not have been expected to know of the characteristics of the Malibu that had the potential to cause enhanced injuries in a foreseeable crash.

159.    As a direct and proximate result of Defendant GM's failure to warn of the dangers of the

20

Malibu, as more fully described above, Plaintiff Joshua Barbot sustained injuries and damages as more particularly described herein.

160.    As a direct and proximate result of Defendant GM's failure to warn of the dangers of the Malibu, as more fully described above, Plaintiff Faith Chopp sustained damages as more particularly described herein.

Defendant GM is liable for its failure to warn, the ensuing injuries to Plaintiffs and the damages sustained by Plaintiffs in an amount to be determined at trial.

**WHEREFORE, Plaintiffs pray for judgment** against Defendant GM, joint and severally with other Defendants, under Count IV in an amount which this Court deems fair and reasonable; for costs of this action to be assessed against the Defendant; for pre and post-judgment interest as may be allowed by law; for punitive damages in an amount sufficient to punish Defendant and to deter it and others from similar conduct; and for such further and proper relief as this Court deems just and proper.

**COUNT V**
**STRICT LIABILITY**
**TRW DEFENDANTS**

**COME NOW the Plaintiffs**, by and through their attorneys, and for Count V of their Petition for Damages against the TRW Defendants state as follows:

161.    Plaintiffs hereby incorporate by reference paragraphs 1 through 160 above as if they were fully set forth herein.

162.    TRW Defendants designed and/or co-designed, manufactured and sold as new the driver's side seat belt system installed in the Malibu.

163.    The driver's side seat belt system of the Malibu was defective and unreasonably dangerous when sold as new.

164.    The driver's side seat belt system of the Malibu was in the same or substantially the same condition on March 9, 2013 as it was when it was sold as new.

165.    The driver's side seat belt system of the Malibu was defective and unreasonably dangerous in that the components of the buckle would separate under foreseeable circumstances such as those of the instant case.

166.    TRW Defendants knew or should have known that the components of the driver's side seat belt system of the Malibu had a propensity to separate under foreseeable circumstances.

167.    TRW Defendants knew or should have known that a seat belt system with components with a propensity to separate under foreseeable circumstances posed a grave danger to human lives.

21

168.   TRW Defendants knew or should have known that a seat belt system which failed under foreseeable circumstances posed a grave danger to human lives.

169.   The driver's side seat belt system of the Malibu was also defective and unreasonably dangerous because of TRW Defendants' failure to adequately inform purchasers and/or users of the belt system about the belt system's components' propensity to become separated during foreseeable circumstances such as those in the instant case.

170.   The defects in the driver's side seat belt system of the Malibu were a proximate cause of Plaintiff Joshua Barbot's damages and severe injuries.

171.   The defects in the driver's side seat belt system of the Malibu were a proximate cause of Plaintiff, Faith Chopp's damages.

172.   TRW Defendants' conduct showed complete indifference to or conscious disregard for the safety of others, justifying the imposition of punitive damages in an amount sufficient to punish TRW Defendants and to deter TRW Defendants and others from like conduct.

**WHEREFORE, Plaintiffs pray for judgment** against TRW Defendants, joint and severally with other Defendants, under Count V in an amount which this Court deems fair and reasonable; for costs of this action to be assessed against the Defendant; for pre and post-judgment interest as may be allowed by law; for punitive damages in an amount sufficient to punish Defendant and to deter it and others from similar conduct; and for such further and proper relief as this Court deems just and proper.

**COUNT VI**
**NEGLIGENT DESIGN/MANUFACTURE**
**TRW DEFENDANTS**

**COME NOW the Plaintiffs,** by and through their attorneys, and for Count VI of their Petition for Damages against TRW Defendants state as follows:

173.   Plaintiffs hereby incorporate by reference paragraphs 1 through 172 above as if they were fully set forth herein.

174.   TRW Defendants designed and manufactured the driver's side seat belt system used in the Malibu.

175.   TRW Defendants had a duty to make a seat belt system that was not defective and unreasonably dangerous.

176.   The driver's side seat belt system in the Malibu was defective and unreasonably dangerous for all the reasons stated above.

22

177.   TRW Defendants failed to use ordinary care to design, manufacture, properly test and/or adequately warn of the risk of harm from the defective and unreasonably dangerous driver's side seat belt system in the Malibu.

178.   As a direct and proximate result of such negligent acts and omissions, Plaintiff Joshua Barbot sustained injuries and damages as more particularly described herein..

179.   As a direct and proximate result of such negligent acts and omissions, Plaintiff Faith Chopp sustained damages.

180.   TRW Defendants' conduct showed complete indifference to or conscious disregard for the safety of others, justifying the imposition of punitive damages in an amount sufficient to punish TRW Defendants and to deter TRW Defendants and others from like conduct.

WHEREFORE, Plaintiffs pray for judgment against TRW Defendants, joint and severally with other Defendants, under Count VI in an amount which this Court deems fair and reasonable; for costs of this action to be assessed against the Defendant; for pre and post-judgment interest as may be allowed by law; for punitive damages in an amount sufficient to punish Defendant and to deter it and others from similar conduct; and for such further and proper relief as this Court deems just and proper.

### COUNT VII
### STRICT LIABILITY AND NEGLIENT FAILURE TO WARN
### TRW DEFENDANTS

COME NOW, the Plaintiffs, by and through their attorneys, and for Count VII of their Petition for Damages against TRW Defendants state as follows:

181.   Plaintiffs hereby incorporate by reference paragraphs 1 through 180 above as if they were fully set forth herein.

182.   As more fully described above, TRW Defendants designed and/or manufactured a defective and unreasonably dangerous driver's side seat belt system for the Malibu.

183.   The driver's side seat belt system in the Malibu was further rendered unreasonably dangerous because an adequate warning about the driver's side seat belt system's dangerous propensities was not provided to consumers, including the Plaintiffs.

184.   TRW Defendants failed to use reasonable care when they did not provide an adequate warning with respect to the dangerous propensities associated with the driver's side seat belt system used in the Malibu.

185.   At the time of the incident that is the subject of this petition, the Malibu's driver's side seat belt system was dangerous to an extent beyond that which would be contemplated by the ordinary

23

user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics.

186.   Users or handlers of the Malibu's driver's side seat belt system, including Plaintiffs, did not know and should not have been expected to know of the characteristics of the Malibu's driver's side seat belt system that had the potential to cause enhanced injuries in a foreseeable crash.

187.   As a direct and proximate result of TRW Defendants' failure to warn of the dangers in the Malibu, as more fully described above, Plaintiff Joshua Barbot sustained injuries and damages.

188.   As a direct and proximate result of TRW Defendants' failure to warn of the dangers in the Malibu, as more fully described above, Plaintiff, Faith Chopp, sustained damages.

189.   TRW Defendants are liable for their failure to warn about the ensuing injuries and damages to both Plaintiffs in an amount to be determined at trial.

190.   TRW Defendants' conduct showed complete indifference to or conscious disregard for the safety of others, justifying the imposition of punitive damages in an amount sufficient to punish TRW Defendants and to deter TRW Defendants and others from like conduct.

**WHEREFORE, Plaintiffs pray for judgment** against TRW Defendants, joint and severally with other Defendants, under Count VII in an amount which this Court deems fair and reasonable; for costs of this action to be assessed against the Defendant; for pre and post-judgment interest as may be allowed by law; for punitive damages in an amount sufficient to punish Defendant and to deter it and others from similar conduct; and for such further and proper relief as this Court deems just and proper.

**COUNT VIII**
**BREACH OF EXPRESS AND IMPLIED WARRANTIES**
**TRW DEFENDANTS**

**COME NOW the Plaintiffs,** by and through their attorneys, and for Count VIII of their Petition for Damages against TRW Defendants state as follows:

191.   Plaintiffs hereby incorporate by reference paragraphs 1 through 190 above as if they were fully set forth herein.

192.   The TRW Defendants warranted, both expressly and impliedly through their advertisements and sales representatives, that the Malibu's seat belt systems were of merchantable quality, fit for the ordinary purpose for which they were sold.

193.   Plaintiffs were foreseeable users of the Malibu's seat belt systems and the Malibu's seat belt systems were being used in a reasonably anticipated and/or intended manner at the time of the

24

accident.

194.   Plaintiffs relied on the TRW Defendants to provide merchantable and suitable seat belt systems fit for the purpose for which the seat belt systems were intended.

195.   Because of the defective and unreasonably dangerous design and/or manufacture of the Malibu's seat belt systems, more fully described above, the seat belt systems could be involved in a foreseeable crash sequence and fail to keep an occupant safe in a foreseeable, reasonably anticipated crash, or otherwise sustaining injury.   Additionally, because the seat belt systems were ineffective in retaining occupants, the seat belt systems were neither merchantable nor fit for ordinary purposes.

196.   As a direct, proximate and foreseeable result of the defective and unreasonably dangerous design and/or manufacture of the Malibu's seat belt systems, the seat belt systems failed to prevent the damages and injuries sustained by Plaintiff Joshua Barbot and the damages sustained by Plaintiff, Faith Chopp.

197.   The Malibu's seat belt systems were neither of merchantable quality nor reasonably fit to be used for the purpose for which they was intended, including the foreseeable accident alleged herein, and were unmerchantable.

198.   The defective and/or unreasonably dangerous condition constituted a breach of the TRW Defendants' express and implied warranties.

199.   As a direct and proximate result of the TRW Defendants' breach of the express and implied warranties of the Malibu, Plaintiffs sustained injuries and damages as more particularly described herein.

200.   The TRW Defendants are liable for breaching the express and implied warranties, the ensuing injuries to Plaintiffs and the damages sustained by Plaintiffs in an amount to be determined at trial.

**WHEREFORE, Plaintiffs pray for judgment** against the TRW Defendants, joint and severally with other Defendants, under Count VIII in an amount which this Court deems fair and reasonable; for costs of this action to be assessed against the Defendants; for pre and post-judgment interest as may be allowed by law; for punitive damages in an amount sufficient to punish Defendants and to deter them and others from similar conduct; and for such further and proper relief as this Court deems just and proper.

25

## COUNT IX
## NEGLIGENCE
## DARNELL PETTIES

201.    Plaintiffs hereby incorporate by reference paragraphs 1 through 200 above as if they were fully set forth herein.

202.    Defendant Darnell Petties is guilty of the following acts and/or omissions of common law negligence:

 a.    Negligently failing to use the degree of care and caution in the operation of the vehicle as was required of a reasonable and prudent person under the same or similar circumstances existing at the time and place of the aforementioned crash sequence;

 b.    Negligently failing to use reasonable care to avoid injury to others while operating a motor vehicle;

 c.    Negligently following too close to the Malibu;

 d.    Failure to stop;

 e.    Failure to pay attention to other vehicles;

 f.    Careless operation of a motor vehicle;

 g.    Failure to do what should have been done and failing to see what should have been seen in order to have avoided the occurrence of the accident made the basis of these proceedings;

 g)    Failure to maintain proper control of the vehicle; and,

 h)    Any and all other acts of negligence and liability which shall be shown at the time of trial.

**WHEREFORE, Plaintiffs pray for judgment** against Defendant Darnell Petties, joint and severally with other Defendants, under Count IX in an amount which this Court deems fair and reasonable; for costs of this action to be assessed against the Defendant; for pre and post-judgment interest as may be allowed by law; and for such further and proper relief as this Court deems just and proper.

## COUNT X
## PUNITIVE DAMAGES
## GENERAL MOTORS and TRW DEFENDANTS

**COME NOW the Plaintiffs,** by and through their attorneys, and for Count X of their Petition for Damages against Defendant GM, TRW Defendants and Defendant Pilkington state as follows:

26

203.    Plaintiffs hereby incorporate by reference paragraphs 1 through 202 above as if they were fully set forth herein.

204.    Defendants GM's and TRW Defendants' conduct showed complete indifference to or conscious disregard for the safety of others, justifying the imposition of punitive damages in an amount sufficient to punish those Defendants and to deter those Defendants and others from like conduct.

**WHEREFORE,** Plaintiffs pray for punitive damages against Defendant GM and TRW Defendants under Count X in an amount sufficient to punish Defendants and to deter Defendants and others from like conduct.

Respectfully submitted,

REGAN LAW, PLC

Martin E. Regan, Jr. (LA Bar # 11153)
John O. Pieksen, Jr. (LA Bar # 21023)
2125 St.Charles Avenue
New Orleans, LA 70130
Work: (504) 522-7260; Fax: (504) 522-7507
*Attorneys for PLAINTIFFS*

**SHERIFF PLEASE SERVE:**

1)      Defendant, General Motors LLC,
through its registered agent for process in Louisiana,
CORPORATION SERVICE COMPANY,
320 Somerulos Street, Baton Rouge, Louisiana, 70802;

And

2)  Defendant Darnell Petties, personally at
8241 Curran Boulevard, New Orleans, Louisiana, 70126.

Plaintiffs will effect Long-Arm Service on the TRW Defendants

27

A TRUE COPY

DEPUTY CLERK, CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA.