UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
|  | . | Case No. 09-50026-mg |
| IN RE: | . | Chapter 11 |
|  | . |  |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| et al., f/k/a GENERAL | . |  |
| MOTORS CORP., et al, | . | One Bowling Green |
|  | . | New York, NY 10004 |
| Debtors. | . |  |
|  | . | Monday, June 27, 2016 |
| . . . . . . . . . . . . . . . | . | 11:05 a.m. |

TRANSCRIPT OF (CC: DOC# 13634,13648) MOTION TO AUTHORIZE NOTICE
OF MOTION BY GENERAL MOTORS LLC PURSUANT TO 11 U.S.C. 105
AND 363 TO ENFORCE THE BANKRUPTCY COURT'S JULY 5, 2009 SALE
ORDER AND INJUNCTION, AND THE RULINGS IN CONNECTION THEREWITH
(VERONICA ALAINE FOX, CLAUDIA LEMUS, TAMMIE CHAPMAN AND
CONSTANCE HAYNES-TIBBETTS)
**BEFORE THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

For the Debtor:          King & Spalding LLP
                         By:  ARTHUR JAY STEINBERG, ESQ.
                              SCOTT I. DAVIDSON, ESQ.
                         1185 Avenue of the Americas
                         New York, New York 10036
                         (212)556-2100

For State Court Plaintiffs
Fox, Chapman, Tibbetts:  Goodwin Procter LLP
                         By:  WILLIAM P. WEINTRAUB, ESQ.
                              GREGORY W. FOX, ESQ.
                         The New York Times Building
                         620 Eighth Avenue
                         New York, NY 10018-1405
                         (212) 813-8839

APPEARANCES CONTINUED.

Audio Operator:          Michelle Brown, ECR

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46038
                         (855) 873-2223
                         www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (Continued):

For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs:                     Brown Rudnick LLP
                                By:  HOWARD S. STEEL, ESQ.
                                7 Times Square
                                New York, New York 10036
                                (212) 209-4917

Also appearing:                 Butler Wooten Cheeley & Peak LLP
                                By:  JAMES E. BUTLER, JR., ESQ.
                                     ROBERT H. SNYDER, ESQ.
                                2719 Buford Highway
                                Atlanta, GA  30324
                                (404) 321-1700

3

1   (Proceedings commence at 11:05 a.m.)

2     THE COURT:  Please be seated.  All right.  We're here

3 in Motors Liquidation Company, Number 09-50026.  I have the

4 list of appearances in front of me.  Who's (indiscernible)?

5     Mr. Steinberg, are you arguing?

6     MR. STEINBERG:  Good morning, Your Honor.  Arthur

7 Steinberg and my colleague, Scott Davidson, and some -- from

8 General Motors, in-house Mark Riashi at this table on behalf of

9 New General Motors.

10     THE COURT:  Okay.  I have the other appearances.

11 Let's just begin.  Did you all check in?  I mean, I have a list

12 in front of me.

13     MR. WEINTRAUB:  Yes, Your Honor.  I did.  William

14 Weintraub with Goodwin Procter.

15     THE COURT:  That's fine.

16     MR. STEINBERG:  Good morning, Your Honor.  We filed a

17 motion to enforce, which had originally involved four cases.

18 One case was a state court case filed by Mr. Butler, which is

19 the Fox case; and three of the cases, Chapman, Tibbetts, and

20 Lemus, were filed by Mr. Turner.  The Lemus case has been

21 settled and so the only things before Your Honor in connection

22 with this motion to enforce are Fox, Chapman, and Tibbetts.

23     Since the time that we filed the motions to enforce,

24 there's been some movement of the parties, but not all the way

25 there, in connection with resolving the motion to enforce.  In

ACCESS TRANSCRIPTS, LLC   1-855-USE-ACCESS (873-2223)

4

1  many cases, the plaintiffs re-pled their complaint.

2  Occasionally they would move to strike a claim.  Many times

3  they tried to clean up the allegations when we showed them a

4  marked complaint and why they were not compliant with Judge

5  Gerber's December judgment.  But we are at an impasse where we

6  would need Your Honor to resolve.

7        Now, I think we had pointed out to Your Honor in a

8  letter that we wrote the end of last week that we filed a

9  second motion to enforce on Friday, which involves some of the

10 common issues that are here and there's a return date of July

11 18th on that motion to enforce.  And we had said that the

12 reason why we had singled out these cases to start the process

13 was primarily because of the Fox case, which has a trial date

14 in September, and we wanted to make sure that Your Honor had

15 enough time to resolve the impasse for purposes of allowing

16 that trial to go forward in a timely basis.

17       Since we filed the motion to enforce in the Fox case,

18 there was one significant movement, which was that they dropped

19 the punitive damage claim.

20       THE COURT:  Yeah, I -- look, I've read the letters of

21 June 23rd and June 24th from respective parties that deal with

22 Fox.  So at least in Mr. Davidson's June 24th letter, the issue

23 with respect to Fox seem to be as to the independent claim,

24 whether that was going to be removed, and I certainly read in

25 the Butler letter -- unclear to me.  It refers to "our

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

5

1  negotiations with GM continue," so I don't know what -- you

2  know, here we are on June 27th, whether you've resolved that

3  issue or not.

4          MR. STEINBERG:  I don't think we have resolved the

5  issue, although I would say that it would seem to me that the

6  issues should be resolvable.  Because the general thrust or the

7  major issue in these cases where you have a post-closing

8  accident which is not involving the ignition switch defect,

9  which is defined as the first three recalls, is that they're

10 not allowed to assert an independent claim and the only path

11 for punitive damages in connection with a post-closing accident

12 against New GM for an Old GM vehicle is if you had an ignition

13 switch defect.  So if you're not asserting punitive damages,

14 then issues of your allegations and the types of claims you're

15 asserting are not necessarily as critical as the punitive

16 damage.

17         So once the punitive damage is dropped in Fox, then

18 we're left with whether there's a New GM duty to warn which is

19 different than the old GM duty to warn.  And Judge Gerber

20 decided, in his December judgment, that duty to warn could be

21 an element of an assumed liability, of an assumed product

22 liability.  So that if you were going to assert a product

23 liability case and you were going to assert the traditional

24 causes of action that go with that like a strict liability,

25 like negligence, that he is saying that if you also include

6

 1  duty to warn as part of the assumed product liability, that is

 2  okay.  But if you are asserting it as an assumed liability,

 3  you're not entitled to get punitive damages.

 4       THE COURT:  So let me -- obviously, Judge Gerber

 5  lived with this for a long time and I've only been living with

 6  it for a short time.  So -- and I know the briefs talk about

 7  the (indiscernible).  Bear with me a second.  Okay?  Grumman

 8  Olson, so I think your position in your -- Grumman Olson, I've

 9  read those decisions long before this matter landed on my

10  calendar.

11       Your position is those really aren't relevant because

12  New GM assumed liability for personal injury as part of the

13  sale and Grumman Olson really deals with there was an effort

14  not to have that liability.

15       MR. STEINBERG:  I think there are six distinguishing

16  features to Grumman Olson and if Your Honor would like me just

17  to tick that off at this point, I can do that as well too.  But

18  I'll do it in my presentation.

19       THE COURT:  That's fine.

20       MR. STEINBERG:  The critical thing on all of these

21  cases is are you asserting it as an assumed liability or are

22  you trying to assert something as an independent claim as a

23  vehicle owner without the ignition switch defect you're not

24  allowed to assert an independent claim.  And sometimes the

25  issue is difficult because the duty to warn allegation is stuck

7

1  in the middle of what someone would think of is traditionally

2  an assumed liability, so it's found in the negligence count.

3          In the Fox case, because of our dialogue, I think the

4  Fox plaintiff says, all right, I'm going to break it out so you

5  can see where it is and is as an independent claim.  So with

6  respect to Fox, our position is very simple, that as a post-

7  closing accident plaintiff without the ignition switch defect,

8  they cannot assert an independent claim.  And if they think

9  that that separate count is anything different than the Old GM

10  duty to warn, then they're proscribed from doing that by virtue

11  of the December judgment.

12          The Chapman case and the Tibbetts case present more

13  stark issues because in Chapman, the two counts are strict

14  liability and negligence.  In the negligence count there's

15  something called an asserted failure to identify a defect,

16  which Judge Gerber found in the December judgment wasn't even

17  an assumed liability; and the second was duty to warn.  But the

18  entire complaint for the two counts, strict liability and

19  negligence, asked for punitive damages.  So they are asking in

20  the Chapman case for punitive damages on an account of an

21  assumed liability, as well as to the extent that they think

22  that they can assert an independent claim, whatever those

23  independent claims are.

24          And Chapman also has allegation issues, so I think we

25  still identify that on page 3 of the complaint they say that

8

1  Old GM is now known as New GM, which is the successor-in-

2  interest issue, or that they claim that in 2004 New GM marketed

3  the vehicle.  Now, I assume there's a lot of these allegations

4  complaints and believe me, Your Honor, we have over 100 that

5  we're dealing with.  We try to clean up the allegations, but we

6  don't necessarily try to come to Your Honor for that kind of

7  relief because we feel that we'll be able to get to that point

8  at some point.  But we do do it with regard to punitive damages

9  and claims that are not recognized by the Court.

10          In Tibbetts you have the allegations issue about New

11  GM's supply of the vehicle, which was a 2005 Cadillac, which

12  wasn't true.  In the claims section in Tibbetts, they assert --

13  in the strict liability they use words like "duty to warn."

14  Now, strict liability is normally an assumed liability, but

15  they stuck "duty to warn" in there.  To the extent that duty to

16  warn is Old GM's duty to warn, then that would be okay, but

17  it's hard to tell.

18          In negligence they have failure to identify the

19  defect and failure to recall.  Those are things that were

20  clearly isolated by Judge Gerber in his December decision as

21  not being an assumed liability, but like in Chapman, Tibbetts

22  asks for punitive damages for all of their counts.  So they

23  have taken their position, and we could not move them on this,

24  that assumed liabilities includes that they are entitled to

25  punitive damages for an assumed liability and we're not sure if

9

1  they're asserting these counts as an independent claim, which

2  they're not entitled to do, or an assumed liability, but in

3  either event, they're not entitled to the damages -- I mean,

4  punitive damages.

5        And when you look at both Chapman and Tibbetts, and

6  to some extent Fox, if they were entitled to assert it as an

7  independent claim, they are doing something that is contrary to

8  the definition of an independent claim.  An independent claim

9  is supposed to be something that New GM established post-sale,

10 unrelated to something that it had assumed pursuant to the sale

11 agreement, unrelated to the provisions of the sale agreement,

12 something that would constitute a new duty based on a

13 relationship that New GM had established with an Old GM vehicle

14 owner.

15       When you look at the phraseology of the Chapman

16 complaint and on the Tibbetts complaint, they say things like

17 that the duty to warn is based on having accepted

18 responsibility to certain assumed liabilities.  So Chapman says

19 that in paragraph 13 and Tibbetts in paragraphs 37 through 39.

20 They framed a duty to warn as an assumed liability that New GM

21 assumed the responsibility that Old GM had.  Those things are

22 antithetical to what Judge Gerber had defined as an independent

23 claim, so I think, to some extent, we're fighting over

24 something that is, at most, an assumed liability to the extent

25 that the Court recognized as an assumed liability.

10

1           And so to circle back to what Your Honor had said,

2    which is did you resolve it, and I said no; I said, seems to me

3    resolvable in some respects because if all their adversary is

4    duty to warn as an assumed liability -- and let me be clear on

5    this -- duty to warn as an element of a cause of action that

6    could be part of an assumed product liability, because that's

7    what we agreed to assume, then we don't have an objection to

8    it.  But because we have these issues that we have the problem.

9           THE COURT:  Tell me what issue is pending before the

10   Second Circuit.

11          MR. STEINBERG:  The Second Circuit, first has -- to

12   some extent has the subject matter jurisdiction before it, but

13   the -- it has the three motions to enforce.  The three motions

14   to enforce that were filed in the spring of 2014 were to

15   enforce the sale order with respect to pre-sale accidents, to

16   enforce the sale order with regard to economic loss claims for

17   any vehicle with the ignition switch defect and with a vehicle

18   without the ignition switch defect.  So --

19          THE COURT:  And what's the status in the Second

20   Circuit?

21          MR. STEINBERG:  The Second Circuit argument was had

22   in middle of March, so it's now subjudice with the Second

23   Circuit for this length of time, three months.

24          MR. WEINTRAUB:  Your Honor, I would just need to

25   correct one statement since we're talking about what's before

11

1  the Second Circuit.

2          THE COURT:  You'll get a chance to talk about it in a

3  second.  Just wait --

4          MR. WEINTRAUB:  This is not argument, it's factual,

5  Your Honor.

6          THE COURT:  Can you just wait until I -- you get a

7  chance to talk.  Okay?  Don't interrupt.

8          MR. WEINTRAUB:  Yes, Your Honor.

9          THE COURT:  Go ahead, Mr. Steinberg.

10          MR. STEINBERG:  So what's not before the Second

11  Circuit specifically is anything to do with post-closing

12  accident plaintiffs because that wasn't the subject of the

13  first three motions.  What was in front of the Second Circuit

14  is the issue about vehicle -- a plaintiff's vehicle with the

15  ignition switch defect and one without the ignition switch

16  defect and whether -- who has successfully a due process

17  violation and what can go forward.  And there the only

18  modification to the sale order that Judge Gerber made was for

19  ignition switch defects to people in the first recall.  He said

20  they can assert an independent claim, but he was not nullifying

21  the sale order with regard to vehicles with a non-ignition

22  switch defect.

23          What happened, and I think it's a good segue to what

24  happened after the April 15th, 2015 decision and the June 1

25  judgment is that we had a lot of lawsuits that were pending and

12

1  we weren't -- I was sure but the plaintiffs on the other side

2  may not have been sure as to the application of the ruling to

3  their cases.  So we set up a -- and we had urged Judge Gerber

4  to dismiss these cases because we thought we had one outlier.

5  Judge Gerber, in effect, stayed the cases and set up a

6  procedure for people who felt that they shouldn't be stayed to

7  indicate why they wouldn't be bound by the decision.

8          And so that led to a number of, in effect, no state

9  pleadings that were being filed.  Some people, again, used this

10  as an opportunity to challenge the jurisdiction, the subject

11  matter jurisdiction of the bankruptcy court.  That was the Gary

12  Peller type decisions.  In one case, the Dolly Walton case,

13  which was a post-sale accident without the ignition switch

14  defect, the issue of punitive damages became star because we

15  had moved to strike the punitive damages.  We ultimately

16  settled the Walton case while all of this was pending, with

17  Walton agreeing to withdraw the punitive damage claim.

18          When we had a hearing on August 31st there was a case

19  called Bablosec (phonetic).  Bablosec was another post-sale

20  accident without the ignition switch defect.  They wanted to go

21  forward to trial.  We had said, you had asserted punitive

22  damages, you're not entitled to do that.  Judge Gerber said

23  we're going to, in effect, directly address that issue and

24  you're not going to go forward on your trial, but if you want

25  to file a pleading, let me know; and then two days later they

13

1  withdrew their punitive damage request.

2       So the issue of non-ignition switch defects, people

3  with vehicles without the non-ignition switch defect, was

4  clearly the subject of the proceedings that led to the April

5  decision, June judgment.  But specifically, you got to the

6  November decision and the December judgment, Judge Gerber had

7  to deal with post-sale accidents where claims had been

8  asserted.  And he had that both for non-ignition switch --

9  people without the non-ignition switch, and he had it for

10 ignition switch cases.  And he was asking us to mark up

11 pleadings in connection with both cases so that he can give

12 general pronouncements as to what would work and what doesn't

13 work.

14       THE COURT:  Am I correct that counsel in Fox,

15 Tibbetts, and Chapman received the notice letter from GM's --

16 New GM's counsel advising them of the procedures that were

17 going to take place and that they didn't file anything or

18 participate before Judge Gerber?  Am I correct in that?

19       MR. STEINBERG:  That is correct.

20       THE COURT:  And there seems to be a dispute between

21 you as to whether Judge Gerber's September 3 scheduling order

22 required marked pleadings in all post-closing accident cases or

23 your position in the reply is it was only in -- that it could

24 be done in representative cases.  Is that --

25       MR. STEINBERG:  Your Honor, I think the record will

14

1  be clear that my position is correct, and I'll tell you why.

2          THE COURT:  I'm sure that's your position.

3          MR. STEINBERG:  No, no, no.  But I'll tell you why in

4  the context of what happened here.  The MDL complaint was over

5  1,000 pages.  The -- each of the bellwether complaints were

6  over 100 pages.  We had suggested to Judge Gerber a schedule

7  which he considered way too lax, that he -- that would stretch

8  months and he said I'm resolving his issues very quickly.

9          And so we said to the judge, Judge, you understand

10  that all of the complaints that are involved are thousands and

11  thousands of pages.

12          THE COURT:  How many did you mark up?

13          MR. STEINBERG:  We marked up the six bellwether

14  complaints, we marked up the two state court complaints, we

15  marked up the MDL complaint as flagging general issues.  We did

16  other complaints which are non-ignition -- vehicles without the

17  ignition switch defect, at least three or four -- at least

18  three of those, because they were covered by our other

19  complaints letter.

20          THE COURT:  And you believe that the, quote/unquote,

21  "representative complaints" that you marked up are -- embody

22  characteristics of Fox, Chapman, Tibbetts?

23          MR. STEINBERG:  Yes.  Yes.  I mean, I think you can

24  see that the issues on Fox, Tibbetts, and Chapman are really

25  three types of claims.  They are duty to warn, failure to

1  identify a defect, and failure to recall.  All of them are

2  specifically addressed in the December decision.  And I'm

3  giving them more credit about what is actually alleged because

4  in Tibbetts, failure to identify a defect and failure to recall

5  are words that are used in a count that's described as

6  negligence.  And negligence, generally for a product case,

7  would be an assumed liability.  Some of those things that are

8  alleged, though, don't constitute the negligence the judge is

9  talking about.  It's negligence in the design of the car and

10  those types of things.

11         And he also said that to the extent that someone --

12  there was a viable duty under state law to warn, that you can

13  assert that as a causation issue in connection with an assumed

14  product liability.  So those representative samples were

15  clearly covered.

16         But Judge Gerber had given us five pages to comment

17  on a thousand-page complaint.  He had given us three pages to

18  cover all the other complaints that weren't covered by anything

19  else and he basically -- we said to the judge, we could

20  overwhelm you with stuff; I don't know whether we could produce

21  all of it within the two-a-week and three-week time frame that

22  you gave us to do all of this stuff, but we think we can

23  summarize this thing for you as a representative sample.

24         And when I said that everybody got the letter, they

25  got notices, at least Tibbetts and Chapman got notices before

16

1  the September 3 order.  Fox got it the day afterwards, but all

2  of them got the September 3 letter, which was the letter that

3  was referenced in the September 3 scheduling order, which

4  basically says you're getting this thing, you have the right to

5  participate if you believe that -- and if you don't

6  participate, you're going to be bound by my ruling.

7          And the whole purpose of Judge Gerber going through

8  this exercise was to -- he knew that -- he had announced that

9  he had retired -- he was going to be retiring at the end of the

10 year and he wanted to be able to finish what he believed his

11 responsibilities were in General Motors and he was going to

12 give the general pronouncements that everybody would have to be

13 bound by and if he was going to let something go through the

14 gate, then he'll let another Court decide it, but in the

15 context of his specific rulings.

16         When he says you can't assert punitive damages, that

17 didn't get through the gate.  That was his actual ruling and we

18 argued in our papers that's collateral estoppel to everybody

19 here.  They had an opportunity to litigate, they didn't choose

20 to litigate, they decided to not deal with it.  And clearly,

21 from the references that we gave to you in the scheduling the

22 order, the scheduling hearing, Judge Gerber said, I want to

23 make sure I cover vehicle owners without the ignition switch

24 defect.  And the counsel there stood up and said that we were

25 going to deal with it.  And we made sure to flag on these

17

1  issues that --

2          THE COURT:  The colloquy with Mr. Weisfelner.

3          MR. STEINBERG:  Right.  That was that colloquy, but

4  the judge had already said before his -- in his scheduling

5  order, he says, I need to be able to address vehicles without

6  the ignition switch defect.  He says -- and he tells Mr.

7  Weisfelner at the hearing that, you know, some of your clients

8  have gotten relief by the modification to the sale orders and

9  some didn't, but I need to address it.  And you could see from

10  Judge Gerber's language in the November decision, he basically

11  said, I gave you an opportunity to address it and you didn't

12  address it.

13          The fact of the matter is, is that Tibbetts and

14  Chapman and Fox don't really challenge due process in the same

15  way that the ignition switch defects have challenged it.

16  Ignition switch defects argued they were known predators

17  because Old GM knew of the ignition switch defect and they --

18  we agreed to certain factual stipulations.  Judge Gerber

19  interpreted the factual stipulations.  We disagree with how he

20  interpreted, it's the subject of a Second Circuit appeal, but

21  that was presented to Judge Gerber and Judge Gerber ruled on

22  the ignition switch defect and said that they had established

23  enough with prejudice to have a limited modification to be able

24  to assert independent claims.

25          THE COURT:  Mr. Steinberg, let me ask, do you believe

18

1  that -- I mean, we'll see when the Second Circuit rules.  It

2  could be quick; it could be a very long time.  Do you believe

3  it's going to be dispositive of the issues raised on these

4  motions and the ones you're about to file or just filed?

5          MR. STEINBERG:  I think that the Second Circuit will

6  have to deal with the subject matter jurisdiction issue, which

7  is Manville 4, which is raised on appeal.  Frankly --

8          THE COURT:  I thought Celetex was pretty dispositive

9  of the subject matter jurisdiction issue, but --

10         MR. STEINBERG:  Well, I think that -- look, the sale

11 order dealt with the issues raised by Manville for the appeal.

12 I think it was in Campbell specifically referenced Manville 4

13 and said, well, this was a different circumstance.  And then

14 the appeals were dismissed on an equitably moot ground.

15         The four threshold issues -- we were briefing

16 Manville 4 in the four threshold issues.  Judge Gerber said he

17 had jurisdiction to do it.  Gary Peller, on behalf of his non-

18 ignition switch defect clients, and the ignition switch defect

19 clients, challenged Manville 4 every argument.  Judge Gerber

20 almost sanctioned him for saying he's raising a frivolous

21 appeal, frivolous comment.  He already decided it before.  So

22 four times Manville 4 has been decided and now it's up on the

23 Second Circuit and the Second Circuit will have a chance to

24 resolve it.

25         Some of the issues about independent claim, the

19

1  colloquy on the second circuit was -- I mean, we had raised the

2  issue as to whether we had stipulated that 24 people had --

3  actually knew of the ignition switch defect in order to

4  substantiate a recall.  And the colloquy, and it will be borne

5  out by the transcript if Your Honor wants to see the

6  transcript, has a least Justice Chin saying, I didn't see it,

7  meaning that can you show me where they said that.  And then he

8  asks specifically Mr. Berman, who was arguing on behalf of the

9  MDL clients, he said, are you saying that you should have more

10 discovery or were you reliant on the factual stipulations.  And

11 Mr. Berman says, I think you could decide this based on the

12 factual stipulations, we're not saying we need more discovery;

13 whatever is in the closed record, you can decide whether it

14 substantiates.

15        So to the extent that the entire independent claim

16 notion is triggered by whether we knew enough to justify a

17 modification of a final and non-appealable sale order that

18 existed for six years, that is in the Second Circuit and that

19 is the triggering point.  The problem is, is that we have cases

20 that are going forward in the state court.  Some cases are

21 closer to trial than the other.  You know, Tibbetts and Chapman

22 certainly could wait until July 18th to deal with the other 11

23 cases that we had.  Fox could probably even wait too, but since

24 we've been accused of being dilatory and clever in trying to

25 delay all -- everything here, I'm happy to deal with the Fox

20

1  issue now, recognizing that I'm not exactly sure what we are

2  really fighting over in Fox in that.

3        If it truly is just an assumed liability that he's

4  asserting, then I've been told by product lawyers, of which I'm

5  not, I'm a restructuring lawyer as Your Honor knows, is that if

6  you have a certain duty to warn as part of your strict

7  liability, as part of your otherwise negligence claim, you're

8  going to get the same compensatory damages.  All roads lead to

9  the same amount anyway.  People have it as an additional count.

10 They want to be able to say something.

11       In the Fox case, what we have as an issue is that

12 they still have New GM allegations and we just said, we won't

13 fight you by putting it in, but it can tie into, in effect,

14 what would otherwise be an independent claim in a New GM cause

15 of action.

16       I will say to Your Honor that we actually have

17 something that's brewing unrelated to this case, but Your Honor

18 should understand because it relates to something that's here,

19 is that we agreed with one plaintiff in the Texas MDL to amend

20 their complaint and they agreed to narrow -- it was an ignition

21 switch case and we agreed to narrow it only for certain

22 allegations which they say constitute their independent claim.

23       And now they've made a motion to, in effect, lift the

24 cap on punitive damages in the Texas court and the entire

25 complaint is based on Old GM conduct and Old GM things, so

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

21

1  we're trying to figure out how to deal with those issues.  But

2  part of the problem that we face is that while we clean it up,

3  as you get closer to trial or as you get closer to filing other

4  briefs in connection with the case, the things that we thought

5  we resolved re-emerge again.  So one of the things that we

6  would certainly be urging to Your Honor as -- if you resolve

7  this in our favor is the dismissal of these claims and these

8  requests with prejudice so there's no issue that these things

9  will re-emerge at a later point in time.

10         The procedures that we followed, and I think --

11         THE COURT:  I don't know how I discuss claims with --

12  I can enjoin parties from prosecuting claims, but it isn't for

13  me -- the cases -- the underlying cases are not pending before

14  me, I can't dismiss them.  I could enjoin parties from

15  prosecuting them.

16         MR. STEINBERG:  Your Honor is absolutely correct.  I

17  spoke too shorthand on that.  That's all that you can do.  Your

18  jurisdiction is for the parties in front of you to not be able

19  to assert these types of claims.

20         THE COURT:  Right.

21         MR. STEINBERG:  And that's like the -- all we can ask

22  you to do on that.

23         THE COURT:  You know, with respect to Fox, I'm going

24  to hear counsel in a minute but, you know, one of the things in

25  my mind is that, hey, you know, if they really think you're

22

1   going to go to trial in September, the -- it may be I'm just

2   not going to let them go to trial with the independent claims

3   argument.  They want to -- you know, they're trying to

4   condition on something I don't -- you know, if they work out an

5   agreement with New GM, fine, but if they don't, I mean, part of

6   my reaction is I'm going to enjoin it until they stop.  I'm

7   going to enter a preliminary injunction against them until the

8   Second Circuit rules.  It could be a year from now, it could be

9   four or five months from now.

10        Because I think that what the Second Circuit has to

11   say may well be dispositive of the issues, if there's service

12   and I see that they say, well, it will go to the jury now, it

13   won't go to a bench trial in September, I know they count on

14   having a decision from the Second Circuit with serious issues

15   that quickly.

16        But, you know, those all may simply be -- I'm going

17   to enjoin it and when the Second Circuit rules, I'll revisit if

18   I have to, but we shouldn't think that they're going to go

19   forward but I might, you know, want to wait and hear what they

20   want to say about it.

21        Go ahead, Mr. Steinberg.

22        MR. STEINBERG:  Your Honor, on Grumman Olson, there

23   are six reasons why we think that is not useful precedent.  One

24   is the one that I think Your Honor had first touched on, which

25   is that when you assume the liability under the sale agreement,

23

1  you're taking it out of the Grumman Olson precedent.

2         THE COURT:  Yeah.  I mean, Grumman Olson, the due

3  process clearly on Judge Marston -- I read both Judge Marston's

4  decision and the district court decision in my bankruptcy class

5  at Columbia, we spent a whole class dealing with due process

6  issues, so I'm very familiar with these due process issues.

7  But Grumman Olson, the due process issue was because unknown

8  claimants there couldn't be -- abide by a sale order.

9         Well, it's not an issue here because there is an

10 assumption of liabilities.

11        MR. STEINBERG:  Right.  So that's absolutely correct

12 and so the first thing -- and actually the district court

13 decision in Grumman Olson, in distinguishing the fact pattern

14 in that case to the GM case, the GM case was different because

15 they had assumed the liability.  And when you think about it,

16 what was the Grumman Olson thing most concerned about?  It was

17 that these potential future creditors down the road didn't have

18 a remedy and that the seller was now defunct, and therefore, as

19 a matter of policy, where are you going to provide?

20        In effect, it's a relaxation of the successor

21 liability finding, which is derivative of an obligation that

22 the seller, Old GM, had.  So one of the distinguishing features

23 of Grumman Olson is that the whole thrust of an independent

24 claim is that it can't be based on Old GM conduct.  And if they

25 want to use Grumman Olson as a basis to say, well, I should be

24

1 able to assert an independent claim, it's counter to what

2 Grumman Olson stood for and the reason why it had its holding.

3       The other thing is that Grumman holding was an

4 exception to the successor liability case and they're explicit

5 in their papers, saying, I'm not looking to change the

6 successor liability finding.  Their issue that I had said

7 before, what they're asserting in Grumman Olson, is really

8 dressed up in assumed liability, and I gave Your Honor the

9 specific allegations where they're basically saying, I'm suing

10 them because of a liability that they had assumed pursuant to

11 the sale agreement.

12       And Grumman Olson was actually raised at the October

13 hearing by Mr. Weintraub, on behalf of the clients that he was

14 representing at the time, as to why the Court shouldn't bind

15 them for being able to assert punitive damages and Judge Gerber

16 rejected that argument.  So for all of those reasons, I think

17 Grumman Olson is not applicable.

18       On Manville 4, I told you four times so far GM has

19 won on that issue, but when you look at Manville 4 and what was

20 driving what was a tortuous history of a case that went up and

21 down and up and down, was that the two distinctions between an

22 in rem transaction and in personam transaction, a sale of

23 assets is unlike what happened in Manville 4, is an in rem

24 transaction.  The claims against the purchaser where they're

25 asserting success or liability is derivative through a debtor

25

1 and that's the opposite of an independent claim.  They were

2 arguing that they shouldn't be able to -- they should be able

3 to assert their independent claim against the other insurer

4 with regard to insurance contracts that had nothing to do with

5 the debtor; a totally different circumstances that is here.

6       The thrust of Manville 4 is that nobody contemplated

7 that Chubb would be barred.  Here, the sale hearing, the sale

8 order expressly dealt -- tackled with this issue.  The original

9 motion that was filed did not provide for, in effect, assuming

10 post-closing accidents.  It was amended based on people who

11 stood up in court on behalf of the future accident victims, the

12 states' attorney generals, et cetera, and they specifically

13 recognized that they were going to assert this until they were

14 satisfied; and ultimately they were satisfied.

15       So unlike Manville 4, when they found the document

16 four years into the appellate history that basically said, we

17 never intended to enjoin this type of claim, this was a case

18 where they expressly decided and Judge Gerber made decision on

19 that.  And Judge Gerber actually said that no successor

20 liability finding is the kind of thing that would otherwise be

21 federally preempted under Section 363 adopting the same kind of

22 rationale of White Motor.

23       And he also said it's different because -- than the

24 Manville 4 paradigm because we had a situation where we're not

25 extinguishing claims but they're channeled to the proceeds of

26

1  sale.  The plan could deal with this; something after the sale

2  can deal with it.  This is a totally different situation.  And

3  he said, as a general matter, you take away the bankruptcy

4  court's ability to deal with the sale of the assets and those

5  things that are integral to the sale, you won't have much left

6  in the in rem jurisdiction of the bankruptcy court to follow.

7           So when you take a step back, we have a situation is

8  you have a clear order that says independent claims cannot be

9  asserted by a post-closing accidents without ignition switch

10 defect, and they can't assert punitive damages.  They are doing

11 that.  They were notified of the proceedings before Judge

12 Gerber ruled.  They were notified of the proceedings after

13 Judge Gerber ruled.  They refused to make any of these changes

14 that they should have to make.  And their defense is now, after

15 being exposed for what they're doing, is that I want to raise

16 due process in Grumman Olson style or due process in Manville 4

17 style, all of which have been rejected.

18          We've been trying to deal with the whole slew of the

19 plaintiffs' bar to get them to understand that there's certain

20 things they can do and certain things that they can't do within

21 the confines of the Court's rulings.  These are the first set

22 of people who we're having major issues with and hopefully we

23 can get this resolved quickly.  Thank you.

24          THE COURT:  Thank you.

25          MR. WEINTRAUB:  Good morning, Your Honor.  William

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

27

1  Weintraub of Goodwin for the state court --

2         THE COURT:  If you would like to now -- if you would

3  now like to correct what you thought that Mr. Steinberg was --

4  misstated, I'll let you do it, but I don't let you interrupt.

5         MR. WEINTRAUB:  I understand, Your Honor.  I didn't

6  want that point to be lost, and it won't be lost.  I'm going to

7  correct almost everything that Mr. Steinberg said.

8         Your Honor, going out of order and just trying to

9  address the high points of Mr. Steinberg's presentation before

10  I go into my own presentation, I want to emphasize a few

11  things.

12        First of all, Your Honor, no court has decided that

13  non-ignition switch defect post-sale accident plaintiffs cannot

14  assert an independent claim.  That's never been decided.  There

15  is a due process issue here that we believe is fundamentally

16  different than the ignition switch due process issue that was

17  determined in connection with the four threshold issues.

18        There the issue, which basically focused on successor

19  liability issues because post-sale accidents were not yet an

20  issue in the case, was whether the claimants there were known

21  or unknown creditors of Old General Motors, and whether the

22  ignition switch defect was a known defect or not, which

23  required a recall in advance of the sale notice which, when

24  joined with the sale notice, would have told those people that

25  they had claims that needed to be protected.  That has nothing

28

1  to do with the independent claims that we're talking about

2  today.

3          The independent claims are a claim against New

4  General Motors based solely on its post-sale conduct.  And

5  there's no order in this case, Your Honor, that's effectively

6  barred those claims.  Grumman Olson is not cited by us as a

7  successor liability case.  It is cited as a cased that holds

8  that future claimants cannot be enjoined in a proceeding that

9  they were not given proper notice of and did not participate

10 in.  We understand the difference between a successor liability

11 claim and an independent claim, but the overriding issue in

12 Grumman Olson was whether future claimants got effective notice

13 to be able to come into the court and defend their rights.  No

14 one in --

15         THE COURT:  If the accident didn't -- hadn't occurred

16 --

17         MR. WEINTRAUB:  Right.

18         THE COURT:  -- you couldn't know who they are.  They

19 couldn't have known that they had to come in.  I understand

20 that.

21         MR. WEINTRAUB:  Right.  And not just that the

22 accident hadn't occurred yet, Your Honor, also that GM's post-

23 sale conduct hadn't occurred yet.  No one before the sale knew

24 how GM would act or not act.

25         THE COURT:  What specifically is the New GM post-sale

29

1  conduct that you believe gives rise to the independent claims

2  that you're seeking to press?

3       MR. WEINTRAUB:  Your Honor, there would be a whole

4  panoply of those, and since I'm not the state court litigator,

5  I can only give an example.  So for example, failure to warn,

6  the position of many is that New GM inherited the employees,

7  the information and knowledge, the books and records with

8  respect to all defective vehicles; not just ignition switch

9  defect vehicles, all vehicles.

10      If it can be proven in trial, because as Judge Gerber

11 was very clear, I don't decide, once it's past the date, the

12 merits of the independent claim, the state court does that.  If

13 it could be shown that people were permitted to ride around in

14 defective vehicles where, if they had been noticed, they would

15 have stopped driving the vehicle or had the vehicle corrected

16 or fixed, they may have never have had that accident.

17      So when New General Motors argues that there's no

18 independent claim because we've agreed to successor liability,

19 successor liability focuses on the conduct of Old GM and

20 there's no requirement to have a successor liability claim that

21 there be culpable conduct on the part of New GM.

22      With respect to an independent claim as distinct from

23 a successor liability claim, the lynchpin of the independent

24 claim is culpable conduct, so it's a different claim.  So when

25 New General Motors says, I assume liability for post-sale

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

30

1  accidents, they're also saying if you can't have an independent

2  claim, that because I'm paying the estate of someone who was

3  killed in an Old General Motors vehicle, the fact that New

4  General Motors let that person ride around in that vehicle for

5  two, three, or four years before that person had the fatal

6  crash, you don't get to complain about that because we're

7  paying you compensatory damages.  We don't agree with that.

8         We think, and Judge Gerber agreed, with respect to

9  the ignition switch defect cases, that there can be punitive

10 damages.  We won on two paths for punitive damages with respect

11 to the bellwether trials, which were ignition switch defect

12 cases.  So we fundamentally disagree that <u>Grumman Olson</u> is not

13 applicable here.

14        THE COURT:  So I don't want to get in the middle of

15 your so far unsuccessful negotiations, but on page 2 of your

16 June 23rd letter where you say "We have also offered to drop

17 that claim," which is the failure to warn claim against New GM,

18 that GM will simply agree to a proposed consent stipulation to

19 be filed in this court that will avoid what we anticipate GM

20 will otherwise do.  It goes on from there.  I'm not going to

21 read it.

22        What claim are you offering to drop?  I don't

23 understand that because you're now arguing --

24        MR. WEINTRAUB:  Your Honor, I'm not directly involved

25 in those negotiations.

31

1          THE COURT:  Well, you wrote the letter.  You signed

2    the letter.

3          MR. WEINTRAUB:  That's right, but all I said was

4    negotiations aren't --

5          THE COURT:  Well, tell me what you meant in the

6    letter.

7          MR. WEINTRAUB:  What I meant in the letter was

8    there's no agreement yet, and that there are --

9          THE COURT:  Well, what did you offer to drop?

10         MR. WEINTRAUB:  Counsel offered to drop the claim if

11   they could reach a stipulation with respect to certain matters

12   that, since these are settlement discussions, I don't feel

13   comfortable saying on the record.

14         THE COURT:  And I don't want to know about the

15   settlement discussions.

16         MR. WEINTRAUB:  Right.  So all I could say is they

17   could not agree to the terms of the stipulation that my client

18   was requiring in order to drop the claims.

19         THE COURT:  Okay.

20         MR. WEINTRAUB:  The thing I was trying to correct

21   before, Your Honor, is Mr. Steinberg misspoke.  The third

22   motion to enforce, which is the motion for economic damages

23   asserted by non-ignition switch defect people, was never heard

24   by Judge Gerber.  If you go to Judge Gerber's long decision, I

25   think it's in the first three or four pages where he sets forth

32

1  the three motions to enforce, and he says that he's going ahead

2  with respect to the ignition switch defect, economic damages,

3  and the pre-closing ignition switch defect.

4        But the third motion, which is the non-ignition

5  switch economic damages, he expressly says is being deferred.

6  So his opinion that was issued in April of 2015 does not

7  address those issues and therefore it is not one of the issues

8  that's on appeal because it wasn't adjudicated or determined.

9        With respect to whether or not my clients received

10  more complaints, they did not receive more complaints.

11        THE COURT:  Well, I don't -- look, I have to tell you

12  on this one I think that Mr. Steinberg (indiscernible) had a

13  much better side of the argument.  I don't read Judge Gerber as

14  having required marked pleadings in every case in which GM, New

15  GM, contended that there were improper claims being asserted.

16  I read it as requiring a representative sample, not everyone.

17  That's why I asked Mr. Steinberg -- and I don't think you

18  dispute this -- that you or the state court counsel received a

19  copy of the letter that put him on notice of the hearing before

20  Judge Gerber and an opportunity to participate, which they

21  didn't take up.  Do you agree with that?

22        MR. WEINTRAUB:  Your Honor, I don't agree that there

23  was an opportunity to participate.

24        THE COURT:  Really?

25        MR. WEINTRAUB:  Yeah, I'm going to get to all of it.

 1          THE COURT:  Well, did they show up and say, "We want

 2  to participate"?

 3          MR. WEINTRAUB:  No.

 4          THE COURT:  No.  I read the letter as giving them a

 5  -- putting them on notice of the hearing.  They could have come

 6  in; they didn't.  I don't -- I disagree with your apparent

 7  reading that required New GM's counsel to give a marked-up

 8  pleading in every case where they believe allegations were

 9  impermissible.  I read it is as requiring representative

10  pleadings, not everyone, and that they did that in that people

11  in your situation had the opportunity to either negotiate with

12  GM or come in before Judge Gerber and they didn't.

13          MR. WEINTRAUB:  And I disagree with all of that, Your

14  Honor, and --

15          THE COURT:  Okay.  Well, you can disagree --

16          MR. WEINTRAUB:  But let me --

17          THE COURT:  -- but I'm the one that has to rule.

18  That part I did -- that part is clear as day to me.

19          MR. WEINTRAUB:  Well, let me explain why I disagree

20  with you and then you tell me --

21          THE COURT:  Okay.

22          MR. WEINTRAUB:  -- whether you agree with me or not.

23  With respect to the marked pleadings, I'm not saying that every

24  plaintiff in America was required to get a marked pleading.

25  But if you read that paragraph, what it says is people got

34

1  letters, and that people who got letters would get marked

2  pleadings, and it refers to "such representative cases."  Such

3  representative cases, Your Honor, relates back to the people

4  who got letters.

5          THE COURT:  That I'm ruling against you on.  You can

6  drop that argument and move on from there.

7          MR. WEINTRAUB:  Okay.

8          THE COURT:  I do not -- I conclude that GM, New GM,

9  did not have to provide marked pleadings for every matter where

10 they believed that the allegations of the complaint ran afoul

11 of Judge Gerber's rulings.  It would be a different story if

12 the clients you're representing, the counsel, state court

13 counsel, whatever, hadn't received a letter -- and they got the

14 letter -- putting them on notice that this is how it's going to

15 go forward.  They could have found that they didn't have --

16 they could have found all of the so-called representative

17 pleadings and see what New GM was saying.  And they could have

18 gone and negotiated with Mr. Steinberg or his colleagues or

19 other counsel about it.  So that part I'm ruling against you.

20         MR. WEINTRAUB:  I understand, Your Honor, but I will

21 get to the other part, which is the more important part, I

22 think, which is the scheduling order.  We don't believe, and

23 the letters that they received, we don't believe told our

24 clients or anybody else in this category that one of the issues

25 to be adjudicated were independent claims against New GM based

35

1  upon New GM's post-sale conduct.  And I will show you when I

2  get there the letters from Mr. Steinberg that talk about not

3  being able to sue New GM for punitive damages based upon Old GM

4  conduct, and --

5          THE COURT:  Let me just say, Mr. Weintraub, I'm not

6  ruling on this point at this point, but I have a problem with

7  Mr. Steinberg's argument with respect to independent claims

8  that are based solely on New GM's post-sale conduct, accident

9  cases.  Economic loss is a different issue from my standpoint,

10 but on accident cases post -- New GM post-sale conduct, I'm not

11 ruling yet, but that I'm having some pause with.  Okay.  Go

12 ahead.

13         MR. WEINTRAUB:  Thank you, Your Honor.  So just to

14 try to round out, like I said, I had a long presentation just

15 to address some of the things Mr. Steinberg said, and I may

16 revisit these in my presentation.  We don't believe that the

17 Second Circuit decision is going to be dispositive of this

18 issue because this issue on this particular due process

19 violation is not before the Second Circuit.

20         As I said earlier, the issue before the Second

21 Circuit is whether the pre-closing accident plaintiffs and the

22 non-ignition switch people were known or unknown creditors of

23 Old GM.  And the issue that I'm raising here is a different

24 question which is how do you bar prospectively independent

25 claims against the buyer where the conduct has not yet occurred

1  and the injury has not yet occurred.  And I think that's a

2  different question and it's not before the Second Circuit yet.

3          Your Honor, we do think that Manville IV is directly

4  on point.  The issue in that case was the quality of notice and

5  the ability to bar independent claims.  We think that with --

6  in Manville IV, Chubb, which is an issue that took 24 years to

7  percolate and get resolved, so this is way ahead of 24 years

8  here.  Chubb was already a creditor at that point in time.  It

9  already had its independent claim because the Manville case had

10 been going on for years, Chubb's independent claim was based

11 upon a contribution claim, and that contribution claim already

12 existed.

13         Our case is one removed from that because, as we said

14 earlier, the injury didn't happen yet and the conduct hadn't

15 happened yet.  And what the Second Circuit said in Manville IV

16 is that Chubb would have had to have been prescient to read

17 that notice and figure out that some court down the road would

18 say that their independent claim is barred, and I think we have

19 the same issue here.

20         I don't understand how lay persons like Fox and

21 Chapman and Tibbetts could ever get the notice that was in this

22 case and divine from there that they had independent claims

23 that they had to come into the bankruptcy court in 2009 and

24 protect.  In fact, Judge Gerber, who we all know is a 35, 40-

25 year bankruptcy expert and a bankruptcy judge, ruled in this

37

1  case that when he revisited the language that he had approved

2  in 2009, he said if somebody had come to me in 2009 and said

3  you're going too far, I would have agreed with them.  So Judge

4  Gerber apparently missed this issue in 2009, but Tibbetts and

5  Chapman and Fox, how were they supposed to catch it?

6          Your Honor, we think there are really just two issues

7  before the Court this morning.  First, are these state court

8  plaintiffs barred from seeking to prove a claim against New GM

9  based on its own post-sale conduct?  These are allegations that

10 New GM did something or failed to do something after the 2009

11 sale closed that contributed to or permitted an accident to

12 occur.  No one is asking this Court to determine whether New GM

13 is or is not culpable or whether New GM had a duty to act.  The

14 issue in the parlance of Judge Gerber and his prior decisions

15 is whether the ability to even assert the claim gets through

16 the bankruptcy gate.

17         The second issue here is if the Court is

18 contemplating answering the first question in the negative, I

19 think the Court has to ask itself did something happen in 2009

20 in connection with the sale proceeding that was

21 constitutionally sufficient to bar these plaintiffs, who had

22 not yet had their crashes in 2009 and who could not predict in

23 2009 that they would ever have a crash years later.

24         Did something happen that effectively barred them

25 from bringing independent claims against New GM for its future

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

38

1  post-sale conduct?  We don't think it did.  We think as a

2  matter of common sense as well as constitutional due process, a

3  bankruptcy court cannot prospectively bar future claims by

4  exonerating a buyer from its own post-sale conduct before the

5  conduct even occurs.

6          As we said earlier, Your Honor, it's well-established

7  in this court -- in this circuit that --

8          THE COURT:  Mr. Weintraub, it wasn't clear to me from

9  the pleadings that I reviewed that the claim is based solely on

10 New GM post-sale conduct.  You try to bootstrap arguments based

11 on Old GM conduct, and I don't believe that's permissible.

12 Okay.  What was clear was there was a separately pleaded claim

13 that made clear that it was based exclusively on New GM post-

14 sale conduct and articulating what is the claim that you

15 believe arises, I would have a much more clear-cut issue that I

16 was dealing with, and I don't think I have that.

17         MR. WEINTRAUB:  Your Honor, all I can say is that to

18 the extent there needs to be re-pleading --

19         THE COURT:  I'm not ordering --

20         MR. WEINTRAUB:  I understand.

21         THE COURT:  You know, all -- I'm going to do one of

22 two things.  I either can (indiscernible) or not.  Okay.  And

23 as I said to Mr. Steinberg, what I may well do is enjoin the

24 proceeding to try in September in Fox with the complaint

25 currently on file.  If you want to drop the alleged independent

39

1  claim, fine.  If not, we'll all wait for the Second Circuit to

2  decide, and I'll see what issues the Second Circuit decides and

3  which ones it doesn't.

4        I've read and will continue to reread Judge Gerber's

5  decisions operative to the issues before me.  I don't think it

6  really is clear that either of you make out in your arguments,

7  and -- but, you know, I can only deal with the motion to

8  enforce the plan with -- or the plan injunction with respect to

9  the Fox plan as presently filed.  If it was amended, if you've

10  already agreed to take out the punitive damage claim, that

11  would resolve one of the big issues.  The independent claim

12  issue, despite the correspondence from both sides, I don't know

13  where it stands.  I'm not getting in the middle of settlement

14  negotiations.  But I'll tell you this, Mr. Weintraub.  I don't

15  think Fox should plan on going to trial in September unless the

16  Second Circuit decides the pending appeal very soon.

17        MR. WEINTRAUB:  Your Honor, we think that what Judge

18  Gerber clearly decided was that if a litigant can show a due

19  process violation, then independent claims similar to the

20  independent claims --

21        THE COURT:  If Fox counsel had come in response to

22  the letter received and teed up the issue, I think we would be

23  dealing with something much clearer, but they chose to ignore

24  it.

25        MR. WEINTRAUB:  Your Honor, and I will get to that,

40

1   and maybe I should, but I think before I get to that, I need to

2   really jump to kind of the background to how we got to

3   October/November/December, because how we got there, the

4   evolution of the case, is important to understanding why my

5   clients looked at the correspondence and looked at the

6   scheduling order and said, "We don't understand what this has

7   to do with us because we're only asserting independent claims."

8          After the way the four threshold issues we think came

9   about was after the existence of the ignition switch defect

10  came to light in 2014, five years after the sale closed.

11  Hundreds of lawsuits were brought.  Anton Valukas was engaged

12  by New General Motors, and it should report that focused on the

13  ignition switch defect.  New GM, as we said earlier, filed

14  three motions to enforce the sale order.  This motion was not

15  one of the three.  The first motion was limited to plaintiffs

16  asserting economic losses based upon the ignition switch

17  defect.  Those are people that had not had accidents but were

18  suing for the devaluation of their vehicle, the value of their

19  vehicle.

20         The second motion was limited to pre-sale accident

21  victims whose cars had the ignition switch defect.  Those are

22  people that had already had accidents and were suing New GM as

23  a successor to Old GM.

24         The third motion targeted economic losses sued for by

25  persons whose vehicles did not contain the ignition switch

41

1  defect then.  I don't want to over-generalize, but I think this

2  had to do with devaluation of the brand in general affecting

3  all vehicles, including vehicles that did not have the ignition

4  switch defect but had other defects.  This was the motion that

5  Judge Gerber deferred on.

6        The four threshold issues were confined to the first

7  and second motions because they concerned the ignition switch

8  defect, and the reason everyone focused on the ignition switch

9  defect was because that was the explosion of litigation that

10 was getting all of the publicity, and the parties had the

11 benefit of the Valukas report which could be used to agree upon

12 a set of stipulated facts that would aid Judge Gerber in ruling

13 on the four threshold issues.

14        The key threshold issue, as I said earlier, was

15 whether the economic loss ignition switch defect people and the

16 pre-sale ignition switch defect accident people received due

17 process in connection with the sale, sale motion, the sale

18 hearing.  The important point for this proceeding, which

19 relates to the fourth motion, which was not filed until June 1

20 of 2016, almost two years after the other three motions, is

21 that the briefing on the four threshold issues and on due

22 process that occurred in 2014 and '15 and that resulted in the

23 April 2015 decision and the December -- I'm sorry, and the June

24 2015 judgment did not address post-sale accidents and did not

25 address non-ignition switch defect cases.

42

1          When Judge Gerber decided the independent claim issue

2   as part of his April 2015 decision on the four threshold

3   issues, he decided it based upon what was pending before him.

4   The only thing pending before him with respect to independent

5   claims were the ignition switch defect economic loss plaintiffs

6   because clearly the pre-sale people didn't have independent

7   claims.

8          There was no basis to decide this issue for any other

9   party because no other parties were before him.  But

10  nonetheless the Court's logic and reasoning we think were

11  appropriate with respect to if there's been a due process

12  violation, independent claims can go forward.

13         The June 2015 judgment does nothing more than recite

14  that the ignition switch defect economic loss plaintiffs could

15  now assert independent claims against New GM.  This limitation

16  on the enforceable scope of the sale order was premised on the

17  due process violation found by Judge Gerber.  We talked about

18  earlier that he found that there was a due process violation

19  because this was a known defect.  People should have been given

20  either express notice or when joined with a recall, they would

21  know that they had the ignition switch defect.  They could have

22  then protected themselves, and with respect to the ignition

23  switch defect economic loss people, they would have had enough

24  notice to come into court, object to the over-broad future

25  exoneration of New GM, and Judge Gerber said I would have

43

1  entered a narrower order.

2         No other relief was granted on this point of

3  independent claims because there were no other participants to

4  the four threshold issues other than the ones that I

5  identified.  The June judgment implemented the April 2015

6  decision and it was essentially a roadmap to show what claims

7  against New GM were now permitted because certain ignition

8  switch defect plaintiffs were successful, what claims against

9  New GM were still stayed under the 2009 sale order because

10 certain other ignition switch defect people were not successful

11 on the four threshold issues briefing.  That's what's up on the

12 Second Circuit, Your Honor.

13        And to clarify that any other plaintiffs were still

14 stayed by the sale order because those plaintiffs had not yet

15 shown why the sale order should not be applied against them,

16 the critical point for both the April 5, 2015 decision and the

17 June 2015 judgment is neither of them address or cover or even

18 mention post-sale accident cases.  No defined term of the June

19 2015 judgment covers them and no schedule of lawsuits attached

20 to the judgment lists post-sale accidents as claims that were

21 addressed or that were barred or stayed.

22        If you go to the schedules attached to the June

23 judgment, Your Honor, the only reference is with respect to

24 hybrid actions.  Hybrid actions are post-sale accident cases

25 that have economic losses, and the only issue with respect to

44

1  those economic losses were independent claims by those economic

2  losses.  It had nothing to do with the post-sale accident

3  aspect of those hybrid cases.

4        We also contend, Your Honor, that if you look at the

5  June judgment, in paragraphs 11(a) and 13(a), the Court makes

6  it clear that it's not barring people from ever coming back

7  with a due process issue if they feel that that is a basis for

8  them being able to plead.  And nothing in the June judgment

9  dismisses any cases with prejudice.  They're either stayed or

10 they would be dismissed without prejudice.  So there were no

11 dispositive rulings made with respect to post-sale accident

12 people in connection with April or June, Your Honor.

13       After the entry of the June judgment, two big

14 disputes broke out.  First, three economic loss complaints

15 asserted independent claims, the State of Arizona, the State of

16 California, and the master consolidated complaint filed in the

17 MDL.

18       The second big dispute was with respect to the six

19 bellwether complaints.  Those were post-sale ignition switch

20 defect accident cases that were going to trial in front of

21 Judge Furman.  Following entry of the case management order,

22 which was an order that was issued without any notice to my

23 clients, that was not served on my clients, the Court entered

24 its September 3, 2015 scheduling order.  That scheduling order

25 lists categories of claims and claimants.  It does not list

45

1  non-ignition switch defect post-sale accident cases.  It does

2  not list independent claims as defined in the April 2015

3  decision.

4       It doesn't use the term "independent claims" anywhere

5  in the scheduling order, and "independent claims" is a term

6  that has been defined in the April and June orders.  It became

7  part of the vernacular of the case.  And even if the term

8  "independent claims" was not there in shorthand, the words

9  "claims against New GM based on its own post-sale conduct" do

10 not appear anywhere in the September 3 order.

11      In fact, nothing in the September 3 order plainly

12 spells out that an issue to be adjudicated for post-sale

13 accident plaintiffs without the ignition switch defect was

14 going to be litigated with respect to due process or anything

15 else, and if people didn't come forward, they would be forever

16 barred.  The order was silent and we believe at best ambiguous.

17      What New GM did next --

18      THE COURT:  Do you agree that the -- what Judge

19 Gerber did ultimately was modify the sale order because of the

20 issues that were initially raised because of the ignition

21 switch problem?  So absent the modifications, would the

22 language of the sale order bar the assertion of the claims that

23 your clients are making now?

24      MR. WEINTRAUB:  That's a great question, Your Honor.

25 We respectfully disagree with Judge Gerber, and we think that

46

1  he didn't need to read the language the way he did.

2          THE COURT:  But he did.

3          MR. WEINTRAUB:  But he did, so for now we're -- we

4  have to labor under that, so --

5          THE COURT:  Okay.  So -- and that's really my

6  starting point.  Okay.  When I say "my starting point," there's

7  a sale order.  It bars lots of things.  Judge Gerber modified

8  it.  It didn't seem to me it was modified in respect of the

9  claims that your clients are asserting here.  And so the issue

10 is are you permitted now to raise the challenges that you're

11 raising is why I come back to the letter that was sent and your

12 clients did receive.  Should they have -- and because my

13 concern is, I mean, anybody can sit back and (indiscernible)

14 and five years from now they come in, and even if they had

15 notice and didn't bother coming in and raising the issues, that

16 forever more, no matter how much time passes, people come up

17 and say, "Oh, well, this is an independent claim; it's not

18 barred."  It seems to me that the sale order bars the claims.

19 The issue is for due process reasons or otherwise, does the

20 sale order have to be modified.  Judge Gerber did it in the

21 respects that we've all talked about.  That's what bothered me,

22 Mr. Weintraub.

23         MR. WEINTRAUB:  I understand, and two things:  We

24 believe we're in the same constitutional boat as the people for

25 whom the sale order was modified, and we don't believe that we

47

1  were given an opportunity or warned that this is your last and

2  final opportunity to come in to court and raise due process

3  issues.  And for the reasons that I stated, and independent

4  claims not mentioned in the scheduling order, and even if the

5  defined term wasn't used, the words to describe what an

6  independent claim are not in the September 3 order.  So the

7  September 3 order shows up on the doorstep of my clients.  In

8  one case it came on September 8th, which was many days later,

9  and it was supposed to have come under the order.  It was

10 supposed to be two business days; it wasn't.  It was on

11 September 8th.

12       But be that as it may, and we think it is

13 significant, when it showed up, they're good lawyers, they read

14 it, they thought, well, we're asserting independent claims.  We

15 don't see where this affects us.  And they reached out to

16 General Motors and they were served with a telephone book of

17 pleadings and said we don't understand why this relates to us.

18 And they were met with another telephone book of pleadings or a

19 letter that says these issues are going to be determined by

20 Judge Gerber in upcoming pleadings.

21       It also says that designated counsel is representing

22 you, which is not correct because these guys are not part of

23 the MDL and there is no designated counsel for them.  They

24 didn't appear through anyone.  I was not representing anyone at

25 that hearing other than the MDL bellwether post-sale ignition

48

1  switch defect people.  Those were my clients, not these guys.

2  That issue was not even on my radar screen.

3         So then the question becomes, Your Honor, doing the

4  colloquy back and forth, what were these guys told by GM?  And

5  I want to go to the letters that Mr. Steinberg put into the

6  record as part of their motion.  And here's a letter of

7  September 4 to Mr. Butler.  It's Exhibit J to their papers.

8  And I'm obviously not going to read the whole thing because

9  it's --

10     (Counsel confer)

11         MR. WEINTRAUB:  It was received only by email on

12  September 8th, Your Honor.  I'm not going to read the whole

13  thing, but I think that I'm not taking things out of context,

14  and it's a long, single-spaced letter, and again people are

15  trying to figure out why am I getting this letter?  Why am I

16  being told that I can't bring these claims?  I'm not suing as a

17  successor.

18         On page 2 of the letter:  "To the extent the request

19  for" -- and this is a letter that's stated specifically on

20  punitive damages.

21         "To the extent the request for punitive damages

22         contained in the pleading is based on a successor

23         liability theory, such liabilities were not assumed

24         by New GM, and accordingly New GM cannot be liable to

25         the plaintiff under that theory of recovery."

1        Skipping down two paragraphs:

2        "The bankruptcy court recently issued the judgment

3        which reiterated that, quote, 'Except for independent

4        claims and assumed liabilities, if any, all claims

5        and/or causes of action that the ignition switch

6        plaintiffs may have against New GM concerning an Old

7        GM vehicle or part seeking to impose liability or

8        damages based in whole or in part on Old GM conduct,

9        including without limitation on any successor

10       liability theory are barred and enjoined pursuant to

11       the sale order."

12       Now, what does that say?  It says except for

13  independent claims, they go through.  And it says except for

14  independent claims and assumed liabilities that the ignition

15  switch plaintiffs may have.  They're not warned --

16       THE COURT:  I thought I said I don't have it in front

17  of me.  I was a bit -- you read the language quickly, but it

18  was independent claims not based on conduct of Old GM.

19       MR. WEINTRAUB:  Right.

20       THE COURT:  Part of the problem we're having here is

21  that there's not a clear pleading that says the only thing

22  we're basing this independent claim on is the post-sale conduct

23  of New GM.

24     (Counsel confer)

25       MR. WEINTRAUB:  I'm being told that it is explicit,

50

1   Your Honor.  I can't --

2              THE COURT:  All right.  Go ahead.

3              MR. WEINTRAUB:  -- switch back and forth between --

4              THE COURT:  Go ahead.  I'm not ruling.  I'm taking

5   this under submission.  I've got to go back and reread this

6   stuff again.

7              MR. WEINTRAUB:  But the point is New GM is saying

8   whether it's completely based on New GM conduct or not, it's

9   barred, and we don't believe that it is.  And this letter, and

10  there's more to this letter that I'll read, and Mr. Turin

11  (phonetic) got a similar letter.  It suggests that independent

12  claims are okay.  That's not the position they're taking now,

13  and they do call it out as to ignition switch plaintiffs.  But

14  these guys are not in the matrix.  They haven't taken the red

15  pill or the blue pill.  They don't know.  This is a very

16  complicated case that has taken two years to get to this point,

17  and I'm sure as Your Honor can appreciate, trying to make sense

18  of all of the stuff, it's not easy.  And what this letter

19  doesn't do is say, hey, you're a non-ignition switch guy.  You

20  think you have an independent claim but you don't because you

21  have to show a due process violation which you haven't done.

22              That's not in here, Your Honor.  And the letter goes

23  on to say:

24              "To the extent the pleading requests punitive damages

25              based on Old GM conduct, such a request is

51

1          prescribed."

2          Accordingly, the pleadings should be amended so it's

3    consistent with the judgment.  So, again, it's leading them to

4    believe that if it's truly an independent claim, it's not the

5    subject of the September 3 briefing.  Mr. Steinberg is here

6    today saying they had their opportunity to raise their due

7    process issue on independent claims; they don't, they're out.

8    They're out because they didn't participate in the October

9    briefing.  And what we're saying, Your Honor, is the September

10   3 order was not clear, and this letter is affirmatively

11   misleading.

12         And there's a similar letter.  I won't read it.  It's

13   essentially the same thing from Mr. Davidson to Mr. Turner.

14   Mr. Turner actually responds, and he responds and he says as

15   follows, and again this is in Mr. Steinberg's submission as

16   Exhibit Q:

17         "Second, allow this to confirm that my clients are

18         not alleging that New GM is liable for punitive

19         damages for any alleged conduct of Old GM."

20         Now I'll skip down a few lines:

21         "New GM then acted in a manner that should subject it

22         to punitive damages by failing to warn and/or

23         fraudulently concealing the defect from my clients."

24         The response from General Motors is:

25         "The issues raised in your correspondence are or will

52

1          shortly be before the bankruptcy court."

2          Again, not engaging on the issue.  I wouldn't call it

3   a rope-a-dope tactic to see if people are going to come in or

4   not and try to bar them or not, but this clearly, when joined

5   with the defects that we believe are in the September order,

6   does not elucidate the issues in a way that meaningfully tell

7   people you've got to show up or we're going to take the

8   position you're out.

9          Now, Your Honor, as interesting as the run-up to the

10  hearing set by the scheduling order are -- it provides useful

11  background, but I want to focus on something that's equally if

12  not more critical, which is two things.  First, no one

13  represented the interests of the post-sale non-ignition switch

14  defect accident plaintiffs at the October 2015 hearing.  As I

15  said, my role was very limited.  Mr. Weisfelner was through the

16  MDL and only for the economic loss people.  My clients did --

17  were not part of the MDL, so no designated counsel could appear

18  for them.  No one appeared for them.  No one was authorized to

19  appear for them.  No one with an attorney-client relationship

20  with their clients appeared for them.  And the issues that are

21  particular to my client were not raised or litigated by anyone.

22          There was no summons or complaint issued in

23  connection with the September 3 scheduling order or the follow-

24  on hearing.  No contested matter was commenced by motion that

25  would have required them to appear as they are today because

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

53

1  now this is the fourth motion to enforce after a two-year gap

2  from the previous ones.

3        And most importantly, Your Honor, if you look at what

4  happened in the November 2015 decision and the December 2015

5  judgment, we think it's clear that the Court did not

6  permanently bar non-participating parties from ever raising due

7  process or other objections to the sale order.  There is zero

8  language in either the November 2015 decision or the December

9  2015 judgment that says anything other than independent claims

10  purportedly barred under the 2009 sale order remain stayed.

11        There's no statement or ruling that parties such as

12  my clients that had -- such as my clients had come into court

13  and tried and failed to assert the due process arguments that

14  we're making now, or that this --

15        THE COURT:  Just come back a second.  Didn't the

16  ruling continue the stay of both ignition and non-ignition

17  switch post-sale accident independent claims?  I mean, do you

18  agree with that?

19        MR. WEINTRAUB:  I do agree with that, Your Honor,

20  and --

21        THE COURT:  So as you come in today, Judge Gerber

22  maintained the stay in place and the issues before me are do I

23  continue to enforce -- I mean, you didn't move and Mr. Davidson

24  raised in his briefing, you know, they had to move under 9024,

25  they had to do this, they had to do that.  They didn't -- what

54

1  I have is I've got an existing sale order.  I've got existing

2  decisions from Judge Gerber.  You just acknowledged he

3  continued the stay with respect to the independent claims in

4  effect.  That's the status today.  They're asking me to

5  continue to enforce it.  That's what's the procedural problem

6  I'm having with your position.

7          MR. WEINTRAUB:  Let me address that this way, Your

8  Honor.

9          THE COURT:  Okay.

10          MR. WEINTRAUB:  And I'll caveat by saying if I have

11  to come back in a different format, I will.  However, the four

12  threshold issues were teed up and addressed on the first two

13  motions to enforce.  It was in the context of those first two

14  motions to enforce that the due process issues were raised.  We

15  were not required to file a Rule 60 motion or a 9024 motion.

16  This was the procedure that was used in this case.  In Grumman

17  Olson, Grumman Olson was a lawsuit in New Jersey on successor

18  liability.  The buyer came into the bankruptcy court with a

19  motion to enforce the sale order.  In the context of Grumman

20  Olson, the due process issues were raised and went up on

21  appeal.  They were ruled on by Judge Bernstein and went up on

22  appeal and were affirmed by the district court.

23          In Manville, Manville was generated by a motion to

24  approve a settlement and a motion for a clarifying order.  In

25  the context of that motion, Chubb objected and said no subject

55

matter jurisdiction in denial of due process.  On the basis of
the response to the motion, that case went to the Third Circuit
three times and to the Supreme Court once.  So for better or
for worse, this is a recognized procedure and we felt this was
not an inappropriate way to raise it.

Going back to what --

THE COURT:  Maybe after the Second Circuit hands down
its ruling, I'll agree with you.

MR. WEINTRAUB:  With respect to what Judge Gerber
did, and I think that footnote 70 of the November 2015 decision
is very illuminating, and we also think that paragraphs 14 and
29 and 30 of the December judgment are very illuminating.  I
can take the time to read them --

THE COURT:  I've written them down and I will go back
and look at them --

MR. WEINTRAUB:  Okay.  You spare us both, Your Honor.
So our position is that what Judge Gerber said in footnote 70
is basically unless and until somebody comes in with a due
process issue, you're stayed.  He doesn't say, "Hey, guess
what, you're all done, so I don't have to think about this
anymore."

In paragraph 14 of the December judgment, the judge
says, "These claims are stayed."  And he cites to the sale
order, the April decision, and the June judgment.  He does not
cite to his own November decision.  He does not say, "You're

56

1    out, you're out, you're out, you're done."  I think it's very

2    significant that he only relied upon what he had done earlier

3    because, as we spoke about earlier, the April decision and the

4    June judgment were limited to the four threshold issues with

5    respect to the ignition switch defect people, and then you've

6    got the roadmap as to what's not stayed and what's stayed,

7    again no dispositive ruling.

8           Going to the issues that we think are live, which

9    would be the constitutional issues, to the extent as had the

10   colloquy about earlier that you can even read those provisions

11   of the sale order as barring independent claims against New GM,

12   my clients are in the same constitutional boat, as I said

13   earlier, as the ignition switch defect economic loss

14   plaintiffs.  Just as Judge Gerber ruled when he looked at that

15   language, five years later in 2015, that he exceeded his

16   authority by ostensibly prospectively releasing people who

17   had --

18          THE COURT:  In order for there to be a constitutional

19   due process defect, do you have to establish that Old GM had

20   knowledge of the specific defects that are alleged in these

21   complaints?

22          MR. WEINTRAUB:  No, I don't believe I do, Your Honor.

23   I think that that's a horse of a different color, and that

24   issue came up with respect to known versus unknown creditors of

25   Old GM.  We're talking about people who have independent claims

57

1  against New GM, and it wouldn't have anything to do with

2  whether or not they were --

3          THE COURT:  It's just purely New GM conduct.

4          MR. WEINTRAUB:  Yes.

5          THE COURT:  You've got -- so nothing in any of the

6  pleadings should be read as seeking to establish liability for

7  New GM based on any conduct pre-sale of Old GM.  Is that

8  correct?

9          MR. WEINTRAUB:  That's right.  It would be added --

10          THE COURT:  It's not the 24 employees or however many

11  employees came over to New GM and whether their knowledge is

12  attributable --

13          MR. WEINTRAUB:  No, that's a different issue, Your

14  Honor.  I think that that isn't --

15          THE COURT:  I just want to know whether you're --

16          MR. WEINTRAUB:  Yes.

17          THE COURT:  Whether in Fox, the plaintiff is seeking

18  to rely upon any conduct, pre-sale conduct by Old GM, because

19  that was where I was getting hung up because it seemed to me --

20          MR. WEINTRAUB:  That's --

21          THE COURT:  -- that they're trying -- you're trying

22  to straddle that and you're not relying on --

23          MR. WEINTRAUB:  But that's --

24          THE COURT:  Let me -- don't interrupt.  When I'm

25  speaking, don't interrupt.

58

1           It seemed to me that the Fox plaintiffs are seeking
2    to straddle this issue and rely on and prove conduct of Old GM
3    as a basis for establishing purported liability for independent
4    claims for New GM.  Am I incorrect?

5           MR. WEINTRAUB:  What Judge Gerber ruled --

6           THE COURT:  No, tell me whether -- I don't want to
7    know what Judge Gerber ruled.  My question is specifically in
8    Fox, under the existing pleadings, that plaintiffs seeking to
9    rely in any respect on conduct -- pre-sale conduct of Old GM or
10   its employees in asserting the supposed independent claims
11   against New GM, yes or no?

12          MR. WEINTRAUB:  I'll answer that in two ways.  First
13   I would need to actually speak to the person who was trying to
14   talk to me.  But with respect to knowledge, knowledge that was
15   acquired by virtue of buying the books and records of Old GM,
16   knowledge that was acquired by acquiring the transferred
17   employees who brought that knowledge with them.  Judge Gerber
18   has ruled that that knowledge, which would give an awareness to
19   New GM, which in turn would have given it an obligation to act
20   or warn or not act or do something, that's fair game.

21          THE COURT:  You can do that in the context of the
22   ignition switch defect which, by the time he ruled, was
23   established that old GM knew about.  That's why I ask whether
24   is there an -- I don't know what -- you know, is it alleged
25   that old GM knew of the defects that are alleged in Fox?  Okay.

59

1  I didn't -- you know, I think you're being -- we're -- I'm

2  concerned, Mr. Weintraub, that I am being misled about -- well,

3  I'm serious about this, though I had understood you earlier to

4  say that the independent claims against New GM are based solely

5  on pre-sale conduct by New GM, and now you decline to answer my

6  question, I think, that called for a yes or no answer as to

7  whether the plaintiffs in Fox are seeking to plead and prove

8  the supposed independent claim against New GM based on any

9  conduct or knowledge by old GM.  You haven't answered that, but

10 what I got was a mushy answer, not a clear answer.  I asked for

11 a yes or no and I didn't get it.

12         MR. WEINTRAUB:  The reason I can't answer yes or no

13 is because the conduct is separate from the knowledge in the

14 sense that the knowledge clearly, if it was developed at Old

15 GM, it moved over to New GM.  So to say that you failed to warn

16 because you were aware of a defect and the awareness of that

17 defect is based upon you having inherited the knowledge of the

18 product managers and the lawyers and the other employees, I

19 don't think that's based upon old GM conduct.

20         THE COURT:  Well, it's -- you're opening Pandora's

21 box because an issue of the ignition switch, by the time Judge

22 Gerber decided, it was pretty well established that Old GM had

23 knowledge, and that's not the case that's been presented to me

24 here.

25         MR. WEINTRAUB:  But I think there's an easy answer to

1   that, Your Honor, and Judge Gerber has given us that answer,

2   which is GM has all of its defenses.  If it says, we didn't

3   know, we didn't know because Old GM didn't know, or we didn't

4   know because that was in somebody's file drawer and nobody ever

5   looked for it, so we never became aware that it was in our

6   files, that's part of their defenses.  And Judge Gerber

7   expressly, expressly ruled that that's an issue for the state

8   court or the non-bankruptcy court judge, that once the issue of

9   independent claims gets through the gate, and he did rule that

10   imputation also gets through the gate, the question of whether

11   or not GM was actually aware because of independent knowledge,

12   that's part of their defense to the lawsuit and that's

13   something that the non-bankruptcy court is determining.  So

14   when the Court says to me if they had -- if they are using

15   knowledge that was developed by Old GM to say that there was a

16   failure to warn post-sale and that's barred, I -- and that's

17   using Old GM knowledge --

18           THE COURT:  Well, let me --

19           MR. WEINTRAUB:  -- I don't agree.

20           THE COURT:  Let me say one thing.  So I understand

21   what you're telling me now that the plaintiffs in Fox are

22   seeking to base their supposed independent claim upon the

23   conduct or knowledge of Old GM, correct?

24           MR. WEINTRAUB:  You know, I've got to tell Your

25   Honor --

61

1              THE COURT:  Is that a yes, that you can answer?

2              MR. WEINTRAUB:  That's a no.  That's a no because I

3    don't agree with your premise.  I don't agree that when New GM,

4    aware of the defect, fails to warn, that that's conduct of Old

5    GM.  That's conduct of New GM.  New GM is the one with the duty

6    to warn, and the fact that they aren't --

7              THE COURT:  And your belief is that you believe that

8    the plaintiffs can prove that Old GM had knowledge of the

9    defect, I assume, in the position that have been -- they had a

10   duty to warn and they didn't.  Meanwhile, they're trying to

11   carry out Old GM -- yeah, New GM came into existence and

12   whatever knowledge Old GM had is imputed to New GM, and

13   therefore it had a duty to warn.

14             MR. WEINTRAUB:  No, we're not saying that whatever

15   knowledge they had is imputed.  Imputation, as Judge Gerber

16   said, is a question of fact.  And we are not saying that

17   there's automatic imputation.  Judge Gerber didn't say there

18   was automatic imputation, but what he did say is if you can

19   show that people at New GM were aware of information developed

20   at Old GM, and if you can show that based upon that awareness

21   there was a duty to act and that's culpable, then that's

22   something that the state court can decide.

23             And New GM has all of their defenses with respect to

24   that, so the action and the independent claim is based upon

25   assuming they have the knowledge.  What did they do with the

62

1  knowledge?  If they did nothing with the knowledge and people

2  were killed because they did nothing with the knowledge, that's

3  a culpable act, Your Honor.  And that's not based upon Old GM

4  conduct.  That's based upon New GM deciding we're not going to

5  tell people about the defect even though we know about it.

6          THE COURT:  Okay.  Go ahead with your argument.

7          MR. WEINTRAUB:  Can I just confer with counsel?  He's

8  trying to say something.

9          THE COURT:  Yes.

10     (Counsel confer)

11         MR. JAMES:  Judge, may the drafter of the pleading be

12  heard?

13         THE COURT:  Yeah, identify yourself for the record.

14         MR. BUTLER:  James E. Butler, Jr.  May the drafter of

15  the pleading be heard and respond to the Court's questions?

16         THE COURT:  Go ahead, Mr. Butler.

17         MR. BUTLER:  Yes, sir.  I typed this with my own

18  fingers after going back and forth with the GM counsel about it

19  several times.  The only claim at issue with respect to my

20  client, Ms. Fox, is failure to warn against New GM for New GM's

21  post-bankruptcy conduct -- based on New GM's post-bankruptcy

22  conduct.  It's Count 3 on page 20 of the filed second recast

23  amended complaint that was provided to Your Honor by

24  Mr. Weintraub on Friday.  And there are three operative

25  paragraphs in Count 3.  Paragraph 49 says:

63

1          "GM, LLC did, in fact, foresee, based upon its own

2          knowledge after the bankruptcy sale, the occurrence

3          of rollover events."

4          Paragraph 50:

5          "Based upon its own knowledge after the bankruptcy

6          sale, GM, LLC owed a duty to the consuming public in

7          general," et cetera.

8          Paragraph 51:

9          "GM, LLC knew after the bankruptcy sale about the

10          danger of the roof of the 2004 through 2009 Cadillac

11          SRX."

12          The only allegations, failure to warn allegations,

13 made against GM, LLC are based upon GM, LLC's own knowledge and

14 own conduct after the sale.

15          THE COURT:  May I ask you this, Mr. Butler?  What

16 facts are you relying on in support of the allegation that New

17 GM had knowledge of the rollover danger?  I mean, I -- you --

18          MR. BUTLER:  I didn't hear the first part of the

19 Court's question.  I'm sorry.

20          THE COURT:  What are the fact -- your pleading made a

21 standing state law of pleading requirements that the allegation

22 appears conclusory to me.  And my question is on what facts do

23 you rely upon in supporting the allegation that New GM had

24 knowledge of the rollover danger with the vehicle at issue?

25          MR. BUTLER:  I think two different --

64

1          THE COURT:  Because you're supposed to go trial in

2  September, so you ought to know that by now.

3          MR. BUTLER:  I do.  I do know that, Your Honor --

4          THE COURT:  Okay.

5          MR. BUTLER:  -- respectfully.  Two different

6  categories.  One is the sworn testimony of three GM engineers -

7  - four GM engineers, including the two GM engineers as lead

8  design engineers for the roof, the 2004 through 2009 Cadillac

9  SRX and its successor vehicle.  All three of -- or four of

10  whom, including those two lead design engineers, worked for Old

11  GM on June 24 and for New GM on June 25, 2009.  And also the

12  admission by New GM that all of the knowledge of the employees

13  it retained and all the books and records that were possessed

14  by Old GM were obtained by New GM the day after the bankruptcy

15  sale, which would include the knowledge of those engineers and

16  all the books and records.

17          The fact that of all the vehicles ever made by

18  General Motors, any General Motors, the lead design roof

19  engineer for the Cadillac SRX testified under oath that this

20  particular vehicle had rolled over more often at GM's proving

21  grounds than any other vehicle he'd ever -- that he'd known

22  about.  One of those rollovers was identical to the rollover my

23  client was rendered a quadriplegic in.  Her rollover was nine

24  years later.  All of those engineers' knowledge of what Old GM

25  knew continued to work for New GM.  They were deposed as

65

1  employees/engineers of New GM.

2          In addition to that, and this gets -- I can go on for

3  a long time.  This can get pretty technical.  The New GM

4  started -- my client was injured in a 2004 Cadillac SRX.  New

5  GM started redesigning the roof on that vehicle in early 2006

6  as a result of rollover rates of that vehicle at GM's own

7  proving grounds in 2004 -- 2005 -- 2004.

8          THE COURT:  What was the date of the Fox accident?

9          MR. BUTLER:  November 12, 2013.  GM started

10  redesigning the roof in early 2006 as a result of the wrecks at

11  the proving grounds.  Though that redesign continued by Old GM,

12  it was continued and finished by New GM.  The reason for the

13  redesign was to make it about three times -- the roof about

14  three times stronger, which they did.  New GM continued that

15  process.  New GM, however, continued to sell the old SRX with

16  the weak roof even after the bankruptcy, and that's not in

17  doubt.

18          So New GM had the books, records, had the knowledge

19  of the employees, continued the process of producing the same

20  car with a three times stronger roof after bankruptcy, but kept

21  selling the car with the old weak roof after the bankruptcy.

22  So there's literally nothing that Old GM knew that New GM

23  didn't know or did not continue.

24          But having said that, we do have a count, a claim

25  against Old GM for its failure to warn.  That's Count 4.  We

66

1  have a totally separate count against New GM for its failure to

2  warn.  And as I just read, I don't know I could have drafted it

3  -- it may be conclusory, but it's binding on us.  It says:

4          "Our claim -- our failure to warn claim against

5          New GM is based solely upon its own knowledge after

6          the bankruptcy sale."

7          THE COURT:  Okay.  Thanks very much, Mr. Butler.

8          MR. BUTLER:  Thank you, Your Honor.

9          THE COURT:  Mr. Weintraub.

10          MR. WEINTRAUB:  Thank you, Your Honor.  I think -- I

11  don't want to belabor this anymore.  I think it's a semantic

12  argument, but I think it's distinctual, the difference in our

13  view is that once it becomes aware of Old GM knowledge, it

14  becomes New GM knowledge.

15          I think we've already spoken about why we think

16  Manville and Melane (phonetic) are relevant on the due process

17  issue.  There was nothing in the notice that would have tipped

18  people off.  Judge Gerber didn't see anything in the sale

19  motion that would have tipped him off and then five years later

20  when he revisited it, he knew that he had gone too far.

21          We explained why we think Grumman Olson is

22  appropriate here and I think precedent in the sense that even

23  though it is a successor line that litigates, we don't quibble

24  with that, that the issue there was, how do you bind people who

25  have not yet been injured.

67

1          THE COURT:  Are you representing the plaintiffs who

2 are opposing the motion that's coming out on July 18th?  Am I

3 going to see you again on July 18th?

4          MR. WEINTRAUB:  I haven't checked my emails yet, Your

5 Honor.  We had spoken to some people who had gotten letters.  I

6 don't know if they're in that --

7          THE COURT:  All right.

8          MR. WEINTRAUB:  -- bucket.

9          THE COURT:  Okay.

10          MR. WEINTRAUB:  I might be here again.

11          THE COURT:  Okay.

12          MR. WEINTRAUB:  We don't think that Campbell is

13 applicable.  Campbell was an appeal that was based upon the

14 arguments that the bankruptcy court couldn't sell free and

15 clear of successor liability under 363(f).  You know, that's a

16 hot issue.  I think, you know, in this circuit, especially with

17 what was done in Chrysler, and General Motors had some dicta in

18 the Chrysler opinion, you could do that.

19          THE COURT:  Well, the Chrysler opinion certainly says

20 you can do it, and the circuit opinion left out the issue about

21 the post-sale personal injury claims, and that's, you know --

22          MR. WEINTRAUB:  Exactly, so that's --

23          THE COURT:  -- the part we're doing.

24          MR. WEINTRAUB:  That's right, but my point with

25 respect to that is Campbell didn't deal with independent

68

1  claims.

2            THE COURT:  Right.

3            MR. WEINTRAUB:  And certainly not with future issues

4  like this one, which as Your Honor has said, the Second Circuit

5  wouldn't even go that far and barred those future claims.

6            THE COURT:  Right.

7            MR. WEINTRAUB:  I'd be repeating myself, Your Honor.

8  I think that, you know, what I said in the beginning hit a lot

9  of the issues that I was going to hit in my representation, so

10 if I could just summarize.

11           THE COURT:  Go ahead.

12           MR. WEINTRAUB:  We don't believe that anything that

13 occurred under the four threshold issues briefing involved or

14 affected my clients who are post-sale accident plaintiffs.  We

15 think that Judge Gerber held that predicates to assertion of an

16 independent claim are a due process violation in connection

17 with the notice of the 2009 sale hearing, and prejudiced by

18 virtue of being deprived of a claim.  We think we hit both the

19 lack of notice and the prejudice.

20           We don't believe that any proceeding in the

21 bankruptcy court since 2009 has compelled my clients to come

22 forward and address the issues that I addressed today.  We

23 don't think anything ever clearly said to us that we would be

24 permanently barred.  We don't think that what actually happened

25 in the decisions and the judgment permanently barred us, so we

69

1  think that now is an appropriate time.

2          We don't think that collateral estoppel applies for

3  the obvious reason that we were not here, not represented,

4  never had an opportunity to litigate the issues.  And we think

5  that a dispositive ruling on a scheduling order that didn't

6  compel us to come here and was we think, to be kind, ambiguous,

7  didn't use the magic words, didn't even describe the thing that

8  was being sought would deny us again of due process if we were

9  permanently barred from raising these issues.

10          And with that, Your Honor, I'll --

11          THE COURT:  Okay.  Thank you.

12          MR. WEINTRAUB:  -- thank you for your time.

13          THE COURT:  Thank you, Mr. Weintraub.  Hang on,

14  Mr. Steinberg.  We've got -- Mr. Steel.

15          MR. STEEL:  Good afternoon, Your Honor.  Howard

16  Steel, Brown Rudnick, designated counsel for the ignition

17  switch plaintiffs and certain non-ignition switch plaintiffs.

18          Real quick, our view is that the Second Circuit

19  decision will be dispositive of the independent claim

20  jurisdiction issue.  And then also to clarify for the record,

21  we do agree with Mr. Weintraub on the scope of our role in the

22  August and November proceedings.  Mr. Weisfelner clearly

23  articulated that he was designated counsel for the economic

24  loss plaintiffs.  Our authority emanates from the MDL

25  leadership's authority.  We can't represent the state court

70

1    claims before you.

2          And just last, if Your Honor does choose to address

3    independent claims, I went back through and I think a good

4    framework or point of reference is not 1301, but Your Honor's

5    1031 <u>Tax Reporting Group</u> decision.  Swap in "direct" for

6    "independent" and then you look at Judge --

7          THE COURT:  <u>McHale v. Alvarez</u>, is that -- on indirect

8    or derivative claims, is that the --

9          MR. STEEL:  That's the one I'm referring to.  And

10   Judge Holwell (indiscernible) and he actually goes through

11   <u>Manville</u> and then he uses the actual language that these are

12   independent non-derivative claims that don't affect the rest of

13   the bankruptcies.  And that's the argument that's in front of

14   the Second Circuit that I think will be dispositive, Your

15   Honor.

16         THE COURT:  Yeah, I mean, look, one of the -- still

17   one of the things that's bothering me, and Mr. Weintraub and

18   Mr. Butler have addressed it, it's one thing to label something

19   independent claim and then to try and bootstrap it by arguing

20   based on Old GM conduct, is it really an independent claim at

21   that point?  I understand Mr. Weintraub's argument.  I'm not

22   trying to -- and I'm not deciding it now, but that's one of the

23   things that's bothering me about it.

24         Okay.  Anything else, Mr. Steel?

25         MR. STEEL:  No, Your Honor.

71

1                THE COURT:  Okay.

2                MR. STEEL:  Thank you for the time.

3                THE COURT:  So is anybody -- is someone arguing on

4    behalf of Chapman and Tibbetts?

5                MR. WEINTRAUB:  Is that --

6                THE COURT:  Mr. Weintraub, your arguments apply to

7    them as well?

8                MR. WEINTRAUB:  Yes, Your Honor.

9                THE COURT:  Let me just -- before you get back up,

10   Mr. Steinberg, I mean, with respect to Chapman and Tibbetts,

11   the situation -- GM's position it seems to me is much clearer

12   with respect to Chapman and Tibbetts because the complaint

13   alleges that New GM is a successor of Old GM and that's already

14   been decided.  It argues -- it tries to distinguish between Old

15   GM and New GM, and it alleges that New GM manufactured or

16   designed Old GM vehicles or performed other conduct relating to

17   Old GM vehicles before the entry of the sale order.  I mean,

18   that seems to me quite clear that Chapman and Tibbetts --

19   whatever I decide about independent claims, Chapman and

20   Tibbetts just don't pass muster under the -- under a part of

21   Judge Gerber's rulings that you have not challenged.  Do you

22   dispute that?

23               MR. WEINTRAUB:  Your Honor, clearly, they are not a

24   successor per the ruling, and I'll speak with counsel about

25   that.

72

1          In terms of historical facts, you know, there

2    happened to have been an Old GM before there was a New GM, and

3    I don't think you're barred from ever uttering those words.

4    It's what --

5          THE COURT:  Well, this is one of the few issues that

6    I've already had to decide in GM.  I did have the published

7    opinion because it involved a Georgia -- I can't remember,

8    Mr. Steinberg, what case that was, but --

9          MR. STEINBERG:  (Indiscernible).

10         THE COURT:  Yeah.  So that's easy to fix, but,

11   nevertheless, it's in there and it's defective.  All right.  I

12   just wanted to be sure.  Okay.

13         MR. WEINTRAUB:  I guess the only thing I would add,

14   Your Honor, is in terms of knowledge, imputation, and all of

15   that, if the Court has not already read it, I would guess you

16   did, but the November 2015 decision goes through that --

17         THE COURT:  I've read everything at least once, some

18   of it more than once.  I need to go back and read again, but

19   I'm not going to -- I'm going to hear Mr. Steinberg, but I'm

20   not going to rule today.  Again, they're going to be up on July

21   18th, and I'm going to wait and hear the July 18th hearing

22   before I'm going to rule on what's today.  I don't want to

23   foreclose arguments that are made on July 18th.

24         But I've already said that, I mean, one of the things

25   I'm very seriously contemplating is maintaining a stay in place

73

1   until the Second Circuit rules and then giving everybody a

2   chance to come back and tell me how the Second Circuit does or

3   does not resolve the issues.

4          In terms of Mr. Butler's case, that may mean he isn't

5   going to trial in September because I don't know when the

6   Second Circuit is going to decide very important, complicated

7   issues.  It may be sooner and it may not, so -- but let me hear

8   from Mr. Steinberg and then we'll --

9          MR. STEINBERG:  Thank you, Your Honor.

10          THE COURT:  Okay.

11          MR. STEINBERG:  I know I've said this before, but I

12   think the due process issue in front of the Second Circuit is

13   different than the issue --

14          THE COURT:  Well, it may be, and when I get to read

15   what the Second Circuit says, it may clarify things for me and

16   -- but it's not like I'm waiting -- I would be waiting on

17   something that hasn't been briefed, hasn't been argued.  It

18   was.

19          And, Mr. Steinberg, I would like you to send me the

20   transcript of the argument.  I haven't seen it.  I certainly

21   read some of the commentary after the argument, but I haven't

22   read the argument itself and I would like to see that.  It's --

23   but obviously what counts is what they rule.

24          Thanks, Mr. Weintraub.

25          Mr. Steinberg, go ahead.

74

1          MR. WEINTRAUB:  I just actually remembered one other

2   point that I wanted --

3          THE COURT:  Sure.

4          MR. WEINTRAUB:  -- if it's okay, Your Honor.  One of

5   the things Mr. Steinberg said was that I argued due process in

6   February of 2015.  And the due process issue that I argued

7   there was with respect to successor liability, not with respect

8   to independent claims.  It was clear on the transcript excerpt

9   that I repeatedly said successor liability.  And if the Court

10  would look at our brief, which you could take judicial notice

11  of, the section in the brief, the lead-in paragraph says this

12  is a distinct argument from independent claims.

13         THE COURT:  All right.  Thank you.

14         Mr. Steinberg.

15         MR. STEINBERG:  Your Honor, I thank you for your

16  patience so far and I will try to be brief, although there is

17  much to respond, including the very last thing that Mr.

18  Weintraub said, which is that my argument, and I think the

19  transcript will bear out, is that he made the Grumman Olson

20  argument at the October 2015th hearing.

21         The second thing is, is that no one who participated

22  in that October hearing thought we were talking about whether

23  punitive damages were assumed only in the context of vehicles

24  with the ignition switch defect --

25         THE COURT:  Well, just let me stop you there.

75

1  They've taken the punitive damages out.  All right?  They've

2  agreed in that.

3          MR. STEINBERG:  They have in Fox --

4          THE COURT:  Right.

5          MR. STEINBERG:  -- but not in Chapman and Tibbetts.

6          THE COURT:  Okay.  Well, Chapman and Tibbetts have

7  got other problems I've already identified.

8          MR. STEINBERG:  All right.  So --

9          THE COURT:  Fox is the more immediate issue because

10  of Mr. Butler's September trial date.

11          MR. STEINBERG:  So if you read the brief filed by

12  Mr. Weintraub, and even in his oral argument today, he builds

13  on a false premise, which is that the April 15th decision in

14  2015 and the June judgment didn't deal at all with the non-

15  ignition switch plaintiffs, that it solely dealt with ignition

16  switch -- vehicles with the ignition switch defect.

17          If you go to page 6 of his brief, he specifically

18  lists the issues covered by the April 15th decision, what was

19  dealt with.  Non-ignition switch plaintiffs is listed there

20  contradicting in his words the oral argument that he's made --

21          THE COURT:  Let me ask you this, Mr. Steinberg.  In

22  order for you to bind Fox, wouldn't you have to have brought

23  Fox into a proceeding by either serving an adversary complaint,

24  or I don't know whether you could simply do it through a

25  contested matter, but it's not a -- it strikes that you never

76

1   sent them the letter.  They haven't disputed that they got a

2   letter, they disputed as to what the letter meant and

3   everything, but you don't initiate process to bring parties

4   into a court proceeding simply by sending them a letter.

5          If -- and you don't really -- you haven't really

6   argued that an agency theory that they're bound.  If you want

7   to make them bound by Judge Gerber's prior rulings, don't you

8   have to have established they might be able to bind you because

9   there's no mutuality of -- for collateral estoppel after

10  Blonder Tongue years ago, but you're trying to bind them.  And

11  can you do that?

12          MR. STEINBERG:  Yes.

13          THE COURT:  How?

14          MR. STEINBERG:  Because I'm not look -- I'm looking

15  to enforce an existing injunction and --

16          THE COURT:  And that was part of my point about --

17  yes.  I mean, I -- my starting place is, there's an injunction.

18  Okay?  And it has to be an order -- unless -- well, Mr.

19  Weintraub and I have had a discussion about whether

20  procedurally how they can -- can they do it in opposition to a

21  motion to enforce.  And maybe they can.  Okay?

22          MR. STEINBERG:  Well, Your Honor, we actually have

23  this issue in connection with the April decision, which is that

24  it was all teed up by a motion to enforce.  One of the

25  arguments made by Mr. Peller is that you needed to do it by

77

1  adversary proceeding.  Judge Gerber ruled that the motion to

2  enforce was appropriate.

3       So then -- so we had the concept that you can do this

4  by a motion to enforce.  We were reacting to the judge's status

5  order in August when he said, I want to decide all the other

6  issues; I want recommendations from the counsel how to decide

7  all the issues that are pending on all the other cases, and he

8  was specific about also dealing with the -- without the

9  ignition switch defect.  He said, Counsel, write to us and tell

10 -- write to me and give me what your concerns are.  He had a

11 status conference on August 31 and he issued the September 3

12 hearing -- the September 3 case management order --

13       THE COURT:  Scheduling order, yeah.

14       MR. STEINBERG:  -- scheduling order.  The scheduling

15 order blessed a letter that I had drafted, which would bring in

16 all the other parties.  And that letter was actually reviewed

17 by Mr. Weintraub with his -- whatever hat he thought he was

18 wearing at that time and was reviewed by other counsel.  They

19 all passed on the letter.  Judge Gerber, when he was ruling,

20 was ruling on the issue, which is that he invited to -- who

21 wanted to participate that they could participate, they could

22 come in and file whatever pleading they wanted to see, that

23 they otherwise -- otherwise, they were going to be bound by his

24 rulings.  And that's in the letter that he had approved and

25 said that I should sent out to everybody.  So that was the

78

1  process upon which we were going.

2          THE COURT:  Mr. Weintraub argues that the letter

3  isn't clear as to what effect it had on non-ignition switch --

4          MR. STEINBERG:  The letter --

5          THE COURT:  -- plaintiffs.

6          MR. STEINBERG:  The letter was absolutely clear and I

7  was going to start with the first part, which is that it builds

8  on the false premise --

9          THE COURT:  Pardon me though.  You've got all the

10  stuff in front of you.  Give me the language in the letter that

11  you believe makes it clear that procedure applied to non-

12  ignition switch plaintiffs.  Mr. Weintraub disputes it.

13          MR. STEINBERG:  It you have any --

14          THE COURT:  He's read portions of it to me, so you're

15  going to -- you're --

16          MR. STEINBERG:  I think Mr. Weintraub read you only a

17  portion --

18          THE COURT:  I know, that's --

19          MR. STEINBERG:  -- of my letter.

20          THE COURT:  -- why I'm asking you to do it.  Okay?

21          MR. STEINBERG:  I'm going to read to you the letter

22  that was approved that was contained -- that I was allowed to

23  send pursuant to the September --

24          THE COURT:  Yes.

25          MR. STEINBERG:  -- 3 scheduling order.  It says --

79

1          MR. WEINTRAUB:  Which letter?

2          THE COURT:  He's going --

3          MR. STEINBERG:  Please.

4          THE COURT:  -- to tell you that.  Okay?

5          MR. STEINBERG:  Which it's the letter that was

6  sent --

7          THE COURT:  Give him the date and --

8          MR. STEINBERG:  It was the letter that was sent out

9  in conjunction with the scheduling order.  And the scheduling

10 order -- I'm reading that from the scheduling order.

11         MR. WEINTRAUB:  I'd like to know what letter.

12         THE COURT:  Okay.  Let him read from the scheduling

13 order, Mr. Weintraub.

14         MR. STEINBERG:  I'm reading from the --

15         THE COURT:  Just wait.

16         MR. STEINBERG:  -- scheduling order on page 4 of the

17 September 3 scheduling order, which is Exhibit I to my motion.

18 He says that I can send out this letter with a cover note that

19 states as follows:

20         "General Motors previously served you with a band

21         letter in connection with a lawsuit commenced by you

22         against New GM which sets forth that certain

23         deadlines for filing pleading with the bankruptcy

24         court as defined therein with the band letter."

25         I think Tibbetts got their demand letter before this

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1   -- the hearing and then Chapman got it before the September 30

2   hearing.   The order and Fox had their letter sent the next day.

3               "The attachment is a scheduling order attached by the

4               bankruptcy court on September 3.  Please review the

5               scheduling order, as it modifies the time periods set

6               forth in the demand letter for filing certain

7               pleadings with the bankruptcy including, without

8               limitation, the 17 business days to respond to the

9               demand letter.

10              "If you have any objections to the procedure set

11              forth in the scheduling order, you must file

12              objections in writing with the bankruptcy court

13              within three business days of receipt of this notice;

14              otherwise, you will be bound by the terms of the

15              scheduling order and the determinations made pursuant

16              thereto.

17              "If you believe there are issues that should be

18              presented to the court relating to your lawsuit that

19              will not otherwise be briefed and argued in

20              accordance with the scheduling order, you must set

21              forth that position with specificity in your

22              objection.  The court will decide whether a hearing

23              is required with respect to any objection timely

24              filed; and if so, will promptly notify the parties

25              involved."

81

1                THE COURT:  Okay.  Wait, let me come back and ask,

2    that's the notice and what Mr. Weintraub read to me from a

3    letter which he said did not identify the non-ignition

4    switch --

5                MR. STEINBERG:  He stopped reading --

6                THE COURT:  I know, so you're going to --

7                MR. STEINBERG:  I'm going to give you that.

8                THE COURT:  You're going to give me that.

9                MR. STEINBERG:  I'm going to give you that.

10                THE COURT:  And you're going to identify the date of

11   the letter and --

12                MR. STEINBERG:  It's the September 4th letter to Mr.

13   Butler.

14                THE COURT:  And where can I find that?

15                MR. STEINBERG:  And that's on Exhibit J of my motion.

16                THE COURT:  Okay.

17                MR. STEINBERG:  And Mr. Weintraub was reading on

18   page 2, the last paragraph there, but he stopped reading.  So

19   I'll put it in context.

20                THE COURT:  Read the whole paragraph.

21                MR. STEINBERG:  Okay.  It says:

22                "The bankruptcy court recently issued the judgment

23                which reiterated that, quote, 'except for independent

24                claims and assumed liabilities, if any, all claims

25                and causes of action that the ignition switch

82

1          plaintiffs may have against New GM concerning an Old

2          GM vehicle or part seeking to impose liability or

3          damages, based in whole or in part on Old GM conduct,

4          including, without limitation, on any successor

5          liability theory recovery, are barred and enjoined

6          pursuant to the sale order,' citing to the judgment

7          and the decision."

8          And there's a parenthetical which quotes from the

9    decision and that's where he stopped.  The next sentence:

10         "The reasoning and ruling set forth in the judgment

11         and decision are equally applicable to the lawsuit"

12         -- which is the -- his lawsuit.  That's -- "to the

13         extent that the pleadings request punitive damages

14         based on Old GM conduct, such a request is

15         proscribed.  Accordingly, the pleadings should be

16         amended so that it's consistent with the rulings, and

17         the judgment decision, and the sale order, and

18         junction.

19         "While the judgment provides" -- "provided procedures

20         for amending pleadings that violated the judgment,

21         decision, and sale order, and injunction, or filing a

22         pleading with the bankruptcy court, if you have a

23         good faith basis to  maintain that your pleadings

24         should not be amended, the bankruptcy court, on

25         September 3, entered a scheduling order which

83

1          contains procedures that supercede the procedures set

2          forth in the judgment.  A copy of the scheduling

3          order is attached hereto as Exhibit C.  Please

4          consult the scheduling order for the procedures that

5          apply to this matter."

6     THE COURT:  Okay.  And what you read me did not, in

7  specific words, identify non-ignition switch claims as being

8  subject to the letter and the scheduling order.  Am I correct?

9     MR. STEINBERG:  What I read was, is that I quoted

10 from his decision that said independent claims placed on Old GM

11 conduct by reason of the court's other -- I'm sorry.  When he

12 quoted from the decision, the quote that was there said:

13          "Claims premised in any way on Old GM conduct are

14          properly prescribed under the sale agreement and the

15          sale order, and by reason of the court's other

16          rulings, their prohibitions against the assertions of

17          such claims stand."

18     And the next sentence says:

19          "The reasoning and ruling set forth in the judgment

20          and decision are equally applicable to the lawsuit."

21     Meaning, his lawsuit.

22     The other thing that --

23     THE COURT:  They got Mr. Fox or Miss -- I don't know,

24 Fox's counsel got a letter that both referred -- and it's a

25 non-ignition switch case, and it has a letter -- got a letter

84

1    that says this is -- you know, I've got a bunch of rulings on

2    the ignition switch cases, but the reasoning applies to your

3    lawsuit as well.    That's --

4            MR. STEINBERG:    Correct.

5            THE COURT:    That's your position.

6            MR. STEINBERG:    The other thing, Your Honor, is that

7    the MDL has various liaison counsel, including liaison dealing

8    specifically with state court plaintiffs.    They have someone

9    who just -- he -- they have the people that you call and ask a

10   question on the defense side if you want to know what should

11   happen here.    So the notion that they were relying on me to

12   give greater advice of how they should defend a demand letter

13   that I have is rather unusual.

14           The thing that I wanted to say from the beginning is

15   that Mr. Weintraub's premise, which is that the August -- that

16   the April decision and the June judgment had nothing to do with

17   non-ignition switch defects besides what he wrote in his brief,

18   to say to the contrary.    He's actually contradicted by MDL

19   counsel.    The three-page pleading that they filed with Your

20   Honor was a reminder that -- which we disagree with, but is a

21   reminder that issues relating to non-ignition switch defects

22   are on appeal to the Second Circuit.

23           THE COURT:    Well, Mr. Steel tells me that he believes

24   the Second Circuit decision is going to be dispositive of the

25   issues I have before me today.

85

1          MR. STEINBERG:  Right, so --

2          THE COURT:  Mr. Steel just said that.

3          MR. STEINBERG:  So he himself, although, he didn't

4  want to say it as being contrary to Mr. Weintraub, actually

5  filed the pleading that was contrary to Mr. Weintraub's

6  fundamental assertion because then he builds on that false

7  premise.  He says that because the April and June decisions

8  didn't deal with non-ignition switch defects, there was no

9  intention to try to deal with these otherwise.

10         To get there, you have to ignore Judge Gerber's

11 statement saying I'm particularly concerned -- his statements

12 to Mr. Weisfelner that says, you know, you have some of your

13 guys that aren't doing.  Mr. Weisfelner is saying that I will

14 deal with it.  And me dealing with briefing -- and if you read

15 the briefing for the punitive damage issues, no one says this

16 is only related to ignition switch cars.

17         So I'd like to now just switch to the complaints

18 because Your Honor asked legitimate questions about what are

19 you asserting as an independent claim.  And I can, Your Honor,

20 give you five minutes as to why -- what an independent claim

21 meets in accordance with Judge Gerber's decisions.  I'll pass

22 on that unless you really want, but because I think there's a

23 much simpler answer.  In Chapman, the independent claims that

24 they are asserting are buried in their negligent Count 2.

25         THE COURT:  Chapman and Tibbetts just don't pass

86

1  muster.  I mean, it just --

2            MR. STEINBERG:  Okay.

3            THE COURT:  It doesn't, but they don't.

4            MR. STEINBERG:  Fox, which is the only other one, the

5  only paragraph that Mr. Butler didn't read to you is the first

6  paragraph, 48, of the newest Fox complaint, which says:

7            "Plaintiff incorporates as if we alleged herein in

8            full paragraphs 1 through 47 of this complaint."

9            So he basically re-alleged everything else there.

10           I will say that if you take one step back and realize

11 what has happened here, is that because we told him that he

12 didn't break out what was the independent claim for New GM, he

13 decided I'm going to put it in a separate count and I'll keep

14 the Old GM count as a separate count.  And that's what he did,

15 but it obviously makes no sense because, first of all, as Your

16 Honor had ruled in Schnolt (phonetic), he's still stayed from

17 suing Old GM to Old GM he put as a separate count but is not a

18 named as a defendant in the lawsuit itself.  So in trying to

19 create what he thought was a clever solution, he created much

20 more problems for himself.

21           And Judge Gerber ruled that if you didn't do it right

22 in your allegations, it was really allegations, he said your

23 actions are stayed.  So the extent that Fox hadn't been doing

24 it right up until the last time that they amended and now

25 they've amended in a different way that creates problems and

1  Tibbetts and Chapman still have major problems in how they've

2  had their allegations, they were stayed.  The burden really

3  wasn't on me to tell them to comply with their orders.  They

4  should know how to comply with an order.  The burden is on me

5  to come to Your Honor if I need you to enforce it because they

6  aren't complying with the order.  And that's what we're doing

7  now.

8           THE COURT:  Well, just so it's crystal clear, Chapman

9  and Tibbetts don't comply with the prior orders of the court

10  and they remain stayed.  That's as simple as that.

11          With respect to Fox, I'm taking it under advisement.

12  We're going to have a hearing on July 18th.  I will hear more

13  arguments then.

14          Mr. Butler, I said this -- I'm not hiding the ball on

15  this, if -- you know, I don't force anybody to resolve things

16  by settlement or agreement.  I got competing letters saying

17  negotiations are going on.  All I can say is, if you really

18  think you're going to go to trial in September, you ought to

19  seriously try and resolve the issue as to whether you can drop

20  this supposed independent claim.  Whether you believe you need

21  it or not is up to you.  I'm not telling you what to do, but I

22  think, sure, I mean, the Second Circuit could hand down a

23  ruling tomorrow.  I wouldn't bet on it.  And I'm going to hear

24  more argument on July 18th and the arguments may further

25  elucidate the issues that have been raised today.

88

1          I'm going to go back and reread a lot of things, but

2    you've got an impending trial date and I'm sure you've got

3    things to do.  And I see you waived a jury and -- you know, and

4    I assume the judge is ready to go to trial in September.  If

5    you think you can resolve issues with Mr. Steinberg or other GM

6    counsel so as to -- you've already resolved the punitive damage

7    issue, it sounds like.  If you can resolve the independent

8    claim issue, you'll submit a stipulation, and it'll be

9    resolved, and god speed in trial.  I don't know what to say

10   other than that.

11          MR. BUTLER:  Your Honor, we appreciate that.  We

12   understand.   On the morning of September 13, Count III of our

13   second recast and amended complaint is going to be stayed or

14   not.  And --

15          THE COURT:  I'm -- you know, your whole case --

16          MR. BUTLER:  -- the trial will --

17          THE COURT:  -- may be stayed.  Don't -- I'm not sure

18   what part of the order is going to be, but don't assume you're

19   going to trial on everything other than one count.  That's not

20   for me to decide today.  Just don't assume anything other than,

21   you know, the stay --

22          MR. BUTLER:  Your Honor --

23          THE COURT:  There is a stay.  Okay?

24          MR. BUTLER:  I want to point out that they're --

25          THE COURT:  Stop.  There's a stay in place.  That's

89

1  unquestionable.  GM is seeking to enforce the injunction.

2  Okay?  You and Mr. Weintraub argued why it shouldn't be

3  enforced and in due course I will decide that.  It may not be

4  until after the Second Circuit decides, but what the state

5  court judge decides to do -- if there's a stay in place, the

6  state court judge can do what he or she thinks is appropriate.

7           But, Mr. Steinberg, go ahead.

8           MR. STEINBERG:  Right, Your Honor, you --

9           THE COURT:  Mr. Butler, I'll give you a chance in a

10  second.

11          Go ahead, Mr. Steinberg.

12          MR. STEINBERG:  Your Honor, you've already indicated

13  what you're going to do on Chapman and Tibbetts and that you're

14  going to reserve on Fox until I have another opportunity to

15  speak, presumably in addition, on these same issues.  So I have

16  one final comment to make recognizing that I will have another

17  time to expand further to the extent that I think necessary.

18  But --

19          THE COURT:  You may not have another chance to expand

20  on Fox.  Don't --

21          MR. STEINBERG:  Well, I mean, Fox, yeah.  Okay.

22          THE COURT:  Okay.

23          MR. STEINBERG:  Then on Fox.  I think the other thing

24  that I would say on Fox is that they are asserting an assumed

25  liability.  Old GM sold their vehicle before the sale.  The

90

1   sale order specifically defined what were the assumed

2   liabilities.  They are the glove box warranty to do a repair,

3   which is not -- the lemon law, which is not an assumed product

4   liabilities, which an independent claim is not.  By definition,

5   independent claims can't be an assumed product liability.  Duty

6   to warn is given to a manufacturer or a seller.  We're not he

7   manufacturer, New GM.  We're not the seller, as vis-a-vis an

8   independent claim, and we're not the successor in interest

9   because we have a no successor liability finding.

10           They're asserting, like Chapman and Tibbetts without

11   using the Chapman and Tibbetts words, is that since Old GM had

12   a duty warn, that we had a continuing duty to warn.  But our

13   duty was on an assumed product liability.  They can assert duty

14   to warn as a separate element of a cause of action to establish

15   the assumed product liability.  That doesn't get them to assert

16   this as an independent claim.  They have not asserted anything

17   in their complaint that identifies anything other than since

18   Old GM didn't warn, New GM also didn't warn.  There wasn't any

19   volitional conduct that was alleged --

20           THE COURT:  Mr. Steinberg, go talk to Mr. Butler.  If

21   you -- either you work it out or you won't work it out.  What

22   can I say?

23           MR. STEINBERG:  Okay.

24           THE COURT:  I'm taking -- we're going to hear

25   argument on July 18th.

1          MR. STEINBERG:  Okay.

2          THE COURT:  Mr. Butler, go ahead, briefly.  We've got

3   to end.

4          MR. BUTLER:  Your Honor, yes, very briefly.  For the

5   record, GM has not moved to enforce a stay except as to

6   Count III, the failure to warn claim versus New GM.  There's

7   nothing before the Court except that.  That complaint by GM,

8   contrary to Mr. Steinberg's arguments about the September 2015

9   letter not received until September 8, that complaint about

10  failure to warn versus New GM based upon New GM's post-

11  bankruptcy conduct was never mentioned by King & Spaulding or

12  New GM until May 16, 2016.

13         And Mr. Steinberg's statement that our claim against

14  New GM, but for failure to warn, is, quote, "since Old GM had a

15  duty to warn, then New GM had a continuing duty to warn."

16  That's not correct, as our second recast and amended complaint

17  shows, and the first recast and amended complaint showed.

18  Thank you, Your Honor.

19         THE COURT:  Thanks, Mr. Butler.

20         No, no more.  No more.  No more.  No, we're recessed.

21         MR. STEINBERG:  Thank you, Your Honor.

22         MR. WEINTRAUB:  Thank you, Your Honor.

23      (Proceedings concluded at 1:15 p.m.)

24                       *  *  *  *  *

25

92

1    **C E R T I F I C A T I O N**

2

3         I, Lisa Luciano, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9    _____

10   LISA LUCIANO, AAERT NO. 327         DATE:  June 28, 2016

11   ACCESS TRANSCRIPTS, LLC

12

13

14   **C E R T I F I C A T I O N**

15

16         I, ILENE WATSON, court approved transcriber, certify

17   that the foregoing is a correct transcript from the official

18   electronic sound recording of the proceedings in the above-

19   entitled matter.

20

21

22

23   _____

24   ILENE WATSON, AAERT NO. 447         DATE:  June 28, 2016

25   ACCESS TRANSCRIPTS, LLC

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)