# Exhibit  A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
:
In re                                         :      Chapter 11 Case No.
:
**GENERAL MOTORS CORP.,** *et al.*,           :      09-50026 (REG)
:
                       Debtors.               :      (Jointly Administered)
:
----------------------------------------------------------------x

### ORDER (I) AUTHORIZING SALE OF ASSETS PURSUANT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT WITH NGMCO, INC., A U.S. TREASURY-SPONSORED PURCHASER; (II) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE; AND (III) GRANTING RELATED RELIEF

Upon the motion, dated June 1, 2009 (the "**Motion**"), of General Motors

Corporation ("**GM**") and its affiliated debtors, as debtors in possession (collectively, the

"**Debtors**"), pursuant to sections 105, 363, and 365 of title 11, United States Code (the

"**Bankruptcy Code**") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**") for, among other things, entry of an order authorizing and

approving (A) that certain Amended and Restated Master Sale and Purchase Agreement, dated as

of June 26, 2009, by and among GM and its Debtor subsidiaries (collectively, the "**Sellers**") and

NGMCO, Inc., as successor in interest to Vehicle Acquisition Holdings LLC (the "**Purchaser**"),

a purchaser sponsored by the United States Department of the Treasury (the "**U.S. Treasury**"),

together with all related documents and agreements as well as all exhibits, schedules, and

addenda thereto (as amended, the "**MPA**"), a copy of which is annexed hereto as Exhibit "A"

(excluding the exhibits and schedules thereto); (B) the sale of the Purchased Assets[1] to the

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Motion or the MPA.

US_ACTIVE:\43085833\07\43085833_7.DOC\).

09-50026-reg    Doc 2968    Filed 07/01/16    Entered 07/01/16 23:17:28    Exhibits A

Purchaser free and clear of liens, claims, encumbrances, and interests (other than Permitted

Encumbrances), including rights or claims based on any successor or transferee liability; (C) the

assumption and assignment of the Assumable Executory Contracts; (D) the establishment of

certain Cure Amounts; and (E) the UAW Retiree Settlement Agreement (as defined below); and

the Court having jurisdiction to consider the Motion and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York of Any and All Proceedings Under

Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided in accordance with this Court's Order, dated June 2, 2009 (the

"**Sale Procedures Order**"), and it appearing that no other or further notice need be provided;

and a hearing having been held on June 30 through July 2, 2009, to consider the relief requested

in the Motion (the "**Sale Hearing**"); and upon the record of the Sale Hearing, including all

affidavits and declarations submitted in connection therewith, and all of the proceedings had

before the Court; and the Court having reviewed the Motion and all objections thereto (the

"**Objections**") and found and determined that the relief sought in the Motion is necessary to

avoid immediate and irreparable harm to the Debtors and their estates, as contemplated by

Bankruptcy Rule 6003 and is in the best interests of the Debtors, their estates and creditors, and

other parties in interest and that the legal and factual bases set forth in the Motion establish just

cause for the relief granted herein; and after due deliberation and sufficient cause appearing

therefor, it is

FOUND AND DETERMINED THAT:

A.      The findings and conclusions set forth herein and in the Court's Decision

dated July 5, 2009 (the "**Decision**") constitute the Court's findings of fact and conclusions of law

pursuant to Fed. R. Bankr. P. 7052, made applicable to this proceeding pursuant to Fed. R.

Bankr. P. 9014.

B.      To the extent any of the following findings of fact or Findings of Fact in

the Decision constitute conclusions of law, they are adopted as such.  To the extent any of the

following conclusions of law or Conclusions of Law in the Decision constitute findings of fact,

they are adopted as such.

C.      This Court has jurisdiction over the Motion, the MPA, and the 363

Transaction pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant

to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the Motion in this District is

proper under 28 U.S.C. §§ 1408 and 1409.

D.      The statutory predicates for the relief sought in the Motion are sections

105(a), 363, and 365 of the Bankruptcy Code as supplemented by Bankruptcy Rules 2002, 6004,

and 6006.

E.      As evidenced by the affidavits and certificates of service and Publication

Notice previously filed with the Court, in light of the exigent circumstances of these chapter 11

cases and the wasting nature of the Purchased Assets and based on the representations of counsel

at the Sale Procedures Hearing and the Sale Hearing, (i) proper, timely, adequate, and sufficient

notice of the Motion, the Sale Procedures, the 363 Transaction, the procedures for assuming and

assigning the Assumable Executory Contracts as described in the Sale Procedures Order and as

modified herein (the "**Modified Assumption and Assignment Procedures**"), the UAW Retiree

Formatted: Font: Bold

09-50026-reg    Doc 2968    Filed 07/09/09    Entered 07/09/09 23:17:23    Main Document Pg 4 of 52

Settlement Agreement, and the Sale Hearing have been provided in accordance with Bankruptcy

Rules 2002(a), 6004(a), and 6006(c) and in compliance with the Sale Procedures Order; (ii) such

notice was good and sufficient, reasonable, and appropriate under the particular circumstances of

these chapter 11 cases, and reasonably calculated to reach and apprise all holders of liens, claims,

encumbrances, and other interests, including rights or claims based on any successor or

transferee liability, about the Sale Procedures, the sale of the Purchased Assets, the 363

Transaction, and the assumption and assignment of the Assumable Executory Contracts, and to

reach all UAW-Represented Retirees about the UAW Retiree Settlement Agreement and the

terms of that certain Letter Agreement, dated May 29, 2009, between GM, the International

Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the

"**UAW**"), and Stember, Feinstein, Doyle & Payne, LLC (the "**UAW Claims Agreement**")

relating thereto; and (iii) no other or further notice of the Motion, the 363 Transaction, the Sale

Procedures, the Modified Assumption and Assignment Procedures, the UAW Retiree Settlement

Agreement, the UAW Claims Agreement, and the Sale Hearing or any matters in connection

therewith is or shall be required.  With respect to parties who may have claims against the

Debtors, but whose identities are not reasonably ascertainable by the Debtors (including, but not

limited to, potential contingent warranty claims against the Debtors), the Publication Notice was

sufficient and reasonably calculated under the circumstances to reach such parties.

       F.     On June 1, 2009, this Court entered the Sale Procedures Order approving

the Sale Procedures for the Purchased Assets.  The Sale Procedures provided a full, fair, and

reasonable opportunity for any entity to make an offer to purchase the Purchased Assets.  The

Debtors received no bids under the Sale Procedures for the Purchased Assets.  Therefore, the

Purchaser's bid was designated as the Successful Bid pursuant to the Sale Procedures Order.

G.    As demonstrated by (i) the Motion, (ii) the testimony and other evidence

proffered or adduced at the Sale Hearing, and (iii) the representations of counsel made on the

record at the Sale Hearing, in light of the exigent circumstances presented, (a) the Debtors have

adequately marketed the Purchased Assets and conducted the sale process in compliance with the

Sale Procedures Order; (b) a reasonable opportunity has been given to any interested party to

make a higher or better offer for the Purchased Assets; (c) the consideration provided for in the

MPA constitutes the highest or otherwise best offer for the Purchased Assets and provides fair

and reasonable consideration for the Purchased Assets; (d) the 363 Transaction is a sale of

deteriorating assets and the only alternative to liquidation available for the Debtors; (e) if the 363

Transaction is not approved, the Debtors will be forced to cease operations altogether; (f) the

failure to approve the 363 Transaction promptly will lead to systemic failure and dire

consequences, including the loss of hundreds of thousands of auto-related jobs; (g) prompt

approval of the 363 Transaction is the only means to preserve and maximize the value of the

Debtors' assets; (h) the 363 Transaction maximizes fair value for the Debtors' parties in interest;

(i) the Debtors are receiving fair value for the assets being sold; (j) the 363 Transaction will

provide a greater recovery for the Debtors' creditors than would be provided by any other

practical available alternative, including liquidation under chapters 7 or 11 of the Bankruptcy

Code; (k) no other entity has offered to purchase the Purchased Assets for greater economic

value to the Debtors or their estates; (l) the consideration to be paid by the Purchaser under the

MPA exceeds the liquidation value of the Purchased Assets; and (m) the Debtors' determination

that the MPA constitutes the highest or best offer for the Purchased Assets and that the 363

Transaction represents a better alternative for the Debtors' parties in interest than an immediate

liquidation constitute valid and sound exercises of the Debtors' business judgment.

H.     The actions represented to be taken by the Sellers and the Purchaser are appropriate under the circumstances of these chapter 11 cases and are in the best interests of the Debtors, their estates and creditors, and other parties in interest.

I.     Approval of the MPA and consummation of the 363 Transaction at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

J.     The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the sale of the Purchased Assets pursuant to the 363 Transaction prior to, and outside of, a plan of reorganization and for the immediate approval of the MPA and the 363 Transaction because, among other things, the Debtors' estates will suffer immediate and irreparable harm if the relief requested in the Motion is not granted on an expedited basis.  In light of the exigent circumstances of these chapter 11 cases and the risk of deterioration in the going concern value of the Purchased Assets pending the 363 Transaction, time is of the essence in (i) consummating the 363 Transaction, (ii) preserving the viability of the Debtors' businesses as going concerns, and (iii) minimizing the widespread and adverse economic consequences for the Debtors, their estates, their creditors, employees, the automotive industry, and the national economy that would be threatened by protracted proceedings in these chapter 11 cases.

K.     The consideration provided by the Purchaser pursuant to the MPA (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a greater recovery to the Debtors' estates than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

L.      The 363 Transaction must be approved and consummated as promptly as
practicable in order to preserve the viability of the business to which the Purchased Assets relate
as a going concern.

M.      The MPA was not entered into and none of the Debtors, the Purchaser, or
the Purchasers' present or contemplated owners have entered into the MPA or propose to
consummate the 363 Transaction for the purpose of hindering, delaying, or defrauding the
Debtors' present or future creditors.  None of the Debtors, the Purchaser, nor the Purchaser's
present or contemplated owners is entering into the MPA or proposing to consummate the 363
Transaction fraudulently for the purpose of statutory and common law fraudulent conveyance
and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the
United States, any state, territory, or possession thereof, or the District of Columbia, or any other
applicable jurisdiction with laws substantially similar to any of the foregoing.

N.      In light of the extensive prepetition negotiations culminating in the MPA,
the Purchaser's commitment to consummate the 363 Transaction is clear without the need to
provide a good faith deposit.

O.      Each Debtor (i) has full corporate power and authority to execute the MPA
and all other documents contemplated thereby, and the sale of the Purchased Assets has been
duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all
of the corporate power and authority necessary to consummate the transactions contemplated by
the MPA, (iii) has taken all corporate action necessary to authorize and approve the MPA and the
consummation by the Debtors of the transactions contemplated thereby, and (iv) subject to entry
of this Order, needs no consents or approvals, other than those expressly provided for in the
MPA which may be waived by the Purchaser, to consummate such transactions.

US_ACTIVE:\43085833\07\43085833_7.DOC\.                     7

09-50026-reg    Doc 2966    Filed 07/09/09    Entered 07/09/09 23:17:23    Exhibits A
                                                                    through N    Pg 9 of 481

P.       The consummation of the 363 Transaction outside of a plan of

reorganization pursuant to the MPA neither impermissibly restructures the rights of the Debtors'

creditors, allocates or distributes any of the sale proceeds, nor impermissibly dictates the terms of

a liquidating plan of reorganization for the Debtors.  The 363 Transaction does not constitute a

*sub rosa* plan of reorganization.  The 363 Transaction in no way dictates distribution of the

Debtors' property to creditors and does not impinge upon any chapter 11 plan that may be

confirmed.

Q.       The MPA and the 363 Transaction were negotiated, proposed, and entered

into by the Sellers and the Purchaser without collusion, in good faith, and from arm's-length

bargaining positions.  Neither the Sellers, the Purchaser, the U.S. Treasury, nor their respective

agents, officials, personnel, representatives, and advisors, has engaged in any conduct that would

cause or permit the MPA to be avoided under 11 U.S.C. § 363(n).

R.       The Purchaser is a newly-formed Delaware corporation that, as of the date

of the Sale Hearing, is wholly-owned by the U.S. Treasury.  The Purchaser is a good faith

purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the

protections afforded thereby.

S.       Neither the Purchaser, the U.S. Treasury, nor their respective agents,

officials, personnel, representatives, or advisors is an "insider" of any of the Debtors, as that term

is defined in section 101(31) of the Bankruptcy Code.

T.       Upon the Closing of the 363 Transaction, the Debtors will transfer to the

Purchaser substantially all of its assets.  In exchange, the Purchaser will provide the Debtors with

(i) cancellation of billions of dollars in secured debt; (ii) assumption by the Purchaser of a

portion of the Debtors' business obligations and liabilities that the Purchaser will satisfy; and (iii)

no less than 10% of the Common Stock of the Purchaser as of the Closing (100% of which the

Debtors' retained financial advisor values at between $38 billion and $48 billion) and warrants to

purchase an additional 15% of the Common Stock of the Purchaser as of the Closing, the

combination of which the Debtors' retained financial advisor values at between $7.4 billion and

$9.8 billion (which amount, for the avoidance of doubt, does not include any amount for the

Adjustment Shares).

      U.     The Purchaser, not the Debtors, has determined its ownership composition

and capital structure.  The Purchaser will assign ownership interests to certain parties based on

the Purchaser's belief that the transfer is necessary to conduct its business going forward, that the

transfer is to attain goodwill and consumer confidence for the Purchaser and to increase the

Purchaser's sales after completion of the 363 Transaction.  The assignment by the Purchaser of

ownership interests is neither a distribution of estate assets, discrimination by the Debtors on

account of prepetition claims, nor the assignment of proceeds from the sale of the Debtors'

assets.  The assignment of equity to the New VEBA (as defined in the UAW Retiree Settlement

Agreement) and 7176384 Canada Inc. is the product of separately negotiated arm's-length

agreements between the Purchaser and its equity holders and their respective representatives and

advisors.  Likewise, the value that the Debtors will receive on consummation of the 363

Transaction is the product of arm's-length negotiations between the Debtors, the Purchaser, the

U.S. Treasury, and their respective representatives and advisors.

      V.     The U.S. Treasury and Export Development Canada ("**EDC**"), on behalf

of the Governments of Canada and Ontario, have extended credit to, and acquired a security

interest in, the assets of the Debtors as set forth in the DIP Facility and as authorized by the

interim and final orders approving the DIP Facility (Docket Nos. 292 and 2529, respectively).

Before entering into the DIP Facility and the Loan and Security Agreement, dated as of

December 31, 2008 (the "**Existing UST Loan Agreement**"), the Secretary of the Treasury, in

consultation with the Chairman of the Board of Governors of the Federal Reserve System and as

communicated to the appropriate committees of Congress, found that the extension of credit to

the Debtors is "necessary to promote financial market stability," and is a valid use of funds

pursuant to the statutory authority granted to the Secretary of the Treasury under the Emergency

Economic Stabilization Act of 2008, 12 U.S.C. §§ 5201 et seq. ("**EESA**").  The U.S. Treasury's

extension of credit to, and resulting security interest in, the Debtors, as set forth in the DIP

Facility and the Existing UST Loan Agreement and as authorized in the interim and final orders

approving the DIP Facility, is a valid use of funds pursuant to EESA.

       W.      The DIP Facility and the Existing UST Loan Agreement are loans and

shall not be recharacterized.  The Court has already approved the DIP Facility.  The Existing

UST Loan Agreement bears the undisputed hallmarks of a loan, not an equity investment.

Among other things:

      (i)      The U.S. Treasury structured its prepetition transactions with GM as (a) a loan, made pursuant to and governed by the Existing UST Loan Agreement, in addition to (b) a separate, and separately documented, equity component in the form of warrants;

      (ii)      The Existing UST Loan Agreement has customary terms and covenants of a loan rather than an equity investment.  For example, the Existing UST Loan Agreement contains provisions for repayment and pre-payment, and provides for remedies in the event of a default;

      (iii)      The Existing UST Loan Agreement is secured by first liens (subject to certain permitted encumbrances) on GM's and the guarantors' equity interests in most of their domestic subsidiaries and certain of their foreign subsidiaries (limited in most cases to 65% of the equity interests of the pledged foreign subsidiaries), intellectual property, domestic real estate (other than manufacturing plants or facilities) inventory that was not pledged to other lenders, and cash and cash equivalents in the United States;

      (iv)      The U.S. Treasury also received junior liens on certain additional collateral, and thus, its claim for recovery on such collateral under the Existing UST Loan Agreement is, in part, junior to the claims of other creditors;

      (v)      the Existing UST Loan Agreement requires the grant of security by its terms, as well as by separate collateral documents, including:  (a) a guaranty and

security agreement, (b) an equity pledge agreement, (c) mortgages and deeds of trust, and (d) an intellectual property pledge agreement;

        (vi)    Loans under the Existing UST Loan Agreement are interest-bearing with a rate of 3.00% over the 3-month LIBOR with a LIBOR floor of 2.00%. The Default Rate on this loan is 5.00% above the non-default rate.

        (vii)    The U.S. Treasury always treated the loans under the Existing UST Loan Agreement as debt, and advances to GM under the Existing Loan Agreement were conditioned upon GM's demonstration to the United States Government of a viable plan to regain competitiveness and repay the loans.

        (viii)    The U.S. Treasury has acted as a prudent lender seeking to protect its investment and thus expressly conditioned its financial commitment upon GM's meaningful progress toward long-term viability.

Other secured creditors of the Debtors also clearly recognized the loans under the Existing UST Loan Agreement as debt by entering into intercreditor agreements with the U.S. Treasury in order to set forth the secured lenders' respective prepetition priority.

        X.    This Court has previously authorized the Purchaser to credit bid the amounts owed under both the DIP Facility and the Existing UST Loan Agreement and held the Purchaser's credit bid to be, for all purposes, a "Qualified Bid" under the Sale Procedures Order.

        Y.    The Debtors, the Purchaser, and the UAW, as the exclusive collective bargaining representative of the Debtors' UAW-represented employees and the authorized representative of the persons in the Class and the Covered Group (as described in the UAW Retiree Settlement Agreement) (the "**UAW-Represented Retirees**") under section 1114(c) of the Bankruptcy Code, engaged in good faith negotiations in conjunction with the 363 Transaction regarding the funding of "retiree benefits" within the meaning of section 1114(a) of the Bankruptcy Code and related matters. Conditioned upon the consummation of the 363 Transaction and the approval of the Bankruptcy Court granted in this Order, the Purchaser and the UAW will enter into that certain Retiree Settlement Agreement, dated as of the Closing Date (the "**UAW Retiree Settlement Agreement**"), which is Exhibit D to the MPA, which resolves

09-50026-reg    Doc 2968    Filed 07/09/09    Entered 07/09/09 23:17:28    Exhibits A
                                    through N    Pg 120 of 131

issues with respect to the provision of certain retiree benefits to UAW-Represented Retirees as described in the UAW Retiree Settlement Agreement.  As set forth in the UAW Retiree Settlement Agreement, the Purchaser has agreed to make contributions of cash, stock, and warrants of the Purchaser to the New VEBA (as defined in the UAW Retiree Settlement Agreement), which will have the obligation to fund certain health and welfare benefits for the UAW-Represented Retirees.  The New VEBA will also be funded by the transfer of assets from the Existing External VEBA and the assets in the UAW Related Account of the Existing Internal VEBA (each as defined in the UAW Retiree Settlement Agreement).  GM and the UAW, as the authorized representative of the UAW-Represented Retirees, as well as the representatives for the class of plaintiffs in a certain class action against GM (the "**Class Representatives**"), through class counsel, Stemper, Feinstein, Doyle and Payne LLC ("**Class Counsel**"), negotiated in good faith the UAW Claims Agreement, which requires the UAW and the Class Representatives to take actions to effectuate the withdrawal of certain claims against the Debtors, among others, relating to retiree benefits in the event the 363 Transaction is consummated and the Bankruptcy Court approves, and the Purchaser becomes fully bound by, the UAW Retiree Settlement Agreement, subject to reinstatement of such claims to the extent of any adverse impact to the rights or benefits of UAW-Represented Retirees under the UAW Retiree Settlement Agreement resulting from any reversal or modification of the 363 Transaction, the UAW Retiree Settlement Agreement, or the approval of the Bankruptcy Court thereof, the foregoing as subject to the terms of, and as set forth in, the UAW Claims Agreement.

Z.    Effective as of the Closing of  the 363 Transaction, the Debtors will assume and assign to the Purchaser the UAW Collective Bargaining Agreement and all liabilities thereunder.  The Debtors, the Purchaser, the UAW and Class Representatives intend that their actions in connection with the UAW Retiree Settlement Agreement and related undertakings

09-50026-reg    Doc 2968    Filed 07/09/09    Entered 07/09/09 23:17:28    Exhibits A
through A Pg 130 of 151

incorporate the compromise of certain claims and rights and shall be deemed to satisfy the

requirements of 29 U.S.C. § 186(c)(2).

AA.    The transfer of the Purchased Assets to the Purchaser will be a legal, valid,

and effective transfer of the Purchased Assets and, except for the Assumed Liabilities, will vest

the Purchaser with all right, title, and interest of the Sellers to the Purchased Assets free and clear

of liens, claims, encumbrances, and other interests (other than Permitted Encumbrances),

including rights or claims (for purposes of this Order, the term "claim" shall have the meaning

ascribed to such term in section 101(5) of the Bankruptcy Code) based on any successor or

transferee liability, including, but not limited to (i) those that purport to give to any party a right

or option to effect any forfeiture, modification, right of first refusal, or termination of the Sellers'

or the Purchaser's interest in the Purchased Assets, or any similar rights and (ii) (a) those arising

under all mortgages, deeds of trust, security interests, conditional sale or other title retention

agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal or charges

of any kind or nature, if any, including, but not limited to, any restriction on the use, voting,

transfer, receipt of income, or other exercise of any attributes of ownership and (b) all claims

arising in any way in connection with any agreements, acts, or failures to act, of any of the

Sellers or any of the Sellers' predecessors or affiliates, whether known or unknown, contingent

or otherwise, whether arising prior to or subsequent to the commencement of these chapter 11

cases, and whether imposed by agreement, understanding, law, equity or otherwise, including,

but not limited to, claims otherwise arising under doctrines of successor or transferee liability.

BB.    The Sellers may sell the Purchased Assets free and clear of all liens,

claims, encumbrances, and other interests of any kind or nature whatsoever (other than Permitted

Encumbrances), including rights or claims based on any successor or transferee liability,

because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the

Bankruptcy Code has been satisfied. Those (i) holders of liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, and (ii) non-Debtor parties to the Assumable Executory Contracts who did not object, or who withdrew their Objections, to the 363 Transaction or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those (i) holders of liens, claims, and encumbrances, and (ii) non-Debtor parties to the Assumable Executory Contracts who did object, fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and, to the extent they have valid and enforceable liens or encumbrances, are adequately protected by having such liens or encumbrances, if any, attach to the proceeds of the 363 Transaction ultimately attributable to the property against or in which they assert a lien or encumbrance. To the extent liens or encumbrances secure liabilities that are Assumed Liabilities under this Order and the MPA, no such liens or encumbrances shall attach to the proceeds of the 363 Transaction.

CC.    Under the MPA, GM is transferring all of its right, title, and interest in the Memphis, TN SPO Warehouse and the White Marsh, MD Allison Transmission Plant (the "**TPC Property**") to the Purchaser pursuant to section 363(f) of the Bankruptcy Code free and clear of all liens (including, without limitation, the TPC Liens (as hereinafter defined)), claims, interests, and encumbrances (other than Permitted Encumbrances). For purposes of this Order, "**TPC Liens**" shall mean and refer to any liens on the TPC Property granted or extended pursuant to the TPC Participation Agreement and any claims relating to that certain Second Amended and Restated Participation Agreement and Amendment of Other Operative Documents (the "**TPC Participation Agreement**"), dated as of June 30, 2004, among GM, as Lessee, Wilmington Trust Company, a Delaware corporation, not in its individual capacity except as expressly stated herein but solely as Owner Trustee (the "**TPC Trustee**") under GM Facilities Trust No. 1999-I (the "**TPC Trust**"), as Lessor, GM, as Certificate Holder, Hannover Funding Company LLC, as

US_ACTIVE:\43085833\07\43085833_7.DOC\.                    14

CP Lender, Wells Fargo Bank Northwest, N.A., as Agent, Norddeutsche Landesbank

Girozentrale (New York Branch), as Administrator, and Deutsche Bank, AG, New York Branch,

HSBC Bank USA, ABN AMRO Bank N.V., Royal Bank of Canada, Bank of America, N.A.,

Citicorp USA, Inc., Merrill Lynch Bank USA, Morgan Stanley Bank, collectively, as Purchasers

(collectively, with CP Lender, Agent and Administrator, the "**TPC Lenders**"), together with the

Operative Documents (as defined in the TPC Participation Agreements (the "**TPC Operative**

**Documents**").

DD.    The Purchaser would not have entered into the MPA and would not

consummate the 363 Transaction (i) if the sale of the Purchased Assets was not free and clear of

all liens, claims, encumbrances, and other interests (other than Permitted Encumbrances),

including rights or claims based on any successor or transferee liability or (ii) if the Purchaser

would, or in the future could, be liable for any such liens, claims, encumbrances, and other

interests, including rights or claims based on any successor or transferee liability (collectively,

the "**Retained Liabilities**"), other than, in each case, the Assumed Liabilities.  The Purchaser

will not consummate the 363 Transaction unless this Court expressly orders that none of the

Purchaser, its affiliates, their present or contemplated members or shareholders (other than the

Debtors as the holder of equity in the Purchaser), or the Purchased Assets will have any liability

whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or

by payment, setoff, or otherwise, directly or indirectly, any liens, claims, encumbrances, and

other interests, including rights or claims based on any successor or transferee liability or

Retained Liabilities, other than as expressly provided herein or in agreements made by the

Debtors and/or the Purchaser on the record at the Sale Hearing or in the MPA.

EE.    The Debtors have demonstrated that it is an exercise of their sound

business judgment to assume and assign the Purchased Contracts to the Purchaser in connection

with the consummation of the 363 Transaction, and the assumption and assignment of the

Purchased Contracts is in the best interests of the Debtors, their estates and creditors, and other

parties in interest.  The Purchased Contracts being assigned to, and the liabilities being assumed

by, the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser,

and, accordingly, such assumption and assignment of the Purchased Contracts and liabilities are

reasonable, enhance the value of the Debtors' estates, and do not constitute unfair discrimination.

       FF.     For the avoidance of doubt, and notwithstanding anything else in this

Order to the contrary:

- The Debtors are neither assuming nor assigning to the Purchaser the agreement to provide certain retiree medical benefits specified in (i) the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between the Company and the UAW, and (ii) the Settlement Agreement, dated February 21, 2008, between the Company and the UAW (together, the "**VEBA Settlement Agreement**");

- at the Closing, and in accordance with the MPA, the UAW Collective Bargaining Agreement, and all liabilities thereunder, shall be assumed by the Debtors and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code.  Assumption and assignment of the UAW Collective Bargaining Agreement is integral to the 363 Transaction and the MPA, are in the best interests of the Debtors and their estates, creditors, employees, and retirees, and represent the exercise of the Debtors' sound business judgment, enhances the value of the Debtors' estates, and does not constitute unfair discrimination;

- the UAW, as the exclusive collective bargaining representative of employees of the Purchaser and the "authorized representative" of the UAW-Represented Retirees under section 1114(c) of the Bankruptcy Code, GM, and the Purchaser engaged in good faith negotiations in conjunction with the 363 Transaction regarding the funding of retiree health benefits within the meaning of section 1114(a) of the Bankruptcy Code.  Conditioned upon the consummation of the 363 Transaction, the UAW and the Purchaser have entered into the UAW Retiree Settlement Agreement, which, among other things, provides for the financing by the Purchaser of modified retiree health care obligations for the Class and Covered Group (as defined in the UAW Retiree Settlement Agreement) through contributions by the Purchaser (as referenced in paragraph Y herein).  The New VEBA will also be funded by the transfer of the UAW Related Account from the Existing Internal VEBA and the assets of the Existing External VEBA to the New VEBA (each as defined in the UAW Retiree Settlement Agreement).  The Debtors, the

Purchaser, and the UAW specifically intend that their actions in connection
with the UAW Retiree Settlement Agreement and related undertakings
incorporate the compromise of certain claims and rights and shall be deemed
to satisfy the requirements of 29 U.S.C. § 186(c)(2);

- the Debtors' sponsorship of the Existing Internal VEBA (as defined in the
  UAW Retiree Settlement Agreement) shall be transferred to the Purchaser
  under the MPA.

GG.     The Debtors have (i) cured and/or provided adequate assurance of cure

(through the Purchaser) of any default existing prior to the date hereof under any of the

Purchased Contracts that have been designated by the Purchaser for assumption and assignment

under the MPA, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (ii)

provided compensation or adequate assurance of compensation through the Purchaser to any

party for any actual pecuniary loss to such party resulting from a default prior to the date hereof

under any of the Purchased Contracts, within the meaning of section 365(b)(1)(B) of the

Bankruptcy Code, and the Purchaser has provided adequate assurance of future performance

under the Purchased Contracts, within the meaning of section 365(b)(1)(C) of the Bankruptcy

Code.  The Modified Assumption and Assignment Procedures are fair, appropriate, and effective

and, upon the payment by the Purchaser of all Cure Amounts (as hereinafter defined) and

approval of the assumption and assignment for a particular Purchased Contract thereunder, the

Debtors shall be forever released from any and all liability under the Purchased Contracts.

HH.     The Debtors are the sole and lawful owners of the Purchased Assets, and

no other person has any ownership right, title, or interest therein.  The Debtors' non-Debtor

Affiliates have acknowledged and agreed to the 363 Transaction and, as required by, and in

accordance with, the MPA and the Transition Services Agreement, transferred any legal,

equitable, or beneficial right, title, or interest they may have in or to the Purchased Assets to the

Purchaser.

II.    The Debtors currently maintain certain privacy policies that govern the use

of "personally identifiable information" (as defined in section 101(41A) of the Bankruptcy Code)

in conducting their business operations.  The 363 Transaction may contemplate the transfer of

certain personally identifiable information to the Purchaser in a manner that may not be

consistent with certain aspects of their existing privacy policies.  Accordingly, on June 2, 2009,

the Court directed the U.S. Trustee to promptly appoint a consumer privacy ombudsman in

accordance with section 332 of the Bankruptcy Code, and such ombudsman was appointed on

June 10, 2009.  The Privacy Ombudsman is a disinterested person as required by section 332(a)

of the Bankruptcy Code.  The Privacy Ombudsman filed his report with the Court on July 1,

2009 (Docket No. 2873) (the "**Ombudsman Report**") and presented his report at the Sale

Hearing, and the Ombudsman Report has been reviewed and considered by the Court.  The Court

has given due consideration to the facts, including the exigent circumstances surrounding the

conditions of the sale of personally identifiable information in connection with the 363

Transaction.  No showing has been made that the sale of personally identifiable information in

connection with the 363 Transaction in accordance with the provisions of this Order violates

applicable nonbankruptcy law, and the Court concludes that such sale is appropriate in

conjunction with the 363 Transaction.

JJ.    Pursuant to Section 6.7(a) of the MPA, GM offered Wind-Down

Agreements and Deferred Termination Agreements (collectively, the "**Deferred Termination**

**Agreements**") in forms prescribed by the MPA to franchised motor vehicle dealers, including

dealers authorized to sell and service vehicles marketed under the Pontiac brand (which is being

discontinued), dealers authorized to sell and service vehicles marketed under the Hummer,

Saturn and Saab brands (which may or may not be discontinued depending on whether the

brands are sold to third parties) and dealers authorized to sell and service vehicles marketed

under brands which will be continued by the Purchaser.  The Deferred Termination Agreements were offered as an alternative to rejection of the existing Dealer Sales and Service Agreements of these dealers pursuant to section 365 of the Bankruptcy Code and provide substantial additional benefits to dealers which enter into such agreements.  Approximately 99% of the dealers offered Deferred Termination Agreements accepted and executed those agreements and did so for good and sufficient consideration.

KK.    Pursuant to Section 6.7(b) of the MPA, GM offered Participation Agreements in the form prescribed by the MPA to dealers identified as candidates for a long term relationship with the Purchaser.  The Participation Agreements provide substantial benefits to accepting dealers, as they grant the opportunity for such dealers to enter into a potentially valuable relationship with the Purchaser as a component of a reduced and more efficient dealer network.  Approximately 99% of the dealers offered Participation Agreements accepted and executed those agreements.

LL.    This Order constitutes approval of the UAW Retiree Settlement Agreement and the compromise and settlement embodied therein.

MM.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Consistent with Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order to the full extent to which those rules provide, but that its Order should not become effective instantaneously.  Thus the Court will shorten, but not wholly eliminate, the periods set forth in Fed.R.Bankr.P. 6004(h) and 6006, and expressly directs entry of judgment as set forth in accordance with the provisions of Paragraph 70 below.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

US_ACTIVE:\43085833\07\43085833_7.DOC\.    19

09-50026-reg    Doc 2966    Filed 07/09/09    Entered 07/09/09 23:17:21    Exhibits A

### **General Provisions**

1.       The Motion is granted as provided herein, and entry into and performance

under, and in respect of, the MPA and the 363 Transaction is approved.

2.       All Objections to the Motion or the relief requested therein that have not

been withdrawn, waived, settled, or resolved, and all reservation of rights included in such

Objections, are overruled on the merits other than a continuing Objection (each a "**Limited

Contract Objection**") that does not contest or challenge the merits of the 363 Transaction and

that is limited to (a) contesting a particular Cure Amount(s) (a "**Cure Objection**"), (b)

determining whether a particular Assumable Executory Contract is an executory contract that

may be assumed and/or assigned under section 365 of the Bankruptcy Code, and/or (c)

challenging, as to a particular Assumable Executory Contract, whether the Debtors have

assumed, or are attempting to assume, such contract in its entirety or whether the Debtors are

seeking to assume only part of such contract.  A Limited Contract Objection shall include, until

resolved, a dispute regarding any Cure Amount that is subject to resolution by the Bankruptcy

Court , or pursuant to the dispute resolution procedures established by the Sale Procedures Order

or pursuant to agreement of the parties, including agreements under which an objection to the

Cure Amount was withdrawn in connection with a reservation of rights under such dispute

resolution procedures.  Limited Contract Objections shall not constitute objections to the 363

Transaction, and to the extent such Limited Contract Objections remain continuing objections to

be resolved before the Court, the hearing to consider each such Limited Contract Objection shall

be adjourned to August 3, 2009 at 9:00a.m. (the "**Limited Contract Objection Hearing**").

Within two (2) business days of the entry of this Order, the Debtors shall serve upon each of the

counterparties to the remaining Limited Contract Objections a notice of the Limited Contract

Objection Hearing.  The Debtors or any party that withdraws, or has withdrawn, a Limited

| Deleted: July __ |
| Deleted: __:__ _. |

Contract Objection without prejudice shall have the right, unless it has agreed otherwise, to

schedule the hearing to consider a Limited Contract Objection on not less than fifteen (15) days

notice to the Debtors, the counterparties to the subject Assumable Executory Contracts, the

Purchaser, and the Creditors' Committee, or within such other time as otherwise may be agreed

by the parties.

### Approval of the MPA

3.        The MPA, all transactions contemplated thereby, and all the terms and

conditions thereof (subject to any modifications contained herein) are approved.  If there is any

conflict between the MPA, the Sale Procedures Order, and this Order, this Order shall govern.

4.        Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the

Debtors are authorized to perform their obligations under, and comply with the terms of, the

MPA and consummate the 363 Transaction pursuant to, and in accordance with, the terms and

provisions of the MPA and this Order.

5.        The Debtors are authorized and directed to execute and deliver, and

empowered to perform under, consummate, and implement, the MPA, together with all

additional instruments and documents that the Sellers or the Purchaser deem necessary or

appropriate to implement the MPA and effectuate the 363 Transaction, and to take all further

actions as may reasonably be required by the Purchaser for the purpose of assigning, transferring,

granting, conveying, and conferring to the Purchaser or reducing to possession the Purchased

Assets or as may be necessary or appropriate to the performance of the obligations as

contemplated by the MPA.

6.        This Order and the MPA shall be binding in all respects upon the Debtors,

their affiliates, all known and unknown creditors of, and holders of equity security interests in,

any Debtor, including any holders of liens, claims, encumbrances, or other interests, including

US_ACTIVE:\43085833\07\43085833_7.DOC\.                    21

rights or claims based on any successor or transferee liability, all non-Debtor parties to the Assumable Executory Contracts, all successors and assigns of the Purchaser, each Seller and their Affiliates and subsidiaries, the Purchased Assets, all interested parties, their successors and assigns, and any trustees appointed in the Debtors' chapter 11 cases or upon a conversion of any of such cases to cases under chapter 7 of the Bankruptcy Code and shall not be subject to rejection. Nothing contained in any chapter 11 plan confirmed in any of the Debtors' chapter 11 cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the MPA or this Order.

### Transfer of Purchased Assets Free and Clear

7.       Except for the Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser in accordance with the MPA, and, upon the Closing, shall be free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (other than Permitted Encumbrances), including rights or claims based on any successor or transferee liability, and all such liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, shall attach to the net proceeds of the 363 Transaction in the order of their priority, with the same validity, force, and effect that they now have as against the Purchased Assets, subject to any claims and defenses a Seller or any other party in interest may possess with respect thereto.

8.       Except as expressly permitted or otherwise specifically provided by the MPA or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, and other creditors, holding liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims

based on any successor or transferee liability, against or in a Seller or the Purchased Assets
(whether legal or equitable, secured or unsecured, matured or unmatured, contingent or
noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way
relating to, the Sellers, the Purchased Assets, the operation of the Purchased Assets prior to the
Closing, or the 363 Transaction, are forever barred, estopped, and permanently enjoined (with
respect to future claims or demands based on exposure to asbestos, to the fullest extent
constitutionally permissible) from asserting against the Purchaser, its successors or assigns, its
property, or the Purchased Assets, such persons' or entities' liens, claims, encumbrances, and
other interests, including rights or claims based on any successor or transferee liability.

9.       This Order (a) shall be effective as a determination that, as of the Closing,
(i) no claims other than Assumed Liabilities, will be assertable against the Purchaser, its
affiliates, their present or contemplated members or shareholders, successors, or assigns, or any
of their respective assets (including the Purchased Assets); (ii) the Purchased Assets shall have
been transferred to the Purchaser free and clear of all claims (other than Permitted
Encumbrances); and (iii) the conveyances described herein have been effected; and (b) is and
shall be binding upon and govern the acts of all entities, including, without limitation, all filing
agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds,
registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative
agencies, governmental departments, secretaries of state, federal and local officials, and all other
persons and entities who may be required by operation of law, the duties of their office, or
contract, to accept, file, register, or otherwise record or release any documents or instruments, or
who may be required to report or insure any title or state of title in or to any lease; and each of
the foregoing persons and entities is directed to accept for filing any and all of the documents

and instruments necessary and appropriate to consummate the transactions contemplated by the MPA.

10. The transfer of the Purchased Assets to the Purchaser pursuant to the MPA constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the Purchaser with all right, title, and interest of the Sellers in and to the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (other than Permitted Encumbrances), including rights or claims based on any successor or transferee liability, other than the Assumed Liabilities.

11. On the Closing of the 363 Transaction, each of the Sellers' creditors and any other holder of a lien, claim, encumbrance, or other interest, is authorized and directed to execute such documents and take all other actions as may be necessary to release its lien, claim, encumbrance (other than Permitted Encumbrances), or other interest in the Purchased Assets, if any, as such lien, claim, encumbrance, or other interest may have been recorded or may otherwise exist.

12. If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing a lien, claim, encumbrance, or other interest in the Sellers or the Purchased Assets (other than Permitted Encumbrances) shall not have delivered to the Sellers prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all liens, claims, encumbrances, or other interests, which the person or entity has with respect to the Sellers or the Purchased Assets or otherwise, then (a) the Sellers are authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Sellers or the Purchased Assets, and (b) the Purchaser is authorized to file, register, or otherwise record a certified copy of this Order, which

shall constitute conclusive evidence of the release of all liens, claims, encumbrances, and other

interests of any kind or nature whatsoever in the Sellers or the Purchased Assets.

13.    All persons or entities in possession of any of the Purchased Assets are

directed to surrender possession of such Purchased Assets to the Purchaser or its respective

designees at the time of Closing of the 363 Transaction.

14.    Following the Closing of the 363 Transaction, no holder of any lien,

claim, encumbrance, or other interest (other than Permitted Encumbrances) shall interfere with

the Purchaser's title to, or use and enjoyment of, the Purchased Assets based on, or related to,

any such lien, claim, encumbrance, or other interest, or based on any actions the Debtors may

take in their chapter 11 cases.

15.    All persons and entities are prohibited and enjoined from taking any action

to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to

the Purchaser in accordance with the MPA and this Order; *provided, however*, that the foregoing

restriction shall not prevent any person or entity from appealing this Order or opposing any

appeal of this Order.

16.    To the extent provided by section 525 of the Bankruptcy Code, no

governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar

grant relating to the operation of the Purchased Assets sold, transferred, or conveyed to the

Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of

the 363 Transaction contemplated by the MPA.

17.    From and after the Closing, the Purchaser shall comply with the

certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety

Act, as amended and recodified, including by the Transportation Recall Enhancement,

Accountability and Documentation Act, the Clean Air Act, the California Health and Safety

Code, and similar Laws, in each case, to the extent applicable in respect of motor vehicles, vehicles, motor vehicle equipment, and vehicle parts manufactured or distributed by the Sellers prior to the Closing.

18.    Notwithstanding anything to the contrary in this Order or the MPA, (a) any Purchased Asset that is subject to any mechanic's, materialman's, laborer's, workmen's, repairman's, carrier's liens and other similar Encumbrances arising by operation of law or statute in the Ordinary Course of Business for amounts that are not delinquent or that are being contested in good faith by appropriate proceedings, or any lien for Taxes, the validity or amount of which is being contested in good faith by appropriate proceedings, and statutory liens for current Taxes not yet due, payable, or delinquent (or which may be paid without interest or penalties) shall continue to be subject to such lien after the Closing Date if and to the extent that such lien (i) is valid, perfected and enforceable as of the Commencement Date (or becomes valid, perfected and enforceable after the Commencement Date as permitted by section 546(b) or 362(b)(18) of the Bankruptcy Code), (ii) could not be avoided by any Debtor under sections 544 to 549, inclusive, of the Bankruptcy Code or otherwise, were the Closing not to occur; and (iii) the Purchased Asset subject to such lien could not be sold free and clear of such lien under applicable non-bankruptcy law, and (b) any Liability as of the Closing Date that is secured by a lien described in clause (a) above (such lien, a "**Continuing Lien**") that is not otherwise an Assumed Liability shall constitute an Assumed Liability with respect to which there shall be no recourse to the Purchaser or any property of the Purchaser other than recourse to the property subject to such Continuing Lien. The Purchased Assets are sold free and clear of any reclamation rights, *provided, however,* that nothing, in this Order or the MPA shall in any way impair the right of any claimant against the Debtors with respect to any alleged reclamation right to the extent such reclamation right is not subject to the prior rights of a holder of a security interest in

US_ACTIVE:\43085833\07\43085833_7.DOC\.    26

the goods or proceeds with respect to which such reclamation right is alleged, or impair the

ability of a claimant to seek adequate protection against the Debtors with respect to any such

alleged reclamation right. Further, nothing in this Order or the MPA shall prejudice any rights,

defenses, objections or counterclaims that the Debtors, the Purchaser, the U.S. Treasury, EDC,

the Creditors' Committee or any other party in interest may have with respect to the validity or

priority of such asserted liens or rights, or with respect to any claim for adequate protection.

### Approval of the UAW Retiree Settlement Agreement

19.     The UAW Retiree Settlement Agreement, the transactions contemplated

therein, and the terms and conditions thereof, are fair, reasonable, and in the best interests of the

retirees, and are approved.  The Debtors, the Purchaser, and the UAW are authorized and

directed to perform their obligations under, or in connection with, the implementation of the

UAW Retiree Settlement Agreement and to comply with the terms of the UAW Retiree

Settlement Agreement, including the obligation of the Purchaser to reimburse the UAW for

certain expenses relating to the 363 Transaction and the transition to the New VEBA

arrangements.  The amendments to the Trust Agreement (as defined in the UAW Retiree

Settlement Agreement) set forth on Exhibit E to the UAW Retiree Settlement Agreement, are

approved, and the Trust Agreement is reformed accordingly.

20.     In accordance with the terms of the UAW Retiree Settlement Agreement,

(I) as of the Closing, there shall be no requirement to amend the Pension Plan as set forth in

section 15 of the Henry II Settlement (as such terms are defined in the UAW Retiree Settlement

Agreement); (II) on the later of December 31, 2009, or the Closing of the 363 Transaction (the

"**Implementation Date**"), (i) the committee and the trustees of the Existing External VEBA (as

defined in the UAW Retiree Settlement Agreement) are directed to transfer to the New VEBA all

assets and liabilities of the Existing External VEBA and to terminate the Existing External

VEBA within fifteen (15) days thereafter, as provided under Section 12.C of the UAW Retiree

Settlement Agreement, (ii) the trustee of the Existing Internal VEBA is directed to transfer to the

New VEBA the UAW Related Account's share of assets in the Existing Internal VEBA within

ten (10) business days thereafter as provided in Section 12.B of the UAW Retiree Settlement

Agreement, and, upon the completion of such transfer, the Existing Internal VEBA shall be

deemed to be amended to terminate participation and coverage regarding Retiree Medical

Benefits for the Class and the Covered Group, effective as of the Implementation Date (each as

defined in the UAW Retiree Settlement Agreement); and (III) all obligations of the Purchaser

and the Sellers to provide Retiree Medical Benefits to members of the Class and Covered Group

shall be governed by the UAW Retiree Settlement Agreement, and, in accordance with section

5.D of the UAW Retiree Settlement Agreement, all provisions of the Purchaser's Plan relating to

Retiree Medical Benefits for the Class and/or the Covered Group shall terminate as of the

Implementation Date or otherwise be amended so as to be consistent with the UAW Retiree

Settlement Agreement (as each term is defined in the UAW Retiree Settlement Agreement), and

the Purchaser shall not thereafter have any such obligations as set forth in Section 5.D of the

UAW Retiree Settlement Agreement.

### Approval of GM's Assumption of the UAW Claims Agreement

21.    Pursuant to section 365 of the Bankruptcy Code, GM's assumption of the

UAW Claims Agreement is approved, and GM, the UAW, and the Class Representatives are

authorized and directed to perform their obligations under, or in connection with, the

implementation of the UAW Claims Agreement and comply with the terms of the UAW Claims

Agreement.

**Assumption and Assignment to the Purchaser of Assumable Executory Contracts**

22.      Pursuant to sections 105(a), 363, and  365 of the Bankruptcy Code and

subject to and conditioned upon (a) the Closing of the 363 Transaction, (b) the occurrence of the

Assumption Effective Date, and (c) the resolution of any relevant Limited Contract Objections,

other than a Cure Objection, by order of this Court overruling such objection or upon agreement

of the parties, the Debtors' assumption and assignment to the Purchaser of each Assumable

Executory Contract (including, without limitation, for purposes of this paragraph 22) the UAW

Collective Bargaining Agreement) is approved, and the requirements of section 365(b)(1) of the

Bankruptcy Code with respect thereto are deemed satisfied.

23.      The Debtors are authorized and directed in accordance with sections

105(a) and 365 of the Bankruptcy Code to (i) assume and assign to the Purchaser, effective as of

the Assumption Effective Date, as provided by, and in accordance with, the Sale Procedures

Order, the Modified Assumption and Assignment Procedures, and the MPA, those Assumable

Executory Contracts that have been designated by the Purchaser for assumption pursuant to

sections 6.6 and 6.31 of the MPA and that are not subject to a Limited Contract Objection other

than a Cure Objection, free and clear of all liens, claims, encumbrances, or other interests of any

kind or nature whatsoever (other than Permitted Encumbrances), including rights or claims based

on any successor or transferee liability, other than the Assumed Liabilities, and (ii) execute and

deliver to the Purchaser such documents or other instruments as the Purchaser reasonably deems

may be necessary to assign and transfer such Assumable Executory Contracts and Assumed

Liabilities to the Purchaser.  The Purchaser shall Promptly Pay (as defined below) the following

(the "**Cure Amount**"):  (a) all amounts due under such Assumable Executory Contract as of the

Commencement Date as reflected on the website established by the Debtors (the "**Contract**

**Website**"), which is referenced and is accessible as set forth in the Assumption and Assignment

Notice or as otherwise agreed to in writing by an authorized officer of the parties (for this

purpose only, Susanna Webber shall be deemed an authorized officer of the Debtors) (the

"**Prepetition Cure Amount**"), less amounts, if any, paid after the Commencement Date on

account of the Prepetition Cure Amount (such net amount, the "**Net Prepetition Cure**

**Amount**"), plus (b) any such amount past due and owing as of the Assumption Effective Date, as

required under the Modified Assumption and Assignment Procedures, exclusive of the Net

Prepetition Cure Amount.  For the avoidance of doubt, all of the Debtors' rights to assert credits,

chargebacks, setoffs, rebates, and other claims under the Purchased Contracts are purchased by

and assigned to the Purchaser as of the Assumption Effective Date.  As used herein, "**Promptly**

**Pay**" means (i) with respect to any Cure Amount (or portion thereof, if any) which is undisputed,

payment as soon as reasonably practicable, but not later than five (5) business days after the

Assumption Effective Date, and (ii) with respect to any Cure Amount (or portion thereof, if any)

which is disputed, payment as soon as reasonably practicable, but not later than five (5) business

days after such dispute is resolved or such later date upon agreement of the parties and, in the

event Bankruptcy Court approval is required, upon entry of a final order of the Bankruptcy

Court.  On and after the Assumption Effective Date, the Purchaser shall (i) perform any

nonmonetary defaults that are required under section 365(b) of the Bankruptcy Code; *provided*

that such defaults are undisputed or directed by this Court and are timely asserted under the

Modified Assumption and Assignment Procedures, and (ii) pay all undisputed obligations and

perform all obligations that arise or come due under each Assumable Executory Contract in the

ordinary course.  Notwithstanding any provision in this Order to the contrary, the Purchaser shall

not be obligated to pay any Cure Amount or any other amount due with respect to any

Assumable Executory Contract before such amount becomes due and payable under the

applicable payment terms of such Contract.

24.     The Debtors shall make available a writing, acknowledged by the
Purchaser, of the assumption and assignment of an Assumable Executory Contract and the
effective date of such assignment (which may be a printable acknowledgment of assignment on
the Contract Website).  The Assumable Executory Contracts shall be transferred and assigned to,
pursuant to the Sale Procedures Order and the MPA, and thereafter remain in full force and
effect for the benefit of, the Purchaser, notwithstanding any provision in any such Assumable
Executory Contract (including those of the type described in sections 365(b)(2), (e)(1), and (f) of
the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and,
pursuant to section 365(k) of the Bankruptcy Code, the Sellers shall be relieved from any further
liability with respect to the Assumable Executory Contracts after such assumption and
assignment to the Purchaser.  Except as may be contested in a Limited Contract Objection, each
Assumable Executory Contract is an executory contract or unexpired lease under section 365 of
the Bankruptcy Code and the Debtors may assume each of their respective Assumable Executory
Contracts in accordance with section 365 of the Bankruptcy Code.  Except as may be contested
in a Limited Contract Objection other than a Cure Objection, the Debtors may assign each
Assumable Executory Contract in accordance with sections 363 and 365 of the Bankruptcy
Code, and any provisions in any Assumable Executory Contract that prohibit or condition the
assignment of such Assumable Executory Contract or terminate, recapture, impose any penalty,
condition renewal or extension, or modify any term or condition upon the assignment of such
Assumable Executory Contract, constitute unenforceable antiassignment provisions which are
void and of no force and effect in connection with the transactions contemplated hereunder.  All
other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the
assumption by the Debtors and assignment to the Purchaser of each Assumable Executory
Contract have been satisfied, and, pursuant to section 365(k) of the Bankruptcy Code, the

31

Debtors are hereby relieved from any further liability with respect to the Assumable Executory

Contracts, including, without limitation, in connection with the payment of any Cure Amounts

related thereto which shall be paid by the Purchaser.  At such time as provided in the Sale

Procedures Order and the MPA, in accordance with sections 363 and 365 of the Bankruptcy

Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest of each

Purchased Contract.  With respect to leases of personal property that are true leases and not

subject to recharacterization, nothing in this Order or the MPA shall transfer to the Purchaser an

ownership interest in any leased property not owned by a Debtor.  Any portion of any of the

Debtors' unexpired leases of nonresidential real property that purport to permit the respective

landlords thereunder to cancel the remaining term of any such leases if the Sellers discontinue

their use or operation of the Leased Real Property are void and of no force and effect and shall

not be enforceable against the Purchaser, its assignees and sublessees, and the landlords under

such leases shall not have the right to cancel or otherwise modify such leases or increase the rent,

assert any Claim, or impose any penalty by reason of such discontinuation, the Sellers' cessation

of operations, the assignment of such leases to the Purchaser, or the interruption of business

activities at any of the leased premises.

25.    Except in connection with any ongoing Limited Contract Objection, each

non-Debtor party to an Assumable Executory Contract is forever barred, estopped, and

permanently enjoined from (a) asserting against the Debtors or the Purchaser, their successors or

assigns, or their respective property, any default arising prior to, or existing as of, the

Commencement Date, or, against the Purchaser, any counterclaim, defense, or setoff (other than

defenses interposed in connection with, or related to, credits, chargebacks, setoffs, rebates, and

other claims asserted by the Sellers or the Purchaser in its capacity as assignee), or other claim

asserted or assertable against the Sellers and (b) imposing or charging against the Debtors, the

Purchaser, or its Affiliates any rent accelerations, assignment fees, increases, or any other fees as a result of the Sellers' assumption and assignment to the Purchaser of the Assumable Executory Contracts. The validity of such assumption and assignment of the Assumable Executory Contracts shall not be affected by any dispute between the Sellers and any non-Debtor party to an Assumable Executory Contract.

26.    Except as expressly provided in the MPA or this Order, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities other than certain Cure Amounts as provided in the MPA, and all holders of such claims are forever barred and estopped from asserting such claims against the Debtors, their successors or assigns, and their estates.

27.    The failure of the Sellers or the Purchaser to enforce at any time one or more terms or conditions of any Assumable Executory Contract shall not be a waiver of such terms or conditions, or of the Sellers' and the Purchaser's rights to enforce every term and condition of the Assumable Executory Contracts.

28.    The authority hereunder for the Debtors to assume and assign an Assumable Executory Contract to the Purchaser includes the authority to assume and assign an Assumable Executory Contract, as amended.

29.    Upon the assumption by a Debtor and the assignment to the Purchaser of any Assumable Executory Contract and the payment of the Cure Amount in full, all defaults under the Assumable Executory Contract shall be deemed to have been cured, and any counterparty to such Assumable Executory Contract shall be prohibited from exercising any rights or remedies against any Debtor or non-Debtor party to such Assumable Executory Contract based on an asserted default that occurred on, prior to, or as a result of, the Closing, including the type of default specified in section 365(b)(1)(A) of the Bankruptcy Code.

30.     The assignments of each of the Assumable Executory Contracts are made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

31.     Entry by GM into the Deferred Termination Agreements with accepting dealers is hereby approved.  Executed Deferred Termination Agreements represent valid and binding contracts, enforceable in accordance with their terms.

32.     Entry by GM into the Participation Agreements with accepting dealers is hereby approved and the offer by GM of entry into the Participation Agreements and entry into the Participation Agreements was appropriate and not the product of coercion.  The Court makes no finding as to whether any specific provision of any Participation Agreement governing the obligations of Purchaser and its dealers is enforceable under applicable provisions of state law.  Any disputes that may arise under the Participation Agreements shall be adjudicated on a case by case basis in an appropriate forum other than this Court.

33.     Nothing contained in the preceding two paragraphs shall impact the authority of any state or of the federal government to regulate Purchaser subsequent to the Closing.

34.     Notwithstanding any other provision in the MPA or this Order, no assignment of any rights and interests of the Debtors in any federal license issued by the Federal Communications Commission ("**FCC**") shall take place prior to the issuance of FCC regulatory approval for such assignment pursuant to the Communications Act of 1934, and the rules and regulations promulgated thereunder.

### **TPC Property**

35.     The TPC Participation Agreement and the other TPC Operative Documents are financing transactions secured to the extent of the TPC Value (as hereinafter defined) and shall be Retained Liabilities.

36.    As a result of the Debtors' interests in the TPC Property being transferred to the Purchaser free and clear of all liens, claims, interests, and encumbrances (other than Permitted Encumbrances), including, without limitation, the TPC Lenders' Liens and Claims, pursuant to section 363(e) of the Bankruptcy Code, the TPC Lenders shall have an allowed secured claim in a total amount equal to the fair market value of the TPC Property on the Commencement Date under section 506 of the Bankruptcy Code (the "**TPC Value**"), as determined at a valuation hearing conducted by this Court or by mutual agreement of the Debtors, the Purchaser, and the TPC Lenders (such claim, the "**TPC Secured Claim**").  Either the Debtors, the Purchaser, the TPC Lenders, or the Creditors' Committee may file a motion with this Court to determine the TPC Value on twenty (20) days notice.

37.    Pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection for the TPC Secured Claim and for the sole benefit of the TPC Lenders, at the Closing or as soon as commercially practicable thereafter, but in any event not later than five (5) business days after the Closing, the Purchaser shall place $90,700,000 (the "**TPC Escrow Amount**") in cash into an interest-bearing escrow account (the "**TPC Escrow Account**") at a financial institution selected by the Purchaser and acceptable to the other parties (the "**Escrow Bank**").  Interest earned on the TPC Escrow Amount from the date of deposit through the date of the disposition of the proceeds of such account (the "**TPC Escrow Interest**") will follow principal, such that interest earned on the amount of cash deposited into the TPC Escrow Account equal to the TPC Value shall be paid to the TPC Lenders and interest earned on the balance of the TPC Escrow Amount shall be paid to the Purchaser.

38.    Promptly after the determination of the TPC Value, an amount of cash equal to the TPC Secured Claim plus the TPC Lenders' pro rata share of the TPC Escrow Interest shall be released from the TPC Escrow Account and paid to the TPC Lenders (the "**TPC

US_ACTIVE:\43085833\07\43085833_7.DOC\.                    35

**Payment**") without further order of this Court.  If the TPC Value is less than $90,700,000, the

TPC Lenders shall have, in addition to the TPC Secured Claim, an aggregate allowed unsecured

claim against GM's estate equal to the lesser of (i) $45,000,000 and (ii) the difference between

$90,700,000 and the TPC Value (the "**TPC Unsecured Claim**").

        39.    If the TPC Value exceeds $90,700,000, the TPC Lenders shall be entitled

to assert a secured claim against GM's estate to the extent the TPC Lenders would have an

allowed claim for such excess under section 506 of the Bankruptcy Code (the "**TPC Excess**

**Secured Claim**"); *provided, however*, that any TPC Excess Secured Claim shall be paid from the

consideration of the 363 Transaction as a secured claim thereon and shall not be payable from

the proceeds of the Wind-Down Facility; *and provided further, however,* that the Debtors, the

Creditors' Committee, and all parties in interest shall have the right to contest the allowance and

amount of the TPC Excess Secured Claim under section 506 of the Bankruptcy Code (other than

to contest the TPC Value as previously determined by the Court).  All parties' rights and

arguments respecting the determination of the TPC Secured Claim are reserved; *provided,*

*however*, that in consideration of the settlement contained in these paragraphs, the TPC Lenders

waive any legal argument that the TPC Lenders are entitled to a secured claim equal to the face

amount of their claim under section 363(f)(3) or any other provision of the Bankruptcy Code

solely as a matter of law, including, without limitation, on the grounds that the Debtors are

required to pay the full face amount of the TPC Lenders' secured claims in order to transfer, or

as a result of the transfer of, the TPC Property to the Purchaser.  After the TPC Payment is made,

any funds remaining in the TPC Escrow Account plus the Purchasers' pro rata share of the TPC

Escrow Interest shall be released and paid to the Purchaser without further order of this Court.

Upon the receipt of the TPC Payment by the TPC Lenders, other than any right to payment from

GM on account of the TPC Unsecured Claim and the TPC Excess Secured Claim, the TPC

Lenders' Claims relating to the TPC Property shall be deemed fully satisfied and discharged,
including, without limitation, any claims the TPC Lenders might have asserted against the
Purchaser relating to the TPC Property, the TPC Participation Agreement, or the TPC Operative
Documents.  For the avoidance of doubt, any and all claims of the TPC Lenders arising from or
in connection with the TPC Property, the TPC Participation Agreement, or the TPC Operative
Documents shall be payable solely from the TPC Escrow Account or GM and shall be
nonrecourse to the Purchaser.

> 40.    The TPC Lenders shall not be entitled to payment of any fees, costs, or
expenses (including legal fees) except to the extent that the TPC Value results in a TPC Excess
Secured Claim and is thereby oversecured under the Bankruptcy Code and such claim is allowed
by the Court as a secured claim under section 506 of the Bankruptcy Code.

> 41.    In connection with the foregoing, and pursuant to Section 11.2 of the TPC
Trust Agreement, GM, as the sole Certificate Holder and Beneficiary under the TPC Trust,
together with the consent of GM as the Lessee, effective as of the date of the Closing, (a)
exercises its election to terminate the TPC Trust and (b) in connection therewith, assumes all of
the obligations of the TPC Trust and TPC Trustee under or contemplated by the TPC Operative
Documents to which the TPC Trust or TPC Trustee is a party and all other obligations of the
TPC Trust or TPC Trustee incurred under the TPC Trust Agreement (other than obligations set
forth in clauses (i) through (iii) of the second sentence of Section 7.1 of the TPC Trust
Agreement).

> 42.    As a condition precedent to the 363 Transaction, in connection with the
termination of the TPC Trust, effective as of the date of the Closing, all of the assets of the TPC
Trust (the "**TPC Trust Assets**") shall be distributed to GM, as sole Certificate Holder and
beneficiary under the TPC Trust, including, without limitation, the following:

US_ACTIVE:\43085833\07\43085833_7.DOC\.                     37

(i)         Industrial Development Revenue Real Property Note (General Motors Project) Series 1999-I, dated November 18, 1999, in the principal amount of $21,700,000, made by the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, to PVV Southpoint 14, LLC, as assigned by Assignment and Assumption of Loan and Loan Documents dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the TPC Trustee of the TPC Trust, as Assignee, recorded as JW1268 in the records of the Shelby County Register of Deeds (the "**TPC Tennessee Ground Lease**");

(ii)        Real Property Lease Agreement dated as of November 18, 1999, between the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, as Lessor, and PVV Southpoint 14, LLC, as Lessee, recorded as JW1262 in the records of the Shelby County Register of Deeds, as assigned by Assignment and Assumption of Real Property Lease dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the TPC Trustee of the TPC Trust, as Assignee, recorded as JW1267 in the records of the Shelby County Register of Deeds;

(iii)       Deed of Trust dated as of November 18, 1999, between the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, as Grantor, in favor of Mid-South Title Corporation, as Trustee, for the benefit of PVV Southpoint 14, LLC, Beneficiary, recorded as JW1263 in the records of the Shelby County Register of Deeds, as assigned by Assignment and Assumption of Loan and Loan Documents dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the TPC Trustee of the TPC Trust, as Assignee, recorded as JW1268 in the records of the Shelby County Register of Deeds;

(iv)       Assignment of Rents and Lease dated as of November 18, 1999, between the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, as Assignor, and PVV Southpoint 14, LLC, as Assignee, recorded as JW1264 in the records of the Shelby County Register of Deeds, as assigned by Assignment and Assumption of Loan and Loan Documents dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the TPC Trustee of the TPC Trust, as Assignee, recorded as JW1268 in the records of the Shelby County Register of Deeds;

(v)        The Tennessee Master Lease (as defined in the TPC Participation Agreement);

(vi)       A certain tract of land being known and designated as Lot 1, as shown on  a Subdivision Plat entitled "Final Plat – Lot 1, Whitemarsh Associates, LLC Property," which Plat is recorded among the Land Records of Baltimore County in Plat Book SM No. 71 at folio 144, Maryland, together with a certain tract of land being known and designated as "1.1865 Acre of Highway Widening," as shown on a Subdivision Plat entitled "Final Plat – Lot 1, Whitemarsh Associates, LLC Property," which Plat is recorded among the Land Records of Baltimore County in Plat Book SM No. 71 at folio 144, Baltimore, Maryland, saving and excepting from the above described property all that land conveyed to the State of Maryland to the use of the State Highway Administration of the Department of Transportation dated November 24, 2003, and

recorded among the Land Records of Baltimore County in Liber 19569, folio 074, Maryland, together with all rights, easements, covenants, licenses, and appurtenances associated with the ownership thereof in any way, including, without limitation, those easements benefiting Parcel 1 set forth in the Declaration and Agreement Respecting Easements, Restrictions and Operations, between the TPC Trust, GM, and Whitemarsh Associates, LLC, recorded among the Land Records of Baltimore County in Liber 14019, folio 430, as amended (collectively, the "**Maryland Property**");

(vii)    alternatively to the transfer of a direct interest in the Maryland Property pursuant to item (vi) above, if such documents are still extant, the following interests shall be transferred:  (a) Ground Lease Agreement dated as of September 8, 1999, between the TPC Trustee of the TPC Trust. as lessor, and Maryland Economic Development Corporation, as lessee, recorded among the Land Records of Baltimore County in Liber 14019, folio 565, (b) Sublease Agreement dated as of September 8, 1999, between the Maryland Economic Development Corporation, as sublessor, and the TPC Trustee of the TPC Trust, as sublessee, recorded among the Land Records of Baltimore County in Liber 14019, folio 589, together with (c) all agreements, loan agreements, notes, rights, obligations, and interests held by the TPC Trustee of the TPC Trust and/or issued by the TPC Trustee of the TPC Trust in connection therewith; and

(viii)    The Maryland Master Lease (as defined in the TPC Participation Agreement).

43.    As a result of the distribution of the TPC Trust Assets, effective as of the date of the Closing, title to the leasehold interest of the TPC Trustee of the TPC Trust under the TPC Tennessee Ground Lease and the lessor's interest under the Tennessee Master Lease shall be held by GM, as are the lessor's and lessee's interests under the Tennessee Master Lease, and as permitted by the TPC Trust Agreement, the Tennessee Master Lease shall hereby be terminated, and GM shall succeed to all rights of the lessor thereunder to the property leased thereby, together with all rights, easements, covenants, licenses, and appurtenances associated with the ownership thereof in any way.

44.    As a result of the distribution of the TPC Trust Assets, effective as of the date of the Closing, title to the Maryland Property, the lessor's and lessee's interests under the Maryland Master Lease shall be held by GM, and as permitted by the TPC Trust Agreement, the Maryland Master Lease shall hereby be terminated, and GM shall succeed to all rights of the

US_ACTIVE:\43085833\07\43085833_7.DOC\.                    39

lessor thereunder to the property leased thereby, together with all rights, easements, covenants, licenses, and appurtenances associated with the ownership thereof in any way.

45.      All of the TPC Trust Assets and the TPC Property are Purchased Assets under the MPA and shall be transferred by GM pursuant thereto to the Purchaser free and clear of all liens, claims, encumbrances, and interests (other than Permitted Encumbrances), including, without limitation, any liens, claims, encumbrances, and interests of the TPC Lenders.  To the extent any of the TPC Trust Assets are executory contracts and unexpired leases, they shall be Assumable Executory Contracts, which shall be assumed by GM and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code and the Sale Procedures Order.

**Additional Provisions**

46.      Except for the Assumed Liabilities expressly set forth in the MPA, none of the Purchaser, its present or contemplated members or shareholders, its successors or assigns, or any of their respective affiliates or any of their respective agents, officials, personnel, representatives, or advisors shall have any liability for any claim that arose prior to the Closing Date, relates to the production of vehicles prior to the Closing Date, or otherwise is assertable against the Debtors or is related to the Purchased Assets prior to the Closing Date.  The Purchaser shall not be deemed, as a result of any action taken in connection with the MPA or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets, to:  (i) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations arising under the Purchased Assets from and after the Closing); (ii) have, de facto or otherwise, merged with or into the Debtors; or (iii) be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors.  Without limiting the foregoing, the Purchaser shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any claims,

US_ACTIVE:\43085833\07\43085833_7.DOC\.                    40

including, but not limited to, under any theory of successor or transferee liability, de facto

merger or continuity, environmental, labor and employment, and products or antitrust liability,

whether known or unknown as of the Closing, now existing or hereafter arising, asserted, or

unasserted, fixed or contingent, liquidated or unliquidated.

           47.     Effective upon the Closing and except as may be otherwise provided by

stipulation filed with or announced to the Court with respect to a specific matter or an order of

the Court, all persons and entities are forever prohibited and enjoined from commencing or

continuing in any manner any action or other proceeding, whether in law or equity, in any

judicial, administrative, arbitral, or other proceeding against the Purchaser, its present or

contemplated members or shareholders, its successors and assigns, or the Purchased Assets, with

respect to any (i) claim against the Debtors other than Assumed Liabilities, or (ii) successor or

transferee liability of the Purchaser for any of the Debtors, including, without limitation, the

following actions:  (a) commencing or continuing any action or other proceeding pending or

threatened against the Debtors as against the Purchaser, or its successors, assigns, affiliates, or

their respective assets, including the Purchased Assets; (b) enforcing, attaching, collecting, or

recovering in any manner any judgment, award, decree, or order against the Debtors as against

the Purchaser, its successors, assigns, affiliates, or their respective assets, including the

Purchased Assets; (c) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance

against the Debtors as against the Purchaser or its successors, assigns, affiliates, or their

respective assets, including the Purchased Assets; (d) asserting any setoff, right of subrogation,

or recoupment of any kind for any obligation of any of the Debtors as against any obligation due

the Purchaser or its successors, assigns, affiliates, or their respective assets, including the

Purchased Assets; (e) commencing or continuing any action, in any manner or place, that does

not comply, or is inconsistent with, the provisions of this Order or other orders of this Court, or

US_ACTIVE:\43085833\07\43085833_7.DOC\.               41

the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to renew any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with such assets. Notwithstanding the foregoing, a relevant taxing authority's ability to exercise its rights of setoff and recoupment are preserved.

48.     Except for the Assumed Liabilities, or as expressly permitted or otherwise specifically provided for in the MPA or this Order, the Purchaser shall have no liability or responsibility for any liability or other obligation of the Sellers arising under or related to the Purchased Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided in this Order and the MPA, the Purchaser shall not be liable for any claims against the Sellers or any of their predecessors or Affiliates, and the Purchaser shall have no successor, transferee, or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor, or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to the Sellers or any obligations of the Sellers arising prior to the Closing.

49.     The Purchaser has given fair and substantial consideration under the MPA for the benefit of the holders of liens, claims, encumbrances, or other interests. The consideration provided by the Purchaser for the Purchased Assets under the MPA is greater than the liquidation value of the Purchased Assets and shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

50.    The consideration provided by the Purchaser for the Purchased Assets under the MPA is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

51.    If there is an Agreed G Transaction (determined no later than the due date, with extensions, of GM's tax return for the taxable year in which the 363 Transaction occurs), (i) the MPA shall, and hereby does, constitute a "plan" of GM and the Purchaser solely for purposes of sections 368 and 354 of the Tax Code, and (ii) the 363 Transaction, as set forth in the MPA, and the subsequent liquidation of the Sellers, are intended to constitute a tax reorganization of GM pursuant to section 368(a)(1)(G) of the Tax Code.

52.    This Order (a) shall be effective as a determination that, except for the Assumed Liabilities, at Closing, all liens, claims, encumbrances, and other interests of any kind or nature whatsoever existing as to the Sellers with respect to the Purchased Assets prior to the Closing (other than Permitted Encumbrances) have been unconditionally released and terminated, and that the conveyances described in this Order have been effected, and (b) shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

53.    Each and every federal, state, and local governmental agency or department is authorized to accept any and all documents and instruments necessary or appropriate to consummate the transactions contemplated by the MPA.

54.    Any amounts that become payable by the Sellers to the Purchaser pursuant

to the MPA (and related agreements executed in connection therewith, including, but not limited

to, any obligation arising under Section 8.2(b) of the MPA) shall (a) constitute administrative

expenses of the Debtors' estates under sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code

and (b) be paid by the Debtors in the time and manner provided for in the MPA without further

Court order.

55.    The transactions contemplated by the MPA are undertaken by the

Purchaser without collusion and in good faith, as that term is used in section 363(m) of the

Bankruptcy Code, and were negotiated by the parties at arm's length, and, accordingly, the

reversal or modification on appeal of the authorization provided in this Order to consummate the

363 Transaction shall not affect the validity of the 363 Transaction (including the assumption

and assignment of any of the Assumable Executory Contracts and the UAW Collective

Bargaining Agreement), unless such authorization is duly stayed pending such appeal.  The

Purchaser is a purchaser in good faith of the Purchased Assets and the Purchaser and its agents,

officials, personnel, representatives, and advisors are entitled to all the protections afforded by

section 363(m) of the Bankruptcy Code.

56.    The Purchaser is assuming the obligations of the Sellers pursuant to and

subject to conditions and limitations contained in their express written warranties, which were

delivered in connection with the sale of vehicles and vehicle components prior to the Closing of

the 363 Transaction and specifically identified as a "warranty."  The Purchaser is not assuming

responsibility for Liabilities contended to arise by virtue of other alleged warranties, including

implied warranties and statements in materials such as, without limitation, individual customer

communications, owner's manuals, advertisements, and other promotional materials, catalogs,

and point of purchase materials.  Notwithstanding the foregoing, the Purchaser has assumed the

Sellers' obligations under state "lemon law" statutes, which require a manufacturer to provide a consumer remedy when the manufacturer is unable to conform the vehicle to the warranty, as defined in the applicable statute, after a reasonable number of attempts as further defined in the statute, and other related regulatory obligations under such statutes.

57.    Subject to further Court order and consistent with the terms of the MPA and the Transition Services Agreement, the Debtors and the Purchaser are authorized to, and shall, take appropriate measures to maintain and preserve, until the consummation of any chapter 11 plan for the Debtors, (a) the books, records, and any other documentation, including tapes or other audio or digital recordings and data in, or retrievable from, computers or servers relating to or reflecting the records held by the Debtors or their affiliates relating to the Debtors' business, and (b) the cash management system maintained by the Debtors prior to the Closing, as such system may be necessary to effect the orderly administration of the Debtors' estates.

58.    The Debtors are authorized to take any and all actions that are contemplated by or in furtherance of the MPA, including transferring assets between subsidiaries and transferring direct and indirect subsidiaries between entities in the corporate structure, with the consent of the Purchaser.

59.    Upon the Closing, the Purchaser shall assume all liabilities of the Debtors arising out of, relating to, in respect of, or in connection with workers' compensation claims against any Debtor, except for workers' compensation claims against the Debtors with respect to Employees residing in or employed in, as the case may be as defined by applicable law, the states of Alabama, Georgia, New Jersey, and Oklahoma.

60.    During the week after Closing, the Purchaser shall send an e-mail to the Debtors' customers for whom the Debtors have usable e-mail addresses in their database, which will provide information about the Purchaser and procedures for consumers to opt out of being

contacted by the Purchaser for marketing purposes. For a period of ninety (90) days following

the Closing Date, the Purchaser shall include on the home page of GM's consumer web site

(www.gm.com) a conspicuous disclosure of information about the Purchaser, its procedures for

consumers to opt out of being contacted by the Purchaser for marketing purposes, and a notice of

the Purchaser's new privacy statement. The Debtors and the Purchaser shall comply with the

terms of established business relationship provisions in any applicable state and federal

telemarketing laws. The Dealers who are parties to Deferred Termination Agreements shall not

be required to transfer personally identifying information in violation of applicable law or

existing privacy policies.

61.    Nothing in this Order or the MPA releases, nullifies, or enjoins the

enforcement of any Liability to a governmental unit under Environmental Laws or regulations

(or any associated Liabilities for penalties, damages, cost recovery, or injunctive relief) that any

entity would be subject to as the owner, lessor, or operator of property after the date of entry of

this Order. Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to

deem the Purchaser as the successor to the Debtors under any state law successor liability

doctrine with respect to any Liabilities under Environmental Laws or regulations for penalties for

days of violation prior to entry of this Order. Nothing in this paragraph should be construed to

create for any governmental unit any substantive right that does not already exist under law.

62.    Nothing contained in this Order or in the MPA shall in any way (i)

diminish the obligation of the Purchaser to comply with Environmental Laws, or (ii) diminish the

obligations of the Debtors to comply with Environmental Laws consistent with their rights and

obligations as debtors in possession under the Bankruptcy Code. The definition of

Environmental Laws in the MPA shall be amended to delete the words "in existence on the date

of the Original Agreement." For purposes of clarity, the exclusion of asbestos liabilities in

US_ACTIVE:\43085833\07\43085833_7.DOC\.                    46

section 2.3(b)(x) of the MPA shall not be deemed to affect coverage of asbestos as a Hazardous

Material with respect to the Purchaser's remedial obligations under Environmental Laws.

63.    No law of any state or other jurisdiction relating to bulk sales or similar

laws shall apply in any way to the transactions contemplated by the 363 Transaction, the MPA,

the Motion, and this Order.

64.    The Debtors shall comply with their tax obligations under 28 U.S.C.

§ 960, except to the extent that such obligations are Assumed Liabilities.

65.    Notwithstanding anything contained in their respective organizational

documents or applicable state law to the contrary, each of the Debtors is authorized and directed,

upon and in connection with the Closing, to change their respective names, and any amendment

to the organizational documents (including the certificate of incorporation) of any of the Debtors

to effect such a change is authorized and approved, without Board or shareholder approval.

Upon any such change with respect to GM, the Debtors shall file with the Court a notice of

change of case caption within two (2) business days of the Closing, and the change of case

caption for these chapter 11 cases shall be deemed effective as of the Closing.

66.    The terms and provisions of the MPA and this Order shall inure to the

benefit of the Debtors, their estates, and their creditors, the Purchaser, and their respective

agents, officials, personnel, representatives, and advisors.

67.    The failure to specifically include any particular provisions of the MPA in

this Order shall not diminish or impair the effectiveness of such provision, it being the intent of

the Court that the MPA be authorized and approved in its entirety, except as modified herein.

68.    The MPA and any related agreements, documents, or other instruments

may be modified, amended, or supplemented by the parties thereto and in accordance with the

terms thereof, without further order of the Court, provided that any such modification,

amendment, or supplement does not have a material adverse effect on the Debtors' estates.  Any such proposed modification, amendment, or supplement that does have a material adverse effect on the Debtors' estates shall be subject to further order of the Court, on appropriate notice.

69.     The provisions of this Order are nonseverable and mutually dependent on each other.

70.     As provided in Fed.R.Bankr.P. 6004(h) and 6006(d), this Order shall not be stayed for ten days after its entry, and instead shall be effective as of 12:00 noon, EDT, on Thursday, July 9, 2009.  The Debtors and the Purchaser are authorized to close the 363 Transaction on or after 12:00 noon on Thursday, July 9.  Any party objecting to this Order must exercise due diligence in filing any appeal and pursuing a stay or risk its appeal being foreclosed as moot in the event Purchaser and the Debtors elect to close prior to this Order becoming a Final Order.

71.     This Court retains exclusive jurisdiction to enforce and implement the terms and provisions of this Order, the MPA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith, including the Deferred Termination Agreements, in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Purchaser, (b) compel delivery of the purchase price or performance of other obligations owed by or to the Debtors, (c) resolve any disputes arising under or related to the MPA, except as otherwise provided therein, (d) interpret, implement, and enforce the provisions of this Order, (e) protect the Purchaser against any of the Retained Liabilities or the assertion of any lien, claim, encumbrance, or other interest, of any kind or nature whatsoever, against the Purchased Assets, and (f) resolve any disputes with respect to or concerning the Deferred Termination Agreements.  The Court does not retain jurisdiction to hear disputes arising in connection with the application of the Participation

**Deleted:** Pursuant to Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for ten days after its entry and shall be effective immediately upon entry, and the Debtors and the Purchaser are authorized to close the 363 Transaction immediately upon entry of this Order.

US_ACTIVE:\43085833\07\43085833_7.DOC\.                    48

09-50026-reg    Doc 2968    Filed 07/09/09    Entered 07/09/09 23:17:21    Main Document
Pg 49 of 61

Agreements, stockholder agreements or other documents concerning the corporate governance of

the Purchaser, and documents governed by foreign law, which disputes shall be adjudicated as

09-50026-reg   Doc 2968   Filed 07/09/09   Entered 07/09/09 23:17:21   Main Document Pg 51 of 481

necessary under applicable law in any other court or administrative agency of competent

jurisdiction.

Dated: New York, York
     July **5**, 2009


                            _____s/Robert E. Gerber_____
                            UNITED STATES BANKRUPTCY JUDGE



# AMENDED AND RESTATED

## MASTER SALE AND PURCHASE AGREEMENT

### BY AND AMONG

### GENERAL MOTORS CORPORATION,

### SATURN LLC,

### SATURN DISTRIBUTION CORPORATION

### AND

### CHEVROLET-SATURN OF HARLEM, INC.,

*as Sellers*

### AND

### NGMCO, INC.,

*as Purchaser*

### DATED AS OF

### JUNE 26, 2009

# TABLE OF CONTENTS

**DESCRIPTION**                                                                                    **PAGE**

ARTICLE I DEFINITIONS ........................................................................................ 2

Section 1.1          Defined Terms. ...................................................................2
Section 1.2          Other Interpretive Provisions...........................................23

ARTICLE II PURCHASE AND SALE ..................................................................... 23

Section 2.1          Purchase and Sale of Assets; Assumption of Liabilities.............................23
Section 2.2          Purchased and Excluded Assets.......................................23
Section 2.3          Assumed and Retained Liabilities. ..................................28
Section 2.4          Non-Assignability. ...........................................................32

ARTICLE III CLOSING; PURCHASE PRICE ........................................................ 33

Section 3.1          Closing. ..............................................................................33
Section 3.2          Purchase Price....................................................................34
Section 3.3          Allocation...........................................................................35
Section 3.4          Prorations...........................................................................35
Section 3.5          Post-Closing True-up of Certain Accounts.......................36

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS ............ 37

Section 4.1          Organization and Good Standing.......................................37
Section 4.2          Authorization; Enforceability. ..........................................37
Section 4.3          Noncontravention; Consents..............................................37
Section 4.4          Subsidiaries........................................................................38
Section 4.5          Reports and Financial Statements; Internal Controls................................38
Section 4.6          Absence of Certain Changes and Events. ..........................39
Section 4.7          Title to and Sufficiency of Assets......................................41
Section 4.8          Compliance with Laws; Permits. ......................................41
Section 4.9          Environmental Laws. .........................................................42
Section 4.10         Employee Benefit Plans.....................................................42
Section 4.11         Labor Matters.....................................................................44
Section 4.12         Investigations; Litigation. .................................................45
Section 4.13         Tax Matters.........................................................................45
Section 4.14         Intellectual Property and IT Systems.................................46
Section 4.15         Real Property. ....................................................................47
Section 4.16         Material Contracts..............................................................48
Section 4.17         Dealer Sales and Service Agreements for Continuing Brands. .................49
Section 4.18         Sellers' Products. ...............................................................49
Section 4.19         Certain Business Practices. ...............................................49
Section 4.20         Brokers and Other Advisors...............................................50

Section 4.21        Investment Representations. .......................................................50
Section 4.22        No Other Representations or Warranties of Sellers. ...............................51

ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................... 51

Section 5.1         Organization and Good Standing. ............................................................51
Section 5.2         Authorization; Enforceability. ...................................................................52
Section 5.3         Noncontravention; Consents. .....................................................................52
Section 5.4         Capitalization. ............................................................................................53
Section 5.5         Valid Issuance of Shares. ...........................................................................54
Section 5.6         Investment Representations. .......................................................................54
Section 5.7         Continuity of Business Enterprise. .............................................................55
Section 5.8         Integrated Transaction. ...............................................................................55
Section 5.9         No Other Representations or Warranties of Sellers. ...............................55

ARTICLE VI COVENANTS ......................................................................................... 56

Section 6.1         Access to Information. ................................................................................56
Section 6.2         Conduct of Business. ..................................................................................57
Section 6.3         Notices and Consents. ................................................................................60
Section 6.4         Sale Procedures; Bankruptcy Court Approval. .........................................61
Section 6.5         Supplements to Purchased Assets. ...........................................................62
Section 6.6         Assumption or Rejection of Contracts. ......................................................62
Section 6.7         Deferred Termination  Agreements; Participation Agreements. ...............65
Section 6.8         [Reserved] ...................................................................................................66
Section 6.9         Purchaser Assumed Debt; Wind Down Facility. .......................................66
Section 6.10        Litigation  and Other Assistance. ..............................................................66
Section 6.11        Further Assurances. ....................................................................................67
Section 6.12        Notifications. ...............................................................................................68
Section 6.13        Actions by Affiliates. ..................................................................................69
Section 6.14        Compliance Remediation. ..........................................................................69
Section 6.15        Product Certification, Recall and Warranty Claims. .................................69
Section 6.16        Tax Matters; Cooperation. ..........................................................................69
Section 6.17        Employees; Benefit Plans; Labor Matters. .................................................74
Section 6.18        TARP. ..........................................................................................................79
Section 6.19        Guarantees; Letters of Credit. ....................................................................79
Section 6.20        Customs Duties. ..........................................................................................79
Section 6.21        Termination of Intellectual Property Rights. .............................................79
Section 6.22        Trademarks. .................................................................................................80
Section 6.23        Preservation of Records. .............................................................................81
Section 6.24        Confidentiality. ...........................................................................................81
Section 6.25        Privacy Policies. .........................................................................................82
Section 6.26        Supplements to Sellers' Disclosure Schedule. ..........................................82
Section 6.27        Real Property Matters. ...............................................................................82
Section 6.28        Equity Incentive Plans. ...............................................................................84
Section 6.29        Purchase of Personal Property Subject to Executory Contracts. ...............84

Section 6.30    Transfer of Riverfront Holdings, Inc. Equity Interests or Purchased Assets; Ren Cen Lease. ..................................................................................84
Section 6.31    Delphi Agreements. ............................................................................85
Section 6.32    GM Strasbourg S.A. Restructuring. ...................................................85
Section 6.33    Holding Company Reorganization. .....................................................85
Section 6.34    Transfer of Promark Global Advisors Limited and Promark Investment Trustees Limited Equity Interests. ......................................................86
Section 6.35    Transfer of Equity Interests in Certain Subsidiaries. ..........................86

ARTICLE VII CONDITIONS TO CLOSING ...................................................... 86

Section 7.1    Conditions to Obligations of Purchaser and Sellers. ..............................86
Section 7.2    Conditions to Obligations of Purchaser. ...............................................87
Section 7.3    Conditions to Obligations of Sellers. ...................................................91

ARTICLE VIII TERMINATION ..................................................................... 93

Section 8.1    Termination. ....................................................................................93
Section 8.2    Procedure and Effect of Termination. ...................................................94

ARTICLE IX MISCELLANEOUS ................................................................... 95

Section 9.1    Survival of Representations, Warranties, Covenants and Agreements and Consequences of Certain Breaches. .....................................................95
Section 9.2    Notices. ..........................................................................................95
Section 9.3    Fees and Expenses; No Right of Setoff. ...............................................97
Section 9.4    Bulk Sales Laws. ..............................................................................97
Section 9.5    Assignment. .....................................................................................97
Section 9.6    Amendment. .....................................................................................98
Section 9.7    Waiver. ...........................................................................................98
Section 9.8    Severability. .....................................................................................98
Section 9.9    Counterparts; Facsimiles. ..................................................................98
Section 9.10    Headings. .......................................................................................98
Section 9.11    Parties in Interest. ............................................................................98
Section 9.12    Governing Law. ...............................................................................99
Section 9.13    Venue and Retention of Jurisdiction. ...................................................99
Section 9.14    Waiver of Jury Trial. ........................................................................99
Section 9.15    Risk of Loss. ...................................................................................99
Section 9.16    Enforcement of Agreement. ...............................................................99
Section 9.17    Entire Agreement. ...........................................................................100
Section 9.18    Publicity. .......................................................................................100
Section 9.19    No Successor or Transferee Liability. ................................................100
Section 9.20    Time Periods. .................................................................................101
Section 9.21    Sellers' Disclosure Schedule. ...........................................................101
Section 9.22    No Binding Effect. ..........................................................................101

# EXHIBITS

Exhibit A            Form of Parent Warrant A
Exhibit B            Form of Parent Warrant B
Exhibit C            UAW Active Labor Modifications
Exhibit D            Form of UAW Retiree Settlement Agreement
Exhibit E            Form of VEBA Warrant
Exhibit F            Certain Excluded Owned Real Property
Exhibit G            Certain Retained Workers' Compensation Claims
Exhibit H            Form of Sale Procedures Order
Exhibit I            Form of Sale Approval Order
Exhibit J-1          Form of Deferred Termination Agreement for Saturn Discontinued
                     Brand Dealer Agreements
Exhibit J-2          Form of Deferred Termination Agreement for Hummer Discontinued
                     Brand  Dealer Agreements
Exhibit J-3          Form of Deferred Termination Agreement for non-Saturn and
                     non-Hummer Discontinued Brand Dealer Agreements and Excluded
                     Continuing Brand Dealer Agreements
Exhibit K            Form of Participation Agreement
Exhibit L            Form of Subdivision Master Lease
Exhibit M            Form of Assignment and Assumption of Willow Run Lease
Exhibit N            Form of Ren Cen Lease
Exhibit O            Form of Equity Registration Rights Agreement
Exhibit P            Form of Bill of Sale
Exhibit Q            Form of Assignment and Assumption Agreement
Exhibit R            Form of Novation Agreement
Exhibit S            Form of Government Related Subcontract Agreement
Exhibit T            Form of Intellectual Property Assignment Agreement
Exhibit U            Form of Transition Services Agreement
Exhibit V            Form of Assignment and Assumption of Real Property Leases
Exhibit W            Form of Assignment and Assumption of Harlem Lease
Exhibit X            Form of Master Lease Agreement
Exhibit Y            Form of Certificate of Designation of Purchaser for Preferred Stock
Exhibit Z            VEBA Note Term Sheet

# AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT

THIS AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT (this "Agreement"), dated as of June 26, 2009, is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem," and collectively with Parent, S LLC and S Distribution, "Sellers," and each a "Seller"), and NGMCO, Inc., a Delaware corporation and successor-in-interest to Vehicle Acquisition Holdings LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, on June 1, 2009 (the "Petition Date"), the Parties entered into that certain Master Sale and Purchase Agreement (the "Original Agreement"), and, in connection therewith, Sellers filed voluntary petitions for relief (the "Bankruptcy Cases") under Chapter 11 of Title 11, U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, pursuant to Sections 363 and 365 of the Bankruptcy Code, Sellers desire to sell, transfer, assign, convey and deliver to Purchaser, and Purchaser desires to purchase, accept and acquire from Sellers all of the Purchased Assets (as hereinafter defined) and assume and thereafter pay or perform as and when due, or otherwise discharge, all of the Assumed Liabilities (as hereinafter defined), in each case, in accordance with the terms and subject to the conditions set forth in this Agreement and the Bankruptcy Code;

WHEREAS, on the Petition Date, Purchaser entered into equity subscription agreements with each of Canada, Sponsor and the New VEBA (each as hereinafter defined), pursuant to which Purchaser has agreed to issue, on the Closing Date (as hereinafter defined), the Canada Shares, the Sponsor Shares, the VEBA Shares, the VEBA Note and the VEBA Warrant (each as hereinafter defined);

WHEREAS, pursuant to the equity subscription agreement between Purchaser and Canada, Canada has agreed to (i) contribute on or before the Closing Date an amount of Indebtedness (as hereinafter defined) owed to it by General Motors of Canada Limited ("GMCL"), which results in not more than $1,288,135,593 of such Indebtedness remaining an obligation of GMCL, to Canada immediately following the Closing (the "Canadian Debt Contribution") and (ii) exchange immediately following the Closing the $3,887,000,000 loan to be made by Canada to Purchaser for additional shares of capital stock of Purchaser;

WHEREAS, the transactions contemplated by this Agreement are in furtherance of the conditions, covenants and requirements of the UST Credit Facilities (as hereinafter defined) and are intended to result in a rationalization of the costs, capitalization and capacity with respect to the manufacturing workforce of, and suppliers to, Sellers and their Subsidiaries (as hereinafter defined);

WHEREAS, it is contemplated that Purchaser may, in accordance with the terms of this Agreement, prior to the Closing (as hereinafter defined), engage in one or more related transactions (the "Holding Company Reorganization") generally designed to reorganize

Purchaser and one or more newly-formed, direct or indirect, wholly-owned Subsidiaries of Purchaser into a holding company structure that results in Purchaser becoming a direct or indirect, wholly-owned Subsidiary of a newly-formed Delaware corporation ("Holding Company"); and

WHEREAS, it is contemplated that Purchaser may, in accordance with the terms of this Agreement, direct the transfer of the Purchased Assets on its behalf by assigning its rights to purchase, accept and acquire the Purchased Assets and its obligations to assume and thereafter pay or perform as and when due, or otherwise discharge, the Assumed Liabilities, to Holding Company or one or more newly-formed, direct or indirect, wholly-owned Subsidiaries of Holding Company or Purchaser.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties (as hereinafter defined) hereby agree as follows:

# ARTICLE I
# DEFINITIONS

Section 1.1    Defined Terms.   As used in this Agreement, the following terms have the meanings set forth below or in the Sections referred to below:

"Adjustment Shares" has the meaning set forth in **Section 3.2(c)(i)**.

"Advisory Fees" has the meaning set forth in **Section 4.20**.

"Affiliate" has the meaning set forth in Rule 12b-2 of the Exchange Act.

"Affiliate Contract" means a Contract between a Seller or a Subsidiary of a Seller, on the one hand, and an Affiliate of such Seller or Subsidiary of a Seller, on the other hand.

"Agreed G Transaction" has the meaning set forth in **Section 6.16(g)(i)**.

"Agreement" has the meaning set forth in the Preamble.

"Allocation" has the meaning set forth in **Section 3.3**.

"Alternative Transaction" means the sale, transfer, lease or other disposition, directly or indirectly, including through an asset sale, stock sale, merger or other similar transaction, of all or substantially all of the Purchased Assets in a transaction or a series of transactions with one or more Persons other than Purchaser (or its Affiliates).

"Ancillary Agreements" means the Parent Warrants, the UAW Active Labor Modifications, the UAW Retiree Settlement Agreement, the VEBA Warrant, the Equity Registration Rights Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Novation Agreement, the Government Related Subcontract Agreement, the Intellectual Property Assignment Agreement, the Transition Services Agreement, the Quitclaim Deeds, the

Assignment and Assumption of Real Property Leases, the Assignment and Assumption of Harlem Lease, the Master Lease Agreement, the Subdivision Master Lease (if required), the Saginaw Service Contracts (if required), the Assignment and Assumption of Willow Run Lease, the Ren Cen Lease, the VEBA Note and each other agreement or document executed by the Parties pursuant to this Agreement or any of the foregoing and each certificate and other document to be delivered by the Parties pursuant to **ARTICLE VII**.

"Antitrust Laws" means all Laws that (i) are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or the lessening of competition through merger or acquisition or (ii) involve foreign investment review by Governmental Authorities.

"Applicable Employee" means all (i) current salaried employees of Parent and (ii) current hourly employees of any Seller or any of its Affiliates (excluding Purchased Subsidiaries and any dealership) represented by the UAW, in each case, including such current salaried and current hourly employees who are on (a) long-term or short-term disability, military leave, sick leave, family medical leave or some other approved leave of absence or (b) layoff status or who have recall rights.

"Arms-Length Basis" means a transaction between two Persons that is carried out on terms no less favorable than the terms on which the transaction would be carried out by unrelated or unaffiliated Persons, acting as a willing buyer and a willing seller, and each acting in his own self-interest.

"Assignment and Assumption Agreement" has the meaning set forth in **Section 7.2(c)(v)**.

"Assignment and Assumption of Harlem Lease" has the meaning set forth in **Section 7.2(c)(xiii)**.

"Assignment and Assumption of Real Property Leases" has the meaning set forth in **Section 7.2(c)(xii)**.

"Assignment and Assumption of Willow Run Lease" has the meaning set forth in **Section 6.27(e)**.

"Assumable Executory Contract" has the meaning set forth in **Section 6.6(a)**.

"Assumable Executory Contract Schedule" means Section 1.1A of the Sellers' Disclosure Schedule.

"Assumed Liabilities" has the meaning set forth in **Section 2.3(a)**.

"Assumed Plans" has the meaning set forth in **Section 6.17(e)**.

"Assumption Effective Date" has the meaning set forth in **Section 6.6(d)**.

"Bankruptcy Avoidance Actions" has the meaning set forth in **Section 2.2(b)(xi)**.

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Benefit Plans" has the meaning set forth in **Section 4.10(a)**.

"Bidders" has the meaning set forth in **Section 6.4(c)**.

"Bids" has the meaning set forth in **Section 6.4(c)**.

"Bill of Sale" has the meaning set forth in **Section 7.2(c)(iv)**.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by Law to be closed in the City of New York, New York.

"CA" has the meaning set forth in **Section 6.16(g)(i)**.

"Canada" means 7176384 Canada Inc., a corporation organized under the Laws of Canada, and a wholly-owned subsidiary of Canada Development Investment Corporation, and its successors and assigns.

"Canada Affiliate" has the meaning set forth in **Section 9.22**.

"Canada Shares" has the meaning set forth in **Section 5.4(c)**.

"Canadian Debt Contribution" has the meaning set forth in the Recitals.

"Claims" means all rights, claims (including any cross-claim or counterclaim), investigations, causes of action, choses in action, charges, suits, defenses, demands, damages, defaults, assessments, rights of recovery, rights of set-off, rights of recoupment, litigation, third party actions, arbitral proceedings or proceedings by or before any Governmental Authority or any other Person, of any kind or nature, whether known or unknown, accrued, fixed, absolute, contingent or matured, liquidated or unliquidated, due or to become due, and all rights and remedies with respect thereto.

"Claims Estimate Order" has the meaning set forth in **Section 3.2(c)(i)**.

"Closing" has the meaning set forth in **Section 3.1**.

"Closing Date" has the meaning set forth in **Section 3.1**.

"Collective Bargaining Agreement" means any collective bargaining agreement or other written or oral agreement, understanding or mutually recognized past practice with respect to Employees, between any Seller (or any Subsidiary thereof) and any labor organization or other Representative of Employees (including the UAW Collective Bargaining Agreement, local agreements, amendments, supplements and letters and memoranda of understanding of any kind).

"Common Stock" has the meaning set forth in **Section 5.4(b)**.

"Confidential Information" has the meaning set forth in **Section 6.24.**

"Confidentiality Period" has the meaning set forth in **Section 6.24**.

"Continuing Brand Dealer Agreement" means a United States dealer sales and service Contract related to one or more of the Continuing Brands, together with all other Contracts between any Seller and the relevant dealer that are related to the dealership operations of such dealer other than Contracts identified on Section 1.1B of the Sellers' Disclosure Schedule, each of which Contract identified on Section 1.1B of the Sellers' Disclosure Schedule shall be deemed to be a Rejectable Executory Contract.

"Continuing Brands" means each of the following vehicle line-makes, currently distributed in the United States by Parent or its Subsidiaries: Buick, Cadillac, Chevrolet and GMC.

"Contracts" means all purchase orders, sales agreements, supply agreements, distribution agreements, sales representative agreements, employee or consulting agreements, leases, subleases, licenses, product warranty or service agreements and other binding commitments, agreements, contracts, arrangements, obligations and undertakings of any nature (whether written or oral, and whether express or implied).

"Copyright Licenses" means all Contracts naming a Seller as licensee or licensor and providing for the grant of any right to reproduce, publicly display, publicly perform, distribute, create derivative works of or otherwise exploit any works covered by any Copyright.

"Copyrights" means all domestic and foreign copyrights, whether registered or unregistered, including all copyright rights throughout the universe (whether now or hereafter arising) in any and all media (whether now or hereafter developed), in and to all original works of authorship (including all compilations of information or marketing materials created by or on behalf of any Seller), acquired, owned or licensed by any Seller, all applications, registrations and recordings thereof (including applications, registrations and recordings in the United States Copyright Office or in any similar office or agency of the United States or any other country or any political subdivision thereof) and all reissues, renewals, restorations, extensions and revisions thereof.

"Cure Amounts" means all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by the applicable Seller and assignment to Purchaser of the Purchased Contracts.

"Damages" means any and all Losses, other than punitive damages.

"Dealer Agreement" has the meaning set forth in **Section 4.17**.

"Deferred Executory Contract" has the meaning set forth in **Section 6.6(c)**.

"<u>Deferred Termination Agreements</u>" has the meaning set forth in **Section 6.7(a)**.

"<u>Delayed Closing Entities</u>" has the meaning set forth in **Section 6.35**.

"<u>Delphi</u>" means Delphi Corporation.

"<u>Delphi Motion</u>" means the motion filed by Parent with the Bankruptcy Court in the Bankruptcy Cases on June 20, 2009, seeking authorization and approval of (i) the purchase, and guarantee of purchase, of certain assets of Delphi, (ii) entry into certain agreements in connection with the sale of substantially all of the remaining assets of Delphi to a third party, (iii) the assumption of certain Executory Contracts in connection with such sale, (iv) entry into an agreement with the PBGC in connection with such sale and (v) entry into an alternative transaction with the successful bidder in the auction for the assets of Delphi.

"<u>Delphi Transaction Agreements</u>" means (i) either (A) the MDA, the SPA, the Loan Agreement, the Operating Agreement, the Commercial Agreements and any Ancillary Agreements (in each case, as defined in the Delphi Motion), which any Seller is a party to, or (B) in the event that an Acceptable Alternative Transaction (as defined in the Delphi Motion) is consummated, any agreements relating to the Acceptable Alternative Transaction, which any Seller is a party to, and (ii) in the event that the PBGC Agreement is entered into at or prior to the Closing, the PBGC Agreement (as defined in the Delphi Motion) and any ancillary agreements entered into pursuant thereto, which any Seller is a party to, as each of the agreements described in clauses (i) or (ii) hereof may be amended from time to time.

"<u>DIP Facility</u>" means that certain Secured Superpriority Debtor-in-Possession Credit Agreement entered into or to be entered into by Parent, as borrower, certain Subsidiaries of Parent listed therein, as guarantors, Sponsor, as lender, and Export Development Canada, as lender.

"<u>Discontinued Brand Dealer Agreement</u>" means a United States dealer sales and service Contract related to one or more of the Discontinued Brands, together with all other Contracts between any Seller and the relevant dealer that are related to the dealership operations of such dealer other than Contracts identified on Section 1.1B of the Sellers' Disclosure Schedule, each of which Contract identified on Section 1.1B of the Sellers' Disclosure Schedule shall be deemed to be a Rejectable Executory Contract.

"<u>Discontinued Brands</u>" means each of the following vehicle line-makes, currently distributed in the United States by Parent or its Subsidiaries: Hummer, Saab, Saturn and Pontiac.

"<u>Disqualified Individual</u>" has the meaning set forth in **Section 4.10(f)**.

"<u>Employees</u>" means (i) each employee or officer of any of Sellers or their Affiliates (including (a) any current, former or retired employees or officers, (b) employees or officers on long-term or short-term disability, military leave, sick leave, family medical leave or some other approved leave of absence and (c) employees on layoff status or with recall rights); (ii) each consultant or other service provider of any of Sellers or their Affiliates who is a former employee, officer or director of any of Sellers or their Affiliates; and (iii) each individual recognized under any Collective Bargaining Agreement as being employed by or having rights to

employment by any of Sellers or their Affiliates.  For the avoidance of doubt, Employees includes all employees of Sellers or any of their Affiliates, whether or not Transferred Employees.

"Employment-Related Obligations" means all Liabilities arising out of, related to, in respect of or in connection with employment relationships or alleged or potential employment relationships with Sellers or any Affiliate of Sellers relating to Employees, leased employees, applicants, and/or independent contractors or those individuals who are deemed to be employees of Sellers or any Affiliate of Sellers by Contract or Law, whether filed or asserted before, on or after the Closing.    "Employment-Related Obligations" includes Claims relating to discrimination, torts, compensation for services (and related employment and withholding Taxes), workers' compensation or similar benefits and payments on account of occupational illnesses and injuries, employment Contracts, Collective Bargaining Agreements,  grievances originating under a Collective Bargaining Agreement, wrongful discharge, invasion of privacy, infliction of emotional distress, defamation, slander, provision of leave under the Family and Medical Leave Act of 1993, as amended, or other similar Laws, car programs, relocation, expense-reporting, Tax protection policies, Claims arising out of WARN or employment, terms of employment, transfers, re-levels, demotions, failure to hire, failure to promote, compensation policies, practices and treatment, termination of employment, harassment, pay equity, employee benefits (including post-employment welfare and other benefits), employee treatment, employee suggestions or ideas, fiduciary performance, employment practices, the modification or termination of Benefit Plans or employee benefit plans, policies, programs, agreements and arrangements of Purchaser, including decisions to provide plans that are different from Benefit Plans, and the like.   Without limiting the generality of the foregoing, with respect to any Employees, leased employees, and/or independent contractors or those individuals who are deemed to be employees of Sellers or any Affiliate of Sellers by Contract or Law, "Employment-Related Obligations" includes payroll and social security Taxes, contributions (whether required or voluntary) to any retirement, health and welfare or similar plan or arrangement, notice, severance or similar payments required under Law, and obligations under Law with respect to occupational injuries and illnesses.

"Encumbrance" means any lien (statutory or otherwise), charge, deed of trust, pledge, security interest, conditional sale or other title retention agreement, lease, mortgage, option, charge, hypothecation, easement, right of first offer, license, covenant, restriction, ownership interest of another Person or other encumbrance.

"End Date" has the meaning set forth in **Section 8.1(b)**.

"Environment" means any surface water, groundwater, drinking water supply, land surface or subsurface soil or strata, ambient air, natural resource or wildlife habitat.

"Environmental Law" means any Law in existence on the date of the Original Agreement relating to the management or Release of, or exposure of humans to, any Hazardous Materials; or pollution; or the protection of human health and welfare and the Environment.

"Equity Incentive Plans" has the meaning set forth in **Section 6.28**.

"Equity Interest" means, with respect to any Person, any shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, options or rights for the purchase or other acquisition from such Person of such shares (or such other ownership or profits interests) and other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting.

"Equity Registration Rights Agreement" has the meaning set forth in **Section 7.1(c)**.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is part of the same controlled group, or under common control with, or part of an affiliated service group that includes any Seller, within the meaning of Section 414(b), (c), (m) or (o) of the Tax Code or Section 4001(a)(14) of ERISA.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Assets" has the meaning set forth in **Section 2.2(b)**.

"Excluded Cash" has the meaning set forth in **Section 2.2(b)(i)**.

"Excluded Continuing Brand Dealer Agreements" means all Continuing Brand Dealer Agreements, other than those that are Assumable Executory Contracts.

"Excluded Contracts" has the meaning set forth in **Section 2.2(b)(vii)**.

"Excluded Entities" has the meaning set forth in **Section 2.2(b)(iv)**.

"Excluded Insurance Policies" has the meaning set forth in **Section 2.2(b)(xiii)**.

"Excluded Personal Property" has the meaning set forth in **Section 2.2(b)(vi)**.

"Excluded Real Property" has the meaning set forth in **Section 2.2(b)(v)**.

"Excluded Subsidiaries" means, collectively, the direct Subsidiaries of Sellers included in the Excluded Entities and their respective direct and indirect Subsidiaries, in each case, as of the Closing Date.

"Executory Contract" means an executory Contract or unexpired lease of personal property or nonresidential real property.

"Executory Contract Designation Deadline" has the meaning set forth in **Section 6.6(a)**.

"Existing Internal VEBA" has the meaning set forth in **Section 6.17(h)**.

"Existing Saginaw Wastewater Facility" has the meaning set forth in **Section 6.27(b)**.

"Existing UST Loan and Security Agreement" means the Loan and Security Agreement, dated as of December 31, 2008, between Parent and Sponsor, as amended.

"FCPA" has the meaning set forth in **Section 4.19**.

"Final Determination" means (i) with respect to U.S. federal income Taxes, a "determination" as defined in Section 1313(a) of the Tax Code or execution of an IRS Form 870-AD and, (ii) with respect to Taxes other than U.S. federal income Taxes, any final determination of Liability in respect of a Tax that, under applicable Law, is not subject to further appeal, review or modification through proceedings or otherwise, including the expiration of a statute of limitations or a period for the filing of Claims for refunds, amended Tax Returns or appeals from adverse determinations.

"Final Order" means (i) an Order of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, or (ii) in the event that an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such Order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such Order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that no Order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such Order.

"FSA Approval" has the meaning set forth in **Section 6.34**.

"G Transaction" has the meaning set forth in **Section 6.16(g)(i)**.

"GAAP" means the United States generally accepted accounting principles and practices as in effect from time to time, consistently applied throughout the specified period.

"GMAC" means GMAC LLC.

"GM Assumed Contracts" has the meaning set forth in the Delphi Motion.

"GMCL" has the meaning set forth in the Recitals.

"Governmental Authority" means any United States or non-United States federal, national, provincial, state or local government or other political subdivision thereof, any entity, authority, agency or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"Government Related Subcontract Agreement" has the meaning set forth in **Section 7.2(c)(vii)**.

"Harlem" has the meaning set forth in the Preamble.

"Hazardous Materials" means any material or substance that is regulated, or can give rise to Claims, Liabilities or Losses, under any Environmental Law or a Permit issued pursuant to any Environmental Law, including any petroleum, petroleum-based or petroleum-derived product, polychlorinated biphenyls, asbestos or asbestos-containing materials, lead and any noxious, radioactive, flammable, corrosive, toxic, hazardous or caustic substance (whether solid, liquid or gaseous).

"Holding Company" has the meaning set forth in the Recitals.

"Holding Company Reorganization" has the meaning set forth in the Recitals.

"Indebtedness" means, with respect to any Person, without duplication: (i) all obligations of such Person for borrowed money (including all accrued and unpaid interest and all prepayment penalties or premiums in respect thereof); (ii) all obligations of such Person to pay amounts evidenced by bonds, debentures, notes or similar instruments (including all accrued and unpaid interest and all prepayment penalties or premiums in respect thereof); (iii) all obligations of others, of the types set forth in clauses (i)-(ii) above that are secured by any Encumbrance on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, but only to the extent so secured; (iv) all unreimbursed reimbursement obligations of such Person under letters of credit issued for the account of such Person; (v) obligations of such Person under conditional sale, title retention or similar arrangements or other obligations, in each case, to pay the deferred purchase price for property or services, to the extent of the unpaid purchase price (other than trade payables and customary reservations or retentions of title under Contracts with suppliers, in each case, in the Ordinary Course of Business); (vi) all net monetary obligations of such Person in respect of interest rate, equity and currency swap and other derivative transaction obligations; and (vii) all guarantees of or by such Person of any of the matters described in clauses (i)-(vi) above, to the extent of the maximum amount for which such Person may be liable pursuant to such guarantee.

"Intellectual Property" means all Patents, Trademarks, Copyrights, Trade Secrets, Software, all rights under the Licenses and all concepts, ideas, know-how, show-how, proprietary information, technology, formulae, processes and other general intangibles of like nature, and other intellectual property to the extent entitled to legal protection as such, including products under development and methodologies therefor, in each case acquired, owned or licensed by a Seller.

"Intellectual Property Assignment Agreement" has the meaning set forth in **Section 7.2(c)(viii)**.

"Intercompany Obligations" has the meaning set forth in **Section 2.2(a)(iv)**.

"Inventory" has the meaning set forth in **Section 2.2(a)(viii)**.

"IRS" means the United States Internal Revenue Service.

"<u>Key Subsidiary</u>" means any direct or indirect Subsidiary (which, for the avoidance of doubt, shall only include any legal entity in which a Seller, directly or indirectly, owns greater than 50% of the outstanding Equity Interests in such legal entity) of Sellers (other than trusts) with assets (excluding any Intercompany Obligations) in excess of Two Hundred and Fifty Million Dollars ($250,000,000) as reflected on Parent's consolidated balance sheet as of March 31, 2009 and listed on Section 1.1C of the Sellers' Disclosure Schedule.

"<u>Knowledge of Sellers</u>" means the actual knowledge of the individuals listed on Section 1.1D of the Sellers' Disclosure Schedule as to the matters represented and as of the date the representation is made.

"<u>Law</u>" means any and all applicable United States or non-United States federal, national, provincial, state or local laws, rules, regulations, directives, decrees, treaties, statutes, provisions of any constitution and principles (including principles of common law) of any Governmental Authority, as well as any applicable Final Order.

"<u>Landlocked Parcel</u>" has the meaning set forth in **Section 6.27(c)**.

"<u>Leased Real Property</u>" means all the real property leased or subleased by Sellers, except for any such leased or subleased real property subject to any Contracts designated as Excluded Contracts.

"<u>Lemon Laws</u>" means a state statute requiring a vehicle manufacturer to provide a consumer remedy when such manufacturer is unable to conform a vehicle to the express written warranty after a reasonable number of attempts, as defined in the applicable statute.

"<u>Liabilities</u>" means any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise.

"<u>Licenses</u>" means the Patent Licenses, the Trademark Licenses, the Copyright Licenses, the Software Licenses and the Trade Secret Licenses.

"<u>Losses</u>" means any and all Liabilities, losses, damages, fines, amounts paid in settlement, penalties, costs and expenses (including reasonable and documented attorneys', accountants', consultants', engineers' and experts' fees and expenses).

"<u>LSA Agreement</u>" means the Amended and Restated GM-Delphi Agreement, dated as of June 1, 2009, and any ancillary agreements entered into pursuant thereto, which any Seller is a party to, as each such agreement may be amended from time to time.

"<u>Master Lease Agreement</u>" has the meaning set forth in **Section 7.2(c)(xiv)**.

"<u>Material Adverse Effect</u>" means any change, effect, occurrence or development that, individually or in the aggregate, has or would reasonably be expected to have a material adverse effect on the Purchased Assets, Assumed Liabilities or results of operations of Parent and its

Purchased Subsidiaries, taken as a whole; provided, however, that the term "Material Adverse Effect" does not, and shall not be deemed to, include, either alone or in combination, any changes, effects, occurrences or developments: (i) resulting from general economic or business conditions in the United States or any other country in which Sellers and their respective Subsidiaries have operations, or the worldwide economy taken as a whole; (ii) affecting Sellers in the industry or the markets where Sellers operate (except to the extent such change, occurrence or development has a disproportionate adverse effect on Parent and its Subsidiaries relative to other participants in such industry or markets, taken as a whole); (iii) resulting from any changes (or proposed or prospective changes) in any Law or in GAAP or any foreign generally accepted accounting principles; (iv) in securities markets, interest rates, regulatory or political conditions, including resulting or arising from acts of terrorism or the commencement or escalation of any war, whether declared or undeclared, or other hostilities; (v) resulting from the negotiation, announcement or performance of this Agreement or the DIP Facility, or the transactions contemplated hereby and thereby, including by reason of the identity of Sellers, Purchaser or Sponsor or any communication by Sellers, Purchaser or Sponsor of any plans or intentions regarding the operation of Sellers' business, including the Purchased Assets, prior to or following the Closing; (vi) resulting from any act or omission of any Seller required or contemplated by the terms of this Agreement, the DIP Facility or the Viability Plans, or otherwise taken with the prior consent of Sponsor or Purchaser, including Parent's announced shutdown, which began in May 2009; and (vii) resulting from the filing of the Bankruptcy Cases (or any other bankruptcy, insolvency or similar proceeding filed by any Subsidiary of Parent) or from any action approved by the Bankruptcy Court (or any other court in connection with any such other proceedings).

"New VEBA" means the trust fund established pursuant to the Settlement Agreement.

"Non-Assignable Assets" has the meaning set forth in **Section 2.4(a)**.

"Non-UAW Collective Bargaining Agreements" has the meaning set forth in **Section 6.17(m)(i)**.

"Non-UAW Settlement Agreements" has the meaning set forth in **Section 6.17(m)(ii)**.

"Notice of Intent to Reject" has the meaning set forth in **Section 6.6(b)**.

"Novation Agreement" has the meaning set forth in **Section 7.2(c)(vi)**.

"Option Period" has the meaning set forth in **Section 6.6(b)**.

"Order" means any writ, judgment, decree, stipulation, agreement, determination, award, injunction or similar order of any Governmental Authority, whether temporary, preliminary or permanent.

"Ordinary Course of Business" means the usual, regular and ordinary course of business consistent with the past practice thereof (including with respect to quantity and frequency) as and to the extent modified in connection with (i) the implementation of the Viability Plans; (ii) Parent's announced shutdown, which began in May 2009; and (iii) the Bankruptcy Cases (or any other bankruptcy, insolvency or similar proceeding filed by or in respect of any Subsidiary of

Parent), in the case of clause (iii), to the extent such modifications were approved by the Bankruptcy Court (or any other court or other Governmental Authority in connection with any such other proceedings), or in furtherance of such approval.

"Organizational Document" means (i) with respect to a corporation, the certificate or articles of incorporation and bylaws or their equivalent; (ii) with respect to any other entity, any charter, bylaws, limited liability company agreement, certificate of formation, articles of organization or similar document adopted or filed in connection with the creation, formation or organization of a Person; and (iii) in the case of clauses (i) and (ii) above, any amendment to any of the foregoing other than as prohibited by **Section 6.2(b)(vi)**.

"Original Agreement" has the meaning set forth in the Recitals.

"Owned Real Property" means all real property owned by Sellers (including all buildings, structures and improvements thereon and appurtenances thereto), except for any such real property included in the Excluded Real Property.

"Parent" has the meaning set forth in the Preamble.

"Parent Employee Benefit Plans and Policies" means all  (i) "employee benefit plans" (as defined in Section 3(3) of ERISA) and all pension, savings, profit sharing, retirement, bonus, incentive, health, dental, life, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, other equity, executive or deferred compensation, hospitalization, post-retirement (including retiree medical or retiree life, voluntary employees' beneficiary associations, and multiemployer plans (as defined in Section 3(37) of ERISA)), severance, retention, change in control, vacation, cafeteria, sick leave, fringe, perquisite, welfare benefits or other employee benefit plans, programs, policies, agreements or arrangements (whether written or oral), including those plans, programs, policies, agreements and arrangements with respect to which any Employee covered by the UAW Collective Bargaining Agreement is an eligible participant, (ii) employment or individual consulting Contracts and (iii) employee manuals and written policies, practices or understandings relating to employment, compensation and benefits, and in the case of clauses (i) through (iii), sponsored, maintained, entered into, or contributed to, or required to be maintained or contributed to, by Parent.

"Parent SEC Documents" has the meaning set forth in **Section 4.5(a)**.

"Parent Shares" has the meaning set forth in **Section 3.2(a)(iii)**.

"Parent Warrant A" means warrants to acquire 45,454,545 shares of Common Stock issued pursuant to a warrant agreement, substantially in the form attached hereto as **Exhibit A**.

"Parent Warrant B" means warrants to acquire 45,454,545 shares of Common Stock issued pursuant to a warrant agreement, substantially in the form attached hereto as **Exhibit B**.

"Parent Warrants" means collectively, Parent Warrant A and Parent Warrant B.

"Participation Agreement" has the meaning set forth in **Section 6.7(b)**.

"Parties" means Sellers and Purchaser together, and "Party" means any of Sellers, on the one hand, or Purchaser, on the other hand, as appropriate and as the case may be.

"Patent Licenses" means all Contracts naming a Seller as licensee or licensor and providing for the grant of any right to manufacture, use, lease, or sell any invention, design, idea, concept, method, technique or process covered by any Patent.

"Patents" means all inventions, patentable designs, letters patent and design letters patent of the United States or any other country and all applications (regular and provisional) for letters patent or design letters patent of the United States or any other country, including applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof, and all reissues, divisions, continuations, continuations in part, revisions, reexaminations and extensions or renewals of any of the foregoing.

"PBGC" has the meaning set forth in **Section 4.10(a)**.

"Permits" has the meaning set forth in **Section 2.2(a)(xi)**.

"Permitted Encumbrances" means all (i) purchase money security interests arising in the Ordinary Course of Business; (ii) security interests relating to progress payments created or arising pursuant to government Contracts in the Ordinary Course of Business; (iii) security interests relating to vendor tooling arising in the Ordinary Course of Business; (iv) Encumbrances that have been or may be created by or with the written consent of Purchaser; (v) mechanic's, materialmen's, laborer's, workmen's, repairmen's, carrier's liens and other similar Encumbrances arising by operation of law or statute in the Ordinary Course of Business for amounts that are not delinquent or that are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established; (vi) liens for Taxes, the validity or amount of which is being contested in good faith by appropriate proceedings, and statutory liens for current Taxes not yet due, payable or delinquent (or which may be paid without interest or penalties); (vii) with respect to the Transferred Real Property that is Owned Real Property, other than Secured Real Property Encumbrances at and following the Closing: (a) matters that a current ALTA/ACSM survey, or a similar cadastral survey in any country other than the United States, would disclose, the existence of which, individually or in the aggregate, would not materially and adversely interfere with the present use of the affected property; (b) rights of the public, any Governmental Authority and adjoining property owners in streets and highways abutting or adjacent to the applicable Owned Real Property; (c) easements, licenses, rights-of-way, covenants, servitudes, restrictions, encroachments, site plans, subdivision plans and other Encumbrances of public record or that would be disclosed by a current title commitment of the applicable Owned Real Property, which, individually or in the aggregate, would not materially and adversely interfere with the present use of the applicable Owned Real Property; and (d) such other Encumbrances, the existence of which, individually or in the aggregate, would not materially and adversely interfere with or affect the present use or occupancy of the applicable Owned Real Property; (viii) with respect to the Transferred Real Property that is Leased Real Property: (1) matters that a current ALTA/ACSM survey, or a similar cadastral survey in any country other than the United States, would disclose; (2) rights of the public, any Governmental Authority and adjoining property owners in streets and highways

abutting or adjacent to the applicable Leased Real Property; (3) easements, licenses, rights-of-way, covenants, servitudes, restrictions, encroachments, site plans, subdivision plans and other Encumbrances of public record or that would be disclosed by a current title commitment of the applicable Leased Real Property or which have otherwise been imposed on such property by landlords; (ix) in the case of the Transferred Equity Interests, all restrictions and obligations contained in any Organizational Document, joint venture agreement, shareholders agreement, voting agreement and related documents and agreements, in each case, affecting the Transferred Equity Interests; (x) except to the extent otherwise agreed to in the Ratification Agreement entered into by Sellers and GMAC on June 1, 2009 and approved by the Bankruptcy Court on the date thereof or any other written agreement between GMAC or any of its Subsidiaries and any Seller, all Claims (in each case solely to the extent such Claims constitute Encumbrances) and Encumbrances in favor of GMAC or any of its Subsidiaries in, upon or with respect to any property of Sellers or in which Sellers have an interest, including any of the following: (1) cash, deposits, certificates of deposit, deposit accounts, escrow funds, surety bonds, letters of credit and similar agreements and instruments; (2) owned or leased equipment; (3) owned or leased real property; (4) motor vehicles, inventory, equipment, statements of origin, certificates of title, accounts, chattel paper, general intangibles, documents and instruments of dealers, including property of dealers in-transit to, surrendered or returned by or repossessed from dealers or otherwise in any Seller's possession or under its control; (5) property securing obligations of Sellers under derivatives Contracts; (6) rights or property with respect to which a Claim or Encumbrance in favor of GMAC or any of its Subsidiaries is disclosed in any filing made by Parent with the SEC (including any filed exhibit); and (7) supporting obligations, insurance rights and Claims against third parties relating to the foregoing; and (xi) all rights of setoff and/or recoupment that are Encumbrances in favor of GMAC and/or its Subsidiaries against amounts owed to Sellers and/or any of their Subsidiaries with respect to any property of Sellers or in which Sellers have an interest as more fully described in clause (x) above; it being understood that nothing in this clause (xi) or preceding clause (x) shall be deemed to modify, amend or otherwise change any agreement as between GMAC or any of its Subsidiaries and any Seller.

"Person" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"Personal Information" means any information relating to an identified or identifiable living individual, including (i) first initial or first name and last name; (ii) home address or other physical address, including street name and name of city or town; (iii) e-mail address or other online contact information (e.g., instant messaging user identifier); (iv) telephone number; (v) social security number or other government-issued personal identifier such as a tax identification number or driver's license number; (vi) internet protocol address; (vii) persistent identifier (e.g., a unique customer number in a cookie); (viii) financial account information (account number, credit or debit card numbers or banking information); (ix) date of birth; (x) mother's maiden name; (xi) medical information (including electronic protected health information as defined by the rules and regulations of the Health Information Portability and Privacy Act, as amended); (xii) digitized or electronic signature; and (xiii) any other information that is combined with any of the above.

-15-

"Personal Property" has the meaning set forth in **Section 2.2(a)(vii)**.

"Petition Date" has the meaning set forth in the Recitals.

"PLR" has the meaning set forth in **Section 6.16(g)(i)**.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date and the portion of any Straddle Period beginning after the Closing Date.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

"Preferred Stock" has the meaning set forth in **Section 5.4(b)**.

"Privacy Policy" means, with respect to any Person, any written privacy policy, statement, rule or notice regarding the collection, use, access, safeguarding and retention of Personal Information or "Personally Identifiable Information" (as defined by Section 101(41A) of the Bankruptcy Code) of any individual, including a customer, potential customer, employee or former employee of such Person, or an employee of any of such Person's automotive or parts dealers.

"Product Liabilities" has the meaning set forth in **Section 2.3(a)(ix)**.

"Promark UK Subsidiaries" has the meaning set forth in **Section 6.34**.

"Proposed Rejectable Executory Contract" has the meaning set forth in **Section 6.6(b)**.

"Purchase Price" has the meaning set forth in **Section 3.2(a)**.

"Purchased Assets" has the meaning set forth in **Section 2.2(a)**.

"Purchased Contracts" has the meaning set forth in **Section 2.2(a)(x)**.

"Purchased Subsidiaries" means, collectively, the direct Subsidiaries of Sellers included in the Transferred Entities, and their respective direct and indirect Subsidiaries, in each case, as of the Closing Date.

"Purchased Subsidiaries Employee Benefit Plans" means any (i) defined benefit or defined contribution retirement plan maintained by any Purchased Subsidiary and (ii) severance, change in control, bonus, incentive or any similar plan or arrangement maintained by a Purchased Subsidiary for the benefit of officers or senior management of such Purchased Subsidiary.

"Purchaser" has the meaning set forth in the Preamble.

"Purchaser Assumed Debt" has the meaning set forth in **Section 2.3(a)(i)**.

"Purchaser Expense Reimbursement" has the meaning set forth in **Section 8.2(b)**.

"Purchaser Material Adverse Effect" has the meaning set forth in **Section 5.3(a)**.

"Purchaser's Disclosure Schedule" means the Schedule pertaining to, and corresponding to the Section references of this Agreement, delivered by Purchaser immediately prior to the execution of the Original Agreement.

"Quitclaim Deeds" has the meaning set forth in **Section 7.2(c)(x)**.

"Receivables" has the meaning set forth in **Section 2.2(a)(iii)**.

"Rejectable Executory Contract" has the meaning set forth in **Section 6.6(b)**.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, dumping, discarding, burying, abandoning or disposing into the Environment of Hazardous Materials that is prohibited under, or reasonably likely to result in a Liability under, any applicable Environmental Law.

"Relevant Information" has the meaning set forth in **Section 6.16(g)(ii)**.

"Relevant Transactions" has the meaning set forth in **Section 6.16(g)(i)**.

"Ren Cen Lease" has the meaning set forth in **Section 6.30**.

"Representatives" means all officers, directors, employees, consultants, agents, lenders, accountants, attorneys and other representatives of a Person.

"Required Subdivision" has the meaning set forth in **Section 6.27(a)**.

"Restricted Cash" has the meaning set forth in **Section 2.2(a)(ii)**.

"Retained Liabilities" has the meaning set forth in **Section 2.3(b)**.

"Retained Plans" means any Parent Employee Benefit Plan and Policy that is not an Assumed Plan.

"Retained Subsidiaries" means all Subsidiaries of Sellers and their respective direct and indirect Subsidiaries, as of the Closing Date, other than the Purchased Subsidiaries.

"Retained Workers' Compensation Claims" has the meaning set forth in **Section 2.3(b)(xii)**.

"RHI" has the meaning set forth in **Section 6.30**.

"RHI Post-Closing Period" has the meaning set forth in **Section 6.30**.

"S Distribution" has the meaning set forth in the Preamble.

"S LLC" has the meaning set forth in the Preamble.

"Saginaw Landfill" has the meaning set forth in **Section 6.27(b)**.

"Saginaw Metal Casting Land" has the meaning set forth in **Section 6.27(b)**.

"Saginaw Nodular Iron Land" has the meaning set forth in **Section 6.27(b)**.

"Saginaw Service Contracts" has the meaning set forth in **Section 6.27(b)**.

"Sale Approval Order" has the meaning set forth in **Section 6.4(b)**.

"Sale Hearing" means the hearing of the Bankruptcy Court to approve the Sale Procedures and Sale Motion and enter the Sale Approval Order.

"Sale Procedures and Sale Motion" has the meaning set forth in **Section 6.4(b)**.

"Sale Procedures Order" has the meaning set forth in **Section 6.4(b)**.

"SEC" means the United States Securities and Exchange Commission.

"Secured Real Property Encumbrances" means all Encumbrances related to the Indebtedness of Sellers, which is secured by one or more parcels of the Owned Real Property, including Encumbrances related to the Indebtedness of Sellers under any synthetic lease arrangements at the White Marsh, Maryland GMPT - Baltimore manufacturing facility and the Memphis, Tennessee (SPO - Memphis) facility.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Seller" or "Sellers" has the meaning set forth in the Preamble.

"Seller Group" means any combined, unitary, consolidated or other affiliated group of which any Seller or Purchased Subsidiary is or has been a member for federal, state, provincial, local or foreign Tax purposes.

"Seller Key Personnel" means those individuals described on Section 1.1E of the Sellers' Disclosure Schedule.

"Seller Material Contracts" has the meaning set forth in **Section 4.16(a)**.

"Sellers' Disclosure Schedule" means the Schedule pertaining to, and corresponding to the Section references of this Agreement, delivered by Sellers to Purchaser immediately prior to the execution of this Agreement, as updated and supplemented pursuant to **Section 6.5**, **Section 6.6** and **Section 6.26**.

"Series A Preferred Stock" has the meaning set forth in **Section 5.4(b)**.

"Settlement Agreement" means the Settlement Agreement, dated February 21, 2008 (as amended, supplemented, replaced or otherwise altered from time to time), among Parent, the UAW and certain class representatives, on behalf of the class of plaintiffs in the class action of

*Int'l Union, UAW, et al. v. General Motors Corp.*, Civil Action No. 07-14074 (E.D. Mich. filed Sept. 9, 2007).

"Shared Executory Contracts" has the meaning set forth in **Section 6.6(d)**.

"Software" means all software of any type (including programs, applications, middleware, utilities, tools, drivers, firmware, microcode, scripts, batch files, JCL files, instruction sets and macros) and in any form (including source code, object code, executable code and user interface), databases and associated data and related documentation, in each case owned, acquired or licensed by any Seller.

"Software Licenses" means all Contracts naming a Seller as licensee or licensor and providing for the grant of any right to use, modify, reproduce, distribute or create derivative works of any Software.

"Sponsor" means the United States Department of the Treasury.

"Sponsor Affiliate" has the meaning set forth in **Section 9.22**.

"Sponsor Shares" has the meaning set forth in **Section 5.4(c)**.

"Straddle Period" means a taxable period that includes but does not end on the Closing Date.

"Subdivision Master Lease" has the meaning set forth in **Section 6.27(a)**.

"Subdivision Properties" has the meaning set forth in **Section 6.27(a)**.

"Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation, limited liability company, partnership or other legal entity (in each case, other than a joint venture if such Person is not empowered to control the day-to-day operations of such joint venture) of which such Person (either alone or through or together with any other Subsidiary) owns, directly or indirectly, more than fifty percent (50%) of the Equity Interests, the holder of which is entitled to vote for the election of the board of directors or other governing body of such corporation, limited liability company, partnership or other legal entity.

"Superior Bid" has the meaning set forth in **Section 6.4(d)**.

"TARP" means the Troubled Assets Relief Program established by Sponsor under the Emergency Economic Stabilization Act of 2008, Public Law No. 110-343, effective as of October 3, 2008, as amended by Section 7001 of Division B, Title VII of the American Recovery and Reinvestment Act of 2009, Public Law No. 111-5, effective as of February 17, 2009, as may be further amended and in effect from time to time and any guidance issued by a regulatory authority thereunder and other related Laws in effect currently or in the future in the United States.

"Tax" or "Taxes" means any federal, state, provincial, local, foreign and other income, alternative minimum, accumulated earnings, personal holding company, franchise, capital stock,

net worth or gross receipts, income, alternative or add-on minimum, capital, capital gains, sales, use, ad valorem, franchise, profits, license, privilege, transfer, withholding, payroll, employment, social, excise, severance, stamp, occupation, premium, goods and services, value added, property (including real property and personal property taxes), environmental, windfall profits or other taxes, customs, duties or similar fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any Governmental Authority, including any transferee, successor or secondary liability for any such tax and any Liability assumed by Contract or arising as a result of being or ceasing to be a member of any affiliated group or similar group under state, provincial, local or foreign Law, or being included or required to be included in any Tax Return relating thereto.

"Tax Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Taxing Authority" means, with respect to any Tax, the Governmental Authority thereof that imposes such Tax and the agency, court or other Person or body (if any) charged with the interpretation, administration or collection of such Tax for such Governmental Authority.

"Tax Return" means any return, report, declaration, form, election letter, statement or other information filed or required to be filed with any Governmental Authority with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

"Trademark Licenses" means all Contracts naming any Seller as licensor or licensee and providing for the grant of any right concerning any Trademark together with any goodwill connected with and symbolized by any such Trademark or Trademark Contract, and the right to prepare for sale or lease and sell or lease any and all products, inventory or services now or hereafter owned or provided by any Seller or any other Person and now or hereafter covered by such Contracts.

"Trademarks" means all domestic and foreign trademarks, service marks, collective marks, certification marks, trade dress, trade names, business names, d/b/a's, Internet domain names, designs, logos and other source or business identifiers, and all general intangibles of like nature, now or hereafter owned, adopted, used, acquired, or licensed by any Seller, all applications, registrations and recordings thereof (including applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof) and all reissues, extensions or renewals thereof, together with all goodwill of the business symbolized by or associated with such marks.

"Trade Secrets" means all trade secrets or Confidential Information, including any confidential technical and business information, program, process, method, plan, formula, product design, compilation of information, customer list, sales forecast, know-how, Software, and any other confidential proprietary intellectual property, and all additions and improvements to, and books and records describing or used in connection with, any of the foregoing, in each case, owned, acquired or licensed by any Seller.

"Trade Secret Licenses" means all Contracts naming a Seller as licensee or licensor and providing for the grant of any rights with respect to Trade Secrets.

"Transfer Taxes" means all transfer, documentary, sales, use, stamp, registration and other similar Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the transactions contemplated hereby and not otherwise exempted under the Bankruptcy Code, including relating to the transfer of the Transferred Real Property.

"Transfer Tax Forms" has the meaning set forth in **Section 7.2(c)(xi)**.

"Transferred Employee" has the meaning set forth in **Section 6.17(a)**.

"Transferred Entities" means all of the direct Subsidiaries of Sellers and joint venture entities or other entities in which any Seller has an Equity Interest, other than the Excluded Entities.

"Transferred Equity Interests" has the meaning set forth in **Section 2.2(a)(v)**.

"Transferred Real Property" has the meaning set forth in **Section 2.2(a)(vi)**.

"Transition Services Agreement" has the meaning set forth in **Section 7.2(c)(ix)**.

"Transition Team" has the meaning set forth in **Section 6.11(c)**.

"UAW" means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America.

"UAW Active Labor Modifications" means the modifications to the UAW Collective Bargaining Agreement, as agreed to in the 2009 Addendum to the 2007 UAW-GM National Agreement, dated May 17, 2009, the cover page of which is attached hereto as **Exhibit C** (the 2009 Addendum without attachments), which modifications were ratified by the UAW membership on May 29, 2009.

"UAW Collective Bargaining Agreement" means any written or oral Contract, understanding or mutually recognized past practice between Sellers and the UAW with respect to Employees, including the UAW Active Labor Modifications, but excluding the agreement to provide certain retiree medical benefits specified in the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between Parent and the UAW, and the Settlement Agreement.  For purpose of clarity, the term "UAW Collective Bargaining Agreement" includes all special attrition programs, divestiture-related memorandums of understanding or implementation agreements relating to any unit or location where covered UAW-represented employees remain and any current local agreement between Parent and a UAW local relating to any unit or location where UAW-represented employees are employed as of the date of the Original Agreement.  For purposes of clarity, nothing in this definition extends the coverage of the UAW-GM National Agreement to any Employee of S LLC, S Distribution, Harlem, a Purchased Subsidiary or one of Parent's Affiliates; nothing in this Agreement creates a direct employment relationship with a Purchased Subsidiary's employee or an Affiliate's Employee and Parent.

"UAW Retiree Settlement Agreement" means the UAW Retiree Settlement Agreement to be executed prior to the Closing, substantially in the form attached hereto as **Exhibit D**.

"Union" means any labor union, organization or association representing any employees (but not including the UAW) with respect to their employment with any of Sellers or their Affiliates.

"United States" or "U.S." means the United States of America, including its territories and insular possessions.

"UST Credit Bid Amount" has the meaning set forth in **Section 3.2(a)(i)**.

"UST Credit Facilities" means (i) the Existing UST Loan and Security Agreement and (ii) those certain promissory notes dated December 31, 2008, April 22, 2009, May 20, 2009, and May 27, 2009, issued by Parent to Sponsor as additional compensation for the extensions of credit under the Existing UST Loan and Security Agreement, in each case, as amended.

"UST Warrant" means the warrant issued by Parent to Sponsor in consideration for the extension of credit made available to Parent under the Existing UST Loan and Security Agreement.

"VEBA Shares" has the meaning set forth in **Section 5.4(c)**.

"VEBA Note" has the meaning set forth in **Section 7.3(g)(iv)**.

"VEBA Warrant" means warrants to acquire 15,151,515 shares of Common Stock issued pursuant to a warrant agreement, substantially in the form attached hereto as **Exhibit E**.

"Viability Plans" means (i) Parent's Restructuring Plan for Long-Term Viability, dated December 2, 2008; (ii) Parent's 2009-2014 Restructuring Plan, dated February 17, 2009; (iii) Parent's 2009-2014 Restructuring Plan:  Progress Report, dated March 30, 2009; and (iv) Parent's Revised Viability Plan, all as described in Parent's Registration Statement on Form S-4 (Reg. No 333-158802), initially filed with the SEC on April 27, 2009, in each case, as amended, supplemented and/or superseded.

"WARN" means the Workers Adjustment and Retraining Notification Act of 1988, as amended, and similar foreign, state and local Laws.

"Willow Run Landlord" means the Wayne County Airport Authority, or any successor landlord under the Willow Run Lease.

"Willow Run Lease" means that certain Willow Run Airport Lease of Land dated October 11, 1985, as the same may be amended, by and between the Willow Run Landlord, as landlord, and Parent, as tenant, for certain premises located at the Willow Run Airport in Wayne and Washtenaw Counties, Michigan.

"Willow Run Lease Amendment" has the meaning set forth in **Section 6.27(e)**.

"Wind Down Facility" has the meaning set forth in **Section 6.9(b)**.

Section 1.2     *Other Interpretive Provisions.*  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole (including the Sellers' Disclosure Schedule) and not to any particular provision of this Agreement, and all Article, Section, Sections of the Sellers' Disclosure Schedule and Exhibit references are to this Agreement unless otherwise specified. The words "include", "includes" and "including" are deemed to be followed by the phrase "without limitation." The meanings given to terms defined herein are equally applicable to both the singular and plural forms of such terms. Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.  Except as otherwise expressly provided herein, all references to "Dollars" or "$" are deemed references to lawful money of the United States.  Unless otherwise specified, references to any statute, listing rule, rule, standard, regulation or other Law (a) include a reference to the corresponding rules and regulations and (b) include a reference to each of them as amended, modified, supplemented, consolidated, replaced or rewritten from time to time, and to any section of any statute, listing rule, rule, standard, regulation or other Law, including any successor to such section.  Where this Agreement states that a Party "shall" or "will" perform in some manner or otherwise act or omit to act, it means that the Party is legally obligated to do so in accordance with this Agreement.

# ARTICLE II
# PURCHASE AND SALE

Section 2.1     *Purchase and Sale of Assets; Assumption of Liabilities.*  On the terms and subject to the conditions set forth in this Agreement, other than as set forth in **Section 6.30**, **Section 6.34** and **Section 6.35**, at the Closing, Purchaser shall (a) purchase, accept and acquire from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Purchaser, free and clear of all Encumbrances (other than Permitted Encumbrances), Claims and other interests, the Purchased Assets and (b) assume and thereafter pay or perform as and when due, or otherwise discharge, all of the Assumed Liabilities.

Section 2.2     *Purchased and Excluded Assets.*

(a)     The "Purchased Assets" shall consist of the right, title and interest that Sellers possess and have the right to legally transfer in and to all of the properties, assets, rights, titles and interests of every kind and nature, owned, leased, used or held for use by Sellers (including indirect and other forms of beneficial ownership), whether tangible or intangible, real, personal or mixed, and wherever located and by whomever possessed, in each case, as the same may exist as of the Closing, including the following properties, assets, rights, titles and interests (but, in every case, excluding the Excluded Assets):

(i)     all cash and cash equivalents, including all marketable securities, certificates of deposit and all collected funds or items in the process of collection at Sellers' financial institutions through and including the Closing, and all bank deposits, investment accounts and lockboxes related thereto, other than the Excluded Cash and Restricted Cash;

(ii)      all restricted or escrowed cash and cash equivalents, including restricted marketable securities and certificates of deposit (collectively, "Restricted Cash") other than the Restricted Cash described in **Section 2.2(b)(ii)**;

(iii)     all accounts and notes receivable and other such Claims for money due to Sellers, including the full benefit of all security for such accounts, notes and Claims, however arising, including arising from the rendering of services or the sale of goods or materials, together with any unpaid interest accrued thereon from the respective obligors and any security or collateral therefor, other than intercompany receivables (collectively, "Receivables");

(iv)     all intercompany obligations ("Intercompany Obligations") owed or due, directly or indirectly, to Sellers by any Subsidiary of a Seller or joint venture or other entity in which a Seller or a Subsidiary of a Seller has any Equity Interest;

(v)      (A) subject to **Section 2.4**, all Equity Interests in the Transferred Entities (collectively, the "Transferred Equity Interests") and (B) the corporate charter, qualification to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, corporate seal, minute books, stock transfer books, blank stock certificates and any other documents relating to the organization, maintenance and existence of each Transferred Entity;

(vi)     all Owned Real Property and Leased Real Property (collectively, the "Transferred Real Property");

(vii)    all machinery, equipment (including test equipment and material handling equipment), hardware, spare parts, tools, dies, jigs, molds, patterns, gauges, fixtures (including production fixtures), business machines, computer hardware, other information technology assets, furniture, supplies, vehicles, spare parts in respect of any of the foregoing and other tangible personal property (including any of the foregoing in the possession of manufacturers, suppliers, customers, dealers or others and any of the foregoing in transit) that does not constitute Inventory (collectively, "Personal Property"), including the Personal Property located at the Excluded Real Property and identified on Section 2.2(a)(vii) of the Sellers' Disclosure Schedule;

(viii)   all inventories of vehicles, raw materials, work-in-process, finished goods, supplies, stock, parts, packaging materials and other accessories related thereto (collectively, "Inventory"), wherever located, including any of the foregoing in the possession of manufacturers, suppliers, customers, dealers or others and any of the foregoing in transit or that is classified as returned goods;

(ix)     (A) all Intellectual Property, whether owned, licensed or otherwise held, and whether or not registrable (including any Trademarks and other Intellectual Property associated with the Discontinued Brands), and (B) all rights

and benefits associated with the foregoing, including all rights to sue or recover for past, present and future infringement, misappropriation, dilution, unauthorized use or other impairment or violation of any of the foregoing, and all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing;

(x)      subject to **Section 2.4**, all Contracts, other than the Excluded Contracts (collectively, the "Purchased Contracts"), including, for the avoidance of doubt, (A) the UAW Collective Bargaining Agreement and (B) any Executory Contract designated as an Assumable Executory Contract as of the applicable Assumption Effective Date;

(xi)      subject to **Section 2.4**, all approvals, Contracts, authorizations, permits, licenses, easements, Orders, certificates, registrations, franchises, qualifications, rulings, waivers, variances or other forms of permission, consent, exemption or authority issued, granted, given or otherwise made available by or under the authority of any Governmental Authority, including all pending applications therefor and all renewals and extensions thereof (collectively, "Permits"), other than to the extent that any of the foregoing relate exclusively to the Excluded Assets or Retained Liabilities;

(xii)      all credits, deferred charges, prepaid expenses, deposits, advances, warranties, rights, guarantees, surety bonds, letters of credit, trust arrangements and other similar financial arrangements, in each case, relating to the Purchased Assets or Assumed Liabilities, including all warranties, rights and guarantees (whether express or implied) made by suppliers, manufacturers, contractors and other third parties under or in connection with the Purchased Contracts;

(xiii)      all Claims (including Tax refunds) relating to the Purchased Assets or Assumed Liabilities, including the Claims identified on Section 2.2(a)(xiii) of the Sellers' Disclosure Schedule and all Claims against any Taxing Authority for any period, other than Bankruptcy Avoidance Actions and any of the foregoing to the extent that they relate exclusively to the Excluded Assets or Retained Liabilities;

(xiv)      all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials, reports and other materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

(xv)      all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities;

(xvi)      to the extent provided in **Section 6.17(e)**, all Assumed Plans;

(xvii)      all insurance policies and the rights to the proceeds thereof, other than the Excluded Insurance Policies;

(xviii)      any rights of any Seller, Subsidiary of any Seller or Seller Group member to any Tax refunds, credits or abatements that relate to any Pre-Closing Tax Period or Straddle Period; and

(xix)      any interest in Excluded Insurance Policies, only to the extent such interest relates to any Purchased Asset or Assumed Liability.

(b)      Notwithstanding anything to the contrary contained in this Agreement, Sellers shall retain all of their respective right, title and interest in and to, and shall not, and shall not be deemed to, sell, transfer, assign, convey or deliver to Purchaser, and the Purchased Assets shall not, and shall not be deemed to, include the following (collectively, the "Excluded Assets"):

(i)      cash or cash equivalents in an amount equal to $950,000,000 (the "Excluded Cash");

(ii)      all Restricted Cash exclusively relating to the Excluded Assets or Retained Liabilities;

(iii)      all Receivables (other than Intercompany Obligations) exclusively related to any Excluded Assets or Retained Liabilities;

(iv)      all of Sellers' Equity Interests in (A) S LLC, (B) S Distribution, (C) Harlem and (D) the Subsidiaries, joint ventures and the other entities in which any Seller has any Equity Interest and that are identified on Section 2.2(b)(iv) of the Sellers' Disclosure Schedule (collectively, the "Excluded Entities");

(v)      (A) all owned real property set forth on **Exhibit F** and such additional owned real property set forth on Section 2.2(b)(v) of the Sellers' Disclosure Schedule (including, in each case, any structures, buildings or other improvements located thereon and appurtenances thereto) and (B) all real property leased or subleased that is subject to a Contract designated as an "Excluded Contract" (collectively, the "Excluded Real Property");

(vi)      all Personal Property that is (A) located at the Transferred Real Property and identified on Section 2.2(b)(vi) of the Sellers' Disclosure Schedule, (B) located at the Excluded Real Property, except for those items identified on Section 2.2(a)(vii) of the Sellers' Disclosure Schedule or (C) subject to a Contract

designated as an Excluded Contract (collectively, the "<u>Excluded Personal Property</u>");

(vii)    (A) all Contracts identified on Section 2.2(b)(vii) of the Sellers' Disclosure Schedule immediately prior to the Closing, (B) all pre-petition Executory Contracts designated as Rejectable Executory Contracts, (C) all pre-petition Executory Contracts (including, for the avoidance of doubt, the Delphi Transaction Agreements and GM Assumed Contracts) that have not been designated as or deemed to be Assumable Executory Contracts in accordance with **Section 6.6** or **Section 6.31**, or that are determined, pursuant to the procedures set forth in the Sale Procedures Order, not to be assumable and assignable to Purchaser, (D) all Collective Bargaining Agreements not set forth on the Assumable Executory Contract Schedule and (E) all non-Executory Contracts for which performance by a third-party or counterparty is substantially complete and for which a Seller owes a continuing or future obligation with respect to such non-Executory Contracts (collectively, the "<u>Excluded Contracts</u>"), including any accounts receivable arising out of or in connection with any Excluded Contract; it being understood and agreed by the Parties hereto that, notwithstanding anything to the contrary herein, in no event shall the UAW Collective Bargaining Agreement be designated or otherwise deemed or considered an Excluded Contract;

(viii)    all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials, reports and other materials (in whatever form or medium) relating exclusively to the Excluded Assets or Retained Liabilities, and any books, records and other materials that any Seller is required by Law to retain;

(ix)    the corporate charter, qualification to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, corporate seal, minute books, stock transfer books, blank stock certificates and any other documents relating to the organization, maintenance and existence of each Seller and each Excluded Entity;

(x)    all Claims against suppliers, dealers and any other third parties relating exclusively to the Excluded Assets or Retained Liabilities;

(xi)    all of Sellers' Claims under this Agreement, the Ancillary Agreements and the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551 (inclusive), 553, 558 and any other applicable provisions of the Bankruptcy Code, and any related Claims and actions arising under such sections by operation of Law or otherwise, including any and all proceeds of the foregoing (the "<u>Bankruptcy Avoidance Actions</u>"), but in all cases, excluding all rights and Claims identified on Section 2.2(b)(xi) of the Sellers' Disclosure Schedule;

(xii)    all credits, deferred charges, prepaid expenses, deposits and advances, warranties, rights, guarantees, surety bonds, letters of credit, trust arrangements and other similar financial arrangements, in each case, relating exclusively to the Excluded Assets or Retained Liabilities;

(xiii)    all insurance policies identified on Section 2.2(b)(xiii) of the Sellers' Disclosure Schedule and the rights to proceeds thereof (collectively, the "Excluded Insurance Policies"), other than any rights to proceeds to the extent such proceeds relate to any Purchased Asset or Assumed Liability;

(xiv)    all Permits, to the extent that they relate exclusively to the Excluded Assets or Retained Liabilities;

(xv)    all Retained Plans; and

(xvi)    those assets identified on Section 2.2(b)(xvi) of the Sellers' Disclosure Schedule.

*Section 2.3    Assumed and Retained Liabilities.*

(a)    The "Assumed Liabilities" shall consist only of the following Liabilities of Sellers:

(i)    $7,072,488,605 of Indebtedness incurred under the DIP Facility, to be restructured pursuant to the terms of **Section 6.9** (the "Purchaser Assumed Debt");

(ii)    all Liabilities under each Purchased Contract;

(iii)    all Intercompany Obligations owed or due, directly or indirectly, by Sellers to (A) any Purchased Subsidiary or (B) any joint venture or other entity in which a Seller or a Purchased Subsidiary has any Equity Interest (other than an Excluded Entity);

(iv)    all Cure Amounts under each Assumable Executory Contract that becomes a Purchased Contract;

(v)    all Liabilities of Sellers (A) arising in the Ordinary Course of Business during the Bankruptcy Case through and including the Closing Date, to the extent such Liabilities are administrative expenses of Sellers' estates pursuant to Section 503(b) of the Bankruptcy Code and (B) arising prior to the commencement of the Bankruptcy Cases to the extent approved by the Bankruptcy Court for payment by Sellers pursuant to a Final Order (and for the avoidance of doubt, Sellers' Liabilities in clauses (A) and (B) above include Sellers' Liabilities for personal property Taxes, real estate and/or other ad valorem Taxes, use Taxes, sales Taxes, franchise Taxes, income Taxes, gross receipt Taxes, excise Taxes, Michigan Business Taxes and Michigan Single Business Taxes), in each case, other than (1) Liabilities of the type described in

**Section 2.3(b)(iv)**, **Section 2.3(b)(vi)** and **Section 2.3(b)(ix)**, (2) Liabilities arising under any dealer sales and service Contract and any Contract related thereto, to the extent such Contract has been designated as a Rejectable Executory Contract, and (3) Liabilities otherwise assumed in this **Section 2.3(a)**;

(vi)      all Transfer Taxes payable in connection with the sale, transfer, assignment, conveyance and delivery of the Purchased Assets pursuant to the terms of this Agreement;

(vii)      (A) all Liabilities arising under express written warranties of Sellers that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws;

(viii)      all Liabilities arising under any Environmental Law (A) relating to conditions present on the Transferred Real Property, other than those Liabilities described in **Section 2.3(b)(iv)**, (B) resulting from Purchaser's ownership or operation of the Transferred Real Property after the Closing or (C) relating to Purchaser's failure to comply with Environmental Laws after the Closing;

(ix)      all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance (for avoidance of doubt, Purchaser shall not assume, or become liable to pay, perform or discharge, any Liability arising or contended to arise by reason of exposure to materials utilized in the assembly or fabrication of motor vehicles manufactured by Sellers and delivered prior to the Closing Date, including asbestos, silicates or fluids, regardless of when such alleged exposure occurs);

(x)      all Liabilities of Sellers arising out of, relating to, in respect of, or in connection with workers' compensation claims against any Seller, except for Retained Workers' Compensation Claims;

(xi)      all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing;

(xii)      all Liabilities (A) specifically assumed by Purchaser pursuant to **Section 6.17** and (B) arising out of, relating to or in connection with the salaries and/or wages and vacation of all Transferred Employees that are accrued and unpaid (or with respect to vacation, unused) as of the Closing Date;

(xiii)      (A) all Employment-Related Obligations and (B) Liabilities under any Assumed Plan, in each case, relating to any Employee that is or was covered by the UAW Collective Bargaining Agreement, except for Retained Workers Compensation Claims;

(xiv)      all Liabilities of Sellers underlying any construction liens that constitute Permitted Encumbrances with respect to Transferred Real Property; and

(xv)      those other Liabilities identified on Section 2.3(a)(xv) of the Sellers' Disclosure Schedule.

(b)      Each Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Purchaser shall not assume, or become liable to pay, perform or discharge, any Liability of any Seller, whether occurring or accruing before, at or after the Closing, other than the Assumed Liabilities.  In furtherance and not in limitation of the foregoing, and in all cases with the exception of the Assumed Liabilities, neither Purchaser nor any of its Affiliates shall assume, or be deemed to have assumed, any Indebtedness, Claim or other Liability of any Seller or any predecessor, Subsidiary or Affiliate of any Seller whatsoever, whether occurring or accruing before, at or after the Closing, including the following (collectively, the "Retained Liabilities"):

(i)      all Liabilities arising out of, relating to, in respect of or in connection with any Indebtedness of Sellers (other than Intercompany Obligations and the Purchaser Assumed Debt), including those items identified on  Section 2.3(b)(i) of the Sellers' Disclosure Schedule;

(ii)      all Intercompany Obligations owed or due, directly or indirectly, by Sellers to (A) another Seller, (B) any Excluded Subsidiary or (C) any joint venture or other entity in which a Seller or an Excluded Subsidiary has an Equity Interest (other than a Transferred Entity);

(iii)      all Liabilities arising out of, relating to, in respect of or in connection with the Excluded Assets, other than Liabilities otherwise retained in this **Section 2.3(b)**;

(iv)      all Liabilities (A) associated with noncompliance with Environmental Laws (including for fines, penalties, damages and remedies); (B) arising out of, relating to, in respect of or in connection with the transportation, off-site storage or off-site disposal of any Hazardous Materials generated or located at any Transferred Real Property; (C) arising out of, relating to, in respect of or in connection with third-party Claims related to Hazardous Materials that were or are located at or that migrated or may migrate from any Transferred Real Property, except as otherwise required under applicable Environmental Laws; (D) arising under Environmental Laws related to the Excluded Real Property; or (E) for environmental Liabilities with respect to real property formerly owned, operated or leased by Sellers (as of the Closing), which, in the case of clauses (A),

(B) and (C), arose prior to or at the Closing, and which, in the case of clause (D) and (E), arise prior to, at or after the Closing;

(v)      except for Taxes assumed in **Section 2.3(a)(v)** and **Section 2.3(a)(vi)**, all Liabilities with respect to any (A) Taxes arising in connection with Sellers' business, the Purchased Assets or the Assumed Liabilities and that are attributable to a Pre-Closing Tax Period (including any Taxes incurred in connection with the sale of the Purchased Assets, other than all Transfer Taxes), (B) other Taxes of any Seller and (C) Taxes of any Seller Group, including any Liability of any Seller or any Seller Group member for Taxes arising as a result of being or ceasing to be a member of any Seller Group (it being understood, for the avoidance of doubt, that no provision of this Agreement shall cause Sellers to be liable for Taxes of any Purchased Subsidiary for which Sellers would not be liable absent this Agreement);

(vi)      all Liabilities for (A) costs and expenses relating to the preparation, negotiation and entry into this Agreement and the Ancillary Agreements (and the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements, which, for the avoidance of doubt, shall not include any Transfer Taxes), including Advisory Fees, (B) administrative fees, professional fees and all other expenses under the Bankruptcy Code and (C) all other fees and expenses associated with the administration of the Bankruptcy Cases;

(vii)      all Employment-Related Obligations not otherwise assumed in **Section 2.3(a)** and **Section 6.17**, including those arising out of, relating to, in respect of or in connection with the employment, potential employment or termination of employment of any individual (other than any Employee that is or was covered by the UAW Collective Bargaining Agreement) (A) prior to or at the Closing (including any severance policy, plan or program that exists or arises, or may be deemed to exist or arise, as a result of, or in connection with, the transactions contemplated by this Agreement) or (B) who is not a Transferred Employee arising after the Closing and with respect to both clauses (A) and (B) above, including any Liability arising out of, relating to, in respect of or in connection with any Collective Bargaining Agreement (other than the UAW Collective Bargaining Agreement);

(viii)      all Liabilities arising out of, relating to, in respect of or in connection with Claims for infringement or misappropriation of third party intellectual property rights;

(ix)      all Product Liabilities arising in whole or in part from any accidents, incidents or other  occurrences that happen prior to the Closing Date;

(x)      all Liabilities to third parties for death, personal injury, other injury to Persons or damage to property, in each case, arising out of asbestos exposure;

(xi)     all Liabilities to third parties for Claims based upon Contract, tort or any other basis;

(xii)     all workers' compensation Claims with respect to Employees residing in or employed in, as the case may be as defined by applicable Law, the states set forth on **Exhibit G** (collectively, "Retained Workers' Compensation Claims");

(xiii)     all Liabilities arising out of, relating to, in respect of or in connection with any Retained Plan;

(xiv)     all Liabilities arising out of, relating to, in respect of or in connection with any Assumed Plan or Purchased Subsidiaries Employee Benefit Plan, but only to the extent such Liabilities result from the failure of such Assumed Plan or Purchased Subsidiaries Employee Benefit Plan to comply in all respects with TARP or such Liability related to any changes to or from the administration of such Assumed Plan or Purchased Subsidiaries Employee Benefit Plan prior to the Closing Date;

(xv)     the Settlement Agreement, except as provided with respect to Liabilities under Section 5A of the UAW Retiree Settlement Agreement; and

(xvi)     all Liabilities arising out of, related to or in connection with any (A) implied warranty or other implied obligation arising under statutory or common law without the necessity of an express warranty or (B) allegation, statement or writing by or attributable to Sellers.

*Section 2.4     Non-Assignability.*

(a)     If any Contract, Transferred Equity Interest (or any interest therein), Permit or other asset, which by the terms of this Agreement, is intended to be included in the Purchased Assets is determined not capable of being assigned or transferred (whether pursuant to Sections 363 or 365 of the Bankruptcy Code) to Purchaser at the Closing without the consent of another party thereto, the issuer thereof or any third party (including a Governmental Authority) ("Non-Assignable Assets"), this Agreement shall not constitute an assignment thereof, or an attempted assignment thereof, unless and until any such consent is obtained.  Subject to **Section 6.3**, Sellers shall use reasonable best efforts, and Purchaser shall use reasonable best efforts to cooperate with Sellers, to obtain the consents necessary to assign to Purchaser the Non-Assignable Assets before, at or after the Closing; provided, however, that neither Sellers nor Purchaser shall be required to make any expenditure, incur any Liability, agree to any modification to any Contract or forego or alter any rights in connection with such efforts.

(b)     To the extent that the consents referred to in **Section 2.4(a)** are not obtained by Sellers, except as otherwise provided in the Ancillary Documents to which one or more Sellers is a party, Sellers' sole responsibility with respect to such Non-Assignable Assets shall be to use reasonable best efforts, at no cost to Sellers, to (i) provide to Purchaser the benefits of any Non-Assignable Assets; (ii) cooperate in any

reasonable and lawful arrangement designed to provide the benefits of any Non-Assignable Assets to Purchaser without incurring any financial obligation to Purchaser; and (iii) enforce for the account of Purchaser and at the cost of Purchaser any rights of Sellers arising from any Non-Assignable Asset against such party or parties thereto; provided, however, that any such efforts described in clauses (i) through (iii) above shall be made only with the consent, and at the direction, of Purchaser.  Without limiting the generality of the foregoing, with respect to any Non-Assignable Asset that is a Contract of Leased Real Property for which a consent is not obtained on or prior to the Closing Date, Purchaser shall enter into a sublease containing the same terms and conditions as such lease (unless such lease by its terms prohibits such subleasing arrangement), and entry into and compliance with such sublease shall satisfy the obligations of the Parties under this **Section 2.4(b)** until such consent is obtained.

(c)     If Purchaser is provided the benefits of any Non-Assignable Asset pursuant to **Section 2.4(b)**, Purchaser shall perform, on behalf of the applicable Seller, for the benefit of the issuer thereof or the other party or parties thereto, the obligations (including payment obligations) of the applicable Seller thereunder or in connection therewith arising from and after the Closing Date and if Purchaser fails to perform to the extent required herein, Sellers, without waiving any rights or remedies that they may have under this Agreement or applicable Laws, may (i) suspend their performance under **Section 2.4(b)** in respect of the Non-Assignable Asset that is the subject of such failure to perform unless and until such situation is remedied, or (ii) perform at Purchaser's sole cost and expense, in which case, Purchaser shall reimburse Sellers' costs and expenses of such performance immediately upon receipt of an invoice therefor.  To the extent that Purchaser is provided the benefits of any Non-Assignable Asset pursuant to **Section 2.4(b),** Purchaser shall indemnify, defend and hold Sellers harmless from and against any and all Liabilities relating to such Non-Assignable Asset and arising from and after the Closing Date (other than such Damages that have resulted from the gross negligence or willful misconduct of Sellers).

(d)     For the avoidance of doubt, the inability of any Contract, Transferred Equity Interest (or any other interest therein), Permit or other asset, which by the terms of this Agreement is intended to be included in the Purchased Assets to be assigned or transferred to Purchaser at the Closing shall not (i) give rise to a basis for termination of this Agreement pursuant to **ARTICLE VIII** or (ii) give rise to any right to any adjustment to the Purchase Price.

## ARTICLE III
## CLOSING; PURCHASE PRICE

*Section 3.1     Closing*.  The closing of the transactions contemplated by this Agreement (the "Closing") shall occur on the date that falls at least three (3) Business Days following the satisfaction and/or waiver of all conditions to the Closing set forth in **ARTICLE VII** (other than any of such conditions that by its nature is to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or on such other date as the Parties mutually agree, at the offices of Jenner & Block LLP, 919 Third Avenue, New York City, New York 10022-3908, or at such other place or such other date as the Parties may agree in

writing.  The date on which the Closing actually occurs shall be referred to as the "Closing Date," and except as otherwise expressly provided herein, the Closing shall for all purposes be deemed effective as of 9:00 a.m., New York City time, on the Closing Date.

Section 3.2    Purchase Price.

(a)    The purchase price (the "Purchase Price") shall be equal to the sum of:

(i)    a Bankruptcy Code Section 363(k) credit bid in an amount equal to:  (A) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing pursuant to the UST Credit Facilities, and (B) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing under the DIP Facility, less $8,022,488,605 of Indebtedness under the DIP Facility (such amount, the "UST Credit Bid Amount");

(ii)    the UST Warrant (which the Parties agree has a value of no less than $1,000);

(iii)    the valid issuance by Purchaser to Parent of (A) 50,000,000 shares of Common Stock (collectively, the "Parent Shares") and (B) the Parent Warrants; and

(iv)    the assumption by Purchaser or its designated Subsidiaries of the Assumed Liabilities.

(b)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall (i) offset, pursuant to Section 363(k) of the Bankruptcy Code, the UST Credit Bid Amount against Indebtedness of Parent and its Subsidiaries owed to Purchaser as of the Closing under the UST Credit Facilities and the DIP Facility; (ii) transfer to Parent, in accordance with the instructions provided by Parent to Purchaser prior to the Closing, the UST Warrant; and (iii) issue to Parent, in accordance with the instructions provided by Parent to Purchaser prior to the Closing, the Parent Shares and the Parent Warrants.

(c)

(i)    Sellers may, at any time, seek an Order of the Bankruptcy Court (the "Claims Estimate Order"), which Order may be the Order confirming Sellers' Chapter 11 plan, estimating the aggregate allowed general unsecured claims against Sellers' estates.  If in the Claims Estimate Order, the Bankruptcy Court makes a finding that the estimated aggregate allowed general unsecured claims against Sellers' estates exceed $35,000,000,000, then Purchaser will, within five (5) days of entry of the Claims Estimate Order, issue 10,000,000 additional shares of Common Stock (the "Adjustment Shares") to Parent, as an adjustment to the Purchase Price.

(ii)    The number of Adjustment Shares shall be adjusted to take into account any stock dividend, stock split, combination of shares, recapitalization,

merger, consolidation, reorganization or similar transaction with respect to the Common Stock, effected from and after the Closing and before issuance of the Adjustment Shares.

(iii)    At the Closing, Purchaser shall have authorized and, thereafter, shall reserve for issuance the Adjustment Shares that may be issued hereunder.

Section 3.3    *Allocation.*    Following the Closing, Purchaser shall prepare and deliver to Sellers an allocation of the aggregate consideration among Sellers and, for any transactions contemplated by this Agreement that do not constitute an Agreed G Transaction pursuant to **Section 6.16**, Purchaser shall also prepare and deliver to the applicable Seller a proposed allocation of the Purchase Price and other consideration paid in exchange for the Purchased Assets, prepared in accordance with Section 1060, and if applicable, Section 338, of the Tax Code (the "Allocation").    The applicable Seller shall have thirty (30) days after the delivery of the Allocation to review and consent to the Allocation in writing, which consent shall not be unreasonably withheld, conditioned or delayed.    If the applicable Seller consents to the Allocation, such Seller and Purchaser shall use such Allocation to prepare and file in a timely manner all appropriate Tax filings, including the preparation and filing of all applicable forms in accordance with applicable Law, including Forms 8594 and 8023, if applicable, with their respective Tax Returns for the taxable year that includes the Closing Date and shall take no position in any Tax Return that is inconsistent with such Allocation; provided, however, that nothing contained herein shall prevent the applicable Seller and Purchaser from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of such Allocation, and neither the applicable Seller nor Purchaser shall be required to litigate before any court, any proposed deficiency or adjustment by any Taxing Authority challenging such Allocation.    If the applicable Seller does not consent to such Allocation, the applicable Seller shall notify Purchaser in writing of such disagreement within such thirty (30) day period, and thereafter, the applicable Seller shall attempt in good faith to promptly resolve any such disagreement.    If the Parties cannot resolve a disagreement under this **Section 3.3**, such disagreement shall be resolved by an independent accounting firm chosen by Purchaser and reasonably acceptable to the applicable Seller, and such resolution shall be final and binding on the Parties.    The fees and expenses of such accounting firm shall be borne equally by Purchaser, on the one hand, and the applicable Seller, on the other hand.    The applicable Seller shall provide Purchaser, and Purchaser shall provide the applicable Seller, with a copy of any information described above required to be furnished to any Taxing Authority in connection with the transactions contemplated herein.

Section 3.4    *Prorations.*

(a)    The following prorations relating to the Purchased Assets shall be made:

(i)    Except as provided in **Section 2.3(a)(v)** and **Section 2.3(a)(vi)**, in the case of Taxes with respect to a Straddle Period, for purposes of Retained Liabilities, the portion of any such Tax that is allocable to Sellers with respect to any Purchased Asset shall be:

(A)    in the case of Taxes that are either (1) based upon or related to income or receipts, or (2) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible), other than Transfer Taxes, equal to the amount that would be payable if the taxable period ended on the Closing Date; and

(B)    in the case of Taxes imposed on a periodic basis, or otherwise measured by the level of any item, deemed to be the amount of such Taxes for the entire Straddle Period (after giving effect to amounts which may be deducted from or offset against such Taxes) (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period), multiplied by a fraction, the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

In the case of any Tax based upon or measured by capital (including net worth or long-term debt) or intangibles, any amount thereof required to be allocated under this clause (i) shall be computed by reference to the level of such items on the Closing Date. All determinations necessary to effect the foregoing allocations shall be made in a manner consistent with prior practice of the applicable Seller, Seller Group member, or Seller Subsidiary.

(ii)    All charges for water, wastewater treatment, sewers, electricity, fuel, gas, telephone, garbage and other utilities relating to the Transferred Real Property shall be prorated as of the Closing Date, with Sellers being liable to the extent such items relate to the Pre-Closing Tax Period, and Purchaser being liable to the extent such items relate to the Post-Closing Tax Period.

(b)    If any of the foregoing proration amounts cannot be determined as of the Closing Date due to final invoices not being issued as of the Closing Date, Purchasers and Sellers shall prorate such items as and when the actual invoices are issued to the appropriate Party.  The Party owing amounts to the other by means of such prorations shall pay the same within thirty (30) days after delivery of a written request by the paying Party.

*Section 3.5    Post-Closing True-up of Certain Accounts.*

(a)    Sellers shall promptly reimburse Purchaser in U.S. Dollars for the aggregate amount of all checks, drafts and similar instruments of disbursement, including wire and similar transfers of funds, written or initiated by Sellers prior to the Closing in respect of any obligations that would have constituted Retained Liabilities at the Closing, and that clear or settle in accounts maintained by Purchaser (or its Affiliates) at or following the Closing.

(b)    Purchaser shall promptly reimburse Sellers in U.S. Dollars for the aggregate amount of all checks, drafts and similar instruments of disbursement, including

wire and similar transfers of funds, written or initiated by Sellers following the Closing in respect of any obligations that would have constituted Assumed Liabilities at the Closing, and that clear or settle in accounts maintained by Sellers (or their Affiliates) at or following the Closing.

# ARTICLE IV
# REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as disclosed in the Parent SEC Documents or in the Sellers' Disclosure Schedule, each Seller represents and warrants severally, and not jointly, to Purchaser as follows:

Section 4.1    *Organization and Good Standing.*    Each Seller and each Purchased Subsidiary is duly organized and validly existing under the Laws of its jurisdiction of organization. Subject to the limitations imposed on Sellers as a result of having filed the Bankruptcy Cases, each Seller and each Purchased Subsidiary has all requisite corporate, limited liability company, partnership or similar power, as the case may be, and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted. Each Seller and each Purchased Subsidiary is duly qualified or licensed or admitted to do business, and is in good standing in (where such concept is recognized under applicable Law), the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, in each case, except where the failure to be so qualified, licensed or in good standing would not reasonably be expected to have a Material Adverse Effect. Sellers have made available to Purchaser prior to the execution of this Agreement true and complete copies of Sellers' Organizational Documents, in each case, as in effect on the date of this Agreement.

Section 4.2    *Authorization; Enforceability.*    Subject to the entry and effectiveness of the Sale Approval Order, each Seller has the requisite corporate or limited liability company power and authority, as the case may be, to (a) execute and deliver this Agreement and the Ancillary Agreements to which such Seller is a party; (b) perform its obligations hereunder and thereunder; and (c) consummate the transactions contemplated by this Agreement and the Ancillary Agreements to which such Seller is a party. Subject to the entry and effectiveness of the Sale Approval Order, this Agreement constitutes, and each Ancillary Agreement, when duly executed and delivered by each Seller that is a party thereto, shall constitute, a valid and legally binding obligation of such Seller (assuming that this Agreement and such Ancillary Agreements constitute valid and legally binding obligations of Purchaser), enforceable against such Seller in accordance with its respective terms and conditions, except as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent transfer and other similar Laws relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

Section 4.3    *Noncontravention; Consents.*

(a)    Subject, in the case of clauses (i), (iii) and (iv), to the entry and effectiveness of the Sale Approval Order, the execution, delivery and performance by each Seller of this Agreement and the Ancillary Agreements to which it is a party, and (subject to the entry of the Sale Approval Order) the consummation by such Seller of the

transactions contemplated hereby and thereby, do not (i) violate any Law to which the Purchased Assets are subject; (ii) conflict with or result in a breach of any provision of the Organizational Documents of such Seller; (iii) result in a material breach or constitute a material default under, or create in any Person the right to terminate, cancel or accelerate any material obligation of such Seller pursuant to any material Purchased Contract (including any material License); or (iv) result in the creation or imposition of any Encumbrance, other than a Permitted Encumbrance, upon the Purchased Assets, except for any of the foregoing in the case of clauses (i), (iii) and (iv), that would not reasonably be expected to have a Material Adverse Effect.

(b)     Subject to the entry and effectiveness of the Sale Approval Order, no consent, waiver, approval, Order, Permit, qualification or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority (other than the Bankruptcy Court) is required by any Seller for the consummation by each Seller of the transactions contemplated by this Agreement or by the Ancillary Agreements to which such Seller is a party or the compliance by such Seller with any of the provisions hereof or thereof, except for (i) compliance with the applicable requirements of any Antitrust Laws and (ii) such consent, waiver, approval, Order, Permit, qualification or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority, the failure of which to be received or made would not reasonably be expected to have a Material Adverse Effect.

Section 4.4     Subsidiaries.     Section 4.4 of the Sellers' Disclosure Schedule identifies each Purchased Subsidiary and the jurisdiction of organization thereof.  There are no Equity Interests in any Purchased Subsidiary issued, reserved for issuance or outstanding.  All of the outstanding shares of capital stock, if applicable, of each Purchased Subsidiary have been duly authorized, validly issued, are fully paid and nonassessable and are owned, directly or indirectly, by Sellers, free and clear of all Encumbrances other than Permitted Encumbrances. Sellers, directly or indirectly, have good and valid title to the outstanding Equity Interests of the Purchased Subsidiaries and, upon delivery by Sellers to Purchaser of the outstanding Equity Interests of the Purchased Subsidiaries (either directly or indirectly) at the Closing, good and valid title to the outstanding Equity Interests of the Purchased Subsidiaries will pass to Purchaser (or, with respect to any Purchased Subsidiary that is not a direct Subsidiary of a Seller, the Purchased Subsidiary with regard to which it is a Subsidiary will continue to have good and valid title to such outstanding Equity Interests).   None of the outstanding Equity Interests in the Purchased Subsidiaries has been conveyed in violation of, and none of the outstanding Equity Interests in the Purchased Subsidiaries has been issued in violation of (a) any preemptive or subscription rights, rights of first offer or first refusal or similar rights or (b) any voting trust, proxy or other Contract (including options or rights of first offer or first refusal) with respect to the voting, purchase, sale or other disposition thereof.

Section 4.5     Reports and Financial Statements; Internal Controls.

(a)     (i) Parent has filed or furnished, or will file or furnish, as applicable, all forms, documents, schedules and reports, together with any amendments required to be made with respect thereto, required to be filed or furnished with the SEC from April 1, 2007 until the Closing (the "Parent SEC Documents"), and (ii) as of their respective

filing dates, or, if amended, as of the date of the last such amendment, the Parent SEC Documents complied or will comply in all material respects with the requirements of the Securities Act and the Exchange Act, as applicable, and none of the Parent SEC Documents contained or will contain any untrue statement of a material fact or omitted or will omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, subject, in the case of Parent SEC Documents filed or furnished during the period beginning on the date of the Original Agreement and ending on the Closing Date, to any modification by Parent of its reporting obligations under Section 12 or Section 15(d) of the Exchange Act as a result of the filing of the Bankruptcy Cases.

(b)     (i) The consolidated financial statements of Parent included in the Parent SEC Documents (including all related notes and schedules, where applicable) fairly present or will fairly present in all material respects the consolidated financial position of Parent and its consolidated Subsidiaries, as at the respective dates thereof, and (ii) the consolidated results of their operations and their consolidated cash flows for the respective periods then ended (subject, in the case of the unaudited statements, to normal year-end audit adjustments and to any other adjustments described therein, including the notes thereto) in conformity with GAAP (except, in the case of the unaudited statements, as permitted by the SEC) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto), subject, in the case of Parent SEC Documents filed or furnished during the period beginning on the date of the Original Agreement and ending on the Closing Date, to any modification by Parent of its reporting obligations under Section 12 or Section 15(d) of the Exchange Act as a result of the filing of the Bankruptcy Cases.

(c)     Parent maintains a system of internal control over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for inclusion in the Parent SEC Documents in accordance with GAAP and maintains records that (i) in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of Parent and its consolidated Subsidiaries, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures are made only in accordance with appropriate authorizations and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of assets.  There are no (A) material weaknesses in the design or operation of the internal controls of Parent or (B) to the Knowledge of Sellers, any fraud, whether or not material, that involves management or other employees of Parent or any Purchased Subsidiary who have a significant role in internal control.

*Section 4.6*     *Absence of Certain Changes and Events.*  From January 1, 2009 through the date hereof, except as otherwise contemplated, required or permitted by this Agreement, there has not been:

(a)     (i) any declaration, setting aside or payment of any dividend or other distribution (whether in cash, securities or other property or by allocation of additional Indebtedness to any Seller or any Key Subsidiary without receipt of fair value) with

respect to any Equity Interests in any Seller or any Key Subsidiary or any repurchase for value of any Equity Interests or rights of any Seller or any Key Subsidiary (except for dividends and distributions among its Subsidiaries) or (ii) any split, combination or reclassification of any Equity Interests in Sellers or any issuance or the authorization of any issuance of any other Equity Interests in respect of, in lieu of or in substitution for Equity Interests of Sellers;

(b)      other than as is required by the terms of the Parent Employee Benefit Plans and Policies, the Settlement Agreement, the UAW Collective Bargaining Agreement or consistent with the expiration of a Collective Bargaining Agreement or as may be required by applicable Law, in each case, as may be permitted by TARP or under any enhanced restrictions on executive compensation agreed to by Parent and Sponsor, any (i) grant to any Seller Key Personnel of any increase in compensation, except increases required under employment Contracts in effect as of January 1, 2009, or as a result of a promotion to a position of additional responsibility, (ii) grant to any Seller Key Personnel of any increase in retention, change in control, severance or termination compensation or benefits, except as required under any employment Contracts in effect as of January 1, 2009, (iii) other than in the Ordinary Course of Business, adoption, termination of, entry into or amendment or modification of, in a material manner, any Benefit Plan, (iv) adoption, termination of, entry into or amendment or modification of, in a material manner, any employment, retention, change in control, severance or termination Contract with any Seller Key Personnel or (v) entry into or amendment, modification or termination of any Collective Bargaining Agreement or other Contract with any Union of any Seller or Purchased Subsidiary;

(c)      any material change in accounting methods, principles or practices by any Seller, Purchased Subsidiary or Seller Group member or any material joint venture to which any Seller or Purchased Subsidiary is a party, in each case, materially affecting the consolidated assets or Liabilities of Parent, except to the extent required by a change in GAAP or applicable Law, including Tax Laws;

(d)      any sale, transfer, pledge or other disposition by any Seller or any Purchased Subsidiary of any portion of its assets or properties not in the Ordinary Course of Business and with a sale price or fair value in excess of $100,000,000;

(e)      aggregate capital expenditures by any Seller or any Purchased Subsidiary in excess of $100,000,000 in a single project or group of related projects or capital expenditures in excess of $100,000,000 in the aggregate;

(f)      any acquisition by any Seller or any Purchased Subsidiary (including by merger, consolidation, combination or acquisition of any Equity Interests or assets) of any Person or business or division thereof (other than acquisitions of portfolio assets and acquisitions in the Ordinary Course of Business) in a transaction (or series of related transactions) where the aggregate consideration paid or received (including non-cash equity consideration) exceeded $100,000,000;

(g)    any discharge or satisfaction of any Indebtedness by any Seller or any Purchased Subsidiary in excess of $100,000,000, other than the discharge or satisfaction of any Indebtedness when due in accordance with its terms;

(h)    any alteration, whether through a complete or partial liquidation, dissolution, merger, consolidation, restructuring, reorganization or in any other manner, the legal structure or ownership of any Seller or any Key Subsidiary or any material joint venture to which any Seller or any Key Subsidiary is a party, or the adoption or alteration of a plan with respect to any of the foregoing;

(i)    any amendment or modification to the material adverse detriment of any Key Subsidiary of any material Affiliate Contract or Seller Material Contract, or termination of any material Affiliate Contract or Seller Material Contract to the material adverse detriment of any Seller or any Key Subsidiary, in each case, other than in the Ordinary Course of Business;

(j)    any event, development or circumstance involving, or any change in the financial condition, properties, assets, liabilities, business, or results of operations of Sellers or any circumstance, occurrence or development (including any adverse change with respect to any circumstance, occurrence or development existing on or prior to the end of the most recent fiscal year end) of Sellers that has had or would reasonably be expected to have a Material Adverse Effect; or

(k)    any commitment by any Seller, any Key Subsidiary (in the case of clauses (a), (g) and (h) above) or any Purchased Subsidiary (in the case of clauses (b) through (f) and clauses (h) and (j) above) to do any of the foregoing.

Section 4.7    *Title to and Sufficiency of Assets.*

(a)    Subject to the entry and effectiveness of the Sale Approval Order, at the Closing, Sellers will obtain good and marketable title to, or a valid and enforceable right by Contract to use, the Purchased Assets, which shall be transferred to Purchaser, free and clear of all Encumbrances other than Permitted Encumbrances.

(b)    The tangible Purchased Assets of each Seller are in normal operating condition and repair, subject to ordinary wear and tear, and sufficient for the operation of such Seller's business as currently conducted, except where such instances of noncompliance with the foregoing would not reasonably be expected to have a Material Adverse Effect.

Section 4.8    *Compliance with Laws; Permits.*

(a)    Each Seller and each Purchased Subsidiary is in compliance with and is not in default under or in violation of any applicable Law, except where such non-compliance, default or violation would not reasonably be expected to have a Material Adverse Effect.    Notwithstanding anything contained in this **Section 4.8(a)**, no representation or warranty shall be deemed to be made in this **Section 4.8(a)** in respect of

the matters referenced in **Section 4.5**, **Section 4.9**, **Section 4.10**, **Section 4.11** or **Section 4.13**, each of which matters is addressed by such other Sections of this Agreement.

(b)    (i) Each Seller has all Permits necessary for such Seller to own, lease and operate the Purchased Assets and (ii) each Purchased Subsidiary has all Permits necessary for such entity to own, lease and operate its properties and assets, except in each case, where the failure to possess such Permits would not reasonably be expected to have a Material Adverse Effect. All such Permits are in full force and effect, except where the failure to be in full force and effect would not reasonably be expected to have a Material Adverse Effect.

Section 4.9    *Environmental Laws.*  Except as would not reasonably be expected to have a Material Adverse Effect, to the Knowledge of Sellers, (a) each Seller and each Purchased Subsidiary has conducted its business on the Transferred Real Property in compliance with all applicable Environmental Laws; (b) none of the Transferred Real Property currently contains any Hazardous Materials, which could reasonably be expected to give rise to an undisclosed Liability under applicable Environmental Laws; (c) as of the date of this Agreement, no Seller or Purchased Subsidiary has received any currently unresolved written notices, demand letters or written requests for information from any Governmental Authority indicating that such entity may be in violation of any Environmental Law in connection with the ownership or operation of the Transferred Real Property; and (d) since April 1, 2007, no Hazardous Materials have been transported in violation of any applicable Environmental Law, or in a manner reasonably foreseen to give rise to any Liability under any Environmental Law, from any Transferred Real Property as a result of any activity of any Seller or Purchased Subsidiary. Except as provided in **Section 4.8(b)** with respect to Permits under Environmental Laws, Purchaser agrees and understands that no representation or warranty is made in respect of environmental matters in any Section of this Agreement other than this **Section 4.9**.

Section 4.10    *Employee Benefit Plans.*

(a)    Section 4.10 of the Sellers' Disclosure Schedule sets forth all material Parent Employee Benefit Plans and Policies and Purchased Subsidiaries Employee Benefit Plans (collectively, the "<u>Benefit Plans</u>"). Sellers have made available, upon reasonable request, to Purchaser true, complete and correct copies of (i) each material Benefit Plan, (ii) the three (3) most recent annual reports on Form 5500 (including all schedules, auditor's reports and attachments thereto) filed with the IRS with respect to each such Benefit Plan (if any such report was required by applicable Law), (iii) the most recent actuarial or other financial report prepared with respect to such Benefit Plan, if any, (iv) each trust agreement and insurance or annuity Contract or other funding or financing arrangement relating to such Benefit Plan and (v) to the extent not subject to confidentiality restrictions, any material written communications received by Sellers or any Subsidiaries of Sellers from any Governmental Authority relating to a Benefit Plan, including any communication from the Pension Benefit Guaranty Corporation (the "<u>PBGC</u>"), in respect of any Benefit Plan, subject to Title IV of ERISA.

(b)    Except as would not reasonably be expected to have a Material Adverse Effect, (i) each Benefit Plan has been administered in accordance with its terms, (ii) each

of Sellers, any of their Subsidiaries and each Benefit Plan is in compliance with the applicable provisions of ERISA, the Tax Code, all other applicable Laws (including Section 409A of the Tax Code, TARP or under any enhanced restrictions on executive compensation agreed to by Sellers with Sponsor) and the terms of all applicable Collective Bargaining Agreements, (iii) there are no (A) investigations by any Governmental Authority, (B) termination proceedings or other Claims (except routine Claims for benefits payable under any Benefit Plans) or (C) Claims, in each case, against or involving any Benefit Plan or asserting any rights to or Claims for benefits under any Benefit Plan that could give rise to any Liability, and there are not any facts or circumstances that could give rise to any Liability in the event of any such Claim and (iv) each Benefit Plan that is intended to be a Tax-qualified plan under Section 401(a) of the Tax Code (or similar provisions for Tax-registered or Tax-favored plans of non-United States jurisdictions) is qualified and any trust established in connection with any Benefit Plan that is intended to be exempt from taxation under Section 501(a) of the Tax Code (or similar provisions for Tax-registered or Tax-favored plans of non-United States jurisdictions) is exempt from United States federal income Taxes under Section 501(a) of the Tax Code (or similar provisions under non-United States law).  To the Knowledge of Sellers, no circumstance and no fact or event exists that would be reasonably expected to adversely affect the qualified status of any Benefit Plan.

(c)    None of the Parent Employee Benefit Plans and Policies or any material Purchased Subsidiaries Employee Benefit Plans that is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) has failed to satisfy, as applicable, the minimum funding standards (as described in Section 302 of ERISA or Section 412 of the Tax Code), whether or not waived, nor has any waiver of the minimum funding standards of Section 302 of ERISA or Section 412 of the Tax Code been requested.

(d)    No Seller or any ERISA Affiliate of any Seller (including any Purchased Subsidiary) (i) has any actual or contingent Liability (A) under any employee benefit plan subject to Title IV of ERISA other than the Benefit Plans (except for contributions not yet due), (B) to the PBGC (except for the payment of premiums not yet due), which Liability, in each case, has not been fully paid as of the date hereof, or, if applicable, which has not been accrued in accordance with GAAP or (C) under any "multiemployer plan" (as defined in Section 3(37) of ERISA), or (ii) will incur withdrawal Liability under Title IV of ERISA as a result of the consummation of the transactions contemplated hereby, except for Liabilities with respect to any of the foregoing that would not reasonably be expected to have a Material Adverse Effect.

(e)    Neither the execution of this Agreement or any Ancillary Agreement nor the consummation of the transactions contemplated hereby (alone or in conjunction with any other event, including termination of employment) will entitle any member of the board of directors of Parent or any Applicable Employee who is an officer or member of senior management of Parent to any increase in compensation or benefits, any grant of severance, retention, change in control or other similar compensation or benefits, any acceleration of the time of payment or vesting of any compensation or benefits (but not including, for this purpose, any retention, stay bonus or other incentive plan, program, arrangement that is a Retained Plan) or will require the securing or funding of any

compensation or benefits or limit the right of Sellers, any Subsidiary of Sellers or Purchaser or any Affiliates of Purchaser to amend, modify or terminate any Benefit Plan. Any new grant of severance, retention, change in control or other similar compensation or benefits to any Applicable Employee, and any payout to any Transferred Employee under any such existing arrangements, that would otherwise occur as a result of the execution of this Agreement or any Ancillary Agreement (alone or in conjunction with any other event, including termination of employment), has been waived by such Applicable Employee or otherwise cancelled.

(f)     No amount or other entitlement currently in effect that could be received (whether in cash or property or the vesting of property) as a result of the actions contemplated by this Agreement and the Ancillary Agreements (alone or in combination with any other event) by any Person who is a "disqualified individual" (as defined in Treasury Regulation Section 1.280G-1) (each, a "Disqualified Individual") with respect to Sellers would be an "excess parachute payment" (as defined in Section 280G(b)(1) of the Tax Code). No Disqualified Individual or Applicable Employee is entitled to receive any additional payment (e.g., any Tax gross-up or any other payment) from Sellers or any Subsidiaries of Sellers in the event that the additional or excise Tax required by Section 409A or 4999 of the Tax Code, respectively is imposed on such individual.

(g)     All individuals covered by the UAW Collective Bargaining Agreement are either Applicable Employees or employed by a Purchased Subsidiary.

(h)     Section 4.10(h) of the Sellers' Disclosure Schedule lists all non-standard individual agreements currently in effect providing for compensation, benefits and perquisites for any current and former officer, director or top twenty-five (25) most highly paid employee of Parent and any other such material non-standard individual agreements with non-top twenty-five (25) employees.

*Section 4.11    Labor Matters.*  There is not any labor strike, work stoppage or lockout pending, or, to the Knowledge of Sellers, threatened in writing against or affecting any Seller or any Purchased Subsidiary.  Except as would not reasonably be expected to have a Material Adverse Effect: (a) none of Sellers or any Purchased Subsidiary is engaged in any material unfair labor practice; (b) there are not any unfair labor practice charges or complaints against Sellers or any Purchased Subsidiary pending, or, to the Knowledge of Sellers, threatened, before the National Labor Relations Board; (c) there are not any pending or, to the Knowledge of Sellers, threatened in writing, union grievances against Sellers or any Purchased Subsidiary as to which there is a reasonable possibility of adverse determination; (d) there are not any pending, or, to the Knowledge of Sellers, threatened in writing, charges against Sellers or any Purchased Subsidiary or any of their current or former employees before the Equal Employment Opportunity Commission or any state or local agency responsible for the prevention of unlawful employment practices; (e) no union organizational campaign is in progress with respect to the employees of any Seller or any Purchased Subsidiary and no question concerning representation of such employees exists; and (f) no Seller nor any Purchased Subsidiary has received written communication during the past five (5) years of the intent of any Governmental Authority responsible for the enforcement of labor or employment Laws to conduct an investigation of or

affecting Sellers or any Subsidiary of Sellers and, to the Knowledge of Sellers, no such investigation is in progress.

Section 4.12    *Investigations; Litigation.*  (a) To the Knowledge of Sellers, there is no investigation or review pending by any Governmental Authority with respect to any Seller that would reasonably be expected to have a Material Adverse Effect, and (b) there are no actions, suits, inquiries or proceedings, or to the Knowledge of Sellers, investigations, pending against any Seller, or relating to any of the Transferred Real Property, at law or in equity before, and there are no Orders of or before, any Governmental Authority, in each case that would reasonably be expected to have a Material Adverse Effect.

Section 4.13    *Tax Matters.*  Except as would not reasonably be expected to have a Material Adverse Effect, (a) all Tax Returns required to have been filed by, with respect to or on behalf of any Seller, Seller Group member or Purchased Subsidiary have been timely filed (taking into account any extension of time to file granted or obtained) and are correct and complete in all respects, (b) all amounts of Tax required to be paid with respect to any Seller, Seller Group member or Purchased Subsidiary (whether or not shown on any Tax Return) have been timely paid or are being contested in good faith by appropriate proceedings and have been reserved for in accordance with GAAP in Parent's consolidated audited financial statements, (c) no deficiency for any amount of Tax has been asserted or assessed by a Taxing Authority in writing relating to any Seller, Seller Group member or Purchased Subsidiary that has not been satisfied by payment, settled or withdrawn, (d) there are no audits, Claims or controversies currently asserted or threatened in writing with respect to any Seller, Seller Group member or Purchased Subsidiary in respect of any amount of Tax or failure to file any Tax Return, (e) no Seller, Seller Group member or Purchased Subsidiary has agreed to any extension or waiver of the statute of limitations applicable to any Tax Return, or agreed to any extension of time with respect to a Tax assessment or deficiency, which period (after giving effect to such extension or waiver) has not yet expired, (f) no Seller, Seller Group member or Purchased Subsidiary is a party to or the subject of any ruling requests, private letter rulings, closing agreements, settlement agreements or similar agreements with any Taxing Authority for any periods for which the statute of limitations has not yet run, (g) no Seller, Seller Group member or Purchased Subsidiary (A) has any Liability for Taxes of any Person (other than any Purchased Subsidiary), including as a transferee or successor, or pursuant to any contractual obligation (other than pursuant to any commercial Contract not primarily related to Tax), or (B) is a party to or bound by any Tax sharing agreement, Tax allocation agreement or Tax indemnity agreement (in every case, other than this Agreement and those Tax sharing, Tax allocation or Tax indemnity agreements that will be terminated prior to Closing and with respect to which no post-Closing Liabilities will exist), (h) each of the Purchased Subsidiaries and each Seller and Seller Group member has withheld or collected all Taxes required to have been withheld or collected and, to the extent required, has paid such Taxes to the proper Taxing Authority, (i) no Seller, Seller Group member or Purchased Subsidiary will be required to make any adjustments in taxable income for any Tax period (or portion thereof) ending after the Closing Date, including pursuant to Section 481(a) or 263A of the Tax Code or any similar provision of foreign, provincial, state, local or other Law as a result of transactions or events occurring, or accounting methods employed, prior to the Closing, nor is any application pending with any Taxing Authority requesting permission for any changes in accounting methods that relate to any Seller, Seller Group member or Purchased Subsidiary, (j) the Assumed Liabilities were incurred through the

Ordinary Course of Business, (k) there are no Tax Encumbrances on any of the Purchased Assets or the assets of any Purchased Subsidiary (other than Permitted Encumbrances for which appropriate reserves have been established (and to the extent that such liens relate to a period ending on or before December 31, 2008, the amount of any such Liability is accrued or reserved for as a Liability in accordance with GAAP in the audited consolidated balance sheet of Sellers at December 31, 2008)), (l) none of the Purchased Subsidiaries or Sellers has been a "distributing corporation" or a "controlled corporation" in a distribution intended to qualify under Section 355(a) of the Tax Code, (m) none of the Purchased Subsidiaries, Sellers or Seller Group members has participated in any "listed transactions" or "reportable transactions" within the meaning of Treasury Regulations Section 1.6011-4, (n) there are no unpaid Taxes with respect to any Seller, Seller Group member or Purchased Asset for which Purchaser will have liability as a transferee or successor and (o) the most recent financial statements contained in the Parent SEC Documents reflect an adequate reserve for all Taxes payable by Sellers, the Purchased Subsidiaries and the members of all Seller Groups for all taxable periods and portions thereof through the date of such financial statements.

### Section 4.14    Intellectual Property and IT Systems.

(a)      Except as would not reasonably be expected to have a Material Adverse Effect: (i) each Seller and each Purchased Subsidiary owns, controls, or otherwise possesses sufficient rights to use, free and clear of all Encumbrances (other than Permitted Encumbrances) all Intellectual Property necessary for the conduct of its business in substantially the same manner as conducted as of the date hereof; and (ii) all Intellectual Property owned by Sellers that is necessary for the conduct of the business of Sellers and each Purchased Subsidiary as conducted as of the date hereof is subsisting and in full force and effect, has not been adjudged invalid or unenforceable, has not been abandoned or allowed to lapse, in whole or in part, and to the Knowledge of Sellers, is valid and enforceable.

(b)      Except as would not reasonably be expected to have a Material Adverse Effect, all necessary registration, maintenance and renewal fees in connection with the Intellectual Property owned by Sellers have been paid and all necessary documents and certificates in connection with such Intellectual Property have been filed with the relevant patent, copyright, trademark or other authorities in the United States or applicable foreign jurisdictions, as the case may be, for the purposes of prosecuting, maintaining or renewing such Intellectual Property.

(c)      Except as would not reasonably be expected to have a Material Adverse Effect, no Intellectual Property owned by Sellers is the subject of any licensing or franchising Contract that prohibits or materially restricts the conduct of business as presently conducted by any Seller or Purchased Subsidiary or the transfer of such Intellectual Property.

(d)      Except as would not reasonably be expected to have a Material Adverse Effect: (i) the Intellectual Property or the conduct of Sellers' and the Purchased Subsidiaries' businesses does not infringe, misappropriate, dilute, or otherwise violate or conflict with the trademarks, patents, copyrights, inventions, trade secrets, proprietary

information and technology, know-how, formulae, rights of publicity or any other intellectual property rights of any Person; (ii) to the Knowledge of Sellers, no other Person is now infringing or in conflict with any Intellectual Property owned by Sellers or Sellers' rights thereunder; and (iii) no Seller or any Purchased Subsidiary has received any written notice that it is violating or has violated the trademarks, patents, copyrights, inventions, trade secrets, proprietary information and technology, know-how, formulae, rights of publicity or any other intellectual property rights of any third party.

(e)      Except as would not reasonably be expected to have a Material Adverse Effect, no holding, decision or judgment has been rendered by any Governmental Authority against any Seller, which would limit, cancel or invalidate any Intellectual Property owned by Sellers.

(f)      No action or proceeding is pending, or to the Knowledge of Sellers, threatened, on the date hereof that (i) seeks to limit, cancel or invalidate any Intellectual Property owned by Sellers or such Sellers' ownership interest therein; and (ii) if adversely determined, would reasonably be expected to have a Material Adverse Effect.

(g)      Except as would not reasonably be expected to have a Material Adverse Effect, Sellers and the Purchased Subsidiaries have taken reasonable actions to (i) maintain, enforce and police their Intellectual Property; and (ii) protect their material Software, websites and other systems (and the information therein) from unauthorized access or use.

(h)      Except as would not reasonably be expected to have a Material Adverse Effect: (i) each Seller and Purchased Subsidiary has taken reasonable steps to protect its rights in, and confidentiality of, all the Trade Secrets, and any other confidential information owned by such Seller or Purchased Subsidiary; and (ii) to the Knowledge of Sellers, such Trade Secrets have not been disclosed by Sellers to any Person except pursuant to a valid and appropriate non-disclosure, license or any other appropriate Contract that has not been breached.

(i)      Except as would not reasonably be expected to have a Material Adverse Effect, there has not been any malfunction with respect to any of the Software, electronic data processing, data communication lines, telecommunication lines, firmware, hardware, Internet websites or other information technology equipment of any Seller or Purchased Subsidiary since April 1, 2007, which has not been remedied or replaced in all respects.

(j)      Except as would not reasonably be expected to have a Material Adverse Effect: (i) the consummation of the transactions contemplated by this Agreement will not cause to be provided or licensed to any third Person, or give rise to any rights of any third Person with respect to, any source code that is part of the Software owned by Sellers; and (ii) Sellers have implemented reasonable disaster recovery and back-up plans with respect to the Software.

*Section 4.15   Real Property.*   Each Seller owns and has valid title to the Transferred Real Property that is Owned Real Property owned by it and has valid leasehold or

subleasehold interests, as the case may be, in all of the Transferred Real Property that is Leased Real Property leased or subleased by it, in each case, free and clear of all Encumbrances, other than Permitted Encumbrances. Each of Sellers and the Purchased Subsidiaries has complied with the terms of each lease, sublease, license or other Contract relating to the Transferred Real Property to which it is a party, except any failure to comply that would not reasonably be expected to have a Material Adverse Effect.

*Section 4.16    Material Contracts.*

(a)    Except for this Agreement, the Parent Employee Benefit Plans and Policies, except as filed with, or disclosed or incorporated in, the Parent SEC Documents or except as set forth on Section 4.16 of the Sellers' Disclosure Schedule, as of the date hereof, no Seller is a party to or bound by (i) any "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K of the SEC); (ii) any non-compete or exclusivity agreement that materially restricts the operation of Sellers' core business; (iii) any asset purchase agreement, stock purchase agreement or other agreement entered into within the past six years governing a material joint venture or the acquisition or disposition of assets or other property where the consideration paid or received for such assets or other property exceeded $500,000,000 (whether in cash, stock or otherwise); (iv) any agreement or series of related agreements with any supplier of Sellers who directly support the production of vehicles, which provided collectively for payments by Sellers to such supplier in excess of $250,000,000 during the 12-month period ended December 31, 2008; (v) any agreement or series of related agreements with any supplier of Sellers who does not directly support the production of vehicles, which, provided collectively for payments by Sellers to such supplier in excess of $100,000,000 during the 12-month period ended April 30, 2009; (vi) any Contract relating to the lease or purchase of aircraft; (vii) any settlement agreement where a Seller has paid or may be required to pay an amount in excess of $100,000,000 to settle the Claims covered by such settlement agreement; (viii) any material Contract that will, following the Closing, as a result of transactions contemplated hereby, be between or among a Seller or any Retained Subsidiary, on the one hand, and Purchaser or any Purchased Subsidiary, on the other hand (other than the Ancillary Agreements); and (ix) agreements entered into in connection with a material joint venture (all Contracts of the type described in this **Section 4.16(a)** being referred to herein as "<u>Seller Material Contracts</u>").

(b)    No Seller is in breach of or default under, or has received any written notice alleging any breach of or default under, the terms of any Seller Material Contract or material License, where such breach or default would reasonably be expected to have a Material Adverse Effect. To the Knowledge of Sellers, no other party to any Seller Material Contract or material License is in breach of or default under the terms of any Seller Material Contract or material License, where such breach or default would reasonably be expected to have a Material Adverse Effect. Except as would not reasonably be expected to have a Material Adverse Effect, each Seller Material Contract or material License is a valid, binding and enforceable obligation of such Seller that is party thereto and, to the Knowledge of Sellers, of each other party thereto, and is in full force and effect, except as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent transfer and other similar Laws

relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

Section 4.17  *Dealer Sales and Service Agreements for Continuing Brands.* Parent is not in breach of or default under the terms of any United States dealer sales and service Contract for Continuing Brands other than any Excluded Continuing Brand Dealer Agreement (each, a "<u>Dealer Agreement</u>"), where such breach or default would reasonably be expected to have a Material Adverse Effect.  To the Knowledge of Sellers, no other party to any Dealer Agreement is in breach of or default under the terms of such Dealer Agreement, where such breach or default would not reasonably be expected to have a Material Adverse Effect.  Except as would not reasonably be expected to have a Material Adverse Effect, each Dealer Agreement is a valid and binding obligation of Parent and, to the Knowledge of Sellers, of each other party thereto, and is in full force and effect, except as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent transfer and other similar Laws relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

Section 4.18  *Sellers' Products.*

(a)    To the Knowledge of Sellers, since April 1, 2007, neither Sellers nor any Purchased Subsidiary has conducted or decided to conduct any material recall or other field action concerning any product developed, designed, manufactured, sold, provided or placed in the stream of commerce by or on behalf of any Seller or any Purchased Subsidiary.

(b)    As of the date hereof, there are no material pending actions for negligence, manufacturing negligence or improper workmanship, or material pending actions, in whole or in part, premised upon product liability, against or otherwise naming as a party any Seller, Purchased Subsidiary or any predecessor-in-interest of any of the foregoing Persons, or to the Knowledge of Sellers, threatened in writing or of which Seller has received written notice that involve a product liability Claim resulting from the ownership, possession or use of any product manufactured, sold or delivered by any Seller, any Purchased Subsidiary or any predecessor-in-interest of any of the foregoing Persons, which would reasonably be expected to have a Material Adverse Effect.

(c)    To the Knowledge of Sellers and except as would not reasonably be expected to have a Material Adverse Effect, no supplier to any Seller has threatened in writing to cease the supply of products or services that could impair future production at a major production facility of such Seller.

Section 4.19  *Certain Business Practices.*  Each of Sellers and the Purchased Subsidiaries is in compliance with the legal requirements under the Foreign Corrupt Practices Act, as amended (the "<u>FCPA</u>"), except for such failures, whether individually or in the aggregate, to maintain books and records or internal controls as required thereunder that are not

material.  To the Knowledge of Sellers, since April 1, 2007, no Seller or Purchased Subsidiary, nor any director, officer, employee or agent thereof, acting on its, his or her own behalf or on behalf of any of the foregoing Persons, has offered, promised, authorized the payment of, or paid, any money, or the transfer of anything of value, directly or indirectly, to or for the benefit of: (a) any employee, official, agent or other representative of any foreign Governmental Authority, or of any public international organization; or (b) any foreign political party or official thereof or candidate for foreign political office for the purpose of influencing any act or decision of such recipient in the recipient's official capacity, or inducing such recipient to use his, her or its influence to affect any act or decision of such foreign government or department, agency or instrumentality thereof or of such public international organization, or securing any improper advantage, in the case of both clause (a) and (b) above, in order to assist any Seller or any Purchased Subsidiary to obtain or retain business for, or to direct business to, any Seller or any Purchased Subsidiary and under circumstances that would subject any Seller or any Purchased Subsidiary to material Liability under any applicable Laws of the United States (including the FCPA) or of any foreign jurisdiction where any Seller or any Purchased Subsidiary does business relating to corruption, bribery, ethical business conduct, money laundering, political contributions, gifts and gratuities, or lawful expenses.

Section 4.20    *Brokers and Other Advisors.*    No broker, investment banker, financial advisor, counsel (other than legal counsel) or other Person is entitled to any broker's, finder's or financial advisor's fee or commission (collectively, "Advisory Fees") in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Sellers or any Affiliate of any Seller.

Section 4.21    *Investment Representations.*

(a)    Each Seller is acquiring the Parent Shares for its own account solely for investment and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act or the applicable securities Laws of any jurisdiction. Each Seller agrees that it shall not transfer any of the Parent Shares, except in compliance with the Securities Act and with the applicable securities Laws of any other jurisdiction.

(b)    Each Seller is an "Accredited Investor" as defined in Rule 501(a) promulgated under the Securities Act.

(c)    Each Seller understands that the acquisition of the Parent Shares to be acquired by it pursuant to the terms of this Agreement involves substantial risk. Each Seller and its officers have experience as an investor in the Equity Interests of companies such as the ones being transferred pursuant to this Agreement and each Seller acknowledges that it can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the Parent Shares to be acquired by it pursuant to the transactions contemplated by this Agreement.

(d)    Each Seller further understands and acknowledges that the Parent Shares have not been registered under the Securities Act or under the applicable securities Laws of any jurisdiction and agrees that the Parent Shares may not be sold, transferred, offered

for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act or under the applicable securities Laws of any jurisdiction, or, in each case, an applicable exemption therefrom.

(e)     Each Seller acknowledges that the offer and sale of the Parent Shares has not been accomplished by the publication of any advertisement.

*Section 4.22   No Other Representations or Warranties of Sellers.*  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS **ARTICLE IV**, NONE OF SELLERS AND ANY PERSON ACTING ON BEHALF OF A SELLER MAKES ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, ANY OF THEIR AFFILIATES, SELLERS' BUSINESS, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR WITH RESPECT TO ANY OTHER INFORMATION PROVIDED TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  WITHOUT LIMITING THE FOREGOING, EXCEPT AS SET FORTH IN THE REPRESENTATIONS AND WARRANTIES OF SELLERS CONTAINED IN THIS **ARTICLE IV**, SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO (A) MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE, TITLE OR NON-INFRINGEMENT OF THE PURCHASED ASSETS, (B) ANY INFORMATION, WRITTEN OR ORAL AND IN ANY FORM PROVIDED OR MADE AVAILABLE (WHETHER BEFORE OR, IN CONNECTION WITH ANY SUPPLEMENT, MODIFICATION OR UPDATE TO THE SELLERS' DISCLOSURE SCHEDULE PURSUANT TO **SECTION 6.5**, **SECTION 6.6** OR **SECTION 6.26,** AFTER THE DATE HEREOF) TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES, INCLUDING IN "DATA ROOMS" (INCLUDING ON-LINE DATA ROOMS), MANAGEMENT PRESENTATIONS, FUNCTIONAL "BREAK-OUT" DISCUSSIONS, RESPONSES TO QUESTIONS SUBMITTED ON BEHALF OF THEM OR OTHER COMMUNICATIONS BETWEEN THEM OR ANY OF THEIR REPRESENTATIVES, ON THE ONE HAND, AND SELLERS, THEIR AFFILIATES, OR ANY OF THEIR REPRESENTATIVES, ON THE OTHER HAND, OR ON THE ACCURACY OR COMPLETENESS OF ANY SUCH INFORMATION, OR ANY PROJECTIONS, ESTIMATES, BUSINESS PLANS OR BUDGETS DELIVERED TO OR MADE AVAILABLE TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES OR (C) FUTURE REVENUES, EXPENSES OR EXPENDITURES, FUTURE RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), FUTURE CASH FLOWS OR FUTURE FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) OF SELLERS' BUSINESS OR THE PURCHASED ASSETS.

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers as follows:

*Section 5.1    Organization and Good Standing.*  Purchaser is a legal entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of

incorporation. Purchaser has the requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

Section 5.2    Authorization; Enforceability.

(a)    Purchaser has the requisite corporate power and authority to (i) execute and deliver this Agreement and the Ancillary Agreements to which it is a party; (ii) perform its obligations hereunder and thereunder; and (iii) consummate the transactions contemplated by this Agreement and the Ancillary Agreements to which it is a party.

(b)    This Agreement constitutes, and each of the Ancillary Agreements to which Purchaser is a party, when duly executed and delivered by Purchaser, shall constitute, a valid and legally binding obligation of Purchaser (assuming that this Agreement and such Ancillary Agreements constitute valid and legally binding obligations of each Seller that is a party thereto and the other applicable parties thereto), enforceable against Purchaser in accordance with its respective terms and conditions, except as may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent transfer and other similar Laws relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

Section 5.3    Noncontravention; Consents.

(a)    The execution and delivery by Purchaser of this Agreement and the Ancillary Agreements to which it is a party, and (subject to the entry of the Sale Approval Order) the consummation by Purchaser of the transactions contemplated hereby and thereby, do not (i) violate any Law to which Purchaser or its assets is subject; (ii) conflict with or result in a breach of any provision of the Organizational Documents of Purchaser; or (iii) create a breach, default, termination, cancellation or acceleration of any obligation of Purchaser under any Contract to which Purchaser is a party or by which Purchaser or any of its assets or properties is bound or subject, except for any of the foregoing in the cases of clauses (i) and (iii), that would not reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby or thereby or to perform any of its obligations under this Agreement or any Ancillary Agreement to which it is a party (a "Purchaser Material Adverse Effect").

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required by Purchaser for the consummation by Purchaser of the transactions contemplated by this Agreement or the Ancillary Agreements to which it is a party or the compliance by Purchaser with any of the provisions hereof or thereof, except for (i) compliance with the applicable requirements of any Antitrust Laws and (ii) such consent, waiver, approval, Order, Permit, qualification or authorization of, or declaration or filing with, or notification to, any Governmental Authority, the failure of which to be received

or made would not, individually or in the aggregate, reasonably be expected to have a Purchaser Material Adverse Effect.

    *Section 5.4    Capitalization.*

    (a)    As of the date hereof, Sponsor holds beneficially and of record 1,000 shares of common stock, par value $0.01 per share, of Purchaser, which constitutes all of the outstanding capital stock of Purchaser, and all such capital stock is validly issued, fully paid and nonassessable.

    (b)    Immediately following the Closing, the authorized capital stock of Purchaser (or, if a Holding Company Reorganization has occurred prior to the Closing, Holding Company) will consist of 2,500,000,000 shares of common stock, par value $0.01 per share ("Common Stock"), and 1,000,000,000 shares of preferred stock, par value $0.01 per share ("Preferred Stock"), of which 360,000,000 shares of Preferred Stock are designated as Series A Fixed Rate Cumulative Perpetual Preferred Stock, par value $0.01 per share (the "Series A Preferred Stock").

    (c)    Immediately following the Closing, (i) Canada or one or more of its Affiliates will hold beneficially and of record 58,368,644 shares of Common Stock and 16,101,695 shares of Series A Preferred Stock (collectively, the "Canada Shares"), (ii) Sponsor or one or more of its Affiliates collectively will hold beneficially and of record 304,131,356 shares of Common Stock and 83,898,305 shares of Series A Preferred Stock (collectively, the "Sponsor Shares") and (iii) the New VEBA will hold beneficially and of record 87,500,000 shares of Common Stock and 260,000,000 shares of Series A Preferred Stock (collectively, the "VEBA Shares").  Immediately following the Closing, there will be no other holders of Common Stock or Preferred Stock.

    (d)    Except as provided under the Parent Warrants, VEBA Warrants, Equity Incentive Plans or as disclosed on the Purchaser's Disclosure Schedule, there are and, immediately following the Closing, there will be no outstanding options, warrants, subscriptions, calls, convertible securities, phantom equity, equity appreciation or similar rights, or other rights or Contracts (contingent or otherwise) (including any right of conversion or exchange under any outstanding security, instrument or other Contract or any preemptive right) obligating Purchaser to deliver or sell, or cause to be issued, delivered or sold, any shares of its capital stock or other equity securities, instruments or rights that are, directly or indirectly, convertible into or exercisable or exchangeable for any shares of its capital stock.  There are no outstanding contractual obligations of Purchaser to repurchase, redeem or otherwise acquire any shares of its capital stock or to provide funds to, or make any material investment (in the form of a loan, capital contribution or otherwise) in, any other Person.  There are no voting trusts, shareholder agreements, proxies or other Contracts or understandings in effect with respect to the voting or transfer of any of the shares of Common Stock to which Purchaser is a party or by which Purchaser is bound. Except as provided under the Equity Registration Rights Agreement or as disclosed in the Purchaser's Disclosure Schedule, Purchaser has not granted or agreed to grant any holders of shares of Common Stock or securities

convertible into shares of Common Stock registration rights with respect to such shares under the Securities Act.

(e)    Immediately following the Closing, (i) all of the Canada Shares, the Parent Shares and the Sponsor Shares will be duly and validly authorized and issued, fully paid and nonassessable, and will be issued in accordance with the registration or qualification provisions of the Securities Act or pursuant to valid exemptions therefrom and (ii) none of the Canada Shares, the Parent Shares or the Sponsor Shares will be issued in violation of any preemptive rights.

Section 5.5    *Valid Issuance of Shares.* The Parent Shares, Adjustment Shares and the Common Stock underlying the Parent Warrants, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement and the related warrant agreement, as applicable, will be (a) validly issued, fully paid and nonassessable and (b) free of restrictions on transfer other than restrictions on transfer under applicable state and federal securities Laws and Encumbrances created by or imposed by Sellers.  Assuming the accuracy of the representations of Sellers in **Section 4.21**, the Parent Shares, Adjustment Shares and Parent Warrants will be issued in compliance with all applicable federal and state securities Laws.

Section 5.6    *Investment Representations.*

(a)    Purchaser is acquiring the Transferred Equity Interests for its own account solely for investment and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act or the applicable securities Laws of any jurisdiction. Purchaser agrees that it shall not transfer any of the Transferred Equity Interests, except in compliance with the Securities Act and with the applicable securities Laws of any other jurisdiction.

(b)    Purchaser is an "Accredited Investor" as defined in Rule 501(a) promulgated under the Securities Act.

(c)    Purchaser understands that the acquisition of the Transferred Equity Interests to be acquired by it pursuant to the terms of this Agreement involves substantial risk.  Purchaser and its officers have experience as an investor in Equity Interests of companies such as the ones being transferred pursuant to this Agreement and Purchaser acknowledges that it can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the Transferred Equity Interests to be acquired by it pursuant to the transactions contemplated hereby.

(d)    Purchaser further understands and acknowledges that the Transferred Equity Interests have not been registered under the Securities Act or under the applicable securities Laws of any jurisdiction and agrees that the Transferred Equity Interests may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act or under the applicable securities Laws of any jurisdiction, or, in each case, an applicable exemption therefrom.

(e)     Purchaser acknowledges that the offer and sale of the Transferred Equity Interests has not been accomplished by the publication of any advertisement.

Section 5.7     *Continuity of Business Enterprise.*  It is the present intention of Purchaser to directly, or indirectly through its Subsidiaries, continue at least one significant historic business line of each Seller, or use at least a significant portion of each Seller's historic business assets in a business, in each case, within the meaning of Treas. Reg. § 1.368-1(d).

Section 5.8     *Integrated Transaction.*  Sponsor has contributed, or will, prior to the Closing, contribute the UST Credit Facilities, a portion of the DIP Facility that is owed as of the Closing and the UST Warrant to Purchaser solely for the purposes of effectuating the transactions contemplated by this Agreement.

Section 5.9     *No Other Representations or Warranties of Sellers.*  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN **ARTICLE IV**, NONE OF SELLERS AND ANY PERSON ACTING ON BEHALF OF A SELLER MAKES ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, ANY OF THEIR AFFILIATES, SELLERS' BUSINESS, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR WITH RESPECT TO ANY OTHER INFORMATION PROVIDED TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  WITHOUT LIMITING THE FOREGOING, EXCEPT AS SET FORTH IN THE REPRESENTATIONS AND WARRANTIES OF SELLERS CONTAINED IN **ARTICLE IV**, PURCHASER FURTHER HEREBY ACKNOWLEDGES AND AGREES THAT SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO (A) MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE, TITLE OR NON-INFRINGEMENT OF THE PURCHASED ASSETS, (B) ANY INFORMATION, WRITTEN OR ORAL AND IN ANY FORM PROVIDED OR MADE AVAILABLE (WHETHER BEFORE OR, IN CONNECTION WITH ANY SUPPLEMENT, MODIFICATION OR UPDATE TO THE SELLERS' DISCLOSURE SCHEDULE PURSUANT TO **SECTION 6.5**, **SECTION 6.6** OR **SECTION 6.26,** AFTER THE DATE HEREOF) TO PURCHASER OR ANY OF ITS REPRESENTATIVES, INCLUDING IN "DATA ROOMS" (INCLUDING ON-LINE DATA ROOMS), MANAGEMENT PRESENTATIONS, FUNCTIONAL "BREAK-OUT" DISCUSSIONS, RESPONSES TO QUESTIONS SUBMITTED ON BEHALF OF IT OR OTHER COMMUNICATIONS BETWEEN IT OR ANY OF ITS AFFILIATES OR REPRESENTATIVES, ON THE ONE HAND, AND SELLERS, THEIR AFFILIATES, OR ANY OF THEIR REPRESENTATIVES, ON THE OTHER HAND, OR ON THE ACCURACY OR COMPLETENESS OF ANY SUCH INFORMATION OR (C) ANY PROJECTIONS, ESTIMATES, BUSINESS PLANS OR BUDGETS DELIVERED TO OR MADE AVAILABLE TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES OR (D) FUTURE REVENUES, EXPENSES OR EXPENDITURES, FUTURE RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), FUTURE CASH FLOWS OR FUTURE FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) OF SELLERS' BUSINESS OR THE PURCHASED ASSETS.

# ARTICLE VI
# COVENANTS

*Section 6.1      Access to Information.*

(a)      Sellers agree that, until the earlier of the Executory Contract Designation Deadline and the termination of this Agreement, Purchaser shall be entitled, through its Representatives or otherwise, to have reasonable access to the executive officers and Representatives of Sellers and the properties and other facilities, businesses, books, Contracts, personnel, records and operations (including the Purchased Assets and Assumed Liabilities) of Sellers and their Subsidiaries, including access to systems, data, databases for benefit plan administration; provided however, that no such investigation or examination shall be permitted to the extent that it would, in Sellers' reasonable determination, require any Seller, any Subsidiary of any Seller or any of their respective Representatives to disclose information subject to attorney-client privilege or in conflict with any confidentiality agreement to which any Seller, any Subsidiary of any Seller or any of their respective Representatives are bound (in which case, to the extent requested by Purchaser, Sellers will use reasonable best efforts to seek an amendment or appropriate waiver, or necessary consents, as may be required to avoid such conflict, or restructure the form of access, so as to permit the access requested); provided further, that notwithstanding the notice provisions in **Section 9.2** hereof, all such requests for access to the executive officers of Sellers shall be directed, prior to the Closing, to the Chief Financial Officer of Parent or his designee, and following the Closing, to the Chief Restructuring Officer of Parent or his or her designee.  If any material is withheld pursuant to this **Section 6.1(a)**, Seller shall inform Purchaser in writing as to the general nature of what is being withheld and the reason for withholding such material.

(b)      Any investigation and examination contemplated by this **Section 6.1** shall be subject to restrictions set forth in **Section 6.24** and under applicable Law.  Sellers shall cooperate, and shall cause their Subsidiaries and each of their respective Representatives to cooperate, with Purchaser and its Representatives in connection with such investigation and examination, and each of Purchaser and its Representatives shall use their reasonable best efforts to not materially interfere with the business of Sellers and their Subsidiaries.  Without limiting the generality of the foregoing, subject to **Section 6.1(a),** such investigation and examination shall include reasonable access to Sellers' executive officers (and employees of Sellers and their respective Subsidiaries identified by such executive officers), offices, properties and other facilities, and books, Contracts and records (including any document retention policies of Sellers) and access to accountants of Sellers and each of their respective Subsidiaries (provided that Sellers and each of their respective Subsidiaries, as applicable, shall have the right to be present at any meeting between any such accountant and Purchaser or Representative of Purchaser, whether such meeting is in person, telephonic or otherwise) and Sellers and each of their respective Subsidiaries and their Representatives shall prepare and furnish to Purchaser's Representatives such additional financial and operating data and other information as Purchaser may from time to time reasonably request, subject, in each case, to the confidentiality restrictions outlined in this **Section 6.1**.  Notwithstanding anything contained herein to the contrary, Purchaser shall consult with Sellers prior to conducting

09-50026-reg    Doc 13664-3    Filed 07/04/16    Entered 07/04/16 21:27:11    Exhibit MSPA
through A    Pg 62 of 132
through A    Pg 62 of 481

any environmental investigations or examinations of any nature, including Phase I and Phase II site assessments and any environmental sampling in respect of the Transferred Real Property.

Section 6.2    *Conduct of Business.*

(a)    Except as (i) otherwise expressly contemplated by or permitted under this Agreement, including the DIP Facility; (ii) disclosed on Section 6.2 of the Sellers' Disclosure Schedule; (iii) approved by the Bankruptcy Court (or any other court or other Governmental Authority in connection with any other bankruptcy, insolvency or similar proceeding filed by or in respect of any Subsidiary of Parent); or (iv) required by or resulting from any changes to applicable Laws, from and after the date of this Agreement and until the earlier of the Closing and the termination of this Agreement, Sellers shall and shall cause each Purchased Subsidiary to (A) conduct their operations in the Ordinary Course of Business, (B) not take any action inconsistent with this Agreement or with the consummation of the Closing, (C) use reasonable best efforts to preserve in the Ordinary Course of Business and in all material respects the present relationships of Sellers and each of their Subsidiaries with their respective customers, suppliers and others having significant business dealings with them, (D) not take any action to cause any of Sellers' representations and warranties set forth in **ARTICLE IV** to be untrue in any material respect as of any such date when such representation or warranty is made or deemed to be made and (E) not take any action that would reasonably be expected to materially prevent or delay the Closing.

(b)    Subject to the exceptions contained in clauses (i) through (iv) of **Section 6.2(a)**, each Seller agrees that, from and after the date of this Agreement and until the earlier of the Closing and the termination of this Agreement, without the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), such Seller shall not, and shall not permit any of the Key Subsidiaries (and in the case of clauses (i), (ix), (xiii) or (xvi), shall not permit any Purchased Subsidiary) to:

(i)    take any action with respect to which any Seller has granted approval rights to Sponsor under any Contract, including under the UST Credit Facilities, without obtaining the prior approval of such action from Sponsor;

(ii)    issue, sell, pledge, create an Encumbrance or otherwise dispose of or authorize the issuance, sale, pledge, Encumbrance or disposition of any Equity Interests of the Transferred Entities, or grant any options, warrants or other rights to purchase or obtain (including upon conversion, exchange or exercise) any such Equity Interests;

(iii)    declare, set aside or pay any dividend or make any distribution (whether in cash, securities or other property or by allocation of additional Indebtedness to any Seller or any Key Subsidiary without receipt of fair value with respect to any Equity Interest of Seller or any Key Subsidiary), except for dividends and distributions among the Purchased Subsidiaries;

(iv)    directly or indirectly, purchase, redeem or otherwise acquire any Equity Interests or any rights to acquire any Equity Interests of any Seller or Key Subsidiary;

(v)    materially change any of its financial accounting policies or procedures or any of its methods of reporting income, deductions or other material items for financial accounting purposes, except as permitted by GAAP, a SEC rule, regulation or policy or applicable Law, or as modified by Parent as a result of the filing of the Bankruptcy Cases;

(vi)    adopt any amendments to its Organizational Documents or permit the adoption of any amendment of the Organizational Documents of any Key Subsidiary or effect a split, combination or reclassification or other adjustment of Equity Interests of any Purchased Subsidiary or a recapitalization thereof;

(vii)    sell, pledge, lease, transfer, assign or dispose of any Purchased Asset or permit any Purchased Asset to become subject to any Encumbrance, other than a Permitted Encumbrance, in each case, except in the Ordinary Course of Business or pursuant to a Contract in existence as of the date hereof (or entered into in compliance with this **Section 6.2**);

(viii)    (A) incur or assume any Indebtedness for borrowed money or issue any debt securities, except for Indebtedness for borrowed money incurred by Purchased Subsidiaries under existing lines of credit (including through the incurrence of Intercompany Obligations) to fund operations of Purchased Subsidiaries and Indebtedness for borrowed money incurred by Sellers under the DIP Facility or (B) assume, guarantee, endorse or otherwise become liable or responsible (whether directly, contingently or otherwise) for the obligations of any other Person, except for Indebtedness for borrowed money among any Seller and Subsidiary or among the Subsidiaries;

(ix)    discharge or satisfy any Indebtedness in excess of $100,000,000 other than the discharge or satisfaction of any Indebtedness when due in accordance with its originally scheduled terms;

(x)    other than as is required by the terms of a Parent Employee Benefit Plan and Policy (in effect on the date hereof and set forth on Section 4.10 of the Sellers' Disclosure Schedule), any Assumed Plan (in effect on the date hereof) the UAW Collective Bargaining Agreement or consistent with the expiration of a Collective Bargaining Agreement, the Settlement Agreement, the UAW Retiree Settlement Agreement or as may be required by applicable Law or TARP or under any enhanced restrictions on executive compensation agreed to by Sellers and Sponsor, (A) increase the compensation or benefits of any Employee of Sellers or any Purchased Subsidiary (except for increases in salary or wages in the Ordinary Course of Business with respect to Employees who are not current or former directors or officers of Sellers or Seller Key Personnel), (B) grant any severance or termination pay to any Employee of Sellers or any Purchased

Subsidiary except for severance or termination pay provided under any Parent Employee Benefit Plan and Policy or as the result of a settlement of any pending Claim or charge involving a Governmental Authority or litigation with respect to Employees who are not current or former officers or directors of Sellers or Seller Key Personnel), (C) establish, adopt, enter into, amend or terminate any Benefit Plan (including any change to any actuarial or other assumption used to calculate funding obligations with respect to any Benefit Plan or any change to the manner in which contributions to any Benefit Plan are made or the basis on which such contributions are determined), except where any such action would reduce Sellers' costs or Liabilities pursuant to such plan, (D) grant any awards under any Benefit Plan (including any equity or equity-based awards), (E) increase or promise to increase or provide for the funding under any Benefit Plan, (F) forgive any loans to Employees of Sellers or any Purchased Subsidiary (other than as part of a settlement of any pending Claim or charge involving a Governmental Authority or litigation in the Ordinary Course of Business or with respect to obligations of Employees whose employment is terminated by Sellers or a Purchased Subsidiary in the Ordinary Course of Business, other than Employees who are current or former officers or directors of Sellers or Seller Key Personnel or directors of Sellers or a Purchased Subsidiary) or (G) exercise any discretion to accelerate the time of payment or vesting of any compensation or benefits under any Benefit Plan;

(xi)     modify, amend, terminate or waive any rights under any Affiliate Contract or Seller Material Contract (except for any dealer sales and service Contracts or as contemplated by **Section 6.7**) in any material respect in a manner that is adverse to any Seller that is a party thereto, other than in the Ordinary Course of Business;

(xii)     enter into any Seller Material Contract other than as contemplated by **Section 6.7**;

(xiii)     acquire (including by merger, consolidation, combination or acquisition of Equity Interests or assets) any Person or business or division thereof (other than acquisitions of portfolio assets and acquisitions in the Ordinary Course of Business) in a transaction (or series of related transactions) where the aggregate consideration paid or received (including non-cash equity consideration) exceeds $100,000,000;

(xiv)     alter, whether through a complete or partial liquidation, dissolution, merger, consolidation, restructuring, reorganization or in any other manner, the legal structure or ownership of any Key Subsidiary, or adopt or approve a plan with respect to any of the foregoing;

(xv)     enter into any Contract that limits or otherwise restricts or that would reasonably be expected to, after the Closing, restrict or limit in any material respect (A) Purchaser or any of its Subsidiaries or any successor thereto or (B) any Affiliates of Purchaser or any successor thereto, in the case of each of

clause (A) or (B), from engaging or competing in any line of business or in any geographic area;

(xvi)    enter into any Contracts for capital expenditures, exceeding $100,000,000 in the aggregate in connection with any single project or group of related projects;

(xvii)    open or reopen any major production facility; and

(xviii)    agree, in writing or otherwise, to take any of the foregoing actions.

Section 6.3    *Notices and Consents.*

(a)    Sellers shall and shall cause each of their Subsidiaries to, and Purchaser shall use reasonable best efforts to, promptly give all notices to, obtain all material consents, approvals or authorizations from, and file all notifications and related materials with, any third parties (including any Governmental Authority) that may be or become necessary to be given or obtained by Sellers or their Affiliates, or Purchaser, respectively, in connection with the transactions contemplated by this Agreement.

(b)    Each of Purchaser and Parent shall, to the extent permitted by Law, promptly notify the other Party of any communication it or any of its Affiliates receives from any Governmental Authority relating to the transactions contemplated by this Agreement and permit the other Party to review in advance any proposed substantive communication by such Party to any Governmental Authority. Neither Purchaser nor Parent shall agree to participate in any material meeting with any Governmental Authority in respect of any significant filings, investigation (including any settlement of the investigation), litigation or other inquiry unless it consults with the other Party in advance and, to the extent permitted by such Governmental Authority, gives the other Party the opportunity to attend and participate at such meeting; provided, however, in the event either Party is prohibited by applicable Law or such Governmental Authority from participating in or attending any such meeting, then the Party who participates in such meeting shall keep the other Party apprised with respect thereto to the extent permitted by Law. To the extent permitted by Law, Purchaser and Parent shall coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Party may reasonably request in connection with the foregoing, including, to the extent reasonably practicable, providing to the other Party in advance of submission, drafts of all material filings, submissions, correspondences or other written communications, providing the other Party with an opportunity to comment on the drafts, and, where practicable, incorporating such comments, if any, into the final documents. To the extent permitted by applicable Law, Purchaser and Parent shall provide each other with copies of all material correspondences, filings or written communications between them or any of their Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement or the transactions contemplated by this Agreement.

(c)     None of Purchaser, Parent or their respective Affiliates shall be required to pay any fees or other payments to any Governmental Authorities in order to obtain any authorization, consent, Order or approval (other than normal filing fees and administrative fees that are imposed by Law on Purchaser), and in the event that any fees in addition to normal filing fees imposed by Law may be required to obtain any such authorization, consent, Order or approval, such fees shall be for the account of Purchaser.

(d)     Notwithstanding anything to the contrary contained herein, no Seller shall be required to make any expenditure or incur any Liability in connection with the requirements set forth in this **Section 6.3**.

*Section 6.4     Sale Procedures; Bankruptcy Court Approval.*

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers and the Bankruptcy Court of higher or better competing Bids with respect to an Alternative Transaction.  Nothing contained herein shall be construed to prohibit Sellers and their respective Affiliates and Representatives from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of, any Alternative Transaction but only to the extent that Sellers determine in good faith that such actions are permitted or required by the Sale Procedures Order.

(b)     On the Petition Date, Sellers filed with the Bankruptcy Court the Bankruptcy Cases under the Bankruptcy Code and a motion (and related notices and proposed Orders) (the "Sale Procedures and Sale Motion"), seeking entry of (i) the sale procedures order, in the form attached hereto as **Exhibit H** (the "Sale Procedures Order"), and (ii) the sale approval order, in the form attached hereto as **Exhibit I** (the "Sale Approval Order").   The Sale Approval Order shall declare that if there is an Agreed G Transaction, (A) this Agreement constitutes a "plan" of Parent and Purchaser solely for purposes of Sections 368 and 354 of the Tax Code and (B) the transactions with respect to Parent described herein, in combination with the subsequent liquidation of Sellers, are intended to constitute a reorganization of Parent pursuant to Section 368(a)(1)(G) of the Tax Code.  To the extent reasonably practicable, Sellers shall consult with and provide Purchaser and the UAW a reasonable opportunity to review and comment on material motions, applications and supporting papers prepared by Sellers in connection with this Agreement prior to the filing or delivery thereof in the Bankruptcy Cases.

(c)     Purchaser acknowledges that Sellers may receive bids ("Bids") from prospective purchasers (such prospective purchasers, the "Bidders") with respect to an Alternative Transaction, as provided in the Sale Procedures Order.  All Bids (other than Bids submitted by Purchaser) shall be submitted with two copies of this Agreement marked to show changes requested by the Bidder.

(d)     If Sellers receive any Bids, Sellers shall have the right to select, and seek final approval of the Bankruptcy Court for, the highest or otherwise best Bid or Bids from the Bidders (the "Superior Bid"), which will be determined in accordance with the Sale Procedure Order.

(e)     Sellers shall use their reasonable best efforts to obtain entry of the Sale Approval Order on the Bankruptcy Court's docket as soon as practicable, and in no event no later than July 10, 2009.

(f)     Sellers shall use reasonable best efforts to comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the transactions contemplated by this Agreement, including serving on all required Persons in the Bankruptcy Cases (including all holders of Encumbrances and parties to the Purchased Contracts), a notice of the Sale Procedures and Sale Motion, the Sale Hearing and the objection deadline in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (as modified by Orders of the Bankruptcy Court), the Sale Procedures Order or other Orders of the Bankruptcy Court, including General Order M-331 issued by the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

(g)     Sellers shall provide Purchaser with a reasonable opportunity to review and comment on all motions, applications and supporting papers prepared by Sellers in connection with this Agreement (including forms of Orders and of notices to interested parties) prior to the filing or delivery thereof in the Bankruptcy Cases.  All motions, applications and supporting papers prepared by Sellers and relating to the approval of this Agreement (including forms of Orders and of notices to interested parties) to be filed or delivered on behalf of Sellers shall be reasonably acceptable in form and substance to Purchaser.  Sellers shall provide written notice to Purchaser of all matters that are required to be served on Sellers' creditors pursuant to the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.  In the event the Sale Procedures Order and the Sale Approval Order is appealed, Sellers shall use their reasonable best efforts to defend such appeal.

(h)     Purchaser agrees, to the extent reasonably requested by Sellers, to cooperate with and assist Sellers in seeking entry of the Sale Procedures Order and the Sale Approval Order by the Bankruptcy Court, including attending all hearings on the Sale Procedures and Sale Motion.

Section 6.5     Supplements to Purchased Assets.  Purchaser shall, from the date hereof until the Executory Contract Designation Deadline, have the right to designate in writing additional Personal Property it wishes to designate as Purchased Assets if such Personal Property is located at a parcel of leased real property where the underlying lease has been designated as a Rejectable Executory Contract pursuant to **Section 6.6** following the Closing.

Section 6.6     Assumption or Rejection of Contracts.

(a)     The Assumable Executory Contract Schedule sets forth a list of Executory Contracts entered into by Sellers that Sellers may assume and assign to Purchaser in accordance with this **Section 6.6(a)** (each, an "Assumable Executory Contract").  Any Contract identified on Section 6.6(a)(i) of the Sellers' Disclosure Schedule and Section 6.6(a)(ii) of the Sellers' Disclosure Schedule shall automatically be designated as an

Assumable Executory Contract and deemed to be set forth on the Assumable Executory Contract Schedule. Purchaser may, until the Executory Contract Designation Deadline, designate in writing any additional Executory Contract it wishes to designate as an Assumable Executory Contract and include on the Assumable Executory Contract Schedule, or any Assumable Executory Contract it no longer wishes to designate as an Assumable Executory Contract and remove from the Assumable Executory Contract Schedule; provided, however, that (i) Purchaser may not designate as an Assumable Executory Contract any (A) Rejectable Executory Contract, unless Sellers have consented to such designation in writing or (B) Contract that has previously been rejected by Sellers pursuant to Section 365 of the Bankruptcy Code, and (ii) Purchaser may not remove from the Assumable Executory Contract Schedule (v) the UAW Collective Bargaining Agreement, (w) any Contract identified on Section 6.6(a)(i) of the Sellers' Disclosure Schedule or Section 6.6(a)(ii) of the Sellers' Disclosure Schedule, (x) any Contract that has been previously assumed by Sellers pursuant to Section 365 of the Bankruptcy Code, (y) any Deferred Termination Agreement (or the related Discontinued Brand Dealer Agreement or Continuing Brand Dealer Agreement) or (z) any Participation Agreement (or the related Continuing Brand Dealer Agreement). Except as otherwise provided above, for each Assumable Executory Contract, Purchaser must determine, prior to the Executory Contract Designation Deadline, the date on which it seeks to have the assumption and assignment become effective, which date may be the Closing Date or a later date (but not an earlier date). The term "Executory Contract Designation Deadline" shall mean the date that is thirty (30) calendar days following the Closing Date, or if such date is not a Business Day, the next Business Day, or if mutually agreed upon by the Parties, any later date up to and including the Business Day immediately prior to the date of the confirmation hearing for Sellers' plan of liquidation or reorganization. For the avoidance of doubt, the Executory Contract Designation Deadline may be extended by mutual agreement of the Parties with respect to any single unassumed and unassigned Executory Contract, groups of unassumed and unassigned Executory Contracts or all of the unassumed and unassigned Executory Contracts.

(b)    Sellers may, until the Closing, provide written notice (a "Notice of Intent to Reject") to Purchaser of Sellers' intent to designate any Executory Contract (that has not been designated as an Assumable Executory Contract) as a Rejectable Executory Contract (each a "Proposed Rejectable Executory Contract"). Following receipt of a Notice of Intent to Reject, Purchaser shall as soon as reasonably practicable, but in no event later than fifteen (15) calendar days following receipt of a Notice of Intent to Reject (the "Option Period"), provide Sellers written notice of Purchaser's designation of one or more Proposed Rejectable Executory Contracts identified in such Notice of Intent to Reject as an Assumable Executory Contract. Each Proposed Rejectable Executory Contract that has not been designated by Purchaser as an Assumable Executory Contract during the applicable Option Period shall automatically, without further action by Sellers, be designated as a Rejectable Executory Contract. A "Rejectable Executory Contract" is an Executory Contract that Sellers may, but are not obligated to, reject pursuant Section 365 of the Bankruptcy Code.

(c)    Immediately following the Closing, each Executory Contract entered into by Sellers and then in existence that has not previously been designated as an Assumable

Executory Contract, a Rejectable Executory Contract or a Proposed Rejectable Executory Contract, and that has not otherwise been assumed or rejected by Sellers pursuant to Section 365 of the Bankruptcy Code, shall be deemed to be an Executory Contract subject to subsequent designation by Purchaser as an Assumable Executory Contract or a Rejectable Executory Contract (each a "<u>Deferred Executory Contract</u>").

(d)     All Assumable Executory Contracts shall be assumed and assigned to Purchaser on the date (the "<u>Assumption Effective Date</u>") that is the later of (i) the date designated by the Purchaser and (ii) the date following expiration of the objection deadline if no objection, other than to the Cure Amount, has been timely filed or the date of resolution of any objection unrelated to Cure Amount, as provided in the Sale Procedures Order; <u>provided</u>, <u>however</u>, that in the case of each (A) Assumable Executory Contract identified on Section 6.6(a)(i) of the Sellers' Disclosure Schedule, (2) Deferred Termination Agreement (and the related Discontinued Brand Dealer Agreement or Continuing Brand Dealer Agreement) designated as an Assumable Executory Contract and (3) Participation Agreement (and the related Continuing Brand Dealer Agreement) designated as an Assumable Executory Contract, the Assumption Effective Date shall be the Closing Date and (B) Assumable Executory Contract identified on Section 6.6(a)(ii) of the Sellers' Disclosure Schedule, the Assumption Effective Date shall be a date that is no later than the date set forth with respect to such Executory Contract on Section 6.6(a)(ii) of the Sellers' Disclosure Schedule.  On the Assumption Effective Date for any Assumable Executory Contract, such Assumable Executory Contract shall be deemed to be a Purchased Contract hereunder.  If it is determined under the procedures set forth in the Sale Procedures Order that Sellers may not assume and assign to Purchaser any Assumable Executory Contract, such Executory Contract shall cease to be an Assumable Executory Contract and shall be an Excluded Contract and a Rejectable Executory Contract.  Except as provided in **Section 6.31**, notwithstanding anything else to the contrary herein, any Executory Contract that has not been specifically designated as an Assumable Executory Contract as of the Executory Contract Designation Deadline applicable to such Executory Contract, including any Deferred Executory Contract, shall automatically be deemed to be a Rejectable Executory Contract and an Excluded Contract hereunder.  Sellers shall have the right, but not the obligation, to reject, at any time, any Rejectable Executory Contract; <u>provided</u>, <u>however</u>, that Sellers shall not reject any Contract that affects both Owned Real Property and Excluded Real Property (whether designated on **<u>Exhibit F</u>** or now or hereafter designated on Section 2.2(b)(v) of the Sellers' Disclosure Schedule), including any such Executory Contract that involves the provision of water, water treatment, electric, fuel, gas, telephone and other utilities to any facilities located at the Excluded Real Property, whether designated on **<u>Exhibit F</u>** or now or hereafter designated on Section 2.2(b)(v) of the Sellers' Disclosure Schedule (the "<u>Shared Executory Contracts</u>"), without the prior written consent of Purchaser.

(e)     From and after the Closing and during the applicable period specified below, Purchaser shall be obligated to pay or cause to be paid all amounts due in respect of Sellers' performance (i) under each Proposed Rejectable Executory Contract, during the pendency of the applicable Option Period under such Proposed Rejectable Executory Contract, (ii) under each Deferred Executory Contract, for so long as such Contract remains a Deferred Executory Contract, (iii) under each Assumable Executory Contract,

as long as such Contract remains an Assumable Executory Contract and (iv) under each GM Assumed Contract, until the applicable Assumption Effective Date.  At and after the Closing and until such time as any Shared Executory Contract is either (y) rejected by Sellers pursuant to the provision set forth in this **Section 6.6** or (z) assumed by Sellers and subsequently modified with Purchaser's consent so as to no longer be applicable to the affected Owned Real Property, Purchaser shall reimburse Sellers as and when requested by Sellers for Purchasers' and its Affiliates' allocable share of all costs and expenses incurred under such Shared Executory Contract.

(f)    Sellers and Purchaser shall comply with the procedures set forth in the Sale Procedures Order with respect to the assumption and assignment or rejection of any Executory Contract pursuant to, and in accordance with, this **Section 6.6**.

(g)    No designation of any Executory Contract for assumption and assignment or rejection in accordance with this **Section 6.6** shall give rise to any right to any adjustment to the Purchase Price.

(h)    Without limiting the foregoing, if, following the Executory Contract Designation Deadline, Sellers or Purchaser identify an Executory Contract that has not previously been identified as a Contract for assumption and assignment, and such Contract is important to Purchaser's ability to use or hold the Purchased Assets or operate its businesses in connection therewith, Sellers will assume and assign such Contract and assign it to Purchaser without any adjustment to the Purchase Price; <u>provided</u> that Purchaser consents and agrees at such time to (i) assume such Executory Contract and (ii) and discharge all Cure Amounts in respect hereof.

Section 6.7    *Deferred Termination Agreements; Participation Agreements.*

(a)    Sellers shall, and shall cause their Affiliates to, use reasonable best efforts to enter into short-term deferred voluntary termination agreements in substantially the form attached hereto as **<u>Exhibit J-1</u>** (in respect of all Saturn Discontinued Brand Dealer Agreements), **<u>Exhibit J-2</u>** (in respect of all Hummer Discontinued Brand Dealer Agreements) and **<u>Exhibit J-3</u>** (in respect of all non-Saturn and non-Hummer Discontinued Brand Dealer Agreements and all Excluded Continuing Brand Dealer Agreements) that will, when executed by the relevant dealer counterparty thereto, modify the respective Discontinued Brand Dealer Agreements and selected Continuing Brand Dealer Agreements (collectively, the "<u>Deferred Termination Agreements</u>").  For the avoidance of doubt, (i) each Deferred Termination Agreement, and the related Discontinued Brand Dealer Agreement or Continuing Brand Dealer Agreement modified thereby, will automatically be an Assumable Executory Contract hereunder upon valid execution of such Deferred Termination Agreement by the parties thereto and (ii) all Discontinued Brand Dealer Agreements that are not modified by a Deferred Termination Agreement, and all Continuing Brand Dealer Agreements that are not modified by either a Deferred Termination Agreement or a Participation Agreement, will automatically be a Rejectable Executory Contract hereunder.

(b)     Sellers shall, and shall cause their Affiliates to, use reasonable best efforts to enter into agreements, substantially in the form attached hereto as **Exhibit K** that will modify all Continuing Brand Dealer Agreements (other than the Continuing Brand Dealer Agreements that are proposed to be modified by Deferred Termination Agreements) (the "Participation Agreements").   For the avoidance of doubt, (i) all Participation Agreements, and the related Continuing Brand Dealer Agreements, will automatically be Assumable Executory Contracts hereunder upon valid execution of such Participation Agreement and (ii) all Continuing Brand Dealer Agreements that are proposed to be modified by a Participation Agreement and are not modified by a Participation Agreement will be offered Deferred Termination Agreements pursuant to **Section 6.7(a)**.

Section 6.8     [Reserved]

Section 6.9     Purchaser Assumed Debt; Wind Down Facility.

(a)     Purchaser shall use reasonable best efforts to agree with Sponsor on the terms of a restructuring of the Purchaser Assumed Debt so as to be assumed by Purchaser immediately prior to the Closing.  Purchaser shall use reasonable best efforts to enter into definitive financing agreements with respect to the Purchaser Assumed Debt so that such agreements are in effect as promptly as practicable but in any event no later than the Closing.

(b)     Sellers shall use reasonable best efforts to agree with Sponsor on the terms of a restructuring of $950,000,000 of Indebtedness accrued under the DIP Facility (as restructured, the "Wind Down Facility") to provide for such Wind Down Facility to be non-recourse, to accrue payment-in-kind interest at LIBOR plus 300 basis points, to be secured by all assets of Sellers (other than the Parent Shares, Adjustment Shares, Parent Warrants and any securities received in respect thereof), and to be subject to mandatory repayment from the proceeds of asset sales (other than the sale of Parent Shares, Adjustment Shares, Parent Warrants and any securities received in respect thereof). Sellers shall use reasonable best efforts to enter into definitive financing agreements with respect to the Wind Down Facility so that such agreements are in effect as promptly as practicable but in any event no later than the Closing.

Section 6.10   Litigation  and Other Assistance.  In the event and for so long as any Party is actively contesting or defending against any action, investigation, charge, Claim or demand by a third party in connection with any transaction contemplated by this Agreement, the other Parties shall reasonably cooperate with the contesting or defending Party and its counsel in such contest or defense, make available its personnel and provide such testimony and access to its books, records and other materials as shall be reasonably necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party; provided, however, that no Party shall be required to provide the contesting or defending party with any access to its books, records or materials if such access would violate the attorney-client privilege or conflict with any confidentiality obligations to which the non-contesting or defending Party is subject.  In addition, the Parties agree to cooperate in connection with the making or filing of claims, requests for information, document retrieval and other activities in connection with any

and all Claims made under insurance policies specified on Section 2.2(b)(xiii) of the Sellers' Disclosure Schedule to the extent any such Claim relates to any Purchased Asset or Assumed Liability. For the avoidance of doubt, this **Section 6.10** shall not apply to any action, investigation, charge, Claim or demand by any of Sellers or their Affiliates, on the one hand, or Purchaser or any of its Affiliates, on the other hand.

*Section 6.11    Further Assurances.*

(a)    Upon the terms and subject to the conditions set forth in this Agreement, each of the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all actions necessary, proper or advisable to consummate and make effective as promptly as practicable, the transactions contemplated by this Agreement in accordance with the terms hereof and to bring about the satisfaction of all other conditions to the other Parties' obligations hereunder; provided, however, that nothing in this Agreement shall obligate Sellers or Purchaser, or any of their respective Affiliates, to waive or modify any of the terms and conditions of this Agreement or any documents contemplated hereby, except as expressly set forth herein. The Parties acknowledge that Sponsor's acquisition of interest is a sovereign act and that no filings should be made by Sponsor or Purchaser in non-United States jurisdictions.

(b)    The Parties shall negotiate the forms, terms and conditions of the Ancillary Agreements, to the extent the forms thereof are not attached to this Agreement, on the basis of the respective term sheets attached to this Agreement, in good faith, with such Ancillary Agreements to set forth terms on an Arms-Length Basis and incorporate usual and customary provisions for similar agreements.

(c)    Until the Closing, Sellers shall maintain a team of appropriate personnel (each such team, a "Transition Team") to assist Purchaser and its Representatives in connection with Purchaser's efforts to complete prior to the Closing the activities described below. Sellers shall use their reasonable best efforts to cause the Transition Team to (A) meet with Purchaser and its Representatives on a regular basis at such times as Purchaser may reasonably request and (B) take such action and provide such information, including background and summary information, as Purchaser and its Representatives may reasonably request in connection with the following activities:

(i)    evaluation and identification of all Contracts that Purchaser may elect to designate as Purchased Contracts or Excluded Contracts, consistent with its rights under this Agreement;

(ii)    evaluation and identification of all assets and entities that Purchaser may elect to designate as Purchased Assets or Excluded Assets, consistent with its rights under this Agreement;

(iii)    maintaining and obtaining necessary governmental consents, permits, authorizations, licenses and financial assurance for operation of the business by Purchaser following the Closing;

(iv)    obtaining necessary third party consents for operation of the business by Purchaser following the Closing;

(v)    implementing the optimal structure for Purchaser and its subsidiaries to acquire and hold the Purchased Assets and operate the business following the Closing;

(vi)    implementing the assumption of all Assumed Plans and otherwise satisfying the obligations of Purchaser as provided in **Section 6.17** with respect to Employment Related Obligations; and

(vii)    such other transition matters as Purchaser may reasonably determine are necessary for Purchaser to fulfill its obligations and exercise its rights under this Agreement.

*Section 6.12    Notifications.*

(a)    Sellers shall give written notice to Purchaser as soon as practicable upon becoming aware of any event, circumstance, condition, fact, effect or other matter that resulted in, or that would reasonably be likely to result in (i) any representation or warranty set forth in **ARTICLE IV** being or becoming untrue or inaccurate in any material respect as of any date on or after the date hereof (as if then made, except to the extent such representation or warranty is expressly made only as of a specific date, in which case, as of such date), (ii) the failure by Sellers to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by Sellers under this Agreement or (iii) a condition to the Closing set forth in **Section 7.1** or **Section 7.2** becoming incapable of being satisfied; provided, however, that no such notification shall affect or cure a breach of any of Sellers' representations or warranties, a failure to perform any of the covenants or agreements of Sellers or a failure to have satisfied the conditions to the obligations of Sellers under this Agreement.  Such notice shall be in form of a certificate signed by an executive officer of Parent setting forth the details of such event and the action which Parent proposes to take with respect thereto.

(b)    Purchaser shall give written notice to Sellers as soon as practicable upon becoming aware of any event, circumstance, condition, fact, effect or other matter that resulted in, or that would reasonably be likely to result in (i) any representation or warranty set forth in **ARTICLE V** being or becoming untrue or inaccurate in any material respect with respect to Purchaser as of any date on or after the date hereof (as if then made, except to the extent such representation or warranty is expressly made only as of a specific date, in which case, as of such date), (ii) the failure by Purchaser to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by Purchaser under this Agreement or (iii) a condition to the Closing set forth in **Section 7.1** or **Section 7.3** becoming incapable of being satisfied; provided, however, that no such notification shall affect or cure a breach of any of Purchaser's representations or warranties, a failure to perform any of the covenants or agreements of Purchaser or a failure to have satisfied the conditions to the obligations of Purchaser under this Agreement.  Such notice shall be in a form of a certificate signed by

an executive officer of Purchaser setting forth the details of such event and the action which Purchaser proposes to take with respect thereto.

Section 6.13    *Actions by Affiliates.*  Each of Purchaser and Sellers shall cause their respective controlled Affiliates, and shall use their reasonable best efforts to ensure that each of their respective other Affiliates (other than Sponsor in the case of Purchaser) takes all actions reasonably necessary to be taken by such Affiliate in order to fulfill the obligations of Purchaser or Sellers, as the case may be, under this Agreement.

Section 6.14    *Compliance Remediation.*  Except with respect to the Excluded Assets or Retained Liabilities, prior to the Closing, Sellers shall use reasonable best efforts to, and shall use reasonable best efforts to cause their Subsidiaries to use their reasonable best efforts to, cure in all material respects any instances of non-compliance with Laws or Orders, failures to possess or maintain Permits or defaults under Permits.

Section 6.15    *Product Certification, Recall and Warranty Claims.*

(a)    From and after the Closing, Purchaser shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.

(b)    From and after the Closing, Purchaser shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.  In connection with the foregoing clause (ii), (A) Purchaser shall continue to address Lemon Law Claims using the same procedural mechanisms previously utilized by the applicable Sellers and (B) for avoidance of doubt, Purchaser shall not assume Liabilities arising under the law of implied warranty or other analogous provisions of state Law, other than Lemon Laws, that provide consumer remedies in addition to or different from those specified in Sellers' express warranties.

(c)    For the avoidance of doubt, Liabilities of the Transferred Entities arising from or in connection with products manufactured or sold by the Transferred Entities remain the responsibility of the Transferred Entities and shall be neither Assumed Liabilities nor Retained Liabilities for the purposes of this Agreement.

Section 6.16    *Tax Matters; Cooperation.*

(a)    Prior to the Closing Date, Sellers shall prepare and timely file (or cause to be prepared and timely filed) all Tax Returns required to be filed prior to such date (taking into account any extension of time to file granted or obtained) that relate to Sellers, the Purchased Subsidiaries and the Purchased Assets in a manner consistent with

past practices (except as otherwise required by Law), and shall provide Purchaser prompt opportunity for review and comment and shall obtain Purchaser's written approval prior to filing any such Tax Returns.  After the Closing Date, at Purchaser's election, Purchaser shall prepare, and the applicable Seller, Seller Subsidiary or Seller Group member shall timely file, any Tax Return relating to any Seller, Seller Subsidiary or Seller Group member for any Pre-Closing Tax Period or Straddle Period due after the Closing Date or other taxable period of any entity that includes the Closing Date, subject to the right of the applicable Seller to review any such material Tax Return.  Purchaser shall prepare and file all other Tax Returns required to be filed after the Closing Date in respect of the Purchased Assets.  Sellers shall prepare and file all other Tax Returns relating to the Post-Closing Tax Period of Sellers, subject to the prior review and approval of Purchaser, which approval may be withheld, conditioned or delayed with good reason.  No Seller or Seller Group member shall be entitled to any payment or other consideration in addition to the Purchase Price with respect to the acquisition or use of any Tax items or attributes by Purchaser, any Purchased Subsidiary or Affiliates thereof.  At Purchaser's request, any Seller or Seller Group member shall designate Purchaser or any of its Affiliates as a substitute agent for the Seller Group for Tax purposes.  Purchaser shall be entitled to make all determinations, including the right to make or cause to be made any elections with respect to Taxes and Tax Returns of Sellers, Seller Subsidiaries, Seller Groups and Seller Group members with respect to Pre-Closing Tax Periods and Straddle Periods and with respect to the Tax consequences of the Relevant Transactions (including the treatment of such transactions as an Agreed G Transaction) and the other transactions contemplated by this Agreement, including (i) the "date of distribution or transfer" for purposes of Section 381(b) of the Tax Code, if applicable; (ii) the relevant Tax periods and members of the Seller Group and the Purchaser and its Affiliates; (iii) whether the Purchaser and/or any of its Affiliates shall be treated as a continuation of Seller Group; and (iv) any other determinations required under Section 381 of the Tax Code.  Purchaser shall have the sole right to represent the interests, as applicable, of any Seller, Seller Group member or Purchased Subsidiary in any Tax proceeding in connection with any Tax Liability or any Tax item for any Pre-Closing Tax Period, Straddle Period or other Tax period affecting any such earlier Tax period.  After the Closing, Purchaser shall have the right to assume control of any PLR or CA request filed by Sellers or any Affiliate thereof, including the right to represent Sellers and their Affiliates and to direct all professionals acting on their behalf in connection with such request, and no settlement, concession, compromise, commitment or other agreements in respect of such PLR or CA request shall be made without Purchaser's prior written consent.

(b)        All Taxes required to be paid by any Seller or Seller Group member for any Pre-Closing Tax Period or any Straddle Period shall be timely paid.  To the extent a Party hereto is liable for a Tax pursuant to this Agreement and such Tax is paid or payable by another Party or such other Party's Affiliates, the Party liable for such Tax shall make payment in the amount of such Tax to the other Party no later than three (3) days prior to the due date for payment of such Tax, unless a later time for payment is agreed to in writing by such other Party.  To the extent that any Seller or Seller Group member receives or realizes the benefit of any Tax refund, abatement or credit that is a Purchased Asset, such Seller or Seller Group member receiving the benefit shall transfer

an amount equal to such refund, abatement or credit to Purchaser within fourteen (14) days of receipt or realization of the benefit.

(c)     Purchaser and Sellers shall provide each other with such assistance and non-privileged information relating to the Purchased Assets as may reasonably be requested in connection with any Tax matter, including the matters contemplated by this **Section 6.16**, the preparation of any Tax Return or the performance of any audit, examination or other proceeding by any Taxing Authority, whether conducted in a judicial or administrative forum. Purchaser and Sellers shall retain and provide to each other all non-privileged records and other information reasonably requested by the other and that may be relevant to any such Tax Return, audit, examination or other proceeding.

(d)     After the Closing, at Purchaser's election, Purchaser shall exercise exclusive control over the handling, disposition and settlement of any inquiry, examination or proceeding (including an audit) by a Governmental Authority (or that portion of any inquiry, examination or proceeding by a Governmental Authority) with respect to Sellers, any Subsidiary of Sellers or any Seller Group, provided that to the extent any such inquiry, examination or proceeding by a Governmental Authority could materially affect the Taxes due or payable by Sellers, Purchaser shall control the handling, disposition and settlement thereof, subject to reasonable consultation rights of Sellers. Each Party shall notify the other Party (or Parties) in writing promptly upon learning of any such inquiry, examination or proceeding. The Parties and their Affiliates shall cooperate with each other in any such inquiry, examination or proceeding as a Party may reasonably request. Neither Parent nor any of its Affiliates shall extend, without Purchaser's prior written consent, the statute of limitations for any Tax for which Purchaser or any of its Affiliates may be liable.

(e)     Notwithstanding anything contained herein, Purchaser shall prepare and Sellers shall timely file all Tax Returns required to be filed in connection with the payment of Transfer Taxes.

(f)     From the date of this Agreement to and including the Closing Date, except to the extent relating solely to an Excluded Asset or Retained Liability, no Seller, Seller Group member or Purchased Subsidiary shall, without the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed, and shall not be withheld if not resulting in any Tax impact on Purchaser or any Purchased Asset), (i) make, change, or terminate any material election with respect to Taxes (including elections with respect to the use of Tax accounting methods) of any Seller, Seller Group member or Purchased Subsidiary or any material joint venture to which any Seller or Purchased Subsidiary is a party, (ii) settle or compromise any Claim or assessment for Taxes (including refunds) that could be reasonably expected to result in any adverse consequence on Purchaser or any Purchased Asset following the Closing Date, (iii) agree to an extension of the statute of limitations with respect to the assessment or collection of the Taxes of any Seller, Seller Group member or Purchased Subsidiary or any material joint venture of which any Seller or Purchased Subsidiary is a party or (iv) make or surrender any Claim for a refund of a material amount of the Taxes of any of

Sellers or Purchased Subsidiaries or file an amended Tax Return with respect to a material amount of Taxes.

(g)

(i)    Purchaser shall treat the transactions with respect to Parent described herein, in combination with the subsequent liquidation of Sellers (such transactions, collectively, the "Relevant Transactions"), as a reorganization pursuant to Section 368(a)(1)(G) of the Tax Code with any actual or deemed distribution by Parent qualifying solely under Sections 354 and 356 of the Tax Code but not under Section 355 of the Tax Code (a "G Transaction") if (x) the IRS issues a private letter ruling ("PLR") or executes a closing agreement ("CA"), in each case reasonably acceptable to Purchaser, confirming that the Relevant Transactions shall qualify as a G Transaction for U.S. federal income Tax purposes, or (y) Purchaser determines to treat the Relevant Transactions as so qualifying (clause (x) or (y), an "Agreed G Transaction").  In connection with the foregoing, Sellers shall use their reasonable best efforts to obtain a PLR or execute a CA with respect to the Relevant Transactions at least seven (7) days prior to the Closing Date.  At least three (3) days prior to the Closing Date, Purchaser shall advise Parent in writing as to whether Purchaser has made a determination regarding the treatment of the Relevant Transactions for U.S. federal income Tax purposes and, if applicable, the outcome of any such determination.

(ii)    On or prior to the Closing Date, Sellers shall deliver to Purchaser all information in the possession of Sellers and their Affiliates that is reasonably related to the determination of whether the Relevant Transactions constitute an Agreed G Transaction ("Relevant Information"), and, after the Closing, Sellers shall promptly provide to Purchaser any newly produced or obtained Relevant Information.  For the avoidance of doubt, the Parties shall cooperate in taking any actions and providing any information that Purchaser determines is necessary or appropriate in furtherance of the intended U.S. federal income Tax treatment of the Relevant Transactions and the other transactions contemplated by this Agreement.

(iii)    If Purchaser has not determined as of the Closing Date whether to treat the Relevant Transactions as an Agreed G Transaction, Purchaser shall make such determination in accordance with this **Section 6.16** prior to the due date (including validly obtained extensions) for filing the corporate income Tax Return for Parent's U.S. affiliated group (as defined in Section 1504 of the Tax Code) for the taxable year in which the Closing Date occurs, and shall convey such decision in writing to Parent, which decision shall be binding on Parent.

(iv)    If the Relevant Transactions constitute an Agreed G Transaction under this **Section 6.16**: (A) Sellers shall use their reasonable best efforts, and Purchaser shall use reasonable best efforts to assist Sellers, to effectuate such treatment and the Parties shall not take any action or position inconsistent with, or

fail to take any necessary action in furtherance of, such treatment (subject to **Section 6.16(g)(vi)**); (B) the Parties agree that this Agreement shall constitute a "plan" of Parent and Purchaser for purposes of Sections 368 and 354 of the Tax Code; (C) the board of directors of Parent and Purchaser shall, by resolution, approve the execution of this Agreement and expressly recognize its treatment as a "plan" of Parent and Purchaser for purposes of Sections 368 and 354 of the Tax Code, and the treatment of the Relevant Transactions as a G Transaction for federal income Tax purposes; (D) Sellers shall provide Purchaser with a statement setting forth the adjusted Tax basis of the Purchased Assets and the amount of net operating losses and other material Tax attributes of Sellers and any Purchased Subsidiary that are available as of the Closing Date and after the close of any taxable year of any Seller or Seller Group member that impacts the numbers previously provided, all based on the best information available, but with no Liability for any errors or omissions in information; and (E) Sellers shall provide Purchaser with an estimate of the cancellation of Indebtedness income that Sellers and any Seller Group member anticipate realizing for the taxable year that includes the Closing Date, and shall provide revised numbers after the close of any taxable year of any Seller or Seller Group member that impacts this number.

(v)    If the Relevant Transactions do not constitute an Agreed G Transaction under this **Section 6.16**, the Parties hereby agree, and Sellers hereby consent, to treat the sale of the Purchased Assets by Parent as a taxable asset sale for all Tax purposes, to make any elections pursuant to Section 338 of the Tax Code requested by Purchaser, and to report consistently herewith for purposes of **Section 3.3**.  In addition, the Parties hereby agree, and Sellers hereby consent, to treat the sales of the Purchased Assets by S Distribution and Harlem as taxable asset sales for all Tax purposes, to make any elections pursuant to Section 338 of the Tax Code requested by Purchaser, and to report consistently herewith for purposes of **Section 3.3**.

(vi)    No Party shall take any position with respect to the Relevant Transactions that is inconsistent with the position determined in accordance with this **Section 6.16**, unless, and then only to the extent, otherwise required to do so by a Final Determination.

(vii)    Each Seller shall liquidate, as determined for U.S. federal income Tax purposes and to the satisfaction of Purchaser, no later than December 31, 2011, and each such liquidation may include a distribution of assets to a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4, the terms of which shall be satisfactory to Purchaser.

(viii)    Effective no later than the Closing Date, Purchaser shall be treated as a corporation for federal income Tax purposes.

Section 6.17    *Employees; Benefit Plans; Labor Matters.*

(a)    *Transferred Employees.*  Effective as of the Closing Date, Purchaser or one of its Affiliates shall make an offer of employment to each Applicable Employee. Notwithstanding anything herein to the contrary and except as provided in an individual employment Contract with any Applicable Employee or as required by the terms of an Assumed Plan, offers of employment to Applicable Employees whose employment rights are subject to the UAW Collective Bargaining Agreement as of the Closing Date, shall be made in accordance with the applicable terms and conditions of the UAW Collective Bargaining Agreement and Purchaser's obligations under the Labor Management Relations Act of 1974, as amended.  Each offer of employment to an Applicable Employee who is not covered by the UAW Collective Bargaining Agreement shall provide, until at least the first anniversary of the Closing Date, for (i) base salary or hourly wage rates initially at least equal to such Applicable Employee's base salary or hourly wage rate in effect as of immediately prior to the Closing Date and (ii) employee pension and welfare benefits, Contracts and arrangements that are not less favorable in the aggregate than those listed on Section 4.10 of the Sellers' Disclosure Schedule, but not including any Retained Plan, equity or equity-based compensation plans or any Benefit Plan that does not comply in all respects with TARP.  For the avoidance of doubt, each Applicable Employee on layoff status, leave status or with recall rights as of the Closing Date, shall continue in such status and/or retain such rights after Closing in the Ordinary Course of Business.  Each Applicable Employee who accepts employment with Purchaser or one of its Affiliates and commences working for Purchaser or one of its Affiliates shall become a "Transferred Employee."    To the extent such offer of employment by Purchaser or its Affiliates is not accepted, Sellers shall, as soon as practicable following the Closing Date, terminate the employment of all such Applicable Employees.  Nothing in this **Section 6.17(a)** shall prohibit Purchaser or any of its Affiliates from terminating the employment of any Transferred Employee after the Closing Date, subject to the terms and conditions of the UAW Collective Bargaining Agreement.  It is understood that the intent of this **Section 6.17(a)** is to provide a seamless transition from Sellers to Purchaser of any Applicable Employee subject to the UAW Collective Bargaining Agreement.  Except for Applicable Employees with non-standard individual agreements providing for severance benefits, until at least the first anniversary of the Closing Date, Purchaser further agrees and acknowledges that it shall provide to each Transferred Employee who is not covered by the UAW Collective Bargaining Agreement and whose employment is involuntarily terminated by Purchaser or its Affiliates on or prior to the first anniversary of the Closing Date, severance benefits that are not less favorable than the severance benefits such Transferred Employee would have received under the applicable Benefit Plans listed on Section 4.10 of the Sellers' Disclosure Schedule.  Purchaser or one of its Affiliates shall take all actions necessary such that Transferred Employees shall be credited for their actual and credited service with Sellers and each of their respective Affiliates, for purposes of eligibility, vesting and benefit accrual (except in the case of a defined benefit pension plan sponsored by Purchaser or any of its Affiliates in which Transferred Employees may commence participation after the Closing that is not an Assumed Plan), in any employee benefit plans (excluding equity compensation plans or programs) covering Transferred Employees after the Closing to the same extent as such Transferred Employee was

entitled as of immediately prior to the Closing Date to credit for such service under any similar employee benefit plans, programs or arrangements of any of Sellers or any Affiliate of Sellers; provided, however, that such crediting of service shall not operate to duplicate any benefit to any such Transferred Employee or the funding for any such benefit. Such benefits shall not be subject to any exclusion for any pre-existing conditions to the extent such conditions were satisfied by such Transferred Employees under a Parent Employee Benefit Plan as of the Closing Date, and credit shall be provided for any deductible or out-of-pocket amounts paid by such Transferred Employee during the plan year in which the Closing Date occurs.

(b)      *Employees of Purchased Subsidiaries*.   As of the Closing Date, those employees of Purchased Subsidiaries who participate in the Assumed Plans, may, subject to the applicable Collective Bargaining Agreement, for all purposes continue to participate in such Assumed Plans, in accordance with their terms in effect from time to time.  For the avoidance of any doubt, Purchaser shall continue the employment of any current Employee of any Purchased Subsidiary covered by the UAW Collective Bargaining Agreement on the terms and conditions of the UAW Collective Bargaining Agreement in effect immediately prior to the Closing Date, subject to its terms; provided, however, that nothing in this Agreement shall be construed to terminate the coverage of any UAW-represented Employee in an Assumed Plan if such Employee was a participant in the Assumed Plan immediately prior to the Closing Date. Further provided, that nothing in this Agreement shall create a direct employment relationship between Parent or Purchaser and an Employee of a Purchased Subsidiary or an Affiliate of Parent.

(c)      *No Third Party Beneficiaries*. Nothing contained herein, express or implied, (i) is intended to confer or shall confer upon any Employee or Transferred Employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment, (ii) except as set forth in **Section 9.11**, is intended to confer or shall confer upon any individual or any legal Representative of any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees and including collective bargaining agents or representatives) any right as a third-party beneficiary of this Agreement or (iii) shall be deemed to confer upon any such individual or legal Representative any rights under or with respect to any plan, program or arrangement described in or contemplated by this Agreement, and each such individual or legal Representative shall be entitled to look only to the express terms of any such plans, program or arrangement for his or her rights thereunder. Nothing herein is intended to override the terms and conditions of the UAW Collective Bargaining Agreement.

(d)      *Plan Authority*.   Nothing contained herein, express or implied, shall prohibit Purchaser or its Affiliates, as applicable, from, subject to applicable Law and the terms of the UAW Collective Bargaining Agreement, adding, deleting or changing providers of benefits, changing, increasing or decreasing co-payments, deductibles or other requirements for coverage or benefits (e.g., utilization review or pre-certification requirements), and/or making other changes in the administration or in the design, coverage and benefits provided to such Transferred Employees.  Without reducing the obligations of Purchaser as set forth in **Section 6.17(a)**, no provision of this Agreement

shall be construed as a limitation on the right of Purchaser or its Affiliates, as applicable, to suspend, amend, modify or terminate any employee benefit plan, subject to the terms of the UAW Collective Bargaining Agreement. Further, (i) no provision of this Agreement shall be construed as an amendment to any employee benefit plan, and (ii) no provision of this Agreement shall be construed as limiting Purchaser's or its Affiliate's, as applicable, discretion and authority to interpret the respective employee benefit and compensation plans, agreements arrangements, and programs, in accordance with their terms and applicable Law.

(e)     *Assumption of Certain Parent Employee Benefit Plans and Policies.* As of the Closing Date, Purchaser or one of its Affiliates shall assume (i) the Parent Employee Benefit Plans and Policies set forth on Section 6.17(e) of the Sellers' Disclosure Schedule as modified thereon, and all assets, trusts, insurance policies and other Contracts relating thereto, except for any that do not comply in all respects with TARP or as otherwise provided in **Section 6.17(h)** and (ii) all employee benefit plans, programs, policies, agreements or arrangements (whether written or oral) in which Employees who are covered by the UAW Collective Bargaining Agreement participate and all assets, trusts, insurance and other Contracts relating thereto (the "Assumed Plans"), for the benefit of the Transferred Employees and Sellers and Purchaser shall cooperate with each other to take all actions and execute and deliver all documents and furnish all notices necessary to establish Purchaser or one of its Affiliates as the sponsor of such Assumed Plans including all assets, trusts, insurance policies and other Contracts relating thereto. Other than with respect to any Employee who was or is covered by the UAW Collective Bargaining Agreement, Purchaser shall have no Liability with respect to any modifications or changes to Benefit Plans contemplated by Section 6.17(e) of the Sellers' Disclosure Schedule, or changes made by Parent prior to the Closing Date, and Purchaser shall not assume any Liability with respect to any such decisions or actions related thereto, and Purchaser shall only assume the Liabilities for benefits provided pursuant to the written terms and conditions of the Assumed Plan as of the Closing Date. Notwithstanding the foregoing, the assumption of the Assumed Plans is subject to Purchaser taking all necessary action, including reduction of benefits, to ensure that the Assumed Plans comply in all respects with TARP. Notwithstanding the foregoing, but subject to the terms of any Collective Bargaining Agreement to which Purchaser or one of its Affiliates is a party, Purchaser and its Affiliates may, in its sole discretion, amend, suspend or terminate any such Assumed Plan at any time in accordance with its terms.

(f)     *UAW Collective Bargaining Agreement.* Parent shall assume and assign to Purchaser, as of the Closing, the UAW Collective Bargaining Agreement and all rights and Liabilities of Parent relating thereto (including Liabilities for wages, benefits and other compensation, unfair labor practices, grievances, arbitrations and contractual obligations). With respect to the UAW Collective Bargaining Agreement, Purchaser agrees to (i) recognize the UAW as the exclusive collective bargaining representative for the Transferred Employees covered by the terms of the UAW Collective Bargaining Agreement, (ii) offer employment to all Applicable Employees covered by the UAW Collective Bargaining Agreement with full recognition of all seniority rights, (iii) negotiate with the UAW over the terms of any successor collective bargaining agreement upon the expiration of the UAW Collective Bargaining Agreement and upon timely

demand by the UAW, (iv) with the agreement of the UAW or otherwise as provided by Law and to the extent necessary, adopt or assume or replace, effective as of the Closing Date, employee benefit plans, policies, programs, agreements and arrangements specified in or covered by the UAW Collective Bargaining Agreement as required to be provided to the Transferred Employees covered by the UAW Collective Bargaining Agreement, and (v) otherwise abide by all terms and conditions of the UAW Collective Bargaining Agreement. For the avoidance of doubt, the provisions of this **Section 6.17(f)** are not intended to (A) give, and shall not be construed as giving, the UAW or any Transferred Employee any enhanced or additional rights or (B) otherwise restrict the rights that Purchaser and its Affiliates have, under the terms of the UAW Collective Bargaining Agreement.

(g)     *UAW Retiree Settlement Agreement.*  Prior to the Closing, Purchaser and the UAW shall have entered into the UAW Retiree Settlement Agreement.

(h)     *Assumption of Existing Internal VEBA*.  Purchaser or one of its Affiliates shall, effective as of the Closing Date, assume from Sellers the sponsorship of the voluntary employees' beneficiary association trust between Sellers and State Street Bank and Trust Company dated as of December 17, 1997, that is funded and maintained by Sellers ("Existing Internal VEBA") and, in connection therewith, Purchaser shall, or shall cause one of its Affiliates to, (i) succeed to all of the rights, title and interest (including the rights of Sellers, if any) as plan sponsor, plan administrator or employer) under the Existing Internal VEBA, (ii) assume any responsibility or Liability relating to the Existing Internal VEBA and each Contract established thereunder or relating thereto, and (iii) to operate the Existing Internal VEBA in accordance with, and to otherwise comply with the Purchaser's obligations under, the New UAW Retiree Settlement Agreement between Purchaser and the UAW, effective as of the Closing and subject to approval by a court having jurisdiction over this matter, including the obligation to direct the trustee of the Existing Internal VEBA to transfer the UAW's share of assets in the Existing Internal VEBA to the New VEBA.  The Parties shall cooperate in the execution of any documents, the adoption of any corporate resolutions or the taking of any other reasonable actions to effectuate such succession of the settlor rights, title, and interest with respect to the Existing Internal VEBA.  For avoidance of doubt, Purchaser shall not assume any Liabilities relating to the Existing Internal VEBA except with respect to such Contracts set forth in Section 6.17(h) of the Sellers' Disclosure Schedule.

(i)     *Wage and Tax Reporting.*  Sellers and Purchaser agree to apply, and cause their Affiliates to apply, the standard procedure for successor employers set forth in Revenue Procedure 2004-53 for wage and employment Tax reporting.

(j)     *Non-solicitation*.  Sellers shall not, for a period of two (2) years from the Closing Date, without Purchaser's written consent, solicit, offer employment to or hire any Transferred Employee.

(k)     *Cooperation*.  Purchaser and Sellers shall provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this **Section 6.17**; provided, that all

records, information systems data bases, computer programs, data rooms and data related to any Assumed Plan or Liabilities of such, assumed by Purchaser, shall be transferred to Purchaser.

(l)      *Union Notifications.*   Purchaser and Sellers shall reasonably cooperate with each other in connection with any notification required by Law to, or any required consultation with, or the provision of documents and information to, the employees, employee representatives, the UAW and relevant Governmental Authorities and governmental officials concerning the transactions contemplated by this Agreement, including any notice to any of Sellers' retired Employees represented by the UAW, describing the transactions contemplated herein.

(m)      *Union-Represented Employees (Non-UAW).*

(i)      Effective as of the Closing Date, Purchaser or one of its Affiliates shall assume the collective bargaining agreements, as amended, set forth on Section 6.17(m)(i) of the Sellers' Disclosure Schedule (collectively, the "Non-UAW Collective Bargaining Agreements") and make offers of employment to each current employee of Parent who is covered by them in accordance with the applicable terms and conditions of such Non-UAW Collective Bargaining Agreements, such assumption and offers conditioned upon (A) the non-UAW represented employees' ratification of the amendments thereto (including termination of the application of the Supplemental Agreements Covering Health Care Program to retirees and the reduction to retiree life insurance coverage) and (B) Bankruptcy Court approval of Settlement Agreements between Purchaser and such Unions and Proposed Memorandum of Understanding Regarding Retiree Health Care and Life Insurance between Sellers and such Unions, as identified on Section 6.17(m)(ii) of the Sellers' Disclosure Schedule and satisfaction of all conditions stated therein.  Each such non-UAW hourly employee on layoff status, leave status or with recall rights as of the Closing Date shall continue in such status and/or retain such rights after the Closing in the Ordinary Course of Business, subject to the terms of the applicable Non-UAW Collective Bargaining Agreement.   Other than as set forth in this **Section 6.17(m)**, no non-UAW collective bargaining agreement shall be assumed by Purchaser.

(ii)      Section 6.17(m)(ii) of the Sellers' Disclosure Schedule sets forth agreements relating to post-retirement health care and life insurance coverage for non-UAW retired employees (the "Non-UAW Settlement Agreements"), including those agreements covering retirees who once belonged to Unions that no longer have any active employees at Sellers.  Conditioned on both the approval of the Bankruptcy Court and the non-UAW represented employees' ratification of the amendments to the applicable Non-UAW Collective Bargaining Agreement providing for such coverage as described in **Section 6.17(m)(i)** above, Purchaser or one of its Affiliates shall assume and enter into the agreements identified on Section 6.17(m)(ii) of the Sellers' Disclosure Schedule.  Except as set forth in those agreements identified on Section 6.17(m)(i) and Section 6.17(m)(ii) of the Sellers' Disclosure Schedule,  Purchaser shall not assume any Liability to provide

post-retirement health care or life insurance coverage for current or future hourly non-UAW retirees.

(iii)     Other than as expressly set forth in this **Section 6.17(m)**, Purchaser assumes no Employment-Related Obligations for non-UAW hourly Employees. For the avoidance of doubt, (A) the provisions of **Section 6.17(f)** shall not apply to this **Section 6.17(m)** and (B) the provisions of this **Section 6.17(m)** are not intended to (y) give, and shall not be construed as giving, any non-UAW Union or the covered employee or retiree of any Non-UAW Collective Bargaining Agreement any enhanced or additional rights or (z) otherwise restrict the rights that Purchaser and its Affiliates have under the terms of the Non-UAW Collective Bargaining Agreements identified on Section 6.17(m)(i) of the Sellers' Disclosure Schedule.

Section 6.18   *TARP.*   From and after the date hereof and until such time as all amounts under the UST Credit Facilities have been paid in full, forgiven or otherwise extinguished or such longer period as may be required by Law, subject to any applicable Order of the Bankruptcy Court, each of Sellers and Purchaser shall, and shall cause each of their respective Subsidiaries to, take all necessary action to ensure that it complies in all material respects with TARP or any enhanced restrictions on executive compensation agreed to by Sellers and Sponsor prior to the Closing.

Section 6.19   *Guarantees; Letters of Credit.*   Purchaser shall use its reasonable best efforts to cause Purchaser or one or more of its Subsidiaries to be substituted in all respects for each Seller and Excluded Entity, effective as of the Closing Date, in respect of all Liabilities of each Seller and Excluded Entity under each of the guarantees, letters of credit, letters of comfort, bid bonds and performance bonds (a) obtained by any Seller or Excluded Entity for the benefit of the business of Sellers and their Subsidiaries and (b) which is assumed by Purchaser as an Assumed Liability.  As a result of such substitution, each Seller and Excluded Entity shall be released of its obligations of, and shall have no Liability following the Closing from, or in connection with any such guarantees, letters of credit, letters of comfort, bid bonds and performance bonds.

Section 6.20   *Customs Duties.*   Purchaser shall reimburse Sellers for all customs-related duties, fees and associated costs incurred by Sellers on behalf of Purchaser with respect to periods following the Closing, including all such duties, fees and costs incurred in connection with co-loaded containers that clear customs intentionally or unintentionally under any Seller's importer or exporter identification numbers and bonds or guarantees with respect to periods following the Closing.

Section 6.21   *Termination of Intellectual Property Rights.*   Each Seller agrees that any rights of any Seller, including any rights arising under Contracts, if any, to any and all of the Intellectual Property transferred to Purchaser pursuant to this Agreement (including indirect transfers resulting from the transfer of the Transferred Equity Interests and including transfers resulting from this **Section 6.21**), whether owned or licensed, shall terminate as of the Closing. Before and after the Closing, each Seller agrees to use its reasonable best efforts to cause the Retained Subsidiaries to do the following, but only to the extent that such Seller can do so

without incurring any Liabilities to such Retained Subsidiaries or their equity owners or creditors as a result thereof: (a) enter into a written Contract with Purchaser that expressly terminates any rights of such Retained Subsidiaries, including any rights arising under Contracts, if any, to any and all of the Intellectual Property transferred to Purchaser pursuant to this Agreement (including indirect transfers resulting from the transfer of the Transferred Equity Interests), whether owned or licensed; and (b) assign to Purchaser or its designee(s): (i) all domestic and foreign trademarks, service marks, collective marks, certification marks, trade dress, trade names, business names, d/b/a's, Internet domain names, designs, logos and other source or business identifiers and all general intangibles of like nature, now or hereafter owned, adopted, used, acquired, or licensed by any Seller, all applications, registrations and recordings thereof (including applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof), and all reissues, extensions or renewals thereof, together with all goodwill of the business symbolized by or associated with such marks, in each case, that are owned by such Retained Subsidiaries and that contain or are confusingly similar with (whether in whole or in part) any of the Trademarks; and (ii) all other intellectual property owned by such Retained Subsidiaries.  Nothing in this **Section 6.21** shall preserve any rights of Sellers or the Retained Subsidiaries, or any third parties, that are otherwise terminated or extinguished pursuant to this Agreement or applicable Law, and nothing in this **Section 6.21** shall create any rights of Sellers or the Retained Subsidiaries, or any third parties, that do not already exist as of the date hereof.  Notwithstanding anything to the contrary in this **Section 6.21**, Sellers may enter into (and may cause or permit any of the Purchased Subsidiaries to enter into) any of the transactions contemplated by Section 6.2 of the Sellers' Disclosure Schedule.

Section 6.22    Trademarks.

(a)    At or before the Closing (i) Parent shall take any and all actions that are reasonably necessary to change the corporate name of Parent to a new name that bears no resemblance to Parent's present corporate name and that does not contain, and is not confusingly similar with, any of the Trademarks; and (ii) to the extent that the corporate name of any Seller (other than Parent) or any Retained Subsidiary resembles Parent's present corporate name or contains or is confusingly similar with any of the Trademarks, Sellers (including Parent) shall take any and all actions that are reasonably necessary to change such corporate names to new names that bear no resemblance to Parent's present corporate name, and that do not contain and are not confusingly similar with any of the Trademarks.

(b)    As promptly as practicable following the Closing, but in no event later than ninety (90) days after the Closing (except as set forth in this **Section 6.22(b)**), Sellers shall cease, and shall cause the Retained Subsidiaries to cease, using the Trademarks in any form, whether by removing, permanently obliterating, covering, or otherwise eliminating all Trademarks that appear on any of their assets, including all signs, promotional or advertising literature, labels, stationery, business cards, office forms and packaging materials.  During such time period, Sellers and the Retained Subsidiaries may continue to use Trademarks in a manner consistent with their usage of the Trademarks as of immediately prior to the Closing, but only to the extent reasonably necessary for them to continue their operations as contemplated by the Parties as of the

Closing.  If requested by Purchaser within a reasonable time after the Closing, Sellers and Retained Subsidiaries shall enter into a written agreement that specifies quality control of such Trademarks and their underlying goods and services.  For signs and the like that exist as of the Closing on the Excluded Real Property, if it is not reasonably practicable for Sellers or the Retained Subsidiaries to remove, permanently obliterate, cover or otherwise eliminate the Trademarks from such signs and the like within the time period specified above, then Sellers and the Retained Subsidiaries shall do so as soon as practicable following such time period, but in no event later than one-hundred eighty (180) days following the Closing.

(c)     From and after the date of this Agreement and, until the earlier of the Closing or termination of this Agreement, each Seller shall use its reasonable best efforts to protect and maintain the Intellectual Property owned by Sellers that is material to the conduct of its business in a manner that is consistent with the value of such Intellectual Property.

(d)     At or prior to the Closing, Sellers shall provide a true, correct and complete list setting forth all worldwide patents, patent applications, trademark registrations and applications and copyright registrations and applications included in the Intellectual Property owned by Sellers.

Section 6.23   Preservation of Records.  The Parties shall preserve and keep all books and records that they own immediately after the Closing relating to the Purchased Assets, the Assumed Liabilities and Sellers' operation of the business related thereto prior to the Closing for a period of six (6) years following the Closing Date or for such longer period as may be required by applicable Law, unless disposed of in good faith pursuant to a document retention policy.  During such retention period, duly authorized Representatives of a Party shall, upon reasonable notice, have reasonable access during normal business hours to examine, inspect and copy such books and records held by the other Parties for any proper purpose, except as may be prohibited by Law or by the terms of any Contract (including any confidentiality agreement); provided that to the extent that disclosing any such information would reasonably be expected to constitute a waiver of attorney-client, work product or other legal privilege with respect thereto, the Parties shall take all reasonable best efforts to permit such disclosure without the waiver of any such privilege, including entering into an appropriate joint defense agreement in connection with affording access to such information.  The access provided pursuant to this **Section 6.23** shall be subject to such additional confidentiality provisions as the disclosing Party may reasonably deem necessary.

Section 6.24   Confidentiality.  During the Confidentiality Period, Sellers and their Affiliates shall treat all trade secrets and all other proprietary, legally privileged or sensitive information related to the Transferred Entities, the Purchased Assets and/or the Assumed Liabilities (collectively, the "Confidential Information"), whether furnished before or after the Closing, whether documentary, electronic or oral, labeled or otherwise identified as confidential, and regardless of the form of communication or the manner in which it is or was furnished, as confidential, preserve the confidentiality thereof, not use or disclose to any Person such Confidential Information and instruct their Representatives who have had access to such information to keep confidential such Confidential Information.  The "Confidentiality Period"

shall be a period commencing on the date of the Original Agreement and (a) with respect to a trade secret, continuing for as long as it remains a trade secret and (b) for all other Confidential Information, ending four (4) years from the Closing Date. Confidential Information shall be deemed not to include any information that (i) is now available to or is hereafter disclosed in a manner making it available to the general public, in each case, through no act or omission of Sellers, any of their Affiliates or any of their Representatives, or (ii) is required by Law to be disclosed, including any applicable requirements of the SEC or any other Governmental Authority responsible for securities Law regulation and compliance or any stock market or stock exchange on which any Seller's securities are listed.

Section 6.25   *Privacy Policies.*   At or prior to the Closing, Purchaser shall, or shall cause its Subsidiaries to, establish Privacy Policies that are substantially similar to the Privacy Policies of Parent and the Purchased Subsidiaries as of immediately prior to the Closing, and Purchaser or its Affiliates, as applicable, shall honor all "opt-out" requests or preferences made by individuals in accordance with the Privacy Policies of Parent and the Purchased Subsidiaries and applicable Law; <u>provided</u> that such Privacy Policies and any related "opt-out" requests or preferences are delivered or otherwise made available to Purchaser prior to the Closing, to the extent not publicly available.

Section 6.26   *Supplements to Sellers' Disclosure Schedule.*   At any time and from time to time prior to the Closing, Sellers shall have the right to supplement, modify or update Section 4.1 through Section 4.22 of the Sellers' Disclosure Schedule (a) to reflect changes and developments that have arisen after the date of the Original Agreement and that, if they existed prior to the date of the Original Agreement, would have been required to be set forth on such Sellers' Disclosure Schedule or (b) as may be necessary to correct any disclosures contained in such Sellers' Disclosure Schedule or in any representation and warranty of Sellers that has been rendered inaccurate by such changes or developments. No supplement, modification or amendment to Section 4.1 through Section 4.22 of the Sellers' Disclosure Schedule shall without the prior written consent of Purchaser, (i) cure any inaccuracy of any representation and warranty made in this Agreement by Sellers or (ii) give rise to Purchaser's right to terminate this Agreement unless and until this Agreement shall be terminable by Purchaser in accordance with **Section 8.1(f)**.

Section 6.27   *Real Property Matters.*

(a)      Sellers and Purchaser acknowledge that certain real properties (the "Subdivision Properties") may need to be subdivided or otherwise legally partitioned in accordance with applicable Law (a "Required Subdivision") so as to permit the affected Owned Real Property to be conveyed to Purchaser separate and apart from adjacent Excluded Real Property. Section 6.27 of the Sellers' Disclosure Schedule contains a list of the Subdivision Properties that was determined based on the current list of Excluded Real Property. Section 6.27 of the Sellers' Disclosure Schedule may be updated at any time prior to the Closing to either (i) add additional Subdivision Properties or (ii) remove any Subdivision Properties, which have been determined to not require a Required Subdivision or for which a Required Subdivision has been obtained. Purchaser shall pay for all costs incurred to complete all Required Subdivisions. Sellers shall cooperate in good faith with Purchaser in connection with the completion with all Required

Subdivisions, including executing all required applications or other similar documents with Governmental Authorities.  To the extent that any Required Subdivision for a Subdivision Property is not completed prior to Closing, then at Closing, Sellers shall lease to Purchaser only that portion of such Subdivision Property that constitutes Owned Real Property pursuant to the Master Lease Agreement (Subdivision Properties) substantially in the form attached hereto as **Exhibit L** (the "Subdivision Master Lease"). Upon completion of a Required Subdivision affecting an Owned Real Property that is subject to the Subdivision Master Lease, the Subdivision Master Lease shall be terminated as to such Owned Real Property and such Owned Real Property shall be conveyed to Purchaser by Quitclaim Deed for One Dollar ($1.00) in stated consideration.

(b)    Sellers and Purchaser acknowledge that the Saginaw Nodular Iron facility in Saginaw, Michigan (the "Saginaw Nodular Iron Land") contains a wastewater treatment facility (the "Existing Saginaw Wastewater Facility") and a landfill (the "Saginaw Landfill") that currently serve the Owned Real Property commonly known as the GMPT - Saginaw Metal Casting facility (the "Saginaw Metal Casting Land").  The Saginaw Nodular Iron Land has been designated as an Excluded Real Property under Section 2.2(b)(v) of the Sellers' Disclosure Schedule.  At the Closing (or within sixty (60) days after the Closing with respect to the Saginaw Landfill), Sellers shall enter into one or more service agreements with one or more third party contractors (collectively, the "Saginaw Service Contracts") to operate the Existing Saginaw Wastewater Facility and the Saginaw Landfill for the benefit of the Saginaw Metal Casting Land.  The terms and conditions of the Saginaw Service Contracts shall be mutually acceptable to Purchaser and Sellers; provided that the term of each Saginaw Service Contract shall not extend beyond December 31, 2012, and Purchaser shall have the right to terminate any Saginaw Service Contract upon prior written notice of not less than forty-five (45) days.  At any time during the term of the Saginaw Service Contracts, Purchaser may elect to purchase the Existing Saginaw Wastewater Facility, the Saginaw Landfill, or both, for One Dollar ($1.00) in stated consideration; provided that (i) Purchaser shall pay all costs and fees related to such purchase, including the costs of completing any Required Subdivision necessary to effectuate the terms of this **Section 6.27(b)**, (ii) Sellers shall convey title to the Existing Saginaw Wastewater Facility, the Saginaw Landfill and/or such other portion of the Saginaw Nodular Iron Land as is required by Purchaser to operate the Existing Saginaw Wastewater Facility and/or the Saginaw Landfill, including lagoons, but not any other portion of the Saginaw Nodular Iron Land, to Purchaser by quitclaim deed and (iii) Sellers shall grant Purchaser such easements for utilities over the portion of the Saginaw Nodular Iron Land retained by Sellers as may be required to operate the Existing Saginaw Wastewater Facility and/or the Saginaw Landfill.

(c)    Sellers and Purchaser acknowledge that access to certain Excluded Real Property owned by Sellers or other real properties owned by Excluded Entities and certain Owned Real Property that may hereafter be designated as Excluded Real Property on Section 2.2(b)(v) of the Sellers' Disclosure Schedule (a "Landlocked Parcel") is provided over land that is part of the Owned Real Property.   To the extent that direct access to a public right-of-way is not obtained for any Landlocked Parcel by the Closing, then at Closing,  Purchaser, in its sole election, shall for each such Landlocked Parcel either (i) grant an access easement over a mutually agreeable portion of the adjacent

Owned Real Property for the benefit of the Landlocked Parcel until such time as the Landlocked Parcel obtains direct access to the public right-of-way, pursuant to the terms of a mutually acceptable easement agreement, or (ii) convey to the owner of the affected Landlocked Parcel by quitclaim deed such portion of the adjacent Owned Real Property as is required to provide the Landlocked Parcel with direct access to a public right-of-way.

(d)    At and after Closing, Sellers and Purchasers shall cooperate in good faith to investigate and resolve all issues reasonably related to or arising in connection with Shared Executory Contracts that involve the provision of water, water treatment, electricity, fuel, gas, telephone and other utilities to both Owned Real Property and Excluded Real Property.

(e)    Parent shall use reasonable best efforts to cause the Willow Run Landlord to execute, within thirty (30) days after the Closing, or at such later date as may be mutually agreed upon, an amendment to the Willow Run Lease which extends the term of the Willow Run Lease until December 31, 2010 with three (3) one-month options to extend, all at the current rental rate under the Willow Run Lease (the "Willow Run Lease Amendment").  In the event that the Willow Run Lease Amendment is approved and executed by the Willow Run Landlord, then Purchaser shall designate the Willow Run Lease as an Assumable Executory Contract and Parent and Purchaser, or one of its designated Subsidiaries, shall enter into an assignment and assumption of the Willow Run Lease substantially in the form attached hereto as **Exhibit M** (the "Assignment and Assumption of Willow Run Lease").

*Section 6.28    Equity Incentive Plans.*    Within a reasonable period of time following the Closing, Purchaser, through its board of directors, will adopt equity incentive plans to be maintained by Purchaser for the benefit of officers, directors, and employees of Purchaser that will provide the opportunity for equity incentive benefits for such persons ("Equity Incentive Plans").

*Section 6.29    Purchase of Personal Property Subject to Executory Contracts.* With respect to any Personal Property subject to an Executory Contract that is nominally an unexpired lease of Personal Property, if (a) such Contract is recharacterized by a Final Order of the Bankruptcy Court as a secured financing or (b) Purchaser, Sellers and the counterparty to such Contract agree, then Purchaser shall have the option to purchase such personal property by paying to the applicable Seller for the benefit of the counterparty to such Contract an amount equal to the amount, as applicable (i) of such counterparty's allowed secured Claim arising in connection with the recharacterization of such Contract as determined by such Order or (ii) agreed to by Purchaser, Sellers and such counterparty.

*Section 6.30    Transfer of Riverfront Holdings, Inc. Equity Interests or Purchased Assets; Ren Cen Lease.*  Notwithstanding anything to the contrary set forth in this Agreement, in lieu of or in addition to the transfer of Sellers' Equity Interest in Riverfront Holdings, Inc., a Delaware corporation ("RHI"), Purchaser shall have the right at the Closing or at any time during the RHI Post-Closing Period, to require Sellers to cause RHI to transfer good and marketable title to, or a valid and enforceable right by Contract to use, all or any portion of the assets of RHI

to Purchaser.  Purchaser shall, at its option, have the right to cause Sellers to postpone the transfer of Sellers' Equity Interest in RHI and/or title to the assets of RHI to Purchaser up until the earlier of (i) January 31, 2010 and (ii) the Business Day immediately prior to the date of the confirmation hearing for Sellers' plan of liquidation or reorganization (the "RHI Post-Closing Period"); provided, however, that (a) Purchaser may cause Sellers to effectuate said transfers at any time and from time to time during the RHI-Post Closing Period upon at least five (5) Business Days' prior written notice to Sellers and (b) at the closing, RHI, as landlord, and Purchaser, or one of its designated Subsidiaries, as tenant, shall enter into a lease agreement substantially in the form attached hereto as **Exhibit N** (the "Ren Cen Lease") for the premises described therein.

> Section 6.31    *Delphi Agreements.*  Notwithstanding anything to the contrary in this Agreement, including **Section 6.6**:

> (a)    Subject to and simultaneously with the consummation of the transactions contemplated by the MDA or of an Acceptable Alternative Transaction (in each case, as defined in the Delphi Motion), (i) the Delphi Transaction Agreements shall, effective immediately upon and simultaneously with such consummation, (A) be deemed to be Assumable Executory Contracts and (B) be assumed and assigned to Purchaser and (ii) the Assumption Effective Date with respect thereto shall be deemed to be the date of such consummation.

> (b)    The LSA Agreement shall, effective at the Closing, (i) be deemed to be an Assumable Executory Contract and (B) be assumed and assigned to Purchaser and (ii) the Assumption Effective Date with respect thereto shall be deemed to be the Closing Date. To the extent that any such agreement is not an Executory Contract, such agreement shall be deemed to be a Purchased Contract.

> Section 6.32    *GM Strasbourg S.A. Restructuring.*  The Parties acknowledge and agree that General Motors International Holdings, Inc., a direct Subsidiary of Parent and the direct parent of GM Strasbourg S.A., may, prior to the Closing, dividend its Equity Interest in GM Strasbourg S.A. to Parent, such that following such dividend, GM Strasbourg S.A. will become a wholly-owned direct Subsidiary of Parent.  Notwithstanding anything to the contrary in this Agreement, the Parties further acknowledge and agree that following the consummation of such restructuring at any time prior to the Closing, GM Strasbourg S.A. shall automatically, without further action by the Parties, be designated as an Excluded Entity and deemed to be set forth on Section 2.2(b)(iv) of the Sellers' Disclosure Schedule.

> Section 6.33    *Holding Company Reorganization.*  The Parties agree that Purchaser may, with the prior written consent of Sellers, reorganize prior to the Closing such that Purchaser may become a direct or indirect, wholly-owned Subsidiary of Holding Company on such terms and in such manner as is reasonably acceptable to Sellers, and Purchaser may assign all or a portion of its rights and obligations under this Agreement to Holding Company (or one or more newly formed, direct or indirect, wholly-owned Subsidiaries of Holding Company) in accordance with **Section 9.5**.  In connection with any restructuring effected pursuant to this **Section 6.33**, the Parties further agree that, notwithstanding anything to the contrary in this Agreement (a) Parent shall receive securities of Holding Company with the same rights and

privileges, and in the same proportions, as the Parent Shares and the Parent Warrants, in each case, in lieu of the Parent Shares and Parent Warrants, as Purchase Price hereunder, (b) Canada, New VEBA and Sponsor shall receive securities of Holding Company with the same rights and privileges, and in the same proportions, as the Canada Shares, VEBA Shares, VEBA Warrant and Sponsor Shares, as applicable, in each case, in connection with the Closing and (c) New VEBA shall receive the VEBA Note issued by the same entity that becomes the obligor on the Purchaser Assumed Debt.

Section 6.34    *Transfer of Promark Global Advisors Limited and Promark Investment Trustees Limited Equity Interests.*  Notwithstanding anything to the contrary set forth in this Agreement, in the event approval by the Financial Services Authority (the "FSA Approval") of the transfer of Sellers' Equity Interests in Promark Global Advisors Limited and Promark Investments Trustees Limited (together, the "Promark UK Subsidiaries") has not been obtained as of the Closing Date, Sellers shall, at their option, have the right to postpone the transfer of Sellers' Equity Interests in the Promark UK Subsidiaries until such time as the FSA Approval is obtained.  If the transfer of Sellers' Equity Interests in the Promark UK Subsidiaries is postponed pursuant to this **Section 6.34**, then (a) Sellers and Purchaser shall effectuate the transfer of Sellers' Equity Interests in the Promark UK Subsidiaries no later than five (5) Business Days following the date that the FSA Approval is obtained and (b) Sellers shall enter into a transitional services agreement with Promark Global Advisors, Inc. in the form provided by Promark Global Advisors, Inc., which shall include terms and provisions regarding:  (i) certain transitional services to be provided by Promark Global Advisors, Inc. to the Promark UK Subsidiaries, (ii) the continued availability of director and officer liability insurance for directors and officers of the Promark UK Subsidiaries and (iii) certain actions on the part of the Promark UK Subsidiaries to require the prior written consent of Promark Global Advisors, Inc., including changes to employee benefits or compensation, declaration of dividends, material financial transactions, disposition of material assets, entry into material agreements, changes to existing business plans, changes in management and the boards of directors of the Promark UK Subsidiaries and other similar actions.

Section 6.35    *Transfer of Equity Interests in Certain Subsidiaries.*  Notwithstanding anything to the contrary set forth in this Agreement, the Parties may mutually agree to postpone the transfer of Sellers' Equity Interests in those Transferred Entities as are mutually agreed upon by the Parties ("Delayed Closing Entities") to a date following the Closing.

# ARTICLE VII
# CONDITIONS TO CLOSING

Section 7.1    *Conditions to Obligations of Purchaser and Sellers.*    The respective obligations of Purchaser and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment or written waiver (to the extent permitted by applicable Law), prior to or at the Closing, of each of the following conditions:

(a)    The Bankruptcy Court shall have entered the Sale Approval Order and the Sale Procedures Order on terms acceptable to the Parties and reasonably acceptable to the UAW, and each shall be a Final Order and shall not have been vacated, stayed or

reversed; provided, however, that the conditions contained in this **Section 7.1(a)** shall be satisfied notwithstanding the pendency of an appeal if the effectiveness of the Sale Approval Order has not been stayed.

(b)    No Order or Law of a United States Governmental Authority shall be in effect that declares this Agreement invalid or unenforceable or that restrains, enjoins or otherwise prohibits the consummation of the transactions contemplated by this Agreement.

(c)    Sponsor shall have delivered, or caused to be delivered to Sellers and Purchaser an equity registration rights agreement, substantially in the form attached hereto as **Exhibit O** (the "Equity Registration Rights Agreement"), duly executed by Sponsor.

(d)    Canada shall have delivered, or caused to be delivered to Sellers and Purchaser the Equity Registration Rights Agreement, duly executed by Canada.

(e)    The Canadian Debt Contribution shall have been consummated.

(f)    The New VEBA shall have delivered, or caused to be delivered to Sellers and Purchaser, the Equity Registration Rights Agreement, duly executed by the New VEBA.

(g)    Purchaser shall have received (i) consents from Governmental Authorities, (ii) Permits and (iii) consents from non-Governmental Authorities, in each case with respect to the transactions contemplated by this Agreement and the ownership and operation of the Purchased Assets and Assumed Liabilities by Purchaser from and after the Closing, sufficient in the aggregate to permit Purchaser to own and operate the Purchased Assets and Assumed Liabilities from and after the Closing in substantially the same manner as owned and operated by Sellers immediately prior to the Closing (after giving effect to (A) the implementation of the Viability Plans; (B) Parent's announced shutdown, which began in May 2009; and (C) the Bankruptcy Cases (or any other bankruptcy, insolvency or similar proceeding filed by or in respect of any Subsidiary of Parent).

(h)    Sellers shall have executed and delivered definitive financing agreements restructuring the Wind Down Facility in accordance with the provisions of **Section 6.9(b)**.

Section 7.2    Conditions to Obligations of Purchaser.    The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment or written waiver, prior to or at the Closing, of each of the following conditions; provided, however, that in no event may Purchaser waive the conditions contained in **Section 7.2(d)** or **Section 7.2(e)**:

(a)    Each of the representations and warranties of Sellers contained in **ARTICLE IV** of this Agreement shall be true and correct (disregarding for the purposes of such determination any qualification as to materiality or Material Adverse Effect) as of

the Closing Date as if made on the Closing Date (except for representations and warranties that speak as of a specific date or time, which representations and warranties shall be true and correct only as of such date or time), except to the extent that any breaches of such representations and warranties, individually or in the aggregate, have not had, or would not reasonably be expected to have, a Material Adverse Effect.

(b)    Sellers shall have performed or complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by Sellers prior to or at the Closing.

(c)    Sellers shall have delivered, or caused to be delivered, to Purchaser:

(i)    a certificate executed as of the Closing Date by a duly authorized representative of Sellers, on behalf of Sellers and not in such authorized representative's individual capacity, certifying that the conditions set forth in **Section 7.2(a)** and **Section 7.2(b)** have been satisfied;

(ii)    the Equity Registration Rights Agreement, duly executed by Parent;

(iii)    stock certificates or membership interest certificates, if any, evidencing the Transferred Equity Interests (other than in respect of the Equity Interests held by Sellers in RHI, Promark Global Advisors Limited, Promark Investments Trustees Limited and the Delayed Closing Entities, which the Parties agree may be transferred following the Closing in accordance with **Section 6.30**, **Section 6.34** and **Section 6.35**), duly endorsed in blank or accompanied by stock powers (or similar documentation) duly endorsed in blank, in proper form for transfer to Purchaser, including any required stamps affixed thereto;

(iv)    an omnibus bill of sale, substantially in the form attached hereto as **Exhibit P** (the "Bill of Sale"), together with transfer tax declarations and all other instruments of conveyance that are necessary to effect transfer to Purchaser of title to the Purchased Assets, each in a form reasonably satisfactory to the Parties and duly executed by the appropriate Seller;

(v)    an omnibus assignment and assumption agreement, substantially in the form attached hereto as **Exhibit Q** (the "Assignment and Assumption Agreement"), together with all other instruments of assignment and assumption that are necessary to transfer the Purchased Contracts and Assumed Liabilities to Purchaser, each in a form reasonably satisfactory to the Parties and duly executed by the appropriate Seller;

(vi)    a novation agreement, substantially in the form attached hereto as **Exhibit R** (the "Novation Agreement"), duly executed by Sellers and the appropriate United States Governmental Authorities;

(vii)    a government related subcontract agreement, substantially in the form attached hereto as **Exhibit S** (the "Government Related Subcontract Agreement"), duly executed by Sellers;

(viii)    an omnibus intellectual property assignment agreement, substantially in the form attached hereto as **Exhibit T** (the "Intellectual Property Assignment Agreement"), duly executed by Sellers;

(ix)    a transition services agreement, substantially in the form attached hereto as **Exhibit U** (the "Transition Services Agreement"), duly executed by Sellers;

(x)    all quitclaim deeds or deeds without warranty (or equivalents for those parcels of Owned Real Property located in jurisdictions outside of the United States), in customary form, subject only to Permitted Encumbrances, conveying the Owned Real Property to Purchaser (the "Quitclaim Deeds"), duly executed by the appropriate Seller;

(xi)    all required Transfer Tax or sales disclosure forms relating to the Transferred Real Property (the "Transfer Tax Forms"), duly executed by the appropriate Seller;

(xii)    an assignment and assumption of the leases and subleases underlying the Leased Real Property, in substantially the form attached hereto as **Exhibit V** (the "Assignment and Assumption of Real Property Leases"), together with such other instruments of assignment and assumption that are necessary to transfer the leases and subleases underlying the Leased Real Property located in jurisdictions outside of the United States, each duly executed by Sellers; provided, however, that if it is required for the assumption and assignment of any lease or sublease underlying a Leased Real Property that a separate assignment and assumption for such lease or sublease be executed, then a separate assignment and assumption of such lease or sublease shall be executed in a form substantially similar to **Exhibit V** or as otherwise required to assume or assign such Leased Real Property;

(xiii)    an assignment and assumption of the lease in respect of the premises located at 2485 Second Avenue, New York, New York, substantially in the form attached hereto as **Exhibit W** (the "Assignment and Assumption of Harlem Lease"), duly executed by Harlem;

(xiv)    an omnibus lease agreement in respect of the lease of certain portions of the Excluded Real Property that is owned real property, substantially in the form attached hereto as **Exhibit X** (the "Master Lease Agreement"), duly executed by Parent;

(xv)    *[Reserved]*;

(xvi)    the Saginaw Service Contracts, if required, duly executed by the appropriate Seller;

(xvii)    any easement agreements required under **Section 6.27(c)**, duly executed by the appropriate Seller;

(xviii)    the Subdivision Master Lease, if required, duly executed by the appropriate Sellers;

(xix)    a certificate of an officer of each Seller (A) certifying that attached to such certificate are true and complete copies of (1) such Seller's Organizational Documents, each as amended through and in effect on the Closing Date and (2) resolutions of the board of directors of such Seller, authorizing the execution, delivery and performance of this Agreement and the Ancillary Agreements to which such Seller is a party, the consummation of the transactions contemplated by this Agreement and such Ancillary Agreements and the matters set forth in **Section 6.16(e)**, and (B) certifying as to the incumbency of the officer(s) of such Seller executing this Agreement and the Ancillary Agreements to which such Seller is a party;

(xx)    a certificate in compliance with Treas. Reg. §1.1445-2(b)(2) that each Seller is not a foreign person as defined under Section 897 of the Tax Code;

(xxi)    a certificate of good standing for each Seller from the Secretary of State of the State of Delaware;

(xxii)    their written agreement to treat the Relevant Transactions and the other transactions contemplated by this Agreement in accordance with Purchaser's determination in **Section 6.16**;

(xxiii)    payoff letters and related Encumbrance-release documentation (including, if applicable, UCC-3 termination statements), each in a form reasonably satisfactory to the Parties and duly executed by the holders of the secured Indebtedness; and

(xxiv)    all books and records of Sellers described in **Section 2.2(a)(xiv)**.

(d)    The UAW Collective Bargaining Agreement shall have been ratified by the membership, shall have been assumed by the applicable Sellers and assigned to Purchaser, and shall be in full force and effect.

(e)    The UAW Retiree Settlement Agreement shall have been executed and delivered by the UAW and shall have been approved by the Bankruptcy Court as part of the Sale Approval Order.

(f)    The Canadian Operations Continuation Agreement shall have been executed and delivered by the parties thereto in the form previously distributed among them.

-90-

Section 7.3    *Conditions to Obligations of Sellers.*  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment or written waiver, prior to or at the Closing, of each of the following conditions; provided, however, that in no event may Sellers waive the conditions contained in **Section 7.3(h)** or **Section 7.3(i)**:

(a)    Each of the representations and warranties of Purchaser contained in **ARTICLE V** of this Agreement shall be true and correct (disregarding for the purpose of such determination any qualification as to materiality or Purchaser Material Adverse Effect) as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which representations and warranties shall be true and correct only as of such date or time), except to the extent that any breaches of such representations and warranties, individually or in the aggregate, have not had, or would not reasonably be expected to have, a Purchaser Material Adverse Effect.

(b)    Purchaser shall have performed or complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it prior to or at the Closing.

(c)    Purchaser shall have delivered, or caused to be delivered, to Sellers:

(i)    Parent Warrant A (including the related warrant agreement), duly executed by Purchaser;

(ii)    Parent Warrant B (including the related warrant agreement), duly executed by Purchaser;

(iii)    a certificate executed as of the Closing Date by a duly authorized representative of Purchaser, on behalf of Purchaser and not in such authorized representative's individual capacity, certifying that the conditions set forth in **Section 7.3(a)** and **Section 7.3(b)** are satisfied;

(iv)    stock certificates evidencing the Parent Shares, duly endorsed in blank or accompanied by stock powers duly endorsed in blank, in proper form for transfer, including any required stamps affixed thereto;

(v)    the Equity Registration Rights Agreement, duly executed by Purchaser;

(vi)    the Bill of Sale, together with all other documents described in **Section 7.2(c)(iv)**, each duly executed by Purchaser or its designated Subsidiaries;

(vii)    the Assignment and Assumption Agreement, together with all other documents described in **Section 7.2(c)(v)**, each duly executed by Purchaser or its designated Subsidiaries;

(viii)    the Novation Agreement, duly executed by Purchaser or its designated Subsidiaries;

(ix)    the Government Related Subcontract Agreement, duly executed by Purchaser or its designated Subsidiary;

(x)    the Intellectual Property Assignment Agreement, duly executed by Purchaser or its designated Subsidiaries;

(xi)    the Transition Services Agreement, duly executed by Purchaser or its designated Subsidiaries;

(xii)    the Transfer Tax Forms, duly executed by Purchaser or its designated Subsidiaries, to the extent required;

(xiii)    the Assignment and Assumption of Real Property Leases, together with all other documents described in **Section 7.2(c)(xii)**, each duly executed by Purchaser or its designated Subsidiaries;

(xiv)    the Assignment and Assumption of Harlem Lease, duly executed by Purchaser or its designated Subsidiaries;

(xv)    the Master Lease Agreement, duly executed by Purchaser or its designated Subsidiaries;

(xvi)    *[Reserved]*;

(xvii)    the Subdivision Master Lease, if required, duly executed by Purchaser or its designated Subsidiaries;

(xviii)    any easement agreements required under **Section 6.27(c)**, duly executed by Purchaser or its designated Subsidiaries;

(xix)    a certificate of a duly authorized representative of Purchaser (A) certifying that attached to such certificate are true and complete copies of (1) Purchaser's Organizational Documents, each as amended through and in effect on the Closing Date and (2) resolutions of the board of directors of Purchaser, authorizing the execution, delivery and performance of this Agreement and the Ancillary Agreements to which Purchaser is a party, the consummation of the transactions contemplated by this Agreement and such Ancillary Agreements and the matters set forth in **Section 6.16(g)**, and (B) certifying as to the incumbency of the officer(s) of Purchaser executing this Agreement and the Ancillary Agreements to which Purchaser is a party; and

(xx)    a certificate of good standing for Purchaser from the Secretary of State of the State of Delaware.

(d)    *[Reserved]*

(e)     Purchaser shall have filed a certificate of designation for the Preferred Stock, substantially in the form attached hereto as **Exhibit Y**, with the Secretary of State of the State of Delaware.

(f)     Purchaser shall have offset the UST Credit Bid Amount against the amount of Indebtedness of Parent and its Subsidiaries owed to Purchaser as of the Closing under the UST Credit Facilities pursuant to a Bankruptcy Code Section 363(k) credit bid and delivered releases and waivers and related Encumbrance-release documentation (including, if applicable, UCC-3 termination statements) with respect to the UST Credit Bid Amount, in a form reasonably satisfactory to the Parties and duly executed by Purchaser in accordance with the applicable requirements in effect on the date hereof, (iii) transferred to Sellers the UST Warrant and (iv) issued to Parent, in accordance with instructions provided by Parent, the Purchaser Shares and the Parent Warrants (duly executed by Purchaser).

(g)     Purchaser shall have delivered, or caused to be delivered, to Canada, Sponsor and/or the New VEBA, as applicable:

(i)     certificates representing the Canada Shares, the Sponsor Shares and the VEBA Shares in accordance with the applicable equity subscription agreements in effect on the date hereof;

(ii)     the Equity Registration Rights Agreement, duly executed by Purchaser;

(iii)     the VEBA Warrant (including the related warrant agreement), duly executed by Purchaser; and

(iv)     a note, in form and substance consistent with the terms set forth on **Exhibit Z** attached hereto, to the New VEBA (the "VEBA Note").

(h)     The UAW Collective Bargaining Agreement shall have been ratified by the membership, shall have been assumed by Purchaser, and shall be in full force and effect.

(i)     The UAW Retiree Settlement Agreement shall have been executed and delivered, shall be in full force and effect, and shall have been approved by the Bankruptcy Court as part of the Sale Approval Order.

## ARTICLE VIII
## TERMINATION

*Section 8.1    Termination.*    This Agreement may be terminated, and the transactions contemplated hereby may be abandoned, at any time prior to the Closing Date as follows:

(a)     by the mutual written consent of Sellers and Purchaser;

(b)    by either Sellers or Purchaser, if (i) the Closing shall not have occurred on or before August 15, 2009, or such later date as the Parties may agree in writing, such date not to be later than September 15, 2009 (as extended, the "<u>End Date</u>"), and (ii) the Party seeking to terminate this Agreement pursuant to this **Section 8.1(b)** shall not have breached in any material respect its obligations under this Agreement in any manner that shall have proximately caused the failure of the transactions contemplated hereby to close on or before such date;

(c)    by either Sellers or Purchaser, if the Bankruptcy Court shall not have entered the Sale Approval Order by July 10, 2009;

(d)    by either Sellers or Purchaser, if any court of competent jurisdiction in the United States or other United States Governmental Authority shall have issued a Final Order permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement or the sale of a material portion of the Purchased Assets;

(e)    by Sellers, if Purchaser shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform has not been cured by the End Date, <u>provided</u> that (i) Sellers shall have given Purchaser written notice, delivered at least thirty (30) days prior to such termination, stating Sellers' intention to terminate this Agreement pursuant to this **Section 8.1(e)** and the basis for such termination and (ii) Sellers shall not have the right to terminate this Agreement pursuant to this **Section 8.1(e)** if Sellers are then in material breach of any its representations, warranties, covenants or other agreements set forth herein;

(f)    by Purchaser, if Sellers shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would (if it occurred or was continuing as of the Closing Date) give rise to the failure of a condition set forth in **Section 7.2(a)** or **Section 7.2(b)** to be fulfilled, (ii) cannot be cured by the End Date, <u>provided</u> that (i) Purchaser shall have given Sellers written notice, delivered at least thirty (30) days prior to such termination, stating Purchaser's intention to terminate this Agreement pursuant to this **Section 8.1(f)** and the basis for such termination and (iii) Purchaser shall not have the right to terminate this Agreement pursuant to this **Section 8.1(f)** if Purchaser is then in material breach of any its representations, warranties, covenants or other agreements set forth herein; or

(g)    by either Sellers or Purchaser, if  the Bankruptcy Court shall have entered an Order approving an Alternative Transaction.

*Section 8.2*    *Procedure and Effect of Termination.*

(a)    If this Agreement is terminated pursuant to **Section 8.1**, this Agreement shall become null and void and have no effect, and all obligations of the Parties hereunder shall terminate, except for those obligations of the Parties set forth this **Section 8.2** and **ARTICLE IX**, which shall remain in full force and effect; <u>provided</u> that nothing

herein shall relieve any Party from Liability for any material breach of any of its representations, warranties, covenants or other agreements set forth herein. If this Agreement is terminated as provided herein, all filings, applications and other submissions made pursuant to this Agreement shall, to the extent practicable, be withdrawn from the agency or other Person to which they were made.

(b)     If this Agreement is terminated by Sellers or Purchaser pursuant to **Section 8.1(a)** through **Section 8.1(d)** or **Section 8.1(g)** or by Purchaser pursuant to **Section 8.1(f)**, Sellers, severally and not jointly, shall reimburse Purchaser for its reasonable, out-of-pocket costs and expenses (including reasonable attorneys' fees) incurred by Purchaser in connection with this Agreement and the transactions contemplated hereby (the "Purchaser Expense Reimbursement"). The Purchaser Expense Reimbursement shall be paid as an administrative expense Claim of Sellers pursuant to Section 503(b)(1) of the Bankruptcy Code.

(c)     Except as expressly provided for in this **Section 8.2**, any termination of this Agreement pursuant to **Section 8.1** shall be without Liability to Purchaser or Sellers, including any Liability by Sellers to Purchaser for any break-up fee, termination fee, expense reimbursement or other compensation as a result of a termination of this Agreement.

(d)     If this Agreement is terminated for any reason, Purchaser shall, and shall cause each of its Affiliates and Representatives to, treat and hold as confidential all Confidential Information, whether documentary, electronic or oral, labeled or otherwise identified as confidential, and regardless of the form of communication or the manner in which it was furnished. For purposes of this **Section 8.2(d)**, Confidential Information shall be deemed not to include any information that (i) is now available to or is hereafter disclosed in a manner making it available to the general public, in each case, through no act or omission of Purchaser, any of its Affiliates or any of their Representatives, or (ii) is required by Law to be disclosed.

## ARTICLE IX
## MISCELLANEOUS

*Section 9.1     Survival of Representations, Warranties, Covenants and Agreements and Consequences of Certain Breaches.*  The representations and warranties of the Parties contained in this Agreement shall be extinguished by and shall not survive the Closing, and no Claims may be asserted in respect of, and no Party shall have any Liability for any breach of, the representations and warranties.  All covenants and agreements contained in this Agreement, including those covenants and agreements set forth in **ARTICLE II** and **ARTICLE VI**, shall survive the Closing indefinitely.

*Section 9.2     Notices.*  Any notice, request, instruction, consent, document or other communication required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been sufficiently given or served for all purposes (a) upon delivery when personally delivered; (b) on the delivery date after having been sent by a nationally or internationally recognized overnight courier service (charges prepaid); (c) at the time received

when sent by registered or certified mail, return receipt requested, postage prepaid; or (d) at the time when confirmation of successful transmission is received (or the first Business Day following such receipt if the date of such receipt is not a Business Day) if sent by facsimile, in each case, to the recipient at the address or facsimile number, as applicable, indicated below:

If to any Seller:       General Motors Corporation
300 Renaissance Center
Tower 300, 25th Floor, Room D55
M/C 482-C25-D81
Detroit, Michigan 48265-3000
Attn: General Counsel
Tel.: 313-667-3450
Facsimile: 248-267-4584

With copies to:       Jenner & Block LLP
330 North Wabash Avenue
Chicago, Illinois 60611-7603
Attn:  Joseph P. Gromacki
       Michael T. Wolf
Tel.:  312-222-9350
Facsimile:  312-527-0484

and

Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: Harvey R. Miller
       Stephen Karotkin
       Raymond Gietz
Tel.: 212-310-8000
Facsimile: 212-310-8007

If to Purchaser:       NGMCO, Inc.
c/o The United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington D.C. 20220
Attn: Chief Counsel Office of Financial Stability
Facsimile: 202-927-9225

09-50026-reg    Doc 2968-2   Filed 07/05/09   Entered 07/05/09 23:27:11   First MSPA
Pg 154 of 481

|  | With a copy to: | Cadwalader, Wickersham & Taft LLP |
|---|---|---|
|  |  | One World Financial Center |
|  |  | New York, New York 10281 |
|  |  | Attn:   John J. Rapisardi |
|  |  |        R. Ronald Hopkinson |
|  |  | Tel.:  212-504-6000 |
|  |  | Facsimile:  212-504-6666 |

provided, however, if any Party shall have designated a different addressee and/or contact information by notice in accordance with this **Section 9.2**, then to the last addressee as so designated.

Section 9.3     *Fees and Expenses; No Right of Setoff.*   Except as otherwise provided in this Agreement, including **Section 8.2(b)**, Purchaser, on the one hand, and each Seller, on the other hand, shall bear its own fees, costs and expenses, including fees and disbursements of counsel, financial advisors, investment bankers, accountants and other agents and representatives, incurred in connection with the negotiation and execution of this Agreement and each Ancillary Agreement and the consummation of the transactions contemplated hereby and thereby.  In furtherance of the foregoing, Purchaser shall be solely responsible for (a) all expenses incurred by it in connection with its due diligence review of Sellers and their respective businesses, including surveys, title work, title inspections, title searches, environmental testing or inspections, building inspections, Uniform Commercial Code lien and other searches and (b) any cost (including any filing fees) incurred by it in connection with notarization, registration or recording of this Agreement or an Ancillary Agreement required by applicable Law.  No Party nor any of its Affiliates shall have any right of holdback or setoff or assert any Claim or defense with respect to any amounts that may be owed by such Party or its Affiliates to any other Party (or Parties) hereto or its or their Affiliates as a result of and with respect to any amount that may be owing to such Party or its Affiliates under this Agreement, any Ancillary Agreement or any other commercial arrangement entered into in between or among such Parties and/or their respective Affiliates.

Section 9.4     *Bulk Sales Laws.*   Each Party hereto waives compliance by the other Parties with any applicable bulk sales Law.

Section 9.5     *Assignment.*   Neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned or delegated by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties, and any such assignment or delegation without such prior written consent shall be null and void; provided, however, that, without the consent of Sellers, Purchaser may assign or direct the transfer on its behalf on or prior to the Closing of all, or any portion, of its rights to purchase, accept and acquire the Purchased Assets and its obligations to assume and thereafter pay or perform as and when due, or otherwise discharge, the Assumed Liabilities, to Holding Company or one or more newly-formed, direct or indirect, wholly-owned Subsidiaries of Holding Company or Purchaser; provided, further, that no such assignment or delegation shall relieve Purchaser of any of its obligations under this Agreement.  Subject to the preceding sentence and except as otherwise expressly provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

Section 9.6    *Amendment.*    This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by a duly authorized representative or officer of each of the Parties.

Section 9.7    *Waiver.*    At any time prior to the Closing, each Party may (a) extend the time for the performance of any of the obligations or other acts of the other Parties; (b) waive any inaccuracies in the representations and warranties contained in this Agreement or in any document delivered pursuant hereto; or (c) waive compliance with any of the agreements or conditions contained herein (to the extent permitted by Law).  Any such waiver or extension by a Party (i) shall be valid only if, and to the extent, set forth in a written instrument signed by a duly authorized representative or officer of the Party to be bound and (ii) shall not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.  The failure in any one or more instances of a Party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said Party of any breach of any of the terms, covenants or conditions of this Agreement shall not be construed as a subsequent waiver of, or estoppel with respect to, any other terms, covenants, conditions, rights or privileges, but the same will continue and remain in full force and effect as if no such forbearance or waiver had occurred.

Section 9.8    *Severability.*    Whenever possible, each term and provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law.  If any term or provision of this Agreement, or the application thereof to any Person or any circumstance, is held to be illegal, invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefore in order to carry out, so far as may be legal, valid and enforceable, the intent and purpose of such illegal, invalid or unenforceable provision and (b) the remainder of this Agreement or such term or provision and the application of such term or provision to other Persons or circumstances shall remain in full force and effect and shall not be affected by such illegality, invalidity or unenforceability, nor shall such invalidity or unenforceability affect the legality, validity or enforceability of such term or provision, or the application thereof, in any jurisdiction.

Section 9.9    *Counterparts; Facsimiles.*    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.  All signatures of the Parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and be binding upon such Party.

Section 9.10    *Headings.*    The descriptive headings of the Articles, Sections and paragraphs of, and Schedules and Exhibits to, this Agreement, and the table of contents, table of Exhibits and table of Schedules contained in this Agreement, are included for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit, modify or affect any of the provisions hereof.

Section 9.11    *Parties in Interest.*    This Agreement shall be binding upon and inure solely to the benefit of each Party hereto and their respective permitted successors and

assigns; <u>provided</u>, that (a) for all purposes each of Sponsor, the New VEBA, and Canada shall be express third-party beneficiaries of this Agreement and (b) for purposes of **Section 2.2(a)(x)** and **(xvi)**, **Section 2.2(b)(vii)**, **Section 2.3(a)(x)**, **(xii)**, **(xiii)** and **(xv)**, **Section 2.3(b)(xv)**, **Section 4.6(b)**, **Section 4.10**, **Section 5.4(c)**, **Section 6.2(b)(x)**, **(xv)** and **(xvii)**, **Section 6.4(a)**, **Section 6.4(b)**, **Section 6.6(a)**, **(d)**, **(f)** and **(g)**, **Section 6.11(c)(i)** and **(vi)**, **Section 6.17**, **Section 7.1(a)** and **(f)**, **Section 7.2(d)** and **(e)** and **Section 7.3(g)**, **(h)** and **(i)**, the UAW shall be an express third-party beneficiary of this Agreement. Subject to the preceding sentence, nothing express or implied in this Agreement is intended or shall be construed to confer upon or give to any Person, other than the Parties, their Affiliates and their respective permitted successors or assigns, any legal or equitable Claims, benefits, rights or remedies of any nature whatsoever under or by reason of this Agreement.

    *Section 9.12    Governing Law.*  The construction, interpretation and other matters arising out of or in connection with this Agreement (whether arising in contract, tort, equity or otherwise) shall in all respects be governed by and construed (a) to the extent applicable, in accordance with the Bankruptcy Code, and (b) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflict of laws.

    *Section 9.13    Venue and Retention of Jurisdiction.*  Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court for any litigation arising out of or in connection with this Agreement and the transactions contemplated hereby (and agrees not to commence any litigation relating thereto except in the Bankruptcy Court, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court as described herein); <u>provided</u>, <u>however</u>, that this **Section 9.13** shall not be applicable in the event the Bankruptcy Cases have closed, in which case the Parties irrevocably and unconditionally submit to the exclusive jurisdiction of the federal courts in the Southern District of New York and state courts of the State of New York located in the Borough of Manhattan in the City of New York for any litigation arising out of or in connection with this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating thereto except in the federal courts in the Southern District of New York and state courts of the State of New York located in the Borough of Manhattan in the City of New York, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court as described herein).

    *Section 9.14    Waiver of Jury Trial.*  EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN, AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

    *Section 9.15    Risk of Loss.*  Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Purchased Assets shall be borne exclusively by Sellers.

    *Section 9.16    Enforcement of Agreement.*  The Parties agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached.  It is accordingly agreed that the

Parties shall, without the posting of a bond, be entitled, subject to a determination by a court of competent jurisdiction, to an injunction or injunctions to prevent any such failure of performance under, or breaches of, this Agreement, and to enforce specifically the terms and provisions hereof and thereof, this being in addition to all other remedies available at law or in equity, and each Party agrees that it will not oppose the granting of such relief on the basis that the requesting Party has an adequate remedy at law.

Section 9.17    *Entire Agreement.*    This Agreement (together with the Ancillary Agreements, the Sellers' Disclosure Schedule and the Exhibits) contains the final, exclusive and entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, among the Parties with respect to the subject matter hereof and thereof. Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 9.18    *Publicity.*    Prior to the first public announcement of this Agreement and the transactions contemplated hereby, Sellers, on the one hand, and Purchaser, on the other hand, shall consult with each other regarding, and share with each other copies of, their respective communications plans, including draft press releases and related materials, with regard to such announcement. Neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party or Parties, as applicable, which approval shall not be unreasonably withheld, conditioned or delayed, unless, in the sole judgment of the Party intending to make such release, disclosure is otherwise required by applicable Law, or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers list securities; provided, that the Party intending to make such release shall use reasonable best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party or Parties, as applicable, with respect to the text thereof; provided, further, that, notwithstanding anything to the contrary contained in this section, no Party shall be prohibited from publishing, disseminating or otherwise making public, without the prior written approval of the other Party or Parties, as applicable, any materials that are derived from or consistent with the materials included in the communications plan referred to above. In an effort to coordinate consistent communications, the Parties shall agree upon procedures relating to all press releases and public announcements concerning this Agreement and the transactions contemplated hereby.

Section 9.19    *No Successor or Transferee Liability.*    Except where expressly prohibited under applicable Law or otherwise expressly ordered by the Bankruptcy Court, upon the Closing, neither Purchaser nor any of its Affiliates or stockholders shall be deemed to (a) be the successor of Sellers; (b) have, de facto, or otherwise, merged with or into Sellers; (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers; or (d) other than as set forth in this Agreement, be liable for any acts or omissions of Sellers in the conduct of Sellers' business or arising under or related to the Purchased Assets. Without limiting

the generality of the foregoing, and except as otherwise provided in this Agreement, neither Purchaser nor any of its Affiliates or stockholders shall be liable for any Claims against Sellers or any of their predecessors or Affiliates, and neither Purchaser nor any of its Affiliates or stockholders shall have any successor, transferee or vicarious Liability of any kind or character whether known or unknown as of the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to Sellers' business or any obligations of Sellers arising prior to the Closing, except as provided in this Agreement, including Liabilities on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of Sellers' business prior to the Closing.

Section 9.20   *Time Periods.*   Unless otherwise specified in this Agreement, an action required under this Agreement to be taken within a certain number of days or any other time period specified herein shall be taken within the applicable number of calendar days (and not Business Days); provided, however, that if the last day for taking such action falls on a day that is not a Business Day, the period during which such action may be taken shall be automatically extended to the next Business Day.

Section 9.21   *Sellers' Disclosure Schedule.*   The representations and warranties of Sellers set forth in this Agreement are made and given subject to the disclosures contained in the Sellers' Disclosure Schedule.  Inclusion of information in the Sellers' Disclosure Schedule shall not be construed as an admission that such information is material to the business, operations or condition of the business of Sellers, the Purchased Assets or the Assumed Liabilities, taken in part or as a whole, or as an admission of Liability of any Seller to any third party.  The specific disclosures set forth in the Sellers' Disclosure Schedule have been organized to correspond to Section references in this Agreement to which the disclosure may be most likely to relate; provided, however, that any disclosure in the Sellers' Disclosure Schedule shall apply to, and shall be deemed to be disclosed for, any other Section of this Agreement to the extent the relevance of such disclosure to such other Section is reasonably apparent on its face.

Section 9.22   *No Binding Effect.*   Notwithstanding anything in this Agreement to the contrary, no provision of this Agreement shall (i) be binding on or create any obligation on the part of Sponsor, the United States Government or any branch, agency or political subdivision thereof (a "Sponsor Affiliate") or the Government of Canada, or any crown corporation, agency or department thereof (a "Canada Affiliate") or (ii) require Purchaser to initiate any Claim or other action against Sponsor or any Sponsor Affiliate or otherwise attempt to cause Sponsor, any Sponsor Affiliate, Government of Canada or any Canada Affiliate to comply with or abide by the terms of this Agreement.  No facts, materials or other information received or action taken by any Person who is an officer, director or agent of Purchaser by virtue of such Person's affiliation with or employment by Sponsor, any Sponsor Affiliate, Government of Canada or any Canada Affiliate shall be attributed to Purchaser for purposes of this Agreement or shall form the basis of any claim against such Person in their individual capacity.

[Remainder of the page left intentionally blank]

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
            Officer

SATURN LLC

By: _____
    Name:  Jill Lajdziak
    Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name:  Jill Lajdziak
    Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name:  Michael Garrick
    Title:   President

NGMCO, INC.

By: _____
    Name:  Sadiq A. Malik
    Title:   Vice President and Treasurer

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
             Officer

SATURN LLC

By: _____
    Name:  Jill Lajdziak
    Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name:  Jill Lajdziak
    Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name:  Michael Garrick
    Title:   President

NGMCO, INC.

By: _____
    Name:  Sadiq A. Malik
    Title:   Vice President and Treasurer

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____

    Name: Frederick A. Henderson
    Title: President and Chief Executive
           Officer

SATURN LLC

By: _____

    Name: Jill Lajdziak
    Title: President

SATURN DISTRIBUTION CORPORATION

By: _____

    Name: Jill Lajdziak
    Title: President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____

    Name: Michael Garrick
    Title: President

NGMCO, INC.

By: _____

    Name: Sadiq A. Malik
    Title: Vice President and Treasurer

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
           Officer

SATURN LLC

By: _____
    Name:  Jill Lajdziak
    Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name:  Jill Lajdziak
    Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name:  Michael Garrick
    Title:   President

NGMCO, INC.

By: _____
Name: Sadiq A. Malik
    Title:   Vice President and Treasurer

SIGNATURE PAGE TO THE AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT

# FIRST AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT

THIS FIRST AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT, dated as of June 30, 2009 (this "Amendment"), is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem," and collectively with Parent, S LLC and S Distribution, "Sellers," and each a "Seller"), and NGMCO, Inc., a Delaware corporation and successor-in-interest to Vehicle Acquisition Holdings LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, Sellers and Purchaser have entered into that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "Purchase Agreement"); and

WHEREAS, the Parties desire to amend the Purchase Agreement as set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties hereby agree as follows:

Section 1.    *Capitalized Terms.*  All capitalized terms used but not defined herein shall have the meanings specified in the Purchase Agreement.

Section 2.    *Amendments to Purchase Agreement.*

(a)    **Section 2.3(a)(v)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(v)    all Liabilities of Sellers (A) arising in the Ordinary Course of Business during the Bankruptcy Cases through and including the Closing Date, to the extent such Liabilities are administrative expenses of Sellers' estates pursuant to Section 503(b) of the Bankruptcy Code and (B) arising prior to the commencement of the Bankruptcy Cases, to the extent approved by the Bankruptcy Court for payment by Sellers pursuant to a Final Order (and for the avoidance of doubt, Sellers' Liabilities in clauses (A) and (B) above include all of Sellers' Liabilities for personal property Taxes, real estate and/or other ad valorem Taxes, use Taxes, sales Taxes, franchise Taxes, income Taxes, gross receipt Taxes, excise Taxes, Michigan Business Taxes and Michigan Single Business Taxes and other Liabilities mentioned in the Bankruptcy Court's Order - Docket No. 174), in each case, other than (1) Liabilities of the type described in **Section 2.3(b)(iv)**, **Section 2.3(b)(vi)**, **Section 2.3(b)(ix)** and **Section 2.3(b)(xii)**, (2) Liabilities arising under any dealer sales and service Contract and any Contract related thereto, to the extent such Contract has been designated as

a Rejectable Executory Contract, and (3) Liabilities otherwise assumed in this **Section 2.3(a)**;

(b)        **Section 2.3(a)(ix)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(ix)    all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of death, personal injury or other injury to Persons or damage to property caused by accidents or incidents first occurring on or after the Closing Date and arising from such motor vehicles' operation or performance (for avoidance of doubt, Purchaser shall not assume, or become liable to pay, perform or discharge, any Liability arising or contended to arise by reason of exposure to materials utilized in the assembly or fabrication of motor vehicles manufactured by Sellers and delivered prior to the Closing Date, including asbestos, silicates or fluids, regardless of when such alleged exposure occurs);

(c)        **Section 2.3(b)(xii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xii)    all workers' compensation Claims with respect to Employees residing or employed in, as the case may be and as defined by applicable Law, (A) the states set forth on **Exhibit G** and (B) if the State of Michigan (1) fails to authorize Purchaser and its Affiliates operating within the State of Michigan to be a self-insurer for purposes of administering workers' compensation Claims or (2) requires Purchaser and its Affiliates operating within the State of Michigan to post collateral, bonds or other forms of security to secure workers' compensation Claims, the State of Michigan (collectively, "Retained Workers' Compensation Claims");

(d)        **Section 6.6(d)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(d)        All Assumable Executory Contracts shall be assumed and assigned to Purchaser on the date (the "Assumption Effective Date") that is the later of (i) the date designated by the Purchaser and (ii) the date following expiration of the objection deadline if no objection, other than to the Cure Amount, has been timely filed or the date of resolution of any objection unrelated to Cure Amount, as provided in the Sale Procedures Order; provided, however, that in the case of each (A) Assumable Executory Contract identified on Section 6.6(a)(i) of the Sellers' Disclosure Schedule, (2) Deferred Termination Agreement (and the related Discontinued Brand Dealer Agreement or Continuing Brand Dealer Agreement)

2

designated as an Assumable Executory Contract and (3) Participation Agreement (and the related Continuing Brand Dealer Agreement) designated as an Assumable Executory Contract, the Assumption Effective Date shall be the Closing Date and (B) Assumable Executory Contract identified on Section 6.6(a)(ii) of the Sellers' Disclosure Schedule, the Assumption Effective Date shall be a date that is no later than the date set forth with respect to such Executory Contract on Section 6.6(a)(ii) of the Sellers' Disclosure Schedule. As soon as reasonably practicable following a determination that an Executory Contract shall be designated as an Assumable Executory Contract hereunder, Sellers shall use reasonable best efforts to notify each third party to such Executory Contract of their intention to assume and assign such Executory Contract in accordance with the terms of this Agreement and the Sale Procedures Order. On the Assumption Effective Date for any Assumable Executory Contract, such Assumable Executory Contract shall be deemed to be a Purchased Contract hereunder. If it is determined under the procedures set forth in the Sale Procedures Order that Sellers may not assume and assign to Purchaser any Assumable Executory Contract, such Executory Contract shall cease to be an Assumable Executory Contract and shall be an Excluded Contract and a Rejectable Executory Contract. Except as provided in **Section 6.31**, notwithstanding anything else to the contrary herein, any Executory Contract that has not been specifically designated as an Assumable Executory Contract as of the Executory Contract Designation Deadline applicable to such Executory Contract, including any Deferred Executory Contract, shall automatically be deemed to be a Rejectable Executory Contract and an Excluded Contract hereunder. Sellers shall have the right, but not the obligation, to reject, at any time, any Rejectable Executory Contract; provided, however, that Sellers shall not reject any Contract that affects both Owned Real Property and Excluded Real Property (whether designated on **Exhibit F** or now or hereafter designated on Section 2.2(b)(v) of the Sellers' Disclosure Schedule), including any such Executory Contract that involves the provision of water, water treatment, electric, fuel, gas, telephone and other utilities to any facilities located at the Excluded Real Property, whether designated on **Exhibit F** or now or hereafter designated on Section 2.2(b)(v) of the Sellers' Disclosure Schedule (the "Shared Executory Contracts"), without the prior written consent of Purchaser.

Section 3.    *Effectiveness of Amendment.*  Upon the execution and delivery hereof, the Purchase Agreement shall thereupon be deemed to be amended and restated as set forth in Section 2, as fully and with the same effect as if such amendments and restatements were originally set forth in the Purchase Agreement.

Section 4.    *Ratification of Purchase Agreement; Incorporation by Reference.*  Except as specifically provided for in this Amendment, the Purchase Agreement is hereby confirmed and ratified in all respects and shall be and remain in full force and effect in accordance with its terms. This Amendment is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement, including **Article IX** thereof, which sections are hereby incorporated into this Amendment, mutatis mutandis, as if they were set forth in their entirety herein.

Section 5.    *Counterparts.*  This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.  All signatures of the Parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and be binding upon such Party.

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____

    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
             Officer

SATURN LLC

By: _____

    Name:  Jill Lajdziak
    Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____

    Name:  Jill Lajdziak
    Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____

    Name:  Michael Garrick
    Title:   President

NGMCO, INC.

By: _____

    Name: Sadiq Malik
    Title:  Vice President and Treasurer

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
　　Name: Frederick A. Henderson
　　Title: President and Chief Executive
　　　　　 Officer

SATURN LLC

By: _____
　　Name: Jill Lajdziak
　　Title: President

SATURN DISTRIBUTION CORPORATION

By: _____
　　Name: Jill Lajdziak
　　Title: President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
　　Name: Michael Garrick
　　Title: President

NGM CO, INC.

By: _____
　　Name: Sadiq Malik
　　Title: Vice President and Treasurer

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
           Officer

SATURN LLC

By: _____
    Name:  Jill Lajdziak
    Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name:  Jill Lajdziak
    Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name:  Michael Garrick
    Title:   President

NGMCO, INC.

By: _____
    Name: Sadiq Malik
    Title:   Vice President and Treasurer

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
      Name: Frederick A. Henderson
      Title: President and Chief Executive
             Officer

SATURN LLC

By: _____
      Name: Jill Lajdziak
      Title: President

SATURN DISTRIBUTION CORPORATION

By: _____
      Name: Jill Lajdziak
      Title: President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
      Name: Michael Garrick
      Title: President

NGMCO, INC.

By: _____
      Name: Sadiq Malik
      Title: Vice President and Treasurer

## SECOND AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT

THIS SECOND AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT, dated as of July 5, 2009 (this "Amendment"), is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem," and collectively with Parent, S LLC and S Distribution, "Sellers," and each a "Seller"), and NGMCO, Inc., a Delaware corporation and successor-in-interest to Vehicle Acquisition Holdings LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, Sellers and Purchaser have entered into that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (as amended, the "Purchase Agreement");

WHEREAS, Sellers and Purchaser have entered into that certain First Amendment to Amended and Restated Master and Purchase Agreement; and

WHEREAS, the Parties desire to amend the Purchase Agreement as set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties hereby agree as follows:

Section 1.        *Capitalized Terms.*  All capitalized terms used but not defined herein shall have the meanings specified in the Purchase Agreement.

Section 2.        *Amendments to Purchase Agreement.*

(a)        The following new definition of "Advanced Technology Credits" is hereby included in **Section 1.1** of the Purchase Agreement:

"Advanced Technology Credits" has the meaning set forth in **Section 6.36**.

(b)        The following new definition of "Advanced Technology Projects" is hereby included in **Section 1.1** of the Purchase Agreement:

"Advanced Technology Projects" means development, design, engineering and production of advanced technology vehicles and components, including the vehicles known as "the Volt", "the Cruze" and components, transmissions and systems for vehicles employing hybrid technologies.

(c)        The definition of "Ancillary Agreements" is hereby amended and restated in its entirety to read as follows:

"Ancillary Agreements" means the Parent Warrants, the UAW Active Labor Modifications, the UAW Retiree Settlement Agreement, the VEBA Warrant, the Equity Registration Rights Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Intellectual Property Assignment Agreement, the Transition Services Agreement, the Quitclaim Deeds, the Assignment and Assumption of Real Property Leases, the Assignment and Assumption of Harlem Lease, the Master Lease Agreement, the Subdivision Master Lease (if required), the Saginaw Service Contracts (if required), the Assignment and Assumption of Willow Run Lease, the Ren Cen Lease, the VEBA Note and each other agreement or document executed by the Parties pursuant to this Agreement or any of the foregoing and each certificate and other document to be delivered by the Parties pursuant to **ARTICLE VII**.

(d)    The following new definition of "Excess Estimated Unsecured Claim Amount" is hereby included in **Section 1.1** of the Purchase Agreement:

"Excess Estimated Unsecured Claim Amount" has the meaning set forth in **Section 3.2(c)(i)**.

(e)    The definition of "Permitted Encumbrances" is hereby amended and restated in its entirety to read as follows:

"Permitted Encumbrances" means all (i) purchase money security interests arising in the Ordinary Course of Business; (ii) security interests relating to progress payments created or arising pursuant to government Contracts in the Ordinary Course of Business; (iii) security interests relating to vendor tooling arising in the Ordinary Course of Business; (iv) Encumbrances that have been or may be created by or with the written consent of Purchaser; (v) mechanic's, materialmen's, laborer's, workmen's, repairmen's, carrier's liens and other similar Encumbrances arising by operation of law or statute in the Ordinary Course of Business for amounts that are not delinquent or that are being contested in good faith by appropriate proceedings; (vi) liens for Taxes, the validity or amount of which is being contested in good faith by appropriate proceedings, and statutory liens for current Taxes not yet due, payable or delinquent (or which may be paid without interest or penalties); (vii) with respect to the Transferred Real Property that is Owned Real Property, other than Secured Real Property Encumbrances at and following the Closing: (a) matters that a current ALTA/ACSM survey, or a similar cadastral survey in any country other than the United States, would disclose, the existence of which, individually or in the aggregate, would not materially and adversely interfere with the present use of the affected property; (b) rights of the public, any Governmental Authority and adjoining property owners in streets and highways abutting or adjacent to the applicable Owned Real Property; (c) easements, licenses, rights-of-way, covenants, servitudes, restrictions, encroachments, site plans, subdivision plans and other Encumbrances of public record or that would be disclosed by a current title commitment of the applicable Owned Real Property, which, individually or in the aggregate, would not materially and adversely interfere with the present use

of the applicable Owned Real Property; and (d) such other Encumbrances, the existence of which, individually or in the aggregate, would not materially and adversely interfere with or affect the present use or occupancy of the applicable Owned Real Property; (viii) with respect to the Transferred Real Property that is Leased Real Property: (1) matters that a current ALTA/ACSM survey, or a similar cadastral survey in any country other than the United States, would disclose; (2) rights of the public, any Governmental Authority and adjoining property owners in streets and highways abutting or adjacent to the applicable Leased Real Property; (3) easements, licenses, rights-of-way, covenants, servitudes, restrictions, encroachments, site plans, subdivision plans and other Encumbrances of public record or that would be disclosed by a current title commitment of the applicable Leased Real Property or which have otherwise been imposed on such property by landlords; (ix) in the case of the Transferred Equity Interests, all restrictions and obligations contained in any Organizational Document, joint venture agreement, shareholders agreement, voting agreement and related documents and agreements, in each case, affecting the Transferred Equity Interests; (x) except to the extent otherwise agreed to in the Ratification Agreement entered into by Sellers and GMAC on June 1, 2009 and approved by the Bankruptcy Court on the date thereof or any other written agreement between GMAC or any of its Subsidiaries and any Seller, all Claims (in each case solely to the extent such Claims constitute Encumbrances) and Encumbrances in favor of GMAC or any of its Subsidiaries in, upon or with respect to any property of Sellers or in which Sellers have an interest, including any of the following: (1) cash, deposits, certificates of deposit, deposit accounts, escrow funds, surety bonds, letters of credit and similar agreements and instruments; (2) owned or leased equipment; (3) owned or leased real property; (4) motor vehicles, inventory, equipment, statements of origin, certificates of title, accounts, chattel paper, general intangibles, documents and instruments of dealers, including property of dealers in-transit to, surrendered or returned by or repossessed from dealers or otherwise in any Seller's possession or under its control; (5) property securing obligations of Sellers under derivatives Contracts; (6) rights or property with respect to which a Claim or Encumbrance in favor of GMAC or any of its Subsidiaries is disclosed in any filing made by Parent with the SEC (including any filed exhibit); and (7) supporting obligations, insurance rights and Claims against third parties relating to the foregoing; and (xi) all rights of setoff and/or recoupment that are Encumbrances in favor of GMAC and/or its Subsidiaries against amounts owed to Sellers and/or any of their Subsidiaries with respect to any property of Sellers or in which Sellers have an interest as more fully described in clause (x) above; it being understood that nothing in this clause (xi) or preceding clause (x) shall be deemed to modify, amend or otherwise change any agreement as between GMAC or any of its Subsidiaries and any Seller.

(f)    The following new definition of "Purchaser Escrow Funds" is hereby included in **Section 1.1** of the Purchase Agreement:

"Purchaser Escrow Funds" has the meaning set forth in **Section 2.2(a)(xx)**.

(g)  **Section 2.2(a)(xii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xii)  all credits, Advanced Technology Credits, deferred charges, prepaid expenses, deposits, advances, warranties, rights, guarantees, surety bonds, letters of credit, trust arrangements and other similar financial arrangements, in each case, relating to the Purchased Assets or Assumed Liabilities, including all warranties, rights and guarantees (whether express or implied) made by suppliers, manufacturers, contractors and other third parties under or in connection with the Purchased Contracts;

(h)  **Section 2.2(a)(xviii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xviii) any rights of any Seller, Subsidiary of any Seller or Seller Group member to any Tax refunds, credits or abatements that relate to any Pre-Closing Tax Period or Straddle Period;

(i)  **Section 2.2(a)(xix)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xix)  any interest in Excluded Insurance Policies, only to the extent such interest relates to any Purchased Asset or Assumed Liability; and

(j)  A new **Section 2.2(a)(xx)** is hereby added to the Purchase Agreement to read as follows:

(xx)  all cash and cash equivalents, including all marketable securities, held in (1) escrow pursuant to, or as contemplated by that certain letter agreement dated as of June 30, 2009, by and between Parent, Citicorp USA, Inc., as Bank Representative, and Citibank, N.A., as Escrow Agent or (2) any escrow established in contemplation or for the purpose of the Closing, that would otherwise constitute a Purchased Asset pursuant to **Section 2.2(a)(i)** (collectively, "Purchaser Escrow Funds");

(k)  **Section 2.2(b)(i)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(i)  cash or cash equivalents in an amount equal to $1,175,000,000 (the "Excluded Cash");

(l)  **Section 2.2(b)(ii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(ii)  all Restricted Cash exclusively relating to the Excluded Assets or Retained Liabilities, which for the avoidance of doubt, shall not be deemed to include Purchaser Escrow Funds;

(m)     **Section 2.3(a)(viii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(viii)   all Liabilities arising under any Environmental Law (A) relating to the Transferred Real Property, other than those Liabilities described in **Section 2.3(b)(iv)**, (B) resulting from Purchaser's ownership or operation of the Transferred Real Property after the Closing or (C) relating to Purchaser's failure to comply with Environmental Laws after the Closing;

(n)     **Section 2.3(a)(xii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xii)    all Liabilities (A) specifically assumed by Purchaser pursuant to **Section 6.17** or (B) arising out of, relating to or in connection with the salaries and/or wages and vacation of all Transferred Employees that are accrued and unpaid (or with respect to vacation, unused) as of the Closing Date;

(o)     **Section 2.3(b)(iv)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(iv)    all Liabilities (A) associated with noncompliance with Environmental Laws (including for fines, penalties, damages and remedies); (B) arising out of, relating to, in respect of or in connection with the transportation, off-site storage or off-site disposal of any Hazardous Materials generated or located at any Transferred Real Property; (C) arising out of, relating to, in respect of or in connection with third party Claims related to Hazardous Materials that were or are located at or that were Released into the Environment from Transferred Real Property prior to the Closing, except as otherwise required under applicable Environmental Laws; (D) arising under Environmental Laws related to the Excluded Real Property, except as provided under Section 18.2(e) of the Master Lease Agreement or as provided under the "Facility Idling Process" section of Schedule A of the Transition Services Agreement; or (E) for environmental Liabilities with respect to real property formerly owned, operated or leased by Sellers (as of the Closing), which, in the case of clauses (A), (B) and (C), arose prior to or at the Closing, and which, in the case of clause (D) and (E), arise prior to, at or after the Closing;

(p)     **Section 2.3(b)(xii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xii)    all workers' compensation Claims with respect to Employees residing or employed in, as the case may be and as defined by applicable Law, the states set forth on **Exhibit G** (collectively, "Retained Workers' Compensation Claims");

(q)     **Section 3.2(a)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(a)     The purchase price (the "<u>Purchase Price</u>") shall be equal to the sum of:

(i)     a Bankruptcy Code Section 363(k) credit bid in an amount equal to: (A) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing pursuant to the UST Credit Facilities, and (B) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing under the DIP Facility, <u>less</u> $8,247,488,605 of Indebtedness under the DIP Facility (such amount, the "<u>UST Credit Bid Amount</u>");

(ii)    the UST Warrant (which the Parties agree has a value of no less than $1,000);

(iii)   the valid issuance by Purchaser to Parent of (A) 50,000,000 shares of Common Stock (collectively, the "<u>Parent Shares</u>") and (B) the Parent Warrants; and

(iv)   the assumption by Purchaser or its designated Subsidiaries of the Assumed Liabilities.

For the avoidance of doubt, immediately following the Closing, the only indebtedness for borrowed money (or any guarantees thereof) of Sellers and their Subsidiaries to Sponsor, Canada and Export Development Canada is amounts under the Wind Down Facility.

(r)     **Section 3.2(c)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(c)

(i)     Sellers may, at any time, seek an Order of the Bankruptcy Court (the "<u>Claims Estimate Order</u>"), which Order may be the Order confirming Sellers' Chapter 11 plan, estimating the aggregate allowed general unsecured claims against Sellers' estates. If in the Claims Estimate Order, the Bankruptcy Court makes a finding that the estimated aggregate allowed general unsecured claims against Sellers' estates exceed $35,000,000,000, then Purchaser will, within five (5) Business Days of entry of the Claims Estimate Order, issue additional shares of Common Stock (the "<u>Adjustment Shares</u>") to Parent, as an adjustment to the Purchase Price, based on the extent by which such estimated aggregate general unsecured claims exceed $35,000,000,000 (such amount, the "<u>Excess Estimated Unsecured Claim Amount</u>;" in the event this amount exceeds $7,000,000,000 the Excess Estimated Unsecured Claim Amount will be reduced to a cap of $7,000,000,000). The number of Adjustment Shares to be issued will be equal to the number of shares, rounded up to the next whole share, calculated by multiplying (i) 10,000,000 shares of Common Stock (adjusted to take into account any stock dividend, stock split, combination of shares, recapitalization, merger, consolidation, reorganization or similar transaction with respect to the

Common Stock, effected from and after the Closing and before issuance of the Adjustment Shares) and (ii) a fraction, (A) the numerator of which is Excess Estimated Unsecured Claim Amount (capped at $7,000,000,000) and (B) the denominator of which is $7,000,000,000.

(ii)    At the Closing, Purchaser will have authorized and, thereafter, will reserve for issuance the maximum number of shares of Common Stock issuable as Adjustment Shares.

(s)    **Section 6.9(b)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(b)    Sellers shall use reasonable best efforts to agree with Sponsor on the terms of a restructuring of $1,175,000,000 of Indebtedness accrued under the DIP Facility (as restructured, the "Wind Down Facility") to provide for such Wind Down Facility to be non-recourse, to accrue payment-in-kind interest at the Eurodollar Rate (as defined in the Wind-Down Facility) plus 300 basis points, to be secured by all assets of Sellers (other than the Parent Shares, Adjustment Shares, Parent Warrants and any securities or proceeds received in respect thereof). Sellers shall use reasonable best efforts to enter into definitive financing agreements with respect to the Wind Down Facility so that such agreements are in effect as promptly as practicable but in any event no later than the Closing.

(t)    **Section 6.17(e)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(e)    *Assumption of Certain Parent Employee Benefit Plans and Policies.*  As of the Closing Date, Purchaser or one of its Affiliates shall assume (i) the Parent Employee Benefit Plans and Policies set forth on Section 6.17(e) of the Sellers' Disclosure Schedule as modified thereon, and all assets, trusts, insurance policies and other Contracts relating thereto, except for any that do not comply in all respects with TARP or as otherwise provided in **Section 6.17(h)** and (ii) all employee benefit plans, programs, policies, agreements or arrangements (whether written or oral) in which Employees who are covered by the UAW Collective Bargaining Agreement participate and all assets, trusts, insurance and other Contracts relating thereto (collectively, the "Assumed Plans"), and Sellers and Purchaser shall cooperate with each other to take all actions and execute and deliver all documents and furnish all notices necessary to establish Purchaser or one of its Affiliates as the sponsor of such Assumed Plans including all assets, trusts, insurance policies and other Contracts relating thereto. Other than with respect to any Employee who was or is covered by the UAW Collective Bargaining Agreement, Purchaser shall have no Liability with respect to any modifications or changes to Benefit Plans contemplated by Section 6.17(e) of the Sellers' Disclosure Schedule, or changes made by Parent prior to the Closing Date, and Purchaser shall not assume any Liability with respect to any such decisions or actions related thereto, and Purchaser shall only assume the Liabilities for benefits provided pursuant to the written terms and conditions of

the Assumed Plan as of the Closing Date. Notwithstanding the foregoing, the assumption of the Assumed Plans is subject to Purchaser taking all necessary action, including reduction of benefits, to ensure that the Assumed Plans comply in all respects with TARP. Notwithstanding the foregoing, but subject to the terms of any Collective Bargaining Agreement to which Purchaser or one of its Affiliates is a party, Purchaser and its Affiliates may, in its sole discretion, amend, suspend or terminate any such Assumed Plan at any time in accordance with its terms.

(u)   A new **Section 6.17(n)** is hereby added to the Purchase Agreement to read as follows:

(n)   *Harlem Employees*.   With respect to non-UAW employees of Harlem, Purchaser or one of its Affiliates may make offers of employment to such individuals at its discretion. With respect to UAW-represented employees of Harlem and such other non-UAW employees who accept offers of employment with Purchaser or one of its Affiliates, in addition to obligations under the UAW Collective Bargaining Agreement with respect to UAW-represented employees, Purchaser shall assume all Liabilities arising out of, relating to or in connection with the salaries and/or wages and vacation of all such individuals that are accrued and unpaid (or with respect to vacation, unused) as of the Closing Date. With respect to non-UAW employees of Harlem who accept such offers of employment, Purchaser or one of its Affiliates shall take all actions necessary such that such individuals shall be credited for their actual and credited service with Sellers and each of their respective Affiliates, for purposes of eligibility, vesting and benefit accrual in any employee benefit plans (excluding equity compensation plans or programs) covering such individuals after the Closing; provided, however, that such crediting of service shall not operate to duplicate any benefit to any such individual or the funding for any such benefit. Purchaser or one of its Affiliates, in its sole discretion, may assume certain employee benefit plans maintained by Harlem by delivering written notice (which such notice shall indentify such employee benefit plans of Harlem to be assumed) to Sellers of such assumption on or before the Closing, and upon delivery of such notice, such employee benefit plans shall automatically be deemed to be set forth on Section 6.17(e) of the Sellers' Disclosure Schedules. All such employee benefit plans that are assumed by Purchaser or one of its Affiliates pursuant to the preceding sentence shall be deemed to be Assumed Plans for purposes of this Agreement.

(v)   A new **Section 6.36** is hereby added to the Purchase Agreement to read as follows:

*Section 6.36   Advanced Technology Credits*.   The Parties agree that Purchaser shall, to the extent permissible by applicable Law (including all rules, regulations and policies pertaining to Advanced Technology Projects), be entitled to receive full credit for expenditures incurred by Sellers prior to the Closing towards Advanced Technology Projects for the purpose of any current or future program sponsored by a Governmental Authority providing financial assistance in

connection with any such project, including any program pursuant to Section 136 of the Energy Independence and Security Act of 2007 ("Advanced Technology Credits"), and acknowledge that the Purchase Price includes and represents consideration for the full value of such expenditures incurred by Sellers.

(w)     **Section 7.2(c)(vi)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(vi)     *[Reserved]*;

(x)     **Section 7.2(c)(vii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(vii)     *[Reserved]*;

(y)     **Section 7.3(c)(viii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(viii)     *[Reserved]*;

(z)     **Section 7.3(c)(ix)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(ix)     *[Reserved]*;

(aa)     **Section 7.3(f)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(f)     Purchaser shall have (i) offset the UST Credit Bid Amount against the amount of Indebtedness of Parent and its Subsidiaries owed to Purchaser as of the Closing under the UST Credit Facilities and the DIP Facility pursuant to a Bankruptcy Code Section 363(k) credit bid and delivered releases and waivers and related Encumbrance-release documentation (including, if applicable, UCC-3 termination statements) with respect to the UST Credit Bid Amount, in a form reasonably satisfactory to the Parties and duly executed by Purchaser in accordance with the applicable requirements in effect on the date hereof, (ii) transferred to Sellers the UST Warrant and (iii) issued to Parent, in accordance with instructions provided by Parent, the Purchaser Shares and the Parent Warrants (duly executed by Purchaser).

(bb)     **Exhibit R** to the Purchase Agreement is hereby deleted in its entirety.

(cc)     **Exhibit S** to the Purchase Agreement is hereby deleted in its entirety.

(dd)     **Exhibit U** to the Purchase Agreement is hereby replaced in its entirety with **Exhibit U** attached hereto.

(ee)    **Exhibit X** to the Purchase Agreement is hereby replaced in its entirety with **Exhibit X** attached hereto.

(ff)    Section 2.2(b)(iv) of the Sellers' Disclosure Schedule is hereby replaced in its entirety with Section 2.2(b)(iv) of the Sellers' Disclosure Schedule attached hereto.

(gg)    Section 4.4 of the Sellers' Disclosure Schedule is hereby replaced in its entirety with Section 4.4 of the Sellers' Disclosure Schedule attached hereto.

(hh)    Section 6.6(a)(i) of the Sellers' Disclosure Schedule is hereby replaced in its entirety with Section 6.6(a)(i) of the Sellers' Disclosure Schedule attached hereto.

Section 3.    *Effectiveness of Amendment.*  Upon the execution and delivery hereof, the Purchase Agreement shall thereupon be deemed to be amended and restated as set forth in Section 2, as fully and with the same effect as if such amendments and restatements were originally set forth in the Purchase Agreement.

Section 4.    *Ratification of Purchase Agreement; Incorporation by Reference.*  Except as specifically provided for in this Amendment, the Purchase Agreement is hereby confirmed and ratified in all respects and shall be and remain in full force and effect in accordance with its terms.  This Amendment is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement, including **Article IX** thereof, which sections are hereby incorporated into this Amendment, mutatis mutandis, as if they were set forth in their entirety herein.

Section 5.    *Counterparts.*  This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.  All signatures of the Parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and be binding upon such Party.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____

Name: Frederick A. Henderson
Title: President and Chief Executive
Officer

SATURN LLC

By: _____

Name: Jill Lajdziak
Title: President

SATURN DISTRIBUTION CORPORATION

By: _____

Name: Jill Lajdziak
Title: President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____

Name: Michael Garrick
Title: President

NGMCO, INC.

By: _____

Name: Sadiq Malik
Title: Vice President and Treasurer

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name: Frederick A. Henderson
    Title: President and Chief Executive
          Officer

SATURN LLC

By: _____
    Name: Jill Lajdziak
    Title: President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name: Jill Lajdziak
    Title: President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name: Michael Garrick
    Title: President

NGM CO, INC.

By: _____
    Name: Sadiq Malik
    Title: Vice President and Treasurer

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name: Frederick A. Henderson
    Title:   President and Chief Executive
           Officer

SATURN LLC

By: _____
    Name: Jill Lajdziak
    Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name: Jill Lajdziak
    Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name: Michael Garrick
    Title:   President

NGMCO, INC.

By: _____
    Name: Sadiq Malik
    Title:   Vice President and Treasurer

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
           Officer

SATURN LLC

By: _____
    Name:  Jill Lajdziak
    Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name:  Jill Lajdziak
    Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name:  Michael Garrick
    Title:   President

NGMCO, INC.

By: _____
    Name:  Sadiq Malik
    Title:   Vice President and Treasurer

# Exhibit  B

## CAUSE NO. 2015-04442

| | | |
|---|---|---|
| ZACHARY STEVENS, LISA STEVENS<br>AND MARK STEVENS, | §<br>§<br>§ | |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | Transferred to the 152nd Judicial District<br>Court of Harris County, Texas |
| GENERAL MOTORS LLC; DDH<br>INVESTMENTS OF SOUTH TEXAS,<br>INC. d/b/a SATURN OF HOUSTON,<br>INC., AND MANUEL FERNANDEZ, | §<br>§<br>§<br>§<br>§ | (MDL Pretrial Court Before the<br>Honorable Judge Robert Schaffer) |
| Defendants. | §<br>§ | |

### PLAINTIFFS' TRADITIONAL MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs, Zachary Stevens, Lisa Stevens, and Mark Stevens, hereby file this Traditional

Motion for Partial Summary Judgment, and in support thereof show the Court the following:

### SUMMARY

### FACTUAL BACKGROUND

On July 10, 2009, General Motors, LLC acquired all of the assets and assumed certain

liabilities of General Motors Corporation by way of a § 363 sale under Chapter 11 of the

Bankruptcy Code. New GM assumed specific liabilities of Old GM, who filed a voluntary

petition for relief under Chapter 11 of the U.S. Bankruptcy Code on June 1, 2009. New GM

acquired substantially all of Old GM's employees, officers, and management personnel. New

GM also acquired Old GM's designs, tools, inventory, books, records, and its key contracts,

among other essential assets. Under the June 26, 2009 Amended and Restated Master Sale and

Purchase Agreement (the "Sale Agreement"), attached hereto as <u>Exhibit A</u>, New GM expressly

assumed liability for post-sale accidents involving Old GM vehicles causing personal injury, loss

of life, or property damages.[1] New GM also assumed certain express statutory requirements, including:

> From and after the Closing, Purchaser [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by the Seller [Old GM].[2]

In addition, New GM expressly set forth that it:

> Shall be responsible for the administration, management and payment of all Liabilities arising under (i) express warranties of Sellers [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers [Old GM] or Purchasers [New GM] prior to or after the Closing and (ii) Lemon Laws.

On February 7, 2014, New GM issued a recall for Stevens Plaintiffs' Saturn Sky, model year 2007, for an ignition switch failure.[3] The foregoing defect resulted from a low-torque ignition switch, which, under certain circumstances, will move out of the "Run" position into the "Accessory" or "Off" position, resulting in loss of power steering, loss of power braking, and airbag non-deployment.[4] As described more fully below, GM officers and employees knew or should have known about the dangerous safety defect, but did nothing to correct—or in some cases, actively concealed—the deadly defect for over a decade prior to the recall.

Before the defective switch even went into production in 2002, GM engineers knew that it was prone to movement out of the Run position.[5] Testing conducted by GM's switch supplier in late 2001 and early 2002 showed that the torque return between the Run and Accessory

---

[1] Exhibit A, Amended and Restated Master Sale and Purchase Agreement.
[2] Id.
[3] Exhibit B, February 7, 2014 Recall Notice.
[4] Id.; Exhibit C, September 17, 2015 Deferred Prosecution Agreement Statement of Facts, ¶ 4.
[5] Exhibit C, ¶ 5.

positions fell below GM's own internal specifications.[6] GM engineers ignored the obvious safety risks and approved the switch's production.[7]

At least as early as 2004 and 2005, GM was well aware of the defect in its ignition switch due to reports of sudden stalls and engine shutoffs it received from GM employees, media representatives, and customers.[8] GM employees tasked with driving the early productions of vehicles equipped with the Defective Switch were reporting stalls while driving, and some of them even notified GM that the stalls were attributable to the easy rotation of the key within the Defective Switch.[9] In November 2004, GM opened its first of many engineering inquiries that would take place over the next five years.[10] Although at least one GM engineer expressed views to the company that the Defective Switch posed a safety problem due to loss of power steering and power braking, GM refused to classify the defect as a safety concern, closing the inquiry "with no action," because they believed implementing a solution would take too long, cost too much, and not totally eliminate the possibility of the ignition being turned off during driving.[11] GM even rejected a simple improvement to the corresponding keys that would have significantly reduced the number of shutoffs at a price of less than one dollar per car.[12] In June 2005, GM issued a statement acknowledging circumstances where the ignition key could move to the Accessory or Off positions, but reiterated that the ignition did not pose a safety concern.[13] GM did not disclose the falsity of its June 2005 release to the public until 2014:

---

[6] *Id*. at ¶¶ 6, 21, 22.

[7] *Id*. at ¶ 22.

[8] *Id*. at ¶ 6.

[9] *Id. at* ¶ 24.

[10] *Id*. at ¶ 29.

[11] *Id*. at ¶¶ 6, 29, 31.

[12] *Id*. at ¶ 6.

[13] *Id*.

"Moreover, for much of this period during which GM failed to disclose this safety defect, it not only failed to correct its June 2005 assurance that the Defective Switch posed no safety concern but also actively touted the reliability and safety of cars equipped with the Defective Switch, with a view to promoting the sales of used GM cars…. These sales were accompanied by certifications from GM, assuring the unwitting customers that the vehicles' components, including their ignition systems and keys, met all safety standards."[14]

In early 2005, GM issued a formal Service Bulletin to its dealers.[15] GM intentionally omitted the word "stall" from its bulletin even though it was fully aware that customers would naturally describe the defect as stalling.[16] The intentional omission of this critical word was designed to hide the true safety problem associated with the defective switch because GM knew that dealers responding to a customer complaint would not be able to locate the bulletin using the anticipated search term "stall."[17] Another primary reason for removing the word "stall" from its service bulletin was to avoid attracting attention of GM's regulator, the National Highway Traffic Safety Administration ("NHTSA").[18]

GM took further action to conceal the serious nature of the Defective Switch in 2006. At that time, the GM engineer who initially approved the below-specifications ignition switch, in response to numerous complaints about the Defective Switch from other GM employees, authorized the replacement of the Defective Switch in certain new cars with a new switch that had significantly higher torque.[19] In order to avoid attracting attention, the GM engineer ordered that the part change be implemented without changing the part number on the new ignition switches.[20]

---

[14] *Id*. at ¶ 10.
[15] *Id*. at ¶ 37.
[16] *Id*. at ¶ 38.
[17] *Id*. at ¶ 37.
[18] *Id*. at ¶ 38.
[19] *Id*. at ¶ 41.
[20] *Id*.

"[T]he deadly effects of the Defective Switch on airbag non-deployment began manifesting themselves early on, in crashes about which GM was made aware contemporaneously."[21] Specifically, from at least as early as 2004, GM received reports of numerous vehicle crashes resulting in fatalities where a GM manufactured vehicle lost power, there was airbag non-deployment, and the ignition was in the Accessory or Off position at the time of the crash.[22] Naturally, many of these incidents resulted in legal actions. As a result, by no later than early 2011—three years prior to the recall—GM was unquestionably made aware that a large number of these airbag non-deployment cases were caused by the ignition switch.[23]

On July 27, 2011, the GM Products Investigations group met with GM attorneys to discuss the airbag non-deployment crashes.[24] The PI group opened an investigation in response to the meeting but did nothing to advance the investigation until March 15, 2012, when one of GM's outside counsel demanded that action be taken.[25] GM actively concealed the imminent risk of death posed by the Defective Switch for two more years so the issue could be fully packaged, presented, explained, and handled.[26]

In November 2011, despite having more than adequate information to address the serious safety concerns posed by the Defective Switch, GM had taken no action to prevent the injuries and death that occurred in the accident made the basis of this lawsuit. On November 15, 2011, Zachary Stevens was driving his 2007 Saturn Sky bearing VIN#1G8MB35B57Y103556 westbound on FM 1485 in Montgomery County, Texas.[27] Mariano Elias Landaverde was

---

[21] *Id.* at ¶ 45.
[22] *Id.* at ¶¶ 44-56.
[23] *Id.* at ¶ 57.
[24] *Id.* at ¶ 61.
[25] *Id.* at ¶¶ 61-65.
[26] *Id.* at ¶ 9.
[27] Exhibit D, Accident Report.

traveling eastbound on FM 1485 in a Nissan Frontier.[28] As Stevens approached a line of cars, his vehicle began to act erratically, and he lost control of the vehicle, crashing into Landaverde's vehicle almost head-on.[29] The 2007 Saturn Sky was manufactured with the Defective Switch and contained the Defective Switch at the time of the accident.[30] The Saturn's airbags did not deploy during the accident sequence.[31] At the time of the accident, Zachary Stevens had never received any warning that his car might be equipped with a defective ignition switch posing a serious safety concern.[32] As a result of the accident, Stevens suffered severe head trauma requiring hospitalization and ongoing treatment.[33] Landaverde was pronounced dead at the scene.[34]

## SUMMARY JUDGMENT STANDARD

A traditional motion for summary judgment requires the movant to establish that there is no genuine issue of material fact, and that the movant is entitled to judgment as a matter of law.[35] On a traditional motion for summary judgment on affirmative claims, the movant bears the initial burden of showing its entitlement to judgment as a matter of law by conclusively proving each element of its cause of action.[36] When the movant satisfies this burden, the burden shifts to the non-movant to raise a genuine issue of material fact precluding summary judgment.[37] In deciding a motion for summary judgment, evidence favorable to the non-movant will be taken as true, and

---

[28] *Id.*

[29] *Id.*

[30] Exhibit B.

[31] Exhibit D.

[32] Exhibit B.

[33] Exhibit D.

[34] *Id.*

[35] TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985).

[36] *M.D. Anderson Hosp. & Tumor Inst. V. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000) (per curiam).

[37] *Id.*

the Court must resolve every doubt and indulge every reasonable inference in the non-movant's favor.[38]

## ARGUMENT

Here, Plaintiffs seek summary judgment on their claim that the award of exemplary damages shall not be bound by the limitations set forth in § 41.008 of the TEXAS CIVIL PRACTICE & REMEDIES CODE. Awards of exemplary damages are typically capped at an amount equal to the greater of: (1) two times the amount of the plaintiff's economic damages, plus an amount equal to any non-economic damages found by the jury, not to exceed $750,000; or (2) $200,000.[39] However, the foregoing cap on exemplary damages does not apply in cases where the conduct of the defendant constitutes the knowing or intentional commission of one or more specified felonies, including aggravated assault.[40] A person acts intentionally, or with intent, with respect to the nature of his conduct or to the result of his conduct when it is his conscious objective or desire to engage in the conduct or the result.[41] A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.[42] A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.[43]

A person commits the offense of assault if the person intentionally, knowingly, or recklessly causes bodily injury to another.[44] An assault is considered an aggravated assault if the person also causes serious bodily injury to another, including the person's spouse, or uses or

---

[38] *Nixon*, 690 S.W.2d at 548-49.
[39] TEX. CIV. PRAC. & REM. CODE § 41.008(b).
[40] TEX. CIV. PRAC. & REM. CODE § 41.008(c).
[41] TEX. CIV. PRAC. & REM. CODE § 41.008(d); TEX. PENAL CODE § 6.03(a).
[42] TEX. CIV. PRAC. & REM. CODE § 41.008(d); TEX. PENAL CODE § 6.03(b).
[43] *Id.*
[44] TEX. PENAL CODE § 22.01(a)(1).

exhibits a deadly weapon during the commission of an assault.[45] Bodily injury means physical pain, illness, or any impairment of physical condition.[46] Serious bodily injury means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.[47] A person acts recklessly, or is reckless, with respect to the circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.[48] Additionally, the risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.[49]

Here, it is undisputed—and, in fact, GM admits—that "starting no later than 2003, GM knowingly manufactured and sold several models of vehicles equipped with the Defective Switch."[50] It is also undisputed that Stevens suffered serious bodily injuries and Mariano Elias Landaverde died as a result of GM's knowing sale of a 2007 Saturn Sky equipped with a defective ignition switch causing loss of power and airbag non-deployment. In accordance with the precepts discussed above, GM's conduct satisfies the elements of an aggravated assault. Thus, in the event exemplary damages are submitted to the jury at trial, the jury is not bound by the exemplary damages cap set forth in the TEXAS CIVIL PRACTICE & REMEDIES CODE as a matter of law.[51]

---

[45] *Id*. at § 22.02(a).
[46] *Id*. at § 1.07(a)(8).
[47] *Id*. at § 1.07(46).
[48] *Id*. at § 6.03(c).
[49] *Id*.
[50] Exhibit C, ¶ 115.
[51] TEX. CIV. PRAC. & REM. CODE § 41.008(c).

This conclusion is entirely consistent with similar cases involving civil claims premised on assaultive conduct. For example, in *Wackenhut Corrections Corporation v. de la Rosa*, a Texas Court of Appeals held that exemplary damages limitations did not apply because, like here, the defendant clearly committed a dangerous aggravated assault.[52] The *de la Rosa* court noted that "nearly all the indicators of reprehensible conduct exist [] in this record" as "the harm caused to [the plaintiff] and his family was physical, rather than merely economic" and "involves the most serious injury of all—death to a human being."[53] Like *de la Rosa*, this case involves clear reprehensible conduct. GM actively concealed a highly dangerous safety defect in its vehicles for its own benefit, ignoring the wellbeing of its customers. GM's conduct resulted in bodily harm and the most serious injury of all: death to a human being. Accordingly, the exemplary damages cap set forth in the TEXAS CIVIL PRACTICE & REMEDIES CODE does not apply in this case as a matter of law.

In Texas, under most circumstances, corporations are criminally responsible for the criminal acts of their agents when the criminal acts were performed by the agent within the scope of his office or employment.[54] Corporate criminal responsibility includes culpability for assaults committed by employees in the scope of their employment.[55] Here, it is undisputed that the GM employees who actively concealed a dangerous safety defect in GM vehicles for over a decade were at all relevant times acting within the scope of their employment.[56]

---

[52] *Wackenhut Corrections Corporation v. de la Rosa*, 305 S.W.3d 594, 656 (Tex.App.—Corpus Christi 2009, ) (abrogated on other grounds by *Zorrilla v. Aypco Construction II, LLC*, 469 S.W.3d 143 (Tex. 2015).

[53] *Id.*

[54] TEX. PENAL CODE § 7.22(a).

[55] *See Vaughan and Sons, Inc. v. State*, 737 S.W.2d 805, 813-14 (Tex.Crim.App. 1987) (holding "[C]orporations have been held liable for assault and battery" and are liable for misdemeanor and criminally negligent homicide offenses under Penal Code Section 7.22) (citing Brickley, *Corporate Criminal Liability*, Vol. I (Evolution of Liability), § 209, p. 31).

[56] *See* <u>Exhibit C</u>.

**CONCLUSION**

Based on the foregoing, Plaintiffs, Zachary Stevens, Lisa Stevens, and Mark Stevens respectfully request the Court grant partial summary judgment in their favor, issue judgment against Defendant General Motors, LLC for committing the offense of aggravated assault as defined in Chapter 22 of the Texas Penal Code, and grant Plaintiffs any further relief to which they are justly entitled.

Respectfully submitted,

**DAVIS LAW GROUP**

By: ___*/s/ Joshua P. Davis*___
    Joshua P. Davis
    State Bar No. 24055379
    Mitchell A. Greene
    State Bar No. 24078591
    Katherine Ray
    State Bar No. 24091634
1010 Lamar, Suite 200
Houston, Texas 77002
(713) 337-4100/Phone
(713) 337-4101/Fax
*josh@thejdfirm.com*
*mitch@thejdfirm.com*
*katie@thejdfirm.com*

**Attorney for Plaintiffs**

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing instrument was served on all counsel of record in accordance with the TEXAS RULES OF CIVIL PROCEDURE on June 24, 2016 as follows:

**_Via ECF_**
Kyle H. Dreyer
Giovanna Tarantino Bingham
Thomas G. Jacks
HARTLINE DACUS BARGER DREYER LLP
8750 N. Central Expressway, Suite 1600
Dallas, Texas 75231

**_Via Email bobh@hmglawfirm.com_**
Robert C. Hilliard
HILLIARD MUNOZ GONZALES LLP
719 S. Shoreline Blvd., Suite 500
Corpus Christi, Texas 78401

**_Via ECF_**
Darrell L. Barger
HARTLINE DACUS BARGER DREYER LLP
1980 Post Oak Blvd, Suite 1800
Houston, Texas 77056

**_Via Email rmithoff@mithofflaw.com_**
Richard Warren Mithoff
MITHOFF LAW
500 Dallas, Suite 3450
Houston, Texas 77002

**_Via Email jwigington@wigrum.com_**
Jeffrey G. Wigington
WIGINGTON RUMLEY DUNN, LLP
800 N Shoreline Blvd.
14th Floor, South Tower
Corpus Christi, Texas 78401

**_Via Email chris.gadoury@lanierfirm.com_**
Chris Gadoury
THE LANIER LAW FIRM, P.C.
6810 FM 1960 West
Houston, Texas 77069

/s/ _Joshua P. Davis_
Joshua P. Davis

# EXHIBIT A

EXECUTION COPY

AMENDED AND RESTATED

MASTER SALE AND PURCHASE AGREEMENT

BY AND AMONG

GENERAL MOTORS CORPORATION,

SATURN LLC,

SATURN DISTRIBUTION CORPORATION

AND

CHEVROLET-SATURN OF HARLEM, INC.,

*as Sellers*

AND

NGMCO, INC.,

*as Purchaser*

DATED AS OF

JUNE 26, 2009

"Wind Down Facility" has the meaning set forth in **Section 6.9(b)**.

Section 1.2    *Other Interpretive Provisions.*  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole (including the Sellers' Disclosure Schedule) and not to any particular provision of this Agreement, and all Article, Section, Sections of the Sellers' Disclosure Schedule and Exhibit references are to this Agreement unless otherwise specified. The words "include", "includes" and "including" are deemed to be followed by the phrase "without limitation." The meanings given to terms defined herein are equally applicable to both the singular and plural forms of such terms. Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.  Except as otherwise expressly provided herein, all references to "Dollars" or "$" are deemed references to lawful money of the United States.  Unless otherwise specified, references to any statute, listing rule, rule, standard, regulation or other Law (a) include a reference to the corresponding rules and regulations and (b) include a reference to each of them as amended, modified, supplemented, consolidated, replaced or rewritten from time to time, and to any section of any statute, listing rule, rule, standard, regulation or other Law, including any successor to such section.  Where this Agreement states that a Party "shall" or "will" perform in some manner or otherwise act or omit to act, it means that the Party is legally obligated to do so in accordance with this Agreement.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    *Purchase and Sale of Assets; Assumption of Liabilities.*  On the terms and subject to the conditions set forth in this Agreement, other than as set forth in **Section 6.30**, **Section 6.34** and **Section 6.35**, at the Closing, Purchaser shall (a) purchase, accept and acquire from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Purchaser, free and clear of all Encumbrances (other than Permitted Encumbrances), Claims and other interests, the Purchased Assets and (b) assume and thereafter pay or perform as and when due, or otherwise discharge, all of the Assumed Liabilities.

Section 2.2    *Purchased and Excluded Assets.*

(a)    The "Purchased Assets" shall consist of the right, title and interest that Sellers possess and have the right to legally transfer in and to all of the properties, assets, rights, titles and interests of every kind and nature, owned, leased, used or held for use by Sellers (including indirect and other forms of beneficial ownership), whether tangible or intangible, real, personal or mixed, and wherever located and by whomever possessed, in each case, as the same may exist as of the Closing, including the following properties, assets, rights, titles and interests (but, in every case, excluding the Excluded Assets):

(i)    all cash and cash equivalents, including all marketable securities, certificates of deposit and all collected funds or items in the process of collection at Sellers' financial institutions through and including the Closing, and all bank deposits, investment accounts and lockboxes related thereto, other than the Excluded Cash and Restricted Cash;

(ii)     all restricted or escrowed cash and cash equivalents, including restricted marketable securities and certificates of deposit (collectively, "Restricted Cash") other than the Restricted Cash described in **Section 2.2(b)(ii)**;

(iii)    all accounts and notes receivable and other such Claims for money due to Sellers, including the full benefit of all security for such accounts, notes and Claims, however arising, including arising from the rendering of services or the sale of goods or materials, together with any unpaid interest accrued thereon from the respective obligors and any security or collateral therefor, other than intercompany receivables (collectively, "Receivables");

(iv)    all intercompany obligations ("Intercompany Obligations") owed or due, directly or indirectly, to Sellers by any Subsidiary of a Seller or joint venture or other entity in which a Seller or a Subsidiary of a Seller has any Equity Interest;

(v)     (A) subject to **Section 2.4**, all Equity Interests in the Transferred Entities (collectively, the "Transferred Equity Interests") and (B) the corporate charter, qualification to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, corporate seal, minute books, stock transfer books, blank stock certificates and any other documents relating to the organization, maintenance and existence of each Transferred Entity;

(vi)    all Owned Real Property and Leased Real Property (collectively, the "Transferred Real Property");

(vii)   all machinery, equipment (including test equipment and material handling equipment), hardware, spare parts, tools, dies, jigs, molds, patterns, gauges, fixtures (including production fixtures), business machines, computer hardware, other information technology assets, furniture, supplies, vehicles, spare parts in respect of any of the foregoing and other tangible personal property (including any of the foregoing in the possession of manufacturers, suppliers, customers, dealers or others and any of the foregoing in transit) that does not constitute Inventory (collectively, "Personal Property"), including the Personal Property located at the Excluded Real Property and identified on Section 2.2(a)(vii) of the Sellers' Disclosure Schedule;

(viii)  all inventories of vehicles, raw materials, work-in-process, finished goods, supplies, stock, parts, packaging materials and other accessories related thereto (collectively, "Inventory"), wherever located, including any of the foregoing in the possession of manufacturers, suppliers, customers, dealers or others and any of the foregoing in transit or that is classified as returned goods;

(ix)    (A) all Intellectual Property, whether owned, licensed or otherwise held, and whether or not registrable (including any Trademarks and other Intellectual Property associated with the Discontinued Brands), and (B) all rights

and benefits associated with the foregoing, including all rights to sue or recover for past, present and future infringement, misappropriation, dilution, unauthorized use or other impairment or violation of any of the foregoing, and all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing;

(x)    subject to **Section 2.4**, all Contracts, other than the Excluded Contracts (collectively, the "Purchased Contracts"), including, for the avoidance of doubt, (A) the UAW Collective Bargaining Agreement and (B) any Executory Contract designated as an Assumable Executory Contract as of the applicable Assumption Effective Date;

(xi)    subject to **Section 2.4**, all approvals, Contracts, authorizations, permits, licenses, easements, Orders, certificates, registrations, franchises, qualifications, rulings, waivers, variances or other forms of permission, consent, exemption or authority issued, granted, given or otherwise made available by or under the authority of any Governmental Authority, including all pending applications therefor and all renewals and extensions thereof (collectively, "Permits"), other than to the extent that any of the foregoing relate exclusively to the Excluded Assets or Retained Liabilities;

(xii)    all credits, deferred charges, prepaid expenses, deposits, advances, warranties, rights, guarantees, surety bonds, letters of credit, trust arrangements and other similar financial arrangements, in each case, relating to the Purchased Assets or Assumed Liabilities, including all warranties, rights and guarantees (whether express or implied) made by suppliers, manufacturers, contractors and other third parties under or in connection with the Purchased Contracts;

(xiii)    all Claims (including Tax refunds) relating to the Purchased Assets or Assumed Liabilities, including the Claims identified on Section 2.2(a)(xiii) of the Sellers' Disclosure Schedule and all Claims against any Taxing Authority for any period, other than Bankruptcy Avoidance Actions and any of the foregoing to the extent that they relate exclusively to the Excluded Assets or Retained Liabilities;

(xiv)    all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials, reports and other materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

(xv)     all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities;

(xvi)     to the extent provided in **Section 6.17(e)**, all Assumed Plans;

(xvii)     all insurance policies and the rights to the proceeds thereof, other than the Excluded Insurance Policies;

(xviii)     any rights of any Seller, Subsidiary of any Seller or Seller Group member to any Tax refunds, credits or abatements that relate to any Pre-Closing Tax Period or Straddle Period; and

(xix)     any interest in Excluded Insurance Policies, only to the extent such interest relates to any Purchased Asset or Assumed Liability.

(b)     Notwithstanding anything to the contrary contained in this Agreement, Sellers shall retain all of their respective right, title and interest in and to, and shall not, and shall not be deemed to, sell, transfer, assign, convey or deliver to Purchaser, and the Purchased Assets shall not, and shall not be deemed to, include the following (collectively, the "Excluded Assets"):

(i)     cash or cash equivalents in an amount equal to $950,000,000 (the "Excluded Cash");

(ii)     all Restricted Cash exclusively relating to the Excluded Assets or Retained Liabilities;

(iii)     all Receivables (other than Intercompany Obligations) exclusively related to any Excluded Assets or Retained Liabilities;

(iv)     all of Sellers' Equity Interests in (A) S LLC, (B) S Distribution, (C) Harlem and (D) the Subsidiaries, joint ventures and the other entities in which any Seller has any Equity Interest and that are identified on Section 2.2(b)(iv) of the Sellers' Disclosure Schedule (collectively, the "Excluded Entities");

(v)     (A) all owned real property set forth on **Exhibit F** and such additional owned real property set forth on Section 2.2(b)(v) of the Sellers' Disclosure Schedule (including, in each case, any structures, buildings or other improvements located thereon and appurtenances thereto) and (B) all real property leased or subleased that is subject to a Contract designated as an "Excluded Contract" (collectively, the "Excluded Real Property");

(vi)     all Personal Property that is (A) located at the Transferred Real Property and identified on Section 2.2(b)(vi) of the Sellers' Disclosure Schedule, (B) located at the Excluded Real Property, except for those items identified on Section 2.2(a)(vii) of the Sellers' Disclosure Schedule or (C) subject to a Contract

designated as an Excluded Contract (collectively, the "Excluded Personal Property");

(vii)    (A) all Contracts identified on Section 2.2(b)(vii) of the Sellers' Disclosure Schedule immediately prior to the Closing, (B) all pre-petition Executory Contracts designated as Rejectable Executory Contracts, (C) all pre-petition Executory Contracts (including, for the avoidance of doubt, the Delphi Transaction Agreements and GM Assumed Contracts) that have not been designated as or deemed to be Assumable Executory Contracts in accordance with **Section 6.6** or **Section 6.31**, or that are determined, pursuant to the procedures set forth in the Sale Procedures Order, not to be assumable and assignable to Purchaser, (D) all Collective Bargaining Agreements not set forth on the Assumable Executory Contract Schedule and (E) all non-Executory Contracts for which performance by a third-party or counterparty is substantially complete and for which a Seller owes a continuing or future obligation with respect to such non-Executory Contracts (collectively, the "Excluded Contracts"), including any accounts receivable arising out of or in connection with any Excluded Contract; it being understood and agreed by the Parties hereto that, notwithstanding anything to the contrary herein, in no event shall the UAW Collective Bargaining Agreement be designated or otherwise deemed or considered an Excluded Contract;

(viii)    all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials, reports and other materials (in whatever form or medium) relating exclusively to the Excluded Assets or Retained Liabilities, and any books, records and other materials that any Seller is required by Law to retain;

(ix)    the corporate charter, qualification to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, corporate seal, minute books, stock transfer books, blank stock certificates and any other documents relating to the organization, maintenance and existence of each Seller and each Excluded Entity;

(x)    all Claims against suppliers, dealers and any other third parties relating exclusively to the Excluded Assets or Retained Liabilities;

(xi)    all of Sellers' Claims under this Agreement, the Ancillary Agreements and the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551 (inclusive), 553, 558 and any other applicable provisions of the Bankruptcy Code, and any related Claims and actions arising under such sections by operation of Law or otherwise, including any and all proceeds of the foregoing (the "Bankruptcy Avoidance Actions"), but in all cases, excluding all rights and Claims identified on Section 2.2(b)(xi) of the Sellers' Disclosure Schedule;

(xii)    all credits, deferred charges, prepaid expenses, deposits and advances, warranties, rights, guarantees, surety bonds, letters of credit, trust arrangements and other similar financial arrangements, in each case, relating exclusively to the Excluded Assets or Retained Liabilities;

(xiii)    all insurance policies identified on Section 2.2(b)(xiii) of the Sellers' Disclosure Schedule and the rights to proceeds thereof (collectively, the "Excluded Insurance Policies"), other than any rights to proceeds to the extent such proceeds relate to any Purchased Asset or Assumed Liability;

(xiv)    all Permits, to the extent that they relate exclusively to the Excluded Assets or Retained Liabilities;

(xv)    all Retained Plans; and

(xvi)    those assets identified on Section 2.2(b)(xvi) of the Sellers' Disclosure Schedule.

*Section 2.3    Assumed and Retained Liabilities.*

(a)    The "Assumed Liabilities" shall consist only of the following Liabilities of Sellers:

(i)    $7,072,488,605 of Indebtedness incurred under the DIP Facility, to be restructured pursuant to the terms of **Section 6.9** (the "Purchaser Assumed Debt");

(ii)    all Liabilities under each Purchased Contract;

(iii)    all Intercompany Obligations owed or due, directly or indirectly, by Sellers to (A) any Purchased Subsidiary or (B) any joint venture or other entity in which a Seller or a Purchased Subsidiary has any Equity Interest (other than an Excluded Entity);

(iv)    all Cure Amounts under each Assumable Executory Contract that becomes a Purchased Contract;

(v)    all Liabilities of Sellers (A) arising in the Ordinary Course of Business during the Bankruptcy Case through and including the Closing Date, to the extent such Liabilities are administrative expenses of Sellers' estates pursuant to Section 503(b) of the Bankruptcy Code and (B) arising prior to the commencement of the Bankruptcy Cases to the extent approved by the Bankruptcy Court for payment by Sellers pursuant to a Final Order (and for the avoidance of doubt, Sellers' Liabilities in clauses (A) and (B) above include Sellers' Liabilities for personal property Taxes, real estate and/or other ad valorem Taxes, use Taxes, sales Taxes, franchise Taxes, income Taxes, gross receipt Taxes, excise Taxes, Michigan Business Taxes and Michigan Single Business Taxes), in each case, other than (1) Liabilities of the type described in

**Section 2.3(b)(iv)**, **Section 2.3(b)(vi)** and **Section 2.3(b)(ix)**, (2) Liabilities arising under any dealer sales and service Contract and any Contract related thereto, to the extent such Contract has been designated as a Rejectable Executory Contract, and (3) Liabilities otherwise assumed in this **Section 2.3(a)**;

(vi)     all Transfer Taxes payable in connection with the sale, transfer, assignment, conveyance and delivery of the Purchased Assets pursuant to the terms of this Agreement;

(vii)     (A) all Liabilities arising under express written warranties of Sellers that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws;

(viii)     all Liabilities arising under any Environmental Law (A) relating to conditions present on the Transferred Real Property, other than those Liabilities described in **Section 2.3(b)(iv)**, (B) resulting from Purchaser's ownership or operation of the Transferred Real Property after the Closing or (C) relating to Purchaser's failure to comply with Environmental Laws after the Closing;

(ix)     all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance (for avoidance of doubt, Purchaser shall not assume, or become liable to pay, perform or discharge, any Liability arising or contended to arise by reason of exposure to materials utilized in the assembly or fabrication of motor vehicles manufactured by Sellers and delivered prior to the Closing Date, including asbestos, silicates or fluids, regardless of when such alleged exposure occurs);

(x)     all Liabilities of Sellers arising out of, relating to, in respect of, or in connection with workers' compensation claims against any Seller, except for Retained Workers' Compensation Claims;

(xi)     all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing;

(xii)     all Liabilities (A) specifically assumed by Purchaser pursuant to **Section 6.17** and (B) arising out of, relating to or in connection with the salaries and/or wages and vacation of all Transferred Employees that are accrued and unpaid (or with respect to vacation, unused) as of the Closing Date;

(xiii)    (A) all Employment-Related Obligations and (B) Liabilities under any Assumed Plan, in each case, relating to any Employee that is or was covered by the UAW Collective Bargaining Agreement, except for Retained Workers Compensation Claims;

(xiv)    all Liabilities of Sellers underlying any construction liens that constitute Permitted Encumbrances with respect to Transferred Real Property; and

(xv)    those other Liabilities identified on Section 2.3(a)(xv) of the Sellers' Disclosure Schedule.

(b)    Each Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Purchaser shall not assume, or become liable to pay, perform or discharge, any Liability of any Seller, whether occurring or accruing before, at or after the Closing, other than the Assumed Liabilities.  In furtherance and not in limitation of the foregoing, and in all cases with the exception of the Assumed Liabilities, neither Purchaser nor any of its Affiliates shall assume, or be deemed to have assumed, any Indebtedness, Claim or other Liability of any Seller or any predecessor, Subsidiary or Affiliate of any Seller whatsoever, whether occurring or accruing before, at or after the Closing, including the following (collectively, the "Retained Liabilities"):

(i)    all Liabilities arising out of, relating to, in respect of or in connection with any Indebtedness of Sellers (other than Intercompany Obligations and the Purchaser Assumed Debt), including those items identified on  Section 2.3(b)(i) of the Sellers' Disclosure Schedule;

(ii)    all Intercompany Obligations owed or due, directly or indirectly, by Sellers to (A) another Seller, (B) any Excluded Subsidiary or (C) any joint venture or other entity in which a Seller or an Excluded Subsidiary has an Equity Interest (other than a Transferred Entity);

(iii)    all Liabilities arising out of, relating to, in respect of or in connection with the Excluded Assets, other than Liabilities otherwise retained in this **Section 2.3(b)**;

(iv)    all Liabilities (A) associated with noncompliance with Environmental Laws (including for fines, penalties, damages and remedies); (B) arising out of, relating to, in respect of or in connection with the transportation, off-site storage or off-site disposal of any Hazardous Materials generated or located at any Transferred Real Property; (C) arising out of, relating to, in respect of or in connection with third-party Claims related to Hazardous Materials that were or are located at or that migrated or may migrate from any Transferred Real Property, except as otherwise required under applicable Environmental Laws; (D) arising under Environmental Laws related to the Excluded Real Property; or (E) for environmental Liabilities with respect to real property formerly owned, operated or leased by Sellers (as of the Closing), which, in the case of clauses (A),

(B) and (C), arose prior to or at the Closing, and which, in the case of clause (D) and (E), arise prior to, at or after the Closing;

(v)       except for Taxes assumed in **Section 2.3(a)(v)** and **Section 2.3(a)(vi)**, all Liabilities with respect to any (A) Taxes arising in connection with Sellers' business, the Purchased Assets or the Assumed Liabilities and that are attributable to a Pre-Closing Tax Period (including any Taxes incurred in connection with the sale of the Purchased Assets, other than all Transfer Taxes), (B) other Taxes of any Seller and (C) Taxes of any Seller Group, including any Liability of any Seller or any Seller Group member for Taxes arising as a result of being or ceasing to be a member of any Seller Group (it being understood, for the avoidance of doubt, that no provision of this Agreement shall cause Sellers to be liable for Taxes of any Purchased Subsidiary for which Sellers would not be liable absent this Agreement);

(vi)      all Liabilities for (A) costs and expenses relating to the preparation, negotiation and entry into this Agreement and the Ancillary Agreements (and the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements, which, for the avoidance of doubt, shall not include any Transfer Taxes), including Advisory Fees, (B) administrative fees, professional fees and all other expenses under the Bankruptcy Code and (C) all other fees and expenses associated with the administration of the Bankruptcy Cases;

(vii)     all Employment-Related Obligations not otherwise assumed in **Section 2.3(a)** and **Section 6.17**, including those arising out of, relating to, in respect of or in connection with the employment, potential employment or termination of employment of any individual (other than any Employee that is or was covered by the UAW Collective Bargaining Agreement) (A) prior to or at the Closing (including any severance policy, plan or program that exists or arises, or may be deemed to exist or arise, as a result of, or in connection with, the transactions contemplated by this Agreement) or (B) who is not a Transferred Employee arising after the Closing and with respect to both clauses (A) and (B) above, including any Liability arising out of, relating to, in respect of or in connection with any Collective Bargaining Agreement (other than the UAW Collective Bargaining Agreement);

(viii)    all Liabilities arising out of, relating to, in respect of or in connection with Claims for infringement or misappropriation of third party intellectual property rights;

(ix)      all Product Liabilities arising in whole or in part from any accidents, incidents or other  occurrences that happen prior to the Closing Date;

(x)       all Liabilities to third parties for death, personal injury, other injury to Persons or damage to property, in each case, arising out of asbestos exposure;

(xi)    all Liabilities to third parties for Claims based upon Contract, tort or any other basis;

(xii)    all workers' compensation Claims with respect to Employees residing in or employed in, as the case may be as defined by applicable Law, the states set forth on **Exhibit G** (collectively, "Retained Workers' Compensation Claims");

(xiii)    all Liabilities arising out of, relating to, in respect of or in connection with any Retained Plan;

(xiv)    all Liabilities arising out of, relating to, in respect of or in connection with any Assumed Plan or Purchased Subsidiaries Employee Benefit Plan, but only to the extent such Liabilities result from the failure of such Assumed Plan or Purchased Subsidiaries Employee Benefit Plan to comply in all respects with TARP or such Liability related to any changes to or from the administration of such Assumed Plan or Purchased Subsidiaries Employee Benefit Plan prior to the Closing Date;

(xv)    the Settlement Agreement, except as provided with respect to Liabilities under Section 5A of the UAW Retiree Settlement Agreement; and

(xvi)    all Liabilities arising out of, related to or in connection with any (A) implied warranty or other implied obligation arising under statutory or common law without the necessity of an express warranty or (B) allegation, statement or writing by or attributable to Sellers.

*Section 2.4    Non-Assignability.*

(a)    If any Contract, Transferred Equity Interest (or any interest therein), Permit or other asset, which by the terms of this Agreement, is intended to be included in the Purchased Assets is determined not capable of being assigned or transferred (whether pursuant to Sections 363 or 365 of the Bankruptcy Code) to Purchaser at the Closing without the consent of another party thereto, the issuer thereof or any third party (including a Governmental Authority) ("Non-Assignable Assets"), this Agreement shall not constitute an assignment thereof, or an attempted assignment thereof, unless and until any such consent is obtained.  Subject to **Section 6.3**, Sellers shall use reasonable best efforts, and Purchaser shall use reasonable best efforts to cooperate with Sellers, to obtain the consents necessary to assign to Purchaser the Non-Assignable Assets before, at or after the Closing; provided, however, that neither Sellers nor Purchaser shall be required to make any expenditure, incur any Liability, agree to any modification to any Contract or forego or alter any rights in connection with such efforts.

(b)    To the extent that the consents referred to in **Section 2.4(a)** are not obtained by Sellers, except as otherwise provided in the Ancillary Documents to which one or more Sellers is a party, Sellers' sole responsibility with respect to such Non-Assignable Assets shall be to use reasonable best efforts, at no cost to Sellers, to (i) provide to Purchaser the benefits of any Non-Assignable Assets; (ii) cooperate in any

relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

Section 4.17    *Dealer Sales and Service Agreements for Continuing Brands.* Parent is not in breach of or default under the terms of any United States dealer sales and service Contract for Continuing Brands other than any Excluded Continuing Brand Dealer Agreement (each, a "Dealer Agreement"), where such breach or default would reasonably be expected to have a Material Adverse Effect. To the Knowledge of Sellers, no other party to any Dealer Agreement is in breach of or default under the terms of such Dealer Agreement, where such breach or default would not reasonably be expected to have a Material Adverse Effect. Except as would not reasonably be expected to have a Material Adverse Effect, each Dealer Agreement is a valid and binding obligation of Parent and, to the Knowledge of Sellers, of each other party thereto, and is in full force and effect, except as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent transfer and other similar Laws relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

Section 4.18    *Sellers' Products.*

(a)    To the Knowledge of Sellers, since April 1, 2007, neither Sellers nor any Purchased Subsidiary has conducted or decided to conduct any material recall or other field action concerning any product developed, designed, manufactured, sold, provided or placed in the stream of commerce by or on behalf of any Seller or any Purchased Subsidiary.

(b)    As of the date hereof, there are no material pending actions for negligence, manufacturing negligence or improper workmanship, or material pending actions, in whole or in part, premised upon product liability, against or otherwise naming as a party any Seller, Purchased Subsidiary or any predecessor-in-interest of any of the foregoing Persons, or to the Knowledge of Sellers, threatened in writing or of which Seller has received written notice that involve a product liability Claim resulting from the ownership, possession or use of any product manufactured, sold or delivered by any Seller, any Purchased Subsidiary or any predecessor-in-interest of any of the foregoing Persons, which would reasonably be expected to have a Material Adverse Effect.

(c)    To the Knowledge of Sellers and except as would not reasonably be expected to have a Material Adverse Effect, no supplier to any Seller has threatened in writing to cease the supply of products or services that could impair future production at a major production facility of such Seller.

Section 4.19    *Certain Business Practices.* Each of Sellers and the Purchased Subsidiaries is in compliance with the legal requirements under the Foreign Corrupt Practices Act, as amended (the "FCPA"), except for such failures, whether individually or in the aggregate, to maintain books and records or internal controls as required thereunder that are not

an executive officer of Purchaser setting forth the details of such event and the action which Purchaser proposes to take with respect thereto.

Section 6.13    *Actions by Affiliates.*    Each of Purchaser and Sellers shall cause their respective controlled Affiliates, and shall use their reasonable best efforts to ensure that each of their respective other Affiliates (other than Sponsor in the case of Purchaser) takes all actions reasonably necessary to be taken by such Affiliate in order to fulfill the obligations of Purchaser or Sellers, as the case may be, under this Agreement.

Section 6.14    *Compliance Remediation.*    Except with respect to the Excluded Assets or Retained Liabilities, prior to the Closing, Sellers shall use reasonable best efforts to, and shall use reasonable best efforts to cause their Subsidiaries to use their reasonable best efforts to, cure in all material respects any instances of non-compliance with Laws or Orders, failures to possess or maintain Permits or defaults under Permits.

Section 6.15    *Product Certification, Recall and Warranty Claims.*

(a)    From and after the Closing, Purchaser shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.

(b)    From and after the Closing, Purchaser shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.    In connection with the foregoing clause (ii), (A) Purchaser shall continue to address Lemon Law Claims using the same procedural mechanisms previously utilized by the applicable Sellers and (B) for avoidance of doubt, Purchaser shall not assume Liabilities arising under the law of implied warranty or other analogous provisions of state Law, other than Lemon Laws, that provide consumer remedies in addition to or different from those specified in Sellers' express warranties.

(c)    For the avoidance of doubt, Liabilities of the Transferred Entities arising from or in connection with products manufactured or sold by the Transferred Entities remain the responsibility of the Transferred Entities and shall be neither Assumed Liabilities nor Retained Liabilities for the purposes of this Agreement.

Section 6.16    *Tax Matters; Cooperation.*

(a)    Prior to the Closing Date, Sellers shall prepare and timely file (or cause to be prepared and timely filed) all Tax Returns required to be filed prior to such date (taking into account any extension of time to file granted or obtained) that relate to Sellers, the Purchased Subsidiaries and the Purchased Assets in a manner consistent with

# FIRST AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT

THIS FIRST AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT, dated as of June 30, 2009 (this "Amendment"), is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem," and collectively with Parent, S LLC and S Distribution, "Sellers," and each a "Seller"), and NGMCO, Inc., a Delaware corporation and successor-in-interest to Vehicle Acquisition Holdings LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, Sellers and Purchaser have entered into that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "Purchase Agreement"); and

WHEREAS, the Parties desire to amend the Purchase Agreement as set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties hereby agree as follows:

Section 1.    *Capitalized Terms.*  All capitalized terms used but not defined herein shall have the meanings specified in the Purchase Agreement.

Section 2.    *Amendments to Purchase Agreement.*

(a)    **Section 2.3(a)(v)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(v)    all Liabilities of Sellers (A) arising in the Ordinary Course of Business during the Bankruptcy Cases through and including the Closing Date, to the extent such Liabilities are administrative expenses of Sellers' estates pursuant to Section 503(b) of the Bankruptcy Code and (B) arising prior to the commencement of the Bankruptcy Cases, to the extent approved by the Bankruptcy Court for payment by Sellers pursuant to a Final Order (and for the avoidance of doubt, Sellers' Liabilities in clauses (A) and (B) above include all of Sellers' Liabilities for personal property Taxes, real estate and/or other ad valorem Taxes, use Taxes, sales Taxes, franchise Taxes, income Taxes, gross receipt Taxes, excise Taxes, Michigan Business Taxes and Michigan Single Business Taxes and other Liabilities mentioned in the Bankruptcy Court's Order - Docket No. 174), in each case, other than (1) Liabilities of the type described in **Section 2.3(b)(iv)**, **Section 2.3(b)(vi)**, **Section 2.3(b)(ix)** and **Section 2.3(b)(xii)**, (2) Liabilities arising under any dealer sales and service Contract and any Contract related thereto, to the extent such Contract has been designated as

a Rejectable Executory Contract, and (3) Liabilities otherwise assumed in
this **Section 2.3(a)**;

(b)      **Section 2.3(a)(ix)** of the Purchase Agreement is hereby amended and restated in
its entirety to read as follows:

(ix)     all Liabilities to third parties for death, personal injury, or
other injury to Persons or damage to property caused by motor vehicles
designed for operation on public roadways or by the component parts of
such motor vehicles and, in each case, manufactured, sold or delivered by
Sellers (collectively, "Product Liabilities"), which arise directly out of
death, personal injury or other injury to Persons or damage to property
caused by accidents or incidents first occurring on or after the Closing
Date and arising from such motor vehicles' operation or performance (for
avoidance of doubt, Purchaser shall not assume, or become liable to pay,
perform or discharge, any Liability arising or contended to arise by reason
of exposure to materials utilized in the assembly or fabrication of motor
vehicles manufactured by Sellers and delivered prior to the Closing Date,
including asbestos, silicates or fluids, regardless of when such alleged
exposure occurs);

(c)      **Section 2.3(b)(xii)** of the Purchase Agreement is hereby amended and restated in
its entirety to read as follows:

(xii)    all workers' compensation Claims with respect to
Employees residing or employed in, as the case may be and as defined by
applicable Law, (A) the states set forth on **Exhibit G** and (B) if the State
of Michigan (1) fails to authorize Purchaser and its Affiliates operating
within the State of Michigan to be a self-insurer for purposes of
administering workers' compensation Claims or (2) requires Purchaser
and its Affiliates operating within the State of Michigan to post collateral,
bonds or other forms of security to secure workers' compensation Claims,
the State of Michigan (collectively, "Retained Workers' Compensation
Claims");

(d)      **Section 6.6(d)** of the Purchase Agreement is hereby amended and restated in its
entirety to read as follows:

(d)      All Assumable Executory Contracts shall be assumed and assigned
to Purchaser on the date (the "Assumption Effective Date") that is the later of (i)
the date designated by the Purchaser and (ii) the date following expiration of the
objection deadline if no objection, other than to the Cure Amount, has been timely
filed or the date of resolution of any objection unrelated to Cure Amount, as
provided in the Sale Procedures Order; provided, however, that in the case of each
(A) Assumable Executory Contract identified on Section 6.6(a)(i) of the Sellers'
Disclosure Schedule, (2) Deferred Termination Agreement (and the related
Discontinued Brand Dealer Agreement or Continuing Brand Dealer Agreement)

2

# EXHIBIT B

14V-047
(3 pages)



**GENERAL MOTORS LLC**
Vehicle Safety and Crashworthiness

**RECEIVED**
By Recall Management Division at 6:41 am, Feb 10, 2014

February 7, 2014

Ms. Nancy Lewis
Associate Administrator for Enforcement
National Highway Traffic Safety Administration
Recall Management Division (NVS-215)
1200 New Jersey Avenue, SE – Room W45-306
Washington, DC  20590

Dear Ms. Lewis:

The following information is submitted pursuant to the requirements of 49 CFR 573.6 as it applies to a determination by General Motors to conduct a safety related recall for certain 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles.

573.6(c)(1): General Motors Company; Chevrolet and Pontiac Brands

573.6(c)(2),(3),(4): This information is shown on the attached sheet.

573.6(c)(5): General Motors has decided that a defect, which relates to motor vehicle safety, exists in 2005-2007 model year Chevrolet Cobalt and 2007 Pontiac G5 vehicles.  The ignition switch torque performance may not meet General Motors' specification.  If the torque performance is not to specification, and the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the "run" position.  The timing of the key movement out of the "run" position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes.

Until this correction is performed, customers should remove non-essential items from their key ring.

573.6(c)(6): The issue was presented to the Field Performance Evaluation Review Committee and on January 31, 2014, the Executive Field Action Decision Committee decided to conduct a safety recall.

573.6(c)(8): Dealers are to replace the ignition switch.

GM will provide the dealer bulletin and owner letter mail dates when available.

Pursuant to 577.11(e), GM will provide reimbursement to owners for repairs completed on or before ten days after the owner mailing is completed, according to the plan submitted on May 23, 2013.

Mail Code: 480-210-2V1
30001 Van Dyke Road • Warren, MI  48090-9020
N130454 573 Letter.docx



Letter to Ms. Nancy Lewis
N130454 573 Letter
February 7, 2014
Page 2

<u>573.6(c)(10)</u>: GM will provide copies of the dealer bulletin and owner letter under separate cover.

<u>573.6(c)(11)</u>: GM's assigned recall number is 13454.

Sincerely,

M. Carmen Benavides, Director
Product Investigations and Safety Regulations

13454
Attachment

573.6(c)(2),(3),(4)

## VEHICLES POTENTIALLY AFFECTED BY MAKE, MODEL, AND MODEL YEAR PLUS INCLUSIVE DATES OF MANUFACTURE

| MAKE | MODEL SERIES | MODEL YEAR | NUMBER INVOLVED | INCLUSIVE MANUFACTURING DATES (FROM) | (TO) | DESCRIPTIVE INFO. TO PROPERLY IDENT. VEH. | EST. NO. W/CONDITION |
|---|---|---|---|---|---|---|---|
| Chevrolet | A | 2005 | 140,978 | 08/03/2004 | 06/17/2005 | Cobalt | * |
| Chevrolet | A | 2006 | 229,578 | 04/05/2005 | 06/09/2006 | Cobalt | :: |
| Chevrolet | A | 2007 | 215,667 | 04/20/2006 | 08/16/2007 | Cobalt | :: |
| Pontiac | A | 2007 | 32,889 | 04/20/2006 | 08/06/2007 | G5 | :: |
| GM Total: | | | 619,122 | | | | |

\* All involved vehicles will be corrected as necessary.

573.6(c)(2)(iv): Delphi Packard Electrical/Electronic Architecture
5725 Delphi Drive
M/C 483.400.301
Troy, Michigan 48098

Tel: [1] 248.813.2334
Fax: [1] 248.813.2333

The involved parts are manufactured in Mexico.

13454

# EXHIBIT C

PREET BHARARA
United States Attorney for the
Southern District of New York
By:   JASON H. COWLEY
      ALEXANDER J. WILSON

Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,                :

            Plaintiff,                   :        VERIFIED COMPLAINT

            -v.-                         :        15 Civ. _____

$900,000,000 in United States            :
Currency,
                                         :
            Defendant *in rem*.
- - - - - - - - - - - - - - - - - -x

       Plaintiff United States of America, by its attorney, PREET

BHARARA, United States Attorney for the Southern District of New

York, for its Verified Complaint (the "Complaint") alleges, upon

information and belief, as follows:

                    I.   JURISDICTION AND VENUE

       1.   This action is brought by the United States of

America pursuant to 18 U.S.C. § 981(a)(1)(C), seeking the

forfeiture of $900,000,000 in United States Currency (the

"Defendant Funds" or the "defendant-in-rem").

2.    This Court has jurisdiction pursuant to 28 U.S.C.
§ 1355.

3.    Venue is proper pursuant to 28 U.S.C. §
1355(b)(1)(A) because certain acts and omissions giving rise to
the forfeiture took place in the Southern District of New York,
and pursuant to Title 28, United States Code, Section 1395
because the defendant-in-rem shall be transferred to the
Southern District of New York.

4.    The Defendant Funds represent property
constituting and derived from proceeds of wire fraud in
violation of Title 18, United States Code, Sections 1343, and
property traceable to such property; and are thus subject to
forfeiture to the United States pursuant to Title 18, United
States Code, Section 981(a)(1)(C).

## II.    PROBABLE CAUSE FOR FORFEITURE

5.    General Motors Company ("GM"), an automotive
company headquartered in Detroit, Michigan, entered into a
Deferred Prosecution Agreement with the United States, wherein,
*inter alia*, GM agreed to forfeit a total of $900,000,000, i.e.,
the Defendant Funds, to the United States.  GM agrees that the
Defendant Funds are substitute *res* for the proceeds of GM's wire
fraud offense.  The Deferred Prosecution Agreement, with the

2

09-50026-mg   Doc 13664-3   Filed 07/01/16   Entered 07/01/16 19:28:11   Exhibits A
through N   Pg 220 of 481
Case 1:15-cv-07342   Document 6   Filed 09/07/15   Page 3 of 5

accompanying Statement of Facts and Information, is attached as Exhibit A and incorporated herein.

### III. CLAIM FOR FORFEITURE

6.   The allegations contained in paragraphs one through five of this Verified Complaint are incorporated by reference herein.

7.   Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

8.   "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include any offense under 18 U.S.C. § 1961(1).  Section 1961(1) lists, among others offenses, violations of Title 18, United States Code, Section 1343 (relating to wire fraud).

9.   By reason of the foregoing, the defendant-in-rem is subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(C), as it is substitute *res* for property derived from wire fraud, in violation of Title 18, United States Code, Section 1343.

09-50026-mg    Doc 13664-3    Filed 07/01/16    Entered 07/01/16 19:28:11    Exhibits A
through N    Pg 221 of 481
Case 1:15-cv-07342    Document 1    Filed 09/17/15    Page 8 of 15

WHEREFORE, plaintiff United States of America
prays that process issue to enforce the forfeiture of the
defendant-in-rem and that all persons having an interest in
the defendant-in-rem be cited to appear and show cause why
the forfeiture should not be decreed, and that this Court
decree forfeiture of the defendant-in-rem to the United States
of America for disposition according to law, and that this
Court grant plaintiff such further relief as this Court may
deem just and proper, together with the costs and
disbursements of this action.

Dated:      New York, New York
            September 16, 2015

                              PREET BHARARA
                              United States Attorney for
                              Plaintiff United States of America


            By:     _____
                    JASON H. COWLEY
                    ALEXANDER J. WILSON
                    Assistant United States Attorneys
                    One St. Andrew's Plaza
                    New York, New York 10007
                    (212) 637-2200

4

VERIFICATION

STATE OF NEW YORK            )
COUNTY OF NEW YORK          :
SOUTHERN DISTRICT OF NEW YORK )

      KENNETH W. JACOUTOT, being duly sworn, deposes and says that he is a Special Agent with the United States Department of Transportation, Office of Inspector General; that he has read the foregoing Verified Complaint and knows the contents thereof; and that the same is true to the best of his knowledge, information and belief.

      The sources of deponent's information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

                        _____
                        Kenneth W. Jacoutot
                        Special Agent
                        Department of Transportation,
                        Office of Inspector General

Sworn to before me this
16 th day of September, 2015

_____
Notary Public

**NAEEM A. CONWAY**
Notary Public, State of New York
No. 01CO6110667
Qualified in New York County
Commission Expires June 01, 2016

Case 1:15-cv-07342    Document 1-61    Filed 09/17/15    Page 3 of 52

# Exhibit

# A



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York New York 10007*

September 16, 2015

Anton R. Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
Jenner & Block LLP
919 Third Avenue
New York, NY 10022

### Re: General Motors Company – Deferred Prosecution Agreement

Dear Messrs. Valukas, Schar, and Barkow:

Pursuant to the understandings specified below, the Office of the United States Attorney for the Southern District of New York (the "Office") and the defendant General Motors Company ("GM"),[1] under authority granted by its Board of Directors in the form of the written authorization attached as Exhibit A, hereby enter into this Deferred Prosecution Agreement (the "Agreement").

### The Criminal Information

1. GM consents to the filing of a two-count Information (the "Information") in the United States District Court for the Southern District of New York (the "Court"), charging GM with engaging in a scheme to conceal a deadly safety defect from its U.S. regulator, in violation of Title 18, United States Code, Section 1001, and committing wire fraud, in violation of Title 18, United States Code, Section 1343. A copy of the Information is attached as Exhibit B. This Agreement shall take effect upon its execution by both parties.

---

[1] For the purposes of this Deferred Prosecution Agreement, to the extent any conduct, statement, actions, or documents occurred on or are dated before July 10, 2009, references to "GM" shall mean and are intended to mean solely "Motors Liquidation Company," previously known as General Motors Corporation ("Old GM"). Although New GM in the Statement of Facts attached as Exhibit C hereto admits certain facts about Old GM's acts, conduct, or knowledge prior to July 10, 2009 based on New GM's current knowledge, New GM does not intend those admissions to imply or suggest that New GM is responsible for any acts, conduct or knowledge of Old GM, or that such acts, conduct, and knowledge of Old GM can be imputed to New GM. The Statement of Facts is not intended to alter, modify, expand, or otherwise affect any provision of the July 5, 2009 Sale Order that was issued by the U.S. Bankruptcy Court for the Southern District of New York, or the rights, protections, and responsibilities of New GM under the Sale Order..

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

## Acceptance of Responsibility

2.    GM admits and stipulates that the facts set forth in the Statement of Facts attached as Exhibit C and incorporated herein are true and accurate. In sum, GM admits that it failed to disclose to its U.S. regulator and the public a potentially lethal safety defect that caused airbag non-deployment in certain GM model cars, and that GM further affirmatively misled consumers about the safety of GM cars afflicted by the defect.

## Forfeiture

3.    As a result of the conduct described in the Information and the Statement of Facts, GM agrees to pay to the United States $900 million (the "Stipulated Forfeiture Amount") representing the proceeds resulting from such conduct. GM agrees that the allegations contained in the Information and the facts set forth in the Statement of Facts are sufficient to establish that the Stipulated Forfeiture Amount is subject to civil forfeiture to the United States and that this Agreement, Information, and Statement of Facts may be attached to and incorporated into the Civil Forfeiture Complaint to be filed against the Stipulated Forfeiture Amount, a copy of which is attached as Exhibit D hereto. By this Agreement, GM specifically waives service of said Civil Forfeiture Complaint and agrees that a Final Order of Forfeiture may be entered against the Stipulated Forfeiture Amount. Upon payment of the Stipulated Forfeiture Amount, GM shall release any and all claims it may have to such funds and execute such documents as necessary to accomplish the forfeiture of the funds. GM agrees that it will not file a claim with the Court or otherwise contest the civil forfeiture of the Stipulated Forfeiture Amount and will not assist a third party in asserting any claim to the Stipulated Forfeiture Amount. GM agrees that the Stipulated Forfeiture Amount shall be treated as a penalty paid to the United States government for all purposes, including all tax purposes. GM agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, local, or foreign tax for any fine or forfeiture paid pursuant to this Agreement.

4.    GM shall transfer $900 million to the United States by no later than September 24, 2015 (or as otherwise directed by the Office following such date). Such payment shall be made by wire transfer to the United States Marshals Service, pursuant to wire instructions provided by the Office. If GM fails to timely make the payment required under this paragraph, interest (at the rate specified in Title 28, United States Code, Section 1961) shall accrue on the unpaid balance through the date of payment, unless the Office, in its sole discretion, chooses to reinstate prosecution pursuant to paragraphs 10 and 11 below.

## Obligation to Cooperate

5.    GM has cooperated with this Office's criminal investigation and agrees to cooperate fully and actively with the Office, the Federal Bureau of Investigation ("FBI"), the Department of Transportation ("DOT"), the Office of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP"), the National Highway Traffic Safety Administration ("NHTSA"), and any other agency of the government designated by the Office

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

regarding any matter relating to the Office's investigation about which GM has knowledge or information.

6.      It is understood that GM shall (a) truthfully and completely disclose all information with respect to the activities of itself and its subsidiaries, as well as with respect to the activities of officers, agents, and employees of GM and its subsidiaries, concerning all matters about which the Office inquires of it, which information can be used for any purpose; (b) cooperate fully with the Office, FBI, DOT, SIGTARP, NHTSA, and any other law enforcement agency designated by the Office; (c) attend all meetings at which the Office requests its presence and use its best efforts to secure the attendance and truthful statements or testimony of any past or current officers, agents, or employees of GM or its subsidiaries at any meeting or interview or before the grand jury or at trial or at any other court proceeding; (d) provide to the Office upon request any document, record, or other tangible evidence relating to matters about which the Office or any designated law enforcement agency inquires of it; (e) assemble, organize, and provide in a responsive and prompt fashion, and upon request, on an expedited schedule, all documents, records, information and other evidence in GM's possession, custody or control as may be requested by the Office, FBI, DOT, SIGTARP, NHTSA, or designated law enforcement agency; (f) volunteer and provide to the Office any information and documents that come to GM's attention that may be relevant to the Office's investigation of this matter, any issue related to the Statement of Facts, and any issue that would fall within the scope of the duties of the independent monitor (the "Monitor") as set forth in paragraph 15; (g) provide testimony or information necessary to identify or establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any criminal or other proceeding as requested by the Office, FBI, DOT, SIGTARP, NHTSA, or designated law enforcement agency, including but not limited to information and testimony concerning the conduct set forth in the Information and Statement of Facts; (h) bring to the Office's attention all criminal conduct by or criminal investigations of GM or any of its agents or employees acting within the scope of their employment related to violations of the federal laws of the United States, as to which GM's Board of Directors, senior management, or United States legal and compliance personnel are aware; (i) bring to the Office's attention any administrative or regulatory proceeding or civil action brought by or investigation conducted by any U.S. governmental authority that alleges fraud by GM; and (j) commit no crimes whatsoever under the federal laws of the United States subsequent to the execution of this Agreement.  In the event the Office determines that information it receives from GM pursuant to this provision should be shared with DOT and/or NHTSA, the Office may request that GM provide such information to DOT and/or NHTSA directly. GM will submit such information to DOT and/or NHTSA consistent with the regulatory provisions related to the protection of confidential business information contained in 49 C.F.R. Part 512 and 49 C.F.R. Part 7. Nothing in this Agreement shall be construed to require GM to provide any information, documents or testimony protected by the attorney-client privilege, work product doctrine, or any other applicable privilege.

7.      GM agrees that its obligations pursuant to this Agreement, which shall commence upon the signing of this Agreement, will continue for three years from the date of the

3

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

Court's acceptance of this Agreement, unless otherwise extended pursuant to paragraph 12 below. GM's obligation to cooperate is not intended to apply in the event that a prosecution against GM by this Office is pursued and not deferred.

## Deferral of Prosecution

8.     In consideration of GM's entry into this Agreement, the actions it has taken to date to demonstrate acceptance and acknowledgement of responsibility for its conduct (including, among other things, conducting a swift and robust internal investigation, furnishing this Office with a continuous flow of unvarnished facts gathered during the course of that internal investigation, voluntarily providing, without prompting, certain documents and information otherwise protected by the attorney-client privilege, providing timely and meaningful cooperation more generally in the investigation conducted by this Office, terminating wrongdoers, and establishing a full and independent victim compensation program that has to date paid out hundreds of millions of dollars in awards), and its commitment to: (a) continue to accept and acknowledge responsibility for its conduct; (b) continue to cooperate with the Office, FBI, DOT, SIGTARP, NHTSA, and any other law enforcement agency designated by this Office; (c) make the payments specified in this Agreement; (d) comply with Federal criminal laws; and (e) otherwise comply with all of the terms of this Agreement, the Office shall recommend to the Court that prosecution of GM on the Information be deferred for three years from the date of the signing of this Agreement. GM shall expressly waive indictment and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of New York for the period during which this Agreement is in effect. GM shall expressly waive any objection to venue with respect to any charges arising out of the conduct described in the Statement of Facts and shall expressly consent to the filing of the Information in the Southern District of New York.

9.     It is understood that this Office cannot, and does not, agree not to prosecute GM for criminal tax violations. However, if GM fully complies with the terms of this Agreement, no testimony given or other information provided by GM (or any other information directly or indirectly derived therefrom) will be used against GM in any criminal tax prosecution. In addition, the Office agrees that, if GM is in compliance with all of its obligations under this Agreement, the Office will, within thirty (30) days after the expiration of the period of deferral (including any extensions thereof), seek dismissal with prejudice as to GM of the Information filed against GM pursuant to this Agreement. Except in the event of a violation by GM of any term of this Agreement, the Office will bring no additional charges against GM, except for criminal tax violations, relating to its conduct as described in the admitted Statement of Facts. This Agreement does not provide any protection against prosecution for any crimes except as set forth above and does not apply to any individual or entity other than GM and its subsidiaries. GM and the Office understand that the Agreement to defer prosecution of GM must be approved by the Court, in accordance with 18 U.S.C. § 3161(h)(2). Should the Court decline to approve the Agreement to defer prosecution for any reason, both the Office and GM are released from any

4

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

obligation imposed upon them by this Agreement, and this Agreement shall be null and void, except for the tolling provision set forth in paragraph 10.

10.    It is further understood that should the Office in its sole discretion determine based on facts learned subsequent to the execution of this Agreement that GM has: (a) knowingly given false, incomplete or misleading information to the Office, FBI, DOT, SIGTARP, or NHTSA, either during the term of this Agreement or in connection with the Office's investigation of the conduct described in the Information and Statement of Facts, (b) committed any crime under the federal laws of the United States subsequent to the execution of this Agreement, or (c) otherwise violated any provision of this Agreement, GM shall, in the Office's sole discretion, thereafter be subject to prosecution for any federal criminal violation of which the Office has knowledge, including but not limited to a prosecution based on the Information, the Statement of Facts, or the conduct described therein.  Any such prosecution may be premised on any information provided by or on behalf of GM to the Office and/or FBI, DOT, SIGTARP, or NHTSA at any time. In any such prosecution, no charge would be time-barred provided that such prosecution is brought within the applicable statute of limitations period, excluding (a) any period subject to any prior or existing tolling agreement between the Office and GM and (b) the period from the execution of this Agreement until its termination.  GM agrees to toll, and exclude from any calculation of time, the running of the applicable criminal statute of limitations for the length of this Agreement starting from the date of the execution of this Agreement and including any extension of the period of deferral of prosecution pursuant to paragraph 12 below.  By this Agreement, GM expressly intends to and hereby does waive its rights in the foregoing respects, including any right to make a claim premised on the statute of limitations, as well as any constitutional, statutory, or other claim concerning pre-indictment delay.  Such waivers are knowing, voluntary, and in express reliance on the advice of GM's counsel.

11.    It is further agreed that in the event that the Office, in its sole discretion, determines that GM has violated any provision of this Agreement, including by failure to meet its obligations under this Agreement: (a) all statements made by or on behalf of GM to the Office, FBI, DOT, SIGTARP, and/or NHTSA, including but not limited to the Statement of Facts, or any testimony given by GM or by any agent of GM before a grand jury, or elsewhere, whether before or after the date of this Agreement, or any leads from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings hereinafter brought by the Office against GM; and (b) GM shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of GM before or after the date of this Agreement, or any leads derived therefrom, should be suppressed or otherwise excluded from evidence.  It is the intent of this Agreement to waive any and all rights in the foregoing respects.

12.    GM agrees that, in the event that the Office determines during the period of deferral of prosecution described in paragraph 8 above (or any extensions thereof) that GM has violated any provision of this Agreement, an extension of the period of deferral of prosecution

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

may be imposed in the sole discretion of the Office, up to an additional one year, but in no event shall the total term of the deferral-of-prosecution period of this Agreement exceed four (4) years.

13.    GM, having truthfully admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement.  Consistent with this provision, GM may raise defenses and/or assert affirmative claims and defenses in any proceedings brought by private and/or public parties as long as doing so does not contradict the Statement of Facts or such representations.  Any such contradictory statement by GM, its present or future attorneys, agents, or employees shall constitute a violation of this Agreement and GM thereafter shall be subject to prosecution as specified in paragraphs 8 through 11, above, or the deferral-of-prosecution period shall be extended pursuant to paragraph 12, above.  The decision as to whether any such contradictory statement will be imputed to GM for the purpose of determining whether GM has violated this Agreement shall be within the sole discretion of the Office.  Upon the Office's notifying GM of any such contradictory statement, GM may avoid a finding of violation of this Agreement by repudiating such statement both to the recipient of such statement and to the Office within two business days after having been provided notice by the Office.  GM consents to the public release by the Office, in its sole discretion, of any such repudiation.  Nothing in this Agreement is meant to affect the obligation of GM or its officers, directors, agents or employees to testify truthfully to the best of their personal knowledge and belief in any proceeding.

14.    GM agrees that it is within the Office's sole discretion to choose, in the event of a violation, the remedies contained in paragraphs 10 and 11 above, or instead to choose to extend the period of deferral of prosecution pursuant to paragraph 12.  GM understands and agrees that the exercise of the Office's discretion under this Agreement is unreviewable by any court.  Should the Office determine that GM has violated this Agreement, the Office shall provide notice to GM of that determination and provide GM with an opportunity to make a presentation to the Office to demonstrate that no violation occurred, or, to the extent applicable, that the violation should not result in the exercise of those remedies or in an extension of the period of deferral of prosecution, including because the violation has been cured by GM.

## Independent Monitor

15.    GM agrees to retain a Monitor upon selection by the Office and approval by the Office of the Deputy Attorney General, whose powers, rights and responsibilities shall be as set forth below.

(a).    Jurisdiction, Powers, and Oversight Authority.    To address issues related to the Statement of Facts and Information, the Monitor shall have the authorities and duties defined below.  The scope of the Monitor's authority is to review and assess GM's policies, practices or procedures as set forth below, and is not intended to include substantive review of the correctness of any of GM's prior, present, or future decisions relating to compliance with NHTSA's regulatory regime, including the National Traffic and Motor Vehicle

6

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

Safety Act, its implementing regulations, and related policies. Nor is it intended to supplant NHTSA's authority over decisions related to motor vehicle safety. Except as expressly set forth below, the authority granted below shall not include the authority to exercise oversight, or to participate in, decisions by GM about product offerings, decisions relating to product development, engineering of GM vehicles, capital allocation, and investment decisions.

(1). Review and assess the efficacy of GM's current policies, practices, and procedures in ensuring that GM corrects prior statements and assurances concerning motor vehicle safety;

(2). Review and assess the effectiveness of GM's current policies, practices, or procedures for sharing allegations and engineering analyses associated with lawsuits and not-in-suit matters with those responsible for recall decisions;

(3). Review and assess GM's current compliance with its stated recall processes; and

(4). Review and assess the adequacy of GM's current procedures for addressing known defects in certified pre-owned vehicles.

It is the intent of this Agreement that the provisions regarding the Monitor's jurisdiction, powers, and oversight authority and duties be broadly construed, subject to the following limitation: the Monitor's responsibilities shall be limited to GM's activities in the United States, and to the extent the Monitor seeks information outside the United States, compliance with such requests shall be consistent with the applicable legal principles in that jurisdiction. GM shall adopt all recommendations submitted by the Monitor unless GM objects to any recommendation and the Office agrees that adoption of such recommendation should not be required.

(b). Access to Information. The Monitor shall have the authority to take such reasonable steps, in the Monitor's view, as necessary to be fully informed about those operations of GM within or relating to his or her jurisdiction. To that end, the Monitor shall have:

(1). Access to, and the right to make copies of, any and all non-privileged books, records, accounts, correspondence, files, and any and all other documents or electronic records, including e-mails, of GM and its subsidiaries, and of officers, agents, and employees of GM and its subsidiaries, within or relating to his or her jurisdiction that are located in the United States; and

(2). The right to interview any officer, employee, agent, or consultant of GM conducting business in or present in the United States and to participate in any meeting in the United States concerning any matter within or relating to the Monitor's jurisdiction.

7

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

To the extent that the Monitor seeks access to information contained within privileged documents or materials, GM shall use its best efforts to provide the Monitor with the information without compromising the asserted privilege.

(c).   Confidentiality.

(1).   The Monitor shall maintain the confidentiality of any non-public information entrusted or made available to the Monitor. The Monitor shall share such information only with the Office, FBI and SIGTARP. The Monitor may also determine that such information should be shared with DOT and/or NHTSA. In the event of such a determination, the Monitor may request that GM provide the subject information directly to DOT and/or NHTSA. GM will submit such information to DOT or NHTSA consistent with the regulatory provisions related to the protection of confidential business information contained in 49 C.F.R. Part 512 and 49 C.F.R. Part 7.

(2).   The Monitor shall sign a non-disclosure agreement with GM prohibiting disclosure of information received from GM to anyone other than to the Office, FBI, DOT, SIGTARP or NHTSA, and anyone hired by the Monitor. Within thirty days after the end of the Monitor's term, the Monitor shall either return anything obtained from GM, or certify that such information has been destroyed. Anyone hired by the Monitor shall also sign a non-disclosure agreement with similar return or destruction requirements as set forth in this sub-paragraph.

(d).   Hiring Authority. The Monitor shall have the authority to employ legal counsel, consultants, investigators, experts, and any other personnel necessary to assist in the proper discharge of the Monitor's duties.

(e).   Implementing Authority. The Monitor shall have the authority to take any other actions in the United States that are necessary to effectuate the Monitor's oversight and monitoring responsibilities.

(f).   Miscellaneous Provisions.

(1).   Term. The Monitor's authority set forth herein shall extend for a period of three years from the commencement of the Monitor's duties, except that (a) in the event the Office determines during the period of the Monitorship (or any extensions thereof) that GM has violated any provision of this Agreement, an extension of the period of the Monitorship may be imposed in the sole discretion of the Office, up to an additional one-year extension, but in no event shall the total term of the Monitorship exceed the term of the Agreement; and (b) in the event the Office, in its sole discretion, determines during the period of the Monitorship that the employment of a Monitor is no longer necessary to carry out the purposes of this Agreement, the Office may shorten the period of the Monitorship.

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

(2).    <u>Selection of the Monitor</u>.    The Office shall consult with GM, including soliciting nominations from GM, using its best efforts to select and appoint a mutually acceptable Monitor (and any replacement Monitors, if required) as promptly as possible. In the event that the Office is unable to select a Monitor acceptable to GM, the Office shall have the sole right to select a monitor (and any replacement Monitors, if required). To ensure the integrity of the Monitorship, the Monitor must be independent and objective and the following persons shall not be eligible as either a Monitor or an agent, consultant or employee of the Monitor: (a) any person previously employed by GM; or (b) any person who has been directly adverse to GM in any proceeding. The selection of the Monitor must be approved by the Deputy Attorney General.

(3).    <u>Notice regarding the Monitor; Monitor's Authority to Act on Information received from Employees; No Penalty for Reporting</u>. GM shall establish an independent, toll-free answering service to facilitate communication anonymously or otherwise with the Monitor. Within 10 days of the commencement of the Monitor's duties, GM shall advise its employees of the appointment of the Monitor, the Monitor's powers and duties as set forth in this Agreement, the toll-free number established for contacting the Monitor, and email and mail addresses designated by the Monitor. Such notice shall inform employees that they may communicate with the Monitor anonymously or otherwise, and that no agent, consultant, or employee of GM shall be penalized in any way for providing information to the Monitor. In addition, such notice shall direct that, if an employee is aware of any violation of any law or any unethical conduct that has not been reported to an appropriate federal, state or municipal agency, the employee is obligated to report such violation or conduct to GM's compliance office in the United States or the Monitor. The Monitor shall have access to all communications made using this toll-free number. The Monitor has the sole discretion to determine whether the toll-free number is sufficient to permit confidential and/or anonymous communications or whether the establishment of an additional toll-free number is required. Further, the Monitor shall inform GM of communications made to the Monitor regarding motor vehicle safety so that GM can address any allegations consistent with its Code of Conduct and related policies and procedures.

(4).    <u>Reports to the Office</u>. The Monitor shall keep records of his or her activities, including copies of all correspondence and telephone logs, as well as records relating to actions taken in response to correspondence or telephone calls. If potentially illegal or unethical conduct is reported to the Monitor, the Monitor may, at his or her option, conduct an investigation, and/or refer the matter to the Office. The Monitor should, at his or her option, refer any potentially illegal or unethical conduct to GM's compliance office. The Monitor may report to the Office whenever the Monitor deems fit but, in any event, shall file a written report not less often than every four months regarding: the Monitor's activities; whether GM is complying with the terms of this Agreement; and any changes that are necessary to foster GM's compliance with any applicable laws, regulations and standards related to the Monitor's jurisdiction as set forth in paragraph 15(a). Such periodic written reports are to be provided to GM and the Office. The Office may, in its sole discretion, provide to FBI and SIGTARP all or part of any such periodic written report, or other information provided to the Office by the Monitor. The Office may also

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

determine that all or part of any such periodic report, or other information provided to the Office by the Monitor, be provided to DOT and/or NHTSA. In the event of such a determination, the Office may request that GM transmit such report, part of a report, and/or non-public information to DOT and/or NHTSA directly. GM will submit such report, part of a report, and/or non-public information to DOT and/or NHTSA consistent with the regulatory provisions related to the protection of confidential business information contained in 49 C.F.R. Part 512 and 49 C.F.R. Part 7. GM may provide all or part of any periodic written reports to NHTSA or other federal agencies or governmental entities. Should the Monitor determine that it appears that GM has violated any law, has violated any provision of this Agreement, or has engaged in any conduct that could warrant the modification of his or her jurisdiction, the Monitor shall promptly notify the Office, and when appropriate, GM.

(5).   <u>Cooperation with the Monitor</u>.   GM and all of its officers, directors, employees, agents, and consultants, and all of the officers, directors, employees, agents, and consultants of GM's subsidiaries shall have an affirmative duty to cooperate with and assist the Monitor in the execution of his or her duties provided in this Agreement and shall inform the Monitor of any non-privileged information that may relate to the Monitor's duties or lead to information that relates to his or her duties. Failure of any GM officer, director, employee, or agent to cooperate with the Monitor may, in the sole discretion of the Monitor, serve as a basis for the Monitor to recommend dismissal or other disciplinary action.

(6).   <u>Compensation and Expenses</u>. Although the Monitor shall operate under the supervision of the Office, the compensation and expenses of the Monitor, and of the persons hired under his or her authority, shall be paid by GM. The Monitor, and any persons hired by the Monitor, shall be compensated in accordance with their respective typical hourly rates. GM shall pay bills for compensation and expenses promptly, and in any event within 30 days. In addition, within one week after the selection of the Monitor, GM shall make available office space, telephone service and clerical assistance sufficient for the Monitor to carry out his or her duties.

(7).   <u>Indemnification</u>. GM shall provide an appropriate indemnification agreement to the Monitor with respect to any claims arising out of the performance of the Monitor's duties.

(8).   <u>No Affiliation</u>. The Monitor is not, and shall not be treated for any purpose, as an officer, employee, agent, or affiliate of GM.

<u>Limits of this Agreement</u>

16.   It is understood that this Agreement is binding on the Office but does not bind any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities. However, if requested by GM or its attorneys, the Office will bring to the attention of any such agencies, including but not limited to any regulators,

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

as applicable, this Agreement, the cooperation of GM, and GM's compliance with its obligations under this Agreement.

## Public Filing

17.     GM and the Office agree that, upon the submission of this Agreement (including the Statement of Facts and other attachments) to the Court, this Agreement and its attachments shall be filed publicly in the proceedings in the United States District Court for the Southern District of New York.

18.     The parties understand that this Agreement reflects the unique facts of this case and is not intended as precedent for other cases.

## Execution in Counterparts

19.     This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

## Integration Clause

20.    This Agreement sets forth all the terms of the Deferred Prosecution Agreement between GM and the Office. No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, GM's attorneys, and a duly authorized representative of GM.

PREET BHARARA
United States Attorney
Southern District of New York

By:    _Bonnie Jonas_ _____

BONNIE JONAS
SARAH EDDY MCCALLUM
EDWARD A. IMPERATORE
Assistant United States Attorneys

_Daniel L Stein_ _____

DANIEL L. STEIN
Chief, Criminal Division

Accepted and agreed to:

_Craig B Glidden_ _____

Craig Glidden, Esq.

General Counsel and Chief Legal Officer,
General Motors Company

_____

Anton R. Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.

Attorneys for General Motors Company

# Exhibit A
# to the Deferred
# Prosecution Agreement

09-50026-mg    Doc 13667-32    Filed 07/01/16    Entered 07/01/16 19:28:14    Exhibits A
through N    Pg 237 of 481
Case 1:15-cr-00712    Document 16    Filed 07/15/15    Page 85 of 52Exhibits A

GENERAL MOTORS COMPANY
RESOLUTIONS OF THE BOARD OF DIRECTORS

The following resolutions were duly adopted at a meeting of the Board of Directors of General Motors Company held on September 16, 2015:

WHEREAS, the Company has been engaged in discussions with the U.S. Attorney's Office for the Southern District of New York (the "U.S. Attorney's Office") in connection with an investigation being conducted by the U.S. Attorney's Office of the Company's recalls of vehicles equipped with a defective ignition switch and related matters (the "Investigation"); and

WHEREAS, the Board has determined that it is in the best interest of the Company to enter into a Deferred Prosecution Agreement with the U.S. Attorney's Office that would resolve the Investigation on the terms that have been presented by and discussed with the U.S. Attorney's Office (the "DPA").

RESOLVED that the Board hereby authorizes the Company to resolve the Investigation by entering into the DPA on substantially the same terms set forth in materials provided to the Board in advance of the meeting and described to and reviewed with the Board on September 16, 2015;

RESOLVED that the Board hereby authorizes the Company to disclose the DPA, as appropriate, and the Authorized Officers (defined below) are hereby authorized to take all steps necessary to carry out the disclosure of the DPA; and

RESOLVED that the Board hereby authorizes Mr. Craig B. Glidden, General Counsel for the Company, and outside counsel representing the Company from Jenner & Block LLP, acting together, to execute and deliver the DPA on behalf of the Company and further authorizes them and other appropriate officers of the Company, any one of which acting alone (individually and collectively, the "Authorized Officers"), to take any and all other actions as may be necessary or appropriate to effectuate and finalize the DPA.


_Craig B. Glidden_

Craig B. Glidden
General Counsel

Case 1:15-cv-07342    Document 1-1    Filed 09/17/15    Page 16 of 52

# Exhibit B
# to the Deferred
# Prosecution Agreement

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,          :          INFORMATION

     -v.-                          :

GENERAL MOTORS COMPANY,            :          15 Cr. ___

       Defendant.                 :

- - - - - - - - - - - - - - - - - -x

COUNT ONE
(Scheme to Conceal Material Facts
from a Government Regulator)

The United States Attorney charges:

1.    GENERAL MOTORS COMPANY ("GM" or the "Company"),
the defendant, is an automotive company headquartered in
Detroit, Michigan.  In 2012, GM was the largest automotive
company in the world.

2.    At all times relevant to this Information, GM
designed, manufactured, assembled, and sold Chevrolet brand
vehicles.  From the earliest date relevant to this Information
until in or about 2010, GM designed, manufactured, assembled,
and sold Pontiac brand vehicles.  From the earliest date
relevant to this Information until in or about 2009, GM
designed, manufactured, assembled, and sold Saturn brand
vehicles.  And from the earliest date relevant to this
Information until in or about the spring of 2013, GM promoted

sales of "pre-owned" (i.e., used) Chevrolet, Pontiac, and Saturn brand vehicles by GM dealerships nationwide.

3.    At all times relevant to this Information, GM was required to disclose to its U.S. regulator, the National Highway Traffic Safety Administration ("NHTSA"), any defect in its cars "related to motor vehicle safety" within five business days of identifying said defect. See 49 U.S.C. § 30118(c) & 49 C.F.R. § 573.6.

4.    From in or about the spring of 2012 through in or about February 2014, GM, through its agents and employees, concealed a potentially deadly safety defect from NHTSA and the public. The defect related to an ignition switch that had been designed and manufactured with too-low torque (the "Defective Switch"). As GM knew by no later than 2005, the Defective Switch was prone to too-easy movement from the "Run" to the "Accessory" or "Off" position. And as GM personnel well knew no later than the spring of 2012, when that movement occurred, the driver would lose not only the assistance of power steering and power brakes but also the protection afforded by the vehicle's frontal airbags in the event of a crash.

5.    Rather than remedy the Defective Switch when its torque deficiencies and attendant stalling consequences became clear no later than in or about 2005, GM continued to sell and manufacture new cars equipped with the Defective Switch.

2

Moreover, although the public was made aware, through media reports, of the Defective Switch's existence, GM affirmatively assured consumers in or about June 2005 that the Defective Switch presented no "safety" problem.

6.   In or about April 2006, a GM engineer directed that the Defective Switch no longer be used in new cars, and that it be replaced with another, non-defective switch that would bear the same part number as the Defective Switch. Nothing was done at this time to remedy the cars equipped with the Defective Switch that were already on the road.

7.   When the fact that the Defective Switch could cause airbag non-deployment -- and therefore undeniably presented a *safety* defect -- became plain no later than in or about the spring of 2012, GM did not correct its earlier assurance that the Defective Switch posed no "safety" concern. Nor did it recall the affected vehicles. Instead, it concealed the defect from NHTSA and the public, taking the matter "offline," outside the normal recall process, so that the Company could buy time to package, present, explain, and manage the issue. Fearing an adverse impact on the Company's business, GM engineers and executives wanted to have answers to all questions that NHTSA, the media, and consumers might pose about the defect before alerting the regulator and the public to it.

8.   GM did not recall the vehicles equipped with the Defective Switch until February 2014.  In the meantime, in or about October 2012 and again in or about November 2013, GM personnel gave presentations to NHTSA in which they touted the robustness of GM's internal recall process and gave the misleading impression that GM worked promptly and efficiently to resolve known safety defects, including, specifically, defects related to airbag non-deployment.

## Statutory Allegations

9.   From in or about the spring of 2012 through in or about February 2014, GM, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, willfully and knowingly did falsify, conceal, and cover up by trick, scheme, and device material facts, and made materially false, fictitious, and fraudulent statements and representations, to wit, GM engaged in a scheme to conceal from its federal U.S. regulator, NHTSA, a potentially deadly safety defect that GM was required to disclose within five business days of discovery thereof.

(Title 18, United States Code, Sections 1001 and 2.)

COUNT TWO
(Wire Fraud)

The United States Attorney further charges:

10.   The allegations contained in Paragraphs 1 through 8 are repeated and realleged as though fully set forth herein.

11.   From in or about the spring of 2012 through in or about the spring of 2013, GM dealerships continued to sell GM-certified pre-owned Chevrolet, Pontiac, and Saturn brand vehicles equipped with the Defective Switch.  To promote these sales and give customers assurance about the safety of the cars subject to its certified pre-owned program, GM made representations by means of interstate wires -- that is, over the Internet -- falsely assuring customers of the safety of the used cars they were purchasing.  In particular, GM certified that used vehicles sold pursuant to this program had been checked for safety of their ignition systems and keys.  In truth and in fact, and as GM well knew, cars equipped with the Defective Switch posed a potentially deadly safety threat related to the cars' ignition switches and keys.

12.   In addition to making these false representations as part of its certified pre-owned program, GM, more generally, failed to disclose a material fact that it had a duty to disclose -- namely, that cars equipped with the Defective Switch presented a safety defect.  GM's duty to disclose this fact

5

derived from two sources: (a) its false June 2005 representation that the Defective Switch presented no safety concern; and (b) its obligation under applicable regulations to inform NHTSA of any known safety defect within five business days of discovery thereof.

### Statutory Allegation

13.   From in or about the spring of 2012 through in or about February 2014, in the Southern District of New York and elsewhere, GM, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted and aid and abet the transmission, by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, GM defrauded U.S. consumers into purchasing its products by concealing information and making misleading statements about the safety of vehicles equipped with the Defective Switch.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATION

14.   As a result of committing the wire fraud offense

alleged in Count Two of this Information, GM, the defendant,

shall forfeit to the United States, pursuant to Title 18, United

States Code, Section 981(a)(1)(C) and Title 28, United States

Code, Section 2461, any property, real or personal, which

constitutes or is derived from proceeds traceable to such

offense.

## Substitute Asset Provision

15.   If any of the above-described forfeitable

property, as a result of any act or omission of the defendant:

(a)   cannot be located upon the exercise of due diligence;

(b)   has been transferred or sold to, or deposited with, a

third person;

(c)   has been placed beyond the jurisdiction of the Court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot

be subdivided without difficulty;

it is the intent of the United States, pursuant to Title

18, United States Code, Section 982(b) and Title 21, United

States Code, Section 853(p), to seek forfeiture of any

other property of said defendant up to the value of the

above forfeitable property.

    (Title 18, United States Code, Sections 981 and 982; Title 21
              United States Code, Section 853; and
        Title 28, United States Code, Section 2461.)

PREET BHARARA
United States Attorney

Case 1:15-cv-07342    Document 1-1    Filed 09/17/15    Page 25 of 52

# Exhibit C
# to the Deferred
# Prosecution Agreement

Statement of Facts

Overview

1.      GENERAL MOTORS COMPANY ("GM" or the "Company"), which in 2012 was the largest automotive manufacturer in the world, is headquartered in Detroit, Michigan.[1]

2.      At all times relevant to this Statement of Facts, GM designed, manufactured, assembled, and sold Chevrolet brand vehicles. From the earliest date relevant to this Statement of Facts until in or about 2010, GM designed, manufactured, assembled, and sold Pontiac brand vehicles. From the earliest date relevant to this Statement of Facts until in or about 2009, GM designed, manufactured, assembled, and sold Saturn brand vehicles. And from the earliest date relevant to this Statement of Facts until in or about the spring of 2013, GM promoted sales of "pre-owned" (*i.e.*, used) Chevrolet, Pontiac, and Saturn brand vehicles by GM dealerships nationwide.

3.      As set forth in more detail below, from in or about the spring of 2012 through in or about February 2014, GM failed to disclose a deadly safety defect to its U.S. regulator, the National Highway Traffic Safety Administration ("NHTSA"). It also falsely represented to consumers that vehicles containing the defect posed no safety concern.

4.      The defect at issue is a low-torque ignition switch installed in many of the vehicles identified below, which, under certain circumstances, may move out of the "Run" position (the "Defective Switch"). If this movement occurs, the driver loses the assistance of power steering and power brakes. And if a collision occurs while the switch is in the Accessory or Off position, the vehicle's safety airbags may fail to deploy—increasing the risk of death and serious injury in certain types of crashes in which the airbag was otherwise designed to deploy. The model year cars which may have been equipped with the Defective Switch are the 2005, 2006, and 2007 Chevrolet Cobalt; the 2005, 2006, and 2007 Pontiac G5; the 2003, 2004, 2005, 2006, and 2007 Saturn Ion; the 2006 and 2007 Chevrolet HHR; the 2007 Saturn Sky; and the

---

[1] For the purposes of this Statement of Facts, to the extent any conduct, statement, actions, or documents occurred on or are dated before July 10, 2009, references to "GM" shall mean and are intended to mean solely "Motors Liquidation Company," previously known as General Motors Corporation ("Old GM"). Although New GM in this Statement of Facts admits certain facts about Old GM's acts, conduct, or knowledge prior to July 10, 2009 based on New GM's current knowledge, New GM does not intend those admissions to imply or suggest that New GM is responsible for any acts, conduct or knowledge of Old GM, or that such acts, conduct, and knowledge of Old GM can be imputed to New GM. This Statement of Facts is not intended to alter, modify, expand, or otherwise affect any provision of the July 5, 2009 Sale Order that was issued by the U.S. Bankruptcy Court for the Southern District of New York, or the rights, protections, and responsibilities of New GM under the Sale Order.

2006 and 2007 Pontiac Solstice. To date, GM has acknowledged a total of 15 deaths, as well as a number of serious injuries, that occurred in crashes in which the Defective Switch may have caused or contributed to frontal airbag non-deployment.

5.    Before the Defective Switch went into production in 2002, certain GM engineers knew that it was prone to movement out of the Run position; testing of a prototype showed that the torque return between the Run and Accessory positions fell below GM's own internal specifications. But the engineer in charge of the Defective Switch approved its production anyway.

6.    In or about 2004 and 2005, as GM employees, media representatives, and GM customers began to experience sudden stalls and engine shutoffs caused by the Defective Switch, GM considered fixing the problem. However, having decided that the switch did not pose a safety concern, and citing cost and other factors, engineers responsible for decision-making on the issue opted to leave the Defective Switch as it was and simply promulgate an advisory to dealerships with tips on how to minimize the risk of unexpected movement out of the Run position. GM even rejected a simple improvement to the head of the key that would have significantly reduced unexpected shutoffs at a price of less than a dollar a car. At the same time, in or about June 2005, GM issued a statement that acknowledged circumstances where the ignition key could inadvertently move to the Accessory or Off position when the car was running. In response to a further inquiry, GM informed a newspaper that GM did not believe the inadvertent rotation of the ignition key was a safety issue.

7.    From approximately the spring of 2012, certain GM personnel knew that the Defective Switch presented a safety defect because it could cause airbag non-deployment associated with death and serious injury.

8.    Yet not until approximately 20 months later, in February 2014, did GM first notify NHTSA and the public of the connection between the Defective Switch and fatal airbag non-deployment incidents. This announcement accompanied an initial recall of approximately 700,000 vehicles—a population that would, by March 2014, grow to more than 2 million.

9.    Inside GM, certain personnel responsible for shepherding safety defects through GM's internal recall process delayed this recall until GM could fully package, present, explain, and handle the deadly problem, taking affirmative steps to keep the Defective Switch matter outside the normal process. On at least two occasions while the Defective Switch condition was well known by some within GM but not disclosed to the public or NHTSA, certain GM personnel made incomplete and therefore misleading presentations to NHTSA assuring the regulator that GM would and did act promptly, effectively, and in accordance with its formal recall policy to respond to safety problems—including airbag-related safety defects.

10.    Moreover, for much of the period during which GM failed to disclose this safety defect, it not only failed to correct its June 2005 assurance that the Defective Switch posed no safety concern but also actively touted the reliability and safety of cars equipped with the Defective Switch, with a view to promoting sales of used GM cars. Although GM sold no *new* cars equipped with the Defective Switch during this period, GM dealers were still, from in or about the spring of 2012 through in or about the spring of 2013, selling pre-owned Chevrolet, Pontiac, and Saturn brand cars that would later become subject to the February 2014 recalls. These sales were accompanied by certifications from GM, assuring the unwitting consumers that the vehicles' components, including their ignition systems and keys, met all safety standards.

11.    After the spring of 2012 but before the recall was announced, the fifteenth Company-acknowledged death associated with the Defective Switch occurred.

<u>Regulatory Framework and GM's Formal Recall Process</u>

12.    Under regulations applicable to GM at all relevant times, the Company was required to disclose to NHTSA any "defect . . . related to motor vehicle safety." "Motor vehicle safety" was defined as "performance of a motor vehicle . . . in a way that protects the public against unreasonable risk of accidents . . . and against unreasonable risk of death or injury in an accident." 49 U.S.C. §§ 30118(c)(1); 30102(a)(8). Such disclosure had to be "submitted not more than 5 working days after a defect in a vehicle or item of equipment ha[d] been determined to be safety related." *See* 49 U.S.C. § 30118(c) and 49 C.F.R. § 573.6.[2]

13.    The required disclosure was to be made by filing a "Defect Information Report" or "DIR." An auto manufacturer's filing of a DIR with NHTSA is commonly referred to as a "recall."

14.    At all times relevant to this Statement of Facts, GM had a formal recall decision-making process, called the Field Performance Evaluation or "FPE" process, the steps of which were well documented. According to Company policy, the FPE process was supposed to be initiated by dedicated engineers in the Product Investigations ("PI") group. PI, which was at all relevant times headed by GM's Director of Safety & Crashworthiness or Director of Product Investigations, was responsible for identifying and investigating suspected safety and compliance problems with GM cars.

15.    Once PI had completed its investigation of a suspected safety problem, it would, according to GM policy, hand the matter off from the engineering side of the house to the

---

[2] Congress has adopted no criminal penalty for violating this regulatory disclosure requirement. Instead, in order for a company to be held criminally liable under federal law for even an egregious failure to report a known safety defect, its conduct must have independently violated some other federal law to which criminal penalties do attach.

"Quality" organization—specifically, to the "FPE Director." This entailed presenting the problem at a weekly Investigation Status Review ("ISR") meeting attended by the FPE Director, GM's Director of Safety & Crashworthiness or Director of Product Investigations, and a member of GM's legal department.

16.    If, based on PI's presentation at the ISR, these three individuals believed that the matter involved a potential safety defect, they were to advance it for consideration by the Field Performance Evaluation Team ("FPET"). The FPET had no recall decision-making authority but was tasked with gathering information needed to execute a potential recall.

17.    At roughly the same time that the FPET was apprised of the issue, the matter was also supposed to go before the Field Performance Evaluation Review Committee ("FPERC"). The FPERC would make a preliminary decision about whether the issue under consideration qualified as a "defect . . . related to motor vehicle safety" under the applicable regulations and thus warranted a recall. It would then transmit its recommendation to the ultimate recall decision-making body, the Executive Field Action Decision Committee ("EFADC"). The EFADC was at all relevant times made up of three GM Vice Presidents.

18.    Typically, the EFADC's decision would have followed within approximately a week of the FPET's and the FPERC's consideration of the matter. If the EFADC voted for a recall, that decision would be reported to NHTSA within five business days, at which time a DIR would also be filed.

## GM Equips Cars with a Defective Switch

19.    In the early 2000s, GM launched a series of compact cars that it marketed as affordable, safe, and fuel-efficient—features particularly attractive to young, first-time car owners. One of these small cars was the Saturn Ion, first launched in 2002. Another was the Chevrolet Cobalt, launched in 2004. These two models belonged to GM's "Delta" platform, and, from their respective launches until around late 2006, both were equipped with the same defective ignition switch (the Defective Switch). The Defective Switch would also be installed in other, less popular Chevrolet, Saturn, and Pontiac models from in or about 2004 through in or about late 2006.

20.    Development of the switch that would end up first in the Ion and then in the Cobalt and other models began in the late 1990s. By March 2001, the GM design release engineer then in charge of the Ion's switch (the "Switch DRE") had finalized the applicable design specifications and communicated them to the supplier in charge of testing and manufacturing the component (the "Switch Supplier"). Among the specifications communicated to the Switch Supplier was that the torque necessary to move the switch from Run to Accessory must be no less than 15 Newton centimeters ("N-cm") (the "Torque Specification").

Mechanically, this torque performance was to be maintained by a detent plunger and spring within the switch.

21.     Testing conducted by the Switch Supplier in 2001 and early 2002 revealed that an early version of the pre-production Defective Switch was not meeting the Torque Specification; it repeatedly scored "Not OK." A July 2001 pre-production report for the Ion within GM made the same observation: the switch had "low detent plunger force."

22.     In email correspondence between the Switch DRE and the Switch Supplier in early 2002, the Switch Supplier confirmed that an early version of the Defective Switch was not meeting the Torque Specification and outlined the problems that might arise if the part were brought into compliance—including pressure on other switch components, delay, and increased costs. Saying that he was "tired of the switch from hell" and did not want to either compromise the electrical performance of the switch or slow the production schedule, the Switch DRE directed the Switch Supplier to "maintain present course" notwithstanding that there was "still too soft of a detent." Accordingly, the Defective Switch was put into production and installed into the first model year of the Ion (model year 2003), which was first sold to the public in 2002.

23.     By email dated March 28, 2002, the Switch DRE recommended that the Defective Switch also be used in the Cobalt, which was to launch the next year. GM followed that recommendation.

24.     Almost immediately, customers began to report problems with cars equipped with the Defective Switch. Meanwhile, GM employees tasked with driving early production versions of the Ion and then the Cobalt were reporting stalls while driving, and some of them were able to attribute the problem to the easy rotation of the key within the Defective Switch.

25.     Members of the press covering the Cobalt's launch also experienced the unexpected shutoff problem. Alerted by one of the press reports, two executives in charge of safety at GM[3] determined to experience for themselves the complained-of phenomenon. In June 2005, they test drove a Cobalt and found that, as reported, the Cobalt could be easily keyed off by contact with the driver's knee.

26.     Shortly afterward, GM issued a press statement acknowledging the problem as it pertained to the Cobalt, which had the greatest number of consumer complaints: "In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running." The press release further recommended that drivers remove "nonessential material from their key rings." Before its public release, this statement was reviewed and approved by the

---

[3] The two executives were GM's then-Director of Vehicle Safety & Crashworthiness and the Senior Manager of the PI group (the "PI Senior Manager").

PI Senior Manager and by the senior GM attorney who advised engineers about safety- and recall-related issues (the "GM Safety Attorney"). In a response to further media inquiry, GM stated that it did not believe this condition presented a safety concern.

27.    A June 2005 *Cleveland Plain Dealer* article reporting on the ignition switch problem marveled at GM's public statement, commenting "you have to admit it is pretty funny to hear somebody pretend that turning off the engine by mistake isn't a safety issue."

28.    Just days before this article was published, GM engineers working on the Pontiac Solstice, another new car equipped with the Defective Switch, learned of a complaint about a Solstice that had experienced the same inadvertent shutoff problem as had been reported in the Ion and the Cobalt.

### GM Considers a Fix

29.    In November 2004, the Company opened the first of six engineering inquiries that would be initiated in the ensuing five years to consider ameliorative engineering changes for new cars being rolled off the production line. This first inquiry was closed "with no action" in March 2005. Fixes such as improving the torque performance of the Defective Switch itself and changing the head of the associated key to reduce the likelihood of inadvertent movement from Run to Accessory were rejected as not representing "an acceptable business case." Having decided that the switch did not pose a safety concern, GM engineers concluded that each proposed solution would take too long to implement, would cost too much, and would not fully fix "the possibility of the key being turned (ignition turn off) during driving."

30.    Accordingly, GM decided to keep producing and selling new Cobalts, Ions, Solstices, Skys, G5s, and HHRs equipped with the Defective Switch.

31.    Not all involved in the November 2004 engineering inquiry agreed with this outcome at the time. The Vehicle Performance Manager for the Cobalt believed that the Defective Switch presented a potential safety problem because it could cause sudden loss of power steering and power brakes. (This engineer did not have in mind at the time the loss of power to the airbag system.) He therefore thought a remedy should have been implemented without regard to cost concerns. His views did not prevail.

32.    Meanwhile, in February 2005, while the November 2004 engineering inquiry was still open, the Company released a "Preliminary Information" to its dealers aimed at helping them diagnose and address the Defective Switch problem if a customer experienced it in a 2005 Cobalt or 2005 Pontiac Pursuit.[4] This publication explained that the Defective Switch's too-low "key ignition cylinder torque/effort" could cause "Engine Stalls" and "Loss of Electrical

---

[4] The Ion was not covered by this Preliminary Information.

Systems." It advised dealers to tell customers to remove non-essential items from their key chains. It offered no other fixes.

33.     In May 2005, just two months after the November 2004 engineering inquiry into the Defective Switch was closed without action, a GM brand quality manager opened a second inquiry to consider fixing the problem for new cars. This manager cited a customer complaint that the "vehicle ignition will turn off while driving," and noted that GM was having to buy back Cobalts as a result of the Defective Switch.

34.     Still not believing this was a safety issue, GM engineers closed this inquiry too, without issuing a recall. Although GM engineers involved in the inquiry initially resolved to ameliorate the low torque problem for newly produced 2007 Cobalts by changing the design of the key head so that the key ring would sit in a "hole" rather than a "slot" (thus reducing the lever arm and attendant potential torque), they ultimately rejected this solution.

35.     GM continued producing and selling new cars equipped with the Defective Switch and accompanying slot-head key.

36.     Meanwhile, GM's PI group, which was responsible for addressing problems with cars already on the road, began in the summer of 2005 to study the low torque issue. Like the engineering inquiries targeted at yet-to-be-manufactured cars, this investigation essentially went nowhere. Although PI engineers presented the matter to the ISR (the first stage of the potential recall process) in the summer of 2005, decision-makers who attended that ISR decided that the problem did not present a safety concern and thus did not warrant further consideration for recall. At the time, neither PI nor any member of the ISR seems to have appreciated that one of the electronic systems shut off by an inadvertent movement of the Defective Switch out of the Run position was the airbag system.

37.     Having determined that the problem did not pose a safety concern and thus need not be considered further for recall, GM simply replaced the February 2005 Preliminary Information with a more formal "Service Bulletin" to its dealers (the "2005 Service Bulletin"), alerting them to an "inadvertent turning off" problem and instructing them to provide any complaining customers with inserts for their key heads that would transform the slot into a hole and thus reduce the lever arm. Unlike the Preliminary Information, which accurately described the condition caused by the Defective Switch as (among other things) a "stall," the 2005 Service Bulletin omitted that word. Thus, a dealer responding to a customer inquiry or complaint would not locate the bulletin if he or she only used the word "stall" in the search.

38.     The omission of the word "stall" from the 2005 Service Bulletin was deliberate. The PI Senior Manager, who oversaw and could control the wording of GM service bulletins, directed that the word be kept out of this bulletin even though he knew customers would naturally describe the problem as "stalling." The reason for the omission was to avoid attracting

the attention of GM's regulator, NHTSA. As it had happened, in the interim between the
February 2005 Preliminary Information and the 2005 Service Bulletin, some within GM had
been meeting with representatives of NHTSA to try to persuade them that defects causing
vehicles to stall were not necessarily safety defects warranting recall action. NHTSA agreed that
stalls were not necessarily safety issues, but certain GM personnel were also aware of the
regulator's sensitivity to stalling problems throughout this period.

     39.    Although the bulletin referenced not just the Cobalt but also the HHR, the Ion, the
Solstice, and the Pursuit, and although it was updated in October 2006 to cover the model year
2007 versions of these cars and the 2007 Saturn Sky, the customers who would ultimately
receive the bulletin's recommended key-head inserts between 2005 and 2014 numbered only
about 430.

<u>The Changes to the Switch and the Key</u>

     40.    As of the spring of 2006, the 2005 Service Bulletin was the lone measure in place
to address the Defective Switch. There were no systematic efforts to provide key modifications
for all owners of affected cars—or even all owners who came into dealerships for service. And
every day more and more new cars with the Defective Switch were being manufactured and sold
to unwary customers.

     41.    In April 2006, that changed. The Switch DRE, who had received numerous
complaints about the Defective Switch from other GM employees, authorized replacement of the
Defective Switch in new cars with a different one that had a longer detent plunger and therefore
significantly greater torque. The Switch DRE further directed, in contravention of accepted GM
practice, that this change be implemented without a corresponding part number change. As a
result, no one looking at the switch would be able, without taking it apart, to tell the difference
between the old, Defective Switch and the new, non-defective one.

     42.    Although it was effectuated without a part number change, the switch change that
the Switch DRE approved was documented internally, and other engineers were aware of it at the
time and afterward. For example, a March 2007 note logged in connection with an engineering
inquiry into another matter related to the Ion specifically observed that "[t]he detent plunger
torque force was increased" by the Switch DRE in April 2006.

     43.    Another relevant change to the Cobalt was made in 2009. Having previously
rejected the slot-to-hole alteration to the key head design, GM finally decided to implement that
change. An engineer involved in the decision wrote at the time: "This issue has been around
since man first lumbered out of [the] sea and stood on two feet." The long-overdue change went
into effect for the model year 2010 Cobalt.

## The Defective Switch's Deadly Consequences[5]

44.    As noted, the too-easy movement of the Defective Switch from the Run to the Accessory or Off position resulted in an unexpected shutoff of the engine and—as both the February 2005 Preliminary Information and the 2005 Service Bulletin properly described—a "loss of electrical system[s]." These electrical systems included power steering and power brakes. They also included the sensing diagnostic module or "SDM," which controlled airbag deployment. Internal GM documents reflect that although the impact of an engine shutoff on the SDM was not on GM engineers' minds, certain employees within GM understood no later than 2001 the natural connection between a loss of electrical systems and non-deployment of airbags: if the ignition switch turned to Off or Accessory, the SDM would "drop," and the airbags would therefore be disabled. If a crash then ensued, neither the driver nor any passengers could have the protection of an airbag.

45.    And, indeed, the deadly effects of the Defective Switch on airbag non-deployment began manifesting themselves early on, in crashes about which GM was made aware contemporaneously. In July 2004, the 37 year-old driver of a 2004 Ion, a mother of three children and two step-children, died in a crash after her airbags failed to deploy. A few months later, in November 2004, the passenger of a 2004 Ion died in another crash where the airbags failed to deploy. The driver was charged with, and ultimately pled guilty to, negligent homicide. Then, in June 2005, a 40-year-old man suffered serious injuries after his 2005 Ion crashed and the airbags failed to deploy.

46.    For each of these Ion crashes in which the subject vehicles evidently lost power before impact, the SDM data recovered from the crashed vehicles was unilluminating. Unlike the SDM installed in the Cobalt, the Ion's SDM was incapable of recording data—including power mode status—after the vehicle had lost power.

47.    The Cobalt SDM data, by contrast, reflected a number of non-deployments accompanied by a power mode status recording of Accessory or Off.

48.    In July 2005, just months after GM closed its first engineering inquiry into the Defective Switch, a 16-year-old driver died in Maryland when the airbags in her 2005 Cobalt failed to deploy. The power mode status recorded for that vehicle at the time of the crash was Accessory.

49.    In October 2006, two more teenagers died, also in a 2005 Cobalt, in Wisconsin. The airbags in the vehicle failed to deploy when they should have, and the police officer who

---

[5]  GM has acknowledged 15 deaths occurring in crashes in which the Defective Switch may have caused or contributed to airbag non-deployment, not all of which are described herein. Many other deaths have been alleged to have been associated with the Defective Switch.

examined the crashed vehicle noted in a February 2007 report on the incident that the ignition
switch "appeared to have been in the accessory position . . . preventing the airbags from
deploying." An April 2007 report about the same crash by Indiana University likewise posited
that the airbags had failed to deploy because the key was in the Accessory position. This report
even specifically referenced the October 2006 version of the 2005 Service Bulletin, which
described the Defective Switch.

50.     In the spring of 2007, NHTSA approached certain GM personnel to express
concern about a high number of airbag non-deployment complaints in Cobalts and Ions, and to
ask questions about the July 2005 Cobalt crash resulting in the death of the 16-year-old girl.
Around this same time, and as a result of NHTSA's inquiries, a GM field performance
assessment engineer with expertise in airbags who worked principally with GM lawyers (the
"Airbag FPA Engineer") began, at the request of his supervisors, to track reports of crashes in
Cobalts where the airbags failed to deploy. And, in May 2007, the PI group even placed the issue
of Cobalt airbag non-deployment into the first stage of GM's recall process, the ISR. But the PI
group, under the supervision of the PI Senior Manager, conducted no follow-up at the time.

51.     In September 2008, another crash, this one involving a 2006 Cobalt, killed two
people. The airbags failed to deploy when they should have. GM sent the crashed car's SDM to
the Company's SDM supplier for examination. In May 2009, the SDM supplier reported that the
power mode status was at one point during the crash recorded as Off, and that this was one of
two possible explanations for the failure of the airbags to deploy. This report was provided in
writing, but also in person, at a meeting attended by several GM employees—including a
member of the PI group, in-house counsel, and the Airbag FPA Engineer who had been tracking
the Cobalt non-deploy incidents.

52.     In April 2009, a 73-year-old grandmother and her 13-year-old granddaughter
were killed in rural Pennsylvania in a crash when the ignition switch in the grandmother's 2005
Cobalt slipped into the Accessory position, thereby disabling the frontal airbags and preventing
their deployment. The grandmother and her 13-year-old granddaughter, who was in the front
passenger seat, both died at the scene. A 12-month-old great grandson, the sole survivor, was
paralyzed from the waist down. He was hospitalized for 33 days following the crash.

53.     In December 2009, a 35-year-old Virginia woman crashed her 2005 Cobalt,
sustaining serious head injuries and rib fractures (hereinafter, the "Virginia Crash"). The airbags
failed to deploy, and, as the Airbag FPA Engineer noted, the power mode at the time of the crash
was recorded as Accessory.

54.     Two weeks later, a 25-year-old nursing student died in Tennessee following a
head-on collision in her 2006 Cobalt (hereinafter, the "Tennessee Crash"). Again, the airbags
failed to deploy when they should have, and the power mode status was recorded as Off at the
time of the crash.

55.     In March 2010, a 29 year-old woman was killed in Georgia after her 2005 Cobalt crashed (hereinafter, the "Georgia Crash"). Although there was no allegation that the frontal airbag should have deployed, there was an allegation that loss of power steering caused the crash. The SDM from the vehicle showed that the power mode status was recorded as Accessory at the time of the crash.

56.     Notably, just nine days before the Georgia Crash, GM had conducted a safety recall for a power steering problem in the Cobalt unrelated to the Defective Switch, in which it acknowledged that loss of power steering, standing alone, constituted a "defect . . . relate[d] to motor vehicle safety" and thus warranted recall action. The Defective Switch, of course, caused more than just loss of power steering; it also caused loss of other electrical systems. This was known by many within GM by no later than 2004—even if they did not appreciate precisely what electrical system components were affected (e.g., the airbag SDM). Yet at no time before February 2014 did GM announce a recall for cars associated with the Defective Switch.

GM Identifies the Connection Between the Ignition Switch and Airbag Non-Deployment and Initiates a Formal Investigation

57.     Many of the deaths and serious injuries associated with airbag non-deployment discussed in the foregoing paragraphs became the subject of legal claims—formal and informal—against GM. Certain GM lawyers, aided by the Airbag FPA Engineer and others like him who assisted in evaluating causes of crashes, realized by no later than early 2011 that a number of these non-deployment cases involved some sort of "anomaly" in the ignition switch. Specifically, in connection with the Tennessee Crash, discussed above, a GM engineer explained to legal staff that when the ignition switch power mode status is in Off (as it was in that case), the SDM "powers down," and the airbags fail to deploy. The engineer further opined that the "a crash sensing system 'anomaly'" resulting in a power mode status of Off had indeed caused non-deployment in the Tennessee Crash case.

58.     This crash sensing "anomaly" risked the prospect of punitive damages. Three months later, GM settled the Tennessee Crash case.

59.     Just days before that settlement, a 15-year-old girl in South Carolina crashed her mother's 2007 Cobalt and suffered significant injuries when the airbag did not deploy. The power mode status was recorded as Accessory at the time of the crash. GM engineers evaluating the crash theorized that, as in the case of the Tennessee Crash, the non-deployment here may have been caused by a crash sensing "anomaly" related to the ignition switch.

60.     Meanwhile, the GM attorney principally responsible for airbag non-deployment claims (the "GM Airbag Attorney"), who had become familiar with a number of Cobalt non-deployment incidents, grew concerned that the "anomaly" identified in these cases was getting insufficient attention from the PI group, which was supposed to investigate and work toward

remedying safety problems with cars on the road. At the time, no one within GM had yet sourced the "anomaly" to the Defective Switch's torque.

61.   Certain members of the legal department took the unusual step of arranging a meeting with PI. The meeting, which took place on July 27, 2011, was attended not just by the PI Senior Manager, who ran the PI group on a day-to-day basis, but also by his boss, the GM Director of Product Investigations (the "GM Safety Director"). Also present were the Airbag FPA Engineer, the GM Airbag Attorney, and the GM Safety Attorney. In advance of the meeting, the PI Senior Manager wrote to a colleague that the Cobalt airbag non-deployment problem was "ugly" and would make for "a difficult investigation."

62.   At the July 27, 2011 meeting, the Airbag FPA Engineer showed photographs of three of the most serious non-deployment crashes he had seen involving Cobalts, including photographs of the Tennessee Crash, and specifically highlighted his observations that many of these Cobalt non-deployment crashes had occurred while the power mode was in Accessory or Off.

63.   After the meeting, the PI Senior Manager assigned an investigator (the "PI Investigator") to examine the matter.

## GM Identifies the Defective Switch as the Likely Cause of Airbag Non-Deployment in 2005-2007 Model Year Cobalts

64.   One of the first steps the PI Investigator took, in or about August 2011, was to gather learning and materials from the Airbag FPA Engineer who had been tracking non-deployment incidents in Cobalts since 2007, and who had been involved in evaluating a number of crashes that were the subject of Cobalt non-deployment legal claims. The Airbag FPA Engineer explained to the PI Investigator that he had observed that in some of these cases the power mode was recorded as either Accessory or Off at the time of the subject crashes. The Airbag FPA Engineer further noted that the non-deployment problem appeared to be limited to 2005-2007 model years of the Cobalt and appeared not to affect model years 2008 and later.

65.   By March 2012, more than six months after he had been assigned to the matter, the PI Investigator had done little to advance the investigation. The GM Airbag Attorney called another meeting with PI for March 15, 2012. Attendees at this meeting included the GM Safety Attorney, the GM Airbag Attorney, the GM Safety Director, the PI Investigator, the PI Senior Manager, and the Airbag FPA Engineer. During the meeting, the PI Investigator complained that he needed more support from GM's electrical engineering group to investigate a potential electrical (as opposed to mechanical) explanation for the Accessory and Off power mode recordings in many of the subject crashes.

66.    Two weeks later, the Airbag FPA Engineer, members of GM's electrical engineering group, and others travelled to an auto salvage yard to examine potential electric problems related to the ignition switch—to see whether, as the PI Investigator and others had posited, the Accessory and Off power mode status recordings within the SDMs of the subject vehicles were attributable to an electrical "bounce" in the ignition switch.

67.    At the yard, one of the engineers noticed that the effort needed to turn the ignition switch of the 2006 Cobalt they were examining was low. The group immediately dispatched one of their members to retrieve fish scales from a local bait and tackle shop to measure the rotational force in this and other salvage yard Cobalts. A GM electrical engineer involved in the exercise (the "GM Electrical Engineer") recorded the findings, noted the unusually low force needed to move the examined switches out of Run, searched and found records of customer complaints about the low torque issue, and located the 2005 Service Bulletin addressing the issue.

68.    The next day, the GM Electrical Engineer reported to his own boss these findings and his view that a probable root cause of the non-deployment problem was the Defective Switch moving out of Run to Accessory or Off. And that same day, the boss reported all of this to the PI Senior Manager and to the GM Safety Attorney.

69.    At around the same time, the plaintiffs in a lawsuit stemming from the Virginia Crash, referenced above, located the 2005 Service Bulletin and identified the Defective Switch described therein as the cause of non-deployment in the vehicle at issue in that case. The GM Airbag Attorney identified the 2005 Service Bulletin as potentially related to the Virginia Crash.

70.    In an April 23, 2012 email responding to a query about an ignition switch turning too easily from Run to Off, the PI Senior Manager wrote to colleagues claiming—inexplicably— that he had "not heard of" complaints about low torque in the "Cobalt or other models" since 2005, when the first PI examination was conducted and closed with the issuance of the 2005 Service Bulletin. The PI Investigator, meanwhile, pressed electrical engineers to continue to look into other possible causes of non-deployment, beyond the low torque problem.

71.    No one from PI ushered the matter into the first stage of the formal recall process, the ISR, at this time. This approach represented a stark contrast even to the way in which the Defective Switch itself had been handled in 2005. Back then, *before* the dangerous connection to airbag non-deployment had been drawn, PI had promptly introduced the matter into the ISR.

72.    In May 2012, the GM Safety Attorney asked a GM Vice President to act as an "Executive Champion" in order to propel the matter forward. During the first meeting chaired by this Executive Champion, on May 15, 2012, the GM Electrical Engineer presented his view that the Defective Switch was the cause of non-deployment in the affected Cobalt models. Those in attendance included the GM Safety Attorney, the GM Safety Director, the PI Senior Manager,

the PI Investigator, and others. The Executive Champion encouraged confirmation of this hypothesis through more scientific study.

73.    Days later, on May 22, 2012, such confirmation was obtained. The GM Electrical Engineer, the PI Investigator, and others traveled once more to an auto salvage yard and, using equipment much more sophisticated than fish scales, conducted a thorough study of torque in the ignition switches of several model years of Cobalt, Ion, and other cars. The results confirmed that the majority of vehicles from model years 2003 through 2007 exhibited torque performance below the Torque Specification that GM had adopted in 2001. They also showed that starting somewhere in model year 2007 (that is, for vehicles produced at some point in 2006), the torque values were higher and within specification.

74.    The observed discrepancy was, of course, due to the ignition switch part change that the Switch DRE had ordered in April 2006. But neither anyone from PI nor others working on the airbag non-deployment investigation in the spring of 2012 knew yet about that change; the part number was the same for the Defective Switch and the new one. Indeed, when the PI Investigator asked the Switch DRE in early 2012 to detail any changes that might account for the discrepancy observed at the salvage yard, the Switch DRE denied any of relevance. This was baffling to the PI Investigator and others.

75.    Still, the engineers involved knew that studied cars built before a certain point in 2006 were equipped with low-torque ignition switches, and that low torque in an ignition switch could result in airbag non-deployment. At this time, no further engineering tests were conducted to explore any other purported root cause of the observed non-deployment pattern or to compare the 2005 through 2007 model year Cobalt ignition switches with those of later model years.

76.    On June 12, 2012, three weeks after the May 2012 salvage yard expedition, an expert retained by the Virginia Crash plaintiffs issued a report. Noting both the 2005 Service Bulletin and the Indiana University study from 2007 that had identified a connection between the Defective Switch and non-deployment of an airbag in a fatal Cobalt crash, the expert opined that the Defective Switch was indeed responsible for non-deployment in the Virginia Crash. In early July, outside counsel for GM forwarded the Virginia Crash expert's report to the GM Airbag Attorney. In late July, the GM Airbag Attorney forwarded the Indiana University study to the PI Senior Manager, the GM Safety Attorney, and the Airbag FPA Engineer.

77.    At a meeting among GM lawyers in late July 2012 in which the Virginia Crash expert's report was discussed, a newly hired GM attorney asked the group why the Cobalt had not been recalled for the Defective Switch. Those present explained that the engineers had yet to devise a solution to the problem but that engineering was looking into it. The new attorney took from this that the GM legal department had done all it could do.

78.     The PI Investigator, the PI Senior Manager, the GM Safety Attorney, the GM Safety Director, and others met at lengthy intervals through the summer and fall of 2012 and early 2013 to consider potential solutions and further explore why the defect condition appeared to be limited to earlier model years. As one of the several Executive Champions who would be tasked with overseeing these meetings from early 2012 through 2013 has explained, the purpose of the meetings was *not* to identify the root cause of the problem, which had by approximately the spring of 2012 been traced to the Defective Switch, but rather to develop the optimal remedy for the defect condition and set with precision the scope of the anticipated recall. Certain GM personnel wanted to be sure that the fix adopted for the problem would be affordable and yet appeal to consumers; that GM would have sufficient parts on hand to address the recall; and that GM representatives would be able to fully articulate to NHTSA and the public a "complete root cause" accounting for the discrepancy between the earlier and later vehicle populations.

## GM's Representations to NHTSA About Its Recall Process

79.     At the same time, the manner in which the responsible GM personnel were approaching the Defective Switch and its deadly consequences in 2012 contrasted with the picture the Company was presenting to NHTSA about its recall process.

80.     On October 22, 2012, certain GM personnel, including the GM Safety Director, met with NHTSA officials in Washington, D.C., and gave a description of the Company's recall process intended to assure the regulator that safety issues were routinely addressed in a methodical and efficient fashion. The presentation, which touted a "common global process" with "standard work templates," explained that the first step toward potential recall involved investigation by PI of the suspected safety problem. Then, according to the presentation, the matter would be placed promptly into the FPE process, which was controlled not by engineers but by personnel in charge of Quality. At this stage, GM further explained, the FPET would consider the logistics of implementing the proposed recall or other contemplated action; the FPERC would recommend the particular field action to be taken (recall or, for example, a customer advisory); and, in short order thereafter, the EFADC would either make the final decision concerning that recommended field action or order "further study." According to individuals who attended this meeting and others in 2012 and 2013, GM gave the impression that its recall process was linear, robust, uniform, and prompt.

81.     To the extent this presentation may have accurately described GM's general recall process and handling of other defects, it did not accurately describe GM's handling of the Defective Switch (about which NHTSA would remain unaware until 2014). By approximately

five months prior to this presentation, certain GM personnel had identified what they knew to be a dangerous safety defect and had not started it into the first phase of the recall process.[6]

### GM Delays Recall After Learning of the 2006 Switch Change

82.     By early 2013, the Defective Switch *still* had not been introduced into the FPE process. GM was exploring optimal remedies and trying to understand why the defect appeared to affect only a limited population. Those involved remained unaware of the part change that the Switch DRE had made back in April 2006—the change that explained why cars built after around late 2006 seemed not to be affected.

83.     Meanwhile, during this same period, GM lawyers were engaged in heavy litigation related to the Georgia Crash, referenced above. The Georgia Crash plaintiffs' attorney had learned about the 2005 Service Bulletin, and had developed a theory that the Defective Switch caused the driver to lose control of her vehicle. The attorney was seeking discovery related to the bulletin and the Defective Switch more generally. He was also asking about any design changes that had been made to the switch.

84.     GM denied that any such design changes had been made that would affect the amount of torque it takes to move the key from Run to Accessory.

85.     Then, on April 29, 2013, the Georgia Crash plaintiffs' attorney took the deposition of the Switch DRE. During that deposition, the plaintiffs' attorney showed x-ray photographs of the ignition switch from the subject vehicle (the Defective Switch) and another switch from a later model year Cobalt (one installed after implementation of the Switch DRE's April 2006 part change directive). The photographs showed that the detent plunger in the Georgia Crash car was much shorter—and therefore would have had much lower torque performance—than the one in the later model year Cobalt. The Switch DRE, confronted with these photographs, continued to deny knowledge of any change to the switch that would have accounted for this difference.

86.     But, as the Switch DRE has acknowledged, he knew almost immediately following his deposition that there had been a design change to the switch following production of the model year 2005 Cobalt, and that he must have been the engineer responsible for that design change. He knew as much because, the day after the April 29, 2013 deposition, he

---

[6] As NHTSA and GM understood, GM's regulatory obligation to disclose safety defects within five days of their discovery was an obligation of the Company and not of any individual employee. Indeed, as NHTSA further understood, neither the GM Safety Director nor any other GM employee was authorized to disclose a safety defect to NHTSA without a decision from the EFADC that such a defect existed.

personally collected and took apart switches from a 2005 Cobalt and a later model year Cobalt and observed the difference in lengths of their respective detent plungers.

87. The Switch DRE has said that he recalls communicating these observations to his boss and to another supervisor and being advised to let the legal department handle the matter.

88. The GM Safety Attorney learned what transpired during the Switch DRE's deposition. Having previously received a request from the PI group for retention of an outside expert (the "Switch Expert") to help determine why the Defective Switch seemed to affect only a limited vehicle population, the GM Safety Attorney, on or about May 2, 2013, authorized retention of the Switch Expert in connection with the Georgia Crash case. The PI Investigator and the PI Senior Manager did not participate in meetings with the Switch Expert until the Switch Expert presented his conclusions following the settlement of the Georgia Crash case. The PI Investigator understood that he was to put his own investigation on hold pending the Switch Expert's evaluation.

89. Of course, by the time the Switch Expert had been retained, certain GM personnel had already learned from the Georgia Crash plaintiffs' attorney about the design change to the Defective Switch, and the Switch DRE had already confirmed that the change had in fact occurred. GM thus had an explanation for why the defect condition did not appear to affect cars built after the middle of 2006. And, indeed, some within GM had known for approximately a year that a confirmed population of GM's compact cars was equipped with the Defective Switch. Yet *still* there was no recall; indeed, still there was no move to even place the matter into the FPE process. Instead, GM personnel awaited the study and conclusions of the Switch Expert.

90. Meanwhile, on June 22, 2013, a 23-year-old man was killed in a crash on a highway near Roxton Pond, Quebec after his 2007 Cobalt left the road and ran into some trees. The driver-side airbag in the Cobalt failed to deploy. The power mode status was recorded as Accessory.

GM Receives Documentary Evidence of the Part Change and Finally Begins the Recall Process

91. By July 2013, the Switch Expert had confirmed what the Georgia Crash plaintiffs' expert and the Switch DRE had known since no later than April 2013: Cobalts from model years 2008 through 2010 had longer detent plungers and springs than those from model years 2005 and 2006. GM's outside counsel in the Georgia Crash case urged GM in-house lawyers to settle it: "[T]here is little doubt that a jury here will find that the ignition switch used on [the Georgia Crash car] was defective and unreasonably dangerous, and that it did not meet GM's own torque specifications. In addition, the [engineering inquiry documents about the Defective Switch from 2004 and 2005] and the on-going FPE investigation have enabled plaintiffs' counsel to develop a record from which he can compellingly argue that GM has known about this safety defect from the time the first 2005 Cobalts rolled off the assembly line and essentially has done nothing to

correct the problem for the last nine years."

92.    GM followed its outside counsel's advice and settled the Georgia Crash case at the end of August 2013, agreeing to pay $5 million.

93.    Then, in late October 2013, GM received documentary confirmation from the Switch Supplier that the Switch DRE had in fact directed a part change to fix the Defective Switch in April 2006. This evidence further showed that the part was changed without a corresponding change to the part number.

94.    . Only at this point did GM finally place the Defective Switch matter into the formal FPE process. An ISR was scheduled for November 5, 2013. Meanwhile, on October 30, the PI Investigator, who was by now back working on the matter and helping to lay the practical groundwork for a recall, asked an employee in charge of ordering vehicle parts what the costs of new ignition switch components would be for the 2005 through 2007 Cobalts.

### GM Makes Further Statements to NHTSA About Its Recall Process

95..    On July 23, 2013, one day after GM's outside counsel had advised GM to settle the Georgia Crash case and noted that plaintiffs' counsel could make a "compelling" argument that GM "essentially has done nothing to correct" the Defective Switch "for the last nine years," the GM Safety Director received an email from NHTSA's Director of Defects Investigation accusing GM of being "slow to communicate" and "slow to act" in the face of safety defects— including defects unrelated to the Defective Switch (about which NHTSA remained unaware) but related to non-deployment of airbags.

96.    Two days later, certain GM personnel, including the GM Safety Director, met with NHTSA to try to quell the agency's concerns. According to notes taken by the GM Safety Director at that meeting, NHTSA agreed with GM that the Company appeared to have a "robust and rigorous process" for evaluating and addressing safety issues, but worried that it "tend[ed] to focus on proving the issue [wa]s not a safety defect."

97.    On November 7, 2013, two days after the ISR concerning the Defective Switch, certain GM personnel met again with NHTSA, this time to give a more in-depth presentation targeted at assuring the regulator that GM was "responsive" and "customer focused" when it came to safety concerns. Although the presentation did not specifically address the Defective Switch-related airbag non-deployment problem—which, having just entered the recall process within GM, remained unknown to NHTSA—it did address concerns related to airbag non-deployment more generally.

98.    First, certain GM personnel showed NHTSA slides that touted the increasing swiftness with which GM had addressed safety defects from 2008 through 2012. One graph

reflected that the average time taken from identification of the issue through to execution of the recall was 160 days in 2008 and 84 days in 2012. It further showed that the average time an issue remained in the "pre-FPE" stage was 105 days in 2008 and 33 days in 2012. And the average number of days between entry into the FPE process and recall decision was 15 days in 2008 and 13 days in 2012.

99.    Other portions of GM's presentation suggested that any airbag defect that presented with a failure to warn the driver and/or certain other aggravating factors would be recalled swiftly.

## GM Delays Recall for Three More Months

100.    Although the Defective Switch matter entered the ISR on November 5, 2013, after approximately *804 days* of formal investigation, and although GM had at the November 7 meeting with NHTSA touted an average lag of just 13 days between entry into the FPE process and recall approval by the EFADC, GM would not ultimately decide to conduct a recall for the Defective Switch until January 31, 2014. The recall was announced to NHTSA seven days later, on February 7, 2014.

101.    The individual principally responsible for shepherding the matter through the FPE process was GM's FPE Director, who worked closely with the GM Safety Director, the GM Safety Attorney, and a member of the EFADC responsible for deciding whether to recall.

102.    As a general matter, EFADCs were scheduled weekly. The Defective Switch matter was initially contemplated for inclusion on the agenda of an EFADC scheduled for November 18. Citing the issue's "complex[ity]," however, an assistant to the FPE Director recommended—and the FPE Director agreed—that the matter be put off until an EFADC scheduled for December 3.

103.    The matter did not go to the EFADC on December 3, however. Instead, it was pushed to December 17. On December 2, the FPE Director met with the GM Safety Director, the PI Investigator, the GM Safety Attorney, and a few others in yet another "offline" meeting to discuss the matter. Then, on December 16, the issue was the subject of an FPERC meeting that had been scheduled to occur right before the December 17 EFADC meeting.

104.    After that meeting, the FPE Director expressed concern about "execution details" of the recall. She explained to one of the three EFADC decision-makers that "[t]he absolute last thing we need to do from a customer perspective is to rush a decision, post it on the NHTSA website that [sic] we have a safety decision but we cannot fix the customer vehicles for some period of time." The FPE Director informed this decision-maker that "we aren't ready for a decision" because there were "[t]oo many items on how we know how the fix will perform and

the competitive solutions." The decision-maker pledged to "push [to] do additional follow up on this prior to a decision."

105.    The EFADC meeting on December 17, 2013 yielded no decision, and further "study" was directed.

106.    By this time, all involved understood—and some had for a period of time understood—that a Cobalt recall was inevitable.

107.    Some within GM—including the GM Safety Director and the GM Safety Attorney—openly expressed concern about how the "timeline" of GM's response to the Defective Switch would look to NHTSA. As noted, a manufacturer must, under applicable regulations, report a known safety defect to NHTSA within five business days of its discovery. Here, certain GM personnel knew by approximately the spring of 2012 that the Defective Switch posed a serious safety issue because it disabled airbags in situations when they should have deployed. Yet more than a year and a half after that discovery, GM still had not conducted a recall.

<u>Recall</u>

108.    On January 31, the voting members agreed that a recall of the affected model year Cobalts, G5s, and Pursuits was warranted. On February 7, 2014, GM announced the recall to the public and NHTSA.

109.    Although other models—the Ion, most notably—were likewise equipped with the Defective Switch, these were not recalled on February 7. The stated reasons for not including these other models varied. Some believed there were differences in electronic architecture and physical switch placement between the unrecalled cars and the recalled cars, such that the risk of switch movement and/or airbag non-deployment was reduced. Others cited an error by the PI Investigator in collecting incident data about the Ion, which they said gave the erroneous impression that there was no comparable problem with the Ion.

110.    In any event, following intense criticism from the press about the limited scope of the February 7 recall, GM held another EFADC meeting on February 24, 2014 to consider the affected model years of the Ion, Sky, HHR, and Solstice. Voting members agreed that the February 7 recall should be expanded to encompass these other models. The next day, GM announced that decision.

<u>GM's Certifications for Pre-Owned Vehicles</u>

111.    All of the cars subject to the February and March 2014 airbag non-deployment recalls were relatively old. GM stopped manufacturing the Ion in 2006; stopped manufacturing

the Cobalt, the G5, the Sky, and the Solstice in 2009; and stopped manufacturing the HHR in 2010.

112.    From in or about the spring of 2012, when certain GM personnel knew that the Defective Switch could cause airbag non-deployment, through at least in or about May of 2013, GM dealerships (which GM had not made aware of the issue) continued to sell "certified pre-owned" cars equipped with the Defective Switch. GM, which profited indirectly from these sales, certified the safety of the vehicles to the public, explaining that the certification process involved testing of over a hundred components, including, specifically, the ignition system.

113.    But the safety certification was made despite there being no change or alteration to either the ignition switch itself or the accompanying key in these cars. The Defective Switch was left intact and unremedied.

114.    Approximately 800 consumers purchased certified pre-owned vehicles equipped with the Defective Switch. The GM dealer certifications thus may have caused consumers who relied on the certifications to buy vehicles that they may incorrectly have believed to be safe.

<u>Conclusion</u>

115.    As detailed above, starting no later than 2003, GM knowingly manufactured and sold several models of vehicles equipped with the Defective Switch. By approximately the spring of 2012, certain GM personnel knew that the Defective Switch could cause frontal airbag non-deployment in at least some model years of the Cobalt, and were aware of several fatal incidents and serious injuries that occurred as a result of accidents in which the Defective Switch may have caused or contributed to airbag non-deployment. This knowledge extended well above the ranks of investigating engineers to certain supervisors and attorneys at the Company—including GM's Safety Director and the GM Safety Attorney. Yet, GM overshot the five-day regulatory reporting requirement for safety defects by approximately 20 months. And throughout this 20-month period, GM failed to correct its 2005 statement that the Defective Switch posed no "safety" problem.

Case 1:15-cv-07342    Document 11    Filed 09/07/15    Page 47 of 52

# Exhibit D
# to the Deferred
# Prosecution Agreement

PREET BHARARA
United States Attorney for the
Southern District of New York
By:   JASON H. COWLEY
      ALEXANDER J. WILSON

Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,                    :

                Plaintiff,                   :        VERIFIED COMPLAINT

                -v.-                         :        15 Civ. ____

$900,000,000 in United States               :
Currency,
                                             :
                Defendant in rem.
- - - - - - - - - - - - - - - - - -x

        Plaintiff United States of America, by its attorney, PREET

BHARARA, United States Attorney for the Southern District of New

York, for its Verified Complaint (the "Complaint") alleges, upon

information and belief, as follows:

                I.    JURISDICTION AND VENUE

        1.    This action is brought by the United States of

America pursuant to 18 U.S.C. § 981(a)(1)(C), seeking the

forfeiture of $900,000,000 in United States Currency (the

"Defendant Funds" or the "defendant-in-rem").

2.    This Court has jurisdiction pursuant to 28 U.S.C. § 1355.

3.    Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because certain acts and omissions giving rise to the forfeiture took place in the Southern District of New York, and pursuant to Title 28, United States Code, Section 1395 because the defendant-in-rem shall be transferred to the Southern District of New York.

4.    The Defendant Funds represent property constituting and derived from proceeds of wire fraud in violation of Title 18, United States Code, Sections 1343, and property traceable to such property; and are thus subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C).

## II.   PROBABLE CAUSE FOR FORFEITURE

5.    General Motors Company ("GM"), an automotive company headquartered in Detroit, Michigan, entered into a Deferred Prosecution Agreement with the United States, wherein, *inter alia*, GM agreed to forfeit a total of $900,000,000, i.e., the Defendant Funds, to the United States.  GM agrees that the Defendant Funds are substitute *res* for the proceeds of GM's wire fraud offense.  The Deferred Prosecution Agreement, with the

2

accompanying Statement of Facts and Information, is attached as Exhibit A and incorporated herein.

### III. CLAIM FOR FORFEITURE

6.    The allegations contained in paragraphs one through five of this Verified Complaint are incorporated by reference herein.

7.    Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

8.    "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include any offense under 18 U.S.C. § 1961(1).  Section 1961(1) lists, among others offenses, violations of Title 18, United States Code, Section 1343 (relating to wire fraud).

9.    By reason of the foregoing, the defendant-in-rem is subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(C), as it is substitute *res* for property derived from wire fraud, in violation of Title 18, United States Code, Section 1343.

3

09-50026-mg   Doc 13664-32   Filed 07/01/16   Entered 07/01/16 19:28:11   Exhibits A
through N   Pg 273 of 481
Case 1:15-cv-07342   Document 1-6   Filed 09/17/15   Page 31 of 52

WHEREFORE, plaintiff United States of America

prays that process issue to enforce the forfeiture of the

defendant-in-rem and that all persons having an interest in

the defendant-in-rem be cited to appear and show cause why

the forfeiture should not be decreed, and that this Court

decree forfeiture of the defendant-in-rem to the United States

of America for disposition according to law, and that this

Court grant plaintiff such further relief as this Court may

deem just and proper, together with the costs and

disbursements of this action.

Dated:     New York, New York
           September 16, 2015

                         PREET BHARARA
                         United States Attorney for
                         Plaintiff United States of America


           By:     _____
                         JASON H. COWLEY
                         ALEXANDER J. WILSON
                         Assistant United States Attorneys
                         One St. Andrew's Plaza
                         New York, New York 10007
                         (212) 637-2200

09-50026-mg   Doc 13667-32   Filed 07/01/16   Entered 07/01/16 19:28:11   Exhibits A
through N   Pg 274 of 481
Case 1:15-cv-07342   Document 16   Filed 09/16/15   Page 32 of 52

VERIFICATION

STATE OF NEW YORK              )
COUNTY OF NEW YORK             :
SOUTHERN DISTRICT OF NEW YORK  )

      KENNETH W. JACOUTOT, being duly sworn, deposes and

says that he is a Special Agent with the United States

Department of Transportation, Office of Inspector General; that

he has read the foregoing Verified Complaint and knows the

contents thereof; and that the same is true to the best of his

knowledge, information and belief.

      The sources of deponent's information and the grounds

of his belief are his personal involvement in the investigation,

and conversations with and documents prepared by law enforcement

officers and others.

_____
Kenneth W. Jacoutot
Special Agent
Department of Transportation,
Office of Inspector General


Sworn to before me this
16 th day of September, 2015

_____
Notary Public

NAEEM A. CONWAY
Notary Public, State of New York
No. 01CO6110567
Qualified in New York County
Commission Expires June 01, 2016

# EXHIBIT D

**Texas Department of Transportation**

125 EAST 11TH STREET | AUSTIN, TEXAS 78701-2483 | (512) 463-8700 | WWW.TXDOT.GOV

Thu, 12 Feb 2015

STATE OF TEXAS        §

This is to certify that I, Debra Vermillion, am employed by the Texas Department of Transportation (Department); that I am the Custodian of Motor Vehicle Crash Records for such Department; that the attached is a true and correct copy of the peace officer's report filed with the Department referred to in the attached request with the crash date of __Tue, 15 Nov 2011__ , which occurred in __Montgomery__ County; that the investigations of motor vehicle crashes by peace officers are authorized by law; that this Texas Peace Officer's Crash Report is required by law to be completed and filed with this Department; that this report sets forth matters observed pursuant to duty imposed by law as to which matters there was a duty to report, or factual findings resulting from an investigation made pursuant to authority granted by law.

Debra Vermillion

Debra Vermillion, Director
Crash Data and Analysis Section
P. O. Box 149349
Austin, Texas 78714
(512) 486-5780



DEC 2 0 2011

12435176.1 / 2011417419
TxDOT Crash ID

Law Enforcement and TxDOT Use Only

[X] FATAL  [ ] CMV  [ ] SCHOOL BUS  [ ] RAILROAD  [ ] MAB  [ ] SUPPLEMENT  [ ] ACTIVE SCHOOL ZONE

Total Num. Units: 0, 0, 2
Total Num. Prsns.: 0, 0, 2

**Texas Peace Officer's Crash Report (Form CR-3 1/1/2010)**
Mail to: Texas Department of Transportation, Crash Records, P.O. Box 149348, Austin, TX 78714 Questions? Call (512)486-5780
Refer to Attached Code Sheet for Numbered Fields
★ These fields are required on all additional sheets submitted for this crash (ex.: additional vehicles, occupants, injured, etc.).

Page 1 of 2

## IDENTIFICATION AND LOCATION

* Crash Date (MM/DD/YYYY): 1,1 / 1,5 / 2,0,1,1
* Crash Time (24HRMM): 1,6,2,5
Case ID:
Local Use:

* County Name: Montgomery
* City Name:
[X] Outside City Limit

In your opinion, did this crash result in at least $1,000 [X] Yes [ ] No damage to any one person's property?
Latitude (decimal degrees): 3,0 . 1,5,0,3,2
Longitude (decimal degrees): -0,9,5 . 1,9,7,3,8

### ROAD ON WHICH CRASH OCCURRED

★1 Rdwy. Sys.: FM  ★ Hwy. Num.: 1485  2 Rdwy. Part: 1  Block Num.:  3 Street Prefix:  ★ Street Name:  4 Street Suffix:

[ ] Crash Occurred on a Private Drive or Road/Private Property/Parking Lot  [ ] Toll Road/Toll Lane  Speed Limit: 55  Const. Zone: [ ] Yes [X] No  Workers Present: [ ] Yes [X] No  Street Desc.:

### INTERSECTING ROAD, OR IF CRASH NOT AT INTERSECTION, NEAREST POINT OR REFERENCE MARKER

At Int.: [ ] Yes [X] No  1 Rdwy. Sys.: CR  Hwy. Num.:  2 Rdwy. Part:  Block Num.:  3 Street Prefix:  Street Name: SULLIVAN  4 Street Suffix: RD

Distance from Int. or Ref. Marker: 0.1  [ ] FT [X] MI  3 Dir. From Int. or Ref. Marker: E  Reference Marker:  Street Desc.:  RRX Num.:

## VEHICLE, DRIVER, & PERSONS (Unit 1)

Unit Num.: 1  5 Unit Desc.: 1  [ ] Parked Vehicle [ ] Hit and Run  LP State: TX  LP Num.: 647NXD  VIN: 1,G,8,M,B,3,5,B,5,7,Y,1,0,3,5,5,6

Veh. Year: 2,0,0,7  6 Veh. Color: GRY  Veh. Make: SATURN  Veh. Model: SKY  7 Body Style: P2  Pol., Fire, EMS on Emergency (Explain in Narrative if checked)

8 DL/ID Type: 1  DL/ID State: TX  DL/ID Num.: 28977643  9 DL Class: C  10 CDL End.: 96  11 DL Rest.: 96  DOB (MM/DD/YYYY):

Address (Street, City, State, ZIP):

| Person Num. | 12 Prsn. Type | 13 Seat Position | Name: Last, First, Middle (Enter Driver or Primary Person for this Unit on first line) | 14 Injury Severity | Age | 15 Ethnicity | 16 Sex | 17 Eject. | 18 Restr. | 19 Airbag | 20 Helmet | 21 Sol. | 22 Alc. Spec. | Alc. Result | 23 Drug Spec. | 24 Drug Test | 25 Drug Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 1 | STEVENS, ZACHARY, JAMES | A | 19 | W | 1 | 1 | 1 | 1 | 97 | N | 96 | | 96 | 97 | 96 |

Not Applicable - Alcohol and Drug Results are only reported for Driver/Primary Person for each Unit.

[X] Owner [ ] Lessee  Owner/Lessee Name & Address: LISA & MARK STEVENS,

Proof of Fin. Resp.: [X] Yes [ ] No [ ] Expired [ ] Exempt  26 Fin. Resp. Type: 2  Fin. Resp. Name: STATE FARM  Fin. Resp. Num.: 113032875

Fin. Resp. Phone Num.: 800-255-7645  27 Vehicle Damage Rating 1: 4,R,F,Q,7  27 Vehicle Damage Rating 2: 1,R,D,1  Vehicle Inventoried: [X] Yes [ ] No

Towed by: EMC TOWING  Towed To: 22855 GASOLINE ALLEY, NEW CANEY, TX 77357  281-399-5100

## VEHICLE, DRIVER, & PERSONS (Unit 2)

Unit Num.: 2  5 Unit Desc.: 1  [ ] Parked Vehicle [ ] Hit and Run  LP State: TX  LP Num.: AG22758  VIN: 1,N,6,D,D,2,6,S,5,X,C,3,4,4,4,5,5

Veh. Year: 1,9,9,9  6 Veh. Color: SIL  Veh. Make: NISSAN  Veh. Model: FRONTIER  7 Body Style: PK  Pol., Fire, EMS on Emergency (Explain in Narrative if checked)

8 DL/ID Type: 1  DL/ID State: TX  DL/ID Num.: 02986739  9 DL Class: C  10 CDL End.: 96  11 DL Rest.: 96  DOB (MM/DD/YYYY):

Address (Street, City, State, ZIP):

| Person Num. | 12 Prsn. Type | 13 Seat Position | Name: Last, First, Middle (Enter Driver or Primary Person for this Unit on first line) | 14 Injury Severity | Age | 15 Ethnicity | 16 Sex | 17 Eject. | 18 Restr. | 19 Airbag | 20 Helmet | 21 Sol. | 22 Alc. Spec. | Alc. Result | 23 Drug Spec. | 24 Drug Test | 25 Drug Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 1 | LANDAVERDE, MARIANO, ELIAS | K | 40 | H | 1 | 1 | 96 | 1 | 97 | N | 96 | | 96 | 97 | 97 |

Not Applicable - Alcohol and Drug Results are only reported for Driver/Primary Person for each Unit.

[X] Owner [ ] Lessee  Owner/Lessee Name & Address: PEDRO LANDAVERDE, 8331 SWAN MEADOW DR, HUMBLE, TX 77338

Proof of Fin. Resp.: [X] Yes [ ] No [ ] Expired [ ] Exempt  26 Fin. Resp. Type: 2  Fin. Resp. Name: PROGRESSIVE  Fin. Resp. Num.: 19237357

Fin. Resp. Phone Num.: 800-876-5581  27 Vehicle Damage Rating 1: 1,2,F,L,7  27 Vehicle Damage Rating 2: 3,R,&,T,3  Vehicle Inventoried: [X] Yes [ ] No

Towed by: GIT R DONE TOWING  Towed To: 23604 ROBERTS RD, NEW CANEY, TX 77357  281-689-0746

Copy from Custodial File

REDACTED PURSUANT TO MDL ORDER NO. 10/JOINT COORDINATION ORDER

Law Enforcement and TxDOT Use ONLY.
Form CR-3 1/1/2010

| Case ID | | TxDOT Crash ID | | Page 2 of 2 |

## DISPOSITION OF INJURED/KILLED

| Unit Num. | Prsn. Num. | Taken To | Taken By | Date of Death (MM/DD/YYYY) | Time of Death (24HRMM) |
|---|---|---|---|---|---|
| 1 | 1 | MEMORIAL HERMAN - HOUSTON ,TX | MCHD | | |
| 2 | 1 | MONTGOMERY CO FORENSICS CENTER - CONROE, TX | METCALF FUNERAL HOMES | 1 1 / 1 5 / 2 0 1 1 | 1 6 3 3 |
| | | | | | |
| | | | | | |
| | | | | | |

## CHARGES

| Unit Num. | Prsn. Num. | Charge | Citation/Reference Num. |
|---|---|---|---|
| | | | |

## DAMAGE

| Damaged Property Other Than Vehicles | Owner's Name | Owner's Address |
|---|---|---|
| | | |

## CMV

| Unit Num. | | 10,001+ LBS. | | TRANSPORTING HAZARDOUS MATERIAL | | 9+ Capacity | 28 Veh. Oper. | 29 Carrier ID Type | Carrier ID Num. | |
|---|---|---|---|---|---|---|---|---|---|---|

Carrier's Corp. Name / Carrier's Primary Addr.

| 30 Rdwy. Access | 31 Veh. Type | RGVW / GVWR | HazMat Released | Yes / No | 32 HazMat Class Num. | HazMat ID Num. | 32 HazMat Class Num. | HazMat ID Num. |
|---|---|---|---|---|---|---|---|---|

| 33 Cargo Body Style | Trailer 1 | Unit Num. | RGVW / GVWR | 34 Trlr. Type | Trailer 2 | Unit Num. | RGVW / GVWR | 34 Trlr. Type |
|---|---|---|---|---|---|---|---|---|

| Sequence Of Events | 35 Seq. 1 | 35 Seq. 2 | 35 Seq. 3 | 35 Seq. 4 | Total Num. Axles | Total Num. Tires |
|---|---|---|---|---|---|---|

## FACTORS & CONDITIONS

| | 36 Contributing Factors (Investigator's Opinion) | | 37 Vehicle Defects (Investigator's Opinion) | | Environmental and Roadway Conditions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Unit Num. | Contributing / May Have Contrib. | | Contributing / May Have Contrib. | | 38 Weather cond. | 39 Light Cond. | 40 Entering Roads | 41 Roadway Type | 42 Roadway Alignment | 43 Surface Condition | 44 Traffic Control |
| 1 | 60 | 58 | | | | | | | | | |
| 2 | | | | 2 | 1 | 97 | 1 | 4 | 2 | 12 |

## NARRATIVE AND DIAGRAM

Investigator's Narrative Opinion of What Happened
(Attach Additional Sheets If Necessary)

UNIT 1 WAS TRAVELING W/B ON FM 1485 AT AN UNSAFE
SPEED. UNIT 2 WAS TRAVELING E/B. UNIT 1 MADE AN
ILLEGAL PASS ON THE SHOULDER (UNIT 1 STRUCK THE
GUARDRAIL WITH ITS RD), LOST CONTROL, AND DROVE
INTO ONCOMING TRAFFIC WHERE IT STRUCK UNIT 2'S FL
WITH ITS RFQ. UNIT 2 ATTEMPTED TO TAKE EVASIVE ACTION
BY VEERING RIGHT. UNIT 1 WAS FOUND, UPRIGHT, IN THE
CENTER OF THE ROADWAY FACING S. UNIT 2 TRAVELED
INTO THE S DITCH WHERE IT ROLLED ONTO ITS PASSENGER'S
SIDE. UNIT 2 WAS UP RIGHTED BY BYSTANDERS
ATTEMPTING TO RENDER AID TO THE DRIVER. UNIT 2 WAS
FOUND, UPRIGHT, IN THE S DITCH FACING S/E.
WITNESS INFORMATION: CRYSTAL WILSON ████████ ;
JIMMY & LISA HIGGINSON ████████ ; KURTIS PROCTER
████████ ; STEPHEN O'PRY ████████ ; ERIC PATRICK
████████

Indicate North ↑

Field Diagram - Not to Scale

GUARDRAIL

1

FM 1485    TRAFFIC

2

UNIT 2

## INVESTIGATOR

| Time Notified (24HRMM) | 1 6 2 7 | How Notified | MCSO - DISPATCHED | Time Arrived (24HRMM) | 1 6 3 2 | Report Date (MM/DD/YYYY) | 1 1 / 1 5 / 2 0 1 1 |
|---|---|---|---|---|---|---|---|

| Invest. Comp. | X Yes / No | Investigator Name (Printed) | A. PAPANOS | | ID Num. | 12451 |
|---|---|---|---|---|---|---|

| ORI Num. | | *Agency | TEXAS DEPARTMENT OF PUBLIC SAFETY | District/Area | H P 2 C 1 1 |
|---|---|---|---|---|---|

Copy from Custodial File

REDACTED PURSUANT TO MDL ORDER NO. 10/JOINT

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

## AFFIDAVIT

BEFORE ME, the undersigned authority, personally appeared Joshua P. Davis, who, being by me duly sworn, stated as follows:

"My name is Joshua P. Davis. I am over 18 years of age, of sound mind, competent to make this affidavit, and personally acquainted with the facts herein stated.

I am the custodian of business records of Davis Law Group and attest that the exhibits to Plaintiffs' Traditional Motion for Partial Summary Judgment were made and kept by Davis Law Group in the regular course of its business of Davis Law Group. It was the regular course of business for Davis Law Group to have its employees or representatives with knowledge of the act, event, condition, or opinion recorded, to make the entries contained in these records, or to transmit the information contained in these records to other employees for the purpose of including the information in the records. The entries contained in these records were made at or near the time of the act or event recorded, or reasonably soon thereafter.

The attached records are originals or exact duplicates of the originals."

SIGNED this the 24th day of June, 2016.

_____
Joshua P. Davis

SWORN TO AND SUBSCRIBED before me on this the 24th day of _____, 2016.

_____
Notary Public in and the State of Texas



KELLY A MEZA
My Notary ID # 160872
Expires June 1, 2020

## CAUSE NO. 2015-04442

| | |
|---|---|
| ZACHARY STEVENS, LISA STEVENS AND MARK STEVENS, | § § § |
| Plaintiffs, | § § |
| v. | § § |
| GENERAL MOTORS LLC; DDH INVESTMENTS OF SOUTH TEXAS, INC. d/b/a SATURN OF HOUSTON, INC., AND MANUEL FERNANDEZ, | § § § § |
| Defendants. | § § § |
| IN RE: GENERAL MOTORS IGNITION SWITCH LITIGATION | § § § |

Transferred to the 152nd Judicial District Court of Harris County, Texas

(MDL Pretrial Court Before the Honorable Judge Robert Schaffer)

## ORDER

On this day the Court came to consider Plaintiffs' Traditional Motion for Partial Summary Judgment. After considering said motion, responses and the arguments of counsel, it is Ordered that said motion should in all things be Granted. It is therefore,

Ordered that Plaintiffs' Traditional Motion for Partial Summary Judgment is Granted.

SIGNED this _____ day of _____, 2016.

_____
JUDGE PRESIDING

# Exhibit  C

6/15/2016 2:58:32 PM
Chris Daniel - District Clerk Harris County
Envelope No. 11163004
By: SALENE SMITH
Filed: 6/15/2016 2:58:32 PM

## CAUSE NO. 2015-04442

| | | |
|---|---|---|
| ZACHARY STEVENS, LISA STEVENS AND MARK STEVENS, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Transferred to the 152nd Judicial District Court of Harris County, Texas |
| GENERAL MOTORS LLC; DDH INVESTMENTS OF SOUTH TEXAS, INC. d/b/a SATURN OF HOUSTON, INC., AND MANUEL FERNANDEZ, | § § § § | (MDL Pretrial Court Before the Honorable Judge Robert Schaffer) |
| Defendants. | § § § | |
| IN RE: GENERAL MOTORS IGNITION SWITCH LITIGATION | § § | |

### PLAINTIFFS' FIRST AMENDED PETITION

COME NOW Plaintiffs, Zachary Stevens, Lisa Stevens, and Mark Stevens (hereinafter, "Stevens Plaintiffs" or "Plaintiffs"), and file this Amended Petition complaining of General Motors LLC, DDH Investments of South Texas, Inc. d/b/a Saturn of Houston, and Manuel Fernandez (hereinafter "Defendants") and in support of this petition would show the Court as follows:

### I.
### DISCOVERY LEVEL

1.      Discovery shall be conducted in this case according to a Level III discovery control plan.

## II.
## PARTIES

2.      Plaintiff, Zachary Stevens, is an individual residing in Texas.

3.      Plaintiff, Lisa Stevens, is an individual residing in Texas.

4.      Plaintiff, Mark Stevens, is an individual residing in Texas.

5.      Defendant General Motors LLC ("New GM") is a Delaware limited liability company. General Motors Corporation ("Old GM") filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code on June 1, 2009. On July 10, 2009, New GM acquired substantially all of the assets and assumed certain liabilities of Old GM by way of a § 363 sale under Chapter 11 of the Bankruptcy Code. Plaintiffs' causes of action in this lawsuit are brought against New GM, and Plaintiffs do not assert any causes of action against Old GM. Although this Petition references facts against Old GM, it is for background and reference purposes only.  Since July 10, 2009, New GM has been in the business of developing, manufacturing, and marketing cars throughout the State of Texas. New GM has a network of authorized retailers that sells New GM vehicles and parts throughout Texas. General Motors LLC has been served and filed an answer herein.

6.      DDH Investments of South Texas, Inc. d/b/a Saturn of Houston, Inc. is a corporation with its principal place of business in Texas and has been served and filed an answer herein.

7.      Defendant Manuel Fernandez is an individual residing in Texas and can be served at his place of employment, 7250 Gulf Freeway, Houston, Texas 77017. No citation is requested.

Plaintiffs' First Amended Petition                                                             3

## III.
## VENUE AND JURISDICTION

8.    Venue is proper in Harris County pursuant to TEXAS CIVIL PRACTICE AND REMEDIES CODE § 15.002(a)(1)&(2) because all or a substantial part of the events giving rise to the claims brought by this lawsuit occurred in Harris County, Texas and because one or more of the Defendants are residents of Harris County at the time the events giving rise to this lawsuit occurred.

9.    The Court has subject matter jurisdiction over this civil action because Plaintiffs seek damages in an amount exceeding the Court's minimum jurisdictional limits.

10.    The Court has specific and general personal jurisdiction over the Defendants because the Defendants purposely availed themselves of the privilege of conducting activities within Texas; has substantial and continuous contacts with the State of Texas, generally and with respect to this action, to satisfy both general and specific minimum contacts; and exercising jurisdiction over them does not offend the traditional notions of fair play and substantial justice.

11.    There is incomplete diversity of citizenship, and Plaintiffs' claims raise no federal question. Plaintiffs seek no relief under a federal law, statute, regulation, treaty, or constitution, nor do Plaintiffs' rights to relief necessarily depend on the resolution of a substantial question of federal law. Thus, removal would be improper. Removal would also be improper due to the presence of one defendant with Texas citizenship.

# IV.
## FACTS

12.     On July 10, 2009, General Motors LLC acquired substantially all of the assets and assumed certain liabilities of General Motors Corporation by way of a § 363 sale under Chapter 11 of the Bankruptcy Code. New GM assumed specific liabilities of Old GM, who filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code on June 1, 2009. New GM acquired substantially all of Old GM's employees, officers and management personnel. New GM also acquired designs, tools, inventory, books, records, and its key contracts, among other essential assets from Old GM. Plaintiffs' causes of action in this lawsuit are brought against New GM, and they do not assert any causes of action against General Motors Corporation ("Old GM").

13.     Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement ("Sale Agreement"), New GM expressly assumed certain liability for post-sale accidents involving Old GM vehicles causing personal injury, loss of life or property damages. Plaintiffs bring this claim for their post-sale accident involving an Old GM vehicle that caused their personal injuries, and New GM is therefore expressly liable to the Plaintiffs.

14.     New GM also expressly agreed to undertake certain statutory requirements:

> From and after the Closing, Purchaser [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.

15.    In addition, [New GM] expressly set forth that it:

shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [General Motors Corporation] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.

16.    On February 10, 2014 New GM issued a recall for Stevens Plaintiffs' Saturn Sky, model year 2007 for an ignition switch failure. New GM identifies that in the event a subject vehicle experiences such a failure, the ignition switch will move out of the run position, making the vehicle unresponsive and prohibiting the vehicle's airbags from deploying.

17.    On November 15, 2011, Zachary Stevens was driving a 2007 Saturn Sky bearing VIN#1G8MB35B57Y103556 traveling westbound on FM 1485 in Montgomery County, Texas. Mariano Elias Landaverde was traveling eastbound on 1485 in a Nissan Frontier.

18.    As Stevens approached a line of cars his Saturn Sky began to act erratically and Stevens was unable to control the vehicle. Witnesses described the Saturn Sky passing slowed traffic on the right-hand side, striking a guardrail, then losing control and crashing into Mr. Landaverde's Nissan Frontier almost head-on. The Saturn Sky's airbags did not deploy during the accident sequence.

19.    As a result of the crash Zachary Stevens suffered a severe head injury requiring immediate emergency care and treatment and an extended hospitalization and follow-up care. Mr. Stevens continues to suffer from his injuries. Mariano Landaverde was dead at the scene.

20.    Additionally, as a result of the accident Zachary Stevens was the subject of a grand jury investigation and criminal indictment that required him to obtain an attorney. While a toxicology report demonstrated that Mr. Stevens was not under the influence of any drugs or alcohol, he was still charged with manslaughter. Only after New GM's recalls of 2014 was Mr. Stevens' criminal complaint dismissed.

21.    The subject Saturn Sky was purchased by Stevens Plaintiffs from Saturn of Houston and Manuel Fernandez (hereafter, "Saturn Defendants") prior to the incident in question. Prior to the accident in question, the subject Saturn Sky was taken to Saturn Defendants' service department, located in Harris County, Texas for service, maintenance, and/or inspections on different occasions. Saturn Defendants represented to Stevens Plaintiffs and their agents, representatives, and affiliates that the 2007 Saturn Sky was safe to operate and without defect.

22.    Plaintiffs contend that the subject Saturn Sky was defective and unreasonably dangerous by design in its electrical and airbag systems. As a result of the defects of the subject vehicle Zachary Stevens suffered serious permanent personal injuries, including but not limited to severe injuries. The Landaverdes previously resolved their wrongful death claim for the untimely death of Mr. Mariano Landaverde.

**V.**
**CLAIMS AGAINST DEFENDANT GENERAL MOTORS LLC**
**COUNT I – Negligence, Gross Negligence, Recklessness**

23.    Plaintiffs re-allege as if fully set forth, each and every allegation set forth herein.

24.    Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets, New GM expressly assumed certain liabilities for post-sale accidents involving Old GM vehicles causing personal injury, loss of life or property damages. New GM also acquired knowledge of Old GM's activities via the mind of the employees, officers, managers, books and records obtained and/or acquired as a result of the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement and subsequent Sale Order. Thus, the duties of Old GM are part of the foundation for the liability assumed by New GM. Further, as identified therein, the Plaintiffs have claims for a post-sale accident involving an Old GM vehicle that caused personal injury and New GM is therefore expressly liable to the Named Plaintiffs.

25.    Old GM and New GM owed consumers, including Plaintiffs, a duty to design, manufacture, fabricate, assemble, inspect, market, distribute, sell, and/or supply products in such a way as to avoid harm to persons using them. It is understood that New GM did not design, manufacture, fabricate, assemble, inspect, market, distribute or sell the subject vehicle.

Plaintiffs' First Amended Petition

26.    Old GM and New GM owed consumers, including Plaintiffs, a duty to detect known safety defects in vehicles they manufactured. It is understood that New GM did not manufacture the subject vehicle.

27.    Old GM knew that consumers, and specifically Plaintiffs, expect that it will employ all reasonable efforts to detect safety defects, warn drivers of their existence, and develop and make available an appropriate repair procedure. New GM knew that consumers expect that it will employ all reasonable efforts to detect safety defects, warn drivers of their existence, and develop and make available an appropriate repair procedure.

28.    Old GM and New GM's efforts to discover, provide notice of, and provide repair procedures for safety related defects exist for the benefit of Plaintiffs and other drivers of GM vehicles. Old GM and New GM were aware that by providing maintenance and repair information and assistance, including through authorized dealerships, Old GM and New GM had a responsibility to Plaintiffs and other drivers to take the reasonable measures listed above.

29.    By reason of New GM's assumption of liability under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement for post-sale accidents involving Old GM vehicles causing personal injury, loss of life or property damages, the failures of Old GM described above that contributed to or were causally connected to the injuries sustained by Plaintiffs were among the liabilities of Old GM assumed by New GM.

30.    On the occasion in question, Old GM, by and through its officers, employees, agents and representatives, committed acts of omission and commission, which collectively and severally constituted negligence. Said acts include, but are not limited to, the following:

a.  Designing the subject vehicle with defective and inadequate airbag systems;

b.  Failing to adequately test the subject vehicle's electrical and airbag systems; and

c.  Failing to implement alternative designs in the subject vehicle that would have made the vehicle's electrical and airbag systems more reliable and/or effective.

31.    Plaintiffs will show that these acts of omission and commission, when taken separately and/or together, constitute negligence as that term is understood at law. Plaintiffs will further show that the foregoing acts of negligence were proximate causes of the injuries to Plaintiffs herein, and all subsequent damages.

32.    Independent of any failures by Old GM as described herein New GM breached its duties to Plaintiffs by failing to provide appropriate notice of and repair procedures for the defects in the subject vehicle. In doing so, New GM departed from the reasonable standard of care required of it.

33.    It was foreseeable that if New GM did not provide appropriate notice and repair procedures for the defect, Plaintiffs and other drivers would be endangered.

34.    Plaintiffs' injuries were reasonably foreseeable to Old GM and New GM.

35.    Plaintiffs could not through the exercise of reasonable diligence have prevented the injuries caused by Old GM and New GM's negligence and gross negligence.

36.    Old GM and New GM's acts and omissions, when viewed objectively from the actor's standpoint, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Old GM and New GM nevertheless proceeded with conscious indifference to the rights, safety and welfare of others.

37.    For purposes of all of Plaintiffs' facts, claims and damages as alleged and outlined herein, Plaintiffs limit their demand for punitive or exemplary damages to only those Independent Claims (as defined in the Judgment entered by the United States Bankruptcy Court for the Southern District of New York ('Bankruptcy Court') on April 15, 2015, and as construed in subsequent rulings by the Bankruptcy Court and by District Judge Furman in MDL 2543 pending in the United States District Court for the Southern District of New York) against New GM arising on or after July 10, 2009.

## COUNT II – Strict Liability

38.    Plaintiffs re-allege as if fully set forth, each and every allegation set forth herein.

39.    Old GM, at all times relevant to this action, was engaged in the design, testing, manufacture, distribution, and sale of automobiles, including the subject vehicle.

40.    The subject vehicle was expected to and did reach users and consumers without substantial change in the condition in which it was sold.

41.    The subject vehicle was in a defective condition creating risk of harm to a user or a consumer, including the Plaintiffs, that was foreseeable to Old GM and thus rendered the vehicle unreasonably dangerous and defective as designed, taking into consideration the utility of the subject vehicle and the risks involved in its use.

42.    The defects caused Plaintiffs' injuries.

43.    At the time the subject vehicle left the possession of Old GM, there were safer alternative designs other than the designs used in the subject vehicle that would have prevented or significantly reduced the risk of injury and/or death.

44.    These alternative designs were both economically and technologically feasible by the application of existing or reasonably achievable scientific knowledge at the time the subject vehicle left the control of Old GM. Furthermore, New GM was also aware of safer alternative designs and the need to conduct a recall to implement these safer alternative designs because the subject vehicle posed an unreasonable risk of injury and/or death, but did nothing until January 2014.

45.    Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets, New GM expressly assumed certain liabilities for post-sale accidents involving Old GM vehicles causing personal injury, loss of life or property damage. As identified therein, the Plaintiffs have claims for a post-sale accident involving an Old GM vehicle that caused personal injury and New GM is therefore expressly liable to these Plaintiffs.

46.    These injuries and losses were caused by Old GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling and/or supplying the subject automobile in a defective condition for which New GM is strictly liable to Plaintiffs pursuant to Restatement (Second) of Torts § 402A because these liabilities were expressly assumed by New GM.

47.    These injuries were caused by Old GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling and/or supplying the subject automobile without proper and adequate warnings, instructions, and/or guidelines for safe use for which New GM is strictly liable to Plaintiffs because these liabilities were expressly assumed by New GM.

48.    By reason of New GM's assumption of certain liabilities under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement for post-sale accidents involving Old GM vehicles causing personal injury, loss of life or property damage, the failures of Old GM described above that contributed to or were causally connected to the injuries sustained by Plaintiffs were among the liabilities of Old GM assumed by New GM.  Independent of any failures by Old GM as described herein, between July 10, 2009 and March 2014, New GM breached its duties owed to Plaintiffs as described herein.

## VI.
## CLAIMS AGAINST SATURN DEFENDANTS
### COUNT I – Negligence

49.    Plaintiffs re-allege as if fully set forth, each and every allegation set forth herein. Saturn Defendants had a duty to exercise the degree of care that a reasonably

prudent company would use to avoid harm to others under circumstances similar to those described herein. Plaintiffs' damages were proximately caused by the Saturn Defendants' negligent, careless, and reckless disregard of said duty.

50.     The Saturn Defendants' negligent, careless, and reckless disregard of its duty consisted of the following acts and omissions, based on the information currently available to Plaintiffs:

a.  Failing to properly identify the defect in the subject vehicle;

b.  Making an express factual representation to Plaintiffs about an aspect of the product; that is, making the incorrect factual representation to Plaintiffs that the defect of non-deployment of airbags in a collision, would not occur;

c.  Representing to Plaintiffs that the vehicle was safe and reasonable to operate;

d.  Causing Plaintiffs to rely on the express, incorrect factual representation about the product and continue to use the product when it was unsafe to do so; and

e.  Representing to Plaintiffs that the vehicle's airbags would deploy as designed during a collision. Stevens Plaintiffs would not have been harmed by the product or would not have suffered the same degree of harm.

## COUNT II – Strict Liability

51.     Plaintiffs re-allege as if fully set forth, each and every allegation set forth herein. Saturn Defendants had a duty to exercise the degree of care that a reasonably

prudent company would use to avoid harm to others under circumstances similar to those described herein. In violation of CPCRC § 82.003(a)(5) Saturn Defendants made an express factual representation that the 2007 Saturn Sky had working airbags, and that it was safe for Stevens Plaintiffs to continue driving the subject vehicle. That representation proved to be incorrect; however, Plaintiffs relied on that representation in continuing to drive the subject vehicle. The wreck that occurred on November 15, 2011 and the Plaintiffs' damages were proximately caused by Saturn Defendants' express, but incorrect representations.

52.    The subject vehicle injured Plaintiffs due to defects in the design of said vehicle. Said defects were producing causes of the injuries to Plaintiffs and Plaintiffs' resulting damages.

## VII.
## TEXAS C.P.R.C. § 82.008

53.    No mandatory safety standard or regulation adopted and promulgated by the federal government or an agency of the federal government was applicable to the subject vehicle at the time it was manufactured by Old GM that governed any product risk that caused the injuries to Plaintiffs herein.

54.    To the extent any Defendants attempt to rely on any standards or regulations of the federal government, such standards or regulations were inadequate to protect against the risk of accident and/or injuries that occurred in this accident and/or Old GM and/or New GM withheld or misrepresented information to the government regarding the adequacy of the safety standard alleged to be at issue.

# VIII.
## DAMAGES

55.    Plaintiffs seek unliquidated damages in an amount that is within the jurisdictional limits of the court.

56.    As a proximate result of the conduct of Defendants, Plaintiffs have serious injuries and resulting damages.

57.    Stevens Plaintiffs seek monetary damages from Defendants to compensate them for the following elements of damages, including but not limited to:

a.  Past and future physical pain and mental anguish;

b.  Past and future loss of earning capacity;

c.  Past and future lost wages;

d.  Past and future disfigurement;

e.  Past and future physical impairment;

f.  Loss of consortium in the past;

g.  Past economic and consequential damages, including costs associated with Stevens Plaintiffs' criminal case; and,

h.  Past and future medical expenses.

58.    Plaintiffs' damages in this regard are in excess of the minimum jurisdiction of this Court. Plaintiffs state for notice purposes that by this pleading they are claiming any and all damages to which they are entitled under Texas law.

59.    The conduct of Defendants, described above, was more than momentary thoughtlessness, inadvertence, or error of judgment and was of such a character as to

Plaintiffs' First Amended Petition

make the Defendants guilty of gross negligence.  Defendants' acts or omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others of which Defendants had actual awareness, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, and Plaintiffs therefore sue for exemplary damages, pursuant to TEXAS CIVIL PRACTICE AND REMEDIES CODE § 41.003, in the amount determined by the trier of fact.

## IX.
## PREJUDGMENT AND POST-JUDGMENT INTEREST

60.    Plaintiffs seek prejudgment and post-judgment interest at the maximum rate permitted by law.

## X.
## JURY DEMAND

61.    In accordance with Rule 216 of the TEXAS RULES OF CIVIL PROCEDURE, Plaintiffs hereby make application for a jury trial and request that this cause be set on the Court's Jury Docket. In support of this application, the appropriate jury fee has been paid to the Clerk at least thirty (30) days in advance of the trial setting.

## XI.
## PRAYER

62.    For the foregoing reasons, Plaintiffs pray that Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiffs against Defendants for actual damages, as alleged, and exemplary damages, in an amount within the jurisdictional limits of this Court; together with pre-judgment interest (from the date of injury through the date of judgment) at the maximum rate

Plaintiffs' First Amended Petition

17

allowed by law; post-judgment interest at the legal rate, costs of court; and such other and

further relief to which Plaintiffs may be entitled at law or in equity.

Respectfully submitted,

**DAVIS LAW GROUP**

By:  */s/ Joshua P. Davis*

     Joshua P. Davis

     State Bar No. 24055379

     Mitchell A. Greene

     State Bar No. 24078591

     Katherine Ray

     State Bar No. 24091634

1010 Lamar, Suite 200

Houston, Texas 77002

(713) 337-4100/Phone

(713) 337-4101/Fax

*josh@thejdfirm.com*

*mitch@thejdfirm.com*

*katie@thejdfirm.com*

**Attorney for Plaintiffs**

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing instrument was served on all counsel of record in accordance with the TEXAS RULES OF CIVIL PROCEDURE on June 9, 2016 as follows:

*Via ECF*
Kyle H. Dreyer
Giovanna Tarantino Bingham
Thomas G. Jacks
HARTLINE DACUS BARGER DREYER LLP
8750 N. Central Expressway, Suite 1600
Dallas, Texas 75231

*Via ECF*
Darrell L. Barger
HARTLINE DACUS BARGER DREYER LLP
1980 Post Oak Blvd, Suite 1800
Houston, Texas 77056

*Via Email jwigington@wigrum.com*
Jeffrey G. Wigington
WIGINGTON RUMLEY DUNN, LLP
800 N Shoreline Blvd.
14th Floor, South Tower
Corpus Christi, Texas 78401

*Via Email bobh@hmglawfirm.com*
Robert C. Hilliard
HILLIARD MUNOZ GONZALES LLP
719 S. Shoreline Blvd., Suite 500
Corpus Christi, Texas 78401

*Via Email rmithoff@mithofflaw.com*
Richard Warren Mithoff
MITHOFF LAW
500 Dallas, Suite 3450
Houston, Texas 77002

*Via Email chris.gadoury@lanierfirm.com*
Chris Gadoury
THE LANIER LAW FIRM, P.C.
6810 FM 1960 West
Houston, Texas 77069


/s/ *Joshua P. Davis*
Joshua P. Davis

# Exhibit  D

CAUSE NO. 2015-04442

| | | |
|---|---|---|
| ZACHARY STEVENS, LISA STEVENS, AND MARK STEVENS | § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| GENERAL MOTORS LLC; DDH INVESTMENTS OF SOUTH TEXAS, INC. d/b/a SATURN OF HOUSTON, INC., AND MANUEL FERNANDEZ, | § § § § § § | Transferred to the 152nd Judicial District Court of Harris County, Texas |
| Defendants. | § § § | (MDL Pretrial Court Before the Honorable Judge Robert Schaffer) |
| IN RE: GENERAL MOTORS IGNITION SWITCH LITIGATION | § § § § | |

**GENERAL MOTORS LLC'S COMBINED MOTION
FOR SUMMARY JUDGMENT ON PUNITIVE DAMAGES CLAIMS
- AND -
CROSS-MOTION FOR SUMMARY JUDGMENT ON
EXEMPLARY DAMAGES CAPS UNDER TEX. CIV. PRAC. & REM. CODE § 41.008(b)
-AND-
OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

SUMMARY OF ARGUMENT .......................................................................... 2

UNDISPUTED FACTUAL BACKGROUND................................................. 5

    A.    The July 2009 Bankruptcy Court Sale Order And Agreement. ............................ 5

    B.    The November 2011 Accident And Plaintiffs' Allegations................................... 7

    C.    The September 2015 Deferred Prosecution Agreement ......................................... 8

    D.    The June 2016 New Cap-Busting Theory................................................................ 9

LEGAL STANDARD......................................................................................... 10

ARGUMENT AND AUTHORITIES.............................................................. 10

I.    THE COURT SHOULD GRANT SUMMARY JUDGMENT DISMISSING PUNITIVE DAMAGES CLAIMS ................................................................ 10

    A.    Plaintiffs May Only Recover Punitive Damages Based On Viable Independent Claims .......................................................................... 10

    B.    Plaintiffs Have Not Pled Any Viable Independent Claim Against New GM ....... 12

        1.    New GM Had No Post-Sale Duty To Recall Or Warn Under Texas Law. ................................................................................ 12

        2.    The Recall Provisions Of The Sale Agreement Cannot Create A Viable Claim Against New GM................................................ 16

II.    ALTERNATIVELY, THE COURT SHOULD FIND THAT THE EXEMPLARY DAMAGES CAPS APPLY. ................................................. 17

    A.    Plaintiffs' Failure To Plead A Cap-Busting Theory Waived Any Exemption To The Statutory Limits On Exemplary Damages............................ 17

        1.    Plaintiffs Failed To Plead, And Have Therefore Waived, Any Cap-Busting Exception. .................................................. 17

        2.    The Court Should Reject Any Request By Plaintiffs To Amend Their Pleading To Add Cap-Busting Theories Because It Would Unfairly Reshape This Case On The Eve Of Trial. ............................ 18

    B.    The Aggravated Assault Exception Is Inapplicable To This Products Liability Case And Should Be Rejected As A Matter Of Law. ............................ 20

1.      To Exceed The Cap, Plaintiffs Must Plead And Prove The
Intentional Or Knowing Commission Of A Specific Enumerated
Felony. ................................................................................................. 20

2.      Plaintiffs Cannot Establish The Elements Of Intentional Or
Knowing Aggravated Assault Against Them. ......................................... 21

C.    Plaintiffs' Cap-Busting Allegations Violate The Bankruptcy Court's
Orders................................................................................................................... 27

D.    The Court Should Reject Plaintiffs' Motion for Summary Judgment. ................. 29

CONCLUSION............................................................................................................................ 30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Al Parker Buick Co. v. Touchy*,
   788 S.W.2d 129 (Tex. App.—Houston [1st Dist.] 1990, orig. proceeding) ........................... 18

*Am. Tobacco Co., Inc. v. Grinnell*,
   951 S.W.2d 420 (Tex. 1997) ................................................................................................ 12

*Arreola v. State*,
   2014 WL 7014187 (Tex. App.—Dallas Dec. 5, 2014) ......................................................... 27

*Bell Helicopter Co. v. Bradshaw*,
   594 S.W.2d 519 (Tex. Civ. App.—Corpus Christi 1979, writ ref'd n.r.e) ........................... 13

*Bennett v. Reynolds*,
   315 S.W.3d 867 (Tex. 2010) ................................................................................................ 22

*Block v. Wyeth, Inc.*,
   2003 WL 203067 (N.D. Tex. Jan. 28, 2003) ................................................................. 14, 15

*Brooks v. State*,
   967 S.W.2d 946 (Tex. App.—Austin 1998, no pet.) ............................................................ 22

*Buchanan v. Rose*,
   159 S.W.2d 109 (Tex. 1942) ................................................................................................ 25

*Cook v. State*,
   884 S.W.3d 485 (Tex. Crim. App. 1994) ............................................................................. 22

*Davis v. White*,
   2016 WL 1163764 (Tex. App.—Fort Worth Mar. 24, 2016) ............................................... 18

*Dion v. Ford Motor Co.*,
   804 S.W.2d 302 (Tex. App.—Eastland 1991, writ denied) .................................................. 13

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   2010 WL 9077875 (S.D. Tex. Jan. 19, 2010) ...................................................................... 23

*Finnicum v. Wyeth, Inc.*,
   708 F. Supp. 2d 616 (E.D. Tex. 2010) ................................................................................. 15

*Firestone Steel Prods. Co. v. Barajas*,
   927 S.W.2d 608 (Tex. 1996) ......................................................................................... 14, 15

*Flock v. Scripto-Tokai Corp.*,
    2001 WL 34111723 (S.D. Tex. Nov. 20, 2001) ....................................................23

*Gatten v. McCarley*,
    391 S.W.3d 669 (Tex. App.—Dallas 2013, no pet.)...........................................25

*Gaulding v. Celotex Corp.*,
    772 S.W.2d 66 (Tex. 1989)................................................................................14, 15

*In re Gen. Motors LLC Ignition Switch Litig.*,
    2016 WL 874778 (S.D.N.Y. Mar. 3, 2016) ...............................................2, 5, 15, 25

*In re General Motors Corp.*,
    407 B.R. 463 (Bankr. S.D.N.Y. 2009) ...............................................................10

*Hakemy Bros. v. State Bank & Trust. Co.*,
    189 S.W.3d 920 (Tex. App.—Dallas 2006, pet. denied) ....................................19

*Hampden Corp. v. Remark, Inc.*,
    331 S.W.3d 489 (Tex. App.—Dallas 2010, pet. denied) ....................................19

*HCRA of Tex., Inc. v. Johnston*,
    178 S.W.3d 861 (Tex. App.—Fort Worth 2005, no pet.) ......................................21

*Hernandez v. Ford Motor Co.*,
    2005 WL 1574474 (S.D. Tex. June 28, 2005) ............................................3, 12, 13

*In re I.L.*,
    389 S.W.3d 445 (Tex. App.—El Paso 2012, no pet.)..........................................22

*Innovative Mailing Solutions, Inc. v. Label Source, Inc.*,
    2010 Tex. App. LEXIS 834 (Tex. App.—Fort Worth Feb. 4, 2010, no pet.)..........18

*Johnson v. State*,
    364 S.W.3d 292 (Tex. Crim. App. 2012)...........................................................22

*Jones v. SIG Arms, Inc.*,
    2001 WL 1617187 (Tex. App.—San Antonio Dec. 19, 2001, no pet.) ..................14

*Kierstead v. Fleetwood Travel Trailers of Texas, Inc.*,
    1993 WL 58731, at *2 n.4 (Tex. App. Mar. 4, 1993) ............................................13

*Knight v Depena*,
    2002 WL 32855376 (Dist. Ct., Nueces County, Tex. Aug. 8, 2002)......................26

*Knight v. Depena*,
    2003 WL 24056199 (Dist. Ct., Neuces County, Tex. Apr. 25, 2003) ....................26

*Landrian v. State*,
    268 S.W.3d 532 (Tex. Crim. App. 2008)................................................................23

*Madison v. Williamson*,
    241 S.W.3d 145 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)....................21

*Marin v. IESI TX Corp.*,
    317 S.W.3d 314 (Tex. App.—Houston [1st Dist.] 2010, pet denied)....................18

*McCracken v. Ford Motor Co.*,
    588 F. Supp. 2d 635 (E.D. Pa. 2008) ....................................................................26

*Mission Res., Inc. v. Garza Energy Trust*,
    166 S.W.3d 301 (Tex. App.—Corpus Christi 2005), rev'd on other grounds,
    268 S.W.3d 1 (Tex. 2008)......................................................................................20

*In re Motors Liquidation Co.*,
    09-50026 (REG), Docket No. 13177 (Bankr. S.D.N.Y. June 1, 2015) ....................2

*In re Motors Liquidation Co.*,
    2015 WL 11070293 (Bankr. S.D.N.Y. Dec. 4, 2015)....................................5, 6, 11

*In re Motors Liquidation Co.*,
    529 B.R. 510 (Bankr. S.D.N.Y. 2015) ............................................................5, 6, 11

*In re Motors Liquidation Co.*,
    541 B.R. 104 (Bankr. S.D.N.Y. 2015) .......................................................... *passim*

*Nester v. Textron, Inc.*,
    2015 WL 9413891 (W.D. Tex. Dec. 22, 2015) ......................................................12

*Newsom v. B.B.*,
    306 S.W.3d 910 (Tex. App.—Beaumont 2010, pet. denied)..................................25

*O'Hare v. Graham*,
    455 Fed. App'x 377 (5th Cir. 2011) .......................................................................21

*In re Old Carco LLC*,
    442 B.R. 196 (S.D.N.Y. 2010)................................................................................10

*Olivas v. Am. Home Prods. Corp.*,
    2002 WL 32620351 (W.D. Tex. Oct. 18, 2002)....................................................14

*Phares v. Actavis-Elizabeth LLC*,
    892 F. Supp. 2d 835 (S.D. Tex. 2012) ...................................................................15

*Philip Morris USA v. Williams*,
    549 U.S. 346 (2007)................................................................................................22

*Poliner v. Texas Health Sys.*,
   239 F.R.D. 468 (N.D. Tex. 2006) ..................................................................22, 24

*Price v. Short*,
   931 S.W.2d 677 (Tex. App.—Dallas 1996, no pet.) .................................................19

*Price v. State*,
   2016 WL 259639 (Tex. App.—Dallas, Jan. 21, 2016) ............................................27

*Sanchez v. Liggett & Myers, Inc.*,
   187 F.3d 486 (5th Cir. 1999) ..................................................................................15

*Shaw v. Brown & Williamson Tobacco Corp.*,
   973 F. Supp. 539 (D. Md. 1997) .............................................................................25

*Signal Peak Enter. of Texas, Inc. v. Bettina Invests, Inc.*,
   138 S.W.3d 915 (Tex. App.—Dallas 2004, pet. struck) ..........................................21

*Sixtos v. State*,
   2014 WL 4202796 (Tex. App.—Dallas Aug. 26, 2014) ..........................................27

*Smith v. Cent. Mine Equip. Co.*,
   559 F. App'x 679 (10th Cir. 2014) .........................................................................13

*Tijerina v. Philip Morris Inc.*,
   1996 WL 885617 (N.D. Tex. 1996) .........................................................................26

*Timpte Indus., Inc. v. Gish*,
   286 S.W.3d 306 (Tex. 2009) ...................................................................................10

*Torrington Co. v. Stutzman*,
   46 S.W.3d 829 (Tex. 2000) .....................................................................................13

*Wackenhut Corrections Corp. v. de la Rosa*,
   305 S.W.3d 594 (Tex. App.—Corpus Christi 2009, dismissed as moot) ................24

*Walton v. Harnischfeger*,
   796 S.W.2d 225 (Tex. App.—San Antonio 1990, writ denied) ...............................15

*In re White Motor Credit Corp.*,
   75 B.R. 944 (Bankr. N.D. Ohio 1987) .....................................................................10

*Wilson v. State*,
   2012 WL 3264396 (Tex. App.—Dallas Aug. 13, 2012) ..........................................27

*Zorrilla v. Aypco Constr. II, LLC*,
   469 S.W.3d 143 (Tex. 2015) ....................................................................4, 17, 18, 24

**Statutes**

Tex. Civ. Prac. & Rem. Code § 41.003 ....................................................................................9, 20

Tex. Civ. Prac. & Rem. Code § 41.005(a) ....................................................................................28

Tex. Civ. Prac. & Rem. Code § 41.008(b) ........................................................................... *passim*

Tex. Civ. Prac. & Rem. Code § 41.008(c) ........................................................................... *passim*

Tex. Penal Code § 22.02(a)(1) ..............................................................................................21, 22

**Rules**

Tex. R. Civ. P.  5(b) ..................................................................................................................18

Tex. R. Civ. P. 56 ......................................................................................................................18

Tex. R. Civ. P. 63 ......................................................................................................................18

Tex. R. Civ. P. 166 ....................................................................................................................19

Tex. R. Civ. P. 166a(i) ..............................................................................................................10

Tex. R. Civ. P. 166a(c) ..............................................................................................................29

**Other Authorities**

House Research Org., Bill Analysis, Tex. S.B. 25, 74th Leg., R.S. (1995) ..................................26

Oliver Wendell Holmes, *The Common Law* 54 (1881) ................................................................25

Senate Bill Analysis C.S.S.B. 25 (Feb. 14, 1995) ......................................................................26

## INTRODUCTION

Plaintiffs seek compensatory and exemplary (or punitive) damages from General Motors LLC ("New GM") for injuries allegedly sustained in a November 15, 2011 accident involving a 2007 Saturn Sky manufactured and distributed by General Motors Corporation ("Old GM"), a separate legal entity who is not a defendant in this case.  The Court should grant summary judgment dismissing all punitive damages claims because there is no viable "Independent Claim" under Texas law based solely on New GM's conduct, which is a prerequisite to asserting a punitive damages claim against New GM under binding federal Bankruptcy Court orders.

Alternatively, the Court should grant summary judgment finding that the exemplary damages caps set forth in section 41.008(b) of the Texas Civil Practice & Remedies Code apply, and should deny Plaintiffs' attempt to bust the cap using the criminal "aggravated assault" exception.  Plaintiffs' cap-busting theory (i) was never pled by Plaintiffs and is therefore waived; (ii) is based on allegations that cannot state a claim for felonious aggravated assault against New GM; and (iii) violates the federal Bankruptcy Court's orders.  The Court should preclude Plaintiffs from transforming this civil products liability action into a legally baseless sideshow about whether New GM committed an intentional, personalized crime against Plaintiffs.

Plaintiffs' eleventh-hour attempt to bust the punitive damages cap also creates a serious risk that the August 8 bellwether trial will not occur because the Bankruptcy Court will enforce its injunction against plaintiffs taking such action before that date.  As set forth below (*see infra* Argument, Part II.C), Plaintiffs' allegations of aggravated assault rely primarily on events that occurred before New GM came into existence in July 2009 (that is, Plaintiffs rely on Old GM conduct).  The Bankruptcy Court has ruled that reliance on Old GM conduct to seek punitive damages against New GM is barred, and that any case in which such allegations are made should be stayed until the allegations are deleted or cured.  Because Plaintiffs' motion to bust the

punitive damages cap relies on Old GM conduct, New GM will need to seek relief from the

Bankruptcy Court to enforce its prior rulings.  New GM intends to move on Friday, July 1, to

enforce the 2009 Sale Order and Injunction in the Bankruptcy Court against Plaintiffs.  In other

similar cases, the Bankruptcy Court has stayed plaintiffs from proceeding in the trial court

pending its decision or until the offending allegations are deleted or cured.  Sometimes those

rulings are appealed, and the appellate courts also stay plaintiffs from proceeding until the

appeals are resolved.  Accordingly, if Plaintiffs do not withdraw their motion, there is a

significant possibility that Plaintiffs will be enjoined by the Bankruptcy Court and no trial will

occur on August 8.

## SUMMARY OF ARGUMENT

<u>The Court should grant summary judgment on all punitive damages claims</u>.  The scope of

New GM's liability in this case is expressly limited by, among other things, the terms of the

July 2009 Sale Order entered by the Bankruptcy Court, which approved the Sale Agreement

between New GM and Old GM.  Under the Sale Agreement, New GM purchased certain assets

and assumed certain specifically defined liabilities of Old GM, including compensatory damage

claims for personal injuries involving vehicles manufactured and sold by Old GM that were

involved in accidents after the Sale date.[1]  In particular, both the federal Bankruptcy Court and

the federal MDL Court have held that "New GM did not assume liability for punitive damages."

*In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 874778, at *1-2 (S.D.N.Y. Mar. 3,

2016).[2]  Instead, any claim for punitive damages against New GM must be based on and be

limited to an "Independent Claim," which the Bankruptcy Court defined as a viable state-law

---

[1]    Ex. 1, Sale Order & Agreement § 2.3(a)(ix).

[2]    Citing *In re Motors Liquidation Co.*, 541 B.R. 104, 108 (Bankr. S.D.N.Y. 2015) ("New GM did not
contractually assume liability for punitive damages based on Old GM knowledge or conduct.").

cause of action that is "based solely on New GM's own, independent, post-Closing acts or conduct" and not based in any way on the conduct of Old GM. *Id.* at *2.[3]

Plaintiffs do not allege any viable Independent Claims against New GM under Texas law. Plaintiffs' claims for negligence and strict liability are predicated on classic manufacturer-based product liability theories, such as negligence and design defect. While New GM may have assumed Old GM's liability for compensatory damages in connection with those claims (even though New GM did not manufacture the car), it did not assume liability for punitive damages based on those claims, and Plaintiffs are barred by the federal Bankruptcy Court's orders from seeking punitive damages against New GM on those claims. In this case, the only allegations in Plaintiffs' petition concerning New GM conduct are accusations that New GM failed (i) to recall the vehicles, (ii) to provide Plaintiffs with notice of the defect at issue, and (iii) to repair the defects. None of those claims is a viable cause of action under Texas law. *See Hernandez v. Ford Motor Co.*, 2005 WL 1574474, at *1 (S.D. Tex. June 28, 2005) ("Texas law generally does not recognize a common law post-sale duty to warn or to recall defective products."). As a result, the Court should grant summary judgment dismissing all punitive damages claims.

<u>The statutory caps on exemplary damages apply as a matter of law</u>. New GM cross-moves for partial summary judgment on a related but distinct issue (and one that the Court need not reach if it grants New GM's motion for summary judgment on all punitive damages claims). In particular, if the Court declines to grant summary judgment against Plaintiffs' punitive damages claims, it should grant summary judgment holding that the caps on the amount of exemplary damages set forth in section 41.008(b) of the Texas Civil Practice & Remedies Code apply in this case, and that Plaintiffs are barred from seeking jury findings on their tardy, legally

---

[3]    Quoting *In re Motors Liquidation Co.*, 09-50026 (REG), Docket No. 13177 ¶ 4 (Bankr. S.D.N.Y. June 1, 2015).

flawed request to "bust" the caps under the narrow exceptions enumerated under section 41.008(c). New GM is entitled to summary judgment on the statutory caps for three reasons.

*First*, Plaintiffs have waived the request to bust the punitive damages caps. The first time Plaintiffs ever suggested that the caps should not apply was their June 24, 2016 motion, months after the February 1, 2016 deadline for amending pleadings had passed. Plaintiffs' failure to plead an exception to the caps waived any argument that an exemption applies. *See Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 157 (Tex. 2015).

*Second*, Plaintiffs' novel attempt to squeeze this case into the "aggravated assault" exception should be rejected. Plaintiffs have pled and pursued this case as a products liability civil action premised on traditional negligence or strict liability concepts, and this case was selected as a bellwether trial in the Texas MDL on the basis of those pleadings. No reasonable jury could find that New GM—who neither manufactured the 2007 Saturn Sky at issue nor had any contact whatsoever with Plaintiffs before the November 2011 accident—intentionally or knowingly caused serious bodily injury to Mr. Stevens.

*Third*, the Court should bar Plaintiffs from attempting to circumvent the statutory limits on punitive damages because most of Plaintiffs' contrived aggravated assault claim is based upon or relates to Old GM conduct. Plaintiffs cannot do this because the Bankruptcy Court's orders preclude the assertion of any claims against New GM (other than Assumed Liabilities) that are based on the conduct of Old GM. Because Plaintiffs plainly rely on Old GM conduct to allege aggravated assault, the attempt to bust the cap violates the Bankruptcy Court's orders and injunctions and must be rejected.

In addition, because Plaintiffs' motion violates the Bankruptcy Court's orders and injunctions, New GM has no choice but to file a motion on July 1 in the Bankruptcy Court to

enforce the stay against Plaintiffs proceeding in this manner (*i.e.* until Plaintiffs drop their motion or cure the allegations). New GM will serve the Court and the parties with a copy of that motion. Because the Bankruptcy Court has enforced its orders against plaintiffs in other cases in which claims against New GM are based on allegations involving Old GM conduct, New GM believes there is a significant possibility that the Bankruptcy Court may do so here as well and that no trial will occur on August 8 as a result. New GM is prepared (and wants) to try this case on August 8 for a variety of reasons, but Plaintiffs' last-minute improper motion which violates another court's orders leaves New GM with no other option but to seek relief from the Bankruptcy Court.

## UNDISPUTED FACTUAL BACKGROUND

### A.    The July 2009 Bankruptcy Court Sale Order And Agreement.

On June 1, 2009, Old GM petitioned for relief under Chapter 11 of the Bankruptcy Code. On July 5, 2009, the Bankruptcy Court entered the Sale Order approving the Sale Agreement under Section 363 of the Bankruptcy Code. (Ex. 1, Sale Order & Agreement.) New GM, which was formed in June 2009, is not a successor to Old GM.[4] New GM bought certain of Old GM's assets "free and clear" of all claims, obligations, and duties that Old GM owed to vehicle owners, other than certain specifically defined "Assumed Liabilities."[5] (*Id.* at Sale Agreement § 2.1; Sale

---

[4]    Ex. 1, Sale Order & Agreement at 13, 40 (assets purchased "free and clear of . . . claims . . . based on any successor or transferee liability" and New GM "shall not be deemed . . . a mere continuation" of Old GM); *see also e.g.*, *In re: Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 874778, at *4 (S.D.N.Y. Mar. 3, 2016) (arguments that New GM is a successor or "mere continuation" of Old GM, or any suggestion "that New GM can be treated as a manufacturer" are "squarely foreclosed by the 2009 Sale Order and Judge Gerber's rulings in the bankruptcy proceeding."); *In re Motors Liquidation Co.*, 529 B.R. 510, 528 (Bankr. S.D.N.Y. 2015) ( "any court analyzing claims that are supposedly against New GM only must be extraordinarily careful to ensure that they are not in substance successor liability claims"); *In re Motors Liquidation Co.*, 2015 WL 11070293, at *3 (Bankr. S.D.N.Y. Dec. 4, 2015) ("Allegations that speak of New GM as the successor of Old GM (e.g. allegations that refer to New GM as the 'successor of,' a 'mere continuation of,' or a 'de facto successor of' of Old GM) are proscribed by the Sale Order, April Decision and June Judgment.").

[5]    With respect to claims based on Old GM vehicles, Assumed Liabilities are limited to three categories: (1) post-sale accidents/incidents involving personal injury, loss of life, or property damage; (2) repairs or the

Order ¶¶ 7-18, 46.)   Under the Sale Agreement, every claim based on an Old GM vehicle or part

that was not specifically defined as an Assumed Liability is, by definition, a "Retained Liability"

of Old GM.   *See In re Motors Liquidation Co.*, 2015 WL 11070293, at *1 n.3 ("Retained

Liabilities [] are any Liabilities that Old GM had prior to the closing of the 363 Sale that are not

Assumed Liabilities.").   New GM is not liable for Retained Liabilities.

In April 2015, the Bankruptcy Court modified the Sale Order to provide that ignition-

switch plaintiffs may be able to assert against New GM what it defined as "Independent

Claims."[6]   According to the Bankruptcy Court, Independent Claims are "claims based solely on

New GM's alleged wrongful conduct" and that are not in any way based on the conduct of Old

GM.   *In re Motors Liquidation Co.*, 541 B.R. at 109.   "Independent Claims against New GM

can't be based, for either compensatory or punitive damages purposes, on Old GM knowledge

and conduct, because damages of any character on Independent Claims must be based solely on

New GM's knowledge and conduct."   *Id.* at 122.   "[T]o the extent, if any, that New GM might be

liable on claims based solely on any wrongful conduct on its own part (and in no way relying on

wrongful conduct by Old GM), New GM would have such liability not because it had assumed

any Old GM liabilities, or was responsible for anything wrong that Old GM did, but only

because it had engaged in independently wrongful, and otherwise actionable, conduct on its

own."   *In re Motors Liquidation Co.*, 529 B.R. 510, 528 (Bankr. S.D.N.Y. 2015).   Thus, under

the Bankruptcy Court's rulings, the only claims that may be asserted against New GM based on a

post-sale accident involving an Old GM vehicle (such as the accident in this case) fall into one of

---

replacement of parts (but not monetary damages) for a limited duration provided for under the "glove box
warranty"; and (3) Lemon Law claims, which are essentially related to a breach of the glove box warranty
remedy.  (Ex. 1, Sale Order & Agreement  § 2.3.)

[6]    New GM has appealed whether the Bankruptcy Court should have modified the Sale Order to provide for
Independent Claims.  The matter was argued in the Second Circuit in March 2016, and is *sub judice.*

two categories: (1) those based on Assumed Liabilities set forth in the Sale Agreement (for which no punitive damages are permitted); and (2) Independent Claims "based solely" on "New GM's own independent, post-Closing acts or conduct." *In re Motors Liquidation Co.*, 541 B.R. at 110.

### B.    The November 2011 Accident And Plaintiffs' Allegations

This product liability case arises from an accident that occurred when Plaintiff Zachary Stevens was driving a 2007 Saturn Sky (the "Vehicle"). Plaintiffs Lisa and Mark Stevens (Zachary Stevens' parents) purchased the Vehicle on July 17, 2006. The Vehicle was manufactured and distributed by Old GM. (*See* Am. Pet. ¶¶ 24-25.) Plaintiffs concede that New GM—which first came into existence ***almost three years*** after the Stevens' purchase—"did not design, manufacture, fabricate, assemble, inspect, market, distribute or sell" the Vehicle. (*Id.* ¶ 25.) Indeed, Plaintiffs had no contact or communication with New GM in any manner until ***after*** the November 15, 2011 accident.

On January 27, 2015, Plaintiffs filed this lawsuit against New GM. Plaintiffs' only claims against New GM are negligence and strict liability. (*Id.* ¶¶ 23-48.) These claims include the typical manufacturer-based liability theories such as a purported breach of "a duty to design, manufacture, [and] sell" safe vehicles, and strict liability for purportedly "designing, manufacturing, [and] selling … the subject automobile in a defective condition." (*Id.* ¶¶ 25, 46.) There are no separate counts for Independent Claims as to New GM.

Indeed, the only allegations arguably directed toward **conduct** by New GM are very limited and are as follows:

- "On February 10, 2014 New GM issued a recall for Stevens Plaintiffs' Saturn Sky, model year 2007 for an ignition switch failure. New GM identifies that in the event a subject vehicle experiences such a failure, the ignition switch will move out of the run position, making the vehicle unresponsive and prohibiting the vehicle's airbags from deploying." (Am. Pet. ¶ 16; *see also* 4th Am. Req. for Disclosure at 4.)

- "New GM knew that consumers expect that it will employ all reasonable efforts to detect safety defects, warn drivers of their existence, and develop and make available an appropriate repair procedure." (Am. Pet. ¶ 27; *see also* 4th Am. Req. for Disclosure at 6.)

- "Independent of any failures by Old GM as described herein New GM breached its duties to Plaintiffs by failing to provide appropriate notice of and repair procedures for the defects in the subject vehicle. In doing so, New GM departed from the reasonable standard of care required of it." (Am. Pet. ¶ 32; *see also* 4th Am. Req. for Disclosure at 6.)

- "Independent of any failures by Old GM as described herein, between July 10, 2009 and March 2014, New GM breached its duties owed to Plaintiffs as described herein." (Am. Pet. ¶ 48; *see also* 4th Am. Req. for Disclosure at 8.)

These allegations do not state any viable Independent Claims against New GM under Texas law.

### C.    The September 2015 Deferred Prosecution Agreement

On September 16, 2015, New GM entered into a Deferred Prosecution Agreement ("DPA") with the United States Attorney for the Southern District of New York.[7] New GM fully stands by and accepts the DPA and the Statement of Facts ("SOF") associated with that Agreement, and nothing in this filing is intended to contradict the SOF or New GM's representations in the DPA. As part of the DPA, New GM "consent[ed] to the filing of a two-count Information" "charging GM with engaging in a scheme to conceal a deadly safety defect from its U.S. regulator, in violation of Title 18, United States Code, Section 1001, and committing wire fraud, in violation of Title 18, United States Code Section 1343." (DPA ¶ 1) Neither the DPA nor any associated documents refer to aggravated assault (or any other enumerated felonies listed in Tex. Civ. Prac. & Rem. Code § 41.008(c)). Neither the DPA nor the SOF nor any associated documents state that New GM intentionally or knowingly caused

---

[7]    Although the DPA and the SOF refer to and admit certain facts about Old GM's acts, conduct, or knowledge prior to July 10, 2009, "New GM does not intend those admissions to imply or suggest that New GM is responsible for any acts, conduct or knowledge of Old GM, or that such acts, conduct, and knowledge of Old GM can be imputed to New GM." (DPA ¶ 1 n.1; SOF n.1)  To the contrary, the DPA and the SOF expressly provide that the SOF "is not intended to alter, modify, expand, or otherwise affect any provision of the July 5, 2009 Sale Order . . . or the rights, protections, and responsibilities of New GM under the Sale Order." (*Id.*)

serious bodily harm to Mr. Stevens or Mr. Landaverde.  New GM pled not guilty to the two-count Information, which will be dismissed if New GM complies with the DPA's terms.

### D.  The June 2016 New Cap-Busting Theory

While Plaintiffs "sue for exemplary damages" pursuant to Tex. Civ. Prac. & Rem. Code § 41.003 (Am. Pet. ¶¶ 59, 62), their Petition does not plead any of the narrow exceptions to the statutory caps on such damages enumerated in section 41.008(c).  (*See generally* Orig. Pet.; Am. Pet.)  Nor have they alleged that New GM intentionally or knowingly caused serious bodily injury to Mr. Stevens or Mr. Landaverde.  (*See generally id.*)  Indeed, when Plaintiffs amended their Petition in June to conform their pleadings to the Bankruptcy Court's orders, they neither mentioned nor pled any facts supporting the aggravated assault exception (or any other cap-busting theory).  Instead, just weeks ago, Plaintiffs agreed to and pled the following:

> Plaintiffs *limit their demand for punitive or exemplary damages to only those Independent Claims* (as defined in the Judgment entered by [the Bankruptcy Court] on April 15, 2015, and as construed in subsequent rulings by the Bankruptcy Court and by District Judge Furman in MDL 2543 pending in the United States District Court for the Southern District of New York) *against New GM arising on or after July 10, 2009*.

(Am. Pet. ¶ 37 (emphasis added).)  To be clear, New GM's bankruptcy counsel was unequivocal with Plaintiffs' counsel that, based on the explicit rulings of the Bankruptcy Court to which his client was bound, he could not base *any* allegation relating to an Independent Claim on Old GM conduct.

The first time Plaintiffs ever raised any exception to the punitive damages caps was in their June 24, 2016 motion for partial summary judgment where they argued that the caps could be exceeded under the "aggravated assault" exception.  (*See* Pls. Mot. at 7.)  Despite their commitment to pursue exemplary or punitive damages based only on Independent Claims against New GM arising on or after July 10, 2009, Plaintiffs' cap-busting motion focuses almost

exclusively on Old GM conduct.  (*See id.* at 2-6.)  Plaintiffs' only reference to New GM conduct

after July 10, 2009 and before November 15, 2011 (the date of this accident) is their claim that

New GM "had taken no action to prevent the injuries and death that occurred in the accident

made the basis of this lawsuit."  (*Id.* at 6.)

## LEGAL STANDARD

Under Texas Rule of Civil Procedure 166a(i), a party "may move for summary judgment

on the ground that there is no evidence of one or more essential elements of a claim … on which

an adverse party would have the burden of proof at trial."  Tex. R. Civ. P. 166a(i).  "A no-

evidence summary judgment motion under Rule 166a(i) . . . requires the nonmoving party to

present evidence raising a genuine issue of material fact supporting each element contested in the

motion."  *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009).  "The court **must** grant

the motion unless the respondent produces summary judgment evidence raising a genuine issue

of material fact."  Tex. R. Civ. P. 166a(i) (emphasis added).

## ARGUMENT AND AUTHORITIES

**I.    THE COURT SHOULD GRANT SUMMARY JUDGMENT DISMISSING
PUNITIVE DAMAGES CLAIMS.**

**A.    Plaintiffs May Only Recover Punitive Damages Based On Viable
Independent Claims.**

The Bankruptcy Court's orders govern[8] the scope of New GM's liability for damages in

this case.[9]  Under those orders, punitive damages are not recoverable for claims based on

---

[8]    Certain plaintiffs appealed portions of the Bankruptcy Court's orders, but there was no appeal with respect to
the order delineating the limits of punitive damages liability against New GM.  Accordingly, the Bankruptcy
Court's orders on this issue are final and non-appealable.

[9]    The federal Bankruptcy Court's orders preempt Texas successor liability (or any other) laws in conflict with
the Sale Order & Agreement as interpreted by the Bankruptcy Court's orders.  *In re General Motors Corp.*, 407
B.R. 463, 503,n.99 (Bankr. S.D.N.Y. 2009) ("[P]rovisions of the [Bankruptcy]Code can and do sometimes
trump state law. And section 363(f), for as much or as little as it covers, is exactly such a provision. In fact, 363
(f) is a classic example of an instance where a 'federal interest requires a different result.'"); *In re Old Carco
LLC*, 442 B.R. 196, 210 (S.D.N.Y. 2010) (state laws conflicting with orders of the Bankruptcy Court "are

Assumed Liabilities.  Punitive damages are only recoverable, if at all, in connection with a viable Independent Claim.  Specifically, "[a] claim for punitive damages with respect to a post-Sale accident involving vehicles manufactured by Old GM with the Ignition Switch Defect may be asserted against New GM to the extent—but only to the extent—it relates to an otherwise viable Independent Claim and is based solely on New GM conduct or knowledge," *In re Motors Liquidation Co.*, 2015 WL 11070293, at *2, and is not based "*in any way on Old GM conduct*." *In re Motors Liquidation Co.*, 541 B.R. at 134 (original emphasis) (quoting *In re Motors Liquidation Co.*, 529 B.R. at 528).[10]  "The extent to which any [Independent Claim] is 'viable' shall be determined under nonbankruptcy law by the nonbankruptcy court presiding over that action."  *In re Motors Liquidation Co.*, 2015 WL 11070293, at *2.

In other words, to state an Independent Claim, Plaintiffs must allege a cause of action against New GM that (i) is recognized by Texas law and (ii) is based solely on the conduct of New GM and not in any way on the conduct or actions of Old GM.  *See id.* ("'New GM did not contractually assume liability for punitive damages from Old GM.  Nor is New GM liable for punitive damages based on Old GM conduct under any other theories, such as by operation of law. Therefore, punitive damages may not be premised on Old GM knowledge or conduct, or anything else that took place at Old GM.").  Plaintiffs fail to allege a viable claim based solely on New GM conduct.

---

preempted by the Bankruptcy Code, pursuant to the Supremacy Clause of the United States Constitution"); *see also In re White Motor Credit Corp.*, 75 B.R. 944, 951 (Bankr. N.D. Ohio 1987) ("Successor liability … has, therefore, been pre-empted by the Bankruptcy Code" where "[t]he [] order approving the sale of White Motor's truck assets to Volvo, by its terms, precludes imposition of successor liability on Volvo").

[10]   *Cf.* Am. Pet. ¶ 37 (limiting "demand for punitive or exemplary damages to only [] Independent Claims").  *See also In re Motors Liquidation Co.*, 2015 WL 11070293, at *6 ("For the avoidance of doubt, except as provided in the June Judgment and the April Decision, the provisions of the Sale Order shall remain unmodified and in full force and effect including, without limitation paragraph AA of the Sale Order, which states that, except with respect to Assumed Liabilities, New GM is not liable for the actions or inactions of Old GM.").

**B.**    **Plaintiffs Have Not Pled Any Viable Independent Claim Against New GM.**

**1.**    **New GM Had No Post-Sale Duty To Recall Or Warn Under Texas Law.**

Plaintiffs allege that "New GM breached its duties to Plaintiffs by failing to provide appropriate notice of and repair procedures for the defects in the subject vehicle" and "was [] aware of safer alternative designs and the need to conduct a recall to implement these safer alternative designs … but did nothing until January 2014."   (Am. Pet. ¶¶ 32, 44.)   Those allegations provide no viable Independent Claim because Texas generally does not recognize post-sale duties to warn or recall.  To the extent courts have suggested that such duties may exist, they have done so only in limited circumstances that are not present here.  In any event, any post-sale duty to warn or recall would not apply to a non-manufacturer, non-seller, and non-successor like New GM.

**a.**    **Texas Generally Does Not Recognize Post-Sale Duties To Warn Or Recall.**

"Texas law generally does not recognize a common law post-sale duty to warn or to recall defective products."  *Hernandez*, 2005 WL 1574474, at *1 (granting partial summary judgment "as to the alleged post-sale duty to warn or recall" based on automotive manufacturer's failure "to notify consumers as required by law that a defect exists in the vehicle that relates to public safety" and failure "to recall the vehicle or, alternatively, retrofitting the vehicle to enhance safety"); *see also Nester v. Textron, Inc.*, 2015 WL 9413891, at *13-14 (W.D. Tex. Dec. 22, 2015) (granting summary judgment against claim that defendant was "negligent based on its failure to recall the product, correct the product through a technical bulletin, and exercise reasonable care to learn of post-sale problems with the product" because "Texas courts generally do not recognize a common law duty to prevent risk once prior conduct is found to be dangerous"); *Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 438 (Tex. 1997) (directing

12

entry of summary judgment on post-sale warning claim against manufacture because "[t]his Court has not recognized [a] duty to act to prevent risk once prior conduct is found to be dangerous").

One Texas appellate court recognized an exception to this general rule if "the manufacturer (1) take[s] title and actual control of the product [after the initial sale], (2) undertake[s] a replacement program, and (3) resell[s] the product to the plaintiff after having learn[ed] of dangers that were not apparent at the time of the initial sale." *Hernandez*, 2005 WL 1574474, at *1 (citing *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519 (Tex. Civ. App.—Corpus Christi 1979, writ ref'd n.r.e)). But this exception does not apply because New GM did not manufacture the Vehicle, never had control or possession of the Vehicle, did not undertake a pre-accident replacement program, and did not sell (or resell) the Vehicle to Plaintiffs. *See Dion v. Ford Motor Co.*, 804 S.W.2d 302, 311-12 (Tex. App.—Eastland 1991, writ denied) (affirming judgment for manufacturer defendant [Ford] because it "never took title to the tractor," and thus "did not regain a 'significant degree of control'" over the tractor after discovery of dangerous condition).[11]

>    **b.    Any Post-Sale Duties To Warn or Recall Do Not Apply Because New GM Did Not Manufacture Or Supply The Vehicle.**

New GM also is entitled to summary judgment because it did not manufacture the Vehicle. Texas does not recognize post-sale duty claims against a non-manufacturing, non-

---

[11]    It is unclear whether the *Bradshaw* "control-based" liability standard remains good law. *Bradshaw* "has been largely criticized and specifically disapproved by the Texas Supreme Court." *Smith v. Cent. Mine Equip. Co.*, 559 F. App'x 679, 686 n.4 (10th Cir. 2014) (citing *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 838 n.7 (Tex. 2000) ("To the extent *Bradshaw* recognized liability … without proof of reliance or increased risk of harm, we disapprove it.")); *see also Kierstead v. Fleetwood Travel Trailers of Texas, Inc.*, 1993 WL 58731, at *2 n.4 (Tex. App.—Dallas Mar. 4, 1993) (affirming judgment for defendant and noting that "[o]nly one Texas case has held" that a "post-sale duty to retrofit, recall, or warn" exits and that case [*Bradshaw*] "has been limited to its facts").

selling asset purchaser like New GM. *Jones v. SIG Arms, Inc.*, 2001 WL 1617187, at *3-4 (Tex. App.—San Antonio Dec. 19, 2001, no pet.) (granting summary judgment on "post sale duty to warn" negligence and strict liability claims against alleged successor corporation where the defendant "was not even in existence at the time the [product] was manufactured and distributed" and thus "did not manufacture, design, market, sell or distribute the [product]").  Indeed, under Texas law, a non-manufacturer "owe[s] no duty" at all to consumers of a product "it did not design, manufacture or sell," and cannot be strictly liable because it "was not involved in the production, marketing or distribution" of the allegedly defective product. *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 615-16 (Tex. 1996); *see also Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 68 (Tex. 1989) ("A fundamental principle of traditional products liability law is that the plaintiff must prove that the defendants supplied the product which caused the injury."); *Olivas v. Am. Home Prods. Corp.*, 2002 WL 32620351, at *3 (W.D. Tex. Oct. 18, 2002) (plaintiffs are "barred from asserting a claim of negligence and strict liability against a defendant who did not supply the injury-producing product") (citing *Barajas*, 927 S.W.2d at 616).

Thus, courts addressing products liability claims asserted against non-manufacturing defendants conduct "a brief Texas two-step analysis: (1) because [the defendant] did not design, manufacture, or sell the product, it owed no legal duty to plaintiff; and (2) because it owed no legal duty, plaintiff's tort claim fail[s]." *Block v. Wyeth, Inc.*, 2003 WL 203067, at *1-2 (N.D. Tex. Jan. 28, 2003).   Plaintiffs concede that "New GM did not design, manufacture, fabricate, assemble, inspect, market, distribute or sell the subject vehicle."  (Am. Pet. ¶ 25.)  Accordingly, under Texas law, New GM "owed no duty" to Plaintiffs, and Plaintiffs' post-sale recall and warning claims are not legally viable under either negligence or strict-liability theories. *See Barajas*, 927 S.W.2d at 616 (affirming summary judgment on negligence and strict liability

14

claims asserted against a non-manufacturer); *Gaulding*, 772 S.W.2d at 68 (same); *Walton v. Harnischfeger*, 796 S.W.2d 225, 227-28 (Tex. App.—San Antonio 1990, writ denied) (same); *Phares v. Actavis-Elizabeth LLC*, 892 F. Supp. 2d 835, 845 (S.D. Tex. 2012) (granting summary judgment on negligence and strict liability claims because "it is not contested that [the plaintiff] did not ingest products manufactured or distributed by [the defendants]" and "[i]n Texas, the 'imposition of products liability is precluded when the defendant did not supply the product that caused the plaintiffs injuries") (collecting cases).[12]

\*\*\*

In sum, under Texas law, there is no duty to warn or recall applicable to New GM here, and as a result, Plaintiffs' "Independent Claims" against New GM are not viable as a matter of law.  *Cf. In re Gen. Motors LLC*, 2016 WL 874778, at \*6 (granting summary judgment in New GM's favor on post-sale failure-to-warn claims brought under Louisiana law: "Given that Louisiana precedent provides that no post-sale duty to warn exists … for a successor corporation such as New GM, Plaintiffs' claim for negligent failure to warn must be and is dismissed"). Because Plaintiffs have not identified any viable claim based on New GM's independent conduct, the punitive damages claims against New GM fail as a matter of law, and the Court should grant summary judgment in New GM's favor.  *See id.*, at \*2 ("claims for punitive damages could only be 'based on New GM knowledge and conduct alone' because New GM did

---

[12]    *See also Finnicum v. Wyeth, Inc.*, 708 F. Supp. 2d 616, 619 (E.D. Tex. 2010) (granting summary judgment on negligence and strict liability claims against non-manufacturer because "the Texas Supreme Court … has recognized that imposition of products liability is precluded when the defendant did not supply the product that caused the plaintiff's injuries") (citing *Barajas*, 927 S.W.2d at 614; *Gaulding*, 772 S.W.2d at 68; *Sanchez v. Liggett & Myers, Inc.*, 187 F.3d 486, 491 (5th Cir. 1999)); *Block*, 2003 WL 203067, at \*1-3 (dismissing products liability claims against non-manufacturer and declining to "extend Texas tort law into new and uncharted territory" where "[t]here is no indication" the Texas Supreme Court would recognize a duty owed by a non-manufacturer).

not assume liability for punitive damages under the Sale Agreement") (quoting *In re Motors Liquidation Co.* 541 B.R. at 108).

### 2. The Recall Provisions Of The Sale Agreement Cannot Create A Viable Claim Against New GM.

Plaintiffs allege that "New GM [] expressly agreed [in the Sale Agreement] to undertake certain statutory requirements," including certain recall and reporting requirements with respect to Old GM vehicles. (Am. Pet. ¶ 14.) Although the Sale Agreement contains New GM's covenant with the federal government to comply with Old GM's Safety Act obligations,[13] that provision does not provide Plaintiffs with a basis to assert a duty-to-recall cause of action. There are no third-party beneficiaries under the Sale Agreement, and the Sale Agreement expressly bars any person from asserting "any legal or equitable Claims, benefits, rights or remedies of any nature whatsoever" based on the Sale Agreement. (Ex. 1, Sale Order & Agreement § 9.11 ("[N]othing express or implied in this Agreement is intended or shall be construed to confer upon or give to any Person … any legal or equitable Claims, benefits, rights or remedies of any nature whatsoever under or by reason of this Agreement.").) This has been confirmed by the federal Bankruptcy Court, which likewise held that the Sale Agreement confers no third-party beneficiary rights on vehicle owners, such as Plaintiffs here. *In re Motors Liquidation Co.*, 541 B.R. at 129 n.67 ("New GM notes, properly, that … vehicle owners were not third party beneficiaries of the Sale Agreement.").

---

[13]  *See* Ex. 1, Sale Order & Agreement § 6.15 ("From and after the Closing, Purchaser [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [Old GM.]").

## II.    ALTERNATIVELY, THE COURT SHOULD FIND THAT THE EXEMPLARY DAMAGES CAPS APPLY.

If the Court does not grant New GM summary judgment on all punitive damages claims, at a minimum it should (i) find as a matter of law that the exemplary damages caps in section 41.008(b) apply in this case; (ii) bar Plaintiffs from raising any exceptions to those caps; and (iii) deny Plaintiffs' motion for partial summary judgment on the claim that they may exceed the damages limitations under the aggravated assault exception.

### A.    Plaintiffs' Failure To Plead A Cap-Busting Theory Waived Any Exemption To The Statutory Limits On Exemplary Damages.

Texas limits the amount of exemplary damages to "an amount equal to the greater of: (1)(A) two times the amount of economic damages; plus (B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or (2) $200,000."  Tex. Civ. Prac. & Rem. Code § 41.008(b).  "Though certain types of claims are excluded from the statute's application, the statutory cap applies automatically to claims not expressly excepted.  The cap is therefore the rule, not the exception."  *Zorrilla*, 469 S.W.3d at 157. "A plaintiff can avoid the cap by pleading and proving the defendant intentionally or knowingly engaged in felonious conduct under criminal statutes expressly excluded from the cap under section 41.008(c)."  *Id.*

#### 1.    Plaintiffs Failed To Plead, And Have Therefore Waived, Any Cap-Busting Exception.

New GM pled the statutory exemplary damages caps in its answer to Plaintiffs' petition. (Am. Answer ¶ 11.)  To this day, however, Plaintiffs have not pled any exception to the cap, and the deadline for the parties to amend their pleadings expired on February 1, 2016.  Nor have Plaintiffs attempted to amend their Petition to plead an exception to the cap, despite the fact that just weeks ago they filed an Amended Petition to comport with the Bankruptcy Court's orders. (*See generally* Am. Pet.)  Indeed, the first time that Plaintiffs mentioned the statutory caps was

17

their motion for partial summary judgment arguing that the caps did not apply because New GM knowingly or intentionally committed the felony of aggravated assault.  (Pls. Mot. at 7.)

Plaintiffs' failure to plead an exception to the cap waived any rights to seek an exception to the statutory punitive damages limit: "In the absence of a plea and proof of cap-busting conduct, the exemplary damages cap applies as a matter of law."  *Zorrilla*, 469 S.W.3d at 157; *see also Davis v. White*, 2016 WL 1163764 (Tex. App.—Fort Worth Mar. 24, 2016) ("We conclude and hold that—in light of appellants' concession that they did not plead and prove a capbuster and in light of a fair reading of their pleadings—the trial court did not err by applying the cap in section 41.008(b) to reduce the jury's exemplary damages award").  *Cf.* Tex. R. Civ. P. 56 ("When items of special damages are claimed, they shall be specifically stated"); *Al Parker Buick Co. v. Touchy,* 788 S.W.2d 129, 130 (Tex. App.—Houston [1st Dist.] 1990, orig. proceeding) (recovery of exemplary damages must be "supported by express allegations").[14]

### 2. The Court Should Reject Any Request By Plaintiffs To Amend Their Pleading To Add Cap-Busting Theories Because It Would Unfairly Reshape This Case On The Eve Of Trial.

Plaintiffs have offered no explanation (let alone established good cause) for their failure to plead allegations to bust the cap before now.  *Innovative Mailing Solutions, Inc. v. Label Source, Inc.*, 2010 Tex. App. LEXIS 834, at * 12 (Tex. App.—Fort Worth Feb. 4, 2010, no pet.) ("Inaction or neglect does not constitute good cause."); *see also* Tex. R. Civ. P.  5(b), 63 and

---

[14]    While the appellate court in *Marin v. IESI TX Corp.*, 317 S.W.3d 314, 332 (Tex. App.—Houston 2010, pet denied), found that an exception to the statutory cap need not be specially pled, that holding was predicated on the now-abrogated holding that a defendant had to affirmatively plead the cap.  *Zorrilla*, 469 S.W.3d at 157. Moreover, in *Marin*, the Court found that plaintiff's petition "provides fair notice of the basic issues supporting its claim for intentional misapplication of fiduciary property [another felony-exception to the cap], and therefore, necessarily alerted Marin that the exemplary damages cap would not apply because the statute governing exemplary damages provides that the cap may be exceeded for that circumstance." *Marin*, 317 S.W.3d at 332.  Here, in contrast, Plaintiffs' Amended Petition, which was filed less than two weeks ago, provided no factual allegations (let alone the required notice) that they would seek to "bust the cap" under their unprecedented "aggravated assault" theory.

166.  Even if they were to try to do so now, this Court should reject any belated request by Plaintiffs for leave to amend because it would unfairly prejudice New GM.  This new felony aggravated assault theory was never contemplated by the parties and never raised previously by Plaintiffs.    Injecting new *criminal* allegations one month before trial—well after expert disclosures and other crucial deadlines have passed and discovery has closed—would introduce significant substantive and procedural complexities and raise insurmountable challenges to New GM's trial preparation.  This is precisely the type of "reshaping" amendment that the appellate courts have rejected as "prejudicial on its face."  *See Hampden Corp. v. Remark, Inc.*, 331 S.W.3d 489, 498 (Tex. App.—Dallas 2010, pet. denied) ("An amendment is prejudicial on its face if, viewed in the context of the record, (1) it asserts a new substantive matter that reshapes the cause of action or the nature of the trial, (2) the opposing party could not have anticipated the amendment in light of the prior development of the case, and (3) the amendment would detrimentally affect the opposing party's presentation of the case.").

The Court should reject Plaintiffs' eleventh-hour attempt to reshape this civil products liability case into a criminal aggravated assault trial.  *See id.* at 498-99 (reversing leave to amend petition to add a new claim because it "detrimentally affect[ed] [defendant]'s presentation of the case" because, among other things, they "did not have the opportunity" to question or impeach a witness about the new claim or "to conduct discovery" on the issue); *Hakemy Bros. v. State Bank & Trust. Co.*, 189 S.W.3d 920, 925 (Tex. App.—Dallas 2006, pet. denied) (affirming denial of amendment that "would have reshaped the litigation, prejudicing the opposing parties and delaying the trial"); *Price v. Short*, 931 S.W.2d 677, 685-86 (Tex. App.—Dallas 1996, no pet.) (affirming denial of leave to amend mid-trial to assert new "justification" defense because

claimant "could have presented his case differently" if the defense had been "timely pleaded") (internal citations omitted).

Moreover, if this petition is further amended to do what Plaintiffs have belatedly now suggested, Plaintiffs would violate the Bankruptcy Court's orders by which Plaintiffs are bound. The tacit request for an amendment on these grounds will engender new litigation in the Bankruptcy Court (to enforce an existing injunction against Plaintiffs), and risks delaying this trial.

> **B.    The Aggravated Assault Exception Is Inapplicable To This Products Liability Case And Should Be Rejected As A Matter Of Law.**

Plaintiffs independently are barred from seeking to exceed the caps because there is no evidence that would allow a reasonable juror to conclude beyond a reasonable doubt that New GM intentionally or knowingly committed the felony of aggravated assault against Mr. Stevens or Mr. Landaverde.

> **1.    To Exceed The Cap, Plaintiffs Must Plead And Prove The Intentional Or Knowing Commission Of A Specific Enumerated Felony.**

Under section 41.003 of the civil practice and remedies code, exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which exemplary damages are sought resulted from fraud, malice, or gross negligence. Tex. Civ. Prac. & Rem. Code § 41.003.  In order for one the statutory exceptions to apply, a plaintiff must first establish that he is entitled to exemplary damages by a unanimous jury finding.  *Id.* (As explained in Section I above, Plaintiffs cannot get past this initial threshold because the issue of punitive damages is foreclosed as matter of law and should never reach the jury.)

If a plaintiff meets this first requirement, the statutory limits on exemplary damages apply unless he can prove "beyond a reasonable doubt" that a defendant's conduct violated one of several specific enumerated felonies.  Tex. Civ. Prac. & Rem. Code § 41.008(c); *Mission Res.,*

*Inc. v. Garza Energy Trust*, 166 S.W.3d 301, 315 (Tex. App.—Corpus Christi 2005), rev'd on

other grounds, 268 S.W.3d 1 (Tex. 2008) ("In order to avoid the statutory cap on punitive

damages," plaintiff was required "to prove, beyond a reasonable doubt, that when Coastal

fractured its well, it intended to and did unlawfully deprive the appellees of their property in

excess of $20,000."). "[A] showing of fraud or malice by clear and convincing evidence does

not as a matter of law establish one of the statutory exceptions in section 41.008(c))." *Signal*

*Peak Enter. of Texas, Inc. v. Bettina Invests, Inc.*, 138 S.W.3d 915, 927 (Tex. App.—Dallas

2004, pet. struck).[15]

To "bust the cap," a plaintiff must obtain a "jury finding on the specific criminal code

violation *and* a separate finding that the violation was committed knowingly or intentionally."

*Id.* (original emphasis). Thus, although a criminal aggravated assault charge may be based on

knowing, intentional, or reckless conduct,[16] to exceed the exemplary damages cap in a civil case,

reckless conduct is not enough. Under the plain terms of the statute, to bust the cap, the criminal

conduct must have been committed "***knowingly or intentionally***." Tex. Civ. Prac. & Rem. Code

§ 41.008(c) (emphasis added).

### 2.    Plaintiffs Cannot Establish The Elements Of Intentional Or Knowing Aggravated Assault Against Them.

Plaintiffs contend that New GM's conduct fits within the aggravated assault felony

exception to the exemplary damages caps because New GM committed serious bodily injury

---

[15]    *See also HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 874 n. 13 (Tex. App.—Fort Worth 2005, no pet.) (noting that jury's malice finding alone does not trigger exception to statutory damage caps because definition of malice is different than definition of intentional or knowing conduct under Texas Penal Code); *Madison v. Williamson*, 241 S.W.3d 145, 161 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ("Although the jury found that Williamson acted with malice, thus entitling Madison to punitive damages, such a finding alone is insufficient under the Civil Practice and Remedies Code to remove the caps on exemplary damages because it lacks the required statutory finding of a knowing or intentional violation of the criminal law."); *O'Hare v. Graham*, 455 Fed. App'x 377 (5th Cir. 2011) (district court erred in deciding in bench ruling that caps did not apply without specific finding by jury on elements of felony exception alleged).

[16]    Tex. Penal Code § 22.02(a)(1).

aggravated assault.  *See* Pls. Mot. at 7-8; Tex. Penal Code § 22.02(a)(1).  This bold charge overreaches on both the facts and the law. The Court should grant summary judgment in New GM's favor on the applicability of the proposed exemption for three reasons.

*First*, Plaintiffs' attempt to twist the facts of this products liability case into the crime of aggravated assault reflects a fundamental misunderstanding of the elements of aggravated assault.  To avoid the cap on punitive damages, Plaintiffs must show that New GM "intentionally or knowingly" ***caused*** serious bodily injury to Mr. Stevens.[17]  Contrary to Plaintiffs' argument, it is not enough that a defendant may have intended or known that it manufactured or sold a defective product or otherwise knew the "nature of his conduct."  (Pls. Mot. at 7-8.)  Section 6.03 of the Penal Code "delineates three 'conduct elements' which may be involved in an offense: (1) the nature of the conduct; (2) the result of the conduct; and (3) the circumstances surrounding the conduct."  *Cook v. State*, 884 S.W.3d 485, 487 (Tex. Crim. App. 1994).  Aggravated assault by causing serious bodily injury is a results-oriented offense.  *Johnson v. State*, 364 S.W.3d 292, 298 (Tex. Crim. App. 2012).  "To be guilty of assault, ***one must intend the result of the conduct,*** not just the conduct itself; "assault requires intentionally or knowingly causing a certain *result*." *Brooks v. State*, 967 S.W.2d 946, 950 (Tex. App.—Austin 1998, no pet.) (bold emphasis added; italicized emphasis in original; internal citations omitted); *In re I.L.*, 389 S.W.3d 445, 450 (Tex. App.—El Paso 2012, no pet.) ("Assault causing bodily injury is a result-oriented offense.

---

[17]    Plaintiffs' reliance on Mr. Landaverde's death is misplaced.  The Landaverdes are no longer plaintiffs in this lawsuit, and any purported aggravated assault as to Mr. Landaverde cannot support an exception to the damages cap here.  *See Poliner v. Texas Health Sys.*, 239 F.R.D. 468, 477-48 (N.D. Tex. 2006) (finding punitive damages award limited to cap in section 41.008(b) because (among other things) "the cause of action for which Plaintiffs seek recovery--defamation--is not a claim based on [the enumerated felony of] securing a document by deception.").  *Cf.  Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007) (assessing punitive damages based on conduct directed at nonparty deprived tobacco companies of presenting defenses particular to that person); *Bennett v. Reynolds*, 315 S.W.3d 867, 876 (Tex. 2010) (affirming consideration of third-party harm for purposes of punitive damages *when such harm actually targets the plaintiff and the instant litigation*") (emphasis added).

Therefore, the proper definitions of culpable mental states (intentionally, knowingly, recklessly) should be limited to include only the result conduct element.").

Thus, Plaintiffs must plead and prove not that New GM intended or knew of the conduct that allegedly later led to serious bodily injury, but rather that New GM intended or knew that its conduct would actually cause or result in serious bodily injury to Mr. Stevens:

> The gravamen of the offense of aggravated assault is the specific type of assault defined in Section 22.01. Thus, the *actus reus* for "bodily injury" aggravated assault is "causing bodily injury." Turning to the eighth-grade grammar test, the subject is "the defendant," the verb is "cause" and the direct object is "bodily injury." The precise act or nature of conduct in this result-oriented offense is inconsequential. "What matters is that the conduct (whatever it may be) is done with the required culpability to effect the *result* the Legislature has specified."

*Landrian v. State*, 268 S.W.3d 532, 537 (Tex. Crim. App. 2008) (citations omitted; original emphasis). Plaintiffs have not alleged and have no evidence that New GM intentionally or knowingly caused serious bodily injury to Mr. Stevens or Mr. Landaverde.

Because Plaintiffs cannot show the requisite result-oriented intent or knowledge element of aggravated assault here, the Court should enter summary judgment finding that the aggravated assault exception does not apply and should limit any punitive damages awards to the caps in section 41.008(b). *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 2010 WL 9077875, at *49 (S.D. Tex. Jan. 19, 2010) (granting motion to dismiss as to claimed exception to cap on exemplary damages where "Plaintiffs' allegations fail as a matter of law to adequately plead a violation of either Section 32.46 [securing execution of document by deception] or 32.47 [fraudulent destruction, removal, or concealment of writing]."); *Flock v. Scripto-Tokai Corp.*, 2001 WL 34111723, at *27-28 (S.D. Tex. Nov. 20, 2001) (granting summary judgment on applicability of exemplary damages caps  because  plaintiff did not present evidence on one element of alleged felony exception for "Fraudulent Destruction, Removal, or Concealment of [a] Writing," . . . [t]hus, Plaintiffs have not presented grounds for avoiding the exemplary

damages cap."); *Poliner v. Texas Health Sys.*, 239 F.R.D. 468, 477-48 (N.D. Tex. 2006)[18] (finding punitive damages award limited to cap in section 41.008(b) despite contention that the conduct was based on enumerated felony "securing execution of document by exception" because there was no evidence of requisite element of deception).

Moreover, Plaintiffs' reliance on *Wackenhut Corr. Corp. v. de la Rosa*, 305 S.W.3d 594 (Tex. App.—Corpus Christi 2009, dismissed as moot), is mistaken.  (Pls. Mot. at 9.)  Contrary to Plaintiffs' assertion, the Texas Court of Appeals did ***not*** exempt plaintiff from the exemplary damages caps because "the defendant clearly committed a dangerous aggravated assault."  The *de la Rosa* Court instead found the cap did not apply because the defendant waived "its right to impose the cap" by failing to plead it.[19]  305 S.W.3d at 655.  In light of the waiver holding, the *de la Rosa* Court did "***not*** address the family's arguments that the findings the jury made were sufficient to support a cap-busting theory."  *Id.* at 655 n.59 (emphasis added).  The factors that Plaintiffs claim the *de la Rosa* court relied on to support a finding of aggravated assault were actually instead related to the determination of whether the damages awarded exceeded the constitutional limits on the awards of punitive damages under a reprehensibility analysis.  *Id.* at 655-56.  Plaintiffs' misunderstanding of the *de la Rosa* opinion does not advance their cause.

*Second*, it is difficult to imagine how New GM, which did not exist until years after the Stevens purchased the Vehicle in 2006 and who had absolutely no relationship or contact with Plaintiffs before the November 2011 accident, could be guilty of knowingly or intentionally causing serious bodily injury to them.  Plaintiffs do not contend that New GM controlled Old GM (whose actions are really the crux of Plaintiffs' aggravated assault claim), and Plaintiffs

---

[18]    *Reversed on other grounds*, 537 F.3d 368 (5th Cir. 2008).

[19]    As noted above, this holding was abrogated by *Zorrilla*.

identify no affirmative act of New GM at all.[20]  Plaintiffs instead claim that New GM "had taken no action to prevent the injuries and death that occurred in the accident made the basis of this lawsuit."  (Pls. Mot. at 5.)  But this failure-to-act, bystander-type liability theory cannot sustain an aggravated assault charge as a matter of law: "Generally, a person's duty to warn of a dangerous situation that the person did not create is a moral duty, not a legal one." *Newsom v. B.B.,* 306 S.W.3d 910, 916 (Tex. App.—Beaumont 2010, pet. denied) (citing *Buchanan v. Rose,* 159 S.W.2d 109, 110 (Tex. 1942)); *cf.* Oliver Wendell Holmes, *The Common Law* 54 (1881) (a voluntarily act is requirement for criminal liability).

In addition, Texas appellate courts have rejected even negligence-based theories predicated on failure to prevent an assault where, as here, a defendant had "no right to control the behavior" of the third party and where claimant "has not identified an ***affirmative act***" "that created an unreasonable and foreseeable risk."  *Gatten v. McCarley*, 391 S.W.3d 669, 676-77 (Tex. App.—Dallas 2013, no pet.) (emphasis added) (holding defendant had no duty to intervene or warn plaintiff that assailant intended to provoke a fight with her husband).  The absence of any affirmative action by New GM with respect to Plaintiffs therefore provides an additional reason why Plaintiffs' aggravated assault theory fails as a matter of law.

*Third*, Plaintiffs have identified no case in Texas or elsewhere (and New GM has located none) finding a civil products liability defendant guilty of criminal aggravated assault under any circumstances[21]—let alone any authority exempting a products liability claimant from exemplary

---

[20]    As discussed above, New GM also cannot be held liable for the acts of Old GM under any successor liability theory. *See In re Gen. Motors LLC*, 2016 WL 874778, at *4 (arguments that New GM is a successor or "mere continuation" of Old GM, or any suggestion "that New GM can be treated as a manufacturer" are "squarely foreclosed by the 2009 Sale Order and Judge Gerber's rulings in the bankruptcy proceeding.").

[21]    *Cf. Shaw v. Brown & Williamson Tobacco Corp*., 973 F. Supp. 539, 548 (D. Md. 1997) (rejecting battery claim based on "intentional manufacture, marketing, and distribution of Raleigh cigarettes," where, among other things, manufacturer did not "know with a substantial degree of certainty that second-hand smoke would touch any particular non-smoker.  While it may have had knowledge that second-hand smoke would reach some non-

damages caps based on a felony aggravated assault exception.  Plaintiffs' unprecedented request to except products liability defendants (who, of course, frequently face claims of serious bodily injury claims) from punitive damages caps under an aggravated assault theory would impermissibly rewrite the statute—contrary to the Legislature's direction.  In this regard, such a result would be incompatible with the legislative intent in passing the exemplary damages caps in the first place, *i.e.*, to curb the threat of large punitive damages and to address concerns as to whether the amount of punitive damages "exceed these central purposes" of punishment and deterrence.  *See* House Research Org., Bill Analysis, Tex. S.B. 25, 74th Leg., R.S. at 5 (1995); Senate Bill Analysis C.S.S.B. 25 (Feb. 14, 1995).

* * *

    The facts of this products liability case simply cannot be stretched to create a disputed issue on felony aggravated assault, and it would be a chaotic sideshow to do so.  Indeed, the only case New GM has been able to identify where a Texas trial court entered final judgment that the exemplary damages caps could be exceeded under an aggravated assault exception was a case where the claimant alleged that the defendant "continually assaulted" her and picked her up "and threw her off a balcony causing her to fall twenty-five to thirty feet."  *See Knight v. Depena*, 2003 WL 24056199 (Dist. Ct., Nueces County, Tex. Apr. 25, 2003); Pls.' Orig. Pet., *Knight v. Depena*, 2002 WL 32855376 (Dist. Ct., Nueces County, Tex. Aug. 8, 2002).  These types of

---

smokers, the Court finds that such generalized knowledge is insufficient to satisfy the intent requirement for battery. . . .  Such a finding would expose the courts to a flood of farfetched and nebulous litigation concerning the tort of battery.  It is unsurprising that neither plaintiffs nor the Court have been able to unearth any case where a manufacturer of cigarettes or handguns was found to have committed a battery against those allegedly injured by its products."); *McCracken v. Ford Motor Co.*, 588 F. Supp. 2d 635, 645 (E.D. Pa. 2008) (dismissing assault and battery claims where plaintiff "alleges that Ford 'knew or should have known' about the toxic exposure in their automobiles, but the complaint lacks any allegation that Ford intentionally or deliberately exposed him to radiation or caused his thyroid cancer."); *Tijerina v. Philip Morris Inc.*, 1996 WL 885617, at *4-5 (N.D. Tex. 1996) (noting "there are no reported or unreported cases from any jurisdiction that have advanced the claims" that a cigarette manufacture could be liable for battery).

personalized-attacks typify aggravated assault claims.[22]  A products liability case premised on a defective ignition switch that the defendant (New GM) did not even manufacture or sell to Plaintiffs, and where the defendant was adjudged by a binding federal court order (the Sale Order) not to be the successor in interest of the manufacturer/seller of Plaintiff's Vehicle, does not fit within the aggravated assault exception.  The Court should decline Plaintiffs' request to apply the exception in this unprecedented manner.

### C.    Plaintiffs' Cap-Busting Allegations Violate The Bankruptcy Court's Orders.

Plaintiffs' request to bust the exemplary damages caps fails for the same reason that all Plaintiffs' punitive damages claims fail—the exception is based primarily if not exclusively on alleged "Old GM" conduct.  As discussed in Section I above, punitive damages claims cannot be based on Old GM conduct, but must be based solely on actionable, independent conduct of New GM.   In the same manner, requests to bust the punitive damages caps may not be based on Old GM conduct.  Where, as here, New GM did not exist when Plaintiffs purchased the Vehicle and never had any contact with Plaintiffs before the 2011 accident, it is not surprising that Plaintiffs' motion relies almost entirely on Old GM, pre-July 2009 conduct.  (*See, e.g.*, Pls. Mot. at 2 ("Before the defective switch even went into production in 2002, GM engineers knew that it was prone to movement out of the Run position"); *id.* at 3 ("At least as early as 2004 and 2005, GM was well aware of the defect in its ignition switch due to reports of sudden stalls and engine shutoffs it received from GM employees, media representatives, and customers"); *id.* ("In

---

[22]  *See also, e.g., Wilson v. State*, 2012 WL 3264396, at *7 (Tex. App.—Dallas Aug. 13, 2012) (affirming aggravated assault convicting for punching policing officer): *Sixtos v. State*, 2014 WL 4202796 (Tex. App.—Dallas Aug. 26, 2014) (affirming aggravated assault conviction where defendant intentionally "floored gas" and ran over person with whom she had a romantic relationship); *Arreola v. State*, 2014 WL 7014187 (Tex. App.—Dallas Dec. 5, 2014) (affirming aggravated assault conviction where defendant choked, beat, and repeatedly hit victim with a brick); *Price v. State*, 2016 WL 259639 (Tex. App.—Dallas, Jan. 21, 2016) (affirming aggravated assault conviction where defendant doused victim with rubbing alcohol and lighter fluid causing 24-day hospitalization for burns).

June 2005, GM issued a statement acknowledging circumstances where the ignition key could move to the Accessory or Off positions, but reiterated that the ignition did not pose a safety concern"); *id.* at 4 ("In early 2005, GM issued a formal Service Bulletin to its dealers. GM intentionally omitted the word 'stall' from its bulletin even though it was fully aware that customers would naturally describe the defect as stalling"); *id.* ("GM took further action to conceal the serious nature of the Defective Switch in 2006").)

Plaintiffs' reliance on allegation of Old GM conduct to circumvent the exemplary damages limits violates the Bankruptcy Court's orders limiting punitive damages to Independent Claims "based solely on New GM's own, independent, post-Closing acts or conduct" and not premised in any way on Old GM conduct. *E.g.*, *In re Motors Liquidation Co.*, 541 B.R. at 108-10. It is also incompatible with Plaintiffs' pled commitment to "limit their demand for punitive or exemplary damages to only those Independent Claims . . . against New GM arising on or after July 10, 2009." (Am. Pet. ¶ 37) Accordingly, the Bankruptcy Court's orders precluding New GM liability for punitive damages based on Old GM conduct foreclose Plaintiffs' attempt to exceed the statutory exemplary damages limits and require summary judgment in New GM's favor on this issue.[23]

Moreover, as noted, Plaintiffs' reliance on Old GM conduct to avoid punitive damages caps is a clear violation of the Sale Order and the Bankruptcy Court's December 2015 Judgment. Because Plaintiffs are in violation of an existing injunction of the Bankruptcy Court, New GM intends to promptly raise this issue by bringing a motion to enforce against Plaintiffs before the

---

[23] Texas's general proscription against exemplary damages for purported criminal acts of another similarly precludes subjecting New GM to exceptions to the punitive damages caps based on purported criminal conduct of Old GM. *See* Tex. Civ. Prac. & Rem. Code § 41.005(a) ("In an action arising from an assault, theft, or other criminal act, a court may not award exemplary damages against a defendant because of the criminal act of another.").

Bankruptcy Court on July 1st.  New GM believes the Bankruptcy Court may then issue an order staying the Plaintiffs from proceeding in this manner.  Unless Plaintiffs withdraw their motion, their intentional violation of the Bankruptcy Court's orders thus raises significant risks that (contrary to the desires of New GM and this Court) the first Texas MDL trial will not proceed as scheduled on August 8th.

### D.    The Court Should Reject Plaintiffs' Motion for Summary Judgment.

Finally, as shown above, the Court should grant summary judgment in New GM's favor on the issue of the applicability of the exemplary damages caps, and therefore must deny Plaintiffs' cross-motion for summary judgment on this issue.  Moreover, in addition to Plaintiffs' inability to prove New GM "intentionally" or "knowingly" caused bodily injury to Mr. Stevens, there are disputed issues of material fact related to other elements of Plaintiffs' aggravated assault claims that preclude summary judgment in Plaintiffs' favor.  For example, while the Vehicle is subject to the ignition switch recall, there are disputed issues of fact as to whether the ignition switch in the Vehicle rotated at the time of the accident, whether such rotation caused the accident and Mr. Stevens' alleged injuries, and whether Mr. Stevens' own negligent operation of the Vehicle was the proximate and/or producing cause of the accident and his alleged injuries.  As Plaintiffs concede, to be entitled to summary judgment they must "establish that there is no genuine issue of material fact" and "conclusively prov[e] each element" of their cap-busting claim.  (Pls. Mot. at 6 (citing *e.g.*, Tex. R. Civ. P. 166a(c)).)  Plaintiffs have not carried (and cannot carry) that burden here.  Thus, the Court should reject Plaintiffs' motion for summary judgment that the punitive damages caps do not apply.

## CONCLUSION

For the foregoing reasons, New GM respectfully requests the Court grant it summary judgment dismissing all punitive damages claims; or alternatively, hold that any punitive damages awards against New GM may not exceed the statutory limits set forth in Texas Civil Practice & Remedies Code § 41.008(b).


Dated: June 30, 2016                                  Respectfully submitted,


                                                     */s/  Kyle H. Dreyer*

Kimberly Branscome                                   Kyle H. Dreyer
KIRKLAND & ELLIS LLP                                 State Bar No. 06119500
333 South Hope Street                                Giovanna Tarantino Bingham
Los Angeles, CA 90071                                State Bar No. 24042613
Telephone: (213) 680-8400                            Thomas G. Jacks
Facsimile: (213) 680-8500                            State Bar No. 24067681
kimberly.branscome@kirkland.com                      HARTLINE DACUS BARGER DREYER LLP
                                                     8750 North Central Expressway, Suite 1600
Andrew B. Bloomer                                    Dallas, TX 75231
Renee D. Smith                                       Telephone: (214) 369-2100
KIRKLAND & ELLIS LLP                                 Facsimile: (214) 369-2118
300 North LaSalle                                    kdreyer@hdbdlaw.com
Chicago, IL 60654                                    gtarantino@hdbdlaw.com
Telephone: (312) 862-2000                            tjacks@hdbdlaw.com
Facsimile: (312) 862-2200
abloomer@kirkland.com                                Mike Brock
renee.smith@kirkland.com                             KIRKLAND & ELLIS LLP
                                                     655 Fifteenth Street, N.W.
                                                     Washington, D.C. 20005
                                                     Telephone: (202) 879-5000
                                                     Facsimile: (202) 879-5200
                                                     mike.brock@kirkland.com


*Attorneys for General Motors LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all known counsel of record in this cause in accordance with the Texas Rules of Civil Procedure on this 30th day of June, 2016.

*/s/  Kyle H. Dreyer*
Kyle H. Dreyer
Attorney for General Motors LLC

# Exhibit  E

09-50026-reg   Doc 13563   Filed 12/04/15   Entered 12/04/15 13:37:27   Main Document
Pg 3 of 43

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------------------------x
In re                                   :       Chapter 11
                                        :
MOTORS LIQUIDATION COMPANY, et al.,     :       Case No.: 09-50026 (REG)
        f/k/a General Motors Corp., et al.   :
                                        :
                    Debtors.            :       (Jointly Administered)
---------------------------------------------------------------x
```

## JUDGMENT

For the reasons set forth in the Court's *Decision on Imputation, Punitive Damages, and Other No-Strike and No-Dismissal Pleadings Issues*, entered on November 9, 2015 [Dkt. No. 13533] ("**Decision**");[1] and pursuant to the Court's "gatekeeper" role deciding what claims and allegations may be asserted by plaintiffs under the Sale Order, April Decision and June Judgment, deciding issues of bankruptcy law, but minimizing its role in deciding issues better decided by the nonbankruptcy courts adjudicating plaintiffs' claims, it is hereby ORDERED AND ADJUDGED as follows:[2]

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Decision. For purposes of this Judgment, the following terms shall apply: (i) "**Ignition Switch Plaintiffs**" shall mean plaintiffs that have commenced a lawsuit against New GM asserting economic losses based on or arising from the Ignition Switch in the Subject Vehicles (each term as defined in the *Agreed and Disputed Stipulations of Fact Pursuant to the Court's Supplemental Scheduling Order, Dated July 11, 2014*, filed on August 8, 2014 [Dkt. No. 12826], at 3); (ii) "**Non-Ignition Switch Plaintiffs**" shall mean plaintiffs that have commenced a lawsuit against New GM asserting economic losses based on or arising from an alleged defect, other than the Ignition Switch, in an Old GM Vehicle (as herein defined); (iii) "**Pre-Closing Accident Plaintiffs**" shall mean plaintiffs that have commenced a lawsuit against New GM based on an accident or incident that first occurred prior to the closing of the 363 Sale; and (iv) "**Post-Closing Accident Plaintiffs**" shall mean plaintiffs that have commenced a lawsuit against New GM based on an accident or incident that occurred after the closing of the 363 Sale.

The term "**Economic Loss Plaintiffs**" as used on page 7 of the Decision shall be changed to "Ignition Switch Plaintiffs."

[2] Any ruling set forth in this Judgment that refers to a particular lawsuit, complaint and/or plaintiff shall apply equally to all lawsuits, complaints and plaintiffs where such ruling may be applicable.

09-50026-reg   Doc 13664-3   Filed 07/03/16   Entered 07/03/16 19:37:27   Main Document
Pg 342 of 481

## A.   <u>Imputation</u>

1.      Knowledge of New GM personnel, whenever acquired, may be imputed to New GM if permitted under nonbankruptcy law.

2.      Knowledge of Old GM personnel may not be imputed to New GM based on any type of successorship theory.

3.      With respect to Product Liability Claims assumed by New GM under the Sale Order, to the extent knowledge of Old GM personnel is permitted to be imputed to Old GM under nonbankruptcy law, such knowledge may be imputed to New GM.

4.      With respect to Independent Claims,[3] knowledge of Old GM may be imputed to New GM, if permitted by nonbankruptcy law, to the extent such knowledge was "inherited" from Old GM if such information (a) was actually known to a New GM employee (*e.g.*, because it is the knowledge of the same employee or because it was communicated to a New GM employee), or (b) could be ascertained from New GM's books and records, even if such books and records were transferred by Old GM to New GM as part of the 363 Sale and, therefore, first came into existence before the 363 Sale.  Accordingly, allegations in pleadings starting with "New GM knew…" or "New GM was on notice that…" are permissible. For causes of action where nonbankruptcy law permits imputation of knowledge to New GM using the above principles, it is possible for such knowledge, depending on the specific circumstances, to be imputed to New GM as early as the first day of its existence.

5.      Imputation of knowledge to New GM turns on application of applicable nonbankruptcy law to the specifics and context of the factual situation and the particular purpose

---

[3]    "Independent Claim" shall mean a claim or cause of action asserted against New GM that is based solely on New GM's own independent post-Closing acts or conduct.  Independent Claims do not include (a) Assumed Liabilities, or (b) Retained Liabilities, which are any Liabilities that Old GM had prior to the closing of the 363 Sale that are not Assumed Liabilities.

09-50026-reg  Doc 13569  Filed 12/04/15  Entered 12/04/15 13:37:27  Main Document Pg 3 of 43

for which imputation is sought, and it must be based on identified individuals or identified documents. The extent to which plaintiffs must identify specific matters alleged to be known, by whom and by what means, and the legal ground rules necessary to establish imputation as a matter of nonbankruptcy law are questions for the nonbankruptcy courts hearing plaintiffs' claims and allegations to decide. By reason of this Court's limited gatekeeper role, this Court will not engage in further examination of whether particular allegations may be imputed to New GM, beyond the extent to which it has done so in the Decision and this Judgment. The application of the general principles included in this Judgment and the Decision to determine the propriety of imputation in particular contexts in particular cases is up to the judges hearing those cases.

**B.**    **Punitive Damages and Related Issues**

6.    New GM did not contractually assume liability for punitive damages from Old GM. Nor is New GM liable for punitive damages based on Old GM conduct under any other theories, such as by operation of law. Therefore, punitive damages may not be premised on Old GM knowledge or conduct, or anything else that took place at Old GM.

7.    A claim for punitive damages with respect to a post-Sale accident involving vehicles manufactured by Old GM with the Ignition Switch Defect may be asserted against New GM to the extent—but only to the extent—it relates to an otherwise viable Independent Claim and is based solely on New GM conduct or knowledge, including (a) knowledge that can be imputed to New GM under the principles set forth in the Decision and this Judgment (and under nonbankruptcy law), and (b) information obtained by New GM after the 363 Sale. The extent to which any such claim is "viable" shall be determined under nonbankruptcy law by the

nonbankruptcy court presiding over that action. Except as expressly stated in this Judgment, this Court expresses no view as to whether any claim is viable.

8.    Claims for punitive damages may be asserted in actions based on post-Sale accidents involving vehicles manufactured by Old GM with the Ignition Switch Defect to the extent the claim is premised on New GM action or inaction after it was on notice of information "inherited" by New GM, or information developed by New GM post-Sale.

9.    Claims for punitive damages involving New GM manufactured vehicles were never foreclosed under the Sale Order, and remain permissible. The underlying allegations and evidence used to support such claims for punitive damages are subject only to the limitations, if any, provided by nonbankruptcy law.

10.    Claims for punitive damages relating to post-Sale Non-Product Liabilities actions involving personal injuries suffered in vehicles manufactured by Old GM with the Ignition Switch Defect may be asserted to the extent, but only the extent, they are premised on New GM knowledge and conduct, including "inherited" knowledge and knowledge acquired after the Sale.

11.    Claims for punitive damages relating to post-Sale Non-Product Liabilities actions involving personal injuries suffered in vehicles manufactured by New GM are not subject to the Sale Order and may proceed. The underlying allegations and evidence used to support such claims for punitive damages are subject only to the limitations, if any, provided by nonbankruptcy law.

12.    Claims for punitive damages asserted in economic loss actions involving vehicles manufactured by Old GM with the Ignition Switch Defect cannot be asserted except for any that might be recoverable in connection with Independent Claims, and then based only on New GM knowledge and conduct. The determination whether such an Independent Claim can be

4

adequately pled is a question of nonbankruptcy law and is left to the nonbankruptcy judge(s) hearing the claims.

13.     Claims for punitive damages asserted in economic loss actions involving vehicles manufactured by New GM are not subject to the Sale Order and may proceed.  The underlying allegations and evidence used to support such claims for punitive damages are subject only to the limitations, if any, provided by nonbankruptcy law.

**C.     Particular Allegations, Claims and Causes of Actions in Complaints**

14.     Plaintiffs of two types—1) plaintiffs whose claims arise in connection with vehicles without the Ignition Switch Defect, and 2) Pre-Closing Accident Plaintiffs—are not entitled to assert Independent Claims against New GM with respect to vehicles manufactured and first sold by Old GM (an "**Old GM Vehicle**").  To the extent such Plaintiffs have attempted to assert an Independent Claim against New GM in a pre-existing lawsuit with respect to an Old GM Vehicle, such claims are proscribed by the Sale Order, April Decision and the Judgment dated June 1, 2015 [Dkt. No. 13177] ("**June Judgment**").

15.     Claims of any type against New GM that are based on vehicles manufactured by New GM are not affected by the Sale Order and may proceed in the nonbankruptcy court where they were brought.

16.     Allegations that speak of New GM as the successor of Old GM (e.g. allegations that refer to New GM as the "successor of," a "mere continuation of," or a "de facto successor of" of Old GM) are proscribed by the Sale Order, April Decision and June Judgment, and complaints that contain such allegations are and remain stayed, unless and until they are amended consistent with the Decision and this Judgment.

17.     Allegations that do not distinguish between Old GM and New GM (*e.g.*, referring to "GM" or "General Motors"), or between Old GM vehicles and New GM vehicles (*e.g.,* referring to "GM-branded vehicles"), or that assert that New GM "was not born innocent" (or any substantially similar phrase or language) are proscribed by the Sale Order, April Decision and June Judgment, and complaints containing such allegations are and remain stayed, unless and until they are amended consistent with the Decision and this Judgment.  Notwithstanding the foregoing, (i) references to "GM-branded vehicles" may be used when the context is clear that the reference can only refer to New GM, and does not blend the periods during which vehicles were manufactured by Old GM and New GM; and (ii) complaints may say, without using code words as euphemisms for imposing successor liability, or muddying the distinctions between Old GM and New GM, that New GM purchased the assets of Old GM; that New GM assumed *Product Liabilities* from Old GM; and that New GM acquired specified knowledge from Old GM.

18.     Allegations that allege or suggest that New GM manufactured or designed an Old GM Vehicle, or performed other conduct relating to an Old GM Vehicle before the Sale Order, are proscribed by the Sale Order, April Decision and June Judgment, and complaints containing such allegations are and remain stayed, unless and until they are amended consistent with the Decision and this Judgment.

**D.     Claims in the Bellwether Complaints and MDL 2543**

19.     Claims with respect to Old GM Vehicles that are based on fraud (including, but not limited to, actual fraud, constructive fraud, fraudulent concealment, fraudulent misrepresentation, or negligent misrepresentation) or consumer protection statutes are not included within the definition of Product Liabilities, and therefore do not constitute Assumed

09-50026-reg   Doc 13563   Filed 12/04/15   Entered 12/04/15 13:57:27   Main Document
Pg 7 of 13

Liabilities, because (a) they are not for "death" or "personal injury", and their nexus to any death or personal injury that might thereafter follow is too tangential, and (b) they are not "caused by motor vehicles."  The Court expresses no view whether such claims may, however, constitute viable Independent Claims against New GM if they are based on New GM knowledge or conduct.

20.    The Court expresses no view as to whether, as a matter of nonbankruptcy law, failure to warn claims in connection with Old GM Vehicles are actionable against New GM, or whether New GM has a duty related thereto.  A court other than this Court can make that determination for Post-Closing Accident Claims.

21.    A duty to recall or retrofit is not an Assumed Liability, and New GM is not responsible for any failures of Old GM to do so.  But whether an Independent Claim can be asserted that New GM had a duty to recall or retrofit an Old GM Vehicle with the Ignition Switch Defect is a question of nonbankruptcy law that can be determined by a court other than this Court.

22.    Whether New GM had a duty, enforceable in damages to vehicle owners, to notify people who had previously purchased Old GM Vehicles of the Ignition Switch Defect is an issue to be determined by a court other than this Court.

23.    Under the principles in this Judgment and the Decision, the determination of whether claims asserted in complaints filed by Ignition Switch Plaintiffs (including the MDL Consolidated Complaint filed in MDL 2543), or complaints filed by Post-Closing Accident Plaintiffs (including the Bellwether Complaints filed in MDL 2543) with the Ignition Switch Defect, are Independent Claims that may properly be asserted against New GM, or Retained Liabilities of Old GM, can be made by nonbankruptcy courts overseeing such lawsuits, *provided*

7

*however*, such plaintiffs may not assert allegations of Old GM knowledge or seek to introduce evidence of Old GM's knowledge in support of such Independent Claims (except to the extent the Imputation principles set forth in the Decision and this Judgment are applicable).

**E.      Claims in Complaints Alleging New GM is Liable for Vehicle
         Owners' Failure to File Proofs of Claim Against Old GM**

24.      Claims that allege that New GM is liable in connection with vehicle owners' failure to file proofs of claim in the Old GM bankruptcy case are barred and enjoined by the Sale Order, April Decision and June Judgment, and shall not be asserted against New GM.

**F.      The States Complaints**

25.      New GM shall not be liable to the States for any violations of consumer protection statutes that took place before the 363 Sale.   Whether New GM can be held liable to the States for New GM's sale of vehicles that post-date the 363 Sale is a matter of nonbankruptcy law that may be decided by nonbankruptcy courts overseeing such cases.   To the extent nonbankruptcy law imposes duties at the time of a vehicle's sale, and a claim relates to the sale of an Old GM Vehicle other than one sold as "certified" after the 363 Sale, claims premised on a breach of such duties are barred by the Sale Order, April Decision and June Judgment as against New GM.

26.      With respect to the California complaint, the rulings included in this Judgment and the Decision apply.   By way of example, the allegations relating to Old GM conduct in paragraphs 46-54, 58-60, 71, 95-96, 112-114, 189-190 and 200-201 violate the Sale Order, April Decision and June Judgment.   Paragraphs 192, 195, 196, 198, 199, 203-206 and 211 do not say whether they make reference to Old GM or New GM and must be clarified.   However, allegations contained in paragraphs 9, 11, 16, 18, 22, 32, 43, 44 and 45, for example, are benign.

The California Action shall remain stayed until the complaint is amended to be consistent with the Decision and this Judgment.

27.     With respect to the Arizona complaint, the rulings included in this Judgment and the Decision apply.  By way of example, (i) the allegation in paragraph 19 that New GM "was not born innocent" is impermissible and violates the Sale Order, April Decision and June Judgment; (ii) the allegations relating solely to Old GM conduct in paragraphs 92, 93, and 357 violate the Sale Order, April Decision and June Judgment; (iii) the allegations that do not clearly relate solely to New GM conduct in paragraphs 140-180, 289, 290-310 violate the Sale Order, April Decision and June Judgment; and (iv) the allegation in paragraph 136 that knowledge of Old GM is "directly attributable" to New GM violates the Sale Order, April Decision and June Judgment (and is false as a matter of law).  Nevertheless, the allegations in paragraphs 19 (other than as described above), 81, 135, 137, 138, 139, 335 and 499, for example, are benign.  The Arizona Action shall remain stayed until the complaint is amended to be consistent with the Decision and this Judgment.

**G.      The Peller Complaints**

28.     With respect to the Peller Complaints, the Ignition Switch Plaintiffs may assert claims based on alleged duties of New GM relating to post-Sale events relating to Old GM Vehicles  to the extent they are actionable as matters of nonbankruptcy law (to be decided by nonbankruptcy courts), *provided however*, the Peller Complaints shall remain stayed unless and until they are amended (i) to remove claims that rely on Old GM conduct as the predicate for claims against New GM, (ii) to comply with the applicable provisions of the Decision and this Judgment (including those with respect to claims that fail to distinguish between Old GM and New GM), and (iii) to strike any purported Independent Claims by Non-Ignition Switch

Plaintiffs.  To the extent the Peller Complaints assert claims against New GM based on New GM manufactured vehicles, such claims are not proscribed by the Sale Order, April Decision and June Judgment.

**H.**    **Other Complaints**

*(1)    "Failure to Recall/Retrofit Vehicles"*

29.    Obligations, if any, that New GM had to recall or retrofit Old GM Vehicles were not Assumed Liabilities, and New GM is not responsible for any failures of Old GM to do so. But whether New GM had an independent duty to recall or retrofit previously sold Old GM Vehicles that New GM did not manufacture is a question of nonbankruptcy law that may be decided by the nonbankruptcy court hearing that action.

30.    The Court does not decide whether there is the requisite duty for New GM under nonbankruptcy law for such Old GM Vehicles, but allows this claim to be asserted by the Ignition Switch Plaintiffs and the Post-Closing Accident Plaintiffs (such as has been asserted by the plaintiff in *Moore v. Ross*) with the Ignition Switch Defect, leaving determination of whether there is the requisite duty under nonbankruptcy law to the nonbankruptcy court hearing that action.

*(2)    "Negligent Failure to Identify Defects or Respond to Notice of a Defect"*

31.    Obligations, if any, that New GM had to identify or respond to defects in previously sold Old GM Vehicles were not Assumed Liabilities, and New GM is not responsible for any failures of Old GM to do so.  But whether New GM had an independent duty to identify or respond to defects in previously sold Old GM Vehicles that New GM did not manufacture is a question of nonbankruptcy law that may be decided by the nonbankruptcy court hearing that action.

10

32.    The Court does not decide whether there is the requisite duty for New GM under nonbankruptcy law for such Old GM Vehicles, and allows this claim to be asserted by the Ignition Switch Plaintiffs and the Post-Closing Accident Plaintiffs with the Ignition Switch Defect, leaving determination of whether there is the requisite duty under nonbankruptcy law to the court hearing that action.

*(3)*    *"Negligent Infliction of Economic Loss and Increased Risk"*

33.    Claims that New GM had a duty to warn consumers owning Old GM Vehicles of the Ignition Switch Defect but instead concealed it, and by doing so, the economic value of the Ignition Switch Plaintiffs' vehicles was diminished (such as been raised by the plaintiffs in *Elliott* and *Sesay*) were not Assumed Liabilities, and New GM is not responsible for any failures of Old GM to do so.  But whether New GM had an independent duty to warn consumers owning previously sold Old GM Vehicles that New GM did not manufacture of the Ignition Switch Defect is a question of nonbankruptcy law to be decided by the nonbankruptcy court hearing the underlying action.  The Court does not decide whether there is the requisite duty on the part of New GM under nonbankruptcy law to warn for such Old GM Vehicles with the Ignition Switch Defect.  Thus, the Court allows this claim to be asserted by the Ignition Switch Plaintiffs to the extent, but only the extent, that New GM had an independent "duty to warn" owners of Old GM Vehicles of the Ignition Switch Defect, as relevant to situations *in which no one is alleged to have been injured* by that failure, but where the Old GM Vehicles involved are alleged to have lost value as a result. Determination of whether there is the requisite duty is left to the court hearing the underlying actions.

*(4)*    *"Civil Conspiracy"*

34.     Claims that New GM was involved "in a civil conspiracy with others to conceal the alleged ignition switch defect" were not Assumed Liabilities.  The extent to which they might constitute Independent Claims requires a determination of nonbankruptcy law, which determination this Court leaves, with respect to vehicles previously manufactured and sold by a different entity, to the nonbankruptcy court hearing the underlying action.

(5)     *"Section 402B—Misrepresentation by Seller"*

35.     Claims based on "Section 402B-Misrepresentation by Seller" fall within the definition of assumed Product Liabilities, and such claims may be asserted against New GM.

(6)     *Claims Based on Pre-Closing Accidents*

36.     All claims brought by Pre-Closing Accident Plaintiffs (like the *Coleman* action in the Eastern District of Louisiana) seeking to hold New GM liable, under any theory of liability, for accidents or incidents that first occurred prior to the closing of the 363 Sale are barred and enjoined pursuant to the Sale Order, April Decision and June Judgment. The Pre-Closing Accident Plaintiffs shall not assert or maintain such claims against New GM.

## I.   **Jurisdiction**

37.     The Court shall retain jurisdiction, to the fullest extent permissible under law, to construe or enforce the Sale Order, this Judgment, and the Decision on which it was based; *provided, however*, that the nonbankruptcy courts hearing the plaintiffs' claims shall have the authority to construe and implement the Decision and this Judgment, and to apply the principles laid out in the Decision and this Judgment, with respect to the particular cases before them.  This Judgment shall not be collaterally attacked, or otherwise subjected to review or modification, in any Court other than this Court or any court exercising appellate authority over this Court.

## J.   **Amended Complaints**

12

09-50026-reg    Doc 13569    Filed 12/04/15    Entered 12/04/15 13:37:27    Main Document Pg 13 of 13

38.     For the avoidance of any doubt, complaints amended in compliance with this Judgment may be filed in the non-bankruptcy courts with jurisdiction over them, without violating any automatic stay or injunction or necessitating further Bankruptcy Court approval to file same.

**K.     <u>Prior Orders</u>**

39.     For the avoidance of doubt, except as provided in the June Judgment and the April Decision, the provisions of the Sale Order shall remain unmodified and in full force and effect, including, without limitation, paragraph AA of the Sale Order, which states that, except with respect to Assumed Liabilities, New GM is not liable for the actions or inactions of Old GM.

**L.     <u>Earlier Decisions as Interpretive Aids</u>**

40.     To the extent, if any, that this Judgment fails, in whole or in part, to address an issue or is ambiguous, the Court's statements in the April Decision and the Decision may be used as interpretive aids.

Dated: New York, New York          **_s/Robert E. Gerber_**
       December 4, 2015          United States Bankruptcy Judge

# Exhibit  F

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
In re                                    :        Chapter 11
                                         :
MOTORS LIQUIDATION COMPANY, *et al.*,    :        Case No.: 09-50026 (REG)
    f/k/a General Motors Corp., *et al.*     :
                                         :
               Debtors.    :        (Jointly Administered)
----------------------------------------------------------------x

## JUDGMENT

For the reasons set forth in the Court's *Decision on Motion to Enforce Sale Order*,

entered on April 15, 2015 ("**Decision**"),[1] it is hereby ADJUDGED as follows:

1.        The Ignition Switch Plaintiffs and the Ignition Switch Pre-Closing Accident

Plaintiffs (collectively, the "**Plaintiffs**") were "known creditors" of the Debtors.  The Plaintiffs

did not receive the notice of the sale of assets of Old GM to New GM ("**363 Sale**") that due

process required.

2.        Except with respect to Independent Claims (as herein defined), the Ignition

Switch Plaintiffs were not prejudiced by their lack of notice of the 363 Sale, and they thus failed

to demonstrate a due process violation with respect to the 363 Sale.

---

[1]        Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Decision.
For purposes of this Judgment, the following terms shall apply: (i) "**Ignition Switch Plaintiffs**" shall mean
plaintiffs that have commenced a lawsuit against New GM asserting economic losses based on or arising
from the Ignition Switch in the Subject Vehicles (each term as defined in the *Agreed and Disputed
Stipulations of Fact Pursuant to the Court's Supplemental Scheduling Order, Dated July 11, 2014*, filed on
August 8, 2014 [Dkt. No. 12826], at 3); (ii) "**Pre-Closing Accident Plaintiffs**" shall mean plaintiffs that
have commenced a lawsuit against New GM based on an accident or incident that occurred prior to the
closing of the 363 Sale; (iii) "**Ignition Switch Pre-Closing Accident Plaintiffs**" shall mean that subset of
the Pre-Closing Accident Plaintiffs that had the Ignition Switch in their Subject Vehicles; (iv) "**Non-
Ignition Switch Pre-Closing Accident Plaintiffs**" shall mean that subset of Pre-Closing Accident
Plaintiffs that are not Ignition Switch Pre-Closing Accident Plaintiffs; and (v) "**Non-Ignition Switch
Plaintiffs**" shall mean plaintiffs that have commenced a lawsuit against New GM asserting economic
losses based on or arising from an alleged defect, other than the Ignition Switch, in an Old GM vehicle.

-1-

3.     The Ignition Switch Pre-Closing Accident Plaintiffs were not prejudiced by their lack of notice of the 363 Sale, and they thus failed to demonstrate a due process violation with respect to the 363 Sale.

4.     With respect to the Independent Claims, the Ignition Switch Plaintiffs were prejudiced by the failure to give them the notice of the 363 Sale that due process required.  The Ignition Switch Plaintiffs established a due process violation with respect to the Independent Claims.  The Sale Order shall be deemed modified to permit the assertion of Independent Claims.  For purposes of this Judgment, "**Independent Claims**" shall mean claims or causes of action asserted by Ignition Switch Plaintiffs against New GM (whether or not involving Old GM vehicles or parts) that are based solely on New GM's own, independent, post-Closing acts or conduct.  Nothing set forth herein shall be construed to set forth a view or imply whether or not Ignition Switch Plaintiffs have viable Independent Claims against New GM.

5.     Except for the modification to permit the assertion  of Independent Claims by the Ignition Switch Plaintiffs, the Sale Order shall remain unmodified and in full force and effect.

6.     The Plaintiffs were prejudiced by the failure to receive the notice due process required of the deadline ("**Bar Date**") to file proofs of claim against the Old GM bankruptcy estate.  Any Plaintiff may petition the Bankruptcy Court (on motion and notice) for authorization to file a late or amended proof of claim against the Old GM bankruptcy estate.  The Court has not determined the extent to which any late or amended proof of claim will ultimately be allowed or allowed in a different amount.  But based on the doctrine of equitable mootness, in no event shall assets of the GUC Trust held at any time in the past, now, or in the future (collectively, the "**GUC Trust Assets**") (as defined in the Plan) be used to satisfy any claims of the Plaintiffs, nor will Old GM's Plan be modified with respect to such claims; *provided* that nothing in this

09-50026-reg Doc 13377-1 Filed 06/01/15 Entered 06/01/15 15:03:27 Main Document Pg 3 of 21

Judgment shall impair any party's rights with respect to the potential applicability of Bankruptcy Code section 502(j) to any claims that were previously allowed or disallowed by the Court. The constraints on recourse from GUC Trust Assets shall not apply to any Ignition Switch Plaintiff, Pre-Closing Accident Plaintiff, or Non-Ignition Switch Plaintiff who had a claim previously allowed or disallowed by the Court, but in no event shall he or she be entitled to increase the amount of any allowed claim without the prior authorization of the Bankruptcy Court or an appellate court following an appeal from the Bankruptcy Court.

7.      Any claims and/or causes of action brought by the Ignition Switch Pre-Closing Accident Plaintiffs that seek to hold New GM liable for accidents or incidents that occurred prior to the closing of the 363 Sale are barred and enjoined pursuant to the Sale Order. The Ignition Switch Pre-Closing Accident Plaintiffs shall not assert or maintain any such claim or cause of action against New GM.

8.      (a)      Subject to the other provisions of this paragraph 8, each Ignition Switch Pre-Closing Accident Plaintiff (including without limitation the Ignition Switch Pre-Closing Accident Plaintiffs identified on Exhibit "A" attached hereto) is stayed and enjoined from prosecuting any lawsuit against New GM.

(b)      Within two (2) business days of the entry of this Judgment, New GM shall serve a copy of this Judgment on counsel in the lawsuits identified on Exhibit "A," by e-mail, facsimile, overnight mail or, if none of the foregoing are available, regular mail, with a cover note that states: "The attachment is the Judgment entered by the Bankruptcy Court. Please review the Judgment, including without limitation, the provisions of paragraph 8 of the Judgment."

09-50026-reg   Doc 13777-1   Filed 06/01/15   Entered 06/01/15 03:27:11   Main Document Pg 4 of 21

(c)     If counsel for an Ignition Switch Pre-Closing Accident Plaintiff (including, but not limited to, one identified on Exhibit "A") believes that, notwithstanding the Decision and this Judgment, it has a good faith basis to maintain that its lawsuit against New GM should not be stayed, it shall file a pleading with this Court within 17 business days of this Judgment ("**No Stay Pleading**").  The No Stay Pleading shall not reargue issues that were already decided by the Decision, this Judgment, or any other decision, order, or judgment of this Court.  If a No Stay Pleading is timely filed, New GM shall have 17 business days to respond to such pleading.  The Court will schedule a hearing thereon if it believes one is necessary.

9.  Except for  Independent Claims and Assumed Liabilities (if any), all claims and/or causes of action that the Ignition Switch Plaintiffs may have against New GM concerning an Old GM vehicle or part seeking to impose liability or damages based in whole or in part on Old GM conduct (including, without limitation, on any successor liability theory of recovery) are barred and enjoined pursuant to the Sale Order, and such lawsuits shall remain stayed pending appeal of the Decision and this Judgment.

10.     (a)     The lawsuits stayed pursuant to the preceding paragraph shall include those on the attached Exhibit "B."  The lawsuits identified on Exhibit "B" include the Pre-Sale Consolidated Complaint.

(b)     Within two (2) business days of the entry of this Judgment, New GM shall serve a copy of this Judgment on counsel in the lawsuits identified on Exhibit "B", by e-mail, facsimile, overnight mail or, if none of the foregoing are available, regular mail, with a cover note that states: "The attachment is the Judgment entered by the Bankruptcy Court.  Please review the Judgment, including without limitation, the provisions of paragraph 10 of the Judgment."

(c)     If a counsel listed on Exhibit "B" believes that, notwithstanding the

Decision and this Judgment, it has a good faith basis to maintain that its lawsuit against New GM

should not be stayed, it shall file a No Stay Pleading with this Court within 17 business days of

this Judgment.  The No Stay Pleading shall not reargue issues that were already decided by the

Decision and this Judgment, or any other decision or order of this Court.  If a No Stay Pleading

is timely filed, New GM shall have 17 business days to respond to such pleading.  The Court will

schedule a hearing thereon if it believes one is necessary.

11.     (a)     The complaints in the lawsuits listed on the attached Exhibit "C"

("**Hybrid Lawsuits**") include claims and allegations that are permitted under the Decision and

this Judgment and others that are not.  Accordingly, until and unless the complaint in a Hybrid

Lawsuit is (x) amended to assert solely claims and allegations permissible under the Decision

and this Judgment (as determined by this or any higher court, if necessary), or (y) is judicially

determined (by this or any higher court) not to require amendment, that lawsuit is and shall

remain stayed.  The Hybrid Lawsuits include the Post-Sale Consolidated Complaint.  Within two

(2) business days of the entry of this Judgment, New GM shall serve a copy of this Judgment on

counsel in the Hybrid Lawsuits, by e-mail, facsimile, overnight mail or, if none of the foregoing

are available, regular mail, with a cover note that states: "The attachment is the Judgment entered

by the Bankruptcy Court.  Please review the Judgment, including without limitation, the

provisions of paragraph 11 of the Judgment."

(b)     Notwithstanding the stay under the preceding subparagraph, however, the

complaints in the actions listed in Exhibit "C" may, if desired, be amended in accordance with

the subparagraphs that follow.  Subject to the other provisions of this paragraph 11, and unless

the applicable complaint already has been dismissed without prejudice pursuant to an order

entered in MDL 2543, each Plaintiff in a Hybrid Lawsuit wishing to proceed at this time may

amend his or her complaint on or before June 12, 2015, such that any allegations, claims or

causes of action concerning an Old GM vehicle or part seeking to impose liability or damages

based on Old GM conduct (including, without limitation, any successor liability theory of

recovery) are stricken, and only Independent Claims are pled.

      (c)     If a counsel listed in the lawsuits on Exhibit "C" believes that,

notwithstanding the Decision and this Judgment, it has a good faith basis to maintain that its

allegations, claims or causes of action against New GM should not be stricken, it shall file a

pleading with this Court within 17 business days of this Judgment ("**No Strike Pleading**").  The

No Strike Pleading shall not reargue issues that were already decided by the Decision and

Judgment.  If a No Strike Pleading is timely filed, New GM shall have 17 business days to

respond to such pleading.  The Court will schedule a hearing thereon if it believes one is

necessary.

      (d)     If an Ignition Switch Plaintiff fails to either (i) amend his or her respective

complaints on or before June 12, 2015, such that all allegations, claims and/or causes of action

concerning an Old GM vehicle or part seeking to impose liability or damages based on Old GM

conduct (including, without limitation, any successor liability theory of recovery) are stricken,

and only Independent Claims are pled, or (ii) timely file a No Strike Pleading with the Court

within the time period set forth above, New GM shall be permitted to file with this Court a notice

of presentment on five (5) business days' notice, with an attached order ("**Strike Order**") that

directs the Ignition Switch Plaintiff to strike specifically-identified allegations, claims and/or

causes of action contained in his or her complaint that violate the Decision, this Judgment and/or

the Sale Order (as modified by the Decision and this Judgment), within 17 business days of

receipt of the Strike Order.

(e) For any allegations, claims or causes of action of the Ignition Switch Plaintiffs listed on Exhibit "C" that are stricken pursuant to this Judgment (voluntarily or otherwise), (i) the statute of limitations shall be tolled from the date of the amended complaint to 30 days after all appeals of the Decision and Judgment are decided, and (ii) if the Decision and Judgment are reversed on appeal such that the appellate court finds that the Ignition Switch Plaintiffs can make the allegations, or maintain the claims or causes of action, against New GM heretofore stricken pursuant to this Judgment, all of the Ignition Switch Plaintiffs' rights against New GM that existed prior to the striking of such claims or causes of action pursuant to this Judgment shall be reinstated as if the striking of such claims or causes of action never occurred.

(f) Notwithstanding the foregoing, to the extent (but only the extent) acceptable to the MDL Court, the Plaintiff in any lawsuit listed on Exhibit "C" may elect not to amend his or her complaint and may await the outcome of appellate review of this Judgment. If that plaintiff thereafter determines to proceed with his or her lawsuit, the plaintiff's counsel shall provide notice to New GM, and the procedures set forth above shall apply.

12. (a) The lawsuits captioned *People of California v. General Motors LLC, et al.*, No. 30-2014-00731038-CU-BT-CXC (Orange County, Cal.) and *State of Arizona v. General Motors LLC*, No. CV2014-014090 (Maricopa County, Ariz.) (the "**State Lawsuits**") likewise include claims and allegations that are permitted under the Decision and this Judgment and others that are not. Accordingly, until and unless the complaint in a State Lawsuit is (x) amended to assert solely claims and allegations permissible under the Decision and this Judgment (as determined by this or any higher court, if necessary), or (y) is judicially determined (by this or any higher court) not to require amendment, that lawsuit is and shall remain stayed.

-7-

09-50026-reg   Doc 13177-4   Filed 06/01/15   Entered 06/01/15 15:03:27   Main Document
Pg 8 of 21

Within two (2) business days of the entry of this Judgment, New GM shall serve a copy of this
Judgment on counsel in the State Lawsuits, by e-mail, facsimile, overnight mail or, if none of the
foregoing are available, regular mail, with a cover note that states: "The attachment is the
Judgment entered by the Bankruptcy Court.  Please review the Judgment, including without
limitation, the provisions of paragraph 12 of the Judgment."

(b)        Notwithstanding the stay under the preceding subparagraph, however, the
State Lawsuits may, if desired, be amended in accordance with the subparagraphs that follow.
Subject to the other provisions of this paragraph 12, and unless the applicable complaint already
has been dismissed without prejudice, each Plaintiff in a State Lawsuit ("**State Plaintiff**")
wishing to proceed at this time may amend its complaint on or before June 12, 2015, such that
any allegations, claims or causes of action concerning an Old GM vehicle or part seeking to
impose liability or damages based on Old GM conduct (including, without limitation, any
successor liability theory of recovery) are stricken, and only Independent Claims are pled.

(c)        If a counsel in a State Lawsuit believes that, notwithstanding the Decision
and this Judgment, it has a good faith basis to maintain that its allegations, claims or causes of
action against New GM should not be stricken, it shall file a No Strike Pleading with this Court
within 17 business days of this Judgment.  The No Strike Pleading shall not reargue issues that
were already decided by the Decision and Judgment.  If a No Strike Pleading is timely filed,
New GM shall have 17 business days to respond to such pleading.  The Court will schedule a
hearing thereon if it believes one is necessary.

(d)        If a State Plaintiff fails to either (i) amend its complaint, on or before June
12, 2015, such that all allegations, claims and/or causes of action concerning an Old GM vehicle
or part seeking to impose liability or damages based on Old GM conduct (including, without

limitation, any successor liability theory of recovery) are stricken, and only Independent Claims

are pled, or (ii) timely file a No Strike Pleading with the Court within the time period set forth

above, New GM shall be permitted to file with this Court a notice of presentment on five (5)

business days' notice, with an attached Strike Order that directs such State Plaintiff to strike

specifically-identified allegations, claims and/or causes of action contained in its complaint that

violate the Decision, this Judgment and/or the Sale Order (as modified by the Decision and

Judgment), within 17 business days of receipt of the Strike Order.

       (e)     For any allegations, claims or causes of action of a State Plaintiff that are

stricken pursuant to this Judgment (voluntarily or otherwise), (i) the statute of limitations shall be

tolled from the date of the amended complaint to 30 days after all appeals of the Decision and

Judgment are decided, and (ii) if the Decision and Judgment are reversed on appeal such that the

appellate court finds that the State Plaintiff can make the allegations, or maintain the claims or

causes of action, against New GM heretofore stricken pursuant to this Judgment, all of the State

Plaintiff's rights against New GM that existed prior to the striking of such allegations, claims or

causes of action pursuant to this Judgment shall be reinstated as if their striking never occurred.

       (f)     Notwithstanding the foregoing, a State Plaintiff may elect not to amend its

complaint and may await the outcome of appellate review of this Judgment.  If such plaintiff

thereafter determines to proceed with its lawsuit, the plaintiff's counsel shall provide notice to

New GM, and the procedures set forth above shall apply.

     13.     (a)     The rulings set forth herein and in the Decision that proscribe claims and

actions being taken against New GM shall apply to the "Identified Parties"[2] who were heard

---

[2]      **_Identified Parties_** as defined in the Court's Scheduling Order entered on May 16, 2014
(ECF No. 12697), and persons that have asserted Pre-Closing personal injury and wrongful death claims
against New GM based on the Ignition Switch Defect (as defined in the Decision).

during the proceedings regarding the Four Threshold Issues and any other parties who had notice

of the proceedings regarding the Four Threshold Issues and the opportunity to be heard in

them—including, for the avoidance of doubt, the plaintiffs in the *Bledsoe*, *Elliott* and *Sesay*

lawsuits listed on Exhibit "C." They shall also apply to any other plaintiffs in these proceedings

(including, without limitation, the Non-Ignition Switch Pre-Closing Accident Plaintiffs and Non-

Ignition Switch Plaintiffs identified on Exhibit "D" attached hereto), subject to any objection

("**Objection Pleading**") submitted by any such party within 17 business days of the entry of this

Judgment. New GM shall file a response to any such Objection Pleading within 17 business

days of service. The Court will schedule a hearing thereon if it believes one is necessary.   To

the extent an issue shall arise in the future as to whether (i) the Non-Ignition Switch Pre-Closing

Accident Plaintiffs and Non-Ignition Switch Plaintiffs were known or unknown creditors of the

Debtors, (ii) the doctrine of equitable mootness bars the use of any GUC Trust Assets to satisfy

late-filed claims of the Non-Ignition Switch Pre-Closing Accident Plaintiffs and Non-Ignition

Switch Plaintiffs, or (iii) the Non-Ignition Switch Pre-Closing Accident Plaintiffs or Non-

Ignition Switch Plaintiffs were otherwise bound by the provisions of the Sale Order, the Non-

Ignition Switch Pre-Closing Accident Plaintiffs or Non-Ignition Switch Plaintiffs shall be

required to first seek resolution of such issues from this Court before proceeding any further

against New GM and/or the GUC Trust.

(b)     Within two (2) business days of the entry of this Judgment, New GM shall

serve a copy of this Judgment on counsel for the Non-Ignition Switch Pre-Closing Accident

Plaintiffs or Non-Ignition Switch Plaintiffs identified on Exhibit "D", by e-mail, facsimile,

overnight mail or, if none of the foregoing are available, regular mail, with a cover note that

states: "The attachment is the Judgment entered by the Bankruptcy Court. Please review the

Judgment, including without limitation, the provisions of paragraph 13 of the Judgment."

(c)     If a counsel for a Non-Ignition Switch Pre-Closing Accident Plaintiff or

Non-Ignition Switch Plaintiff listed on Exhibit "D" believes that, notwithstanding the Decision

and this Judgment, it has a good faith basis to maintain that its lawsuit, or certain claims or

causes of action contained therein, against New GM should not be dismissed or stricken, it shall

file a pleading with this Court within 17 business days of this Judgment ("**No Dismissal**

**Pleading**").  Such No Dismissal Pleading may request, as part of any good faith basis to

maintain a lawsuit (or certain claims or causes of action contained therein) against New GM, (i)

an opportunity to select one or more designated counsel from among the affected parties to

address the Four Threshold Issues with respect to particular defects in the vehicles involved in

the accidents or incidents that form the basis for the subject claims, and (ii) the establishment of

appropriate procedures (including a briefing schedule and discovery, if appropriate) with respect

thereto.  If a No Dismissal Pleading is timely filed, New GM shall have 17 business days to

respond to such pleading.  The Court will schedule a hearing thereon if it believes one is

necessary.

(d)     If counsel for a Non-Ignition Switch Pre-Closing Accident Plaintiff or a

Non-Ignition Switch Plaintiff believes that, notwithstanding the Decision and this Judgment, it

has a good faith basis to believe that any of the GUC Trust Assets may be used to satisfy late

proofs of claim filed by them that may ultimately be allowed by the Bankruptcy Court, it shall

file a pleading with this Court within 17 business days of this Judgment ("**GUC Trust Asset**

**Pleading**").  The GUC Trust Asset Pleading shall not reargue issues that were already decided

by the Decision and Judgment.  If a GUC Trust Asset Pleading is timely filed, the GUC Trust,

the GUC Trust Unitholders and/or New GM shall have 17 business days to respond to such pleading. The Court will schedule a hearing thereon if it believes one is necessary.

(e)     If a Non-Ignition Switch Pre-Closing Accident Plaintiff or Non-Ignition Switch Plaintiff listed on Exhibit "D" fails to timely file a No Dismissal Pleading or a GUC Trust Asset Pleading with the Court within the time period set forth in paragraphs 13(c) and (d) above, New GM, the GUC Trust and/or the GUC Trust Unitholders, as applicable, shall be permitted to file with this Court a notice of presentment on five (5) business days' notice, with an attached order ("**Dismissal Order**") that directs the Non-Ignition Switch Pre-Closing Accident Plaintiff or Non-Ignition Switch Plaintiff to dismiss with prejudice its lawsuit, or certain claims or causes of action contained therein that violate the Decision, this Judgment and/or the Sale Order (as modified by the Decision and Judgment), within 17 business days of receipt of the Dismissal Order. For any lawsuit, or any claims or causes of action contained therein, of the Non-Ignition Switch Pre-Closing Accident Plaintiffs or Non-Ignition Switch Plaintiffs that are dismissed pursuant to this Judgment, (i) the statute of limitations shall be tolled from the date of dismissal to 30 days after all appeals of the Decision and Judgment are decided, and (ii) if the Decision and Judgment are reversed on appeal, such that the appellate court finds that the Non-Ignition Switch Pre-Closing Accident Plaintiffs or Non-Ignition Switch Plaintiffs can make the allegations, or maintain the lawsuit or claims or causes of action, against New GM and/or the GUC Trust heretofore dismissed or stricken pursuant to this Judgment, all of the Non-Ignition Switch Pre-Closing Accident Plaintiffs' or Non-Ignition Switch Plaintiffs' rights against New GM and/or the GUC Trust that existed prior to the dismissal of their lawsuit or the striking of claims or causes of action pursuant to this Judgment shall be reinstated as if the dismissal or the striking of such claims or causes of action never occurred.

-12-

(f)     Notwithstanding the provisions of this Paragraph 13, any plaintiff whose
lawsuit would otherwise have to be dismissed, in whole or in part, under this Paragraph 13 may
elect, by notice filed on ECF and served upon New GM and the GUC Trust (no later than 14
days after the entry of this judgment), to stay the lawsuit instead.  Except as the Court may
otherwise provide by separate order (entered on stipulation or on motion), the provisions of
Paragraph 13 shall then apply to any request for relief from that stay.

14.     The Court adopts the legal standard for "fraud on the court" as set forth in the
Decision.

15.     (a)     By agreement of New GM, Designated Counsel for the Ignition Switch
Plaintiffs, the GUC Trust, and the GUC Trust Unitholders, and as approved by the Court, no
discovery in the Bankruptcy Court was conducted in connection with the resolution of the Four
Threshold Issues.  The Ignition Switch Pre-Closing Accident Plaintiffs did not challenge the
earlier decision not to seek discovery in the Bankruptcy Court in connection with the Bankruptcy
Court's determination of the Four Threshold Issues.  New GM, Designated Counsel, the Groman
Plaintiffs, the GUC Trust, and the GUC Trust Unitholders developed and submitted to the Court
a set of agreed upon stipulated facts.  Such parties also submitted to the Bankruptcy Court certain
disputed facts and exhibits.  The Court decided the Four Threshold Issues on the agreed upon
stipulated facts only.

(b)     The Court has determined that the agreed-upon factual stipulations were
sufficient for purposes of determining the Four Threshold Issues; that none of the disputed facts
were or would have been material to the Court's conclusions as to any of the Four Threshold
Issues; and that treating any disputed fact as undisputed would not have affected the outcome or
reasoning of the Decision.

(c)      The Groman Plaintiffs requested discovery with respect to the Four

Threshold Issues but the other parties opposed that request, and the Court denied that request.

To the extent the Groman Plaintiffs' discovery request continues, it is denied without prejudice

to renewal in the event that after appeal of this Judgment, the discovery they seek becomes

necessary or appropriate.

(d)      For these reasons (and others), the findings of fact in the Decision shall

apply only for the purpose of this Court's resolution of the Four Threshold Issues, and shall have

no force or applicability in any other legal proceeding or matter, including without limitation,

MDL 2543.  Notwithstanding the foregoing, in all events, however, the Decision and Judgment

shall apply with respect to (a) the Court's interpretation of the enforceability of the Sale Order,

and (b) the actions of the affected parties that are authorized and proscribed by the Decision and

Judgment.

16.      The Court shall retain exclusive jurisdiction, to the fullest extent permissible

under law, to construe or enforce the Sale Order, this Judgment, and/or the Decision on which it

was based.  For the avoidance of doubt, except as otherwise provided in this Judgment, the Sale

Order remains fully enforceable, and in full force and effect.  This Judgment shall not be

collaterally attacked, or otherwise subjected to review or modification, in any Court other than

this Court or any court exercising appellate authority over this Court.

17.      Count One of the amended complaint ("**Groman Complaint**") filed in *Groman et

al v. General Motors LLC* (Adv. Proc. No. 14-01929 (REG)) is dismissed with prejudice.  The

remaining counts of the Groman Complaint that deal with the "fraud on the court" issue are

deferred and stayed until 30 days after all appeals of the Decision and Judgment are decided.

With respect to Count One of the Groman Complaint, (i) the statute of limitations shall be tolled

from the date of dismissal of Count One to 30 days after all appeals of the Decision and

Judgment are decided, and (ii) if the Decision and Judgment are reversed or modified on appeal

such that the appellate court finds that the Groman Plaintiffs can maintain the cause of action in

Count One of the Groman Complaint heretofore dismissed pursuant to this Judgment, the

Groman Plaintiffs' rights against New GM that existed as of the dismissal of Count One shall be

reinstated as if the dismissal of Count One never occurred.

18.     (a)     New GM is hereby authorized to serve this Judgment and the Decision

upon any additional party (or his or her attorney) (each, an "**Additional Party**") that commences

a lawsuit and/or is not otherwise on Exhibits "A" through "D" hereto (each, an "**Additional

Lawsuit**") against New GM that would be proscribed by the Sale Order (as modified by the

Decision and this Judgment).  Any Additional Party shall have 17 business days upon receipt of

service by New GM of the Decision and Judgment to dismiss, without prejudice, such Additional

Lawsuit or the allegations, claims or causes of action contained in such Additional Lawsuit that

would violate the Decision, this Judgment, or the Sale Order (as modified by the Decision and

this Judgment).

(b)     If any Additional Party has a good faith basis to maintain that the

Additional Lawsuit or certain allegations, claims or causes of action contained in such Additional

Lawsuit should not be dismissed without prejudice, such Additional Party shall, within 17

business days upon receipt of the Decision and Judgment, file with this Court a No Dismissal

Pleading explaining why such Additional Lawsuit or certain claims or causes of action contained

therein should not be dismissed without prejudice. The No Dismissal Pleading shall not reargue

issues that were already decided by the Decision and Judgment.  New GM shall file a response to

the No Dismissal Pleading within 17 business days of service of the No Dismissal Pleading.  The

Court will schedule a hearing thereon if it believes one is necessary.

(c)      If an Additional Party fails to either (i) dismiss without prejudice the

Additional Lawsuit or the claims and/or causes of action contained therein that New GM asserts

violates the Decision, Judgment, and/or Sale Order (as modified by the Decision and this

Judgment), or (ii) timely file a No Dismissal Pleading with the Court within the time period set

forth above, New GM shall be permitted to file with this Court a notice of presentment on five

(5) business days' notice, with an attached Dismissal Order that directs the Additional Party to

dismiss without prejudice the Additional Lawsuit or the claims and/or causes of action contained

therein that violate the Decision, this Judgment and/or the Sale Order (as modified by the

Decision and this Judgment), within 17 business days of receipt of the Dismissal Order.  With

respect to any lawsuit that is dismissed pursuant to this paragraph, (i) the statute of limitations

shall be tolled from the date of dismissal of such lawsuit to 30 days after all appeals of the

Decision and Judgment are decided, and (ii) if the Decision and Judgment are reversed on appeal

such that the appellate court finds that the Additional Party can maintain the lawsuit heretofore

dismissed pursuant to this Judgment, the Additional Party's rights against New GM that existed

as of the dismissal of the lawsuit shall be reinstated as if the dismissal of the lawsuit never

occurred.

(d)      For the avoidance of doubt, nothing in this paragraph 18 shall apply to the

Amended Consolidated Complaint to be filed in MDL 2543 on or before June 12, 2015.


Dated: New York, New York              ____*s/ Robert E. Gerber*_____
       June 1, 2015                     United States Bankruptcy Judge

## Exhibit "A": Complaints Alleging Pre-Closing Ignition Switch Accidents To Be Stayed

Bachelder, et al. v. General Motors LLC, MDL No. 1:15-cv-00155-JMF (S.D.N.Y.)[3]

Betancourt Vega v. General Motors LLC, et al., No. 3:15-cv-01245-DRD (D.P.R.)
(MDL No. 1:15-cv-02638)

Bledsoe, et al. v. General Motors LLC, MDL No. 1:14-cv-07631-JMF (S.D.N.Y.)[4]

Boyd, et al. v. General Motors LLC, No. 4:14-cv-01205-HEA (E.D. Mo.)
(MDL No. 1:14-cv-08385)[5]

Doerfler-Bashucky v. General Motors LLC, et al., No. 5:15-cv-00511-GTS-DEP (N.D.N.Y.)

Edwards, et al. v. General Motors LLC, MDL No. 1:14-cv-06924-JMF (S.D.N.Y.)[6]

Johnston-Twining v. General Motors LLC, et al., No. 3956 (Philadelphia County, Pa.)

Meyers v. General Motors LLC, No. 1:15-cv-00177-CCC (M.D. Pa.)

Occulto v. General Motors Co., et al., No. 15-cv-1545 (Lackawanna County, Pa.)

Scott v. General Motors Company, et al., No. 8:15-cv-00307-JDW-AEP (M.D. Fla.)
(MDL No. 1:15-cv-01790)

Vest v. General Motors LLC, et al., No. 1:14-cv-24995-DAF (S.D. W.Va.)
(MDL No. 1:14-cv-07475)

---

[3]   The *Bachelder* complaint includes both Ignition Switch and non-Ignition Switch Pre-Closing Accident vehicles subject to the Judgment. Accordingly, it is listed both on Exhibits "A" and "D."

[4]   The *Bledsoe* complaint includes both Ignition Switch and non-Ignition Switch Pre-Closing Accident vehicles subject to the Judgment. Accordingly, it is listed both on Exhibits "A" and "D." In addition, the *Bledsoe* complaint includes economic loss claims regarding Old GM conduct and vehicles and, therefore, also appears on Exhibit "C."

[5]   The *Boyd* complaint contains allegations regarding both a Pre-Closing ignition switch accident and one or more Post-Closing ignition switch accidents. To the extent the complaint concerns one or more Post-Closing ignition switch accidents, those portions of the *Boyd* complaint that assert Product Liabilities (as defined in the Sale Agreement) based on a Post-Closing ignition switch accident are not subject to the Judgment.

[6]   The *Edwards* complaint includes both Ignition Switch and non-Ignition Switch Pre-Closing Accident vehicles subject to the Judgment. Accordingly, it is listed both on Exhibits "A" and "D."

## Exhibit "B": Economic Loss Complaints To Be Stayed

Hailes, et al. v. General Motors LLC, et al., No. 15PU-CV00412 (Pulaski County, Mo.)

In re General Motors LLC Ignition Switch Litigation, 14-MD-2543, *Consolidated Class Action Complaint Against New GM For Recalled Vehicles Manufactured By Old GM and Purchased Before July 11, 2009*

**Exhibit "C": Complaints Containing Particular Allegations
And/Or Claims Barred By Sale Order To Be Stricken**

**Post-Sale Personal Injury/Wrongful Death Complaints With Economic Loss Claims To Be Stricken:**

Ackerman v. General Motors Corp., et al., No. MRS-L-2898-14 (Morris County, N.J.)

Austin, et al. v. General Motors LLC, No. 2015-L- 000026 (St. Clair County, Ill.)

Berger, et al. v. General Motors LLC, No. 9241/2014 (Kings County, N.Y.)

Casey, et al. v. General Motors LLC, et al., No. 2014-54547 (Texas MDL)

Colarossi v. General Motors, et al., No. 14-22445 (Suffolk County, N.Y.)

Dobbs v. General Motors LLC, et al., No. 49D051504PL010527 (Marion County, Ind.)

Felix, et al. v. General Motors LLC, No. 1422-CC09472 (City of St. Louis, Mo.)

Gable, et al. v. Walton, et al., No. 6737 (Lauderdale County, Tenn.)

Goins v. General Motors LLC, et al., No. 2014-CI40 (Yazoo County, Miss.)

Grant v. General Motors LLC, et al., No. 2014CV02570MG (Clayton County, Ga.)

Green v. General Motors LLC, et al., No. 15-144964-NF (Oakland County, Mich.)

Hellems v. General Motors LLC, No. 15-459-NP (Eaton County, Mich.)

Hinrichs v. General Motors LLC, et al., No. 15-DCV-221509 (Texas MDL)

Jackson v. General Motors LLC, et al., No. 2014-69442 (Texas MDL)

Largent v. General Motors LLC, et al., No. 14-006509-NP (Wayne County, Mich.)

Licardo v. General Motors LLC, No. 03236 (Fulton County, N.Y.)

Lincoln, et al. v. General Motors LLC, No. 2015-0449-CV (Steuben County, N.Y.)

Lucas v. General Motors LLC, et al., No. 15-CI-00033 (Perry County, Ky.)

Miller v. General Motors LLC, et al., No. CACE-15-002297 (Broward County, Fla.)

Mullin, et al. v. General Motors LLC, et al., No. BC568381 (Los Angeles County, Cal.)

Nelson v. General Motors LLC, et al., No. D140141 (Texas MDL)

Petrocelli v. General Motors LLC, et al., No. 14-17405 (Suffolk County, N.Y.)

-19-

Polanco, et al. v. General Motors LLC, et al., No. CIVRS1200622 (San Bernardino County, Cal.)

Quiles v. Catsoulis, et al., No. 702871/14 (Queens County, N.Y.)

Quintero v. General Motors LLC, et al., No. 15-995 (Orleans Parish, La.)

Shell, et al. v. General Motors LLC, No. 1522-CC00346 (City of St. Louis, Mo.)

Solomon v. General Motors LLC, No. 15A794-1 (Cobb County, Ga.)

Spencer v. General Motors LLC, et al., No. D-1-GN-14-001337 (Texas MDL)

Szatkowski, et al. v. General Motors LLC, et al., No. 2014-08274-0 (Luzerne County, Pa.)

Tyre v. General Motors LLC, et al., No. GD-14-010489 (Allegheny County, Pa.)

Wilson v. General Motors LLC, et al., No. 2014-29914 (Texas MDL)

**Post-Sale Economic Loss Complaints With Old GM Allegations/Claims To Be Stricken:**

Bledsoe, et al. v. General Motors LLC, MDL No. 1:14-cv-07631-JMF (S.D.N.Y.)

Elliott, et al. v. General Motors LLC, No. 1:14-cv-00691-KBJ (D.D.C.)
(MDL No. 1:14-cv-08382)

Sesay, et al. v. General Motors LLC, et al., MDL No.1:14-cv-06018-JMF (S.D.N.Y.)

In re General Motors LLC Ignition Switch Litigation, 14-MD-2543, *Consolidated Complaint Concerning All GM-Branded Vehicles That Were Acquired July 11, 2009 or Later*

## Exhibit "D": Non-Ignition Switch Complaints Subject to the Judgment

**Personal Injury/Wrongful Death Complaints:**

Abney, et al. v. General Motors LLC, MDL No. 1:14-cv-05810-JMF (S.D.N.Y.)[7]

Bachelder, et al. v. General Motors LLC, MDL No. 1:15-cv-00155-JMF (S.D.N.Y.)

Bacon v. General Motors LLC, MDL No. 1:15-cv-00918-JMF (S.D.N.Y.)

Edwards, et al. v. General Motors LLC, MDL No. 1:14-cv-06924-JMF (S.D.N.Y.)

Phillips-Powledge v. General Motors LLC, No. 3:14-cv-00192 (S.D. Tex.)
(MDL No. 1:14-cv-08540)

Pillars v. General Motors LLC, No. 1:15-cv-11360-TLL-PTM (E.D. Mich.)

Williams, et al. v. General Motors LLC, No. 5:15-cv-01070-EEF-MLH (W.D. La.)
(MDL No. 1:15-cv-03272)

**Economic Loss Complaints:**

Bledsoe, et al. v. General Motors LLC, MDL No. 1:14-cv-07631-JMF (S.D.N.Y.)

Elliott, et al. v. General Motors LLC, No. 1:14-cv-00691-KBJ (D.D.C.)
(MDL No. 1:14-cv-08382)

Sesay, et al. v. General Motors LLC, et al., MDL No.1:14-cv-06018-JMF (S.D.N.Y.)

Watson, et al. v. General Motors LLC, et al., No. 6:14-cv-02832 (W.D. La.)

---

[7]  The *Abney* complaint includes a non-Ignition Switch Pre-Closing Accident vehicle subject to the Judgment.

# Exhibit  G

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re                                          :          Chapter 11
                                               :
MOTORS LIQUIDATION COMPANY, *et al.*,          :          Case No.: 09-50026 (REG)
    f/k/a General Motors Corp., *et al.*        :
                                               :          (Jointly Administered)
          Debtors.               :

-------------------------------------------------------------x

## CASE MANAGEMENT ORDER RE NO-STRIKE, NO-STAY, OBJECTION, AND GUC TRUST ASSET PLEADINGS

     1.  The Court has received and reviewed New GM's letter (ECF #13381) and the
accompanying order of the district court denying withdrawal of the reference on issues
related to No-Strike, No-Stay, Objection, and GUC Trust Asset Pleadings.  To facilitate
consideration of the matters yet to be determined in this Court with respect to these and
related matters,[1] the parties are to advise this Court by letter (also docketed, of course, on
ECF), submitted no later than the close of business one week from today, of:

          (a) each of the individual complaints that are the subjects of No-
          Strike Pleadings, Objection Pleadings, or GUC Trust Asset Pleadings (or,
          to the extent applicable, No-Stay Pleadings and No Dismissal Pleadings),
          that need to be decided in this Court;

          (b) the extent to which briefs are expected to be filed that have not
          yet been filed with respect to the disputes listed in Paragraph 1(a)—broken
          down by dispute and complaint (including, without limitation, New GM's
          disputes with each of the Ignition Switch Economic Plaintiffs; the Non-
          Ignition Switch Economic Plaintiffs; the *Elliott*, *Sesay*, and *Bledsoe*

---

[1]     Thus this Order does not cover New GM's Pillars Rule 9023 motion.  It does, however, cover
anything that needs to be done with respect to the *Elliott*, *Sesay*, and *Bledsoe* actions.

Plaintiffs; and the states of California and Arizona, and the GUC Trust's disputes with plaintiffs on the GUC Trust Asset pleading), and any deadlines that have been agreed upon or otherwise set for their submission;

(c) how long it would take for New GM to submit to the Court marked pleadings, with respect to each complaint as to which it has concerns (*e.g.*, the Ignition Switch Plaintiffs' Second Amended Consolidated Complaint)—which marked pleadings would show the particular individual paragraphs (or parts of paragraphs) to which New GM objects, and shorthand descriptions of the grounds for objection;

(d) whether New GM, any plaintiff, or any other party in interest would wish to provide commentary with respect to any marked pleadings (either with the marked pleading's submission or thereafter) apart from any briefs otherwise submitted or to be submitted;

(e) any alternative suggestions (beyond or instead of the combination of briefs and marked pleadings that the Court currently envisions) as to the best means for this Court to provide the MDL Court and other courts with rulings of the level of specificity they might need vis-à-vis issues yet to be decided by this Court;

(f) the extent to which oral argument on any of the matters subject to Paragraph 1(a) is desired;

(g) any other matters that need to be addressed by this Court; and

09-50026-mg  Doc 13386  Filed 08/19/15  Entered 08/19/15 09:37:57  Main Document  Pg 379 of 481

(h) any upcoming dates as to which counsel, by reason of religious observance or other obligations, would be unavailable for oral argument at a hearing on the preceding matters.

2.  The Court is in particular need of information with respect to the Non-Ignition Switch Plaintiffs' claims (whether for injury or death or economic loss), and pending and future matters affecting them, but so long as such claims are satisfactorily covered in the letter(s) to come, they can be addressed in connection with other claims to the extent appropriate.

3.  Though the Court would prefer a joint submission, it will accept separate submissions if parties cannot timely agree.


SO ORDERED.


Dated: New York, New York          _*s/Robert E. Gerber*_____
            August **19,** 2015                   United States Bankruptcy Judge

# Exhibit  H

09-50026-reg   Doc 13390   Filed 08/26/15   Entered 08/26/15 16:32:23   Main Document
Pg 1 of 3

# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036-4003

Tel:  (212) 556-2100
Fax:  (212) 556-2222
www.kslaw.com

Arthur Steinberg
Direct Dial:  212-556-2158
asteinberg@kslaw.com

August 26, 2015

**VIA E-MAIL TRANSMISSION
AND ECF FILING**
The Honorable Robert E. Gerber
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
Alexander Hamilton Custom House
One Bowling Green
New York, New York  10004

> Re:  **In re Motors Liquidation Company,** *et al.*
> **Case No. 09-50026 (REG)**
>
> **Letter In Response to Case
> Management Order, dated August 19, 2015**

Dear Judge Gerber:

King & Spalding LLP is co-counsel with Kirkland & Ellis LLP for General Motors LLC ("**New GM**") in the above-referenced matter.  New GM has had two "meet and confers" with Designated Counsel and counsel for the GUC Trust/Unitholders (each of whom is copied on this correspondence) with respect to Your Honor's *Case Management Order Re No-Strike, No Stay, Objection, and GUC Trust Asset Pleadings*, entered by the Court on August 19, 2015 [ECF No. 13383].  While we were able to reach agreement on certain issues with Designated Counsel (subject to Your Honor's approval), we were not able to reach an agreement on all issues.  We were able to reach an agreement with the GUC Trust/Unit holders on their issues. This letter will set forth where there is consensus among the parties, and New GM's position on the disputed issues.

1.      The individual complaints that already are the subject of pleadings filed with the Court pursuant to the Judgment, dated June 1, 2015 [ECF No. 13177] ("**Judgment**"), are those filed in the following lawsuits:

Honorable Robert E. Gerber
August 26, 2015
Page 2

a.   The Second Amended Consolidated Complaint filed in *In re General Motors LLC Ignition Switch Litigation*; Case No. 14-MD-2543 (S.D.N.Y.) ("**No Strike SACC Pleading**");

b.   *People of California v. General Motors LLC*, *et al.*, No. 30-2014-00731038-CU-BT-CXC (Orange County, Cal.) ("**California No Strike Pleading**");

c.   *State of Arizona v. General Motors LLC*, No. CV2014-014090 (Maricopa County, Ariz.) ("**Arizona No Strike Pleading**," and with the California No Strike Pleading, the "**States No Strike Pleadings**"); and

d.   *Adams v. General Motors LLC*; Case No. 15-5528 (S.D.N.Y.).[1]

New GM notes that, while formal pleadings have not yet been filed with the Court, New GM has sent demand letters to plaintiffs involved in other lawsuits—including but not limited to six bellwether personal injury complaints filed in MDL 2543, the first of which is scheduled for trial in January 2016—pursuant to the procedures set forth in the Judgment. It is anticipated that pleadings may eventually be filed in response to some (or all) of these demand letters. Attached hereto as **Exhibit "A"** is a list of lawsuits where demand letters have been sent by New GM as of the date hereof, but the deadline to amend or dismiss a complaint, or file a pleading pursuant to the Judgment has not yet occurred.[2] Although there are a number of lawsuits listed on Exhibit "A," many of them can be grouped together, and raise the same common issue. New GM believes that the issues raised by these lawsuits can be resolved at one time in the context of the procedures described herein.[3] It should be noted that many of the demand letters were recently sent out by New GM so that affected parties would be bound by Your Honor's rulings on the issues to be determined as set forth in this letter. In other words, affected parties would be subject to principles of collateral estoppel for these issues and not simply *stare decisis*.

It is further noted that New GM did not send out new demand letters for lawsuits that are already listed on the Exhibits to the Judgment. Such plaintiffs already received notice of the Judgment from New GM pursuant to the procedures set forth in the Judgment. To the extent such plaintiffs  (a) did not amend their complaints to be fully compliant with the Judgment (in New

---

[1]   Mr. Peller believes that Your Honor did not address all of the issues raised in his No Stay/No Strike/No Dismissal Pleading in *Bledsoe*, but New GM believes the Court has done so.

[2]   Lawsuits against New GM based on Old GM vehicles continue to be filed against New GM. New GM believes that there may be other pending lawsuits against New GM, or future lawsuits filed against New GM, that may also warrant a demand letter. Accordingly, New GM reserves the right to send out demand letters on any lawsuit (currently pending against New GM or that will be filed in the future) if it believes such lawsuit violates the Judgment, April 15 Decision (as herein defined) or the Sale Order and Injunction. New GM will endeavor to do so before September 21, 2015 (the suggested time for it to submit the Marked Pleadings as defined herein)), and will timely supplement Exhibit "A" and file and serve the relevant Marked Pleadings as described in paragraph 4.

[3]   New GM believes that the procedures set forth herein should supplement the procedures set forth in the Judgment such that, for plaintiffs who receive a demand letter from New GM and the deadline to file a No Strike/No Dismissal Pleading has not yet expired, they should file a Supplemental Pleading in accordance with the deadlines set forth herein, in lieu of a No Strike/No Dismissal Pleading.

Honorable Robert E. Gerber
August 26, 2015
Page 3

GM's view), or (b) did not file No Strike/No Dismissal pleadings, the Judgment provides, among
other things, for New GM to file a pleading in this Court so that such disputed issues could be
determined. New GM believes that the procedures set forth in this Letter are intended to do just
that—present the issues disputed by the parties (in these and other lawsuits) relating to the
Judgment for this Court's determination.

2.      Subject to paragraph 3 below, additional pleadings with respect to the complaints
listed in paragraph 1(a) through (c) above are not expected, as all pleadings authorized by the
Judgment have been filed with the Court. With respect to the complaint referenced in paragraph
1(d) above, New GM's response to the Adams No Dismissal Pleading is due to be filed on or
before September 3, 2015. The Adams Omnibus Complaint concerns Pre-Sale Accident
Plaintiffs who seek damages against New GM for their failure to file a proof of claim by the Bar
Date.

3.      The accelerated briefing schedule for the Punitive Damages Issue (as herein
defined), as suggested by New GM in paragraph 5(a)(i) below, has not been agreed to by the
parties.

4.      New GM believes that, except for the Punitive Damages Issue, there is an
agreement with Designated Counsel regarding the timing of the following pleading submissions
(subject to Your Honor's approval). New GM will submit to the Court by September 21, 2015
marked pleadings ("**Marked Pleadings**") with respect to each complaint that is set forth in
paragraph 1 above and representative examples of the other complaints listed on Exhibit "A" (as
may be amended), that highlight the issues to be decided by the Court. In addition, the parties
believe that an appropriate briefing schedule for supplemental pleadings ("**Supplemental
Pleadings**") with respect to, among other things, (i) the issues identified in pleadings already
filed with the Court pursuant to the Judgment ("**Current Pleadings**," and with the Supplemental
Pleadings, the "**Pleadings**"), and (ii) the issues set forth in paragraph 5 below, is as follows:

a.      Simultaneously with filing the Marked Pleadings, New GM will file its
supplemental brief ("**New GM Supplemental Brief**") with the Court, which will
be 50 pages or less.

b.      With respect to Marked Pleadings, Designated Counsel, and any other plaintiff
counsel involved in a lawsuit affected by the Marked Pleadings submitted by New
GM, shall filed a response to the Marked Pleading on or before October 12, 2015.

c.      Designated Counsel and/or any other party that has filed a Current Pleading or is
subject to a demand letter sent by New GM, may file a response (collectively,
"**Responses**") to the New GM Supplemental Brief on or before October 19, 2015.
So as to avoid duplication and, as has been the past practice, and in an effort to
limit the number of Responses filed with the Court, to the extent reasonably
practicable, Designated Counsel will consult and coordinate with other counsel
who may wish to respond to the New GM Supplemental Brief. Assuming there
will be only one Response brief, it shall be 50 pages or less. If coordination

Honorable Robert E. Gerber
August 26, 2015
Page 4

   becomes difficult, Designated Counsel and/or other plaintiff's counsel should inform the Court who would then set a page limit for each of those parties wishing to file a Response pleading. It should be noted that Designated Counsel requested the extra week for responding to New GM's Supplemental Brief in order to coordinate their response with others to minimize the number of responding briefs to be filed with this Court.

d.  New GM shall file an omnibus reply ("**New GM Reply**") to all Responses on or before November 2, 2015, that will be 30 pages or less.

e.  The parties agree that no further submissions or oral argument is necessary with respect to the GUC Trust Asset Pleading, and that the GUC Trust Asset Pleading may be decided separately from the other issues referenced herein.

f.  The parties request that the Court schedule oral argument on all remaining issues raised in the Pleadings at its earliest convenience after the New GM Reply is filed.

5.  New GM believes that matters that the Court should address and which are the subject of Current Pleadings, or will be the subject of the Supplemental Pleadings, are the following:

a.  Whether the following claims, causes of action or requests for damages are barred by the Judgment, April 15 Decision, Sale Order and Injunction, and/or any other rulings by the Court:

i.  requests for punitive/special damages against New GM based in any way on Old GM conduct, including but not limited to post-363 Sale accidents of Old GM vehicles ("**Punitive Damages Issue**").

**Proposed Briefing Schedule for Punitive Damages Issue:** As the Punitive Damages Issue is raised in certain lawsuits that are coming up for trial in the very near term, New GM requests an expedited briefing schedule on this issue.  As the Court may recall, this issue was raised in the *Walton* No Strike Pleading (which was fully briefed), and New GM believed that *Walton* would have resolved the issue.  However, *Walton* agreed to voluntarily dismiss the punitive damages claim, thus leaving the issue still ripe for determination.  Because of its briefing in *Walton*, New GM can promptly file the opening brief on this issue.  New GM suggests the following briefing schedule be established: (A) New GM will file its opening brief on the Punitive Damages Issue (not to exceed 20 pages) on or before September 4, 2015; (B) Designated Counsel and other parties that are affected by the Punitive Damages Issue shall file any response (not to exceed 20 pages) by September 18, 2015; and (C) New GM shall file any reply (not to exceed 10 pages) by September 29, 2015.  The Court

    will schedule a hearing on the Punitive Damages Issue if it believes one is necessary.

ii.    economic loss causes of action arising in cases that concern post-363 Sale accidents/incidents of an Old GM vehicle. (These are in the Hybrid Lawsuits referred to in the Judgment.)

iii.    causes of action based on the timing of New GM recalling Old GM vehicles which allegedly prevented plaintiffs from timely filing proofs of claim in Old GM's bankruptcy case. (This issue is raised in Designated Counsel's No Strike SACC Pleading and in the Adams No Dismissal Pleading);

iv.    causes of action based on state law consumer protection statutes relating to Old GM vehicles/parts. (This issue is raised in the No Strike SACC Pleading, the States No Strike Pleadings, and in certain of the Hybrid Lawsuits);

v.    causes of action based on a failure to warn/duty to recall an Old GM vehicle (This issue is raised in the No Strike SACC Pleading, and in certain of the Hybrid Lawsuits); and

vi.    other causes of action that are based on Old GM conduct, where New GM did not assume such liabilities. (This issue is raised in, among other lawsuits, the No Strike SACC Pleading.)

b.    Whether there are proper causes of action against New GM relating to Old GM vehicles/parts that are based on the knowledge Old GM employees gained while working for Old GM? Assuming plaintiffs identify such proper causes of action, can that knowledge be imputed to New GM at the time such employees were hired by New GM? (This issue is generally raised in Designated Counsel's No Strike SACC Pleading and in the Adams No Dismissal Pleading).

c.    Whether plaintiffs are misusing the findings in the April 15 Decision regarding the purported knowledge of 24 Old GM employees, and Old GM's knowledge as of July 2009, in violation of the terms of the Judgment, which expressly provides that "the findings of fact in the Decision shall apply only for the purpose of this Court's resolution of the Four Threshold Issues, and shall have no force or applicability in any other legal proceeding or matter, including without limitation, MDL 2543" (Judgment, ¶ 15(d))? (This issue is raised in certain lawsuits recently filed.)

d.    Whether plaintiffs named in the Second Amended Consolidated Complaint filed in MDL 2543 who were named Plaintiffs in the Pre-Sale Consolidated Complaint (*i.e.*, those Plaintiffs that purchased Old GM vehicles either (i) new and prior to

09-50026-reg   Doc 13390-1   Filed 08/20/15   Entered 08/20/15 16:52:23   Main Document   Pg 336

Honorable Robert E. Gerber
August 26, 2015
Page 6

the closing of the 363 Sale, or (ii) used from a third party either prior to or after the closing of the 363 Sale), should be stricken and/or dismissed from the Second Amended Consolidated Complaint? (This issue is raised in the No Strike SACC Pleading.).

e.      Whether the plaintiffs in MDL 2543 can seek economic loss damages for all owners of all Old GM vehicles, including those Old GM vehicle owners that never had a vehicle recalled? (This issue is raised in the No Strike SACC Pleading.)

6.      With respect to Non-Ignition Switch Plaintiffs (*i.e.*, plaintiffs that are involved in both pre-363 Sale accident cases and economic loss cases), based on the April 15 Decision and the Judgment, such plaintiffs may not assert against New GM claims based on Old GM vehicles/ parts, including any claims that are allegedly based on New GM's independent conduct that would otherwise be barred by the Sale Order and Injunction, because Non-Ignition Switch Plaintiffs have not established a due process violation with respect to the 363 Sale.  New GM is not certain whether any such independent claims, otherwise barred by the Sale Order and Injunction, exist, and Non-Ignition Switch Plaintiffs have never identified this category of claims.  In MDL 2543, New GM already has produced over 1.7 million documents, totaling 12.5 million pages, and at least 219 depositions have been taken.  Non-Ignition Switch Plaintiffs (who are also represented by Lead counsel in MDL 2543) have had the benefit of such discovery. They should set forth in their Supplemental Pleading whether they have Independent Claims that would otherwise be barred by the Sale Order and Injunction, and, if so, what they are and how and when they intend to establish any due process violation arising from the 363 Sale.

Other issues with respect to the Non-Ignition Switch Plaintiffs are (a) whether the "no prejudice" finding relating to the Due Process Threshold Issue as to Ignition Switch Plaintiffs should also be binding on them, and (b) whether the ruling on equitable mootness for Ignition Switch Plaintiffs should be binding on them.  The Judgment required that the parties brief those issues, which has been done.  No oral argument is requested by New GM or the GUC Trust on the issues identified in this paragraph.[4]

*****

---

[4]   The Court has scheduled a hearing for September 22, 2015 on Designated Counsel's request to enjoin further distributions from the GUC Trust.

Honorable Robert E. Gerber
August 26, 2015
Page 7

       To facilitate the implementation of the foregoing procedures, the parties request that the Court schedule a status conference at its earliest convenience so that any remaining issues can be addressed and the necessary procedures finalized.

                                                     Respectfully submitted,

                                                    */s/ Arthur Steinberg*

                                                    Arthur Steinberg

cc:    Richard C. Godfrey, P.C.
        Andrew B. Bloomer, P.C.
        Edward S. Weisfelner
        Howard Steel
        Sander L. Esserman
        Jonathan L. Flaxer
        S. Preston Ricardo
        Matthew J. Williams
        Lisa H. Rubin
        Keith Martorana
        Daniel Golden
        Deborah J. Newman
        William P. Weintraub
        Eamonn O'Hagan
        Gregory W. Fox
        Steve W. Berman
        Elizabeth J. Cabraser
        Robert C. Hilliard

# Exhibit A

09-50026-reg   Doc 13390-1   Filed 08/26/15   Entered 08/26/15 16:51:13   Exhibits A
through N   Pg 389 of 481

# EXHIBIT A

## Category 1:  Lawsuits that Raise the Punitive Damages Issue Only

- Alexander v. General Motors LLC, et al.
  Case No.: 2013-29761 (Dist. Ct., Harris County, Texas)

- Ballard v. General Motors LLC
  Case No.: 14-CI-00162 (Barren Co. Cir. Ct, KY)

- Barbot v. General Motors LLC, et al.
  Case No.: 2015-07436 (Dist. Ct. Parish of Orleans, LA)

- C. Grant v. General Motors LLC
  Case No.: 6:14-cv-2132 (United States District Court, M.D. Fla.)

- Callahan v. General Motors LLC
  Case No.: 13-CI-00387 (Carter Circuit Court, KY)

- Collins et al. v. General Motors LLC, et al
  Case No.: 1322-CC09999 (Cir. Ct. St. Louis, Missouri)

- Curtis v. General Motors LLC, et al.
  Case No.: CV2014-053479 (Sup. Ct. Arizona)

- Fain v. General Motors LLC, et al.
  Case No.: 15BA-CV01733 (Cir. Ct. Boone Cty., MO)

- Flor Aguero-Fraire v. General Motors LLC, et al.
  Case No.: 2015DCV1065

- Flores v. General Motors LLC
  Case No.: BC545589 (Sup. Ct. of California)

- Howell v. General Motors LLC
  Case No.: 1:15-CV-0398 (N.D. Ga.)

- Kelley et al. v. General Motors LLC et al.
  Case No.:  CIV26294 (411th Dist. Ct., Polk Cty., TX

- Lai v. General Motors LLC
  Case No.: CJ-14-77 (Dist. Ct. Murray Cty., OK)

- Lebron v. General Motors LLC, et al.
  Case No.: 2015-25589 (Harris Cty. Dist. Ct., TX)

**Category 1:  Lawsuits that Raise the Punitive Damages Issue Only (Cont'd)**

- Little et al. v. General Motors LLC
  Case No.: 14-CI-00926 (Floyd Cty., KY)

- McGrath v. General Motors Company et al.
  Case No.: BC560375 (L.A. Sup. Ct., CA)

- McNeil v. General Motors LLC, et al.
  Case No.: 2014-CP-15-91 (Ct. of Common Pleas, S.C.)

- Meisel v. General Motors LLC, et al.
  Case No.: BC511453 (Superior Court, California)

- Meza et al. v. General Motors LLC, et al.
  Case No.: 30-2015-00786518-CU-PL-CXC (Orange Cty. Sup. Ct.)

- Michael Bavlsik and Kathleen Skelly v. General Motors LLC
  Case No. 4:13-cv-00509-DDN (USDC, E.D. of Missouri, Eastern Division)

- Miller v. General Motors LLC, et al.
  Case No.: 257,917-B (Dist. Ct. Bell Cty., TX)

- Minard v. General Motors LLC, et al.
  Case No.: 39-2013-00298477-CU-PL-STK (Sup. Ct of California)

- Morris v. General Motors LLC, et al.
  Case No.: 15-C-566 (Circuit Court for Davidson Cty, TN)

- Moss v. General Motors LLC
  Case No.: 3:15-cv-00200 (U.S. Dist. Ct., E.D. Ark.)

- Neal v. General Motors LLC
  Case No.: 2:14-CV-633 (U.S.D.C.  N. Div. M.D. AL)

- Nunez v. General Motors LLC et al.
  Case No.: 14SL-CC01787 (St. Louis Cty. MO)

- Perez v. General Motors LLC, et al.
  Case No.: 1:15-cv-240 (N.D.N.Y.)

- Peterson v. General Motors LLC, et al.
  Case No.: 2:15-cv-01108-SPL (D Az.)

- Phillips v. General Motors LLC, et al.
  Case No.: 2014CCV-61957-3 (County Court, Nueces County, Texas)

## Category 1:  Lawsuits that Raise the Punitive Damages Issue Only (Cont'd)

- Pitterman et al. v. General Motors LLC
  Case No.: 3:14-cv-00967 (JCH) (U.S.D.C. D. Conn.)

- Roberts v. General Motors LLC
  Case No.: 4:13-cv-00541-CAS (U.S.D.C. E.D. MO)

- Rone, et al. v. General Motors LLC, et al.
  Case No.: 14C1474-202 (Dist. Ct. Bowie County, Texas)

- Rooney v. General Motors LLC
  Case No.: 15-2247-NP (Circuit Court for Macomb County, MI)

- Schrader v. General Motors LLC, et al.
  Case No.: 15SL-CC01853 (St. Louis Cty. MO)

- Sevilla et al. v. General Motors LLC, et al.
  Case No.: 34-2015-00175939 (Super. Ct. Sacramento Cty., CA)

- Sixkiller v. General Motors LLC, et al.
  Case No.: CJ-15-105 (Dist Ct. Mayes County, Oklahoma)

- Smith, et al., v. General Motors LLC, et al.
  Case No.: CV2015-051753 (Super. Ct. Maricopa Cty., AZ)

- Stevens et al. v. General Motors LLC, et al.
  Case No.: 2015-04442 (Dist. Ct. of Harris County, Texas)

- Tafoya, et al. v. General Motors LLC, et al.
  Case No.: D-412-CV-2012-00055 (4th J.D., San Miguel Cty., NM)

- Tibbetts v. General Motors LLC, et al.
  Case No.: D-202-CV-2015-04918 (Dist. Ct., Bernalillo Cty., NM)

- Vaughan v. General Motors LLC, et al.
  Case No.: S-1500-cv-284626 (Sup. Ct. of California)

- Vieira v. General Motors LLC
  Case No.: C-14-00775 (Sup. Ct. of California)

- Wilson, et al. v. General Motors LLC, et al.
  Case No.: 2014CVC01003 (Court of Common Pleas, Clermont County, Ohio)

- Worthington v. General Motors LLC, et al.
  Case No.: 14-A-3063-3 (Cobb Cty. Super. Ct., GA)

**Category 2:  Lawsuits that Concern Post Sale Accidents and Allege Claims
That Should Be Barred and Seek Punitive Damages**

- Alden et al. v. General Motors LLC
  Case No.: 1522-CC09842 (Cir. Ct. of St. Louis, MO, Division I)

- Barragan, et al. v. General Motors LLC
  Case No.: P-14-CV-093

- Barthelemy v. General Motors LLC
  Case No.: 1:14-cv-05810 (S.D.N.Y.)

- Blood, at al. v. General Motors LLC[1]
  Case No.: 1:15-cv-06578 (S.D.N.Y.)

- Broderson v. General Motors LLC, et al.
  Case No.: 49Civ11-001627 (2nd J.C., Cir. Ct., Minnehaha Cty., S.D.)

- Carl Hand  v. General Motors LLC
  Case No.: 2014-308 (Smith County Circuit Court, MS)

- Cockram v. General Motors LLC
  Case No.: 1:14-cv-08176 (S.D.N.Y.)

- Cull, et al. v. General Motors LLC, et al.
  Case No.: 10C02-1404-CT060 (Circuit Court, Clark County, Indiana)

- De Los Santos v. General Motors LLC, et al.
  Case No.: 2014CCV-6078802 (County Court, Nueces County, Texas)

- Dean, et al. v. General Motors LLC, et al.
  Case No.: 14-C-1693 (Cir. Ct. Kanawha Cty., WV)

- Dewalt v. General Motors LLC
  Case No.: 5:15-cv-00708-EGS (E.D. Pa.)

- Dunleavy v. General Motors LLC, et al.
  Case No.: 13-011278 (C.P. Allegheny Cty., PA)

---

[1]    While the Blood Lawsuit was filed on behalf of numerous plaintiffs who were allegedly involved in accidents that occurred after the closing of the 363-Sale ("**Post-Sale Accident Plaintiffs**"), a few plaintiffs named in the Blood Lawsuit were involved in accidents that occurred prior to the closing of the 363 Sale ("**Pre-Sale Accident Plaintiffs**").  Accordingly, in addition to improperly alleging claims and seeking punitive damages on behalf of Post-Sale Accident Plaintiffs (which should be barred), the Blood Lawsuit also improperly asserts claims on behalf of Pre-Sale Accident Plaintiffs in violation of the Judgment, April 15 Decision and Sale Order and Injunction.

## <u>Category 2:  Lawsuits that Concern Post Sale Accidents and Allege Claims</u>
### <u>That Should Be Barred and Seek Punitive Damages (Cont'd)</u>

- Gilbert v. General Motors LLC
  Case No.: 00140 (Ct of Common Pleas, Philadelphia County)

- Green v. General Motors LLC, et al.
  Case No.: 2015-24496 (Dist. Ct. Harris County, Texas)

- Grey v. General Motors LLC
  Case No.: 5:15-cv-00227-KKC (E.D. KY)

- Grier v. General Motors LLC
  Case No.: CV-2014-385-1 (Cir. Ct. White Cty. AK)

- Grindle v. General Motors LLC, et al.
  Case No.: 15-C-83 (Circuit Court of Randolph County, WV)

- Hafen v. General Motors LLC, et al.
  Case No.: A-14-696746-C (Dept. No. XIX, Dist. Ct. Clark Cty., NV)

- Hague, et al. v. General Motors Company
  Case No.: CGC-11-514543 (Super. Ct., San Francisco Cty., CA)

- Jacobs v. General Motors LLC
  Case No.: 7:14-cv-00257 (E.D. N.C.)

- Jarvis, et al. v. General Motors LLC, et al.
  Case No.: [Pending] (Circuit Court for Macomb County, MI)

- Lowe v. General Motors LLC, et al.
  Case No.: 14-A-523395 (DeKalb Cty., GA)

- Melhorn v. General Motors LLC, et al.
  Case No.: GD-12-000362 (Allegheny County, PA)

- Minx v. GM Motors et al.
  Cause No.: 15-04-77819-C (Dist. Ct. Victoria Cty, TX)

- Nelson et al. v. General Motors LLC, et al.
  Case No.: 2-138-15 (Circuit Ct for Knox County, TN)

- Norville v. General Motors LLC
  Case No.: 1:14-cv-08176 (S.D.N.Y.)

- Pelletier v. General Motors Co., et al.
  Case No.: 2012-CP-10-7438 (Ct. of Common Pleas, Charleston Cty., SC)

## Category 2:  Lawsuits that Concern Post Sale Accidents and Allege Claims
## That Should Be Barred and Seek Punitive Damages (Cont'd)

- Reid v. General Motors LLC
  Case No.: 1:14-cv-05810 (S.D.N.Y.)

- Salazar vs. GM, LLC, et al
  Case No.: BC487984 (Superior Court, Los Angeles Cty., CA)

- Scheuer v. General Motors LLC
  Case No.: 1:14-cv-08176 (S.D.N.Y.)

- Solomon v. General Motors LLC, et al.
  Case No.: 14-C-1694 (Cir. Ct. Kanawha Cty., WV)

- Tarver v. G.M.C. Corp. et al.
  Cause No.: C-1430282 and 2014-65837 (TX MDL)

- Terrell v. General Motors LLC, et al.
  Case No.: 15-CV-877 (Ct. of Common Please, Mahoning Cty., OH)

- Vaughn v. General Motors LLC, et al.
  Case No.: S-1500-CV-284626 (Super. Ct. Kern Cty., CA)

- Williams v. General Motors LLC
  Case No.: 1:15cv249 HSO-JCG (U.S. Dist. Ct., S.D. Miss.)

- Wilson v. General Motors LLC, et al.
  Cause No.: 2014-51871 (Dist. Ct. Harris County, Texas)

- Yingling v. General Motors LLC
  Case No.: 1:14-cv-05336 (S.D.N.Y.)

## Category 3:  Lawsuits that Concern Post Sale Accidents and Allege Claims
## That Should Be Barred (But Do Not Seek Punitive Damages)

- Benbow v. General Motors LLC, et al.
  Case No.: 14-789 (Superior Court, Massachusetts)

- Gore v. General Motors LLC,  et al.
  Case No.: 623,410 (19th J.D.C., Parsh of Baton Rouge, LA)

- J.Williams v. General Motors LLC, et al.
  Case No.: 14-CI-027 (Magoffin Circuit Court, KY)

- Lowe, et al. v. General Motors LLC, et al.
  Case No.: 3:15-cv-00532 (M.D. LA)

- Ratcliff v. General Motors LLC
  Case No.: 21-C-13-047954 (Circuit Court for Washington Cty, MD)

- Rickard v. General Motors LLC et al.
  Case No.: GD-14-020549 (Ct. of Common Pleas, Allegheny Cty., PA)

- Thacker v. General Motors LLC
  Case No.: 7:15-cv-00015-ART-EBA (E.D. KY)

- Varney et al. v. General Motors LLC
  Case No.: 3:15-cv-10129-MGM

### Category 4: Lawsuits that Concern Economic Loss Claims That Should Be Barred

- Christenberry v. General Motors LLC
  Case No.: 2014-016 (Blount County Chancery Ct., TN)

- Duba v. General Motors LLC, et al.
  Case No.: 13-C-235 (Logan County Circuit Ct., WV)

- Figley, et al., v. General Motors LLC et al.
  Case No.: 2015-32887 (190th Judicial Dist. Ct. of Harris County, TX)

- Medlin v. General Motors LLC
  Case No.: 15SL-AC20440 (Circuit Ct. of St. Louis Co., MO)

- Roussel v. General Motors LLC, et al.
  Case No.: 2008-16334-E (22nd Jud. Dist. Ct. St. Tammany Parrish, LA)

- Wright v. General Motors LLC, et al.
  Case No.: SU-14-CV-627-68 (Super. Ct. Muscogee Cty., GA)

- Russell v. General Motors LLC
  Case No.: 13-C-62 (Wyoming County Circuit Ct., WV)

# Exhibit  I

# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036-4003

Tel:  (212) 556-2100
Fax:  (212) 556-2222
www.kslaw.com

Scott Davidson
Direct Dial:  212-556-2164
sdavidson@kslaw.com

August 26, 2015

**Via E-Mail And Overnight Delivery**
Joshua P. Davis, Esq.
Josh Davis Law Firm
1010 Lamar, Suite 200
Houston, Texas 77002

      **Re:**   *Stevens et al. v. General Motors LLC, et al.*
           **Case No.: 2015-04442 (Dist. Ct. of Harris County, Texas)**

Dear Counsel:

     Reference is made to the *Plaintiffs' Original Petition* ("**Pleading**"), filed in the above-referenced lawsuit ("**Lawsuit**"), which seeks to hold General Motors LLC ("**New GM**") liable for various claims, as well as seeks punitive damages relating to vehicles/parts manufactured and sold by Motors Liquidation Company (f/k/a General Motors Corporation) ("**Old GM**").  From a review of the Pleading, it appears that Plaintiff is making allegations and seeking punitive and other damages from New GM that arise from the conduct of Old GM (and not New GM).    The attempt to seek such punitive and other damages from New GM is a violation of the Sale Order and Injunction (as herein defined) entered by the Bankruptcy Court (as herein defined).  *See Decision on Motion to Enforce Sale Order, In re Motors Liquidation Company*, 529 B.R. 510 (Bankr. S.D.N.Y 2015) ("**Decision**"), as well as the Judgment entered by the Bankruptcy Court on June 1, 2015 ("**Judgment**").[1]  As such, the request for punitive and certain other damages cannot be maintained against New GM.

     The Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (as amended) ("**Sale Agreement**"), which was approved by an Order, dated July 5, 2009 ("**Sale Order and Injunction**"), of the United States Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**"), is clear in this regard.  Specifically, under the Sale Agreement, New GM assumed only three categories of liabilities for vehicles and parts sold by Old GM: (a) post-sale accidents or incidents[2] involving Old GM vehicles causing personal injury, loss of life or property

---

[1]    A copy of the Judgment is annexed hereto as **Exhibit "A."**   The Judgment memorializes the rulings in the Decision, a copy of which is annexed hereto as **Exhibit "B."**

[2]    According to the Pleading, Plaintiff is asserting, among others, product liability claims resulting from an accident that took place after the closing of the sale from Old GM to New GM.  New GM assumed "Product Liabilities" (as defined in the Sale Agreement, as amended) for post-363 Sale accidents.  As such, to the extent the Pleading asserts

Joshua P. Davis, Esq.
August 26, 2015
Page 2

damage; (b) repairs provided for under the "Glove Box Warranty"—a specific written warranty, of limited duration, that only covers repairs and replacement of parts and not monetary damages; and (c) Lemon Law claims (as defined in the Sale Agreement) essentially tied to the failure to honor the Glove Box Warranty. All other liabilities relating to vehicles and parts sold by Old GM were "Retained Liabilities" of Old GM. *See* Sale Agreement § 2.3(b). To the extent the request for punitive damages contained in the Pleading is based on a successor liability theory, such liabilities were not assumed by New GM and, accordingly, New GM cannot be liable to the Plaintiff under that theory of recovery.

In addition, the Sale Agreement made clear that while New GM assumed liabilities for post-sale accidents involving Old GM vehicles directly causing personal injury, loss of life, or property damage, that obligation was for the assumption of compensatory damages only – not punitive damages. The Sale Agreement defines "damages" as all Losses other than punitive damages. Moreover, the word "directly" in the definition of Product Liabilities was specifically used to make clear that the only liabilities assumed by New GM for post-sale accidents are those damages directly related to the accident. Punitive damages which are assessed to deter future wrongful conduct of Old GM, unrelated to the specific accident, was never something that New GM assumed. The Bankruptcy Court has previously found that New GM only assumed the liabilities that were commercially necessary for its post-sale business activities. Punitive damages assessed to punish alleged pre-sale wrongful conduct of Old GM would never be something considered "commercially necessary." In fact, based on the subordinated priority of punitive damage claims in bankruptcy, even Old GM would not have been required to pay such damages. And, clearly, New GM did not assume an obligation that Old GM would never have been required to pay.

Various provisions of the Sale Agreement and the Sale Order and Injunction provide that New GM would have no responsibility for any liabilities (except for Assumed Liabilities, as defined in the Sale Agreement) predicated on Old GM conduct, relating to the operation of Old GM's business, or the production of vehicles and parts before July 10, 2009. *See, e.g.*, Sale Order and Injunction ¶¶ AA, 8, 46. The Sale Order and Injunction enjoins parties from bringing actions against New GM for unassumed Old GM liabilities. *Id.*, ¶ 8. It also provides that the Bankruptcy Court retains "exclusive jurisdiction to enforce and implement the terms and provision of [the] Order" including to "protect [New GM] against any of the [liabilities that it did not expressly assume under the Sale Agreement]." *Id.*, ¶ 71. If there is any ambiguity with respect to any of the foregoing -- which there should not be -- the exclusive forum to clarify that ambiguity is the Bankruptcy Court. The Bankruptcy Court has consistently exercised jurisdiction over issues such as those raised in the Lawsuit.[3]

The Bankruptcy Court recently issued the Judgment, which reiterated that "[e]xcept for Independent Claims and Assumed Liabilities (if any), all claims and/or causes of action that the Ignition Switch Plaintiffs may have against New GM concerning an Old GM vehicle or part seeking to impose liability or damages based in whole or in part on Old GM conduct (including, without

---

assumed Product Liabilities, those aspects of the Pleading would not be barred by the Sale Order and Injunction, the Sale Agreement or the Judgment. Note, however, that New GM disputes any and all liability for such claims.

[3]   *See, e.g., Trusky v. Gen. Motors LLC (In re Motors Liquidation Co.)*, Adv. Proc. No. 09-09803, 2013 WL 620281 (Bankr. S.D.N.Y. Feb. 19, 2013); *Castillo v. Gen. Motors LLC (In re Motors Liquidation Co.)*, Adv. Proc. No. 09–00509, 2012 WL 1339496 (Bankr. S.D.N.Y. Apr. 17, 2012), *aff'd*, 500 B.R. 333 (S.D.N.Y. 2013), *aff'd*, No. 13-4223-BK, 2014 WL 4653066 (2d Cir. Sept. 19, 2014). *See also Celotex Corp. v. Edward*, 514 U.S. 300 (1995).

Joshua P. Davis, Esq.
August 26, 2015
Page 3

limitation, on any successor liability theory of recovery) are barred and enjoined pursuant to the Sale Order . . . ." Judgment ¶ 9; *see also* Decision, 529 B.R. at 528 ("Claims premised in any way on Old GM conduct are properly proscribed under the Sale Agreement and the Sale Order, and by reason of the Court's other rulings, the prohibitions against the assertion of such claims stand."). The reasoning and rulings set forth in the Judgment and Decision are equally applicable to the Lawsuit. To the extent that the Pleading requests punitive damages based on Old GM conduct, such a request is proscribed. Accordingly, the Pleading should be amended so that it is consistent with the rulings in the Judgment, Decision and Sale Order and Injunction.

The Judgment provides procedures for amending pleadings that violate the Judgment, Decision and Sale Order and Injunction. Specifically, it provides as follows:

> New GM is hereby authorized to serve this Judgment and the Decision upon any additional party (or his or her attorney) (each, an "**Additional Party**") that commences a lawsuit and/or is not otherwise on Exhibits "A" through "D" hereto (each, an "**Additional Lawsuit**") against New GM that would be proscribed by the Sale Order (as modified by the Decision and this Judgment). Any Additional Party shall have 17 business days upon receipt of service by New GM of the Decision and Judgment to dismiss, without prejudice, such Additional Lawsuit or the allegations, claims or causes of action contained in such Additional Lawsuit that would violate the Decision, this Judgment, or the Sale Order (as modified by the Decision and this Judgment).

Judgment ¶ 18(a). Accordingly, pursuant to the terms of the Judgment, you have 17 business days from receipt of the Decision and Judgment to amend the Pleading by striking the provisions that do not comply with the Judgment, Decision and Sale Order and Injunction.

> To the extent you have a

> good faith basis to maintain that the Additional Lawsuit or certain allegations, claims or causes of action contained in such Additional Lawsuit should not be dismissed without prejudice, [you] shall, within 17 business days upon receipt of the Decision and Judgment, file with [the Bankruptcy Court] a No Dismissal Pleading explaining why such Additional Lawsuit or certain claims or causes of action contained therein should not be dismissed without prejudice. ***The No Dismissal Pleading shall not reargue issues that were already decided by the Decision and Judgment***. New GM shall file a response to the No Dismissal Pleading within 17 business days of service of the No Dismissal Pleading. The [Bankruptcy] Court will schedule a hearing thereon if it believes one is necessary.

*Id.* ¶ 18(b) (emphasis added).

If you fail to either timely strike the offending provisions in the Pleading or timely file a No Dismissal Pleading, New GM is permitted to file with the Bankruptcy Court a "notice of presentment on five (5) business days' notice, with an attached Dismissal Order that directs [you] to dismiss without prejudice the [offending provisions in the Pleading] . . ., within 17 business days of receipt of the Dismissal Order." *Id.* ¶ 18(c).

Joshua P. Davis, Esq.
August 26, 2015
Page 4

This letter and its attachments constitute service on you of the Judgment and Decision, which triggers the provisions in paragraph 18 of the Judgment with respect to the Lawsuit.

New GM reserves all of its rights regarding any continuing violations of the Bankruptcy Court's rulings.

If you have any questions, please call me.

Very truly yours,

*/s/ Scott I. Davidson*

Scott I. Davidson

SD/hs
Encl.

cc:    Kyle H. Dreyer
       Giovanna T. Bingham
       Darrell L. Barger

# Exhibit  J

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In re                                              :        Chapter 11
                                                   :
MOTORS LIQUIDATION COMPANY, *et al.*,              :        Case No.: 09-50026 (REG)
    f/k/a General Motors Corp., *et al.*              :
                                                   :
                  Debtors.              :        (Jointly Administered)
------------------------------------------------------------------x

## SCHEDULING ORDER REGARDING CASE MANAGEMENT ORDER
## RE: NO-STRIKE, NO STAY, OBJECTION, AND GUC TRUST ASSET PLEADING

        Upon the Court's Case Management Order, dated August 19, 2015 ("**August 19
Order**"), regarding issues related to No-Strike, No Stay, Objection and GUC Trust Asset
Pleadings (each as defined in the Court's Judgment, dated June 1, 2015 ("**Judgment**")); and
upon responses thereto being filed on August 26, 2015 by certain parties in connection with  the
issues raised in the August 19 Order; and upon the record of the Case Management Conference
held before the Court on August 31, 2015 ("**August 31 Conference**"); and due and proper notice
of the August 31 Conference having been provided; and the Court having issued directives from
the bench at the August 31 Conference in connection with the issues raised thereat which are
memorialized in this Order.  Accordingly, it is hereby

        ORDERED that the following procedures shall apply:

1.      The briefing schedule with respect to the issue ("**Punitive Damages Issue**") in
complaints filed against General Motors LLC ("**New GM**") that request
punitive/special/exemplary damages against New GM based in any way on the
conduct of Motors Liquidation Co. (f/k/a General Motors Corporation) ("**Old
GM**"), shall be as follows: (i) simultaneous opening briefs shall be filed by
Sunday, September 13, 2015 at 12:00 noon (Eastern Time), and shall be no longer
than 25 pages; and (ii) simultaneous reply briefs shall be filed by no later than
Tuesday, September 22, 2015 at 12:00 noon (Eastern Time), and shall be no
longer than 10 pages.[1]  Designated Counsel for the Bellwether Cases (as herein

---

[1]    Hard copies of the briefs referred to in this paragraph may be delivered to Chambers the next business day.

defined) and Designated Counsel for the Economic Loss Claims asserted in MDL 2543 shall try to coordinate the responses from various plaintiffs in order to minimize the number of briefs filed on this issue.

2.   The briefing schedule with respect to whether causes of action in complaints filed against New GM relating to Old GM vehicles/parts based on the knowledge Old GM employees gained while working for Old GM and/or as reflected in Old GM's books and records transferred to New GM can be imputed to New GM ("**Imputation Issue**"), shall be as follows: (i) simultaneous opening briefs shall be filed by Friday, September 18 2015, and shall be no longer than 20 pages; and (ii) simultaneous reply briefs shall be filed by no later than Wednesday September 30, 2015, and shall be no longer than 10 pages.

3.   With respect to the complaints in the six bellwether cases (collectively, the "**Bellwether Cases**") identified in MDL 2543 pending in the United States District Court for the Southern District Of New York:[2]

a.   On or before September 21, 2015, New GM shall file with the Court and serve on counsel of record in such cases  (i) marked complaints ("**Bellwether Marked Complaints**") with respect to the Bellwether Cases, showing which portions thereof New GM contends violate the Judgment, this Court's *Decision on Motion to Enforce Sale Order*, dated April 15, 2015 ("**Decision**"),[3] and/or the Order of this Court dated July 5, 2009 ("**Sale Order and Injunction**")  and (ii) a letter, not to exceed three (3) single-spaced pages for all the Bellwether Cases, setting forth New GM's position with respect to the Bellwether Marked Complaints ("**New GM Bellwether Letter**"); and

b.   On or before September 28, 2015, the plaintiffs in the Bellwether Cases shall file with the Court and serve on counsel of record in such cases their commentary next to the comments made by New GM with regard to the Bellwether Marked Complaints, together with a letter, not to exceed three (3) single-spaced pages for all the Bellwether Cases, responding to the Bellwether Marked Complaints and the New GM Bellwether Letter.

---

[2]   The plaintiffs in the Bellwether Cases are (i) Scheuer, (ii) Barthelemy and Spain, (iii) Reid, (iv) Cockram, (v) Norville, and (vi) Yingling.  Each of the plaintiffs in the Bellwether Cases are seeking, among other damages, compensation for property damage to their respective vehicles that occurred or was sustained in the applicable incident ("**Property Damage**").  The plaintiffs acknowledge that they are not seeking to recover damages for devaluation of their respective vehicles that is independent of Property Damage ("**Vehicle Devaluation Damages**").  To the extent that any of the requests for damages in the complaints in the Bellwether Cases can be construed to include Vehicle Devaluation Damages, the complaints are deemed to be amended to exclude Vehicle Devaluation Damages.  In particular (i) paragraphs 367-369 of the complaint in *Norville v. General Motors, LLC* (Case No. 14-cv-08176) (S.D.N.Y.) and (ii) paragraphs 415-417 of the complaint in *Cockram v. General Motors, LLC* (Case No. 14-cv-08176) (S.D.N.Y.), shall be deemed amended to exclude any request for Vehicle Devaluation Damages.  New GM will submit the Bellwether Marked Complaints with the assumption that such amendments were made.

[3]   *In re Motors Liquidation Co.*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015).

4.      With respect to the Second Amended Consolidated Complaint filed in MDL 2543 ("SACC"):

    a.      On or before September 23, 2015, New GM shall file with the Court and serve as appropriate (i) a marked-up version of the Second Amended Consolidated Complaint ("**Marked SACC**"), showing which portions thereof New GM contends violate the Judgment, the Decision and/or the Sale Order and Injunction, and (ii) a letter, not to exceed five (5) single-spaced pages, setting forth New GM's position with respect to the Marked SACC ("**New GM Marked SACC Letter**"); and

    b.      On or before September 30, 2015, the Designated Counsel for the plaintiffs named in the Second Amended Consolidated Complaint shall file with the Court and serve on counsel of record in such cases their commentary next to the comments made by New GM with regard to the Marked SACC, together with a letter, not to exceed five (5) single-spaced pages, responding to the Marked SACC and New GM Marked SACC Letter.

    c.      Due to the length of the SACC, New GM and Designated Counsel are directed to consult with each other to see if there is an agreed-upon procedure such that the Marked SACC, and the response thereto, can be stream-lined, so that the relevant, representative issues are efficiently presented to this Court for resolution.

5.      With respect to the complaints filed in *People of California v. General Motors LLC, et al.*, No. 30-2014-00731038-CUBT-CXC (Orange County, Cal.) and *State of Arizona v. General Motors LLC*, No. CV2014-014090 (Maricopa County, Ariz.) (collectively, the "**State Complaints**"):

    a.      On or before September 23, 2015, New GM shall file with the Court and serve on counsel of record in such cases (i) a marked-up version of the State Complaints ("**Marked State Complaints**"), marked to show which portions thereof New GM contends violate the Judgment, the Decision and/or the Sale Order and Injunction, and (ii) a letter, not to exceed five (5) single-spaced pages for the States' Complaints, setting forth New GM's position with respect to the Marked State Complaints ("**New GM Marked State Complaint Letter**"); and

    b.      On or before September 30, 2015, the plaintiffs named in the State Complaints shall file with the Court and serve on counsel of record in such cases their commentary next to the comments made by New GM with regard to the Marked State Complaints, together with a letter, not to exceed five (5) single-spaced pages for the States' Complaints, responding

to the Marked State Complaints and New GM Marked State Complaints Letter.

6.     The Court has scheduled oral argument for the matters covered by paragraphs 1-5 for October 14, 2015 at 9:45 a.m.

7.     The parties agree that no further pleadings relating to the GUC Trust Asset Pleading need be submitted and no side has requested oral argument with respect to such Pleading.

8.     Counsel for the plaintiffs in *Bavlsik v. General Motors LLC* ("***Bavlsik* Lawsuit**") pending in the United States District Court for the Eastern District of Missouri has notified New GM that they will withdraw their claim for punitive damages in order to promptly proceed to trial in the *Bavlsik* Lawsuit.  Accordingly, there is no need for this Court to deal with the *Bavlsik* Lawsuit at this time.

ORDERED that within two (2) business days of the entry of this Scheduling Order, New GM shall serve, by either e-mail, facsimile, overnight mail or, if none of the foregoing are available, regular mail, a copy of this Scheduling Order on plaintiffs in any lawsuit where New GM has previously sent a demand letter as authorized by the Judgment, with a cover note that states as follows:

General Motors LLC ("**New GM**") previously served on you a demand letter ("**Demand Letter**") in connection with a lawsuit commenced by you against New GM which set forth certain deadlines for filings pleadings with the Bankruptcy Court (as defined in the Demand Letter).  The attachment is a Scheduling Order entered by the Bankruptcy Court on September 3, 2015 ("**Scheduling Order**").  Please review the Scheduling Order as it modifies the time periods set forth in the Demand Letter for filing certain pleadings with the Bankruptcy Court, including without limitation, the 17 business days to respond to the Demand Letter.

If you have any objection to the procedures set forth in the Scheduling Order, you must file such objection in writing with the Bankruptcy Court within three (3) business days of receipt of this notice ("**Objection**").  Otherwise, you will be bound by the terms of the Scheduling Order and the determinations made pursuant thereto.  If you believe there are issues that should be presented to the Court relating to your lawsuit that will not otherwise be briefed and argued in accordance with the Scheduling Order, you must set forth that position, with specificity in your Objection.  The Court will decide whether a hearing is required with respect to any Objection timely filed and, if so, will, promptly notify the parties involved.

and it is further

ORDERED that in the event New GM believe there are issues to be decided by the Court in actions that received a demand letter that are not covered in paragraphs 1-5 above, New GM shall file with the Court and serve on counsel of record in such representative case(s) on or before September 23, 2015 (i) a marked-up version of their complaints ("**Other Plaintiffs' Complaints**"), showing which portions thereof New GM contends violate the Judgment, the Decision and/or the Sale Order and Injunction, and (ii) a letter, not to exceed three (3) single-spaced pages for the Other Plaintiffs' Complaints, setting forth New GM's position with respect to the Marked Other Plaintiffs' Complaints ("**New GM Marked Other Plaintiffs' Complaints Letter**"); and it is further

ORDERED that on or before September 30, 2015, the plaintiffs named in the Other Plaintiffs' Complaints shall file with the Court and serve on counsel of record in such cases their commentary next to the comments made by New GM with regard to the Other Plaintiffs' Complaints, together with a letter, not to exceed three (3) single-spaced pages for the Other Plaintiffs' Complaints, responding to the Marked Other Plaintiffs' Complaints and the New GM Marked Other Plaintiffs' Complaints Letter; and it is further

ORDERED that nothing in this Order is intended to nor shall preclude any other plaintiff's counsel (or *pro se* plaintiff), affected by the issues being resolved by this Court, from taking a position in connection with any such matters; *provided, however*, that such affected other plaintiffs' counsel who wishes to file a separate pleading with respect such matter(s) shall timely file a letter with the Court seeking permission to do so.  Such letter shall specify (a) which issue is to be covered, (b) the length of the pleading sought to be filed, and (c) why such issue is not otherwise covered by the pleading to be filed by Designated Counsel.  Prior to such time, such counsel shall consult with the Designated Counsel for the Bellwether Cases and Designated

Counsel for the Plaintiffs in MDL 2543 so as to avoid duplicative arguments and in an effort to limit the number of responsive briefs on the same issue(s); and it is further

ORDERED that, as stated on the record of the August 31 Conference, for all plaintiffs that have received a demand letter from New GM where the time period to file a No Strike, No Stay, and No Dismissal Pleading as set forth in the Judgment ("**Judgment Pleading**") had not expired as of the August 31 Conference, the briefing schedule set forth herein shall supersede the requirement to file such Judgment Pleadings; and it is further

ORDERED that this Court shall retain exclusive jurisdiction to interpret and enforce this Order.

Dated: September 3, 2015
New York, New York

_____*s/ Robert E. Gerber*_____
UNITED STATES BANKRUPTCY JUDGE

# Exhibit  K

09-50026-reg   Doc 13440-1   Filed 09/16/15   Entered 09/16/15 12:01:32   Main Document   Pg 410 of 410

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
Arthur Steinberg
Scott Davidson

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Richard C. Godfrey, P.C. (admitted *pro hac vice*)
Andrew B. Bloomer, P.C. (admitted *pro hac vice*)

*Attorneys for General Motors LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re                                                      :      Chapter 11
                                                           :
MOTORS LIQUIDATION COMPANY, *et al.*,                      :      Case No.: 09-50026 (REG)
    f/k/a General Motors Corp., *et al.*                :
                                                           :
                     Debtors.                :      (Jointly Administered)
------------------------------------------------------------x

## CERTIFICATE OF SERVICE

      This is to certify that on *September 13-15, 2015*, pursuant to the *Scheduling Order Regarding Case Management Order Re: No-Strike, No Stay, Objection, and GUC Trust Asset Pleading*, entered on September 3, 2015 [Dkt. No 13416] ("**Scheduling Order**"), I caused to be served a true and correct copy of the *Opening Brief by General Motors LLC with Respect to Whether Plaintiffs May Seek Punitive  Damages from General Motors LLC Based on the Conduct of General Motors Corporation* (with Exhibit) [Dkt. No 13437]. Copies of the document listed in the annexed service lists was served upon each of the persons and entities

listed therein on *September 13-15, 2015*, by causing copies of same to be delivered *via* email and/or *via* overnight mail.

Dated:  September 16, 2015
        New York, New York

                                    KING & SPALDING LLP

                                  By:   /s/  Scott I. Davidson
                                        Arthur J. Steinberg
                                        Scott Davidson
                                        King & Spalding LLP
                                        1185 Avenue of the Americas
                                        New York, NY 10036
                                        Telephone: (212) 556-2100
                                        Facsimile: (212) 556-2222

                                        *Attorneys for General Motors LLC*

09-50026-mg   Doc 13564-3   Filed 07/01/16   Entered 07/01/16 12:28:11   Exhibits A
Pg 412 of 481

**Service List For September 13, 2015:**

**Documents Served *via* Email:**

1 - *Opening Brief by General Motors LLC with Respect to Whether Plaintiffs May Seek Punitive Damages from General Motors LLC Based on the Conduct of General Motors Corporation* (with Exhibit) [Dkt. No 13437]

| Service Addresses | Service Addresses |
|---|---|
| acarter@sgpblaw.com | brianc@wrighttroy.com |
| acutruzzula@cnlawfirm.net | brown@whafh.com |
| adam@lelaw.com | bsk@kbklawyers.com |
| adogali@dogalilaw.com | cale@conleygriggs.com |
| agoneiljr@nco-law.com | cbailey@bpblaw.com |
| ajanutolo@goodinabernathy.com | cdalbey@weitzlux.com |
| akaram@karamlawfirm.com | cellison@eaalawfirm.com |
| akearse@motleyrice.com | chad@kuhlmanlucas.com |
| akmartin@lchb.com | chaffin@chaffinluhana.com |
| alans@ksbrlaw.com | chris@nidellaw.com |
| anne@hilliardshadowenlaw.com | cjuhas@wernlawyers.com |
| aoffenhartz@gibsondunn.com | ckitner@chaikenlaw.com |
| aribeiro@vrslaw.com | ckutteh@popemcmillan.com |
| attorneyhagmaier@gmail.com | cole.portis@beasleyallen.com |
| attys@foothills.net | conrad_r_blease@yahoo.com |
| attysatlaw@aol.com | contact@sangisettylaw.com |
| awu@gibsondunn.com | corrigan@onderlaw.com |
| bagosto@abrahamwatkins.com | cpeifer@peiferlaw.com |
| bchase@bisnarchase.com | dave@getstewart.com |
| bcorl@potts-law.com | david@davidbryantlaw.com |
| bcorson@sloanewalsh.com | dcarasso@bisnarchase.com |
| beachlawyer51@hotmail.com | ddefeo@defeokolker.com |
| ben.baker@beasleyallen.com | demingmd@deminglaw.com |
| ben@hoganlawoffice.com | dfranco@dugan-lawfirm.com |
| bentonmusslewhite@gmail.com | dgolden@akingump.com |
| bfinley@thefinleyfirm.com | dharris@swhhb.com |
| bgideon@bermansimmons.com* | dhm@morrisplayer.com |
| blair@durhamanddread.com | dixonlaw101@yahoo.com |
| bleger@lkclawfirm.com | djnewman@akingump.com |
| bleydon@toolerwocl.com | dmatthews@thematthewslawfirm.com |
| bob@butlerwooten.com | dmolton@brownrudnick.com |
| bob@gtinjurylaw.com | doreen@thecooperfirm.com |
| bob@lelaw.com | dpotts@potts-law.com |
| bobh@hmglawfirm.com | drl@spanglaw.com |
| brad@kuhlmanlucas.com | ecabraser@lchb.com |

| Service Addresses | Service Addresses |
|---|---|
| edk@stlouisattorney.com | josephhoats@hotmail.com |
| eforaker@stipelaw.com | josh@thejdfirm.com |
| egoldis@feldmanshepherd.com | jpb@barrettlawms.com |
| eohagan@goodwinprocter.com | jprather@garmerprather.com |
| ericchandlerlaw@gmail.com | jritch@elliottritch.com |
| eservice@egletwall.com | jsimon@simonlawpc.com |
| esserman@sbep-law.com | jsm@rhinelawfirm.com |
| eweisfelner@brownrudnick.com | jttenge@tengelaw.com |
| fcwilkerson@aol.com | justin@stephenskellylaw.com |
| fherrera@herreralaw.com | jwharris1@prodigy.net |
| frank@tomenylawfirm.com | jwigington@wigrum.com |
| gcantu@norriscantulaw.com | kanthony@anthonylaw.com |
| genetullos@tullosandtullos.com | kcarnie@simonlawpc.com |
| gerdes@nocoxmail.com | kdean@motleyrice.com |
| gfox@goodwinprocter.com | ken@ulawok.com |
| ghlf@scrtc.com | kent@lelaw.com |
| ghoward@doatty.com* | kharvey@mlgautomotivelaw.com |
| gmarcos@marcoslawfirm.com | kmarks@lkclawfirm.com |
| graham.esdale@beasleyallen.com | kmartorana@gibsondunn.com |
| gscott@lewlaw.com | kris@ledford-lawfirm.com |
| gwhealyiv@aol.com | kworks@christiansenlaw.com |
| hsteel@brownrudnick.com | lance@thecooperfirm.com |
| hwhite@wcwattorneys.com | lauren@hmglawfirm.com |
| janthony@anthonylaw.com | lawwb@sbcglobal.net* |
| jasonharr@harrlawfirm.com | lbrad@kuhlmanlucas.com |
| jasonz@hbsslaw.com | lbrown@leebrownlaw.com |
| jbilsborrow@weitzlux.com | lcoben@anapolschwartz.com |
| jdiehl@akingump.com | lkrzesienski@flemingattorneys.com |
| jdugan@dugan-lawfirm.com | lrayon@reganlaw.net* |
| jdunahoe@heardrobins.com | lrubin@gibsondunn.com |
| jdunn@wigrum.com | lspringberg@thomasandspringberg.com |
| jeff@lbjmlaw.com | ltien@bpblaw.com |
| jelliott@richardsonplowden.com | lwalsh@vrslaw.com |
| jere.beasley@beasleyallen.com | mac@mccoollawms.com |
| jflaxer@golenbock.com | mail@doatty.com* |
| jgilbert@thegilbertlawgroup.com | marion@hmglawfirm.com |
| jguest@jguestlaw.com | marksossi@hotmail.com |
| jim@butlerwooten.com | marshall@poncelaw.com |
| jimragan13@gmail.com | matoups@wgttlaw.com |
| jlowe@lewlaw.com | mbs@clalaw.com |
| jniemi@anapolschwartz.com | mdoebler@pribanic.com |
| jonbailey@thebaileyfirm.com | mgaertner@holloranlaw.com |

| Service Addresses |
|---|
| mgraham@grgpc.com |
| michael@lexingtonlg.com |
| michael@mhrolaw.com |
| michael@poncelaw.com |
| michael@vilesandbeckman.com |
| mike.andrews@beasleyallen.com |
| mikerglaw@gmail.com |
| mitch@vralawyers.com |
| mjwilliams@gibsondunn.com |
| mmlk@mmlkadvantage.com |
| morenstein@brownrudnick.com |
| mpentz@popemcmillan.com |
| mrader@bflawfirm.com |
| mrobinson@rcrlaw.net |
| mstaun@hartleyobrien.com |
| mtilton@tiltonlawfirm.com |
| mweisberg@weisberglawoffices.com |
| nancy@erlegal.com |
| nmoss@akingump.com |
| noahprosser@harrlawfirm.com |
| nwest@deminglaw.com |
| obie26@aol.com |
| oleary@onderlaw.com |
| onder@onderlaw.com |
| pardis@wolffardis.com |
| patricia@ammonslaw.com |
| paul@komyattelawfirm.com |
| paul@pdhermannpc.com |
| pcarroll@cozen.com |
| pcarter@carterlawgroupllc.com |
| peller@law.georgetown.edu |
| pete@christiansenlaw.com |
| power@lemonlawonline.com |
| pricardo@golenbock.com |
| radelman@ahctriallaw.com |
| ranse@conleygriggs.com |
| rbale@dbbwc.com |
| rcanche@lkclawfirm.com |
| rchaiken@chaikenlaw.com |
| rcowan@bpblaw.com |
| rcrosby@pmped.com |
| rdreyer@dbbwc.com |

| Service Addresses |
|---|
| rgreenwald@weitzlux.com |
| rhanson@peiferlaw.com |
| richard@conleygriggs.com |
| rick.morrison@beasleyallen.com |
| rob@ammonslaw.com* |
| rob@butlerwooten.com |
| robert@fergusonlaw.com |
| rporter@ralphporterlaw.com |
| rsahadi@wigrum.com |
| rshenkan@shenkanlaw.com |
| rsullivan@sullivantrial.com |
| ryan@stephenskellylaw.com |
| samantha@ammonslaw.com |
| sawyer.higinbotham@gmail.com |
| schmidt@whafh.com |
| scott@scottcallahan.com |
| scott@scottpalmerlaw.com |
| scrowley@cbs-lawyers.com |
| sferrell@ferrell-lawfirm.com* |
| sidney@bcoonlaw.com |
| simpsoncurtis@comcast.net |
| snapolitano@carterlawgroupllc.com |
| snorris@norriscantulaw.com |
| steve.hammond@hammondtownsend.com |
| steve@hbsslaw.com |
| steve@hilliardshadowenlaw.com |
| stevenstolze@sbcglobal.net |
| stewart@erlegal.com |
| tab@tturner.com* |
| tch@psstf.com |
| tcoplaw@bellsouth.net |
| tedra@butlerwooten.com |
| thelaw@robertwmillerky.com |
| tjhenry@thomasjhenrylaw.com |
| tmaxcey@stipelaw.com |
| tmorgan@sullivantrial.com |
| tom@bryantlawkc.com |
| tomyuhas@ix.netcom.com |
| tterry@christiansenlaw.com |
| tvanronzelen@cvdl.net |
| tyesmith@carrcarrokc.com |
| vpribanic@pribanic.com |

| Service Addresses |
| --- |
| walton@hartleyhickman.com |
| wbriggs@winstonbriggslaw.com |
| whammill@attorneykennugent.com |
| will@bccnlaw.com |
| william@lawlandsman.com |

| Service Addresses |
| --- |
| wjsingleton@singletonlaw.com |
| wstapleton@hooperhathaway.com |
| wweintraub@goodwinprocter.com |
| zinbarglaw@aol.com |

* Denotes an email address where an "undeliverable" message was received. In these instances, the document was mailed via overnight mail (as indicated in the next section) to the respective mailing address for the email address.

09-50026-reg   Doc 13440-1   Filed 09/16/15   Entered 09/16/15 12:01:32   Main Document   Pg 416 of 481

## Service List For September 14, 2015

**Documents Served _via_ Overnight Delivery:**

1 - _Opening Brief by General Motors LLC with Respect to Whether Plaintiffs May Seek Punitive Damages from General Motors LLC Based on the Conduct of General Motors Corporation_ (with Exhibit) [Dkt. No 13437]

| Service Address | |
|---|---|
| Brian S. Masumoto<br>OFFICE OF THE UNITED STATES TRUSTEE<br>U.S. Federal Office Building<br>201 Varick Street, Suite 1006<br>New York, NY 10014 | Mark Brnovich<br>Attorney General<br>OFFICE OF THE ATTORNEY GENERAL<br>1275 West Washington Street<br>Phoenix, AZ 85007 |
| Robert P. Woodliff<br>ARAIZA & WOODLIFF<br>4144 N. Central Expressway, #600<br>Dallas, TX 75204 | W. Ransom Piples<br>Blaine T. Aydell<br>HANNAH, COLVIN & PIPES, LLP<br>10626 Timberlake Dr.<br>Bataon Rouge, LA 70810 |
| Eric D. Applebaum<br>FEIN, EMOND & APPLEBAUM, P.C.<br>52 Mulberry Street<br>Springfield, MA 01105 | Benjamin R. Gideon<br>BERMAN & SIMMONS, P.A.<br>129 Lisbon Street<br>Lewiston, ME 04240 |
| John M. Neal<br>THE NEAL LAW FIRM<br>P.O. Box 51930<br>Knoxville, Tennessee | Martin E. Regan, Jr.<br>John O. Pieksen, Jr.<br>REGAN LAW, PLC<br>2125 St. Charles Avenue<br>New Orleans, LA 70130 |
| Stephen P. New<br>114 Main Street<br>Beckley WV 25801 | Thomas J. Weihing<br>DALY WEIHING & BOCHANIS<br>1776 North Ave.<br>Bridgeport, CT 06604 |
| D. Adrian Hoosier, II<br>THE HOOSIER LAW FIRM PLLC<br>120 Capital Street<br>Charleston, W. Virginia 25301 | Joseph E. Ritch<br>Elliott & Ritch, L.L.P.<br>321 Artesian St.<br>Corpus Christi, Texas 78401 |

| **Service Address** | |
|---|---|
| Richard J. Valle<br>CARTER & VALLE LAW FIRM, P.C.<br>8012 Pennsylvania Circle, NE<br>Albuquerque, NM 87110 | Robert E. Ammons<br>The Ammons Law Firm, LLP,<br>3700 Montrose Boulevard<br>Houston, Texas 77006 |
| Carlos Eduardo Cardenas<br>LAW OFFICE OF CARLOS EDUARDO<br>CARDENAS<br>717 E. San Antonio Street<br>3rd Floor<br>El Paso, TX 79901 | Darryl Dunsmore<br>AD #6327<br>P.O. BOX 2000<br>1600 California Drive<br>Vacaville, CA 95696-2000 |
| Frank E. Simmerman, Jr.<br>Chad L. Taylor<br>Frank E. Simmerman, III<br>SIMMERMAN LAW OFFICE, PLLC<br>254 East Main Street<br>Clarksburg, WV 26301 | C. Tab Turner<br>TURNER & ASSOCIATES, P.A.<br>4705 Somers Ave.<br>Suite 100<br>North Little Rock, AK 7611 |
| John C. Collins, Esquire<br>LAW OFFICE OF JOHN C. COLLINS<br>228 West Maple Street<br>P.O. Box 475<br>Salyersville, KY 41465 | R. Stephen Ferrell,<br>THE FERRELL LAW FIRM, P.C.,<br>2211 Norfolk Street<br>Suite 610<br>Houston, Texas 77098 |
| E. Todd Tracy<br>THE TRACY FIRM<br>5473 Blair Road, Suite 200<br>Dallas, TX 75231 | Lance Entrekin<br>THE ENTREKIN LAW FIRM<br>One East Camelback Road, Suite 710<br>Phoenix, AZ 85012 |
| D. Blayne Honeycutt<br>Colt Fore<br>FAYARD & HONEYCUTT<br>519 Florida Boulevard SW<br>Denham Springs, LA 70726 | Richard C. Dalton<br>RICHARD C. DALTON, LLC<br>111 Park West Drive<br>Scott, Louisiana 70583 |
| Paul Tershel, Esquire<br>TERSHEL & ASSOCIATES<br>Helena Professional Building<br>55 S. Main Street<br>Washington, PA 15301 | Timothy P. Lupardus<br>LUPARDUS LAW OFFICE<br>Post Office Box 1680<br>Pineville, West Virginia 24874 |

| Service Address | |
|---|---|
| Joseph W. Carcione, Jr.<br>CARCIONE, CATTERMOLE, DOLINSKY,<br>STUCKY, MARKOWITZ, CARCIONE,<br>LLP<br>601 Brewster Avenue, P.O. Box 3389<br>Redwood City, CA 94063 | Ramin R. Younessi<br>LAW OFFICES OF<br>RAMIN R. YOUNESSI<br>3435 Wilshire Boulevard Suite 2200<br>Los Angeles, CA 90010 |
| Paul Minx<br>2330 Quail Lane<br>Longview, TX 75602 | Michael E. Carr<br>Patrick E. Carr<br>A. Laurie Koller<br>CARR & CARR ATTORNEYS<br>4416 South Harvard Avenue<br>Tulsa, OK 74135 |
| Glen B. Rutherford<br>RUTHERFORD WEINSTEIN LAW<br>GROUP PLLC<br>418 S. Gay St., Suite 204<br>Knoxville, TN 37901-1668 | Michael B. Fox<br>FOX LAW OFFICES<br>185 W. Tom T. Hall Blvd<br>Olive Hill, KY 41164 |
| Gladys Perez<br>63 Second Street, Unit 1<br>Waterford, New York | J. Norman O'Connor, Jr., Esquire<br>Gregory P. Howard, Esquire<br>DONOVAN & O'CONNOR, LLP<br>1330 Mass MoCA Way<br>North Adams, MA 01247 |
| Mitch Templeton, Bar<br>CHAMBERS, TEMPLETON, THOMAS &<br>BRINKLEY<br>2090 Broadway<br>Beaumont, TX 77701 | Gilbert Arrazolo<br>ARRAZOLO LAW PC<br>715 Tijeras Ave NW<br>Albuquerque, NM 87102 |
| James W. Flood, III<br>FLOOD LAW GROUP, LLP<br>1101 Pennsylvania Ave. NW<br>Suite 600<br>Washington, DC 20004 | Jan S. Kublick, Esquire<br>MCMAHON, KUBLICK LAW FIRM<br>500 South Salina Street<br>Suite 816<br>Syracuse, NY 13202 |
| Ben B. Mills , Jr.<br>MILLS LAW FIRM<br>315 S Main St<br>Fitzgerald, GA 31750 | |

<u>**Service List For September 15, 2015**</u>[1]

<u>**Documents Served *via* Overnight Delivery:**</u>

1 - *Opening Brief by General Motors LLC with Respect to Whether Plaintiffs May Seek Punitive Damages from General Motors LLC Based on the Conduct of General Motors Corporation* (with Exhibit) [Dkt. No 13437]

| **Service Address** | |
|---|---|
| John J. Driscoll<br>Christopher J. Quinn<br>THE DRISCOLL FIRM, P.C.<br>211 N. Broadway, 40th Floor<br>St. Louis, MO 63102 | |

---

[1]    Due to an administrative error, this mailing was sent via overnight mail on September 15, 2015.

09-50026-reg   Doc 13451   Filed 09/21/15   Entered 09/21/15 17:39:32   Main Document
Pg 4 of 20

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
Arthur Steinberg
Scott Davidson

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Richard C. Godfrey, P.C. (admitted *pro hac vice*)
Andrew B. Bloomer, P.C. (admitted *pro hac vice*)

*Attorneys for General Motors LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
In re                                      :        Chapter 11
                                           :
MOTORS LIQUIDATION COMPANY, *et al.*,      :        Case No.: 09-50026 (REG)
        f/k/a General Motors Corp., *et al.*   :
                                           :
                Debtors.                    :        (Jointly Administered)
-------------------------------------------------------------x

## CERTIFICATE OF SERVICE

This is to certify that on *September 18, 2015*, pursuant to the *Scheduling Order
Regarding Case Management Order Re: No-Strike, No Stay, Objection, and GUC Trust Asset
Pleading*, entered on September 3, 2015 [Dkt. No 13416] ("**Scheduling Order**"), I caused to be
served a true and correct copy of the *Opening Brief by General Motors LLC with Respect to
Whether Plaintiffs Can Automatically Impute to New GM  Knowledge of the Events that Took
Place at Old GM and/or as Reflected in Old GM'S Books and Records* [Dkt. No. 13451]. Copies
of the document listed in the annexed service lists was served upon each of the persons and

09-50026-reg   Doc 13457   Filed 09/21/15   Entered 09/21/15 17:39:32   Main Document   Pg 421 of 481

entities listed therein, by causing copies of same to be delivered *via* email and/or *via* overnight mail and/or *via* first class mail.

Dated:  September 21, 2015
       New York, New York

                        KING & SPALDING LLP

                        By:   /s/  Scott I. Davidson
                              Arthur J. Steinberg
                              Scott Davidson
                              King & Spalding LLP
                              1185 Avenue of the Americas
                              New York, NY 10036
                              Telephone: (212) 556-2100
                              Facsimile: (212) 556-2222

                              *Attorneys for General Motors LLC*

<u>Service List For September 18, 2015:</u>

<u>Documents Served *via* Email:</u>

1 - *Opening Brief by General Motors LLC with Respect to Whether Plaintiffs Can Automatically Impute to New GM  Knowledge of the Events that Took Place at Old GM and/or as Reflected in Old GM'S Books and Records* [Dkt. No. 13451]

| <u>Service Addresses</u> | <u>Service Addresses</u> |
|---|---|
| acarter@sgpblaw.com | brianc@wrightroy.com |
| acutruzzula@cnlawfirm.net | brown@whafh.com |
| adam@lelaw.com | bsk@kbklawyers.com |
| adogali@dogalilaw.com | cale@conleygriggs.com |
| agoneiljr@nco-law.com | cbailey@bpblaw.com |
| ajanutolo@goodinabernathy.com | cdalbey@weitzlux.com |
| akaram@karamlawfirm.com | cellison@eaalawfirm.com |
| akearse@motleyrice.com | chaffin@chaffinluhana.com |
| akmartin@lchb.com | chris@nidellaw.com |
| alans@ksbrlaw.com | cjuhas@wernlawyers.com |
| anne@hilliardshadowenlaw.com | ckitner@chaikenlaw.com |
| aoffenhartz@gibsondunn.com | ckutteh@popemcmillan.com |
| aribeiro@vrslaw.com | cole.portis@beasleyallen.com |
| attorneyhagmaier@gmail.com | conrad_r_blease@yahoo.com |
| attys@foothills.net | contact@sangisettylaw.com |
| awu@gibsondunn.com | corrigan@onderlaw.com |
| bagosto@abrahamwatkins.com | cpeifer@peiferlaw.com |
| bchase@bisnarchase.com | dave@getstewart.com |
| bcorl@potts-law.com | david@davidbryantlaw.com |
| bcorson@sloanewalsh.com | dcarasso@bisnarchase.com |
| beachlawyer51@hotmail.com | ddefeo@defeokolker.com |
| ben.baker@beasleyallen.com | demingmd@deminglaw.com |
| ben@hoganlawoffice.com | dfranco@dugan-lawfirm.com |
| bentonmusslewhite@gmail.com | dgolden@akingump.com |
| bfinley@thefinleyfirm.com | dharris@swhhb.com |
| bgideon@bermansimmons.com | dhm@morrisplayer.com |
| blair@durhamanddread.com | dixonlaw101@yahoo.com |
| bleger@lkclawfirm.com | djnewman@akingump.com |
| bleydon@tooherwocl.com | dmatthews@thematthewslawfirm.com |
| bob@butlerwooten.com | dmolton@brownrudnick.com |
| bob@gtinjurylaw.com | doreen@thecooperfirm.com |
| bob@lelaw.com | dpotts@potts-law.com |
| bobh@hmglawfirm.com | drl@spanglaw.com |
| brad@kuhlmanlucas.com | ecabraser@lchb.com |

| Service Addresses |
| --- |
| edk@stlouisattorney.com |
| eforaker@stipelaw.com |
| eohagan@goodwinprocter.com |
| ejensen@potts-law.com |
| ericchandlerlaw@gmail.com |
| eservice@egletwall.com |
| esserman@sbep-law.com |
| eweisfelner@brownrudnick.com |
| fcwilkerson@aol.com |
| fherrera@herreralaw.com |
| frank@tomenylawfirm.com |
| gcantu@norriscantulaw.com |
| genetullos@tullosandtullos.com |
| gerdes@nocoxmail.com |
| gfox@goodwinprocter.com |
| ghlf@scrtc.com |
| ghoward@doatty.com* |
| gmarcos@marcoslawfirm.com |
| graham.esdale@beasleyallen.com |
| gscott@lewlaw.com |
| gwhealyiv@aol.com |
| hsteel@brownrudnick.com |
| hwhite@wcwattorneys.com |
| janthony@anthonylaw.com |
| jasonharr@harrlawfirm.com |
| jasonz@hbsslaw.com |
| jbilsborrow@weitzlux.com |
| jdiehl@akingump.com |
| jdugan@dugan-lawfirm.com |
| jdunahoe@heardrobins.com |
| jdunn@wigrum.com |
| jeff@lbjmlaw.com |
| jelliott@richardsonplowden.com |
| jere.beasley@beasleyallen.com |
| jflaxer@golenbock.com |
| jgilbert@thegilbertlawgroup.com |
| jguest@jguestlaw.com |
| jim@butlerwooten.com |
| jimragan13@gmail.com |
| jlowe@lewlaw.com |
| jniemi@anapolschwartz.com |
| jonbailey@thebaileyfirm.com |

| Service Addresses |
| --- |
| josephhoats@hotmail.com |
| josh@thejdfirm.com |
| jprather@garmerprather.com |
| jritch@elliottritch.com |
| jsimon@simonlawpc.com |
| jsm@rhinelawfirm.com |
| jttenge@tengelaw.com |
| justin@stephenskellylaw.com |
| jwharris1@prodigy.net |
| jwigington@wigrum.com |
| kanthony@anthonylaw.com |
| kcarnie@simonlawpc.com |
| kdean@motleyrice.com |
| ken@ulawok.com |
| kent@lelaw.com |
| kharvey@mlgautomotivelaw.com |
| kmarks@lkclawfirm.com |
| kmartorana@gibsondunn.com |
| kris@ledford-lawfirm.com |
| kworks@christiansenlaw.com |
| lance@thecooperfirm.com |
| lauren@hmglawfirm.com |
| lawwb@sbcglobal.net* |
| lbrad@kuhlmanlucas.com |
| lbrown@leebrownlaw.com |
| lcoben@anapolschwartz.com |
| lkrzesienski@flemingattorneys.com |
| lrayon@reganlaw.net |
| lrubin@gibsondunn.com |
| lspringberg@thomasandspringberg.com |
| ltien@bpblaw.com |
| lwalsh@vrslaw.com |
| mac@mccoollawms.com |
| mail@doatty.com |
| marion@hmglawfirm.com |
| marksossi@hotmail.com |
| marshall@poncelaw.com |
| matoups@wgttlaw.com |
| mbs@clalaw.com |
| mccarley@fnlawfirm.com |
| mdoebler@pribanic.com |
| mgraham@grgpc.com |

| Service Addresses |
|---|
| michael@lexingtonlg.com |
| michael@mhrolaw.com |
| michael@poncelaw.com |
| michael@vilesandbeckman.com |
| mike.andrews@beasleyallen.com |
| mikerglaw@gmail.com |
| mjwilliams@gibsondunn.com |
| mmlk@mmlkadvantage.com |
| morenstein@brownrudnick.com |
| mpentz@popemcmillan.com |
| mrader@bflawfirm.com |
| mrobinson@rcrlaw.net |
| mstaun@hartleyobrien.com |
| mtilton@tiltonlawfirm.com |
| mweisberg@weisberglawoffices.com |
| nancy@erlegal.com |
| nmoss@akingump.com |
| noahprosser@harrlawfirm.com |
| nwest@deminglaw.com |
| obie26@aol.com |
| oleary@onderlaw.com |
| onder@onderlaw.com |
| patricia@ammonslaw.com |
| paul@komyattelawfirm.com |
| paul@pdhermannpc.com |
| pcarroll@cozen.com |
| pcarter@carterlawgroupllc.com |
| peller@law.georgetown.edu |
| pete@christiansenlaw.com |
| power@lemonlawonline.com |
| pricardo@golenbock.com |
| radelman@ahctriallaw.com |
| ranse@conleygriggs.com |
| rbale@dbbwc.com |
| rcanche@lkclawfirm.com |
| rchaiken@chaikenlaw.com |
| rcowan@bpblaw.com |
| rcrosby@pmped.com |
| rdreyer@dbbwc.com |
| rgreenwald@weitzlux.com |
| rhanson@peiferlaw.com |
| richard@conleygriggs.com |

| Service Addresses |
|---|
| rick.morrison@beasleyallen.com |
| rob@ammonslaw.com |
| rob@butlerwooten.com |
| robert@fergusonlaw.com |
| rporter@ralphporterlaw.com |
| rsahadi@wigrum.com |
| rshenkan@shenkanlaw.com |
| rsullivan@sullivantrial.com |
| ryan@stephenskellylaw.com |
| samantha@ammonslaw.com |
| sawyer.higinbotham@gmail.com |
| schmidt@whafh.com |
| scott@scottcallahan.com |
| scott@scottpalmerlaw.com |
| scrowley@cbs-lawyers.com |
| sferrell@ferrell-lawfirm.com |
| sidney@bcoonlaw.com |
| simpsoncurtis@comcast.net |
| snapolitano@carterlawgroupllc.com |
| snorris@norriscantulaw.com |
| steve.hammond@hammondtownsend.com |
| steve@hbsslaw.com |
| steve@hilliardshadowenlaw.com |
| stevenstolze@sbcglobal.net |
| stewart@erlegal.com |
| tab@tturner.com |
| tch@psstf.com |
| tcoplaw@bellsouth.net |
| tedra@butlerwooten.com |
| thelaw@robertwmillerky.com |
| tjhenry@thomasjhenrylaw.com |
| tmaxcey@stipelaw.com |
| tmorgan@sullivantrial.com |
| tom@bryantlawkc.com |
| tomyuhas@ix.netcom.com |
| tterry@christiansenlaw.com |
| tvanronzelen@cvdl.net |
| tyesmith@carrcarrokc.com |
| vpribanic@pribanic.com |
| walton@hartleyhickman.com |
| wbriggs@winstonbriggslaw.com |
| whammill@attorneykennugent.com |

| Service Addresses |
| --- |
| will@bccnlaw.com |
| william@lawlandsman.com |
| wjsingleton@singletonlaw.com |

| Service Addresses |
| --- |
| wstapleton@hooperhathaway.com |
| wweintraub@goodwinprocter.com |
| zinbarglaw@aol.com |

\* Denotes an email address where an "undeliverable" message was received. In these instances, the document was mailed via overnight mail (as indicated in the next section) to the respective mailing address for the email address.

## Service List For September 18, 2015

**Documents Served *via* Overnight Delivery:**

1 - *Opening Brief by General Motors LLC with Respect to Whether Plaintiffs Can Automatically Impute to New GM  Knowledge of the Events that Took Place at Old GM and/or as Reflected in Old GM'S Books and Records* [Dkt. No. 13451]

| Service Address | |
|---|---|
| Brian S. Masumoto<br>OFFICE OF THE UNITED STATES TRUSTEE<br>U.S. Federal Office Building<br>201 Varick Street, Suite 1006<br>New York, NY 10014 | Mark Brnovich<br>Attorney General<br>OFFICE OF THE ATTORNEY GENERAL<br>1275 West Washington Street<br>Phoenix, AZ 85007 |
| Robert P. Woodliff<br>ARAIZA & WOODLIFF<br>4144 N. Central Expressway, #600<br>Dallas, TX  75204 | W. Ransom Piples<br>Blaine T. Aydell<br>HANNAH, COLVIN & PIPES, LLP<br>10626 Timberlake Dr.<br>Bataon Rouge, LA 70810 |
| Eric D. Applebaum<br>FEIN, EMOND & APPLEBAUM, P.C.<br>52 Mulberry Street<br>Springfield, MA 01105 | Thomas J. Weihing<br>DALY WEIHING & BOCHANIS<br>1776 North Ave.<br>Bridgeport, CT 06604 |
| John M. Neal<br>THE NEAL LAW FIRM<br>P.O. Box 51930<br>Knoxville, Tennessee | Timothy P. Lupardus<br>LUPARDUS LAW OFFICE<br>Post Office Box 1680<br>Pineville, West Virginia 24874 |
| Stephen P. New<br>114 Main Street<br>Beckley WV 25801 | Frank E. Simmerman, Jr.<br>Chad L. Taylor<br>Frank E. Simmerman, III<br>SIMMERMAN LAW OFFICE, PLLC<br>254 East Main Street<br>Clarksburg, WV 26301 |
| D. Adrian Hoosier, II<br>THE HOOSIER LAW FIRM PLLC<br>120 Capital Street<br>Charleston, W. Virginia 25301 | John C. Collins, Esquire<br>LAW OFFICE OF JOHN C. COLLINS<br>228 West Maple Street<br>P.O. Box 475<br>Salyersville, KY 41465 |

| Service Address | |
|---|---|
| | |
| Richard J. Valle<br>CARTER & VALLE LAW FIRM, P.C.<br>8012 Pennsylvania Circle, NE<br>Albuquerque, NM 87110 | Lance Entrekin<br>THE ENTREKIN LAW FIRM<br>One East Camelback Road, Suite 710<br>Phoenix, AZ 85012 |
| Carlos Eduardo Cardenas<br>LAW OFFICE OF CARLOS EDUARDO<br>CARDENAS<br>717 E. San Antonio Street<br>3rd Floor<br>El Paso, TX 79901 | Darryl Dunsmore<br>AD #6327<br>P.O. BOX 2000<br>1600 California Drive<br>Vacaville, CA 95696-2000 |
| E. Todd Tracy<br>THE TRACY FIRM<br>5473 Blair Road, Suite 200<br>Dallas, TX 75231 | Richard C. Dalton<br>RICHARD C. DALTON, LLC<br>111 Park West Drive<br>Scott, Louisiana 70583 |
| D. Blayne Honeycutt<br>Colt Fore<br>FAYARD & HONEYCUTT<br>519 Florida Boulevard SW<br>Denham Springs, LA 70726 | Ramin R. Younessi<br>LAW OFFICES OF<br>RAMIN R. YOUNESSI<br>3435 Wilshire Boulevard Suite 2200<br>Los Angeles, CA 90010 |
| Joseph W. Carcione, Jr.<br>CARCIONE, CATTERMOLE, DOLINSKY,<br>STUCKY, MARKOWITZ, CARCIONE,<br>LLP<br>601 Brewster Avenue, P.O. Box 3389<br>Redwood City, CA 94063 | Michael E. Carr<br>Patrick E. Carr<br>A. Laurie Koller<br>CARR & CARR ATTORNEYS<br>4416 South Harvard Avenue<br>Tulsa, OK 74135 |
| Paul Minx<br>2330 Quail Lane<br>Longview, TX 75602 | Michael B. Fox<br>FOX LAW OFFICES<br>185 W. Tom T. Hall Blvd<br>Olive Hill, KY 41164 |
| Glen B. Rutherford<br>RUTHERFORD WEINSTEIN LAW<br>GROUP PLLC<br>418 S. Gay St., Suite 204<br>Knoxville, TN 37901-1668 | J. Norman O'Connor, Jr., Esquire<br>Gregory P. Howard, Esquire<br>DONOVAN & O'CONNOR, LLP<br>1330 Mass MoCA Way<br>North Adams, MA 01247 |

09-50026-reg   Doc 13457-1   Filed 09/21/15   Entered 09/21/15 17:39:32   Main Document
Pg 428 of 481

| **Service Address** | |
|---|---|
| Gladys Perez<br>63 Second Street, Unit 1<br>Waterford, New York | Gilbert Arrazolo<br>ARRAZOLO LAW PC<br>715 Tijeras Ave NW<br>Albuquerque, NM 87102 |
| John J. Driscoll<br>Christopher J. Quinn<br>THE DRISCOLL FIRM, P.C.<br>211 N. Broadway, 40th Floor<br>St. Louis, MO 63102 | Ben B. Mills , Jr.<br>MILLS LAW FIRM<br>315 S Main St<br>Fitzgerald, GA 31750 |
| James W. Flood, III<br>FLOOD LAW GROUP, LLP<br>1101 Pennsylvania Ave. NW<br>Suite 600<br>Washington, DC 20004 | Jan S. Kublick, Esquire<br>MCMAHON, KUBLICK LAW FIRM<br>500 South Salina Street<br>Suite 816<br>Syracuse, NY 13202 |

**Service List For September 18, 2015**

**Documents Served *via* First-Class Mail Delivery:**

1 - *Opening Brief by General Motors LLC with Respect to Whether Plaintiffs Can Automatically Impute to New GM  Knowledge of the Events that Took Place at Old GM and/or as Reflected in Old GM'S Books and Records* [Dkt. No. 13451]

| Service Address | |
|---|---|
| Angela Singleton<br>P.O. Box 1263<br>Woodville, MI 39669 | |

09-50026-reg   Doc 13464-1   Filed 09/22/15   Entered 09/22/15 16:22:35   Main Document
Pg 3 of 4

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
Arthur Steinberg
Scott Davidson

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Richard C. Godfrey, P.C. (admitted *pro hac vice*)
Andrew B. Bloomer, P.C. (admitted *pro hac vice*)

*Attorneys for General Motors LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------x
In re                                  :      Chapter 11
                                       :
MOTORS LIQUIDATION COMPANY, et al.,    :      Case No.: 09-50026 (REG)
    f/k/a General Motors Corp., et al. :
                                       :
                         Debtors.      :      (Jointly Administered)
-------------------------------------------------------------x
```

## <u>CERTIFICATE OF SERVICE</u>

      This is to certify that on *September 21, 2015* and *September 22, 2015*, pursuant to the

*Scheduling Order Regarding Case Management Order Re: No-Strike, No Stay, Objection, and*

*GUC Trust Asset Pleading*, entered on September 3, 2015 [Dkt. No 13416] ("**Scheduling**

**Order**"), I caused to be served a true and correct copy of the *New GM Bellwether Letter, with*

*Marked Bellwether Complaints, Pursuant to Scheduling Order dated September 3, 2015 (with*

*Exhibits)* [Dkt. No. 13456]. Copies of the document listed in the annexed service lists was served

upon each of the persons and entities listed therein, by causing copies of same to be delivered *via*

email and/or *via* overnight mail and/or *via* first-class mail.


Dated: September 22, 2015
      New York, New York

           KING & SPALDING LLP

           By:   /s/  Scott I. Davidson
                Arthur J. Steinberg
                Scott Davidson
                King & Spalding LLP
                1185 Avenue of the Americas
                New York, NY 10036
                Telephone: (212) 556-2100
                Facsimile: (212) 556-2222

                *Attorneys for General Motors LLC*

09-50026-mg    Doc 13464-3    Filed 09/21/16    Entered 09/21/16 19:22:33    Main Document

# Service List For September 21, 2015:

## Documents Served *via* Email:

1 - *New GM Bellwether Letter, with Marked Bellwether Complaints, Pursuant to Scheduling Order dated September 3, 2015 (with Exhibits)* [Dkt. No. 13456]

| Service Addresses | Service Addresses |
|---|---|
| acarter@sgpblaw.com | brown@whafh.com |
| acutruzzula@cnlawlaw.net | bsk@kbklawyers.com |
| adam@lelaw.com | cale@conleygriggs.com |
| adogali@dogalilaw.com | cathy@butlerwooten.com |
| agoneiljr@nco-law.com | cbailey@bpblaw.com |
| ajanutolo@goodinabernathy.com | cdalbey@weitzlux.com |
| akaram@karamlawfirm.com | cellison@eaalawfirm.com |
| akearse@motleyrice.com | chaffin@chaffinluhana.com |
| akmartin@lchb.com | chris@nidellaw.com |
| alans@ksbrlaw.com | cjuhas@wernlawyers.com |
| anne@hilliardshadowenlaw.com | ckitner@chaikenlaw.com |
| aoffenhartz@gibsondunn.com | ckutteh@popemcmillan.com |
| aribeiro@vrslaw.com* | cole.portis@beasleyallen.com |
| attorneyhagmaier@gmail.com | conrad_r_blease@yahoo.com |
| attys@foothills.net | contact@sangisettylaw.com* |
| awu@gibsondunn.com | corrigan@onderlaw.com |
| bagosto@abrahamwatkins.com | cpeifer@peiferlaw.com |
| bchase@bisnarchase.com | cwilson@courtlaw.net |
| bcorl@potts-law.com | dave@getstewart.com* |
| bcorson@sloanewalsh.com | david@davidbryantlaw.com |
| beachlawyer51@hotmail.com* | dcarasso@bisnarchase.com |
| ben.baker@beasleyallen.com | ddefeo@defeokolker.com |
| ben@hoganlawoffice.com | demingmd@deminglaw.com |
| bentonmusslewhite@gmail.com | dfranco@dugan-lawfirm.com |
| bfinley@thefinleyfirm.com | dgolden@akingump.com |
| bgideon@bermansimmons.com* | dharris@swhhb.com |
| bill@ballardandfeagle.com | dhm@morrisplayer.com |
| blair@durhamanddread.com | dixonlaw101@yahoo.com |
| bleger@lkclawfirm.com | djnewman@akingump.com |
| bleydon@tooherwocl.com | dmatthews@thematthewslawfirm.com |
| bob@butlerwooten.com | dmolton@brownrudnick.com |
| bob@gtinjurylaw.com | doreen@thecooperfirm.com |
| bob@lelaw.com | dpotts@potts-law.com |
| bobh@hmglawfirm.com | drl@spanglaw.com |
| brad@kuhlmanlucas.com | ecabraser@lchb.com |
| brianc@wrighttroy.com | edk@stlouisattorney.com |

| Service Addresses |
|---|
| eforaker@stipelaw.com |
| eohagan@goodwinprocter.com |
| ejensen@potts-law.com |
| ericchandlerlaw@gmail.com |
| eservice@egletwall.com |
| esserman@sbep-law.com |
| eweisfelner@brownrudnick.com |
| fcwilkerson@aol.com |
| fherrera@herreralaw.com |
| frank@tomenylawfirm.com |
| gcantu@norriscantulaw.com |
| genetullos@tullosandtullos.com |
| gerdes@nocoxmail.com |
| greg@gevanslaw.com |
| gfox@goodwinprocter.com |
| ghlf@scrtc.com |
| ghoward@doatty.com* |
| gmarcos@marcoslawfirm.com |
| graham.esdale@beasleyallen.com |
| greg@ballardandfeagle.com |
| gscott@lewlaw.com |
| gwhealyiv@aol.com |
| hsteel@brownrudnick.com |
| hwhite@wcwattorneys.com |
| janthony@anthonylaw.com |
| jasonharr@harrlawfirm.com |
| jasonz@hbsslaw.com |
| jbilsborrow@weitzlux.com |
| jdiehl@akingump.com |
| jdugan@dugan-lawfirm.com |
| jdunahoe@heardrobins.com |
| jdunn@wigrum.com |
| jeff@lbjmlaw.com |
| jelliott@richardsonplowden.com |
| jere.beasley@beasleyallen.com |
| jflaxer@golenbock.com |
| jgilbert@thegilbertlawgroup.com |
| jguest@jguestlaw.com |
| jimragan13@gmail.com |
| jlowe@lewlaw.com |
| jniemi@anapolschwartz.com |
| jonbailey@thebaileyfirm.com |

| Service Addresses |
|---|
| josephhoats@hotmail.com |
| josh@thejdfirm.com |
| jprather@garmerprather.com |
| jritch@elliottritch.com |
| jsimon@simonlawpc.com |
| jsm@rhinelawfirm.com* |
| jttenge@tengelaw.com |
| julie@butlerwooten.com |
| justin@stephenskellylaw.com |
| jwharris1@prodigy.net |
| jwigington@wigrum.com |
| kanthony@anthonylaw.com |
| kcarnie@simonlawpc.com |
| kdean@motleyrice.com |
| ken@ulawok.com |
| kent@lelaw.com |
| kharvey@mlgautomotivelaw.com |
| kmarks@lkclawfirm.com |
| kmartorana@gibsondunn.com |
| kris@ledford-lawfirm.com |
| kworks@christiansenlaw.com |
| lance@thecooperfirm.com |
| lauren@hmglawfirm.com |
| lawwb@sbcglobal.net* |
| lbrad@kuhlmanlucas.com |
| lbrown@leebrownlaw.com |
| lcoben@anapolschwartz.com |
| lkrzesienski@flemingattorneys.com |
| lrayon@reganlaw.net |
| lrubin@gibsondunn.com |
| lspringberg@thomasandspringberg.com |
| ltien@bpblaw.com |
| lwalsh@vrslaw.com |
| mac@mccoollawms.com |
| mail@doatty.com* |
| marion@hmglawfirm.com |
| marksossi@hotmail.com |
| marshall@poncelaw.com |
| matoups@wgttlaw.com |
| mbs@clalaw.com |
| mccarley@fnlawfirm.com |
| mdoebler@pribanic.com |

| Service Addresses |
|---|
| mgraham@grgpc.com |
| michael@lexingtonlg.com |
| michael@mhrolaw.com* |
| michael@poncelaw.com |
| michael@vilesandbeckman.com |
| mike.andrews@beasleyallen.com |
| mikerglaw@gmail.com |
| mjwilliams@gibsondunn.com |
| mmlk@mmlkadvantage.com |
| morenstein@brownrudnick.com |
| mpentz@popemcmillan.com |
| mrader@bflawfirm.com* |
| mrobinson@rcrlaw.net |
| mstaun@hartleyobrien.com |
| mtilton@tiltonlawfirm.com |
| mweisberg@weisberglawoffices.com |
| nancy@erlegal.com |
| nmoss@akingump.com |
| noahprosser@harrlawfirm.com |
| nwest@deminglaw.com |
| obie26@aol.com |
| oleary@onderlaw.com |
| onder@onderlaw.com |
| patricia@ammonslaw.com |
| paul@komyattelawfirm.com |
| paul@pdhermannpc.com |
| pcarroll@cozen.com |
| pcarter@carterlawgroupllc.com |
| peller@law.georgetown.edu* |
| pete@christiansenlaw.com |
| power@lemonlawonline.com |
| pricardo@golenbock.com |
| radelman@ahctriallaw.com |
| ranse@conleygriggs.com |
| rbale@dbbwc.com |
| rcanche@lkclawfirm.com |
| rchaiken@chaikenlaw.com |
| rcowan@bpblaw.com |
| rcrosby@pmped.com |
| rdreyer@dbbwc.com |
| rgreenwald@weitzlux.com |
| rhanson@peiferlaw.com |

| Service Addresses |
|---|
| richard@conleygriggs.com |
| rick.morrison@beasleyallen.com |
| rob@ammonslaw.com |
| rob@butlerwooten.com |
| robert@fergusonlaw.com |
| rporter@ralphporterlaw.com |
| rsahadi@wigrum.com |
| rshenkan@shenkanlaw.com |
| ryan@stephenskellylaw.com |
| samantha@ammonslaw.com |
| sawyer.higinbotham@gmail.com |
| schmidt@whafh.com |
| scott@scottcallahan.com |
| scott@scottpalmerlaw.com |
| scrowley@cbs-lawyers.com |
| sferrell@ferrell-lawfirm.com* |
| sidney@bcoonlaw.com |
| simpsoncurtis@comcast.net |
| snapolitano@carterlawgroupllc.com |
| snorris@norriscantulaw.com |
| steve.hammond@hammondtownsend.com |
| steve@hbsslaw.com |
| steve@hilliardshadowenlaw.com |
| stevenstolze@sbcglobal.net |
| stewart@erlegal.com |
| tab@tturner.com* |
| tch@psstf.com |
| tcoplaw@bellsouth.net |
| tedra@butlerwooten.com |
| thelaw@robertwmillerky.com |
| tjhenry@thomasjhenrylaw.com |
| tmaxcey@stipelaw.com |
| tom@bryantlawkc.com |
| tomyuhas@ix.netcom.com |
| tterry@christiansenlaw.com |
| tvanronzelen@cvdl.net |
| tyesmith@carrcarrokc.com |
| vpribanic@pribanic.com |
| walton@hartleyhickman.com |
| wbriggs@winstonbriggslaw.com |
| whammill@attorneykennugent.com |
| will@bccnlaw.com |

09-50026-reg  Doc 13464  Filed 09/22/15  Entered 09/22/15 16:22:33  Main Document  Pg 435 of 481

| Service Addresses |
| --- |
| william@lawlandsman.com |
| wjsingleton@singletonlaw.com |
| wstapleton@hooperhathaway.com |
| wweintraub@goodwinprocter.com |

| Service Addresses |
| --- |
| zinbarglaw@aol.com |
| tmorgan@sullivantrial.com |
| rsullivan@sullivantrial.com |

\* Denotes an email address where an "undeliverable" message was received. In these instances, the document was mailed via overnight mail (as indicated in the next section(s)) to the respective mailing address for the email address.

09-50026-reg   Doc 13464-1   Filed 09/21/16   Entered 09/21/16 22:35:11   Main Document
Pg 436 of 481

## Service List For September 21, 2015

**Documents Served *via* Overnight Delivery:**

1 -  *New GM Bellwether Letter, with Marked Bellwether Complaints, Pursuant to Scheduling
Order dated September 3, 2015 (with Exhibits)* [Dkt. No. 13456]

| Service Address | |
|---|---|
| Brian S. Masumoto<br>OFFICE OF THE UNITED STATES<br>TRUSTEE<br>U.S. Federal Office Building<br>201 Varick Street, Suite 1006<br>New York, NY 10014 | Mark Brnovich<br>Attorney General<br>OFFICE OF THE ATTORNEY GENERAL<br>1275 West Washington Street<br>Phoenix, AZ 85007 |
| Robert P. Woodliff<br>ARAIZA & WOODLIFF<br>4144 N. Central Expressway, #600<br>Dallas, TX  75204 | W. Ransom Piples<br>Blaine T. Aydell<br>HANNAH, COLVIN & PIPES, LLP<br>10626 Timberlake Dr.<br>Bataon Rouge, LA 70810 |
| Eric D. Applebaum<br>FEIN, EMOND & APPLEBAUM, P.C.<br>52 Mulberry Street<br>Springfield, MA 01105 | Thomas J. Weihing<br>DALY WEIHING & BOCHANIS<br>1776 North Ave.<br>Bridgeport, CT 06604 |
| John M. Neal<br>THE NEAL LAW FIRM<br>P.O. Box 51930<br>Knoxville, Tennessee | Timothy P. Lupardus<br>LUPARDUS LAW OFFICE<br>Post Office Box 1680<br>Pineville, West Virginia 24874 |
| Stephen P. New<br>114 Main Street<br>Beckley WV 25801 | Frank E. Simmerman, Jr.<br>Chad L. Taylor<br>Frank E. Simmerman, III<br>SIMMERMAN LAW OFFICE, PLLC<br>254 East Main Street<br>Clarksburg, WV 26301 |
| D. Adrian Hoosier, II<br>THE HOOSIER LAW FIRM PLLC<br>120 Capital Street<br>Charleston, W. Virginia 25301 | John C. Collins, Esquire<br>LAW OFFICE OF JOHN C. COLLINS<br>228 West Maple Street<br>P.O. Box 475<br>Salyersville, KY 41465 |

| Service Address | |
|---|---|
| Richard J. Valle<br>CARTER & VALLE LAW FIRM, P.C.<br>8012 Pennsylvania Circle, NE<br>Albuquerque, NM 87110 | Lance Entrekin<br>THE ENTREKIN LAW FIRM<br>One East Camelback Road, Suite 710<br>Phoenix, AZ 85012 |
| Carlos Eduardo Cardenas<br>LAW OFFICE OF CARLOS EDUARDO<br>CARDENAS<br>717 E. San Antonio Street<br>3rd Floor<br>El Paso, TX 79901 | Darryl Dunsmore<br>AD #6327<br>P.O. BOX 2000<br>1600 California Drive<br>Vacaville, CA 95696-2000 |
| E. Todd Tracy<br>THE TRACY FIRM<br>5473 Blair Road, Suite 200<br>Dallas, TX 75231 | Richard C. Dalton<br>RICHARD C. DALTON, LLC<br>111 Park West Drive<br>Scott, Louisiana 70583 |
| D. Blayne Honeycutt<br>Colt Fore<br>FAYARD & HONEYCUTT<br>519 Florida Boulevard SW<br>Denham Springs, LA 70726 | Ramin R. Younessi<br>LAW OFFICES OF<br>RAMIN R. YOUNESSI<br>3435 Wilshire Boulevard Suite 2200<br>Los Angeles, CA 90010 |
| Joseph W. Carcione, Jr.<br>CARCIONE, CATTERMOLE, DOLINSKY,<br>STUCKY, MARKOWITZ, CARCIONE, LLP<br>601 Brewster Avenue, P.O. Box 3389<br>Redwood City, CA 94063 | Joseph W. Carcione, Jr.<br>CARCIONE, CATTERMOLE, DOLINSKY,<br>STUCKY, MARKOWITZ, CARCIONE, LLP<br>1300 S. El Camino Real, Suite 300<br>San Mateo, CA 94402-2971 |
| Paul Minx<br>2330 Quail Lane<br>Longview, TX 75602 | Michael B. Fox<br>FOX LAW OFFICES<br>185 W. Tom T. Hall Blvd<br>Olive Hill, KY 41164 |
| Glen B. Rutherford<br>RUTHERFORD WEINSTEIN LAW GROUP<br>PLLC<br>418 S. Gay St., Suite 204<br>Knoxville, TN 37901-1668 | J. Norman O'Connor, Jr., Esquire<br>Gregory P. Howard, Esquire<br>DONOVAN & O'CONNOR, LLP<br>1330 Mass MoCA Way<br>North Adams, MA 01247 |
| Gladys Perez<br>63 Second Street, Unit 1<br>Waterford, New York | Gilbert Arrazolo<br>ARRAZOLO LAW PC<br>715 Tijeras Ave NW<br>Albuquerque, NM 87102 |

09-50026-reg  Doc 13464-4  Filed 09/22/15  Entered 09/23/15 22:35:11  Main Document  Pg 439 of 481

| Service Address | |
|---|---|
| John J. Driscoll<br>Christopher J. Quinn<br>THE DRISCOLL FIRM, P.C.<br>211 N. Broadway, 40th Floor<br>St. Louis, MO 63102 | Ben B. Mills , Jr.<br>MILLS LAW FIRM<br>315 S Main St<br>Fitzgerald, GA 31750 |
| James W. Flood, III<br>FLOOD LAW GROUP, LLP<br>1101 Pennsylvania Ave. NW<br>Suite 600<br>Washington, DC 20004 | Jan S. Kublick, Esquire<br>MCMAHON, KUBLICK LAW FIRM<br>500 South Salina Street<br>Suite 816<br>Syracuse, NY 13202 |
| Michael E. Carr<br>Patrick E. Carr<br>A. Laurie Koller<br>CARR & CARR ATTORNEYS<br>4416 South Harvard Avenue<br>Tulsa, OK 74135 | Benjamin R. Gideon<br>BERMAN & SIMMONS, P.A.<br>129 Lisbon Street<br>Lewiston, ME 04240 |
| C. Tab Turner<br>TURNER & ASSOCIATES, P.A.<br>4705 Somers Ave.<br>Suite 100<br>North Little Rock, AK 7611 | R. Stephen Ferrell,<br>THE FERRELL LAW FIRM, P.C.,<br>2211 Norfolk Street<br>Suite 610<br>Houston, Texas 77098 |

## Service List For September 21, 2015

**Documents Served *via* USPS Express Mail Delivery:**

1 - *New GM Bellwether Letter, with Marked Bellwether Complaints, Pursuant to Scheduling Order dated September 3, 2015 (with Exhibits)* [Dkt. No. 13456]

| Service Address | |
|---|---|
| Angela Singleton<br>P.O. Box 1263<br>Woodville, MI 39669 | |

09-50026-reg   Doc 13464   Filed 09/27/15   Entered 09/27/15 22:35:11   Main Document
Pg 440 of 481

## Service List For September 22, 2015[1]

### Documents Served *via* Overnight Delivery:

1 - *New GM Bellwether Letter, with Marked Bellwether Complaints, Pursuant to Scheduling Order dated September 3, 2015 (with Exhibits)* [Dkt. No. 13456]

| Service Address | |
|---|---|
| Michael J. Hackett, Esq<br>Martineau, Hackett, O'Neil & Klaus, P.C.<br>555 N. Main Street<br>Mt. Pleasant, MI 48858 | Ravik Sangisetty<br>Michael E. Lillis<br>SANGISETTY LAW FIRM, LLC<br>935 Gravier Street, Suite 835<br>New Orleans, La 70112 |
| Gary Peller<br>600 New Jersey Avenue, N.W.<br>Washington, D.C. 20001 | Mark P. Robinson<br>Robinson Calcagnie Robinson Shapiro<br>Davis, Inc.<br>19 Corporate Plaza Drive<br>Newport Beach, CA 92660 |
| Michael C. Rader<br>Bartimus, Frickleton, Robertson & Goza, P.C.<br>11150 Overbrook Rd<br>Leawood, KS 66211 | David Stewart<br>Stewart & Stewart<br>931 S. Rangelie Road<br>Carmel, IN 46032 |
| Jean Sutton Martin<br>Rhine Martin Law Firm, P.C.<br>1612 Military Cutoff, Suite 300<br>Wilmington, NC 28403 | Agostinho J. Ribeiro<br>Leah F. Walsh<br>Ventura, Ribeiro & Smith<br>Attorneys at Law<br>235 Main Street<br>Danbury, CT 06810 |

---

[1]   As indicated above, the parties that were served via overnight mail on September 22, 2015 were previously served via e-mail transmission on September 21, 2015. However, in response to such e-mail transmission, an "undeliverable" message was received and, accordingly, the documents were then sent via overnight mail.

09-50026-mg   Doc 13467-1   Filed 09/01/16   Entered 09/01/16 19:28:11   Exhibits A
                            through N   Pg 441 of 481

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
Arthur Steinberg
Scott Davidson

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Richard C. Godfrey, P.C. (admitted *pro hac vice*)
Andrew B. Bloomer, P.C. (admitted *pro hac vice*)

*Attorneys for General Motors LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re                                                  :        Chapter 11
                                                       :
MOTORS LIQUIDATION COMPANY, *et al.*,                  :        Case No.: 09-50026 (REG)
        f/k/a General Motors Corp., *et al.*           :
                                                       :
                        Debtors.                       :        (Jointly Administered)
------------------------------------------------------------x

## CERTIFICATE OF SERVICE

    This is to certify that on *September 22, 2015*, pursuant to the *Scheduling Order Regarding Case Management Order Re: No-Strike, No Stay, Objection, and GUC Trust Asset Pleading*, entered on September 3, 2015 [Dkt. No 13416] ("**Scheduling Order**"), I caused to be served a true and correct copy of the *Reply Brief by General Motors LLC with Respect to Whether Plaintiffs May Seek Punitive Damages From General Motors LLC Based On The Conduct Of General Motors Corporation* [Dkt. No. 13460].  Copies of the document listed in the annexed service lists was served upon each of the persons and entities listed therein, by

causing copies of same to be delivered *via* email and/or *via* overnight mail and/or *via* first-class mail.

Dated: September 23, 2015
      New York, New York

                    KING & SPALDING LLP

                    By:   /s/  Scott I. Davidson
                        Arthur J. Steinberg
                        Scott Davidson
                        King & Spalding LLP
                        1185 Avenue of the Americas
                        New York, NY 10036
                        Telephone: (212) 556-2100
                        Facsimile: (212) 556-2222

                        *Attorneys for General Motors LLC*

**Service List For September 22, 2015:**

**Documents Served *via* Email:**

1 - *Reply Brief by General Motors LLC with Respect to Whether Plaintiffs May Seek Punitive Damages From General Motors LLC Based On The Conduct Of General Motors Corporation* [Dkt. No. 13460]

| Service Addresses |
|---|
| acarter@sgpblaw.com |
| acutruzzula@cnlawfirm.net |
| adam@lelaw.com |
| adogali@dogalilaw.com |
| agoneiljr@nco-law.com |
| ajanutolo@goodinabernathy.com |
| akaram@karamlawfirm.com |
| akearse@motleyrice.com |
| akmartin@lchb.com |
| alans@ksbrlaw.com |
| anne@hilliardshadowenlaw.com |
| aoffenhartz@gibsondunn.com |
| aribeiro@vrslaw.com |
| attorneyhagmaier@gmail.com |
| attys@foothills.net |
| awu@gibsondunn.com |
| bagosto@abrahamwatkins.com |
| bchase@bisnarchase.com |
| bcorl@potts-law.com |
| bcorson@sloanewalsh.com |
| beachlawyer51@hotmail.com |
| ben.baker@beasleyallen.com |
| ben@hoganlawoffice.com |
| bentonmusslewhite@gmail.com |
| bfinley@thefinleyfirm.com |
| bgideon@bermansimmons.com |
| bill@ballardandfeagle.com |
| blair@durhamanddread.com |
| bleger@lkclawfirm.com |
| bleydon@tooherwocl.com |
| bob@butlerwooten.com |
| bob@gtinjurylaw.com |
| bob@lelaw.com |
| bobh@hmglawfirm.com |

| Service Addresses |
|---|
| brad@kuhlmanlucas.com |
| brianc@wrightroy.com |
| brown@whafh.com |
| bsk@kbklawyers.com |
| cale@conleygriggs.com |
| cathy@butlerwooten.com |
| cbailey@bpblaw.com |
| cdalbey@weitzlux.com |
| cellison@eaalawfirm.com |
| chaffin@chaffinluhana.com |
| chris@nidellaw.com |
| cjuhas@wernlawyers.com |
| ckitner@chaikenlaw.com |
| ckutteh@popemcmillan.com |
| cole.portis@beasleyallen.com |
| conrad_r_blease@yahoo.com |
| contact@sangisettylaw.com* |
| corrigan@onderlaw.com |
| cpeifer@peiferlaw.com |
| cwilson@courtlaw.net |
| dave@getstewart.com |
| david@davidbryantlaw.com |
| dcarasso@bisnarchase.com |
| ddefeo@defeokolker.com |
| demingmd@deminglaw.com |
| dfranco@dugan-lawfirm.com |
| dgolden@akingump.com |
| dharris@swhhb.com |
| dhm@morrisplayer.com |
| dixonlaw101@yahoo.com |
| djnewman@akingump.com |
| dmatthews@thematthewslawfirm.com |
| dmolton@brownrudnick.com |
| doreen@thecooperfirm.com |

| Service Addresses | Service Addresses |
|---|---|
| dpotts@potts-law.com | jimragan13@gmail.com |
| drl@spanglaw.com | jlowe@lewlaw.com |
| ecabraser@lchb.com | jniemi@anapolschwartz.com |
| edk@stlouisattorney.com | jonbailey@thebaileyfirm.com |
| eforaker@stipelaw.com | josephhoats@hotmail.com |
| eohagan@goodwinprocter.com | josh@thejdfirm.com |
| ejensen@potts-law.com | jprather@garmerprather.com |
| ericchandlerlaw@gmail.com | jritch@elliottritch.com |
| eservice@egletwall.com | jsimon@simonlawpc.com |
| esserman@sbep-law.com | jsm@rhinelawfirm.com |
| eweisfelner@brownrudnick.com | jttenge@tengelaw.com |
| fcwilkerson@aol.com | julie@butlerwooten.com |
| fherrera@herreralaw.com | justin@stephenskellylaw.com |
| frank@tomenylawfirm.com | jwharris1@prodigy.net |
| gcantu@norriscantulaw.com | jwigington@wigrum.com |
| genetullos@tullosandtullos.com | kanthony@anthonylaw.com |
| gerdes@nocoxmail.com | kcarnie@simonlawpc.com |
| greg@gevanslaw.com | kdean@motleyrice.com |
| gfox@goodwinprocter.com | ken@ulawok.com |
| ghlf@scrtc.com | kent@lelaw.com |
| ghoward@doatty.com* | kharvey@mlgautomotivelaw.com |
| gmarcos@marcoslawfirm.com | kmarks@lkclawfirm.com |
| graham.esdale@beasleyallen.com | kmartorana@gibsondunn.com |
| greg@ballardandfeagle.com | kris@ledford-lawfirm.com |
| gscott@lewlaw.com | kworks@christiansenlaw.com |
| gwhealyiv@aol.com | lance@thecooperfirm.com |
| hsteel@brownrudnick.com | lauren@hmglawfirm.com |
| hwhite@wcwattorneys.com | lawwb@sbcglobal.net* |
| janthony@anthonylaw.com | lbrad@kuhlmanlucas.com |
| jasonharr@harrlawfirm.com | lbrown@leebrownlaw.com |
| jasonz@hbsslaw.com | lcoben@anapolschwartz.com |
| jbilsborrow@weitzlux.com | lkrzesienski@flemingattorneys.com |
| jdiehl@akingump.com | lrayon@reganlaw.net |
| jdugan@dugan-lawfirm.com | lrubin@gibsondunn.com |
| jdunahoe@heardrobins.com | lspringberg@thomasandspringberg.com |
| jdunn@wigrum.com | ltien@bpblaw.com |
| jeff@lbjmlaw.com | lwalsh@vrslaw.com |
| jelliott@richardsonplowden.com | mac@mccoollawms.com |
| jere.beasley@beasleyallen.com | mail@doatty.com* |
| jflaxer@golenbock.com | marion@hmglawfirm.com |
| jgilbert@thegilbertlawgroup.com | marksossi@hotmail.com |
| jguest@jguestlaw.com | marshall@poncelaw.com |

| Service Addresses | Service Addresses |
|---|---|
| matoups@wgttlaw.com | rcrosby@pmped.com |
| mbs@clalaw.com | rdreyer@dbbwc.com |
| mccarley@fnlawfirm.com | rgreenwald@weitzlux.com |
| mdoebler@pribanic.com | rhanson@peiferlaw.com |
| mgraham@grgpc.com | richard@conleygriggs.com |
| michael@lexingtonlg.com | rick.morrison@beasleyallen.com |
| michael@mhrolaw.com | rob@ammonslaw.com |
| michael@poncelaw.com | rob@butlerwooten.com |
| michael@vilesandbeckman.com | robert@fergusonlaw.com |
| mike.andrews@beasleyallen.com | rporter@ralphporterlaw.com |
| mikerglaw@gmail.com | rsahadi@wigrum.com |
| mjwilliams@gibsondunn.com | rshenkan@shenkanlaw.com |
| mmlk@mmlkadvantage.com | ryan@stephenskellylaw.com |
| morenstein@brownrudnick.com | samantha@ammonslaw.com |
| mpentz@popemcmillan.com | sawyer.higinbotham@gmail.com |
| mrader@bflawfirm.com | schmidt@whafh.com |
| mrobinson@rcrlaw.net | scott@scottcallahan.com |
| mstaun@hartleyobrien.com | scott@scottpalmerlaw.com |
| mtilton@tiltonlawfirm.com | scrowley@cbs-lawyers.com |
| mweisberg@weisberglawoffices.com | sferrell@ferrell-lawfirm.com |
| nancy@erlegal.com | sidney@bcoonlaw.com |
| nmoss@akingump.com | simpsoncurtis@comcast.net |
| noahprosser@harrlawfirm.com | snapolitano@carterlawgroupllc.com |
| nwest@deminglaw.com | snorris@norriscantulaw.com |
| obie26@aol.com | steve.hammond@hammondtownsend.com |
| oleary@onderlaw.com | steve@hbsslaw.com |
| onder@onderlaw.com | steve@hilliardshadowenlaw.com |
| patricia@ammonslaw.com | stevenstolze@sbcglobal.net |
| paul@komyattelawfirm.com | stewart@erlegal.com |
| paul@pdhermannpc.com | tab@tturner.com |
| pcarroll@cozen.com | tch@psstf.com |
| pcarter@carterlawgroupllc.com | tcoplaw@bellsouth.net |
| peller@law.georgetown.edu | tedra@butlerwooten.com |
| pete@christiansenlaw.com | thelaw@robertwmillerky.com |
| power@lemonlawonline.com | tjhenry@thomasjhenrylaw.com |
| pricardo@golenbock.com | tmaxcey@stipelaw.com |
| radelman@ahctriallaw.com | tom@bryantlawkc.com |
| ranse@conleygriggs.com | tomyuhas@ix.netcom.com |
| rbale@dbbwc.com | tterry@christiansenlaw.com |
| rcanche@lkclawfirm.com | tvanronzelen@cvdl.net |
| rchaiken@chaikenlaw.com | tyesmith@carrcarrokc.com |
| rcowan@bpblaw.com | vpribanic@pribanic.com |

| Service Addresses |
| --- |
| walton@hartleyhickman.com |
| wbriggs@winstonbriggslaw.com |
| whammill@attorneykennugent.com |
| will@bccnlaw.com |
| william@lawlandsman.com |
| wjsingleton@singletonlaw.com |

| Service Addresses |
| --- |
| wstapleton@hooperhathaway.com |
| wweintraub@goodwinprocter.com |
| zinbarglaw@aol.com |
| tmorgan@sullivantrial.com |
| rsullivan@sullivantrial.com |

* Denotes an email address where an "undeliverable" message was received. In these instances, the document was mailed via overnight mail (as indicated in the next section) to the respective mailing address for the email address.

09-50026-reg   Doc 13460-1   Filed 09/23/15   Entered 09/23/15 19:38:11   Main Document Pg 447 of 481

## Service List For September 22, 2015

### Documents Served *via* Overnight Delivery:

1 -  *Reply Brief by General Motors LLC with Respect to Whether Plaintiffs May Seek Punitive Damages From General Motors LLC Based On The Conduct Of General Motors Corporation* [Dkt. No. 13460]

| Service Address | |
|---|---|
| Brian S. Masumoto<br>OFFICE OF THE UNITED STATES TRUSTEE<br>U.S. Federal Office Building<br>201 Varick Street, Suite 1006<br>New York, NY 10014 | Mark Brnovich<br>Attorney General<br>OFFICE OF THE ATTORNEY GENERAL<br>1275 West Washington Street<br>Phoenix, AZ 85007 |
| Robert P. Woodliff<br>ARAIZA & WOODLIFF<br>4144 N. Central Expressway, #600<br>Dallas, TX  75204 | W. Ransom Piples<br>Blaine T. Aydell<br>HANNAH, COLVIN & PIPES, LLP<br>10626 Timberlake Dr.<br>Bataon Rouge, LA 70810 |
| Eric D. Applebaum<br>FEIN, EMOND & APPLEBAUM, P.C.<br>52 Mulberry Street<br>Springfield, MA 01105 | Thomas J. Weihing<br>DALY WEIHING & BOCHANIS<br>1776 North Ave.<br>Bridgeport, CT 06604 |
| John M. Neal<br>THE NEAL LAW FIRM<br>P.O. Box 51930<br>Knoxville, Tennessee | Timothy P. Lupardus<br>LUPARDUS LAW OFFICE<br>Post Office Box 1680<br>Pineville, West Virginia 24874 |
| Stephen P. New<br>114 Main Street<br>Beckley WV 25801 | Frank E. Simmerman, Jr.<br>Chad L. Taylor<br>Frank E. Simmerman, III<br>SIMMERMAN LAW OFFICE, PLLC<br>254 East Main Street<br>Clarksburg, WV 26301 |
| D. Adrian Hoosier, II<br>THE HOOSIER LAW FIRM PLLC<br>120 Capital Street<br>Charleston, W. Virginia 25301 | John C. Collins, Esquire<br>LAW OFFICE OF JOHN C. COLLINS<br>228 West Maple Street<br>P.O. Box 475<br>Salyersville, KY 41465 |

| **Service Address** | |
|---|---|
| | |
| Richard J. Valle<br>CARTER & VALLE LAW FIRM, P.C.<br>8012 Pennsylvania Circle, NE<br>Albuquerque, NM 87110 | Lance Entrekin<br>THE ENTREKIN LAW FIRM<br>One East Camelback Road, Suite 710<br>Phoenix, AZ 85012 |
| Carlos Eduardo Cardenas<br>LAW OFFICE OF CARLOS EDUARDO<br>CARDENAS<br>717 E. San Antonio Street<br>3rd Floor<br>El Paso, TX 79901 | Darryl Dunsmore<br>AD #6327<br>P.O. BOX 2000<br>1600 California Drive<br>Vacaville, CA 95696-2000 |
| E. Todd Tracy<br>THE TRACY FIRM<br>5473 Blair Road, Suite 200<br>Dallas, TX 75231 | Richard C. Dalton<br>RICHARD C. DALTON, LLC<br>111 Park West Drive<br>Scott, Louisiana 70583 |
| D. Blayne Honeycutt<br>Colt Fore<br>FAYARD & HONEYCUTT<br>519 Florida Boulevard SW<br>Denham Springs, LA 70726 | Ramin R. Younessi<br>LAW OFFICES OF<br>RAMIN R. YOUNESSI<br>3435 Wilshire Boulevard Suite 2200<br>Los Angeles, CA 90010 |
| Joseph W. Carcione, Jr.<br>CARCIONE, CATTERMOLE, DOLINSKY,<br>STUCKY, MARKOWITZ, CARCIONE,<br>LLP<br>601 Brewster Avenue, P.O. Box 3389<br>Redwood City, CA 94063 | Joseph W. Carcione, Jr.<br>CARCIONE, CATTERMOLE, DOLINSKY,<br>STUCKY, MARKOWITZ, CARCIONE, LLP<br>1300 S. El Camino Real, Suite 300<br>San Mateo, CA 94402-2971 |
| Paul Minx<br>2330 Quail Lane<br>Longview, TX 75602 | Michael B. Fox<br>FOX LAW OFFICES<br>185 W. Tom T. Hall Blvd<br>Olive Hill, KY 41164 |
| Glen B. Rutherford<br>RUTHERFORD WEINSTEIN LAW<br>GROUP PLLC<br>418 S. Gay St., Suite 204<br>Knoxville, TN 37901-1668 | J. Norman O'Connor, Jr., Esquire<br>Gregory P. Howard, Esquire<br>DONOVAN & O'CONNOR, LLP<br>1330 Mass MoCA Way<br>North Adams, MA 01247 |

| **Service Address** | |
|---|---|
| | |
| Gladys Perez<br>63 Second Street, Unit 1<br>Waterford, New York | Gilbert Arrazolo<br>ARRAZOLO LAW PC<br>715 Tijeras Ave NW<br>Albuquerque, NM 87102 |
| John J. Driscoll<br>Christopher J. Quinn<br>THE DRISCOLL FIRM, P.C.<br>211 N. Broadway, 40th Floor<br>St. Louis, MO 63102 | Ben B. Mills , Jr.<br>MILLS LAW FIRM<br>315 S Main St<br>Fitzgerald, GA 31750 |
| James W. Flood, III<br>FLOOD LAW GROUP, LLP<br>1101 Pennsylvania Ave. NW<br>Suite 600<br>Washington, DC 20004 | Jan S. Kublick, Esquire<br>MCMAHON, KUBLICK LAW FIRM<br>500 South Salina Street<br>Suite 816<br>Syracuse, NY 13202 |
| Michael E. Carr<br>Patrick E. Carr<br>A. Laurie Koller<br>CARR & CARR ATTORNEYS<br>4416 South Harvard Avenue<br>Tulsa, OK 74135 | Ravik Sangisetty<br>Michael E. Lillis<br>SANGISETTY LAW FIRM, LLC<br>935 Gravier Street, Suite 835<br>New Orleans, La 70112 |

**Service List For September 22, 2015**

**Documents Served *via* First-Class Mail Delivery:**

1 - *Reply Brief by General Motors LLC with Respect to Whether Plaintiffs May Seek Punitive Damages From General Motors LLC Based On The Conduct Of General Motors Corporation* [Dkt. No. 13460]

| Service Address | |
|---|---|
| Angela Singleton<br>P.O. Box 1263<br>Woodville, MI 39669 | |

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur Steinberg
Scott Davidson

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Richard C. Godfrey, P.C. (admitted *pro hac vice*)
Andrew B. Bloomer, P.C. (admitted *pro hac vice*)

*Attorneys for General Motors LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
In re                                          :        Chapter 11
                                               :
MOTORS LIQUIDATION COMPANY, *et al.*,          :        Case No.: 09-50026 (REG)
        f/k/a General Motors Corp., *et al.*   :
                                               :
                        Debtors.               :        (Jointly Administered)
---------------------------------------------------------------x

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on *September 23, 2015* pursuant to the *Scheduling Order Regarding Case Management Order Re: No-Strike, No Stay, Objection, and GUC Trust Asset Pleading*, entered on September 3, 2015 [Dkt. No 13416] ("**<u>Scheduling Order</u>**"), I caused to be served a true and correct copy of the *Letter Filed on Behalf of General Motors LLC Regarding Other Plaintiffs' Complaints* (with Exhibits) [Dkt. No. 13466]. Copies of the document listed in the annexed service lists was served upon each of the persons and entities listed therein, by causing copies of same to be delivered *via* email and/or *via* overnight mail and/or *via* first-class mail.

Dated: September 24, 2015
      New York, New York

                      KING & SPALDING LLP

                      By:    /s/  Scott I. Davidson
                            Arthur J. Steinberg
                            Scott Davidson
                            King & Spalding LLP
                            1185 Avenue of the Americas
                            New York, NY 10036
                            Telephone: (212) 556-2100
                            Facsimile: (212) 556-2222

                            *Attorneys for General Motors LLC*

## Service List For September 23, 2015:

## Documents Served *via* Email:

1 - *Letter Filed on Behalf of General Motors LLC Regarding Other Plaintiffs' Complaints* (with Exhibits) [Dkt. No. 13466]

| Service Addresses | Service Addresses |
|---|---|
| acarter@sgpblaw.com | brianc@wrightroy.com |
| acutruzzula@cnlawfirm.net | brown@whafh.com |
| adam@lelaw.com | bsk@kbklawyers.com |
| adogali@dogalilaw.com | cale@conleygriggs.com |
| agoneiljr@nco-law.com | cathy@butlerwooten.com |
| ajanutolo@goodinabernathy.com | cbailey@bpblaw.com |
| akaram@karamlawfirm.com | cdalbey@weitzlux.com |
| akearse@motleyrice.com | cellison@eaalawfirm.com |
| akmartin@lchb.com | chaffin@chaffinluhana.com |
| alans@ksbrlaw.com | chris@nidellaw.com |
| anne@hilliardshadowenlaw.com | cjuhas@wernlawyers.com |
| aoffenhartz@gibsondunn.com | ckitner@chaikenlaw.com |
| aribeiro@vrslaw.com | ckutteh@popemcmillan.com |
| attorneyhagmaier@gmail.com | cole.portis@beasleyallen.com |
| attys@foothills.net | contact@sangisettylaw.com* |
| awu@gibsondunn.com | corrigan@onderlaw.com |
| bagosto@abrahamwatkins.com | cpeifer@peiferlaw.com |
| bchase@bisnarchase.com | cwilson@courtlaw.net |
| bcorl@potts-law.com | dave@getstewart.com |
| bcorson@sloanewalsh.com | david@davidbryantlaw.com |
| beachlawyer51@hotmail.com | dcarasso@bisnarchase.com |
| ben.baker@beasleyallen.com | ddefeo@defeokolker.com |
| ben@hoganlawoffice.com | demingmd@deminglaw.com |
| bentonmusslewhite@gmail.com | dfranco@dugan-lawfirm.com |
| bfinley@thefinleyfirm.com | dgolden@akingump.com |
| bgideon@bermansimmons.com | dharris@swhhb.com |
| bill@ballardandfeagle.com | dhm@morrisplayer.com |
| blair@durhamanddread.com | dixonlaw101@yahoo.com |
| bleger@lkclawfirm.com | djnewman@akingump.com |
| bleydon@tooherwocl.com | dmatthews@thematthewslawfirm.com |
| bob@butlerwooten.com | dmolton@brownrudnick.com |
| bob@gtinjurylaw.com | doreen@thecooperfirm.com |
| bob@lelaw.com | dpotts@potts-law.com |
| bobh@hmglawfirm.com | drl@spanglaw.com |
| brad@kuhlmanlucas.com | ecabraser@lchb.com |

| Service Addresses |
|---|
| edk@stlouisattorney.com |
| eforaker@stipelaw.com |
| eohagan@goodwinprocter.com |
| ejensen@potts-law.com |
| ericchandlerlaw@gmail.com |
| eservice@egletwall.com |
| esserman@sbep-law.com |
| eweisfelner@brownrudnick.com |
| fcwilkerson@aol.com |
| fherrera@herreralaw.com |
| frank@tomenylawfirm.com |
| gcantu@norriscantulaw.com |
| genetullos@tullosandtullos.com |
| gerdes@nocoxmail.com |
| greg@gevanslaw.com |
| gfox@goodwinprocter.com |
| ghlf@scrtc.com |
| ghoward@doatty.com* |
| gmarcos@marcoslawfirm.com |
| graham.esdale@beasleyallen.com |
| greg@ballardandfeagle.com |
| gscott@lewlaw.com |
| gwhealyiv@aol.com |
| hsteel@brownrudnick.com |
| hwhite@wcwattorneys.com |
| janthony@anthonylaw.com |
| jasonharr@harrlawfirm.com |
| jasonz@hbsslaw.com |
| jbilsborrow@weitzlux.com |
| jdiehl@akingump.com |
| jdugan@dugan-lawfirm.com |
| jdunahoe@heardrobins.com |
| jdunn@wigrum.com |
| jeff@lbjmlaw.com |
| jelliott@richardsonplowden.com |
| jere.beasley@beasleyallen.com |
| jflaxer@golenbock.com |
| jgilbert@thegilbertlawgroup.com |
| jguest@jguestlaw.com |
| jimragan13@gmail.com |
| jlowe@lewlaw.com |
| jniemi@anapolschwartz.com |

| Service Addresses |
|---|
| jonbailey@thebaileyfirm.com |
| josephhoats@hotmail.com |
| josh@thejdfirm.com |
| jprather@garmerprather.com |
| jritch@elliottritch.com |
| jsimon@simonlawpc.com |
| jsm@rhinelawfirm.com* |
| jttenge@tengelaw.com |
| julie@butlerwooten.com |
| justin@stephenskellylaw.com |
| jwharris1@prodigy.net |
| jwigington@wigrum.com |
| kanthony@anthonylaw.com |
| kcarnie@simonlawpc.com |
| kdean@motleyrice.com |
| ken@ulawok.com |
| kent@lelaw.com |
| kharvey@mlgautomotivelaw.com |
| kmarks@lkclawfirm.com |
| kmartorana@gibsondunn.com |
| kris@ledford-lawfirm.com |
| kworks@christiansenlaw.com |
| lance@thecooperfirm.com |
| lauren@hmglawfirm.com |
| lawwb@sbcglobal.net* |
| lbrad@kuhlmanlucas.com |
| lbrown@leebrownlaw.com |
| lcoben@anapolschwartz.com |
| lkrzesienski@flemingattorneys.com |
| lrayon@reganlaw.net |
| lrubin@gibsondunn.com |
| lspringberg@thomasandspringberg.com |
| ltien@bpblaw.com |
| lwalsh@vrslaw.com |
| mac@mccoollawms.com |
| mail@doatty.com* |
| marion@hmglawfirm.com |
| marksossi@hotmail.com |
| marshall@poncelaw.com |
| matoups@wgttlaw.com |
| mbs@clalaw.com |
| mccarley@fnlawfirm.com |

| Service Addresses |
|---|
| mdoebler@pribanic.com |
| mgraham@grgpc.com |
| michael@lexingtonlg.com |
| michael@mhrolaw.com |
| michael@poncelaw.com |
| michael@vilesandbeckman.com |
| mike.andrews@beasleyallen.com |
| mikerglaw@gmail.com |
| mjwilliams@gibsondunn.com |
| mmlk@mmlkadvantage.com |
| morenstein@brownrudnick.com |
| mpentz@popemcmillan.com |
| mrader@bflawfirm.com |
| mrobinson@rcrlaw.net |
| mstaun@hartleyobrien.com |
| mtilton@tiltonlawfirm.com |
| mweisberg@weisberglawoffices.com |
| nancy@erlegal.com |
| nmoss@akingump.com |
| noahprosser@harrlawfirm.com |
| nwest@deminglaw.com |
| obie26@aol.com |
| oleary@onderlaw.com |
| onder@onderlaw.com |
| patricia@ammonslaw.com |
| paul@komyattelawfirm.com |
| paul@pdhermannpc.com |
| pcarroll@cozen.com |
| pcarter@carterlawgroupllc.com |
| peller@law.georgetown.edu |
| pete@christiansenlaw.com |
| power@lemonlawonline.com |
| pricardo@golenbock.com |
| radelman@ahctriallaw.com |
| ranse@conleygriggs.com |
| rbale@dbbwc.com |
| rcanche@lkclawfirm.com |
| rchaiken@chaikenlaw.com |
| rcowan@pgblaw.com |
| rcrosby@pmped.com |
| rdreyer@dbbwc.com |
| rgreenwald@weitzlux.com |

| Service Addresses |
|---|
| rhanson@peiferlaw.com |
| richard@conleygriggs.com |
| rick.morrison@beasleyallen.com |
| rob@ammonslaw.com |
| rob@butlerwooten.com |
| robert@fergusonlaw.com |
| rporter@ralphporterlaw.com |
| rsahadi@wigrum.com |
| rshenkan@shenkanlaw.com |
| ryan@stephenskellylaw.com |
| samantha@ammonslaw.com |
| sawyer.higinbotham@gmail.com |
| schmidt@whafh.com |
| scott@scottcallahan.com |
| scott@scottpalmerlaw.com |
| scrowley@cbs-lawyers.com |
| sferrell@ferrell-lawfirm.com |
| sidney@bcoonlaw.com |
| simpsoncurtis@comcast.net |
| snapolitano@carterlawgroupllc.com |
| snorris@norriscantulaw.com |
| steve.hammond@hammondtownsend.com |
| steve@hbsslaw.com |
| steve@hilliardshadowenlaw.com |
| stevenstolze@sbcglobal.net |
| stewart@erlegal.com |
| tab@tturner.com |
| tch@psstf.com |
| tcoplaw@bellsouth.net |
| tedra@butlerwooten.com |
| thelaw@robertwmillerky.com |
| tjhenry@thomasjhenrylaw.com |
| tmaxcey@stipelaw.com |
| tom@bryantlawkc.com |
| tomyuhas@ix.netcom.com |
| tterry@christiansenlaw.com |
| tvanronzelen@cvdl.net |
| tyesmith@carrcarrokc.com |
| vpribanic@pribanic.com |
| walton@hartleyhickman.com |
| wbriggs@winstonbriggslaw.com |
| whammill@attorneykennugent.com |

09-50026-reg   Doc 13466   Filed 09/24/15   Entered 09/24/15 14:32:43   Main Document
Pg 9 of 50

| Service Addresses |
| --- |
| will@bccnlaw.com |
| william@lawlandsman.com |
| wjsingleton@singletonlaw.com |
| wstapleton@hooperhathaway.com |

| Service Addresses |
| --- |
| wweintraub@goodwinprocter.com |
| zinbarglaw@aol.com |
| tmorgan@sullivantrial.com |
| rsullivan@sullivantrial.com |

\* Denotes an email address where an "undeliverable" message was received. In these instances, the document was mailed via overnight mail (as indicated in the next section(s)) to the respective mailing address for the email address.

## Service List For September 23, 2015

### Documents Served *via* Overnight Delivery:

1 - *Letter Filed on Behalf of General Motors LLC Regarding Other Plaintiffs' Complaints* (with Exhibits) [Dkt. No. 13466]

| Service Address | |
|---|---|
| Brian S. Masumoto<br>OFFICE OF THE UNITED STATES TRUSTEE<br>U.S. Federal Office Building<br>201 Varick Street, Suite 1006<br>New York, NY 10014 | Mark Brnovich<br>Attorney General<br>OFFICE OF THE ATTORNEY GENERAL<br>1275 West Washington Street<br>Phoenix, AZ 85007 |
| Robert P. Woodliff<br>ARAIZA & WOODLIFF<br>4144 N. Central Expressway, #600<br>Dallas, TX 75204 | W. Ransom Piples<br>Blaine T. Aydell<br>HANNAH, COLVIN & PIPES, LLP<br>10626 Timberlake Dr.<br>Bataon Rouge, LA 70810 |
| Eric D. Applebaum<br>FEIN, EMOND & APPLEBAUM, P.C.<br>52 Mulberry Street<br>Springfield, MA 01105 | Thomas J. Weihing<br>DALY WEIHING & BOCHANIS<br>1776 North Ave.<br>Bridgeport, CT 06604 |
| John M. Neal<br>THE NEAL LAW FIRM<br>P.O. Box 51930<br>Knoxville, Tennessee | Timothy P. Lupardus<br>LUPARDUS LAW OFFICE<br>Post Office Box 1680<br>Pineville, West Virginia 24874 |
| Stephen P. New<br>114 Main Street<br>Beckley WV 25801 | Frank E. Simmerman, Jr.<br>Chad L. Taylor<br>Frank E. Simmerman, III<br>SIMMERMAN LAW OFFICE, PLLC<br>254 East Main Street<br>Clarksburg, WV 26301 |
| D. Adrian Hoosier, II<br>THE HOOSIER LAW FIRM PLLC<br>120 Capital Street<br>Charleston, W. Virginia 25301 | John C. Collins, Esquire<br>LAW OFFICE OF JOHN C. COLLINS<br>228 West Maple Street<br>P.O. Box 475<br>Salyersville, KY 41465 |

| Service Address | |
|---|---|
| Richard J. Valle<br>CARTER & VALLE LAW FIRM, P.C.<br>8012 Pennsylvania Circle, NE<br>Albuquerque, NM 87110 | Lance Entrekin<br>THE ENTREKIN LAW FIRM<br>One East Camelback Road, Suite 710<br>Phoenix, AZ 85012 |
| Carlos Eduardo Cardenas<br>LAW OFFICE OF CARLOS EDUARDO<br>CARDENAS<br>717 E. San Antonio Street<br>3rd Floor<br>El Paso, TX  79901 | Darryl Dunsmore<br>AD #6327<br>P.O. BOX 2000<br>1600 California Drive<br>Vacaville, CA 95696-2000 |
| E. Todd Tracy<br>THE TRACY FIRM<br>5473 Blair Road, Suite 200<br>Dallas, TX 75231 | Richard C. Dalton<br>RICHARD C. DALTON, LLC<br>111 Park West Drive<br>Scott, Louisiana 70583 |
| D. Blayne Honeycutt<br>Colt Fore<br>FAYARD & HONEYCUTT<br>519 Florida Boulevard SW<br>Denham Springs, LA 70726 | Ramin R. Younessi<br>LAW OFFICES OF<br>RAMIN R. YOUNESSI<br>3435 Wilshire Boulevard Suite 2200<br>Los Angeles, CA 90010 |
| Joseph W. Carcione, Jr.<br>CARCIONE, CATTERMOLE, DOLINSKY,<br>STUCKY, MARKOWITZ, CARCIONE, LLP<br>601 Brewster Avenue, P.O. Box 3389<br>Redwood City, CA 94063 | Joseph W. Carcione, Jr.<br>CARCIONE, CATTERMOLE, DOLINSKY,<br>STUCKY, MARKOWITZ, CARCIONE, LLP<br>1300 S. El Camino Real, Suite 300<br>San Mateo, CA  94402-2971 |
| Paul Minx<br>2330 Quail Lane<br>Longview, TX 75602 | Michael B. Fox<br>FOX LAW OFFICES<br>185 W. Tom T. Hall Blvd<br>Olive Hill, KY 41164 |
| Glen B. Rutherford<br>RUTHERFORD WEINSTEIN LAW GROUP<br>PLLC<br>418 S. Gay St., Suite 204<br>Knoxville, TN 37901-1668 | J. Norman O'Connor, Jr., Esquire<br>Gregory P. Howard, Esquire<br>DONOVAN & O'CONNOR, LLP<br>1330 Mass MoCA Way<br>North Adams, MA  01247 |

09-50026-reg   Doc 13466   Filed 09/24/15   Entered 09/24/15 14:31:11   Main Document Pg 9 of 20

| Service Address | |
|---|---|
| Gladys Perez<br>63 Second Street, Unit 1<br>Waterford, New York | Gilbert Arrazolo<br>ARRAZOLO LAW PC<br>715 Tijeras Ave NW<br>Albuquerque, NM 87102 |
| John J. Driscoll<br>Christopher J. Quinn<br>THE DRISCOLL FIRM, P.C.<br>211 N. Broadway, 40th Floor<br>St. Louis, MO 63102 | Ben B. Mills , Jr.<br>MILLS LAW FIRM<br>315 S Main St<br>Fitzgerald, GA 31750 |
| James W. Flood, III<br>FLOOD LAW GROUP, LLP<br>1101 Pennsylvania Ave. NW<br>Suite 600<br>Washington, DC 20004 | Jan S. Kublick, Esquire<br>MCMAHON, KUBLICK LAW FIRM<br>500 South Salina Street<br>Suite 816<br>Syracuse, NY 13202 |
| Michael E. Carr<br>Patrick E. Carr<br>A. Laurie Koller<br>CARR & CARR ATTORNEYS<br>4416 South Harvard Avenue<br>Tulsa, OK 74135 | Ravik Sangisetty<br>Michael E. Lillis<br>SANGISETTY LAW FIRM, LLC<br>935 Gravier Street, Suite 835<br>New Orleans, La 70112 |
| Jean Sutton Martin<br>RHINE MARTIN LAW FIRM, P.C.<br>1612 Military Cutoff, Suite 300<br>Wilmington, NC 28403 | |

09-50026-reg  Doc 13466  Filed 09/24/15  Entered 09/24/15 14:31:11  Main Document
Pg 10 of 10

**Service List For September 23, 2015**

**Documents Served *via* USPS Express Mail Delivery:**

1 - *Letter Filed on Behalf of General Motors LLC Regarding Other Plaintiffs' Complaints* (with Exhibits) [Dkt. No. 13466]

| Service Address | |
|---|---|
| Angela Singleton<br>P.O. Box 1263<br>Woodville, MI 39669 | |

09-50026-reg   Doc 13485-1   Filed 10/01/15   Entered 10/01/15 13:35:46   Main Document Pg 461 of 481

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
Arthur Steinberg
Scott Davidson

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Richard C. Godfrey, P.C. (admitted *pro hac vice*)
Andrew B. Bloomer, P.C. (admitted *pro hac vice*)

*Attorneys for General Motors LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re                                              :        Chapter 11
                                                   :
MOTORS LIQUIDATION COMPANY, *et al.*,              :        Case No.: 09-50026 (REG)
      f/k/a General Motors Corp., *et al.*         :
                                                   :
                              Debtors.             :        (Jointly Administered)
------------------------------------------------------------x

## CERTIFICATE OF SERVICE

This is to certify that on September 30, 2015, pursuant to the *Scheduling Order Regarding Case Management Order Re: No-Strike, No Stay, Objection, and GUC Trust Asset Pleading*, entered on September 3, 2015 [Dkt. No 13416] ("**Scheduling Order**"), I caused to be served a true and correct copy of the *Reply Brief by General Motors LLC with Respect to Whether Plaintiffs Can Automatically Impute to New GM Knowledge of the Events that Took Place at Old GM and/or as Reflected in Old GM'S Books and Records* [Dkt. No. 13482], by electronic mail on all parties receiving notice via the Court's ECF System.

In addition, copies of the document listed in the annexed service lists was served upon each of the persons and entities listed therein, by causing copies of same to be delivered *via* email and/or *via* overnight mail and/or *via* first-class mail.

Dated: October 1, 2015
        New York, New York

KING & SPALDING LLP

By:    /s/  Scott I. Davidson
        Arthur J. Steinberg
        Scott Davidson
        King & Spalding LLP
        1185 Avenue of the Americas
        New York, NY 10036
        Telephone: (212) 556-2100
        Facsimile: (212) 556-2222

        *Attorneys for General Motors LLC*

**Service List For September 30, 2015:**

**Documents Served *via* Email:**

(1) *Reply Brief by General Motors LLC with Respect to Whether Plaintiffs Can Automatically Impute to New GM Knowledge of the Events that Took Place at Old GM and/or as Reflected in Old GM'S Books and Records* [Dkt. No. 13482]

| **Service Addresses** | **Service Addresses** |
|---|---|
| acarter@sgpblaw.com | brown@whafh.com |
| acutruzzula@cnlawfirm.net | bsk@kbklawyers.com |
| adam@lelaw.com | cale@conleygriggs.com |
| adogali@dogalilaw.com | cathy@butlerwooten.com |
| agoneiljr@nco-law.com | cbailey@bpblaw.com |
| ajanutolo@goodinabernathy.com | cdalbey@weitzlux.com |
| akaram@karamlawfirm.com | cellison@eaalawfirm.com |
| akearse@motleyrice.com | chaffin@chaffinluhana.com |
| akmartin@lchb.com | chris@nidellaw.com |
| alans@ksbrlaw.com | cjuhas@wernlawyers.com |
| anne@hilliardshadowenlaw.com | ckitner@chaikenlaw.com |
| aoffenhartz@gibsondunn.com | ckutteh@popemcmillan.com |
| aribeiro@vrslaw.com | cole.portis@beasleyallen.com |
| attorneyhagmaier@gmail.com | contact@sangisettylaw.com* |
| attys@foothills.net | corrigan@onderlaw.com |
| awu@gibsondunn.com | cpeifer@peiferlaw.com |
| bchase@bisnarchase.com | cwilson@courtlaw.net |
| bcorl@potts-law.com | daltonlawfirm@aol.com |
| bcorson@sloanewalsh.com | dave@getstewart.com |
| beachlawyer51@hotmail.com | david@davidbryantlaw.com |
| ben.baker@beasleyallen.com | dcarasso@bisnarchase.com |
| ben@hoganlawoffice.com | ddefeo@defeokolker.com |
| bentonmusslewhite@gmail.com | demingmd@deminglaw.com |
| bfinley@thefinleyfirm.com | dfranco@dugan-lawfirm.com |
| bgideon@bermansimmons.com | dgolden@akingump.com |
| bill@ballardandfeagle.com | dhm@morrisplayer.com |
| blair@durhamanddread.com | dixonlaw101@yahoo.com |
| bleger@lkclawfirm.com | djnewman@akingump.com |
| bleydon@tooherwocl.com | dmatthews@thematthewslawfirm.com |
| bob@butlerwooten.com | dmolton@brownrudnick.com |
| bob@gtinjurylaw.com | doreen@thecooperfirm.com |
| bob@lelaw.com | dpotts@potts-law.com |
| bobh@hmglawfirm.com | drl@spanglaw.com |
| brad@kuhlmanlucas.com | ecabraser@lchb.com |
| brianc@wrightroy.com | edk@stlouisattorney.com |

| Service Addresses |
|---|
| eforaker@stipelaw.com |
| eohagan@goodwinprocter.com |
| ejensen@potts-law.com |
| ericchandlerlaw@gmail.com |
| eservice@egletwall.com |
| esserman@sbep-law.com |
| eweisfelner@brownrudnick.com |
| fcwilkerson@aol.com |
| frank@tomenylawfirm.com |
| genetullos@tullosandtullos.com |
| gerdes@nocoxmail.com |
| greg@gevanslaw.com |
| gfox@goodwinprocter.com |
| ghlf@scrtc.com |
| ghoward@doatty.com* |
| gmarcos@marcoslawfirm.com |
| graham.esdale@beasleyallen.com |
| greg@ballardandfeagle.com |
| gscott@lewlaw.com |
| gwhealyiv@aol.com |
| hsteel@brownrudnick.com |
| hwhite@wcwattorneys.com |
| janthony@anthonylaw.com |
| jasonharr@harrlawfirm.com |
| jasonz@hbsslaw.com |
| jbilsborrow@weitzlux.com |
| jdiehl@akingump.com |
| jdugan@dugan-lawfirm.com |
| jdunahoe@heardrobins.com |
| jdunn@wigrum.com |
| jeff@lbjmlaw.com |
| jelliott@richardsonplowden.com |
| jere.beasley@beasleyallen.com |
| jflaxer@golenbock.com |
| jgilbert@thegilbertlawgroup.com |
| jguest@jguestlaw.com |
| jimragan13@gmail.com |
| jlowe@lewlaw.com |
| jniemi@anapolschwartz.com |
| jonbailey@thebaileyfirm.com |
| josephhoats@hotmail.com |
| josh@thejdfirm.com |
| jprather@garmerprather.com |

| Service Addresses |
|---|
| jritch@elliottritch.com |
| jsimon@simonlawpc.com |
| jsm@rhinelawfirm.com |
| jttenge@tengelaw.com |
| julie@butlerwooten.com |
| justin@stephenskellylaw.com |
| jwharris1@prodigy.net |
| jwigington@wigrum.com |
| kanthony@anthonylaw.com |
| kcarnie@simonlawpc.com |
| kdean@motleyrice.com |
| ken@ulawok.com |
| kent@lelaw.com |
| kharvey@mlgautomotivelaw.com |
| kmarks@lkclawfirm.com |
| kmartorana@gibsondunn.com |
| kris@ledford-lawfirm.com |
| kworks@christiansenlaw.com |
| lance@thecooperfirm.com |
| lauren@hmglawfirm.com |
| lawwb@sbcglobal.net* |
| lbrown@leebrownlaw.com |
| lcoben@anapolschwartz.com |
| lrayon@reganlaw.net |
| lrubin@gibsondunn.com |
| lspringberg@thomasandspringberg.com |
| ltien@bpblaw.com |
| lwalsh@vrslaw.com |
| mac@mccoollawms.com |
| mail@doatty.com* |
| marion@hmglawfirm.com |
| marksossi@hotmail.com |
| marshall@poncelaw.com |
| matoups@wgttlaw.com |
| mbs@clalaw.com |
| mccarley@fnlawfirm.com |
| mdoebler@pribanic.com |
| mgraham@grgpc.com |
| michael@lexingtonlg.com |
| michael@mhrolaw.com |
| michael@poncelaw.com |
| michael@vilesandbeckman.com |
| mike.andrews@beasleyallen.com |

| Service Addresses |
| --- |
| mikerglaw@gmail.com |
| mjwilliams@gibsondunn.com |
| mmlk@mmlkadvantage.com |
| morenstein@brownrudnick.com |
| mpentz@popemcmillan.com |
| mrader@bflawfirm.com |
| mrobinson@rcrlaw.net |
| mstaun@hartleyobrien.com |
| mtilton@tiltonlawfirm.com |
| mweisberg@weisberglawoffices.com |
| nancy@erlegal.com |
| nmoss@akingump.com |
| noahprosser@harrlawfirm.com |
| nwest@deminglaw.com |
| obie26@aol.com |
| oleary@onderlaw.com |
| onder@onderlaw.com |
| patricia@ammonslaw.com |
| paul@komyattelawfirm.com |
| paul@pdhermannpc.com |
| pcarter@carterlawgroupllc.com |
| peller@law.georgetown.edu |
| pete@christiansenlaw.com |
| power@lemonlawonline.com |
| pricardo@golenbock.com |
| radelman@ahctriallaw.com |
| ranse@conleygriggs.com |
| rbale@dbbwc.com |
| rcanche@lkclawfirm.com |
| rchaiken@chaikenlaw.com |
| rcowan@bpblaw.com |
| rcrosby@pmped.com |
| rdreyer@dbbwc.com |
| rgreenwald@weitzlux.com |
| rhanson@peiferlaw.com |
| richard@conleygriggs.com |
| rick.morrison@beasleyallen.com |
| rob@ammonslaw.com |
| rob@butlerwooten.com |
| robert@fergusonlaw.com |
| rporter@ralphporterlaw.com |
| rsahadi@wigrum.com |
| rshenkan@shenkanlaw.com |

| Service Addresses |
| --- |
| ryan@stephenskellylaw.com |
| samantha@ammonslaw.com |
| sawyer.higinbotham@gmail.com |
| schmidt@whafh.com |
| scott@scottcallahan.com |
| scott@scottpalmerlaw.com |
| scrowley@cbs-lawyers.com |
| sferrell@ferrell-lawfirm.com |
| sidney@bcoonlaw.com |
| simpsoncurtis@comcast.net |
| snapolitano@carterlawgroupllc.com |
| stacey@simmermanlaw.com |
| steve.hammond@hammondtownsend.com |
| steve@hbsslaw.com |
| steve@hilliardshadowenlaw.com |
| stevenstolze@sbcglobal.net |
| stewart@erlegal.com |
| tab@tturner.com |
| tch@psstf.com |
| tcoplaw@bellsouth.net |
| tedra@butlerwooten.com |
| thelaw@robertwmillerky.com |
| tjhenry@thomasjhenrylaw.com |
| tmaxcey@stipelaw.com |
| tom@bryantlawkc.com |
| tomyuhas@ix.netcom.com |
| tterry@christiansenlaw.com |
| tvanronzelen@cvdl.net |
| tyesmith@carrcarrokc.com |
| vpribanic@pribanic.com |
| walton@hartleyhickman.com |
| wbriggs@winstonbriggslaw.com |
| whammill@attorneykennugent.com |
| will@bccnlaw.com |
| william@lawlandsman.com |
| wjsingleton@singletonlaw.com |
| wstapleton@hooperhathaway.com |
| wweintraub@goodwinprocter.com |
| zinbarglaw@aol.com |
| tmorgan@sullivantrial.com |
| rsullivan@sullivantrial.com |

\* Denotes an email address where an "undeliverable" message was received. In these instances, the
document(s) was mailed via overnight mail (as indicated in the next section(s)) to the respective mailing
address for the email address.

09-50026-reg   Doc 13485-4   Filed 10/01/15   Entered 10/01/15 13:35:46   Main Document Pg 467 of 470

## Service List For September 30, 2015

**Documents Served *via* Overnight Delivery:**

(1) *Reply Brief by General Motors LLC with Respect to Whether Plaintiffs Can Automatically Impute to New GM Knowledge of the Events that Took Place at Old GM and/or as Reflected in Old GM'S Books and Records* [Dkt. No. 13482]

| Service Address | |
|---|---|
| Brian S. Masumoto<br>OFFICE OF THE UNITED STATES TRUSTEE<br>U.S. Federal Office Building<br>201 Varick Street, Suite 1006<br>New York, NY 10014 | Mark Brnovich<br>Attorney General<br>OFFICE OF THE ATTORNEY GENERAL<br>1275 West Washington Street<br>Phoenix, AZ 85007 |
| Robert P. Woodliff<br>ARAIZA & WOODLIFF<br>4144 N. Central Expressway, #600<br>Dallas, TX 75204 | W. Ransom Piples<br>Blaine T. Aydell<br>HANNAH, COLVIN & PIPES, LLP<br>10626 Timberlake Dr.<br>Bataon Rouge, LA 70810 |
| Eric D. Applebaum<br>FEIN, EMOND & APPLEBAUM, P.C.<br>52 Mulberry Street<br>Springfield, MA 01105 | Thomas J. Weihing<br>DALY WEIHING & BOCHANIS<br>1776 North Ave.<br>Bridgeport, CT 06604 |
| John M. Neal<br>THE NEAL LAW FIRM<br>1240B Old Weisgarber Rd.<br>P.O. Box 51930<br>Knoxville, TN 37909 | Timothy P. Lupardus<br>LUPARDUS LAW OFFICE<br>Post Office Box 1680<br>Pineville, West Virginia 24874 |
| Stephen P. New<br>114 Main Street<br>Beckley WV 25801 | Frank E. Simmerman, Jr.<br>Chad L. Taylor<br>Frank E. Simmerman, III<br>SIMMERMAN LAW OFFICE, PLLC<br>254 East Main Street<br>Clarksburg, WV 26301 |
| D. Adrian Hoosier, II<br>THE HOOSIER LAW FIRM PLLC<br>120 Capital Street<br>Charleston, W. Virginia 25301 | John C. Collins, Esquire<br>LAW OFFICE OF JOHN C. COLLINS<br>228 West Maple Street<br>P.O. Box 475<br>Salyersville, KY 41465 |

| Service Address | |
|---|---|
| Richard J. Valle<br>CARTER & VALLE LAW FIRM, P.C.<br>8012 Pennsylvania Circle, NE<br>Albuquerque, NM 87110 | Lance Entrekin<br>THE ENTREKIN LAW FIRM<br>One East Camelback Road, Suite 710<br>Phoenix, AZ 85012 |
| Carlos Eduardo Cardenas<br>LAW OFFICE OF CARLOS EDUARDO<br>CARDENAS<br>717 E. San Antonio Street<br>3rd Floor<br>El Paso, TX  79901 | Darryl Dunsmore<br>AD #6327<br>P.O. BOX 2000<br>1600 California Drive<br>Vacaville, CA 95696-2000 |
| E. Todd Tracy<br>THE TRACY FIRM<br>5473 Blair Road, Suite 200<br>Dallas, TX 75231 | Richard C. Dalton<br>RICHARD C. DALTON, LLC<br>1343 W Causeway Approach<br>Mandeville, LA 70471 |
| D. Blayne Honeycutt<br>Colt Fore<br>FAYARD & HONEYCUTT<br>519 Florida Boulevard SW<br>Denham Springs, LA 70726 | Ramin R. Younessi<br>LAW OFFICES OF<br>RAMIN R. YOUNESSI<br>3435 Wilshire Boulevard Suite 2200<br>Los Angeles, CA 90010 |
| Joseph W. Carcione, Jr.<br>CARCIONE, CATTERMOLE, DOLINSKY,<br>STUCKY, MARKOWITZ, CARCIONE, LLP<br>601 Brewster Avenue, P.O. Box 3389<br>Redwood City, CA 94063 | Joseph W. Carcione, Jr.<br>CARCIONE, CATTERMOLE, DOLINSKY,<br>STUCKY, MARKOWITZ, CARCIONE, LLP<br>1300 S. El Camino Real, Suite 300<br>San Mateo, CA   94402-2971 |
| Paul Minx<br>2330 Quail Lane<br>Longview, TX 75602 | Michael B. Fox<br>FOX LAW OFFICES<br>185 W. Tom T. Hall Blvd<br>Olive Hill, KY 41164 |
| Glen B. Rutherford<br>RUTHERFORD WEINSTEIN LAW GROUP<br>PLLC<br>418 S. Gay St., Suite 204<br>Knoxville, TN 37901-1668 | J. Norman O'Connor, Jr., Esquire<br>Gregory P. Howard, Esquire<br>DONOVAN & O'CONNOR, LLP<br>1330 Mass MoCA Way<br>North Adams, MA  01247 |
| Gladys Perez<br>63 Second Street, Unit 1<br>Waterford, New York | Gilbert Arrazolo<br>ARRAZOLO LAW PC<br>715 Tijeras Ave NW<br>Albuquerque, NM 87102 |

09-50026-mg    Doc 13485-4    Filed 10/01/15    Entered 10/01/15 13:35:46    Main Document
Pg 469 of 481

| Service Address | |
|---|---|
| John J. Driscoll<br>Christopher J. Quinn<br>THE DRISCOLL FIRM, P.C.<br>211 N. Broadway, 40th Floor<br>St. Louis, MO 63102 | Ben B. Mills , Jr.<br>MILLS LAW FIRM<br>315 S Main St<br>Fitzgerald, GA 31750 |
| James W. Flood, III<br>FLOOD LAW GROUP, LLP<br>1101 Pennsylvania Ave. NW<br>Suite 600<br>Washington, DC 20004 | Jan S. Kublick, Esquire<br>MCMAHON, KUBLICK LAW FIRM<br>500 South Salina Street<br>Suite 816<br>Syracuse, NY 13202 |
| Michael E. Carr<br>Patrick E. Carr<br>A. Laurie Koller<br>CARR & CARR ATTORNEYS<br>4416 South Harvard Avenue<br>Tulsa, OK 74135 | Ravik Sangisetty<br>Michael E. Lillis<br>SANGISETTY LAW FIRM, LLC<br>935 Gravier Street, Suite 835<br>New Orleans, La 70112 |
| Jean Sutton Martin<br>Rhine Martin Law Firm, P.C.<br>1612 Military Cutoff, Suite 300<br>Wilmington, NC 28403 | |

## Service List For September 30, 2015

**Documents Served *via* USPS Express Mail Delivery:**

(1) *Reply Brief by General Motors LLC with Respect to Whether Plaintiffs Can Automatically Impute to New GM Knowledge of the Events that Took Place at Old GM and/or as Reflected in Old GM'S Books and Records* [Dkt. No. 13482]

| Service Address | |
|---|---|
| Angela Singleton<br>P.O. Box 1263<br>Woodville, MI 39669 | |

# Exhibit  L

# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036-4003

Tel:  (212) 556-2100
Fax:  (212) 556-2222
www.kslaw.com

Scott Davidson
Direct Dial:  212-556-2164
sdavidson@kslaw.com

May 5, 2016

**Via E-Mail And Overnight Delivery**
Joshua P. Davis, Esq.
JOSH DAVIS LAW FIRM
1010 Lamar, Suite 200
Houston, Texas 77002

> Re:    *Stevens v. General Motors LLC, et al.*
>        *Case No.: 2015-04442*

Dear Counsel:

By this letter, General Motors LLC ("**New GM**") demands that certain allegations and damage requests made in the Original Petition filed in the above referenced lawsuit be withdrawn and/or amended due to the requirements of federal bankruptcy law, for the reasons explained below. You were previously sent a letter in August 2015 ("**2015 Letter**"), prior to the amended pleadings deadline for this case, highlighting issues with the Petition and explaining that the Petition needed to be amended.  At that time, the Bankruptcy Court had not yet issued the November Decision and December Judgment (each as defined below).  Those rulings (which were also issued prior to the amended pleadings deadline), mandate the amendment of the Petition, as explained herein.

Plaintiff is violating the Sale Order and Injunction[1] entered by the United States Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**"), as well as certain recent decisions and judgments entered by the Bankruptcy Court.[2]  The following allegations and damage requests are legally barred:

- Allegations that New GM is the successor of Old GM (no matter how phrased) (*see* Petition, ¶ 9);

---

[1]    A copy of the Sale Order and Injunction (with the Sale Agreement attached thereto) is annexed hereto as **Exhibit "A."**

[2]    *See In re Motors Liquidation Co.*, 529 B.R. 510 (Bankr. S.D.N.Y 2015) ("**April Decision**"); Judgment entered by the Bankruptcy Court on June 1, 2015 ("**June Judgment**"); *In re Motors Liquidation Co.*, 541 B.R. 104 (Bankr. S.D.N.Y. 2015) ("**November Decision**"); and Judgment entered by the Bankruptcy Court on December 4, 2015 ("**December Judgment**"). Copies of the June Judgment and December Judgment are annexed hereto as **Exhibit "B"** and **Exhibit "C,"** respectively.  Copies of the two published decisions of the Bankruptcy Court can be provided upon request.

Joshua P. Davis, Esq.
May 5, 2016
Page 2

- Allegations that merely refer to "GM" and do not distinguish between Old GM and New GM (*see id.*, ¶¶ 34, 38, 39, 40, 42, 46);

- Allegations that New GM designed, manufactured, tested, marketed and/or distributed the subject vehicle, a 2007 Saturn Sky ("**Subject Vehicle**"), or performed other conduct relating to the Subject Vehicle before the closing of the Sale from Old GM to New GM (*see id.*, ¶¶ 34 (and all subparts therein), 42, 44, 46, 47, 49, 50);

- Allegations that New GM assumed liabilities associated with the Recall Covenant contained in Section 6.15(a) of the Sale Agreement (*see id.*, ¶ 18); and

- All requests for punitive/exemplary damages sought in connection with Assumed Liabilities (as defined in the Sale Agreement) as against New GM; to the extent Plaintiff's claims purport to assert both Assumed Liabilities and Independent Claims in a single count (*see, e.g.*, Count I), they should clearly differentiate the allegations that relate to Assumed Liabilities and those that relate to Independent Claims.

## **Applicable Bankruptcy Court Rulings**

The Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (as amended) ("**Sale Agreement**"), which was approved by an Order, dated July 5, 2009 ("**Sale Order and Injunction**") of the Bankruptcy Court, provides that New GM assumed only three categories of liabilities for vehicles sold by Old GM: (a) post-sale accidents or incidents involving Old GM vehicles causing personal injury, loss of life or property damage; (b) repairs provided for under the "Glove Box Warranty"—a specific written warranty, of limited duration, that only covers repairs and replacement of parts and not monetary damages; and (c) Lemon Law claims (as defined in the Sale Agreement) essentially tied to the failure to honor the Glove Box Warranty. Except to the extent a claim is adequately pled as a viable Independent Claim (as defined in the June Judgment), all other liabilities relating to vehicles sold by Old GM were "Retained Liabilities" of Old GM. *See* Sale Agreement § 2.3(b). To the extent the claims asserted in the Petition are based on a successor liability theory or otherwise constitute Retained Liabilities, they were not assumed by New GM and, accordingly, New GM cannot be liable to Plaintiff for such claims. *See* Sale Order and Injunction, ¶¶ 7, 46; Sale Agreement, §§ 2.3(a), 2.3(b).

The December Judgment also described what types of allegations cannot be made in complaints asserting claims against New GM based on Old GM vehicles. Specifically, Plaintiff is prohibited from making allegations: (i) that New GM is the successor of Old GM (no matter how phrased) (*see* December Judgment, ¶ 16); (ii) that do not distinguish between Old GM and New GM (*see id.* ¶ 17); or (iii) that allege or suggest that New GM manufactured or designed an Old GM vehicle, or performed other conduct relating to an Old GM vehicle before the entry of the Sale Order and Injunction (*i.e.*, July 10, 2009) (*see id.* ¶ 18).

In addition, the December Judgment determined that New GM did not assume punitive/exemplary damages relating to assumed Product Liabilities under the Sale Agreement. Parties such as Plaintiff can only seek compensatory damages with respect to Assumed Liabilities. *See* December Judgment, ¶ 6 ("New GM did not contractually assume liability for punitive damages from Old GM.").

Joshua P. Davis, Esq.
May 5, 2016
Page 3

## The Barred Allegations and Requests for Damages in the Petition

The Bankruptcy Court's rulings apply to Plaintiff's lawsuit. As set forth on pages 1 to 2 above, the Petition contains allegations that are prohibited by the December Judgment, requiring that the Petition be amended and those allegations removed. Moreover, in the November Decision, the Bankruptcy Court expressly stated that the Recall Covenant contained in Section 6.15(a) of the Sale Agreement was not an Assumed Liability. *See* November Decision, 541 B.R. at 129 n. 67 ("New GM notes, properly, that this covenant was not an Assumed Liability . . . ."). Language in paragraph 18 of the Petition expressly alleges that New GM assumed liabilities associated with the Recall Covenant. This paragraph needs to be corrected.

In addition, it appears that Count I in the Petition purports to assert both an Assumed Liability and an Independent Claim.[3] Paragraph 67 in the Petition seeks punitive/exemplary damages, without distinguishing whether such damages are based on Assumed Liabilities or Independent Claims. As the Bankruptcy Court ruled in the December Judgment, Plaintiff may only seek punitive/exemplary damages against New GM for Independent Claims that are based solely on New GM's own independent post-Sale conduct, and not in any way based on Old GM conduct. *See* December Judgment, ¶¶ 6, 7. The Petition should be amended to make clear what specifically is being alleged as an Assumed Liability (for which Plaintiff cannot seek punitive/exemplary damages) and what specifically is being asserted as an Independent Claim in Count I. Any requests for punitive/exemplary damages as against New GM based on Assumed Liabilities should be stricken from the Petition.

## Deadline for You to Respond

The December Judgment stays the Lawsuit until all violations of the Sale Order and Injunction, and of the Bankruptcy Court's other rulings, are sufficiently addressed. *See, e.g.*, December Judgment, ¶¶ 16, 17, 18. Please let us know by **May 13, 2016** whether you will take the requested action and comply with the Bankruptcy Court's rulings.

New GM reserves all of its rights regarding any continuing violations of the Bankruptcy Court's rulings, including, but not limited to seeking all available relief if it is determined that there is a willful violation of the Sale Order and Injunction and the Bankruptcy Court's other rulings, particularly where Plaintiff previously received the 2015 Letter, which put Plaintiff on notice of applicable Bankruptcy Court rulings and the need to amend the Petition. *See FirstBank Puerto Rico v. Barclays Capital Inc. (In re Lehman Brothers Holdings Inc.)*; Summary Order, Case No. 15-149-br. (2d Cir. March 29, 2016).

This letter is intended to address only the existing Petition and those sections of the Petition that are contrary to the Bankruptcy Court's rulings. New GM does not consent to the filing of an amended pleading for any other purpose, such as adding heretofore unpled claims or theories as the deadline for amended pleadings has passed.

---

[3]    Count II appears to only assert an Assumed Liability against New GM.

Joshua P. Davis, Esq.
May 5, 2016
Page 4

If you have any questions, please call me.

Very truly yours,

*/s/ Scott Davidson*

Scott I. Davidson

SD/hs
Encl.

cc:    Kyle Dryer, Esq.
       Giovanna Tarantino Bingham, Esq.
       Andrew Bloomer, Esq.

# Exhibit  M



## DAVIS LAW GROUP

713.337.4100
TELEPHONE

1010 LAMAR, STE. 200
HOUSTON, TEXAS 77002

713.337.4101
FACSIMILE

JOSH DAVIS
josh@thejdfirm.com

June 9, 2016

***Via E-Filing***

Honorable Robert Schaffer
Judge of the 152nd Judicial District Court
Harris County Civil Courthouse
201 Caroline, 11th Floor
Houston, Texas 77002

      Re:    Cause No. 2015-04442; *Zachary Stevens et al. v. General Motors LLC et al.*; in the 152nd Judicial District Court of Harris County, Texas

Dear Judge Schaffer:

After further consultation between counsel for Plaintiffs and Defendants, the parties agreed to the attached Amended Petition to further clarify that Plaintiffs do not seek punitive damages against New GM that are not clearly allowed as Independent Claims. The attached proposed First Amended Petition includes paragraph 37 that reads as follows:

"For purposes of all of Plaintiffs' facts, claims and damages as alleged and outlined herein, Plaintiffs limit their demand for punitive or exemplary damages to only those Independent Claims (as defined in the Judgment entered by the United States Bankruptcy Court for the Southern District of New York ('Bankruptcy Court') on April 15, 2015, and as construed in subsequent rulings by the Bankruptcy Court and by District Judge Furman in MDL 2543 pending in the United States District Court for the Southern District of New York) against New GM arising on or after July 10, 2009."

HOUSTON OFFICE
1010 LAMAR, SUITE 200
HOUSTON, TEXAS 77002

SAN ANTONIO OFFICE
10999 IH-10 WEST, SUITE 318
SAN ANTONIO, TEXAS 78230

DAVIS LAW GROUP

Honorable Robert Schaffer
June 9, 2016
Page 2


     The parties are in agreement that this language should be included to further clarify Plaintiffs' claims. Please accept this proposed Fist Amended Petition to be <u>Exhibit A</u> to Plaintiffs' Unopposed Motion for Leave to File Plaintiffs' First Amended Petition and to be filed by the Clerk in accordance with the Court's anticipated Order. This is not, obviously, stipulating that New GM agrees to anything contained within the proposed First Amended Petition. Just that the clarification is necessary. Thank you.


     With best wishes,


     */s/ Joshua P. Davis*


     Joshua P. Davis


JPD/kam
Enclosure

cc:    All counsel

# Exhibit  N

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **MOTORS LIQUIDATION COMPANY,** *et al.,* | : | **Case No.: 09-50026 (MG)** |
| **f/k/a General Motors Corp.,** *et al.* | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-------------------------------------------------------------x

### ORDER GRANTING MOTION OF GENERAL MOTORS LLC  TO ENFORCE THE BANKRUPTCY COURT'S JULY 5, 2009 SALE ORDER AND INJUNCTION AND THE RULINGS IN CONNECTION THEREWITH WITH RESPECT TO STEVENS PLAINTIFFS

Upon the Motion, dated July 1, 2016 ("**Motion**"), of General Motors LLC ("**New GM**"),[1]

seeking the entry of an order (i) enforcing the Sale Order and Injunction, entered by the

Bankruptcy Court on July 5, 2009, and the Bankruptcy Court's rulings in connection therewith,

by directing the Stevens Plaintiffs to amend the Stevens Partial Summary Judgment Motion so

that it complies with the Sale Order and Injunction and the other Bankruptcy Court rulings, all as

more fully set forth in the Motion; and due and proper notice of the Motion having been

provided to counsel for the Stevens Plaintiffs, and it appearing that no other or further notice

need be given; and a hearing (the "**Hearing**") having been held with respect to the Motion on

July 18, 2016; and upon the record of the Hearing, the Court having found and determined that

the legal and factual bases set forth in the Motion establish just cause for the relief granted

herein; and after due deliberation and sufficient cause appearing therefore, it is therefore:

ORDERED that the Motion is GRANTED as set forth herein; and it is further

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

ORDERED that the Stevens Plaintiffs are enjoined from seeking any relief in the Stevens Lawsuit that seeks punitive damages based, in any way, on the acts or conduct of Old GM, including without limitation, seeking an exemption from the limitations placed on exemplary/punitive damages by the Texas Statute, as set forth in the Stevens Partial Summary Judgment Motion filed in the Stevens Lawsuit on June 24, 2016, based, in any way, on the acts or conduct of Old GM; and it is further

ORDERED that within one business day of this Order, the Stevens Plaintiffs shall either (i) withdraw their Stevens Partial Summary Judgment Motion; or (ii) file an amended motion, if permissible, that fully complies with this Order, the Sale Order and Injunction and the other Bankruptcy Court rulings; and it is further

ORDERED that until the Stevens Partial Summary Judgment Motion is withdrawn or a fully compliant amended Stevens Partial Summary Judgment Motion is filed with the Texas State Court, the Stevens Plaintiffs are enjoined from prosecuting the Stevens Lawsuit in its entirety: and it is further

ORDERED that this Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: _____, 2016
       New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

DMSLIBRARY01\29116365.v1