# EXHIBIT A

15-2844-bk(L)
*In re Motors Liquidation Co.*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

––––––––––––––––––––

August Term 2015

(Argued: March 15, 2016        Decided: July 13, 2016)

Docket Nos. 15-2844-bk(L), 15-2847-bk(XAP), 15-2848-bk(XAP)

––––––––––––––––––––

IN THE MATTER OF: MOTORS LIQUIDATION COMPANY,

*Debtor.*

––––––––––––––––––––

CELESTINE ELLIOTT, LAWRENCE ELLIOTT, BERENICE SUMMERVILLE,

*Creditors-Appellants-Cross-Appellees,*

SESAY AND BLEDSOE PLAINTIFFS, IGNITION SWITCH PLAINTIFFS, IGNITION SWITCH
PRE-CLOSING ACCIDENT PLAINTIFFS, DORIS POWLEDGE PHILLIPS,

*Appellants-Cross-Appellees,*

GROMAN PLAINTIFFS,

*Appellants,*

*v.*

GENERAL MOTORS LLC,

*Appellee-Cross-Appellant,*

Case 15-2844, Document 304-1, 07/13/2016, 1814453, Page2 of 74

WILMINGTON TRUST COMPANY,

*Trustee-Appellee-Cross-Appellant*,

PARTICIPATING UNITHOLDERS,

*Creditors-Appellees-Cross-Appellants*.[1]

―――――――――――――

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

―――――――――――――

Before:

STRAUB, CHIN, and CARNEY, *Circuit Judges*.

―――――――――――――

Appeal from a judgment of the United States Bankruptcy Court for

the Southern District of New York (Gerber, *J.*), enforcing a "free and clear"

provision of a sale order to enjoin claims against a debtor's successor corporation

and concluding under the equitable mootness doctrine that assets of the debtor's

unsecured creditors' trust would be protected from late-filed claims.  On appeal,

plaintiffs challenge the bankruptcy court's rulings that:  (1) it had jurisdiction, (2)

the sale order covered their claims, (3) enforcement of the sale order would not

―――――――――――

[1]        The Clerk of Court is respectfully directed to amend the official caption to
conform to the above.

Case 15-2844, Document 645, 07/13/2016, 1814311, Page3 of 74

violate procedural due process, and (4) relief for any late-filed claims would be

barred as equitably moot.

AFFIRMED, REVERSED, AND VACATED IN PART, AND REMANDED.

────────────────────

GARY PELLER, Washington, D.C., *for Creditors-Appellants-Cross-Appellees Celestine Elliott, Lawrence Elliott, and Berenice Summerville, and Appellants-Cross-Appellees Sesay and Bledsoe Plaintiffs.*

STEVEN W. BERMAN (Andrew M. Volk, *on the brief*), Hagens Berman Sobol Shapiro LLP, Seattle, Washington, *and* Elizabeth J. Cabraser, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, California, *and* Rachel J. Geman, Lieff Cabraser Heimann & Bernstein, LLP, New York, New York, *and* Edward S. Weisfelner, David J. Molton, Howard S. Steel, Brown Rudnick LLP, New York, New York, *and* Sandra L. Esserman, Stutzman, Bromberg, Esserman & Plifka, P.C., Dallas Texas, *for Appellants-Cross-Appellees Ignition Switch Plaintiffs.*

WILLIAM P. WEINTRAUB (Gregory W. Fox, *on the brief*), Goodwin Procter LLP, New York, New York, *for Appellants-Cross-Appellees Ignition Switch Pre-Closing Accident Plaintiffs.*

Joshua P. Davis, Josh Davis Law Firm, Houston, Texas, *for Appellant-Cross-Appellee Doris Powledge Phillips.*

ALEXANDER H. SCHMIDT, Wolf Haldenstein Adler
Freeman & Herz LLP, New York, New
York, *and* Jonathan L. Flaxer, Golenbock
Eiseman Assor Bell & Peskoe LLP, New
York, New York, *for Appellants Groman
Plaintiffs.*

ARTHUR J. STEINBERG (Scott Davidson, *on the brief*),
King & Spalding LLP, New York, New
York, *and* Merritt E. McAlister, King &
Spalding LLP, Atlanta, Georgia, *and*
Edward L. Ripley, King & Spalding LLP,
Houston, Texas, *and* Richard C. Godfrey,
Andrew B. Bloomer, Kirkland & Ellis LLP,
Chicago, Illinois, *for Appellee-Cross-
Appellant General Motors LLC.*

Adam H. Offenhartz, Aric H. Wu, Lisa H. Rubin,
Gabriel K. Gillett, Gibson, Dunn &
Crutcher LLP, New York, New York, *for
Trustee-Appellee-Cross-Appellant Wilmington
Trust Company.*

PRATIK A. SHAH, Akin Gump Strauss Hauer &
Feld LLP, Washington, D.C., *and* Daniel H.
Golden, Deborah J. Newman, Akin Gump
Strauss Hauer & Feld LLP, New York, New
York, *for  Creditors-Appellees-Cross-
Appellants Participating Unitholders.*

---

- 4 -

CHIN, *Circuit Judge*:

On June 1, 2009, General Motors Corporation ("Old GM"), the nation's largest manufacturer of automobiles and the creator of such iconic American brands as Chevrolet, Cadillac, and Jeep, filed for bankruptcy. During the financial crisis of 2007 and 2008, as access to credit tightened and consumer spending diminished, Old GM posted net losses of $70 billion over the course of a year and a half. The U.S. Department of the Treasury ("Treasury") loaned billions of dollars from the Troubled Asset Relief Program ("TARP") to buy the company time to revamp its business model. When Old GM's private efforts failed, President Barack Obama announced to the nation a solution -- "a quick, surgical bankruptcy."[2] Old GM petitioned for Chapter 11 bankruptcy protection, and only forty days later the new General Motors LLC ("New GM") emerged.

This case involves one of the consequences of the GM bankruptcy. Beginning in February 2014, New GM began recalling cars due to a defect in their ignition switches. The defect was potentially lethal: while in motion, a car's ignition could accidentally turn off, shutting down the engine, disabling power steering and braking, and deactivating the airbags.

---

[2]     *Remarks on the United States Automobile Industry*, 2009 Daily Comp. Pres. Doc. 2 (June 1, 2009).

Case 15-2844, Document 394-1, 07/13/2016, 1814093/1, Page8 of 74

Many of the cars in question were built years before the GM
bankruptcy, but individuals claiming harm from the ignition switch defect faced
a potential barrier created by the bankruptcy process.  In bankruptcy, Old GM
had used 11 U.S.C. § 363 of the Bankruptcy Code (the "Code") to sell its assets to
New GM "free and clear."  In plain terms, where individuals might have had
claims against Old GM, a "free and clear" provision in the bankruptcy court's sale
order (the "Sale Order") barred those same claims from being brought against
New GM as the successor corporation.

Various individuals nonetheless initiated class action lawsuits
against New GM, asserting "successor liability" claims and seeking damages for
losses and injuries arising from the ignition switch defect and other defects.  New
GM argued that, because of the "free and clear" provision, claims could only be
brought against Old GM, and not New GM.

On April 15, 2015, the United States Bankruptcy Court for the
Southern District of New York (Gerber, *J.*) agreed and enforced the Sale Order to
enjoin many of these claims against New GM.  Though the bankruptcy court also
determined that these plaintiffs did not have notice of the Sale Order as required
by the Due Process Clause of the Fifth Amendment, the bankruptcy court denied

plaintiffs relief from the Sale Order on all but a subset of claims.  Finally, the

bankruptcy court invoked the doctrine of equitable mootness to bar relief for

would-be claims against a trust established in bankruptcy court to pay out

unsecured claims against Old GM ("GUC Trust").[3]

The bankruptcy court entered judgment and certified the judgment

for direct review by this Court.[4]  Four groups of plaintiffs appealed, as did New

GM and GUC Trust.  We affirm, reverse, and vacate in part the bankruptcy

court's decision to enforce the Sale Order against plaintiffs and vacate as

advisory its decision on equitable mootness.

## BACKGROUND

### I.    *Bailout*

In the final two quarters of 2007, as the American economy suffered

a significant downturn, Old GM posted net losses of approximately $39 billion

and $722 million.  General Motors Corp., *Annual Report (Form 10-K)* 245 (Mar. 5,

2009).  In 2008, it posted quarterly net losses of approximately $3.3 billion, $15.5

---

[3]        For ease of reference, in the context of this appeal, we also refer to
Wilmington Trust Company (the administrator of GUC Trust) and the unitholders of
GUC Trust collectively and singularly as "GUC Trust."

[4]        *See* 28 U.S.C. § 158(d)(2) (providing jurisdiction for courts of appeals to
hear appeals if the bankruptcy court certifies that certain conditions are met).

Case 1:12-cv-13681    Document 564    Filed 07/13/16    Page 9 of 74

billion, $2.5 billion, and $9.6 billion. *Id.* In a year and a half, Old GM had managed to hemorrhage over $70 billion.

The possibility of Old GM's collapse alarmed many. Old GM employed roughly 240,000 workers and provided pensions to another 500,000 retirees. *Id.* at 19, 262. The company also purchased parts from over eleven thousand suppliers and marketed through roughly six thousand dealerships. A disorderly collapse of Old GM would have far-reaching consequences.

After Congress declined to bail out Old GM, President George W. Bush announced on December 19, 2008 that the executive branch would provide emergency loans to help automakers "stave off bankruptcy while they develop plans for viability."[5] In Old GM's case, TARP loaned $13.4 billion on the condition that Old GM both submit a business plan for long-term viability to the President no later than February 17, 2009 and undergo any necessary revisions no later than March 31, 2009. If the President found the business plan unsatisfactory, the TARP funds would become due and payable in thirty days, rendering Old GM insolvent and effectively forcing it into bankruptcy.

---

[5]    *Remarks on the American Auto Industry*, 44 Weekly Comp. Pres. Doc. 1569 (Dec. 19, 2008).

On March 30, 2009, President Obama told the nation that Old GM's business plan was not viable.[6]  At the same time, the President provided Old GM with another $6 billion loan and sixty more days to revise its plan along certain parameters.  President Obama also reassured the public:

> But just in case there's still nagging doubts, let me say it as plainly as I can:  If you buy a car from Chrysler or General Motors, you will be able to get your car serviced and repaired, just like always.  Your warranty will be safe.  In fact, it will be safer than it's ever been, because starting today, the United States Government will stand behind your warranty.[7]

As the President stood behind the reliability of GM cars, pledging another $600 million to back all warranty coverage, bankruptcy remained a stark possibility.[8]

## II.    *Bankruptcy*

The federal aid did not succeed in averting bankruptcy.  Old GM fared no better in the first quarter of 2009 -- posting on May 8, 2009 a $5.9 billion net loss.  General Motors Corp., *Quarterly Report (Form 10-Q)* 57 (May 8, 2009).

---

[6]    *Remarks on the United States Automobile Industry*, 2009 Daily Comp. Pres. Doc. 2 (Mar. 30, 2009) [hereinafter "March 30, 2009 Presidential Remarks"].

[7]    March 30, 2009 Presidential Remarks, *supra* note 6, at 3.

[8]    *See* Office of the Press Sec'y, White House, *Obama Administration's New Warrantee Commitment Program* (Mar. 30, 2009); *see also* Office of the Press Sec'y, White House, *Obama Administration New Path to Viability for GM & Chrysler* (Mar. 30, 2009); Steven Rattner, *Overhaul:  An Insider's Account of the Obama Administration's Emergency Rescue of the Auto Industry* 299 (2010).

Case 15-2844, Document 99-1, 11/13/15, 1632704, Page10 of 74

But entering bankruptcy posed a unique set of problems: Old GM sought to

restructure and become profitable again, not to shut down; yet if Old GM

lingered in bankruptcy too long, operating expenses would accumulate and

consumer confidence in the GM brand could deteriorate, leaving Old GM no

alternative but to liquidate and close once and for all.  On June 1, 2009, with these

risks in mind, Old GM petitioned for Chapter 11 bankruptcy protection in the

United States Bankruptcy Court for the Southern District of New York.

### A.  *Mechanics of the § 363 Sale*

The same day, Old GM filed a motion to sell itself to New GM (also

dubbed "Vehicle Acquisition Holdings LLC" or "NGMCO, Inc."), complete with a

103-page draft sale agreement and 30-page proposed sale order.

Through this proposed sale, Old GM was attempting not a

traditional Chapter 11 reorganization, but a transaction pursuant to 11 U.S.C.

§ 363 -- a less common way of effecting a bankruptcy.  *See, e.g.*, *In re Lionel Corp.*,

722 F.2d 1063, 1066-70 (2d Cir. 1983) (explaining the history of § 363).  The usual

Chapter 11 reorganization follows set procedures:  the company entering

bankruptcy (the "debtor") files a reorganization plan disclosing to creditors how

they will be treated, asks those creditors to vote to accept the plan, and then

emerges from bankruptcy with its liabilities restructured along certain

parameters. *See* 11 U.S.C. §§ 1121-1129.[9]  This jostling can take years.[10]  In

contrast, in a § 363 sale of substantially all assets, the debtor does not truly

"reorganize."  Instead, it sells its primary assets to a successor corporation, which

immediately takes over the business. *See Fla. Dep't of Revenue v. Piccadilly

Cafeterias, Inc.*, 554 U.S. 33, 37 n.2 (2008).  As evidenced by the GM bankruptcy, a

§ 363 sale can close in a matter of weeks.

The proposed sale was, in effect, a complex transaction made

possible by bankruptcy law.  GM's sale would proceed in several parts.  First,

Old GM would become a "debtor-in-possession" under the Code. *See* 11 U.S.C.

§ 1101.  Where a trustee might otherwise be appointed to assert outside control of

the debtor, *id.* § 1104, a debtor-in-possession continues operating its business, *id.*

§§ 1107, 1108. *See In re Smart World Techs., LLC*, 423 F.3d 166, 174 n.10 (2d Cir.

---

[9]      *See generally* Evan F. Rosen, Note, *A New Approach to Section 363(f)(3)*, 109 Mich. L. Rev. 1529, 1538-39 (2011) ("However, unlike sales pursuant to the standard Chapter 11 plan confirmation process, 363(f) Sales occur without the benefit of the Chapter 11 Safeguards -- the disclosure, notice, voting, and priority safeguards . . . to protect secured creditors.").

[10]      *See* Jacob A. Kling, *Rethinking 363 Sales*, 17 Stan. J.L. Bus. & Fin. 258, 262 (2012) ("A plan of reorganization must be submitted to a vote of creditors and equity holders after furnishing them with a disclosure statement, a process that can take years." (footnote omitted)).

2005) ("In a chapter 11 case, . . . the debtor usually remains in control of the estate

as the 'debtor in possession.'").  Still in control, Old GM could seek the

bankruptcy court's permission to sell portions of its business.  *See* 11 U.S.C. §

363(b)(1).

Second, there would be New GM, a company owned predominantly

by Treasury (over sixty percent).  As proposed, New GM would acquire from

Old GM substantially all of its business -- what one might commonly think of as

the automaker "GM."  But New GM would not take on all of Old GM's liabilities.

The Code allows a § 363 sale "free and clear of any interest in such property."

11 U.S.C. § 363(f).  The proposed sale order provided that New GM would

acquire Old GM assets "free and clear of all liens, claims, encumbrances, and

other interests of any kind or nature whatsoever, including rights or claims based

on any successor or transferee liability."  J. App. 276.  Other than a few liabilities

that New GM would assume as its own, this "free and clear" provision would act

as a liability shield to prevent individuals with claims against Old GM from

suing New GM.  Once the sale closed, the "bankruptcy" would be done:  New

GM could immediately begin operating the GM business, free of Old GM's debts.

Third, Old GM would remain.  The proposed sale would leave Old GM with some assets, including $1.175 billion in cash, interests in the Saturn brand, and certain real and personal property.  Old GM would also receive consideration from New GM, including a promise to repay Treasury and Canadian government loans used to finance the business through bankruptcy and a ten-percent equity stake in New GM.  Old GM would retain, however, the bulk of its old liabilities.

Fourth, Old GM would liquidate.  Though liquidation is not formally part of a § 363 sale, the sale would result in two GM companies.  Old GM would disband:  it would rename itself "Motors Liquidation Company" and arrange a plan for liquidation that addressed how its remaining liabilities would be paid.  *See* 11 U.S.C. § 1129(a)(11).  Thus, while New GM would quickly emerge from bankruptcy to operate the GM business, Old GM would remain in bankruptcy and undergo a traditional, lengthy liquidation process.

**B.**    ***Sale Order***

One day after Old GM filed its motion, on June 2, 2009, the bankruptcy court ordered Old GM to provide notice of the proposed sale order. Old GM was required to send direct mail notice of its proposed sale order to

numerous interested parties, including "all parties who are known to have

asserted any lien, claim, encumbrance, or interest in or on [the to-be-sold assets],"

and to post publication notice of the same in major publications, including the

*Wall Street Journal* and *New York Times*.  J. App. 385-86.  The sale notice specified

that interested parties would have until June 19, 2009 to submit to the

bankruptcy court responses and objections to the proposed sale order.

  The bankruptcy court proceeded to hear over 850 objections to the

proposed sale order over the course of three days, between June 30 and July 2,

2009.  On July 5, 2009, after addressing and dismissing the objections, the

bankruptcy court approved the § 363 sale.  *In re General Motors Corp.* ("*GM*"), 407

B.R. 463 (Bankr. S.D.N.Y. 2009) (Gerber, *J.*).  Among those objections were

arguments against the imposition of a "free and clear" provision to bar claims

against New GM as the successor to Old GM made by consumer organizations,

state attorneys general, and accident victims.

  Next, the bankruptcy court issued the Sale Order, which entered

into effect the final sale agreement between Old GM and New GM (the "Sale

Agreement").  In the Sale Agreement, New GM assumed fifteen categories of

liabilities.  As relevant here, New GM agreed to assume liability for accidents

*after* the closing date for the § 363 sale and to make repairs pursuant to express

warranties issued in connection with the sale of GM cars -- two liability

provisions present in the initial draft sale agreement.  The Sale Agreement also

provided a new provision -- resulting from negotiations among state attorneys

general, the GM parties, and Treasury during the course of the sale hearing --

that New GM would assume liability for any Lemon Law claims.[11]  With these

exceptions, New GM would be "free and clear" of any and all liabilities of Old

GM.

      On July 10, 2009, the § 363 sale officially closed, and New GM began

operating the automaker business.  As a matter of public perception, the GM

bankruptcy was over -- the company had exited bankruptcy in forty days.[12]

---

[11]     The Sale Agreement defined "Lemon Laws" as "state statute[s] requiring a
vehicle manufacturer to provide a consumer remedy when such manufacturer is unable
to conform a vehicle to the express written warranty after a reasonable number of
attempts, as defined in the applicable statute."  J. App. 1676.

[12]     *See, e.g.*, Bill Vlasic, *G.M. Vow to Slim Includes Top Ranks*, N.Y. Times (July
10, 2009) ("General Motors . . . emerged from bankruptcy on Friday . . . ."); John D. Stoll
& Neil King Jr., *GM Set to Exit Bankruptcy*, Wall Street Journal (July 10, 2009) ("The new
General Motors Co. is poised to exit Chapter 11 protection as soon as Friday morning,
and to emerge as a leaner, more focused company after only 40 days in bankruptcy
court.").

### C.    *Liquidation of Old GM*

Meanwhile, Old GM remained in bankruptcy.  Over the next several

years, the bankruptcy court managed the process of satisfying liabilities that

remained with Old GM (*i.e.*, not taken on by New GM).

The bankruptcy court set November 30, 2009 as the "bar date" for

any individual or entity to file a proof of claim -- that is, to assert a claim as to

Old GM's remaining assets.  Old GM filed its first Chapter 11 liquidation plan on

August 31, 2010, and amended it on December 8, 2010 and again on March 29,

2011.  The proposed plan provided how claims against Old GM would be paid:

secured claims, other priority claims, and environmental claims made by the

government would be paid in full; unsecured claims (claims without an

assurance of payment, such as in the form of a lien on property) would not.

Instead, under the plan, Old GM would establish GUC Trust, which

would be administered by the Wilmington Trust Company.  Once GUC Trust

(and other like trusts) was established, Old GM would dissolve.

GUC Trust would hold certain Old GM assets -- including New GM

stock and stock warrants that could be used to purchase shares at fixed prices,

along with other financial instruments.  Creditors with unsecured claims against

Case 15-2844, Document 99-2, 11/17/2015, 1661704, Page17 of 74

Old GM would receive these New GM securities and "units" of GUC Trust (the

value of which would be pegged to the residual value of GUC Trust) on a pro

rata basis in satisfaction of their claims.  The Sale Agreement also imposed an

"accordion feature" to ensure that GUC Trust would remain adequately funded

in the event that the amount of unsecured claims grew too large.  The accordion

feature provided that if "the Bankruptcy Court makes a finding that the

estimated aggregate allowed general unsecured claims against [Old GM's]

estates exceed $35 [billion], then [New GM] will . . . issue 10,000,000 additional

shares of Common Stock . . . to [Old GM]."  J. App. 1699.

On March 29, 2011, the bankruptcy court confirmed this liquidation

plan.  GUC Trust made quarterly distributions of its assets thereafter.  The initial

distribution released more than seventy-five percent of the New GM securities.

On February 8, 2012, the bankruptcy court ordered that no further

claims against Old GM and payable by GUC Trust would be allowed unless the

claim amended a prior claim, was filed with GUC Trust's consent, or was

deemed timely filed by the bankruptcy court.  As of March 31, 2014, GUC Trust

had distributed roughly ninety percent of its New GM securities and nearly 32

million units of GUC Trust; the expected value of unsecured claims against Old

GM totaled roughly $32 billion, not enough to trigger the accordion feature and

involve New GM in the bankruptcy.  The GM bankruptcy that began five years

earlier appeared to be approaching its end.

## III.    *Ignition Switch Defect*

On February 7, 2014, New GM first informed the National Highway

Traffic Safety Administration ("NHTSA") that it would be recalling, among other

vehicles, the 2005 Chevrolet Cobalt.  A defect in the ignition switch could prevent

airbags from deploying.

A later congressional staff report, which followed four days of

testimony by New GM CEO Mary Barra before committees of the House of

Representatives and Senate, described what could happen by referring to an

actual tragic accident caused by the defect:[13]  In October 2006, three teenagers

---

[13]    Staff of H. Comm. on Energy & Commerce, 113th Cong., *Report on the GM Ignition Switch Recall:  Review of NHTSA* 1 (Sept. 16, 2014); *Examining Accountability and Corporate Culture in Wake of the GM Recalls:  Hearing Before the Subcomm. on Consumer Prot., Prod. Safety, & Ins. of the S. Comm. on Commerce, Sci., & Transp.*, 113th Cong. (2014); *The GM Ignition Switch Recall:  Investigation Update:  Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 113th Cong. (2014); *Examining the GM Recall and NHTSA's Defect Investigation Process:  Hearing Before the Subcomm. on Consumer Prot., Prod. Safety, & Ins. of the S. Comm. on Commerce, Sci., & Transp.*, 113th Cong. (2014) [hereinafter "April 2, 2014 Senate Hearing"]; *The GM Ignition Switch Recall:  Why Did It Take So Long?:  Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 113th Cong. (2014).

were riding in a 2005 Chevrolet Cobalt when the driver lost control and the car

careened off the side of the road.  The vehicle flew into a telephone utility box

and several trees.  The airbags did not deploy, and two of the teenagers died.

From February until October 2014, New GM would issue over 60

recalls, with the number of affected vehicles in the United States alone

surpassing 25 million.  New GM hired attorney Anton Valukas of the law firm

Jenner & Block to investigate; he did so and prepared an extensive report (the

"Valukas Report").[14]

In 1997, Old GM sold three out of ten cars on the road in North

America.  *See* General Motors Corp., *Annual Report (Form 10-K)* 60 (Mar. 20, 1998).

Engineers began developing a new ignition switch that could be used in multiple

vehicles across the GM brand, first by setting technical specifications for the

switch and then by testing prototypes against those specifications.

Throughout testing, which lasted until 2002, prototypes consistently

failed to meet technical specifications.  In particular, a low amount of torque

---

[14]       Plaintiffs and New GM each extensively cite and quote to the Valukas
Report as an account of the underlying facts regarding the ignition switch defect, and
we do as well.

could cause the ignition switch to switch to "accessory" or "off."[15]  A low torque

threshold on an ignition switch would mean that little force -- perhaps even the

bump of a stray knee -- would be needed to rotate the key in the switch from the

"on" position to the "accessory" or "off" position.

Near the end of testing, an engineer commented on the ignition

switch's lingering problems in an email:  he was "tired of the switch from hell."  J.

App. 9696.  Three months later, in May 2002, the ignition switch was approved

for production, despite never having passed testing.

In the fall of 2002, Old GM began producing vehicles with the faulty

ignition switch.  Almost immediately, customers complained of moving stalls,

sometimes at highway speeds -- instances where the engine and power steering

and braking cut off while the car was in motion, leaving drivers to manually

maneuver the vehicle, that is, without assistance of the car's power steering and

braking systems.

Despite customer complaints, and grumblings in the press, Old GM

classified the moving stall as a "non-safety issue."  *Id.* at 9711.  As Valukas put it,

"on a scale of 1 (most severe) to 4 (least severe) . . . the problem could have been

---

[15]      Torque is a measure of twisting force -- it is generated, for example, when
one twists off the cap of a soda bottle or tightens a bolt with a wrench.

designated a severity level 1 safety problem, [but] it was not." *Id.* Instead, the

moving stall was assigned a severity level of 3. Old GM personnel considered

the problem to be a matter of customer satisfaction, not safety. These personnel

apparently also did not then fully realize that when a car shuts off, so does its

airbags. But as early as August 2001, at least some Old GM engineers understood

that turning off the ignition switch could prevent airbags from deploying.

Complaints about the ignition switch continued. Between 2004 and

2005, NHTSA began asking questions about engine stalls. In 2005, several media

outlets also reported on the stalls. *See, e.g.*, Jeff Sabatini, *Making a Case for Keyless

Ignitions*, N.Y. Times (June 19, 2005). Senior attorneys studied the stalls, but

considered the risk to be "remote[]." J. App. 9734. At the same time, Old GM's

product investigations unit recreated the ignition switch's issues by using only a

heavy keychain to generate torque. Finally, in December 2005, Old GM issued a

bulletin to dealers, but not to customers, warning them that "low ignition key

cylinder torque" could cause cars to turn off. *Id.* at 9740. The bulletin did not

mention that, as a result, cars could stall on the road.

Then came reports of fatalities. In late 2005 through 2006, news of

deaths from airbag non-deployments in crashes where airbags should have

deployed reached the desks of Old GM's legal team.  Around April 2006, Old GM

engineers decided on a design change of the ignition switch to increase the

torque.  Old GM engineers did so quietly, without changing the ignition switch's

part number, a change that would have signaled that improvements or

adjustments had been made.

In February 2007, a Wisconsin state trooper's report made its way

into the files of Old GM's legal department:  "The two front seat airbags did not

deploy.  It appears that the ignition switch had somehow been turned from the

run position to accessory prior to the collision with the trees."  *Id.* at 9764.

NHTSA similarly brought to Old GM's attention reported airbag non-

deployments.  *See* Transportation Research Center, Indiana University, *On-Site*

*Air Bag Non-Deployment Investigation* 7 (Apr. 25, 2007, rev. Mar. 31, 2008).  As

more incidents with its cars piled up, Old GM finally drafted an updated bulletin

to dealers warning them of possible "stalls," but never sent it out.

Old GM internally continued to investigate.  By May 2009, staff had

figured out that non-deployment of airbags in these crashes was attributable to a

sudden loss of power.  They believed that one of the two "most likely

explanation[s] for the power mode signal change was . . . a problem with the

Case 15-2844, Document 99-3, 12/14/2015, 1661304, Page23 of 74

Ignition Switch."  J. App. 9783.  By June 2009, Old GM engineers had

implemented a change to the ignition key, hoping to fix the problem once and for

all.  One engineer lamented that "[t]his issue has been around since man first

lumbered out of [the] sea and stood on two feet."  *Id.* at 9781.

Later, the Valukas Report commented on the general attitude at Old

GM.  For eleven years, "GM heard over and over from various quarters --

including customers, dealers, the press, and their own employees -- that the car's

ignition switch led to moving stalls, group after group and committee after

committee within GM that reviewed the issue failed to take action or acted too

slowly.  Although everyone had responsibility to fix the problem, nobody took

responsibility."  J. App. 9650.

The Valukas Report recounted aspects of GM's corporate culture.

With the "GM salute," employees would attend action meetings and literally

cross their arms and point fingers at others to shirk responsibility.  With the "GM

nod," employees would (again) literally nod in agreement to endorse a proposed

plan, understanding that they and others had no intention of following through.

Finally, the Report described how GM employees, instead of taking action,

would claim the need to keep searching for the "root cause" of the moving stalls

and airbag non-deployments.  This "search for root cause became a basis for doing nothing to resolve the problem for years."  *Id.* at 9906.

Indeed, New GM would not begin recalling cars for ignition switch defects until February 2014.   Soon after New GM's initial recall, individuals filed dozens of class actions lawsuits, claiming that the ignition switch defect caused personal injuries and economic losses, both before and after the § 363 sale closed.[16]  New GM sought to enforce the Sale Order, invoking the liability shield to hold New GM "free and clear" of various claims.  This meant that when it came to Old GM cars New GM would pay for post-closing personal injuries, make repairs, and follow Lemon Laws, but nothing else.  The amount of purportedly barred liabilities was substantial -- an estimated $7 to $10 billion in economic losses, not to mention damages from pre-closing accidents.

## IV.  *Proceedings Below*

On April 21, 2014, Steven Groman and others (the "Groman Plaintiffs") initiated an adversary proceeding against New GM in the bankruptcy court below, asserting economic losses arising from the ignition switch defect.

---

[16]      Those class actions are consolidated before a district judge in the United States District Court for the Southern District of New York.  *See In re General Motors LLC Ignition Switch Litigation*, No. 14-MD-2543 (S.D.N.Y.) (Furman, *J.*).

The same day, New GM moved to enforce the Sale Order to enjoin those claims,
as well as claims in other ignition switch actions then being pursued against New
GM.

Other plaintiffs allegedly affected by the Sale Order included classes
of individuals who had suffered pre-closing injuries arising from the ignition
switch defect ("Pre-Closing Accident Plaintiffs"), economic losses arising from the
ignition switch defect in Old GM cars ("Ignition Switch Plaintiffs"), and damages
arising from defects other than the ignition switch in Old GM cars ("Non-Ignition
Switch Plaintiffs").[17]  Included within the Ignition Switch Plaintiffs were
individuals who had purchased Old GM cars secondhand after the § 363 sale
closed ("Used Car Purchasers").

On appeal, several orders are before us.  First, the Non-Ignition
Switch Plaintiffs filed a motion, asserting, among other things, that the
bankruptcy court lacked jurisdiction to enforce the Sale Order.  On August 6,
2014, the bankruptcy court denied that motion.  *In re Motors Liquidation Co.*
("*MLC I*"), 514 B.R. 377 (Bankr. S.D.N.Y. 2014) (Gerber, *J.*).

---

[17]     On August 1, 2014, New GM filed motions to enforce the Sale Order
against the Pre-Closing Accident Plaintiffs and Non-Ignition Switch Plaintiffs, who
entered the bankruptcy proceedings later.

Second, after receiving further briefing and hearing oral argument

on the motion to enforce, on April 15, 2015 the bankruptcy court decided to

enforce the Sale Order in part and dismiss any would-be claims against GUC

Trust because relief would be equitably moot. *In re Motors Liquidation Co.* ("*MLC

II*"), 529 B.R. 510 (Bankr. S.D.N.Y. 2015) (Gerber, *J.*).  The bankruptcy court first

determined plaintiffs lacked notice consistent with procedural due process. *Id.* at

540-60.  In particular, the bankruptcy court found that the ignition switch claims

were known to or reasonably ascertainable by Old GM prior to the sale, and thus

plaintiffs were entitled to actual notice, as opposed to the mere publication notice

that they received. *Id.* at 556-60.  The bankruptcy court found, however, that

with one exception plaintiffs had not been "prejudiced" by this lack of notice --

the exception being claims stemming from New GM's own wrongful conduct in

concealing defects (so-called "independent claims"). *Id.* at 560-74.  In other

words, the bankruptcy court held that New GM could not be sued -- in

bankruptcy court or elsewhere -- for ignition switch claims that otherwise could

have been brought against Old GM, unless those claims arose from New GM's

own wrongful conduct. *Id.* at 574-83.

In the same decision, the bankruptcy court addressed arguments by GUC Trust that it should not be held as a source for relief either. Applying the factors set out in *In re Chateaugay Corp.* ("*Chateaugay III*"), 10 F.3d 944 (2d Cir. 1993), the bankruptcy court concluded that relief for any late claims against GUC Trust was equitably moot, as the plan had long been substantially consummated. *MLC II*, 529 B.R. at 583-92. Finally, the bankruptcy court outlined the standard for any future fraud on the court claims. *Id.* at 592-97. With these issues resolved, the bankruptcy court certified its decision for appeal to this Court pursuant to 28 U.S.C. § 158. *Id.* at 597-98.

Third, the bankruptcy court issued another decision after the parties disagreed on the form of judgment and other ancillary issues. On May 27, 2015, the bankruptcy court clarified that the Non-Ignition Switch Plaintiffs would be bound by the judgment against the other plaintiffs, but would have seventeen days following entry of judgment to object. *In re Motors Liquidation Co.* ("*MLC III*"), 531 B.R. 354 (Bankr. S.D.N.Y. 2015) (Gerber, J.). The bankruptcy court left open the question of whether Old GM knew of other defects.

On June 1, 2015, the bankruptcy court entered judgment against all plaintiffs and issued an order certifying the judgment for direct appeal.

Following briefing by the Non-Ignition Switch Plaintiffs, on July 22, 2015, the

bankruptcy court rejected their objections to the judgment.

New GM, GUC Trust, and the four groups of plaintiffs described

above -- the Groman Plaintiffs, Ignition Switch Plaintiffs, Non-Ignition Switch

Plaintiffs, and Pre-Closing Accident Plaintiffs -- appealed.[18]  We turn to these

appeals.

## DISCUSSION

The Code permits a debtor to sell substantially all of its assets to a

successor corporation through a § 363 sale, outside of the normal reorganization

process.  Here, no party seeks to undo the sale of Old GM's assets to New GM, as

executed through the Sale Order.[19]  Instead, plaintiffs challenge the extent to

which the bankruptcy court may absolve New GM, as a successor corporation, of

Old GM's liabilities.  *See generally* 3 *Collier on Bankruptcy* ¶ 363.02[2] (Alan N.

---

[18]    On appeal, the Non-Ignition Switch Plaintiffs are joined by certain ignition
switch and pre-closing accident plaintiffs and call themselves the "*Elliot*, *Sesay*, and
*Bledsoe* Plaintiffs."  That group also represents two other appellants captioned above:
Berenice Summerville and Doris Powledge Phillips.  For ease of reference, in the context
of this appeal, we will continue to call the group the "Non-Ignition Switch Plaintiffs."

[19]    Indeed, the bankruptcy court's opinion in *GM*, 407 B.R. 463, which
approved the § 363 sale, has been reviewed on appeal has three times:  a stay pending
appeal was denied in *In re General Motors Corp.*, No. M 47(LAK), 2009 WL 2033079
(S.D.N.Y. July 9, 2009), and the opinion was affirmed in *In re Motors Liquidation Co.*, 428
B.R. 43 (S.D.N.Y. 2010), and in *In re Motors Liquidation Co.*, 430 B.R. 65 (S.D.N.Y. 2010).

Resnick & Harry J. Sommer eds., 16th ed. 2013) [hereinafter "*Collier on Bankruptcy*"] (noting that "use of a section 363 sale probably reached its zenith" with the GM bankruptcy).  In particular, they dispute whether New GM may use the Sale Order's "free and clear" provision to shield itself from claims primarily arising out of the ignition switch defect and other defects.

The decisions below generate four issues on appeal:  (1) the bankruptcy court's jurisdiction to enforce the Sale Order, (2) the scope of the power to sell assets "free and clear" of all interests, (3) the procedural due process requirements with respect to notice of such a sale, and (4) the bankruptcy court's ruling that would-be claims against GUC Trust are equitably moot.

I.      *Jurisdiction*

We first address the bankruptcy court's subject matter jurisdiction. New GM argued below that successor liability claims against it should be enjoined, and the bankruptcy court concluded as a threshold matter that it had jurisdiction to enforce the Sale Order.  *See MLC I*, 514 B.R. at 380-83.  The Non-Ignition Switch Plaintiffs challenge jurisdiction:  (1) as a whole to enjoin claims against New GM, (2) with respect to independent claims, which stem from New GM's own wrongful conduct, and (3) to issue a successive injunction.  We review

*de novo* rulings as to the bankruptcy court's jurisdiction. *See In re Petrie Retail,*

*Inc.*, 304 F.3d 223, 228 (2d Cir. 2002).

First, as to jurisdiction broadly, "[t]he jurisdiction of the bankruptcy

courts, like that of other federal courts, is grounded in, and limited by, statute."

*Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995); *see* 28 U.S.C. § 1334. Bankruptcy

courts may exercise jurisdiction, through referral from the district court, over

three broad categories of proceedings: those "arising under title 11" of the Code,

those "arising in . . . a case under title 11," and those "related to a case under title

11." 28 U.S.C. § 157(a). Proceedings "arising under title 11, or arising in a case

under title 11," are deemed "core proceedings." *Stern v. Marshall*, 564 U.S. 462,

476 (2011) (quoting 28 U.S.C. § 157(b)). In those proceedings, bankruptcy courts

retain comprehensive power to resolve claims and enter orders or judgments.

*See In re Millenium Seacarriers, Inc.*, 419 F.3d 83, 96 (2d Cir. 2005).

"[T]he meaning of the statutory language 'arising in' may not be

entirely clear." *Baker v. Simpson*, 613 F.3d 346, 351 (2d Cir. 2010). At a minimum,

a bankruptcy court's "arising in" jurisdiction includes claims that "are not based

on any right expressly created by [T]itle 11, but nevertheless, would have no

existence outside of the bankruptcy." *Id.* (quoting *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987)).

A bankruptcy court's decision to interpret and enforce a prior sale order falls under this formulation of "arising in" jurisdiction. An order consummating a debtor's sale of property would not exist but for the Code, *see* 11 U.S.C. § 363(b), and the Code charges the bankruptcy court with carrying out its orders, *see id.* § 105(a) (providing that bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title"). Hence, a bankruptcy court "plainly ha[s] jurisdiction to interpret and enforce its own prior orders." *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009); *see Millenium Seacarriers*, 419 F.3d at 96 ("A bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization." (quoting *Petrie Retail*, 304 F.3d at 230)). That is what happened here. The bankruptcy court first interpreted the "free and clear" provision that barred successor liability claims -- a provision that was integral to resolving Old GM's bankruptcy -- and then determined whether to enforce that provision.

Second, the Non-Ignition Switch Plaintiffs specify that the
bankruptcy court lacked jurisdiction over independent claims.  Even though the
bankruptcy court ultimately did not enjoin independent claims, we address this
argument because it implicates subject matter jurisdiction.  In any event, the
argument is misguided.  The Sale Order, on its face, does not bar independent
claims against New GM; instead, it broadly transfers assets to New GM "free and
clear of liens, claims, encumbrances, and other interests . . . , including rights or
claims . . . based on any successor or transferee liability."  J. App. 1621.  By
making the argument that the bankruptcy court could not enjoin independent
claims through the Sale Order, the Non-Ignition Switch Plaintiffs already assume
that the bankruptcy court indeed has jurisdiction to interpret the Sale Order to
determine whether it covers independent claims and to hear a motion to enforce
in the first place.

Third, the Non-Ignition Switch Plaintiffs argue that the bankruptcy
court lacked power to issue a so-called successive injunction.  In certain parts of
the Sale Order, the bankruptcy court had included language that successor
liability claims would be "forever prohibited and enjoined."  J. App. 1649.  But
New GM was not seeking an injunction to stop plaintiffs from violating that

prior injunction; New GM wanted the bankruptcy court to confirm that the Sale

Order covered *these* plaintiffs.  In other words, New GM "did not seek a new

injunction but, rather, '[sought] to enforce an injunction already in place.'"  *In re*

*Kalikow*, 602 F.3d 82, 93 (2d Cir. 2010) (quoting *In re Texaco Inc.*, 182 B.R. 937, 945

(Bankr. S.D.N.Y. 1995)).  In such situations, bankruptcy courts have jurisdiction

to decide a "motion s[eeking] enforcement of a pre-existing injunction issued as

part of the bankruptcy court's sale order."  *Petrie Retail*, 304 F.3d at 230.

Accordingly, we agree that the bankruptcy court had jurisdiction to

interpret and enforce the Sale Order.  *See MLC I*, 514 B.R. at 380-83.

## II.    *Scope of "Free and Clear" Provision*

We turn to the scope of the Sale Order.  The Sale Order transferred

assets from Old GM to New GM "free and clear of liens, claims, encumbrances,

and other interests . . . , including rights or claims . . . based on any successor or

transferee liability."  J. App. 1621.  The bankruptcy court did not explicitly

address what claims were covered by the Sale Order.[20]

---

[20]    The bankruptcy court mentioned, however, that claims based on New GM's "independently wrongful, and otherwise actionable, conduct" could not be categorized as claims that could be assumed by New GM or retained by Old GM via the Sale Order.  *MLC II*, 529 B.R. at 583.  But the bankruptcy court did not explicitly address whether it still considered those claims to be covered by the Sale Order.

We address the scope of the Sale Order because it implicates our

procedural due process analysis that follows.  If the Sale Order covers certain

claims, then we would have to consider whether plaintiffs' due process rights are

violated by applying the "free and clear" clause to those claims.  If the Sale Order

did not cover certain claims, however, then those claims could not be enjoined by

enforcing the Sale Order and due process concerns would not be implicated.  We

interpret the Sale Order *de novo* to determine what claims are barred.  *See In re*

*Duplan Corp.*, 212 F.3d 144, 151 (2d Cir. 2000); *see also Petrie Retail*, 304 F.3d at 229

(noting instance where enforcement first required interpretation of prior order).

### A.   *Applicable Law*

The Code allows the trustee or debtor-in-possession to "use, sell, or

lease, other than in the ordinary course of business, property of the estate."  11

U.S.C. § 363(b)(1).  A sale pursuant to § 363(b) may be made "free and clear of

any interest in such property" if any condition on a list of conditions is met.  *Id.*

§ 363(f).  "Yet the Code does not define the concept of 'interest,' of which the

property may be sold free and clear," 3 *Collier on Bankruptcy* ¶ 363.06[1], nor does

it express the extent to which "claims" fall within the ambit of "interests."

New GM asserts that *In re Chrysler LLC*, 576 F.3d 108, 126 (2d Cir.

2009), resolved that successor liability claims are interests.  New GM Br. 75.[21]  But

*Chrysler* was vacated by the Supreme Court after it became moot during the

certiorari process and remanded with instructions to dismiss the appeal as moot.

*See Ind. State Police Pension Tr. v. Chrysler LLC*, 558 U.S. 1087 (2009).  The Supreme

Court vacated *Chrysler* pursuant to *United States v. Munsingwear, Inc.*, 340 U.S. 36,

41 (1950), which "prevent[s] a judgment, unreviewable because of mootness,

from spawning any legal consequences."  *See Russman v. Bd. of Educ. of Enlarged

City Sch. Dist.*, 260 F.3d 114, 121-22 n.2 (2d Cir. 2001) ("[V]acatur eliminates an

appellate precedent that would otherwise control decision on a contested

question throughout the circuit.").  We had not addressed the issue before

*Chrysler*, and now that case is no longer controlling precedent.[22]  *See* 576 F.3d at

124 ("We have never addressed the scope of the language 'any interest in such

property,' and the statute does not define the term.").

---

[21]     New GM also cites a non-precedential summary order on this issue.  *See
Douglas v. Stamco*, 363 F. App'x 100 (2d Cir. 2010).

[22]     When the bankruptcy court determined that successor liability claims
could constitute interests, *Chrysler* had not yet been vacated.  *See GM*, 407 B.R. at 505
("*Chrysler* is not distinguishable in any legally cognizable respect.").

Rather than formulating a single precise definition for "any interest in such property," courts have continued to address the phrase "on a case-by-case basis." *In re PBBPC, Inc.*, 484 B.R. 860, 867 (B.A.P. 1st Cir. 2013). At minimum, the language in § 363(f) permits the sale of property free and clear of *in rem* interests in the property, such as liens that attach to the property. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 288 (3d Cir. 2003). But courts have permitted a "broader definition that encompasses other obligations that may flow from ownership of the property." 3 *Collier on Bankruptcy* ¶ 363.06[1]. Sister courts have held that § 363(f) may be used to bar a variety of successor liability claims that relate to ownership of property: an "interest" might encompass Coal Act obligations otherwise placed upon a successor purchasing coal assets, *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-82 (4th Cir. 1996), travel vouchers issued to settle an airline's discrimination claims in a sale of airline assets, *Trans World Airlines*, 322 F.3d at 288-90, or a license for future use of intellectual property when that property is sold, *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002). *See generally Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 545 (7th Cir. 2003) ("[T]he term 'interest' is a broad term no doubt selected by Congress to avoid 'rigid and technical definitions drawn from other areas of the

law.'" (quoting *Russello v. United States*, 464 U.S. 16, 21 (1983))).  In these

instances, courts require "a relationship between the[] right to demand . . .

payments from the debtors and the use to which the debtors had put their

assets." *Trans World Airlines*, 322 F.3d at 289.

We agree that successor liability claims can be "interests" when they

flow from a debtor's ownership of transferred assets. *See* 3 *Collier in Bankruptcy*

¶¶ 363.06[1], [7]; *Trans World Airlines*, 322 F.3d at 289.  But successor liability

claims must also still qualify as "claims" under Chapter 11.  Though § 363(f) does

not expressly invoke the Chapter 11 definition of "claims," *see* 11 U.S.C. § 101(5),

it makes sense to "harmonize" Chapter 11 reorganizations and § 363 sales "to the

extent permitted by the statutory language." *Chrysler*, 576 F.3d at 125; *see Lionel*,

722 F.2d at 1071 ("[S]ome play for the operation of both § 363(b) and Chapter 11

must be allowed for.").[23]  Here, the bankruptcy court's power to bar "claims" in a

quick § 363 sale is plainly no broader than its power in a traditional Chapter 11

reorganization. *Compare* 11 U.S.C. § 363(f) ("free and clear of any interest in such

---

[23]    Although *Chrysler* was vacated on grounds of mootness, it still
"constitute[s] persuasive authority."  *Anderson v. Rochester-Genesee Reg'l Transp. Auth.*,
337 F.3d 201, 208 n.5 (2d Cir. 2003).  Both our Circuit and the Third Circuit have
continued to cite *Chrysler* favorably.  *See In re N. New Eng. Tel. Operations LLC*, 795 F.3d
343, 346, (2d Cir. 2015); *In re Jevic Holding Corp.*, 787 F.3d 173, 188-89 (3d Cir. 2015).

property"), *with* § 1141(c) ("free and clear of all claims and interests").  We thus

consider what claims may be barred under Chapter 11 generally.

Section 101(5) defines "claim" as any "right to payment, whether or

not such right is reduced to judgment, liquidated, unliquidated, fixed,

contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured,

or unsecured."  11 U.S.C. § 101(5).  A claim is (1) a right to payment (2) that arose

before the filing of the petition.  *See Pension Ben. Guar. Corp. v. Oneida Ltd.*, 562

F.3d 154, 157 (2d Cir. 2009).  If the right to payment is contingent on future

events, the claim must instead "result from pre-petition conduct fairly giving rise

to that contingent claim."  *In re Chateaugay Corp.* ("*Chateaugay I*"), 944 F.2d 997,

1005 (2d Cir. 1991) (internal quotation marks omitted).

This Court has not decided, however, "the difficult case of pre-

petition conduct that has not yet resulted in detectable injury, much less the

extreme case of pre-petition conduct that has not yet resulted in any tortious

consequence to a victim."  *Id.* at 1004.  *Chateaugay I* considered a hypothetical

bankrupt bridge building company, which could predict that out of the 10,000

bridges it built, one would one day fail, causing deaths and other injuries.  *Id.* at

1003.  If that bridge did fail, the individuals might have tort claims resulting from

pre-petition conduct, namely the building of the bridge.

Recognizing these claims would engender "enormous practical and

perhaps constitutional problems." *Id*.  Thus, "'claim' cannot be extended to

include . . . claimants whom the record indicates were completely unknown and

unidentified at the time [the debtor] filed its petition and whose rights depended

entirely on the fortuity of future occurrences." *Lemelle v. Universal Mfg. Corp.*, 18

F.3d 1268, 1277 (5th Cir. 1994); *see In re Chateaugay Corp.* ("*Chateaugay IV*"), 53 F.3d

478, 497 (2d Cir. 1995) (stating that, in "common sense," "claim" is "not infinite").

To avoid any practical and constitutional problems, courts require some

minimum "contact," *Chateaugay I*, 944 F.2d at 1003-04, or "relationship,"

*Chateaugay IV*, 53 F.3d at 497, that makes identifiable the individual with whom

the claim does or would rest.

To summarize, a bankruptcy court may approve a § 363 sale "free

and clear" of successor liability claims if those claims flow from the debtor's

ownership of the sold assets.  Such a claim must arise from a (1) right to payment

(2) that arose before the filing of the petition or resulted from pre-petition

conduct fairly giving rise to the claim.  Further, there must be some contact or

relationship between the debtor and the claimant such that the claimant is

identifiable.

### B.    *Application*

We apply these principles to:  (1) pre-closing accident claims, (2)

economic loss claims arising from the ignition switch defect or other defects, (3)

independent claims relating only to New GM's conduct, and (4) Used Car

Purchasers' claims.  The bankruptcy court assumed that the Sale Order's broad

language suggested that all of these claims fell within the scope of the "free and

clear" provision.  We hold, however, that the first two sets of claims are covered

by the Sale Order but that the latter two sets of claims are not.

First, the pre-closing accident claims clearly fall within the scope of

the Sale Order.  Those claims directly relate to the ownership of the GM

automaker's business -- Old GM built cars with ignition switch defects.  And

those plaintiffs' claims are properly thought of as tort claims that arose before the

filing of the petition; indeed, the claims arise from accidents that occurred pre-

closing involving Old GM cars.[24]

---

[24]    To the extent that Pre-Closing Accident Plaintiffs assert claims arising
after the petition but before the § 363 sale closing, no party on appeal suggests that we
treat claims in this timeframe differently.  In any event, those claims are contingent on

Second, the economic loss claims arising from the ignition switch defect or other defects present a closer call.  Like the claims of Pre-Closing Accident Plaintiffs, these claims flow from the operation of Old GM's automaker business.  These individuals also, by virtue of owning Old GM cars, had come into contact with the debtor prior to the bankruptcy petition.  Yet the ignition switch defect (and other defects) were only revealed some five years later.

GUC Trust thus asserts that there was no right to payment prior to the petition.  We disagree.  The economic losses claimed by these individuals were "contingent" claims.  11 U.S.C. § 101(5).  That is, the ignition switch defect was there, but was not yet so patent that an individual could, as a practical matter, bring a case in court.  The contingency standing in the way was Old GM telling plaintiffs that the ignition switch defect existed.  In other words, Old GM's creation of the ignition switch defect fairly gave rise to these claims, even if the claimants did not yet know.  *See Chateaugay I*, 944 F.2d at 1005.

Third, however, the independent claims do not meet the Code's limitation on claims.  By definition, independent claims are claims based on New GM's own post-closing wrongful conduct.  Though the parties do not lay out the

the accident occurring and "result from pre-petition conduct fairly giving rise to [a] contingent claim."  *Chateaugay I*, 944 F.2d at 1005 (internal quotation marks omitted).

- 41 -

whole universe of possible independent claims, we can imagine that some claims involve misrepresentations by New GM as to the safety of Old GM cars. These sorts of claims are based on New GM's *post*-petition conduct, and are not claims that are based on a right to payment that arose before the filing of petition or that are based on pre-petition conduct. Thus, these claims are outside the scope of the Sale Order's "free and clear" provision.

Fourth, the Sale Order likewise does not cover the Used Car Purchasers' claims. The Used Car Purchasers were individuals who purchased Old GM cars *after* the closing, without knowledge of the defect or possible claim against New GM. They had no relation with Old GM prior to bankruptcy. Indeed, as of the bankruptcy petition there were an unknown number of unknown individuals who would one day purchase Old GM vehicles secondhand. There could have been no contact or relationship -- actual or presumed -- between Old GM and these specific plaintiffs, who otherwise had no awareness of the ignition switch defect or putative claims against New GM. We cannot, consistent with bankruptcy law, read the Sale Order to cover their claims. *See Chateaugay I*, 944 F.2d at 1003-04 (calling such a reading "absurd").

New GM argues that "modifying" the Sale Order would "knock the props out of the foundation on which the [Sale Order] was based" or otherwise be unlawful.  New GM Br. 77 (internal quotation marks omitted).  But we do not *modify* the Sale Order.  Instead, we merely interpret the Sale Order in accordance with bankruptcy law.  Indeed, by filing a motion to enforce, New GM in effect asked for the courts to interpret the Sale Order.  *See Petrie Retail*, 304 F.3d at 229.

In sum, the "free and clear" provision covers pre-closing accident claims and economic loss claims based on the ignition switch and other defects.  It does not cover independent claims or Used Car Purchasers' claims.  Accordingly, we affirm the bankruptcy court's decision not to enjoin independent claims, *see MLC II*, 529 B.R. at 568-70, and reverse its decision to enjoin the Used Car Purchasers' claims, *see id.* at 570-72.

## III.   *Procedural Due Process*

The Sale Order covers the pre-closing accident claims and economic loss claims based on the ignition switch and other defects.  The Sale Order, if enforced, would thus bar those claims.  Plaintiffs contend on appeal that enforcing the Sale Order would violate procedural due process.  We address two issues:  (1) what notice plaintiffs were entitled to as a matter of procedural due

process, and (2) if they were provided inadequate notice, whether the

bankruptcy court erred in denying relief on the basis that most plaintiffs were

not "prejudiced."

We review factual findings for clear error and legal conclusions,

including interpretations of the Constitution, *de novo*. *In re Barnet*, 737 F.3d 238,

246 (2d Cir. 2013). Our clear error standard is a deferential one, and if the

bankruptcy court's "'account of the evidence is plausible in light of the record

viewed in its entirety, the court of appeals may not reverse it even though

convinced that had it been sitting as the trier of fact, it would have weighed the

evidence differently.'" *Amadeo v. Zant*, 486 U.S. 214, 223 (1988) (quoting *Anderson

v. Bessemer City*, 470 U.S. 564, 573-74 (1985)).

## A.   *Notice*

The bankruptcy court first concluded that plaintiffs were not

provided notice as required by procedural due process. *See MLC II*, 529 B.R. at

555-60. The bankruptcy court held that because Old GM knew or with

reasonable diligence should have known of the ignition switch claims, plaintiffs

were entitled to actual or direct mail notice, but received only publication notice.

*See id.* at 557-60.  The parties dispute the extent of Old GM's knowledge of the

ignition switch problem.

### 1.    *Applicable Law*

The Due Process Clause provides, "No person shall . . . be deprived

of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

Certain procedural protections attach when "deprivations trigger due process."

*Connecticut v. Doehr*, 501 U.S. 1, 12 (1991).  Generally, legal claims are sufficient to

constitute property such that a deprivation would trigger due process scrutiny.

*See N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 169-70 (2d Cir. 2001).

Once due process is triggered, the question becomes what process is

due.  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  "An elementary and

fundamental requirement of due process in any proceeding which is to be

accorded finality is notice reasonably calculated, under all the circumstances, to

apprise interested parties of the pendency of the action and afford them an

opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Tr. Co.*,

339 U.S. 306, 314 (1950).  Courts ask "whether the state acted reasonably in

selecting means likely to inform persons affected, not whether each property

owner actually received notice."  *Weigner v. City of New York*, 852 F.2d 646, 649 (2d

Cir. 1988). Notice is adequate if "[t]he means employed [are] such as one

desirous of actually informing the absentee might reasonably adopt to

accomplish it." *Mullane*, 339 U.S. at 315.

This requirement also applies to bankruptcy proceedings. *See*

*Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989), *superseded by statute on other grounds*,

Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071. Indeed, a

fundamental purpose of bankruptcy is to discharge, restructure, or impair claims

against the debtor in an orderly fashion. *See Lines v. Frederick*, 400 U.S. 18, 19

(1970). "The general rule that emerges . . . is that notice by publication is not

enough with respect to a person whose name and address are known or very

easily ascertainable and whose legally protected interests are directly affected by

the proceedings in question." *Schroeder v. City of New York*, 371 U.S. 208, 212-13

(1962); *accord Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 800 (1983). In other

words, adequacy of notice "turns on what the debtor . . . knew about the claim or,

with reasonable diligence, should have known." *DPWN Holdings (USA), Inc. v.*

*United Air Lines, Inc.*, 747 F.3d 145, 150 (2d Cir. 2014) (citing *Chemetron Corp. v.*

*Jones*, 72 F.3d 341, 345-46 (3d Cir. 1995)). If the debtor knew or reasonably should

have known about the claims, then due process entitles potential claimants to

actual notice of the bankruptcy proceedings, but if the claims were unknown,

publication notice suffices. *Chemetron*, 72 F.3d at 345-46.

      If a debtor reveals in bankruptcy the claims against it and provides

potential claimants notice consistent with due process of law, then the Code

affords vast protections. Both § 1141(c) and § 363(f) permit "free and clear"

provisions that act as liability shield. These provisions provide enormous

incentives for a struggling company to be forthright. But if a debtor does not

reveal claims that it is aware of, then bankruptcy law cannot protect it. Courts

must "limit[] the opportunity for a completely unencumbered new beginning to

the 'honest but unfortunate debtor.'" *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)

(quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

      **2.**    *Application*

      The parties do not dispute that plaintiffs received only publication

notice. The question is whether they were entitled to more. The bankruptcy

court found that because Old GM knew or reasonably should have known about

the ignition switch defect prior to bankruptcy, it should have provided direct

mail notice to vehicle owners. We find no clear error in this factual finding.

As background, federal law requires that automakers keep records of the first owners of their vehicles. 49 U.S.C. § 30117(b)(1) ("A manufacturer of a motor vehicle . . . shall cause to be maintained a record of the name and address of the first purchaser of each vehicle . . . ."). This provision facilitates recalls and other consequences of the consumer-automaker relationship. Thus, to the extent that Old GM knew of defects in its cars, it would also necessarily know the identity of a significant number of affected owners.

The facts paint a picture that Old GM did nothing, even as it knew that the ignition switch defect impacted consumers. From its development in 1997, the ignition switch never passed Old GM's own technical specifications. Old GM knew that the switch was defective, but it approved the switch for millions of cars anyway.

Once the ignition switch was installed, Old GM almost immediately received various complaints. News outlets reported about the faulty ignition switch. NHTSA approached Old GM about moving stalls and airbag non-deployments. A police report, which Old GM's legal team possessed, linked these breakdowns to a faulty ignition switch. Old GM even considered warning dealers (but not consumers) about moving stalls. By May 2009, at the latest, Old

GM personnel had essentially concluded that the ignition switch, moving stalls, and airbag non-deployments were related.  Considering the airbag issues, they believed that one of the two "most likely explanation[s] for the power mode signal change was . . . a problem with the Ignition Switch."  J. App. 9783.

A bankruptcy court could reasonably read from this record that Old GM knew about the ignition switch defect.  Old GM knew that the defect caused stalls and had linked the airbag non-deployments to the defect by May 2009.

Even assuming the bankruptcy court erred in concluding that Old GM *knew*, Old GM -- if reasonably diligent -- surely *should have known* about the defect.  Old GM engineers should have followed up when they learned their ignition switch did not initially pass certain technical specifications.  Old GM lawyers should have followed up when they heard disturbing reports about airbag non-deployments or moving stalls.  Old GM product safety teams should have followed up when they were able to recreate the ignition switch defect with ease after being approached by NHTSA.  If any of these leads had been diligently pursued in the seven years between 2002 and 2009, Old GM likely would have learned that the ignition switch defect posed a hazard for vehicle owners.

Such "reckless disregard of the facts [is] sufficient to satisfy the

requirement of knowledge." *McGinty v. State*, 193 F.3d 64, 70 (2d Cir. 1999).  In

the face of all the reports and complaints of faulty ignition switches, moving

stalls, airbag non-deployments, and, indeed, serious accidents, and in light of the

conclusions of its own personnel, Old GM had an obligation to take steps to

"acquire full or exact knowledge of the nature and extent" of the defect.  *United*

*States v. Macias*, 786 F.3d 1060, 1062 (7th Cir. 2015).  Under these circumstances,

Old GM had a duty to identify the cause of the problem and fix it.  Instead, the

Valukas Report recounts a corporate culture that sought to pin responsibility on

others and a Sisyphean search for the "root cause."

Further, even if the precise linkage between the ignition switch

defect and moving stalls and airbag non-deployments was unclear, Old GM had

enough knowledge.  At minimum, Old GM knew about moving stalls and airbag

non-deployments in certain models, and should have revealed those facts in

bankruptcy.  Those defects would still be the basis of "claims," even if the root

cause (the ignition switch) was not clear.

New GM argues in response that because plaintiffs' claims were

"contingent," those individuals were "unknown" creditors as a matter of law.  But

contingent claims are still claims, 11 U.S.C. § 101(5), and claimants are entitled to

adequate notice if the debtor knows of the claims. Moreover, as discussed above,

the only contingency was Old GM telling owners about the ignition switch defect

-- a contingency wholly in Old GM's control and without bearing as to *Old GM's*

own knowledge. New GM essentially asks that we reward debtors who conceal

claims against potential creditors. We decline to do so. *See Grogan*, 498 U.S. at

286-87.

Finally, we address a theme in this case that the GM bankruptcy was

extraordinary because a quick § 363 sale was required to preserve the value of

the company and to save it from liquidation. *See* New GM Br. 34 ("Time was of

the essence, and costs were a significant factor."). Forty days was indeed quick

for bankruptcy and previously unthinkable for one of this scale. While the desire

to move through bankruptcy as expeditiously as possible was laudable, Old

GM's precarious situation and the need for speed did not obviate basic

constitutional principles. Due process applies even in a company's moment of

crisis. *Cf. Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425 (1934) ("The

Constitution was adopted in a period of grave emergency.").

We find no clear error in the bankruptcy court's finding that Old GM

knew or should have known with reasonable diligence about the defect.  *See*

*MLC II*, 529 B.R. at 556-60.  Individuals with claims arising out of the ignition

switch defect were entitled to notice by direct mail or some equivalent, as

required by procedural due process.

**B.**      ***"Prejudice"***

After concluding that Old GM did not provide adequate notice, the

bankruptcy court nonetheless enforced the Sale Order.  *See id.* at 565-73.  The

bankruptcy court held that "prejudice" is an "essential element" of procedural

due process and that plaintiffs were not prejudiced -- except as to independent

claims -- because the bankruptcy court would have approved the Sale Order

even if plaintiffs were provided adequate notice.  *Id.* at 565.  The parties dispute

whether "prejudice" is required and, if it is, whether there is prejudice here.

**1.**      ***Applicable Law***

The bankruptcy court held that "prejudice" is a requirement of the

Due Process Clause and that even if inadequate notice deprived an individual of

property without a meaningful opportunity to be heard, there is no prejudice if

in hindsight the outcome would have been the same with adequate notice.  *Id.*

Some courts have indeed held that "a party who claims to be aggrieved by a

violation of procedural due process must show prejudice." *Perry v. Blum*, 629

F.3d 1, 17 (1st Cir. 2010). Other courts have held otherwise that "a due process

violation cannot constitute harmless error." *In re New Concept Hous., Inc.*, 951

F.2d 932, 937 n.7 (8th Cir. 1991); *see Fuentes v. Shevin*, 407 U.S. 67, 87 (1972) ("The

right to be heard does not depend upon an advance showing that one will surely

prevail at the hearing.").[25] Courts have concluded that a "free and clear" clause

was unenforceable because of lack of notice and a hearing in accordance with

---

[25]      *See, e.g., McNabb v. Comm'r Ala. Dep't of Corr.*, 727 F.3d 1334, 1347 (11th
Cir. 2013) ("Our cases have long held that certain procedural due process violations,
such as the flat-out denial of the right to be heard on a material issue, can never be
harmless."); *Kim v. Hurston*, 182 F.3d 113, 119 (2d Cir. 1999) (commenting that even
though the "minimal hearing that procedural due process requires would have done
[the plaintiff] little good since she could not have realistically contested the changed
reason," that "[n]evertheless, the procedural due process requirement[s] . . . must be
observed"); *Lane Hollow Coal Co. v. Dir., Office of Workers' Compensation Programs*, 137
F.3d 799, 806 (4th Cir. 1998) ("[A] just result is not enough."); *In re Boomgarden*, 780 F.2d
657, 661 (7th Cir. 1985) ("In bankruptcy proceedings, both debtors and creditors have a
constitutional right to be heard on their claims, and the denial of that right to them is
the denial of due process which is never harmless error." (internal quotation marks
omitted)); *In re George W. Myers Co.*, 412 F.2d 785, 786 (3d Cir. 1969) (holding that
"alleged bankrupt was denied procedural due process by the . . . refusal of its offer to
present evidence at the close of the evidence" and that such denial could not be
"harmless error"); *Republic Nat'l Bank of Dallas v. Crippen*, 224 F.2d 565, 566 (5th Cir.
1955) ("The right to be heard on their claims was a constitutional right and the denial of
that right to them was the denial of due process which is never harmless error."); *Phila.
Co. v. SEC*, 175 F.2d 808, 820 (D.C. Cir. 1948) ("Denial of a procedural right guaranteed
by the Constitution -- in this instance denial of the type of hearing guaranteed . . . by the
due process clause -- is never 'harmless error.'"), *vacated as moot*, 337 U.S. 901 (1949).

procedural due process, without exploring prejudice. *See In re Savage Indus.*, 43

F.3d 714, 721-22 (1st Cir. 1994); *cf. Nolasco v. Holder*, 637 F.3d 159, 164 (2d Cir.

2011) ("There may well be instances in which . . . failure to comply with [a

procedural rule] results in a lack of notice or the denial of a meaningful

opportunity to be heard such that . . . due process rights are violated.").

        The § 363 sale context presents unique challenges for due process

analysis. As seen here -- with over 850 objections filed -- objections may often be

duplicative. *See GM*, 407 B.R. at 500 (finding successor liability "most debatable"

of issues); *cf. Mullane,* 339 U.S. at 319 ("[N]otice reasonably certain to reach most

of those interested in objecting is likely to safeguard the interests of all, since any

objections sustained would inure to the benefit of all."). Many of the objections,

especially those made against a "free and clear" provision, are not likely to be

grounded in any legal right to change the terms of the sale, but rather will be

grounded in a particular factual context. Section 363 sales are, in essence, private

transactions. On one side, the debtor-in-possession "has ample administrative

flexibility in the conduct of sales," 3 *Collier on Bankruptcy* ¶ 363.02[2], and on the

other side, the purchaser need not take on liabilities unless it wishes to do so, *see*

*id.* ¶ 363.06[7]. A bankruptcy court reviews a proposed § 363 sale's terms only for

some minimal "good business reason." *Lionel*, 722 F.2d at 1071; *see also* 3 *Collier on Bankruptcy* ¶ 363.02[1][e] ("One of the major policy decisions in drafting the Code was to separate the court from the day-to-day administrative activities in bankruptcy cases . . . ."). Many sale objections will thus sound in business reasons to change the proposed sale order, and not by reference to some legal requirement that the order *must* be changed.[26]

Assuming plaintiffs must demonstrate prejudice, the relevant inquiry is whether courts can be confident in the reliability of prior proceedings when there has been a procedural defect. *See Lane Hollow Coal Co. v. Dir., Office of Workers' Compensation Programs*, 137 F.3d 799, 808 (4th Cir. 1998) (considering "fairness of the trial and its reliability as an accurate indicator of guilt"); *see also Rose v. Clark*, 478 U.S. 570, 577-78 (1986) (asking whether adjudication in the criminal context without procedural protections can "reliably serve its function as

---

[26]    *See* A. Joseph Warburton, *Understanding the Bankruptcies of Chrysler and General Motors: A Primer*, 60 Syracuse L. Rev. 531, 531 (2010) ("Certain creditors, who saw their investments in the companies sharply reduced, vigorously objected to the role of the government in the bankruptcy process. Some charged that in protecting the interests of taxpayers, the Treasury Department negotiated aggressively with creditors but, in protecting the interests of organized labor, it offered the United Autoworkers union special treatment."); *see also GM*, 407 B.R. at 496 ("The objectors' real problem is with the decisions of the Purchaser, not with the Debtor, nor with any violation of the Code or caselaw.").

a vehicle for determination of" a case).  In considering reliability, "[t]he entire

record must be considered and the probable effect of the error determined in the

light of all the evidence."  11 Charles Alan Wright, Arthur R. Miller, et al., *Federal*

*Practice & Procedure* § 2883 (3d ed. 2016) [hereinafter "Wright & Miller"]; *see*

*Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 50-51 (2d Cir. 2014).  "[I]f [the court]

cannot say, with fair assurance, after pondering all that happened without

stripping the erroneous action from the whole, that the judgment was not

substantially swayed by the error," then it must find a procedural due process

violation.  *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

## 2.    *Application*

We need not decide whether prejudice is an element when there is

inadequate notice of a proposed § 363 sale, for even assuming plaintiffs must

demonstrate prejudice, they have done so here.  After examining the record as a

whole, we cannot say with fair assurance that the outcome of the § 363 sale

proceedings would have been the same had Old GM disclosed the ignition

switch defect and these plaintiffs voiced their objections to the "free and clear"

provision.  Because we cannot say with any confidence that no accommodation

would have been made for them in the Sale Order, we reverse.

At the outset, it is difficult to evaluate in hindsight what the objections would have been had plaintiffs participated in the § 363 sale. Perhaps they would have tried to identify some legal defect in the Sale Order, asked that economic losses or pre-closing accidents arising from the ignition switch defect be exempted from the "free and clear" provision, or requested greater priority in any GUC Trust distribution. But this uncertainty about the content of plaintiffs' objections is the natural result of the lack of any meaningful opportunity to be heard in the § 363 sale proceedings. *Cf. Lane Hollow*, 137 F.3d at 808 ("If there has been no fair day in court, the reliability of the result is irrelevant, because a fair day in court is how we assure the reliability of results."). This lack of certainty in turn influences our degree of confidence in the outcome.

The bankruptcy court instead concluded that it would have reached the same decision -- that it would have entered the Sale Order on the same terms -- even if plaintiffs had been given an opportunity to be heard. The bankruptcy court concluded that these plaintiffs "offer no legally based arguments as to why they would have, or even *could* have, succeeded on the successor liability legal argument when all of the other objectors failed." *MLC II*, 529 B.R. at 567; *see GM*,

407 B.R. at 499-506 (considering objections). The bankruptcy court found that other arguments were too "speculative." *MLC II*, 529 B.R. at 567-68, 573.

We disagree. The bankruptcy court failed to recognize that the terms of this § 363 sale were not within its exclusive control. Instead, the GM sale was a negotiated deal with input from multiple parties -- Old GM, New GM, Treasury, and other stakeholders. The Sale Order and Sale Agreement reflect this polycentric approach: it includes some fifteen sets of liabilities that New GM voluntarily, and without legal compulsion, took on as its own.

The process of how New GM voluntarily assumed liabilities is most apparent with its assumption of Lemon Law claims.[27] Following the proposed sale order, numerous state attorneys general objected that the proposed sale would bar claims based on state Lemon Laws. But their objections were not particularly *legal* in character -- that is, no state attorney general focused on how a liability shield that barred Lemon Law claims would be illegal. Citing no law, the objection was that New GM *should* assume these liabilities "[i]n light of the relationship between [Old GM] and [New GM] . . . , as well as the statements by the United States government promising that all warranty obligations would be

---

[27]    New GM informs the Court that a similar process occurred with respect to New GM accepting responsibility for post-closing accidents.

honored." Bankr. ECF No. 2043, at 39; *accord* Bankr. ECF No. 2076, at 10.  In other

words, because President Obama had promised to back warranties, the state

attorneys general argued that that Lemon Laws should be honored as well.

Following these objections, "Lemon Law claims were added as an

assumed liability during the course of the 363 Sale hearing after negotiation with

the [state attorneys general]." *MLC II*, 529 B.R. at 534 n.36.  The state attorneys

general had made a practical, business-minded argument, which brought Old

GM, New GM, and Treasury to the negotiating table.  At the sale hearing, counsel

to the National Association of Attorneys General commented that the state

attorneys general "have worked very hard since the beginning of the case with

debtors' counsel initially, with Treasury counsel, almost everybody in this room

at some point or another." J. App. 2084.  The result of these negotiations was an

understanding that "lemon laws were covered under the notion of warranty

claims" and inclusion in the Sale Agreement of language reflecting this

agreement. *Id.* at 2086.

Opportunities to negotiate are difficult if not impossible to recreate.

We do not know what would have happened in 2009 if counsel representing

plaintiffs with billions of dollars in claims had sat across the table from Old GM,

- 59 -

New GM, and Treasury.  Our lack of confidence, however, is not imputed on

plaintiffs denied notice but instead bolsters a conclusion that enforcing the Sale

Order would violate procedural due process.  Indeed, for the following reasons,

while we cannot say with any certainty that the outcome would have been

different, we can say that the business circumstances at the time were such that

plaintiffs could have had some negotiating leverage, and the opportunity to

participate in the proceedings would have been meaningful.

    First, it is well documented that one of the primary impetuses

behind a quick § 363 sale was to "restore consumer confidence."  *GM*, 407 B.R. at

480.  "The problem is that if the 363 Transaction got off track . . . , the U.S.

Government would see that there was no means of early exit for GM; . . .

customer confidence would plummet; and . . . the U.S. Treasury would have to

keep funding GM."  *Id.* at 492.  If consumer confidence dissipated, neither

Treasury loans nor a § 363 sale could save GM:  nobody would buy a GM car.

    These concerns were reflected in President Obama's $600 million

guarantee of GM and Chrysler warranties.  The business of cars is unique,

dependent largely on the goodwill of consumers.  Cars are owned for years and

form the cornerstones of quintessentially American activities:  dropping off and

picking up children from school, drive-ins and drive-thrus, family vacations and

road trips.  "[T]he road and the automobile" are, in American history,

"sanctuaries, hidden from the intrusive gaze of the state, [where] individuals live

freely."  Sarah Seo, *The New Public*, 125 Yale L.J. 1616, 1620 (2016).  The safety and

reliability of a car are central to these activities.  As the head of President

Obama's auto task force put it, in relation to Chrysler's bankruptcy:  "what

consumer would buy another Chrysler if the company didn't honor its

warranties?"  Rattner, *supra* note 8, at 181.  In other words, plaintiffs could have

tried to convince the bankruptcy parties that it made good business sense to

spend substantial sums to preserve customer goodwill in the GM brand and, in

turn, GM's business value.

Second, New GM was not a truly private corporation.  Instead, the

President and Treasury oversaw its affairs during the bailout and Treasury

owned a majority stake following the bankruptcy.  While private shareholders

expect their investments to be profitable, the government does not necessarily

share the same profit motive.  Treasury injected hundreds of billions of dollars

into the economy during the financial crisis, not on the expectation that it would

make a reasonable rate of return but on the understanding that millions of

Americans would be affected if the economy were to collapse.  If the ignition

switch defect were revealed in the course of bankruptcy, plaintiffs could have

petitioned the government, as the majority owner of New GM, to consider how

millions of faultless individuals with defective Old GM cars could be affected.

Indeed, during the later congressional hearings, Representatives and Senators

questioned New GM's CEO on her invocation of the liability shield when the

government guided the process.  *See supra* note 13.  Senator Richard Blumenthal,

for instance, indicated that he would have objected in bankruptcy had he known,

because he "opposed it at the time, as Attorney General for the state of

Connecticut, not [foreseeing] that the material adverse fact being concealed was

as gigantic as this one."  April 2, 2014 Senate Hearing, *supra* note 13, at 22-23

(statement of Sen. Richard Blumenthal, Member, S. Subcomm. on Consumer

Prot., Prod. Safety & Ins.).

     Third, we must price in the real cost of disrupting the bankruptcy

process.  From the middle of 2007 through the first quarter of 2009, Old GM's

average net loss exceeded $10 billion per quarter; a day's worth of delay would

cost over $125 million, a week almost a billion dollars.  We do not know whether

the proceedings would have been delayed, but some delay was certainly

possible.  For instance, Congress called the GM CEO to testify over the course of

four days.[28]  Old GM likewise conducted a thorough internal investigation on the

ignition switch defect, and the Valukas Report took more than two-and-a-half

months to prepare.  It seems unlikely that a bankruptcy court would have

casually approved a "free and clear" provision while these investigations into the

ignition switch defect's precise nature were still ongoing.

Finally, there is the detriment of added litigation -- had the class

actions been filed in the midst of bankruptcy, the mere administration of those

cases could have taken considerable resources.  Had the government also

brought criminal charges -- such as the charges now suspended by a deferred

prosecution agreement with the U.S. Attorney's Office for the Southern District of

New York in which New GM forfeited $900 million -- managing how to juggle

bankruptcy with a criminal prosecution could have taken even longer.  *United

States v. $900,000,000 in U.S. Currency*, No. 15 Civ. 7342 (S.D.N.Y.), ECF No. 1; *see*

11 U.S.C. § 362(b)(1) (exempting from usual automatic stay criminal actions

against debtor).  The reasonable conclusion is that, with the likelihood and price

of disruption to the bankruptcy proceedings being so high, plaintiffs at least had

---

[28]    *See* Rattner, *supra* note 8, at 304 ("The auto rescue succeeded in no small
part because we did not have to deal with Congress.").

Case 15-2844, Document 99-3, 07/13/16, 1817634, Page64 of 74

a basis for making business-minded arguments for why they should receive

some accommodation in or carve-out from the Sale Order.

Under these circumstances, we cannot be confident that the Sale

Order would have been negotiated and approved exactly as it was if Old GM

had revealed the ignition switch defect in bankruptcy.  The facts here were

peculiar and are no doubt colored by the inadequate notice and plaintiffs' lack of

*any* meaningful opportunity to be heard.  *See Kotteakos*, 328 U.S. at 765 (directing

courts to consider "all that happened without stripping the erroneous action

from the whole").  Given the bankruptcy court's focus on consumer confidence,

the involvement of Treasury, the financial stakes at the time, and all the business

circumstances, there was a reasonable possibility that plaintiffs could have

negotiated some relief from the Sale Order.

We address two further concerns.  First, the bankruptcy court stated

that it "would not have let GM go into the liquidation that would have resulted if

[it] denied approval of the 363 Sale."  *MLC II*, 529 B.R at 567; *see* J. App. 1623.  In

other words, the bankruptcy court suggested that it would have approved the

§ 363 sale anyway, because the alternative was liquidation -- and liquidation

would have been catastrophic.  While we agree that liquidation would have been

catastrophic, we are confident that Old GM, New GM, Treasury, and the

bankruptcy court itself would have endeavored to address the ignition switch

claims in the Sale Order if doing so was good for the GM business.  The choice

was not just between the Sale Order as issued and liquidation; accommodations

could have been made.

Second, many of the peculiar facts discussed apply with less force to

the Non-Ignition Switch Plaintiffs, who assert claims arising from other defects.

The bankruptcy court entered judgment against the Non-Ignition Switch

Plaintiffs based on its opinion determining the rights of the other plaintiffs, but

left as an open question whether Old GM knew of the Non-Ignition Switch

Plaintiffs' claims based in other defects.  *See MLC III*, 531 B.R. at 360.  Without

factual findings relevant to determining knowledge, we have no basis for

deciding whether notice was adequate let alone whether enforcement of the Sale

Order would violate procedural due process as to these claims.

To conclude, we reverse the bankruptcy court's decision insofar as it

enforced the Sale Order to enjoin claims relating to the ignition switch defect.[29]

*See MLC II*, 529 B.R. at 566-73.  Because enforcing the Sale Order would violate

---

[29]     In reversing, we express no views on the Groman Plaintiffs' request for
discovery to prove a procedural due process violation or fraud on the court.

procedural due process in these circumstances, the bankruptcy court erred in

granting New GM's motion to enforce and these plaintiffs thus cannot be "bound

by the terms of the [Sale] Order[]." *In re Johns-Manville Corp.*, 600 F.3d 135, 158

(2d Cir. 2010).  As to claims based in non-ignition switch defects, we vacate the

bankruptcy court's decision to enjoin those claims, *see MLC III*, 531 B.R. at 360,

and remand for further proceedings consistent with this opinion.

## IV. *Equitable Mootness*

Finally, we address the bankruptcy court's decision that relief for

any would-be claims against GUC Trust was equitably moot.  *MLC II*, 529 B.R. at

583-92.  We ordinarily review "dismissal on grounds of equitable mootness for

abuse of discretion, under which we examine conclusions of law de novo and

findings of fact for clear error." *In re BGI, Inc.*, 772 F.3d 102, 107 (2d Cir. 2014)

(citation omitted).  There were, however, no claims asserted against Old GM or

GUC Trust in bankruptcy court or in the multi-district litigation.  Under these

circumstances, we exercise our "independent obligation" to ensure that the case

"satisfies the 'case-or-controversy' requirement of Article III, Section 2 of the

Constitution." *United States v. Williams*, 475 F.3d 468, 478-9 (2d Cir. 2007).

A.    *Applicable Law*

The doctrine of equitable mootness allows appellate courts to

dismiss bankruptcy appeals "when, during the pendency of an appeal, events

occur" such that "even though effective relief could conceivably be fashioned,

implementation of that relief would be inequitable." *In re Chateaugay Corp.*

("*Chateaugay II*"), 988 F.2d 322, 325 (2d Cir. 1993).  "[A] bankruptcy appeal is

presumed equitably moot when the debtor's reorganization plan has been

substantially consummated." *In re BGI*, 772 F.3d at 108.  To obtain relief in these

circumstances, a claimant must satisfy the so-called "*Chateaugay* factors." *See*

*Chateaugay III*, 10 F.3d at 952-53.

The equitable mootness doctrine has enigmatic origins, and the

range of proceedings in which it applies is not well settled.  *See In re Continental*

*Airlines*, 91 F.3d 553, 567 (3d Cir. 1996) (*en banc*) (Alito, J., dissenting) (labeling it a

"curious doctrine").  Our Circuit has acknowledged that the doctrine draws on

"equitable considerations as well as the constitutional requirement that there be a

case or controversy." *Chateaugay III*, 10 F.3d at 952.  Other courts have focused

instead on the doctrine's statutory underpinnings and role in "fill[ing] the

interstices of the Code." *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994)

(explaining also difference between "*inability* to alter the outcome (real mootness) and *unwillingness* to alter the outcome ('equitable mootness')").  Indeed, several provisions of the Code prohibit modification of bankruptcy orders unless those orders are stayed pending appeal.  *See, e.g.*, 11 U.S.C. §§ 363(m), 364(e).

However broad the doctrine of equitable mootness, Article III requires a case or controversy before relief may be equitably mooted.[30] "[E]quitable mootness bears only upon the proper *remedy*, and does not raise a threshold question of our power to rule."  *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 144 (2d Cir. 2005) (emphasis added).

---

[30]    We do not resolve whether it is appropriate for a bankruptcy court -- as opposed to an appellate court -- to apply equitable mootness, which appears to be a recent phenomenon.  *E.g.*, *In re Innovative Clinical Sols., Ltd.*, 302 B.R. 136, 141 (Bankr. D. Del. 2003) (citing *In re Circle K Corp.*, 171 B.R. 666, 669 (Bankr. D. Ariz. 1994), which nominally applied constitutional mootness); *see also* Alan M. Ahart, *The Limited Scope of Implied Powers of a Bankruptcy Judge:  A Statutory Court of Bankruptcy, Not A Court of Equity*, 79 Am. Bankr. L.J. 1, 32-33 (2005) ("Since a bankruptcy court is not a court of equity, a bankruptcy judge ought not resort to non-statutory equitable principles, defenses, doctrines or remedies to excuse compliance with or to override provision(s) of the Bankruptcy Code or rules, or nonbankruptcy federal law."(footnotes omitted)).  Indeed, this Circuit's equitable mootness cases have all involved an appellate body applying the doctrine in the first instance.  *See, e.g.*, *BGI*, 772 F.3d 102; *In re Charter Commc'ns, Inc.*, 691 F.3d 476 (2d Cir. 2012); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005); *In re Burger Boys, Inc.*, 94 F.3d 755 (2d Cir. 1996); *In re Chateaugay Corp.*, 94 F.3d 772 (2d Cir. 1996); *In re Best Prods. Co.*, 68 F.3d 26 (2d Cir. 1995); *Chateaugay III*, 10 F.3d 944; *Chateaugay II*, 988 F.2d 322.

"The oldest and most consistent thread in the federal law of justiciability is that federal courts will not give advisory opinions." 13 Wright & Miller § 3529.1. A controversy that is "appropriate for judicial determination . . . must be definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937); *see Flast v. Cohen*, 392 U.S. 83, 95 (1968) ("limit[ing] the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process"). "[F]ederal courts are without power to decide questions that cannot affect the rights of *litigants in the case before them*." *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (emphasis added). That is, courts may not give "an opinion advising what the law would be upon a hypothetical state of facts," *Aetna Life Ins.*, 300 U.S. at 241, for instance, where a party did not "seek the adjudication of any adverse legal interests," *S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exch. Inc.*, 24 F.3d 427, 432 (2d Cir. 1994).

These limitations apply to bankruptcy courts. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1945 (2015) ("Bankruptcy courts hear matters solely on a district court's reference [and]possess no free-floating authority to decide claims traditionally heard by Article III courts."). In

bankruptcy, moreover, the adjudication of claims may be subject to other preparatory steps.  Bankruptcy courts will generally set a "bar date" that fixes the time to file a proof of claim against the bankruptcy estate.  *See* Fed. R. Bankr. P. 3002(c)(3).  If the bar date has passed, then the initial step for an individual seeking relief against the estate would be to seek permission to file a late proof of claim:  only after permission is granted can that individual claim that she is entitled to relief.  *See* Fed. R. Bankr. P. 9006(b)(1); *see also Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*, 507 U.S. 380, 394-95 (1993) (setting forth standard for "excusable neglect" for late claims under Rule 9006(b)(1)).

B.    *Application*

Here, the bankruptcy court held that any relief from GUC Trust would be equitably moot.  But plaintiffs never sought relief from GUC Trust. The bankruptcy court's ruling on equitable mootness was therefore advisory.

Neither GUC Trust nor Old GM are parties to the multi-district litigation now ongoing in district court.  Only one defendant is named:  New GM.  Likewise, as GUC Trust confirmed at oral argument, plaintiffs have not filed any proofs of claim with GUC Trust, nor have they even asked the

bankruptcy court for permission to file late proofs of claim or to lift the bar date, as would be required before relief could be granted.[31]

Instead, it appears from the record that GUC Trust became involved at *New GM's* behest. New GM noted "well there is a GUC Trust" and suggested that because of the Sale Order's bar on successor liability, any claims remained with Old GM and thus GUC Trust. J. App. 11038. But New GM has not sought to implead and bring cross-claims against GUC Trust in the multi-district litigation under Federal Rule of Civil Procedure 14 or to do the same in the Groman Plaintiffs' adversary proceeding in bankruptcy under Federal Rule of Bankruptcy Procedure 7014.

Moreover, GUC Trust has protested its involvement in the case. At a May 2, 2014 hearing, GUC Trust notified the bankruptcy court that it was "frankly [a] stranger[] to these proceedings." *Id.* at 11093. This was, according to GUC Trust's uncontested representation, because:

---

[31]     The bankruptcy court lifted the bar date for independent claims as a remedy. *See MLC II*, 529 B.R. at 583. We note, however, that neither the Groman Plaintiffs nor Ignition Switch Plaintiffs requested this as relief. The Ignition Switch Plaintiffs only mentioned in a footnote in their opposition to the motion to enforce that Old GM failed to provide notice of the bar date. The Pre-Closing Accident Plaintiffs stated on behalf of all plaintiffs that "Plaintiffs are not asserting a due process challenge to a bar date order or a discharge injunction issued in favor of a debtor." Bankr. ECF No. 13021, at 48 n.26.

> No claimants, none of the plaintiffs, no claimants
> or potential claimants had raised this as a possibility.
> No one has filed a motion to lift the bar date. The only
> person that has raised it has been New GM, based
> upon, you know, some statements of fact in some
> pleadings. But the only person that has actually moved
> forward with it is New GM, and frankly, you know, it's
> our view that this is essentially a way to deflect liability
> away, and you know, the attention away from New GM
> and put it on a third party.

*Id.* at 11090. At a July 2, 2014 hearing, GUC Trust continued to push that

litigation of the equitable mootness issue was premature, and dependent on

whether the Sale Order could be enforced. *Id.* at 8485.[32]

Nonetheless, the bankruptcy court asked the parties (including GUC

Trust) to brief initially whether claims against New GM were really claims

against Old GM's bankruptcy estate or GUC Trust. As the bankruptcy court

stated: "we're going to consider as [a] threshold issue[] . . . the *possibility* that the

claims now being asserted *may be* claims against Old GM or the GUC Trust." J.

App. 11103 (emphases added). Following a later hearing, the bankruptcy court

---

[32] The bankruptcy court seemingly agreed momentarily, commenting at the hearing that they could proceed "without now addressing and while maintaining reservations of rights with respect to issues such as . . . equitable [moot]ness." *Id.* at 8491.

added an issue of whether claims, if any, against GUC Trust should be

"disallowed/dismissed on grounds of equitable mootness." *Id.* at 5780.

GUC Trust was thus not a "litigant[] in the case before [the

bankruptcy court]," *Rice*, 404 U.S. at 246, who "s[ought] the adjudication of any

adverse legal interests," *S. Jackson & Son, Inc.*, 24 F.3d at 432. GUC Trust sought

*not* to be involved, but the bankruptcy court ordered otherwise. In doing so, the

bankruptcy court was concerned with a "hypothetical" scenario, *see Aetna Life*

*Ins.*, 300 U.S. at 241 -- the "possibility" that there "may be" late-filed claims against

GUC Trust, J. App. 11103. The bankruptcy court's decision on equitable

mootness that followed essentially advised on this hypothetical controversy.

We acknowledge that the parties have expended considerable time

arguing about equitable mootness. We are likewise cognizant that plaintiffs at

one point sent a letter to GUC Trust suggesting that it should freeze its

distributions pending the bankruptcy proceedings. *See MLC II*, 529 B.R. at 537-

38. But plaintiffs did not pursue any claims. Ultimately, it is the *parties*, and not

the court, that must create the controversy. *See Dep't of Envtl. Prot. & Energy v.*

*Heldor Indus., Inc.*, 989 F.2d 702, 707 (3d Cir. 1993) (rendering advisory "an answer

to a question not asked" by the parties).

We thus conclude that the bankruptcy court's decision on equitable

mootness was advisory and vacate that decision.  *See MLC II*, 529 B.R. at 583-92.

### *CONCLUSION*

For the reasons set forth above, with respect to the bankruptcy

court's decisions below, we:

(1)    **AFFIRM** the decision not to enforce the Sale Order as to the
independent claims;

(2)    **REVERSE** the decision to enforce the Sale Order as to the Used Car
Purchasers' claims and claims relating to the ignition switch defect,
including pre-closing accident claims and economic loss claims;

(3)    **VACATE** the decision to enforce the Sale Order as to claims relating
to other defects; and

(4)    **VACATE** the decision on equitable mootness as advisory.

We **REMAND** the case for further proceedings consistent with this

opinion.

Case 15-2844, Document 324-1, 06/13/2016, 1814344, Page1 of 1

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**ROBERT A. KATZMANN**
CHIEF JUDGE

Date: July 13, 2016
Docket #: 15-2844bk
Short Title: In re: Motors Liquidation Comp

**CATHERINE O'HAGAN WOLFE**
CLERK OF COURT

DC Docket #: 09-50026
DC Court: SDNY (NEW YORK
CITY)
DC Judge: Gerber

**BILL OF COSTS INSTRUCTIONS**

The requirements for filing a bill of costs are set forth in FRAP 39. A form for filing a bill of costs is on the Court's website.

The bill of costs must:
*   be filed within 14 days after the entry of judgment;
*   be verified;
*   be served on all adversaries;
*   not include charges for postage, delivery, service, overtime and the filers edits;
*   identify the number of copies which comprise the printer's unit;
*   include the printer's bills, which must state the minimum charge per printer's unit for a page, a cover, foot lines by the line, and an index and table of cases by the page;
*   state only the number of necessary copies inserted in enclosed form;
*   state actual costs at rates not higher than those generally charged for printing services in New York, New York; excessive charges are subject to reduction;
*   be filed via CM/ECF or if counsel is exempted with the original and two copies.

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**ROBERT A. KATZMANN**
CHIEF JUDGE

Date: July 13, 2016
Docket #: 15-2844bk
Short Title: In re: Motors Liquidation Comp

**CATHERINE O'HAGAN WOLFE**
CLERK OF COURT

DC Docket #: 09-50026
DC Court: SDNY (NEW YORK CITY)
DC Judge: Gerber

**VERIFIED ITEMIZED BILL OF COSTS**

Counsel for
_____

respectfully submits, pursuant to FRAP 39 (c) the within bill of costs and requests the Clerk to prepare an itemized statement of costs taxed against the
_____

and in favor of
_____

for insertion in the mandate.

Docketing Fee          _____

Costs of printing appendix (necessary copies _____ )  _____

Costs of printing brief (necessary copies _____ ____)  _____

Costs of printing reply brief (necessary copies _____ )  _____

**(VERIFICATION HERE)**

                                                                        _____
                                                                        Signature

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**ROBERT A. KATZMANN**
**CHIEF JUDGE**

Date: July 13, 2016
Docket #: 15-2844bk
Short Title: In re: Motors Liquidation Comp

**CATHERINE O'HAGAN WOLFE**
**CLERK OF COURT**

DC Docket #: 09-50026
DC Court: SDNY (NEW YORK CITY)
DC Judge: Gerber

**NOTICE OF DECISION**

The court has issued a decision in the above-entitled case. It is available on the Court's website http://www.ca2.uscourts.gov.

Judgment was entered on July 13, 2016; and a mandate will later issue in accordance with FRAP 41.

If pursuant to FRAP Rule 39 (c) you are required to file an itemized and verified bill of costs you must do so, with proof of service, within 14 days after entry of judgment. The form, with instructions, is also available on Court's website.

Inquiries regarding this case may be directed to 212-857-8523.