**HEARING DATE AND TIME: August 5, 2016 at 10:00 a.m. (Eastern Time)**
**OBJECTION DEADLINE: July 29, 2016 at 4:00 p.m. (Eastern Time)**

Eric B. Fisher
Neil S. Binder
Lindsay A. Bush
Lauren K. Handelsman
BINDER & SCHWARTZ LLP
366 Madison Avenue, 6th Floor
New York, New York 10017
Telephone: (212) 510-7008

Thomas Moers Mayer
Robert T. Schmidt
Jonathan M. Wagner
Jennifer Sharret
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

*Attorneys for the Motors Liquidation Company Avoidance Action Trust*

*Attorneys for Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, f/k/a GENERAL MOTORS CORPORATION, *et al.*, | Case No. 09-50026 (MG) (Jointly Administered) |
| Debtors. | Adversary Proceeding Case No. 11-09406 (MG) |

------------------------------------------------------------------------x

**JOINT MOTION OF MOTORS LIQUIDATION COMPANY AVOIDANCE
ACTION TRUST AND OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR ENTRY OF (A) STIPULATION AND AGREED ORDER
(I) SETTLING DISPUTED ENTITLEMENTS OF DEBTOR-IN-POSSESSION
LENDERS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO POTENTIAL TERM LOAN AVOIDANCE ACTION PROCEEDS AND
(II) MODIFYING AVOIDANCE ACTION TRUST AGREEMENT TO IMPLEMENT
SETTLEMENT, AND (B) ORDER (I) APPROVING SETTLEMENT OF
THE ALLOCATION DISPUTE, (II) APPROVING AMENDMENTS TO THE
AVOIDANCE ACTION TRUST AGREEMENT, AND (III) AUTHORIZING THE
AVOIDANCE ACTION TRUST TO GRANT A LIEN TO THE DIP LENDERS**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................................ii

PRELIMINARY STATEMENT ................................................................................................ 2

JURISDICTION AND VENUE ................................................................................................. 4

BACKGROUND ........................................................................................................................5

    A.    Old GM Files for Bankruptcy, the Term Loan Is Paid Off and the Committee Commences the Term Loan Avoidance Action ...................................................... 5

    B.    The Plan Is Confirmed and Dispute over Ownership of the Term Loan Avoidance Action Proceeds ......................................................................................... 7

    C.    Status of the Term Loan Avoidance Action ................................................. 9

    D.    The Term Loan Avoidance Action May Not Be Fully and Finally Resolved For Years, and the Avoidance Action Trust Does Not Have Sufficient Funds to Prosecute the Litigation to Completion ............................................................ 10

    E.    The Avoidance Action Trust Undertook a Competitive Bidding Process to Obtain Required Funding ............................................................................ 12

    F.    The Stipulation and the Litigation Cost Advance Agreement ..................... 14

BASIS FOR REQUESTED RELIEF ...................................................................................... 15

    A.    The Settlement is Fair and Reasonable ..................................................... 15

    B.    The Stipulation and Agreed Order, the Litigation Cost Advance and the Avoidance Action Trust Amendments Are Permitted under the Avoidance Action Trust Agreement, the Plan and the Bankruptcy Code ................................... 22

        1.    The Avoidance Action Trust Amendment Should Be Approved ........................ 24

        2.    The Avoidance Action Trust Should be Authorized to Grant a Lien ................... 25

NOTICE ................................................................................................................................... 26

CONCLUSION ........................................................................................................................ 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010) .................................................................16

*Hosp. & Univ. Prop. Damage Claimants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
7 F.3d 32 (2d Cir. 1993) ......................................................................................23

*In re Ionosphere Clubs, Inc.*,
156 B.R. 414 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) .......................16

*In re Iridium Operation LLC*,
478 F.3d 452 (2d. Cir. 2007) ...............................................................................17

*LTV Corp. v. Back (In re Chateaugay Corp.)*,
201 B.R. 48 (Bankr. S.D.N.Y. 1996), *aff'd in part,* 213 B.R. 633 (S.D.N.Y. 1997) .....................................................................................................................23

*Nellis v. Shugrue*,
165 B.R. 115 (S.D.N.Y. 1994) .............................................................................16

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*,
777 F.3d 100 (2d Cir. 2015) ...........................................................................5, 6, 7

*Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.), Adv. Pro. No. 09-00504*
(Bankr. S.D.N.Y. July 31, 2009) ................................................................. *passim*

*Penthouse Media Grp. v. Guccione (In re Gen. Media, Inc.)*,
335 B.R. 66 (Bankr. S.D.N.Y. 2005) ..................................................................23

*In re Petition of Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*,
272 B.R 396 (Bankr. S.D.N.Y. 2002) ..................................................................23

*In re Purofied Down Prods. Corp.*,
150 B.R. 519 (S.D.N.Y. 1993*)* .............................................................................16

*U.S. Dep't of Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co.*,
475 B.R. 347 (S.D.N.Y. 2012) ...............................................................................9

ii

*In re W.T. Grant Co.,*
   699 F.2d 599 (2d Cir. 1982)................................................................................17

**Statutes**

11 U.S.C § 105................................................................................1, 4, 16, 22

11 U.S.C § 1129................................................................................18

11 U.S.C § 1142................................................................................1, 4, 16, 22, 23

28 U.S.C. § 157................................................................................4

28 U.S.C. § 1334................................................................................4

28 U.S.C. § 1409................................................................................4

**Other Authorities**

Fed. R. Bankr. P. 3020................................................................................1, 4, 16, 23

Fed. R. Bankr. P. 9019................................................................................1, 4, 16

KL2 2965559.8

TO:    **THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:**

Wilmington Trust Company, solely in its capacity as trust administrator and trustee (the "**Avoidance Action Trust Administrator**") of the Motors Liquidation Company Avoidance Action Trust (the "**Avoidance Action Trust**"), as established under the Debtors' Second Amended Joint Chapter 11 Plan dated as of March 18, 2011 [Bankr. Dkt. No. 9836] (as confirmed, the "**Plan**") of the above-captioned post-effective date debtors (the "**Debtors**") and the Official Committee of Unsecured Creditors of Motors Liquidation Company f/k/a General Motors Corporation (the "**Committee**"), jointly submit this motion (the "**Motion**"), pursuant to sections 105 and 1142 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 9019(a) and 3020(d) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking entry of the following:

(i)    So-Ordered Stipulation and Agreed Order (I) Settling Disputed Entitlements of Debtor-in-Possession Lenders and Official Committee of Unsecured Creditors to Potential Term Loan Avoidance Action Proceeds, and (II) Modifying Avoidance Action Trust Agreement to Implement Settlement executed by the Committee, the DIP Lenders (as defined below) and the Avoidance Action Trust, substantially in the form attached hereto as Exhibit A (the "**Stipulation and Agreed Order**"); and

(ii)    An Order substantially in the form attached hereto as Exhibit B: (1) approving settlement of the Allocation Dispute (as defined below) on the terms set forth in the Stipulation and Agreed Order; (2) approving amendments to the Avoidance Action Trust Agreement (as defined below), in the form attached hereto as Exhibit D (the "**Avoidance Action Trust Amendment**") to implement the terms of the Stipulation and Agreed Order; (3) authorizing the Avoidance Action Trust to grant

a lien to the DIP Lenders on the proceeds of the Term Loan Avoidance Action (as defined below) and other specified property of the Avoidance Action Trust; and (4) granting such other and further relief as may be necessary to implement the terms of the Stipulation and Agreed Order and the Litigation Cost Advance Agreement (as defined below).

In support of the foregoing, the Avoidance Action Trust Administrator and the Committee respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Stipulation and Agreed Order resolves two critical issues arising in connection with two adversary proceedings that remain open and pending from the Debtors' 2009 Bankruptcy Case:[1] (1) settlement of the Allocation Dispute between the Committee, on the one hand, and Treasury and EDC (each as defined below) on the other hand, about who is entitled to the proceeds of the Term Loan Avoidance Action, and (2) the Avoidance Action Trust's need for funding to continue to prosecute the Term Loan Avoidance Action.

2.      While the Court is very familiar with the Term Loan Avoidance Action, the Allocation Dispute has received less attention in recent years.  The Allocation Dispute relates to the DIP Lenders' assertion that they were entitled to the proceeds of the Term Loan Avoidance Action under the terms of the Wind-Down Order.  The confirmed Plan left this dispute open to be either resolved by "mutual agreement" or upon a "Final Order."  After lengthy and difficult arms' length negotiations, the proposed Stipulation and Agreed Order resolves the Allocation Dispute

---

[1] The two adversary proceeding are: *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. U.S. Dep't of Treasury (In re Motors Liquidation Co.)*, Adv. Pro. No. 11-09406, Dkt. No. 1 (Bankr. S.D.N.Y. June 6, 2011) (the "**Allocation Dispute**") and *Motors Liquidation Company Avoidance Action Trust v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, Adv. Pro. No. 09-00504 (Bankr. S.D.N.Y. July 31, 2009) [Adv. Pro. Dkt. No. 1] (the "**Term Loan Avoidance Action**").

by establishing a mutually acceptable allocation of any proceeds ultimately received from the Term Loan Avoidance Action.

3.      As the Court is aware, the Term Loan Avoidance Action has recently become very active on multiple fronts.  However, absent a substantial infusion of funds, the Avoidance Action Trust will soon run out of money to prosecute the Term Loan Avoidance Action – putting in jeopardy the Avoidance Action Trust's ability to realize distributable proceeds from this valuable litigation.  To address its need for funding, the Avoidance Action Trust explored potential funding from the GUC Trust, private funders and the DIP Lenders, and on June 23, 2016, filed the motion to approve a funding agreement with the Private Funder (as defined below) [Bankr. Dkt. 13650].

4.      In the course of discussions, the DIP Lenders stated that they would consider the possibility of making a litigation cost advance, but only if it were an integral part of a final and acceptable resolution of the Allocation Dispute.  As described more fully below, a key element of the settlement of the Allocation Dispute is the agreement by the DIP Lenders to provide a litigation cost advance to the Avoidance Action Trust.

5.      The negotiations between and among the Committee, the Avoidance Action Trust and the DIP Lenders have resulted in a settlement that resolves the Allocation Dispute while at the same time solving the Avoidance Action Trust's need for an additional cost advance on favorable terms.  The Stipulation and Agreed Order provides as follows: holders of Allowed General Unsecured Claims (as defined in the Plan) eligible to receive distributions from the Avoidance Action Trust will receive 70% of the distributable proceeds of the Term Loan Avoidance Action and the DIP Lenders will receive 30% of the distributable proceeds of the Term Loan Avoidance Action.[2]  The Committee's agreement to this settlement was expressly conditioned on the DIP

---

[2] The specifics of the settlement are set forth in the Stipulation and Agreed Order.

Lenders providing $15 million as an interest-free litigation cost advance to the Avoidance Action

Trust on terms acceptable to the Avoidance Action Trust.  The Committee submits that the

settlement of the Allocation Dispute is reasonable and appropriate in light of the potential risks on

appeal and the costs associated with further litigation and delays in distribution that continuing to

litigate the Allocation Dispute would cause.

6.     By this Motion, the Avoidance Action Trust and the Committee seek approval of

the Stipulation and Agreed Order, which settles the Allocation Dispute and incorporates the

Litigation Cost Advance Agreement with the DIP Lenders.  In addition, the Avoidance Action

Trust seeks approval of amendments to the Avoidance Action Trust Agreement necessary to

implement the Stipulation and Agreed Order and authorizing the Avoidance Action Trust to grant

a lien to the DIP Lenders, consistent with the Stipulation and Agreed Order and the Litigation Cost

Advance Agreement.

## JURISDICTION AND VENUE

7.     The Bankruptcy Court has jurisdiction to consider this matter under 28 U.S.C. §§

157 and 1334, paragraph II of the order of the Bankruptcy Court dated as of March 29, 2011,

confirming the Plan [Bankr. Dkt. No. 9941], Article XI of the Plan, and Sections 6.1(b), 8.1 and

13.13 of the Amended and Restated Avoidance Action Trust Agreement, dated as of May 11, 2012

(the "**Avoidance Action Trust Agreement**") [Bankr. Dkt. No. 11704-1].  This is a core

proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28

U.S.C. § 1409.  The statutory predicates for the relief requested are sections 105 and 1142 of the

Bankruptcy Code and Bankruptcy Rules 9019 and 3020.

## BACKGROUND

A.      **Old GM Files for Bankruptcy, the Term Loan is Paid Off and the Committee Commences the Term Loan Avoidance Action**

8.      On June 1, 2009 (the "**Petition Date**"), Motors Liquidation Company ("**Old GM**") and its affiliated Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") which are jointly administered under Case No. 09-50026.

9.      On the Petition Date, the Debtors also filed a motion (the "**DIP Motion**") [Bankr. Dkt. No 64] seeking authority from the Bankruptcy Court to obtain $33.3 billion in post-petition financing (the "**DIP Financing**") from the United States Department of the Treasury ("**Treasury**") and Export Development Canada ("**EDC**," and collectively, the "**DIP Lenders**"). The Bankruptcy Court approved three DIP Orders: (1) the Interim DIP Financing Order, entered on June 2, 2009 (the "**Interim DIP Order**") [Bankr. Dkt. No. 292], (2) the Final DIP Financing Order, entered on June 25, 2009 (the "**Final DIP Order**") [Bankr. Dkt. No. 2529], and (3) the modified final DIP financing order, entered on July 5, 2009 (the "**Wind-Down Order**") [Bankr. Dkt. No. 2969] and collectively with the Interim DIP Order and the Final DIP Order, the "**DIP Orders**.")

10.      Prior to the Petition Date, Old GM obtained a syndicated secured term loan (the "**Term Loan**") of approximately $1.5 billion pursuant to a term loan agreement, dated as of November 29, 2006, as amended on March 4, 2009 (the "**Term Loan Agreement**"). *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 777 F.3d 100, 101 (2d Cir. 2015) ("**Second Circuit 2015 Decision**").[3] To secure repayment of the Term Loan, the Term Loan Lenders took security interests in a large

---

[3]      All references to the Bankruptcy Docket are to *In re: Motors Liquidation Company f/k/a General Motors Corporation*, Case No. 09-50026.

number of Old GM's assets, including all of the equipment and fixtures at Old GM's facilities throughout the United States (the "**Collateral**"). *Id.* JPMorgan, as administrative agent of the Term Loan, caused the filing of twenty-eight UCC-1 financing statements throughout the United States to perfect the Term Loan Lenders' security interests in the Collateral. *Id.* One of the twenty-eight UCC-1 financing statements covered all the equipment and fixtures at forty-two Old GM facilities and was filed with the Delaware Secretary of State and designated as file number 6416808 4 (the "**Main Lien**"). *Id.*

11. Through the DIP Motion, the Debtors requested authority to use a portion of the DIP financing to repay fully the approximately $1.5 billion Term Loan to a syndicate of more than 400 lenders (the "**Term Loan Lenders**"), including JPMorgan as administrative agent and lender. DIP Motion ¶¶ 75-78. Old GM repaid the Term Loan Lenders in full, ahead of other creditors of Old GM, on the assumption that their claims arising under the Term Loan Agreement were fully secured. Final DIP Order ¶ 19.

12. However, days before entry of the Final DIP Order, the Committee learned that the Term Loan Lenders' security interests, in fact, may not all have been perfected as of the Petition Date on account of the filing of a termination statement relating to the Main Lien (the "**2008 Termination Statement**") months before the Petition Date. *Second Circuit 2015 Decision*, 777 F.3d at 102. Therefore, the Final DIP Order, while conditionally approving Old GM's repayment of the Term Loan, expressly preserved the right of the Committee to investigate and bring actions based upon, among other things, the purported perfection of the security interests related to the Term Loan. Final DIP Order ¶ 19(d).

13. Following its investigation, the Committee determined that JPMorgan had authorized the filing of the 2008 Termination Statement, and that as a result the Term Loan

Lenders' security interest with respect to the collateral secured by the Main Lien was not perfected as of the Petition Date, and, therefore, according to the Committee, the claims of the Term Loan Lenders arising under the Term Loan Agreement were substantially undersecured. *Second Circuit 2015 Decision*, 777 F.3d at 102-03. To recover amounts alleged to have been improperly paid by Old GM to the Term Loan Lenders after the Petition Date (and during the ninety-day prepetition preference period) (the "**Transfers**"), based on the erroneous assumption that the Term Loan Lenders' security interests were perfected and their claims fully secured, the Committee filed the Term Loan Avoidance Action [Adv. Pro. No. 09-00504, Dkt No. 1].

**B.      The Plan Is Confirmed and Dispute over Ownership of the Term Loan Avoidance Action Proceeds**

14.      On March 29, 2011, the Bankruptcy Court entered an order (the "**Confirmation Order**") confirming the Plan [Bankr. Dkt. No. 9941]. The effective date of the Plan (the "**Effective Date**") was March 31, 2011. The Plan provided for the creation of the Avoidance Action Trust, which was established to liquidate and distribute its non-administrative assets, which consist entirely of the proceeds, if any, of the Term Loan Avoidance Action. Plan § 6.5. On December 15, 2011, prosecution of the Term Loan Avoidance Action was transferred to the Avoidance Action Trust.

15.      Prior to confirmation of the Plan, the DIP Lenders took the position that the Wind-Down Order provided them with a super-priority administrative expense claim for any amounts not otherwise paid back (subject to some carve-outs not relevant to the dispute), and, further, that the DIP Lenders had not waived the right to be repaid by the estate from whatever funds the estate recovered through the Term Loan Avoidance Action. The Committee, on the other hand, asserted that other provisions of the Wind-Down Order trumped the grant of the super-priority administrative expense claim, and that it was the parties' intent that the DIP Lenders not reach the

proceeds of the Term Loan Avoidance Action.  Specifically, the Committee pointed to the provisions of the Wind-Down Order that provided that the DIP Lenders' collateral would not include the Term Loan Avoidance Action and that the DIP loan would be non-recourse to Old GM, such that the DIP Lenders' recourse would be only to the collateral securing the DIP loans.

16.    In an effort to resolve the dispute, on October 4, 2010, the Committee filed a motion seeking to enforce the Final DIP Order and the Wind-Down Order, arguing that the DIP Lenders could not claim rights to any proceeds of the Term Loan Avoidance Action [Bankr. Dkt. No. 7226]. The DIP Lenders opposed that motion on the ground that no justiciable controversy existed.  The Bankruptcy Court ruled that the Committee's motion was not yet ripe for judicial adjudication, but did not foreclose a further application for a ruling at a later time [Bankr. Dkt. No. 7642].

17.    Both the Plan and the Avoidance Action Trust Agreement deferred the issue as to whether the DIP Lenders or unsecured creditors would be the beneficiary of the Term Loan Avoidance Action, providing that the Allocation Dispute would be resolved either by: (i) mutual agreement between the DIP Lenders and the Committee, or (ii) Final Order.  Plan § 1.124.  Under the Plan, the Committee was dissolved for most purposes, but specifically survived to continue prosecution or settlement of the Allocation Dispute.

18.    On June 6, 2011, the Committee commenced the Allocation Dispute seeking a declaratory judgment that: (i) the DIP Lenders were not entitled to any proceeds of the Term Loan Avoidance Action and had no interests in the Avoidance Action Trust, and (ii) the holders of Allowed General Unsecured Claims had the exclusive right to receive any and all proceeds of the Term Loan Avoidance Action, and are the exclusive beneficiaries of the Avoidance Action Trust. [Adv. Pro. No. 11-09406, Dkt. No. 1].  On December 12, 2011, the Bankruptcy Court entered an order in favor of the Committee, denying the DIP Lenders' motion to dismiss and for summary

8

judgment (the "**Bench Decision in Allocation Dispute**") [Adv. Pro. No. 11-09406, Dkt. No. 30].

On December 16, 2011, the DIP Lenders appealed the Bench Decision in Allocation Dispute [Adv.

Pro. No. 11-09406, Dkt. No. 31]. On July 3, 2012, the District Court for the Southern District of

New York vacated the Bench Decision in Allocation Dispute on the grounds that the dispute was

not ripe and remanded the case to the Bankruptcy Court with instructions to dismiss the

Committee's complaint without prejudice. *U.S. Dep't of the Treasury v. Official Comm. of*

*Unsecured Creditors of Motors Liquidation Co.*, 475 B.R. 347, 367 (S.D.N.Y. 2012). If approved,

the Stipulation and Agreed Order will fully resolve the Allocation Dispute.

### C.     Status of the Term Loan Avoidance Action

19.     As noted above, on July 31, 2009, the Committee commenced the Term Loan

Avoidance Action. JPMorgan, as Administrative Agent for the Term Loan Lenders, and the

Committee agreed to litigate whether the 2008 Termination Statement terminated the security

interest in the Collateral covered by the Main Lien ("**Phase I**") before litigating any other issues

in this case. The Bankruptcy Court approved this bifurcation and after several rulings and levels

of appeals, ultimately granted summary judgment in favor of the Avoidance Action Trust. The

Avoidance Action Trust then filed an amended complaint against most of the Term Loan Lenders.

Several of the Term Loan Lenders filed motions to dismiss, which were denied by this Court on

Order dated June 30, 2016. [Adv. Pro. No. 09-00504. Dkt. No. 643].

20.     The next phase of the litigation, which is now underway, primarily involves

classification and valuation of the remaining collateral related to the Term Loan that was secured

and perfected by filings other than the Main Lien (the "**Surviving Collateral**"). The overall

discovery schedule in place for the Term Loan Avoidance Action contemplates: July 31, 2016, as

the deadline for fact discovery (including depositions and plant inspections); October 31, 2016, as

the deadline for the completion of expert discovery; and November 15, 2016, as the deadline for

the filing of summary judgment motions (or letter requests for dispositive motions, if required). [Adv. Pro. No. 09-00504. Dkt. No. 153].

21.    In addition, on May 4, 2016, the Court entered an *Order Amending the August 17, 2015 'Order Regarding Discovery and Scheduling' to Provide for Proceedings Concerning Characterization and Valuation of Representative Assets* (the "**May 4, 2016 Order**"), which provides for a schedule to streamline proceedings regarding fixture classification and valuation issues with regard to a total of forty representative assets to be selected by the parties.  [Adv. Pro. No. 09-00504, Dkt. No. 547].  The May 4, 2016 Order provides for the filing of pre-trial briefs to the Court on November 18, 2016, with a trial on the representative assets to take place thereafter on a date to be set by the Court.

### D.    The Term Loan Avoidance Action May Not Be Fully and Finally Resolved For Years, and the Avoidance Action Trust Does Not Have Sufficient Funds to Prosecute the Litigation to Completion

22.    The initial administrative assets of the Avoidance Action Trust consisted of approximately $1.6 million in cash to be held and maintained by the Avoidance Action Trust Administrator for fees and expenses in connection with trust administration and prosecution of the Term Loan Avoidance Action (the "**Avoidance Action Trust Administrative Cash**").[4]

23.    The $1.6 million of Avoidance Action Trust Administrative Cash set aside under the Plan proved to be insufficient to fund litigation costs related to the Term Loan Avoidance Action and to satisfy the Avoidance Action Trust's general administrative costs.  Accordingly, on January 20, 2012, the GUC Trust filed a motion seeking, among other things, to liquidate securities

---

[4]    The Avoidance Action Trust also received $500,000 of Avoidance Action Trust SEC Reporting Cash to be used solely for SEC Reporting Costs to the extent there is no other available source of funds to pay such costs.  [Bankr. Dkt. No. 11330 ¶ 18].  Any unused portion of the Avoidance Action Trust SEC Reporting Cash will be returned to the GUC Trust.  [Bankr. Dkt. No. 11704-1 (Avoidance Action Trust Agreement § 2.3(e))].

to fund additional Avoidance Action Trust fees, costs and expenses primarily related to the prosecution of the Term Loan Avoidance Action.  [Bankr. Dkt No. 11330].  The Court granted the GUC Trust's motion and entered an order, which, among other things, allocated an additional $13,714,000 to the Avoidance Action Trust to satisfy the Avoidance Action Trust's estimated fees, costs and expenses for 2012, 2013, and 2014 (the "**GUC Trust Supplemental Cash**").  [Bankr. Dkt. No. 11507].  Pursuant to the terms of the Avoidance Action Trust Agreement, when the proceeds, if any, of the Avoidance Action Trust are distributed, the GUC Trust Supplemental Cash is not repaid to the GUC Trust; rather, an amount equal to the GUC Trust Supplemental Cash is placed into a segregated account for distribution to the holders of Allowed General Unsecured Claims.  [Bankr. Dkt. No. 11704-1 (Avoidance Action Trust Agreement § 5.1(d)(ii), (iv))].

24.    The Avoidance Action Trust projects that, absent additional funding, the Avoidance Action Trust will not have sufficient cash to meet its accrued financial obligations, including the fees and costs associated with prosecution of the Term Loan Avoidance Action, the administrative expenses of the Avoidance Action Trust, and the fees of the Trust Administrator and trust monitor (the "**Avoidance Action Trust Monitor**").  Declaration of Arthur J. Gonzalez, dated July 15, 2016 (the "**Gonzalez Declaration**") ¶ 4.[5]  In addition to litigating to final resolution the Term Loan Avoidance Action against the hundreds of defendants in the Term Loan Avoidance Action (the "**Term Loan Defendants**"), including any appeals, the Avoidance Action Trust has also commenced two proceedings in Delaware seeking to nullify certificates of cancellation of two entities named as Defendants in the Term Loan Avoidance Action based on their failure to wind

---

[5] Section 6.1(d)(ii) of the Avoidance Action Trust Agreement requires the filing of a declaration from the Trust Monitor in support of certain relief sought by this Motion and the Gonzalez Declaration is being filed contemporaneously with this Motion.

up and distribute their assets in accordance with Delaware law so that the Avoidance Action Trust can prosecute the Term Loan Avoidance Action against the reconstituted entities.

25.    Accordingly, the final resolution of the Term Loan Avoidance Action could take years, and the Avoidance Action Trust does not have sufficient funds to prosecute the Term Loan Avoidance Action to completion absent additional funding.

**E.    The Avoidance Action Trust Undertook a Competitive Bidding Process to Obtain Required Funding**

26.    Pursuant to the Avoidance Action Trust Agreement, the Avoidance Action Trust Administrator "shall at all times, to the extent practicable, retain . . . sufficient Avoidance Action Trust Administrative Cash and Supplemental Avoidance Action Trust Cash as the Trust Administrator shall determine, with the approval of the Trust Monitor and subject to the Budget, is necessary (x) to pay the reasonable incurred or anticipated fees and expenses of the Trust . . . and (y) to satisfy other liabilities incurred or anticipated by the Trust in accordance with the Plan, the Confirmation Order and this Trust Agreement."  [Bankr. Dkt. No. 11704-1 (Avoidance Action Trust Agreement § 5.5(b))].

27.    The Avoidance Action Trust Agreement specifically sets forth a mechanism for the Avoidance Action Trust to seek additional funding in the event that the Avoidance Action Trust Administrative Cash and the GUC Trust Supplemental Cash "is not reasonably likely to be adequate to satisfy the current and projected future fees, costs and expenses" of the Avoidance Action Trust.  *Id.* § 6.1(c).

28.    In accordance with its obligations under the Avoidance Action Trust Agreement, the Avoidance Action Trust Administrator, in consultation with the Avoidance Action Trust Monitor, made a determination that the cash available to the Avoidance Action Trust was not sufficient to meet its projected fees and expenses.  *See* Gonzalez Decl. ¶ 4.  After initially exploring

a potential transaction with the GUC Trust as a path to addressing the Trust's need for supplemental cash, the Avoidance Action Trust Administrator, through counsel, commenced a competitive bidding process to obtain private funding for the Avoidance Action Trust. *See id.* ¶ 5.

29.     Throughout this competitive bidding process, the Avoidance Action Trust kept the DIP Lenders apprised of the negotiations with potential funders. *See id.* ¶ 6. The DIP Lenders expressed an interest in providing a litigation cost advance to the Avoidance Action Trust as a condition of a settlement with the Committee on the Allocation Dispute, if such a settlement could be reached.

30.     On April 4, 2016, after a careful analysis of all the proposals submitted by potential third-party private funders, the Avoidance Action Trust reached an agreement in principle with the a private funder (the "**Private Funder**") for a $15 million loan in exchange for a return that could be as high as the greater of 2.25 times the amount of the funds drawn or 4.75% of the aggregate proceeds of the Term Loan Avoidance Action. The Avoidance Action Trust shared a copy of the initial term sheet with the DIP Lenders. On May 19, 2016, the Avoidance Action Trust provided the DIP Lenders a copy of the executed litigation funding agreement with the Private Funder (the "**Private Litigation Funding Agreement**"). On June 23, 2016, the Avoidance Action Trust filed a motion seeking approval of the Private Litigation Funding Agreement [Bankr. Dkt. 13650].

31.     The Avoidance Action Trust negotiated the following provision in the Private Litigation Funding Agreement permitting the Avoidance Action Trust to terminate the Private Litigation Funding Agreement within a certain period of time in the event that the DIP Lenders agreed to provide funding to the Avoidance Action Trust:

> "Permitted Alternative Funding Event" means the occurrence, on or before the earlier of (x) July 20, 2016; and (y) the originally-scheduled hearing date

established by the Bankruptcy Court to consider the motion required pursuant to
Section 5.1(f) (without regard to any adjournment thereof), of either: (i) any
submission to the Bankruptcy Court of a motion seeking the approval of any
agreement or arrangement, including, without limitation, the approval of any
stipulation, with one or more DIP Lenders to provide funding for the Trust's
prosecution of the Term Loan Avoidance Action, the Oaktree Action, and any other
action brought by the Trust; or (ii) the Trust's entry into an agreement or
arrangement with one or more DIP Lenders pursuant to which such DIP Lenders
will provide funding for the Trust's prosecution of the Term Loan Avoidance
Action, the Oaktree Action, and any other action brought by the Trust, in any such
case on terms materially more favorable to the Trust than those provided by the
Investors under this Agreement.

[Bankr. Dkt. No. 13650-2 (Private Litigation Funding Agreement § 1.1)].

### F.    The Stipulation and the Litigation Cost Advance Agreement

32.    After extensive negotiations, the DIP Lenders, the Avoidance Action Trust and the

Committee entered into the Stipulation and Agreed Order which settled, among other things, the

Allocation Dispute.    The Committee's entry into this Stipulation and Agreed Order was

conditioned on the DIP Lenders providing $15 million in litigation funding (the "**Litigation Cost**

**Advance**") to the Avoidance Action Trust (instead of the Private Funder providing funding) on

terms acceptable to the Avoidance Action Trust.    Having reached an agreement with the DIP

Lenders to provide the Litigation Cost Advance for the Trust's prosecution of the Term Loan

Avoidance Action, contemporaneously with this Motion, the Avoidance Action Trust will

terminate the Private Litigation Funding Agreement pursuant to its terms.

33.    The Stipulation and Agreed Order provides that, after repayment of all DIP Lender

Advances (including the Litigation Cost Advance) and the GUC Trust Advances, the DIP Lenders

shall be entitled to receive 30% of the remaining net proceeds resulting from the Term Loan

Avoidance Action and unsecured creditors shall be entitled to receive 70% of the remaining net

proceeds resulting from the Term Loan Avoidance Action, with each such distribution to the DIP

Lenders and unsecured creditors to be made on or about the same time and on a *pari passu* basis.

34.     In addition, the Stipulation and Agreed Order approves the litigation cost advance agreement with the DIP Lenders (the "**Litigation Cost Advance Agreement**"), attached as <u>Exhibit C</u>,[6] under which the DIP Lenders will advance the $15 million Litigation Cost Advance to the Avoidance Action Trust.  The Stipulation and Agreed Order further grants the DIP Lenders a first priority lien on the Avoidance Action Proceeds and the Funding Account (as defined in the Litigation Cost Advance Agreement) up to the amount of the Litigation Cost Advance.  The Litigation Cost Advance Agreement further provides that the Avoidance Action Trust Agreement shall be amended to reflect the terms of the Stipulation and Agreed Order, including to provide for the Litigation Cost Advance and the relative priority of the Avoidance Action Trust's obligations to repay the DIP Lenders.

35.     As required by Section 6.1(d)(ii) of the Avoidance Action Trust Agreement, the Avoidance Action Trust Monitor has submitted the Gonzalez Declaration herewith setting forth his approval of the Litigation Cost Advance Agreement and entry into the Stipulation and Agreed Order, to the extent such order relates to the Litigation Cost Advance Agreement.  *See* Gonzalez Decl. ¶¶ 9-11.

## BASIS FOR REQUESTED RELIEF

36.     This Court has the authority to enter the proposed Stipulation and Agreed Order and approve the Litigation Cost Advance Agreement under the terms of the Plan and under sections 105 and 1142(b) of the Bankruptcy Code and Bankruptcy Rules 9019 and 3020.

### A.     The Settlement Is Fair and Reasonable

37.     The Plan provides that the Committee survives post-Effective Date to litigate or settle the Allocation Dispute.  Similarly, the Avoidance Action Trust Agreement provides that the

---

[6] The Litigation Cost Advance Agreement will also be an exhibit to the Stipulation and Agreed Order.

ultimate beneficiaries of the Avoidance Action Trust would be determined either by mutual agreement between the Committee and the DIP Lenders or by Final Order. After more than four months of negotiations with the DIP Lenders, the Committee agreed to the terms of the Stipulation and Agreed Order, which it believes reflects a settlement that is fair and reasonable and in the best interest of the ultimate beneficiaries of the Avoidance Action Trust.

38.    A bankruptcy court may approve a proposed settlement when the settlement is fair and equitable and in the best interests of the estate. *See In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994). "[T]he general rule [is] that settlements are favored and, in fact, encouraged by the approval process outlined above." *See Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 523 (S.D.N.Y. 1993).

39.    In determining whether the settlement is fair and reasonable, the court need not decide the numerous issues of law and fact raised by the settlement, but rather should "canvass the issues" to determine whether the settlement "fall[s] below the lowest point in the range of reasonableness." *In re Chemtura Corp.*, 439 B.R. 561, 593 (Bankr. S.D.N.Y. 2010) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1982) (internal citation omitted). *See also Purofied Down Prods.*, 150 B.R. at 522 ("[T]he court need not conduct a 'mini-trial' to determine the merits of the underlying litigation.").

40.    In deciding whether a particular settlement falls within the "range of reasonableness," the Second Circuit Court of Appeals in *Iridium* set forth a list of factors,, including: (1) the balance between the probability of success in the litigation versus the concrete benefits of settlement; (2) the likelihood of complex and protracted litigation; (3) the paramount interests of creditors, including each affected class's relative benefits; (4) whether other parties in

interest support the settlement; (5) the competency and experience of counsel supporting the settlement; and (6) the extent to which the settlement is the product of arms' length bargaining. *In re Iridium Operation LLC*, 478 F.3d 452, 462 (2d. Cir. 2007).[7]  The Committee respectfully submits that, based on the *Iridium* factors, the Stipulation and Agreed Order is fair and reasonable and should be approved.

41.    The Allocation Dispute already has a long history of litigation and, absent settlement, there is a strong likelihood of future complex litigation.   While the Committee continues to believe in the merits of the arguments and positions it has taken in the Allocation Dispute, the Committee understands there is a risk it may not ultimately prevail.

42.    The extensive briefing before the Bankruptcy Court and the District Court, the earlier Bench Decision on Allocation Dispute and the questions raised in oral argument at the District Court underscore the complexity of the legal issues in interpreting the DIP Orders.  The DIP Lenders contended that they were entitled to be repaid out of any available assets including the Term Loan Avoidance Action proceeds as a result of their superpriority administrative expense claim (which was only subject to a carve-out for professional fees).  The Committee contended that a later paragraph in the Wind-Down Order, which limited the DIP Lender's recourse to the "Collateral" (as defined in the Wind-Down Order and which specifically excluded the proceeds of the Term Loan Avoidance Action) trumped the DIP Lenders' superpriority claim.  The Committee and its counsel were intimately involved in the extensive negotiations of the Wind-Down Order in June and July 2009.   While the Committee and its counsel continue to believe that their interpretation of the Wind-Down Order is correct and evidences the parties' intention, the DIP

---

[7] *Iridium* references an additional factor relating to release of directors and officers which is not applicable here.

Lenders have taken a contrary position which would need to be litigated to conclusion, absent a settlement.[8]

43.     The DIP Lenders filed both a motion to dismiss the Committee's complaint in the Allocation Dispute because, they claimed, the controversy was not yet ripe, as well as a cross-motion for summary judgment.  The DIP Lenders raised several arguments in their cross-motion for summary judgment, including: (i) plain meaning and canons of construction, (ii) the superpriority claim should not be surplusage, (iii) the superpriority claim excluded funds for the carve-out but not the proceeds of the avoidance action, (iv) the DIP Lenders would be entitled to payment of their administrative expense claim in full under Section 1129(a)(9) of the Bankruptcy Code, (v) "non-recourse" only limits right to prepetition claims, and (vi) the Committee was only given derivative standing to litigate the Term Loan Avoidance Action and any proceeds would have to be distributed in accordance with the Bankruptcy Code's priority scheme.

44.     The Bankruptcy Court denied the motion to dismiss and granted summary judgment in favor of the Committee.  However, in its 50+ page detailed opinion, the Bankruptcy Court acknowledged that while on the one hand the motion to dismiss did not present any difficult issues, "the issues on summary judgment are closer" and the DIP Lender's position (on the merits) was not frivolous.  Bench Decision in Allocation Dispute pp. 3, 27.  In finding in favor of the Committee, the Bankruptcy Court engaged in an extensive analysis of plain meaning, canons of construction,  chronology of events when language appeared/disappeared in the DIP Orders, and analysis of statement of parties' intent, and  addressed the DIP Lenders' other arguments (referenced above).

---

[8] The Committee was further concerned that because each of the DIP Lenders are governmental entities, they may not be subject to the same litigation concerns and timing constraints that private litigants are generally subject to.

45.    On appeal, the DIP Lenders raised many of the same arguments as they did in the Bankruptcy Court and contested much of the Bench Decision in Allocation Dispute, including that its ruling conflicted with statutory provisions and that the Bankruptcy Court misapplied certain canons of construction, assigned improper weight to certain statements by parties and erroneously concluded that adopting the DIP Lenders' contentions would yield an absurd result. In addition, the DIP Lenders argued that questions of contract interpretation and the grant of summary judgment are subject to *de novo* review on appeal.

46.    The District Court vacated the Bankruptcy Court's opinion on jurisdictional grounds.  However, prior to issuing that decision, the District Court held oral argument, engaging in extensive debate with counsel to the Committee and the DIP Lenders on the merits of the Allocation Dispute, including additional issues not raised earlier in the proceeding such as the need for discovery and burden of proof.  *See Transcript of Oral Argument, U.S. Dep't of Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co., No. 12-cv-00695-CM (S.D.N.Y. May 4, 2012), Dkt No. 12* (a copy of the transcript  is attached hereto as Exhibit F). Following oral argument, the District Court issued an order directing the parties to submit responses to additional questions, several of which related to the merits of the Allocation Dispute, as opposed to pure jurisdictional issues.  *U.S. Dep't of Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co.*, No. 12-cv-00695-CM, Dkt. Nos. 12, 13, 14, 15 (S.D.N.Y. June 6, 2012).

47.    Particularly in light of this prior history, it is clear that absent a settlement, the Allocation Dispute would likely result in protracted litigation.  The District Court vacated the Bankruptcy Court's opinion on ripeness grounds in 2012, at a time when the Bankruptcy Court had not yet ruled on Phase I of the underlying Term Loan Avoidance Action.  While the

19

Bankruptcy Court has now denied the Term Loan Defendants' motion to dismiss and will now turn to the next phase of the litigation (identifying the surviving Collateral and valuing it), it is not clear if either the Bankruptcy Court or the District Court would entertain a revival of the Allocation Dispute until there are actual proceeds to be distributed.

48.     Absent the settlement, it could take many more years for the Allocation Dispute to run its course through the Bankruptcy Court and on appeal.  At the Bankruptcy Court level, it is not clear if the parties would stipulate to an expedited procedure (deeming the Bench Decision in Allocation Dispute to be a final decision and order to allow for an immediate appeal) or if there would need to be new briefing, hearing and a decision.  Moreover, during oral argument, the District Court raised the possibility of the need for discovery, which would add even more cost and delay.  The Committee believes that there is value to settling the dispute now, which would guarantee a distribution to holders of Allowed General Unsecured Claims immediately after the Avoidance Action Trust receives proceeds from the underlying litigation, and not potentially multiple years later.

49.     As described above, in March, counsel for the Committee and the DIP Lenders re-opened negotiations.  In part because of the continued existence of litigable issues and the potential for significant further delay, the Committee decided to engage in settlement discussions with the DIP Lenders.  The Committee submits that the ultimate settlement, which allocates 70% of the net proceeds of the Avoidance Action Trust in favor of holders of Allowed General Unsecured Claims, is an appropriate and fair compromise of the potential risks of prolonged, complicated litigation.

50.     Moreover, the Committee submits that the "cost" of the settlement should be viewed as closer to 25%, as opposed to 30% because absent this settlement, the Avoidance Action Trust would have to obtain private funding, which, using the Private Litigation Funding Agreement

as the benchmark, would require payment of the greater of 2.25 times the amount of the funds drawn or 4.75% of the Avoidance Action Trust proceeds (to come ahead of whoever the ultimate Avoidance Action Trust Beneficiaries are) and payment of other fees and expenses. In that scenario, if the Committee litigated and successfully prevailed in the Allocation Dispute, unsecured creditors would still have only been able to receive approximately 95% of the Avoidance Action Trust proceeds (not 100%).

51.    In addition to the agreement on allocation, another key element of the settlement is the requirement that the DIP Lenders provide the $15 million (interest-free) Litigation Cost Advance, which is inextricably linked to (and conditioned on) resolution of the Allocation Dispute. The DIP Lenders would not have agreed to make the Litigation Cost Advance without approval of the settlement on the Allocation Dispute and the Committee would not have agreed to settlement of the Allocation Dispute without the DIP Lenders agreeing to the Litigation Cost Advance Agreement on terms that were acceptable to the Avoidance Action Trust. The Avoidance Action Trust, the DIP Lenders and holders of Allowed General Unsecured Claims all benefit from the Litigation Cost Advance, which will enable the Avoidance Action Trust to continue its litigation against the Term Loan Defendants.

52.    In applying the *Iridium* factors, the benefit of settling the Allocation Dispute outweighs the risks inherent in litigating this issue. Here, the settlement offers the concrete benefit of assuring holders of Allowed General Unsecured Claims receive 70% of the net distributable Term Loan Avoidance Action proceeds and ensures adequate funding to the Avoidance Action Trust. As described above, the settlement avoids the potential for complex and protracted litigation. The settlement was the product of arms' length negotiations between and among the Committee, the Avoidance Action Trust and the DIP Lenders. Finally, counsel for the Committee,

the DIP Lenders and the Avoidance Action Trust are highly experienced practitioners who have been involved in the bankruptcy case since the beginning and are intimately familiar with the issues and disputes that are being resolved by this settlement.   Accordingly, the Committee respectfully submits that the Stipulation and Agreed Order is in the best interest of all parties-in-interest and should therefore be approved.

**B.      The Stipulation and Agreed Order, the Litigation Cost Advance and the Avoidance Action Trust Amendments Are Permitted under the Avoidance Action Trust Agreement, the Plan and the Bankruptcy Code**

53.      The Plan specifies that the Bankruptcy Court retains exclusive jurisdiction "of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code" and for, *inter alia*, the following purposes: (1) "to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced before or after the Confirmation Date . . ."; (2) to "ensure that distributions to holders of Allowed Claims are accomplished as provided herein"; (3) to "hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, . . . the Avoidance Action Trust, . . . and the Avoidance Action Trust Agreement . . . ."; and (4) to "take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan to maintain the integrity of the Plan following consummation." [Bankr. Dkt. No. 9836 (Plan §§ 11.1 (b), (c), (i), (j))].

54.      Furthermore, section 1142(b) of the Bankruptcy Code authorizes the Court to "direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act . . . that is necessary for the consummation of the plan."  11 U.S.C. § 1142(b); *see also Hosp. & Univ. Prop. Damage Claimants v. Johns-Manville Corp. (In re Johns-*

*Manville Corp.)*, 7 F.3d 32, 34 (2d Cir. 1993) (finding that bankruptcy courts retain postconfirmation jurisdiction in chapter 11 proceedings to the extent provided by the plan); *Penthouse Media Grp. v. Guccione (In re Gen. Media, Inc.)*, 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005) (finding that bankruptcy courts retain post-confirmation jurisdiction to matters related to the implementation of a plan); *In re Petition of Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*, 272 B.R 396, 407 n.11 (Bankr. S.D.N.Y. 2002) ("[T]he Court may direct parties to perform any act necessary to consummate the plan.") (citing 11 U.S.C. § 1142(b)); *LTV Corp. v. Back (In re Chateaugay Corp.)*, 201 B.R. 48, 66 (Bankr. S.D.N.Y. 1996), ("The clear intent of Section 1142(b) of the Bankruptcy Code is to assure that the terms and provisions of a confirmed chapter 11 plan are carried out until the plan is completed and the final decree is entered closing the case.") *aff'd in part,* 213 B.R. 633 (S.D.N.Y. 1997). In addition, Bankruptcy Rule 3020(d) provides that "[n]otwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate." Fed. R. Bankr. P. 3020(d).

55.     Here, the Stipulation and Agreed Order settles the Allocation Dispute, which is a pending adversary proceeding.   In addition, the Stipulation and Agreed Order allows the Avoidance Action Trust to fulfill its basic purpose under the Plan.  The Plan specifies that the "sole purpose" of the Avoidance Action Trust is to liquidate and distribute its assets, which consist of the proceeds of the Term Loan Avoidance Action.  Plan §§ 1.23, 6.5.  The Litigation Cost Advance Agreement promotes this goal.  Approval of the Litigation Cost Advance Agreement will provide necessary funding to the Avoidance Action Trust to prosecute the Term Loan Avoidance Action to maximize its value for the Avoidance Action Trust's beneficiaries.

### 1.    The Avoidance Action Trust Amendment Should Be Approved

56.    The amendments to the Avoidance Action Trust Agreement are intended to implement the terms of the Stipulation and Agreed Order and the Litigation Cost Advance Agreement.  Because it was not anticipated that the DIP Lenders would provide additional funding to the Avoidance Action Trust, the Avoidance Action Trust Agreement needs to be amended to implement the mechanisms for the use of, and repayment of, the Litigation Cost Advance.  In addition, the Avoidance Action Trust Agreement reflects the dispute between the Committee and the DIP Lenders over entitlement to the proceeds of the Term Loan Avoidance Action, which has now been resolved pursuant to the Stipulation and Agreed Order.  Accordingly, the Avoidance Action Trust Agreement needs to be amended to reflect the agreed-upon allocation of proceeds and other settlement terms set forth in the Stipulation and Agreed Order and the Litigation Cost Advance Agreement.

57.    The Avoidance Action Trust Agreement permits that:

The Trust Administrator may amend or supplement this Trust Agreement for any other purpose, but only on petition to, and with the approval of, the Bankruptcy Court; *provided* that (x) no amendment or supplement to this Trust Agreement shall be inconsistent with the purpose and intent of the Trust to dispose of in an expeditious but orderly manner the Avoidance Action Trust Assets in accordance with the terms of the Plan, the Confirmation Order and this Trust Agreement, and (y) this Trust Agreement shall not be amended in a manner that is inconsistent with the Plan in the form confirmed by the Bankruptcy Court, subject to any post-confirmation modifications to the Plan pursuant to Section 1127 of the Bankruptcy Code.

[Bankr. Dkt. No. 11704-1 (Avoidance Action Trust Agreement § 13.13(b))].

58.    Pursuant to the Plan, the Avoidance Action Trust was established to liquidate and distribute its assets, which consist entirely of the proceeds, if any, of the Avoidance Action.  Plan § 6.5.  The additional funding provided to the Avoidance Action Trust through the Litigation Cost Advance is necessary to complete the recovery and liquidation of the "Avoidance Action

Trust Assets" – the Term Loan Avoidance Action.  While the Avoidance Action Trust is working in good faith to prosecute the Term Loan Avoidance Action, the cash currently available to the Avoidance Action Trust is not sufficient to meet its projected fees and expenses to continue to prosecute the Term Loan Avoidance Action and/or to facilitate the successful resolution of the Term Loan Avoidance Action.  Accordingly, the Avoidance Action Trust Amendment is consistent with the purpose and intent of the Avoidance Action Trust, as well as the Plan.

59.    The Avoidance Action Trust Amendment also implements the details of the settlement of the Allocation Dispute.  As required by the Avoidance Action Trust Agreement, through execution of the Stipulation and Agreed Order, the DIP Lenders have provided their written consent to the Avoidance Action Trust Amendment, including such provisions that "materially and adversely" affect their rights.  [Bankr. Dkt. No. 11704-1 (Avoidance Action Trust Agreement § 13.13 (d))].

60.    The amendments to the Avoidance Action Trust Agreement have been narrowly tailored to implement only the terms of the Stipulation and Agreed Order and the Litigation Cost Advance Agreement and, for all the reasons stated above, should be approved.  A copy of the Avoidance Action Trust Amendments are attached hereto as Exhibit D and a copy of the Amended and Restated Avoidance Action Trust (incorporating the amendments) is attached hereto as Exhibit E.

## 2.    The Avoidance Action Trust Should Be Authorized to Grant a Lien

61.    The Avoidance Action Trust Agreement permits, upon approval of the Bankruptcy Court, the granting of a lien on the Term Loan Avoidance Action or other property of the Avoidance Action Trust in exchange for proceeds that may be used to satisfy the fees, costs and expenses of the Avoidance Action Trust.

25

62.    As a condition of providing the Litigation Cost Advance, and as provided in the Stipulation and Agreed Order and the Litigation Cost Advance Agreement, the DIP Lenders require the Avoidance Action Trust to grant a lien on proceeds of the Term Loan Avoidance Action and the Funding Account (as defined in the Litigation Cost Advance Agreement).

63.    As required by the Avoidance Action Trust Agreement, the Trust Monitor has submitted the Gonzalez Declaration in support of granting the lien. *See* Gonzalez Decl. ¶¶ 9-10.

## NOTICE

64.    The Avoidance Action Trust and the Committee have provided notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004; (b) the DIP Lenders; (c) the other parties in interest in accordance with the *Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures*, dated May 5, 2011 [Bankr. Dkt. No. 10183]; (d) JPMorgan and each of the Term Loan Defendants; and (e) any other required notice parties under Section 6.1(b)(ii) of the Avoidance Action Trust Agreement.  The Avoidance Action Trust and the Committee submit that such notice is sufficient and no other or further notice need be provided.[9]

---

[9]    The Avoidance Action Trust Agreement requires notice to "the Trust Monitor, the holders of Units and the holders of Disputed General Unsecured Claims."  [Bankr. Dkt. No. 11704-1 (Avoidance Action Trust Agreement § 6.1(d)(ii))].  Notice has been provided to all potential Unit holders and/or beneficiaries of the Avoidance Action Trust and other interested parties, including the DIP Lenders; the holders of Motors Liquidation Company (f/k/a General Motors Company) debentures and notes with the following CUSIP Nos.: 370ESCAN5; 370ESCAJ4; 370ESCAR6; 370ESCAG3; 370ESCAS7; 370ESCAT2; 370ESCAU9; 370ESCAV7; 370ESCAZ8; 370ESCBB0; 370ESCBQ7; 370ESCBT1; 370ESCBW4; 370ESCBS3; 370ESC816; 370ESC774; 370ESC766; 370ESC758; 370ESC741; 370ESC733; 370ESC725; 370ESC717; 370ESC121; 370ESC691; 616ESC AA2; 616ESC AB0; 349ESC AT1; 677ESC AU2; 677ESC BC2; 455ESC AB8; 594ESC AQ6; XS0171942757; XS0171943649; CH0008769264 (served through the Depository Trust Company (DTC)); the non-bondholder holders of Allowed General Unsecured Claims (as defined in the Avoidance Action Trust Agreement); and any holders of disputed General Unsecured Claims.

## CONCLUSION

WHEREFORE, the Avoidance Action Trust and the Committee respectfully request that the Court (i) so-order the Stipulation and Agreed Order (attached hereto as <u>Exhibit A</u>), and (ii) enter the Order (substantially in the form attached hereto as <u>Exhibit B</u>: (1) approving settlement of the Allocation Dispute on the terms set forth in the Stipulation and Agreed Order; (2) approving amendments to the Avoidance Action Trust Agreement to implement the terms of the Stipulation and Agreed Order; (3) authorizing the Avoidance Action Trust to grant a lien to the DIP Lenders on the proceeds of the Term Loan Avoidance Action and other specified property of the Avoidance Action Trust pursuant to the Litigation Cost Advance Agreement; and (4) granting such other and further relief as may be necessary to implement the terms of the Stipulation and Agreed Order and the Litigation Cost Advance Agreement.

Dated: New York, New York
July 15, 2016

Respectfully submitted,

**BINDER & SCHWARTZ LLP**

/s/ Eric B. Fisher
Eric B. Fisher
Neil S. Binder
Lindsay A. Bush
Lauren K. Handelsman
366 Madison Avenue, 6th Floor
New York, New York 10017
Tel: (212) 510-7008

*Attorneys for the Motors Liquidation
Company Avoidance Action Trust*

**KRAMER LEVIN
NAFTALIS & FRANKEL LLP**

/s/ Robert T. Schmidt
Thomas Moers Mayer
Robert T. Schmidt
Jonathan M. Wagner
Jennifer Sharret
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

*Attorneys for Official Committee of
Unsecured Creditors*

27