# EXHIBIT F

C549mota

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES DEPARTMENT OF
      TREASURY,
 4
                   Appellant,
 5
              v.                        12 CV 00561 (CM)
 6
      OFFICIAL COMMITTEE OF
 7    UNSECURED CREDITORS OF MOTORS
      LIQUIDATED COMPANY, ET AL.,
 8
                   Appellees.
 9
      ------------------------------x
10

11    EXPORT DEVELOPMENT CANADA,

12
                   Appellant,
13
              v.                        12 CV 00695 (CM)
14
      OFFICIAL COMMITTEE OF
15    UNSECURED CREDITORS OF MOTORS
      LIQUIDATED COMPANY, ET AL.,
16
                   Appellees.
17
      ------------------------------x
18
                                        New York, N.Y.
19                                      May 4, 2012
                                        11:34 a.m.
20
      Before:
21
                       HON. COLLEEN MCMAHON
22
                                            District Judge
23

24

25
```

C549mota

1                                      APPEARANCES

2    PREET BHARARA
          United States Attorney for the
3         Southern District of New York
     DAVID S. JONES
4    NATALIE KUEHLER
          Assistant United States Attorneys
5
     VEDDER PRICE
6         Attorneys for Appellant Export Development Canada
     BY:  MICHAEL J. EDELMAN
7          MICHAEL L. SCHEIN

8    KRAMER LEVIN NAFTALIS & FRANKEL LLP
          Attorneys for Appellee Official Committee of Unsecured
9    Creditors of Motors Liquidation Company
     BY:  THOMAS MOERS MAYER
10         CRAIG L. SIEGEL
           JONATHAN M. WAGNER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court; case called)

 2              THE COURT:  Okay.  Have a seat.

 3              Now, I have been playing with this case off and on all

 4    week.  And I would like to run a kind of unorthodox argument,

 5    at least at first, because I think it will help me to

 6    crystallize some thinking that I've been doing and to give you

 7    opportunities to, as you see this developing, poke holes in my

 8    reasoning.  So rather than have you all do an argument -- and

 9    I'll let you say whatever you want I would love it if you

10    would -- if you could just try something a little different.

11              Mr. Jones you're speaking for the government?

12              MR. JONES:  Yes, your Honor.

13              THE COURT:  And who is going to speak for Canada?

14              MR. EDELMAN:  Michael Edelman, your Honor.

15              THE COURT:  And Mr. Mayer, you're speaking for --

16              MR. MAYER:  Yes, your Honor.

17              THE COURT:  Okay.  Here's what I want to do.  I'm

18    going to throw out a thought or a proposition or a question.

19    And I'd like you one, two, three, to respond, either to agree

20    with me or to disagree with me.  And if you disagree with me

21    tell me why.  Okay.  But part of this is because I am not, as

22    you all are, an expert in bankruptcy law.  I'm pretty good at

23    contract interpretation.  But I am not an expert in bankruptcy

24    law.  And I don't claim to be.  And I want to be sure I'm not

25    in my thinking running afoul of some bankruptcy stuff that I
```

1    don't know about.  Okay.

2           So, here goes.  I am the goverments of the United

3    States and Canada.  I give the bankruptcy estate of General

4    Motors a hundred million dollar loan postpetition.

5           That, as I understand it, that postpetition loan,

6    gives rise to an administrative claim against the estate, which

7    means that my loan has to be repaid in full ahead of a whole

8    bunch of other types of claims, including the claims of the

9    unsecured creditor.  Forget about the SuperPri.

10           I've got an administrative claim.  Administrative

11   claims come ahead of unsecured creditors.

12           Any problem so far with my thinking?

13           Great.  Okay.

14           I have just done something entirely unprecedented for

15   the goverments of the United States and Canada because I have

16   gotten involved in this too-big-to-fail bankruptcy and I've

17   become the DIP lender.

18           So I am not going to be just another administrative

19   claimant.  I'm not willing to go forward on that basis.  I want

20   to be not just in a group of people who are the first guys in

21   line, I want to be the first guy in line.

22           So I get something that's called super-priority, which

23   except for something called the carve-out -- and I understand

24   about the carve-out, the U.S. trustee always comes first --

25   puts me ahead of all the other administrative claimants in the

 1  sense that I'm going to get every dime that I'm owed before any

 2  other administrative claimant get anything else.

 3          Am I right?  That's what it means to have

 4  super-priority?

 5          MR. JONES:  Your Honor --

 6          THE COURT:  Yes or no?

 7          MR. JONES:  Yes but.

 8          Yes.  That is absolutely correct.  It's the way it

 9  usually works.  It is the way it worked for the treasury in

10  Canada advancing money to fund the initial rescue and

11  turnaround and sale process.

12          As to the slice that is the funding of the wind-down,

13  once that sale occurred, the DIP lenders, meaning treasury and

14  Canada, did agree to allow one set of people to come in ahead

15  of them.

16          THE COURT:  The carve-out people.

17          MR. JONES:  In addition to the carve-out people, they

18  agreed that administrative expenses of the estate could come

19  first.

20          THE COURT:  Thank you.

21          MR. JONES:  Environmental clean up.  Other

22  professional fees.

23          Other than that, you're absolutely correct.

24          THE COURT:  You mean the lawyers got to come in ahead

25  of the government?

```
 1              MR. JONES:  Yes.

 2              THE COURT:  As a taxpayer I am outraged.  As a lawyer

 3      I am thrilled.

 4              But I just want to be clear because I literally never

 5      heard the word super-priority before this week.

 6              So super-priority defines my place in line.  That's

 7      what it defines, correct?

 8              Priority.  I mean I understand bankruptcy priority.  I

 9      remember that from the bar review course.  I still do remember

10      the bar review course.

11              But super-priority, I'm really first in line because

12      I'm going to get all my money before other people get theirs,

13      who I would normally share, right?

14              MR. JONES:  Correct.

15              THE COURT:  That's the superness of my priority.

16              Okay.  And my super-priority relates to my right to be

17      repaid for my loan.  And the right to be repaid for my loan

18      gives me something called a claim.  I'm right?

19              And it's the claim that enjoys super-priority status.

20              MR. JONES:  That's correct.

21              And there's different varieties of claims.  So this is

22      a long-winded term, super-priority administrative expense

23      claim.

24              THE COURT:  Right.  Allowed super-priority

25      administrative expense.  It's a claim.  Because everything in
```

1   bankruptcy, as I understand it, is a claim against the estate.

2   Okay.

3          Now, as a general matter, as I understand how

4   bankruptcy works, administrative claims are paid in accordance

5   with their priority status among the members of the class out

6   of all the assets of the estate.

7          MR. JONES:  Correct.

8          THE COURT:  In the ordinary course, right?  Unless

9   there's an agreement otherwise.

10         MR. JONES:  Correct.

11         THE COURT:  It will be out of less than all the assets

12  of the case.

13         Is there any reason in the bankruptcy law that I don't

14  know about why an administrative claimant can't say:  I will --

15  ordinarily I could look to the whole pot of assets that's left

16  when it's my turn, when we get to my place in line, but I'll

17  agree that we won't look to the farm, Black Acre.

18         Is there any reason in the bankruptcy law why an

19  administrative claimant can't say that?  Can't agree to that?

20         MR. EDELMAN:  If they expressly agree.

21         THE COURT:  As long as it's expressed, they can agree.

22  That's all I want to know.  Okay.

23         Now because I am who I am, the governments of the

24  United States and Canada, I am in a position not just to say I

25  want to be first in line.  I can extract, what looks to me like

1    belt-and-suspenders protection, by securing the estate's

2    obligation to repay my postpetition loan with collateral which

3    creates a lien in my favor, right?

4              And the assets on which I obtain a lien in this case,

5    which assures that nobody is going to get a dime of those

6    assets until I've been paid in full, consists of everything in

7    the GM bankruptcy estate except a few things; is that right?

8              MR. JONES:  Yes.

9              THE COURT:  Okay.  So it's the whole pot minus a few

10   things.

11             One of those few things is the equity interest in new

12   GM that is going to the unsecured creditors?

13             Correct?

14             MR. JONES:  Correct.

15             MR. EDELMAN:  That's correct.

16             THE COURT:  And one of those things is the proceeds of

17   this avoidance action against the prepetition lenders.  That's

18   one of the things that's not part of the collateral.

19             MR. EDELMAN:  That's not part of the collateral.

20   That's correct.

21             THE COURT:  That's not part of the collateral.  Okay.

22             And that's the action that should have been decided a

23   long time ago.  No offense.  I mean two years is an awful long

24   time to wait.  Anybody want to withdraw the reference on that?

25   Happy to decide that for you.

1          There was a point at which I wanted to know what was

2    going to happen with that motion just because it's like why am

3    I doing this?  Now, whether there's jurisdiction or not,

4    whether there's a 12(b)(1) motion or not, why am I doing this

5    now?  Why don't I just say I'll wait?  I don't have to think

6    this through.  But.  Okay.  So, I've been thinking it through.

7    Maybe some day you'll get a decision on that.

8          So now let's turn to the language that I have to

9    construe, which is the language in the wind-down order.

10         The sixth decretal paragraph of the wind-down order,

11   subsection (a), provides that the government lenders have

12   super-priority status.

13         That's what it provides for, correct?

14         It confirms something that happened earlier in the

15   negotiations but it -- this is the last and final order.  This

16   is the order I'm going to construe.  And it says the DIP

17   lenders have super-priority status for their claim.

18         MR. JONES:  Your Honor, I think that's right in

19   substance.  In case it's helpful, I'm just going --

20         THE COURT:  I have the language.  I want to put the

21   language into plain English.

22         The plain English -- I don't care about anything

23   prior.  I don't want to hear anything prior.  Do it my way and

24   then I'll let you say anything you want.

25         MR. JONES:  I do have a narrow correction of what you

1    said, which is that paragraph, I don't read it -- it's

2    self-conferring the super-priority status.  It confirms it

3    exists.  The prior paragraph on the same page carries over that

4    super-priority status.

5         THE COURT:  I don't care whether it's conferred, it's

6    carried over, or what.  But it says the claims -- it talks

7    about the claims -- the claims of the DIP lenders.  And we all

8    agreed the claims of the DIP lenders are the claims to

9    repayment of the postpetition loans.  There are no other claims

10   of the DIP lenders, are there?

11        MR. JONES:  No.  You've got it right, your Honor.

12        THE COURT:  So the claims of the DIP lenders that

13   arise from the amended DIP facility shall be and are accorded a

14   super-priority administrative expense status.  And subject to

15   the carve -- only to the carve-out shall have priority over any

16   and all other administrative expenses, with a little "provided"

17   that you corrected me about earlier.  Okay.

18        So paragraph 6(a) describes the priority status of the

19   DIP lenders' claim for repayment of the loan.

20        And paragraph (b) -- so let me ask a question.  Is

21   there anything in paragraph (a) that I don't understand that

22   says a word about what will be in the pot that the

23   super-priority claimant can look to for repayment of its loan?

24        I don't see anything that says:  And this is what is

25   in the pot at the time that you exercise your super-priority

```
1    status.

2              Am I right about that?

3              MR. JONES:  Yes.

4              THE COURT:  Okay.  Then there is paragraph (b) of the

5    sixth decretal paragraph, and that paragraph provides that the

6    liens on the collateral that are being used to super-duper

7    secure my super-priority loan -- claim -- I want to be very

8    precise about this -- my super-priority claim, consists of

9    everything that's in the estate except the equity interest in

10   new GM and the proceeds, if there are any, of this avoidance

11   action.

12             That's excluded from the collateral, right?

13             MR. EDELMAN:  That's correct.

14             THE COURT:  So all that paragraph six does is describe

15   what my collateral consists of, what I have a lien on,

16   paragraph 6(b).

17             MR. EDELMAN:  Yes.

18             THE COURT:  Now let's go to the tenth decretal

19   paragraph.

20             The tenth decretal paragraph does not talk about

21   claims.  And the tenth decretal paragraph does not talk about

22   liens.

23             The tenth decretal paragraph talks about loans.

24             A loan is not a claim.  A claim is for repayment of

25   the loan.  So the loan is something different than the claim.
```

1          A loan is not a lien.  A lien is something that you

2    have to secure repayment of a loan.

3          The tenth decretal paragraph talks about the actual

4    loans that give rise to my super-priority claim and that are

5    collateralized with the property on which I have liens.  And

6    that paragraph says those loans are nonrecourse loans.

7          Right?

8          Well, I know what a nonrecourse loan is, folks.  And I

9    did not have to go to law school to know what a nonrecourse

10   loan is.  A nonrecourse loan is a loan in which the lender says

11   I've loaned you money and I agree that I will not look to

12   something or other.  I will not have recourse to something or

13   other to repay that loan.

14         And as far as I can see, the tenth decretal paragraph

15   says that the loans that give rise to my super-priority

16   administrative claim will be nonrecourse loans such that the

17   DIP lenders', me, recourse shall be only to the collateral.

18         And the only way I, the nonbankruptcy

19   contract-construer, can see to make sense out of every word in

20   this wind-down order, giving effect to its language and meaning

21   to every clause, is that the DIP lenders have a super-priority

22   claim for repayment of a nonrecourse loan.  And they have

23   explicitly agreed that it's a nonrecourse loan.  And therefore,

24   they have explicitly agreed that they will look only to the

25   collateral for repayment of that loan.

 1          And you've already told me that super-priority status

 2     doesn't have anything to do with what's in the pot.

 3          So paragraph 10, it looks to me like, defines what's

 4     in the pot.  Paragraph 6(b) is almost irrelevant but it does

 5     say what the collateral is.

 6          Paragraph 10 says the characteristics of this loan are

 7     it's a nonrecourse loan and we agree it's secured only by

 8     collateral.  And we're only going to look to the collateral.

 9     We may be first in line, but this is what's in the pot.

10          What's wrong with this?  What's wrong with my

11     reasoning?  What am I missing?

12          I don't look at your past negotiations.  I don't have

13     to send this back for a trial, which I thought I did.  I don't

14     have to construe anything crazy.  There is no ambiguity.

15          The tenth decretal paragraph says I, the goverments of

16     the United States and Canada, have agreed this will be a

17     nonrecourse loan and that I will only look to the collateral

18     for repayment.  I insist on being first in line and I can have

19     every dime of that collateral before anybody else gets

20     anything.  But, okay, these two things won't be in the pot.

21          It took me a long time to get there, probably because

22     you guys never got there in that way.  But that's real simple.

23     That's really easy contract construction.

24          So tell me where my flaw is.  I can't see a flaw in my

25     reasoning, but I probably don't know something

C549mota

1        MR. EDELMAN:  I think your reasoning would create a --

2   would violate the rule of surplusage.

3        THE COURT:  No.  It doesn't.  It's the only thing that

4   doesn't make anything surplusage.  Nothing is surplus.

5        Ten and 6(a) are talking about completely different

6   things.  A loan is not a claim.  It was -- the thing that

7   bugged me when I read this wind-down order was that you guys

8   were conflating what was in six and what was in ten.  And so

9   was Judge Gerber.  And I kept saying but six is talking about

10  claims and liens.  And ten is talking about loans.  And claims

11  are not loans.  And liens aren't loans.  They're three

12  different things.  So how do we make those three different

13  things work together?

14        Well the governments have a claim for a nonrecourse

15  loan which a collateralized by that on which they have liens.

16        MR. JONES:  Your Honor, if I may, if you're reading

17  the tenth decretal paragraph --

18        THE COURT:  I am.

19        MR. JONES:  Right.

20        -- to say that the super-priority, likewise, is

21  limited to the extent of the assets --

22        THE COURT:  Priority is only where you stand in line.

23  I keep asking this question.

24        If there's something about priority that defines

25  what's in the pot, you show me in the bankruptcy code where

 1    that is.  My understanding is priority is only about where you

 2    stand in line.

 3            You're saying I'm SuperPri, therefore, I can put back

 4    in the pot that which I have said is not in the pot.

 5            All you have as the government of the United States is

 6    a claim for repayment of the loan in accordance with the terms

 7    of the loan.  And in the tenth decretal paragraph you have

 8    agreed that the terms of the loan are that it's a nonrecourse

 9    loan.  It's nonrecourse to anything except the collateral.

10            Isn't that what the document says?

11            MR. JONES:  No.

12            THE COURT:  Fine.

13            MR. JONES:  Because.

14            THE COURT:  Show me where it says something else.

15            MR. JONES:  First, the term -- the very terms of the

16    tenth decretal paragraph -- as your Honor says, a loan does not

17    equal a claim, first off.

18            So I think there's an error in saying that the

19    exclusions which are worded in terms of what the government's

20    recourse is about --

21            THE COURT:  No.  You have a claim.  The nature of your

22    claim is for repayment of the loan.

23            So what are the terms of the loan?

24            Paragraph 10 says the terms of this loan include the

25    following.  The loan is not nonrecourse as against the assets

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    of the borrower and the guarantor other than the collateral.

2    We agree that we can only look to the collateral.  It's the

3    only way to make paragraph 10 make sense.

4              MR. JONES:  I don't think that's right, your Honor.

5    And I have a negative answer and a positive answer.

6              THE COURT:  No.  I want answers that come out of

7    language in the order.

8              MR. JONES:  I'm going to give you that, your Honor.

9              THE COURT:  Or in the bankruptcy code.

10             MR. JONES:  Right.  Okay.

11             Page R85 of the record, which is the final DIP order,

12    which I pointed out earlier, is incorporated into the terms of

13    the wind-down order unless expressly modified at page 85,

14    paragraph five.  This is what defines what the super-priority

15    claim is for.

16             And it says, "The DIP lenders are hereby granted and

17    allowed a super-priority administrative expense claim for all

18    loans, reimbursement obligations, and any other indebtedness or

19    obligations, contingent or absolute, which may now or from time

20    to time be owing by any of the debtors."

21             THE COURT:  Right.

22             MR. JONES:  My point, your Honor, if you look --

23             THE COURT:  That's right.  And you said in the other

24    document that's part of this, which is the wind-down order,

25    that the loans, your DIP loans under the amended DIP facility,

                                                                      17

 1    would be nonrecourse loans.  That's a term of the loan.

 2            All this says is any money I lend you, I have -- I'm

 3    first in line to get paid.  I have a super-priority

 4    administrative claim.  But that doesn't set out the terms of

 5    the loans.  You still are subject to any limitations to which

 6    you have agreed that constitute a term of the loan.

 7            And in the tenth decretal paragraph of the wind-down

 8    order you say those loans, the loans that are referred to in

 9    paragraph five of the final DIP order are nonrecourse except to

10    the collateral.  You say that.

11            You agreed to it.  And Judge Gerber so ordered it.

12    That's an express agreement.

13            MR. JONES:  It's an express agreement to what it says.

14            But what it says --

15            THE COURT:  It says the loans are nonrecourse except

16    as to the collateral.

17            And your claim is only a claim to have the loans

18    repaid.

19            MR. JONES:  But, your Honor, let me answer it this

20    way.  My point is that the word recourse and the limitation on

21    recourse operates independently from whatever amount is owed,

22    whatever amount was lent --

23            THE COURT:  That's not true.  Look, the word recourse

24    refers to a type of loan.

25            MR. JONES:  Correct.

1          THE COURT:  Recourse is a type of -- a loan is either

2    a recourse loan or a nonrecourse loan.  That is Black's Law

3    Dictionary.  That is common understanding.  It's not even

4    really a legal term.  Any banker can tell you that there's --

5    there are recourse loans and there are nonrecourse loans.

6          And it has no greater meaning than that unless you

7    point me to a provision of the bankruptcy code that says in the

8    context of a bankruptcy recourse means something different than

9    what it means in the ordinary course of commercial affairs.

10         MR. JONES:  Your Honor, we talk about this in our --

11         THE COURT:  Point me to a provision of the bankruptcy

12   code that says that.

13         MR. JONES:  If I can say two things, your Honor.

14         One is that this order at 85 and incorporated through

15   the wind-down and the underlying debt set forth a payment

16   schedule and a payment obligation and amount owed that is

17   independent and exists independently of the collateral, the

18   value of the collateral, and the nonrecourse.

19         THE COURT:  The fact that the loan is nonrecourse

20   exists independently of the collateral.

21         MR. JONES:  So if some stupid bank lent me $10 million

22   on account of my, I promise, quite modest home on a nonrecourse

23   basis, and I failed to pay, there would still exist a debt of

24   $10 million.

25         THE COURT:  Indeed, and there would be a deficiency

C549mota

1    proceeding after they took your house, your $250,000 house.

2              MR. JONES:  If they had a nonrecourse limitation, that

3    is saying:  Too bad for you, you can have my house but all that

4    other debt.

5              THE COURT:  Well if some stupid government -- don't

6    make me do this -- if some government said:  I'll loan you $117

7    million to wind-down the estate of GM, and I'll look to all the

8    assets of GM except not this stock and not the proceeds of this

9    lawsuit, that's no different than the stupid banker who lends

10   $10 million against the proceeds of my house.

11             I'm sure the government had a good -- the governments,

12   I apologize to the Canadians -- had a good and valid reason in

13   July of 2009 for agreeing to put a provision in an order that

14   said the loans we are giving you, the DIP loans that we are

15   giving you are nonrecourse except as to the collateral.  But

16   if -- I must tell you, if a government lawyer or someone

17   retained to represent the government thought that

18   super-priority status -- which has nothing to do with recourse

19   or nonrecourse, it has nothing to do with what's in the pot.

20   It just means where you stand in line.

21             MR. EDELMAN:  I disagree, your Honor.

22             THE COURT:  Tell me where in the bankruptcy code.

23   Show me in the bankruptcy code.

24             MR. EDELMAN:  Claims are against the estate.

25             THE COURT:  I understand.

20

 1                MR. EDELMAN:  Liens are against the borrower and the

 2      borrower's property.

 3                THE COURT:  Right.

 4                MR. EDELMAN:  And this paragraph talks about

 5      nonrecourse to the borrower and the guarantors.  Super-priority

 6      claims --

 7                THE COURT:  So what you're saying -- this is what I

 8      want to know -- what you're saying is the flaw in my reasoning

 9      is that the borrower and the guarantor are not the same thing

10      as the estate; just as the loan is not the same thing as the

11      claim.

12                MR. EDELMAN:  That's correct.

13                THE COURT:  That's what you're saying.

14                MR. EDELMAN:  The estate is a creation under

15      bankruptcy law.  And claims of all types are claims against the

16      estate.  And they have to be dealt with under the bankruptcy

17      code.

18                So you're conflating -- the two paragraphs have

19      different terms for a purpose.

20                THE COURT:  I figured they did.

21                But it can't be the purpose that's described in your

22      briefs because your briefs don't make any sense.  At least what

23      I said makes sense, but I may be wrong because I don't

24      understand -- you've now, for the first time, suggested to me

25      the flaw in my reasoning.  The flaw in my reasoning is the

1     claim for repayment of the loan is against the estate.

2              MR. EDELMAN:  That's correct.

3              THE COURT:  Whereas the --

4              MR. EDELMAN:  Property that was collateral belonged to

5     the specific entity.

6              THE COURT:  So you say that, at one and the same time,

7     the borrower can say:  I'm limited to the collateral, but I'm

8     not.

9              Because there is no -- there's nothing other than a

10    claim for repayment of the loans.  There is no other way to get

11    the loans repaid, except by making a claim against the

12    bankruptcy estate, right?  This is a bankruptcy, after all.

13             MR. EDELMAN:  That is true.  But I think claims and

14    loans are a slightly different term.

15             THE COURT:  Claims and loans are completely different

16    terms.

17             MR. EDELMAN:  Claims are dealt with under the

18    bankruptcy code, have to be paid and dealt with under the

19    bankruptcy code.

20             THE COURT:  And is it not the case that you can say --

21    well let me go back one step.

22             Do we agree that the claim in this case, that the DIP

23    lenders have against the estate, is for repayment of the loans?

24    The nature of the claim is for repayment of the DIP loans?

25             Right?

1          MR. JONES:  No, your Honor.

2          THE COURT:  It's not?  It's not for repayment of the

3     DIP loans?  What is it?

4          MR. JONES:  It's for the amount lent, provided to the

5     borrowers.

6          THE COURT:  Excuse me.  What is the difference between

7     repayment of the loans and repayment of the amount lent?

8          The amount lent is what's loaned.  That's sophistry.

9          MR. JONES:  Your Honor's reading of paragraph ten

10    talks about the loans as being nonrecourse and causing to exist

11    no obligation other than the extent of the pot as defined by

12    collateral.

13         I'm saying that the amount loaned has independent

14    force, as my colleague says, by function of the bankruptcy law

15    and by function of the fact that it's a claim.  It has an

16    independent existence.  And these documents tell you that that

17    amount -- the amount that that's for is not limited by the

18    extent of collateral.  It operates independently.  And it's in

19    the full amount advanced.

20         If that amount exceeds the value of the collateral,

21    then what the committee bargained for and got is that there

22    won't be any grab or foreclosure on it.  We cannot takeover the

23    litigation of the suit.  They can negotiate it as they see fit.

24         But at the end of the day, after they've gotten the

25    full benefit of the government's services of funding the

1   wind-down of this entire estate as well as causing the

2   rejuvenation of General Motors to occur, conferring big value

3   on them, the government gets paid back in the amount that's

4   outstanding if there's any asset available that isn't

5   explicitly excluded not from the collateral but from the claim.

6   The claim has independent existence.  And as we talk in our

7   briefs that collateral concepts and super-priority claim

8   concepts operate differently.  There are different statutory

9   provisions 364(c)(1), etc.?

10          THE COURT:  Read them.

11          MR. JONES:  And that even as Judge Gerber recognizes,

12   when the security is insufficient in that Ocean Power case we

13   cite in our reply brief, security interests completely have

14   gone poof.  The debtor -- excuse me.  The DIP lenders would be

15   totally out of luck.  But they are saved by their independently

16   operating super-priority claim status.

17          So really the same is what exists here.  It's by

18   virtue of the fact that what we have is a claim.  The claim

19   itself is not limited by the amount of the collateral.  And it

20   has independent existence both under the code and under the

21   terms of these documents as negotiated.

22          MR. EDELMAN:  Also, your Honor, under your

23   interpretation --

24          THE COURT:  Don't call it my interpretation.  I

25   haven't interpreted it yet.  I'm trying to see my way clear to

1    not finding an ambiguity and not sending you back through

2    trial, a trial at which Judge Gerber will not be a witness for

3    80 pages.  Because that's what I've got now.  I've got Judge

4    Gerber as a witness recreating the negotiations for 80 pages.

5    And that's no good.  That's not a trial.  If this thing has to

6    be tried, all your lawyers got to get on the stand.  You've got

7    to come up with all the drafts.  And you've got to testify

8    about the course of the negotiations.

9           So if we're not going to go there, which is where I

10   thought we were going to go 24 hours ago, we're going to go --

11   it's going to be because I can find no ambiguity among these

12   provisions.  Me, last night, at 5:30 in my office with no

13   particular bankruptcy expertise, just looking at this as a

14   contract lawyer, I thought I found something.

15          I'm waiting.  I want you to shoot me down.  I want you

16   to shoot me down.

17          MR. EDELMAN:  I think there's different concepts

18   between loans against the borrower and claims against the

19   estate, first of all.

20          Second under your supposition that would render the

21   super-priority provisions superfluous which was the same

22   mistake that the bankruptcy court made.  There would be no

23   purpose.  We could have just been granted rights against the

24   collateral and there would be no --

25          THE COURT:  Well, I have to tell you from where I sit

```
 1    one or the other provision is superfluous.  Either your
 2    super-priority status protects you so you didn't need the liens
 3    or the liens, because you agreed to look away to the
 4    collateral, the liens are the limit of your protection and you
 5    don't need the SuperPri.  Except the SuperPri status gives you
 6    something else.  It puts you first in line.  People have liens
 7    on property and they still have to take with other people who
 8    have liens.  Super-priority status says no, no, I'm first in
 9    line.
10            MR. EDELMAN:  That's the same thing with the first in
11    line DIP collateral.  Under bankruptcy law, if we have the
12    first priority lien, we're entitled to be the first and only
13    people to look to that property, unless under strange
14    circumstances --
15            THE COURT:  If there's more than your loan, which
16    never happens.
17            MR. EDELMAN:  Bankruptcy says that the estate did
18    something for your benefit and there's a surcharge, but that's
19    not really an issue here.
20            THE COURT:  That's not here.
21            MR. EDELMAN:  So the two concepts are very different
22    under bankruptcy.  There's super-priority administrative
23    expense, which does allow you to look to the free cash.  You
24    don't have to go exercise remedies against your collateral or
25    even assert what's in your collateral.
```

1          There's a collateral package which gives you the

2     rights.  And you're the only person who is entitled to that

3     right if you're a DIP lender.

4          THE COURT:  And I understand everything that you're

5     saying.  The issue is whether, by virtue of the tenth decretal

6     paragraph, you did not agree, which you tell me you are allowed

7     to do, you did not agree that it would be otherwise than it

8     usually is.

9          MR. EDELMAN:  Under your supposition, if the tenth

10    paragraph really controlled, which is what you're saying, then

11    there would be --

12         THE COURT:  The tenth paragraph tells you what the

13    terms of the loan are.  It describes the loan.

14         MR. EDELMAN:  So does the super-priority.

15         The super-priority tells you which claims and what

16    priority they're entitled to get paid from.

17         THE COURT:  The super-priority describes a claim.  It

18    doesn't describe the loan.

19         The loan and the claim, you and I agree, are two

20    different things.

21         And my understanding of the nature of the claim is

22    that it's for repayment of the loan.  If I'm wrong about that,

23    then I'm wrong about everything that I've been thinking for the

24    last 18 hours.

25         MR. EDELMAN:  But the loans are a specific obligation

1    under the contracts.  There's also broader terms such as, you

2    know, obligations.  And so this is a limitation --

3              THE COURT:  What obligations are there in this case as

4    a practical matter other than the DIP loans?

5              MR. EDELMAN:  Repayment of all our claims.

6              THE COURT:  What other claims do you have?

7         Tell me what other claims the government of Canada has

8    besides repayment of monies advanced as a DIP lender.  What

9    other claim do you have against the GM estate?

10             MR. EDELMAN:  You're trying to shoehorn everything.

11             THE COURT:  You're not answering my question, which

12   tells me I'm right.

13        Your claim, your super-priority administrative claim

14   is for repayment of your loan and nothing else.  Repayment of

15   the money that you've lent to GM and nothing else.  Which makes

16   sense because that's an administrative claim.

17        If the government of Canada has a claim against GM for

18   some violation of an environmental regulation in a plant in

19   Canada, that's a different thing.

20             MR. EDELMAN:  It would be for loans and other

21   obligations arising under the --

22             THE COURT:  What other obligations have arisen as a

23   practical matter.  Identify for me one other obligation that

24   has arisen under the DIP wind-down facility.  In your favor.

25        What other obligation has arisen in your favor under

1    the DIP wind-down facility?

2              MR. EDELMAN:  The funding of the wind-down.

3              THE COURT:  So your claim is for repayment of the

4    loan.

5              MR. EDELMAN:  But the nonrecourse --

6              THE COURT:  Can't you agree, as long as you do it

7    explicitly, that the loans can only be repaid out of certain

8    monies?  Contrary to what would otherwise be the case with your

9    SuperPri.

10              MR. EDELMAN:  What we have agreed is that the

11    collateral would be limited.  That's what that provision,

12    decretal paragraph ten provides.

13              THE COURT:  No.  Decretal paragraph ten provides that

14    the loans shall be nonrecourse except against the collateral.

15              MR. EDELMAN:  To the borrower.  It doesn't say the

16    claims against the estate.

17              THE COURT:  So your argument depends on drawing a

18    distinction between the borrower and the estate.

19              MR. EDELMAN:  It's more than that.

20              THE COURT:  What's the distinction between the

21    borrower and the estate?  I'm prepared to be told that there is

22    one.  I told you I don't know better.

23              MR. EDELMAN:  The estate is a creation that's exists

24    while the bankruptcy case is pending.

25              THE COURT:  What's the difference between -- I haven't

```
 1    even heard from the creditors committee.  Maybe I should let

 2    the creditors committee say something.

 3              Is there a distinction between the borrower and the

 4    estate?

 5              MR. MAYER:  In this case, your Honor, the answer is

 6    no.  It does require you to look at the actual wind-down loan

 7    agreement itself.

 8              THE COURT:  Okay.  What should I look at?

 9              MR. MAYER:  If you look at, I believe it's the first

10    page.

11              THE COURT:  Where is it in the record?

12              MR. MAYER:  This is in our supplemental exhibits.  And

13    I also have a binder which may help.  The tab is the

14    cross-reference.  It's attached to the wind-down order, your

15    Honor.  It's an exhibit to the wind-down order.

16              THE COURT:  Just give me the whole thing.

17              MR. MAYER:  May I approach?

18              THE COURT:  We've got it.  We just have to find it.

19              MR. MAYER:  In our supplemental submission to the

20    Court there is a large binder which is tab -- item eight.  And

21    it's at tab --

22              THE COURT:  Is it tab (b)?

23              MR. MAYER:  VII.

24              THE COURT:  I have a tab (b) followed by Roman

25    Numerals one, two, three, four, five, six, seven, eight.
```

C549mota

1          MR. MAYER:  I believe that's correct.  It's VII.

2          THE COURT:  There's the order and attached to it is

3     the amended and restated secured super-priority debtor in

4     possession credit agreement.

5          MR. MAYER:  Yes, your Honor.

6          If you go to the first page, past the table of

7     contents.

8          THE COURT:  I think that is this document.

9          This is a draft of it from --

10          MR. MAYER:  This was the agreement that was approved

11     by the bankruptcy court on June 29.

12          MR. JONES:  Your Honor, really quickly.  I don't mean

13     to interrupt.  I want to say it's also, in our Bates stamp set,

14     it's our 204.

15          THE COURT:  It's dated as of July 10, 2009.

16          Is that correct date on this document?

17          Amended and restated.

18          MR. MAYER:  Actually, what was approved by the

19     bankruptcy court has a blank date; as of July blank 2009.

20          The actual signed document is dated July 10.

21          We have a copy of that too.

22          THE COURT:  Well I'm looking at a copy -- I want to

23     give you back your binder so I don't write on it because I

24     have -- this is a very dangerous implement and I'll write all

25     over your thing.

C549mota

```
 1            What do you want me to look at in this document?

 2            MR. MAYER:  I want you to look at the first page of

 3     text after the table of contents.

 4            THE COURT:  Witnesseth?  Whereas?

 5            MR. MAYER:  Right above the witnesseth, your Honor.

 6     That first paragraph.

 7            THE COURT:  Yes.  Okay.

 8            Debtor in possession agreement.

 9            Dated as of July 10, 2009.

10            By and among, Motors Liquidation Company, formerly

11     known as General Motors, a Delaware Corporation, and a debtor

12     and debtor in possession, in a case under Chapter 11 of the

13     Bankruptcy Code, the borrower.  The guarantors as defined

14     below, whoever they are, and several lenders, from time to time

15     parties to this agreement, and we can agree that those are the

16     governments of the United States and Canada.

17            MR. MAYER:  Yes.  The point is the phrase "the

18     borrower" here is all encompassing it includes the debtor.  It

19     includes the debtor in possession.  And, therefore, under the

20     terms of this loan document --

21            THE COURT:  Does it, therefore, include the estate?

22            MR. MAYER:  Yes, your Honor.

23            It includes the debtor and the debtor in possession.

24     There is nothing else that the estate -- that is the estate.

25            MR. EDELMAN:  Your Honor, this is answered under the
```

1    bankruptcy code.

2              THE COURT:  Good.

3              MR. EDELMAN:  The debtor, if you look at the

4    definition of what a debtor is, under Section 11 U.S.C. 101, I

5    think it's subclause 13, says a debtor means the person or

6    municipality concerning which a case under this title has been

7    commenced.

8              So that is just the entity.

9              THE COURT:  Correct.

10             MR. EDELMAN:  Bankruptcy code also defines what an

11   estate is.  An estate is defined under Section 541 of the

12   bankruptcy code and it provides that the commencement of a case

13   under this title creates an estate.  Such estate is comprised

14   of the following property, wherever located and by whomever

15   held.  And it lists.

16             THE COURT:  All kinds of property.

17             MR. EDELMAN:  All types of property.

18             What's interesting to know is that it's not the same

19   thing as a debtor because then if you look at (b).  Property of

20   the estate does not include any power the debtor may exercise

21   solely for the benefit of another entity.

22             So there's a distinction, if you look at 541, it's

23   clearly a distinction between the estate and what a debtor is.

24   The debtor is the entity that falls into bankruptcy.

25             THE COURT:  Right.

 1              MR. EDELMAN:  The estate deals with how to deal with

 2     all the property of the estate and dealing with the claims

 3     administration process.  So if you -- there's is a distinction

 4     between the estate, which deals with claims; and the debtor,

 5     which deals with the actual entity itself.

 6              So when you're dealing with the entity itself, the DIP

 7     lenders agreed that the collateral, the specific collateral

 8     held by the borrower will be limited.  And they limited it in

 9     certain circumstances.  They limited it to exclude the new GM

10     equity interest.

11              And that was the primary focus that the DIP lenders

12     did.  And there are numerous statements on the record, in

13     pleadings, in oral testimony, that said that the nonrecourse

14     provision was meant to apply solely to the new GM equity

15     interest.

16              THE COURT:  Except that you agreed to and allowed

17     Judge Gerber to sign an order that didn't just apply it to

18     that.  That the nonrecourse doesn't just apply to that.

19     Otherwise I would have to read words out of the document.

20              MR. EDELMAN:  We don't think you do.  It deals with

21     the loans --

22              THE COURT:  Explain to me why.  I have the provisions,

23     relevant provisions of the wind-down order in front of me.

24     Explain to me why.

25              MR. EDELMAN:  As we just said, that the nonrecourse

C549mota

 1    deals with the property of the borrower.  Not the claims

 2    against the estate.

 3              THE COURT:  I understand that.  But explain to me what

 4    you just said -- what you just said and what you said in your

 5    brief that made no sense to me is that the exclusion applied

 6    only to the new GM stock and yet it quite clearly refers --

 7    talks about the avoidance actions as well, so --

 8              MR. EDELMAN:  No, it doesn't.  Not with respect to

 9    collateral.  No, it doesn't --

10              THE COURT:  Show me where.

11              MR. EDELMAN:  Solely refers to --

12              THE COURT:  Show me where.

13              MR. EDELMAN:  The super-priority provision under 6(a)

14    talks about --

15              THE COURT:  Can I have --

16              MR. EDELMAN:  Under 6 (a) there is a broad

17    super-priority grant.  It's not -- there's only a few

18    carve-outs to it.  There is express carve-outs to the

19    super-priority for the carve out --

20              THE COURT:  I hear that.  I hear that.

21              MR. EDELMAN:  And there is also under section 8.20 of

22    the DIP loan agreement, it expressly carves out the proceeds of

23    the avoidance action from the collateral -- sorry.  I just

24    misspoke.  Section 8.20 protects the new GM equity interest

25    from the DIP lenders' super-priority.  It does no such thing

```
1     with respect to the avoidance action proceeds.
2                MR. MAYER:  Your Honor, if I may offer a --
3                THE COURT:  I want to look at -- the document I have
4     to construe is the wind-down order, right?
5                MR. MAYER:  Can I go back to the wind-down order, your
6     Honor?
7                THE COURT:  Yes.
8                MR. MAYER:  Let's go back to the tenth decretal
9     paragraph.  If you read the tenth decretal paragraph, it says
10    two things.
11               It says that the loans shall be nonrecourse for the
12    borrower and guarantors.  And then it says such that the DIP
13    lenders' recourse, that's the recourse held by these gentlemen.
14               THE COURT:  Yes.
15               MR. MAYER:  Shall be only to the collateral.
16               THE COURT:  Which looks to me like an agreement.
17               MR. MAYER:  Exactly, your Honor.
18               THE COURT:  That recourse on the loans, the loan --
19    the loans which are -- which give rise to the claim that must
20    be repaid shall be only to the collateral and not against the
21    rest of the estate.  That's what it looks like to me.
22               MR. MAYER:  Yes, your Honor.
23               I think that the distinction that is being drawn out
24    in argument today because we have not -- the papers don't focus
25    on it -- between the borrower and the estate is, frankly, a, I
```

1    would call it a piece of sophistry.

2            This document, the estate is limited -- is a different

3    entity from the debtor and the debtor in possession than the

4    borrower -- than the loan agreement has no recourse to the

5    estate at all because the estate is not a signatory to the loan

6    agreement.

7            To the extent the tenth decretal paragraph means

8    anything, it means that these lenders don't -- only have

9    recourse to this pot.  And if it turns out that there is --

10   that the estate exists in some other universe -- this is like I

11   have recourse to the partnership but not to the partners.  If

12   there are really two different entities, paragraph ten deals

13   with this problem by saying:  You have recourse only to that.

14   It doesn't make any difference which entity we're talking

15   about.  You have recourse only to the collateral.

16           MR. EDELMAN:  That interpretation, your Honor, it

17   reads out the second portion of the paragraph, which would also

18   have no purpose if it has an expanded meaning as counsel just

19   stated.

20           THE COURT:  Well it would certainly would suggest that

21   the creditors committee was particularly interested in making

22   sure it got to keep that stock.

23           MR. EDELMAN:  That's all it was interested in.

24           MR. MAYER:  No, no, your Honor.  That's not true.

25           MR. EDELMAN:  We have numerous express --

 1              MR. MAYER:  That's not true.

 2              MR. EDELMAN:  The numerous express statements --

 3              THE COURT:  Can I hear from him.  One at a time.

 4              MR. MAYER:  You've already expressed your concern

 5    about Judge Gerber's account of the record.

 6              THE COURT:  It's not that I have a concern.  He was

 7    there.  He was present at the creation.

 8              But it's clear that he resolved a number of disputed

 9    issues of fact in the course of writing that opinion.

10              MR. MAYER:  Your Honor, the following is not -- there

11    are no -- frankly, your Honor, there are no disputed issues of

12    fact because there isn't a dispute as to the documents and the

13    statements and what's in the record before you.

14              What's in the record before you is that we asked for

15    the collateral to exclude the litigation.  We asked for

16    recourse to be limited to the collateral with reference to the

17    litigation.  We got the limitation of recourse because we

18    wanted the litigation to be ours.  What is in the record is

19    that --

20              THE COURT:  Now where is that in the record?

21              Because I have to tell you, I can't pick that up from

22    the documents.  That's not in the four corners of the

23    documents.

24              MR. MAYER:  It's not in the four corners of the

25    orders.

09-50026-mg    Doc 13688-6    Filed 07/15/16    Entered 07/15/16 16:48:13    Exhibit F
Pg 39 of 68
Case 1:12-cv-08881-CM    Document 62    Filed 05/14/15    Page 38 of 67

C549mota

```
 1              THE COURT:  Right.

 2              MR. MAYER:  That is correct.  I will grant that.  If

 3      the Court wishes to stick to the three orders and the

 4      agreements attached to them, we continue to believe that they

 5      are, as your Honor's questions seem to indicate to us,

 6      certainly that is the way we read them, completely unambiguous.

 7      I don't think -- I think both Mr. Edelman and I should probably

 8      refrain from referring to statements in the record.

 9              THE COURT:  I think you should because once you get

10      beyond the four corners of these documents into a history that

11      has not been developed in proper record form through testimony

12      that an appeals court can review but that's known only to those

13      of you who were in the backroom, then you got to go back and

14      have a trial.  And it may be that the trial judge knows

15      everything that went on because he was in the backroom too, but

16      I don't.

17              MR. MAYER:  Let me put it another way, your Honor.

18      If, in fact, there was this distinction between the estate and

19      the borrower, as Mr. Edelman would like to Court to believe,

20      under the bankruptcy code, a super-priority claim is supposed

21      to be paid in cash and in full out of the estate, as he would

22      put it, before you exit the bankruptcy case.

23              THE COURT:  Right.

24              MR. MAYER:  The agreement that says we're not going to

25      do that, we're going to wait until the last share of stock is
```

1    distributed to the last unsecured creditor in order for our

2    loan to mature, that agreement is in the loan agreement which

3    applies only to the loans to the borrower, defines main debtor

4    and debtor in possession.

5           In this case there is no difference between a

6    limitation of recourse against the borrower and a limitation of

7    recourse against the estate.

8           THE COURT:  There would be none because I understand

9    that the estate is the property of the borrower that goes into

10   bankruptcy and that is available for the creditors to collect

11   against.  But so it's for the most part prepetition property,

12   and then there's postpetition property, and then it gives rise

13   to administrative claims.

14          But is there any property of General Motors that's not

15   part of the bankruptcy estate that could be looked to by

16   someone who was looking to a borrower but not an estate?

17          MR. MAYER:  Not that I know of, your Honor.

18          MR. EDELMAN:  And there's potentially under section

19   541 defines what property of the debtor.

20          THE COURT:  I'm asking as a practical matter.

21          Does General Motors own anything that's not part of

22   the estate in bankruptcy, that if -- such that if there really

23   were a meaningful distinction between the borrower and the

24   borrower's property it would mean something to have recourse

25   against the borrower?  Because the borrower had other property

| 1 | out there that you could collect against.  That was not part of |

1    out there that you could collect against.  That was not part of

2    the bankruptcy estate.  That's what would make recourse against

3    the borrower meaningful.

4            MR. EDELMAN:  Yes, your Honor.  The estate does

5    include property other than what the borrower gives to it.  And

6    that -- the primary other than -- and I know some of these

7    apply but they are probably not meaningful under 541, but the

8    primary piece of asset, created in the bankruptcy that comes

9    from the estate, are the avoidance actions.  The avoidance

10   actions are not part of the borrower.  It's a creation of a

11   bankruptcy estate.

12           So that by itself is a vast distinction between the

13   borrower, the debtor, and its estate.  The estate has property

14   that is greater than the specific assets because they also have

15   the bankruptcy causes of action.

16           And there's case law, numerous case law in this

17   circuit that says that avoidance actions are not the property

18   of the borrower; it's the property of the estate.  So there is

19   a distinction between the two.

20           MR. MAYER:  Your Honor, this is confusing two

21   different strains of law.  There are cases where there is an

22   individual debtor and he retains certain or she retains certain

23   assets.  And there are cases where there is a distinction

24   between a borrower and his estate which is administered by a

25   trustee.  Where a lawsuit is brought under the avoidance

1    action, it's brought in the name of the debtor.  Sometimes it's

2    brought in the name of the debtor and the debtor in possession

3    when there is one.  And that's why it's referred to that way in

4    the loan agreement as well as in the order.

5            That's how the creditors committee brought the

6    lawsuit.  They brought the lawsuit in the name instead of the

7    debtor and the debtor in possession.  The debtor is the named

8    plaintiff.  That's because the debtor owns the estate.  And a

9    limitation of recourse against the debtor is a limitation of

10   recourse against the debtor's property.  The debtor's property

11   is the estate.

12           THE COURT:  Well as a logical matter that makes sense

13   to me and I just want to be sure -- but he's suggesting that

14   that's not true.

15           MR. EDELMAN:  I disagree with the characterization of

16   what the cases say because they don't just deal with

17   individuals.  The estate is a different entity than a debtor

18   and it's replete with -- in every aspect of the law, you know,

19   whether certain exclusions from insurance policies apply to the

20   estate.  And many of the cases say no because it's not -- the

21   estate is different than the debtor.  The property is

22   different.  Avoidance actions are not the property of the

23   debtor.  It's created because of the bankruptcy filing.

24           Now, what committee counsel is stating is who controls

25   the litigation.  It's true in a Chapter 11 the debtor in

1    possession controls these assets or if it essentially agrees it

2    can agree that the committee can control.  But it's a very

3    different question as to who manages and if there's a

4    difference between the debtor and the estate.  And there is --

5    there is a difference between those two things.

6            MR. MAYER:  But at the end of the day, your Honor, you

7    come back to paragraph ten.  Recourse is limited to the

8    collateral.  It's limited to a defined pot of assets.  And that

9    pot of assets doesn't include this lawsuit.

10           THE COURT:  I will say I think you all did a lousy job

11   of drafting.

12           MR. MAYER:  We were somewhat rushed, your Honor.

13           THE COURT:  I understand.

14           MR. JONES:  Your Honor.

15           MR. EDELMAN:  Under that interpretation, you would be

16   rendering the second part of decretal paragraph ten

17   superfluous.

18           MR. MAYER:  Your Honor, just because a buyer --

19           THE COURT:  Excuse me.  Let me see.

20           No.  It doesn't render it surplusage.  It just

21   emphasizes it.

22           MR. MAYER:  Thank you, your Honor.

23           THE COURT:  It just emphatically says:  And don't you

24   touch that stock.

25           MR. EDELMAN:  It would also render -- there would be

C549mota

```
1      no difference between the super-priority rights and the

2      collateral rights.  So you'd be --

3              THE COURT:  It may be that you agreed in effect to

4      drafting or wording that has that effect.

5              MR. EDELMAN:  If that was the case, then the

6      carve-outs from both should have been the same.  And they were

7      not.  There were express carve-outs to one that were not

8      included in the other.

9              THE COURT:  I understand that except there is -- then

10     there's an ambiguity.  Then there's an inconsistency.  And then

11     you're coming back for trial.

12             MR. EDELMAN:  Then that may be, in fact, what you do.

13     The specific -- we believe that you have to look at the

14     specific terms that govern the super-priority rights are

15     contained in that paragraph.  And if you were to look at the

16     nonrecourse paragraph as -- there's definitely an inconsistency

17     or an ambiguity between those two provisions.  It's one or the

18     other.

19             We're trying to argue that the nonrecourse provisions

20     only -- are not affected -- do not affect the super-priority

21     rights.  Committee is taking the opposite.

22             But there's definitely a tension between those two

23     provisions.  And it doesn't make sense for decretal paragraph

24     ten to control because you'd be rendering numerous provisions

25     superfluous.
```

C549mota

```
 1              THE COURT:  One way or another, unless you do it my
 2    way -- and if I'm wrong, and I'll admit it's possible that I'm
 3    wrong as a matter of bankruptcy law.  But any other way, some
 4    provision is superfluous.  Any other way I slice this salami,
 5    some other provision is superfluous.
 6              MR. EDELMAN:  We don't think it's superfluous.  We
 7    think that the nonrecourse --
 8              THE COURT:  I know you don't think it.
 9              I think that every way I read this that you guys
10    suggest that I should read it renders something superfluous.
11              MR. EDELMAN:  There's two ways we think you can read
12    the nonrecourse provision, which is either that nonrecourse
13    only relates to the collateral provision or that nonrecourse
14    was meant to apply to the new GM equity.
15              THE COURT:  Well if it was meant to apply to the new
16    GM equity it should have said so.  But it doesn't say recourse
17    shall be only to the assets of the estate other than the new GM
18    equity.  It says recourse shall be only to the collateral.  And
19    the new GM equity is not coterminous with the collateral.  With
20    what's excluded from the collateral.  Other things are excluded
21    from the collateral too.  The avoidance actions are excluded
22    from the collateral.  They're excluded from the collateral.
23              So if it was your intent that recourse should be only
24    to everything except the new GM equity, you should have said
25    so.  But that's not what you said.  And you're bound by what
```

1    you said.  You said recourse shall be only to the collateral

2    and the collateral does not include the avoidance actions

3    proceeds.  Of course, there may not be any avoidance actions

4    proceeds, which gets me back to where I was on Monday morning:

5    Why am I doing this?

6          MR. JONES:  Your Honor, if I -- I have nothing to say

7    about whether or not there's an identity of the entity that's

8    subject to these agreements.  I wanted to raise another point,

9    if I may.

10         But it circles back to, again, what I think is really

11   a fundamental misreading that I think the bankruptcy court made

12   and that your Honor's comments are also giving voice to.

13   Paragraph ten, decretal paragraph ten.

14         And I've said this previously but I'm going to circle

15   back.  To the government, the core of this case is that it

16   advanced money on a super-priority basis and that it had an

17   entitlement set forth at R85 of the record to be repaid the

18   amount it lent on a super-priority basis at the end of the day.

19   Recourse -- that recourse provision in paragraph ten is not

20   rendered surplusage by that.

21         THE COURT:  Because you say that super-priority status

22   means something more than just I'm first in line?  You say it

23   means I'm first in line and.

24         MR. JONES:  Your Honor, as a bankruptcy law concept,

25   it places you in line.  Paragraph five at page R85 says --

1          THE COURT:  I don't have R85.

2          MR. JONES:  I'll just tell you.  It's the passage I

3     read before in the final DIP order.  And it talks about what

4     the DIP act lenders have a super-priority expense claim for.

5     It doesn't just say --

6          THE COURT:  Okay.  Is there anything other than the

7     proceeds that you loan that as a particular matter falls within

8     that language?  No.  There isn't anything.

9          MR. JONES:  No.  I don't think so.  We lent money.

10    The money sat in the estate and to step back to the real world

11    the government agreed to pay for whatever needed to be done to

12    wrap this case up as part of its turnaround effort.

13         THE COURT:  Right.

14         MR. JONES:  And the quid pro quo for that was we get

15    paid back at the end of the day unless we agreed otherwise.

16              One point I want to make is, your Honor --

17         THE COURT:  You certainly agreed that you would get

18    paid back and that you would get paid back first.  The only

19    question is whether you said but we won't look to certain

20    assets for that payment.

21         MR. JONES:  Right.

22         THE COURT:  That's the only -- the only issue is

23    whether the tenth decretal paragraph constitutes an express

24    agreement by you, the government of the United States, that you

25    would not look to the avoidance action proceeds for repayment

1    because they're not part of the collateral.

2              MR. JONES:  Right.

3              THE COURT:  That's all this is about.

4              MR. JONES:  And here is a reason to think that the

5    tenth paragraph and the nonrecourse language does not do that

6    work of saying that the super-priority claim at the end of the

7    day will be diminished and limited by that nonrecourse language

8    and by the extent of the available collateral.  The reason for

9    that is the parties, when they wanted to limit the

10   super-priority, did so explicitly, both as to the carve-out and

11   as to the GM equity interests.

12             THE COURT:  Yes.  But if I'm right that the only way

13   to give effect to paragraph ten, to give it some independent

14   meaning, is to say it doesn't relate to the claims and it

15   doesn't relate to liens, it relates to the loan and it's the

16   repayment of the loan that is the release of the claim and the

17   loan has terms, like all loans have terms.

18             MR. JONES:  Right, your Honor --

19             THE COURT:  And super-priority status doesn't override

20   the terms of the loan.  And one of the terms to which you

21   agreed is that you would only look to certain assets and not to

22   others for repayment.  All those assets have to be made

23   available to you before anybody else gets a dime of them.

24   That's what super-priority gives you.

25             MR. JONES:  Your Honor, our reading does not render

```
 1        that paragraph surplusage.  It has meaning that's not --
 2                    THE COURT:  I don't understand the meaning.
 3                    MR. JONES:  Sure.  Well let me --
 4                    THE COURT:  I've tried and tried and tried.
 5                    MR. JONES:  Let me try, your Honor.
 6               We don't -- first off, we don't dispute.  We don't
 7        pretend there weren't negotiations about the avoidance action
 8        proceeds.  Of course there were.  There's specific provisions.
 9        So I want to be upfront and acknowledge that.
10                    THE COURT:  Come on.  You guys are very good at what
11        you do.  Of course there were.
12                    MR. JONES:  So I'm not putting my head in the sand
13        about that.
14               But -- now I've diverted myself from my train of
15        thought.
16               Paragraph ten's meaning is talking about remedies in
17        the event of nonpayment on the loans.
18               And it is complimentary to paragraph 6(b).  I'm sure
19        your Honor knows that lawyers say complimentary or even
20        identical things at different points in instruments.
21                    THE COURT:  They do.
22                    MR. JONES:  And what it does is say what happens in
23        the event of some default.  If early on in the case there was a
24        terrible default or a meltdown, could the government come
25        grabbing assets?  No, we couldn't grab this.
```

```
1            I mean I know your Honor doesn't want to hear intent
2      and I'm not going to testify.  But it does have logical purpose
3      to say that the government can't come in and grab this at an
4      early stage.  It's for the committee to run this litigation.
5      They can try to settle.  They talk about how it's
6      disadvantageous to them.  But they can control the outcome
7      through negotiations to some extent and steer it in a way that
8      won't bite them.  They're doing so, by the way, paid for by DIP
9      lender dollars.  So they're not being caused to spend their own
10     money in this pursuit.
11            But all of that operates quite independently, are
12     remedies as secured lenders under 364(c) (2) and (3), operate
13     totally independently from our super-priority claim which says,
14     okay, at the end of the day we come first.  And as to what?
15     Well, as to the amount we lent.  Again, you see that at R85.
16            THE COURT:  I agree.  You come first as to the amount
17     that you've lent.  But that doesn't say that if you agree that
18     you won't look to a particular pot of assets for repayment that
19     somehow super-priority status pulls those assets back into the
20     pot that you've agreed you will look to.
21            MR. JONES:  Your Honor, if we --
22            THE COURT:  That's what I keep asking.  If there's
23     something about super-priority status that you say:  I won't
24     look to Black Acre for repayment of this loan, but I get repaid
25     on a super-priority basis, therefore, I can look to Black Acre.
```

                                                                           50

 1   That logic makes no sense.  Explain to me what I'm missing.

 2            MR. JONES:  Your Honor, the difference is we're owed

 3   what we lent.  If we don't --

 4            THE COURT:  You're always owed what you lent.  You're

 5   owed what you lent whether it's super-priority or not.  You're

 6   owed what you lent whether it's secured or not.

 7            MR. JONES:  That fact has legal significance, your

 8   Honor.  And the fact that we have a super-priority claim in the

 9   amount we lent has independent meaning.  Recourse is a concept.

10   All the cases talk about recourse in the context of:  What is

11   the secured lenders' remedy?  What good does that collateral

12   get that secured lender?  That concept is simply inapplicable

13   to the super-priority context.

14            Your Honor, I want to note -- I'm going to stick to

15   the code because I think your Honor is steering us there

16   repeatedly.  1129 -- this of the bankruptcy code 11 U.S.C.

17   1129(a)(9).  That section in general talks about what has to

18   exist for a plan to be confirmed.  And (a)(9) says except to

19   the extent that the holder of a particular claim, that's us,

20   has agreed to a different treatment, then (a) under that says

21   we have to be paid in full.

22            Now our super-priority claim itself tells you what

23   we're supposed to be paid.  The amount we lent.  If the

24   government is going to give away the right to be repaid, it

25   will do so explicitly.  And it did so explicitly as to the GM

09-50026-mg   Doc 13689-6   Filed 07/15/16   Entered 07/15/16 16:48:13   Exhibit F   51
Pg 52 of 68
Case 1:12-cv-00381-CM   Document 22   Filed 05/14/12   Page 51 of 67

C549mota

 1    equity interest and as to the carve-out.  It didn't do that

 2    here.

 3            THE COURT:  But then what does it mean that the loan,

 4    which is what you're entitled to be repaid -- and there isn't

 5    anything else but the loan -- that the loan shall be

 6    nonrecourse.  What does that mean?

 7            MR. JONES:  Your Honor, I think you're --

 8            THE COURT:  Please tell me what it means.  Just tell

 9    me what it means.  Under your reasoning, under your reasoning

10    the recourse is inapplicable to super-priority.  What does it

11    mean that the loan shall be nonrecourse because super-priority

12    applies only to where you stand in line to get the loan that is

13    nonrecourse repaid.

14            MR. JONES:  Loan --

15            THE COURT:  The loan that is nonrecourse.

16            MR. JONES:  What we have is a super-priority claim,

17    not conflated with the terms of the capital L Loan in this

18    document.

19            Our claim is for the amount we lent.  Plain and

20    simple.  This talks about how does this loan operate.  At

21    stages earlier than the end of this case, do we have secured

22    lender rights to grab that asset, to foreclose on our liens and

23    seize it.  Now that has independent real world significance,

24    your Honor.

25            THE COURT:  So what you're saying is the tenth

1   decretal paragraph applies only in certain circumstances that

2   are not articulated in the tenth decretal paragraph.

3           The tenth decretal paragraph doesn't say that at early

4   stages in this bankruptcy before the bankruptcy is finally

5   wound up, the last share of stock is distributed, and we get

6   our money back, the loan shall be nonrecourse against the

7   borrower.

8           It just says the loans are nonrecourse.  Now maybe you

9   bankruptcy people understand that to have some specific

10   meaning.  But I the nonbankruptcy district court judge don't

11   know that.

12           MR. JONES:  Let me --

13           THE COURT:  And there's nothing in the record to

14   explain that to me.  And if there's something in the bankruptcy

15   code or the four corners of the documents that explains that to

16   me that's great.  Otherwise, you got to go back and have a

17   trial.

18           MR. JONES:  Your Honor, I want to say three things on

19   that.

20           One is by its own terms, by its own language that

21   tenth paragraph is talking about remedies, and remedies as a

22   secured lender.  An as I've said, super-priority is

23   conceptualized as not even being a secured loan.  So by its

24   terms it is illogical to read paragraph ten as modifying the

25   super-priority.  We've briefed that.  And that's stated in

1    Colliers and elsewhere.

2            Your Honor, you're right, there is not an evidentiary

3    record about what the timing effect would be and what the

4    parties' intentions were.

5            THE COURT:  There isn't even an evidentiary record who

6    drafted this such that I would know who to construe it against.

7            MR. JONES:  I don't want to lose my thread.

8            The reason I'm telling you this, when I start to talk

9    about timing and the consequences, that is a response to a

10   claim that either I render this language surplusage, which is

11   wrong; or that it would be irrational and therefore it

12   shouldn't be construed that way.  So it is purely my explaining

13   why that's not so.  It's not a record-based argument, an

14   evidentiary argument.

15           The other thing I want to point out, because there's

16   been repeated reference to remand and a trial, and this is just

17   a practical answer.  Judge Gerber asked us explicitly this, at

18   argument.  All parties agreed.  There simply is no parol

19   evidence that will shed light on this.  They were given the

20   opportunity.

21           THE COURT:  Excuse me.  The testimony of the lawyers

22   who negotiated this deal.

23           MR. JONES:  As to --

24           THE COURT:  That's the parol evidence that sheds

25   light.

1         MR. JONES:  Your Honor we could do voluminous -- we

2    could depose people until the cows come home.  Nobody believes

3    that discovery would actually provide an answer to the very

4    specific question here, which is what's this deal means and is

5    the super-priority limited by the nonrecourse language.

6         I will point out in our brief we cite.

7         THE COURT:  What's a girl to do?  I wasn't there.  You

8    all were there.  Judge Gerber was there.  I wasn't there.

9         MR. JONES:  Actually I think it should be an easy task

10   and that you should rule for us.  If you disagree, the Second

11   Circuit in the Compagnie Financiere case cited at page ten of

12   our brief tells you when no one comes forward with parol

13   evidence it can be decided as a matter of law by the court.

14   And of course this is de novo review.  So you have the record

15   that the parties, for better or worse, have identified.  And

16   that is -- so that's where we are.

17        Your Honor, I guess I'm going to save an oration, but

18   the guts of my position, and you can agree or disagree, that

19   the nonrecourse concept in that paragraph relates to the liens

20   in the collateral by the nature of the concepts and the

21   description in paragraph ten.  It just says the loan shall be

22   nonrecourse.  It doesn't say anything about:  Oh, but there's

23   this accompanying super-priority in here so that will work.

24   It's talking about remedy characteristics that accompany the

25   loan on account of the government's secured lender status.

C549mota

 1    That's it.  To use that to modify or limit the separate

 2    independent super-priority rights that exist under the code and

 3    that were negotiated is error.  It was error below and it would

 4    be error at this time.  That's the guts of our position, your

 5    Honor.

 6              THE COURT:  Canada.

 7              MR. EDELMAN:  Your Honor, a couple things, in no

 8    particular order.

 9              You asked how to make sense of decretal paragraph ten.

10    We think there are two interpretations would allow you to

11    reconcile all these various provisions.  First, as I think

12    argued by U.S. treasury, you could limit this as a collateral

13    and collateral remedy concept.  We think that would allow you

14    to reconcile all the provisions and give effect to everything.

15              We also think there's an alternative interpretation

16    that would apply which is that this provision, the nonrecourse

17    and their restatement about nonrecourse was meant to apply.  It

18    was nonrecourse to the GM equity interest.  And that was the

19    purpose of the nonrecourse statement.

20              THE COURT:  But my problem with that, I already told

21    you.  That's not what it says.  That's not what the literal

22    words of -- then there's a big drafting error.

23              MR. EDELMAN:  It's in the second part.

24              And we also think that's supported by some of the

25    statements that were -- are part of the record before the

1    bankruptcy court including the statement of committee at the

2    DIP hearing which it said that the DIP is nonrecourse that new

3    GM --

4            THE COURT:  I know.  I have seen all that.  The

5    problem is there's contradictory language in the actual

6    document and I'm stuck with the contradictory language in the

7    actual document.

8            MR. EDELMAN:  There's also a statement in the final

9    order that says the super-priority claim shall be subject and

10   subordinate only to the carve-out and the claims set forth in

11   the preceding order.  That's in the final order.  But that's

12   brought into the wind-down order.

13           One other -- I would also like to make reference to a

14   statement by the committee which is part, I think this court

15   can take judicial notice, if I can hand up another motion that

16   was filed in bankruptcy court which talked about the scope of

17   the nonrecourse provision.  In the committee's fee application

18   and I'll hand out copies to my colleagues.  And that -- this

19   was in their final fee application.  This was done several

20   months after the fact.  And it talked about what they said they

21   had done as part of the DIP negotiations.  And in paragraph 35

22   of their fee application which was filed in November, so

23   several months after all this was done.

24           THE COURT:  November of 2009.

25           MR. EDELMAN:  November of 2009.  And this is docket

C549mota

 1    number 4459.  And it was filed November 16, 2009.

 2              And paragraph 35, it says the applicant, which is

 3    Kramer Levin, counsel for the committee, was very active in

 4    negotiations over the final DIP order and the amended DIP

 5    credit agreement governing the wind-down facility.  So the

 6    amended DIP facility is the thing that governs the wind-down

 7    facility.  In particular, the applicant negotiated certain

 8    modifications to the final DIP order to provide that the DIP

 9    loans would not extend to the avoidance actions against the

10    prepetition lender or to the ten percent stock and --

11              THE COURT:  DIP loans would not extend to the

12    avoidance actions.

13              MR. EDELMAN:  The liens.  It says the DIP liens.

14              THE COURT:  Yes.  I said would not extend.

15              MR. EDELMAN:  -- would not extend to the avoidance

16    actions or what we call the new GM equity interest.

17              THE COURT:  Right.

18              MR. EDELMAN:  There's also a final sentence in that

19    provision says.  The amended DIP agreement provided that the

20    loans would be nonrecourse to the GM equity interest.

21              We think that's significant because it showed the

22    intent of what the nonrecourse would be.  In the prior sentence

23    it just said the liens didn't apply to both the new GM equity

24    interest and the avoidance loans.  But then it says the

25    nonrecourse only applied to the new --

1          THE COURT:  Wouldn't that be written into the order.

2    That would have made this very easy.

3          MR. EDELMAN:  We think that there are numerous reasons

4    why it was.

5          THE COURT:  Well it says -- sadly, it says the DIP

6    lenders' recourse under the amended DIP facility shall be only

7    to the collateral.  That's what it says.

8          MR. EDELMAN:  It also says further on so that --

9          THE COURT:  But that's -- see that's a very clear

10   statement.  Recourse shall be only to the collateral.  I know

11   what that means.  I knew what that meant before I went to law

12   school.  Recourse shall be only to the collateral.  The rest of

13   it.

14         MR. EDELMAN:  We think that the interpretation that I

15   just posited before would give effect to that paragraph if you

16   limit it to the collateral or the new GM equity --

17         THE COURT:  But the collateral is not -- the

18   exclusions from collateral are not coterminous with the new GM

19   equity interest.  Therefore, there's a mistake somewhere.

20   Somebody made a mistake somewhere.  All right.  Because those

21   two things are inconsistent.  Recourse to the collateral.  And

22   it only protects the new GM equity interest.  The collateral

23   does not just consist of the assets other than the new GM

24   equity interest.

25         MR. EDELMAN:  We think that recourse is a lien

C549mota

 1    concept.  And no other reading of this document --

 2              THE COURT:  Recourse is a loan concept.

 3              MR. EDELMAN:  In this context we think it's a lien

 4    concept.  But also no other interpretation would give effect to

 5    all provisions of the agreement because otherwise you read out

 6    6(a) and 6(b) because if we're --

 7              THE COURT:  You're just telling me what you've already

 8    said.  You're telling me what you've already said.

 9              Creditors attorney, I'm happy to hear something else.

10              MR. MAYER:  I just want to offer one additional

11    comment.  Otherwise, I think we'll rest on our papers.

12              One of the issues that didn't get talked about at all

13    before Judge Gerber, in anyone's papers was raised by my

14    partner, Jonathan Wagner, who is a civil litigator and

15    therefore focuses on such things, is who has the burden of

16    proving.

17              If you take a look at Judge Sotomayor's opinion in

18    Bethlehem Steel Corp.  The cite is 479 F.3d 167 at page 172.  I

19    have copies if people want it, but the reports are open to

20    everyone.

21              THE COURT:  I'll be happy to take a copy.

22              We're all getting paid for by the government anyway.

23              MR. MAYER:  Your Honor, as an aside, whatever treasury

24    and Canada lent to pay for administrative expenses in

25    connection with this exercise was long ago exhausted.  It is

 1    now coming out of the unsecured creditors' pockets, not that

 2    that is relevant to anything.

 3              If you look at page 172, your Honor.  And this is

 4    under the heading that says discussion.  It's on the left-hand

 5    column.  I think it's page five of the printout on the

 6    right-hand side.

 7              THE COURT:  Right.

 8              MR. MAYER:  If you go down to the bottom of the middle

 9    paragraph, it says, "The burden of proving entitlement to

10    priority payment," this is right before the cite.

11              THE COURT:  "Rests with the party requesting it."

12              MR. MAYER:  "The burden of proving entitlement to

13    priority payment as an administrative expense rests with the

14    party requesting it."

15              THE COURT:  But nobody doubts that it's an

16    administrative expense.  Nobody questions that it's a

17    super-priority administrative expense.

18              MR. MAYER:  That is correct.

19              What is at issue is does the super-priority extend to

20    this asset notwithstanding the waiver of recourse.

21              THE COURT:  Okay.  Right.  Because as far as I

22    understand the question presented, it would plainly extend to

23    this asset unless the parties have explicitly agreed that it

24    did not extend to this asset.  And the question is whether the

25    tenth decretal paragraph constitutes such an express

1    disclaimer.  That's all this is about.

2              MR. MAYER:  That's correct, your Honor.  What we have

3    here in effect is an asset that the creditors committee was the

4    only party to bring this lawsuit.  We brought this lawsuit.

5    And a year later the government asserted -- the governments

6    asserted a cloud on title.  That's what this is about.  They

7    filed a reservation of rights and the summary judgment motion,

8    first time we ever heard of it.  They showed up and said wait a

9    minute that action you're bringing, it really belongs to us.

10   And this litigation followed.

11             In Judge Rakoff's decision in the Schoeps case, which

12   again, I'm happy to hand up copies of.

13             THE COURT:  It says what.

14             MR. MAYER:  It's Julius H. Schoeps v. Museum of Modern

15   Art.  Has to do with title of a painting.  It's a Holocaust

16   case, actually.

17             THE COURT:  I've had a number of them.  Should have

18   cited one of mine.

19             MR. MAYER:  Well, your Honor.  I'm not sure the

20   particular procedural point was at issue in your cases.

21             But the issue here, and it's one I want to address.

22   We brought this action for declaratory judgment.  And in a

23   situation where we are the plaintiff the issue of burden of

24   proof becomes an important one.  We think we carry that burden

25   no matter whether we have it or whether they have it.  We don't

1    think they've come close to carrying it if it lies with them.

2            I want to direct the Court at the bottom of what --

3    it's the page number is four of nine at top right-hand corner.

4    It's at the very bottom of the page.  "In an action for

5    declaratory judgment, the burden of proof rests on the party

6    who would bear it if the action were brought in due course as a

7    claim for nondeclaratory relief."

8            The governments are asserting a claim to this lawsuit.

9    If the governments had never shown up, this lawsuit would have

10   been -- if it ever ends up being decided and there are

11   proceeds, would end up being distributed to unsecured

12   creditors.  The only reason that didn't happen is because the

13   government put cloud on title.

14           THE COURT:  I understand that.

15           MR. MAYER:  We move to remove -- we have acted to

16   remove that cloud in that circumstance.  And that's why we

17   found the Schoeps case so relevant, because it is a

18   cloud-on-title case.

19           And what Judge Rakoff held was that when someone

20   asserts a cloud on title, it is the person asserting the cloud

21   that has the burden of proof.  That's what we have here.  We

22   have the governments asserting a cloud on title.

23           THE COURT:  Well, folks, apparently, or so I'm told,

24   you all agreed at one point in time that the record was the

25   record, and the proof was the proof, and that there was nothing

Case 1:12-cv-08881-CM    Document 12    Filed 05/14/15    Page 63 of 67    63

C549mota

1    else that could possibly be introduced that would shed any

2    light on the subject.

3            MR. MAYER:  We agreed there were no issues, disputed

4    issues of fact.  That's correct, your Honor.

5            THE COURT:  Fine.  Then the burden of proof is just

6    dropped out of the case.  The question is who prevails on a

7    legal argument.

8            MR. MAYER:  In that case, your Honor, we rest on our

9    papers.  We think that you have it right.

10           THE COURT:  Well I don't know that I have it.  That

11   was where I was in trying to -- is there something else that we

12   have to say?

13           MR. EDELMAN:  Yes, your Honor.  I actually disagree.

14           THE COURT:  Burden of proof is not in this case.  Can

15   we not talk about the burden of proof.

16           MR. EDELMAN:  I won't.  But I think it just raises

17   another issue, which is we were granted a super-priority right

18   for everything including the avoidance action proceeds at least

19   some point in time.  There are allegations that we waived our

20   right.  And in order under New York law for a waiver to be

21   found the waiver cannot be inferred but it must be clear.

22           THE COURT:  I agree.  The issue is:  Is the tenth

23   decretal paragraph a clear waiver of your right?

24           MR. EDELMAN:  And we don't think --

25           THE COURT:  And you say no and they say yes.

```
1              MR. EDELMAN:  And we think that like, such as the fee

2    application, we do think there could be extrinsic evidence that

3    would shine light on this.  And so we think the papers can

4    be -- the only way to read the papers in a consistent fashion

5    would be for the DIP lenders.  But if not, then we do not think

6    that the intent of EDC and, I think the federal government

7    would also agree that their intent -- we never intended --

8              THE COURT:  Their unexpressed intent is of no

9    relevance.  You can't -- parol evidence of unexpressed intent

10   is not admissible.  Parol evidence is admissible to show intent

11   as expressed during the course of negotiations.

12             MR. EDELMAN:  I agree.

13             THE COURT:  The fact that you were secretly thinking

14   something is not parol evidence that overcomes the expressed

15   statements of the parties, which is why I said there was a

16   point in time at which I thought this had to be remanded for a

17   trial to reconstruct those negotiations in order to know who

18   said what to whom, not to have someone talk about what he was

19   thinking in the back of his mind, because what he was thinking

20   in the back of his mind has no relevance at all.

21             MR. EDELMAN:  We agree with that.  But the only way to

22   construe these documents without rendering portions of them

23   pure --

24             THE COURT:  You've said that fifteen times.

25             MR. EDELMAN:  Yes, I have.  But there is no other way.
```

 1              THE COURT:  Except my way.

 2              Nothing is superfluous my way.  It may be wrong, but

 3     nothing is superfluous.

 4              MR. EDELMAN:  Your Honor, I think that your

 5     interpretation would render the super-priority superfluous and

 6     without any meaning.  We could have just had paragraph 6(b).

 7     And the only reason posited by the bankruptcy court was that it

 8     protected -- the bankruptcy court probably found the same

 9     problem that we're here about, and didn't know how --

10              THE COURT:  Well certainly not cramdown.  Certainly

11     not cramdown.  You guys aren't cramdown lenders.  And that

12     whole statement about cramdown in the bankruptcy court is just

13     plain wrong.

14              MR. EDELMAN:  We agree with that.

15              THE COURT:  All right.  I have to do a criminal

16     matter.  One last word from the United States.

17              MR. JONES:  Your Honor, I'm going to resoundingly end

18     on two small points, one just raised by Mr. Mayer, and not

19     repeat.

20              He objects that the governments came forward after a

21     year's delay and imposed a cloud on title.  And my point is

22     this action was brought from the very outset on behalf of the

23     estate and we understood ourselves to be an entity holding

24     entitlements against the estate and therefore there was no

25     reason for us to --

```
 1          THE COURT:  It is a fair statement, given my reading
 2   of what Judge Gerber did, it's a fair statement that you didn't
 3   make your position expressly known.
 4          MR. JONES:  True.
 5          THE COURT:  For a year.  That's all.  That's all he's
 6   saying.
 7          MR. JONES:  Right.  When we first perceived a claim --
 8   an assertion that it shouldn't be for us, we came forward and
 9   said wait a minute, not so fast.  Until then we perceived no
10   need.
11          I won't spell it out but, your Honor, there's one
12   thing, factor that Judge Gerber deemed significant that simply
13   results from a misreading of a debtor motion, and we point that
14   out in our reply brief at five.  He reads parties to this case
15   as having understood nonrecourse to apply to super-priority.
16   That's a misreading.  I explain that at page five of the reply.
17   I won't drone on.  But I want to make sure that that doesn't
18   escape one's attention.
19          THE COURT:  I don't want to get into that.  Because if
20   we have to get into that you are going to go back.  And whether
21   you think you can't reconstruct this or not, you are going to
22   have to reconstruct it.  If we have to get into people's
23   intent, then there will have to be evidence about who said what
24   to whom in the heated month of July 2009.
25          MR. JONES:  He understood that to be a factor helping
```

C549mota

1   him decide how to read these documents.

2           THE COURT:  I'm trying not to get there.

3           MR. JONES:  That's great, your Honor.

4           THE COURT:  Trying not to get there.  Because I know

5   you don't want to go have a trial.

6           MR. JONES:  I don't even know which way that cuts for

7   the government.  I just feel obliged to point it out because we

8   did say that to Judge Gerber.

9           THE COURT:  Thank you, folks.  Thank you very much.

10          (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25