UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK


|  |  |  |
|---|---|---|
| | . | Case No. 09-50026-mg |
| IN RE: | . | Chapter 11 |
| | . | |
| MOTORS LIQUIDATION COMPANY, | . | One Bowling Green |
| | . | New York, NY 10004 |
| | . | |
| Debtor. | . | Monday, July 18, 2016 |
| | . | A.M. SESSION |
| . . . . . . . . . . . . . . . | . | 10:04 a.m. |


TRANSCRIPT OF STATUS CONFERENCE RE: MOTION BY
GENERAL MOTORS LLC PURSUANT TO 11 U.S.C. 105 AND 363
TO ENFORCE THE BANKRUPTCY COURT'S JULY 5, 2009 SALE ORDER AND
INJUNCTION, AND THE RULINGS IN CONNECTION THEREWITH [13634];
(CC: DOC# 13637, 13636) MOTION FOR ENTRY OF AN ORDER PURSUANT
TO FED. R. BANKR. P. 9006(b) EXTENDING THE DURATION
OF THE AVOIDANCE ACTION TRUST
BEFORE THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | King & Spalding LLP |
| | By:  ARTHUR STEINBERG, ESQ. |
| | SCOTT DAVIDSON, ESQ. |
| | 1185 Avenue of the Americas |
| | New York, New York 10036-2601 |
| | |
| For Motors Liquidation | |
| Company Avoidance | |
| Action Trust: | Binder & Schwartz |
| | By:  ERIC FISHER, ESQ. |
| | NEIL S. BINDER, ESQ. |
| | 366 Madison Avenue, 6th Floor |
| | New York, NY 10017 |
| | (212) 933-4551 |


APPEARANCES CONTINUED.


| | |
|---|---|
| Audio Operator: | R. Liell, ECR |
| | |
| Transcription Company: | Access Transcripts, LLC |
| | 10110 Youngwood Lane |
| | Fishers, IN 46038 |
| | (855) 873-2223 |
| | www.accesstranscripts.com |


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES (Continued):

For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs:                    Brown Rudnick LLP
                              By:  EDWARD S. WEISFELNER, ESQ.
                                   HOWARD S. STEEL, ESQ.
                              7 Times Square
                              New York, New York 10036
                              (212) 209-4917

For Export Development
Canada:                       Vedder Price
                              By:  MICHAEL L. SCHEIN, ESQ.
                              1633 Broadway, 47th Floor
                              New York, NY 10019
                              (212) 407-7700

For the Personal Injury
Accident Plaintiffs:          Goodwin Procter LLP
                              By:  WILLIAM P. WEINTRAUB, ESQ.
                              The New York Times Building
                              620 Eighth Avenue
                              New York, NY 10018-1405
                              (212) 813-8839

For River Birch
Capital:                      Westerman Ball Ederer Miller
                               Zucker & Sharfstein, LLP
                              By:  ERIC G. WAXMAN, III, ESQ.
                              1201 RXR Plaza
                              Uniondale, NY  11556
                              (516) 622-9200

For the Groman
Plaintiffs:                   Golenbock Eiseman Assor Bell &
                               Peskoe
                              By:  JONATHAN L. FLAXER, ESQ.
                              437 Madison Avenue
                              New York, NY 10022
                              (212) 907-7300

                              Wolf Haldenstein Adler Freeman
                               & Herz LLP
                              By:  ALEXANDER H. SCHMIDT, ESQ.
                              270 Madison Avenue
                              New York, NY 10016
                              212-545-4600



APPEARANCES (Continued):

```
For the Committee Of
Unsecured Creditors:        Kramer Levin Naftalis & Frankel, LLP
                            By:  ROBERT T. SCHMIDT, ESQ.
                            1177 Avenue of the Americas
                            New York, NY 10036
                            (212) 715-9100




TELEPHONIC APPEARANCES:


For the Ignition Switch
Plaintiffs:                 Stutzman Bromberg Esserman & Plifka
                            By:  SANDER L. ESSERMAN, ESQ.
                            2323 Bryan Street, Suite 2200
                            Dallas, TX 75201-2689
                            (214) 969-4910

For Bernard Pitterman:      Adelman Hirsch & Connors LLP
                            By:  JORAM HIRSCH, ESQ.
                            1000 Lafayette Boulevard
                            Bridgeport, CT 06604
                            (203) 331-8888

For Brianna Minard:         Carcione Cattermole Dolinski Stucky
                              Markowitz & Carcione LLP
                            By:  JOSH S. MARKOWITZ, ESQ.
                            1300 South El Camino Real, Suite 300
                            San Mateo, CA 94402-2971
                            (650) 367-6811
```



4

1      (Proceedings commence at 10:04 a.m.)

2           THE COURT:  Please be seated.  We're here in Motors

3   Liquidation Company, 09-50026.  I first want to take up the

4   motion of Wilmington Trust as avoidance action trust

5   administrator and trustee per an order extending the duration

6   of the avoidance action trust.

7           MR. FISHER:  Good morning, Your Honor.  Eric Fisher

8   from Binder & Schwartz on behalf of the avoidance action trust.

9   We're here today on the motion to extend the duration of the

10  trust through December 15th, 2019.  Your Honor, no objection

11  was filed with respect to this motion.  The relief requested is

12  justified under Section 4.1 of the avoidance action trust

13  agreement, which allows the trust to apply for extensions of

14  its duration to, quote, "facilitate or complete the recovery

15  and liquidation of the trust's assets," Your Honor.

16           The only precondition to the extension of the trust

17  is that the trust needs to obtain from the IRS a private letter

18  ruling indicating that the extension of the life of the trust

19  won't adversely affect the trust's status as a liquidating

20  trust.  We made that request, Your Honor, to the IRS in

21  February.  I'm certainly hoping that we would have the outcome

22  before we had to file the motion to extend the life of the

23  trust.  We don't have the private letter ruling yet, Your

24  Honor.  We have had communications with the IRS over the past

25  couple of weeks that indicate that we should be getting the

1  ruling that we are anticipating and that we should be getting

2  it in the next couple weeks.  And so what we would respectfully

3  request, Your Honor, is that the Court grant the requested

4  relief, but we would not submit an order until we obtain a

5  private letter ruling, and we would then notify the Court of

6  the private letter ruling.

7          THE COURT:  All right.  Does anybody else wish to be

8  heard with respect to the motion?

9      (No audible response.)

10          THE COURT:  All right.  Before the Court is the

11  motion of Wilmington Trust Company, as avoidance action trust

12  administrator and trustee, for entry of an order pursuant to

13  Federal Rule of Bankruptcy Procedure 9006(b) extending duration

14  of the avoidance action trust.  The motion is filed as ECF

15  Docket Number 13637.  The motion is supported by the

16  declaration of David Vanaskey appended to the motion as Exhibit

17  C.  The motion is unopposed.  The motion seeks an extension of

18  the duration of the avoidance action trust for an additional 36

19  months, through and including December 15th, 2019.  The

20  extension of the duration of the trust is also dependent on the

21  receipt by the trust of a favorable private letter ruling from

22  the Internal Revenue Service that such extension would not

23  adversely affect the status of the trust as a liquidating trust

24  for U.S. federal income tax purposes.  To date, the trust has

25  not received a private letter ruling from the IRS.

1       Upon consideration of the motion, with no objections

2   being filed in opposition, the Court hereby approves the

3   motion, granting the 36-month extension of the duration of the

4   trust subject to the following:  Given that the extension of

5   the duration of the trust is also dependent on the receipt of

6   the private letter ruling from the IRS, the Court will hold the

7   entry of the order in abeyance until such time as the letter is

8   received.  The trustee shall promptly notify the Court of the

9   receipt of the letter ruling, at which time the approval order

10  will be entered.

11      Thank you, Mr. Fisher.

12      MR. FISHER:  As Your Honor is aware, there was

13  another motion on for today, which was withdrawn on Friday.

14      THE COURT:  Yes.  And I saw that there's a 9019

15  that's scheduled.  This is with respect to the funding of the

16  trust, and I've seen papers about it, I guess, where it's --

17  there's a date in August when that 9019 is on.

18      MR. FISHER:  Yes, Your Honor, August 5th.

19      THE COURT:  Okay.  Thanks very much, Mr. Fisher.

20      MR. FISHER:  Thank you.

21      THE COURT:  All right.  So now, let's move to the

22  status conference in connection with the June 2016 motions to

23  enforce the plan injunction and adjournment of the hearing in

24  connection with the second June 2016 motion to enforce.

25      Obviously, the Second Circuit's decision in Motors

7

1  Liquidation, which I guess -- what was the date of the order --

2  decided July 13th, 2016, probably just about the time,

3  Mr. Steinberg, you submitted your reply brief.

4        MR. STEINBERG:  Yes, Your Honor.  It was a busy

5  morning.

6        THE COURT:  It was a busy morning, no doubt.  So, you

7  know, from the Court's standpoint, I've read the decision.  I'd

8  like to know what each side's view as to how to proceed at this

9  point.

10        Mr. Steinberg.

11        MR. STEINBERG:  Good morning, Your Honor.  Our view

12  -- let me just describe something as to the general case, and

13  let me then turn specifically to the second motion to enforce.

14        First, the case was decided by the Second Circuit on

15  July 13th, and we are going to be moving for a rehearing on --

16  for the panel and a rehearing on bond, which would have to be

17  filed within 14 days or by July 27th.  So presently, for that

18  case, the mandate is still in the Second Circuit until that is

19  determined.

20        Second, and I apologize for this, Your Honor, and I

21  promise that we will be better next time in trying to inform

22  you of proceedings that are going on in other courts.  So in

23  case Your Honor had not been aware of it, Judge Furman, in a

24  multi-district litigation, has scheduled a telephonic

25  conference for 2:30 this afternoon, trying to inquire for the

1  same issues that Your Honor has, now that the Second Circuit

2  decision has come down, how does that impact, if at all, the

3  next bellwether trial, which is the Coppola trial.  So there is

4  a status conference on -- telephonically this afternoon.

5       The next MDL conference is July 28th.  Judge Furman

6  has also said to the parties involved in that litigation, I

7  want you to be prepared to say how the Second Circuit ruling

8  affects the entire case before me.  So parties are now

9  presently trying to understand and set forth what their

10 positions will be in connection with that status conference.

11 Already, I think there's been correspondence that have

12 indicated that the plaintiffs will want to amend their third

13 amended complaint in view of the Second Circuit decision and

14 have asked for approximately 60 days for purposes of doing

15 that, as well, too.  I don't know whether that's been agreed to

16 or not, but I'm trying to indicate to you there's a state of

17 flux going on in proceedings with regard to the Second Circuit

18 decision outside of this courtroom.

19      In Texas, there's an MDL proceeding.  It's called --

20 and the first bellwether trial, which is an ignition switch

21 case, is the Stevens case.  Your Honor might remember that we

22 had filed a motion to enforce in connection with Stevens, and

23 there was some interim relief that the parties had agreed to

24 before the Second Circuit decision, and we carried the second

25 motion to enforce to August 5th.  So we have a return date on

1   that.

2          And then, just to sort of round out, when we --

3          THE COURT:  Let me just say -- well, go ahead,

4   Mr. Steinberg.

5          MR. STEINBERG:  So in the _Stevens_ case, there is a

6   motion for summary judgment that is going to be heard by the

7   Texas state court on July 29th.  So there's a lot of flurry of

8   activity in _Stevens_, and the trial is supposed to start on

9   August 9th, something in the first two weeks of August.  So

10  people are trying to figure out whether they want to go

11  forward, not go forward, and how the Second Circuit opinion

12  impacts them.

13          With regard to matters before Your Honor, the only

14  thing that I think I can recollect that has been stayed pending

15  the result of the Second Circuit is the _Pilgrim_ matter, which

16  was filed back in the beginning of this year.  It involved

17  economic losses for non-ignition switch plaintiffs, and they

18  wanted to see what happened in the Second Circuit.  The

19  stipulation that Your Honor approved said that the parties are

20  to meet and to confer within 21 days after the resolution in

21  the Second Circuit.  So with our moving to -- for rehearing on

22  bond, I'm not sure when the 21 days is starting, but we have

23  not communicated with the Pilgrim plaintiffs, and the Pilgrim

24  plaintiffs have not communicated with us.  All of this has come

25  down fairly quickly since the Wednesday ruling.

1      So this would be our thought process with regard to

2  the first motion to enforce that was filed in June and the

3  second motion to enforce that was filed in June, both of which

4  relate to post-closing accidents with vehicles without the

5  ignition switch defect.  There -- in the first one, there was

6  the <u>Fox</u> matter, and then there's <u>Tibbetts and Chapman</u>.  <u>Fox</u> was

7  resolved by stipulation that Your Honor had approved.  It is

8  not our intention to try to do anything further in this court

9  with regard to <u>Fox</u>.  Whatever happens with that trial, they're

10 coming in September, and whatever skirmishes are happening,

11 we're happy to let trial counsel and Mr. Butler battle it out

12 in the Georgia state court.

13      Tibbetts and Chapman, Your Honor, had taken the

14 matter under advisement and is waiting for the next hearing

15 date, which was today, to see what the other people were gonna

16 do.  But my feeling on <u>Tibbetts</u> and <u>Chapman</u> is that if anybody

17 feels that the Second Circuit opinion impacted the positions

18 that they had stated already that are before Your Honor so that

19 counsel for Tibbetts and Chapman should file a pleading to

20 supplement whatever they've done, and we will respond to

21 whatever they file, and then Your Honor will have the complete

22 record for that first motion to enforce.

23      With regard to the second motion to enforce, there

24 were 11 cases that were involved.  Four of them had objected.

25 Seven had not.  I think with regard to all 11, they should be

11

1 given the same opportunity to, in effect, file a supplemental

2 pleading in view of the Second Circuit decision to say whatever

3 it is that they want to say about the impact of the Second

4 Circuit decision.  And we will say that -- we will then respond

5 to that, and then Your Honor could hold a hearing, if you want,

6 on that.

7          THE COURT:  Mr. Steinberg, one of the things -- and I

8 do have some specific questions.  I recognize the mandate

9 hasn't issued from the Second Circuit.  We'll see what happens

10 there, but because at Page 65 of the Second Circuit's slip

11 opinion, where the court addressed -- it's the paragraph

12 starts:

13          "Second, many of the peculiar facts discussed apply

14          with less force to the non-ignition switch

15          plaintiffs, who assert claims arising from other

16          defects."

17          And then, it goes on from there, and -- skipping a

18 little bit, it says, without factual findings relevant to

19 determining knowledge, we have no basis for deciding whether

20 notice was adequate, let alone whether enforcement of the sale

21 order would violate procedural due process as to those claims.

22          Then, the next paragraph:

23          "To conclude, we reverse the bankruptcy court's

24          decision insofar as it enforced the sale order to

25          enjoin claims relating to the ignition switch

1          defect."

2          And then, I'll leave something out.  And then, it

3   says as to -- this is on Page 66:  "As to claims based in

4   non-ignition switch defects, we vacate the bankruptcy court's

5   decision to enjoin those claims" -- I'll leave the cite out --

6   "and remand for further proceedings consistent with this

7   opinion."

8          So, you know, when the mandate issues, I suppose

9   that's what I'm being told.  And what I -- well, you'll take

10  whatever further appellate steps you think is appropriate, but

11  what I want to happen, Mr. Steinberg, is not just -- I think

12  before people run off starting pleadings, you need to meet and

13  confer with the non-ignition switch plaintiffs and see whether

14  you can resolve issues about the effect -- let's assume that

15  the mandate issues -- whether you're able to resolve issues.  I

16  mean, the opinion addresses whether the sale order covers

17  independent claims.  It concludes it doesn't.  And I heard

18  argument the last go-around about what are alleged independent

19  claims or not.  And so what I think needs to happen is you need

20  to confer with the plaintiffs in those cases and to see to what

21  extent you're able to consensually resolve any issues.  I want

22  to hear from other counsel on one of the issues.

23         It does seem to me in light of what I read at Page 65

24  is there's going to be an issue whether there needs to be

25  discovery with respect to Old GM's knowledge about non-ignition

13

1  switch defects, and you need to proactively discuss with the

2  plaintiffs' counsel whether you can reach an agreement on what,

3  if any.  Your position may be no discovery.  Their position may

4  be, yes, we need discovery, but you need to -- when you come

5  back, when everybody comes back here, I want to know that there

6  had been a discussion about what, if any, discovery of Old GM's

7  knowledge or New GM's knowledge about non-ignition switch

8  defects.  I don't know, for example, maybe it was in papers, I

9  didn't see it, whether there have been any recalls by New GM of

10  -- for any of the alleged non-ignition switch defects, and I

11  would assume that that -- if there were, you know, that will,

12  no doubt, spur discussion or discovery about who knew what and

13  when.

14          So I guess what I'm telling you, Mr. Steinberg, I

15  think that before you just tell the plaintiffs if they think

16  there's some pleading they want to file, go ahead and file it,

17  I'm directing that in light of the Second Circuit's opinion,

18  you know, if you want to wait until the mandate issues, you'll

19  do that, but I'm not sure that you ought to do that.  I think

20  you just ought to start talking now.  And when the mandate

21  issues, that's when I want you all coming back here.  It may --

22  when did you say the next date was, August what, 4th?

23          MR. STEINBERG:  August 5th.

24          THE COURT:  5th.

25          MR. STEINBERG:  August 5th.

14

1          THE COURT:  Yeah.  I get back from vacation the day

2  before that hearing, and I think we're going to need to -- you

3  know, this has now become a more complicated set of issues that

4  I've got to deal with, and I think some more time may be

5  needed.  Certainly, if there are going to be additional

6  pleadings, you ought to try and reach an agreement on a

7  schedule for each side filing additional pleadings.  But that's

8  -- let me hear from other counsel.

9          Go ahead, Mr. Steinberg.

10          MR. STEINBERG:  I have two other issues that I want

11  to --

12          THE COURT:  And I have some other questions, but for

13  now --

14          MR. STEINBERG:  -- you know --

15          THE COURT:  -- go ahead.

16          MR. STEINBERG:  One is that -- to put it on the table

17  -- and Your Honor heard some of this argument before on the

18  June motions to enforce with the colloquy that I had with

19  Mr. Steel, which is for the non-ignition switch plaintiffs that

20  the Second Circuit is referring to and whether it's what I call

21  the Gary Peller represented clients or whether it's a much

22  broader group.  And we have specific arguments, including the

23  footnote that's in the Second Circuit opinion, to argue that

24  what the Second Circuit was talking about there was only what

25  would have been appealed in front of the Second Circuit, which

1  were Gary Peller type clients and not for --

2          THE COURT:  Yeah.  And, you know, sometimes,

3  Mr. Steinberg, the law of the circuit, whether the parties are

4  before the court or not and whether it's binding on other

5  parties, it may be persuasive as to that.  There may be law of

6  the circuit as to them.  So I'm not making any decisions about

7  it, but whether there are non-ignition switch defect cases that

8  were not before the circuit, after the last hearing, you did

9  send me the transcript from the Second Circuit argument, which

10 I reviewed, and there was some brief mention of non-ignition

11 switch plaintiffs in there.

12         MR. STEINBERG:  The other thing, Your Honor, I just

13 want to say, without trying to argue the point is that that, I

14 think, is actually a point that will need to be fleshed out.

15 And there is Supreme Court precedent that says that if an order

16 was final, then the fact that that party had the opportunity to

17 and did not raise a due process violation means that they

18 cannot do it now because the concept of finality trumps that.

19 And so we would like the ability to brief that issue to Your

20 Honor in the context of trying to frame what it is that we

21 think is before Your Honor.

22         The second thing is that the Second Circuit clearly

23 was not dealing with post-closing accident cases in the context

24 of that appeal.  And there was a separate proceeding that took

25 place after the April decision and the June judgment, which led

16

1  to the November decision and the December judgment.  And there,

2  there was only a very limited appeal of Judge Gerber's ruling,

3  where he had made specific rulings about non-ignition switch

4  plaintiffs, about their ability to assert independent claims.

5  The appeal on that is before Judge Furman and was stayed

6  subject to the ruling in the Second Circuit.  So one of the

7  issues that we will also want to be able to brief to somebody,

8  I'm not sure exactly which court, is what is the impact of the

9  fact that there was a December judgment dealing with these

10  issues that have not been appealed and that was subsequent to

11  the decision which didn't relate specifically to post-closing

12  accidents, what is the impact of those events in the context of

13  this case.  And I think we need to be able to flesh that, as

14  well.  Now, it may be that through the meet and confer process,

15  we'll talk about how that should be done, but I wanted to be

16  able to flag to Your Honor that those are two issues that we

17  have been thinking about in the context of the Second Circuit

18  decision.

19        THE COURT:  Yeah.  And I guess you'll have to address

20  this because to the extent that you're arguing there was no

21  appeal and the judgment's final, you know, Rule 9024

22  incorporates Rule 60, and 60(b)(4), the judgment is void.

23  That's, you know, under 60(c), timing and the effect of the

24  motion.  For reasons under (1), (2), and (3), there's a

25  one-year time limit, but not if the judgment's void.  So I

17

1  don't know.  I'm not making any --

2          MR. STEINBERG:  Right.

3          THE COURT:  I'm just -- you know, it gets

4  complicated, Mr. Steinberg.

5          MR. STEINBERG:  And then, Your Honor, the purpose of

6  the status conference was, one, to -- for me to be educated

7  both by Your Honor and to see what the plaintiffs are doing.

8  Everybody has got their parts --

9          THE COURT:  Right.

10          MR. STEINBERG:  -- and no one's applying them as of

11  yet, and Your Honor wants to have an organized procedure.

12          THE COURT:  I do.  And I want -- on this issue of the

13  organized procedure, I don't want -- I really don't want to get

14  all these motions seriatim.  I'd like the parties to agree on a

15  schedule that will get the range of issues -- if you say Peller

16  clients did appeal and if you acknowledge whatever effect comes

17  from that as to others who didn't appeal, it may raise this

18  question under Rule 60(b) as to whether they can still

19  challenge it now.  I'd like to get those -- the full -- so I'm

20  seeing the whole range of issues at one time.

21          MR. STEINBERG:  And one final comment.  Your Honor

22  has witnessed, from the motions to enforce and the response, is

23  that when we tried to do this first with Judge Gerber, we tried

24  to have an organized procedure.  We tried to make it binding on

25  all parties.  We tried to make it so that when the judge ruled,

1   it would be binding across the board.  In the context about

2   trying to enforce what Judge Gerber had ruled, we were getting

3   responses that said, I didn't know I was a party, I didn't --

4   it wasn't clear enough, I don't think the procedure was right,

5   I don't think -- it should have been done in a different way.

6   And we, like you, want to avoid any of those arguments

7   afterwards, which is that when Your Honor ultimately decides

8   whatever issues are presented to Your Honor, it is binding

9   across the board so that everybody knows what the rights are

10   going forward.  Thank you.

11         THE COURT:  All right.  Let me hear from other

12   counsel.

13         MR. WEINTRAUB:  Good morning, Your Honor.  William

14   Weintraub of Goodwin Procter for the pre-closing ignition

15   switch accident plaintiffs and for, in the first motions to

16   enforce, Tibbetts, Chapman, and Fox.

17         Your Honor, our understanding, my understanding of

18   what happened earlier this morning was that with respect to

19   Tibbetts and Chapman, the issue of independent claims and

20   punitive damages that could be asserted in connection with that

21   was carried forward, and -- to see what happened at the Second

22   Circuit.  Our view of what happened --

23         THE COURT:  Happened faster than I thought it was,

24   but, you know, you --

25         MR. WEINTRAUB:  Your Honor, I was at home preparing

1  for a trial on something else, and I got the phone call.  It

2  really destroyed my day, but in a good way.

3         So our understanding was that this was held in

4  abeyance pending what the Second Circuit was going to do.  Our

5  reading of what the Second Circuit did is unequivocal, and it

6  said that the court did not have the power to bar independent

7  claims against New GM for its own post-sale conduct.  And, Your

8  Honor, the portion of the opinion that you were focused on

9  today, Page 65, we believe was dealing with the successful

10  liability issue and not with the independent claim issue.

11         THE COURT:  Well, yeah, I've got those pages marked,

12  too, where I -- I've certainly read the point about what

13  they've said about independent claims.  You know,

14  Mr. Weintraub, I think when you were here last time, and one of

15  the issues that may be an issue as we go forward, it looked to

16  me that -- perhaps not your clients, I don't know -- but some

17  of the plaintiffs were trying to bootstrap and independent

18  claims argument by really challenging conduct of Old GM.  And

19  we had a colloquy about, you know, whether knowledge could be

20  imputed, et cetera.  I'm not going to go through that now.

21         So, I mean, some of the issue about independent

22  claims, I don't know -- I mean, if they're truly independent

23  claims, I thought Judge Gerber said they could go forward.  I'm

24  not sure anything changed about that.  Certainly, the Second

25  Circuit's opinion, he didn't get reversed on that part.  I mean

20

1  --

2          MR. WEINTRAUB:  Exactly.

3          THE COURT:  Okay.

4          MR. WEINTRAUB:  So -- and --

5          THE COURT:  But the question is what are independent

6  claims.

7          MR. WEINTRAUB:  Exactly.

8          THE COURT:  And if you're trying to bootstrap

9  so-called independent claims by improperly raising Old GM

10  conduct, that's a separate issue, but --

11          MR. WEINTRAUB:  I understand, Your Honor.  We think

12  that the Second Circuit defined independent claims at Page 40.

13  And I think the colloquy that you and I had last time was once

14  GM -- New GM is aware of information or knowledge acquired from

15  Old GM, our view is, and we think that Judge Gerber will agree

16  with us, that becomes New GM knowledge.  And then --

17          THE COURT:  Well, let's -- we'll see about that.

18  We'll see about that.  The Second Circuit opinion, Judge

19  Gerber's opinion, has very long recitations about the facts

20  specifically relating to the ignition switch defect and what

21  knowledge Old GM had at various times and what people were

22  saying within Old GM about it.  So don't tell me that that

23  automatically means that anybody with a non-ignition switch

24  defect gets the benefit of imputation.  None of that -- there

25  is no factual record on which to base that at this point.

1          MR. WEINTRAUB:  And I would disagree with that, Your

2    Honor.  My point is a slightly different point.

3          THE COURT:  Okay.

4          MR. WEINTRAUB:  It's not an imputation point.  The

5    point is once the knowledge is in your files or in the minds of

6    the people that have transferred from Old GM to New GM and you

7    become aware of it, then it becomes your knowledge.

8          THE COURT:  I don't believe the opinion is saying

9    what you just said.

10          MR. WEINTRAUB:  I understand, Your Honor.  That will

11    be something for a later day.

12          With respect to some of the other things that

13    Mr. Steinberg said, we were here last time, and we briefed and

14    we raised the due process issues, which we believe are

15    different due process issues than the due process issues

16    addressed in the four threshold issues.  There, the due process

17    was, was Old GM aware of or should it have been aware of the

18    ignition switch defect and should it have been disclosed.  When

19    we're dealing with these motions to enforce, we're dealing with

20    post-closing accident claims.  So the issue there is did people

21    who were not yet injured or not yet had accidents and New GM

22    who was not yet in existent, did the Court have the authority

23    to prospectively release New GM from actions it hadn't taken

24    yet with respect to independent claims.  We think that's a

25    different due process issue, and we don't think that that due

1  process issue was either properly set up in connection with the

2  September 23 scheduling order.

3        And as we talked about at the last hearing, we

4  thought and we contended that the letters that were sent to

5  people were misleading because it said independent claims are

6  allowed, and they all thought, well, that's right, independent

7  claims are allowed.  So our position is that there was nothing

8  that compelled people to appear at the November briefings, and

9  there was nothing that warned those people that due process

10  rights may be forever foreclosed and independent claims issues

11  may be ever foreclosed.  Understand, now that we're all aware

12  of this going forward, the next time we do this, it'll be done

13  more carefully, but our position is that what happened last

14  time didn't bar the plaintiffs who are defending themselves.

15        THE COURT:  And Mr. Weintraub, after you confer with

16  Mr. Steinberg and others representing New GM and see what -- in

17  terms of procedures, if there are going to be discovery issues,

18  you'll discuss that.  All of it's going to come back to me at

19  one hearing, so I have the full range of issues that are being

20  raised as to what's barred by the sale order, what's not barred

21  by the sale order.

22        MR. WEINTRAUB:  Thank you, Your Honor.  And I think

23  just one last point.  Your Honor, so there are no surprises,

24  the Court may recall that it entered a stipulation and order

25  with respect to the Fox plaintiffs.  I'm told -- and this will

1  have to be verified in a transcript -- that that stipulation

2  may have been violated at a hearing in the non-bankruptcy

3  court, and they would be bringing that to your attention, Your

4  Honor.

5          THE COURT:  Okay.

6          MR. WEINTRAUB:  Thank you, Your Honor.

7          THE COURT:  Mr. Weisfelner.

8          MR. WEISFELNER:  Your Honor, for the record, Ed

9  Weisfelner, Brown Rudnick, together with Sander -- not Sandra,

10  Sander Esserman.  We are designated counsel for the ignition

11  switch plaintiffs.

12          Your Honor, I just want to advise the Court and the

13  other parties that consistent with the Second Circuit ruling

14  with regard to vacatur of the equitable mootness --

15          THE COURT:  That's what I have a question about.  Go

16  ahead.

17          MR. WEISFELNER:  -- issue, we will work as best we

18  can with the GUC Trust and the GUC unit holders, but we do

19  intend to seek relief from this Court for authority to file

20  late proofs of claim.

21          THE COURT:  Can I ask you -- at Page 17 of the

22  opinion, the Second Circuit Judge Chin said the sale agreement

23  also imposes an accordion feature to ensure the GUC Trust would

24  remain adequately funded.  In the event that the amount of

25  unsecured claims grew too large, the accordion feature provided

24

1    that if the bankruptcy court makes the finding that the

2    estimated aggregate allowed general unsecured claims against

3    Old GM's estate exceeded $35 billion, then New GM will issue

4    ten million additional shares of common stock to Old GM.  This

5    is Page 17.  I take it those additional shares never did issue.

6           MR. WEISFELNER:  Correct.  As best as I can recall,

7    in terms of round numbers, the aggregate amount of allowed

8    claims against the GUC Trust is some $32 billion.  So the

9    trigger for the accordion feature never occurred.  And by the

10   way, I think it's a sliding scale.  In other words, once you

11   hit 35, you don't get all of the stock, you get the stock on a

12   sliding scale up to the maximum amount.

13          THE COURT:  I take it that's what this is about in

14   part, Mr. Weisfelner.

15          MR. WEISFELNER:  Well, there's two things.  Number

16   one, it's a question of would the claims that the ignition

17   switch plaintiffs have --

18          THE COURT:  Would they have been claims.

19          MR. WEISFELNER:  -- were they to have been claims and

20   were the Court ultimately to allow those claims to be filed,

21   would they ultimately trigger the $35 billion threshold amount,

22   how far above the 35 billion would you go, and how much of the

23   so-called accordion feature would be available.

24          Now, not that they need anyone to speak for them, but

25   I assume that the GUC Trust would say, well, even assuming all

25

1  that's true, it leaves open the question of what happens to the

2  accordion value, who does it go to.  Our position would be,

3  well, given that you've already distributed somewhere between

4  75 and 90 percent of all of the value you ever had, and if you

5  assume that we should have been in line on day one, that in a

6  minimum, in order to make up the shortfall of not having been

7  around when 75 to 90 percent of your trust was distributed, we

8  are to get priority, if not the exclusive right, to the

9  accordion feature.  That's another set of issues.

10         Frankly, there is yet again a set of issues.  My

11  understanding is that the GUC Trust currently has something

12  less than $500 million still available, and this issue came up

13  before Judge Gerber in another context, but the question is we

14  understood the GUC Trust to be in a position to want to

15  distribute most of that remaining value on or about November of

16  this year.  We're going to want to talk to the GUC Trust about

17  whether or not it's still their intention to move forward, and

18  if so, some procedure to bring issues relating to that

19  intention before the Court.  We're going to try and do it in a

20  coordinated, consolidated way so you don't get seriatim filings

21  and pleadings in this regard.

22         I should also mention, because they're here, the

23  avoidance action trust.  To the extent that there is a recovery

24  for the benefit of that trust, since it all relates back to the

25  original beneficiaries of timely filed proofs of claim, that

26

1  the ignition switch plaintiffs may very well have rights with

2  regard to any recovery, and we will be talking to Wilmington

3  and counsel for that trust in an effort to, again, try and

4  bring the procedural context to the floor in a way that makes

5  sense to the Court.

6          THE COURT:  I'm not -- I'm going to ask a question.

7  I have no idea whether -- what -- so what's the current value

8  of ten million GM shares?  I guess you really wouldn't know

9  what currently has been issued.  Is there some estimate of what

10 the value of --

11         MR. WEISFELNER:  The way I remember it is again you

12 have a sliding scale.  If we were to establish $10 billion

13 worth of damages, you would trigger the accordion and you'd get

14 to the maximum amount of value that that accordion could

15 derive, and the number, if I recall, is just under a billion

16 dollars' worth of GM stock value.  Now, it ratchets down if you

17 go, you know, a lower amount of claims.

18         THE COURT:  Okay.  Thanks, Mr. Weisfelner.

19         MR. WEISFELNER:  Thank you, Judge.

20         THE COURT:  Anybody else want to be heard?

21 Mr. Flaxer?

22         Steinberg, you'll get your chance.

23         Mr. Flaxer?

24         Mr. FLAXER:  Morning, Your Honor.  Jonathan Flaxer of

25 Golenbock, Eiseman, Assor, Bell & Peskoe on behalf of the

1  Groman plaintiffs.  I'm here with my co-counsel, Alex Schmidt,

2  Wolf Haldenstein.  I just wanted to observe that we have a

3  pending adversary proceeding, and to the extent the designated

4  counsel and we, in discussions, decide that that would be a

5  good vehicle to use to pursue a late claim, we're happy to do

6  that.  If they have another way to do it, we're willing to

7  basically speak with them and figure out what to do with that

8  pending adversary proceeding.

9            THE COURT:  Okay.  Thanks, Mr. Flaxer.

10            Anybody -- before Mr. Steinberg gets up, anybody else

11  wish to be heard?

12            All right, Mr. Steinberg, go ahead.

13            MR. MARKOWITZ:  Your Honor?

14            THE COURT:  Oh, wait.  Yes, go ahead.  Who's on the

15  phone?

16            MR. MARKOWITZ:  Joshua Markowitz on behalf of Brianna

17  Minard.

18            THE COURT:  I'm sorry, just say it again, please.

19            MR. MARKOWITZ:  Sure.  Joshua Markowitz on behalf of

20  Brianna Minard.

21            THE COURT:  Okay, go ahead.

22            MR. MARKOWITZ:  Yes, Your Honor.  I -- hearing that

23  we're talking about setting a schedule going forward, I'm

24  confused and concerned that two groups are getting lumped

25  together, and I want to make sure they're kept separate, and

1  that's the post-sale accident plaintiffs and those non-ignition

2  switch plaintiffs who haven't had an accident or are just

3  seeking economic damages.  And I think what the Second Circuit

4  opinion makes clear is for the post-sale accident, based upon

5  independent claims, there is no due process requirement.  We

6  don't have to show that Old GM or New GM knew of us and should

7  have told us about the bankruptcy because they say the sale

8  order simply doesn't affect those groups of people.

9          So Your Honor's talking about discovery into GM

10 knowledge.  Old GM's knowledge is relevant to the post-sale

11 accident independent parties merely to show they had knowledge

12 and they continue to have that knowledge as New GM, and then it

13 becomes an issue of state court law as to whether that

14 knowledge, along with New GM's post-sale conduct, imposed a

15 duty to the injured person.  And the November decision by Judge

16 Gerber makes it clear that's not for a bankruptcy court to

17 decide.  That's for a state court to decide.

18         So GM can make the argument that, hey, they're not

19 really being punished -- they're not really -- the liability

20 isn't based on New GM's conduct, it's really based on Old GM's

21 conduct, but that's an issue of state law.  Under California

22 law, does the fact that they acquired the good will, they

23 continued to build the vehicles, they continued to inform the

24 public about the safety of those vehicles, did that create a

25 duty, and that's not something that's appropriate for the

29

1  bankruptcy court.  I think those should go to the state court.

2  So what I do want to make sure is when you get --

3          THE COURT:  You can argue what you want, but you're

4  going to do it in a pleading before me and not on the

5  telephone.

6          MR. MARKOWITZ:  Okay, Your Honor.

7          THE COURT:  Just bear with me a second,

8  Mr. Steinberg.

9          MR. MARKOWITZ:  Then, that's all I have.

10          THE COURT:  Anybody else on the phone who wants to be

11  heard?

12          All right.  I just want to find something,

13  Mr. Steinberg, okay?

14          Mr. ESSERMAN:  Your Honor, this is Sandy Esserman.  I

15  just wanted to enter an appearance.  That's all.

16          THE COURT:  Okay, Mr. Esserman, thank you.

17          I can't find -- I saw some reference that Judge

18  Furman entered a ruling with respect to --

19          MR. STEINBERG:  I have that on my list.

20          THE COURT:  -- economic loss.  Could you enlighten me

21  about that?

22          MR. STEINBERG:  Sure.  Last week, and I can't

23  remember whether it was Wednesday or Thursday, Judge Furman

24  entered a decision in connection with the third motion to -- in

25  connection with a motion to dismiss, and I guess the reason is

30

1    because my workday didn't end on the weekend.  The motion -- he

2    entered a decision with regard to New GM vehicles, so it didn't

3    involve Old GM vehicles, but the issue that he was -- rendered

4    a lengthy decision had significant impact up to the theory of

5    damages that had been asserted by the lead counsel in the MDL

6    with regard to the New GM vehicles.  But that was the same

7    theory of damages that they had also asserted in connection

8    with Old GM vehicles before Judge Gerber had ruled.  So Judge

9    Furman's decision -- and if Your Honor -- if it's easier for

10   Your Honor, we can easily send that to Your Honor's chambers.

11            THE COURT:  I would appreciate it.

12            MR. STEINBERG:  Okay.  So we will do that this

13   afternoon.  So people are digesting that decision from Friday.

14   It was a lengthy decision, as well, too.  It has major

15   ramifications with regard to the ability to have class status.

16            THE COURT:  I guess the ABI newsroom had it on one of

17   their -- that's where I saw it this morning.

18            MR. STEINBERG:  So that was another thing.  And, Your

19   Honor, just to be complete, as well, too, we will send you -- I

20   don't know if there's going to be a transcript for this

21   afternoon's conference with Judge Furman.  If there is one,

22   then we will send you that transcript, as well.  I just don't

23   know -- I assume he's going to record it, and if he is, we'll

24   share that then and we'll CC the lead counsel so they know

25   that's what we're communicating.

31

1          THE COURT:  Yeah.  I haven't -- I may reach out to

2    talk to Judge Furman directly.  I'll probably wait until after

3    he has his conference this afternoon, but you know, whether

4    he'll want to talk to me about it or not, I don't know.  We've

5    only had -- after the <u>Motors Liquidation</u> matters were

6    reassigned to me, Judge Furman and I had a brief conversation

7    way back, but have not spoken since.  I don't talk substance

8    with other judges, but in terms of understanding the procedural

9    context of what he's got and what I've got, I may well reach

10   out to talk to him.

11         MR. STEINBERG:  I think anybody in the courtroom will

12   correct me if I'm wrong, but I'm pretty sure that both Judge

13   Furman and Judge Gerber have disclosed that they have had

14   discussions before, as well, so --

15         THE COURT:  I'm aware that they --

16         MR. STEINBERG:  -- it would be not uncommon.

17         THE COURT:  No, I'm aware that they did, and what I

18   usually try to do is if I speak with another judge who's got

19   parallel proceedings, at a next hearing, I'll usually just very

20   briefly give a summary of it.  Not chapter and verse, but just

21   briefly that I spoke to Judge So-and-So and generally we

22   discussed the following.  So I try to make it transparent as to

23   what I've done, but I'm just alerting you today that I may well

24   reach out until after he has his -- I wasn't aware there was a

25   hearing this afternoon, so I'll wait certainly until after that

 1  occurs.

 2          MR. STEINBERG:  The two other points, Your Honor, is

 3  that Mr. Markowitz, just to connect the dots, represents

 4  Minard, who is one of the people who objected on the second

 5  motion to enforce.  And so whatever he was saying as to the

 6  basis of how to interpret the Second Circuit ruling was the

 7  kind of thing that I had said that at some point in time after

 8  a meet of confer, if he thought that the Second Circuit had

 9  given him another argument or a different argument, he would

10  have the opportunity to do that, and we would have the

11  opportunity to respond.  And I've been reluctant to try to say

12  every time someone has tried to suggest how the Second Circuit

13  opinion affected what happened to immediately say why I

14  disagree.

15          THE COURT:  Right.

16          MR. STEINBERG:  But recognize that we do have a

17  position and we will want to present it, and we do think it's

18  important to do it on papers with everybody participating so

19  that when Your Honor rules, you will rule -- if you rule in our

20  favor, it will be binding on everyone, and if you rule against

21  us, I know it was going to be collateral estoppel against us

22  anyway, but at least I want to have the benefit of affirmative

23  collateral estoppel.

24          THE COURT:  Just on that point, you know, I know from

25  your prior argument on the motion to enforce, Mr. Weintraub's

33

1   argument that, well, people didn't really know they had to

2   appear, they weren't given proper notice of that, the letters

3   were vague or -- I'm not faulting either side on it, but it

4   really is important if you want to bind people that they

5   receive proper notice, they know exactly what's coming up.  And

6   I do -- I may sound like a broken record on this.  Because

7   there are, you know, there are differences between different

8   groups of plaintiffs and what their arguments are, and I'm

9   obviously much newer to this than Judge Gerber was, when I

10  rule, I want to try and make sure I'm seeing how all of these

11  pieces arguably fit together so I don't enter a ruling and then

12  somebody else comes in with a motion two weeks later with some

13  different set of facts.  So to the extent possible, I'd like a

14  schedule that gets as much as possible before me at the same

15  hearing with people having an opportunity to brief and stuff.

16          It may be, Mr. Steinberg, that you'll resolve some

17  issues with some parties.  You know, for example, on issues of

18  non-ignition switch plaintiffs are raising due process

19  arguments, your position is they may not be entitled to

20  discovery.  Their position is they may not need discovery.

21  Their position is we want discovery.  I want that addressed.

22  And so if parties are agreeing as to what discovery will be

23  permitted and what time period in which that will occur, you

24  know, I want that.  So before the hearing is going to get

25  scheduled, to the extent things can be covered by agreement,

34

1  that will be a status letter ahead of time that reflects what

2  are agreements, if there are proposed stipulations, that

3  they're before me so I can try and deal with as much of it as

4  possible.

5          MR. STEINBERG:  So Your Honor understands, that is

6  clearly the goal.  And so Your Honor understands some of the

7  difficulties in meeting the goal, as reflected from the history

8  of the last proceeding, is my recollection was -- and I could

9  be off by this, but after we had the September 3 status

10  conference and before Judge Gerber ruled, there may have been

11  another hundred cases that have been filed so that people seem

12  to file it not with regard -- without regard to whether they

13  should or they shouldn't, but we're dealing with a moving

14  target, and we'll try to --

15          THE COURT:  People may want to wait until the Court

16  rules and then go ahead and say, well, we weren't before you

17  and --

18          MR. STEINBERG:  Right.  The final thing --

19          THE COURT:  It's not unknown.

20          MR. STEINBERG:  The final thing -- and Your Honor may

21  have further questions or not, but the final thing I just

22  wanted to mention is that Mr. Weisfelner mentioned the

23  accordion feature, the ability to file a late-filed claim, and

24  we'll see whatever the papers are and we'll see whatever those

25  discussions are.  The only thing I would like to say is that

1 obviously New GM is potentially financially impacted by

2 whatever happens, and we consider ourselves a party in

3 interest.  And so either they will include us as part of the

4 discussions or we will be before Your Honor in connection with

5 any type of resolution that is had to the extent that we

6 believe it affects New GM's rights.

7        THE COURT:  Yeah.  I mean, you know, when I read the

8 Second Circuit opinion, this provision on Page 17 about the

9 accordion feature wasn't then linked when the Court vacated the

10 equitable mootness decision, but it did click with me that that

11 seemed to me to be an important set of issues, so --

12        MR. STEINBERG:  And for whatever it's worth, the

13 passage that you read, which said the accordion feature was

14 done so that the trust would need to be funded, that wasn't the

15 purpose of an accordion feature.  I think -- whatever it is,

16 our belief is that the Second Circuit got it wrong.  The

17 accordion feature was to reflect the fact that going into the

18 sale, no one really knew the magnitude of the claims in the

19 case, and therefore they created a flexible purchase price to

20 the extent that it turned out after the claims resolution

21 process, which was a post-sale process, that it exceeded a

22 certain threshold, that instead of being a pure pot plan, they

23 would increase the consideration to take effect to how it

24 resolved the sale, right.

25        THE COURT:  You're saying that wouldn't apply if

36

1  relief to file late claims was granted and $7 billion -- just a

2  hypothetical number of late claims were filed and it brought

3  you over the trigger for the accordion?  I'm not saying that's

4  happening, but I just --

5          MR. STEINBERG:  But I don't think our position is

6  that the accordion -- that that would not apply, but I think

7  that there are defenses with regard to the accordion feature

8  that we would present to Your Honor, and there are

9  ramifications for seeking relief against Old GM, which we will

10 present to Your Honor on papers at the appropriate time, but

11 clearly, clearly if they had timely filed a proof of claim and

12 that had taken it over the $35 billion threshold, then that

13 would have triggered the accordion feature.

14         There are issues that Judge Gerber had to grapple

15 with, which Your Honor may be familiar with, which is whether

16 there was a strategic decision not to file claims and that

17 there was a concession made that they --

18         THE COURT:  Well, maybe they didn't think there was

19 going to be enough money to pay them.  I don't know, but --

20         MR. STEINBERG:  Well, whatever it is, whatever it is,

21 there are ramifications upon actions which may have impact as

22 to whether the accordion is triggered.  But I just wanted to

23 explain to Your Honor that the accordion feature was a

24 flexibility in the purchase price that was supposed to be paid

25 in the event that the claims resolved greater than a certain

37

1  amount, and it had nothing to do with funding the GUC Trust.

2  The GUC Trust was essentially funded by the billion one that

3  was set aside in cash as part of the cash consideration.

4      THE COURT:  There was 10 percent of the stock that

5  was part of the --

6      MR. STEINBERG:  Yeah, but there was a cash

7  consideration.

8      THE COURT:  I understand that, but there was also 10

9  percent of the stock.

10     MR. STEINBERG:  I agree.  I agree with that, but I

11 think people were -- when they were negotiating the cash

12 consideration, instead of touching the stock, they wanted to

13 make sure there was enough cash to administer.  And whether

14 that's turned out or not, they always had the ability to rely

15 on the stock, but it wasn't a funding issue.

16     THE COURT:  It may be even premature to raise this,

17 but you know, when I read the opinion several times already and

18 saw the thing about the accordion feature and saw the vacating

19 the equitable mootness decision, then was going to ask some

20 questions about it today.  You know, it does strike me,

21 Mr. Steinberg, that -- I'm not -- obviously, the cases that are

22 before Judge Furman, they're before him, they're not before me,

23 but one thing that strikes me is there may be new issues to

24 talk about in mediation if -- put it this way, if New GM's

25 going to pay one way or the other, it might be better to find a

38

1   consensual resolution.  And it won't be before me, you know, at

2   this stage.  I don't get involved in settlement discussions,

3   but, you know, it may be appropriate at some point to resume a

4   mediation to see whether you can short circuit a lot of issues

5   that might otherwise have to be dealt with.  But I just --

6   that's something to just kind of throw out.

7            MR. STEINBERG:  I don't think Mr. Weisfelner has been

8   shy in saying if I can't go through one door, there's a

9   possibility that I can go through another door.

10            THE COURT:  Well, I've never seen Mr. Weisfelner

11   being shy, so --

12            MR. STEINBERG:  Anyway, Your Honor --

13            THE COURT:  Not to stand, I guess, but --

14            MR. STEINBERG:  Your Honor, so we will do our best to

15   have a meet and confer.  We will just -- Your Honor knows there

16   -- in the MDL, there's a structure about how to bring other

17   plaintiffs and state courts involved.  We will try to push as

18   much as we can to make sure that those people are brought in to

19   the extent that lead counsel believes they need to be brought

20   in so they will buy into a process.

21            We will try to work with your chambers, not with

22   regard to the August 5th date, but to try to get a new date

23   that pushes it back a little bit further.  I do think for

24   purposes of today, we may have gone as far as we can go, and I

25   think we need to actually now engage the other side --

1          THE COURT:  You do.

2          MR. STEINBERG:  -- instead of staring at each.

3          THE COURT:  You do.  And I -- you know, engage the

4   other side doesn't mean just filing briefs.  It does mean

5   actually engaging and talking and see what -- okay, all right.

6          MR. STEINBERG:  Thank you.

7          THE COURT:  All right.  Ms. Weisfelner?

8          MR. WEISFELNER:  Your Honor, just to make sure the

9   record is clear, and I may not be shy, but I hope I'm always

10  reserved.

11         THE COURT:  Well --

12         MR. WEISFELNER:  I said I hope.

13         THE COURT:  Hope springs eternal, Mr. Weisfelner.

14         MR. WEISFELNER:  Springs eternal.  Your Honor, I

15  think, made reference to mediation.  You have to be aware that,

16  to my knowledge, certainly not at the bankruptcy court level

17  and I doubt at the MDL level, has there been any mediation

18  effort to date, but just so that the -- Your Honor's clear.

19         THE COURT:  Wait, Mr. Steinberg, wait, wait, wait.

20         MR. WEISFELNER:  With regard to the late claims, and

21  I appreciate Mr. Steinberg's desire to be involved, and I know

22  he knows how to get involved, and my guess is that his position

23  will get heard in one forum or another, but the procedure under

24  the GUC Trust for the allowance of claims puts the GUC Trust in

25  a position of either allowing, disallowing, or objecting to

40

1   claims and doesn't put GM, even though it's its stock that's

2   the subject of the accordion feature, in the position of a

3   normal debtor-in-possession who objects to claims.  But

4   obviously, he's not shy nor resolved about stating his

5   position.

6         THE COURT:  And you're not shy, and so the two of you

7   ought to be talking to each other, okay.

8         MR. WEISFELNER:  And we will.

9         THE COURT:  All right.  Mr. Steinberg.

10        MR. STEINBERG:  Just one thing, and maybe

11  Mr. Weisfelner wasn't aware of it, in the MDL proceeding, there

12  is a magistrate that's been appointed that is, in essence, a

13  settlement type judge, and there's been ongoing discussions.

14        THE COURT:  Who is that?

15        MR. STEINBERG:  We would -- we'll supply it.  I just

16  remember.  It's a magistrate that Judge Furman appointed.

17  There's been ongoing discussions.  There's been ongoing

18  settlements of individual cases going on throughout the MDL.

19  So -- but that doesn't mean that there -- at some point in

20  time, there shouldn't be a broader effort to figure out how to

21  resolve these issues, but that clearly involves people way

22  beyond -- other than me, other decisions to be made, and I'm

23  not prepared to go further.  I just wanted to point that to

24  Your Honor, that there was a mechanism and a structure that is

25  going on in the district court now.

1          THE COURT:  Sure.  And I would fully expect that.

2  You know, those are individual cases, and you know, cases

3  settle, don't settle, reaches decisions, whatever.  I -- you

4  know, just from reading 360 Bankruptcy, I mean, I know that

5  with 360Law [sic] that cases have settled or are dismissed or

6  whatever.  But let's leave it at that.

7          MR. STEINBERG:  But Judge Furman's agenda that he

8  sets for each of these bimonthly now conferences, the last item

9  on every one of those agendas for more than a year has been

10 settlement possibilities discussions.  So the issue hasn't been

11 lost on the MDL court, and the issue is not lost on me that

12 Your Honor has alluded to that in the context of today's

13 conference.  Thank you.

14         THE COURT:  Okay, thank you.

15         All right.  Anybody else wish to be heard?  Anybody

16 on the telephone?

17         MR. MARKOWITZ:  Your Honor, Josh --

18         THE COURT:  Go ahead.  Start -- and I didn't hear

19 your name, please.

20         MR. MARKOWITZ:  I'm Joshua Markowitz --

21         THE COURT:  Yes, Mr. Markowitz?

22         MR. MARKOWITZ:  -- on behalf of Brianna Minard.  Just

23 wanted a clarification because obviously there are ongoing

24 state proceedings.  We have a motion to amend currently before

25 the state court, and I just wanted to -- are we enjoined from

42

1  doing that.  You know, obviously, if there was a trial, that

2  might be a problem, but --

3      THE COURT:  Mr. Markowitz, I think things are

4  actually fairly simple.  If there's an injunction in place, it

5  remains in place.  If -- I'm not entering any order vacating

6  injunctions or issuing injunctions.  Whatever the existing

7  orders provide, they still provide it.  Obviously, the Second

8  Circuit ruling is an important ruling.  If you go ahead and

9  violate an injunction, there are consequences for violating an

10  injunction.  If you want to vacate an injunction, you're going

11  to have to follow my directive that I want all of this brought

12  before me at one hearing where all of the contestants are

13  before me with briefs.  So I'm not vacating injunctions or

14  entering injunctions.  Whatever the existing situation is, it

15  remains that.

16      Okay.  We're adjourned.  Thanks very much, everybody.

17      (Proceedings concluded at 11:01 a.m.)

18                      * * * * *

19

20

21

22

23

24

25

43

**C E R T I F I C A T I O N**

I, Alicia Jarrett, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

ALICIA JARRETT, AAERT NO. 428      DATE:  July 19, 2016

ACCESS TRANSCRIPTS, LLC

**C E R T I F I C A T I O N**

I, Lisa Luciano, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

LISA LUCIANO, AAERT NO. 327      DATE:  July 19, 2016

ACCESS TRANSCRIPTS, LLC