Hearing Date and Time: August 5, 2016 at 10:00 a.m. (Eastern Time)

Kristopher M. Hansen
Daniel A. Ross
Christopher M. Guhin
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038-4982
Telephone: (212) 806-5400

*Attorneys for Davidson Kempner Capital Management LP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, f/k/a | : | Case No. 09-50026 (MG) |
| GENERAL MOTORS CORPORATION, *et al.,* | : | |
| | : | Joint Administration Pending |
| Debtors. | : | |
| | : | |
| OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS OF MOTORS LIQUIDATION | : | |
| COMPANY, *et al.*, | : | Adv. P. No. 11-09406 (MG) |
| | : | |
| Plaintiff, | : | |
| | : | |
| - against - | : | |
| | : | |
| UNITED STATED DEPARTMENT OF THE | : | |
| TREASURY and EXPORT DEVELOPMENT | : | |
| CANADA, | : | |
| | : | |
| Defendants. | : | |

**OBJECTION OF DAVIDSON KEMPNER CAPITAL MANAGEMENT LP TO THE
MOTION OF MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST
AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF (A)
STIPULATION AND AGREED ORDER (I) SETTLING DISPUTED ENTITLEMENTS
OF DEBTOR-IN-POSSESSION LENDERS AND OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO POTENTIAL TERM LOAN AVOIDANCE ACTION
PROCEEDS AND (II) MODIFYING AVOIDANCE ACTION TRUST AGREEMENT TO
IMPLEMENT SETTLEMENT, AND (B) ORDER (I) APPROVING SETTLEMENT OF
THE ALLOCATION DISPUTE, (II) APPROVING AMENDMENTS TO THE
AVOIDANCE ACTION TRUST AGREEMENT, AND (III) AUTHORIZING THE
<u>AVOIDANCE ACTION TRUST TO GRANT A LIEN TO THE DIP LENDERS</u>**

**Table of Contents**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

THE ALLOCATION DISPUTE............................................................................................... 7

THE ALTERNATE SOURCE OF FUNDING ...................................................................... 10

THE STANDARD OF REVIEW OF THE PROPOSED SETTLEMENT ................................ 11

CONCLUSION.......................................................................................................... 16

09-50026-mg    Doc 13704    Filed 07/29/16    Entered 07/29/16 14:46:20    Main Document
    Pg 3 of 19


# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ............................................................................ 11

*In re Imperial Tooling and Manufacturing, Inc.*,
    314 B.R. 340 (Bankr. N.D. Tex. 2004) ........................................................................... 13

*In re Ionosphere Clubs, Inc.*,
    156 B.R. 414 (S.D.N.Y 1993.), *aff'd* 17 F.3d 600 (2d Cir. 1994) ................................... 13

*In re Iridium Operation LLC*,
    478 F.3d 452 (2d Cir. 2007) ........................................................................................... 13

*In re Motors Liquidation Co.*,
    460 B.R. 603 (Bankr. S.D.N.Y. 2011) .............................................................................. 7

*Nellis v. Shugrue*,
    165 B.R. 115 (S.D.N.Y. 1994) .................................................................................. 11, 13

*Official Committee of Unsecured Creditors of Motors Liquidation Co. v.*
    *JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*,
    777 F.3d 100 (2d Cir. 2015) ............................................................................................. 3

*In re Planned Protective Services, Inc.*,
    130 B.R. 94 (Bankr. C.D. Cal. 1991) ............................................................................. 13

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.*
    *Anderson*, 390 U.S. 414 (1968) ..................................................................................... 11

*In re Remsen Partners, Ltd.*,
    294 B.R. 557 (Bankr. S.D.N.Y. 2003) ...................................................................... 13, 14

*In re Spielfogel*,
    211 B.R. 133 (Bankr. E.D.N.Y. 1997) ...................................................................... 12, 13

*U.S. Dep't of Treasury v. Official Comm. of Unsecured Creditors of Motors*
    *Liquidation Co.*, 475 B.R. 347 (S.D.N.Y. 2012) ................................................. 7, 12, 15

*In re W.T. Grant Co.*,
    699 F.2d 599 (2d Cir. 1982) ........................................................................................... 13

TO: **THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Davidson Kempner Capital Management LP (together with its affiliated investment funds, "Davidson Kempner"), a holder of general unsecured claims of the above-captioned Debtors and a beneficiary of the Avoidance Action Trust,[1] by and through its undersigned counsel, hereby respectfully objects to the *Joint Motion of Motors Liquidation Company Avoidance Action Trust and Official Committee of Unsecured Creditors for Entry of (A) Stipulation and Agreed Order (I) Settling Disputed Entitlements of Debtor-In-Possession Lenders and Official Committee of Unsecured Creditors to Potential Term Loan Avoidance Action Proceeds and (II) Modifying Avoidance Action Trust Agreement to Implement Settlement, and (B) Order (I) Approving Settlement of the Allocation Dispute, (II) Approving Amendments to the Avoidance Action Trust Agreement, and (III) Authorizing the Avoidance Action Trust to Grant a Lien to the DIP Lenders* [Dkt. No. 13688] (the "**Joint Motion**").[2] In respect of its objection, Davidson Kempner respectfully sets forth as follows:

**PRELIMINARY STATEMENT**

1. On June 23, 2016, the Committee and the Avoidance Action Trust Administrator (the "**Administrator**") asked this Court to approve a contract with a Private Funder that would provide up to $15 million in financing to facilitate further litigation of the Term Loan Avoidance Action. [Dkt. No. 13650] (the "**Initial Motion**"). Despite the risk of litigation with the Private Funder created by the Administrator's potential breach of the Private Litigation Funding

---

[1] For purposes of full disclosure, Davidson Kempner would participate in the Private Funding to the extent approved by this Court.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Joint Motion.

-1-

Agreement, the Committee and the Administrator now ask this Court to ignore the Initial Motion and instead approve a source of funding that would be far more expensive and drain far more resources from the Avoidance Action Trust, to the detriment of the Avoidance Action Trust's rightful beneficiaries, the Debtors' general unsecured creditors. This is not an issue of whether the Term Loan Avoidance Action will be funded; the only question presented herein is if it is in any way reasonable to obtain that funding at the cost of potentially hundreds of millions of dollars to the Avoidance Action Trust beneficiaries. As explained below, the price the Committee is inexplicably willing to pay for the DIP Lenders' loan – 30% of any recovery in the Allocation Dispute – is well beyond the range of reasonableness, and the Joint Motion must therefore be denied.

2.      In a well-reasoned and thorough decision in the Allocation Dispute, Judge Gerber determined that "(i) the DIP Lenders were not entitled to any proceeds of the Term Loan Avoidance Action and had no interests in the Avoidance Action Trust, and (ii) the holders of Allowed General Unsecured Claims had the exclusive right to receive any and all proceeds of the Term Loan Avoidance Action, and are the exclusive beneficiaries of the Avoidance Action Trust." Joint Motion ¶ 18. While Judge Gerber's Decision and Order was vacated on appeal, the District Court (McMahon, J.) did so based only on subject-matter jurisdiction and not on the merits of the dispute and actually noted during oral argument that she found the Committee's argument on the merits (which tracked Judge Gerber's findings) persuasive.

3.      Notwithstanding this background, the Committee and the Administrator now ask this Court to bless a settlement of the Allocation Dispute that would give the DIP Lenders a windfall in the amount of 30% of any recovery in the Term Loan Avoidance Action – an amount that could far exceed the limited litigation risk faced by the Committee with respect to the

Allocation Dispute, particularly since $1.5 billion plus interest is being sought in the Term Loan Avoidance Action, and the Second Circuit has already ruled in favor of the Avoidance Action Trust on the key issue in the case. *See Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 777 F.3d 100 (2d Cir. 2015).

4. As of March 2012, the DIP Lenders were owed approximately $849 million. Br. of Appellant, *U.S. Dep't of Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co.*, No. 12-cv-00695-CM (S.D.N.Y. May 4, 2012), Docket No. 7 at 5. As shown in the chart below, under the Litigation Cost Advance Agreement, the DIP Lenders could receive as much as $445.5 million pursuant to the proposed settlement of the Allocation Dispute, ***which is more than half*** of the total amount the DIP Lenders could recover if they had prevailed in the Allocation Dispute instead of losing the dispute before Judge Gerber.

| DIP Lenders' Fees/Recovery - Litigation Cost Advance Agreement | | | |
|---|---|---|---|
| **Term Loan Avoidance Action Recovery** | **Amount Lent / Advanced by DIP Lenders** | **Recovery After Repayment of Advance/Loan** | **30% Share of Recovery Paid to DIP Lenders** |
| $100,000,000 | ($15,000,000) | $85,000,000 | **$25,500,000** |
| $200,000,000 | ($15,000,000) | $185,000,000 | **$55,500,000** |
| $300,000,000 | ($15,000,000) | $285,000,000 | **$85,500,000** |
| $400,000,000 | ($15,000,000) | $385,000,000 | **$115,500,000** |
| $500,000,000 | ($15,000,000) | $485,000,000 | **$145,500,000** |
| $600,000,000 | ($15,000,000) | $585,000,000 | **$175,500,000** |
| $700,000,000 | ($15,000,000) | $685,000,000 | **$205,500,000** |
| $800,000,000 | ($15,000,000) | $785,000,000 | **$235,500,000** |
| $900,000,000 | ($15,000,000) | $885,000,000 | **$265,500,000** |
| $1,000,000,000 | ($15,000,000) | $985,000,000 | **$295,500,000** |
| $1,100,000,000 | ($15,000,000) | $1,085,000,000 | **$325,500,000** |
| $1,200,000,000 | ($15,000,000) | $1,185,000,000 | **$355,500,000** |
| $1,300,000,000 | ($15,000,000) | $1,285,000,000 | **$385,500,000** |
| $1,400,000,000 | ($15,000,000) | $1,385,000,000 | **$415,500,000** |
| $1,500,000,000 | ($15,000,000) | $1,485,000,000 | **$445,500,000** |

5.       While the Committee and the Administrator point out that the settlement also includes $15 million in financing for the Term Loan Avoidance Action, such financing was already available from the Private Funder on far less onerous terms.  The Private Funder agreed to provide the same $15 million in financing, repayable only if there were a recovery in the Term Loan Avoidance Action, with repayment capped at the greater of 4.75% of any recovery or 2.25 times the amount owed.

6.       The Committee and the Administrator try to argue that the $15 million would be provided by the DIP Lenders without any interest or associated fees, but that is simply not true.  Were the settlement of the Allocation Dispute and the financing with the DIP Lender separated from one another such that each could be independently approved, the Committee and the Administrator would be correct.  However, there is no chance that the DIP Lender would agree to provide an interest-free loan if the Court could separately reject the proposed settlement of the Allocation Dispute.  In fact, as is acknowledged in the Joint Motion, the advance of the $15 million by the DIP Lenders is ***conditioned on*** the Committee and the Administrator agreeing to pay the DIP Lenders 30% of proceeds from the Term Loan Avoidance Action – a sum that far exceeds the limited 4.75% recovery pursuant to the financing from the Private Funder.

-4-

7.     The dramatic difference between the two loan proposals is reflected in the chart below, which compares, at various recovery amounts: (a) the 30% of recoveries that would be received by the DIP Lender under the Litigation Cost Advance Agreement; and (b) the fees/recovery that would have been received under the Private Litigation Funding Agreement.

| Comparison of Fees/Recovery | | | |
|---|---|---|---|
| **Term Loan Avoidance Action Recovery** | **DIP Lenders' Fees/Recovery Under Litigation Cost Advance Agreement** | **Private Funder's Fees/Recovery Under Private Litigation Funding Agreement** | **Harm to Trust From Litigation Cost Advance Agreement** |
| $100,000,000 | $25,500,000 | $18,750,000 | **($6,750,000)** |
| $200,000,000 | $55,500,000 | $18,750,000 | **($36,750,000)** |
| $300,000,000 | $85,500,000 | $18,750,000 | **($66,750,000)** |
| $400,000,000 | $115,500,000 | $18,750,000 | **($96,750,000)** |
| $500,000,000 | $145,500,000 | $18,750,000 | **($126,750,000)** |
| $600,000,000 | $175,500,000 | $18,750,000 | **($156,750,000)** |
| $700,000,000 | $205,500,000 | $18,750,000 | **($186,750,000)** |
| $800,000,000 | $235,500,000 | $23,000,000 | **($212,500,000)** |
| $900,000,000 | $265,500,000 | $27,750,000 | **($237,750,000)** |
| $1,000,000,000 | $295,500,000 | $32,500,000 | **($263,000,000)** |
| $1,100,000,000 | $325,500,000 | $37,250,000 | **($288,250,000)** |
| $1,200,000,000 | $355,500,000 | $42,000,000 | **($313,500,000)** |
| $1,300,000,000 | $385,500,000 | $46,750,000 | **($338,750,000)** |
| $1,400,000,000 | $415,500,000 | $51,500,000 | **($364,000,000)** |
| $1,500,000,000 | $445,500,000 | $56,250,000 | **($389,250,000)** |

Far from being a strings-free "advance" of funds, the terms of the Litigation Cost Advance Agreement potentially leave the Avoidance Action Trust (and hence, the beneficiaries of the Avoidance Action Trust) worse off by up to hundreds of millions of dollars, with the only benefit being that the DIP Lenders would agree to settle the Allocation Dispute, even though those claims have already been decided in the Committee's favor.

8.     The reason why the chart above shows such a wide variety of potential recovery amounts is that the Committee and the Avoidance Action Trust are settling this matter without

clearly understanding the quantum of what they are giving up. Neither the Avoidance Action Trust nor the Committee have set forth their opinion on the amount of potential distributions that could accrete to holders of general unsecured claims as a result of the successful litigation of the Allocation Dispute. In essence, the Committee and Avoidance Action Trust propose to give up 30% of general unsecured recoveries without making an informed decision on what that amount may actually be. Indeed, the Joint Motion is bereft of any analysis whatsoever.

9.      If the potential recovery in the Term Loan Avoidance Action is too difficult to quantify at this point, then the obvious question is why are the Committee and the Administrator intent on settling the Allocation Dispute now, rather than after there is greater clarity on likely recoveries in the Term Loan Avoidance Action. Nor would settling the Allocation Dispute now speed up any recovery to the general unsecured creditors, which will only occur upon a resolution of the Term Loan Avoidance Action. Further, by reason of Judge McMahon's ruling, the Allocation Dispute is effectively on hold until resolution of the Term Loan Avoidance Action, so its continuance would not cost the Avoidance Action Trust anything. Judge McMahon clearly ruled that this Court did not have jurisdiction over the Allocation Dispute because there was no justiciable case or controversy. As such the Court should not even engage in a determination of whether the proposed settlement is appropriate until such time as there is a justiciable case to settle.

10.     To the extent this Court has the authority to rule on the Joint Motion, the ultimate legal analysis herein is simple: To justify the proposed settlement, the Committee must convince this Court that it bears a substantial enough risk of losing a re-litigation of the Allocation Dispute (which it already won) to justify giving up 30% of general unsecured creditors' recoveries in the Term Loan Avoidance Action and potentially agreeing to give the DIP Lenders a windfall of

more than 50% of what they were owed.  Because the Administrator and the Committee cannot meet this burden, the Joint Motion should be denied.

## THE ALLOCATION DISPUTE

11.  As set forth in the Joint Motion, on June 6, 2011 the Committee commenced the Allocation Dispute by service of a complaint seeking a declaratory judgment that the DIP Lenders were not entitled to the proceeds of the Term Loan Avoidance Action, and that only the holders of general unsecured claims (the beneficiaries of the Avoidance Action Trust) were entitled to those proceeds.  On July 22, 2011, without taking any discovery (because it was not necessary), the Committee filed a motion for summary judgment.  On August 5, 2011 the DIP Lenders filed a motion to dismiss on the grounds that there was no present case or controversy to decide.  On September 9, 2011 the DIP Lenders filed a cross-motion for summary judgment addressing the merits of the dispute.  After service of reply briefs, Judge Gerber heard argument on October 24, 2011, and issued a 48-page Bench Decision on November 28, 2011.  *In re Motors Liquidation Co.*, 460 B.R. 603 (Bankr. S.D.N.Y. 2011) (the "**Decision**"), *vacated sub nom. U.S. Dep't of Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co.*, 475 B.R. 347 (S.D.N.Y. 2012).  The Allocation Dispute was thus resolved on the merits, on papers only, in less than six months.

12.  In the Decision, Judge Gerber reviewed the procedural and drafting history of the various DIP Loans and DIP Orders entered between June 1, 2009 and July 5, 2009.  *See In re Motors Liquidation Co.*, 460 B.R. at 609-15.  However, it is only the final version of the last of those orders, the Wind-Down Financing Order, dated as of July 5, 2009 [Docket No. 2969], and the Wind-Down Borrowing Agreement dated as of July 10, 2009, which govern the Allocation Dispute.  *See id.*

13. In making its determination, the Court focused on the Sixth and Tenth Decretal paragraphs of the Wind-Down Financing Order. The Sixth Decretal paragraph granted the DIP Lenders a super-priority administrative expense claim, while the Tenth Decretal paragraph provided that the DIP financing was "nonrecourse" only, and could be satisfied only out of "Collateral." "Collateral," in turn, was defined in relevant part in the Wind-Down Borrowing Agreement as "all property and assets of every kind or type whatsoever, . . . including avoidance actions . . . *except avoidance actions against the Prepetition Senior Facilities Secured Parties*." *Id.* at 615 (italics in original).

14. Judge Gerber relied upon "traditional canons of construction" to address the "apparent inconsistency" between the Sixth and Tenth Decretal paragraphs. *Id.* at 623. In particular, Judge Gerber held that the specific exclusion of the Term Loan Avoidance Action from Collateral, and the equally explicit characterization of the DIP Loans as "nonrecourse," demonstrate a clear intent to exclude the DIP Lenders from sharing in the recoveries, if any, of the Term Loan Avoidance Action. *Id.* at 622-23.

15. Further bolstering this interpretation, Judge Gerber observed the change of the DIP Loans to "nonrecourse" occurred only in the very last, and operative, Order addressing DIP financing, signaling a clear intent that the pre-existing super-priority administrative expense claim was being cut back to not include the proceeds of what became the Term Loan Avoidance Action. *Id.* at 623-28. Judge Gerber, who presided over the evolving scope of the DIP financing over the one month period in question, found that the sequence described above "make[s] the intent of the parties quite clear." *Id.* at 628.

-8-

16. Judge Gerber further held that it would be "absurd" to rule that the Committee would have "gone to all of the trouble to request the nonrecourse provisions in the Tenth Decretal Paragraph . . . all to the end that the revision would be useless." *Id.* at 629-630.

17. Judge Gerber's analysis and holding is persuasive, and likely would be followed by whatever court (or courts, if there were an appeal) is called upon to review the same documents and decide the same issues. Indeed, the Committee agrees that Judge Gerber reached the right result (Joint Motion ¶ 41) and does not adequately explain how it came to the conclusion that it should nevertheless settle the Allocation Dispute in a manner which could cost the beneficiaries of the Avoidance Action Trust hundreds of millions of dollars.

18. The DIP Lenders appealed to the District Court (McMahon, J.), which dismissed the proceeding without prejudice on the grounds that, because the Term Loan Avoidance Action was still in progress, there was no present case or controversy concerning the allocation of proceeds, if any, from that Action. There is no indication, in the transcript of that oral argument or elsewhere, that Judge McMahon in any way disagreed with Judge Gerber's analysis as to the implications of the governing contractual provisions. In fact, Judge McMahon's comments during oral argument suggested that she read the Tenth Decretal paragraph to support the Committee's position:

> The tenth decretal paragraph talks about the actual loans that give rise to my super-priority claim and that are collateralized with the property on which I have liens. And that paragraph says those loans are nonrecourse loans. Right? Well, I know what a nonrecourse loan is, folks. And I did not have to go to law school to know what a nonrecourse loan is. A nonrecourse loan is a loan in which the lender says I've loaned you money and I agree that I will not look to something or other. I will not have recourse to something or other to repay that loan. And as far as I can see, the tenth decretal paragraph says that the loans that give rise to my super-priority administrative claim will be nonrecourse loans such that the DIP lenders', [sic] me [sic], recourse shall be only to the

> collateral. And the only way I, the nonbankruptcy contract-construer, can see to make sense out of every word in this wind-down order, giving effect to its language and meaning to every clause, is that the DIP lenders have a super-priority claim for repayment of a nonrecourse loan. And they have explicitly agreed that it's a nonrecourse loan. And therefore, they have explicitly agreed that they will look only to the collateral for repayment of that loan.

Tr. of Oral Argument, *U.S. Dep't of Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co.*, No. 12-cv-00695-CM (S.D.N.Y. May 4, 2012), Docket No. 12 at 12:3-25.

19. In summary, there is every reason to believe that the Allocation Dispute would ultimately be resolved exactly the way it was the last time – in the Committee's favor.

### THE ALTERNATIVE SOURCE OF FUNDING

20. The Administrator's attempt to terminate the Private Litigation Funding Agreement calls into question its business judgement. As reflected in the charts above and as further set forth in the Initial Motion, the Committee and the Administrator had already agreed to far less onerous funding terms in the Private Litigation Funding Agreement. Pursuant to the Private Funding Litigation Agreement, the Private Funder agreed to provide the same $15 million in financing, repayable only if there were a recovery in the Term Loan Avoidance Action, with repayment capped at the greater of 4.75% of any recovery or 2.25 times the amount owed (rather than 30% of any recovery, as provided for in the Litigation Cost Advance Agreement). To escape its obligations to perform and/or pay damages to the Private Funder under the Private Funding Litigation Agreement, the Administrator must show that the funding it would now receive from the DIP Lenders is "on terms materially more favorable to the Trust than those provided by the Investors under this [Private Litigation Funding] Agreement." Initial Motion, Ex. B § 1.1 at 6.

-10-

21.     As noted above, the loan proposed by the Private Funder is clearly less expensive than the loan proposed by the DIP Lenders.  As such, the funding from the DIP Lenders is on terms *materially less favorable* to the Avoidance Action Trust, so the standard set forth in the Private Litigation Funding Agreement cannot possibly be met.  As a result, the Administrator's attempt to exercise its termination rights has caused the Private Funder to object to the Motion and contest the Administrator's actions.  It is quite possible that the Administrator's actions may lead to (a) separate legal action by the Private Funder against the Administrator and Avoidance Action Trust and (b) potential liability for breach of the contractual obligations to the Private Funder.  Fighting with the Private Funder and risking further expense is nonsensical.[3]

## THE STANDARD OF REVIEW OF THE PROPOSED SETTLEMENT

22.     While "settlements are favored," (*Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994)), and should be approved so long as the settlement is superior to the "lowest point in the range of reasonableness," (*In re Chemtura Corp.*, 439 B.R. 561, 593 (Bankr. S.D.N.Y. 2010)), "a bankruptcy court must make an independent determination when approving a settlement" and "cannot accept the [proponent's] word that the settlement is reasonable" (*Nellis v. Shugrue*, 165 B.R. at 122).  To determine whether a compromise is fair and equitable, a bankruptcy court must use its "informed and independent judgment" and "appraise[] himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).  Inherent in a bankruptcy court's decision-making process "is the need to compare the terms of the compromise with the likely rewards of litigation." *Id.*

---

[3]     The Avoidance Action Trust should not be charged for any fees and expenses incurred by the Committee and the Administrator (and their professionals) in connection with the negotiation of the Private Litigation Funding Agreement, filing the Initial Motion and litigating with the Private Funder over the termination of the agreement.

-11-

"The bankruptcy court should also consider the paramount interest of the creditors and give proper deference to their reasonable views." *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997) (denying 9019 motion after finding that the trustee did not adequately investigate the value of the estate's interest in the litigation) (citations omitted).

23.     As an initial matter, this Court should not decide a matter that the District Court specifically found not to be a justiciable case or controversy. On July 3, 2012, Judge McMahon determined that "[t]here is no case or controversy in the constitutional sense to decide; the action is not ripe." *See U.S. Dep't of Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co.*, 475 B.R. at 366. In essence, there is no present case or controversy between the DIP Lenders and the Avoidance Action Trust to settle because there has been no resolution of the Term Loan Avoidance Action. Bankruptcy Rule 9019 should not provide a back door to allow an effective adjudication, through settlement, of an action that the District Court told this Court does not yet exist and over which it has no constitutional authority. When combined with the clear weakness of the DIP Lenders' position on the merits, and the availability of more favorable litigation funding terms from the Private Funder, adjudication via settlement of a non-existent dispute, there is no justification for the Committee and the Administrator to settle the Allocation Dispute at this time.[4]

24.     However, assuming *arguendo* that this Court does have authority to rule on this issue, it is patently unreasonable for a party in the possession of a well-reasoned decision in its favor to then settle that matter at 30% of a recovery (or potentially at more than 50% of the

---

[4]     The only issue that should be brought before the Court at this time is a request to approve financing, not a settlement combined with a financing, so that the Avoidance Action Trust can continue the underlying litigation. As noted above, the DIP Lenders are free to propose financing to the Avoidance Action Trust and the trust is free to accept it, but it must be on terms that are materially more favorable to the trust than the terms of the Private Funding.

-12-

underlying amount owed to the DIP Lenders) without any other facts that would demonstrate the emergent need to enter into a settlement. This is especially the case where, as here, the Decision was not based upon a determination of an unsettled area of the law, the question of the settling defendant's ability to satisfy a judgment is irrelevant, and general unsecured creditors, who have waited five years for a recovery already, would not be prejudiced by waiting for a final decision on the underlying dispute, since any distribution will only occur upon a final resolution of the Term Loan Avoidance Action.

25.  The cases cited by the Administrator and the Committee in the Joint Motion are inapplicable to the facts here. These cases involved claims or actions that were, at best, in the early stages of litigation, with the expectation that it would take years and extensive proceedings to even reach a resolution on the merits. *See* Joint Motion ¶¶ 38-40.[5] In those cases, reliance on the judgment of counsel supporting the settlement was arguably more necessary than here, where the issue comes down to a determination of how likely it is that Judge Gerber's holding will be followed by another court reviewing the exact same record. *See, e.g., In re Remsen Partners, Ltd.*, 294 B.R. 557 (Bankr. S.D.N.Y. 2003); *see also In re Spielfogel*, 211 B.R. 133, 146-47 (Bankr. E.D.N.Y. 1997); *In re Imperial Tooling and Manufacturing, Inc.*, 314 B.R. 340 (Bankr. N.D. Tex. 2004) (denying 9019 motion where consideration offered in settlement of estate claims was inadequate); *In re Planned Protective Services, Inc.*, 130 B.R. 94 (Bankr. C.D. Cal. 1991) (same).

---

[5] *See e.g. In re Ionosphere Clubs, Inc.*, 156 B.R. 414 (S.D.N.Y 1993.), *aff'd* 17 F.3d 600 (2d Cir. 1994); *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1982); *In re Iridium Operation LLC*, 478 F.3d 452 (2d Cir. 2007), *Nellis v. Shugrue*, 165 B.R. 115 (S.D.N.Y. 1994). In *In re Chemtura Corp.*, 699 F.2d 599 (Bankr. S.D.N.Y. 2010), the court approved a settlement where the issue came down to determination of the proper treatment of post-petition make-whole payments and no-call provisions, at a time when the law was unsettled but was trending in favor of the bondholders (*i.e.*, they were likely to win), and where the bondholders settled at 42% or 38% of their claims (depending on the issuance).

26.     This case is more analogous to *In re Remsen Partners, Ltd.*, 294 B.R. 557, where the Court denied a motion under Rule 9019 to settle, for $68,000, a post-petition claim that, with interest, could have led to a recovery of as much as $390,000. In rejecting the settlement, the Court observed that "the court may not simply rubber stamp the recommendation of a trustee or debtor in possession, but, instead, must make an independent, full and fair assessment of the wisdom of the proposed compromise." 294 B.R. at 565 (citation and internal quotation marks omitted). After a careful analysis of the proposed compromise in *Remsen*, the Court found that it fell "at or below the floor that [the debtor] could expect to recover." *Id.* at 570. Crucial to the Court's determination was the fact that the debtor had already successfully pursued a similar pre-petition claim against the defendant. *Id.* While the defendant arguably had some defenses that could result in its prevailing in the post-petition action in spite of its earlier loss, the Court analyzed each of those defenses and found them not likely to prevail. *Id.* Further, as here, there was no concern that the defendant could not pay a judgment if the debtor prevailed. *Id.* Accordingly, the Court held that "this is the rare case in which the Court cannot approve a proposed compromise, notwithstanding the fundamental role that settlements generally play in bankruptcy cases." *Id.* at 571.

27.     Here, the terms of the settlement proposed in the Joint Motion are significantly more unreasonable than the terms of the settlement in *Remsen*, because the exact issue, and not just a similar issue, has already been decided in the Committee's favor. The DIP Lenders have no new defenses to the Allocation Dispute; instead, they would be forced to rely on the exact same arguments that Judge Gerber, persuasively and at length, rejected, and that the District Court cast skepticism on during oral argument. Nor would a new litigation of the Allocation Dispute be expensive. The Decision was reached on cross-motions for summary judgment,

without the need for discovery, and relied upon publicly-filed documents and well-understood principles of contract construction. The issues raised in the Allocation Dispute have already been thoroughly briefed twice – first, in the cross motions for summary judgment submitted to Judge Gerber in 2011, and second in the appeal before Judge McMahon in 2012. There have been no changes in the facts or the law since that earlier round of briefing. Nor is it likely that resolution of the issues a second time will, in contrast to the original proceedings in the Allocation Dispute, require any additional discovery or a lengthy hearing.

28.     Indeed, at the argument on the appeal before Judge McMahon, counsel for the DIP Lenders represented as follows: "All parties agreed there is simply no parol evidence that will shed light on this . . . we could depose people until the cows come home. Nobody believes that discovery would actually provide an answer to the very specific question here, which is what this deal means and is the super-priority limited by the nonrecourse language." Tr. of Oral Argument, *U.S. Dep't of Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co.*, No. 12-cv-00695-CM (S.D.N.Y. May 4, 2012), Docket No. 12 at 54:18-55:5. Judge McMahon also recognized the ease at which this matter could be re-litigated. In her decision, Judge McMahon specifically suggested that the parties could stipulate to an expedited procedure, in which the Decision would be deemed to be a final decision and order in a new declaratory judgment action, which would allow for an immediate appeal to the District Court. *See U.S. Dep't of Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co.*, 47 B.R. at 367. Judge McMahon further implied that an appeal before her could be done without any further briefing or argument. *See id.*("If such an appeal materializes, I will pull out my extensive notes and immediately get down to work on an opinion on the merits."). The limited cost of re-litigating the Allocation Dispute on similar papers would be easily dwarfed by the

more onerous terms of the proposed Litigation Cost Advance Agreement, which may result in the Avoidance Action Trust paying hundreds of millions of dollars more in Trust funds to the DIP Lenders than the Private Funder would have received under the Private Litigation Funding Agreement.

29. It is clear that the Administrator and the Committee have failed to adequately assess the costs of the intertwined loan and settlement from the DIP Lenders, and approval of the Joint Motion would only result in a windfall to the DIP Lenders to the detriment of all beneficiaries of the Avoidance Action Trust. As such, the Joint Motion should be denied.

## CONCLUSION

WHEREFORE, Davidson Kempner respectfully requests that the Court deny the Joint Motion in its entirety.

Dated: New York, New York
July 29, 2016

Respectfully submitted,

STROOCK & STROOCK & LAVAN LLP

By: /s/ Kristopher M. Hansen
Kristopher M. Hansen
Daniel A. Ross
Christopher M. Guhin
180 Maiden Lane
New York, New York 10038-4982
Telephone: (212) 806-5400

*Attorneys for Davidson Kempner Capital Management LP*

-16-