**Hearing Date and Time: August 10, 2016 at 2:00 p.m. (ET)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>MOTORS LIQUIDATION COMPANY,<br>f/k/a General Motors Corporation, *et al.*,<br><br>Debtor. | Chapter 11 Case No. 09-50026 (MG)<br>(Jointly Administered) |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS<br>OF MOTORS LIQUIDATION COMPANY, *et al.*,<br><br>Plaintiff,<br><br>- against -<br><br>UNITED STATES DEPARTMENT OF THE TREASURY<br>and EXPORT DEVELOPMENT CANADA,<br><br>Defendants. | Adv. P. No. 11-09406 (MG) |

**UNITED STATES' STATEMENT IN RESPONSE TO OBJECTION TO JOINT MOTION OF MLC AVOIDANCE ACTION TRUST AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF STIPULATION AND AGREED ORDER SETTLING DISPUTED ENTITLEMENTS OF DEBTOR-IN-POSSESSION LENDERS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND RELATED RELIEF**

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel. No.: (212) 637-2739
Fax No.: (212) 637-2730
*Attorney for United States Department of the Treasury*

Of Counsel:

DAVID S. JONES
Assistant United States Attorney

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................1

I. BACKGROUND ........................................................................2

    A. Governmental Funding of the Auto Industry Turnaround, and Relevant Terms of Debtor-in-Possession Orders and Agreements ...........................................................3

    B. The Dispute Among the DIP Lenders and the Committee Regarding the Avoidance Action Proceeds ..................................6

    C. The Proceeds Allocation Settlement Agreement ......................................11

II. ARGUMENT ..........................................................................12

    THE COURT SHOULD APPROVE THE SETTLEMENT AGREEMENT BECAUSE IT IS FAIR AND EQUITABLE.......................................12

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# TABLE OF AUTHORITIES

## *Cases*

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010)...................................................... 12

*In re Ionosphere Clubs, Inc.*,
    156 B.R. 414 (S.D.N.Y. 1993) ............................................................ 12

*In re Iridium Operation LLC*,
    478 F.3d 452 (2d Cir. 2007) ............................................................. 12

*In re Remsen Partners, Ltd.*,
    294 B.R. 557 (Bankr. S.D.N.Y. 2003)...................................................... 14

*Mathirampuzha v. Potter*,
    548 F.3d 70 (2d Cir. 2008) .............................................................. 13

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. U.S. Dep't of the Treasury (In re Motors Liquidation Co.)*,
    460 B.R. 603 (Bankr. S.D.N.Y. 2011)................................................... 8, 9

*U.S. Dep't of the Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co. (In re Motors Liquidation Co.)*, 475 B.R. 347 (S.D.N.Y. 2012) .............................................. 11

## PRELIMINARY STATEMENT

The United States of America (the "**United States**"), on behalf of debtor-in-possession

("**DIP**") lender the United States Department of the Treasury ("**Treasury**"), respectfully submits

this statement in response to the Objection of Davidson Kempner Capital Management LP

("**Davidson Kempner**") (Dkt. No. 47 in Adv. P. 11-09406) and the Limited Objection of River

Birch Capital LLC ("**River Birch**") (Dkt. No. 44 in Adv. P. 11-09406) to the joint motion (the

"**Joint Motion**") of the Avoidance Action Trust (the "**AAT**" or "**Trust**") and Official Committee

of Unsecured Creditors (the "**Committee**" or "**UCC**") (Dkt. No. 13688 in Case No. 09-50026),

seeking approval of a stipulation and agreed order (the "**Proceeds Allocation Settlement**

**Agreement**" or "**Settlement Agreement**").  Upon approval, the Settlement Agreement will

resolve a longstanding and significant dispute between the DIP Lenders and the Committee over

entitlement to the proceeds of *Motors Liquidation Co. Avoidance Action Trust v. JPMorgan*

*Chase Bank, N.A.*, Adv. P. No. 09-00504 (MG) (the "**Term Loan Avoidance Action**" or

"**Avoidance Action**"), and, as one term of the settlement, will provide the AAT with no-fee, no-

interest funding to continue the Avoidance Action without depriving Trust beneficiaries of the

substantial share of proceeds that otherwise would be diverted to a third-party litigation funder.

As is explained below, the settlement also eliminates the risk that unsecured creditors now bear

that 100% of Avoidance Action proceeds could eventually be paid solely to the DIP Lenders, and

instead establishes an agreed split of those proceeds that is commensurate with the settling

parties' respective litigation risks.  This agreement is manifestly within the range of

reasonableness. Accordingly, the Settlement Agreement should be approved.

As the Joint Motion demonstrates, the Settlement Agreement resulted from negotiations

that were extended, vigorous, merit-based, and arms'-length, and the resulting settlement is an

entirely reasonable, appropriate resolution of a longstanding and contentious dispute in which

both parties bore significant litigation risk.  Indeed, the proposed resolution is so clearly

appropriate that, out of the thousands of potential objectors, the only objections to be filed come

from the disappointed proponents of alternative litigation financing.  The Limited Objection of

River Birch does not even ask the Court to deny the motion seeking approval of the settlement.

It simply raises the specter of litigation based on the specious assertion that the no-interest, no-

fee litigation cost advance being made available to the AAT is not financially better for the Trust

than River Birch financing that will cost the AAT millions of dollars.  The Objection of

Davidson Kempner, which acknowledges that it has a financial interest in the alternative River

Birch funding proposal, similarly presents no serious reason to reject the Settlement Agreement.

Instead, Davidson Kempner relies on a mischaracterization of the Settlement Agreement and the

litigation cost advance that is one component of it, and radically understates the degree of

litigation risk that the proceeds allocation dispute presents, including by relying heavily on one

comment that in reality was a question posed by the district judge early in an oral argument,

while ignoring the DIP Lenders' powerful responses and the district court's resulting issuance of

an order seeking additional briefing on points raised by the DIP Lenders (one of which was

conceded by the Committee) – thus completely undermining Davidson Kempner's assertion that

the Committee has conceded too much in settling this hotly contested issue.

## I.    BACKGROUND

1.    The Joint Motion extensively describes the background of the Term Loan

Avoidance Action and the dispute between the Committee and the DIP Lenders concerning

whether the DIP Lenders waived any right to be repaid on account of their superpriority

administrative claim from proceeds of the Avoidance Action.  This Statement outlines portions

of the matter's background that explain and support the DIP Lenders' position that the super-priority administrative expense claim granted in the Final DIP Order attaches to any proceeds of the Term Loan Avoidance Action, and, in turn, that relate to the DIP Lenders' view that the Settlement Agreement whose approval is sought by the Joint Motion is indeed fair and reasonable, and should be approved. This Statement does not detail the Term Loan Avoidance Action itself, which is well known to the Court and which is described in the Joint Motion.

A. **Governmental Funding of the Auto Industry Turnaround, and Relevant Terms of Debtor-in-Possession Orders and Agreements**

2.      In 2008 and 2009, Treasury and the Canadian agency Export Development Canada ("**EDC**") took the extraordinary step of providing governmental funding to rescue the then-failing "Old GM," to avoid disastrous consequences for the economy and for the many communities that depended on the auto industry. As a key part of the industry turnaround process, on June 1, 2009, General Motors Corporation and certain of its subsidiaries (the "**Debtors**") filed a voluntary chapter 11 bankruptcy petition in this Court.

3.      The following day, the Court entered an interim order (the "**Interim DIP Order**," Dkt. No. 292 in Case No. 09-50026) approving the Debtors' emergency borrowing of $15 billion of the $33 billion available under the Secured Superpriority Debtor-in-Possession Credit Agreement (Exhibit 1 to Dkt. No. 292) among Treasury and EDC, as lenders (the "**DIP Lenders**"), and General Motors Corporation, as Borrower (the "**DIP Credit Agreement**" and the loans thereunder, the "**DIP Facility**"). Pursuant to the Interim Order and the DIP Credit Agreement, the DIP Lenders were granted (1) a super-priority administrative expense claim (the "**DIP Claim**") for all indebtedness owing by the Debtors to the DIP Lenders under the DIP Facility, with priority over all administrative expenses and unsecured claims against the Debtors, subject only to a carve-out for certain "burial expenses" of the Debtors' estates (the "**Carve-**

3

Out," *see* Interim DIP Order ¶ 5);  and (2) valid, binding and automatically perfected liens (the

"**DIP Liens**") on any and all property and assets of each of the Debtors, excluding certain joint

ventures (the "**Property**," *see* Interim Order ¶ 6, DIP Facility § 3.28).

4.      Also on June 1, 2009, the Debtors filed a motion with the Bankruptcy Court (Dkt.

No. 92) seeking approval of a sale of substantially all of the Debtors' assets to a government-

sponsored purchaser, NGMCO, Inc. (the "**Purchaser**") under section 363 of the Bankruptcy

Code (the "**363 Sale**").  The purchase price for the Debtors' assets included: (i) a Bankruptcy

Code section 363(k) "credit bid" of indebtedness owed to the DIP Lenders; (ii) the issuance by

the Purchaser to the Debtors of at least 10% (and up to 12%) of the common stock of the

Purchaser; (iii) the issuance by the Purchaser to the Debtors of warrants to purchase an additional

15% of the stock of the Purchaser on a fully-diluted basis, and (iv) the assumption of certain of

the Debtors' liabilities.[1]   It was understood that the common stock and the warrants issued

through the 363 Sale (the "New GM Equity Interests") would be set aside for the Debtors'

general unsecured creditors.  The hearing on the 363 Sale was scheduled for June 30, 2009.

5.      On June 25, 2009, the Bankruptcy Court entered a final order (the "**Final DIP**

**Order**," Dkt. No. 2529), approving the DIP Facility in the full amount of $33 billion.  Among

other transactions or payments that occurred at or about this time, a $1.5 billion term loan (the

"**Term Loan**") that JPMorgan Chase Bank N.A. ("**JPMorgan**") and certain syndicate members

(with JPMorgan, the "**Prepetition Term Lenders**") made to the Debtors in November 2006 was

repaid in full.  The Final DIP Order granted the Committee standing to investigate and "bring

actions based upon" so-called Reserved Claims relating to the Prepetition Term Lenders' first

---

[1] *See* Amended and Restated Master Sale and Purchase Agreement by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers, and NGMCO, Inc. as Purchaser, dated as of June 26, 2009, § 3.2(a), (d) (Exhibit A to Dkt. No. 2968); Amended Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan at 29 (Dkt. No. 8023).

priority liens.  *See* Final DIP Order at 25 (¶19(d)).  The Committee ultimately brought such an

action, seeking to recover the $1.5 billion payment to the Prepetition Term Lenders "for the

Debtors' estates."  *See* Complaint (Dkt. No. 1 (July 31, 2009) in Adv. P. 09-00504) for a full

statement of the underlying allegations of fact regarding the Committee's action.

6.      The Final DIP Order reaffirmed the super-priority administrative status of the DIP

Claim, subject only to a "carve-out" not applicable here and certain administrative expenses of

the Debtors' estates.  *See* Final DIP Order ¶ 5.  The Final DIP Order also reaffirmed the DIP

Liens, but added express statements exempting from the DIP Liens (1) any avoidance actions

against the Prepetition Term Lenders and (2) the New GM Equity Interests.  *See id.* ¶ 6.   The

Final DIP Order further stated that nothing in the Final DIP Order, the Interim Order or the DIP

Facility "shall in any way be construed to permit or authorize the DIP Lenders to seek recourse

against the New GM Equity Interests at any time."  Final DIP Order at 16.

7.      On July 5, 2009, the Bankruptcy Court entered an order approving the 363 Sale

(the "**Sale Order**," Dkt. No. 2968).  Among other provisions, the Sale Agreement required the

Sellers to restructure $1.175 billion of the remaining DIP Facility (as restructured, the "**Wind-**

**Down Facility**").  *See* Sale Agreement (Exhibit A to Dkt. No. 2968) § 6.9(b) and annexed

Second Amendment to Sale Agreement at 7.  The Sale Agreement provided that the Wind-Down

Facility should be non-recourse, and should be secured by all assets of the Sellers other than the

New GM Equity Interests.   Sale Agreement § 6.9(b) (requiring a $950 million wind-down

facility); Second Amendment to Sale Agreement at 4 (increasing amount of facility to $1.175

billion).  The remaining $7 billion of indebtedness outstanding under the DIP Facility was

assumed by the Purchaser pursuant to the Sale Agreement.  *See* Sale Agreement § 2.3.

8.      Also on July 5, 2009, the Bankruptcy Court entered an order (the "**Wind-Down**

**Order**," Dkt. No. 2969) authorizing the Debtors to enter into the $1.175 billion Wind-Down

Facility.  The claims and liens granted to the DIP Lenders under the Final DIP Order applied to

the Wind-Down Facility.  *Id.* at 4-5.  In addition, the tenth decretal paragraph of the Wind-Down

Order stated that:

> The Loans (as defined in the Amended DIP Facility) shall be non-recourse to the
> Borrower and the Guarantors, such that the DIP Lenders' recourse under the
> Amended DIP Facility shall be only to the Collateral (as defined in the Amended
> DIP Facility) securing the DIP Loans, and nothing in this Order, the Final DIP
> Order, the DIP Credit Facility or the Amended DIP Facility shall, or shall be
> construed in any way, to authorize or permit the DIP Lenders to seek recourse
> against the New GM Equity Interests at any time.

*Id.* at 6.  The Wind-Down Credit Agreement (Exhibit 1 to Wind-Down Order (Dkt. No. 2969))

defines "Collateral" to exclude avoidance actions against the Prepetition Term Lenders.  Wind-

Down Credit Agreement at 6.

### B.    The Dispute Among the DIP Lenders and the Committee Regarding the Avoidance Action Proceeds

9.    In 2010, the Committee, which before the Plan's confirmation was charged with

prosecuting the Avoidance Action, filed summary judgment papers against JPMorgan that

suggested that the Committee believed the DIP Lenders had waived any right to be repaid by the

estate from proceeds of the Avoidance Action.  On August 26, 2010, Treasury filed a statement

in the Term Loan Avoidance Action, stating that any resolution on the cross-motions for

summary judgment in favor of the Committee should not determine the ultimate distribution of

any funds recovered by the Debtors' estates.  *See* Statement of the United States of America with

Respect to Cross-Motions for Summary Judgment at 2 (Adv. P. No. 09-00504, Dkt. No. 54).  On

August 31, 2010, the Debtors filed their Joint Chapter 11 Plan, which provided for the transfer of

the Term Loan Avoidance Action to an Avoidance Action Trust, and stated that the interests in

the Avoidance Action Trust will be distributed to the DIP Lenders and/or general unsecured

creditors, as determined by mutual agreement of the Committee and the DIP Lenders or by final

order of the Bankruptcy Court. *See* Debtors' Joint Chapter 11 Plan at § 6.5 (Dkt. No. 6829); *see*

*also* Debtors' Second Amended Joint Chapter 11 Plan (Dkt. No. 9836).

10.    On October 4, 2010, the Committee filed a motion in the main bankruptcy case,

seeking entry of an order determining that Treasury had no interest in the Term Loan Avoidance

Action and that the interests in the Avoidance Action Trust should be distributed to unsecured

creditors.[2]  Treasury and EDC opposed the motion, arguing that (i) the motion did not present a

ripe case or controversy because the Term Loan Avoidance Action was still pending in front of

the Bankruptcy Court, and thus the parties could be arguing about how to allocate nothing, and

(ii) although it agreed to exempt the Term Loan Avoidance Action from the Collateral securing

its DIP Liens, nowhere in the Final DIP Order or Wind-Down Order did it exempt the Avoidance

Action proceeds from its separate super-priority DIP Claim.[3]  On October 21, 2010, the

Bankruptcy Court rendered an oral ruling that denied the Committee's motion, without prejudice,

on ripeness grounds.[4]

11.    Subsequently, on June 7, 2011, the Committee filed an adversary proceeding (No.

11-9406) and complaint (Dkt. No. 1) seeking a declaratory judgment that the DIP Lenders are

not entitled to the Avoidance Action proceeds and have no interests in the Avoidance Action

Trust, and the holders of Allowed General Unsecured Claims have the exclusive right to receive

any and all Avoidance Action proceeds.  The Committee asserted that the dispute had become

ripe for resolution because there would be adverse tax consequences if the ultimate beneficiaries

of the Term Loan Avoidance Action were not determined by December 15, 2011. *Id.* ¶ 6.  In its

---

[2] Motion of the Official Committee of Unsecured Creditors of Motors Liquidation Company to Enforce (A) the Final DIP Order, (b) the Wind-Down Order, and (C) the Amended DIP Facility ¶ 28 (Dkt. No. 7226).
[3] United States of America's Opposition to Motion of the Official Committee of Unsecured Creditors of Motors Liquidation Company to Enforce (A) the Final DIP Order, (B) the Wind-Down Order, and (C) the Amended DIP Facility at ¶¶ 3-4, 38 (Dkt. No. 7338).
[4] *See* Disclosure Statement at 32.

complaint, the Committee argued that it was entitled to declaratory relief because (i) the DIP

Lenders released any and all claims that they may have against the Prepetition Term Lenders in

the Final DIP Order, (ii) the DIP Lenders excluded the Avoidance Action proceeds from their

Collateral, (iii) the DIP Lenders limited their recourse on the DIP Claim solely to their

Collateral, and (iv) the DIP Lenders waived any claim to payment of the Avoidance Action

proceeds by failing to disclose their claim as required by the Bankruptcy Court's Guidelines for

Financing Requests.  *E.g., id.* ¶¶ 2, 3.  On July 22, 2011, the Committee filed a Motion for

Summary Judgment, reiterating the arguments and requests set forth in its complaint.  (Dkt. Nos.

9, 11).

12.     On August 5, 2011, Treasury, supported by EDC, filed a Motion to Dismiss the

complaint (Dkt. No. 12), and soon thereafter also cross-moved for summary judgment (Dkt. No.

17), arguing in essence that (i) the dispute between the DIP Lenders and the Committee was still

not ripe, (ii) the Term Loan Avoidance Action and the Avoidance Action proceeds belong to the

Debtors' estates, and not the Committee, (iii) the DIP Lenders remained entitled to payment in

full on their DIP Claim, and (iv) adoption of the Committee's interpretation of the relevant

documents would improperly render the DIP Claim superfluous.  *See generally* Dkt. Nos. 12, 17.

13.     On October 21, 2011, Judge Gerber heard argument on the parties' motions.  On

November 28, 2011, Judge Gerber granted the Committee's Motion for Summary Judgment.  *See*

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. U.S. Dep't of the Treasury*

*(In re Motors Liquidation Co.)*, 460 B.R. 603 (Bankr. S.D.N.Y. 2011).  In his decision, Judge

Gerber rejected the DIP Lenders' argument that the Committee's (and now the Bankruptcy

Court's) interpretation impermissibly rendered the DIP Claim superfluous.  According to the

court, the DIP Claim retained independent significance because it prevented the DIP Lenders

8

from being subject to "cramdown" of a chapter 11 plan under the Bankruptcy Code. *Id.* at 630.

14.     The DIP Lenders appealed the Bankruptcy Court's decision to the District Court for the Southern District of New York (the "District Court"), and the appeals were assigned to Judge McMahon.  On appeal, Treasury argued that nothing in the Wind-Down Order, including the "non-recourse" language on which Judge Gerber relied, limits the DIP Lenders' super-priority DIP Claim with respect to the Avoidance Action proceeds, and that the Bankruptcy Court decision improperly nullified the DIP Claim.  *See* Brief of Appellant United States of America (Case No. 12 Civ. 561, Dkt. No. 7).  Treasury also argued that  when the parties agreed to exclude certain assets from the funds available to pay the DIP Claim, such as the "Carve-Out" and the "New GM Equity Interests," they did so explicitly, and they chose not to do so as to proceeds of the Avoidance Action.  *Id.* at 14.  Finally, Treasury argued that both Judge Gerber's reliance on the evolution of the DIP documents, and Judge Gerber's inference that the addition of the tenth decretal paragraph to the Wind-Down Order served to limit the assets from which the DIP Claim could be repaid, were improper.  *Id.* at 17-22.  EDC also appealed, raising similar and additional arguments.  *See* Case No. 12 Civ. 695.  The Committee opposed, disputed these contentions, and defended Judge Gerber's analysis.  *See* Case No. 12 Civ. 561, Dkt. No. 8.

15.     Although Davidson Kempner cites what it terms "comments" of Judge McMahon from oral argument on the appeal, *see* Objection at 9-10 (quoting transcript reprinted as Joint Motion Exh. F, at 12), those "comments" were posed early in the proceedings, and not as definite or final conclusions, but as propositions that the Court explicitly asked the DIP Lenders to address to assist the Court's consideration of the appeal and, specifically, of the significance of the "non-recourse" term on which Judge Gerber heavily relied.  *See* Joint Motion Exh. F at 13 lines 10-11 (Judge McMahon continuing after passage quoted by Davidson Kempner:  "What's

wrong with this?  What's wrong with my reasoning?  What am I missing?").  And the DIP

Lenders forcefully and at length explained why the "non-recourse" provision was inapplicable to

their super-priority DIP administrative claim, and instead applied solely to their remedies

pursuant to their independent security interests in certain specified collateral, which (unlike the

super-priority provisions) did exclude the Avoidance Action proceeds.  *See, e.g.*, Tr. (Joint

Motion Exh. F) at 16; 18; 22-23; 45 ("the core of this case is that [the Government] advanced

money on a super-priority basis and that it had an entitlement set forth at R85 of the record to be

repaid the amount it lent on a super-priority basis at the end of the day.  Recourse – the recourse

provision in paragraph 10 is not rendered surplusage by that."); 48 (rather than affecting the

superpriority claim, the recourse provision establishes "what happens in the event of some

default"); 51-53; 54-55 ("the nonrecourse concept . . . relates to the liens [o]n the collateral by

the nature of the concepts and the description in paragraph ten. . . .  It's talking about remedy

characteristics that accompany the loan on account of the government's secured lender status.

That's it.  To use that to modify or limit the separate independent super-priority rights that exist

under the code and that were negotiated is error.").  Moreover, the argument also highlighted

other troublesome aspects of Judge Gerber's ruling.  *See, e.g.*, Tr. At 24 (Judge McMahon: "I've

got Judge Gerber as a witness recreating the negotiations for 80 pages.  And that's no good"); *id.*

at 37 (Court: "it's clear that he resolved a number of disputed issues of fact in the course of

writing that opinion").

        16.      Following oral argument, and having heard the DIP Lenders' arguments that

Judge Gerber erroneously concluded that his ruling did not render the super-priority claim

surplusage because it would prevent cramdown of the DIP Lenders' claim, Judge McMahon

directed that the parties answer several questions on bankruptcy law to assist her determination

of the appeal. *See* Dkt. No. 14 in Case No. 12 Civ. 561 (S.D.N.Y. June 6, 2012).  Among these

questions was whether DIP lenders can be subject to cramdown of a chapter 11 plan under

section 1129 of the Bankruptcy Code.  *Id.*  Contrary to Judge Gerber's analysis, the Committee's

written response conceded that DIP lenders cannot be subject to cramdown.  *See*  Case No. 12

Civ. 561 (S.D.N.Y. June 15, 2012) (Dkt. No. 16, at 3).  This response by the Committee, which,

of course, properly reflects the law, effectively eliminates a principal basis that Judge Gerber's

decision identified for rejecting the DIP Lenders' showing that the Committee's position

impermissibly rendered meaningless surplusage the allowed super-priority administrative claim

for which the DIP Lenders negotiated, and which the DIP Lenders were granted as a critical part

of the protections they received in exchange for their extraordinary funding of the GM

bankruptcy proceedings.

17.    On July 3, 2012, Judge McMahon vacated the Bankruptcy Court's order on

ripeness grounds and remanded the matter to this Court.  *U.S. Dep't of the Treasury v. Official

Comm. of Unsecured Creditors of Motors Liquidation Co. (In re Motors Liquidation Co.)*, 475

B.R. 347, 367 (S.D.N.Y. 2012).  There have been no further Court proceedings in the matter.

### C.    The Proceeds Allocation Settlement Agreement

18.    The Proceeds Allocation Settlement Agreement is annexed as Exhibit A to the

Join Motion (Dkt. No. 13688 in 09-50026), and the litigation cost advance agreement that forms

one component of the Settlement Agreement appears at Exhibit C to the Joint Motion.

Paragraphs 32-34 of the Joint Motion summarize the Settlement Agreement including the

litigation cost advance agreement.  In brief, the Committee and the DIP Lenders have agreed,

subject to the Court's approval, that, on conditions including the DIP Lenders' agreement to

advance $15 million in litigation costs to the Avoidance Action Trust which is to be repaid first

out of any proceeds of the Avoidance Action with no costs, fees, or interest due to the DIP

Lenders, seventy percent (70%) of the remaining net proceeds of the Avoidance Action will be

distributed to unsecured creditors, and thirty percent (30%) will be distributed to the DIP

Lenders, in full satisfaction of the DIP Lenders' and the Committee's respective claims of

entitlement to be repaid from the estate's recovery of proceeds from the Avoidance Action.

## II.    ARGUMENT

### THE COURT SHOULD APPROVE THE SETTLEMENT
### AGREEMENT BECAUSE IT IS FAIR AND EQUITABLE

19.    The Objection and Limited Objection should be rejected and the Joint Motion

approved.  There appears to be no dispute that the proposed settlement should be approved so

long as it is fair and equitable and in the best interests of the estate, *see* Joint Motion at 16 (citing

*In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir.

1994); Objection at 11 (settlements are favored and should be approved so long as the settlement

is superior to the "lowest point in the range of reasonableness" (quoting *In re Chemtura Corp.*,

439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010)).  The settlement here easily surpasses that standard.

20.    The Objection fails to discuss or meaningfully apply the controlling test

elaborating on this standard, *In re Iridium Operation LLC*, 478 F.3d 452, 462 (2d Cir. 2007),

which enumerates factors for courts to consider in assessing whether a particular settlement falls

within the required "range of reasonableness."  *See* Joint Motion at 16-17 (listing factors).  As

the Joint Motion shows, many of these factors weigh in favor of approving the settlement as

reasonable and none weigh against approval: for example, the settlement will avoid complex and

protracted litigation, which the Committee reasonably has determined will be detrimental to it

and to unsecured creditors; the settlement affords benefits (certainty, avoidance of risk of an

adverse outcome in the proceeds allocation dispute by which unsecured creditors could receive

nothing, avoidance of delay) to the estate's creditors; as is confirmed by the absence of objection

of parties other than those with an interest in providing costly alternative financing that will be

unnecessary in light of the settlement, other parties in interest support the settlement or at least

do not oppose it; the settlement is supported by competent and experienced counsel; and the

settlement resulted from arms'-length negotiations that were vigorous and spanned a period of

months.

21.     Instead, the Objection relies principally on its assertion that the settlement allows

the DIP Lenders too great a share of any Avoidance Action proceeds, because Judge Gerber has

already ruled for the Committee, and because any future judge to consider the matter assertedly

will be swayed by Judge Gerber's analysis.  *See* Objection at 14-15.  This superficial analysis is

patently deficient.  First, it ignores that Judge Gerber's now-vacated decision is legally entitled to

no deference both because it has been vacated, and also because the controlling issue, which was

decided on summary judgment, is subject to *de novo* review.  *See, e.g.*, *Mathirampuzha v. Potter,*

548 F.3d 70, 74 (2d Cir. 2008).  And the Objection fails to acknowledge, much less grapple with,

the reality that the DIP Lenders have strong contentions that have not been conclusively decided,

especially now that Judge Gerber's decision has been vacated.  In fact, the inconclusive appeal

before Judge McMahon has laid the issues bare, including forceful and unrebutted contentions

that all controlling orders and documents give the DIP Lenders a super-priority administrative

claim in the full amount they lent the estate; that no order or contract expressly waives any right

of the DIP Lenders to be repaid from proceeds of the Avoidance Action on account of their

super-priority claim; that this silence is probative because the controlling orders and contracts do,

by contrast, expressly waive such a right of repayment with respect to other estate assets, such as

an equity stake in New GM that is reserved solely for unsecured creditors; that the "non-

13

recourse" provision on which the Committee and Judge Gerber relied does not logically limit the effect of the DIP Lenders' super-priority administrative claim in the amount they lent, and, instead, merely underscores the unavailability to the DIP Lenders of entirely separate secured lender remedies as against the Avoidance Action and its proceeds; and that Judge Gerber's articulated reasoning for concluding that his ruling did not render the super-priority claim surplusage has now been conceded by the Committee to be incorrect.  The Objection also improperly gives no weight to the expert and informed judgment of the UCC and its counsel, who have been intimately involved in this bankruptcy and this dispute from their inception.  In the face of all of these considerations, as well as other benefits including a no-cost litigation cost advance as a settlement condition, the proposed settlement is more than reasonable.[5]

22.    The Court should also reject the puzzling contentions in both the Limited Objection and the Objection that the proposed settlement somehow is adverse to the Trust.  To the contrary, the Trust's mandate is simply to litigate the Avoidance Action so as to obtain the greatest possible recovery for its beneficiaries, which are the DIP Lenders and/or the Committee, and the Settlement Agreement is overwhelmingly the best way to meet that goal by ensuring that litigation recoveries go to Trust beneficiaries, and are not diverted as profits to a third-party litigation funder that otherwise would have no entitlement to *any* Avoidance Action proceeds. Under the Settlement Agreement, the DIP Lenders will provide a no-interest, no-fee advance of litigation costs to the Trust, thereby rendering unnecessary River Birch's proposed highly costly funding of the Trust, in which Davidson Kempner reports that it shares an undisclosed interest.

---

[5] The Objection is not aided by the sole case it meaningfully discusses, *In re Remsen Partners, Ltd.*, 294 B.R. 557 (Bankr. S.D.N.Y. 2003), which rejected a proposed settlement that the court found would yield no distributions for most creditors (*id.* at 566) where "the record clearly indicates that [the debtor] is likely to succeed in the litigation," *id.* at 568.  Here, by contrast, the issue in dispute was never finally resolved, substantial issues remain in dispute such that unsecured creditors face significant litigation risk of an outcome in which the DIP Lenders receive all Avoidance Action recoveries until the outstanding DIP loan balance is repaid in full, and, absent a settlement, unsecured creditors and the estate face difficult, costly, and protracted litigation in addition to an uncertain outcome.

Davidson Kempner projects that River Birch's proposed alternative financing would result in financing costs (evidently beyond the required repayment of the $15 million in principal that would be advanced) ranging from nearly $19 million to more than $56 million, *see* Objection ¶ 7, which necessarily would decrease the funds available to pay whoever is entitled to receive proceeds of the Avoidance Action.  It is indisputable that a no-cost, no-interest litigation cost advance will better serve the Trust's needs than will the costly conditions of River Birch's offer to finance the litigation.  And use of the River Birch funding alternative would void the Settlement between the UCC and the DIP Lenders, thereby leaving unresolved the dispute as to entitlement to proceeds of the Avoidance Action – such that unsecured creditors might eventually recover nothing at all.  The Settlement's allocation of 30% of the recovery to the DIP Lenders in settlement of the proceeds allocation dispute is in no way a financing cost; rather, the completely free litigation cost advance is a benefit that inures to the AAT itself as a consequence of the successful settlement of the proceeds allocation issue.

23.     Finally, the Objection suggests, without authority, that the Court should "not even engage in a determination of whether the proposed settlement is appropriate until such time as there is a justiciable case to settle."  Objection at ¶ 9.  This suggestion should give the Court no pause.  There is nothing in Rule 9019 or any other provision known to the Government that precludes the Court from approving negotiated agreements resolving disputed issues or even contingent rights, whether or not they are fully ripe for Article III purposes.  Moreover, the fact that one material term of the Settlement is an agreement by the DIP Lenders to provide litigation funding to the Trust creates an immediate, tangible issue that is concrete, not hypothetical, and that has significant consequences (and benefit) to the estate.  Finally, the Court should not overlook the inequitable result that would follow from deeming the Settlement not ripe for

approval – namely, that the Trust must either accept River Birch's financing package and the

costs associated with it, to the financial detriment of the Trust's beneficiaries, or else must allow

itself to run out of funds and potentially fail to achieve any recovery whatsoever.

## CONCLUSION

For the reasons set forth above, the Court should (a) approve the Joint Motion that seeks

approves the Settlement Agreement, (b) reject in their entirety the objections raised in the

responses of each of River Birch and Davidson Kempner and (c) grant such other and further

relief as this Court deems just and equitable.

Dated:    New York, New York
            August 5, 2016

                       PREET BHARARA
                       United States Attorney for the
                       Southern District of New York
                       Attorney for the United States of America

              By:      */s/  David S. Jones*_____
                       DAVID S. JONES
                       Assistant United States Attorney
                       86 Chambers Street, 3rd Floor
                       New York, New York 10007
                       Telephone:  (212) 637-2539
                       Facsimile:  (212) 637-2730
                       Email: david.jones6@usdoj.gov