UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE: | . | Case No. 09-50026-mg |
|  | . | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, et al., f/k/a GENERAL MOTORS CORP., et al, | . | (Jointly administered) |
| Debtor. | . | |
| . . . . . . . . . . . . . . . | . | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MOTORS LIQUIDATION COMPANY, ET AL, | . | Adv. Proc. No. 11-09406-mg |
| Plaintiff, | . | |
| v. | . | |
|  | . | One Bowling Green |
| UNITED STATES DEPARTMENT OF TREASURY and EXPORT DEVELOPMENT CANADA, | . | New York, NY 10004-1408 |
|  | . | Wednesday, August 10, 2016 |
| Defendants. | . | 2:04 p.m. |
| . . . . . . . . . . . . . . . | | |

TRANSCRIPT OF JOINT MOTION TO APPROVE SETTLEMENT OF DISPUTED
ENTITLEMENTS OF DIP LENDERS AND COMMITTEE TO POTENTIAL TERM
LOAN AVOIDANCE ACTION PROCEEDS, AND FOR ENTRY OF AN ORDER
MODIFYING AVOIDANCE ACTION TRUST AGREEMENT AND AUTHORIZING THE
GRANT OF A LIEN TO THE DIP LENDERS [13688, 13687, 13689];
NOTICE OF AGENDA OF MATTERS SCHEDULED FOR HEARING ON
AUGUST 10, 2016 AT 2:00 P.M. [13724];
ADVERSARY PROCEEDING: 11-09406-MG OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF MOTOR V. UNITED STATES DEPARTMENT OF
TREASURY ET AL, JOINT MOTION TO APPROVE SETTLEMENT OF DISPUTED
ENTITLEMENTS OF DIP LENDERS AND COMMITTEE TO POTENTIAL TERM
LOAN AVOIDANCE ACTION PROCEEDS, AND FOR ENTRY OF AN ORDER
MODIFYING AVOIDANCE ACTION TRUST AGREEMENT AND AUTHORIZING THE
GRANT OF A LIEN TO THE DIP LENDERS [41, 42, 43, 44, 47, 51]
**BEFORE THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES CONTINUED

Audio Operator:          F. Ferguson , ECR

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46038
                         (855) 873-2223
                         www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (Continued):

For the Official
Committee of Unsecured
Creditors of Motors
Liquidation Company,
et al:                        Kramer, Levin, Naftalis & Frankel
                                LLP
                              By:  ROBERT T. SCHMIDT, ESQ.
                                   JENNIFER SHARRET, ESQ.
                                   JONATHAN M. WAGNER, ESQ.
                              1177 Avenue of the Americas
                              New York, NY 10036
                              (212) 715-9100

For the Motors
Liquidation Company
Avoidance Action Trust:       Binder & Schwartz LLP
                              By:  ERIC B. FISHER, ESQ.
                              366 Madison Avenue, 6th Floor
                              New York, NY 10017
                              (212) 933-4551

                              Emmet, Marvin & Martin, LLP
                              By:  PAUL T. WEINSTEIN, ESQ.
                              120 Broadway
                              New York, NY 10271
                              (212) 238-3000

For River Birch
Capital, LLC:                 Westerman, Ball, Ederer, Miller,
                                Zucker & Sharestein, LLP
                              By: ERIC G. WAXMAN, III, ESQ.
                                   RICHARD F. HARRISON, ESQ.
                              1201 RXR Plaza
                              Uniondale, NY 11556
                              (516) 622-9200

For Export Development
Canada:                       Vedder Price
                              By: MICHAEL L. SCHEIN, ESQ.
                              1633 Broadway, 47th Floor
                              New York, NY 10019
                              (212) 407-7700

APPEARANCES (Continued):

For Davidson Kempner
Capital Management LP:    Stroock & Stroock & Lavan LLP
                         By: KRISTOPHER M. HANSEN, ESQ.
                         180 Maiden Lane
                         New York, NY 10038-4982
                         (212) 806-5400

For United States
Department of Treasury:   U.S. Attorney Office, SDNY
                         By: DAVID S. JONES, ESQ.
                         86 Chambers Street
                         New York, NY 10007
                         (212) 637-2739

For JPMorgan Chase Bank: Wachtell, Lipton, Rosen & Katz
                         By: HAROLD S. NOVIKOFF, ESQ.
                         51 West 52nd Street
                         New York, NY 10019

4

1          (Proceedings commence at 2:04 p.m.)

2          THE COURT:  Please be seated.  We're here in Motors

3   Liquidation Company, 09-50026.  I have the list of appearances

4   in front of me.  Who's going to begin?

5          MR. FISHER:  Your Honor, Eric Fisher from Binder and

6   Schwartz on behalf of the Avoidance Action Trust.  I want to

7   just --

8          THE COURT:  Before we begin, while my law clerk,

9   Mariloly Orozco, is present in the courtroom, she has recused

10  herself from this matter since she previously worked at Stroock

11  and, I think, is going back there, but she's just present in

12  the courtroom.  She's recused herself from the matter.

13         MR. FISHER:  I want to begin, Your Honor, by

14  specifying the relief that's being sought by the Trust by way

15  of just delineating responsibility for the various parts of

16  this joint motion.  Specifically, the Avoidance Action Trust is

17  seeking this Court's permission to amend the trust agreement,

18  and the trust agreement provides that we need to seek Your

19  Honor's permission for such an amendment.  The main substantive

20  amendment to the -- there are two main substantive amendments

21  to the trust agreement.  One is the waterfall provision.  We

22  seek to amend the waterfall provision to reflect the allocation

23  settlement that has been reached between the DIP lenders and

24  the Creditors' Committee.  And then, the other amendment is to

25  authorize our trust to provide a lien to the DIP lenders in the

5

1  amount of the $15 million of litigation financing that they

2  have agreed to provide to the Trust.  With regard to the lien,

3  we have submitted the declaration of Arthur Gonzalez (ph), who

4  is the Trust monitor, as required by the trust agreement, and

5  he concurs with the Trust's grant of a lien to the DIP lenders.

6       The issue of the cost of the allocation settlement

7  itself will be addressed by the Creditors' Committee and by the

8  DIP lenders.  Both of them are beneficiaries of the Trust.  We

9  think it is a good thing for the Trust that if this settlement

10  is approved, there will be clarity for the Trust about who our

11  beneficiaries are and their respective interests in the Trust.

12  But as the Trust's counsel, we take no position on the

13  particulars of the allocation and we'll leave it to them to

14  address that issue, Your Honor.

15       Really, the issue -- the substantive issue that we

16  had to address is -- boils down to one issue, which is the

17  funding that has been offered to us by the DIP lenders, is that

18  funding on terms that are materially more favorable to the

19  Trust than the terms that had been offered by the private

20  funder with whom we entered into an agreement.  And we -- that

21  just was not a difficult decision for the Trust, Your Honor.

22       THE COURT:  Well, that's -- I mean, the argument that

23  -- opposing you is that while nominally it's at zero cost, that

24  you would need to allocate a portion of the recovery that the

25  DIP lenders would be entitled to receive if the allocation

6

1  settlement is approved and approval of both -- they're

2  contingent on each other.  So I mean, the argument -- and I do

3  want to hear either you or someone to address why I should

4  consider it a zero-cost loan option when it's conditioned on

5  approval of an allocation agreement that could result in

6  hundreds of millions of dollars being paid to the DIP lenders,

7  depending on the outcome of the avoidance action.

8           MR. FISHER:  Right.  And I think, Your Honor, that

9  that question overlaps significantly with the issue that the

10 Creditors' Committee and the DIP lenders will be addressing,

11 and so I'm going to defer to them for the most part on that

12 question, although of course, I'm happy to return to the podium

13 and address that question further if Your Honor should wish.

14 But it -- with respect to the Trust, it's absolutely clear that

15 our obligation, vis-à-vis the DIP lenders, is to return the

16 funds advanced with no additional payments.  And then, if Your

17 Honor is satisfied that the 70/30 allocation settlement that

18 has been reached between the beneficiaries of the Trust is a

19 reasonable one in light of litigation risk, I think it fully

20 supports our view, which is that there are no hidden costs

21 here, and any allocation to the DIP lenders should not in any

22 way be considered a cost of funding to the Trust.

23          THE COURT:  You conducted a competitive auction

24 process to identify a funding lender, correct?

25          MR. FISHER:  Yes, Your Honor.

7

1        THE COURT:  And you had originally made a motion to
2  approve a funding agreement, which resulted from the auction
3  process and which your motion seeking approval had argued that
4  was the best offer available.  And so why shouldn't -- in the
5  absence of -- and I guess the (indiscernible) was also that the
6  DIP lenders were kept fully informed of the process and had the
7  opportunity to submit their own proposal.  What I'm having some
8  problem with, somebody's going to have to convince me why that
9  I shouldn't conclude that the cost of the financing from the
10 DIP lenders is at least equivalent to the best offer you were
11 able to obtain when you conducted your auction.

12       MR. FISHER:  But, Your Honor, the deal we had -- we
13 entered into with the private funder was clearly the best
14 private funding available to us.  That's why we entered into
15 that agreement, and it was for -- the greater of 4.75 percent
16 of litigation recoveries for 2.25 times the amount invested.
17 At the time that we entered into that agreement with the
18 private funder, we kept the DIP lenders apprised of our
19 negotiations and entering into the agreement with private
20 funder, and we kept the private funder -- the private funder
21 was aware that we were continuing to discuss matters with the
22 DIP lenders.  The DIP lenders were clear from the very
23 beginning that they were open to providing us an interest-free
24 litigation advance provided that they were able to reach
25 agreement with the Creditors' Committee about the allocation.

8

1  And I think the issue simply was that they did not want to find

2  themselves in the position of funding the Trust without having

3  certainty and clarity around what their litigation recoveries

4  would be.

5        We, of course, recognized that $15 million in

6  interest-free funding was better than the private funding we

7  had secured, and we encouraged them to speak directly to the

8  Creditors' Committee and commence negotiation.  They had their

9  negotiation, arrived at the allocation that they did, and it

10  was reported to us.  And on the basis of having arrived at an

11  allocation, they then were willing to fund the Trust.  There

12  was never any discussion about some embedded cost of funding.

13  In terms of how things were presented to the Trust, it was

14  always presented as funding -- as a cost advance similar to

15  previous cost advanced.

16        THE COURT:  Like I was saying, why are you being

17  agnostic if you're not taking the position about the

18  reasonableness of the allocation settlement?  From the

19  standpoint of the Trust, zero interest is obviously better than

20  some interest, right?  Go ahead.

21        MR. FISHER:  Well, Your Honor, if I may, at this

22  point, I'd actually like to turn the podium over to Jennifer

23  Sharret from Kramer Levin, who will speak on behalf of the

24  Creditors' Committee and will directly address the issue of the

25  reasonableness of the allocation.

9

1          THE COURT:  Let me ask you a couple of questions

2    before you do that because I think this does affect the Trust.

3    The private funding agreement -- and I know you dispute the

4    standing of the private funder to argue, but the private

5    funding agreement provided a termination provision, the gist of

6    which is if you secured better financing, you could terminate

7    with the private funder.  And what happens if the Court

8    concludes that the terms of the DIP funding are not on better

9    terms?  What happens if you terminate the private funding

10   agreement?

11          MR. FISHER:  Your Honor, I'm getting ahead of myself

12   in speculating about what would happen if Your Honor were to

13   rule that way.  My clear sense from the papers is that the

14   private funder would want to continue to fund the Trust.  And

15   if it were --

16          THE COURT:  Maybe I'm missing -- go ahead and finish.

17   I'm not sure we're communicating clearly.  So my hypothetical

18   is the -- let me five you the following hypothetical.  You -- I

19   approve the settlement.  You terminate the agreement with the

20   private funder.  You get a billion-dollar settlement or

21   judgment in the avoidance action.  And does the private funder

22   have a breach of contract action for the amount that they would

23   have been entitled to receive on a billion-dollar avoidance

24   recovery?

25          MR. FISHER:  Your Honor, our position is certainly

1  not.

2          THE COURT:  Why not?

3          MR. FISHER:  Well, be --

4          THE COURT:  You entered into a contract with them.

5  They gave you certain termination rights and allowed you to

6  terminate if the terms of the alternate funding were better

7  than what they were giving you.  That's the gist of it.  And

8  I'm not being asked -- am I being asked today to make a

9  determination on whether the DIP funding is on better terms

10 than the private funding?

11         MR. FISHER:  I don't think, Your Honor --

12         THE COURT:  I don't think so either.

13         MR. FISHER:  -- that you're specifically being asked

14 to make that determination.

15         THE COURT:  Okay.  So if I'm not making -- if I'm not

16 being asked to make the determination today and the private

17 funder takes the position you terminated and you got a

18 billion-dollar recovery, and under the agreement we had, we

19 would have been entitled to, what, four-point-whatever percent,

20 a lot of money.  Do they have a breach of contract claim

21 against the Trust?

22         MR. FISHER:  Your Honor, the issue, I suppose, that

23 we would be disputing is whether the DIP lender funding was on

24 materially --

25         THE COURT:  Yes.

11

1          MR. FISHER:  -- favorable terms.  If the 70/30

2    allocation stands on its own legs as a reasonable compromise of

3    litigation --

4          THE COURT:  Well, if they weren't inextricably

5    linked, it might be able to stand on its own terms.  If the DIP

6    funding wasn't contingent on approval of the allocation

7    settlement, it could very well stand on its own terms, but it's

8    not.  It's not.  They're inextricably linked.  It's a condition

9    precedent.

10          MR. FISHER:  They are conditioned one on the other,

11   Your Honor, but the way in which we understand that link is

12   that the DIP lenders are unwilling to fund unless they know

13   that there's certainty around their recovery.  That's not --

14   that doesn't impute some cost to the funding, Your Honor, if

15   the --

16          THE COURT:  That's your position.

17          MR. FISHER:  -- settlement stands on its own as a

18   reasonable compromise of the litigation risk.

19          THE COURT:  Well, you say if the settlement stands on

20   its own, if it wasn't conditioned on -- if the DIP funding

21   wasn't conditioned on approval of the settlement, it could

22   stand on its own, okay, but once they're linked together, my

23   concern is, you know, tell me why, you know, the private funder

24   wouldn't be entitled, you know -- in the hypothetical of a

25   billion-dollar recovery, wouldn't be able to state a claim for

1 breach of contract, arguing that the two are conditioned on

2 each other and we would recover X millions of dollars from this

3 billion-dollar recovery.

4      MR. FISHER:  Your Honor, the private funder has

5 threatened to make exactly that argument, and --

6      THE COURT:  I know that.  That's why I'm asking these

7 questions.

8      MR. FISHER:  And if the private funder were to follow

9 through on that threat, I suppose I -- we'd be litigating with

10 one another about whether what we're saying about the funding,

11 which is that it does not have a cost to the Trust, is, in

12 fact, true.  If Your Honor reaches that issue on the way to

13 reaching the other issues before the Court, then I think it

14 would nip that issue in the bud, and if not, I suppose we'd

15 have a dispute that we'd have to work out with the private

16 funder.

17      THE COURT:  So don't I -- in applying the _Iridium_

18 seven non-exclusive factors in deciding whether to approve the

19 settlement, don't I have to consider -- because the cases

20 instruct that while I'm not supposed to have a mini trial and

21 decide the underlying merits of the claim, I am supposed to --

22 I think the cases talk about that the bankruptcy judge has

23 apprised himself of all facts necessary for an intelligent and

24 objective opinion of the probabilities of ultimate success

25 should the claim be litigated.  But don't I also have to

13

1  consider what the possible -- what the probable outcome of a

2  claim by the private funder would be?  Because I think it's --

3  you're almost guaranteed that they're going to sue the Trust

4  for breach of the funding agreement, and you know, don't I have

5  to take that -- I'm not saying which way it necessarily points,

6  but don't I have to consider that as part of the risks

7  associated with whether I approve the -- this combined motion,

8  funding agreement and settlement agreement?

9      MR. FISHER:  I suppose, Your Honor -- well, the -- I

10  think that there's something confusing about the way in which

11  this has been presented as a joint motion.  I think it was --

12      THE COURT:  Yes, I would be much happier if it hadn't

13  been presented as a joint motion.

14      MR. FISHER:  And that's why, Your Honor, I began by

15  trying to be specific about the relief that the Trust was

16  seeking, which I really do see as distinct --

17      THE COURT:  You filed a joint motion, though.  You

18  filed a joint motion and then asked for two things, so you

19  can't -- you know, you might like to separate yourself, but I'm

20  asked to provide relief on both approval of the DIP funding and

21  the settlement reallocation agreement and rise and fall

22  together on what's been -- what you have signed and presented

23  to me.

24      MR. FISHER:  And, Your Honor, to explain why -- it

25  may be confusing, but I nonetheless think it's appropriate that

14

1  it be a joint motion.  And taking half a step back, this

2  dispute between the DIP lenders and the Creditors' Committee is

3  already memorialized in our trust agreement.  From the

4  beginning -- from the very beginning of this trust, this

5  dispute was known.

6           THE COURT:  I'm aware of that.

7           MR. FISHER:  And our trust agreement provides that

8  that dispute will have to be resolved either by agreement

9  between the parties or by final order of the Court.  The

10  dispute was resolved by agreement between the parties, and the

11  parties being the DIP lenders and the Creditors' Committee.

12  The Trust -- the heart of the relief that we need are

13  amendments to our trust agreement --

14           THE COURT:  Let me ask you --

15           MR. FISHER:  -- in order to facilitate that

16  settlement.

17           THE COURT:  When do you run out of money?

18           MR. FISHER:  We are virtually out of money now.

19           THE COURT:  The money is to pay your attorneys' fees?

20           MR. FISHER:  And expert fees and other costs of the

21  Trust.  Yes, Your Honor.

22           THE COURT:  Okay.  And give me a -- I just want to

23  know how quickly you need a decision on this.  When do you

24  expect to run out of money?

25           MR. FISHER:  We need a decision very quickly, Your

15

1  Honor.  If the Trust were to pay all of the pending invoices

2  that are due now, it would be out of money.

3          THE COURT:  All right.  I may have more questions for

4  you later.

5          MR. FISHER:  Okay.  Thank you, Your Honor.

6          THE COURT:  Thank you very much.

7          MS. SHARRET:  Good afternoon, Your Honor.  Jennifer

8  Sharret from Kramer, Levin, Naftalis & Frankel on behalf of the

9  Official Committee of Unsecured Creditors.  Your Honor, let's

10  address the order that you entered yesterday first.

11          THE COURT:  Yes.

12          MS. SHARRET:  So the question in the order was

13  whether or not there should have been an order in the adversary

14  proceeding dismissing it for --

15          THE COURT:  Yes.

16          MS. SHARRET:  -- wont of subject matter jurisdiction

17  and how that impacts this instant joint motion.  In reviewing

18  Judge McMahon's order, it clearly says that the order -- that

19  such an order should have been entered, and the Committee would

20  not be opposed if that order was entered.

21          THE COURT:  I don't -- do I have a choice?

22          MS. SHARRET:  No.  I don't -- and while we --

23          THE COURT:  No, look, I inherited all of this on

24  January 5th.  When I inherited this, I was totally unaware -- I

25  will honestly say I didn't review the docket of each adversary

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1 proceeding that had been transferred to me.  Okay.  So no,

2 there was no activity in this -- you know, there's some where

3 there's very active litigation going on.

4          MS. SHARRET:  And --

5          THE COURT:  So this -- when I was preparing for this

6 hearing today and re-read Judge Gerber's decision several times

7 and re-read Judge McMahon's decision several times, it -- when

8 I got to the, you know, probably the second or third time

9 through Judge McMahon, I read the last paragraph, I saw what

10 she ordered.  And then, I went back and looked at the docket

11 and I saw her -- this wasn't Judge Gerber's doing.  I mean, her

12 decision -- it's supposed to be automatic that when a decision

13 is rendered in the district court in one of our cases, it gets

14 transmitted here and gets put on the docket.  It wasn't so, you

15 know, I think it escaped anybody's radar screen here.

16          MS. SHARRET:  So -- but in light of that, what had

17 been still technically open, that is why we filed the joint

18 motion in both the main case and the adversary proceeding.

19          THE COURT:  Okay.  You might have told me that, oh,

20 by the way, Judge McMahon ordered that this case be dismissed,

21 but anyway --

22          MS. SHARRET:  But we believe that the stipulation

23 agreed order --

24          THE COURT:  Yes.

25          MS. SHARRET:  -- can easily be entered in the main

1  case.

2        THE COURT:  Oh, absolutely.

3        MS. SHARRET:  So in support of the motion and reply,

4  we submitted declaration of Mr. Thomas Moers Mayer, and he is

5  available in the courtroom today --

6        THE COURT:  I see him in the courtroom.

7        MS. SHARRET:  -- if you have any questions.  The

8  question before Your Honor today is whether to approve the

9  settlement that's embodied in the stipulation agreed order,

10  which does two things.  It settles the longstanding allocation

11  dispute among the Committee and the DIP lender.  Part of that

12  settlement is that the DIP lenders will be providing 15 million

13  litigation costs advanced to the Avoidance Action Trust.  I can

14  -- if you -- I know you've -- I can go through the background

15  of the underlying allocation dispute and the procedural

16  history, if you'd like.

17        THE COURT:  Well, I mean, I re-read Judge Gerber's

18  decision as recently as this morning, so he does lay out in

19  there how the allocation dispute first hit his radar screen,

20  the initial motion in the contested matter, what he did with

21  that, when the adversary proceeding was filed.  So if there's

22  something you want to add that's not in Judge Gerber's opinion,

23  go ahead.

24        MS. SHARRET:  No, I mean, the only additional item is

25  this -- what happened before Judge McMahon, who dismissed the

18

1  vacated decision for lack of ripeness, and since then, up until

2  recently, there has been no activity in the allocation dispute.

3  And at the time that Judge McMahon issued her ruling, Judge

4  Gerber had not issued any decision on the underlying merits of

5  the term loan avoidance action, and since that time, as you're

6  aware, the Second Circuit has now --

7          THE COURT:  It was -- so -- bear with me a second.

8  Judge McMahon's decision was on July 3rd, 2012, and as a

9  reference point for me, the Delaware Supreme Court decision

10  saying that UCC is a notice-filing system was October 17th,

11  2014.  So it's well after Judge McMahon's opinion.  I know

12  Judge McMahon says that she didn't think it would be ripe until

13  a judgment was entered in the avoidance action.  I'm not sure

14  that anyone had presented to her the possibility that it would

15  have been through the Second Circuit through the Delaware

16  Supreme Court.  And now, while I have the avoidance action

17  pending before me, the Delaware Supreme Court and Second

18  Circuit decision preach strong medicine.  I'm not sure that it

19  would be unripe at this point, the allocation dispute.

20          MS. SHARRET:  Any --

21          THE COURT:  The situation certainly changed after the

22  Delaware Supreme Court --

23          MS. SHARRET:  Right.

24          THE COURT:  -- entered its ruling.

25          MS. SHARRET:  The situation, Your Honor, has changed.

19

1  The Committee has been hesitant to restart the allocation

2  dispute in light of the fact that we have lost in ripeness

3  twice --

4          THE COURT:  Right.

5          MS. SHARRET:  -- both before bankruptcy court and the

6  district court, and Judge McMahon's decision could be -- well,

7  could easily be read once there's a merit space, but we know

8  there's still damages.

9          THE COURT:  Let me just say this.  Contrary to

10 Mr. Hansen's argument, I do think that this is -- at least on

11 the 9019, is ripe for decision now.  So I reject the argument

12 that the Court shouldn't reach that issue.  Disputes do get

13 resolved before there's litigation.  Go ahead.

14         MS. SHARRET:  So as mentioned before, nothing has

15 happened in the allocation dispute for approximately four

16 years, and because the Avoidance Action Trust was exploring

17 funding options, which the DIP lenders were aware of, that

18 prompted them to contact counsel to the Committee to see if

19 there could be a resolution on the allocation dispute.  As

20 mentioned, the DIP lenders were willing to make the litigation

21 costs advance, provided they could reach an acceptable

22 settlement.

23         Now, when the Committee was approached with this,

24 they -- we had three options.  We could have entered into

25 negotiations, see if we could come to a reasonable settlement.

1   We could have declined to negotiate at all, litigate all the

2   way up to the Second Circuit, and hope for a -- hope to win 100

3   percent, but there's no way that was guaranteed.  And third, we

4   could have not negotiated at the time.  The Avoidance Action

5   Trust would have taken funding from the private funder, which

6   would have taken potentially 4.75 percent off the top, at which

7   time if the Committee and DIP lenders ever had to negotiate

8   again, we wouldn't be dividing up the 100 percent of -- or 100

9   percent minus the 15 million of the pot, but 95 percent of the

10  pot.  And so Committee, while hadn't yet concluded that they

11  could necessarily come to a resolution, decided that it was

12  worthwhile to engage in these negotiations.  The Committee, as

13  set forth in Mr. Mayer's declaration, these were arm's length

14  negotiations that -- with a lot of back and forth that occurred

15  over the course of several months, and after all this back and

16  forth, the eventual settlement was that unsecured creditors

17  would receive 70 percent of the net proceeds and the DIP

18  lenders would receive 30 percent of the net proceeds.

19       THE COURT:  So what I'm -- basically been trying to

20  do is make the independent analysis that I need to make of the

21  merits of this.  Obviously not decide the dispute, to decide

22  whether this was an appropriate exercise of business judgment

23  by the Trust and the Committee in deciding to enter into this

24  settlement.  The -- what's usual here -- in so, you know, I do

25  get -- occasionally, we get contested settlement motions.  More

often than not, they're uncontested.  But when I've had

contested settlement motions, it's -- this is a highly unusual

situation where there was a prior decision by Judge Gerber

granting summary judgment to the Committee.  And while that

decision has been vacated, it's still -- in my view, the issue

is what persuasive force does it have.

I don't -- the fact that it's been vacated doesn't

mean I disregard it.  It's, you know, about a 50-page decision,

and some of it deals with the ripeness argument, but most of it

deals with the merits arguments, and you won.  And you won, but

you're prepared to enter into a settlement that, at the billion

-- let's just hypothetically say at a billion-dollar recovery

would result in the DIP lenders recovering, according to

Mr. Hansen's chart -- I didn't check the math, but

$295,500,000, a lot of money, okay, versus total victory under

Judge Gerber's prior ruling.

So necessarily, I ask myself, well, why -- yes ,there

are always litigation risks.  How serious are those risks now?

And so, you know, I've studied Judge Gerber's decision many

times and tried to evaluate the arguments, and I'll have some

arguments -- some questions I think I would prefer to ask

Mr. Jones than to ask you because I don't think the -- if the

settlement is not approved, the Committee shouldn't undercut

the -- I'm not trying to seek to get the Committee to undercut

its position that it was entitled to prevail and that if the

1 case -- if a new case is filed, it should prevail.  Okay.  So I

2 don't want to put you in that position.  Mr. Jones can deal

3 with that.  Okay.  But that's what I've been struggling with,

4 okay.

5      MS. SHARRET:  So, I mean, the Committee continues to

6 believe that Judge Gerber's decision is correct and would hope

7 that would prevail on appeal, but we did recognize the risk on

8 appeal --

9      THE COURT:  Sure.

10      MS. SHARRET:  -- and particularly because we had the

11 benefit of oral argument before Judge McMahon, where even after

12 oral argument and all the briefing, she issued an order asking

13 for responses to five questions, two of which went to the

14 merits and one of which was a new argument raised by counsel to

15 EDC that had never been addressed.

16      THE COURT:  Which argument is that?

17      MS. SHARRET:  That was the distinction between Old GM

18 and the estate, so the recourse language limits the recourse to

19 the borrower, which is defined as Old GM, and they then

20 asserted that their superpriority claim went -- was for against

21 the estate, and therefore the avoidance action would be able to

22 include the term loan avoidance action.  So therefore, the

23 superpriority claim could again get the benefits of the term

24 loan avoidance action.

25      We do not -- we don't think that is a winning

23

1  argument.  We submitted a letter in response to that -- Judge

2  McMahon's order.  But we don't have the benefit of what a judge

3  would take --

4           THE COURT:  Right.

5           MS. SHARRET:  -- on to that argument.

6           THE COURT:  And you think that's a $300 million

7  issue.

8           MS. SHARRET:  And then, there was a second argument

9  on the relevance of 1129(b), which at the --

10          THE COURT:  This is the cramdowns.

11          MS. SHARRET:  The cramdown.

12          THE COURT:  I'm going to ask Mr. Jones about that

13 because it -- in the course of Judge Gerber's lengthy decision,

14 you know, on Page 42 of the opinion, is the only place I see

15 where it addresses the so-called cramdown argument.  It's one

16 of many issues that Judge Gerber dealt with and -- but let me

17 ask you this.  Mr. Jones, in his brief, argues that the

18 Committee conceded in argument before Judge McMahon that Judge

19 Gerber was in error with respect to his cramdown argument.

20 What's your view of that?

21          MS. SHARRET:  So we did not -- so the statement we

22 made to the district court was just that the DIP lenders could

23 not be subject to cramdown.  As, you know, we would want the

24 opportunity, if this ever had to be re-litigated, there would

25 be other argument as to why the superpriority claim is not

24

1  surplusage, as well.

2          THE COURT:  Yeah.  I mean, this -- it literally, one

3  page out of this length opinion, which I sort of viewed as -- I

4  mean, it was -- he did -- Judge Gerber considered the argument

5  in this 48-page opinion and said what he said about cramdown,

6  where he seemed to accept an argument that the Committee had

7  made, but there's lots of other arguments that have nothing to

8  do with the cramdown argument on which he supported his

9  decision.

10         MS. SHARRET:  But again, we do believe that -- we

11  would hope that Judge Gerber's decision would stand, but there

12  were litigation risks on appeal, and I think it's important to

13  view this -- this was a -- if we did not settle this and it

14  turned out we were wrong --

15         THE COURT:  Sure.  It's --

16         MS. SHARRET:  -- then we would -- it was a zero-sum

17  game, zero versus 70 percent.

18         So in balance, one of the first Iridium factors is

19  balancing the probability of success in litigation versus the

20  concrete benefits.  Here, you know, there -- given these

21  litigation risks, we thought the assurance that unsecured

22  creditors would get 70 percent plus the value add of the 15

23  million litigation costs advance balanced out those risks to

24  arrive at that settlement.  And in response in some of your

25  questions you asked Mr. Fisher, we -- the Committee was aware

1  that the Avoidance Action Trust was in discussions with a

2  private funder and that it was -- you know, that it ultimately

3  ended up with the 4.75 percent, and we viewed the DIP lenders'

4  proposal as a value add to the settlement because if not, there

5  would have been an extra percentage that would have to come off

6  the top from any recovery that we could have received.

7         THE COURT:  Did you take a position -- did the

8  Committee take a position at the time that the Trust entered

9  into the private funding agreement?

10         MS. SHARRET:  No.  We did not --

11         THE COURT:  They filed a motion of approval.

12         MS. SHARRET:  Yeah.  We did not oppose the private

13  funding agreement.  It was -- during that time, we were still

14  in negotiations with the Treasury, but we were not going to

15  oppose the motion.

16         THE COURT:  Okay.

17         MS. SHARRET:  So in turning back to the Iridium

18  factors, just addressed factor number one.  The second factor

19  is the likelihood of complex and protracted litigation.  As

20  mentioned earlier, while theoretically maybe we may be able to

21  restart the allocation dispute, it's not 100 percent clear we

22  could.  And certainly, we want to be extra careful so as not to

23  be turned down for ripeness again.  And the DIP lenders are

24  governmental agencies who would have every intent to litigate

25  this all the way up to the Second Circuit, so we knew this

26

1  could potentially take years for this to be resolved.

2          THE COURT:  In factors three and four, the paramount

3  interest of creditors and whether other parties interests

4  support the settlement, the Committee is a fiduciary to the

5  unsecured creditors, who we believe, in the exercise of its

6  duty, entered into the settlement.  And with notice going out

7  to all unsecured creditors, we've only received two objections

8  to the settlement, both of whom have an interest in the private

9  funding agreement.

10          The fifth factor is the competency and experience of

11  counsel supporting the settlement.  Counsel to both the

12  Committee and the DIP lenders were the ones who negotiated the

13  wind-down order back in July of 2009 and were deeply involved

14  in every stage of the litigation before the bankruptcy court

15  and district court and were aware of all the pros and cons and

16  merits of their arguments.

17          And finally, the last applicable factor is whether

18  the settlement is the result of arm's length negotiations.  As

19  set forth in Mr. Mayer's declaration, went -- the negotiations

20  went back and forth a lot.  The DIP lenders that go into exact

21  numbers wanted a much greater percentage when we started, and

22  it was only after two months and then extensive debate among

23  the committee members that the Committee ultimately reached the

24  70/30 settlement.  And then, the actual form of order, the

25  stipulation agreed order that we would ask Your Honor to sign

1    that was signed by all the parties, that was also a very

2    heavily negotiated document among the DIP lenders, the Trust

3    and the Committee, and the DIP lenders can attest more to how

4    it required many different levels of review at Treasury.

5            THE COURT:  One thing -- so again, I've got this --

6    the only place I saw this was in Mr. Hansen's brief, where he

7    says on paragraph four on Page 3 that as of March 2012, the DIP

8    lenders were owed approximately $849 million.  Is that -- do

9    you know that --

10           MS. SHARRET:  I do not know if that's correct.

11           THE COURT:  Okay.  What I was trying to -- as I work

12   through Judge Gerber's decision and going through the

13   chronology of each of the interim DIP loan, the final DIP loan,

14   the wind-down approval, how much was outstanding on the DIP

15   loan, for example, at the time that the wind-down order was

16   approved.  Because I know that it had the wind -- so the 363

17   sale had been approved, and the wind-down budget was to bridge

18   Old GM until the sale could be closed, consummated.

19           And, you know, Judge Gerber goes through how the

20   amount was increased from what -- originally, it was for 750

21   million, then it was, I don't know, something over a billion

22   dollars that was put in.  And I was trying to see whether there

23   was anything in the record before me that showed how much was

24   the outstanding DIP at the time that the wind-down issue arose,

25   had it been paid down or what was -- how much was contemplated

28

1  to be paid down.

2          I mean, one of the issues Judge Gerber does not

3  address -- I don't know -- and I assume it's because nobody

4  addressed it to him -- was that the -- a difference in

5  treatment for whether superpriority would apply to the

6  additional amounts for the wind-down.  It has somewhat

7  different use at that point, use of proceeds.  This was to

8  bridge Old GM to New GM.  And I could certainly understand from

9  a business standpoint that Treasury wanted to get this all done

10 and wanted New GM to get operating, that there would be

11 negotiation that would treat that additional billion one or

12 whatever the exact amount is differently in terms of how --

13 what protection in getting repaid.  I -- do you know whether

14 there's anything in the record that deals with that?

15          MS. SHARRET:  I don't believe there is.

16          THE COURT:  Okay.  One of the things that I was

17 trying to garner is, is there any extrinsic -- but Judge Gerber

18 decided it essentially on cross-motions for summary judgment,

19 and I didn't see anything about disputed issues where one side

20 or the other argued there are disputed issues of fact that

21 prevent the Court from determining summary judgment.  Is there

22 any extrinsic evidence relating to the interpretation of the

23 wind-down order that was not presented or considered by Judge

24 Gerber?

25          MS. SHARRET:  So at the time before Judge Gerber, the

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

29

1  Committee and the DIP lenders had decided that they -- there

2  was no extrinsic evidence and that -- but we did not go through

3  the exercise of deposing all the different attorneys who

4  negotiated the order.  During oral argument before Judge

5  McMahon, she questioned several times whether or not there

6  would be a need for parol evidence, and although at the -- you

7  know, counsel to the DIP lenders, I believe, stood up at that

8  point and said, you know, we could take up issues until the

9  cows come home, but it's not clear if that would do anything if

10 a judge, you know, whether it be Your Honor or a district

11 court, wanted the parties to do that, that could, you know --

12 people could do -- go through that exercise.  But at the time,

13 they didn't think that there was anything out there to show

14 exactly what people's intent were.

15        THE COURT:  Okay.  Anything else you want to add,

16 ma'am?

17        MS. SHARRET:  No.  Thank you, Your Honor.

18        THE COURT:  Okay.

19        MR. JONES:  Good afternoon, Your Honor.  And may it

20 please the Court, David Jones from the U.S. Attorney's Office,

21 Southern District, for United States Department of the Treasury

22 as DIP lender.

23        THE COURT:  Can I -- I've got all my papers out.  I

24 had marked up your brief, and I must have left it on my desk,

25 so everybody just stay seated, I'll be right back in, okay?

1  Because I wrote some questions down.

2      (Recess taken at 2:44 p.m.)

3      (Proceedings resumed at 2:45 p.m.)

4      THE COURT:  I apologize for that.  I'm rushing.  Go

5  ahead, Mr. Jones.

6      MR. JONES:  Thank you, Your Honor.  First, Your Honor

7  has answered quite a number of questions, and I am more than

8  happy --

9      THE COURT:  I didn't answer them.  I've got --

10     MR. JONES:  And I'm very happy to entertain them.  So

11 I'm going to -- if I may, I'll try at the outset to hit some

12 central, overarching points and possibly -- and attempt to

13 address some of Your Honor's questions in the course of doing

14 that, but of course, I don't need to tell the judge, but I'm at

15 your disposal.  So -- but if I may, I'll just take a shot at

16 some overarching themes first.

17     The United States Department of the Treasury, in

18 conjunction with a Canadian agency, Export Development Canada,

19 did something truly extraordinary in these cases, and on the

20 one hand, that's -- I don't want that to -- one could say

21 that's a platitudinal observation, but it's a very important

22 one.  The position the government's put themselves in is

23 extraordinary for governments to take and to be in, and that

24 position was that we funded these bankruptcies for very

25 important public policy missions, and we did that with the

1  clear and important understanding that we were to be made whole

2  to the maximum extent possible.  To the extent we were

3  providing DIP financing, and Your Honor asked some questions

4  about how the wind-down worked, first off, this 1.175 billion

5  wind-down facility was actually not a bridge to New GM.  It was

6  entered at the time -- I'm going to -- I don't have my dates

7  exactly right, but it was essentially for purposes of funding

8  the orderly disposition of the remaining estate of Old GM after

9  the sale transaction occurred, and hundreds of millions of

10  dollars of that went to meeting legacy environmental

11  obligations and cleanup obligations at sites that remained in

12  the estate because they weren't assumed.  Hundreds of millions

13  of dollars, I believe that's literally correct.

14          My professional costs associated with the case.

15  There were just very -- I know my Treasury lawyer used to sit

16  in the courtroom with me and ask how many people that he was

17  paying for, and the answer was pretty much everyone.

18          So I take a moment to remind the Court and conjure up

19  that image to hopefully lend some credence and sympathy to what

20  we're here about today, which is one important element of that,

21  and it's that the government's commitment for public policy

22  purposes, yes, was to achieve this rescue of this industry, but

23  also to do so in a way that was fiscally responsible for the

24  taxpayer and that was going to yield the maximum possible

25  recovery consistent with the commitments and the terms that the

32

1  government entered into.

2        So with respect to this dispute that gives rise to

3  the settlement agreement then, this is, I think, the last

4  substantial potential recovery the government has on its

5  outstanding DIP loan amounts.  And I don't have a precise

6  number for Your Honor, but for ballpark purposes, I believe

7  Treasury is still owed in the neighborhood of $800 million or a

8  little over in uncompensated wind-down financing.  The sale

9  transaction involved the credit bid of other bridge-type debt

10 that the -- that Treasury issued, so that's not what we're

11 seeking to recover here.

12        This dispute is serious, gives rise to very serious

13 litigation risk for both parties.  Obviously, you're -- the

14 Court has closely studied Judge Gerber's decision, but at an

15 earlier stage, I think during one of the arguments that he

16 entertained in this, he termed the issues close.

17        THE COURT:  It says it in the opinion.

18        MR. JONES:  Yeah, he took -- I mean, he took it very

19 seriously, our position, and I think it -- I'm glad the Court

20 recognizes that because Judge Gerber is a terrific judge and

21 writes a seemingly compelling decision, and if that's your

22 framing narrative, the temptation is to think, well, gosh,

23 what's the Committee giving up to that 30 percent of the case

24 they won.  But the litigation issues are real.  They're

25 important.  The government is committed to them, and you know,

1  really it is undisputed that there -- the governing orders and

2  agreements nowhere explicitly say that the government won't be

3  repaid on account of the recovery in this lawsuit.

4          THE COURT:  Well, but it -- that's -- I agree with

5  that.  It does expressly state that there are some sources that

6  you can't seek to recover from.  And, of course, the central

7  part of the decision of Judge Gerber was the non-recourse

8  language.

9          MR. JONES:  Yes, that's right.  And --

10          THE COURT:  May I ask you this?

11          MR. JONES:  Yes.

12          THE COURT:  What arguments could the DIP lenders make

13  now that were not made or considered by Judge Gerber?  I'm

14  starting with -- I didn't live with this case.  I've read

15  everything that's been filed for today.  I read multiple times

16  Judge Gerber's decision, Judge McMahon's decision.  And the

17  moving papers allude to the fact that the DIP lenders raise

18  issues now that weren't raised earlier, and so that's actually

19  the first note I had to myself was what arguments could the DIP

20  lenders make that were not made or considered by Judge Gerber.

21          MR. JONES:  I think Ms. Sharret identified the thing

22  that she has in mind, which I think I have in mind also, and

23  it's an argument actually that was pressed more directly by

24  EDC's counsel, Canada's lawyers' counsel, but it's a discussion

25  of the distinction between the borrower and the estate and that

34

1  the recovery is on behalf of the estate and the borrower was

2  not identical to the estate and that as DIP lenders with a

3  superpriority administrative claim, we were entitled to be

4  repaid out of recoveries for the estate, except to the extent

5  we agreed otherwise.

6          So a lot of our arguments will be the same, and our

7  response to any skepticism about the settlement arising from

8  that statement would be, yeah, that our arguments are good and

9  they present real litigation risk.  And by the way the courts

10  recognize they should defer to litigators' judgment, at least

11  to some extent, and Mr. Mayer and his colleagues are terrific

12  litigators, and they believe this degree of risk to be present,

13  and that is what's required.  The procedural requirements are

14  amply met here.  Negotiations were merit based and lengthy, et

15  cetera.

16          There are -- there is also the --

17          THE COURT:  May I ask you is there anything other

18  than a distinction between the borrower and the estate and the

19  other arguments that you believe you would make that were not

20  considered by Judge Gerber?

21          MR. JONES:  The other thing -- I don't have a

22  specific legal argument up my sleeve, Your Honor, and so the

23  other question is the question of parol evidence.  And at prior

24  stages, the parties litigated and made only informal

25  assessments that there was no parol evidence that would shed

1  light on this seeming ambiguity or tension within different

2  provisions.

3        THE COURT:  Yeah, that was my question about is there

4  any extrinsic evidence relating to the interpretation of the

5  wind-down order that was not presented or considered by Judge

6  Gerber.

7        MR. JONES:  None has been developed.  I think if this

8  matter were to be litigated, the parties would take a fresh

9  look at whether they wanted to develop or try to develop parol

10  evidence in light of how litigation went the first time.  I

11  think I'm not willing to waive the possibility or definitely

12  speak that there could be none.  My sense is that it would

13  probably be pretty consistent with the parties' positions in

14  the litigation, which is -- I think folks on our side would say

15  we were never asked that and we never gave it, that being an

16  explicit agreement on account of our DIP claim not to be repaid

17  by the estate from this recovery.  And the Committee would say

18  whatever the Committee says, which is -- I think they would

19  probably say something like, come on, it's abundantly clear

20  when you do a loan on a non-recourse basis and you exclude it

21  from collateral that you are intending not to be repaid, to

22  which we would say not so.

23        THE COURT:  Not be repaid from sources other than the

24  collateral.

25        MR. JONES:  Not be repaid from this source, and to

36

1  which we would then say not so because a DIP claim and a

2  superpriority administrative claim is different, functions

3  differently.  The nature -- the term "non-recourse" is about

4  remedies in the event of a default in the nature of your

5  security.  It's not about the existence or non-existence of a

6  repayment obligation.

7          THE COURT:  Well, Judge Gerber, you know, he goes --

8  he looks at several dictionary definitions of non-recourse, so

9  I'm not sure that it's limited solely -- I mean, it's most

10  often used in a secured lender context, but I'm not sure that

11  that is the intellectible conclusion that has to be drawn here.

12          MR. JONES:  Well, and then the question -- so Your

13  Honor is articulating the existence of a litigation dispute,

14  really, I would respectfully say because with the --

15          THE COURT:  It's -- no, I mean, because the -- Judge

16  Gerber undertook an analysis of the principles for

17  interpretation with contracts.  Yes, there was a court order,

18  but it was -- it only makes clear that he didn't have an intent

19  when it was -- he's got two very lengthy footnotes that deal

20  with intent made clear.  He didn't have an intent with respect

21  to his wind-down order earlier, the initial, to be very clear.

22  And I agree with what he said in footnotes.  Certainly, I tried

23  to be protective before there's a committee in place, just as

24  Judge Gerber described in his opinion.  But he went through --

25  you don't disagree that he was correct in essentially applying

37

1  contract interpretation principles to an order that was

2  presented to him to sign?

3       MR. JONES:  I think as a general matter, it is

4  correct that contract interpretation principles are properly

5  applied when interpreting orders.

6       THE COURT:  Okay.

7       MR. JONES:  And I think that's --

8       THE COURT:  And do you disagree with any of the

9  contract interpretation principles that Judge Gerber applied in

10 reaching his decision?

11      MR. JONES:  I don't want to say no because I have not

12 studied carefully enough, but I think the answer is we

13 certainly disagree with his outcome, obviously.

14      THE COURT:  I know you do.

15      MR. JONES:  And I think that he -- yes, because I

16 think -- first off, I think that as Judge McMahon observed, he

17 infused his analysis with personal observations and extra

18 record considerations or experiential considerations from how

19 bankruptcies ordinarily work.

20      THE COURT:  Yeah, but he -- I think he also made --

21 yes, he did, but I think he also -- I just -- I thought he made

22 clear that he wasn't resolving this -- I mean, you don't check

23 at the door your experience when you're handling things, and

24 judges don't either.

25      MR. JONES:  Your Honor, I'm sorry.  It's -- certain

38

1  thoughts are coming to me piecemeal --

2          THE COURT:  That's fine.

3          MR. JONES:  -- but also responsive to your last

4  question.

5          THE COURT:  Go ahead.

6          MR. JONES:  The cramdown point Your Honor identified

7  is an important aspect of recognized contract or order

8  interpretation precepts.  And although, yes, that discussion

9  appeared on Page 42, it was very important because the parties

10 -- a lot of the parties' arguments are sort of at cross

11 purposes.  The Committee is saying to us that we render their

12 protections meaningless surplusage, and we saying back at them,

13 no, no, you are trying to render our important protections

14 meaningless surplusage.  And --

15         THE COURT:  But without resolving the surplusage

16 question where you're each accusing the other of creating

17 something that's surplusage, if you come back to a plain

18 meaning -- and the part of that that Judge Gerber seemed to me

19 at the core of his decision is you've got to give some meaning

20 to the non-recourse language.  Now, he traces through how

21 protection for the DIP lenders was first rejected, then put

22 into an order, then taken out of an order, then something put

23 back into the order.  And he went through that chronology, it

24 seemed to me, and that's just something I think was left out of

25 the chronology.  It seemed to me to be very careful analysis.

1          But I read your brief here carefully to see what

2     arguments -- where do you think Judge Gerber went wrong and

3     why?  And I have to say that other than the brief discussion in

4     Judge Gerber's opinion whether the DIP loan could be crammed

5     down, I don't see any other specific portions of the opinion

6     that you think Judge Gerber got wrong.  Obviously, you think

7     the conclusion was wrong, but I want you to tell me what you

8     think he got wrong and why.

9          MR. JONES:  Sure.  And thank you.  Let me say that he

10    consistently undervalued or failed to acknowledge the

11    importance and correct meaning of the cluster of provisions by

12    which the DIP lenders were granted their superpriority DIP

13    claim.  He also failed to acknowledge that there were all sorts

14    of negotiations on the limits of that claim.  There were

15    explicit exceptions from the repayment obligation on account of

16    that claim for other things and not for this, and that has

17    independent interpretative significance.

18          THE COURT:  Which can you be more specific?

19          MR. JONES:  Sure.  The --

20          THE COURT:  I did not go back and read the briefs

21    that were given to Judge Gerber before he rendered his

22    decision.

23          MR. JONES:  So specifically, the DIP lenders agreed

24    that the estate would never need to repay them out of certain

25    funds set aside for so-called burial expenses.

40

1          THE COURT:  Well, that's classic.  I mean, it's just

2  --

3          MR. JONES:  Right.  Well, it may be classic, but it

4  was specific in the agreement.  And also --

5          THE COURT:  You know, I -- well, never mind.  Go

6  ahead.

7          MR. JONES:  Well, let me -- maybe I led with --

8          THE COURT:  Classic, I don't think --

9          MR. JONES:  Maybe --

10          THE COURT:  You know, the U.S. Trustee stands up at

11  every hearing and insists that there be a carve-out for burial

12  expenses, and I've certainly never entered an order that didn't

13  provide for it.

14          MR. JONES:  Okay, Your Honor.  I led with my less

15  than impressive example.  I was building to a crescendo, and

16  here it is.  The crescendo is that we had a very carefully

17  negotiated, explicit deal with the unsecured creditors that a

18  component -- a 10 percent or more share of the equity value of

19  the New GM company was reserved and would not be touched for us

20  and was specifically reserved for --

21          THE COURT:  Right.  That's expressly carved out --

22          MR. JONES:  And that's --

23          THE COURT:  -- with no question.  There's an express

24  language about it.

25          MR. JONES:  Right.  And so our point is when we were

1  limiting our ability to be repaid at the end of the day by the

2  estate on account of our unprecedented and financially very

3  significant facilitation of this remarkably successful

4  bankruptcy, when we were going to agree to not be repaid out of

5  something, we said so explicitly.  And other than that, our

6  baseline entitlement and our baseline demand was to be repaid

7  out of available estate assets.  And simply, you know, we're

8  arguing from an absence, a telling absence, of something

9  creating similar exception here.  In addition, although yes he

10 did make a meticulous tracing of the evolution of the recourse

11 language and other things, an error that he made is that all of

12 those are with respect to security-related entitlements of us

13 certainly, in our view, and they quite simply do not alter or

14 effect the meaning or terms of the entitlement to be repaid on

15 account of the DIP claim.

16      THE COURT:  Let me ask you this.  One of the things

17 that our financing guidelines have always dealt with, and Judge

18 Gerber talks about them in his opinion, is that extraordinary

19 provisions have to be specifically expressly identified.  And

20 don't you agree that an agreement to enable a DIP lender to

21 recover proceeds from an avoidance action are an extraordinary

22 provision?

23      MR. JONES:  I'm not in a position to agree with that,

24 Your Honor.  And I hasten to say I --

25      THE COURT:  Are you in a position to disagree with

1  that?

2          MR. JONES:  I'm -- I am not well enough informed to

3  concede that point.  I think that -- and I'm not conversant in

4  -- I'm not ordinarily a DIP lender's lawyer nor a debtor's

5  lawyer, so you've got a roomful of them who can comment on

6  this, but in my view and I think in the government's view, it

7  was -- what we had is a DIP lender entitlement that was

8  absolute and unqualified except to the extent it was qualified

9  and it simply was not.  So it would be odd to impose a

10 requirement.  It did not -- it does not strike me as jarring to

11 think that we had an obligation to point out that our absolute

12 entitlement included some specific applications of that

13 absolute entitlement when, you know, when it's simply absolute.

14 So I think that's -- I guess that's the best I can do with that

15 question.

16         THE COURT:  Just bear with me a second, okay?

17         MR. JONES:  Of course.

18         THE COURT:  So in footnote 102 of Judge Gerber's

19 opinion, which is at Pages 36 and 37, he quotes from General

20 Order M-274, Guidelines for Financing Requests, and he quotes

21 from section, Lien on Avoidance Actions, because it goes -- the

22 provision deals with more than just liens.  It also deals with

23 superpriority.  And quoting from it is, quote:

24         "Extraordinary provisions include the granting of

25          liens on the debtor's claims and causes of action

43

1          arising under Sections 544, 545, 547, 548, and 549,

2          but not liens on recoveries under Section 549 on

3          account of collateral as to which the lender has a

4          post-petition lien and the proceeds thereof" --

5          And then, he has italicized, "or a superpriority

6 administrative claim payable from the proceeds of such claims

7 and causes of action."  That's end of the quote, and that last

8 portion is in italics.  And that's why I asked the question

9 about whether a adequate protection claim lien talks about

10 collateral, but superpriority has to be expressly stated.

11          You're arguing that silence, the absence of a

12 provision -- there's not -- well, there's his discretion.  I

13 mean, there is an express provision about non-recourse.  Your

14 argument is, ah, but it doesn't say superpriority, without

15 recourse to a superpriority lien.  It doesn't say we're the --

16 but we're allowed our superpriority claim.

17          So it's one on -- and Judge Gerber doesn't

18 specifically address this, and maybe I'm off base on it, but it

19 seemed to me as where we have this presumption that we, as the

20 court, expressed in our guidelines and in a lot of decisions

21 since that anything that's extraordinary, you've got to put it

22 in the order.  You don't put it in, you don't get it.  We don't

23 want silence to mean that you get something that we consider

24 extraordinary.

25          And what -- one of the things that the guidelines did

44

1  expressly put in the extraordinary category was a superpriority

2  administrative claim payable from the proceeds of such claims

3  and causes of action.  In rare instances -- and Judge Gerber

4  makes this point -- and in very rare instances, I have approved

5  it when there's no other potential source and it's expressly

6  put in.  Yes, I've reluctantly approved superpriority claim or

7  even a lien on recovery on avoidance actions, but it's very

8  reluctant.  It's only where it's really set out clearly.  And

9  you're arguing that silence means you get it.  And here, you've

10  got the non-recourse language.  You know, I'm just -- look, I'm

11  arguing -- one of the things I would like to get, and I'll

12  raise it now with you, I'd like to see these letter briefs that

13  were submitted to Judge McMahon on the issues she raised.  I'm

14  aware that from the briefs that she raised questions regarding,

15  but I don't have what it is that each side submitted.  I'd like

16  to see those and see -- I want to see specifically put that

17  relation of here's the question she asked and here's the

18  answers that each of the parties gave.

19       But that's why I'm struggling with this.  It just --

20  we're reluctant to provide a superpriority claim on avoidance

21  -- recoveries on avoidance actions.  I used the term claim.

22  It's not a claim.  Allow recovery of superpriority expenses

23  from proceeds of an avoidance claim.

24       MR. JONES:  I mean, Your Honor, all I can say is I

25  understand that point.  Nevertheless, the controlling -- I

45

1  believe the controlling documents, nevertheless, are the orders

2  and agreements, and they provide what they provide.

3        THE COURT:  But don't our -- I mean, a general order

4  from the Court that says what you've got to do -- I mean, isn't

5  that part of the appropriate interpretative principles which

6  our guidelines say we've got to specifically identify it, put

7  it in our order if you're going to get something that's

8  extraordinary?  Wouldn't that be a relevant consideration in

9  interpreting the orders that were entered?  Judge Gerber said,

10 look, I -- he said basically, I didn't have an intent at that

11 point in the case.  Okay, that's fair.  And he was very

12 straightforward about it.  Okay.  But isn't it an appropriate

13 fact, you know, consideration for interpreting the order what

14 are general order requires about this kind of protection for a

15 DIP lender?

16       MR. JONES:  Well, for me to say no, I think, Your

17 Honor, requires me to say that it's error to look at that as

18 one tool in an interpretive toolbox.

19       THE COURT:  But you're not going to tell me that,

20 right?

21       MR. JONES:  I can't -- I don't -- I think --

22 honestly, I don't think I can tell you that, but I don't think

23 it's the only tool and I don't think it's dispositive.

24       THE COURT:  That, I agree with you.  Okay.  Are there

25 any -- let me just so I'm clear, so I have my notes clear.  Are

46

1  there other specifics in which you think Judge Gerber went

2  wrong in his opinion that you identify?

3          MR. JONES:  I mean, he -- there may be isolated

4  errors and I may be drawing a blank in some respects.  The guts

5  of the issue, I think as I put it to Judge McMahon, is quite

6  simply that we have an unqualified absolute grant of a

7  superpriority administrative repayment entitlement.

8          THE COURT:  You mean the carve-out that says all

9  recovery is -- the recovery is not -- it's -- that's why -- do

10 you know what the balance -- that's why I ask -- what the

11 balance of the DIP loans were at the time that the wind-down

12 order was entered?  It had sources of recovered --

13         MR. JONES:  I --

14         THE COURT:  So you were credit bidding most of the

15 DIP loan, right?

16         MR. JONES:  Right.  Well, there were tens of billions

17 of dollars in DIP loans, most of which were credit bid and

18 exhausted.  I think New GM -- I'm scaling the numbers, but I

19 think New GM assumed in the neighborhood of eight billion, if

20 I'm not mistaken.  If you don't mind, I'm going to look over my

21 shoulder --

22         THE COURT:  Oh, please.

23         MR. JONES:  -- and see if my Treasury friends correct

24 me.

25         THE COURT:  Sure, go ahead.

47

1          MR. JONES:  Yeah, okay, we think that's right.  So I

2   think New GM assumed eight billion.  We credit bid the bulk of

3   the remainder.  I think the 1.175 wind-down facility was

4   separate.  Mr. Mayer would probably know.  I believe it was --

5   I believe that amount was either advanced or available to fund

6   the estate going forward, and then the other data point I have

7   is -- with reasonable confidence is that we're now owed in

8   excess of 800 million on that.  So I don't know the sequence of

9   advances and amounts outstanding.

10          THE COURT:  Well, I just -- I guess it's speculation

11   on my part, in the absence of the parties offering extrinsic

12   evidence on it.  It just -- I asked myself the question, well

13   -- or maybe provided myself with a hypothetical, that you just

14   treat the wind-down advance differently than the rest of the

15   DIP.  It was just -- the case was at a different place at that

16   point.

17          MR. JONES:  Well --

18          THE COURT:  So was it --

19          MR. JONES:  -- I understand --

20          THE COURT:  -- so extraordinary that you wouldn't

21   assure that it would -- look, you agreed you wouldn't get any

22   recovery from the stock, and I know that's expressly in there,

23   but there -- the Creditors' Committee arguing put the

24   non-recourse language expressly in there.

25          MR. JONES:  Right.  I guess, Your Honor, what I'd say

48

1   is the wind-down order and agreement expressly incorporated and

2   included the identical superpriority administrative claimant

3   status or an entitlement to be repaid on the amount owed.  So I

4   don't think there's any formally correct way to say that it was

5   somehow less super.  It retained that full superpriority status

6   and for a reason, because again, that's a lot of public money

7   to be laying out, and we were committed as part of this broader

8   context.  It is true that the wind-down portion was in the

9   context of a much bigger series of transactions, but that, in

10  and of itself, was something where the governments were

11  determined to recapture as much as possible of assets available

12  after the wind-down.

13        One distinguishing sort of equitable factor I'll

14  point out is -- also flows from the broader context, which is

15  the government's funded and facilitated the realization by

16  everyone, including unsecured creditors, of vastly greater

17  recoveries than anyone dreamed of and would have been possible

18  but for this very large infusion of governmental money.  So

19  we're left with a dispute that sounds like we're playing rough

20  maybe to the Court or to the Committee, but it's in a broader

21  context where we funded every interested player's professional

22  exposure and we brought very huge value into play.

23        THE COURT:  I commented before only indirectly

24  related here.  I had a case, the Metaldyne case, which I guess

25  was a tier one part supplier.  And where that case started, I

49

1  was quite surprised to learn that the DIP funding came from GM,

2  Chrysler and Ford.  GM and Chrysler were obviously in Chapter

3  11 proceedings, so where the money come from was TARP money.

4  It was the government money.  And I completely understood the

5  necessity of funding the parts suppliers because for the wont

6  of the horseshoe nail, you know, the war is lost.  If they

7  couldn't get the parts to build the cars, that was it, so I --

8  you know, the government obviously played an important role.  I

9  don't -- not for the moment do I dispute the importance of it

10  or what the beneficial -- despite some public controversy about

11  it, what the beneficial effect of all the money that the

12  government put out to do it, but that's not -- that's a much

13  narrower issue that's here.

14        Let me ask you a couple more questions, and I'll give

15  you a chance.  I'm probably wasting my breath on this, but are

16  the DIP lenders prepared to agree to provide the funding

17  without conditioning approval of the settlement -- the

18  allocation settlement?  Look, I'm having a hard time --

19        MR. JONES:  No.

20        THE COURT:  -- Mr. Jones, because you've linked these

21  inextricably, and I've got objections that say, but it's not a

22  zero-cost loan.  I don't know what the cost is, but it's some

23  portion of the recovery that the DIP lenders will get if

24  there's a recovery in the avoidance action.

25        MR. JONES:  Your Honor, yeah, let me address that

1   very forcefully --

2             THE COURT:  Please.

3             MR. JONES:  -- because it absolutely is a zero cost.

4   We don't call it a loan.  We call it a litigation cost advance,

5   and the reason we call it that is this is not being afforded

6   through an exercise of governmental lending authority, which

7   I'm not -- we have not identified ourselves as having.  So this

8   is -- this --

9             THE COURT:  You have authority to advance money for

10  litigation.

11            MR. JONES:  I'm sorry, Your Honor?

12            THE COURT:  You have money to advance to support

13  litigation.

14            MR. JONES:  I'll explain exactly.  What we have is

15  authority to enter compromises in litigation and settle

16  litigated disputes.  And this entire settlement agreement and

17  the term requiring the 15 million litigation cost advance was

18  done as an exercise of governmental and justice department

19  settlement authority with treasury department concurrence.  And

20  the reason -- so -- and I should say this settlement has

21  received very heavy DOJ approval up to specifically the

22  associate attorney general, acting associate attorney general.

23  It's received very heavy review and approvals within the

24  treasury department.  It is viewed entirely, from the

25  governmental perspective, as a litigation settlement of the

1  proceeds dispute -- proceeds allocation dispute.  And the

2  payment is purely and solely a term of that settlement.  It is

3  not in any -- it is not an exercise of governmental funding

4  authority through TARP or anything else.

5          THE COURT:  Have you reviewed the prior funding

6  agreement?

7          MR. JONES:  Yes.  I mean, not with rigorous care, but

8  yes.

9          THE COURT:  So I've got to deal with this argument

10 that they make that the termination provision of the private

11 funding agreement, it could only be terminated if the Trust

12 obtained financing on better terms.  And so the argument that's

13 being made to me is I either have to determine or impute the

14 cost of the funding that the DIP lenders are providing --

15 you're saying it's through the settlement approval authority,

16 and I understand your argument about it, but does that somehow

17 -- does that mean that I still don't have to try and determine

18 whether there's an imputed cost to the Trust for obtaining that

19 $15 million?  We're not going to know the result of the

20 avoidance action.  It would be great if we knew tomorrow, but

21 we're obviously not.

22         MR. JONES:  Your Honor, I'm quite confident, although

23 I haven't vetted this through a million governmental people,

24 but that it would be absolutely wrong to impute any cost from

25 our settlement as a financing cost.

52

1              THE COURT:  Tell me why.

2              MR. JONES:  And -- sure.  The reason is, first off,

3    what the financing cost is, is something borne by the Avoidance

4    Action Trust as a borrower or recipient of funds.  There is no

5    circumstance in which the -- the Avoidance Action Trust simply

6    bears no cost as a factual matter from the litigation cost

7    that's being provided should this settlement be approved, full

8    stop.  There's absolutely no cost to the Trust.

9              So I think it is simply a logical error to say that

10   you need to compare the costs that the River Birch -- am I

11   allowed to say their name?

12             THE COURT:  Yes.

13             MR. JONES:  The private financer.

14             THE COURT:  That's in the papers.

15             MR. JONES:  Okay.

16             THE COURT:  River Birch is there.

17             MR. JONES:  The private financing --

18             THE COURT:  And I've got to ask Mr. Hansen

19   specifically what Kempner's -- he's got his footnote one where

20   he acknowledges they have some interest.  I don't know what the

21   interest is, he's going to have to tell me that, but go ahead.

22             MR. JONES:  So the private financing indisputably

23   requires payment to the private financer of the greater of 4.75

24   percent of the total recovery or two and a half times the

25   amount lent --

1                    THE COURT:  That they have asked --

2                    MR. JONES:  -- to the private financer from the Trust

3     before any proceeds get distributed.  So the apples to apples

4     comparison or the --

5                    THE COURT:  But that's a lot less than if a court,

6     after a final order is entered, wherever court that is,

7     determines that the DIP lenders get nothing, that their -- they

8     lose their allocation claim for the reasons that Judge Gerber

9     or another judge determines, so --

10                   MR. JONES:  That should be a matter of -- sorry, Your

11    Honor.

12                   THE COURT:  Go ahead.

13                   MR. JONES:  That should be a matter of total

14    indifference to the Trust.  If -- well, they can't have our

15    money if they -- if we don't get our settlement, so -- but if

16    you assume a world where they got their 15 million, no cost, no

17    interest, whether or not our settlement flags -- or I guess

18    Your Honor's hypothetical was if litigate to the end of the day

19    against the UCC, which we're prepared to do --

20                   THE COURT:  I haven't had any doubt about that.

21                   MR. JONES:  -- and we lose, that is a matter of

22    indifference to the Trust except for that it may complicate

23    their life because they won't know who the beneficiaries are

24    and whose expectations they need to meet in settlement

25    discussions and so forth.  But financially speaking, there's

54

 1  just no world in which our deal is not superior to the -- for

 2  the Trust as compared to the private financer.  So that's

 3  really it.

 4          Let me also --

 5          THE COURT:  There -- what you're saying is the Trust

 6  is indifferent to what the allocation is at the end of the day?

 7          MR. JONES:  Well, they've stated they take no

 8  position on the particulars of the allocation resolution, but

 9  they like the fact of a settlement.

10          THE COURT:  That it resolves it.  Yes, I understand.

11          MR. JONES:  Yes, resolution, good.  Particulars, they

12  don't care.  And that's fair enough.  But I think Your Honor's

13  question, to circle back, was as to the private financer

14  objector, are they right that some portion of our settlement

15  should be imputed in a weighing of whether our financing is

16  superior or inferior to theirs, and the answer is no because

17  the proper measure is what's the impact on the Trust, and free

18  money beats expensive money.

19          THE COURT:  Well, the Trust -- if the Trust

20  terminates -- well, let me assume that after the Trust

21  terminates the private funding agreement and let's assume a

22  billion-dollar recovery agreement -- Mr. Fisher probably wants

23  to assume a billion and a half recovery, but it's a big number.

24  The private funders could turn around and sue the Trust.

25  They're not going to be indifferent to the outcome of that

55

1 lawsuit.

2        MR. JONES:  No, the Trust won't be indifferent to

3 that lawsuit.  I -- respectfully, I would say that -- I did

4 listen attentively and with interest to your exchange with Mr.

5 Fisher on that.  I think -- there's no scenario where River

6 Birch sues and gets more than it would have gotten out of this

7 deal and we're free.  So I don't think there's a world in which

8 the Trust is worse off but for professional fees in dealing

9 with that.

10       THE COURT:  Well --

11       MR. JONES:  But more importantly, what I really want

12 to say --

13       THE COURT:  -- do you think the Trust cares whether

14 creditor recoveries, whether it's the DIP lenders or the

15 unsecured creditors, their recovery is reduced by $15 million?

16 Let's assume hypothetically that's what River Birch was able to

17 recover for breach of contracts.  They most certainly ought to

18 care about that.

19       MR. JONES:  No, no, not indifferent, but they're no

20 worse off -- if the outcome of today's hearing or ultimate

21 related rulings is that the no-cost DIP litigation cost advance

22 does not occur and instead the Trust gets money from River

23 Birch on the terms negotiated, they will have immediately

24 incurred the same obligation that is the very best-case

25 litigation outcome for River Birch.  There's no worst-case

56

1  litigation outcome.  That's what I'm saying.

2          But beyond that, I think it's a very, very weak

3  claim.  I heard Your Honor's observations --

4          THE COURT:  I'm not making -- I'm not putting --

5  saying whether it's a strong claim or a weak claim.  I'm just

6  asking hypotheticals because, you know, it's a fund that's

7  going to sue, and --

8          MR. JONES:  Right.  I --

9          THE COURT:  -- that's probably the only thing you can

10 be pretty sure of.

11         MR. JONES:  Well, I -- I mean, I don't want to step

12 on the Trust's toes, but to me, a contractual breach claim

13 saying you breached by deciding not to let me have 18 to $56

14 million of profit and instead taking free money when you had a

15 contract with me that said you were entitled to walk if you got

16 a better deal, it's very hard to see the Trust losing that.  So

17 maybe my imagination is limited.  I see Your Honor's factual

18 reaction.  But I do think that's -- even if there's no

19 collateral estoppel effect of today's ruling --

20         THE COURT:  I'm not being asked to make a decision

21 whether -- at least I didn't understand it, that I was being

22 asked to make a decision today on this -- on that precise

23 question.

24         MR. JONES:  I understand, Your Honor, and that's

25 fine, but the issues have been fleshed out and, I think would

1  be helpful to the record on that.  Let me also just add one

2  additional observation on that, which is -- on the financer's

3  entitlements, which is you also shouldn't impute the settlement

4  any portion of the proceeds split to the cost of the

5  transaction because that's counterfactual.  The Committee and

6  the DIP lenders argued and negotiated over a very long period

7  of time.  We had some discussions when the prior litigation was

8  going on that sort of went dormant and then they reactivated,

9  and they've occurred for months.

10       And the -- again, to say -- to impute any portion of

11  the settlement outcome to the financing is to put it exactly

12  backwards.  We used the financing as a tool and a lever to

13  bridge a final gap and achieve an agreement, subject to

14  approval, that we both could live with.  So that is not, in any

15  true way, attributable as a financing cost.  Instead, what we

16  have is a settlement that we worked very hard and had a hard

17  time achieving that the Committee and the DIP lenders could

18  live with that had, as one feature, one value add, this benefit

19  of free government money being advanced on stringent conditions

20  to assure, you know, repayment of the amount that was advanced.

21       Let's see, I think I just want to circle back to the

22  nature of the proceeding, if I may, Your Honor, and just to say

23  I know -- I understand the Court has an obligation to closely

24  probe the nature of the dispute being resolved by settlement to

25  assure itself --

58

1            THE COURT:  Yeah.  In fairness, it's got to be you

2   who I pick on about that rather than the Committee.  The

3   Committee shouldn't have to argue against their victory.

4            MR. JONES:  I am more than happy to do my part to try

5   to persuade the Court, under the appropriate standard of

6   review, that this falls within the applicable standard, which

7   is anywhere in the range of reasonableness, but because we've

8   had this lengthy discussion about the merits of our litigation,

9   I want to just circle back to what the test is, which is not

10  whether the Court thinks we're going to win or lose or what the

11  ultimate outcome is.  The appropriate test is are there genuine

12  issues to be litigated, do the parties bear meaningful

13  litigation risk, and does the settlement fall within a range of

14  reasonableness of a resolution of that, and the answer is yes.

15           THE COURT:  Okay.

16           MR. JONES:  Thank you.

17           THE COURT:  Thank you very much.

18           Mr. Hansen?

19           MR. HANSEN:  Your Honor, did you want to minute or

20  you ready to go?

21           THE COURT:  Sure, let's take a ten-minute recess,

22  okay?

23      (Recess taken at 3:27 p.m.)

24      (Proceedings resumed at 3:43 p.m.)

25           THE COURT:  Please be seated.  Mr. Hansen?

59

1           MR. HANSEN:  Good afternoon, Your Honor.  Kris Hansen

2  with Stroock on behalf of Davidson Kempner Capital Management.

3  Your Honor, just to get rid of the question of potential

4  conflict up front, Davidson Kempner has a 25-percent interest

5  in the River Birch loan.  But from Davidson Kempner's

6  perspective, were there better financing on the table,

7  materially better, I guess that's the provision that we're

8  dealing with within the River Birch financing agreement, you

9  know, Davidson Kempner wouldn't be objecting to the DIP

10  financing component.  Like we're not --

11           THE COURT:  I'm just surprised because, you know,

12  you -- other than the jilted bride, you're the only -- your

13  client is the only creditor that's objected.  And lo and

14  behold, it has a 25-percent interest in the private funding.

15  There's certainly lots of creditors that -- who received notice

16  of this and they're all silent.  So you have to understand that

17  it raises -- you put it right in your footnote 1, without

18  telling me what the interest was, but you certainly flagged the

19  issue.

20           MR. HANSEN:  Absolutely, Your Honor.  We wanted to

21  make sure that you knew about it up front.  And then I guess

22  that in that we were a participant in the financing, we knew

23  more about what was going on in the case.  The case is

24  obviously quite old, so.  And there --

25           THE COURT:  Lots of creditors know what's, you

60

1  know --

2          MR. HANSEN:  And there is a very large, I guess,

3  universe of Avoidance Action Trust interest holders.  But I

4  can't -- obviously I have no idea why they --

5          THE COURT:  But you would agree that under _Iridium_

6  one of the factors I have to look at is the level of creditor

7  support for -- or parties in interest support for settlement?

8          MR. HANSEN:  I would, Your Honor.

9          THE COURT:  And that cuts against you.

10          MR. HANSEN:  It does and it doesn't.  Because you

11  have to kind of throw out the Committee and the Trust support

12  for that.

13          THE COURT:  How many creditors are there?

14          MR. HANSEN:  Well, they haven't come out and said

15  they support it.  They just haven't said anything.  So it's --

16          THE COURT:  Well, there's lots of big creditors

17  who -- because I've seen them at other hearings.  And you're

18  really not ready to concede that that factor is against you?

19          MR. HANSEN:  No, I'm not, Your Honor.  I think that

20  silence doesn't equal support.  And I think that there are --

21  and also I do, by the way, think it's the weakest factor or one

22  of the weakest factors in connection with --

23          THE COURT:  You think so?

24          MR. HANSEN:  -- in this case.

25          THE COURT:  I mean, it -- _Iridium_ doesn't weight the

61

1  seven nonexclusive factors.

2         MR. HANSEN:  No, I -- absolutely, Your Honor.  I

3  think you have to weight them in the context of the dispute

4  that you're adjudicating, so to speak, to determine whether,

5  you know, the settlement makes sense.  I'd like to start where

6  you started, though.  You started where I was going to start,

7  which is why aren't --

8         THE COURT:  You're just saying that, but go ahead.

9         MR. HANSEN:  No, I have it in my papers.  I wrote it.

10 Why aren't these separated?  And it's interesting because you

11 asked a question -- I think you explored it enough, that you

12 asked, they said they wouldn't.  I don't really need to get

13 into that too much.  But you asked a question which said -- you

14 said I'm not being asked to make a determination that DIP

15 lender financing is better and basically if the private funder

16 brings a breach of contract action, I'm not really being asked

17 to make a ruling on that today either.  And you explored that a

18 little bit.

19        I think if you turn to the Exhibit A and Exhibit B to

20 the motion that was filed, one is a stipulation that you're

21 being asked to effectively approve and the second is the order

22 that you're being asked to put in place.  Paragraph 5 of the

23 stipulation says:

24        "The DIP lenders are hereby granted, consistent with

25        the terms contained in the agreement, and without

1       filing or further action required by the DIP lenders,

2       a first priority perfected continuing security

3       interest in and lien on the Avoidance Actions

4       proceeds and the funding account up to the amount of

5       litigation cost advance."

6   And then the order says that:

7       "The Avoidance Actions Trust is authorized to grant

8       the lien to the DIP lenders as set forth in the

9       stipulation and the litigation cost advance

10      agreement."

11  So in many ways, right, the granting of a lien is

12 what enables them to be able to go ahead and make the cost

13 advance.  If you said, hey, I'm not giving you a lien here, you

14 can keep the super priority claim you think you have and I'm

15 just not going to do that and --

16      THE COURT:  Well, they're putting new money up.  And

17 it doesn't surprise me at all that that's --

18      MR. HANSEN:  Absolutely.  And by putting new money

19 up, they're implicitly asking you -- it's -- we're in a weird

20 state.  This isn't a debtor.  The debtor is not standing in

21 front of you saying under Section 364, you know, these are the

22 standards that applies and you have to go out to the -- and

23 basically market test, in some respects, the financing.  But

24 that's kind of what the provision that they agreed to in the

25 private financing does.

63

1         THE COURT:  If I were to -- let's put aside the

2    allocation settlement.  You don't dispute that the terms --

3    you're just focusing on the trusts and the terms around -- the

4    terms along what they're proposing are superior to what your

5    client has offered.  It just -- it can't be disputed.

6         MR. HANSEN:  Nobody can make the determination.

7    Well, it's not that it can't be disputed.  We can't figure it

8    out.

9         THE COURT:  Well, how -- what do you mean you can't

10   figure it out?  I had an assumption that -- let's put aside

11   the -- don't consider the settlement or the allocation dispute.

12   Just focus on the terms of the financing.  There just simply

13   can't be any dispute that what they're offering the Trust is

14   superior to what your client has offered.  It's zero cost

15   versus the cost that's in your agreement.

16        MR. HANSEN:  Were that the reality, I agree with you.

17   But that's not the reality we're dealing with.

18        THE COURT:  So Mr. Jones, I -- and I must say I

19   didn't appreciate what the government's position is.  The

20   Treasury doesn't have the authority to provide a DIP loan to

21   the Trust at this point.  I mean, what they have is authority

22   to settle a dispute.  So what is wrong with that argument?

23        MR. HANSEN:  Well --

24        THE COURT:  You're smiling, but I don't --

25        MR. HANSEN:  Because it sounds --

64

1           THE COURT:  I found it persuasive.

2           MR. HANSEN:  Because it sounds to me like litigation

3 funding.  It just sounds like litigation financing in some

4 respects.  It's a settlement financing.  And what they're doing

5 is they're financing the underlying litigation.

6           THE COURT:  But the difference is that for a long

7 time they have -- as everybody knows, Treasury has asserted

8 that it's entitled to an allocation of any recovery.  Your

9 client -- well, maybe because your client has a -- you know,

10 does have a claim.  But it also has a 25-percent interest in

11 the proposed litigation funding agreement.  And you're

12 differently situated, aren't you?

13          MR. HANSEN:  No, Your Honor.  Again, if these were

14 separated -- and I'm going to go back to this for a second.

15 They're no different than a patent troll at this point, right,

16 somebody who comes in and says, oh, you want to pursue that

17 litigation, I'll finance it.  That's what they're doing.  It's

18 litigation financing.  You want to call it litigation

19 financing, you want to call it a direct loan, it's financing.

20 We all know what it is.  If Treasury can do a back flip and get

21 comfortable by litigation financing as opposed to making a

22 direct loan, good for them.  Maybe the taxpayers, you know,

23 don't know about it, they don't complain, we're all happy.  But

24 that's really what seems to me to be going on.

25          So when you get back to the question that you asked them,

1  which was can you separate these because it's -- we cannot

2  determine if you're making an interest-free loan and -- because

3  it's inextricably linked, they are conditioned upon one

4  another --

5              THE COURT:  That's what's bothering me about it.

6              MR. HANSEN:  -- you know, and they said, no, I can't,

7  then we don't know what it costs.  But if it was severable and

8  they did say we won't link these, we're going to make an

9  interest-free loan -- which nobody does, but let's just say

10 they did -- Davidson Kempner would not object to the DIP,

11 period.  We'd be happy to have the government with a zero-

12 percent loan being made to the Trust.

13             We would probably -- if it was still a 30-percent

14 settlement, we would still object to the settlement.  We would

15 say that that's too much given the -- what happened here, given

16 Judge Gerber's ruling, given the way that we think the

17 Committee worked on the order, how we read the order ourselves.

18 We think 30 percent is way too high in that type of a

19 situation.  So it -- to state --

20             THE COURT:  But it's not -- you know, you think it's

21 too high.  Obviously I've pushed hard about this issue because

22 the Committee won before Judge Gerber.  That decision is

23 vacated.  The case is going to be dismissed tomorrow.  But the

24 arguments remain.

25             And it's why I pressed Mr. Jones about tell me, you

66

1    know, what's wrong with Judge Gerber's decision.  His brief

2    here really argues principally about the one issue, the

3    cramdown.  He's identified some others.  I'm going to look at

4    the letters that were submitted to Judge McMahon after the

5    argument where the parties laid out some of the other issues.

6              But it's not -- my task in determining whether to

7    approve the settlement is not to decide the precise amount that

8    I think they should offer, but whether this proposed settlement

9    is in the range of reasonableness.  You agree with that?

10             MR. HANSEN:  I do agree with that.

11             THE COURT:  Okay.  And I'm sure you don't dispute

12   that the agreement was negotiated by very experienced counsel.

13             MR. HANSEN:  I agree that -- I agree with that as

14   well.

15             THE COURT:  And counsel who were fully informed about

16   the background of the dispute.  Mr. Jones talked about his

17   argument before Judge McMahon.  I mean, I know that the -- I

18   guess Cadwalader represented the government in negotiating the

19   DIP.  But U.S. Attorney, I -- they were involved.  From what

20   I've seen from the transcripts, they were present at all the

21   hearings.  So experienced counsel informed about the matters in

22   dispute.  The government, as -- in their capacity as DIP

23   lenders, raised the issues about allocation early.  This is not

24   just a Johnny-come-lately argument.  It's existed for a long

25   time.  All that true?

1          MR. HANSEN:  There were better ways to have drafted

2     the order, Your Honor.  But we think the order is crystal

3     clear.  And, yes, there were competent counsel representing all

4     the parties.  But of course --

5          THE COURT:  Those are frantic days when those orders

6     get drafted.

7          MR. HANSEN:  Absolutely.  Absolutely.  But there

8     were --

9          THE COURT:  I'm sure yours would be crystal clear, at

10    least your associates would view them as crystal clear.  But --

11         MR. HANSEN:  No, but like -- seriously, Your Honor,

12    they -- like they -- definite competent counsel.  There's no

13    question.  And I know that's an _Iridium_ factor.  But -- and no

14    one is casting any aspersions on the lawyers.  But obviously

15    people who have negotiated DIP orders many, many, many times.

16    And they somehow -- one of them says, well, I think it means

17    this.  And the other one says, I think it meant that.

18         We looked at Judge Gerber's order and we say we agree

19    with Judge Gerber, we agree with the Committee.  The Committee

20    repeatedly, through the pleadings that they put in and their

21    reply in this case, say we were right, we drafted it properly,

22    we got it right, we got it right, we got it right.  Even Ms.

23    Sharret, when she was up here, didn't say we think we got it

24    30-percent wrong.  She said we got it right, we know we were

25    right.

68

1          But because Judge McMahon asked --

2          THE COURT:  Well, as I said to her, I would not -- I

3 wasn't going to ask Committee's counsel to argue against the

4 position that they successfully waged before Judge Gerber.

5          MR. HANSEN:  And which, by the way, Your Honor, you

6 know, in the Finley Kumble case and others that came after it

7 here in the Southern District, and as well as other circuits,

8 they all follow the same rule that vacated opinions are

9 persuasive authority; not binding, but persuasive.  So the

10 fact -- once you dismiss the case, it's not as if that decision

11 is gone forever.  It's --

12          MR. HANSEN:  No.  The issue is, is it persuasive

13 and --

14          MR. HANSEN:  Yes.  And we believe it is persuasive.

15 It's lengthy.  It's detailed.  It was written by the judge that

16 presided over the situation at the time that it happened.  We

17 think that's very relevant.  And we think that when you look at

18 it, it really leaves no question as to what the outcome will

19 be.

20          So then the question becomes is the settlement

21 reasonable.  And before I said --

22          THE COURT:  Well, he acknowledges that the questions

23 on summary judgment were close questions.

24          MR. HANSEN:  And --

25          THE COURT:  He says that.

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

1          MR. HANSEN:  He acknowledges that they were close,

2  but then he finds resoundingly in favor of the Committee.  And,

3  you know, he -- and it is a finding for the Committee.  And --

4          THE COURT:  Let me ask you this.  I take it you would

5  agree that if the settlement is not approved, there are

6  litigation risks?  You don't think it's 70/30, but you agree

7  there's -- you have to agree it's litigation risks?

8          MR. HANSEN:  Yeah.  So let's get to that.  Because

9  from an _Iridium_ perspective, right, you have the different

10 factors.  Some of them overlap in some respects.  Probability

11 of success in litigation versus concrete benefits overlaps a

12 little bit with likelihood of complex and contracted

13 litigation.  They kind of -- those two blend a bit.  And that's

14 where I feel a lot of this is.

15     But before we get there, can I just make another point

16 about the 30 percent?

17          THE COURT:  Sure.  Go ahead.

18          MR. HANSEN:  We think it's unreasonable, given what

19 I'm about to get into with the complex litigation on Judge

20 Gerber's decision.  The reality, though, is that we have a

21 bigger problem.  And it's the one that Judge McMahon

22 identified, which is that without knowing what the underlying

23 avoidance action will yield, how can you determine that 30

24 percent is a sensible outcome?

25          THE COURT:  Because if the government prevails, they

70

1  get a hundred percent until their DIP is fully repaid.  That's

2  how you determine it.

3           MR. HANSEN:  But the government lost.

4           THE COURT:  They --

5           MR. HANSEN:  And the issues raised by Judge McMahon

6  were --

7           THE COURT:  Well, they didn't lose anymore because

8  the decision is vacated and --

9           MR. HANSEN:  And --

10          THE COURT:  -- the issue is persuasive and --

11          MR. HANSEN:  And that's an actually -- an interesting

12  issue, too.  And I want to get to the merits.  But that -- I

13  heard you when you said, look, we can settle anything, right,

14  people can -- before they even litigate they can come before

15  you and say please settle it.

16          THE COURT:  Yeah.  The one argument I tried -- I

17  rejected early on is your argument that --

18          MR. HANSEN:  I agree.  But --

19          THE COURT:  -- this isn't ripe for decision.

20          MR. HANSEN:  I hear where you're coming from.  But I

21  wanted to raise a point with you, which is that let's say you

22  approve this settlement under Bankruptcy Rule 9019 and Davidson

23  Kempner would like to pursue an appeal.  If we pursue that

24  appeal and we arrive in front of Judge McMahon -- first of all,

25  I have to know whether I have a final order to appeal from.

1          When you go to Second Circuit authority on this,

2   which I believe is <u>Bennett Funding</u> is the Second Circuit case

3   on this, <u>Bennett Funding</u> says -- and I brought a copy of it up

4   here.  It's the Second Circuit.  It's 439 F.3d 155 (2d Cir.

5   2006).  And on page 159, the Court says -- they're examining

6   whether or not basically a 9019 is something that's final for

7   purposes of appeal.  And they cite to -- I apologize for the

8   humor in the name.  They cite to a case called <u>Shimer versus</u>

9   <u>Fugazy</u>, 982 F.2d 769 (2d Cir. 1992).  And what they say is that

10  effectively you need to be settling a dispute that results in a

11  finality with respect to that dispute so you can appeal it.

12          "By disputes we do not mean merely competing

13           contentions with respect to separable issues; rather,

14           we apply the same standards of finality that we apply

15           to an appeal under 28 U.S.C. Section 1291.  Given the

16           strong federal policy against piecemeal appeals, a

17           dispute for appealability purposes in the bankruptcy

18           context means at least an entire claim on which

19           relief may be granted."

20          And we are stuck in a situation where the District

21  Court said we don't have an entire claim on which relief can be

22  granted because it's not yet a justiciable case or controversy.

23  So while I understand your point that you can --

24          THE COURT:  Are you telling me that disputes in a

25  Chapter 11 case can't be resolved before their -- the

72

1  underlying issues have been fully litigated and determined?

2          MR. HANSEN:  Not at all.

3          THE COURT:  That's not the --

4          MR. HANSEN:  Not at all.  I completely agree with

5  you.  I've done it myself many times.  What I'm saying is the

6  unique circumstances of this case where we have a District

7  Court telling you not yet and please dismiss that action, I'm

8  worried that if you decide to approve this and I go up in front

9  of Judge McMahon and she says, I'm sorry, that -- A, that

10 wasn't a final order --

11         THE COURT:  You know, if she --

12         MR. HANSEN:  -- so you may not even have the chance

13 to appeal --

14         THE COURT:  If it goes back to her and -- if I

15 approve it and it goes back to her and she reverses me, okay,

16 she reverses me.

17         MR. HANSEN:  But then we've --

18         THE COURT:  You know, the thing that's dramatically

19 changed since her first decision I think is the Second Circuit

20 and Delaware Supreme Court decisions.  And you wouldn't have

21 been entering into a funding agreement.  Or you didn't do it.

22 But you wouldn't have a 25-percent interest in a funding

23 agreement if you didn't think that you were going to -- you

24 know, that your client's going to make money out of it.  Why do

25 they think they're going to make money out of it?  Because

1  the -- you know, the Second Circuit has basically said grant

2  summary judgment on this issue of this unperfected lien.  Well,

3  that's what -- and now that's back, you know?  And I'm dealing

4  with whether fixtures -- what's the value of fixtures.  But

5  there's no question that at least as to JPMorgan Chase, the

6  UCC-3 released the lien on most of the collateral.  Okay?

7  And --

8          MR. HANSEN:  No, we -- I agree with that, Your Honor.

9  I think what I'm --

10         THE COURT:  Your client wouldn't -- you know, when

11 did your client decide to participate in this funding

12 agreement?

13         MR. HANSEN:  I don't know the answer to that, Your

14 Honor.  I don't represent them in connection with the funding

15 agreement.

16         THE COURT:  Okay.  All right.

17         MR. HANSEN:  So I was just pointing out that this

18 issue of appeal rights --

19         THE COURT:  I'll tell you what, I'm not going to rule

20 on what's appealable.  Somebody else can decide that.

21         MR. HANSEN:  Okay.  That's fine, Your Honor.  So

22 getting back to this question on the Iridium factors of

23 probability of success in litigation, benefits of settlement,

24 and the complexity of this, you heard Ms. Sharret tell you that

25 this case has effectively been frozen in time.  It's just

74

1  frozen.

2          There are no new facts.  These issues that came up in

3  connection with Judge McMahon, questioning and then having

4  supplemental briefing, they're two discrete legal issues.

5  There's no facts associated with them.  Is it an estate versus

6  a debtor?  Can you cram down a DIP lender?  Those are legal

7  issues.  Those are briefed and decided.  Those are not

8  extrinsic evidence.

9          THE COURT:  Okay.

10          MR. HANSEN:  It's not new facts.

11          THE COURT:  Well, let me assume, for purposes of

12  discussion, that Judge Gerber, in accepting the argument that

13  the Committee made -- it's not that he came up with it

14  himself -- was -- that that portion -- that one page of this

15  lengthy opinion was incorrect as to what the risk of -- whether

16  it could have been crammed down.  Okay?  You know, there are 20

17  pages addressing -- 25 pages addressing other arguments.  That

18  seemed, to me, to be a small point in his analysis.

19          MR. HANSEN:  We agree.  We think that effectively --

20  you get a little bit of -- in the pleadings, all the pleadings

21  that have come in, you get a bit of -- because they're trying

22  to satisfy the Iridium factor, you get a little bit of watch

23  out for the Bogeyman.  The Bogeyman here is we could be

24  litigating for the next ten years.

25          THE COURT:  I don't think that -- that I don't think

75

1  is real.  Okay?  I --

2           MR. HANSEN:  And I don't think it's real either.

3           THE COURT:  Okay.

4           MR. HANSEN:  I think this is basically take the

5  same --

6           THE COURT:  Because if I don't --

7           MR. HANSEN:  -- pleadings you have --

8           THE COURT:  If I don't approve it, and even if the

9  parties insist that they want to take some discovery, they'll

10 get 60 days to do that discovery and then we'll get it on for

11 hearing and, you know, either a trial or whatever.  It would

12 get resolved pretty quickly.  So this is not going to be -- in

13 the big scheme of things, this is not going to be protracted.

14          MR. HANSEN:  We agree, Your Honor.  So we think that

15 Iridium factor weighs against approving the settlement, because

16 that is an Iridium factor that has to be looked at.

17          In terms of the probabilities of success in

18 litigation where we kind of come back to it, I would also say

19 that they didn't really talk to each other for four years and

20 suddenly in a matter of weeks, matter of months, they had a

21 settlement.  So it's not like if you waited to find out what

22 the actual quantum was in terms of the avoidance action

23 recovery, they couldn't figure out a way to settle quickly

24 again.

25          So here we are making an estimation of -- Mr. Mayer

76

1    uses a billion dollars in his footnote and he says let's assume

2    a billion dollars, in that billion-dollar scenario, $315

3    million is going to get -- he uses percentages, which I think

4    are confusing.  I use dollar amounts.  If we had a billion-

5    dollar settlement, $315 million gets paid to the government,

6    685- goes to Trust beneficiaries.  You should be so happy

7    because there's a big risk here.  And of course as a Trust

8    beneficiary, Davidson Kempner says, I'm not happy, I don't

9    think there's a big risk, Judge Gerber already ruled for me.

10           THE COURT:  I won't ask how much they paid for their

11   claim, but --

12           MR. HANSEN:  I don't have that information either,

13   Your Honor.  I --

14           THE COURT:  -- I suspect they would -- I suspect

15   they'll come out okay.

16           MR. HANSEN:  I don't have that information either,

17   Your Honor.  I --

18           THE COURT:  Okay.  I don't want to know it.  I don't

19   want to know the answer to that anyway.

20           MR. HANSEN:  And I don't think it's relevant,

21   honestly.  The --

22           THE COURT:  I agree.

23           MR. HANSEN:  The other issue is that on the other

24   side if -- and if it was this private -- if it was a private

25   funder, if it was River Birch's financing and DK's financing or

1  if it was somebody else's financing that was less expensive

2  materially, because that's the standard in their contract, the

3  differences are extraordinary.  Now, granted you haven't

4  settled the underlying dispute, okay, at this point in time,

5  but that's where this analysis gets tricky.  And I feel like

6  it's the quintessential cart before the horse.  Because when

7  you look at the situation and you say, well, if we have 4.75

8  percent of a billion-dollar judgment, that's $47.5 million.

9  That leaves $952.5 million to go to the Trust beneficiaries,

10 subject to working something out with the government or just

11 beating them all the way through in litigation.

12          Now, yes, there's a time value of money associated

13 with that.  But it's not $300 million.  That's around the

14 range.  If you take 952.5- and subtract the 685-, I guess it

15 is, it leaves you $260-ish million, maybe more.  That's a lot

16 of money.  That amount of money can be used to settle.  That

17 amount of money can be used to litigate.  That is not going to

18 cost that much to litigate this dispute to conclusion.

19          And that's where we say to ourselves, how could you

20 make the decision?  And all of the pleadings -- it's their

21 burden.  They have to come here and demonstrate that they've

22 made a reasonable choice.  And the pleadings have no analysis.

23          THE COURT:  Yeah.  Not an exact choice, not -- well,

24 you know, Mr. Mayer, in reply -- we have his declaration.  He

25 represented the Committee.  And it does address -- it doesn't

78

1  quantify in terms of specific numbers, but it does address the

2  issues and risks and how the Committee decided to go forward

3  with this proposed settlement.

4          MR. HANSEN:  Your Honor, respectfully --

5          THE COURT:  I might come to a different conclusion

6  because maybe I have a different risk appetite.  I might come

7  to a different conclusion personally about what the risks are

8  of litigating with the DIP lenders.  And so in my own calculus,

9  it might not be 70/30.  I don't know for sure where I would

10 come out.  But that's not -- you -- yes, I'm supposed to

11 exercise independent judgment.  I'm supposed to exercise

12 independent judgment in determining whether this proposed

13 settlement is in the range of reasonableness.  The fact that I

14 might come out differently or you might come out differently is

15 not the answer.  This was --

16         MR. HANSEN:  Yeah.  I --

17         THE COURT:  You aren't disputing that it was an

18 agreement that was negotiated at arm's length?

19         MR. HANSEN:  Oh, it certainly appears to be

20 negotiated at arm's length, Your Honor.  I agree with that.  I

21 think that this entire -- the decision from Davidson Kempner's

22 perspective really turns -- paramount interest of creditors,

23 complex protracted litigation, probability of success if woven

24 into one from our perspective.  And it -- yes, they were arm's

25 length.  Yes, they're smart people and they're very

79

1  experienced.  We don't have an issue with that.

2          I mean, I -- you know, we point out that the -- it's

3  interesting the Committee exists for one single purpose, which

4  was to deal with the allocation dispute.  They're probably

5  pretty fatigued.  They probably need it over with.  But I'm not

6  going to say that they just threw --

7          THE COURT:  I don't think they've --

8          MR. HANSEN:  Yeah, I don't think they threw --

9          THE COURT:  -- lost a lot of sleep over it, but --

10         MR. HANSEN:  I don't think they threw in the towel

11 because of that.  I know that's not the issue.  I think what

12 we're dealing with here is can you make an educated choice,

13 given where we sit right now, when you really don't know what

14 the outcome of the avoidance action litigation is.  If the

15 avoidance action yielded a dollar --

16         THE COURT:  So what do I have --

17         MR. HANSEN:  -- would a 30 --

18         THE COURT:  What do I -- you can tell me, what do you

19 think I have to decide with respect to the reasonableness of

20 this proposed settlement?

21         MR. HANSEN:  Well, I think you have to decide, A,

22 whether the methodology upon arriving at the settlement was

23 reasonable.  And their pleadings have been completely devoid of

24 that methodology.  The only thing Mr. Mayer says in his

25 declaration is effectively a couple questions got raised by

80

1    Judge McMahon and boy that scared us.  Those questions are

2    purely of law, one of which was dealt with by Judge Gerber.

3    And the other one, which the Committee even says in its own

4    pleading and they said in front of Judge McMahon didn't make

5    any sense, was this distinction between a debtor and an estate.

6         So I don't know.  To me you had a resounding victory

7    in front of Judge Gerber.  You believe and you have great

8    conviction in the way that you drafted the order.  But Canada

9    raises a question about whether or not an estate is the same

10   thing as a debtor and Judge McMahon says I don't really know

11   because I'm not a bankruptcy judge, can somebody explain that

12   to me.  And you turn around and say I got to settle at 30

13   percent.

14        And I don't understand the methodology.  Like there's

15   been no methodology.  There's been no analysis presented to you

16   from the Committee or from the Trust that says, well, we took

17   these range of recoveries and we decided to -- we said to

18   ourselves given the fact that what's occurred in, you know, the

19   Delaware Supreme Court and with respect to the Second Circuit

20   that we have a greater likelihood to recover in this amount of

21   money and we looked at the risk profile and for us we arrived

22   here.  We don't have any of that.

23        What we have is we were looking for financing and the

24   government reactivated negotiations, we talked to them, we

25   arrived here, please approve it because --

1                  THE COURT:  That's not exactly what I was told, but

2       it's not worth quibbling about.

3                  MR. HANSEN:  Yeah.  But it's close, right?  I mean,

4       it's -- and so to us we say you need to test the methodology.

5       And we don't know what the methodology was.  So that's devoid.

6       That's not on the record.  They haven't satisfied the burden.

7                  Then even if you would accept the methodology at

8       which they arrived, you have to test whether or not 30 percent

9       makes sense given the wide range of outcomes here.

10                 THE COURT:  Let me ask you this.  Do you have case

11      support that -- you were arguing that I have to now -- they

12      have to tell me what methodology they used.  Are there cases

13      that say that?

14                 MR. HANSEN:  I just -- well, Your Honor, I think it's

15      implicit in these _Iridium_ factors.

16                 THE COURT:  I know.  I --

17                 MR. HANSEN:  I don't -- while I'm standing here --

18                 THE COURT:  It's probably every week that I'm

19      applying _Iridium_.  But do you have any case that supports your

20      argument that they have to lay out the methodology they applied

21      in determining that this proposed settlement is reasonable?

22                 MR. HANSEN:  I don't, Your Honor.

23                 THE COURT:  Okay.

24                 MR. HANSEN:  I think -- again, I think --

25                 THE COURT:  All right.

1          MR. HANSEN:  -- it's within Iridium.  I think when

2     you're testing the probability of success of litigation and

3     you're questioning the reasonableness of somebody's desire to

4     settle, you have to say how did you arrive at your settlement.

5     It can't just be take my word for it.  Because if it was take

6     my word for it, we'd lower 9019 to an even lower standard, and

7     it's pretty low already.

8          And candidly, it's -- that's a little bit strange

9     here, too.  You know, they're -- in order -- they're grabbing

10    for 9019.  I think you said it best when you first came out:

11    you're testing business judgment.  That's what this really is.

12    This is a business judgment test.  This isn't really 9019

13    because 9019 is that lowest level in the realm of

14    reasonableness.  Right?  I think we're a bit above that.  I

15    think this is business judgment because this is a Trust that

16    didn't need to --

17          THE COURT:  So you agree that this is in the range of

18    reasonableness.  But you're questioning the business judgment

19    in entering into it?

20          MR. HANSEN:  No, I'm not -- I don't believe it's in

21    the range of reasonableness, Your Honor.  I don't think you can

22    make that determination.

23          THE COURT:  Okay

24          MR. HANSEN:  I think it's impossible for this Court

25    to evaluate the reasonableness standard because you don't know

83

1  where we're going to land on the avoidance action.  And, I

2  mean, if you take a billion and a half as the -- they win the

3  whole thing and forgetting about potential interest accruals

4  and everything else that might be associated with it.  Let's

5  say it's a billion-and-a-half dollars.  That's $450 million to

6  the government.  Which they say it's not relevant, but

7  they're -- let's say they're owed around 800-, we've now passed

8  more than 50 percent of a recovery to them, which does have

9  relevance.  When you look at that, you say to yourself, wait a

10 minute, I just handed the government more than half of what

11 they're currently owed when I won a resounding judgment in

12 front of Judge Gerber.

13        And I also think when you evaluate the

14 reasonableness, you have to go back to Judge Gerber's decision,

15 which you did, and which the Committee, in some respects, says

16 it was vacated, we got to start all over again, we're starting

17 from scratch.  They're not starting from scratch.  They're

18 starting from, first of all, the same pleadings they filed

19 because nothing has changed.  You could almost change the dates

20 on them.  So it's not really cost or protraction, et cetera.

21 You yourself said even if they wanted to take extrinsic

22 evidence, give them a couple of months, come back, you can

23 probably complete that in half a day.  It's a very narrow and

24 very focused issue.  So we're not really dealing with a

25 situation where those are compelling factors.  Oh, boy, we have

84

1  to settle this because if we don't, we're going to be stuck

2  here for years and spend tons of money.  That's not true.  It's

3  just simply not true.

4          And the other point here, Your Honor, that bears on

5  the same issue is they found a way to settle pretty quickly.

6  So I think once they actually know what the quantum is that

7  they're dealing with on behalf of Trust beneficiaries, they can

8  reignite settlement discussions if they want to.  And lo and

9  behold, by then they may have gotten another decision from you

10 because you yourself said, hey, I think the situation has

11 changed.

12         And, you know, you heard the Committee say, well, I

13 don't want to run to Judge McMahon on ripeness grounds again.

14 But if you were prepared to rule again along that period of

15 time or within the couple of months that you wanted to -- let's

16 just say for a second you ruled the same way Judge Gerber did.

17 If you ruled the same way Judge Gerber did, 30 percent is going

18 to be a ceiling at that point in time.

19         THE COURT:  You think so?

20         MR. HANSEN:  Oh, come on.  If they --

21         THE COURT:  I don't because if I went the same way as

22 Judge Gerber and Judge McMahon or another judge, and she said

23 she would take any -- yeah, any appeal -- you know, if she

24 concluded, no, the government wins, they're going to get their

25 $800 million --

85

1        MR. HANSEN:  She came out of the blocks pretty hard

2   in favor of the Committee when she had the oral argument.  Now,

3   she asked questions and ultimately decided to vacate on a

4   ripeness basis, but --

5        THE COURT:  Well, I'll see what -- I believe I -- you

6   know, I didn't -- I saw what she did.  I read her opinion.  I'm

7   going to see what the supplemental letter briefs were.  And I

8   must say, look, until -- when I first reviewed papers and I

9   didn't have all the papers in this yet, I thought that there

10  was a big pull in the joint motion in that there was -- you had

11  the monitor's declaration which said that zero cost is better

12  than the private funders, obvious.  Didn't address the issue of

13  the reasonableness of the settlement.  Until Mr. Mayer filed

14  his declaration or it was filed, it was -- that was a big hole.

15  Okay?

16       And I understand your argument is that that does not

17  sufficiently support the methodology or -- and I don't expect

18  the Committee to argue against its victory.  Okay?

19       MR. HANSEN:  Your Honor, all his declaration says is

20  we had arm's length negotiations.  That's basically what his

21  declaration says.

22       THE COURT:  Okay.

23       MR. HANSEN:  He sets out the timeline and says been

24  going on for a long time and there's definite merits to doing

25  this.  It's half brief, half declaration, right?  So --

1   THE COURT:  Even if I decided the matter in a matter

2 of months -- and I don't have an adversary proceeding before

3 me, but even if I were to decide it within four or five or six

4 months, it could well take six to twelve months in the district

5 court.  And then the losing party appeals to the Second

6 Circuit, and that could well be a year or two years down the

7 road.  I don't know.  I mean, so I might decide it quickly, but

8 that doesn't resolve the matter.  So when you talk about

9 protracted litigation, yes, it's very likely to be protracted.

10   MR. HANSEN:  Your Honor, the case is seven years old.

11 I will tell you from Davidson Kempner's perspective, because I

12 asked them the question, they're prepared to wait.  They're a

13 beneficiary of the Trust.  They say they're prepared to wait.

14 And for their perspective, they want the --

15   THE COURT:  I don't know how much skin they have in

16 the game, but --

17   MR. HANSEN:  Hundreds of millions of dollars is -- in

18 terms of claims.  I don't know what they bought them for, but

19 hundreds of millions of dollars.  So from our perspective, you

20 know, Your Honor, we're -- it could be well in excess of a

21 hundred million.  Let me just say that because that's probably

22 a better answer, so -- but from our perspective, you also have

23 to look at harm.  If you look at harm here, there is no harm if

24 you said no to this because, one, the underlying avoidance

25 action is going to continue to proceed.  It's not like we have

1  a corpus today from that.  And they have financing, and maybe

2  the government might change their mind.

3            THE COURT:  Okay.  I --

4            MR. HANSEN:  And maybe the government might say I'll

5  give you cheaper financing.

6            THE COURT:  There isn't anything cheaper than zero.

7  Anything else you want to add?

8            MR. HANSEN:  No, Your Honor.

9            THE COURT:  Thank you very much, Mr. Hansen.

10            MR. HANSEN:  Thank you for your time.

11            THE COURT:  Mr. Harrison, are you going to argue?  I

12  know everybody says you don't have any -- not everybody, but

13  some people have argued you don't have any standing.  I'm happy

14  to hear from you, Mr. Harrison.

15            MR. HARRISON:  Your Honor, on May 19 --

16            THE COURT:  Just make your appearance so we --

17            MR. HARRISON:  Westerman Ball by Richard Harrison for

18  River Birch.  Thank you, Your Honor.  On May 19, 2016, Your

19  Honor, River Birch entered into a 36-page agreement with the

20  Trust to provide for private litigation funding in the

21  avoidance action.  Contained in that agreement was a

22  representation insisted on by the Trust during negotiations

23  that both River Birch and the Trust irrevocably submit to the

24  continuing jurisdiction of this Court.  That's contained in

25  Document 13650-2 at Section 10.7.

88

1        Subsequent to that, Your Honor, the terms of the

2   agreement are clear -- Your Honor went through them better than

3   I -- that the permitted alternative funding option by which the

4   Trust could rescind this agreement required the Trust to

5   demonstrate that it had obtained a funding agreement whose

6   terms were materially superior to River Birch.

7        THE COURT:  Zero is better than what your client is

8   offering.

9        MR. HARRISON:  Well, Judge, we have not been able to

10  ascertain what is zero financing in this case because, as we go

11  through the chronology of this case, you'll see that there was

12  no independent analysis provided to River Birch at any time

13  prior to the limited objections that we filed.

14       THE COURT:  Did there have to be?  Is there

15  something -- is there a provision in your private funding

16  agreement that requires that before the Trust terminates the

17  agreement based on its obtaining financing on materially better

18  terms that they have to give you some notice, an opportunity to

19  do something?  I didn't -- I think I wasn't aware of that.

20       MR. HARRISON:  Your Honor --

21       THE COURT:  Could you answer that?

22       MR. HARRISON:  Yes.  We believe there is, Your Honor.

23       THE COURT:  Where?

24       MR. HARRISON:  Contained under the permitted

25  alternative funding --

89

1              THE COURT:  Read me the language, if you would.

2     Okay?  I mean, do you have a right of refusal to match whatever

3     they come up with from an alternative source?

4              MR. HARRISON:  Your Honor, the permitted alternative

5     funding definition is contained at page 6 of the River Birch

6     agreement that was Exhibit B.  The permitted alternative

7     funding condition that we're talking about is that:

8                   "In any such case, the agreement may be terminated on

9                   terms materially more favorable to the Trust than

10                  those provided by the investors under this

11                  agreement."

12             All we did --

13             THE COURT:  Is there something in there that it

14    says -- because the statement you made to me is they didn't

15    come back to us and say something about it, but they had a --

16    is there language in the agreement, in the funding agreement,

17    that would have required the Trust to come back to you and

18    demonstrate that they had obtained funding on materially better

19    terms?

20             MR. HARRISON:  Your Honor, what the Trust sent us was

21    a one-page letter on July --

22             THE COURT:  Could you answer my question?  Is there

23    anything in the funding agreement that required the Trust to

24    come back to River Birch to demonstrate that it had obtained

25    funding on materially better terms from an alternate source?

90

1           MR. HARRISON:  In order to rescind, Your Honor, the

2   Trust had to give us notice under this provision that it had

3   obtained a materially superior funding agreement.

4           THE COURT:  And did they do that?

5           MR. HARRISON:  They gave us a notice --

6           THE COURT:  Okay.

7           MR. HARRISON:  -- on July 15th, Your Honor.

8           THE COURT:  Okay.

9           MR. HARRISON:  The notice says that there has been an

10  occurrence of permitted funding.

11          THE COURT:  Okay.  But did -- there's nothing -- you

12  haven't pointed to any language in your agreement that would

13  have required the Trust to come back to you in advance or in

14  connection with the notice to demonstrate that the funding they

15  obtained from the alternative source was on materially better

16  terms, correct?

17          MR. HARRISON:  Correct, Judge.

18          THE COURT:  Okay.

19          MR. HARRISON:  In the context of the actual facts of

20  the case, Judge, we get a one-page notice --

21          THE COURT:  I understand your client's not happy.

22  Okay?

23          MR. HARRISON:  Well, it's more than that, Your Honor.

24  We do have a contract.  The contract contains a protection to

25  River Birch that there would be a demonstration that an

1   alternative funding agreement has been reached on materially

2   superior terms.  We got a one-page letter telling us that an

3   occurrence has occurred, an occurrence in the opinion of the

4   Trust which allows it to unilaterally --

5            THE COURT:  Sure.

6            MR. HARRISON:  -- terminate its funding agreement.

7   On July 21st, a partner at River Birch writes the Trust and

8   asks for an independent analysis of the cost of the financing

9   agreement.  River Birch provides its own analysis of the

10  funding agreement and River Birch shows that the funding

11  agreement could cost the Trust as much as $400 million in terms

12  of the allocation of the settlement proceeds.  We received back

13  a letter from Mr. Banasky (phonetic) of the Trust contained as

14  an exhibit in our limited objection in which Mr. Banasky says

15  in sum and substance the economics are obvious, we don't have

16  to give you a comparative analysis, thereby prompting our

17  limited objection.

18           THE COURT:  The DIP lender's assertion that they're

19  entitled to an -- not just an -- they're entitled to have -- if

20  they have a super priority protection of their -- and they're

21  owed $800 million, they get paid first.  Do you agree with

22  that?

23           MR. HARRISON:  Yes, Your Honor.  But I come at this

24  from the disadvantage of not being a party in this case.  I

25  understand the --

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

92

1              THE COURT:  I wasn't either.  But, you know, I'm

2   just -- I'm recent -- recently come to this.  But in reading

3   the papers, as I understand the dispute, if the government

4   prevails -- they lost the first go-round, no question about it.

5   But if they ultimately prevail that they have a super priority

6   right to recover from the avoidance proceeds, they'll get the

7   first 800 million, correct?

8              MR. HARRISON:  Your Honor, I understand that is the

9   government's argument.

10             THE COURT:  Okay.

11             MR. HARRISON:  But I come at this --

12             THE COURT:  But if it -- because if you assume -- you

13  understand their argument is they have a super priority right

14  to proceeds from avoidance?

15             MR. HARRISON:  I understand that, sir.

16             THE COURT:  Okay.  And so the first -- and if they --

17  I'm assuming that -- Mr. Jones, that the approximate $800

18  million is the rough number.  They'll get the first 800

19  million.

20             MR. JONES:  Your Honor, can I just quickly clarify?

21  I did get confirmation --

22             THE COURT:  Yeah.

23             MR. JONES:  -- on the amount due to Treasury is 814

24  million.

25             THE COURT:  Okay.  All right.  That's --

93

```
 1          MR. JONES:  I just want to add, don't lose sight of
 2  Canada.  They're roughly a one-sixth participant --
 3          THE COURT:  Okay.
 4          MR. JONES:  -- so there's more on top of that for
 5  Canada.
 6          THE COURT:  That's fine.  Okay.
 7          The point, Mr. Harrison, the Committee won the first
 8  time.  That doesn't assure that they'll win the next time.  If
 9  the DIP lenders win, they get the first 814 million plus
10  whatever Canada tacks on on top of that.  If they lose -- the
11  Committee wins again, the DIP lenders get nothing.  True,
12  right?
13          MR. HARRISON:  Acknowledged.
14          THE COURT:  Okay.
15          MR. HARRISON:  Your Honor, I'd say simply that from a
16  contract perspective, we were entitled to a demonstration that
17  there was a funding --
18          THE COURT:  Show me where in the -- that's the point
19  I come back to.  I'm sorry to interrupt you, Mr. Harrison, but
20  it's really what I asked you the first time.  Where in the
21  contract does it say you're entitled to a -- it may be that if
22  there's a litigation, either myself or somebody would have to
23  decide that.  But where in the contract -- you say that you're
24  entitled, and I didn't see anything in the contract that says
25  you're entitled to anything other than what they gave you,
```

1   notice of termination.

2          MR. HARRISON:  How do we determine what a materially

3   favorable funding agreement is unless we're able to compare the

4   costs of our funding agreement to theirs?  Simultaneous to

5   their July 15th one-page notice that a permitted funding

6   occurrence has happened, they filed their present application

7   to the Court.  Their application, Paragraph 51, tells us that

8   the 39 percent allocation of the settlement proceeds of the

9   avoidance trust is now an integral term that is inextricably

10  interrelated --

11          THE COURT:  And that's what bothers me about it.  No

12  question about it, you know, it --

13          MR. HARRISON:  That is --

14          THE COURT:  Does it require an imputed cost of the

15  financing?  I asked that question.  Mr. Jones' answer to that

16  was the Treasury doesn't do DIP financing.  Its authority is

17  part of a litigation settlement as to what it did, and whether

18  that answer is satisfactory , well, that was his answer.

19          MR. HARRISON:  But Justice appears to fund

20  settlements, Your Honor.  And throughout the months and months

21  of competitive bidding in this matter, Justice didn't come

22  forward in the competitive bidding process with any settlement

23  proposal.  We treat our settlement proposal with standalone

24  costs.  We take either a 2.25 share of the monies that were

25  actually funded or we take 4.75 of the gross proceeds.

95

1            THE COURT:  I think that your motion, though, made

2    clear -- I think it said that your client was kept apprised

3    that there were discussions with Treasury that were going on.

4    It's not like you were blind sided when the Treasury and Canada

5    at the end of the day, maybe at the eleventh and a half hour

6    because the motion to approve your agreement was already on

7    file --

8            MR. HARRISON:  Yes.

9            THE COURT:  -- but your client was aware that there

10   were ongoing discussions of -- whether they were serious or not

11   is a different issue.  But where that -- the Trust was

12   continuing discussions with the DIP lenders, correct?

13           MR. HARRISON:  We had reason to believe --

14           THE COURT:  Okay.  All right.

15           MR. HARRISON:  -- that such discussions were

16   occurring.

17           THE COURT:  Okay.

18           MR. HARRISON:  We were not blind sided, Your Honor.

19   That is why we invested so much time in drafting a single

20   escape provision, if you will, from this contract.  This was an

21   exclusive agreement --

22           THE COURT:  You obviously knew when your client

23   agreed to the escape provision that there was a possibility

24   that it would get triggered, that --

25           MR. HARRISON:  I think --

96

1           THE COURT:  -- a DIP lender would step forward and on

2  more favorable terms provide litigation funding.

3           MR. HARRISON:  Agreed.

4           THE COURT:  Okay.

5           MR. HARRISON:  I would think, Your Honor, that

6  implied in the demonstration of a materially more favorable

7  funding agreement is the actual cost of that funding agreement,

8  but that has been buried in the actual funding agreement.

9           THE COURT:  Yeah.  I mean, they say the cost is zero.

10  Whether I accept that or not is a different issue, but they say

11  the cost is zero, that the negotiated 70/30 split is

12  attributable to the allocation dispute and not to the funding

13  cost.  That's their position.  Whether I accept it or not is a

14  different issue, but that's their position.

15          MR. HARRISON:  Your Honor, to put some meat on the

16  bones, we point to Mr. Mayer's declaration, page 23, note 3,

17  when Mr. Mayer spun out certain hypotheticals at a $1 billion

18  settlement.  At a $1 billion settlement, Mr. Mayer contemplated

19  that the costs of the River Birch funding agreement would be

20  $47.5 million.  The DIP lender's cost would be 15 million

21  because the DIP lenders required payment on the full amount

22  funded.

23          That left a differential of 32.5 million, which

24  Mr. Mayer claimed was the cost of the private funding

25  agreement.  But to achieve that cost savings, Your Honor, both

97

1  the Committee and the Trust forego $295.5 million of settlement

2  proceeds.  And we think that is disproportionately inferior to

3  anything that River Birch has offered.  And therefore the Trust

4  continues to fail to demonstrate that it has obtained a

5  materially superior funding agreement.

6          THE COURT:  Okay.  Thank you.

7          MR. HARRISON:  Thank you, Judge.

8          THE COURT:  Anything else you want to add,

9  Mr. Harrison?

10          MR. HARRISON:  Nothing else, Judge.

11          THE COURT:  Okay.  Thank you very much.

12          MR. HARRISON:  Other than the fact that, Your Honor,

13  River Birch remains ready to immediately fund the agreement

14  pursuant to its terms.

15          THE COURT:  Okay.  All right.

16          Mr. Fisher, who --

17          Mr. Jones, you want to say something else briefly,

18  quickly?

19          MR. JONES:  Yes, Your Honor.  I was just asking

20  Mr. Fisher if he'd be kind enough to let me respond because I

21  think I'll be extremely brief.

22          THE COURT:  Go ahead.

23          MR. JONES:  I don't want to do a detailed point-by-

24  point rebuttal, but I want to correct a fundamental

25  misperception that's popped up in the most recent presentations

98

1  and otherwise, which is to say that somehow this is a bestowing

2  of a $300 million give or take windfall on Treasury and the DIP

3  lenders, and it's anything but.  Right now that money is

4  nobody's but the estate's.  It is every bit as fair to say this

5  settlement is --

6          THE COURT:  It isn't the estate's yet.

7          MR. JONES:  Well, it is a potential asset of the

8  estate's, or the potential recovery is an asset of the estate.

9  In the hypothetical that's being discussed of a billion-dollar

10 recovery, you know, the -- it is wrong to assume as a baseline

11 that DIP lenders get zero and that all of this is the

12 Committee's money unless it agrees otherwise.  I understand we

13 lost in the first instance before Judge Gerber, and I know the

14 Court understands that this remains a hotly-contested issue.

15 But framing does matter, and it's easy to slip into a mindset

16 of, huh, is this concession legitimate on the part of unsecured

17 creditors?  Not so.  It's an even contest or a contest in which

18 either party could come out happy or unhappy.

19         THE COURT:  Well, even you or your clients

20 acknowledge that it's a -- 70/30 is where you ended up, not

21 even.

22         MR. JONES:  We're accepting 30 percent, and of course

23 that bespeaks a degree of litigation risk analysis.  The other

24 thing I want to say is the emphasis on methodology --

25         THE COURT:  Yeah.  That --

99

1           MR. JONES:  -- doesn't make sense, Your Honor.  And

2    what we have here is experienced expert litigators who know the

3    case better than anyone and who have formed their own informed

4    opinion as to litigation risk borne and whether this is a

5    supportable, acceptable resolution.  And the answer is yes.  It

6    bestows some pain on each side.  From the government's

7    perspective, we had to swallow hard before giving up

8    potentially 500 -- well, whatever it would -- you know, the

9    delta between what we're locking in at our 30 percent and full

10   repayment.

11          I'm sure the -- and I know the Committee fought hard

12   and had -- was not quick to surrender a potentially greater

13   recovery for their constituencies.  That is in the nature of

14   tough negotiations and reasonable settlements when

15   professionals on each side recognize the risks, take them into

16   account, and come out at an appropriate resolution and one

17   that, of course -- I mean, we haven't even talked about the

18   judicial policy and well-established preference for settlements

19   as opposed to litigated outcomes.  But that's the backdrop

20   against which we're operating.  Thank you.

21          THE COURT:  Okay.  Thank you.

22          Mr. Fisher?

23          MR. FISHER:  Eric Fisher for the Trust.  Your Honor,

24   I also will be very brief.  But just to address some points

25   that have come up about the funding.  Your Honor asked at the

1  outset about the possibility of a litigation brought by River

2  Birch with regard to an alleged breach of the funding agreement

3  and whether that's a consideration that Your Honor ought to

4  consider.  Even in that hypothetical scenario, to state it

5  starkly, the Trust is better off accepting the funding that's

6  been offered by the government even if that buys us a lawsuit

7  with River Birch.

8          And the economics of that very briefly stated -- and

9  I will grudgingly buy into the billion-dollar hypothetical

10 illustration.

11         THE COURT:  Well, I guess I picked it up from

12 Mr. Mayer.  And also in the avoidance action litigation, I

13 think I asked you at an early hearing what do you think the

14 fixtures are worth and you said, well, maybe 200 million.  And

15 I asked JP Morgan's counsel what they thought and they think

16 1.5 billion, but -- so what the shortfall is, I'm just saying

17 roughly a billion dollars.

18         MR. FISHER:  Right.

19         THE COURT:  But that's --

20         MR. FISHER:  So with that billion-dollar

21 hypothetical, Your Honor, we -- if in theory River Birch were

22 to sue the Trust, which would be extremely unfortunate -- and

23 this is not the day to tell Your Honor why that would be a

24 meritless lawsuit -- at the end of the day, if they litigated

25 against us and prevailed, they would be entitled to 4.75

101

1 percent of whatever we recover less their costs saved.  They

2 wouldn't had to -- they wouldn't have had to have invested the

3 $15 million.

4         So in the billion-dollar illustration, they would be

5 paid $47.5 million less the $15 million that they didn't have

6 to invest in the litigation because we didn't take the funding

7 from them.  And so on a net basis the Trust would owe them

8 $32.5 million.

9         THE COURT:  Well, let me ask a different question.  I

10 understand that.  Are there -- are you aware -- and I'll ask

11 the Committee's counsel the same thing because I -- look, I

12 said this before, I was concerned about -- I got Mr. Mayer's

13 declaration, but before that there was nothing in the papers

14 you filed that -- other than saying, you know, we thought this

15 would be a long and costly litigation and therefore 70/30.

16 There was nothing that supported this risk -- you know,

17 evaluation of risk.

18         And I wouldn't ordinarily expect that you would lay

19 out what your side -- how you decided on the -- you know, what

20 you were prepared to do.  But are there cases that deal with

21 what -- is there a requirement to disclose the methodology that

22 a party has used in determining that a proposed settlement is

23 fair and reasonable?

24         MR. FISHER:  Your Honor, when it comes to assessing

25 fairly binary litigation risk like this, I am not aware --

1            THE COURT:  Okay.

2            MR. FISHER:  -- of any such case.  But again, in

3    terms of the Trust's point of view --

4            THE COURT:  Well, you're agnostic to this you're

5    telling me --

6            MR. FISHER:  We're agnostic and --

7            THE COURT:  -- so I shouldn't hear from you.

8            MR. FISHER:  And it's more than agnostic.  I mean,

9    we -- it's of course "Hornbook" law and we've cited cases that

10   explain that when a trust has multiple potential beneficiaries,

11   it has to look out for the interests of all of them.  And I

12   think that this is a point that I know is not lost on Your

13   Honor, but maybe it is worth making it explicit.  The

14   fundamental mistake that River Birch makes in their objection

15   is in conflating the Trust and its beneficiaries, and that

16   allows them to argue that --

17           THE COURT:  All right.  Let me hear from the

18   Committee's counsel then.  Okay?

19           MR. FISHER:  Okay.

20           THE COURT:  Are you all right?  Any last points you

21   want to make, Mr. Fisher?

22           MR. FISHER:  Yes, Your Honor, just very briefly.  If

23   Your Honor -- consider the other scenario where we have an

24   agreement among our Trust beneficiaries and we have an offer of

25   $15 million of financing that at least vis-à-vis the Trust does

1  not involve any cost.  And we tell our beneficiaries and the

2  DIP lenders we're not interested in that funding, we're going

3  to stick with River Birch at 4.75 percent.  It's almost

4  impossible --

5        THE COURT:  No.  What you're telling them is that the

6  judge refused to approve the settlement.  It's not that you

7  were backing away, that the Court -- that's what you tell them.

8  It would be the circumstance where the Court refused to approve

9  the settlement.

10       MR. FISHER:  It would have been unreasonable for us

11  to pursue that course of action under the circumstances and

12  stand by River Birch and say no to what is a deal that we think

13  is -- promotes the interests of the Trust here.  And I think

14  the unreasonableness of what would have been that course of

15  action demonstrates the reasonableness --

16       THE COURT:  All right.  But you're only a

17  co-proponent of this motion.  The Committee is the other

18  proponent, so let me hear from the Committee on this.

19       MR. FISHER:  All right.  And my last point then --

20       THE COURT:  Okay.

21       MR. FISHER:  -- Your Honor, is the point about

22  urgency.  And it is an uncomfortable position for a lawyer to

23  be in to tell the judge that this is a matter that does need to

24  be urgently addressed, but I suppose I've already let the cat

25  out of the bag in saying that the Trust is out of money.  And I

1  was reluctant to say that to Your Honor, not out of a lack of

2  wanting to be candid with the Court, but out of an awareness

3  that we have an army of litigation foes in this case who are

4  litigating this case extremely aggressively.

5          And it is so -- with some reluctance that I say

6  publicly that that is the situation that the Trust is in and

7  that makes this matter of extreme importance to all

8  beneficiaries of the Trust.

9          THE COURT:  Well, you're going to get your funding

10 one way or the other.  I don't know which way it's going to go

11 yet.  Okay?

12         MR. FISHER:  Thank you, Your Honor.

13         THE COURT:  All right.  Let me hear from Committee's

14 counsel.

15         MS. SHARRET:  Jennifer Sharret and on behalf of the

16 Committee.  Just as a housekeeping manner since there have been

17 references to Mr. Mayer's declaration, if it could be --

18         THE COURT:  Yeah.

19         MS. SHARRET:  -- admitted as part of the record?

20         THE COURT:  Do you have an ECF docket number?  I

21 didn't write it down I don't think.

22         MS. SHARRET:  I do.  In the adversary proceeding case

23 it's 58, but I can't --

24         THE COURT:  But we're not --

25         MS. SHARRET:  We're not going to use them though.

1          THE COURT:  But the adversary proceeding is being

2    closed tomorrow.

3          MS. SHARRET:  It's 13-718.

4          THE COURT:  Thank you very much.  Okay.  Any

5    objection to admitting the declaration of Thomas Mayer?

6    Hearing no objection, it's admitted into evidence.  But now

7    tell me why that satisfies the requirements for establishing a

8    proposed settlement as fair and reasonable.

9          MS. SHARRET:  So the -- well, in response to what

10   your -- so anticipating Your Honor's question, I mean, we have

11   not done independent research since the question came up, but

12   we're not aware that we need to show the methodology in how we

13   came to the settlement.  Although the -- first of all, I don't

14   think any litigator would ever say that there's a hundred-

15   percent certainty of no risk on appeal.

16         THE COURT:  I would agree with that completely.

17         MS. SHARRET:  Decisions get overturned.  I wouldn't

18   say often, but they do get overturned.  And in recognition of

19   that risk, we came -- we decided it was prudent to try to

20   engage in settlement discussions.  And the test is whether it's

21   in the lowest range of reasonableness.  Now, I'm sure the

22   objectors would -- I'm not sure if they would have been okay

23   with 90/10 or 80/20, but for some reason they have decided that

24   70/30 is not acceptable to them.

25         We think just in assessing the risks and just never

1  guaranteeing that 70 percent -- well, of course we would have

2  preferred a higher settlement.  And there was a lot of

3  negotiations.  That was the arm's length negotiation that we --

4  or settlement that we ended up with.

5          THE COURT:  Okay.

6          MS. SHARRET:  And just to make one distinction, which

7  I know the -- Mr. Fisher has made as well, there is a

8  distinction between the Trust and the Committee.  Here the --

9          THE COURT:  What was the Committee process in

10 determining to go forward with the settlement?

11         MS. SHARRET:  So the -- there were several Committee

12 calls in which there was a discussion.  We -- discussion about

13 the merits of the -- what happened between -- before Judge

14 Gerber and Judge McMahon.  There were discussions specifically

15 about the five questions, which we tomorrow morning can send a

16 copy to Your Honor.  And then after discussing the different

17 merits, there were then more percentage numbers that -- I

18 mean --

19         THE COURT:  I don't want to know the back and forth.

20         MS. SHARRET:  -- it went back and forth --

21         THE COURT:  Okay.

22         MS. SHARRET:  -- quite a lot.  And contrary to what

23 was asserted by Mr. Hansen, it was not a quick decision.  As

24 set forth in Mr. Mayer's declaration, it took two weeks before

25 the Committee finally came back with their final offer, but

1  even before the final offer there was a lot of give and take.

2  And this was heavily, heavily discussed among the Committee

3  members.

4     THE COURT:  All right.

5     MS. SHARRET:  Thank you.

6     THE COURT:  All right.  The Court's going to take a

7  ten-minute recess.  I still have my calendar, so thank you very

8  much, everybody.  And I'll get tomorrow the letter briefs on

9  these additional questions.  Okay?  Thank you very much.

10    (Proceedings concluded at 4:39 p.m.)

11          *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       **C E R T I F I C A T I O N**

2

3        We, Alicia Jarrett, Ilene Watson, and Lisa Luciano,

4  court-approved transcribers, hereby certify that the foregoing

5  is a correct transcript from the official electronic sound

6  recording of the proceedings in the above-entitled matter.

7

8

9

10 _____

11 ALICIA JARRETT, AAERT NO. 428     DATE:  August 12, 2016

12 ACCESS TRANSCRIPTS, LLC

13

14

15

16 _____

17 ILENE WATSON, AAERT NO. 447      DATE:  August 12, 2016

18 ACCESS TRANSCRIPTS, LLC

19

20

21

22 _____

23 LISA LUCIANO, AAERT NO. 327      DATE:  August 12, 2016

24 ACCESS TRANSCRIPTS, LLC

25