# Exhibit  A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

IN RE:

**GENERAL MOTORS LLC IGNITION SWITCH
LITIGATION**

**14-MD-2543(JMF)
14-CV-8176(JMF)**

-------------------------------------------------------------x

*This Document Relates to:*

**AMY LADON NORVILLE,**

        **Plaintiff,**

        **v.**

**GENERAL MOTORS, LLC,**

        **Defendant.**

-------------------------------------------------------------x

**FOURTH AMENDED
COMPLAINT FOR DAMAGES
AND JURY TRIAL DEMANDED**

## FOURTH AMENDED COMPLAINT

**COMES NOW PLAINTIFF**, Amy Ladon Norville ("Plaintiff"), by and through undersigned Counsel of Record, and files this Complaint against Defendant General Motors LLC ("New GM" or "Defendant") based upon information and belief and the investigation of counsel to date, to state and allege as follows[1]:

## NATURE OF THE ACTION

1.     This action arises out of a motor vehicle accident that occurred on November 21, 2013. On that date, Plaintiff Amy Ladon Norville was driving her 2003 Saturn Ion Cobalt

---

[1] Pursuant to the Transfer Order dated June 9, 2014, issued by the United States Judicial Panel on MultiDistrict Litigation, all actions against General Motors LLC related to the ignition switch litigation are to be consolidated in the Southern District of New York before the Honorable Jesse M. Furman.

("Vehicle", "Subject Vehicle", or "2003 Saturn Ion") on Highway 62 in Gage, Kentucky. As she approached a curve in the highway, Ms. Norville observed a deer in the road and attempted to avoid it. She was unable to control her vehicle and traveled off the roadway, colliding with a nearby tree. Ms. Norville's airbags did not deploy during the collision.

2.      As a result of the November 21, 2013 motor vehicle accident, Amy Norville suffered injuries that continue to cause her pain and suffering to this day.

3.      New GM has admitted that General Motors Corporation ("Old GM") equipped model year 2003 Saturn Ions (including the Vehicle)[2] with a defective ignition switch. The defect at issue is a low-torque ignition switch that may move out of the "run" and into the "off" or "accessory" position. If this movement occurs, the driver loses assistance of power steering and power brakes. And if a collision occurs while the ignition switch is not in the "run" position, the vehicle's safety airbags will not deploy—increasing the risk of death and serious injury. Despite knowing that the ignition switch installed in the Vehicle was defective, Old GM failed to adequately warn Plaintiff about the risk of harm and failed to recall the Vehicle.

4.      On July 10, 2009, the United States Bankruptcy Court for the Southern District of New York entered an order approving the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement (the "Sale Order"), wherein New GM acquired certain Old GM assets. Because Plaintiff asserts Products Liability claims within the meaning of the Sale Order through which New GM acquired substantially all the assets of Old GM, Plaintiff properly bases her Products Liability claims for damages (on the conduct of both Old GM and Defendant New GM.

---

[2] In addition to 2003 Saturn Ions, Old GM also installed defective ignition switches into the 2005-07 Chevrolet Cobalt, 2005-07 Pontiac G5, 2006-07 Chevrolet HHR, 2003-2007 Saturn Ions, 2007 Saturn Skys, and the 2006-07 Pontiac Solstice.

5.      Prior to New GM's acquisition of Old GM's assets, Old GM knew it had installed defective ignition switches into millions of vehicles, including Plaintiff's vehicle, and failed to warn consumers or recall the defective vehicles. Indeed, Old GM willfully and deliberately concealed the defect. Because, under Kentucky law, New GM is a mere continuation of Old GM, Plaintiff properly bases certain punitive damages claims on the conduct of Old GM.

6.      After the sale, New GM retained a great number of Old GM personnel, including at least twenty-four engineers, lawyers and executives who knew about the ignition switch defect while acting within the scope of their authority at Old GM. New GM also retained Old GM's books and records, which indicated, *inter alia*, that Old GM had manufactured and sold millions of vehicles containing a defective ignition switch. As a result of these employees and documents, New GM inherited information about Old GM's knowledge and conduct with respect to the ignition switch defect. New GM also acquired its own independent knowledge and committed its own independent misconduct regarding the ignition switch defect after the bankruptcy sale.

7.      Despite knowing that Old GM had installed defective ignition switches into millions of vehicles, failed to warn consumers, and failed to recall the defective vehicles, New GM also failed to warn consumers and failed to recall the defective vehicles and did so for almost five years.    And despite ever-increasing post-sale knowledge of the ignition switch defect, including the connection between the ignition switch defect and airbag non-deployment and the ignition switch defect's deadly consequences, New GM deliberately concealed the defect, delayed the recall, misrepresented to consumers that vehicles containing the defect were safe, and failed to adequately notify Plaintiff about the Vehicle's ignition switch defect. New GM intentionally delayed the ignition switch defect recall in order to minimize harm to the corporation. Defendant further engaged in a scheme to cover up that knowledge and deny any

3

responsibility for the defect, *inter alia*, misrepresenting the scope of the defect even after the accident at issue in this Complaint occurred.

8.      Accordingly, Plaintiff Amy Norville brings this action against Defendant General Motors LLC for negligence, strict liability, fraudulent concealment, crashworthiness, and negligent misrepresentation under applicable law. Further, Plaintiff Amy Norville seeks punitive damages based solely on New GM's knowledge and conduct, including information inherited from Old GM's employees and documents and information obtained by New GM after the Sale. Plaintiff seeks further punitive damages based on Old GM's knowledge and conduct, which New GM – as a mere continuation of Old GM – is liable for.

9.      Plaintiff now has information and belief that certain operational parts in that Vehicle were knowingly defective, and/or improperly designed, manufactured, or installed by Old GM and failed to prevent, proximately caused, and/or directly resulted in the personal injuries and collision that occurred.

10.      Plaintiff also has since learned that, despite its prior knowledge, Defendant New GM deliberately failed to notify Plaintiff adequately about the ignition switch defect in the Vehicle before the accident's occurrence.  Defendant further has engaged in a scheme to cover up its knowledge and deny any responsibility for the defect by misrepresenting the scope of the defect even after the accident at issue in this Third Amended Complaint occurred.

11.      Therefore, Plaintiff Amy Ladon Norville comes now to bring this action individually to recover any and all economic and non-economic damages she has incurred, including but not limited to damages for physical injuries and pain and suffering sustained as a result of the crash and accident.

4449969v1/014242

**THE PARTIES**

12.     At all times relevant herein, injured Plaintiff Amy Ladon Norville is and was a competent adult and resident citizen of the State of Paducah, McCracken County, Kentucky. Ms. Norville was injured as a result of the automobile accident described herein.

13.     Defendant General Motors LLC ("New GM") is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan.

14.     The sole member and owner of General Motors LLC is General Motors Holding LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.

15.     The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware Corporation with its principal place of business in the State of Michigan, and is a citizen of the States of Delaware and Michigan.

16.     New GM was incorporated in 2009 and, effective on July 10, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code. It is undisputed that New GM had express obligations, as well as obligations by law, to comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act and the Transportation Recall Enhancement, Accountability and Documentation Act, including with respect to Old GM vehicles.

17.     General Motors LLC does business in the State of Kentucky with its principal domestic address located at Corporation Service Company d/b/a/ CSC-Lawyers Incorporating Service Company, 421 West Main Street, Frankfort, Kentucky 40601.

4449969v1/014242

18.     At all times relevant herein, the event out of which this cause of action arose occurred on November 21, 2013, on Highway 62, in Gage, Kentucky.

19.     In June 2009, General Motors Corporation ("Old GM") filed for bankruptcy. On July 9, 2009, the United States Bankruptcy Court approved the sale of substantially all of Old GM's assets pursuant to a Master Sales and Purchase Agreement ("Agreement"). The Agreement became effective on July 10, 2009. The Agreement approved the sale of Old GM's assets to Defendant General Motors LLC.

20.     The Agreement defines Defendant's "Purchased Assets" as:

(xiv)   all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

(xv)    all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities; . . . .

Amended and Restated Master Sale and Purchase Agreement at Section 2.2.

21.     Along with the Purchased Assets, Defendant New GM also expressly took on a range of liabilities. "Liabilities" is defined in the Agreement as "any and all liabilities and

6

obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise."

22.     Among many others, the Liabilities assumed by Defendant New GM under the Agreement include:

(vii) (A) all Liabilities arising under express written warranties of Sellers [i.e., old GM] that are specifically identified as warranties and delivered in connection with sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser [i.e., New GM] prior to or after the Closing and (B) all obligations under Lemon Laws; . . .


(ix) all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents, or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance; . . .


(xi) all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing; . . .

23.    Defendant New GM also undertook contractual responsibility for compliance with a wide range of laws and other regulations, including:

(a)    From and after the Closing, Purchaser [Defendant New GM] shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [Old GM].

(b)    From and after the Closing, Purchaser [Defendant New GM] shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [Old GM] . . . (ii) Lemon Laws.

24.    Pursuant to the Agreement and other orders of the Bankruptcy Court, Defendant New GM purchased the assets of Old GM and hired many, if not most, of Old GM's employees including, on information and belief, most of the same senior-level management, officers, and directors.

25.    New GM is also liable for successor liability claims under Kentucky law as Old GM's mere continuation:

(a)    After the Bankruptcy Sale, there existed a continuity of shareholders and ownership, management, personnel, physical location, and business operations between Old GM and New GM. As consideration for the sale, Old GM was given 10% of New

GM's stock, with two warrants to purchase an additional 15%, giving Old GM the ability to own and control 25% of New GM. The vast majority of Old GM's management continued in their roles at New GM after the Bankruptcy Sale, as well as the majority of Old GM's personnel and employees. The physical location and business operations of New GM are essentially identical to those of Old GM. The address of New GM's principal executive offices did not change after the Bankruptcy Sale. New GM also assumed the goodwill of Old GM after the sale, and continued manufacturing many of the same automobile brands.

(b)     New GM did not pay Old GM sufficient consideration for the Bankruptcy Sale. No cash consideration was given for the sale, which was an all-stock transaction.

(c)     Shortly after the Bankruptcy Sale, Old GM ceased business operations and dissolved. Old GM remained in existence for 18 months after the Bankruptcy Sale solely to arrange its own liquidation.

(d)     New GM was incorporated solely for the purpose of acquiring Old GM's viable assets, and, as part of the Bankruptcy Sale, acquired certain of Old GM's liabilities and subsidiaries, thus agreeing to pay Old GM's debts.

(e)     After the sale, New GM held itself out to the public as a continuation of Old GM. For example, in April 2010, General Motors Company Chairman and CEO Ed Whitacre

9

starred in a video commercial on behalf of New GM, asking Americans to give "GM a second chance."

26.    The allegations pertaining to Old GM above are included for purposes of background and context, and to set forth the scope of Defendant New GM's liabilities and responsibilities under the Agreement and as a mere continuation of Old GM. This Complaint does not assert any causes of action against Old GM; all causes of action and attributions of liability are directed solely against Defendant General Motors LLC.

## JURISDICTION AND VENUE

27.    This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Plaintiff exceeds $75,000, and Plaintiff is a citizen of a different state than Defendant.  Jurisdiction is also proper in this Court as it has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

28.    This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction.  This Court has personal jurisdiction over New GM because New GM conducts substantial business in this District, and some of the actions giving rise to the complaint took place in this District.  This Court also has personal jurisdiction over New GM under 18 U.S.C. § 1965 because New GM is found in, has an agent in, or transacts business in this District.

29.    Venue is proper in this District under 28 U.S.C. § 1391 because New GM, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, New GM transacts business within the District, and some of the events establishing the claims arose in this District.  Venue is also proper under 18 U.S.C. § 1965.

## THE INCIDENT

30.     On or about the night of November 21, 2013, Plaintiff Amy Norville was driving her 2003 Saturn Ion on Highway 62 in Gage, Kentucky.

31.     Ms. Norville approached a curve in the roadway when she saw a deer in her path up ahead. Ms. Norville attempted to steer away from the deer to avoid a collision when she suddenly lost her ability to control the vehicle. Ms. Norville's Ion did not make the curve. Instead, she traveled off the roadway and struck a tree. The airbags in Ms. Norville's Saturn Ion did not deploy during the collision.

32.     At the time of the accident, the road was dry, the weather was clear, Ms. Norville was wearing her seatbelt, and she was not exceeding the posted speed limit. In addition, Ms. Norville had at least two keys on the keychain along with her ignition key.

33.     Ms. Norville suffered significant personal injuries as a result of the November 21, 2013 accident.

34.     Ms. Norville was transported by emergency responders to Baptist Health in Paducah, Kentucky.   After significant treatment, Ms. Norville was diagnosed with a broken sternum and multiple fractures in her neck.

35.     As a result of the crash, Plaintiff suffered personal injuries and damages in an amount to be determined at trial.

36.     Defendant New GM is one of the largest vehicle manufacturers in the United States, and it assumed certain liabilities for vehicles manufactured by Old GM, including Product Liability claims for non-punitive damages. New GM is also liable for Old GM's actions as Old GM's mere continuation.

11

37.     Prior to the accident on November 21, 2013, Defendant New GM had not reported any potential problems with the Vehicle and/or any other vehicles of its kind and had not recalled the Vehicle and/or any other vehicles of its kind for ignition switch defects.

38.     Upon information and belief, prior to November 21, 2013, Defendant New GM was in the business of designing, manufacturing, testing, and selling and/or distributing vehicles in Kentucky, and also expressly assumed liability for Products Liability claims arising after the Sale in vehicles manufactured by Old GM, including but not limited to the Vehicle at issue in this Fourth Amended Complaint. As Old GM's mere continuation, New GM is also liable for Old GM's actions preceding the Bankruptcy Sale.

39.     Also upon information and belief, Defendant New GM knew about the safety-related defects in the Vehicle at issue in this Complaint for nearly five years before the Vehicle was recalled for an ignition switch defect, but did not adequately recall, remedy, warn, or protect against the problem prior to the time that the November 21, 2013 accident occurred. And Old GM itself was aware of the ignition switch defect for many years before it went bankrupt in 2009, but did not adequately recall, remedy, or warn the public before Plaintiff's accident.

40.     Beginning on or shortly after the time it came into existence on July 10, 2009, Defendant New GM continuously operated in direct contravention of the public's trust and safety, and covered up the ignition switch defect for nearly five years, which has impacted approximately 15 million vehicles worldwide ("Defective Vehicles"). Under agency principles arising from governing Kentucky law, the widespread knowledge of Old GM employees of the ignition switch defect may be imputed to New GM—even where the employees gained that knowledge in whole or in part while they were employed in the same or similar capacities at Old GM.

41. As a result of Old GM and New GM's disregard for public safety over the last five years, Plaintiff has suffered additional economic injury, loss, and damages related to the injuries sustained in the accident.

42. Therefore, by reason of the foregoing, and for its failure to remedy a Vehicle that it knew or should have known was not reasonably safe for its intended use on November 21, 2013, and/or to disclose its prior knowledge about the dangerous nature of the defect that caused Plaintiff's injuries, Defendant New GM is liable to Plaintiff for all damages, injuries, and losses that she has suffered and sustained as a result of the accident at issue in this Third Amended Complaint.

## LIABILITY

43. Rule No. 1: Manufacturers of any product—from toys to automobiles to medical devices—must manufacture and sell products that are, above all else, safe for use. Safety protects consumers, is essential to long-term brand value and corporate success, and is required by law.

44. Rule No. 2: Manufacturers must also tell the complete truth about the safety of their products. When a safety defect does occur, manufacturers must initiate some form of recall to address the problem.

45. Rule No. 3: Manufacturers of products whose operation can cause injuries and fatalities must have good manufacturing processes in place such that they can produce safe products and detect and correct quality control issues.

46. Through its CEO Mary Barra, Defendant New GM admitted on June 5, 2014 that it had a duty to build safe cars and failed:

Our job is clear:  To build high quality, safe vehicles.  In this case with these vehicles, we didn't do our job.  We failed these customers. We must face up to it and learn from it.

…

Furthermore, numerous individuals did not accept any responsibility to drive our organization to understand what was truly happening.  The report [commissioned by New GM] highlights a company that operated in silos, with a number of individuals seemingly looking for reasons not to act, instead of finding ways to protect our customers.

Let me be clear:  This should never have happened.  It is unacceptable. Our customers have to know they can count on our cars, our trucks and our word.  Because of the actions of a few people, and the willingness of others in the company to condone bureaucratic processes that avoided accountability, we let these customers down.

47.      Defendant New GM's violation of the rules governing car manufacturers was egregious. From the date of its inception on July 10, 2009, it knew that Old GM had manufactured and sold millions of vehicles that were not safe and were defective.  Defendant New GM also failed to disclose the truth about its patent inability to manufacture and sell safe and reliable vehicles and its systematic scheme to misrepresent the safety and reliability of its vehicles, and failed to remedy the defects in millions of Old GM vehicles that were on the road. These violations were in derogation of express obligations Defendant New GM agreed to perform, and of various laws.  And to be clear, these violations were done by Defendant New GM and this action arises from New GM's actions (and from knowledge and information it inherited from Old GM personnel and from Old GM documents in New GM records), except with respect to the claims for Products Liability, which is an Assumed Liability through which New GM can be held liable for the conduct of Old GM.

48.      Old GM also knew it had installed defective ignition switches into millions of vehicles, including Plaintiff's vehicle, and failed to warn consumers or recall the defective vehicles. Old GM also deliberately concealed the defect from the public. Because New GM is a

mere continuation of Old GM under Kentucky law, New GM is also liable as Old GM's successor.

49.     Defendant New GM led consumers in the United States and worldwide to believe that, after Old GM's bankruptcy, it was a changed company. For example, in numerous public announcements and public filings, such as in its 2012 Annual Report, Defendant New GM repeatedly proclaimed that it was a company committed to innovation, safety, and maintaining a strong brand. An example from its 2012 Annual Report:



50.     Defendant New GM was successful in selling its "processes and culture change" and building "the best vehicles in the world" story. Sales of all New GM models went up, and Defendant New GM became profitable.

51.     Old GM's and New GM's brand images were an illusion given their egregious failure to disclose, and the affirmative concealment of, ignition switch defects and a plethora of

4449969v1/014242

other safety and quality defects in vehicles manufactured by Old GM (about which New GM expressly agreed to perform Safety Act obligations in the Sale Agreement) and New GM. Old and New GM concealed the existence of the many known safety and quality defects plaguing many models and years of those vehicles, and that Old and New GM valued cost-cutting over safety, while concurrently marketing Old and New GM vehicles as "safe" and "reliable," and claiming that they built the "world's best vehicles." And Old and New GM's concealment of their safety and quality problems caused owners of Old GM vehicles to drive and retain vehicles that they would not have retained or continued to drive had they known the truth.

52.     The systematic concealment of known defects was deliberate, as Defendant New GM followed a consistent pattern of endless "investigation" and delay each time it became aware of a given defect, as epitomized by the ignition switch defects and cover-up of same that have given rise to criminal investigations, including potential wire fraud. Recently revealed documents show that Old and New GM valued cost-cutting over safety, trained personnel to *never* use the word "defect," "stall," or other words suggesting that their vehicles are defective, routinely chose the cheapest parts supplier without regard to safety, and discouraged employees from acting to address safety issues.

53.     In addition, Old and New GM were plagued by what CEO Mary Barra euphemistically calls "transactional decision making," in which Old and New GM employees "color[] inside the lines of their own precise job description without thinking independently or holistically," *i.e.*, without looking at the larger issue of safety.[3]

54.     According to the administrator of the National Highway Traffic Safety Administration ("NHTSA"), Defendant New GM worked to hide documents from NHTSA and

---

[3] TIME MAGAZINE, October 6, 2014, p. 36.

4449969v1/014242

created firewalls to prevent people within New GM from "connecting the dots" with respect to safety issues and defects.

55.     Defendant New GM has received reports of crashes, deaths, injuries, and safety concerns expressed by owners of both Old GM and New GM vehicles that put Defendant New GM on notice of the serious safety issues presented by many of these defects.  Defendant New GM knew and was fully aware of the now infamous ignition switch defect (and many other serious defects in numerous models of Old GM vehicles) *from the very date of its inception on July 10, 2009*.  For example, at least two dozen Old GM employees, many high-level or in positions of influence, knew of the defects as of that date, and, under governing principles of Kentucky agency law, their knowledge is imputed to New GM.  Defendant New GM's public commitment to culture and process change remains entirely hollow.

56.     Defendant New GM's claims that the defects were known only to lower level engineers is as false as it is irrelevant.  For example, current CEO Mary Barra, while head of product development, was informed in 2011 of a safety defect in the electronic power steering of several models.  Despite 4,800 consumer complaints and more than 30,000 warranty repairs, Defendant New GM waited until 2014 to disclose this defect.

57.     Defendant New GM's claims about its own conduct in connection with the ignition switch defect are also false.  While Defendant New GM claims that it was unaware that the unintended movement of the ignition switch in its cars rendered the front airbags inoperable, recently produced documents show otherwise.  For example, in the course of settling the claims involving a Cobalt in 2010, Defendant New GM and its outside litigation counsel, King & Spalding, became aware that the failure of the airbags resulted from the unintended movement of the ignition to the "accessory" position.  Armed with this knowledge, Defendant New GM chose

to settle the case, and continue to cover up the ignition switch defect and its deadly consequences rather than report the defect to NHTSA and institute an immediate recall, as it was plainly required to do.

58. Defendant New GM has now effectively admitted that the ignition switch defect alone is responsible for at least 100 deaths—and Defendant New GM bears responsibility for all the deaths that occurred on its watch after July 10, 2009.

59. But there is more. As noted above, Defendant New GM did not act alone. From as early as its inception and no later than 2010, Defendant New GM, including its legal department, other outside law firms handling cases where airbags did not deploy and the car was in the accessory position, its outside counsel King & Spalding ("K&S"), and its claims administrator ESIS, were all aware of a serious safety defect such that "the facts ... could provide fertile ground for laying the foundation for an award of punitive damages." Despite this awareness, Defendant New GM, K&S, ESIS, and other law firms, using the mails and wires, worked to keep this defect secret. Defendant New GM hid the defect from NHTSA, and K&S and ESIS went along with the cover-up and worked to confidentially settle all cases where evidence of the defect would be made public if the case did not settle. And Defendant New GM, its in-house lawyers, and K&S, were aware that victims were being kept in the dark about an ignition switch defect because the crash recorder indicated the vehicle was in the "Run" position when in fact Old GM engineers and its outside expert concluded the recorder was in error and the vehicle was in "Accessory." They further knew that in the accessory position the airbags would not deploy.

60. Defendant New GM's now highly publicized campaign of deception in connection with the ignition switch defect first revealed in February 2014 sent shockwaves

18

throughout the country. Unfortunately for all owners of vehicles sold by Defendant New GM, the ignition switch defect announced in February 2014 was only one of a parade of recalls in 2014— many concerning safety defects that had long been known to Defendant New GM and were previously known to Old GM.

61.     On May 16, 2014, Defendant New GM entered into a Consent Order with NHTSA in which it admitted that it violated the TREAD Act by not disclosing the ignition switch defect that gave rise to the February and March 2014 recalls, and agreed to pay the maximum available civil penalties for its violations.

62.     Defendant New GM's CEO, Mary Barra, has admitted in a video message that: "Something went wrong with our process…, and terrible things happened."  But that admission is cold comfort for Plaintiff.

63.     Defendant New GM systematically and repeatedly breached its obligations and duties to make truthful and full disclosures concerning its vehicles – particularly, the safety, quality, and reliability of its vehicles and the importance of safety and quality to the Company. Plaintiff has suffered personal injuries and damages as a direct and proximate result of the defect in this case by Defendant New GM's and Old GM's conduct, concealment, and non-disclosure of the ignition switch defect.

### A.     Defendant New GM Falsely Promoted Its Vehicles as Safe, Reliable, and High-Quality

64.     Defendant New GM was financially successful after the Bankruptcy Sale. Sales of all its models went up, and Defendant New GM became profitable.  Defendant New GM claimed to have turned over a new leaf in the bankruptcy, or so the world thought.

65.     In 2010, Defendant New GM sold 4.26 million vehicles globally, an average of one every 7.4 seconds.  Joel Ewanick, Defendant New GM's global chief marketing officer at the

4449969v1/014242

time, described the success of one of its brands in a statement to the press: "Chevrolet's dedication to compelling designs, quality, durability and great value is a winning formula that resonates with consumers around the world."[4]

66.    Defendant New GM repeatedly proclaimed to the world and U.S. consumers that, after Old GM's bankruptcy in 2009, New GM was a new company committed to innovation, safety, and maintaining a strong brand:



General Motors Company 2010 Annual Report, cover page.

---

[4]https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2011/Jan/0117_chev_ global.

4449969v1/014242

67.    In GM's 2010 Annual Report, Defendant New GM proclaimed its products would "improve safety and enhance the overall driving experience for our customers:"

> As we regain our financial footing, we expect the number of new product launches to steadily rise over the next several years. And these new products will increasingly embrace advanced technology to reduce fuel consumption and emissions, improve safety and enhance the overall driving experience for our customers.

General Motors Company 2010 Annual Report, pp. 4, 10.

68.    Defendant New GM claimed it would create vehicles that would define the industry standard:

> **BUILDING THE NEW GM**
> We are moving with increased speed and agility, and implementing change faster than ever before. We are becoming a company with the capability, resources and confidence to play offense, not defense. Instead of creating new vehicles that are just better than their predecessors, we're working to design, build and sell vehicles that define the industry standard.

General Motors Company 2010 Annual Report, p. 5.

69.    In its 2010 Annual Report, Defendant New GM told consumers that it built the world's best vehicles:

> We truly are building a new GM, from the inside out.  Our vision is clear: to design, build, and sell the world's best vehicles, and we have a new business model to bring that vision to life.  We have a lower cost structure, a stronger balance sheet, and a dramatically lower risk profile.  We have a new leadership team – a strong mix of executive talent from outside the industry and automotive veterans – and a passionate, rejuvenated workforce.

> "Our plan is to steadily invest in creating world-class vehicles, which will continuously drive our cycle of great design, high quality and higher profitability."

> General Motors Company 2010 Annual Report, p. 2.

70.     Defendant New GM represented that it was building vehicles with design excellence, quality, and performance:

> And across the globe, other GM vehicles are gaining similar acclaim for design excellence, quality, and performance, including the Holden Commodore in Australia. Chevrolet Agile in Brazil, Buick LaCrosse in China, and many others.

> The company's progress is early evidence of a new business model that begins and ends with great vehicles. We are leveraging our global resources and scale to maintain stringent cost management while taking advantage of growth and revenue opportunities around the world, to ultimately deliver sustainable results for all of our shareholders.

> General Motors Company 2010 Annual Report, p. 3.

71.     These themes were repeatedly put forward as the core message about Defendant New GM's Brand:

The new General Motors has one clear vision: to design, build and sell the world's best vehicles. Our new business model revolves around this vision, focusing on fewer brands, compelling vehicle design, innovative technology, improved manufacturing productivity and streamlined, more efficient inventory processes. The end result is products that delight customers and generate higher volumes and margins—and ultimately deliver more cash to invest in our future vehicles.

A New Vision,
a New Business Model

Our vision is simple, straightforward and clear: to design, build and sell the world's best vehicles. That doesn't mean just making our vehicles better than the ones they replace. We have set a higher standard for the new GM—and that means building the best.

Our vision comes to life in a continuous cycle that starts, ends and begins again with great vehicle designs. To accelerate the momentum we've already created, we reduced our North American portfolio from eight brands to four: Chevrolet, Buick, Cadillac and GMC. Worldwide, we're aggressively developing and leveraging global vehicle architectures to maximize our talent and resources and achieve optimum economies of scale.

Across our manufacturing operations, we have largely eliminated overcapacity in North America while making progress in Europe, and we're committed to managing inventory with a new level of discipline. By using our manufacturing capacity more efficiently

and maintaining leaner vehicle inventories, we are reducing the need to offer sales incentives on our vehicles. These moves, combined with offering attractive, high-quality vehicles, are driving healthier margins—and at the same time building stronger brands.

Our new business model creates a self-sustaining cycle of reinvestment that drives continuous improvement in vehicle design, manufacturing discipline, brand strength, pricing and margins, because we are now able to make money at the bottom as well as at the top of the industry cycles.

We are seeing positive results already. In the United States, for example, improved design, content and quality have resulted in solid gains in segment share, average transaction prices and projected residual values for the Chevrolet Equinox, Buick LaCrosse and Cadillac SRX. This is just the beginning.

General Motors Company 2010 Annual Report, p. 6.

72.    Defendant New GM represented that it had a world-class lineup in North America:



General Motors Company 2010 Annual Report, pp. 12-13.

73. Defendant New GM boasted of its new "culture":

4449969v1/014242



General Motors Company 2010 Annual Report, p. 16.

74.    In its 2011 Annual Report, Defendant New GM proclaimed that it was putting its customers first:

Every driver of a GM car, crossover
or truck is a driver of our growth. We're
putting our vision in motion by putting our
customers first—executing our strategy
to attract and delight more of them
every day, all over the world.

General Motors Company 2011 Annual Report, p. 1.

75.     Defendant New GM also announced that it is committed to leadership in vehicle safety:

Automotive

We offer a global vehicle portfolio of cars, crossovers and trucks. We are committed to leadership in vehicle design, quality, reliability, telematics and infotainment and safety, as well as to developing key energy efficiency, energy diversity and advanced propulsion technologies, including electric vehicles with range extending capabilities such as the Chevrolet Volt. Our business is

General Motors Company 2011 Annual Report, p. 11.

76.     In a "Letter to Stockholders" contained in its 2011 Annual Report, Defendant New GM noted that its brand had grown in value and that it designed the "World's Best Vehicles":

*Dear Stockholder:*

*Your company is on the move once again. While there were highs and lows in 2011, our overall report card shows very solid marks, including record net income attributable to common stockholders of $7.6 billion and EBIT-adjusted income of $8.3 billion.*

*•     GM's overall momentum, including a 13 percent sales increase in the United States, created new jobs and drove investments. We have announced investments in 29 U.S. facilities totaling more than $7.1 billion since July 2009, with more than 17,500 jobs created or retained.*

26

*Design, Build and Sell the World's Best Vehicles*

*This pillar is intended to keep the customer at the center of everything we do, and success is pretty easy to define. It means creating vehicles that people desire, value and are proud to own. When we get this right, it transforms our reputation and the company's bottom line.*

General Motors Company 2011 Annual Report, p. 2.

*Strengthen Brand Value*

*Clarity of purpose and consistency of execution are the cornerstones of our product strategy, and two brands will drive our global growth. They are Chevrolet, which embodies the qualities of value, reliability, performance, and expressive design; and Cadillac, which creates luxury vehicles that are provocative and powerful. At the same time the Holden, Buick, GMC, Baojun, Opel and Vauxhall brands are being carefully cultivated to satisfy as many customers as possible in select regions.*

*Each day the cultural change underway at GM becomes more striking. The old internally focused, consensus-driven and overly complicated GM is being reinvented brick by brick, by truly accountable executives who know how to take calculated risks and lead global teams that are committed to building the best vehicles in the world as efficiently as we can.*

*That's the crux of our plan. The plan is something we can control. We like the results we're starting to see and we're going to stick to it – always.*

General Motors Company 2011 Annual Report, p. 3.

77.     These themes continued in Defendant New GM's 2012 Annual Report:



General Motors Company 2012 Annual Report, p. 3.

78.    Defendant New GM boasted of its "focus on the customer" and its desire to be

"great" and produce "quality" vehicles:

*What is immutable is our focus on the customer, which requires us to go from
"good" today to "great" in everything we do, including product design, initial
quality, durability, and service after the sale.*

General Motors Company 2012 Annual Report, p. 4.

79.    Defendant New GM also indicated it had changed its structure to create more

"accountability" which, as shown below, was a blatant falsehood:

> *That work continues, and it has been complemented by changes to our design and engineering organization that have flattened the structure and created more accountability for produce execution, profitability and customer satisfaction.*

> General Motors Company 2012 Annual Report, p. 10.

80. And Defendant New GM represented that product quality was a key focus – another blatant falsehood:

> *Product quality and long-term durability are two other areas that demand our unrelenting attention, even though we are doing well on key measures.*

> General Motors Company 2012 Annual Report, p. 10.

81. Defendant New GM's 2013 Annual Report stated, "Today's GM is born of the passion of our people to bring our customers the finest cars and trucks we've ever built":



> General Motors Company 2013 Annual Report, inside front cover dual page, (unnumbered).

82. Most importantly given its inaccuracy and the damage wrought in this case, Defendant New GM proclaimed, "Nothing is more important than the safety of our customers":

Case 1:14-cv-08176-JMF    Document 582    Filed 08/12/16    Page 30 of 127

> Nothing is more important than the safety of our customers, so we are also making changes to ensure that something like this does not happen again. One of our first actions was to name a vice president of Global Vehicle Safety to oversee the safety development of GM vehicle systems on a global basis, the confirmation and validation of safety performance, and post-sale safety activities such as recalls. There will be more changes because we are determined to emerge from this crisis stronger and wiser so we can accelerate the momentum we generated through-out 2013.

General Motors Company 2013 Annual Report, p. 4.

**B.    Defendant New GM's Advertising and Marketing Literature Falsely Claimed that GM Placed Safety and Quality First**

83.    In May of 2014, Defendant New GM sponsored the North American Conference on Elderly Mobility.  Gay Kent, director of Defendant New GM global vehicle safety and a presenter at the conference, proclaimed the primacy of safety within Defendant New GM's new company culture:  "The safety of all our customers is our utmost concern."[5]

84.    Defendant New GM vigorously incorporated this messaging into its public-facing communications.  In advertisements and company literature, Defendant New GM consistently promoted all its vehicles as safe and reliable, and presented itself as a responsible manufacturer that stands behind GM-branded vehicles after they are sold.  Examples of Defendant New GM's misleading claims of safety and reliability made in public statements, advertisements, and literature provided with its vehicles follow.

---

[5] https://media.gm.com/media/us/en/gm/news.detail./content/Pages/news/us/en/2014/May/0514-cameras.

Case 1:14-cv-08176-JMF   Document 582   Filed 08/22/16   Page 31 of 127

85.   An online ad for "GM certified" used vehicles that ran from July 6, 2009, until April 5, 2010, stated that "GM certified means no worries."

86.   In April 2010, General Motors Company Chairman and CEO Ed Whitacre starred in a video commercial on behalf of Defendant New GM.  In it, Mr. Whitacre acknowledged that not all Americans wanted to give "GM a second chance," but that Defendant New GM wanted to make itself a company that "all Americans can be proud of again" and "exceed every goal [Americans] set for [General Motors]."   He stated that Defendant New GM was "designing, building, and selling the best cars in the world."  He continued by saying that Defendant New GM has "unmatched lifesaving technology" to keep customers safe.  He concluded by inviting the viewer to take a look at "the new GM."[6]



87.   A radio ad that ran from Defendant New GM's inception until July 16, 2010, stated that "[a]t GM, building quality cars is the most important thing we can do."

88.   On November 10, 2010, Defendant New GM published a video that told consumers that New GM actually prevents any defects from reaching consumers.  The video, entitled "Andy Danko: The White Glove Quality Check," explains that there are "quality processes in the plant that prevent any defects from getting out."  The video also promoted the

_____

[6] https://www.youtube.com/watch?v=jbXpV0aqEM4.

ideal that, when a customer buys a GM vehicle, they "drive it down the road and they never go back to the dealer."[7]



Andy Danko
Flint Assembly Quality Director

89.     In 2010, Defendant New GM ran a television advertisement for its Chevrolet brand that implied its vehicles were safe by showing parents bringing their newborn babies home from the hospital, with the tagline "as long as there are babies, there will be Chevys to bring them home."[8]

90.     Another 2010 television ad informed consumers that "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

91.     Defendant New GM's 2010 brochure for the Chevy Cobalt states, "Chevy Cobalt is savvy when it comes to standard safety" and "you'll see we've thought about safety so you don't have to."  It also states "[w]e're filling our cars and trucks with the kind of thinking, features and craftsmanship you'd expect to pay a lot more for."[9]

---

[7] https://www.youtube.com/watch?v=JRFO8UzoNho&list=UUxN-Csvy_9sveql5HJviDjA.

[8] https://www.youtube.com/watch?v=rb28vTN382g.

[9] https://www.auto-brochures.com/makes/Chevrolet/Cobalt/Chevrolet_US%20Cobalt_2010.pdf.

4449969v1/014242



**COBALT**

See a photo gallery of Cobalt at chevy.com/cobalt. ■

Cobalt is engineered to save you money years down the road with long-life components like 100,000-mile spark plugs and 150,000-mile engine coolant, plus automatic transmission fluid that never needs changing.

## STREET-SMART ABOUT SAFETY.

Chevy Cobalt is savvy when it comes to standard safety. It's equipped with dual frontal air bags and **HEAD-CURTAIN SIDE-IMPACT AIR BAGS**; the OnStar Safe & Sound Plan (standard for the first year); and a Driver Information Center that alerts you to tire pressure, oil life and many other vehicle functions and also includes personalization settings. The **STABILITRAK** Electronic Stability Control System (including Traction Control) is standard on SS models. Factor in antilock brakes — standard on 2LT and SS, available on LS and 1LT — and you'll see we've thought about safety so you don't have to.

The Driver Information Center includes a Tire Pressure Monitor (excludes spare tire), 15 messages and personalization settings.

**CHEVY** To us, it's pretty simple: Build vehicles that anyone would be proud to own, and put them within reach. We offer more models than Toyota or Honda with **30 MPG HIGHWAY OR BETTER**. We're backing our quality with the **BEST COVERAGE IN AMERICA**, which includes the 100,000 mile/5-year transferable Powertrain Limited Warranty plus Roadside Assistance and Courtesy Transportation Programs. We're filling our cars and trucks with the kind of thinking, features and craftsmanship you'd expect to pay a lot more for. This philosophy has earned us more *CONSUMERS DIGEST* "BEST BUY" awards for 2009 models than any other brand. So owning a Chevy isn't just a source of transportation. It's a source of pride. **CHEVY.COM**

92.     Defendant New GM's 2010 Chevy HHR brochure proclaims, "PLAY IT SAFE" and "It's easier to have fun when you have less to worry about."[10]

---

[10] https://www.auto-brochures.com/makes/Chevrolet/HHR/Chevrolet_US%20HHR_2010.pdf.

4449969v1/014242



93.     Defendant New GM's brochure for the 2011 Chevrolet Silverado states, "Silverado – the most dependable, long-lasting full size pickups on the road."  It goes on to say, "There are three stages of safety.  Silverado takes every one as seriously as you do."[11]



---

[11] https://www.auto-brochures.com/makes/Chevrolet/Silverado/Chevrolet_US%20Silverado_2011.pdf.

4449969v1/014242

**There are three stages of safety.** Silverado takes every one as seriously as you do.

**Before.** StabiliTrak Electronic Stability Control System with Traction Control helps keep you on the road and in control. Four-wheel antilock disc brakes are standard and deliver consistent stopping power, even when you're hauling big loads. A Tire Pressure Monitor keeps a constant watch on the inflation level of the four road tires.

**During.** Six air bags¹ are standard: driver and right-front passenger dual-stage frontal air bags, head-curtain side-impact air bags for the front and rear outboard seating positions, and front-seat mounted air bags for thorax and pelvic protection. You're also surrounded by a high-strength steel safety cage and strategically placed crush zones to help absorb any impact.

**After.** Protected and Connected with OnStar® Experience the safe, simple way to stay connected on the road. OnStar,² including Automatic Crash Response, is standard on most models for the first six months. In a collision, vehicle sensors can automatically alert an OnStar Advisor and relay critical crash details. The Advisor is immediately connected into your vehicle and can request that emergency help be sent to your exact GPS location, even if you can't respond.

94.     The brochure for the 2011 Cadillac DTS and STS states, "Passenger safety is a primary consideration throughout the engineering process," and "[t]he STS and DTS were carefully designed to provide a host of features to help you from getting into a collision in the first place."[12]

---

[12] https://www.auto-brochures.com/makes/Cadillac/Cadillac_US%20STS-DTS_2011.pdf.

4449969v1/014242



95.     On August 29, 2011, Defendant New GM's website advertised:  "Chevrolet provides consumers with fuel-efficient, safe and reliable vehicles that deliver high quality, expressive design, spirited performance and value."[13]

96.     On September 29, 2011, Defendant New GM announced on the "News" portion of its website the introduction of front center airbags.  The announcement included a quote from Gay Kent, Defendant New GM Executive Director of Vehicle Safety and Crashworthiness, who stated that: "This technology is a further demonstration of New GM's above-and-beyond commitment to provide continuous occupant protection before, during and after a crash."[14]

---

[13] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2014/Jul/0731-mpg.
[14] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2011/Sep/0929_air bag.

97.     On December 27, 2011, Gay Kent was quoted in an interview on Defendant New GM's website as saying: "Our safety strategy is about providing continuous protection for our customers before, during and after a crash."[15]

98.     Defendant New GM's brochure for the 2012 Chevrolet Impala proclaims: "A safety philosophy that RUNS DEEP," and that "if a moderate to severe collision does happen, Impala is designed to respond quickly":[16]



99.     Defendant New GM's brochure for the 2012 Cadillac CTS announces, "At Cadillac, we believe the best way to survive a collision is to avoid one in the first place," and "Active safety begins with a responsive engine, powerful brakes, and an agile suspension."[17]

---

[15] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2011/Dec/1227_safety.

[16] https://www.chevrolet.com/content/dam/Chevrolet/northamerica/usa/nscwebsite/en/Home/Help%20Center/Download%20a%20Brochure/02_PDFs/2012_Impala_eBrochure.pdf.

[17] https://www.auto-brochures.com/makes/Cadillac/CTS/Cadillac_US%20CTS_2012.pdf.

4449969v1/014242



100.    On January 3, 2012, Gay Kent, GM Executive Director of Vehicle Safety, was quoted on Defendant New GM's website as saying:  "From the largest vehicles in our lineup to the smallest, we are putting overall crashworthiness and state-of-the-art safety technologies at the top of the list of must-haves."[18]

101.    An online national ad campaign for Defendant New GM in April 2012 stressed "Safety. Utility.  Performance."

102.    On June 5, 2012, Defendant New GM posted an article on its website announcing that its Malibu Eco had received top safety ratings from the National Highway Traffic Safety Administration and the Insurance Institute for Highway Safety.  The article includes the following quotes:  "With the Malibu Eco, Chevrolet has earned seven 2012 TOP SAFETY PICK awards," said IIHS President Adrian Lund.  "The IIHS and NHTSA results demonstrate GM's commitment to state-of-the-art crash protection."  And, "We are now seeing the results from our commitment to design the highest-rated vehicles in the world in safety performance," said Gay Kent, Defendant New GM's Executive Director of Vehicle Safety.  "Earning these top safety

---

[18] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2012/Jan/0103_sonic.

ratings demonstrates the strength of the Malibu's advanced structure, overall crashworthiness and effectiveness of the vehicle's state-of-the-art safety technologies."[19]

103.    On June 5, 2012, Defendant New GM posted an article on its website entitled "Chevrolet Backs New Vehicle Lineup with Guarantee," which included the following statement:  "We have transformed the Chevrolet lineup, so there is no better time than now to reach out to new customers with the love it or return it guarantee and very attractive, bottom line pricing," said Chris Perry, Chevrolet Global Vice President of Marketing.  "We think customers who have been driving competitive makes or even older Chevrolets will be very pleased by today's Chevrolet designs, easy-to-use technologies, comprehensive safety and the quality built into all of our cars, trucks and crossovers."[20]

104.    On November 5, 2012, Defendant New GM published a video to advertise its "Safety Alert Seat" and other safety sensors.  The video described older safety systems and then added that new systems "can offer drivers even more protection."  A Cadillac Safety Engineer added that "are a variety of crash avoidance sensors that work together to help the driver avoid crashes." The engineer then discussed all the sensors and the safety alert seat on the Cadillac XTS, leaving the viewer with the impression safety was a top priority at Cadillac.[21]

---

[19] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2012/Jun/0605_malibu safety.

[20] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2012/Jul/0710_ confidence.

[21] https://www.youtube.com/watch?v=CBEvflZMTeM.

4449969v1/014242

Case 1:14-cv-08176-JMF   Document 582   Filed 08/12/16   Page 40 of 127



105.   Defendant New GM's brochure for the 2013 Chevrolet Traverse states, "Traverse provides peace of mind with an array of innovative safety features," and "[i]t helps protect against the unexpected."[22]



106.   A national print ad campaign in April 2013 states that, "[w]hen lives are on the line, you need a dependable vehicle you can rely on.   Chevrolet and GM … for power, performance and safety."

---

[22] https://www.auto-brochures.com/makes/Chevrolet/Traverse/Chevrolet_US%20Traverse_2013.pdf.

4449969v1/014242

107.    On November 8, 2013, Defendant New GM posted a press release on its website regarding GMC, referring to it as "one of the industry's healthiest brands":[23]



**About GMC**
GMC has manufactured trucks since 1902, and is one of the industry's healthiest brands. Innovation and engineering excellence is built into all GMC vehicles and the brand is evolving to offer more fuel-efficient trucks and crossovers, including the Terrain small SUV and Acadia crossover. The 2014 Sierra half-ton pickup boasts all-new powertrains and design, and the Sierra Heavy Duty pickups are the most capable and powerful trucks ever built by GMC. Every retail GMC model, including Yukon and Yukon XL full-size SUVs, is now available in Denali luxury trim. Details on all GMC models are available at http://www.gmc.com/, on Twitter at @thisisgmc or at http://www.facebook.com/gmc.

108.    A December 2013 a New GM testimonial ad stated that "GM has been able to deliver a quality product that satisfies my need for dignity and safety."

109.    In 2013, Defendant New GM proclaimed on its website, https://www.gm.com, the company's passion for building and selling the world's best vehicles as "the hallmark of our customer-driven culture":[24]



---

[23] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2013/Nov/1108-truck-lightweighting.

[24] https://www.gm.com/company/aboutGM/our_company.

4449969v1/014242

Case 1:14-cv-08176-JMF Document 582 Filed 08/12/16 Page 42 of 127

110. On the same website in 2013, Defendant New GM stated: "At GM, it's about getting everything right for our customers – from the way we design, engineer and manufacture our vehicles, all the way through the ownership experience."[25]



111. On its website, Chevrolet.com, Defendant New GM promises that it is "Putting safety ON TOP," and that "Chevy Makes Safety a Top Priority":[26]



---

[25] https://www.gm.com/vision/quality_safety/it_begins_with_a_commitment_to_Quality.

[26] https://www.chevrolet.com/culture/article/vehicle-safety-preparation.

112.     On its website, Buick.com, Defendant New GM represented that "Keeping you and your family safe is a priority":[27]



TOP 5 INNOVATIVE VEHICLE SAFETY FEATURES FROM BUICK

Innovative car safety features are usually high on the list of must-haves when selecting a new car and expectations are even higher when it comes to purchasing a luxury vehicle. Buick delivers with great advancements in vehicle safety technology, giving you greater awareness of your surroundings, greater control over your vehicle, and even alerts to any potential trouble before it happens. Such vehicle safety features are available or standard in all current Buick luxury sedans and luxury crossover SUVs.

Sometimes, when you're backing up, you can't always see your surroundings with absolute clarity. Such blind spots can leave you open to the possibility of backing into a potentially dangerous situation. The state-of-the-art Rear Cross Traffic Alert, on the Verano with the available Convenience Group, was developed to alert you to any approaching vehicles or pedestrians within 65 feet of your vehicle. Like the blind zones that may impede visibility when backing up, there can be blind spots on the sides. Many drivers have had the experience of being surprised by another vehicle in a blind spot alongside when intending to change lanes. To reduce this potential danger, Side Blind Zone Alert was created. Available in the Enclave luxury SUV and Lacrosse luxury AWD mid-size sedan models, this feature uses radar to sense vehicles that are in your blind spot and alerts you to their presence. Driving on slick or loose surfaces, you run the risk of losing grip of the road and losing control. In recent years, extremely sophisticated traction and vehicle control systems have developed to give you greater car control. Continuously monitoring how much grip your tires have, traction control comes standard in Enclave, Lacrosse, Verano, and Regal models to transfer power to the wheel with the most grip. In the event that your car is not adequately responding to your steering commands, StabiliTrak detects the difference between the steering wheel angle and the direction you are turning, then applies quick, precise force to the appropriate brakes to help you maintain control the vehicle's direction and help keep it on course.

There are certain situations on the road in which events unfold more quickly than we might first be aware. Luckily, one of the newest available car safety features is Forward Collision Alert. Using cameras mounted on the front of the vehicle, your Buick can alert you to a possible collision threat so you can take action to reduce the risk of having a frontal crash.

Lastly, one of the most unique new car safety features is a system that helps you stay between the lines. There are some instances when we may start to drift out of our lane. Using onboard cameras, the Lane Departure Warning system gives you a visual and audible alert if it senses you are moving from your lane without using your turn signal. The system constantly monitors lane markings on the road and helps you to be aware and stay safe.

Keeping you and your family safe is a priority and Buick is committed to this priority through the delivery of innovative safety technologies. Discover all the reasons why Buick luxury vehicles are considered some of the most advanced on the road and begin demanding more from your luxury car.

113.     On March 3, 2014, Defendant  New GM announced that "Customer Safety is our guiding compass" in response to the 2014 Malibu receiving a Top Safety Pick rating, from the Insurance Institutes For Highway Safety.

114.     Defendant New GM's website in 2014 touted its purported "Commitment to Safety," which is "at the top of the agenda at GM:"[28]

---

[27] https://www.buick.com/top-vehicle-safety-features.

[28] https://www.gm.com/vision/quality_safety/gms_commitment_tosafety.

Case 1:14-cv-08176-JMF    Document 582    Filed 08/22/16    Page 45 of 127

*Innovation: Quality & Safety; GM's Commitment to Safety; Quality and safety are at the top of the agenda at GM, as we work on technology improvements in crash avoidance and crashworthiness to augment the post-event benefits of OnStar, like advanced automatic crash notification.*

*Understanding what you want and need from your vehicle helps GM proactively design and test features that help keep you safe and enjoy the drive.  Our engineers thoroughly test our vehicles for durability, comfort, and noise minimization before you think about them.  The same quality process ensures our safety technology performs when you need it.*

115.    Defendant New GM's website further promised "Safety and Quality First:  Safety will always be a priority at GM.   We continue to emphasize our safety-first culture in our facilities," and that, "[i]n addition to safety, delivering the highest quality vehicles is a major cornerstone of our promise to our customers":[29]

> At the new GM, we make a strong commitment to our customers, employees, partners and other important stakeholders.  We state proudly our five principles that guide us in everything we do:
>
> - **Safety and Quality First:** Safety will always be a priority at GM.  We continue to emphasize our safety-first culture in our facilities, and as we grow our business in new markets. Our safety philosophy is at the heart of the development of each vehicle. In addition to safety, delivering the highest quality vehicles is a major cornerstone of our promise to our customers.  That is why our vehicles go through extreme testing procedures in the lab, on the road and in our production facilities prior to being offered to customers. Learn More

116.    According to Defendant New GM's website, "Leading the way is our seasoned leadership team who set high standards for our company so that we can give you the best cars

---

[29] https://www.gm.com/company/aboutGM/our_company.

and trucks. This means that we are committed to delivering vehicles with compelling designs, flawless quality, and reliability, and leading safety, fuel economy and infotainment features."[30]

117.    In its 2011 10-K SEC filing, Defendant New GM stated "We are a leading global automotive company.  Our vision is to design, build and sell the world's best vehicles.  We seek to distinguish our vehicles through superior design, quality, reliability, telematics (wireless voice and data) and infotainment and safety within their respective segments."  General Motors 2011 Form 10-K, p. 50.[31]

118.    Defendant New GM made these and similar representations to boost vehicle sales while knowing that millions of GM-branded vehicles, across numerous models and years, were plagued with serious and concealed safety defects.  Defendant New GM was well aware of the impact vehicle recalls, and their timeliness, have on its brand image.  In its 2010 Form 10-K submitted to the United States Securities and Exchange Commission ("SEC"), New GM admitted that "Product recalls can harm our reputation and cause us to lose customers, particularly if those recalls cause consumers to question the safety or reliability of our products. Any costs incurred or lost sales caused by future product recalls could materially adversely affect our business."  General Motors 2010 Form 10-K, p. 31.[32]  This is precisely why New GM decided to disregard safety issues and conceal them.

### C.    The Ignition Switch System Defect

119.    More than 12 million GM-branded vehicles, including the Saturn Ion, contained a defective ignition switch and cylinder. In these vehicles, the key position of the lock module is located low on the steering column, in close proximity to the driver's knee.  The ignition switch

---

[30] http://www.gm.com/company/aboutGM/our_company.

[31] http://www.sec.gov/Archives/edgar/data/1467858/000119312511051462/d10k.htm.

[32] https://www.sec.gov/Archives/edgar/data/1467858/000119312510078119/d10k.htm#toc85733_4.

Case 1:14-cv-08176-JMF Document 582 Filed 08/12/16 Page 48 of 127

in these vehicles, the "Defective Ignition Switch Vehicles," is prone to fail during ordinary and foreseeable driving situations.

120. The consequences of product failure in each of the recalled vehicles caused the vehicle to stall, disabling the power steering and power brakes, and disabling the airbag system in normal and foreseeable driving circumstances.

121. More specifically, the ignition switch in the Saturn Ion can inadvertently move from the "run" to the "accessory" or "off" position at any time during normal and proper operation of the Defective Ignition Switch Vehicles. The ignition switch is most likely to move when the vehicle is jarred or travels across a bumpy road; if the key chain is heavy; if a driver inadvertently touches the ignition key with his or her knee; or for a host of additional reasons. When the ignition switch inadvertently moves out of the "run" position, the vehicle suddenly and unexpectedly loses engine power, power steering, and power brakes, and certain safety features are disabled, including the vehicle's airbags. This leaves occupants vulnerable to crashes, serious injuries, and death.

122. The ignition switch systems at issue are defective in at least three major respects. First, the switches are simply weak; because of a faulty and below specification "detent plunger," the switch can inadvertently move from the "run" to the "accessory" position. Second, because the ignition switch is placed low on the steering column, the driver's knee can easily bump the key (or the hanging fob below the key) and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position. Third, when the ignition switch moves from the "run" to the "accessory" or "off" position, the vehicle's power is disabled. This also immediately disables the airbags. Thus, when power is lost during ordinary operation of the vehicle, drivers and passengers are left without the protection of the airbag system even if traveling at high

speeds. Defendant New GM was aware of safer alternative designs for airbag systems that would have prevented the non-deployment of airbags caused by the ignition defects, but chose not to employ them, in part to avoid disclosure of the defective ignition switch and its tragic consequences. Old GM had the same awareness and made the same choices.

123.     Vehicles with defective ignition switches are therefore unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the vehicles.

124.     Old GM knew it had installed defective ignition switches into millions of vehicles, but willfully and deliberately concealed the defect from the public. As Old GM's mere continuation, New GM is liable for Old GM's conduct.

125.     Indeed, Defendant New GM itself has acknowledged that the defective ignition switches pose an "increas[ed] risk of injury or fatality." Ken Feinberg, who was hired by Defendant New GM to settle wrongful death claims arising from the ignition switch defects, has already linked the defect to over 100 deaths, and has not yet completed his review of wrongful death claims. The Center for Auto Safety studied collisions in just two vehicle makes, and linked the defect to over 300 accidents. There is every reason to believe that as more information is made public, these numbers will continue to grow.

126.     Alarmingly, Defendant New GM knew of the deadly ignition switch defects and their dangerous consequences from the date of its creation on July 10, 2009, but concealed its knowledge from consumers and regulators. To this day, Defendant New GM continues to conceal material facts regarding the extent and nature of this safety defect, as well as what steps must be taken to remedy the defect.

4449969v1/014242

127.    While Defendant New GM has instituted a recall of millions of vehicles for defective ignition switches, it knew *and its own engineering documents reflect*—that the defects transcend the design of the ignition switch and also include the placement of the ignition switch on the steering column, a lack of adequate protection of the ignition switch from forces of inadvertent driver contact, and the need to redesign the airbag system so that it is not immediately disabled when the ignition switch fails in ordinary and foreseeable driving situations.

128.    Further, and as set forth more fully below, Defendant New GM's recall of the Defective Ignition Switch Vehicles has been, to date, incomplete and inadequate, and it underscores Defendant New GM's ongoing fraudulent concealment and fraudulent misrepresentation of the nature and extent of the defects.  Defendant New GM has long known of and understood the ignition switch defect and failed to fully remedy the problems associated with this defect.

### 1.    Old GM equipped the Vehicle with a defective ignition switch.

129.    New GM has admitted that Old GM knowingly equipped 2003 Saturn Ions (including the Vehicle) with a defective ignition switch that may move out of the "run" position, disabling power steering, power brakes and frontal airbags.

130.    New GM has admitted that Old GM knew, through testing conducted in 2001 and 2002, that the ignition switch was consistently not meeting torque specifications.  To avoid slowing the production schedule, however, the switch design release engineer, Ray DeGiorgio, ordered the defective switches to be put into production.  The defective switch was then installed in model year 2003 Saturn Ions (including the Vehicle).  DeGiorgio continued at New GM after the sale and worked at New GM until 2014.

131.    New GM has admitted that almost immediately thereafter, customers began reporting problems with cars equipped with the Defective Switch.  Meanwhile, Old GM employees tasked with driving early production versions of the Ion and then the Cobalt were reporting stalls while driving, and some of them were able to attribute the problem to the easy rotation of the key within the Defective Switch.  New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, DeGiorgio and engineer Gary Altman.

132.    New GM has admitted that in June 2005, while at Old GM, two executives who were later in charge of safety at New GM test drove a Cobalt and found that, as reported, the Cobalt could be easily keyed off by contact with the driver's knee.  New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, Gay Kent and Doug Wachtel.

133.    New GM has admitted that in response to press reports about moving stalls, Old GM told the public that the defect did not present a safety concern.  New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, Alan Adler and William Kemp.

134.    New GM has admitted that in November 2004 Old GM opened the first of six engineering inquiries to consider fixing the defective ignition switch, but that Old GM engineers decided not to fix the defect in light of cost concerns.  At least one Old GM engineer, Albert Manzor, believed that the ignition switch defect presented a safety concern and should have been fixed without regard to cost concerns.  His views did not prevail.  New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, Manzor and Altman.

Case 1:14-cv-08176-JMF    Document 582    Filed 08/22/16    Page 50 of 127

135.    New GM has admitted that after receiving another customer complaint, Old GM opened a second engineering inquiry to consider fixing the problem, but again Old GM took no action.  New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, DeGiorgio, Altman and quality brand manager Steven Oakley.

136.    New GM has admitted that Old GM's Product Investigations group began to study the low torque defect issue in summer 2005, but again Old GM took no action to fix the defect or recall defective vehicles.  New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, Kent, Manzor, Altman and Product Investigations manager Doug Wachtel.

137.    New GM has admitted that Old GM issued a 2005 Service Bulletin to its dealers, alerting them to the "inadvertent turning off" problem.   Old GM, however, deliberately omitted the word "stall" from the bulletin to avoid attracting the attention of Old GM's regulator, NHTSA.  New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, Oakley.

138.    New GM has admitted that in April 2006, DeGiorgio, who had received numerous complaints about the defective ignition switch from other Old GM employees, authorized replacement of the defective switch with one with significantly greater torque.  Other Old GM engineers also knew about the part change.  DeGiorgio further directed that the change was to be implemented without a corresponding part number change.   New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, DeGiorgio.

139.    New GM has admitted that certain employees within Old GM understood no later than 2001 the natural connection between a loss of electrical systems and non-deployment of airbags: if the ignition switch turned to Off or Accessory, the SDM would "drop," and the

airbags would therefore be disabled.  If a crash then ensued, neither the driver nor any passengers could have the protection of an airbag.   New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, product liability attorney Jaclyn Palmer and Field Performance Assessment Engineers John Sprague and Kathy Anderson.

140.    New GM has admitted that the deadly effects of the defective ignition switch on airbag non-deployment began manifesting themselves early on, in crashes about which Old GM was made aware contemporaneously, including, but not limited to:

141.    a July 2004 crash in which the driver of a 2004 Saturn Ion died after her airbags failed to deploy;

142.    a November 2004 crash in which the passenger of a 2004 Saturn Ion died after the airbags failed to deploy;

143.    a June 2005 crash in which a man suffered serious injuries after the airbags in his 2005 Ion failed to deploy;

144.    a July 2005 crash in which a 16 year old driver died after the airbags in her 2005 Cobalt failed to deploy;

145.    an October 2006 crash in which two teenagers died after the airbags in a 2005 Cobalt failed to deploy;

146.    a September 2008 crash in which two people died after the airbags in a 2006 Cobalt failed to deploy; and

147.    an April 2009 crash in which two people were killed after the airbags in a 2005 Cobalt failed to deploy.

148. New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, Sprague, Anderson, engineer Manual Peace, attorneys Palmer, Doug Brown and Deb Nowak-Vanderhoef.

149. New GM is liable for Old GM's conduct as its mere continuation.

> ### 2. Defendant New GM was aware of the defective ignition switch problem from the date of its inception.

150. On July 10, 2009, the United States Bankruptcy Court approved the sale of substantially all of the assets of General Motors Corporation, or Old GM, to General Motors, LLC, or New GM. From its creation, Defendant New GM, which retained the vast majority of Old GM's senior level executives and engineers as well as Old GM's books and records, knew that Old GM had manufactured and sold millions of vehicles afflicted with the ignition switch defects. That is the case under governing principles of Kentucky agency law, through which the knowledge of key employees of the ignition switch defect is imputed to New GM, even where some or all of the knowledge was acquired before the Bankruptcy Sale.

151. The knowledge and conduct of Old GM are generally important and relevant because they are imputed to Defendant New GM under governing principles of Kentucky agency law given that New GM chose to hire the same key personnel with knowledge of the ignition switch defect and Old GM's concealment of that defect—and it employed them in the same key positions where they were obliged to know and act on this information. In light of its knowledge of the ignition switch defects, and the myriad other defects, Defendant New GM had (and breached) its legal obligations to Plaintiff. New GM is also liable for Old GM's conduct as its mere continuation.

152. In part, Defendant New GM's knowledge of the ignition switch defects arises from the fact that key personnel with knowledge of the defects were employed by Defendant

New GM when Old GM ceased to exist. Moreover, many of these employees held managerial and decision-making authority in Old GM, and accepted similar positions with Defendant New GM. For example, the design research engineer who was responsible for the rollout of the defective ignition switch in the Saturn Ion was Ray DeGiorgio. Mr. DeGiorgio continued to serve as an engineer at New GM until April 2014, when he was suspended (and ultimately fired) as a result of his involvement in the ignition switch crisis. Once again, the knowledge of Mr. DeGiorgio and the other key personnel is imputed to New GM under governing principles of Kentucky agency law.

153.    Mr. DeGiorgio was hardly the only employee who retained his Old GM position with Defendant New GM. Other Old GM employees with knowledge of the ignition switch defects and other defects who were retained and given decision-making authority in Defendant New GM include: current CEO Mary T. Barra; Director of Product Investigations Carmen Benavides; Safety Communications Manager Alan Adler; Program Engineering Manager Gary Altman; engineer Eric Buddrius, engineer Jim Federico; Vice Presidents for Product Safety John Calabrese and Alicia Boler-Davis; Warranty Engineer William K. Chase; Engineer James Churchwell; Senior Manager for TREAD Reporting Dwayne Davidson; electrical engineer John Dolan; engineer and Field Performance Assessment Engineer Brian Everest; sensing performance engineer William Hohnstadt; Vice President of Regulatory Affairs Michael Robinson; Director of Product Investigations Gay Kent; Product Investigations Engineer Elizabeth Kiihr; engineer Alberto Manzor; Field Performance Assessment Engineer Kathy Anderson; General Counsel and Vice President Michael P. Milliken; Vehicle Chief Engineer Doug Parks; Brand Quality Manager Steven Oakley; Field Performance Assessment Engineer Manuel Peace; Manager of Internal Investigations Keith Schultz; Field Performance Assessment

Engineer John Sprague; Field Performance Assessment Engineer Lisa Stacey; Design Engineer David Trush; Product Investigations Manager Douglas Wachtel; in-house counsel Douglas Brown; attorney Michael Gruskin (who at one point headed GM's product litigation team and chaired the Settlement Review Committee from September 2007 to March 2012); in-house product liability attorney Jaclyn C. Palmer; and in-house product liability lawyer William Kemp. These employees' knowledge regarding the ignition switch defect is imputed to New GM, whenever obtained.

154. A number of Defendant New GM employees were fired or "retired" as a result of the ignition switch scandal, including: Michael Robinson; William Kemp; Ray DeGiorgio; Gary Altman; Jaclyn Palmer; Ron Porter; Lawrence Buonomo; Jennifer Sevigny; Gay Kent; Carmen Benavides; Maureen Foley-Gardner; Jim Federico; John Calabrese; and Brian Stouffer. That New GM chose to fire these employees is further proof that these New GM personnel—and, by imputation, New GM, were complicit in the cover-up of the ignition switch defect that had such disastrous consequences for Plaintiff.

155. In the recent Decision on Motion to Enforce Sale Order, the bankruptcy court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers, and attorneys, were informed or otherwise aware of the Ignition Switch Defect …"[33] Based on this fact, the court concluded that "Old GM personnel knew enough as of … June 2009 ... for Old GM then to have been obligated, under the Safety Act, to conduct a recall of the affected vehicles."[34] These same 24 personnel necessarily had the same

---

[33] *In re Motors Liquidation co.*, No. 09-50026 (REG) (Bankr. Ct. S.D.N.Y. Apr. 15, 2015), at 32.

[34] *Id.* at 33.

knowledge on day one of New GM's existence, and, under governing Kentucky law, as discussed above, their knowledge is imputed to New GM.

156.    In addition, all the documents discussed herein that were generated prior to the inception of New GM remained in Defendant New GM's files.  Given Defendant New GM's knowledge of these documents, and its continuing and ongoing monitoring and reporting duties under the Safety Act,[35] Defendant New GM acquired the knowledge of such documents.

157.    In fact, Defendant New GM had ongoing obligations under the Safety Act to monitor Old and New GM vehicles on the road, to make quarterly reports to NHTSA, and to maintain all relevant records for five years.  Defendant New GM explicitly accepted Safety Act responsibilities for Old GM vehicles in § 6.15 of the Sale Agreement through which it acquired Old GM.

158.    The Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including incidents involving death or injury, claims relating to property damage received by the manufacturer, warranty claims paid by the manufacturer, consumer complaints, and field reports prepared by the manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues.  49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.  Manufacturers must retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety.  49 C.F.R. §§ 576.5 to 576.6.

---

[35] The "Safety Act" refers to the National Traffic Vehicle and Motor Vehicle Safety Act, 49 U.S.C. §§ 30101, *et seq.*, as amended by the Transportation Recall, Enhancement, Accountability and Documentation Act (the "TREAD Act").

159.    The Safety Act further requires *immediate* action when a manufacturer *determines or should determine that a safety defect exists*. *United States v. General Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983). A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident."  49 U.S.C. § 30102(a)(8). Within five days of learning about a safety defect, a manufacturer *must* notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related.  49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c). Then, "within a reasonable time"[36] after deciding that a safety issue exists, the manufacturer *must* notify the owners of the defective vehicles.  49 C.F.R. §§ 577.5(a), 577.7(a). Violating these notification requirements can result in a maximum civil penalty of $15,000,000. 49 U.S.C. § 30165(a)(1).

160.    Defendant New GM used several processes to identify safety issues, including the TREAD database and Problem Resolution Tracking System ("PRTS").[37] The TREAD database, used to store the data required for the quarterly NHTSA early warning reports, was the principal database used by Old and New GM to track incidents related to Old and New GM vehicles. *Id.* at 306. The database included information from (i) customer service requests; (ii) repair orders

---

[36] 49 C.F.R. § 577.7(a) was updated, effective October 11, 2013, to replace "within a reasonable time" to "no later than 60 days" from the filing of the NHTSA notification.

[37] *See* Anton R. Valukas, Report to Board of Directors of General Motors Co. Regarding Ignition Switch Recalls ("Valukas Report" or "V.R."), at 282-313.

from dealers; (iii) internal and external surveys; (iv) field reports from employees who bought Old and New GM vehicles and from Captured Test Fleet reports;[38] (v) complaints from the OnStar call center; and (vi) a database maintained by Old and New GM legal staff to track data concerning complaints filed in court. *Id.* A TREAD reporting team would conduct monthly database searches and prepare scatter graphs to identify spikes in the number of accidents or complaints related to various Old and New GM vehicles.[39] The PRTS is a database that tracks engineering problems identified in testing, manufacturing, through warranty data, and through customer feedback.[40] The PRTS process involves five steps: "identification of the issue; identification of the root cause; identification of a solution; implementation of the solution; and feedback."[41]

161. Because the same employees carried out the TREAD Act obligations at Old and Defendant New GM, they not only retained the knowledge they acquired at Old GM—they were in fact required to. This fact further supports the propriety of imputing the knowledge of Old GM employees to New GM—even where that knowledge stems in part from their performance of the same or similar roles at Old GM.

162. New GM knew that the TREAD team was not staffed with enough personnel to meet Old GM's promise of safety. According to the Valukas Report, the TREAD team had between eight and 12 employees from 2003 through 2007 or 2008 with the responsibility of mining through the TREAD data on a month-by-month basis and preparing graphs for each of

---

[38] Captured Test Fleet reports were submitted by employees who were given vehicles and asked to document any problems that arose while driving. *Id.* at 300. The Quality Group would review, summarize, and group these reports into categories. *Id.*

[39] *Id.* at 307.

[40] *Id.* at 282.

[41] *Id.* at 284.

4449969v1/014242

the 24 categories of data in an effort to identify any spikes in the number of accidents or complaints.  Old GM then cut the TREAD team down to three employees and pared back the monthly data mining process. Defendant New GM chose not to restore the necessary number of employees to enable the TREAD team to adequately perform its vital function.

163.    According to the Valukas Report, until 2014 the TREAD team did not have sufficient funds to obtain any of the data mining software programs available in the industry to better identify and understand potential defects.  In his deposition, the senior manager of the TREAD team at both Old and New GM testified that he did not have the necessary expertise, manpower or resources, and the team did not have the right people in place after the bankruptcy to enable the team to perform effectively.

164.    Indeed, from the day of its formation as an entity, Defendant New GM had notice and full knowledge of the ignition switch, power steering, and other defects as set forth below.

### 3.    The Ignition Switch Defect giving rise to the February and March 2014 Recalls.

#### a.    Defendant New GM was long aware of the defect.

165.    For years prior to the Sale, Old GM knew that it had installed defective ignition switches in millions of vehicles and failed to warn consumers or recall the defective vehicles. From virtually the start of its existence on July 10, 2009, Defendant New GM was aware of the following facts regarding Old GM's knowledge and conduct:

166.    In 2001, during pre-production testing of the 2003 Saturn Ion, GM engineers learned that the vehicle's ignition switch could unintentionally move from the "run" to the "accessory" or "off" position.  GM further learned that where the ignition switch moved from "run" to "accessory" or "off," the vehicle's engine would stall and/or lose power. New GM

employees with knowledge of this Old GM knowledge and conduct include, but are not limited to William Skelton.

167. Defendant New GM knew that Delphi Mechatronics ("Delphi"), the manufacturer of many of the defective ignition switches in the Defective Ignition Switch Vehicles including those in the vehicles that gave rise to the February and March 2014 recalls, informed Old GM that the ignition switch did not meet Old GM's design specifications. Rather than delay production of the Saturn Ion in order to ensure that the ignition switch met specifications, Old GM's design release engineer, Ray DeGiorgio, simply lowered the specification requirements and approved use of ignition switches that he knew did not meet Old GM's specifications. New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to DeGiorgio and at least one additional engineer.

168. Defendant New GM knew that in 2004, Old GM engineers reported that the ignition switch in the Saturn Ion was so weak and the ignition placed so low on the steering column that the driver's knee could easily bump the key and turn off the vehicle. New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to DeGiorgio.

169. Defendant New GM knew that this defect was sufficiently serious for an Old GM engineer to conclude, in January 2004, that "[t]his is a basic design flaw and should be corrected if we want repeat sales." Employees with knowledge of this Old GM knowledge and conduct continued on at New GM.

170. Defendant New GM knew that a July 1, 2004 report by Siemens VDO Automotive analyzed the relationship between the ignition switch in Old GM vehicles and the airbag system. The Siemens report concluded that when an Old GM vehicle experienced a

4449969v1/014242

power failure, the airbag sensors were disabled.  The Siemens report was distributed to at least five Old GM engineers.  The Chevrolet Cobalt was in pre-production at this time.

171.    Defendant New GM knew that in 2004, Old GM began manufacturing and selling the 2005 Chevrolet Cobalt.  Old GM installed the same ignition switch in the 2005 Cobalt as it did in the Saturn Ion. New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, DeGiorgio.

172.    Defendant New GM knew that during testing of the Cobalt, Old and New GM engineer Gary Altman observed an incident in which a Cobalt suddenly lost engine power because the ignition switch moved out of the "run" position during vehicle operation.

173.    Defendant New GM knew that in late 2004, while testing was ongoing on the Cobalt, Chief Cobalt Engineer Doug Parks asked Mr. Altman to investigate a journalist's complaint that he had turned off a Cobalt vehicle by hitting his knee against the key fob.

174.    Defendant New GM knew that Old GM opened an engineering inquiry known as a Problem Resolution Tracking System ("Problem Resolution") to evaluate a number of potential solutions to this moving engine stall problem.  At this time, Problem Resolution issues were analyzed by a Current Production Improvement Team ("Improvement Team").    The Improvement Team that examined the Cobalt issue beginning in late 2004 included a cross-section of business people and engineers, including Altman and Lori Queen, Vehicle Line Executive on the case. Both Altman and Queen were employed by New GM after the bankruptcy sale.

175.    The moment it came into existence, Defendant New GM knew that Doug Parks, Chief Cobalt Engineer, was also active in Problem Resolution; on March 1, 2005, he attended a meeting whose subject was "vehicle can be keyed off with knee while driving"; and Parks also

attended a June 14, 2005 meeting that included slides discussing a NEW YORK TIMES article that described how the Cobalt's engine could cut out because of the ignition switch problem.

176.    The moment it came into existence, Defendant New GM knew that in 2005, Parks sent an email with the subject, "Inadvertent Ign turn-off."   In the email, Parks wrote, "For service, can we come up with a 'plug' to go into the key that centers the ring through the middle of the key and not the edge/slot?  This appears to me to be the only real, quick solution."

177.    The moment it came into existence, Defendant New GM knew that after considering this and a number of other solutions (including changes to the key position and measures to increase the torque in the ignition switch), the Improvement Team examining the issue decided to do nothing. Old GM and New GM FPE engineer Doug Parks carried over his Old GM knowledge to New GM, where he is now Vice President of Global Product Programs.

178.    Defendant New GM knew that Old and New GM engineer Gary Altman recently admitted that engineering managers (including himself and Ray DeGiorgio) knew about ignition switch problems in the Cobalt that could cause these vehicles to stall, and disable power steering and brakes, but launched the vehicle anyway because they believed that the vehicles could be safely coasted off the road after a stall.  Mr. Altman insisted that "the [Cobalt] was maneuverable and controllable" with the power steering and power brakes inoperable.

179.    Defendant New GM knew that on February 28, 2005, Old GM issued a bulletin to its dealers regarding engine-stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5). New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, Oakley.

180.     Defendant New GM knew that in the February 28, 2005 bulletin, Old GM provided the following recommendations and instructions to its dealers—but not to the public in general:

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort.  The concern is more likely to occur if the driver is short and has a large heavy key chain.

> In the case this condition was documented, the driver's knee would contact the key chain while the vehicle was turning.  The steering column was adjusted all the way down.  This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.

> In cases that fit this profile, question the customer thoroughly to determine if this may be the cause.  The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.

> Please follow this diagnosis process thoroughly and complete each step.  If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

181.     Defendant New GM knew that on June 19, 2005, the *New York Times* reported that Chevrolet dealers were advising some Cobalt owners to remove items from heavy key rings so that they would not inadvertently move the ignition into the "off" position.  The article's author reported that his wife had bumped the steering column with her knee while driving on the freeway and the engine "just went dead."

182.     Defendant New GM knew that the *New York Times* contacted Old GM and Alan Adler, Manager for Safety Communications, who provided the following statement:

> In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running.  Service advisers are telling customers they can virtually eliminate the possibility by taking several steps, including removing nonessential material from their key rings.

183.    Defendant New GM knew that, in connection with this *New York Times* article, Adler specifically told the editor that Old GM "had not had any complaints," which was false, as shown below.

184.    Defendant New GM knew that between February 2005 and December 2005, Old GM opened multiple Problem Resolution inquiries regarding reports of power failure and/or engine shutdown in Defective Ignition Switch Vehicles. New GM employees with knowledge of this Old GM knowledge and conduct include, but are not limited to, Lori Queen, Altman and Doug Parks.

185.    Defendant New GM knew that one of these, opened by quality brand manager Steve Oakley in March 2005, was prompted by Old GM engineer Jack Weber, who reported turning off a Cobalt with his knee while driving.  After Oakley opened the Problem Resolution, Gary Altman advised that the inadvertent shut down was not a safety issue.  Oakley still works at New GM.

186.    Defendant New GM knew that as part of the Problem Resolution, Oakley asked William Chase, an Old GM warranty engineer, to estimate the warranty impact of the ignition switch defect in the Cobalt and Pontiac G5 vehicles.  Chase estimated that for Cobalt and G5 vehicles on the road for 26 months, 12.40 out of every 1,000 vehicles would experience inadvertent power failure while driving.

187.    Defendant New GM knew that in September 2005, Old GM received notice that Amber Marie Rose, a 16-year old resident of Clinton, Maryland, was killed in an accident after her 2005 Chevrolet Cobalt drove off the road and struck a tree head-on.  During Old GM's investigation, it learned that the ignition switch in Amber's Cobalt was in the "accessory" or "off" position at the time of the collision.  Upon information and belief, Old GM subsequently

entered into a confidential settlement agreement with Amber's mother. Old GM personnel familiar with Ms. Rose's fatal accident continued on at New GM after the bankruptcy sale.

188.   Defendant New GM knew that in December 2005, Old GM issued Technical Service Bulletin 05-02-35-007. The Bulletin applied to 2005-2006 Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005-2006 Pontiac Pursuits, 2006 Pontiac Solstices, and 2003-2006 Saturn Ions. The Bulletin explained that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort." Old GM personnel familiar with this information continued on at New GM after the bankruptcy sale.

189.   Defendant New GM knew that Old GM failed to disclose in this Technical Service Bulletin that it knew that there had been fatal incidents involving vehicles with the ignition switch defect. On November 17, 2005 – shortly after Amber's death and immediately before Old GM issued the December Bulletin – a Cobalt went off the road and hit a tree in Baldwin, Louisiana. The front airbags did not deploy in this accident. Old GM received notice of the accident, opened a file, and referred to it as the "Colbert" incident. Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

190.   Defendant New GM knew that on February 10, 2006, in Lanexa, Virginia – shortly after Old GM issued the Technical Service Bulletin – a 2005 Cobalt flew off of the road and hit a light pole. As with the Colbert incident (above), the frontal airbags failed to deploy in this incident as well. The download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this accident, opened a file, and referred to it as the "Carroll" incident. Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

64

191.     Defendant New GM knew that on March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road and struck a utility pole. The frontal airbags did not deploy in this incident. The download of the SDM showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this incident, opened a file, and referred to it as the "Oakley" incident. Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

192.     Defendant New GM knew that in April 2006, Old GM design engineer Ray DeGiorgio approved a design change for the Chevrolet Cobalt's ignition switch, as proposed by Delphi. The changes included a new detent plunger and spring and were intended to generate greater torque values in the ignition switch. These values, though improved, were still consistently below Old GM's design specifications. Despite its redesign of the ignition switch, Old GM did not change the part number for the switch.

193.     While Defendant New GM has claimed that the ignition switch redesign was unknown to any Old GM personnel outside of Mr. DeGiorgio, recently revealed documents show that other Old GM personnel were aware of the change—including personnel who continued working at New GM after the bankruptcy sale.

194.     In congressional testimony in 2014, Defendant New GM CEO Mary Barra acknowledged that Old GM should have changed the part number when it redesigned the ignition switch, and that its failure to do so did not meet industry standard behavior.

195.     Defendant New GM knew that in October 2006, Old GM updated Technical Service Bulletin 05-02-35-007 to include additional model years:  the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, 2007 Cobalt, and 2007 Pontiac Solstice and G5. These vehicles had the same safety-related defects in the ignition switch systems as the vehicles in the original Bulletin.

Old GM personnel familiar with this information continued on at New GM after the bankruptcy sale.

196.    Defendant New GM knew that on December 29, 2006, in Sellenville, Pennsylvania, a 2005 Cobalt drove off the road and hit a tree.  The frontal airbags failed to deploy in this incident.  Old GM received notice of this incident, opened a file, and referred to it as the "Frei" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

197.    Defendant New GM knew that GM's practices were so deficient that key personnel did not critically examine red flags raising safety issues.

198.    Dwayne Davidson, senior manager for TREAD reporting at New GM, testified he did not recall if, in November 2006, he took enough interest in a news  story about potential airbag non-deployment in an accident  to actually watch the news story.[42]

199.    Defendant New GM knew that in 2007, Davidson was involved in a death inquiry involving two teenage girls who were killed in a Chevy Cobalt on October 24, 2006.  The death inquiry was the result of a request for further information by NHTSA arising out of GM's quarterly report to NHTSA concerning the Wisconsin accident.  As part of the death inquiry, Davidson received a report prepared by Trooper Young from the Wisconsin State Patrol.  Trooper Young's report noted that the ignition switch on the vehicle "appears to have been in the 'accessory' position when it impacted the trees preventing the airbags from deploying."  Rather than critically analyzing the report Davidson only scanned the report to see if the CD was working properly.  Davidson, when asked at his deposition if he connected this report to the prior

---

[42] May 15, 2015 Dwayne Davidson Dep. at 87.

4449969v1/014242

media inquiry involving the two girls killed in Wisconsin, where airbags did not deploy in a 2005 Chevy Cobalt, testified that he "did not put two-and-two together."

200.    Defendant New GM knew that on February 6, 2007, in Shaker Township, Pennsylvania, a 2006 Cobalt sailed off the road and struck a truck. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. Old GM received notice of this incident, opened a file, and referred to it as the "White" incident. Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

201.    Defendant New GM knew that on August 6, 2007, in Cross Lanes, West Virginia, a 2006 Cobalt rear-ended a truck. The frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "McCormick" incident. Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

202.    Defendant New GM knew that on September 25, 2007, in New Orleans, Louisiana, a 2007 Cobalt lost control and struck a guardrail. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "Gathe" incident. Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

203.    Defendant New GM knew that on October 16, 2007, in Lyndhurst, Ohio, a 2005 Cobalt traveled off road and hit a tree. The frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "Breen" incident. Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

204.    New GM knew that on April 5, 2008, in Sommerville, Tennessee, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the

frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Old GM received notice of this incident, opened a file, and referred to it as the "Freeman" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

205.    Defendant New GM knew that on May 21, 2008, in Argyle, Wisconsin, a 2007 G5 traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Old GM received notice of this incident, opened a file, and referred to it as the "Wild" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

206.    Defendant New GM knew that on May 28, 2008, in Lufkin, Texas, a 2007 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "McDonald" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

207.    Defendant New GM knew that on September 13, 2008, in Lincoln Township, Michigan, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Harding" incident.  Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

208.    Defendant New GM knew that on November 29, 2008, in Rolling Hills Estates, California, a 2008 Cobalt traveled off the road and hit a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this

incident, opened a file, and referred to it as the "Dunn" incident. Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

209.    Defendant New GM knew that on December 6, 2008, in Lake Placid, Florida, a 2007 Cobalt traveled off the road and hit a utility pole. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. Old GM received notice of this incident, opened a file, and referred to it as the "Grondona" incident. Old GM personnel familiar with this incident continued on at New GM after the bankruptcy sale.

210.    Defendant New GM knew that in February 2009, Old GM opened another Problem Resolution regarding the ignition switches in the Defective Ignition Switch Vehicles. Old GM engineers decided at this time to change the top of the Chevrolet Cobalt key from a "slot" to a "hole" design, as had originally been suggested in 2005. The new key design was produced for the 2010 model year. Old GM did not provide these redesigned keys to the owners or lessees of any of the vehicles implicated in prior Technical Service Bulletins, including the 2005-2007 Cobalts. Old GM personnel familiar with this information continued on at New GM after the bankruptcy sale.

211.    Defendant New GM knew that just prior to Old GM's bankruptcy sale, Old GM met with Continental Automotive Systems US, its airbag supplier for the Cobalt, Ion, and other Defective Ignition Switch Vehicles. Old GM requested that Continental download SDM data from a 2006 Chevrolet Cobalt accident where the airbags failed to deploy. In a report dated May 11, 2009, Continental analyzed the SDM data and concluded that the SDM ignition state changed from "run" to "off" during the accident. According to Continental, this, in turn, disabled the airbags. New GM did not disclose this finding to NHTSA, despite its knowledge that NHTSA

69

was interested in airbag non-deployment incidents in Chevrolet Cobalt vehicles. Old GM personnel familiar with this information continued on at New GM after the bankruptcy sale.

212.    In addition to liability from its own, independent knowledge of the above events, New GM is liable as Old GM's mere continuation, having the same knowledge and the same liability as Old GM.

### b.    Defendant New GM continues to conceal the ignition switch defect.

213.    Through the Valukas Report, Defendant New GM concedes, as it must, that it was aware of the ignition switch defect giving rise to the ignition switch recalls from the date of its inception. But, in an attempt to minimize the egregiousness of continuing concealment of the defect, it makes several illogical claims. Recently revealed evidence shows that the claims are false.

214.    *First*, Defendant New GM claims that it was unaware of the fact that the movement of the ignition from the "run" to the "accessory" position caused the airbags not to deploy—***even though***, as Defendant New GM concedes, its own engineers specifically designed the airbags to be disabled when the ignition moves out of the run position.

215.    But recently-revealed evidence shows that (i) Defendant New GM likely was aware of this connection from the date of its inception and (ii) was definitively aware of the connection no later than 2010. Moreover, Old GM knew about this connection, and its knowledge is imputed to its mere continuation, New GM.

216.    *Second*, Defendant New GM claims that – because it was unaware that the defect rendered the airbags inoperable – it believed that the defect was a "customer convenience" issue and ***not*** a safety issue. In other words, according to Defendant New GM, no safety issues arise when a moving vehicle stalls, loses its power steering and loses its power brakes.

217.    Defendant New GM's "customer convenience" claim was never credible – and the evidence now shows the falsity of the claim.

218.    So, for example, in March 2010, Defendant New GM recalled nearly 1.1 million Cobalt and Pontiac G5 vehicles with power steering defects. In recalling these vehicles, Defendant New GM recognized that loss of power steering, standing alone, was grounds for a safety recall. Yet, incredibly, Defendant New GM claims it did not view the ignition switch defect as a "safety issue," even though it admittedly knew that the ignition switch defect caused stalling and power brake failure *in addition to* the loss of power steering. Despite its knowledge of the ignition switch defect, which caused a loss of power steering, Defendant New GM did not include the ignition switch defect in this recall.

219.    From its inception, Defendant New GM embraced a culture that emphasized the avoidance of recalls—not through an insistence on quality or spending on safety, but by avoiding the disclosure of safety issues and concealing safety issues of which the New GM was aware. New GM embraced the same culture of Old GM which avoided using the word "stall," in part to avoid the attention of regulators. Defendant New GM also actively discouraged personnel from flagging the ignition switch defect (or any defect) as a safety issue that would require an immediate response under the TREAD Act.

220.    While Defendant New GM attempts to downplay the severity of its misconduct by blaming its failure on a lack of communication between "corporate silos," the truth is far more damning: Defendant New GM engaged in a prolonged and fraudulent cover-up of the ignition switch defect.

221.    But the ignition switch defect remained quite real, and quite dangerous, and Defendant New GM continued to receive reports of deadly accidents caused by the defect.

222.   On March 10, 2010, Brooke Melton was driving her 2005 Cobalt on a two-lane highway in Paulding County, Georgia.  While she was driving, her key turned from the "run" to the "accessory/off" position causing her engine to shut off.  After her engine shut off, she lost control of her Cobalt, which traveled into an oncoming traffic lane, where it collided with an oncoming car.  Brooke was killed in the crash.  Defendant New GM received notice of this incident, and knew or should have known the accident was caused by the ignition switch defect.

223.   On December 31, 2010, in Rutherford County Tennessee, a 2006 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Defendant New GM received notice of this incident, opened a file, and referred to it as the "Chansuthus" incident, and knew the accident was caused by the ignition switch defect.  When a lawsuit was filed over the Chansuthus incident, Defendant New GM chose to settle it confidentially and continue to conceal the defect and its horrible consequences from NHTSA and the public.

224.   On December 31, 2010, in Harlingen, Texas, a 2006 Cobalt traveled off the road and struck a curb.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Defendant New GM received notice of this incident, opened a file, and referred to it as the "Najera" incident.  Defendant New GM knew or should have known the accident was caused by the ignition switch defect.

225.   On March 22, 2011, Ryan Jahr, a New GM engineer, downloaded the SDM from Brooke Melton's Cobalt.  The information from the SDM download showed that the key in Brooke's Cobalt turned from the "run" to the "accessory/off" position 3-4 seconds before the crash.  On June 24, 2011, Brooke Melton's parents, Ken and Beth Melton, filed a lawsuit against

GM.  Defendant New GM knew or should have known the accident was caused by the ignition switch defect.

226.    In August 2011, Defendant New GM assigned Engineering Group Manager Brian Stouffer to assist with a Field Performance Evaluation that it had opened to investigate frontal airbag non- deployment incidents in Chevrolet Cobalts and Pontiac G5s.

227.    On December 18, 2011, in Parksville, South Carolina, a 2007 Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.  Defendant New GM received notice of this incident, opened a file, and referred to it as the "Sullivan" incident.  Defendant New GM knew or should have known the accident was caused by the ignition switch defect.

228.    In early 2012, Mr. Stouffer asked Jim Federico, who reported directly to Mary Barra, to oversee the Field Performance Evaluation investigation into frontal airbag non-deployment incidents.  Federico was named the "executive champion" for the investigation to help coordinate resources.

229.    In May 2012, New GM engineers tested the torque on numerous ignition switches of 2005-2009 Chevrolet Cobalt, 2009 Pontiac G5, 2006-2009 HHR, and 2003-2007 Saturn Ion vehicles that were parked in a junkyard.  The results of these tests showed that the torque required to turn the ignition switches from the "run" to the "accessory" or "off" position in most of these vehicles did not meet Old GM's minimum torque specification requirements.  These results were reported to Mr. Stouffer and other members of the Field Performance Evaluation team.

73

230.    In September 2012, Stouffer requested assistance from a "Red X Team" as part of the Field Performance Evaluation investigation.  The Red X Team was a group of engineers within New GM assigned to find the root cause of the airbag non-deployments in frontal accidents involving Chevrolet Cobalts and Pontiac G5s.  By that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the frontal accidents was the defective ignition switch and airbag system.

231.    Indeed, Mr. Stouffer acknowledged in his request for assistance that the Chevrolet Cobalt could experience a power failure during an off-road event, or if the driver's knee contacted the key and turned off the ignition.  Mr. Stouffer further acknowledged that such a loss of power could cause the airbags not to deploy.

232.    At the time, Defendant New GM did not provide this information to NHTSA or the public.

233.    Acting NHTSA Administrator David Friedman recently stated, "at least by 2012, [New] GM staff was very explicit about an unreasonable risk to safety" from the ignition switches in the Defective Ignition Switch Vehicles involved in the February and March 2014 recalls.

234.    Mr. Friedman continued: "[New] GM engineers knew about the defect. [New] GM lawyers knew about the defect.  But [New] GM did not act to protect Americans from the defect."

235.    There is significant evidence that multiple in-house attorneys also knew of and understood the ignition switch defect.  These attorneys, including Michael Milliken, negotiated settlement agreements with families whose loved ones had been killed and/or injured while operating a Defective Ignition Switch Vehicle.  In spite of this knowledge, Defendant New GM's

attorneys concealed their knowledge and neglected to question whether the Defective Ignition

Switch Vehicles should be recalled.  This quest to keep the ignition switch defect secret delayed

its public disclosure and contributed to increased death and injury as a result of the ignition

switch defect, and also caused significant financial harm to Plaintiff.

236.    Complaints received by Old GM prior to July 10, 2009 and received by New GM

after July 10, 2009 from vehicle owners who experienced an ignition switch failure and a stall

make it abundantly clear that Defendant New GM and ESIS knew that a safety defect was at

issue:

> COMPLAINT 1/21/2010:   CUSTOMER WAS INVOLVED IN AN ACCIDENT ON THE 4TH OF JANUARY.  WHEN HE WAS DRIVING VEHICLE HAS SHUTTED OFF, AND HE SMASHED AGAINST A TREE.

> COMPLAINT 9/10/2007:   CUSTOMER WAS VERY UPSET AND CRYING – ALLEGES DAUGHTER INJURED B/C OF VEHICLE FAILURE THAT HAS BEEN ONGOING. CUST STS: WE DONT WANT THIS VEHICLE ANYMORE. WE'VE HAD THIS ISSUE SINCE WE BOUGHT IT. THE DEALER HASN'T BEEN ABLE TO FIX IT. AND NOW MY DAUGHTER IS HURT! SHE COULD HAVE BEEN KILLED! WAS DRIVING ON HWY 80 IN PA. NEAR LOCKHAVEN DRIVING AROUND

> 80 MPH WHENTHE VEHICLE COMPLETELY SHUT OFF IN THE MIDDLE OF THE HWY. NO EMERGANY LIGHTS. NO POWER. NO ENGINE. JUST DEAD. THANK GO[D] SHE WASN'T HIT BY ANYTHING BUT SHE COULD HAVE! THEY SENT AN AMBULENCE AND POLICE. SO I DON'T KNOW WHATS HAPPENING YET. BUT THI[S] IS UNSAFE! HOW DO I ENACT THE LEMON LAW?

> COMPLAINT 11/29/2006:   FIRST, I ACTUALLY HAVE A 2006 COBALT, BUT THAT OPTION WASN'T AVAILABLE ON THE PULL-DOWN MENU ABOVE. SECOND, THE PROBLEM I HAVE WITH MY CAR IS A SCARY ONE. MY CAR IS CURRENTLY AT HERITAGE AUTO PLAZA. IT IS THERE BECAUSE I WAS IN A CAR ACCIDENT WHEN THE POWER IN MY CAR COMPLETELY SHUT OFF WHILE I WAS DRIVING IT.  THE STEERING WHEEL DID NOT WORK.

THE BRAKES WERE UNRESPONSIVE, AND EVERYTHING IN THE COCKPIT WENT DOWN TO ZERO. ONLY THE HEADLIGHTS AND RADIO CONTINUE TO WORK. THIS IS THE SECOND TIME THIS HAPPENED. THE FIRST TIME, I WAS ABLE TO MOVE THE CAR OFF THE ROAD. I TOOK MY CAR TO ROSENTHAL CHEVROLET, THEY TOLD ME NOTHING WAS WRONG. IT WAS A FLUKE, AND WOULD NEVER HAPPEN AGAIN. I AM NOW COMPLETELY AFRAID OF MY CAR. AGAIN THEY HAVE SAID THERE IS NO PROBLEM. I HAVE SINCE LEARNED SOME THINGS ABOUT HOW THE COBALT IS MADE. IT IS VERY DISTURBING. I DO NOT WANT THE CAR. CAN SOMEONE PLEASE CONTACT ME SO WE CAN DISCUSS HOW TO RESOLVE THIS?

COMPLAINT 2/12/2008:   ALLEGED PRODUCT ALLEGATION-INJURY/COLLISONCUST STS. THE IGNITION AND THE SHIFTER AND THE WHEEL LOCKS UP AND THE CAR SHUFTS OFF. A WEEK AGO I WRECKED THE VEHICLE. AND IT IS GOING TO COST $5000.00. THAT IS HOW MUCH DAMAGE. BUT I DO HAVE A DEDUCTABLE FOR MY INSURANCE. THE DIR SHIP DIDN'T WANT TO TOUCH IT UNTIL YOU SAID WHAT WE ARE GOING TO DO IT. AND EVEN WHEN I WRECKED THE CAR THE AIRBAGS DIDN'T DEPLY. DLR STATED IT WAS IN THE CRUISE CONTROL THERE WAS A BAD SENSOR WHICH CAUSED EVRYTHGIN TO LCOK UP. MY 2 WRISTS ARE BRUISED AND I HIT MY HEAD. BUT I HAVE BEEN BACK AND FORTH TO THE HOSPITAL AND I HAVE INSURANCE FOR ALL OF THAT.

237.    New GM knew, from information and knowledge that New GM acquired from Old GM, that during the Field Performance Evaluation process, Old GM had determined that, although increasing the detent in the ignition switch would reduce the chance that the key would inadvertently move from the "run" to the "accessory" or "off" position, it would not be a total solution to the problem.

238.    Indeed, Old GM's engineers identified several additional ways to actually fix the problem.  These ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position, and adding a push button to the lock cylinder to prevent it from slipping out of "run."  Old GM rejected each of these ideas.

239.    The photographs below are of a New GM engineer in the driver's seat of a Cobalt during the investigation of Cobalt engine stalling incidents:



240.    These photographs show the dangerous position of the key in the lock module on the steering column, as well as the key with the slot, which allow the key fob to hang too low off the steering column.  New GM engineers understood that the key fob can be impacted and pinched between the driver's knee and the steering column, and that this will cause the key to inadvertently turn from the "run" to the "accessory" or "off" position.  The photographs show that the New GM engineers understood that increasing the detent in the ignition switch would not be a total solution to the problem.  They also show why New GM engineers believed that additional changes (such as the shroud) were necessary to fix the defects with the ignition switch.

241.    The New GM engineers clearly understood that increasing the detent in the ignition switch alone was not a solution to the problem.  But Defendant New GM concealed – and continues to conceal – from the public the full nature and extent of the defects.

242.    On October 4, 2012, there was a meeting of the Red X Team during which Mr. Federico gave an update of the Cobalt airbag non-deployment investigation.  According to an email from Mr. Stouffer on the same date, the "primary discussion was on what it would take to keep the SDM active if the ignition key was turned to the accessory mode."  Despite this

Case 1:14-cv-08176-JMF   Document 582   Filed 08/22/16   Page 78 of 127

recognition by New GM engineers that the SDM should remain active if the key is turned to the

"accessory" or "off" position, Defendant New GM took no action to remedy the ignition switch

defect or notify customers that the defect existed.

243.    During the October 4, 2012 meeting, Mr. Stouffer and other members of the Red

X Team also discussed "revising the ignition switch to increase the effort to turn the key from

Run to Accessory."

244.    On October 4, 2012, Mr. Stouffer emailed Ray DeGiorgio and asked him to

"develop a high level proposal on what it would take to create a new switch for service with

higher efforts."  On October 5, 2012, DeGiorgio responded:

> Brian,
>
> In order to provide you with a HIGH level proposal, I need to understand
> what my requirements are.  what is the TORQUE that you desire?
>
> Without this information I cannot develop a proposal.

245.    On October 5, Stouffer responded to DeGiorgio's email, stating: Ray, As I said in

my original statement, I currently don't know what the torque value needs to be.  Significant

work is required to determine the torque.  What is requested is a high level understanding of

what it would take to create a new switch.

246.    DeGiorgio replied to Stouffer the following morning:  "Brian, Not knowing what

my requirements are I will take a SWAG at the Torque required for a new switch.  Here is my

level proposal:

> Assumption is 100 N cm Torque.
>
> •    New switch design = Engineering Cost Estimate approx. $300,000
>
> •    Lead Time = 18 – 24 months from issuance of GM Purchase Order
> and supplier selection.
>
> Let me know if you have any additional questions."

78

247.    Stouffer later admitted in a deposition that DeGiorgio's reference to "SWAG" was an acronym for "Silly Wild-Ass Guess."

248.    DeGiorgio's cavalier attitude exemplifies Defendant New GM's approach to the safety- related defects that existed in the ignition switch and airbag system in the Defective Ignition Switch Vehicles, including Plaintiff's Vehicle.  Rather than seriously addressing the safety-related defects, DeGiorgio's emails show he understood the ignition switches were contributing to the crashes and fatalities and he could not care less.

249.    It is also obvious from this email exchange that Stouffer, who was a leader of the Red X Team, had no problem with DeGiorgio's cavalier and condescending response to the request that he evaluate the redesign of the ignition switches.

250.    In December 2012, in Pensacola, Florida, Ebram Handy, a New GM engineer, participated in an inspection of components from Brooke Melton's Cobalt, including the ignition switch.  At that inspection, Handy, along with Mark Hood, a mechanical engineer retained by the Meltons, conducted testing on the ignition switch from Brooke Melton's vehicle, as well as a replacement ignition switch for the 2005 Cobalt.

251.    At that inspection, Handy observed that the results of the testing showed that the torque performance on the ignition switch from Brooke Melton's Cobalt was well below Old GM's minimum torque performance specifications.   Handy also observed that the torque performance on the replacement ignition switch was significantly higher than the torque performance on the ignition switch in Brooke Melton's Cobalt.

252.    On April 29, 2013, Ray DeGiorgio, the chief design engineer for the ignition switches in these Defective Vehicles, was deposed.   At his deposition, Mr. DeGiorgio was

questioned about his knowledge of differences in the ignition switches in early model-year Cobalts and the switches installed in later model-year Cobalts:

> Q.      And I'll ask the same question.  You were not aware before today that GM had changed the spring – the spring on the ignition switch had been changed from '05 to the replacement switch?
>
> MR. HOLLADAY:    Object to the form.  Lack of predicate and foundation.  You can answer.
>
> THE WITNESS:      I was not aware of a detent plunger switch change. We certainly did not approve a detent plunger design change.
>
> Q.      Well, suppliers aren't supposed to make changes such as this without GM's approval, correct?
>
> A.      That is correct.
>
> Q.      And you are saying that no one at GM, as far as you know, was aware of this before today?
>
> MR. HOLLADAY:    Object.  Lack of predicate and foundation. You can answer.
>
> THE WITNESS:      I am not aware about this change.

253.    When Mr. DeGiorgio testified, he knew that he personally had authorized the ignition switch design change in 2006, but he stated unequivocally that no such change had occurred.

### c.      Defendant New GM received many complaints of power failures in Defective Ignition Switch Vehicles.

254.    Throughout the entirety of its corporate existence, Defendant New GM received numerous and repeated complaints of moving engine stalls and/or power failures.  These complaints are yet more evidence that Defendant New GM was fully aware of the ignition switch defect and should have announced a recall much sooner than it did.

255.    Defendant New GM was aware of these problems year after year and nationwide, as reflected not only by the internal documents reflecting knowledge and cover-up at high levels,

but in the thousands of customer complaints, some of which are reflected in the common fact patterns presented by the experiences of the named Plaintiff (as discussed above), but also, and not by way of limitation, by New GM's internal complaint logs and other documents.

256.    Defendant New GM opened at least 38 complaint files between September 2009 and February 2014. Further, in December 2010, New GM closed at least 40 complaint files – which Old GM had opened before the bankruptcy sale in July 2009 – without disclosing the safety defect to the customers, thus further indicating that Old GM's knowledge of these Defective Ignition Switch Vehicles carried over to Defendant New GM.

257.    Defendant New GM was certainly put on notice of safety issues with power steering.

258.    During the years 2010 to the present, New GM's Technical Assistance Center received hundreds, if not thousands, of complaints concerning stalling or misperforming vehicles due to ignition issues, including "heavy key chains."

259.    Within the complaint files which New GM closed after the bankruptcy sale—those opened both before and after the bankruptcy sale—at least six customers complained they did not feel safe in their vehicles because of the stalling.  Three customers described accidents caused by stalling.  The airbags did not deploy in one of these accidents.

260.    Another customer, who contacted Defendant New GM in February 2014, complained that he was aware that people were dying from this defect and that he refused to risk the lives of himself, his wife, and his children.  He was nearly rear-ended when his vehicle stalled at 60 mph.

261.    Finally, a customer contacted Defendant New GM in January 2011 complaining that he had read various online forums describing the stalling problem and expressing his outrage

that New GM had done nothing to solve the problem.  This customer's car stalled at 65 mph on the Interstate.

> **d.    Defendant New GM recalls 2.1 million vehicles with defective ignition switches in February and March of 2014.**

262.    Under continuing pressure to produce high-ranking employees for deposition in the Melton litigation, New GM's Field Performance Review Committee and Executive Field Action Decision Committee ("Decision Committee") finally decided to order a recall of *some* vehicles with defective ignition switches on January 31, 2014.

263.    Initially, the Decision Committee ordered a recall of only the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007, and those were the only cars included in the first recall ordered in February 2014.  The Saturn Sky was not included even though it has the same platform and part as the Cobalt.

264.    After additional analysis, the Decision Committee expanded the recall on February 24, 2014 to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

265.    Public criticism in the wake of these recalls was withering.  On March 17, 2014, Mary Barra issued an internal video, which was broadcast to employees.  In the video, Ms. Barra admits:

> Scrutiny of the recall has expanded beyond the review by the federal regulators at NHTSA, the National Highway Traffic Safety Administration.    As of now, two congressional committees have announced that they will examine the issue.  And it's been reported that the Department of Justice is looking into this matter. . . . These are serious developments that shouldn't surprise anyone.  After all, something went wrong with our process in this instance and terrible things happened.

266.    The public backlash continued and intensified.  Eventually, Defendant New GM expanded the ignition switch recall yet again on March 28, 2014.  This expansion covered all

model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice, and finally the Saturn Ion and Sky.

267.    Several high-ranking New GM employees were summoned to testify before Congress, including Ms. Barra and executive vice president and in-house counsel Michael Milliken.  Further, in an effort to counter the negative backlash, Defendant New GM announced that it had hired Anton R. Valukas to conduct an internal investigation into the decade-long concealment of the ignition switch defect.

268.    As individuals came forward who had been injured and/or whose loved ones were killed in the Defective Vehicles, the public criticism continued.   Under intense, continuing pressure, Defendant New GM agreed in April 2014 to hire Ken Feinberg to design and administer a claims program in order to compensate certain victims who were injured or killed in the Defective Vehicles.  Ms. Barra explained to Congress:  "[W]e will make the best decisions for our customers, recognizing that we have legal obligations and responsibilities as well as moral obligations.  We are committed to our customers, and we are going to work very hard to do the right thing for our customers."

269.    Defendant New GM's compensation of such individuals, however, was limited to the protocol set forth in the Feinberg Compensation Fund.  In the courts, Defendant New GM has taken the position that any accident that occurred prior to the bankruptcy sale is barred by the bankruptcy sale order.  In addition, Defendant New GM has argued that it has no responsibility whatsoever for the manufacture and sale of any vehicle prior to July 10, 2009.  This position is obviously inconsistent with the statements Ms. Barra provided to Congress and the public at large.

4449969v1/014242

### 4.    The ignition switch recalls are inadequate and poorly conducted.

270.    Defendant New GM sent its first recall notices to the owners of vehicles with defective ignition switches in late February and early March of 2014.  New GM's recall letter minimized the risk of the ignition switch defect, indicating that ignition problems would occur only "under certain circumstances."  Defendant New GM's recall notification emphasized that the risk of power failure increased if the "key ring is carrying added weight . . . or your vehicle experiences rough road conditions."

271.    To repair the Defective Vehicles targeted in the February and March 2014 recalls, Defendant New GM replaced the defective ignition switch with a new, presumably improved, ignition switch.  At the time it announced the recall of these Defective Vehicles, however, Defendant New GM did not have replacement switches ready.  New GM CEO Mary Barra told Congress that Defendant New GM would start replacing ignition switches beginning in April of 2014.

272.    Defendant New GM later revised its timeline, notifying NHTSA that all replacement switches would be ready by October 4, 2014.

273.    Defendant New GM's repair of the defective switches proceeded painfully slowly.  As of August 5, 2014, Defendant New GM had repaired only 683,196 of the 2.1 million Defective Ignition Switch Vehicles at issue in the February and March recalls.  As of January 23, 2015, New GM had repaired only 1,229,529 of the involved vehicles—or less than 60% of the total.

274.    On September 8, 2014, Ms. Barra told CNBC radio that the repair process was "substantially complete."  Nonetheless, at that time, Defendant New GM had repaired only 1 million vehicles.

275.    Meanwhile, dealerships across the country have struggled to implement New GM's repair process.  One dealership in Kalamazoo, Michigan, hired a "recall concierge" simply to deal with the myriad issues raised by the recall repair process.

276.    Although Defendant New GM has touted to courts around the country that it is offering to provide any concerned driver with a temporary loaner vehicle while he or she awaits a replacement part (for some over five months and counting), New GM's recall letter failed to inform vehicle owners whether temporary loaner vehicles would be made available while they awaited replacement parts.  The letter also provided no time frame in which repairs would be completed.

277.    To add insult to injury, the Defendant New GM recall is fraught with problems for consumers.  Many consumers are unable to obtain a loaner vehicle despite Defendant New GM's promise to provide them with one pending repair.  When individuals have been fortunate enough to obtain a loaner, they often experience problems associated with the loaner program.  Even worse, many consumers continue to experience safety problems with the Defective Ignition Switch Vehicles, even after the ignition switch has been replaced pursuant to the recall.

> **a.    Defendant New GM failed to alert drivers of recalled vehicles to the possibility of obtaining a loaner vehicle, and when consumers are aware, they often find that loaner vehicles are not available.**

278.    One common problem consumers have faced and continue to face is the difficulty, if not impossibility, of obtaining a rental or loaner vehicle while awaiting the replacement part for their Defective Vehicle pursuant to the recall.  Yet since it announced the recalls, Defendant New GM has represented to the government and courts across the country that it is offering consumers temporary loaner vehicles, free of charge, while those consumers wait for their Defective Vehicle to be repaired.

279. Defendant New GM did not make this information easily accessible for consumers. Shortly after the recall was announced, for example, Defendant New GM published a website at gmignitionupdate.com. The front page of that website does not inform consumers that they are eligible to obtain a temporary replacement vehicle.

280. Indeed, consumers must click on the Frequently Asked Questions page to learn about Defendant New GM's offer. Even there, the information is not included in a section entitled, "What will GM do?" Neither is it included in a section entitled, "What should you do if you have an affected vehicle?"

281. To learn that Defendant New GM is offering temporary loaner vehicles, a customer must click on a section under the heading, "Parts Availability & Repair Timing." A subsection entitled, "Who is eligible for a rental vehicle?" states that "[a]ny affected customer who is concerned about operating their vehicle may request courtesy transportation. Dealership service management is empowered to place the customer into a rental or loaner vehicle until parts are available to repair the customer's vehicle."

282. Numerous owners and/or lessees of Defective Vehicles were unaware that Defendant New GM was offering temporary loaner vehicles. As a result, drivers and passengers in one of the Defective Ignition Switch Vehicles and who are rightfully fearful of continuing to drive their vehicles in light of the now-disclosed safety defect are denied an alternate vehicle pre-repair. They either are forced to drive their unsafe Defective Ignition Switch Vehicles out of necessity, and fear every time they sit behind the wheel they could be involved in an accident that will injure them or an innocent bystander, or to park their vehicles while awaiting the replacement part for their vehicles and seek alternative means of transportation.

283.    Further, licensed New GM dealerships aware of the loaner program quickly exhausted their supply of loaner vehicles early into the recall.  Numerous dealerships then refused interested consumers.  Because Defendant New GM's ignition repair website only states that "[d]ealership service management" is empowered to provide a temporary loaner vehicle, many such customers reasonably believed that their sole avenue for relief was foreclosed when their dealership refused.

284.    These delays in properly addressing and implementing the ignition switch recall herein has had real and significant consequences.  As one illustrative example of the worst, yet entirely foreseeable, outcome of this common problem known to Defendant New GM, on September 27, 2014, the *New York Times* reported that Laura Gass, a 27-year-old owner of a 2006 Saturn Ion, was killed just days after she received her recall notice. That notice informed her that replacement parts were not yet available.  The notice also did not inform Ms. Gass that she was eligible to obtain a loaner vehicle should she not wish to drive her defective Saturn.  Ms. Gass needed transportation, and was unaware that Defendant New GM was prepared to provide temporary transportation to replace her defective automobile.  As a result, she continued to drive her defective Ion, a turn of events that had disastrous consequences.  On March 18, 2014, the ignition switch in Ms. Gass's Saturn slipped to the "accessory" or "off" position, the power to the vehicle failed, and she was unable to control the vehicle as it collided with a truck on the interstate.  Ms. Gass was killed, but the tragedy should have been prevented.

**D.    Contrary to its Barrage of Representations about Safety and Quality, Defendant New GM Concealed and Disregarded Safety Issues as a Way of Doing Business**

285.    As of or shortly after its inception, Defendant New GM possessed vastly superior (if not exclusive) knowledge and information to that of consumers about the design and function of GM-branded vehicles and the existence of the defects in those vehicles. Moreover, as a mere

continuation of Old GM, Old GM's knowledge of the dangerously defective ignition switch is imputed to New GM.

286.    Recently revealed information presents a disturbing picture of Defendant New GM's approach to safety issues—both in the design and manufacturing stages, and in discovering and responding to defects in Old and New GM vehicles that have already been sold.

287.    Old and New GM made very clear to its personnel that cost-cutting was more important than safety, deprived its personnel of necessary resources for spotting and remedying defects, trained its employees not to reveal known defects, and rebuked those who attempted to "push hard" on safety issues.

288.    In stark contrast to Defendant New GM's public mantra that "Nothing is more important than the safety of our customers" and similar statements, a prime "directive" at Old and New GM was "cost is everything."[43]   The messages from top leadership at New GM to employees, as well as their actions, were focused on the need to control cost.[44]

289.    One New GM engineer stated that emphasis on cost control at Old and New GM "permeates the fabric of the whole culture."[45]

290.    According to Mark Reuss (President of GMNA from 2009-2013 before succeeding Mary Barra as Executive Vice President for Global Product Development, Purchasing and Supply Chain in 2014), cost and time-cutting principles known as the "Big 4" at Old and New GM "emphasized timing over quality."[46]

---

[43] Valukas Report at 249.

[44] *Id*. at 250.

[45] Valukas Report at 250.

[46] *Id*.

4449969v1/014242

291.    Old and New GM's focus on cost-cutting created major disincentives to personnel who might wish to address safety issues.  For example, those responsible for a vehicle were responsible for its costs, but if they wanted to make a change that incurred cost and affected other vehicles, they also became responsible for the costs incurred in the other vehicles.

292.    The drive to cut costs also resulted in a policy to "minimize needless part number changes" in order to achieve "cost savings to the corporation," as reflected in a 2012 instructional document from Global Product Description System.

293.    The culture of cost cutting directly affected Old and New GM's unwillingness to adequately remediate the defects.

294.    This measure undoubtedly would have saved many lives and mitigated many injuries, including Plaintiff's.  But Old and New GM—focused on costs, not customer safety—ultimately decided not to implement the "fix."

295.    When Defendant New GM finally decided to take action to address the ignition switch defects, cost, not customer safety, remained the driving consideration.  Defendant New GM opted not to replace all the ignition switches, and to rely solely on a key fix for many of the Defective Ignition Switch Vehicles.

296.    As another cost-cutting measure, parts at Old GM were sourced to the lowest bidder, even if they were not the highest quality parts.[47]

297.    Because of Old GM's focus on cost-cutting, Old GM engineers did not believe they had extra funds to spend on product improvements.[48]

---

[47] Valukas Report at 251.

[48] *Id.*

4449969v1/014242

298.    Defendant New GM's focus on cost-cutting also made it harder for New GM personnel to discover safety defects, as in the case of the "TREAD Reporting team."

299.    Defendant New GM used its TREAD database (known as "TREAD") to store the data required to be reported quarterly to NHTSA under the TREAD Act.[49]   From the date of its inception in 2009, TREAD has been the principal database used by New GM to track incidents related to its vehicles.[50]

300.    Generally, the TREAD Reporting team has consisted of employees who conduct monthly searches and prepare scatter graphs to identify spikes in the number of accidents or complaints with respect to various GM-branded vehicles.  The TREAD Reporting team reports have gone to a review panel and have sometimes spawned investigations to determine if any safety defect existed.[51]

301.    In 2010, Defendant New GM elected to continue the understaffing of the TREAD team, adding two people to the team of three but opting not to have them participate in the TREAD database searches.[52]   Moreover, until 2014, the TREAD Reporting team did not have sufficient resources to obtain any of the advanced data mining software programs available in the industry to better identify and understand potential defects.[53]

302.    By starving the TREAD Reporting team of the resources it needed to identify potential safety issues, New GM helped to insure that safety issues would not come to light.

---

[49] *Id*. at 306.

[50] *Id*.

[51] *Id*. at 307.

[52] *Id*. at 307-308.

[53] *Id*. at 208.

303.    "[T]here was resistance or reluctance to raise issues or concerns in the GM culture."  The culture, atmosphere and supervisor response at Old and New GM "discouraged individuals from raising safety concerns."[54]

304.    Dwayne Davidson, senior manager for TREAD reporting at New GM, testified that after the creation of New GM, his team did not have the expertise, manpower, or resources necessary to perform his job.[55]

305.    New GM CEO, Mary Barra, experienced instances where New GM engineers were "unwilling to identify issues out of concern that it would delay the launch" of a vehicle.[56]

306.    Old and New GM supervisors warned employees to "never put anything above the company" and "never put the company at risk."[57]

307.    Old and New GM systematically "pushed back" on describing matters as safety issues and, as a result, "GM personnel failed to raise significant issues to key decision-makers."[58]

308.    So, for example, Old GM discouraged the use of the word "stall" in Technical Service Bulletins ("TSBs") that it sometimes sent to dealers about issues in Old GM vehicles. According to Steve Oakley, who drafted a Technical Service Bulletin in connection with the ignition switch defects while he worked at Old GM, "the term 'stall' is a 'hot' word that GM generally does not use in bulletins because it may raise a concern about vehicle safety, which suggests GM should recall the vehicle, not issue a bulletin."[59]    Other New GM personnel confirmed Oakley on this point, stating that "there was concern about the use of 'stall' in a TSB

---

[54] *Id*. at 252.

[55] May 15, 2015 Dwayne Davidson Dep. at 292.

[56] Valukas Report at 252.

[57] *Id*. at 252-253.

[58] *Id*. at 253.

[59] *Id*. at 92.

because such language might draw the attention of NHTSA."[60] New GM's July 2011 ignition switch TSB also did not use the word "stall."

309.     Oakley further noted that "he was reluctant to push hard on safety issues because of his perception that his predecessor had been pushed out of the job for doing just that."[61]

310.     Many Old and New GM employees "did not take notes at all at critical safety meetings because they believed New GM lawyers did not want such notes taken."[62]

311.     A New GM training document released by NHTSA as an attachment to its Consent Order sheds further light on the lengths to which Old and New GM went to ensure that known defects were concealed.  It appears that the defects were concealed pursuant to New GM company policy.  The presentation focused on recalls and the "reasons for recalls."

312.     One major component of the presentation was captioned "Documentation Guidelines," and focused on what employees should (and should not say) when describing problems in vehicles.  Employees were instructed to "[w]rite smart," and to "[b]e factual, not fantastic" in their writing.  In practice, "factual" was a euphemism for avoiding facts and relevant details.

313.     Employees were given examples of comments to avoid, including the following: "This is a safety and security issue"; "I believe the wheels are too soft and weak and could cause a serious problem"; and "Dangerous … almost caused accident."

314.     In documents used for reports and presentations, employees were advised to avoid a long list of words, including:  "bad," "dangerous," "defect," "defective," "failed," "flawed," "life-threatening," "problem," "safety," "safety-related," and "serious."

---

[60] *Id*. at 93.

[61] *Id*.

[62] *Id*. at 254.

315.    In truly Orwellian fashion, the company advised employees to use the words (1) "Issue, Condition [or] Matter" instead of "Problem"; (2) "Has Potential Safety Implications" instead of "Safety"; (3) "Broke and separated 10 mm" instead of "Failed"; (4) "Above/Below/Exceeds Specification" instead of "Good [or] Bad"; and (5) "Does not perform to design" instead of "Defect/Defective."

316.    As NHTSA's Acting Administrator Friedman noted at the May 16, 2014 press conference announcing the Ignition Switch Defect Consent Order, it was Old and New GM's company policy to avoid using words that might suggest the existence of a safety defect:

> "GM desperately needs to rethink the corporate philosophy reflected in the documents we reviewed - including training materials that explicitly discouraged employees from using words like 'defect,' 'dangerous,' 'safety related,' and many more essential terms for engineers and investigators to clearly communicate up the chain when they suspect a problem."

317.    Thus, Old and New GM trained their employees to conceal the existence of known safety defects from consumers and regulators.  Indeed, it is nearly impossible to convey the potential existence of a safety defect without using the words "safety" or "defect" or similarly strong language that was forbidden at New GM.

318.    So institutionalized was the "phenomenon of avoiding responsibility" at Old and New GM that the practice was given a name:  "the 'GM salute,'" which was "a crossing of the arms and pointing outward towards others, indicating that the responsibility belongs to someone else, not me."[63]

319.    Similarly, Old and New GM had a silo-ed culture, designed to cabin information relating to potential safety defects rather than reveal such information.

---

[63] GM Valukas Report at 255.

320.     CEO Mary Barra described a related phenomenon, "known as the 'GM nod,'" which was "when everyone nods in agreement to a proposed plan of action, but then leaves the room with no intention to follow through, and the nod is an empty gesture."[64]

321.     According to the Report prepared by Anton R. Valukas for the New GM Board of Directors, part of the failure to properly correct the ignition switch defect was due to problems with Defendant New GM's organizational structure[65] and a corporate culture that did not care enough about safety.[66]   Other culprits included a lack of open and honest communication with NHTSA regarding safety issues,[67] and the improper conduct and handling of safety issues by lawyers within New GM's Legal Staff.[68]   On information and belief, all of these issues independently and in tandem helped cause the concealment of, and failure to remedy, the many defects that have led to the spate of recalls in 2014.

322.     An automobile manufacturer has a duty to promptly disclose and remedy defects. Old and New GM knowingly concealed information about material safety hazards from the driving public, its own customers, and Plaintiff, thereby allowing unsuspecting vehicle owners to continue unknowingly driving patently unsafe vehicles that posed a mortal danger to themselves, their passengers and loved ones, other drivers, and pedestrians.

323.     Not only did Defendant New GM and Old GM take far too long in failing to address or remedy the defects, they deliberately worked to cover-up, hide, omit, fraudulently conceal, and/or suppress material facts from Plaintiff who relied upon them to her detriment.

---

[64] Valukas Report at 256.

[65] *Id.* at 259-260.

[66] *Id.* at 260-61.

[67] *Id.* at 263.

[68] *Id.* at 264.

4449969v1/014242

324.    Defendant New GM and Old GM further endeavored to conceal and suppress material facts by quietly settling claims brought on behalf of people hurt or killed by the defects in the Defective Ignition Switch Vehicles.

325.    Even after the 2014 Recalls, Defendant New GM continued its efforts to conceal facts about the defects by offering terminated employees generous severance packages tied to confidentiality provisions.

### E.    Defendant New GM's Deceptions Continued In Its Public Discussions of the Ignition Switch Recalls

326.    From the CEO on down, GM has once again embarked on a public relations campaign to convince consumers and regulators that, ***this time***, New GM has sincerely reformed.

327.    On February 25, 2014, New GM North America President Alan Batey publicly apologized and again reiterated Defendant New GM's purported commitment to safety: "Ensuring our customers' safety is our first order of business.  We are deeply sorry and we are working to address this issue as quickly as we can."[69]

328.    In a press release on March 18, 2014, Defendant New GM announced that Jeff Boyer had been named to the newly created position of Vice President, Global Vehicle Safety. In the press release, New GM quoted Mr. Boyer as stating that:  "Nothing is more important than the safety of our customers in the vehicles they drive.  Today's GM is committed to this, and I'm ready to take on this assignment."

329.    In an April 10, 2014 press release, CEO Mary Barra announced that New GM was "creating a Speak Up for Safety program to recognize employees for ideas that make vehicles safer, and for speaking up when they see something that could impact customer safety."  Barra

---

[69] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2014/Feb/0225-ion.

explained: "We will recognize employees who discover and report safety issues to fix problems that could have been found earlier and identify ways to make vehicles safer."[70]

330. On May 13, 2014, Defendant New GM published a video to defend its product and maintain that the ignition defect will never occur when only a single key is used. Jeff Boyer addressed viewers and told them New GM's Milford Proving Ground is one of "the largest and most comprehensive testing facilities in the world." He told viewers that if you use a New GM single key that there is no safety risk.[71]



331. As of July 2014, Defendant New GM continued to praise its safety testing. It published a video entitled "90 Years of Safety Testing at New GM's Milford Proving Ground." The narrator describes New GM's testing facility as "one of the world's top automotive facilities" where data is "analyzed for customer safety." The narrator concludes by saying, "[o]ver the past ninety years one thing remained unchanged, GM continues to develop and use the most advanced technologies available to deliver customers the safest vehicles possible."[72]

---

[70] http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/ Apr/0410-speakup.html.

[71] https://www.youtube.com/watch?v=rXO7F3aUBAY.

[72] https://www.youtube.com/watch?v=BPQdlJZvZhE&list=UUxN-Csvy_9sveql5HJviDjA.



332.   On July 31, 2014, Jack Jensen, the New GM engineering group manager for the "Milford Proving Ground" dummy lab, told customers that "[w]e have more sophisticated dummies, computers to monitor crashes and new facilities to observe different types of potential hazards.  All those things together give our engineers the ability to design a broad range of vehicles that safely get our customers where they need to go."[73]

333.   As discussed in this Third Amended Complaint, these most recent statements from New GM personnel contrast starkly with Defendant New GM's wholly inadequate response to remedy the defects in its vehicles, including the ignition switch defect.

**F.   Defendant New GM's Deception Harmed The Plaintiff**

334.   Defendant New GM was well aware that vehicle recalls, especially untimely ones, can taint its brand image and the value of GM vehicles.  In its 2010 Form 10-K submitted to the SEC, Defendant New GM admitted that "Product recalls can harm our reputation and cause us to lose customers, particularly if those recalls cause consumers to question the safety or reliability of our products.

---

[73] https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2014/ Jul/0731-mpg.

335.    Any costs incurred or lost sales caused by future product recalls could materially adversely affect our business."[74]

336.    Defendant New GM also understood that safety was an important feature to Congress:

> According to GM research, safety ranks among the top 10 reasons for purchase. According to 2012 calendar year sales data, 54 percent of Chevrolet, Cadillac, GMC and Buick buyers surveyed listed safety features as an "extremely important" purchase consideration. The same percentage of buyers industrywide also listed safety features as "extremely important."
>
> "We design safety and crashworthiness into our vehicles very early in development," said Gay Kent, GM's general director of Vehicle Safety and Crashworthiness. "We are committed to offering advanced safety technologies on a broad range of models, not just on the most expensive vehicles. All of our vehicles are designed to provide continuous protection for customers before, during and after a crash."[75]

337.    Unfortunately for owners of defective vehicles, Defendant New GM was correct. It is difficult to find a brand whose reputation has taken as great a beating as has the New GM brand starting in February 2014 when the first ignition switch recall occurred.

338.    In fact, the public outcry has been significant in response to the ongoing revelations of the massive number of defects Defendant New GM concealed, and the massive number of defective vehicles New GM has sold.  The following are illustrative examples of the almost constant beating the New GM brand has taken ever since the first ignition switch recall was announced on July 13, 2014.

339.    After the announcement of the first ignition switch recall the media was highly critical of Defendant New GM.  For example, a CBS February 27, 2014, news report headlined:

---

[74] General Motors 2010 Form 10-K, p. 31, available at
https://www.sec.gov/Archives/edgar/data/1467858/0001193125 10078119/dl0k.htm#toc857334.

[75] http://media.gm.com/media/us/en/chevrolet/news.detail.html/content/ Pages/news/us/en/2013/Sep/0920-5-star.html.

*By* AIMEE PICCHI · MONEYWATCH · *February 27, 2014, 1:42 PM*

# Did GM wait too long to issue its recall?

340.    The CBS report had a video link:[76]



**Play** **VIDEO**

## 13 deaths now linked to GM faulty ignition switches, recall expanded

341.    On March 13, 2014, a CNN report was entitled:

# Feds demand answers from GM on recall defect

By **Mike M. Ahlers, CNN**
updated 7:51 AM EDT, Thu March 13, 2014

342.    On March 16, 2014, *Reuters* reported as follows:

Owners of recalled GM cars feel angry, vindicated

(Reuters) – As details emerge about how General Motors Co dealt with faulty ignition switches in some of its models, car owners are increasingly angry after learning that the automaker knowingly allowed them to drive defective vehicles.

---

[76] http://www.cbsnews.com/news/did-general-motors-wait-too-long -to-issue-its-recall/.

4449969v1/014242

Saturn Ion owner Nancy Bowman of Washington, Michigan, said she is outraged that GM allowed her to drive a "death trap." She said her car had so many ignition problems she was afraid to resell it to an innocent buyer.

She bought the 2004 model car new and still drives it after extensive repairs and multiple run-ins with a Saturn dealer she called dismissive.

"Five times the car died right out from under me after hitting a bump in the road," she wrote in a 2013 posting on a complaint website, arfc.org, that says it sends information to the National Highway Traffic Safety Administration (NHTSA).

Every time I brought it in they said it was an isolated incident. Couldn't find the problem, so they acted like I was an idiot.

343.     On March 24, 2014, the *New York Times* issued an article entitled:

BUSINESS DAY

# General Motors Misled Grieving Families on a Lethal Flaw

By HILARY STOUT, BILL VLASIC, DANIELLE IVORY and REBECCA R. RUIZ    MARCH 24, 2014

344.     It contained a troublesome account of Old and New GM's conduct:

It was nearly five years ago that any doubts were laid to rest among engineers at General Motors about a dangerous and faulty ignition switch. At a meeting on May 15, 2009, they learned that data in the black boxes of Chevrolet Cobalts confirmed a potentially fatal defect existed in hundreds of thousands of cars.

But in the months and years that followed, as a trove of internal documents and studies mounted, G.M. told the families of accident victims and other customers that it did not have enough evidence of any defect in their cars, interviews, letters and legal documents show. Last month, G.M. recalled 1.6 million Cobalts and other small cars, saying that if the switch was bumped or weighed down it could shut off the engine's power and disable air bags. In one case, G.M. threatened to come after the family of an accident victim for reimbursement of legal fees if the family did not withdraw its lawsuit. In another instance, it dismissed a family with a terse, formulaic letter, saying there was no basis for claims.

* * *

Since the engineers' meeting in May 2009, at least 23 fatal crashes have involved the recalled models, resulting in 26 deaths. G.M. reported the accidents to the government under a system called Early Warning

Reporting, which requires automakers to disclose claims they receive blaming vehicle defects for serious injuries or deaths.

A New York Times review of 19 of those accidents – where victims were identified through interviews with survivors, family members, lawyers and law enforcement officials – found that G.M. pushed back against families in at least two of the accidents, and reached settlements that required the victims to keep the discussions confidential.

\* \* \*

In other instances, G.M. ignored repeated calls, families said. "We did call G.M.," said Leslie Dueno, whose 18-year-old son, Christopher Hamberg, was killed on June 12, 2009 – not quite a month after the critical May 15 meeting of G.M. engineers about the ignition data – driving his 2007 Cobalt home before dawn in Houston.  He lost control at 45 miles per hour and hit a curb, then a tree, the police report said.  "Nobody ever called me.  They never followed up.  Ever."

Last month's recalls of the Cobalt and five other models encompassed model years 2003 through 2007.  G.M. faces numerous investigations, including one by the Justice Department looking into the company's disclosures in its 2009 bankruptcy filing as well as what it told regulators.

"We are conducting an unsparing, comprehensive review of the circumstances leading to the ignition switch recall," G.M. said in a statement on Monday.  "As part of that review we are examining previous claims and our response to them.  If anything changes as a result of our review, we will promptly bring that to the attention of regulators."

G.M. has said it has evidence of 12 deaths tied to the switch problem, but it has declined to give details other than to say that they all occurred in 2009 or earlier.  It says it has no conclusive evidence of more recent deaths tied to the switch.

\* \* \*

It was unclear how many of the 26 deaths since the 2009 meeting were related to the faulty ignition, but some appeared to fit patterns that reflected the problem, such as an inexplicable loss of control or air bags that did not deploy.  In some cases, the drivers had put themselves at risk, including having high blood-alcohol levels or texting.

Still, by the time Benjamin Hair, 20, crashed into a tree in Charlottesville, Va., on Dec. 13, 2009, while driving a Pontiac G5 home, G.M. had conducted five internal studies about the ignition problem, its records indicate.

101

Case 1:14-cv-03769-JMF    Document 382    Filed 06/22/16    Page 153 of 127

…

Consumer complaints and claims came to the company in a variety of
ways – through lawsuits, calls, letters and emails, warranty claims, or
insurance claims.   G.M.'s legal staff was the recipient of lawsuits,
insurance information, accident reports and any other litigation-related
paperwork.  But warranty claims and customer calls were routed through
the sales and service division – a vast bureaucracy that occupies most of
one tower at G.M.'s headquarters in Detroit.  Because the legal staff
reports to the chief executive, and the sales department to the head of
G.M. North America, it is unclear whether they share information related
to a specific car, like the Cobalt.

345.    NPR ran a story on March 31, 2014:

# Timeline: A History Of GM's Ignition Switch Defect

by TANYA BASU

March 31, 2014   4:33 PM ET

346.    The NPR story raised questions about Old and New GM's candor:

NPR looked into the timeline of events that led to the recall.  It's long and
winding, and it presents many questions about how GM handled the
situation:  How long did the company know of the problem?  Why did the
company not inform federal safety officials of the problem sooner?  Why
weren't recalls done sooner?   And did GM continue to manufacture
models knowing of the defect?

347.    On May 11, 2014, the *Chicago Tribune* ran an article entitled:

GM ranked worst automaker by U.S. suppliers:  survey

DETROIT (Reuters) – General Motors Co, already locked in a public
relations crisis because of a deadly ignition defect that has triggered the
recall of 2.6 million vehicles, has a new perception problem on its hands.

The U.S. company is now considered the worst big automaker to deal
with, according to a new survey of top suppliers to the car industry in the
United States.

Those so-called "Tier 1" suppliers say GM is now their least favorite big
customer, according to the rankings, less popular even than Chrysler, the
unit of Fiat Chrysler Automobiles FIA.MI, which since 2008 had
consistently earned that dubious distinction.

Suppliers gave GM low marks on all kinds of key measures, including its overall trustworthiness, its communication skills, and its protection of intellectual property.

348.   On May 25, 2014, an article reported on a 2.4 million vehicle recall:

When Will GM's Recall Mess End?

General Motors (NYSE: <u>GM)</u> on Tuesday said it is recalling about 2.4 million additional vehicles in four separate recalls for a variety of problems, including faulty seat belts and gearshift troubles.

This announcement came on the heels of another set of GM recalls, announced last Thursday, covering 2.7 million vehicles. Including the four recalls announced on Tuesday, GM has issued a total of 30 recalls in the U.S. so far in 2014, encompassing about 13.8 million vehicles.

That's a stupendous number.[77]

349.   On May 26, 2014, the *New York Times* ran an article:

BUSINESS DAY

## 13 Deaths, Untold Heartache, From G.M. Defect

By REBECCA R. RUIZ, DANIELLE IVORY and HILARY STOUT   MAY 26, 2014

350.   The article once again pointed blame at GM:

BEN WHEELER, Tex. – For most of the last decade, Candice Anderson has carried unspeakable guilt over the death of her boyfriend. He was killed in 2004 in a car accident here, and she was at the wheel. At one point, Ms. Anderson, who had a trace of Xanax in her blood, even faced a manslaughter charge. She was 21.

All these years, Ms. Anderson – now engaged and a mother – has been a devoted visitor to his grave. She tidies it every season, sweeping away leaves and setting down blue daisies with gold glitter for his birthday, miniature lit trees for Christmas, stones with etched sayings for the anniversary of their accident.

"It's torn me up," Ms. Anderson said of the death of Gene Mikale Erickson. "I've always wondered, was it really my fault?" Last week, she learned it was not.

---

[77] http://www.fool.com/investing/general/2014/05/25/when-will-gms-recall-mess-end.aspx.

* * *

       Inside G.M., the nation's largest automaker, some of the 13 victims appear
on charts and graphs with a date and a single word: "fatal."

351.    News of Defendant New GM's misconduct and of the recalls made the front page
of every major newspaper and was the lead story on every major television news program in the
country.

352.    The congressional hearings where New GM executives were subject to harsh
questioning and criticism were widely reported in every type of media.

353.    The impact on the value of New GM-brand is also evidenced by the decline in
New GM's stock price, which hit a 52 week low on October 10, 2014.

354.    Defendant New GM's unprecedented concealment of the Ignition Switch Defect,
and its irresponsible approach to safety, quality, and reliability issues, has caused personal
injuries and damages to Plaintiff in an amount to be determined at trial.

## TOLLING THE STATUTE OF LIMITATIONS

355.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained
in the paragraphs of this Third Amended Complaint.

356.    Old GM manufactured the Saturn Ion at issue in this case over twelve years prior
to the filing of this action. Any statutes of repose or limitation are tolled, however, because of
Old GM and New GM's fraudulent concealment of the ignition switch defect, and conduct
equivalent to that required for a finding of willful and wanton conduct against Old GM and New
GM.

357.    Despite Old GM's knowledge of the ignition switch defect, the knowledge of the
ignition switch defect that New GM inherited from Old GM, and the knowledge of the ignition
switch defect that New GM gained on its own since its inception on July 10, 2009, Old GM and

New GM intentionally concealed from Plaintiff, the public, and NHTSA, the existence of and the dangers arising from, the ignition switch defect and Plaintiff's potential cause of action.

358.    Further, Old GM and New GM were under a continuous duty to disclose to Plaintiff the true character, quality, and nature of the Defective Ignition Switch Vehicles.  Old GM and New GM actively concealed the true character, quality, and nature of the vehicles. Plaintiff was misled by Old GM and New GM's intentional concealment, and as a result, suffered personal injuries.  Based on the foregoing, New GM is estopped from relying on any statutes of limitations in defense of this action.

359.    Prior to the recall, Plaintiff had no knowledge of the ignition switch defect.  Only after New GM announced the recall in 2014 did Plaintiff understand that the ignition switch defect was to blame for airbag non-deployment in the November 2013 crash that left her severely injured.

360.    New GM knew of the ignition switch defect from July 10, 2009 forward, from knowledge it inherited from Old GM personnel and records and documents, and from knowledge it obtained on its own following the Sale. Old GM's knowledge dates back even further, and is imputed to its successor New GM.

361.    As a result of Old and New GM's intentional concealment of the ignition switch defect, Plaintiff, like the public, was unaware of and ignorant about the danger to her and the public created by the ignition switch defect and about New GM's fraudulent concealment regarding the ignition switch defect and the safety of the Defective Vehicles, including her own Vehicle.

362.    Old and New GM intentionally concealed the ignition switch defect with the intention that Plaintiff, and the public, act or refrain from acting.

363.     Plaintiff was misled by Old and New GM's intentional concealment, and as a result, suffered personal injuries.

364.     Because the evidence of the foregoing is clear, precise, and unequivocal, New GM is equitably estopped from raising a statute of limitations in this matter.

## COUNT I

## NEGLIGENCE

365.     Plaintiff hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

366.     This Claim is brought under Kentucky law.

367.     Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement, New GM expressly assumed liability for post-sale accidents involving Old GM vehicles causing personal injury, loss of life, or property damages.  New GM also acquired knowledge of Old GM's activities and the defective ignition switch via the mind of the employees, officers, managers, books and records obtained and/or acquired as a result of the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement and subsequent Sale Order.  Thus, the acts or omissions of Old GM are part of the foundation for the liability assumed by New GM.  New GM also has successor liability for Old GM's conduct as its mere continuation. Further, Plaintiff has claims for a post-sale accident involving an Old GM vehicle that caused personal injury or property damage and New GM is therefore expressly liable to Plaintiff.

368.     Old GM was negligent in designing, inspecting, testing, manufacturing, assembling, marketing, selling, and providing warnings for the Subject Vehicle, including the ignition switch defect, all as set forth in the paragraphs above.

369.     Old GM and Defendant New GM owed foreseeable users, including Plaintiff, a duty to ensure that their vehicles were reasonably safe to operate and did not contain defective components.

370.     Old and New GM owed a duty to warn Plaintiff and other Vehicle purchasers of the ignition switch defect derives because, among other things, it had a continuing duty to monitor and notify Old GM purchasers of defects contained in Old GM vehicles including under the TREAD Act.

371.     Old GM (prior to the Bankruptcy Sale) and New GM (from and after the Bankruptcy Sale) breached their duties to Plaintiff as follows:

372.     Old GM designed, marketed, manufactured, tested, sold, and distributed the Subject Vehicle with a latent, dangerous defect in the ignition switch;

373.     Old GM and New GM failed to warn of the defects; and

374.     Old GM and New GM failed to adopt a safer, practical, feasible or otherwise reasonable alternative design that could have then been reasonably adopted to prevent or substantially reduce the risk of harm without substantially impairing the usefulness, practicality, or desirability of the Subject Vehicle.

375.     New GM is also liable for actions prior to the Bankruptcy Sale as Old GM's mere continuation.

376.     Old GM and Defendant New GM failed to warn about the dangers related to the Subject Vehicle set forth above and throughout this Third Amended Complaint.  Both Old GM and Defendant New GM (who stands in Old GM's shoes and who acquired knowledge from Old GM's employees and books and records at the time of the closing of the sale and obtained its

own knowledge after the Sale) knew, or in the exercise of reasonable diligence, should have known that the Subject Vehicle was dangerous when put to its intended use.

377.    At all times relevant herein, both Old GM and Defendant New GM (who stands in Old GM's shoes and who acquired knowledge from Old GM's employees and books and records at the time of the closing of the sale and obtained its own knowledge after the sale and is Old GM's mere continuation) knew or, in the exercise of reasonable diligence, should have known that the ignition switch in the Vehicle was a dangerous instrumentality if not properly designed, manufactured, tested, inspected, or fixed and that the Vehicle, therefore, presented the probability of harm to any foreseeable users unless it was free from all defects.

378.    At all times relevant herein, Old GM knew or, in the exercise of reasonable diligence, should have known that the ignition switch in the Vehicle was defective and/or unable to withstand the Vehicle's normal and reasonable operations in the normal course, but did nothing to warn or protect against the problem prior to the time the Plaintiffs' accident occurred.

379.    At all relevant times herein, Defendant New GM (who stands in Old GM's shoes and who acquired knowledge from Old GM's employees and books and records at the time of the closing of the sale and obtained its own knowledge after the sale and is Old GM's mere continuation) also knew or, in the exercise of reasonable diligence, should have known that the ignition switch in the Vehicle was defective and/or unable to withstand the Vehicle's normal and reasonable operations in the normal course, but did nothing to recall, remedy, warn, or protect against the problem prior to the time the Plaintiffs' accident occurred.

380.    As a result, at all times relevant herein, both Old and Defendant New GM (who stands in Old GM's shoes and who acquired knowledge from Old GM's employees and books and records at the time of the closing of the sale and obtained its own knowledge after the sale

and is Old GM's mere continuation) had a duty to foreseeable users, and to the Plaintiff, in particular, to:

    a.    Inspect the Vehicle so as to determine whether it would be reasonably fit for its intended uses; and

    b.    Warn or give fair and adequate notice of the inherently dangerous condition existing as a result of the negligent design and manufacture of the Vehicle; and

381.    At all times relevant herein, Old GM breached those duties described above in that it negligently and carelessly failed to warn plaintiff of the inherently dangerous condition of the Vehicle, failed to inspect or test the Vehicle to determine whether it was reasonably fit for the its intended uses prior to the accident, and failed to protect against the problem.

382.    At all relevant times herein, Defendant New GM (who stands in Old GM's shoes and who acquired knowledge from Old GM's employees and books and records at the time of the closing of the sale and obtained its own knowledge after the sale and is Old GM's mere continuation) breached those duties described above in that they negligently and carelessly failed to warn plaintiff of the inherently dangerous condition of the Vehicle, failed to inspect or test the Vehicle to determine whether it was reasonably fit for the its intended uses prior to the accident, and failed to adequately recall and fix the defect.

383.    Old GM and Defendant New GM had no reason to believe that the foreseeable user would know of the dangerous conditions of the Subject Vehicle. Old GM and Defendant New GM negligently warned or failed to warn about the dangerous conditions.

384.    Old GM and Defendant New GM were negligent because they failed to do what reasonably prudent actors would have done in a similar situation.

385.    Further, a reasonably prudent actor, under the same or similar conditions as Old and New GM, would have recalled the Defective Ignition Switch Vehicles well before Amy

Norville's November 2013 accident and/or warned the owners of those vehicles as soon as it learned of the defect. Old and New GM knew of the defective ignition switches long before Ms. Norville's accident, yet chose to do nothing to protect Ms. Norville or those like her.

386.    At all times relevant herein, as a direct and proximate result of Old GM's design, manufacture and sale of a Vehicle with unreasonably dangerous and defective component parts, including the ignition switch, and the failure or refusal of Old GM before the Sale and New GM after the Sale, to adequately warn, Plaintiff was injured and suffered damages.

387.    The foregoing negligent acts and/or omissions of Old GM and Defendant New GM were a producing and/or proximate cause of Plaintiff's damages.

388.    As Old GM's successor and mere continuation, New GM is liable to Plaintiff for damages, including punitive damages, based on Old GM's conduct.

389.    New GM is also liable to Plaintiff for punitive damages based solely on New GM's conduct and knowledge, including information inherited from Old GM and obtained by New GM after the Sale.

390.    New GM is further liable for fair and reasonable damages for medical expenses, and/or damages as may be determined by the Court or the jury, as well as costs, expenses, and reasonable attorneys' fees.

## COUNT II

### STRICT LIABILITY

391.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

392.    This Claim is brought under Kentucky law.

4449969v1/014242

393.    Old GM designed, inspected, selected, tested, manufactured, assembled, equipped, marketed, distributed, and sold the 2003 Saturn Ion and its components. As detailed below, New GM expressly assumed liability for this claim against Old GM, the manufacturer of Plaintiff's 2003 Saturn Ion.

394.    New GM assumed liability under Section 2.3 of the Sale Agreement for "Product Liabilities" that arose out of "accidents" or "incidents" that occurred on or after the 2009 closing date.

395.    At all times relevant herein, New GM has assumed liability for Products Liability claims for compensatory damages involving Old GM vehicles post-sale and therefore stands in Old GM's shoes as manufacturer pursuant to governing Kentucky law. New GM is also liable for Old GM's conduct as its mere continuation.

396.    Old GM had a legal duty to design, inspect, test, manufacture, and assemble the 2003 Saturn Ion so that it would be reasonably crashworthy and provide a reasonable degree of occupant safety in foreseeable collisions occurring in the highway environment of its expected use. Defendant New GM stands in the shoes of Old GM with respect to this claim for Products Liability.

397.    Among other things, the 2003 Saturn Ion is not crashworthy, is defective, and is unreasonably dangerous and unsafe for foreseeable users and occupants in each of the following particulars:

(a)    it has an ignition switch that allows the Saturn Ion to stall or lose engine power, power steering, and/or power braking while in normal and foreseeable operation;

111

(b)      it has an ignition that is placed in a position so that it is common and foreseeable

for a driver to impact the ignition with his or her knee, thereby moving the ignition

switch from the "run" to the "accessory" or "off" position; and

(c)      it has front airbags that do not deploy when the ignition is in the "accessory" or

"off" position.

398.    The defective nature of the 2003 Saturn Ion was the proximate cause of Amy

Norville's damages, as set forth herein, thus rendering New GM strictly liable for compensatory

damages, and for fair and reasonable damages. In addition, Ms. Norville requests any and all

damages as may be determined by the Court or jury, as well as for costs, expenses, and

reasonable attorneys' fees.

## COUNT III

## FRAUDULENT CONCEALMENT

399.    Plaintiff hereby incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint. Plaintiff bases this claim on Old GM's knowledge and

conduct to the extent New GM inherited information from Old GM employees and documents.

Plaintiff separately bases this claim on Old GM's knowledge and conduct to the extent New GM

is liable as Old GM's successor. Further, Plaintiff does not base this claim on affirmative

misrepresentations Old GM or New GM made to Plaintiff.

400.    This Claim is brought under Kentucky law.

401.    Defendant New GM engaged in fraud based on concealment.

402.    At all times relevant herein, Old GM and Defendant New GM consistently failed

to disclose and actively concealed from Plaintiff the risks of death, personal injury, and property

damage posed by its products.

403.    Old GM and Defendant New GM concealed and suppressed material facts concerning the Subject Vehicle, including the defect in the ignition switch and the safety of the Subject Vehicle.

404.    As described above, Old GM and Defendant New GM made material omissions regarding the Subject Vehicle.

405.    Old and New GM intentionally concealed material facts from the Ms. Norville, NHTSA, and the public in general, and it continues to do so today. Old and New GM knew that the Defective Ignition Switch Vehicles, including the 2003 Saturn Ion, were designed and manufactured with ignition switch defects, but Old and New GM concealed those material facts, as set forth herein. Although the Defective Ignition Switch Vehicles contain safety-related defects about which Old and New GM knew, or should have known, Old and New GM recklessly concealed that information from consumers in the United States. Those consumers, including Ms. Norville, had no knowledge of the safety-related defects.

406.    Old and New GM had a duty to disclose the facts to Ms. Norville, the public who owned defective Old and New GM vehicles, and NHTSA, but failed to do so.

407.    Old and New GM knew that Amy Norville had no knowledge of the concealed facts, and that she did not have an equal opportunity to discover the concealed facts. Old and New GM were in a position of superiority over Ms. Norville. Indeed, Ms. Norville trusted Old and New GM not to allow defective vehicles for which it was responsible to remain in the marketplace. Ms. Norville further trusted Old and New GM to warn of defects and to recall defective vehicles.

408.    Old and New GM had a duty to disclose the facts to Plaintiff because: (1) Old and New GM knew that Plaintiff was ignorant of the material facts that Old GM and New GM

113

Case 14-cv-03763-MF Document 582 Filed 08/12/16 Page 134 of 147

intentionally concealed; (2) Plaintiff did not have an equal opportunity to discover the material facts that Old and New GM intentionally concealed; and (3) Old and New GM had notification and recall obligations under the Safety Act with respect to Old GM vehicles, including a continuing duty to monitor and notify Old GM purchasers of defects.

409. By failing to disclose these material facts, Old and New GM intended to hide information regarding the defect, mislead, avoid suspicion, or prevent further inquiry into the matter by NHTSA, Ms. Norville, and the public in general. Old and New GM further intended to induce NHTSA not to recall Ms. Norville's 2003 Saturn Ion, as well as other Defective Ignition Switch Vehicles, in order to reduce its eventual financial exposure.

410. Old and New GM intentionally concealed the fact that Plaintiff's Vehicle had the ignition switch defect and was unsafe from Plaintiff. By failing to disclose these material facts, Old and New GM intended to induce Plaintiff to take some action or refrain from acting. Had Plaintiff known that her vehicles had these serious safety defects, she would either have stopped driving the Vehicle or sold the Vehicle. Plaintiff reasonably and justifiably relied on Old and New GM's non-disclosure and she was injured as a result of acting without knowledge of the undisclosed facts.

411. Ms. Norville reasonably relied on Old and New GM's nondisclosure, and reasonably but unknowingly continued to use the 2003 Saturn Ion until the date of the accident.

412. Ms. Norville would not have continued to drive, or would have sold, the 2003 Saturn Ion had she known of the ignition switch defect.

413. Old and New GM reaped the benefits of their failure to disclose and active concealment of the Defective Ignition Switch because they did not disclose the defects to the public and to NHTSA. Additionally, in not disclosing the Defective Ignition Switch Vehicles'

defects, Old and New GM prevented any meaningful investigation of numerous accidents that were likely the result of those defects. Further, because Old and New GM had hidden this matter from NHTSA and the public, cars and components in those other similar accidents were disposed of without the appropriate and adequate investigation. Indeed, Ms. Norville's 2003 Saturn Ion was, upon information and belief, demolished shortly after her accident. At that time, she had no reason to ensure that her vehicle was preserved.

414.    As a direct and proximate result of Old and New GM's wrongful conduct and fraudulent concealment, Amy Norville suffered damages described herein.

415.    New GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Ms. Norville, such that punitive damages are appropriate (based on New GM's knowledge and conduct, including information inherited from Old GM and obtained by New GM after the Sale), as well any other damages deemed appropriate by the Court and/or jury, including costs, expenses, and attorneys' fees.

416.    Old GM's conduct was also knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Ms. Norville. Punitive damages for Old GM's conduct are appropriate, and New GM is liable for such damages as Old GM's successor.

## COUNT V

## CRASHWORTHINESS

417.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint.

418.    This Claim is brought under Kentucky law.

419.    Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement, New GM expressly assumed liability for post-sale accidents involving Old GM vehicles causing personal injury, loss of life, or property damages.  New GM also acquired knowledge of Old GM's activities and the defective ignition switch via the mind of the employees, officers, managers, books and records obtained and/or acquired as a result of the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement and subsequent Sale Order.  Thus, the acts or omissions of Old GM are part of the foundation for the liability assumed by New GM.  New GM is also liable as Old GM's mere continuation. Further, Plaintiff has claims for a post-sale accident involving an Old GM vehicle that caused personal injury or property damage and New GM is therefore expressly liable to Plaintiff.

420.    At all times relevant herein, both Old GM and Defendant New GM (who stands in Old GM's shoes and who acquired knowledge from Old GM's employees and books and records at the time of the closing of the sale and obtained its own knowledge after the sale and is Old GM's mere continuation) were aware of safer alternative designs to avoid the loss of power caused by the ignition defects, but chose not to employ them, in part to avoid disclosure of the defective ignition switch and its tragic consequences.

421.    Old GM failed to adopt a safer, practical, feasible or otherwise reasonable alternative design that could have then been reasonably adopted to prevent or substantially reduce the risk of harm without substantially impairing the usefulness, practicality, or desirability of the Subject Vehicle.  The safer, alternative designs for the ignition switch were practical for Old GM to implement.   Had the safer, alternative designs for the ignition switch been implemented, Ms. Norville would not have suffered injury.  In addition, had the safer, alternative designs for the ignition switch been implemented, Ms. Norville's accident and her injuries would

have been less severe. The failure to implement a safer alternative design proximately caused the damages sustained by Amy Norville, as set forth herein, thus rendering Defendant New GM liable for compensatory and punitive damages.

422.    As Old GM's successor and mere continuation, New GM is liable to Plaintiff for damages, including punitive damages, based on Old GM's conduct.

423.    New GM is further liable for fair and reasonable damages for medical expenses, and/or damages as may be determined by the Court or the jury, as well as costs, expenses, and reasonable attorneys' fees.

## COUNT VI

## NEGLIGENT MISREPRESENTATION

424.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Third Amended Complaint. Plaintiff bases this claim on Old GM knowledge and conduct to the extent New GM inherited information from Old GM employees and documents. Plaintiff separately bases this claim on Old GM's knowledge and conduct to the extent New GM is liable as Old GM's successor. Further, Plaintiff does not base this claim on affirmative misrepresentations Old GM or New GM made to Plaintiff.

425.    This Claim is brought under Kentucky law.

426.    Old GM and Defendant New GM fraudulently, negligently, or intentionally concealed material facts from the Ms. Norville, NHTSA, and the public in general, and it continues to do so today. Old GM and Defendant New GM knew that the Defective Ignition Switch Vehicles, including the 2003 Saturn Ion, were designed and manufactured with ignition switch defects, but Old GM and Defendant New GM concealed those material facts, as set forth herein. Although the Defective Ignition Switch Vehicles contain safety-related defects about

which Old GM and Defendant New GM knew, or should have known, Old GM and Defendant New GM recklessly concealed that information from consumers in the United States. Those consumers, including Ms. Norville, had no knowledge of the safety-related defects.

427.    Old GM and Defendant New GM had a duty to disclose the facts to Ms. Norville, the public who owned defective Old and New GM vehicles, and NHTSA, but failed to do so.

428.    Old GM and Defendant New GM knew that Amy Norville had no knowledge of the concealed facts, and that she did not have an equal opportunity to discover the concealed facts. Old GM and Defendant New GM was in a position of superiority over Ms. Norville. Indeed, Ms. Norville trusted Old GM and Defendant New GM not to allow defective vehicles for which it was responsible to remain in the marketplace. Ms. Norville further trusted Old GM and Defendant New GM to warn of defects and to recall defective vehicles.

429.    By failing to disclose these material facts, Old GM and Defendant New GM intended to hide information regarding the defect, mislead, avoid suspicion, or prevent further inquiry into the matter by NHTSA, Ms. Norville, and the public in general. Old GM and Defendant New GM further intended to induce NHTSA not to recall Ms. Norville's 2003 Saturn Ion, as well as other Defective Ignition Switch Vehicles, in order to reduce its eventual financial exposure.

430.    Ms. Norville reasonably relied on Old GM and Defendant New GM's nondisclosure, and reasonably but unknowingly continued to use the 2003 Saturn Ion until the date of the accident.

431.    Ms. Norville would not have continued to use the 2003 Saturn Ion had she known of the ignition switch defect.

432.    Old GM and Defendant New GM reaped the benefits of the sales and leases from the Defective Ignition Switch Vehicles because they did not disclose the defects to the public and to NHTSA. Additionally, in not disclosing the Defective Ignition Switch Vehicles' defects, Old GM and Defendant New GM prevented any meaningful investigation of numerous accidents that were likely the result of those defects. Further, because Old GM and Defendant New GM had hidden this matter from NHTSA and the public, cars and components in those other similar accidents were disposed of without the appropriate and adequate investigation. Indeed, Ms. Norville's 2003 Saturn Ion was, upon information and belief, demolished shortly after her accident. At that time, she had no reason to ensure that her vehicle was preserved.

433.    As a direct and proximate result of Old GM and Defendant New GM's wrongful conduct and fraudulent concealment, Amy Norville suffered damages described herein.

434.    Defendant New GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Ms. Norville, such that punitive damages are appropriate, as well any other damages deemed appropriate by the Court and/or jury, including costs, expenses, and attorneys' fees.

435.    Old GM's conduct was also knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Ms. Norville. Punitive damages for Old GM's conduct are appropriate, and New GM is liable for such damages as Old GM's successor.

436.    WHEREFORE, Plaintiff demands judgment against Defendant New GM as described in further detail below.

4449969v1/014242

## DAMAGES

437.   Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

438.   As a direct and proximate result of the incident Plaintiff has experienced personal injury and has, therefore, also sustained and is claiming damages, including:

Past, present and future medical and rehabilitation expenses;

Attorney's fees and costs, as allowable under applicable law;

Other such injuries, damages, and particulars as the evidence may show.

439.   At all times relevant herein, all of the aforesaid injuries and damages were caused solely and proximately by the wrongful acts and/or omissions of Old GM and Defendant New GM (on its own and standing in the shoes of Old GM with respect to Plaintiff's Product Liability claims and as its mere continuation).

440.   WHEREFORE, Plaintiff demands judgment against Defendant New GM for compensatory damages and for such other and further relief as the Court may deem just and proper at trial.

## PUNITIVE DAMAGES FOR INDEPENDENT CLAIMS BASED ON NEW GM'S KNOWLEDGE AND CONDUCT

441.   Plaintiff adopts and re-alleges each prior paragraph that supports its Independent Claims, as if set forth fully herein. Plaintiff bases her punitive damages claims on New GM conduct and knowledge, including knowledge inherited from Old GM employees and documents and knowledge acquired independently by New GM after the Bankruptcy Sale.

4449969v1/014242

442.    At all times relevant herein, Defendant New GM acted with a conscious and flagrant disregard for the rights and safety of Plaintiff, and the general public and deliberately engaged in willful, wanton, and reckless disregard for the life and safety of Plaintiff, and the general public by failing to disclose and repair the known defects in its vehicles.

443.    Although Defendant New GM knew the defects alleged herein were contained in the Vehicle and could cause severe injury and loss of life, Defendant New GM took no adequate steps to correct, warn or protect the Plaintiff, or the consumer public from those known defects. In fact, New GM intentionally concealed the unsafe character of the Defective Vehicles, including Plaintiff's.

444.    The actions and inactions of Defendant New GM were of such a character as to constitute a pattern or practice of willful, wanton and reckless misconduct causing substantial harm and resulting in damages to Plaintiff.

445.    In addition, the wrongful acts of the Defendant were committed with specific intent to cause harm to Plaintiff, and Defendant succeeded in so doing.

446.    Therefore, Defendant New GM and/or its agents and servants engaged in conduct that demonstrates malice, aggravated or egregious fraud, oppression, or insult, which injured Plaintiff, thereby entitling Plaintiff to punitive damages.

447.    Additionally, the wrongful acts of the Defendant New GM constitute willful misconduct, malice, fraud, wantonness, oppression and that entire want of care which would raise the presumption of conscious indifference to consequences and the rights of others, thereby also entitling Plaintiff to punitive damages.  New GM acted with reckless disregard of the rights of others, and intentionally and with malice toward others, both of which warrant the imposition of punitive damages.

4449969v1/014242

448.    WHEREFORE, Plaintiff demands judgment against Defendant New GM for punitive and exemplary damages, plus interest, costs and attorneys' fees for having to bring this action, and such other and further relief as this Honorable Court or jury may deem just and proper.

## PUNITIVE DAMAGES FOR CLAIMS BASED ON OLD GM'S KNOWLEDGE AND CONDUCT

449.    Plaintiff adopts and re-alleges each prior paragraph that supports her claims, as if set forth fully herein. Plaintiff bases her punitive damages claims on Old GM conduct and knowledge, which New GM is liable for as Old GM's successor and mere continuation.

450.    At all times relevant herein, Old GM acted with a conscious and flagrant disregard for the rights and safety of Plaintiff, and the general public and deliberately engaged in willful, wanton, and reckless disregard for the life and safety of Plaintiff, and the general public by failing to disclose and repair the known defects in its vehicles.

451.    Although Old GM knew the defects alleged herein were contained in the Vehicle and could cause severe injury and loss of life, Old GM took no adequate steps to correct, warn or protect the Plaintiff, or the consumer public from those known defects. In fact, Old GM intentionally concealed the unsafe character of the Defective Vehicles, including Plaintiff's.

452.    The actions and inactions of Old GM were of such a character as to constitute a pattern or practice of willful, wanton and reckless misconduct causing substantial harm and resulting in damages to Plaintiff.

453.    In addition, the wrongful acts of Old GM were committed with specific intent to cause harm to Plaintiff, and Defendant succeeded in so doing.

Case 1:14-cv-08176-JMF   Document 382   Filed 08/12/16   Page 123 of 127

454.     Therefore, Old GM and/or its agents and servants engaged in conduct that demonstrates malice, aggravated or egregious fraud, oppression, or insult, which injured Plaintiff, thereby entitling Plaintiff to punitive damages.

455.     Additionally, the wrongful acts of the Old GM constitute willful misconduct, malice, fraud, wantonness, oppression and that entire want of care which would raise the presumption of conscious indifference to consequences and the rights of others, thereby also entitling Plaintiff to punitive damages. Old GM acted with reckless disregard of the rights of others, and intentionally and with malice toward others, both of which warrant the imposition of punitive damages.

456.     Defendant New GM is liable for Old GM's knowledge and conduct, including punitive damages, and Old GM's successor and mere continuation.

457.     WHEREFORE, Plaintiff demands judgment against Defendant New GM for punitive  and exemplary damages, plus interest, costs and attorneys' fees for having to bring this action, and such other and further relief as this Honorable Court or jury may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment against New GM and in favor of Plaintiff, and grant the following relief:

A.     Declare, adjudge, and decree the conduct of New GM as alleged herein to be unlawful, unfair, and/or deceptive and otherwise in violation of law, enjoin any such future conduct, and issue an injunction under which the Court will monitor New GM's response to problems with the recalls and efforts to improve its safety processes;

B.     Award Plaintiff actual, compensatory damages or, in the alternative, statutory damages, as proven at trial;

C.      Award Plaintiff exemplary and punitive damages in such amount as proven with respect to Plaintiff's Independent Claims;

D.      Award damages and other remedies, including, but not limited to, statutory penalties, as allowed by any applicable law;

E.      Award Plaintiff reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

F.      Leave to amend this Complaint to conform to the evidence produced at trial;

G.      Award Plaintiff restitution and/or disgorgement of New GM's ill-gotten gains relating to the conduct described in this Complaint; and

H.      Award Plaintiff such other further and different relief as the case may require or as determined to be just, equitable, and proper by this Court.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all issues triable by jury, as enumerated and set forth in more detail in this Complaint.

Dated: August 12, 2016                                        Respectfully Submitted,

By: */s/ Steven G. Sklaver*

Robert C. Hilliard
State Bar No. 09677700
Federal ID No. 5912
bobh@hmglawfirm.com
Rudy Gonzales, Jr.
State Bar No. 08121700
Federal ID No. 1896
rudyg@hmglawfirm.com
Catherine D. Tobin
State Bar No. 24013642
Federal ID No. 25316

4449969v1/014242

catherine@hmglawfirm.com
Marion Reilly
Texas Bar No. 24079195
Federal ID No. 1357491
marion@hmglawfirm.com
**HILLIARD MUÑOZ GONZALES LLP**
719 S. Shoreline Boulevard, Suite 500
Corpus Christi, TX  78401
Telephone No.:  (361) 882-1612
Facsimile No.:   (361) 882-3015

Thomas J. Henry
State Bar No. 09484210
Federal ID No. 12980
tjh@tjhlaw.com
Curtis W. Fitzgerald, II
State Bar No. 24012626
Federal ID No. 24980
cfitzgerald@tjhlaw.com
**THOMAS J. HENRY INJURY ATTORNEYS**
521 Starr St.
Corpus Christi, Texas 78401
Telephone No.:  (361) 985-0600
Facsimile No.:  (361) 985-0601

Seth Ard
New York State Bar No. 4773982
Tamar Lusztig
New York State Bar No. 5125174
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6022
sard@susmangodfrey.com
tlusztig@susmangodfrey.com
Telephone:  (212) 336-8330
Facsimile:  (212) 336-8340

Marc M. Seltzer
California State Bar No. 054534
Steven G. Sklaver
California State Bar No. 237612
Kalpana Srinivasan
California State Bar No. 237460
Krysta Kauble Pachman
California State Bar No. 280951
**SUSMAN GODFREY L.L.P.**

125

1901 Avenue of the Stars, Suite 950
Los Angeles, California  90067-6029
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com
ksrinivasan@susmangodfrey.com
kpachman@susmangodfrey.com
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150

**ATTORNEYS FOR PLAINTIFFS**

4449969v1/014242

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a true copy of the above document was served upon the attorneys of record for each other party through the Court's electronic filing service on August 12, 2016, which will send notification of such filing to the e-mail addresses registered.

*/s/ Steven G. Sklaver*       
Steven G. Sklaver
