STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen
Daniel A. Ross
Christopher M. Guhin
Gabriel E. Sasson
180 Maiden Lane
New York, NY 10038-4982
Telephone: (212) 806-5400

*Attorneys for Davidson Kempner Capital Management LP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------ x | | |
| In re | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, f/k/a | : | Case No. 09-50026 (MG) |
| GENERAL MOTORS CORPORATION, *et al.,* | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| ------------------------------------------------------------ x | | |

## <u>NOTICE OF APPEAL</u>

Davidson Kempner Capital Management LP hereby appeals under 28 U.S.C. § 158(a)(1) and Federal Rules of Bankruptcy Procedure 8001, 8002 and 8003, to the United States District Court for the Southern District of New York from (i) the *Memorandum Opinion and Order Approving Motion for an Order Approving Stipulation of Settlement and Other Relief* (the "<u>Opinion and Order</u>") [ECF No. 13744] entered by the United States Bankruptcy Court for the Southern District of New York (Hon. Martin Glenn) (the "<u>Bankruptcy Court</u>") on August 24, 2016, and from each and every part thereof and (ii) the *Stipulation and Agreed Order (I) Settling Disputed Entitlements of Debtor-in-Possession Lenders and Official Committee of Unsecured Creditors to Potential Term Loan Avoidance Action Proceeds, and (II) Modifying Avoidance Action Trust Agreement to Implement Settlement* (the "<u>Stipulation and Order</u>") [ECF No. 13748]

entered by the Bankruptcy Court on August 30, 2016, and from each and every part thereof.

True and correct copies of the Opinion and Order and Stipulation and Order are annexed hereto

as **Exhibit A** and **Exhibit B**, respectively.  The parties to this appeal and their respective counsel

are identified on **Schedule 1** annexed hereto.

Dated: August 30, 2016                          STROOCK & STROOCK & LAVAN LLP
       New York, New York

/s/ Kristopher M. Hansen
Kristopher M. Hansen
Daniel A. Ross
Christopher M. Guhin
Gabriel E. Sasson
180 Maiden Lane
New York, New York 10038-4982
Telephone: (212) 806-5400

*Attorneys for Davidson Kempner Capital Management LP*

**<u>Exhibit  A</u>**

**<u>(Opinion and Order)</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

MOTORS LIQUIDATION COMPANY,
f/k/a GENERAL MOTORS
CORPORATION, *et al.*,

Debtors.

**FOR PUBLICATION**

Chapter 11

Case No. 09-50026 (MG)
(Jointly Administered)

## MEMORANDUM OPINION AND ORDER APPROVING MOTION FOR AN ORDER APPROVING STIPULATION OF SETTLEMENT AND OTHER RELIEF

**A P P E A R A N C E S :**

KRAMER, LEVIN, NAFTALIS & FRANKEL LLP
*Attorneys for the Official Committee of Unsecured Creditors of Motors Liquidation Company, et. al.*
1177 Avenue of the Americas
New York, New York 10036
By:      Robert T. Schmidt, Esq.
         Jennifer Sharret, Esq.
         Jonathan M. Wagner, Esq.

BINDER & SCHWARTZ LLP
*Attorneys for the Motors Liquidation Company Avoidance Action Trust*
336 Madison Avenue, 6th Floor
New York, New York 10017
By:      Eric B. Fisher, Esq.

EMMET, MARVIN & MARTIN, LLP
*Attorneys for the Motors Liquidation Company Avoidance Action Trust*
120 Broadway
New York, New York 10271
By:      Paul T. Weinstein, Esq.

WESTERMAN, BALL, EDERER, MILLER, ZUCKER & SHARESTEIN, LLP
*Attorneys for River Birch Capital, LLC*
1201 RXR Plaza
Uniondale, New York 11556
By:      Richard F. Harrison, III, Esq.
         Eric G. Waxman, III, Esq.

VEDDER PRICE
*Attorneys for Export Development Canada*
1633 Broadway, 47th Floor
New York, New York 10019
By:    Michael L. Schein, Esq.

STROOCK & STROOCK & LAVAN LLP
*Attorneys for Davidson Kempner Capital Management LP*
180 Maiden Lane
New York, New York 10038
By:    Kristopher M. Hansen, Esq.

UNITED STATES ATTORNEY FOR THE SOUTHERN DISTRICT OF NEW YORK
*Attorneys for United States Department of Treasury*
86 Chambers Street
New York, New York 10007
By:    David S. Jones, Esq.

**MARTIN GLENN,**
**United States Bankruptcy Judge**

Pending before the Court is the *Joint Motion of Motors Liquidation Company Avoidance Action Trust and Official Committee of Unsecured Creditors for Entry of (A) Stipulation and Agreed Order (I) Settling Disputed Entitlements of Debtor-in-Possession Lenders and Official Committee of Unsecured Creditors to Potential Term Loan Avoidance Action Proceeds and (II) Modifying Avoidance Action Trust Agreement to Implement Settlement, and (B) Order (I) Approving Settlement of the Allocation Dispute, (II) Approving Amendments to the Avoidance Action Trust Agreement, and (III) Authorizing the Avoidance Action Trust to Grant a Lien to the DIP Lenders* (the "Motion," ECF Doc. # 13688), filed jointly by the Wilmington Trust Company, as trust administrator and trustee (the "Trust Administrator") of the Motors Liquidation Company Avoidance Trust (the "Trust"), and the Official Committee of Unsecured

2

Creditors of Motors Liquidation Company f/k/a General Motors Corporation (the "Committee,"

collectively with the Avoidance Action Trust Administrator, "Movants").[1]

Davidson Kempner Capital Management LP ("Kempner"), a general unsecured claimant

and a beneficiary of the Trust, filed an objection to the Motion (the "Kempner Objection," ECF

Doc # 13704). River Birch Capital LLC ("River Birch"), a private funder under the Private

Litigation Funding Agreement (as defined below), filed a separate objection to the Motion (the

"River Birch Objection," ECF Doc # 13701).

The United States of America (the "United States"), on behalf of the debtor-in-possession

lender the United States Department of the Treasury ("Treasury"), filed a statement in response

to the Kempner Objection and the River Birch Objection (the "Treasury Response," ECF Doc #

13713). Export Development Canada ("EDC") joined the Treasury Response ("EDC Joinder,"

ECF Doc # 13716).

The Trust Administrator filed a reply to the River Birch Objection (the "Trust Reply to

River Birch Objection," ECF Doc # 13714) and a separate reply to the Kempner Objection (the

"Trust Reply to Kempner Objection," ECF Doc # 13715). The Committee filed an omnibus

reply (the "Omnibus Reply," ECF Doc # 13717).[2]

The Court held a hearing (the "Hearing") on the Motion on August 10, 2016, after which

the Court took this matter under submission. For the following reasons, the Court **GRANTS** the

Motion.

---

[1]     The Motion is supported by the declaration of Arthur J. Gonzalez, the Trust Monitor of the Trust (the "Gonzalez Declaration," ECF Doc # 13689).

[2]     The Omnibus reply is supported by the declaration of Thomas Moers Mayer (the "Mayer Declaration," ECF Doc # 13718).

# I.   **BACKGROUND**

On June 1, 2009 (the "Petition Date"), the Motors Liquidation Company ("Old GM"),

and its affiliated Debtors, filed voluntary petitions for relief under chapter 11 of the Bankruptcy

Code.  (Mot. ¶ 8.)

On the Petition Date, the Debtor filed a motion ("the DIP Motion," ECF Doc. # 64)

seeking authority from the Court to obtain $33.3 billion in post-petition financing (the "DIP

Financing") from the United States Department of the Treasury and Export Development Canada

(collectively, "DIP Lenders").  (*Id.*)  The Court approved three DIP Orders: (1) the Interim DIP

Financing Order, entered on June 2, 2009 (the "Interim DIP Order," ECF Doc. # 292), (2) the

Final DIP Financing Order, entered on June 25, 2009 (the "Final DIP Order," ECF Doc. # 2529),

and (3) the modified final DIP financing order, entered on July 5, 2009 (the "Wind-Down

Order," ECF Doc. # 2969) (all three collectively, the "DIP Orders").

Prior to the Petition Date, Old GM obtained a syndicated secured term loan (the "Term

Loan") of approximately $1.5 billion pursuant to a term loan agreement, dated November 29,

2006, as amended on March 4, 2009 (the "Term Loan Agreement").  (Mot. ¶ 10.)  To secure

repayment of the Term Loan, Old GM granted the Term Loan Lenders security interests in a

large number of Old GM's assets, including all of the equipment and fixtures at Old GM's

facilities throughout the United States (the "Collateral").  (*Id.*)  JPMorgan Chase Bank, N.A.

("JPMorgan"), as administrative agent of the Term Loan, caused the filing of twenty-eight UCC-

1 financing statements throughout the United States to perfect the Term Loan Lenders' security

interests in the Collateral.  (*Id.*)  One of the twenty-eight UCC-1 financing statements covered all

of the equipment and fixtures at forty-two of Old GM facilities and was filed with the Delaware

Secretary of State, designated as file number 64168084 (the "Main Lien").  (*Id.*)

4

Through the DIP Motion, the Debtors requested authority to use a portion of the DIP

financing to fully repay the approximately $1.5 billion Term Loan to a syndicate of more than

400 lenders (the "Term Loan Lenders"), including JPMorgan as administrative agent and lender.

(*Id.* ¶ 11.)  On the presumption that the Term Loan Lenders' claims arising under the Term Loan

Agreement were fully secured, Old GM repaid the Term Loan Lenders in full.

However, before the entry of the Final DIP Order, the Committee learned that the Term

Loan Lenders' security interests may not have been perfected as of the Petition Date as a result

of the filing of the termination statement relating to the Main Lien (the "2008 Termination

Statement") months before the Petition Date.  (*Id.* ¶ 12.)  Therefore, the Final DIP Order, while

conditionally approving repayment of the Term Loan, expressly preserved the right for the

Committee to investigate and bring actions based upon, among other things, the purported

perfection of the security interests related to the Term Loan.  (*Id.* ¶ 12.)

The Committee determined that JPMorgan had authorized the filing of the 2008

Termination Statement, and that, as a result, the Term Loan Lenders' security interest with

respect to the collateral secured by the Main Lien was not perfected as of the Petition Date.

Therefore, according to the Committee, the claims of the Term Loan Lenders were substantially

undersecured.  (*Id.* ¶ 13.)  To recover amounts that the Committee alleges that Old GM paid to

the Term Loan Lenders after the Petition Date—based on the erroneous assumption that the

Term Loan Lender's interests were perfected and their claims fully secured—the Committee

commenced an adversary proceeding (the "Term Loan Avoidance Action").  (*Id.*)

On March 29, 2011, the Court entered an order (the "Confirmation Order," ECF Doc. #

9941) confirming the plan (the "Plan"), which provided for the creation of the Trust to liquidate

and distribute its non-administrative assets, which would consist entirely of the proceeds, if any,

of the Term Loan Avoidance Action. (Mot. ¶ 14.) In December 2011, the prosecution of the

Term Loan Avoidance Action was transferred to the Trust. (*Id.*)

Prior to the confirmation of the Plan, the DIP Lenders took the position that the Wind-

Down Order provided them with a super-priority administrative expense claim for any amounts

not otherwise paid back (subject to certain carve-outs not relevant here), and that the DIP lenders

had not waived the right to be repaid by the estate from funds recovered through the Term Loan

Avoidance Action. (*Id.* ¶ 15.) The Committee opposed this view and moved, on October 4,

2010, to enforce the Final DIP Order and Wind-Down Order, arguing that the DIP Lenders could

not claim rights to any proceeds of the Term Loan Avoidance Action (the "Allocation Dispute").

(*Id.* ¶ 16.) The Court ruled that the Committee's motion was unripe for judicial administration

but did not foreclose a further application for a ruling to resolve the Allocation Dispute at a later

time. (*Id.*) As a result of that decision, both the Plan and Avoidance Action Trust Agreement

deferred the issue of whether the DIP lenders would be the beneficiaries of the Term Loan

Avoidance Action and provided that it would be resolved either by mutual agreement between

the DIP Lenders and the Committee or by final order. (*Id.* ¶ 17.)

On June 6, 2011, further prosecuting the Allocation Dispute, the Committee commenced

an adversary proceeding, seeking a declaratory judgment that: (i) the DIP Lenders were not

entitled to any proceeds of the Term Loan Avoidance Action and had no interests in the Trust,

and (ii) the holders of the allowed general unsecured claims had the exclusive rights to any and

all proceeds of the Term Loan Avoidance Action, and were the exclusive beneficiaries of the

Trust. (*Id.* ¶ 18.) On December 12, 2011, this Court ruled in favor of the Committee, denying

the DIP Lender's motion to dismiss and for summary judgment, and granting the Committee's

motion for summary judgment (the "Decision"). *See In re Motors Liquidation Co.*, 460 B.R. 603

(Bankr. S.D.N.Y. 2011), *vacated sub nom.*, *U.S. Dep't of the Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co.*, 475 B.R. 347, 367 (S.D.N.Y. 2012). The DIP Lenders appealed, and on July 3, 2012, the District Court for the Southern District of New York vacated the Decision on the grounds that the Allocation Dispute was not ripe and remanded the matter to the Court with instructions to dismiss the Committee's complaint without prejudice. *See U.S. Dep't of the Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co.*, 475 B.R. 347, 367 (S.D.N.Y. 2012) (the "District Court Decision"). (Mot. ¶ 18.) Notably, in holding that the Allocation Dispute was not ripe, the District Court left untouched the merits of the Decision. *See id.*

## A.    The Motion

The initial administrative assets of the Trust consisted of approximately $1.6 million in cash to be held and maintained by the Trust Administrator for fees and expenses in connection with trust administration and prosecution of the Term Loan Avoidance Action (the "Avoidance Action Cash"). (*Id.* ¶ 22.) However, the Trust maintains that the $1.6 million of Avoidance Action Cash proved to be insufficient to fund litigation costs related to the Term Loan Avoidance Action and to satisfy the Trust's general administrative costs. (*Id.* ¶ 23.) On January 20, 2012, the Motors Liquidation Company GUC Trust (the "GUC Trust") filed a motion seeking, among other things, to liquidate securities to fund additional Trust costs. (*Id.* ¶ 23.) The Court granted the GUC Trust's motion and entered an order, which, among other things, allocated an additional $13,714,000 to the Trust to satisfy the Trust's estimated fees, costs and expenses for 2012, 2013, and 2014. (*Id.*)

The Trust Administrator, in consultation with the Trust Monitor, determined that the cash available to the Trust was insufficient to meet its projected fees and expenses. (*Id.* ¶ 28.) The

Trust Administrator commenced a competitive bidding process to obtain private funding for the Trust. (*Id.*) On April 4, 2016, the Trust reached an agreement in principle with a private funder (the "Private Funder") for a $15 million loan in exchange for a return that could be as high as the greater of 2.25 times the amount of the funds drawn or 4.75% of the aggregate proceeds of the Term Loan Avoidance Action. (*Id.* ¶ 30.) On May 19, 2016, the Trust provided the DIP Lenders with a copy of the executed litigation funding agreement with the Private Funder (the "Private Litigation Funding Agreement"). (*Id.*) On June 23, 2016, the Trust sought approval of the Private Litigation Funding Agreement. (*Id.*)

The Trust negotiated a provision into the Private Litigation Funding Agreement which permitted the Trust to terminate the Private Litigation Funding Agreement within a certain period of time in the event that the DIP Lenders agreed to provide funding to the Trust "on terms materially more favorable to the Trust than those provided by the [i]nvestors under [the Private Litigation Funding Agreement]." (*Id.* ¶ 31.)

The DIP Lenders, the Trust and Committee entered into the stipulation and agreed order (the "Stipulation and Agreed Order," Mot. Ex. A). (*Id.* ¶ 32.) The Committee's entry into this Stipulation and Agreed Order was conditioned on the DIP Lenders providing $15 million in litigation funding (the "Litigation Cost Advance") to the Trust on terms acceptable to the Trust. (*Id.*) The Stipulation and Agreed Order provides that, after repayment of all DIP Lender Advances (including the Litigation Cost Advance) and the GUC Trust Advances (both, as defined therein), the DIP Lenders shall be entitled to receive 30% of the remaining net proceeds resulting from the Term Loan Avoidance Action and unsecured creditors shall be entitled to receive the remaining 70%, with each such distribution to the DIP Lenders and unsecured creditors to be made contemporaneously and on a *pari passu* basis. (*Id.* ¶ 33.) In addition, the

8

Stipulation and Agreed Order approves the litigation cost advance agreement with the DIP

Lenders (the "Litigation Cost Advance Agreement," and collectively with the Stipulation and

Agreed Order, the "Settlement"), under which the DIP Lenders will advance the $15 million

Litigation Cost Advance to the Trust.  (*Id.* ¶ 34.)  The Stipulation and Agreed Order further

grants the DIP Lenders a first priority lien on the Avoidance Action Proceeds and the Funding

Account (as defined in the Litigation Cost Advance Agreement) up to the amount of the

Litigation Cost Advance.  (*Id.*)  The Litigation Cost Advance Agreement further provides that

the Trust Agreement shall be amended to reflect the terms of the Stipulation and Agreed Order,

including providing for the Litigation Cost Advance and the relative priority of the Trust's

obligations to repay the DIP Lenders.  (*Id.*)  Having reached an agreement with the DIP Lenders

to provide the Litigation Cost Advance, the Trust seeks to terminate the Private Litigation

Funding Agreement pursuant to its terms.  (*Id.* ¶ 32.)

The Movants request the Court to enter the Stipulation and Agreed Order and approve the

Litigation Cost Advance Agreement.  (*Id.* ¶ 36.)

The Movants contend that the Settlement is fair and reasonable.  (*Id.* ¶ 40.)  The Movants

assert that the Allocation Dispute has a long history of litigation, and absent settlement, there is a

strong likelihood of future complex litigation.  (*Id.* ¶ 41.)  Settling the Allocation Dispute would

guarantee a distribution to holders of unsecured debt immediately after the Trust receives the

proceeds from the underlying litigation and not potentially multiple years later if the Movants

had to litigate the Allocation Dispute.  (*Id.* ¶ 48.)

The Movants argue that the benefit of settling the Allocation Dispute outweighs the risks

in litigating that issue.  (*Id.* ¶ 52.)  According to the Movants, settlement assures holders of

unsecured debt that they would receive 70% of the net distributable proceeds of the Term Loan

Avoidance Action, ensures adequate funding for the Trust and avoids the potential for complex and protracted litigation concerning the Allocation Dispute. (*Id.* ¶¶ 37, 47, 52.) The Movants also point out that the Settlement was the product of arm's length negotiations among the Committee, DIP Lenders and the Trust and that the counsel for the Committee, DIP Lenders and the Trust are highly experienced practitioners who have been involved in the bankruptcy case from the beginning and are intimately familiar with the issues and disputes involved in the Settlement. (*Id.*)

The Movants also assert that the Stipulation and Agreed Order, the Litigation Cost Advance and the Avoidance Action Trust Amendments are permitted under the Avoidance Action Trust Agreement, the Plan and Sections 105(a) and 1142 of the Bankruptcy Code.

### B.     The Kempner Objection

Kempner argues that the Litigation Cost Agreement, under which the DIP Lenders would receive 30% of the net proceeds from the Term Loan Avoidance Action, is significantly more expensive than the Private Litigation Funding Agreement. (Kempner Obj. ¶ 7.) Kempner argues that in order to justify the Settlement, the Committee would have to convince the Court that it bears a significant enough risk of losing a re-litigation of the Allocation Dispute to justify giving up 30% of the general unsecured creditor's recovery from the Term Loan Avoidance Action. (*Id.* ¶ 10.) In this vein, Kempner contends that the Movants cannot meet this burden since the Allocation Dispute had already been litigated on the merits in this Court, which had ruled against the DIP Lenders in the Decision. (*Id.* ¶ 11.) Even though the District Court Decision vacated the Decision, it did so on jurisdictional grounds and not on the merits. *See* District Court Decision, 475 B.R. at 367. (Mot. ¶ 18.) Kempner argues that any court reviewing the matter again would

find the Court's analysis persuasive and would likely rule against the DIP Lenders.  (Kempner Obj. ¶ 17.)

Kempner also argues that since the funding from the DIP Lenders is materially less favorable to the Trust than that obtained from the Private Funder, the standard set forth in the Private Litigation Funding Agreement allowing for termination of the agreement cannot be met. (*Id.* ¶ 21.)  As a result, termination of the Private Litigation Funding Agreement by the Trust Administrator may lead the Private Funder to commence a separate legal action against the Trust for breach of contract.  (*Id.*)

Additionally, Kempner argues that because the District Court ruled that this Court does not have jurisdiction over the Allocation Dispute as there is no justiciable case or controversy, this Court should not engage in a determination of whether the Settlement is appropriate until such time as there is a justiciable issue.   (*Id.* ¶ 9.)

### C.    River Birch Objection

River Birch contends that the DIP Lender's Litigation Cost Advance is materially more expensive, under most recovery outcomes, than the funding under the Private Litigation Funding Agreement.  (River Birch Obj. ¶ 7.)  Hence, the Trust is not authorized to terminate the Private Litigation Funding Agreement because that agreement only permits termination if the DIP Lenders provide funding "on terms materially more favorable" to the Trust.  (*See* Private Litigation Funding Agreement § 1.1).  Therefore, River Birch warns that termination of the Private Litigation Funding Agreement could expose the Trust to breach of contract claims. (River Birch Obj. ¶ 8.)

### D.      Treasury Response

The United States argues that both the Kempner Objection and the River Birch Objection should be rejected.  (Treasury Response ¶ 19.)  According to the United States, the Settlement is reasonable because, among other things, it avoids the adverse outcome in which a court decides that unsecured creditors are not entitled to any proceeds from the Allocation Dispute.  (*Id.* ¶ 20.) The United States further contends that Kempner places unreasonable weight on the Court's vacated Decision, in which the Court held that the DIP Lenders were not entitled to any proceeds from the Allocation Dispute.  (*Id.* ¶ 21.)  According to the United States, the Decision is not entitled to deference both because it has been vacated and also because the controlling issue, which was decided on summary judgment, is subject to *de novo* review.  (*Id.*)  The United States maintains that the reasoning in that Decision may not be persuasive to a court in a subsequent litigation because the DIP Lenders have contentions that have not been conclusively resolved and the Committee has conceded that one strand of reasoning in the Decision was incorrect.  (*Id.*)

The United States rejects Kempner's argument that the Settlement is suboptimal for the Trust.  (*Id.* ¶ 22.)  The United States argues that the mandate of the Trust is to obtain the greatest possible benefit for its beneficiaries, whoever they are.  (*Id.*)  The Settlement maximizes the return to the Trust beneficiaries because, unlike the Private Funder, the DIP Lenders would provide a no-interest, no-fee advance of litigation costs to the Trust.  (*Id.*)  Payment of financing costs to the Private Funder would reduce the amounts receivable by the beneficiaries of the Trust.  (*Id.*)  The United States argues that the Settlement's allocation of 30% to the DIP Lenders should not be viewed as a financing cost; rather, the interest free advance is a benefit that inures to the Trust as a result of settling the Allocation Dispute.  (*Id.*)

12

The United States also rejects Kempner's contention that the Court should not determine whether the Settlement is appropriate because the matter is unripe. (*Id.* ¶ 23.) The United States argues that there is nothing in Bankruptcy Rule 9019 or any other provision that precludes the Court from approving negotiated agreements resolving disputed issues, whether or not they are fully ripe for Article III purposes. (*Id.*) The United States argues that equity supports accepting the Settlement because rejecting the Settlement would lead to the inequitable result that the Trust either would have to accept costly funding from the Private Funders to the financial detriment of the trust beneficiaries, or it would run out of funds and thus, fail to achieve any recovery. (*Id.*)

Additionally, the United States argues that Kempner's objection does not give any weight to the judgment of the Committee and its counsel, who have been involved in the bankruptcy from its inception. (*Id.* ¶ 21.)

### E.    Trust Administrator's Reply to River Birch Objection

The Trust Administrator argues that River Birch lacks standing under section 1109 of the Bankruptcy Code because it is not a "party in interest." (Trust Reply to River Birch Obj. ¶ 8.) Furthermore, according to the Trust Administrator, the risk of litigation arising from a potential breach of the Private Litigation Funding Agreement is not a factor that should be considered by the Court in reviewing the Motion. (*Id.* ¶ 10.)

The Trust Administrator argues that the Private Litigation Funding Agreement was properly terminated because the Settlement provides funds on terms that are materially more favorable to the Trust. (*Id.* ¶11.) The Settlement provides funds without any interest or other costs while under the Private Litigation Funding Agreement, the cost of the funds, according to the Trust Administrator, would range from approximately $18.75 million to $56 million. (*Id.* ¶ 13.) The Trust Administrator further argues that River Birch Capital mischaracterizes the

13

allocation of 30% of the Avoidance Action Proceeds to the DIP Lenders as a cost of the

Settlement.  (*Id.* ¶ 14.)

In a similar vein, the Trust Administrator notes that the mandate of the Trust is to

maximize the proceeds for the beneficiaries of the Trust, who are either the unsecured creditors

or the DIP Lenders or both.  (*Id.* ¶ 15.)  The Settlement achieves that goal, because unlike the

Private Litigation Funding Agreement, it provides funds to the Trust free of cost.  (*Id.*  ¶ 18.)

The Trust Administrator argues that the Settlement is consistent with the Trust's requirement to

deal impartially with all of its beneficiaries because all beneficiaries, the unsecured creditors as

represented by the Committee and the DIP Lenders, agree that the Settlement is materially more

favorable to the Trust.  (*Id.*)

## F.    Trust Administrator's Reply to Kempner Objection

The Trust Administrator rejects Kempner's argument that funding under the Private

Litigation Funding Agreement is more favorable to the Trust than that under the Settlement.

(Trust Reply to Kempner Obj. ¶ 6.)  The Trust Administrator argues that the Settlement, by

providing cost-free funds to the Trust, maximizes the proceeds available collectively to the

beneficiaries of the Trust.  (*Id.*)  The Trust Administrator notes that it has not participated in the

Allocation Dispute because it remains neutral with respect to the allocation of the proceeds

between the DIP Lenders and the unsecured creditors.  (*Id.* ¶ 8.)

## G.    Omnibus Reply

The Committee argues that the issue before the Court is not whether the Private

Litigation Funding Agreement is better than the Litigation Cost Advance; rather, the issue is

whether the Court should approve the Settlement in which the DIP Lenders and unsecured

creditors get 30% and 70% of the proceeds, respectively.  (Omnibus Reply ¶¶ 2–3.)

14

The Committee discusses at length the seven non-exclusive factors that a court should

consider in deciding whether to approve a bankruptcy settlement, set forth in the Second

Circuit's decision in *Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium*

*Operating LLC)*, 478 F.3d 452 (2d Cir. 2007) (the "*Iridium* factors").  According to the

Committee, the *Iridium* factors establish that the Settlement is reasonable and should be

approved.  (Omnibus Reply ¶ 9.)  The Committee argues with respect to the first *Iridium*

factor—"the probability of success versus the concrete benefits of settlement"—that the

Settlement provides the concrete benefit that unsecured creditors would receive 70% of the

Avoidance Action proceeds.  Litigation of the Allocation Dispute carries the risk that the

Committee would get a lower proportion of proceeds from a successful outcome of the Litigation

Trust Avoidance Action.  Furthermore, the Committee argues that the issues raised in the appeal

of the Decision illustrate that winning in the Allocation Dispute is not a forgone conclusion.  (*Id.*

¶¶ 10–22.)

With respect to the second *Iridium* factor—"the likelihood of complex and protracted

litigation"—the Committee argues that, because of the District Court Decision, it may be unable

to restart litigation of the Allocation Dispute until after it the completion of the Term Loan

Avoidance Action.  (*Id.* ¶ 26.)  The Committee contends that full resolution of the Allocation

Dispute may take a long time and delay payment to the unsecured creditors.  (*Id.*)  The proposed

Settlement, on the other hand, would, by avoiding that litigation, bring finality and certainty.

(*Id.*)

With respect to the third and fourth *Iridium* factors—"the paramount interests of the

creditors" and "whether other parties in interest support the settlement"—respectively, the

Committee contends that the Settlement should be approved since the Committee, which is

15

charged with the paramount interest of creditors, itself negotiated the Settlement.  (*Id.* ¶ 27.)
Furthermore, the Committee argues that the objections of Kempner and River Birch should be
discounted because both have financial interests in the Private Litigation Funding Agreement.[3]
(*Id.*)  The Committee argues that the absence of objections to the Settlement by any other
creditors speaks in favor of the Settlement.  (*Id.*)

With respect to the fifth *Iridium* factor—the "competency and experience of counsel
supporting [the Settlement]"—the Committee explains that the counsel for the Committee has
been involved for six years in the Allocation Dispute while this is the first appearance in this
matter for counsels for River Birch and Kempner.  (*Id.* 28.)  With respect to the sixth *Iridium*
factor—"the extent to which the settlement is the product of arm's length bargaining"—the
Committee demonstrates that it negotiated the Settlement, at arm's length, over a period of
months.  (*Id.* ¶ 29.)

The Committee rejects Kempner's argument that the Court does not have authority to
approve the Settlement and argues that ripeness has no bearing on whether the Court can approve
the Settlement.  (*Id.* ¶ 31.)

## II.    DISCUSSION

Settlements and compromises are favored in bankruptcy as they minimize costly
litigation and further parties' interests in expediting the administration of the bankruptcy estate.
*Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).  Under Rule 9019 of the
Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the court has the authority to
"approve a compromise or settlement."  FED. R. BANKR. P. 9019(a).  A court must determine that
a settlement under Bankruptcy Rule 9019 is fair, equitable, and in the best interests of the estate

---

[3]    Kempner has acknowledged during the Hearing that, in addition to being an unsecured claimant, it holds a
25% interest in the Private Litigation Funding Agreement.

before it may approve a settlement. *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493,

496 (Bankr. S.D.N.Y. 1991) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer

Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see also Topwater Exclusive Fund III, LLC

v. SageCrest II, LLC (In re SageCrest II)*, Nos. 3:10cv978 (SRU), 3:10cv979 (SRU), 2011 WL

134893, at *8–9 (D. Conn. Jan. 14, 2011); *Cousins v. Pereira (In re Cousins)*, No. 09 Civ.

1190(RJS), 2010 WL 5298172, at *3 (S.D.N.Y. Dec. 22, 2010); *In re Chemtura Corp.*, 439 B.R.

561, 593–94 (Bankr. S.D.N.Y. 2010); *In re Lehman Bros. Holdings*, 435 B.R. 122, 134

(S.D.N.Y. 2010).

A court's responsibility is to "canvass the issues and see whether the settlement falls

below the lowest point in the range of reasonableness." *Chemtura*, 439 B.R. at 594 (quoting *In

re W.T. Grant, Co.*, 699 F.2d 599, 608 (2d Cir. 1983)) (internal quotations omitted). But the

court is not required to go so far as to conduct a trial on the terms to approve a settlement.

*See id.* Before making a determination, however, the court must inform itself of "all facts

necessary for an intelligent and objective opinion of the probabilities of ultimate success should

the claim be litigated." *O'Connell v. Packles (In re Hilsen)*, 404 B.R. 58, 70 (Bankr. E.D.N.Y.

2009) (internal quotations omitted) (quoting *TMT Trailer Ferry*, 390 U.S. at 424). Although

courts have discretion to approve settlements, the business judgment of the debtor in

recommending the settlement should be factored into the court's analysis. *See JP Morgan Chase

Bank, N.A. v. Charter Commc'ns Operating LLC (In re Charter Commc'ns)*, 419 B.R. 221, 252

(Bankr. S.D.N.Y. 2009). "At the same time, a court may not simply defer to a debtor in

possession's judgment, but must independently evaluate the reasonableness of the settlement."

*In re Rosenberg*, 419 B.R. 532, 536 (Bankr. E.D.N.Y. 2009) (citations omitted). In addition,

courts may give weight to the opinion of bankruptcy counsel supporting the settlement. *See id.*

17

("In [approving the settlement agreement], the court is permitted to rely upon 'opinions of the

trustee, the parties, and their attorneys.'"); *Chemtura*, 439 B.R. at 594.

To that end, courts have developed standards to evaluate if a settlement is fair and

equitable and identified factors for approval of settlements based on the original framework

announced in *TMT Trailer Ferry, Inc.*, 390 U.S. 414 (1968).  The Second Circuit outlined the

test for consideration of settlements under the Bankruptcy Rules in *Iridium Operating LLC*, 478

F.3d at 462.  The factors to be considered are interrelated and require the court to evaluate:

> (1) the balance between the litigation's possibility of success and
> the settlement's future benefits; (2) the likelihood of complex and
> protracted litigation, "with its attendant expense, inconvenience,
> and delay," including the difficulty in collecting on the judgment;
> (3) "the paramount interests of the creditors," including each
> affected class's relative benefits "and the degree to which creditors
> either do not object to or affirmatively support the proposed
> settlement;" (4) whether other parties in interest support the
> settlement; (5) the "competency and experience of counsel"
> supporting, and "[t]he experience and knowledge of the
> bankruptcy court judge" reviewing, the settlement; (6) "the nature
> and breadth of releases to be obtained by officers and directors;"
> and (7) "the extent to which the settlement is the product of arm's
> length bargaining."

*Id.* (internal citations omitted).

## A.    Approval of the Settlement Maximizes Recovery to Trust Beneficiaries

At the outset, it is important to focus on what is and what is not before the Court.  The

Court here is asked to approve the Settlement which would, among other things, bring the

Allocation Dispute to a final resolution.  Approval of the Settlement also results in the DIP

Lenders providing an interest-free $15 million Litigation Cost Advance to fund the Trust, the

Committee's required condition for entering into the Settlement.  The Court is not asked to

choose the *better* deal as between the Private Litigation Funding Agreement and the Settlement.

Rather, the Court's task is to determine the reasonableness of the Settlement.  While the terms of

the Private Litigation Funding Agreement do inform the Court's assessment of the

reasonableness of the Settlement, the Court's task is to determine whether the Settlement is

within the "range of reasonableness." On this score, the Court's conclusion is a clear yes.

Moreover, as explained below, the Trust's decision to terminate the Private Litigation Funding

Agreement in favor of pursuing interest-free funding from the DIP Lenders is sound.

The function of the Trust is to maximize recoveries for distribution to creditors with

entitlements to distributions of the Trust's assets. The allocation of those proceeds, determined

in accordance with the confirmed Plan, is not an issue for the Trust Administrator. The Trust

Administrator acts as the fiduciary for all creditors who have claims on the proceeds from the

Term Loan Avoidance Action. Maximizing the Trust's assets depends on recovery, if any, from

the Term Loan Avoidance Action, less any of the Trust's administrative expenses. One of those

expenses is the cost of prosecuting the Term Loan Avoidance Action.

Because the Trust's assets available to pay expenses are projected to be insufficient to

prosecute the Term Loan Avoidance Action, the Trust has concluded that it needs to borrow

funds to accomplish its objective. (*See* Gonzalez Decl. ¶ 4.) The Trust conducted an auction

process to obtain litigation funding on the best possible terms. At the conclusion of the process,

the Trust entered into the Private Litigation Funding Agreement, entitling the Trust to borrow up

to $15 million. The Private Litigation Funding Agreement permitted the Trust to terminate the

agreement if it obtained funding from the DIP Lenders on more favorable terms. Funding on

better terms became available when the Committee negotiated the Settlement of the long

standing Allocation Dispute with the DIP Lenders. The Settlement, if approved, enables the

Trust to borrow at no cost—clearly better terms than those in the Private Litigation Funding

Agreement that requires the Trust to pay the Private Funder a return that is the greater of 2.25

times the amount of the funds drawn or 4.75% of the aggregate proceeds of the Term Loan

Avoidance Action.  (*See* Private Litigation Funding Agreement § 1.1 at 5, 6.)[4]  Therefore, the

Trust fulfilled its fiduciary duty when it terminated the Private Litigation Funding Agreement.

Terminating that agreement may or may not result in litigation with the Private Funder, but even

considering that risk, the Trust acted prudently in opting for the DIP Lender's funding at no cost

to the Trust.

The Court rejects Kempner's argument that the Settlement imposes a cost of 30% of the

proceeds from the Term Loan Avoidance Action on the Trust.  (*See* Kempner Obj. ¶¶ 7, 21.)

The Trust takes no position on the allocation issue between the DIP Lenders and the Committee,

explaining that its fiduciary duty is to all claimants entitled to Trust distributions.  (*See* Trust

Reply to Kempner Obj. ¶ 15.)  The Trust cannot take sides on who has the right to what

entitlement.  From the Trust's standpoint, though, the issue is which funding arrangement

provides better terms for the Trust.  The DIP Lender's funding is clearly superior for the Trust

because it is costless while the Trust would have to pay interest and other fees to the Private

Lender if it borrowed under the Private Litigation Funding Agreement.  The Trust does not have

to impute some portion of the allocation settlement to the funding cost because the Trust is

neutral as to how the Allocation Dispute is resolved—the Trust's focus is obtaining funding at

the lowest cost to it.

### B.    The Settlement is within the "Range of Reasonableness"

The Court finds that the Settlement, which, among other things, allocates 30% of the net

proceeds from the Term Loan Avoidance Action to the DIP Lenders and 70% to the unsecured

creditors, is "within the range of reasonableness."

---

[4]      Under the Private Litigation Funding Agreement, the cost of the funds, according to the Trust
Administrator, would range from approximately $18.75 million to $56 million.  (Trust Reply to River Birch Obj. ¶
13.)

The *Iridium* factors guide this Court's analysis.  Not all factors must point in the same direction, and not all factors must be given the same weight.  The Court considers each of these factors, in turn, below.

The first factor requires the Court to consider "the balance between the litigation's possibility of success and the settlement's future benefits."  *Iridium*, 478 F.3d at 462 (citation omitted).  This factor presents the closest question in the required analysis.  The starting point is Judge Gerber's Decision—now vacated—granting the Committee summary judgment determining that the DIP Lenders were not entitled to any proceeds from any recovery in the Term Loan Avoidance Action.  The District Court Decision vacated the Decision on jurisdictional grounds but not on the merits.  *See Official Comm. of Unsecured Creditors of Motors Liquidation Co.*, 475 B.R. at 367.  Reviewing the Decision, the Court concludes that Judge Gerber's Decision is persuasive but not preclusive.  But if this Court reached the same decision again, once the issues are properly presented for decision, this Court's decision would be far from the last word.

Kempner argues that in order to justify the Settlement, the Committee would have to convince the Court that it bears a significant enough risk of losing a re-litigation of the Allocation Dispute to justify giving up 30% of the general unsecured creditor's recovery from the Term Loan Avoidance Action.  (Kempner Obj. ¶ 10.)

However, the role of this Court is not to second-guess the business decision of the Committee; rather, the Court is only to "see whether the settlement falls below the lowest point in the range of reasonableness."  *Chemtura*, 439 B.R. at 594.  The Settlement was negotiated by very experienced counsel, at arm's length, and approved by the Committee's members after due deliberations.  (*See* Mayer Decl. ¶¶ 4–27.)

The DIP Lenders identify several legal and factual issues that they argue were incorrectly resolved in the Decision, and which may allow them to prevail on a re-litigation of the Allocation Dispute. (*See* Treasury Response ¶ 21.) It is entirely possible that the Committee will lose the Allocation Dispute. The DIP Lenders estimated during the Hearing that the unpaid balance of the DIP Loans is $814 million. If the DIP Lenders prevail in the Allocation Dispute, that balance would have to be repaid in full from the proceeds of any recovery from the Term Loan Avoidance Action before the unsecured creditors can recover anything. That this Court might assess the Committee's possibility of success as greater than 70% does not determine the outcome of the Motion. The issue here is whether the Settlement is "below the lowest point in the range of reasonableness."[5] *Chemtura*, 439 B.R. at 594.

The Settlement offers the concrete benefit that it would resolve a long standing dispute between the DIP Lenders and the Committee. Additionally, as a result of the Settlement, the Trust would obtain a costless litigation advance, which is clearly better than the funding under the Private Litigation Funding Agreement that it would otherwise have had to rely upon. On balance, while it is a very close question, the Court concludes that the first *Iridium* factor weighs slightly in favor of approving the Settlement.

The second *Iridium* factor, requiring the Court to consider "the likelihood of complex and protracted litigation," weighs in favor of the Settlement. *Iridium*, 478 F.3d at 462 (citation omitted). As explained above, in the absence of the Settlement, the Committee would need to re-litigate the Allocation Dispute. Even if this Court (and an appellate court) were to find Judge Gerber's Decision persuasive, the DIP Lenders are committed litigants—the $814 million remaining unpaid balance on the DIP Loans is a lot of money to fight about. There would likely

---

[5]    The Committee may well have pegged the possibility of success as greater than 70%. The other factors, particularly the likelihood of complex litigation, may have lowered the range of reasonableness.

be a lengthy trial and appeals process in the Allocation Dispute, which could very well delay

payment to the unsecured creditors, assuming a successful outcome in the Term Loan Avoidance

Action.  Furthermore, the Committee argues that there may be further delays in paying the

unsecured creditors; because of the District Court Decision, the Committee might be unable to

restart the Allocation Dispute litigation until after the Term Loan Avoidance Action is resolved.

(Omnibus Reply ¶ 26.)  The Settlement avoids all of these re-litigation risks.

The third *Iridium* factor, requiring the Court to consider "the paramount interests of the

creditors," is inconclusive.  *Iridium*, 478 F.3d at 462 (quotations and citations omitted).  Under

the Settlement, the unsecured creditors would give up 30% of the net proceeds from the Term

Loan Avoidance Action to the DIP Lenders.  Although the DIP Lenders would provide interest-

free funding to the Trust under the Settlement, if instead the Committee prevails again in the

Allocation Dispute, the net cost of the Settlement to unsecured creditors is higher than if there is

no Settlement and the litigation funding is provided under the Private Litigation Funding

Agreement.  (*See* Kempner Obj. ¶ 7.)  Of course, the DIP Lenders are creditors as well, still

owed $814 million, with a legitimate interest in recovering the unpaid balance of the DIP Loans.

The Trust correctly takes no position on entitlements, viewing its proper role as maximizing the

recovery for all creditors entitled to receive a share of any recovery from the Term Loan

Avoidance Action.  On the other hand, for the Creditors Committee, the Settlement avoids both

the delay and the risk of losing a re-litigation of the Allocation Dispute.  Furthermore, the fact

that the Committee, which is charged with guarding the paramount interests of the creditors,

itself negotiated the Settlement supports the view that the Settlement is in the best interests of

unsecured creditors.  (Omnibus Reply ¶ 27.)

The fourth *Iridium* factor, requiring the Court to consider "whether other parties in interest support the settlement," weighs in favor of the Settlement. *Iridium*, 478 F.3d at 462 (citations omitted).  The fact that no creditor other than Kempner, which has a private financial interest against the Settlement, opposes the Settlement supports approving it.  The Court credits the Mayer Declaration which demonstrates that the Settlement was the result of a fair and reasonable process that involved arm's length bargaining.  (Mayer Decl. ¶¶ 4–27.)  As such, the only objections are from parties that have a private financial interest in the Private Litigation Funding Agreement.

The fifth and seventh *Iridium* factors, respectively, require the Court to consider the "competency and experience of counsel supporting [the Settlement] and the experience and knowledge of the bankruptcy court judge," and the "extent to which the settlement is product of arm's length bargaining." *Iridium*, 478 F.3d at 462 (quotations and citations omitted).  Based on the representations in the Motion and the Mayer Declaration, these factors support approving the Settlement.  (*See* Mot. ¶ 52; Mayer Decl. ¶¶ 4–27.)  The Committee and DIP Lenders are both represented by excellent counsel who have been involved in this matter for over six years and the Settlement is the result of arms' length bargaining and thoughtful deliberations over a period of months.

The sixth *Iridium* factor, concerning "the nature and breadth of releases to be obtained by officers and directors," is irrelevant in the instant case. *Iridium*, 478 F.3d at 462 (quotations omitted).

The Court concludes that the Movants have established that the Settlement is within the range of reasonableness and should be approved by the Court.

24

09-50026-mg    Doc 13744    Filed 08/24/16    Entered 08/24/16 03:12:53    Main Document
Pg 28 of 46

### III.    CONCLUSION

For the reasons explained above, the Court **GRANTS** the Motion.

**IT IS SO ORDERED.**

Dated:    August 24, 2016
         New York, New York

_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge

## Exhibit  B

## (Stipulation and Order)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

In re:                                                          Chapter 11

MOTORS LIQUIDATION COMPANY, *et al.*,        Case No. 09-50026 (MG)
f/k/a General Motors Corp., *et al.*,

                                                                (Jointly Administered)

                     Debtors,


------------------------------------------------------------------------X


### STIPULATION AND AGREED ORDER (I) SETTLING DISPUTED ENTITLEMENTS OF DEBTOR-IN-POSSESSION LENDERS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO POTENTIAL TERM LOAN AVOIDANCE ACTION PROCEEDS, AND (II) MODIFYING AVOIDANCE ACTION TRUST AGREEMENT TO IMPLEMENT SETTLEMENT

This Stipulation and Agreed Order (this "**Stipulation and Order**") is made and entered

into on the date hereof by and among (i) the United States Department of the Treasury and

Export Development Canada (together, the "**DIP Lenders**"); (ii) the Official Committee of

Unsecured Creditors of Motors Liquidation Company (the "**UCC**"); and (iii) the Motors

Liquidation Company Avoidance Action Trust (the "**AAT**"), through Wilmington Trust

Company, as Avoidance Action Trust Administrator and Trustee, and Arthur J. Gonzalez, as

Avoidance Action Trust Monitor.


### RECITALS

A.      The DIP Lenders provided debtor-in-possession financing ("**DIP Financing**") to

the Motors Liquidation Company bankruptcy estate (the "**Estate**"), including, without limitation,

a $1.175 billion credit facility (the "**Wind-Down Facility**") to fund the wind-down of the Estate

after the sale of substantially all the Estate's assets to an entity now known informally as New

GM.

1

B.      As part of the DIP Financing, the DIP Lenders were granted, among other things, a superpriority administrative expense claim on account of the Wind-Down Facility in a total amount of $1.175 billion.

C.      The DIP Lenders also received certain security interests on account of the Wind-Down Facility, but agreed to exempt solely from the collateral that secured the Wind-Down Facility any interest in, among other things, the future proceeds from a pending adversary proceeding styled *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A., et al.*, Adv. Pro. No. 09-504 (Bankr. S.D.N.Y.) (the "**Term Loan Avoidance Action**"), which the UCC was then authorized to pursue on behalf of the Estate.

D.      The Term Loan Avoidance Action remains pending and, pursuant to the Debtors' Second Amended Joint Chapter 11 Plan dated March 18, 2011 (the "**Plan**") and the Amended and Restated Avoidance Action Trust Agreement dated as of May 11, 2012 (the "**Avoidance Action Trust Agreement**"), is now being prosecuted by the AAT, with allocation of proceeds to be determined either by mutual agreement between the DIP Lenders and the UCC or by future order of this Court.  *See* Notice of Amendment and Restatement of Motors Liquidation Company Avoidance Action Trust Agreement (ECF No. 11704).

E.      The DIP Lenders maintain that their superpriority administrative expense claim reaches any and all proceeds of the Term Loan Avoidance Action.

F.      The UCC disputes the DIP Lenders' entitlement to any of the funds recovered by the AAT through the Term Loan Avoidance Action.  The UCC further asserts that the DIP Lenders agreed not to be repaid from Term Loan Avoidance Action proceeds and any such recovery should be distributed to unsecured creditors whose interests are represented by the UCC.

2

G.      The UCC commenced an adversary proceeding in the Bankruptcy Court

(the "**DIP/UCC Proceeding**") against the DIP Lenders, by which the UCC sought a declaratory

judgment on this issue, resulting in a ruling in favor of the UCC by this Court on November 28,

2011. *See Official Committee of Unsecured Creditors of Motors Liquidation Company v. United*

*States Department of the Treasury (In re Motors Liquidation Company)*, 460 B.R. 603 (Bankr.

S.D.N.Y. 2011)).  The DIP Lenders appealed this ruling to the United States District Court for

the Southern District of New York, which entered an opinion and order vacating the Bankruptcy

Court's decision, and remanded the matter.  *See United States Department of the Treasury v.*

*Official Committee of Unsecured Creditors of Motors Liquidation Company*, 475 B.R. 347

(S.D.N.Y. 2012).  No further applications or proceedings have occurred since the matter was

remanded.

H.      The DIP Lenders and the UCC wish to resolve their dispute as to entitlements to

proceeds of the Term Loan Avoidance Action based on the terms set forth herein and without the

burden, expense, and uncertainty of further litigation.  As a condition of such settlement, the DIP

Lenders have agreed to provide certain additional funding to the AAT in respect of the Term

Loan Avoidance Action expressly on terms provided herein.

I.      The AAT previously received certain funding to prosecute the Term Loan

Avoidance Action, including from the DIP Lenders, but now requires additional funding to

further prosecute this action.  The AAT consents to both (i) the terms of this Stipulation and

Order and (ii) the terms of the Litigation Cost Advance (as defined therein) set forth in the

agreement (the "**Agreement**") annexed hereto as <u>Exhibit A</u>.  Each of the AAT, the DIP Lenders

and the UCC also consents to certain modifications to the Avoidance Action Trust Agreement as

contemplated herein and in the Agreement, and as may be necessary to implement the provisions

of this Stipulation and Order and the Agreement, including but not limited to the financing

arrangements, lien rights and allocation of litigation proceeds set forth herein.

It is therefore hereby STIPULATED, AGREED AND, UPON COURT APPROVAL

HEREOF, IT SHALL BE ORDERED that:

1.      The terms contained herein, including in the Agreement annexed hereto, are

hereby approved in all respects and are incorporated herein and made a part hereof.  The DIP

Lenders and the AAT are authorized to implement such terms as they deem necessary, including,

without limitation, through amendments to the Avoidance Action Trust Agreement, without

further order of this Court.

2.      Upon entry of this Stipulation and Order, the DIP Lenders shall advance $15

million to the AAT (the "Litigation Cost Advance") on terms and conditions provided herein and

in the Agreement.  The AAT shall repay such $15 million advance to the DIP Lenders consistent

with the terms of the Agreement and those Avoidance Action Trust Agreement modifications

implemented pursuant to the terms set forth herein and in the Agreement.

3.      Notwithstanding the waterfall priorities set forth in the current version of Sections

5.1(d)(iii) and (iv) of the Avoidance Action Trust Agreement, if and when the AAT has

Distributable Trust Assets,[1] and following the repayment of all DIP Lender Advances (including

the Litigation Cost Advance) and GUC Trust Advances in accordance with Sections 5.1(d)(i) and

5.1(d)(ii) of the Avoidance Action Trust Agreement, the DIP Lenders shall be entitled to receive

thirty (30%) percent of all remaining Distributable Trust Assets, and holders of Allowed General

Unsecured Claims (or Units) shall be entitled to receive seventy (70%) percent of all remaining

Distributable Trust Assets, with each such distribution to the DIP Lenders and holders of

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Avoidance Action Trust Agreement.

Allowed General Unsecured Claims (or Units) to be made on a pari passu basis. The parties

shall work in good faith to amend the Avoidance Action Trust Agreement to incorporate the

foregoing settlement.

4.        This Stipulation and Order, the Agreement and the payments and obligations

required thereby are in full satisfaction, settlement and release of the DIP Lenders' and UCC's

(and their respective predecessors', successors', agents' and assigns') respective claims and

defenses against one another in connection with the DIP/UCC Proceeding.

5.        The DIP Lenders are hereby granted, consistent with the terms contained in the

Agreement and without filing or further action required by the DIP Lenders, a first priority,

perfected continuing security interest in and lien on the Avoidance Action Proceeds and the

Funding Account (as defined in the Agreement), up to the amount of the Litigation Cost

Advance. Notwithstanding anything herein, in any other order of this Court or any agreement of

the AAT or any other person or entity, in each case, whether entered before or after the date

hereof, by the approval of this Stipulation by this Court, this Court hereby orders that no person

or entity shall be granted any liens or security interests of any type or nature against the Term

Loan Avoidance Action and/or the Avoidance Action Proceeds unless the DIP Lenders have

provided written consent (which consent shall not be unreasonably withheld) of such liens (and

any liens and/or security interests granted without the express written consent of the DIP Lenders

shall be null and void and of no power or effect).

6.        Other than the rights of Avoidance Action Trust Beneficiaries under the terms of

the Avoidance Action Trust Agreement (which shall be amended as set forth in paragraph 3

above), this Stipulation and Order does not grant third-party beneficiaries any additional rights to

enforce the terms of this Stipulation and Order.

7.      Except as provided herein, each party to this Stipulation and Order bears its own costs and fees in connection with any and all litigation, dispute, negotiation, or analysis concerning their respective entitlements to proceeds of the Term Loan Avoidance Action, and/or in connection with the provision of additional funding to the AAT as provided for herein.

8.      This Stipulation and Order (with exhibits if any) represents the entire agreement of the parties hereto.  No prior discussions or communications form any part of such agreement.

9.      Each signatory to this Stipulation and Order represents that he or she is authorized to bind his or her client, and does so bind his or her client.

10.     No party's agreement to this Stipulation and Order is or shall be construed as an admission of liability or culpability of any kind, nor of any fact alleged or argument asserted by any other party.

11.     This Court shall have exclusive jurisdiction over any and all disputes arising out of or otherwise relating to this Stipulation and Order.

12.     This Stipulation and Order is conditioned upon this Court's approval, and if not so approved, is null and void, with no force or effect.

13.     In the event this Stipulation and Order is vacated by a court of competent jurisdiction, the AAT's obligation to repay any and all advances made pursuant to this Stipulation and Order shall mature, and the DIP Lenders shall be entitled to immediate, first priority repayment from the first to become available of either (a) replacement financing or (b) Distributable Trust Assets, excluding from Distributable Trust Assets the amount of cash on hand on the day this Stipulation and Order is entered.  The AAT shall be obligated to promptly seek, and shall use its best efforts to obtain, replacement financing for the purpose of repaying the DIP Lenders.  The obligation to repay the DIP Lenders in accordance with this paragraph

shall be secured by the lien granted pursuant to Paragraph 5 above.  Further, this paragraph is severable from the rest of this Stipulation and Order.

14.    Upon repayment by the AAT of all advances to the DIP Lenders that were made pursuant to this Stipulation and Order in accordance with Paragraph 13 above, the provisions of Paragraph 3 and 4 of this Stipulation and Order shall be null and void, with no force and effect.

15.    The Avoidance Action Trust Agreement shall be amended to conform with this Stipulation and Order, specifically including with respect to the relative priority of the AAT's obligations to repay to the DIP Lenders any advances made pursuant to this Stipulation and Order.  In the event the provisions in Paragraph 3 of this Order are vacated or deemed null and void, the Avoidance Action Trust Agreement shall be further amended to remove the allocation of the remaining Distributable Trust Assets between the DIP Lenders and holders of Allowed General Unsecured Claims (or Units) as set forth in Paragraph 3.

Dated:  New York, New York
        July 14, 2016


**UNITED STATES DEPARTMENT OF THE TREASURY**
PREET BHARARA
United States Attorney for the Southern District of New York
Counsel for United States Department of the Treasury


By: /s/David S. Jones
DAVID S. JONES
JOSEPH CORDARO
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Tel.:  (212) 637-2739/2745
Fax:  (212) 637-2730
Email:  David.Jones6@usdoj.gov
        Joseph.Cordaro@usdoj.gov

**EXPORT DEVELOPMENT CANADA**

By: /s/Sean Mitchell
Title: Principal

By: /s/Janet Boyd
Title: Loan Portfolio Manager

With respect to the Litigation Cost Advance and modifications of the Avoidance Action Trust
Agreement:

BINDER & SCHWARTZ LLP

/s/Eric B. Fisher
Eric B. Fisher
Neil S. Binder
Lindsay A. Bush
Lauren K. Handelsman
366 Madison Avenue, 6th Floor
New York, New York 10017
Tel: (212) 510-7008
*Attorneys for the Motors Liquidation Company Avoidance Action Trust*

With respect to the settlement of the DIP/UCC Proceeding:

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MOTORS
LIQUIDATION COMPANY**
KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/Thomas Moers Mayer
Thomas Moers Mayer
Robert T. Schmidt
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax.: (212) 715-8000

**IT IS SO ORDERED.**

Dated:    August 30, 2016
              New York, New York

                                                                        **/s/Martin Glenn**
                                                                        MARTIN GLENN
                                                        United States Bankruptcy Judge

**EXHIBIT A**

# AGREEMENT

## Motors Liquidation Company Avoidance Action Trust
## $15,000,000 Litigation-Related Advance

### July 14, 2016

The signatory parties hereto agree as follows with respect to a proposed advance of fifteen million dollars ($15,000,000.00) (the "**Litigation Cost Advance**") to be provided by the Motors Liquidation Company ("**MLC**") debtor-in-possession lenders (the "**DIP Lenders**") to the MLC Avoidance Action Trust (the "**Trust**") on conditions described herein. This agreement (this "Agreement") arises in connection with, and is conditioned upon approval by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") of, the settlement of litigation between the DIP Lenders, on the one hand, and the MLC Official Committee of Unsecured Creditors (the "**Committee**"), on the other hand. Finalization and Bankruptcy Court approval of that settlement is a condition precedent to the DIP Lenders' obligation to provide the contemplated Litigation Cost Advance, which is a contemplated term of that settlement. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Amended and Restated Motors Liquidation Company Avoidance Action Trust Agreement (the "**Trust Agreement**").

1.  **DIP Lenders:** United States Department of the Treasury and Export Development Canada, in relative proportion

2.  **AAT:** Motors Liquidation Company Avoidance Action Trust

3.  **Litigation Cost Advance Amount:** $15,000,000

4.  **Permitted Uses:** Section 1.1(e) of the Trust Agreement shall be amended to include the Litigation Cost Advance proceeds as part of Avoidance Action Trust Administrative Cash and such funds may be used as provided in the Trust Agreement.

5.  **Availability:** The Litigation Cost Advance shall be made available on the Closing Date through a single funding to a segregated account in the name of the Trust (the "**Funding Account**"). The Funding Account shall be established at a bank reasonably acceptable to the Trust and the DIP Lenders. The Litigation Cost Advance is one term of a proposed litigation settlement between the DIP Lenders and the Committee ("**Litigation Settlement**"), and the DIP Lenders' agreement to provide the Litigation Cost Advance shall be expressly conditioned upon, and shall not precede or arise in the absence of, approval by the Bankruptcy Court of such Litigation Settlement that includes the terms contained in this Agreement.

6.  **Security:** The Litigation Cost Advance shall be secured by a first priority lien over the Funding Account and the Avoidance Action Proceeds. The grant of such liens shall be included in the Bankruptcy Court order approving the Litigation Cost Advance. The Funding Account shall also be subject to a deposit account control agreement acceptable to the DIP Lenders and the AAT.

7.  **Budgets:** The DIP Lenders shall receive annual Budgets and quarterly updates in accordance with Section 6.3 of the Trust Agreement. The quarterly updates shall reconcile actual expenditures with projections that had been included in the relevant Budget, and, if and when the

1

Trust identifies a need for or the occurrence of actual expenditures that materially differ from the relevant Budget, they will notify the DIP Lenders as promptly as practicable, and no later than 15 days after identifying the issue.

8.   **Invoices:** Section 8.3(b) of the Trust Agreement shall be amended to provide that Trust Professionals and any other persons entitled to payment from the Trust (other than the Trust Administrator and the Trust Monitor) shall be required to submit reasonably detailed invoices on a monthly basis to the Trust Administrator, the Trust Monitor and the DIP Lenders, including in such invoices a description of the work performed, the individuals who performed such work, and the hourly rate of such person, plus an itemized statement of expenses for which payment is sought.  Invoices submitted to the DIP Lenders may be in a form reasonably necessary to protect the attorney-client privilege.  For the avoidance of doubt, any and all payments by the Trust from funds that originated from the Litigation Cost Advance or that are contained in the Funding Account shall be subject to this invoice disclosure requirement.  No payment on account of such invoices shall be made until 15 days after presentation of the invoices to the DIP Lenders.  The Trust Administrator shall timely pay all such invoices that are not disputed by the Trust Administrator or the Trust Monitor.  If either or both of the DIP Lenders have questions or concerns about any invoice  submitted to the Trust, or about any other issue relating to the Trust's finances or administration, they shall be entitled to discuss the matter with the Trust Monitor, as well as with the Trust Administrator and/or counsel for the Trust, as appropriate, and the Trust Monitor will consult with the DIP Lenders and give good faith consideration to any objection that the DIP Lenders raise before approval of payment by the Trust Administrator or non-objection by the Trust Monitor.  The Trust Monitor, Trust Administrator, and/or counsel for the Trust, as appropriate, will engage in good faith discussions and attempt in good faith to provide information reasonably requested by either or both DIP Lenders.

9.   **Funding Account Records; Reporting:**  The bank administering the Funding Account shall be required to provide the DIP Lenders with account statements for the Funding Account, and shall be required to provide immediate access to any or all Funding Account records upon request by either or both of the DIP Lenders.  Additionally, the Trust shall provide periodic and timely reporting to the DIP Lenders, on terms to be agreed upon, regarding the prosecution of the Term Loan Avoidance Litigation.

10.  **Draws:**  Prior to the Maturity Date (as defined below), and subject to the requirements of paragraph 8 hereof, the Trust shall be entitled to make withdrawals from the Funding Account at any time and in any amount determined by the Trust Administrator to be reasonable and appropriate to meet the needs of the Trust and not inconsistent with the terms and requirements of the Trust Agreement as amended hereby.  Amounts not drawn shall remain in the Funding Account.  Any amounts not withdrawn by the Maturity Date shall be returned to the DIP Lenders.

11.  **Repayment:**  As stated above, Section 1.1(e) of the Trust Agreement shall be amended to include the Litigation Cost Advance in the defined term "Avoidance Action Trust Administrative Cash," which will carry through to the definition of "DIP Lender Advances."  An amount equal to the Litigation Cost Advance <u>less</u> any amounts returned to the DIP Lenders pursuant to paragraph 10 of this Agreement plus any other DIP Lender Advances, shall be repaid to the DIP Lenders first out of any Distributable Trust Assets in accordance with Section 5.1(d) of the Trust Agreement.

12.  **No Additional Indebtedness or Liens:**  Except as provided in this paragraph 12, the Trust may not incur additional indebtedness, whether unsecured or secured by any interest (including a security interest) in the Term Loan Avoidance Action or Avoidance Action Proceeds without the prior written consent of the DIP Lenders, except that the Trust may incur expenses in the ordinary

2

course of the Trust's business provided no lien or right of setoff is attached thereto. In the event that the Trust seeks other litigation funding, (a) the DIP Lenders shall be provided a right of first refusal to provide such funding, which right of first refusal must be exercised within thirty (30) days after being presented in writing the opportunity to provide such funding, and (b) such funding shall be junior and subordinate to the Litigation Cost Advance and to the amounts owed to the DIP Lenders on account of prior funding of the Trust, subject to a form of subordination that is acceptable to the DIP Lenders in all respects, such consent not to be unreasonably withheld.

13. **Closing Date:** The earliest date on which all conditions, including Bankruptcy Court approval of a settlement agreement that includes as a term the DIP Lenders' provision of the Litigation Cost Advance, are met.

14. **Maturity Date:** The third anniversary of the Closing Date. The Maturity Date may be extended for three (3) additional one-year periods thereafter, each with the prior written consent of the DIP Lenders.

15. **Documentation:** Documentation shall include, without limitation, (i) amendments to certain sections of the Trust Agreement and a motion of the Trust Administrator to approve such amendments; (ii) a motion to approve (A) the settlement between the DIP Lenders and the Committee over the allocation of the Avoidance Action Proceeds, and (B) the additional funding provided by the DIP Lenders to the Trust in the form of the Litigation Cost Advance on the terms herein; and (iii) deposit account control agreement for the Funding Account to be established pursuant to the terms herein.

16. **Governing Law:** The Litigation Cost Advance and all agreements related to it shall be governed by the laws of the United States, and, to the extent the laws of any state apply, the State of New York (without regard to choice of law rules thereof).

17. **Jurisdiction:** Any disputes with respect to the Litigation Cost Advance, the parties submit to the exclusive jurisdiction of the Bankruptcy Court, and any appellate court thereto.

18. **Termination:** The Trust is currently seeking Bankruptcy Court approval of a proposed alternative financing (the "Proposed Financing") and the Trust will continue to seek such approval unless the following has occurred on or before July 18, 2016: either (i) a submission to the Bankruptcy Court of a motion seeking the approval of any agreement or arrangement, including, without limitation, the approval of any stipulation, with one or more DIP Lenders to provide funding for the Trust's prosecution of the Term Loan Avoidance Action and any other action brought by the Trust; or (ii) an agreement or arrangement between the Trust and one or more DIP Lenders pursuant to which such DIP Lenders will provide funding for the Trust's prosecution of the Term Loan Avoidance Action and any other action brought by the Trust. In the event of Bankruptcy Court approval of the Proposed Financing, this Agreement shall terminate and, in such event, the parties hereto shall have no further obligations or liabilities to each other under this Agreement.

*     *     *     *     *

3

AGREED AND ACCEPTED:

**MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST**

**By: Wilmington Trust Company, as Avoidance Action Trust Administrator and Trustee**

By: _____
David A. Vanaskey Jr.
Vice President

**By: Arthur J. Gonzalez, as Avoidance Action Trust Monitor**

By:_____
Arthur J. Gonzalez

**UNITED STATES DEPARTMENT OF THE TREASURY**
PREET BHARARA
United States Attorney for the Southern District of New York
Counsel for United States Department of the Treasury

By: _____ 2/11/2016
DAVID S. JONES
JOSEPH CORDARO
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2739/2745
Fax: (212) 637-2730
Email: David.Jones6@usdoj.gov
        Joseph.Cordaro@usdoj.gov

**EXPORT DEVELOPMENT CANADA**

By: _____

Title: _____

By: _____

Title: _____

AGREED AND ACCEPTED:

**MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST**

**By:  Wilmington Trust Company, as Avoidance Action Trust Administrator and Trustee**

By: _____
David A. Vanaskey Jr.
Vice President

**By:  Arthur J. Gonzalez, as Avoidance Action Trust Monitor**

By: _____
Arthur J. Gonzalez

**UNITED STATES DEPARTMENT OF THE TREASURY**
PREET BHARARA
United States Attorney for the Southern District of New York
Counsel for United States Department of the Treasury

By: _____
DAVID S. JONES
JOSEPH CORDARO
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2739/2745
Fax: (212) 637-2730
Email:  David.Jones6@usdoj.gov
          Joseph.Cordaro@usdoj.gov

**EXPORT DEVELOPMENT CANADA**

By: _____

Title: _____

By: _____

Title: _____

AGREED AND ACCEPTED:

**MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST**

**By:  Wilmington Trust Company, as Avoidance Action Trust Administrator and Trustee**

By: _____
David A. Vanaskey Jr.
Vice President

**By:  Arthur J. Gonzalez, as Avoidance Action Trust Monitor**

By: _____
Arthur J. Gonzalez

**UNITED STATES DEPARTMENT OF THE TREASURY**
PREET BHARARA
United States Attorney for the Southern District of New York
Counsel for United States Department of the Treasury

By: _____
DAVID S. JONES
JOSEPH CORDARO
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2739/2745
Fax: (212) 637-2730
Email: David.Jones6@usdoj.gov
          Joseph.Cordaro@usdoj.gov

**EXPORT DEVELOPMENT CANADA**

By: _____

Title: Sean Mitchell
       Principal

By: _____

Title: Janet Boyd
       Loan Portfolio Manager

## Schedule 1

### Appellant and Counsel

Stroock & Stroock & Lavan LLP
Kristopher M. Hansen
Daniel A. Ross
Christopher M. Guhin
Gabriel E. Sasson
180 Maiden Lane
New York, New York  10038

*Attorneys for Davidson Kempner Capital
Management LP*

### Appellees and Counsel

Kramer, Levin, Naftalis & Frankel LLP
Thomas Moers Mayer
Robert T. Schmidt
Jonathan M. Wagner
Jennifer Sharret
1177 Avenue of the Americas
New York, New York 10036

*Attorneys for the Official Committee of
Unsecured Creditors of Motors Liquidation
Company, et. al.*

Emmet, Marvin & Martin, LLP
Paul T. Weinstein, Esq.
120 Broadway
New York, New York 10271

*Conflicts Counsel for the Motors Liquidation
Company Avoidance Action Trust*

Preet Bharara
David S. Jones, Of Counsel
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007

*Attorney for United States Department of the
Treasury*

Binder & Schwartz LLP
Eric B. Fisher
Neil S. Binder
Lindsay A. Bush
Lauren K. Handelsman
336 Madison Avenue, 6th Floor
New York, New York 10017

*Attorneys for the Motors Liquidation
Company Avoidance Action Trust*

Vedder Price
Michael J. Edelman
Michael L. Schein
1633 Broadway, 47th Floor
New York, New York 10019

*Attorneys for Export Development Canada*

**<u>Other Parties in Interest</u>**

Westerman, Ball, Ederer, Miller, Zucker &
Sharestein, LLP
Richard F. Harrison, III
Eric G. Waxman, III
1201 RXR Plaza
Uniondale, New York 11556

*Attorneys for River Birch Capital, LLC*