UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE: | . | Case No.  09-50026-mg |
| MOTORS LIQUIDATION COMPANY, et al., f/k/a GENERAL MOTORS CORP., et al, | . . . | Chapter 11 (Jointly administered) |
| Debtors. | . | |
| . . . . . . . . . . . . . . . . | . | |
| MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST, by and through the Wilmington Trust Company, solely in its capacity as Trust Administrator and Trustee, | . . . . . . | Adv. Proc. No. 09-00504-mg |
| Plaintiff, | . . | |
| v. | . | |
| JPMORGAN CHASE BANK, N.A., individually and as Administrative Agent for Various lenders party to the Term Loan Agreement described herein, et al., | . . . . . . | One Bowling Green New York, NY 10004 |
| Defendants. | . . | Wednesday, November 2, 2016 1:17 p.m. |
| . . . . . . . . . . . . . . . . | . | |

TRANSCRIPT OF TELEPHONE CONFERENCE, ON THE RECORD,
REGARDING DISCOVERY DISPUTE
**BEFORE THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

Audio Operator:          Karen Cappiello, ECR

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46038
                         (855) 873-2223
                         www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

TELEPHONIC APPEARANCES:

For Motors Liquidation
Company Avoidance
Action Trust:                  Binder & Schwartz
                               By:  ERIC FISHER, ESQ.
                               366 Madison Avenue, 6th Floor
                               New York, NY 10017
                               (212) 510-7008

For JPMorgan Chase
Bank, N.A.:                    Wachtell, Lipton, Rosen & Katz
                               By:  MARC WOLINSKY, ESQ.
                               51 West 52nd Street
                               New York, NY 10019
                               (212) 403-1000

For JPMorgan Trust
Bank, N.A., et al:             Kelley Drye
                               By:  NICHOLAS J. PANARELLA, ESQ.
                               101 Park Avenue
                               New York, NY 10178
                               (212) 808-7897

For Certain Term Loan
Investors:                     Hahn & Hessen LLP
                               By:  MARK T. POWER, ESQ.
                               488 Madison Avenue
                               New York, NY 10022
                               (212) 478-7350

For Group of
Term Lenders:                  Jones Day
                               By:  CHRISTOPHER DIPOMPEO, ESQ.
                               51 Louisiana Avenue Northwest
                               Washington, DC 20001-2113
                               (202) 879-7686


                               Munger, Tolles & Olson
                               By:  MATTHEW A. MACDONALD, ESQ.
                               355 South Grand Avenue #3500
                               Los Angeles, CA 90071
                               (213) 683-9231

3

TELEPHONIC APPEARANCES (Continued):

```
For Ad Hoc Group of
Term Lenders:              Kasowitz, Benson, Torres,
                             & Friedman LLP
                          By:  ANDREW K. GLENN, ESQ.
                          1633 Broadway
                          New York, NY 10019
                          (212) 506-1747
```

4

1          (Proceedings commence at 1:17 p.m.)

2          THE COURT:  All right.  This is Judge Glenn.  I'm on

3    the lectern in <u>Motors Liquidation Company Avoidance Action</u>

4    <u>Trust v. JPMorgan Chase Bank, N.A., et al.</u>, Adversary

5    Proceeding Number 09-00504.  I have a list of lawyers who are

6    appearing on CourtCall this hearing.  It is entirely on

7    CourtCall.

8          Mr. Fisher, you requested the hearing.  Is that

9    correct?

10          MR. FISHER:  -- with the defendant (indiscernible).

11          THE COURT:  You'll have to speak up because you're

12    not coming through clearly.

13          MR. FISHER:  I'm sorry, Your Honor.  Is this better?

14          THE COURT:  Yes.  Go ahead.

15          MR. FISHER:  Jointly requested a conference with the

16    defendants (indiscernible) and I'm --

17          THE COURT:  This is really not coming -- are you on

18    speaker?

19          MR. FISHER:  I am, Your Honor.

20          THE COURT:  You're going to need to pick up the phone

21    because it's almost impossible to hear you, and there is --

22    this is on the record, there is a transcript being made, so I

23    have to hear you clearly.

24          MR. FISHER:  I apologize, Your Honor.  If this is not

25    better, then I'm going to have to go to my office and dial back

5

1    in.  Is that any better, Your Honor?

2            THE COURT:  Hold on, let me check with the -- all

3    right, you're being picked up, but make sure you keep your

4    voice up when you talk.

5            Let me ask who else is appearing.  I know there's a

6    reasonably long list of people, but, Mr. Fisher, which parties

7    does this discovery dispute involve?

8            MR. FISHER:  It really involves all of the parties,

9    Your Honor.

10           THE COURT:  Okay.

11           MR. FISHER:  We had a -- so we --

12           THE COURT:  All right.  Let me do this then in light

13   of that.  Let's go through and let me get the appearances.  So,

14   Mr. Fisher, you're appearing on behalf of the trust.

15           Let's one at a time -- counsel should go through and

16   make your appearances on the record.

17           MR. WOLINSKY:  Your Honor, this is Marc Wolinsky from

18   Wachtell Lipton for JPMorgan, and I'll be addressing one of the

19   two issues that are on the table for today.

20           THE COURT:  Okay.

21           MR. DIPOMPEO:  Your Honor, this is Christopher

22   DiPompeo of Jones Day.  We represent a group of the term loan

23   lenders.  I'll be addressing the appropriateness of a pencil

24   stay of discovery.

25           THE COURT:  All right.

6

1          MR. DIPOMPEO:  I believe my --

2          THE COURT:  Thank you.  I'm sorry, Mr. DiPompeo, I

3  have your appearance.

4          Okay.  Who else?

5          MR. MACDONALD:  Your Honor, this is Matt MacDonald

6  from Munger Tolles.  I represent the same group of term lenders

7  that Mr. DiPompeo does.

8          THE COURT:  All right.

9          MR. GLENN:  Good afternoon, Judge.  It's Andrew

10  Glenn, Kasowitz, Benson, Torres & Friedman on behalf of one of

11  the defendant groups.

12          THE COURT:  Thank you.

13          MR. PANARELLA:  This is Nicholas Panarella from

14  Kelley, Drye & Warren for JPMorgan Chase.

15          THE COURT:  All right.

16          MR. POWER:  Your Honor, this is Mark Power from Hahn

17  & Hessen.  We have a separate group of approximately 80 term

18  lenders.

19          THE COURT:  Anybody else?

20          All right.  Mr. Fisher, go ahead.

21          MR. FISHER:  Your Honor, the first issue is one of

22  enforcing the fact discovery cutoff in the case.  We were last

23  in front of the Court on September 28th, and at that status

24  conference, we jointly proposed extending fact discovery until

25  October 31st, and the Court approved that extension.  We have,

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1   of course, taken many depositions leading up to the fact

2   discovery cutoff, and then before the cutoff, which was this

3   past Monday, there were four depositions that we had all agreed

4   could take place the week after the cutoff this week.  So two

5   of those, two wild 30(b)(6) depositions occurred yesterday and

6   two are scheduled to occur tomorrow.  Our view is that should

7   be it, that should be the end of discovery, but -- of fact

8   discovery.

9           But what has happened is since the cutoff, we're now

10  in discussions with the defendant about their desire to

11  schedule an additional seven fact depositions, and we oppose

12  any of these depositions going forward after the fact discovery

13  for a number of different reasons.  For one thing, we all have

14  initial expert report deadlines on November 21st, and we don't

15  want to do anything that would jeopardize that next deadline or

16  jeopardize our ability to prepare our expert reports.

17          Just this past Monday, the defendant identified their

18  21st expert, and before that, they had -- since the status

19  conference, they had identified another.  So there are two

20  additional experts they identified since September 28th.  We

21  think that this is an attempt to go looking for fact discovery

22  to support these new experts, and it's just not a proper use or

23  a proper reason to have discovery spill over past the fact

24  discovery cutoff.

25          And a couple of weeks ago, we told the defendant that

8

1    with the deadline coming up, it's time for everyone to start

2    paring things down to meet the deadline, and we ourselves

3    voluntarily withdrew efforts to seek seven depositions that we

4    otherwise ourselves would have wanted to seek, but we didn't

5    because we recognized there was no realistic way to get that

6    done before October 31st.  So we engaged in a kind of triage.

7    And so we just feel as though we've reached a point where we

8    need the Court to enforce on all the parties the deadline so

9    that we can all continue to move the case forward on the

10   schedule that the Court has laid out for us.

11           THE COURT:  All right.  Who wants to speak first for

12   defendants?

13           MR. WOLINSKY:  Your Honor, this is Marc Wolinsky.

14   There's a lot of things that Mr. Fisher said that I disagree

15   with.  You know, as you're going back to when we were in front

16   of Your Honor, there have been a number of discovery cutoffs

17   and a number of extensions in the cutoffs, and it's all been

18   driven by the same problem, obtaining cooperation from third

19   parties that no one controls, and actually that's a little bit

20   of an overstatement, but I'll come back to that.

21           Every witness, with one exception, that we're seeking

22   to get deposed has been on the table long before October 31st,

23   and the problem that we've had is obtaining the cooperation

24   from -- and the lawyers on the other side, they have clients,

25   they had issues, but we've had difficulty getting cooperation

9

1  from General Motors, Treasury, and the accounting firms that

2  worked on the valuation of GM's assets, and I can go through

3  each witness and explain the situation as to each, but frankly,

4  Your Honor, what we think is going on here is gamesmanship.

5  Every witness that we're seeking has been on the table, with

6  one exception, for months, and now the plaintiffs are saying

7  because you couldn't get a behind in a chair by October 31st,

8  it's too late.

9       Your Honor, the reason why I say this is gamesmanship

10  is because in light of Your Honor's ruling on -- we went out

11  and identified 12 experts on the assets that are involved in

12  this case.  We retained them, we prepared them, and Your Honor

13  ruled that they should be deposed as fact witnesses, which was

14  -- you know, we understand the ruling.  And over the past -- in

15  October, we scheduled and produced 12 fact witnesses, former GM

16  people, and if they had been in the position of having to work

17  through GM to find people -- to find witnesses at the level of

18  expertise that the 12 that we identified did, they would never,

19  never have been able to accomplish that discovery by October

20  31st.

21       So because of our industriousness and our

22  cooperation, they find themselves in the position of having

23  everything that they believe they need, and we find ourselves

24  in the position because General Motors itself has not been as

25  cooperative, because Pricewaterhouse hasn't been cooperative,

1  and KPMG hasn't been cooperative, we find ourselves in the

2  position that we need another week or two to complete these

3  additional depositions.

4          THE COURT:  Mr. Wolinsky, did you serve subpoenas for

5  the depositions of these third parties?

6          MR. WOLINSKY:  Let me go through each one.  And I'll

7  start with, frankly, the one that we have the thinnest record

8  on.  One witness is Jennifer Weigel at Visioneering, and she --

9  we have not served a -- we did not serve a subpoena for her

10 returnable before October 31st because we only located her

11 recently.  We've been working with Visioneering for a long time

12 to try to find a witness.

13         But the reason why -- one of the reasons why I say

14 this is gamesmanship, if Your Honor looks at the plaintiff's

15 pretrial brief --

16         THE COURT:  Can we -- Mr. Wolinsky, before you go on

17 with that, are all -- the total number of witnesses is how

18 many, seven?

19         MR. WOLINSKY:  He says seven.  I actually think it's

20 six because I think the seventh is a person in a category that

21 everyone agrees can go through to November 21st.  There are

22 witnesses who are relevant to the constructive trust issue and

23 who are overlapping that I understood were going to slip over.

24 But my --

25         THE COURT:  So who -- let's assume for this

1  discussion that it's six witnesses, and Ms. Weigel is one of

2  the six, did you serve the other five with subpoenas for their

3  depositions?

4       MR. WOLINSKY:  We either served them as 30 -- these

5  are either witnesses that were 30(b)(6) and the 30(b)(6) failed

6  to come through with the information we expected or they were

7  subpoenaed in their individual capacity.  So for KPMG, we

8  served a 30(b)(6) and a subpoena.  One witness, the 30(b)(6)

9  witness turned out to be insufficient on one issue, so we

10  worked with KPMG to find an additional witness.  And the second

11  KPMG witness, Eric Greenwald, was subpoenaed long before

12  October 31st and noticed before -- and subpoenaed to appear

13  before October 31st, and we've been working with KPMG, and the

14  best they can do is November 9th.

15       THE COURT:  Well, when you say the best they can do,

16  subpoenas are enforceable.  I don't know where they're located,

17  but you can either -- you know, you normally have to enforce it

18  in the district where the deposition's going to be unless the

19  court in that district, under the circumstances provided by the

20  rules, transfers the issue to this court, but you know, when I

21  set a discovery cutoff, I mean it.  And my -- I didn't go back

22  to look at the case management order here, but I think every

23  case management order I enter provides that for any party

24  that's going to seek an extension, you need to do it at least

25  five days before the discovery cutoff occurs, okay.

1          I got the request for this hearing yesterday, I'm on

2    the phone today despite the fact that I have a long trial going

3    on, okay.  So when an issue comes up, the Court resolves it

4    quickly.  What I'm unsympathetic about is when, after a

5    discovery cutoff date occurs, when parties can't agree to

6    resolve it, coming to me and asking for relief from a discovery

7    cutoff date that I've established.  So when you were all here

8    last time and I was told there were some difficulties

9    scheduling some third-party witnesses, I did provide a modest

10   extension to try and get those last depositions done.

11         You know, it's not -- and I'm not saying,

12   Mr. Wolinsky, that that's what you're describing to me, but

13   it's not a unilateral decision by a party that's subject to a

14   discovery cutoff to say, well, I can't voluntarily get the

15   witness to appear for a deposition before the discovery, but

16   you know, I can get him within a few weeks after.  Sure, as to

17   -- and I think it was raised with me, there were a few

18   witnesses that, for scheduling reasons, were hard to get done

19   by the cutoff and where the parties agree and you'll say, fine,

20   you can do those.  But that's the dilemma, Mr. Wolinsky.  I

21   treat these discovery cutoff dates very seriously, and I don't

22   want to get into whether one side or the other thinks there's

23   gamesmanship going on.  What I'm faced with is an issue of

24   whether to modify an order that I've previously entered that

25   required an application to extend the discovery dates at least

13

 1  five days before the discovery cutoff occurs.  So tell me why I

 2  shouldn't enforce that here.  Go ahead, Mr. Wolinsky.

 3        MR. WOLINSKY:  And, Your Honor, the reason why is

 4  because we've been working cooperatively with the plaintiffs up

 5  until yesterday, and not once up until the time we were working

 6  cooperatively up until yesterday did they say, sorry, you're

 7  too -- it's too late, five days has passed, and we're not going

 8  to talk to you anymore.  To the contrary, we consensually were

 9  agreeing to schedule depositions for this week with them up

10  until the end of last week.

11        So I -- you know, I think there's an element of

12  fairness here and an element that we're getting hung up on our

13  effort to work consensually and cooperatively with the

14  plaintiffs to get the discovery done.

15        For example, Your Honor, let's focus specifically on

16  the Treasury deposition.  The witness was subpoenaed long ago.

17  Treasury took the position that we should take a different

18  witness first, and if we were unsatisfied with that different

19  witness, we could seek -- we could get the witness that we

20  specifically had asked for, Mr. Malik.  The plaintiffs are

21  agreeable to take the Treasury deposition of the individual

22  that Treasury has pushed us to take, Mr. Feldman.  What the

23  plaintiffs are saying is if Mr. Feldman doesn't know -- have

24  the answers to the questions, we're stuck and

25  notwithstanding -- and we can't hold Treasury to its word that

14

1  it would produce a witness that would actually be

2  knowledgeable.

3          THE COURT:  Well, you can hold them to it because

4  that's what subpoenas are about.

5          MR. WOLINSKY:  Well, we can if you permit us, Your

6  Honor.  That's really the core issue here.  We all agree

7  that --

8          THE COURT:  Well, you know, you're in a different

9  position if this issue had been raised with me before the

10 discovery cutoff, and I would say, try and work out a mutually

11 convenient date.  If it's shortly after the discovery cutoff, I

12 consider extending it, but I'm hearing about all of this now

13 after the discovery cutoff.  But let me --

14         MR. WOLINSKY:  Now, Your Honor, and I don't mean to

15 be --

16         THE COURT:  Hold on a second, Mr. Wolinsky.

17         MR. WOLINSKY:  Sure.

18         THE COURT:  So you said it's a total of six

19 witnesses, including Jennifer Weigel?

20         MR. WOLINSKY:  Yes.

21         THE COURT:  And Weigel is the only one who's not

22 under subpoena?

23         MR. WOLINSKY:  She is not, but we did not issue the

24 subpoena until October 30 -- October 27th.

25         THE COURT:  Okay.  How long do you anticipate each of

15

1  these depositions taking?

2          MR. WOLINSKY:  I think some are as short as 15 to 20

3  minutes.  Ms. Weigel fits in that category.  The others are an

4  hour -- all the others are less than half a day.

5          THE COURT:  Tell me what's the issue on which you

6  wish to depose Ms. Weigel.

7          MR. WOLINSKY:  Your Honor, Ms. Weigel is -- it's a

8  very interesting issue.  There's a -- one federal court case in

9  Michigan applying Michigan law to the kind of asset that is

10  involved specifically in this case, a milling machine.  She

11  works at a company called -- she worked at a company called

12  Visioneering.  Visioneering had milling machines of exactly the

13  same type or essentially the same type as you'll find in any

14  General Motors factory.  The Court in that case held that the

15  machine was a fixture.

16          The plaintiffs, in their pretrial brief, have said to

17  you when assessing intent, the key inquiry is whether an asset

18  has been moved or may be moved by the annexing party, and then

19  they specifically distinguished this case, this leading

20  Michigan case, Cincinnati Insurance, on the ground that there

21  was a lack of evidence that the machine was ever moved.

22          THE COURT:  Tell me who the other five witnesses are.

23          MR. WOLINSKY:  The other five -- do you want me to

24  finish what she's going to say or -- she's going to say the

25  machine has been moved.  So you're going to have a fact witness

16

1  who will specifically establish that an asset of the type

2  involved in this case has been moved.

3          So the other witnesses, Your Honor, KPMG, two

4  witnesses, Jovan Cruz and Eric Greenwald.  Mr. Cruz prepared a

5  single spreadsheet that we need -- we want to understand that

6  lays out the evolution of KPMG's valuation of New GM, and we

7  need to -- we want to depose him just to explain the one

8  spreadsheet.  Mr. Greenwald from -- Mr. Greenwald of KPMG, we

9  would only pursue with him, depending on what we see in the

10 PricewaterhouseCoopers (indiscernible).  Mr. Greenwald was the

11 senior engagement partner on the KPMG engagement.  We have one

12 area of inquiry of him.  Treasury, Mr. Malik.  Mr. Malik was

13 the -- he was the numbers guy in the auto -- Treasury auto

14 industry task force.  The Treasury has told us to take a

15 gentleman named Matt Feldman, who is a lawyer on the auto

16 industry task --

17          THE COURT:  Oh, I know Mr. Feldman.  You're talking

18 about at Willkie Farr?

19          MR. WOLINSKY:  He's -- yes, we're working with

20 Willkie Farr.

21          THE COURT:  Right.

22          MR. WOLINSKY:  We've got Willkie Farr now, yeah.  And

23 Mr. Feldman --

24          THE COURT:  He was at Willkie Farr before, he's back

25 at Willkie Farr now.

1          MR. WOLINSKY:  Treasury told us that Mr. Feldman

2    should be able to cover the universe, and -- but from the

3    documents, we believe Mr. Malik will be the better, more

4    knowledgeable witness, and our understanding with Treasury is

5    that if Mr. Feldman can do the job, great, we don't need Mr.

6    Malik.  If Mr. Feldman can't do the job, we'd like to get Mr.

7    Malik, and they've told us Mr. Malik is not available until

8    November 16th.

9          THE COURT:  When is Mr. Feldman -- did you agree on a

10   date for Mr. Feldman?

11         MR. WOLINSKY:  Yes.  We'll all -- we've all agreed

12   that we're going to proceed with Mr. Feldman tomorrow.

13         THE COURT:  That's one of the two that's agreed?

14         MR. WOLINSKY:  Yes.  Yes.

15         THE COURT:  All right.  What's -- who's next?

16         MR. WOLINSKY:  One witness from New GM.  Actually, on

17   that subject, we originally had a 30(b)(6) witness to New GM

18   for six subject matters.  We dropped six and then focused just

19   on one.  I believe the witness going to be the chief economist

20   from New GM, and he's going to testify about the reasonableness

21   of the projections that we've prepared in connection with the

22   reorganization, which is an important issue in the valuation.

23   We've been pursuing that deposition for a very long time with

24   GM, and --

25         THE COURT:  Have they indicated when he's available

1  for deposition?

2  　　　　　MR. WOLINSKY:  They have not pinned down a date yet.

3  　　　　　THE COURT:  Is he under subpoena?

4  　　　　　MR. WOLINSKY:  Yes.

5  　　　　　THE COURT:  Did you put a date in the subpoena?

6  　　　　　MR. WOLINSKY:  Yes, for -- the date of the subpoena

7  was for October 31st.

8  　　　　　THE COURT:  Who else?

9  　　　　　MR. WOLINSKY: PricewaterhouseCoopers -- at the KPMG

10 deposition, we -- which took place at the end of September, we

11 learned for the first time that PricewaterhouseCoopers would --

12 had some involvement in the fresh-start accounting.  Actually,

13 we didn't learn until when we were in front of you last time.

14 We were not aware about PricewaterhouseCoopers's involvement --

15 　　　　　THE COURT:  There a specific person from PwC who's

16 under subpoena?

17 　　　　　MR. WOLINSKY:  A 30(b)(6) witness under subpoena.

18 The return date for the subpoena was --

19 　　　　　UNIDENTIFIED:  Toward the end of October.

20 　　　　　MR. WOLINSKY:  I don't have the date, but it would

21 have been, yeah, end of October.  And we've been working with

22 PricewaterhouseCoopers lawyers at Reed Smith to identify a

23 witness and get a date.  We've been calling them every -- twice

24 a day to get their documents and to get a witness, and they've

25 told us that the documents would be produced this week.

1          THE COURT:  So, you know, by my count, Weigel is

2   number one.  There are two people at KPMG, one at Treasury, one

3   at New GM, and a 30(b)(6) at Pricewaterhouse, that's what

4   you're talking about?

5          MR. WOLINSKY:  Yes, Your Honor.

6          THE COURT:  Do any of the other defendants wish to be

7   heard?

8          MR. DIPOMPEO:  Yes, Your Honor.  This is Christopher

9   DiPompeo of Jones Day.  We represent a group of term loan

10  lenders.  I'm primarily going to speak about a different topic,

11  which is what to do about affirmative defenses that have

12  nothing to do with the represented assets trial.

13         THE COURT:  I'm not dealing with that.  I'm dealing

14  with a discovery dispute now.  I'm not dealing with what you

15  think should be done with affirmative defenses.  I've got a

16  trial that's supposed to resume in five minutes, so if you --

17  what is it that -- tell me what it is -- quickly what it is

18  your beef is about the affirmative defenses.

19         MR. DIPOMPEO:  Sure.  And this is, Your Honor, to be

20  clear, a discovery dispute over whether the affirmative

21  discovery -- fact discovery and the affirmative defenses should

22  also be subject to the October 31st deadline.  As it was, very

23  briefly, Your Honor, the plaintiffs requested several weeks

24  ago, as you probably remember, to have defendant's specific

25  affirmative defenses put off until after the *(indiscernible

20

1  23:47) assets trial.  We initially resisted that, but at the

2  status conference, Your Honor said that there was really no

3  rush on that, those weren't going to be dealt with during the

4  trial, and so they could be put off.

5       Defendant set up a list of those defendants' specific

6  affirmative defenses, which originally we had anticipated was

7  just going to be your conduit to potentially solving any of

8  those kind of issues, and what ended up coming back was a list

9  of 32 affirmative defenses, which are essentially all defenses

10 except constructive trust and your marking.

11      So then when the plaintiff asked to put a firm end

12 date to the discovery that's going on now, we think it doesn't

13 make sense to make that distinction because defendant-specific

14 affirmative defenses and other affirmative defenses, which are

15 also not going to be part of -- represented at trial.  We

16 actually think that's fundamentally unfair.

17      THE COURT:  All right.  I'm not going to deal with

18 that issue today.

19      MR. DIPOMPEO:  Okay.

20      THE COURT:  Anybody else wish to be heard?

21      MR. MACDONALD:  Your Honor, this is Matt McDonald

22 from Munger Tolles representing the same group of term lenders.

23 I just wanted to -- I definitely do not need the Court to

24 address this now.  I just wanted to alert the Court that there

25 is a separate fact discovery cutoff for cross-claims and for

1    certain effectiveness issues.

2            THE COURT:  Right.

3            MR. MACDONALD:  I just want to make sure that nothing

4    today that happens today affects that deadline and to alert the

5    Court that the parties are currently negotiating a schedule

6    extension.  I think we'll be able to resolve that amicably, and

7    we'll come back to the Court with a stipulation to that effect

8    that will move that deadline between --

9            THE COURT:  Well, we'll see whether the Court agrees

10   to it, but we'll put that for another day.

11           Anybody else want to be heard?

12           MR. FISHER:  Your Honor, it's Eric Fisher again.

13           THE COURT:  Let me see whether any of the other

14   defendants want to be heard, Mr. Fisher, and then I'll give you

15   another chance.

16           MR. FISHER:  Thank you.

17           THE COURT:  Any of the other defendants' counsel wish

18   to be heard?

19           All right.  Mr. Fisher, go ahead.

20           MR. WOLINSKY:  Your Honor, it's Marc Wolinsky.

21           THE COURT:  Go ahead, Mr. Wolinsky.

22           MR. WOLINSKY:  I went back -- yeah, I just -- I don't

23   see anything in the case management order that provided -- that

24   has a provision along the lines you outlined.  I'm not saying

25   it's not there.  We haven't gone back and looked through every

22

1  single case management order, but frankly, we don't see it.

2         THE COURT:  Okay.  I haven't gone back to look back.

3  My standard case management order requires any party who wants

4  to seek an extension and they can't agree on -- actually, even

5  if they agree on, they have to seek an extension within, you

6  know, more than five days before, at least five days before the

7  time period runs out.  Let me hear from Mr. Fisher.

8         MR. WOLINSKY:  Or it could be an accident of history

9  because of how this case wound up in front of us.

10        THE COURT:  Yeah, I know.  I inherited it from Judge

11 Gerber, but I'm familiar with that.  That's the trial -- one of

12 the trials that I have is another case I inherited from Judge

13 Gerber.

14        Mr. Fisher, let me hear from you.

15        MR. FISHER:  I will be very brief because I do

16 appreciate that you're conducting a trial.  Just to respond to

17 a few of the points -- specific points that Mr. Wolinsky made

18 about the specific witnesses.  This Jennifer Weigel deposition

19 at Visioneering, a subpoena was issued on October 27th, two

20 business days before --

21        THE COURT:  Yeah, I understand about Ms. Weigel.

22 They were very straightforward that a subpoena just got issued.

23 What about the other five?

24        MR. FISHER:  New GM, we don't agree that they've been

25 uncooperative.  We do think it takes a lot of time sometimes to

23

1  work with them, and we have been working with New GM since

2  August 2nd to coordinate deposition issues.  We went out to

3  Detroit for New GM depositions.  The defendants participated in

4  all of those discussions and made a decision, I suppose, at the

5  time that they didn't think they needed a witness because the

6  discussions that we had with New GM's counsel was always along

7  the lines of, once we're flying out to Detroit, let's make sure

8  that we get all the depositions done that need to get done, so

9  this is an issue that has cropped up belatedly.  And the KPMG

10 and PwC witnesses, you know, it's not as though the defendants

11 are left without discovery, I mean, on these issues --

12             THE COURT:  Let me stop you, Mr. Fisher.

13             Mr. Wolinsky, what district were the subpoenas issued

14 from?

15             MR. WOLINSKY:  They were issued from the Southern

16 District, Your Honor.

17             THE COURT:  You issued subpoenas from the Southern

18 District for witnesses in Michigan?

19             MR. WOLINSKY:  Yes.

20             THE COURT:  Good luck.  You know, a subpoena has to

21 be issued in the district within 100 -- you know, the 100-mile

22 bulge rule applies in --

23             MR. WOLINSKY:  Yeah.

24             THE COURT:  You may be out of luck, but that's -- I'm

25 not going to decide that today.

24

1          MR. WOLINSKY:  So, Your Honor, I -- the location of

2   the deposition was where the witness is located.

3          THE COURT:  Yeah, but go read the rules.

4          MR. WOLINSKY:  All right, Your Honor.  I understand.

5          THE COURT:  Here is what I'm going to say -- what I'm

6   going to -- I'm going to order, subject to the witnesses -- the

7   ability of the proposed deponents to seek to quash any subpoena

8   that's been served, I'm going to order that with respect to the

9   six depositions -- there may be -- as I understand it, Mr.

10  Wolinsky, it may be five because if you take Mr. Feldman's

11  deposition and you're satisfied, then Mr. Malik is not going to

12  be deposed.  Is that correct?

13         MR. WOLINSKY:  That's correct, Your Honor.  And the

14  same actually is true of the KPMG witness.  If we get what we

15  need from PricewaterhouseCoopers, we don't --

16         THE COURT:  All right.  So I'm going to order, on the

17  record, that the depositions -- the six depositions be

18  completed on or before 5 p.m. November 16th and that no

19  deposition shall exceed three hours in length unless both sides

20  agree to it.  So I'm imposing the three-hour limit across the

21  board for each deposition, and if one deposition takes 15

22  minutes, you can't apply the time to another deposition, okay.

23         I hope their depositions are shorter than three

24  hours, but I'm going to permit depositions -- six depositions,

25  not to exceed three hours in length, to be completed on or

25

1  before 5 p.m., November 16th.  And, of course, it's subject to

2  the ability of the deponents or their employers seeking to

3  quash the subpoenas, but inform them that that's the deadline.

4  And you said that for Mr. Malik, we may or may not need to

5  depose.  You said he's available on November 16th, so that's

6  the last day that -- with the day you said he was available.

7        And with respect to other issues, I think it's time

8  for -- Mr. Fisher, confer with the defendants' counsel, liaison

9  committee, and speak with my courtroom deputy and arrange a

10  date for an in-court status conference in the adversary

11  proceeding.  In advance of that conference, I'll accept letter

12  submissions addressing the issue of discovery with respect to

13  affirmative defenses in both.  I want -- I guess, you've got to

14  confer about it, and if there's a disagreement, I want

15  simultaneous filings of letter submissions a week before the

16  status conference.  Okay.  That's going to be the Court's --

17  I'm so ordering the transcript with respect to the depositions,

18  and I'm not -- I'm going to make it crystal clear, I'm not

19  expending the fact discovery cutoff beyond the extension that

20  I've just granted, and it's only with respect to six

21  depositions.  Understood?

22        MR. WOLINSKY:  Marc Wolinsky.  Yes, Your Honor.

23        THE COURT:  All right.  We're adjourned.

24      (Proceedings concluded at 1:49 p.m.)

25                    *  *  *  *  *

26

## **C E R T I F I C A T I O N**

I, Alicia Jarrett, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.



ALICIA JARRETT, AAERT NO. 428      DATE:  November 3, 2016

ACCESS TRANSCRIPTS, LLC