# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
IN RE:

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION

*This Document Relates to All Actions*

14-MD-2543 (JMF)

Hon. Jesse M. Furman

------------------------------------------------------------------------x

# DEFENDANT NEW GM'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Local Rule 56.1(a), defendant General Motors LLC ("New GM" or "GM LLC") submits the following Statement of Undisputed Material Facts:

1. In 2008 and 2009, General Motors Corporation ("Old GM"), the world's largest automotive manufacturer, experienced financial distress due to a combination of international competitive forces and a global recession. (Ex. 1, 6/1/09 F. Henderson Aff., ¶¶ 10.) Contributing factors included "jumps in the price of gasoline; a massive recession (with global dislocation not seen since the 1930s); a dramatic decline in U.S. domestic auto sales; and a freeze-up in consumer and commercial credit markets[.]" (*In re General Motors Corp.*, 407 B.R. 463, 476 (Bankr. S.D.N.Y. 2009) ("Sale Decision").) From January 2008 to January 2009, the Seasonally Adjusted Annual Rate of automobile sales for the United States declined from 15.6 million to 9.8 million. (Ex. 1, 6/1/09 F. Henderson Aff., ¶ 11.) Old GM's domestic automobile sales in the fourth quarter of 2008 were 36 percent lower than in 2007, and sales in the first quarter of 2009 were down 49 percent compared to 2008. (*Id.*) The share price of Old GM's common stock declined from $93.62 on April 28, 2000, to $1.09 on May 15, 2009, resulting in approximately $59.5 billion in decreased market capitalization. (*Id.*)

1

2.  In November 2008, Old GM reported a deteriorating liquidity position that it predicted would fall below the minimum required to operate its business in the first and second quarters of 2009. (Ex. 2, 11/10/08 Old GM 10-Q at 6; Ex. 1, 6/1/09 F. Henderson Aff., ¶¶ 12-13; Sale Decision, 407 B.R. at 476-77.)

3.  Old GM submitted an initial restructuring plan to Congress on December 2, 2008. (Ex. 1, F. Henderson Aff., ¶ 51; Sale Decision, 407 B.R. at 477.)

4.  On December 21, 2008, in response to Old GM's liquidity crisis, the U.S. Treasury extended more than $13.4 billion in loans to fund working capital. (Ex. 3, 6/25/09 Wilson Decl., ¶ 9, Ex. 1, 6/1/09 Henderson Affidavit ¶ 54; Sale Decision, 407 B.R. at 477.)

5.  Old GM sought emergency financing from the U.S. Treasury under the Troubled Assets Relief Program: "Treasury structured the [Old] GM transactions as a loan with the only equity received by Treasury being in the form of warrants []." (Ex. 3, H. Wilson Decl., ¶ 10; Sale Decision, 407 B.R. at 477-78.)

6.  Old GM's access to this financing was conditioned in part on its development of a proposed viability plan, absent which the government could call its loans. (Ex. 3, H. Wilson Decl., ¶ 9; Ex. 4, 2008 U.S. Treasury Loan Agreement (defining "Termination Event" as non-issuance of President's Designee's certification of viability plan); Ex. 5, 6/30/09 Bankr. H'rg Tr. at 63:17-64:2; Sale Decision, 407 B.R. at 477-78.)

7.  Old GM was unable to get the necessary financing to maintain viability from any source other than the U.S. Treasury. (Ex. 1, F. Henderson Aff., ¶ 14; Ex. 6, 6/1/09 W. Repko Decl., ¶ 37.)

8. On February 17, 2009, Old GM submitted a restructuring plan to the U.S. Treasury; Old GM's plan proposed a number of changes to its business operations, including workforce reductions, plant closings and consolidations, and the elimination of certain Old GM brands. (Ex. 1, F. Henderson Aff., ¶ 60-61.) Part of Old GM's proposed plan included the potential sale or wind-down of Old GM brands including Saturn, Saab, and Hummer. (*Id.*)

9. On March 30, 2009, the federal government announced that Old GM's proposed viability plan was not satisfactory to justify the additional investment requested by Old GM. (Ex. 3, 6/1/09 H. Wilson Decl. Ex. B; Ex. 7, 3/30/09 Remarks By the President on the American Automotive Industry.)

10. The federal government made an additional $6 billion in loans to Old GM—$2 billion on April 24, 2009, and $4 billion on May 20, 2009—to provide funding while it worked to amend its proposed viability plan. (Ex. 8, 3/10/10 U.S. Treasury Monthly TARP Report to Congress at Appendix 1, p. 6; Ex. 1, F. Henderson Aff., ¶¶ 63, 65 68; Sale Decision, 407 B.R. at 479.)

11. On April 27, 2009, Old GM launched a public bond exchange offer for approximately $27 billion of its unsecured bonds and also announced it expected to commence a bankruptcy case if it did not receive enough tenders to consummate the exchange offer. (Ex. 1 F. Henderson Aff. 71; Ex. 9, 4/27/09 Old GM 8-K, Ex. 99.) On May 26, 2009, the exchange offer expired without meeting the threshold for tendered acceptances. (Ex. 1, F. Henderson Aff., ¶ 73; Ex. 10, 5/27/09 Old GM 8-K, Ex. 99.)

12. On May 8, 2009, Old GM disclosed its quarterly report for the quarter ended March 31, 2009; as of March 31, 2009, Old GM had consolidated assets of $82.3 billion and

3

consolidated liabilities of $172.8 billion. (Ex. 11, 5/8/09 Old GM 10-Q at 1-2; Sale Decision, 407 B.R. at 479.)

13. During the spring of 2009, Old GM and the U.S. Treasury engaged in arm's length negotiations regarding a 363 Sale and related financing. (Ex. 3, H. Wilson Decl., ¶¶ 15-16; Sale Decision, 407 B.R. at 494.)

14. From the moment that it put the very first dollar of emergency financing into Old GM, the U.S. Treasury acted as a prudent lender seeking to protect its investment, and thus expressly conditioned its financial commitment upon GM's meaningful progress towards long-term viability. (Ex. 12, 6/1/09 Statement of U.S., ¶ 10.)

15. Throughout the spring of 2009, Old GM and the U.S. Treasury, as well as the UAW and the UAW voluntary employee beneficiary association, the Debtors' prepetition secured lenders, certain of the Debtors' prepetition unsecured lenders, and Treasury's Canadian co-investors engaged in negotiations over the terms of the sale and related issues including financing. These negotiations continued through the Debtors' Chapter 11 bankruptcy filings on June 1, 2009 (the "Petition Date"), and beyond. From May 22 through June 1, 2009, the parties engaged in nearly around the clock negotiations at Old GM's New York headquarters and the offices of its counsel. After the Petition Date, the negotiations expanded in New York to include the Debtors' statutory committee of unsecured creditors and other interested parties, and the U.S. Treasury, as purchaser, made certain concessions to those parties in the course of those negotiations. (Ex. 3, H. Wilson Decl., ¶ 16.)

16. On May 27, 2009, AlixPartners LLP submitted to Old GM an analysis of Old GM's estimated liquidation value; the AlixPartners analysis determined an estimated liquidation

4

value for Old GM's assets of between $6.5 billion and $9.7 billion. (Ex. 13, 6/4/09 A. Koch Decl. 7; *id.* at Ex. B; Sale Decision, 407 B.R. at 481.) The analysis also determined that, if Old GM were to liquidate, there would be "no proceeds available for distribution to unsecured creditors." (Ex. 13, A. Koch Decl. 7.) The Bankruptcy Court found "no basis to doubt those conclusions" and also found that "in the event of a liquidation, unsecured creditors would recover nothing." (Sale Decision, 407 B.R. at 481.)

17. On June 1, 2009, Old GM filed a petition for Chapter 11 bankruptcy relief with the United States Bankruptcy Court for the Southern District of New York. ("Bankruptcy Court") (Ex. 14, 6/01/09 Old GM Petition for Chapter 11 Relief, *In re Motors Liquidation Co.*, 09-bk-50026 ("Bankruptcy Proceeding"), Docket No. 1.) Old GM subsidiaries Saturn LLC, Saturn Distribution Corporation, and Chevrolet-Saturn of Harlem Inc. also filed petitions for Chapter 11 bankruptcy relief with the Bankruptcy Court, and their fcases were administratively consolidated with Old GM's bankruptcy case. (*Id.*) On the same day, Old GM and its subsidiaries filed a motion to authorize a 363 Sale. (Ex. 15, 06/01/09 Motion to Authorize 363 Sale.)

18. Old GM explored various financing options with different entities, but only the U.S. Treasury expressed willingness to provide debtor-in-possession financing to Old GM, with such financing contingent on the approval of a 363 Sale. (Ex. 6, W. Repko Decl., ¶¶ 24-37; Ex. 1, F. Henderson Aff., ¶ 15; Sale Decision, 407 B.R. at 484.)

19. Without a prompt 363 Sale, Old GM would have been forced into liquidation. (Ex. 1, F. Henderson Aff., ¶ 15; Ex. 16, S. Worth Decl., ¶ 24; Sale Decision, 407 B.R. at 484.)

20. On June 1, 2009, Old GM filed a motion for authorization of a $33.3 billion debtor-in-possession credit facility financed by the U.S. Treasury and Export Canada. (Ex. 17,

5

6/25/09 Final Order Authorizing DIP Facility.) On June 3, 2009, the Bankruptcy Court entered an interim order authorizing Old GM to access up to $15 billion in the facility; on June 25, 2009, the court entered a final order authorizing Old GM to access the entirety of the $33.3 billion facility. (*Id.*) Accordingly, prior to approval of the 363 Sale, the U.S. and Canadian governments had provided Old GM approximately $52.7 billion in financing. (*Id.*; SUF ¶¶ 4, 10.)

21. Old GM and Vehicle Acquisitions Holdings LLC f/k/a NGMCO, Inc., a corporate entity sponsored by the U.S. Treasury, reached an agreement to purchase assets of Old GM as part of a 363 transaction. This offer was expressly subject to higher and better offers. (Ex. 15, 6/1/09 Motion to Authorize 363 Sale, ¶ 15; Ex. 21, 7/5/09 Order Authorizing 363 Sale ("Sale Order"), ¶ G.)

22. NGMCO, Inc. was a Delaware corporation incorporated for the purpose of acquiring certain assets of Old GM. (Ex. 3, H. Wilson Decl., ¶ 18.) Prior to the 363 Sale, NGMCO, Inc. was owned entirely by the U.S. Treasury. (*Id.*)

23. Under the proposed sale, NGMCO, Inc., as the purchaser would acquire the purchased assets and operate New GM free of any entanglement with the bankruptcy cases, and thereby preserve going concern value, avoid systemic failure, provide employment, and protect the many communities dependent upon the business being purchased. (Ex. 1, F. Henderson Aff., ¶ 74; Sale Decision, 407 B.R. at 480.)

24. On May 31, 2009, Evercore Group LLC submitted to Old GM's board a fairness opinion concerning the proposed 363 sale. (Ex. 16, S. Worth Decl., ¶ 32.) Evercore determined that the proposed consideration for the sale of Old GM's assets—which included a $49 billion credit bid, 10 percent of the new company's common equity, warrants to acquire

6

up to an additional 15 percent in common equity, and assumption of certain liabilities—was fair. (*Id.* at Ex. F.) The Bankruptcy Court took notice of the fairness opinion and found that "[n]o contrary evidence ha[d] been submitted." (Sale Decision, 407 B.R. at 481.)

25. Evercore determined that the proposed sale was "fair from a financial point of view." (Ex. 16, S. Worth Decl., ¶ 33.) Evercore based its determination on "(1) our understanding, based on discussions with [Old] GM management, that [Old] GM has insufficient funds to continue operating as a going concern beyond May of 2009; (2) our understanding, based on discussions with [Old] GM management and Evercore's experience, that (a) no sufficient sources of financing exist for [Old] GM as a going concern other than that provided by the U.S. Treasury, and (b) no bona fide potential buyers have expressed an interest in acquiring [Old] GM other than the proposed 363 Sale involving the U.S. Treasury; (3) the values ascribed to the Debtors' assets and liabilities in the Liquidation Analysis; (4) the amount of the cash and noncash consideration to be received by [Old] GM in connection with the 363 Sale; and (5) the value ascribed to certain liabilities of [Old] GM to be assumed by Vehicle Acquisition Holdings LLC in connection with the 363 Sale, as set forth in estimates provided to us by [Old] GM or otherwise estimated by Evercore." (*Id.* at ¶ 30.)

26. After the Sale, New GM was owned by four entities: the U.S. government (60.8%), the Canadian government (11.7%), a new employees' beneficiary association trust (17.5%), and the bankruptcy estate of Old GM. (10%). (Ex. 22, Stockholders Agreement at 1 and Annex I; Sale Decision, 407 B.R. at 482; Ex. 21, Sale Order ¶ T.)

7

27. The Sale Order stated that New GM, "not the Debtors, has determined its ownership composition and capital structure. The Purchaser will assign ownership interests to certain parties based on the Purchaser's belief that the transfer is necessary to conduct its business going forward, that the transfer is to attain goodwill and consumer confidence for the Purchaser and to increase the Purchaser's sales after completion of the 363 Transaction." (Ex. 21, Sale Order, ¶ U.)

28. The purchaser's offer included a credit bid for the majority of Old GM's secured indebtedness under (i) the U.S. Treasury prepetition credit facilities, and (ii) the U.S. Treasury and Canadian DIP facility. (Ex. 48, Sale Agreement § 3.2(a)(i).)

29. The value of the credit bid was $48.7 billion. (Ex. 16, S. Worth Decl., Ex. F. Evercore Opinion at 15.)

30. Under the 363 Sale Agreement, New GM was to provide consideration valued at no-less-than $45 billion, in addition to equity interests in New GM. (Sale Order ¶ X; Sale Decision, 407 B.R. at 482.) The total value of the consideration was estimated at more than $90 billion. (Ex. 23, 2/23/11 T. Morrow Decl., ¶ 9.)

31. Following the 363 Sale, Old GM changed its name to Motors Liquidation Company ("MLC"). (Ex. 24, Restated Certificate of Incorporation.)

32. The New GM equity interest and warrants for additional New GM equity which MLC received in the 363 Sale were earmarked for distribution to Old GM's creditors. (Ex. 24, T. Morrow Decl., ¶ 41) ("As part of the consideration from the 363 Transaction, the Debtors received -- and will distribute to their creditors -- the New GM Securities.").) The Chapter 11 Plan provided that "each holder of an Allowed General Unsecured Claim . . . shall receive from the GUC Trust its Pro Rata Share of (i) the New GM Securities or

8

the proceeds there of, if any, and (ii) the GUC Trust Units[.]" (*Id.*, ¶ 41; Ex. 25, 2d Am. Ch. 11 Plan at §§ 1.98-1.100, 4.3; Ex. 26, 8/31/10 MLC Disclosure Statement at 17-18.)

33. Pursuant to the Sale Order, following the 363 Sale, New GM was required to send an email message to consumers in its marketing database whose contact information had originally been collected by Old GM. (Ex. 21, Sale Order, ¶ 60.) This email was to notify consumers of their ability to opt-out of receiving marketing communications from New GM. (*Id.*) New GM sent the email to approximately 8.8-million consumers between July 9, 2009, and July 13, 2009. (Ex. 27, 11/10/16 R. Hoffman Decl.). Further, New GM was required for 90 days to include on the home page of its consumer web page a conspicuous disclosure of information about the new entity, opt-out procedures for marketing communications, and a notice of the new entity's new privacy statement. (Ex. 21, Sale Order, ¶ 60.)

34. Old GM's bylaws were revised to eliminate periodic shareholder meetings for MLC. (Ex. 50, 7/14/09 MLC Bylaws, § 1.1.) The revised bylaws provided that MLC's board would consist of five members—three nominated by MLC's bondholders and two nominated by the Creditors Committee. (*Id.* at § 2.2.)

35. A new board of directors was elected for Motors Liquidation Company: Stephen Case, James Holden, Alan Johnson, Alan M. Jacobs, and Wendell Adair. (Ex. 28, 7/14/09 Old GM 8-K at Item 5.02.) The new board appointed officers, who were retained through AP Services, LLC, an affiliate of AlixPartners; MLC's directors and officers were indemnified by MLC and were covered by MLC's directors and officers insurance policy. (*Id.*)

9

36. The Stockholders Agreement associated with the Sale Agreement permitted three of the four ownership entities to nominate 12 of the 13 board members of the new company— 10 by the U.S. Treasury, one by the Canadian government, and one by the voluntary employee beneficiary association ("New VEBA")—with the 13th being the company's CEO. (Ex. 22, Stockholders Agreement, Art. II, § 2.2.) The ownership interest held by Old GM's bankruptcy estate did not provide it a role in appointing board members. (*Id.*) No more than five members of the Old GM board were permitted to become New GM board members, absent consultation among the U.S. Treasury, the Canadian government, and the New VEBA. (*Id.*)

37. A new board of directors was elected for New GM: Daniel Akerson, David Bonderman, Erroll B. Davis, Jr., Stephen J. Girsky, Frederick A. Henderson, E. Neville Isdell, Robert D. Krebs, Kent Kresa, Philip A. Laskawy, Kathryn V. Marinello, Patricia F. Russo, Carol M. Stephenson, and Edward E. Whitacre. (Ex. 29, 8/7/09 New GM 8-K.) Directors Davis, Henderson, Isdell, Kresa, Laskawy, and Marinello had been directors for Old GM; seven of the 13 original New GM directors had not been Old GM directors. (*Id.*) The New GM directors had general executive authority to appoint or replace New GM's officers and management. (Ex. 30, 7/9/09 New GM Bylaws, art. IV.)

38. Old GM was retained 16 categories of assets and all of its liabilities except those liabilities expressly assumed by New GM under the Sale Agreement. (Ex. 48, Sale Agreement §§ 2.2(b), 2.3(b).)

39. On August 11, 2009, Old GM filed a Notice of Interim Report disclosing assets, including: (i) a cash balance of $1.170 billion; (ii) 16 manufacturing properties; (iii) leased office space and parts warehouses; (iv) numerous other real estate holdings,

10

including decommissioned plants, office space, dealerships, vacant land, residence, churches, and a golf course, for which MLC assumed responsibility for property management of the sites acquired, including providing site maintenance and security and marketing properties to interested buyers; (v) 50% equity in New United Motor Manufacturing, Inc., a 50/50 jointly-owned company with Toyota Motor Company; (vi) 100% equity in General Motors Strasbourg S.A.S., a French powertrain manufacturing plant; (vii) "all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotion materials, reports and other materials (in whatever form or medium) relating exclusively to the Excluded Assets or Retained Liabilities, and any books, records and other materials that any Seller is required by Law to retain[.]"; and (viii) 152 wholly or partially owned subsidiaries. (Ex. 31, 8/11/09 MLC Interim Rpt. at 2-6.)

40. MLC's liabilities included the $1.175 billion wind-down facility, accounts payable, public debt and industrial revenue bonds, union obligations, asbestos, product liability and other litigation claims, environmental claims, workers compensation claims, contract rejection damages, and other priority claims and general unsecured claims. (Ex. 31, 8/11/09 MLC Interim Rpt. at 6-10.)

41. As of July 10, 2009, Old GM had hundreds of thousands of shareholders. (Ex. 32, 6/15/09 Certificate of Service.) Equity interests in Old GM, as of May 1, 2009, consisted of more than 610 million shares of common stock. (Ex. 23, T. Morrow Decl., ¶ 69.) Under the Chapter 11 Plan, Old GM shareholders would "neither receive nor retain any property on account of their Equity interests"; *i.e.*, Old GM shareholders would receive no payment from Old GM's ownership of shares in New GM. (*Id.*; *see also* Ex. 26,

11

  8/31/10 MLC Disclosure Statement at 17-18 ("The New GM Stock and New GM Warrants are reserved for distribution to the Debtors' general unsecured creditors in an arrangement that was agreed to by the U.S. Treasury prior to the Commencement Date."); Ex. 3, H. Wilson Decl., ¶ 21)

42. In an August 7, 2009 SEC 8-K filing, MLC stated, "It is the Company's strong belief that there will be no value at all for common stockholders in the bankruptcy liquidation process, even under the most optimistic of scenarios." (Ex. 33, 8/7/09 Old GM 8-K Filing.)

43. In a December 8, 2010 Disclosure Statement filed with the Bankruptcy Court, MLC stated, "Equity Interests issued by MLC shall be cancelled.. . . .Each holder of an Equity Interest shall neither receive nor retain any property on account of such Equity Interest." (Ex. 26, 8/31/10 MLC Disclosure Statement at 18.)

44. As stated by Old GM in its response to objections to the 363 Sale filed by Old GM's equity holders, "[t]he value generated by a sale pursuant to section 363(b) will be distributed in accordance with the absolute priority distribution scheme set forth in section 1129(b)(2)(B)(ii) of the Bankruptcy Code, in which creditors must be paid in full before equity interest holders receive any recovery. [citation omitted]. Therefore, the inability to receive a recovery on account of their shares absent full payment to the unsecured creditors, including the bondholders, cannot be the basis of a sustainable objection to the 363 Transaction." (Ex. 34, Omnibus Reply to Sale Objections, ¶ 78.)

45. MLC's Chapter 11 plan provided for its ultimate wind-down, with MLC being succeeded by the Motors Liquidation Company General Unsecured Creditors Trust ("MLC GUC Trust"). (Ex. 25, 2d Am. Ch. 11 Plan at § 6.10.) MLC was to be dissolved no later than

12

December 15, 2011, at which time all assets and liabilities would be transferred to the MLC GUC Trust. (*Id.*)

46. The Sale Agreement required Old GM to change its name to MLC, because Old GM's intellectual property, including its trademarks, was among the assets sold to New GM. (Ex. 48, Sale Agreement, § 6.22.)

47. On December 15, 2011, MLC filed a Certificate of Dissolution with the Delaware Secretary of State. (Ex. 35, 12/15/11 MLC Certificate of Dissolution.)

48. According to the MLC GUC Trust, it "was formed for the purposes of implementing the Plan [] as a post-confirmation successor to MLC." (Ex. 36, 3/31/16 MLC GUC Trust 10-K Filing at Item 1.)

49. Bankruptcy Judge Gerber stated that the MLC GUC Trust "stands in the shoes of the unsecured creditor community and the Old GM estates." (Ex. 37, 10/21/13 Bankr. Hr'g Tr. at 13:9-10.)

50. MLC common stock shares were cancelled as of March 31, 2011; MLC shareholders received no distribution at cancellation and did not receive a distribution under the Chapter 11 Plan. (Ex. 20, 4/4/11 MLC 8-K Filing at Item 3.03.)

51. Pursuant to the MLC GUC Trust Assignment and Assumption Agreement dated December 15, 2011, MLC assigned to the MLC GUC Trust certain assets and agreements, and the MLC GUC Trust assumed certain obligations and defenses of Old GM. (Ex. 38, MLC GUC Trust Assignment and Assumption Agreement, § 1.1.)

52. In a December 15, 2011 SEC 8-K filing, the MLC GUC Trust stated it would "implement the wind-down of MLC and its affiliated debtors, paying taxes and filing tax returns, making any other necessary filings related to the wind-down and in general taking any

13

other actions necessary or appropriate to wind-down MLC and its debtor subsidiaries. The MLC GUC Trust also assumed and shall administer the resolution of all disputed administrative expenses, priority tax claims, priority non-tax claims and secured claims against MLC and its debtor subsidiaries that were not resolved or satisfied prior to the Dissolution Date." (Ex. 39, 12/21/11 MLC GUC Trust 8-K Filing at Item 8.01.)

53. In July 2015, the MLC GUC Trust converted all of its holdings of New GM warrants received by MLC in the 363 Sale into New GM common stock. (Ex. 40, 8/12/16 MLC GUC Trust Quarterly Report, Condensed Financial Statements at 4.) Thereafter, the MLC GUC Trust sold its holdings of New GM common stock. (*Id.*) The proceeds of the sale of New GM common stock were allocated to the MLC GUC Trust's beneficiaries, *i.e.*, creditors of Old GM. (*Id.*)

54. As of March 31, 2016, the MLC GUC Trust had resolved $31.8 billion in allowed general unsecured claims against MLC. (Ex. 41, 7/22/16 MLC GUC Trust Status Report.)

55. "Under the terms of the Plan, for each $1,000 in amount of allowed general unsecured claims against the Debtors, or the Allowed General Unsecured Claims, the holders of such claims are currently entitled to receive (upon delivery of any information required by the GUC Trust) approximately $293 in cash (which dollar cash value shifts slightly due to rounding as required by the Plan), which represents the net cash value of the New GM Securities that otherwise would have been distributed to such claimant prior to entry of the Liquidation Order (as defined below), together with associated cash in lieu of fractional shares and Dividend Cash (as defined below), as well as one GUC Trust Unit." (Ex. 42, 5/25/16 MLC GUC Trust 10-K at 3.)

14

56. Old GM met the demands of North American customers with vehicles under the Chevrolet, Buick, Cadillac, GMC, Saturn, Pontiac, Hummer, and Saab brands. (Ex. 43, 3/4/09 10-K Filing at 1.)

57. By October 2010, New GM had completed a wind-down of the Saturn brand. (Ex. 44, 11/10/10 New GM 10-Q at 93.) New GM also sold the Saab brand and discontinued the Hummer and Pontiac brands shortly after the 363 Sale. (*Id.*)

58. Old GM had approximately 6,000 dealer franchise agreements for the sale of Old GM vehicles. (Ex. 1, F. Henderson Aff., ¶ 92; Sale Decision, 407 B.R. at 512.) In connection with the 363 Sale, approximately 4,100 of those dealer franchise agreements were transferred to New GM. (*Id.*)

59. In the United States, 19 of the 80 manufacturing plants and service-parts distribution centers previously owned or leased by Old GM were wound down following the 363 Sale. (Ex. 45, 11/10/16 T. Kole Decl.) These 19 facilities included 14 manufacturing plants in Indianapolis, IN, Flint, MI, Livonia, MI, Pontiac, MI (three sites), Mansfield, OH, Parma, OH, Fredericksburg, VA, Grand Rapids, MI, Shreveport, LA (two sites), Wilmington, DE, and Moraine, OH, and five service-parts distribution centers in Boston, MA, Jacksonville, FL, Groveport, OH, Martinsburg, WV, and St. Charles, MO. (*Id.*)

60. On February 5, 2010, MLC moved in the Bankruptcy Court for an order approving a stipulation between MLC and New GM "resolving certain ambiguities with respect to the terms of that certain Master Sale and Purchase Agreement, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet Saturn of Harlem, as Sellers, and NGMCO, Inc. (n/k/a General Motors, LLC) as Purchaser (the "MSPA"), and (ii) authorizing the Parties to enter into future settlements for similar

15

clarifications under the MSPA, without seeking the approval of this Court, provided that the Debtors obtain the prior written consent of the official committee of unsecured creditors in the Debtors' chapter 11 cases[.]" (Ex. 46, 2/5/10 MLC Motion.) MLC and New GM were represented by separate counsel in the dispute, with New GM represented by the U.S. Department of Justice. (Ex. 47, 3/2/10 H'rg Tr. at 12:20-24.)

61. Under the Sale Agreement, New GM assumed certain liabilities for Old GM vehicle owners who would have otherwise received nothing if the Sale had not been approved: (a) post-sale accidents involving Old GM vehicles causing personal injury, loss of life or property damage; (b) repairs or the replacement of parts provided for under the "glove box warranty" (usually the lesser of 36,000 miles or 3 years from the original purchase) to Old GM vehicle owners; and (c) Lemon Law violations as defined in the Sale Agreement. (Ex. 48, Sale Agreement at § 2.2.) New GM also covenanted to perform Old GM's recall obligations relating to Old GM vehicles. (*Id.* at § 6.15.)

62. Plaintiffs asserting economic loss claims in MDL 2543 are pursuing claims against the MLC GUC Trust. (Ex. 49, 11/10/16 Joint Status Rpt at 14.)

63. In its 10-K for the year ended December 31, 2009, publicly filed on April 7, 2010, New GM stated that "we have launched a new company with a strong balance sheet, a competitive cost structure, and a strong cash position, which we believe will enable us to compete more effectively with our U.S. and foreign-based competitors in the U.S. and to continue our strong presence in growing global markets. In particular, we acquired Old GM's strongest operations and we believe we will have a competitive operating cost structure . . ." (Ex. 19, 4/7/10 New GM 10-K Filing at Item 1.)

Dated: November 11, 2016                         Respectfully submitted,

                                                 */s/ Richard C. Godfrey, P.C.*

                                                 Richard C. Godfrey, P.C.
                                                 Andrew B. Bloomer, P.C.
                                                 KIRKLAND & ELLIS LLP
                                                 300 N. LaSalle
                                                 Chicago, IL 60654-3406
                                                 Phone:  312-862-2000
                                                 Fax: 312-862-2200
                                                 richard.godfrey@kirkland.com
                                                 andrew.bloomer@kirkland.com

                                                 *Attorneys for Defendant General Motors LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on November 11, 2016, I electronically filed the foregoing document using the CM/ECF system which will serve notification of such filing to the email of all counsel of record in this action.

/s/ *Andrew B. Bloomer, P.C.*

Andrew B. Bloomer, P.C.