# Exhibit  D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------x
IN RE:

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION

14-MD-2543 (JMF)

Hon. Jesse M. Furman

-----------------------------------------------------------------------------x

## MEMORANDUM IN SUPPORT OF NEW GM'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT ON SUCCESSOR LIABILITY

Richard C. Godfrey, P.C.
Andrew B. Bloomer, P.C.
KIRKLAND & ELLIS LLP
300 N. LaSalle St.
Chicago, IL 60654
Phone: 312-862-2000
Fax: 312-862-2200
richard.godfrey@kirkland.com
andrew.bloomer@kirkland.com

*Attorneys for Defendant*
*General Motors LLC*

Date: November 11, 2016

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................1

II.  UNDISPUTED FACTUAL BACKGROUND.................................................................7

    A.   Because Of Its Severe Financial Distress, Old GM Filed For Bankruptcy. ............7

    B.   Old GM Sold Its Assets In A Court-Approved Section 363 Bankruptcy
        Sale................................................................................................................10

    C.   MLC Existed Years After The 363 Sale. ..............................................................12

    D.   New GM Is A Different Entity From Old GM, With A Different
        Ownership And Different Board..........................................................................15

III. PLAINTIFFS' SUCCESSOR LIABILITY ALLEGATIONS.........................................18

IV.  DELAWARE LAW OR, ALTERNATIVELY, NEW YORK LAW GOVERNS
    PLAINTIFFS' SUCCESSOR LIABILITY CLAIMS. .....................................................19

    A.   Federal Choice-Of-Law Principles Apply Because Plaintiffs' Successor
        Liability Claims Implicate Federal Bankruptcy Law And Policy. .......................19

    B.   Delaware Law Applies.......................................................................................24

    C.   If Delaware Law Does Not Apply, New York Law Applies................................27

    D.   The Choice-Of-Law Principles Of Nearly All States At Issue Dictate The
        Application Of Delaware Substantive Law Or, Alternatively, New York
        Substantive Law................................................................................................28

        1.   The Law of Delaware, New GM's State Of Registration, Applies
            To Claims For Successor Liability. ........................................................28

        2.   Alternatively, New York Law Should Apply Because Plaintiffs'
            Successor Liability Claims Sound In Contract. .......................................30

V.   PLAINTIFFS'  SUCCESSOR  LIABILITY  CLAIMS  FAIL  IN  ANY
    JURISDICTION. ......................................................................................................32

    A.   Plaintiffs' Successor Liability Claims Fail Under Delaware Law........................34

VI.    ALTERNATIVELY, PLAINTIFFS' SUCCESSOR LIABILITY CLAIMS FAIL
       UNDER THE LAW OF NEW YORK AND THE REMAINING
       JURISDICTIONS. .................................................................................................36

       A.    Plaintiffs' Mere Continuation Claims Fail Because the 363 Sale Was Not
             Intended To and Did Not Deprive Plaintiffs Of Any Recovery. ..........................37

       B.    Plaintiffs' Mere Continuation Claims Also Fail Because Plaintiffs Have
             No Evidence To Contradict The Bankruptcy Court's Finding That The 363
             Sale Was An Arm's Length Transaction That Involved Fair Consideration.........44

       C.    Plaintiffs' Mere Continuation Claims Fail Because MLC And The MLC
             GUC Trust Continued To Exist And Pay Creditors After The Transaction. .........51

       D.    Plaintiffs' Mere Continuation Claims Fail Because There Was No
             Continuity Of Shareholders. ................................................................................53

       E.    Mere Continuation Claims Cannot Arise From A Court-Approved 363
             Sale That The Bankruptcy Court Determined Was Not A
             "Reorganization" Under Federal Law. .................................................................59

       F.    Continuity of Business Operations Is Insufficient To Establish Mere
             Continuation.........................................................................................................62

       G.    Plaintiffs' Product-Line Exception Claims Fail Under California And
             Pennsylvania Law. ...............................................................................................64

       H.    Plaintiffs' Successor Liability Claims Also Fail Under The Continuity of
             Enterprise Exception. ...........................................................................................68

       I.     Plaintiffs' Successor Liability Claims Fail Under Texas Law..............................74

VII.   CONCLUSION........................................................................................................74

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABF Capital Corp. v. Berglass,*
    30 Cal. Rptr. 3d 588 (Cal. Ct. App. 2005)................................................................31

*Academy of IRM v. LVI Environmental Servs. Inc.,*
    344 Md. 434 (Md. Ct. App. 1997)............................................................................48

*In re Acme Sec., Inc.,*
    484 B.R. 475 (Bankr. N.D. Ga. 2012).................................................................60, 61

*Adolph Coors Co. v. Truck Ins. Exchange,*
    960 A.2d 617 (D.C. Ct. App.2008)...........................................................................31

*Advocate Fin. Grp., LLC v. 5434 N. Winthrop, LLC,*
    2014 IL App (2d) 130998, 15 N.E.3d 955..................................................................56

*Alberto v. Diversified Group, Inc.,*
    55 F.3d 201 (5th Cir. 1995).....................................................................................29

*Allison v. Clos-ette Too, LLC,*
    No. 14 CIV. 1618 LAK JCF, 2014 WL 4996358 (S.D.N.Y. Sept. 15, 2014) ...............25

*Altus Bank v. State Farm Fire & Cas. Co.,*
    No. 91–55329, 1992 WL 341321 (9th Cir. Nov. 19, 1992).........................................46

*Ambrose v. Southworth Prods. Corp.,*
    953 F. Supp. 728 (W.D. Va. 1997)............................................................................30

*Ammend v. BioPort, Inc.,*
    322 F. Supp. 2d 848 (W.D. Mich. 2004)..............................................................passim

*Andrews v. John E. Smith's Sons Co.,*
    369 So. 2d 781 (Ala. 1979) .....................................................................................71

*ASARCO LLC v. Americas Mining Corp.,*
    382 B.R. 49 (S.D. Tex. 2007)...................................................................................29

*Asher v. KCS Int'l, Inc.,*
    659 So. 2d 598 (Ala. 1995) .....................................................................................71

*In re Aug.,*
    448 B.R. 331 (E.D. Pa. 2011)..................................................................................20

*Baltimore Luggage Co. v. Holtzman,*
    80 Md. App. 282, 562 A.2d 1286 (1989) .............................................................passim

*In re Bath,*
    442 B.R. 377 (E.D. Pa. 2010)..................................................................................21

*Beatrice Co. v. State Bd. of Equalization*
(1993) 6 Cal.4th 767 ........................................................................................................52

*Berg Chilling Sys., Inc. v. Hull Corp.*,
435 F.3d 455 (3d Cir. 2006) ...........................................................................................57

*Bernal v. Charter County Mut. Ins. Co.*,
209 P.3d 309 (Okla. 2009) .............................................................................................32

*Bernard v. Kee Mfg. Co.*,
409 So. 2d 1047 (Fla. 1982) ...........................................................................................62

*Berrios v. Orlando Regional Healthcare Sys.*,
100 So.3d 128 (Fla. Dist. Ct. App. 2012) ......................................................................32

*In re Best Products Co., Inc.*,
168 B.R. 35 (Bankr. S.D.N.Y. 1994) ..............................................................................20

*In re Bill Hionas*,
361 B.R. 269 (Bankr. S.D. Fla. 2006) ............................................................................21

*Bingham v. Goldberg, Marchesano, Kohlman, Inc.*,
637 A.2d 81 (D.C. 1994) .....................................................................................47, 52, 55

*Black v. Powers*,
628 S.E.2d 546 (Va. Ct. App. 2006) ...............................................................................32

*Bonee v. L & M Contr. Chemicals*,
518 F. Supp. 375 (M.D. Tenn. 1981) ..............................................................................31

*Brainware, Inc. v. Scan-Optics, Ltd.*,
2012 WL 1999549 (E.D. Va. May 9, 2012) ....................................................................29

*Brandon v. Anesthesia & Pain Mgmt. Associates, Ltd.*,
419 F.3d 594 (7th Cir. 2005) .....................................................................................40, 53

*Broderick v. Stephano*,
171 A. 582 (Pa. 1934) .....................................................................................................29

*Brunner v. Estate of Lax*,
47 Misc.3d 1206(A), 2015 WL 1509815 (N.Y. Sup. Ct. April 3, 2015) ....................38, 39

*Buja v. KCI Konecranes Intern. Plc.*,
12 Misc.3d 859, 815 N.Y.S.2d 412 (N.Y. Sup. Ct. 2006) ...............................................51

*Burkholder v. Okmulgee Coal Co.*,
1921 OK 84, 82 Okla. 80, 196 P. 679 .............................................................................50

*Bushkin Assocs., Inc. v. Raytheon Co.*,
473 N.E.2d 662 (Mass. 1985) .........................................................................................31

*C.F. Trust, Inc. v. First Flight Ltd. P'ship*,
359 F. Supp .2d 497 (E.D. Va. 2005) ..............................................................................29

*C.T. Charlton & Associates, Inc. v. Thule, Inc.*,
    541 F. App'x 549 (6th Cir. 2013) ................................................................69, 71

*In re Cambridge Biotech Corp.*,
    186 F.3d 1356 (Fed.Cir.1999) ........................................................................29

*Canal Ins. Co. v. Montello, Inc.*,
    822 F. Supp. 2d 1177 (N.D. Okla. 2011) .......................................................29

*Cargo Partner AG v. Albatrans Inc.*,
    207 F. Supp. 2d 86 (S.D.N.Y. 2002) ..........................................................47, 53

*Cargo Partner AG v. Albatrans, Inc.*,
    352 F.3d 41 (2d Cir. 2003) ......................................................................*passim*

*Carriero v. Rhodes Gill & Co.*,
    1995 WL 866092 (D. Mass. Jan. 13, 1995) ..................................................29

*CenterPoint Energy, Inc. v. Superior Court*,
    157 Cal. App. 4th 1101 (Cal. Ct. App. 2007) ...............................................47

*Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.*,
    822 N.Y.S.2d 30 (N.Y. App. Div. 2006) .......................................................31

*Chieftain Royalty Co. v. Dominion Okla. Tex. Exploration & Prod., Inc.*,
    2011 WL 9527717 (W.D. Okla. July 14, 2011) .............................................29

*Chrysler Corp. v. Skyline Indus. Servs., Inc.*,
    528 N.W.2d 698 (Mich. 1995) ......................................................................31

*Chumney v. U.S. Repeating Arms Co.*,
    196 F.R.D. 419 (M.D. Ala. 2000) .................................................................68

*Cleveland v. Johnson*,
    209 Cal. App. 4th 1315 (Cal. Ct. App. 2013) ...............................................47

*Collins v. Olin Corp.*,
    434 F. Supp. 2d 97 (D. Conn. 2006) .............................................................68

*Collinsville Nat. Bank v. Esau*,
    176 P. 514 (Okla. 1918) .................................................................................42

*Con-Tech Sales Defined Ben. Trust v. Cockerham*,
    No. CIV. A. 87-5137, 1991 WL 5944 (E.D. Pa. Jan. 16, 1991) ....................52

*Consol. Elec. Coop. v. Panhandle E. Pipeline Co.*,
    189 F.2d 777 (8th Cir. 1951) .........................................................................59

*In re Coudert Bros., LLP*,
    673 F.3d 180 (2d Cir. 2012) .....................................................................19, 20

*Crawford Harbor Assoc. v. Blake Const. Co., Inc.*,
    661 F.Supp. 880 (E.D. Va. 1987) ..................................................................57

*Crutchfield v. Marine Power Engine Co.*,
    2009 OK 27, 209 P.3d 295 ...................................................................................... 42, 54, 57

*In re Cyrus II P'Ship*,
    413 B.R. 609 (Bankr. S.D. Tex. 2008) ................................................................................ 21

*Davaco, Inc. v. AZ3, Inc.*,
    2008 WL 2243382 (N.D. Tex. May 30, 2008) ................................................................... 29

*Dawejko v. Jorgensen Steel Co.*,
    290 Pa. Super. 15, 434 A.2d 106 (1981) .......................................................................... 65

*Desclafani v. Pave-Mark Corp.*,
    No. 07 CIV. 4639 (HBP), 2008 WL 3914881 (S.D.N.Y. Aug. 22, 2008) ........................... 33

*Diguilio v. Goss Int'l Corp.*,
    389 Ill. App. 3d 1052, 906 N.E.2d 1268 (2009) ........................................................... 40, 62

*State ex rel. Donahue v. Perkins & Will Architects, Inc.*,
    90 Ill. App. 3d 349, 413 N.E.2d 29 (1980) ................................................................... 68, 72

*Downtowner, Inc. v. Acrometal Prod., Inc.*,
    347 N.W.2d 118 (N.D. 1984) ...................................................................................... 67, 72

*EHA Consulting Grp., Inc. v. Hardin & Assocs., P.C.*,
    RDB 09-2859, 2010 WL 1137514 (D. Md. 2010) ............................................................. 63

*Ellison v. Clos-ette Too, LLC*,
    No. 14-CV-1618 LAK, 2014 WL 5002099 (S.D.N.Y. Oct. 7, 2014) .................................. 25

*Elmer v. Tenneco Resins, Inc.*,
    698 F. Supp. 535 (D. Del. 1988) .................................................................................. 35, 59

*In re Emoral, Inc.*,
    740 F.3d 875 (3d Cir. 2014), *cert denied sub nom.*,
    *Diacetyl Plaintiffs v. Aaroma Holdings, LLC*,
    135 S. Ct. 436 (2014) .................................................................................................. 24, 62

*In re Ener1, Inc.*,
    No. 12-10299 (MG), 2016 WL 6127513 (Bankr. S.D.N.Y. Oct. 20, 2016) ........................ 20

*Energy Coal v. CITGO Petroleum Corp.*,
    836 F.3d 457, 2016 WL 4575569 (5th Cir. Sept. 1, 2016) ............................................... 29

*Energy Intel. Group, Inc. v. Cowen & Co., LLC*,
    2016 WL 3939747 (S.D.N.Y. July 15, 2016) ........................................................ 25, 26, 30

*ExxonMobil Research & Engineering Co. v. Gensym Corp.*,
    2013 WL 1314461 (W.D. Tex. Mar. 28, 2013) ................................................................. 29

*Ezzard v. State Nat'l Bank*,
    1916 OK 471, 57 Okla. 371, 157 P. 127 .......................................................................... 50

*In re F & C Servs., Inc.*,
    44 B.R. 863 (Bankr. S.D. Fla. 1984) ............................................................................... 48

*Fiber-Lite Corp. v. Molded Acoustical Prod. of Easton, Inc.*,
   186 B.R. 603 (E.D. Pa. 1994), *aff'd*, 66 F.3d 310 (3d Cir. 1995) ........................................... 42

*First Presbyterian Church Of Ypsilanti v. H.A. Howell Pipe Organs, Inc.*,
   No. 07-13132, 2010 WL 419972 (E.D. Mich. Feb. 1, 2010) ........................................... 73

*Fish v. Amsted Indus., Inc.*,
   126 Wis. 2d 293, 376 N.W.2d 820 (1985) ........................................... 58, 63

*Fisher v. Allis-Chalmers Corp. Prod. Liab. Trust*,
   95 Cal. App. 4th 1182, 116 Cal. Rptr. 2d 310 (2002) ........................................... 64

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
   554 U.S. 33 (2008) ........................................... 21

*Fletcher v. Atex*,
   68 F.3d 1451 (2d Cir. 1995) ........................................... 25

*Florio v. Manitex Skycrane, LLC*,
   No. 6:07-CV-1700-ORL-28, 2010 WL 5137626 (M.D. Fla. Dec. 10, 2010) ................................. 33, 55

*Fluor Corp. v. Superior Court*,
   61 Cal. 4th 1175, 354 P.3d 302 (2015) ........................................... 64

*Fly Shoes s.r.l. v. Bettye Muller Designs Inc.*,
   2015 WL 4092392 (S.D.N.Y. July 6, 2015) ........................................... 26, 30

*Foster v. Cone–Blanchard Mach. Co.*,
   460 Mich. 696, 597 N.W.2d 506 (1999) ........................................... 68, 69, 70, 71

*Fountain v. Colonial Chevrolet Co.*,
   1988 WL 40019 (Del. Super Ct., April 13, 1988) ........................................... 34, 35

*Franklin v. USX Corp.*,
   87 Cal. App. 4th 615, 105 Cal. Rptr. 2d 11 (2001) ........................................... 47

*In re Friedlander Cap. Mgmt. Corp.*,
   411 B.R. 434 (Bankr. S.D. Fla. 2009) ........................................... 28

*Gallenberg Equip., Inc. v. Agromac Int'l, Inc.*,
   10 F. Supp. 2d 1050 (E.D. Wis. 1998) ...........................................*passim*

*Garland v. Herrin*,
   724 F.2d 16 (2d Cir. 1983) ........................................... 68

*In re Gaston & Snow*,
   243 F.3d 599 (2d Cir. 2001) ........................................... 19, 20, 22, 24

*In re Gen. Motors Corp.*,
   407 B.R. 463 (Bankr. S.D.N.Y. 2009) ...........................................*passim*

*In re Gen. Motors LLC Ignition Switch Litig.*,
   154 F. Supp. 3d 30 (S.D.N.Y. 2015) ........................................... 44

*In re Gen. Motors LLC Ignition Switch Litig.*,
2016 WL 3920353 (S.D.N.Y. July 15, 2016) ............................................................ 19, 31

*Goodwin v. McGehee*,
15 Ala. 232 (1849) ...................................................................................................... 72

*Goucher v. Parmac, Inc.*,
1984 OK CIV APP 46, 694 P.2d 953 ...................................................................... 52, 63

*Graham v. James*,
144 F.3d 229 (2d Cir. 1998) ..................................................................................... 6, 55

*Green v. Montgomery Ward & Co.*,
775 S.W.2d 162 (Mo. Ct. App. 1989) .......................................................................... 49

*Grenell v. Detroit Gas Co.*,
112 Mich. 70, 70 N.W. 413 (1897) ............................................................................... 73

*In re Gucci*,
105 F.3d 837 (2d Cir. 1997) .......................................................................................... 21

*Guinan v. A.I. duPont Hosp. for Children*,
597 F.Supp.2d 485, 495 (E.D. Pa.2009), *rev'd in part on other grounds*,
*M.G. ex rel. K.G. v. A.I. duPont Hosp. for Children*,
393 F. App'x 884 (3d Cir. Aug. 24, 2010) .................................................................... 29

*Guy v. Leiderbach*,
459 A.2d 744 (Pa. 1983) ............................................................................................... 31

*Guzman v. MRM/Elgin*,
567 N.E.2d 929 (Mass. 1991) ....................................................................................... 63

*Haines v. Mid-Century Ins. Co.*,
177 N.W.2d 328 (Wis. 1970) ........................................................................................ 31

*Harris v. T.I., Inc.*,
243 Va. 63, 413 S.E.2d 605 (1992) .............................................................. 33, 50, 57, 63

*Harvell v. Goodyear Tire & Rubber Co.*,
164 P.3d 1028 (Okla. 2006) .......................................................................................... 32

*Hayden Cap. USA, LLC v. Northstar Agri Indus., LLC*,
2012 WL 1449257 (S.D.N.Y. Apr. 23, 2012) ............................................................... 26

*Health & Racquet Club, Inc. v. Fitness Today of Charlottesville*,
29 Va. Cir. 61 (1992) ..................................................................................................... 50

*Henkel Corp. v. Hartford Accident & Indem. Co.*,
29 Cal. 4th 934, 62 P.3d 69 (2003) ............................................................................... 64

*Henry Tech. Holdings, LLC v. Giordano*,
2014 WL 3845870 (W.D. Wis. Aug. 5, 2014) .............................................................. 30

*Hibernia Ins. Co. v. St. Louis & N.O. Transp. Co.*,
13 F. 516 (C.C.E.D. Mo. 1882), *aff'd*, 120 U.S. 166, 7 S. Ct. 550, 30 L. Ed. 621 (1887) .............. 42

*Hoffeditz v. AM Gen., LLC*,
No. 09-00257, 2011 WL 5880992 (E.D. Pa. July 29, 2011) ................................................................ 65, 66, 67

*In Continental Ins. Co. v. Schneider, Inc.*,
582 Pa. 591, 599 A.2d 1286 (2005) ............................................................................................................ 64

*Indosuez Int'l Fin B.V. v. Nat'l Reserve Bank*,
774 N.E.2d 696 (N.Y. 2002) ....................................................................................................................... 31

*Ingram v. Prairie Block Coal Co.*,
319 Mo. 644, 5 S.W.2d 413 (1928) ..................................................................................................... 41, 49

*Jackson v. George*,
2016 WL 5335791 (D.C. Sept. 22, 2016) ................................................................................................... 39

*Joseph Huber Brewing Co. v. Pamado, Inc.*,
No. 05 C 2783, 2006 WL 2583719 (N.D. Ill. Sept. 5, 2006) ............................................................... 48, 52

*Kaiser Found. Health Plan v. Clary & Moore, P.C.*,
123 F.3d 201 (4th Cir.1997) ....................................................................................................................... 57

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
8 F.3d 130 (2d Cir. 1993) ..................................................................................................................... 25, 28

*Katzir's Floor & Home Design, Inc. v. M–MLS.com*,
394 F.3d 1143 (9th Cir.2004) ..................................................................................................................... 47

*In re Keene Corp.*,
164 B.R. 844 (Bankr. S.D.N.Y. 1994) ................................................................................................. 24, 62

*Kemper v. Saline Lectronics*,
366 F. Supp. 2d 550 (N.D. Ohio 2005) ...................................................................................................... 73

*Kline v. Johns–Manville*,
745 F.2d 1217 (9th Cir.1984) ..................................................................................................................... 65

*Konover Property Trust, Inc. v. WHE Assocs, Inc.*,
790 A.2d 720 (Md. Ct. Spec. App. 2002) .................................................................................................. 32

*In re Koreag, Controle et Revision, S.A.*,
961 F.2d 341 (2d Cir. 1992) ................................................................................................... 20, 21, 24, 26

*Kradel v. Fox River Tractor Co.*,
308 F.3d 328 (3d Cir. 2002) ....................................................................................................................... 65

*Kramer v. Bally's Park Place, Inc.*,
535 A.2d 466 (Md. 1988) ........................................................................................................................... 32

*LeSane v. Hillenbrand Indus.*,
791 F. Supp. 871 (D.D.C. 1992) ................................................................................................................ 62

*Lewis v. Blackman Plumbing Supply L.L.C.*,
51 F. Supp. 3d 289 (S.D.N.Y. 2014) .................................................................................................. 37, 55

*Lexington Coal Co., LLC v. Miller, Buckfire, Lewis Ying & Co., LLC,*
   340 B.R. 818 (Bankr. E. D. Ky. 2006) ............................................................. 46

*Lily Transp. Corp. v. Royal Inst. Servs., Inc.,*
   832 N.E.2d 666 (Mass. App. Ct. 2005) ............................................................ 29

*Lockheed Martin Corp. v. Gordon,*
   16 S.W.3d 127 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) ...................... 73

*Lyons v. Turner Constr. Co.,*
   551 N.E.2d 1062 (Ill. Ct. App. 1990) .......................................................... 31, 70

*Magnolia's at Bethany, LLC v. Artesian Consulting Engineers, Inc.,*
   No. CIV.A. S11C-04013ESB, 2011 WL 4826106 (Del. Super. Ct. Sept. 19, 2011) ........ 35

*Maine State Retirement Sys. v. Countrywide Fin. Corp.,*
   2011 WL 1765509 (C.D. Cal. Apr. 20, 2011) .................................................... 28

*Maloney v. Am. Pharm. Co.,*
   207 Cal.App.3d 282 (Cal. Ct. App. 1988) ........................................................ 47

*Martin v. TWP Enterprises Inc.,*
   227 Md. App. 33, 132 A.3d 361 (2016) ............................................... 33, 41, 48, 49

*McCarthy v. Litton Indus., Inc.,*
   410 Mass. 15, 570 N.E.2d 1008 (1991) ............................................................ 52

*Meisel v. Ustaoglu,*
   2000 WL 33374486 (D. Md. Mar. 31, 2000), *aff'd,* 5 Fed. App'x 206 (4th Cir. 2001) ...... 29

*Milliken & Co. v. Duro Textiles, LLC,*
   451 Mass. 547, 887 N.E.2d 244 (2008) ................................................. 41, 54, 57, 61

*Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.,*
   2013 WL 3786618 (N.D. Cal. July 18, 2013) ................................................... 47

*Montross v. Loggy Bayou, Inc.,*
   No. 5:07-CV-390 FJS/GHL, 2008 WL 2385931 (N.D.N.Y. June 9, 2008) ................ 59

*Motor Components, LLC v. Devon Energy Corp.,*
   338 S.W.3d 198 (Tex.App.-Houston [14th Dist.] 2011, no pet.) ......................... 73

*In re Motors Liquidation Co.,*
   428 B.R. 43 (S.D.N.Y. 2010) .......................................................................... 27

*In re Motors Liquidation Co.,*
   430 B.R. 65 (S.D.N.Y. 2010) .......................................................................... 27

*In re Motors Liquidation Co.,*
   529 B.R. 510 (Bankr. S.D.N.Y. 2015) ............................................................. 24

*In re Motors Liquidation Co.,*
   541 B.R. 104, 2015 WL 6876114 (S.D.N.Y. 2015) .......................................... 74

*In re Motors Liquidation Co.*,
    552 B.R. 253 (Bankr. S.D.N.Y. 2016).............................................................................3

*In Matter of Motors Liquidation Co.*,
    829 F.3d 135 (2d Cir. 2016) ....................................................................................3, 45

*MPI Acquisition, LLC v. Northcutt*,
    14 So. 3d 126 (Ala. 2009) ....................................................................................69, 73

*Murphy v. Blackjet, Inc.*,
    No. 13-80280-CIV-HURLEY, 2016 WL 3017224 (S.D. Fla. May 26, 2016) ...................40

*Nat'l Carloading Corp. v. Astro Van Lines, Inc.*,
    593 F.2d 559 (4th Cir. 1979) .........................................................................................43

*Nat'l Sur. Corp. v. Pope Park, Inc.*,
    240 La. 63, 121 So. 2d 240 (1960) ...............................................................................56

*NCR Corp. v. Transport Ins. Co.*,
    823 N.W.2d 532 (Wis. Ct. App. 2012) ..........................................................................31

*Nelson v. Tiffany Indus., Inc.*,
    778 F.2d 533 (9th Cir. 1985) ...................................................................................65, 67

*NetJets Aviation, Inc. v. LHC Communications, LLC*,
    537 F.3d 168 (2d Cir.2008) ...........................................................................................25

*Nile v. Nile*,
    734 N.E.2d 1153 (Mass. 2000) .....................................................................................31

*Nilsson v. Cont'l Mach. Mfg. Co.*,
    251 Ill. App. 3d 415, 621 N.E.2d 1032 (1993) .........................................................56, 59

*NorAm Drilling Co. v. E & PCo Int'l, LLC*,
    131 So.3d 926 (La. Ct. App. 2013) ...............................................................................31

*O'Brien v. Pennington School*,
    2008 WL 160588 (E.D. Pa. Jan. 15, 2008).....................................................................31

*Okla. v. Montgomery*,
    2012 WL 12864334 (W.D. Okla. May 24, 2012).............................................................29

*Old W. Annuity & Life Ins. Co. v. Apollo Grp.*,
    No. 5:03-CV-354-OC-10GRJ, 2008 WL 2993958 (M.D. Fla. Aug. 1, 2008)....................40

*On Command Video Corp. v. Roti*,
    705 F.3d 267 (7th Cir. 2013) .........................................................................................28

*Ostrolenk Faber LLP v. Genender Int'l Imports, Inc.*,
    2013 IL App (1st) 112105-U ...........................................................................................56

*Ozan Lumber Co. v. Davis Sewing Machine Co.*,
    284 F. 161 (D. Del. 1922).............................................................................................34

*Page v. Gulf Oil Co.*,
   812 F.2d 249 (5th Cir. 1987) ............................................................................................. 63

*Pacific Cycle, Inc. v. PowerGroup Int'l, LLC*,
   2013 WL 5745692 (W.D. Wis. Oct. 23, 2013) ................................................................. 30

*Panthera Rail Car LLC v. Kasgro Rail Corp.*,
   2013 WL 4500468 (W.D. Pa. Aug. 21, 2013) ................................................................... 29

*Parker v. Motors Liquidation Company*,
   10-4882-BK (2d Cir. July 28, 2011) .................................................................................. 27

*Patin v. Thoroughbred Power Boats Inc.*,
   294 F.3d 640 (5th Cir. 2002) ............................................................................................. 29

*Pearce v. Schneider*,
   242 Mich. 28, 217 N.W. 761 (1928) .................................................................................. 73

*Pennison v. Chicago, M. & St. P.R. Co.*,
   93 Wis. 344, 67 N.W. 702 (1896) ...................................................................................... 50

*Phillips v. Cooper Laboratories*,
   215 Cal. App. 3d 1648, 264 Cal. Rptr. 311 (1989) ........................................................... 66

*Phillips v. Reed Group, Ltd.*,
   955 F. Supp. 2d 201 (S.D.N.Y. 2013) ............................................................................... 25

*In re Portnoy*,
   201 B.R. 685 (Bankr. S.D.N.Y. 1996) ............................................................................... 20

*Powell v. N. Missouri R. Co.*,
   42 Mo. 63 (1867) .......................................................................................................... 42, 49

*Principles Solutions, LLC v. Feed.Ing B.V.*,
   2014 WL 2446239 (E.D. Wis. May 30, 2014) .................................................................. 30

*Pulis v. United States Electrical Tool Co.*,
   561 P.2d 68, 71 (Okla. 1977) ............................................................................................ 63

*In re QR Properties, LLC*,
   485 B.R. 20 (Bankr. D. Mass. 2013) ................................................................................. 41

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   132 S. Ct. 2065 (2012) ......................................................................................... 6, 23, 46

*Ray v. Alad Corp.*,
   19 Cal. 3d 22, 560 P.2d 3 (1977) ................................................................................. 64, 68

*In re Related Asbestos Cases*,
   578 F. Supp. 91 (N.D. Cal. 1983) ...................................................................................... 65

*Retzler v. Pratt & Whitney Co.*,
   723 N.E.2d 345 (Ill. Ct. App. 1999) .................................................................................. 28

*Riverside Mktg., LLC v. Signaturecard, Inc.*,
    425 F. Supp. 2d 523 (S.D.N.Y. 2006) ........................................................................................ 51

*Roberts v. Time Plus Payroll Servs., Inc.*,
    2008 WL 376288 (E.D. Pa. Feb. 7, 2008) ................................................................................. 31

*Royal All. Associates, Inc. v. Branch Ave. Plaza, L.P.*,
    587 F. Supp. 2d 729 (E.D. Va. 2008) .................................................................................. 43, 57

*Rual Trade Ltd. v. Viva Trade LLC*,
    549 F. Supp. 2d 1067 (E.D. Wis. 2008) ................................................................................... 30

*Russe & Burgess v. Miesner Lumber & Mfg. Co.*,
    243 S.W. 353 (Mo. Ct. App. 1922) .......................................................................................... 49

*S. Bend Lathe, Inc. v. Amsted Indus., Inc.*,
    925 F.2d 1043 (7th Cir. 1991) .................................................................................................. 66

*Sabad v. Fessenden*,
    825 A.2d 682 (Pa. Super. Ct. 2003) .......................................................................................... 31

*Safeco Ins. Co. v. Jelen*,
    886 N.E.2d 555 (Ill. Ct. App. 2008) ........................................................................................ 31

*Santa Maria v. Owens-ILs, Inc.*,
    808 F.2d 848 (1st Cir. 1986) ........................................................................................ 4, 34, 70

*Schmidt v. Boardman Co.*,
    608 Pa. 327, 11 A.3d 924 (Pa. 2011) ................................................................................ 65, 67

*In re School Asbestos Litig.*,
    1993 WL 209719 (E.D. Pa. June 15, 1993) .............................................................................. 29

*Schweitzer v. Consolidated Rail Corp.*,
    65 B.R. 794 (E.D. Pa. 1986) ..................................................................................................... 67

*Semenetz v. Sherling & Walden, Inc.*,
    851 N.E.2d 1170 (N.Y. Ct. App. 2006) ................................................................................... 62

*Sidell v. Missouri Pac. Ry. Co.*,
    78 F. 724 (2d Cir. 1897) ..................................................................................................... 37, 38

*Skirvin Operating Co. v. Sw. Elec. Co.*,
    1918 OK 503, 71 Okla. 25, 174 P. 1069 .................................................................................. 42

*Smith v. Meadows Mills, Inc.*,
    60 F. Supp. 2d 911 (E.D. Wis. 1999) ...................................................................................... 58

*Societe Anonyme Dauphitex v. Schoenfelder Corp.*,
    No. 07 CIV. 489, 2007 WL 3253592 (S.D.N.Y. Nov. 2, 2007) ......................................... 38, 39

*Software Freedom Conservancy, Inc. v. Best Buy Co.*,
    783 F. Supp. 2d 648 (S.D.N.Y. 2011) ................................................................................ 47, 62

*Sonat Exploration Co. v. Cudd Pressure Control, Inc.*,
   271 S.W.3d 228 (Tex. 2008) ............................................................................................... 31

*Soviet Pan Am Travel Effort v. Travel Committee, Inc.*,
   756 F. Supp. 126 (S.D.N.Y. 1991) .................................................................................... 26

*In re Spillman Dev. Grp., Ltd.*,
   401 B.R. 240 (Bankr. W.D. Tex. 2009) ............................................................................... 6

*Spring Real Estate, LLC v. Echo/RT Holdings, LLC*,
   No. CIV.A. 7994-VCN, 2013 WL 6916277 (Del. Ch. Dec. 31, 2013) ............................ 34

*Stanford Hotel Co. v. M. Schwind Co.*,
   180 Cal. 348, 181 P. 780 (1919) ....................................................................................... 55

*Starks v. Michigan Welding Specialists, Inc.*,
   722 N.W.2d 888 (Mich. 2006) ......................................................................................... 72

*Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*,
   906 F. Supp. 2d 202 (S.D.N.Y. 2012) ................................................................................ 7

*State Farm Mut. Auto. Ins. Co. v. Roach*,
   945 So.2d 1160 (Fla. 2006) ............................................................................................... 32

*Steel Co. v. Morgan Marshall Indus., Inc.*,
   278 Ill.App.3d 241, 214 Ill.Dec. 1029, 662 N.E.2d 595 (1996) ...................................... 40

*Stewart v. Telex Commc'ns, Inc.*,
   1 Cal. App. 4th 190, 1 Cal. Rptr. 2d 669 (1991) .............................................................. 65

*Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.*,
   17 Cal. Rptr. 2d 713 (Cal. Ct. App. 1993) ....................................................................... 31

*Stramaglia v. U.S.*,
   377 F. App'x 472 (6th Cir. 2010) ..................................................................................... 69

*Stutzman v. Syncro Mach. Co. Inc.*,
   No. CIV. A. 88-9673, 1991 WL 66796 (E.D. Pa. Apr. 18, 1991) .................................... 43

*SungChang Interfashion Co. Ltd. v. Stone Mtn. Accessories, Inc.*,
   2013 WL 5366373 (S.D.N.Y. Sept. 25, 2013) ................................................................. 26

*Sunnyside Dev. Co., LLC v. Opsys Ltd.*,
   2005 WL 1876106 (N.D. Cal. Aug. 8, 2005) ................................................................... 28

*Sunnyside Dev. Co. v. Opsys Ltd.*,
   No. C 05 0553, 2007 WL 2462142 (N.D.Cal. Aug. 29, 2007) ......................................... 39

*In re SunSport, Inc.*,
   260 B.R. 88 (Bankr. E.D. Va. 2000) ............................................................................ 50, 53

*Sweeney, Cohn, Stahl & Vaccaro v. Kane*,
   773 N.Y.S.2d 420 (N.Y. App. Div. 2004) ....................................................................... 28

*Thomas v. Johnson Agri-Trucking*,
  802 F. Supp. 2d 1242 (D. Kan. 2011)................................................................................31

*Estate of Thomas v. Southworth, Inc.*,
  2001 WL 36383623 (D.D.C. Jan. 30, 2001).....................................................................28

*Toibb v. Radloff*,
  501 U.S. 157 (1991) ..........................................................................................................21

*Tomlinson v. Combined Underwriters Life Ins. Co.*,
  2009 WL 2601940 (N.D. Okla. Aug., 21, 2009)...............................................................29

*Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.*,
  971 F. Supp. 2d 368 (S.D.N.Y. 2013) .........................................................................25, 26

*Turner v. Bituminous Casualty Co.*,
  397 Mich. 406, 244 N.W.2d 873 (1976)............................................................69, 70, 71, 73

*U.S. Automatic Sprinkler Co. v. Reliable Automatic Sprinkler Co.*,
  719 F. Supp. 2d 1020 (S.D. Ind. 2010).............................................................................67

*U.S. Fidelity & Guaranty Co. v. Petroleo Brasileiro S.A.-Petrobas*,
  2005 WL 289575 (S.D.N.Y. Feb. 4, 2005)........................................................................26

*U.S. S.E.C. v. Levine*,
  671 F. Supp. 2d 14 (D.D.C.2009)......................................................................................28

*U.S. v. Little Lake Misere Land Co., Inc.*,
  412 U.S. 580 (1973) ..........................................................................................................19

*In re UNR Indus.*,
  20 F.3d 766 (7th Cir. 1994)...............................................................................................21

*Urban Telecomm. Corp. v. Halsey*,
  No. CIV. A. 95-00035-C, 1996 WL 76160 (W.D. Va. Feb. 8, 1996) ....................50, 57, 58

*Vanston Bondholders Protective Comm. v. Green*,
  329 U.S. 156 (1946) ..........................................................................................................24

*Vernon v. Schuster*,
  179 Ill. 2d 338, 688 N.E.2d 1172 (1997)...........................................................................56

*Wachovia Secs., LLC v. Banco Panamericano, Inc.*,
  674 F.3d 743 (7th Cir. 2012).............................................................................................28

*Warren v. Mayer Fertilizer & Junk Co.*,
  145 Mo. App. 558, 122 S.W. 1087 (1909).........................................................................49

*Wehlage v. EmpRes Healthcare Inc.*,
  821 F. Supp. 2d 1122 (N.D. Cal. 2011).............................................................................28

*White v. Cone-Blanchard Corp.*,
  217 F. Supp. 2d 767 (E.D. Tex. 2002)...............................................................................33

*Williams v. Morris Transp.*,
    184 So.3d 136 (La. Ct. App. 2015) ................................................................................ 31

*Wolff v. Shreveport Gas, Elec. Light & Power Co.*,
    138 La. 743, 70 So. 789 (1916) ............................................................... 41, 48, 54, 56

*Woodridge Hills Ass'n v. Williams*,
    No. 310940, 2013 WL 5762990 (Mich. Ct. App. Oct. 24, 2013) .......................... 72

*Workforce Solutions v. Urban Servs. of Am., Inc.*,
    977 N.E.2d 267 (Ill. App. Ct. 2012) .................................................................... 56

*In re World Vision Ent., Inc.*,
    275 B.R. 641 (Bankr. M.D. Fla. 2002) ................................................................ 28

*Young v. Fulton Iron Works Co.*,
    709 S.W.2d 927 (Mo. Ct. App. 1986) .................................................................. 63

*Zimmerman v. W.L. Grush Produce & Comm'n Co.*,
    156 Mo. App. 588, 137 S.W. 642 (1911) ............................................................ 41

*Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*,
    642 N.E.2d 1065 (N.Y. 1994) .............................................................................. 31

**Statutes**

11 U.S.C. § 363 ...................................................................................................... 19, 23

11 U.S.C. § 363(k) ....................................................................................... 11, 18, 23, 46

11 U.S.C. § 523(a) ........................................................................................................ 21

11 U.S.C. § 544(b) ........................................................................................................ 21

La. Civ. Code, art. 3537 ................................................................................................ 31

Tex. Bus. Orgs. Code Ann. § 10.254 (Vernon Supp. 2012) ........................................ 73

**Rules**

Fed. R. Evid. 201(b)(2) ................................................................................................... 7

**Other Authorities**

Ala. Pers. Inj. & Torts (2016 ed.) ................................................................................. 73

C.J.S. Corporations (2013) ........................................................................................... 72

Fletcher, W.,
    Cyclopedia of the Law of Private Corporations (perm ed., rev. vol. 1999) ........... *passim*

King, Donald B. & Michael D. Murray,
    *Missouri Products Liability* (2d ed. 2002) ............................................................ 42

Missouri Products Liability (2d ed. 2002) .................................................................. 53

Mo. Practice, Business Organizations ........................................................................................ 44

Morris & Holmes, Business Organizations,
    8 La. Civ. L. Treatise (2015) .......................................................................................... 57

Restatement (Second) Conflicts of Laws .......................................................................... 28, 31, 32

Restatement (Third) of Torts: Prod. Liab. (1998) ...................................................................*passim*

## I.   INTRODUCTION[1]

"The general rule, which is well settled, is that where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor." 15 Fletcher, Cyc. Corp. § 7122.  The "mere continuation" exception to that rule applies only to certain asset sales that unfairly harm creditors of the seller.  *See* Restatement (Third) of Torts § 12 cmt. b ("Imposing liability on successor corporations constitutes acceptable public policy when the successor either agrees to be liable or is implicated in the transfer of assets in a way that, without such liability, would unfairly deprive future products liability plaintiffs of the *remedies that would otherwise have been available against the predecessor.*") (emphasis added); Fletcher, Cyclopedia of the Law of Private Corporations § 7124.10 (perm ed., rev. vol.1999).  In their Fourth Amended Consolidated Complaint, plaintiffs seek to hold New GM liable for Old GM's unsecured debts based on a mechanical application of certain factors allegedly relevant to the mere continuation exception.  But none of those alleged factors, individually or taken together, establish that the historic, heavily-litigated and well publicized 363 Sale of Old GM assets[2] to an entity owned by the United States and Canadian governments actually harmed or was intended to harm creditors of Old GM.  To the contrary, the Bankruptcy Court held that, if the Sale had *not* occurred, Old GM would have "liquidate[d]" and creditors would have recovered "nothing."  *In re Gen. Motors Corp.*, 407 B.R. 463, 475 (Bankr. S.D.N.Y. 2009).  In short, the Sale did not harm creditors.  In fact, it is undisputed that the Sale enhanced

---

[1]    GM LLC fully stands by its Deferred Prosecution Agreement with the United States Attorney for the Southern District of New York, dated September 16, 2015, and the Statement of Facts associated with that Agreement. Nothing in this filing is intended to contradict the Statement of Facts or GM LLC's representations in the DPA.

[2]    The sale was memorialized in the Amended and Restated Master Sale And Purchase Agreement By And Among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation And Chevrolet-Saturn Of Harlem, Inc., as Sellers, And NGMCO, Inc., Dated As Of June 26, 2009 and effectuated  in the Bankruptcy Court's July 5, 2009 Order (i) Authorizing Sale Of Assets Pursuant To Amended And Restated Master Sale And Purchase Agreement With NGMCO, Inc., A U.S. Treasury-Sponsored Purchaser; (ii) Authorizing Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases In Connection With The Sale; And (iii) Granting Related Relief (the "363 Sale" or the "Sale").

the recoveries of various kinds of Old GM unsecured creditors because: (i) plaintiffs are currently pursuing claims against Old GM's successor, the Motors Liquidation Company GUC Trust, to recover from the Sale proceeds; (ii) other ignition switch plaintiffs have asserted Assumed Liability claims against New GM; and (iii) unsecured creditors generally have received billions in recoveries from Old GM and its successor the Motors Liquidation Company GUC Trust. The Bankruptcy Court's conclusions and supporting undisputed facts (described more fully below) – the existence of which are contrary to the nature and purposes of the mere continuation exception—collectively doom plaintiffs' attempt to avoid the well-settled rule precluding New GM's successor liability.

Plaintiffs' "mere continuation" allegations, if credited, would improperly undermine the Bankruptcy Court's holdings that form the very foundation of the seven-year-old 363 Sale. The Bankruptcy Court approved the more-than-$45 billion purchase price that New GM paid for Old GM assets after three days of hearings in New York, and after considering numerous objections it held:

(i)     "the only alternative to an immediate sale is liquidation—a disastrous result for GM's creditors, its employees, the suppliers who depend on GM for their own existence, and the communities in which GM operates. In the event of a liquidation, creditors now trying to increase their incremental recoveries would get nothing";

(ii)    the purchase price was fair, and there was no evidence to the contrary;

(iii)   "[n]o other, much less better, offer was received" for Old GM after a Bankruptcy-Court-sanctioned auction "[i]n accordance with standard section 363 practice";

(iv)    the sale was an arm's length transaction involving, among other things, a $49 billion secured creditor "credit bid" for Old GM assets—not a transaction in which New GM's stock was distributed to Old GM shareholders;

(v)     the sale "was *not* entered into and none of the Debtors, the Purchaser, or the Purchasers' present or contemplated owners have entered into the MPA or propose to consummate the 363 Transaction *for the purpose of hindering,*

*delaying, or defrauding the Debtors' present or future creditors*" (*id.* ¶ M; see also id. ¶ K) (emphasis added);

(vi)    The U.S. Treasury was a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code;

(vii)    the transaction was not a "reorganization" of Old GM but a judicially approved sale of assets pursuant to Section 363 of the Bankruptcy Code; and

(viii)    New GM was not a "mere continuation" of Old GM/MLC.

*Id.* at 480-94.  The facts supporting these conclusions are undisputed, have not changed during the last seven years, and preclude successor liability in the applicable jurisdictions.  Although plaintiffs argue that the Sale Order is not enforceable against them, their complaint cites no new facts or evidence to controvert any of these determinations the Bankruptcy Court made in 2009.[3] *Compare In re Motors Liquidation Co.,* 552 B.R. 253, 276 (Bankr. S.D.N.Y. 2016) ("Even if the Term Loan Defendants had been served with the Initial Complaint at the outset of the case and participated in the Phase I litigation, the Court concludes, based on the Second Circuit and Delaware Supreme Court decisions, that the outcome would have been the same, at least on the issues addressed in Phase I.  The Term Loan Defendants, at this stage at least, have not identified any legal or factual issues that could have and may still lead to a different result, at least as to them.").

Under the choice of law rules applicable to plaintiffs' successor liability claims, Delaware law applies.  Alternatively, New York law should apply.  Under Delaware law—and, indeed, under the law of every other jurisdiction at issue here[4]—plaintiffs' successor liability claims fail for at least four reasons.

---

[3]    *In Matter of Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016), the Second Circuit held that the "free and clear" provision of the Sale Order is not enforceable against these economic loss plaintiffs. *Id.* at 166.  The Second Circuit did not address the viability of any successor liability claims.

[4]    Alabama, California, the District of Columbia, Florida, Illinois, Louisiana, Maryland, Massachusetts, Michigan, Missouri, New York, Oklahoma, Pennsylvania, Texas, Virginia, and Wisconsin.

*First*, plaintiffs rely on the "mere continuation" exception to the general rule against successor liability.  (4th Am. Compl. ¶ 901) ("New GM is the mere continuation or reincarnation of the same business enterprise as Old GM.")  But that exception "is designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of the predecessor's creditors."  15 W. Fletcher, Cyc. of the Law of Private Corporations. Corp. § 7124.10 (1999); Restatement (Third) of Torts: Prod. Liab. § 12, cmt. b (1998) (explaining rationale for mere continuation exception: "If mere changes in form were allowed to control substance, corporations intending to continue operations could periodically wash themselves clean of potential liability at practically zero cost, in sham transactions, and thereby unreasonably undermine incentives for producers and distributors to invest in product safety and unfairly deny tort plaintiffs adequate remedies when defective products later cause harm.").  Plaintiffs cannot cite any evidence that the 363 Sale deprived them of recoveries that they would have had but for the Sale, much less that it was the "specific purpose" of the U.S. and Canadian governments to deprive them of a recovery.  And even under the continuity of enterprise and product line theories of successor liability applicable in a small minority of jurisdictions (which do not apply here for choice-of-law and other reasons described in Section IV), "it is crystal clear [that] the injured plaintiff must have been *deprived by the asset transaction of an effective remedy* against the predecessor corporation."  *Santa Maria v. Owens-ILs, Inc.*, 808 F.2d 848, 858 (1st Cir. 1986) (emphasis added); *Ammend v. BioPort, Inc.*, 322 F. Supp. 2d 848, 867 (W.D. Mich. 2004) (same).  Here, the Sale did not deprive plaintiffs of an "effective remedy" against Old GM.  Without the Sale, Old GM would have "liquidate[d]" and creditors would have recovered "nothing."  *In re Gen. Motors Corp.*, 407 B.R. at 475.  Thus, plaintiffs were not "deprived by the asset transaction" of any remedy.  *Santa Maria*, 808 F.2d at 858.

*Second*, plaintiffs' successor liability claims fail because Old GM creditors had a viable source of recovery following the Sale. Old GM/Motors Liquidation Company (MLC)[5] and its successor, the Motors Liquidation Company GUC Trust (MLC GUC Trust), existed after the Sale, held assets worth billions of dollars, and made distributions on allowed claims totaling approximately $32 billion.[6] Indeed, plaintiffs are planning to assert claims against the MLC GUC Trust. Moreover, the Sale also improved the recoveries of certain Old GM creditors (including certain ignition-switch plaintiffs) because New GM assumed certain categories of liabilities from Old GM, including post-sale accidents involving Old GM vehicles and parts causing personal injury, loss of life or property damage, the glove box warranty claims and lemon law claims.

*Third*, courts have rejected successor liability claims arising from arm's length transactions in which the seller received adequate consideration. Here, the Bankruptcy Court held that the Sale was negotiated at arm's length and that the $45-billion plus consideration paid by the U.S. and Canada was adequate, particularly given Old GM's $6.5-9.7 billion liquidation value. Plaintiffs' allegation that "New GM provided no cash consideration for the 363 Sale" (4th Am. Compl. ¶899) is contradicted by the Bankruptcy Court-approved, statutorily-authorized $49 billion credit bid by the U.S. and Canadian governments, whereby those governments: (i) provided secured loans to Old GM in advance of the Sale, which were then (ii) credited back at the time of the Sale. Plaintiffs' position that a credit bid is a lesser form of consideration than

---

[5]    On July 10, 2009, Old GM became "Motors Liquidation Company," which is referred to in this brief as "MLC."

[6]    "Under the terms of the Plan, for each $1,000 in amount of allowed general unsecured claims against the Debtors, or the Allowed General Unsecured Claims, the holders of such claims are currently entitled to receive (upon delivery of any information required by the GUC Trust) approximately $293 in cash (which dollar cash value shifts slightly due to rounding as required by the Plan), which represents the net cash value of the New GM Securities that otherwise would have been distributed to such claimant prior to entry of the Liquidation Order (as defined below), together with associated cash in lieu of fractional shares and Dividend Cash (as defined below), as well as one GUC Trust Unit." (*See* New GM Statement of Undisputed Material Facts ¶ 55.)

cash is contrary to federal bankruptcy law and U.S. Supreme Court precedent.  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S.Ct. 2065, 2069 (2012); *In re Spillman Dev. Grp., Ltd.*, 401 B.R. 240, 253 (Bankr. W.D. Tex. 2009) ("Fire Eagle's purchase of the SDG assets by credit bid of $9.3 million is the equivalent of a cash purchase.").  Moreover, unlike in *Norville*, plaintiffs do not challenge whether the consideration New GM paid was "sufficient." (*See Norville* Compl. ¶ 25.)  But even if plaintiffs were to seek to amend their Complaint to include such an allegation, it would be insufficient to establish successor liability.  The test is whether the Sale "deprived" creditors of an effective remedy against the seller, not whether—in circumstances involving a Sale that did *not* deprive creditors of a remedy—plaintiffs can claim that another hypothetical transaction would have increased creditor recoveries.

*Fourth*, plaintiffs' successor liability claims fail because the Bankruptcy Court authorized the auction procedures that resulted in the Sale, conducted an extensive hearing to approve the Sale transaction, and rejected claims that the Sale was actually a "reorganization" of Old GM under federal bankruptcy law.  The Bankruptcy Court's rejection of creditors' claim that the Sale was a *sub rosa* reorganization was affirmed on appeal.

These deficiencies require dismissal of plaintiffs' successor liability claims in all 16 jurisdictions.  In addition, to proceed with their mere continuation claims in a substantial majority of the jurisdictions at issue, plaintiffs must demonstrate "an identity of stock, stockholders, *and* directors between the successor and predecessor corporations."  *Graham v. James*, 144 F.3d 229, 240 (2d Cir. 1998) (emphasis added) (internal citations and quotations omitted).  Plaintiffs cannot prove *any* of these elements, much less all of them:  (i) there was no "single corporation after the transfer of assets" because MLC continued after the bankruptcy sale with substantial assets and resolved creditor claims until its dissolution in December 2011, at

Case 1:14-mc-02543-JMF   Document 9520   Filed 11/17/16   Page 25 of 94

which time it was succeeded by the MLC GUC Trust (which continues to resolve creditor claims); (ii) Old GM shareholders had their stock cancelled without receiving any Sale proceeds, and Old GM's 10% share in New GM was distributed for the benefit of Old GM *creditors*—not Old GM shareholders; (iii) Old GM was owned by hundreds of thousands of shareholders, but New GM was primarily owned by the U.S. and Canadian governments; and (iv) at the time the Sale closed, there was no overlap between New GM and Old GM directors—indeed, the majority of New GM directors had never served as Old GM directors.

Accordingly, the Court should grant New GM summary judgment on plaintiffs' successor liability claims.

## II.    UNDISPUTED FACTUAL BACKGROUND

### A.    Because Of Its Severe Financial Distress, Old GM Filed For Bankruptcy.

The majority of the relevant facts are set forth in the Bankruptcy Court's July 5, 2009 Sale Decision and the affidavits filed with Judge Gerber in the bankruptcy proceedings. *See In re General Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009) ("Sale Decision"), and July 5, 2009 Sale Order (Ex. 21); *see also* Exs. 1, 3, 6, 13, 16 (affidavits filed prior to Sale Decision and Sale Order).[7]

Old GM faced sharply deteriorating economic conditions during the second half of 2008 and the first quarter of 2009.   (SUF ¶ 1.)   The financial market crisis not only affected large institutions, but also affected consumers, as both income and financing for buyers and lessees of automobiles diminished.   (*Id.*; *see also Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*, 906 F. Supp. 2d 202, 205 (S.D.N.Y. 2012) ("The Court also takes notice of the events constituting the financial crisis that occurred in fall 2008, for the purpose of providing historical context, *see* Fed.

---

[7]   Citations to "Ex." are to the Exhibits to the Affirmation of R. Allan Pixton supporting New GM's motion.

R. Evid. 201(b)(2), and because the Court may take judicial notice of indisputable historical events.") (internal quotations omitted).)

"By the fall of 2008, [Old] GM was in the midst of a severe liquidity crisis, and its ability to continue operations grew more and more uncertain with each passing day. As a result, in November 2008, [Old] GM was compelled to seek financial assistance from the U.S. Government." (SUF ¶ 1-2; *Sale Decision*, 407 B.R. at 476.) In 2008 and 2009, "fear[ing] . . . a systemic failure throughout the domestic automotive industry and the significant harm to the overall U.S. economy that would result from the loss of hundreds of thousands of jobs and the sequential shutdown of hundreds of ancillary businesses," the U.S. government provided emergency secured financing to Old GM "to sustain GM's operations while GM developed a new business plan." (*Sale Decision*, 407 B.R. at 477; SUF ¶¶ 1-2, 4, 6.) "At the time that the U.S. Treasury first extended credit to GM, there was absolutely no other source of financing available. No party other than Treasury conveyed its willingness to loan funds to GM and thereby enable it to continue operating." (*Sale Decision*, 407 B.R. at 477; SUF ¶ 7.)

Old GM submitted an initial restructuring plan to Congress on December 2, 2008, in support of its request for $18 billion in federal loans. (SUF ¶ 8.) Following negotiations, the U.S. Treasury and Old GM entered into a loan agreement providing access to $13.4 billion in financing on a senior secured basis. (SUF ¶ 4.)

Old GM secured loans from the federal government under the Trouble Assets Relief Program ("TARP"). (SUF ¶ 5.) TARP funding did not give the government any stock in Old GM, nor did the funding entitle the government to appoint or nominate Old GM board members or officers; however, Old GM covenanted to make wholesale changes to its business, and if Old GM failed to develop a satisfactory restructuring plan, the government could discontinue funding

and/or demand prompt repayment of the loans, which would effectively force Old GM to liquidate.  (SUF ¶¶ 5-6.)

On February 17, 2009, and pursuant to its federal loan obligations, Old GM submitted a restructuring plan to the U.S. Treasury.  Old GM's plan proposed a number of changes to its business operations, including workforce reductions, plant closings and consolidations, and the elimination of certain Old GM brands.  (SUF ¶ 8.)  The U.S. Treasury found Old GM's February 17, 2009 plan insufficient.  (SUF ¶ 9.)  Thus, on March 31, 2009, President Obama announced that Old GM's proposal did not establish "a credible path to viability" that justified continued taxpayer investment.  (SUF ¶ 9.)  In rejecting Old GM's plan, the Obama administration announced that it would provide Old GM funding to sustain an additional 60 days of operations so that Old GM and the government could continue to negotiate a viable restructuring plan. Because Old GM continued to lose money at an alarming rate, the government provided an additional $6 billion in loans during this 60-day period.  (SUF ¶¶ 9-10.)

Also during this period, Old GM launched an out-of-court bond exchange offer for $27 billion in unsecured bonds.  (SUF ¶ 11.)  In connection with the bond exchange offer, Old GM disclosed it would file for bankruptcy if it did not receive enough tendered acceptances to consummate the exchange offer.  (SUF ¶ 11.)  The exchange offer expired on May 26, 2009 without meeting the threshold for tendered acceptances.  (SUF ¶ 11.)  Further presaging bankruptcy, "[o]n May 8, 2009, about three weeks before the Filing Date, GM announced its first quarter 2009 results.  They presented a grim financial picture, and equally grim trends." *Sale Decision*, at 479.  As of March 31, 2009, Old GM had consolidated reported global assets of $82.3 billion and liabilities of $172.8 billion.  (SUF ¶ 12.)

Throughout the pre-bankruptcy process, Old GM and the U.S. Treasury engaged in arms-length negotiations regarding Old GM's requests for federal financing: "[F]rom the moment that it put the very first dollar of emergency financing into GM, Treasury [] acted as a prudent lender seeking to protect its investment, and thus expressly conditioned its financial commitment upon [Old] GM's meaningful progress towards long-term viability." (SUF ¶¶ 13-14.)  Throughout the spring of 2009, Old GM and the U.S. Treasury—as well as the UAW and the UAW VEBA (on behalf of current and retired employees), Old GM's pre-petition secured lenders, certain of Old GM's pre-petition unsecured debt holders, and the government of Canada (the U.S. Treasury's co-investor)—engaged in contentious negotiations over the long term viability of Old GM, including the terms of additional loans to Old GM and the potential sale of its business operations.  (SUF ¶ 15.)  During the period from May 22 through June 1, 2009, the parties engaged in nearly around-the-clock negotiations at Old GM's New York headquarters and the office of their New York counsel.  (SUF ¶ 15.)  After the filing of Old GM's bankruptcy petition, the negotiations in New York expanded to include the Creditors' Committee—a fiduciary appointed under Section 1102 of the Bankruptcy Code to represent the interest of all general unsecured creditors of Old GM—and a group of Old GM's noteholders, each of whom reviewed the terms of the contemplated bankruptcy sale to a U.S. Treasury-owned entity.  (SUF ¶ 15.) Substantially all of these negotiations occurred in New York, which was the venue of Old GM's bankruptcy case.  (SUF ¶¶ 15, 17.)

### B.   Old GM Sold Its Assets In A Court-Approved Section 363 Bankruptcy Sale.

On June 1, 2009, Old GM filed a Chapter 11 bankruptcy petition, and on the same day sought approval of the Sale.  (SUF ¶ 17.)  In its July 5, 2009 Decision, the Bankruptcy Court found that Old GM's financial condition had deteriorated such that it could avoid liquidation only by obtaining additional financing.  (*Sale Decision*, 407 B.R. at 480; SUF ¶ 19.)  "The U.S.

Treasury (with its Canadian EDC co-lender)" was the "only entity" willing to provide such financing. (*Sale Decision*, 407 B.R. at 480; SUF ¶ 18.) Moreover, the U.S. was willing to provide such financing only if Old GM engaged in a prompt Sale process. (*Sale Decision*, 407 B.R. at 480; SUF ¶ 19.) In the Sale Decision, the Bankruptcy Court held that "the only alternative to an immediate sale is liquidation," which was not a viable option because "in the event of a liquidation, unsecured creditors would recover nothing." (*Sale Decision*, 407 B.R. at 474-75, 481, 493; SUF ¶ 16.)

The bankruptcy sale option would enable "the Purchaser [to] acquire the purchased assets; create a New GM; and operate New GM free of any entanglement with the bankruptcy cases." (SUF ¶ 23.) A quick Sale—one that closed before Old GM's value further dissipated as a result of continuing losses and growing consumer uncertainty as to its viability—would stop Old GM from rapidly losing cash that could be used post-Sale to pay creditors, preserve the going concern value of the Old GM assets to be sold, avoid systemic failure in the national automobile industry and economy, and provide employment to potentially hundreds of thousands of Old GM employees. (SUF ¶ 23.)

Accordingly, NGMCO, Inc. (a predecessor to General Motors LLC, *i.e.*, "New GM"), a newly-formed Delaware corporation wholly owned by the U.S. Treasury, entered into an agreement to purchase certain Old GM assets. (SUF ¶¶ 21-23.) As part of the Sale, MLC received at least $45 billion in consideration from New GM. (SUF ¶ 30.) An important element of the purchase price was a credit bid, under 11 U.S.C. § 363(k), by the U.S. and Canadian governments based upon secured loans they had made to Old GM.[8] (SUF ¶¶ 20, 24, 28-29.) The

---

[8]    The U.S. Treasury issued $19.4 billion in pre-Petition loans to Old GM: $13.4 billion on December 31, 2008, $2 billion on April 24, 2009, and $4 billion on May 20, 2009. During bankruptcy and before the closing of the 363 Sale, Treasury made an additional $33.3 billion in debtor-in-possession loans. The Canadian government's share of the U.S. Treasury debtor-in-possession loan was approximately $9.1 billion.

Bankruptcy Court determined the not-less-than $45 billion purchase price was fair and the product of good-faith negotiation.  (SUF ¶ 24.)

The Bankruptcy Court considered an Evercore fairness opinion offered in support of the Sale transaction, as well as an AlixPartners analysis estimating the liquidation value of Old GM assets.  (SUF ¶¶ 16, 24)  Specifically, the important factors Evercore reviewed in rendering its fairness opinion were:  (i) that Old GM had "insufficient funds to continue operating as a going concern beyond" May 2009, and thus required financing to avoid liquidation; (ii) there were no sufficient sources of financing for Old GM as a going concern other than the U.S. government; (iii) "no bona fide potential buyers ha[d] expressed an interest in acquiring" Old GM assets other than the U.S. government; (iv) the values ascribed to Old GM's assets and liabilities in the liquidation analysis by AlixPartners LLP; [9] (v) "the amount of the cash and noncash consideration to be received by [Old] GM in connection with the 363 Sale;" and (vi) the value placed on certain liabilities of Old GM that were to be assumed by New GM in connection with the Sale.  (SUF ¶ 25.)  Ultimately, Evercore determined that the consideration Old GM was to receive in connection with the Sale was "fair, from a financial point of view, to [Old] GM." (SUF ¶ 25.)

### C.    MLC Existed Years After The 363 Sale.

Following the Sale, Motors Liquidation Company (MLC) continued to exist separate and distinct from New GM until it was succeeded by the Motors Liquidation Company GUC Trust (the MLC GUC Trust) in 2011.  Old GM was required to change its name to MLC, because the intellectual property of Old GM was one of the assets sold to New GM.  (SUF ¶ 46.)  MLC and New GM each had its own Board of Directors and Officers (with no overlap).  (SUF ¶¶ 35-37.)

---

[9]    The Alix Partners liquidation analysis estimated that the net proceeds from assets available for distribution were approximately $8.1 billion (or, in the range of $6.5 billion to $9.7 billion).  (SUF ¶ 16.)  The Alix Partners analysis concluded that "there will be no proceeds available for distribution to unsecured creditors." (SUF ¶ 16.)

MLC's bylaws were revised to eliminate both shareholders' right to elect Board members and periodic shareholder meetings. (SUF ¶¶ 45, 47.) The reconstituted MLC board consisted of five new members: three nominees from the bondholders and two from the Creditors Committee (*i.e.*, none from the Old GM stockholders). (SUF ¶ 34.) Three directors—Stephen Case, James Holden, and Alan Johnson—were appointed on July 8, 2009 (two days before the Sale closing); they appointed Wendell Adair and Alan M. Jacobs, both of whom were Creditors' Committee recommendations. (SUF ¶ 35.) The MLC board then appointed MLC's officers. (SUF ¶ 35.) MLC's directors and officers were indemnified by MLC (not New GM) and covered by MLC's separate D&O insurance policy. (SUF ¶ 35.)

Pursuant to Section 2.2(b) of the Sale Agreement, MLC retained: (i) 16 categories of assets and (ii) all liabilities not specifically assumed by New GM (including without limitation, 16 categories of liabilities specifically identified in the Sale Agreement). (SUF ¶ 38.) Among the post-Sale assets that MLC retained were:

- A cash balance of $1.170 billion that had been advanced by U.S. Treasury just prior to the Sale closing.

- Equity securities in New GM stock provided to the Old GM bankruptcy estate as part of the Sale Consideration, the proceeds of which were for MLC creditors—not shareholders. (SUF ¶ 32 ("Under the Plan, holders of Equity Interests in Class 6 will neither receive nor retain any property on account of their Equity Interests.").)

- Leased office space, parts warehouses, and numerous other real estate holdings. MLC assumed responsibility for property management of the sites retained, including providing site maintenance and security and marketing properties to interested buyers.

- 16 manufacturing properties.

- 50% equity in New United Motor Manufacturing, Inc., a 50/50 jointly-owned company with Toyota Motor Company.

- 100% equity in General Motors Strasbourg S.A.S., a French powertrain manufacturing plant.

13

- "[A]ll books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotion materials, reports and other materials (in whatever form or medium) relating exclusively to the Excluded Assets or Retained Liabilities, and any books, records and other materials that any Seller is required by Law to retain[.]"

- 152 wholly or partially owned subsidiaries.

(SUF ¶ 39.)  Old GM's liabilities included $1.175 billion of U.S. Treasury loans that were not otherwise satisfied as part of the Sale, accounts payable, public debt and industrial revenue bonds, union obligations, asbestos, product liability and other litigation claims, environmental claims, workers compensation claims, contract rejection damages, and other priority claims and general unsecured claims.  (SUF ¶ 40.)

After the Sale, MLC notified Old GM shareholders that their equity interests were worthless because MLC's liabilities far exceeded its assets.  (SUF ¶ 42.)  In the Disclosure Statement filed with the Bankruptcy Court in December 2010 in connection with its proposed Chapter 11 plan, MLC stated:  "Equity Interests issued by MLC shall be cancelled. . . . Each holder of an Equity Interest shall neither receive nor retain any property on account of such Equity Interest."  (SUF ¶ 43.)   MLC shares were cancelled on March 31, 2011; MLC shareholders recovered nothing.  (SUF ¶ 50.)

MLC was succeeded by the MLC GUC Trust, which received substantial assets from MLC and assumed Plan obligations incurred by MLC.  (SUF ¶ 51.)  As Judge Gerber explained, the MLC GUC Trust "stands in the shoes of the unsecured creditor community and the Old GM Estates."  (SUF ¶ 49.)   Indeed, the MLC GUC Trust "was formed for the purposes of implementing the Plan [] as a post-confirmation successor to MLC."  (SUF ¶ 48.)  MLC was dissolved on December 15, 2011; however, its successor—the MLC GUC Trust—still exists today.  (SUF ¶¶ 47.)  Upon its dissolution, MLC's residual wind-down assets, certain reserve

14

cash, and obligations owed by MLC under the Chapter 11 plan were transferred to the MLC GUC Trust.  (SUF ¶ 51.)

       As successor to MLC, the MLC GUC Trust was, among other things, assigned the right to assert defenses and counterclaims to claims made against MLC.  (SUF ¶ 51; *see also* Bankruptcy Code Section 558 ("The [bankruptcy] estate shall have the benefit of any defense available to the debtor against any entity other than the estate…".)  In addition, after MLC dissolved, the MLC GUC Trust assumed responsibility for the affairs of and certain claims against MLC, including paying taxes and filing tax returns, making any other necessary filings related to the wind-down, and taking any other actions necessary or appropriate to wind-down MLC and its debtor subsidiaries.  (SUF ¶ 52.)  As of March 31, 2016, the MLC GUC Trust had resolved approximately $31.8 billion in allowed general unsecured claims against MLC.  (SUF ¶ 54.)

      **D.**    **New GM Is A Different Entity From Old GM, With A Different Ownership And Different Board.**

       Immediately before the Sale, New GM had one shareholder: the U.S. Treasury.  (SUF ¶ 22.)  Immediately after the Sale, New GM had four shareholders:  (1) the U.S. government (60.8%); (2) the Canadian government (11.7%); (3) a new employees' beneficiary association trust ("New VEBA") to fund health and welfare benefits for UAW retirees (17.5%); and (4) the bankruptcy estate of Old GM (10.0%).  (SUF ¶ 26.)  The Old GM bankruptcy estate also received warrants to purchase up to 15% of New GM's shares of common stock; this equity was to be distributed by MLC to creditors as part of any Chapter 11 plan.  (SUF ¶¶ 24, 32.)  Per the Sale Order, New GM and "not the Debtors, has determined its ownership composition and capital structure.  The Purchaser will assign ownership interests to certain parties based on the Purchaser's belief that the transfer is necessary to conduct its business going forward, that the

transfer is to attain goodwill and consumer confidence for the Purchaser and to increase the Purchaser's sales after completion of the 363 Transaction."  (SUF ¶ 27.)

New GM expressly assumed under the Sale Agreement certain liabilities for Old GM vehicle owners who would have otherwise received nothing if the Sale had not been approved: (a) post-sale accidents involving Old GM vehicles causing personal injury, loss of life or property damage; (b) repairs or the replacement of parts provided for under the "glove box warranty" (usually the lesser of 36,000 miles or 3 years from the original purchase) to Old GM vehicle owners; and (c) Lemon Law violations as defined in the Sale Agreement.  (SUF ¶ 61.) New GM also covenanted to perform Old GM's recall obligations relating to Old GM vehicles. [10]  (SUF ¶ 61.)

In its 10-K for the year ended December 31, 2009, publicly filed on April 7, 2010, New GM stated that "we have launched a new company with a strong balance sheet, a competitive cost structure, and a strong cash position, which we believe will enable us to compete more effectively with our U.S. and foreign-based competitors in the U.S. and to continue our strong presence in growing global markets.  In particular, we acquired Old GM's strongest operations and we believe we will have a competitive operating cost structure . . ." (SUF ¶ 63.)

Old GM's shareholders obtained no recovery from MLC's ownership of 10 percent of New GM stock or its warrants.  (SUF ¶ 50.)  Instead, "[t]he New GM Stock and New GM Warrants are reserved for distribution to the Debtors' general unsecured *creditors* in an arrangement that was agreed to by the U.S. Treasury prior to the Commencement Date."  (SUF ¶ 41.)  Accordingly, the Old GM estate's shares were distributed to MLC's creditors, not MLC's

---

[10]    All other liabilities to Old GM vehicle owners that were not expressly assumed under the Sale Agreement by New GM remained liabilities of MLC (*i.e.*, the Retained Liabilities).

shareholders.  (SUF ¶ 53.)  Dividends from New GM stock were also distributed to MLC creditors.  (SUF ¶¶ 53, 55.)

The New GM Stockholders Agreement gave the U.S. government, the Canadian government, and the New VEBA—but not the MLC estate—the right to appoint twelve of New GM's thirteen board members, the thirteenth being its CEO.  (SUF ¶ 36.)  A majority of New GM's board immediately following the Sale (7 of 13 members) never served as Old GM board members.  (SUF ¶ 37.)  This new board appointed New GM's executive officers, who in turn had "general executive responsibility" to appoint management.  (SUF ¶ 37.)

Pursuant to the Sale Order, following the Sale, New GM was required to send an email to MLC's customers in its database providing information about New GM and advising them of procedures for opting out from being contacted by the new entity for marketing purposes.  (SUF ¶ 33.)  New GM sent the email to 8.8 million consumers.  (*Id.*)  Further, New GM was required for 90 days to include on the home page of its consumer web site a conspicuous disclosure of information about the new entity, opt-out procedures for marketing communications, and a notice of the new entity's new privacy statement.  (SUF ¶ 33.)

Shortly after the Sale, New GM sold or wound down four of the eight Old GM brands: Pontiac, Saturn, Hummer, and Saab.  (SUF ¶ 57.)  Additionally, in the United States, 19 of the 80 manufacturing plants and service-parts distribution centers previously owned or leased by Old GM were wound down following the 363 Sale, including two which were partially wound down.  (SUF ¶ 59.)  These 19 facilities included 14 manufacturing plants in Indianapolis, IN, Flint, MI, Livonia, MI,  Pontiac, MI (three sites), Mansfield, OH, Parma, OH, Fredericksburg, VA, Grand Rapids, MI, Shreveport, LA (two sites), Wilmington, DE, and Moraine, OH, and five service-parts distribution centers in Boston, MA, Jacksonville, FL, Groveport, OH, Martinsburg, WV,

17

and St. Charles, MO.  (SUF ¶ 59.)  Further, of the approximately 6,000 dealerships in Old GM's network, New GM entered into dealer agreements with only 4,100 dealerships in connection with the Sale.   (SUF ¶ 58.)

After the Sale, disputes arose between MLC and New GM regarding certain provisions of the Sale Agreement, including whether specific assets constituted Purchased Assets owned by New GM or Retained Assets owned by MLC.  (SUF ¶ 60.)  Old GM moved in the Bankruptcy Court for an order to resolve such disputes. (SUF ¶ 60.)  MLC and New GM were represented by separate counsel who subsequently attended hearings and entered into stipulations resolving those disputes.  (SUF ¶ 60.)

## III.  PLAINTIFFS' SUCCESSOR LIABILITY ALLEGATIONS

In their complaint, Plaintiffs allege that "New GM is the mere continuation or reincarnation of the same business enterprise as Old GM."  (4th Am. Compl. ¶ 901.)  They claim that "New GM provided no cash consideration for the 363 Sale" (*id.* ¶ 899), ignoring that MLC received at least $45 billion in consideration from New GM from a secured lender credit bid, pursuant to 11 U.S.C. § 363(k), made by the U.S. and Canadian governments, which is the functional equivalent of a cash bid.  *See Sale Decision*, 407 B.R. at 482.  Based upon these allegations, plaintiffs purport to bring successor liability claims on behalf of a subclass of purchasers and lessors of Old GM Delta Ignition Switch Vehicles.[11]  (4th Am. Compl. ¶¶ 437, 973.)  This "Delta Ignition Switch Defect Successor Liability Subclass" asserts successor liability under state consumer protection statutes and for fraud by concealment under the law of all states, as well as implied warranty and violation of the Magnuson-Moss Warranty Act for

---

[11] Plaintiffs define the Delta Ignition Switch Vehicles as the 2005-10 Chevy Cobalt, 2006-11 Chevy HHR, 2007-10 Pontiac G5, 2007-10 Saturn Sky, 2003-07 Saturn ION, and 2006-10 Pontiac Solstice.  (4th Am. Compl. at p. 2.)

certain states, and for negligence for a handful of states.  (*See, e.g., id.* ¶¶ 1106-22, 1196-1232,

1756-1817.)

## ARGUMENT & AUTHORITIES[12]

## IV.    DELAWARE LAW OR, ALTERNATIVELY, NEW YORK LAW GOVERNS PLAINTIFFS' SUCCESSOR LIABILITY CLAIMS.

The significant federal interests in the consistent application of 11 U.S.C. § 363 and the

Bankruptcy Court's well-supported conclusions mandate the use of federal choice-of-law

principles to resolve plaintiffs' successor liability claims.   Those principles lead to the

substantive law of Delaware—the state of New GM's registration.  Courts in the Second Circuit

regularly hold that the state of incorporation or registration has the most significant interest in

successor liability claims.  Alternatively, the Court should apply New York law—the location of

the Bankruptcy Court whose conclusions are under attack and where the Sale Agreement was

negotiated, as well as the law selected in the judicially-approved Sale Agreement.  Finally, even

if state choice-of-law principles were to apply, for a substantial majority of states they lead to the

same results—Delaware law (as the state of New GM's registration) or, alternatively, New York

law (as the state with the most significant contacts) governs successor liability issues.[13]

### A.    Federal Choice-Of-Law Principles Apply Because Plaintiffs' Successor Liability Claims Implicate Federal Bankruptcy Law And Policy.

A court should apply federal choice of law principles where, as here, there is "an

important federal interest or policy concern that would justify application of federal choice of

law rules in place of any state choice of law . . . ."  *In re Coudert Bros., LLP*, 673 F.3d 180, 188

(2d Cir. 2012); *see also id.* at 187 (explaining that the need for a federal rule of decision "arises

---

[12]  This Court has addressed the legal standard for summary judgment in previous rulings.  *See In re: Gen. Motors LLC Ignition Switch Litig.*, 154 F. Supp. 3d at 30, 34–35 (S.D.N.Y. 2016)

[13]  In conducting a choice-of-law analysis, courts should determine whether there is a "true conflict" among the laws of different jurisdictions; if those laws are the same, then here is no need to determine which jurisdiction's law applies.  As explained in Sections V-VI *infra*, although there are some differences among the laws of the 16 states at issue, the law of each state rejects plaintiffs' successor liability claims.

Case 1:14-mc-02543-JMF   Document 526   Filed 11/17/16   Page 38 of 94

because application of state law would conflict with a federal policy or interest"); *In re Gaston & Snow*, 243 F.3d 599, 606 (2d Cir. 2001) (same); *see also U.S. v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580, 592 (1973) (holding, in a case involving land acquisition under the federal Migratory Bird Conservation Act, that "the choice-of-law task is a federal task for federal courts"). Applying federal choice of law principles "is especially appropriate when a case involves controversies implicating important federal bankruptcy policy." *In re Koreag, Controle et Revision, S.A.*, 961 F.2d 341, 350 (2d Cir. 1992); *In re Ener1, Inc.*, No. 12-10299 (MG), 2016 WL 6127513, at *7 (Bankr. S.D.N.Y. Oct. 20, 2016) ("The Second Circuit [in *Gaston & Snow*], took a balancing approach, holding that bankruptcy courts should apply the choice of law rules of the forum state unless an important federal policy is implicated.")

In determining whether federal or state choice-of-law principles apply, a court must analyze whether the issue is "predominantly founded upon state-created rights, or involv[es] important concerns implicating national bankruptcy policy." *Id.*; *see also In re Portnoy*, 201 B.R. 685, 697 (Bankr. S.D.N.Y. 1996). Thus, for claims based wholly on state law that do not involve any substantive bankruptcy interests, courts use state choice-of-law principles. *See, e.g., Coudert Bros.*, 673 F.3d at 184, 190; *Gaston & Snow*, 243 F.3d at 602-03. By contrast, federal choice-of-law principles apply when a claim concerns important bankruptcy interests such as the application of Bankruptcy Code provisions. *See, e.g., In re Best Products Co., Inc.*, 168 B.R. 35, 51 (Bankr. S.D.N.Y. 1994) ("In determining the choice of law issue, the court probably would apply federal common law choice of law rules because the court possesses federal question jurisdiction over any [fraudulent conveyance] claim based on section 544(b) of the Bankruptcy Code."); *In re Aug.*, 448 B.R. 331, 348 (E.D. Pa. 2011) (explaining that "in decisions involving objections to discharge and nondischargeability, courts have applied federal common law rather

than the forum state's choice of law approach to determine relevant state law" because "the debtor's right to a bankruptcy discharge or the scope of that discharge … involve important federal interests").[14]

Plaintiffs' successor liability claims involve controversies implicating important federal bankruptcy policy and plaintiffs' claims, if sustained in connection with a 363 Sale containing the detailed conclusions and factual findings in the Old GM bankruptcy matter, would significantly conflict with important federal interests and policy concerns.

*First*, plaintiffs' request for findings and conclusions that contradict the 363 Order and the Bankruptcy Code itself "involves important concerns implicating national bankruptcy policy." *Koreag*, 961 F.2d at 350. Section 363 fulfills Chapter 11's twin purposes by protecting both the "debtor's interest in reorganizing and restructuring its debts and the creditors' interest in maximizing the value of the bankruptcy estate." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 51 (2008); *see also Toibb v. Radloff*, 501 U.S. 157, 163 (1991). Section 363 allows the debtor's assets to be used productively while the purchase price provides funds to pay creditors' claims, advancing both of Chapter 11's purposes by "assist[ing] the bankruptcy court to secure the best price for the debtor's assets." *In re Gucci*, 105 F.3d 837, 840 (2d Cir. 1997); *see also In re UNR Indus.*, 20 F.3d 766, 770 (7th Cir. 1994).

*Second*, as discussed in Sections V-VI below, plaintiffs' claims fail under the law of any state because there is no evidence that the Sale unfairly harmed creditors. However, plaintiffs may argue that certain state choice-of-law rules would select state laws that plaintiffs claim

---

[14] *See also In re Bath*, 442 B.R. 377 (E.D. Pa. 2010) (applying "federal common law choice of law principles" where a dispute arises "from federal substantive law, such as 11 U.S.C. § 523(a)"); *In re Cyrus II P'Ship*, 413 B.R. 609, 614 (Bankr. S.D. Tex. 2008) (applying federal choice of law rules to fraudulent conveyance claims under 11 U.S.C. § 544(b) because they "involve important federal bankruptcy law and policy"); *In re Bill Hionas*, 361 B.R. 269, 274-75 (Bankr. S.D. Fla. 2006) (collecting cases) (applying federal choice-of-law to allowance of claims in bankruptcy).

impose successor liability for transactions that do not harm the seller's creditors.   But a Sale that does not harm the seller's creditors and nonetheless imposes liability on the purchaser would create the potential for new creditor recoveries where none had existed against either buyer or seller before the transaction.   Any such rule would directly conflict with the federal interest in 363 Sales generally, and in particular with this Sale involving the U.S. as purchaser.  *See Gaston & Snow*, 243 F.3d at 606 (discussing potential for "significant conflict between some federal policy or interest and the use of state law").

*Third*, plaintiffs' mere continuation claims challenge the purpose and intent of the U.S. and Canada in connection with the Sale.  Plaintiffs allege that the 363 Sale falls within the mere continuation exception, which applies to sham transactions designed to evade creditors.  *See* 15 W. Fletcher, Cyclopedia of the Law of Private Corporations § 7124.10 (perm ed., rev. vol.1999); Restatement (Third) of Torts: Prod. Liab. § 12, cmt. b (1998).   Here, the Bankruptcy Court concluded that the transaction "was not entered into and none of the Debtors, the Purchaser, or the Purchasers' present or contemplated owners have entered into the MPA or propose to consummate the 363 Transaction *for the purpose of hindering, delaying, or defrauding the Debtors' present or future creditors*" (*id.* ¶ M; *see also id.* ¶ K) (emphasis added), and that the U.S. was a good-faith purchaser under section 363(m) of the Bankruptcy Code (*id.* ¶ R; *see also id.* ¶¶ Q, 55); *see also Sale Decision*, 407 B.R. at 494 (discussing "the section 363(m) finding that the U.S. Government understandably desires," and "ruling that the U.S. Government has indeed acted in good faith").   Plaintiffs' claims are therefore attacking the legitimacy of a 363 Sale where the U.S. and Canada governments were the buyers and, if upheld, would lead to the unwarranted conclusion that the U.S. (and Canadian) governments engaged in a sham

transaction—approved by the U.S. Bankruptcy Court after extensive Section 363 auction procedures and a three-day trial—to unfairly injure Old GM creditors.

*Fourth*, far from being motivated by a desire to evade creditor claims, the U.S. had a significant federal interest in preventing what Judge Gerber described as a potential "systemic failure throughout the domestic automotive industry and [] significant harm to the overall U.S. economy." *Sale Decision*, 407 B.R. at 477-78.

*Fifth*, plaintiffs challenge the value of the credit bid by the U.S. and Canada under Section 363(k) of the federal Bankruptcy Code asserting that New GM was a "mere continuation" because, among other things, "New GM provided no cash consideration for the 363 Sale." (4th Am. Compl. ¶¶ 899, 901.)  To the contrary, the U.S. and Canadian governments submitted a credit bid $49 billion, the amount of secured debt they had loaned Old GM.  The Bankruptcy Code expressly authorizes credit bids as valid consideration.  *See* 11 U.S.C. § 363(k).  Indeed, the U.S. Supreme Court recently recognized the Federal Government's significant interest in such bids:

> The ability to credit-bid helps to protect a creditor against the risk that its collateral will be sold at a depressed price.  It enables the creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan.  That right is particularly important for the Federal Government, which is frequently a secured creditor in bankruptcy and which often lacks appropriations authority to throw good money after bad in a cash-only bankruptcy auction.  *RadLAX*, 132 S. Ct. at 2070 (2012).

Plaintiffs' effort to obtain a ruling that New GM is liable as a successor on the ground that the $49 billion credit bid constitutes lesser consideration than cash under state successor liability law fundamentally conflicts with federal bankruptcy policy.

*Sixth*, plaintiffs' claim that New GM is the "continuation" of Old GM directly conflicts with the Bankruptcy Court's holding that the transaction was a "sale" under 11 U.S.C. § 363, not

a "*sub rosa* reorganization."  *See Sale Decision*, 407 B.R. at 486; *see also id.* (Bankruptcy Court holding that there was no "*sub rosa* reorganization").

*Seventh*, once a debtor files for bankruptcy, as a matter of federal bankruptcy preemption, general claims held by all creditors, such as successor liability claims based on mere continuation (and other claims like piercing the corporate veil, corporate waste by management, *etc.*) are considered general claims of the bankruptcy estate, and no longer claims that can be pursued by individual creditors (such as Plaintiffs).  *See In re Emoral, Inc.*, 740 F.3d 875, 882 (3d Cir. 2014), *cert denied sub nom.*, *Diacetyl Plaintiffs v. Aaroma Holdings, LLC*, 135 S. Ct. 436 (2014); *In re Keene Corp.*, 164 B.R. 844, 849 (Bankr. S.D.N.Y. 1994)).[15]  Since successor liability claims become general claims of the bankruptcy estate because of federal preemption principles, there clearly is a strong federal interest in construing such claims in accordance with federal choice of law principles.

In short, because plaintiffs' attack on the 363 court-approved Sale involves controversies implicating important federal bankruptcy policy, and because plaintiffs seek to apply state choice of law rules and state substantive laws in a manner that would conflict with federal interests, the Court should apply federal choice of law rules.  *See Gaston & Snow*, 243 F.3d at 606; *Koreag*, 961 F.2d at 350.

###    B.    Delaware Law Applies.

"[F]ederal choice of law rules apply the law of the jurisdiction with the most significant relationship with the action."  *Gaston & Snow*, 243 F.3d at 605.[16]  The state that has the most

---

[15] Judge Gerber declined to follow *In re Emoral*.  *See In re Motors Liquidation Co.*, 529 B.R. 510, 553 (Bankr. S.D.N.Y. 2015).

[16] In *Gaston*, the Second Circuit reiterated that "[t]he ability of the federal courts to create federal common law and displace state created rules is severely limited." 243 F.3d a 606.  However, the court "limit[ed] [its] holding to cases where no significant federal policy, calling for the imposition of a federal conflicts rule, exists.  This limitation is dictated by [*Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 172, (1946)]."  *Id.* at 607; *see also*

significant relationship with this action is Delaware.  New GM is registered in Delaware, and

courts within the Second Circuit regularly hold that successor liability claims are governed by

the state of incorporation.[17]  The state that has the most significant relationship with this action is

Delaware.  As the Second Circuit explained in holding that the law of the incorporation state

governs alter ego claims, "[b]ecause a corporation is a creature of state law whose primary

purpose is to insulate shareholders from legal liability, the state of incorporation has the greater

interest in determining when and if that insulation is to be stripped away."  *Kalb, Voorhis & Co.*

*v. Am. Fin. Corp.*, 8 F.3d 130, 132-33 (2d Cir. 1993); *Fletcher v. Atex*, 68 F.3d 1451, 1456 (2d

Cir. 1995) ("the law of the state of incorporation determines when the corporate form will be

disregarded and liability will be imposed on shareholders") (internal brackets and quotation

marks omitted); *see also Energy Intel. Group, Inc. v. Cowen & Co., LLC*, 2016 WL 3939747, at

\*11 (S.D.N.Y. July 15, 2016) ("[I]ssues involving the rights and liabilities of a corporation are

generally governed by the law of the state of incorporation, based on the rationale that

---

*Vanston*, 329 U.S. at 162-63 ("bankruptcy courts must administer and enforce the Bankruptcy Act as interpreted by this Court in accordance with authority granted by Congress to determine how and what claims shall be allowed under equitable principles. And we think an allowance of interest on interest under the circumstances shown by this case would not be in accord with the equitable principles governing bankruptcy distributions").  Here, there are a number of significant federal policies—discussed *supra*—that require application of federal conflicts rules.

[17] Although a limited liability company is technically "formed" and not "incorporated" (and thus lacks a "state of incorporation") this is a distinction without a difference in the choice-of-law context. *See Allison v. Clos-ette Too, LLC*, No. 14 CIV. 1618 LAK JCF, 2014 WL 4996358, at \*4 (S.D.N.Y. Sept. 15, 2014), report and recommendation adopted sub nom. *Ellison v. Clos-ette Too, LLC*, No. 14-CV-1618 LAK, 2014 WL 5002099 (S.D.N.Y. Oct. 7, 2014) ("Under New York choice of law rules, '[t]he law of the state of incorporation determines when the corporate form will be disregarded"). This principle applies to LLCs as well as corporations. *See NetJets Aviation, Inc. v. LHC Communications, LLC*, 537 F.3d 168, 178 (2d Cir.2008) (corporate veil-piercing principles generally applicable to LLCs); *Phillips v. Reed Group, Ltd.*, 955 F.Supp.2d 201, 228 (S.D.N.Y.2013) (applying choice-of-law analysis to LLC as well as corporations.") (internal citations omitted); *see also Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.*, 971 F. Supp. 2d 368, 378 (S.D.N.Y. 2013) (disregarding distinction between corporations and limited liability companies when applying choice-of-law analysis to successor liability claims: "As with piercing the veil, New York courts determining successor liability have similarly concluded that the state with the most interest is the defendant corporation's place of incorporation… Because SMU LLC is a Delaware corporation and SMU Corp. is a New York corporation, I turn to the law of those states in determining whether successor liability is properly pleaded. As SMU Corp. is a New York corporation and New York is the forum state, New York law applies to the successor liability claim for SMU Corp. regardless. As for SMU LLC, I will apply Delaware law if there is an actual conflict with New York law.")

corporations are creatures of the state and are intentionally incorporated in a particular place in order to organize their liabilities.").  This rationale applies to successor liability claims because veil piercing and successor liability claims both concern the extent to which corporate protections will be respected, so the state of incorporation or registration has the greatest interest in both claims.  For this reason, numerous courts from this district have held that the state of incorporation governs successor liability claims.  *Id.*, at \*11 (collecting cases and holding that law of state of incorporation applies to "issues of corporate veil piercing, successor liability, and de facto mergers"); *Fly Shoes s.r.l. v. Bettye Muller Designs Inc.*, 2015 WL 4092392, at \*6 n.1 (S.D.N.Y. July 6, 2015) ("[I]t is the law of the successor's state of incorporation that typically determines successor liability.")[18]  Although many of these cases involved New York choice-of-law rules, federal and New York choice-of-law rules are similar, making them relevant here.  *See Koreag*, 961 F.2d at 350.  Applying the purchaser's state of incorporation also advances the strong federal interest in Section 363 Sales, as the purchaser can achieve better certainty in knowing which state law will apply to issues that may arise post-closing, including lingering issues relating to successor liability.  The more a purchaser can achieve predictability of outcome, the more willing it will be to pay a higher purchase price for the debtor's assets, which is consistent with the strong federal interest underlying Section 363 bankruptcy sales. As such,

---

[18]  *SungChang Interfashion Co. Ltd. v. Stone Mtn. Accessories, Inc.*, 2013 WL 5366373, at \* 13 (S.D.N.Y. Sept. 25, 2013) ("courts determining successor liability have similar concluded that the state with the most interest is the defendant corporation's place of incorporation"); *Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.*, 971 F. Supp. 2d 368, 378 (S.D.N.Y. 2013) ("courts determining successor liability have [] concluded that the state with the most interest is the defendant corporation's place of incorporation"); *Hayden Cap. USA, LLC v. Northstar Agri Indus., LLC*, 2012 WL 1449257, at \*6-7 (S.D.N.Y. Apr. 23, 2012) (explaining that courts in this district apply the law of the state of the defendant's incorporation to successor liability claims); *U.S. Fidelity & Guaranty Co. v. Petroleo Brasileiro S.A.-Petrobas*, 2005 WL 289575, at \*5 (S.D.N.Y. Feb. 4, 2005) ("The question of successor liability … should be governed by the law of Brazil, which is the jurisdiction of the relevant entities' incorporation."); *Soviet Pan Am Travel Effort v. Travel Committee, Inc.*, 756 F. Supp. 126, 131 (S.D.N.Y. 1991) (holding that law of the state of incorporation applies to successor liability claims).

26

because New GM is registered in Delaware, Delaware law should apply to plaintiffs' successor liability claims.

### C.        If Delaware Law Does Not Apply, New York Law Applies.

If this Court were to find that Delaware law does not apply, then it should conclude that New York law applies because plaintiffs' claim seeks to abrogate certain determinations by the Bankruptcy Court, as well as the opinions of this Court and the Second Circuit affirming the Sale Order, all of which were entered by courts in New York.  *See, e.g., Parker v. Motors Liquidation Company*, 10-4882-BK (2d Cir. July 28, 2011); *In re Motors Liquidation Co.*, 428 B.R. 43 (S.D.N.Y. 2010); *In re Motors Liquidation Co.*, 430 B.R. 65 (S.D.N.Y. 2010).  Moreover, New York is where the Sale Agreement that forms the basis of plaintiffs' successor liability claims was executed and judicially approved, as well as where the sale negotiations and proceedings leading up to that Sale occurred.  (SUF ¶¶ 15, 17.)

That New York has the most significant relationship with the action (other than Delaware) is further reinforced by the Sale Agreement's choice-of-law clause.   The Sale Agreement, which the Bankruptcy Court approved (*see, e.g.*, Sale Order ¶¶ 1, 3), expressly provides that all "matters arising out of or in connection with Agreement" shall be construed in accord with the Bankruptcy Code, or, to the extent the Bankruptcy Code does not apply, "in accordance with the Laws of the State of New York, without giving effect to rules governing the conflict of laws."  (Sale Agreement ¶ 9.12.)  Applying New York law—as specifically negotiated by and between the debtor and purchaser and approved by the Bankruptcy Court—protects the important federal interest in Section 363 sales discussed above, by allowing them to select the state law that will protect the sale and reject attacks on it.

Case 1:14-mc-02543-JMF    Document 3526    Filed 11/17/16    Page 46 of 94

**D.    The Choice-Of-Law Principles Of Nearly All States At Issue Dictate The Application Of Delaware Substantive Law Or, Alternatively, New York Substantive Law.**

**1.    The Law of Delaware, New GM's State Of Registration, Applies To Claims For Successor Liability.**

The vast majority of states follow the same choice-of-law principle as the Second Circuit—that alter ego and veil piercing claims are governed by the law of the state of incorporation.  The Second Circuit has expressly held that New York choice-of-law principles apply the state of incorporation for alter ego and veil piercing claims.  *See Kalb*, 8 F.3d at 132; *see also Sweeney, Cohn, Stahl & Vaccaro v. Kane*, 773 N.Y.S.2d 420, 423 (N.Y. App. Div. 2004).  Nearly all of the other jurisdictions at issue apply the substantive law of the state of incorporation to veil piercing claims:  California, [19] the District of Columbia, [20] Florida, [21] Illinois, [22] Louisiana, [23] Maryland, [24] Massachusetts, [25] Oklahoma, [26] Pennsylvania, [27] Texas, [28]

---

[19]  *Wehlage v. EmpRes Healthcare Inc.*, 821 F. Supp. 2d 1122, 1128-1130 (N.D. Cal. 2011) (holding that under California choice-of-law rules the state of incorporation applies to alter ego claims); *Maine State Retirement Sys. v. Countrywide Fin. Corp.*, 2011 WL 1765509, at *4 (C.D. Cal. Apr. 20, 2011) ("The particular issue in this case is successor liability by virtue of de facto merger. Mergers, reorganizations, and matters that may affect the interests of the corporation's creditors all fall within the scope of Section 302, which prescribes the law of the state of incorporation.") (emphasis omitted); *Sunnyside Dev. Co., LLC v. Opsys Ltd.*, 2005 WL 1876106, at *3 (N.D. Cal. Aug. 8, 2005) (applying California choice-of-law principles and concluding that alter ego claims should be governed by the state of incorporation).

[20]  *U.S. S.E.C. v. Levine*, 671 F. Supp. 2d 14, 35 (D.D.C.2009) ("Because Wire to Wire is incorporated in Nevada, Nevada law controls the alter ego analysis," citing Restatement (Second) Conflicts Of Laws § 307); *Estate of Thomas v. Southworth, Inc.*, 2001 WL 36383623, at *5 (D.D.C. Jan. 30, 2001) (applying law of Maine to successor liability claims using D.C. choice-of-law principles, explaining that "Maine clearly has a significant interest in the governance of its corporate relationships, specifically in terms of successor liability, while Maryland and the District of Columbia have little, if any interest").

[21]  *In re Friedlander Cap. Mgmt. Corp.*, 411 B.R. 434, *442 (Bankr. S.D. Fla. 2009) (holding under Florida choice of law rule that "[r]everse veil piercing involves the internal affairs of the Debtor, mainly the rights and liability of the Debtor," and thus applying the law of the state of the debtor's incorporation); *In re World Vision Ent., Inc.*, 275 B.R. 641, 661-62 (Bankr. M.D. Fla. 2002) (holding that under Florida choice-of-law principles the state of incorporation government veil piercing claims).

[22]  *On Command Video Corp. v. Roti*, 705 F.3d 267 at *272 (7th Cir. 2013) ("veil-piercing claims are governed by the law of the state of the corporation whose veil is sought to be pierced"); *Wachovia Secs., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 (7th Cir. 2012) ("Illinois applies the law of the state of incorporation for veil piercing claims."); *Retzler v. Pratt & Whitney Co.*, 723 N.E.2d 345, 354 (Ill. Ct. App. 1999) ("Efforts to pierce the corporate veil are governed by the law of the state of incorporation.").

Virginia,[29] and Wisconsin.[30]   While many of these states do not have established case law

regarding choice of law for successor liability, such claims are closely related to veil-piercing

---

[23] *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 646-47 (5th Cir. 2002) ("In light of these authorities, we agree with the district court's determination that the Louisiana State Supreme Court would most likely conclude that the law of the state of incorporation governs the determination when to pierce a corporate veil."); *Energy Coal v. CITGO Petroleum Corp.*, 836 F.3d 457, 2016 WL 4575569, at *4-5 (5th Cir. Sept. 1, 2016) (holding that Louisiana choice-of-law principles would apply the state of defendant's incorporation in determining whether the "single business enterprise theory" applies, a Louisiana doctrine allowing a court to ignore the corporate separateness of affiliated companies).

[24] *Meisel v. Ustaoglu*, 2000 WL 33374486, at *4 (D. Md. Mar. 31, 2000) (holding that "piercing the corporate veil" theories are governed by the law of the state of incorporation), *aff'd*, 5 Fed. App'x 206 (4th Cir. 2001).

[25] *Lily Transp. Corp. v. Royal Inst. Servs., Inc.*, 832 N.E.2d 666, 674 n. 15 (Mass. App. Ct. 2005) ("The matter [regarding piercing the corporate veil] is governed by the law of Gem's place of incorporation."); *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1376 n. 11 (Fed.Cir.1999) (applying Massachusetts law and holding that "[w]hen a court considers disregarding the corporate entity, i.e., 'piercing the corporate veil,' the court applies the law of the state of incorporation"); *Carriero v. Rhodes Gill & Co.*, 1995 WL 866092, at *2 (D. Mass. Jan. 13, 1995) ("As to the issue of corporate successorship, Rhode Island has the greater interest because both [the alleged predecessor and successor corporations] were incorporated under Rhode Island law.").

[26] *Tomlinson v. Combined Underwriters Life Ins. Co.*, 2009 WL 2601940 (N.D. Okla. Aug., 21, 2009) ("Accordingly, based on citation to Restatement (Second) of Conflicts of Laws in other circumstances, the Court finds that the Oklahoma Supreme Court would follow § 307 in holding that the state of incorporation's law applies to issues of piercing the corporate veil" and also noting "that the majority of jurisdictions addressing this question have also applied the law of the state of incorporation to veil-piercing issues"); *Canal Ins. Co. v. Montello, Inc.*, 822 F. Supp. 2d 1177, 1183-84 (N.D. Okla. 2011) (same); *Okla. v. Montgomery*, 2012 WL 12864334, at *6 (W.D. Okla. May 24, 2012) (same); *Chieftain Royalty Co. v. Dominion Okla. Tex. Exploration & Prod., Inc.*, 2011 WL 9527717, at *1 (W.D. Okla. July 14, 2011) (same).

[27] *Panthera Rail Car LLC v. Kasgro Rail Corp.*, 2013 WL 4500468, at *6 (W.D. Pa. Aug. 21, 2013) (applying Pennsylvania choice-of-law rules and holding that "[b]ecause piercing of corporate veil theories essentially seek to hold shareholders responsible for the liabilities of their corporations, courts use the corporate law of the targeted entity's state of incorporation"); *Guinan v. A.I. duPont Hosp. for Children*, 597 F.Supp.2d 485, 495 (E.D.Pa.2009) ("Pennsylvania courts apply the internal affairs doctrine, which 'holds that courts look to the law of the state of incorporation to resolve issues involving the internal affairs of a corporation" and therefore applying law of state of incorporation to veil piercing claim) (internal citations omitted), *rev'd in part on other grounds, M.G. ex rel. K.G. v. A.I. duPont Hosp. for Children*, 393 F. App'x 884 (3d Cir. Aug. 24, 2010); *In re School Asbestos Litig.*, 1993 WL 209719, at *3 (E.D. Pa. June 15, 1993) ("Under Pennsylvania's choice of law rules, the existence and extent of the liability of a shareholder for the payment of debts of the corporation, is determined by the law of the state of incorporation.") (internal modifications omitted); *see also Broderick v. Stephano*, 171 A. 582 (Pa. 1934) (holding that "[t]he existence and extent of the liability of a shareholder for assessments or to contribute to the corporation for the payment of debts of the corporation, is determined by the law of the state of incorporation").

[28] *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 203-04 (5th Cir. 1995) (holding that Texas choice-of-law rules would use the state of incorporation for alter ego claims); *ASARCO LLC v. Americas Mining Corp.*, 382 B.R. 49 (S.D. Tex. 2007) (same for veil-piercing claims and collecting cases); *Davaco, Inc. v. AZ3, Inc.*, 2008 WL 2243382, at *1 (N.D. Tex. May 30, 2008) ("The Court agrees with Couvrette that the law of Quebec, Couvrette's state of incorporation, provides the relevant law for the veil-piercing analysis."); *ExxonMobil Research & Engineering Co. v. Gensym Corp.*, 2013 WL 1314461, at *2 (W.D. Tex. Mar. 28, 2013) ("Under Texas choice-of-law rules, shareholder liability for corporate debts, pursuant to a veil-piercing or alter ego theory, is determined by the law of the state in which the corporation was incorporated.").

[29] *Brainware, Inc. v. Scan-Optics, Ltd.*, 2012 WL 1999549, at *5 (E.D. Va. May 9, 2012) ("In Virginia, the law of the state of incorporation determines whether the corporate veil may be pierced."); *C.F. Trust, Inc. v. First Flight*

Case 14-mc-02543-JMF    Document 526    Filed 11/17/16    Page 48 of 94

and alter ego claims.  Accordingly, numerous other courts within this District have relied on choice-of-law decisions in veil-piercing and alter ego cases to hold that the state of incorporation also governs successor liability claims.  *See, e.g.*, *Energy Intel.*, 2016 WL 3939747, at *11; *Fly Shoes*, 2015 WL 4092392, at *3 n.1.  All these claims address whether and to what extent the formal distinction between corporate entities should be honored, and the state of registration has the most significant interest in those questions.  Thus, for plaintiffs from these jurisdictions, the Court should apply the successor liability law of Delaware, New GM's state of registration.

### 2. **Alternatively, New York Law Should Apply Because Plaintiffs' Successor Liability Claims Sound In Contract.**

Even if federal choice-of-law principles or the law of the state of New GM's registration did not apply, the conflict-of-law rules of most states would apply New York law to plaintiffs' successor liability claims.  Successor liability claims sound in contract, and plaintiffs' claims here arise out of the 363 Sale.  In *Ambrose v. Southworth Prods. Corp.*, 953 F. Supp. 728, 734 (W.D. Va. 1997), which asserted successor liability claims in a product liability action, the court explained:

> A finding of successor liability is derived from an analysis of the relationship between two corporate parties and the agreements undertaken between those parties.  The agreements necessarily impose obligations and responsibilities on a party.  A determination of whether these responsibilities include successor liability for the prior tortious acts of the former corporation is more appropriately characterized as an issue of contract rather than tort.

---

*Ltd. P'ship*, 359 F. Supp .2d 497, 501 n.6 (E.D. Va. 2005) ("Under Virginia law, the law of the state of incorporation determines whether the corporate veil may be pierced.").

[30]  *Henry Tech. Holdings, LLC v. Giordano,* 2014 WL 3845870, at *6 (W.D. Wis. Aug. 5, 2014) ("The general rule is that a plaintiff's alter ego theory is governed by the law of the state in which the business at issue is organized. ... Courts applying Wisconsin choice of law rules in recent years have followed this rule.") (ellipsis in original, internal quotation marks omitted); *Rual Trade Ltd. v. Viva Trade LLC*, 549 F. Supp. 2d 1067, 1077–78 (E.D. Wis. 2008) (same, collecting cases); *Pacific Cycle, Inc. v. PowerGroup Int'l, LLC*, 2013 WL 5745692, at *1 (W.D. Wis. Oct. 23, 2013) (same, collecting cases); *Principles Solutions, LLC v. Feed.Ing B.V.*, 2014 WL 2446239, at *1 (E.D. Wis. May 30, 2014) (same, collecting cases).

*See also Thomas v. Johnson Agri-Trucking*, 802 F. Supp. 2d 1242, 1250 (D. Kan. 2011) (applying contractual choice-of-law principles to a successor liability claim); *Bonee v. L & M Contr. Chemicals*, 518 F. Supp. 375, 380 (M.D. Tenn. 1981) ("The rights of a corporation that contracts in Ohio to purchase the assets of another corporation should be the same with respect to assumption of liability for personal injuries regardless of where the personal injury occurs.").

Most states follow Section 188 of the Restatement (Second) of Conflict of Laws (1971) or similar principles[31] to decide contractual choice of law issues, including California,[32] the District of Columbia,[33] Illinois,[34] Louisiana,[35] Massachusetts,[36] Michigan,[37] New York,[38] Pennsylvania,[39] Texas,[40] and Wisconsin.[41] Contractual choice-of-law principles consider the

---

[31]  As this Court has previously explained, "subtle differences in state law can dictate different results for plaintiffs in different jurisdictions." *In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *18 (S.D.N.Y. July 15, 2016); *see also* Docket No. 597 at 28-30 (discussing contractual choice-of-law principles of various states). Likewise, here each state has case law weighing the various choice-of-law factors differently, but almost all states would select New York under contractual choice-of-law principles given that plaintiffs' successor liability allegations rest on the 363 Sale.

[32]  *ABF Capital Corp. v. Berglass*, 30 Cal. Rptr. 3d 588, 596-97 (Cal. Ct. App. 2005); *Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.*, 17 Cal. Rptr. 2d 713, 718 (Cal. Ct. App. 1993).

[33]  *Adolph Coors Co. v. Truck Ins. Exchange*, 960 A.2d 617, 620-21 (D.C. Ct. App.2008).

[34]  *Lyons v. Turner Constr. Co.*, 551 N.E.2d 1062, 1065-66 (Ill. Ct. App. 1990); *Safeco Ins. Co. v. Jelen*, 886 N.E.2d 555, 558 (Ill. Ct. App. 2008).

[35] La. Civ. Code,. art. 3537; *Williams v. Morris Transp.*, 184 So.3d 136, 140-41 (La. Ct. App. 2015); *NorAm Drilling Co. v. E & PCo Int'l, LLC*, 131 So.3d 926, 929-30 (La. Ct. App. 2013).

[36]  *Nile v. Nile*, 734 N.E.2d 1153, 1161 (Mass. 2000); *Bushkin Assocs., Inc. v. Raytheon Co.*, 473 N.E.2d 662, 669-70 (Mass. 1985);

[37]  *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 703 (Mich. 1995).  Although New GM is not arguing in this motion that Michigan would apply Delaware law to plaintiffs' successor liability claims, New GM is arguing that it would apply New York law.

[38]  *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 642 N.E.2d 1065, 1068-69 (N.Y. 1994); *Indosuez Int'l Fin B.V. v. Nat'l Reserve Bank*, 774 N.E.2d 696, 700 (N.Y. 2002); *Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.*, 822 N.Y.S.2d 30, 33 (N.Y. App. Div. 2006).

[39]  *Guy v. Leiderbach*, 459 A.2d 744, 748 n.5 (Pa. 1983); *Sabad v. Fessenden*, 825 A.2d 682, 687 (Pa. Super. Ct. 2003); *Roberts v. Time Plus Payroll Servs., Inc.*, 2008 WL 376288, at *2 n.2 (E.D. Pa. Feb. 7, 2008); *O'Brien v. Pennington School*, 2008 WL 160588, at *5 (E.D. Pa. Jan. 15, 2008);

[40]  *Sonat Exploration Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 231 (Tex. 2008).

[41]  *Haines v. Mid-Century Ins. Co.*, 177 N.W.2d 328, 330 (Wis. 1970); *NCR Corp. v. Transport Ins. Co.*, 823 N.W.2d 532, 536 (Wis. Ct. App. 2012).

place of negotiation, contracting, performance, subject matter, and residence of the parties, with the overarching question being which state "has the most significant relationship to the transaction and the parties." Restatement (Second) of Conflict of Laws § 188. Here, these factors lead to applying New York law to plaintiffs' successor liability claims for the reasons described in Section IV.

States like Florida,[42] Maryland,[43] Oklahoma,[44] and Virginia[45] apply a version of *lex loci contractus* or related principles, meaning that the law of the jurisdiction where the contract was made governs the rights and liabilities of the parties. The Sale Agreement was negotiated and executed in New York, so for these states New York law applies to successor liability claims.[46]

## V.   PLAINTIFFS' SUCCESSOR LIABILITY CLAIMS FAIL IN ANY JURISDICTION.

As discussed in Sections V.A and VI, *infra*, plaintiffs' successor liability claims fail under Delaware law. They also fail under New York law.

As discussed in Section VI, *infra*, plaintiffs' successor liability claims fare no better under the law of jurisdictions other than Delaware and New York, both under the mere continuation exception adopted by a majority of jurisdictions and certain broader exceptions adopted by a small minority. Plaintiffs' complaint alleges that the "mere continuation"[47]

---

[42]  *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So.2d 1160, 1163-64 (Fla. 2006); *Berrios v. Orlando Regional Healthcare Sys.*, 100 So.3d 128, 130 (Fla. Dist. Ct. App. 2012).

[43]  *Kramer v. Bally's Park Place, Inc.*, 535 A.2d 466, 467 (Md. 1988); *Konover Property Trust, Inc. v. WHE Assocs., Inc.*, 790 A.2d 720, 728 (Md. Ct. Spec. App. 2002).

[44]  *Bernal v. Charter County Mut. Ins. Co.*, 209 P.3d 309, 315-16 (Okla. 2009) (holding that law of of whether contract performance occurs governs, or if the location of performance is not specified, then where the contract was made); *Harvell v. Goodyear Tire & Rubber Co.*, 164 P.3d 1028, 1033-1034 (Okla. 2006);

[45]  *Black v. Powers*, 628 S.E.2d 546, 554 (Va. Ct. App. 2006) (collecting cases).

[46]  For Alabama and Missouri, federal choice-of-law rules should apply and require either Delaware or New York law. To the extent federal choice-of-law rules do not apply, and for purposes of this motion only, New GM does not dispute that each of these two states would apply their own substantive laws to successor liability claims brought by residents of each state. Regardless, those claims fail on the merits for the reasons described in Section VI.

[47]  Plaintiffs do not allege that the *de facto* merger exception applies.

32

exception applies.[48]  (4th Am. Compl. at ¶ 901.).  That exception is recognized in the majority of applicable jurisdictions, with the notable exception of Texas.

A "small minority" of jurisdictions have expanded successor liability (although not for economic loss cases like this one) by adopting the product line exception or the continuity of enterprise exception, "which eliminate[] the [mere continuation] necessity of proving a common identity of officers, directors, and shareholders."  *See Florio v. Manitex Skycrane, LLC*, No. 6:07-CV-1700-ORL-28, 2010 WL 5137626, at *5 (M.D. Fla. Dec. 10, 2010); *Harris v. T.I., Inc.*, 243 Va. 63, 71, 413 S.E.2d 605, 609 (1992) ("small minority"); *White v. Cone-Blanchard Corp.*, 217 F. Supp. 2d 767, 774 (E.D. Tex. 2002) ("The product-line theory imposes liability on a successor corporation without regard to continuity of ownership, whereas the traditional exceptions . . . all require a continuity of ownership.").  This "small minority" includes California, Pennsylvania,[49] Michigan, and Alabama.  These exceptions do not apply here for the reasons set forth in Section IV.  In any event, plaintiffs cannot satisfy either the product line exception or the continuity of enterprise exception.

As described in Sections V-VI, the undisputed facts of the Sale bar plaintiffs' successor liability claims in all of the applicable jurisdictions:

- Jurisdictions that recognize the mere continuation exception but have not recognized the product line or continuity of enterprise exceptions (*i.e.*, Delaware, District of Columbia, Florida, Illinois, Louisiana, Maryland, Massachusetts, Missouri, New York, Oklahoma, Virginia, and Wisconsin), *see, e.g.*, *Martin v. TWP Enterprises Inc.*, 227 Md. App. 33, 52–53, 132 A.3d 361, 373 (2016) ("mere continuation" is "designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of the predecessor's creditors"); 15 W. Fletcher, Cyclopedia of the Law of Private Corporations § 7124.10 (perm ed., rev. vol.1999) (same).  *See* Sections VI.A-F, *infra*.

---

[48] Plaintiffs bear the burden of proving one of the exceptions to the general rule of successor nonliability.  *See Desclafani v. Pave-Mark Corp.*, No. 07 CIV. 4639 (HBP), 2008 WL 3914881, at *3 (S.D.N.Y. Aug. 22, 2008).

[49] As discussed below, although lower courts in Pennsylvania have applied the product line exception, it has not been adopted by the Pennsylvania Supreme Court.

- ▪ Jurisdictions in which courts have recognized the product line successor liability exception (*i.e.*, California and Pennsylvania (collectively, the Product Line Jurisdictions)) or the continuity of enterprise exception (*i.e.*, Michigan and Alabama (collectively, the Continuity of Enterprise Jurisdictions)), *see, e.g.*, *Santa Maria*, 808 F.2d at 858; *Ammend*, 322 F. Supp. 2d at 867 (no successor liability where "asset sale therefore did not deprive Plaintiffs of an effective remedy against the predecessor"); *see* Section VI.G, *infra*; and

- ▪ In Texas, which does not recognize the mere continuation exception, the product line exception, or the continuity of enterprise exception. *See* Section VI.I, *infra*.

**A.     Plaintiffs' Successor Liability Claims Fail Under Delaware Law.**

As discussed in Section IV, both federal choice-of-law rules and the choice-of-law rules in California, the District of Columbia, Florida, Illinois, Louisiana, Maryland, Massachusetts, Oklahoma, Pennsylvania, Texas, Virginia, and Wisconsin all result in the application of Delaware law to plaintiffs' successor liability claims. Plaintiffs' claims fail under Delaware's "narrow" mere continuation exception. *Fountain v. Colonial Chevrolet Co.*, 1988 WL 40019, at *8-9 (Del. Super Ct., April 13, 1988).

"The continuation theory of corporate successor liability has been narrowly construed by the Delaware courts." *Id.* For the mere continuation exception to apply, the defendant "must be the same legal person having a continued existence under a new name." *Id.* (no mere continuation where "the evidence reflects that the sale was an arm's length transaction between SAK and Tupp to the extent that cash consideration was paid by the Goldbergs to the Keysers individually, and to SAK, Inc. for Tupp Signs"); *Spring Real Estate, LLC v. Echo/RT Holdings, LLC*, No. CIV.A. 7994-VCN, 2013 WL 6916277, at *5 (Del. Ch. Dec. 31, 2013) ("this exception has been construed very narrowly to require the purchaser of the assets to be a continuation of the same legal entity"); *Ozan Lumber Co. v. Davis Sewing Machine Co.*, 284 F. 161 (D. Del. 1922) ("same legal person").

Moreover, the continuation of business operations is insufficient to impose successor liability under Delaware law, absent continuation of the corporate entity itself. *See Elmer v. Tenneco Resins, Inc.*, 698 F. Supp. 535, 542 (D. Del. 1988) (defendant was not mere continuation because "test is not the continuation of the business operation, but rather the continuation of the corporate entity"; "cannot be said that [entities] were the same legal person"). For example, in *Fountain*, the court rejected plaintiff's argument that the mere continuation exception applied to the purchase by "Tupp Signs, Inc." of "Tupp Signs," even though the "defendants continued to hold themselves out as being the same company which had manufactured signs for 60 years." 1988 WL 40019, at *1-9 (Del. 1988) ("[t]he test is not the continuation of the business operation").

Here, New GM was not the "continuation of the [Old GM] corporate entity"; nor were Old GM and New GM "the same legal person":

- New GM was created by the U.S. Treasury as a separate legal entity; it was not created by Old GM. MLC continued to co-exist with New GM until MLC was succeeded by the MLC GUC Trust, during which time both MLC and the MLC GUC Trust retained billions of dollars in assets and made substantial creditor payouts. (SUF ¶¶ 22, 39, 54.)

- MLC and New GM filed separate financial statements. New GM's financial statements described it as a "new company." (*Id.* ¶ 63.)

- MLC and New GM had separate boards, officers, and shareholders. (*Id.* ¶ 35, 37.)

- After the Sale, MLC and New GM negotiated and settled disputes between the two entities about what assets and liabilities had been retained or assumed. (*Id.* ¶ 60.) (discussing settlement of disputes between MLC and New GM, including New GM being separately represented by the Department of Justice). In *Magnolia's at Bethany, LLC v. Artesian Consulting Engineers, Inc.*, No. CIV.A. S11C-04013ESB, 2011 WL 4826106, at *3 (Del. Super. Ct. Sept. 19, 2011), the court cited litigation involving the two parties as evidence that they are "separate legal entities." *Id.* at *3.

- Judge Gerber held that the U.S. was a "good faith purchaser." (*Sale Decision*, 407 B.R. at 486.)

35

- Although the test is not the continuation of relevant business operations under Delaware law, in fact New GM did not continue four of the eight Old GM brands, and discontinued the Ion, Cobalt, G5, Sky, Solstice, and HHR models shortly after its formation. *See supra* at 17.

In sum, New GM was not the mere continuation of MLC under Delaware law; therefore, the Court should grant New GM summary judgment on plaintiffs' successor liability claims.

## VI.    ALTERNATIVELY, PLAINTIFFS' SUCCESSOR LIABILITY CLAIMS FAIL UNDER THE LAW OF NEW YORK AND THE REMAINING JURISDICTIONS.

If the Court does not apply Delaware law, then it should apply New York law.  As explained below, application of New York law should result in dismissal of plaintiffs' successor liability claims.  To the extent neither Delaware nor New York law applies, plaintiffs' successor liability claims fail under the law of the remaining jurisdiction.

Sections VI.A-F address the jurisdictions at issue that recognize the mere continuation exception: California, the District of Columbia, Florida, Illinois, Louisiana, Maryland, Massachusetts, Missouri, New York, Oklahoma, Pennsylvania Virginia, and Wisconsin. [50]

Sections VI.G-H address the Product Line Jurisdictions (California and Pennsylvania)[51] and the Continuity of Enterprise Jurisdictions (Michigan and Alabama).

In these jurisdictions, plaintiffs' claims fail for several reasons, including the lack of evidence that the court-approved Sale deprived plaintiffs of recoveries against Old GM.  Indeed, the only evidence is to the contrary.  In addition, to the extent plaintiffs' claims are based on mere continuation, they also fail because the transaction lacked the requisite continuity of ownership between Old GM and New GM.

---

[50] Delaware law is addressed above.

[51] California and Pennsylvania recognize both the mere continuation exception and the product line exception.

### A.    Plaintiffs' Mere Continuation Claims Fail Because the 363 Sale Was Not Intended To and Did Not Deprive Plaintiffs Of Any Recovery.

New York and other states follow the "well settled" "general rule" that "where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor."  15 Fletcher, Cyc. Corp. § 7122; *see also Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 n.3 (2d Cir. 2003) ("[T]he purchaser of a corporation's assets does not, as a result of the purchase, ordinarily become liable for the seller's debts.").  Mere continuation is an exception to this general rule.  *See Lewis v. Blackman Plumbing Supply L.L.C.*, 51 F. Supp. 3d 289, 313 (S.D.N.Y. 2014); 15 Fletcher Cyc. Corp. § 7122.  "Courts [analyzing successor liability] will give close scrutiny to corporate realities, not mechanical application of a multi-factor test."  *Gallenberg Equip., Inc. v. Agromac Int'l, Inc.*, 10 F. Supp. 2d 1050, 1054, 1057 (E.D. Wis. 1998) (applying Wisconsin law)f.

To pursue the mere continuation exception, plaintiffs must demonstrate that the 363 Sale placed assets "out of creditors' reach."  15 W. Fletcher Cyc. of the Law of Private Corporations. § 7124.10 (1999).  As the Second Circuit explained in *Cargo Partner*:

> Under New York law, there are at least three ways in which a corporation can acquire the business of another:  The purchaser can buy the seller's capital stock, it can buy the seller's assets, or it can merge with the seller to form a single corporation.  [In the second case involving an asset purchase], the purchaser of a corporation's assets does not, as a result of the purchase, ordinarily become liable for the seller's debts.  The amount paid for the assets would ordinarily be available to satisfy those debts, at least in part.  So long as the buyer pays a bona fide, arms-length price for the assets, there is no unfairness to creditors in thus limiting recovery to the proceeds of the sale-cash or other consideration roughly equal to the value of the purchased assets would take the place of the purchased assets as a resource for satisfying the seller's debts.  Moreover, as the magistrate judge observed, allowing creditors to collect against the purchasers of insolvent debtors' assets would "give the creditors a windfall by increasing the *funds available compared to what would have been available if no sale had taken place.*

352 F.3d at 44-45 (emphasis added).  Similarly, in *Sidell v. Missouri Pac. Ry. Co.*, 78 F. 724, 728 (2d Cir. 1897), the Second Circuit denied plaintiff's successor liability claim because the

transaction did not deprive plaintiff of any recovery. The court explained that "*Ex nihilo nihil est.*" *Id.* at 728; *see also Brunner v. Estate of Lax*, 47 Misc.3d 1206(A), 2015 WL 1509815, *8 (N.Y. Sup. Ct. April 3, 2015) (mere continuation exception is grounded in the "basic concept" that "the transaction which purported to transfer a business from one entity to another is a sham and that, here, such transaction occurred as a means to evade liability"); *Societe Anonyme Dauphitex v. Schoenfelder Corp.*, No. 07 CIV. 489, 2007 WL 3253592, at *6 (S.D.N.Y. Nov. 2, 2007) ("The mere continuation exception is designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of the predecessor's creditors") (internal citations and quotations omitted); *see also* 15 W. Fletcher Cyc. of the Law of Private Corporations. § 7124.10 (1999).

As explained in the Restatement (Third) of Torts: Prod. Liab. § 12, cmt. b (1998):

> Post-transfer plaintiffs harmed by pre-transfer defects have a right to expect that a transfer of assets will not be allowed to prejudice financially their chances of satisfying a judgment; they have *no legitimate claim that the transfer should increase those chances over what they would have been if no transfer had occurred*. In the likely event that the successor is financially stronger than the predecessor, imposing a broader liability for pre-transfer product defects would unjustifiably increase the funds available to those injured by such defects compared with what would have been available to them if no transfer had taken place. (Emphasis added).

Here, plaintiffs do not claim and have no evidence to show that the 363 Sale diminished creditor recoveries from Old GM "over what they have been if no transfer had occurred." *Id.* To the contrary, the Bankruptcy Court held that, without the Sale, Old GM would have "liquidate[d]" and creditors would have recovered "nothing." Put differently, without the Sale, plaintiffs would have recovered $0 from Old GM. It would be impossible for the Sale to have made plaintiffs worse off than $0. The Bankruptcy Court's holdings and plaintiffs' lack of contrary evidence doom plaintiffs' successor liability claims under the law of any state.

38

Although the absence of evidence that creditors were unfairly harmed by the Sale is dispositive, plaintiffs' claims are also barred because Old GM, the U.S., and Canada did not have the "specific purpose" of depriving plaintiffs of recoveries against Old GM.  15 W. Fletcher, Cyc. of the Law of Private Corporations. Corp. § 7124.10 (1999); *Brunner,* 2015 WL 1509815, at *8 ("sham"); *Societe Anonyme Dauphitex*, 2007 WL 3253592, at *6 (transaction must have "specific purpose" of placing assets out of creditors' reach); *see also Cargo Partner*, 207 F. Supp. 2d at 95 (New York law) (internal quotations omitted) ("For this exception to come into operation, the purchasing corporation must represent merely a new hat for the seller.") (internal quotations omitted).  Plaintiffs do not allege, and cannot prove, that the Sale was structured to evade their claims.  *See* Sale Order, ¶ M (Sale not entered "for the purpose of hindering, delaying, or defrauding the Debtors' present or future creditors"); *see also id.* ¶ K.

Like New York, the other jurisdictions at issue do not permit mere continuation claims where there is no evidence of either (i) harm to creditors arising from the transaction or (ii) any intent to evade creditor claims.

**California:**  *Sunnyside Dev. Co. v. Opsys Ltd.*, No. C 05 0553, 2007 WL 2462142, at *10 (N.D.Cal. Aug. 29, 2007) ("Where it is a lack of sufficient assets that deprive[s] the predecessor's creditors of their remedy, not the acquisition of the predecessor's assets by another entity, successor liability cannot attach based on a theory of mere continuation") (internal quotations omitted).

**District of Columbia:**  *See Jackson v. George*, 2016 WL 5335791, at *4 (D.C. Sept. 22, 2016) (D.C. law) (successor liability exceptions are "designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of the predecessor's creditors") (quoting *Baltimore Luggage*).

**Florida**: *Old W. Annuity & Life Ins. Co. v. Apollo Grp.*, No. 5:03-CV-354-OC-10GRJ, 2008 WL 2993958, at *11 (M.D. Fla. Aug. 1, 2008) (Florida law) ("the United States' failure to establish that the acquisition of the Clermont property through a court-approved bankruptcy auction was fraudulent similarly dooms its 'mere continuation' theory") (internal quotations omitted); *Murphy v. Blackjet, Inc.*, No. 13-80280-CIV-HURLEY, 2016 WL 3017224, at *4, *6 (S.D. Fla. May 26, 2016) (finding "mere continuation" where "BlackJet's directors and officers prompted a premature foreclosure on the Haysjet Loan in order to orchestrate a transfer of its assets to a reconstituted version of itself and to continue its business under a new name with a potential for increased profits, while shedding its obligations to unsecured creditors, such as Murphy & King. . . .[using] machination of a licensing agreement").

**Illinois:** *See Diguilio v. Goss Int'l Corp.*, 389 Ill. App. 3d 1052, 1061, 906 N.E.2d 1268, 1276 (2009) ("the continuation exception to the successor corporate nonliability rule has a specific purpose . . . to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of the reach of the predecessor's creditors"); *Steel Co. v. Morgan Marshall Indus., Inc.*, 278 Ill.App.3d 241, 214 Ill.Dec. 1029, 662 N.E.2d 595, 600 (1996) ("We cannot allow the law to be circumvented by an individual exerting control through his spouse. A creditor's rights cannot be cut off by a corporation which merely puts on a new coat."); *Brandon v. Anesthesia & Pain Mgmt. Associates, Ltd.*, 419 F.3d 594, 599 (7th Cir. 2005) (Posner J.) (applying Illinois law) (holding defendant was "continuation" of seller where "evasive purpose of creating St. Clair is plain and supports our interpretation of the rule's scope. . . The defendants admit that they pay the annual corporate fee for APM for the sole purpose of preventing St. Clair's being held liable for APM's debt to Brandon.").

**Louisiana**: *Wolff v. Shreveport Gas, Elec. Light & Power Co.*, 138 La. 743, 760, 70 So. 789, 795 (1916).

**Maryland:** *Martin v. TWP Enterprises, Inc.*, 227 Md. App. 33, 63, 132 A.3d 361, 378 (2016) ("The purpose of the exceptions to the general rule against successor liability is to protect the rights of creditors . . . ."); *Baltimore Luggage Co. v. Holtzman*, 80 Md. App. 282, 562 A.2d 1286, 1293 (1989) (mere continuation exception is "designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of the predecessor's creditors").

**Massachusetts:** *Milliken & Co. v. Duro Textiles*, LLC, 451 Mass. 547, 556, 560–61, 887 N.E.2d 244, 254-55, 257 (2008) (holding that mere continuation existed where the same group controlled the buyer, seller, and secured lender; "[w]hen analyzing a claim for successor liability under theories of de facto merger or mere continuation of the predecessor, our focus is on whether one company has become another for the purpose of eliminating its corporate debt . . . [t]he public policy underlying the imposition of successor liability is the fair remuneration of innocent corporate creditors. . . "); *In re QR Properties, LLC*, 485 B.R. 20, 27 (Bankr. D. Mass. 2013) ("[T]he purchaser represents merely a new hat for the seller.") (internal citations omitted).

**Missouri:** *Ingram v. Prairie Block Coal Co.*, 319 Mo. 644, 654, 5 S.W.2d 413, 417 (1928) ("mere continuance" exception applies where one corporation "purchases all the assets of another, *without provision for the debts of the latter*") (internal citations omitted) (emphasis added); *Zimmerman v. W.L. Grush Produce & Comm'n Co.*, 156 Mo. App. 588, 137 S.W. 642, 643–44 (1911) (no successor liability as a "continuation" where "it was arranged that the new company should take over the property of the old, and that Grush was to continue to run the business in the same manner that he had formerly under the old organization . . . The purpose of

the new company was not to continue in existence the old company, but to put into existence a new corporation with new stockholders. . . . It was in no sense a continuation of the old company except in name. . . . It was not their object to defeat creditors, but to help to re-establish their friend upon a new footing in business."); *Powell v. N. Missouri R. Co.*, 42 Mo. 63, 69 (1867) ("A corporation cannot give away the effects belonging to it, to the prejudice of creditors. A court of equity will follow the trust fund into the hands of other than bona fide creditors and purchasers.") (internal citations omitted); *Hibernia Ins. Co. v. St. Louis & N.O. Transp. Co.*, 13 F. 516, 519 (C.C.E.D. Mo. 1882) ("The thing which we pronounce unconscionable is an arrangement by which one corporation takes from another all its property, *deprives it of the means of paying its debts*, enables it to dissolve its corporate existence and place itself practically beyond the reach of creditors, and this without assuming its liabilities.") (emphasis added), *aff'd*, 120 U.S. 166, 7 S. Ct. 550, 30 L. Ed. 621 (1887); Donald B. King & Michael D. Murray, *Missouri Products Liability* § 14-6 (2d ed. 2002) (noting Missouri courts "have been reluctant" to find successor liability based on mere continuation and stating "the scale must tip very far in the direction of commonality between the predecessor and the successor in order for liability to be imposed") (footnotes omitted).

**Oklahoma:** *Collinsville Nat. Bank v. Esau*, 176 P. 514, 517 (Okla. 1918); *Crutchfield v. Marine Power Engine Co.*, 2009 OK 27, ¶ 14, 209 P.3d 295, 300–01; *Skirvin Operating Co. v. Sw. Elec. Co.*, 1918 OK 503, 71 Okla. 25, 174 P. 1069, 1073 (collecting cases) ("Neither law nor equity will permit one corporation to take all the property of another, deprive it of the means of paying its debts, enable it to dissolve its corporate existence, and place itself practically beyond the reach of creditors, without assuming its liabilities.") (internal citations omitted).

**Pennsylvania:**  *Fiber-Lite Corp. v. Molded Acoustical Prod. of Easton, Inc*., 186 B.R. 603, 610 (E.D. Pa. 1994), *aff'd*, 66 F.3d 310 (3d Cir. 1995) (finding mere continuation where secured creditor "dictated to Mr. D'Amico that he had to be the buyer and personal guarantor of Easton and his children had to be the shareholders and that he had no choice but to sign the closing documents . . . Bank orchestrated the sale of Indiana's assets to Easton in order to dispose of all of Indiana's unsecured creditors so that the Bank would not lose its priority as a secured creditor of Indiana"); *Stutzman v. Syncro Mach. Co. Inc.,* No. CIV. A. 88-9673, 1991 WL 66796, at *4-5 (E.D. Pa. Apr. 18, 1991) (applying Pennsylvania law) ("[*t*]*he continuity exception is very limited* and focuses on the continuity of the corporate entity, not the continuity of the business operation"; "exception is designed to extend liability where the specific purpose of transferring assets is to put them beyond the reach of the predecessor's creditors") (emphasis added).

**Virginia:**  *Nat'l Carloading Corp. v. Astro Van Lines, Inc.*, 593 F.2d 559, 564 (4th Cir. 1979) (applying Virginia law) (finding that the defendant was a "continuation" where "the transaction was not in good faith but to evade debts, and that Van Lines was left with no assets with which to pay its debts, therefore we are of opinion Astro is responsible for the plaintiffs' debts"); *Royal All. Associates, Inc. v. Branch Ave. Plaza, L.P*., 587 F. Supp. 2d 729, 740 (E.D. Va. 2008) ("[T]here is nothing to suggest that United Securities was any less capable of paying debts or claims after the Transfer Agreement than before. As such, the rationale underlying the successor-in-interest doctrine is not present.").

**Wisconsin:**  *Gallenberg Equip., Inc.*, 10 F. Supp. 2d 1050 at 1057, *aff'd*, 191 F.3d 456 ("[t]hese exceptions prevent a corporation from escaping its liabilities merely by changing hats"; rejecting mere continuation claim where evidence "does not show that the asset sale was a device to evade creditor").

In sum, as explained in Missouri Practice on Business Organizations, the mere continuation rule exists so that "the shareholder [cannot] continue incorporating new businesses whenever he or she want[s] to avoid liabilities and begin with a clean slate." 26 Mo. Practice, Business Organizations, Section 31.10. Because there is no evidence that the Sale deprived MLC creditors of recoveries that were available in the absence of the Sale, much less that the Sale was intended to evade creditors, the mere continuation exception does not apply under the law of any state.

> **B.      Plaintiffs' Mere Continuation Claims Also Fail Because Plaintiffs Have No Evidence To Contradict The Bankruptcy Court's Finding That The 363 Sale Was An Arm's Length Transaction That Involved Fair Consideration.**

Plaintiffs' mere continuation claims are further barred under the law of New York and the remaining jurisdictions because the Bankruptcy Court held that the Sale—conducted pursuant to federal bankruptcy auction procedures—was at arm's length and involved adequate consideration, and plaintiffs have no contrary evidence. *See Cargo Partner*, 352 F.3d at 45.

If the seller surrenders certain assets in exchange for other assets of equal value, the seller's creditors are no worse off after the transaction. As the Second Circuit explained: "So long as the buyer pays a bona fide, arms-length price for the assets, there is no unfairness to creditors." *Id.*; *see also Cargo Partner*, 207 F. Supp. 2d 86.

Unlike in *Norville*, plaintiffs do not allege that the consideration that New GM paid was not "sufficient." Even if they had, the Bankruptcy Court found that Old GM would have "liquidated" without the Sale and creditors would have taken "nothing." *See Sale Decision*, 407 B.R. at 475. Successor liability applies where a "transfer of assets . . . prejudices financially [a plaintiff's] chances of satisfying a judgment." Restatement (Third) of Torts: Prod. Liab. § 12, cmt. b (1998); *In re Gen. Motors LLC Ignition Switch Litig.*, 154 F. Supp. 3d 30, 39 (S.D.N.Y. 2015) (noting influence of Restatement (Third) of Torts)); 15 W. Fletcher, Cyc. of the Law of

Private Corporations. Corp. § 7124.10 (1999). The test here is whether, compared to the pre-Sale situation where Old GM would liquidate and creditors could recover $0, *see Sale Decision*, 407 B.R. at 475, the Sale put Old GM creditors in a *worse* position. Plaintiffs have no authority for the proposition that where, as here, a transaction either increased creditor recoveries or left them unchanged, a plaintiff can invoke the "mere continuation" exception because the plaintiff claims that another hypothetical transaction would have increased creditor recoveries by *more*. In sum, an (unpled) claim that the Sale consideration should have been some number greater than $45 billion does not change the dispositive fact that the "*transfer of assets* [did not] *prejudice financially* [plaintiffs'] chances of satisfying a judgment," Restatement (Third) of Torts Section 12, cmt. b (emphasis added), because plaintiffs' recovery from Old GM would have been $0 but for the Sale.

In *Matter of Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016), the Second Circuit analyzed, in the context of whether the Sale notice provided by Old GM was proper, whether an "accommodation would have been made for [plaintiffs] in the Sale Order," such that certain claims might not have been barred outright as a matter of federal bankruptcy law if "Old GM disclosed the ignition switch defect and these plaintiffs voiced their objections to the 'free and clear' provision." *Id.* at 163. Here, regardless of what "accommodation" might hypothetically have been made to the Bankruptcy Sale Order, successor liability under state law arises from transactions that deprive creditors of recoveries that were available to them *before* that transaction was consummated. Restatement (Third) of Torts § 12 cmt. b ("no legitimate claim that the transfer should increase those change [of recovery] over what they would have been *if no transfer had occurred*") (emphasis added). No such recoveries were available in the Old GM bankruptcy case, as Old GM's unsecured creditors would have received "nothing" without the

Case 1:14-mc-02543-JMF    Document 520    Filed 11/17/16    Page 34 of 94

363 Sale.  And nothing in the Second Circuit's Opinion changes this fundamental requirement of state successor liability law.

In any event, plaintiffs' Complaint does not attack the sufficiency of the consideration. Instead, plaintiffs allege only that that "New GM provided no cash consideration for the 363 Sale." (4th Am. Compl. ¶899.)  However, under federal law, the credit bid approved by the Bankruptcy Court is the equivalent of a cash purchase.  *See RadLAX*, 132 S.Ct. at 2069, n.3; *see also Lexington Coal Co., LLC v. Miller, Buckfire, Lewis Ying & Co., LLC (In re HNRC Dissolution Co.)*, 340 B.R. 818, 824–25 (Bankr. E. D. Ky. 2006) ("Clearly 11 USC § 363(k) treats credit bids as a method of payment-the same as if the secured creditor has paid cash and then immediately reclaimed that cash in payment of the secured debt."); *Altus Bank v. State Farm Fire & Cas. Co.*, No. 91–55329, 1992 WL 341321, at *1 (9th Cir. Nov. 19, 1992) ("[T]he result of Altus Bank's full-credit bid is no different than if Altus had tendered cash to purchase the mortgaged property, or than if some other purchaser had bought the property at the foreclosure sale for the same amount of money.").  To the extent plaintiffs suggest that any state law holds otherwise, that argument would be preempted by federal law, which expressly authorizes credit bids in 363 Sales.  *See* 11 U.S.C. § 363(k) ("[S]uch holder may offset such claim against the purchase price of such property.").

Plaintiffs also allege that, in addition to the cash-equivalent credit bid, MLC received stock.  However, as Judge Gerber made clear, that stock is separate from an additional $45 billion in consideration that New GM paid:  "Old GM is to receive consideration estimated to be worth approximately $45 billion, *plus* the value of equity interests that it will receive in New GM." *Sale Decision*, 407 B.R. at 482 (emphasis added).  Moreover, MLC's share of New GM

stock was used for the benefit of creditors whom successor liability is designed to protect, not for MLC shareholders. *See, supra,* at 16; Morro Dec. Par. 69.

Courts have rejected mere continuation claims where, as here, the transactions were at arm's length or involved adequate consideration.

**New York:** *See Cargo Partner*, 352 F.3d 41; *Cargo Partner AG v. Albatrans Inc.*, 207 F. Supp. 2d 86, 112 (S.D.N.Y. 2002).

**California:** *Software Freedom Conservancy, Inc. v. Best Buy Co.*, 783 F. Supp. 2d 648, 654 (S.D.N.Y. 2011) (applying California law) ("[A]lthough other factors are relevant to both the de facto merger and mere continuation exceptions, the common denominator, which must be present in order to avoid the general rule of successor nonliability, is the payment of inadequate consideration."); *Franklin v. USX Corp.*, 87 Cal. App. 4th 615, 627, 105 Cal. Rptr. 2d 11, 19 (2001) (same); *CenterPoint Energy, Inc. v. Superior Court*, 157 Cal. App. 4th 1101, 1121 (Cal. Ct. App. 2007) (same); *Maloney v. Am. Pharm. Co.*, 207 Cal.App.3d 282, 288–89 (Cal. Ct. App. 1988) (same); *Katzir's Floor & Home Design, Inc. v. M–MLS.com*, 394 F.3d 1143, 1150-51 (9th Cir.2004) (same).[52]

**District of Columbia:**  *Bingham v. Goldberg, Marchesano, Kohlman, Inc.*, 637 A.2d 81, 92 (D.C. 1994) ("Another factor of importance to the determination is the sufficiency of the consideration passing from one entity for the sale of its interest to another.").

---

[52] In *Cleveland v. Johnson*, 209 Cal.App. 4th 1315, 1320–23 (Cal. Ct. App. 2013), the court held that, while inadequate consideration is a factor, proof of inadequate consideration is not necessary to establish successor liability under California law. However, as the court explained in *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 2013 WL 3786618, at *6 (N.D. Cal. July 18, 2013), *Cleveland* is distinguishable for three reasons: (1) in *Cleveland*, the "defendant invested the plaintiff's money in a successor organization to avoid the obligations owed to the plaintiff," *id.*; (2) "the court of appeals noted that *Cleveland* was distinct from other successor liability cases because the individual defendant and the successor corporation owed a fiduciary duty to the plaintiff," *id.*; and (3) the plaintiff in *Mitsui* in "had an opportunity to file a claim with the bankruptcy court." *Id.* The *Mitsui* court held that, for these reasons, *Cleveland* was distinguishable, and the plaintiff was required to "show that [defendant] paid inadequate consideration for the assets." *See id.*

47

**Florida:** *In re F & C Servs., Inc.*, 44 B.R. 863, 868 (Bankr. S.D. Fla. 1984) ("Where principals of a debtor attempt to transfer corporate assets to a newly created corporate entity, which they also control, the transaction is fraudulent when the new corporation is a mere continuation of the debtor, controlled by the same persons, and made up essentially of the same assets and resources as the old corporation.  The fraudulent nature of the transaction may be found to exist in the transfer of assets of a corporation without consideration or for grossly inadequate consideration to a successor corporation to the prejudice of creditors for the benefit of the same individuals who constitute the beneficial owners of each of the corporations involved.") (internal citations and quotations omitted).

**Illinois:**  *Joseph Huber Brewing Co. v. Pamado, Inc.*, No. 05 C 2783, 2006 WL 2583719, at *15 (N.D. Ill. Sept. 5, 2006) ("additional factor).

**Louisiana:** *Wolff v. Shreveport Gas, Elec. Light & Power Co.*, 138 La. 743, 760, 70 So. 789, 795 (1916) ("In the case of a sale, in good faith, of the property and business of a strictly private corporation, duly authorized by its shareholders, to a third person, for an adequate consideration, the property would no doubt pass free of incumbrance, and the creditors would be relegated to the proceeds in the hands of the debtor corporation.").

**Maryland**: *Academy of IRM v. LVI Environmental Servs. Inc.*, 344 Md. 434, 457 (Md. Ct. App. 1997) (holding that buyer was not mere continuation of seller and stating "[i]t is sufficient for present purposes to note that there was adequate consideration paid"; "a key element  . . . is insufficient consideration running to the seller from the purchaser corporation'") (internal citations omitted); *Martin v. TWP Enterprises, Inc.*, 132 A.3d 361 (Md. Ct. App. 2016) (surveying Maryland caselaw and holding "in all three cases, the Courts assessed the adequacy of consideration as a factor and consistently found the exception did not apply where

48

consideration was adequate, although none of the cited cases relied solely on the adequacy of consideration in their conclusions"); 132 A.2d at 376 ("suppose that in *Parsons*, [successor corporation] had paid full consideration for the transfer of assets from [predecessor corporation] and further that [predecessor corporation] continued in existence as a holding company. In such case there would be no need or reason to pursue the new corporation despite the fact that there were common personnel and despite the fact the new corporation continued the business of the old . . . the factual conclusion that the transferee corporation is a continuation of the transferor corporation does not inexorably lead to the legal conclusion that the transferee is therefore liable for its transferor's obligations.") (internal citations and quotations omitted).

**Missouri:** *Green v. Montgomery Ward & Co.*, 775 S.W.2d 162, 165 (Mo. Ct. App. 1989) ("A distinction between an arms length transaction for the sale of assets and a 'mere continuation' of a company needs to be made."); *Ingram v. Prairie Block Coal Co.*, 319 Mo. 644, 653, 5 S.W.2d 413, 417 (1928) (court applied mere continuation exception where "all the assets of the Prairie Block Company were transferred to the Elmira for a recited consideration none of which was paid"); *Russe & Burgess v. Miesner Lumber & Mfg. Co.*, 243 S.W. 353, 356 (Mo. Ct. App. 1922) (no "continuation" where "[i]n the instant case it appears that the old corporation received adequate consideration for the properties transferred by it in the manner aforesaid. Though the company received but little actual cash in the transaction, the undisputed evidence tends to show that thereby debts of the company were paid amounting to much more than the value of the assets received by the new company."); *Warren v. Mayer Fertilizer & Junk Co.*, 145 Mo. App. 558, 122 S.W. 1087, 1091 (1909) (no successor liability where "[t]he new company, defendant here, paid adequate, and the testimony tends to show full, consideration for the assets which it had received and took over"); *Powell v. N. Missouri R. Co.*, 42 Mo. 63, 69 (1867) (no successor

49

liability where "[t]here was no averment and no proof that this defendant held this property otherwise than as a bona fide purchaser for a valuable consideration").

**Oklahoma:** *Burkholder v. Okmulgee Coal Co*., 1921 OK 84, 82 Okla. 80, 196 P. 679, 681 (no mere continuation where "the price paid was fair and reasonable"); *Ezzard v. State Nat'l. Bank*, 1916 OK 471, 57 Okla. 371, 157 P. 127, 132.

**Virginia:** *In re SunSport, Inc.*, 260 B.R. 88, 106 (Bankr. E.D. Va. 2000) ("[T]he Virginia Supreme Court has emphasized that a new corporation is not a mere continuation when the purchase of the seller's assets occurred in a bona fide, arm's length transaction.") (citing *Harris*) (emphasis omitted); *Health & Racquet Club, Inc. v. Fitness Today of Charlottesville*, 29 Va. Cir. 61 (1992) ("In order to make out a successful claim under the mere continuation doctrine, a plaintiff must first demonstrate that the asset purchase was not a bona fide, arm's length transaction") (internal quotations omitted); *Harris*, 413 S.E.2d at 609-10 ("When, however, the purchase of all the assets of a corporation is a bona fide, arm's-length transaction, the 'mere continuation' exception does not apply."); *Urban Telecomm. Corp. v. Halsey*, No. CIV. A. 95-00035-C, 1996 WL 76160, at *5 (W.D. Va. Feb. 8, 1996) ("the arm's length transaction exception operates to negate the effect of the mere continuation exception to successor corporate nonliability").

**Wisconsin:** *Pennison v. Chicago, M. & St. P.R. Co.*, 93 Wis. 344, 67 N.W. 702 (1896) (no successor liability where seller "presumptively received a proper consideration for the sale of its property"); *Gallenberg Equip., Inc.*, 10 F. Supp. 2d at 1054, 1057, *aff'd*, 191 F.3d 456 ("[i]f the transaction is not an arm's-length affair, courts may impose successor liability, not only to protect innocent victims, but also because the policies underlying the general rule no longer

Case 14-mc-02543-JMF    Document 520    Filed 11/17/16    Page 69 of 94

apply"; no mere continuation where plaintiff could not "show that Agromac's control was used to effectuate a transaction involving inadequate consideration").

Accordingly, the Bankruptcy Court's holdings that the Sale was conducted at arm's length and the $45-billion-plus consideration was fair—together with plaintiffs' failure to point to contrary evidence—further preclude plaintiffs' mere continuation claims.

### C. Plaintiffs' Mere Continuation Claims Fail Because MLC And The MLC GUC Trust Continued To Exist And Pay Creditors After The Transaction.

Plaintiffs cannot prove the Sale *harmed* creditors' ability to recover from Old GM, and New GM is not required to prove that creditors' ability to recover from MLC and the MLC GUC Trust was *enhanced* by the Sale.  *See* Restatement (Third) of Torts § 12 cmt. b (successor liability is acceptable public policy when applied to transactions that deprive plaintiffs of remedies).  But plaintiffs themselves have represented that, seven years after the Sale, they may pursue claims against the MLC GUC Trust.[53]  (SUF ¶ 62.)  Under the laws of the states at issue, plaintiffs' mere continuation claims also fail because MLC and the MLC GUC Trust remained in existence after the Sale with billions in assets and continued to make substantial distributions to creditors.  *See* 15 W. Fletcher, Cyclopedia of the Law of Private Corporations § 7124.10 ("Imposition of successor liability under the continuation of business theory requires a threshold determination that the predecessor no longer represents a viable source of relief.").

**New York:** *See Riverside Mktg., LLC v. Signaturecard, Inc.*, 425 F. Supp. 2d 523, 536 (S.D.N.Y. 2006) ("iDine is not a mere continuation of Signature, because Signature continues to exist to this day as a viable business entity."); *Buja v. KCI Konecranes Intern. Plc.*, 12 Misc.3d 859, 863, 815 N.Y.S.2d 412 (N.Y. Sup. Ct. 2006) ("[w]here a company survives the asset

---

[53] Other ignition switch plaintiffs have filed claims against New GM arising from post-Sale accident liabilities that New GM assumed from Old GM—a source of ignition switch recoveries that would not exist but for the Sale.

transfer as a distinct corporation, even if such corporation is in bankruptcy, the purchaser cannot be cast as its mere continuation") (internal quotations omitted).

**California:** *Beatrice Co. v. State Bd. of Equalization* (1993) 6 Cal.4th 767, 778 ("Standard Dry Wall is not a continuation of Beatrice.   Beatrice continue[d] to exist").

**District of Columbia:** *Bingham*, 637 A.2d at 91.

**Illinois:** *Joseph Huber Brewing Co., Inc. v. Pamado, Inc.*, No. 05 C 2783, 2006 WL 2583719, at *14 (N.D. Ill. Sept. 5, 2006) ("Given that precedent has noted the continued existence of the prior business entity for as little as a week after the asset sale, the fact that Central Distributing existed for over a month after the asset sale further supports a finding that Pamado was not a 'mere continuation' of the entity.") (internal citations omitted).

**Maryland:** *Baltimore Luggage*, 80 Md.App. at 299, 562 A.2d at 1294 (no mere continuation where court found: "[n]or was there a sole corporation remaining after the sale").

**Massachusetts:** *McCarthy v. Litton Indus., Inc.*, 410 Mass. 15, 21–22, 570 N.E.2d 1008, 1012-13 (1991) (no successor liability where seller dissolved because mere continuation "envisions a reorganization transforming a single company from one corporate entity into another . . . the indices of a continuation are, at a minimum . . .  the continued existence of only one corporation after the sale of assets").

**Oklahoma:**  *Goucher v. Parmac, Inc.*, 1984 OK CIV APP 46, 694 P.2d 953, 954 ("The facts strongly indicate that Parmac and Textron were distinct corporate entities after the sale of Textron's Parkersburg Division. As a result, Parmac was not a mere continuation of Textron.")

**Pennsylvania:** *Con-Tech Sales Defined Ben. Trust v. Cockerham*, No. CIV. A. 87-5137, 1991 WL 5944, at *4 (E.D. Pa. Jan. 16, 1991).

**Virginia:** *In re SunSport, Inc.,* 260 B.R. 88, 106 (Bankr. E.D. Va. 2000) (one "consideration is whether two corporations or only one remain after the transaction, although a finding that the predecessor corporation remains after selling its assets is not fatal to a finding of successor liability.").

The Seventh Circuit has recognized an exception to this principle where the seller "is brain dead, but is being kept on corporate life support in order to prevent [plaintiff] from getting hold of any of [purchaser's] assets." *Brandon v. Anesthesia & Pain Mgmt. Associates, Ltd.*, 419 F.3d 594, 599 (7th Cir. 2005) (Posner J.) (applying Illinois law). That "corporate life support" exception does not apply here for two reasons: (1) there is no evidence that either MLC or the MLC GUC Trust continued to exist solely to prevent claims against New GM; and (2) MLC and the MLC GUC Trust retained billions in assets and have made distributions on account of approximately $32 billion of allowed claims against Old GM. The continued existence of MLC and MLC GUC Trust, and their continued significant payments to creditors, preclude plaintiffs' mere continuation claims.

> **D.   Plaintiffs' Mere Continuation Claims Fail Because There Was No Continuity Of Shareholders.**

Plaintiffs' mere continuation claim also fails because there was no continuity of shareholders between Old GM and New GM. Successor liability protects creditors from transactions that permit shareholders to retain control while shedding creditor claims. *See Cargo Partner*, 207 F. Supp. 2d at 94, *aff'd*, 352 F.3d at 41 ("The 'mere continuation' and 'de facto merger' exceptions originated in cases where the seller's shareholders retained their interest in the transferred assets through an ownership interest in the purchasing corporation, while freeing the assets from the claims of the seller's creditors by disguising the transaction as an asset sale."); *Milliken*, 2005 WL 1791562, at *8-9 ("The harm addressed by successor liability grounded upon

Case 1:14-mc-02543-JMF    Document 526    Filed 11/17/16    Page 72 of 94

mere continuation or de facto merger is the elimination of corporate debt while allowing the seller's shareholders to retain their interest. . . By virtue of their majority ownership interest in Duro, the purchase of the assets at the foreclosure sale permitted the defendants to retain control of the company and its anticipated future profitability."); *Crutchfield*, 2009 OK 27, ¶ 14, 209 P.3d at 300–01 ("[T]he exceptions to the general rule of successor non-liability exist to prevent the shareholders, officers, and directors of a corporation from *eluding its debts and liabilities while maintaining control over its assets*.") (emphasis added).

Transactions involving an identity of shareholders present a greater risk for creditors because shareholders who own and control both buyer and seller are more willing to accept an inadequate purchase price for the seller's assets (at no loss to the shareholders themselves because they are on both sides of the transaction), depriving the seller's creditors of potential recoveries. "Continuity of ownership strongly suggests the absence of a bona fide transaction." *Gallenberg Equip., Inc.,* 10 F. Supp. 2d at 1057, *aff'd*, 191 F.3d 456; *see also Wolff v. Shreveport Gas, Elec. Light & Power Co.*, 138 La. 743, 762, 70 So. 789, 795 (1916) ("If the corporation receiving the transfer . . . was controlled by the same persons as the company executing it or if the real parties in interest were substantially the same, the burden of showing that the transfer was made in good faith, for value, would fall upon those asserting its validity against unpaid creditors.") (internal citations and quotations omitted).

Moreover, courts weigh continuity of shareholders more heavily than continuity of the Board of Directors or management.  Shareholders have authority to select the Board, which in turn has the authority to select executives.  (SUF ¶ 36.)  If the same shareholder owns two companies, there is a greater risk of one company providing assets without consideration to the other, at creditors' expense.

Accordingly, courts have rejected mere continuation claims in circumstances where the seller's owners did not maintain a controlling interest or there was no substantial identity of ownership.

**New York:** *See Graham v. James*, 144 F.3d 229, 240 (2d Cir. 1998); *Lewis v. Blackman Plumbing Supply L.L.C.*, 51 F. Supp. 3d 289, 313 (S.D.N.Y. 2014) ("To impose successor liability under either the 'de facto merger' or the 'mere continuation' exception, a plaintiff must prove 'continuity of ownership' between the predecessor and the successor corporations.  Here, however, there is no continuity of ownership between Ridgewood and Blackman because it is undisputed that Blackman purchased certain of Ridgewood's assets in connection with a bankruptcy proceeding.") (internal citations omitted).

**California:**  *Stanford Hotel Co. v. M. Schwind Co.*, 180 Cal. 348, 354, 181 P. 780, 783 (1919) ("where a corporation reorganizes under a new name, but with practically the same stockholders and directors, and continues to carry on the same business, a court of equity will regard the new corporation as a continuation of the former corporation, and will hold it liable for the debts of the former corporation").

**District of Columbia:** *Bingham,* 637 A.2d at 91 (D.C. 1994).

**Florida:** *Florio*, 2010 WL 5137626, at *5 ("Florida courts have uniformly required a finding of substantial continuity of ownership.").

**Illinois:** *Vernon v. Schuster*, 179 Ill. 2d 338, 348, 688 N.E.2d 1172, 1177 (1997) (based on lack of "common identity of ownership, the continuation exception to the rule of successor corporate nonliability cannot be applied to defendant"); *Ostrolenk Faber LLP v. Genender Int'l Imports, Inc.*, 2013 IL App (1st) 112105-U, ¶ 37 ("Though a finding of mere continuation does not require complete identity between the shareholders of the former and successor corporations,

there must be facts pleaded that indicate the owners of the predecessor company maintain a controlling interest."); *Nilsson*, 251 Ill.App.3d at 418, 190 Ill.Dec. 579, 621 N.E.2d 1032 (Illinois courts have consistently required "identity of ownership before imposing successor liability under [the mere continuation] theory"); *Workforce Solutions v. Urban Servs. of Am., Inc.*, 977 N.E.2d 267, 285 (Ill. App. Ct. 2012) ("[A] change of shareholders is consistent with mere continuation as long as the former owners retain a controlling interest in the successor entity.") (internal citations and quotations omitted)); *Advocate Fin. Grp., LLC v. 5434 N. Winthrop, LLC*, 2014 IL App (2d) 130998, ¶ 34, 15 N.E.3d 955, 964 (distinguishing circumstances in which sale back to original shareholders was "arranged in advance"; "*Ed Peters* is dissimilar to the present case in that there the plaintiff had raised the factual possibility that the two transfers, from Anson to Fleet and then from Fleet to C & J, were in reality parts of one integrated transaction arranged in advance by both the owners of the two corporations and the ostensibly independent third party.

**Louisiana:** *Nat'l Sur. Corp. v. Pope Park, Inc.*, 240 La. 63, 71, 121 So. 2d 240, 243 (1960) ("the major stockholders of the selling corporation [must] also have a substantial or almost identical interest in the purchasing corporation. . . . It is not essential, however, to freedom from liability in such a purchase that the two corporations have no common members or shareholders.") (internal citations and quotations omitted); *Wolff v. Shreveport Gas, Elec. Light & Power Co.*, 138 La. 743, 760, 70 So. 789, 795 (1916); Morris & Holmes, Business Organizations, § 37.02, 8 La. Civ. L. Treatise (2015) ("The chief limitation on the de facto merger and mere continuation theories is the requirement that each imposes of a continuity in ownership between the predecessor and successor firms. . . . The mere continuation and de facto merger theories impose

56

liability on a successor firm only when, in substance, the same owners continue the same business by itself or in a merged form with another firm.").

**Maryland:** *Baltimore Luggage,* 80 Md.App. at 297, 562 A.2d 1286 ("indicia of continuation are: 'common officers, directors, and stockholders,'" although "not essential").

**Massachusetts:** *Milliken & Co,* 451 Mass. at 557, 887 N.E.2d at 255 ("[T]he indices of a 'continuation' are, at a minimum: continuity of directors, officers, and stockholders . . .").

**Missouri:** Missouri Products Liability § 14-6 (2d ed. 2002) ("The Missouri Court of Appeals in the *Roper Electric Company* case made it clear that although the first factor of common identity of officers, directors and stockholders is a "key" factor, it is not a necessary or dispositive factor.").

**Oklahoma:** *Crutchfield*, 2009 OK 27, ¶ 22, 209 P.3d at 303.

**Pennsylvania:** *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 469 (3d Cir. 2006) ("[T]he District Courts in this Circuit consider the second factor—continuity of ownership—to be critical to a successful successor liability claim under Pennsylvania law.").

**Virginia:** *Harris*, 243 Va. at 70, 413 S.E.2d at 609 ("[A] common identity of the officers, directors, and stockholders in the selling and purchasing corporations is the key element of a 'continuation.'"); *Kaiser Found. Health Plan v. Clary & Moore, P.C.*, 123 F.3d 201, 206 (4th Cir.1997) (focusing on ultimate shareholder control between the two entities); *Urban Telecom. v. Halsey*, No. 95-00035-C, 1996 WL 76160 at *3 (W.D.Va. Feb. 8, 1996) (tracing Virginia law and finding that determinative factor is whether ultimate control of the two companies is the same); *Crawford Harbor Assoc. v. Blake Const. Co., Inc.*, 661 F.Supp. 880, 885 (E.D. Va. 1987) (mere continuation exception requires that the "legal and economic ownership be essentially the same both before and after the transaction") (internal quotations omitted); *Royal Alliance*

*Assocs., Inc. v. Branch Ave. Plaza, L.P.*, 587 F. Supp. 2d 729, 739 (E.D. Va. 2008) (same); *Urban Telecomm. Corp. v. Halsey*, No. CIV. A. 95-00035-C, 1996 WL 76160, at *3 (W.D. Va. Feb. 8, 1996) ("the determinative factor is that White has the actual and ultimate control over both companies").

**Wisconsin:** *Fish v. Amsted Indus., Inc.*, 126 Wis. 2d 293, 301, 376 N.W.2d 820, 824 (1985) ("Identity refers to identity of ownership, not identity of product line. . . . In determining if the successor is the continuation of the seller corporation, the key element is a common identity of the officers, directors and stockholders in the selling and purchasing corporations.") (internal quotations and citations omitted); *Smith v. Meadows Mills, Inc.*, 60 F. Supp. 2d 911, 918 (E.D. Wis. 1999) ("it appears that the Wisconsin Supreme Court has made one factor—identity of ownership—a necessary requirement for the mere continuation exception to apply"); *Gallenberg Equip., Inc.*, 10 F. Supp. 2d at 1057, *aff'd*, 191 F.3d 456 ("Courts will not generally find a case within either the mere continuation or de facto merger exceptions unless there is continuity of ownership between the selling and purchasing corporations.").

Here, MLC's shareholders never had, let alone maintained, a controlling interest in New GM, nor was there a substantial identity of ownership between MLC and New GM:

- Old GM had hundreds of thousands of shareholders, while New GM had four. (SUF ¶ 41.)

- MLC's and the MLC GUC Trust's shares in New GM (and New GM dividends) were distributed solely to MLC's creditors instead of MLC shareholders.  (*Id.* ¶ 32, 55.)

- MLC shares were worthless after the Sale because the value of creditor claims substantially exceeded the value of MLC assets.   (*Id.* ¶ 50.)

- Old GM shares were cancelled in March 2011 without payments to shareholders.  (*Id.* ¶ 50.)

- MLC shareholders had no control over the election of the MLC Board, and MLC had no right to elect any New GM Board members.   (*Id.* ¶ 36.)

58

- The U.S. and Canada had the right to elect most of the New GM Board, which in turn had the right to appoint New GM executives. (*Id.* ¶¶ 36-37.)

In sum, the lack of shareholder continuity between Old GM and New GM further precludes plaintiffs' mere continuation claims.

### E. Mere Continuation Claims Cannot Arise From A Court-Approved 363 Sale That The Bankruptcy Court Determined Was Not A "Reorganization" Under Federal Law.

Plaintiffs' claims that New GM represents the "continuation" or reorganization of Old GM are preempted by the Bankruptcy Court's approval of the Sale and by federal law. *See also* Dkt. No. 3273 at 10 (argument by plaintiffs' counsel that sale was "reorganization"). Indeed, "[t]he mere continuation exception applies where a corporate reorganization has taken place." *Nilsson v. Cont'l Mach. Mfg. Co.*, 251 Ill. App. 3d 415, 418, 621 N.E.2d 1032, 1034 (1993); *see also Elmer v. Tenneco Resins, Inc.*, 698 F. Supp. 535, 542 (D. Del. 1988) (no mere continuation where "transaction was more than a mere reorganization or change of corporate name"); *Montross v. Loggy Bayou, Inc.*, No. 5:07-CV-390 FJS/GHL, 2008 WL 2385931, at *2 (N.D.N.Y. June 9, 2008) (applying New York law) ("mere continuation exception refers to corporate reorganization"); *Consol. Elec. Coop. v. Panhandle E. Pipeline Co.*, 189 F.2d 777, 782 (8th Cir. 1951) (applying Missouri law) (entity formed in reorganization is "in fact a mere continuation of the predecessor corporation. There is complete identity between defendant and its predecessor in name, stockholders, directors, officers, location of office, property and business"). But the argument that New GM is a "reorganized" version of Old GM was rejected by the Bankruptcy Court years ago. *Sale Decision*, 407 B.R. at 486 (noting that conclusion that "sub rosa reorganization" had occurred would have triggered different requirements for Old GM bankruptcy under federal law). In sum, any claim that New GM is the "mere continuation" or

"reorganization" of Old GM under state law is preempted by federal law and by the Bankruptcy

Court's holding the transaction was not a "reorganization" but a "Sale." *Id.*

Moreover, other courts have rejected bankruptcy-related mere continuation claims much

stronger than those asserted by plaintiffs here.  In *In re Acme Sec., Inc.*, 484 B.R. 475 (Bankr.

N.D. Ga. 2012), after a bankruptcy court declined to approve a proposed sale of a debtor's assets,

the lender (controlled by the same person as the debtor) separately agreed to accept the debtor's

collateral in satisfaction of its debt, resulting in "the same business after the transaction" as

before.  The Court held that the transaction did not result in a mere continuation:

> The court in the ALK case declined to approve the proposed sale. . . . Mr.
> Hassebrock chose to cause both companies to agree to a transfer of the assets to
> Acme Security in full satisfaction of ALK's secured debt. . . . Substantial
> continuity of ownership is present because Mr. Hassebrock was a shareholder of,
> and controlled, both corporations. . . . Acme Security did the same business after
> the transaction that ALK had done before the transaction. . . .  *In any event, it is
> quite obvious that the transactions did not, and could not, unfairly deprive CLN of
> a remedy against ALK because CLN had no remedy against ALK*. In the absence
> of Acme Security's acquisition of the assets in full satisfaction of the debt under
> O.C.G.A. § 11–9–620, ALK would have discontinued its business and Acme
> Security would have conducted a liquidation sale that would have produced
> substantially less in proceeds than the amount of its debt. Nothing in the evidence
> suggests that sale of the assets as a going concern to an unrelated party would
> have produced anything in excess of the amount of the secured debt.  In short,
> *Acme Security's acquisition of the assets did not cost CLN a single penny*. In this
> situation, *imposition of successor liability on Acme Security as a 'mere
> continuation' of ALK would not serve the purpose of that equitable doctrine,
> which is to protect creditors from having assets of a debtor entity put beyond their
> reach through manipulation of corporate forms*. . . . [T]he mere continuation
> doctrine exists to protect a creditor who *has* a remedy from being unfairly
> deprived of the loss of that remedy.  The doctrine does not properly extend to
> provide a remedy for a creditor who did not have one against the original debtor
> and has actually lost nothing.  *Id.* (emphasis added).

The case for mere continuation was far stronger in *Acme* than here because in *Acme* (1) the

bankruptcy court rejected the proposed sale and (2) the buyer and seller were controlled by the

same person.  *Id.*  In any event, plaintiffs here (as in *Acme*) have no evidence that the "acquisition

of the assets cost. . . [plaintiffs] a single penny." *Id.*

Case 1:14-mc-02543-JMF    Document 526    Filed 11/17/16    Page 79 of 94

Similarly, in *Milliken*, 2005 WL 1791562, at *11, the defendants (who controlled the seller, the seller's secured lender, and the purchaser), carried out a foreclosure sale following "somewhat limited" marketing efforts. The court found that "[a]s both the senior secured lender and majority shareholder in Duro, the defendants employed the foreclosure sale to eliminate the debt of Duro's unsecured creditors without any Bankruptcy Court oversight while keeping control of Duro and retaining its value as a going concern with the hope of future profitability. . . . Milliken was harmed by losing its right, as a creditor, to wait to see if the debtor's circumstances improve." *Id.* at 8-11. The *Milliken* court held that, in contrast to a foreclosure sale, bankruptcy is "an acceptable mechanism for shedding debt":

> Bankruptcy, with all creditors entitled to the protections of the Bankruptcy Code and all actions taken vis-a-vis the bankrupt corporation supervised by the Bankruptcy Court, is an acceptable mechanism for shedding debt. That route was not employed. . . . As both the senior secured lender and majority shareholder in Duro, the defendants employed the foreclosure sale to eliminate the debt of Duro's unsecured creditors without any Bankruptcy Court oversight while keeping control of Duro and retaining its value as a going concern with the hope of future profitability. (*Id*. at *7, 11)

Unlike in *Milliken*, the Bankruptcy Sale proposed by the U.S., Canada, and Old GM was "overs[een]" by the Bankruptcy Court. Also unlike *Milliken*, there was no "hope of future profitability" for Old GM, *id.*, given the Bankruptcy Court's conclusion that Old GM would have been required to "liquidate" absent the 363 Sale. *Sale Decision*, 407 B.R. at 484.

Because the 363 Sale was extensively examined, overseen, and approved by the Bankruptcy Court, plaintiffs have an exceptionally high burden of proof that they cannot satisfy, especially because Old GM otherwise would have liquidated with creditors recovering nothing. Plaintiffs' successor liability claims are "quite obvious[ly]" barred. *Acme*, 484 B.R. at 492.[54]

---

[54]    Plaintiffs' successor liability claims based on the mere continuation exception also fail because, once Old GM became a debtor, any successor liability claims held by it became a general claim of the bankruptcy estate. Old GM, as the bankruptcy estate fiduciary holding such claims, released such claims (to the extent they ever existed) as part

### F.    Continuity of Business Operations Is Insufficient To Establish Mere Continuation.

As discussed above, New GM did not continue certain relevant MLC business operations. For example, the Ion, Cobalt, G5, Sky, and Solstice were discontinued between 2006 and 2010.

Even if New GM had continued all of MLC's relevant business operations (it did not), the continuation of business operations is insufficient for imposition of mere continuation liability under the laws of the states at issue.

**New York:** *See Semenetz v. Sherling & Walden, Inc.*, 851 N.E.2d 1170, 1172 (N.Y. Ct. App. 2006) (dismissing successor liability claim where purchaser manufactured sawmills at "same plant in Alabama" as seller, and advertising described purchaser as "formerly S & W Edger Works," and stated purchaser "opened [its] doors for business in [the year seller was founded]"; *Cargo Partner*, 352 F.3d at 47 (New York Court of Appeals "declined to adopt" continuity of enterprise exception).

**California:** *Software Freedom Conservancy,* 783 F. Supp. 2d at 656 (applying California law) (continuation of business operations is insufficient for a finding of mere continuation in California, absent "the causal relationship between the inadequate consideration and the creditors' inability to recover.").

**District of Columbia:** *LeSane v. Hillenbrand Indus.,* 791 F. Supp. 871, 875 (D.D.C. 1992).

**Florida:** *Bernard v. Kee Mfg. Co.*, 409 So. 2d 1047, 1049 (Fla. 1982).

**Illinois:** *Diguilio v. Goss Int'l Corp.*, 389 Ill. App. 3d 1052, 1063 (Ill. App. Ct. 2009) (rejecting argument that "the alleged continuity of ownership comes from the fact that Goss International

---

of the Sale. *See In re Emoral, Inc.*, 740 F.3d 875, 882 (3d Cir. 2014), *cert denied sub nom.*, *Diacetyl Plaintiffs v. Aaroma Holdings, LLC*, 135 S. Ct. 436 (2014) (explaining that a "no successor liability" holding would be binding on all plaintiffs because successor liability claims are general claims of the bankruptcy estate); *see also id.* at 880 ("[S]tate law causes of action for successor liability . . . are properly characterized as property of the bankruptcy estate.") (citing *In re Keene Corp.*, 164 B.R. 844, 849 (Bankr. S.D.N.Y. 1994)).

produced the same product lines, continued to do business with the same customers and kept the same phone numbers as Goss Graphic.").

**Louisiana:** *Page v. Gulf Oil Co.*, 812 F.2d 249, 250 (5th Cir. 1987).

**Maryland:** *Baltimore Luggage*, 80 Md. App. at 298, 562 A.2d at 1293 ("Balt Lug" was not mere continuation of "Baltimore Luggage," even though "it would be difficult for customers dealing with Baltimore Luggage (RI) to conceive that they were dealing with a separate entity" and "the basis business of selling luggage continued"); *EHA Consulting Grp., Inc. v. Hardin & Assocs., P.C.*, RDB 09-2859, 2010 WL 1137514 *3 (D. Md. 2010) ("Specifically, EHA alleges that Hardin Thompson P.C. operates at the same location with the same employees; . . . has the same telephone number and email address; . . . provides the same services to the same clients . . . Virtually all of these allegations are irrelevant to whether there is successor liability under Maryland law.").

**Massachusetts:** *Guzman v. MRM/Elgin*, 567 N.E.2d 929, 931 (Mass. 1991).

**Missouri:** *Young v. Fulton Iron Works Co.*, 709 S.W.2d 927, 940 (Mo. Ct. App. 1986).

**Oklahoma:** *Pulis v. United States Elec. Tool Co.*, 561 P.2d 68, 71 (Okla. 1977) ( "test is not the continuation of the business operation, but the continuation of the corporate entity"); *Goucher v. Parmac, Inc.*, 694 P.2d 953, 954 (Okla. Ct. App. 1985).

**Virginia:** *Harris,* 413 S.E.2d at 609 (declining to adopt product line or continuation of enterprise exceptions adopted by "a small minority of jurisdictions").

**Wisconsin:** *Fish v. Amsted Indus., Inc.*, 376 N.W.2d 820, 829 (Wis. 1985).

Case 114-mc-02543-JMF    Document 526    Filed 11/17/16    Page 82 of 94

### G.    Plaintiffs' Product-Line Exception Claims Fail Under California And Pennsylvania Law.

As explained in Section IV, Delaware law or, alternatively, New York, law should apply to California and Pennsylvania plaintiffs, but even under California and Pennsylvania law, plaintiffs' successor liability claims fail.

Under both California and Pennsylvania law, the general rule is that an asset purchaser does not assume the selling corporation's debts and liabilities.  *See Fisher v. Allis-Chalmers Corp. Prod. Liab. Trust*, 95 Cal. App. 4th 1182, 1188, 116 Cal. Rptr. 2d 310, 315 (2002); *In Continental Ins. Co. v. Schneider, Inc.*, 582 Pa. 591, 599 A.2d 1286, 1291 (2005) ("when one company sells or transfers all of its assets to another company, the purchasing or receiving company is not responsible for the debts and liabilities of the selling company simply because it acquired the seller's property").

In *Ray v. Alad Corp.*, 19 Cal. 3d 22, 26, 31, 34, 560 P.2d 3, 6, 9, 11 (1977), the California Supreme Court recognized a product-line exception to the general rule of asset purchaser non-liability because the seller agreed "to dissolve its corporate existence as soon as practical," resulting in the "virtual destruction of the plaintiff's remedies against the original manufacture caused by the successor's acquisition of the business."  The *Ray* Court held:

> Justification for imposing strict liability upon a successor to a manufacturer under the circumstances here presented rests upon (1) *the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business*, (2) the successor's ability to assume the original manufacturer's risk spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.  (*Id.* at 32, 8-9) (emphasis added).

Each of these three elements must be proved for the product line exception to apply under California law.  *See Henkel Corp. v. Hartford Accident & Indem. Co.*, 29 Cal. 4th 934, 942, 62 P.3d 69, 73 (2003) (referring to *Ray* "conditions"), *overruled on other grounds by Fluor Corp. v.*

*Superior Court*, 61 Cal. 4th 1175, 354 P.3d 302 (2015); *Kradel v. Fox River Tractor Co.*, 308 F.3d 328, 331 (3d Cir. 2002) ("The California Supreme Court in *Ray* announced three requirements before the exception would apply[.]")

In *Dawejko v. Jorgensen Steel Co.*, 290 Pa. Super. 15, 434 A.2d 106 (1981), the Superior Court of Pennsylvania predicted that Pennsylvania would adopt the product line exception first recognized by the California Supreme Court in *Ray*.[55]

Plaintiffs' product-line theory fails under California and Pennsylvania law for four reasons. First, "[t]he traditional corporate rule of nonliability is only counterbalanced by the policies of strict liability when *acquisition* by the successor, and *not some* [*other*] *event or act*, virtually *destroys the ability of the plaintiff to seek redress* from the manufacturer of the defective product." *Stewart v. Telex Commc'ns, Inc.*, 1 Cal. App. 4th 190, 199, 1 Cal. Rptr. 2d 669, 675 (1991) (emphasis added) (internal citations and quotations omitted); *Nelson v. Tiffany Indus., Inc.*, 778 F.2d 533, 536 (9th Cir. 1985); *Kline v. Johns–Manville*, 745 F.2d 1217, 1220 (9th Cir.1984) ("the critical hardship, the asset sale's elimination of a remedy that would otherwise exist, is missing . . . the asset sale [must] contribute to the destruction of the plaintiffs' remedies . . . Unlike the plaintiff in *Ray*, who sought only to avoid a worsening of his position by reason of the sale of assets, the plaintiffs here seek to better theirs...."); *In re Related Asbestos Cases*, 578 F. Supp. 91, 93 (N.D. Cal. 1983).

Similarly, in *Hoffeditz v. AM Gen., LLC*, 2011 WL 5880992, at *1 (E.D. Pa. July 29, 2011), the court rejected plaintiff's product line claim against a defendant that (like New GM)

---

[55] In *Schmidt v. Boardman Co.*, 608 Pa. 327, 331, 11 A.3d 924, 927 (Pa. 2011), the Pennsylvania Supreme Court declined to rule on whether Pennsylvania would adopt the product line exception, because a party had waived the issue. The *Boardman* court held that, "under the most appropriate reconciliation of presently prevailing Superior Court precedent," proof of each of the *Ray* elements would not be required under Superior Court precedent. *See Schmidt v. Boardman Co.*, 608 Pa. at 364, 11 A.3d at 946 (Pa.2011). However, even in Pennsylvania, the first element -- the virtual destruction of the plaintiffs' remedies against the original manufacturer caused by the successor's acquisition of the business -- is dispositive in cases such as this one. *See Hoffeditz v. AM Gen., LLC*, No. 09-00257, 2011 WL 5880992, at *1 (E.D. Pa. July 29, 2011) (discussed *infra*).

had purchased assets from Old GM, on the ground that the asset purchase transaction itself did

not cause the destruction of plaintiff's remedies:

> [The court first found that the fact the defendant had not purchased all of Old GM's assets did not bar successor liability, and that this issue 'would be relevant in determining whether the plaintiff's remedies against the predecessor were destroyed by virtue of the sale of the division.']

> The parties do not contest that the second factor, whether the purchasing corporation undertakes essentially the same manufacturing operation as the selling corporation, is met in this case.

> As to the third factor, whether the sale caused the destruction of plaintiff's remedies against the predecessor corporation, this Court notes that plaintiff initially filed a claim against GM in this lawsuit. It was GM's 2009 bankruptcy and not the sale of GM's division to Detroit Diesel in 1988 which destroyed plaintiff's remedies against GM. GM remained a viable defendant to be held liable for the engines at issue in this case for 20 years after Detroit Diesel purchased GM's division. Therefore, no matter how far the causation argument is stretched, it was GM's bankruptcy, and *not the sale of GM's division to Detroit Diesel, which caused the destruction of the Plaintiffs' remedies*. As to the indemnity agreement where GM agreed to indemnify Detroit Diesel for liabilities associated with GM's division, this only establishes that in some jurisdictions, Detroit Diesel could have been held liable and then would have had a right of indemnification against GM. Because this Court concludes that Detroit Diesel cannot be held liable under the product line exception to Pennsylvania's rule of successor nonliability since GM's bankruptcy and not the sale of GM's division to Detroit Diesel resulted in the destruction of the Plaintiffs' remedies, the indemnity agreement has no bearing on this matter.

*Id.* (emphasis added).  Here, as in *Hoffeditz*, there is no evidence that the "sale" of assets by Old

GM "caused the destruction of the Plaintiff's remedies."[56]  *Id.*  The Sale merely monetized Old

GM's assets, and the proceeds of that Sale (which were well in excess of Old GM's liquidation

value) were used to make distributions to holders of Old GM claims.

---

[56] Old GM's bankruptcy filing is distinct from the 363 Sale. While the Sale was approved by the Bankruptcy Court, New GM was not a debtor; it was a purchaser of the debtor's assets. Therefore, it is unnecessary for the Court to decide whether the bankruptcy filing itself deprived Old GM's creditors of remedies.  In any event, plaintiffs point to no evidence that it was the bankruptcy filing itself, as opposed to the 2008-2009 financial crisis and what Judge Gerber described as Old GM's "grim" financial condition, *see supra* at 9, that caused Old GM's inability to pay creditors.  Irrespective of the bankruptcy filing, Old GM could not obtain financing without the Sale, and it could not avoid liquidation without obtaining financing.  *Sale Decision*, 407 B.R. at 480.

Second, the product-line exception also fails because "[t]he continuation of the predecessor corporation bars recovery from the successor under the product line rule." *See S. Bend Lathe, Inc. v. Amsted Indus., Inc.*, 925 F.2d 1043, 1047 (7th Cir. 1991) (citing California law) (holding that rule applies "in every decision we have found that considers this issue") (*citing Phillips v. Cooper Laboratories*, 215 Cal.App.3d 1648, 264 Cal.Rptr. 311, 316 (1989)); *Hoffeditz*, 2011 WL 5880992, at *1; *Schweitzer v. Consolidated Rail Corp.*, 65 B.R. 794, 803 (E.D. Pa. 1986) ("[w]hen a seller continues to be viable, the tort victim has not been deprived of a remedy and there is no need to impose successor liability"). MLC and the MLC GUC Trust have continued to pay creditor claims, and plaintiffs have represented that they will pursue claims against the MLC GUC Trust.

Third, the product-line exception does not apply where, as here, "there is a good faith dissolution in bankruptcy which is not intended to avoid future tort claims against the predecessor." *Nelson v. Tiffany Indus., Inc.*, 778 F.2d 533, 537-38 (9th Cir. 1985) (product line exception does not apply to good faith dissolution; "the essential element of causation will be shown by evidence of a *collusive agreement to use bankruptcy proceedings to shield the successor corporation from the predecessor's liabilities*.") (emphasis added); Sale Order, ¶ Q ("The MPA and the 363 Transaction were negotiated, proposed, and entered into by the Sellers and the Purchaser without collusion . . . .").

Fourth, neither the California Supreme Court nor the Pennsylvania Supreme Court[57] has applied the product line exception to economic loss claims not involving a personal injury. Nor is there any basis to predict that those Supreme Courts would extend the product line exception to cover plaintiffs' economic loss claims. The rationale for the product line exception applies, at

---

[57]   Indeed, the Pennsylvania Supreme Court itself has not adopted the product line exception at all, *Schmidt v. Boardman Co.*, 608 Pa. 327, 11 A.3d 924, 927 (Pa. 2011), much less extended it to economic loss claims.

most, to personal injury claims, not to economic loss claims. *See Downtowner, Inc. v. Acrometal Prod., Inc.*, 347 N.W.2d 118, 123 (N.D. 1984) ("The vast majority of cases cited by the appellants involve bodily injury. It has, however, been held that where the injury complained of is to property, the expansion of the mere continuation exception and the adoption of the product line exception is unwarranted."); *U.S. Automatic Sprinkler Co. v. Reliable Automatic Sprinkler Co.*, 719 F. Supp. 2d 1020, 1031 (S.D. Ind. 2010) ("U.S. Automatic's reliance on the product-line exception to the law of successor liability is equally misplaced, given that this exception applies only when the claim is one for product liability involving personal injury."); *Collins v. Olin Corp.*, 434 F. Supp. 2d 97, 106 (D. Conn. 2006) ("[T]he Connecticut Superior Courts that have applied the product-line exception have only done so in cases of strict products liability for personal injury."); *State ex rel. Donahue v. Perkins & Will Architects, Inc.*, 90 Ill. App. 3d 349, 354, 413 N.E.2d 29, 33 (1980); *Ray v. Alad Corp.*, 19 Cal. 3d 22, 30–31, 560 P.2d 3, 8–9 (1977) ("The purpose of the rule of strict tort liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves."); *see also Garland v. Herrin*, 724 F.2d 16, 18-20 (2d Cir. 1983) ("A federal court should not make such a policy-based extension of state law, a development better left to the state's own courts or its legislature.").

## H.    Plaintiffs' Successor Liability Claims Also Fail Under The Continuity of Enterprise Exception.

As explained in Section IV, Delaware law or, alternatively, New York law should apply to Michigan and Alabama plaintiffs.  Regardless, plaintiffs' claims fail under Michigan and Alabama law. Michigan and Alabama follow the "traditional rule of nonliability for corporate successors who acquire the predecessor through the purchase of assets."  *Foster v. Cone–Blanchard Mach. Co.*, 460 Mich. 696, 597 N.W.2d 506, 509 (1999); *Chumney v. U.S. Repeating*

68

*Arms Co.*, 196 F.R.D. 419, 423 (M.D. Ala. 2000) ("In Alabama, the general rule of successor

liability is that where one company sells or transfers its assets to another company, the transferee

is not liable for the debts and obligations of the transferor.").  Both states recognize exceptions to

the general rule of non-liability.  *See Stramaglia v. U.S.*, 377 F. App'x 472, 474–75 (6th Cir.

2010); *MPI Acquisition, LLC v. Northcutt*, 14 So. 3d 126 (Ala. 2009).

In *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976), the

Michigan Supreme Court adopted the "continuity of enterprise" exception:

> *Turner* held that a prima facie case of continuity of enterprise exists where the
> plaintiff establishes the following facts: (1) there is continuation of the seller
> corporation, so that there is a continuity of management, personnel, physical
> location, assets, and general business operations of the predecessor corporation;
> (2) the predecessor corporation ceases its ordinary business operations, liquidates,
> and dissolves as soon as legally and practically possible; and (3) the purchasing
> corporation assumes those liabilities and obligations of the seller ordinarily
> necessary for the uninterrupted continuation of normal business operations of the
> selling corporation.  *See Foster v. Cone-Blanchard Mach. Co.*, 460 Mich. 696,
> 703, 597 N.W.2d 506, 509 (1999).

The *Turner* court explained that "if there are no real business reasons for choosing a cash

acquisition of corporate assets and the only real reason is to avoid products liability suits, then it

would seem that the machinery of corporate law is unreasonably geared up to accomplish a

purpose not really intended for it or in the public interest."  397 Mich. 406, 244 N.W.2d 873.

As the Michigan Supreme Court recognized in *Foster*, "*Turner's* holding" applies "only"

where there is no other "viable" recovery for the plaintiff.  597 N.W.2d at 511.  The *Foster* court

explained that "[w]hile failure of the predecessor to dissolve may not be fatal in every action for

successor liability, especially, for example, where the predecessor continues as a shell or is

otherwise underfunded, the fact that a predecessor remains a viable source for recourse is."  *Id.*;

*see also C.T. Charlton & Associates, Inc. v. Thule, Inc.*, 541 F. App'x 549 (6th Cir. 2013)

(applying Michigan law) ("Viable source for recourse is not the same thing as solvent. Creditors

have recourse (*i.e.*, a right to recovery) against insolvent companies, even though they may ultimately get pennies on the dollar or nothing."). Although the *Ammend* court held that a plaintiff need not satisfy "*each Turner* factor," 322 F. Supp. 2d at 867 (emphasis added), the "fact that a predecessor remains a viable source for recourse" is dispositive in Michigan. *Foster*, 460 Mich. at 701–02, 597 N.W.2d at 509 (existence of "viable source of recourse" is "fatal"); *see also Ammend*, 322 F. Supp. 2d at 867 ("In spite of the overall balancing orientation of the *Turner* analysis, the second *Turner* guideline [viable source for recourse] operates with dispositive force in certain circumstances.").

Moreover, it is "crystal clear" that (like the product line exception) the continuity of enterprise exception does not apply if the "transaction" did not "deprive" plaintiffs of "an effective remedy against the predecessor corporation." *Santa Maria*, 808 F.2d at 859. As the First Circuit explained:

> Both the *Turner* and *Alad* cases are clearly distinguishable from the present case in crucial factual aspects. First of all, it is crystal clear that under either of these cases it is absolutely essential for the broader exception to the rule of nonliability in products liability cases to come to bear that the injured plaintiff must have been *deprived by the asset transaction of an effective remedy* against the predecessor corporation that actively manufactured the product causing the injury. *Turner*, 397 Mich. at 429, 244 N.W.2d at 883 ("[I]n a products liability case where the corporation fabricating the injury-producing item changes corporate structure before injury and suit, as a matter of policy neither the victim nor the successor corporation has a different interest vis-a-vis the suit whatever the type of corporate metamorphosis ... so long as the tranferor corporation becomes defunct."). . .  In each of these cases the court is at obvious pains to make it explicit that the asset vendor became *defunct as a result of the asset transaction*.

*Id.* at 859 (emphasis added). *Santa Maria* was cited the Michigan Supreme Court's 1999 decision in *Foster v. Cone-Blanchard*, 460 Mich at 705 n.8.

Similarly, in *Ammend v. Bioport, Inc.*, 322 F. Supp. 2d 848, 868 (W.D. Mich. 2004), the

court held that the continuity of enterprise exception did not apply under Michigan law because

plaintiffs did not "los[e] a remedy that they were once entitled to pursue":

> The asset sale therefore did not deprive Plaintiffs of an effective remedy against
> the predecessor; Plaintiffs never had such a remedy in the first place.  Thus, this
> case fails to implicate the policy rationale behind the successor liability doctrine,
> which *Turner* explained to be the preservation of an injured person's access to
> relief notwithstanding the occurrence of a corporate transfer between the time the
> predecessor makes a product and the time a person injured by the product files
> suit.  In discussing the "underlying logic" of its holding, the *Turner* court
> explained how successor liability prevents changes in corporate forms from
> victimizing plaintiffs. Without successor liability, an injured person faces "the
> problem of recovery" when a predecessor "legally and/or practically becomes
> defunct." 397 Mich. at 419, 244 N.W.2d at 878.  The injured person "has no place
> to turn for relief except to the second corporation." *Id.  Turner's* holding solves
> the problem of recovery, ensuring that plaintiffs do not lose access to a remedy
> they once had. Moreover, the successor liability doctrine avoids the "unfair and
> unbelievable" perverse incentive that would arise absent the *Turner* rule whereby
> businesses would engage in cash-for-asset transactions when "the only real reason
> is to avoid products liability suits." *Id.* at 422–23, 244 N.W.2d at 880. . . . .
> [T]o peg BioPort with successor liability for the actions of its immune
> predecessor would work an injustice on BioPort and deliver an unfair windfall to
> Plaintiffs.  Rather than losing a remedy that they were once entitled to pursue,
> Plaintiffs in this case seek to gain a remedy which they never had prior to the
> asset sale.  Shielding BioPort from successor liability under the continuity of
> enterprise theory leaves Plaintiffs *no worse off than they would be had the state
> never sold MBPI's assets, and that is a fair result*.

*Id.* at 867-68 (emphasis added).

The Alabama Supreme Court has adopted Michigan's continuity of enterprise test.  *See

Andrews v. John E. Smith's Sons Co.*, 369 So. 2d 781, 785 (Ala. 1979) ("[t]he reasoning of

*Turner* is persuasive").

Plaintiffs' continuity-of-enterprise claims fail for five reasons.  First, as in *Ammend*,

"[p]laintiffs never had . . . a remedy in the first place" because, without the Sale, Old GM would

have "liquidate[d]" and creditors would have recovered "nothing."  *See Sale Decision*, 407 B.R.

at 475.  Second, MLC and the MLC GUC Trust each remained a "viable source for recourse"

71

after the Sale. *Foster*, 460 Mich. at 706, 597 N.W.2d at 511; *C.T. Charlton & Associates, Inc. v. Thule, Inc.*, 541 F. App'x 549 (6th Cir. 2013) (applying Michigan law) ("viable source of recourse" does not require full recovery); *Asher v. KCS Int'l, Inc.*, 659 So. 2d 598, 599 (Ala. 1995) (continuity of enterprise test met only where alternative source of relief "dissolved soon after distribution of consideration [58] received from the buying corporation"); *Goodwin v. McGehee,* 15 Ala. 232, 247 (1849) (successor liability applies to transactions carried out "with a view of defeating the claims of creditors"); 19 C.J.S. Corporations § 747 (2013) ("There can be no continuity of enterprise, and thus no successor liability, if the predecessor corporation remains a viable source for recourse."); William M. Fletcher, 15 Fletcher Cyclopedia Corp. § 7124.10. Third, New GM did not continue some of Old GM's business operations relevant to plaintiffs' economic loss claims. As discussed above, New GM discontinued production of Saturn, and Pontiac models, among others, between 2006 and 2010. *See, supra*, at 17. Fourth, the Michigan Supreme Court has not extended the continuity of enterprise exception to economic loss claims. To the contrary, as that Court explained in *Starks v. Michigan Welding Specialists, Inc.*, 722 N.W.2d 888, 889 (Mich. 2006), the continuity of enterprise exception is "designed to protect injured victims of defective products."[59] *Id.* at 889; *see also Downtowner, Inc. v. Acrometal Prod., Inc.*, 347 N.W.2d 118, 123 (N.D. 1984); *State ex rel. Donahue v. Perkins & Will Architects, Inc.*, 90 Ill. App. 3d 349, 354, 413 N.E.2d 29, 33 (1980). The continuity of enterprise

---

[58] Courts consider dissolution "soon after distribution of consideration" because, as discussed above, successor liability protects against transactions by shareholders intended to place assets out of reach of the predecessor's creditors. Dissolution "soon after distribution of consideration" may result in shareholders receiving sale proceeds without creditors being paid. Here, as also discussed above, the consideration paid by the U.S. and Canadian governments was not distributed to MLC's shareholders but to its creditors.

[59] In *Woodridge Hills Ass'n v. Williams*, No. 310940, 2013 WL 5762990 (Mich. Ct. App. Oct. 24, 2013), the court referred both to the "mere continuation" exception and the "continuity of enterprise" test, in a "breach of contract" claim arising from "substandard work" on a roofing job. To the extent Woodridge is interpreted to apply the continuity of enterprise exception in a breach of contract case not involving an "injured victim" of a "defective product," it is wrongly decided and inconsistent with in *Starks v. Michigan Welding Specialists, Inc.*, 477 Mich. 922, 722 N.W.2d 888, 889 (2006).

Case 14-mc-02543-JMF Document 526 Filed 11/17/16 Page 91 of 94

exception depends upon "special public policy factors inherent in strict liability actions" that are not present here.  *See State ex rel. Donahue*, 90 Ill. App. 3d at 354, 413 N.E.2d at 33 (*citing Turner*).  Fifth, under Alabama law, "the bankruptcy of the predecessor corporation and the sale of its assets by the Bankruptcy Court effectively precludes the imposition of successor liability upon the purchasing corporation."  1 Ala. Pers. Inj. & Torts § 2:22 (2016 ed.); *see also PI Acquisition, LLC v. Northcutt,* 14 So.3d 126 (2009).[60]

Plaintiffs' claims would also fail under Michigan's traditional "mere continuation" test. As in other states, that exception "encompass[es] the situation where one corporation sells its assets to another corporation with the same people owning both corporations."  *Turner*, 244 N.W.2d at 892 ("Thus, the acquiring corporation is just a new hat for, or reincarnation of, the acquired corporation. This is actually a reorganization."); *see also Pearce v. Schneider*, 242 Mich. 28, 29, 217 N.W. 761, 762 (1928); *Grenell v. Detroit Gas Co.*, 112 Mich. 70, 72–73, 70 N.W. 413, 414 (1897) ("a corporation cannot sell all of its property, and take in payment stock in a new corporation, under an arrangement  that has the effect of distributing the assets of the vendor among its stockholders, *to the exclusion and prejudice of its creditors*") (emphasis added); *First Presbyterian Church Of Ypsilanti v. H.A. Howell Pipe Organs, Inc.*, No. 07-13132, 2010 WL 419972, at *7 (E.D. Mich. Feb. 1, 2010) ("there must be insufficient consideration running from the new company to the old before the mere continuation exception can apply"); *Kemper v. Saline Lectronics*, 366 F. Supp. 2d 550, 558 (N.D. Ohio 2005) (applying Michigan law) (ownership of twenty-two percent of stock insufficient for continuity of ownership).

In sum, plaintiffs' successor liability claims fail under Michigan and Alabama law.

---

[60] New GM will file with the Supreme Court its petition for *certiorari* relating to Judge Gerber's "free and clear" order, and preserves the arguments set forth in that petition.

## I.        Plaintiffs' Successor Liability Claims Fail Under Texas Law.

Plaintiffs' successor liability claims also fail under Texas law, which does not recognize the mere continuation exception or implied successor liability.  *See* Tex. Bus. Orgs. Code Ann. § 10.254 (Vernon Supp. 2012).

As reflected in this statute, Texas "strongly embraces" a "nonliability" rule for corporate successors.  *See Lockheed Martin Corp. v. Gordon*, 16 S.W.3d 127, 139 (Tex.App.-Houston [1st Dist.] 2000, pet. denied).  Thus, under Texas law, there is no successor in interest when an acquiring corporation does not expressly agree to assume the liabilities of the other party to an agreement.  *See Motor Components, LLC v. Devon Energy Corp.*, 338 S.W.3d 198, 205 (Tex.App.-Houston [14th Dist.] 2011, no pet.) ("The Texas legislature rejected long ago the 'continuation' doctrine of implied successor liability ....") (*citing* Tex. Bus.  Orgs. Code Ann. § 10.254).

Because plaintiffs' successor liability claims are not based on an express assumption of liability by New GM, plaintiffs' claims are barred under Texas law.

## VII.    CONCLUSION

For all of the foregoing reasons, New GM respectfully requests that the Court grant summary judgment dismissing all of plaintiffs' successor liability claims.[61]

---

[61] This motion does not seek summary judgment on the issue of punitive damages.  But even if plaintiffs could otherwise prove successor liability (they cannot), they cannot recover punitive damages from New GM as Old GM's successor.  Plaintiffs' successor liability claims against New GM are wholly derivative of any claims that they may have against Old GM as the seller, and plaintiffs could not have recovered punitive damages against Old GM: "[I]n the claim process, you don't get punitive damages." *See* Hr'g Tr. 89:11-17, Feb. 18, 2015. The Bankruptcy Court held that "[s]ince punitive damages punish past conduct (which, for Liabilities to be assumed, would by definition have been Old GM's, not New GM's), and deter future wrongdoing (which could not occur in the case of a liquidating Old GM), imposing punitives for Old GM conduct would not be consistent with punitive damages' purposes; claims for punitive damages if asserted against Old GM would have been at least subordinated, if not disallowed, as they would only penalize innocent creditors (and, in either event, out of the money, given Old GM's deep insolvency)."  *See In re Motors Liquidation Co.*, 541 B.R. 104, 120, 2015 WL 6876114 (S.D.N.Y. 2015). Because plaintiff could not recover punitive damages against Old GM, plaintiff cannot recover such damages from New GM.

Dated:  November 11, 2016                    Respectfully submitted,

                                          */s/ Richard C. Godfrey, P.C.*

                                          Richard C. Godfrey, P.C.
                                          Andrew B. Bloomer, P.C.
                                          KIRKLAND & ELLIS LLP
                                          300 N. LaSalle
                                          Chicago, IL 60654-3406
                                          Phone:  312-862-2000
                                          Fax: 312-862-2200
                                          richard.godfrey@kirkland.com
                                          andrew.bloomer@kirkland.com

                                          *Attorneys for Defendant General Motors LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on November 11, 2016, I electronically filed the foregoing Brief using the CM/ECF system which will serve notification of such filing to the email of all counsel of record in this action.

/s/ *Andrew B. Bloomer, P.C.*

Andrew B. Bloomer, P.C.