# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036-4003

Tel:  (212) 556-2100
Fax:  (212) 556-2222
www.kslaw.com

Scott Davidson
Direct Dial:  212-556-2164
sdavidson@kslaw.com

December 22, 2016

**VIA E-MAIL TRANSMISSION**
**AND ECF FILING**
The Honorable Martin Glenn
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
Alexander Hamilton Custom House
One Bowling Green
New York, New York 10004

> Re:    In re Motors Liquidation Company, *et al.*
>         Case No. 09-50026 (MG)
>
>         **Letter Regarding Update on Related Proceedings**

Dear Judge Glenn:

King & Spalding LLP is co-counsel with Kirkland & Ellis LLP for General Motors LLC ("**New GM**") in the above-referenced matter.  Pursuant to Judge Gerber's Endorsed Order dated May 5, 2015 [Dkt. No. 13131], we write to update the Court regarding developments in proceedings relating to New GM.  Specifically, on December 13, 2016, New GM filed a *Petition for Writ of Certiorari* ("**Cert. Petition**") with the Supreme Court of the United States in connection with the Opinion issued on July 13, 2016 by the United States Court of Appeals for the Second Circuit.  A copy of the Cert. Petition is attached hereto as **Exhibit "A."**

If the Court has any questions or needs additional information, please let me know.

Respectfully submitted,

*/s/ Scott Davidson*

Scott Davidson

SD/hs
Encl.

# **Exhibit A**

No. ____

In the
# Supreme Court of the United States

———————

GENERAL MOTORS LLC,

*Petitioner,*

v.

CELESTINE ELLIOTT, et al.,

*Respondents.*

———————

**On Petition for Writ of Certiorari to the
United States Court of Appeals
for the Second Circuit**

———————

## PETITION FOR WRIT OF CERTIORARI

———————

ARTHUR J. STEINBERG
SCOTT DAVIDSON
KING & SPALDING LLP
1185 Avenue of the
 Americas
New York, NY 10036

RICHARD C. GODFREY
ANDREW B. BLOOMER
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
MICHAEL D. LIEBERMAN
MATTHEW D. ROWEN
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005
(202) 879-5000
paul.clement@kirkland.com

*Counsel for Petitioner*
*(Additional Counsel Listed on Inside Cover)*
December 13, 2016

MERRITT E. MCALISTER
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, GA 30309

EDWARD L. RIPLEY
KING & SPALDING LLP
1100 Louisiana
Suite 4000
Houston, TX 77002

## QUESTIONS PRESENTED

In 2008, during the Great Recession, General Motors Corporation (Old GM) was insolvent and nearing collapse. The only viable way to avert the demise of the domestic auto industry was for the government to form a new corporate entity and purchase Old GM's assets in a sale under Section 363 of the Bankruptcy Code. As authorized by Section 363(f), the Sale Order provided that the government-owned entity obtained Old GM's assets "free and clear" of Old GM's liabilities (other than those expressly assumed). Years after the sale closed, groups of plaintiffs sued the good-faith purchaser of Old GM's assets, seeking to impose successor liability for Old GM's alleged pre-sale wrongdoing. The plaintiffs claimed that they could strip the good-faith purchaser of its "free and clear" protection because the seller, Old GM, gave them inadequate notice of the Section 363 sale. The bankruptcy court rejected that claim, but the Second Circuit reversed and exposed the good-faith purchaser to enormous potential liability for the supposed sale notice failures of the seller.

The questions presented are:

1. Whether the Due Process Clause requires a debtor selling its assets under Section 363 to notify its creditors not only of the details of the sale, as required by Section 363, but also of the grounds for potential claims against the seller.

2. Whether a seller's failure to provide potential creditors with adequate notice of a Section 363 sale deprives the good-faith purchaser of Section 363's "free and clear" protections.

ii

## PARTIES TO THE PROCEEDING

Petitioner General Motors LLC was an Appellee/Cross-Appellant below.

Respondents Celestine Elliott, Lawrence Elliott, Berenice Summerville, and Sesay and Bledsoe Plaintiffs were Appellants/Cross-Appellees below.

Respondents Ignition Switch Plaintiffs; Ignition Switch Pre-Closing Accident Plaintiffs; State of Arizona; People of the State of California; and Groman Plaintiffs were Appellants below.

Respondents Wilmington Trust Company and Participating Unitholders were an Appellee-Cross-Appellant below.

iii

## CORPORATE DISCLOSURE STATEMENT

General Motors LLC is a Delaware limited liability company whose only member is General Motors Holdings LLC. General Motors Holdings LLC's only member is General Motors Company, a Delaware corporation with its principal place of business in Wayne County, Michigan. General Motors Company owns 100% of General Motors Holdings LLC.

iv

# TABLE OF CONTENTS

QUESTIONS PRESENTED........................................ i

PARTIES TO THE PROCEEDING .......................... ii

CORPORATE DISCLOSURE STATEMENT........... iii

PETITION FOR WRIT OF CERTIORARI ................ 1

OPINIONS BELOW .................................................. 4

JURISDICTION ........................................................ 4

CONSTITUTIONAL AND STATUTORY
   PROVISIONS INVOLVED...................................... 4

STATEMENT OF THE CASE ................................... 4

   A.   Statutory Background................................. 4

   B.   Factual Background .................................... 7

      1.   The Section 363 Sale............................ 7

      2.   The Ignition-Switch Defect and the
           Ensuing Class Actions ........................ 11

      3.   The Bankruptcy Court Proceedings.... 13

      4.   The Second Circuit's Decision ............. 15

REASONS FOR GRANTING THE PETITION....... 16

I.   The Decision Below Imposes A Novel And
     Unjustifiable   Constitutional   Notice
     Requirement ...................................................... 20

II.  The Decision Below Erroneously Punishes A
     Good-Faith  Purchaser  For  The  Seller's
     Purported Notice Failings.................................. 26

III. This Case Presents Exceptionally Important
     Questions .......................................................... 33

CONCLUSION ........................................................ 36

v

APPENDIX

Appendix A

Opinion, United States Court of Appeals for
the Second Circuit, *In re: Motors Liquidation
Co.*,              No.              15-2844-bk(L)
(July 13, 2016) ............................................ App-1

Appendix B

Order Denying Rehearing, United States
Court of Appeals for the Second Circuit, *In
re:        Motors        Liquidation        Co.*,
No. 15-2844-bk(L) (Sept. 14, 2016) ........... App-63

Appendix C

Decision on Motion to Enforce Sale Order,
United States Bankruptcy Court for the
Southern District of New York, *In re: Motors
Liquidation                                    Co.*,
No. 09-50026 (REG) (Apr. 15, 2015) ........ App-65

Appendix D

U.S. Const. amend. V .............................. App-239

Appendix E

Relevant Statutory Provisions ................ App-240

vi

## TABLE OF AUTHORITIES

**Cases**

*Chemetron Corp. v. Jones*,
    72 F.3d 341 (3d Cir. 1995) .......................... 6, 22, 25

*Factors' & Traders' Ins. Co. v. Murphy*,
    111 U.S. 738 (1884) ..................................... 3, 29, 30

*Fla. Dep't of Revenue*
*v. Piccadilly Cafeterias, Inc.*,
    554 U.S. 33 (2008) .................................................. 5

*In re Edwards*,
    962 F.2d 641 (7th Cir. 1992) ................. 3, 28, 29, 30

*In re Gen. Motors Corp.*,
    407 B.R. 463 (Bankr. S.D.N.Y. 2009) ............. 7, 8, 9

*In re Gen. Motors LLC Ignition Switch Litig.*,
    No. 14-MD-2543 (S.D.N.Y.) ................................... 13

*In re Gen. Motors*,
    2009 WL 2033079 (S.D.N.Y. July 9, 2009) ..... 10, 21

*In re Gen. Motors*,
    409 B.R. 24 (Bankr. S.D.N.Y. 2009) ...................... 10

*In re Gucci*,
    126 F.3d 380 (2d Cir. 1997) .................................. 27

*In re Lehman Bros. Holdings Inc.*,
    761 F.3d 303 (2d Cir. 2014) .................................. 34

*In re Met-L-Wood Corp.*,
    861 F.2d 1012 (7th Cir. 1988) ................................. 5

*In re Motors Liquidation Co.*,
    428 B.R. 43 (S.D.N.Y. 2010) ................................. 10

*In re Motors Liquidation Co.*,
    430 B.R. 65 (S.D.N.Y. 2010) ........................... 10, 28

vii

*In re Motors Liquidation Co.*,
  462 B.R. 494 (Bankr. S.D.N.Y. 2012)................... 32

*In re Placid Oil Co.*,
  753 F.3d 151 (5th Cir. 2014)........................... 24, 25

*In re Trans World Airlines, Inc.*,
  322 F.3d 283 (3d Cir. 2003) ........................ 5, 31, 33

*In re UNR Indus., Inc.*,
  20 F.3d 766 (7th Cir. 1994)................................... 27

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
  339 U.S. 306 (1950)........................................ 22, 23

*RadLAX Gateway Hotel, LLC v.*
  *Amalgamated Bank*,
  132 S. Ct. 2065 (2012)............................................ 27

*United States v. Winstar Corp.*,
  518 U.S. 839 (1996).............................................. 34

**Statutes**

11 U.S.C. §363 ................................................. *passim*

11 U.S.C. §363(f)...................................................... 27

11 U.S.C. §363(m)......................................... 5, 27, 35

**Rules**

Fed. R. Bankr. P. 2002(a)(2)....................................... 6

Fed. R. Bankr. P. 2002(c)(1) ................................. 6, 20

Fed. R. Bankr. P. 6004(a) .......................................... 6

**Other Authorities**

Mot. Order, *In re Motors Liquidation Co.*,
  No. 10-4882-BK (2d Cir. July 28, 2011)............... 10

Tom Hals, *Potential bidders for Takata may*
  *balk at GM bankruptcy precedent*,
  Reuters (Nov. 6, 2016) ........................................... 35

## PETITION FOR WRIT OF CERTIORARI

This case emanates from one of the largest and most highly publicized bankruptcies in history. When General Motors Corporation (Old GM), the nation's largest auto manufacturer, was on the brink of collapse, the government determined that the only way to save the domestic auto industry and the countless jobs that depended on it was to purchase Old GM's assets through a sale under Section 363 of the Bankruptcy Code. Section 363 permits a good-faith purchaser—here, a new company formed and owned by the government—to obtain a debtor's rapidly deteriorating assets before the confirmation of a Chapter 11 plan, and "free and clear" of the debtor's liabilities. This "free and clear" protection assures good-faith purchasers that they can acquire the debtor's assets without also assuming the risk of successor liability for the debtor's past acts. That assurance also helps maximize the price paid for the debtor's assets, which in turn provides creditors with more substantial recoveries after the ensuing claims-resolution process. The finality of a "free and clear" sale is so fundamental to Section 363's functioning that Congress has prohibited reviewing courts from invalidating or even modifying the terms of a sale to a good-faith purchaser once consummated.

Section 363 worked as intended during Old GM's bankruptcy. Old GM's creditors received significant recovery from the sale proceeds, and the government-backed good-faith purchaser (NGMCO) used the assets it bought to build a stable business that employs hundreds of thousands of people. The government, for its part, later sold its shares in

2

NGMCO once markets stabilized. Now, however, seven years after the good-faith purchaser acquired Old GM's assets, and after millions of transactions have taken place in reliance on the inviolability of the Sale Order, the Second Circuit has retroactively stripped NGMCO of its "free and clear" protections. Incredibly, the Second Circuit did this not because the *good-faith purchaser* did anything wrong, but because the *seller* allegedly provided inadequate notice to certain potential creditors before consummating the Section 363 sale.

The Second Circuit reached that inverted and extraordinary outcome by way of two fundamental errors, both of which warrant this Court's review. The first was holding that the Due Process Clause demands that debtors proposing Section 363 sales provide more notice than the Bankruptcy Code requires—in other words, effectively holding Section 363 unconstitutional as applied. According to the Second Circuit, debtors must inform their potential creditors not just that a Section 363 sale is taking place (as the Code and Bankruptcy Rules require), but also of the basis for any potential claims against the debtor. The court cited no authority for that novel holding, and there is none. It is emphatically wrong, and threatens the viability of Section 363, as superimposing that constitutional notice obligation atop what the Code and Rules require would jeopardize debtors' ability to quickly sell already-distressed and rapidly deteriorating assets. That onerous requirement is also wholly disproportionate to the harm it seeks to avoid, as Section 363 sales do not extinguish creditors' claims, but instead generate proceeds for distribution to creditors in accordance

3

with the Code and the ensuing claims-resolution process.

The decision strayed even further afield when it held that the remedy for the *seller*'s failure to provide this notice is to impose potentially massive successor liability on the *good-faith purchaser*. Section 363 itself expressly prohibits that result, as Congress recognized that an emergency asset sale can perform its value-maximizing function only if good-faith purchasers are confident that they can truly take the assets "free and clear." Indeed, this Court has held that even a creditor who receives *no* notice of a bankruptcy sale lacks recourse against the good-faith purchaser, who bears no responsibility for any notice defects. *See Factors' & Traders' Ins. Co. v. Murphy*, 111 U.S. 738 (1884). And the Seventh Circuit has followed that holding to reject the argument that a notice defect can undo the good-faith purchaser's "free and clear" protections in a Section 363 sale. *In re Edwards*, 962 F.2d 641 (7th Cir. 1992). The decision below cannot be reconciled with either of those decisions—let alone with Congress' express prohibition on modifying a Section 363 sale after the fact to the detriment of a good-faith purchaser.

Left standing, the decision below not only will undermine a crucial aspect of one of the biggest and most important bankruptcies in history, but also will vitiate the very provisions that make Section 363 sales viable. If good-faith purchasers cannot be assured that they are purchasing the debtor's assets free and clear of its liabilities, they will demand steep discounts to offset the very risks Congress intended to eliminate, and creditors will have to settle for

4

meager recoveries. Meanwhile, creditors will be incentivized to follow plaintiffs' lead and ignore the Bankruptcy Code's priority scheme, jump ahead of other creditors, and pursue recovery from good-faith purchasers instead of bankruptcy estates.

In short, this case presents exceptionally important questions, and the Second Circuit's answers were exceptionally wrong. The Court should grant review.

## OPINIONS BELOW

The Second Circuit's opinion is reported at 829 F.3d 135 and reproduced at App.1-62. The bankruptcy court's opinion is reported at 529 B.R. 510 and reproduced at App.65-238.

## JURISDICTION

The Second Circuit issued its opinion on July 13, 2016, and denied NGMCO's petition for rehearing on September 14, 2016. This Court has jurisdiction under 28 U.S.C. §1254(1).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

The Due Process Clause and Section 363 of the Bankruptcy Code are reproduced at App.239-42.

## STATEMENT OF THE CASE

### A. Statutory Background

Section 363 of the Bankruptcy Code authorizes a debtor-in-possession to sell property before the confirmation of a Chapter 11 plan. 11 U.S.C. §363. Section 363 typically is used when the debtor has rapidly deteriorating assets that must be sold promptly to retain their value. After the sale, the

5

purchaser will use the assets in its own business, and the bankruptcy estate will use the sale proceeds to satisfy creditors' claims under a Chapter 11 plan. *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 37 n.2 (2008). While some Section 363 sales involve discrete assets, many involve essentially the entirety of the debtor's business. Particularly in that context, the goal is to sell the assets "as quickly as possible, so that the business can continue in other hands than the bankrupt's, free of the stigma and uncertainty of bankruptcy." *In re Met-L-Wood Corp.*, 861 F.2d 1012, 1017 (7th Cir. 1988). To maximize the value of the newly purchased assets, minimize the loss of customers, and preserve jobs, the purchaser often retains many of the seller's employees. *See, e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 293 (3d Cir. 2003).

Section 363 cannot achieve its objective of maximizing the value of the estate unless purchasers are assured that they are acquiring valuable assets, not costly headaches. To that end, Section 363(f) allows good-faith purchasers to obtain a debtor's assets "free and clear" of its liabilities. This cornerstone provision is critical because purchasers would not buy the assets if doing so could expose them to the liabilities that put the seller into bankruptcy. Nor would they buy the assets if that "free and clear" protection were not inviolable. Accordingly, Congress has flatly prohibited courts from invalidating or modifying a consummated Section 363 sale to the detriment of a good-faith purchaser, even on direct appeal. 11 U.S.C. §363(m). That protection ultimately benefits the debtor's creditors as well. A Section 363 sale does not

6

extinguish creditors' claims against the debtor. Those claims survive the sale and attach to the proceeds it generates. And by enabling the debtor to sell its assets at maximum value, Section 363's "free and clear" protections maximize creditor recoveries from the estate.

Consistent with the fact that Section 363 sales do not extinguish creditors' claims, the Code imposes only limited notice requirements before a Section 363 sale may take place. Section 363(b)(1) requires "notice and a hearing" before a sale may be approved, and the Bankruptcy Rules require the seller to provide notice to "all creditors." Fed. R. Bankr. P. 2002(a)(2); *see also* Fed. R. Bankr. P. 6004(a). The "content of notice" must include only "the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002(c)(1). The seller need not notify creditors of the grounds for potential claims against it. The seller generally must provide direct-mail notice to "known" creditors, but only publication notice to "unknown" creditors. *See Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995). These notice obligations fall solely on the seller; the purchaser has no notice obligation whatsoever.

Creditors may object to a Section 363 sale, and the bankruptcy court must consider those objections in deciding whether to approve the sale. Regardless of whether a creditor objects, however, its claim against the debtor survives the sale. Objectors may also ask the courts to stay an approved sale pending appeal, but if the courts decline and the sale goes

7

forward, Section 363(m) bars any court from undoing or altering the sale to the detriment of the good-faith purchaser.

## B.  Factual Background

### 1.  The Section 363 Sale

In 2008, the domestic auto industry was in extremis.  The Great Recession reduced consumers' ability to acquire credit, and rising oil prices reduced their appetite for new cars.  Amidst that crisis, Old GM and Chrysler—two of the "Big Three" domestic auto manufacturers and among the largest corporations in the world—posted nine-figure losses for six consecutive quarters.  That situation proved untenable.  Old GM alone was responsible for a quarter-million American jobs, and hundreds of thousands more depended on its continuing vitality.  Given the stakes, the government took unprecedented action, providing Old GM and Chrysler with billions of dollars in emergency loans.  The loans kept the automakers afloat for a short time, but they ultimately proved insufficient.  Chrysler entered bankruptcy in April 2009; Old GM followed suit in June 2009.  Old GM's bankruptcy was, at the time, the fourth-largest in U.S. history.

Had Old GM simply liquidated, the results would have been "disastrous," not just "for [its] creditors," but also for "its employees, the suppliers who depend on [it] for their own existence, and the communities in which [it] operates."  *In re Gen. Motors Corp.*, 407 B.R. 463, 474 (Bankr. S.D.N.Y. 2009).  The only viable option was to sell Old GM's core assets through a Section 363 sale, so they could be used to operate an auto business "free of any entanglement

8

with the bankruptcy." *Id.* at 480. And the only entity willing and able to purchase those assets was the government. To do so, the government formed a new corporate entity called NGMCO, Inc., and used that entity to purchase the assets at a bankruptcy-court-supervised auction. App.6-7. When the sale closed, three entities owned the vast majority of NGMCO common stock: the U.S. Treasury (60.8%); the governments of Canada and Ontario (11.7%); and a trust for UAW retirees (17.5%). *In re Gen. Motors*, 407 B.R. at 482. The remaining 10% was earmarked for subsequent distribution to Old GM's creditors. *Id.* at 483.

The government owners agreed that NGMCO would assume certain specific Old GM obligations, including to honor certain warranties and satisfy claims arising out of accidents involving Old GM vehicles that took place after the sale. App.11-12. They were not willing, however, for NGMCO to take on any additional liabilities. Instead, as authorized by Section 363(f), NGMCO insisted on acquiring the assets "free and clear" of liabilities not expressly assumed, including successor-liability claims. App.9. This "free and clear" provision "was integral to resolving Old GM's bankruptcy," as it assured the government NGMCO could acquire Old GM's assets without also acquiring Old GM's massive actual and potential liabilities. App.26.

Old GM, as the seller, was responsible for providing notice of the sale to its creditors. App.10-11. Old GM sent direct-mail notice to its "known" creditors—*i.e.*, anyone who had contracted with or filed a demand or claim against it—and provided

9

notice to any "unknown" creditors in several major publications. *Id.* Both notices were virtually identical, and both were approved by the bankruptcy court. The notices explained that "a purchaser sponsored by the United States Department of the Treasury" would purchase Old GM's assets "free and clear of all liens, claims, encumbrances, and other interests." Dkt.92-4 at 2. They also explained when and where the sale would take place and how to bid or object. The notices were supplemented by more than 1,250 news stories about Old GM's bankruptcy and the impending sale.

Recipients of both forms of notice, ranging from consumer organizations to state attorneys general to accident victims, objected to the sale, including to its "free and clear" provision. In their view, NGMCO should have been required to assume all consumer liabilities, including any claims owners of Old GM vehicles might later bring based on Old GM's conduct. Some objections precipitated limited concessions; in particular, the government agreed to allow NGMCO to assume Old GM's liability for state "Lemon Law" claims. But the government held fast in refusing to allow NGCMO to assume additional Old GM liabilities. App.11-12.

After considering and rejecting hundreds of objections, including strenuous objections to the "free and clear" provision, the bankruptcy court approved the sale. In doing so, the court expressly found that NGMCO was "a good faith purchaser." *In re Gen. Motors*, 407 B.R. at 494. Various objectors sought a stay pending appeal, which the bankruptcy court denied. *In re Gen. Motors*, 409 B.R. 24 (Bankr.

10

S.D.N.Y. 2009). The objectors sought an emergency stay from the district court, which also turned them down. *In re Gen. Motors*, 2009 WL 2033079, at *1-2 (S.D.N.Y. July 9, 2009). The sale then closed on July 10, 2009.

Although Section 363(m) barred courts from undoing or altering the sale terms at that point, some objectors appealed nonetheless. First, individuals pressing product-liability claims against Old GM based on pre-sale accidents tried to persuade the bankruptcy court that NGMCO could not obtain Old GM's assets "free and clear" of its liabilities. The bankruptcy court disagreed, and the district court held their appeal moot because the sale had closed. *In re Motors Liquidation Co.*, 428 B.R. 43 (S.D.N.Y. 2010). Second, one objector tried to escape the Sale Order by arguing that NGMCO was not a good-faith purchaser, but the district court disagreed, finding nothing that "casts any doubt on [NGMCO's] integrity or good faith." *In re Motors Liquidation Co.*, 430 B.R. 65, 79 (S.D.N.Y. 2010). The court also rejected the argument that Old GM provided constitutionally inadequate notice under the Due Process Clause, finding that "the record clearly demonstrates that adequate notice was provided." *Id.* at 99. The objector appealed, and the Second Circuit dismissed the appeal as equitably moot. Mot. Order, *In re Motors Liquidation Co.*, No. 10-4882-BK (2d Cir. July 28, 2011).

Over the next several years, the bankruptcy court managed Old GM's Chapter 11 case. App.12. Pursuant to the confirmed plan, Old GM paid secured and other priority claims in full with, *inter*

11

*alia*, the proceeds of the Section 363 sale. App.13. Old GM (and its successor, GUC Trust) also made distributions on allowed unsecured claims from the sale proceeds. Those creditors receive quarterly distributions from GUC Trust on a pro rata basis, which include both NGMCO securities and "units" of the trust. App.12-13.

NGMCO, which later became known as General Motors Company,[1] had its initial public offering in November 2010, well after the sale closed and Section 363(m) foreclosed any possibility of undoing it. The U.S. government gradually sold its shares over the next three years, selling the last of its stake in December 2013. Millions of transactions have taken place over the past six years in reliance on the terms and inviolability of the Sale Order.

## 2. The Ignition-Switch Defect and the Ensuing Class Actions

In 2014, NGMCO informed the National Highway Traffic Safety Administration that certain vehicles manufactured by Old GM had defective ignition switches. App.14. In accordance with its covenant to comply with Old GM's recall obligations, NGMCO recalled all affected vehicles, offering to replace the defective ignition switches for free. App.15. Remedies also existed for anyone who suffered a personal injury on account of an accident caused by the defect. If the accident pre-dated the sale, the injured party had a remedy against Old

---

[1] For ease of reference, the petition refers to NGMCO, General Motors LLC, and General Motors Company (petitioner's parent) collectively as NGMCO.

12

GM/GUC Trust, with its claim to be paid on the same pro rata basis as any other unsecured creditor. If the accident post-dated the sale, the injured party had a remedy against NGMCO, which expressly assumed Old GM's liabilities for claims arising out of post-sale accidents. App.68 n.4. Accordingly, no one had to pay to fix the defect, and no one who suffered an injury on account of it lacked a remedy.

Nonetheless, shortly after the recall, several groups of plaintiffs filed class-action lawsuits relating to the defect—and filed them against NGMCO, seeking to hold it liable through exactly the kinds of "successor-liability" claims that the "free and clear" provision of the Sale Order precludes. Most of the plaintiffs fall into two groups. The "Economic Loss Plaintiffs" allege that even though NGMCO fixed ignition-switch defects for free, the defect caused them "economic loss" by reducing the value of their Old GM vehicles. App.20. According to these plaintiffs, their claims are worth "$7 to $10 billion." *Id.* The "Pre-Sale Accident Plaintiffs" are individuals who were in accidents before the Section 363 sale that allegedly were caused by the ignition-switch defect. *Id.* These plaintiffs unquestionably had "the right to assert [their] claims against Old GM (the only entity that was in existence at the time their accidents took place)." App.69. But they strategically decided to file suit against NGMCO instead of GUC Trust after learning of the defect, in hopes of abrogating the Sale Order and obtaining

13

greater recovery than other unsecured creditors. App.103-04.[2]

In all, over 100 class actions were filed, most of which involve Economic Loss Plaintiffs and have been consolidated in the Southern District of New York. *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (S.D.N.Y.). When plaintiffs filed their lawsuits, GUC Trust was (and is) still making distributions. App.102-03. In October 2014, after GUC Trust announced that it was planning to make a further distribution, plaintiffs' counsel advised the trust that plaintiffs were "known potential contingent beneficiaries of the GUC Trust" and asked it to "not make any further distributions." App.103. The trust replied that it would proceed with the distribution absent a court order. *Id.* For "admitted strategic reasons," App.103-04, plaintiffs neither sought a court order nor filed claims against GUC Trust.

### 3.    The Bankruptcy Court Proceedings

NGMCO asked the same bankruptcy court judge who approved the Sale Order to enforce its "free and clear" provision by enjoining plaintiffs' successor-liability claims. NGMCO explained that while "it had voluntarily undertaken … an array of Old GM

---

[2] The other two groups of plaintiffs are "Used Car Purchasers"—*i.e.*, individuals who purchased used Old GM vehicles after the Section 363 sale—and "Non-Ignition-Switch Defect Plaintiffs"—*i.e.*, individuals whose Old GM vehicles were recalled for defects other than the ignition-switch defect. App.20. Both groups are pursuing the same types of claims as the Economic Loss Plaintiffs.

14

liabilities," the Sale Order blocked any other claims. App.68, 71.

Plaintiffs did not contend that they had pled around the Sale Order; nor did they dispute that the order, by its terms, barred their successor-liability claims. Instead, they argued that enforcing the order against them would violate their constitutional right to procedural due process. In their view, Old GM knew enough about the ignition-switch defect before the sale that it should have treated plaintiffs as "known" creditors entitled to direct-mail notice. Moreover, in their view, they were entitled not just to direct-mail notice of the sale, but also to notice of the *defect*. And rather than simply ask to be allowed to file late claims to share in the sale proceeds like other unsecured creditors, plaintiffs claimed that the remedy for this purported constitutional violation by the *seller* (Old GM) should be to strip the *good-faith purchaser* (NGMCO) of its "free and clear" protection under the Sale Order. App.21.

The bankruptcy court rejected plaintiffs' arguments and enforced the Sale Order to enjoin their claims insofar as they arose from Old GM's conduct. According to the court, Old GM knew enough about the ignition-switch defect that it should have issued a recall notice pursuant to the National Traffic and Motor Vehicle Safety Act before the sale. App.145-52.[3] But the court found that this violation

---

[3] The bankruptcy court purported to base this holding on the parties' stipulated facts, but the stipulated facts state that some Old GM employees were aware of instances in which vehicles experienced issues with airbag non-deployment, ignition switches, or stalls. Only later, in approximately the spring of

15

did not prejudice plaintiffs, as they failed to explain "why they would have, or even *could* have" persuaded NGMCO to assume *their* successor-liability claims when they concededly made no arguments different from those considered and rejected by the bankruptcy court when it approved the sale over the objections of other creditors seeking to preserve successor-liability claims. App.167-69. The court further found that it "would not have disapproved the 363 Sale or conditioned its approval on modifications to the carefully negotiated restructuring to favor one or more groups seeking special treatment." App.170-71.

### 4.    The Second Circuit's Decision

The Second Circuit reversed. Like the bankruptcy court, it found that Old GM committed a notice violation. Unlike the bankruptcy court, however, the Second Circuit did not ground this violation in the Safety Act or any other recall obligation. Instead, the court reasoned only that Old GM knew enough about the ignition-switch defect that it should have treated plaintiffs as "known" creditors and given them direct-mail notice, rather than the publication notice plaintiffs undisputedly received. App.47.

In determining whether this purported violation caused plaintiffs any prejudice, however, the court did not ask whether plaintiffs would have successfully objected to the sale had they learned of it by mail rather than by publication. Instead, the

---

2012, was it determined that an ignition-switch safety defect was the cause. NGMCO has since acknowledged that the recall should have been initiated at that time.

16

court asked whether plaintiffs would have successfully objected had "Old GM disclosed the ignition switch defect." App.47. And in direct contradiction to the findings of the bankruptcy judge who presided over the sale and the Treasury Department's testimony during the sale proceedings that NGMCO would not assume any additional liabilities, the court concluded that there was "a reasonable possibility that plaintiffs could have negotiated some relief from the Sale Order." App.53.

Although the only constitutional violation the court found was by *Old GM*, the remedy it imposed was to strip *NGMCO* of its "free and clear" protection under the Sale Order. App.54-55. The court did not explain that non-sequitur or make any effort to square it with Section 363(m)'s absolute protections for good-faith purchasers. Nor did it explain why its conclusion that plaintiffs might have obtained "some relief" from the Sale Order entitled plaintiffs to pursue *complete* relief from NGMCO.

## REASONS FOR GRANTING THE PETITION

The decision below essentially holds Section 363 unconstitutional as applied, and eviscerates the well-established and statutorily prescribed rule that a good-faith purchaser takes title "free and clear." That alone would be enough to merit plenary review. But the decision also threatens to undermine one of the largest bankruptcies in history, and to deprive bankruptcy estates large and small of a critical tool for protecting creditors by selling assets expeditiously before the dynamic that put the debtor in bankruptcy further erodes their value. The need for this Court's review is thus truly imperative.

17

Section 363 is an indispensable tool for maximizing the value of bankruptcy estates, and its sale notice requirements are well settled. First and foremost, all agree that only *sellers* have notice obligations; purchasers have none. That alone renders the decision to punish the good-faith purchaser for a notice violation *by the seller* deeply flawed and contrary to settled law. But the decision below is all the more indefensible because there was no notice violation by Old GM in the first place. The Second Circuit concluded otherwise based on a fundamental misunderstanding of the role Section 363 plays in the course of a bankruptcy. Seemingly convinced that a Section 363 sale extinguishes creditors' claims, the court reached the erroneous conclusion that the Constitution requires notice that goes far beyond what the Bankruptcy Rules specify— notice not just of the Section 363 sale, but also of creditors' potential claims against the debtor. That decision essentially holds Section 363 and the related Bankruptcy Rules unconstitutional as applied.

In reaching that mistaken conclusion, the Second Circuit lost sight of Section 363's role in the overall scheme of the Code. Unlike other bankruptcy proceedings, a Section 363 sale does not extinguish creditors' claims. Creditors may assert their claims against the sale proceeds, and will recover more than they would have if the sale had not occurred and the estate's assets had further deteriorated. The Bankruptcy Rules thus provide for relatively streamlined notice, and Congress even took the extraordinary step of limiting direct appeals of the sale's validity, all toward the end of maximizing the sale's proceeds to the ultimate benefit of creditors.

18

While additional safeguards apply before claims may be extinguished in the ensuing Chapter 11 proceedings, Congress provided streamlined protections that precisely fit the distinct role of Section 363 sales. The Second Circuit's determination, years after the fact, that the Due Process Clause requires more is antithetical to Congress' policy decisions embodied in provisions like Sections 363(b)(1) and (m). Requiring a debtor, amidst the urgency of an emergency asset sale, to issue notices that identify every potential claim that might someday be brought against it would cause untold delay and defeat Section 363's core objective of facilitating expeditious sales at prices that will provide the greatest benefit to creditors.

But even if the Second Circuit were correct that Old GM failed to comply with its due process obligations, nothing in bankruptcy law, the Constitution, or common sense supports the court's decision to remedy the seller's mistake by punishing the good-faith purchaser (NGMCO). In fact, Section 363(m) expressly prohibits that result, as do this Court's decision in *Factors'* and the Seventh Circuit's decision in *Edwards*. Tellingly, the Second Circuit provided no explanation for how it arrived at its profoundly misguided remedy. Instead, the court just proceeded as if there were no meaningful difference between the seller and the good-faith purchaser. That is plainly wrong as a matter of fact and law, and is impossible to reconcile with Section 363's paramount protections for a good-faith purchaser, which the government-owned NGMCO unquestionably was.

19

The decision below is supremely unfair not just to NGMCO, but also to stakeholders in both Old GM's bankruptcy and NGMCO. The Bankruptcy Code ensures that Old GM's unsecured creditors recover only against the bankruptcy estate, only in accordance with the Code's priority scheme, and only on a pro rata basis. The decision below allows plaintiffs—*and plaintiffs alone*, among the universe of unsecured creditors—to circumvent the priority scheme, jump to the front of the line, and seek payment in full from the good-faith purchaser. And any recovery against NGMCO will directly harm the thousands of innocent shareholders who purchased stock on the understanding that NGMCO could not be held liable for Old GM's wrongdoings.

Those manifestly unjust results underscore the Second Circuit's fundamental error and the pressing need for this Court's intervention. Section 363 sales will work only if they are expeditious and truly final. By imposing unprecedented notice obligations years after the fact, the decision below ensures they will be neither. And by allowing plaintiffs to strip purchasers of their free and clear protections for the supposed sins of the seller, the decision threatens to destroy the efficacy of Section 363 for future bankruptcies big and small. There is always a temptation, after the Bankruptcy Code has worked as intended and averted the disaster of an immediate liquidation, to revisit matters and extract more value for creditors. But a host of precedents and statutory provisions, *e.g.*, Section 363(m), stand as an obstacle, lest the success of the last Section 363 sale eliminate the tools necessary to avert the next disaster. By failing to resist that temptation, the decision below

20

not only conflicts with precedent and statute, but also deprives estates of a critical tool for maximizing creditor recovery. The decision merits this Court's immediate review.

## I.   The Decision Below Imposes A Novel And Unjustifiable Constitutional Notice Requirement.

Under long-settled law, a debtor who seeks to sell its assets through a Section 363 sale need only provide its known and unknown creditors with notice of the sale. The debtor does *not* have to provide either with notice of their potential claims against it. That is not just a matter of custom; the "content of notice" debtors must provide before an asset sale is spelled out in the Bankruptcy Rules: The notice need only "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002(c)(1). Neither the Rules nor the Code entitles creditors to notice of their claims—whether existing or potential—against the debtor. And with good reason, as Section 363 sales do not extinguish those claims; to the contrary, they maximize the value of the estate that will pay those claims in the ensuing Chapter 11 proceedings. Imposing costly and unwieldy notice obligations would threaten the time-sensitive transactions Section 363 contemplates—and do so to the detriment of creditors.

Yet according to the decision below, even though *the Bankruptcy Rules* entitle creditors only to notice of the sale, *the Due Process Clause* entitles them to much more:  notice of all claims about which "the debtor knew or reasonably should have known."

21

App.38.   In other words, according to the Second Circuit, a severely distressed debtor cannot sell its dissipating assets through a Section 363 sale without first affirmatively inviting claims against it, and indeed advising potential claimants of the claims they might bring.

That the Second Circuit imposed such an obligation is clear from how it analyzed the due process issue.  While the court purported to rest its holding on whether plaintiffs were "known" creditors entitled to direct-mail notice or "unknown" creditors entitled to publication notice, it grounded its holding in its belief that "the outcome of the §363 sale proceedings [might not] have been the same *had Old GM disclosed the ignition switch defect.*"   App.47 (emphasis added).   Thus, according to the Second Circuit, the problem was not just that plaintiffs did not receive notice of the sale by mail.  Indeed, that could not possibly have been the problem, as plaintiffs have never disputed that they (like nearly every other "sentient American," *In re Gen. Motors*, 2009 WL 2033079, at *1) were aware of the sale, and they cannot plausibly have been prejudiced by learning of it by publication rather than by mail. Instead, according to the Second Circuit, the problem was that plaintiffs were not given notice of *the defect.* But neither the Code nor the Rules entitles potential creditors to notice of potential *claims.*   Accordingly, the Second Circuit's decision can only be understood as imposing on Old GM a freestanding *constitutional* obligation to provide that much more extensive notice.

22

That conclusion is both unprecedented and wrong. The notice requirements of procedural due process are not particularly demanding in any context. Notice need only be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). That inquiry is inherently context-specific and must be sensitive to all interests at stake. *Id.* The balance of interests in the Section 363 context weighs decidedly in favor of streamlined notice. Section 363 sales do not extinguish creditors' claims; claims resolution is a separate process with separate notice requirements. Section 363 sales thus are not focused on the merits of any creditor's claim; they are simply focused on whether the sale should go forward. Moreover, they are focused on the sale's benefits to the creditor class as a whole; indeed, the whole point of quickly selling the assets is to maximize their value so the estate will have more money to pay its creditors.

Precisely because time is of the essence in a Section 363 sale, requiring the debtor to "search out each conceivable or possible creditor and urge that person or entity to make a claim against it," *Chemetron*, 72 F.3d at 346, before consummating the sale would hurt creditors far more than any notice imperfections. Indeed, the potential harm to creditors who wanted more detailed notice is dwarfed by the harm to the creditor class as a whole if the delay caused by onerous notice obligations reduces the value of the assets or, worse still, forces a fire-sale liquidation. Accordingly, this is plainly a context

23

in which "reasonable risks" that some creditors might not receive all the notice they want "are justifiable." *Mullane*, 339 U.S. at 319.

This is a case in point. Despite the best efforts of two national governments, Old GM faced immediate liquidation. Before the sale, "[t]he cash bleeding was brutal; Old GM suffered negative cash flow of $9.4 billion in the first quarter of 2009 alone." App.86. "Without a very quick end to the bleeding, Old GM would [have] plunge[d] into liquidation," which would have "result[ed] in the loss of over 200,000 jobs at Old GM alone, and grievous loss to the approximately 11,500 vendors, with more than 500,000 workers, in the Supplier Chain." App.86-87. Immediate liquidation would have resulted "in virtually no recovery for any of Old GM's prepetition creditors," let alone for plaintiffs here. App.87. Halting the sale process while Old GM was losing millions of dollars a day so it could investigate all varieties of potential claims and send direct-mail notice to *70 million* vehicle owners, describing any and all claims they might someday try to bring, would have accelerated the decline of Old GM's already-depleted assets and sharply increased the likelihood of immediate liquidation.

The Second Circuit seemed to think that the extensive extra-Code notice obligation it imposed followed from the broader policies of the Bankruptcy Code. As the court put it, the "vast protections" of Section 363's "'free and clear' provisions" should "act as liability shield" for "a debtor" only if the "debtor reveals in bankruptcy the claims against it." App.38-39. That profoundly flawed reasoning reveals the

24

court's fundamental misconception of Section 363. Section 363 does not give the *debtor* a "fresh start" or a "liability shield." The "free and clear" provision protects only the *good-faith purchaser*; the debtor just employs Section 363 to sell its assets expeditiously—which inures to the ultimate *benefit* of creditors because the debtor *retains* all liabilities that the purchaser is unwilling to assume. Those liabilities will be satisfied or extinguished only through the ordinary Chapter 11 proceeding that follows, with its own distinct and more rigorous notice requirements. Section 363's more limited notice requirements, by contrast, follow its function: to enable expeditious sales that benefit creditors without extinguishing their claims. The Second Circuit's extra-Code protections are thus wholly out of place in this context.

Indeed, even in contexts where (unlike here) a creditor alleges constitutionally deficient notice of a proceeding that *did* extinguish its claim, courts have refused to require the claims-based notice that the decision below demands. For instance, in *In re Placid Oil Co.*, 753 F.3d 151 (5th Cir. 2014), creditors argued that they could not be barred from bringing asbestos-related claims because the debtor knew that its employees had been exposed to asbestos but did not notify them before the cut-off date for asserting claims. The Fifth Circuit rejected that due process argument, concluding that it had "never required bar date notices to contain information about specific potential claims," and "declin[ing] to articulate a new rule that would require more specific notice." *Id.* at 158. Likewise, in *Chemetron*, the debtor knew that the community surrounding its toxic site was exposed

25

to radiation but did not notify individuals who had not yet suffered identifiable injuries.   The Third Circuit rejected the plaintiffs' due process arguments, concluding that "[a] debtor does not have a 'duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it.'" 72 F.3d at 346-47.[4]

This case should have followed *a fortiori* from *Placid Oil* and *Chemetron*.  If, as those courts held, due process does not require creditors to be informed of potential claims even when failure to assert those claims will *extinguish* them, then due process certainly does not require Section 363 sale notices to inform creditors of potential claims that the sale will not extinguish.  Yet the Second Circuit, without a word about creditors' recourse to the sale proceeds, or any deference to the bankruptcy court's findings about "Old GM's precarious situation and the need for speed," App.42, superimposed a brand-new constitutional obligation that conflicts with the very purpose of a Section 363 sale.  And to make matters worse, the court found the violation of this purported obligation *prejudicial* for the flimsiest of reasons, essentially deeming it sufficient that the outcome *might* have differed in some unidentifiable way had plaintiffs known of the defect.  The court reached that conclusion, moreover, even though the

---

[4] As those decisions confirm, the Second Circuit was equally wrong to classify plaintiffs as "known" creditors; most plaintiffs' claims are not "based on an actualized injury" that existed pre-sale.  *Placid Oil*, 753 F.3d at 156.  Indeed, even taking their allegations at face value, it is far from clear that the Economic Loss Plaintiffs have *ever* suffered any legally cognizable injury.

26

bankruptcy judge, who actually presided over the Section 363 sale and rejected all the same arguments when made by other creditors seeking to preserve their potential successor-liability claims, expressly found exactly the opposite. That holding cannot be reconciled with decisions rejecting the same arguments in contexts where claims are actually extinguished. Left standing, it threatens the viability of Section 363 sales as an efficient and effective mechanism that benefits debtor, purchaser, and creditor alike.

## II. The Decision Below Erroneously Punishes A Good-Faith Purchaser For The Seller's Purported Notice Failings.

Even if Old GM failed to comply with its due process obligations, nothing in bankruptcy law, the Constitution, or common sense supports the Second Circuit's decision to remedy the seller's mistake by punishing the innocent good-faith purchaser. Indeed, the Second Circuit did not even try to reconcile that remarkable holding with Section 363 or the Bankruptcy Code. Instead, perhaps confused by the reality that both Old GM and NGMCO sell GM-branded vehicles (or implicitly adopting the demonstrably wrong premise that NGMCO was a successor to Old GM), the court just proceeded as if it were obvious that the remedy for a notice violation by the seller is to strip the good-faith purchaser of its "free and clear" protections. That unprecedented holding is wrong at every turn: It is irreconcilable with the text and purpose of Section 363; it conflicts with decisions from this Court and the Seventh Circuit; and it allows plaintiffs to circumvent the

27

Bankruptcy Code's priority scheme, to the ultimate detriment of other creditors.

In Section 363, Congress "deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012). Recognizing the near-impossibility of finding a buyer who would be willing to pay anything close to fair market value for an insolvent debtor's assets if the debtor's liabilities necessarily came with them, Congress authorized good-faith purchasers to obtain a debtor's assets "free and clear" of those liabilities, so long as certain conditions (undisputed here) are met.  11 U.S.C. §363(f).  That "free and clear" protection is no minor detail.  Without it, purchasers—if they materialized at all—would insist on steep discounts to offset the risk of future liability for the seller's past wrongs, *In re Gucci*, 126 F.3d 380, 387 (2d Cir. 1997), which would dramatically diminish the value of the estate to the detriment of creditors, *In re UNR Indus., Inc.*, 20 F.3d 766, 770 (7th Cir. 1994).

Congress also recognized that Section 363 could perform its value-maximizing role only if good-faith purchasers are confident that their "free and clear" protections are inviolable.  Congress accordingly prohibited courts from undoing or modifying sale orders to the detriment of good-faith purchasers once a sale has been consummated.  11 U.S.C. §363(m). Absent a stay, a challenger to the sale may not even obtain relief through a direct appeal.  *Id.*  That extraordinary restriction underscores the unique importance of finality in this context.  Once the sale is consummated, the "bona fide purchaser … gets

28

good title," full stop. *Edwards*, 962 F.2d at 645. It can then use the purchased assets without the lingering fear of being hauled into court by plaintiffs seeking to hold it accountable for the seller's wrongs. And third parties dealing with the good-faith purchaser have the same assurance, thus enhancing the purchaser's ability to successfully utilize the assets.

The decision below is impossible to reconcile with those clear statutory mandates and the uniquely important interest in finality they serve. There is no question that NGMCO was a good-faith purchaser. A district court expressly found as much, *see In re Motors Liquidation*, 430 B.R. at 79, and plaintiffs have never suggested that NGMCO's government owners knew about the ignition-switch defect before the sale. Yet despite the unquestioned good faith of the government-owned purchaser, the decision below exposes NGMCO to potentially billions of dollars of liability for harms it did not even know *existed* when it purchased Old GM's assets "free and clear" of exactly those kinds of liabilities. And the decision does so not on direct appeal, but years after the fact, after countless transactions have proceeded in reliance on the finality accorded the Section 363 sale. Worse still, the decision allows this extraordinary reopening not because of anything *NGMCO* did wrong, but because *Old GM* purportedly failed to provide plaintiffs with adequate notice.

Not only does that result squarely conflict with the plain terms of Section 363; it also conflicts with this Court's decision in *Factors'* and the Seventh Circuit's decision in *Edwards*, both of which confirm

29

that the remedy for a notice violation by the seller is
decidedly *not* to impose liability on the good-faith
purchaser.    In *Factors'*, the Court considered a
bankruptcy sale that extinguished the liens of
several mortgagees, one of whom (Murphy)
concededly received *no notice* of the sale.  111 U.S. at
740-41.    Upon learning of the mistake, Murphy
argued that her lien should continue to encumber the
property because of the notice defect, meaning the
good-faith purchaser would not take title "free and
clear."  *Id.*  This Court rejected that contention out of
hand.  Even though Murphy received no notice of the
sale, and that sale (unlike a Section 363 sale)
actually extinguished her lien, this Court found it
"impossible to shut one's eyes to the injustice" of
allowing her to maintain her lien against the good-
faith purchaser's property and thus obtain priority
over similarly (or better) situated lienholders.  *Id.* at
741-42.  Instead, Murphy had only two options:  (1)
ratify the sale and accept her share of the proceeds,
or (2) demand a new sale of the property, "subject to
the rights of all parties as they stood before the other
sale."  *Id.* at 742-43.

Following *Factors'*, the Seventh Circuit applied
the same rule to Section 363 sales.  *Edwards*, 962
F.2d 641.  The debtor in *Edwards* sold its property
"free and clear" of all liens pursuant to Section 363,
but failed to notify the second mortgagee.    That
mortgagee argued that this notice defect allowed it to
circumvent the sale order's "free and clear" provision
and obtain a lien on the good-faith purchaser's
assets.  *Id.* at 642-43.  The Seventh Circuit rejected
that argument, confirming that "a bona fide
purchaser at a bankruptcy sale gets good title," and

30

explaining that finality "would mean rather little if years after the sale a secured creditor could undo it by showing that through some slip-up he hadn't got notice." *Id.* at 645. As in *Factors'*, the mortgagee's options did not include a remedy against the innocent good-faith purchaser. Nor could they, as "the liquidation of bankrupt estates will be impeded if the bona fide purchaser cannot obtain a good title, and creditors will suffer." *Id.*[5]

The decision below squarely conflicts with those decisions. Indeed, if anything, this case should have followed *a fortiori* from *Factors'* and *Edwards*, as the creditors in those cases received *no* notice of the sale. Here, by contrast, plaintiffs have never disputed that they knew of the sale; they are just complaining that they were entitled to notice of something more— namely, information about specific claims they may have had. They were not entitled to that extensive, extra-Code notice, but even if they were, *Factors'*, *Edwards*, and Section 363 all foreclose their effort to use the seller's inadequate notice to impose liability on the good-faith purchaser. And with good reason, as any other result not only would be fundamentally unfair to the purchaser, but also would defeat the Bankruptcy Code's "main purpose" of "secur[ing] an equal distribution of an insolvent debtor's property among all his creditors." *Factors'*, 111 U.S. at 742.

---

[5] Notably, the mortgagee sought relief pursuant to Rule 60(b), which the court concluded "must be interpreted in light of" "[t]he strong policy of finality of bankruptcy sales embodied in section 363(m)." *Edwards*, 962 F.2d at 645. Rule 60(b) thus provides no better avenue for relief in this context than a direct appeal.

31

This case is illustrative. Old GM creditors who timely asserted their claims were required to abide by the Code's priority scheme, subordinating their claims to higher-priority creditors and settling for pro rata recovery from the limited remaining assets of the bankruptcy estate. Under the decision below, however, plaintiffs *alone* get to bypass those hurdles, jump to the front of the line, and seek payment *in full* from the good-faith purchaser. Worse still, they get to do so at the expense of the very mechanism that was used to pay other unsecured creditors, who received NGMCO common stock to satisfy their claims. App.12-13. That manifestly unjust result plainly "subvert[s] the specific priorities which define Congressional policy for bankruptcy distribution to creditors." *Trans World*, 322 F.3d at 292. Indeed, it does not even comport with the Second Circuit's own findings, as the court found only "a reasonable possibility that plaintiffs could have negotiated *some relief*," not that they could have negotiated *complete* relief, had they known about the defect before the sale. App.53 (emphasis added).

While the Second Circuit never explained how it arrived at its profoundly inequitable remedy, its decision appears to be the product of two fundamental mistakes. First, as noted, the court seemed to labor under the misimpression that Section 363's "free and clear" provisions "act as liability shield" for "*a debtor*." App.38-39 (emphasis added). Indeed, the court expressed concern that foreclosing plaintiffs' claims against NGMCO might "reward debtors who conceal claims against potential creditors." App.42. As explained, *supra* pp.23-24, that is just flat wrong. Section 363(f)'s "free and

32

clear" provision protects *purchasers*, not debtors.
Conditioning the good-faith purchaser's "free and
clear" protections on whether *the debtor* was
"forthright," App.39, gets matters exactly backwards:
If the debtor/seller really did violate a disclosure
obligation, the purchaser would be a *victim*, as the
undisclosed information could have adversely
impacted the price paid for the seller's assets.
Punishing the good-faith purchaser for the seller's
error is a non-sequitur.

The Second Circuit also seemed to think the
Section 363 sale was something less than an arms-
length transaction, and that it accordingly made
sense to punish NGMCO for Old GM's mistakes. But
Old GM and NGMCO are not one and the same.[6]
NGMCO did not even exist until the government
created it in 2009, and it did not take possession of
Old GM's assets or hire any employees until after the
sale. Thus, even accepting the lower courts'
erroneous finding that Old GM knew or should have
known of the safety defect and the risks it posed, that
knowledge could not possibly be imputed to NGMCO
until after the sale. Nor is it relevant, as the Second
Circuit seemed to think, that NGMCO now operates
a business similar to the one operated by Old GM
and retained many of Old GM's employees. That sort
of overlap is commonplace—and salutary—following

---

[6] Nor, contrary to the Second Circuit's characterizations,
App.4, 8, 11, 23, is NGMCO the "successor" to Old GM. The
only "successor" to Old GM is GUC Trust, a distinct entity with
distinct interests separately represented in this litigation. *See
In re Motors Liquidation Co.*, 462 B.R. 494, 497-98 (Bankr.
S.D.N.Y. 2012).

33

Section 363 sales, *see, e.g.*, *Trans World*, 322 F.3d at 293, especially when substantially all the debtor's assets are sold. Thus, to the extent the Second Circuit thought NGMCO shared some of the blame for the deficient pre-sale notice, once again, that is inexplicable.

In short, the Second Circuit effectuated its desired result by claiming a power that Section 363 does not provide. While the statute allows a bankruptcy court to refuse to approve a Section 363 sale, it *does not* allow courts to force purchasers to take on liabilities they did not agree to assume. But the Second Circuit exercised just that power here, and it did so well after NGMCO had lost the opportunity to walk away from the sale or renegotiate other terms. The unfairness of that one-sided amendment to the Sale Order vividly illustrates why Congress has taken great pains to assure that Section 363 sales are, in fact, final. The Second Circuit's failure to abide by that mandate effectively writes Congress' protections for good-faith purchasers out of the statute. Indeed, it cannot be understood as anything other than a *sub silentio* holding that Section 363 is unconstitutional as applied.

## III. This Case Presents Exceptionally Important Questions.

The questions presented are exceptionally important, both for this case and for all Section 363 cases. As to this case, by allowing millions of claimants to retroactively abrogate the Sale Order and press forward with successor-liability claims seeking billions of dollars from NGMCO, the decision

34

below threatens to undermine the government's
rescue of the domestic auto industry. Any recovery
would come at the expense of innocent NGMCO
shareholders who purchased their shares, in some
cases from the government, on the understanding
that this distinct entity could not be held liable for
the wrongs of Old GM. Allowing plaintiffs to ignore
the express terms of the sale to the detriment of the
good-faith purchaser would inflict substantial harm
on NGMCO and its innocent shareholders, a
manifestly unjust result with considerable
constitutional implications of its own. *Cf. United
States v. Winstar Corp.*, 518 U.S. 839 (1996).

The harm created by the decision below will also
reach far beyond this particular bankruptcy.
Companies such as Lehman Brothers, Polaroid,
Kodak, and more have used Section 363 to sell their
core assets during their recent bankruptcies. *See,
e.g.*, *In re Lehman Bros. Holdings Inc.*, 761 F.3d 303,
306 (2d Cir. 2014) ("The sale of Lehman's businesses
as a going concern saved thousands of jobs and
avoided losses estimated to be in the hundreds of
billions of dollars."). The good-faith purchasers of
those assets acted in reliance on the "free and clear"
protections Section 363(f) provides and the finality
Section 363(m) commands, both of which are
imperiled by the Second Circuit's decision.

But the biggest threat the decision below poses is
to the usefulness of Section 363 in future
bankruptcies large and small. There is always a
temptation after a reorganization has succeeded to
revisit the terms of the bankruptcy at the behest of
some unsecured creditor who was not made whole.

35

But numerous provisions of the Code shield against such after-the-fact efforts to undermine the finality on which the Code generally and Section 363 specifically depend to produce success stories in the first place. In the Section 363 context in particular, the finality of the sale and the free and clear provision is so paramount that even the right to a direct appeal generally yields. 11 U.S.C. §363(m). If good-faith purchasers in Section 363 sales cannot be assured that they are acquiring the debtor's assets free and clear, then they either will not purchase at all or will pay far less. Either way, creditors lose. By giving a green light to a collateral attack on a Section 363 sale years after the fact, the decision below imperils future efforts to use Section 363 to stave off the ruinous consequences of immediate liquidation. That is no mere hypothetical; the real-world impacts of the decision are already evident. *See, e.g.*, Tom Hals, *Potential bidders for Takata may balk at GM bankruptcy precedent*, Reuters (Nov. 6, 2016).

The time for intervention is now. Section 363 is one of the Bankruptcy Code's most important provisions. Yet Section 363 cases rarely reach this Court—presumably because, as Congress intended, Section 363(m) typically forecloses appeals. The very fact that this case has made it this far is a clear sign that it is an impermissible collateral attack that contravenes Congress' statutory scheme. The decision below will undermine countless Section 363 sales until another chance to correct it presents itself, and there is a very real risk that it will cripple subsequent efforts to preserve going concerns in the interim. This Court should intervene now, before the decision below deprives debtors, purchasers, and

36

creditors of the critically important tool that Section 363 provides.

## CONCLUSION

For the foregoing reasons, this Court should grant the petition.

Respectfully submitted,

ARTHUR J. STEINBERG        PAUL D. CLEMENT
SCOTT DAVIDSON              *Counsel of Record*
KING & SPALDING LLP        ERIN E. MURPHY
1185 Avenue of the Americas MICHAEL D. LIEBERMAN
New York, NY 10036         MATTHEW D. ROWEN
                           KIRKLAND & ELLIS LLP
MERRITT E. MCALISTER       655 Fifteenth Street, NW
KING & SPALDING LLP        Washington, DC 20005
1180 Peachtree Street, NE  (202) 879-5000
Atlanta, GA 30309          paul.clement@kirkland.com

EDWARD L. RIPLEY           RICHARD C. GODFREY
KING & SPALDING LLP        ANDREW B. BLOOMER
1100 Louisiana             KIRKLAND & ELLIS LLP
Suite 4000                 300 North LaSalle
Houston, TX 77002          Chicago, IL 60654

*Counsel for Petitioner*

December 13, 2016

# APPENDIX

## TABLE OF APPENDICES

Appendix A

    Opinion, United States Court of Appeals
for the Second Circuit, *In re: Motors
Liquidation Co.*, No. 15-2844-bk(L)
(July 13, 2016) ............................................ App-1

Appendix B

    Order Denying Rehearing, United States
Court of Appeals for the Second Circuit,
*In re: Motors Liquidation Co.*,
No. 15-2844-bk(L) (Sept. 14, 2016) ........... App-63

Appendix C

    Decision on Motion to Enforce Sale
Order, United States Bankruptcy Court
for the Southern District of New York, *In
re: Motors Liquidation Co.*,
No. 09-50026 (REG) (Apr. 15, 2015) ........ App-65

Appendix D

    U.S. Const. amend. V .............................. App-239

Appendix E

    Relevant Statutory Provisions ................ App-240

App-1

*Appendix A*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

————————

Nos. 15-2844-bk(L), 15-2847-bk(XAP),
15-2848-bk(XAP)

————————

IN RE MOTORS LIQUIDATION COMPANY,

*Debtor.*

————————

CELESTINE ELLIOTT, LAWRENCE ELLIOTT,
BERENICE SUMMERVILLE,

*Creditors-Appellants-
Cross-Appellees,*

SESAY AND BLEDSOE PLAINTIFFS, IGNITION SWITCH
PLAINTIFFS, IGNITION SWITCH PRE-CLOSING ACCIDENT
PLAINTIFFS, DORIS POWLEDGE PHILLIPS,

*Appellants-Cross-
Appellees,*

GROMAN PLAINTIFFS,

*Appellants,*

v.

GENERAL MOTORS LLC,

*Appellee-Cross-
Appellant,*

WILMINGTON TRUST COMPANY,

*Trustee-Appellee-
Cross-Appellant,*

App-2

PARTICIPATING UNITHOLDERS,

*Creditors-Appellees-
Cross-Appellants.*[1]

————————

On Appeal from the United States Bankruptcy Court
for the Southern District of New York

————————

Argued:  March 15, 2016
Decided:  July 13, 2016

————————

Before: STRAUB, CHIN, and CARNEY, *Circuit Judges.*

————————

Appeal from a judgment of the United States
Bankruptcy Court for the Southern District of New
York (Gerber, *J.*), enforcing a "free and clear"
provision of a sale order to enjoin claims against a
debtor's successor corporation and concluding under
the equitable mootness doctrine that assets of the
debtor's unsecured creditors' trust would be protected
from late-filed claims. On appeal, plaintiffs challenge
the bankruptcy court's rulings that: (1) it had
jurisdiction, (2) the sale order covered their claims,
(3) enforcement of the sale order would not violate
procedural due process, and (4) relief for any late-
filed claims would be barred as equitably moot.

AFFIRMED, REVERSED, AND VACATED IN PART, AND
REMANDED.

————————————

[1] The Clerk of Court is respectfully directed to amend the
official caption to conform to the above.

App-3

CHIN, *Circuit Judge*:

On June 1, 2009, General Motors Corporation ("Old GM"), the nation's largest manufacturer of automobiles and the creator of such iconic American brands as Chevrolet, Cadillac, and Jeep, filed for bankruptcy. During the financial crisis of 2007 and 2008, as access to credit tightened and consumer spending diminished, Old GM posted net losses of $70 billion over the course of a year and a half. The U.S. Department of the Treasury ("Treasury") loaned billions of dollars from the Troubled Asset Relief Program ("TARP") to buy the company time to revamp its business model. When Old GM's private efforts failed, President Barack Obama announced to the nation a solution—"a quick, surgical bankruptcy."[2] Old GM petitioned for Chapter 11 bankruptcy protection, and only forty days later the new General Motors LLC ("New GM") emerged.

This case involves one of the consequences of the GM bankruptcy. Beginning in February 2014, New GM began recalling cars due to a defect in their ignition switches. The defect was potentially lethal: while in motion, a car's ignition could accidentally turn off, shutting down the engine, disabling power steering and braking, and deactivating the airbags.

Many of the cars in question were built years before the GM bankruptcy, but individuals claiming harm from the ignition switch defect faced a potential barrier created by the bankruptcy process. In bankruptcy, Old GM had used 11 U.S.C. § 363 of the

---

[2] *Remarks on the United States Automobile Industry*, 2009 Daily Comp. Pres. Doc. 2 (June 1, 2009).

App-4

Bankruptcy Code (the "Code") to sell its assets to New GM "free and clear." In plain terms, where individuals might have had claims against Old GM, a "free and clear" provision in the bankruptcy court's sale order (the "Sale Order") barred those same claims from being brought against New GM as the successor corporation.

Various individuals nonetheless initiated class action lawsuits against New GM, asserting "successor liability" claims and seeking damages for losses and injuries arising from the ignition switch defect and other defects. New GM argued that, because of the "free and clear" provision, claims could only be brought against Old GM, and not New GM.

On April 15, 2015, the United States Bankruptcy Court for the Southern District of New York (Gerber, *J.*) agreed and enforced the Sale Order to enjoin many of these claims against New GM. Though the bankruptcy court also determined that these plaintiffs did not have notice of the Sale Order as required by the Due Process Clause of the Fifth Amendment, the bankruptcy court denied plaintiffs relief from the Sale Order on all but a subset of claims. Finally, the bankruptcy court invoked the doctrine of equitable mootness to bar relief for would-be claims against a trust established in bankruptcy court to pay out unsecured claims against Old GM ("GUC Trust").[3]

---

[3] For ease of reference, in the context of this appeal, we also refer to Wilmington Trust Company (the administrator of GUC Trust) and the unitholders of GUC Trust collectively and singularly as "GUC Trust."

App-5

The bankruptcy court entered judgment and certified the judgment for direct review by this Court.[4] Four groups of plaintiffs appealed, as did New GM and GUC Trust. We affirm, reverse, and vacate in part the bankruptcy court's decision to enforce the Sale Order against plaintiffs and vacate as advisory its decision on equitable mootness.

## BACKGROUND

### I. Bailout

In the final two quarters of 2007, as the American economy suffered a significant downturn, Old GM posted net losses of approximately $39 billion and $722 million. General Motors Corp., *Annual Report (Form 10-K)* 245 (Mar. 5, 2009). In 2008, it posted quarterly net losses of approximately $3.3 billion, $15.5 billion, $2.5 billion, and $9.6 billion. *Id.* In a year and a half, Old GM had managed to hemorrhage over $70 billion.

The possibility of Old GM's collapse alarmed many. Old GM employed roughly 240,000 workers and provided pensions to another 500,000 retirees. *Id.* at 19, 262. The company also purchased parts from over eleven thousand suppliers and marketed through roughly six thousand dealerships. A disorderly collapse of Old GM would have far-reaching consequences.

After Congress declined to bail out Old GM, President George W. Bush announced on December 19, 2008 that the executive branch would provide

---

[4] *See* 28 U.S.C. § 158(d)(2) (providing jurisdiction for courts of appeals to hear appeals if the bankruptcy court certifies that certain conditions are met).

App-6

emergency loans to help automakers "stave off bankruptcy while they develop plans for viability."[5] In Old GM's case, TARP loaned $13.4 billion on the condition that Old GM both submit a business plan for long-term viability to the President no later than February 17, 2009 and undergo any necessary revisions no later than March 31, 2009. If the President found the business plan unsatisfactory, the TARP funds would become due and payable in thirty days, rendering Old GM insolvent and effectively forcing it into bankruptcy.

On March 30, 2009, President Obama told the nation that Old GM's business plan was not viable.[6] At the same time, the President provided Old GM with another $6 billion loan and sixty more days to revise its plan along certain parameters. President Obama also reassured the public:

> But just in case there's still nagging doubts, let me say it as plainly as I can: If you buy a car from Chrysler or General Motors, you will be able to get your car serviced and repaired, just like always. Your warranty will be safe. In fact, it will be safer than it's ever been, because starting today, the United States Government will stand behind your warranty.[7]

---

[5] *Remarks on the American Auto Industry*, 44 Weekly Comp. Pres. Doc. 1569 (Dec. 19, 2008).

[6] *Remarks on the United States Automobile Industry*, 2009 Daily Comp. Pres. Doc. 2 (Mar. 30, 2009) [hereinafter "March 30, 2009 Presidential Remarks"].

[7] March 30, 2009 Presidential Remarks, *supra* note 6, at 3.

App-7

As the President stood behind the reliability of GM cars, pledging another $600 million to back all warranty coverage, bankruptcy remained a stark possibility.[8]

## II. Bankruptcy

The federal aid did not succeed in averting bankruptcy. Old GM fared no better in the first quarter of 2009—posting on May 8, 2009 a $5.9 billion net loss. General Motors Corp., *Quarterly Report (Form 10-Q)* 57 (May 8, 2009). But entering bankruptcy posed a unique set of problems: Old GM sought to restructure and become profitable again, not to shut down; yet if Old GM lingered in bankruptcy too long, the operating expenses would accumulate and consumer confidence in the GM brand could deteriorate, leaving Old GM no alternative but to liquidate and close once and for all. On June 1, 2009, with these risks in mind, Old GM petitioned for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York.

## A. Mechanics of the § 363 Sale

The same day, Old GM filed a motion to sell itself to New GM (also dubbed "Vehicle Acquisition Holdings LLC" or "NGMCO, Inc."), complete with a

---

[8] *See* Office of the Press Sec'y, White House, *Obama Administration's New Warrantee Commitment Program* (Mar. 30, 2009); *see also* Office of the Press Sec'y, White House, *Obama Administration New Path to Viability for GM & Chrysler* (Mar. 30, 2009); Steven Rattner, *Overhaul: An Insider's Account of the Obama Administration's Emergency Rescue of the Auto Industry* 299 (2010).

App-8

103-page draft sale agreement and 30-page proposed sale order.

Through this proposed sale, Old GM was attempting not a traditional Chapter 11 reorganization, but a transaction pursuant to 11 U.S.C. § 363—a less common way of effecting a bankruptcy. *See, eg.*, *In re Lionel Corp.*, 722 F.2d 1063, 1066-70 (2d Cir. 1983) (explaining the history of § 363). The usual Chapter 11 reorganization follows set procedures: the company entering bankruptcy (the "debtor") files a reorganization plan disclosing to creditors how they will be treated, asks those creditors to vote to accept the plan, and then emerges from bankruptcy with its liabilities restructured along certain parameters. *See* 11 U.S.C. §§ 1121-1129.[9] This jostling can take years.[10] In contrast, in a § 363 sale of substantially all assets, the debtor does not truly "reorganize." Instead, it sells its primary assets to a successor corporation, which immediately takes over the business. *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 37 n.2 (2008). As evidenced by the GM

---

[9] *See generally* Evan F. Rosen, Note, *A New Approach to Section 363(f)(3)*, 109 Mich. L. Rev. 1529, 1538-39 (2011) ("However, unlike sales pursuant to the standard Chapter 11 plan confirmation process, 363(f) Sales occur without the benefit of the Chapter 11 Safeguards—the disclosure, notice, voting, and priority safeguards . . . to protect secured creditors.").

[10] *See* Jacob A. Kling, *Rethinking 363 Sales*, 17 Stan. J.L. Bus. & Fin. 258, 262 (2012) ("A plan of reorganization must be submitted to a vote of creditors and equity holders after furnishing them with a disclosure statement, a process that can take years." (footnote omitted)).

App-9

bankruptcy, a § 363 sale can close in a matter of weeks.

The proposed sale was, in effect, a complex transaction made possible by bankruptcy law. GM's sale would proceed in several parts. First, Old GM would become a "debtor-in-possession" under the Code. *See* 11 U.S.C. § 1101. Where a trustee might otherwise be appointed to assert outside control of the debtor, *id.* § 1104, a debtor-in-possession continues operating its business, *id.* §§ 1107, 1108. *See In re Smart World Techs., LLC*, 423 F.3d 166, 174 n.10 (2d Cir. 2005) ("In a chapter 11 case, . . . the debtor usually remains in control of the estate as the 'debtor in possession.'"). Still in control, Old GM could seek the bankruptcy court's permission to sell portions of its business. See 11 U.S.C. § 363(b)(1).

Second, there would be New GM, a company owned predominantly by Treasury (over sixty percent). As proposed, New GM would acquire from Old GM substantially all of its business—what one might commonly think of as the automaker "GM." But New GM would not take on all of Old GM's liabilities. The Code allows a § 363 sale "free and clear of any interest in such property." 11 U.S.C. § 363(f). The proposed sale order provided that New GM would acquire Old GM assets "free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability." J. App. 276. Other than a few liabilities that New GM would assume as its own, this "free and clear" provision would act as a liability shield to prevent individuals with claims against Old GM from suing

App-10

New GM. Once the sale closed, the "bankruptcy" would be done: New GM could immediately begin operating the GM business, free of Old GM's debts.

Third, Old GM would remain. The proposed sale would leave Old GM with some assets, including $1.175 billion in cash, interests in the Saturn brand, and certain real and personal property. Old GM would also receive consideration from New GM, including a promise to repay Treasury and Canadian government loans used to finance the business through bankruptcy and a ten-percent equity stake in New GM. Old GM would retain, however, the bulk of its old liabilities.

Fourth, Old GM would liquidate. Though liquidation is not formally part of a § 363 sale, the sale would result in two GM companies. Old GM would disband: it would rename itself "Motors Liquidation Company" and arrange a plan for liquidation that addressed how its remaining liabilities would be paid. *See* 11 U.S.C. § 1129(a)(11). Thus, while New GM would quickly emerge from bankruptcy to operate the GM business, Old GM would remain in bankruptcy and undergo a traditional, length liquidation process.

## B. Sale Order

One day after Old GM filed its motion, on June 2, 2009, the bankruptcy court ordered Old GM to provide notice of the proposed sale order. Old GM was required to send direct mail notice of its proposed sale order to numerous interested parties, including "all parties who are known to have asserted any lien, claim, encumbrance, or interest in or on [the to-be-sold assets]," and to post publication notice of

App-11

the same in major publications, including the *Wall Street Journal* and *New York Times*. J. App. 385-86. The sale notice specified that interested parties would have until June 19, 2009 to submit to the bankruptcy court responses and objections to the proposed sale order.

The bankruptcy court proceeded to hear over 850 objections to the proposed sale order over the course of three days, between June 30 and July 2, 2009. On July 5, 2009, after addressing and dismissing the objections, the bankruptcy court approved the § 363 sale. *In re General Motors Corp.* ("*GM*"), 407 B.R. 463 (Bankr. S.D.N.Y. 2009) (Gerber, *J.*). Among those objections were arguments against the imposition of a "free and clear" provision to bar claims against New GM as the successor to Old GM made by consumer organizations, state attorneys general, and accident victims.

Next, the bankruptcy court issued the Sale Order, which entered into effect the final sale agreement between Old GM and New GM (the "Sale Agreement"). In the Sale Agreement, New GM assumed fifteen categories of liabilities. As relevant here, New GM agreed to assume liability for accidents *after* the closing date for the § 363 sale and to make repairs pursuant to express warranties issued in connection with the sale of GM cars—two liability provisions present in the initial draft sale agreement. The Sale Agreement also provided a new provision—resulting from negotiations among state attorneys general, the GM parties, and Treasury during the course of the sale hearing—that New GM

App-12

would assume liability for any Lemon Law claims.[11] With these exceptions, New GM would be "free and clear" of any and all liabilities of Old GM.

On July 10, 2009, the § 363 sale officially closed, and New GM began operating the automaker business. As a matter of public perception, the GM bankruptcy was over—the company had exited bankruptcy in forty days.[12]

### C. Liquidation of Old GM

Meanwhile, Old GM remained in bankruptcy. Over the next several years, the bankruptcy court managed the process of satisfying liabilities that remained with Old GM (*i.e.*, not taken on by New GM).

The bankruptcy court set November 30, 2009 as the "bar date" for any individual or entity to file a proof of claim—that is, assert a claim as to Old GM's remaining assets. Old GM filed its first Chapter 11 liquidation plan on August 31, 2010, and amended it on December 8, 2010 and again on March 29, 2011.

---

[11] The Sale Agreement defined "Lemon Laws" as "state statute[s] requiring a vehicle manufacturer to provide a consumer remedy when such manufacturer is unable to conform a vehicle to the express written warranty after a reasonable number of attempts, as defined in the applicable statute." J. App. 1676.

[12] *See, e.g.*, Bill Vlasic, *G.M. Vow to Slim Includes Top Ranks*, N.Y. Times (July 10, 2009) ("General Motors . . . emerged from bankruptcy on Friday . . . ."); John D. Stoll & Neil King Jr., *GM Set to Exit Bankruptcy,* Wall Street Journal (July 10, 2009) ("The new General Motors Co. is poised to exit Chapter 11 protection as soon as Friday morning, and to emerge as a leaner, more focused company after only 40 days in bankruptcy court.").

App-13

The proposed plan provided how claims against Old GM would be paid: secured claims, other priority claims, and environmental claims made by the government would be paid in full; unsecured claims (claims without an assurance of payment such as in the form of a lien on property) would not.

Instead, under the plan, Old GM would establish GUC Trust, which would be administered by the Wilmington Trust Company. Once GUC Trust (and other like trusts) was established, Old GM would dissolve.

GUC Trust would hold certain Old GM assets—including New GM stock and stock warrants that could be used to purchase shares at fixed prices, along with other financial instruments. Creditors with unsecured claims against Old GM would receive these New GM securities and "units" of GUC Trust (the value of which would be pegged to the residual value of GUC Trust) on a pro rata basis in satisfaction of their claims. The Sale Agreement also imposed an "accordion feature" to ensure that GUC Trust would remain adequately funded in the event that the amount of unsecured claims grew too large. The accordion feature provided that if "the Bankruptcy Court makes a finding that the estimated aggregate allowed general unsecured claims against [Old GM's] estates exceed $35 [billion], then [New GM] will . . . issue 10,000,000 additional shares of Common Stock . . . to [Old GM]." J. App. 1699.

On March 29, 2011, the bankruptcy court confirmed this liquidation plan. GUC Trust made quarterly distributions of its assets thereafter. The

App-14

initial distribution released more than seventy-five percent of the New GM securities.

On February 8, 2012, the bankruptcy court ordered that no further claims against Old GM and payable by GUC Trust would be allowed unless the claim amended a prior claim, was filed with GUC Trust's consent, or was deemed timely filed by the bankruptcy court. As of March 31, 2014, GUC Trust had distributed roughly ninety percent of its New GM securities and nearly 32 million units of GUC Trust; the expected value of unsecured claims against Old GM totaled roughly $32 billion, not enough to trigger the accordion feature and involve New GM in the bankruptcy. The GM bankruptcy that began five years earlier appeared to be approaching its end.

III. Ignition Switch Defect

On February 7, 2014, New GM first informed the National Highway Traffic Safety Administration ("NHTSA") that it would be recalling, among other vehicles, the 2005 Chevrolet Cobalt. A defect in the ignition switch could prevent airbags from deploying.

A later congressional staff report, which followed four days of testimony by New GM CEO Mary Barra before committees of the House of Representatives and Senate, described what could happen by referring to an actual tragic accident caused by the defect:[13] In October 2006, three teenagers were riding

---

[13] Staff of H. Comm. on Energy & Commerce, 113th Cong., *Report on the GM Ignition Switch Recall: Review of NHTSA* 1 (Sept. 16, 2014); *Examining Accountability and Corporate Culture in Wake of the GM Recalls: Hearing Before the Subcomm. on Consumer Prot., Prod. Safety, & Ins. of the S. Comm. on Commerce, Sci., & Transp.*, 113th Cong. (2014); *The*

App-15

in a 2005 Chevrolet Cobalt when the driver lost control and the car careened off the side of the road. The vehicle flew into a telephone utility box and several trees. The airbags did not deploy, and two of the teenagers died.

From February until October 2014, New GM would issue over 60 recalls, with the number of affected vehicles in the United States alone surpassing 25 million. New GM hired attorney Anton Valukas of the law firm Jenner & Block to investigate; he did so and prepared an extensive report (the "Valukas Report").[14]

In 1997, Old GM sold three out of ten cars on the road in North America. *See* General Motors Corp., *Annual Report (Form 10-K)* 60 (Mar. 20, 1998). Engineers began developing a new ignition switch that could be used in multiple vehicles across the GM brand, first by setting technical specifications for the switch and then by testing prototypes against those specifications.

---

*GM Ignition Switch Recall: Investigation Update: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 113th Cong. (2014); *Examining the GM Recall and NHTSA's Defect Investigation Process: Hearing Before the Subcomm. on Consumer Prot., Prod. Safety, & Ins. of the S. Comm. on Commerce, Sci., & Transp.*, 113th Cong. (2014) [hereinafter "April 2, 2014 Senate Hearing"]; *The GM Ignition Switch Recall: Why Did It Take So Long?: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 113th Cong. (2014).

[14] Plaintiffs and New GM each extensively cite and quote to the Valukas Report as an account of the underlying facts regarding the ignition switch defect, and we do as well.

App-16

Throughout testing, which lasted until 2002, prototypes consistently failed to meet technical specifications. In particular, a low amount of torque could cause the ignition switch to switch to "accessory" or "off."[15] A low torque threshold on an ignition switch would mean that little force—perhaps even the bump of a stray knee—would be needed to rotate the key in the switch from the "on" position to the "accessory" or "off" position.

Near the end of testing, an engineer commented on the ignition switch's lingering problems in an email: he was "tired of the switch from hell." J. App. 9696. Three months later, in May 2002, the ignition switch was approved for production, despite never having passed testing.

In the fall of 2002, Old GM began producing vehicles with the faulty ignition switch. Almost immediately, customers complained of moving stalls, sometimes at highway speeds—instances where the engine and power steering and braking cut off while the car was in motion, leaving drivers to manually maneuver the vehicle, that is, without assistance of the car's power steering and braking systems.

Despite customer complaints, and grumblings in the press, Old GM classified the moving stall as a "non-safety issue." *Id.* at 9711. As Valukas put it, "on a scale of 1 (most severe) to 4 (least severe) . . . the problem could have been designated a severity level 1 safety problem, [but] it was not." *Id.* Instead, the

---

[15] Torque is a measure of twisting force—it is generated, for example, when one twists off the cap of a soda bottle or tightens a bolt with a wrench.

App-17

moving stall was assigned a severity level of 3. Old
GM personnel considered the problem to be a matter
of customer satisfaction, not safety. These personnel
apparently also did not then fully realize that when a
car shuts off, so does its airbags. But as early as
August 2001, at least some Old GM engineers
understood that turning off the ignition switch could
prevent airbags from deploying.

Complaints about the ignition switch continued.
Between 2004 and 2005, NHTSA began asking
questions about engine stalls. In 2005, several media
outlets also reported on the stalls. *See, e.g.,* Jeff
Sabatini, *Making a Case for Keyless Ignitions*, N.Y.
Times (June 19, 2005). Senior attorneys studied the
stalls, but considered the risk to be "remote[]."
J. App. 9734. At the same time, Old GM's product
investigations unit recreated the ignition switch's
issues by using only a heavy keychain to generate
torque. Finally, in December 2005, Old GM issued a
bulletin to dealers, but not to customers, warning
them that "low ignition key cylinder torque" could
cause cars to turn off. *Id.* at 9740. The bulletin did
not mention that, as a result, cars could stall on the
road.

Then came reports of fatalities. In late 2005
through 2006, news of deaths from airbag non-
deployments in crashes where airbags should have
deployed reached the desks of Old GM's legal team.
Around April 2006, Old GM engineers decided on a
design change of the ignition switch to increase the
torque. Old GM engineers did so quietly, without
changing the ignition switch's part number, a change

App-18

that would have signaled that improvements or adjustments had been made.

In February 2007, a Wisconsin state trooper's report made its way into the files of Old GM's legal department: "The two front seat airbags did not deploy. It appears that the ignition switch had somehow been turned from the run position to accessory prior to the collision with the trees." *Id.* at 9764. NHTSA similarly brought to Old GM's attention reported airbag non-deployments. *See* Transportation Research Center, Indiana University, *On-Site Air Bag Non-Deployment Investigation* 7 (Apr. 25, 2007, rev. Mar. 31, 2008). As more incidents with its cars piled up, Old GM finally drafted an updated bulletin to dealers warning them of possible "stalls," but never sent it out.

Old GM internally continued to investigate. By May 2009, staff had figured out that non-deployment of airbags in these crashes was attributable to a sudden loss of power. They believed that one of the two "most likely explanation[s] for the power mode signal change was . . . a problem with the Ignition Switch." J. App. 9783. By June 2009, Old GM engineers had implemented a change to the ignition key, hoping to fix the problem once and for all. One engineer lamented that "[t]his issue has been around since man first lumbered out of [the] sea and stood on two feet." *Id.* at 9781.

Later, the Valukas Report commented on the general attitude at Old GM. For eleven years, "GM heard over and over from various quarters— including customers, dealers, the press, and their own employees—that the car's ignition switch led to

App-19

moving stalls, group after group and committee after committee within GM that reviewed the issue failed to take action or acted too slowly. Although everyone had responsibility to fix the problem, nobody took responsibility." J. App. 9650.

The Valukas Report recounted aspects of GM's corporate culture. With the "GM salute," employees would attend action meetings and literally cross their arms and point fingers at others to shirk responsibility. With the "GM nod," employees would (again) literally nod in agreement to endorse a proposed plan, understanding that they and others had no intention of following through. Finally, the Report described how GM employees, instead of taking action, would claim the need to keep searching for the "root cause" of the moving stalls and airbag non-deployments. This "search for root cause became a basis for doing nothing to resolve the problem for years." *Id.* at 9906.

Indeed, New GM would not begin recalling cars for ignition switch defects until February 2014. Soon after New GM's initial recall, individuals filed dozens of class actions lawsuits, claiming that the ignition switch defect caused personal injuries and economic losses, both before and after the § 363 sale closed.[16] New GM sought to enforce the Sale Order, invoking the liability shield to hold New GM "free and clear" of various claims. This meant that when it came to Old GM cars New GM would pay for post-closing personal

---

[16] Those class actions are consolidated before a district judge in the United States District Court for the Southern District of New York. *See In re General Motors LLC Ignition Switch Litigation*, No. 14-MD-2543 (S.D.N.Y.) (Furman, *J.*).

App-20

injuries, make repairs, and follow Lemon Laws, but nothing else. The amount of purportedly barred liabilities was substantial—an estimated $7 to $10 billion in economic losses, not to mention damages from pre-closing accidents.

## IV. Proceedings Below

On April 21, 2014, Steven Groman and others (the "Groman Plaintiffs") initiated an adversary proceeding against New GM in the bankruptcy court below, asserting economic losses arising from the ignition switch defect. The same day, New GM moved to enforce the Sale Order to enjoin those claims, as well as claims in other ignition switch actions then being pursued against New GM.

Other plaintiffs allegedly affected by the Sale Order included classes of individuals who had suffered pre-closing injuries arising from the ignition switch defect ("Pre-Closing Accident Plaintiffs"), economic losses arising from the ignition switch defect in Old GM cars ("Ignition Switch Plaintiffs"), and damages arising from defects other than the ignition switch in Old GM cars ("Non-Ignition Switch Plaintiffs").[17] Included within the Ignition Switch Plaintiffs were individuals who had purchased Old GM cars secondhand after the § 363 sale closed ("Used Car Purchasers").

On appeal, several orders are before us. First, the Non-Ignition Switch Plaintiffs filed a motion,

---

[17] On August 1, 2014, New GM filed motions to enforce the Sale Order against the Pre-Closing Accident Plaintiffs and Non-Ignition Switch Plaintiffs, who entered the bankruptcy proceedings later.

App-21

asserting, among other things, that the bankruptcy
court lacked jurisdiction to enforce the Sale Order.
On August 6, 2014, the bankruptcy court denied that
motion. *In re Motors Liquidation Co.* ("*MLC I*"), 514
B.R. 377 (Bankr. S.D.N.Y. 2014) (Gerber, *J.*).

Second, after receiving further briefing and
hearing oral argument on the motion to enforce, on
April 15, 2015 the bankruptcy court decided to
enforce the Sale Order in part and dismiss any
would-be claims against GUC Trust because relief
would be equitably moot. *In re Motors Liquidation
Co.* ("*MLC II*"), 529 B.R. 510 (Bankr. S.D.N.Y. 2015)
(Gerber, *J.*). The bankruptcy court first determined
plaintiffs lacked notice consistent with procedural
due process. *Id.* at 540-60. In particular, the
bankruptcy court found that the ignition switch
claims were known to or reasonably ascertainable by
Old GM prior to the sale, and thus plaintiffs were
entitled to actual notice, as opposed to the mere
publication notice that they received. *Id.* at 556-60.
The bankruptcy court found, however, that with one
exception plaintiffs had not been "prejudiced" by this
lack of notice—the exception being claims stemming
from New GM's own wrongful conduct in concealing
defects (so-called "independent claims"). *Id.* at 560-
74. In other words, the bankruptcy court held that
New GM could not be sued—in bankruptcy court or
elsewhere—for ignition switch claims that otherwise
could have been brought against Old GM, unless
those claims arose from New GM's own wrongful
conduct. *Id.* at 574-83.

In the same decision, the bankruptcy court
addressed arguments by GUC Trust that it should

App-22

not be held as a source for relief either. Applying the factors set out in *In re Chateaugay Corp.* ("*Chateaugay III*"), 10 F.3d 944 (2d Cir. 1993), the bankruptcy court concluded that relief for any late claims against GUC Trust was equitably moot, as the plan had long been substantially consummated. *MLC II*, 529 B.R. at 583-92. Finally, the bankruptcy court outlined the standard for any future fraud on the court claims. *Id.* at 592-97. With these issues resolved, the bankruptcy court certified its decision for appeal to this Court pursuant to 28 U.S.C. § 158. *Id.* at 597-98.

Third, the bankruptcy court issued another decision after the parties disagreed on the form of judgment and other ancillary issues. On May 27, 2015, the bankruptcy court clarified that the Non-Ignition Switch Plaintiffs would be bound by the judgment against the other plaintiffs, but would have seventeen days following entry of judgment to object. *In re Motors Liquidation Co.* ("*MLC III*"), 531 B.R. 354 (Bankr. S.D.N.Y. 2015) (Gerber, *J.*). The bankruptcy court left open the question of whether Old GM knew of other defects.

On June 1, 2015, the bankruptcy court entered judgment against all plaintiffs and issued an order certifying the judgment for direct appeal. Following briefing by the Non-Ignition Switch Plaintiffs, on July 22, 2015, the bankruptcy court rejected their objections to the judgment.

New GM, GUC Trust, and the four groups of plaintiffs described above—the Groman Plaintiffs, Ignition Switch Plaintiffs, Non-Ignition Switch

App-23

Plaintiffs, and Pre-Closing Accident Plaintiffs—appealed.[18] We turn to these appeals.

### DISCUSSION

The Code permits a debtor to sell substantially all of its assets to a successor corporation through a § 363 sale, outside of the normal reorganization process. Here, no party seeks to undo the sale of Old GM's assets to New GM, as executed through the Sale Order.[19] Instead, plaintiffs challenge the extent to which the bankruptcy court may absolve New GM, as a successor corporation, of Old GM's liabilities. *See generally* 3 *Collier on Bankruptcy* ¶ 363.02[2] (Alan N. Resnick & Harry J. Sommer eds., 16th ed. 2013) [hereinafter "*Collier on Bankruptcy*"] (noting that "use of a section 363 sale probably reached its zenith" with the GM bankruptcy). In particular, they dispute whether New GM may use the Sale Order's "free and clear" provision to shield itself from claims primarily arising out of the ignition switch defect and other defects.

---

[18] On appeal, the Non-Ignition Switch Plaintiffs are joined by certain ignition switch and pre-closing accident plaintiffs and call themselves the "*Elliot*, *Sesay*, and *Bledsoe* Plaintiffs." That group also represents two other appellants captioned above: Berenice Summerville and Doris Powledge Phillips. For ease of reference, in the context of this appeal, we will continue to call the group the "Non-Ignition Switch Plaintiffs."

[19] Indeed, the bankruptcy court's opinion in *GM*, 407 B.R. 463, which approved the § 363 sale, has been reviewed on appeal has three times: a stay pending appeal was denied in *In re General Motors Corp.*, No. M 47(LAK), 2009 WL 2033079 (S.D.N.Y. July 9, 2009), and the opinion was affirmed in *In re Motors Liquidation Co.*, 428 B.R. 43 (S.D.N.Y. 2010), and in *In re Motors Liquidation Co.*, 430 B.R. 65 (S.D.N.Y. 2010).

App-24

The decisions below generate four issues on appeal: (1) the bankruptcy court's jurisdiction to enforce the Sale Order, (2) the scope of the power to sell assets "free and clear" of all interests, (3) the procedural due process requirements with respect to notice of such a sale, and (4) the bankruptcy court's ruling that would-be claims against GUC Trust are equitably moot.

## I. Jurisdiction

We first address the bankruptcy court's subject matter jurisdiction. New GM argued below that successor liability claims against it should be enjoined, and the bankruptcy court concluded as a threshold matter that it had jurisdiction to enforce the Sale Order. *See MLC I*, 514 B.R. at 380-83. The Non-Ignition Switch Plaintiffs challenge jurisdiction: (1) as a whole to enjoin claims against New GM, (2) with respect to independent claims, which stem from New GM's own wrongful conduct, and (3) to issue a successive injunction. We review *de novo* rulings as to the bankruptcy court's jurisdiction. *See In re Petrie Retail, Inc.*, 304 F.3d 223, 228 (2d Cir. 2002).

First, as to jurisdiction broadly, "[t]he jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995); *see* 28 U.S.C. § 1334. Bankruptcy courts may exercise jurisdiction, through referral from the district court, over three broad categories of proceedings: those "arising under title 11" of the Code, those "arising in . . . a case under title 11," and those "related to a case under title 11." 28 U.S.C. § 157(a). Proceedings "arising under title 11, or

App-25

arising in a case under title 11," are deemed "core proceedings." *Stern v. Marshall*, 564 U.S. 462, 476 (2011) (quoting 28 U.S.C. § 157(b)). In those proceedings, bankruptcy courts retain comprehensive power to resolve claims and enter orders or judgments. *See In re Millenium Seacarriers, Inc.*, 419 F.3d 83, 96 (2d Cir. 2005).

"[T]he meaning of the statutory language 'arising in' may not be entirely clear." *Baker v. Simpson*, 613 F.3d 346, 351 (2d Cir. 2010). At a minimum, a bankruptcy court's "arising in" jurisdiction includes claims that "are not based on any right expressly created by [T]itle 11, but nevertheless, would have no existence outside of the bankruptcy." *Id.* (quoting *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987)).

A bankruptcy court's decision to interpret and enforce a prior sale order falls under this formulation of "arising in" jurisdiction. An order consummating a debtor's sale of property would not exist but for the Code, *see* 11 U.S.C. § 363(b), and the Code charges the bankruptcy court with carrying out its orders, *see id.* § 105(a) (providing that bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title"). Hence, a bankruptcy court "plainly ha[s] jurisdiction to interpret and enforce its own prior orders." *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009); *see Millenium Seacarriers*, 419 F.3d at 96 ("A bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization." (quoting *Petrie Retail*, 304 F.3d at 230)). That is what happened here. The

App-26

bankruptcy court first interpreted the "free and clear" provision that barred successor liability claims—a provision that was integral to resolving Old GM's bankruptcy—and then determined whether to enforce that provision.

Second, the Non-Ignition Switch Plaintiffs specify that the bankruptcy court lacked jurisdiction over independent claims. Even though the bankruptcy court ultimately did not enjoin independent claims, we address this argument because it implicates subject matter jurisdiction. In any event, the argument is misguided. The Sale Order, on its face, does not bar independent claims against New GM; instead, it broadly transfers assets to New GM "free and clear of liens, claims, encumbrances, and other interests . . . , including rights or claims . . . based on any successor or transferee liability." J. App. 1621. By making the argument that the bankruptcy court could not enjoin independent claims through the Sale Order, the Non-Ignition Switch Plaintiffs already assume that the bankruptcy court indeed has jurisdiction to interpret the Sale Order to determine whether it covers independent claims and to hear a motion to enforce in the first place.

Third, the Non-Ignition Switch Plaintiffs argue that the bankruptcy court lacked power to issue a so-called successive injunction. In certain parts of the Sale Order, the bankruptcy court had included language that successor liability claims would be "forever prohibited and enjoined." J. App. 1649. But New GM was not seeking an injunction to stop plaintiffs from violating that prior injunction; New

App-27

GM wanted the bankruptcy court to confirm that the Sale Order covered *these* plaintiffs. In other words, New GM "did not seek a new injunction but, rather, '[sought] to enforce an injunction already in place.'" *In re Kalikow*, 602 F.3d 82, 93 (2d Cir. 2010) (quoting *In re Texaco Inc.*, 182 B.R. 937, 945 (Bankr. S.D.N.Y. 1995)). In such situations, bankruptcy courts have jurisdiction to decide a "motion s[eeking] enforcement of a pre-existing injunction issued as part of the bankruptcy court's sale order." *Petrie Retail*, 304 F.3d at 230.

Accordingly, we agree that the bankruptcy court had jurisdiction to interpret and enforce the Sale Order. *See MLC I*, 514 B.R. at 380-83.

II. Scope of "Free and Clear" Provision

We turn to the scope of the Sale Order. The Sale Order transferred assets from Old GM to New GM "free and clear of liens, claims, encumbrances, and other interests . . . , including rights or claims . . . based on any successor or transferee liability." J. App. 1621. The bankruptcy court did not explicitly address what claims were covered by the Sale Order.[20]

We address the scope of the Sale Order because it implicates our procedural due process analysis that follows. If the Sale Order covers certain claims, then

---

[20] The bankruptcy court mentioned, however, that claims based on New GM's "independently wrongful, and otherwise actionable, conduct" could not be categorized as claims that could be assumed by New GM or retained by Old GM via the Sale Order. *MLC II*, 529 B.R. at 583. But the bankruptcy court did not explicitly address whether it still considered those claims to be covered by the Sale Order.

App-28

we would have to consider whether plaintiffs' due process rights are violated by applying the "free and clear" clause to those claims. If the Sale Order did not cover certain claims, however, then those claims could not be enjoined by enforcing the Sale Order and due process concerns would not be implicated. We interpret the Sale Order *de novo* to determine what claims are barred. *See In re Duplan Corp.*, 212 F.3d 144, 151 (2d Cir. 2000); *see also Petrie Retail*, 304 F.3d at 229 (noting instance where enforcement first required interpretation of prior order).

### A. Applicable Law

The Code allows the trustee or debtor-in-possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A sale pursuant to § 363(b) may be made "free and clear of any interest in such property" if any condition on a list of conditions is met. *Id.* § 363(f). "Yet the Code does not define the concept of 'interest,' of which the property may be sold free and clear," 3 *Collier on Bankruptcy* ¶ 363.06[1], not does it express the extent to which "claims" fall within the ambit of "interests."

New GM asserts that *In re Chrysler LLC*, 576 F.3d 108, 126 (2d Cir. 2009), resolved that successor liability claims are interests. New GM Br. 75.[21] But *Chrysler* was vacated by the Supreme Court after it became moot during the certiorari process and remanded with instructions to dismiss the appeal as

---

[21] New GM also cites a non-precedential summary order on this issue. *See Douglas v. Stamco*, 363 F. App'x 100 (2d Cir. 2010).

App-29

moot. *See Ind. State Police Pension Tr. v. Chrysler LLC*, 558 U.S. 1087 (2009). The Supreme Court vacated *Chrysler* pursuant to *United States v. Munsingwear, Inc.*, 340 U.S. 36, 41 (1950), which "prevent[s] a judgment, unreviewable because of mootness, from spawning any legal consequences." *See Russman v. Bd. of Educ. of Enlarged City Sch. Dist.*, 260 F.3d 114, 121-22 n.2 (2d Cir. 2001) ("[V]acatur eliminates an appellate precedent that would otherwise control decision on a contested question throughout the circuit."). We had not addressed the issue before *Chrysler*, and now that case is no longer controlling precedent.[22] *See* 576 F.3d at 124 ("We have never addressed the scope of the language 'any interest in such property,' and the statute does not define the term.").

Rather than formulating a single precise definition for "any interest in such property," courts have continued to address the phrase "on a case-by-case basis." *In re PBBPC, Inc.*, 484 B.R. 860, 867 (B.A.P. 1st Cir. 2013). At minimum, the language in § 363(f) permits the sale of property free and clear of *in rem* interests in the property, such as liens that attach to the property. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 288 (3d Cir. 2003). But courts have permitted a "broader definition that encompasses other obligations that may flow from ownership of the property." 3 *Collier on Bankruptcy* ¶ 363.06[1]. Sister courts have held that

---

[22] When the bankruptcy court determined that successor liability claims could constitute interests, *Chrysler* had not yet been vacated. *See GM*, 407 B.R. at 505 ("*Chrysler* is not distinguishable in any legally cognizable respect.").

App-30

§ 363(f) may be used to bar a variety of successor liability claims that relate to ownership of property: an "interest" might encompass Coal Act obligations otherwise placed upon a successor purchasing coal assets, *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-82 (4th Cir. 1996), travel vouchers issued to settle an airline's discrimination claims in a sale of airline assets, *Trans World Airlines*, 322 F.3d at 288-90, or a license for future use of intellectual property when that property is sold, *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002). *See generally Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 545 (7th Cir. 2003) ("[T]he term 'interest' is a broad term no doubt selected by Congress to avoid 'rigid and technical definitions drawn from other areas of the law.'" (quoting *Russello v. United States*, 464 U.S. 16, 21 (1983))). In these instances, courts require "a relationship between the[] right to demand . . . payments from the debtors and the use to which the debtors had put their assets." *Trans World Airlines*, 322 F.3d at 289.

We agree that successor liability claims can be "interests" when they flow from a debtor's ownership of transferred assets. *See 3 Collier in Bankruptcy* ¶¶ 363.06[1], [7]; *Trans World Airlines*, 322 F.3d at 289. But successor liability claims must also still qualify as "claims" under Chapter 11. Though § 363(f) does not expressly invoke the Chapter 11 definition of "claims," *see* 11 U.S.C. § 101(5), it makes sense to "harmonize" Chapter 11 reorganizations and § 363 sales "to the extent permitted by the statutory language." *Chrysler*, 576 F.3d at 125; *see Lionel*, 722 F.2d at 1071 ("[S]ome play for the operation of both

App-31

§ 363(b) and Chapter 11 must be allowed for.").[23] Here, the bankruptcy court's power to bar "claims" in a quick § 363 sale is plainly no broader than its power in a traditional Chapter 11 reorganization. *Compare* 11 U.S.C. § 363(f) ("free and clear of any interest in such property"), *with* § 1141(c) ("free and clear of all claims and interests"). We thus consider what claims may be barred under Chapter 11 generally.

Section 101(5) defines "claim" as any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5). A claim is (1) a right to payment (2) that arose before the filing of the petition. *See Pension Ben. Guar. Corp. v. Oneida Ltd.*, 562 F.3d 154, 157 (2d Cir. 2009). If the right to payment is contingent on future events, the claim must instead "result from pre-petition conduct fairly giving rise to that contingent claim." *In re Chateaugay Corp.* ("*Chateaugay I*"), 944 F.2d 997, 1005 (2d Cir. 1991) (internal quotation marks omitted).

This Court has not decided, however, "the difficult case of pre-petition conduct that has not yet resulted in detectable injury, much less the extreme

---

[23] Although *Chrysler* was vacated on grounds of mootness, it still "constitute[s] persuasive authority." *Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 208 n.5 (2d Cir. 2003). Both our Circuit and the Third Circuit have continued to cite *Chrysler* favorably. *See In re N. New Eng. Tel. Operations LLC*, 795 F.3d 343, 346, (2d Cir. 2015); *In re Jevic Holding Corp.*, 787 F.3d 173, 188-89 (3d Cir. 2015).

App-32

case of pre-petition conduct that has not yet resulted in any tortious consequence to a victim." *Id.* at 1004. *Chateaugay I* considered a hypothetical bankrupt bridge building company, which could predict that out of the 10,000 bridges it built, one would one day fail, causing deaths and other injuries. *Id.* at 1003. If that bridge did fail, the individuals might have tort claims resulting from pre-petition conduct, namely the building of the bridge.

Recognizing these claims would engender "enormous practical and perhaps constitutional problems." *Id.* Thus, "'claim' cannot be extended to include . . . claimants whom the record indicates were completely unknown and unidentified at the time [the debtor] filed its petition and whose rights depended entirely on the fortuity of future occurrences." *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1277 (5th Cir. 1994); *see In re Chateaugay Corp.* ("*Chateaugay IV*"), 53 F.3d 478, 497 (2d Cir. 1995) (stating that, in "common sense," "claim" is "not infinite"). To avoid any practical and constitutional problems, courts require some minimum "contact," *Chateaugay I*, 944 F.2d at 1003-04, or "relationship," *Chateaugay IV*, 53 F.3d at 497, that makes identifiable the individual with whom the claim does or would rest.

To summarize, a bankruptcy court may approve a § 363 sale "free and clear" of successor liability claims if those claims flow from the debtor's ownership of the sold assets. Such a claim must arise from a (1) right to payment (2) that arose before the filing of the petition or resulted from pre-petition conduct fairly giving rise to the claim. Further, there

App-33

must be some contact or relationship between the debtor and the claimant such that the claimant is identifiable.

### B. Application

We apply these principles to: (1) pre-closing accident claims, (2) economic loss claims arising from the ignition switch defect or other defects, (3) independent claims relating only to New GM's conduct, and (4) Used Car Purchasers' claims. The bankruptcy court assumed that the Sale Order's broad language suggested that all of these claims fell within the scope of the "free and clear" provision. We hold, however, that the first two sets of claims are covered by the Sale Order but that the latter two sets of claims are not.

First, the pre-closing accident claims clearly fall within the scope of the Sale Order. Those claims directly relate to the ownership of the GM automaker's business—Old GM built cars with ignition switch defects. And those plaintiffs' claims are properly thought of as tort claims that arose before the filing of the petition; indeed, the claims arise from accidents that occurred pre-closing involving Old GM cars.[24]

Second, the economic loss claims arising from the ignition switch defect or other defects present a

---

[24] To the extent that Pre-Closing Accident Plaintiffs assert claims arising after the petition but before the § 363 sale closing, no party on appeal suggests that we treat claims in this timeframe differently. In any event, those claims are contingent on the accident occurring and "result from pre-petition conduct fairly giving rise to [a] contingent claim." *Chateaugay I*, 944 F.2d at 1005 (internal quotation marks omitted).

App-34

closer call. Like the claims of Pre-Closing Accident Plaintiffs, these claims flow from the operation of Old GM's automaker business. These individuals also, by virtue of owning Old GM cars, had come into contact with the debtor prior to the bankruptcy petition. Yet the ignition switch defect (and other defects) were only revealed some five years later.

GUC Trust thus asserts that there was no right to payment prior to the petition. We disagree. The economic losses claimed by these individuals were "contingent" claims. 11 U.S.C. § 101(5). That is, the ignition switch defect was there, but was not yet so patent that an individual could, as a practical matter, bring a case in court. The contingency standing in the way was Old GM telling plaintiffs that the ignition switch defect existed. In other words, Old GM's creation of the ignition switch defect fairly gave rise to these claims, even if the claimants did not yet know. *See Chateaugay I*, 944 F.2d at 1005.

Third, however, the independent claims do not meet the Code's limitation on claims. By definition, independent claims are claims based on New GM's own post-closing wrongful conduct. Though the parties do not lay out the whole universe of possible independent claims, we can imagine that some claims involve misrepresentations by New GM as to the safety of Old GM cars. These sorts of claims are based on New GM's *post*-petition conduct, and are not claims that are based on a right to payment that arose before the filing of petition or that are based on pre-petition conduct. Thus, these claims are outside

App-35

the scope of the Sale Order's "free and clear" provision.

Fourth, the Sale Order likewise does not cover the Used Car Purchasers' claims. The Used Car Purchasers were individuals who purchased Old GM cars *after* the closing, without knowledge of the defect or possible claim against New GM. They had no relation with Old GM prior to bankruptcy. Indeed, as of the bankruptcy petition there were an unknown number of unknown individuals who would one day purchase Old GM vehicles secondhand. There could have been no contact or relationship—actual or presumed—between Old GM and these specific plaintiffs, who otherwise had no awareness of the ignition switch defect or putative claims against New GM. We cannot, consistent with bankruptcy law, read the Sale Order to cover their claims. *See Chateaugay I*, 944 F.2d at 1003-04 (calling such a reading "absurd").

New GM argues that "modifying" the Sale Order would "knock the props out of the foundation on which the [Sale Order] was based" or otherwise be unlawful. New GM Br. 77 (internal quotation marks omitted). But we do not *modify* the Sale Order. Instead, we merely interpret the Sale Order in accordance with bankruptcy law. Indeed, by filing a motion to enforce, New GM in effect asked for the courts to interpret the Sale Order. *See Petrie Retail*, 304 F.3d at 229.

In sum, the "free and clear" provision covers pre-closing accident claims and economic loss claims based on the ignition switch and other defects. It does not cover independent claims or Used Car

App-36

Purchasers' claims. Accordingly, we affirm the bankruptcy court's decision not to enjoin independent claims, *see MLC II*, 529 B.R. at 568-70, and reverse its decision to enjoin the Used Car Purchasers' claims, *see id.* at 570-72.

### III. Procedural Due Process

The Sale Order covers the pre-closing accident claims and economic loss claims based on the ignition switch and other defects. The Sale Order, if enforced, would thus bar those claims. Plaintiffs contend on appeal that enforcing the Sale Order would violate procedural due process. We address two issues: (1) what notice plaintiffs were entitled to as a matter of procedural due process, and (2) if they were provided inadequate notice, whether the bankruptcy court erred in denying relief on the basis that most plaintiffs were not "prejudiced."

We review factual findings for clear error and legal conclusions, including interpretations of the Constitution, *de novo*. *In re Barnet*, 737 F.3d 238, 246 (2d Cir. 2013). Our clear error standard is a deferential one, and if the bankruptcy court's "'Account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *Amadeo v. Zant*, 486 U.S. 214, 223 (1988) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985)).

### A. Notice

The bankruptcy court first concluded that plaintiffs were not provided notice as required by procedural due process. *See MLC II*, 529 B.R. at 555-

App-37

60. The bankruptcy court held that because Old GM knew or with reasonable diligence should have known of the ignition switch claims, plaintiffs were entitled to actual or direct mail notice, but received only publication notice. *See id.* at 557-60. The parties dispute the extent of Old GM's knowledge of the ignition switch problem.

### 1. Applicable Law

The Due Process Clause provides, "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Certain procedural protections attach when "deprivations trigger due process." *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991). Generally, legal claims are sufficient to constitute property such that a deprivation would trigger due process scrutiny. *See N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 169-70 (2d Cir. 2001).

Once due process is triggered, the question becomes what process is due. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Courts ask "whether the state acted reasonably in selecting means likely to inform persons affected, not whether each property owner actually received notice." *Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir. 1988). Notice is adequate if "[t]he means

App-38

employed [are] such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane*, 339 U.S. at 315.

This requirement also applies to bankruptcy proceedings. *See Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071. Indeed, a fundamental purpose of bankruptcy is to discharge, restructure, or impair claims against the debtor in an orderly fashion. *See Lines v. Frederick*, 400 U.S. 18, 19 (1970). "The general rule that emerges . . . is that notice by publication is not enough with respect to a person whose name and address are known or very easily ascertainable and whose legally protected interests are directly affected by the proceedings in question." *Schroeder v. City of New York*, 371 U.S. 208, 212-13 (1962); *accord Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 800 (1983). In other words, adequacy of notice "turns on what the debtor . . . knew about the claim or, with reasonable diligence, should have known." *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 150 (2d Cir. 2014) (citing *Chemetron Corp. v. Jones*, 72 F.3d 341, 345-46 (3d Cir. 1995)). If the debtor knew or reasonably should have known about the claims, then due process entitles potential claimants to actual notice of the bankruptcy proceedings, but if the claims were unknown, publication notice suffices. *Chemetron*, 72 F.3d at 345-46.

If a debtor reveals in bankruptcy the claims against it and provides potential claimants notice consistent with due process of law, then the Code

App-39

affords vast protections. Both § 1141(c) and § 363(f) permit "free and clear" provisions that act as liability shield. These provisions provide enormous incentives for a struggling company to be forthright. But if a debtor does not reveal claims that it is aware of, then bankruptcy law cannot protect it. Courts must "limit[] the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'" *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

### 2. Application

The parties do not dispute that plaintiffs received only publication notice. The question is whether they were entitled to more. The bankruptcy court found that because Old GM knew or reasonably should have known about the ignition switch defect prior to bankruptcy, it should have provided direct mail notice to vehicle owners. We find no clear error in this factual finding.

As background, federal law requires that automakers keep records of the first owners of their vehicles. 49 U.S.C. § 30117(b)(1) ("A manufacturer of a motor vehicle . . . shall cause to be maintained a record of the name and address of the first purchaser of each vehicle . . . ."). This provision facilitates recalls and other consequences of the consumer-automaker relationship. Thus, to the extent that Old GM knew of defects in its cars, it would also necessarily know the identity of a significant number of affected owners.

The facts paint a picture that Old GM did nothing, even as it knew that the ignition switch

App-40

defect impacted consumers. From its development in 1997, the ignition switch never passed Old GM's own technical specifications. Old GM knew that the switch was defective, but it approved the switch for millions of cars anyway.

Once the ignition switch was installed, Old GM almost immediately received various complaints. News outlets reported about the faulty ignition switch. NHTSA approached Old GM about moving stalls and airbag non-deployments. A police report, which Old GM's legal team possessed, linked these breakdowns to a faulty ignition switch. Old GM even considered warning dealers (but not consumers) about moving stalls. By May 2009, at the latest, Old GM personnel had essentially concluded that the ignition switch, moving stalls, and airbag non-deployments were related. Considering the airbag issues, they believed that one of the two "most likely explanation[s] for the power mode signal change was . . . a problem with the Ignition Switch." J. App. 9783.

A bankruptcy court could reasonably read from this record that Old GM knew about the ignition switch defect. Old GM knew that the defect caused stalls and had linked the airbag non-deployments to the defect by May 2009.

Even assuming the bankruptcy court erred in concluding that Old GM *knew*, Old GM—if reasonably diligent—surely *should have known* about the defect. Old GM engineers should have followed up when they learned their ignition switch did not initially pass certain technical specifications. Old GM lawyers should have followed up when they heard

App-41

disturbing reports about airbag non-deployments or moving stalls. Old GM product safety teams should have followed up when they were able to recreate the ignition switch defect with ease after being approached by NHTSA. If any of these leads had been diligently pursued in the seven years between 2002 and 2009, Old GM likely would have learned that the ignition switch defect posed a hazard for vehicle owners.

Such "reckless disregard of the facts [is] sufficient to satisfy the requirement of knowledge." *McGinty v. State*, 193 F.3d 64, 70 (2d Cir. 1999). In the face of all the reports and complaints of faulty ignition switches, moving stalls, airbag non-deployments, and, indeed, serious accidents, and in light of the conclusions of its own personnel, Old GM had an obligation to take steps to "acquire full or exact knowledge of the nature and extent" of the defect. *United States v. Macias*, 786 F.3d 1060, 1062 (7th Cir. 2015). Under these circumstances, Old GM had a duty to identify the cause of the problem and fix it. Instead, the Valukas Report recounts a corporate culture that sought to pin responsibility on others and a Sisyphean search for the "root cause."

Further, even if the precise linkage between the ignition switch defect and moving stalls and airbag non-deployments was unclear, Old GM had enough knowledge. At minimum, Old GM knew about moving stalls and airbag non-deployments in certain models, and should have revealed those facts in bankruptcy. Those defects would still be the basis of "claims," even if the root cause (the ignition switch) was not clear.

App-42

New GM argues in response that because plaintiffs' claims were "contingent," those individuals were "unknown" creditors as a matter of law. But contingent claims are still claims, 11 U.S.C. § 101(5), and claimants are entitled to adequate notice if the debtor knows of the claims. Moreover, as discussed above, the only contingency was Old GM telling owners about the ignition switch defect—a contingency wholly in Old GM's control and without bearing as to *Old GM's* own knowledge. New GM essentially asks that we reward debtors who conceal claims against potential creditors. We decline to do so. *See Grogan*, 498 U.S. at 286-87.

Finally, we address a theme in this case that the GM bankruptcy was extraordinary because a quick § 363 sale was required to preserve the value of the company and to save it from liquidation. *See* New GM Br. 34 ("Time was of the essence, and costs were a significant factor."). Forty days was indeed quick for bankruptcy and previously unthinkable for one of this scale. While the desire to move through bankruptcy as expeditiously as possible was laudable, Old GM's precarious situation and the need for speed did not obviate basic constitutional principles. Due process applies even in a company's moment of crisis. *Cf. Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425 (1934) ("The Constitution was adopted in a period of grave emergency.").

We find no clear error in the bankruptcy court's finding that Old GM knew or should have known with reasonable diligence about the defect. *See MLC II*, 529 B.R. at 556-60. Individuals with claims arising out of the ignition switch defect were entitled

App-43

to notice by direct mail or some equivalent, as required by procedural due process.

## B. "Prejudice"

After concluding that Old GM did not provide adequate notice, the bankruptcy court nonetheless enforced the Sale Order. *See id.* at 565-73. The bankruptcy court held that "prejudice" is an "essential element" of procedural due process and that plaintiffs were not prejudiced—except as to independent claims—because the bankruptcy court would have approved the Sale Order even if plaintiffs were provided adequate notice. *Id.* at 565. The parties dispute whether "prejudice" is required and, if it is, whether there is prejudice here.

### 1. Applicable Law

The bankruptcy court held that "prejudice" is a requirement of the Due Process Clause and that even if inadequate notice deprived an individual of property without a meaningful opportunity to be heard, there is no prejudice if in hindsight the outcome would have been the same with adequate notice. *Id.* Some courts have indeed held that "a party who claims to be aggrieved by a violation of procedural due process must show prejudice." *Perry v. Blum*, 629 F.3d 1, 17 (1st Cir. 2010). Other courts have held otherwise that "a due process violation cannot constitute harmless error." *In re New Concept Hous., Inc.*, 951 F.2d 932, 937 n.7 (8th Cir. 1991); *see Fuentes v. Shevin*, 407 U.S. 67, 87 (1972) ("The right to be heard does not depend upon an advance showing that one will surely prevail at the

App-44

hearing.").[25] Courts have concluded that a "free and clear" clause was unenforceable because of lack of notice and a hearing in accordance with procedural due process, without exploring prejudice. *See In re Savage Indus.*, 43 F.3d 714, 721-22 (1st Cir. 1994); *cf. Nolasco v. Holder*, 637 F.3d 159, 164 (2d Cir. 2011) ("There may well be instances in which . . . failure to comply with [a procedural rule] results in a lack of

---

[25] *See, e.g., McNabb v. Comm'r Ala. Dep't of Corr.*, 727 F.3d 1334, 1347 (11th Cir. 2013) ("Our cases have long held that certain procedural due process violations, such as the flat-out denial of the right to be heard on a material issue, can never be harmless."); *Kim v. Hurston*, 182 F.3d 113, 119 (2d Cir. 1999) (commenting that even though the "minimal hearing that procedural due process requires would have done [the plaintiff] little good since she could not have realistically contested the changed reason," that "[n]evertheless, the procedural due process requirement[s] . . . must be observed"); *Lane Hollow Coal Co. v. Dir., Office of Workers' Compensation Programs*, 137 F.3d 799, 806 (4th Cir. 1998) ("[A] just result is not enough."); *In re Boomgarden*, 780 F.2d 657, 661 (7th Cir. 1985) ("In bankruptcy proceedings, both debtors and creditors have a constitutional right to be heard on their claims, and the denial of that right to them is the denial of due process which is never harmless error." (internal quotation marks omitted)); *In re George W. Myers Co.*, 412 F.2d 785, 786 (3d Cir. 1969) (holding that "alleged bankrupt was denied procedural due process by the . . . refusal of its offer to present evidence at the close of the evidence" and that such denial could not be "harmless error"); *Republic Nat'l Bank of Dallas v. Crippen*, 224 F.2d 565, 566 (5th Cir. 1955) ("The right to be heard on their claims was a constitutional right and the denial of that right to them was the denial of due process which is never harmless error."); *Phila. Co. v. SEC*, 175 F.2d 808, 820 (D.C. Cir. 1948) ("Denial of a procedural right guaranteed by the Constitution—in this instance denial of the type of hearing guaranteed . . . by the due process clause—is never 'harmless error.'"), *vacated as moot*, 337 U.S. 901 (1949).

App-45

notice or the denial of a meaningful opportunity to be heard such that . . . due process rights are violated.").

The § 363 sale context presents unique challenges for due process analysis. As seen here—with over 850 objections filed—objections may often be duplicative. *See GM*, 407 B.R. at 500 (finding successor liability "most debatable" of issues); *cf. Mullane,* 339 U.S. at 319 ("[N]otice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any objections sustained would inure to the benefit of all."). Many of the objections, especially those made against a "free and clear" provision, are not likely to be grounded in any legal right to change the terms of the sale, but rather will be grounded in a particular factual context. Section 363 sales are, in essence, private transactions. On one side, the debtor-in-possession "has ample administrative flexibility in the conduct of sales," 3 *Collier on Bankruptcy* ¶ 363.02[2], and on the other side, the purchaser need not take on liabilities unless it wishes to do so, *see id.* ¶ 363.06[7]. A bankruptcy court reviews a proposed § 363 sale's terms only for some minimal "good business reason." *Lionel*, 722 F.2d at 1071; *see also* 3 *Collier on Bankruptcy* ¶ 363.02[1][e] ("One of the major policy decisions in drafting the Code was to separate the court from the day-to-day administrative activities in bankruptcy cases . . . ."). Many sale objections will thus sound in business reasons to change the

App-46

proposed sale order, and not by reference to some legal requirement that the order *must* be changed.[26]

Assuming plaintiffs must demonstrate prejudice, the relevant inquiry is whether courts can be confident in the reliability of prior proceedings when there has been a procedural defect. *See Lane Hollow Coal Co. v. Dir., Office of Workers' Compensation Programs*, 137 F.3d 799, 808 (4th Cir. 1998) (considering "fairness of the trial and its reliability as an accurate indicator of guilt"); *see also Rose v. Clark*, 478 U.S. 570, 577-78 (1986) (asking whether adjudication in the criminal context without procedural protections can "reliably serve its function as a vehicle for determination of" a case). In considering reliability, "[t]he entire record must be considered and the probable effect of the error determined in the light of all the evidence." 11 Charles Alan Wright, Arthur R. Miller, et al., *Federal Practice & Procedure* § 2883 (3d ed. 2016) [hereinafter "Wright & Miller"]; *see Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 50-51 (2d Cir. 2014). "[I]f [the court] cannot say, with fair assurance, after

---

[26] *See* A. Joseph Warburton, *Understanding the Bankruptcies of Chrysler and General Motors: A Primer*, 60 Syracuse L. Rev. 531, 531 (2010) ("Certain creditors, who saw their investments in the companies sharply reduced, vigorously objected to the role of the government in the bankruptcy process. Some charged that in protecting the interests of taxpayers, the Treasury Department negotiated aggressively with creditors but, in protecting the interests of organized labor, it offered the United Autoworkers union special treatment."); *see also GM*, 407 B.R. at 496 ("The objectors' real problem is with the decisions of the Purchaser, not with the Debtor, nor with any violation of the Code or caselaw.").

App-47

pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error," then it must find a procedural due process violation. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

## 2. Application

We need not decide whether prejudice is an element when there is inadequate notice of a proposed § 363 sale, for even assuming plaintiffs must demonstrate prejudice, they have done so here. After examining the record as a whole, we cannot say with fair assurance that the outcome of the § 363 sale proceedings would have been the same had Old GM disclosed the ignition switch defect and these plaintiffs voiced their objections to the "free and clear" provision. Because we cannot say with any confidence that no accommodation would have been made for them in the Sale Order, we reverse.

At the outset, it is difficult to evaluate in hindsight what the objections would have been had plaintiffs participated in the § 363 sale. Perhaps they would have tried to identify some legal defect in the Sale Order, asked that economic losses or pre-closing accidents arising from the ignition switch defect be exempted from the "free and clear" provision, or requested greater priority in any GUC Trust distribution. But this uncertainty about the content of plaintiffs' objections is the natural result of the lack of any meaningful opportunity to be heard in the § 363 sale proceedings. *Cf. Lane Hollow*, 137 F.3d at 808 ("If there has been no fair day in court, the reliability of the result is irrelevant, because a fair day in court is how we assure the reliability of

App-48

results."). This lack of certainty in turn influences our degree of confidence in the outcome.

The bankruptcy court instead concluded that it would have reached the same decision—that it would have entered the Sale Order on the same terms— even if plaintiffs had been given an opportunity to be heard. The bankruptcy court concluded that these plaintiffs "offer no legally based arguments as to why they would have, or even *could* have, succeeded on the successor liability legal argument when all of the other objectors failed." *MLC II*, 529 B.R. at 567; *see GM*, 407 B.R. at 499-506 (considering objections). The bankruptcy court found that other arguments were too "speculative." *MLC II*, 529 B.R. at 567-68, 573.

We disagree. The bankruptcy court failed to recognize that the terms of this § 363 sale were not within its exclusive control. Instead, the GM sale was a negotiated deal with input from multiple parties— Old GM, New GM, Treasury, and other stakeholders. The Sale Order and Sale Agreement reflect this polycentric approach: it includes some fifteen sets of liabilities that New GM voluntarily, and without legal compulsion, took on as its own.

The process of how New GM voluntarily assumed liabilities is most apparent with its assumption of Lemon Law claims.[27] Following the proposed sale order, numerous state attorneys general objected that the proposed sale would bar claims based on state Lemon Laws. But their objections were not

---

[27] New GM informs the Court that a similar process occurred with respect to New GM accepting responsibility for post-closing accidents.

App-49

particularly *legal* in character—that is, no state attorney general focused on how a liability shield that barred Lemon Law claims would be illegal. Citing no law, the objection was that New GM *should* assume these liabilities "[i]n light of the relationship between [Old GM] and [New GM] . . . , as well as the statements by the United States government promising that all warranty obligations would be honored." Bankr. ECF No. 2043, at 39; *accord* Bankr. ECF No. 2076, at 10. In other words, because President Obama had promised to back warranties, the state attorneys general argued that that Lemon Laws should be honored as well.

Following these objections, "Lemon Law claims were added as an assumed liability during the course of the 363 Sale hearing after negotiation with the [state attorneys general]." *MLC II*, 529 B.R. at 534 n.36. The state attorneys general had made a practical, business-minded argument, which brought Old GM, New GM, and Treasury to the negotiating table. At the sale hearing, counsel to the National Association of Attorneys General commented that the state attorneys general "have worked very hard since the beginning of the case with debtors' counsel initially, with Treasury counsel, almost everybody in this room at some point or another." J. App. 2084. The result of these negotiations was an understanding that "lemon laws were covered under the notion of warranty claims" and inclusion in the Sale Agreement of language reflecting this agreement. *Id.* at 2086.

Opportunities to negotiate are difficult if not impossible to recreate. We do not know what would

App-50

have happened in 2009 if counsel representing plaintiffs with billions of dollars in claims had sat across the table from Old GM, New GM, and Treasury. Our lack of confidence, however, is not imputed on plaintiffs denied notice but instead bolsters a conclusion that enforcing the Sale Order would violate procedural due process. Indeed, for the following reasons, while we cannot say with any certainty that the outcome would have been different, we can say that the business circumstances at the time were such that plaintiffs could have had some negotiating leverage, and the opportunity to participate in the proceedings would have been meaningful.

First, it is well documented that one of the primary impetuses behind a quick § 363 sale was to "restore consumer confidence." *GM*, 407 B.R. at 480. "The problem is that if the 363 Transaction got off track . . . , the U.S. Government would see that there was no means of early exit for GM; . . . customer confidence would plummet; and . . . the U.S. Treasury would have to keep funding GM." *Id.* at 492. If consumer confidence dissipated, neither Treasury loans nor a § 363 sale could save GM: nobody would buy a GM car.

These concerns were reflected in President Obama's $600 million guarantee of GM and Chrysler warranties. The business of cars is unique, dependent largely on the goodwill of consumers. Cars are owned for years and form the cornerstones of quintessentially American activities: dropping off and picking up children from school, drive-ins and drive-thrus, family vacations and road trips. "[T]he

App-51

road and the automobile" are, in American history, "sanctuaries, hidden from the intrusive gaze of the state, [where] individuals live freely." Sarah Seo, *The New Public*, 125 Yale L.J. 1616, 1620 (2016). The safety and reliability of a car are central to these activities. As the head of President Obama's auto task force put it, in relation to Chrysler's bankruptcy: "what consumer would buy another Chrysler if the company didn't honor its warranties?" Rattner, *supra* note 8, at 181. In other words, plaintiffs could have tried to convince the bankruptcy parties that it made good business sense to spend substantial sums to preserve customer goodwill in the GM brand and, in turn, GM's business value.

Second, New GM was not a truly private corporation. Instead, the President and Treasury oversaw its affairs during the bailout and Treasury owned a majority stake following the bankruptcy. While private shareholders expect their investments to be profitable, the government does not necessarily share the same profit motive. Treasury injected hundreds of billions of dollars into the economy during the financial crisis, not on the expectation that it would make a reasonable rate of return but on the understanding that millions of Americans would be affected if the economy were to collapse. If the ignition switch defect were revealed in the course of bankruptcy, plaintiffs could have petitioned the government, as the majority owner of New GM, to consider how millions of faultless individuals with defective Old GM cars could be affected. Indeed, during the later congressional hearings, Representatives and Senators questioned New GM's CEO on her invocation of the liability shield when

App-52

the government guided the process. *See supra* note 13. Senator Richard Blumenthal, for instance, indicated that he would have objected in bankruptcy had he known, because he "opposed it at the time, as Attorney General for the state of Connecticut, not [foreseeing] that the material adverse fact being concealed was as gigantic as this one." April 2, 2014 Senate Hearing, *supra* note 13, at 22-23 (statement of Sen. Richard Blumenthal, Member, S. Subcomm. on Consumer Prot., Prod. Safety & Ins.).

Third, we must price in the real cost of disrupting the bankruptcy process. From the middle of 2007 through the first quarter of 2009, Old GM's average net loss exceeded $10 billion per quarter; a day's worth of delay would cost over $125 million, a week almost a billion dollars. We do not know whether the proceedings would have been delayed, but some delay was certainly possible. For instance, Congress called the GM CEO to testify over the course of four days.[28] Old GM likewise conducted a thorough internal investigation on the ignition switch defect, and the Valukas Report took more than two-and-a-half months to prepare. It seems unlikely that a bankruptcy court would have casually approved a "free and clear" provision while these investigations into the ignition switch defect's precise nature were still ongoing.

Finally, there is the detriment of added litigation—had the class actions been filed in the midst of bankruptcy, the mere administration of

---

[28] *See* Rattner, *supra* note 8, at 304 ("The auto rescue succeeded in no small part because we did not have to deal with Congress.").

App-53

those cases could have taken considerable resources. Had the government also brought criminal charges— such as the charges now suspended by a deferred prosecution agreement with the U.S. Attorney's Office for the Southern District of New York in which New GM forfeited $900 million—managing how to juggle bankruptcy with a criminal prosecution could have taken even longer. *United States v. $900,000,000 in U.S. Currency*, No. 15 Civ. 7342 (S.D.N.Y.), ECF No. 1; *see* 11 U.S.C. § 362(b)(1) (exempting from usual automatic stay criminal actions against debtor). The reasonable conclusion is that, with the likelihood and price of disruption to the bankruptcy proceedings being so high, plaintiffs at least had a basis for making business-minded arguments for why they should receive some accommodation in or carve-out from the Sale Order.

Under these circumstances, we cannot be confident that the Sale Order would have been negotiated and approved exactly as it was if Old GM had revealed the ignition switch defect in bankruptcy. The facts here were peculiar and are no doubt colored by the inadequate notice and plaintiffs' lack of *any* meaningful opportunity to be heard. *See Kotteakos*, 328 U.S. at 765 (directing courts to consider "all that happened without stripping the erroneous action from the whole"). Given the bankruptcy court's focus on consumer confidence, the involvement of Treasury, the financial stakes at the time, and all the business circumstances, there was a reasonable possibility that plaintiffs could have negotiated some relief from the Sale Order.

App-54

We address two further concerns. First, the bankruptcy court stated that it "would not have let GM go into the liquidation that would have resulted if [it] denied approval of the 363 Sale." *MLC II*, 529 B.R at 567; *see* J. App. 1623. In other words, the bankruptcy court suggested that it would have approved the § 363 sale anyway, because the alternative was liquidation—and liquidation would have been catastrophic. While we agree that liquidation would have been catastrophic, we are confident that Old GM, New GM, Treasury, and the bankruptcy court itself would have endeavored to address the ignition switch claims in the Sale Order if doing so was good for the GM business. The choice was not just between the Sale Order as issued and liquidation; accommodations could have been made.

Second, many of the peculiar facts discussed apply with less force to the Non-Ignition Switch Plaintiffs, who assert claims arising from other defects. The bankruptcy court entered judgment against the Non-Ignition Switch Plaintiffs based on its opinion determining the rights of the other plaintiffs, but left as an open question whether Old GM knew of the Non-Ignition Switch Plaintiffs' claims based in other defects. *See MLC III*, 531 B.R. at 360. Without factual findings relevant to determining knowledge, we have no basis for deciding whether notice was adequate let alone whether enforcement of the Sale Order would violate procedural due process as to these claims.

To conclude, we reverse the bankruptcy court's decision insofar as it enforced the Sale Order to

App-55

enjoin claims relating to the ignition switch defect.[29] *See MLC II*, 529 B.R. at 566-73. Because enforcing the Sale Order would violate procedural due process in these circumstances, the bankruptcy court erred in granting New GM's motion to enforce and these plaintiffs thus cannot be "bound by the terms of the [Sale] Order[]." *In re Johns-Manville Corp.*, 600 F.3d 135, 158 (2d Cir. 2010). As to claims based in non-ignition switch defects, we vacate the bankruptcy court's decision to enjoin those claims, *see MLC III*, 531 B.R. at 360, and remand for further proceedings consistent with this opinion.

## IV. Equitable Mootness

Finally, we address the bankruptcy court's decision that relief for any would-be claims against GUC Trust was equitably moot. *MLC II*, 529 B.R. at 583-92. We ordinarily review "dismissal on grounds of equitable mootness for abuse of discretion, under which we examine conclusions of law de novo and findings of fact for clear error." *In re BGI, Inc.*, 772 F.3d 102, 107 (2d Cir. 2014) (citation omitted). There were, however, no claims asserted against Old GM or GUC Trust in bankruptcy court or in the multi-district litigation. Under these circumstances, we exercise our "independent obligation" to ensure that the case "satisfies the 'case-or-controversy' requirement of Article III, Section 2 of the Constitution." *United States v. Williams*, 475 F.3d 468, 478-9 (2d Cir. 2007).

---

[29] In reversing, we express no views on the Groman Plaintiffs' request for discovery to prove a procedural due process violation or fraud on the court.

App-56

## A. Applicable Law

The doctrine of equitable mootness allows appellate courts to dismiss bankruptcy appeals "when, during the pendency of an appeal, events occur" such that "even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." *In re Chateaugay Corp.* ("*Chateaugay II*"), 988 F.2d 322, 325 (2d Cir. 1993). "[A] bankruptcy appeal is presumed equitably moot when the debtor's reorganization plan has been substantially consummated." *In re BGI*, 772 F.3d at 108. To obtain relief in these circumstances, a claimant must satisfy the so-called "*Chateaugay* factors." *See Chateaugay III*, 10 F.3d at 952-53.

The equitable mootness doctrine has enigmatic origins, and the range of proceedings in which it applies is not well settled. *See In re Continental Airlines*, 91 F.3d 553, 567 (3d Cir. 1996) (*en banc*) (Alito, *J.*, dissenting) (labeling it a "curious doctrine"). Our Circuit has acknowledged that the doctrine draws on "equitable considerations as well as the constitutional requirement that there be a case or controversy." *Chateaugay III*, 10 F.3d at 952. Other courts have focused instead on the doctrine's statutory underpinnings and role in "fill[ing] the interstices of the Code." *In re UNR Indus., Inc.*, 20 F.3d 766,769 (7th Cir. 1994) (explaining also difference between "*inability* to alter the outcome (real mootness) and *unwillingness* to alter the outcome ('equitable mootness')"). Indeed, several provisions of the Code prohibit modification of bankruptcy orders unless those orders are stayed pending appeal. *See, e.g.*, 11 U.S.C. §§ 363(m), 364(e).

App-57

However broad the doctrine of equitable mootness, Article III requires a case or controversy before relief may be equitably mooted.[30] "[E]quitable mootness bears only upon the proper *remedy*, and does not raise a threshold question of our power to rule." *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 144 (2d Cir. 2005) (emphasis added).

"The oldest and most consistent thread in the federal law of justiciability is that federal courts will not give advisory opinions." 13 Wright & Miller § 3529.1. A controversy that is "appropriate for judicial determination . . . must be definite and concrete, touching the legal relations of parties

---

[30] We do not resolve whether it is appropriate for a bankruptcy court—as opposed to an appellate court—to apply equitable mootness, which appears to be a recent phenomenon. *E.g.*, *In re Innovative Clinical Sols., Ltd.*, 302 B.R. 136, 141 (Bankr. D. Del. 2003) (citing *In re Circle K Corp.*, 171 B.R. 666, 669 (Bankr. D. Ariz. 1994), which nominally applied constitutional mootness); *see also* Alan M. Ahart, *The Limited Scope of Implied Powers of a Bankruptcy Judge: A Statutory Court of Bankruptcy, Not A Court of Equity,* 79 Am. Bankr. L.J. 1, 32-33 (2005) ("Since a bankruptcy court is not a court of equity, a bankruptcy judge ought not resort to non-statutory equitable principles, defenses, doctrines or remedies to excuse compliance with or to override provision(s) of the Bankruptcy Code or rules, or nonbankruptcy federal law."(footnotes omitted)). Indeed, this Circuit's equitable mootness cases have all involved an appellate body applying the doctrine in the first instance. *See, e.g.*, *BGI*, 772 F.3d 102; *In re Charter Commc'ns, Inc.*, 691 F.3d 476 (2d Cir. 2012); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005); *In re Burger Boys, Inc.*, 94 F.3d 755 (2d Cir. 1996); *In re Chateaugay Corp.*, 94 F.3d 772 (2d Cir. 1996); *In re Best Prods. Co.*, 68 F.3d 26 (2d Cir. 1995); *Chateaugay III*, 10 F.3d 944; *Chateaugay II*, 988 F.2d 322.

App-58

having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937); *see Flast v. Cohen*, 392 U.S. 83, 95 (1968) ("limit[ing] the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process"). "[F]ederal courts are without power to decide questions that cannot affect the rights of *litigants in the case before them.*" *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (emphasis added). That is, courts may not give "an opinion advising what the law would be upon a hypothetical state of facts," *Aetna Life Ins.*, 300 U.S. at 241, for instance, where a party did not "seek the adjudication of any adverse legal interests," *S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exch. Inc.*, 24 F.3d 427, 432 (2d Cir. 1994).

These limitations apply to bankruptcy courts. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1945 (2015) ("Bankruptcy courts hear matters solely on a district court's reference [and] possess no free-floating authority to decide claims traditionally heard by Article III courts."). In bankruptcy, moreover, the adjudication of claims may be subject to other preparatory steps. Bankruptcy courts will generally set a "bar date" that fixes the time to file a proof of claim against the bankruptcy estate. *See* Fed. R. Bankr. P. 3002(c)(3). If the bar date has passed, then the initial step for an individual seeking relief against the estate would be to seek permission to file a late proof of claim: only after permission is granted can that individual claim that she in entitled to relief. *See* Fed. R. Bankr. P. 9006(b)(1); *see also Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*, 507

App-59

U.S. 380, 394-95 (1993) (setting forth standard for "excusable neglect" for late claims under Rule 9006(b)(1)).

## B. Application

Here, the bankruptcy court held that any relief from GUC Trust would be equitably moot. But plaintiffs never sought relief form GUC Trust. The bankruptcy court's ruling on equitable mootness was therefore advisory.

Neither GUC Trust nor Old GM are parties to the multi-district litigation now ongoing in district court. Only one defendant is named: New GM. Likewise, as GUC Trust confirmed at oral argument, plaintiffs have not filed any proofs of claim with GUC Trust, nor have they even asked the bankruptcy court for permission to file late proofs of claim or to lift the bar date, as would be required before relief could be granted.[31]

Instead, it appears from the record that GUC Trust became involved at *New GM's* behest. New GM noted "well there is a GUC Trust" and suggested that because of the Sale Order's bar on successor liability, any claims remained with Old GM and thus GUC

---

[31] The bankruptcy court lifted the bar date for independent claims as a remedy. *See MLC II*, 529 B.R. at 583. We note, however, that neither the Groman Plaintiffs nor Ignition Switch Plaintiffs requested this as relief. The Ignition Switch Plaintiffs only mentioned in a footnote in their opposition to the motion to enforce that Old GM failed to provide notice of the bar date. The Pre-Closing Accident Plaintiffs stated on behalf of all plaintiffs that "Plaintiffs are not asserting a due process challenge to a bar date order or a discharge injunction issued in favor of a debtor." Bankr. ECF No. 13021, at 48 n.26.

App-60

Trust. J. App. 11038. But New GM has not sought to implead and bring cross-claims against GUC Trust in the multi-district litigation under Federal Rule of Civil Procedure 14 or to do the same in the Groman Plaintiffs' adversary proceeding in bankruptcy under Federal Rule of Bankruptcy Procedure 7014.

Moreover, GUC Trust has protested its involvement in the case. At a May 2, 2014 hearing, GUC Trust notified the bankruptcy court that it was "frankly [a] stranger[]" to these proceedings." *Id.* at 11093. This was, according to GUC Trust's uncontested representation, because:

> No claimants, none of the plaintiffs, no claimants or potential claimants had raised this as a possibility. No one has filed a motion to lift the bar date. The only person that has raised it has been New GM, based upon, you know, some statements of fact in some pleadings. But the only person that has actually moved forward with it is New GM, and frankly, you know, it's our view that this is essentially a way to deflect liability away, and you know, the attention away from New GM and put it on a third party.

*Id.* at 11090. At a July 2, 2014 hearing, GUC Trust continued to push that litigation of the equitable mootness issue was premature, and dependent on whether the Sale Order could be enforced. *Id.* at 8485.[32]

---

[32] The bankruptcy court seemingly agreed momentarily, commenting at the hearing that they could proceed "without now addressing and while maintaining reservations of rights

App-61

Nonetheless, the bankruptcy court asked the parties (including GUC Trust) to brief initially whether claims against New GM were really claims against Old GM's bankruptcy estate or GUC Trust. As the bankruptcy court stated: "we're going to consider as [a] threshold issue[] . . . the *possibility* that the claims now being asserted *may be* claims against Old GM or the GUC Trust." J. App. 11103 (emphases added). Following a later hearing, the bankruptcy court added an issue of whether claims, if any, against GUC Trust should be "disallowed/dismissed on grounds of equitable mootness." *Id.* at 5780.

GUC Trust was thus not a "litigant[] in the case before [the bankruptcy court]," *Rice*, 404 U.S. at 246, who "s[ought] the adjudication of any adverse legal interests," *S. Jackson & Son, Inc.*, 24 F.3d at 432. GUC Trust sought *not* to be involved, but the bankruptcy court ordered otherwise. In doing so, the bankruptcy court was concerned with a "hypothetical" scenario, *see Aetn*a *Life Ins.*, 300 U.S. at 241—the "possibility" that there "may be" late-filed claims against GUC Trust, J. App. 11103. The bankruptcy court's decision on equitable mootness that followed essentially advised on this hypothetical controversy.

We acknowledge that the parties have expended considerable time arguing about equitable mootness. We are likewise cognizant that plaintiffs at one point sent a letter to GUC Trust suggesting that it should

---

with respect to issues such as . . . equitable [moot]ness." *Id.* at 8491.

App-62

freeze its distributions pending the bankruptcy proceedings. *See MLC II*, 529 B.R. at 537-38. But plaintiffs did not pursue any claims. Ultimately, it is the *parties*, and not the court, that must create the controversy. *See Dep't of Envtl. Prot. & Energy v. Heldor Indus., Inc.*, 989 F.2d 702, 707 (3d Cir. 1993) (rendering advisory "an answer to a question not asked" by the parties).

We thus conclude that the bankruptcy court's decision on equitable mootness was advisory and vacate that decision. *See MLC II*, 529 B.R. at 583-92.

## CONCLUSION

For the reasons set forth above, with respect to the bankruptcy court's decisions below, we:

(1) AFFIRM the decision not to enforce the Sale Order as to the independent claims;

(2) REVERSE the decision to enforce the Sale Order as to the Used Car Purchasers' claims and claims relating to the ignition switch defect, including pre-closing accident claims and economic loss claims;

(3) VACATE the decision to enforce the Sale Order as to claims relating to other defects; and

(4) VACATE the decision on equitable mootness as advisory.

We REMAND the case for further proceedings consistent with this opinion.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit
[handwritten: signature]

App-63

*Appendix B*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————————————

Nos. 15-2844-bk(L), 15-2847-bk(XAP),
15-2848-bk(XAP)

————————————

IN RE MOTORS LIQUIDATION COMPANY,

*Debtor.*

————————————

CELESTINE ELLIOTT, LAWRENCE ELLIOTT,
BERENICE SUMMERVILLE,

*Creditors-Appellants-
Cross-Appellees,*

SESAY AND BLEDSOE PLAINTIFFS, IGNITION SWITCH
PLAINTIFFS, IGNITION SWITCH PRE-CLOSING ACCIDENT
PLAINTIFFS, DORIS POWLEDGE PHILLIPS,

*Appellants-Cross-
Appellees,*

GROMAN PLAINTIFFS,

*Appellants,*

v.

GENERAL MOTORS LLC,

*Appellee-Cross-
Appellant,*

WILMINGTON TRUST COMPANY,

*Trustee-Appellee-
Cross-Appellant,*

App-64

PARTICIPATING UNITHOLDERS,

*Creditors-Appellees-*
*Cross-Appellants.*

————————

On Appeal from the United States Bankruptcy Court
for the Southern District of New York

————————

Filed: September 14, 2016

————————

ORDER

————————

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 14th day of September, two thousand sixteen.

* * *

Appelle-Cross-Appellants, General Motors LLC, filed a petition for panel rehearing, or, in the alternative, for rehearing *en banc*. The panel that determined the appeal has considered the request for panel rehearing, and the active members of the Court have considered the request for rehearing *en banc*.

IT IS HEREBY ORDERED that the petition is denied.

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk

[handwritten: signature]

App-65

*Appendix C*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

————————

No. 09-50026 (REG)

————————

IN RE MOTORS LIQUIDATION COMPANY, et al.

f/k/a General Motors Corp., et al.

*Debtors.*

————————

Filed:  April 15, 2015

————————

DECISION ON MOTION TO ENFORCE SALE
ORDER

————————

ROBERT E. GERBER
United States Bankruptcy Judge:

### INTRODUCTION

In this contested matter in the chapter 11 case of Debtor Motors Liquidation Company, previously known as General Motors Corporation ("Old GM"), General Motors LLC ("New GM")—the acquirer of most of Old GM's assets in a section 363 sale back in July 2009—moves for an order enforcing provisions of the July 5, 2009 order (the "Sale Order") by which

App-66

this Court approved New GM's purchase of Old GM's assets.[1]

The Sale Order, filed in proposed form on the first day of Old GM's chapter 11 case with Old GM's motion for the sale's approval, was entered, in a slightly modified form, within a few hours after this Court issued its opinion approving the sale.[2] There were approximately 850 objections to the 363 Sale, the proposed Sale Order, or both. But the most serious were those relating to elements of the Sale Order ("Free and Clear Provisions"), discussed in more detail below, that provided that New GM would purchase Old GM's assets "free and clear" of successor liability claims. After lengthy analysis,[3] the Court overruled those objections.

In March 2014, New GM announced to the public, for the first time, serious defects in ignition switches that had been installed in Chevy Cobalts and HHRs, Pontiac G5s and Solstices, and Saturn Ions and Skys (the "Ignition Switch Defect"), going

---

[1] ECF No. 12620. New GM's motion has been referred to by New GM, the other parties, and the Court as the "Motion to Enforce."

[2] See *In re General Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009) (Gerber, J.) (the "*Sale Opinion* "), *stay pending appeal denied,* 2009 WL 2033079 (S.D.N.Y. Jul. 9, 2009) (Kaplan, J.) (the "*Stay Opinion*"), *appeal dismissed and aff'd sub nom Campbell v. General Motors Corp.*, 428 B.R. 43 (S.D.N.Y. 2010) (Buchwald, J.) ("*Affirmance Opinion #1*) and *Parker v. General Motors Corp.*, 430 B.R. 65 (S.D.N.Y. 2010) (Sweet, J.) ("*Affirmance Opinion #2*), *appeal dismissed*, No. 10-4882-bk (2d Cir. July 28, 2011) (*per curiam*, Jacobs, CJ, and Hall and Carney, JJ.), *cert. denied*, 132 S.Ct. 1023 (2012).

[3] See *Sale Opinion*, 407 B.R. at 499-506.

App-67

back to the 2005 model year. In the Spring of 2014 (though many have queried why Old GM and/or New GM failed to do so much sooner), New GM then issued a recall of the affected vehicles, under which New GM would replace the defective switches, and bear the costs for doing so.

New GM previously had agreed to assume responsibility for any accident claims involving post-sale deaths, personal injury, and property damage—which would include any that might have resulted from the Ignition Switch Defect. But New GM's announcement was almost immediately followed by the filing of about 60 class actions in courts around the United States, seeking compensatory damages, punitive damages, RICO damages and attorneys fees for *other* kinds of losses to consumers—"Economic Loss"—alleged to have resulted from the Ignition Switch Defect. The claims for Economic Loss include claims for alleged reduction in the resale value of affected cars, other economic loss (such as unpaid time off from work when getting an ignition switch replaced), and inconvenience. The Court has been informed that the number of class actions now pending against New GM—the great bulk of which were brought by or on behalf of individuals claiming Economic Loss ("Economic Loss Plaintiffs")—now exceeds 140. Though the amount sought by Economic Loss Plaintiffs is for the most part unliquidated, it has been described as from $7 to $10 billion. Most of those actions ("Ignition Switch Actions") are now being jointly administered, for pretrial purposes, in a multi-district proceeding before the Hon. Jesse Furman, U.S.D.J., in the Southern District of New York (the "MDL Court").

App-68

New GM here seeks to enforce the Sale Order's provisions, quoted below, blocking economic loss lawsuits against New GM on claims involving vehicles and parts manufactured by Old GM.[4] New GM argues that while it had voluntarily undertaken, under the Sale Order, to take on an array of Old GM liabilities (for the post-sale accidents involving both Old GM and New GM vehicles just described; under the express warranty on the sale of any Old GM or New GM vehicle (the "Glove Box Warranty"); to satisfy statutory recall obligations with respect to Old GM and New GM vehicles alike; and under Lemon Laws, again with respect to Old GM and New GM vehicles alike), the Sale Order blocked any others—including those in these suits for Economic Loss.

The Sale Order, as discussed below, plainly so provides. But as to 70 million Old GM cars whose owners had not been in accidents of which they'd advised Old GM, the Sale Order was entered with notice only by publication. And those owning cars with Ignition Switch Defects (again, those who had

---

[4] There may be misunderstandings as to the matters now before the Court. New GM has already undertaken to satisfy claims for death, personal injury, and property damage in accidents occurring after the 363 Sale—involving vehicles manufactured by New GM and Old GM alike. Except for the *pre*-Sale accidents that are the subject of the Pre-Closing Accident Plaintiffs' contentions, addressed below (where those plaintiffs wish to sue New GM in lieu of Old GM), this controversy does not involve death, personal injury, or property damage arising in accidents. Instead it involves only *economic losses* allegedly sustained with respect to Old GM vehicles or parts.

App-69

not been in accidents known to Old GM)—an estimated 27 million in number—were given neither individual mailed notice of the 363 Sale, nor mailed notice of the opportunity to file claims for any losses they allegedly suffered. And more importantly, from the perspective of these car owners, they were not given *recall notices* which (in addition to facilitating switch replacement before accidents took place), they contend were essential to enabling them to respond to the published notices to object to the 363 Sale or to file claims.

Then, after New GM filed the Motion to Enforce, two other categories of Plaintiffs came into the picture. One was another group of Ignition Switch Defect plaintiffs (the "Pre-Closing Accident Plaintiffs") who (unlike the Economic Loss Plaintiffs) are suing with respect to actual accidents. But because those accidents involved Old GM and took place *before* the 363 Sale Closing—and taking on pre-closing accident liability was not commercially necessary to New GM's future success—they were not among the accidents involving Old GM vehicles for which New GM agreed to assume responsibility. The Pre-Closing Accident Plaintiffs have (or at least had) the right to assert claims against Old GM (the only entity that was in existence at the time their accidents took place), but they nevertheless wish to proceed against New GM. New GM brought a second motion to enforce the Sale Order[5] with respect to the Pre-Closing Accident Plaintiffs, and issues with respect to this Plaintiff group were heard in tandem with the Motion to Enforce.

---

[5] ECF No. 12807.

App-70

The other category of Plaintiffs later coming into the picture ("Non-Ignition Switch Plaintiffs") brought actions asserting Economic Loss claims as to GM branded cars that *did not have* Ignition Switch Defects, including cars made by New GM and Old GM alike. In fact, most of their cars did not have defects, and/or were not the subject of recalls, at all. But they contend, in substance, that the Ignition Switch Defect caused damage to "the brand,"[6] resulting in Economic Loss to them. New GM brought still another motion[7] to enforce the Sale Order with respect to them, though this third motion

---

[6] *See* Day 1 Arg. Tr. at 137:4-138:16, Feb. 17, 2015 ("[PL. COUNSEL]: The revelation of New GM's extensive deceptions tarnished the brand further . . . They allege that new GM concealed and suppressed material facts about the quality of its vehicle and the GM brand."); Day 2 Arg. Tr. at 61:16-62:5, Feb. 18. 2015 ("THE COURT: I thought I heard arguments from either you or Mr. Esserman or both, that the contention being made on the Plaintiffs' side is that the failure to deal with the ignition switches damaged the GM brand, and is some Court of competent jurisdiction then going to hear an argument that there are 70 million vehicles that lost value and not just the 27 million that are the subject of the recalls, or the lesser 13 million to which you just made reference? [PL. COUNSEL]: I'm not counsel of record there, but I guess I would be surprised if the Plaintiffs in those actions aren't likewise looking for recompense for the people without ignition switch defects in their car, on the theory, which may or may not be upheld by Judge Furman . . . as giving rise to cognizable claims and causes of action.") Though not mentioned by Plaintiffs' counsel then, those claims were made with respect to cars made by Old GM, *see, e.g.,* Consolidated Amended Complaint for Post-Sale Vehicles ¶¶ 820-825, and thus were violative of the Sale Order, to the extent it remains enforceable.

[7] ECF No. 12808.

App-71

has been deferred pending the determination of the issues here.

In this Court, the first two groups of Plaintiffs, whose issues the Court could consider on a common set of stipulated facts and is in major respects considering together,[8] contend that by reason of Old GM's failure to send out recall notices, they never learned of the Ignition Switch Defect, and that the Sale Order is unenforceable against them.

## SUMMARY OF CONCLUSIONS

New GM is right when it says that most of the claims now asserted against it are proscribed under the Sale Order. But that is only the start, and not the end, of the relevant inquiry. And assuming, as the Plaintiffs argue, that Old GM's and then New GM's delay in announcing the Ignition Switch Defect to the driving public was unforgiveable, that too is only the start, and not the end of the relevant inquiry.

The real issues before the Court involve questions of procedural due process, and what to do about it if due process is denied: (1) what notice was

---

[8] When they can be referred to together, they are collectively referred to as the "Plaintiffs." Their bankruptcy counsel, retained and then designated to act for the large number of plaintiffs whose counsel at least generally litigate tort matters, rather than bankruptcy issues, have been referred to as "Designated Counsel." As the two groups of Plaintiffs' circumstances overlap in part and diverge in part, one brief was filed by Designated Counsel for Economic Loss Plaintiffs, and another by Designated Counsel for Pre-Closing Accident Plaintiffs—with the latter relying on the former's brief with respect to overlapping themes. References to "Pl. Br." are thus to the main brief filed by the Economic Loss Plaintiffs' Designated Counsel.

App-72

sufficient; (2) to what extent an assertedly aggrieved individual's lack of prejudice from insufficient notice matters; (3) what remedies are appropriate for any due process denial; and (4) to what extent sale orders can be modified after the fact at the expense of those who purchased assets from an estate on the expectation that the sale orders would be enforced in accordance with their terms. They also involve the needs and concerns of Old GM creditors whose claims are pending, and of holders of units of the Old GM General Unsecured Creditors Trust ("GUC Trust"), formed for the benefit of unsecured creditors when Old GM confirmed its liquidating plan of reorganization (the "Plan")—all of whom would be prejudiced if Old GM's remaining assets were tapped to satisfy an additional $7 to $10 billion in claims.

For the reasons discussed at length below, the Court concludes:

### 1. Due Process

Notice must be provided in bankruptcy cases, as in plenary litigation, that is "reasonably calculated, under all the circumstances" to apprise people of the pendency of any proceeding that may result in their being deprived of any property, and to "afford them an opportunity to present their objections."[9] The Second Circuit, like many other courts, has held that "the Due Process Clause requires the best notice practical under the circumstances."[10] But "actual"

---

[9] *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("*Mullane*") (citations omitted).

[10] *In re Drexel Burnham Lambert Grp.*, 995 F.2d 1138, 1144 (2d Cir. 1993) ("*Drexel Burnham*"). The *Drexel Burnham* chapter 11 case generated several opinions relevant to this

App-73

(*i.e.*, personalized) notice is required for "known" creditors—those whose names and addresses are "reasonably ascertainable."[11] "Constructive" notice (typically provided by publication) can be used when it is the best notice practical under the circumstances. But publication notice, as a substitute for actual notice, at least normally is insufficient for "known" creditors.

In the bankruptcy context, those general principles apply to both the notice required incident to sale approval motions, on the one hand, and to claims allowance, on the other. And in this case, the Court ultimately reaches largely the same conclusions with respect to each. But the different circumstances applicable to the sale process (to be completed before a grievously bleeding Old GM ran out of money) and the claims process (which lacked comparable urgency) cause the Court to reach those conclusions in different ways.

(a) Notice Before Entry of Sale Order

The Court disagrees with New GM's contention that imposing free and clear provisions doesn't result in a potential deprivation of property, and thus concludes that due process requirements apply. But the caselaw—in plenary litigation and in bankruptcy cases alike—permits, and indeed requires, consideration of practicality.

---

controversy. The Court has given another of them a different shorthand name to help tell it apart. *See* n.105 below.

[11] *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 800 (1983) ("*Mennonite Board*").

App-74

There was extraordinary urgency in connection with the 363 Sale. In June 2009, Old GM was bleeding cash at an extraordinary rate. And U.S. and Canadian governmental authorities, who had agreed to provide cash to keep Old GM alive until the closing of a 363 sale, had conditioned their willingness to continue the necessary funding on the approval of the 363 Sale by July 10, 2009, only 40 days after the chapter 11 filing.

Given that urgency, with the sale hearing to commence 29 days after the Petition Date; objections due 18 days after the Petition Date; and 70 million Old GM vehicles on the road, notice by publication to vehicle owners was obviously proper. Indeed, it was essential. It would be wholly unreasonable to expect actual notice of the 363 Sale hearing then to have been mailed to the owners of the 70 million GM cars on the road at the time, or even the 27 million whose cars were then (or later became) the subject of pending recalls. Though notice by publication would at least normally also be acceptable in instances involving considerably smaller bodies of creditors, this is exactly the kind of situation for which notice by publication is the norm. Under normal circumstances, notice by publication would easily be sufficient under *Mullane, Drexel Burnham,* and their respective progeny.

But the Court must also determine whether the knowledge of many Old GM personnel of the Ignition Switch Defect removes this case from the general rule. While there is no indication on this record, if there ever will be, that Old GM's bankruptcy counsel knew of the need to focus on notice to owners of cars

App-75

with Ignition Switch Defects, at least 24 business and in-house legal personnel at Old GM were aware of the problem. As of June 2009, when entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required, under the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), to send out mailed recall notices to owners of affected Old GM vehicles. And Old GM knew to whom it had to mail the recall notices, and had addresses for them.

The adequacy of notice issue is nevertheless close, however, because while Old GM had a known recall obligation, and knew the names and addresses of those owning the vehicles that were affected, Old GM gave *actual* notice of the 363 Sale to anyone who had previously asserted a claim against it for injury or death—by reason of Ignition Switch Defects or otherwise. And only a subset (and, possibly a small subset) of the others who were entitled to Ignition Switch Defect recall notices would later turn out to have been injured, killed, or economically damaged as a result of the circumstances that led to the recall, or want to object to the 363 Sale or any of its terms. That *some* of them would be killed or injured was known; *who they would be* was not.

But on balance the Court believes that the distinction is insufficient to be meaningful. The known safety hazard that engendered the unsatisfied recall obligations gave rise to claims associated with the repair (and assertedly, though this is yet to be decided, decreases in value) of the cars and would give rise to more claims if car occupants were killed or injured as a result. Old GM knew—even if it knew

App-76

the particular identities of only *some* cars that had been in Ignition Switch Defect accidents—that the defect had caused accidents; that is exactly why this particular recall was required. And Old GM also knew, from the same facts that caused it to be on notice of the need for the recall, that *others*, in the future, would be in accidents as well.

The publication notice here given, which otherwise would have been perfectly satisfactory (especially given the time exigencies), was not by itself enough for those whose cars had Ignition Switch Defects—because from Old GM's perspective, the facts that gave rise to its recall obligation resulted in "known" claims, as that expression is used in due process jurisprudence. Because owners of cars with Ignition Switch Defects received neither the notice required under the Safety Act nor any reasonable substitute (either of which, if given before Old GM's chapter 11 filing, could have been followed by the otherwise satisfactory post-filing notice by publication), they were denied the notice that due process requires.

(b) Notice Before Expungement of Claims

By contrast to the 363 Sale, there was no particular urgency with respect to the allowance of claims. Claims could be (and ultimately were) considered in a less hurried fashion. And while notice only by publication to 70 million (or even 27 million) vehicle owners not known by Old GM to have been in accidents would be the norm for the claims process as well (and notice by publication, applicable in this respect and others, is what this Court then approved), the fact is that even at the later times set

App-77

as deadlines for the filing of claims, Old GM still had not sent out notice of the recall, and Old GM car owners were still unaware of any resulting potential claims.

In the claims allowance respect too, the Court concludes that Old GM's knowledge of facts sufficient to justify notice of a recall, and its failure to provide the recall notice, effectively resulted in a denial of the notice due process requires.

### (c) Requirement for Prejudice

Though the Court has found failures, insofar as the Plaintiffs are concerned, to provide the notice that due process requires, that does not by itself mean that they have established a due process violation. The Court categorically rejects the Plaintiffs' contention that prejudice is irrelevant. Rather, in order to establish a due process violation, they must demonstrate that they have sustained prejudice as a result of the allegedly insufficient notice.[12]

In some instances, a lack of notice plainly results in prejudice, as in instances in which the earlier judicial action cannot be undone. In others, it does not—and it can be cured by providing the opportunity to be heard at a later time, and, where the law permits and requires, vacating or modifying the earlier order, or exempting parties from the order's effect. In every case, however, a denial of notice need not result in an automatic win for the party that failed to get appropriate notice the first

---

[12] *Perry v. Blum*, 629 F.3d 1, 17 (1st Cir. 2010); *accord* all of the other cases cited in nn.162 through 164 *infra*.

App-78

time around. Instead that party should get the full
and fair hearing it was initially denied, with the
Court then focusing on the extent to which prejudice
actually resulted—and, of course, on achieving the
right outcome on the merits, which in a perfect world
would have been reached the first time.[13]

Both groups of Plaintiffs were plainly prejudiced
with respect to the bar date for filing claims. But the
Pre-Closing Accident Plaintiffs were not prejudiced
at all, and the Economic Loss Plaintiffs were
prejudiced only in part, by the failure to give them
the requisite notice in connection with the 363 Sale.
Neither the Economic Loss Plaintiffs nor the Pre-
Closing Sale Plaintiffs were prejudiced with respect
to the Sale Order's Free and Clear Provisions. Back
in 2009, the Court heard many others make the same
arguments, and rejected them. The Court now has
heard from both the Economic Loss Plaintiffs and
Pre-Closing Accident Plaintiffs with respect to the
Free and Clear Provisions and successor liability,
with full and fair opportunity to be heard. And
neither Plaintiff group has advanced any arguments
on successor liability that were not previously made,
and made exceedingly well before. Their principal
contention—that they would have won by reason of
public outrage, political pressure, or the U.S.
Treasury's anger with Old GM, when they would not

---

[13] That was referred to in oral argument here, initially by the
Court, as a "do-over." In many, if not most, instances, that will
be required, but in many, if not most, cases that will also be
sufficient. What is critical, however it is accomplished, is that
the Court gauge in a non-speculative fashion whether (and how)
the outcome might have been different if the requisite notice
had been provided.

App-79

have won in the courtroom—is the very speculation that they rightfully criticize. Thus insofar as successor liability is concerned, while the Plaintiffs established a failure to provide them with the notice due process requires, they did not establish a due process violation. The Free and Clear Provisions stand.[14]

But the Economic Loss Plaintiffs were prejudiced in one respect. Nobody else had argued a point that they argue now: that the proposed Sale Order was overly broad, and that it should have allowed them to assert claims involving Old GM vehicles and parts so long as they were basing their claims *solely on New GM conduct*, and not based on any kind of successor liability or any other act by Old GM. If the Economic Loss Plaintiffs had made that argument back in 2009, the Court would have agreed with them. And by contrast to their predictions as to possible results of public outrage, this is not at all speculative, since the Court had ruled on closely similar issues before, seven years earlier, and, indeed, again in that very same *Sale Opinion*. Here, by contrast, the failure to provide the notice that due process requires was coupled with resulting prejudice. The Economic Loss Plaintiffs were not furnished the opportunity to make the overbreadth argument back in 2009, and in that respect they were prejudiced. The failure to be heard

---

[14] They also stand with respect to a subset of Economic Loss Plaintiffs (the "Used Car Purchasers") who acquired cars manufactured by Old GM in the aftermarket after the 363 Sale (*e.g.*, from their original owners, or used car dealers). They too were not prejudiced by the inability to make successor liability arguments that others made, and, in addition, they can have no greater rights than the original owners of their cars had.

App-80

on this latter argument necessarily must be viewed as having affected the earlier result.

Thus, with respect to Sale Order overbreadth, the Economic Loss Plaintiffs suffered a denial of due process, requiring the Court to then turn to the appropriate remedy.

## 2. Remedies

As noted above, the Court has rejected the Plaintiffs' contention that prejudice is irrelevant to a claim for denial of due process. And it has likewise rejected the notion that the denial of the notice that due process requires means that the Plaintiffs should automatically win. But to the extent they were prejudiced (and the Court has determined that the Economic Loss Plaintiffs *were* prejudiced with respect to Sale Order overbreadth), they deserve a remedy tailored to the prejudice they suffered, to the extent the law permits.

The Court rejects, for reasons discussed below, New GM's contention that the principles under which property is sold free and clear of liens, with the liens to attach instead to sale proceeds, apply universally to interests other than liens—as relevant here, interests permitting the assertion of successor liability. But New GM's next several points—that purchasers of assets acquire property rights too, and that taking away purchasers' contractually bargained-for rights strikes at the heart of understandings critically important to the bankruptcy system—have great merit. They have so much merit, in fact, that were it not for the fact that the Plaintiffs' claim is a constitutional one, the Court would not deny enforcement of the Sale Order, in

App-81

whole or in part. There is no good reason to give creditors asserting successor liability claims recovery rights greater than those of other creditors. And as importantly or more so, the interests inherent in the enforceability of 363 orders (on which the buyers of assets should justifiably be able to rely, and on which the interests of creditors, keenly interested in the maximization of estate value, likewise rest) are hugely important.

But the Court concludes that remedying a constitutional violation must trump those concerns. Decisions of the Second Circuit and other courts hold, or suggest (with little in the way of countervailing authority), that with or without reliance on Fed.R.Civ.P. 60(b), lower courts may—and should—deny enforcement, against those who were prejudiced thereby, of even cherry-picked components of sale orders that have been entered with denials of due process. Those cases make clear that it is not necessary for a court to invalidate the sale order in full. That is so whether or not the Court declares the order, or part of it, to be "void." And if the order can be declared to be void (or if it can be selectively enforced, to avoid enforcing it against one denied due process), provisions in the order providing that it is nonseverable fall as well.

In the absence of a constitutional violation, the Court suspects that the power to deny full enforcement of a sale order (assuming that such is even permissible) will rarely, if ever, be invoked. The principles underlying the finality of 363 sale orders are much too important. But in cases where a sale order can be declared to be void (and orders entered

App-82

without due process are subject to such a consequence), sale orders may be modified, or selectively enforced, as well.

### 3. Assumed Liabilities

In light of the Court's conclusions, summarized above, New GM's concerns as to the limited liabilities that New GM assumed are not as significant as they might otherwise have been. New GM is right that it expressly declined to assume any liabilities based on Old GM's wrongful conduct, and that these were "retained liabilities" to be satisfied by Old GM. But the Court's ruling that it will continue to enforce prohibitions against successor liability makes New GM's concerns as to that academic. And to the extent, if any, that New GM might be liable on claims based solely on any wrongful conduct on its own part (and in no way relying on wrongful conduct by Old GM), New GM would have such liability not because it had assumed any Old GM liabilities, or was responsible for anything wrong that Old GM did, but only because it had engaged in independently wrongful, and otherwise actionable, conduct on its own.

But it is plain that to the extent the Plaintiffs seek to impose successor liability, or to rely, in suits against New GM, on any wrongful conduct by Old GM, these are actually claims against Old GM, and not New GM. It also is plain that any court analyzing claims that are supposedly against New GM only must be extraordinarily careful to ensure that they are not in substance successor liability claims,

App-83

"dressed up to look like something else."[15] Claims premised in any way on Old GM conduct are properly proscribed under the Sale Agreement and the Sale Order, and by reason of the Court's other rulings, the prohibitions against the assertion of such claims stand.

### 4. Equitable Mootness

Because the successor liability claims start by being claims against Old GM, the Court also must consider the GUC Trust's concerns as to Equitable Mootness. The Court recognizes that mootness concerns will materially, if not entirely, impair the Plaintiffs' ability to collect on any allowed claims against Old GM (or more precisely, the GUC Trust) that they otherwise might have. But nevertheless, the Court concludes, contrary to its original instincts at the outset of this controversy, that the GUC Trust is right in its mootness contentions, and that the rights of GUC Trust beneficiaries cannot be impaired at this late time.

Mootness doctrine already made a return of past distributions from all of Old GM's many thousands of creditors unthinkable. But the Court, being mindful of the Second Circuit's holdings that mootness doctrine does not foreclose relief where *some* meaningful relief can be fashioned, originally thought that mootness concerns would not foreclose at least some relief—such as permitting the late filing of claims, and thereby permitting Economic

---

[15] *Burton v. Chrysler Grp., LLC* (*In re Old Carco*), 492 B.R. 392, 405 (Bankr. S.D.N.Y. 2013) (Bernstein, C.J.) ("*Old Carco*").

App-84

Loss Plaintiffs to share in assets remaining in the GUC Trust. In the course of subsequent briefing, however, the GUC Trust and its unit holders (the "Unitholders") pointed out (along with other reasons for denial of relief) that granting relief now to the Plaintiffs would require not just the allowance of late claims (which by itself would be acceptable), but also *the modification of the confirmation order*—and with it, impairment of the rights of the Unitholders, especially those who acquired those units in post-confirmation trading. Though late claims filed by the Plaintiffs might still be allowed, assets transferred to the GUC Trust under the Plan could not now be tapped to pay them. Under the mootness standards laid down by the Second Circuit in its leading decisions in the area,[16] GUC Trust Unitholders must be protected from a modification of the Plan.

### 5. Fraud on the Court

Believing that rulings now might expedite or moot further litigation down the road, the Court also undertook to rule on the legal standards applicable to litigation over whether, in connection with the entry of the Sale Order, there might have been a fraud on the Court. Though they become less important for reasons discussed below, the Court provides them in Section V.

---

[16] *See Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.)*, 988 F.2d 322 (2d Cir. 1993) ("*Chateaugay I*"); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944 (2d Cir. 1993) ("*Chateaugay II*); *Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.)*, 772 F.3d 102 (2d Cir. 2014) ("*BGI*").

App-85

Of the standards for establishing fraud on the Court, discussed below, three are particularly relevant here. One is that fraud on the court requires action that does or attempts to defile the *court itself*. Another, related to the first, is that establishing a fraud on the Court requires defrauding the *court*, as contrasted to a non-judicial victim (such as a vehicle owner). A third is because it involves an effect on the Court (as contrasted to any injured third parties), it turns on the knowledge and intent of *those actually interfacing with the Court*. In each of those respects, and its application otherwise, establishing a fraud on the Court requires a knowing and purposeful effort to subvert the judicial process.

### 6. Certification to the Circuit

The issues here are important, difficult, and involve the application of often conflicting authority. Their prompt determination will affect further proceedings not just in this Court, but also the MDL Court. The Court believes that it should certify its judgment for direct review by the Circuit.

### FACTS[17]

### 1. Background

In late 2008 and the first half of 2009, Old GM— then the only "GM"—was in extremis. As the Court found in the *Sale Opinion*, Old GM had suffered a steep erosion in revenues, significant operating

---

[17] The Court asked the parties to agree on stipulated facts, and they did so. By analogy to motions for summary judgment, the Court has relied only on undisputed facts. To avoid lengthening this Decision further, the Court has limited its citations to quotations and the most important matters.

App-86

losses, and a dramatic loss of liquidity, putting its future in grave jeopardy. It was bleeding cash at an extraordinary rate.

Old GM was assisted in December 2008 by an emergency infusion of cash by the Bush administration, and then again, in January and February 2009, by two more emergency infusions of cash by the Obama administration. But the latter declared that its financial support would last for only a limited period of time, and that Old GM would have to address its problems as a matter of great urgency.

In March 2009, the U.S. Treasury ("Treasury"), whose Presidential Task Force on the Auto Industry ("Auto Task Force") was quarterbacking the rescue effort, gave Old GM 60 days to submit a viable restructuring plan. Failure to accomplish that would force Old GM to liquidate. But Old GM was unable to achieve an out-of-court restructuring. It quickly became obvious that Old GM's only viable option was to file a chapter 11 case and to sell its assets through a 363 Sale, shed of the great bulk of its prepetition liabilities. The acquirer ultimately became New GM.

The urgency at the time is apparent. The cash bleeding was brutal; Old GM suffered negative cash flow of $9.4 billion in the first quarter of 2009 alone.[18] Without a very quick end to the bleeding, Old GM would plunge into liquidation. Apart from the loss to Old GM's creditors, Old GM's liquidation would result in the loss of over 200,000 jobs at Old GM alone, and grievous loss to the approximately 11,500 vendors, with more than 500,000 workers, in

---

[18] *Sale Opinion*, 407 B.R. at 476, 479.

App-87

the Supplier Chain.[19] Liquidation would also result in virtually no recovery for any of Old GM's prepetition creditors—including Pre-Closing Accident Plaintiffs and Economic Loss Plaintiffs before the Court now.

### 2. Chapter 11 Filing

On June 1, 2009 (the "Petition Date")—40 days prior to the deadline imposed under the critical DIP Financing—Old GM and three affiliates commenced these now jointly administered chapter 11 cases before this Court. That same day, Old GM filed the motion (the "Sale Motion") for authority to engage in the required 363 Sale.

### 3. The Sale Motion and Notice Order

In its Sale Motion, GM asked the Court to authorize the 363 Sale "free and clear of all other 'liens, claims, encumbrances and other interests,' including, specifically, 'all successor liability claims.'"

Specifically, GM submitted a proposed order to the Court (the "Proposed Sale Order") containing provisions directed at cutting off successor liability except in the respects where successor liability was contractually assumed. As the Court noted in 2009, the Proposed Sale Order would effectuate a free and clear sale through a double-barreled approach:

---

[19] *Id.* at 476, 477 n.6. The Supplier Chain is the body of vendors that supply parts and subassemblies that go into the vehicles that are manufactured by the U.S. Big Three—GM, Chrysler, and Ford—and many of their foreign counterparts, at least those that manufacture vehicles in the U.S. The Court learned, in connection with the 363 Sale Hearing back in 2009, that the majority of the value that would go into a GM vehicle would in fact have come from the Supplier Chain.

App-88

First, the Proposed Sale Order contains a finding—and a decretal provision to similar effect—that the Debtors may sell the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

Second, the Proposed Sale Order would enjoin all persons (including "litigation claimants") holding liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, from asserting them against New GM or the Purchased Assets.[20]

Along with its submission of the Proposed Sale Order, GM moved for court approval of the sale procedures, and for an order fixing and approving the form and manner of notice. After hearing argument on the motion, the Court approved the sale procedures, and the next day entered an order laying out the procedures for the upcoming 363 Sale (the "Sale Procedures Order").

4. Notice of the Sale

As relevant here, the Sale Procedures Order provided for *actual* notice to 25 categories of persons and entities, including, among many others, all parties who were known to have asserted any lien, claim, encumbrance, or interest in or on the Purchased Assets; all vehicle owners involved in

---

[20] *Sale Opinion*, 407 B.R. at 483 (internal citations omitted).

App-89

actual litigation with Old GM (or, who though not yet involved in actual litigation, had asserted claims or otherwise threatened to sue); and all other known creditors.[21]

And the Sale Procedures Order additionally provided for constructive notice, by publication, in the *Wall Street Journal* (global edition); *New York Times* (national edition); *Financial Times* (global edition); *USA Today* (national edition); *Detroit Free Press*; *Detroit News*; in the Canadian *Le Journal de Montreal*, *Montreal Gazette*, *The Globe and Mail,* and *The National Post*; and on the website of Old GM's noticing agent, The Garden City Group.[22]

The notice of hearing on the proposed 363 Sale ("Sale Notice") provided the general terms of the sale, including the date and location at which the sale was to occur, and instructions for those wishing to object or otherwise respond. The Sale Notice did not, however, attempt to describe the claims any recipient might have against Old GM, or any bases for objections to the sale or Proposed Sale Order that any notice recipient might wish to assert.

### 5. Objections to Free and Clear Provisions

Many of the 850 parties objecting to the Sale Motion made limited objections—not opposing the 363 Sale or its timing as such, but objecting instead to provisions in the Proposed Sale Order. They argued that New GM should assume certain kinds of

---

[21] *See* Sale Procedures Order ¶¶ 9(a)(i) through (xxv), 9(b)(i) through (ii) (ECF No. 274).

[22] *See id.*  ¶ 9(e); *see also* New GM Stipulations of Fact ¶¶ 22-23 (ECF No. 12826-2).

App-90

claims; that the Free and Clear Provisions limiting successor liability were improper; or both. More specifically:

(a) Many of the states' Attorneys General ("AGs"), assisted in significant part by an attorney with the National Association of Attorneys' General well known for her expertise in the interplay between bankruptcy law and states' regulatory needs and concerns, argued that New GM should assume consumer claims for implied, express, and statutory warranties.[23]

(b) Old GM's Official Committee of Unsecured Creditors (the "Creditors' Committee"), representing unsecured creditors of all types (including tort plaintiffs and other vehicle owners), objected to the Proposed Sale Order because (as the Creditors' Committee well understood) it would cut off state law successor liability and limit any current or future claimants to recovery from the assets "left behind in the old company."[24]

(c) The Ad Hoc Committee of Consumer Victims (the "Consumer Victims Committee"); attorneys for individual accident litigants (the "Individual Accident Litigants"); attorneys for asbestos victim litigants (the "Asbestos Litigants"); and the Center for Auto Safety, Consumer Action, Consumers for Auto Reliability and Safety, National Association of Consumer Advocates, and Public Citizen (collectively, the "Consumer Organizations," and, together with the others, the "Successor Liability Objectors")

---

[23] *See* AGs Objections, ECF Nos. 1926 and 2043.

[24] Creditors' Committee Objection at 3 (ECF No. 2362).

App-91

likewise argued that Old GM could not sell its assets free and clear of any rights or claims based on successor or transferee liability.[25]

The Successor Liability Objectors argued that shedding potential successor liability was not permitted under Bankruptcy Code section 363(f). They further argued that section 363(f) "authorize[d] the sale of property free and clear only of 'interests in' property to be sold, not *in personam* claims against the Purchaser under theories of successor liability."[26] They further argued that the Court "lack[ed] jurisdiction to enjoin actions between non-debtor product liability claimants and the Purchaser post-closing since resolution of these claims [would] not affect the Debtors' estates."[27] And they argued that the Free and Clear Provisions would violate due process—asserting that individuals who might have future claims for injuries "cannot have received meaningful notice that the bankruptcy proceeding was resolving their rights or a meaningful opportunity to protect those rights, which otherwise might allow a state law cause of action for their injuries."[28]

In the *Sale Opinion*, the Court considered, but ultimately rejected, those contentions and similar ones. Relying on, among other things, the then recent

---

[25] *See* Successor Liability Objectors' Limited Obj. (ECF No. 2041).

[26] Successor Liability Objectors' Mem. of Law at 2 (ECF No. 2050).

[27] *Id.*

[28] *Id.*

App-92

opinions by the Bankruptcy Court in *Chrysler*[29] (which had recently issued its own sale order with free and clear provisions); of the Second Circuit (which, three weeks before the Old GM 363 Sale hearing, affirmed the *Chrysler* decision for "substantially the same reasons articulated by the bankruptcy court"[30]); and earlier authority,[31] this

---

[29] *See In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009) (" *Chrysler* "), (Gonzalez, CJ.), *aff'd for substantially the reasons stated in the opinions below,* No. 09-2311-bk (2d Cir. Jun. 5, 2009) ("*Chrysler Circuit Order* "), *temporary stay vacated and further stay denied*, 556 U.S. 960 (June 9, 2009), *Circuit written opinion issued*, 576 F.3d 108 (2d Cir. Aug. 5, 2009) ("*Chrysler Circuit Opinion*")*, judgment vacated and case remanded with instructions to dismiss appeal as moot*, 558 U.S. 1087 (Dec. 14, 2009).

[30] *See Chrysler Circuit Order.* The Circuit first issued a short written order, affirming for "substantially the reasons articulated by the Bankruptcy Court," *id.*, and advising that its order would be followed by a written order more fully explaining the Circuit's ruling. The Circuit thereafter issued a lengthy opinion explaining its earlier ruling in great detail. *See Chrysler Circuit Opinion.* But about four months later, the Circuit's "judgment" was vacated by the United States Supreme Court with directions to dismiss the appeal as moot. What the Supreme Court meant by "judgment" in that context was not explained, but one can infer (though the Supreme Court did not explain this either) that the appeal was moot at the time the Circuit's written opinion was issued, since Chrysler's 363 sale had already closed. But even assuming that the controversy was moot by the time the Circuit issued the *Chrysler Circuit* written opinion), the controversy was not moot when the Circuit issued its initial affirmance order—the *Chrysler Circuit Order*—preceding the Chrysler 363 sale closing, upon which this Court also relied. And assuming, *arguendo*, that, by reason of these matters of timing, the Circuit's written *Chrysler Circuit Opinion* can no longer be regarded as binding on the lower courts in the Second Circuit (a matter this Court has no need to decide), the

App-93

Court overruled the objections to the Free and Clear Provisions—determining, after lengthy analysis, that New GM should be protected against successor liability claims.[32]

6. Sale Agreement—Relevant Provisions

The agreement under which the 363 Sale would take place, which had the formal name of "Amended and Restated Master Sale and Purchase Agreement," dated June 26, 2009 (often referred to by the parties as the "ARMSPA" but by this Court as the "Sale Agreement"), was originally filed with the Sale Motion on June 1, 2009. It was thereafter amended— in respects relevant here (1) to incorporate an agreement with the AGs under which New GM would assume liabilities under state Lemon Laws, and (2) to provide that New GM would assume responsibility for any and all accidents or incidents giving rise to death, personal injury, or property damage after the date of closing of the 363 Sale, irrespective of whether the vehicle was manufactured by Old GM or New GM.

The Sale Agreement, in its Section 2.3, listed liabilities that New GM would assume ("Assumed Liabilities"), on the one hand, and that Old GM would retain ("Retained Liabilities"), on the other.

---

Court thinks the Circuit's written thinking on the subject should continue to be respected.

[31] *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 581-82 (4th Cir.1996).

[32] *See Sale Opinion*, 407 B.R. at 499-506.

App-94

Those that would be assumed by agreement were listed in subsection (a); those that would be retained (which would cover everything else) were listed in subsection (b). As provided in subsection (a), Assumed Liabilities included:

(a) Claims for "Product Liabilities" (a term defined in the Sale Agreement), with respect to which New GM would assume (but assume only) those that arose out of "accidents or incidents"[33] occurring on or after the Closing Date;[34]

---

[33] The Court addressed the meaning of "incidents" in its decisions in *In re Motors Liquidation Co.*, 447 B.R. 142, 149 (Bankr. S.D.N.Y. 2011) (Gerber, J.) (" *GM-Deutsch*"), and *In re Motors Liquidation Co.*, 513 B.R. 467 (Bankr. S.D.N.Y. 2014) (Gerber, J.) ("*GM-Phaneuf*"). In *GM-Deutsch*, the Court accepted the explanation proffered by New GM counsel in which he stated that the language was drafted to cover situations similar to accidents that might not be said to be accidents, such as a car catching on fire, blowing up, or running off the road—in each case where it could cause a physical injury to someone. 447 B.R. at 148 n.20. In *GM-Phaneuf*, the Court made reference to its earlier *GM-Deutsch* ruling, describing it, in a parenthetical following the citation, as "construing the 'incidents' portion of the "'accidents or incidents' language (in the context of claims against New GM by the estate of a consumer who had been in an accident before the 363 Sale, but died thereafter) as covering more than just "accidents," but covering things that were similar, such as fires, explosions, or other definite events that caused injuries and resulted in the right to sue"). 513 B.R. at 472 n.17.

[34] Sale Agreement § 2.3(a)(ix) (as amended) (ECF No. 2968-2). As a practical matter the great bulk of covered occurrences would be accidents. For brevity, except where quoting language that did not do likewise, the Court uses "Accidents" to cover anything within that category.

App-95

(b) Repairs or the replacement of parts provided for under the Glove Box Warranty;[35] and

(c) Lemon Law claims.[36]

And as noted in the Sale Decision, "an important change [] was made in the [Sale Agreement] after the filing of the motion" which broadened the Assumed Liabilities to include "*all* product liability claims arising from accidents or other discrete incidents arising from operation of GM vehicles occurring subsequent to the closing of the 363 Transaction, *regardless of when the product was purchased.*"[37]

But by contrast, the liabilities retained by Old GM—and not assumed by New GM—expressly

---

The "Closing Date"—the date the 363 Sale closed, under the authority of the Sale Order—turned out to be July 10, 2009.

[35] Sale Agreement § 2.3(a)(vii). This is a duty to make, or cause to be made, the necessary repairs. It is not a monetary obligation. *See Trusky v. General Motors Co. (In re Motors Liquidation Co.),* 2013 Bankr. LEXIS 620, at *26, 2013 WL 620281, at *9 (Bankr. S.D.N.Y. Feb. 19, 2013) (Gerber, J.) ("*GM-Trusky*") ("Performance of repairs and needed adjustments is the exclusive remedy under this written warranty. What is recoverable, in substance, is specific performance of the repair or replacement obligation for otherwise qualifying defects.").

[36] *See* Sale Agreement §2.3(a)(vii). Lemon Law claims were added as an assumed liability during the course of the 363 Sale hearing after negotiation with the AGs**.** Additionally, and importantly here, New GM undertook to comply with its statutory recall obligations, even with respect to Old GM manufactured vehicles. Though to the extent these related to Old GM manufactured vehicles, these might be thought of as Old GM liabilities to be assumed, they were not characterized as such. But the characterization doesn't matter; what is clear is that New GM agreed that it would be responsible for them.

[37] 407 B.R. at 481-82 (emphasis in original).

App-96

included: (a) Product Liabilities arising in whole or in part from any Accidents, that happened *prior to* the Closing Date;[38] and (b) Liabilities to third parties for prepetition claims based on contract, tort, or any other basis.[39]

The Sale Agreement also required New GM to comply with recall obligations imposed by federal and state law, even for cars or parts manufactured by Old GM.[40]

### 7. The Sale Order

As previously discussed, the Court overruled objections to Free and Clear Provisions, and the Sale Order thus had five (somewhat duplicative) provisions, including injunctive provisions, protecting New GM from successor liability.

One provided, for example, that except for Assumed Liabilities, Old GM's assets were acquired "free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever [other than permitted liens], *including rights or claims based on any successor or transferee liability,*"

---

[38] Sale Agreement § 2.3(b)(ix). The Pre-Closing Accident Plaintiffs' claims are in this category.

[39] Sale Agreement § 2.3(b)(xi). The Economic Loss Plaintiffs' Claims are in this category.

[40] *See* Sale Agreement § 6.15(a) ("From and after the Closing, Purchaser shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.").

App-97

with "all such liens, claims, encumbrances, and other interests, *including rights or claims based on any successor or transferee liability,* [to] attach to the net proceeds" of the Sale.[41]

Three others provided that "*no claims, other than Assumed Liabilities, will be assertable against the Purchaser* [New GM];"[42] that New GM would have no liability "*for any claim that arose prior to the Closing Date, relates to the production of vehicles prior to the Closing Date, or otherwise is assertable against the Debtors or is related to the Purchased Assets prior to the Closing Date*";[43] and that "*the Purchaser shall have no successor, transferee, or vicarious liabilities of any kind or character.*"[44] And another included injunctive provisions barring assertion of successor liability claims.[45]

But tracking the language of the Sale Agreement, almost verbatim, the Sale Order imposed certain recall and other obligations on New GM in accordance with federal and state law, even with respect to parts and vehicles manufactured by Old GM:

> From and after the Closing, the Purchaser shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, as amended and recodified, including by

---

[41] Sale Order ¶ 7 (ECF No. 2968) (emphasis added).

[42] *Id.* at ¶ 9(a) (reformatted for readability, emphasis added).

[43] *Id.* at ¶ 46 (reformatted for readability, emphasis added).

[44] *Id.* at ¶ 48 (reformatted for readability, emphasis added).

[45] *Id.* at ¶ 8 (the "Injunctive Provision").

App-98

the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar Laws, in each case, to the extent applicable in respect of motor vehicles, vehicles, motor vehicle equipment, and vehicle parts manufactured or distributed by the Sellers prior to the Closing.[46]

And the Sale Order also addressed severability: "The provisions of this Order are nonseverable and mutually dependent on each other."[47]

### 8. Matters After the Sale

Upon the closing of the 363 Sale, New GM provided Old GM, as provided in the Sale Agreement, shares of New GM common stock and warrants (the "New GM Securities"), to be later distributed to Old GM creditors pursuant to a future plan.

In September 2009, about two months after the Sale was completed, the Court entered an order (the "Bar Date Order") establishing November 30, 2009, as the deadline (the "Bar Date") for proofs of claim to be filed against Old GM, and approved the form and manner of notice of the Bar Date. The Bar Date Order allowed for publication notice to holders of unknown claims. The Plaintiffs here are among those who received publication notice only as to any claims they might have against Old GM.

---

[46] *Id.* at ¶ 17.

[47] *Id.* at ¶ 69.

App-99

In March 2011, Old GM filed the Plan, and without opposition anything like the opposition that the 363 Sale had engendered (though the opposition was sufficient to warrant a written opinion),[48] the Plan was confirmed. On March 29, 2011, the Court entered an order (the "Confirmation Order") confirming the Plan.

The Plan became effective on March 31, 2011 (the "Effective Date"), and the Plan provided that it would be deemed substantially consummated as of the Effective Date. The parties have stipulated that the Plan has been substantially consummated.[49]

### 9. The GUC Trust and its Operation

Among many other things, the Confirmation Order authorized the creation of the GUC Trust. Under the agreement by which the GUC Trust was formed (the "GUC Trust Agreement"), only certain categories of persons or entities were made beneficiaries. The GUC Trust Agreements limited GUC Trust Beneficiaries to:

(i) the holders of *allowed* general unsecured claims against Old GM that existed as of the Effective Date;

---

[48] *See In re Motors Liquidation Co.*, 447 B.R. 198 (Bankr. S.D.N.Y. 2011) (Gerber, J.) (the "*Confirmation Decision*").

[49] Equitable Mootness Stipulated Facts ¶ 18 (ECF No. 12826-4); s*ee also Morgenstein v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 462 B.R. 494, 501 n. 36 (Bankr. S.D.N.Y. 2012) (Gerber, J.) ("*Morgenstein*") ("[T]he Plan already has been substantially consummated."), *aff'd* 12-cv-01746-AJN, ECF No. 21 (S.D.N.Y. Aug. 9, 2012) (Nathan, J.).

App-100

(ii) the holders of claims asserted against Old GM that *were disputed* as of the Effective Date ("Disputed Claims") and *subsequently allowed* (collectively with claims that were allowed as of the Effective Date, "Allowed Claims"),

(iii) the holders of potential general unsecured claims ("JPMorgan Claims") that might arise in connection with the GUC Trust's lien avoidance action relating to a mistakenly released financing statement;[50] and

---

[50] Before Old GM's Plan was confirmed, the Creditors' Committee brought an adversary proceeding seeking a determination that the principal lien securing a syndicated $1.5 billion term loan (the "Term Loan") that had been made to GM in November 2006 was terminated in October 2008, before the filing of GM's chapter 11 case—thereby making most of the $1.5 billion in indebtedness under the Term Loan unsecured. The defendants were the syndicate members who together made the Term Loan and JPMorgan Chase Bank, N.A. ("JPMorgan"), the agent under the facility. On cross-motions for summary judgment in that adversary proceeding, this Court ruled in favor of JPMorgan, but that decision, after an intermediate certification to the Delaware Supreme Court, was thereafter reversed by the Second Circuit and remanded to this Court. *See Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JP Morgan Chase Bank, N.A* (*In re Motors Liquidation Co.*), 486 B.R. 596 (Bankr. S.D.N.Y. 2013) ("*GM-UCC-3 Opinion*"), *question certified for determination by Delaware Supreme Court*, 755 F.3d 78 (2d Cir. 2014), *question answered*, 103 A.3d 1010 (Del. 2014), *rev'd and remanded*, 777 F.3d 100 (2d Cir. 2015), *rehearing en banc denied*, No.13-2187 ECF No. 179 (2d Cir. Apr. 13, 2015).

When Old GM's Plan was confirmed, after that adversary proceeding was commenced, the Creditors' Committee's right to pursue that litigation devolved to another trust created under the Plan—the "Avoidance Action Trust." Depending on the outcome of further litigation in this Court, it is possible that a

App-101

(iv) the holders of units of beneficial interest (each, a "GUC Trust Unit")[51] in the GUC Trust.

The GUC Trust Agreement also set forth provisions governing the GUC Trust's ability to distribute the New GM Securities and their proceeds (collectively, the "GUC Trust Assets"), which were intended to ensure that the Unitholders would receive, as promptly as practicable, any GUC Trust Assets that were not necessary to fund the Allowed Claims (or potential Allowed Claims); any additional JPMorgan Claims; or projected liquidation and administrative costs of the GUC Trust (collectively, the "GUC Trust Liabilities"), and that the GUC Trust would retain sufficient assets to fund those liabilities.

By January 2012, more than two years after the original Bar Date, many claims continued to be filed

---

portion (and perhaps a major portion) of the Term Loan Debt would have to be paid to the Avoidance Action Trust and then result in additional unsecured claims against the GUC Trust. *See* 486 B.R. at 615 n.54 ("To the extent that the Committee might be successful in this adversary proceeding, the amount paid to JPMorgan and the Lenders would be subject to recapture, as provided in the final DIP Financing Order when the payoff of the Term Loan was authorized. In that event, after the return of the amount previously paid on what was thought to be a duly secured claim, the Lenders would still have a claim for the Term Loan debt, but would have only an unsecured claim, sharing *pari passu* with the many billions of dollars of other unsecured claims in GM's chapter 11 case.").

[51] The GUC Trust Units are freely tradable. As reported by Bloomberg Finance, as of October 21, 2014, approximately 100 million GUC Trust Units had been bought and sold since June 14, 2012, and the aggregate value of those GUC Trust Units (based on daily closing prices) totaled approximately $2.1 billion.

App-102

against Old GM. On January 1, 2012 (nearly a year after the Effective Date), the GUC Trust filed a motion (the "Late Filed Claims Motion") seeking an order disallowing late filed claims.[52] Under the requested order, any future late filed claims would be disallowed unless, among other things, the claimant filed a motion with the Court seeking permission to file a late proof of claim.

The Court granted the GUC Trust's Late Filed Claims Motion, and in February 2012, entered its order (the "Late Filed Claims Order") implementing that ruling.

The Late Filed Claims Order explicitly stated that "nothing in [the Late Filed Claims Order] shall prevent any claimant submitting a Late Claim from filing a motion with the Court seeking to have its Late Claim deemed timely filed."[53] Likewise, none of the Plan, Confirmation Order, and GUC Trust Agreement prohibited late filed claims. In two known instances, late filed claims have been allowed in the Old GM bankruptcy case both before and after the Effective Date. Under the Plan, a late filed proof of claim may be subsequently adjudicated as an Allowed General Unsecured Claim.

In April and May 2011, initial distributions—consisting of 75% of the New GM Securities, along with nearly 30 million GUC Trust Units—were made to those who had Allowed Claims as of the Effective Date. The only New GM Securities that were not distributed were those that could be necessary to

---

[52] ECF No. 11351.

[53] Late Filed Claims Order at 2 (ECF No. 11394).

App-103

fund GUC Trust Liabilities[54]—principally claims that as of that time had been neither allowed or disallowed, and administrative costs.

Between May 2011 and the end of September 2014, the GUC Trust made distributions on formerly Disputed Claims that had thereafter been resolved. Similarly, in July and October 2011, and December 2013, the GUC Trust made additional distributions of New GM Securities—to the end that by September 30, 2014, the GUC Trust had distributed more than 89% of the New GM Securities and nearly 32 million GUC Trust Units.

On October 24, 2014, the GUC Trust Administrator disclosed that it was planning on making still another distribution, scheduled for November 12, 2014. Shortly thereafter, certain Plaintiffs' counsel wrote the GUC Trust's counsel advising that Plaintiffs were "known potential contingent beneficiaries of the GUC Trust and the GUC Trust should not make any further distributions unless and until it demonstrates that adequate reserves ha[d] been established with respect to Plaintiffs' potential claims against Old GM and/or the GUC Trust that could be in the multiple billions of dollars."[55] The next day, counsel for the GUC Trust Administrator replied that it would *not* establish reserves for the Plaintiffs' claims, and that it was going forward with the planned November 2014 GUC Trust Distribution. Plaintiffs chose, for

---

[54] Equitable Mootness Stipulated Facts ¶ 35 (ECF No. 12826-4).

[55] *See* ECF No. 13029, Exhibit A, at 3.

App-104

admitted strategic reasons,[56] not to seek a stay of the GUC Trust's distributions.

The GUC Trust Administrator then made that distribution, without establishing any reserves for the Plaintiffs' claims.

As of December 16, 2014, the GUC Trust had total assets of approximately $773.7 million, comprised principally of New GM Securities, though with approximately $64 million in commercial paper, demand notes, and cash equivalents.[57]

The GUC Trust Assets stand to be augmented upon allowance of any Plaintiffs' claims against Old GM and/or the GUC Trust through an "accordion feature"[58] in the Sale Agreement and any order by the Court requiring New GM to contribute more money or New GM Common Stock to the GUC Trust.[59]

10. Knowledge of the Ignition Switch Defect

In February and March of 2014, New GM informed the Safety Administration of the Ignition Switch Defect, and that a recall would be conducted to address it. New GM does not contend, and there is

---

[56] *See* Day 1 Arg. Tr. at 112:13-16 ("yes, there was a strategic element to the decision that was taken on our side").

[57] *See* GUC Trust Q3 2014 Form 10-Q at 1, 12.

[58] Under the Sale Agreement, New GM agreed to provide additional consideration to Old GM if the aggregate amount of Allowed General Unsecured Claims against Old GM exceeded $35 billion. *See* Equitable Mootness Stipulated Facts ¶ 5. In such case, New GM is required to issue additional shares of New GM Common Stock to the GUC Trust. *Id*.

[59] *See id*. ¶ 32.

App-105

no evidence in the record from which the Court now could find, that any Plaintiff knew of the Ignition Switch Defect before New GM's announcement in the Spring of 2014. But more than a few at Old GM knew of it as of the time of Old GM's chapter 11 filing. The parties stipulated that at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers, and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale Motion, as early as 2003.[60]

New GM does not dispute that Old GM personnel knew enough as of the time of Old GM's June 2009 bankruptcy filing for Old GM then to have been obligated, under the Safety Act, to conduct a recall of the affected vehicles.[61]

### 11. The Motion to Enforce

Very nearly immediately after New GM's Spring 2014 announcement, a large number of class actions—the earliest Ignition Switch Actions—were commenced against New GM, asserting, among other things, successor liability.  In April 2014, New GM filed the Motion to Enforce, contending that most of the claims in the Ignition Switch Actions related to vehicles or parts manufactured and sold by Old GM, and that the Sale Order's Free and Clear Provisions, and injunctions against successor liability, proscribed such claims. In August 2014, New GM filed similar motions to enforce the Sale Order against the Pre-Closing Accident Plaintiffs and the Non-Ignition

---

[60] *See* Pl. Stipulated Facts ¶ 14 (ECF No. 12826-2).

[61] *See id.*; *see also* Pl. Br. at 47; Day 1 Arg. Tr. at 91:1-18; Day 2 Arg. Tr. at 7:11-19, 13:5-10.

App-106

Switch Plaintiffs, though the latter is on hold pending the rulings here.

In June 2014, the Judicial Panel on Multidistrict Litigation established MDL 2543 and designated the United States District Court for the Southern District of New York as the MDL court, assigning Judge Furman to oversee coordinated proceedings for the actions assigned to the MDL. New GM has stated in its Reply that "[t]here are over 140 class action lawsuits currently pending against [it], with more being filed."[62] The Court understands the great bulk of these to involve economic loss claims.

At an August 11, 2014 case management conference in MDL 2543, it was determined that certain plaintiffs' counsel who had been designated to take the lead in MDL 2543 ("Lead Counsel") would file a consolidated master complaint for all economic loss actions. This Court then adjusted the briefing and argument of the issues here to take into consideration any claims added or dropped in MDL 2543. In October 2014, Lead Counsel filed two Consolidated Complaints, each seeking class action treatment. The first—referred to by many as the "Pre-Sale Consolidated Complaint"—seeks damages from New GM on behalf of class members who purchased vehicles with an Ignition Switch Defect (which necessarily would have been manufactured by Old GM) *before* the closing of the 363 Sale.[63]

---

[62] New GM Reply at 45.

[63] These would all be barred under the Sale Order, to the extent it is enforceable.

App-107

The second—referred to by some as the "Post-Sale Consolidated Complaint"—seeks relief on behalf of class members who had purchased vehicles *after* the closing of the 363 Sale.[64]

12. The Threshold Issues

After this Court held conferences with the parties to establish means to most efficiently litigate the issues here, the parties identified, at the Court's request, four threshold issues for judicial determination. They were:

> Whether Plaintiffs' procedural due process rights were violated in connection with the Sale Motion and the Sale Order and Injunction, or alternatively, whether Plaintiffs' procedural due process rights would be violated if the Sale Order and Injunction is enforced against them (the "Due Process Threshold Issue");

> If procedural due process was violated as described in (a) above, whether a remedy can or should be fashioned as a result of such violation and, if so, against whom (the "Remedies Threshold Issue");

> Whether any or all of the claims asserted in the Ignition Switch Actions are claims against the Old GM bankruptcy estate

---

[64] Some of these would be barred under the Sale Order and some would not, depending on whether the vehicle acquired after the 363 Sale had been previously manufactured by Old GM, or had Old GM parts.

App-108

(and/or the GUC Trust) (the "Old GM Claim Threshold Issue");[65] and

> If any or all of the claims asserted in the Ignition Switch Actions are or could be claims against the Old GM bankruptcy estate (and/or the GUC Trust), should such claims or the actions asserting such claims nevertheless be disallowed/dismissed on grounds of equitable mootness (the "Equitable Mootness Threshold Issue").[66]

The Court also asked for briefing on the legal standards that would apply to any claims asserting Fraud on the Court, and announced that it would rule on those as well.[67]

The Court addresses those issues, in some instances breaking them down further and restating them slightly to conform to a more appropriate framework, in the discussion to follow.

---

[65] They agreed, however, that the issue of whether a claim asserted in the Ignition Switch Actions would be timely and/or meritorious against the Old GM bankruptcy estate (and/or the GUC Trust) is not a Threshold Issue.

[66] *See* Supplemental Scheduling Order, dated Jul. 11, 2014, ECF No. 12770. Though the Threshold Issues were first identified before the Consolidated Complaints were filed, nobody has suggested that what has been pleaded in the Consolidated Complaint requires any change in the Threshold Issues.

[67] *Id.*

App-109

## DISCUSSION

### I. Due Process

The Due Process Threshold Issue requires the Court to decide, with respect to the Sale Order, whether

(1) as New GM contends and the Plaintiffs dispute, insufficient notice of the 363 Sale hearing could not result in a deprivation of due process (principally because any successor liability claims would belong to the Old GM estate, and not to the Plaintiffs, and because the Plaintiffs' rights would attach to the sale proceeds), as there would not be the requisite potential deprivation of property;

(2) as the Plaintiffs contend and New GM disputes, the Plaintiffs failed to get the notice due process requires (and related to that, whether the Plaintiffs had "known claims" as that expression is used in the due process jurisprudence); and

(3) as New GM contends and the Plaintiffs dispute, prejudice is an essential element of any claim for a denial of due process, and the Plaintiffs failed to show the requisite prejudice here, with respect to all or some of their claims.

After the Court does so, it then must decide the extent to which the Sale Order remains subject to attack, and any areas as to which the Plaintiffs, or some of them, may potentially qualify for a remedy. The Court also believes that it should address these same issues with respect to the allowance of Plaintiff claims against Old GM, from which their successor liability contentions emanate, and which cannot

App-110

appropriately be divorced from any due process analysis. Discussion of these matters follows.

### A. Underlying Principles

#### 1. *Mullane*

All parties, appropriately, begin with the Supreme Court's decision in *Mullane*—which Plaintiffs describe as "the seminal Supreme Court case establishing due process requirements for creditors in a bankruptcy proceeding."[68] They are right to start with *Mullane*; it is the seminal Supreme Court opinion clarifying what due process requires in litigation. But it was not a bankruptcy case.[69] In *Mullane,* the Supreme Court held that a

---

[68] Pl. Br. at 27.

[69] Nevertheless, considerable authority, by the Second Circuit and other circuit courts, holds, not surprisingly, that due process requirements apply in bankruptcy cases, just as they do in plenary litigation. *See, e.g., DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 150 (2d Cir. 2014) (Newman, Pooler, and Livingston, JJ) ("*DPWN*") ("[A] claim cannot be discharged if the claimant is denied due process because of lack of adequate notice."); *In re Johns-Manville Corp.*, 600 F.3d 135, 153-54 (2d Cir. 2010) (*per curiam*) ("*Manville-2010,*"sometimes also referred to as *"Manville IV"*) (Calabrese and Wesley, JJ) (ruling that due process was denied in dispute over whether an earlier bankruptcy court order in a chapter 11 case properly enjoined not only claims directed at Travelers insurance policies in the *res* of the Manville estate, but also non-derivative claims by Chubb that sought to impose liability on Travelers separately); *Koepp v. Holland*, 593 Fed. Appx. 20 (2d Cir. 2014) (Summary Order, Katzmann, CJ, and Hall and Livingston, JJ) ("*Koepp*") (ruling that due process was denied in dispute over easements on land previously owned by a debtor reorganized under § 77 of the now-superseded Bankruptcy Act); *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 n.1 (3d Cir. 1995) ("*Chemetron*") ("Although *Mullane* involved

App-111

statute authorizing notice by publication of a proposed judicial settlement of a "common trust," holding the assets of 113 smaller trusts, failed to satisfy due process requirements for the trust's known beneficiaries.[70] The common trust had "many" beneficiaries.[71] But despite that (and even though the

---

the notice due beneficiaries on judicial settlement of accounts by the trustee of a common trust fund, subsequent courts have interpreted the case to set the standard for notice required under the Due Process Clause in Chapter 11 bar date cases."); *In re Edwards*, 962 F.2d 641 (7th Cir. 1992) ("*Edwards*") (considering due process contentions by a secured creditor whose interest was extinguished in a free and clear section 363 sale without notice, though ultimately ruling in favor of a bona fide purchaser).

[70] *See Mullane*, 339 U.S. at 320 ("We hold the notice of judicial settlement of accounts required by the New York Banking Law § 100-c(12) is incompatible with the requirements of the Fourteenth Amendment as a basis for adjudication depriving known persons whose whereabouts are also known of substantial property rights.").

[71] *Id.* at 309. But the Plaintiffs exaggerate, however, when they assert that the *Mullane* court ruled as it did notwithstanding the "very large" number of beneficiaries involved. Pl. Br. at 27. Actually, the *Mullane* court said that "the record [did] not show the number or residence of the beneficiaries," 339 U.S. at 309, though it also said that there were 113 contributing trusts, with aggregate assets of about $3 million. *Id.* A $3 million trust corpus was a bigger number in 1950 than it is now, but the likely number of individuals having interests in the 113 contributing trusts whose collective assets led to that $3 million corpus would at least seemingly be many orders of magnitude smaller than the huge number of vehicle owners here—of 27 million cars with Ignition Switch Defects and of 70 million on the road. That and the fact later mentioned by the *Mullane* court that mailed notices had been sent to ascertainable beneficiaries in the past, which was "persuasive" as to the Trust Company's ability to mail notice there, *see* 339

App-112

statute authorized service by publication), the Court found that because the trustee, Central Hanover Bank & Trust Company (the "Trust Company"), seeking the judicial settlement of the trust for which it was responsible, could with due diligence ascertain their names and addresses, they were entitled to mailed notice of the settlement.

In reaching that result, the *Mullane* court started with the recognition that while "[a] construction of the Due Process Clause which would place impossible or impractical obstacles in the way could not be justified," the Court would have to "balance" against that interest an individual's right to be heard.[72] It continued by observing that while it "ha[d] not committed itself to any formula" in achieving that balance, "a few general principles stand out in the books."[73] One was that:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.[74]

---

U.S. at 319, suggests that the number to be given mailed notice there, while relatively large, was much less than huge, most likely in the thousands (and perhaps low thousands), rather than tens of millions.

[72] *Id.* at 313-14.

[73] *Id.* at 314.

[74] *Id.*

App-113

Others were that "[t]he notice must be of such nature as reasonably to convey the required information . . . and it must afford a reasonable time for those interested to make their appearance."[75]

The *Mullane* court qualified its statement of those general requirements, however, by including an element of practicality:

> But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met the constitutional requirements are satisfied. The criterion is not the possibility of conceivable injury, but the just and reasonable character of the requirements, having reference to the subject with which the statute deals.[76]

And once again recognizing the need for practicality, it stated that

> [t]he reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected, or, *where conditions do not reasonably permit such notice*, that the form chosen is not substantially less likely to bring home notice than other of the *feasible* and customary substitutes.[77]

---

[75] *Id.*

[76] *Id.* at 314-15 (internal quotation marks deleted).

[77] *Id.* at 315 (emphasis added) (citations omitted).

App-114

The *Mullane* court expressly endorsed the use of publication when it would not be practical to provide better notice:

> This Court has not hesitated to approve of resort to publication as a customary substitute in another class of cases where it is not reasonably possible or practicable to give more adequate warning. Thus it has been recognized that, in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights.

> Those beneficiaries represented by appellant whose interests or whereabouts could not with due diligence be ascertained come clearly within this category. As to them the statutory notice [*i.e.*, notice by publication] is sufficient. However great the odds that publication will never reach the eyes of such unknown parties, it is not in the typical case much more likely to fail than any of the choices open to legislators endeavoring to prescribe the best notice practicable.[78]

In a later post-*Mullane* decision,[79] the Supreme Court reiterated this.

> In the years since *Mullane* the Court has adhered to these principles, balancing the

---

[78] *Id.* at 317 (citations omitted).

[79] *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478 (1988) ("*Tulsa Collection Services*").

App-115

"interest of the State" and "the individual interest sought to be protected by the Fourteenth Amendment." The focus is on the reasonableness of the balance, and, as *Mullane* itself made clear, whether a particular method of notice is reasonable depends on the particular circumstances.[80]

Thus it is hardly surprising that the Supreme Court has also stated, albeit in a different context (there, deciding the extent of the hearing required before a revocation of a former inmate's parole), that "[i]t has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands."[81]

Finally, the *Mullane* court made one other point—one which is frequently overlooked—of considerable relevance here. It recognized that notice to *others* with an interest in objecting could ameliorate prejudice (and impliedly, if not expressly, even the existence of constitutionally deficient notice in the first place) to those who did not get notice. It observed:

This type of trust presupposes a large number of small interests. *The individual interest does not stand alone but is identical with that of a class.* The rights of each in the integrity of the fund and the fidelity of the trustee are shared by many other

---

[80] *Id.* at 484.

[81] *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("*Morrissey*").

App-116

beneficiaries. *Therefore notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any objections sustained would inure to the benefit of all.* We think that under such circumstances reasonable risks that notice might not actually reach every beneficiary are justifiable. 'Now and then an extraordinary case may turn up, but constitutional law, like other mortal contrivances, has to take some chances, and in the great majority of instances, no doubt, justice will be done.'[82]

### 2. Second Circuit Guidance

The Second Circuit has given the lower courts in this Circuit more specific guidance, in several key cases. In its 1989 decision in *Weigner v. City of New York,*[83] the Circuit held that "[t]he proper inquiry [on a due process contention] is whether the [noticing party] *acted reasonably in selecting means likely to inform persons affected*, not whether each property owner actually received notice."[84]

Then, in its 1993 decision in *Drexel Burnham*, first mentioned above,[85] the Circuit put forward its understanding of *Mullane's* principles by stating that "no person may be deprived of life, liberty or property by an adjudicatory process without first being

---

[82] *Mullane*, 339 U.S. at 319 (emphasis added).

[83] 852 F.2d 646 (2d Cir. 1988) ("*Weigner*"), *cert. denied,* 488 U.S. 1005 (1989).

[84] *Id.* at 649 (emphasis added).

[85] *See* n.10 *supra*.

App-117

afforded notice and a full opportunity to appear and be heard, *appropriate to the nature of a given case.*[86]

There, the "given case," a proceeding in the *Drexel Burnham* chapter 11 case, involved the approval of a settlement under which, among other things, Drexel Burnham and a sub-class of its securities claimants pooled their recoveries from lawsuits Drexel Burnham had brought against its former officers and directors, and the settling parties granted a release to former officer Michael Milken. As here, the *Drexel Burnham* objectors were apparently troubled that the settlement would impair their recoveries against parties other than the debtor itself. The objectors raised both due process and substantive objections to the settlement— contending, in the due process prong of their objection, that the notice of the proposed settlement that had been mailed to 7,700 Drexel bankruptcy claimants was insufficiently descriptive of the proposed settlement.

In that context, as part of its due process analysis, the Circuit observed in *Drexel Burnham* that "[n]o rigid constitutionally mandated standard governs the contents of notice in a case like the one before us. Rather, the Due Process Clause requires *the best notice practical under the circumstances.*"[87] And once again citing *Mullane*, the Circuit continued that "the Supreme Court has warned against

---

[86] 995 F.2d at 1144 (emphasis added).

[87] *Drexel Burnham*, 995 F.2d at 1144 (citing *Mullane*) (emphasis added).

App-118

interpreting this notice requirement so inflexibly as to make it an 'impractical or impossible obstacle[].'"[88]

Similarly, in its 2014 decision in *DPWN*,[89] the Second Circuit reiterated that "whether notice comports with due process requirements turns on the *reasonableness* of the notice, a *flexible* standard that often turns on what the debtor or the claimant knew about the claim or, with reasonable diligence, should have known."[90]

Like *Weigner* before it (where the notice had also been mailed), *Drexel Burnham* was a *quality* of notice case, rather than a *means* of notice case.[91] Nevertheless, its direction that notice must be "*appropriate to the nature of a given case*"[92] was not

---

[88] *Id.* (once again citing *Mullane*). With a *cf.*, the Circuit also cited, and quoted, a considerably older Supreme Court decision, *Grannis v. Ordean*, 234 U.S. 385, 395 (1914), quoting the earlier opinion's observation that the Due Process Clause "does not impose an unattainable standard of accuracy."

[89] 747 F.3d 145.

[90] *Id.* at 150 (citing *Mullane* and *Chemetron*) (emphasis added).

[91] It considered whether the duly mailed notice was still insufficient, because it didn't tell creditors enough. In that respect, *Drexel Burnham* considered a contention like the Pre-Closing Accident Plaintiffs' assertions here that "Old GM did not disclose the existence of the Ignition Switch defect in the Sale Motion or in the Sale Notice mailed to Pre-Closing Accident Plaintiffs that had already sued Old GM" (Pre-Closing Accident Pl. Br. at 9) and "[t]he notice that Old GM provided with respect to the 363 Sale was constitutionally deficient … regardless of whether the notice was mailed directly to the Plaintiff or published in the newspaper." (*Id.* at 26; accord *id.* at 29).

[92] 995 F.2d at 1144.

App-119

limited to cases of the first type. And *Mullane*, the opinion on which the *Drexel Burnham* court relied, was a case of the second type. For each of those reasons, along with common sense, the Court reads the Circuit's *Drexel Burnham* directions that "the Due Process Clause requires the best notice practical under the circumstances,"[93] and that the notice requirement should not be interpreted "so inflexibly as to make it an 'impractical or impossible obstacle'"[94]—each of which was derived by citing *Mullane*—as applicable to cases involving either the *means* or the *quality* of any notice whose adequacy is questioned.

Then, though it involves a materially different factual situation, the Circuit's decision in *DPWN* is nevertheless significant in several respects. *DPWN* was an antitrust case, but with a bankruptcy discharge defense. The plaintiff there, the well-known courier DHL, which used United Airlines for cargo delivery services, sued United under the Sherman Act, alleging price-fixing. United had been reorganized in a chapter 11 case in Chicago, at the conclusion of which it received a discharge of its debts, and moved to dismiss the antitrust action under Rule 12(b)(6), relying on its earlier discharge.[95]

DHL (which had earlier received mailed notice in the bankruptcy of the opportunity to file claims, but without particularized mention of United's susceptibility to antitrust claims) had anticipated the

---

[93] *Id.*

[94] *Id.*

[95] *See* 747 F.3d at 147.

App-120

discharge defense, and proactively pleaded a potential basis for avoiding it—that it lacked sufficient notice of the availability of its antitrust claim to satisfy due process requirements for rendering that claim discharged. The District Court, taking that allegation as true, declined to dismiss at that state of the proceedings. But the Circuit remanded, considering the allegation to be too conclusory to pass *Iqbal*[96] scrutiny, and directed the District Court to conduct further inquiry as to whether it was supportable. More specifically, the Circuit remanded for District Court inquiry as to *DHL's* knowledge of its potential antitrust claim during United's chapter 11 case, and *United's* knowledge with respect to a DHL claim.[97]

*DPWN* also suggests two other concerns that turn out not to be determinative in this case, but that may well be important in others. First, it suggests (if it does not also require) a two-step methodology that should be used, to the extent applicable, in examining contentions that the notice that due process requires was denied. The first step calls for inquiry as to whether the *claimant* knew of the claim it might assert.[98] The second step calls for the lower court to determine whether the claim was, from the perspective of the *notice-giver* (often a debtor in a

---

[96] *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

[97] *See* 747 F.3d at 153.

[98] This Court said "to the extent applicable," however, because here New GM does not contend that any of the Plaintiffs knew of the Ignition Switch Defect, or had the means to ascertain it. Thus all parties here, and the Court, go straight to the second step.

App-121

bankruptcy case), a "known" claim, obligating the notice-giver to provide actual, and possibly more detailed, notice.[99]

The second is a hint that in some cases, it may be the *quality*—as contrasted to the *means*—of notice that matters. That might suggest that even if the means of notice were entirely satisfactory (as it obviously was when DHL received *mailed* notice of the bankruptcy and of the deadline to file claims), notice lacking the requisite quality might nevertheless warrant relief. And this suggests that *notice of the bankruptcy* is not enough, or even the *deadline for the filing of claims*—and that assuming that the debtor has knowledge of the existence of the claim (which debtors will typically have in the case of contractual obligations but typically won't have with respect to non-contractual ones), something more detailed in the way of notice might have to be provided.[100]

---

[99] That "known claim" second step, of course, is one of the most important elements of this Court's inquiry here.

[100] Importantly, however, the *DPWN* court did not do away with the "known" claim requirement. And that is understandable. Unless the debtor knew of the claim or could reasonably ascertain its existence (a task that is particularly challenging for noncontractual obligations), the debtor could not provide sufficiently detailed notice, and the bankruptcy system could not operate. Debtors (with resulting prejudice to their genuinely known creditors) would be subject to extraordinary expense and uncertainty in trying to think up, and explain in sufficient detail, claims that potential creditors might assert. They would be uncertain whether all of their claims could actually be discharged. And the process would be particularly fraught with peril under the rushed circumstances that typify section 363 sales. Though the *DPWN* court did not lay it down

App-122

### 3. Guidance from Lower Courts

Courts below the Circuit level likewise have been sensitive to the need for practicality and flexibility in due process analysis. In *Affirmance Opinion #2*, referred to by several parties in their briefs as "*Parker*," on one of the appeals from the *Sale Decision*, Judge Sweet considered a number of objections by appellant Oliver Parker, a bondholder, claiming that the 363 Sale violated his due process rights. Before rejecting Parker's contentions, Judge Sweet synthesized the underlying law, making reference to *Mullane* and *Morrissey* in the Supreme Court, and *Drexel Burnham* in the Circuit:

> The U.S. Supreme Court has repeatedly emphasized the flexibility of the due process requirement, which simply "calls for such procedural protections as the particular situation demands." An "elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the

---

as a legal principle, it made another very important observation as to claims that are known and those that are not. It observed that "a debtor will normally be less likely to be charged with knowledge that it has violated the law than that it owes money unrelated to a law violation." 747 F.3d at 151. That is equally true with respect to many types of tort liabilities, especially product liability claims. Both violations of law and tort liabilities present challenges in knowing of the existence of the claim that are quite different from those in knowing of contractual obligations or transactions (such as the granting of liens or easements) involving earlier grants of property interests.

App-123

circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." In short, the constitutional requirements of due process are satisfied if notice is given with "due regard for the practicalities and peculiarities of the case."[101]

Thus New GM is right when, quoting *Mullane* and *Affirmance Opinion #2*, it argues that "[d]ue process is a flexible standard." In fact, New GM's point that due process is "flexible" comes verbatim from the Supreme Court's opinion in *Morrissey*,[102] and also appears in so many words in *DPWN*.[103] But as *Morrissey* also at least implies, the caselaw does not support a wholly standardless flexibility.[104] Other authority—especially authority addressing the "known"-"unknown" claim distinction discussed in the subsection that follows—rather suggests a standard requiring a fairly thoughtful, and sometimes nuanced, consideration of the circumstances, to ascertain whether any failure to

---

[101] *Affirmance Opinion #2*, 430 B.R. at 97 (citations omitted).

[102] *See* 408 U.S. at 481 ("It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands.").

[103] *See* 747 F.3d at 150.

[104] *See* 408 U.S. at 481 ("To say that the concept of due process is flexible does not mean that judges are at large to apply it to any and all relationships. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure.").

App-124

provide better notice (either more direct or more detailed) can appropriately be excused.

### 4. The "Known"-"Unknown" Creditor Distinction

Apart from focusing on the practicality of requiring notice by one means or another, and of one argued level of detail or another, a court also has to focus on whether providing notice to one particular person or entity, or group of such, is required in the first place. As an abstract matter, that latter issue turns on whether those to be noticed (which in bankruptcy most commonly are creditors and those with ownership or security interests in estate property) are "known," on the one hand, or "unknown," on the other.[105] Stating the distinction is easy; applying it is much more difficult.

In many cases, whether the notice recipient would want the right to file a claim or to be heard—

---

[105] *See, e.g.*, *Chemetron*, 72 F.3d at 347 ("As characterized by the Supreme Court, a 'known' creditor is one whose identity is either known or 'reasonably ascertainable by the debtor.' An 'unknown' creditor is one whose 'interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor].'") (citations omitted); *In re Drexel Burnham Lambert Grp.*, 151 B.R. 674, 680 (Bankr. S.D.N.Y. 1993) (Conrad, J) ("*Drexel Burnham-Bankruptcy*") ("For purposes of determining constitutionally acceptable notice of an impending bar date, bankruptcy law divides creditors into two groups: known and unknown. According to well-established case law, due process requires that a debtor's known creditors be afforded actual notice of the bar date . . . For obvious reasons, debtors need not provide actual notice to unknown creditors. It is widely held that unknown creditors are entitled to no more than constructive notice (i.e., notice by publication) of the bar date.") (citations omitted).

App-125

and hence is "known"—is obvious. In others, as here, it is much less so. Caselaw, at the Supreme Court and, especially, in the lower courts, has provided some guidance in this area. But it has been less than totally helpful.

*Mullane,* which was decided 65 years ago, did not yet make a "known"-"unknown" distinction, nor did it yet use the expression "reasonably ascertainable," which later became the standard, as discussed below. But *Mullane* did say—apart from saying that actual notice wasn't required for those whose interests were "conjectural"[106]—that actual notice was not required for those who, "although they could be discovered upon investigation, do not in due course of business come to knowledge of the common trustee."[107] That is plainly a rejection of a duty of investigation. But it is less helpful when the notice-giver has considerable knowledge, but lacks knowledge of every detail.

The standard was clarified somewhat thereafter. In its 1983 decision in *Mennonite Board,* a post-*Mullane* opinion (though once again in a non-bankruptcy context), the Supreme Court held that notice by mail or by other means "as certain to ensure actual notice" was required if the name and

---

[106] 339 U.S. at 317. "Conjectural" has since been joined by "conceivable" and "speculative." *See In re Thomson McKinnon Sec., Inc.,* 130 B.R. 717, 720 (Bankr. S.D.N.Y. 1991) (Schwartzberg, J.) ("*Thomson McKinnon*"); *In re XO Commc'ns, Inc.,* 301 B.R. 782, 793 (Bankr. S.D.N.Y. 2003) (Gonzalez, C.J.) ("XO Communications") (quoting *Thomson McKinnon*). With each of those three words, the idea is the same; many claims are *possible*, but to be known they must be much more than that.

[107] 339 U.S. at 317.

App-126

address of the entity to be notified was "*reasonably ascertainable.*"[108] But the *Mennonite Board* court did not flesh out the standards in determining what the "reasonably ascertainable" standard required—concluding only that when the name of the mortgagee and its county in Ohio were shown on the underlying mortgage, but the mortgagee's full mailing address was not,[109] the "reasonably ascertainable" requirement was satisfied, and actual notice was required.[110]

Likewise, in *Tulsa Collection Services*,[111] another nonbankruptcy post-*Mullane* decision about five years after *Mennonite Board*, the Supreme Court repeated that if a claimant's identity was "known or reasonably ascertainable," actual notice was required.[112] But once again, the Court did not flesh

---

[108] 462 U.S. at 800. In a dissent in which Justices Powell and Rehnquist joined, Justice O'Connor argued for a more flexible standard (and hence a greater willingness to accept notice by publication), considering it a departure from the "balancing required by *Mullane*." *Id.* at 806. But this view secured only three votes.

[109] *See id.* at 798 n.4; *id.* at 805 (dissent).

[110] Without stating in so many words that it would embody the standard, the *Mennonite Board* court said in a footnote that "[w]e assume that the mortgagee's address could have been ascertained by reasonably diligent efforts." 462 U.S. at 798 n.4. But it did not say whether, in determining whether a claimant's interest or address was "reasonably ascertainable," how much in the way of "diligent efforts" was required, or what would happen if efforts were insufficiently diligent.

[111] *See* n.79 *supra.*

[112] 485 U.S. at 490. Conversely, the Court made clear that actual notice need not be provided to claimants who are *not*

App-127

out the standards for "reasonably ascertainable," and on the record there presented, simply remanded for a factual determination as to that issue.[113]

However lower courts have addressed the applicable standards more extensively than the Supreme Court did. In its 1995 decision in *Chemetron*, the Third Circuit provided more guidance, focusing in particular on the opposite extreme. After reading the language in the *Mennonite Board* footnote quoted above to say that a creditor's identity is "reasonably ascertainable" if that creditor can be identified through "reasonably diligent efforts," the *Chemetron* court went on to say that "[r]easonable diligence does not require 'impracticable and extended searches . . . in the name of due process.'"[114] And it stated further that:

> The requisite search instead focuses on the debtor's own books and records. Efforts beyond a careful examination of these

---

actually known or "reasonably ascertainable." In fact, speaking of the other extreme, it stated:

> Nor is everyone who may conceivably have a claim properly considered a creditor entitled to actual notice. Here, as in *Mullane,* it is reasonable to dispense with actual notice to those with mere "conjectural" claims. *Id.*

[113] *Id.* at 491 ("Appellee of course was aware that her husband endured a long stay at St. John Medical Center, but it is not clear that this awareness translates into a knowledge of appellant's claim. We therefore must remand the case for further proceedings to determine whether "reasonably diligent efforts," would have identified appellant and uncovered its claim.") (citation omitted).

[114] 72 F.3d at 346.

App-128

documents are generally not required. Only those claimants who are identifiable through a diligent search are "reasonably ascertainable" and hence "known" creditors.[115]

Importantly, the *Chemetron* court declined to apply a "reasonably foreseeable" standard that had appeared in dictum in an earlier case in this District[116]—finding insufficient a contention that "Chemetron knew or should have known that it was reasonably foreseeable" that it could suffer claims from individuals living near the debtor's waste dump.[117] The *Chemetron* court explained:

> In the instant case, the bankruptcy court failed to apply the "reasonably ascertainable" standard. It instead crafted a "reasonably foreseeable" test from dictum in *In re Brooks Fashion Stores, Inc.*, 124 B.R. 436 (Bankr. S.D.N.Y. 1991). In applying this test, the bankruptcy court found that "Chemetron knew or should have known that it was reasonably foreseeable that it

---

[115] *Id.* at 347. The *Chemetron* court emphasized, however, that while some courts had held, regardless of the circumstances, that the "reasonably ascertainable" standard would require only an examination of the debtor's books and records, without an analysis of the specific facts of each case, it did not construe the standard that narrowly. It pointed out that situations could arise when creditors are "reasonably ascertainable" although not identifiable through the debtor's books and records. *Id.* at n.2.

[116] *See In re Brooks Fashion Stores, Inc.*, 124 B.R. 436 (Bankr. S.D.N.Y. 1991) (Blackshear, J.) ("*Brooks Fashion Stores*")

[117] 72 F.3d at 347.

App-129

could suffer claims from individuals living near the Bert Avenue Dump . . . ." It therefore found that claimants were known creditors.

We hold that in substituting a broad "reasonably foreseeable" test for the "reasonably ascertainable" standard, the bankruptcy court applied an incorrect rule of law. This constitutes clear error. The bankruptcy court's expansive test departed from established rules of law and produced a result in conflict with other decisions. Even if we were writing on a blank slate, we would reject the bankruptcy court's expansive standard. Put simply, such a test would place an impossible burden on debtors.[118]

To the contrary, the *Chemetron* court held that "[a] debtor does not have a 'duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it," and that what is required "is not a vast, open-ended investigation."[119] Applying these standards, the Third Circuit rejected the contention that though the debtor could reasonably *foresee* that parties present in the immediate vicinity of its toxic waste dump would have toxic tort claims against it, their claims would thereby become "known." As a result, it ruled, publication notice was sufficient.

---

[118] *Id.* (citations omitted).

[119] *Id.* at 346.

App-130

Since then, *Chemetron*, rather than *Brooks Fashion Stores*, has been followed in this District[120] and elsewhere.[121] In his 2003 decision in *XO Communications*, Chief Judge Gonzalez cited *Brooks Fashion Stores* for a different proposition, but relied on *Chemetron* for the latter's rejection of the "reasonably foreseeable" standard. And fleshing out

---

[120] *See XO Communications*, 301 B.R. at 793 (citing *Chemetron* as "emphasizing that claimants must be reasonably ascertainable, not reasonably foreseeable").

[121] *See Louisiana Dep't of Envtl. Quality v. Crystal Oil Co. (In re Crystal Oil Co.)*, 158 F.3d 291, 297 (5th Cir. 1998) ("*Crystal Oil*"). In *Crystal Oil*, the Fifth Circuit affirmed a bankruptcy court's order declining to allow an environmental agency's late filing of a claim, even though the environmental agency had received notice only by publication. Though the "evidence could go either way," see *id.* at 298, the bankruptcy court's determination that the environmental claim was not "reasonably ascertainable" was held not to be clearly erroneous. Though Crystal Oil had dealt with environmental agencies in the past, including this one, the Fifth Circuit held that there could be "no basis for concluding that a debtor is required to send notices to any government agency that possibly may have a claim against it." *Id.* at 297. And it further held that even though the Louisiana Department of Environmental Quality had a telephone call with an individual at Crystal Oil discussing the particular polluted site with which it later would assert a claim, and Crystal looked up its records and erroneously concluded that it had no relationship with the property (because the records that would confirm ownership were "ancient ones in long-term storage"), the environmental agency was not a "reasonably ascertainable," and hence "known," creditor. *See id.* at 297-98. In articulating the standard, the Fifth Circuit stated that "[a]s we read these cases, in order for a claim to be reasonably ascertainable, the debtor must have in his possession, at the very least, some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable." *Id.* at 297.

App-131

the standards further, Judge Gonzalez quoted another decision in the *Drexel Burnham* chapter 11 case:

> Reasonable diligence in ferreting out known creditors will, of course, vary in different contexts and may depend on the nature of the property interest held by the debtor. Applying *Mullane's* "reasonable under the circumstances" standard, due process requires a reasonable search for contingent or unmatured claims so that ascertainable creditors can receive adequate notice of the bar date. What is reasonable depends on the particular facts of each case. A debtor need not be omnipotent or clairvoyant. A debtor is obligated, however, to undertake more than a cursory review of its records and files to ascertain its known creditors.[122]

The takeaway from the cases discussing the general principles helping courts decide what are "known" and "unknown" claims is that the debtor must make effective use of the information already available, but the fact that additional claims may be "foreseeable" does not make them "known." Then, in each case, the Court must determine on which side of the line the facts before it fall.

### B. The Particular Issues Here

#### 1. Do Due Process Requirements Apply?

New GM argues preliminarily that due process requirements did not apply to the 363 Sale at all,

---

[122] 301 B.R. at 793-94 (*quoting Drexel Burnham-Bankruptcy*, 151 B.R at 681).

App-132

because this Court's earlier bar to successor liability did not result in a deprivation of property. The Court cannot agree.

New GM premises that argument on five separate contentions:

(1) that in most 363 sales (including this one), claims or interests would attach to the sale proceeds, and thus that there is no extinguishment of a property right;

(2) that there was no extinguishment of a property right, because any successor liability claims really belonged to the Old GM estate;

(3) that section 363(f) of the Bankruptcy Code preempts—*i.e.,* trumps—state laws imposing successor liability;

(4) that the Court already ruled that there was no continuity of ownership between purchaser and seller, and thus no basis for successor liability; and

(5) that there could be no successor liability anyway for Economic Loss Plaintiffs, because, unlike accident victims, they would not get the benefit of the "product line exception."

The Court finds these preliminary contentions unpersuasive.

New GM is right when it says that in bankruptcy sales—either from the start or by agreement to resolve objections—creditors with *security interests or other liens* regularly get substitute liens on sale proceeds when estate property subject to their liens is sold to a third party, and that the bankruptcy community regularly regards that as a fair substitute. But comparable protection often cannot

App-133

be provided for claims or interests other than liens. And here that comparable protection could not effectively be obtained.[123] Neither back in 2009, nor

---

[123] Thus Judge Posner, speaking for the Seventh Circuit in *Edwards*, *see* n.69 *supra*, was correct when he observed that the failure to give a lien creditor notice of a section 363 sale resulted in no more than a *de minimis* deprivation of property, since the value of the secured creditor's interest in the property (*i.e.*, the value of its lien) was no more than the value of the property, and the sale proceeds were the best measure of that. *See* 962 F.2d at 645 ("[secured creditor] Guernsey does not suggest that the property was worth more than the $85,000 that the bankrupt estate received for selling it—and if it was worth no more Guernsey suffered only a trivial loss of interest (the interest on $7,000 during the period it was in the hands of the trustee) as a result of the failure to notify it of the sale."). But as this Court explained in the *Sale Opinion*, see 407 B.R. at 501, "we know that 'interest' includes more than just a lien." Because estate property can be sold free and clear of many types of claims and interests apart from liens, it would at least generally be inappropriate to apply *Edwards*-style analysis to claims and interests other than liens whose value is capped at the value of the property sold (and hence the available sale proceeds).

For that reason, although the Court agrees with nearly all of the analysis in *In re Paris Indus. Corp.*, 132 B.R. 504 (D. Me. 1991) (Hornby, J.) ("*Paris Industries*") (a non-lien case in which plaintiffs were enjoined from asserting successor liability in a tort action against an estate's assets' purchaser, and where the court concluded that "the liquidation of the assets and their replacement with cash (which was then apparently distributed to a secured creditor) has not affected [the plaintiffs'] ability to recover on their claim," *id.* at 510), the Court agrees with the portion it has just quoted only in part. The *Paris Industries* plaintiffs might have recovered more from the purchaser if their successor liability theory survived and prevailed. But this Court agrees with the next observation made by the *Paris Industries* court, pointing to a different kind of lack of prejudice—"[t]he irony of [the plaintiffs'] argument is that they would not even be able to make their claim against [the purchaser] were it not for

App-134

in 2011 when Old GM's plan was confirmed, did anyone suggest that Old GM's product liability creditors became secured creditors—the natural corollary of New GM's position. They were ordinary members of the unsecured creditor class, sharing in the proceeds of the 363 Sale in accordance with the usual bankruptcy priorities waterfall.[124] That would not, of course, make a sale free and clear of successor liability claims improper. But it likewise does not make it true that the Economic Loss Plaintiffs asserting successor liability claims would have "no property interest that was extinguished," as argued by New GM,[125] and thus no interests at stake and no interest in being heard. Rather, the Economic Loss Plaintiffs would have the same interest in being heard as the accident victims who likewise wanted to (and did) oppose successor liability. The Court ultimately overruled the latter's objections on the merits, but there never was any doubt that they had a right to be heard.

The Court also cannot agree with New GM's second contention in this regard—that successor liability claims did not really belong to the Economic Loss Plaintiffs and Pre-Closing Accident Plaintiffs who might wish to assert them, but were actually claims owned by Old GM. Though New GM offers caselaw support that at first blush supports its

---

the sale, for it is only by the sale of assets and the doctrine of successor liability that they can even assert such a claim." *Id.* There, as here, the plaintiffs would have received no more in a liquidation.

[124] *See* Plan at §§ 1.79, 4.3 (ECF No. 9941-1).

[125] *See* New GM Reply at 36.

App-135

position, New GM's contention sidesteps the basic fact that a prepetition right that the Plaintiffs had to at least try to sue a successor was taken away from them, without giving them a chance to be heard as to whether or not that was proper.

New GM relies on three cases in support of its contention: *In re Keene Corp.*,[126] *In re Emoral, Inc.*,[127] (which heavily relied on *Keene*), and *In re Alper Holdings USA.*[128] Each of *Keene* and *Alper Holdings*, in this Court's view, was properly decided; *Emoral,* a 2-1 decision with a cogently articulated dissent by Judge Cowen, probably was not. But whether or not all were properly decided, none supports the conclusion, which New GM asks the Court to reach, that tort litigants' interest in pursuing successor liability was so minimal that they didn't even have a right to be heard.

*Keene*, the first of the three, involved approximately 1,600 lawsuits by asbestos plaintiffs who at least arguably had claims against the debtor Keene. But their rights to recover against the debtor were impaired when Keene transferred over $200 million of its assets to its then affiliates during the 1980s and then spun off the affiliates.[129] Not surprisingly, the transfer and spin-off triggered

---

[126] *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844 (Bankr. S.D.N.Y. 1994) (Bernstein, C.J.) ("*Keene*").

[127] 740 F.3d 875 (3d Cir. 2014), *cert. denied,* 135 S. Ct. 436 (2014) ("*Emoral*").

[128] 386 B.R. 441 (Bankr. S.D.N.Y. 2008) (Lifland, C.J.) ("*Alper Holdings*").

[129] *See* 164 B.R. at 846.

App-136

fraudulent conveyance claims, initially brought prepetition. In those same prepetition actions, asbestos plaintiffs also brought claims against the transferees, asserting successor liability and tort liability based on piercing the corporate veil.[130]

Thereafter, Keene filed a chapter 11 case. Judge Bernstein granted the Keene estate's motion for an injunction blocking the continued prosecution of those actions, concluding that they were violative of section 362(a)(1) of the Code, which bars, among other things, the continuation of suits to recover on claims against the debtor that arose before the filing of the bankruptcy case.[131] He noted that the fraudulent conveyance claims became the estate's claims to prosecute under section 544 of the Code, and reasoned, properly, that "the Wrongful Transfer Claims should be asserted, in the first instance, by Keene or any other estate representative designated for that purpose."[132] He likewise blocked the asbestos plaintiffs' efforts to go after the defendants on corporate veil piercing and successor tort liability theories, noting that the thrust of those actions would be to "subject all of the assets of these non-debtor defendants to the claims of Keene's creditors."[133] Even with respect to the successor liability claims, he read them as a species of fraudulent transfer claim,[134] with the purpose of

---

[130] *See id.* at 847-48.

[131] *See id.* at 848-49; *accord id.* at 850.

[132] *Id.* at 849.

[133] *Id.* at 850.

[134] *Id.* at 853.

App-137

increasing the assets of the estate as a whole to satisfy the claims of the creditor community as a whole.[135]

Given the asbestos plaintiffs' effort in *Keene* to recover assets that should have been recovered for the benefit of all (and, notably, the transfer of their litigation rights to the estate under section 544), Judge Bernstein's ruling in *Keene* was plainly correct. But in *Emoral*, which followed and heavily relied on *Keene*, the distinction between a benefit to all and a benefit to individual creditors seeking to impose successor liability was blurred—and it was this blurring that triggered Judge Cowen's dissent, and, in this Court's view, the greater persuasiveness of Judge Cowen's view.

*Emoral* involved a prepetition sale of assets from a company (known most commonly as Palorome International, but later renamed Emoral) that manufactured diacetyl, a chemical used in the food flavoring industry that was the subject of many toxic tort suits. Emoral later filed for bankruptcy protection, and disputes arose between the Emoral estate's trustee and the buyer of the assets, a

---

[135] *Id.* ("In any event, the remedy against a successor corporation for the tort liability of the predecessor is, like the piercing remedy, an equitable means of expanding the assets available to satisfy creditor claims. The class action plaintiffs that invoke it allege a *general* injury, their standing depends on their status as creditors of Keene, and their success would have the effect of *increasing the assets available for distribution to all creditors*. For the same reasons stated with respect to the piercing claims, claims based upon successor liability should be asserted by the trustee on behalf of all creditors.") (emphasis added).

App-138

company called Aaroma—including, most significantly, claims by the trustee that the prepetition asset sale had been a fraudulent transfer. The trustee and Aaroma settled those disputes; as part of the settlement, the trustee agreed to release Aaroma from any causes of action that were property of the Emoral estate. But at the bankruptcy court hearing considering the propriety of the settlement, the trustee's representative stated that any successor liability claims against Aaroma didn't belong to the Emoral estate, and that the trustee therefore couldn't release them.[136] Aaroma's counsel argued that whether or not the diacetyl plaintiffs' causes of action were property of the estate (and therefore covered by the release) was not an issue before the bankruptcy court at that time, and the approval order was modified to provide, in substance, that nothing in the approval order or the underlying sale agreement would operate as a bar to prosecution of any claims that weren't property of the Emoral estate.[137]

Thereafter, plaintiffs asserting diacetyl injury claims sued Aaroma, arguing for successor liability and citing the trustee's remarks that their claims didn't belong to the estate, and that the estate couldn't release them. In a 2-1 decision (and disagreeing with the Bankruptcy Court, which had held to the contrary), the *Emoral* majority held, relying heavily on *Keene*, that the claims did in fact belong to the estate, and that Aaroma was thus protected. The two judges in the majority did so

---

[136] 740 F.3d at 877.

[137] *Id.*

App-139

based on their view that as a legal matter, the claim for successor liability was for the benefit of all of the estate's creditors. But they did not, so far as this Court can discern, parse the plaintiffs' complaint to focus on what the plaintiffs were actually asking for, to see if that was actually true. Judge Cowen, dissenting (who agreed with the conclusion of the Bankruptcy Court), found the majority's mechanical approach troublesome for several reasons, most significantly because the majority failed to consider, as a factual matter, what he considered to be critical—whether plaintiffs bringing the diacetyl claims would be suing for themselves or for the benefit of all.[138]

The third case, *Alper Holdings*, offered by New GM with a "*See also*," involved an objection to claims. Somewhat like *Emoral* (though *Emoral* involved successor liability claims, rather than alter ego claims) *Alper Holdings,* decided by Chief Judge Lifland, involved an issue as to whether alter ego claims had been previously released by the estate.[139] As in all of these cases, the focus was on whether the injury was to creditors as whole or only to particular ones. And as Judge Bernstein had done in *Keene*, and as Judge Cowen dissenting in *Emoral* did (and as his colleagues should have done), Judge Lifland looked, as a factual matter, to the nature of the successor liability claims, to see if they were asserted for the

---

[138] *See id.* at 885-86 & n.1.

[139] *See* 386 B.R. at 446.

App-140

benefit of all of the estate's creditors or only to particular ones.[140]

Importantly, none of *Keene*, *Emoral*, or *Alper Holdings* involved a 363 sale, nor considered the rights of plaintiffs to be heard before a free and clear order was entered. And for that reason, they are not as important as they might otherwise appear at first blush. But on the principle for which they are cited— that taking away the right to sue on a successor liability theory isn't a deprivation of property from the person who might wish to sue—they are at best irrelevant to New GM's position and at worst harmful to it. Each of *Keene*, *Alper Holdings* and Judge Cowen in *Emoral* focused on whether the particular successor liability action sought to recover for the benefit of all, on the one hand, or to secure a private benefit, on the other.[141] If it is the latter, a

---

[140] *See id.* ("[I]t was clear based upon the conduct alleged by the Holt Plaintiffs that such alter ego claims were of a generalized nature and did not allege a 'particularized injury' specific only to the Holt Plaintiffs. Accordingly, this Court held that such alter ego claims were in fact property of Saltire's bankruptcy estate and were, therefore, released under section 13.1 of the Saltire Plan.").

[141] In that connection, the Plaintiffs point to a 2013 decision of the Second Circuit, *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC),* 721 F.3d 54 (2d Cir. 2013) ("*Madoff*"). *Madoff* is not as closely on point as the Plaintiffs suggest, as it was a *Wagoner* Rule *in pari delicto* case; it involved neither a 363 sale nor claims of successor liability. Nevertheless, the Plaintiffs properly observe (Pl. Br. at 36 n.44) that *Madoff* focused, as a factual matter, on whether the underlying creditor claims, in the *in pari delicto* context, were personal to the creditor or really belonged to the debtor corporation, and it tends to undercut New GM's position in that regard. *See* 721 F.3d at 70 (rejecting the trustee's contention

App-141

party at risk of losing that private benefit deserves the opportunity to be heard.

As the Court noted in oral argument,[142] theories of successor liability, when permissible, permit a claimant to assert claims not just against the transferor of the assets, but also against the transferee; they provide a second target for recovery. Here the Plaintiffs have not purported to sue for the benefit of Old GM creditors generally; they have instead sued to advance their own, personal, interests. They have not asked New GM to make a payment to Old GM; they want New GM's money for themselves. Taking away the right to recover from that additional defendant (where such a right otherwise exists under the law of those states that permit such) may easily be understood as a matter of bankruptcy policy, and the supremacy clause, but it nevertheless represents a taking of rights from the perspective of the tort plaintiff who loses the right to sue the successor.

New GM's last three reasons for why Plaintiffs would not have any due process rights at all require considerably less discussion. As the third of its five reasons, New GM argues that section 363(f) of the Bankruptcy Code prevails over state laws imposing successor liability. That is true, but that is why New

---

that he could bring claims against third party financial institutions because his "claim [was] a general one, with no particularized injury arising from it," and that the claims against the financial institutions were "common to all customers because all customers were similarly injured by Madoff's fraud and the Defendants' facilitation").

[142] *See* Day 1 Arg. Tr. at 41.

App-142

GM should *win on the merits*. It does not justify denying those who might wish to argue otherwise the opportunity to be heard.

As the fourth of its five reasons, New GM argues that the Court already ruled that there was no continuity of ownership between purchaser and seller, and thus no basis for successor liability. Once again that is true, but it was done before the Plaintiffs had appeared in the case. The Court cannot rely on conclusions it reached in a hearing to which the Plaintiffs were not invited as a basis for retroactively blessing the failure to invite them.

As the fifth of its five reasons, New GM argues that there could be no successor liability anyway for Economic Loss Plaintiffs, because, unlike accident victims, they would not get the benefit of the "product line exception." That too might be true (though it could vary depending on the particular state whose law would apply), but it once again goes to the merits—not the Plaintiffs' rights to be heard before successor liability claims were barred.

For these reasons, the Court concludes that the Plaintiffs were entitled to due process in the context of each of the sale and claims processes—requiring the Court then to consider whether they received it.

2. Notice by Publication

Having determined that the Plaintiffs did have due process rights, the Court must determine whether those rights were violated. The first (though not last) issue in that inquiry is whether notice by publication to owners of Old GM vehicles not known by Old GM to have been in accidents was, as a

App-143

general matter, constitutionally sufficient. It plainly was.

As noted above, the Second Circuit has held that the proper inquiry on a due process contention is whether the noticing party (here Old GM)[143] "acted reasonably in selecting means likely to inform persons affected . . . ."[144] The notice required is that "appropriate to the nature of a given case,"[145] and "*the best notice practical under the circumstances.*"[146] The very reason why property is sold under section 363, and not under a reorganization plan, is because time and liquidity constraints do not permit a more leisurely process.[147]

---

[143] The Court is not persuaded by New GM's contention that because it was Old GM and not New GM that may have provided insufficient notice, New GM should not be penalized for that. It is the possible failure to provide requisite notice—and not who was responsible for it—that results in the need for the Court to take judicial action. The potential constitutional violation must trump determinations of fault and New GM's contractual rights.

[144] *Weigner*, 852 F.2d at 649.

[145] *Drexel Burnham*, 995 F.2d at 1144.

[146] *Id.* at 1144 (citing *Mullane*) (emphasis added).

[147] It should go without saying that the urgency of the situation is a hugely important factor in determining what is the best notice practical under the circumstances. Exemplifying this is *Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp. (In re Caldor Corp.),* 266 B.R. 575 (S.D.N.Y. 2001) (Casey, J.) ("*Caldor-District*"), *aff'g In re Caldor Corp.,* 240 B.R. 180 (Bankr. S.D.N.Y. 1999) (Garrity, J.) ("*Caldor-Bankruptcy*"). There Judge Casey of the District Court, affirming an order of Judge Garrity of this Court, rejected contentions by the appellant that it had been denied due process when it failed to get notice in advance of Judge Garrity's order (in the face of Caldor's inability to

App-144

Actual notice to those in the 27 categories above resulted in mailed notice of the 363 Sale to over 4 million people and entities[148]—including any known by Old GM to have been in accidents. But given the urgency of GM's circumstances, it would be wholly unreasonable to expect individual mailed notice of the 363 Sale hearing to go to the owners of the approximately 70 million GM cars then on the road, or even the approximately 27 million whose cars were then (or later became) the subject of pending recalls.

This is exactly the kind of situation for which notice by publication would be the norm. Old GM's counsel could hardly be faulted for availing itself of that approach. Under normal circumstances, notice by publication to Old GM vehicle owners—describing the upcoming sale and the fact that New GM would be assuming only very limited types of Old GM liabilities—would be the only kind of notice that

---

continue in business during the course of its chapter 11 case) authorizing the prompt wind-down of Caldor's business operations and restraining payment on anything more than a pro-rata basis, of administrative claims that had accrued before the time of that order. *See* 266 B.R. at 579, 583. Judge Casey applied the Second Circuit's *Weigner* test of whether the noticing party "acted reasonably," as contrasted to whether there was actual receipt of notice. And recognizing that Caldor was faced "with the formidable task of providing notice to approximately 35,000 entities," *id.* at 583, and that the record was "replete with evidence as to Caldor's dire financial circumstances," *id.* at n.5, he found Caldor's actions "reasonable given the circumstances under which it was operating." *Id.* at 583.

[148] *See* Davidson Decl. ¶ 5, New GM Appx. of Exh. 1 (ECF No. 12982-1).

App-145

would be practical under circumstances like these, and would easily meet the Supreme Court's and the Second Circuit's requirements.

### 3. Known Claim Analysis

But Old GM's ability to provide notice by publication, rather than actual notice, rests on the premise that those who received publication notice only did not have "known" claims. For that reason, both sides debate at length whether owners of cars with Ignition Switch Defects—but who had neither been in accidents of which Old GM was aware, nor sued Old GM or manifested any intent to sue—were "reasonably ascertainable (and thus "known") creditors, on the one hand, or no more than "foreseeable" (and thus "unknown") creditors on the other.

That question is close. It is true, as New GM argues, that Old GM sent out actual notice of the 363 sale (and later, of the Bar Date) to anyone who had sued it or manifested a possible intention to sue, and that all or nearly all of those with Ignition Switch Defects were not yet in that category. It also is true that sending out notice of a recall is not the same as expecting to be sued; that not all recalls are the same in terms of the risk of resulting death or injury; and indeed that many (and perhaps most) recalls might not result from the risk of death or injury at all.

But it is also true that at least 24 Old GM engineers, senior managers and attorneys knew of the Ignition Switch Defect and the need to send out recall notices—and of the reasons why recall notices had to go out, here. And it is uncontroverted that Old GM had enough knowledge of the Ignition Switch

App-146

Defect to be required, under the Safety Act, to send out mailed recall notices to owners of affected Old GM vehicles, and knew the names and addresses to whom it had to send them. On balance the Court concludes that by reason of the knowledge of those 24 individuals, the owners of cars with Ignition Switch Defects had "known" claims, from Old GM's perspective, as that expression is used in the due process jurisprudence.

The caselaw does not require actual notice to those whose claims are merely "foreseeable." But the caselaw requires actual notice to claimants whose identity is "reasonably ascertainable."[149] So the Court must consider how this case fits in that spectrum when 24 Old GM personnel knew of the need to conduct a recall (and with that, of the need to fix the cars); and, in addition, a critical safety situation; and, in addition, the exact names and addresses of the owners of the cars that were at risk.

Preliminarily, there can be no doubt that the names and addresses of the car owners whose cars Old GM's personnel knew to be subject to the recall obligation—and here, to have safety defects as well— were "reasonably ascertainable" and, in fact, actually known. Old GM (like New GM later) was subject to the Safety Act, which requires vehicle manufacturers to keep records of vehicle ownership, including vehicle owners' names and addresses. Once Old GM knew which cars had the Ignition Switch Defect, Old GM knew exactly to whom, and where, it had to send the statutorily required recall notice.

---

[149] *See* pages 49 et seq. *supra.*

App-147

But not all of those with Ignition Switch Defects would be killed, injured, or want to sue Old GM on economic claims. Those 24 Old GM personnel did not have knowledge of *which particular* car owners with Ignition Switch Defects would later be killed or injured in accidents, but they knew that some would—which is why Old GM needed to conduct the recall. Those Old GM personnel also knew that all of those vehicle owners had a statutory right to get their cars fixed at Old GM's (and later New GM's) expense.

Taking the easier element first, the duty to fix the cars with Ignition Switch Defects was owed to every one of those whose cars were subject to the known recall obligation. That aspect of Old GM's obligations was not subject to the uncertainty of whether or not there would be a subsequent accident or lawsuit.

The other element is plainly harder, but the Court comes out the same way. Old GM faced the recall obligation and known claims here not by reason of any kind of actuarial foreseeability (or the reality that in any line of endeavor, people can make mistakes and others can be hurt as a result), but by reason of the *known safety risk* that required the recall—*i.e.*, that here there was known death or injury in the making to someone (or many) in the body of people whose names and addresses were known, with the only uncertainty being who, exactly, those killed or injured might be. It is not a satisfactory answer, in this Court's view, to say that because the particular individuals in a known group who would turn out to be accident victims were

App-148

unknown, all of them were unknown. Rather than
concluding that because of that uncertainty, *none*
were entitled to notice, the Court concludes that *all*
of them were.

New GM understandably points to a considerable
body of caselaw holding, in substance, that creditors
are not "known" unless their status as such is
reflected in the debtor's "books and records." That is
true, but what "books and records" means in this
context is all important. At oral argument on its
motion, New GM understandably did not press its
earlier position[150] that its financial accounting (and
in particular, liabilities on its balance sheet) would
be determinative of whether claims were known.[151]
And for good reason: such a view would fail to
comport with the caselaw or common sense. The
"books and records" standard does not rest on
whether the notice-giver has booked a liability or
created a reserve on its balance sheet; on the
treatment of the loss contingency under FASB 5
standards; or on whether the debtor has
acknowledged its responsibility for the claim;[152] it
merely requires having the requisite knowledge in
one way or another that can be relatively easily
ascertained and thereafter used incident to the

---

[150] *See* New GM Opening Br. at 27-29.

[151] *See* Day 1 Arg. Tr. at 78 ("I agree it's not the financial
statements.").

[152] *See, e.g., Drexel-Burnham-Bankruptcy*, n.105 *supra*, 151
B.R. at 681-82 (in late proof of claim context, holding that a
guaranty liability not booked on the balance sheet was still a
known claim, reflected on the debtor's "books and records," and
that accounting practices were not determinative).

App-149

noticing process. In the Court's view, the standard requires much more than the fact that somewhere, buried in a company's books, is information from which the liability could be ascertained,[153] and the Court doubts (though under the facts here it does not need to decide) that the knowledge of one or very few people in a large enterprise would be enough to meet the standard.[154] But "books and records" must be

---

[153] *See, e.g., XO Communications*, 301 B.R. at 793-94 (in late proof of claim context, noting that "[w]hat is reasonable depends on the particular facts of each case. A debtor need not be omnipotent or clairvoyant. A debtor is obligated, however, to undertake more than a cursory review of its records and files to ascertain its known creditors.").

[154] The Court has based its conclusion that the Plaintiffs were known creditors here on the fact that at least 24 Old GM engineers, senior managers, and attorneys knew of the Ignition Switch Defect—a group large in size and relatively senior in position. The Court has drawn this conclusion based not (as the Plaintiffs argue) on any kind of automatic or mechanical imputation drawn from agency doctrine (which the Court would find to be of doubtful wisdom), but rather on its view that a group of this size is sufficient for the Court to conclude that a "critical mass" of Old GM personnel had the requisite knowledge—*i.e.*, were in a position to influence the noticing process. *Cf. Weisfelner v. Fund 1 (In re Lyondell Chemical Co.)*, 503 B.R. 348, 389 (Bankr. S.D.N.Y. 2014) (Gerber, J.) (in a case alleging an intentional fraudulent conveyance in an LBO, rejecting arguments based on automatic imputation of a CEO's alleged intent under ordinary agency rules, and ruling that if a creditor litigation trust pressing those claims could not plead facts supporting intent to hinder, delay or defraud on the part of a "critical mass of the *directors* who made the decisions in question," it would then have to allege facts plausibly suggesting that the CEO, who was only one member of a multi-member Board, could nevertheless control the disposition of Lyondell's property) (emphasis in original).

App-150

construed in a fashion consistent with the Supreme Court's requirements that "known" liabilities include those that are not just actually known, but also "reasonably ascertainable."

New GM points out that it maintained a "litigation calendar," showing people who had sued it, threatened to do so, or even made claims against it, and that Old GM was careful to provide all of them with actual notice.[155] That of course was the right thing to do, and under other circumstances, it would do the job.[156] But here we have the unique fact that Old GM knew enough to send out recall notices (to meet a statutory obligation to car owners, and, more importantly, to forestall the injury or death which, without corrective action, would result), whose mailing, coupled with the publication notice it could appropriately send, would have been more than sufficient. But Old GM did not do so.

New GM calls the Court's attention to its earlier decision in *Morgenstein,* in which this Court held that the plaintiffs there were "unknown" creditors, who could not use lack of actual notice to vacate the confirmation order in this case—though admittedly

---

[155] *See* Day 1 Arg. Tr. at 78-79.

[156] New GM also points out that it is much easier for a debtor to recognize contractual obligations than those that may arise in tort, for alleged violations of law, or in other instances where the debtor and possible claimants have not had personal dealings. That is true, and it underscores why publication notice for claimants in the latter categories is normally sufficient. But here, once again, Old GM personnel knew of the need to send out recall notices, where to send them, and why they needed to go out. This changes everything.

App-151

they received notice only by publication. There the plaintiffs (on their own behalf and a class they wished to represent) sought to bring an untimely class proof of claim after the bar date and after Old GM's liquidation plan went effective. But they failed to plausibly allege any evidentiary facts supporting their contention that Old GM *knew* that the alleged design defect affected the vehicles they owned. Nor were their vehicles subject to a recall. Old GM's knowledge of the Ignition Switch Defect here, and of its need to effect a recall of the Plaintiffs' cars here, makes *Morgenstein* a different case.

New GM also calls this Court's attention to Judge Bernstein's decision in *Old Carco*[157]—the *Chrysler* chapter 11 case—which in many respects is closely on point, and with which this Court fully agrees. There, after Old Carco's[158] own 363 sale, owners of Jeep Wranglers and Dodge Durangos manufactured by Old Carco brought a class action for economic loss against New Chrysler in the District Court in Delaware, alleging that their cars suffered from a design flaw known as "fuel spit back." As here, the affected car owners in *Old Carco* had received notice only by publication. With the same issue as to whether the *Old Carco* sale order's free and clear provisions barred the economic loss claims there, the Delaware District Court referred that question to the *Old Carco* bankruptcy court. Judge Bernstein concluded that Old Carco's Sale Order did indeed bar

---

[157] *See* n.15, *supra*.

[158] Just as Old GM came to be officially known as "Motors Liquidation Co." after the 363 Sale here, the former Chrysler came to be officially known as "Old Carco" after its 363 sale.

App-152

those economic loss claims, and found no due process impediment to enforcing the *Old Carco* sale order against those asserting the economic loss claims there—even against those who bought their cars in the used car market[159]—finding that their claims had arisen when their cars had been manufactured, which was before Old Carco's 363 sale.

But while *Old Carco* plainly was correctly decided, it is distinguishable from this case, in a highly significant respect. Old Carco had *already* issued at least three recall notices for the "fuel spit back" problem for certain Durango and other Old Carco vehicles before the original purchasers bought their vehicles from Old Carco,[160] avoiding the exact problem this Court has identified here.

The publication notice here given, which otherwise would have been perfectly satisfactory (especially given the time exigencies), was insufficient, because from Old GM's perspective, owners of cars with Ignition Switch Defects had "known" claims. Because Old GM failed to provide the notice required under the Safety Act (which, if given before Old GM's chapter 11 filing, could have been followed by the otherwise satisfactory post-filing notice by publication), the Plaintiffs were denied the notice due process requires.

---

[159] *See* 492 B.R. at 403.

[160] *Id.* at 395 (Old Carco issued a "safety defect recall in 2002"; "a second safety recall … in 2005"; and a "further safety recall" in January 2009).

App-153

### 4. The Requirement for Prejudice

But the Court's determination that Plaintiffs were denied the notice due process requires does not necessarily mean that they were "denied due process." The latter turns on the extent to which a denial of due process also requires a showing of resulting prejudice.

Plaintiffs argue that once they have shown the denial of the notice that due process requires, any resulting prejudice is simply irrelevant. In their view, the denial of the notice that due process requires means that they need not show anything more, and that the Court need not, and should not, think about how things might have been different if they had received the notice that was denied.

The Court disagrees. The contention runs contrary to massive caselaw, and common sense.

Though the Second Circuit, so far as the parties' briefing has revealed and this Court is aware, has not ruled on this issue,[161] no less than six other Circuits have. They have repeatedly, and very explicitly, identified prejudice as an essential element of a denial of due process claim—saying, in exactly these words or words that are very close, that

---

[161] In the recent cases in which the Circuit granted relief for denials of due process, the prejudice to the party that had received inadequate notice was obvious, and no other party in the case had made the exact same argument that the party failing to get notice might have made. *See Manville-2010*, 600 F.3d at 154-58 (injunction against insurer's non-derivative claims that had no relation to bankruptcy); *DPWN*, 747 F.3d at 151 (discharge of claim); *Koepp*, 593 Fed. Appx. at 23 (extinguishment of easement).

App-154

"a party who claims to be aggrieved by a violation of procedural due process must show prejudice."[162] So

---

[162] *Perry*, 629 F.3d at 17. *See also Rapp v. U.S. Dep't of Treasury, Office of Thrift Supervision*, 52 F.3d 1510, 1520 (10th Cir. 1995) ("*Rapp*") ("In order to establish a due process violation, petitioners must demonstrate that they have sustained prejudice as a result of the allegedly insufficient notice."); *Brock v. Dow Chemical U.S.A.*, 801 F.2d 926, 930-31 (7th Cir. 1986) ("*Brock*") (in context of review of administrative order affecting an employer where improper notice was alleged, "it must be noted that, unless the employer demonstrates that the lack of formal notice was prejudicial, we will not order that the charges be dismissed"); *Savina Home Indus., Inc. v. Sec'y of Labor*, 594 F.2d 1358, 1365 (10th Cir. 1979) ("*Savina Home Industries*") (in considering due process claim, fact that "no prejudice has been alleged" was identified as one of two factors supporting conclusion that "no due process violation has been established"); *In re New Concept Housing, Inc.*, 951 F.2d 932, 939 (8th Cir. 1991) ("*New Concept Housing*") (ruling that failure to give the debtor notice of a hearing on the approval of a settlement violated two of the Federal Rules of Bankruptcy Procedure, but (rejecting the views of the dissenter that the failure to provide notice of the hearing resulted in a denial of due process that could not be subject to harmless error analysis) that "the violation of these rules constituted harmless error, because the Debtor's presence at the hearing would not have changed its outcome. The Debtor had neither a legal nor factual basis for establishing that the settlement was unreasonable."). *See also In re Parcel Consultants, Inc.*, 58 Fed. Appx. 946, 951 (3d Cir. 2003) (unpublished) ("*Parcel Consultants*") ("Proof of prejudice is a necessary element of a due process claim."); *Cedar Bluff Broad., Inc. v. Rasnake*, 940 F.2d 651 (Table), 1991 U.S. App. LEXIS 17220, at *7, 1991 WL 141035, at *2 (4th Cir. Aug. 1, 1991) (unpublished) ("*Cedar Bluff Broadcasting*") (creditor complaining of notice deficiency failed to show, among other things, "that it was prejudiced by the lack of notice to general creditors").

The Plaintiffs cite one case at the Circuit level which they argue would lead to a different conclusion, *Lane Hollow Coal*

App-155

---

*Co. v. Director, Office of Workers' Compensation Programs*, 137 F.3d 799 (4th Cir. 1998) ("*Lane Hollow Coal*"). They quote a line from the opinion that the claimant is not obligated to demonstrate a "reasonable likelihood that the result of this claim would have been different absent the violation," *id.* at 807, though this is not the same as holding that there is no requirement to show prejudice, as the *Lane Hollow Coal* court itself seemed to recognize. There the Fourth Circuit vacated, in part, an administrative law judge determination granting benefits to a coal miner's widow when there was a 17-year delay in notifying the coal mine operator of the claim, by which time evidence was no longer available and the coal mine operator was thus deprived of the opportunity to mount a meaningful defense. *Id.* at 807. The *Lane Hollow Coal* court did not cite or criticize its earlier holding in *Cedar Bluff Broadcasting* that had denied relief based on a failure to show a lack of prejudice, and in fact stated that *"[t]o be sure, there are 'due process' cases in which we require a showing that the error complained of actually prejudiced the result on the merits…." Id.* at 808 (emphasis added). Though the other cases were not named or otherwise substantively addressed, the *Lane Hollow Coal* court continued "but these cases are of a much different ilk." *Id.* And it declined to authorize "speculation about the would-have-been and could-have-been" if notice had not been denied for those 17 years. *Id.* at 807. *Lane Hollow Coal* is insufficient, in this Court's view, to trump the holdings of the ten cases expressly holding that prejudice is an element of any due process claim. Rather, it is better read as merely assuming that there was in fact prejudice, and holding that a finding of an absence of prejudice when evidence was unavailable after a 17 year delay would necessarily have been based on unacceptable speculation. A later (and very similar) Fourth Circuit holding upon which the Plaintiffs likewise rely, *Consolidation Coal Co. v. Borda*, 171 F.3d 175 (4th Cir. 1999), supports this Court's view. *See id.* at 183 ("It is not the mere fact of the government's delay that violates due process, but *rather the prejudice resulting from such delay.*") (emphasis added).

App-156

have lower courts in this District (at both the District Court[163] and Bankruptcy Court[164] levels), and elsewhere.[165] Several of the above were bankruptcy cases, in which litigants sought to be relieved of bankruptcy court orders based on contentions of denial of due process.[166]

Neither the Plaintiffs, nor the GUC Trust (which is allied with the Plaintiffs on this issue), cite any case that contradicts that authority.[167] Rather, they

---

[163] *See Caldor-District*, 266 B.R. at 583 ("even if notice was inadequate, the objecting party must demonstrate prejudice as a result thereof") (citing, *inter alia, Rapp*); *Affirmance Opinion #2*, 430 B.R. at 99 (rejecting appellant Parker's contentions that he was denied due process as a result of the expedited hearing on the 363 Sale in this case, as "Parker was in no way prejudiced by the expedited schedule").

[164] *See Caldor-Bankruptcy*, 240 B.R. at 188 ("Thus, in addition to establishing that the means of notification employed by Caldor was inadequate, Pearl must demonstrate that it was prejudiced because it did not receive adequate notice.") (citing, *inter alia, Rapp, Brock,* and *Savina Home Industries*).

[165] *In re Gen. Dev. Corp.*, 165 B.R. 685, 688 (S.D. Fla. 1994) (Aronovitz, J.) ("*General Development*") ("A creditor's due process rights are not violated where the creditor has suffered no prejudice.").

[166] *See Cedar Bluff Broadcasting*, n.162 *supra* (bankruptcy court order converting case to chapter 7); *Caldor-District* and *Caldor-Bankruptcy,* nn. 163 and 164 *supra* (bankruptcy court wind-down order); *General Development,* n.165 *supra* (bankruptcy court approval of settlement); *Affirmance Opinion #2*, n. 163 *supra* (the Sale Order in this case).

[167] *See* Pl. Br. at 36-39; GUC Trust Opp. at 27-32 & nn.9 and 10. The GUC Trust does, however, cite and quote at length a Bankruptcy Court decision, *White v. Chance Indus., Inc. (In re Chance Indus., Inc.)*, 367 B.R. 689 (Bankr. D. Kan. 2006) (Nugent, C.J.) ("*Chance Industries*"), in which Judge Nugent

App-157

addressed a situation in which a child was injured on a debtor-manufactured amusement ride after the confirmation of a reorganization plan, allegedly as a result of the reorganized debtor's wrongful prepetition conduct. *See id.* at 692. Judge Nugent ruled, correctly in this Court's view, that because the child was injured after confirmation, and had no prepetition (or even pre-confirmation) relationship with the debtor, *see id.* at 701, the child did not have a claim capable of being discharged, see *id.* at 703-04, and could not be bound by a confirmation order as to which, for obvious reasons, he was not given notice. (Of course that situation is not present here, because New GM expressly assumed liability for death or injuries taking place after the 363 Sale, even if involving vehicles made by Old GM.)

The GUC Trust relies on language that came after that holding in which Judge Nugent declined to agree with an argument that the failure to provide notice to the child was "harmless error," based on the argument before him that the plan—which provided for no future claims representative, but nevertheless sought to bar future claims—would not have changed after an objection and would have been confirmed anyway. *See id.* at 709. But the GUC Trust takes Judge Nugent's comments out of context. Judge Nugent made his "harmless error" observations in the context of his discussion, see *id.* at 709-10 & n.81, of the reorganized debtor's invocation of Fed.R.Bankr.P. 9005, and Fed.R.Civ.P. 61, which together provide that in bankruptcy, as elsewhere, courts should "disregard all errors and defects that do not affect any party's substantial rights." Understandably, Judge Nugent considered that the matter before him affected substantive rights. Though the word "prejudice" never was used in his opinion (which of course undercuts the GUC Trust's argument), he effectively ruled that the child would be substantively prejudiced—by "the extinguishing of an unknown claim that has yet to accrue," *id.* at 709—thus making Rule 61 harmless error analysis inappropriate.

The Plaintiffs also cite *Chance Industries, see* Pl. Br. at 37, but only for further support for their contention (with which, as noted above, the Court agrees) that in defective notice cases, speculation as to what the outcome would have been with

App-158

variously argue that "the Due Process Clause protects . . . the right to be heard, not the right to win;[168] that all of the above cases are distinguishable on their facts;[169] and that imposition of a prejudice requirement would require the Court to speculate as to the outcome if appropriate notice had been provided.[170] The first contention is overly simplistic, the second misses the point; and the third fails based on a mistaken assumption.

As to the first, the issue is not, as Plaintiffs, argue, whether the Due Process clause guarantees "a right to win." Of course it is true that there is no constitutional right to win—though ironically, under the Plaintiffs' argument (that inadequate notice automatically gives them the win), they effectively

---

proper notice is inappropriate. They read Judge Nugent's ruling has having rejected the *Chance Industries* debtor's arguments "notwithstanding [the] debtor's speculation that the tort claimant's participation in confirmation process would not have changed the result." *Id.* This Court agrees with that reading, and would even go farther; it reads Judge Nugent's *Chance Industries* opinion as suggesting that if the objection had been raised, he would have denied confirmation of the plan on those terms.

*Chance Industries* represents an excellent example of what courts do when they think parties are prejudiced; it does not stand for the notion that prejudice doesn't matter. *Chance Industries* did not, and could not, contradict the decisions of its own Tenth Circuit, *see Rapp* and *Savina Home Industries,* n.162, *supra,* that are among those expressly imposing a requirement for showing prejudice.

[168] Pl. Br. at 4.

[169] *See id.* at 37-39; GUC Trust Opp. at 27 n.9 and 29 n.10.

[170] *See* Pl. Br. at 36-37; GUC Trust Opp. at 27.

App-159

seek exactly that. The real issue is rather whether, assuming that there has been a denial of the right to be heard, more is necessary to establish a *judicially cognizable* due process violation—*i.e.*, a right to the desired curative relief. The caselaw answers that; it requires the arguably injured party to show prejudice from the denial.

The Plaintiffs' and GUC Trust's second argument is that "the cases [New GM] cites do not support its contention."[171] But of course they do. Because due process cases are heavily fact-driven, it is hardly surprising that the Plaintiffs can point out factual distinctions between the ten cases discussed above[172] and this one. But the Court does not rely upon those cases for their factual similarity to this one; it relies on them for the *legal principles* that each enunciates, in very clear terms—as stated by the First Circuit in *Perry*, for example, "a party who claims to be aggrieved by a violation of procedural due process *must show prejudice*."[173]

The third contention does not go to the existence of the requirement for showing prejudice. It goes to *how* the Court should examine possible prejudice—and in particular, whether courts should speculate as to resulting harm once they have been presented with a showing of insufficient notice.

In that third contention, the Plaintiffs cite *Fuentes v. Shevin*,[174] in which the Supreme Court

---

[171] Pl. Br. at 37; *accord* GUC Trust Opp. at 27 n.9, 29 n.10.

[172] *See* n.162 *supra*.

[173] 629 F.3d at 17 (emphasis added).

[174] 407 U.S. 67 (1972) ("*Fuentes*").

App-160

reversed the judgments of three-judge District Courts that had upheld the constitutionality of Florida and Pennsylvania replevin statutes that denied a prior opportunity to be heard before chattels were taken from consumers' possession, in several instances without a lawsuit.[175] The Plaintiffs do not argue that *Fuentes*, or any principles it articulated, trumped any of the holdings to which this Court has just referred—that a showing of prejudice must be made before court orders entered with insufficient notice are undone. Nor could they, as *Fuentes* involved facts nothing like this case, and instead involved a facial attack on the constitutionality of statutes that authorized the seizure of property without any notice, and, in many cases, any earlier judicial action at all. The different, later, possible judicial outcomes to which *Fuentes* referred (and upon which the Plaintiffs rely)[176] related to judicial proceedings that never took place, and (for good reasons) needed to take place.

The Plaintiffs then argue a different proposition, on which they are on stronger ground; they say that courts should reject "speculation" that the litigant would have lost anyway. And in this respect, the Court agrees with them. In determining prejudice, courts should not speculate as to outcome if an aggrieved party was denied the notice to which it was

---

[175] *See id.* at 71-72 and n.4.

[176] *See* 407 U.S. at 87 ("To one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merit."), quoted at Pl. Br. at 36.

App-161

entitled. If there is a non-speculative reason to doubt the reliability of the outcome, the Court agrees that it should take action—though the opposite is also true. For that reason, the Court believes that it here should neither deny, nor grant, relief to the Plaintiffs here based on a request by either side that the Court engage in speculation.[177] The Court will refrain from doing so.

Finally, and apart from the caselaw previously noted, the Plaintiffs' contention that prejudice need not be shown in cases like this one runs contrary not just to existing law, but also fairness and sound policy. Bankruptcy sale due process cases, much more than in plenary litigation, involve competing interests—including those of parties who have acquired property rights as buyers of estate assets, and have a justifiable expectation that when they acquire assets pursuant to a bankruptcy court order, they can rely on what the order says. That was an important element of the Seventh Circuit's opinion in *Edwards*,[178] in which that court held that a bona fide

---

[177] But that view, once again, does not go to the requirement that prejudice must be shown; it goes only to how the required prejudice should or should not be found.

To avoid the need for such speculation, it is very possible that in a case where it made a difference, the Court would not require, incident to ascertaining the existence of prejudice, that the result *would* have been different; the Court might well hold that it should suffice that there is a reasonable likelihood that the result *could* have been different. But the Court does not need to decide that here. In this case, there are no matters argued by either side where the distinction would matter.

[178] *See* n.69 *supra*. The Plaintiffs argue that *Edwards*, which was written by Judge Posner, was wrongly decided. *See* Pl. Br.

App-162

purchaser of property in a free and clear sale acquired good title to it, even though a second mortgagee had not received notice of the sale until more than a year later.

The *Edwards* court noted that "[i]f purchasers at judicially approved sales of property of a bankrupt estate, and their lenders, cannot rely on the deed that they receive at the sale, it will be difficult to liquidate bankrupt estates at positive prices,"[179] and that "the liquidation of bankrupt estates will be impeded if the bona fide purchaser cannot obtain a good title, and creditors will suffer."[180] That does not mean, at least in this Court's view, that the purchasers of assets automatically should win, but it does mean that their needs and concerns—and the protection of their own property rights—cannot be disregarded either.

The *Edwards* court twice addressed the competing interests on matters of this character:

> We are left with the practical question, in what circumstances can a civil judgment be set aside without limit of time and without regard to the harm to innocent third parties? The answer requires a consideration of

---

at 34. But the Court believes *Edwards* was correct in its result, and in most of its analysis—especially insofar as it focuses on the prejudice (or lack of prejudice) to the party that received inadequate notice, and speaks of others' property rights that likewise need to be taken into account.

[179] 962 F.2d at 643.

[180] *Id.* at 645.

App-163

> competing    interests    rather    than    a
> formula.[181]

And again:

> To take away a person's property—and a
> lien is property—without compensation or
> even notice is pretty shocking, but we have
> property rights *on both sides of the equation
> here,* since [the second mortgagee] wants to
> take away property that [the purchaser]
> bought    and    [the    purchaser's    lender]
> financed, without compensating them for
> their loss.[182]

The Court is mindful of concerns articulated by
Chief Judge Jacobs dissenting in *Petrie Retail*[183]
(even though they were not embraced by the *Petrie
Retail* majority) that the requirements of law in
bankruptcy cases should not be trumped by concerns
as to whether they might have a chilling effect on
sales in bankruptcy cases, on the one hand, or
"promote[] the sale of the assets marketed by
bankrupt estates," on the other. And for reasons
discussed below, the Court believes that in the
Second Circuit, the requirements of due process
would trump the interests of finality and maximizing
creditor recovery. But in bankruptcy, the interests
inherent in the enforceability of 363 orders (on which
the buyers of assets should justifiably be able to rely,

---

[181] *Id.* at 644 (citation omitted).

[182] *Id.* at 645 (emphasis added).

[183] *See Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie
Retail, Inc.)*, 304 F.3d 223, 233 (2d Cir. 2002) ("*Petrie Retail*")
(Jacobs, C.J., dissenting).

App-164

and the interests of creditors depending on the maximization of estate value likewise rest) are hugely important. And to the extent that courts can respect and enforce sale orders as written unless there is genuine prejudice, they should do so. Since parties' competing needs and concerns "are on both sides of the equation here,"[184] that means that in instances in which prejudice has not been shown, there is no good reason for depriving asset purchasers of their own property rights—and of the benefits for which they provided value to a chapter 11 estate.

And the facts here (which may present a relatively uncommon situation)—where while insufficient notice was given, others duly given notice made the same, and indeed better, arguments against successor liability, and lost—raise an additional common sense and fairness concern. It defies common sense—and also is manifestly unfair—to give those who have not been prejudiced the bonanza of exemption from a ruling as to which other creditors, with no lesser equities in their favor, were heard on the merits, lost, and now have to live with the result.

For all of these reasons, the Court holds—consistent with the ten other cases that have held likewise—that even where inadequate notice has been given, prejudice is an essential element for vacating or modifying an order implementing a 363 sale.

---

[184] *Edwards*, 962 F.2d at 645.

App-165

### 5. Application of Those Principles to Economic Loss Plaintiffs

Having concluded that the Economic Loss Plaintiffs were denied the notice due process requires, but that establishing a claim for a denial of due process requires a showing of prejudice, the Court must then consider the extent to which they were prejudiced as a result. The Court finds that they were not at all prejudiced with respect to successor liability, but that they were prejudiced with respect to overbreadth of the Sale Order.

### (a) Successor Liability

After arguing that prejudice need not be shown, and that they should win without any prejudice at all (contentions that the Court has rejected), the Plaintiffs go on to argue that even if prejudice must be established, it was shown.[185] They argue that if they had the opportunity to be heard, the result would have been different. Insofar as successor liability is concerned, the Court easily rejects that contention.

It is undisputed that although the Plaintiffs did not get adequate notice of the 363 Sale hearing, over 4 million others did, including a very large number who vigorously argued against the Free and Clear Provisions, but ultimately failed. While the Plaintiffs quote from *Mullane* repeatedly, and rely on *Mullane* principles even more often, they overlook the language in *Mullane* that expressly addressed situations where many would be similarly affected—

---

[185] *See* Pl. Br. at 58-60.

App-166

and where all, because of incomplete notice, might not be able to be heard, but many could.

*Mullane* recognizes that where notice is imperfect, the ability of others to argue the point would preclude the prejudice that might result if *none* could. It even suggests that in such instances, there is no persuasive claim that even notice was defective. In language that the Plaintiffs fail to address, the *Mullane* court stated:

> This type of trust presupposes a large number of small interests. *The individual interest does not stand alone but is identical with that of a class.* The rights of each in the integrity of the fund and the fidelity of the trustee are shared by many other beneficiaries. *Therefore notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any objections sustained would inure to the benefit of all.* We think that under such circumstances reasonable risks that notice might not actually reach every beneficiary are justifiable. 'Now and then an extraordinary case may turn up, but constitutional law, like other mortal contrivances, has to take some chances, and in the great majority of instances, no doubt, justice will be done.'[186]

Here, as in the situation addressed in *Mullane*, the notice that was sufficient to trigger many objections to the Free and Clear Provisions was "likely to

---

[186] *Mullane*, 339 U.S. at 318-19 (emphasis added).

App-167

safeguard the interests of all."[187] If those who got notice and made those objections had been successful, the "objections sustained would inure to the benefit of all.[188] These observations by the Supreme Court bolster the conclusion that there was no prejudice here. In fact, just as the *Mullane* court declared that "under such circumstances, reasonable risks that notice might not actually reach every beneficiary [were] justifiable," that element of the *Mullane* holding strongly suggests that notice that did not reach the subset of vehicle owners with Ignition Switch Defects was not constitutionally deficient in the first place.[189]

But even if *Mullane* does not by itself dispose of the question, the Plaintiffs' failure to show any reason why the Free and Clear Provisions were improperly imposed does. That failure underscores the lack of prejudice here.[190] Notably, the Plaintiffs

---

[187] *Id.*

[188] *Id.*

[189] However, while that conclusion follows from what the Supreme Court said in the quoted language, the Court prefers to analyze the matter in terms of the massive caselaw requiring a showing of prejudice. The distinction doesn't matter with respect to the Free and Clear Provisions, because so many people argued against them. But it could matter with respect to overbreadth, discussed below, where those with notice didn't make an overbreadth argument. The Court is more comfortable in denying relief in instances where people made the same argument and lost than it is in instances where those with notice failed to make the argument at all.

[190] *See Paris Industries, supra* n.123, 132 B.R. at 510 ("I conclude that [objectors] were in no way prejudiced by the lack of notice and their inability to appear and argue their position on the sale. They have made no showing that, if they had been

App-168

do not argue that when the Court barred successor liability back in 2009, it got it wrong.[191] They do not

_____

notified and had appeared, they could have made any arguments to dissuade the bankruptcy court from issuing its order that the assets be sold free and clear of all claims."); *Austin v. BFW Liquidation, LLC (In re BFW Liquidation, LLC),* 471 B.R. 652, 672-73 (Bankr. N.D. Ala. 2012) (Cohen, J.) (declining to set aside bankruptcy sale even though a creditor was not given notice of it where creditors' committee and many creditors participated in the process and court could conclude that all creditors' interests in the sale were adequately represented by that committee and those creditors, and the creditor "did not allege in her complaint that she possessed any grounds for opposing the sale which she could have raised had she been notified of the sale before it was authorized").

[191] *See* Pl. Br. at 58-60. The closest they come is an accusation that it is New GM that is engaging in speculation, and a suggestion that the Court would not have written "exactly the same opinion." *See* Pl. Br. at 58-59 ("New GM's argument speculatively presumes that this Court would have written exactly the same opinion in July of 2009 *even if* it had been aware of the ISD, the now well-documented campaign to cover it up, and Old GM's abdication of its legal duties to owners and lessees of Defective Vehicles.") (emphasis in original). In light of the Plaintiffs' failure to put forward any new successor liability arguments or caselaw authority, the Facts section of any opinion might have added a paragraph or two, but the legal discussion would not at all have changed—nor, more importantly, would the outcome.

The Plaintiffs also argue, though only in a footnote, that if they had an opportunity to be heard, they would have objected to a finding in the Sale Order that New GM was a "good faith purchaser" (relevant under Bankruptcy Code section 363(m)), and that the Court likely would have agreed with them. *See* Pl. Br. at 59 n.67. That contention does not help them. Their prediction of the Court's ruling if they had made such an argument is speculative, but even if such a ruling might have come to pass, it would not have an effect on the inclusion of provisions imposing successor liability. "Good faith purchaser"

App-169

bring to the Court's attention any cases that other
objectors missed, or any statutory or other authority
suggesting a different outcome on the successor
liability merits. In fact, they offer no legally based
arguments as to why they would have, or even *could*
have, succeeded on the successor liability legal
argument when all of the other objectors failed.[192]

Rather, while the Plaintiffs recognize that the
Court would not have let GM go into the liquidation
that would have resulted if the Court denied
approval of the 363 Sale, they argue that they could
have defeated the successor liability injunction for
reasons unrelated to its propriety as a matter of
bankruptcy law. While criticizing New GM for
improper speculation,[193] they ask the Court to rely on

---

findings provide safe harbors for buyers *on appeal*; they do not
go to whether or not a sale should be approved, or the nature or
extent of any provisions barring successor liability. *See* section
363(m).

[192] The Court would have fully and fairly considered any such
argument now if it had been made, but (presumably because of
the absence of supporting authority) that is not the Plaintiffs'
argument here.

[193] *See* Pl. Br. at 4 ("New GM's self-serving speculation
regarding possible outcomes had the ISD been disclosed and
notice to the Pre-Sale Class been given are not even plausible.");
*id.* at 58 ("New GM's argument speculatively presumes that this
Court would have written exactly the same opinion in July of
2009 . . . ."); *id.* at 59 ("New GM cannot support its speculation
as to the potential outcome had Old GM disclosed, on the eve of
filing for bankruptcy, that it had put millions of cars on the road
with a known but hidden life-threatening defect while failing to
disclose that fact to those most affected by it.").

App-170

the speculation they prefer;[194] they ask the Court to accept the likelihood that by reason of public outrage or public pressure, they could have required Old GM or Treasury to rewrite the deal to accede to their desires.[195] And they know, or should, the fundamental principle of bankruptcy law that a buyer of assets cannot be required to take on liabilities it doesn't want.

So it requires no speculation for the Court to rule that given Old GM's circumstances at the time, the Court would not have disapproved the 363 Sale or

---

[194] *See* Pl. Br. at 59 ("[I]t is equally or even more likely that Old GM and Treasury—who, New GM acknowledges, was the one to draw 'the line in the sand'—would have chosen to deal with objections from Plaintiffs in the same way it chose to deal with objections from consumer safety groups, by adding Plaintiffs' claims to assumed liabilities."); *id.* at 4 ("[T]here is no way to determine, some five years later, what the outcome would have been had the bombshell of Old GM's concealment of this massive safety defect been made known to the Court, the Treasury, Congress, the public, the press and the various objectors.").

[195] *See id.* at 4-5 ("[H]ad the Court and governmental authorities known that Old GM had knowingly placed millions of cars on the road with a life-threatening safety defect (and that New GM intended to continue to allow such cars to remain on the road with those known defects), it is not reasonable to assume (as New GM does) that such a revelation could only have resulted in a disastrous liquidation and the end of GM as a functioning company. Instead, it is likely that such an outcome would have still been avoided (for numerous reasons, political, national economic and otherwise, that were still significant, compelling and extant), *and that the entry of the Sale Order would have been conditioned on New GM's assumption of all related liabilities so as to ensure the commercial success of the purchasing entity.*") (emphasis added).

App-171

conditioned its approval on modifications to the carefully negotiated restructuring to favor one or more groups seeking special treatment.

As noted above, the Court agrees with the Plaintiffs and the GUC Trust that speculation is inappropriate on an inquiry of this nature. But gauging the outcome on the bar of successor liability if Plaintiffs had been heard does not at all involve speculation, especially since they offered no authority beyond what the other objectors offered in 2009. Rather, it is the Plaintiffs' alternative argument—that they could have succeeded by reason of public outrage, political pressure, or Treasury's anger with Old GM, when they could not prevail in the courtroom—that asks the Court to speculate. For the very reason the Plaintiffs themselves advance, the Court should not, and will not, do so.

Insofar as the Free and Clear Provisions' prohibition of successor liability claims are concerned, while the Plaintiffs failed to receive the notice due process requires, they were not prejudiced as a result. Thus they have failed to establish a claim for a denial of due process. The Free and Clear Provisions must stand.

### (b) New GM's Own Wrongful Acts

What the Court would have done in the face of a Sale Order overbreadth objection is likewise not subject to speculation. The Court follows its own precedent. If the Plaintiffs had been heard to make the argument back in 2009 that they are making now—that they should have the right to allege claims based on wrongful conduct by New GM alone, without any reliance on anything that Old GM might

App-172

have done—the Court would have entered a narrower order, as it did in similar situations. In this respect, the Economic Loss Plaintiffs were prejudiced.

The Court has twice dealt with what is effectively the same issue before. In another chapter 11 case on the Court's watch, quite a number of years before the 363 Sale in this case, Magnesium Corporation of America ("MagCorp"), one of the two debtors in that case,[196] had massive bond debt, environmental, and other liabilities, leading to a chapter 11 filing in August 2001. In May 2002, lacking an ability to reorganize, MagCorp sought approval of a 363 sale to US Magnesium, an affiliate, of substantially all of its assets, with free and clear provisions that would protect the purchaser from successor liability on the debtors' legacy claims—including, most significantly,

MagCorp's environmental liabilities to the EPA and other U.S. Government entities. Understandably upset that it would have to recover its very substantial claims from a shell that at the time seemed largely worthless, the Government objected to the free and clear provisions.

Consistent with the law at the time (which was even clearer by 2009), the Court nevertheless granted the requested free and clear provisions. But it further ruled that *while successor liability would be proscribed,* US Magnesium would not be protected with respect to any future matters *that were its own*

---

[196] *In re Magnesium Corp. of Am.,* No. 01-14312-reg ("*MagCorp*").

App-173

*liability.* As part of its dictated rulings, the Court stated:

> When you are talking about free and clear of liens, it means you don't take it subject to claims which, in essence, carry with the property. It doesn't absolve you from compliance with the law going forward.[197]

And though it later rejected an effort by the Government to reargue the free and clear provisions there, the Court then said:

> I've made it clear that the new owners will have to comply with the law and will be subject to any and all obligations that the EPA or other regulatory authorities can impose with respect to the new owners of the land, including requiring that they do whatever they have to do with cleaning up their land if it's messed up.[198]

The Court's sale order in *MagCorp* therefore included, after its free and clear provisions, a key proviso:

> <u>provided, however, that</u> *nothing contained herein shall* (a) release US Magnesium LLC or any affiliate or insider thereof from any claim of the United States against US Magnesium or such affiliate or insider which existed immediately prior to the Closing (but not as a successor in interest to the Seller)

---

[197] Tr. of Hr'g, Jun 4, 2002, No. 01-14312 ECF No. 290, at 129:21-25.

[198] *Id.* at 132:22-133:5 (transcription errors corrected).

App-174

and (b) *excuse US Magnesium LLC from any obligations under applicable law* (including, without limitation, RCRA or other environmental laws) *as the owner and operator of the Assets (but not as successor in interest to Seller).*[199]

Similarly, at the 2009 sale hearing in this case, certain objectors voiced concerns that any approval order would too broadly release either Old GM or New GM from their respective duties to comply with environmental laws and cleanup obligations. After they did so, the Court noted that it had originally shared their concerns, but that their concerns were addressed by amendments to the proposed order that were made after objections were filed.[200] The Sale Order in this case was amended to say:

> Nothing in this Order or the [Sale Agreement] releases, nullifies, or enjoins the enforcement of any Liability to a governmental unit under Environmental Laws or regulations (or any associated Liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, or operator of property after the date of entry of this Order. Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to deem the Purchaser as the successor to the Debtors under any state law

---

[199] Order, No. 01-14312 ECF No. 283 (Jun. 5, 2002) ¶ 13 (underlining in original but emphasis by italics added).

[200] *See Sale Opinion*, 407 B.R. at 507-08.

App-175

successor liability doctrine with respect to any Liabilities under Environmental Laws or regulations for penalties for days of violation prior to entry of this Order. Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under law.[201]

Here the Sale Order, in addition to barring successor liability (which for reasons discussed above, remains fully appropriate), also proscribed any claims involving vehicles and parts manufactured by Old GM, even if the claims might rely solely on wrongful conduct by New GM alone. By not having the opportunity to argue that such was inappropriate here (and to seek a proviso similar to the ones granted in *MagCorp* and for the environmental objectors here), the Economic Loss Plaintiffs were prejudiced. They thus established an actionable denial of due process with respect to Sale Order overbreadth.

(c) The Used Car Purchasers

A subset of the Economic Loss Plaintiffs, the Used Car Purchasers (whom the Plaintiffs refer to as the "Post-Sale Class"), assert that they have special rights—to assert claims for successor liability when nobody else can—because they had not yet purchased their cars at the time of the 363 Sale. The Court

---

[201] *Id.* at 507. Another provision provided similarly: "Nothing contained in this Order or in the [Sale Agreement] shall in any way (i) diminish the obligation of the Purchaser to comply with Environmental Laws…." *Id.* at 507-08.

App-176

cannot agree. Aside from the illogic and unfairness of the contention, it is erroneous as a matter of law, for at least two reasons.

First, when the Court issued the Sale Order, approving the disposition of Old GM assets—a matter over which the Court had unquestionable subject matter jurisdiction, derived from its statutory subject matter jurisdiction under 28 U.S.C. § 1334 and, more importantly for these purposes, the *in rem* jurisdiction the Court had over estate assets then being sold—those assets were sold free and clear of successor liability claims. The substance of the Sale Order was to proscribe claims based on the transferor Old GM's conduct that could be argued to travel with the assets transferred.[202] The bar against successor liability claims premised on continued ownership of the property traveled with the property. The Used Car Plaintiffs would thus be bound by the *in rem* nature of that order except to the extent that its enforcement, by reason of due process concerns, would be improper as to them.

Because they were unknown at the time, and were not even creditors (not having yet acquired the cars they now assert have decreased value), mailed notice was impossible, and publication notice (or for

---

[202] *See Sale Opinion*, 407 B.R. at 501 (as part of Court's analysis that successor liability claims were "interests" properly subject to a free and clear order, recognizing that "we know that an 'interest' is something that may accompany the transfer of the underlying property, and where bankruptcy policy, as implemented by the drafters of the Code, requires specific provisions to ensure that it *will not* follow the transfer.") (emphasis in original).

App-177

that matter, actual notice) would not have been meaningful to them, even if Old GM had previously sent out recall notices. Thus the Used Car Purchasers were denied the notice due process requires to bind them to the Free and Clear Provisions,[203] just as the remainder of the Plaintiffs were.

But like the other Plaintiffs, the Used Car Purchasers were not prejudiced, because others made the same arguments that Used Car Plaintiffs might have made, and the Court rejected those contentions. Especially since purchasers of estate property under sale orders have property rights too, the methodology for correcting a denial of an opportunity to be heard under such circumstances (if not others as well) should be (1) at least temporarily relieving an adversely affected litigant of the effect of the order, and then (2) giving the adversely affected litigant the opportunity to be heard that was previously denied— referred to colloquially by this Court, in oral argument, as a "do-over"[204]—fixing any damage that might have resulted from an incorrect or incomplete ruling the first time. Granting any more than that would favor the Plaintiffs with an outcome that the Court has already determined is contrary to existing

---

[203] *See Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.)*, 445 B.R. 243 (Bankr. S.D.N.Y. 2011) (Bernstein, C.J.) ("*Grumman Olson-Bankruptcy*"), *aff'd* 467 B.R. 694, 706-07 (S.D.N.Y. 2012) (Oetkin, J.) ("*Grumman Olson-District*") (finding due process concerns made bar of successor liability unenforceable against claimants who were unknown, future, claimants at the time of the sale) (collectively, the "*Grumman Olson Decisions*").

[204] *See* Day 1 Arg. Tr. at 15, 20, 21.

App-178

law, and would grant them a wholly inappropriate windfall.

Like the other Economic Loss Plaintiffs (and for that matter, the Pre-Closing Accident Plaintiffs), if the Used Car Purchasers made arguments at this time that were not previously raised, the Court believes that it would be obligated to consider those arguments now, and effectively give Used Car Plaintiffs a do-over. But once again like the other Plaintiffs, the Used Car Plaintiffs have identified no arguments they might have made that others did not. As with the other Plaintiffs, the denial of notice gave them the chance to be heard on the merits at a later time, but not to an automatic win.

Second (assuming *arguendo* that they were injured), the Used Car Owners were injured as the successors in ownership to individuals or entities who had been the prior owners of their Old GM cars. And for each of them, an earlier owner was in the body of owners of Old GM vehicles who were bound by the Free and Clear Provisions. With exceptions not applicable here (such as holders in due course of negotiable instruments), the successor in interest to a person or entity cannot acquire greater rights than his, her, or its transferor.[205] That is the principle

---

[205] *See Tital Real Estate Ventures, LLC v. MJCC Realty L.P. (In re Flanagan)*, 415 B.R. 29, 42 (D. Conn. 2009) (Underhill, J.) ("In acquiring the estate's rights and interests . . . Titan [the acquiror from a trustee] acquired no more and no less than whatever rights and interests to MJCC and its properties the estate possessed at the time of the assignment . . . Titan can only prevail on its claims if, and to the extent that, the Trustee would have prevailed on those claims at the time of the assignment.").

App-179

underlying the *Wagoner* Rule,[206] which, while an amalgam of state and federal law, is firmly embedded in the law in the Second Circuit.[207] And that principle has likewise been applied to creditors seeking better treatment than the assignors of their claims.[208] Thus it is not at all surprising to this Court that in *Old Carco,*[209] Judge Bernstein blocked the suits by those who bought *used* 2005 and 2006 Dodge Durangos or

---

[206] *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991) ("*Wagoner*").

[207] *See, e.g., Buchwald v. The Renco Group, Inc. (In re Magnesium Corp. of America)*, 399 B.R. 722, 757 nn. 113 & 114 (Bankr. S.D.N.Y. 2009) (Gerber, J.) (applying *Wagoner* Rule to hold chapter 7 trustee to *in pari delicto* defenses applicable to the corporation and its management whom the trustee replaced).

[208] *See In re KB Toys, Inc.*, 736 F.3d 247, 252-54 (3rd Cir. 2013) ("*KB Toys*") (a trade claim that was subject to disallowance in the hands of the original claimant as a preferential transfer was similarly disallowable in the hands of a subsequent transferee). Like the Third Circuit in *KB Toys, see id.* at 254 n.11, the Court has considered, but declined to follow, the contrary holding in *Enron Corp. v. Springfield Assocs. (In re Enron Corp.)*, 379 B.R. 425 (S.D.N.Y. 2007) (Scheindlin, J.) ("*Enron-District*"), which had held that susceptibility for equitable subordination and claims disallowance would continue if a transfer was by way of an "assignment," but not by "sale." The Third Circuit in *KB Toys* court found this distinction to be "problematic," *id.*, and for that reason and others, it followed the contrary decisions in *Enron Corp. v. Avenue Special Situations Fund II, LP (In re Enron Corp.)*, 340 B.R. 180 (Bankr. S.D.N.Y. 2006) (Gonzalez, J.) ("*Enron-Bankruptcy*") (which the *Enron-District* court had reversed), and in *In re Metiom, Inc.,* 301 B.R. 634 (Bankr. S.D.N.Y. 2003) (Drain, J.), with which this Court, like the Third Circuit, agrees.

[209] *See* n.157 *supra.*

App-180

Jeep Wranglers,[210] distinguishing *Grumman Olson-Bankruptcy* on the ground that those plaintiffs *"or their predecessors (the previous owners of the vehicles)* had a pre-petition relationship with Old Carco, and the design flaws that they now point to existed pre-petition."[211]

Thus the caselaw requires that New GM receive the same protection from Used Car Owners' successor liability claims that it had from their assignors'.

The Used Car Purchasers' contention that they deserve better treatment than other GM vehicle owners is also illogical and unfair. As New GM argues, with considerable force, "an owner of an Old GM vehicle should not be able to 'end-run' the applicability of the Sale Order and Injunction by merely selling that vehicle after the closing of the 363 Sale . . . if the Sale Order and Injunction would have applied to the original owner who purchased the vehicle prior to the 363 Sale, it equally applies to the current owner who purchased the vehicle after the 363 Sale."[212] There is no basis in logic or fairness for a different result.

For all of these reasons, the Court concludes, after what is effectively *de novo* review (focused on the non-showing by Used Car Purchasers of anything they might have argued to defeat the Free and Clear Provisions beyond anything previously argued), that Used Car Purchasers have likewise failed to make a

---

[210] *See Old Carco*, 492 B.R. at 399.

[211] 492 B.R. at 403 (emphasis added).

[212] *See* New GM Opening Br. at 66.

App-181

showing of prejudice, and the Free and Clear
Provisions stand for them as well.

### 6. Application of Those Principles to Pre-Closing Accident Plaintiffs

Like the Economic Loss Plaintiffs whose claims
the Court just addressed, the Pre-Closing Accident
Plaintiffs seek to impose successor liability on New
GM. But though the Court has found that they did
not get the notice due process requires, they were not
prejudiced by the failure.

Preliminarily, the Court's determination that the
Economic Loss Plaintiffs were not prejudiced by the
Free and Clear Provisions applies equally to the Pre-
Closing Accident Plaintiffs. The Pre-Closing Accident
Plaintiffs likewise have offered no arguments here as
to why the Court's earlier order proscribing successor
liability was wrong. And it requires no speculation
here for the Court again to find no basis for a
different legal result. In fact, many of the objectors
whose contentions the Court rejected back in 2009
were asserting the exact same types of claims the
Pre-Closing Accident Plaintiffs have—claims for
injury or death from pre-closing accidents, involving
vehicles or parts manufactured by Old GM. While the
Pre-Closing Accident Plaintiffs' claims (premised
upon actual injury or death, and, at least allegedly,
from the safety risk of which Old GM was aware),
might be regarded by many as more sympathetic
than those of Economic Loss Plaintiffs, they
nevertheless are efforts to impose successor liability.
And contentions that the Pre-Closing Accident
Plaintiffs would successfully impose successor
liability by reason of political concerns are once again

App-182

speculative, just as the similar arguments of the Economic Loss Plaintiffs were.

The arguments as to Sale Order breadth that the Economic Loss Plaintiffs might have asserted would not be relevant to the Pre-Closing Accident Plaintiffs. To the extent the Sale Order was overbroad, it was so as to any claims that might arise *solely by reason of New GM's conduct*. The Pre-Closing Accident Plaintiffs suffered the injury or death underlying their claims in Old GM cars, and with Old GM parts. Any actionable conduct causing that injury or death took place before the 363 Sale—and necessarily was by Old GM, not New GM, and indeed before New GM could have done anything wrong.

If the overbreadth objection were sustained and the Sale Order could be, and were, fixed (a matter addressed in Section II below, dealing with Remedies), the Pre-Closing Accident Plaintiffs still could not assert claims against New GM.

The Pre-Closing Accident Plaintiffs did not suffer the prejudice that is an element to a denial of due process claim.

### 7. Application to Filing of Claims

Much of the analysis above applies equally to the allowance of claims. But due process analysis in the claims allowance context must take into account two differences. First, here there was not the same degree of urgency with respect to the deadline for filing claims. And second, while prejudice is required in the claims context as well, the denial of the opportunity to file a timely proof of claim—and with it, the likely or certain expungement of one's claim—is at least generally, if not always, classic prejudice.

App-183

As noted above, due process analysis requires the consideration of the surrounding circumstances. While the need for urgency in a judicial process is the paradigmatic example of a relevant circumstance, the converse is also true. When the urgency is lacking, the hugely important factor of impracticality by reason of time constraints drops out of the picture. In contrast to the 363 sale process, claims could be (and ultimately were) considered in a less hurried fashion.

Nevertheless, were it not for the fact that Ignition Switch Defects were known claims (for reasons discussed in Section I(A)(5) above), service of notice of the Bar Date by the publication that here was utilized[213] would still be adequate. Old GM was careful to send out notice of the Bar Date to any who

───────────────

[213] The Plaintiffs seek to compare and contrast the highly detailed and carefully structured publication notice that this Court authorized with respect to worker claims that might have arisen by reason of their exposure to the chemical diacetyl, in another case on the Court's watch, *Chemtura* (No. 09-11233 (reg)), where a challenge to the adequacy of the notice was rejected by this Court and later affirmed on appeal. *See Gabauer v. Chemtura Corp. (In re Chemtura Corp.),* 505 B.R. 427 (S.D.N.Y. 2014) (Furman, J.). The comparison is not an apt one. There, as a result of a shared desire of the debtor and the Court to provide the best notice possible to workers who might have been exposed to diacetyl (and because Chemtura wanted to lean over backwards to get a discharge of such claims on which it could rely), the Court established special measures, such as notices with an unusually detailed discussion of the possibility of illness, postings of notices in each potentially affected plant, notices in local community newspapers, and publication in both English and Spanish. But these measures are properly thought of as "best practices," or at least an excess of caution, which would not establish a minimum standard for the quality of notice that is constitutionally required.

App-184

had brought suit against Old GM or expressed to Old GM their belief that they might have claims, and the Court approved Old GM's proposals for notice by publication to those not known by Old GM to have potential claims against the Old GM estate.

But with respect to the allowance of claims, the failure to send out Ignition Switch Defect recall notices, much more clearly than with respect to notice of the 363 Sale, resulted in the denial of the notice that due process requires. And though a showing of prejudice here too is required, the Court finds that the denial of timely notice of the Old GM Bar Date prejudiced the Plaintiffs with respect to any claims they might have filed against Old GM.

By reason of its failure to provide the Plaintiffs with either the notice required under the Safety Act or any other form of written notice, Old GM failed to provide the Plaintiffs with the notice that due process requires.[214] And because that failure prejudiced them in filing timely claims, the Plaintiffs were prejudiced as a result. The failure to give the Plaintiffs the notice that due process requires, coupled with the prejudice to them that resulted, denied the Plaintiffs the requisite due process.

---

[214] The Court does not need to decide, and does not decide (in either this context or in the context of the adequacy of notice of the 363 Sale), a matter also debated by the parties—the extent to which a detailed notice describing the types of claims Plaintiffs might assert (or, by analogy, of how they might be adversely affected by the Free and Clear Provisions) was required as a matter of due process law. Because Old GM failed to send out *any* recall notices, or provide *any* alternative form of notice to those with Ignition Switch Defects, whatever, the degree of detail that might otherwise be required is academic.

App-185

## II. Remedies

The second threshold issue requires the Court to determine the appropriate remedies for any denials of due process that the Court may have found. Once again, the Court focuses on the Sale Order and claims allowance process separately.

### A. The Sale Order

The Plaintiffs argue that the Court should simply deny New GM enforcement of the Sale Order "as to the objecting claimant[s] who did not receive due process,"[215] (*i.e.*, as to *them*), even with respect to the same successor liability as to which the Court ruled against others who got notice and argued against it. They argue, in substance, that they should be permanently absolved from the Sale Order's Free and Clear Provisions irrespective of whether those provisions were right or wrong. Not surprisingly, the Court rejects this contention.

By the same token, New GM argues that the Plaintiffs' remedy, if any, is to enforce their claims against the proceeds of the 363 Sale, and that the unitary nature of the Sale Order requires that the Court either enforce it as a whole or vacate it as a whole—while also reminding the Court (though the Court need hardly be reminded) that unwinding the sale at this point is unthinkable. Though these contentions are not as offensive as the Plaintiffs', these too are flawed.

Like the Due Process issue, the Court analyzes the Remedies issue in ways materially different than

---

[215] Pl. Br. at 62.

App-186

the parties here do—in accordance with the discussion that follows.

### 1. Prejudice As Affecting Remedy

For reasons discussed above,[216] the Court has already rejected the Plaintiffs' contention that prejudice is irrelevant to the existence of a due process violation resulting from a denial of the requisite notice. That limits, though it does not eliminate, the matters for which a remedy must be crafted.

Here the Plaintiffs failed to receive notice they might have used to join others likewise arguing against the Free and Clear Provisions. But the others made those points, and made them well. And while the prejudice analysis might be different if the Plaintiffs now identified successor liability points others failed to make, here no such points have been identified. On the Free and Clear Provisions barring successor liability, there is no prejudice; thus no due process claim; and thus nothing to remedy.[217]

---

[216] *See* page 71 & nn.162 through 165 *supra*.

[217] Even if prejudice did not need to be found as an element of a claim of denial of due process in the first place, prejudice would nevertheless be a critical element in determining the proper remedy. As noted above, the Court believes that the methodology for the correction of a denial of an opportunity to be heard in a sale order context should be (1) at least temporarily relieving an adversely affected litigant of the effect of the order, and then (2) giving the adversely affected litigant the opportunity to be heard that was previously denied—repairing any damage that might have resulted from an incorrect or incomplete ruling the first time. Apart from the unfairness of treating the Plaintiffs better than others similarly situated, granting them any more than that would favor the

App-187

But on the Plaintiffs' second principal matter of concern—the overbreadth of the Sale Order—the situation is different. There is a flaw in the order, protecting New GM from liability on claims that, while they involve Old GM vehicles or Old GM parts, do not rest on successor liability, and instead rely on New GM's alleged wrongful conduct alone. The Plaintiffs could have made overbreadth arguments if given appropriate notice before the 363 Sale hearing, and to that extent they were prejudiced. And for that the Plaintiffs should be entitled to remedial relief to the extent the law otherwise permits.

2. Attaching Claims to Sale Proceeds

So it is necessary then to turn to New GM's points. In several respects, New GM is right, but in material respects New GM extends existing law too far, or fails to recognize the holdings or implications of existing precedent.

Over-extension of existing law is the problem with respect to New GM's first point: its contention that the Plaintiffs' claims should attach to the 363 Sale Proceeds. That often works fine; courts routinely provide that upon sales of estate property subject to a lien, the rights of parties with liens on the collateral that was sold attach to the proceeds instead.[218] And

---

Plaintiffs with an outcome that the Court has already determined is contrary to existing law, and grant them a wholly inappropriate windfall.

[218] In fact, the Court did exactly that at the time of the 363 Sale, with respect to lenders (the "TPC Lenders") who had liens on a transmission manufacturing plant in Maryland, and a service parts distribution center in Tennessee, that went over to New GM in the Sale. *See In re Motors Liquidation Co.*, 482 B.R.

App-188

since the secured component of a claim protected by a lien cannot exceed the value of the collateral, that will typically eliminate any prejudice to the lien creditor. That was the situation in *Edwards*, which (because it involved a lien) reached the right bottom line. But as this Court noted above,[219] the claims and interests proscribed by a sale order can go beyond mere liens, and New GM's analysis can work only for liens—or, perhaps, any similar interests whose value is capped by the value of collateral being sold. If another kind of interest was impacted—as it has been here—a different remedy must be considered.

New GM's second point (that the Sale Order cannot be vacated or modified at this late point in time) breaks down into several distinct, but related, points—raising issues of bankruptcy policy and the finality of judicial sales; of due process law; and of respect for the nonseverability provisions in orders upon which many rely. Each raises matters of legitimate concern from New GM's perspective. But they can be taken only so far.

### 3. Protection of Purchasers of Estate Assets

New GM points out that the buyers of assets from chapter 11 estates acquire property interests

---

485, 487 (Bankr. S.D.N.Y. 2012) (Gerber, J). After a series of negotiations, the TPC Lenders and Old GM agreed to protective provisions under which the proposed sale could go through while protecting the TPC Lenders' lien rights. The two properties were sold free and clear of liens; cash proceeds were put into an escrow account, to which the TPC Lenders' liens would attach; and the Court later ruled on valuation issues that would determine the TPC Lenders' monetary entitlement.

[219] *See* page 54 et seq. & n.123, *supra*.

App-189

too—as recognized by the Seventh Circuit in *Edwards*[220]—and that taking away those purchasers' contractually bargained-for rights strikes at the heart of understandings critically important to the bankruptcy system. In this respect, New GM is right. The Second Circuit has repeatedly recognized the importance to the bankruptcy system of concerns before the Court here. In one instance, the Circuit observed that "[w]e have long recognized the value of finality in judicial sales."[221] In another, the Circuit affirmed a District Court judgment dismissing successor liability claims after a bankruptcy sale, observing that:

> Allowing the plaintiff to proceed with his tort claim directly against [the asset purchaser] would be inconsistent with the Bankruptcy Code's priority scheme because plaintiff's claim is otherwise a low-priority, unsecured claim. Moreover, to the extent that the "free and clear" nature of the sale (as provided for in the Asset Purchase Agreement ("APA") and § 363(f)) was a crucial inducement in the sale's successful transaction…it is evident that the potential chilling effect of allowing a tort claim subsequent to the sale would run counter to a core aim of the Bankruptcy Code, which is to maximize the value of the assets and

---

[220] *See* nn.69 & 123 *supra.*

[221] *Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380, 387 (2d Cir. 1997) ("Gucci").

App-190

thereby maximize potential recovery to the creditors.[222]

For all of these reasons, if it were not for the fact that the Plaintiffs' claim is a constitutional one, the Court would decline to deny enforcement of the Sale Order, in whole or in part. There is no good reason to give creditors asserting successor liability claims recovery rights greater than those of other creditors. And as importantly or more so, the interests inherent in the enforceability of 363 orders (on which the buyers of assets should justifiably be able to rely,[223]

_____

[222] *Douglas v. Stamco,* 363 Fed. Appx. 100, 102 (2d Cir. 2010) (summary opinion, Katzmann, Walker, and Feinberg, C.JJ.) (quoting *In re Trans World Airlines, Inc.,* 322 F.3d 283, 292 (3d Cir. 2003) ("To allow the [plaintiff] to assert successor liability claims against [the purchaser] while limiting other creditors' recourse to the proceeds of the asset sale would be inconsistent with the Bankruptcy Code's priority scheme.")) (citation, and footnote reference explaining why "free and clear" nature of the sale was an inducement there, omitted).

[223] *See, e.g.*, *In re Lehman Bros. Holdings Inc.*, 445 B.R. 143 (Bankr. S.D.N.Y. 2011) (Peck, J.) ("*Lehman*"), *aff'd in part and rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012), *aff'd*, 761 F.3d 303 (2d Cir. 2014). As Judge Peck observed in *Lehman,* declining to grant Rule 60(b) relief as to a sale order even though significant information was not provided to him (and even while recognizing that sale orders are not exempt from Rule 60(b) relief when cause is shown):

> This tension relating to finality naturally exists to some extent in every motion under Rule 60(b) but the Court views final sale orders as falling within a select category of court order that may be worthy of greater protection from being upset by later motion practice. Sale orders ordinarily should not be disturbed or subjected to challenges under Rule 60(b) unless there are truly special circumstances that warrant judicial

App-191

and on which the interests of creditors, keenly interested in the maximization of estate value, likewise rest) are hugely important.[224]

4. Effect of Constitutional Violations

But we here have a constitutional violation—a denial of due process. In such an instance, the Court must then determine whether doctrine that would bar modification of the Sale Order under less extreme circumstances has to give way to constitutional concerns. The Court concludes that it must.

New GM has called the Court's attention to two decisions in which courts declined to grant relief from sale orders where those seeking the relief received inadequate notice.[225] But in each case the party

---

intervention and the granting of relief from the binding effect of such orders.

*Id.* at 149.

[224] There is also a policy concern, though the Court does not suggest that a policy concern could trump the requirements of law, or, especially, parties' constitutional rights. But those in the bankruptcy community would instantly understand it. As the court noted in *In re White Motor Credit Corp.,* 75 B.R. 944, 951 (N.D. Ohio 1987):

The effects of successor liability in the context of a corporate reorganization preclude its imposition. The successor liability specter would chill and deleteriously affect sales of corporate assets, forcing debtors to accept less on sales to compensate for this potential liability. This negative effect on sales would only benefit product liability claimants, thereby subverting specific statutory priorities established by the Bankruptcy Code. This result precludes successor liability imposition.

[225] *See Edwards,* n.69, and *Paris Industries,* n.123 *supra.*

App-192

seeking the relief was found not to have been materially prejudiced or prejudiced at all. New GM has not called the Court's attention to any case in which an order was found to have been entered with a prejudicial denial of due process and the court nevertheless denied relief.[226] By contrast, the Plaintiffs have called the Court's attention, and/or the Court has found, six decisions—including two by the Second Circuit—modifying, or declining to enforce as against adversely affected parties, earlier orders in instances where those parties were denied due process and also prejudiced thereby.[227]

---

[226] In its reply, New GM calls the Court's attention to the Supreme Court's decision in *Factors' & Traders Ins. Co. v. Murphy*, 111 U.S. 738 (1884) ("*Factors'*"), a case in which one of the several noteholders of four notes secured by a common mortgage failed to get notice of a free and clear sale, and the Court determined that the choices there were to either uphold a free and clear sale order in full or wholly invalidate it. *See* New GM Reply Br. at 46. It is true that the Court there saw those two options as the only fair alternatives. But the Court's ruling was to that effect not because of a holding that courts lack the power to more selectively enforce orders where a person is denied notice, but because doing so under the facts there (where the party not given notice would get a leg up over her fellow noteholders) would be unfair to the other noteholders, invalidating their liens while upholding only hers. *Factors'* thus does not support New GM's position in the respect for which it was cited. It does, however, support New GM in a different, and ultimately more important, respect—New GM's point that the Plaintiffs cannot secure relief based on a lack of notice alone, without showing prejudice. *Factors'* evidences courts' reluctance to grant windfalls to those who claim to have received deficient notice, and their concern instead with a fair result.

[227] *See Manville-2010*, n.69 *supra*, 600 F.3d at 153-54 (after ruling that due process was denied, ruling that an adversely affected insurer was not bound by an earlier bankruptcy court

App-193

The latter decisions reached those results by varied means (and some with reference to Fed.R.Civ.P. 60(b) and some without it), but they all came to the same bottom line. They relieved the adversely affected party of the effects of the order insofar as it prejudiced that party. New GM insufficiently recognizes the significance of those decisions.

The decision most closely on point is *Metzger*. There the debtor in a chapter 11 case owned land to be later developed for the construction of townhouses

---

order); *Koepp,* n.69 *supra,* 593 Fed. Appx. 20 (ruling that easement holder was not deprived of her interest when her predecessor was not given notice of a railroad reorganization consummation order that extinguished the predecessor's interest); *Doolittle v. Cnty. of Santa Cruz (In re Metzger),* 346 B.R. 806, 819 (Bankr. N.D. Cal. 2006) (Weisbrodt, J.) ("*Metzger*") (finding sale order void to the extent (but only the extent) it affected the rights of an entity with an interest in the sold property that did not receive due process); *In re Polycel Liquidation, Inc.,* 2006 Bankr. LEXIS 4545, at *25-26, 31-34, 2006 WL 4452982, at *9, 11-12 (Bankr. D.N.J. Apr. 18, 2006) ("*Polycel-Bankruptcy*") (Lyons, J.) (after ruling that due process to an entity was denied by reason of failure to provide notice, voiding sale to extent, but only the extent, that it conveyed that entity's property), *aff'd,* 2007 U.S. Dist. LEXIS 955, 2007 WL 77336 (D.N.J. Jan. 8, 2007) ("*Polycel-District*") (Cooper, J.) (holding, *inter alia*, that Bankruptcy Court was not bound to either void the sale or let the sale stand); *Compak Cos., LLC v. Johnson,* 415 B.R. 334, 342 (N.D. Ill. 2009) ("*Compak*") (holding that patent licensors' interests could not be extinguished by a sale order without due process, notwithstanding *Edwards,* given that the lienholder in *Edwards* had suffered only a trivial loss of interest); *Grumman Olson-Bankruptcy,* 445 B.R. 243, *aff'd* 467 B.R. 694, 706-07 (finding due process concerns made bar of successor liability unenforceable against claimants who were unknown, future, claimants at the time of the sale).

App-194

that was subject to a deed restriction entered into
with the county under which four of the units later to
be constructed had to be sold at below market rates.
The debtor sold the property under a free and clear
order in 1992, but without notice to the county. In
2006, 14 years after the court issued the sale order,
the purchaser's successor found itself in a dispute
with the county over the continuing validity of the
restriction, and sought to enforce the free and clear
provisions. As here, the county contended that it
could not be bound by the free and clear provisions,
because it was not given notice of the hearing at
which the sale was approved.[228]

On those facts, the *Metzger* court ruled, under
Fed. R. Civ. P. 60(b),[229] that the order was "void as to
the County's interest."[230] It continued:

> The Court has some flexibility in creating a
> remedy here and need not and will not find
> the entire sale void on these facts. The Court
> need only find, and does find, that the
> County's interest in the Property survived
> the sale to [the purchaser]. The 1992 Sale
> Order is to that limited extent void because
> the County's due process rights were
> violated.[231]

Addressing remedy in the same fashion are the
Bankruptcy Court and District Court decisions in

---

[228] *See* 346 B.R. at 809-10.

[229] With exceptions not applicable here, Rule 60(b) applies in
cases under the Bankruptcy Code under Fed. R. Bankr. P. 9024.

[230] *Id.* at 819.

[231] *Id.* (citations omitted).

App-195

*Polycel.* There the debtor sold its property (or what it said was its property) free and clear, in a 363 sale. The property assertedly conveyed to the buyer included commercial molds used in the manufacture of prefabricated panels used to form the interior surface of inground swimming pools. But a third party, Pool Builders Supply of the Carolinas ("Pool Builders Supply"), which without dispute was not given notice of the sale, and which contended that it was the true owner of the molds, sought relief from the sale order asserting that its property was taken without due process.

The Bankruptcy Court granted relief under Rule 60(b), voiding the sale order as to Pool Builders Supply alone (keeping the remainder of the sale order intact), and the Bankruptcy Court's determination was affirmed on appeal. The *Polycel-Bankruptcy* court balanced the competing concerns of bankruptcy court finality and due process requirements, and concluded that the latter should prevail. Disagreeing with so much of *Edwards* that considered that the interests of finality to outweigh the due process concerns, the *Polycel-Bankruptcy* court stated:

> This court is inclined to disagree with the reasoning of the Seventh Circuit, and instead follows the more persuasive line of cases that recognize the importance of affording parties their due process rights over the interest of finality in bankruptcy sales.

> Although this court agrees that the interest of finality is an important part of ensuring

App-196

participation in bankruptcy sales, this cannot trump constitutionally mandated due process requirements for notice and an opportunity to be heard.[232]

Addressing the Remedies issue in the same fashion is *Compak*. There, a suit over patent infringement and the entitlement to patent royalties turned on whether a patent license could be extinguished in a 363 sale of all of the debtor's assets. A sublicensee of the patent rights was not given notice of a 363 sale that would extinguish the sublicensee's claims.[233] After discussion of the prejudice the sublicensee suffered, and distinguishing *Edwards* because of the much greater "interests at stake," the *Compak* court concluded that "the Sale Order is 'void' insofar as it purports to extinguish the defendants' license."[234]

In the *Grumman Olson Opinions,* Judges Bernstein and Oetkin dealt with a factual variant of the 363 sale order cases discussed above. Those decisions, unlike those previously discussed, did not involve individuals who were supposed to get notice but didn't get it, but rather people who the debtor *could not have given notice to*, because they did not have claims or interests yet.

There certain of the assets of the debtor Grumman Olson, a manufacturer of truck bodies that were installed in complete vehicles, had been sold in

---

[232] 2006 Bankr. LEXIS 4545, at *30, 2006 WL 4452982, at *10-11 (citations omitted).

[233] *See* 415 B.R. at 337.

[234] *See id.* at 342-43.

App-197

a 363 sale with protection against successor liability claims. Prior to its bankruptcy, Grumman Olson sold a truck body that was incorporated into a vehicle sold to Federal Express; years later (long after the sale), a FedEx employee was injured when the FedEx truck she was driving hit a telephone pole, and she and her husband (who joined in the lawsuit) sued the asset purchaser under successor liability doctrine. For obvious reasons (as they had no contact with the debtor prior to the sale), the woman and her husband were not known to the debtor at the time of the sale and received no notice of the sale hearing. Judge Bernstein ruled that they did not have claims (as they had not yet suffered injuries before the sale, and had no earlier contact with the debtor), but his more important conclusion for our purposes was that they could not be bound by the sale order. He concluded that "the Sale Order does not affect their rights to sue [the purchaser]."[235] He did so without resort to Rule 60(b), and without invalidating the sale order as to anyone else or in any other respect.

The Second Circuit has twice addressed these issues in ways relevant here, though in situations not quite as similar to those addressed above. In *Manville-2010*, the Circuit considered the effect of a denial of due process in connection with a bankruptcy court order—though not in connection with a sale order, or, of course, one with free and clear provisions. Though most of the details of that fairly complex controversy need not be discussed here, *Manville-2010* is important for the Circuit's

---

[235] 445 B.R. at 254.

App-198

conclusion as to the appropriate remedy after it found a due process violation.

There the debtor Manville, which had been subject to massive liabilities resulting from its manufacture of asbestos (and whose insurance policies, notwithstanding coverage disputes, were its most valuable asset), entered into a series of settlements and settlement clarifications in the 1980s with a group of its insurers, including Travelers, its primary insurer, which were approved by Bankruptcy Court orders.[236] Under the settlement documents, in exchange for sizable contributions to a settlement fund, the insurers were relieved of all obligations related to the disputed policies, and the insurers would be protected from claims based on such obligations by bankruptcy court injunctive orders. By bankruptcy court orders entered in 1986, claims related to the policies were channeled to a trust created for addressing Manville's liabilities, and injunctive orders implemented broad releases protecting the settling insurers on "Policy Claims"— defined as "any and all claims . . . by any Person . . . based upon, arising out of or related to any or all of the Policies" at issue in the settlement.[237]

But another insurer, Chubb, was not a party to the settlements approved in the 1980s,[238] and had not received notice then that its own claims would be (or at least could be) enjoined too. Chubb thus argued

---

[236] *See* 600 F.3d at 138-39.

[237] *Id.* at 139.

[238] *Id.* at 143.

App-199

that it could not, as a matter of due process, be bound by the 1986 Orders' terms.[239]

For reasons unnecessary to discuss here, the Circuit agreed that Chubb had been denied due process. But it did not vacate the 1986 Orders in their entirety. It held simply that "[u]nder the unique circumstances of this case, there can be little doubt that the publication notice employed by the bankruptcy court in 1984 was insufficient to bind Chubb to the 2004 interpretation of the 1986 Orders."[240]

The *Manville-2010* court did not invoke Rule 60(b) in support of its decision, or even mention it. Nor did it expressly discuss whether orders could be invalidated only in part by reason of a denial of due process. But *Manville-2010* necessarily must be read as having concluded that after a denial of due process prejudicing only a single party (even if the order affects other parties, and affecting those other parties is unthinkable), the partial denial of enforcement of that order, insofar as it binds that party alone, is permissible.

To the same effect is the Circuit's decision in *Koepp*,[241] which, while a Summary Order not binding on the lower courts in the Second Circuit, further evidences the Circuit's thinking on whether orders

---

[239] *See id.* at 148.

[240] *Id.* at 157; accord *id.* at 158 ("Chubb is therefore not bound by the terms of the 1986 Orders. Consequently, it may attack the Orders collaterally as jurisdictionally void. And, as we held in *Manville III,* that attack is meritorious.").

[241] 593 Fed. Appx. 20.

App-200

can be less than fully enforced without wholly vacating them. *Koepp*, unlike *Manville-2010*, involved a free and clear order. As relevant here, the Circuit considered a party's claim to easements on land conveyed to a reorganized company (in a § 77 railroad reorganization under the now superseded Bankruptcy Act) under a reorganization plan with free and clear provisions not materially different than those in the Free and Clear order here. Notice had not been given to the easement owner's predecessor when the reorganization plan had been approved, and for that reason, the Circuit concluded that the District Court correctly ruled that the railroad reorganization consummation order (analogous to a confirmation order under present law) did not extinguish the easements. Once again, the Circuit did not invoke Rule 60(b), nor did it invalidate the consummation order. It simply declined to find the free and clear provisions enforceable against the adversely affected party.

New GM points out, in this connection, that Rule 60(b) provides that a court "may relieve a party... from a final judgment, order or proceeding" for the reason, among others, that "the *judgment* is void,"[242] and does not speak of relieving parties from *provisions within* judgments or orders—*i.e.*, a partial invalidation. And New GM further points out that the Sale Order expressly provided that it was not severable, and that this was a material element of the understanding under which it acquired Old GM's assets, and took on many, but not all, of Old GM's liabilities. For that reason, New GM argues that the

---

[242] Fed. R. Civ. P. 60(b) and 60(b)(4).

App-201

Court can only void the Sale Order in its entirety (which obviously is not an option here) or enforce the sale order as written. In an ordinary situation—one not involving a denial of due process—the Court would agree with New GM; the Court well understands how 363 sale agreements and sale orders are carefully drafted, and how the buyers of assets contemplate taking on certain identified liabilities, but no more. But here failures of notice gave rise, in part,[243] to denials of due process, and that distorts the balancing under which concerns of predictability and finality otherwise prevail.

In each of *Manville-2010, Koepp, Metzger, Polycel-District, Polycell-Bankruptcy, Compak,* and the two *Grumman Olson Opinions,* after they found what they determined to be denials of due process, the courts granted what in substance was a partial denial of enforcement of the order in question—either by invocation of Rule 60(b) in some fashion (finding the order void only to a certain extent, or as to an identified party)[244] or without mentioning Rule 60(b) at all.[245] In *Polycel-Bankruptcy,* for instance, the

---

[243] It will be remembered that the Plaintiffs were denied due process only with respect to the Sale Order's overbreadth. They were not prejudiced with respect to the Free and Clear Provisions, and cannot claim a denial of due process, or, of course a remedy, with respect to those.

[244] *See Metzger*, 346 B.R. at 816; *Polycel-District*, 2007 WL 77336, at *9, 2007 U.S. Dist. LEXIS 955, at *28; *Polycel-Bankruptcy*, 2006 WL 4452982, at *1, 6-8, 11, 2006 Bankr. LEXIS 4545, at *1-2, 17-26, 31-34; *Compak*, 415 B.R. at 341.

[245] *See Manville-2010*, 600 F.3d at 153-54; *Koepp*, 593 Fed. Appx. at 23; *Grumman Olson-Bankruptcy*, 445 B.R. at 245, 254-55 (considering ability of purchaser's successor after a 363 sale

App-202

Bankruptcy Court concluded, after its 60(b) analysis, "*[t]o that extent,* the Sale Order is void . . . ."[246] In *Manville-2010,* the Circuit found the earlier order unenforceable against Chubb without mention of Rule 60(b) at all. Though they reached their bottom lines by different paths, the takeaway from those cases—especially in the aggregate—is effectively as stated by the Bankruptcy Court in *Metzger*—that "[t]he Court has some flexibility in creating a remedy here and need not . . . find the entire sale void on these facts," and that the sale order was "to that limited extent void."[247]

For that reason, New GM's point that the Sale Order provided that it was a unitary document, and that the Free and Clear Provisions could not be carved out of it, cannot be found to be controlling once a court finds that there has been a due process violation. If a court applies Rule 60(b) analysis, and determines, as in *Metzger* and *Polycel-Bankruptcy*, that a sale order can be declared void to a "limited extent," the provisions providing for the sale order's unitary nature fall along with any other objectionable provisions. And if a court considers it unnecessary even to rely on Rule 60(b) at all (as in *Manville-2010* and *Koepp*), it can selectively decline enforceability as the Circuit did in those cases.

---

to enforce sale order against one injured after the sale, without reference to Rule 60(b)); *Grumman Olson-District,* 467 B.R. at 696, 699-700 (affirming *Grumman Olson-Bankruptcy,* and likewise not relying on Rule 60(b)).

[246] 2006 WL 4452982, at *12, 2006 Bankr. LEXIS 4545, at *34 (emphasis added).

[247] 346 B.R. at 819.

App-203

### 5. Remedies Conclusion

For these reasons, the Court concludes that—as in *Manville-2010*, *Koepp*, and the lower court cases—it can excuse the Economic Loss Plaintiffs[248] from compliance with elements of the Sale Order without voiding the Sale Order in its entirety. And the Court further concludes that on the narrow facts here—where the reason for relief is of constitutional dimension—the nonseverability provisions of the Sale Order do not bar such relief.

### B. Claims

The remedy with respect to the denial of notice sufficient to enable the filing of claims before the Bar Date is obvious. That is leave to file late claims. And the Court may grant leave from the deadline imposed by the Court's Bar Date Order, just as the Circuit relieved Chubb and the easements owner from enforcement of the earlier orders in *Manville-2010* and *Koepp*.

There is of course a separate issue as to whether the Plaintiffs should have the ability to tap GUC Trust assets that are being held for other creditors and claimants, even if later claims were allowed. But that separate issue is discussed in Section IV below.

---

[248] It will be recalled that this applies only to the overbreadth objection, and thus does not benefit the Pre-Closing Accident Plaintiffs. For lack of prejudice—and any showing that either group of Plaintiffs would have successfully made any successor liability arguments that others did not make—the Free and Clear Provisions stand.

App-204

### III. Assumed Liabilities

Although once regarded as important enough to be a threshold issue, determination of what liabilities New GM agreed to assume (and conversely declined to assume) is now of very little importance. The Plaintiffs have not disputed what the Sale Agreement and Sale Order say.[249] Earlier potential disputes over what they say have now been overtaken by the issues as to whether any Sale Order protections are unenforceable.

New GM is right that it expressly declined to assume any liabilities based on Old GM's wrongful conduct. But the Court's ruling that it will continue to enforce prohibitions against successor liability makes New GM's concerns as to that academic. And to the extent, if any, that New GM might be liable on claims based solely on any wrongful conduct on its own part (and in no way relying on wrongful by Old GM), New GM would be liable not because it had assumed any Old GM liabilities (or was responsible

---

[249] The GUC Trust, however, raises an issue of that character, contending, somewhat surprisingly, that New GM voluntarily assumed economic loss claims—taking on liability (beyond for death and personal injury) for "other injury to Persons" with respect to "incidents first occurring on or after the Closing Date . . . ." GUC Trust Br. at 40, citing Sale Agreement § 2.3(a)(ix). But the GUC Trust misunderstands the Sale Agreement. The language to which the GUC Trust referred did not relate to economic loss claims, but rather to death, personal injury, or property damage caused by "accidents or incidents" occurring after the Closing Date—which included, in addition to accidents, things that were similar, such as fires, explosions or a car running off the road. See *GM-Deutsch* and *GM-Phaneuf*, n.33 *supra*.

App-205

for anything that Old GM might have done wrong), but only because New GM had engaged in independently wrongful, and otherwise actionable, conduct on its own.

Under the circumstances, the Court need not say any more about what liabilities New GM assumed.

### IV. Equitable Mootness

Understandably concerned that the successor liability claims that the Economic Loss and Pre-Closing Accident Plaintiffs seek to saddle New GM with are still prepetition claims—and that the Court could reason that to the extent those claims have merit and New GM is not liable for them, *somebody* is likely to be—the GUC Trust and its Participating Unitholders argue that tapping the recoveries of GUC Trust Unitholders would be barred by the doctrine of Equitable Mootness. Though the Court's original instinct was to the contrary (and it once thought that at least partial relief might be available), the Court has been persuaded that they are right.

### A. Underlying Principles

The parties do not dispute the underlying principles, nor that three holdings of the Second Circuit largely determine the mootness issues here— the Circuit's two 1993 *Chateaugay* decisions, involving appeals by the Creditors' Committee of LTV Aerospace[250] and creditor Frito-Lay[251] in the *LTV* chapter 11 cases, and the Circuit's 2014 *BGI*

---

[250] *See Chateaugay I*, n.16 *supra.*

[251] *See Chateaugay II*, n.16 *supra.*

App-206

decision, involving an appeal by creditors seeking to file untimely class proofs of claim against debtor Borders Books in the *BGI* chapter 11 cases.[252]

The mootness cases start with the proposition that while the Constitution requires the dismissal of cases as moot whenever effective relief cannot be fashioned, the related, prudential, doctrine of equitable mootness requires dismissal where relief *can* be fashioned, but implementation of such relief would be inequitable.[253] The doctrine of equitable mootness reflects the "pragmatic principle" that "with the passage of time after a judgment in equity and implementation of that judgment, effective relief . . . becomes impractical, imprudent, and therefore inequitable."[254] This principle is "especially pertinent" in proceedings in bankruptcy cases, "where the ability to achieve finality is essential to the fashioning of effective remedies."[255]

In *BGI*, the Circuit explained that:

---

[252] *See BGI*, n.16 *supra.*

[253] *See Church of Scientology v. United States*, 506 U.S. 9, 12 (1992); *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 143 (2d Cir. 2005).

[254] *Id.* at 144 (quotations and citations omitted); *see also Alsohaibi v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*, 2014 U.S. Dist. LEXIS 1053, at *14-15, 2014 WL 46552, at *5, (S.D.N.Y. Jan. 6, 2014) (Scheindlin, J.) ("*Arcapita Bank*").

[255] *Chateaugay I*, 988 F.2d at 325; *see also Compania Internacional Financiera S.A. (In re Calpine Corp.)*, 390 B.R. 508, 517 (S.D.N.Y. 2008) (Marrero, J.) ("*Calpine-District*"), *aff'd by summary order*, 354 Fed. Appx. 479 (2d Cir. 2009) ("*Calpine-Circuit*").

App-207

> Equitable mootness is a prudential doctrine under which a district court [and by extension, any appellate court] may in its discretion dismiss a bankruptcy appeal "when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." The doctrine "requires the district court to carefully balance the importance of finality in bankruptcy proceedings against the appellant's right to review and relief."[256]

And the Circuit there made clear that the doctrine of equitable mootness applies to chapter 11 liquidations as well as reorganizations.[257]

But while mootness doctrine has been applied most frequently in bankruptcy appeals, it has broader application, including other instances likewise presenting situations where a court has to balance the importance of finality against a party's desire for relief. "[T]he doctrine is not limited to appeals from confirmation orders, and has been applied in a variety of contexts, including . . . injunctive relief, leave to file untimely

---

[256] 772 F.3d at 107 (quoting *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 481 (2d Cir. 2012) ("*Charter Communications*")) (internal quotation marks omitted).

[257] 772 F.3d at 109. *See also Schaefer v. Superior Offshore Int'l, Inc. (In re Superior Offshore Int'l, Inc.),* 591 F.3d 350, 353-54 (5th Cir. 2009) (applying equitable mootness analysis to liquidation plan).

App-208

proofs of claim, class certification, property rights, asset sales, and payment of prepetition wages."[258]

In *Chateaugay II*, the Circuit held that substantial consummation of a reorganization plan is a "momentous event," but it does not necessarily make it impossible or inequitable for an appellate court to grant effective relief in all cases.[259] The Circuit synthesized earlier law to say that substantial consummation will not moot an appeal if all of the following circumstances exist:

(a) the court can still order some effective relief;

(b) such relief will not affect "the re-emergence of the debtor as a revitalized corporate entity";

(c) such relief will not unravel intricate transactions so as to "knock the props out from under the authorization for every transaction that has taken place" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court";

(d) the "parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings," and

(e) the appellant "pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a

---

[258] *Arcapita Bank*, 2014 Bankr. LEXIS 1053, at *19, 2014 WL 46552, at *5. *See also BGI*, 772 F.3d at 109 (stating that earlier cases "suggest that the doctrine of equitable mootness has already been accorded broad reach, without apparent ill effect," and citing *Arcapita Bank* approvingly for the latter's statement that the "doctrine of equitable mootness 'has been applied in a variety of contexts'").

[259] See 10 F.3d at 952.

App-209

situation rendering it inequitable to reverse the orders appealed from."[260]

Those five factors are typically referred to as the *Chateaugay* factors. "Only if all five *Chateaugay* factors are met, and if the appellant prevails on the merits of its legal claims, will relief be granted."[261]

### B. Applying Those Principles Here

Here, the parties have stipulated, and the Court has previously found, that the Plan has been substantially consummated.[262] That, coupled with the requirement that all of the *Chateaugay* factors must be shown to avoid mootness, effectively gives rise to a presumption of mootness. The Court can find that some of the *Chateaugay* factors necessary to trump that presumption have been satisfied. But the Court cannot find that they all have been.

### 1. Ability to Fashion Effective Relief

The first factor that must be established in order to overcome the presumption of equitable mootness is that the Court can fashion effective relief. Fashioning effective relief here would require two steps:

---

[260] *Id.* at 952-53.

[261] *Charter Communications,* 691 F.3d at 482; *accord BGI*, 772 F.3d at 110.

[262] Equitable Mootness Stipulated Facts ¶ 18. This Court found likewise in an earlier proceeding in Old GM's chapter 11 case, *Morgenstein)*, 462 B.R. at 501 n.36 ("[T]he Plan already has been substantially consummated"). Neither New GM nor the Plaintiffs here were parties to *Morgenstein*, and they thus are not bound by *res judicata* or collateral estoppel as to that finding. But their stipulation to substantial consummation makes those doctrines academic.

App-210

(1) allowing the Plaintiffs to file late claims, after the Bar Date; and

(2) allowing the GUC Trust's limited assets to be tapped for satisfying those claims.

The first step would not be particularly difficult. But the second could not be achieved. There would be two problems foreclosing the Court's ability to fashion effective relief.

First, the initial step would be effective relief for the Plaintiffs only if the second step could likewise be achieved. And the initial step would be of value (and the second step could be achieved) only if there were assets in the GUC Trust not already allocated for other purposes (such as other creditors' not-yet-liquidated claims, or expenses of the GUC Trust), or if value reserved for others were taken away. It is undisputed that there are no such available assets, and taking away value previously reserved for those whose claims have not yet been either allowed nor disallowed would be inequitable wholly apart from unfairness to GUC Trust investors.[263]

Old GM's plan of reorganization (which as noted was a liquidating plan), made no distributions on

---

[263] Plaintiffs' counsel acknowledged as much. *See* Day 1 Arg. Tr. at 113:15-23 ("by the time of the recalls, by the time the plaintiffs got organized and began their litigation, by the time we were retained in this case, a substantial majority of the funds originally in the GUC Trust had been dispersed to GUC Trust beneficiaries and it would have been impossible or very close to impossible to put the ignition switch defect plaintiffs back in the same position they would have been in had they been given enough information to file a claim before the bar date.").

App-211

claims for as long as they were disputed—not even partial distributions with respect to any undisputed portions. That was not unusually harsh; it is "a regular feature of reorganization plans approved in this Court."[264] But to ameliorate the unfairness that would otherwise result, Old GM was required to, and did, establish reserves sufficient to satisfy the disputed claims.

Those reserves were a point of controversy at the time of confirmation; creditors whose claims then were disputed contended that the reserves had to be segregated.[265] The Court overruled their objection to the extent they demanded *segregated* reserves, but agreed that reserves had to be established, and in the full amount of their disputed claims.[266] Removing that protection now would be grossly unfair to holders of disputed claims, who would have understandably expected at least the more modest protection that they did receive.

Additionally, the terms of the Plan that provided for the reserves were binding contractual commitments. They could not be altered without

---

[264] *Confirmation Decision*, 447 B.R. at 213 & n.34.

[265] *See id.* at 216-17.

[266] *See id.* at 217 ("While, as noted above, caselaw requires that reserves be established for holders of disputed claims, it does not impose any additional requirement that such reserves be *segregated* for each holder of a disputed claim."); *id.* at n.50 ("[W]ithout creating reserves of some kind, I have some difficulty seeing how one could provide the statutorily required equal treatment when dealing with the need to make later distributions on disputed claims that ultimately turn out to be allowed, especially in cases, like this one, with a liquidating plan.").

App-212

revoking the entirety of the Plan and Confirmation Order.[267] But revocation of the Confirmation Order would be impermissible under the Bankruptcy Code, which provides for such revocation only in limited circumstances that are not present here.[268] For that reason or others, no party requests it.

## 2. Effect on Re-emergence of Debtor as Revitalized Corporate Entity

The second factor that needs to be satisfied is that granting relief would not affect the "reemergence of the debtor as a revitalized corporate entity."

Old GM became the subject of a liquidation. It will not be revitalized. To the extent (which the Court believes is minimal) that any effect on New GM by reason of tapping the GUC Trust's assets would be relevant, the Court can see no adverse effect on New GM.

This factor can be deemed to be either inapplicable or to have been satisfied.[269] Either way, it is not an impediment to relief.

---

[267] *See Morgenstein*, 462 B.R. at 504 ("A confirmed plan takes on the attributes of a contract . . . modification of a contract only in part, without revoking it in whole, raises grave risks of upsetting the expectations of those who provided the necessary assents.") (quotations omitted).

[268] *See* 11 U.S.C. § 1144.

[269] *See Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.)*, 2013 U.S. Dist. LEXIS 77740, at *24-25 (S.D.N.Y. May 22, 2013) (Andrew Carter, J.) ("*BGI-District*") ("All parties agree the second Chateaugay factor is inapplicable because the Debtor has liquidated its assets and will not re-emerge as a new corporate entity."); *cf. BGI*, 772 F.3d at 110 n.15 ("All parties

App-213

### 3. Unraveling Intricate Transactions

The third factor is that "such relief will not unravel intricate transactions so as to 'knock the props out from under the authorization for every transaction that has taken place' and 'create an unmanageable, uncontrollable situation for the Bankruptcy Court.'"

The manageability problems would not necessarily be matters of great concern, but the Unitholders are right in their contention that granting relief here would "knock the props out" from the transactions under which they acquired their units.

Allowing a potential $7 to $10 billion in claims against the GUC Trust now would be extraordinarily unjust for the purchasers of GUC Trust units after confirmation. With the Bar Date having already come and gone, they would have made their purchases based on the claims mix at the time—a then-known universe of claims that, by reason of then-pending and future objections to disputed and unliquidated claims, *could only go down*. Of course, the extent to which the aggregate claims would go down was uncertain; that was the economic bet that buyers of GUC Trust units made. But they could not be expected to foresee that the amount of claims would actually go *up*. They also could not foresee that future distributions would be delayed while

---

agreed that the second *Chateaugay* factor—whether such relief will "affect the re-emergence of the debtor as a revitalized corporate entity"—was inapplicable because Borders liquidated its assets and would not emerge as a new corporate entity.").

App-214

additional claims were filed and litigated. Allowing the aggregate claims against the GUC Trust now to go up (and by $7 to $10 billion, no less) would indeed "knock the props" out of their justifiable reliance on the claims mix that was in place when GUC Trust Units were acquired.

In *Morgenstein*, certain creditors sought, after the Bar Date and Effective Date, to file and recover on a class proof of claim in an estimated amount of $180 million, "whose assertion . . . would [have been] barred under the Debtor's reorganization plan . . . and confirmation order."[270] The Court denied the relief sought on other grounds. But it noted that even though the creditors were not seeking to recoup distributions that had already been made, permitting them to proceed even against the assets remaining in the GUC Trust raised "fairness concerns."[271] And on the record then before it, the Court added that "mootness concerns may very well still exist."[272] It continued that it suspected, but was not yet in a position to find, that:

> hundreds of thousands (or more) of shares and warrants, with a value of many millions (or more) of dollars, traded since the Plan became effective, having been bought and sold based on estimates of Plan recoveries *premised on the claims mix at the time the Plan was confirmed*.[273]

---

[270] *Morgenstein*, 462 B.R. at 496-97.

[271] *Id.* at 509.

[272] *Id.*

[273] *Id.* (emphasis added).

App-215

When the Court made those observations, it lacked the evidentiary record it has now. But the record now before the Court confirms the Court's earlier suspicions.

When a large number of transactions have taken place in the context of then-existing states of facts, changing the terrain upon which they foreseeably would have relied makes changing that terrain inequitable. Thus, understandably, the caselaw has evidenced a strong reluctance to modify that terrain.

*BGI* is particularly relevant, since there, as here, the issues before the court involved the allowance of late claims and contentions of inadequate notice. In *BGI*, the bankruptcy court, following confirmation of Borders' plan of liquidation, had denied the appellants leave to assert late priority claims, and refused to certify a class of creditors holding unused gift cards issued by the debtor Borders Books.[274] The appellants argued that they had not received adequate notice of the bar date, and thus that the bankruptcy court had erred when it denied them that relief.

But the BGI liquidating trust had already distributed more than $80 million, and there was an additional approximately $61 million remaining for distribution.[275] In holding that those appeals were equitably moot, Judge Carter in the District Court approvingly quoted Judge Glenn's finding in the Bankruptcy Court that allowing appellants to file

---

[274] *See BGI*, n.16 *supra*, 772 F.3d at 106; *BGI-District,* 2013 U.S. Dist. LEXIS 77740, at *2.

[275] *BGI-District*, 2013 U.S. Dist. LEXIS 77740, at *16.

App-216

late claims "would result in massive prejudice to the estate because the distributions to general unsecured creditors who filed timely proofs of claim would be severely impacted."[276] The Circuit, in affirming Judge Carter's District Court ruling, approved this finding.[277] Other cases too, though not as closely on point as *BGI*, have held similarly.[278]

Finally, although most courts have held that Bankruptcy Courts have the discretion to allow the filing of class proofs of claim,[279] and this Court, consistent with the authority in this district, has adhered to the majority view,[280] courts recognize that "[t]he costs and delay associated with class actions

---

[276] *Id.* at *25-26.

[277] *See BGI*, 772 F.3d at 110 n.15 ("Observing that the transactions in a liquidation proceeding may not be as complex as those in a reorganization proceeding, the court nonetheless predicted, *persuasively*, that allowing Appellants to file late claims and certifying a class of gift card holders would have 'a disastrous effect' on the remainder of the liquidated estate and the distributions under the Plan.") (emphasis added).

[278] *See Calpine-District*, 390 B.R. at 520 (finding that appellant had failed to satisfy the first *Chateaugay* factor based, in part, on the court's view that "modifying the TEV in a consummated plan of reorganization that so many parties have relied upon in making at least some potentially irrevocable decisions would be inequitable."); *In re Enron Corp.,* 326 B.R. 497, 504 (S.D.N.Y. 2005) (Marrero, J.) (holding that it would be "manifestly inequitable" to modify even a single provision of a substantially consummated plan "that so many parties have relied upon in making various, potentially irrevocable, decisions.").

[279] *See, e.g., Thomson McKinnon*, 133 B.R. at 40.

[280] *See In re Motors Liquidation Co.*, 447 B.R. 150, 156-57 (Bankr. S.D.N.Y. 2011) (Gerber, J.) ("*GM-Apartheid*").

App-217

are not compatible with liquidation cases where the need for expeditious administration of assets is paramount"—and that "[c]reditors who are not involved in the class litigation should not have to wait for payment of their distributive liquidated share while the class action grinds on."[281] Thus Unitholders would be prejudiced even if Plaintiffs' claims were ultimately disallowed.

The Court cannot find this third *Chateaugay* factor to have been satisfied.

### 4. Adversely Affected Parties

The fourth *Chateaugay* factor requires a showing that the third parties affected by the relief sought have had notice of and an opportunity to participate in the proceedings.[282] It requires individual notice,

---

[281] *Thomson McKinnon,* 133 B.R. at 41.

[282] *See BGI,* 772 F.3d at 110 *(*"Here, we agree with the District Court that Appellants failed to satisfy at least the fourth … *Chateaugay* factor[]: i.e., ensuring adequate process for parties who would be adversely affected . . . As to the fourth factor, Appellants did not establish that the general unsecured creditors—who could be stripped of their entire recovery if the proposed class was certified"—received notice of their appeal to the District Court.") (citations, internal quotation marks, and brackets deleted); *Arcapita Bank,* 2014 U.S. Dist. LEXIS 1053, at *21, 2014 WL 46552, at *7 ("Appellant does not contend that the numerous third parties who have participated in and relied on the transactions completed pursuant to the Plan have been notified. Accordingly, Appellant fails to satisfy the fourth *Chateaugay* factor."); *O'Connor v. Pan Am Corp. (In re Pan Am Corp.),* 2000 U.S. Dist. LEXIS 2562, at *15, 2000 WL 254010, at *4 (S.D.N.Y. Mar. 7, 2000) (Casey, J) ("*Pan Am*") (the fact that the appellant "did not notify any of the holders of administrative claims of her intent to challenge the distribution order" weighed in favor of a finding of equitable mootness).

App-218

and cannot be satisfied by an "assertion . . . that [affected parties] may have constructive or actual notice."[283] But here there has been no material resulting prejudice from the failure to provide the notice, and this slightly complicates the analysis.

Many who would be adversely affected by tapping GUC Trust assets did not get the requisite notice. They would include the current holders of Disputed Claims; the syndicate members in JPMorgan Chase's Term Loan; the holders of Allowed Claims who have not yet received a distribution, and third-party Unitholders that have purchased or held GUC Trust Units based on the publicly disclosed amounts of potential GUC Trust Liabilities.

But the briefing by the GUC Trust and so-called "Participating Unitholders" (a subset of the larger Unitholder constituency), and the oral argument by one of the Participating Unitholders' counsel, very effectively articulated the objections that all, or substantially all, of the absent parties would share. The Court doubts that any of those adversely affected parties could make the mootness arguments any better. Those who did not file their own briefs, or make the same oral argument, were not prejudiced.

Because the other mootness factors are so lopsided, the Court does not need to decide whether prejudice is a requirement here, as it is in the due

---

[283] *See Calpine-District*, 390 B.R. at 522 ("An assertion by Appellants that purchasers of New Calpine Common Stock may have constructive or actual notice is not sufficient to satisfy their burden of establishing that such purchasers had notice of the Appeals and an opportunity to participate in the proceedings.").

App-219

process analysis discussed above. The Court assumes, in an excess of caution, that this factor is not an impediment to granting relief.

### 5. Pursuit of Stay Remedies

Finally, the Court agrees in part with the contention by the GUC Trust and the Participating Unitholders that the Plaintiffs have not "pursued with diligence all available remedies to obtain a stay of execution of the objectionable order," and "the failure to do so creates a situation rendering it inequitable to reverse the orders"[284]—enough to find that this factor has not been satisfied.

Of course the Plaintiffs could not be expected to have sought a stay of the Confirmation Order when they were then unaware of Ignition Switch claims. Nor, for the same reason, could the Plaintiffs be faulted for not having filed claims with Old GM or the GUC Trust before the Ignition Switch Defect came to light. So the Court cannot find this factor to be satisfied based on any inaction before the Spring of 2014, at which time New GM issued the recall notices and alerted the Plaintiffs to the possibility that they might have legal rights of which they were previously unaware.

Rather, this factor has to be analyzed in different terms—focusing instead on the Plaintiffs' failure to seek a stay of *additional* distributions to Old GM creditors and Unitholders after it learned, on October 24, 2014, that the GUC Trust announced that it was

---

[284] GUC Trust Opening Br. at 31 (quoting *Affirmance Opinion #2*, 430 B.R. at 80, which in turn quoted *Chateaugay II*, 10 F.3d at 952-53).

App-220

planning on making another distribution. By this time, of course, the Ignition Switch Defect was well known (and most of the 140 class actions had already been filed), and the Court had identified, as an issue it wanted briefed, whether the Plaintiffs' claims were more properly asserted against Old GM. As the Court noted at oral argument, at that stage in the litigation process—when the Court considered it entirely possible that it would rule that it would be the GUC Trust that is responsible for the Plaintiffs' otherwise viable claims—the Court would have made the GUC Trust wait before making additional distributions "in a heartbeat."[285]

Without dispute, the failure to block the November distribution did not result from a lack of diligence. It resulted, as the Plaintiffs candidly admitted, from tactical choice.[286] Their reason for that tactical choice would be obvious to any litigator,[287] but it was still a tactical choice.

---

[285] *See* Day 1 Arg. Tr. at 111:7-15.

[286] *See* Day 1 Arg. Tr. at 112:13-113:1 ("Now, I will also tell Your Honor . . . yes there was a strategic element to the decision that was taken on our side . . . Yes Your Honor, the decision was made not to pursue it.") (transcription errors corrected; further explanation for reasons underlying the strategic element deleted).

[287] Any litigators in the Plaintiffs' lawyers shoes would understandably prefer to proceed against a solvent entity (New GM) rather than one with much more limited assets (the GUC Trust)—especially since so much of the GUC Trust's assets had already been distributed. And doing anything to suggest that Old GM or the GUC Trust was the appropriate entity against whom to proceed could undercut their position that they should be allowed to proceed against New GM.

App-221

And it is inappropriate to disregard that tactical choice in light of the Plaintiffs' decision to allow further distributions to be made. In November 2014, additional GUC Trust assets went out the door. And while tapping the assets distributed in November 2014 might have been as inequitable as tapping those that now remain, it makes the challenges of granting even some relief more difficult. Here too circumstances of this character have been regarded as significant in considering the fifth *Chateaugay* factor.[288]

*BGI* is relevant in this respect too. The court in *BGI-District,* later affirmed by the Circuit, held that the appellants "did not pursue their claims with all diligence," noting that the "[a]ppellants' counsel began reviewing the case in early December and was retained by the end of December," but that the appellants "did not appear at the confirmation hearing or file any objections to the Plan," and "did not seek reconsideration of or appeal the confirmation order or seek a stay of the Effective

---

[288] *See Pan Am*, 2000 WL 254010, at *4, 2000 U.S. Dist. LEXIS 2562, at *15 (finding that appellant failed to satisfy the fifth *Chateaugay* factor where she "never sought a stay of execution of the distribution order" and "did not notify any of the holders of administrative claims of her intent to challenge the distribution order."). *See also Affirmance Opinion #1,* 428 B.R. at 62, and n.30 ("Appellants' deliberate failure to 'pursue with diligence all available remedies to obtain a stay of execution of the objectionable order' has indeed 'created a situation rendering it inequitable to reverse the orders appealed from'"; "the Second Circuit has made it clear that an appellant is obligated to protect its litigation position by seeking a stay . . . .").

App-222

Date."[289] It concluded, and the Circuit agreed, that "[t]he fact that no stay of distributions was sought by Appellants until almost a year after they entered the bankruptcy litigation and the Plan was confirmed indicates the lack of diligence with which Appellants moved."[290]

The circumstances here are similar. The Plaintiffs began filing their actions as early as February 2014. Yet the Plaintiffs have taken no steps to seek a stay from the Court preventing the GUC Trust from making further distributions, or, except by one letter, to put affected third parties on notice of an intention to assert claims over the GUC Trust Assets. They have been frank in explaining why: they prefer to pursue claims against New GM first, and resort to the GUC Trust only if necessary. But even though their tactical reasoning is understandable, the underlying fact remains; their failure to diligently pursue claims against the GUC Trust precludes them from doing so now.

\* \* \*

Thus at least three of the five *Chateaugay* factors *cut against* overcoming the presumption in favor of mootness, when all must favor overcoming that presumption. And shifting from individual factors to the big picture, we can see the overriding problem. We here don't have a reorganized debtor continuing in business that would continue to make money and that, by denial of discharge, could absorb additional

---

[289] 2013 U.S. Dist. LEXIS 77740, at *32-33.

[290] *BGI-District*, 2013 U.S. Dist. LEXIS 77740, at *33; *accord BGI*, 772 F.3d at 110-11 (quoting *BGI-District*).

App-223

claims. We have a GUC Trust, funded by discrete bundles of assets—that had been reserved for identified claims under Old GM's reorganization plan—with no unallocated assets left for additional claims. Entities in the marketplace have bought units of the GUC Trust as an investment based upon the GUC Trust's ability to *reduce* the once huge universe of claims against New GM, in a context where the universe of claims could not increase. Allowing $7 to $10 billion (or even much lower amounts) of additional claims against the GUC Trust would wholly frustrate those investors' legitimate expectations, and, indeed, "knock the props" out from the trading in GUC Trust Units that was an important component of the plan.

Granting relief to the Plaintiffs here would simply replace hardship to the Plaintiffs with hardship to others.

## V. Fraud on the Court

After receipt of the various parties' briefs, it now appears that the standards for establishing fraud on the court (one of the bases for relief under Fed.R.Civ.P. 60(b))—though once regarded as important enough to be a Threshold Issue—are not as important as they were originally perceived to be. That is so because fraud on the court issues bear on the time by which a motion for 60(b) relief can be brought—but (as discussed in Section II above), several courts, including the Second Circuit, when faced with denials of due process, have invalidated particular provisions in orders *without addressing* Rule 60(b), and because, even under Rule 60(b), an order entered without due process can be declared to

App-224

be void, and without regard to the time limitations that are applicable to relief for fraud, among other things. But for the sake of completeness, the Court nevertheless decides them.

With exceptions not relevant here, Fed. R. Civ. P. 60, captioned "Relief from a Judgment or Order," applies in bankruptcy cases under Fed.R.Bankr.P. 9024. Its subsection (b) provides, in relevant part:

(b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> …
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> … or
>
> (6) any other reason that justifies relief.[291]

Then, Rule 60's subsection (c), captioned "Timing and Effect of the Motion," provides, in relevant part:

> (1) *Timing.* A motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year

---

[291] *Id.* (portions that are not even arguably applicable omitted).

App-225

after the entry of the judgment or order or the date of the proceeding.

And its subsection (d), captioned "Other Powers to Grant Relief," provides, in relevant part:

(d) Other Powers to Grant Relief. This rule does not limit a court's power to:

…

(3) set aside a judgment for fraud on the court.[292]

As explained by the Supreme Court in *Hazel-Atlas Glass*,[293] an early decision considering Rule 60(b), the federal courts have had a long-standing aversion to altering or setting aside final judgments at times long after their entry[294] "spring[ing] from the belief that in most instances society is best served by putting an end to litigation after a case has been tried and judgment entered."[295] But there likewise has been a rule of equity to the effect that under certain circumstances—one of which is after-discovered fraud—relief could be granted against

---

[292] This last provision, now in a separate subsection (d), was once part of Rule 60(b). It has been described by the Circuit as a "savings clause." *See Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1325 (2d Cir. 1995) ("*Hadges*").

[293] *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) ("*Hazel-Atlas Glass*").

[294] The original rule looked to "the *term* at which the judgments were finally entered." *See id.* at 244 (emphasis added). The one year time-limit under Rule 60(b) approximates that.

[295] *Id.*

App-226

judgments regardless of the term of their entry.[296] That equitable rule was fashioned "to fulfill a universally recognized need for correcting injustices which, in certain instances, are deemed sufficiently gross to demand a departure from rigid adherence to the term rule."[297]

As explained by the Second Circuit in its frequently cited 1985 decision in *Leber-Krebs*,[298] *Hazel-Atlas* deliberately did not define the metes and bounds of this "fraud on the court" doctrine, but it did make clear that it has always been "characterized by flexibility which enables it to meet new situations which demand equitable intervention, and to accord all the relief necessary to correct the particular injustices involved in these situations."[299]

"Out of deference to the deep rooted policy in favor of the repose of judgments entered during past terms, courts of equity have been cautious in exercising their power over such judgments. But where the occasion has demanded, where enforcement of the judgment is 'manifestly unconscionable', they have wielded the power without hesitation."[300]

It is in that context—where the injustices are "sufficiently gross," and where enforcement of the

---

[296] *Id.*

[297] *Id.*

[298] *Leber-Krebs, Inc. v. Capitol Records*, 779 F.2d 895 (2d Cir.1985) ("*Leber-Krebs*").

[299] *Id.* at 899.

[300] *Hazel-Atlas Glass*, 322 U.S. at 244-45 (*quoting Pickford v. Talbott*, 225 U.S. 651, 657 (1912)).

App-227

judgment would be "manifestly unconscionable"—that federal courts may consider requests to modify long-standing judgments for fraud on the court.

### 1. Effect on Process of Adjudication

Consistent with that, the Second Circuit has repeatedly stated that a "fraud on the court" under Fed. R. Civ. P. 60(d)(3) embraces:

> only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases . . . .[301]

In *Hadges* (one the several Second Circuit decisions making the distinction between fraud of a more generalized nature and defrauding the Court), the Circuit explained that fraud is a basis for relief under both Rule 60(b)(3) and Rule 60's savings clause.[302] But "the type of fraud necessary to sustain an independent action attacking the finality of a

---

[301] *Kupferman v. Consol. Research and Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972) (*Kupferman*") (quotation marks omitted); *accord Hadges*, 48 F.3d at 1325 (*quoting Kupferman*); *Transaero, Inc. v. La Fuerza Area Boliviana*, 24 F.3d 457, 460 (2d Cir. 1994) ("*Transaero*") *on reh'g in part sub nom.* 38 F.3d 648 (2d Cir. 1994); *Gleason v. Jandrucko*, 860 F.2d 556, 558-59 (2d Cir. 1988) ("*Gleason*"); *Serzysko v. Chase Manhattan Bank*, 461 F.2d 699, 702 (2d Cir. 1972). *See also Grubin v. Rattet (In re Food Mgmt. Grp., LLC)*, 380 B.R. 677, 714 (Bankr. S.D.N.Y. 2008) (Glenn, J.) ("*Food Management Group*") (*quoting Kupferman*).

[302] *Hadges,* 48 F.3d at 1325.

App-228

judgment is narrower in scope than that which is sufficient for relief by timely motion."[303]

In its repeatedly cited 1972 decision in *Kupferman*, the Circuit, speaking through Judge Friendly, emphasized the additional requirements for any showing of fraud on the court. "Obviously it cannot be read to embrace any conduct of an adverse party of which the court disapproves; to do so would render meaningless the one-year limitation on motions under F.R.Civ.P. 60(b)(3)."[304] Rather, "[f]raud upon the court as distinguished from fraud on an adverse party *is limited to fraud which seriously affects the integrity of the normal process of adjudication.*"[305]

Bankruptcy courts in this district, deciding particular cases under the Circuit's pronouncements, have permitted claims of fraud on the court to proceed in cases with a sufficiently egregious effect on the integrity of the litigation process, but have rejected them in cases lacking such an effect. In his well known decision in *Clinton Street Foods*,[306] Judge Bernstein found *Leber-Krebs* to be instructive,[307] and

---

[303] *Id. See also Gleason,* 860 F.2d at 559; *Transaero,* 24 F.3d at 460.

[304] *Kupferman*, 459 F.2d at 1078.

[305] *Gleason,* 860 F.2d at 559 (internal quote marks deleted).

[306] *Gazes v. DelPrete, (In re Clinton Street Food Corp.),* 254 B.R. 523 (Bankr. S.D.N.Y. 2000) (Bernstein, C.J.) ("*Clinton Street Foods*").

[307] *Id.* at 533. He synthesized the bases for the *Leber-Krebs* finding of fraud on the court based on an attachment garnishee's false denials of ownership of debtor property as based on (1) the defendant's misrepresentation to the court, (2)

App-229

denied a 12(b)(6) motion insofar as it sought to dismiss a trustee's claims of a fraud on the court.[308] But that was in the context of a case involving bid-rigging in a bankruptcy court auction. There the complaint alleged that the defendants—the assets' purchaser and three potential competing bidders— lied when the bankruptcy court inquired about any bidding agreements. The defendants' lies contributed to the acceptance of the winning bid and the approval of the Sale Order; the trustee lacked the opportunity to discover the fraud in light of the summary nature of the sale proceeding and the relatively short time frame (only three weeks between the filing of the sale application and the auction); and the defendants benefited from the lie to the Court.[309]

In *Food Management*, Judge Glenn of this Court, analyzing *Clinton Street Foods* and *Leber-Krebs,* likewise denied a motion to dismiss a fraud on the court claim, where there was once again alleged manipulation of an auction, by reason of a failure to disclose the participation of insiders in an ostensible third party bid for estate assets.[310]

---

the denial of the motion to confirm the attachment based on the misrepresentation, (3) the lack of an opportunity to discover the misrepresentation and either bring it to the court's attention or bring a timely turnover proceeding against the garnishee, and (4) the benefit the defendant derived by inducing the erroneous decision. *Id.* After *Clinton Street Foods*, these factors, referred to as the *Leber-Krebs* factors, have repeatedly been applied in fraud on the court decisions.

[308] *Id.*

[309] *Id.* at 533.

[310] *See* 380 B.R. at 715.

App-230

But in *Ticketplanet*,[311] four years earlier, Judge Gropper of this Court, also analyzing *Clinton Street Foods* and *Leber-Krebs*, found the allegations of fraud on the court to be insufficient. He explained that fraud on the court encompasses only that conduct that "seriously affects the integrity of the normal process of adjudication," and it is available "only to prevent a grave miscarriage of justice."[312] There the trustee charged that the defendants' actions (both before and after the chapter 11 filing) were taken to protect themselves and benefit a secured lender that thereafter obtained relief from the stay to foreclose on estate assets. The alleged wrongful actions included a failure to adequately disclose the competing interest of the debtor's largest shareholder; the appointment of a straw-man at the helm of the debtor; a direction to the debtor's counsel not to fight the lift stay motion; and efforts to engineer a dismissal of the initial chapter 11 case rather than a conversion once the lender had taken control of the debtor's assets. But the basic facts with respect to a relation between the corporate principals, the debtor and its lender were known,[313] and the alleged nondisclosure "did not substantially impact the Court's ruling at the Lift Stay hearing."[314] Relief was not necessary "to prevent a grave miscarriage of justice."[315]

---

[311] *Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*, 313 B.R. 46, 64 (Bankr. S.D.N.Y. 2004) (Gropper, J.) (*Ticketplanet*").

[312] *Id.*

[313] *Id.* at 65.

[314] *Id.*

[315] *Id.*

App-231

The takeaway from these cases is that relief can be granted only where there has been not just an impact on the *accuracy of outcome* of the Court's adjudicative process, but also on the *integrity of the judicial process* itself, and then only where a denial of relief would be "manifestly unconscionable."

### 2. Victim of the Fraud

Thus the failure to disclose pertinent facts relating to a controversy before the court, or even perjury regarding such facts, whether to an adverse party or to the court, does not without more constitute "fraud upon the court" and does not merit relief under Fed. R. Civ. P. 60(d)(3).[316]

In *Hoti Enterprises*, Judge Seibel affirmed the bankruptcy court's denial of reconsideration of a cash collateral order based on alleged fraud by a lender in its representation that it had a secured claim. She held that "neither perjury nor non-disclosure by itself amounts to anything more than fraud involving injury to a single litigant" covered by Fed. R. Civ. P. 60(b)(3), and therefore, is not the type of egregious misconduct necessary for relief under Fed. R. Civ. P. 60(d).[317] That rule also means that assuming,

---

[316] *See, e.g., Gleason*, 860 F.2d at 559-60; *Hoti Enters., L.P. v. GECMC 2007 C-1 Burnett Street, LLC ( In re Hoti Enters., L.P.)*, 2012 U.S. Dist. LEXIS 182395, at *12-13, 2012 WL 6720378, at * 3-4 (S.D.N.Y. Dec. 27, 2012) (Seibel, J.).

[317] *Hoti Enters.*, 2012 U.S. Dist. LEXIS 182395, at *12-13, 2012 WL 6720378, at *3-4. Courts from other jurisdictions have reached the same conclusion. *See In re Tevis*, 2014 Bankr. LEXIS 406, at *12, 2014 WL 345207, at *4 (B.A.P. 9th Cir. Jan. 30, 2014) ("Mere nondisclosure of evidence is typically not enough to constitute fraud on the court, and 'perjury by a party or witness, by itself, is not normally fraud on the court."); *In re*

App-232

arguendo, Old GM had attempted to defraud car owners, that would not be enough. It would need to have defrauded *the Court*.

### 3. Particular Standards to Apply

In each of *Ticketplane*t and *Food Management*, after discussion of *Leber-Krebs* and *Clinton Street Foods*, the courts listed matters to be considered in analyzing a fraud on the court claim for sufficiency, as extracted from *Leber-Krebs* and *Clinton Street Foods*. They were:

(1) the defendant's misrepresentation to the court;

(2) the impact on the motion as a consequence of that misrepresentation;

(3) the lack of an opportunity to discover the misrepresentation and either bring it to the court's attention or bring an appropriate corrective proceeding; and

(4) the benefit the defendants derived by inducing the erroneous decision.[318]

---

*Andrada Fin., LLC*, 2011 Bankr. LEXIS 1779, at *21, 2011 WL 3300983, at *7 (B.A.P. 9th Cir. Apr. 7, 2011); *In re Levander*, 180 F.3d 1114, 1119 (9th Cir. 1999); *Simon v. Navon*, 116 F.3d 1, 6 (1st Cir. 1997); *Wilson v. Johns-Manville Sales Corp.*, 873 F.2d 869, 872 (5th Cir. 1989); *In re Mucci*, 488 BR 186, 193-94 & n.8 (Bankr. D. N.M. 2013) (Jacobvitz, J.); *In re Galanis*, 71 B.R. 953, 960 (Bankr. D. Conn. 1987) (Shiff, J.) ("It is well established that the failure to disclose allegedly pertinent facts relating to a controversy before the court, whether to an adverse party or to the court, does not constitute "fraud upon the court" for purposes of setting aside a judgment . . . .").

[318] 313 B.R. at 64.

App-233

With the courts in *Clinton Street Foods, Ticketplanet, and Food Management* having looked to those factors to supplement the Supreme Court and Circuit holdings discussed above, this Court will too.

Together, the above cases thus suggest a methodology to apply in determining whether any fraud rises to the level of fraud on the court. First, as *Kupferman, Hadges* and the other Circuit cases make clear, the Court must ascertain whether the alleged fraud is of a type that defiles the court itself; is perpetrated by officers of the court; or seriously affects the *integrity* of the normal process of adjudication. Then the Court must analyze the alleged fraud in the context of the *Leber-Krebs* factors, as applied in *Clinton Street Foods*, *Ticketplanet*, and *Food Management*. The *Leber-Krebs* factors bring into the analysis, among other things, requirements of an interface with the court;[319] an injury to the court or the judicial system (as contrasted to an injury to one or more individuals);[320] impact by the fraud on the workings of the judicial system; a nexus between the fraud and injury to the judicial system; and one or more

---

[319] Thus, if the fraud is not linked to either a communication to the court, or a nondisclosure to the court under circumstances where there is a duty to speak with the matter that was not disclosed, that requirement is not satisfied.

[320] *See SEC v. ESM Grp., Inc.,* 835 F.2d 270, 273 (11th Cir. 1988) (holding that fraud on the court is the type of fraud which prevents or impedes the proper functioning of the judicial process, and it must threaten public injury, as distinguished from injury to a particular litigant), *cert denied*, 486 U.S. 1055 (1988).

App-234

benefits to the wrongful actor(s) by reason of the fraud on the court.

The takeaway from these cases is also that there can be no fraud on the court by accident. Those engaging in the fraud must be attempting to subvert the legal process in connection with whatever the court is deciding. There likewise cannot be a fraud on the court by imputation alone. There must be a direct nexus between the knowledge and intent of any wrongdoer and communications to the court. If the fraud has taken place elsewhere (and is unknown to those actually communicating with the court), the requisite attempt to defile the Court itself and subvert the legal process is difficult, if not impossible, to show.

## VI. Certification to Circuit

As the Court did with respect to one other (but much less than all) of its earlier decisions in Old GM's chapter 11 case,[321] the Court certifies its judgment here for direct review by the Second Circuit. Here too, in this Court's view, this is one of those rare occasions where the Circuit might wish to consider immediate review as an option.

In that connection, 28 U.S.C. § 158 grants a court of appeals jurisdiction to hear appeals from final judgments of the bankruptcy court under limited circumstances. First the bankruptcy court (acting on its own motion or on the request of a party to the judgment), or all the appellants and appellees acting jointly, must certify that—

---

[321] See *GM-UCC-3 Opinion*, n.50 *supra*, 486 B.R. at 646-47.

App-235

> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
>
> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or
>
> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken....[322]

Then the Court of Appeals decides whether it wishes to hear the direct appeal.[323]

In this case, the Court considers each of the three bases for a certification to be present. With respect to the first prong, the decision here is one of law based on undisputed facts. There are no controlling decisions of the Second Circuit on the issues here beyond the most basic fundamentals. And this is a matter of considerable public importance. Additionally, though the $7 to $10 billion in controversy here may be regarded as personal to the Plaintiffs and New GM, the underlying legal issues are important as well, as are their potential effect,

---

[322] 28 U.S.C. § 158(d).

[323] *Id.; see also In re General Motors Corp.*, 409 B.R. 24, 27 (Bankr. S.D.N.Y. 2009) (Gerber, J.) ("*GM-Sale Appeal Certification Decision*") ("The Circuit does not have to take the appeal, however, and can decide whether or not to do so in the exercise of its discretion.").

App-236

going forward, on due process in chapter 11 cases, and on 363 sales and the claims allowance process in particular.

With respect to the second prong, available authorities, while helpful to a point, came nowhere close to addressing a factual situation of this nature. The issues were complicated by broad language in the caselaw, and conflicting decisions.[324]

With respect to the third prong, the Court believes that an immediate appeal from the judgment in this matter is likely to advance proceedings in both this case (if the Court is called upon to do anything further) and the MDL case. Plainly a second level of appeal (which would otherwise be almost certain, given the stakes and importance of the controversy) would have a foreseeable adverse effect on the ability of the MDL Court to proceed with the matters on its watch.

CONCLUSION

The Court's conclusions as to the Threshold Issues were set forth at the outset of this Decision, and need not be repeated here. Based on its conclusions as to the Threshold Issues as discussed

---

[324] In one of its earlier decisions in the *GM* case, *see GM-Sale Appeal Certification Decision*, 409 B.R. at 27-29, the Court denied certification to the Circuit of the appeals from the Sale Order following the *Sale Opinion*, even though, as the subsequent history of the *Sale Opinion* indicates, *see* n.2 *supra*, one of them ultimately did go up to the Circuit. This Court denied certification there because while GM's well-being and that of its suppliers, as a business matter, had substantial public importance, the legal issues were not particularly debatable. Here they are plainly so.

App-237

above, the Court will not allow either the Economic Loss Plaintiffs (including the Used Car Purchasers subset of Economic Loss Plaintiffs) or the Pre-Closing Sale Plaintiffs to be exempted from the Sale Order's Free and Clear Provisions barring the assertion of claims for successor liability. The Economic Loss Plaintiffs (but not the Pre-Closing Sale Claimants) may, however, assert otherwise viable claims against New GM for any causes of action that might exist arising solely out of New GM's own, independent, post-Closing acts, so long as those Plaintiffs' claims do not in any way rely on any acts or conduct by Old GM. The Plaintiffs may file late claims, and to the extent otherwise appropriate such late claims may hereafter be allowed—but the assets of the GUC Trust may not be tapped to satisfy them, nor will Old GM's Plan be modified in this or any other respect.

The Court will not lengthen this decision further by specifically addressing any more of the contentions that were raised in the more than 300 pages of briefing on the Motion to Enforce and its sister motions. The Court has canvassed those contentions and satisfied itself that no material points other than those it has specifically addressed were raised and have merit.

The parties are to caucus among themselves to see if there is agreement that no further issues need be determined at the Bankruptcy Court level. If they agree (as the Court is inclined to believe) that there are none, they are to attempt to agree on the form of a judgment (without prejudice, of course, to their respective rights to appeal) consistent with the Court's rulings here. If they cannot agree (after good

App-238

faith efforts to try to agree), any party may settle a judgment (or, if deemed preferable, an order), with a time for response agreed upon in advance by the parties. After the Court has been presented with one or more proposed judgments or orders, the Court will enter a judgment or order in the form it regards as most appropriate, and a separate order providing the necessary certification for review under § 158(d).

Dated: New York, New York   s/Robert E. Gerber
      April 15, 2015        United States
                          Bankruptcy Judge

App-239

*Appendix D*

**U.S. Const. amend. V**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

App-240

*Appendix E*

**Relevant Statutory
Provisions Involved
11 U.S.C. § 363(b)**

(b)  (1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless—

   (A) such sale or such lease is consistent with such policy; or

   (B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease—

      (i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

      (ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

(2) If notification is required under subsection (a) of section 7A of the Clayton Act in the case of a transaction under this subsection, then—

App-241

(A) notwithstanding subsection (a) of such section, the notification required by such subsection to be given by the debtor shall be given by the trustee; and

(B) notwithstanding subsection (b) of such section, the required waiting period shall end on the 15th day after the date of the receipt, by the Federal Trade Commission and the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, of the notification required under such subsection (a), unless such waiting period is extended—

>(i) pursuant to subsection (e)(2) of such section, in the same manner as such subsection (e)(2) applies to a cash tender offer;

>(ii) pursuant to subsection (g)(2) of such section; or

>(iii) by the court after notice and a hearing.

**11 U.S.C. § 363(f)**

(f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

>(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

>(2) such entity consents;

App-242

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest

**11 U.S.C. § 363(m)**

(m) The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.