# Exhibit A

**Proposed Ignition Switch Class Claim**

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

**Name of Debtor** (Check Only One):

☒ Motors Liquidation Company (f/k/a General Motors Corporation) — 09-50026 (REG)
☐ MLCS, LLC (f/k/a Saturn, LLC) — 09-50027 (REG)
☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation) — 09-50028 (REG)
☐ MLC of Harlem, Inc. (f/k/a Chevrolet Saturn of Harlem, Inc.) — 09-13558 (REG)

Case No. **09-50026**

*Your Claim is Scheduled As Follows:*

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case, but may be used for purposes of asserting a claim under 11 U.S.C. § 503(b)(9) (see Item # 5). All other requests for payment of an administrative expense should be filed pursuant to 11 U.S.C. § 503.*

**Name of Creditor** (the person or other entity to whom the debtor owes money or property): Patricia Barker, on behalf of Proposed Class

**Name and address where notices should be sent:**
Patricia Barker
c/o Steve W. Berman, Hagens Berman Sobol Shapiro LLP,
1918 8th Avenue, Suite 3300, Seattle, WA  98101

Telephone number:  (206) 623-7292
Email Address:  steve@hbsslaw.com

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** _____
*(If known)*

Filed on: _____

If an amount is identified above, you have a claim scheduled by one of the Debtors as shown. (This scheduled amount of your claim may be an amendment to a previously scheduled amount.) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor, you do not need to file this proof of claim form, EXCEPT AS FOLLOWS: If the amount shown is listed as DISPUTED, UNLIQUIDATED, or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim. If you have already filed a proof of claim in accordance with the attached instructions, you need not file again.

**Name and address where payment should be sent (if different from above):**

Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed, June 1, 2009:** $  **See attached.**

If all or part of your claim is secured, complete item 4 below; however, if all or part of your claim is unsecured, do not complete item 4. If all or part of your claim is entitled to priority, complete item 5. If all or part of your claim is asserted pursuant to 11 U.S.C. § 503(b)(9), complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:**  **See attached.**
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

**3a. Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Equipment  ☐ Other
**Describe:**

**Value of Property:** $_____   **Annual Interest Rate___%**

**Amount of arrearage and other charges as of time case filed included in secured claim, if any:** $_____

**Basis for perfection:** _____

**Amount of Secured Claim:** $_____   **Amount Unsecured:** $_____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain in an attachment.

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case - 11 U.S.C. § 503(b)(9) (§ 507(a)(2))

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**Date:** 12/22/16

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

*Patricia A. Barker*
Patricia Barker, on behalf of the Proposed Class

**FOR COURT USE ONLY**

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.
**Modified B10 (GCG) (12/08)**

**ATTACHMENT TO PROOF OF CLAIM OF PATRICIA BARKER UNDER B.R. 7023
ON BEHALF OF PURCHASERS OF DELTA IGNITION SWITCH VEHICLES.**

## I.    PRELIMINARY STATEMENT

1.      By this Proof of Claim, Patricia Barker, on behalf of a proposed Nationwide Class

under B.R. 7023,  of owners and lessees of Delta Ignition Switch Vehicles, as defined herein

(collectively, the "Class"), assert unliquidated claims against the debtor, Motors Liquidation

Company, f/k/a General Motors Company (hereinafter "GM").[1]

2.      More specifically, Claimant alleges claims of fraudulent concealment, unjust

enrichment and consumer protection violations on behalf of the following proposed Class

pursuant to B.R. 7023:

>           All persons in the United States who, as of November 30, 2009,
>           either owned or leased a Delta Ignition Switch Vehicle.

Claimant also alleges claims of breach of the implied warranty of merchantability and negligence

on behalf of proposed Subclasses of persons who owned or leased a Delta Ignition Switch

Vehicle as of November 30, 2009, and who reside in jurisdictions that recognize such claims as

set forth herein.

3.      Ms. Barker, a resident of Wilmington, California, purchased a new 2005 Saturn

Ion in Torrance, California in March 2005, and she still owns it to this day.  The ignition switch

that GM used in the Ion (the so-called "Delta Ignition Switch") was dangerously defective, and

left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and

an inoperable airbag.  From the time she bought the car until she received a recall notice in 2014,

Ms. Barker was unaware of the ignition switch defect.

---

[1] In keeping with the convention used in this and other courts, GM's successor corporation, General Motors
LLC, is referred to herein as "New GM."

4.    As defined more specifically herein, "Delta Ignition Switch Vehicles" include each of the following model/years of GM Vehicles ultimately subject to NHTSA Recall No. 14-V-047, provided they were sold or leased prior to November 30, 2009:  (i) 2005-2010 Chevrolet Cobalt; (ii) 2006-2010 Chevrolet HHR; (iii) 2007-2010 Pontiac G5; (iv)  2007-2010 Saturn Sky; (v) 2003-2007 Saturn ION; and (vi) 2006-2010 Pontiac Solstice.

5.    All told, there are approximately 1.6 million Delta Ignition Switch Vehicles at issue in this Proof of Claim.

6.    GM was aware of the defects in the Delta Ignition Switch Vehicles, and the defects resulted from GM's devaluation of and disregard for safety, as detailed in part herein.

7.    GM induced Claimant and the Class to purchase and retain the Delta Ignition Switch Vehicles under false pretenses, and thus deprived Class Members of the benefit of their bargain and saddled them with dangerously defective cars that were worth less than they would have been in the absence of the defects.  Many Class Members also incurred repair costs and other expenses as a direct result of GM's fraudulent conduct, and GM was unjustly enriched at Class Members' expense.

8.    Claimant therefore files this Proof of Claim on behalf of the Class to recover the damages caused by GM's conduct under consumer protection statutes, the law of fraudulent concealment and unjust enrichment, which is essentially the same under the laws of each of the 50 states and the District of Columbia.  Claimant also brings claims for breach of the implied warranty of merchantability under California law, and on behalf of a Class of persons living in other states where the law provides a similar claim (the "Implied Warranty Subclass.")  Finally, Claimant brings a claim for negligence on behalf of herself, other California residents, and residents of other states where the law provides a similar clam (the "Negligence Subclass.")

## II.    THE DELTA IGNITION SWITCH DEFECT

9.    Approximately 1.6 million vehicles manufactured by GM and sold prior to the
Bar Date for claims in GM's bankruptcy contained a defective ignition switch and cylinder. The
ignition switch in these vehicles, the Delta Ignition Switch Vehicles, is prone to fail during
ordinary and foreseeable driving situations.

10.    In each of the Delta Ignition Switch Vehicles, GM installed the same defective
ignition switch in an unreasonable position on the steering cylinder that can cause the vehicle to
stall, disable the power steering and power brakes, and disable the airbag system in normal and
foreseeable driving circumstances.

11.    More specifically, the ignition switches can inadvertently move from the "run" to
the "accessory" or "off" position at any time during normal and proper operation of the Delta
Ignition Switch Vehicles. The ignition switch is most likely to move when the vehicle
is jarred or travels across a bumpy road; if the key chain is heavy; if a driver inadvertently
touches the ignition key with his or her knee; or for a host of additional reasons. When the
ignition switch inadvertently moves out of the "run" position, the vehicle suddenly and
unexpectedly loses engine power, power steering, and power brakes, and certain safety features
are disabled, including the vehicle's airbags. This leaves occupants vulnerable to crashes,
serious injuries, and death.

12.    The Delta Ignition Switch system is defective in at least three major respects.
First, the switches are simply weak and consequently can inadvertently move from the "run" to
the "accessory" or "off" position.  Second, because the ignition switches are placed low on the
steering column, the driver's knee can easily bump the key (or the hanging fob below the key)
and cause the switches to inadvertently move from the "run" to the "accessory" or "off" position.
Third, when the ignition switches move from the "run" to the "accessory" or "off" position, the

vehicle's power is disabled. This also immediately disables the airbags. Thus, when power is lost

during ordinary operation of the vehicle, a driver is left without the protection of the airbag

system even if he or she is traveling at high speeds. GM was aware of safer alternative designs

that would have prevented the non-deployment of airbags caused by the ignition switch defects,

but chose not to employ them, in part to avoid disclosure of the Delta Ignition Switch Defect and

its tragic consequences.

13.     Vehicles with the Delta Ignition Switch Defect are therefore unreasonably prone

to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily

harm or death to the drivers and passengers of the vehicles.

14.     For the purposes of this Proof of Claim, the Delta Ignition Switch Vehicles

include the following vehicles, provided that they were sold or leased prior to November 30,

2009:

| DELTA IGNTION SWITCH VEHICLES |
| --- |
| · 2005-2010 Chevy Cobalt |
| · 2006-2010 Chevy HHR |
| · 2007-2010 Pontiac G5 |
| · 2006-2010 Pontiac Solstice |
| · 2007-2010 Saturn Sky |
| · 2003-2007 Saturn ION |

15.     Alarmingly, GM knew of the Delta Ignition Switch Defect and its tragic

consequences for many years, but concealed its knowledge from consumers and regulators.  As

the Bankruptcy Court found, "at least 24 … GM personnel…, including engineers, senior

managers, and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior

to the Sale Motion, as early as 2003."  *In re Motors Liquidation Co*., 529 B.R. 510, 538 (Bankr.

S.D.N.Y. 2015). On appeal, the Second Circuit Court of Appeals affirmed this finding. *Elliot v.*

*General Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 161 (2d Cir. 2016).

16.    GM chose not to disclose and remedy the Delta Ignition Switch Defect as it was

legally obligated to do under the Safety Act, state consumer protection laws, and the law of

fraudulent concealment, unjust enrichment, implied warranty and negligence, among other laws.

17.    Instead, GM concealed the defects from the early 2000's through the end of its

corporate existence—and continued to tout the safety and reliability of its vehicles—including

the Delta Ignition Switch Vehicles.

**A.    Before It Sold Any Of The Delta Ignition Switch Vehicles, GM Knew The Ignition
Switch Design Was Defective, But Approved The Substandard Switches Anyway,
And Concealed These Material Facts From The Class.**

18.    Well before the first Delta Ignition Switch Vehicles eventually subject to Recall

No. 14-V-047 were sold, GM knew the ignition switches were defective. In the late 1990's and

early 2000's, GM and one of its suppliers, Eaton Mechatronics, finalized the specifications for

the ignition switch for the Saturn Ion—the first of the Delta Ignition Switch Vehicles eventually

subject to Recall No. 14-V-047, introduced in model year 2003. Eaton Corporation sold its

Vehicle Switch/Electronic Division to Delphi Automotive Systems ("Delphi") on March 31,

2001. Delphi went on to manufacture the defective ignition switch for GM.

19.    In 2001, during pre-production testing of the 2003 Saturn Ion, GM engineers

learned that the vehicle's ignition switch could unintentionally move from the "run" to the

"accessory" or "off" position. GM also knew that when the ignition switch moved from "run" to

"accessory" or "off," the vehicle's engine would stall and/or lose power. GM engineers

identified two "causes of failure," namely, "[l]ow contact force and low detent plunger force."

The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating

from one setting to another unless the driver turns the key.

20.     The GM Design Release Engineer assigned to the Delta Ignition Switch, Ray

DeGiorgio, noticed problems with the prototype switches provided by Delphi during early

testing of the switch.  In correspondence in September 2001, DeGiorgio stated that 10 of 12

prototype switches from Delphi failed to meet engineering requirements, and the "failure is

significant."  DeGiorgio noted that GM "must ensure this new design meets engineering

requirements."

21.     But GM did not correct this significant failure.  Instead, DeGiorgio approved the

use of ignition switches that he knew did not meet GM's required specifications.

22.     In fact, validation testing conducted by Delphi in late 2001 showed that the Delta

Ignition Switch consistently failed to meet the torque values in GM's required specifications.

These tests included a test to determine whether the torque required to rotate the switch from

"run" to "accessory" complied with the specification.  The January 2002 test report denoted the

design failure by stating "Not OK" next to each result.

23.     In February 2002, Delphi asked GM to approve production for the substandard

Delta Ignition Switch and submitted a Production Part Approval Process ("PPAP") request.

Even though testing of the ignition switch revealed that it did not meet the original specifications

set by GM and that the switch would fail, GM approved it anyway.  The defective ignition

switch was then used in the Delta Ignition Switch Vehicles, unbeknownst to Claimant and the

Class.

**B.     GM Received Many Complaints And Reports Of Vehicles Stalling Due To The Delta
Ignition Switch Defect, And Concealed That Material Information From The Class.**

24.     In 2003, almost immediately after it sold the first of the Delta Ignition Switch

Vehicles that eventually led to Recall No. 14-V-047, the 2003 Saturn Ion, GM began receiving

complaints of vehicles stalling while driving due to the Delta Ignition Switch Defect.

25.    In 2003, an internal report documented an instance in which the service technician observed a stall while driving.  The service technician stated that the weight of several keys on the key ring had worn out the ignition switch.  GM replaced the switch and closed the matter.

26.    GM employees were also having problems with their own model year 2003 and 2004 Ions that used the Delta Ignition Switch.  A January 9, 2004 report from GM employee Gerald A. Young concerning his 2003 Ion informed GM that "[t]he ignition switch is too low. All other keys and the key fob hit on the driver's right knee.  The switch should be raised at least one inch toward the wiper stalk."  The report characterized the problem as "a basic design flaw [that] should be corrected if we want repeat sales."

27.    In a February 19, 2004 report concerning his 2004 Saturn Ion, GM employee Onassis Matthews stated: "The location of the ignition key was in the general location where my knee would rest (I am 6'3" tall, not many places to put my knee).  On several occasions, I inadvertently turn[ed] the ignition key off with my knee while *driving down the road.*  For a tall person, the location of the ignition key should be moved to a place that will not be inadvertently switched to the off position."

28.    In an April 15, 2004 report concerning his 2004 Saturn Ion, GM employee Raymond P. Smith reported experiencing an inadvertent shut-off:  "I thought that my knee had inadvertently turned the key to the off position."

29.    On July 4, 2004, a vehicle occupant died after her 2004 Saturn Ion (which contained the Delta Ignition Switch) left the road at a high speed and struck a utility pole head on.  The airbag did not deploy.  GM was aware of this incident.

30.    GM concealed these and other similar manifestations of the Delta Ignition Switch Defect.

**C.**    **By 2004, GM Engineers Understood The Need To Correct The Delta Ignition Switch
Defect But Failed To Act To Disclose Or Correct The Defect.**

31.    By 2004, GM knew that the Delta Ignition Switch Defect posed a safety concern,

and that remedial action was necessary.  For example, in October 2004, GM internally

documented incidents in which GM engineers verified that the ignition switch inadvertently

turned out of the "run" position.  The cause of the problem was found to be "low key cylinder

torque/effort."

32.    In 2004, GM began manufacturing and selling the 2005 Chevrolet Cobalt.  GM

installed the same Delta Ignition Switch in the 2005 Cobalt as it did in the Saturn Ion. As the

Cobalt moved into production, it too—like its Saturn Ion predecessor—sustained inadvertent

ignition switch shut-offs that resulted in moving stalls.  Instead of implementing a solution to this

safety problem, GM engineers and higher-ups debated partial solutions, short-term fixes, and

cost.

33.    GM engineers independently encountered the Delta Ignition Switch Defect in

early test drives of the Cobalt, before it went to market.  The GM engineers pinpointed the

problem of engine shut-off in the Cobalt and were "able to replicate this phenomenon during test

drives."  Despite this knowledge, GM told no one.

34.    According to GM, its engineers "believed that low key cylinder torque effort was

an issue and considered a number of potential solutions."  But after considering the cost and

amount of time it would take to develop a fix, GM did not implement a fix, and the vehicles went

to market with the Delta Ignition Switch Defect.

35.    During testing of the Cobalt, GM Program Engineering Manager Gary Altman

observed an incident in which a Cobalt suddenly lost engine power because the ignition switch

moved out of the "run" position during vehicle operation.

36.     Around the time of the Cobalt launch, more reports surfaced of moving stalls caused by a driver bumping the key fob or chain with his knee.  At a 2004 press event associated with the launch of the Cobalt in Santa Barbara, California, a journalist informed Doug Parks, the Cobalt Chief Engineer, that while adjusting his seat in the Cobalt he was test driving, the journalist had inadvertently turned off the car by hitting his knee against the key fob or chain.  GM's Doug Parks asked Gary Altman, the GM Program Engineering Manager, to follow up on the complaint by trying to replicate the incident and to determine a fix.

37.     DeGiorgio learned about the Cobalt press event discussion of the moving stall issue and was approached by a GM engineer who suggested that DeGiorgio should "beef up" the ignition switch and increase the torque.  He did not do so.

38.     As soon as the Chevrolet Cobalt hit the market in late 2004, GM immediately started getting similar complaints about sudden loss of power incidents, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column."  GM engineers determined that the low torque in the ignition switch could cause the key to move from the "run" to the "accessory" or "off" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing key to be cycled to off position inadvertently."  Specifically, in February 2005, GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the ignition switch … [and a] low position of the lock module [on] the [steering] column."

39.     On November 22, 2004, engineers in GM's High Performance Vehicle Operations group wrote  DeGiorgio and informed him that their group had repeatedly experienced moving stalls during a track test of the Cobalt SS (the high-performance version of the Cobalt) when the

driver's knee "slightly graze[d]" the key fob.  A GM engineer forwarded this complaint to

DeGiorgio, and explicitly asked DeGiorgio whether there was "a specification on the

force/torque required to keep that switch in the RUN position."  He also asked DeGiorgio: "If so,

is the switch meeting that spec? If not, what are the options for implementing a stronger spring?"

Once again, DeGiorgio did not act, and neither did GM.

40.     When driving the Cobalt, GM employees, customers, and members of the

automotive press found repeatedly that they would hit the key fob or keychain with their knee,

and the car would turn off.  As noted, GM received some of these reports before the Cobalt's

launch, and others afterwards.  Despite the many complaints describing the moving stalls and

customers' safety concerns, GM covered up the fact of the defect and made safety assurances to

the driving public, its customers, and the Class, upon which they reasonably relied. GM received

reports from dealers documenting this problem and advised dealers to tell customers to modify

their key chains.

41.     On February 28, 2005, GM issued a bulletin to its dealers regarding engine-

stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac

G5).

42.     In the February 28, 2005 bulletin, GM provided the following recommendations

and instructions to its dealers—but not to the public in general:

> There is potential for the driver to inadvertently turn off the
> ignition due to low key ignition cylinder torque/effort.  The
> concern is more likely to occur if the driver is short and has a large
> heavy key chain.
>
> In the cases in which this condition was documented, the driver's
> knee would contact the key chain while the vehicle was turning.
> The steering column was adjusted all the way down.  This is more
> likely to happen to a person that is short as they will have the seat
> positioned closer to the steering column.

In cases that fit this profile, question the customer thoroughly to determine if this may be the cause. The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.

Please follow this diagnosis process thoroughly and complete each step. If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

43. This bulletin was issued by GM as an effort to assuage disgruntled Delta Ignition Switch Vehicle owners who actually complained to GM Dealers, and further GM's fraudulent scheme to conceal the Delta Ignition Switch Defect from, regulators, and consumers – including the Class.

**D. GM Closes Its First Internal Investigation Of The Delta Ignition Switch Defect, Deciding To Take No Action Because Of Cost.**

44. Despite the serious safety issues posed by the Delta Ignition Switch Defect, GM took no action to correct the defect and instead covered it up.

45. On November 19, 2004, GM opened an engineering inquiry known as a Problem Resolution Tracking System ("PRTS") to evaluate a number of potential solutions to address the Delta Ignition Switch Defect in the Chevrolet Cobalt. At this time, Problem Resolution issues were analyzed by a Current Production Improvement Team ("CPIT"). The CPIT that examined the Cobalt issue beginning in late 2004 included a cross-section of business people and engineers, including Altman, Chief Cobalt Engineer Doug Parks, and Lori Queen, Vehicle Line Executive on the case.

46. In early 2005, and as part of the PRTS, Parks sent an email with the subject, "Inadvertent Ign turn-off." In the email, Parks wrote, "For service, can we come up with a 'plug' to go into the key that centers the ring through the middle of the key and not the edge/slot? This appears to me to be the only real, quick solution."

47.    After considering this and a number of other solutions (including changes to the

key position and measures to increase the torque in the ignition switch), the CPIT examining the

issue decided to do nothing.  Indeed, by March 2005, the GM Cobalt Program Engineering

Manager ("PEM") issued a "directive" to close the 2004 PRTS "with no action."[2]  According to

GM's internal documents, the design change was refused because of time, i.e., because the "lead-

time for all solutions is too long," and money, i.e., because the "tooling cost and piece price are

too high…."[3]

48.    The 2004 PRTS was closed because "none of the solutions represents an

acceptable business case"—a standard phrase used by GM personnel for closing a PRTS without

action because of cost.[4]  In deciding to do nothing to correct the serious safety defect that existed

in its vehicles, GM simply shrugged off the issue entirely.  What is more, GM downplayed the

severity of the safety threat, rating the specter of a moving stall (even at highway speeds) with a

severity level of 3—on a scale of 1 (most severe) to 4 (least severe).  GM did not explain what, if

any, criteria existed for an "acceptable business case" or otherwise justify its decision to do

nothing.   David Trush, the DRE for the ignition cylinder, explained that to present an

"acceptable business case," a solution should solve the issue, be cost effective, and have an

acceptable lead time to implement the change. [5]  But one of the very solutions proposed by

Trush—changing the key from a slot to a hole configuration—would have cost less than one

dollar per vehicle.

---

[2] GMHEC000001735 (Nov. 19, 2004).

[3] GMHEC000001735.

[4] GMNA PRTS+ Closure Codes (Close w/out Action) (Effective Dec. 2007) [DOC ID GMCB-000000977300].
Valukas Report at 69, fn. 271.

[5] Valukas Report at 69.

49.    Here, as elsewhere in the story of the Delta Ignition Switch Defect, the corporate

culture within GM was one in which no one was held responsible and no one took

responsibility.[6]

**E.    Complaints Continued And Serious Accidents Came To GM's Attention In 2005.**

50.    After the Cobalt program team closed the November 19, 2004, PRTS with no

action taken, additional complaints of Cobalt stalls and inadvertent ignition switch shut-offs

continued to come into GM's Brand Quality Group.[7]

51.    In March 2005, Jack Weber, a GM engineer, reported that during "heel-toe

downshifting" in a Cobalt SS with a manual transmission (a high-performance Cobalt model),

his knee contacted the key fob and key ring, which caused "pulling on the key to move it to the

'Off' position."[8]

52.    In May 2005, a customer demanded that GM repurchase his Cobalt.  The

complaint was that the ignition switch shut off during normal driving conditions with no

apparent contact between the driver's knee and the key chain or fob.[9]  GM Brand Quality

Manager Steven Oakley forwarded this information internally at GM, stating that the ignition

switch "goes to the off position too easily shutting the car off."[10]  DeGiorgio was one of the GM

personnel who received this email chain, which effectively stated that the customer's car, as well

as others at the dealership, had ignition switches with insufficient torque and cause the car to

---

[6] Valukas Report at 71.

[7] Valukas Report at 75.

[8] Email from Jonathan L. Weber, GM, to Rajiv Mehta, GM, et al. (March 9, 2005), at 22 (attached to
FPR0793/2005/US) [DOC ID GMHEC000019677]. Valukas Report at 76, fn. 303.

[9] Email from Steven Oakley, GM, to Arnaud Dessirieix, GM (May 2, 2005) [DOC ID 000077753011;
GMNHTSA000337483]. Valukas Report at 76, fn. 308.

[10] Email from Steven Oakley, GM, to Arnaud Dessirieix, GM (May 2, 2005) [DOC ID 000077753011;
GMNHTSA000337483]. Valukas Report at 76, fn. 309.

shut off while driving.[11]  This email chain specifically included a request for an ignition switch "at the high end of the tolerance spec."[12]

53.    By May 2005, GM personnel thus had multiple reports of moving stalls and were receiving buyback requests for Cobalts following complaints that consumers made to dealers.[13]

54.    The problem of moving stalls and the ignition switch turning off in GM Delta Ignition Switch Vehicles continued throughout 2005, and was discussed within GM and in the media.  In May and June 2005, reviewers from two newspapers, including the New York Times, wrote about how they or a family member had inadvertently turned a Cobalt off with their knees.[14]  On May 26, 2005, a writer for the Sunbury Daily Item in Pennsylvania reviewed the Cobalt and reported that "[u]nplanned engine shutdowns happened four times during a hard-driving test last week. . . . I never encountered anything like this in 37 years of driving and I hope I never do again."  In furtherance of covering up the material safety hazard posed by the Ignition Switch Defect, one of GM's in-house vehicle safety lawyers emailed a colleague to marshal evidence for the press that the risk of moving stalls was "remote" and "inconsequential."  He wrote that he did not want to be criticized for failing to "defend a brand new launch."[15]

---

[11] Email from Joseph Joshua, GM, to Joseph Manson, GM, Raymond DeGiorgio, GM, et al. (May 4, 2005) [DOC ID 000077753011; GMNHTSA000337483]. Valukas Report at 77, fn. 312.

[12] Email from Joseph Joshua, GM, to Steven Oakley, GM, et al. (May 4, 2005) (noting "[w]e have asked the ign switch DRE for a switch at the high end of the tolerance spec") [DOC ID 000077753011; GMNHTSA000337483]. Valukas Report at 76-77, fn. 310.

[13] J&B Interview of Steven Oakley, May 23, 2014. Valukas Report at 78, fn. 315.

[14] Jeff Sabatini, "Making a Case for Ignitions That Don't Need Keys," *New York Times*, June 19, 2005; *see also* Christopher Jensen, "Salamis, Key Rings and GM's Ongoing Sense of Humor," *Plain Dealer (Cleveland)*, June 26, 2005.

[15] Valukas Report at 86.

55.   In June 2005, a Senior Delphi Project Engineer stated in an email that the "Cobalt is blowing up in [GM's] face in regards to the car turning off with the driver's knee."[16]

56.   A GM customer filed the following complaint about a 2005 Cobalt prone to moving stalls on June 29, 2005:

> Dear Customer Service:
>
> This is a safety/recall issue if ever there was one. … The problem is the ignition turn switch is poorly installed.  Even with the slightest touch, the car will shut off while in motion.  I don't have to list to you the safety problems that may happen, besides an accident or death, a car turning off while doing a high speed ….[17]

57.   In July 2005, a 2005 Chevrolet Cobalt crashed in Maryland, killing the teenage driver.[18]  Calspan Crash Data Research Center was assigned by the NHTSA Special Crash Investigation Program to conduct a Special Crash Investigation (or "SCI"), which found "that the frontal airbag system did not deploy" and the "[Sensing Diagnostic Module (or "SDM")] data indicated that the 'vehicle power mode status' was in 'Accessory.'"[19]  The August 15, 2005, SCI report found that the vehicles SDM data recorded the "vehicle power mode status" of the ignition switch had shifted from "run" to "accessory."  NHTSA continued the SCI and GM failed to report the crash to NHTSA until the third quarter of 2005.[20]  Upon information and belief, GM subsequently entered into a confidential settlement agreement with the victim's mother.

---

[16] SC-000084.

[17] Customer complaint (June 29, 2005) [DOC ID 000014669078; GMNHTSA000540683].  Valukas Report at 89, fn. 379.

[18] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation Case No. CA05-049, Vehicle: 2005 Chevrolet Cobalt (July 2005) (the "2005 SCI Report").

[19] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation Case No. CA05-049, Vehicle: 2005 Chevrolet Cobalt (July 2005) (the "2005 SCI Report").

[20] Letter from Christina Morgan, Chief, Early Warning Division, Office of Defects Investigation to Gay P. Kent, Director, General Motors Corp. (Mar. 1, 2006) and Letter to Christina Morgan from Gay P. Kent, Director, Product Investigations (Apr. 6, 2006), (GMHEC 00198137-198210); (GMHEC00197893).

58.     Inside GM, the defect was raised with the Product Investigations ("PI") unit.  The
PI group was charged with solving significant engineering problems, including safety problems;
it was the primary unit charged with investigating and resolving potential safety defects.[21]  GM
Product Investigations Manager Doug Wachtel assigned PI employee Elizabeth Kiihr to
investigate the Cobalt ignition switch shut-off.  Wachtel's team looked at early data from the
field and found 14 incidents related to the Delta Ignition Switch Defect.

59.     The PI group also tried to recreate the problem themselves.  Doug Wachtel and
Gay Kent drove a Cobalt around GM's property in Warren.  Kent had a long and heavy key
chain, and was able to knock the ignition from "run" to "accessory" simply by moving her leg so
that her jeans caused friction against the fob.[22]  Wachtel also reproduced the stall in the Cobalt
test drive by contact with the key chain.[23]

60.     Notwithstanding the media reporting, the customer complaints, and its replication
of moving stalls in the field, the PI team did not recommend a safety recall on vehicles with the
Delta Ignition Switch Defect.[24]  GM knew that a defect existed in its vehicles, but did nothing to
disclose the truth or warn consumers or the Class, nor did GM correct the defect in vehicles that
it had already sold, or in vehicles it continued to manufacture, sell, warrant, and represent as
safe.

**F.     GM Engineers Proposed Design Modifications To The Delta Ignition Switch In
2005, But GM Management Rejected The Proposed Changes Because Of Cost.**

61.     GM's knowledge of the serious safety problem grew, but still the Company made
no disclosure.  In February 2005, GM engineers met to analyze how to address the Delta Ignition

---

[21] Valukas Report at 86.

[22] TREAD Search Results (June 28, 2005) [DOC ID 000005586004; DOC ID 000005586005; DOC ID
000005586006]. Valukas Report at 86-87, fn. 367.

[23] Valukas Report at 87.

[24] Valukas Report at 87.

Switch Defect.[25]  Indeed, between February 2005 and December 2005, GM opened multiple

PRTS inquiries concerning reports of power failure and/or engine shutdown in the Delta Ignition

Switch Vehicles.

62.    GM engineers internally recognized that there was a need to do something in

order to address the Delta Ignition Switch Defect.  For example, GM engineers investigated a

possible key slot change as "containment" of the defect, and generated development cost and

time estimates.[26]

63.    In May 2005, GM opened PRTS N182276 (the "2005 PRTS") to analyze the

ignition switch in the 2005 Chevrolet Cobalt following continued customer complaints that the

"vehicle ignition will turn off while driving."[27]  GM acknowledged in the 2005 PRTS that it

had previously considered the same issue in the 2004 PRTS and "[d]ue to the level of buyback

activity that is developing in the field, Brand Quality requests that the issue be reopened."[28]  In

other words, customers were asking GM to take back the defective cars, yet GM said nothing to

customers or the Class about the safety risks.  Instead, GM continued to market and warrant the

Delta Ignition Switch Vehicles as safe.  The 2005 PRTS proposed that GM re-design the key

head from a "slotted" to a "hole" configuration.  After initially approving the proposed fix, GM

reversed course and again declined to implement it.[29]

64.    As part of one of the many PRTS inquiries opened in 2005, quality brand

manager Steve Oakley asked William Chase, a GM warranty engineer, to estimate the warranty

---

[25] GMHEC000001733 (Nov. 19, 2004).

[26] GMHEC000001734 (Nov. 19, 2004).

[27] 2005 PRTS, originated May 17, 2005, GMHEC000001742-54.

[28] GMHEC000001743.

[29] February 24, 2014 GM Submission to NHTSA – Chronology Re:  Recall of 2005-2007 Chevrolet Cobalt and 2007 Pontiac G5 Vehicles (or "February GM Chronology"), at 1; March 11, 2014 GM Submission to NHTSA – Chronology Re: Recall of 2006-2007 Chevrolet HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Saturn Sky Vehicles (or "March GM Chronology") at 1; April Chronology at 2.

impact of the Delta Ignition Switch Defect in the Cobalt and Pontiac G5 vehicles.  Chase

estimated that for Cobalt and G5 vehicles on the road for 26 months, 12.40 out of every 1000

vehicles would experience inadvertent power failure while driving.  Still, GM did nothing.

65.    At a June 7, 2005 Vehicle and Process Integration Review ("VAPIR") meeting at

GM, the Cobalt VAPIR team discussed potential solutions to the inadvertent shut-off issue.

Around this same time, GM asked DeGiorgio to propose a change to the ignition switch that

would double the torque required to turn the switch.[30]  DeGiorgio identified two alternatives.

The first was to use a switch under development for the Saturn Vue and the Chevrolet Equinox

(the "GMT 191").   Because the GMT 191 switch was superior to the current ignition switch

both electrically and mechanically, DeGiorgio referred to it as the "gold standard of ignition

switches."[31]  Alternatively, DeGiorgio proposed redesigning the ignition switch already in Delta

platform vehicles.  Part of DeGiorgio's plan included adding a second detent plunger.[32]

66.    At the June 14, 2005 VAPIR meeting, additional proposed fixes were presented—

categorized as either "short-term" or "long-term" solutions.  The short-term solution was to use a

smaller key ring and to change the key going forward with a new key head design that used a

hole instead of a slot.[33]  The "long-term" solutions included DeGiorgio's idea of replacing the

Delta Ignition Switch with the GMT 191, or "gold standard" switch, which would double the

torque needed to shut off the ignition.  The implementation of the new switch was targeted for

---

[30] J&B Interview of Raymond DeGiorgio, May 7-8, 2014.  Valukas Report at 79.

[31] J&B Interview of Raymond DeGiorgio, May 7-8, 2014.  Valukas Report at 79.

[32] J&B Interview of Raymond DeGiorgio, May 7-8, 2014.  Valukas Report at 79.

[33] X001 Ignition Cylinder Effort … Next Actions VAPIR Presentation (June 14, 2005), at 1 [DOC ID
000011020041; GMNHTSA0002l8772].  Valukas Report at 80, fn. 331.

MY 2007 or MY 2008 vehicles, at a cost of just $1.00/vehicle, plus tooling costs which were not known at that time.[34]

67.     The presentation for this VAPIR meeting also included discussion of press coverage describing the Delta Ignition Switch Defect that GM engineers experienced earlier in 2005:  inadvertent shut-off of the ignition switch and moving stalls.  The presentation included GM's official public relations statement regarding the issue reassuring the public and the Class that the vehicle was "still controllable."[35]

68.     Also on June 14, 2005, similar complaints surfaced of "inadvertent ignition shut-offs" in the Solstice, which used the same defective Delta Ignition Switch as the Cobalt and the Ion. A GM engineer emailed DeGiorgio and other GM personnel involved in evaluating short-term and long-term fixes for the ignition switch, informing them that Solstice testing showed the "ignition inadvertently turns off when hit."  The engineer noted that the complaint was "very similar to the ones on the Cobalt" and suggested that the same "preventative measures" under discussion for the Cobalt should be taken for the Solstice.[36]

69.     On June 17, 2005, GM engineer Al Manzor conducted testing on the defective Delta Ignition Switch, and the proposed GMT 191 ignition switch, at GM's Milford Proving

---

[34] X001 Ignition Cylinder Effort … Next Actions VAPIR Presentation (June 14, 2005), at 1 [DOC ID 000011020041; GMNHTSA000218772].  Valukas Report at 80-81, fn. 333.

[35] X001 Ignition Cylinder Effort … Next Actions VAPIR Presentation (June 14, 2005), at 1 [DOC ID 000011020041; GMNHTSA000218772].  Valukas Report at 80-81, fn. 334.

[36] Email from Devin Newell, GM, to Raymond DeGiorgio, GM, et al. (June 14, 2005) [DOC ID 000001748037; GMNHTSA000218756]. Valukas Report at 81, fn. 336.

Ground[37] to evaluate how the switches performed in the Cobalt using a key with a slotted key head versus a key head with a hole.[38]

70.    They also demonstrated that the rotational torque required to move the key out of "run" was 10 N-cm, below the Specification of 15 to 25 N-cm.  However, neither Manzor, nor anyone else interviewed, compared the test results to the actual specification.[39]

71.    Later in June 2005, the VAPIR approved a fix for existing customers—a plug that could be inserted into keys when customers came to the dealer reporting problems—and a change to the key for production in the future (a change that was not implemented).  On July 12, 2005, GM also issued another Preliminary Information to dealers, this time explaining (only for the 2005 Cobalt and 2005 Pontiac Pursuit) that a fix was available (the key insert).  The key change (and the insert) did not, however, address the core problem of the low torque of the ignition switch or the placement of the ignition switch on the steering cylinder; indeed, the engineers still regarded the key head design change as only a temporary solution—or, as one GM engineer described it, a "band-aid."[40]

72.    Manzor said he discussed his safety concerns about the Cobalt, including the potential for airbag non-deployment, with Parks, Altman, and a safety engineer, Naveen Ramachandrappa Nagapola.[41]

---

[37] The Milford Proving Ground is a GM engineering facility designed for vehicle research, development, and testing in Milford, Michigan.  It has extensive test tracks for vehicle testing under a range of road conditions. Valukas Report at 81, fn. 337.

[38] X001 Ignition Cylinder Effort … Next Actions" (June 19, 2005) [DOC ID 000012140574; GMNHTSA000218793]; J&B Interview of Alberto Manzor, May 1, 2014; e mail from Gay Kent, GM, to Deb Nowak-Vanderhoef, GM, et al.(June 14, 2005) [DOC ID S006878_000038279].  Valukas Report at 81, fn. 338.

[39] J&B Interview of Doug Parks, May 1-2, 2014; J&B Interview of Alberto Manzor, May 1, 2014.  Valukas Report at 82, fn. 341.

[40] Valukas Report at 82-83.

[41] J&B Interview of Alberto Manzor, May l, 2014.  Valukas Report at 83, fn. 347.

73.    Ignoring the Delta Ignition Switch Defect did not make the problem or reported incidents go away.

**G.    Rather Than Implementing A Safety Recall And Fixing The Known Delta Ignition Switch Defect, GM Sent An Inadequate Technical Service Bulletin To GM Dealers In Late 2005 That Advocated The Removal Of Heavy Items From Key Rings.**

74.    Throughout 2005, various committees within GM considered proposed fixes, but rejected them as too costly.  In December 2005, rather than issuing a safety recall on the Delta Ignition Switch Defect, GM sent Technical Service Bulletin ("TSB") 05-02-35-007 to GM dealers, titled "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs" for the Chevy Cobalt and HHR, Saturn Ion, and Pontiac Solstice vehicles.[42]  The TSB explained that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder/torque."

75.    When GM issued this TSB, it removed from the dealer database the July 12, 2005 Preliminary Information (which had accurately used the word "stall"). The TSB also did not accurately describe the danger posed by the Delta Ignition Switch Defect and went only to GM dealers, not to the public or the Class.[43]  In the TSB, GM did not mention the possibility of airbag non-deployment, engine stalls, and loss of power steering or power brakes.

76.    Evidencing GM's fraudulent concealment, multiple GM employees confirmed that GM intentionally avoided using the word "stall" in the TSB to dealers.[44]

77.    GM Quality Service Manager, Steve Oakley, who drafted the December 2005 TSB, stated the term "stall" is a "hot" word that GM did not use in TSBs because *it may raise a concern about vehicle safety*, *which "suggests GM should recall the vehicle*, *not issue a*

---

[42] TSB 05-02-35-007, "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs," (Oct. 2006), at GMHEC000329773.

[43] March 2014 GM chronology; GMHEC000329773.

[44] Valukas Report at 91-93; (citing GMHEC000329773).

*bulletin.*"[45]  In addition, GM personnel stated that "there was concern about the use of 'stall' in a TSB because such language might draw the attention of NHTSA."[46]  The December 2005 TSB was intentionally misleading and incomplete.

78.    GM chose not to disclose the true nature of the Delta Ignition Switch Defect and remedy the problem.  Instead, in the December 2005 TSB, GM instructed its dealers to give customers who brought in their vehicle complaining about stalling "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key rings from moving up and down in the slot.  "[T]he previous key ring" was "replaced with a smaller" one; this change was intended to keep the keys from hanging as low as they had in the past.[47]  GM created over 10,000 key plug inserts as a purported cheap fix for the defect.[48]  According to GM's records, its dealers provided key inserts to only 474 customers who brought their vehicles into dealers for service.[49]  But the band-aid failed because GM abandoned the key redesign effort.[50] Furthermore, while GM made the key insert available to consumers of previously purchased vehicles, it did not, at the same time, change the key for cars that were rolling off the assembly line and those yet to be produced.  Thus, GM denied new car purchasers even the "band-aid" its engineers proposed.[51]

79.    Still there was no recall though GM was squarely on notice of the Delta Ignition Switch Defect, as it continued to receive complaints of fatalities and injuries.  Rather than issue the necessary safety recall, GM chose to continue the cover-up.

---

[45] Valukas Report at 92, fn. 390, emphasis added.

[46] Valukas Report at 93, fn. 392.

[47] Valukas Report at 1-2; March GM Chronology at 2; April GM Chronology at 2.

[48] Valukas Report at 93-94.

[49] February GM Chronology at 2.

[50] Valukas Report at 94.

[51] Valukas Report at 94.

**H.   GM Authorized A Design Change To The Delta Ignition Switch In 2006, But Masked The Existence Of The Change By Keeping The Same Part Number.**

80.   GM covertly authorized a design change for the defective ignition switch in 2006.

81.   In late 2005 and early 2006, DeGiorgio discussed with Delphi a proposal to put a stronger spring and plunger into the ignition switch.[52]   An internal Delphi document indicates that this switch design—with a longer detent spring-plunger—was the same as the longer detent spring-plunger design originally drafted by Delphi in 2001.[53]   In other words, GM had this option available before the defective Delta Ignition Switches were ever approved.[54]

82.   In April 2006, DeGiorgio authorized Delphi to implement changes to fix the Delta Ignition Switch Defect.[55]   The design change "was implemented to increase torque performance in the switch."[56]   On April 26, 2006, DeGiorgio approved an ignition switch with a longer detent plunger by signing what is called a Form 3660, giving Delphi permission to begin manufacturing the longer parts for the switch.[57]   The Form 3660 stated, "[n]ew detent plunger (Catera spring/plunger) was implemented to increase torque force in switch."[58]   Each Form 3660 has to link back to a master work order, and this one did as well.   But the work order to which it linked was only for the electrical improvements to the ignition switch; the work order did not mention

---

[52] Email from Arturo Alcala, Delphi to Raymond DeGiorgio, GM, John B. Coniff, Delphi, et al. (Jan. 6, 2006) [DOC ID 000051786002; GMNHTSA000257777]. Valukas Report at 97, fn. 401.

[53] Drawing 741-76307-T [DOC ID GMHEC000003206]; 2001 Long Detent Spring Drawing, Drawing 741-79378 (2001) [Ex. A.3.a(2) 2001 Long Detent Spring Drawing]; 2001 Short Detent Spring Drawing, Drawing 741-75259 (2001) [Ex. A.3.a (1) 2001 Short Detent Spring Drawing]; email from Antero Cuervo, Delphi, to Lyle Miller, Delphi (Oct. 29, 2013) [DOC ID 000004253527; GMNHTSA000223906]. Valukas Report at 97, fn. 402.

[54] Valukas Report at 97.

[55] General Motors Commodity Validation Sign-Off (April 26, 2006, GMHEC000003201).

[56] General Motors Commodity Validation Sign-Off (April 26, 2006, GMHEC000003201).

[57] General Motors Commodity Validation Sign Off (April 26, 2006) GMHEC000003201.

[58] Form 3660 (April 26, 2006), at 3 [DOC ID 000004253529; GMNHTSA000223924].   Valukas Report at 98, fn. 406.

the change to the spring and plunger.[59]  GM fraudulently concealed and acted to suppress and

cover up this material fact.

83.    Delphi documents suggest that the new ignition switch went into production

sometime after June 26, 2006.[60]  Although the design of the ignition switch changed, *the part

number remained the same*.[61]

84.    Consumers, NHTSA, the driving public, and the Class were unaware of the

change, because GM "*concealed the fact*" of the design change and "*failed to disclose this

critical information*," with devastating consequences.[62]

85.    In congressional testimony in 2014, GM CEO Mary Barra acknowledged that GM

should have changed the part number when it redesigned the Delta Ignition Switch, and that its

failure to do so did not meet industry standard behavior.  Former New GM engineers term GM's

failure to change the part number a "cardinal sin" and "an extraordinary violation of internal

processes."

**I.    The Fatalities Resulting From The Ignition Switch Defect And The Cover-Up Came
To GM's Attention As Early As 2004.**

86.    GM's legal department received notice of the first Ion airbag non-deployment

claim in January 2004 involving a 2004 Saturn Ion.  The first Cobalt crash came to GM's

attention in September 2005.[63]

87.    On November 17, 2005—immediately before GM issued the December Technical

Service Bulletin—a Cobalt went off the road and hit a tree in Baldwin, Louisiana.  The front

---

[59] EWO 302726 (Feb. 19, 2004) [DOC ID 000000000080; GMNHTSA000220667]. Valukas Report at 98, fn.
407.

[60] Valukas Report at 99.

[61] Valukas Report at 100 (emphasis added).

[62] Valukas Report at 34 (emphasis added).

[63] Valukas Report at 103, fn. 419.

airbags did not deploy in this accident.  GM received notice of the accident, opened a file, and referred to it as the "Colbert incident."

88.     In January 2006, a 2005 Chevy Cobalt struck several trees as a result of the Delta Ignition Switch Defect.  The driver died en route to the hospital.[64]  The vehicle's power mode status was in "accessory" at the time of the crash and the airbag did not deploy when it should have.[65]

89.     On February 10, 2006, in Lanexa, Virginia—shortly after GM issued the TSB—a 2005 Cobalt flew off of the road and hit a light pole.  As with the Colbert incident, *supra*, the frontal airbags failed to deploy.  The download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash.  GM received notice of this accident, opened a file, and referred to it as the "Carroll incident."

90.     On March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road and struck a utility pole.  The frontal airbags did not deploy in this incident.  The download of the SDM showed the key was in the "accessory/off" position at the time of the crash.  GM received notice of this incident, opened a file, and referred to it as the "Oakley incident."

91.     In September 2006, GM became aware of an incident in which a 2004 Saturn Ion left the road and struck a utility pole head on.  The airbag did not deploy and the driver was wearing her seatbelt, but was pronounced dead at the scene.  GM identified this crash as one in which the airbag should have deployed, and internally acknowledged that the airbag likely would have saved the driver's life.[66]  GM engineers agreed that "1) the airbags … should have

---

[64] Calspan Corporation, Calspan On-Site Air Bag Non-Deployment Investigation, Case No. CA05-049, Dec. 12, 2006 [DOC ID GMCB-000000073786; GMHEC100026303]; GM, Activity Notes form, File No. 501661, Jan. 31, 2006 [DOC ID 000001660023; GMNHTSA000200717]. Valukas Report at 110, fn. 453.

[65] Crash Data Retrieval System, [redacted] SDM Data, Sept. 14, 2005 [DOC ID 000001660011; GMNHTSA000200688].  Valukas Report at 110, fn. 454.

[66] Valukas Report at 112, fn. 463, 464.

deployed; 2) the SDM did not record the crash event, for unknown reasons;… and 4) it is

reasonably likely that deployment of the driver airbag would have prevented [] death in this

accident."[67]  Still, GM admitted nothing and represented that its cars were safe.

92.    On October 24, 2006, a crash occurred in which a 2005 Cobalt left the road and

struck a telephone box and two trees.  There were fatalities and severe injuries, and the airbag

did not deploy.  GM's Alan Adler emailed Dwayne Davidson, Senior Manager for TREAD

Reporting at GM, and others, copying Gay Kent, Jaclyn Palmer, Brian Everest, and Doug

Wachtel, with the subject line "2005 Cobalt Air Bags—Fatal Crash; Alleged Non-

Deployment."[68]

93.    In October 2006, a 2005 Chevy Cobalt was involved in a crash in Wisconsin

which resulted in the deaths of the front right and rear right passengers.  NHTSA assigned

Indiana University Transportation Research Center to investigate the crash.  The vehicle was

inspected on November 6, 2006.[69]  GM reported the crash later in 2006 in an Early Warning

Reporting ("EWR") filing with NHTSA.[70]  NHTSA requested additional information from GM

in May of 2007, and GM responded a month later.[71]

94.    In 2007, two analyses of the fatalities in the Wisconsin Cobalt crash—one by

Wisconsin State Trooper Keith Young and another by the Indiana University researchers

discussed above—both independently concluded that the movement of the ignition switch from

"run" to "accessory" caused the 2006 accident, the airbag non-deployment, and the tragic deaths.

---

[67] Valukas Report at 113, fn. 474.

[68] Valukas Report at 113-114.

[69] Indiana Univ. Transp. Research Ctr., On-site Air Bag Non-deployment Investigation Case No. IN06-033, Vehicle: 2005 Chevrolet Cobalt (Oct. 2006) (hereinafter the "2006 SCI Report").

[70] Letter from Christina Morgan, Chief, Early Warning Division, Office of Defects Investigation, to Gay P. Kent, Director, General Motors Corp. (May 7, 2007); Letter to Christina Morgan from Gay P. Kent, Director, Product Investigations (June 7, 2007) (GMHEC00198410-198414).

[71] GMHEC00197898.

Trooper Young was able to reach this accurate conclusion examining GM's own engineering documents.

95.    Internal GM documents show that the company received at least 248 reports of airbag non-deployment in MY 2005 vehicles.[72]  Internal documents also showed that GM received at least 134 reports of air bag non-deployment in MY 2006 vehicles.[73]

**J.    GM Responded To Growing Evidence Of Fatalities By Updating The Technical Service Bulletin To Dealers About Heavy Key Chains.**

96.    In October 2006, GM updated the December 2005 Service Bulletin to include additional make and MY vehicles, namely:  the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, and 2007 Pontiac Solstice and G5.  As it had previously done, GM avoided acknowledging the Delta Ignition Switch Defect and this time blamed the problem on short people and heavy key rings, stating:

> There is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort.  The concern is more likely to occur if the driver is short and has a large and/or heavy key chain.  In these cases, this condition was documented and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down.  This is more likely to happen to a person who is short, as they will have the seat positioned closer to the steering column.  In cases that fit this profile, question the customer thoroughly to determine if this may be the cause.  The customer should be advised of this potential and should take steps to prevent it—such as removing unessential items from their key chain.[74]

97.    Despite the TSB to dealers, the Delta Ignition Switch Vehicles remained on the road endangering the lives and livelihoods of the Class and the public.

---

[72] GM Internal Summary Points on Airbag Non-Deployment for Cobalt, G5 and Pursuit (Aug. 2013).

[73] GM Internal Summary Points on Airbag Non-Deployment for Cobalt, G5 and Pursuit (Aug. 2013).

[74] GMHEC000143093; GM Technical Service Bulletin, "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and no DTCs," (Oct. 25, 2006), at GMHEC000138614.

**K.      GM Knew Of And Tracked Multiple Accidents Involving The Delta Ignition Switch
Defect But Avoided Scrutiny By Misleading The Class, The Public, And Regulators.**

98.      GM knew that people were being killed and seriously injured because of the Delta

Ignition Switch Defect in its vehicles and the resulting loss of power and airbag non-deployment.

99.      In March 2007, GM met with NHTSA and discussed the July 29, 2005 fatal crash

involving Amber Rose.[75]  At this meeting, NHTSA informed GM that the airbags in Ms. Rose's

Cobalt did not deploy, causing Ms. Rose' death, and that data retrieved from the crashed

vehicle's diagnostic system indicated that the ignition was in the "accessory" position.  This was

no surprise to GM; it had been secretly tracking ignition switch related accidents for some time.

By the end of 2007, GM identified 10 other accidents, including 4 where the ignition switch had

moved into the "accessory" position.[76]

100.      Thus, by the end of 2007, GM knew of at least 10 frontal collisions involving the

Delta Ignition Switch Vehicles in which the airbag did not deploy.[77]

101.      For the next two years, GM continued to receive complaints and continued to

investigate frontal crashes in which the airbags did not deploy in Delta Ignition Switch Vehicles,

but did not disclose the crucial safety information to the Class of unsuspecting drivers of the

vehicles.

102.      In April 2007, as part of its investigation into the July 2005 Maryland Cobalt

crash that killed Amber Rose, NHTSA received a 2006 SCI report stating that the "crash is of

special interest because the vehicle was equipped with … dual stage air bags that did not

---

[75] GM Feb. 24, 2014, Letter to NHTSA, GM February Chronology.

[76] GM Feb. 24, 2014, Letter to NHTSA, GM February chronology.

[77] Letter from M. Carmen Benavides, Dir., Prod. Investigations & Safety Regulations, GM, to Nancy Lewis,
Assoc. Adm'r for Enforcements, NHTSA, Attach. B-573.6(c)(6) at 2 (February 24, 2014), *available at*
http://democrats.energycommerce.house.gov/sites/default/files/ documents/Letter-Benavides-Lewis-2014-02-24.pdf
(or "Benavides Letter").

deploy."[78]  The SCI Report concluded that the air bags did not deploy "as a result of the impact

with the clump of trees, possibly due to the yielding nature of the tree impact or power loss due

to the movement of the ignition switch just prior to impact."[79]  The Electronic Data Recorder for

the vehicle indicated that the ignition switch was in "accessory" mode at the time of impact.[80]

The SCI Report also found that the investigation demonstrated that contact with the ignition

switch could result in "engine shut down and loss of power."[81]

103.    In August 2007, GM met with its airbag supplier, Continental, to review SDM

data from a 2005 Chevrolet Cobalt crash where the airbags failed to deploy.[82]

104.    The next month, in September of 2007, the Chief of the Defects Assessment

Division ("DAD") within NHTSA's Office of Defects Investigation ("ODI") proposed an

investigation of "frontal airbag non-deployment in the 2003-2006 Chevrolet Cobalt/Saturn Ion"

vehicles.[83]  In an email, the Chief of DAD within ODI noted that the "issue was prompted by a

pattern of reported non-deployments in VOQ [("Vehicle Owner Questionnaire")] complaints that

was first observed in early 2005."[84]  The email stated that NHTSA had "discussed the matter

with GM," but that GM had assured NHTSA that "they see no specific problem pattern."[85]

NHTSA's Greg Magno stated:

> Notwithstanding GM's indications that they see no specific
> problem, DAD perceives a pattern of non-deployment in these
> vehicles that does not exist in their peers and that their

---

[78] 2006 NTHSA SCI Report.

[79] 2006 NTHSA SCI Report at ii.

[80] 2006 NTHSA SCI Report at 7.

[81] 2006 NTHSA SCI Report at 7.

[82] Continental Automotive Sys. US, Inc., Field Event Analysis Report, GMHEC00003143-3153, GM Mar. 11, 2014 Letter to NHTSA, GM March chronology at 2.

[83] Email from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.

[84] Email from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.

[85] Email from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.

circumstances are such that, in our engineering judgment, merited
a deployment, and that such a deployment would have reduced
injury levels or saved lives.[86]

105.    In November 2007, NHTSA's ODI considered a proposal to investigate the non-

deployment of airbags in 2003-2006 Chevy Cobalt and Saturn Ion vehicles.[87]  The review was

prompted by 29 complaints, 4 fatal crashes, and 14 field reports that NHTSA knew about.[88]

Again, GM not only failed to act, but it worked to thwart the agency's efforts, in furtherance of

its fraud and concealment to the detriment of the Class.

106.    As part of the cover-up, GM tried to avoid full regulatory investigation and

disclosure by claiming that it was unaware of any problem in its vehicles.  Furthermore, GM

knew that the airbag system in the Delta Ignition Switch Vehicles would be disabled when the

ignition switch moved from the "run" to the "accessory" position.  The airbag system, in other

words, was disabled when the vehicle lost power.  GM knew, however, that NHTSA believed

that in most, if not all, vehicles, the airbag systems were operable for several seconds following a

power loss.  Although GM knew that NHTSA was mistaken, it did not correct NHTSA's

mistaken belief.

107.    From 2001 until July 10, 2009, GM was repeatedly put on notice of the Delta

Ignition Switch Defect and received reports of deaths and injuries in Chevy Cobalts and other

GM vehicles involving airbag failures and/or steering failures, yet acted at every turn to

fraudulently conceal the danger from the Class.  Examples include, but are not limited to the

following:

- 2005: 26 Cobalt Death and Injury Incidents, including 1
  death citing "airbag" as the component involved.

---

[86] Email from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.

[87] DAD Panel (Nov. 17, 2007), at NHTSA-HECC-004462-4483.

[88] DAD Panel (Nov. 17, 2007), at NHTSA-HECC-004462-4483.

- 2006: 69 Cobalt Death and Injury Incidents, including 2
  deaths citing "airbag" as the component involved and 4
  deaths listing the component involved as "unknown."

- 2007: 87 Cobalt Death and Injury Incidents, including 3
  deaths citing "airbag" as the component involved.

- 2008: 106 Cobalt Death and Injury Incidents, including 1
  death citing "airbag" as the component involved and 2
  deaths listing the component involved as "unknown."[89]

**L.    In 2009, As Injuries And Deaths Continued To Mount, GM Opened Yet Another
Internal Investigation Of The Ignition Switch Defect, But Continued To Conceal
Information About The Defect From Its Customers And The Class.**

108.    In February 2009, GM initiated yet another internal investigation of the Delta

Ignition Switch Defect which resulted in a redesign of the ignition key for the 2010 model/year

Cobalt.[90]  However, GM took no remedial action in response to the investigation and continued

to conceal the facts. Consequently, deaths, injuries, and incidents continued to occur related to

the Delta Ignition Switch Defect.  As one GM employee put it when the Delta Ignition Switch

Defect was raised again internally at GM:

> "Gentleman!  This issue has been around since man first lumbered
> out of sea and stood on two feet.  In fact, I think Darwin wrote the
> first PRTS on this and included as an attachment as part of his
> Theory of Evolution."[91]

109.    Some within GM were not mincing words.  Yet GM chose to conceal the truth

from the Class, and the death and injury toll mounted.

110.    Again, in April 2009, a 2005 Chevy Cobalt was involved in a crash in

Pennsylvania which resulted in the deaths of the driver and front passenger.[92]  The crash was

---

[89] NHTSA Cobalt Chronology prepared by the Center for Auto Safety, February 27, 2014.

[90] GM Feb. 24, 2014 Letter To NHSTA, GM Feb. chronology at 2; Valukas Report at 132-133; GM PRTS
Complete Report (1078137)—GMNHTSA000018925.

[91] Memo, Joseph R. Manson, Feb. 18, 2009, GMHEC000282093.

[92] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation SCI Case
No.: CA09022, Vehicle:  2005 Chevrolet Cobalt (Apr. 2009) (the "2009 SCI Report").

investigated by NHTSA.[93]  The 2009 SCI Report noted that data from the Cobalt's SDM
indicated that the ignition switch was in "accessory" mode at the time of the crash.[94]  Still, GM
refused to issue a recall or notify the Class of the danger.

**M.    Right Up Until Its Bankruptcy Filing, GM Concealed Its Knowledge Of The
Ignition Switch Defect And Its Devastating Consequences.**

111.    Beginning in 2007, GM Field Performance Assessment engineer John Sprague
maintained a spreadsheet of accidents involving the Cobalt airbag non-deployment, along with
the vehicle power mode status.  To gather the data for the spreadsheet, Sprague sent SDMs from
crash vehicles to Continental (the SDM manufacturer) so that it could access information that
GM could not.[95]  After receiving the data from Continental, Sprague collected information
regarding the Cobalt crashes and power mode status, added it to the spreadsheet, and discovered
that, in fact, the power mode status was recorded as "off" or "accessory" in many accidents.[96]

112.    Sprague continued to maintain his spreadsheet through and beyond the end of
GM's corporate existence.  In doing so, Sprague noticed a pattern—the problem of non-
deployment of airbags did not appear to be present in MY 2008 and later Cobalts.  That led him
to question whether there had been some change in the Cobalt from MY 2007 to MY 2008.[97]

113.    Sprague brought his spreadsheet on the ignition switches and vehicles losing
power while driving to a meeting with DeGiorgio in 2009 and the two of them reviewed it
together.[98]  Still no action was taken.  Instead there were more non-productive meetings.

---

[93] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation SCI Case
No.:  CA09022, Vehicle:  2005 Chevrolet Cobalt (Apr. 2009) (the "2009 SCI Report").

[94] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation SCI Case
No.:  CA09022, Vehicle:  2005 Chevrolet Cobalt (Apr. 2009) (the "2009 SCI Report").  SDM Data Report, attached
to 2009 SCI Report.

[95] Valukas Report at 134.

[96] J&B Interview of John Sprague, May 27, 2014.  Valukas Report at 135, fn. 596.

[97] Valukas Report at 137.

[98] Valukas Report at 138, fn. 616.

114.    In May 2009, GM again met with its SDM supplier, Continental, and asked for

data in connection with another crash involving a 2006 Chevy Cobalt where the airbags failed to

deploy.[99]  In a report dated May 11, 2009, Continental analyzed the SDM data and concluded

that the state changed from "run" to "off" during the accident.  According to Continental, this, in

turn, disabled the airbags.  GM did not disclose this finding to NHTSA, despite its knowledge

that NHTSA was interested in non-deployment incidents in Chevrolet Cobalt vehicles.  Yet

again, in the face of mounting death tolls, GM did not correct the Delta Ignition Switch Defect,

take the Delta Ignition Switch Vehicles off the road, or warn its consumers or the Class.

Sprague's secret spreadsheet of accidents simply grew.

115.    The next month, in June 2009, GM filed a Chapter 11 petition.  The bankruptcy

sale to "New GM" became effective on July 10, 2009, and the Bar Date for filing proofs of claim

was set for November 30, 2009.

### III.    OTHER DEFECTS PLAGUED DOZENS OF MODELS OF GM VEHICLES.

116.    In addition to the Delta Ignition Switch Defect summarized above, GM sold

vehicles with dozens of other defects—many of which were known to and concealed by GM, and

remained concealed until New GM conducted a parade of recalls in 2014.

117.    In many cases, the available evidence suggests that GM was aware of the defects.

In any event, the defects are the product of GM's systemic valuation of cost-cutting and

devaluation of safety, making it likely that GM was aware of each of the following defects

summarized below.

---

[99] Continental Automotive Sys. US, Inc., Field Event Analysis Report GMHEC00003129-3142.

## A.    Ignition Lock Cylinder Defect In Vehicles Also Affected By The Delta Ignition Switch Defect.

118.    On April 9, 2014, New GM recalled 2,191,014 GM-branded vehicles with faulty ignition lock cylinders, including approximately 1.6 million vehicles sold by GM.[100]  Though the vehicles are the same as those affected by the Delta Ignition Switch Defect,[101] the lock cylinder defect is distinct.

119.    In these vehicles, faulty ignition lock cylinders can allow removal of the ignition key while the engine is not in the "off" position.  If the ignition key is removed when the ignition is not in the "off" position, unintended vehicle motion may occur.  That motion could cause a crash and injury to the vehicle's occupants or pedestrians.  Some of the vehicles with faulty ignition lock cylinders may fail to conform to Federal Motor Vehicle Safety Standard number 114, "*Theft Prevention and Rollaway Prevention*."[102]

120.    According to New GM's Chronology that it submitted to NHTSA on April 23, 2014, the ignition lock cylinder defect recall arose out of the notorious recalls for the Ignition Switch Defect in the Chevrolet Cobalt, Chevrolet HHR, Pontiac G5, Pontiac Solstice, Saturn ION, and Saturn Sky vehicles.[103]

121.    New GM noted several hundred instances of potential key pullout issues in vehicles covered by the previous ignition switch recalls, and specifically listed 139 instances identified from records relating to customer and dealer reports to GM call centers, 479 instances identified from warranty repair data, 1 legal claim, and 6 instances identified from NHTSA VOQ information.  New GM investigators also identified 16 roll-away instances associated with the

---

[100] New GM Letter to NHTSA dated April 9, 2014.

[101] Namely, MY 2005-2010 Chevrolet Cobalts, 2006-2011 Chevrolet HHRs, 2007-2010 Pontiac G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys.  *See id.*

[102] New GM Notice to NHTSA dated April 9, 2014, at 1.

[103] *See* Attachment B to New GM's letter to NHTSA dated April 23, 2014 ("Chronology").

key pullout issue from records relating to customer and dealer reports to GM call centers and
legal claims information.

122.    New GM also considered the possibility that some vehicles may have experienced
key pullout issues at the time they were manufactured by GM, based on information that
included the following:  (a) a majority of instances of key pullouts that had been identified in the
recall population were in early-year Saturn Ion and Chevrolet Cobalt vehicles, and in addition,
repair order data indicated vehicles within that population had experienced a repair potentially
related to key pullout issues as early as 47 days from the date on which the vehicle was put into
service; and (b) an engineering inquiry known within GM as a Problem Resolution related to key
pullout issues was initiated in June 2005, which resulted in an engineering work order to modify
the ignition cylinder going forward.

123.    A majority of the key pullout instances identified involved 2003-2004 model year
Saturn Ion and 2005 model year Chevrolet Cobalt vehicles.  An April 3, 2014 New GM
PowerPoint identified 358 instances of key pullouts involving those vehicles.

124.    In addition, with respect to early-year Saturn Ion and Chevrolet Cobalt vehicles,
the April 3 PowerPoint materials discussed the number of days that elapsed between the "In
Service Date" of those vehicles (the date they first hit the road) and the "Repair Date."  The
April 3 PowerPoint stated that, with respect to the MY 2003 Saturn Ion, a vehicle was reported
as experiencing a potential key pullout repair as early as 47 days from its "In Service Date;" with
respect to the MY 2004 Saturn Ion, a vehicle was reported as experiencing a potential key
pullout repair as early as 106 days from its "In Service Date;" with respect to the MY 2005
Chevrolet Cobalt, a vehicle was reported as experiencing a potential key pullout repair as early
as 173 days from its "In Service Date;" and with respect to the MY 2006 Chevrolet Cobalt, a

vehicle was reported as experiencing a potential key pullout repair as early as 169 days from its "In Service Date." The length of time between the "In Service Date" and the "Repair Date" suggested that these vehicles were defective at the time of manufacture.

125.    The PowerPoint at the April 3, 2014 Decision Committee meeting also discussed a Problem Resolution that was initiated in June 2005 which related to key pullout issues in the Chevrolet Cobalt (PRTS N 183836). According to PRTS N 183836: "Tolerance stack up condition permits key to be removed from lock cylinder while driving." The "Description of Root Cause Investigation Progress and Verification" stated, "[a]s noted a tolerance stack up exists in between the internal components of the cylinder." According to a "Summary," "A tolerance stack up condition exists between components internal to the cylinder which will allow some keys to be removed." The Problem Resolution identified the following "Solution": "A change to the sidebar of the ignition cylinder will occur to eliminate the stack-up conditions that exist in the cylinder."

126.    In response to PRTS N 183836, GM issued an engineering work order to "[c]hange shape of ignition cylinder sidebar top from flat to crowned."

127.    According to the work order: "Profile and overall height of ignition cylinder sidebar [will be] changed in order to assist in preventing key pullout on certain keycodes. Profile of sidebar to be domed as opposed to flat and overall height to be increased by 0.23mm."

128.    According to PRTS N 183836, this "solution fix[ed] the problem" going forward. An entry in Problem Resolution made on March 2, 2007 stated: "There were no incidents of the key coming out of the ignition cylinder in the run position during a review of thirty vehicles…." A "Summary" in Problem Resolution stated: "Because there were no incidents of the key coming out of the ignition cylinder in the run position during a review of thirty vehicles[,] this

PRTS issue should be closed." PRTS N 183836 was the only PRTS discussed at the April 3,

2014, Decision Committee meeting, although it is not the only engineering or field report

relating to potential key pullout issues.

129.    This data led the Decision Committee to conclude that MY 2003-2004 Saturn Ion

vehicles and 2005 and some MY 2006 Chevrolet Cobalt vehicles failed to conform to Federal

Motor Vehicle Safety Standards and Regulations ("FMVSS") 114. In addition, the Decision

Committee concluded that a defect related to motor vehicle safety existed, and decided to recall

all vehicles covered by the Ignition Switch Defect recalls to prevent unintended vehicle motion

potentially caused by key pullout issues that could result in a vehicle crash and occupant or

pedestrian injuries. For vehicles that were built with a defective ignition cylinder that have not

previously had the ignition cylinder replaced with a redesigned part, the recall called for dealers

to replace the ignition cylinder and provide two new ignition/door keys for each vehicle.

**B.      Ignition Lock Cylinder Defect Affecting Over 200,000 Additional GM Vehicles.**

130.    On August 7, 2014, New GM recalled 202,155 MY 2002-2004 Saturn Vue

vehicles.[104] In the affected vehicles, the ignition key can be removed when the vehicle is not in

the "off" position.[105] If this happens, the vehicle can roll away, increasing the risk for a crash

and occupant or pedestrian injuries.[106]

131.    Following New GM's April 9, 2014 recall announcement regarding ignition

switch defects, New GM reviewed field and warranty data for potential instances of ignition

cylinders that permit the operator to remove the ignition key when the key is not in the "off"

---

[104] *See* August 7, 2014 Letter from New GM to NHTSA.

[105] *Id.*

[106] *Id.*

position in other vehicles outside of those already recalled.[107]  New GM identified 152 reports of

vehicle roll away and/or ignition keys being removed when the key is not in the "off" position in

the MY 2002-2004 Saturn Vue vehicles.[108]

132.    After reviewing this data with NHTSA on June 17, 2014, July 7, 2014, and

July 24, 2014, New GM instituted a safety recall on July 31, 2014.[109]

## C.    "Second Wave" Ignition Switch Defects In Millions Of GM Vehicles.

133.    In addition to the vehicles subject to the Delta Ignition Switch Defect, GM

manufactured millions of other vehicles subject to the same or substantially similar ignition

switch defects (collectively, "Defective Ignition Switch Vehicles").  In each case, the ignition

switch defects caused unintended stalling with the attendant shut-down of critical systems,

including power steering, power brakes, seatbelt pretensioners, and airbags.

134.    While these millions of vehicles with defective ignition switches were not

recalled until 2014, the evidence suggests that GM was long aware of the defects, well prior to

the bankruptcy Sale.

### 1.    The Defective Ignition Switch Vehicles that were eventually subject to the June 20, 2014 recall for the "ignition key slot defect."

135.    On June 20, 2014, New GM recalled 3,141,731 vehicles in the United States for

ignition switch, or ignition key slot, defects (NHTSA Recall No. 14-V-355).  New GM

announced to NHTSA and the public that the recall concerns an ignition key slot defect.

136.    Approximately 2,349,095 of the vehicles subject to this recall were made by GM

and sold prior to November 30, 2009, and are therefore at issue in this Proof of Claim.

---

[107] *Id.*

[108] *Id.*

[109] *Id.*

137.    The following vehicles were included in the June 20, 2014 recall: 2005-2009 Buick Lacrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2006-2011 Cadillac DTS, 2006-2011 Buick Lucerne, and 2006-2008 Chevrolet Monte Carlo.

138.    The recall notice states, "In the affected vehicles, the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine."

139.    Further, "[i]f the key is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury. Additionally, a key knocked out of the run position could cause loss of engine power, power steering, and power braking, increasing the risk of a vehicle crash."

140.    The vehicles included in this recall were built on the same platform and their defective ignition switches are likely due to weak detent plungers, just like the Cobalt and other Delta Ignition Switch Vehicles recalled in February and March of 2014 in Recall No. 14-V-047.

141.    GM was long aware of the ignition switch defect in these vehicles, as demonstrated by the following facts, all of which were known to GM:

a.    On or about August 25, 2005, Laura Andres, a GM design engineer, wrote a description of ignition switch issues that she experienced while operating a 2006 Chevrolet Impala on the highway. Ms. Andres stated, "While driving home from work on my usual route, I was driving about 45 mph, where the road changes from paved to gravel & then back to paved, some of the gravel had worn away, and the pavement acted as a speed bump when I went over it. The car shut off. I took the car in for repairs. The technician thinks it might be the ignition detent, because in a road test in the parking lot it also shut off."

b.      GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' account on
August 25, 2005 to four other GM employees.  Mr. Dickinson asked, "Is this a condition we
would expect to occur under some impacts?"

c.      On August 29, 2005, GM employee Jim Zito forwarded the messages to
Ray DeGiorgio and asked, "Do we have any history with the ignition switch as far as it being
sensitive to road bumps?"

d.      Mr. DeGiorgio responded the same day, stating, "To date there has never
been any issues with the detents being too light."

e.      On August 30, 2005, Ms. Andres sent an email to GM employee Jim Zito
and copied ten other GM employees, including Ray DeGiorgio.  Ms. Andres, in her email, stated,
"I picked up the vehicle from repair.  No repairs were done. . . . The technician said there is
nothing they can do to repair it.  He said it is just the design of the switch.  He said other
switches, like on the trucks, have a stronger detent and don't experience this."

f.      Ms. Andres' email continued:

> I think this is a serious safety problem, especially if this switch is on
> multiple programs.  I'm thinking big recall.  I was driving 45 mph when I
> hit the pothole and the car shut off and I had a car driving behind me that
> swerved around me.  I don't like to imagine a customer driving with their
> kids in the back seat, on I-75 and hitting a pothole, in rush-hour traffic.  I
> think you should seriously consider changing this part to a switch with a
> stronger detent.

142.    New GM has tried to characterize the recall of these 3.14 million vehicles as
being different than the recall for the ignition switch defect in the Delta Ignition Switch Vehicles
when in reality, and for all practical purposes it is for exactly the same defect that creates exactly
the same safety risks.

143.    From 2001 to the end of its corporate existence in July of 2009, GM received
numerous reports from consumers regarding complaints, crashes, injuries, and deaths linked to

this safety defect.  The following are examples of just a few of the many reports and complaints

regarding the defect that GM received and/or knew about:

144.    A January 23, 2001 complaint filed with NHTSA involving a MY 2000 Cadillac

Deville and an incident that occurred on January 23, 2001, in which the following was reported:

> COMPLETE ELECTRICAL SYSTEM AND ENGINE
> SHUTDOWN WHILE DRIVING. HAPPENED THREE
> DIFFERENT TIMES TO DATE. DEALER IS UNABLE TO
> DETERMINE CAUSE OF FAILURE. THIS CONDITION
> DEEMED TO BE EXTREMELY HAZARDOUS BY OWNER.
> NHTSA ID Number: 739850.

145.    A June 12, 2001 complaint filed with NHTSA involving a MY 2000 Cadillac

Deville and an incident that occurred on June 12, 2001, in which the following was reported:

> INTERMITTENTLY AT 60 MPH VEHICLE WILL STALL OUT
> AND DIE. MOST TIMES VEHICLE WILL START UP
> IMMEDIATELY AFTER. DEALER HAS REPLACED MAIN
> CONSOLE 3 TIMES, AND ABS BRAKES. BUT, PROBLEM
> HAS NOT BEEN CORRECTED. MANUFACTURER HAS
> BEEN NOTIFIED.*AK  NHTSA ID Number: 890227.

146.    A January 27, 2003 complaint filed with NHTSA involving a MY 2001 Cadillac

Deville and an incident that occurred on January 27, 2003, in which the following was reported:

> WHILE DRIVING AT HIGHWAY SPEED ENGINE SHUT
> DOWN, CAUSING AN ACCIDENT. PLEASE PROVIDE ANY
> ADDITIONAL INFORMATION.*AK  NHTSA ID Number:
> 10004759.

147.    A September 18, 2007 complaint filed with NHTSA involving a MY 2006

Chevrolet Impala and an incident that occurred on September 15, 2006, in which it was reported

that:

> TL*THE CONTACTS SON OWNS A 2006 CHEVROLET
> IMPALA. WHILE DRIVING APPROXIMATELY 33 MPH AT
> NIGHT, THE CONTACTS SON CRASHED INTO A STALLED
> VEHICLE. HE STRUCK THE VEHICLE ON THE DRIVER
> SIDE DOOR AND NEITHER THE DRIVER NOR THE
> PASSENGER SIDE AIR BAGS DEPLOYED. THE DRIVER

> SUSTAINED MINOR INJURIES TO HIS WRIST. THE
> VEHICLE SUSTAINED MAJOR FRONT END DAMAGE. THE
> DEALER WAS NOTIFIED AND STATED THAT THE CRASH
> HAD TO HAVE BEEN A DIRECT HIT ON THE SENSOR. THE
> CURRENT AND FAILURE MILEAGES WERE 21,600. THE
> CONSUMER STATED THE AIR BAGS DID NOT DEPLOY.
> THE CONSUMER PROVIDED PHOTOS OF THE VEHICLE.
> UPDATED 10/10/07 *TR NHTSA ID Number: 10203350.

148.    An April 2, 2009 complaint filed with NHTSA involving a MY 2005 Buick

LaCrosse and an incident that occurred on April 2, 2009, in which the following was reported:

> POWER STEERING WENT OUT COMPLETELY, NO
> WARNING JUST OUT. HAD A VERY HARD TIME
> STEERING CAR. LUCKY KNOW ONE WAS HURT. *TR
> NHTSA ID Number: 10263976.

149.    The approval and implementation of the defective ignition switches resulted in

part from GM's systemic valuation of cost-cutting over safety, and the many disincentives to

flagging or taking responsibility for safety issues at GM.

150.    GM was aware of the so-called "ignition key slot" defect for years yet continued

to sell these Defective Ignition Switch Vehicles, and did nothing to either warn the public or

correct the defect in these vehicles.

**2.      The Defective Ignition Switch Vehicles giving rise to the July 2 and 3 recalls
for so-called "unintended ignition rotation" defects.**

151.    On July 2, 2014, New GM recalled 554,328 vehicles in the United States for

ignition switch defects (Recall No. 14-V-394).  The July 2 recall applied to MY 2003-2014

Cadillac CTS vehicles and MY 2004-2006 Cadillac SRX vehicles.

152.    The recall notice explains that the weight on the key ring and/or road conditions

or some other jarring event may cause the ignition switch to move out of the "run" position,

turning off the engine.  Further, if the key is not in the "run" position, the airbags may not deploy

in the event of a collision, increasing the risk of injury.

153.    On July 3, 2014, New GM recalled 5,877,718 additional vehicles in the United

States for ignition switch defects (Recall No. 14-V-400).

154.    The following vehicles were included in Recall No. 14-V-400:  1997-2005

Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005

Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-

2004 Oldsmobile Alero.

155.    The recall notice states that the weight on the key and/or road conditions or some

other jarring event may cause the ignition switch to move out of the "run" position, turning off

the engine.  If the key is not in the "run" position, the airbags may not deploy if the vehicle is

involved in a collision, increasing the risk of injury.

156.    In both of these recalls, New GM notified NHTSA and the public that the recall

was intended to address a defect involving unintended or "inadvertent key rotation" within the

ignition switch of the vehicles.  As with the ignition key defect announced June 20, 2014,

however, the defects for which these vehicles have been recalled is directly related to the ignition

switch defect in the Cobalt and other Defective Ignition Switch Vehicles and involves the same

safety risks and dangers.

157.    All of the vehicles involved in Recall No. 14-V-400 were manufactured by GM

and sold or leased prior to November 30, 2009, as were approximately 400,000 of the vehicles

involved in Recall No. 14-V-394.

158.    Once again, the unintended ignition rotation defect is substantially similar to and

relates directly to the other ignition switch defects, including the defects that gave rise to the

initial recall of the Delta Ignition Switch Vehicles in February and March of 2014.  Like the

other ignition switch defects, the unintended ignition key rotation defect poses a serious and

dangerous safety risk because it can cause a vehicle to stall while in motion by causing the key in

the ignition to inadvertently move from the "on" or "run" position to "off" or "accessory"

position.  Like the other ignition switch defects, the unintended ignition key rotation defect can

result in a loss of power steering, power braking, and increase the risk of a crash.  And as with

the other ignition switch defects, if a crash occurs, the airbags will not deploy because of the

unintended ignition key rotation defect.

159.    The unintended ignition key rotation defect involves several problems, and they

are identical to the problems in the Delta Ignition Switch Vehicles and the other Defective

Ignition Switch Vehicles:  a weak detent plunger, the low positioning of the ignition on the

steering column, and the algorithm that renders the airbags inoperable when the vehicle leaves

the "run" position.

160.    The 2003-2006 Cadillac CTS and the 2004-2006 Cadillac SRX use the same

Delphi switch and have inadequate torque for the "run"-"accessory" direction of the key rotation.

This was known to GM, and was the basis for a change that was made to a use stronger detent

plunger for the 2007 and later model years of the SRX model.  The 2007 and later CTS vehicles

used a switch manufactured by Dalian Alps.

161.    GM was long aware of the defects in these vehicles, as the following facts

indicate, as well as others not pled herein:

a.    In January of 2003, GM opened an internal investigation after it received

complaints from a Michigan GM dealership that a customer had experienced a power failure

while operating his MY 2003 Pontiac Grand Am.

b.    During the investigation, GM's Brand Quality Manager for the Grand Am

visited the dealership and requested that the affected customer demonstrate the problem.  The

customer was able to recreate the shutdown event by driving over a speed bump at

approximately 30-35 mph.

      c.     The customer's key ring was allegedly quite heavy.  It contained

approximately 50 keys and a set of brass knuckles.

      d.     In May 2003, GM issued a voicemail to dealerships describing the

defective ignition condition experienced by the customer in the Grand Am.  GM identified the

relevant population of affected vehicles as the 1999-2003 Chevrolet Malibu, Oldsmobile Alero,

and Pontiac Grand Am.

      e.     GM did not recall these vehicles.  Nor did it provide owners and/or lessees

with notice of the defective condition.  Instead, its voicemail directed dealerships to pay attention

to the key size and mass of the customer's key ring.

      f.     On July 24, 2003, GM issued an engineering work order to increase the

detent plunger force on the ignition switch for the 1999-2003 Chevrolet Malibu, Oldsmobile

Alero, and Pontiac Grand Am vehicles.  GM engineers allegedly increased the detent plunger

force and changed the part number of the ignition switch.  The new parts were installed

beginning in MY 2004 Malibu, Alero, and Grand Am vehicles.

      g.     GM issued a separate engineering work order in March 2004 to increase

the detent plunger force on the ignition switch in the Pontiac Grand Prix.  GM engineers did not

change the part number for the new Pontiac Grand Prix ignition switch.

      h.     GM design engineer Ray DeGiorgio signed the work order in March 2004

authorizing the part change for the Grand Prix ignition switch.

162.    From 2002 to the end of its corporate existence, GM received numerous reports

from consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect.

The following are just a handful of examples of some of the reports known to GM.

163.    A September 16, 2002 complaint filed with NHTSA regarding a MY 2002

Oldsmobile Intrigue involving an incident that occurred on March 16, 2002, in which the

following was reported:

>WHILE DRIVING AT 30 MPH CONSUMER RAN HEAD ON
>INTO A STEEL GATE, AND THEN HIT THREE TREES.
>UPON IMPACT, NONE OF THE AIR BAGS DEPLOYED.
>CONTACTED DEALER. PLEASE PROVIDE FURTHER
>INFORMATION. *AK  NHTSA ID Number: 8018687.

164.    A November 22, 2002 complaint filed with NHTSA involving a MY 2003

Cadillac CTS involving an incident that occurred on July 1, 2002, in which it was reported that:

>THE CAR STALLS AT 25 MPH TO 45 MPH, OVER 20
>OCCURANCES, DEALER ATTEMPTED 3 REPAIRS. DT
>NHTSA ID Number: 770030.

165.    A January 21, 2003 complaint filed with NHTSA involving a MY 2003 Cadillac

CTS, in which the following was reported:

>WHILE DRIVING AT ANY SPEED, THE VEHICLE WILL
>SUDDENLY SHUT OFF. THE STEERING WHEEL AND THE
>BRAKE PEDAL BECOMES VERY STIFF. CONSUMER FEELS
>ITS VERY UNSAFE TO DRIVE. PLEASE PROVIDE ANY
>FURTHER INFORMATION.  NHTSA ID Number: 10004288.

166.    A June 30, 2003 complaint filed with NHTSA regarding a MY 2001 Oldsmobile

Intrigue which involved the following report:

>CONSUMER NOTICED THAT WHILE TRAVELING DOWN
>HILL AT 40-45 MPH BRAKES FAILED, CAUSING
>CONSUMER TO RUN INTO THREES AND A POLE. UPON
>IMPACT, AIR BAGS DID NOT DEPLOY. *AK  NHTSA ID
>Number: 10026252.

167.    A March 11, 2004 complaint filed with NHTSA involving a MY 2004 Cadillac

CTS involving an incident that occurred on March 11, 2004, in which the following was

reported:

> CONSUMER STATED WHILE DRIVING AT 55-MPH
> VEHICLE STALLED, CAUSING CONSUMER TO PULL OFF
> THE ROAD. DEALER INSPECTED VEHICLE SEVERAL
> TIMES, BUT COULD NOT DUPLICATE OR CORRECT THE
> PROBLEM. *AK  NHTSA ID Number: 10062993.

168.    A March 11, 2004 complaint with NHTSA regarding a MY 2003 Oldsmobile

Alero incident that occurred on July 26, 2003, in which the following was reported:

> THE VEHICLE DIES. WHILE CRUISING AT ANY SPEED,
> THE HYDRAULIC BRAKES & STEERING FAILED DUE TO
> THE ENGINE DYING. THERE IS NO SET PATTERN, IT
> MIGHT STALL 6 TIMES IN ONE DAY, THEN TWICE THE
> NEXT DAY. THEN GO 4 DAYS WITH NO OCURRENCE,
> THEN IT WILL STALL ONCE A DAY FOR 3 DAYS. THEN
> GO A WEEK WITH NO OCURRENCE, THEN STALL 4 TIMES
> A DAY FOR 5 DAYS, ETC., ETC. IN EVERY OCURRENCE, IT
> TAKES APPROXIMATELY 10 MINUTES BEFORE IT WILL
> START BACK UP. AT HIGH SPEEDS, IT IS EXTREMELY
> TOO DANGEROUS TO DRIVE. WE'VE TAKEN IT TO THE
> DEALER, UNDER EXTENDED WARRANTY, THE
> REQUIRED 4 TIMES UNDER THE LEMON LAW PROCESS.
> THE DEALER CANNOT ASCERTAIN, NOR FIX THE
> PROBLEM. IT HAPPENED TO THE DEALER AT LEAST
> ONCE WHEN WE TOOK IT IN. I DOUBT THEY WILL
> ADMIT IT, HOWEVER, MY WIFE WAS WITNESS. THE CAR
> IS A 2003. EVEN THOUGH I BOUGHT IT IN JULY 2003, IT
> WAS CONSIDERED A USED CAR. GM HAS DENIED OUR
> CLAIM SINCE THE LEMON LAW DOES NOT APPLY TO
> USED CARS. THE CAR HAS BEEN PERMANENTLY
> PARKED SINCE NOVEMBER 2003. WE WERE FORCED TO
> BUY ANOTHER CAR. THE DEALER WOULD NOT TRADE.
> THIS HAS RESULTED IN A BADLUCK SITUATION FOR US.
> WE CANNOT AFFORD 2 CAR PAYMENTS / 2 INSURANCE
> PREMIUMS, NOR CAN WE AFFORD $300.00 PER HOUR TO
> SUE GM. I STOPPED MAKING PAYMENTS IN DECEMBER
> 2003. I HAVE KEPT THE FINANCE COMPANY ABREAST OF
> THE SITUATION. THEY HAVE NOT REPOSSESSED AS OF
> YET. THEY WANT ME TO TRY TO SELL IT. CAN YOU
> HELP ?*AK  NHTSA ID Number: 10061898.

169.   A July 20, 2004 complaint filed with NHTSA involving a MY 2004 Cadillac

SRX, involving an incident that occurred on July 9, 2004, in which the following was reported:

> THE CAR DIES AFTER TRAVELING ON HIGHWAY. IT
> GOES FROM 65 MPH TO 0. THE BRAKES, STEERING, AND
> COMPLETE POWER DIES. YOU HAVE NO CONTROL OVER
> THE CAR AT THIS POINT. I HAVE ALMOST BEEN HIT 5
> TIMES NOW. ALSO, WHEN THE CARS DOES TURN BACK
> ON IT WILL ONLY GO 10 MPH AND SOMETIMES WHEN
> YOU TURN IT BACK ON THE RPM'S WILL GO TO THE
> MAX. IT SOUNDS LIKE THE CAR IS GOING TO EXPLODE.
> THIS CAR IS A DEATH TRAP. *LA  NHTSA ID Number:
> 10082289.

170.   An August 2004 complaint filed with NHTSA regarding a MY 2004 Chevrolet

Malibu incident that occurred on June 30, 2004, in which it was reported that:

> WHILE TRAVELING AT ANY SPEED VEHICLE STALLED.
> WITHOUT CONSUMER HAD SEVERAL CLOSE CALLS OF
> BEING REAR ENDED. VEHICLE WAS SERVICED SEVERAL
> TIMES, BUT PROBLEM RECURRED. *AK.  NHTSA ID
> Number:  10089418.

171.   A report in August of 2004 involving a MY 2004 Chevrolet Malibu incident that

occurred on August 3, 2004, in which it was reported that:

> WHEN DRIVING, THE VEHICLE TO CUT OFF. THE DEALER
> COULD NOT FIND ANY DEFECTS. *JB.  NHTSA ID
> Number: 10087966**.**

172.   An October 23, 2004 complaint with NHTSA regarding a MY 2003 Chevrolet

Monte Carlo, in which the following was reported:

> VEHICLE CONTINUOUSLY EXPERIENCED AN
> ELECTRICAL SYSTEM FAILURE. AS A RESULT,
> THERE'WAS AN ELECTRICAL SHUT DOWN WHICH
> RESULTED IN THE ENGINE DYING/ STEERING WHEEL
> LOCKING UP, AND LOSS OF BRAKE POWER.*AK  NHTSA
> ID Number: 10044624**.**

173.    An April 26, 2005 complaint filed with NHTSA involving a MY 2005 Pontiac

Grand Prix, pertaining to an incident that occurred on December 29, 2004, in which the

following was reported:

> 2005 PONTIAC GRAND PRIX GT SEDAN VIN #[XXX]
> PURCHASED 12/16/2004. INTERMITTENTLY VEHICLE
> STALLS/ LOSS OF POWER IN THE ENGINE. WHILE
> DRIVING THE VEHICLE IT WILL SUDDENLY JUST LOSES
> POWER. YOU CONTINUE TO PRESS THE ACCELERATOR
> PEDAL AND THEN THE ENGINE WILL SUDDENLY TAKE
> BACK OFF AT A GREAT SPEED. THIS HAS HAPPENED
> WHILE DRIVING NORMALLY WITHOUT TRYING TO
> ACCELERATE AND ALSO WHILE TRYING TO
> ACCELERATE. THE CAR HAS LOST POWER WHILE
> TRYING TO MERGE IN TRAFFIC. THE CAR HAS LOST
> POWER WHILE TRYING TO CROSS HIGHWAYS. THE CAR
> HAS LOST POWER WHILE JUST DRIVING DOWN THE
> ROAD. GMC HAS PERFORMED THE FOLLOWING REPAIRS
> WITHOUT FIXING THE PROBLEM. 12/30/2004 [XXX]-
> MODULE, POWERTRAIN CONTROL-ENGINE
> REPROGRAMMING. 01/24/2005 [XXX]-
> SOLENOID,PRESSURE CONTROL-REPLACED. 02/04/2005
> [XXX]-MODULE, PCM/VCM-REPLACED. 02/14/2005 [XXX]-
> PEDAL,ACCELERATOR-REPLACED. DEALERSHIP
> PURCHASED FROM CAPITAL BUICK-PONTIAC-GMC 225-
> 293-3500. DEALERSHIP HAS ADVISED THAT THEY DO
> NOT KNOW WHAT IS WRONG WITH THE CAR. WE HAVE
> BEEN TOLD THAT WE HAVE TO GO DIRECT TO PONTIAC
> WITH THE PROBLEM. HAVE BEEN IN CONTACT WITH
> PONTIAC SINCE 02/15/05. PONTIAC ADVISED THAT THEY
> WERE GOING TO RESEARCH THE PROBLEM AND SEE IF
> ANY OTHER GRAND PRI WAS REPORTING LIKE
> PROBLEMS. SO FAR THE ONLY ADVICE FROM PONTIAC
> IS THEY WANT US TO COME IN AND TAKE ANOTHER
> GRAND PRIX OFF THE LOT AND SEE IF WE CAN GET THIS
> CAR TO DUPLICATE THE SAME PROBLEM. THIS DID NOT
> IMPRESS ME AT ALL. SO AFTER WAITING FOR 2-1/2
> MONTHS FOR PONTIAC TO DO SOMETHING TO FIX THE
> PROBLEM, I HAVE DECIDED TO REPORT THIS TO NHTSA.
> *AK *JS INFORMATION REDACTED PURSUANT TO THE
> FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C.
> 552(B)(6)  NHTSA ID Number: 10118501.

174.    A May 2005 complaint filed with NHTSA regarding a MY 2004 Chevrolet

Malibu incident that occurred on July 18, 2004, in which it was reported that:

> THE CAR CUT OFF WHILE I WAS DRIVING AND IN
> HEAVY TRAFFIC MORE THAN ONCE. THERE WAS NO
> WARNING THAT THIS WOULD HAPPEN. THE CAR WAS
> SERVICED BEFORE FOR THIS PROBLEM BUT IT
> CONTINUED TO HAPPEN. I HAVE HAD 3 RECALLS, THE
> HORN FUSE HAS BEEN REPLACED TWICE, AND THE
> BLINKER IS CURRENTLY OUT. THE STEERING COLLAR
> HAS ALSO BEEN REPLACED. THIS CAR WAS SUPPOSED
> TO BE A NEW CAR.  NHTSA ID Number: 10123684.

175.    A June 2, 2005 complaint with NHTSA regarding a MY 2004 Pontiac Grand Am

incident that occurred on February 18, 2005, in which the following was reported:

> 2004 PONTIAC GRAND PRIX SHUTS DOWN WHILE
> DRIVING AND THE POWER STEERING AND BRAKING
> ABILITY ARE LOST.*MR *NM.  NHTSA ID
> Number: 10124713.

176.    An August 12, 2005 complaint filed with NHTSA involving a MY 2003 Cadillac

CTS, regarding an incident that occurred on January 3, 2005, in which it was reported that:

> DT: VEHICLE LOST POWER WHEN THE CONSUMER HIT
> THE BRAKES. THE TRANSMISSION JOLTS AND THEN THE
> ENGINE SHUTS OFF. IT HAS BEEN TO THE DEALER 6
> TIMES SINCE JANUARY. THE DEALER TRIED
> SOMETHING DIFFERENT EVERY TIME SHE TOOK IT IN.
> MANUFACTURER SAID SHE COULD HAVE A NEW
> VEHICLE IF SHE PAID FOR IT. SHE WANTED TO GET RID
> OF THE VEHICLE.*AK THE CHECK ENGINE LIGHT
> ILLUMINATED. *JB  NHTSA ID Number: 10127580.

177.    An August 26, 2005 complaint with NHTSA regarding a MY 2004 Pontiac Grand

Am incident that occurred on August 26, 2005, in which the following was reported:

> WHILE DRIVING MY 2004 PONTIAC GRAND AM THE CAR
> FAILED AT 30 MPH. IT COMPLETELY SHUT OFF LEAVING
> ME WITH NO POWER STEERING AND NO WAY TO
> REGAIN CONTROL OF THE CAR UNTIL COMING TO A
> COMPLETE STOP TO RESTART IT. ONCE I HAD STOPPED
> IT DID RESTART WITHOUT INCIDENT. ONE WEEK LATER

> THE CAR FAILED TO START AT ALL NOT EVEN TURNING
> OVER. WHEN THE PROBLEM WAS DIAGNOSED AT THE
> GARAGE IT WAS FOUND TO BE A FAULTY "IGNITION
> CONTROL MODULE" IN THE CAR. AT THIS TIME THE
> PART WAS REPLACED ONLY TO FAIL AGAIN WITHIN 2
> MONTHS TIME AGAIN WHILE I WAS DRIVING THIS TIME
> IN A MUCH MORE HAZARDOUS CONDITION BEING THAT
> I WAS ON THE HIGHWAY AND WAS TRAVELING AT 50
> MPH AND HAD TO TRAVEL ACROSS TWO LANES OF
> TRAFFIC TO EVEN PULL OVER TO TRY TO RESTART IT.
> THE CAR CONTINUED TO START AND SHUT OFF ALL
> THE WAY TO THE SERVICE GARAGE WHERE IT WAS
> AGAIN FOUND TO BE A FAULTY "IGNITION CONTROL
> MODULE". IN ANOTHER TWO WEEKS TIME THE CAR
> FAILED TO START AND WHEN DIAGNOSED THIS TIME IT
> WAS SAID TO HAVE "ELECTRICAL PROBLEMS"
> POSSIBLE THE "POWER CONTROL MODULE". AT THIS
> TIME THE CAR IS STILL UNDRIVEABLE AND UNSAFE
> FOR TRAVEL. *JB  NHTSA ID Number: 10134303.

178.    A September 22, 2005 complaint filed with NHTSA involving a MY 2005

Cadillac CTS, concerning an incident that occurred on September 16, 2005, in which the

following was reported:

> DT: 2005 CADILLAC CTS – THE CALLER'S VEHICLE WAS
> INVOLVED IN AN ACCIDENT WHILE DRIVING AT 55 MPH.
> UPON IMPACT, AIR BAGS DID NOT DEPLOY. THE
> VEHICLE WENT OFF THE ROAD AND HIT A TREE. THIS
> WAS ON THE DRIVER'S SIDE FRONT. THERE WERE NO
> INDICATOR LIGHTS ON PRIOR TO THE ACCIDENT. THE
> VEHICLE HAS NOT BEEN INSPECTED BY THE
> DEALERSHIP, AND INSURANCE COMPANY TOTALED
> THE VEHICLE. THE CALLER SAW NO REASON FOR THE
> AIR BAGS NOT TO DEPLOY.  TWO INJURED WERE
> INJURED IN THIS CRASH.  A POLICE REPORT WAS
> TAKEN. THERE WAS NO FIRE. *AK  NHTSA ID Number:
> 10137348.

179.    A September 29, 2006 complaint filed with NHTSA involving a MY 2004

Cadillac CTS and an incident that occurred on September 29, 2006, in which the following was

reported:

> DT*: THE CONTACT STATED AT VARIOUS SPEEDS
> WITHOUT WARNING, THE VEHICLE LOST POWER AND
> WOULD NOT ACCELERATE ABOVE 20 MPH. ALSO,
> WITHOUT WARNING, THE VEHICLE STALLED ON
> SEVERAL OCCASIONS, AND WOULD NOT RESTART. THE
> VEHICLE WAS TOWED TO THE DEALERSHIP, WHO
> REPLACED THE THROTTLE TWICE AND THE THROTTLE
> BODY ASSEMBLY HARNESS, BUT THE PROBLEM
> PERSISTED. *AK UPDATED 10/25/2006 – *NM  NHTSA ID
> Number: 10169594.

180.    An April 18, 2007 complaint filed with NHTSA involving a MY 2004 Cadillac

SRX, regarding an incident that occurred on April 13, 2007, in which it was reported that:

> TL*THE CONTACT OWNS A 2004 CADILLAC SRX. THE
> ENGINE STALLED WITHOUT WARNING AND CAUSED
> ANOTHER VEHICLE TO CRASH INTO THE VEHICLE. THE
> VEHICLE WAS ABLE TO RESTART A FEW MINUTES
> AFTER THE CRASH. THE DEALER AND MANUFACTURER
> WAS UNABLE TO DIAGNOSE THE FAILURE. THE
> MANUFACTURER HAD THE VEHICLE INSPECTED BY A
> CADILLAC SPECIALIST WHO WAS UNABLE TO
> DIAGNOSE THE FAILURE. THE DEALER UPDATED THE
> COMPUTER FOUR TIMES, BUT THE ENGINE CONTINUED
> TO STALL. THE CURRENT AND FAILURE MILEAGES
> WERE 48,000.  NHTSA ID Number: 10188245.

181.    A September 20, 2007 complaint filed with NHTSA involving a MY 2007

Cadillac CTS, in connection with an incident that occurred on January 1, 2007, in which it was

reported that:

> TL*THE CONTACT OWNS A 2007 CADILLAC CTS. WHILE
> DRIVING 40 MPH, THE VEHICLE SHUT OFF WITHOUT
> WARNING. THE FAILURE OCCURRED ON FIVE SEPARATE
> OCCASIONS. THE DEALER WAS UNABLE TO DUPLICATE
> THE FAILURE. AS OF SEPTEMBER 20, 2007, THE DEALER
> HAD NOT REPAIRED THE VEHICLE. THE POWERTRAIN
> WAS UNKNOWN. THE FAILURE MILEAGE WAS 2,000 AND
> CURRENT MILEAGE WAS 11,998.  NHTSA ID Number:
> 10203516.

182.    A September 24, 2007 complaint filed with NHTSA involving a MY 2004

Cadillac SRX, regarding an incident that occurred on January 1, 2005, in which the following

was reported:

> TL*THE CONTACT OWNS A 2004 CADILLAC SRX. WHILE
> DRIVING 5 MPH OR GREATER, THE VEHICLE WOULD
> SHUT OFF WITHOUT WARNING. THE DEALER STATED
> THAT THE BATTERY CAUSED THE FAILURE AND THEY
> REPLACED THE BATTERY. APPROXIMATELY EIGHT
> MONTHS LATER, THE FAILURE RECURRED. THE DEALER
> STATED THAT THE BATTERY CAUSED THE FAILURE
> AND REPLACED IT A SECOND TIME. APPROXIMATELY
> THREE MONTHS LATER, THE FAILURE OCCURRED
> AGAIN. SHE WAS ABLE TO RESTART THE VEHICLE. THE
> DEALER WAS UNABLE TO DUPLICATE THE FAILURE,
> HOWEVER, THEY REPLACED THE CRANK SHAFT
> SENSOR. THE FAILURE CONTINUES TO PERSIST. AS OF
> SEPTEMBER 24, 2007, THE DEALER HAD NOT REPAIRED
> THE VEHICLE. THE POWERTRAIN WAS UNKNOWN. THE
> FAILURE MILEAGE WAS 8,000 AND CURRENT MILEAGE
> WAS 70,580.  NHTSA ID Number: 10203943.

183.    A June 18, 2008 complaint filed with NHTSA involving a MY 2006 Cadillac

CTS and an incident that occurred on June 17, 2008, in which it was reported that:

> TL*THE CONTACT OWNS A 2006 CADILLAC CTS. WHILE
> DRIVING 60 MPH AT NIGHT, THE VEHICLE SHUT OFF
> AND LOST TOTAL POWER. WHEN THE FAILURE
> OCCURRED, THE VEHICLE CONTINUED TO ROLL AS IF IT
> WERE IN NEUTRAL. THERE WERE NO WARNING
> INDICATORS PRIOR TO THE FAILURE. THE CONTACT
> FEELS THAT THIS IS A SAFETY HAZARD BECAUSE IT
> COULD HAVE RESULTED IN A SERIOUS CRASH. THE
> VEHICLE WAS TAKEN TO THE DEALER TWICE FOR
> REPAIR FOR THE SAME FAILURE IN FEBURARY OF 2008
> AND JUNE 17, 2008. THE FIRST TIME THE CAUSE OF THE
> FAILURE WAS IDENTIFIED AS A GLITCH WITH THE
> COMPUTER SWITCH THAT CONTROLS THE
> TRANSMISSION. AT THE SECOND VISIT, THE SHOP
> EXPLAINED THAT THEY COULD NOT IDENTIFY THE
> FAILURE. IT WOULD HAVE TO RECUR IN ORDER FOR
> THEM TO DIAGNOSE THE FAILURE PROPERLY. THE
> CURRENT AND FAILURE MILEAGES WERE 43,000.
> NHTSA ID Number: 10231507.

184.    An October 14, 2008 complaint filed with NHTSA involving a MY 2008 Cadillac

CTS and an incident that occurred on April 5, 2008, in which it was reported that:

> WHILE DRIVING MY 2008 CTS, WITH NO ADVANCE
> NOTICE, THE ENGINE JUST DIED. IT SEEMED TO RUN
> OUT OF GAS. MY FUEL GAUGE READ BETWEEN 1/2 TO
> 3/4 FULL. THIS HAPPENED 3 DIFFERENT OCCASIONS. ALL
> 3 TIMES I HAD TO HAVE IT TOWED BACK TO THE
> DEALERSHIP THAT I PURCHASED THE CAR FROM. ALL 3
> TIMES I GOT DIFFERENT REASONS IT HAPPENED, FROM
> BAD FUEL PUMP IN GAS TANK, TO SOME TYPE OF BAD
> CONNECTION, ETC. AFTER THIS HAPPENED THE 3RD
> TIME, I DEMANDED A NEW CAR, WHICH I RECEIVED. I
> HAVE HAD NO PROBLEMS WITH THIS CTS, RUNS GREAT.
> *TR  NHTSA ID Number: 10245423.

185.    A November 13, 2008 complaint with NHTSA regarding a MY 2001 Oldsmobile

Intrigue, in which the following was reported:

> L*THE CONTACT OWNS A 2001 OLDSMOBILE INTRIGUE.
> WHILE DRIVING 35 MPH, THE VEHICLE CONTINUOUSLY
> STALLS AND HESITATES. IN ADDITION, THE
> INSTRUMENT PANEL INDICATORS WOULD ILLUMINATE
> AT RANDOM. THE VEHICLE FAILED INSPECTION AND
> THE CRANKSHAFT SENSOR WAS REPLACED, WHICH
> HELPED WITH THE STALLING AND HESITATION;
> HOWEVER, THE CHECK ENGINE INDICATOR WAS STILL
> ILLUMINATED. DAYS AFTER THE CRANKSHAFT SENSOR
> WAS REPLACED, THE VEHICLE FAILED TO START.
> HOWEVER, ALL OF THE INSTRUMENT PANEL
> INDICATORS FLASHED ON AND OFF. AFTER NUMEROUS
> ATTEMPTS TO START THE VEHICLE, HE HAD IT
> JUMPSTARTED. THE VEHICLE WAS THEN ABLE TO
> START. WHILE DRIVING HOME, ALL OF THE LIGHTING
> FLASHED AND THE VEHICLE SUDDENLY SHUT OFF. THE
> VEHICLE LOST ALL ELECTRICAL POWER AND POWER
> STEERING ABILITY. THE CONTACT MANAGED TO PARK
> THE VEHICLE IN A PARKING LOT AND HAD IT TOWED
> THE FOLLOWING DAY TO A REPAIR SHOP. THE VEHICLE
> IS CURRENTLY STILL IN THE SHOP. THE VEHICLE HAS
> BEEN RECALLED IN CANADA AND HE BELIEVES THAT IT
> SHOULD ALSO BE RECALLED IN THE UNITED STATES.
> THE FAILURE MILEAGE WAS UNKNOWN AND THE
> CURRENT MILEAGE WAS 106,000.  NHTSA ID
> Number: 10248694.

186.    A December 10, 2008 complaint filed with NHTSA regarding a MY 2004

Oldsmobile Alero and an incident that occurred on December 10, 2008, in which the following

was reported:

> I WAS DRIVING DOWN THE ROAD IN RUSH HOUR GOING
> APPROX. 55 MPH AND MY CAR COMPLETELY SHUT OFF,
> THE GAUGES SHUT DOWN, LOST POWER STEERING. HAD
> TO PULL OFF THE ROAD AS SAFELY AS POSSIBLE,
> PLACE VEHICLE IN PARK AND RESTART CAR. MY CAR
> HAS SHUT DOWN PREVIOUSLY TO THIS INCIDENT AND
> FEEL AS THOUGH IT NEEDS SERIOUS INVESTIGATION. I
> COULD HAVE BEEN ON THE HIGHWAY AND BEEN
> KILLED. THIS ALSO HAS HAPPENED WHEN IN A SPIN
> OUT AS WELL THOUGH THIS PARTICULAR INCIDENT
> WAS RANDOM. *TR  NHTSA ID Number: 10251280.

187.    A March 31, 2009 complaint filed with NHTSA regarding a MY 2005 Chevrolet

Malibu incident that occurred on May 30, 2008, in which it was reported that:

> TL*THE CONTACT OWNS A 2005 CHEVROLET MALIBU.
> THE CONTACT STATED THAT THE POWER WINDOWS,
> LOCKS, LINKAGES, AND IGNITION SWITCH
> SPORADICALLY BECOME INOPERATIVE. SHE TOOK THE
> VEHICLE TO THE DEALER AND THEY REPLACED THE
> IGNITION SWITCH AT THE COST OF $495. THE
> MANUFACTURER STATED THAT THEY WOULD NOT
> ASSUME RESPONSIBILITY FOR ANY REPAIRS BECAUSE
> THE VEHICLE EXCEEDED ITS MILEAGE. ALL REMEDIES
> AS OF MARCH 31, 2009 HAVE BEEN INSUFFICIENT IN
> CORRECTING THE FAILURES. THE FAILURE MILEAGE
> WAS 45,000 AND CURRENT MILEAGE WAS 51,000.  NHTSA
> ID Number: 10263716.

188.    New GM has publicly admitted that at least 7 crashes, 8 injuries, and 3 deaths are

linked to this serious safety defect.  However, in reality, the number of reports and complaints is

much higher.

189.    Moreover, notwithstanding years of notice and knowledge of the defect, on top of

numerous complaints and reports from consumers, including reports of crashes, injuries, and

deaths, GM continued to sell these Defective Ignition Switch Vehicles and neither warned the

public nor implemented a recall.

> ### 3. The Defective Ignition Switch Vehicles which gave rise to the September 4, 2014 recall.

190.    On September 4, 2014, New GM recalled, *inter alia,* 2008-2009 Pontiac G8

vehicles for yet another ignition switch defect (NHTSA Recall No. 14-V-540).  New GM's letter

to NHTSA stated the total number of affected vehicles as 46,783—but that includes an

indeterminate number of 2011-2013 Chevrolet Caprices manufactured and sold by New GM.

191.    New GM explains that, in these Defective Ignition Switch Vehicles, "there is a

risk, under certain conditions, that some drivers may bump the ignition key with their knee and

unintentionally move the key away from the 'run' position."  New GM admits that, when this

happens, "engine power, and power braking will be affected, increasing the risk of a crash."

Moreover, "[t]he timing of the key movement out of the 'run' position, relative to the activation

of the sending algorithm of the crash event, may result in the airbags not deploying, increasing

the potential for occupant injury in certain kinds of crashes."[110]

192.    This recall is directly related to the other ignition switch recalls and involves the

same safety risks and dangers.  The defect poses a serious and dangerous safety risk because the

key in the ignition switch can rotate and consequently cause the ignition to switch from the "on"

or "run" position to the "off" or "accessory" position, which causes the loss of engine power,

stalling, loss of speed control, loss of power steering, loss of power braking, and increases the

risk of a crash.  Moreover, as with the ignition switch torque defect, if a crash occurs, the airbags

may not deploy.

---

[110] New GM's Part 573 Safety Recall Report, Sept. 4, 2014.

193.    The recall occurred after New GM "analyzed vehicle test results, warranty data, TREAD data, NHTSA Vehicle Owner Questionnaires, and other data."[111]

194.    Once again, the production of these Defective Ignition Switch Vehicles was a product of GM's systemic devaluation of safety issues, and GM knew or should have known of this defect.

**D.    Safety Defects Of The Airbag Systems Of GM Vehicles.**

**1.    Wiring harness defect.**

195.    On March 17, 2014, New GM recalled nearly 1.2 million MY 2008-2013 Buick Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn Outlook vehicles for a dangerous defect involving airbags and seatbelt pretensioners.

196.    The affected vehicles were sold with defective wiring harnesses.  Increased resistance in the wiring harnesses of driver and passenger seat-mounted, side-impact airbag in the affected vehicles may prevent the side impact airbags, front center airbags, and seat belt pretensioners from deploying in a crash.  The vehicles' failure to deploy airbags and pretensioners in a crash increases the risk of injury and death to the drivers and front-seat passengers.

197.    Once again, the available evidence suggests that GM knew of the dangerous airbag defect but failed to take the requisite remedial action.

198.    As the wiring harness connectors in the side impact airbags corrode or loosen over time, resistance will increase.  The airbag sensing system will interpret this increase in resistance as a fault, which then triggers illumination of the "SERVICE AIR BAG" message on the vehicle's dashboard.  This message may be intermittent at first and the airbags and pretensioners will still deploy.  But over time, the resistance can build to the point where the

---

[111] *Id.*

SIABs, pretensioners, and front center airbags will not deploy in the event of a collision.[112]  The

problem relates to the use of tin, rather than a more solid material, to connect wire harnesses.

199.    GM knew that in 2008 there was an increase in warranty claims for airbag service

on certain of its vehicles and determined it was due to increased resistance in airbag wiring.  A

September 2008 analysis of the tin connectors revealed that corrosion and wear to the connectors

was causing the increased resistance in the airbag wiring.  GM issued  a technical service bulletin

on November 25, 2008, for 2008-2009 Buick Enclave, 2009 Chevy Traverse, 2008-2009 GMC

Acadia, and 2008-2009 Saturn Outlook models, instructing dealers to repair the defect by using

Nyogel grease, securing the connectors, and adding slack to the line.  Finally, GM began the

transition back to gold-plated terminals in certain vehicles and suspended all investigation into

the defective airbag wiring without taking further action.[113]

200.    Thus, through the remainder of its corporate history, GM failed to remedy the

known hazards caused by the wiring harness defect.

### 2.    Front passenger airbag defect.

201.    On March 17, 2014, New GM issued a noncompliance recall of 303,013 MY

2009-2014 GMC Savana and Chevrolet Express vehicles with a front passenger airbag defect, an

indeterminate number of which were manufactured by GM and sold prior to the Bar Date in

GM's bankruptcy.[114]

202.    In the affected vehicles, in certain frontal impact collisions below the airbag

deployment threshold, the panel covering the airbag may not sufficiently absorb the impact of

---

[112] *See* New GM Notice to NHTSA dated March 17, 2014, at 1.

[113] *See* New GM Notification Campaign No. 14V-118 dated March 31, 2014, at 1-2.

[114] *See* March 31, 2014 Letter from New GM to NHTSA.

the collision (especially given the passenger-side airbag housing is plastic).[115]  These vehicles

therefore do not meet the requirements of FMVSS number 201, "Occupant Protection in Interior

Impact."[116]

**E.     Safety Defects Of The Seat Belt Systems In GM Vehicles.**

   **1.     Seat belt connector cable defect.**

   203.    On May 20, 2014, New GM issued a safety recall for nearly 1.4 million MY

2009-2014 Buick Enclave, 2009-2014 Chevrolet Traverse, 2009-2014 GMC Acadia, and 2009-

2010 Saturn Outlook vehicles with a dangerous safety belt defect.

   204.    In the affected vehicles, "[t]he flexible steel cable that connects the safety belt to

the vehicle at the outside of the front outboard seating positions can fatigue and separate over

time as a result of occupant movement into the seat.  In a crash, a separated cable could increase

the risk of injury to the occupant."[117]

   **2.     Seat belt retractor defect.**

   205.    On June 11, 2014, New GM recalled 28,789 MY 2004-2011 Saab 9-3 Convertible

vehicles with a seat belt retractor defect.

   206.    In the affected vehicles, the driver's side front seat belt retractor may break,

causing the seat belt webbing spooled out by the user not to retract.[118]  In the event of a crash, a

seat belt that has not retracted may not properly restrain the seat occupant, increasing the risk of

injury to the driver.[119]

---

[115] *Id.*

[116] *Id.*

[117] *See* New GM Notice to NHTSA dated May 19, 2014, at 1.

[118] *See* New GM's June 11, 2013 Letter to NHTSA.

[119] *See id.*

**F.**    **Safety Defects Affecting The Brakes In GM Vehicles.**

**1.**    **Brake light defect.**

207.    On May 14, 2014, New GM issued a safety recall of approximately 2.4 million

MY 2004-2012 Chevrolet Malibu, 2004-2007 Malibu Maxx, 2005-2010 Pontiac G6, and 2007-

2010 Saturn Aura vehicles with a dangerous brake light defect.

208.    In the affected vehicles, the brake lamps may fail to illuminate when the brakes

are applied or illuminate when the brakes are not engaged; the same defect can disable cruise

control, traction control, electronic stability control, and panic brake assist operation, thereby

increasing the risk of collisions and injuries.[120]

209.    Once again, GM knew of the dangerous brake light defect for years but did not

take anything approaching the requisite remedial action.

210.    According to New GM, the brake defect originates in the Body Control Module

connection system.  "Increased resistance can develop in the [Body Control Module] connection

system and result in voltage fluctuations or intermittency in the Brake Apply Sensor (BAS)

circuit that can cause service brakes lamp malfunction."[121]  The result is brake lamps that may

illuminate when the brakes are not being applied and may not illuminate when the brakes are

being applied.[122]

211.    The same defect can also cause the vehicle to get stuck in cruise control if it is

engaged, or cause cruise control to not engage, and may also disable the traction control,

electronic stability control, and panic-braking assist features.[123]

---

[120] *See* New GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.

[121] *Id.*

[122] *Id.*

[123] *Id.*

212.    New GM now acknowledges that the brake light defect "may increase the risk of a crash."[124]

213.    As early as September 2008, NHTSA opened an investigation for MY 2005-2007 Pontiac G6 vehicles involving allegations that the brake lights may turn on when the driver does not depress the brake pedal and may ***not*** turn on when the driver ***does*** depress the brake pedal.[125]

214.    During an investigation of the brake light defect in 2008, GM discovered elevated warranty claims for the brake light defect for MY 2005 and 2006 vehicles built in January 2005, and found "fretting corrosion in the [Body Control Module] C2 connector was the root cause" of the problem.[126] GM and its part supplier Delphi decided that applying dielectric grease to the [Body Control Module] C2 connector would be "an effective countermeasure to the fretting corrosion."[127] Beginning in November 2008, the Company began applying dielectric grease in its vehicle assembly plants.[128]

215.    On December 4, 2008, GM issued a Technical Service Bulletin recommending the application of dielectric grease to the Body Control Module C2 connector for the MY 2005-2009 Pontiac G6, 2004-2007 Chevrolet Malibu/Malibu Maxx, 2008 Malibu Classic, and 2007-2009 Saturn Aura vehicles.[129] One month later, in January 2009, GM recalled only a small subset of the vehicles with the brake light defect—8,000 MY 2005-2006 Pontiac G6 vehicles built during the month of January 2005.[130]

216.    Not surprisingly, the brake light problem was far from resolved.

---

[124] *Id.*

[125] *Id.* at 2.

[126] *Id.*

[127] *Id.*

[128] *Id* at 3.

[129] *Id.* at 2.

[130] *Id.*

217.    GM sat on and concealed its knowledge of the brake light defect for the remainder

of its corporate existence, and did not even consider available countermeasures (other than the

application of grease that proved ineffective).

**2.    Reduced brake performance defect.**

218.    On July 28, 2014, New GM recalled 1968 MY 2009-2010 Chevrolet Aveo and

2009 Pontiac G3 vehicles.[131] Affected vehicles may contain brake fluid which does not protect

against corrosion of the valves inside the anti-lock brake system module, affecting the closing

motion of the valves.[132] If the anti-lock brake system valve corrodes it may result in longer brake

pedal travel or reduced performance, increasing the risk of a vehicle crash.[133]

**G.    Safety Defects Affecting The Steering In GM Vehicles.**

**1.    Sudden power-steering failure defect.**

219.    Between 2003 and 2010, over 1.3 million GM vehicles in the United States were

sold with a safety defect that caused the vehicle's electric power steering to suddenly fail during

ordinary driving conditions and revert back to manual steering, requiring greater effort by the

driver to steer the vehicle and increasing the risk of collisions and injuries.

220.    The affected vehicles are MY 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-

2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006

and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura vehicles—almost

all of which were manufactured by GM and sold prior to the passing of the Bar Date in GM's

bankruptcy.

---

[131] *See* July 28, 2014 Letter from New GM to NHTSA.

[132] *Id.*

[133] *Id.*

221.    As with the ignition switch defects and many of the other defects, GM was long aware of the power steering defect but refused to take proper remedial action.

222.    When the power steering fails, a message appears on the vehicle's dashboard, and a chime sounds to inform the driver.  Although steering control can be maintained through manual steering, greater driver effort is required, and the risk of an accident is increased.

223.    Documents released by NHTSA show that GM (and then New GM) waited years to recall nearly 335,000 Saturn Ions for power-steering failure – despite receiving nearly 4800 consumer complaints and more than 30,000 claims for warranty repairs.  That translates to a complaint rate of 14.3 incidents per thousand vehicles and a warranty claim rate of 9.1 percent. By way of comparison, NHTSA has described as "high" a complaint rate of 250 complaints per 100,000 vehicles.[134]  Here, the rate translates to 1430 complaints per 100,000 vehicles.

224.    NHTSA database records show complaints from Ion owners as early as June 2004, with the first injury reported in May 2007.

225.    NHTSA has linked approximately 12 crashes and 2 injuries to the power-steering defect in the Ions.

**2.    Loss of electric power steering assist defect.**

226.    On February 4, 2015, New GM announced a recall of 69,633 MY 2006-2007 Chevrolet Malibu, 2006-2007 Chevrolet Malibu Maxx and 2006-2007 Pontiac G6 for a steering defect that may result in a sudden loss of electric power steering assist.[135]

227.    When a vehicle suffers from loss of power steering assist, the driver must exert greater effort to steer the vehicle and risk of a crash increases.

---

[134] *See Search Saety Problems,* NHTSA, https://www-odi.nhtsa.dot.gov/cars/problems/defect/-results.cfm?action_number=EA06002&Search Type= QuickSearch&summary=true (last visted Dec. 8, 2016).

[135] *See* NHTSA Campaign Number 15V064000.

**H.    Transmission Shift Cable Defect Affecting 1.1 Million Chevrolet And Pontiac Vehicles.**

228.    On May 19, 2014, New GM issued a safety recall for more than 1.1 million MY 2007-2008 Chevrolet Saturn Aura, 2004-2008 Chevrolet Malibu, 2004-2007 Chevrolet Malibu Maxx, and 2005-2008 Pontiac G6 vehicles with dangerously defective transmission shift cables.

229.    In the affected vehicles, the shift cable may fracture at any time, preventing the driver from switching gears or placing the transmission in the "park" position.  According to New GM, "[i]f the driver cannot place the vehicle in park, and exits the vehicle without applying the park brake, the vehicle could roll away and a crash could occur without prior warning."[136]

**I.    Light Control Module Defect.**

230.    On May 16, 2014, New GM issued a safety recall of 217,578 MY 2004-2008 Chevrolet Aveo vehicles with a light control module defect.[137]  New GM later updated the number of affected vehicles to 218,000.

231.    In the vehicles, heat generated within the daytime running lamp module in the center console in the instrument panel may melt the module and cause a vehicle fire.[138]

**J.    Electrical Short In Driver's Door Module Defect.**

232.    On June 30, 2014, New GM issued a safety recall of 181,984 MY 2005-2007 Chevrolet Trailblazer, 2006 Chevrolet Trailblazer EXT, 2005-2007 Buick Rainier, 2005-2007 GMC Envoy, 2006 GMC Envoy XL, 2005-2007 Isuzu Ascender, and 2005-2007 Saab 9-7x vehicles with a defect that can cause an electrical short in the driver's door module.[139]

---

[136] *See* New GM letter to NHTSA Re: NHTSA Campaign No. 14V-224 dated May 22, 2014, at 1.

[137] *See* May 30, 2014 Letter from New GM to NHTSA.

[138] *Id.*

[139] *See* July 2, 2014 Letter from New GM to NHTSA.

233.    In the affected vehicles, an electrical short in the driver's door module may occur that can disable the power door lock and window switches and overheat the module.  The overheated module can then cause a fire in the affected vehicles.

## K.    Low-Beam Headlight Defect.

234.    On May 14, 2014, New GM issued a safety recall of 103,158 MY 2005-2007 Chevrolet Corvette vehicles with a low-beam headlight defect.

235.    In the affected vehicles, the underhood bussed electrical center housing can expand and cause the headlamp low beam relay control circuit wire to bend.  When the wire is repeatedly bent, it can fracture and cause a loss of low-beam headlamp illumination.  The loss of illumination decreases the driver's visibility and the vehicle's conspicuity to other motorists, increasing the risk of a crash.

## L.    Fuel Pump Module Defect.

236.    On September 18, 2012 New GM recalled a total of 40,859 vehicles, including certain 2007 MY Chevrolet Equinox and Pontiac Torrent vehicles originally sold or currently registered in Arizona, California, Nevada, and Texas; MY 2007 Chevrolet Cobalt, Pontiac G5, and Saturn ION vehicles originally sold or currently registered in Arizona, California, Florida, Nevada, or Texas; MY 2008 Chevrolet Cobalt and Pontiac G5 vehicles originally sold or currently registered in Arizona; and MY 2009 Chevrolet Cobalt and Pontiac G5 vehicles originally sold or currently registered in Arkansas, Arizona, California, Nevada, Oklahoma, or Texas.

237.    In affected vehicles, the plastic supply or return port on the fuel pump module may crack, which may cause a fuel leak. The customer may notice a fuel odor while the vehicle is being driven or after it is parked. If the crack becomes large enough, fuel may be observed

dripping onto the ground and vehicle performance may be affected. If an ignition source were present, a fire could occur.

**M.    Overloaded Feed Defect.**

238.    On July 2, 2014, New GM recalled 9,371 MY 2007-2011 Chevrolet Silverado HD and 2007-2011 GMC Sierra HD vehicles with an overloaded feed defect.

239.    In the affected vehicles, an overload in the feed may cause the underhood fusible link to melt due to electrical overload, resulting in potential smoke or flames that could damage the electrical center cover and/or the nearby wiring harness conduit.

**N.    Headlamp Driver Module Failure.**

240.    On October 25, 2014, New GM announced a recall of 273,182 vehicles, including the MY 2006-2009 Buick LaCrosse, 2006-2007 Buick Rainier, Chevrolet Trailblazer, GMC Envoy, 2006 Chevrolet Trailblazer EXT, GMC Envoy XL, 2006-2008 Isuzu Ascender, and Saab 9-7x for headlamp driver module failure.[140]  The number of affected vehicles was later modified to 269,586.

241.    In the affected vehicles, the headlamp driver module can overheat and fail, causing the headlamps and daytime running lights to fail, reducing the driver's ability to see the roadway and reducing visibility of the vehicle to oncoming traffic.

**O.    Valve Cover Gasket Defect.**

242.    On April 6, 2015, New GM announced a recall of 1207 MY 2004 Buick Regal, 2004 Chevrolet Impala and 2004 Chevrolet Monte Carlo vehicles for a valve cover gasket defect.[141]  New GM later increased the number of affected vehicles to 50,948, and noted that this also includes 2004 Pontiac Grand Prix vehicles.

---

[140] *See* NHTSA Campaign Number 14V755000.

[141] *See* NHTSA Campaign Number 15V201000.

243.    In these vehicles the valve cover gasket may leak causing engine oil to drip onto

the exhaust manifold increasing the risk of fire.

## IV.    GM'S PRODUCTION OF DEFECTIVE GM VEHICLES AND ITS SERIAL FAILURE TO CONDUCT NECESSARY SAFETY RECALLS STEMMED FROM ITS SYSTEMIC DEVALUATION AND DISREGARD OF SAFETY ISSUES IN ITS VEHICLES.

244.    In a 2008 internal presentation, GM instructed its employees to avoid using the

following judgment words:[142]

| | | |
|---|---|---|
| Always | detonate | Maniacal |
| Annihilate | disemboweling | Mutilating |
| Apocalyptic | enfeebling | Never |
| Asphyxiating | evil | potentially-disfiguring |
| Bad | evicscerated [*sic*] | power [*sic*] keg |
| Band-Aid | explode | Problem |
| big time | failed | Safety |
| brakes like an "X" car | flawed | safety related |
| Cataclysmic | genocide | Serious |
| Catastrophic | ghastly | spontaneous combustion |
| Challenger | grenadelike | Startling |
| chaotic | grisly | Suffocating |
| Cobain | gruesome | Suicidal |
| condemns | Hindenburg | Terrifying |
| Corvair-like | Hobbling | Titanic |
| crippling | Horrific | Tomblike |
| critical | impaling | Unstable |
| dangerous | inferno | widow-maker rolling sarcophagus (tomb or coffin) |
| deathtrap | Kevorkianesque | Words or phrases with biblical connotation |
| debilitating | lacerating | |
| decapitating | life-threatening | |
| defect | maiming | |
| defective | mangling | |

245.    In Orwellian fashion, GM instructed its employees to substitute euphemisms in

place of accurate descriptions of material safety defects such as the ignition switch defects and

the other defects discussed herein.  To avoid disclosure of the material safety risks, and

---

[142] NHTSA Consent Order at Exhibit B, 2008 Q1 Interior Technical Learning Symposium.

furtherance of the cover-up, GM instructed its employees to make the following word substitutions:

- "Issue, Condition [or] Matter" instead of "**Problem**"

- "Has Potential Safety Implications" instead of "**Safety**"

- "Does not perform to design" instead of "**Defect/Defective**"[143]

246.    GM knew its Delta Ignition Switch Vehicles were killing and maiming GM customers, and that it had sold and was selling millions of vehicles with a plethora of other safety defects, yet at the same time it instructed its employees to avoid the words "defect" or "safety." Instead of publicly admitting the dangerous safety defects in the Delta Ignition Switch Vehicles, and the other defective GM Vehicles, GM repeatedly blamed accidents on driver error.

247.    GM's censorship of the words necessary to discuss and remediate safety defects was emblematic of its systematic denigration of safety.  Additional examples of GM's cavalier approach to safety follow.

248.    GM made very clear to its personnel that cost-cutting was more important than safety, deprived its personnel of necessary resources for spotting and remedying defects, trained its employees not to reveal known defects, and rebuked those who attempted to "push hard" on safety issues.

249.    "[T]here was resistance or reluctance to raise issues or concerns in the GM culture."  The culture, atmosphere and supervisor response at GM "discouraged individuals from raising safety concerns."[144]  As a result, "GM personnel failed to raise significant issues to key decision-makers."[145]

---

[143] NHTSA Consent Order at Exhibit B (emphasis added).

[144] *Id*. at 252.

[145] *Id*. at 253.

250.    The focus on cost-cutting at GM created major disincentives to personnel who might wish to address safety issues.  For example, those responsible for a vehicle were responsible for its costs, but if they wanted to make a change that incurred costs and affected other vehicles, they also became responsible for the costs incurred in the other vehicles.

251.    As another cost-cutting measure at GM, parts were sourced to the lowest bidder, even if they were not the highest quality parts.[146]

252.    The focus of GM on cost-cutting also made it harder for personnel to discover safety defects, as in the case of the "TREAD Reporting team."

253.    GM used its TREAD database (known as "TREAD") to store the data required to be reported quarterly to NHTSA under the TREAD Act.[147]  TREAD was the principal database used by GM to track incidents related to its vehicles.[148]  Generally, the TREAD Reporting team consisted of employees who conducted monthly searches and prepared scatter graphs to identify spikes in the number of accidents or complaints with respect to various GM vehicles.  The TREAD Reporting team reports went to a review panel and sometimes spawned investigations to determine if any safety defect existed.[149]

254.    GM severely understaffed the TREAD Reporting team and did not provide it with the resources to obtain the advanced data mining software to better identify and understand potential defects, thereby making it far less likely that safety defects would be remediated.[150]

255.    So institutionalized was the "phenomenon of avoiding responsibility" at GM that the practice was given a name:  "the 'GM salute,'" which was "a crossing of the arms and

---

[146] Valukas Report at 251.

[147] *Id*. at 306.

[148] *Id*.

[149] *Id*. at 307.

[150] *Id*. at 307-308.

pointing outward towards others, indicating that the responsibility belongs to someone else, not me."[151]

256.    Similarly, GM had a siloed culture, designed to cabin information relating to potential safety defects rather than reveal such information.

257.    Similar to the "GM salute" was a related phenomenon, "known as the 'GM nod,'" which was "when everyone nods in agreement to a proposed plan of action, but then leaves the room with no intention to follow through, and the nod is an empty gesture."[152]

258.    According to the Valukas Report, part of the failure to properly correct the Delta Ignition Switch Defect was due to problems with GM's organizational structure[153] and a corporate culture that did not care enough about safety.[154]  Other culprits included a lack of open and honest communication with NHTSA regarding safety issues,[155] and the improper conduct and handling of safety issues by lawyers within GM's Legal Staff.[156]

## V.    GM PROMOTED ALL OF ITS VEHICLES AS SAFE, RELIABLE AND HIGH QUALITY—INCLUDING THE DELTA IGNITION SWITCH VEHICLES.

259.    Throughout its history, GM regularly used print media, press releases, and television and video media to represent its vehicles as safe, reliable, quality products that provide great value to purchasers, and retain their value over time better than other manufacturers' vehicles.  GM also used these media to present itself as an honest, above-board, values-oriented company with integrity. In truth, however, GM was concealing serious safety hazards and endangering its own customers.

---

[151] Valukas Report at 255.

[152] Valukas Report at 256.

[153] Id. at 259-260.

[154] Id. at 260-61.

[155] Id. at 263.

[156] Id. at 264.

260.    A 1988 GM commercial stated: "GM meets your challenge.  With outstanding
quality and great value…  That's leadership, that's GM."[157]

261.    In 1989, a GM commercial represented:

"Fact:  GM cars have held their resale value better than any other
U.S. make."[158]



262.    A 1990 GM Pontiac commercial stated:  "GM is putting quality on the road."[159]



---

[157] https://www.youtube.com/watch?v=h19lFAwGDwU.

[158] https://www.youtube.com/watch?v=Bg8CAt5ZhdI.

[159] https://www.youtube.com/watch?v=_hR7-7eKufQ.

263.    A 1998 General Motors Commercial proclaimed that GM cars were reliable and

safe:

> We are fans and nothing keeps us from the game.  We need cars
> and trucks as reliable as we are.  Season after season.  And when
> the game is over, we need to know that what got us there will also
> get us safely home.  Delivering cars and trucks that fans count on
> is what makes us General Motors.[160]

264.    GM explained that the 2003 Saturn ION had "surprising levels of safety" in the

car's Product Information:  "Bringing a new charge into the small-car segment, the 2003 Saturn

ION sets itself apart from competitors with innovative features, unique personalization

opportunities and surprising levels of safety, sophistication and fun."[161]

265.    On July 1, 2003, GM issued a press release explaining that the 2004 Impala

"offers a comprehensive safety package, solid body structure, room for five passengers, plenty of

cargo space, a surprising number of amenities for the price, and a track record of outstanding

quality, reliability and durability."[162]

266.    In a July 1, 2003 press release GM stated that "[e]nhanced handling and

acceleration are always paramount for Pontiac enthusiasts, and these, plus added safety and

comfort measures, make the 2004 Pontiac lineup one of the most exciting in the division's

history."[163]

267.    On July 1, 2003, GM issued a press release about the 2004 Chevrolet Monte Carlo

that explained that "[a]ttention to safety and security is also key to Monte Carlo's success."[164]

---

[160] https://www.youtube.com/watch?v=Dt12Gti12iA.

[161] https://archives.media.gm.com/division/2003_prodinfo/03_saturn/03_Ion/index.html.

[162] https://archives.media.gm.com/division/2004_prodinfo/chevrolet/cars/impala/index.html.

[163] https://archives.media.gm.com/division/2004_prodinfo/pontiac/pdf/04_Pontiac_Overview.pdf.

[164] https://archives.media.gm.com/division/2004_prodinfo/chevrolet/cars/monte_carlo/ index.html.

268.    On July 1, 2003, GM issued a press release about the 2004 Pontiac Grand Prix that explained that "[s]afety is always a high priority for Grand Prix."[165]

269.    In its Product Information for the 2003 Chevrolet Malibu, GM explained that:

> [S]ince 1997, the new Malibu has offered buyers excellent performance, safety and comfort in a trim, stylish package.  For 2003, Chevrolet Malibu remains a smart buy for those who want a well-equipped midsize sedan at an attractive price. … Designed for individuals or families with high expectations of quality, reliability, safety, driving pleasure, and affordability, the Malibu appeals to domestic and import owners.[166]

270.    On July 1, 2003, GM issued a press release about the 2004 Saturn Ion explaining that, "[t]he ION sedan and quad coupe are designed to carry on the Saturn tradition of being at the top of the class when it comes to safety and security.  The world-class structural design provides the foundation for this focus on safety.  The steel spaceframe's front and rear crush zones help absorb the energy of a crash while protecting the integrity of the safety cage."[167]

271.    On October 4, 2003, GM's website stated that "[m]otor vehicle safety is important to GM and to our customers.  It is at the top of mind in many of the thousands of decisions that are made every day in engineering and manufacturing today's cars, trucks, and SUVs/ Motor vehicle safety is a significant public health concern in the U.S., and GM is proud to partner with government agencies, emergency responders and health care workers in addressing that challenge."[168]

---

[165] https://archives.media.gm.com/division/2004_prodinfo/pontiac/grand_prix/index.html.

[166] https://archives.media.gm.com/division/2003_prodinfo/03_chevrolet/03_malibu/ index.html.

[167] https://archives.media.gm.com/division/2004_prodinfo/saturn/ion/index.html.

[168] http://web.archive.org/web/20031004014908/http://www.gm.com/automotive/vehicle _shopping/suv_facts/100_safety/index.html.



272.    In 2004, GM's marketing campaign incorporated a new phrase "Only GM,"
which highlighted safety features such as electronic stability control.  GM stated:  "We want to
bring this kind of safety, security and peace-of-mind to all of our customers because it's the right
thing to do, and because only GM can do it."

**Only GM**

For example, we recently launched a new corporate adver-
tising campaign under the theme, "Only GM." It's part of
an effort to use the GM brand more aggressively and with
more purpose, to show that we're leading the industry in
ways that only GM can.

The "Only GM" campaign began by highlighting our plans to
equip all our cars and trucks sold to retail customers in the
United States and Canada with OnStar and StabiliTrak, GM's
electronic stability control system. We want to bring this kind
of safety, security and peace-of-mind to all of our customers
because it's the right thing to do, and because only GM can
do it. We also want potential customers to know that GM
offers them great value, and that buying GM matters. (For
more details, go to *onlygm.com*.)

(GM's 2004 Annual Report, p. 6.)

273.   And in the same Report, under the banner "Peace of mind," GM represented that
"[o]nly GM can offer its customers the assurance that someone is looking out for them and their
families when they're on the road," and that "[t]his commitment to safety makes GM the only
automobile manufacturer able to offer a full range of cars, trucks and SUVs that provide safety
protection before, during and after vehicle collisions."



(GM's 2004 Annual Report, p. 22.)

274.     On May 10, 2004, GM's website announced that its "aim is to improve motor vehicle safety for customers, passengers, and other motorists.  Our customers expect and demand vehicles that help them to avoid crashes and reduce the risk of injury in case of a crash.  We strive to exceed these expectations and to protect customers and their families while they are on the road."  The website continued, "GM is committed to continuously improving the crashworthiness and crash avoidance of its vehicles, and we support many programs aimed at encouraging safer motor vehicle use…."[169]

275.     On June 4, 2004, GM's website stated that "[v]ehicle safety is paramount at GM, and we constantly strive to make our cars and trucks safe.  We also continue our support for groups such as the National SAFE KIDS Campaign, and a number of programs aimed at encouraging safer motor vehicle use."[170]

276.     GM's June 4, 2004, website published a message from its CEO, Rick Wagoner, on corporate responsibility.  Mr. Wagoner wrote:

> At a time when current events remind us of the critical importance of corporate responsibility and the value of sustainable development, we at General Motors are fortunate to have inherited a legacy of doing business the right way.  It's a great asset.  And, it's a huge obligation … one we take very seriously.  What we call "winning with integrity" is not an optional or occasional behavior at GM.  Integrity is one of our core values, and a way of doing business that helps us realize our company's full potential….In short, "winning with integrity" is much more than a one-time exercise at GM. It's how we work every day.  It's a philosophy that transcends borders, language, and culture, and something we promote by creating an environment within our company that supports, and demands, proper business conduct.[171]

277.     In its 2005 Annual Report, GM stated:  "We are driving quality and productivity even further."  "Lasting quality—That is why restoring confidence in quality is just as important

---

[169] http://web.archive.org/web/20040510221647/http://www.gm.com/company/ gmability/safety/?section=Company&layer=GMAbility2&action=open&page=1.

[170] http://web.archive.org/web/20040604055658/http://www.gm.com/company/ gmability/sustainability/reports/03/safety.html.

[171] http://web.archive.org/web/20040604055939/http://www.gm.com/company/gmability /sustainability/reports/03/wagoner_message.html.

as design in rebuilding our brands…. We are focused on providing our customers with the best

quality experience over the lifetime of GM ownership."



278.    The 2005 GMC Yukon, Tahoe, and Cadillac Escalade were touted as "distinctly

designed packages that lead the segment in performance, safety, efficiency and capability."[172]

279.    On September 9, 2005, GM's website described its safety technology as "Helping

You Avoid a Crash" and "Giving the driver information never possible before."[173]

---

[172] GM's 2005 Annual Report, p. 23.

[173] http://web.archive.org/web/20050909184042/http://www.gm.com/company/gmability/
safety/avoid_crash/index.html.



280.    At the same time GM announced what it called the next big step in safety:[174]

> No matter what vehicle you drive, your safety is vital.  GM is looking out for you—you deserve that peace of mind on the road. Which is why at GM, we've taken the next big step in our commitment to provide more customers with more safety and security.



281.    In a July 12, 2006 press release regarding GM's 2007 model year lineup, GM stated:

---

[174] http://web.archive.org/web/20050909225925/http://www.gm.com/company/onlygm/.

From an all-new family of full-size pickup trucks and SUVs to carlike crossovers to small cars and a near-complete revitalization of the Saturn portfolio, General Motors is introducing several new or significantly redesigned vehicles for the 2007 model year—stylish products that leverage GM's global resources to deliver value, brand-distinctive design character, safety, fuel efficiency, relevant technologies and quality to the North American market.[175]

282.    In an August 1, 2006 press statement for the 2007 Cadillac Lucerne, GM represented that the "Lucerne's body structure is engineered to provide maximum occupant protection and minimum intrusion under a wide range of impact conditions."[176]

283.    In an August 1, 2006 press statement for the 2007 Cadillac DTS, GM represented: "[d]esigned and engineered with occupant safety and protection in mind, the DTS reinforces Cadillac's long-standing reputation for safe occupant environments in premium vehicles."[177]

284.    GM's website on August 9, 2006, stated:[178]

MAKING VEHICLES SAFER

GM strives to make each new model safer than the one it replaces. Vehicle-based safety strategies generally fall into three categories:

BEFORE:  Collision avoidance—technologies designed to help the driver avoid potential crashes (sometimes called 'active safety' technologies),

DURING:  Crashworthiness—designs and technologies that help mitigate the injury potential of a crash (sometimes called 'passive safety'), and

AFTER:  Post-crash—systems that can help alert emergency rescue to a crash and help provide information to aid rescue specialists.

…

---

[175] https://archives.media.gm.com/us/gm/en/product_services/vehicles/2007/07%20 corporate%20oview.html.

[176] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lucerne/07 index.html.

[177] https://archives.media.gm.com/us/cadillac/en/product_services/r_cars/r_c_DTS/07 index.html.

[178] http://web.archive.org/web/20060809103405/http://www.gm.com/company/gmability/ sustainability/reports/05/400_products/7_seventy/471.html.

GM vehicles are designed to help protect occupants in the 'first' collision, which acts to deform the vehicle structure and change the velocity of the vehicle's center of mass. Also, GM vehicles are designed to help reduce injury risk for occupants in the 'second' collision, which is between the vehicle interior as it responds to the forces imposed by object that collides with the vehicle, and the occupants.

285.    GM's website on September 6, 2006, stated:[179]

Helping drivers avoid crashes and making vehicles safer is a priority for GM.

* * *

Motor vehicle safety involves not only the design of the vehicle, but the manner in which it is driven, and the driving environment as well.  GM is committed to researching and implementing programs and technologies that enhance the safety of vehicles. GM wants to assist drivers to operate their vehicles to avoid hazards, and to help protect occupants in the event of a vehicle crash.  GM also focuses on the circumstances that occur after a crash.

GM's vehicle safety priorities are guided by analysis of the real-world experience that customers have with motor vehicles.

286.    GM stated on its website in October 29, 2006 it is a leader in automotive safety

and that its safety leadership extends as far back as the birth of GM.[180]

---

[179] http://web.archive.org/web/20060906083227/http://www.gm.com/company/gmability /sustainability/reports/05/400_products/7_seventy/470.html.

[180] http://web.archive.org/web/20061029080834/http://www.gm.com/company/gmability/ safety/safety_firsts/index.html.



287.    In a video published on January 2, 2007, GM's Vice Chairman of Product
Development, Bob Lutz, stated "Saturn has always been a great brand" and that it "has
predominately been known for customer service, fair dealers, honest dealers and having happy
buyers."[181]

288.    On GM's website on January 6, 2007, Bob Lange, Executive Director, Structure
and Safety Integration, stated "[o]ur aim is to improve motor vehicle safety for customers,
passengers and other motorists.  Our customers expect and demand vehicles that help them to
avoid crashes and reduce the risk of injury in case of a crash.  We strive to exceed these
expectations and to protect customers and their families while they are on the road."  Further,
Lange stated, "GM is committed to continuously improving the crashworthiness and crash
avoidance of its vehicles…."[182]

289.    In its 2007 Annual Report, GM stated:

In 2007, we continued to implement major improvements to our
U.S. sales and marketing strategy.  Over the past two years, we've

---

[181] https://www.youtube.com/watch?v=Kd1Kg0BBdto&list=UUxN-Csvy_9sveql5HJviDjA.

[182] http://web.archive.org/web/20070106044410/http://www.gm.com/company/gmability /safety/.

re-focused our marketing efforts to emphasize the strength and
value of our products and brands….

We also continued to make progress in our long-term effort to
improve quality….

We've also witnessed, since 2005, an 89 percent reduction in
vehicle recall campaigns involving safety and non-compliance.

(GM 2007 Annual Report, p. 7.)

290.    Moreover, GM represented that it "actively studies trends of claims" to take

action to improve vehicle quality:

> **POLICY, WARRANTY AND RECALLS**
> Provisions for estimated expenses related to policy and product warranties
> are made at the time products are sold. These estimates are established using
> historical information on the nature, frequency, and average cost of claims. We
> actively study trends of claims and take action to improve vehicle quality and
> minimize claims. Actual experience could differ from the amounts estimated
> requiring adjustments to these liabilities in future periods.

(GM 2007 Annual Report, p. 74.)

291.    In an August 1, 2007 press release introducing GM's 2008 lineup, Mark LaNeve,

GM North America Vice President, Vehicle Sales, Service and Marketing, stated "GM's

transformation is being driven by high-quality cars and trucks that look great, drive great, are

fuel-efficient and provide genuine value to our customers."  Further, LaNeve stated, "[n]o other

automaker provides such a diverse lineup of cars and trucks that meets the needs of customers

that range from college studies to contactors.  And our five-year, 100,000-mile powertrain

warranty—the most comprehensive in the industry—adds even more value to the bottom line,

demonstrating that we are putting our money where our mouth is on vehicle quality."[183]

292.    On August 1, 2007, GM represented that:

> The Cobalt enters the 2008 model year on the heels of a successful
> '07 model year, which introduced several significant
> enhancements, including more powerful Ecotec engines.  For '08,

---

[183] https://archives.media.gm.com/us/gm/en/product_services/vehicles/2008/08gmna_ overview.html.

the Cobalt builds on that powerful foundation with a streamlined
model lineup and more standard safety and convenience
equipment…."[184]

293.    On August 1, 2007 GM represented that "[t]he 2008 Impala reinforces the brand's

value story with new features and revisions that add to its safety and efficiency, including the

addition of standard StabiliTrack electronic stability control on 2LT, LTZ and SS models…."[185]

294.    In an August 1, 2007 press statement for the 2008 Buick LaCrosse, GM

represented that the "LaCrosse is built with a strong 'safety cage' structure and a full-perimeter

aluminum engine cradle that directs impact energy away from passengers.  Anti-lock brakes and

side curtain airbags are standard on all models."[186]

295.    In an August 1, 2007 press statement for the 2008 Buick Lucerne, GM

represented that the "Lucerne's body structure is designed to provide maximum occupant

protection and minimum intrusion under a wide range of impact conditions.  Active safety and

handling features offered on Lucerne include a four-channel anti-lock braking system and

traction control; an auto-level rear suspension that automatically adjusts the vehicle height for

heavy loads; and four-channel StabiliTrack electronic stability control with brake assist, which

senses emergency braking situations and boosts power as needed."[187]

296.    In an August 1, 2007, press statement for the 2008 Pontiac Grand Prix, GM

represented that the "Grand Prix's convenience and safety features are perfect for drivers who

enjoy the precise handling characteristics of a sporty, family-friendly package.  The 2008 Grand

---

[184] https://archives.media.gm.com/us/chevrolet/en/product_services/r_cars/08%20
chevrolet%20car%20oview.html.

[185] https://archives.media.gm.com/us/chevrolet/en/product_services/r_cars/08%20
chevrolet%20car%20oview.html.

[186] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lacrosse/ 08index.html.

[187] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lucerne/ 08index.html.

Prix remains a driver's car inside and out. The active and passive safety features on the Grand Prix include standard four-wheel disc brakes, traction control and daytime running lamps."[188]

297.    GM's website on January 15, 2008, stated "GM incorporates a total safety philosophy into each of its designs to help protect you in a collision—and keep one from occurring in the first place."[189]

298.    In February 2008, GM aired a Chevy Malibu commercial during The Grammy's which stated the Chevy Malibu was "built to last" "because safety should last a lifetime." The commercial used images of a child being raised to adulthood, in order to convey protection and safety.[190]

299.    On its website in March of 2008, GM stated it was delivering the best cars and trucks in its 100-year history, and that it was "Obsessed with Quality." The website also spoke of "Continuous Safety," and represented that "GM incorporates a total safety philosophy into each of its designs to help protect you in a collision—and keep one from occurring in the first place."[191]

---

[188] https://archives.media.gm.com/us/pontiac/en/product_services/r_cars/r_c_grandprix/ index.html.

[189] http://web.archive.org/web/20080115004426/http://www.gm.com/explore/safety/.

[190] https://www.youtube.com/watch?v=EgNQ2tns0Gs.

[191] http://web.archive.org/web/20080303182635/http://www.gm.com/corporate/; http://web.archive.org/web/20080305021951/http://www.gm.com/explore/; and http://web.archive.org/web/20080311045525/http://www.gm.com/explore/safety.



## VI.    CLASS ALLEGATIONS.

300.    Under B.R. 7023, Claimant files this Proof of Claim on behalf of herself and a proposed Class and Subclasses initially defined below.

301.    Excluded from the Class and thee Subclasses are GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of GM; Class Counsel and their employees; the judicial officers and their immediate family members and associated court staff assigned to this case; and all persons within the third degree of relationship to any such persons.

### A.    The Class.

302.    Claimant alleges claims, under the consumer protection, fraudulent concealment and unjust enrichment laws of each state and the District of Columbia (all of which are the same or substantially similar):

> All persons in the United States who, as of November 30, 2009,
> either owned or leased a Delta Ignition Switch Vehicle.

303.    "Delta Ignition Switch Vehicles" include the following, provided they were purchased or leased prior to November 30, 2009:

| DELTA IGNTION SWITCH VEHICLES |
|---|
| · 2005-2010 Chevy Cobalt |
| · 2006-2010 Chevy HHR |
| · 2007-2010 Pontiac G5 |
| · 2006-2010 Pontiac Solstice |
| · 2007-2010 Saturn Sky |
| · 2003-2007 Saturn ION |

**B.    The Delta Ignition Switch Implied Warranty Subclass.**

304.    Claimant also alleges implied claims under the substantially similar laws of the following jurisdictions for the Delta Ignition Switch Implied Warranty Subclass on behalf of persons with vehicles sold or leased as new prior to November 30, 2009:  Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and Wyoming.

**C.    The Delta Ignition Switch Negligence Subclass**

305.    Claimant also alleges negligence claims under the substantially similar laws of the following jurisdictions for the Delta Ignition Switch Negligence Subclass on behalf of persons with vehicles sold or leased as new prior to November 30, 2009:  Arkansas, California, Maryland, Louisiana and Ohio.

**D.      The Class And The Subclasses Meet The Requirements For Class Certification.**

306.    Individual joinder of all Class or Subclass members is impracticable, given that
GM manufactured and sold approximately 1.6 million Delta Ignition Switch Vehicles in the
United States.

307.    The Class disclaims recovery, in this Proof of Claim, for physical injury resulting
from the safety defects alleged herein.  But the increased risk of injury from the defects serves as
an independent justification for the relief sought by Claimant and the Class.

308.    The Class can be readily identified using registration records, sales records,
production records, and other information kept by GM's successor, New GM, or third parties in
the usual course of business and within their control.

309.    Questions of law and fact are common to the Class and predominate over
questions affecting only individual members, including the following:

    1.      Whether the Delta Ignition Switch Vehicles suffer from safety defects;

    2.      Whether GM fraudulently concealed the defect;

    3.      Whether GM misrepresented that the Delta Ignition Switch Vehicles were
safe;

    4.      Whether GM engaged in fraudulent, deceptive or unfair acts or practices
by failing to disclose that the Delta Ignition Switch Vehicles were designed, manufactured, and
sold with safety defects and that GM systematically valued cost-cutting over safety;

    5.      Whether GM was unjustly enriched at the expense of Claimant and the
Class;

    6.      Whether GM breached the implied warranty of merchantability in
connection with the Delta Ignition Switch Vehicles;

7.    Whether GM was negligent in its design and manufacture of the Delta

Ignition Switch Vehicles, and/or in failing to warn of the known defect and failing to recall the

vehicles; and

8.    Whether Claimant and the Class are entitled to a remedy as a result of

GM's fraudulent, inequitable and/or negligent conduct.

310.    Claimant's claims are typical of the claims of the Class and Subclass members,

and arise from the same course of conduct by GM.  The relief Claimant seeks is typical of the

relief sought for the absent Class and Subclass members.

311.    Claimant will fairly and adequately represent and protect the interests of all absent

Class and Subclass members.  Claimant is represented by counsel competent and experienced in

product liability, consumer protection, and class action litigation, as well as counsel experienced

in bankruptcy litigation.

312.    A class action is superior to other available methods for the fair and efficient

adjudication of this controversy, since joinder of all the individual Class and Subclass members

is impracticable.  Because the damages suffered by each individual Class Member may be

relatively small, the expense and burden of individual litigation would make it very difficult or

impossible for individual Class Members to redress the wrongs done to each of them

individually, and the burden imposed on the judicial system would be enormous.   B.R. 7023

provides the Court with authority and flexibility to maximize the benefits of the class mechanism

and reduce any management challenges that may arise.

313.    The prosecution of separate actions by the individual Class and Subclass members

would create a risk of inconsistent or varying adjudications for individual Class and Subclass

members.  The conduct of this action as a class action presents far fewer management

difficulties, conserves judicial resources and the parties' resources, and protects the rights of
each Class Member.

314.    Claimant is not aware of any obstacles likely to be encountered in the
management of this action that would preclude its maintenance as a class action.  Claimant
anticipates providing appropriate notice to be approved by the Court after discovery into the size
and nature of the Class and Subclasses.

315.    Absent a class action, most Class Members would likely find the cost of litigating
their claims prohibitively high and would therefore have no effective remedy at law.  Because of
the relatively small size of the individual Class Members' claims, it is likely that only a few
Class Members could afford to seek legal redress for GM's misconduct.

## VII.    THE CLASS' AND SUBCLASSES' CLAIMS

### A.    Class Claims

#### 1.    Fraudulent concealment.

316.    Claimant realleges and incorporates by reference all paragraphs as though fully
set forth herein.

317.    This claim is brought on behalf of the Class.

318.    The law of fraudulent concealment is essentially identical in each state, as
virtually every state, including California, where Claimant resides, generally follows the
principles of §§ 550 and 551 of the RESTATEMENT (SECOND) OF Torts.

319.    Under Section 550, "[o]ne party to a transaction who by concealment or other
action intentionally prevents the other from acquiring material information is subject to the same
liability to the other for pecuniary loss as though he had stated the nonexistence of the matter that
the other was thus prevented from discovering."

320.    Under Section 551:

(1)   One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2)   One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a)  matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b)  matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c)  subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d)  the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e)  facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

321.    As alleged above and discussed below, GM's fraudulent concealment of the safety defects and other material information concerning the Delta Ignition Switch Vehicles renders GM liable to Claimant and the Class under the law of fraudulent concealment of each state and the District of Columbia.

322.    GM concealed and suppressed material facts concerning the quality and safety of GM vehicles in general and in the Delta Ignition Switch Vehicles in particular.

323.    GM concealed and suppressed material facts concerning the culture of GM – a culture characterized by cost-cutting, avoidance of dealing with safety issues and a shoddy design process.

324.    GM concealed and suppressed material facts concerning the safety defects alleged herein, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects, including the Delta Ignition Switch Defect, to regulators or consumers.

325.    GM did so in order to boost confidence in its vehicles, including the Delta Ignition Switch Vehicles, and falsely assure owners, purchasers and lessees of the Delta Ignition Switch Vehicles that GM was a reputable manufacturer that stood behind its vehicles after they were sold and ensured that its vehicles were safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Delta Ignition Switch Vehicles and because they played a significant role in the value of the vehicles.

326.    GM had a duty to disclose the Delta Ignition Switch Defect because it was known and/or accessible only to GM who had superior knowledge and access to the facts, and GM knew the facts were not known to or reasonably discoverable by Claimant and the Class.  These omitted and concealed facts were material because they directly impact the value of the Delta Ignition Switch Vehicles purchased or leased by Claimant and the Class.  Whether a product is safe and reliable, and whether the manufacturer stands behind the product, is a material concern to a consumer.

327.    GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition

Switch Vehicles.  Having provided information to the Class, GM had the duty to disclose not just
the partial truth, but the entire truth.  Finally, GM had monitoring and disclosure duties under the
TREAD Act.

328.    GM actively concealed and/or suppressed these material facts, in whole or in part,
to protect its profits and avoid recalls that would hurt the brand's image and cost GM money, and
it did so at the expense of Claimant and the Class.

329.    GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles
with the intent to deceive Claimant and the Class.

330.    Claimant and the Class were unaware of these omitted material facts and would
not have acted as they did if they had known of the concealed and/or suppressed facts.
Claimant's and the Class' actions were justified.  GM was in exclusive control of the material
facts and such facts were not known to the public, Claimant, or the Class.

331.    Because of the concealment and/or suppression of the facts, Claimant and the
Class sustained damage.  Had they been aware of the safety defects in their Delta Ignition Switch
Vehicles and GM's disregard for safety, Claimant and the Class either would have paid less for
their vehicles or would not have purchased them at all.   Claimant and the Class did not receive
the benefit of their bargain as a result of GM's fraudulent concealment.

332.    More specifically, Claimant and the Class were damaged by GM's fraudulent
concealment in at least the following ways:

a.    Class Members were fraudulently induced into purchasing their
Delta Ignition Switch Vehicles and/or paying more than they otherwise would
have had the defect been revealed.

b.      Class Members remained in possession of vehicles of diminished value which GM would otherwise have been compelled to fix or replace.

c.      Class Members incurred expense and loss in connection with their efforts to repair the defective Delta Ignition Switches and/or eliminate or reduce the risks and costs to which they were exposed by the Delta Ignition Switch Vehicles.

d.      Class Members incurred the inconvenience and expense of having a recall repair done.

333.    Without limitation, Claimant and the Class therefore seek a full refund of the purchase price paid for their Delta Ignition Switch Vehicles (or the overpayments they made for the vehicles) together with any and all other available compensatory, incidental and consequential damages (save for personal injury damages) they may have suffered as a result of their leasing and/or ownership of a Delta Ignition Switch Vehicle, and punitive damages given the extremely outrageous and reprehensible conduct perpetrated by GM to keep and increase the numbers of highly-dangerous Delta Ignition Switch Vehicles on the road in order to avoid the expense and adverse publicity of the requisite safety recall.

**2.      Unjust enrichment.**

334.    Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

335.    This claim is brought on behalf of the Class.

336.    The law of unjust enrichment is essentially identical in each state, including California, where Claimant resides.

337.    GM received and retained a benefit from the Claimant and the Class and inequity resulted.

338.     GM benefitted from selling and leasing the Delta Ignition Switch Vehicles, whose value was artificially inflated by GM's concealment of the defect as well as systemic safety issues that plagued the GM brand, for more than they were worth, at a profit, and Claimant and the Class overpaid for their defective Delta Ignition Switch Vehicles and were forced to pay other costs.

339.     In addition, GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of GM.

340.     Thus, Claimant and all Class Members conferred a benefit on GM.

341.     It was inequitable for GM to retain these benefits.

342.     Claimant and the Class were not aware of the true facts about their Delta Ignition Switch Vehicles, and did not benefit from GM's conduct.

343.     GM knowingly accepted the benefits of its unjust conduct.

344.     As a result of GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**3.     Consumer Protection Claims**

345.     Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

346.     This claim is brought on behalf of the Class.

347.     The consumer protection laws are essentially similar in each state, as virtually every state has adopted consumer protection laws that are modeled after the Federal Trade Commission Act, which makes unlawful "unfair or deceptive acts or practices in or affecting commerce…." 15 U.S.C. § 45.

348.    Because Claimant is a California resident, her consumer protection claims are pled under California law.  However, the Class states claims under the consumer protection statutes of every U.S. jurisdiction.

        **a.**    **Violations of the California Consumer Legal Remedies Act
(Cal. Civ. Code § 1750 *et seq.*)**

349.    Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

350.    GM was a "person" under CAL. CIV. CODE § 1761(c).

351.    Claimant and Class Members are "consumers," as defined by CAL. CIVIL CODE § 1761(d), who purchased or leased one or more Delta Ignition Switch Vehicles.

352.    The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]"  CAL. CIV. CODE § 1770(a).  GM engaged in unfair or deceptive acts or practices that violated CAL. CIV. CODE § 1750, *et seq.*, as described above and below, by, among other things, concealing the known defects in the Delta Ignition Switch Vehicles, representing that the vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the vehicles are of a particular standard, quality, and grade when they are not; advertising the vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving a Delta Ignition Switch Vehicle has been supplied in accordance with a previous representation when it has not.

353.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

354.    In the course of its business, GM concealed the defects in the Delta Ignition Switch Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.   GM also engaged in unlawful trade practices by employing deception,

deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission

of any material fact with intent that others rely upon such concealment, suppression or omission,

in connection with the sale of Delta Ignition Switch Vehicles.

355.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned

or leased by Claimant and the Class.

356.    By failing to disclose and by actively concealing the defects in the Delta Ignition

Switch Vehicles, which it marketed as safe, reliable, and of high quality GM engaged in unfair

and deceptive business practices in violation of the CLRA.

357.    In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in the Class' vehicles.

358.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including the Class, about the true safety and reliability of their vehicles.

359.    GM intentionally and knowingly misrepresented material facts regarding the

Delta Ignition Switch Vehicles with the intent to mislead the Class.

360.    GM knew or should have known that its conduct violated the CLRA.

361.    GM made material statements about the safety and reliability of the Delta Ignition

Switch Vehicles that were either false or misleading.

362.    GM owed the Class a duty to disclose the true safety and reliability of the Delta

Ignition Switch Vehicles, because  GM:

     a.     Possessed exclusive knowledge about the defects in the
          Delta Ignition Switch Vehicles;

     b.     Intentionally concealed the foregoing from the Class;

     c.     Made incomplete representations about the safety and
          reliability of the Delta Ignition Switch Vehicles, while
          purposefully withholding material facts from the Class that
          contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

363.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had the Class been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

364.    GM's concealment of the defects in the Delta Ignition Switch Vehicles was material to the Class.

365.    The Class suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the Delta Ignition Switch Defect in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Class Members either would have paid less for their vehicles or would not have purchased or leased them at all.  The Class also incurred repair and recall costs, as alleged above.

366.    As a direct and proximate result of GM's violations of the CLRA, the Class has suffered injury-in-fact and/or actual damage.

367.    Under CAL. CIV. CODE § 1780(a), the Class seeks monetary relief for the harm caused by GM's violations of the CLRA as alleged herein.

368.    Under CAL. CIV. CODE § 1780(b), the Class seek an additional award against of up to $5,000 for each Class Member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  GM knew or should have known that its conduct was directed to one or more Class Members who are senior citizens or disabled persons.  GM's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or

welfare of the senior citizen or disabled person.  One or more Class Members who are senior

citizens or disabled persons were substantially more vulnerable to GM's conduct because of age,

poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of

them suffered substantial physical, emotional, or economic damage resulting from GM's

conduct.

369.    The Class further seeks costs of court, attorneys' fees under CAL. CIV. CODE

§ 1780(e), and any other just and proper relief available under the CLRA.

**b.    Violations of the California Unfair Competition Law ("UCL")
(CAL. BUS. & PROF. CODE § 17200, *et seq.*)**

370.    Claimant realleges and incorporates by reference all paragraphs as though fully

set forth herein.

371.    CAL. BUS. & PROF. CODE § 17200 prohibits any "unlawful, unfair, or fraudulent

business act or practices."  GM engaged in unlawful, fraudulent, and unfair business acts and

practices in violation of the UCL.

372.     GM violated the unlawful prong of § 17200 by the following:

a.    violations of the CLRA, CAL. CIV. CODE § 1750, *et seq*., as
set forth above.

b.    violation of the National Traffic and Motor Vehicle Safety
Act of 1996, codified at 49 U.S.C. §§ 30101-30170, and its
regulations.  Federal Motor Vehicle Safety Standard
("FMVSS") number 573 governs a motor vehicle
manufacturer's responsibility to notify NHTSA of a motor
vehicle defect within five days of determining that the
defect is safety related.  *See* 49 C.F.R. § 573.6.  GM
violated these reporting requirements by failing to report
the defects in the Delta Ignition Switch Vehicles within the
required time, and failing to timely recall all impacted
vehicles.

373. GM also violated the "fraudulent" prong of CAL. BUS. & PROF. CODE § 17200 by concealing the defects in the Delta Ignition Switch Vehicles, information that was material to a reasonable consumer, while it touted the safety and reliability of the vehicles.

374. GM also violated the unfair prong of CAL. BUS. & PROF. CODE § 17200 because the acts and practices set forth above, including devaluing safety and concealing the defects in the Delta Ignition Switch Vehicles, offend established public policy, and also because the harm GM caused consumers greatly outweighs any benefits associated with those practices. GM's conduct also impaired competition within the automotive vehicles market and prevented the Class from making fully informed decisions about whether to lease, purchase and/or retain their vehicles.

375. In the course of its business, GM concealed the defects in Class Members' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Delta Ignition Switch Vehicles.

376. GM's actions, as set forth above, occurred in the conduct of trade or commerce.

377. GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by the Class.

378. By failing to disclose and by actively concealing the defects in Class Members' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the UCL.

379.   In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Class Members' vehicles.

380.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Class Members, about the true safety and reliability of their

vehicles.

381.   GM intentionally and knowingly misrepresented material facts regarding the

Delta Ignition Switch Vehicles with the intent to mislead the Class.

382.   GM knew or should have known that its conduct violated the UCL.

383.   As alleged above, GM made material statements about the safety and reliability of

the Delta Ignition Switch Vehicles that were either false or misleading.

384.   GM owed the Class a duty to disclose the true safety and reliability of the Delta

Ignition Switch Vehicles, because GM:

    a.   Possessed exclusive knowledge about the defects in the
         Delta Ignition Switch Vehicles;

    b.   Intentionally concealed the foregoing from the Class;

    c.   Made incomplete representations about the safety and
         reliability of the Delta Ignition Switch Vehicles, while
         purposefully withholding material facts from the Class that
         contradicted these representations; and/or

    d.   Had duties under the TREAD Act and related regulations to
         disclose and remedy the defects.

385.   Because GM fraudulently concealed the defects in the Delta Ignition Switch

Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain

since the vehicles they purchased were worth less than they would have been if they were free

from the defects.  Had Class Members been aware of the defects in their vehicles, they would

have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

386.    GM's concealment of the defects in the Delta Ignition Switch Vehicles was material to the Class.

387.    The Class suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Class Members either would have paid less for their vehicles or would not have purchased or leased them at all.

388.    As a direct and proximate result of GM's violations of the UCL, Class Members have suffered injury-in-fact and/or actual damage.

389.    Claimant requests that this Court enter such orders or judgments as may be necessary, including an order and judgment restoring to the Class Members any money lost as the result of GM's unfair, unlawful, and deceptive trade practices, including restitution and disgorgement of any profits GM received as a result of its unfair, unlawful, and/or deceptive practices, as provided in CAL. BUS. & PROF. CODE § 17203, CAL CIV. PROC. § 384 and CAL. CIV. CODE § 3345; and for such other relief as may be just and proper.

**B.    Subclass Claims**

**1.    Breach of the Implied Warranty of Merchantability**

390.    Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

391.    This claim is brought on behalf of the Delta Ignition Switch Implied Warranty Subclass.

392.    The implied warranty laws are essentially similar in each state whose residents are part of this Subclass, as every such state has adopted the Uniform Commercial Code ("U.C.C.") and similarly construed the relevant provisions such that Claimants and the Delta Ignition Switch Implied Warranty Subclass state claims.

393.    Because Claimant is a California resident, her implied warranty claims is pled

under California law.

    **a.    Violations of the Song-Beverly Warranty Act for Breach of Implied
Warranty of Merchantability (Cal. Civ. Code §§ 1791.1 & 1792)**

394.    Claimant realleges and incorporates by reference all paragraphs as though fully

set forth herein.

395.    Claimant and Delta Ignition Switch Implied Warranty Subclass Members are

"buyers" within the meaning of CAL. CIV. CODE § 1791(b).

396.    The Delta Ignition Switch Vehicles are "consumer goods" within the meaning of

CIV. CODE § 1791(a).

397.    GM was the "manufacturer" of the Defective Vehicles within the meaning of

CAL. CIV. CODE § 1791(j).

398.    GM impliedly warranted to Claimant and Delta Ignition Switch Implied Warranty

Subclass Members that Delta Ignition Switch Vehicles were "merchantable" within the meaning

of CAL. CIV. CODE §§ 1791.1(a) & 1792; however, the Delta Ignition Switch Vehicles did not

have the quality that a buyer would reasonably expect, and were therefore not merchantable.

399.    CAL. CIV. CODE § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that
> goods are merchantable" means that the consumer goods meet
> each of the following:

> (1)    Pass without objection in the trade under the contract
> description.

> (2)    Are fit for the ordinary purposes for which such goods are
> used.

> (3)    Are adequately contained, packaged, and labeled.

> (4)    Conform to the promises or affirmations of fact made on
> the container or label.

400.    The Delta Ignition Switch Vehicles would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accident, and an unreasonable likelihood that such accidents will cause serious bodily harm or death to vehicle occupants.

401.    Because of the ignition switch defects that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death., the Delta Ignition Switch Vehicles are not safe to drive and thus not fit for ordinary purposes.

402.    The Delta Ignition Switch Vehicles are not adequately labeled because the labeling fails to disclose the ignition switch defects and does not advise Claimant and Delta Ignition Switch Implied Warranty Subclass Members to avoid attaching anything to their vehicle key rings.  GM failed to warn about the dangerous safety defects in the Delta Ignition Switch Vehicles.

403.    GM breached the implied warranty of merchantability by selling Delta Ignition Switch Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions,  the failure of power steering and power brakes, and the disablement of the vehicles' airbags.  The defects deprived Claimant and Delta Ignition Switch Implied Warranty Subclass Members of the benefit of their bargain.

404.    Notice of breach is not required because Claimant and Delta Ignition Switch Implied Warranty Subclass Members did not purchase their automobiles directly from GM.

405.    As a direct and proximate result of GM's breach of its duties under California's

Lemon Law, Claimant and Delta Ignition Switch Implied Warranty Subclass Members received

goods whose dangerous condition substantially impaired their value.  .

406.    Under CAL. CIV. CODE §§ 1791.1(d) & 1794, Claimant and Delta Ignition Switch

Implied Warranty Subclass Members are entitled to damages and other legal and equitable relief

including, at their election, the purchase price of their vehicles, or the overpayment or diminution

in value of their vehicles.

407.    Under CAL. CIV. CODE § 1794, Claimant and Delta Ignition Switch Implied

Warranty Subclass Members are entitled to costs and attorneys' fees.

### 2.    Negligence

408.    Claimant realleges and incorporates by reference all paragraphs as though fully

set forth herein.

409.    This claim is brought on behalf of the Delta Ignition Switch Negligence Subclass.

410.    The law of negligence is substantially similar under the laws of all the

jurisdictions whose residents are included in the Delta Ignition Switch Negligence Subclass.

411.    GM designed, manufactured and sold or otherwise placed in the stream of

commerce Delta Ignition Switch Vehicles, as set forth above.

412.    GM had a duty to design, manufacture, and sell only a product that would be safe

for its intended and foreseeable uses and users, including the use to which its products were put

by Claimant and the Delta Ignition Switch Negligence Subclass.  GM breached its duties to the

Delta Ignition Switch Negligence Subclass because it was negligent in the design, development,

manufacture, and testing of the Delta Ignition Switch Vehicles it manufactured and sold.

413.    GM was negligent in the design, development, manufacture, testing, and/or

"certification" of the Delta Ignition Switch Vehicles because it knew, or in the exercise of

reasonable care should have known, that the vehicles equipped with defective ignition systems

pose an unreasonable risk of death or serious bodily injury to Delta Ignition Switch Negligence

Subclass Members, passengers, other motorists, pedestrians, and the public at large, because they

are susceptible to incidents in which the vehicles suddenly stall, and the brakes, power steering,

seatbelt pretensioners, and airbags are rendered inoperable.

414.    GM thus "failed to exercise reasonable care in the manufacture of [its Defective

Vehicles]", in violation of RESTATEMENT (SECOND) OF TORTS § 395 ("A manufacturer who fails

to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he

should recognize as involving an unreasonable risk of causing physical harm to those who use it

for a purpose for which the manufacturer should expect it to be used and to those whom he

should expect to be endangered by its probable use, is subject to liability for physical harm

caused to them by its lawful use in a manner and for a purpose for which it is supplied.").

415.    GM further breached its duties to Delta Ignition Switch Negligence Subclass by

supplying directly or through a third person defective Delta Ignition Switch Vehicles to be used

by such foreseeable persons as Delta Ignition Switch Negligence Subclass when:

a.    GM knew or had reason to know that the vehicles were dangerous or likely to be

dangerous for the use for which they were supplied; and

b.    GM failed to exercise reasonable care to inform customers of the dangerous

condition or of the facts under which the vehicles are likely to be dangerous.

416.    GM had a continuing duty to warn and instruct the intended and foreseeable users

of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to

using the vehicles. Delta Ignition Switch Negligence Subclass Members were entitled to know

that the vehicles, in their ordinary operation, were not reasonably safe for their intended and

ordinary purposes and uses.

417.    GM knew or should have known of the defects described herein.  GM breached

its duty to Delta Ignition Switch Negligence Subclass Members because it failed to warn and

instruct the intended and foreseeable users of its vehicles of the defective condition of the

vehicles and the high degree of risk attendant to using the vehicles, and it failed to recall the

vehicles when ordinary care and reasonable prudence so demanded.

418.    As a direct and proximate result of GM's negligence, the Delta Ignition Switch

Negligence Subclass suffered damages.  The damages include overpayment for the Delta

Ignition Switch Vehicles and repair and recall costs, as discussed above.


*        *        *        *


419.    The filing of this Proof of Claim is not, nor shall it be deemed to be, (a) a waiver

of Claimant's rights against any person, entity or property; (b) a consent by Claimant to the

jurisdiction of the Bankruptcy Court with respect to the subject matter of this claim or any

objection or other proceeding commenced in this case or any related case; (c) a waiver of the

right to withdraw the reference, or otherwise to challenge the jurisdiction of the Bankruptcy

Court.