# **Exhibit B**

## **Proposed Non-Ignition Switch Class Claim**

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor (Check Only One): | Case No. 09-50026 | Your Claim is Scheduled As Follows: |
|---|---|---|

☑ Motors Liquidation Company (f/k/a General Motors Corporation) — 09-50026 (REG)
☐ MLCS, LLC (f/k/a Saturn, LLC) — 09-50027 (REG)
☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation) — 09-50028 (REG)
☐ MLC of Harlem, Inc. (f/k/a Chevrolet Saturn of Harlem, Inc.) — 09-13558 (REG)

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case, but may be used for purposes of asserting a claim under 11 U.S.C. § 503(b)(9) (see Item # 5). All other requests for payment of an administrative expense should be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property): **Yvonne James-Bivins, on behalf of Proposed Class**

Name and address where notices should be sent:
Yvonne James-Bivins

c/o Steve W. Berman, Hagens Berman Sobol Shapiro LLP,
1918 8th Avenue, Suite 3300, Seattle, WA  98101

Telephone number: (206) 623-7292
Email Address: steve@hbsslaw.com

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:**
(*If known*)

Filed on: _____

Name and address where payment should be sent (if different from above):

Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

If an amount is identified above, you have a claim scheduled by one of the Debtors as shown. (This scheduled amount of your claim may be an amendment to a previously scheduled amount.) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor, you do not need to file this proof of claim form, EXCEPT AS FOLLOWS: If the amount shown is listed as DISPUTED, UNLIQUIDATED, or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim. If you have already filed a proof of claim in accordance with the attached instructions, you need not file again.

**1. Amount of Claim as of Date Case Filed, June 1, 2009:**   $ See attached.

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. If all or part of your claim is entitled to priority, complete item 5. If all or part of your claim is asserted pursuant to 11 U.S.C. § 503(b)(9), complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:**   See attached.
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

**3a. Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:  ☐ Real Estate   ☐ Motor Vehicle   ☐ Equipment   ☐ Other
**Describe:**

**Value of Property:** $ _____   **Annual Interest Rate** ____ %

**Amount of arrearage and other charges as of time case filed included in secured claim, if any:** $ _____

**Basis for perfection:** _____

**Amount of Secured Claim:** $ _____   **Amount Unsecured:** $ _____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See instruction 7 and definition of "redacted" on reverse side.*)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain in an attachment.

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case - 11 U.S.C. § 503(b)(9) (§ 507(a)(2))

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

$ _____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| | FOR COURT USE ONLY |
|---|---|
| **Date:** 12/22/16  **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. *[signature]* Yvonne James-Bivins, on behalf of the Proposed Class | |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**ATTACHMENT TO PROOF OF CLAIM OF YVONNE JAMES-BIVINS UNDER B.R.
7023 ON BEHALF OF PURCHASERS OF DEFECTIVE GM VEHICLES.**

## I.    PRELIMINARY STATEMENT

1.      By this Proof of Claim, Yvonne James-Bivins, on behalf of a proposed

Nationwide Class under B.R. 7023, of owners and lessees of Defective GM Vehicles, as defined

herein (collectively, the "Class"), assert unliquidated claims against the debtor, Motors

Liquidation Company, f/k/a General Motors Company (hereinafter "GM").[1]

2.      More specifically, Claimant alleges claims of fraudulent concealment, unjust

enrichment and consumer protection violations on behalf of the following proposed Class

pursuant to B.R. 7023:

> All persons in the United States who, as of November 30, 2009,
> either owned or leased a Defective GM Vehicle.

Claimant also alleges claims of breach of the implied warranty of merchantability and negligence

on behalf of proposed Subclasses of persons who owned or leased a Defective GM Vehicle as of

November 30, 2009, and resided in jurisdictions that recognize such claims as set forth herein.

3.      Ms. James-Bivins, a resident of Altadena, California, purchased a new 2006

Cadillac CTS in Alhambra, California on January 9, 2006, and she still owns it to this day.  The

ignition switch that GM used in the CTS (a "Low-Torque Ignition Switch") was dangerously

defective, and left the car prone to sudden unintended stalling, the loss of power steering and

power brakes, and an inoperable airbag.  From the time she bought the car until she received a

recall notice in 2014, Ms. James-Bivins was unaware of the ignition switch defect.

4.      As detailed more specifically herein, "Defective GM Vehicles" include each of

the following vehicles provided they were sold or leased prior to November 30, 2009:

---

[1] In keeping with the convention used in this and other courts, GM's successor corporation, General Motors
LLC, is referred to herein as "New GM."

1

(i)     Low Torque Ignition Switch Defect Vehicles (the vehicles included in Recall
Nos. 14-V-355, 14-V-394, and 14-V-400:  2005-2009 Buick Lacrosse, 2006-2014
Chevrolet Impala, 2000-2005 Cadillac Deville, 2006-2010 Cadillac DTS, 2006-
2010 Buick Lucerne, 2006-2008, and Chevrolet Monte Carlo; 2003-2010 Cadillac
CTS and 2004-2006 Cadillac SRX; and 1997-2005 Chevrolet Malibu, 2000-2005
Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand
Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-
2004 Oldsmobile Alero);

(ii)    Side Airbag Defect Vehicles (the vehicles included in Recall No. 14-V-118:
2008-2010 Buick Enclave, 2009-2010 Chevrolet Traverse, 2008-2010 GMC
Acadia, and 2008-2010 Saturn Outlook); and

(iii)   Power Steering Defect Vehicles (the vehicles included in Recall No. 14-V-153:
2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx,
2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009
Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura).

5.      All told, there are approximately 9.8 million Defective GM Vehicles at issue in
this Proof of Claim.

6.      GM was aware of the defects in the Defective GM Vehicles, and the defects
resulted from GM's devaluation of and disregard for safety, as detailed in part herein.

7.      GM induced Claimant and the Class to purchase and retain the Defective GM
Vehicles under false pretenses, and thus deprived Class Members of the benefit of their bargain
and saddled them with dangerously defective cars that were worth less than they would have
been in the absence of the defects.  Many Class Members also incurred repair costs and other
expenses as a direct result of GM's fraudulent conduct, and GM was unjustly enriched at Class
Members' expense.

8.      Claimant therefore files this Proof of Claim on behalf of the Class to recover the
damages caused by GM's conduct under consumer protection statutes, the law of fraudulent
concealment and unjust enrichment, which is essentially the same under the laws of each of the
50 states and the District of Columbia.  Claimant also brings claims for breach of the implied
warranty of merchantability under California law and on behalf of a Class of persons living in

2

other states where the law provides a similar claim (the "Defective GM Vehicle Implied

Warranty Subclass").  Finally, Claimant brings a claim for negligence on behalf of herself, other

California residents, and residents of other states where the law provides a similar clam (the

"Defective GM Vehicle Negligence Subclass").

## II.    THE LOW TORQUE IGNITION SWITCH DEFECTS

9.    New GM's belated recall of the Defective GM Vehicles occurred in 2014 in the

wake of the stunning revelation that GM and New GM had manufactured and sold some 2.1

million vehicles with a dangerous ignition switch defect (the "Delta Ignition Switch Defect").

The Delta Ignition Switch Vehicles were recalled beginning in February 2014 in NHTSA Recall

No. 14-V-047, and the GM vehicles subject to that recall are the subject of the Proof of Claim

filed by Patricia Barker on December 22, 2016, and the Attachment to that Proof of Claim is

incorporated herein by reference.

10.    The Delta Ignition Switch Vehicles contained ignition switches that can

inadvertently move from the "run" to the "accessory" or "off" position at any time during normal

and proper operation of the vehicles.  The ignition switch is most likely to move when the

vehicle is jarred or travels across a bumpy road; if the key chain is heavy; if a driver

inadvertently touches the ignition key with his or her knee; or for a host of additional reasons.

When the ignition switch inadvertently moves out of the "run" position, the vehicle suddenly and

unexpectedly loses engine power, power steering, and power brakes, and certain safety features

are disabled, including the vehicle's airbags.  This leaves occupants vulnerable to crashes,

serious injuries, and death.

11.    The Delta Ignition Switch System is defective in at least three major respects.

First, the switches are simply weak; because of a faulty "detent plunger," the switch can

inadvertently move from the "run" to the "accessory" position.  Second, because the ignition

switches are placed low on the steering column, the driver's knee can easily bump the key (or the hanging fob below the key) and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position.  Third, when the ignition switch moves from the "run" to the "accessory" or "off" position, the vehicle's power is disabled.  This also immediately disables the airbags.  Thus, when power is lost during ordinary operation of the vehicle, a driver is left without the protection of the airbag system even if he or she is traveling at high speeds.

12.    GM was aware of safer alternative designs for airbag systems that would have prevented the non-deployment of airbags caused by the Delta Ignition Switch Defect as well as the other Low Torque Ignition Switch Defects detailed herein, but chose not to employ them— whether by way of recall of GM vehicles on the road or a design change for GM vehicles it continued to manufacture—in part to avoid disclosure of the defective ignition switches and their tragic consequences.

13.    In June and July 2014, New GM conducted three additional recalls of more than 10.4 million vehicles for ignition switches with low torque ("Low Torque Ignition Switch Defects"):  Safety Recalls No. 14-V-355, 14-V-394, and 14-V-400.  Aproximately 8.7 milllion of these Low Torque Ignition Switch Defect Vehicles were manufactured and sold by GM.

14.    Each of these three recalls involves the same defect (low-torque switches that inadvertently move out of the "run" position on rough roads or due to a weight hanging from the key or knee interaction with the switch) with the same adverse effect (loss of power to steering, brakes, and airbag).

15.    The defects that gave rise to each of these recalls were well-known to GM long before it filed for bankruptcy in June 2009.

a.    **Low Torque Safety Recall No. 14-V-355.**

16.    On June 20, 2014, New GM recalled 3,141,731 vehicles in the United States for ignition switch, or ignition key slot, defects (Recall No. 14-V-355).

17.    Approximately 2,349,095 of the vehicles subject to this recall were made and sold by GM.

18.    The following vehicles were included in the June 20, 2014 recall:  2005-2009 Buick Lacrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2006-2011 Cadillac DTS, 2006-2011 Buick Lucerne, and 2006-2008 Chevrolet Monte Carlo.

19.    The recall notice states, "In the affected vehicles, the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine."  New GM's internal description of the defect was similar:  "The ignition switch may inadvertently move out of the 'run' position if the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event." Thus, all models involved in Safety Recall No. 14-V-355 have a common defect.

20.    The recall notice also explains that, "[i]f the key is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury. Additionally, a key knocked out of the run position could cause loss of engine power, power steering, and power braking, increasing the risk of a vehicle crash."  This is similar to how New GM internally described the *effect* of the defect:  "If the ignition switch moves out of the 'run' position, there is an effect on power steering and power braking."  In addition, the timing of the key movement out of the "run position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying."  Thus, the effect of the defect is the same for all models involved in Safety Recall No. 14-V-355.

21.    The root cause of the defect was as follows:  "The ignition switch torque performance may be below target curve.  The system torque performance may be insufficient to resist energy generated from weight hanging on slotted key."

22.    The vehicles included in this recall were built on the same platform and their defective ignition switches have weak detent plungers, just like the Cobalt and other Delta Ignition Switch Vehicles recalled in February and March of 2014.

23.    GM was aware of the ignition switch defect well before it filed for bankruptcy. The information known to GM included the following facts:

a.    On or about August 25, 2005, GM design engineer Laura Andres wrote a description of ignition switch issues that she experienced while operating a 2006 Chevrolet Impala on the highway.  Ms. Andres stated, "While driving home from work on my usual route, I was driving about 45 mph, where the road changes from paved to gravel & then back to paved, some of the gravel had worn away, and the pavement acted as a speed bump when I went over it. The car shut off.  I took the car in for repairs.  The technician thinks it might be the ignition detent, because in a road test in the parking lot it also shut off."

b.    GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' account on August 25, 2005, to four other GM employees.  Mr. Dickinson asked, "Is this a condition we would expect to occur under some impacts?"

c.    On August 29, 2005, GM employee Jim Zito forwarded the messages to Ray DeGiorgio (the GM Design Research Engineer for the notorious Delta Ignition Switch) and asked, "Do we have any history with the ignition switch as far as it being sensitive to road bumps?"

d.      Mr. DeGiorgio responded the same day, stating, "To date there has never been any issues with the detents being too light."

e.      On August 30, 2005, Ms. Andres sent an email to GM employee Jim Zito and copied ten other GM employees, including Mr. DeGiorgio.  Ms. Andres, in her email, stated, "I picked up the vehicle from repair.  No repairs were done. . . .  The technician said there is nothing they can do to repair it.  He said it is just the design of the switch.  He said other switches, like on the trucks, have a stronger detent and don't experience this."

f.      Ms. Andres' email continued:  "I think this is a serious safety problem, especially if this switch is on multiple programs.  I'm thinking big recall.  I was driving 45 mph when I hit the pothole and the car shut off and I had a car driving behind me that swerved around me.  I don't like to imagine a customer driving with their kids in the back seat, on I-75 and hitting a pothole, in rush-hour traffic.  I think you should seriously consider changing this part to a switch with a stronger detent."

24.      Senior executives and engineers at GM knew that some of the information relayed to allay Ms. Andres' concerns was inaccurate.  For example, Mr. DeGiorgio knew that there had been "issues with detents being too light."  Instead of relaying those "issues," Mr. DeGiorgio falsely stated that there were no such "issues."

25.      From 2001 until the bankruptcy Sale in 2009, GM received numerous reports from consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect. The following are examples of just a few of the many reports and complaints regarding the defect that GM knew before the bankruptcy Sale:

26. GM knew of a January 23, 2001 complaint filed with NHTSA involving a 2000

Cadillac Deville and an incident that occurred on January 23, 2001, in which the following was

reported:

> COMPLETE ELECTRICAL SYSTEM AND ENGINE
> SHUTDOWN WHILE DRIVING. HAPPENED THREE
> DIFFERENT TIMES TO DATE. DEALER IS UNABLE TO
> DETERMINE CAUSE OF FAILURE. THIS CONDITION
> DEEMED TO BE EXTREMELY HAZARDOUS BY OWNER.
> NHTSA ID Number: 739850.

27. GM knew of a June 12, 2001 complaint filed with NHTSA involving a 2000

Cadillac Deville and an incident that occurred on June 12, 2001, in which the following was

reported:

> INTERMITTENTLY AT 60 MPH VEHICLE WILL STALL OUT
> AND DIE. MOST TIMES VEHICLE WILL START UP
> IMMEDIATELY AFTER. DEALER HAS REPLACED MAIN
> CONSOLE 3 TIMES, AND ABS BRAKES. BUT, PROBLEM
> HAS NOT BEEN CORRECTED. MANUFACTURER HAS
> BEEN NOTIFIED.*AK  NHTSA ID Number: 890227.

28. GM knew of a January 27, 2003 complaint filed with NHTSA involving a 2001

Cadillac Deville and an incident that occurred on January 27, 2003, in which the following was

reported:

> WHILE DRIVING AT HIGHWAY SPEED ENGINE SHUT
> DOWN, CAUSING AN ACCIDENT. PLEASE PROVIDE ANY
> ADDITIONAL INFORMATION.*AK    NHTSA ID Number:
> 10004759.

29. GM knew of a September 18, 2007 complaint filed with NHTSA involving a

2006 Chevrolet Impala and an incident that occurred on September 15, 2006, in which it was

reported that:

> TL*THE CONTACTS SON OWNS A 2006 CHEVROLET
> IMPALA. WHILE DRIVING APPROXIMATELY 33 MPH AT
> NIGHT, THE CONTACTS SON CRASHED INTO A STALLED
> VEHICLE. HE STRUCK THE VEHICLE ON THE DRIVER

> SIDE DOOR AND NEITHER THE DRIVER NOR THE
> PASSENGER SIDE AIR BAGS DEPLOYED. THE DRIVER
> SUSTAINED MINOR INJURIES TO HIS WRIST. THE
> VEHICLE SUSTAINED MAJOR FRONT END DAMAGE. THE
> DEALER WAS NOTIFIED AND STATED THAT THE CRASH
> HAD TO HAVE BEEN A DIRECT HIT ON THE SENSOR. THE
> CURRENT AND FAILURE MILEAGES WERE 21,600. THE
> CONSUMER STATED THE AIR BAGS DID NOT DEPLOY.
> THE CONSUMER PROVIDED PHOTOS OF THE VEHICLE.
> UPDATED 10/10/07 *TR NHTSA ID Number: 10203350.

30.    GM knew of an April 2, 2009 complaint filed with NHTSA involving a 2005
Buick LaCrosse and an incident that occurred on April 2, 2009, in which the following was
reported:

> POWER STEERING WENT OUT COMPLETELY, NO
> WARNING JUST OUT. HAD A VERY HARD TIME
> STEERING CAR. LUCKY KNOW ONE WAS HURT. *TR
> NHTSA ID Number: 10263976.

**b.    Low Torque Safety Recalls No. 14-V-394 and 14-V-400.**

31.    On July 2, 2014, New GM recalled 554,328 vehicles in the United States for
ignition switch defects (Recall No. 14-V-394).

32.    The July 2 recall applied to the 2003-2014 Cadillac CTS and the 2004-2006
Cadillac SRX.  Approximately 450,000 of the vehicles involved in Recall No. 14-V-394 were
manufactured and sold by GM.

33.    The recall notice explains that the weight on the key ring and/or road conditions
or some other jarring event may cause the ignition switch to move out of the "run" position,
turning off the engine.  Further, if the key is not in the "run" position, the airbags may not deploy
in the event of a collision, increasing the risk of injury.  Internally, New GM characterized the
defect as "The ignition switch may move from RUN to ACCESSORY or OFF due to driver
interaction with the key or due to the weight of objects on the key ring."  Thus, all vehicles
subject to Safety Recall No. 14-V-394 have the same defect.

34.     New GM internally described the effect of the defect as follows: "This will result in a partial loss of electrical power and turn off the engine. Power steering/braking will be affected and the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury or fatality." Thus the effect of the defect is the same for all models involved in Safety Recall No. 14-V-394.

35.     On July 3, 2014, New GM recalled 5,877,718 additional vehicles in the United States for ignition switch defects (Recall No. 14-V-400).

36.     The following vehicles were included in Recall No. 14-V-400: 1997-2005 Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-2004 Oldsmobile Alero. All of the vehicles involved in Recall No. 14-V-400 were manufactured and sold by GM.

37.     The recall notice states that the weight on the key and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position, turning off the engine. If the key is not in the "run" position, the airbags may not deploy if the vehicle is involved in a collision, increasing the risk of injury. Thus, all vehicles subject to Safety Recall No.14-V-400 have the same defect.

38.     New GM described the effect of the defect as follows: "If the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, it may unintentionally move the key away from the 'run' position. If this occurs, engine power, power steering and power braking will be affected, increasing the risk of a crash. The timing of the key movement out of the 'run' position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury

in certain kinds of crashes."  Thus, the effect of the defect is the same for all models involved in

Safety Recall No. 14-V-400.

39.     The root cause of the defect is as follows:  "The ignition switch torque

performance may be below target curve.  The system torque performance may be insufficient to

resist energy generated from weight hanging on slotted key."

40.     Once again, the unintended ignition rotation defect is substantially similar to and

relates directly to ignition switch defects, including the Delta Ignition Switch Vehicles and the

other Low Torque Ignition Switch Defects.  Like the other ignition switch defects, the

unintended ignition key rotation defect poses a serious and dangerous safety risk because it can

cause a vehicle to stall while in motion by causing the key in the ignition to inadvertently move

from the "on" or "run" position to the "off" or "accessory" position.  Like the other ignition

switch defects, the unintended ignition key rotation defect can result in a loss of power steering,

power braking, and increase the risk of a crash.  And as with the other ignition switch defects, if

a crash occurs, the airbags will not deploy because of the unintended ignition key rotation defect.

41.     The unintended ignition key rotation defect involves several problems, and they

are identical to the problems in the other GM vehicles with defective switches:  a weak detent

plunger, the low positioning of the ignition on the steering column, and the algorithm that

renders the airbags inoperable when the vehicle leaves the "run" position.

42.     The 2003-2006 Cadillac CTS and the 2004-2006 Cadillac SRX use the same

Delphi switch and have inadequate torque for the "run"-"accessory" direction of the key rotation.

This was known to GM, and was the basis for a change that was made to a stronger detent

plunger for the 2007 and later model years of the SRX model.  The 2007 and later CTS vehicles

used a switch manufactured by Dalian Alps.

11

43.    GM was aware of the defects in these vehicles well before it filed for bankruptcy in 2009.  GM's knowledge is evidenced by the following non-exclusive list of incidents:

a.    In January 2003, GM opened an internal investigation after it received complaints from a Michigan GM dealership that a customer had experienced a power failure while operating his 2003 Pontiac Grand Am.

b.    During the investigation, GM's Brand Quality Manager for the Grand Am visited the dealership and requested that the affected customer demonstrate the problem.  The customer was able to recreate the shutdown event by driving over a speed bump at approximately 30 to 35 mph.

c.    GM knew that the customer's key ring was allegedly quite heavy.  It contained approximately 50 keys and a set of brass knuckles.

d.    In May 2003, GM issued a voicemail to dealerships describing the defective ignition condition experienced by the customer in the Grand Am.  GM identified the relevant population of defective vehicles as the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am:

> This information goes out to Chevrolet, Oldsmobile and Pontiac dealers and concerns the 1999 through 2003 Chevrolet Malibu, Oldsmobile Alero and Pontiac Grand Am. This voicemail provides information about a condition that may be driving no trouble found claims on customer vehicles on part replacements such as BCMs, ignition lock cylinders, ignition switches and also some PCMs, ABS modules, door lock modules, restraint control system and theft security system replacements.  We were able to capture a customer's vehicle for the complaint of intermittent vehicle shuts off while driving.  At times this vehicle would start up and then shut off for no apparent reason.  Sometimes no codes would set and sometimes multiple codes would set.  In both instances the vehicle would immediately restart.  The customer had brought the vehicle in to the dealership four times.  On the first three trips the condition could not be duplicated.  On the fourth trip back the dealership service manager noticed the customer's excess size key

ring and mass. The condition was duplicated using the customer's full key ring, which was not left at the dealership on prior visits. The actual cause of this customer's condition was that over bumps the mass and weight of the customer's key ring forces the dash mounted key lock cylinder switch out of its switch detent and allows the key to rotate back one sixteenth of an inch from the on position towards the accessory position. This amount of key movement will shut the vehicle off and create this customer's complaint. Also, when the vehicle is started and the key is quickly released between the ignition lock spring and weight and mass of the key chain, the key can snap back just past the on position detent and allow the engine to shut off. Noting the size of the customer's key ring, replacing the ignition lock cylinder with another one of the same would not have corrected this issue. Additionally, when the ignition is turned off in this type of manner, depending on which module is communicating on the data line at the time, is dependent on whether or not DTC codes will set and which codes will set. The DTCs that set most consistently during this condition was usually the communication or serial data codes DTC U1040, U1088, U1255, C1298, B, as in boy, 2958 and/or B, as in boy, 2960. As we investigated this condition further we also found that it was not uncommon for customers to have a number of items attached to their key rings. In many instances, especially when the vehicle was in for service overnight, the customer usually left only the vehicle key and key fob. Large key rings with multiple items attached can also be responsible for customer complaints of the vehicle shuts off while shifting into park on column mounted ignition lock cylinders. This is caused when the customer is shifting from a drive gear upward into park and an item on the key ring hits the ignition lock cylinder key tabs on the way up and moves the switch back out of the on detent position. Please be aware that these conditions can be caused by excessive key size and mass from the customer's key ring, and attention to this detail should be paid to allow you to better and more properly diagnose the customer's complaint. I also wanted to thank Rob Maziac, the service manager at Art Moran, in Michigan, for his efforts here in assisting General Motors with this issue. And many of you others who have taken the time out of your busy schedules and assisted us in the identification on many other issues. I appreciate your time. Thanks. [GM-MDL2543-300732518]

    e.      GM did not recall these vehicles. Nor did it provide owners and/or lessees

with notice of the defective condition. Instead, its voicemail directed dealerships to pay attention

to the key size and mass of the customer's key ring.

f.    GM engineers had "recommended a higher spring rate from day one," as "this would be the least costly fastest fix."

g.    On July 24, 2003, GM issued an engineering work order to increase the detent plunger force on the ignition switch for the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am vehicles. GM engineers allegedly increased the detent plunger force and changed the part number of the ignition switch. The new parts were installed beginning in the model year 2004 Malibu, Alero, and Grand Am vehicles. No recall was done at the time to increase detent plunger force in prior models.

h.    GM issued a separate engineering work order in March 2004 to increase the detent plunger force on the ignition switch in the Pontiac Grand Prix, ostensibly to "maintain commonality" between the Grand Prix and the Malibu, Grand Am, and the Alero. This change was made only in production vehicles beginning in 2005, and no recall was done at the time to increase detent plunger force in prior models. GM engineers did not change the part number for the new Pontiac Grand Prix ignition switch.

i.    GM design engineer Ray DeGiorgio signed the work order in March 2004 authorizing the part change for the Grand Prix ignition switch without changing the part number. An Engineering Group Manager approved the design change "w/o part number change." GM's decision not to change the part number is a violation of generally accepted engineering standards. For example, the American Society of Mechanical Engineers ("ASME") issued ASME Y14.100-2004, Engineering Drawing Practices, which sets forth essential minimum requirements for engineering drawings and related documentation practices. Such standards are generally relied upon by automotive engineers (indeed, a GM engineer was on the ASME Y14 Standards Committee at the time ASME Y14.100-2004 was approved). ASME Y14.100-2004,

Section 6.8.1 governs "Change Requiring New Identification" and provides that "New PINs [part identification numbers] shall be assigned when a part or item is changed in such a manner that any of the following conditions occur:  (a) When performance or durability is affected to such an extent that the previous versions must be discarded or modified for reasons of safety or malfunction."  GM redesigned the switch "for reasons of safety or malfunction."  ASME Y14.100-2004, Section 6.8.1, applies here and mandates that GM should have changed the part number.  GM's decision not to change the part number is also a violation of generally accepted inventory management standards and practices, which dictate that a modification that is necessary to meet product safety specifications requires a part number change.

j.    On or around August 25, 2005, Laura Andres, a GM design engineer, sent an email describing ignition switch issues that she experienced while operating a 2006 Chevrolet Impala on the highway.  Ms. Andres' email stated:

> While driving home from work on my usual route, I was driving about 45 mph, where the road changes from paved to gravel & then back to paved, some of the gravel had worn away, and the pavement acted as a speed bump when I went over it.  The car shut off.  I took the car in for repairs.  The technician thinks it might be the ignition detent, because in a road test in the parking lot it also shut off.

k.    GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' email on August 25, 2005 to four GM employees.  Mr. Dickinson asked, "Is this a condition we would expect to occur under some impacts?"

l.    On August 29, 2005, GM employee Jim Zito forwarded the messages to Ray DeGiorgio and asked, "Do we have any history with the ignition switch as far as it being sensitive to road bumps?"

m.    Mr. DeGiorgio responded the same day, stating, "To date there has never been any issues with the detents being too light."

44.    From 2002 to the time of the bankruptcy Sale, GM received numerous reports

from consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect.

The following are just a handful of examples of some of the reports known to GM.

45.    GM knew of a September 16, 2002 complaint filed with NHTSA regarding a

2002 Oldsmobile Intrigue involving an incident that occurred on March 16, 2002, in which the

following was reported:

> WHILE DRIVING AT 30 MPH CONSUMER RAN HEAD ON
> INTO A STEEL GATE, AND THEN HIT THREE TREES.
> UPON IMPACT, NONE OF THE AIR BAGS DEPLOYED.
> CONTACTED DEALER. PLEASE PROVIDE FURTHER
> INFORMATION. *AK  NHTSA ID Number**: 8018687.

46.    GM knew of a November 22, 2002 complaint filed with NHTSA involving a 2003

Cadillac CTS involving an incident that occurred on July 1, 2002, in which it was reported that:

> THE CAR STALLS AT 25 MPH TO 45 MPH, OVER 20
> OCCURANCES, DEALER ATTEMPTED 3 REPAIRS. DT
> NHTSA ID Number: 770030.

47.    GM knew of a January 21, 2003 complaint filed with NHTSA involving a 2003

Cadillac CTS, in which the following was reported:

> WHILE DRIVING AT ANY SPEED,THE VEHICLE WILL
> SUDDENLY SHUT OFF. THE STEERING WHEEL AND THE
> BRAKE PEDAL BECOMES VERY STIFF. CONSUMER FEELS
> ITS VERY UNSAFE TO DRIVE. PLEASE PROVIDE ANY
> FURTHER INFORMATION.  NHTSA ID Number: 10004288.

48.    GM knew of a June 30, 2003 complaint filed with NHTSA regarding a 2001

Oldsmobile Intrigue, which involved the following report:

> CONSUMER NOTICED THAT WHILE TRAVELING DOWN
> HILL AT 40-45 MPH BRAKES FAILED, CAUSING
> CONSUMER TO RUN INTO THREES AND A POLE. UPON
> IMPACT, AIR BAGS DID NOT DEPLOY. *AK  NHTSA ID
> Number: 10026252.

49.     GM knew of a March 11, 2004 complaint filed with NHTSA involving a 2004

Cadillac CTS involving an incident that occurred on March 11, 2004, in which the following was

reported:

> CONSUMER STATED WHILE DRIVING AT 55-MPH
> VEHICLE STALLED, CAUSING CONSUMER TO PULL OFF
> THE ROAD. DEALER INSPECTED VEHICLE SEVERAL
> TIMES, BUT COULD NOT DUPLICATE OR CORRECT THE
> PROBLEM. *AK  NHTSA ID Number: 10062993.

50.     GM knew of a March 11, 2004 complaint with NHTSA regarding a 2003

Oldsmobile Alero incident that occurred on July 26, 2003, in which the following was reported:

> THE VEHICLE DIES. WHILE CRUISING AT ANY SPEED,
> THE HYDRAULIC BRAKES & STEERING FAILED DUE TO
> THE ENGINE DYING. THERE IS NO SET PATTERN, IT
> MIGHT STALL 6 TIMES IN ONE DAY, THEN TWICE THE
> NEXT DAY. THEN GO 4 DAYS WITH NO OCURRENCE,
> THEN IT WILL STALL ONCE A DAY FOR 3 DAYS. THEN
> GO A WEEK WITH NO OCURRENCE, THEN STALL 4 TIMES
> A DAY FOR 5 DAYS, ETC., ETC. IN EVERY OCURRENCE, IT
> TAKES APPROXIMATELY 10 MINUTES BEFORE IT WILL
> START BACK UP. AT HIGH SPEEDS, IT IS EXTREMELY
> TOO DANGEROUS TO DRIVE. WE'VE TAKEN IT TO THE
> DEALER, UNDER EXTENDED WARRANTY, THE
> REQUIRED 4 TIMES UNDER THE LEMON LAW PROCESS.
> THE DEALER CANNOT ASCERTAIN, NOR FIX THE
> PROBLEM. IT HAPPENED TO THE DEALER AT LEAST
> ONCE WHEN WE TOOK IT IN. I DOUBT THEY WILL
> ADMIT IT, HOWEVER, MY WIFE WAS WITNESS. THE CAR
> IS A 2003. EVEN THOUGH I BOUGHT IT IN JULY 2003, IT
> WAS CONSIDERED A USED CAR. GM HAS DENIED OUR
> CLAIM SINCE THE LEMON LAW DOES NOT APPLY TO
> USED CARS. THE CAR HAS BEEN PERMANENTLY
> PARKED SINCE NOVEMBER 2003. WE WERE FORCED TO
> BUY ANOTHER CAR. THE DEALER WOULD NOT TRADE.
> THIS HAS RESULTED IN A BADLUCK SITUATION FOR US.
> WE CANNOT AFFORD 2 CAR PAYMENTS / 2 INSURANCE
> PREMIUMS, NOR CAN WE AFFORD $300.00 PER HOUR TO
> SUE GM. I STOPPED MAKING PAYMENTS IN DECEMBER
> 2003. I HAVE KEPT THE FINANCE COMPANY ABREAST OF
> THE SITUATION. THEY HAVE NOT REPOSSED AS OF YET.
> THEY WANT ME TO TRY TO SELL IT. CAN YOU HELP
> ?*AK  NHTSA ID Number: 10061898.

51.     GM knew of a July 20, 2004 complaint filed with NHTSA involving a 2004

Cadillac SRX, involving an incident that occurred on July 9, 2004, in which the following was

reported:

> THE CAR DIES AFTER TRAVELING ON HIGHWAY. IT GOES FROM 65 MPH TO 0. THE BRAKES, STEERING, AND COMPLETE POWER DIES. YOU HAVE NO CONTROL OVER THE CAR AT THIS POINT. I HAVE ALMOST BEEN HIT 5 TIMES NOW. ALSO, WHEN THE CARS DOES TURN BACK ON IT WILL ONLY GO 10 MPH AND SOMETIMES WHEN YOU TURN IT BACK ON THE RPM'S WILL GO TO THE MAX. IT SOUNDS LIKE THE CAR IS GOING TO EXPLODE. THIS CAR IS A DEATH TRAP. *LA   NHTSA ID Number: 10082289.

52.     GM knew of an August 23, 2004 complaint filed with NHTSA regarding a 2004

Chevrolet Malibu incident that occurred on June 30, 2004, in which it was reported that:

> WHILE TRAVELING AT ANY SPEED VEHICLE STALLED. WITHOUT CONSUMER HAD SEVERAL CLOSE CALLS OF BEING REAR ENDED. VEHICLE WAS SERVICED SEVERAL TIMES, BUT PROBLEM RECURRED. *AK.   NHTSA ID Number:  10089418.

53.     GM knew of a report in August of 2004 involving a 2004 Chevrolet Malibu

incident that occurred on August 3, 2004, in which it was reported that:

> WHEN DRIVING, THE VEHICLE TO CUT OFF. THE DEALER COULD NOT FIND ANY DEFECTS. *JB.   NHTSA ID Number: 10087966.

54.     GM knew of an October 23, 2004 complaint filed with NHTSA regarding a 2003

Chevrolet Monte Carlo, in which the following was reported:

> VEHICLE CONTINUOUSLY EXPERIENCED AN ELECTRICAL SYSTEM FAILURE. AS A RESULT, THERE'WAS AN ELECTRICAL SHUT DOWN WHICH RESULTED IN THE ENGINE DYING/ STEERING WHEEL LOCKING UP, AND LOSS OF BRAKE POWER.*AK NHTSA ID Number: 10044624.

55.    GM knew of an April 26, 2005 complaint filed with NHTSA involving a 2005

Pontiac Grand Prix, pertaining to an incident that occurred on December 29, 2004, in which the

following was reported:

> 2005 PONTIAC GRAND PRIX GT SEDAN VIN #[XXX] PURCHASED 12/16/2004. INTERMITTENTLY VEHICLE STALLS/ LOSS OF POWER IN THE ENGINE. WHILE DRIVING THE VEHICLE IT WILL SUDDENLY JUST LOSES POWER. YOU CONTINUE TO PRESS THE ACCELERATOR PEDAL AND THEN THE ENGINE WILL SUDDENLY TAKE BACK OFF AT A GREAT SPEED. THIS HAS HAPPENED WHILE DRIVING NORMALLY WITHOUT TRYING TO ACCELERATE AND ALSO WHILE TRYING TO ACCELERATE. THE CAR HAS LOST POWER WHILE TRYING TO MERGE IN TRAFFIC. THE CAR HAS LOST POWER WHILE TRYING TO CROSS HIGHWAYS. THE CAR HAS LOST POWER WHILE JUST DRIVING DOWN THE ROAD. GMC HAS PERFORMED THE FOLLOWING REPAIRS WITHOUT FIXING THE PROBLEM. 12/30/2004 [XXX]-MODULE, POWERTRAIN CONTROL-ENGINE REPROGRAMMING. 01/24/2005 [XXX]-SOLENOID,PRESSURE CONTROL-REPLACED. 02/04/2005 [XXX]-MODULE, PCM/VCM-REPLACED. 02/14/2005 [XXX]-PEDAL,ACCELERATOR-REPLACED. DEALERSHIP PURCHASED FROM CAPITAL BUICK-PONTIAC-GMC 225-293-3500. DEALERSHIP HAS ADVISED THAT THEY DO NOT KNOW WHAT IS WRONG WITH THE CAR. WE HAVE BEEN TOLD THAT WE HAVE TO GO DIRECT TO PONTIAC WITH THE PROBLEM. HAVE BEEN IN CONTACT WITH PONTIAC SINCE 02/15/05. PONTIAC ADVISED THAT THEY WERE GOING TO RESEARCH THE PROBLEM AND SEE IF ANY OTHER GRAND PRI WAS REPORTING LIKE PROBLEMS. SO FAR THE ONLY ADVICE FROM PONTIAC IS THEY WANT US TO COME IN AND TAKE ANOTHER GRAND PRIX OFF THE LOT AND SEE IF WE CAN GET THIS CAR TO DUPLICATE THE SAME PROBLEM. THIS DID NOT IMPRESS ME AT ALL. SO AFTER WAITING FOR 2-1/2 MONTHS FOR PONTIAC TO DO SOMETHING TO FIX THE PROBLEM, I HAVE DECIDED TO REPORT THIS TO NHTSA. *AK *JS INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6) NHTSA ID Number: 10118501.

56.    GM knew of a May 31, 2005 complaint filed with NHTSA regarding a 2004 Chevrolet Malibu incident that occurred on July 18, 2004, in which it was reported that:

> THE CAR CUT OFF WHILE I WAS DRIVING AND IN HEAVY TRAFFIC MORE THAN ONCE. THERE WAS NO WARNING THAT THIS WOULD HAPPEN. THE CAR WAS SERVICED BEFORE FOR THIS PROBLEM BUT IT CONTINUED TO HAPPEN. I HAVE HAD 3 RECALLS, THE HORN FUSE HAS BEEN REPLACED TWICE, AND THE BLINKER IS CURRENTLY OUT. THE STEERING COLLAR HAS ALSO BEEN REPLACED. THIS CAR WAS SUPPOSED TO BE A NEW CAR.  NHTSA ID Number: 10123684.

57.    GM knew of a June 2, 2005 complaint filed with NHTSA regarding a 2004 Pontiac Grand Am incident that occurred on February 18, 2005, in which the following was reported:

> 2004 PONTIAC GRAND PRIX SHUTS DOWN WHILE DRIVING AND THE POWER STEERING AND BRAKING ABILITY ARE LOST.*MR *NM.    NHTSA ID Number: 10124713.

58.    GM knew of an August 12, 2005 complaint filed with NHTSA involving a 2003 Cadillac CTS, regarding an incident that occurred on January 3, 2005, in which it was reported that:

> DT: VEHICLE LOST POWER WHEN THE CONSUMER HIT THE BRAKES. THE TRANSMISSION JOLTS AND THEN THE ENGINE SHUTS OFF. IT HAS BEEN TO THE DEALER 6 TIMES SINCE JANUARY. THE DEALER TRIED SOMETHING DIFFERENT EVERY TIME SHE TOOK IT IN. MANUFACTURER SAID SHE COULD HAVE A NEW VEHICLE IF SHE PAID FOR IT. SHE WANTED TO GET RID OF THE VEHICLE.*AK THE CHECK ENGINE LIGHT ILLUMINATED. *JB  NHTSA ID Number: 10127580.

59.    GM knew of an August 26, 2005 complaint with NHTSA regarding a 2004 Pontiac Grand Am incident that occurred on August 26, 2005, in which the following was reported:

WHILE DRIVING MY 2004 PONTIAC GRAND AM THE CAR FAILED AT 30 MPH. IT COMPLETELY SHUT OFF LEAVING ME WITH NO POWER STEERING AND NO WAY TO REGAIN CONTROL OF THE CAR UNTIL COMING TO A COMPLETE STOP TO RESTART IT. ONCE I HAD STOPPED IT DID RESTART WITHOUT INCIDENT. ONE WEEK LATER THE CAR FAILED TO START AT ALL NOT EVEN TURNING OVER. WHEN THE PROBLEM WAS DIAGNOSED AT THE GARAGE IT WAS FOUND TO BE A FAULTY "IGNITION CONTROL MODULE" IN THE CAR. AT THIS TIME THE PART WAS REPLACED ONLY TO FAIL AGAIN WITHIN 2 MONTHS TIME AGAIN WHILE I WAS DRIVING THIS TIME IN A MUCH MORE HAZARDOUS CONDITION BEING THAT I WAS ON THE HIGHWAY AND WAS TRAVELING AT 50 MPH AND HAD TO TRAVEL ACROSS TWO LANES OF TRAFFIC TO EVEN PULL OVER TO TRY TO RESTART IT. THE CAR CONTINUED TO START AND SHUT OFF ALL THE WAY TO THE SERVICE GARAGE WHERE IT WAS AGAIN FOUND TO BE A FAULTY "IGNITION CONTROL MODULE". IN ANOTHER TWO WEEKS TIME THE CAR FAILED TO START AND WHEN DIAGNOSED THIS TIME IT WAS SAID TO HAVE "ELECTRICAL PROBLEMS" POSSIBLE THE "POWER CONTROL MODULE". AT THIS TIME THE CAR IS STILL UNDRIVEABLE AND UNSAFE FOR TRAVEL. *JB **NHTSA ID Number:** 10134303.

60.    GM knew of a September 22, 2005 complaint filed with NHTSA involving a

2005 Cadillac CTS, concerning an incident that occurred on September 16, 2005, in which the

following was reported:

DT: 2005 CADILLAC CTS—THE CALLER'S VEHICLE WAS INVOLVED IN AN ACCIDENT WHILE DRIVING AT 55 MPH. UPON IMPACT, AIR BAGS DID NOT DEPLOY. THE VEHICLE WENT OFF THE ROAD AND HIT A TREE. THIS WAS ON THE DRIVER'S SIDE FRONT. THERE WERE NO INDICATOR LIGHTS ON PRIOR TO THE ACCIDENT. THE VEHICLE HAS NOT BEEN INSPECTED BY THE DEALERSHIP, AND INSURANCE COMPANY TOTALED THE VEHICLE. THE CALLER SAW NO REASON FOR THE AIR BAGS NOT TO DEPLOY. . TWO INJURED WERE INJURED IN THIS CRASH. T A POLICE REPORT WAS TAKEN. THERE WAS NO FIRE. *AK  NHTSA ID Number: 10137348.

21

61.     GM knew of a September 29, 2006 complaint filed with NHTSA involving a

2004 Cadillac CTS and an incident that occurred on September 29, 2006, in which the following

was reported:

> DT*: THE CONTACT STATED AT VARIOUS SPEEDS
> WITHOUT WARNING, THE VEHICLE LOST POWER AND
> WOULD NOT ACCELERATE ABOVE 20 MPH. ALSO,
> WITHOUT WARNING, THE VEHICLE STALLED ON
> SEVERAL OCCASIONS, AND WOULD NOT RESTART. THE
> VEHICLE WAS TOWED TO THE DEALERSHIP, WHO
> REPLACED THE THROTTLE TWICE AND THE THROTTLE
> BODY ASSEMBLY HARNESS, BUT THE PROBLEM
> PERSISTED. *AK UPDATED 10/25/2006—*NM  NHTSA ID
> Number: 10169594.

62.     GM knew of an April 18, 2007 complaint filed with NHTSA involving a 2004

Cadillac SRX, regarding an incident that occurred on April 13, 2007, in which it was reported

that:

> TL*THE CONTACT OWNS A 2004 CADILLAC SRX. THE
> ENGINE STALLED WITHOUT WARNING AND CAUSED
> ANOTHER VEHICLE TO CRASH INTO THE VEHICLE. THE
> VEHICLE WAS ABLE TO RESTART A FEW MINUTES
> AFTER THE CRASH. THE DEALER AND MANUFACTURER
> WAS UNABLE TO DIAGNOSE THE FAILURE. THE
> MANUFACTURER HAD THE VEHICLE INSPECTED BY A
> CADILLAC SPECIALIST WHO WAS UNABLE TO
> DIAGNOSE THE FAILURE. THE DEALER UPDATED THE
> COMPUTER FOUR TIMES, BUT THE ENGINE CONTINUED
> TO STALL. THE CURRENT AND FAILURE MILEAGES
> WERE 48,000.  NHTSA ID Number: 10188245.

63.     GM knew of a September 20, 2007 complaint filed with NHTSA involving a

2007 Cadillac CTS, in connection with an incident that occurred on January 1, 2007, in which it

was reported that:

> TL*THE CONTACT OWNS A 2007 CADILLAC CTS. WHILE
> DRIVING 40 MPH, THE VEHICLE SHUT OFF WITHOUT
> WARNING. THE FAILURE OCCURRED ON FIVE SEPARATE
> OCCASIONS. THE DEALER WAS UNABLE TO DUPLICATE
> THE FAILURE. AS OF SEPTEMBER 20, 2007, THE DEALER

HAD NOT REPAIRED THE VEHICLE. THE POWERTRAIN
WAS UNKNOWN. THE FAILURE MILEAGE WAS 2,000 AND
CURRENT MILEAGE WAS 11,998.   NHTSA ID Number:
10203516.

64.    GM knew of a September 24, 2007 complaint filed with NHTSA involving a

2004 Cadillac SRX, regarding an incident that occurred on January 1, 2005, in which the

following was reported:

> TL*THE CONTACT OWNS A 2004 CADILLAC SRX. WHILE
> DRIVING 5 MPH OR GREATER, THE VEHICLE WOULD
> SHUT OFF WITHOUT WARNING. THE DEALER STATED
> THAT THE BATTERY CAUSED THE FAILURE AND THEY
> REPLACED THE BATTERY. APPROXIMATELY EIGHT
> MONTHS LATER, THE FAILURE RECURRED. THE DEALER
> STATED THAT THE BATTERY CAUSED THE FAILURE
> AND REPLACED IT A SECOND TIME. APPROXIMATELY
> THREE MONTHS LATER, THE FAILURE OCCURRED
> AGAIN. SHE WAS ABLE TO RESTART THE VEHICLE. THE
> DEALER WAS UNABLE TO DUPLICATE THE FAILURE,
> HOWEVER, THEY REPLACED THE CRANK SHAFT
> SENSOR. THE FAILURE CONTINUES TO PERSIST. AS OF
> SEPTEMBER 24, 2007, THE DEALER HAD NOT REPAIRED
> THE VEHICLE. THE POWERTRAIN WAS UNKNOWN. THE
> FAILURE MILEAGE WAS 8,000 AND CURRENT MILEAGE
> WAS 70,580.  NHTSA ID Number: 10203943.

65.    GM knew of a June 18, 2008 complaint filed with NHTSA involving a 2006

Cadillac CTS and an incident that occurred on June 17, 2008, in which it was reported that:

> TL*THE CONTACT OWNS A 2006 CADILLAC CTS. WHILE
> DRIVING 60 MPH AT NIGHT, THE VEHICLE SHUT OFF
> AND LOST TOTAL POWER. WHEN THE FAILURE
> OCCURRED, THE VEHICLE CONTINUED TO ROLL AS IF IT
> WERE IN NEUTRAL. THERE WERE NO WARNING
> INDICATORS PRIOR TO THE FAILURE. THE CONTACT
> FEELS THAT THIS IS A SAFETY HAZARD BECAUSE IT
> COULD HAVE RESULTED IN A SERIOUS CRASH. THE
> VEHICLE WAS TAKEN TO THE DEALER TWICE FOR
> REPAIR FOR THE SAME FAILURE IN FEBURARY OF 2008
> AND JUNE 17, 2008. THE FIRST TIME THE CAUSE OF THE
> FAILURE WAS IDENTIFIED AS A GLITCH WITH THE
> COMPUTER    SWITCH    THAT    CONTROLS    THE
> TRANSMISSION. AT THE SECOND VISIT, THE SHOP

> EXPLAINED THAT THEY COULD NOT IDENTIFY THE
> FAILURE. IT WOULD HAVE TO RECUR IN ORDER FOR
> THEM TO DIAGNOSE THE FAILURE PROPERLY. THE
> CURRENT AND FAILURE MILEAGES WERE 43,000.
> NHTSA ID Number: 10231507.

66.    GM knew of an October 14, 2008 complaint filed with NHTSA involving a 2008

Cadillac CTS and an incident that occurred on April 5, 2008, in which it was reported that:

> WHILE DRIVING MY 2008 CTS, WITH NO ADVANCE
> NOTICE, THE ENGINE JUST DIED. IT SEEMED TO RUN
> OUT OF GAS. MY FUEL GAUGE READ BETWEEN 1/2 TO
> 3/4 FULL. THIS HAPPENED 3 DIFFERENT OCCASIONS. ALL
> 3 TIMES I HAD TO HAVE IT TOWED BACK TO THE
> DEALERSHIP THAT I PURCHASED THE CAR FROM. ALL 3
> TIMES I GOT DIFFERENT REASONS IT HAPPENED, FROM
> BAD FUEL PUMP IN GAS TANK, TO SOME TYPE OF BAD
> CONNECTION, ETC. AFTER THIS HAPPENED THE 3RD
> TIME, I DEMANDED A NEW CAR, WHICH I RECEIVED. I
> HAVE HAD NO PROBLEMS WITH THIS CTS, RUNS GREAT.
> *TR  NHTSA ID Number: 10245423.

67.    GM knew of a November 13, 2008 complaint with NHTSA regarding a 2001

Oldsmobile Intrigue, and an incident that occurred on July 1, 2004, in which the following was

reported:

> L*THE CONTACT OWNS A 2001 OLDSMOBILE INTRIGUE.
> WHILE DRIVING 35 MPH, THE VEHICLE CONTINUOUSLY
> STALLS    AND    HESITATES.    IN    ADDITION,    THE
> INSTRUMENT PANEL INDICATORS WOULD ILLUMINATE
> AT RANDOM. THE VEHICLE FAILED INSPECTION AND
> THE CRANKSHAFT SENSOR WAS REPLACED, WHICH
> HELPED WITH THE STALLING AND HESITATION;
> HOWEVER, THE CHECK ENGINE INDICATOR WAS STILL
> ILLUMINATED. DAYS AFTER THE CRANKSHAFT SENSOR
> WAS REPLACED, THE VEHICLE FAILED TO START.
> HOWEVER,    ALL    OF    THE    INSTRUMENT    PANEL
> INDICATORS FLASHED ON AND OFF. AFTER NUMEROUS
> ATTEMPTS TO START THE VEHICLE, HE HAD IT
> JUMPSTARTED. THE VEHICLE WAS THEN ABLE TO
> START. WHILE DRIVING HOME, ALL OF THE LIGHTING
> FLASHED AND THE VEHICLE SUDDENLY SHUT OFF. THE
> VEHICLE LOST ALL ELECTRICAL POWER AND POWER
> STEERING ABILITY. THE CONTACT MANAGED TO PARK

THE VEHICLE IN A PARKING LOT AND HAD IT TOWED
THE FOLLOWING DAY TO A REPAIR SHOP. THE VEHICLE
IS CURRENTLY STILL IN THE SHOP. THE VEHICLE HAS
BEEN RECALLED IN CANADA AND HE BELIEVES THAT IT
SHOULD ALSO BE RECALLED IN THE UNITED STATES.
THE FAILURE MILEAGE WAS UNKNOWN AND THE
CURRENT MILEAGE WAS 106,000. NHTSA ID
Number: 10248694.

68.     GM knew of a December 10, 2008 complaint filed with NHTSA regarding a 2004

Oldsmobile Alero and an incident that occurred on December 10, 2008, in which the following

was reported:

I WAS DRIVING DOWN THE ROAD IN RUSH HOUR GOING
APPROX. 55 MPH AND MY CAR COMPLETELY SHUT OFF,
THE GAUGES SHUT DOWN, LOST POWER STEERING. HAD
TO PULL OFF THE ROAD AS SAFELY AS POSSIBLE,
PLACE VEHICLE IN PARK AND RESTART CAR. MY CAR
HAS SHUT DOWN PREVIOUSLY TO THIS INCIDENT AND
FEEL AS THOUGH IT NEEDS SERIOUS INVESTIGATION. I
COULD HAVE BEEN ON THE HIGHWAY AND BEEN
KILLED. THIS ALSO HAS HAPPENED WHEN IN A SPIN
OUT AS WELL THOUGH THIS PARTICULAR INCIDENT
WAS RANDOM. *TR  NHTSA ID Number: 10251280.

69.     GM knew of a March 31, 2009 complaint filed with NHTSA regarding a 2005

Chevrolet Malibu incident that occurred on May 30, 2008, in which it was reported that:

TL*THE CONTACT OWNS A 2005 CHEVROLET MALIBU.
THE CONTACT STATED THAT THE POWER WINDOWS,
LOCKS, LINKAGES, AND IGNITION SWITCH
SPORADICALLY BECOME INOPERATIVE. SHE TOOK THE
VEHICLE TO THE DEALER AND THEY REPLACED THE
IGNITION SWITCH AT THE COST OF $495. THE
MANUFACTURER STATED THAT THEY WOULD NOT
ASSUME RESPONSIBILITY FOR ANY REPAIRS BECAUSE
THE VEHICLE EXCEEDED ITS MILEAGE. ALL REMEDIES
AS OF MARCH 31, 2009 HAVE BEEN INSUFFICIENT IN
CORRECTING THE FAILURES. THE FAILURE MILEAGE
WAS 45,000 AND CURRENT MILEAGE WAS 51,000.  NHTSA
ID Number: 10263716.

70.    New GM has publicly admitted that it was aware of at least 7 crashes, 8 injuries, and 3 deaths linked to this serious safety defect before deciding to finally implement a recall. However, in reality, the number of reports and complaints is much higher.

71.    Notwithstanding years of notice and knowledge of the defect, on top of numerous complaints and reports from consumers, including reports of crashes, injuries, and deaths, GM did not implement a recall involving this defect at any time before the bankruptcy Sale.

### III.    SIDE-IMPACT AIRBAG WIRING HARNESS DEFECT

72.    On March 17, 2014, New GM recalled nearly 1.2 million MY 2008-2013 Buick Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn Outlook vehicles in Safety Recall No. 14-V-118 for a dangerous defect involving airbags and seatbelt pretensioners.  More than 275,000 of these vehicles were manufactured and sold by GM.

73.    In a March 31, 2014 letter to NHTSA, New GM described the defect as follows:

> Corrosion and/or loose crimps in the driver and passenger seat mounted side impact airbag (SIAB) wiring harness connectors can cause an increase in resistance.  The airbag sensing system will interpret an increase in resistance as a fault.  A fault will illuminate the airbag readiness light on the instrument cluster and a 'SERVICE AIR BAG' message in the Driver Information Center (DIC), and set a Diagnostic Trouble Code (DTC).  At first, at lower levels of resistance, the light and DIC message may be intermittent and the airbags and pretensioners will still deploy.  Over time, the resistance may reach a level where the SIABs, front center side airbag, if equipped, and pretensioners will not deploy in a crash.

Thus, all models involved in Safety Recall No. 14-V-118 have a common defect.

74.    Internally, New GM described the *effect* of the defect as follows:  "If the resistance reaches a high enough level, the SIABs, driver's center side airbag, or pretensioners may not deploy in a crash."  Thus, the effect of the defect is the same for all models involved in Safety Recall No. 14-V-118.

75.     Once again, GM knew of the dangerous airbag defect but never took the requisite remedial action at any time prior to the bankruptcy Sale.

76.     The SIAB module is mounted to the seat back structure and has a direct electrical connection to the inflator.  The wiring harness routes from the airbag, attaches to the seat suspension, secures to the seat structure, and mounts to the front edge of the seat.  The mating socket side of the connector is on a breakout from the body harness that exits through an opening in the carpet.[2]



**Fig. 1 Connecter location and setup**[3]

77.     In 2007, GM launched the GMC Acadia and Saturn Outlook using a Delphi Metropak 150 connector for the driver and passenger SIABs.  Personnel at GM's plant in Lansing Delta Township ("LDT") expressed concern with respect to using that connector because the orientation required the operator to reach in and behind the connector to install the connector position assurance clip.[4]  The blind installation and limited hand clearance prompted LDT to issue Problem Resolution Tracking System ("PRTS") N208096 so that it could meet

---

[2] GM-MDL2543-000698574, sheet 2, row 1686.

[3] GM-MDL2543-402353770.

[4] GM-MDL2543-000698574, sheet 2, row 1686.

production requirements.[5]  To meet these requirements, GM replaced the Delphi Metropak

connecter with a two way connector that was easier to connect—it could be locked with a one-

handed single motion.[6]

78.    But in June 2008, GM found that even after corrections had been made to prevent

claims related to wire routing and terminal crimping, there were still significant SIAB warranty

claims for May 2008-built vehicles.[7]

79.    GM knew that, from September 2, 2008 through September 16, 2008, three pairs

of failed parts were analyzed by supplier JST,[8] which concluded that the issue was fretting

corrosion.[9]  A GM current production PRTS opened in October 2008 confirmed that the issue

was indeed fretting corrosion.[10]  GM Problem Resolution Process Engineer Vinod Katothia

found that fretting corrosion of non-noble metals (tin in this case) is the result of the continual

rupture of oxide films on the contact surfaces caused by motion of the contact interface.[11]

80.    In November 2008, GM released a field service "rework" for MY 2008

vehicles.[12]  GM dealers were advised to clear the terminal of debris and apply Nyogel 760G, a

grease that seals electrical contacts from oxygen, moisture, aggressive gasses and other hostile

elements.  No action was taken for MY 2009 vehicles.

81.    Thus, before the bankruptcy Sale, GM knew that in 2008 there had been an

increase in warranty claims for airbag service on certain of its vehicles and determined it was due

---

[5] GM-MDL2543-402353770.

[6] GM-MDL2543-000698574, sheet 2, row 1686; GM-MDL2543-303352291 (EWO CSXTJ); GM-MDL2543-303352291 (Supply Contract).

[7] GM-MDL2543-402353770.

[8] GM-MDL2543-304666870.

[9] *Id.*

[10] GM-MDL2543-300128031.

[11] *Id.* at p.11.

[12] GM-MDL2543-302802992 (TSB 08-09-41-011).

to increased resistance in airbag wiring.  GM further knew that a September 2008 analysis of the

tin connectors revealed that corrosion and wear to the connectors was causing the increased

resistance in the airbag wiring.  GM knew that  a technical service bulletin had been issued on

November 25, 2008, for 2008-2009 Buick Enclave, 2009 Chevy Traverse, 2008-2009 GMC

Acadia, and 2008-2009 Saturn Outlook models, instructing dealers to repair the defect by using

Nyogel grease, securing the connectors, and adding slack to the line.  Finally, GM had also

begun the transition back to gold-plated terminals in certain vehicles and suspended all

investigation into the defective airbag wiring without taking further action.[13]

82.    Despite this clear knowledge of the defect, GM failed to take appropriate remedial

action at any time prior to the bankruptcy Sale.

### IV.    THE POWER STEERING DEFECT

83.    Between 2003 and 2010, over 1.3 million GM and New GM vehicles in the

United States were sold with a safety defect that causes the vehicle's electric power steering to

suddenly fail during ordinary driving conditions and revert back to manual steering, requiring

greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries

(the "Power Steering Defect").   Approximately 1 million of these vehicles were manufactured

and sold by GM.

84.    The affected vehicles are MY 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-

2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2009

Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura vehicles.  All of these recalls

were subject to Safety Recall No. 14-V-153.

---

[13] *See* New GM Notification Campaign No. 14V-118 dated March 31, 2014, at 1-2.

85.     In a March 28, 2014 letter to NHTSA, New GM described the Power Steering
Defect as follows:  "The subject vehicles equipped with electric power steering (EPS) may
experience a sudden loss of power steering assist that could occur at any time while driving."
Thus, all models involved in Safety Recall No. 14-V-153 have a common defect.

86.     New GM internally described the *effect* of the defect as follows:

> The Driver Information Center (DIC) displays "PWR STRG", a
> diagnostictrouble code is set, and the power steering assist is lost.  A
> chime is momentarily activated to alert the driver to the DIC message.
> Steering control is maintained, although greater driver effort is required at
> low vehicle speeds.  Typically, at the next ignition cycle, power assist is
> regained and the DIC message is off.

In its March 28, 2014 letter to NHTSA, New GM acknowledged that steering that requires
greater driver effort at low vehicle speeds "could result in an increased risk of a crash." Thus,
the effect of the defect is the same for all models involved in Safety Recall No. 14-V-153.

87.     As with the ignition switch defects and many of the other defects that led to
recalls in 2014, GM was aware of the Power Steering Defect but never took anything
approaching full remedial action at any time prior to the bankruptcy Sale.

88.     In 2003, GM began receiving customer complaints regarding loss of power
steering in Ions, and in 2004, GM instituted a "Customer Satisfaction program" for 2004 Malibus
in which dealers were instructed to replace the steering column if a customer complained.
Despite acknowledging the problem, GM did not initiate any recall.

89.     In response to a NHTSA Preliminary Investigation into potential Power Steering
Defect in the 2005-2006 Pontiac G6, GM extended warranty coverage for the 2005-06 G6 and
2005 Malibu and Malibu Maxx to replace the steering column assembly.  But GM initiated no
recall.

90.     NHTSA has linked approximately 12 crashes and 2 injuries to the Power Steering

Defect in the Ions.  The first injury was reported in May 2007, and was known to GM.

91.     In September 2011, after NHTSA began to make inquiries about the safety of the

Saturn Ion, New GM acknowledged that it had received almost 3,500 customer reports claiming

a sudden loss of power steering in 2004-2007 Ion vehicles.  Many of those were received by GM

prior to the bankruptcy Sale.

92.     By the time New GM finally recalled the Saturn Ion in March 2014, NHTSA had

received more than 1,200 complaints about the vehicle's power steering—many of them during

the time of GM.

93.     Despite its knowledge of this defect, GM failed to initiate a recall or take other

necessary remedial measures at any time prior to the bankruptcy Sale.

## V.    OTHER DEFECTS PLAGUED DOZENS OF MODELS OF GM VEHICLES

94.     In addition to the Defective GM Vehicles at issue in this Proof of Claim, and the

Delta Ignition Switch Vehicles at issue in the Proof of Claim field by Patricia Barker, GM sold

vehicles with dozens of other defects—many of which were known to and concealed by GM, and

remained concealed until New GM conducted a parade of recalls in 2014.

95.     In many cases, the available evidence suggests that GM was aware of the defects.

In any event, the defects are the product of GM's systemic valuation of cost-cutting and

devaluation of safety, making it likely that GM was aware of each of the following defects

summarized below.

A.    **Ignition Lock Cylinder Defect In Vehicles Also Affected By The Delta Ignition
Switch Defect.**

96.    On April 9, 2014, New GM recalled 2,191,014 GM-branded vehicles with faulty
ignition lock cylinders, including approximately 1.6 million vehicles sold by GM.[14]  Though the
vehicles are the same as those affected by the Delta Ignition Switch Defect,[15] the lock cylinder
defect is distinct.

97.    In these vehicles, faulty ignition lock cylinders can allow removal of the ignition
key while the engine is not in the "off" position (the "Ignition Lock Cylinder Defect").  If the
ignition key is removed when the ignition is not in the "off" position, unintended vehicle motion
may occur.  That motion could cause a crash and injury to the vehicle's occupants or pedestrians.
Some of the vehicles with faulty ignition lock cylinders may fail to conform to FMVSS number
114, "*Theft Prevention and Rollaway Prevention*."[16]

98.    According to New GM's Chronology that it submitted to NHTSA on April 23,
2014, the Ignition Lock Cylinder Defect recall arose out of the notorious recalls for the Delta
Ignition Switch Defect in the Chevrolet Cobalt, Chevrolet HHR, Pontiac G5, Pontiac Solstice,
Saturn ION, and Saturn Sky vehicles.[17]

99.    New GM noted several hundred instances of potential key pullout issues in
vehicles covered by the previous ignition switch recalls, and specifically listed 139 instances
identified from records relating to customer and dealer reports to GM call centers, 479 instances
identified from warranty repair data, 1 legal claim, and 6 instances identified from NHTSA
vehicle owner questionnaire information.  New GM investigators also identified 16 roll-away

---

[14] New GM Letter to NHTSA dated April 9, 2014.

[15] Namely, MY 2005-2010 Chevrolet Cobalts, 2006-2011 Chevrolet HHRs, 2007-2010 Pontiac G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys.  *See id.*

[16] New GM Notice to NHTSA dated April 9, 2014, at 1.

[17] *See* Attachment B to New GM's letter to NHTSA dated April 23, 2014 ("Chronology").

instances associated with the key pullout issue from records relating to customer and dealer reports to GM call centers and legal claims information.

100.    New GM also considered the possibility that some vehicles may have experienced key pullout issues at the time they were manufactured by GM, based on information that included the following:  (a) a majority of instances of key pullouts that had been identified in the recall population were in early-year Saturn Ion and Chevrolet Cobalt vehicles, and in addition, repair order data indicated vehicles within that population had experienced a repair potentially related to key pullout issues as early as 47 days from the date on which the vehicle was put into service; and (b) an engineering inquiry known within GM as a Problem Resolution related to key pullout issues was initiated in June 2005, which resulted in an engineering work order to modify the ignition cylinder going forward.

101.    A majority of the key pullout instances identified involved MY 2003-2004 Saturn Ion and MY 2005 Chevrolet Cobalt vehicles.  An April 3, 2014 New GM PowerPoint identified 358 instances of key pullouts involving those vehicles.

102.    In addition, with respect to early-year Saturn Ion and Chevrolet Cobalt vehicles, the April 3 2014 Decision Committee meeting PowerPoint materials discussed the number of days that elapsed between the "In Service Date" of those vehicles (the date they first hit the road) and the "Repair Date."  The April 3 PowerPoint stated that, with respect to the MY 2003 Saturn Ion, a vehicle was reported as experiencing a potential key pullout repair as early as 47 days from its "In Service Date;" with respect to the MY 2004 Saturn Ion, a vehicle was reported as experiencing a potential key pullout repair as early as 106 days from its "In Service Date;" with respect to the MY 2005 Chevrolet Cobalt, a vehicle was reported as experiencing a potential key pullout repair as early as 173 days from its "In Service Date;" and with respect to the MY 2006

Chevrolet Cobalt, a vehicle was reported as experiencing a potential key pullout repair as early as 169 days from its "In Service Date." The length of time between the "In Service Date" and the "Repair Date" suggested that these vehicles were defective at the time of manufacture.

103.    The PowerPoint at the April 3, 2014 Decision Committee meeting also discussed a Problem Resolution that was initiated in June 2005 which related to key pullout issues in the Chevrolet Cobalt (PRTS N 183836). According to PRTS N 183836: "Tolerance stack up condition permits key to be removed from lock cylinder while driving." The "Description of Root Cause Investigation Progress and Verification" stated, "[a]s noted a tolerance stack up exists in between the internal components of the cylinder." According to a "Summary," "A tolerance stack up condition exists between components internal to the cylinder which will allow some keys to be removed." The Problem Resolution identified the following "Solution": "A change to the sidebar of the ignition cylinder will occur to eliminate the stack-up conditions that exist in the cylinder."

104.    In response to PRTS N 183836, GM issued an engineering work order to "[c]hange shape of ignition cylinder sidebar top from flat to crowned."

105.    According to the work order: "Profile and overall height of ignition cylinder sidebar [will be] changed in order to assist in preventing key pullout on certain keycodes. Profile of sidebar to be domed as opposed to flat and overall height to be increased by 0.23mm."

106.    According to PRTS N 183836, this "solution fix[ed] the problem" going forward. An entry in Problem Resolution made on March 2, 2007 stated: "There were no incidents of the key coming out of the ignition cylinder in the run position during a review of thirty vehicles. . . ." A "Summary" in Problem Resolution stated: "Because there were no incidents of the key coming out of the ignition cylinder in the run position during a review of thirty vehicles[,] this

PRTS issue should be closed."  PRTS N 183836 was the only PRTS discussed at the April 3,

2014, Decision Committee meeting, although it is not the only engineering or field report

relating to potential key pullout issues.

107.    This data led the Decision Committee to conclude that MY 2003-2004 Saturn Ion

vehicles and 2005 and some MY 2006 Chevrolet Cobalt vehicles failed to conform to FMVSS

number 114.  In addition, the Decision Committee concluded that a defect related to motor

vehicle safety existed, and decided to recall all vehicles covered by the Ignition Switch Defect

recalls to prevent unintended vehicle motion potentially caused by key pullout issues that could

result in a vehicle crash and occupant or pedestrian injuries.  For vehicles that were built with a

defective ignition cylinder that have not previously had the ignition cylinder replaced with a

redesigned part, the recall called for dealers to replace the ignition cylinder and provide two new

ignition/door keys for each vehicle.

**B.      Ignition Lock Cylinder Defect Affecting Over 200,000 Additional GM Vehicles.**

108.    On August 7, 2014, New GM recalled 202,155 MY 2002-2004 Saturn Vue

vehicles.[18]  In the affected vehicles, the ignition key can be removed when the vehicle is not in

the "off" position.[19]  If this happens, the vehicle can roll away, increasing the risk for a crash and

occupant or pedestrian injuries.[20]

109.    Following New GM's April 9, 2014 recall announcement regarding ignition

switch defects, New GM reviewed field and warranty data for potential instances of ignition

cylinders that permit the operator to remove the ignition key when the key is not in the "off"

---

[18] *See* August 7, 2014 Letter from New GM to NHTSA.

[19] *Id.*

[20] *Id.*

position in other vehicles outside of those already recalled.[21]  New GM identified 152 reports of

vehicle roll away and/or ignition keys being removed when the key is not in the "off" position in

the MY 2002-2004 Saturn Vue vehicles.[22]

110.    After reviewing this data with NHTSA on June 17, 2014, July 7, 2014, and

July 24, 2014, New GM instituted a safety recall on July 31, 2014.[23]

**C.    Front Passenger Airbag Defect.**

111.    On March 17, 2014, New GM issued a noncompliance recall of 303,013 MY

2009-2014 GMC Savana and Chevrolet Express vehicles with a front passenger airbag defect, an

indeterminate number of which were manufactured by GM and sold prior to the Bar Date in

GM's bankruptcy.[24]

112.    In the affected vehicles, in certain frontal impact collisions below the airbag

deployment threshold, the panel covering the airbag may not sufficiently absorb the impact of

the collision (especially given the passenger-side airbag housing is plastic).[25]  These vehicles

therefore do not meet the requirements of FMVSS number 201, "Occupant Protection in Interior

Impact."[26]

**D.    Safety Defects Of The Seat Belt Systems In GM Vehicles.**

**1.    Seat belt connector cable defect.**

113.    On May 20, 2014, New GM issued a safety recall for nearly 1.4 million MY

2009-2014 Buick Enclave, 2009-2014 Chevrolet Traverse, 2009-2014 GMC Acadia, and 2009-

2010 Saturn Outlook vehicles with a dangerous safety belt defect.

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *See* March 31, 2014 Letter from New GM to NHTSA.

[25] *Id.*

[26] *Id.*

114.    In the affected vehicles, "[t]he flexible steel cable that connects the safety belt to the vehicle at the outside of the front outboard seating positions can fatigue and separate over time as a result of occupant movement into the seat.  In a crash, a separated cable could increase the risk of injury to the occupant."[27]

### 2.    Seat belt retractor defect.

115.    On June 11, 2014, New GM recalled 28,789 MY 2004-2011 Saab 9-3 Convertible vehicles with a seat belt retractor defect.

116.    In the affected vehicles, the driver's side front seat belt retractor may break, causing the seat belt webbing spooled out by the user not to retract.[28]  In the event of a crash, a seat belt that has not retracted may not properly restrain the seat occupant, increasing the risk of injury to the driver.[29]

### E.    Safety Defects Affecting The Brakes In GM Vehicles.

### 1.    Brake light defect.

117.    On May 14, 2014, New GM issued a safety recall of approximately 2.4 million MY 2004-2012 Chevrolet Malibu, 2004-2007 Malibu Maxx, 2005-2010 Pontiac G6, and 2007-2010 Saturn Aura vehicles with a dangerous brake light defect.

118.    In the affected vehicles, the brake lamps may fail to illuminate when the brakes are applied or illuminate when the brakes are not engaged; the same defect can disable cruise control, traction control, electronic stability control, and panic brake assist operation, thereby increasing the risk of collisions and injuries.[30]

---

[27] *See* New GM Notice to NHTSA dated May 19, 2014, at 1.

[28] *See* New GM's June 11, 2013 Letter to NHTSA.

[29] *See id.*

[30] *See* New GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.

119.    Once again, GM knew of the dangerous brake light defect for years but did not take anything approaching the requisite remedial action.

120.    According to New GM, the brake defect originates in the Body Control Module connection system.  "Increased resistance can develop in the [Body Control Module] connection system and result in voltage fluctuations or intermittency in the Brake Apply Sensor (BAS) circuit that can cause service brakes lamp malfunction."[31]  The result is brake lamps that may illuminate when the brakes are not being applied and may not illuminate when the brakes are being applied.[32]

121.    The same defect can also cause the vehicle to get stuck in cruise control if it is engaged, or cause cruise control to not engage, and may also disable the traction control, electronic stability control, and panic-braking assist features.[33]

122.    New GM now acknowledges that the brake light defect "may increase the risk of a crash."[34]

123.    As early as September 2008, NHTSA opened an investigation for MY 2005-2007 Pontiac G6 vehicles involving allegations that the brake lights may turn on when the driver does not depress the brake pedal and may **not** turn on when the driver **does** depress the brake pedal.[35]

124.    During an investigation of the brake light defect in 2008, GM discovered elevated warranty claims for the brake light defect for MY 2005 and 2006 vehicles built in January 2005, and found "fretting corrosion in the [Body Control Module] C2 connector was the root cause" of

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.* at 2.

the problem.[36]  GM and its part supplier Delphi decided that applying dielectric grease to the

[Body Control Module] C2 connector would be "an effective countermeasure to the fretting

corrosion."[37]  Beginning in November 2008, the Company began applying dielectric grease in its

vehicle assembly plants.[38]

125.    On December 4, 2008, GM issued a Technical Service Bulletin recommending

the application of dielectric grease to the Body Control Module C2 connector for the MY 2005-

2009 Pontiac G6, 2004-2007 Chevrolet Malibu/Malibu Maxx, 2008 Malibu Classic, and 2007-

2009 Saturn Aura vehicles.[39]  One month later, in January 2009, GM recalled only a small subset

of the vehicles with the brake light defect—8,000 MY 2005-2006 Pontiac G6 vehicles built

during the month of January 2005.[40]

126.    Not surprisingly, the brake light problem was far from resolved.

127.    GM sat on and concealed its knowledge of the brake light defect for the remainder

of its corporate existence, and did not even consider available countermeasures (other than the

application of grease that proved ineffective).

**2.    Reduced brake performance defect.**

128.    On July 28, 2014, New GM recalled 1968 MY 2009-2010 Chevrolet Aveo and

2009 Pontiac G3 vehicles.[41]  Affected vehicles may contain brake fluid which does not protect

against corrosion of the valves inside the anti-lock brake system module, affecting the closing

---

[36] *Id.*

[37] *Id.*

[38] *Id* at 3.

[39] *Id.* at 2.

[40] *Id.*

[41] *See* July 28, 2014 Letter from New GM to NHTSA.

motion of the valves.[42] If the anti-lock brake system valve corrodes it may result in longer brake pedal travel or reduced performance, increasing the risk of a vehicle crash.[43]

**F.    Electric Power Steering Assist Defect.**

129.    On February 4, 2015, New GM announced a recall of 69,633 MY 2006-2007 Chevrolet Malibu, 2006-2007 Chevrolet Malibu Maxx and 2006-2007 Pontiac G6 vehicles for a steering defect that may result in a sudden loss of electric power steering assist.[44]

130.    When a vehicle suffers from loss of power steering assist, the driver must exert greater effort to steer the vehicle and risk of a crash increases.

**G.    Transmission Shift Cable Defect Affecting 1.1 Million Chevrolet And Pontiac Vehicles.**

131.    On May 19, 2014, New GM issued a safety recall for more than 1.1 million MY 2007-2008 Chevrolet Saturn Aura, 2004-2008 Chevrolet Malibu, 2004-2007 Chevrolet Malibu Maxx, and 2005-2008 Pontiac G6 vehicles with dangerously defective transmission shift cables.

132.    In the affected vehicles, the shift cable may fracture at any time, preventing the driver from switching gears or placing the transmission in the "park" position.  According to New GM, "[i]f the driver cannot place the vehicle in park, and exits the vehicle without applying the park brake, the vehicle could roll away and a crash could occur without prior warning."[45]

---

[42] *Id.*

[43] *Id.*

[44] *See* NHTSA Campaign Number 15V064000.

[45] *See* New GM letter to NHTSA Re: NHTSA Campaign No. 14V-224 dated May 22, 2014, at 1.

### H.    Light Control Module Defect.

133.    On May 16, 2014, New GM issued a safety recall of 217,578 MY 2004-2008

Chevrolet Aveo vehicles with a light control module defect.[46]  New GM later updated the

number of affected vehicles to 218,000.

134.    In the vehicles, heat generated within the daytime running lamp module in the

center console in the instrument panel may melt the module and cause a vehicle fire.[47]

### I.    Electrical Short In Driver's Door Module Defect.

135.    On June 30, 2014, New GM issued a safety recall of 181,984 MY 2005-2007

Chevrolet Trailblazer, 2006 Chevrolet Trailblazer EXT, 2005-2007 Buick Rainier, 2005-2007

GMC Envoy, 2006 GMC Envoy XL, 2005-2007 Isuzu Ascender, and 2005-2007 Saab 9-7x

vehicles with a defect that can cause an electrical short in the driver's door module.[48]

136.     In the affected vehicles, an electrical short in the driver's door module may occur

that can disable the power door lock and window switches and overheat the module.  The

overheated module can then cause a fire in the affected vehicles.

### J.    Low-Beam Headlight Defect.

137.    On May 14, 2014, New GM issued a safety recall of 103,158 MY 2005-2007

Chevrolet Corvette vehicles with a low-beam headlight defect.

138.    In the affected vehicles, the underhood bussed electrical center housing can

expand and cause the headlamp low beam relay control circuit wire to bend.  When the wire is

repeatedly bent, it can fracture and cause a loss of low-beam headlamp illumination.  The loss of

---

[46] *See* May 30, 2014 Letter from New GM to NHTSA.

[47] *Id.*

[48] *See* July 2, 2014 Letter from New GM to NHTSA.

illumination decreases the driver's visibility and the vehicle's conspicuity to other motorists, increasing the risk of a crash.

**K.**     **Fuel Pump Module Defect.**

139.     On September 18, 2012 New GM recalled a total of 40,859 vehicles, including certain 2007 MY Chevrolet Equinox and Pontiac Torrent vehicles originally sold or currently registered in Arizona, California, Nevada, and Texas; MY 2007 Chevrolet Cobalt, Pontiac G5, and Saturn ION vehicles originally sold or currently registered in Arizona, California, Florida, Nevada, or Texas; MY 2008 Chevrolet Cobalt and Pontiac G5 vehicles originally sold or currently registered in Arizona; and MY 2009 Chevrolet Cobalt and Pontiac G5 vehicles originally sold or currently registered in Arkansas, Arizona, California, Nevada, Oklahoma, or Texas.

140.     In affected vehicles, the plastic supply or return port on the fuel pump module may crack, which may cause a fuel leak. The customer may notice a fuel odor while the vehicle is being driven or after it is parked. If the crack becomes large enough, fuel may be observed dripping onto the ground and vehicle performance may be affected. If an ignition source were present, a fire could occur.

**L.**     **Overloaded Feed Defect.**

141.     On July 2, 2014, New GM recalled 9,371 MY 2007-2011 Chevrolet Silverado HD and 2007-2011 GMC Sierra HD vehicles with an overloaded feed defect.

142.     In the affected vehicles, an overload in the feed may cause the underhood fusible link to melt due to electrical overload, resulting in potential smoke or flames that could damage the electrical center cover and/or the nearby wiring harness conduit.

### M.    Headlamp Driver Module Failure.

143.    On October 25, 2014, New GM announced a recall of 273,182 vehicles, including the MY 2006-2009 Buick LaCrosse, 2006-2007 Buick Rainier, Chevrolet Trailblazer, GMC Envoy, 2006 Chevrolet Trailblazer EXT, GMC Envoy XL, 2006-2008 Isuzu Ascender, and Saab 9-7x vehicles for headlamp driver module failure.[49]  The number of affected vehicles was later modified to 269,586.

144.    In the affected vehicles, the headlamp driver module can overheat and fail, causing the headlamps and daytime running lights to fail, reducing the driver's ability to see the roadway and reducing visibility of the vehicle to oncoming traffic.

### N.    Valve Cover Gasket Defect.

145.    On April 6, 2015, New GM announced a recall of 1207 MY 2004 Buick Regal, 2004 Chevrolet Impala and 2004 Chevrolet Monte Carlo vehicles for a valve cover gasket defect.[50]  New GM later increased the number of affected vehicles to 50,948, and noted that this also includes 2004 Pontiac Grand Prix vehicles.

146.    In these vehicles the valve cover gasket may leak causing engine oil to drip onto the exhaust manifold increasing the risk of fire.

### VI.    GM'S PRODUCTION OF DEFECTIVE GM VEHICLES AND ITS SERIAL FAILURE TO CONDUCT NECESSARY SAFETY RECALLS STEMMED FROM ITS SYSTEMIC DEVALUATION AND DISREGARD OF SAFETY ISSUES IN ITS VEHICLES

147.    In a 2008 internal presentation, GM instructed its employees to avoid using the following judgment words:[51]

Always                      detonate                      maniacal

---

[49] *See* NHTSA Campaign Number 14V755000.

[50] *See* NHTSA Campaign Number 15V201000.

[51] NHTSA Consent Order at Exhibit B, 2008 Q1 Interior Technical Learning Symposium.

| | | |
|---|---|---|
| annihilate | disemboweling | mutilating |
| apocalyptic | enfeebling | never |
| asphyxiating | evil | potentially-disfiguring |
| bad | evicscerated [*sic*] | power [*sic*] keg |
| Band-Aid | explode | problem |
| big time | failed | safety |
| brakes like an "X" car | flawed | safety related |
| cataclysmic | genocide | serious |
| catastrophic | ghastly | spontaneous combustion |
| Challenger | grenadelike | startling |
| chaotic | grisly | suffocating |
| Cobain | gruesome | suicidal |
| condemns | Hindenburg | terrifying |
| Corvair-like | Hobbling | Titanic |
| crippling | Horrific | tomblike |
| critical | impaling | unstable |
| dangerous | inferno | widow-maker rolling sarcophagus (tomb or coffin) |
| deathtrap | Kevorkianesque | Words or phrases with biblical connotation |
| debilitating | lacerating | |
| decapitating | life-threatening | |
| defect | maiming | |
| defective | mangling | |

148.    In Orwellian fashion, GM instructed its employees to substitute euphemisms in place of accurate descriptions of material safety defects such as the ignition switch defects and the other defects discussed herein.  To avoid disclosure of the material safety risks, and furtherance of the cover-up, GM instructed its employees to make the following word substitutions:

- "Issue, Condition [or] Matter" instead of "**Problem**"

- "Has Potential Safety Implications" instead of "**Safety**"

- "Does not perform to design" instead of "**Defect/Defective**"[52]

149.    GM knew its Delta Ignition Switch Vehicles and other Defective GM Vehicles were killing and maiming GM customers, and that it had sold and was selling millions of

---

[52] NHTSA Consent Order at Exhibit B (emphasis added).

vehicles with a plethora of other safety defects, yet at the same time it instructed its employees to avoid the words "defect" or "safety." Instead of publicly admitting the dangerous safety defects in the Defective GM Vehicles, GM repeatedly blamed accidents on driver error.

150.    GM's censorship of the words necessary to discuss and remediate safety defects was emblematic of its systematic denigration of safety. Additional examples of GM's cavalier approach to safety follow.

151.    GM made very clear to its personnel that cost-cutting was more important than safety, deprived its personnel of necessary resources for spotting and remedying defects, trained its employees not to reveal known defects, and rebuked those who attempted to "push hard" on safety issues.

152.    "[T]here was resistance or reluctance to raise issues or concerns in the GM culture." The culture, atmosphere and supervisor response at GM "discouraged individuals from raising safety concerns."[53] As a result, "GM personnel failed to raise significant issues to key decision-makers."[54]

153.    The focus on cost-cutting at GM created major disincentives to personnel who might wish to address safety issues. For example, those responsible for a vehicle were responsible for its costs, but if they wanted to make a change that incurred costs and affected other vehicles, they also became responsible for the costs incurred in the other vehicles.

154.    As another cost-cutting measure at GM, parts were sourced to the lowest bidder, even if they were not the highest quality parts.[55]

---

[53] *Id*. at 252.

[54] *Id*. at 253.

[55] Valukas Report at 251.

155.    The focus of GM on cost-cutting also made it harder for personnel to discover safety defects, as in the case of the "TREAD Reporting team."

156.    GM used its TREAD database (known as "TREAD") to store the data required to be reported quarterly to NHTSA under the TREAD Act.[56]   TREAD was the principal database used by GM to track incidents related to its vehicles.[57]   Generally, the TREAD Reporting team consisted of employees who conducted monthly searches and prepared scatter graphs to identify spikes in the number of accidents or complaints with respect to various GM vehicles.  The TREAD Reporting team reports went to a review panel and sometimes spawned investigations to determine if any safety defect existed.[58]

157.    GM severely understaffed the TREAD Reporting team and did not provide it with the resources to obtain the advanced data mining software to better identify and understand potential defects, thereby making it far less likely that safety defects would be remediated.[59]

158.    So institutionalized was the "phenomenon of avoiding responsibility" at GM that the practice was given a name:  "the 'GM salute,'" which was "a crossing of the arms and pointing outward towards others, indicating that the responsibility belongs to someone else, not me."[60]

159.    Similarly, GM had a siloed culture, designed to cabin information relating to potential safety defects rather than reveal such information.

---

[56] *Id*. at 306.

[57] *Id*.

[58] *Id*. at 307.

[59] *Id*. at 307-308.

[60] Valukas Report at 255.

160.    Similar to the "GM salute" was a related phenomenon, "known as the 'GM nod,'"
which was "when everyone nods in agreement to a proposed plan of action, but then leaves the
room with no intention to follow through, and the nod is an empty gesture."[61]

161.    According to the Valukas Report, part of the failure to properly correct the Delta
Ignition Switch Defect was due to problems with GM's organizational structure[62] and a
corporate culture that did not care enough about safety.[63]   Other culprits included a lack of open
and honest communication with NHTSA regarding safety issues,[64] and the improper conduct and
handling of safety issues by lawyers within GM's Legal Staff.[65]   Claimant believes and
thereupon alleges that this same systematic denigration of safety issues fostered the manufacture
and failure to recall the Defective GM Vehicles.

## VII.    GM PROMOTED ALLOF ITS VEHICLES AS SAFE, RELIABLE AND HIGH QUALITY—INCLUDING THE DEFECTIVE GM VEHICLES

162.    Throughout its history, GM regularly used print media, press releases, and
television and video media to represent its vehicles as safe, reliable, quality products that provide
great value to purchasers, and retain their value over time better than other manufacturers'
vehicles.   GM also used these media to present itself as an honest, above-board, values-oriented
company with integrity. In truth, however, GM was concealing serious safety hazards and
endangering its own customers.

163.    A GM print advertisement exclaimed in bold print:   "**At GM, Safety Isn't One
Thing, It's Everything**."[66]

---

[61] Valukas Report at 256.

[62] *Id*. at 259-260.

[63] *Id*. at 260-61.

[64] *Id*. at 263.

[65] *Id*. at 264.

[66] GM-MDL2543-301025786.

164.    A 1988 GM commercial stated: "GM meets your challenge.  With outstanding quality and great value . . . .  That's leadership, that's GM."[67]

165.    In 1989, a GM commercial represented "Fact:  GM cars have held their resale value better than any other U.S. make."[68]



166.    A 1990 GM Pontiac commercial stated:  "GM is putting quality on the road."[69]



---

48

167.    A 1998 General Motors Commercial proclaimed that GM cars were reliable and

safe:

> We are fans and nothing keeps us from the game.  We need cars
> and trucks as reliable as we are.  Season after season.  And when
> the game is over, we need to know that what got us there will also
> get us safely home.  Delivering cars and trucks that fans count on
> is what makes us General Motors.[70]

168.    GM explained that the 2003 Saturn ION had "surprising levels of safety" in the

car's Product Information:  "Bringing a new charge into the small-car segment, the 2003 Saturn

ION sets itself apart from competitors with innovative features, unique personalization

opportunities and surprising levels of safety, sophistication and fun."[71]

169.    On July 1, 2003, GM issued a press release explaining that the 2004 Impala

"offers a comprehensive safety package, solid body structure, room for five passengers, plenty of

cargo space, a surprising number of amenities for the price, and a track record of outstanding

quality, reliability and durability."[72]

170.    In a July 1, 2003 press release GM stated that "[e]nhanced handling and

acceleration are always paramount for Pontiac enthusiasts, and these, plus added safety and

comfort measures, make the 2004 Pontiac lineup one of the most exciting in the division's

history."[73]

171.    On July 1, 2003, GM issued a press release about the 2004 Chevrolet Monte Carlo

that explained that "[a]ttention to safety and security is also key to Monte Carlo's success."[74]

---

[70] https://www.youtube.com/watch?v=Dt12Gti12iA.

[71] https://archives.media.gm.com/division/2003_prodinfo/03_saturn/03_Ion/index.html.

[72] https://archives.media.gm.com/division/2004_prodinfo/chevrolet/cars/impala/index.html.

[73] https://archives.media.gm.com/division/2004_prodinfo/pontiac/pdf/04_Pontiac_Overview.pdf.

[74] https://archives.media.gm.com/division/2004_prodinfo/chevrolet/cars/monte_carlo/ index.html.

172.    On July 1, 2003, GM issued a press release about the 2004 Pontiac Grand Prix

that explained that "[s]afety is always a high priority for Grand Prix."[75]

173.    In its Product Information for the 2003 Chevrolet Malibu, GM explained that:

> [S]ince 1997, the new Malibu has offered buyers excellent
> performance, safety and comfort in a trim, stylish package.  For
> 2003, Chevrolet Malibu remains a smart buy for those who want a
> well-equipped midsize sedan at an attractive price.…  Designed for
> individuals or families with high expectations of quality,
> reliability, safety, driving pleasure, and affordability, the Malibu
> appeals to domestic and import owners.[76]

174.    On July 1, 2003, GM issued a press release about the 2004 Saturn Ion explaining

that:

> The ION sedan and quad coupe are designed to carry on the Saturn
> tradition of being at the top of the class when it comes to safety
> and security.  Theworld-class structural design provides the
> foundation for this focus on safety.  The steel spaceframe's front
> and rear crush zones help absorb the energy of a crash while
> protecting the integrity of the safety cage.[77]

175.    On October 4, 2003, GM's website stated that:

> Motor vehicle safety is important to GM and to our customers.  It
> is at the top of mind in many of the thousands of decisions that are
> made every day in engineering and manufacturing today's cars,
> trucks, and SUVs/ Motor vehicle safety is a significant public
> health concern in the U.S., and GM is proud to partner with
> government agencies, emergency responders and health care
> workers in addressing that challenge."[78]

---

[75] https://archives.media.gm.com/division/2004_prodinfo/pontiac/grand_prix/index.html.

[76] https://archives.media.gm.com/division/2003_prodinfo/03_chevrolet/03_malibu/ index.html.

[77] https://archives.media.gm.com/division/2004_prodinfo/saturn/ion/index.html.

[78] http://web.archive.org/web/20031004014908/http://www.gm.com/automotive/vehicle
_shopping/suv_facts/100_safety/index.html.



176.    In 2004, GM's marketing campaign incorporated a new phrase "Only GM,"
which highlighted safety features such as electronic stability control.  GM stated:  "We want to
bring this kind of safety, security and peace-of-mind to all of our customers because it's the right
thing to do, and because only GM can do it."

**Only GM**

For example, we recently launched a new corporate adver-
tising campaign under the theme, "Only GM." It's part of
an effort to use the GM brand more aggressively and with
more purpose, to show that we're leading the industry in
ways that only GM can.

The "Only GM" campaign began by highlighting our plans to
equip all our cars and trucks sold to retail customers in the
United States and Canada with OnStar and StabiliTrak, GM's
electronic stability control system. We want to bring this kind
of safety, security and peace-of-mind to all of our customers
because it's the right thing to do, and because only GM can
do it. We also want potential customers to know that GM
offers them great value, and that buying GM matters. (For
more details, go to *onlygm.com*.)

(GM's 2004 Annual Report, p. 6.)

177.    And in the same Report, under the banner "Peace of mind," GM represented that

"[o]nly GM can offer its customers the assurance that someone is looking out for them and their

families when they're on the road," and that "[t]his commitment to safety makes GM the only

automobile manufacturer able to offer a full range of cars, trucks and SUVs that provide safety

protection before, during and after vehicle collisions."



(GM's 2004 Annual Report, p. 22.)

178.    On May 10, 2004, GM's website announced that its

> aim is to improve motor vehicle safety for customers, passengers,
> and other motorists.  Our customers expect and demand vehicles
> that help them to avoid crashes and reduce the risk of injury in case
> of a crash.  We strive to exceed these expectations and to protect
> customers and their families while they are on the road.

The website continued, "GM is committed to continuously improving the crashworthiness and

crash avoidance of its vehicles, and we support many programs aimed at encouraging safer

motor vehicle use…."[79]

179.    On June 4, 2004, GM's website stated that "[v]ehicle safety is paramount at GM,

and we constantly strive to make our cars and trucks safe.  We also continue our support for

groups such as the National SAFE KIDS Campaign, and a number of programs aimed at

encouraging safer motor vehicle use."[80]

180.    GM touted safety for the Malibu and Malibu Maxx, stating in a brochure that

"Safety is built into the heart of the all-new 2004 Chevrolet Malibu sedan and Malibu Maxx

extended sedan," specifically highlighting the airbags.[81]

181.    GM's June 4, 2004, website published a message from its CEO, Rick Wagoner,

on corporate responsibility.  Mr. Wagoner wrote:

> At a time when current events remind us of the critical importance
> of corporate responsibility and the value of sustainable
> development, we at General Motors are fortunate to have inherited
> a legacy of doing business the right way.  It's a great asset.  And,
> it's a huge obligation … one we take very seriously.  What we call
> "winning with integrity" is not an optional or occasional behavior
> at GM.  Integrity is one of our core values, and a way of doing
> business that helps us realize our company's full potential.…In
> short, "winning with integrity" is much more than a one-time

---

[79] http://web.archive.org/web/20040510221647/http://www.gm.com/company/
gmability/safety/?section=Company&layer=GMAbility2&action=open&page=1.

[80] http://web.archive.org/web/20040604055658/http://www.gm.com/company/
gmability/sustainability/reports/03/safety.html.

[81] GM-MDL2543-302128438.

exercise at GM. It's how we work every day. It's a philosophy that transcends borders, language, and culture, and something we promote by creating an environment within our company that supports, and demands, proper business conduct.[82]

182.    In its 2005 Annual Report, GM stated: "We are driving quality and productivity even further." "Lasting quality—That is why restoring confidence in quality is just as important as design in rebuilding our brands…. We are focused on providing our customers with the best quality experience over the lifetime of GM ownership."



183.    The 2005 GMC Yukon, Tahoe, and Cadillac Escalade were touted as "distinctly designed packages that lead the segment in performance, safety, efficiency and capability."[83]

184.    On September 9, 2005, GM's website described its safety technology as "Helping You Avoid a Crash" and "Giving the driver information never possible before."[84]

---

[82] http://web.archive.org/web/20040604055939/http://www.gm.com/company/gmability/sustainability/reports/03/wagoner_message.html.

[83] GM's 2005 Annual Report, p. 23.



185.    At the same time GM announced what it called the next big step in safety:[85]

> No matter what vehicle you drive, your safety is vital.  GM is
> looking out for you—you deserve that peace of mind on the road.
> Which is why at GM, we've taken the next big step in our
> commitment to provide more customers with more safety and
> security.



---

[84] http://web.archive.org/web/20050909184042/http://www.gm.com/company/gmability/
safety/avoid_crash/index.html.

[85] http://web.archive.org/web/20050909225925/http://www.gm.com/company/onlygm/.

186.    A 2005 Pontiac G6 brochure makes "**SAFETY ASSURANCES,**" including standard "dual-stage front airbags."[86]  A brochure for the 2008 Pontiac G6 promised that "safety is all around you.  Standard equipment includes dual-stage frontal driver and front passenger air bags," that would—presumably—actually work.[87]

187.    In a July 12, 2006 press release regarding GM's 2007 model year lineup, GM stated:

> From an all-new family of full-size pickup trucks and SUVs to carlike crossovers to small cars and a near-complete revitalization of the Saturn portfolio, General Motors is introducing several new or significantly redesigned vehicles for the 2007 model year— stylish products that leverage GM's global resources to deliver value, brand-distinctive design character, safety, fuel efficiency, relevant technologies and quality to the North American market.[88]

188.    In an August 1, 2006 press statement for the 2007 Cadillac Lucerne, GM represented that the "Lucerne's body structure is engineered to provide maximum occupant protection and minimum intrusion under a wide range of impact conditions."[89]

189.    In an August 1, 2006 press statement for the 2007 Cadillac DTS, GM represented: "[d]esigned and engineered with occupant safety and protection in mind, the DTS reinforces Cadillac's long-standing reputation for safe occupant environments in premium vehicles."[90]

190.    GM's website on August 9, 2006, stated:[91]

MAKING VEHICLES SAFER

GM strives to make each new model safer than the one it replaces. Vehicle-based safety strategies generally fall into three categories:

---

[86] GM-MDL2543-301463441

[87] GM-MDL2543-302131852.

[88] https://archives.media.gm.com/us/gm/en/product_services/vehicles/2007/07%20 corporate%20oview.html.

[89] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lucerne/07 index.html.

[90] https://archives.media.gm.com/us/cadillac/en/product_services/r_cars/r_c_DTS/07 index.html.

[91] http://web.archive.org/web/20060809103405/http://www.gm.com/company/gmability/ sustainability/reports/05/400_products/7_seventy/471.html.

BEFORE: Collision avoidance—technologies designed to help the driver avoid potential crashes (sometimes called "active safety" technologies),

DURING: Crashworthiness—designs and technologies that help mitigate the injury potential of a crash (sometimes called "passive safety"), and

AFTER: Post-crash—systems that can help alert emergency rescue to a crash and help provide information to aid rescue specialists.

\* \* \*

GM vehicles are designed to help protect occupants in the 'first' collision, which acts to deform the vehicle structure and change the velocity of the vehicle's center of mass. Also, GM vehicles are designed to help reduce injury risk for occupants in the 'second' collision, which is between the vehicle interior as it responds to the forces imposed by object that collides with the vehicle, and the occupants.

191. GM's website on September 6, 2006, stated:[92]

Helping drivers avoid crashes and making vehicles safer is a priority for GM.

\* \* \*

Motor vehicle safety involves not only the design of the vehicle, but the manner in which it is driven, and the driving environment as well. GM is committed to researching and implementing programs and technologies that enhance the safety of vehicles. GM wants to assist drivers to operate their vehicles to avoid hazards, and to help protect occupants in the event of a vehicle crash. GM also focuses on the circumstances that occur after a crash.

GM's vehicle safety priorities are guided by analysis of the real-world experience that customers have with motor vehicles.

192. GM stated on its website in October 29, 2006 that it was a leader in automotive

safety and that its safety leadership extends as far back as the birth of GM.[93]

---

[92] http://web.archive.org/web/20060906083227/http://www.gm.com/company/gmability
/sustainability/reports/05/400_products/7_seventy/470.html.



193.    A 2006 GM brand-wide marketing brochure contained a page dedicated to safety. The page was titled:  "YOUR SAFETY AND SECURITY.  IT'S OUR PRIORITY."  GM then promised:  "General Motors is the only automotive manufacturer committed to offering a full range of cars, trucks, and SUVs with GM continuous safety:  protection before, during and—thanks to OnStar—after vehicle collisions."[94]

194.    This theme was repeated in another marketing brochure for the GM brand, touting: "OUR PRIORITY—YOUR SAFETY AND SECURITY."  GM again promised: "General Motors is the only automotive manufacturer committed to offering a full range of cars, trucks, and SUVs with GM continuous safety:  protection before, during and—thanks to OnStar—after vehicle collisions."[95]

---

[93] http://web.archive.org/web/20061029080834/http://www.gm.com/company/gmability/
safety/safety_firsts/index.html.

[94] GM-MDL2543 -301443177.

[95] GM-MDL2543-301463604; *see also* GM-MDL2543-302767597.

195.    A 2006 GMC *The Magazine* article titled "Not Just HOT AIR" discussed the importance of a vehicle's air bags.  It advised that "Your vehicle's air bags are poised to help protect you in a moment's notice."  Further: "When appropriate conditions arise, your vehicle's air bags inflate rapidly and powerfully to work with your safety belt system to help protect you in the event of a collision."[96]

196.    Safety was an express selling point in a 2006 HHR brochure touting the "HHR Selling Advantage" of "Added Safety and Security," including "enhanced airbag protection."[97] A 2006 GM press release for the HHR added that that "HHR is designed to protect occupants in the event of a crash" through such "safety features" such as "dual-stage frontal air bags."[98]  A 2007 HHR marketing brochure reiterated the GM "WE'VE GOT YOUR BACK" promise, explaining that "Chevrolet is committed to keeping you and your family safe."[99]  Marketing copy for the HHR promised that the "HHR is designed to protect occupants in the event of a crash" in ad copy from 2008 and 2009.[100]

197.    In a print ad for the 2006 Buick LaCrosse, GM represented: "Occupant safety received high priority in the design of LaCrosse—with the goal of providing excellent protection in the event of a collision."[101]

198.    The promise of "Safety" was central to a GM press release for the 2006 Saturn Outlook: "Saturn Outlook is designed to protect passengers before, during and after a crash."[102]

---

[96] GM-MDL2543-100223694.

[97] GM-MDL2543-301464481-82.

[98] GM-MDL2543-301452586.

[99] GM-MDL2543-3023158819.

[100] GM-MDL2543-301452598; GM-MDL2543-301458742.

[101] GM-MDL2543-006787272.

[102] GM-MDL2543-301451107.

199.    A marketing brochure for the 2007 Buick Lucerne promised "PROTECTION

BEYOND PROTECTION:"

> Lucerne was designed with safety and protection as top priorities.
> Helping occupants avoid serious injury in the event of a crash was
> a given.  But our engineers were committed to doing much more.
> Like helping the driver avoid crashes.…  If a crash is unavoidable,
> Lucerne's six air bags and industry leading technology will be
> there to help protect.

200.    In a video published on January 2, 2007, GM's Vice Chairman of Product

Development, Bob Lutz, stated "Saturn has always been a great brand" and that it "has

predominately been known for customer service, fair dealers, honest dealers and having happy

buyers."[103]

201.    On GM's website on January 6, 2007, Bob Lange, Executive Director, Structure

and Safety Integration, stated:

> Our aim is to improve motor vehicle safety for customers,
> passengers and other motorists.  Our customers expect and demand
> vehicles that help them to avoid crashes and reduce the risk of
> injury in case of a crash.  We strive to exceed these expectations
> and to protect customers and their families while they are on the
> road."

Further, Lange stated, "GM is committed to continuously improving the crashworthiness and

crash avoidance of its vehicles."[104]

202.    In its 2007 Annual Report, GM stated:

> In 2007, we continued to implement major improvements to our
> U.S. sales and marketing strategy.  Over the past two years, we've
> re-focused our marketing efforts to emphasize the strength and
> value of our products and brands.…

> We also continued to make progress in our long-term effort to
> improve quality.…

---

[103] https://www.youtube.com/watch?v=Kd1Kg0BBdto&list=UUxN-Csvy_9sveql5HJviDjA.

[104] http://web.archive.org/web/20070106044410/http://www.gm.com/company/gmability /safety/.

> We've also witnessed, since 2005, an 89 percent reduction in
> vehicle recall campaigns involving safety and non-compliance.

(GM 2007 Annual Report, p. 7.)

203.    Moreover, GM represented that it "actively studies trends of claims" to take

action to improve vehicle quality:

> **POLICY, WARRANTY AND RECALLS**
>     Provisions for estimated expenses related to policy and product warranties
> are made at the time products are sold. These estimates are established using
> historical information on the nature, frequency, and average cost of claims. We
> actively study trends of claims and take action to improve vehicle quality and
> minimize claims. Actual experience could differ from the amounts estimated
> requiring adjustments to these liabilities in future periods.

(GM 2007 Annual Report, p. 74.)

204.    In an August 1, 2007 press release introducing GM's 2008 lineup, Mark LaNeve,

GM North America Vice President, Vehicle Sales, Service and Marketing, stated "GM's

transformation is being driven by high-quality cars and trucks that look great, drive great, are

fuel-efficient and provide genuine value to our customers."  Further, LaNeve stated,

> No other automaker provides such a diverse lineup of cars and
> trucks that meets the needs of customers that range from college
> studies to contactors.  And our five-year, 100,000-mile powertrain
> warranty—the most comprehensive in the industry—adds even
> more value to the bottom line, demonstrating that we are putting
> our money where our mouth is on vehicle quality.[105]

205.    On August 1, 2007, GM represented that:

> The Cobalt enters the 2008 model year on the heels of a successful
> '07 model year, which introduced several significant
> enhancements, including more powerful Ecotec engines. For '08,
> the Cobalt builds on that powerful foundation with a streamlined
> model lineup and more standard safety and convenience
> equipment….",[106]

---

[105] https://archives.media.gm.com/us/gm/en/product_services/vehicles/2008/08gmna_ overview.html.

[106] https://archives.media.gm.com/us/chevrolet/en/product_services/r_cars/08%20 chevrolet%20car%20oview.html.

206.    On August 1, 2007 GM represented that "[t]he 2008 Impala reinforces the brand's value story with new features and revisions that add to its safety and efficiency, including the addition of standard StabiliTrack electronic stability control on 2LT, LTZ and SS models …."[107]

207.    In an August 1, 2007 press statement for the 2008 Buick LaCrosse, GM represented that the "LaCrosse is built with a strong 'safety cage' structure and a full-perimeter aluminum engine cradle that directs impact energy away from passengers.  Anti-lock brakes and side curtain airbags are standard on all models."[108]

208.    In an August 1, 2007 press statement for the 2008 Buick Lucerne, GM represented that the

> Lucerne's body structure is designed to provide maximum occupant protection and minimum intrusion under a wide range of impact conditions.  Active safety and handling features offered on Lucerne include a four-channel anti-lock braking system and traction control; an auto-level rear suspension that automatically adjusts the vehicle height for heavy loads; and four-channel StabiliTrack electronic stability control with brake assist, which senses emergency braking situations and boosts power as needed.[109]

209.    In an August 1, 2007, press statement for the 2008 Pontiac Grand Prix, GM represented that the

> Grand Prix's convenience and safety features are perfect for drivers who enjoy the precise handling characteristics of a sporty, family-friendly package.  The 2008 Grand Prix remains a driver's car inside and out.  The active and passive safety features on the Grand Prix include standard four-wheel disc brakes, traction control and daytime running lamps.[110]

---

[107] https://archives.media.gm.com/us/chevrolet/en/product_services/r_cars/08%20 chevrolet%20car%20oview.html.

[108] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lacrosse/ 08index.html.

[109] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lucerne/ 08index.html.

[110] https://archives.media.gm.com/us/pontiac/en/product_services/r_cars/r_c_grandprix/ index.html.

210.    A 2008 Buick Enclave brochure said, "From the outset, safety and protection were top priorities in the design of the Enclave. . . .  If a crash is unavoidable, Enclave's advanced safety technology will be there to help protect." [111]

211.    GM's website on January 15, 2008, stated "GM incorporates a total safety philosophy into each of its designs to help protect you in a collision—and keep one from occurring in the first place."[112]

212.    In February 2008, GM aired a Chevy Malibu commercial during The Grammy's which stated the Chevy Malibu was "built to last" "because safety should last a lifetime."  The commercial used images of a child being raised to adulthood, in order to convey protection and safety.[113]

213.    On its website in March of 2008, GM stated it was delivering the best cars and trucks in its 100-year history, and that it was "Obsessed with Quality."  The website also spoke of "Continuous Safety," and represented that "GM incorporates a total safety philosophy into each of its designs to help protect you in a collision—and keep one from occurring in the first place."[114]

---

[111] GM-MDL2543-303150775.

[112] http://web.archive.org/web/20080115004426/http://www.gm.com/explore/safety/.

[113] https://www.youtube.com/watch?v=EgNQ2tns0Gs.

[114] http://web.archive.org/web/20080303182635/http://www.gm.com/corporate/;
http://web.archive.org/web/20080305021951/http://www.gm.com/explore/; and
http://web.archive.org/web/20080311045525/http://www.gm.com/explore/safety.



214.    In early 2009 owner loyalty mailings, GM touted the quality and reliability of its

vehicles as well as safety:

> **Safe**.
> - 37 of our 2009 models have five-star frontal crash safety
>   ratings.
> - We offer the safety and security of OnStar, including
>   Automatic Crash Response, OnStar Vehicle Diagnostics,
>   and Turn-By-Turn Navigation.  Nobody else offers these
>   services.  Not Honda.  Not Toyota.  Not Ford.  Not
>   Chrysler.  Not Nissan.  Not Dodge.[115]

215.    Brochures for the 2009 and 2010 Cadillac CTS contain the tagline, "**THE ONLY**

**PLACE WHERE WE PLAY IT SAFE,**" claiming that "Passenger safety is one of the first and

most important considerations throughout the engineering process" and that "[o]f course, the

---

[115] GM-MDL2543-100182783 (footnotes omitted).

ultimate luxury is passenger safety. So it's needless to say that this aspect of the CTS has been
scrutinized with utmost care."[116]

216.    A marketing brochure for the 2009 Saturn VUE asked, "Can good looks keep you
Safe?" The answer: "The Saturn VUE Compact SUV. Six air bags. StabiliTrak vehicle
stability control system. OnStar. Now safety isn't a luxury."[117]

## VIII.    CLASS ALLEGATIONS

217.    Under B.R. 7023, Claimant files this Proof of Claim on behalf of herself and a
proposed Class and Subclasses initially defined below.

218.    Excluded from the Class and the Subclasses are GM, its employees, co-
conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly
owned subsidiaries or affiliates of GM; Class Counsel and their employees; the judicial officers
and their immediate family members and associated court staff assigned to this case; and all
persons within the third degree of relationship to any such persons.

## A.    The Class.

219.    Claimant alleges claims, under the consumer protection, fraudulent concealment
and unjust enrichment laws of each state and the District of Columbia (all of which are the same
or substantially similar):

> All persons in the United States who, as of November 30, 2009,
> either owned or leased a Defective GM Vehicle.

220.    "Defective GM Vehicles" include the following, provided they were owned or
leased as of November 30, 2009:

---

[116] GM-MDL2543-302127737; GM-MDL2543-301626861.
[117] GM-MDL2543-100222943.

| DEFECTIVE GM VEHICLES |
| --- |
| · 2005-2009 Buick Lacrosse |
| · 2000-2010 Chevrolet Impala |
| · 2000-2005 Cadillac Deville |
| · 2006-2010 Cadillac DTS |
| · 2006-2010 Buick Lucerne |
| · 2000-2008 Chevrolet Monte Carlo |
| · 2003-2010 Cadillac CTS |
| · 2004-2006 Cadillac SRX |
| · 1997-2005 Chevrolet Malibu |
| · 2000-2005 Pontiac Grand Am |
| · 2004-2008 Pontiac Grand Prix |
| · 1998-2002 Oldsmobile Intrigue |
| · 1999-2004 Oldsmobile Alero |
| · 2008-2010 Buick Enclave |
| · 2009-2010 Chevrolet Traverse |
| · 2008-2010 Acadia |
| · 2008-2010 Saturn Outlook |
| · 2004-2009 Chevrolet Malibu |
| · 2004-2006 Chevrolet Malibu Maxx |
| · 2009-2010 Chevrolet HHR |
| · 2010 Chevrolet Cobalt |
| · 2005-2006 and 2008-2009 Pontiac G6 |

**B.    The Defective GM Vehicle Implied Warranty Subclass.**

221.    Claimant also alleges implied claims under the substantially similar laws of the
following jurisdictions for the Defective GM Vehicle Implied Warranty Subclass on behalf of
persons with Defective GM Vehicles sold or leased as new prior to November 30, 2009:  Alaska,
Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas,
Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri,
Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North
Carolina, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota,
Texas, Utah, Virginia, West Virginia, and Wyoming.

C.      **The Defective GM Vehicle Negligence Subclass.**

222.    Claimant also alleges negligence claims under the substantially similar laws of the
following jurisdictions for the Defective GM Negligence Subclass on behalf of persons with
Defective GM Vehicles sold or leased as new prior to November 30, 2009: Arkansas, California,
Maryland, Louisiana and Ohio.

D.      **The Class And The Subclasses Meet The Requirements For Class Certification.**

223.    Individual joinder of all Class or Subclass Members is impracticable, given that
GM manufactured and sold approximately 9.8 million Defective GM Vehicles in the United
States.

224.    The Class disclaims recovery, in this Proof of Claim, for physical injury resulting
from the safety defects alleged herein.  But the increased risk of injury from the defects serves as
an independent justification for the relief sought by Claimant and the Class.

225.    The Class can be readily identified using registration records, sales records,
production records, and other information kept by GM's successor, New GM, or third parties in
the usual course of business and within their control.

226.    Questions of law and fact are common to the Class and predominate over
questions affecting only individual members, including the following:

      1.      Whether the Defective GM Vehicles suffer from safety defects;

      2.      Whether GM fraudulently concealed the defects;

      3.      Whether GM misrepresented that the Defective GM Vehicles were safe;

      4.      Whether GM engaged in fraudulent, deceptive or unfair acts or practices
by failing to disclose that the Defective GM Vehicles were designed, manufactured, and sold
with safety defects and that GM systematically valued cost-cutting over safety;

5.      Whether GM was unjustly enriched at the expense of Claimant and the

Class;

6.      Whether GM breached the implied warranty of merchantability in

connection with the Defective GM Vehicles;

7.      Whether GM was negligent in its design and manufacture of the Defective

GM Vehicles, and/or in failing to warn of the known defects and failing to recall the vehicles;

and

8.      Whether Claimant and the Class are entitled to a remedy as a result of

GM's fraudulent, inequitable and/or negligent conduct.

227.    Claimant's claims are typical of the claims of the Class and Subclass Members,

and arise from the same course of conduct by GM.  The relief Claimant seeks is typical of the

relief sought for the absent Class and Subclass Members.

228.    Claimant will fairly and adequately represent and protect the interests of all absent

Class and Subclass Members.  Claimant is represented by counsel competent and experienced in

product liability, consumer protection, and class action litigation, as well as counsel experienced

in bankruptcy litigation.

229.    A class action is superior to other available methods for the fair and efficient

adjudication of this controversy, since joinder of all the individual Class and Subclass Members

is impracticable.  Because the damages suffered by each individual Class Member may be

relatively small, the expense and burden of individual litigation would make it very difficult or

impossible for individual Class Members to redress the wrongs done to each of them

individually, and the burden imposed on the judicial system would be enormous.   B.R. 7023

provides the Court with authority and flexibility to maximize the benefits of the class mechanism and reduce any management challenges that may arise.

230.    The prosecution of separate actions by the individual Class and Subclass Members would create a risk of inconsistent or varying adjudications for individual Class and Subclass Members.  The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

231.    Claimant is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Claimant anticipates providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class and Subclasses.

232.    Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for GM's misconduct.

## IX.    THE CLASS' AND SUBCLASSES' CLAIMS

**A.    Class Claims.**

**1.    Fraudulent concealment.**

233.    Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

234.    This claim is brought on behalf of the Class.

235.    The law of fraudulent concealment is essentially identical in each state, as virtually every state, including California, where Claimant resides, generally follows the principles of Sections 550 and 551 of the Restatement (Second) of Torts.

236.    Under Section 550, "[o]ne party to a transaction who by concealment or other

action intentionally prevents the other from acquiring material information is subject to the same

liability to the other for pecuniary loss as though he had stated the nonexistence of the matter that

the other was thus prevented from discovering."

237.    Under Section 551:

(1)    One who fails to disclose to another a fact that he knows may
justifiably induce the other to act or refrain from acting in a
business transaction is subject to the same liability to the other as
though he had represented the nonexistence of the matter that he
has failed to disclose, if, but only if, he is under a duty to the other
to exercise reasonable care to disclose the matter in question.

(2)    One party to a business transaction is under a duty to exercise
reasonable care to disclose to the other before the transaction is
consummated,

(a)    matters known to him that the other is entitled to know because
of a fiduciary or other similar relation of trust and confidence
between them; and

(b)    matters known to him that he knows to be necessary to prevent
his partial or ambiguous statement of the facts from being
misleading; and

(c)    subsequently acquired information that he knows will make
untrue or misleading a previous representation that when made was
true or believed to be so; and

(d)    the falsity of a representation not made with the expectation
that it would be acted upon, if he subsequently learns that the other
is about to act in reliance upon it in a transaction with him; and

(e)    facts basic to the transaction, if he knows that the other is
about to enter into it under a mistake as to them, and that the other,
because of the relationship between them, the customs of the trade
or other objective circumstances, would reasonably expect a
disclosure of those facts.

238.    As alleged above and discussed below, GM's fraudulent concealment of the

safety defects and other material information concerning the Defective GM Vehicles renders GM

liable to Claimant and the Class under the law of fraudulent concealment of each state and the
District of Columbia.

239.    GM concealed and suppressed material facts concerning the quality and safety of
GM vehicles in general and in the Defective GM Vehicles in particular.

240.    GM concealed and suppressed material facts concerning the culture of GM—a
culture characterized by cost-cutting, avoidance of dealing with safety issues and a shoddy
design process.

241.    GM concealed and suppressed material facts concerning the safety defects alleged
herein, and that it valued cost-cutting over safety and took steps to ensure that its employees did
not reveal known safety defects, including the defects in the Defective GM Vehicles, to
regulators or consumers.

242.    GM did so in order to boost confidence in its vehicles, including the Defective
GM Vehicles, and falsely assure owners, purchasers and lessees of the Defective GM Vehicles
that GM was a reputable manufacturer that stood behind its vehicles after they were sold and
ensured that its vehicles were safe and reliable.  The false representations were material to
consumers, both because they concerned the quality and safety of the Defective GM Vehicles
and because they played a significant role in the value of the vehicles.

243.    GM had a duty to disclose the defects in the Defective GM Vehicles because they
were known and/or accessible only to GM who had superior knowledge and access to the facts,
and GM knew the facts were not known to or reasonably discoverable by Claimant and the
Class.  These omitted and concealed facts were material because they directly impact the value
and safety of the Defective GM Vehicles purchased or leased by Claimant and the Class.

Whether a product is safe and reliable, and whether the manufacturer stands behind the product,

is a material concern to a consumer.

244.    GM also had a duty to disclose because it made many affirmative representations

about the safety, quality, and lack of defects in GM vehicles, as set forth above, which were

misleading, deceptive, and incomplete without the disclosure of the defects in the Defective GM

Vehicles.  Having provided information to the Class, GM had the duty to disclose not just the

partial truth, but the entire truth.  Finally, GM had monitoring and disclosure duties under the

TREAD Act.

245.    GM actively concealed and/or suppressed these material facts, in whole or in part,

to protect its profits and avoid recalls that would hurt the brand's image and cost GM money, and

it did so at the expense of Claimant and the Class.

246.    GM concealed and suppressed the defects in the Defective GM Vehicles with the

intent to deceive Claimant and the Class.

247.    Claimant and the Class were unaware of these omitted material facts and would

not have acted as they did if they had known of the concealed and/or suppressed facts.

Claimant's and the Class's actions were justified.  GM was in exclusive control of the material

facts and such facts were not known to the public, Claimant, or the Class.

248.    Because of the concealment and/or suppression of the facts, Claimant and the

Class sustained damage.  Had they been aware of the safety defects in their Defective GM

Vehicles and GM's disregard for safety, Claimant and the Class either would have paid less for

their vehicles or would not have purchased them at all.   Claimant and the Class did not receive

the benefit of their bargain as a result of GM's fraudulent concealment.

249.    More specifically, Claimant and the Class were damaged by GM's fraudulent concealment in at least the following ways:

a.    Class Members were fraudulently induced into purchasing their Defective GM Vehicles and/or paying more than they otherwise would have had the defect been revealed.

b.    Class Members remained in possession of vehicles of diminished value which GM would otherwise have been compelled to fix or replace.

c.    Class Members incurred expense and loss in connection with their efforts to repair the Defective GM Vehicles and/or eliminate or reduce the risks and costs to which they were exposed by the vehicles.

d.    Class Members incurred the inconvenience and expense of having a recall repair done.

250.    Without limitation, Claimant and the Class therefore seek a full refund of the purchase price paid for their Defective GM Vehicles (or the overpayments they made for the vehicles) together with any and all other available compensatory, incidental and consequential damages (save for personal injury damages) they may have suffered as a result of their leasing and/or ownership of a Defective GM Vehicle, and punitive damages given the extremely outrageous and reprehensible conduct perpetrated by GM to keep and increase the numbers of highly-dangerous Defective GM Vehicles on the road in order to avoid the expense and adverse publicity of the requisite safety recall.

**2.    Unjust enrichment.**

251.    Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

252.    This claim is brought on behalf of the Class.

253.    The law of unjust enrichment is essentially identical in each state, including California, where Claimant resides.

254.    GM received and retained a benefit from Claimant and the Class and inequity resulted.

255.    GM benefitted from selling and leasing the Defective GM Vehicles, whose value was artificially inflated by GM's concealment of the defects as well as systemic safety issues that plagued the GM brand, for more than they were worth, at a profit, and Claimant and the Class overpaid for their Defective GM Vehicles and were forced to pay other costs.

256.    In addition, GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of GM.

257.    Thus, Claimant and all Class Members conferred a benefit on GM.

258.    It was inequitable for GM to retain these benefits.

259.    Claimant and the Class were not aware of the true facts about their Defective GM Vehicles, and did not benefit from GM's conduct.

260.    GM knowingly accepted the benefits of its unjust conduct.

261.    As a result of GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**3.    Consumer Protection Claims.**

262.    Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

263.    This claim is brought on behalf of the Class.

264.    The consumer protection laws are essentially similar in each state, as virtually every state has adopted consumer protection laws that are modeled after the Federal Trade

Commission Act, which makes unlawful "unfair or deceptive acts or practices in or affecting

commerce…." 15 U.S.C. § 45.

265.    Because Claimant is a California resident, her consumer protection claims are

pled under California law.  However, the Class states claims under the consumer protection

statutes of every U.S. jurisdiction.

### a.    Violations of the California Consumer Legal Remedies Act (CAL. CIV. CODE § 1750 *et seq.*).

266.    Claimant realleges and incorporates by reference all paragraphs as though fully

set forth herein.

267.    GM was a "person" under CAL. CIV. CODE § 1761(c).

268.    Claimant and Class Members are "consumers," as defined by CAL. CIV. CODE

§ 1761(d), who purchased or leased one or more Defective GM Vehicles.

269.    The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts

or practices undertaken by any person in a transaction intended to result or which results in the

sale or lease of goods or services to any consumer." CAL. CIV. CODE § 1770(a).  GM engaged in

unfair or deceptive acts or practices that violated CAL. CIV. CODE § 1750, *et seq*., as described

above and below, by, among other things, concealing the known defects in the Defective GM

Vehicles, representing that the vehicles have characteristics, uses, benefits, and qualities which

they do not have; representing that the vehicles are of a particular standard, quality, and grade

when they are not; advertising the vehicles with the intent not to sell or lease them as advertised;

and representing that the subject of a transaction involving a Defective GM Vehicle has been

supplied in accordance with a previous representation when it has not.

270.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

271.    In the course of its business, GM concealed the defects in the Defective GM Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.   GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

272.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimant and the Class.

273.    By failing to disclose and by actively concealing the defects in the Defective GM Vehicles, which it marketed as safe, reliable, and of high quality GM engaged in unfair and deceptive business practices in violation of the CLRA.

274.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Class Members' vehicles.

275.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the Class Members, about the true safety and reliability of their vehicles.

276.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead the Class.

277.    GM knew or should have known that its conduct violated the CLRA.

278.    GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

279.    GM owed the Class a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

    a.          Possessed exclusive knowledge about the defects in the
Defective GM Vehicles;

    b.          Intentionally concealed the foregoing from the Class;

    c.          Made incomplete representations about the safety and
reliability of the Defective GM Vehicles, while
purposefully withholding material facts from the Class that
contradicted these representations; and/or

    d.          Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

280.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, the vehicle owners and lessees were deprived of the benefit of their bargain since the vehicles they purchased or leased were worth less than they would have been if they were free from the defects.  Had the Class been aware of the defects in their vehicles, they would have either not bought or leased their Defective GM Vehicles or would have paid less for them.

281.    GM's concealment of the defects in the Defective GM Vehicles was material to the Class.

282.    The Class suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Class Members either would have paid less for their vehicles or would not have purchased or leased them at all.  The Class also incurred repair and recall costs, as alleged above.

283.    As a direct and proximate result of GM's violations of the CLRA, the Class has suffered injury-in-fact and/or actual damage.

284.    Under CAL. CIV. CODE § 1780(a), the Class seeks monetary relief for the harm caused by GM's violations of the CLRA as alleged herein.

285.    Under CAL. CIV. CODE § 1780(b), the Class seeks an additional award against of

up to $5,000 for each Class Member who qualifies as a "senior citizen" or "disabled person"

under the CLRA.  GM knew or should have known that its conduct was directed to one or more

Class Members who are senior citizens or disabled persons.   GM's conduct caused one or more

of these senior citizens or disabled persons to suffer a substantial loss of property set aside for

retirement or for personal or family care and maintenance, or assets essential to the health or

welfare of the senior citizen or disabled person.  One or more Class Members who are senior

citizens or disabled persons were substantially more vulnerable to GM's conduct because of age,

poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of

them suffered substantial physical, emotional, or economic damage resulting from GM's

conduct.

286.    The Class further seeks costs of court, attorneys' fees under CAL. CIV. CODE

§ 1780(e), and any other just and proper relief available under the CLRA.

> **b.    Violations of the California Unfair Competition Law ("UCL")
> (CAL. BUS. & PROF. CODE § 17200, *et seq.*).**

287.    Claimant realleges and incorporates by reference all paragraphs as though fully

set forth herein.

288.    CAL. BUS. & PROF. CODE § 17200 prohibits any "unlawful, unfair, or fraudulent

business act or practices."  GM engaged in unlawful, fraudulent, and unfair business acts and

practices in violation of the UCL.

289.     GM violated the unlawful prong of § 17200 by the following:

    a.    violations of the CLRA, CAL. CIV. CODE § 1750, *et seq*., as set
forth above.

    b.    violation of the National Traffic and Motor Vehicle Safety Act of
1996, codified at 49 U.S.C. §§ 30101-30170, and its regulations.
FMVSS number 573 governs a motor vehicle manufacturer's

responsibility to notify NHTSA of a motor vehicle defect within five days of determining that the defect is safety related.  *See* 49 C.F.R. § 573.6.  GM violated these reporting requirements by failing to report the defects in the Defective GM Vehicles within the required time, and failing to timely recall all impacted vehicles.

290.    GM also violated the "fraudulent" prong of § 17200 by concealing the defects in the Defective GM Vehicles, information that was material to a reasonable consumer, while it touted the safety and reliability of the vehicles.

291.    GM also violated the unfair prong of § 17200 because the acts and practices set forth above, including devaluing safety and concealing the defects in the Defective GM Vehicles, offend established public policy, and also because the harm GM caused consumers greatly outweighs any benefits associated with those practices.  GM's conduct also impaired competition within the automotive vehicles market and prevented the Class from making fully informed decisions about whether to lease, purchase and/or retain their vehicles.

292.    In the course of its business, GM concealed the defects in Class Members' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale and lease of the Defective GM Vehicles.

293.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

294.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by the Class.

295.    By failing to disclose and by actively concealing the defects in Class Members' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the UCL.

296.    In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Class Members' vehicles.

297.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Class Members, about the true safety and reliability of their

vehicles.

298.    GM intentionally and knowingly misrepresented material facts regarding the

Defective GM Vehicles with the intent to mislead the Class.

299.    GM knew or should have known that its conduct violated the UCL.

300.    As alleged above, GM made material statements about the safety and reliability of

the Defective GM Vehicles that were either false or misleading.

301.    GM owed the Class a duty to disclose the true safety and reliability of the

Defective GM Vehicles, because GM:

> a.    Possessed exclusive knowledge about the defects in the Defective
> GM Vehicles;
>
> b.    Intentionally concealed the foregoing from the Class;
>
> c.    Made incomplete representations about the safety and reliability of
> the Defective GM Vehicles, while purposefully withholding
> material facts from the Class that contradicted these
> representations; and/or
>
> d.    Had duties under the TREAD Act and related regulations to
> disclose and remedy the defects.

302.    Because GM fraudulently concealed the defects in the Defective GM Vehicles,

the vehicle owners were deprived of the benefit of their bargain since the vehicles they

purchased were worth less than they would have been if they were free from the defects.  Had

Class Members been aware of the defects in their vehicles, they would have either not bought

their Defective GM Vehicles or would have paid less for them.

303.    GM's concealment of the defects in the Defective GM Vehicles was material to the Class.

304.    The Class suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Class Members either would have paid less for their vehicles or would not have purchased or leased them at all.

305.    As a direct and proximate result of GM's violations of the UCL, Class Members have suffered injury-in-fact and/or actual damage.

306.    Claimant requests that this Court enter such orders or judgments as may be necessary, including an order and judgment restoring to the Class Members any money lost as the result of GM's unfair, unlawful, and deceptive trade practices, including restitution and disgorgement of any profits GM received as a result of its unfair, unlawful, and/or deceptive practices, as provided in CAL. BUS. & PROF. CODE § 17203, CAL CIV. PROC. CODE § 384 and CAL. CIV. CODE § 3345; and for such other relief as may be just and proper.

**B.    Subclass Claims.**

**1.    Breach of the Implied Warranty of Merchantability.**

307.    Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

308.    This claim is brought on behalf of the Defective GM Vehicle Implied Warranty Subclass.

309.    The implied warranty laws are essentially similar in each state whose residents are part of this Subclass, as every such state has adopted the Uniform Commercial Code ("U.C.C.") and similarly construed the relevant provisions such that Claimants and the Defective GM Vehicle Implied Warranty Subclass state claims.

310.  Because Claimant is a California resident, her implied warranty claim is pled under California law.

### a.  Violations of the Song-Beverly Warranty Act for Breach of Implied Warranty of Merchantability (CAL. CIV. CODE §§ 1791.1 & 1792).

311.  Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

312.  Claimant and Defective GM Vehicle Implied Warranty Subclass Members are "buyers" within the meaning of CAL. CIV. CODE § 1791(b).

313.  The Defective GM Vehicles are "consumer goods" within the meaning of CAL. CIV. CODE § 1791(a).

314.  GM was the "manufacturer" of the Defective GM Vehicles within the meaning of CAL. CIV. CODE § 1791(j).

315.  GM impliedly warranted to Claimant and Defective GM Vehicle Implied Warranty Subclass Members that Delta Ignition Switch Vehicles were "merchantable" within the meaning of CAL. CIV. CODE §§ 1791.1(a) & 1792; however, the Defective GM Vehicles did not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

316.  CAL. CIV. CODE § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)  Pass without objection in the trade under the contract description.

(2)  Are fit for the ordinary purposes for which such goods are used.

(3)  Are adequately contained, packaged, and labeled.

(4)  Conform to the promises or affirmations of fact made on the container or label.

317.    The Defective GM Vehicles would not pass without objection in the automotive
trade because of the dangerous defects that created an unreasonable likelihood of accident,
and/or an unreasonable likelihood that such accidents will cause serious bodily harm or death to
vehicle occupants.

318.    Because of the ignition switch defects that cause sudden unintended stalling to
occur, with the attendant shut down of power steering and power brakes and the nondeployment
of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or
death, the Low Torque Ignition Switch Defect Vehicles are not safe to drive and thus not fit for
ordinary purposes.

319.    The Power Steering Defect Vehicles are inherently defective and not fit for
ordinary purposes in that there are defects in the vehicles that can cause the loss of power
steering, resulting in an increased risk of accident.

320.    The Side Airbag Defect Vehicles are inherently defective and not fit for ordinary
purposes in that there are defects in the wiring harness connectors that can cause the side impact
airbags and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an
increased likelihood of serious injury or death.

321.    The Low Torque Ignition Switch Defect Vehicles are not adequately labeled
because the labeling fails to disclose the ignition switch defects and does not advise Claimant
and Defective GM Vehicle Implied Warranty Subclass Members to avoid attaching anything to
their vehicle key rings.  GM failed to warn about the dangerous safety defects in the Defective
GM Vehicles.

322.    GM breached the implied warranty of merchantability by selling Defective  GM
Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles

during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners. The defects deprived Claimant and Defective GM Vehicle Implied Warranty Subclass Members of the benefit of their bargain.

323. Notice of breach is not required because Claimant and Defective GM Vehicle Implied Warranty Subclass Members did not purchase their automobiles directly from GM.

324. As a direct and proximate result of GM's breach of its duties under California's Lemon Law, Claimant and Defective GM Implied Warranty Subclass Members received goods whose dangerous condition substantially impaired their value.

325. Under CAL. CIV. CODE §§ 1791.1(d) & 1794, Claimant and Defective GM Implied Warranty Subclass Members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their vehicles, or the overpayment or diminution in value of their vehicles.

326. Under CAL. CIV. CODE § 1794, Claimant and Defective GM Implied Warranty Subclass Members are entitled to costs and attorneys' fees.

**2.    Negligence.**

327. Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

328. This claim is brought on behalf of the Defective GM Vehicle Negligence Subclass.

329. The law of negligence is substantially similar under the laws of all the jurisdictions whose residents are included in the Defective GM Vehicle Negligence Subclass.

330. GM designed, manufactured and sold or otherwise placed in the stream of commerce Defective GM Vehicles, as set forth above.

331.    GM had a duty to design, manufacture, and sell only products that would be safe for their intended and foreseeable uses and users, including the use to which the Defective GM Vehicles products were put by Claimant and the Defective GM Vehicle Negligence Subclass. GM breached its duties to the Defective GM Vehicle Negligence Subclass because it was negligent in the design, development, manufacture, and testing of the Defective GM Vehicles it manufactured and sold.

332.    GM was negligent in the design, development, manufacture, testing, and/or "certification" of the Defective GM Vehicles because it knew, or in the exercise of reasonable care should have known, that the vehicles posed an unreasonable risk of death or serious bodily injury to Defective GM Vehicle Negligence Subclass Members, passengers, other motorists, pedestrians, and the public at large, because they were susceptible to incidents in which the vehicles suddenly stall, and/or the brakes and/or power steering, and/or airbags and seatbelt pretensioners were rendered inoperable.

333.    GM thus "failed to exercise reasonable care in the manufacture of [its Defective Vehicles]", in violation of RESTATEMENT (SECOND) OF TORTS § 395 ("A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied.").

334.    GM further breached its duties to the Defective GM Vehicle Negligence Subclass by supplying directly or through a third person defective vehicles to be used by such foreseeable persons as the Defective GM Vehicle Negligence Subclass members when:

a.    GM knew or had reason to know that the vehicles were dangerous or likely to be

dangerous for the use for which they were supplied; and

b.    GM failed to exercise reasonable care to inform customers of the dangerous

condition or of the facts under which the vehicles are likely to be dangerous.

335.    GM had a continuing duty to warn and instruct the intended and foreseeable users

of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to

using the vehicles. Defective GM Vehicle Negligence Subclass Members were entitled to know

that the vehicles, in their ordinary operation, were not reasonably safe for their intended and

ordinary purposes and uses.

336.    GM knew or should have known of the defects described herein.  GM breached

its duty to Defective GM Vehicle Negligence Subclass Members because it failed to warn and

instruct the intended and foreseeable users of its vehicles of the defective condition of the

vehicles and the high degree of risk attendant to using the vehicles, and it failed to recall the

vehicles when ordinary care and reasonable prudence so demanded.

337.    As a direct and proximate result of GM's negligence, the Defective GM Vehicle

Negligence Subclass members suffered damages.  The damages include overpayment for the

Delta Ignition Switch Vehicles and repair and recall costs, as discussed above.

*       *       *       *

338.    The filing of this Proof of Claim is not, nor shall it be deemed to be, (a) a waiver

of Claimant's rights against any person, entity or property; (b) a consent by Claimant to the

jurisdiction of the Bankruptcy Court with respect to the subject matter of this claim or any

objection or other proceeding commenced in this case or any related case; (c) a waiver of the

right to withdraw the reference, or otherwise to challenge the jurisdiction of the Bankruptcy

Court.