UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE: | . | Case No. 09-50026-mg |
|  | . | Chapter 11 |
|  | . |  |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| et al., f/k/a GENERAL | . |  |
| MOTORS CORP., et al, | . | One Bowling Green |
|  | . | New York, NY 10004 |
| Debtors. | . |  |
|  | . | Thursday, January 12, 2017 |
| . . . . . . . . . . . . . . . | . | 9:30 a.m. |

TRANSCRIPT OF (CC: DOC# 13802, 13813, 13819, 13820, 13822)
STATUS CONFERENCE REGARDING LATE CLAIMS MOTION; (CC: DOC. NO.
13806) STATUS CONFERENCE RE: MOTION FOR AN ORDER GRANTING
AUTHORITY TO FILE LATE CLASS PROOFS OF CLAIM FILED BY EDWARD S.
WEISFELNER ON BEHALF OF DESIGNATED COUNSEL FOR THE IGNITION
SWITCH PLAINTIFFS & CERTAIN NON-IGNITION SWITCH PLAINTIFFS;
(CC: DOC# 13807) OMNIBUS MOTION TO ALLOW CLAIMS, FILE LATE
PROOFS OF CLAIM FOR PERSONAL INJURIES AND WRONGFUL DEATHS
**BEFORE THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

| | |
|---|---|
| For the Debtor: | King & Spalding LLP |
| | By:  ARTHUR STEINBERG, ESQ. |
| | SCOTT DAVIDSON, ESQ. |
| | 1185 Avenue of the Americas |
| | New York, New York 10036-4003 |
| | (212) 556-2158 |

| | |
|---|---|
| For the Ignition Switch plaintiffs and certain non-Ignition Switch plaintiffs: | Brown Rudnick LLP |
| | By:  EDWARD S. WEISFELNER, ESQ. |
| | HOWARD S. STEEL, ESQ. |
| | 7 Times Square |
| | New York, New York 10036 |
| | (212) 209-4917 |

APPEARANCES CONTINUED.

| | |
|---|---|
| Audio Operator: | Jonathan, ECRO |

| | |
|---|---|
| Transcription Company: | Access Transcripts, LLC |
| | 10110 Youngwood Lane |
| | Fishers, IN 46038 |
| | (855) 873-2223 |
| | www.accesstranscripts.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES (Continued):

For Personal Injury
Accident Plaintiffs:          Goodwin Procter LLP
                              By:  WILLIAM P. WEINTRAUB, ESQ.
                              The New York Times Building
                              620 Eighth Avenue
                              New York, NY 10018-1405
                              (212) 813-8839

For Participating
Unit Holders:                 Akin Gump Strauss Hauer & Feld LLP
                              By:  DANIEL GOLDEN, ESQ.
                                   NAOMI MOSS, ESQ.
                              One Bryant Park
                              New York, NY 10036-6745
                              (212) 872-1000

For the GUC Trust
Administrator:                Gibson, Dunn & Crutcher LLP
                              By:  MITCHELL KARLAN, ESQ.
                              200 Park Avenue
                              New York, New York 10166-0193

For the Ignition Switch
Plaintiffs:                   Stutzman Bromberg Esserman & Plifka
                              By:  SANDER L. ESSERMAN, ESQ.
                              2323 Bryan Street, Suite 2200
                              Dallas, TX 75201-2689
                              (214) 969-4910

For JPMorgan Chase
Bank, N.A.:                   Wachtell, Lipton, Rosen & Katz
                              By:  HAROLD S. NOVIKOFF, ESQ.
                              51 West 52nd Street
                              New York, NY 10019
                              (212) 403-1000

TELEPHONIC APPEARANCES:

For the Ad Hoc Group
Of Term Lenders:              Jones Day
                              By:  BRUCE BENNETT, ESQ.
                              555 South Flower Street, 50th Floor
                              Los Angeles, CA 90071
                              (213) 243-2382

3

1          (Proceedings commence at 9:30 a.m.)

2               THE CLERK:  All rise.

3               THE COURT:  Please be seated.  We're here in <u>Motors</u>

4  <u>Liquidation</u>, 09-50026.  First, let me apologize to everyone for

5  being so late this morning, got caught in a monumental traffic

6  jam, and we started at 9 because the Chapter 13 today, and ten

7  o'clock, it's crowded downstairs, so I apologize to everybody.

8          All right.  So I guess we have two things that we're

9  going to deal with today.  One is the status conference and to

10 deal with the objections to the order to show cause regarding

11 the issues on remand, and then we're also going to talk about

12 the motion for authority to file late claim.

13          Steinberg, let me ask you to -- if you would start.

14               MR. STEINBERG:  Sure.  Your Honor, with respect to

15 the status conference on the late claims motion, the parties

16 met and conferred and had a number of discussions, and it was a

17 -- sort of a freewheeling discussion that took us in a lot of

18 different areas, and I'm afraid to say that we don't have a

19 full consensus to report back to you as to how to go forward.

20          Now, the late claims motion was filed by the

21 plaintiffs.  The GUC Trust has some firm views as to how to go

22 forward, and New GM has some views to go forward.  So I'm happy

23 to start with New GM's, if you'd like.

24          Your Honor, I'll start with a headline as to what we

25 think should happen and then try to explain the reason why, and

ACCESS TRANSCRIPTS, LLC           1-855-USE-ACCESS (873-2223)

4

1  I think the headline is that we think that except for some

2  limited matters relating to discovery, that everything else

3  should be adjourned for a period of time of 60 to 90 days,

4  subject to a further status conference, because of the

5  complexity of how to move forward in this matter and the need

6  to try to do better coordination than to try to ram it through

7  right now.  And the reason why I say that is that there -- the

8  motions that were filed at the end of last year, the two

9  economic loss motion and the presale accident motion, one of

10 them is, under the show cause order, sort of stayed subject to

11 Your Honor's ruling on the 2016 threshold issue.  So the one

12 that was filed as a late claim for what we believe are defined

13 as the non-ignition switch plaintiffs, they're not supposed to

14 go forward.

15         The presale accident cases are pending, for the most

16 part, in the MDL, and they're stayed in the MDL.  And I think

17 both the GUC Trust and New MG --

18         THE COURT:  They're stayed in the MDL because why?

19         MR. STEINBERG:  Because Judge Furman is handling all

20 of the cases in a order that he thinks promotes the best

21 efficiency and towards a resolution, and so he had bellwether

22 trials on ignition switch cases which were post-sale accidents,

23 and then he had -- he was going to -- and they dealt with the

24 ignition switch case.  His next layer of cases deal with what

25 we believe are non-ignition switch, post-sale accident cases.

5

1   The -- he wasn't dealing with the presale accidents because

2   they were barred subject to the Second Circuit decision, and

3   therefore he thought that they would just -- they would be

4   stayed subject to that.

5           So now, there's a need to potentially move those

6   forward, but the people who are litigating in the MDL see the

7   overlap and the need to have coordination and believe that the

8   coordination should be going through with Judge Furman, whose

9   next status conference is, I think, February 11th and stuff

10  like that.  So there was a concern about how to move presale

11  accident cases forward in a context where they're otherwise --

12  they're in the MDL and they're otherwise stayed, and they're

13  stayed for all purposes, and if someone wanted to move forward

14  on a limited basis, then we thought that that involved dealing

15  with Judge Furman, as well.

16          So you have the complexity of the presale accidents,

17  the fact that the show cause order says that one of the two

18  economic loss ignition switch plaintiffs shouldn't go forward,

19  could go forward on discovery, but not briefing.  The other

20  thing is that Judge Furman generally, in the MDL, when he has

21  proceedings outside of the -- of his court that require

22  coordination, he generally asks people to present a

23  coordination order.  The GUC Trust, who would be involved in

24  some of this discovery, is not a party to the MDL, so you'd

25  need it to deal with the coordination order and then giving

6

1  them access to some of the discovery that's already there in

2  the MDL.

3        When we say that it's in effect, that's basically

4  hold the powder for a 90-day period or a 60- to 90-day period.

5  That's not totally accurate in that the MDL will have two

6  depositions scheduled of the class-action putative -- the

7  putative class-action plaintiffs who filed the economic loss

8  claims.  So those depositions can go forward anyway.

9        Also, written discovery in the MDL is taking place

10 with regard to fact sheets that every plaintiff, mostly on the

11 economic loss side, has to provide as to events that related to

12 their purchase of the car and the economic loss that they feel

13 that was involved, some of which may be relevant for discovery

14 that will take place in the late claims issues on the events

15 related to 2009.

16        THE COURT:  Mr. Steinberg, I don't mean any

17 disrespect, but I don't understand anything you've said as to

18 why the matter as to late claims should be delayed before me.

19 I'm just -- maybe I'm missing something, but -- I hear you, I'm

20 listening --

21        MR. STEINBERG:  Because we think --

22        THE COURT:  -- but I'm not understanding.

23        MR. STEINBERG:  Because we think that Your Honor

24 should hear all the issues at one time, that discovery has to

25 be a prelude to -- before that happens, there will be some

7

1  limited discovery going on for the MDL, and that all

2  coordination for discovery should happen through the MDL.  So

3  when I say that it should be delayed, it's not delayed for all

4  purposes.  There's some discovery that needs to go -- that will

5  be going forward, other discovery that needs to be coordinated

6  with the MDL, and we think that's what should happen over the

7  next 90 days.

8          THE COURT:  Let me hear from the proponents of the

9  late claim, and then I'll ask you some more.

10          Mr. Weisfelner.

11          MR. WEISFELNER:  Good morning, Your Honor.  Ed

12  Weisfelner, Brown Rudnick, on behalf of the lead lawyers in the

13  MDL plaintiff lawyers.  Your Honor, I find myself in violent

14  agreement with Mr. Steinberg.  I do think that matter is before

15  you with regard to the ignition switch late claim motion ought

16  to be stayed for a period of 90 days for the same reasons Mr.

17  Steinberg articulated, but let me --

18          THE COURT:  Try it out on me again.  Let me --

19          MR. WEISFELNER:  -- let me try --

20          THE COURT:  And I don't mean to -- I just --

21          MR. WEISFELNER:  Let me try one more time.

22          THE COURT:  Go ahead.

23          MR. WEISFELNER:  And view it from the perspective of

24  the natural adversaries to our motion.  The adversaries to our

25  motion consist primarily of the GUC Trust, the GUC Trust

8

1 unitholders, New GM.  We have a new party in interest appearing

2 on behalf of JPMorgan with regard to the avoidance action.  And

3 initially, one or more of those parties wanted to engage in

4 pretty intensive discovery, both with respect to the economic

5 loss claims and with respect to the non-ignition switch

6 economic loss claims and with regard to the accident

7 plaintiffs.  And our collective view -- when I say

8 "collective", meaning the plaintiffs' side, as well as New GM

9 is, we don't want to interfere with or jump the gun on things

10 that are currently pending before the MDL.  And it's more than

11 just discovery.  As --

12        THE COURT:  Tell me what's currently pending before

13 the MDL that you don't want to jump ahead of.

14        MR. WEISFELNER:  Okay.

15        THE COURT:  I'm sensitive to that.  I mean, Judge

16 Furman's been living with these cases for a long time, and I

17 think he's got things well organized, and I certainly don't

18 want to do anything here -- and I haven't communicated with

19 Judge Furman in advance of this hearing or -- I think my

20 chambers sent him a copy of the order to show cause when it was

21 entered, and I think I had one very -- a non-substantive

22 conversation with him just to indicate that -- when it was in

23 process that it was -- that that was going to be issued.  So I

24 haven't talked to him since then.

25        MR. WEISFELNER:  There are a number of procedural and

9

substantive matters that are ongoing in front of the MDL.  I

will acknowledge up front that Mr. Steinberg is going to be

more aware of them than I am, but I'll do my best to explain it

as I understand it.

First of all, as it relates to discovery, there is a

process that's been put in place by Judge Furman that includes,

but is not limited to, plaintiffs filling out fact sheets.  We

have indicated that we will do whatever is necessary, as will

New GM, to ensure that our adversaries, the GUC Trust, the

unitholders, frankly, anybody else, that wants access to those

fact sheets, subject to filing or signing appropriate

confidentiality agreements that pertain to that discovery, can

have access to it.

THE COURT:  What's the gist of what's supposed to go

onto the fact sheets?

MR. WEISFELNER:  I'm not sure, but --

THE COURT:  Okay.  Somebody else will enlighten me on

that.

MR. WEISFELNER:  -- but beyond that, the putative

class representatives that signed both of our proofs of claim,

for the ignition switch and for the non-ignition switch, are

having their depositions taken very soon in the MDL.  And one

would think that, again, subject to gaining access to that

discovery, the GUC Trust and the rest of our adversaries will

have an opportunity to ask some of the questions that they told

10

1  us in advance they would otherwise want from not just our class

2  representatives, but frankly, virtually every state

3  representative plaintiff, every named plaintiff they could find

4  in the MDL.  Loads of document and deposition testimony is what

5  they wanted.  Our view is, let it happen in the MDL --

6          THE COURT:  These are economic loss plaintiffs?

7          MR. WEISFELNER:  Yes, sir.  And Mr. Weintraub will

8  speak for accident plaintiffs, but a similar situation evolves

9  there.  Again, there are certain cases that are being

10 prioritized by Judge Furman, and we think those ought to move

11 forward before anyone contemplates discovery, before -- within

12 the context of this bankruptcy case, we think it'll be

13 duplicative and potentially in violation of orders that Judge

14 Furman has put in place.  Beyond that, I will tell you that

15 there are additional reasons, in our view, for a 90-day

16 extension.

17         THE COURT:  Are the depositions of the putative class

18 representatives, are those going to occur in the next 90 days?

19         MR. WEISFELNER:  Yes.  Beyond that, Your Honor, Judge

20 Furman is currently in the process of adjudicating motions for,

21 I think a summary judgment as opposed to motions to dismiss,

22 motions for summary judgment on the theories behind the

23 plaintiffs' request to hold New GM liable as the success.  And

24 depending on the resolution of that motion, one could

25 anticipate that the vim and vigor with which the plaintiffs

11

1  prosecute and the adversaries defend the late claims motion may

2  change.

3         THE COURT:  Are those summary judgment motions fully

4  briefed at this point?

5         MR. WEISFELNER:  I think they're in the process of

6  being finalized.  We anticipate they'll be fully briefed before

7  the end of January.  And, of course, we don't have a schedule

8  for when the judge is going to rule, but if the past is any

9  prologue, we suspect that within this 90-day period, the

10 parties will further be able to assess the nature and value of

11 their respective claims and defenses.

12        Now, there was a third reason for -- and I hate to

13 characterize it this way, but there is yet a third reason for

14 doing nothing, in our view, for the next 90 days.  There was

15 some debate during the meet and confer as to whether or not,

16 putting discovery aside for all the reasons I previously

17 indicated, the parties are to move forward on some briefing

18 schedule to resolve legal issues.  And among the legal issues

19 that some folks thought could be advanced was the question of

20 equitable mootness.

21        Now, Your Honor knows that equitable mootness was

22 part of the threshold issues that Judge Gerber considered and

23 ruled upon, and Your Honor is also aware that that decision

24 went up to the Second Circuit, which ultimately vacated Judge

25 Gerber's ruling on the basis of it being an advisory opinion

12

1  since the proofs of claim hadn't advanced any further.  There

2  were some people during the meet and confer that advocated,

3  well, let's -- now that the claims have been filed, let's go

4  ahead and brief for Your Honor and get Your Honor to decide as

5  a matter of law whether the late claims ought to be disallowed

6  based on equitable mootness, and even that, you would think,

7  would be truncated into different pieces.

8         One of the things that Judge Gerber did not deal

9  with, as far as we could tell in his decision, was that aspect

10  of our request for relief that was geared either towards the

11  accordion feature or, for that matter, towards the claim with

12  regard to the billion and change that's part of the avoidance

13  action.  Presumably, he did intend to deal with that portion of

14  our request for relief that would be geared either towards the

15  remaining corpus of the GUC Trust or, for that matter, the

16  ability to claw back distributions already made to the GUC

17  Trust.

18         THE COURT:  May I ask this?  I didn't go back this

19  week to read Judge Gerber's rulings.  I certainly don't

20  remember anything in his opinions dealing with the accordion

21  feature.  Judge Chin briefly deals with it in the circuit

22  opinion, and I certainly raise the issue here before.  Were

23  issues about the accordion feature briefed with respect to

24  whether there was equitable mootness or not?

25         MR. WEISFELNER:  You know, Your Honor, I can't recall

13

1  specifically whether it was part of the briefs.  I do know that

2  it wasn't part of Judge Gerber's decision.  But even beyond

3  that, without prejudicing anybody else's position, I would be

4  surprised were Your Honor to order briefing on the topic of

5  equitable mootness, whether either the GUC Trust or, for that

6  matter, the unitholders would contend that as to the accordion

7  feature, this matter was somehow equitable moot, but I leave it

8  to them to raise it.  But let me tell you why, even as to that

9  narrow topic that we debated whether or not it ought to go

10 forward, most of us have reached the conclusion that it, too,

11 needs to get stayed, and here's why.

12          I don't know that one can, by consensus, agree that

13 something is or isn't advisory.  And I'm concerned least the

14 parties, not to mention the Court, spend their collective

15 wheels on claims that have yet to be granted in terms of

16 filing, let alone granted in terms of allowance, whether Your

17 Honor were to reach a decision with regard to equitable

18 mootness, if we're not going to face the same issue that we saw

19 the Second Circuit resolve.

20          THE COURT:  How close to the $35 billion --

21          MR. WEISFELNER:  Threshold?

22          THE COURT:  -- threshold for the accordion to come

23 into play?  How far --

24          MR. WEISFELNER:  My understanding, in round numbers,

25 is the total amount of claims, not including ignition switch,

1 non-ignition switch, personal injury claims, has hit the $32

2 billion level.

3           THE COURT:  Mr. Steinberg, go ahead.

4           MR. STEINBERG:  I think, rough math, it'll be -- with

5 the avoidance action potential to claim, it'll roughly be

6 around the $33 billion number.  So there will be at $2 billion

7 hurdle to get to the --

8           MR. WEISFELNER:  And then, if you sort of break it

9 down and you think about it, the ignition switch, as Mr.

10 Steinberg would like to define it, meaning those that were the

11 subject of the first set of recalls, is somewhere between 1.6

12 and 2.1 million vehicles.  Beyond that, you have the remaining

13 ignition switch cases that he refers to as non-ignition switch

14 cases, which we believe are another potentially 15 or 20

15 million vehicles -- or eight and a half.

16           THE COURT:  A lot.

17           MR. WEISFELNER:  A lot of cars.

18           THE COURT:  Okay.  It's a lot of vehicles.  All

19 right.

20           MR. WEISFELNER:  And then, beyond that, you have the

21 personal injury claims, and I don't have a grand total.

22           THE COURT:  Sure.

23           MR. WEISFELNER:  But I think each of those, on a per

24 claim basis, could be substantially in excess of the economic

25 losses,  depending again on how the court rules on some of the

1  matters that are before the MDL.

2        THE COURT:  Let me ask this, and I think I asked this

3  at one of the early hearings, and I think I asked you

4  specifically.  What's your estimate of the maximum value of the

5  accordion if it was fully triggered?

6        MR. WEISFELNER:  I believe it's close to $10 billion

7  when you value the stock that would come into the accordion.

8        THE COURT:  This may be off the mark here, but have

9  the parties discussed the possibility of mediating the issue

10 of, I guess, a couple of things.  One, I'm sure that the GUC

11 Trust is -- I ought to listen to the GUC Trust counsel, but I

12 assume they're concerned about the issue of whether any

13 creditors who received distributions would be required where

14 they could be clawed back, diluting the recoveries of creditors

15 if the pool of creditors was increased by the late claims.  But

16 it seems to me that there -- and I don't get involved in

17 settlement negotiations about side issues, but there are going

18 to be plenty of room to work on, you know, an approach that

19 would -- and I think it's suggested in your late claim motion

20 as a possibility that creditors wouldn't be required to

21 disgorge any recoveries they've had, that late claimants would

22 get a priority on any additional amounts that would come in

23 through the accordion.  It just -- that isn't to say that

24 anybody -- it still -- obviously, it would still leave the most

25 important issues of whether any of the late claimants have

16

1  claims that they can recover on and how much.  But, you know,

2  it would seem to me that you could structure an approach that

3  at least avoid the issue of disgorgement.

4          MR. WEISFELNER:  Your Honor, let me --

5          THE COURT:  Go ahead, Mr. Weisfelner.

6          MR. WEISFELNER:  -- let me address that as carefully

7  as I can because --

8          THE COURT:  I want to -- I don't want to know what

9  discussion you're having, but this strikes me as something that

10 you all could spend a lot of time litigating.  Why?

11         MR. WEISFELNER:  And, Your Honor, let me tell you

12 that present company excepted, there happen to be some pretty

13 smart folks on that part of the courtroom, and suffice --

14         THE COURT:  On both sides of the courtroom, so let's,

15 you know --

16         MR. WEISFELNER:  -- suffice to say that those issues

17 with a narrower focus on where Your Honor was directing your

18 commentary have taken place.  There are some complicating

19 factors, not the least of which is our concern about if you

20 were to segregate and focus exclusively on the accordion, to

21 the detriment of everything else, who then is our adversary

22 with regard to acknowledging the dollar value of those claims?

23 And but for the fact that the party for whose benefit we would

24 otherwise focus on the late claims has indicated a desire to

25 get out of the way, notwithstanding what the GUC Trust

1  agreement stands for, and leave us to the wolves as defined by

2  Mr. -- as Mr. Steinberg, we might have made some progress.

3  That's not to say that we won't try again.

4        The other factor I'd like Your Honor to take into

5  consideration is we're just the lowly designated bankruptcy

6  counsel.  Decisions are made at a higher level, that being at

7  lead counsel level.  We've discussed it with the client base.

8  We'll discuss it again.  I see a lot of utility in trying to

9  narrow the issues among the parties, and another reason why we

10 think a 90-day stay makes sense is so that we can reinvigorate

11 these discussions with a new focus.

12        So for all those reasons, Your Honor, we again -- and

13 I would hate to have the record reflect this, but I agree with

14 Mr. Steinberg.  We ought to have a 90-day stay.

15        THE COURT:  Print the transcript, Mr. Steinberg.

16        Mr. Weintraub.

17        MR. WEINTRAUB:  Good morning, Your Honor.  William

18 Weintraub of Goodwin Proctor for the pre-closing accident

19 plaintiffs.  I agree with what Mr. Weisfelner has said and

20 what --

21        THE COURT:  That means you agree with Mr. Steinberg,

22 too?

23        MR. WEINTRAUB:  I'm reluctant to say that, but yes, I

24 guess you could draw that conclusion.

25        THE COURT:  Somehow, I think it's your -- it's a

18

1  bigger deal for Mr. Weisfelner to agree, but you know, it's

2  just --

3          MR. WEINTRAUB:  I'll concede that, Your Honor.  In

4  addition to what has been said, we have additional reasons for

5  why we don't think discovery is appropriate at this time or

6  perhaps not at all with respect to the late claims issue.

7          THE COURT:  But isn't the discovery different with

8  respect to the late claims issue than -- I mean -- I

9  interrupted you, go ahead.  But that is a concern of mine.  It

10  did -- and it's briefly addressed in the motion, and the -- it

11  seems to me that I don't know what -- why is the discovery the

12  same?  I'm -- look, I'm not going to -- I don't want to get in

13  the way of what Judge Furman's doing, but if the discovery that

14  has to happen on the late claims motion is different than the

15  discovery that's going to happen in the MDL, why am I agreeing

16  to hold that up?

17          MR. WEINTRAUB:  Well, two responses to that, Your

18  Honor.  First is we don't know what the discovery is because we

19  never got beyond that in the meet and confer.  We were told, we

20  would like to serve 25 interrogatories, with respect to my

21  clients.  That's 25 interrogatories to 175 individual people

22  who have been uncompensated since their accidents occurred

23  before the bankruptcy case commenced.  So it's a burden, and

24  it's an expense for those people.  But independently of that,

25  we think that this is not a _Pioneer_ issue, as we said in our

19

1   papers.  There was a due process violation here, and under

2   Manville, which was specifically referenced by Judge Gerber in

3   his opinion, that means that the bar date order is not

4   applicable to us or enforceable against us, which means the

5   Pioneer factors are not the factors that you look at as to

6   whether or not the claim is timely.  We believe that, per se,

7   the claim is timely now.

8            The only reason that there's any impediment at all

9   with respect to the proofs of claim is because of the late

10  claim order that was ordered in 2012 in this case, which was

11  asked for by the GUC Trust years before the ignition switch

12  defect was even disclosed to the public.  And the gravamen of

13  that order is that any claim filed after the date of that order

14  is deemed late and disallowed.

15           So we were in the position throughout the proceedings

16  in the bankruptcy court of, we had no place to go until the

17  four threshold issues were determined.  We could have filed

18  those claims.  They would have sat there as late and disallowed

19  until we had a basis to come in and say that they're not late

20  and they should be allowed.

21           THE COURT:  But after Judge Gerber determined that

22  there was a due process violation, why wasn't the motion for

23  late claim filed then with your argument that the bar order

24  can't apply to us because due process violation?

25           MR. WEINTRAUB:  Because, Your Honor, what happened in

20

1  the bankruptcy court with respect to the four threshold issues

2  was highly sequenced and highly controlled by Judge Gerber.

3  And the history of this --

4          THE COURT:  Could have put your place marker down.

5          MR. WEINTRAUB:  We could have, except everyone who

6  ever tried to jump the line was slapped down hard by Judge

7  Gerber.  The Phaneuf plaintiffs, Mr. Peller, several times.

8  But independent of that, Your Honor, back when the threshold

9  briefing began -- and you have to understand the history of

10  this.  The ignition switch defect came to light in early 2014.

11  The recalls began in February and March of 2014.

12          Lawsuits were brought against New General Motors in

13  2014, and the first motion to stay was filed, I believe, in

14  April of 2014 in the bankruptcy court to stay the litigation

15  against New GM as the successor.  And as a result of that

16  motion, we have a scheduling order that was issued in May of

17  2014.  Embedded in that scheduling order was not just the

18  sequencing of events with respect to the four threshold issues,

19  but a tolling with respect to late claims.  Judge Gerber

20  decided early on, I'm going to take this --

21          THE COURT:  It is set out in your motion.

22          MR. WEINTRAUB:  Okay.  And then, when we got

23  involved, when the motion was filed with respect to the pre-

24  closing accident plaintiffs, a second scheduling order was

25  entered in September of 2014 which incorporated a schedule in

21

1  the first scheduling order.  So it was very clear to us, as a

2  matter of just reading comprehension, that the judge had

3  decided that late claims were not going to be litigated until

4  the threshold issues were resolved.

5           THE COURT:  Okay.

6           MR. WEINTRAUB:  Once we got the ruling from Judge

7  Gerber and the judgment was entered in June, we began to

8  accumulate the claims from -- we tried to get them from 200

9  people.  You can imagine that takes some amount of time, Your

10  Honor.  By December of 2015, which was six months before the

11  Second Circuit had ruled, we had 175 claims in hand, all dated

12  2015.

13           THE COURT:  These are accident --

14           MR. WEINTRAUB:  Yes.

15           THE COURT:  -- victims?

16           MR. WEINTRAUB:  We became concerned that

17  notwithstanding the scheduling order, that when we eventually

18  filed the claims that said 2015 and 2017, someone would say,

19  Mr. Weintraub, why did you sit on 200 claims for two years?

20  That was when we went directly to the GUC Trust and entered

21  into a stipulation that said we didn't have to file our 175

22  claims until eventually the class-action people were ready to

23  go ahead because we were always moving in tandem per the

24  scheduling order.  So that, I guess, is kind of a long --

25           THE COURT:  No, that's all right.

22

1          MR. WEINTRAUB:  -- of why we didn't file the claims

2    any sooner than now.  When the time came to file the claims, we

3    were ready.  We didn't wait until the time came to file the

4    claims and then start trying to accumulate them and say, Judge,

5    we need another six months.  We were proactive.

6          So for the historical reasons of it had -- would have

7    been a futile act to try to get a late claim determination

8    before the threshold issues were determined and because the

9    threshold issues hadn't been determined and because of the

10   tolling of the bankruptcy court's orders, we didn't think it

11   was ripe until now, which is a long way of saying, this is not

12   a _Pioneer_ case, and we don't think that 25 interrogatories to

13   175 people would be appropriate.  We'd like to address the

14   scope of discovery, if any, in separate briefings.

15         THE COURT:  Well, I -- it's fine for you to say you

16   don't think it's a _Pioneer_ issue, but I don't know what Mr.

17   Steinberg's response or the GUC Trust's response is going to be

18   on whether it's a _Pioneer_ issue.  I mean, with all due respect,

19   you can't unilaterally decide that, you know, as far as I'm

20   concerned, the issues aren't _Pioneer_ and therefore there

21   shouldn't be any discovery related to it.

22         MR. WEINTRAUB:  No.  And I'm not deciding that, Your

23   Honor.  My point was I want -- I'd like you to decide that, and

24   I'd like an opportunity --

25         THE COURT:  I understand.

23

1          MR. WEINTRAUB:  -- to brief it.

2          THE COURT:  Yes.  I'll express my concern.  Here we

3   are in January of 2017.  I agree -- let's assume I agree to

4   stay for 90 days, okay.  It's not -- you know, I've got plenty

5   to do.  So that's not an issue.  I've got another GM trial

6   start -- Motors Liquidation trial starting April 24th.  You

7   know, I've got closing argument in Mr. Weisfelner's Lyondell

8   case on February 2nd.  I'm -- all I'm doing is litigation these

9   days.

10         Okay.  I'm really busy.  I can see that, okay, we

11  stay for 90 days, and then you come back in and maybe you've

12  agreed on how to go forward, maybe you haven't agreed how to go

13  forward.  I see 2017 kind of going by and this not getting

14  resolved.  And to me, that's unhelpful, the lack of clarity

15  about it.  I understand your position very well.  You don't

16  believe the Pioneer factors apply.  The Second Circuit decided

17  the due process violation.  Judge Gerber decided that it was a

18  due process violation.  Okay.

19         I'm concerned about, you know, somewhere near the end

20  of this year, proceedings start to go forward as to whether,

21  you know, are the late claims going to be permitted, are there

22  going to be class claims, and we're going to be in 2018, and

23  this uncertainty is going to hang over the -- all of the

24  creditors who are currently entitled to distributions from the

25  GUC Trust, you know, unless there's an agreement between the

1  parties that there won't be any disgorgement.  People have to

2  worry about, I get a dollar today, I may have to give it back

3  again.  I don't like that uncertainty continuing.

4          Someone, Mr. Steinberg or somebody else is going to

5  tell me -- and this is what I -- if either the GUC Trust or New

6  GM, which obviously has a big economic interest in preventing

7  late claims if it's going to call on the -- if it's going to

8  trigger the accordion -- if their position is the Pioneer

9  factors apply and we need discovery in order to do that and

10  that discovery is different than what the discovery in the MDL

11  is going to be, my reaction is, okay, I understand people will

12  be busy with the discovery that Judge Furman is permitting, but

13  let's move forward, let's get the, you know, craft in order

14  that permits discovery that is not -- that does not overlap

15  with the discovery that's going on in the MDL because I don't

16  want to find out six, nine months from now that, oh, that

17  discovery was different, we're talking about different

18  discovery, all right, let's start it now.  And my reaction is

19  let's start it now if that's true.

20          I'm mindful and sensitive, and I don't want to do

21  anything to interfere with the progress of the MDL or the

22  discovery that's happening in the MDL.  I don't know on what

23  issues the putative class representatives here are being

24  deposed in the MDL.  Well, let me stop there.  Go ahead, Mr.

25  Weintraub.

25

1          MR. WEINTRAUB:  Well, what I was going to say, Your

2    Honor, is not to break ranks with Mr. Steinberg and Mr.

3    Weisfelner.  I stand in solidarity with them on the 90 days,

4    but my issue is the propriety of discovery of my 175 clients

5    and burdening them with 25, I believe, unnecessary

6    interrogatories.

7          THE COURT:  Have they given you the draft of the --

8    have they given you the interrogatories?

9          MR. WEINTRAUB:  No, Your Honor.  And so my concern

10   and why I speak separately from the others is I don't want to

11   leave this hearing being told, we're in discovery on the

12   Pioneer issues.  I would like an opportunity to brief that.

13         THE COURT:  I understand your position.

14         MR. WEINTRAUB:  Thank you, Your Honor.

15         THE COURT:  Thank you, Mr. Weintraub.

16         Mr. Weisfelner, you're on.

17         MR. WEISFELNER:  Your Honor, I just thought it was

18   important to supplement this.  As Your Honor knows, the

19   scheduling order that Judge Gerber entered, and I think it was

20   back in, I'm going to guess, May of 2014, has a provision in it

21   that ordered that the GUC Trust agrees that it shall not assert

22   a timeliness objection to any claims that we may attempt to

23   assert against Old GM during what was defined as the interval.

24   The interval was from the date of the order until a certain

25   period of time after a final order.  There's been no final

26

1  order with regard to the original threshold issues because of

2  the pendency of cert.  So if you think about it, in terms of

3  discovery, and let's assume Pioneer --

4          THE COURT:  Well, I think -- rather than make it

5  totally hypothetical, I'd like to hear from counsel for the GUC

6  Trust and from New GM, and I want to find out on what basis

7  they contemplate opposing the filing of late claims.  And let's

8  see, if Pioneer is not an issue, well, then that -- we'll put

9  it aside.

10         MR. WEISFELNER:  And --

11         THE COURT:  Go ahead, Mr. Weisfelner.

12         MR. WEISFELNER:  -- as Your Honor gets prepared to

13 hear from the parties, understand that the order that Judge

14 Gerber entered that I just recited was directed to the GUC

15 Trust.  Now, when you think about it, from our perspective back

16 then, the only party that had standing to oppose late claims

17 was the GUC Trust.  For some reason, New GM isn't a party to --

18 they were a party to the proceeding.

19         They're not mentioned in the decretal paragraph

20 because again, the job of defending against late claims falls

21 to the GUC Trust, notwithstanding the fact that New GM is the

22 economic party in interest, but they agreed up front to the

23 accordion feature and they allowed the GUC Trust to be the

24 defender of the accordion feature.  So for New GM now to take a

25 different position on the tolling and the --

1          THE COURT:  Let me hear from them whether the

2   position is different, okay?  Let's not --

3          Who's representing the GUC Trust?

4          MR. KARLAN:  I am, Your Honor.

5          THE COURT:  Why don't you come on up to the

6   microphone, if you would.

7          MR. KARLAN:  Thank you, Your Honor.

8          THE COURT:  I apologize I don't know who you are, so

9   you can just tell me.

10         MR. KARLAN:  Your Honor, any time a federal judge

11  hasn't seen my picture in the post office is a good day.  I'm

12  Mitch Karlan from Gibson Dunn, Your Honor, counsel for the GUC

13  Trust.

14         THE COURT:  Okay, Mr. Karlan.  Thank you.

15         MR. KARLAN:  A few preliminary points to respond to

16  some of the things that you've asked from the bench, Judge.  We

17  do think Pioneer applies.  We do think we need discovery before

18  the Pioneer issues can be resolved.  I can confirm for Your

19  Honor, and I'll go into it in some detail on this, that the

20  discovery we would like to take is different from the discovery

21  that is presently underway in the MDL.  And for what it's

22  worth, we're not parties in the MDL.  I don't presently have

23  access to any discovery that has been or will be taken in the

24  MDL.

25         I have read the fact sheets that -- not the answers,

28

1  but the questions, and as you might expect, they are long, they

2  are detailed.  They ask questions like, were you wearing your

3  seatbelt, and, how old was the car, and how many miles were on

4  it?  That's not what we're interested in.

5          THE COURT:  Well, of course, the accident victims are

6  only one small portion of the -- not small, a very important

7  portion, but we've got all these economic loss plaintiffs.

8  When they had, you know, their seatbelts are irrelevant to

9  that.

10          MR. KARLAN:  Right.  But the issue being tried in the

11  MDL, as I understand it, Your Honor, they are several steps

12  ahead of us with respect to their claims against GM.  They are

13  now onto the merits.  We --

14          THE COURT:  So let me ask you this, Mr. Karlan.

15          MR. KARLAN:  Sure.

16          THE COURT:  Have you drafted your interrogatories?

17          MR. KARLAN:  I have, Your Honor, and I'm sorry that

18  the other parties don't have them.  The reason they don't have

19  them is that as of six o'clock p.m. last night, there was an

20  agreement among all of us as to how we were going to proceed,

21  which involved me not serving the interrogatories.

22          THE COURT:  Okay.  Well --

23          MR. KARLAN:  And that fell apart between -- and I

24  found out when I arrived this morning that there was no deal.

25  I have the interrogatories here.  It's only 15, it's not 25.

1  I'm happy to read them if anybody's really bored and wants to

2  be --

3            THE COURT:  We can save the responsive reading.

4            MR. KARLAN:  Okay.  Okay.  But they are not on the

5  merits, Judge.  They are, you know, what you would expect on a

6  _Pioneer_ set of issues.  When did you first know about the

7  bankruptcy?

8            THE COURT:  Why do you think that the -- explain to

9  me why you think the _Pioneer_ factors are relevant to the

10 Court's decision whether to permit the late claim and later the

11 bankruptcy court and the Second Circuit determining a due

12 process violation?

13           MR. KARLAN:  Your Honor, I don't read the Second

14 Circuit or Judge Glenn's --

15           THE COURT:  Not Judge Glenn, I'm Judge Glenn.

16           MR. KARLAN:  I'm sorry, Judge.  Thank you, thank you.

17           THE COURT:  Begins with a G, Judge Gerber.

18           MR. KARLAN:  Judge Gerber.  I don't read Judge

19 Gerber's or the Second Circuit's opinion to mean that if, in

20 2075, somebody filed a motion for leave to file a late claim in

21 this case that simply because they hadn't gotten the bar notice

22 -- the bar order notice that they could proceed.  I --

23           THE COURT:  So assuming that -- let's assume that the

24 Supreme Court denies cert.

25           MR. KARLAN:  Okay.

1          THE COURT:  Okay.  But until that happens, we don't

2  have a final decision with respect to the due process

3  violation.  Agree with that?

4          MR. KARLAN:  I do.

5          THE COURT:  Okay.  So I have in front of me the

6  motion for leave to file late claims.  Your argument about

7  somebody coming back in 2075 is not reality.  Reality is we

8  don't have a final decision yet with respect to the due process

9  issue.

10          MR. KARLAN:  No, my point was, Judge, the fact that

11  those people who didn't get the bar notice and, according to

12  the Second Circuit, should have, we, as of today, have a due

13  process violation.  That universe may be significantly larger

14  than we know about.  It may -- it is certainly larger than the

15  people who have filed motions for leave to file late proofs of

16  claim, and I think it's appropriate to inquire whether all of

17  those people are now entitled to file late proofs of claim or

18  whether there may be --

19          THE COURT:  I haven't made a decision that anybody's

20  entitled to file a late proof of claim.

21          MR. KARLAN:  Well --

22          THE COURT:  What I have is a motion, and with every

23  -- precluding my agreement that whether it could be a class

24  claim or not, that is not being decided yet.

25          MR. KARLAN:  Right, right.

31

1          THE COURT:  All right.  So you have something

2     concrete.  You have a motion --

3          MR. KARLAN:  I've got three motions, Judge.

4          THE COURT:  Okay.

5          MR. KARLAN:  I've got a motion by Ms. Baker, who

6     claims that she represents about 1.6 million vehicle recalls

7     and wants to proceed as a class, but she's the only class

8     representative.  She is the only person in this mix that we're

9     talking about today who is actually answering a plaintiff fact

10    sheet in the MDL.  She's the only one.  And I've read it, and

11    it's not particularly useful to me, and I'd like to give just

12    her, and nobody else in that group, 15 interrogatories, the

13    answers to which, by the way, are not narratives.  They're

14    dates.  Okay.  So it's not the LSAT, all right?

15         The pre-closing accident ignition switch plaintiffs

16    have also filed a motion.  That's 175 people.  None of those

17    175 people are answering fact sheets in the MDL, none of them.

18    None of their depositions are scheduled in the MDL, none of

19    them.  It is true, 15 times 175 is a big number.  It's not my

20    fault that there's 175 of them.

21         THE COURT:  Well, no one personally has to answer

22    more than 15.

23         MR. KARLAN:  Fifteen, exactly.  Exactly.  The

24    economic loss non-ignition switch plaintiffs represented --

25    purported class represented by Ms. James-Bivins, it's my

32

1  understanding is that everything as to them is stayed and we're

2  not permitted to do anything as with respect to them.

3       THE COURT:  Well, you may not be permitted in the

4  district court, but I've got to decide -- if late claims are

5  permitted and wind up being allowed, it's going to come from

6  somewhere having to do with the estate.  Either creditors are

7  going to have to get -- are clawing back money they've received

8  or what pittance is there now -- not pittance, but not, you

9  know, mega dollars will --

10      MR. KARLAN:  It's a sad day when 500 million isn't --

11      THE COURT:  Yeah.

12      MR. KARLAN:  -- mega dollars, but yes, Judge.

13      THE COURT:  Or whether $10 billion of an accordion --

14      MR. KARLAN:  Right.

15      THE COURT:  -- will get triggered.  Okay.

16      MR. KARLAN:  So, Judge, our view is -- I share your

17  concern that the 90-day proposal that -- the 90 days is kind of

18  arbitrary.  It doesn't tie to anything in particular.  It's not

19  clear to me why the same arguments wouldn't apply in 90 days,

20  and I think you're right, we're writing off 2017.  Meanwhile,

21  the trust is continuing to incur expenses, and we would like to

22  minimize those and get this behind us.

23      THE COURT:  So work out a deal and -- look, I don't

24  -- your parties will settle or they won't settle, but I raised

25  the question with Weisfelner, I would raise it with you, and I

33

1  raise it with Mr. Steinberg.  The major economic interest is in

2  New GM in terms of potential value of the new shares that would

3  come in, but you know, unless the Supreme Court reverses --

4  grants cert and then reverses the circuit -- and even then, I

5  mean, there was no -- you know, both the bankruptcy court and

6  the circuit agreed it's a due process violation.  I think the

7  issue becomes only, if the Supreme Court reverses it, is the

8  issue about successor liability and the free and clear

9  provision.

10         Has anybody even asked the Supreme Court?  I did read

11  the cert petition.  Well-crafted cert petition.  Good luck

12  getting one granted, but well-crafted cert petition.  But I

13  didn't see anybody suggesting that there wasn't a due process

14  violation.  The only thing that cert's being sought on is

15  what's the remedy in terms of the free and clear sale

16  provision.  So no one has raised an argument that Judge Gerber

17  got it wrong or the Second Circuit got it wrong in affirming

18  Judge Gerber and finding a due process violation.

19         Mr. Steinberg, you're -- you'll -- okay.  If I have

20  it wrong, you'll tell me, but -- I don't want to lose 2017.

21         MR. KARLAN:  I agree, Judge.

22         THE COURT:  But I'm also not opening the door to

23  unbounded discovery.

24         MR. KARLAN:  And we're not seeking it.

25         THE COURT:  I'm not --

34

1        MR. KARLAN:  We're not seeking it, Judge.

2        THE COURT:  Go ahead, Mr. Karlan.

3        MR. KARLAN:  No, I --

4        THE COURT:  What else do you want to tell me?

5        MR. KARLAN:  No.  I think that if the 15

6 interrogatories are answered fully and fairly, as sometimes

7 does happen even when lawyers participate, we might want to

8 take one or two depositions, but we're clearly not going to

9 seek 175 depositions.  That's disproportionate, in my opinion.

10 Others may disagree.  In my opinion, that's disproportionate to

11 what's involved in this case on this motion because we're not

12 at the merits stage, okay.  There will, in the future --

13        THE COURT:  Can I ask you this?  Given the motion,

14 what did you say, Mr. Weintraub has 175 --

15        MR. WEINTRAUB:  Yes.

16        THE COURT:  -- plaintiffs?  Why do all of them have

17 to answer the interrogatories?  Why can't --

18        MR. WEINTRAUB:  Because --

19        THE COURT:  Stop, wait.  Why can't the parties meet

20 and confer and agree that some subset of the putative class

21 representatives at this stage will answer the interrogatories?

22 Because -- so let me assume you knocked off 50 or 75 of the

23 175.  No idea whether you would -- just I'm not sure what

24 you've accomplished if you've done that in terms of the filing

25 of late claims and whether they're going to be permitted to be

35

1  class claims.  I guess the individual asset members are

2  different than the economic loss because I guess they're really

3  not class claims for injury victims.

4          You're agreeing with me, Mr. Weintraub?

5          MR. WEINTRAUB:  That's what I was going to say.

6          THE COURT:  Okay.  And I appreciate that.  Let's just

7  even -- maybe the discovery should be focused on the class

8  representatives at this stage on the economic loss claim, which

9  are intended to be class claims if the Court were to permit it.

10 I don't want to lose 2017, and I don't want duplicative

11 discovery.

12         MR. KARLAN:  Your Honor --

13         THE COURT:  What I really want you all to do is

14 either find a mediator or sit down in a room and see whether

15 you can come to an agreement that deals with the issue of

16 disgorgement of distributions that creditors have already made,

17 possible priorities in the additional recoveries that come in,

18 agreeing on a total cap, agreeing on procedures about how

19 you'll deal with individual economic loss claims along the way,

20 but Mr. Weintraub's clients are different.  That's a different

21 situation.  Okay.

22         MR. KARLAN:  Happy to do that, Judge.  We're happy to

23 do that at any time.

24         THE COURT:  Okay.

25         MR. KARLAN:  Judge, if I could just say one word

36

1  about --

2        THE COURT:  Go ahead.

3        MR. KARLAN:  -- equitable mootness, then I'll yield.

4        THE COURT:  Sure.

5        MR. KARLAN:  We do believe that the posture of this

6  case is now materially different in a legally significant way

7  than it was when the Second Circuit issued its ruling and made

8  the remarks about mootness -- about ripeness of that issue.  We

9  now have, which we didn't have then, motions on file for leave

10 to file late proofs of claim, and we actually have the proposed

11 proofs of claim attached to --

12       THE COURT:  Do you agree that the GUC Trust entered

13 into a tolling agreement with the plaintiffs such that the time

14 from whenever that agreement was reached until -- is it still

15 operative and --

16       MR. KARLAN:  It is not.

17       THE COURT:  That doesn't count toward the issue of

18 permitting late claims.  There may be some period that's

19 relevant, but if the GUC Trust agreed to a tolling agreement,

20 then the period for which it's tolled gets cut out.  Do you

21 agree with that?

22       MR. KARLAN:  I do, Your Honor.

23       THE COURT:  Okay.  And what was that period?

24       MR. KARLAN:  With respect to the economic loss

25 ignition switch plaintiffs, Your Honor, there is an order of

1  April -- pardon me, May 16th, 2014 which provides that the

2  excluded period, if you will, is -- starts -- someone will help

3  me if I get this wrong, please -- starts 30 days after a final

4  order is entered on the threshold issues.

5         THE COURT:  So there still is not a final order.  Do

6  you agree with that?

7         MR. KARLAN:  I've got to get --

8         MR. WEISFELNER:  It started, Your Honor -- I have the

9  language right in front of me.

10        MR. KARLAN:  Thank you.  Thank you.  Thank you.

11        MR. WEISFELNER:  It started on May the 16th, 2014

12 because that was the date --

13        MR. KARLAN:  Oh, and ends on that day.  Sorry.

14        THE COURT:  Go ahead, Mr. Weisfelner.  Let me get a

15 clear statement from somebody so I have a clear record.  Go

16 ahead, Mr. Weisfelner.

17        MR. WEISFELNER:  Your Honor, I'm looking at page 3 of

18 7 of the order entered on May 16th, 2014, document 12697 in the

19 main bankruptcy case, and it provides that the trust agrees it

20 shall not assert a timeliness objection to any claims of the

21 plaintiffs, capital P, may attempt to assert against the Old GM

22 bankruptcy estate, and/or the GUC Trust, based directly or

23 indirectly on the ignition switch issue as a result of the

24 plaintiffs' delay in asserting such claims during the interval.

25 Interval is defined as a date that commenced on the date of the

1    order --

2            THE COURT:  Could you please -- hold on.  Go sit down

3    until we -- okay.  Don't -- it's distracting to me when you do

4    that.  It's --

5            MR. KARLAN:  Your Honor, I'm sorry.

6            THE COURT:  -- not courteous either.

7            Go ahead, Mr. Weisfelner.

8            MR. WEISFELNER:  I apologize, Your Honor.

9            THE COURT:  No, you shouldn't be apologizing.

10           MR. WEISFELNER:  The interval commences on the date

11   of the order, May 16th, 2014, and shall end 30 days after a

12   final order is entered with respect to an adjudication of the

13   threshold issues.  I think we all agree no final order has yet

14   been entered.  So what annoys me, Your Honor, and I

15   apologize --

16           THE COURT:  You don't -- I don't have to hear

17   (indiscernible).

18           MR. WEISFELNER:  Okay.  What I find to be

19   incomprehensible of the GUC Trust position as just articulated

20   is that he wants to engage in discovery, as I understand it,

21   with regard to Pioneer issues that he thinks are relevant for

22   the period of time that begins, I guess, on the date of the

23   first recall, February --

24           THE COURT:  2014.

25           MR. WEISFELNER:  -- 2014 to May 2014, and he wants to

39

1  serve me with interrogatories.  By the way, we asked multiple

2  times before yesterday, before the agreement we all thought we

3  had about today, give us copies of the interrogatories so we

4  know what we're talking about, and he refused.

5          THE COURT:  Okay.  We're going to solve that problem,

6  but --

7          Mr. Karlan --

8          MR. KARLAN:  Yes, Your Honor.

9          THE COURT:  -- would you agree that, if anything, the

10 Pioneer factors apply from February to May of 2014?

11         MR. KARLAN:  For Ms. -- I'm sorry, Judge.

12         THE COURT:  I'm sorry?

13         MR. KARLAN:  For Ms. Baker.  That's the only person

14 that --

15         THE COURT:  I (indiscernible) capital P plaintiffs

16 that Mr. Weisfelner --

17         MR. KARLAN:  Capital P --

18         THE COURT:  -- read from an order.

19         MR. KARLAN:  The capital P plaintiffs are the

20 economic loss ignition switch plaintiffs.  Only Ms. Baker

21 purporting to seek to represent a class has filed a motion for

22 late proofs of claims.  We are, by agreement, as I understand

23 it, not dealing at this time with issues of whether she is

24 entitled to represent a class.

25         THE COURT:  We're not dealing with that at this

40

1  point.

2          MR. KARLAN:  And we're -- and therefore, we're not

3  seeking discovery from any of the absent class members.

4          THE COURT:  No, I understand that, but I --

5          MR. KARLAN:  Now -- I'm sorry.

6          THE COURT:  Here, the --

7          MR. KARLAN:  May I just add one thing, Judge.

8          THE COURT:  Go ahead.

9          MR. KARLAN:  What was just read to Your Honor does

10  not apply at all to the 175 clients of Mr. Weintraub.

11          UNIDENTIFIED:  Or the non-ignition switch plaintiffs.

12          MR. KARLAN:  Or the non-ignition switch plaintiffs.

13          THE COURT:  All right.  Do you agree with respect to

14  the ignition switch economic loss plaintiffs that you have no

15  viable Pioneer argument with respect to filing late claims?

16          MR. KARLAN:  I don't know that yet, Judge.  I think I

17  may.

18          THE COURT:  For -- do you agree that the relevant

19  period is February to May of 2014?

20          MR. KARLAN:  For Ms. Baker and for the GUC Trust,

21  yes.  They're -- I think the --

22          THE COURT:  You represent the GUC Trust?

23          MR. KARLAN:  I do, Judge, but there are other parties

24  that may wish to make motions on it.

25          THE COURT:  Okay.  But you're standing up for the GUC

41

1  Trust.

2          MR. KARLAN:  I'm just trying to answer your

3  questions.

4          THE COURT:  Do you agree that for the ignition switch

5  economic loss plaintiffs, the only possible argument about

6  Pioneer factors is February to May 2014.

7          MR. KARLAN:  I do, Judge.

8          THE COURT:  You can't be serious.  I mean, when I say

9  you can't be serious --

10          MR. KARLAN:  I can be diligent, however, Judge.

11          THE COURT:  -- you really think that that period that

12  I'm going to find that the delay from February until May of

13  2016 [sic] would support an argument that I should not permit

14  late claims for ignition switch economic loss plaintiffs?

15          MR. KARLAN:  I think you meant 2014.

16          THE COURT:  I did mean 2014.

17          MR. KARLAN:  I'd like to see the facts, Judge, before

18  I make that decision.

19          THE COURT:  All right.  Anybody else wish to be

20  heard?

21          Mr. Steinberg.

22          MR. STEINBERG:  Your Honor, you raised a number of

23  questions which I waited until my turn to try to respond.

24          THE COURT:  You tried not to wait, but I forced you

25  to wait.  Go ahead.

42

1          MR. STEINBERG:  One, just so it's clear, the impact

2     of the accordion feature is not 10 billion.  It's less than $1

3     billion.  You get to that, but there's the maximum between if

4     the claims hit 35 billion to 42 billion, there's a maximum of

5     30 million shares that could be issued times $30 a share, if

6     that's what the GM price is, maybe 32, I haven't looked lately,

7     but it comes out to 900 and some odd million.

8          THE COURT:  So this is -- you know, it's --

9          MR. STEINBERG:  Your Honor, I --

10         THE COURT:  I was going to tease you about it.

11         MR. STEINBERG:  I know, but Your Honor was operating

12    under the thought because Mr. Weisfelner may have missed a

13    zero, that you're talking about ten billion, and I wanted to be

14    able to at least address it that it's less than $1 billion on

15    the accordion feature for the maximum amount.

16         THE COURT:  All right.  So you --

17         MR. STEINBERG:  I just want to just address that.

18         THE COURT:  Okay.  But all I was going to say is that

19    you or Mr. Weisfelner and Mr. Weintraub or whoever on that side

20    of the table is could engage in a discussion and you can try to

21    persuade them that the maximum amount that the accordion

22    feature would add to the funds available for creditor

23    distributions is $1 billion, not ten billion.  Have you had

24    that discussion yet?

25         MR. STEINBERG:  Well, I think Mr. Weisfelner may have

1  just misspoke.

2          THE COURT:  No, but I just -- I'm asking.  I mean,

3  that -- you could have that discussion, all right?  You

4  could --

5          MR. STEINBERG:  Your Honor, if I could --

6          THE COURT:  All these numbers are staggering to me,

7  but, you know --

8          MR. STEINBERG:  But, Your Honor, I think -- the

9  second point I want to make, which is I think you've heard it

10  from Mr. Weisfelner, but I'll say it more specifically.  The

11  people who are the players before Your Honor are part of a

12  subset of the people involved in the overall controversy,

13  including what has played out in the MDL, and Mr. Weisfelner

14  talks to his lead counsel I talk not only to my in-house

15  counsel, but my colleagues at Kirkland & Ellis handling the

16  MDL.  And everything involves a greater -- when Judge Furman

17  hears a status conference every, what -- usually, it's every

18  month, but it's been -- it was a couple months now.  The last

19  item on the status conference is settlement, right?  So the

20  issue of settlement -- and it's been that way for --

21          THE COURT:  The other bellwether cases have settled.

22          MR. STEINBERG:  A lot of them have settled, Your

23  Honor, and there are a lot of accident cases that have been

24  settled along the process.  There is -- it is not like the

25  parties are only litigating and not trying to figure out how to

44

1 resolve issues, and it's not just what's in the MDL.  There's a

2 number of cases outside of the MDL state court accident cases

3 that are getting resolved all along.  So both sides are

4 responsibly trying to address the matter.

5        THE COURT:  May I ask you this?  Mr. Weisfelner

6 didn't frame it exactly in this way, but he seemed to be

7 arguing that New GM doesn't have standing to argue, but let's

8 assume you do.  Are -- does New GM contend that the <u>Pioneer</u>

9 factors apply and should bar the filing of late claims by some

10 or all of the injury plaintiffs or economic loss plaintiffs --

11        MR. STEINBERG:  Yes.

12        THE COURT:  -- the ignition switch or non-ignition

13 switch?

14        MR. STEINBERG:  Yes, Your Honor.

15        THE COURT:  And why is that?

16        MR. STEINBERG:  Well, first, without trying to debate

17 the issue, we believe that there's a serious issue as to

18 whether the presale accident plaintiffs and the non-ignition

19 switch plaintiffs have any kind of tolling provision.  Clearly,

20 the May order that someone was reading to you, the May 2014

21 scheduling order, was dealing with the --

22        THE COURT:  I heard the order.

23        MR. STEINBERG:  -- ignition switch.  And that's

24 because, Your Honor, because the motion that was filed in April

25 was only ignition switch based.  The non-ignition switch and

1  the presale accident motion wasn't filed until August 1st.

2        THE COURT:  Let me -- in the threshold issues for

3  here, there are certainly issues about whether there's a due

4  process violation with respect to non-ignition switch

5  plaintiffs.  Do you agree?

6        MR. STEINBERG:  It has never been determined that

7  there's been a due process issue.

8        THE COURT:  I know.  I know.  That's one of the

9  issues that's being put to me, I thought.

10        MR. STEINBERG:  Well, Your Honor, what's being put to

11  you is that in the December 2015 judgment by Judge Gerber, he

12  said non-ignition switch plaintiffs have had the time to assert

13  a due process violation, they failed to do so, and therefore it

14  is too late to do so.

15        THE COURT:  Yes.  And you argue -- I understand.

16        MR. STEINBERG:  So they have never articulated -- and

17  when we talk about the economic loss late-filed claims that

18  were filed in this case, understand that ignition switch is 1.6

19  million and the non-ignition switch is eight-point-something

20  million vehicles.  So the predominance is non-ignition switch

21  in this case.  And the level of damages for each person could

22  be something like $600 to $1,500 because they're arguing

23  economic deterioration of a 2005 car which has 125,000 miles on

24  it based on having a recall where their ignition switch was

25  actually repaired, and they argue there was never a

46

1  manifestation of a problem anyway in the first place and now

2  it's been repaired, but their 12-year-old car with that type of

3  mileage still has compensation.

4          THE COURT:  (Indiscernible).

5          MR. STEINBERG:  Well, I'm just trying to add

6  perspective.  But I want to get to sort of the bottom line

7  because I think that's where Your Honor wants to go.  I think

8  Your Honor has sent a clear message that you don't want 2017 to

9  be wasted.  As a practical matter, it only has relevance if the

10 GUC Trust was ready to make a distribution.  They don't have

11 anything to distribute until the avoidance action trust is

12 resolved and that there's money coming in that would go to the

13 avoidance action trust, and that would lead to --

14         THE COURT:  I would be happy if they were able to

15 handle that.

16         MR. STEINBERG:  Right.  But the practical reality is

17 that this is not a first half of 2017 event, and Your Honor

18 sent a clear signal that, I don't want you coming back to court

19 without addressing the concerns I have, which is how to move

20 this case forward from a discovery viewpoint, from a briefing

21 of the Pioneer issues, for putting it in front of me so I can

22 make decisions.  I think our view was everything needed to be

23 resolved at one time because we weren't convinced that the

24 ripeness issue would happen, and then in -- during that 90-day

25 period, I'd like to sort of describe what would happen so Your

47

1    Honor doesn't think that we just kicked a can down the road

2    with nothing happening.

3         Besides the successor liability issues that are being

4    briefed before Judge Furman, there is a substantive motion that

5    is filed by New GM to dismiss major portions of the fourth

6    amended consolidated complaint on the grounds that their damage

7    theory doesn't work, which affects the type of claim, even if

8    they win to file a late file claim, that they would ever be

9    able to assert in this case.  That will be resolved sometime, I

10   assume, in the first half of 2015 [sic].  All of those things

11   have a dynamic as to what their attitude is and when the right

12   time is for resolution or if you're not at the right time for a

13   resolution.

14        The second item that is happening there besides the

15   cert petition -- and I want to just briefly talk about that.

16   There are two issue on cert.  Your Honor identified the first

17   one, which is should you effectuate or remedy against a good-

18   faith purchaser for a seller due process violation.  The other

19   one was the due process violation attack, which is that

20   essentially Judge Gerber had raised, and the Second Circuit had

21   held, that a sale notice that goes out not only has to tell

22   parties when the sale occurred, but also has to describe the

23   content of a claim that could be asserted against the estate as

24   part of the sale notice.  We argue that's never been part of --

25        THE COURT:  That goes to the issue of whether -- I

1  thought I read it.  I thought that goes to the issue of whether

2  the free and clear sale provision applies as to New GM, you

3  know, as to New GM.  If there was a bar -- if the bar date

4  doesn't apply because of a due process violation, that's;

5  different whether -- isn't that different than getting notice

6  of the sale and whether therefore the free and clear sale

7  provision is being applied?

8          MR. STEINBERG:  Let me try it again.  The issue that

9  we challenged on appeal on the cert petition to the Supreme

10  Court was whether a sale notice must contain a description of

11  claims so that plaintiffs know to object to the sale.  It's the

12  same inherent issue.  There's a bar date notice, which Judge

13  Gerber approved, which is consistent with the official form,

14  have to have a description of creditors' claims and telling

15  them how to file a claim in the case.

16          THE COURT:  Aren't known creditors entitled to notice

17  of the bar date notice?  Do you agree with that?

18          MR. STEINBERG:  Yes, Your Honor.

19          THE COURT:  Okay.  And was -- if Judge Gerber and the

20  Second Circuit were correct that people who bought GM cars with

21  an ignition switch defect who weren't advised of it, I thought

22  they were saying that due process was violated there.  Yes,

23  they -- certainly, the focus was on the sale order, but it

24  seemed to flow ineluctably from that that as they're saying

25  they're known creditors, they weren't given notice of a bar

1  date, and therefore they're not bound by the bar date.  But

2  what's wrong with what I just said?

3  　　　　MR. STEINBERG:  Judge Gerber did not find that there

4  was a due process violation -- a constitutional due process

5  violation.  He found that they were known creditors, that they

6  should have gotten mail notice, but they weren't prejudiced by

7  the fact that they didn't get mail notice, and no one on the

8  plaintiffs' side has ever argued that they're unaware of a sale

9  hearing.  The issue was the content, the content that they

10  didn't know that there was a defect, and therefore --

11  　　　　THE COURT:  Let me -- I apologize.  Let me interrupt

12  this.  What discovery -- do you want to take discovery separate

13  and apart from the GUC Trust?

14  　　　　MR. STEINBERG:  I think we may want to take

15  discovery.

16  　　　　THE COURT:  What discovery do you wish to take --

17  　　　　MR. STEINBERG:  I think the issue that --

18  　　　　THE COURT:  (Indiscernible).

19  　　　　MR. STEINBERG:  I think that the issue that you asked

20  the GUC Trust was whether their sole focus was on 2014 events,

21  which is after the announce of the recall, whether there is a

22  basis to assert the Pioneer factors.  And I've been in

23  discussion with my MDL counterparts, and we have not crossed

24  the bridge as to whether events relating to 2009 before the bar

25  date, if we could demonstrate they're aware of the bankruptcy,

50

1   the bar date, and they were having problems with their vehicles

2   at the time, whether that was sufficient so that they should

3   have filed a claim and they otherwise don't have excusable

4   neglect.  And we think certainly the issue is ripe for accident

5   people because if they were in accidents and they had consulted

6   lawyers and they just didn't file proof of claim, we think the

7   issue is ripe.

8         Your Honor should understand that when you see the

9   tolling provision, the other thing that's in that scheduling

10  order in May of 2014 is that Judge Gerber said that late claims

11  motions are not part of the threshold issues.  And no one

12  briefed --

13        THE COURT:  Well, we're here today in 2017 --

14        MR. STEINBERG:  No, no, no.

15        THE COURT:  -- not back with Judge Gerber's

16  scheduling order.  We're here to decide how I'm going to

17  proceed.

18        MR. STEINBERG:  Well, and I thought I answered your

19  question, Your Honor, which is I think 2009 events may be

20  relevant and therefore --

21        THE COURT:  Okay.

22        MR. STEINBERG:  -- that discovery needs to be done,

23  as well.

24        THE COURT:  And have you drafted your proposed

25  interrogatories?

51

1          MR. STEINBERG:  No, because I have -- because I think

2     I'm leaving that to Kirkland & Ellis, and we think the

3     discovery should be done through the MDL process because

4     that --

5          THE COURT:  Tell me what the -- so you're looking for

6     not just discovery about Pioneer factors.

7          MR. STEINBERG:  We think that is part of the Pioneer

8     factors, which is whether it was excusable neglect not to have

9     filed a claim in 2009.  But, Your Honor, what I've said to you

10    now is to try to respond directly to a specific question you

11    have, and that is the present thinking.  What I'm saying to you

12    is that over the 90 days, we understand that Your Honor wants

13    to have a non-overlap discovery program implemented so that

14    this case can go forward and not just sit forever.

15         And what we've tried to identify to you is that there

16    are clearly coordination issues with the MDL and discovery

17    issues.  You have one element of the entire case that is

18    subject to a stay, and we all have MDL counter counsel who will

19    want to weight in on this issue and have not fully come to a

20    decision as to how they think it should go forward.  And we do

21    need the time to be able to better coordinate the MDL

22    proceeding and how to move this matter forward.

23         We didn't have -- and I agree with Mr. Karlan that he

24    was -- he thought this was going in a different direction.  He

25    will have interrogatories to share with us.  We will have to

52

1  decide what else we want to do.  Mr. Weintraub will decide

2  whether that's appropriate discovery, whether he wants to

3  challenge the discovery.  We will need to have briefing

4  schedules to Your Honor to raise all of the issues relating to

5  late claims.

6          And I think that's what the 90 days are for, in

7  addition to giving the GUC Trust access to the fact sheets, to

8  have the depositions of the two lead counsel who filed the

9  economic claims, and to be able to try to coordinate it, and we

10 think 90 days is probably the right amount of time to do it.

11 And recognizing that while the 90 days are happening, between

12 the dismissal motion on the fourth amended consolidated

13 complaint, the cert petition, the successor liability motion,

14 the appeal before Judge Furman on the --

15          THE COURT:  The successor liability issue doesn't

16 impact whether I permit late claims to be filed.

17          MR. STEINBERG:  I agree with that.  I agree with

18 that.

19          THE COURT:  Does not.

20          MR. STEINBERG:  No, I agree with that.  The only

21 thing that it does impact is the dynamic of a case and whether

22 you get closer to a resolution.  Some things are directly --

23          THE COURT:  The thing that gets cases close to a

24 resolution is to move forward in whatever court it's in.  I

25 don't want to have duplication or overlap with what goes on

53

 1  before Judge Furman.  But I'm not going to sit back and wait to

 2  see what happens elsewhere, all right.  I want to make that

 3  crystal clear.

 4          MR. STEINBERG:  Message received.  And the only thing

 5  I wanted to just say in response to that is that I fully

 6  understand, and I think everyone in this courtroom understands,

 7  that cases get resolved when important issues are crystalized

 8  by the courts, and then parties have to assess their positions.

 9  All I was trying to do was to identify to you is that there are

10  matters going on right now that are affecting the parties in

11  this courtroom which may crystalize it in a way that creates

12  the dynamic and that in order for you to then -- to create your

13  own issue resolution, we need a little time to be able to

14  coordinate it, and that's the basis of the 90 days.

15          And it's not that the cases are standing still, and

16  it's not like there's been immediate distribution.  So the

17  message has been clearly received, and I think everybody knows

18  that we need to be better prepared coming into the next status

19  conference of how to move the case forward, and we would ask

20  Your Honor to give us that time to be able to do so.

21          THE COURT:  All right.  Anybody else want to be

22  heard?

23          MR. NOVIKOFF:  Briefly, Your Honor.  Howard Novikoff,

24  Wachtell, Lipton, Rosen & Katz for JPMorgan Chase Bank.  While

25  I'm an old face in the context of the avoidance action, I think

54

1    I'm a new face in this connection, and that's because something

2    that was filed in the ignition switch plaintiffs' brief caused

3    us to come here because it's a unique position on something

4    they raised, and that is they are asserting that a possible

5    remedy that they want to achieve is exclusive or priority

6    access to something that's been described in this court as a

7    pittance, which is approximately $500 million of existing

8    assets in the GUC Trust.  Never before in my career, Your

9    Honor, have I appeared to argue over a pittance, but here I am.

10            If JPMorgan or any of the term lenders have to pay as

11   a result of a resolution of that avoidance action, the

12   architecture of the two trusts is that the payment goes into

13   the avoidance action trust for pro rata distribution among the

14   holders of beneficial interests in that trust.  However, that

15   payment means that, in essence, whoever's paid it has become

16   unpaid on their old general unsecured claim, so they'd become

17   claimants in the GUC Trust.  The GUC Trust recognizes that and

18   is expressly reserved and has been holding in trust

19   distributions based on a maximum $1.5 billion new claim as a

20   result of that action.  That's held in trust for JPMorgan and

21   the other term lenders.

22            We have not received any distributions from the GUC

23   Trust, and if a exclusive or priority distribution is given to

24   Mr. Weisfelner's or any of these other gentlemen's clients,

25   that's come directly out of our hide, and we view that as being

55

1  a unique position for us and especially unfair to us.  If and

2  when that issue is up before this Court or in any discussions,

3  we just want to alert people to the fact that we believe we

4  have a unique position on that, we want to be heard on that,

5  and we are prepared to, you know, participate in any resolution

6  of that issue.

7          THE COURT:  Do you have a position on the motion to

8  file late claims?

9          MR. NOVIKOFF:  We will agree with the GUC Trust and

10 the participating unitholders on that issue.  I mean, we would

11 oppose -- we generally oppose it, but we don't feel that we

12 have a unique position that we need to thrust ourselves into

13 the case on that issue.  But on this unique issue of access to

14 that somewhere between 450 and $500 million, we do have a

15 unique issue and we would like to thrust ourselves in on that

16 issue.

17         THE COURT:  Thank you, Mr. Novikoff.

18         Anyone else wish to be heard?

19         MR. NOVIKOFF:  Thank you, Your Honor.

20         THE COURT:  Mr. Golden.

21         MR. GOLDEN: Good morning, Your Honor.  Daniel Golden,

22 Akin Gump.  Your Honor, we represent what's known -- become

23 known as the participating holders.  We are the, in fact, the

24 equity holders of the GUC Trust, and we have been intimately

25 involved in all of the negotiations and litigation on these

56

1  late claim issues before Judge Gerber.  I only want to make

2  four points.

3        I just want to -- one, first point, I want to clear

4  up any confusion because I think it's unfair to the Court.

5  There has been a fair amount of confusion about who's the

6  beneficiary of a tolling period and for what period of time.  I

7  think it's crystal clear that the only parties that are the

8  beneficiary of the tolling period in the May 2014 scheduling

9  order are the ignition switch plaintiffs represented by

10 Mr. Weisfelner.

11       Who is not a beneficiary of that tolling period are

12 the presale accident victims or the non-ignition switch

13 plaintiffs, also represented by Mr. Weisfelner.  The presale

14 accident victims negotiated for their own tolling period more

15 than a year later, so they have a letter agreement with the GUC

16 Trust entered into in December of 2015, which starts their

17 tolling period.  So the tolling periods are different, and they

18 only apply -- the first one only applies to Mr. Weisfelner.

19       We do believe that despite the finding of a due

20 process violation that the Pioneer factors remain applicable

21 when Your Honor will ultimately have to decide, on the merits,

22 the late claims motion, and the time period is only one of the

23 four factors announced by the Supreme Court in Pioneer, and

24 there are other factors we want to discuss when and if we ever

25 get to the late claims motion.

57

1           We agree with Your Honor.  We don't want to stand

2    still and watch 2017 go by without some kind of resolution.

3    That's why we said if we're not going to do discovery, let's at

4    least move forward on the equitable mootness.  Now, Mr.

5    Weisfelner discussed that there is an issue with respect to

6    equitable mootness.  No one's trying to hide the Second Circuit

7    vacated the equitable mootness finding by Judge Gerber on

8    ripeness grounds.  As Mr. Karlan said, we are in a much

9    different situation.  When the Second Circuit had to rule on

10   that, there had been no late claims motion filed.  There had

11   been no appended proofs of claim filed.

12           THE COURT:  It seemed pretty clear to me when I read

13   the opinion that Judge Chin had, in the back of his mind -- he

14   talks about the accordion.  He talks about the equitable

15   mootness.  He didn't put the two together in the opinion, but I

16   sure read it as saying, by the way, there's more money from

17   which claims can be paid if they're allowed.

18           MR. GOLDEN: We don't disagree with that, Your Honor.

19   And that leads me -- so let me just finish.  We don't see an

20   obstacle to moving forward on equitable mootness, and that was

21   part of the arrangement we thought we had today, that we were

22   going to go forward on equitable mootness.

23           THE COURT:  What does that mean, to go forward on

24   equitable mootness?

25           MR. GOLDEN: We would brief and Your Honor would

58

 1  decide the issue of even if the late claims motions were

 2  granted and those claims were allowed to be filed, should they

 3  be, in effect, disallowed because they have -- they are

 4  equitably moot and therefore not entitled to get a distribution

 5  from the GUC Trust assets.  That's the issue that was presented

 6  to Judge Gerber that he ruled in favor of.  Second Circuit did

 7  not -- vacated, but not on the merits, but because of the

 8  ripeness issue.  I think the ripeness issue has been overcome

 9  by the filing of the late claims motion.  So we think we can go

10  forward and should go forward on an equitable mootness

11  determination.

12          What I don't want to do -- I'm sorry.

13          THE COURT:  Is the equitable mootness issue -- I'll

14  use the term "ripe," but I'm not sure that's what ought to be

15  applied to it, until a determination as to whether there are --

16  late claims will be permitted?  Because in the absence of the

17  late claims, is equitable mootness --

18          MR. GOLDEN: Relevant.

19          THE COURT:  -- relevant?

20          MR. GOLDEN: No, it's not, Your Honor.  But on --

21          THE COURT:  Okay.  So doesn't the issue about late

22  claims have to come before I decide whether there's equitable

23  mootness?  It's kind of advisory to say -- it seems, to me,

24  advisory to say equitable mootness does or doesn't apply until

25  the Court decides whether there are going to be more claims.

59

1          MR. GOLDEN: I certainly understand that, Your Honor,

2    but we have a little bit of a chicken and an egg here.  We're

3    trying to -- we obviously think equitable mootness does apply,

4    and we're trying to, in effect, short circuit it.  We're trying

5    to avoid millions of dollars of discovery.

6          THE COURT:  Why -- I don't understand, Mr. Golden,

7    why there's going to be millions of dollars of discovery on the

8    Pioneer factors.

9          MR. GOLDEN: There likely won't be, from the GUC Trust

10   perspective.  What GM intends to do on discovery --

11         THE COURT:  They may think they're going to unleash

12   the discovery wars, but they may be in for a real surprise when

13   they get back to me.

14         MR. GOLDEN: I won't presume to speak for what

15   discovery GM wants to take on the Pioneer factors, but I do

16   believe --

17         THE COURT:  So we'll let Mr. Steinberg and his

18   colleagues talk about that.

19         MR. GOLDEN: That's fine, Your Honor.  But discovery

20   with respect to these plaintiffs --

21         THE COURT:  Which plaintiffs?  Mr. Weintraub's or the

22   economic loss plaintiffs?

23         MR. GOLDEN: All of those plaintiffs.

24         THE COURT:  Yes.

25         MR. GOLDEN: So let's just deal with Mr. Weintraub.

60

1   He represents -- I thought it was 200, but maybe it's only 175

2   parties who suffered, who allegedly suffered presale accidents.

3   Every one of them is filing an individual claim.  I think the

4   interrogatories don't really work going only to a subset of

5   them because they may all have different facts.

6           THE COURT:  Right.  Right.  I see that.

7           MR. GOLDEN: Okay.  So we thought we could -- if we

8   could get a ruling on equitable mootness that's not going to be

9   tainted by a ripeness issue, we thought that was a way of short

10  circuiting it.  In effect, our way of getting to a summary

11  judgment motion or a motion to dismiss.

12          We still think that makes sense, but we don't want to

13  waste the Court's time.  We don't want to waste our time or

14  their time because there's still a continuing, nagging concern

15  that despite Your Honor's ruling on equitable mootness, that

16  may be overturned again by the Second Circuit on ripeness

17  concerns.  We don't want to go down that path.  And that's why

18  we wanted everyone to agree that they would not raise the

19  ripeness defense.  I understand that does not necessarily

20  confer jurisdiction.

21          THE COURT:  I would -- I'd go beyond "not

22  necessarily."

23          MR. GOLDEN: The last point, Your Honor.  We have

24  attempted to settle, and I'm not going to get involved in

25  settlement negotiations.  I just don't want you to think that

61

1  people have retreated into their corners.  We have tried on

2  numerous occasions.

3         The settlement discussions dynamic are difficult

4  here.  The plaintiffs have two potential sources of recovery,

5  and here, I'm talking about all the plaintiffs, from New GM and

6  from the GUC Trust, if they ever able to file late proofs of

7  claim.  It's because of that dynamic and a sense on the part of

8  the plaintiffs, well, if I do a settlement with the GUC Trust,

9  does that somehow negatively impact my ability to go after New

10  GM?

11         It's the very same reasons, I think Your Honor is

12  aware, in the discussions before Judge Gerber when questions

13  were put to plaintiffs' counsel about why they didn't take

14  certain actions.  For example, move to stay distributions.  And

15  it was, frankly, responded to Judge Gerber, they were tactical.

16  And I think that that -- those tactical considerations

17  continued to hinder the ability to settle these cases.  If you

18  direct it in mediation, we will certainly participate.

19         We believe that there is a simple, easily reached

20  resolution as far as the GUC Trust is concerned.  I think Your

21  Honor has honed in on that when you focused on the accordion

22  feature.  The participating holders never believed that they

23  were going to get distributions from the accordion proceeds.

24  That makes for a perfect settlement dynamic.

25         THE COURT:  Makes a difference whether there's one

1 billion or ten billion, too, but you know --

2        MR. GOLDEN:  Actually, it doesn't, as far as the

3 participating holders are concerned.

4        THE COURT:  Well, that's -- okay.  But it does as to

5 the people who really care about the distributions.

6        MR. GOLDEN: That's right.  So, you know, I don't --

7 you know, I think I've said all I can really --

8        THE COURT:  Okay.  All right.

9        MR. GOLDEN: -- say on the settlement discussions.  If

10 you were to direct mediation, we would participate, and maybe a

11 mediator can find a way to cut through the dynamics of

12 plaintiffs having two potential sources and the impact of

13 settling with one and not settling with the other.

14        THE COURT:  You know, I can remember as a lawyer

15 crafting a lot of settlement agreements that had to deal with

16 this issue of there are several potential pots and not wanting

17 to prejudice rights against another.  I -- you know, those get

18 dealt with all the time.

19        MR. GOLDEN: I'll leave you with, Your Honor, that we

20 don't understand the 90-day delay.  We don't think it makes

21 sense.  We think Your Honor was exactly right.  The discovery

22 that the GUC Trust would seek here --

23        THE COURT:  Well, Mr. Steinberg wants to -- seems to

24 want to unleash the discovery wars about every one of

25 Mr. Weintraub's clients, and going to the merits rather than --

63

1            MR. GOLDEN: My own view on that is that it's not

2   applicable to the Pioneer standards, so I'm not sure I

3   understand it.

4            THE COURT:  All right, thank you.

5            MR. GOLDEN: Thank you, Your Honor.

6            MR. WEISFELNER:  Your Honor, I'm going to do my best,

7   see if I can wrap this up with --

8            THE COURT:  Go ahead.

9            MR. WEISFELNER:  -- Your Honor.

10           THE COURT:  You're not going to be able to wrap it up

11  because Mr. Weintraub wants to be heard, too.

12           MR. WEISFELNER:  Well --

13           THE COURT:  You're closer to the microphone, so why

14  don't you go first --

15           MR. WEISFELNER:  I'm closer to the mic.

16           THE COURT:  -- and then --

17           MR. WEISFELNER:  Your Honor, I'm going to revise our

18  request for relief today in the status conference and ask Your

19  Honor for a 30-day period because I've heard a lot of stuff

20  today that I think is just unconscionable.  So --

21           THE COURT:  That overstates it.  Come on.

22           MR. WEISFELNER:  -- what I'd like to do is see if the

23  parties, within the 30-day period, can't recast and reformulate

24  their collective views as to what Your Honor ought to move

25  forward with and not move forward with.

64

1          For example, there was a debate between you and Mr.

2   Steinberg on what is or isn't part of the cert petition, even a

3   debate, I think, as to what Judge Gerber did or didn't do with

4   regard to the bar date.  And I'm looking at his decision in

5   529 B.R. 510 under the heading of Claims, where he said -- and

6   I'm quoting:

7               "The remedy with respect to the denial of notice

8               sufficient to enable the filing of claims before the

9               bar date is obvious.  That is leave to file late

10              claims.  And the Court may grant leave from the

11              deadline imposed by the Court's bar date order" --

12  -- that was the subsequent order where he said any future

13  claims are going to be disallowed --

14              -- "just as the Circuit relieved Chubb and the

15              easements owner from enforcement of the earlier

16              orders in Manville-210 and Koepp" --

17  -- K-O-E-P-P.

18          Your Honor, my point is that I think that the

19  proceedings before Judge Gerber, the proceedings before the

20  Second Circuit, a proper analysis of the cert petition lays

21  bare the fallacy of the argument that there is any

22  consideration to be given for activity or knowledge that

23  plaintiffs at large, but certainly as to the ignition switch

24  plaintiffs, that there's any Pioneer factor to discover or

25  think about before the recalls and GM's first ever

1  acknowledgment that a defect existed.

2              THE COURT:  February 2014?

3              MR. WEISFELNER:  February of 2014.  Now, Your Honor,

4  I think what we ought to do, be it 30 days or 45 days or

5  whatever period of time Your Honor wants is, give us another

6  chance to try and meet and confer because, frankly, if GM wants

7  to push this issue now or any time in the future, I want a

8  legal resolution of whether or not they're entitled to, given

9  the history we've got --

10             THE COURT:  Whether they're entitled to what?

11             MR. WEISFELNER:  Whether they're entitled to contest

12 late claims based on Pioneer factors going back to a period of

13 time prior to the recall.  That's what he just articulated.  I

14 think it's -- as a matter of law and as a matter of what --

15             THE COURT:  Just explain to me a little more about

16 the non-ignition switch plaintiffs and what you see as the

17 triggering dates for them.

18             MR. WEISFELNER:  Your Honor, I would like to divide

19 non-ignition switch plaintiffs into two categories.  Category

20 number one is folks that suffered from a defect in their

21 ignition switches in their cars, but were part of subsequent

22 2014 recalls, not the first wave of 2014 recalls.  It is our

23 position and our view, based on discovery that's taken place in

24 the MDL and otherwise and admissions that are made by GM on the

25 record before Congress and as part of the Valukas report, that

66

1  there is no substantive distinction between plaintiffs who

2  complain of economic losses as the consequence of a faulty

3  ignition switch as between the first wave and the second wave.

4        Beyond that, the category of non-ignition switch

5  plaintiffs, when viewed from GM's perspective, also includes a

6  group of plaintiffs that my clients, the MDL lead counsel, also

7  represent in the MDL who are complaining about other defects

8  that were the subject of recalls, including -- and I'm not well

9  versed in this, but I think it's seatbelts, rear harness,

10  lights, and other general recalls.

11        THE COURT:  Yeah, I -- just a general observation.

12  I'm not deciding on it, but I feel that -- look, I read Judge

13  Gerber's decision.  I read the Second Circuit opinion.  I find

14  it hard to put my head around the notion that the existence of

15  a recall translates into a due process violation.  You know,

16  cars have defects.  Sometimes they can get recalls.  Sometimes

17  they're discovered a little later and it's discovered, well,

18  yeah, you know, we manufactured this car in 2008 and the recall

19  is in 2015 or 2016.  That doesn't -- I don't see how that

20  translates into a due process violation.  Would you agree with

21  that?

22        MR. WEISFELNER:  No.

23        THE COURT:  You don't agree?

24        MR. WEISFELNER:  No, I don't.

25        THE COURT:  Okay.

67

 1          MR. WEISFELNER:  I think it very much depends on the

 2     nature of the defect and the facts and circumstances

 3     surrounding the manufacturer's refusal, purposeful refusal, to

 4     acknowledge the defect.  When it rises to the level of a safety

 5     defect as defined by the National Highway Safety Administration

 6     and there is evidence that the corporate entity knew about the

 7     existence of the safety defect and purposefully avoided --

 8          THE COURT:  All right.  Well --

 9          MR. WEISFELNER:  -- public discourse --

10          THE COURT:  -- there'll be time to get into -- I

11     understand your position on it.  Okay.

12          MR. WEISFELNER:  Okay.  But I -- my point is this,

13     Your Honor.  And I can go into a lot of other issues that

14     concern me, including the fact that the GUC Trust is, by

15     definition, a fiduciary, and it's a fiduciary to a class of

16     people that had claims against GM's estate, not as they define

17     it, a class of people who knew enough to file proofs of claim

18     on time.

19          And the fact that they distinguish between their

20     fiduciary obligations to the GUC Trust participants represented

21     by Mr. Golden and the people who are entitled to file a late

22     proof of claim pursuant to decisions of courts of competent

23     jurisdiction, which I don't think are challenged by the cert

24     petition, I find a little bit disingenuous and of concern.  But

25     my point is this, Judge.

68

1          Look, I could satisfy everyone's concern about

2    ripeness and take a page out of the book of asbestos and other

3    mass tort claims.  Everyone stipulate to an allowance of the

4    claim at a dollar at a minimum.  And once the claims are

5    allowed, then I don't think you have a ripeness concern with

6    regard to their efforts to brief equitable mootness.

7          THE COURT:  All right.  Let me hear from --

8          MR. WEISFELNER:  But --

9          THE COURT:  -- Mr. Weintraub.

10          MR. WEISFELNER:  -- that's one of the reasons why I'm

11    suggesting an adjournment for a limited period of time.  Let

12    the parties confer and see if they can't come to you with a

13    better agreed position.

14          THE COURT:  One last question.  Do you think the

15    Court can decide, as a matter of law, that equitable mootness

16    can't be applied for a period before the first recall?

17          MR. WEISFELNER:  Yeah, I think you can, as a matter

18    of law.  I think you can decide that the _Pioneer_ factors --

19    given the record in this case and notwithstanding --

20          THE COURT:  Not equitable mootness, the issue of

21    _Pioneer_ factors and the late claim can't be applied prior to

22    the first -- for a period prior to the first recall.

23          MR. WEISFELNER:  Yes.  I do think, as a matter of law

24    and the doctrines of law of the case and the positions that

25    were espoused by the parties, be they called collateral

69

1  estoppel or res judicata, I think Your Honor can, as a matter

2  of law, make a determination that consideration of a period of

3  time before the first recall is not relevant with regard to

4  application of the _Pioneer_ factors.

5          THE COURT:  Thank you, Mr. Weisfelner.

6          All right.  Mr. Weintraub.  So we -- I'll wait until

7  you get up to the microphone.  For pre-closing accident

8  victims, why doesn't a different set of issues about _Pioneer_

9  apply to them?  They were in accidents.  I assume they tried to

10 figure out why they were in an accident.  Was there something

11 wrong with the car?  Why aren't they differently situated than

12 the economic loss plaintiffs?

13         MR. WEINTRAUB:  Your Honor, I believe the reason that

14 they are situated similarly is notwithstanding the accident,

15 they were not told that there was a reason for the accident.

16 Had there been a recall coupled with the bar date notice and

17 had the bar date notice been served on them by first class mail

18 as required, none of that happened, then they would have been

19 able to file a claim.  But because of the absence of a recall,

20 for all the claimant knew, it was my fault, it was the other

21 guy's fault, it was bad gas, it was an act of God, I don't

22 know.  And they didn't get the notice that due process requires

23 with respect to the bar date.  The conjunction of those two

24 things caused Judge Gerber to decide that there was a due

25 process violation and that they were prejudiced.  And --

70

1          THE COURT:  Yes, but he didn't decide this.  So let's

2     assume somebody's in an accident because the engine just shut

3     off and the power steering didn't work and they hit an

4     abutment, okay.  Aren't those facts and circumstances about the

5     accident relevant to the issue of whether any of the _Pioneer_

6     factors apply to them?  They know -- let's hypothetically --

7     you know, one of your 175 clients knows that, ah, just out of

8     the blue, the ignition turned off, the power steering didn't

9     work, the power brakes didn't work, I lost control of the car,

10     and I had an accident.  Isn't that relevant to the issue of

11     whether to permit a late-filed claim on behalf of that person?

12          MR. WEINTRAUB:  If the _Pioneer_ factors were

13     applicable, I would concede that that would be relevant.  We

14     don't believe that _Pioneer_ is applicable because _Pioneer_ arises

15     in the context of someone who got constitutionally sufficient

16     notice and then has to come up with a reason why,

17     notwithstanding the constitutionally sufficient notice, they

18     didn't file a claim.  That --

19          THE COURT:  All right.  Here's -- thank you, Mr.

20     Weintraub.  Is there another point you wanted to make?

21          MR. WEINTRAUB:  Yes.  Yes, Your Honor.  I think a lot

22     of what I was going to say was said by Mr. Weisfelner, but the

23     point that I did want to make is that our argument does not

24     hinge on tolling.  It hinges on some of the other things that I

25     spoke about.  But because things were being read into the

71

1  record, I would like to read the following into the record.

2  And I did allude to the September 15, 2014 scheduling order,

3  which is docket number 12897.  And what the Court ordered was,

4  in the first order paragraph.

5          Until further order of the Court, this schedule

6  governing New GM's ignition switch motion to enforce, which is

7  subject to various orders previously entered by the Court,

8  copies of which shall be provide by New GM to plaintiffs upon

9  written request, shall cover the schedule for the pre-closing

10 action motion to enforce.

11         THE COURT:  Okay.

12         MR. WEINTRAUB:  Our interpretation, our very strong

13 view is that this incorporates the prior order, the prior order

14 embedded in the ordered provisions that the issues of late

15 claims were to be put to the side until the four threshold

16 issues were decided.  And I don't think it's credible to say

17 that my clients should have stood up and said, we want to be

18 treated differently than everybody else, we want our issues

19 adjudicated now.  And for the reasons I said earlier, Your

20 Honor, until the four threshold issues had been decided, there

21 was no basis to seek a late claim.

22         THE COURT:  Okay.  Here is, at least, how we're going

23 to proceed in part.  There's a hearing in Motors Liquidation on

24 a motion to dismiss that's currently scheduled for February

25 14th, and I'm -- which is a 10, but we're going to have an

72

1  eleven o'clock hearing --

2          Don't get too excited, Mr. Steinberg.  Let me finish

3  what I'm saying.

4          MR. STEINBERG:  No, I'm not.  I'm already on

5  February 14th.  I'm going to be away out of town in California

6  on that day.  I can do February 15th, 16th, 17th.

7          MR. WEISFELNER:  You're only saying that because it's

8  Valentine's Day.

9          MR. STEINBERG:  It is.  It's a Valentine's Day trip

10  with my wife.

11          THE COURT:  February 15th.

12          MR. STEINBERG:  February 15th would be --

13          THE COURT:  At eleven o'clock.  I have some things at

14  10 which will be very quick.  At eleven o'clock --

15          MR. STEINBERG:  Thank you.  I appreciate it.

16          THE COURT:  -- on February 15th.

17          What's going to happen before then?  On or before

18  January 26th, the GUC Trust and New GM will exchange -- will

19  provide drafts of not to exceed 20 interrogatories focused

20  exclusively on ostensible <u>Pioneer</u> factors.

21          Mr. Karlan, you've got yours drafted.  Don't wait,

22  give it to them.

23          MR. KARLAN:  I was going to ask, Judge, is it 15 for

24  me and --

25          THE COURT:  No, each of you.  Yeah, circulate them.

73

1          MR. KARLAN:  Okay.  I'll start mine today, Judge.

2          THE COURT:  And I said 20.  You said you have 15.

3          MR. KARLAN:  I have 15.

4          THE COURT:  15 is better than 20, okay.

5          MR. KARLAN:  Start them today.

6          THE COURT:  But not to exceed 20, including subpart.

7    I don't want, you know, one with 100 subparts.

8          MR. KARLAN:  Understood.

9          THE COURT:  Okay.  On or before Thursday, February

10   2nd, the plaintiffs shall confer with the proponents of the

11   interrogatories about objections about the interrogatories and

12   as you meet and confer and try and work out, to the extent they

13   can, which of those interrogatories -- see if you can work out

14   the issue with the interrogatories.

15         On or before five o'clock on February 8th, the

16   parties may file not to exceed ten pages dealing with

17   objections as to any of those interrogatories and attach

18   whatever the state.  You may have renegotiated some of those.

19   The February 8th filing for objections, attach whatever the

20   versions that are operative at that time, and I'll address

21   those on February 15th, if need be.  I obviously want none

22   duplicative, none merits discovery, focused solely on Pioneer

23   factors.  I understand that the plaintiffs' position is Pioneer

24   doesn't apply, but I can't decide that in the abstract.  I want

25   to see what's the discovery.  So far, these interrogatories

74

1   haven't been served to anybody.  They've only been exchanged,

2   and we're going to go through this process that I've just

3   described.

4          Okay.  At that hearing on the 15th, I want to see --

5   I want you all to have been trying to work out how we're going

6   to go forward from here.  I've made clear we're not wasting --

7   it's not waste, okay -- we're not going to take 2017 to wait

8   and see what happens elsewhere.  It does seem to me that

9   equitable mootness is not ripe until the issue of late claims

10  has been sufficiently addressed.  I want you all to work on a

11  path forward here with respect to the motions for late claims,

12  including briefing schedules, and if you can agree on which

13  issues -- you know, if you don't want to -- if you can agree

14  some of the issues should be briefed now and not all of them,

15  I'd like to get the late claim issue resolved.

16         Okay.  So that's how -- so I'm going to see you on

17  February 15th at 11, and I've given you some dates for things

18  along the way.

19         MR. WEISFELNER:  Two points of clarification --

20         THE COURT:  Yes.

21         MR. WEISFELNER:  -- Your Honor.  I'll take the hard

22  one first.  In Your Honor's original order to show cause, in

23  the provision that deals with the whole issue on late claims --

24         THE COURT:  Right.

25         MR. WEISFELNER:  -- all of the parties agreed, and

75

1  Your Honor so ordered, that what we're scheduling is late

2  claims as it relates to what GM defines as ignition switch.  So

3  I want to make sure that Your Honor didn't contemplate that we

4  were going to start getting interrogatories with regard to --

5          THE COURT:  No.

6          MR. WEISFELNER:  -- anything other than that.

7          THE COURT:  No.

8          MR. WEISFELNER:  Okay.

9          THE COURT:  With that.  That's what we're going to

10 focus on.

11         MR. WEISFELNER:  Okay.  And number two, and not to

12 imply any bad faith or misconduct, but when you talk about GM

13 and the GUC Trust coordinating --

14         THE COURT:  No, no, no, I didn't -- each of them is

15 going to -- Mr. Steinberg said that they want to take some

16 discovery.  GUC Trust said they want to take some discovery.

17 Yes, I am mindful of, you know, Mr. Karlan said, well, we'll do

18 these 15, you do 15 different ones.  I'm going to -- you're

19 either going to work out the issues or you're not, and I will

20 deal with it at that --

21         MR. WEISFELNER:  And my point is I'd love to include

22 Mr. Golden, only because it's always fund to deal with him, but

23 I want him to be under the same deadline of getting

24 interrogatories to us so we don't get whipsawed between the due

25 process.

76

1          THE COURT:  Does he have standing to serve

2   interrogatories in this?

3          MR. WEISFELNER:  Who knows?  But I mean, whether he

4   has --

5          THE COURT:  Do you propose interrogatories, Mr.

6   Golden?

7          MR. GOLDEN:  No, Your Honor.  We -- I don't know why

8   Mr. Weisfelner --

9          THE COURT:  You're interested.

10          MR. GOLDEN:  We will work -- we will not be serving

11   our own interrogatories.  We will work through the GUC Trust.

12          THE COURT:  That's fine.  I was -- I tried to be

13   clear.  The only ones who are going to serve interrogatories

14   are the GUC Trust and New GM.

15          MR. WEISFELNER:  I just don't want to get whipsawed

16   and --

17          THE COURT:  I understand.

18          MR. WEISFELNER:  -- find out that, well, nobody told

19   me I had to serve and I'm still alive with my potential

20   interrogatories.

21          THE COURT:  Take the word serve away.  They're going

22   to exchange -- you're going to get the drafts -- Mr. Karlan's

23   going to even get them to you sooner than that time because I

24   think he had some drafts ready.

25          Mr. Weintraub.

77

1          MR. WEINTRAUB:  Just a point of --

2          THE COURT:  Go ahead.

3          MR. WEINTRAUB:  -- clarification.  Should I -- can I

4  do it from here?

5          THE COURT:  You can do it from there.

6          MR. WEINTRAUB:  Point of clarification.  I thought I

7  heard two things.  One would be an objection not to exceed ten

8  pages by February 2nd --

9          THE COURT:  Yes.

10          MR. WEINTRAUB:  -- and the other one was to meet and

11  confer on briefing issues.  In terms of addressing

12  applicability of Pioneer to this case and the discovery, is

13  that for the ten-page objection or for --

14          THE COURT:  No, separate briefings.

15          MR. WEINTRAUB:  So this would be just to the

16  discovery and --

17          THE COURT:  Ten pages as to the discovery.

18          MR. WEINTRAUB:  Okay.

19          THE COURT:  Okay.  Normally, I don't even hear any --

20  I don't get anything in writing.  I look at it.  I'm giving

21  each side the ten pages on the discovery.  Obviously, briefing

22  on Pioneer factors is more substantial.

23          MR. WEINTRAUB:  Also, the applicability of --

24          THE COURT:  Yes, I understood.  That's what I -- I'm

25  including -- I'm subsuming within that applicability of the

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

78

1   Pioneer factors.

2           Mr. Steinberg.  Because we have a lot of other

3   important set of issues.

4           MR. STEINBERG:  Yeah.  The -- I understand the

5   exchange of interrogatories, the objections, and the meet and

6   confer, and Your Honor had also mentioned see if you can work

7   out the path forward, and you mentioned briefing.

8           THE COURT:  Yes.

9           MR. STEINBERG:  I just wanted to raise with Your

10  Honor that there may be other discovery besides just the

11  exchange of interrogatories.

12          THE COURT:  No, I'm only going to -- for now, the

13  only thing I'm permitting --

14          MR. STEINBERG:  I understand.

15          THE COURT:  -- are these interrogatories.  I'm not

16  foreclosing there may be something else.

17          MR. STEINBERG:  Before the --

18          THE COURT:  But the only thing I'm even contemplating

19  at this stage is very limited, not to exceed 20

20  interrogatories.

21          MR. STEINBERG:  I understand all of that.  It's just

22  hard to work out a briefing schedule if you think there may be

23  intervening additional discovery.

24          THE COURT:  Well, you know, tell me about it, but --

25          MR. STEINBERG:  All I want to do is (indiscernible).

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

79

1    That's fine.

2              THE COURT:  Okay.  All right.  You all need to get

3    this -- look, with the order to show cause, I'll use that as an

4    example, you know, you went through your initial jockeying, and

5    I got 26 pages of, we agree on this, we don't agree on that,

6    and I sent you back, and within a short time, you agreed on a

7    form of an order, which I signed.  Would I have drafted every

8    word the same?  No, but I thought that it reflected a good

9    faith effort on all of your parts in agreeing on these are the

10   issues.  So I'm hoping and expecting you're going to do the

11   same thing on the late claim issues.  Okay?

12             MR. STEINBERG:  Would you like an order or do you

13   want to so order the record?

14             THE COURT:  So order the record.  So ordered, okay.

15   It's not earthshaking, anything I've directed you all to do.

16   Okay.  I think it ought -- the dates ought to be clearly in

17   mind in what you're going to do.

18             MR. STEINBERG:  Okay.

19             THE COURT:  Let's deal with the -- there are a  small

20   number of objections to the order to show cause which is filed

21   as ECF Number 13802.

22             MR. STEINBERG:  Your Honor, the -- I just wanted to

23   point out I am prepared to argue this if you'd like, but the

24   first page of the order to show cause said that if someone

25   files an objection within the 20 days, that the Court will

1  decide whether a hearing will be required and then will notify

2  the objectors and the noticed parties of a hearing date.  And I

3  don't think that that has happened yet.

4          THE COURT:  Okay.

5          MR. STEINBERG:  And so while I'm prepared and --

6          THE COURT:  Are the objectors present?

7          MR. STEINBERG:  I don't think they're all here.  They

8  may be on the phone, but --

9          MR. ESSERMAN:  I am, Your Honor.

10          MR. STEINBERG:  Mr. Esserman is here.  I don't know

11  -- is Schmidt here?  So the (indiscernible) plaintiff is not

12  here.

13          THE COURT:  All right.

14          MR. STEINBERG:  There was the lawyer in --

15          THE COURT:  Fair enough.

16          MR. STEINBERG:  So I just wanted to point that out to

17  Your Honor.

18          THE COURT:  Sure.  But let me -- have you worked out

19  any of the objections?

20          MR. STEINBERG:  Well, we filed the response.

21          THE COURT:  I know you did, but that doesn't mean you

22  haven't worked them out after you filed your response.

23          MR. STEINBERG:  No.  We haven't gotten anything.  We

24  do have the hearing date now in February 15th.

25          THE COURT:  We're going to deal with it.  Okay.  So

81

1  file a notice that the hearing on February 15th will also

2  address the objections to the order to show cause, and I

3  apologize that I missed that point. I thought we were going to

4  deal with them today.  I was certainly prepared to deal with

5  them today, but I won't since we laid out the path in the order

6  to show cause.

7          MR. STEINBERG:  So we'll send out a notice to the

8  objecting parties.

9          THE COURT:  No further filings with respect to --

10         MR. STEINBERG:  That's correct.

11         THE COURT:  -- the objections or response to the

12  order to show cause.

13         Mr. Esserman, if you want to participate by

14  telephone, I'll permit you to do that because I guess you're

15  from Texas.  Is that --

16         MR. ESSERMAN:  Yes, Your Honor.  And although I'll be

17  in Washington on the --

18         THE COURT:  Well, you can do it on telephone from

19  Washington if you'd like, so --

20         MR. ESSERMAN:  Okay, thank you.

21         THE COURT:  Is that all right?

22         MR. ESSERMAN:  Yeah.  I may come up here.

23         THE COURT:  Happy to have you here.

24         MR. ESSERMAN:  Thank you.

25         THE COURT:  Okay.

82

1              MR. ESSERMAN:  All right.

2              THE COURT:  All right.  Is there anything else we

3    need to deal with for today?  Okay.

4              Let me just come back to -- I want you all to meet --

5    all -- I would like the principal lawyers to meet and confer on

6    the issue of mediation.  This really seems to cry out to me as

7    a matter that ought to get resolved by settlement with or

8    without a mediator.  I think at this stage, I don't question

9    that you've -- there have been efforts to do it so far.  This

10   really -- report to me on February 15th on the issue of whether

11   you can agree on mediation.  And it sounds like Mr. Novikoff

12   wants to be part of that, as well, so make sure that it

13   includes -- you include him in the discussions of whether --

14   the ground rules.

15             If you can -- if you're -- if the people -- if the

16   principal parties are willing to go forward with a mediation,

17   see if you can agree on a mediator.  And if you can, you can

18   actually come to me with a proposed order for mediation.  I

19   will be much more willing to push dates out for actually having

20   to litigate before me if we have a, you know, a clear path and

21   timetable for mediation.  All right.  I'm urging you to do

22   that, but I'm not requiring you to agree.  Okay?

23             All right.  Thanks very much.  We're adjourned.

24        (Proceedings concluded at 11:26 a.m.)

25                      *  *  *  *  *

# **C E R T I F I C A T I O N**

1

2

3         I, Alicia Jarrett, court-approved transcriber, hereby

4  certify that the foregoing is a correct transcript from the

5  official electronic sound recording of the proceedings in the

6  above-entitled matter.

7

8

9

10  _____

11  ALICIA JARRETT, AAERT NO. 428      DATE:   January 13, 2017

12  ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25