UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE: | . | Case No. 09-50026-mg |
|  | . | Chapter 11 |
|  | . |  |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| Et al., f/k/a GENERAL | . |  |
| MOTORS CORP., et al, | . | One Bowling Green |
|  | . | New York, NY 10004 |
| Debtors. | . |  |
|  | . | Wednesday, February 15, 2017 |
| . . . . . . . . . . . . . . . . | . | 11:05 a.m. |

TRANSCRIPT OF HEARING RE: OBJECTIONS TO ORDER TO SHOW CAUSE;
HEARING RE: MOTION FOR AN ORDER GRANTING AUTHORITY TO FILE LATE
CLASS PROOFS OF CLAIM, FILED BY EDWARD S. WEISFELNER ON BEHALF
OF DESIGNATED COUNSEL FOR THE IGNITION SWITCH PLAINTIFFS &
CERTAIN NON-IGNITION SWITCH PLAINTIFFS
(CC: DOC. NOS. 13806, 13837);
HEARING RE: OMNIBUS MOTION BY CERTAIN IGNITION SWITCH
PRE-CLOSING ACCIDENT PLAINTIFFS FOR AUTHORITY TO FILE LATE
PROOFS OF CLAIM FOR PERSONAL INJURIES AND WRONGFUL DEATHS,
FILED BY WILLIAM P. WEINTRAUB ON BEHALF OF HILLIARD MUNOZ
GONZALES LLP AND THOMAS J. HENRY INJURY ATTORNEY
(ECF NO. 13807, 13836)
**BEFORE THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

For General Motors LLC:   King & Spalding
                          By:  SCOTT DAVIDSON, ESQ.
                               ARTHUR STEINBERG, ESQ.
                          1185 Avenue of the Americas
                          New York, NY  10036-4003
                          (212) 556-2164

APPEARANCES CONTINUED.

Audio Operator:           TL, ECR

Transcription Company:    Access Transcripts, LLC
                          517 Dell Road
                          Landing, NJ  07850
                          (855) 873-2223
                          www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
APPEARANCES (Continued):

For Marlene Karu:            Wolf Haldenstein Adler Freeman &
                              Herz LLP
                             By:  MALCOLM T. BROWN, ESQ.
                             270 Madison Avenue
                             New York, NY  10016
                             (212) 545-4600


For Pre-Sale Accident
Plaintiffs:                  Goodwin Procter LLP
                             By:  WILLIAM P. WEINTRAUB, ESQ.
                             The New York Times Building
                             620 Eighth Avenue
                             New York, NY 10018-1405
                             (212) 813-8839

For Participating
Unit Holders:                Akin Gump Strauss Hauer & Feld LLP
                             By:   NAOMI MOSS, ESQ.
                                   DANIEL H. GOLDEN, ESQ.
                             One Bryant Park
                             New York, NY 10036-6745
                             (212) 827-8010


For Groman Plaintiffs        Golenbock Eiseman Assorbell &
                              Peskoe LLP
                             By:  MICHAEL S. WEINSTEIN, ESQ.
                             711 Third Avenue
                             New York, NY 10017
                             (212) 907-7347


For JPMorgan Chase Bank,
N.A.:                        Wachtell, Lipton, Rosen & Katz
                             By:  HAROLD S. NOVIKOFF, ESQ.
                             51 West 52nd Street
                             New York, NY 10019-6150
                             (212) 403-1000


For GUC Trust:               Gibson Dunn
                             By:  GABRIEL K. GILLETT, ESQ.
                             200 Park Avenue
                             New York, NY 10166-0193
                             (212) 351-4000
```



APPEARANCES (Continued):

For Takata Plaintiffs:          Stutzman, Bromberg, Esserman & Plifka
                                By:  SANDER L. ESSERMAN, ESQ.
                                2323 Bryan Street, Suite 2200
                                Dallas, TX  75201-2689
                                (214) 969-4900

For Ignition Switch
Plaintiffs and certain
Non-Ignition Switch
Plaintiffs:                     Brown Rudnick
                                By:  HOWARD S. STEEL, ESQ.
                                7 Times Square
                                New York, NY  10036
                                (212) 209-4917

For Certain Ignition
Switch Plaintiffs:              Lieff Cabraser Heimann & Bernstein
                                By:  RACHEL J. GEMAN, ESQ.
                                250 Hudson Street
                                Eighth Floor
                                New York, NY  10013-1413
                                (212) 355-9500

TELEPHONIC APPEARANCES:

For Camille Stuber:             Ellis & Estes
                                By:  DANIEL P. ESTES, ESQ.
                                     JIM ELLIS, ESQ.
                                3949 Corrales Road #230
                                Corrales, New Mexico  87048
                                (605) 266-0800

For Ignition Switch
Pre-Sale Accident
Plaintiffs:                     Hilliard Munoz & Gonzales LLP
                                By:  ANNE K. FORNECKER, ESQ.
                                719 South Shoreline Boulevard #500
                                Corpus Christi, Texas  78401
                                (361) 882-1612



4

1      (Proceedings commence at 11:05 a.m.)

2           THE COURT:  All right.  Please be seated.  We're here

3  in Motor Liquidation Company, 09-50026.  All right.  Let's take

4  up first the order to show cause.  There were a handful of

5  objections to it.  Let me hear first from Mr. Steinberg and

6  then give others a chance.

7           MR. STEINBERG:  Good morning, Your Honor.  Arthur

8  Steinberg from King & Spalding with Scott Davidson on behalf of

9  New GM.  We had served the order to show cause on approximately

10  600 to 625 parties, and it has engendered four objections.  One

11  -- and I'm going to take the easiest ones first.  One was filed

12  by a pro se plaintiff named Marcos Michael.

13           THE COURT:  Is Mr. Michael here?  Yes, thank you.

14           MR. STEINBERG:  And so he essentially filed a letter

15  which we construed to be his brief on the threshold issues, and

16  although technically, all plaintiffs were supposed to wait for

17  the designated counsel, we -- as a pro se plaintiff, we just

18  said, we'll respond to whatever he said.

19           THE COURT:  Okay.

20           MR. STEINBERG:  His issues, he is a post-sale

21  accident in a non-ignition switch vehicle.  He raised issues

22  about whether a used car purchaser is allowed to assert a claim

23  outside of the sale order or without regard to the sale order.

24  He has a punitive damage request, and we're going to brief that

25  in ours.  So I think he's not really asked for a change of a

1  show cause order, and I think Your Honor can consider his

2  pleading --

3          THE COURT:  All right.

4          MR. STEINBERG:  -- as you consider everything else.

5          THE COURT:  After we finish, Mr. Michael, I'll give

6  you a chance to address the Court, as well.

7          Go ahead, Mr. Steinberg.

8          MR. STEINBERG:  The second is a Camille Stuber.  She

9  also is a post-sale accident for a non-ignition switch vehicle.

10 There, I think there's some confusion on counsel's part.  They

11 raised the issue about punitive damages as to whether they

12 should be able to assert it, and they raised the issue about

13 whether the claim that they asserted on unfair trade practices

14 is really a claim as a non-ignition switch plaintiff, that they

15 should be allowed to assert.  And they said they wanted to have

16 permission to file an issue -- brief on issue number four.  So

17 I think we said that the show cause order had procedures about

18 if you can file a brief and you're not in compliance with it.

19          The reality is, is because this objection has been

20 carried, the designated counsel, I understand, has actually

21 circulated his brief to the 625 people.  So now, they can make

22 a focused argument as to whether they're entitled to file a

23 brief or not.  And I probably don't have a dog in that hunt, if

24 Your Honor wants --

25          THE COURT:  Okay.  Let me just say generally because

6

1  I thought that -- I guess it's -- Mr. Ellis is Ms. Stuber's

2  counsel.  I'm not going to decide today whether anybody else is

3  going to file any briefs.  The order to show cause -- we had

4  covered at prior hearings the order to show cause sets up a

5  proposed schedule to exchange drafts of briefs, and if there's

6  an argument that somebody thinks is unique to their case that's

7  not include and they want to then seek leave to file a short

8  brief, I'll consider it then, but it's premature today.  I

9  agree with that.

10         MR. STEINBERG:  So that takes us to the last two,

11 which are somewhat linked to the Takata plaintiffs and Marlene

12 Karu.  Marlene Karu filed a complaint against New General

13 Motors, some of which we believe is -- well, we believe that

14 the complaint probably violates, at least in part, existing

15 orders of this Court.  But the Karu plaintiff's claim was

16 merged into the Takata MDL and is stayed there.  So the real

17 issue that we believe that is involved in the Karu complaint is

18 whether whatever Your Honor rules on the four threshold issues

19 would be binding on the Karu plaintiffs.  Clearly, Your Honor

20 had set this up so that would be the case.  The colloquy that

21 you had at the November status conference was -- with Mr.

22 Peller was really with regard to the procedure as to whether an

23 adversary proceeding or contested matter could be used, but I

24 think Your Honor had asked the rhetorical question is that if

25 the procedure was correct, do you think that I have the

7

1  authority to enforce an existing order or an injunction of this
2  court and make a ruling that will be binding on everybody and
3  make a ruling so that I don't have to make consecutive rulings
4  over and over?  And I think Your Honor asked us to draft a show
5  cause order to effectuate that, and that --

6            THE COURT:  And that's what you did.

7            MR. STEINBERG:  And we did, and that's the provision
8  that they're challenging.  And we think that that issue has
9  been decided.  But if Karu wants to say something as to why
10 this doesn't apply to them and they have permission to file a
11 separate brief, then we'll respond to that.  But the issue
12 about used car purchases, which I think is the essence of what
13 they're really arguing about, that is the third threshold
14 issue.

15           THE COURT:  Yes.

16           MR. STEINBERG:  That is what you're going to be
17 getting briefs on.  And they may have a strong view, and I'm
18 sure designated counsel will share that view, but we equally
19 have a view and I assume that Your Honor will decide that when
20 all the briefs are in.

21           The Takata plaintiffs, in their objection, raised an
22 issue about discovery.  And Takata still has not sued New
23 General Motors yet, but because Karu has been moved into the
24 MDL, they have indicated that they will do it.  Now, Takata has
25 New GM vehicles and potentially Old GM vehicles.  So if they

8

1  just sued on the New GM vehicles, that would not implicate the

2  sale order, we would not have an issue.  To the extent that

3  they are suing on Old GM vehicles as a non-ignition switch

4  plaintiff, in our view, then we believe that implicates the

5  sale order.

6         So that's the starting assumption.  The notion that

7  they should be able to take discovery on something that is

8  otherwise prohibited by the sale order and other orders entered

9  by the bankruptcy court, we weren't prepared to agree to, but

10 we are agreeing to make the concession that the show cause

11 order that says that there should -- no discovery be taken is

12 only with respect to the four threshold issues and nothing more

13 than that.  There are obviously other cases that are proceeding

14 in the MDL, outside the MDL, against New GM, where there's

15 active discovery that's going oyes, and we're not asking Your

16 Honor to try to interfere with that.

17        THE COURT:  Yeah, I should say -- because this will

18 come up with -- when we talk about the proposed

19 interrogatories, as well.  I spoke with Judge Furman this

20 morning, and the substance of our conversation was that with

21 respect to the motion to file late claim, the issue of

22 discovery had arisen and that -- I told him what I told all of

23 you.  I was not prepared to wait until sometime in 2018 for

24 things to move forward before me and that I had directed

25 counsel to try and draft interrogatories, and we have some

9

1   objections to some of them we'll talk about today.  I just

2   wanted to be -- I wanted to satisfy myself that I wasn't

3   running afoul of something that Judge Furman had directed with

4   respect to discovery.  I know discovery is stayed in many of

5   the actions at this point, and the upshot of it is, is Judge

6   Furman said, go ahead and do what you think you need to do,

7   including with respect to discovery.

8          So I just -- we didn't have -- we didn't talk

9   substance about anything.  We talked specifically about -- I

10  just thought it was important that I not be entering orders

11  that were contrary to what he was doing or wanted to do, and so

12  he's aware of -- generally.  I haven't shared the proposed

13  interrogatories with him, but --

14         MR. STEINBERG:  So --

15         THE COURT:  So whatever -- you know, the issue for me

16  is there are -- on discovery, there are maybe -- there's

17  discovery on threshold issues, whether that goes forward or

18  that goes forward, but I'm not dealing with broader discovery

19  issues.

20         MR. STEINBERG:  So with regard to the discovery issue

21  on a not yet filed complaint, the not yet discovery procedures,

22  we don't know whether it runs afoul.  We have a sense that it

23  could run afoul and that we would bring an issue to Your Honor

24  to resolve, but we're not there yet to do that.  So we've said

25  that we don't think that the issue on the objection is ripe,

10

1 but we've laid down our marker which is that we believe that if

2 you sue New GM with respect to an Old GM vehicle for an

3 economic loss when you're a non-ignition switch plaintiff that

4 you are barred by the sale order from doing so.  And if you do

5 that, you will be violating an existing injunction of the

6 bankruptcy court.  And we've said that to Karu, and we've said

7 that to the Takata plaintiffs.  There obviously is an issue

8 that they will talk about, which is whether if the lawsuit was

9 brought by a used car purchaser, whether that would violate the

10 sale order, and that's the third threshold issue that's before

11 Your Honor.

12         So the final thing that underlies the Takata and Karu

13 objections is that if there is an issue as to whether you're

14 violating the bankruptcy court orders or not, can they take it

15 to the Takata court or whether this court should be able to

16 decide that issue.  We believe strongly that, as we have done

17 for years, that this Court should decide the appropriateness of

18 whether it is a violation of an existing injunction of the

19 bankruptcy court.  Again, that issue was actually not ripe yet

20 because there hasn't been a lawsuit started or discovery, but

21 -- so what you have a lot with the Takata plaintiffs is they're

22 jousting for position on something that hasn't really started

23 yet.  And I think when you think about it from why I'm standing

24 before Your Honor today is I don't think any of this affects

25 the show cause order that was signed on December 13th.  The

1  briefs -- they're open, and the next briefs are going to be

2  filed by the end of this month, in a couple of weeks, and the

3  briefing schedule will be finished by March, and our bottom

4  line position is that when Your Honor rules on those issues,

5  anybody who we serve with the show cause order is going to be

6  bound by that, and that's the whole purpose of this exercise.

7              THE COURT:  I must say, when I went over the

8  objections, some of them, I'm not sure ought to be

9  characterized as objections, but went over the pleadings

10 relating to the order to show cause, it seemed to me that while

11 some parties were putting down their place markers about what

12 positions they were going to take when we have the briefing,

13 there really was very little in the way of objection to the

14 actual language in the order to show cause.  But that's

15 (indiscernible).

16             MR. STEINBERG:  Anyway, that's -- those are my

17 remarks.

18             THE COURT:  Okay.  Thanks very much.

19             All right.  Who wants to be heard next?

20             MR. ESSERMAN:  I might as well go.  Thank you, Your

21 Honor.  Sandy Esserman of Stutzman, Bromberg, Esserman &

22 Plifka, appearing today on behalf of the Takata lead counsels

23 only, as you know.

24             THE COURT:  You wear many hats.

25             MR. ESSERMAN:  Yeah, exactly.  I should have brought

12

1 | my hats.

2 |      I agree with some of what Mr. Steinberg said.  In

3 | looking at the order to show cause, I think it could be

4 | interpreted in several ways.  Mr. Steinberg's clarified as to

5 | -- in his objection response and today how GM views it.  In

6 | particular, there is a concern because the Takata MDL has not

7 | sued GM.

8 |      THE COURT:  Yet.

9 |      MR. ESSERMAN:  New GM -- yet -- New GM is not yet a

10 | defendant.  The Karu complaint did sue New GM for what is

11 | believed to be a clear, allowed claim under the Second Circuit

12 | opinion.  That case has been sent to the MDL and stayed.

13 | That's the current posture of that case.  It is -- so that case

14 | is completely stayed.  And there will be, at some point, an

15 | amended complaint filed.  I suspect it will be filed after Your

16 | Honor rules on the threshold issues.

17 |      What the Takata plaintiffs were concerned about is

18 | somehow getting roped into some of the issues that aren't even

19 | ripe.  There's really no --

20 |      THE COURT:  Well, they are going to be roped into the

21 | threshold issues, which I am being called on to decide.  I'm

22 | only deciding them once.  If they don't want to play in this

23 | sandbox, that's their choice.  But they've been served, and

24 | when I decide -- I mean, the higher court can decide I was

25 | wrong, but when I decide, it's my intention to have that ruling

13

1  bind all of those people who have received notices preceding,

2  had an opportunity to participate, file briefs.  You can't sit

3  back and later take a position, we're not bound by your ruling

4  on threshold issues, we don't think it affects us.

5          It's my intention to, to the fullest extent I'm

6  permitted to do so by law, bind all parties -- all parties in

7  interest, I'll use the term "parties in interest" -- with

8  respect to whatever decisions I render.  They may go your way,

9  but I'm not going to have people come back, you know, a year or

10 two years from now and say, well, I'm not bound by your ruling,

11 Judge Glenn.  It's my intention -- that's why the notice

12 program -- I recognize that with Judge Gerber's rulings, there

13 were some parties who claimed that they didn't have notice of

14 the proceedings, they didn't participate, they don't feel that

15 they're bound.

16         One of the things I'm trying to assure is that

17 everybody as to whom these issues apply has been given notice,

18 an opportunity to participate.  Don't have to file a brief if

19 they don't want to.  They can.  They can deal with the briefing

20 the way the order to show cause does, so I don't just get

21 briefs thrown, you know, across the transom.  But they

22 shouldn't think that by not participating after they've

23 received notice that they're not going to be bound by my

24 rulings.  Higher court could decide otherwise, but that's how

25 I'm proceeding.

14

1          MR. ESSERMAN:  And Your Honor's clear on the record

2     as to how you proceeded.  We want to raise the issues that it's

3     -- since GM has not been sued in the MDL, and discovery has not

4     been sent out, we think these issues are not yet ripe for

5     determination.

6          THE COURT:  Sit back, take your chances, Mr.

7     Esserman, but I'm telling you, to the fullest extent I'm

8     permitted to do so by law, everybody who's received notice of

9     this proceeding and the order to show cause, when I resolve the

10    issues, it's my intention, to the fullest extent permitted by

11    law, to bind them.  And so if some group -- whatever hat you're

12    wearing at the time, if your clients want to ignore the

13    proceeding and take their best shot later on by arguing, I'm

14    not bound, I wasn't there, the issue wasn't ripe, they'll do

15    that, but fair warning.  Go ahead.

16         MR. ESSERMAN:  Thank you, Your Honor.  You know, the

17    order also had some ambiguity, in our view, as to what

18    discovery was permitted and what discovery was not permitted,

19    but I think Mr. Steinberg and the GM responses clarified that

20    --

21         THE COURT:  And you --

22         MR. ESSERMAN:  -- to our satisfaction.

23         THE COURT:  Why don't you enlighten me by pointing me

24    to the language in the order that you think there's ambiguous.

25         MR. ESSERMAN:  Well, we were concerned that certain

15

1  discovery might be prohibited, but I think it's very clear in

2  GM's response, and I don't have the order in front of me that

3  it's limited to the threshold issues.  There's no discovery on

4  the threshold issues --

5        THE COURT:  Correct.

6        MR. ESSERMAN:  -- only and that there was not an

7  intention --

8        THE COURT:  I'm not becoming a discovery master for

9  anybody else in another case.

10        MR. ESSERMAN:  Exactly.  Exactly.  So that was an

11  issue.  There was a phrase in that sentence, and I --

12        MR. STEINBERG:  Sandy?

13        THE COURT:  Mr. Steinberg's going to hand you a copy,

14  Mr. Esserman.

15        MR. ESSERMAN:  Thank you.

16        THE COURT:  Just tell me the page and --

17        MR. ESSERMAN:  Page 3.

18        THE COURT:  Okay.

19        MR. ESSERMAN:  Order that unless otherwise further

20  ordered by the Court, no discovery shall be authorized or take

21  place in this court regarding the 2016 threshold issues or any

22  other issues -- any other issue related to the enforcement or

23  applicability of the sale order to a claim against New GM.

24        THE COURT:  And what is it that you find not clear

25  about that?

16

1          MR. ESSERMAN:  Well, I think it's been clarified to

2  be clear.  When first reading it, I think you could read it

3  broader than just the 2016 threshold issues.  So I --

4          THE COURT:  Well, it says 2016 threshold issues or

5  any other issue related to the enforcement or applicability of

6  the sale order to a claim against New GM.  So it didn't stop

7  after 2016 threshold issues.

8          Hold on, Mr. Steinberg.

9          MR. ESSERMAN:  Yes.  But once again, we don't have

10  discovery pending.

11          THE COURT:  Okay.

12          MR. ESSERMAN:  So I can't match up discovery against

13  what is necessarily prohibited, but that language seemed a

14  little bit broad to us and we wanted -- we thought some

15  clarification was needed, and I'm satisfied on the record as to

16  that.  Having said that, there is no pending discovery.  There

17  is no pending GM as defendant in this case.  So we're arguing

18  hypotheticals and what may or may not occur and what is ripe

19  and what is not ripe.

20          THE COURT:  Do you have any other position you want

21  to take with a different hat on?

22          MR. ESSERMAN:  I think our papers have adequately

23  stated it, Your Honor.  Thank you.

24          THE COURT:  Thank you very much, Mr. Esserman.

25          Mr. Steinberg, do you want to just respond briefly on

1  the discovery issue?

2          MR. STEINBERG:  Yeah.  The only thing I wanted to

3  just say is that in that paragraph that they were reading to --

4  and I was part of the collective drafting exercise, there was

5  an emphasis on the word in this court, as well, too.  So it's

6  not just the modification of the 2016 threshold issues, but

7  it's the discovery related in and out of this court.

8          THE COURT:  All right, thank you.

9          All right.  Mr. Michael, do you want to come on up

10  and be heard?

11          MR. MICHAEL:  Good afternoon, Your Honor.

12          THE COURT:  You're Marcos Michael?

13          MR. MICHAEL:  Yes, I am.

14          THE COURT:  All right.  And you did -- you filed the

15  pleading.  It's at ECF Docket Number 13819.  Go ahead.

16          MR. MICHAEL:  I have no idea, first of all, why I

17  even received this documentation.  I mean, I have a pending

18  case that I'm in trial right now with General Motors.  We're in

19  settlement discussions and --

20          THE COURT:  Okay.  I don't want to know about your

21  settlement discussions.  Do you have a lawyer in that case?

22          MR. MICHAEL:  No.

23          THE COURT:  Just -- okay.  Where is the case pending?

24          MR. MICHAEL:  Southern District.

25          THE COURT:  Okay.

18

1          MR. MICHAEL:  It's with Judge McMahon.

2          THE COURT:  All right.  I'm sure you were served

3  because this order to show cause was intended to cover anybody

4  who was really potentially affected by the issues.  It doesn't

5  require you -- always happy to have you here.  If there's

6  anything you want to say further, I'm happy to listen.

7          MR. MICHAEL:  Yeah.  I'm here basically to protect

8  myself and protect the lawsuit that's going on right now.  I

9  mean, my vehicle was purchased -- is a 2005 Chevy Avalanche was

10 the vehicle that was in the accident.  The accident happened

11 after bankruptcy in 2012.  It was serviced by New GM after

12 their bankruptcy.  So my case --

13         THE COURT:  Did you buy the car new or used?

14         MR. MICHAEL:  Excuse me?

15         THE COURT:  New or used?

16         MR. MICHAEL:  New.  So my case should not be

17 conducted in here at all is what I believe.

18         THE COURT:  It's not being conducted in here, but --

19         MR. MICHAEL:  You understand what I'm saying.

20         THE COURT:  -- I've been asked to decide certain

21 issues on remand from the Second Circuit, but okay.

22         MR. MICHAEL:  That's basically all I have to say,

23 Your Honor.

24         THE COURT:  Okay.  Thank you.

25         MR. MICHAEL:  Thank you.

19

1           THE COURT:  Mr. Steinberg, do you want to address it

2    at all?

3           MR. STEINBERG:  The only thing I would say about that

4    is that clearly, Mr. Michael has a claim that has a large

5    amount -- large root of being an assumed liability.  That's why

6    the litigation is going forward.  There probably were -- when

7    we served the order to show cause, we probably served the

8    active litigation docket to make sure that everybody who is

9    suing New GM is going to be bound by the rulings, but I think

10   that's the only thing I have to say.

11          THE COURT:  All right.  Thank you very much.

12          Okay.  Anybody else wish to be heard?

13          MR. ESTES:  This is Daniel Estes on behalf of Camille

14   Stuber.

15          THE COURT:  All right.  GO ahead.

16          MR. ESTES:  I'm sitting in on -- thank you.

17          THE COURT:  Tell me your last name again?

18          MR. ESTES:  Frankly, I think --

19          THE COURT:  Tell me your last name again.

20          MR. ESTES:  Spelled E -- Estes.  Can you hear me?

21          THE COURT:  Yes, I can.

22          MR. ESTES:  Estes, E-S-T-E-S.

23          THE COURT:  All right.  And --

24          MR. ESTES:  And I'm with Jim Ellis.

25          THE COURT:  All right.  And --

20

1          MR. ESTES:  I represent Camille Stuber.

2          THE COURT:  Okay.  GO ahead.

3          MR. ESTES:  And I think we're here, just as Mr.

4 Michael is here, we were served the order to show cause along

5 with a letter by Mr. Steinbrenner and -- or Steinberg and Mr.

6 Davidson.  When we read the order to show cause, we were

7 invited by the language to file a letter to see if we might

8 participate in the briefing.  We did.  I understand the judge's

9 concern that it was premature.  I don't know if the timeline

10 was as clear to us as it was to everybody in New York.

11         We did file a letter to preserve any right that we

12 needed to assert our individual assertions and claims why we

13 shouldn't be stayed in a New Mexico litigation against New GM

14 only.  The opposing counsel, I think, just as in the prior

15 claimant's view, New GM is actively litigating and defending

16 the claim.  It's willing to pay any judgment.  We're in

17 settlement negotiations.  So frankly, we were a little

18 blindsided when we were served the order to show cause and were

19 concerned that it put an entire stay on any discovery and any

20 furtherance of our litigation.  So we just entered our

21 appearance and filed a letter to preserve our rights in case

22 the general plaintiff's brief didn't cover everything we wanted

23 to say.

24         THE COURT:  All right.  And you know the order to

25 show cause, it sets out how the briefing procedure is going to

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

21

1 work.  You'll get a draft of the brief, and if there's an issue

2 you think you need to raise that's not included, you can

3 request to file a separate brief.

4          MR. ESTES:  And we have received the draft brief.  We

5 received it yesterday or the day before, have reviewed it, and

6 our position still stands that we have a unique issue that we

7 would like to address.  We don't believe it would be

8 overlapping or duplicative of what the brief already states.

9 It would be more fact-specific to our individual circumstances.

10          THE COURT:  Yeah.  I'm not going to rule on --

11          MR. ESTES:  And we would move again for leave.

12          THE COURT:  Yeah.  At this stage, I'm not going to

13 rule on specific requests to file separate briefs.  The order

14 sets forth the procedure.  I didn't read your letter as

15 objecting to any specific provision in the order to show cause.

16 I understand that your civil suit is pending in the New Mexico

17 state court.  I guess it relates to a 2009 Chevrolet Corvette,

18 if I'm not mistaken.

19          MR. ESTES:  That's right.

20          THE COURT:  Okay.  Mr. Steinberg, do you want to

21 address at all?

22          MR. STEINBERG:  Yeah.  I think just so it's clear so

23 there's no confusion, a post-sale accident like Camille Stuber

24 had in a non-ignition switch vehicle can go forward for

25 compensatory damages as an assumed liability.  Some of the

22

1  threshold issues have general categories as to whether

2  someone's an ignition switch or a non-ignition switch, and

3  therefore we erred on the side of just including everybody --

4          THE COURT:  In the service, yeah.

5          MR. STEINBERG:  -- in service of that.  And to the

6  extent that they -- their avenue as a non-ignition switch

7  plaintiff is to assert an independent claim and then try to get

8  punitive damages on the independent claim, that is potentially

9  implicated by the second threshold issue, as well, too, and

10 that's why they got the receipt of this thing.  But clearly,

11 there are hundreds of litigation that are going forward

12 involving Old GM vehicles and accidents, and we do not intend

13 to stop the progress of those litigations to the extent that

14 they're seeking compensatory damages of what we had -- New GM

15 had agreed as an assumed liability on the --

16         THE COURT:  All right.  Thank you, Mr. Steinberg.

17         All right.  Yes, sir.

18         MR. BROWN:  Good morning, Your Honor.  Malcolm Brown,

19 Wolf Haldenstein, on behalf of Marlene Karu.  I have nothing to

20 add to the presentation that was made by Mr. Esserman.  I just

21 rise to state that we're prepared to stand on the arguments

22 that were set forth in our objection.

23         THE COURT:  Okay.

24         MR. BROWN:  Unless the Court has any questions --

25         THE COURT:  Just let me see if I have any questions.

23

1  As I understand it, Ms. Karu purchased a 2010 -- purchased a

2  used vehicle.  Is that correct?

3          MR. BROWN:  That's correct, Your Honor.

4          THE COURT:  And you objected to the order to show

5  cause to the extent it would bar Karu's efforts to obtain

6  discovery from New GM in the Takata litigation that names New

7  GM as a defendant.

8          MR. BROWN:  That's right, Your Honor.

9          THE COURT:  But you also argued you did not believe

10 you should be deemed subject to the order to show cause and not

11 be required to participate in any proceedings involving the

12 2016 threshold issues.  My comments earlier really -- I -- to

13 Mr. Esserman apply likewise to you, Mr. Brown, and your client.

14 I'm deciding these issues once.  Karu got notice of the

15 proceeding.  It's my intention to apply whatever rulings I

16 render to the fullest extent permitted by law.  You don't have

17 to participate with respect to briefing or hearing on the 2016

18 threshold issues, but it's fully my intention, when I decide

19 them, to make those rulings binding to the fullest extent I

20 can.  So you sit back at your own risk if that's what you

21 decide, but, you know, the order sets out how the briefing will

22 be done, and you'll decide after the briefing as you get -- I

23 take it you got a draft already, as well.

24         MR. BROWN:  Yes, Your Honor.

25         THE COURT:  And you'll decide whether you think

24

1  there's some unique issue that you need to brief, but, you

2  know, if the threshold issues apply to Karu, it's my intention

3  to decide them and bind everybody I can.  Okay?

4          MR. BROWN:  I understand, Your Honor.

5          THE COURT:  All right.  Thank you very much,

6  Mr. Brown.

7          MR. BROWN:  Thank you, Your Honor.

8          THE COURT:  All right.  Anybody else wish to be

9  heard?

10         All right.  With respect to the order to show cause,

11  the Court has reviewed Mr. Michael's letter, which was at ECF

12  13819, the Bledsoe, Elliott, and Thomas plaintiffs represented

13  by Mr. Peller at ECF 13811, the Takata MDL Action plaintiffs

14  represented by Mr. Esserman, it's at 13813, the Karu pleading,

15  13816, the Stuber pleading, 13820, Honaker, 13833, considered

16  New GM's omnibus reply at 13822.  After carefully considering

17  all of the pleadings filed with respect to the order to show

18  cause, the objections, to the extent that their objections are

19  overruled and we'll go forward with the schedule as set forth

20  in the order to show cause.

21         Mr. Steinberg, do any of those dates have to change

22  at this point?  No.

23         MR. STEINBERG:  No.

24         THE COURT:  Okay.  And, you know, there's a lot

25  covered in the order to show cause.  I appreciate the efforts

25

1  that were made by counsel from the parties who worked well

2  together in trying to describe the issues and did so fairly.

3  I'm not sure I would have drafted every one of them exactly as

4  they were done, but I've commented before, I think that they

5  fairly set forth the issues that the Court's going to be

6  presented, and we're going forward with the briefing.  So to

7  the extent of any objections, they're overruled, and go forward

8  with it.

9          All right.  So let's talk about the motion for an

10  order granting authority to file the late class proofs of

11  claim, and I guess, Mr. Weintraub, yours is not class claims,

12  but the late claims.

13          So who wants to be heard first on this?  I'm going to

14  let Mr. Weintraub go first.  Okay, Mr. Steinberg?

15          MR. STEINBERG:  Sure.  We're actually in agreement,

16  so this should be easier.

17          MR. WEINTRAUB:  Uh-oh, I'm in trouble.

18          THE COURT:  That's dangerous.

19          MR. WEINTRAUB:  Well, Your Honor, as requested by the

20  Court, we met and conferred.  We went through the draft

21  interrogatories and we've condensed the disagreement down to, I

22  think, one basic issue, which is whether or not, with respect

23  to the Pioneer factors, could there be discovery with respect

24  to defects other than the ignition switch defect.  And both the

25  economic loss plaintiffs and the personal injury plaintiffs

26

1  filed brief objections and fairly well self-contained that I

2  think say essentially the same thing, which is when you're

3  looking at the <u>Pioneer</u> factors, the focus should be on the

4  claim that you actually seek to file and the defect that is

5  raised in that claim and not other defects, which we believe

6  are irrelevant to the <u>Pioneer</u> issues.

7         We think that whether or not someone may have had an

8  unrelated issue with their vehicle or may have considered

9  filing a claim and not filed a claim is irrelevant to the

10 <u>Pioneer</u> factors.  The questions that have been asked, if the

11 Court permits them to proceed after we brief the other issues,

12 hone in on knowledge of the bar date, knowledge of the

13 bankruptcy, and all the things that would potentially be

14 relevant to the <u>Pioneer</u> factors with respect to the claim that

15 was actually filed.  So for that reason, Your Honor, we would

16 request that discovery be limited to the ignition switch

17 defect.  I would also point out that the instructions to the

18 interrogatories contained a definition for -- I think it's

19 called ignition switch related issues, and those catalog what

20 are the symptoms of an ignition switch defect.

21         THE COURT:  Definition 10 on page 4.

22         MR. WEINTRAUB:  Definition 10.  So that to the extent

23 there was a relevant issue with respect to the vehicle, it

24 would be picked up by the use of that definition.  So more

25 specifically, Your Honor, if you look at our redline, what it

27

 1  essentially comes down to --

 2          THE COURT:  And you had objected to what were numbers

 3  9, 10, 11, 12 --

 4          MR. WEINTRAUB:  15 through 18, 22, and 27.  And they

 5  fall into two buckets.  Nine to 12, 9, 10, 11, and 12, we think

 6  can be deleted altogether because those questions solely relate

 7  to problems other than the ignition switch defect.  And we

 8  think with respect to 15 through 18, 22, and 27, we have

 9  suggested revisions to those to confine those questions to the

10  ignition switch defect.  So with those two modest changes,

11  deleting 9 through 12 and confining 15 through 18, 22, and 27,

12  we have no issues with respect to the discovery, Your Honor.

13          THE COURT:  All right.  Let me hear from Mr.

14  Steinberg.  Or am I going to hear from somebody else?

15          MR. STEINBERG:  Or do you want to ask whether the

16  other --

17          THE COURT:  Mr. Steel?  Is that -- who's going to --

18  go ahead, Mr. Steel.

19          MR. STEEL:  Morning, Your Honor.  Howard Steel of

20  Brown Rudnick.  My hat today is for -- on behalf of Patricia

21  Barker, who's the proposed class representative for the

22  ignition switch plaintiff in connection with the late claim

23  motion.  We'll echo what Mr. Weintraub said.  We have the same

24  comments to the interrogatories, just add a little bit.

25  Barring from Mr. Weintraub's brief, he cites the DPWN case,

28

1 which provides, I think, some critical guidance on this dispute

2 in terms of whether the court for Second Circuit found that the

3 trade claims that that plaintiff had did not relate the same as

4 the anti-trust claim.  So sort of a mirror to the dispute that

5 we're focusing on today.  That being said, we have the same

6 comments as Mr. Weintraub.  Thank you.

7           THE COURT:  Thanks, Mr. Steel.

8           All right.  Anybody else on the plaintiff side of

9 these case?  No?

10          Mr. Steinberg.  So what's wrong with what Mr.

11 Weintraub has said as to why the discovery should be limited to

12 the ignition switch claims?

13          MR. STEINBERG:  Because, first, Your Honor, this type

14 of discovery was solicited in the MDL on behalf of the economic

15 loss plaintiffs.

16          THE COURT:  Well, that's the MDL.  I -- that's in the

17 MDL.  As I said, I talked to Judge Furman, but I'm -- and he

18 said, you know, if there was discovery believe -- that you

19 believe is relevant to the matters before you, fine.

20          MR. STEINBERG:  But my point is that in the MDL, in

21 the context of asserting, in effect, the same claim against New

22 GM, they have answered the -- at least the economic loss

23 plaintiffs in connection with the fact sheets.  They have

24 answered questions as to whether there was an issue with their

25 vehicle, to the extent that it would implicate the -- an

29

1  ignition switch even, and they've answered the questions if it

2  related to an event unrelated to the ignition switch.

3       THE COURT:  Why is there -- let's assume somebody had

4  a non-ignition switch problem.  Why is that relevant to whether

5  people should be permitted to file late claims on ignition

6  switch?

7       MR. STEINBERG:  Because if the general issue --

8  unlike in DPWN, which was whether -- if they had no knowledge

9  of an anti-trust conspiracy that was being committed against

10 them by a debtor, that didn't affect whether they should file a

11 trade claim.  People who own a car know there's a problem with

12 their car, know if there's enough of a problem with their car,

13 that they should file a claim in the bankruptcy case, assuming

14 that they knew that there was a bar date.  So to the extent

15 that they had experienced problems in their vehicle and they

16 didn't know what it was, but it was an experienced problem.

17      THE COURT:  Let me ask you this hypothetical.  Let's

18 assume somebody has an Old GM car and their radio stops

19 working.  And what relevance does it have as to -- to permit

20 discovery about whether somebody went in because their radio

21 wasn't working to the issues that are before me?

22      MR. STEINBERG:  I'm not sure if it would, but on the

23 other hand --

24      THE COURT:  I'm trying to give you a farfetched

25 hypothetical where it's so clear that --

30

1           MR. STEINBERG:  Right.  But sometimes people --

2           THE COURT:  Because your interrogatories, if they

3   complained about the radio, they'd have to disclose that and

4   then have to answer interrogatories about it, right?

5           MR. STEINBERG:  They would have to answer questions

6   that said, in effect, any time I brought my car in for a

7   repair, without trying to distinguish whether it was an

8   ignition witch event or something else, any time I brought my

9   car in --

10          THE COURT:  So I bring my car in for servicing, and

11  the service tech always asks me, are there any problems, and I

12  say, well, something intermittently does whatever, and I tell

13  him and he writes it down.  What -- I don't understand what

14  relevance that would have --

15          MR. STEINBERG:  I don't think it --

16          THE COURT:  -- to the issues that I have to address.

17          MR. STEINBERG:  I don't think it would, but on the

18  other hand, Your Honor, to take a different example, if someone

19  came in complaining that their power steering didn't work and

20  that they brought it in because they thought it was a

21  malfunction, I think that is relevant as to whether they

22  thought they would have a claim in order to file a claim.  Even

23  if they don't want to file a power steering claim now, it shows

24  an awareness of a problem with their vehicle such that, in

25  examining the <u>Pioneer</u> factor as to whether there was a

31

1   justifiable neglect to not file anything, we think that would

2   be relevant.  We also think it avoids the confusion as to

3   whether if the power steering problem was caused by an ignition

4   switch event or a non-ignition switch event.  They don't have

5   to go through with it.  The reality is, is that for the

6   economic loss plaintiffs, they don't have to answer this

7   question because they actually answered the question already.

8   Ms. Barker answered the question in her fact sheet.  You know,

9   she has a 12-year-old car with 180,000 miles who had the

10  ignition switch fixed three years ago, who went on a curb, no

11  property damage, no physical injury, and she brought her car in

12  twice to a dealer before then.  She's answered the questions.

13  We wouldn't be pushing it.  This is really whether someone who

14  was in an accident and then --

15           THE COURT:  Mr. Weintraub's clients.

16           MR. STEINBERG:  Mr. Weintraub's client.  So with

17  regard to Mr. Weintraub's clients, if the car was totaled and

18  that was the first time they knew that it had a problem, there

19  was not going to be an issue anyway, but if the car was in an

20  accident and then they had subsequent problems with that car

21  before the sale date that may or may not have been ignition

22  switch related, which would have triggered a heightened

23  awareness to file a claim, we think that that event, that

24  knowledge, is relevant as to whether it will lead to admissible

25  evidence on the Pioneer issue.  It doesn't have to be exactly

32

1   relevant.  It could lead to something that would be relevant.

2   And certainly, that's the issue that we're trying to capture,

3   not whether the radio needed to be repaired.  And that's the

4   essence of these questions.  We talk about it, I think, in

5   terms of a defect, not worn tires or --

6           THE COURT:  So you had propounded -- your number 9,

7   your old number 9:

8               "Did you bring your vehicle to a dealer or repair

9               shop or a mechanic as a result of what you now

10              believe to be or was a defect other than a defect

11              related to the ignition switch?"

12          MR. STEINBERG:  Right.  We didn't use the word --

13          THE COURT:  So if somebody -- radio didn't work,

14  they'd have to think back, I had a problem with the radio, I

15  had to bring it in.  They'd have to answer that interrogatory.

16  I don't understand what that has to do --

17          MR. STEINBERG:  I think we tried to use the word

18  "defect" to try to take away the radio example.

19          THE COURT:  No, I -- you know, I actually had a car

20  with a defective radio, and -- this was some years ago, and the

21  dealer replaced it.  It was a defective radio.  It was a pretty

22  new car.  The radio just stopped working.  Brought it in, they

23  replaced the radio.  And I'd have to answer this interrogatory

24  about defective radio?

25          MR. STEINBERG:  Yeah.  We think that if you brought

33

1 your car in two or three times, it's not that hard to answer

2 what I brought into a car -- into a dealership for and what was

3 repaired or what wasn't repaired.  It just gives you the scope

4 of what's involved with this vehicle.

5          THE COURT:  And your old -- what was 11:

6          "Did you communicate with Old GM or New GM about what

7          you now allege to be a defect other than a defect

8          related to the ignition switch?"

9          MR. STEINBERG:  Right.

10          THE COURT:  It's the same problem I have.  If

11 somebody had the defective radio, oh, gee, I think I

12 communicated to Old GM that twice I brought this car in, they

13 never fixed -- they couldn't -- they didn't fix the radio, just

14 replace it already.  What does that have to do with what this

15 case is about?

16          MR. STEINBERG:  Well, I think it's written in terms

17 of if they brought it in to a dealer to be repaired, that's not

18 necessarily GM.  It's if they wrote a letter to GM saying, you

19 sold me a lemon car and I'm very unhappy about it, I think I

20 was in an accident and you were at fault.  It's that written

21 communication.

22          THE COURT:  So I brought it in to the dealer twice

23 for the radio and they didn't -- I'm still suffering with this

24 radio problem, so I wrote a letter to GM.

25          MR. STEINBERG:  Saying that, you sold me a radio that

34

1  has not been repaired.  I think it raises the issue as to

2  whether it's relevant to whether they would file a claim in the

3  case, and it relates to their vehicle.  I mean, you could parse

4  a trade claim versus an anti-trust claim, and I think that's

5  different than parsing various elements of a complaint about

6  the way a car has been operating.

7          THE COURT:  All right.  Anything else you want to

8  add?

9          MR. STEINBERG:  On the interrogatory issues?

10          THE COURT:  Yes.

11          MR. STEINBERG:  No.

12          THE COURT:  All right.

13          MR. STEINBERG:  Thanks.

14          THE COURT:  Anybody else want to be heard on this?

15          MR. GILLETT:  Morning, Your Honor.  Gabriel Gillett

16  from Gibson Dunn on behalf of the GUC Trust.  The only thing

17  I'd add is just that in the radio example that you're talking

18  about, it's still not all the burdensome on the plaintiffs.  I

19  mean, we tried very hard to write these questions in a way that

20  were clear and limited, and I take your point that --

21          THE COURT:  Oh, it's clear enough, but it's not

22  limited.  That's the problem.

23          MR. GILLETT:  I guess I would submit that it is not

24  all that burdensome for these people to answer the -- even if

25  it's all 27 questions about when they brought their cars in,

35

 1  when they wrote GM, et cetera.

 2            THE COURT:  Thank you.

 3            Anybody else wish to be heard?

 4            All right.  The objections to the proposed

 5  interrogatories, and they're shown in a redline that has

 6  strike-throughs and some additional language, the objections

 7  are sustained.  The proposed additional language will be made,

 8  so I'm going to approve the service of the interrogatories as

 9  reflected in the redline that's been submitted to the Court.  I

10  didn't write down ECF number, but I'm sure you'll figure that

11  out.

12            Any other questions on the discovery?  Okay.  Is

13  there anything else I need to deal with today?

14            MR. STEINBERG:  Your Honor, we had sent up to Your

15  Honor yesterday what the parties had worked on on a briefing

16  schedule with respect to two -- for lack of a better word, two

17  threshold issues relating to the late claims motion.  One dealt

18  with the tolling issue as to when each of the three categories

19  of plaintiffs, economic loss ignition switch, economic loss

20  non-ignition switch, and pre-sale accident plaintiffs --

21            THE COURT:  I apologize, I didn't see it.  Do you

22  have another copy at all?

23            MR. STEINBERG:  Yes.

24            THE COURT:  You've agreed on a proposed schedule?

25            MR. STEINBERG:  We've agreed on the issues and the

36

1  proposed schedule.

2          THE COURT:  All right.  Let me just look at it.

3  Thank you.

4          MR. STEINBERG:  After Your Honor finishes reading it,

5  there's a couple things I want to highlight to you about that.

6          THE COURT:  Okay.  Let me read it.  Go ahead, Mr.

7  Steinberg.

8          MR. STEINBERG:  So a couple things.  One, the -- you

9  can see the two issues that were identified for a briefing

10 schedule, and parties are proposing simultaneous briefing with

11 page limitations.  It is possible you'll get two briefs from

12 each side, but I think both sides will try to work together so

13 you'll only get one brief from each side on that, and parties

14 have asked for oral argument with Your Honor to fill in the

15 date.

16         The tussle that was going on back and forth was that

17 the plaintiffs were saying that because of Judge Gerber's

18 statements about the bar date in the April 2015 decision, they

19 believe that the <u>Pioneer</u> factors were satisfied and therefore

20 no discovery needed to be taken at all.  So I think the parties

21 agreed that even though you have agreed to the form of

22 interrogatory to be served, that until Your Honor actually

23 decides the issue as to whether discovery is appropriate, that

24 the time clock for responding to the interrogatories will not

25 have started.  But once that time clock starts, the plaintiffs,

37

1  to the extent that they have to answer interrogatories, have 30

2  days to do that response.  I think that was the tradeoff that

3  was done that's reflected in this order.

4       THE COURT:  All right.  So we're talking about the

5  interrogatories that I've just gone over.

6       MR. STEINBERG:  That's correct.

7       THE COURT:  And I've ruled.  You ought to get them

8  served quickly.  And so let's assume that they're served by

9  next Monday.  What follows from that?  They have 30 days to

10 answer them?

11      MR. STEINBERG:  I think plaintiffs will argue that

12 the 30-day clock has not started until you have ruled that it's

13 appropriate for -- to take discovery because the <u>Pioneer</u> issue

14 has not been automatically satisfied by Judge Gerber's

15 statements, and --

16      THE COURT:  And what I thought I made clear last

17 time, I understand their argument that they don't believe

18 discovery is appropriate because Judge Gerber ruled as he did,

19 and I understood your position that you want to be able to take

20 discovery.  I indicated that at this stage, all I would

21 authorize is the interrogatories.  We've now resolved the issue

22 as to the scope of the interrogatories.  Maybe I'm missing

23 something.  The clock on answering those interrogatories runs

24 when they're served, and then it's going to serve -- I assume,

25 you know, by Monday.  And when I get the briefing, you'll each

38

1  take your respective positions as to whether the discovery was

2  relevant or not.  You know, Mr. Weintraub took the position it

3  wasn't -- just Judge Gerber ruled, the discovery is not

4  relevant.  You took the position, no, the <u>Pioneer</u> factors are

5  relevant.  When I decide the issues, I'm going to decide

6  whether -- I may or may not conclude that Judge Gerber ruled in

7  that law of the case where I find it persuasive and I'll follow

8  it.  I don't know, but we're moving forward.

9            MR. STEINBERG:  Okay.

10           THE COURT:  Maybe I'm missing something.

11           MR. STEINBERG:  No, no.  I think Your Honor has

12 clarified the issue.  I'm sure Mr. Weintraub and Mr. Steel may

13 want to say something in response, but I understood what you

14 said.  The only other thing that I would point out that's in

15 this proposed order, which will now have to be modified to

16 reflect Your Honor's statements if that's where we end up, is

17 that MDL discovery is not going to be affected.  So one of the

18 things that is actually going to happen is that the economic

19 loss ignitions switch putative class representative, Ms.

20 Barker, her deposition is going to be taken probably within the

21 next three weeks.  And --

22           THE COURT:  I'm not doing anything to affect the MDL

23 stuff.

24           MR. STEINBERG:  I know, but I just wanted to reflect

25 that that's -- there's a paragraph in that proposed order that

39

1    says nothing is intended to affect MDL discovery.  The only

2    caveat is that they only wanted to put up Ms. Barker once and

3    they wanted her to cover not just MDL issues, but anything

4    someone wanted to ask for late claims issues.  So you'll see a

5    few words or sentence that says that the GUC Trust will have

6    the ability, subject to conforming with MDL procedures, to ask

7    questions at Ms. Barker's deposition.

8            THE COURT:  Okay.  Mr. Weintraub, you want to be

9    heard?

10           MR. WEINTRAUB:  Yes, Your Honor.  What I tried to

11   make clear at the last hearing was that the people that I

12   represent and the law firms I'm working with did not want to go

13   to the expense of answering what are going to be numerous

14   interrogatories with subparts 175 times before they knew

15   whether or not discovery was appropriate, given our arguments

16   about Pioneer.  Now, I may have a 2 percent chance of winning

17   that, but you never know --

18           THE COURT:  You don't.  You don't even have a 2

19   percent chance.  I thought I made that clear last time.  I'm

20   permitting this limited discovery.

21           MR. WEINTRAUB:  I understand that.

22           THE COURT:  I'm permitting depositions with Ms.

23   Barker's deposition.  I'm not quite sure or clear about what's

24   going on there, but --

25           MR. WEINTRAUB:  Okay.  It may have been my

40

1   misunderstanding, but what I thought we were doing was agreeing

2   upon the form of the interrogatories so that when these two

3   threshold issues were decided, people could respond to them.  I

4   understand that you disagree with me, and maybe I got it wrong,

5   but --

6           THE COURT:  No, because I plan -- just to be clear --

7   well, go ahead, Mr. Weintraub.

8           MR. WEINTRAUB:  But the important point is that this

9   order was a negotiated order, and the issues around the

10  interrogatories were all negotiated with the understanding that

11  we would have sufficient time to respond to them given the fact

12  that it's going to 175 people.  We had originally asked, in the

13  meet and confer, for 90 days from the time that it was

14  approved.  There was a lot of pushback on that.  So as part of

15  the agreement that was made, the time would run 30 days from

16  the determining on these threshold issues, which we assumed,

17  given the schedule we were talking about, was sometime in the

18  middle of March.  And what we decided internally was we would

19  take a running start and start working on the discovery right

20  away so that we wouldn't -- so we would, in effect, have more

21  than 30 days.  So I think through no one's fault, Your Honor,

22  we have now lost the benefit of having the additional time that

23  we thought we needed to get the discovery done.  I understand

24  you want us to do the discovery.  We'll incur the expense, but

25  we do need more than 30 days.

41

1          THE COURT:  Expense?  I mean, these are -- how many

2    interrogatories did we wind up with no subparts?

3          MR. WEINTRAUB:  Well, there are subparts.  You know,

4    who, why, when and where is more than one question, but, Your

5    Honor, the point is this is 175 times to unsophisticated people

6    who are going to need to interface with the Hilliard firm to

7    get those responses done.  And as easy as everyone in this

8    courtroom may think that they are, I'm telling you that we

9    believe it's going to take longer than 30 days.

10         THE COURT:  How much time do you want?

11         MR. WEINTRAUB:  I would like 60 days from whenever

12   they're served, Your Honor, under the circumstances.

13         THE COURT:  Mr. Steinberg.

14         MR. STEINBERG:  I would say 60 days on the outside

15   with a commitment to give us a rolling production as they come

16   in.

17         THE COURT:  Well, I'm going to set --

18         MR. WEINTRAUB:  That's fine.

19         THE COURT:  -- change the order to 60 days.  I think

20   you ought to agree on a rolling production.  It doesn't need to

21   be in the order itself.  I expect you to --

22         MR. WEINTRAUB:  We were always amenable to that, Your

23   Honor.

24         THE COURT:  Yes.  And I'm not going to give you an

25   argument date yet because I want to see -- I'm going to look at

42

1    the briefs before I give you an argument date.  My calendar is

2    getting pretty crowded.  I have the Motors Liquidation trial

3    starting April 24th on the lien release or on the fixtures and

4    with lots of things that are going to happen before that.  So I

5    don't let things linger, but I can't assure you yet when I'm

6    going to hear argument.  Okay.  Let's -- but that's why I

7    wanted to get this limited discovery done, the briefing done,

8    and I'll give you a argument date as soon as I can.

9              MR. WEINTRAUB:  Thank you.  Sixty days is fine with

10   us, Your Honor.

11             THE COURT:  Okay.

12             MR. WEINTRAUB:  Thank you.

13             THE COURT:  All right.  So you'll revise the order

14   and -- okay.

15             MR. STEINBERG:  Your Honor, there's just one other

16   subject that I'd like to bring --

17             THE COURT:  Just a minute.  Change the paragraph on

18   scheduling the hearing date.  Just put language on a date to be

19   set, scheduled by the Court.

20             MR. STEINBERG:  Your Honor, just to put my toe in the

21   water, but not to jump in the pool, I just wanted to point out

22   to Your Honor that the MDL did have a conference on February

23   11th and that there was a fairly detailed report that was given

24   as to the status of cases that had been settled in the MDL, and

25   I don't think we have shared with you the transcript of that

43

1  hearing.  And I think to the extent that Your Honor is

2  concerned that progress on the settlement front is being made,

3  we thought that that information may be interesting.  Or you

4  don't necessarily have to look at that because Judge Furman

5  asked the parties to reformat the presentation and to deliver

6  something by February 24th.

7          THE COURT:  Why don't you just give me a copy of

8  that.

9          MR. STEINBERG:  So we will send you the February 24th

10 report.

11         THE COURT:  Yes.

12         MR. STEINBERG:  Thank you.

13         THE COURT:  Okay.  Anybody else have any issues they

14 want to raise today?  Thank you very much.  We're adjourned.

15     (Proceedings concluded at 12:02 p.m.)

16                      *  *  *  *  *

17

18

19

20

21

22

23

24

25

44

# C E R T I F I C A T I O N

I, Alicia Jarrett, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

ALICIA JARRETT, AAERT NO. 428      DATE:  February 17, 2017

ACCESS TRANSCRIPTS, LLC

