# **Exhibit F**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARLENE S. KARU, individually and on behalf of all others similarly situated,<br><br>                       Plaintiff,<br><br>v.<br><br>TAKATA CORPORATION, TK HOLDINGS, INC., and GENERAL MOTORS LLC,<br><br>                      Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, based on personal knowledge as to herself, and upon information and belief as to all other matters, alleges as follows:

### NATURE OF CLAIMS

1.      People trust and rely on the manufacturers of motor vehicles and of critical safety devices to make safe products that do not give rise to a clear danger of death or personal injury. An airbag is a critical safety feature of any motor vehicle. Airbags are meant to inflate rapidly during an automobile collision to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield.

2.      An airbag supplier must take all necessary steps to ensure that its products—which literally can make the difference between life and death in an accident—function as designed, specified, promised, and intended. Profits must take a back seat to safety for the airbag manufacturer, and also for the automobile manufacturer when it makes its product sourcing decisions.

3.      This action concerns defective airbags manufactured by Defendant Takata Corporation and its related entities ("Takata"), and equipped in vehicles manufactured by

General Motors LLC and its related entities ("GM").

     4.    Specifically, Plaintiff brings this proposed class action against Takata on behalf of both a nationwide class (the "Nationwide Class") and a class of New Jersey residents (the "New Jersey Class") who purchased or leased a GM-manufactured vehicle that contains a defective Takata airbag. Plaintiff also brings this action against GM on behalf of the following two distinct subclasses within the Nationwide and New Jersey Classes: (a) persons who purchased or leased GM vehicles containing a defective Takata airbag that were manufactured by GM after July 10, 2009 (the "New GM Subclass"), and (b) persons who purchased or leased *used* GM vehicles after July 10, 2009, regardless of when those vehicles were manufactured (the "Used GM Vehicle Subclass").

     5.    All Takata airbags at issue in this litigation share a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their defectively designed inflators (the "Inflator Defect"). The inflator, as its name suggests, is supposed to inflate the airbag upon vehicle impact. In the milliseconds following a crash, the inflator ignites a propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand and deploy. The term "airbag" shall be used herein to refer to the entire airbag module, including the inflator.

     6.    In the late 1990s, Takata shelved a safer chemical propellant in favor of ammonium nitrate, a far cheaper and more unstable compound that is much better suited for large demolitions in mining and construction.

     7.    Under ordinary conditions, including daily temperature swings and contact with moisture in the air, Takata's ammonium nitrate propellant transforms and destabilizes, causing irregular and dangerous behavior ranging from inertness to violent combustion. When Takata

decided to abandon the safer propellant in favor of the more dangerous but cheaper one, it was aware of these risks and did so over the objections and concerns of its engineers in Michigan. Tellingly, Takata is the only major airbag manufacturer that uses ammonium nitrate as the primary propellant in its airbag inflators.

8.    As a result of the common, uniform Inflator Defect, instead of protecting vehicle occupants from bodily injury during accidents, the defective Takata airbags too often either fail to deploy or violently explode, sometimes expelling metal debris and shrapnel at vehicle occupants. As of May 2016, complaints to regulators blame Takata airbags for at least 10 deaths and more than 100 injuries in the United States alone, including at least 37 reports of airbags that ruptured or spewed metal or chemicals.

9.    When GM purchased Takata's airbags for its vehicles, it was aware that the airbags used the volatile and unstable ammonium nitrate as the primary propellant in the inflators. GM engineers provided the specifications for the airbags in its vehicles to Takata knowing that Takata used ammonium nitrate. GM decided to use Takata's airbags in part because Takata's use of ammonium nitrate enabled Takata to charge GM lower prices for airbags than GM would have had to pay to competing airbag suppliers that used more stable and less inherently dangerous compounds as propellants.

10.    The volatility and instability of Takata's ammonium nitrate propellant has been underscored by the glaring and persistent quality control problems that have plagued Takata's manufacturing operations.

11.    Takata first received word of startling airbag failures no later than 2003, when a Takata inflator ruptured in a BMW vehicle in Switzerland. BMW and Takata jointly investigated the incident in one of Takata's Michigan facilities, and inaccurately minimized the

- 3 -

incident as an anomaly, without alerting federal safety regulators.

12.    Similarly, in 2004, a Takata airbag in a Honda Accord in Alabama exploded, shot out metal shrapnel, and severely injured the car's driver.  Honda and Takata investigated the incident and inaccurately minimized it as "an anomaly."  Honda did not issue a recall.  Neither Honda nor Takata sought the involvement of federal safety regulators.

13.    The serious danger posed by the Inflator Defect was not disclosed to U.S. safety regulators until 2008, despite red flags raised by prior Takata airbag ruptures or explosions.  It took three additional reports of airbag rupture incidents in 2007 to prompt the 2008 disclosure, and even then, Takata and Honda falsely assured regulators that they needed to recall only approximately 4,000 Honda vehicles, claiming that they had identified all "possible vehicles that could potentially experience the problem."

14.    Behind the scenes, however, Takata was busy conducting tests that revealed far more serious problems.  As reported in *The New York Times*, Takata conducted secret tests in 2004, which confirmed that its inflators were defective, and then destroyed those test results to conceal the defect.

15.    Tragically, these airbag failures were the first of many to come.  Honda and Takata were forced to issue further recalls in 2009, 2010, and 2011, but they did so in a limited and misleading way, apparently in an effort to avoid the huge costs and bad publicity that would have been associated with appropriately-sized and broader recalls.  Despite the repeated Takata airbag recalls, and though GM knew its vehicles were also equipped with Takata airbags containing ammonium nitrate, it failed to take reasonable measures to investigate.

16.    Over a decade after the first incidents of airbag ruptures, Defendants' obfuscation and inaction broke down in the face of mounting incidents and increased scrutiny by regulators,

the press, and private plaintiffs. By the middle of 2013, the pace of the recalls increased exponentially as the National Highway Traffic Safety Administration ("NHTSA") began to force Defendants into action. Whereas approximately 3 million vehicles had been recalled up until that point, the April-May 2013 recalls added 4 million more vehicles to the list, across ten manufacturers. Just one year later, in June 2014, another 5.6 million vehicles were recalled. By October 2014, global recalls reached 16.5 million vehicles.

17.    Even as recalls increased, Defendants worked hard to limit the scope of the recall to humid parts of the country. They strenuously and falsely claimed that the risks caused by the Inflator Defect disappeared to the north of some arbitrary latitude in the American South. And they mischaracterized the Inflator Defect as the product of idiosyncratic manufacturing flaws.

18.    By November 2014, in anticipation of a United States Senate hearing to be attended by Takata and the major automakers, NHTSA demanded that the recall be expanded to the entire country for certain driver's side airbags, citing airbag rupture incidents in North Carolina and California. Incredibly, Takata refused, and testified at Congressional hearings that vehicles in non-humid regions were safe, even as it claimed that it had not yet determined the root cause of the failures.

19.    With additional pressure and public scrutiny, vehicle manufacturers whose vehicles contained the Inflator Defect – including GM – eventually agreed to NHTSA's demand. At that point, the total number of recalled vehicles escalated to approximately 17 million in the United States and 25 million worldwide.

20.    In response to the additional pressure and public scrutiny, Defendants were forced to consult with external explosives and airbag specialists, and performed additional testing on Takata's airbags. This testing confirmed what Defendants already knew: Takata's airbags

- 5 -

containing ammonium nitrate were defective and prone to rupture.

21.    In light of this testing, Takata was unable to deny the existence of the Inflator
Defect any longer.  On May 18, 2015, Takata filed four Defect Information Reports ("DIRs")
with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver
air bag inflators; (2) SPI passenger air bag inflators; (3) PSPI-L passenger air bag inflators; and
(4) PSPI passenger air bag inflators, respectively.  After concealing the Inflator Defect for more
than a decade, Takata finally admitted that "a defect related to motor vehicle safety may arise in
some of the subject inflators."  And in testimony presented to Congress following the submission
of its DIRs, Takata's representative admitted that the use of ammonium nitrate is a factor that
contributes to the tendency of Takata's airbags to rupture, and that as a result, Takata will phase
out the use of ammonium nitrate.

22.    Still, even Takata's recent defect admission is inaccurate and misleading, because
the Inflator Defect is manifest in each of Takata's inflators containing ammonium nitrate.  And
shockingly, Takata still intends to produce new inflators with ammonium nitrate, even after
conceding that inflators containing ammonium nitrate create an unacceptable public safety
hazard.

23.    Further, in its DIRs, Takata acknowledged that the defect is present in inflators
that were installed in vehicles as replacement parts through prior recalls, necessitating a second
recall of those vehicles.

24.    As a result of Takata's admission that its inflators are defective, NHTSA
expanded and accelerated the recall of Takata airbags affected by the Inflator Defect, requiring
an additional 35-40 million vehicles to be recalled in the United States, pushing the total number
of recalled vehicles nationwide over 100 million.  While Takata has records of which

manufacturers it sold defective inflators to, it claims not to have records of which vehicles those inflators were installed in. The vehicle manufacturers possess those records, however, and are thus in the process of identifying which vehicles must be recalled based on Takata's DIRs.

25.     Still, Takata has refused to immediately conduct nationwide recalls of all airbags containing the Inflator Defect. Instead, it insists on regional, phased recalls of vehicles equipped with its PSPI-L passenger air bag inflators and PSPI passenger air bag inflators.

26.     GM similarly has refused to immediately recall vehicles subject to recall as a result of the May 2016 amendment to the consent order requiring Takata to issue DIRs for previously unrecalled airbag inflators. In a recent securities filing, GM has stated the vehicles "do not present an unreasonable risk to safety and that no repair will ultimately be required." GM hopes to prove to NHTSA that there is no reason to fix inflators in up to 4.3 million more pickups and SUVs that would be covered under future recalls through December 2019. The automaker has until September to prove to NHTSA that the inflators do not pose an unreasonable risk to safety. If GM cannot adequately demonstrate by that time that vehicles do not present an unreasonable risk to safety, it will be obligated to repair the front passenger airbag inflators in these vehicles.

27.     GM has not yet begun making repairs on the initial 2.5 million vehicles recalled, insisting that Takata inflators used in GM vehicles have a unique design that does not pose a safety risk. NHTSA, on the other hand, reiterated the agency's position that "[t]he science clearly shows that these inflators become unsafe over time, faster when exposed to humidity and variations of temperature."

28.     As a result of Defendants' concealment of the Inflator Defect for more than a decade, the recalls now underway cannot be implemented effectively. Defendants have

acknowledged that the process could take at least three years because of supply constraints. Even before the number of recalled vehicles worldwide tripled from approximately 34 million to over 100 million, Honda's spokesman acknowledged that "[t]here's simply not enough parts to repair every recalled single car immediately."

29.    Even if there were enough airbags, dealers are unable to keep up with the volume of customers rushing to get their Takata airbags replaced. Following the expanded recalls in late 2014, some dealers reported receiving up to 900 calls per day about the recalls, and told customers that they may have to wait months before airbags can be replaced. And following Takata's submission of the May 18, 2015 DIRs, NHTSA's recall website received over one million visits. Now that more than 100 million vehicles worldwide have airbags that need to be replaced before 2019, the volume of inquiries has certainly increased exponentially.

30.    Consumers are, therefore, in the frightening position of having to drive dangerous vehicles for many months (or even years) while they wait for Defendants to replace the defective airbags in their cars. Most of the manufacturers are not providing replacement or loaner vehicles, even though there is an immediate need to provide safe vehicles to Plaintiff and Class members. For example, Toyota has simply disabled the dangerous passenger-side airbags in vehicles, and has offered stickers to paste onto the dashboard as a reminder not to sit in that seat. Likewise, GM has recommended that owners prohibit anyone from riding in the passenger seat. As a result, many consumers are effectively left without a safe vehicle to take them to and from work, to pick up their children from school or childcare, or, in the most urgent situations, to transport themselves or someone else to a hospital.

31.    Worse yet, certain recalls for passenger-side airbags remain regional in scope. This is an indefensible and unnecessarily risky approach because: (a) Defendants have claimed

they have yet to uncover the root cause of the Inflator Defect, making their geographic boundaries arbitrary at best; (b) the passenger-side airbags are made with the same unstable and dangerous ammonium nitrate propellant that is prone to overly-aggressive combustion and becoming inert; (c) vehicles are by definition mobile and therefore can and likely will be operated in high humidity regions; and (d) weather and climate are unpredictable and variable.

32.    Even more troubling, many of the replacement airbags that Takata and the vehicle manufacturers are using to "repair" recalled vehicles suffer from the same common, uniform defect that plagues the airbags being removed—they use unstable and dangerous ammonium nitrate as the propellant within the inflator, a fact that Takata's representative admitted at a recent Congressional hearing in June 2015. At the Congressional hearing, the Takata representative repeatedly refused to provide assurances that Takata's replacement air bags are safe and defect-free.

33.    Takata and GM knew or should have known that the Takata airbags installed in millions of vehicles were defective. Both Takata and GM, who concealed their knowledge of the nature and extent of the defect from the public while continuing to advertise their products as safe and reliable, have shown a blatant disregard for public welfare and safety. Moreover, GM has violated its affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

34.    Takata's actions have been especially disturbing. Despite the shocking record of injuries and failures, Takata was slow to report the full extent of the danger to drivers and passengers, and failed to issue appropriate recalls. Takata provided contradictory and inconsistent explanations to regulators for the Inflator Defect in Takata's airbags, which led to

more confusion and delay. Indeed, the danger of defective airbags and the number of vehicles affected was concealed for years after it became apparent there was a potentially lethal problem. Although Takata had actual knowledge and/or was on notice of, and failed to fully investigate, the problem and issue proper recalls, it allowed the problem to proliferate and cause numerous injuries and several deaths over the last 13 years.

35.    Even before purchasing inflators from Takata, GM was aware that Takata used volatile and unstable ammonium nitrate as the primary propellant in its inflators, and thus GM was on notice of the Inflator Defect even before it installed the inflators in its vehicles, because Takata reviewed the designs of the inflators with GM and GM approved the designs. GM was also put on notice of the Inflator Defect no later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Because its vehicles also contained Takata airbags, GM knew or should have known at that time that there was a safety problem with its airbags, and GM should have launched its own investigations and notified its customers. That responsibility only grew as reported incidents multiplied.

36.    Instead, Defendants put profits ahead of safety. Takata cut corners to build cheaper airbags, and GM sold Class members vehicles that it knew or should have known contained those defective airbags. For several years Defendants engaged in a pattern of reckless disregard, deception, concealment, and obfuscation. Only very recently – on the heels of media scrutiny – have Defendants begun recalling the millions of vehicles in the United States with the Inflator Defect.

37.    As a result of Defendants' misconduct, Plaintiff and members of the proposed Classes were harmed and suffered actual damages. The defective Takata airbags significantly diminish the value of the vehicles in which they are installed.

38.    Further, Plaintiff and the Classes did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. Purchasers or lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the Inflator Defect been disclosed. Plaintiff and the Classes were deprived of having a safe, defect-free airbag installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling their defective products, as they avoided incurring the costs associated with recalls and installing replacement parts for many years.

39.    In addition to the damages suffered by Plaintiff and the Classes as a result of the diminished value of their Class Vehicles, members of the Classes also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.

40.    The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury.

## JURISDICTION AND VENUE

41.    Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Classes are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Also, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because Plaintiff's RICO claims arise under federal law, and this Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

42.     This Court has personal jurisdiction over Plaintiff because Plaintiff resides in this jurisdiction.   This Court has personal jurisdiction over Defendants because they conduct substantial business in this District; some of the actions giving rise to the Complaint took place in this District; and some of Plaintiff's claims arise out of Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of Defendants' acts and omissions outside this state; and at or about the time of such injuries Defendants were engaged in solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by Defendants anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

43.     This Court also has personal jurisdiction over the Defendants under 18 U.S.C. § 1965 because they are found or have agents or transact business in this District.

44.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, Defendants have caused harm to Class members residing in this District, and Defendants are residents of this District under 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this district. Also, venue is proper in this district pursuant to 18 U.S.C. § 1965.

## THE PARTIES

45.     Plaintiff Marlene S. Karu ("Plaintiff") resides in West Orange, New Jersey. Plaintiff owns a 2008 Saab 9-3, which she purchased used in or around September 2010. To the best of Plaintiff's knowledge, the airbags in her Saab have never been replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. Plaintiff would not have

purchased the 2008 Saab 9-3 or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

46.     Plaintiff purchased her Class Vehicle primarily for personal, family, and household use.  Plaintiff and the proposed Classes were harmed and suffered actual damages. The defective Takata airbags significantly diminish the value of the vehicles in which they are installed.  Such vehicles have been stigmatized as a result of being recalled and equipped with Takata airbags, and the widespread publicity of the Inflator Defect.

47.     Further, Plaintiff and the proposed Classes did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  Plaintiff and the Classes, either through a higher purchase price or higher lease payments, paid more for their Class Vehicles than they would have had the Inflator Defect been disclosed.  Plaintiff and the Classes were deprived of having a safe, defect-free airbag installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling their defective products, as they avoided incurring the costs associated with recalls and installing replacement parts for many years.

48.     In addition to the damages suffered by Plaintiff and the Classes as a result of the diminished value of their Class Vehicles, members of the proposed Classes also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.

49.     The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to Plaintiff and the

proposed Classes.

50.    Defendant Takata Corporation ("Takata") is a foreign for-profit corporation with its principal place of business in Tokyo, Japan. Takata is a specialized supplier of automotive safety systems that designs, manufactures, tests, markets, distributes, and sells airbags. Takata is a vertically-integrated company and manufactures component parts in its own facilities. Takata, either directly or through its wholly-owned subsidiaries, manufactures airbags for distribution in the United States, including the airbags at issue in this litigation. Takata delivers its products, including the airbags at issue in this litigation, into the stream of commerce with the expectation that they will be purchased by consumers in the United States.

51.    Defendant TK Holdings Inc. ("TK Holdings") is a subsidiary of Takata Corporation and is headquartered in Auburn Hills, Michigan. TK Holdings sells, designs, manufactures, tests, markets, and distributes airbags in the United States. TK Holdings directly and through subsidiaries, owns and operates 56 manufacturing plants in twenty countries. TK Holdings manufactures airbags in the United States, including airbags at issue in this litigation. TK Holdings delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the United States.

52.    Defendants Takata and TK Holdings are collectively referred to as "Takata" or the "Takata Defendants." Takata is the manufacturer of all the defective airbags that are the subject of this Complaint.

53.    Defendant General Motors LLC ("GM") is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. GM was incorporated in 2009 and, on July 10, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation

through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.  GM develops,

manufactures, distributes, and services vehicles, parts, and accessories worldwide, including in

the United States.  The automotive brands under the GM corporate umbrella include Chevrolet,

Buick, GMC, Cadillac, and formerly included Saab, Saturn and Pontiac, among others.  GM

vehicles sold in the United States contain defective airbags manufactured by Takata.

### GENERAL FACTUAL ALLEGATIONS

54.    Plaintiff brings this action on behalf of herself and all persons similarly situated

who purchased or leased Class Vehicles (defined below).  Plaintiff seeks redress individually and

on behalf of those similarly situated for economic losses stemming from Defendants'

manufacture or use of Defective Airbags in the Class Vehicles, including but not limited to

diminished value.  Plaintiff, on behalf of herself and those similarly situated, seeks to recover

damages and statutory penalties, and injunctive relief/equitable relief.

55.    "Defective Airbags" refers to all airbag modules (including inflators)

manufactured by Takata ("Takata airbags") that are subject to the recalls identified in the table

set forth in paragraph 56, *infra*, all Takata airbags subject to recalls relating to Takata's May 18,

2015 DIRs, and all Takata airbags subject to any subsequent expansion of pre-existing recalls,

new recalls, amendments to pre-existing DIRs, or new DIRs, announced prior to the date of an

order granting class certification, relating to the tendency of such airbags to over-aggressively

deploy, rupture, or fail to deploy.  All Defective Airbags contain the Inflator Defect.  As a result

of the Inflator Defect, Defective Airbags have an unreasonably dangerous tendency to: (a)

rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury

or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through

contact with the airbag; and (c) fail to deploy altogether.

56.    "Class Vehicles" refers to all of the following GM vehicles purchased or leased in the United States that have Defective Airbags, as well as any additional GM vehicles with Defective Airbags that are recalled prior to the date of an order granting class certification. For reference, the following table identifies the recalled vehicles by make, model and model year, specifies which of the front airbags were included in the recall for each vehicle, and identifies whether the recall is a "preliminary" or final "safety" related recall:

| Make | Model | Years | Recall | Sides | Classification |
|------|-------|-------|--------|-------|----------------|
| Cadillac | Escalade | 2007-2011 | 16V381 | Passenger | Preliminary |
| Cadillac | Escalade | 2007-2008 | 16V383 | Passenger | Preliminary |
| Cadillac | Escalade ESV | 2007-2011 | 16V381 | Passenger | Preliminary |
| Cadillac | Escalade ESV | 2007-2008 | 16V383 | Passenger | Preliminary |
| Cadillac | Escalade EXT | 2007-2011 | 16V381 | Passenger | Preliminary |
| Cadillac | Escalade EXT | 2007-2008 | 16V383 | Passenger | Preliminary |
| Chevrolet | Avalanche | 2007-2011 | 16V381 | Passenger | Preliminary |
| Chevrolet | Avalanche | 2007-2008 | 16V383 | Passenger | Preliminary |
| Chevrolet | Cruze | 2013-2014 | 14V372 | Driver | Safety |
| Chevrolet | Silverado 1500 | 2007-2011 | 16V381 | Passenger | Preliminary |
| Chevrolet | Silverado 1500 | 2007-2008 | 16V383 | Passenger | Preliminary |
| Chevrolet | Silverado 2500/3500 HD | 2007-2008 | 15V324 | Passenger | Safety |
| Chevrolet | Silverado 2500/3500 HD | 2009-2011 | 16V381 | Passenger | Preliminary |
| Chevrolet | Suburban | 2007-2011 | 16V381 | Passenger | Preliminary |
| Chevrolet | Suburban | 2007-2008 | 16V383 | Passenger | Preliminary |
| Chevrolet | Tahoe | 2007-2011 | 16V381 | Passenger | Preliminary |
| Chevrolet | Tahoe | 2007-2008 | 16V383 | Passenger | Preliminary |
| GMC | Sierra 1500 | 2007-2011 | 16V381 | Passenger | Preliminary |
| GMC | Sierra 1500 | 2007-2008 | 16V383 | Passenger | Preliminary |
| GMC | Sierra 2500/3500 HD | 2007-2008 | 15V324 | Passenger | Safety |
| GMC | Sierra 2500/3500 HD | 2009-2011 | 16V381 | Passenger | Preliminary |
| GMC | Yukon | 2007-2011 | 16V381 | Passenger | Preliminary |
| GMC | Yukon | 2007-2008 | 16V383 | Passenger | Preliminary |
| GMC | Yukon XL | 2007-2011 | 16V381 | Passenger | Preliminary |
| GMC | Yukon XL | 2007-2008 | 16V383 | Passenger | Preliminary |
| Pontiac | Vibe | 2003-2007 | 15V286 | Passenger | Safety |
| Pontiac | Vibe | 2003-2007 | 15V285 | Passenger | Safety |
| Saab | 9-2X | 2005 | 15V323 | Passenger | Safety |
| Saab | 9-3 | 2006-2011 | 16V063 | Driver | Safety |
| Saab | 9-5 | 2006-2009 | 16V063 | Driver | Safety |
| Saturn | Astra | 2008-2009 | 16V063 | Driver | Safety |

57.    While recalls are ongoing for the Class Vehicles listed as having a "safety" classification, according to the GM website dedicated to Takata airbag safety issues, the "preliminary" recalls involved "passenger-side Takata airbag inflators on certain 2007-2011 full size pickups and full size sport utility vehicles. GM believes these vehicles are safe to drive at this time, and [will] be coordinating next steps in connection with these recalls with NHTSA." The preliminary recalls are "based on a May 2016 defect information report from Takata, which covers the front passenger airbag inflators on 2007-2011 full-size pickups and full-size SUVs in regions of the U.S. with moderate to high heat and humidity."

58.    GM continues to insist that the vehicles for which it has issued a "preliminary recall" were manufactured in such a way that they "do not contain a present defect which poses an unreasonable risk to motor vehicle safety at this time." Although GM has expressed the belief that "these vehicles are safe to drive today," as described above, GM will be required to recall these vehicles if it cannot prove to NHTSA, by September 2016, that the vehicles do not pose an unreasonable risk to safety.

## I.    Takata is a Major Manufacturer of Airbags and Inflators

59.    Takata is the world's second largest manufacturer of automotive safety devices, including airbags. Takata was one of the first companies to market driver-side airbags in the early 1980s. Airbags made up 38.2 percent of its business in its most recently reported quarter.

60.    Takata has supplied airbags to automakers for U.S. vehicles and to state and local governmental purchasers since at least 1983. By 2014, Takata had captured 22 percent of the global automotive airbag market.

61.    Takata Corporation has claimed to prioritize driver safety as its "dream," "dedication," and "commitment."

62.    Takata claims to be "motivated by the preciousness of life" and pledges to "communicate openly and effectively." Takata has failed to live up to these assurances by:

a.    manufacturing, distributing, and selling airbags that can cause serious bodily injury or death;

b.    intentionally concealing the foregoing from Plaintiff, Class members, and federal regulators; and

c.    making incomplete representations about the safety and reliability of its airbags, while purposefully withholding material facts that contradicted these representations from Plaintiff, Class members, and federal regulators.

## II.    Takata's Airbags Have A Common, Uniform Defect

### A.    Takata Recklessly Chose an Inexpensive and Dangerous Propellant

63.    The part of the airbag at issue in this matter is the inflator. The inflator consists of a metal canister loaded with propellant wafers or pellets, and is placed in the airbag module. Upon impact, the propellant wafers or pellets ignite, triggering a chemical reaction that produces gas, which in turn inflates the fabric airbag. This process occurs within milliseconds.

64.    The following basic illustration depicts Takata's airbag module:



65.    When it began manufacturing airbags in the 1980s, Takata used a compound called sodium azide as the propellant in its inflators. In the mid-1990s, Takata began using a different propellant called 5-aminotetrazole, in part due to toxicity associated with sodium azide.

66.    In the late-1990's, Takata's managers pressured its engineers in Michigan to devise a lower cost propellant based upon ammonium nitrate, a compound used in fertilizer and explosives. Ammonium nitrate is a dangerous material that should not be used in airbags. It is an inherently volatile and unstable chemical.

67.    Daily temperature swings are large enough for the ammonium nitrate to cycle through three of its five crystalline states, adding to its volatility. It also readily absorbs moisture from the atmosphere. The chemical's sensitivity to temperature and moisture cause it to break down over time, which in turn results in violent detonation or the chemical becoming effectively inert. As one explosives expert bluntly stated in *The New York Times*, ammonium nitrate "shouldn't be used in airbags," and is better suited to large demolitions in mining and construction.

68.    From the time it began investigating ammonium nitrate in the late 1990s, Takata understood these risks. Indeed, Takata expressed concern in a patent document in 1995 that an ammonium nitrate propellant would be vulnerable to temperature changes and that its casing "might even blow up." Takata further recognized that "[o]ne of the major problems with the use of ammonium nitrate is that it undergoes several crystalline phase changes," one of which occurs at approximately 90 degrees Fahrenheit. If ammonium nitrate undergoes this type of temperature change, the compound may "expand and contract and change shape resulting in growth and cracking" of the propellant, which might cause an airbag inflator to "not operate properly or might even blow up because of the excess pressure generated."

- 19 -

69.    Takata also admitted in a patent document from 1999 that pure ammonium nitrate is "problematic" because gas generating compositions made with it can be "thermally unstable."

70.    In 1999, as the ammonium nitrate design was being considered, Takata's engineering team in Moses Lake, Washington, raised objections and pointed to explosives manuals that warned of the risk of disintegration and irregular, overly-energetic combustion. As one former Takata engineer noted, "ammonium nitrate stuck out like a sore thumb," and yet his team was given only "a couple days" to do its review.

71.    Not surprisingly, other major airbag manufacturers, including Autoliv, Key Safety Systems, and TRW Automotive, have reportedly avoided using ammonium nitrate as a propellant. Indeed, Takata's representative confirmed at a recent Congressional hearing in June 2015 that Takata is the only major airbag manufacturer that uses ammonium nitrate as a primary propellant in its inflators.

72.    The only conceivable advantage to the compound for an airbag manufacturer, according to the expert quoted in *The New York Times*, is that it is "cheap, unbelievably cheap." Indeed, Takata had originally planned to use tetrazole as its propellant, which is not only more stable than ammonium nitrate, but also yields other desired benefits, such as being more environmentally friendly. But tetrazole was too expensive for Takata, and executives ultimately pressured engineers in Michigan to develop a cheaper alternative.

73.    Takata began receiving complaints regarding the Inflator Defect shortly after introducing the redesigned airbag to the market, and those complaints continued to multiply over the years. Nevertheless, rather than switch to the compound it knew would be safer, even if more expensive, Takata recklessly opted to try, over the course of many years, to stabilize a compound that resists stabilization.

74.    In a 2006 patent application, Takata discussed the need to test the performance of ammonium nitrate at various extreme temperatures because it is an unstable chemical, and these tests could reveal many problems, including "over-pressurization of the inflator leading to rupture." The 2006 patent document purportedly contained a fix for that sort of rupturing.

75.    Notably, the alleged fix in 2006 came after a rupture incident in 2004 that caused an injury, and incidents continued to mount after that time as well. Takata submitted a patent application with other purported "fixes" as recently as 2013. These ongoing, albeit unsuccessful, efforts show that Takata knew throughout the relevant period that its airbags were defective.

**B.    Takata's Knowledge of the Inflator Defect**

76.    Takata became further aware of the instability of its ammonium nitrate propellant from the persistent and glaring quality control problems it encountered in its manufacturing operations. The Takata plants that manufactured the airbags and inflators at issue in this Complaint include plants located in Moses Lake, Washington, LaGrange, Georgia, and Monclova, Mexico.

77.    At a House hearing in December 2014, Mr. Hiroshi Shimizu, Takata's Senior Vice President for Global Quality Assurance, admitted: "We considered it a main contribution to the problem is [sic] the high temperature and absolute humidity, together with age of the products and probably maybe a combination with manufacturing issues." Nonetheless, Mr. Shimizu claimed that Takata still had not determined the root cause of the defect: "At this moment, we don't have the root cause. We know the factors may contribute to this problems [sic], so that is why we are still researching these inflators collected from regions." Executive Vice President of Honda North America, Rick Schostek, echoed that claim at the House hearing: "we have theories, but we don't know the cause."

78.    Mr. Shimizu grossly understated the problem.  Starting in 2001, engineers at Takata's Monclova, Mexico plant identified a range of problems, including rust, which they said could have caused inflators to fail.  Between 2001 and 2003, Takata struggled with at least 45 different inflator problems, according to dozens of internal reports titled "potential failures" and reviewed by *Reuters*.

79.    On at least three occasions between 2005 and 2006, Takata engineers struggled to eliminate leaks found in inflators, according to engineering presentations.  In 2005, Shainin, a U.S. consulting firm, found a pattern of additional problems.  Underscoring Takata's reckless use of the volatile and unstable ammonium nitrate, on March 31, 2006, the Monclova, Mexico plant was rocked by violent explosions in containers loaded with propellant, leaving at least a dozen workers injured.

80.    Apparently, not even that terrible accident could prompt serious and lasting improvements: in a February 2007 email to multiple colleagues, one manager stated that "[t]he whole situation makes me sick," referring to Takata's failure to implement checks it had introduced to try to keep the airbags containing the unstable and volatile ammonium nitrate propellant from failing.

81.    Takata engineers also scrambled as late as 2009 to address its propellant issues after "inflators tested from multiple propellant lots showed aggressive ballistics," according to an internal presentation in June 2009.

82.    Based on internal Takata documents, Takata was struggling to meet a surge in demand for its airbags.  Putting profits ahead of safety, Takata exhibited shoddy and reckless behavior in the handling of its ammonium nitrate propellant.  In March 2011, a Takata supervisor at the Monclova, Mexico plant sent an e-mail to other employees stating "A part that is not

welded = one life less, which shows we are not fulfilling the mission." The title of the e-mail was "Defectos y defectos y defectos!!!!" This shoddy and reckless attitude permeated all of Takata's operations and facilities.

83.    Yet, handling problems at Takata facilities persisted: another manager urged employees to examine the propellant visible in a cross section of an airbag inflator, noting that "[t]he propellant arrangement inside is what can be damaged when the airbags are dropped. . . . Here you can see why it is important to handle our product properly." A 2009 presentation of guidelines on handling inflators and airbag units also stressed the dangers of mishandling them. The presentation included a link to a video that appeared to show side-curtain airbags deploying violently, sending the inflator hurtling into the car's cabin.

84.    Despite knowing it was shipping potentially deadly products, including inflators containing unstable and volatile ammonium nitrate propellant, Takata resisted taking back damaged or wet airbag modules, in part because Takata struggled to keep up with a surge in demand for its airbags through the early and mid-2000s as it won big new clients like GM.

85.    Moreover, while Defendants, and particularly Takata, had previously assured the public that the Defective Airbags had been remedied and that the new airbags being placed in recalled vehicles were safe, in fact, GM was recently required to recall model year 2013 and 2014 Chevy Cruze vehicles because of the risk of the Takata airbags rupturing. And Takata has now admitted that replacement airbags installed in recalled vehicles are defective as well, and cannot assure the public that replacement inflators containing ammonium nitrate are safe and not prone to rupture.

III.   **Takata Airbag Failures and Defendants' Inadequate Response**

A.   **2003-2008: Early Incidents and the 2008 Honda Recall (08V-593)**

86.   Honda was among the first automakers to use Takata's new air bags, and installed them in some models beginning in 1998.  Since then, Takata airbags containing the Inflator Defect have been installed in vehicles manufactured by at least ten automakers.

87.   On November 1, 2003, Charlene Weaver was a passenger in a 2004 Subaru Impreza in Arizona (one of the least humid states in the country) when she was killed in a Takata airbag-related accident.  Her car was not recalled until May 2015, more than a decade later.

88.   Also in 2003, an inflator ruptured in a BMW in Switzerland, prompting a January 2004 investigation by Takata and BMW.  That investigation took place at a Takata facility in Michigan, and involved inflators sold to BMW, Honda, and Toyota.  The testing was ordered by a senior Takata executive, and the results indicated that the inflators were defective.

89.   In 2004, a Takata airbag violently exploded in a Honda Accord in Alabama, shooting out metal fragments and injuring the car's driver.  Honda was notified of the incident, and at least one Takata employee recalled being told that Honda examined the part before turning it over to Takata.  Takata reported back to Honda that it was unable to find a cause for the incident.  Ultimately, the companies deemed the incident "an anomaly," and conducted no further investigation or analysis to the public's knowledge.  Notably, Honda and Takata did not issue a recall or even involve federal safety regulators beyond completing a reporting form in a cursory and incomplete manner.

90.   Yet, by this time, Takata was aware of the broad problems associated with its choice of the unstable and volatile ammonium nitrate as a propellant.  As noted above, between 2001 and 2003, internal Takata reports titled "potential failures" showed that Takata struggled

with at least 45 different inflator problems, and that, in 2002, the Monclova, Mexico plant recorded 60 to 80 defects for every million inflators shipped to automakers—six to eight times beyond Takata's own quality control limit.  In light of this accumulated knowledge, Takata's dismissal of the explosion as an anomaly without further study was reckless at best.

91.    Even as it downplayed the incident publicly, engineers at Takata's American headquarters in Auburn Hills, Michigan, began conducting secret tests on 50 airbags it had retrieved from scrapyards.  The tests were conducted by Al Bernat, Takata's then-vice president of engineering, and took place over weekends and holidays during the summer of 2004.

92.    Steel inflators in at least two of the airbags cracked during the tests, a condition which can lead to rupture.  The result was so startling that engineers began designing possible fixes in anticipation of a recall.

93.    But Takata executives ordered the lab technicians to delete the test data, including video and computer backups, from company computers and to dispose of the airbag inflators. Prototypes of design alternatives were also trashed.  One former Takata employee stated that "[a]ll the testing was hush-hush. … Then one day, it was, 'Pack it all up, shut the whole thing down.'  It was not standard procedure."  Takata did not disclose these tests publicly or to federal regulators and, in regulatory filings, stated that it began testing Defective Airbags in 2008.

94.    In June and August of 2007, Honda notified Takata of three additional airbag explosion incidents.  All three accidents involved metal fragments propelling into the faces and bodies of car passengers upon deployment of the airbags.  As with the 2004 incident, Honda did not initiate a recall or provide information about the ruptures to federal investigators.  Rather, it callously risked vehicle occupants' safety as it purportedly awaited a failure mode analysis being conducted by Takata.

95.     After the 2007 incidents, Honda and Takata began another internal investigation, including a survey of inflators. Starting in late 2007 or early 2008, Honda began collecting inflators returned to dealers for reasons unrelated to the exploding-airbag defect, and sent them to Takata for investigation, all without informing vehicle owners or regulators. Honda also collected inflators from scrap yards for the same purpose.

96.     Takata began what became a year-long study of the Inflator Defect. Takata's engineers ultimately claimed that workers at a Takata factory in Monclova, Mexico, had left moisture-sensitive explosives out on the plant floor, making them prone to overly energetic combustion. Takata advised Honda that by November 2002, it had corrected any such handling deficiencies.

97.     Takata shared the results of the inflator survey analysis with Honda on October 2, 2008. That analysis indicated an airbag inflator problem. Honda and Takata claimed, however, that only a small number or inflators were affected. As a result, Honda issued a recall, but only for 3,940 vehicles in the United States.

98.     This November 2008 recall involved certain 2001 Honda Accord and Civic vehicles with airbags that "could produce excessive internal pressure," causing "the inflator to rupture," spraying metal fragments through the airbag cushion ("2008 Recall"). Honda reported that it learned of the problem from a June 2007 claim, and falsely assured regulators that it had identified all "possible vehicles that could potentially experience the problem."

99.     Even as Takata and Honda advocated a minuscule recall focused on older models—less than 0.1 percent of the total Honda recall to date—at about the same time, in April 2009, Takata engineers scrambled to repair a flaw in a machine at the Monclova, Mexico factory

that made the airbag propellant more volatile, according to materials from a company presentation given that year.

**B.    2008-2009: Additional Incidents, the 2009 Honda Recall (09V-259), and Honda's and Takata's Misleading Reporting to NHTSA**

100.    Additional incidents took place after the 2008 Recall that underscored its inadequacy:

a.    On April 27, 2009, six months after the limited 2008 recall, a Takata airbag in Jennifer Griffin's 2001 Honda Civic exploded after a minor accident in Orlando, Florida. The explosion sent a two-inch piece of shrapnel from the Defective Airbag flying into Ms. Griffin's neck. Although Ms. Griffin survived, when highway troopers found her, she was bleeding from a severe gash in her neck. Ms. Griffin's car was not part of the 2008 Recall. Honda received notice of the incident no later than September 2009, and likely months earlier in July towards the beginning of its correspondence with NHTSA regarding the upcoming 2009 recall.

b.    On May 28, 2009, 18-year-old Ashley Parham of Oklahoma was killed while driving a 2001 Honda Accord when the Takata airbag in her car exploded after her car bumped another car in a parking lot. While she apparently survived the accident itself, the metal shrapnel that shot out of the exploding Defective Airbag sliced open her carotid artery and she bled to death. Ms. Parham's car was not part of the 2008 Recall.

c.    Another Takata airbag-related fatal incident took place in Virginia on June 9, 2009, and Honda ultimately settled a lawsuit brought by the decedent's family.

d.    According to one of its submissions related to the upcoming 2009 Recall, Honda received three additional Takata airbag unusual deployment complaints on July 27, July 31, and August 31, 2009.

101.    With incidents mounting, Takata and Honda revisited the issue yet again.  In June 2009, Takata reported to Honda that the defective airbag components had been made at its factory in Moses Lake, Washington.  At the time, Takata engineers claimed that between 2000 and 2002, a flaw in a machine that presses air bag explosives into wafers had made the explosives unstable.  The Takata engineers further claimed that with the defective air bags, explosives in the metal inflator, which would normally burn down and produce the nitrogen gas to inflate the air bag, instead burn aggressively and cause the inflator to burst, shooting hot fragments through the air bag's fabric.

102.    After two years of investigation, Honda and Takata claimed that a machine at Takata's Moses Lake factory in Washington state had failed to compress chemicals firmly enough.  That left the inflators vulnerable to moisture, potentially causing the bags to inflate more forcefully than they were supposed to.  At that time, Takata also acknowledged that the defect covered a wider range of vehicles than initially estimated, but claimed that the plant had made numerous upgrades to its machinery in late 2002, which it claimed had improved the quality of its explosives.

103.    In June 2009, Takata provided a follow up report to Honda on its November 2008 analysis, stating that issues related to propellant production appeared to have caused the improper inflator performance.

104.    As a result of Takata's June 2009 follow-up report and the additional claims of "unusual deployments," on June 30, 2009, Honda issued another recall, this one covering 2001 and 2002 Civic, Accord, and Acura vehicles ("2009 Recall").  Thus, it was two months after Ms. Parham's death that Honda expanded its 2008 Recall to include the model she drove.

105.    In August 2009, NHTSA's Recall Management Division sent Honda an

information request to explain why it did not include 2009 Recall vehicles in the 2008 Recall, and "to evaluate the timeliness of [Honda's] recent defect decision."

106.   NHTSA also wanted to know "the difference between the driver's airbag inflators in those vehicles from the inflators in the 09V-259 vehicles and explain how this distinction, or any other between the two sets of vehicles, convinced [Honda] at the time that it did not need to include the latter set in the 08V-593 recall population."

107.   NHTSA's Recall Management Division further requested that Honda provide complaints, lawsuits, warranty claims, and field reports, along with an explanation of the "unusual driver airbag deployments" and Honda's investigative efforts.

108.   In Honda's September 16, 2009 reply to NHTSA, the automaker said that its information about the "unusual driver airbag deployments" came from Takata: "[w]e understood the causal factors to be related to airbag propellant due to handling of the propellant during airbag inflator module assembly."

109.   Honda also reported, based on information from Takata, that the problem with the airbags was isolated to the "production of the airbag propellant prior to assembly of the inflators." Specifically, the cause was "related to the process of pressing the propellant into wafers that were later installed into the inflator modules," and limited to "a specific production process" involving one high-precision compression press that was used to form the propellant into wafers, the automaker told NHTSA.

110.   Honda also disclosed to NHTSA that it had fielded nine complaints and one lawsuit related to the 2008 and 2009 Recalls. Honda also finally informed NHTSA about the 2004 incident involving an "unusual deployment" of the vehicle's airbag. Honda claimed that it "only recently [was] reminded of this incident," and that, until recently, Honda "had not

associated it with the [2008 Recall] campaign."

111.    Through a November 20, 2009 request, NHTSA also sought information from Takata.  Takata submitted a partial response to NHTSA on December 23, 2009 ("Partial Response"), and then a full response on February 19, 2010 ("Full Response").  Both responses provided vague and misleading information about the seriousness of the problem.

112.    Takata claimed that there were no substantive design differences between the inflators in the airbags at issue in the two recalls, but cited differences in the production processes between the lots.

113.    Takata also claimed that the defects only existed in specific lots manufactured between certain dates.  It claimed that the inflators involved in the 2008 Recall were manufactured between October 29, 2000 and December 1, 2000, and that inflators involved in the 2009 Recall were manufactured between August 23, 2000 and February 25, 2001.  Takata did not provide the dates the inflators were shipped, as NHTSA requested, because, as Takata admitted, its records did not have that information.  Instead, it gave just the manufacturing dates.

114.    In its Full Response, Takata claimed that the defect identified in the 2009 Recall was the result of a single compression press (the "Stokes press") in a single plant.  Takata further claimed that while it did manufacture 2,400 inflators using the same process as the defective inflators, the design was different and "[t]herefore, Takata is convinced that the inflators sold [redacted] contain no safety-related defect."

115.    Takata falsely wrote in its Full Response that it "believed - [redacted] - that expanding the recall to include all vehicles equipped with inflators manufactured with Stokes propellant produced through and including February 28, 2001 would capture all inflators with tablets that had a risk of producing overly energetic combustion.  This recommendation, as well

as the analysis that supported it, was presented to Honda on June 12, 2009."

116.    In both the Partial Response and the Full Response, Takata stated: "Takata has not provided any airbag inflators that are the same or substantially similar to the inflators in vehicles covered by Recalls 08V-593 [in 2008] and 09V-259 [in 2009] to any customers other than Honda. The physical characteristics of the inflator housing used in the Honda vehicles subject to these recalls are unique to Honda." This statement would prove to be false.

117.    Based on Takata's and Honda's misrepresentations and omissions concerning the nature and scope of the Inflator Defect, NHTSA closed its investigation into the Takata airbags on May 6, 2010.

118.    In the months following NHTSA's 2009/2010 request for information, Takata engineers came up with yet another purported explanation for the ruptures; specifically, that in September 2001, machine operators at the Moses Lake, Washington plant could have inadvertently switched off an "auto reject" function that weeded out poorly made explosives that can become unstable. However, Takata assured Honda at the time that, "as part of the upgrades at that plant, in September 2002, the supplier had added a locking mechanism that prevented workers from turning the auto-reject function off."

119.    *The Wall Street Journal* further reported that "Honda and Takata discovered more problems. At Moses Lake, employees had switched off a mechanism that automatically checked whether the right amount of propellant was loaded in inflators; at a plant in Monclova, Mexico, a dehumidifier that kept parts dry hadn't been turned on. At times poor record-keeping meant Honda and Takata couldn't figure out which cars had defective bags."

### C.    2010: The 2010 Recall (10V-041) and Honda's Shifting Explanations

120.    Honda's and Takata's ongoing cover-up and ineffective recalls continued to cost

lives. In December 2009, a 2001 Honda Accord driven by Gurjit Rathore, 33, hit a mail truck in

Richmond, Virginia. Her air bag exploded, propelling shrapnel into her neck and chest, and she

bled to death in front of her three children, according to a lawsuit filed by her family.

121.    In February 2010, only months after its previous recall, Honda announced a third

recall for an additional 379,000 vehicles across a number of models ("2010 Recall").

122.    Honda's explanation for the airbag defect changed yet again, but still

misleadingly focused on the manufacturing process. Honda explained that of the two different

manufacturing processes used in the preparation of an airbag propellant, one process was within

specification and the other was not. Honda's expanded recall supposedly reached those vehicles

employing airbags that had utilized manufacturing processes not within specification.

123.    Once again, however, injuries continued to mount:

124.    In April 2010, two months after the 2010 Recall, the Takata airbag in Kristy

Williams's 2001 Honda Civic exploded while she was stopped at a traffic light in Morrow,

Georgia, sending metal shards into her neck and causing profuse bleeding. She survived only

because she applied pressure with her fingers to stem the arterial bleeding.

125.    On November 8, 2010, Suetania Emmanuel of St. Croix, U.S. Virgin Islands, was

driving a 2002 Honda Civic when the Takata airbag exploded and sent shards of metal into her

face and throat.

### D.    2011-2012: Mounting Honda Recalls, Including the 2011 Recall (11V260)

126.    In April 2011, Honda filed a Part 573 Defect and Noncompliance report for 2,430

replacement service part airbag modules that might have been installed in vehicles covered by

- 32 -

previous recall expansions ("2011 Recall"). Honda was unable to determine which vehicles contained the defective replacement parts, forcing it to recall all 833,277 vehicles that might have had the part installed.

127.    According to documents submitted with the 2011 Recall, on August 15, 2011, Honda became aware of an August 1, 2011 "energetic deployment of a driver's airbag inflator that was outside of the prior range of suspect inflators." On September 2, 2011, Honda and Takata began an analysis of these so-called "outside of range" occurrences.

128.    Further underscoring the instability of the ammonium nitrate propellant, on or about September 14, 2011, Honda and Takata began investigating the possibility that airbag inflator propellant lots were mixed during airbag inflator assembly, prompting further analysis of airbag inflator production records for the period when propellant was processed by the suspect method.

129.    Honda reported its death and injury tallies to regulators only in a confidential submission in December 2011, when it issued a fifth limited recall for the rupture defect, according to NHTSA. That recall expanded Recall No. 11V-260 (April 2011), to include an additional 272,779 Honda and Acura vehicles. The expanded recall also included another 640 airbags sold as replacement parts; however, because Honda could not determine on which vehicles the 640 replacement air bags were installed, an additional 603,241 vehicles had to be recalled. Collectively, 1.7 million Honda and Acura vehicles had been recalled by the end of 2011 because they contained Takata-manufactured airbags.

130.    In the meantime, Honda and Takata quietly continued their internal investigation into the Inflator Defect. According to Honda, an exploding airbag in Puerto Rico in October 2011 prompted Honda to ask permission from NHTSA to collect "healthy" airbag modules to see

- 33 -

if "abnormal combustion was possible." The collection began on March 14, 2012, and by November 21, 2012, Honda in fact found that even its so-called "healthy" airbags could abnormally combust in certain conditions.

131.   Toyota also received additional direct notice of the Inflator Defect in this timeframe. Starting in September 2012, Toyota received field reports of three U.S. vehicles with fractured inflators—two were front passenger side airbags that deployed inadvertently. Toyota recovered 144 in-use inflators from both the Japan and U.S. markets for Takata to evaluate. In February 2013, Takata informed Toyota that some of the propellant wafers found within the recovered inflators were cracked, possibly due to lower material density.

132.   Dangerous and tragic incidents continued to mount during this period:

a.      On April 20, 2011, an unidentified man was hurt in Puerto Rico when the Takata driver airbag ruptured in his 2001 Honda Accord LX. His attorney notified NHTSA on May 26, 2011.

b.      On September 20, 2011, Eddie Rodriguez crashed his Honda Civic in Puerto Rico, deploying airbags that launched sharp pieces of metal toward him. Honda reached a confidential settlement with the driver in 2013.

c.      On October 20, 2011, there was an alleged rupture of a passenger side airbag in Puerto Rico; Honda obtained the vehicle for analysis on February 3, 2012.

d.      On December 4, 2011, Miranda Perez suffered left eye blindness due to a Defective Airbag rupture while driving her 2003 BMW M3 in Buffalo, New York.

e.      On March 2, 2012, Angelina Sujata suffered chest injuries due to a Takata airbag rupture while driving her 2001 Honda Civic in Chapin, South Carolina.

f.      On March 8, 2012, Sharonda Blowe of Jacksonville, Florida was severely

- 34 -

injured while driving a 2001 Honda Accord when she was struck in the head by pieces of metal exploding out of a Defective Airbag. Ms. Blowe brought suit and reached a confidential settlement.

g.    On September 2, 2012, Monique Roig suffered facial injuries due to a Defective Airbag rupture while riding in a 2001 Honda Civic in Miami-Dade County, Florida.

**E.    2013-2014: Takata's Belated Admissions of Broader Defects and the 2013 Recall (13V-132)**

133.    By 2013, it became clear to federal regulators, and Defendants were already aware, that the Defective Airbag issue and the number of Defective Airbags were much more significant than Takata or Honda initially reported to NHTSA.

134.    In February and March 2013, Takata notified Nissan and Mazda that it was investigating airbag quality. Separately, Takata advised Honda "of another potential concern related to airbag inflator production that could affect the performance of these airbag modules."

135.    On April 10, 2013, Honda filed a Recall Notification ("2013 Recall") for an additional 561,422 vehicles that could be affected by the following part defect:

**Defect description:**

In certain vehicles, the passenger's (frontal) airbag inflator could produce excessive internal pressure. If an affected airbag deploys, the increased internal pressure may cause the inflator to rupture. In the event of an inflator rupture, metal fragments could be propelled upward toward the windshield, or downward toward the front passenger's foot well, potentially causing injury to a vehicle occupant.

136.    On April 11, 2013, Takata filed a Defect Information Report titled "Certain Airbag Inflators Used as Original Equipment." In that report, Takata misleadingly attributed the defect to isolated manufacturing flaws, describing the Defective Airbags as follows:

- 35 -

Some propellant wafers produced at Takata's plant in Moses Lake, Washington, between April 13, 2000 and September 11, 2002 may have been produced with an inadequate compaction force. . . . In addition some propellant wafers used in inflators produced at Takata's plant in Monclova, Mexico between October 4, 2001 and October 31, 2002, may have been exposed to uncontrolled moisture conditions. Those wafers could have absorbed moisture beyond the allowable limits . . . . In both cases, the propellant could potentially deteriorate over time due to environmental factors, which could lead to over-aggressive combustion in the event of an air bag deployment. This could create excessive internal pressure within the inflator, and the body of the inflator could rupture.

137.   It was not until its April 2013 Report that Takata finally admitted that the defective inflators were installed as original equipment in vehicles manufactured by companies other than Honda, including Toyota, Nissan, Mazda, and BMW. Takata did not know, however, how many inflators were installed as original equipment in vehicles manufactured by companies other than Honda.

138.   In April 2013, based on Takata's new admissions, six major automakers, including Nissan, Mazda, BMW, Pontiac, and Honda, issued recalls of 3.6 million vehicles containing Takata airbags.

139.   With the increased awareness and scrutiny, news of incidents became more widespread:

a.   On August 5, 2013, Joseph Nasworthy of Jacksonville, Florida suffered severe lacerations to his eye and nose when the Takata airbag exploded upon deployment in his 2005 Honda Civic.

b.   On September 1, 2013, Stephanie Erdman of Destin, Florida was driving a 2002 Honda Civic when she was hit in the eye by shards of metal that shot from the Takata airbag. Ms. Erdman filed suit and reached a confidential settlement.

c.   Also in September 2013, when police got to the scene of a minor car accident in Alhambra, California, they thought the driver, Hai Ming Xu, had been shot in

the face.  In fact, he was killed by shrapnel exploding from the Takata airbag in his 2002

Acura TL that deployed when it hit the wall of a building.  As *The New York Times*

reported:

> The authorities have not determined a reason for the injuries, though his coroner's
> report cited tears in his airbag and facial trauma from a foreign object. And
> problems persist with Honda's reporting of potential defects.
>
> In at least four more recent suspected ruptures, including the one linked to [the
> California driver's] death, Honda has not filed a so-called early warning report
> with safety regulators, as is required in cases where there is a claim of defect that
> resulted in an injury or death, according to case lawyers and legal filings.

     d.     On October 12, 2013, Brandi Owens of Forsyth County, Georgia was

injured in a low-speed accident when the driver's side Takata airbag of her 2013 Chevy

Cruze exploded and detached from the steering wheel.  According to a lawsuit, metal

from the airbag hit Owens in the face and left her blind in one eye.

140.     By 2014, the incident rate picked up even more dramatically, with over a dozen

incidents involving injuries or fatalities in Nissan, Honda, Toyota, Chevy, and Mazda vehicles

taking place in a variety of regions in the country, from humid Puerto Rico to far drier

Massachusetts and California.  For example:

     a.     On February 19, 2014, a Takata passenger airbag ruptured and sprayed

metal fragments at the passenger following a crash in a 2007 Chrysler 300.

     b.     On February 20, 2014, a Takata driver's side airbag in a 2003 Dodge Ram

1500 ruptured and ejected metal fragments following an accident.  The driver suffered

severe physical injury as a result.

     c.     On March 14, 2014, Susan Cosgrove of Fremont, California was injured in

a low-speed accident while driving a 2013 Chevy Cruze.  The Takata-related recall notice

on her car arrived at her residence after the incident.

d.      On May 29, 2014, Corey Burdick of Eustes, Florida, was driving a 2001 Honda Civic when the airbag deployed and sent shards of metal into his eye.

e.      In June 2014, a low-speed accident involving a 2005 Honda Accord in Los Angeles, California, caused the car's driver airbag to "detonate," sending hot metal and plastic shrapnel into the cabin.

141.    With accidents proliferating, Takata met with NHTSA officials on May 20, 2014 to provide information about inflator ruptures not covered by previous recalls. At that meeting, Takata noted that "all six of the potentially-relevant rupture incidents had occurred in either Florida or Puerto Rico." The referenced incidents included both passenger and driver side airbags. This statement omitted one of the earliest incidents, Ms. Weaver's 2003 accident in Arizona, as well as later incidents in drier locales, as noted above.

142.    On June 11, 2014, NHTSA's ODI published an ODI Resume for a preliminary evaluation of Investigation No. PE 14-016. That document stated that NHTSA was opening an investigation "in order to collect all known facts from [Takata] and the vehicle manufacturers that it believes may have manufactured vehicles equipped with inflators produced during the same period as those that have demonstrated rupture events in the field."

143.    Also on June 11, 2014, Takata informed NHTSA that it "believes that an [sic] number of the inflators identified above were provided to the following vehicle manufacturers for use in vehicles sold in the United States (the manufacturers are listed in alphabetical order): BMW, Chrysler, Ford, Honda, Mazda, Nissan, and Toyota." Takata's June 11, 2014 letter further stated:

> If we determine that any of those inflators were sold to other vehicle manufacturers, we will let you know promptly. Takata is not certain which models or model years of vehicles are equipped with the subject inflators, and it does not know how many of those vehicles were sold in or are registered in the States to be covered by the requested field

actions. That information will need to be obtained from the affected vehicle manufacturers.

144.    On June 20, 2014, Honda issued additional recalls for a total of nearly 4.5 million Honda and Acura vehicles that contained Defective Airbags.

145.    On June 26, 2014, GM recalled over 29,000 Chevrolet Cruze vehicles because the Defective Airbags have a tendency to not deploy at all or rupture and cause metal fragments to strike and severely injure vehicle occupants.

146.    By the end of June 2014, the number of vehicles that had been recalled due to Takata's Defective Airbags had increased to over 6 million. Vehicle manufacturers, however, had still not recalled all of the vehicles containing Defective Airbags.

147.    On July 8, 2014, Honda expanded a "two million vehicle air bag recall by as many as one million more vehicles in California." *The New York Times* reported that "[a] defective inflator could explode in a crash, sending shards of its metal casing into the passenger compartment. The inflator was made by Takata Corporation, which has said the propellant inside the inflator was not properly prepared and was too powerful."

148.    In August 2014, Honda issued yet another recall of Honda and Acura vehicles, its ninth for the defect – bringing the total of recalled Honda and Acura vehicles to six million.

149.    The tragic pattern of mounting injuries and casualties in the face of Defendants' sluggish response continued:

        a.    On June 25, 2014, Patricia Mincey was rendered quadriplegic due to a Takata airbag rupture while driving her 2001 Honda Civic in Jacksonville, Florida.

        b.    On July 7, 2014, Claribel Nunez of Hialeah, Florida, suffered severe wounds to her forehead from shrapnel that exploded out of a Takata airbag in her 2001 Honda Civic.

c.      On July 22, 2014, Joshua Reliford suffered severe facial and brain injuries due to a Takata airbag rupture while driving his 2001 Honda Civic in McCraken County, Kentucky.

d.      On July 28, 2014, Francisco Demarco died due to a Takata airbag rupture while riding in the passenger seat of a 2007 Honda Accord in Palm Beach County, Florida.

e.      On August 17, 2014, a Takata airbag ruptured after an accident in a 2007 Ford Mustang, deploying with abrupt force and ejecting a metal fragment into the driver's leg. Ford was notified of the incident.

f.      On October 2, 2014, Florida resident Hien Tran died, four days after her 2001 Honda Accord struck another car in Orlando and the Takata airbag exploded, sending shrapnel into her neck. The medical examiner stated that the shrapnel tore through the airbag, hitting Ms. Tran and causing "stab-type wounds" and cutting her trachea. Indeed, her death was initially investigated as a homicide by detectives. A week after she died, she received a letter in the mail from Honda urging her to get her car fixed because of faulty airbags that could explode.

g.      On October 4, 2014, Devon Rideout suffered permanent loss of vision due to an alleged Takata airbag rupture while riding passenger in a 2001 BMW 330i in Chesapeake City, Virginia.

**F.      2014-2015: Forced National Recall and Takata's Admission of a Defect**

150.    On October 22, 2014, NHTSA expanded the recall list to cover ten automakers and 7.8 million vehicles. In a Consumer Advisory dated October 22, 2014, NHTSA sent an urgent warning to the owners of the now "7.8 million Affected Vehicles":

The National Highway Traffic Safety Administration urges owners of certain Toyota, Honda, Mazda, BMW, Nissan, Mitsubishi, Subaru, Chrysler, Ford and General Motors vehicles to act immediately on recall notices to replace defective Takata airbags. Over seven million vehicles are involved in these recalls, which have occurred as far back as 18 months ago and as recently as Monday. The message comes with urgency, especially for owners of vehicles affected by regional recalls in the following areas: Florida, Puerto Rico, limited areas near the Gulf of Mexico in Texas, Alabama, Mississippi, Georgia, and Louisiana, as well as Guam, Saipan, American Samoa, Virgin Islands and Hawaii.

151.    On October 29, 2014, NHTSA sent letters to ten automakers regarding the safety risks posed by the Takata airbags. The letter stated that "[t]he ongoing cooperation of all manufacturers who have recalled vehicles is essential to address this safety risk," and that the "NHTSA team is engaged with you in critical work to better understand the failures and take action to remedy the safety risk...." NHTSA's letter also asked the automakers to provide NHTSA with information as to their recall process, urged a faster response from them, and stated that "more can and should be done as soon as possible to prevent any further tragedies."

152.    The U.S. Department of Justice is also investigating whether Takata committed any crimes. On November 13, 2014, the United States District Court for the Southern District of New York issued a federal grand jury subpoena to Takata and Honda.

153.    By November 18, 2014, it was clear to NHTSA that even the extensive recalls to date were insufficient. NHTSA therefore demanded a national recall of Chrysler, Ford, Honda, Mazda, and BMW vehicles with certain driver airbags made by Takata.

154.    Takata refused to support a national recall at a hearing before the U.S. House of Representatives Energy and Commerce Subcommittee on December 3, 2014, claiming there was "not enough scientific evidence" to support a national recall. Yet, as NHTSA Administrator David Friedman stated, "when we saw real-world incidents on the driver side, one in California, we pushed Honda to make sure that their recall covered that region. Then very recently, we became aware of a driver side incident in North Carolina. With six total incidents, two of which

are outside that region, we can no longer support a regional recall. Our policy is clear: Recalls must be nationwide unless the manufacturers can demonstrate that they are regional. With the new data, it is clear they can no longer demonstrate that the region that was used before was appropriate for driver side airbags."

155.    The geographic scope of the incidents undermined Takata's focus on humidity as the defining contributor to the dangerous ruptures. As Mr. Friedman explained, "[o]ne of the most frustrating parts about this is that neither the automakers nor Takata have been able to get to the bottom of the root cause on this. We have been pushing them to do so."

156.    As of the December 3, 2014 House hearing, Honda, Ford, Chrysler, and Toyota had all agreed to a nationwide recall, principally for driver side airbags. Days later, Mazda expanded the geographic scope of its recall. By December 23, BMW had also agreed to a nationwide recall.

157.    Having misrepresented and omitted the nature and scope of the Inflator Defect for over a decade, the 10 vehicle manufacturers met in December 2014 to "sort out a way to understand the technical issues involved."

158.    Frustrated by Takata's continual foot-dragging, NHTSA imposed a $14,000 per day fine that started on Friday, February 20, 2015, concluding that Takata had not been forthcoming with the information. Days later, NHTSA demanded that Takata preserve all airbag inflators removed through the recall process.

159.    In response to public scrutiny and pressure from NHTSA and private plaintiffs, Defendants were forced to consult with external explosives and airbag specialists, and performed additional testing on Takata's airbags. This testing confirmed what Defendants already knew: Takata's airbags containing ammonium nitrate were defective and prone to over-aggressive

deployment and rupture.

160.    In light of this testing, Takata was unable to deny the existence of the Inflator Defect any longer.  On May 18, 2015, Takata filed four Defect Information Reports ("DIRs") with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver air bag inflators; (2) SPI passenger air bag inflators; (3) PSPI-L passenger air bag inflators; and (4) PSPI passenger air bag inflators, respectively.  After concealing the Inflator Defect for more than a decade, Takata finally admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators."  And in testimony presented to Congress following the submission of its DIRs, Takata's representative admitted that the use of ammonium nitrate is a factor that contributes to the tendency of Takata's airbags to rupture, and that as a result, Takata will phase out the use of ammonium nitrate.

161.    Still, even Takata's recent defect admission is inaccurate and misleading, because the Inflator Defect is manifest in each of Takata's airbags containing ammonium nitrate.  And shockingly, Takata still intends to produce new airbags with ammonium nitrate, even after admitting that airbags containing ammonium nitrate as the primary propellant are prone to rupture, and thus create an unacceptable public safety hazard.

162.    Further, in its DIRs, Takata acknowledged that the Inflator Defect is present in inflators that were installed in vehicles as replacement parts through prior recalls, necessitating a second recall of those vehicles.

163.    As a result of Takata's admission that its inflators are defective, an additional 17 million vehicles must be recalled in the United States, pushing the total number of recalled vehicles nationwide over 34 million.  While Takata has records tracking which manufacturers it sold Defective Airbags to, it claims not to have records indicating in which vehicles those

Defective Airbags were installed. The vehicle manufacturers possess those records, however, and are thus in the process of identifying which vehicles must be recalled based on Takata's DIRs, and its corresponding admission that its airbags are defective.

164.    Still, Takata refuses to immediately conduct nationwide recalls of all airbags containing the Inflator Defect. While Takata has agreed to participate in a nationwide recall of airbags containing the PSDI, PSDI-4, and PSDI-4K driver-side air bag inflators and SPI passenger-side airbag inflators, it is still insisting on regional, phased recalls of vehicles equipped with its PSPI-L passenger air bag inflators and PSPI passenger air bag inflators.

165.    In the meantime, the risk of injury remains very real, and is exacerbated by Defendants' poor execution of the recalls.

a.    On November 19, 2014, Racquel Hudson suffered extensive first and second degree burns due to a Takata airbag rupture while driving her 2004 Honda Odyssey in San Antonio, Texas.

b.    On December 12, 2014, the driver airbag in a 2002 BMW 325 parked in the owner's driveway deployed with such energy that it melted and burned the dashboard and ceiling panel, created burn marks throughout the cabin, and shattered the front windshield.

c.    On December 31, 2014, the Takata driver airbag in a 2008 Mazda 6 deployed following an accident, ejecting metal fragments that injured the driver's face.

d.    On January 18, 2015, Carlos Solis was killed in an accident in Houston, Texas, and a ruptured Takata airbag was the suspected cause.

e.    On April 5, 2015, the Takata driver-side airbag in a 2005 Honda Accord ruptured, sending metal shards and shrapnel into the vehicle and severing 22-year old

Kylan Langlinais' carotid artery; Honda's recall notice arrived two days after the crash, and Ms. Langlinais died from her injuries two days later.

166.    Over the past 13 years that Takata has known there was a problem with the safety of its airbags, there have been at least seven deaths and 139 injuries linked to defective Takata airbags. As detailed above, the incidents date back to at least 2003, and involve vehicles made by Acura, BMW, Chevrolet, Honda, Mazda, Subaru, and Toyota. Each of the Defendants knew of the Inflator Defect by virtue of these incidents, but failed to disclose the nature and scope of the Inflator Defect.

167.    The Defendants were on further notice due to unusual Takata airbag deployments that should have prompted further inquiry into the airbags' fitness for use. A review of publicly-available NHTSA complaints shows dozens of incidents of Takata airbags inadvertently deploying in the Class Vehicles, an event that may be tied to the unstable and volatile ammonium nitrate propellant. These complaints started as early as September 2005, and involve vehicles manufactured by Acura, BMW, Dodge, Ford, Mitsubishi, Pontiac, Subaru, and Toyota. Some of these incidents showed still further signs of the Inflator Defect, including airbags that deployed with such force that they caused the windshield to crack, break, or shatter, as well as others that caused unusual smoke and/or fire. For example:

a.    Takata airbags inadvertently deployed and caused windshields to crack, shatter, or break in a 2004 Mitsubishi Lancer on November 23, 2006, a 2003 Toyota Corolla on May 3, 2010, a 2003 Toyota Matrix on August 17, 2010 (in addition to causing unusual smoke), and a 2003 Toyota Matrix on January 29, 2012 (in addition to damaging the dashboard).

b.    Takata airbags inadvertently deployed and caused unusual smoke and heat

- 45 -

in a 2003 Acura MDX on January 29, 2012, causing the driver skin burns, and a 2003

Toyota Corolla on March 17, 2014.

**IV.    GM Sold Its Vehicles As "Safe" and "Reliable"**

168.    At all relevant times, in advertisements and promotional materials, GM

continuously maintained that its vehicles were safe and reliable.

169.    Examples of the GM's safety and reliability representations, from 2000 through

the present, include the following:

   a)   In 2004, GM represented on its website: "Our aim is to improve motor vehicle

        safety for customers, passengers and other motorists. Our customers expect and

        demand vehicles that help them to avoid crashes and reduce the risk of injury in

        case of a crash. We strive to exceed these expectations and to protect customers

        and their families while they are on the road."

   b)   In 2010, GM represented on its website that it "incorporates a total safety

        philosophy into each of its designs to help protect [its customers] in a collision."

   c)   In 2016, GM represented on its website: "Appreciating customers and fighting

        every day to earn their loyalty inspires us to make better, safer, higher value cars,

        trucks and crossovers."

**V.    Defendants' Inadequate Recalls and Failure to Assist Impacted Consumers**

   **A.    Slow and Inadequate Recalls**

170.    So far, approximately 34 million cars have been recalled in the United States.

171.    At a recent Congressional hearing in June 2015, Takata's representative testified

that Takata was shipping approximately 700,000 replacement inflators per month, and expected

to increase production to 1 million replacement inflators per month by September 2015—well

short of the number required to supply the ten automakers that have issued recalls.

172.    At the current rate, it will take at least three years to produce enough Takata

inflators to fix all recalled vehicles in the U.S., even setting aside the question of whether service

departments would be able to provide the necessary services in a timely manner.

173.    Not surprisingly, authorized dealers are experiencing a severe shortage of parts to

replace the faulty airbags.  Dealers have been telling frustrated car owners they can expect to

wait many months before their airbags can be replaced.

174.    Honda stated that it would not send recall letters to car owners or lessees until

there are parts available, meaning that many drivers would not receive notices for weeks or

longer, as they continue to drive vehicles with potentially deadly airbags.  Honda owners who

have received recall notices have been told to wait at least a month before their authorized dealer

has availability to assess their vehicle.

175.    Toyota dealers have reported that wait times for customers who own affected

vehicles to get their Takata airbags replaced could be as long as one to three months.

176.    In response to the airbag replacement shortage, GM has taken the extreme step of

disabling passenger airbags entirely and putting a "Do Not Sit Here" decal in the vehicle until a

proper repair can be made.  In the alternative, GM is advising customers to refrain from driving

their vehicles until the airbags can be replaced.

177.    Like GM, other automakers have also chosen to "repair" their customers' vehicles

not by providing temporary replacement vehicles or replacement parts, but by disengaging the

Takata airbags entirely.

178.    Congress has voiced concerns about this serious problem.  Senators Richard

Blumenthal and Edward J. Markey, in a letter to the Department of Transportation ("DOT"), said

they were "alarmed and astonished that NHTSA has endorsed a policy recently announced by Toyota and GM that dealers should disable passenger-side airbags and instruct against permitting passengers in the front seat if replacement parts for these airbags are unavailable. As a matter of policy, this step is extraordinarily troubling and potentially dangerous. As a matter of law . . . §30122(b) of the Motor Vehicle Safety Act (49 U.S.C.) prohibits a manufacturer from knowingly making a safety device inoperative unless the [DOT] issues a specific exemption. We are unaware of an exemption from your office in the case of Takata airbags."

179.    As the manufacturers finally took steps to issue national recalls—after forceful prodding by NHTSA—commentators noted not only the potential supply constraints, but also a more frightening concern: "no one knows if the replacement inflators currently being installed will suffer the same issue." Indeed, in response to repeated questioning at the recent Congressional hearing in June 2015, Takata's representative refused to assure the public that replacement inflators containing ammonium nitrate would be safe and not prone to rupture.

### B.    Failure to Pursue National Passenger-Side Recall

180.    Incredibly, Takata and many vehicle manufacturers are still unwilling to issue nationwide recalls on certain passenger side airbags installed in millions of Class Vehicles. In particular, the recalls for PSPI-L and PSPI passenger-side airbags remain regional in scope, with the focus only on high humidity regions and without the firm commitment to expand the recall nationwide.

181.    The regional recall approach for passenger airbags is indefensible, just as it was for driver airbags. Critically, the passenger-side airbags show serious failure rates. According to the testimony of Takata's Hiroshi Shimizu at the House hearing on December 3, 2014, Takata had tested 4,000 airbags after the June 19, 2014 recall, of which 3,600 were passenger-side

airbags, and approximately 60 of which failed. Moreover, Takata's recently submitted DIRs report that 2.16 percent of the PSPI-L inflators it tested ruptured, and .51 percent of the PSPI inflators it tested ruptured.

182.    Further, the regional approach is especially questionable, if not callous, because: (a) Defendants have claimed they have yet to uncover the root cause of the Inflator Defect, making their geographic boundaries arbitrary at best; (b) the passenger-side airbags are made with the same unstable and volatile ammonium nitrate propellant that is prone to overly-aggressive combustion and becoming inert; (c) vehicles are by definition mobile and therefore can and likely will be operated in high humidity regions; and (d) weather and climate are unpredictable and variable.

183.    Moreover, Defendants have seemingly already forgotten that the driver-side recall began as a regional recall, only to be expanded after horrific accidents in the relatively low-humidity states of California and Arizona.

### C.    Failure to Provide Replacement Vehicles

184.    The Class Vehicles are not safe to drive. They have been recalled, and yet replacement of the Defective Airbags could take years. Due to Defendants' failures, Plaintiff and Class members are left with poor options: be without use of a vehicle; purchase, lease, or rent a new vehicle until GM completes the recalls; or use a vehicle with a dangerous or disabled airbag over an extended period of time.

185.    As Senators Blumenthal and Markey asserted, "all drivers deserve access to loaners or rental cars at no cost to them while they await repairs to their cars that make them safe enough to drive again."

186.    Vehicle manufacturers are not providing loaner or replacement vehicles on a

comprehensive basis. While BMW, Honda, and Toyota pledged at the December 2014 House hearing that they would provide loaner or rental vehicles at no cost to consumers, the full scope of their commitment is unclear. GM made no such assurances, and on information and belief, has announced no such program.

### D.    Defective Replacement Airbags

187.    Perhaps most alarming, the replacement components manufactured by Takata that GM is using to "repair" recalled Class Vehicles suffer from the same Inflator Defect that plagues the parts being removed: they use ammonium nitrate as the inflator's primary propellant. Indeed, Takata admitted in its recently submitted DIRs and at the June 2015 Congressional hearing that inflators installed in recalled vehicles as replacement parts are, in fact, defective and must be replaced yet again. And even recall notices issued in 2015 acknowledge that certain "replacement inflators are of the same design and materials as the inflators being replaced."

188.    Moreover, inspection of inflators manufactured by Takata as recently as 2014 and installed in Class Vehicles by GM through the recall process reveals that the ammonium nitrate pellets within the inflators already show signs of moisture-induced instability, such as rust stains, the tendency to clump together, and size variations. As a result, Takata cannot reasonably assure Plaintiff or Class members that Class Vehicles equipped with such post-recall replacement parts will be any safer than they were with the initial Defective Airbags.

### CHOICE OF LAW ALLEGATIONS

189.    Plaintiff alleges that the law across all states and territories is uniform and does not contain any true conflicts with respect to Plaintiff's claims for unjust enrichment and fraudulent concealment. In the alternative, under New Jersey's operative choice of law rules and consistent with due process, the law of each Defendant's home (headquarters) state may be

applied nationwide to Plaintiff's claims for, *inter alia*, fraudulent concealment, unjust enrichment, and breach of the implied warranty of merchantability, based in part on the following allegations.

## I.   Takata

190.   Takata's United States headquarters is in Auburn Hills, Michigan. The Michigan headquarters is responsible for sales, administration and testing.

191.   Takata does substantial business in Michigan, with a significant portion of the proposed Nationwide Class located in Michigan.

192.   On information and belief, Michigan hosts a significant number of Takata's U.S. operations.

193.   In addition, the conduct that forms the basis for each and every Class members' claims against Takata emanated from Takata's headquarters in Auburn Hills, Michigan.

194.   Takata personnel responsible for customer communications are located at Takata's Michigan headquarters, and the core decision not to disclose the Inflator Defect to consumers was made and implemented from there.

195.   The engineering teams responsible for developing, designing, and testing the ammonium nitrate propellant, and investigating airbag ruptures, were located in Michigan. Takata's presence is more substantial in Michigan than any other state.

## II.   General Motors LLC

196.   GM is headquartered in Detroit, Michigan.

197.   GM does significant business in Michigan, with a significant portion of the proposed Nationwide Class located in Michigan.

198.   Michigan hosts a significant number of GM's operations.

199.    GM's presence is more substantial in Michigan than in any other state.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Fraudulent Concealment

200.    Upon information and belief, Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least 1990s. Prior to installing the Defective Airbags in their vehicles, the GM knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate. In addition, GM was again made aware of the Inflator Defect in Takata's airbags no later than 2008. Defendants have concealed from or failed to notify Plaintiff, Class members, and the public of the full and complete nature of the Inflator Defect.

201.    Although Defendants have now acknowledged to safety regulators that Takata's airbags are defective, for years, Defendants did not fully investigate or disclose the seriousness of the issue and in fact downplayed the widespread prevalence of the problem.

202.    Any applicable statute of limitations has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### Estoppel

203.    Defendants were and are under a continuous duty to disclose to Plaintiff and Class members the true character, quality, and nature of the Class Vehicles. They actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles.

204.    Plaintiff and Class members reasonably relied upon Defendants' knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

### Discovery Rule

205.   The causes of action alleged herein did not accrue until Plaintiff and Class members discovered that their vehicles had the Defective Airbags.

206.   Plaintiff and Class members, however, had no realistic ability to discern that the vehicles were defective until – at the earliest – after either the Defective Airbag exploded or their vehicles were recalled.  And, even then, Plaintiff and Class members had no reason to discover their causes of action because of Defendants' active concealment of the true nature of the defect.

## CLASS ACTION ALLEGATIONS

207.   The Classes' claims all derive directly from a single course of conduct by Takata and GM.  This case is about the responsibility of Takata and GM, at law and in equity, for their knowledge, their conduct, and their products.  Takata and GM have engaged in uniform and standardized conduct toward the Classes.  They did not differentiate, in degree of care or candor, in their actions or inactions, or in the content of their statements or omissions, among individual Class members.  The objective facts on these subjects are the same for all Class members. Within each Claim for Relief asserted by the respective Classes, the same legal standards govern. Additionally, many states, and for some claims all states, share the same legal standards and elements of proof, facilitating the certification of multistate or nationwide classes for some or all claims.  Accordingly, Plaintiff brings this lawsuit as a class action on her own behalf and on behalf of all other persons similarly situated as members of the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

**The Nationwide Class**

208.    Plaintiff brings this action and seeks to certify and maintain it as a class action

under Rules 23(a); (b)(2); and/or (b)(3); and/or c(4) of the Federal Rules of Civil Procedure on

behalf of herself and a Nationwide Class, as against the Takata Defendants, defined as follows:

> All persons in the United States who, prior to the date on which the Class Vehicle was
> recalled, entered into a lease or bought a Class Vehicle, and who (i) still own or lease the
> Class Vehicle, or (ii) sold the Class Vehicle after the date on which the Class Vehicle was
> recalled, or (iii) following an accident, whose Class Vehicle was declared a total loss
> after the date on which the Class Vehicle was recalled.

**The New Jersey Class**

209.    Plaintiff alleges statewide class action claims against the Takata Defendants on

behalf of a class of New Jersey consumers, initially defined as follows:

> All persons who, prior to the date on which the Class Vehicle was recalled, entered into a
> lease or bought a Class Vehicle in the state of New Jersey, and who (i) still own or lease the
> Class Vehicle, or (ii) sold the Class Vehicle after the date on which the Class Vehicle was
> recalled, or (iii) following an accident, whose Class Vehicle was declared a total loss after the
> date on which the Class Vehicle was recalled.

**The New GM and Used GM Vehicle Subclasses**

210.    As to Defendant GM, Plaintiff alleges class action claims only on behalf of a

subclass of GM consumers, initially defined as follows:

> All members of the Nationwide Class and/or the New Jersey Class (a) who purchased or
> leased, *on or after July 10, 2009*, Class Vehicles that were manufactured *before July 10,
> 2009*, and (b) who purchased or leased *used* GM vehicles *on or after July 10, 2009*,
> regardless of when those vehicles were manufactured

211.    The Nationwide Class, the New Jersey Class, the GM Subclasses, and their

members are sometimes referred to herein as the "Class" or "Classes."

212.    Excluded from the Classes are Takata and GM, their employees, officers,

directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or;

Class Counsel and their employees; and the judicial officers and their immediate family

members and associated court staff assigned to this case.

**Numerosity and Ascertainability**

213.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).    There are millions of Class Vehicles nationwide, and thousands of Class Vehicles in New Jersey. Individual joinder of all Class members is impracticable.

214.    Each of the Classes is ascertainable because its members can be readily identified using registration records, sales records, production records, and other information kept by Takata and GM, or third parties in the usual course of business and within their control.    Plaintiff anticipates providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**Predominance of Common Issues**

215.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for each of the respective Classes predominate over questions affecting only individual Class members.    These include, without limitation, the following:

    a.    Whether the Class Vehicles suffer from the Inflator Defect;

    b.    Whether the Class Vehicles have suffered a diminution of value as a result of those Vehicles' incorporation of the airbags at issue;

    c.    Whether Defendants knew or should have known about the Inflator Defect, and, if so, how long Defendants have known of the defect;

    d.    Whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a

Defective Vehicle;

e.  Whether Defendants had a duty to disclose the defective nature of the Class

Vehicles to Plaintiff and Class members;

f.  Whether Defendants omitted and failed to disclose material facts about the Class

Vehicles;

g.  Whether Defendants' concealment of the true defective nature of the Class

Vehicles induced Plaintiff and Class members to act to their detriment by

purchasing the Class Vehicles;

h.  Whether Defendants' conduct tolls any or all applicable limitations periods by

acts of fraudulent concealment, application of the discovery rule, or equitable

estoppel;

i.  Whether Defendants misrepresented that the Class Vehicles were safe;

j.  Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts

or practices in trade or commerce by failing to disclose that the Class Vehicles

were designed, manufactured, and sold with defective airbag inflators;

k.  Whether Defendants' conduct, as alleged herein, was likely to mislead a

reasonable consumer;

l.  Whether Defendants' statements, concealments and omissions regarding the Class

Vehicles were material, in that a reasonable consumer could consider them

important in purchasing, selling, maintaining, or operating such vehicles;

m.  Whether the Class Vehicles were unfit for the ordinary purposes for which they

were used, in violation of the implied warranty of merchantability;

n.  Whether Plaintiff and the Classes are entitled to a declaratory judgment stating

that the airbag inflators in the Class Vehicles are defective and/or not merchantable;

o.  Whether Defendants' unlawful, unfair, and/or deceptive practices harmed Plaintiff and the Classes;

p.  Whether Defendants have been unjustly enriched by their conduct;

q.  Whether Plaintiff and the Classes are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

r.  Whether Defendants should be declared responsible for notifying all Class members of the Inflator Defect and ensuring that all vehicles with the airbag inflator defect are promptly recalled and repaired;

s.  What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants and to vindicate statutory and public policy;

t.  How such penalties should be most equitably distributed among Class members;

u.  Whether certain Defendants conspired together to violate RICO; and

v.  Whether certain Defendants associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

**Typicality**

216.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of the Class members, and arise from the same course of conduct by Takata and GM.  The relief Plaintiff seeks is typical of the relief sought for the absent Class members.

**Adequate Representation**

217.    Plaintiff will fairly and adequately represent and protect the interests of the Classes. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

218.    Plaintiff and her counsel are committed to vigorously prosecuting this action – on behalf of the Nationwide Class and the New Jersey Class, as to claims against the Takata Defendants, and on behalf of the GM Subclasses, as to claims against GM – and have the financial resources to do so. Neither Plaintiff nor her counsel has interests adverse to those of the Classes.

**Superiority**

219.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Takata and GM have acted and refused to act on grounds generally applicable to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

220.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding Takata and GM's conduct and responsibility predominate over any questions affecting only individual Class members.

221.    Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual

litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

222.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

223.    Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiff or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

224.    The Classes expressly disclaim any recovery in this action for physical injury resulting from the Inflator Defect without waiving or dismissing such claims. Plaintiff is informed and believes that injuries suffered in crashes as a result of Defective Airbags implicate the Class Vehicles, constitute evidence supporting various claims, including diminution of value, and are continuing to occur because of Defendants' delays and inaction regarding the

commencement and completion of recalls, and because of the installation of Defective Airbags as replacement airbags. The increased risk of injury from the Inflator Defect serves as an independent justification for the relief sought by Plaintiff and the Classes.

## CLAIMS FOR RELIEF

**I.**     **Claims on Behalf of the Nationwide Class**

     **A.**     **Federal Claims**

### COUNT 1

**Violation of 18 U.S.C. § 1962(c), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), against the Takata Defendants**

225.   Plaintiff realleges and incorporates by reference all of the preceding paragraphs as though fully set forth herein.

226.   Plaintiff brings this Count on behalf of the Nationwide Class.

227.   The Takata Defendants are all "persons" under 18 U.S.C. § 1961(3).

228.   The Takata Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the Takata RICO Enterprise through a pattern of racketeering activity.

229.   Plaintiff and Class members are "person[s] injured in his or her business or property" by reason of Takata's violation of RICO within the meaning of 18 U.S.C. § 1964(c).

### The Takata RICO Enterprise

230.   The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to herein collectively as the Takata RICO Enterprise:

     a.     The Takata Defendants, who designed, manufactured, and sold millions of Defective Airbags knowing that they contained the Inflator Defect, the scope and nature of which they concealed from and misrepresented to the public and regulators for more than a

decade and still refuse to entirely acknowledge.

b.    The Takata Defendants' Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates in fact in the Takata RICO Enterprise to deceive Plaintiff and Class members into purchasing dangerous and defective vehicles, and actively concealing the danger and Inflator Defect from Plaintiff and Class members.

c.    GM, which purchased the Defective Airbags from the Takata Defendants, equipped its vehicles with the Defective Airbags, and falsely and inaccurately represented that its vehicles were safe, thereby deceiving Plaintiff and Class members.

d.    Dealerships that sell vehicles manufactured by GM, which sold or leased the Class Vehicles containing Defective Airbags to Plaintiff and Class members, and continue to install replacement airbags manufactured by Takata into recalled Class Vehicles that suffer from the same Inflator Defect that plagues the removed airbags.

231.    The Takata RICO Enterprise, which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for a common purpose.    The Takata RICO Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

232.    While the Takata Defendants participated in the conduct of the Takata RICO Enterprise, they had an existence separate and distinct from the Takata RICO Enterprise. Further, the Takata RICO Enterprise was separate and distinct from the pattern of racketeering in which the Takata Defendants have engaged.

233. At all relevant times, the Takata Defendants operated, controlled or managed the Takata RICO Enterprise, through a variety of actions. The Takata Defendants' participation in the Takata RICO Enterprise was necessary for the successful operation of its scheme to defraud because the Takata Defendants manufactured the Defective Airbags, concealed the nature and scope of the Inflator Defect, and profited from such concealment.

234. The members of the Takata RICO Enterprise all served a common purpose: to sell as many airbags, and vehicles containing such airbags, as possible, and thereby maximize the revenue and profitability of the Takata RICO Enterprise's members. The members of the Takata RICO Enterprise shared the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud. Each member of the Takata RICO Enterprise benefited from the common purpose: GM sold or leased more Class Vehicles, and received more for those vehicles, than they would have otherwise had the scope and nature of the Inflator Defect not been concealed; the Takata Defendants sold more Defective Airbags to GM than they would have otherwise had the scope and nature of the Inflator Defect not been concealed; and the dealerships sold and serviced more Class Vehicles, and sold or leased those vehicles at a much higher price, as a result of the concealment of the scope and nature of the Inflator Defect from Plaintiff and Class members.

## Pattern of Racketeering Activity

235. The Takata Defendants conducted and participated in the conduct of the affairs of the Takata RICO Enterprise through a pattern of racketeering activity that has lasted for more than a decade, beginning no later than 2004 and continuing to this day, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to

defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

236.    For the Takata Defendants, the purpose of the scheme to defraud was to conceal

the scope and nature of the Inflator Defect found in millions of Defective Airbags in the United

States in order to sell more airbags, to sell them at a higher price or for a higher profit, and to

avoid incurring the expenses associated with repairing the Inflator Defect.  By concealing the

scope and nature of the Inflator Defect in its millions of Defective Airbags, the Takata

Defendants also maintained and boosted consumer confidence in the Takata brand and the GM

brand, and avoided remediation costs and negative publicity, all of which furthered the scheme to

defraud and helped the Takata Defendants sell more airbags than they would otherwise have

sold, and to sell them at a much higher price or for a higher profit.

237.    As detailed in the General Factual Allegations, the Takata Defendants were well

aware of the risks of using ammonium nitrate as the propellant in its inflators, but intentionally

subjected Plaintiff and Class members to those risks or consciously disregarded those risks in

order to maximize their profits.  Moreover, once the Inflator Defect began maiming and killing

vehicle occupants, the Takata Defendants secretly engaged in testing that revealed the dangers

associated with the Inflator Defect, but then destroyed the evidence of their testing to continue to

conceal the nature and scope of the Inflator Defect.

238.    To further the scheme to defraud, the Takata Defendants repeatedly

misrepresented and concealed the nature and scope of the Inflator Defect.   The Takata

Defendants repeatedly described the defect as a contained and corrected manufacturing defect

that only manifested itself in certain areas of the country, when in fact the Takata Defendants

knew that the Inflator Defect is a fundamental, uniform defect—i.e., the reckless use of the

unstable and dangerous ammonium nitrate as the propellant in the inflator—that plagues every

Takata airbag and manifests itself across the country.

239.    To further the scheme to defraud, the Takata Defendants concealed the nature and scope of the Inflator Defect from federal regulators, enabling it to escape investigation and costs associated with recalls for more than a decade.

240.    To further the scheme to defraud, the Takata Defendants would promote and tout the safety, reliability, and quality of their airbags while simultaneously concealing the nature and scope of the Inflator Defect.

241.    To further the scheme to defraud, the Takata Defendants permitted or caused the GM to promote the safety, reliability, and quality of the airbags contained in Class Vehicles while simultaneously concealing the nature and scope of the Inflator Defect.

242.    To carry out, or attempt to carry out the scheme to defraud, the Takata Defendants have conducted or participated in the conduct of the affairs of the Takata RICO Enterprise through the following pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

    a.  The Takata Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, writing(s) and/or signal(s), including the Takata website, communications with NHTSA, statements to the press, and communications with other members of the Takata RICO Enterprise, as well as advertisements and other communications to the Takata Defendants' customers, including Plaintiff and Class members; and

    b.  The Takata Defendants utilized the interstate and international mail and wires for

the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.

243.    The Takata Defendants' pattern of racketeering activity in violation of the mail and wire fraud statutes included but was not limited to the following:

a. As early as the 1990s and in subsequent years, the Takata Defendants transmitted, or caused to be transmitted (which hereinafter also means that the Takata Defendants acted with knowledge that the use of the interstate mails and wires would follow in the ordinary course of business, or such use was reasonably foreseeable), by means of mail and wire communication travelling in interstate or foreign commerce, between its offices in Japan and/or Michigan and/or Washington, D.C., communications concerning the instability and volatility of ammonium nitrate, recognizing that the casing of inflators using the compound as a propellant "might even blow up."

b. In mid-to-late 2004, following the May 2004 accident in Alabama in which a Defective Airbag ruptured and spewed metal debris at the driver, the Takata Defendants transmitted or caused to be transmitted, by means of mail travelling in interstate commerce, from scrapyards around the country to its offices in Michigan, inflators to perform secret testing that revealed the Inflator Defect.

c. In mid-to-late 2004, following the May 2004 accident in Alabama in which a Defective Airbag ruptured and spewed metal debris at the driver, the Takata Defendants transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from its offices in Japan and/or Michigan to the offices of Defendant Honda in California and

offices of regulators in Washington, D.C., representations that the rupture was an "anomaly."

d.  In September of 2007, the Takata Defendants caused to be transmitted, by means of mail travelling in interstate commerce, from scrapyards around the country to its offices in Michigan, inflators to perform testing, the results of which they misrepresented showed that a manufacturing defect was solely responsible for exploding airbag incidents, thereby concealing the nature and scope of the Inflator Defect.

e.  In November 2008, the Takata Defendants caused to be transmitted, by means of mail or wire communication travelling in interstate or foreign commerce, from Honda's offices in California to federal regulators in Washington, D.C., regulatory filings stating that the approximately 4,000 vehicles subject to its 2008 recall included all "possible vehicles that could potentially experience the problem [of a rupturing airbag inflator]," thereby concealing the nature and scope of the Inflator Defect.

f.  In December 2008, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to vehicle owners across the country, letters stating that that "[m]etal fragments could pass through the airbag cushion material, possibly causing injury to vehicle occupants." This letter did not sufficiently communicate the severity of the threat to life and limb, and concealed the scope and nature of the Inflator Defect. Owners are merely advised to make an appointment to have their vehicle repaired, with no sense of urgency. In contrast,

on October 22, 2014, NHTSA urged affected vehicle owners to "act immediately on recall notices to replace defective Takata airbags."

g.  On July 29, 2009, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to federal regulators in Washington, D.C. an amended report identifying an estimated 440,000 additional vehicles that should have been subject to the 08V953 recall.  In this report, Honda stated "[t]he VIN range reflects all possible vehicles that could potentially experience the problem." In light of the 100-fold recall expansion, and what Plaintiff believes Honda knew about Takata's internal difficulties dealing with the recall, this statement was false and concealed the nature and scope of the Inflator Defect. Honda's chronology lists three "unusual deployments"—a euphemistic way of describing Ashley Parham's death in May 2009, Jennifer Griffin's shrapnel injuries in June 2009, and one other incident.  This regulatory filing was misleading and served to conceal and/or minimize the threats posed by the Defective Airbags.

h.  On September 16, 2009, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to federal regulators in Washington, D.C. information concerning safety recalls 08V-593 and 09V-259. This letter was co-drafted by Honda and Takata.  NHTSA wanted to know why the first recall did not include the vehicles covered by the second recall.  Among other things, Honda and Takata explained that several "additional deployments" had occurred outside of the VIN ranges of the first recall, prompting the latter

recall. But Honda and Takata fraudulently omitted that one of those deployments caused Ashley Parham's death. Also, Honda and Takata claimed that the manufacturing problem was limited to only one high-precision compression press. Because Takata was by then aware of the litany of problems plaguing its Monclova, Mexico plant, this "explanation" was grossly self-serving for both Honda and Takata. In addition to the quality control problems stated above, during 2005 and 2006, Takata engineers struggled on three occasions to eliminate leaks found in inflators in the Monclova, Mexico plant. Furthermore, Takata and Honda omitted the existence of the secret testing in 2004 and the negative results of those tests. Once again, NHTSA, and by extension the public, were deprived of accurate and complete information. As a result of this letter, the ODI closed its investigation into these two recalls. The Takata Defendants thereby concealed the nature and scope of the Inflator Defect.

i.    On February 9, 2010, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to federal regulators in Washington, D.C., another recall communication again falsely assuring NHTSA and the public that "[t]he VIN range reflects all possible vehicles that could potentially experience the problem." Honda's "chronology" was false and misleading because it did not mention any injuries. Honda's explanation of the defect—that two processes were used to prepare the inflator propellant and that one of them was not within specifications—was misleading in light of what the Takata Defendants knew, or at least should have known in light of the extensive problems at Takata's

Monclova. Mexico plant.

j.  On February 19, 2010, the Takata Defendants transmitted or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Takata's offices in Michigan and/or Japan a response to the ODI's November 20, 2009 letter seeking more information about recalls 08V-593 and 09V-259 conducted by Honda. Takata falsely and misleadingly asserted that it "ha[d] not provided any air bag inflators that are the same or substantially similar to the inflators in vehicles covered by recalls 08V-593 and 09V-259 to any customers other than Honda." This statement was patently incorrect, as over 10 manufacturers have recalled vehicles containing Defective Airbags since that statement was made. This statement concealed the nature and scope of the Inflator Defect.

k.  On April 27, 2011, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to federal regulators in Washington, D.C., additional recall communications again misleadingly stating that the recall covered "all possible vehicles" with the problem. As before, the letter to owners and lessees did not sufficiently raise a sense of urgency. This statement concealed the nature and scope of the Inflator Defect.

l.  On April 11, 2013, the Takata Defendants transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from its offices in Japan and/or Michigan to the offices of federal regulators in Washington, D.C., misrepresentations that the defect was

limited to inflators produced at a specific plant between certain dates due to a manufacturing error, again concealing the nature and scope of the Inflator Defect.

m.  On June 11, 2014, the Takata Defendants transmitted or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Takata's offices in Michigan or Japan to the ODI in Washington, D.C., a letter titled "Takata Support for Regional Field Actions to Address Potential Inflator Issues."    Takata explained that it would "support the replacement of the identified inflators in vehicles in Puerto Rico, Florida, Hawaii, and the Virgin Islands, based on the high levels of absolute humidity in those areas," because "all six of the potentially-relevant rupture incidents had occurred in either Florida or Puerto Rico."    Takata misleadingly omitted Ashely Parham's death in Oklahoma in May 2009, Gurjit Rathore's death in December 2009 in Virginia, and Brandi Owens's injury in October 2013 in Georgia.  By focusing on areas of high humidity, this communication concealed the nature and scope of the Inflator Defect.

244.    To this day, the Takata Defendants continue to transmit, or cause to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from its offices in Japan and/or Michigan, advertisements and communications with the public and NHTSA misrepresenting that the replacement airbags are safe and reliable, when in fact they too suffer from the Inflator Defect.

245.    The Takata Defendants' conduct in furtherance of this scheme was intentional. Plaintiff and Class members were directly harmed as a result of the Takata Defendants'

intentional conduct. Plaintiff, Class members, and federal regulators, among others, relied on the Takata Defendants' material misrepresentations and omissions.

246.    As described throughout this Complaint, the Takata Defendants engaged in a pattern of related and continuous predicate acts for more than a decade. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiff and other Class members and obtaining significant monies and revenues from them while providing Defective Airbags worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

247.    The predicate acts all had the purpose of generating significant revenue and profits for the Takata Defendants at the expense of Plaintiff and Class members. The predicate acts were committed or caused to be committed by the Takata Defendants through their participation in the Takata RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiff's and Class members' funds and avoiding the expenses associated with remediating the Inflator Defect.

248.    By reason of and as a result of the conduct of the Takata Defendants, and in particular, its pattern of racketeering activity, Plaintiff and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

      a.  overpayment for leased or purchased Class Vehicles, in that Plaintiff and the Class members believed they were paying for vehicles with safe airbag systems and obtained vehicles with anything but, and were deprived of the benefit of their bargain; and

      b.  the value of the Class Vehicles has diminished, thus reducing their resale value.

249.    The Takata Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiff and Class members, and Plaintiff and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. §§ 1964(a) and 1964(c).

## COUNT 2

### Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq.

250.    Plaintiff realleges and incorporates by reference all of the preceding paragraphs as though fully set forth herein.

251.    Plaintiff brings this Count against all Defendants, on behalf of members of the Nationwide Class.

252.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

253.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

254.    Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). She is a consumer because she is a person entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

255.    Each Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

256.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

257.    The Takata Defendants and GM provided Plaintiff and the other Class members

- 72 -

with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).   As a part of the implied warranty of merchantability, the Takata Defendants and GM warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

258.   The Takata Defendants and GM breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiff and the Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common design defect in that they are equipped with Defective Airbags containing the Inflator Defect. The Takata Defendants and GM have admitted that the Class Vehicles are defective in issuing their recalls, but the recalls are woefully insufficient to address the Inflator Defect.

259.   Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

260.   Any limitations on the warranties are procedurally unconscionable.  There was unequal bargaining power between the Takata Defendants and GM, on the one hand, and Plaintiff and the other Class members, on the other.

261.   Any limitations on the warranties are substantively unconscionable.  The Takata Defendants and GM knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired.  The Takata Defendants and GM failed to disclose the Inflator Defect to Plaintiff and the other Class members.   Thus, the Takata Defendants and GM's enforcement of the durational limitations on those warranties is harsh and

shocks the conscience.

262.    Plaintiff and each of the other Class members have had sufficient direct dealings with either GM or its agents (dealerships) to establish privity of contract.

263.    Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between the Takata Defendants and GM, and between GM and its dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect.

264.    Pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and is not required to give the Takata Defendants or GM notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure.

265.    Furthermore, affording the Takata Defendants and GM an opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Class Vehicle, the Takata Defendants and GM knew, should have known, or were reckless in not knowing of their misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff resort to an informal dispute resolution procedure and/or afford the Takata Defendants and GM a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

266.    Plaintiff and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because the Takata Defendants and GM are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and the other Class members have not re-accepted their Defective Vehicles by retaining them.

267.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiff, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiff and the other Class members in connection with the commencement and prosecution of this action.

268.    Plaintiff also requests, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the Inflator Defect in their vehicles. Such expenses and losses will continue as Plaintiff and Class members must take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in going through the recall process.

269.    The right of Class members to recover these expenses as an equitable matter to put them in the place they would have been but for the Takata Defendant's and GM's conduct presents common questions of law. Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded by the Takata

Defendants and GM, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

### B.    Common Law and State Law Claims

### COUNT 3

### Fraudulent Concealment

270.   Plaintiff realleges and incorporates by reference all of the preceding paragraphs as though fully set forth herein.

271.   Plaintiff brings this claim on behalf of the Nationwide Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment.  In the alternative, Plaintiff brings this claim on behalf of the Nationwide Class under Michigan law, because Michigan has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, Plaintiff brings this claim under the laws of the states where Plaintiff and Class Members reside and/or purchased their Class Vehicles.

272.   Defendants concealed and suppressed material facts regarding the Defective Airbags—most importantly, the Inflator Defect, which causes, among other things, the Defective Airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

273.   The Takata Defendants also took steps to ensure that its employees did not reveal the known safety Inflator Defect to regulators or consumers.

274.   On information and belief, Defendants still have not made full and adequate disclosure, continue to defraud Plaintiff and the Classes, and continue to conceal material

information regarding the Inflator Defect that exists in the Defective Airbags.

275.    Defendants had a duty to disclose the Inflator Defect because they:

    a.    Had exclusive and/or far superior knowledge and access to the facts than Plaintiff and Class Members, and knew the Inflator Defect was not known to or reasonably discoverable by Plaintiff and the Classes;

    b.    Intentionally concealed the foregoing from Plaintiff and the Classes; and

    c.    Made incomplete representations about the safety and reliability of the Defective Airbags and, by extension, the Class Vehicles, while purposefully withholding material facts that contradicted these representations from Plaintiff and the Classes.

276.    These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiff and the Classes. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer. Plaintiff and Class Members trusted Defendants not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

277.    Defendants concealed and suppressed these material facts to falsely assure purchasers and consumers that Takata airbags were capable of performing safely, as represented by Defendants and reasonably expected by consumers.

278.    Defendants actively concealed and/or suppressed these material facts, in whole or in part, to protect their profits and to avoid recalls that would hurt the brands' image and cost Defendants money. Defendants concealed these facts at the expense of Plaintiff and the Classes.

279.    Plaintiff and the Classes were unaware of these omitted material facts, and would not have acted as they did if they had known of the concealed and/or suppressed facts.

280.    Had they been aware of the Defective Airbags and Defendants' callous disregard for safety, Plaintiff and the Classes either would have paid less for their Class Vehicles or would not have purchased or leased them at all.  Plaintiff and the other members of the Classes did not receive the benefit of their bargain as a result of Defendants' fraudulent concealment.

281.    Because of the concealment and/or suppression of the facts, Plaintiff and the Classes sustained damage because they own vehicles that diminished in value as a result of Defendants' concealment of, and failure to timely disclose, the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by Defendants' conduct.

282.    The value of all Class members' vehicles has diminished as a result of Defendants' fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

283.    Accordingly, Defendants are liable to the Classes for their damages in an amount to be proven at trial.

284.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Classes' rights and well-being, and with the aim of enriching Defendants.  Defendants' conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 4

### Breach of Implied Warranty

285.    Plaintiff realleges and incorporates by reference all of the preceding paragraphs as though fully set forth herein.

286.    Plaintiff brings this Claim on behalf of the Nationwide Class under Michigan law, because Michigan has the most significant relationship to the facts and issues relevant to this claim.

287.    Takata and GM are merchants with respect to motor vehicles within the meaning of Mich. Comp. Laws § 440.2314(1).

288.    Under Mich. Comp. Laws § 440.2314, a warranty that the Defective Airbags, and by extension, the Class Vehicles, were in merchantable condition was implied by law in the transactions when Plaintiff and Class Members purchased their Class Vehicles.

289.    The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used, because they are fitted with Defective Airbags containing the Inflator Defect, leading to an unreasonable likelihood of serious bodily injury and death.

290.    Defendants were provided notice of the airbag problems through numerous complaints filed against them, internal investigations, and by many individual letters and communications sent by members of the Classes before or within a reasonable amount of time after Takata and GM issued the recalls and the allegations of the Inflator Defect became public. Moreover, Defendants were aware of these problems long before Plaintiff and the Classes and had ample notice and opportunity to correct them.

291.    As a direct and proximate result of Defendants' breach of the implied warranty of

merchantability, Plaintiff and the Classes have been damaged in an amount to be proven at trial.

## COUNT 5

### Unjust Enrichment

292.    Plaintiff realleges and incorporates by reference all of the preceding paragraphs as though fully set forth herein.

293.    Plaintiff brings this claim on behalf of the Nationwide Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment. In the alternative, Plaintiff brings this claim on behalf of the Nationwide Class under Michigan law, because Michigan has the most significant relationship to the issues and facts relevant to this claim. In the alternative, Plaintiff brings this claim under the laws of the states where Plaintiff and Class Members reside and/or purchased their Class Vehicles.

294.    Defendants have received and retained a benefit from the Plaintiff and inequity has resulted.

295.    Defendants benefitted through their unjust conduct, by selling Defective Airbags with a concealed safety-and-reliability related defect, at a profit, for more than these Defective Airbags were worth, to Plaintiff and the other members of the Classes, who overpaid for these Defective Airbags by overpaying for their Class Vehicles, and/or would not have purchased these Defective Airbags and Class Vehicles at all; and who have been forced to pay other costs.

296.    It is inequitable for Defendants to retain these benefits.

297.    Plaintiff and the Class members do not have an adequate remedy at law.

298.    As a result of Defendants' conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## COUNT 6

### Violation of the Michigan Consumer Protection Act,
### Mich. Comp. Laws §§ 445.903, et seq.

299.   Plaintiff realleges and incorporates by reference all of the preceding paragraphs as though fully set forth herein.

300.   Plaintiff brings this Claim on behalf of the Nationwide Class under Michigan law, because Michigan has the most significant relationship to the facts and issues relevant to this claim.

301.   Plaintiff is a "person" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

302.   At all relevant times hereto, Defendants were "person[s]" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

303.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." Mich. Comp. Laws § 445.903(1). Defendants engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have . . . characteristics . . . that they do not have . . . .;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1). By failing to disclose and actively concealing the

dangers and risks posed by the Class Vehicles and/or Defective Airbags installed in them,

Defendants participated in unfair, deceptive, and unconscionable acts that violated the Michigan

CPA.

304.    In the course of their business, Defendants failed to disclose and actively

concealed the dangers and risks posed by the Class Vehicles and/or Defective Airbags installed

in them as described herein and otherwise engaged in activities with a tendency or capacity to

deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive

acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any

material fact with intent that others rely upon such concealment, suppression or omission, in

connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

305.    The Takata Defendants have known of the Inflator Defect in the Defective

Airbags since at least the late 1990s, and GM has known of the Inflator Defect in the Defective

Airbags since 2008, if not earlier.

306.    By failing to disclose and by actively concealing the Inflator Defect in the Class

Vehicles and/or the Defective Airbags installed in them, by permitting the Class Vehicles to be

marketed as safe, reliable, and of high quality, and by presenting themselves as reputable

manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in

violation of the Michigan CPA. Defendants deliberately withheld the information about the

propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with

lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of

protecting vehicle occupants from bodily injury during accidents, in order to ensure that

consumers would purchase the Class Vehicles.

307.    In the course of Defendants' business, they willfully failed to disclose and

- 82 -

actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

308.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

309.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiff and the Classes.

310.    Defendants knew or should have known that their conduct violated the Michigan CPA.

311.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

312.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

313.    Defendants owed Plaintiff and the Class members a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

    a.  Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    b.  Intentionally concealed the foregoing from Plaintiff and the Classes; and/or

    c.  Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts that contradicted these representations from Plaintiff and the Classes.

314.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

315.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiff and the Classes. A vehicle containing components produced by a reputable manufacturer is worth more than an otherwise comparable vehicle containing critical safety components made by a disreputable manufacturer of unsafe products that conceals defects rather than promptly remedies them.

316.    Plaintiff and the Classes suffered ascertainable losses caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiff and the other members of the Classes either would have paid less for their vehicles or would not have purchased or leased them at all.

Plaintiff and the Class members did not receive the benefit of their bargain as a result of Defendants' misconduct.

317.    Defendants' violations present a continuing risk to Plaintiff, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

318.    As a direct and proximate result of Defendants' violations of the Michigan CPA, Plaintiff has suffered injury-in-fact and/or actual damage.

319.    Plaintiff seeks injunctive relief to enjoin Defendants from continuing their unfair and deceptive acts; monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 per Class member; (c) reasonable attorneys' fees; and (d) any other just and proper relief available under Mich. Comp. Laws § 445.911.

320.    Plaintiff also seeks punitive damages against Defendants because they carried out despicable conduct with willful and conscious disregard of the rights and safety of others.  Defendants intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or Defective Airbags installed in them, deceived Plaintiff on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles and/or the Defective Airbags installed in them.  Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT 7

### Negligence

321.    Plaintiff realleges and incorporates by reference all of the preceding paragraphs as though fully set forth herein.

322.    Plaintiff brings this claim on behalf of the Nationwide Class under Michigan law, because Michigan has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, Plaintiff brings this claim under the laws of the states where Plaintiff and Class Members reside and/or purchased their Class Vehicles.

323.    Defendants owed a duty of care to Plaintiff and the other members of the Classes, who were foreseeable end users, to design and manufacture their airbags so that they would not be defective or unreasonably dangerous to foreseeable end users, including Plaintiff.

324.    Defendants breached their duty of care by, among other things:

    a.    Negligently and recklessly failing to take all necessary steps to ensure that their products – which literally can make the difference between life and death in an accident – function as designed, specified, promised, and intended;

    b.    Negligently and recklessly failing to take all necessary steps to ensure that profits took a back seat to safety;

    c.    Negligently and recklessly failing to take all necessary steps to ensure that the Defective Airbags did not suffer from a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their inflators; and

    d.    Negligently and recklessly concealing the nature and scope of the Inflator Defect.

325.    Defendants' negligence was the direct, actual, and proximate cause of foreseeable

damages suffered by Plaintiff and the Class members, as well as ongoing foreseeable damages that Plaintiff and the Class members continue to suffer to this day.

326.    As a direct, actual, and proximate result of Defendants' misconduct, Plaintiff and members of the proposed Classes were harmed and suffered actual damages, which are continuing in nature, including:

   a.   the significantly diminished value of the vehicles in which the defective and unreasonably dangerous airbags are installed; and

   b.   the continued exposure of Plaintiff and the Class members to an unreasonably dangerous condition that gives rise to a clear and present danger of death or personal injury.

327.    Defendants' negligence is ongoing and continuing, because Defendants continue to obfuscate, not fully cooperate with regulatory authorities, and manufacture and install replacement airbags that are defective and unreasonably dangerous, suffering from the same serious Inflator Defect inherent in the original airbags that are at issue in this litigation, which pose an unreasonable risk of serious foreseeable harm or death, from which the original airbags suffer.

328.    In addition to damages, Plaintiff seeks injunctive relief to enjoin the Takata Defendants from continuing their negligence by using the same dangerous chemical in the replacement airbags that the Takata Defendants are manufacturing to this date, and to enjoin GM from continuing its negligence by continuing to install airbags containing an Inflator Defect in its vehicles.

- 87 -

**II.    New Jersey Class Claims**

## COUNT 8

**Violation of the New Jersey Consumer Fraud Act**
**Fla. Stat. §§ 501.201, et seq.**

329.    Plaintiff realleges and incorporates by reference all of the preceding paragraphs as though fully set forth herein.

330.    Plaintiff brings this claim on behalf of the New Jersey Class.

331.    Plaintiff, Defendants, and the Classes are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

332.    Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. §§ 56:8-1(c), (d).

333.    The New Jersey Consumer Fraud Act (the "New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby..." N.J. Stat. Ann. § 56:8-2.

334.    Defendants engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as described herein, and did so with the intent that Class members rely upon their acts, concealment, suppression, or omissions.

335.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags

installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

336.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

337.    Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s. Prior to installing the Defective Airbags in their vehicles, GM knew or should have known of the Inflator Defect, because Takata informed GM that the Defective Airbags contained the volatile and unstable ammonium nitrate and GM approved Takata's designs. GM was again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

338.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the New Jersey CFA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

339.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

340.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other members of the Classes, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

341.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiff and the Classes.

342.    Defendants knew or should have known that their conduct violated the New Jersey CFA.

343.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

344.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to

continue driving highly dangerous vehicles.

345.    Defendants owed Plaintiff and the other members of the Classes a duty to disclose

the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them

because Defendants:

      a.  Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.  Intentionally concealed the foregoing from Plaintiff and the Classes; and

      c.  Made incomplete representations about the safety and reliability of the foregoing

          generally, while purposefully withholding material facts from Plaintiff and the

          Classes that contradicted these representations.

346.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles

and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the

Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly

diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are

now worth significantly less than they otherwise would be.

347.    Defendants' failure to disclose and active concealment of the dangers and risks

posed by the Defective Airbags in Class Vehicles were material to Plaintiff and the other

members of the Classes.  A vehicle made by a reputable manufacturer of safe vehicles is worth

more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe

vehicles that conceals defects rather than promptly remedies them.

348.    Plaintiff and the Classes suffered ascertainable loss caused by Defendants'

misrepresentations and their failure to disclose material information.  Had they been aware of the

Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them,

and Defendants' complete disregard for safety, Plaintiff and the members of the Classes either

would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiff and the Classes did not receive the benefit of their bargain as a result of Defendants' misconduct.

349.    Plaintiff and the Classes risk irreparable injury as a result of Defendants' act and omissions in violation of the New Jersey CFA, and these violations present a continuing risk to Plaintiff, the Classes, and the general public.    Defendants' unlawful acts and practices complained of herein affect the public interest.

350.    As a direct and proximate result of Defendants' violations of the New Jersey CFA, Plaintiff and the Classes have suffered injury-in-fact and/or actual damage.

351.    Plaintiff and the Classes are entitled to recover legal and/or equitable relief, including an order enjoining Defendants' unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

## COUNT 9

### Breach of Implied Warranty of Merchantability
### N.J. Stat. Ann. § 12a:2-314

352.    Plaintiff realleges and incorporates by reference all of the preceding paragraphs as though fully set forth herein.

353.    In the event the Court declines to certify a Nationwide Class under the Magnuson-Moss Warranty Act, this claim is brought on behalf of the New Jersey Class.

354.    Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags.

355.    When Plaintiff and the Classes purchased or leased their Class Vehicles, the transactions contained an implied warranty that the Class Vehicles were in merchantable condition.

- 92 -

356.   The Class Vehicles, and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable or fit for the ordinary purpose for which cars are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

357.   Plaintiff and the Classes, at all relevant times, were intended third-party beneficiaries of: (a) Takata's sale of the Defective Airbags to GM; and (b) GM's sale of vehicles containing the Defective Airbags to Plaintiff and the Classes.

358.   Defendants were provided notice of these issues by their knowledge of the issues, prior complaints filed against them and/or others, and internal investigations.

359.   As a direct and proximate result of Defendants' breach of the warranties of merchantability and fitness for a particular purpose, Plaintiff and the Classes have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiff, on behalf of herself and all others similarly situated, requests that the Court enter judgment against Defendants, as follows:

A. An order certifying the proposed Classes, designating Plaintiff as the named representative of the Classes, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R. Civ. P. 23.;

B. A declaration that the airbags in Class Vehicles are defective;

C. A declaration that Defendants are financially responsible for notifying all Class

Members about the defective nature of the Class Vehicles;

D. An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and such other injunctive relief that the Court deems just and proper;

E. An award to Plaintiff and Class members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

F. An award to Plaintiff and Class members for the return of the purchase prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

G. A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket and loss-of-use expenses and damages claims associated with the Defective Airbags in Plaintiff's and Class members' Class Vehicles, can be made and paid, such that Defendants, not the Class members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defective Airbags;

H. A declaration that Defendants must disgorge, for the benefit of Plaintiff and Class members, all or part of the ill-gotten profits they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiff and Class members;

I. An award of attorneys' fees and costs, as allowed by law;

J. An award of prejudgment and post judgment interest, as provided by law;

K. Leave to amend this Complaint to conform to the evidence produced at trial; and

L.  Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues triable by a jury.

Dated: New York, New York
      July 27, 2016

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

 /s/ *Alexander H. Schmidt*      
Alexander H. Schmidt
Janine L. Pollack
Malcolm T. Brown
Correy A. Kamin
270 Madison Ave.
New York, New York 10016
Tel.: (212) 545-4600
Fax:  (212) 686-0114
Schmidt@whafh.com
Pollack@whafh.com
Brown@whafh.com
Kamin@whafh.com