**Hearing Date and Time: TBD**

William P. Weintraub
Gregory W. Fox
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
T: 212-813-8800
E: wweintraub@goodwinlaw.com
E: gfox@goodwinlaw.com

*Counsel for Ignition Switch Pre-Closing*
*Accident Plaintiffs Represented By*
*Hilliard Muñoz Gonzales L.L.P.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, et al., | : | Case No.: 09-50026 (MG) |
| f/k/a General Motors Corp., et al., | : |  |
|  | : |  |
| Debtors. | : | (Jointly Administered) |

---------------------------------------------------------------X

**REPLY BRIEF ON APPLICABILITY OF *PIONEER* AND TOLLING ISSUES IN
CONNECTION WITH OMNIBUS MOTION BY CERTAIN IGNITION SWITCH
PRE-CLOSING ACCIDENT PLAINTIFFS FOR AUTHORITY TO FILE LATE
PROOFS OF CLAIM FOR PERSONAL INJURIES AND WRONGFUL DEATHS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ....................................................................................................................1

1.  The Bankruptcy Court's Finding of a Due Process Violation In Connection With the Bar Date Stands......................................................................................................................2

2.  The GUC Trust and Participating Unitholders Should Be Judicially Estopped From Arguing that the Claimants Should Have Filed Proofs of Claim Sooner Than February 2014 ....................................................................................................................................3

3.  The December 2015 Tolling Arrangement Was Explicitly Meant to Defer the Filing of Fully Executed  Proofs of Claim Until the Equitable Mootness Ruling Was Addressed on Appeal. ..........................................................................................................................7

4.  The Claimants Filed Their Proofs of Claim at the Appropriate Time.....................................8

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adelphia Recovery Trust v. HSBC Bank USA,*
  *National Association (In re Adelphia Recovery Trust)*,
  634 F.3d 678 (2d Cir. 2011).................................................................................................4

*DeRosa v. Nat'l Envelope Corp.*,
  595 F.3d 99 (2d Cir.2010)...................................................................................................4

*Elliott v. General Motors LLC (In re Motors Liquidation Co.)*,
  829 F.3d 135(2d Cir. 2016).........................................................................................1, 2, 3

*In re Motors Liquidation Co.*,
  529 B.R. 510 (Bankr. S.D.N.Y. 2015)................................................................................6

*In re Motors Liquidation Co.*,
  539 B.R. 676 (Bankr. S.D.N.Y. 2015)................................................................................9

ACTIVE/89846233.4

## INTRODUCTION

The opening briefs filed by New GM, the GUC Trust, and the Participating Unitholders on the *Pioneer* and tolling issues[1] ignore the reality of this case at the time they now claim the Claimants should have pursued late proofs of claim against the GUC Trust. These proceedings began as motions by New GM to prevent successor liability claims from being asserted against it. At the time of the February 2014 Ignition Switch Defect recalls, approximately 90% of the GUC Trust's assets had already been distributed. *Elliott v. General Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 148(2d Cir. 2016). Before the February 2014 recalls, Claimants were not aware their accidents were caused by Old GM. On top of that, as discussed in the Claimants' opening brief, the Late Filed Claims Order deemed all claims filed after February 8, 2012 presumptively disallowed. Until the Claimants successfully established a due process violation in connection with the Bar Date – which did not occur until the Court issued its April 2015 Decision/June 2015 Judgment – there was no point in filing a proof of a disallowed claim. New GM, the GUC Trust and the Participating Unitholders also ignore that the same April 2015 Decision/June 2015 Judgment that established the due process violation that gave the Claimants a basis to seek allowance of untimely claims <u>also</u> rendered those very claims worthless as equitably moot.

Not until the Second Circuit affirmed this Court's finding that Old GM had violated the Claimants' due process rights <u>and</u> vacated the equitable mootness ruling, was the time right to pursue proofs of claim against the GUC Trust. Moreover, any attempt by the Claimants to "jump the line" and litigate proofs of claim while the 2014 Threshold Issues were still being litigated

---

[1] *Opening Brief By General Motors LLC With Respect to Initial Late Claim Motions Issues*, filed March 6, 2017 [Docket No. 13871] (the "<u>New GM Opening Brief</u>"); *Opening Brief of GUC Trust Administrator and Participating Unitholders on the Applicability of Pioneer and Tolling to Plaintiffs' Motions to File Late Claims*, filed March 6, 2017 [Docket No. 13873] (the "<u>GUC Trust Opening Brief</u>"); the *Declaration of Gabriel K. Gillett in Support of the GUC Trust Opening Brief* [Docket No. 13875] (the "<u>Gillett Declaration</u>").

would have been contrary to this Court's scheduling orders and Judge Gerber's understandable desire to control his docket and the sequence in which matters came before him.

For these reasons and the reasons articulated below and in their opening brief, the Claimants respectfully request that the Court reject the arguments presented in the GUC Trust Opening Brief and the New GM Opening Brief and deem the Claimants' proofs of claim timely filed without regard to *Pioneer* and the excusable neglect factors.

## 1.    The Bankruptcy Court's Finding of a Due Process Violation In Connection With the Bar Date Stands.

Both New GM and the GUC Trust attempt to argue that the Bankruptcy Court's ruling in the April 2015 Judgment/June 2015 Judgment that all Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs were denied due process and were prejudiced in connection with the Bar Date was somehow thrown out with the bathwater when the Second Circuit vacated the equitable mootness ruling.  *New GM Opening Brief* at 5-8; GUC Trust Opening Brief at 12.  The Second Circuit did no such thing.

The only thing that the Second Circuit vacated as advisory was Judge Gerber's ruling that any claims that any claims the Claimants may file in the future would be equitably moot.  *See Elliott*, 829 F.3d at 169-70.[2]  Thus, it is inaccurate and misleading for the GUC Trust to state that "[a]lthough Judge Gerber nonetheless found that Plaintiffs did not receive due process in connection with the Bar Date Order, ***the Second Circuit subsequently vacated that finding*** because the issue was not actually presented[.]"  *GUC Trust Opening Brief* at 12.  This Court's findings that Old GM knew of the Ignition Switch Defect prior to the bankruptcy and the Bar Date and that it failed to give affected claimants actual first class mailed notice of the Bar Date

---

[2] In conflating equitable mootness with the remedy for a due process violation, New GM, the GUC Trust, and the Participating Unitholders ignore that (i) those were two distinct threshold issues briefed separately and (ii) those issues were discussed separately in both the April 2015 Decision and the Second Circuit Opinion.

ACTIVE/89846233.4

stand untouched.  Following the binding precedent of the Second Circuit's decision, those

findings lead to the irrefutable conclusion that the Claimants are not bound by the Bar Date

Order and should be able to pursue their proofs of claim without regard to the Bar Date.  *Elliott*,

829 F.3d at 166 (citing *In re Johns-Manville Corp.*, 600 F.3d 135, 158 (2d Cir. 2010)) (holding

that parties cannot be bound by orders entered in violation of their due process rights).

      If the GUC Trust and New GM believed that Judge Gerber had overstepped his bounds

when he made these findings, then it was incumbent on them to seek and obtain reconsideration

or reversal.  They failed to do so and should be forced to live with the consequences.[3]

### 2. The GUC Trust and Participating Unitholders Should Be Judicially Estopped From Arguing that the Claimants Should Have Filed Proofs of Claim Sooner Than February 2014

      It is ironic that the GUC Trust and Participating Unitholders now argue there is no

existing ruling there was a due process violation in connection with the Bar Date considering

they were one of the parties that helped convince this Court to make that ruling.  Because it

benefitted them at the time, as part of the 2014 Threshold Issues briefing the GUC Trust and

Participating Unitholders successfully argued to this Court that (due to Old GM's concealment of

the Ignition Switch Defect) the Claimants were unaware in 2009 of the claims they assert in their

---

[3] Both the GUC Trust and New GM point footnote 31 of the Second Circuit Opinion where the Second Circuit noted that counsel to the Ignition Switch Pre-Closing Accident Plaintiffs stated in its brief on the 2014 Threshold Issues that "Plaintiffs are not asserting a due process challenge to a bar date order or a discharge injunction issued in favor of a debtor."  *Elliott*, 829 F.3d at 168 n.31.  To put that statement in its proper context, the quoted language was contained in the section of a brief entitled "Potential Availability Of Remedies Against Old GM's Estate Is Immaterial," which focused on New GM's argument that the Claimants could not sue New GM on successor liability theories and that their exclusive remedy for a due process violation in connection with the Sale Order was to pursue a claim against the GUC Trust.  *See Responsive Brief of Designated Counsel for Pre-Closing Accident Plaintiffs on Threshold Issues Concerning New GM's Motions to Enforce the Sale Order and Injunction*, filed December 16, 2014 [Docket No. 13021], 46-49 (excerpt attached as Exhibit A).  The specific point being made was that the remedy for the due process violation in connection with the sale was to permit successor liability claims against New GM and not, as argued by New GM, limited to filing late claims against the GUC Trust (which had already distributed 90% of its assets by the time New GM revealed the existence of the Ignition Switch Defect).  The Second Circuit sided with the Claimants and rejected New GM's position on this issue when it held that Ignition Switch Pre-Closing Accident Plaintiffs may bring successor liability claims against New GM as a result of the due process violation inflicted upon them.

ACTIVE/89846233.4

proofs of claim and that they remained unaware of those claims until February 2014 when New

GM belatedly revealed the existence of the Ignition Switch Defect that caused the Claimants'

injuries and deaths.

Now they have changed their tune and argue in their opening brief that "each of the [Pre-

Closing Accident Plaintiffs was on notice that they had a potential claim in the Old GM

bankruptcy when they were in an accident prior to July 2009" and that these Claimants made a

"strategic decision" to "wait more than five years after they suffered accidents to pursue proofs

of claim against the GUC Trust."  GUC Trust Opening Brief at 4, 15.  On judicial estoppel

grounds, this Court should prohibit the GUC Trust and Participating Unitholders from making

such an "about face."  *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir.2010) (quoting

*New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)) ("Where

a party assumes a certain position in a legal proceeding, and succeeds in maintaining that

position, he may not thereafter, simply because his interests have changed, assume a contrary

position[.]").

The Second Circuit has set forth the test for judicial estoppel as follows:

> Typically, judicial estoppel will apply if: 1) a party's later position is "clearly
> inconsistent" with its earlier position; 2) the party's former position has
> been adopted in some way by the court in the earlier proceeding; and 3) the party
> asserting the two positions would derive an unfair advantage against the party
> seeking estoppel.  The third requirement is sometimes couched in terms of "unfair
> detriment [to] the opposing party" rather than advantage to the party to be
> estopped.  In this circuit, moreover, "[w]e further limit 'judicial estoppel to
> situations where the risk of inconsistent results with its impact on judicial
> integrity is certain.'"  This latter requirement means that judicial estoppel may
> only apply where the earlier tribunal accepted the accuracy of the litigant's
> statements.

*Adelphia Recovery Trust v. HSBC Bank USA, National Association (In re Adelphia Recovery*

*Trust)*, 634 F.3d 678, 695–96 (2d Cir. 2011)  (internal citations omitted).  All of these factors are

present here.

ACTIVE/89846233.4

The GUC Trust's and Participating Unitholders' statements in their opening briefs are clearly inconsistent with the position the GUC Trust and the Participating Unitholders took when trying to convince this Court as part of the 2014 Threshold Issues briefing to find a due process violation by Old GM to allow the Claimants to bring successor liability claims against New GM. Indeed, the brief filed by the GUC Trust and the Participating Unitholders put it eloquently:

> *While the Pre-Closing Accident Plaintiffs might have contemplated some cause of action against Old GM, they <u>certainly</u> were not aware of the causes of action they assert now*.  In July 2009, the ignition switch and other defects that New GM disclosed in 2014 were not known to the Pre-Closing Accident Plaintiffs.  Indeed, as New GM admits, neither the direct mail notices nor the publication notices stated that any Old GM vehicles contained one or more serious defects that could cause personal injury, death, or other injuries to persons or property.
>
> *Without notice of these defects, the <u>Pre-Sale Accident Plaintiffs had no reason to believe that their accidents, or the deaths of their loved ones, were caused by serious defects in those cars (i.e., the defects that New GM revealed for the first time in 2014).</u>  Instead, they may well have believed one of the drivers was at fault, that road or weather conditions were to blame, or even that one of the drivers suffered a sudden health crisis.*  The Pre-Sale Accident Plaintiffs did not forfeit their right to adequate notice of their claims simply because they or their loved ones were personally injured or died in pre-Sale accidents involving vehicles that, unbeknownst to them at the time, featured serious safety defects.

*Response of GUC Trust Administrator and Participating Unitholders to New GM's Opening Brief on Threshold Issues Concerning Its Motion to Enforce the Sale Order and Injunction*, filed December 16, 2014 [Docket No. 13030], 26 (emphasis added; internal citations omitted); *See also* Hrg. Tr. 2/17/14 at 164:23-24 (counsel to the GUC Trust stating "It's undisputed that they didn't know about the defect in the subject vehicles until around February of 2014").[4]

Second, the Bankruptcy Court undeniably adopted and accepted as accurate the position quoted above from the GUC Trust's and Participating Unitholders' briefs.  Specifically, the Court wrote in its April 2015 Decision that:

---

[4] An excerpt of the transcript of the first day of oral argument on the 2014 Threshold Issues containing the GUC Trust's arguments on due process is attached hereto as <u>Exhibit B</u>.

5

> [T]he fact is that even at the later times set as deadlines for the filing of claims, Old GM still had not sent out notice of the recall, *and Old GM car owners were still unaware of any resulting potential claims*;

and that:

> Of course the Plaintiffs could not be expected to have sought a stay of the Confirmation Order *when they were then unaware of Ignition Switch claims*. Nor, for the same reason, could the Plaintiffs be faulted for not having filed claims with Old GM or the GUC Trust before the Ignition Switch Defect came to light.  So the Court cannot find this factor to be satisfied based on any inaction before the Spring of 2014, at which time New GM issued the recall notices and alerted the Plaintiffs to the possibility that they might have legal rights of which they were previously unaware.

*In re Motors Liquidation Co.*, 529 B.R. 510, 525, 590 (Bankr. S.D.N.Y. 2015) (emphasis added).

Thus, this Court adopted the GUC Trust's and Participating Unitholders' arguments that the Claimants were unaware of the Ignition Switch Defect and that Claimants' due process rights were violated when Old GM concealed the Ignition Switch Defect from them and failed to provide them with actual notice of bankruptcy events that adversely impacted their claims relating to that defect.  It would be unjust to now adopt the GUC Trust's and Participating Unitholders' new (and forthcoming) arguments that the Claimants should have filed claims against the GUC Trust prior to New GM's belated public announcement and recalls relating to the Ignition Switch Defect in February 2014.

Allowing the GUC Trust and Participating Unitholders to reverse course and argue that the Claimants should have filed claims prior to February 2014 unfairly advantages the Participating Unitholders and disadvantages the Claimants.  Having successfully convinced this Court that the Claimants' due process rights were violated because they were unaware of the Ignition Switch Defect in 2009 (which formed the basis for the Second Circuit's ruling permitting the Claimants to sue New GM on successor liability grounds), the Participating Unitholders should not be permitted to make the opposite argument in order to shield themselves

6

from the risk of dilution and disgorgement associated with allowing the Claimants to recover

from the GUC Trust on their Ignition Switch Defect-related personal injury and wrongful death

claims.

### 3. The December 2015 Tolling Arrangement Was Explicitly Meant to Defer the Filing of Fully Executed Proofs of Claim Until the Equitable Mootness Ruling Was Addressed on Appeal.

The GUC Trust and Participating Unitholders argue the December 2015 tolling

arrangement with the Claimants somehow confirms that the Claimants should have filed their

proofs of claim prior to that date.  That is not the case and such logic is flawed.

The December 2015 tolling arrangement came about because counsel to the Claimants

had collected almost 200 executed proofs of claim from the Claimants and did not want to ignore

the fact that, even though as a practical matter, the Claimants could have filed the PI Late Claims

Motion at that time, the motion was still not yet ripe because the April 2015 Decision and June

2015 Judgment were not yet final.[5]  Indeed, the opening lines of the email containing the

arrangement (which both New GM and the GUC Trust conspicuously omit from their briefs)

spell this out:

> As we have discussed in connection with the General Motors case, Goodwin
> Procter has received proofs of claim of approximately 200 pre-sale accident
> plaintiffs represented by Mr. Hilliard's firm (the "Pre-Sale Accident Plaintiffs").
> Rather than expending resources litigating a motion to allow **these prepetition
> claims** notwithstanding the passage of the bar date, we propose deferring such
> motion practice until after the Second Circuit rules on the pending appeal of
> Judge Gerber's April 15, 2015 equitable mootness ruling (the "Equitable
> Mootness Ruling") If the Second Circuit affirms the Equitable Mootness Ruling,
> the prepetition claims of these Pre-Sale Accident Plaintiffs against the GUC trust

---

[5] In order to be ready to act promptly in the event of a reversal, the Claimants executed their proofs of claim during the latter part of 2015 while the appeal of the April 2015 Decision/June 2015 Judgment to the Second Circuit was still pending.  The Second Circuit did not decide the appeal until July 2016 and New GM filed a petition for a writ of *certiorari* after having failed to obtain *en banc* review.  Everyone agreed a late claims motion would have been premature before the Second Circuit ruled on equitable mootness and due process.  Had the GUC Trust thought otherwise, it simply would have told the Claimants to file the late claims motion at the end of 2015, rather than entering into the tolling stipulation as of December 2015 and then extending that stipulation in August 2016.

7

would be moot and no motion would be necessary.  If the Second Circuit reverses the Equitable Mootness Ruling, the Pre-Sale Accident Plaintiffs would promptly file a motion seeking to allow these claims against the GUC trust notwithstanding the passage of the bar date.

Gillett Declaration at Exh. 2, pages 2-3.  Because the GUC Trust and the Participating Unitholders took the position at the time of the email arrangement that there was not an effective toll on the Claimants' time to file late proofs of claim prior to December 2015, the email arrangement provided that both sides "fully reserved" "all rights and arguments with respect to the period prior to the date of [that] email."  *Id.* at 3.  Contrary to the GUC Trust's argument, the email agreement is entirely consistent with the Claimants' position about the sequencing set forth in the Court's scheduling orders.[6]

It is also worth noting that, had the Participating Unitholders and GUC Trust believed these proofs of claim were ripe in 2015 and wished the Claimants to file their motion at that time, they would have rejected the email proposal.  But they opted for the proposed deferral, as they presumably agreed with counsel to the Claimants that the expenditure of resources on moot claims was not wise.

### 4.  The Claimants Filed Their Proofs of Claim at the Appropriate Time

New GM, the GUC Trust, and the Participating Unitholders try to make much of the Claimants' failure to stop the GUC Trust from making certain distributions to its beneficiaries after New GM revealed the existence of the Ignition Switch Defect in February 2014.  This feigned indignity is overblown and is a red herring.  First, staying distributions by the GUC Trust is not the same thing as filing late proofs of claim, especially considering that 90% of the GUC Trust's assets were gone by February 2014.  In addition, as discussed, any late proof of claim filed after February 2014 would have been (i) disallowed as untimely prior to the establishment

---

[6] As discussed in the Claimants' opening brief, the tolling in the May 2014 Scheduling Order was embedded in the schedule imposed upon the Claimants in the September 2014 Scheduling Order.

8

of a due process violation (which did not occur until the April 2015 Decision/June 2015

Judgment) and (ii) disallowed as equitably moot prior to the Second Circuit vacating that ruling

in July 2016.  After the Second Circuit rendered its decision, the Claimants participated in the

meet and confer process that this Court ordered to address remaining issues in light of that

opinion (which included the issue of late proofs of claim).  That process resulted in the Court's

December 13, 2016 Order to Show Cause which staged the litigation over the 2016 Threshold

Issues (including the Late Proof of Claim Issue).  The Claimants timely filed their PI Late

Claims Motion on the date required of them under the Order to Show Cause.  Put simply, the

Claimants filed their proofs of claim only when the 2014 Threshold Issues had been litigated to

the point at which it made sense to do so.  The distributions the GUC Trust made to the

Participating Unitholders and its other beneficiaries while the 2014 Threshold Issues were being

litigated are irrelevant.[7]

Second, what were Claimants to do to stop the GUC Trust from making distributions?

The Ignition Switch Economic Loss Plaintiffs tried (at great cost) to stop a $135 million

distribution after the issuance of the April 2015 Decision, but this Court sided with the GUC

Trust and the Participating Unitholders and conditioned any stay of distribution on the posting of

a $10.6 million bond.  *In re Motors Liquidation Co.*, 539 B.R. 676, 679 (Bankr. S.D.N.Y. 2015)

("In this contested matter in the chapter 11 case of debtor Motors Liquidation Company, the

Ignition Switch Plaintiffs move, under Fed.R.Bankr.P. 8007(a), for a stay pending their appeal

from the June 1, 2015 Judgment of a contemplated $135 million distribution from the GUC Trust

to its unitholders (the "Unitholders").  I'm granting the request for a stay, subject to the posting

of a bond in the amount of $10.6 million.").  The Claimants are individual plaintiffs who still

---

[7] Separate from the prior distributions from the GUC Trust and the remaining (and reserved) assets held by that
trust, there is a potential remedy for the Claimants from the so-called "accordion feature" if and when it is triggered.
The accordion remedy remains speculative and unknown at this point in time.

9

have never received a penny from the GUC Trust or New GM for the deaths and serious injuries they or their loved ones suffered more than eight years ago in vehicles that Old GM knew contained a deadly safety defect prior to its bankruptcy and that New GM illegally covered up after it acquired Old GM's assets.  These Claimants have contingency fee arrangements with their personal injury counsel and many struggle to make ends meet while they deal with medical costs and other life altering repercussions of their injuries and the deaths of their family members.  Thus, even if it were relevant that the Claimants did not try to stop the GUC Trust from making distributions (which it is not), the Claimants lacked the means to post the bond necessary to do so.

Finally, it is insulting and inappropriate for New GM (which admitted to criminal liability and paid almost a billion dollars to the federal government to avoid prosecution for covering up the very Ignition Switch Defect that killed and injured the Claimants and their loved ones), the GUC Trust, and the hedge funds that comprise the Participating Unitholders to suggest these Claimants are bad faith actors that strategically waited to pursue claims against the GUC Trust. *See GUC Trust Opening Brief* at 11 (incorrectly stating that the Claimants believe they can "continuously lay-in-wait" and "spring up when the *in terrorem* effect of millions of new claims reached its peak").  There is no evidence before the Court that any Claimant with a personal injury or wrongful death claim stemming from the Ignition Switch Defect did anything other than wait to pursue their proofs of claim until the Court-imposed barriers to them doing so – the Bar Date, the Late Filed Claims Order and the equitable mootness ruling – were undone.

10

Dated: March 20, 2017                    Respectfully submitted,

                                         /s/ *William P. Weintraub*
                                         William P. Weintraub
                                         Gregory W. Fox
                                         GOODWIN PROCTER LLP
                                         The New York Times Building
                                         620 Eighth Avenue
                                         New York, NY 10018
                                         Tel.: 212.813.8800
                                         Fax:  212.355.3333
                                         wweintraub@goodwinlaw.com
                                         gfox@goodwinlaw.com

                                         *Counsel for Ignition Switch Pre-Closing*
                                         *Accident Plaintiffs Represented By*
                                         *Hilliard Muñoz Gonzales L.L.P.*

ACTIVE/89846233.4

## <u>CERTIFICATE OF SERVICE</u>

I, William P. Weintraub, hereby certify that on March 20, 2017 a true copy of the foregoing was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ William P. Weintraub

# EXHIBIT A

William P. Weintraub
Eamonn O'Hagan
Gregory W. Fox
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.: 212.813.8800
Fax:  212.355.3333

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>Motors Liquidation Company, *et al.*<br>        f/k/a General Motors Corp., *et al.*<br><br>                Debtors. | Chapter 11<br><br>Case No. 09-50026 (REG)<br><br>(Jointly Administered) |

**RESPONSIVE BRIEF OF DESIGNATED COUNSEL FOR PRE-CLOSING**
**ACCIDENT PLAINTIFFS ON THRESHOLD ISSUES CONCERNING**
**NEW GM'S MOTIONS TO ENFORCE THE SALE ORDER AND INJUNCTION**

New GM's argument that the remedy sought by Plaintiffs "would result in an unjustified windfall" is equally misguided.[24]  New GM Opening Brief at 55.  The Plaintiffs did not choose to have their due process rights violated.  The present litigation is before the Court only because Old GM denied Plaintiffs constitutionally sufficient notice in connection with the Sale Order and Injunction.  As explained above, the existence of the undisclosed defect in the Subject Vehicles was known to Old GM for <u>years</u> prior to its bankruptcy proceedings.  The decision of whether to provide Plaintiffs with adequate information of the Ignition Switch defect was uniquely in the control of Old GM personnel.  This failure to provide constitutionally sufficient notice has consequences.  The consequence here is that Plaintiffs cannot be bound to the injunctive terms of the Sale Order and Injunction.  A different result would only incentivize companies to withhold information until after a "free and clear" sale has been accomplished as both Old GM and New GM did here.[25]

### C.    Potential Availability Of Remedies Against Old GM's Estate Is Immaterial

To support its argument that no remedy can be had against it, New GM suggests that Plaintiffs have a "viable remedy" against Old GM's estate.  New GM Opening Brief at 56.  As an initial matter, New GM incorrectly frames the Remedies Threshold Issue as requiring this Court to specifically choose between allowing <u>either</u> a remedy against Old GM's estate <u>or</u> against New GM.  As explained above, the proper remedy for the due process violation is simply

---

[24] In support of this argument, New GM cites the Third Circuit's decision in *In re Trans World Airlines, Inc.*, 322 F.3d 283, 291-93 (3d Cir. 2003) ("*TWA*").  That decision lends no support to New GM's position because it addressed only whether successor liability claims are "interests" subject to the "free and clear" language of Bankruptcy Code § 363(f).  Thus, *TWA* has no bearing on the appropriate remedy for a due process violation in connection with a sale that was purportedly "free and clear" of successor liability claims.

[25] Thus, contrary to New GM's argument, the truly inequitable result would be to permit Old GM personnel to cross over to the other side of the room, start calling themselves "New GM" and then blame "Old GM" personnel for the deficiency in notice.  Essentially, New GM is blaming itself.  Old GM personnel knew they would be New GM employees the moment the Sale was approved.  Thus, Old GM had every incentive to leave the liability for the Subject Vehicles behind so that its new incarnation would not be saddled with the obligations to account to these victims.

for the Court to rule that the Plaintiffs are not bound by the injunctive provisions of the Sale

Order and Injunction, thereby freeing Plaintiffs to pursue any and all available remedies,

including successor liability claims against New GM.  The Court need go no further.  Such a

remedy does not require the Court to determine whether "viable" remedies also exist against Old

GM's estate.

To the extent New GM argues that the exclusive remedy for the due process violation is a

claim against Old GM's estate, it is mistaken.  In support of its position, New GM primarily

relies on cases where no due process violation was found or that are otherwise readily

distinguishable.  New GM Opening Brief at 56-57 (citing in *In re Edwards*, 962 F.2d 641, 643-

45 (7th Cir. 1992) (holding that entire sale transaction (including transfer of title) could not be

completely unwound based on deficient notice to lien holder where lien holder failed to monitor

the case for two years, took no action for months after learning of notice deficiency complained

of, did not dispute the adequacy of the sale price, and the lien holder's share of the sale proceeds

was still available to pay it); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir.

1988) (addressing bankruptcy court order approving settlement that enjoined claims against

settling insurers and holding: (i) injunction was not "unfair" because objector retained claim

against debtor's estate and (ii) objector's due process rights were not violated because objector

was provided with adequate notice of the settlement order and injunction and specifically

objected); *Conway v. White Trucks, A Div. of White Motor Corp.*, 885 F.2d 90, 96 (3d Cir. 1989)

(affirming dismissal of successor liability claims where plaintiff "did not attempt to assert his

inadequate notice argument" in bankruptcy court or district court); *Molla v. Admar of New

Jersey, Inc.*, No. 11-6470 (JBS/KMW), 2014 WL 2114848, at *3, *5 (D.N.J. May 21, 2014)

(granting defendant's motion to dismiss successor liability claim, in case where no due process

47

violation was found and defendant acquired assets "free and clear of all claims and interests.");

*BFW Liquidation*, 471 B.R. 652 (holding that "free and clear" sale of substantially all of the

debtor's assets barred claims against purchaser and that plaintiff could assert its claims against

the debtor where <u>no due process violation</u> had occurred)).

 Even if the <u>out-of-circuit</u> cases relied by New GM could somehow support its argument

that Plaintiffs' remedy is limited to asserting a claim against Old GM's estate – which they do

not – that argument would remain at odds with governing Second Circuit precedent holding that

a party cannot be bound by the injunctive terms of a bankruptcy court order for which

insufficient notice was provided.  *Manville IV*, 600 F.3d at 153 ("[T]he primary current

contention is the argument of Chubb . . . that 'it was not given constitutionally sufficient notice

of the 1986 Orders, so that due process absolves it from following them, whatever their scope.'

In our view, Chubb is correct."); *Grumman*, 467 B.R. at 711.  More fundamentally, New GM's

proposed remedy would not provide redress for the due process violation <u>actually at issue</u>.  As

New GM is no doubt aware, the operative language of the Due Process Clause provides that

"[n]o person shall . . . deprived of . . . property, without due process of law."  U.S. Const. amend.

V.  Here, the property Plaintiffs were deprived of through the Sale Order and Injunction is their

right to assert claims against <u>New GM</u>.[26]  By suggesting the assertion of a claim against <u>Old</u>

<u>GM's</u> estate, New GM proposes a remedy that is disconnected from the constitutional injury.

This incongruity further highlights the incorrectness of New GM's argument and the soundness

of the Second Circuit's conclusion in *Manville IV*.

---

[26] Stated differently, Plaintiffs are not asserting a due process challenge to a bar date order or a discharge injunction issued in favor of a debtor.  Rather, the due process violation occurred through an order that curtailed their rights vis-à-vis a <u>non-debtor</u> (New GM).

Based on the foregoing, the appropriate remedy for the due process violation at issue is for this Court to determine that Plaintiffs are not bound by the injunctive provisions of the Sale Order and Injunction.

### III.   <u>CONCLUSION</u>

For the reasons set forth above, the Pre-Closing Accident Plaintiffs respectfully request that the Court deny New GM's Motion to Enforce Sale Order re: Pre-Closing Accident Lawsuits and grant such other and further relief as it deems just and proper.

Dated: December 16, 2014

Respectfully submitted,

/s/ *William P. Weintraub*
William P. Weintraub
Eamonn O'Hagan
Gregory W. Fox
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.: 212.813.8800
Fax:  212.355.3333
wweintraub@goodwinprocter.com
eohagan@goodwinprocter.com
gfox@goodwinprocter.com

# EXHIBIT B

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 09-50026-reg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6   MOTORS LIQUIDATION COMPANY, et al.,

7   f/k/a General Motors Corp., et al.

8

9          Debtors.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12

13                  U.S. Bankruptcy Court

14                  300 Quarropas Street

15                  White Plains, New York

16

17

18                  February 17, 2015

19                  9:02 AM

20

21  B E F O R E :

22  HON ROBERT E. GERBER

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  K. HARRIS

1    Hearing re:    Oral Argument on Motion to Enforce.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

Page 3

1    A P P E A R A N C E S :

2

3    KING & SPALDING, LLP

          Attorneys for General Motors, LLC

4

          1185 Avenue of the Americas

5

          New York, New York 10036

6

7

     BY:  ARTHUR J. STEINBERG, ESQ.

8

          SCOTT DAVIDSON, ESQ.

9

10

     GOODWIN PROCTER, LLP

11

          Attorneys for South Texas Plaintiffs

12

          The New York Times Building

13

          620 Eighth Avenue

14

          New York, New York 10018

15

16   BY:  WILLIAM P. WEINTRAUB, ESQ.

17

18   BROWN RUDNICK

19        Attorneys for Certain Plaintiffs

20        Seven Times Square

21        New York, New York 10036

22

23   BY:  EDWARD WEISFELNER, ESQ.

24

25   GOLENBOCK. EISEMAN, ASSOR, BELL & PESKOE, LLP

Page 4

1        Attorneys for Groman Plaintiffs

2        437 Madison Avenue

3        New York, New York 10022

4

5    BY:  JONATHAN L. FLAXER, ESQ.

6

7    GIBSON, DUNN & CRUTCHER, LLP

8        Attorneys for Wilmington Trust Company as

9        GUC Trust Administrator

10       200 Park Avenue

11       New York, New York 10166

12

13   BY:  LISA H. RUBIN, ESQ.

14        KEITH R. MARTORANA, ESQ.

15        MATTHEW WILLIAMS, ESQ

16

17   AKIN, GUMP, STRAUSS, HAUER & FELD, LLP

18        Attorneys for GUC Trust Unit Trust Holders

19        One Bryant Park

20        New York, New York 10036

21

22   BY:  DEBORAH NEWMAN, ESQ.

23        DANNY GOLDIN

24

25   STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

**Page 5**

1          Attorneys for Barron & Budd & Grant

2          2323 Bryan Street, Suite 2200

3          Dallas, Texas 75201

4

5    BY:   SANDER L. ESSERMAN, ESQ.

6

7    KIRKLAND & ELLIS, LLP

8          Attorneys for General Motors, LLC

9          300 North LaSalle

10         Chicago, Illinois 60654

11

12   BY:   RICHARD C. GODFRY, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 145

1          THE COURT:  I assume you're going to reply next,

2     or --

3          MR. STEINBERG:  The GUC Trust hasn't spoken yet.

4     I'm not --

5          THE COURT:  Oh, yeah.  Is GUC Trust going to be --

6     Ms. Rubin, are you going to be weighing in on what I've

7     heard this morning?

8          MS. RUBIN: I fully expect to, Your Honor.

9          THE COURT:  Okay.  Then Ms. Rubin next, and then

10    you can reply after that, Mr. Steinberg.  Now, especially

11    with the extent to which I've interrupted you guys, I'm not

12    going to prevent you from arguing anything, even if it's

13    beyond the original time limits, assuming you're not

14    filibustering or otherwise taxing my patience, but we still

15    have to quit at 3:15 today.  If we're not done at that point

16    -- and of course, the resumption is going to be at 2:05, if

17    we're not done, then we're going to have to pick up tomorrow

18    morning.  We're in recess.

19          MR. STEINBERG:  Thanks.

20          (Court in recess at 1:05 PM)

21          THE CLERK:  All rise.

22          THE COURT:  Have seats, please.  Okay, are we up

23    to Ms. Rubin?

24          MS. RUBIN:  We are, Your Honor, and if I can help

25    it, I don't intend to take the full balance of my time

Page 146

1    today.

2            THE COURT:  Okay.

3            MS. RUBIN:  But I do want to address a number of

4    the issues that you talked about with others today, and hope

5    that I can address some of the questions that you posed to

6    all of us as a group, as well.

7            THE COURT:  Okay.

8            MS. RUBIN:  Your Honor, I want to start from the

9    proposition that you started from this morning, which is

10   that you have been convinced, or at least you assume, where

11   we are right now, that there was enough knowledge at old GM

12   to have warranted a recall in 2009, prior to the sale.  Your

13   Honor is clearly aware that the briefing that my client and

14   the participating unit holder submitted, took a different

15   tack, and the reason that we did that is because we wanted

16   to illustrate that even if everything that Mr. Steinberg and

17   his colleagues said was true, there was still a due process

18   violation here, or would be a due process violation here,

19   with respect to the groups of Plaintiffs that Mr.

20   Weisfelner, Mr. Esserman and Mr. Weintraub represent.

21            That having been said, let's start from the

22   proposition that Your Honor began with this morning and move

23   from there.  The first, and most important reason we believe

24   that that the Plaintiff should be able to proceed against

25   new GM is because, as Mr. Weisfelner and others capably told

Page 147

1    you, they have independent claims in both the pre-sale and

2    the post-sale complaint against new GM, that are predicated

3    on conduct of new GM, and for some reason, in their reply,

4    new GM seems to suggest that that's not true of the pre-sale

5    complaint, and I just want to illustrate one example of why

6    that is, in fact, the case.  In paragraphs 1063 to 1079 of

7    the pre-sale complaint, the pre-sale Plaintiffs make a claim

8    under California's Unfair Competition law, and that claim is

9    predicated, in part but not in full, on the violation of GM,

10   sorry, new GM, on their violation to comply with the Safety

11   Act, and Your Honor, I want to underscore that that was a

12   knowing violation, by consenting to the order with NITSA.

13   What new GM essentially acknowledged is that they didn't

14   comply with that law, they did not provide NITSA with

15   knowledge within five days of determining there needed to be

16   a recall.

17          And from what I understand, Mr. Weisfelner's

18   clients' claim, for violation of the Unfair Competition law,

19   could be predicated on that in and of itself alone.  Now,

20   there's another reason that these claims -- we discussed

21   whether or not these independent claims against new GM are

22   subject to the sale order, and Mr. Esserman pointed out to

23   you this morning a reason why they are not, based on the

24   findings of fact in the sale decision, and their

25   incorporation in full into the sale order.

Page 148

1          Let me suggest to you another reason why, that I

2    think has eluded our discussion so far, and I'll refer Your

3    Honor to Section 2.3(b) of the Master Sale and Purchase

4    Agreement.  That is the definition of retained liabilities,

5    and I'll just read it, in part.  The definition of retained

6    liabilities starts with, "each seller acknowledges and

7    agrees that, pursuant to the terms and provisions of this

8    agreement, Purchaser shall not assume or become liable to

9    pay, perform or discharge, any liability of any Seller," and

10   let me pause there, Your Honor, because when we're talking

11   about retained liabilities, it pertains to the liability of

12   a Seller.  Now, Mr. Steinberg wants to suggest that any

13   liabilities that have to do with private rights of action

14   for failures, for example, to comply with recall

15   obligations, are not assumed liabilities, and therefore, by

16   definition, must be retained.  Respectfully, I'll disagree,

17   and agree with the Plaintiffs that it's not a binary

18   universe of assumed, retained and nothing else.  New GM

19   covenanted, under Section 6.15(a), that it would comply with

20   all of the Federal recall-related laws and regulations

21   applicable to old GM-manufactured, designed or sold

22   vehicles.

23          THE COURT:  That's in the sale agreement?

24          MS. RUBIN:  That is in the sale agreement, Your

25   Honor.

Page 149

1              THE COURT:  What section is that, by the way?

2              MS. RUBIN:  It's 6.15(a) and it's addressed in our

3       briefing as well, Your Honor.

4              THE COURT:  I'm well aware of the point, I would

5       just -- wanted to see the citation, too.

6              MS. RUBIN:  So, Your Honor, it would be our

7       position that, having undertaken that covenant, that is the

8       independent duty that Mr. Steinberg insists that his client

9       does not have, irrespective of the wording of the sale

10      order, they agreed to comply with those recall laws in

11      respect of old vehicles.  Whether or not the sale order goes

12      beyond that in other respects, and maybe goes too far, is

13      another issue entirely, but at least in terms of the sale

14      agreement itself, the retained liabilities are liabilities

15      of any Seller.  I don't hear anybody suggesting, or they

16      shouldn't suggest, that old GM, or the old GM bankrupt

17      estate through the GUC Trust, should somehow be liable for

18      the knowingness conduct of new GM and its failure to

19      disclose to NITSA, disclose to the driving public, to

20      disclose to this Court, and to disclose to anyone at all,

21      that these cars were subject to a safety defect that rose to

22      the level that it warranted a recall.

23              The other thing that -- one other thing that we

24      would say, Your Honor, is, in terms of why the Plaintiff's

25      claims should be allowed to go forward, let me identify

Page 150

1    another group of the Plaintiffs.  I believe Mr. Weisfelner

2    is the one who spoke to you at length about the used car

3    purchasers here, and whether or not their claims are subject

4    to the sale order.  It's hard for us to see, under the

5    Grumman case, which as Your Honor knows, interprets

6    Chateaugay, how the used car purchasers here could ever have

7    been subject to the sale order and injunction.  None of

8    those people had any pre-sale relationship or contact with

9    old GM.  Suddenly, they were not aware at the point in time

10   of their sale that their cars were subject to the serious

11   safety defect of which we're all now aware, and it's hard

12   for us to see how the analysis in the Grumman case is any

13   different than that which should be applied to used car

14   purchasers, who are a class of Plaintiffs implicated by the

15   post-sale consolidated complaint.

16         Now, there was some discussion this morning about

17   the Burton decision, which Your Honor referred to as the

18   Chrysler decision by Judge Bernstein, and to the extent that

19   Your Honor has questions about why these used car purchasers

20   in this situation should be treated any differently than the

21   Burton Plaintiffs, let me try to address that, if I may.

22         First and foremost, the Burton case involved a

23   recurring fuel spit-back problem that had already resulted

24   in two to three recalls prior to Plaintiffs bringing forth

25   claims in that instance.  Here, we have a warranty in the

Page 151

1    sale agreement by old GM, that there had been no material

2    recalls since 2007.  We're not dealing with a factual

3    situation in which anybody who drove one of the vehicles,

4    we'll call them the subject vehicles, that are the subject

5    of this proceeding, nobody is suggesting that drivers should

6    have been on notice of the ignition switch defect by virtue

7    of anything that happened before, as was the case in Burton.

8         Now, new GM is very fond of quoting to Your Honor

9    a particular sentence from the Burton decision in which

10   Judge Bernstein, and I'm sure I'll mangle this somehow, says

11   that anyone who drives a car should reasonably contemplate

12   that their car will need to be repaired.  Again, the end of

13   that sentence, which new GM doesn't quote for you is,

14   "especially whereas here there have already been two to

15   three recalls involving the same problem, and involving some

16   of the same vehicles," but be that as it may, there's

17   another distinction here that I think is a more fundamental

18   and important one.

19        The claims at issue here are not fundamentally

20   about repairs.  The Burton case is one in which the

21   Plaintiffs, who characterized themselves as future claimants

22   and with which Judge Bernstein disagreed, their claims were

23   Duty to Warn claims and failures to honor warranties.

24   Fundamentally, they were upset that their cars weren't being

25   repaired.  That's not really the gravamen of the Plaintiff's

Page 152

1    complaints and the consolidated complaints here.  What are

2    they really talking about, Your Honor?  They're saying,

3    there has been such a widespread erosion of GM's reputation

4    for quality, such that all of their vehicles have suffered

5    economic loss, and to the extent that they are also alleging

6    damages for economic losses associated with repairs, again,

7    I would submit that those are not the sort of repair-related

8    claims that a driver of these vehicles could have or should

9    have anticipated.  They are claims for things like childcare

10   expenses associated with all of the time necessary to get

11   their cars repaired, their lost wages, their rental car

12   expenses.  Your Honor is well aware that there are a number

13   of people who said, "Until GM is able to repair my car

14   consistent with the ignition switch recall, I'm not driving

15   that car, because I know, based on the information that's

16   come out through Feinberg Compensation Fund, that GM has at

17   least admitted that 50+ people died, and has awarded awards

18   under the Feinberg Compensation protocol, to at least 128

19   people."  That being the case, there are people that Mr.

20   Weisfelner and Mr. Esserman represent who say, "I'm not

21   going to drive my car and GM should be liable for the cost

22   of my rental car expenses during that period of time, until

23   my car is 100 percent safe to drive."

24          Now, Your Honor, putting aside the question of

25   whether these Plaintiffs have independent claims against new

Page 153

1    GM, or whether there are future claims on behalf of the used

2    car purchasers that are more akin to the claims in the

3    Grumman/Olsen case, the biggest issue here is obviously

4    whether or not the pre-sale economic loss Plaintiffs

5    suffered a due process violation.  And you see in the

6    briefing that there are starkly different visions of the

7    notice that should have been afforded to those claimants.

8           Let me submit this.  If Your Honor can accept that

9    old GM knew enough that they should have recalled the

10   subject vehicles, the notice that was given was never

11   enough, even for the folks that Mr. Weintraub represents,

12   and here's why.  Last year, in the DPWN case that went up to

13   the Second Circuit, the Court set forth the standard for

14   evaluating the claims of those who otherwise would be barred

15   by a bankruptcy order.  And the Court essentially said, it's

16   a two-part test.  The first thing you have to do is look at

17   what the claimants knew or should have known with reasonable

18   diligence, and if the claimant gets across that threshold,

19   the second part of the inquiry is to ask what "the Debtor

20   knew or should have known of the potential liability, such

21   that it should have provided the claimant with notice of his

22   or her potential claim."

23          Whether or not the folks that Mr. Weisfelner and

24   Mr. Esserman and Mr. Weintraub represent are known

25   Creditors, it is indisputable that old GM knew enough that

Page 154

1    it should have afforded them more notice under the DPWN

2    test.  And Your Honor shouldn't take my word for the fact

3    that the DPWN test now guides evaluations of due process not

4    just in a post-discharge context, but across all bankruptcy

5    contexts, Your Honor may be aware that Judge Gropper issued

6    an opinion in the Direct Access bankruptcy last month on

7    January 6th, the Westlaw site is 2015 WL 94556, and in doing

8    so, Judge Gropper was asked to pass on whether or not a

9    claimant could file a late Proof of Claim after a

10   confirmation order.  Judge Gropper writes as follows, Your

11   Honor: "In DPWN holdings, the Second Circuit recently set

12   forth the showing that a party must make, in order to obtain

13   the right to pursue a claim that otherwise would be barred

14   by virtue of a Debtor's bankruptcy"  It wasn't conditioned

15   on what kind of case we were talking about or what stage in

16   the bankruptcy we were at.  Judge Gropper interpreted the

17   DPWN case to be the guiding analysis for any time someone

18   comes before this Court or a District Court and says, "I

19   have a claim," and the Defendant says, "No, no, no, you're

20   barred by a sale order and an injunction," or, "You're

21   barred by some other order in bankruptcy."

22          So under that analysis, Your Honor, the DPWN

23   analysis, we would respectfully submit that old GM knew or

24   should have known of the potential claims that folks like

25   Mr. Weisfelner's clients would have had, even if they didn't

Page 155

1    have a bunch of lawsuits before them, even if they didn't

2    make the list of Creditors, even if they didn't appear on

3    the general ledger.  The had sufficient knowledge within the

4    company, based on their books and records, construed more

5    broadly, that they should have provided notice of the

6    potential liability before the sale.

7            Now, Your Honor asked an inform question earlier

8    today, which was, "What should that notice have looked

9    like?"  And I think you've heard from Mr. Weintraub and

10   others about what that might have looked like.  Let me

11   underscore Mr. Weintraub's presentation and say, we believe

12   that the right notice here would have looked like the

13   Chemtura situation, and respectfully, while Your Honor

14   identifies that as a situation in which Your Honor approved

15   best practices, and certainly, I'll agree that Judge Furman

16   in affirming that, agreed that maybe that wasn't what was

17   constitutionally mandated under the facts of that case, I

18   think the type of notice provided there is constitutionally

19   mandated in this case.  You have a situation where on the

20   factual record, Mr. Weisfelner has already convinced Your

21   Honor that old GM knew enough that it should have issued a

22   recall in respect of the subject vehicles.  On those facts,

23   why it's not the case that the publication notice should

24   have said, "There is a safety defect of a serious dimension

25   in these makes and models of vehicles, and if you believe

Page 156

1    you have been injured by that, now is the time to come

2    forward.  There will be a hearing about the sale."  That is

3    essentially what was provided in the Chemtura case where the

4    manufacturer understood that a chemical that it produced --

5              THE COURT:  Chemtura was a claims case, that the

6    people worked in factories where diacetyl was used.

7              MS. RUBIN:  Yes, Your Honor.

8              THE COURT:  It wasn't a 363 case.

9              MS. RUBIN:  Well, that's true, Your Honor, it

10   wasn't a 363 case, but respectfully, Your Honor, courts in

11   this District and Circuit and others, borrow, with respect

12   to what notice is constitutionally mandated, from context to

13   context all the time.

14             THE COURT:  Yes, but you would agree, I take it

15   that, Mullaney talks baby talk about the need to look at the

16   facts and circumstances.

17             MS. RUBIN:  Sure, and Your Honor, I'd also agree

18   that the facts --

19             THE COURT:  As do the other cases, the Second

20   Circuit cases such as Drexel Burnham implementing the

21   Mullaney.

22             MS. RUBIN:  Sure, but Your Honor, I would also

23   say, that in talking about 363 cases or otherwise, the

24   fundamentals of notice, the cornerstones of notice, or not

25   only notice of one's claim, but the opportunity to be heard,

Page 157

1    and that doesn't change from context to context, and if we

2    are going to follow the dictates of Mullaney and talk about

3    the facts and circumstances of this case, I think if Your

4    Honor is willing to find that old GM knew enough that it

5    should have recalled the vehicles, certainly it knew enough

6    in those circumstances that it should have incorporated in a

7    publication notice, enough information to put people like

8    Mr. Weisfelner's clients, that if they believed they had a

9    claim, now was the time to come forward.  They didn't have

10   to necessarily say, "If you believe you've suffered an

11   economic loss or diminution of value in your car or lost

12   wages," or any of that, that's not the claim-specific notice

13   that we're talking about.  But they should have apprised

14   people in the Plaintiffs' position of the facts and

15   circumstances that underlie their case, that there was a

16   serious ignition switch defect that ran throughout the

17   subject vehicles, that was serious enough to warrant a

18   recall, and therefore, anyone who believes that they have

19   been injured thereby, should come forth and file a claim.

20          Now, Your Honor, there has been a lot made out of

21   the fact that 363 is sort of a separate situation, and I

22   think Your Honor just alluded to it, that in discharge cases

23   or confirmation cases, maybe notice doesn't mean what it

24   should mean in a 363 case.  But I'll have your -- I'll say

25   for Your Honor's sake, DPWN, at the District Court level,

Page 158

1    which was a known Creditor case, right, DHL didn't know that

2    it has an antitrust claim against United Airlines.  They

3    certainly knew that they were a Creditor, they were

4    certainly apprised of the bankruptcy, and deciding what

5    notice is due to DHL, what did the Eastern District -- how

6    did the Eastern District make that decision?  Well, they

7    borrowed from the Grumman case, which is, in fact, a 363

8    case.

9            Similarly, in the Schwinn case in the Northern

10   District of Illinois, a 363 case involving a purchaser of an

11   exercise bike in 1979, whose grandson is not injured until

12   well after the bankruptcy in the 90s, what does that case

13   do?  It borrows from the Chemtron case in the Third Circuit,

14   which again, is a discharge case.  So, I would submit to

15   Your Honor that what is fundamentally required for notice

16   before depriving someone of a property interest, the facts

17   and circumstances of the cases might change in terms of

18   dictating what form of notice is required, but the content

19   has to be informed by a larger body of case law that is

20   transferrable from one context to the other.

21           It's also true that the idea that none of the

22   Plaintiff's property interests here were affected is sort of

23   a preposterous one, right?  And to the extent that new GM

24   tries to distinguish some of the 363 cases outside this

25   Circuit by saying, "Well, those cases involve property

Page 159

1    interests that were unique and couldn't have been reduced to

2    money," that's actually not true.  First of all, those cases

3    were all decided on grounds other than the type of interest

4    invoked, and Rule 60(b) was considered in all of them.

5              I'll talk about the poly --

6              THE COURT:  Wait, time out.  You said 60(b) was

7    considered?

8              MS. RUBIN:  It was considered, and in each of

9    those cases, Polycel, Metzger, and Compak, after referring

10   to Rule 60(b), each of the courts nonetheless held that the

11   claimant before it should be exempt from the sale order, on

12   the basis that the due process rights were violated.  I'll

13   quote to you, Your Honor from the Metzger case, where, after

14   considering Rule 60(b), for example, the Court said, "The

15   Court has some flexibility in creating a remedy here, and

16   need not and will not find the entire sale void."  But

17   nonetheless, the Court held that it would find that the sale

18   was void as to the claimant before it.

19             THE COURT:  Well, there was no question that

20   Arthur Weissbrodt said that, but I don't have a memory of

21   him discussing the criteria for granting 60(b) relief, and

22   if you say that he mentioned it, and I'm not (indiscernible)

23   to Ms. Rubin, but there was not a material discussion of

24   60(b), was there?

25             MS. RUBIN:  Your Honor, I don't have the case

Page 160

1    right in front of me and I'm unable to answer that question

2    directly, but my recollection is that in at least two of

3    these three cases, there is a discussion by the Defendant

4    that 60(b) only allows for voiding the entire sale order or

5    providing no relief, and in each of those cases, there's a

6    rejection, either implicitly or explicitly, of that theory.

7    So, for example, in the Compaq case -- you know, the other

8    thing I would say, Your Honor, is that certain of these

9    Courts say that notwithstanding Rule 60(b), Rule 60(b) is

10   only one way of getting there.  So, for example, in the

11   Compaq case, the Court says, "There's not a Rule 60(b)

12   motion before me, but sua sponte, I can characterize the

13   relief that this claimant is asking for as a 60(b) motion,

14   or alternatively, I can see this as a motion for relief from

15   the sale order."  That's an implicit recognition that 60(b)

16   is not the only vehicle by which you can remediate a due

17   process violation.  So, respectfully, GM's assertion that

18   the Plaintiffs here have to conform and shoehorn their

19   arguments into a 60(b) analysis in order to prevail is

20   simply not the case.  You have an implicit recognition in

21   the Compaq case that that's true, and more importantly, in

22   this District, let me refer Your Honor to the Lehman

23   Brothers decision that new GM cites in its brief at 2014 WL

24   7229473.  Now, Judge Buchwald in that situation determined

25   that the Creditor, who was making arguments before her, in

Page 161

1    fact didn't qualify as a Creditor at all, but in clarifying

2    the narrowness of her holdings, she said as follows, Your

3    Honor: "We do not decide to question whether a person with a

4    cognizable property interest may attack a final free and

5    clear sale order in the absence of notice," and then,

6    following that immediately with this sentence: "Nor do we

7    decide whether the lack of notice could be grounds…" there

8    is an ellipses here, "for relief from a sale order under

9    Rule 60(b)."  So, you have a District Court Judge in this

10   District, implicitly recognizing that a due process claim,

11   meaning, I didn't get notice of the way in which my property

12   interests would be affected here, could be different from a

13   Rule 60(b) motion.

14        THE COURT:  I'm not sure if I heard you right.  I

15   thought you preceded each of those two sentences by "We do

16   not decide that."

17        MS. RUBIN:  And I did, Your Honor, but I still see

18   the case as standing for a recognition, as a District Court

19   Judge in this District, recognizing that these are two

20   alternative ways of getting to the same place.  I'll

21   recognize that that's dicta.  Judge Buchwald didn't reach

22   those issues in her decision, and she's very clear about

23   that, but notwithstanding that, in clarifying to the larger

24   community reading her decision what she is and is not

25   deciding, she is saying expressly, "I see these things as

Page 162

1   possibly two different avenues for relief," and I think it

2   just underscores the fact that in the Compaq decision, for

3   example, the Court says the same thing. "I don't have a

4   Rule 60(b) motion before me. I can sua sponte interpret the

5   arguments that are being made before me as a 60(b) motion,

6   or alternatively, I can grant relief from the sale order."

7   That doesn't sound to me like the musings of a Judge who

8   believes that 60(b) is the only vehicle by which someone who

9   has a due process argument can seek relief from the sale

10  order.

11          Your Honor, I'll move on to talk about remedy, and

12  I'll note that the primary cases on which new GM depends are

13  the Edwards case, and they also place a lot of emphasis on

14  the Paris case, which hasn't been discussed directly by

15  name, but the general principle has been alluded to a lot

16  here, that's the case --

17          THE COURT: Paris?

18          MS. RUBIN: Yes.

19          THE COURT: Mr. Weisfelner had mentioned Paris.

20          MS. RUBIN: Well, I apologize to Mr. Weisfelner

21  for not hearing that. To the extent that the Court in Paris

22  is saying, "Your interests are not affected here because you

23  have a bunch of assets that can be converted and all

24  Creditors will have access to that." Your Honor, that may be

25  fine and well if we were here four years ago, or five years

Page 163

1    ago, but that's not where we are now, and I think to not

2    appreciate the realities of where the GUC Trust finds itself

3    would be a disservice to everyone, right?  We have a

4    situation here where the GUC Trust has distributed 90 plus

5    percent of distributable assets.  We are three plus years

6    post-confirmation.  All of the remaining resources of the

7    GUC Trust have been reserved for express purposes as Your

8    Honor knows, we filed a quarterly GUC Trust report last

9    week.  There is literally nothing left right now for the

10   Plaintiffs here, and so to not -- if we're going to consider

11   who would be prejudiced by a remedy here or consider a

12   larger context of prejudice with respect to the remedy, I

13   think that has to be considered, too.

14            The final thing that I'll say, Your Honor, is the

15   notion that prejudice is somehow a required element of a due

16   process violation is creative, but not sustained by the case

17   law.  To the extent that old GM siphoned numbers --

18            THE COURT:  Time out.  Before you go too far, Ms.

19   Rubin --

20            MS. RUBIN:  Sure.

21            THE COURT:  -- I need to dust off with you the

22   colloquy I had with Mr. Weisfelner, because I would agree in

23   a heartbeat that you didn't make the supplemental

24   distribution to your constituency last year in the dead of

25   night, but you're saying -- you're talking about hardship,

Page 164

1    presumably to the economic loss Plaintiffs, or maybe Mr.

2    Weintraub's people or both.  At the same time that your

3    folks were the beneficiaries of Mr. Weisfelner's guys

4    decision for admitted strategic reasons, not to try to tap

5    those funds.  So you're trying to exploit the very situation

6    for which your guys were the beneficiary.

7              MS. RUBIN:  I don't believe that it's an attempted

8    exploitation at all, Your Honor.

9              THE COURT:  Well, I'm not accusing you of evil --

10             MS. RUBIN:  I respectfully disagree, if I can.

11             THE COURT:  I'm accusing you of representing a

12    client --

13             MS. RUBIN:  No.

14             THE COURT:  -- but isn't that the bottom line?

15             MS. RUBIN:  No, Your Honor, it's not, and here's

16    why.  Your Honor engaged in a colloquy earlier with Mr.

17    Weisfelner, well first of all, to the extent that you

18    engaged in the colloquy earlier with Mr. Weisfelner also

19    about the efficacy of the bar date notice, correct?  It may

20    be that the bar date notice was not effective as to certain

21    of these Plaintiffs, but the sale notice wasn't effective as

22    to them either, and they had a choice to make at the outset.

23    It's undisputed that they didn't know about the defect in

24    the subject vehicles until around February of 2014, but at

25    that point in time, they made a choice, and they made a

Page 165

1    choice to go after new GM.  They never once filed a claim or

2    sought to file a late proof of claim against the GUC Trust.

3           When there were the initial motions to enforce a

4    few months later, and we came before this Court, the

5    Plaintiffs filed an objection, they filed an adversary

6    proceeding complaint, those issues were not raised there

7    either, and when we first came before Your Honor, let's

8    rehash how the GUC Trust came to be a party here.  It wasn't

9    on motion or any suggestion by the Plaintiffs.  It was on

10   suggestion by new GM, who said the Plaintiffs should be

11   forced and shoehorned into going after the GUC Trust.  But

12   we don't believe that the Plaintiffs should have to do that.

13   We believe that the Plaintiffs' due process rights were

14   violated, and so in making that distribution, I wouldn't

15   characterize it as an exploitation at all.  I would say that

16   my client was well within its rights to distribute assets to

17   its existing beneficiaries, consistent with its fiduciary

18   duties and the documents that govern it.

19           Your Honor, if I can return to prejudice?

20           THE COURT:  Yeah, go ahead.

21           MS. RUBIN:  The notion that prejudice is a

22   required element of a due process violation here, I think,

23   is a fiction, and in advancing that argument, new GM relies

24   on two different strands of cases: one are cases in which,

25   despite a notice defect, the claimants still have an

Page 166

1    opportunity to be heard, and that's particularly true of the

2    cases that they cite within this District.  The Parker case,

3    I think, is a paradigmatic example of that.  The Plaintiff

4    in that case came forward and said they were deprived of

5    their due process rights, but Your Honor found that,

6    notwithstanding that, the guy cross-examined two of the

7    three witnesses during the sale hearing, received ample

8    discovery.  There was no due process violation because he

9    had an opportunity to be heard.  That certainly was not the

10   case with respect to any of the Plaintiffs here, against

11   whom the notice couldn't have possibly been effective,

12   because to just get the notice without notice of their claim

13   is, as Mr. Weisfelner recognized in the Waterman case, no

14   different than being apprised of your claim and not being

15   apprised of the bankruptcy.

16          The other cases that they cite are entirely far of

17   field from bankruptcy altogether.  Most of them involve

18   procedural irregularities, like failure to enter a

19   substitution of counsel order, and notwithstanding that, the

20   new counsel still gets to be heard, or listing the wrong

21   statute in an administrative proceeding on the cover, where

22   everybody knows what's really at issue.  That's certainly

23   not the case in which we found ourselves, so it takes a lot

24   of creativity to cleave onto the due process standard in

25   this Circuit, some prejudice standard.  The Manville case

Page 167

1    and the Cope case that Your Honor referred to earlier, we

2    understand and appreciate those aren't 363 cases.  But to

3    conclude, Your Honor, we would suggest that those should be

4    your guiding principles.  Those are recognitions by the

5    Second Circuit that in a bankruptcy situation, no party can

6    be deprived of a property interest without adequate notice

7    of their claim.

8              Everybody understands, here, that that's not what

9    happened, and to the extent that Your Honor is willing to

10   find on this stipulated factual record, that old GM had

11   sufficient knowledge that it should have recalled the

12   vehicles, it should also be the case that they had

13   sufficient knowledge to put into a publication notice, if

14   not actual mailed notice to all of the people that Mr.

15   Weisfelner and Mr. Esserman and Mr. Weintraub represent.  It

16   should have put into that notice greater content to afford

17   people a better and more complete, and consistent with due

18   process, a constitutional understanding of what their claims

19   are.  And with that, Your Honor, I'll rest.

20             THE COURT:  All right, thank you.  Okay, Mr.

21   Steinberg?

22             MR. STEINBERG:  Your Honor, do we have a stop at a

23   quarter after three today?

24             THE COURT:  Yes.

25             MR. STEINBERG:  I'm not sure if I'll finish with