# <u>Exhibit A</u>

# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036-4003

Tel: (212) 556-2100
Fax: (212) 556-2222
www.kslaw.com

Arthur Steinberg
Direct Dial: 212-556-2158
asteinberg@kslaw.com

September 23, 2015

**VIA E-MAIL TRANSMISSION**
**AND ECF FILING**
The Honorable Robert E. Gerber
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
Alexander Hamilton Custom House
One Bowling Green
New York, New York 10004

Re:     In re Motors Liquidation Company, *et al.*
        Case No. 09-50026 (REG)

Dear Judge Gerber:

Pursuant to page 5 of Your Honor's September 3, 2015 *Scheduling Order* (Dkt. No. 13416), we submit this Letter regarding the claims made in Other Plaintiffs' Complaints against New GM that violate the Sale Order and Judgment, but are not raised by the Bellwether Complaints, the MDL Complaint or the States' Complaints (collectively, the "**Main Cases**").[1]  Because of the large volume of papers already submitted (and to be submitted) to the Court pursuant to the Scheduling Order, for efficiency purposes, New GM is only identifying at this time the specific claims in the Other Plaintiffs' Complaints that violate the Sale Order and Judgment.  New GM believes that submitting marked-up versions of the Other Plaintiffs' Complaints is not necessary for the Court to rule on the issues raised in this Letter.  If the Court decides it would be helpful to have marked-up versions of the Other Plaintiffs' Complaints, we will promptly submit them.

Set forth below are claims in Other Plaintiffs' Complaints that violate the Sale Order and Judgment, with an explanation of New GM's position and references to representative cases where the issue is raised.[2]

---

[1] The issues raised by the Other Plaintiffs' Complaints are found in multiple cases filed against New GM.  Pursuant to the Scheduling Order, New GM was permitted to identify "representative cases" that raise these issues. New GM's arguments are applicable to all such cases, and any rulings by the Court should be binding on all plaintiffs in such cases.

[2] New GM reserves the right to supplement this Letter if it becomes aware of other claims, not in the Main Cases or referenced in this Letter, that violate the Sale Order and Judgment.

Honorable Robert E. Gerber
September 23, 2015
Page 2

*Failure to Recall / Retrofit Vehicles* (*e.g. Moore v. Ross, et al.*, No. 2011-CP-42-3625, 4th Am. Complaint at p. 3 ¶¶ f, g (S.C. 7th Cir. Ct. Com. Pl.) (**Exh. "A" hereto**)): These claims allege that New GM had a duty to recall or retrofit Old GM vehicles. But such claims, if they exist as a matter of law at all, are Retained Liabilities. Once New GM purchased Old GM's assets free and clear of claims and obligations relating to Old GM vehicles, New GM (an entity that did not manufacture or sell the Old GM vehicles at issue) did not have any ongoing duties to Old GM vehicle owners (other than specific Assumed Liabilities). Although New GM had obligations under the Motor Vehicle Safety Act and to the U.S. Government based on a covenant in the Sale Agreement ("**Recall Covenant**"), this covenant was not an Assumed Liability. Vehicle owners were not third party beneficiaries under the Sale Agreement, and did not have a private right of action relating to any breach of the Recall Covenant. *See New GM's Opening Brief With Respect to the Imputation Issue*, Dkt. No. 13451 at 17-18; *New GM's Letter Brief re Bellwether Complaints*, Dkt. No. 13456, at 3. Thus, claims for failure to recall or retrofit the vehicles violate the Sale Order.

*Negligent Failure to Identify Defects Or Respond To Notice of a Defect* (*e.g., Benbow v. Medeiros Williams, Inc., et al.*, No. 14 789, Complaint ¶ 16 (Mass. Hampden Cty. Super. Ct.) (**Exh. "B" hereto**)): These claims purport to allege that New GM should have identified the defect earlier and taken some sort of action in response. These are Retained Liabilities for the same reasons as the claims based on an alleged failure to recall or retrofit Old GM vehicles. Such duties with respect to Old GM vehicles remained with Old GM.

*Negligent Infliction of Economic Loss and Increased Risk* (*e.g., Elliott v. General Motors LLC*, No. 1:14-cv-00691, 1st Am. Complaint ("***Elliott* Complaint**") ¶¶ 79-86 (D.D.C.) (**Exh. "C" hereto**)):[3] This claim alleges that New GM had a duty to warn consumers about the alleged defect but instead concealed it, and by doing so, the economic value of plaintiffs' vehicles was diminished. This claim violates the Sale Order for the reasons set forth in New GM's Bellwether Complaints letter relating to economic loss failure-to-warn claims and fraud claims. Dkt. No. 13456 at 2-3; *see also* the forthcoming *New GM Marked MDL Letter*. Such claims are economic loss claims that relate to Old GM conduct at the time the vehicle was sold. They do not "arise directly out of death, personal injury or other injury to Persons or damage to property caused by accidents or incidents," and are not otherwise Assumed Liabilities.

*Civil Conspiracy* (*e.g., De Los Santos v. Ortega, et al.*, No. 2014CCV-6078802, 1st Am. Petition ¶¶ 50-51 (Tex. Nueces Cty. Ct.) (**Exh. "D" hereto**)):[4] These claims allege that New GM was involved in a civil conspiracy with others to conceal the alleged ignition switch defect. Such claims are based on representations, omissions, or other alleged acts relating to the supposed concealment rather than, as set forth in the Sale Agreement, being "caused by motor vehicles," "aris[ing] directly out of" personal injury or property damages, and being "caused by accidents or incidents." *See also* Dkt. No. 13451 at 18-19; Dkt. No. 13456, at 2-3. As such, these claims are not Product Liabilities, and thus not Assumed Liabilities under the Sale Agreement.

---

[3] The same claim is asserted in *Sesay et al. v. General Motors LLC*, No. 1:14-md-02543, Complaint ("***Sesay* Complaint**") ¶¶ (69-76).

[4] Claims for "Civil Conspiracy, Joint Action or Aiding and Abetting" are also asserted in the *Elliott* Complaint (¶¶ 114-123), *Sesay* Complaint (¶¶ 85-94), and the complaint filed in *Bledsoe v. General Motors LLC*, No. 1:14-cv-07631 (S.D.N.Y.), ¶¶ 115-121.

Honorable Robert E. Gerber
September 23, 2015
Page 3

      *Section 402B – Misrepresentation by Seller* (*e.g.*, *Rickard v. Walsh Const. Co. et al.*, No. GD-14-020549, Am. Complaint ¶¶ 73aaa-73ccc (Pa. Allegheny Cty Ct. Com. Pleas) (**Exh. "E" hereto**)):[5]  These types of claims are based on alleged representations or omissions, and do not satisfy the definition of Product Liabilities because such claims are not "caused by motor vehicles," but are instead caused by statements or omissions.  They also do not "arise directly out of" personal injuries or property damages and are not "caused by accident or incidents."  Instead, they arise from and are caused by statements, omissions or other Old GM conduct.  Such representation or omission-based claims were not assumed by New GM.

      *Claims Based on Pre-Sale Accidents* (*e.g.*, *Coleman v. General Motors LLC*, *et al.*, No. 1:15-cv-03961, Complaint (E.D. La.) (**Exh. "F" hereto**)):  The Judgment authorized New GM to send letters to plaintiffs who filed lawsuits asserting claims based on accidents that occurred prior to the 363 Sale, and set forth procedures with respect to such letters and potential responses.  The Scheduling Order superseded certain procedures in the Judgment.  As a result, New GM includes herein a representative example of complaints that assert claims based on pre-363 Sale accidents.  For the reasons set forth in the Sale Agreement, the Decision and the Judgment, New GM is not liable for claims based on accidents that occurred prior to the closing of the 363 Sale.  The Sale Agreement is clear that Retained Liabilities (as defined in Section 2.3(b) of the Sale Agreement) of Old GM specifically include "all Product Liabilities arising in whole or in part from any accidents, incidents or other occurrences that happen prior to the Closing Date[.]"  Sale Agreement, § 2.3(b)(ix); *see also Judgment*, ¶ 7.  Thus, lawsuits filed against New GM that are based on accidents or incidents occurring prior to the closing of the 363 Sale should be dismissed as provided by the Judgment.

                            Respectfully submitted,

                            */s/ Arthur Steinberg*

                            Arthur Steinberg

AJS/sd

cc:    Edward S. Weisfelner
       Howard Steel
       Sander L. Esserman
       Jonathan L. Flaxer
       S. Preston Ricardo
       Matthew J. Williams
       Lisa H. Rubin
       Keith Martorana
       Daniel Golden

---

[5] Plaintiff filed with this Court a *No Dismissal Pleading Of Carolyn Rickard, Administratrix Of The Estate Of William J. Rickard, Deceased*, dated September 4, 2015 [Dkt. No. 13423].  This letter, and New GM's other letters and pleadings filed pursuant to the Scheduling Order should be deemed its response to the *Rickard* No Dismissal Pleading.

Honorable Robert E. Gerber
September 23, 2015
Page 4

      Deborah J. Newman
      Jamison Diehl
      William Weintraub
      Steve W. Berman
      Elizabeth J. Cabraser
      Robert C. Hilliard
      Gary Peller

# Exhibit A

JAMES WALTER MOORE v. GM, ET AL.

JAIMIE REDA MOORE v. GM, ET AL.

STATE OF SOUTH CAROLINA        )        IN THE COURT OF COMMON PLEAS
                               )        SEVENTH JUDICIAL CIRCUIT
COUNTY OF SPARTANBURG          )
                               )
James Walter Moore,            )
                               )        C.A. No. 2011-CP-42-3625
          Plaintiff,           )
                               )
   vs.                         )        **FOURTH AMENDED COMPLAINT**
                               )        (Jury Trial Demanded)
Anthony Wade Ross, General Motors, LLC )
Dura Automotive Systems, Inc., Dura    )
Operating LLC, Sparton Corporation, and )
Sparton Engineered Products, Inc. – Flora )
Group,                         )
                               )
          Defendants.          )
_____)

Plaintiff would respectfully show unto this Court:

### FOR A FIRST CAUSE OF ACTION

1.    Plaintiff is a citizen and resident of Spartanburg County, South Carolina.

2.    Plaintiff is informed and believes that the Defendant Anthony Wade Ross is a

citizen and resident of Spartanburg County, South Carolina.

3.    Plaintiff is informed and believes that Defendant General Motors, LLC is a

Delaware corporation, doing business in Spartanburg County, South Carolina, and is legally

responsible for vehicles manufactured by General Motors Corporation (n/k/a Motors Liquidation

Company).

4.    Plaintiff is informed and believes that the Defendant Dura Automotive Systems,

Inc., is a corporation organized and existing under and by virtue of the laws of the state of

Michigan or one of the other states of the United States of America, doing business throughout

the United States.

5.      Plaintiff is informed and believes that Dura Operating, LLC is a corporation organized and existing under and by virtue of the laws of the state of Delaware or one of the other states of the United States of America, doing business throughout the United States, and is a wholly-owned subsidiary of Defendant Dura Automotive Systems, Inc.

6.      Plaintiff is informed and believes that the Defendant Sparton Corporation is a corporation organized and existing under and by virtue of the laws of the state of Ohio or one of the other states of the United States of America, doing business throughout the United States.

7.      Plaintiff is informed and believes that Defendant Sparton Engineered Products, Inc. – Flora Group, is a corporation organized and existing under and by virtue of the laws of the state of Illinois or one of the other states of the United States of America, doing business throughout the United States, and is a wholly-owned subsidiary of Defendant Sparton Corporation.

8.      On or about August 8, 2011, the Plaintiff was traveling in a northeasterly direction on Interstate Highway 85 when the spare tire of the Defendant Ross fell from the 1996 GMC pickup truck that the Defendant Ross was driving, into the path of the Plaintiff.  In attempting to avoid the tire, the vehicle of the Plaintiff struck a barrier and overturned.  The truck being operated by the Defendant Ross was manufactured by General Motors Corporation (n/k/a Motors Liquidation Company), for whose acts the Defendant General Motors, LLC, is responsible.  Upon information and belief, the spare wheel retaining device (device) on this vehicle was designed, manufactured, and/or distributed by one or more of the Defendants: Dura Automotive Systems, Inc.; Dura Operating, LLC; Sparton Corporation; and Sparton Engineered Products, Inc. – Flora Group.

9. As a direct and proximate result, the Plaintiff suffered severe disabling and incapacitating injuries, all of which have caused and will in the future cause the Plaintiff to endure great physical and mental pain and suffering, to require extensive medical treatment and care for the rest of his life, and will prevent him from working and earning an income.

10. The injuries and damages suffered by the Plaintiff herein were the direct and proximate result of the following negligent, wilful, wanton, careless, reckless, and grossly negligent acts of the Defendants herein at the time and place above mentioned:

### AS TO THE DEFENDANT ANTHONY WADE ROSS

a) Failing to maintain his vehicle in a proper condition;

b) Failing to have his vehicle properly secured and serviced; and

c) Operating his vehicle in an unsafe manner.

All of which are in violation of the common statutory laws of the state of South Carolina as wel as the rules and regulations of the South Carolina Department of Transportation.

### AS TO THE DEFENDANT
### GENERAL MOTORS, LLC

a) Failing to design the vehicle properly;

b) Failing to manufacture the vehicle properly;

c) Failing to inspect the vehicle properly;

d) Failing to test the vehicle properly;

e) Failing to warn owners and the public as to the dangerous defect in this vehicle;

f) Failing to recall vehicles with this dangerous condition; and

g) Failing to retrofit vehicles with this dangerous condition.

### AS TO THE DEFENDANTS
### DURA AUTOMOTIVE SYSTEMS, INC.,
### DURA OPERATING, LLC,
### SPARTON CORPORATION, AND

## SPARTON ENGINEERED PRODUCTS,
## INC. – FLORA GROUP

a) Failing to design the device properly;

b) Failing to manufacture the device properly;

c) Failing to test the device properly;

d) Failing to warn owners of the vehicles and the public as to the dangerous defect in

   this device;

e) Failing to recall the device; and

f) Failing to retrofit vehicles using the device.

## FOR A SECOND CAUSE OF ACTION
## AS TO DEFENDANTS GENERAL MOTORS, LLC,
## DURA AUTOMOTIVE SYSTEMS, INC.,
## DURA OPERATING, LLC
## SPARTON CORPORATION, AND
## SPARTON ENGINEERED PRODUCTS,
## INC. – FLORA GROUP

11.     Plaintiff reiterates and realleges all of the allegations contained in Paragraphs One

(1) through Nine (9) of the First Cause of Action as fully as though set forth verbatim.

12.     The 1996 pickup truck and the device were in defective condition and

unreasonably dangerous to the consumer.

13.     As a direct and proximate result, the Plaintiff suffered severe disabling and

incapacitating injuries, all of which have caused and will in the future cause the Plaintiff to

endure great physical and mental pain and suffering, to require extensive medical treatment and

care for the rest of his life, and will prevent him from working and earning an income.

14.     Plaintiff is informed and believes that he is entitled to such actual damages from

the Defendants General Motors, LLC, Dura Automotive Systems, Inc., Dura Operating, LLC,

Sparton Corporation, and Sparton Engineered Products, Inc. – Flora Group, as the jury may

determine.

**WHEREFORE**, Plaintiff prays judgment against the Defendants for such actual and punitive damages as the jury may determine, for the costs of this action and for such other and further relief as may seem just and proper.

**THE ANTHONY LAW FIRM, P.A.**

Kenneth C. Anthony, Jr., S.C. Bar No. 0404
K. Jay Anthony, S.C. Bar No. 77433
250 Magnolia Street (29306)
P.O. Box 3565 (29304)
Spartanburg, South Carolina
(864) 582-2355 p
(864) 583-9772 f

**ATTORNEYS FOR THE PLAINTIFF**

Spartanburg, South Carolina
July  29  , 2014

Jury Trial Demanded:

Kenneth C. Anthony, Jr.
Attorney for Plaintiff

| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
|---|---|---|
| | ) | SEVENTH JUDICIAL CIRCUIT |
| COUNTY OF SPARTANBURG | ) | |

STATE OF SOUTH CAROLINA )  IN THE COURT OF COMMON PLEAS
                         )  SEVENTH JUDICIAL CIRCUIT
COUNTY OF SPARTANBURG )
                         )
Jaimie Reda Moore,       )
                         )
            Plaintiff,   )      C.A. No. 2011-CP-42-3627
                         )
     vs.                 )
                         )  **FOURTH AMENDED SUMMONS**
                         )  (Jury Trial Demanded)
Anthony Wade Ross, General Motors, LLC )
Dura Automotive Systems, Inc., Dura    )
Operating LLC, Sparton Corporation, and )
Sparton Engineered Products, Inc. – Flora )
Group,                   )
                         )
            Defendants.  )
_____)

TO THE DEFENDANTS ABOVE NAMED:

You are hereby summoned and required to answer the Complaint, herewith served upon you, (which was filed in the Office of the Clerk of Court), and to serve a copy of your answer to same upon the subscriber at 250 Magnolia Street, Post Office Box 3565, Spartanburg, South Carolina, 29304, within thirty (30) days after the service hereof, exclusive of the day of such service. If you fail to answer within that time, you will be considered to be in default and the Plaintiff will move before the Court for the relief demanded in the Complaint.

**THE ANTHONY LAW FIRM, P.A.**

Kenneth C. Anthony, Jr., S.C. Bar No. 0404
K. Jay Anthony, S.C. Bar No. 77433
P.O. Box 3565 (29304)
250 Magnolia Street (29306)
Spartanburg, S.C.
(864) 582-2355 p
(864) 583-9772 f
kanthony@anthonylaw.com

**ATTORNEYS FOR THE PLAINTIFF**

July 29, 2014
Spartanburg, South Carolina

STATE OF SOUTH CAROLINA )

COUNTY OF SPARTANBURG )

                IN THE COURT OF COMMON PLEAS

Jaimie Reda Moore,                    )

         Plaintiff,                    )

vs.                                        )

Anthony Wade Ross, General        )
Motors, LLC, Dura Automotive      )
Systems Inc., Dura Operating LLC,)
Sparton Corporation, and Sparton  )
Engineered Products, Inc. - Flora   )
Group,                                      )

        Defendants.                    )

              **FOURTH
AMENDED COMPLAINT**
Case No.: 2011-CP-42-3627
(Jury Trial Demanded)

Plaintiff would respectfully show unto this Court:

### FOR A FIRST CAUSE OF ACTION

1.     Plaintiff is a citizen and resident of Spartanburg County, South Carolina.

2.     Plaintiff is informed and believes that the Defendant Anthony Wade Ross is

a citizen and resident of Spartanburg County, South Carolina.

3.     Plaintiff is informed and believes that the Defendant General Motors, LLC,

is a Deleware corporation, doing business in Spartanburg County, South Carolina, and is a

legally responsible for vehicles manufactured by General Motors Corporation (n/ka

Motors Liquidation Company).

4.     Plaintiff is informed and believes that the Defendant Dura Automotive

Systems, Inc., is a corporation organized and existing under and by virtue of the laws of

the state of Michigan or one of the other states of the United States of America, doing

business throughout the United States.

5.      Plaintiff is informed and believes that Dura Operating, LLC is a corporation organized and existing under and by virtue of the laws of the state of Delaware or one of the other states of the United States of America, doing business throughout the United States, and is a wholly-owned subsidiary of Defendant Dura Automotive Systems, Inc.

6.      Plaintiff is informed and believes that the Defendant Sparton Corporation is a corporation organized and existing under and by virtue of the laws of the state of Ohio or one of the other states of the United States of America, doing business throughout the United States.

7.      Plaintiff is informed and believes that Defendant Sparton Engineered Products, Inc. – Flora Group, is a corporation organized and existing under and by virtue of the laws of the state of Illinois or one of the other states of the United States of America, doing business throughout the United States, and is a wholly-owned subsidiary of Defendant Sparton Corporation.

8.      On or about August 8, 2011, the Plaintiff's husband was traveling in a northeasterly direction on Interstate Highway 85 when the spare tire of the Defendant Ross fell from the 1996 GMC pickup truck that the Defendant Ross was driving, into the path of Plaintiff's husband.  In attempting to avoid the tire, the vehicle in which the Plaintiff's husband was driving, struck a barrier and overturned.   The truck being operated by the Defendant Ross was manufactured by General Motors Corporation (n/k/a Motors Liquidation Company), for whose acts for the Defendant General Motors, LLC, is responsible.  Upon information and belief, the spare wheel retaining device (device) on this vehicle was designed, manufactured and/or distributed by one or more of the Defendants: Dura Automotive Systems, Inc.; Dura Operating, LLC; Sparton Corporation; and Sparton Engineered Products, Inc. - Flora Group.

9.      As a direct and proximate result, the Plaintiff's husband suffered severe disabling and incapacitating injuries.

10. As a further direct and proximate result, the Plaintiff has suffered as follows:

a) Experiencing shock, grief and anguish from having seen her husband so injured, watching and assisting in his protracted recovery and viewing the disability with which he now suffers;

b) Losing the care and companionship normally received from her husband;

c) Losing the services and assistance in household chores, repairs, maintenance and other activities usually provided by her husband;

d) Having to care for and assist her husband during his recovery and after to a greater extent than before.

11. The injuries and damages suffered by the Plaintiff herein were the direct and proximate result of the following negligent, willful, wanton, careless, reckless and grossly negligent acts on the part of the Defendants herein at the time and place above mentioned:

## AS TO THE DEFENDANT
## ANTHONY WADE ROSS

a) Failing to maintain his vehicle in proper condition;

b) Failing to have his vehicle properly secured and serviced;

c) Operating his vehicle in an unsafe manner.

All of which are in violation of the common and statutory laws of the state of South Carolina as well as the rules and regulations of the South Carolina Department of Transportation.

## AS TO THE DEFENDANT
## GENERAL MOTORS, LLC

a) Failing to design the vehicle properly;

b) Failing to manufacture the vehicle properly;

c) Failing to inspect the vehicle properly;

d) Failing to test the vehicle properly;

e) Failing to warn owners and the public as to the dangerous defect in this vehicle;

f) Failing to recall vehicles with this dangerous condition; and

g) Failing to retrofit vehicles with this dangerous condition.

## AS TO THE DEFENDANTS
## AS TO DEFENDANTS GENERAL MOTORS, LLC,
## DURA AUTOMOTIVE SYSTEMS, INC.
## DURA OPERATING, LLC
## SPARTON ENGINEERED PRODUCTS,
## INC. - FLORA GROUP

a) Failing to design the device properly;

b) Failing to manufacture the device properly;

c) Failing to test the device properly;

d) Failing to warn owners of vehicles and the public as to the dangerous defect in this device;

e) Failing to recall the device; and

f) Failing to retrofit vehicles using the device.

## FOR A SECOND CAUSE OF ACTION
## AS TO DEFENDANTS GENERAL MOTORS, LLC,
## DURA AUTOMOTIVE SYSTEMS, INC.
## DURA OPERATING, LLC
## SPARTON ENGINEERED PRODUCTS,
## INC. - FLORA GROUP

12. Plaintiff reiterates and realleges all of the allegations contained in

Paragraphs One (1) through Ten (10) of the First Cause of Action as fully as though set

forth verbatim.

13.    The 1996 pickup truck and the device were in defective condition and unreasonably dangerous to the consumer.

14.    As a direct and proximate result, the Plaintiff's husband suffered severe disabling and incapacitating injuries.

15.    Plaintiff is informed and believes that she is entitled to such actual damages from the Defendants General Motors, LLC, Dura Automotive Systems, Inc., Dura Operating, LLC, Sparton Corporation, and Sparton Engineered Products, Inc. - Flora Group, as the jury may determine.

**WHEREFORE**, Plaintiff prays judgment against the Defendants for such actual damages as the jury may determine, for the costs of this action and for such other and further relief as the Court may deem just and proper.

**THE ANTHONY LAW FIRM, P.A.**

Kenneth C. Anthony, Jr., S.C. Bar No. 0404
K. Jay Anthony, S.C. Bar No. 77433
250 Magnolia Street (29306)
Post Office Box 3565 (29304)
Spartanburg, South Carolina
(864) 582-2355 p
(864) 583-9772 f

**ATTORNEYS FOR PLAINTIFF**

July 29, 2014
Spartanburg, South Carolina

Jury Trial Demanded:

Kenneth C. Anthony, Jr.
Attorney for Plaintiff

STATE OF SOUTH CAROLINA    )    IN THE COURT OF COMMON PLEAS
                                    )       SEVENTH JUDICIAL CIRCUIT

COUNTY OF SPARTANBURG    )

James Walter Moore,

        Plaintiff,                  C.A. No. 2011-CP-42-3625

    vs.

Anthony Wade Ross, General Motors, LLC      **FOURTH AMENDED SUMMONS**
Dura Automotive Systems, Inc., Dura          (Jury Trial Demanded)
Operating LLC, Sparton Corporation, and
Sparton Engineered Products, Inc. – Flora
Group,

        Defendants.

TO THE DEFENDANTS ABOVE NAMED:

You are hereby summoned and required to answer the Complaint, herewith served upon

you, (which was filed in the Office of the Clerk of Court), and to serve a copy of your answer to

same upon the subscriber at 250 Magnolia Street, Post Office Box 3565, Spartanburg, South

Carolina, 29304, within thirty (30) days after the service hereof, exclusive of the day of such

service. If you fail to answer within that time, you will be considered to be in default and the

Plaintiffs will move before the Court for the relief demanded in the Complaint.

**THE ANTHONY LAW FIRM, P.A.**

Kenneth C. Anthony, Jr., S.C. Bar No. 0404
K. Jay Anthony, S.C. Bar No. 77433
P.O. Box 3565 (29304)
250 Magnolia Street (29306)
Spartanburg, S.C.
(864) 582-2355 p
(864) 583-9772 f
kanthony@anthonylaw.com

**ATTORNEYS FOR THE PLAINTIFF**

July 29 , 2014
Spartanburg, South Carolina

STATE OF SOUTH CAROLINA )

COUNTY OF SPARTANBURG )

IN THE COURT OF COMMON PLEAS

James Walter Moore,

         Plaintiff,

vs.

Anthony Wade Ross , General
Motors, LLC and Dura
Automotive Systems, Inc., Dura
Operating LLC, Sparton
Corporation, and Sparton
Engineered Products, Inc. - Flora
Group,
         Defendants.

Case No.: 2011-CP-42-3625

**ACCEPTANCE OF SERVICE**

Jaimie Reda Moore,

         Plaintiff,

vs.

Anthony Wade Ross , General
Motors, LLC and Dura
Automotive Systems, Inc., Dura
Operating LLC, Sparton
Corporation, and Sparton
Engineered Products, Inc. - Flora
Group,
         Defendants.

Case No.: 2011-CP-42-3627

**ACCEPTANCE OF SERVICE**

DUE and legal service of the within **Fourth Amended Summons and Fourth Amended Compliant** is accepted and retained this _____ day of _____ 2014.

_____
Thomas M. Kennaday
Attorney for General Motors, LLC
Defendant

# Exhibit B

# COMMONWEALTH OF MASSACHUSETTS
## DEPARTMENT OF THE TRIAL COURT

HAMPDEN, ss.

SUPERIOR COURT
CIVIL ACTION NO:

## 14   789

RAMONA BENBOW,

       Plaintiff,

vs.

       **COMPLAINT AND REQUEST**

MEDEIROS WILLIAMS, INC.,
and
GENERAL MOTORS, LLC.,
and DRIVE USA 2, INC.

       **FOR JURY TRIAL**

       Defendants.

## PARTIES

1. The plaintiff, Ramona Benbow, is a natural person of legal age residing at 33 Genesee Street, First Floor, Springfield, Hampden County, Massachusetts.

2. The defendant, Medeiros Williams, Inc., (Formerly known as Medeiros / Williams Chevrolet, Inc.) (Hereinafter referred in this Complaint as "Medeiros Williams") was a corporation which was dissolved on December 28, 2012, but at all times relevant hereto conducted business in the Commonwealth of Massachusetts and had a usual place of business located at 2045 Boston Road, Wilbraham, MA.

3. The defendant, General Motors, LLC, (Formerly known as: General Motors Company and hereinafter referred in this complaint as "General Motors"), is a foreign limited liability company, which has its principal office at 300 Renaissance Center, Detroit, Michigan, and at all times relevant hereto was a Massachusetts corporation conducting business in the Commonwealth of Massachusetts and maintained an office in the Commonwealth, which is presently located at 84 State Street, Boston, Massachusetts.

4. The Defendant, Drive USA 2, Inc., was a domestic profit corporation involuntarily dissolved by court order or by the Secretary of the Commonwealth of Massachusetts on June 30, 2014, which had a principal place of business at 510 Boston Road, Springfield, Massachusetts, and which was doing business as "Drive USA".

## FACTS

5. On or about February 21, 2009, the plaintiff purchased a 2005 Chevrolet Malibu from the defendant, Drive USA 2 Inc., doing business as Drive USA, in Springfield, Massachusetts.

6.      Beginning in approximately January or February of 2010, the Plaintiff experienced periodic problems operating her 2005 Chevrolet Malibu when the power steering on the vehicle would stop functioning, thereby making it difficult to steer the vehicle in a safe manner.

7.      On March 1, 2010, the plaintiff brought her vehicle to Medeiros Williams. Employees at Medeiros Williams failed to diagnose any problem with the power steering. The plaintiff was sent on her way without being provided any further information nor was she given any options for correcting the periodic problem she experienced steering her vehicle in a safe manner. On this day, the mileage on plaintiff's vehicle was 101,257.

8.      In June, 2010,  the plaintiff, Ramona Benbow, received a notice from the defendant General Motors, notifying her of a possible defect in the power steering of her 2005 Chevrolet Malibu. The notice of defect stated that: "if this condition occurs on your 2005 Chevrolet Malibu within 10 years of the date your vehicle was originally placed in service or 100,000 miles whichever occurs first, the condition will be repaired for you at no charge." The notice of defect stated that the car could be safely steered despite the defect in the power steering.

9.      On the date she received the notice of the defect the plaintiff called the defendant, General Motors. The plaintiff was informed by General Motors that they would do nothing to assist her because of the amount of miles on her vehicle. She immediately informed General Motors that her vehicle was not safe to drive and asked for a Supervisor; however, nothing was done to assist or advise her.

10.     On the same day in June of 2010 the plaintiff called Medeiros Williams and spoke with a supervisor in the Service Department. She was told they would not fix the vehicle because the car was over mileage and that no defect had been detected by Medeiros Williams.

11.     On October 14, 2011, the plaintiff was operating her 2005 Chevrolet Malibu on Elm Street in East Longmeadow, Massachusetts when the vehicle lost power steering. She was not able to control the vehicle after the power steering was lost and was involved in a single car accident, sustaining serious personal injuries.

## COUNT I: MEDEIROS WILLIAMS, INC.
### NEGLIGENT FAILURE TO DIAGNOSE, AND/OR IDENTIFY DEFECT IN A MOTOR VEHICLE AND/OR REPAIR VEHICLE AND/OR NEGLIGENT FAILURE TO WARN

12.     The plaintiff reaffirms paragraphs one through eleven of this Complaint and repeats, realleges and incorporates them by reference herein.

13.     The defendant, Medeiros Williams, was negligent in said services provided to the plaintiff, including but not limited to:

-       Failure to properly identify a mechanical problem with the steering;

-       Failure to property inspect the vehicle for mechanical problems;

-       Failure to repair mechanical problems which they knew or should have known were likely to be present in the plaintiff's vehicle;

-       Failure to adequately use, employ or otherwise operate , diagnostic equipment designed to identify mechanical defects in motor vehicles;

- Failure to warn the plaintiff that her vehicle was inherently dangerous to drive;

- Failure to properly test the vehicle for a dangerous mechanical condition;

- Failure to properly respond to a defect notice regarding a serious condition in the steering mechanism of the plaintiffs vehicle; and/or,

- Failure to properly supervise and train its employees, agents and servants in response to vehicles brought in for service, maintenance and /or repair which were the subject of a notice of defect by the manufacturer.

14.   As a direct and proximate result of the said negligence by the defendant, Medeiros Williams, the plaintiff, Ramona Benbow, suffered severe pain of body and anguish of mind, has sustained serious personal injuries, has been disabled from her normal activities, suffered a diminution in her capacity to earn, and has incurred, and will continue to incur substantial expenses for medical care and attention.

<u>COUNT II: GENERAL MOTORS, LLC. NEGLIGENT FAILURE TO DIAGNOSE, AND/OR
IDENTIFY DEFECT IN A MOTOR VEHICLE, AND/OR REPAIR VEHICLE,
AND/OR NEGLIGENT FAILURE TO WARN.</u>

15.   The plaintiff reaffirms paragraphs one through fourteen of this Complaint and repeats, realleges and incorporates them by reference herein.

16.   The defendant, General Motors, LLC., directly and/or through its agents, dealers, servants and/or employees, failed to repair the plaintiff's power steering, including but not limited to:

- Failure to properly identify a mechanical problem with steering;

- Failure to properly inspect the vehicle for mechanical problems;

- Failure to repair mechanical problems which they knew or should have known were likely to be present in the plaintiff's vehicle;

- Failure to adequately use, employ or otherwise operate, diagnostic equipment designed to identify mechanical defects in motor vehicles;

- Failure to warn the plaintiff that her vehicle was inherently dangerous to drive;

- Failure to properly test the vehicle for a dangerous mechanical condition;

- Failure to properly respond to a inquiries regarding a defect notice it sent to the plaintiff regarding a serious condition in the steering mechanism of the plaintiffs vehicle;

- Failure to properly supervise and train its employees, agents, servants, and/or dealers to respond in a non-negligent manner when vehicles which were the subject of a notice of defect were brought in for service, maintenance and /or repair;

- Negligently limited options for the consumer to have their vehicles repaired to those vehicles with less than 100,000 miles;

- Negligently failed to establish adequate procedures, policies, notices, training, and/or communications with its dealers and/or other repair facilities for the identification and/or repair of the defect in the plaintiff's vehicle;

- Negligently failed to establish adequate procedures, policies, notices and/or communications with owners of 2005 Chevrolet Malibu motor vehicles so that the power steering defect could be identified and/or diagnosed and/or repaired.

17. As a direct and proximate result of the said negligence by the defendant, General Motors, LLC., the plaintiff, Ramona Benbow, suffered severe pain of body and anguish of mind, has sustained serious personal injuries, has been disabled from her normal activities, suffered a diminution in her capacity to earn, and has incurred, and will continue to incur substantial expenses for medical care and attention.

## COUNT III: NEGLIGENT DESIGN BY GENERAL MOTORS, LLC

18. The plaintiff reaffirms paragraphs one through seventeen of this Complaint and repeats, realleges and incorporates them by reference herein.

19. The defendant, General Motors, designed the motor vehicle, and its component parts, which the plaintiff was operating at the time of the automobile accident referenced in Paragraph 10 of this Complaint.

20. The defendant, General Motors, had a duty to design motor vehicles and the components thereof, including the motor vehicle owned and operated by the plaintiff at the time of the automobile accident referenced in Paragraph 11 of this Complaint, in such a manner so that said motor vehicle was safe for its intended purpose as a means of transportation.

21. The defendant, General Motors, breached its duty to properly design said motor vehicle, and its component parts, which the plaintiff owned and operated at the time of the automobile accident referenced in Paragraph 11 of this Complaint, such that said vehicle was unsafe for its intended purpose as a means of transportation..

22. As a direct and proximate result of said breach of its duty to safely design said motor vehicle and its component parts, the plaintiff suffered severe pain and body and anguish of mind, has sustained serious personal injuries, has been disabled from her normal activities, suffered a diminution in her capacity to earn, and has incurred, and will continue to incur, substantial medical expenses for medical care and attention.

## COUNT IV: GENERAL MOTORS, LLC: NEGLIGENT MANUFACTURE OF PLAINTIFF'S MOTOR VEHICLE

23. The plaintiff reaffirms paragraphs one through twenty-two of this Complaint and repeats, realleges and incorporates them by reference herein.

24. The defendant, General Motors, had a duty to manufacture automobiles, including the motor vehicle owned and operated by the plaintiff at the time of the automobile accident referenced in Paragraph 11 of this Complaint, such that said motor vehicle was safe as a means of transportation.

25. The defendant, General Motors, breached its duty to properly manufacture the motor vehicle operated by the plaintiff at the time of the automobile accident referenced in Paragraph 11 of this Complaint, such that said vehicle was unsafe for its intended purpose as a means of transportation.

26.     As a direct and proximate result of the said negligence of the defendant, General Motors, the plaintiff suffered severe pain of body and anguish of mind, has sustained serious personal injuries, has been disabled from her normal activities, suffered a diminution in her capacity to earn, and has incurred, and will continue to incur substantial expenses for medical care and attention.

## COUNT V GENERAL MOTORS, LLC: BREACH OF WARRANTY

27.     The plaintiff reaffirms paragraphs one through twenty-six of this Complaint and repeats, realleges and incorporates them by reference herein.

28.     The defendant, General Motors, sold the motor vehicle which the plaintiff was operating at the time of the automobile accident referenced in Paragraph 11 of this Complaint.

29.     The defendant, General Motors, impliedly warranted to consumers, including the plaintiff as an owner of a 2005 Chevrolet Malibu, that said vehicle, and each of its component parts, was merchantable, safe and/or free of defects.

30.     The vehicle sold by the defendant, General Motors, and owned by the plaintiff at the time of the automobile accident referenced in Paragraph 11 of this Complaint, had a defect and was therefore unsafe at the time the defendant sold said motor vehicle.

31.     As said motor vehicle was defective at the time of said sale, the defendant, General Motors, breached its said implied warranties that the vehicle owned and operated by the plaintiff at the time of the automobile accident referenced in Paragraph 11 of this Complaint was merchantable, safe, and/or free of defects.

32.     As a direct and proximate result of the said breach of said implied warranties by the defendant, General Motors, the plaintiff suffered  severe pain of body and anguish of mind, has sustained serious injuries, has been disabled from her normal activities, suffered a diminution in her capacity to earn, and has incurred, and will continue to incur substantial expenses for medical care and attention.

## COUNT VI: DRIVE USA 2, INC.: BREACH OF WARRANTY

33.     The plaintiff reaffirms paragraphs one through thirty-two of this Complaint and repeats and realleges and incorporates them by reference herein.

34.     The defendant, Drive USA 2, Inc., sold the motor vehicle which the plaintiff was operating at the time of automobile accident referenced in Paragraph 11 of this Complaint.

35.     The defendant, Drive USA 2, Inc., impliedly warranted to consumers, including the plaintiff as an owner of a 2005 Chevrolet Malibu, that said vehicle, and each of its component parts, was merchantable, safe and/or free of defects.

36.     The vehicle sold by the defendant, Drive USA 2, Inc., and owned by the plaintiff at the time of the automobile accident referenced in Paragraph 11 of this Complaint, had a defect and was therefore unsafe at the time the defendant sold said motor vehicle.

37.    As said motor vehicle was defective at the time of said sale, the defendant, Drive USA 2, Inc, breached its said implied warranties that the vehicle owned and operated by the plaintiff at the time of the automobile accident referenced in Paragraph 11 of this Complaint was merchantable, safe, and/or free of defects.

38.    As a direct and proximate result of the said breach of said implied warranties by the defendant, Drive USA 2, Inc., the plaintiff suffered severe pain of body and anguish of mind, has sustained serious injuries, has been disabled from her normal activities, suffered a diminution in her capacity to earn, and has incurred, and will continue to incur substantial expenses for medical care and attention.

Wherefore, pursuant to Count I of this Complaint, the plaintiff demands judgment against the defendant, Medeiros Williams, Inc., in an amount which will adequately compensate her for her severe pain of body and anguish of mind, serious personal injuries, disability from her normal activities, diminution of her capacity to earn, and expenses for past and future medical care and attention, plus interest, costs and attorney's fees, and such other relief as this court deems just and proper.

Wherefore, pursuant to Counts II, III, IV and V of this Complaint, the plaintiff demands judgment against the defendant, General Motors, LLC., in an amount which will adequately compensate her for her severe pain of body and anguish of mind, serious personal injuries, disability from her normal activities, diminution of her capacity to earn, and expenses for past and future medical care and attention, plus interest, costs and attorney's fees, and such other relief as this court deems just and proper.

Wherefore, pursuant to Count VI of this Complaint, the plaintiff demands judgment against the defendant, Drive USA 2, Inc., in an amount which will adequately compensate her for her severe pain of body and anguish of mind, serious personal injuries, disability from her normal activities, diminution of her capacity to earn, and expenses for past and future medical care and attention, plus interest, costs and attorney's fees, and such other relief as this court deems just and proper

The plaintiff, Ramona Benbow, hereby requests a trial by jury on all counts and issues of this Complaint which may be tried to a jury.

The Plaintiff
By Her Attorneys
FEIN, EMOND & APPLEBAUM, P.C.

Eric D. Applebaum, Esq
52 Mulberry Street
Springfield, MA  01105
Tel:   (413) 781-5400
Fax: (413) 739-0801
BBO#: 560298
Date: Oct. 14, 2014

## CERTIFICATE OF COMPLIANCE

I, Eric D. Applebaum, Esq., hereby certify that the foregoing Complaint has been filed within the time period provided therefor.

Eric D. Applebaum, Esq.

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LAWRENCE M. ELLIOTT, | ) | |
| CELESTINE V. ELLIOTT, and | ) | |
| BERENICE SUMMERVILLE, | ) | |
| for themselves, on behalf | ) | **Case No. 1:14-cv-00691 (KBJ)** |
| of all others similarly situated, | ) | |
| and on behalf of the People of the | ) | **CLASS ACTION FOR DECLARATORY,** |
| District of Columbia, | ) | **INJUNCTIVE, AND MONETARY RELIEF** |
| | ) | |
| | ) | **REPRESENTATIVE ACTION FOR** |
| Plaintiffs, | ) | **DECLARATORY, INJUNCTIVE, AND** |
| | ) | **MONETARY RELIEF** |
| | ) | **PURSUANT TO THE** |
| v. | ) | **D.C CONSUMER PROTECTION** |
| | ) | **PROCEDURES ACT, D.C. Code § 28-3901** |
| GENERAL MOTORS LLC, | ) | **et seq.** |
| DELPHI AUTOMOTIVE PLC, | ) | |
| and DPH-DAS LLC f/k/a DELPHI | ) | **JURY TRIAL DEMANDED** |
| AUTOMOTIVE SYSTEMS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### FIRST AMENDED COMPLAINT

### INTRODUCTORY STATEMENT

Plaintiffs LAWRENCE ELLIOTT, CELESTINE ELLIOTT and BERENICE

SUMMERVILLE bring this action for themselves, and on behalf of all persons similarly

situated who own or have owned the substandard and dangerous vehicles identified below at

any time since October 19, 2009.  The Elliotts also bring this action of behalf of the public as

representatives of the People of the District of Columbia.

1.      Mr. and Mrs. Elliott are 78 and 73 years of age respectively as of the date of

filing this Complaint. They have been married for forty-nine years. They are retired

commercial drivers with over twenty-five years of on-the-road experience.  After they retired

from professional driving, they paid the full manufacturer's suggested retail price for a new

2006 Chevrolet Cobalt at a now-defunct GM dealership in Washington, D.C. The Elliotts'

Cobalt has substantial safety related defects that render it dangerous to drive. The Elliotts'

Cobalt has substantial safety related defects that render it dangerous to drive; these same

defects are  suspected of causing death or personal injury to hundreds of people across the

United States, according to the National Highway Traffic Safety Administration ("NHTSA).

      2.      The Elliotts' Cobalt has a defective ignition switch that could, unexpectedly and

without warning, shut down the car's engine and electrical systems while the car is in motion -

rendering the power steering, anti-lock brakes and airbags inoperable.

      3.      The Elliotts' Cobalt has a plastic fuel pump which is mounted on the top of the

gas tank. When the fuel pump leaks, gasoline flows down the side of the tank and can pool

under the car, dangerously close to the car's catalytic converter. The fuel pump is not designed

to withstand the reasonably foreseeable environmental and operating conditions to which a car

can be expected to be exposed. The fuel pump in the Elliotts' car has already failed to

withstand the heat to which it is exposed. After noticing a persistent fuel smell, the Elliotts

eventually discovered a two-foot in diameter pool of leaked gasoline under the car.

Subsequently, a GM dealer replaced the pump at New GM's direction, with, as far as Plaintiffs

can determine, a new plastic replica of the first pump - presenting the same defect and the same

unreasonable safety risk of personal injury and property damages to Plaintiffs and class

members due to the fire hazards associated with the pooling gas.

      4.      The Elliotts, whose entire family – including their children, grandchildren, and

great-grandchildren – depended upon the Cobalt for transportation, are now extremely hesitant

to drive the vehicle. They fear for their own safety and, in particular, for the safety of their

great grandchildren (aged 6 and 8) who reside with them and were frequently driven to school

in the car before the Elliotts discovered the extent and nature of the Cobalt's defects.

5.      In December 2009, Ms. Berenice Summerville bought a 2010 Chevrolet Cobalt as a Christmas gift for her mother, Louella Summerville, who is 80 years of age as of the date of the filing of this First Amended Complaint. Like the Elliotts' 2006 Cobalt, Ms. Summerville's vehicle contains a defective ignition switch and a defective fuel pump, both of which posed and continue to pose risks of imminent death, personal injury or property damage. Ms. Summerville first became aware of problems with the car when she noticed the smell of gasoline when starting or switching off the car. She also noticed that the car had particularly poor gas mileage, which she supposed was consistent with fuel leakage. When she took the car in for maintenance, she asked the mechanic at Ourisman Chevrolet of Marlow Heights ("Ourisman"), a GM dealership, to inspect for fuel leakage, but the dealer refused to do so without a fee. Because the odor and poor performance continued, she again requested that the fuel system be inspected for leaks at her car's most recent service. After searching the vehicle history, Ourisman representatives informed Ms. Summerville that although there had been a recall on the fuel system, it was now closed. Ourisman again refused to inspect the fuel system without a fee. Ms. Summerville also noticed that the airbag light was flickering on and off, inexplicably, on both the passenger and driver sides of the car. She no longer drives the Cobalt because of fear for her own and her mother's safety.

6.      GM admits that, since its incorporation on October 19, 2009, General Motors LLC ("GM" or "New GM") has known and failed to disclose that the Plaintiffs' Cobalts and class members' vehicles are substandard and pose significant and unreasonable risks of death, serious personal injury, and property damage. GM could hardly deny these facts in any event. New GM acquired all the books, records and accounts of General Motors Corporation ("Old GM"), including records that document the unlawful concealment of defects in vehicles sold by Old GM prior to New GM's existence. New GM also retained the engineering, legal and

14

management officials who were responsible for designing, engineering, and concealing safety-

related defects at Old GM; those officials were immediately assigned to precisely the same

tasks at New GM, and they implemented or continued identical policies and practices to

conceal safety related defects in GM products.

7.      The National Highway Traffic Safety Administration (NHTSA) fined New GM

$28,000,000, the maximum permissible under applicable law, for GM's failure to disclose

defects related to the ignition switches in Plaintiffs' and class members' cars.

8.      For nearly five years after its inception, GM failed to disclose to, and actively

concealed from, Plaintiffs, class members, investors, litigants, courts, law enforcement and

other government officials including the NHTSA, the risks of death, personal injury, and

property damage posed by its defective products.  Instead, conspiring with Delphi, Ourisman,

GM's dealers nationwide, outside lawyers, and various others, GM engaged in, and may still

be engaging in, an extensive, aggressive and complex campaign to conceal and minimize the

safety-related defects that exist in Plaintiffs' and class members' vehicles. That campaign is

designed to mislead Plaintiffs, class members, consumers, investors, courts, law enforcement

officials, and other governmental officials, including the NHTSA, that the value of the

company and the worth and safety of its products are greater than they are. With those same

co-conspirators, GM directed an unlawful and continuing enterprise calculated to gain an

unfair advantage over competitor automakers that conduct their business within the bounds of

the law.

9.      Defendants first deployed their campaign of deception on the day that New GM

began operating. The scheme continued at least until its exposure began in early 2014. Through

their deception, Defendants recklessly endangered the safety of Plaintiffs, their families, and

members of the public. Defendants' wrongful acts and omissions harmed Plaintiffs and class

members by exposing them to increased risk of death or serious bodily injury, by depriving

them of the full use and enjoyment of their vehicles, and by causing a substantial diminution in

the value of the vehicles to Plaintiffs and class members, and a substantial diminution in value

of their vehicles on the open automobile market.

10.     As of the date of the filing of this First Amended Complaint, the United States

Department of Justice has opened, and is pursuing, a criminal investigation into GM's

campaign of deceit.

11.     GM's Chief Executive Officer Mary Barra admitted on behalf of the company

that New GM employees knew about safety-related defects in millions of vehicles, including

the Elliotts' 2006 Cobalt and Ms. Summerville's 2010 Cobalt, and that GM did not disclose

those defects as it was required to do by law. Ms. Barra attributed New GM's "failure to

disclose critical pieces of information," in her words, to New GM's policies and practices that

mandated and rewarded the unreasonable elevation of cost concerns over safety risks. For

example, GM chose to use and then conceal defective ignition switches in Plaintiffs' and class

members' vehicles in order to save approximately $0.99 per vehicle.

12.     In executing their scheme to conceal the dangerous character of Plaintiffs'

vehicles, Defendants violated a multitude of laws:

a)      In furtherance of their common design to prevent Plaintiffs, class

members, other consumers, law enforcement and other governmental officials,

litigants, courts, and investors from learning of the safety defects in GM cars,

GM, Delphi, and GM's dealers conducted a racketeering enterprise and engaged

in a pattern of racketeering activities, including repeated and continuous acts of

mail and wire fraud, television and radio fraud, and tampering with witnesses

and victims in violation of the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, causing the harm to Plaintiffs and class members described above.

b)      By concealing the material fact of the dangerousness of the Plaintiffs' and class members' vehicles, by failing properly to repair the safety defects in the cars in a timely manner, and by engaging in other unconscionable and/or unlawful behavior, GM and Delphi violated the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901 *et seq.*, and the Maryland Consumer Protection Act,. Md. Code, Com. Law § 13-408 *et seq.*, causing the harm described above to Plaintiffs and class members.

c)      GM and Delphi also violated their duties to warn Plaintiffs and class members about the dangers that their vehicles posed, resulting in economic loss and increased risk of personal injury for which Defendants are liable to Plaintiffs and Class members under the common law of the District of Columbia and the States of Florida, Maryland, New Jersey and Ohio.

d)      Because they intentionally concealed a material fact from Plaintiffs and Class members, Defendants are liable to Plaintiffs for the harm Plaintiffs and class members have suffered and for punitive damages under the common law of fraud common to the several States.

e)      By civilly conspiring to conceal the safety-related defects of GM vehicles, both among themselves and among nonparties to this litigation, and because they acted jointly to harm Plaintiffs and class members, Defendants are jointly and severally liable for all harm they or any co-conspirator caused.

f)      Defendants aided and abetted the conduct of each other and of nonparties in concealing the safety-related defects of GM vehicles.

17

g)      With respect to the claims of Ms. Summerville and other purchasers of identified cars sold since New GM's inception, Defendants are also liable for breach of a sellers implied warranty of merchantability under the Uniform Commercial Code §2-314 of thirty-one States identified herein that have abolished vertical privity requirements for such suits. They are also liable under the common law of the several States to those purchasers for fraud in inducing the purchases through misrepresentations and material omissions upon which Plaintiffs and class members based their purchases.

**PARTIES**

13.      Plaintiffs Lawrence and Celestine Elliott are citizens and residents of the District of Columbia. Mr. and Mrs. Elliott jointly own a 2006 Chevrolet Cobalt SS. Although Mr. and Mrs. Elliott have always been the primary drivers of their cars, they have children, grand children, and great-grandchildren who live with them, and frequently ride in the cars as passengers and, on rare occasions, also drive the cars.

14.      Plaintiff Berenice Summerville is a citizen and resident of the State of Maryland. She purchased a 2010 Chevrolet Cobalt in December 2010 from a GM dealer in the State of Maryland, and she has been the primary driver of the vehicle for virtually the entire period since she purchased the car. She often drives in the District of Columbia, which is less than 5 miles from her home.

15.      General Motors LLC is a limited liability company formed under the laws of Delaware with its principal place of business in Detroit, Michigan. On October 19, 2009, it began conducting the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the vehicles of class members, and other motor vehicles and motor vehicle components throughout

18

the United States. Plaintiffs' claims and allegations against GM refer solely to this entity. In this First Amended Complaint, Plaintiffs are not making any claim against Old GM (General Motors Corporation) whatsoever, and Plaintiffs are not making any claim against New GM based on its having purchased assets from Old GM or based on its having continued the business or succeeded Old GM. Plaintiffs disavow any claim based on the design or sale of vehicles by Old GM, or based on any retained liability of Old GM. Plaintiffs seek relief from New GM solely for claims that have arisen after October 19, 2009, and solely based on actions and omissions of New GM.

16.    Delphi Automotive PLC is headquartered in Gillingham, Kent, United Kingdom, and is the parent company of Delphi Automotive Systems LLC, headquartered in Troy, Michigan. At all times relevant herein, Delphi, through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the defective ignition switches contained in the Cobalts owned by Plaintiffs, and in at least 6.5 million other vehicles.

17.    GM and Delphi are collectively referred to in this Complaint as "Defendants."

### JURISDICTION AND VENUE

18.    Jurisdiction is proper in this Court pursuant to 28 U.S.C § 1331, because the claims under the Racketeer Influenced and Corrupt Organizations Act present a federal question. Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

19

19.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to these claims occurred in this District, and Defendants have caused harm to plaintiffs and class members residing in this District.

## FACTUAL BACKGROUND

20.    GM has publicly admitted that the ignition switches in Plaintiffs' and class members' cars are defective and pose a safety hazard. It has also admitted that, from its inception in 2009, various New GM engineers, attorneys, and management officials knew of, and took measures to conceal, the ignition switch defect and/or diminish its significance. GM has been found guilty of failing to disclose the defect to Plaintiffs, class members, and governmental officials as required by law, and the NHTSA has fined New GM the maximum penalty that agency is authorized to impose.

21.    GM continues to conceal the defect in the design of the fuel pumps on Plaintiffs' and Class members' vehicles from Plaintiffs, class members, investors, and governmental officials. On October 29, 2009, GM notified the NHTSA that they were recalling 2006 Chevrolet Cobalt and Saturn Ion vehicles sold or registered in Arizona and Nevada, and 2007 Chevrolet Cobalt, Pontiac G5, and Saturn Ion vehicles sold or registered in Arizona, California, Florida, Nevada and Texas. The reason for the recall was that "the plastic supply or return port on the modular reservoir assembly may crack…[and] fuel will leak." (NHTSA Report Campaign No. 09V419000). The consequence of this defect was listed in the report as follows: "Fuel leakage, in the presence of an ignition source, could result in a fire." The recall was limited, however, to vehicles in the five aforementioned states. Special coverage – that is, GM would replace a noticeably leaking fuel pump if the issue was specifically brought to them by a customer – was provided in a limited number of additional states: 2006 vehicles registered in Alabama, Arkansas, California, Florida Georgia, Hawaii, Louisiana, Mississippi, North

Carolina, New Mexico, Oklahoma, South Carolina, Tennessee, and Texas, and 2007 vehicles registered in Alabama, Arkansas, Georgia, Hawaii, Louisiana, Mississippi, North Carolina, New Mexico, Oklahoma, South Carolina, and Tennessee. GM offered vehicle owners outside the listed recall states no recourse, even if their plastic fuel pumps, which were susceptible to exactly the same life-threatening defect, started noticeably leaking.  GM did not inform owners of identical vehicles outside of Arizona, California, Florida, Nevada and Texas that they were in danger of being seriously injured or killed by their defective and potentially leaking fuel pump, despite the fact that the defective fuel pump can cause fuel to pool very close to the catalytic converter, which can temperatures in excess of 1000 degrees Fahrenheit in some circumstances. A fuel leak in close proximity to such high temperatures is extremely unsafe.

22.	On September 19, 2012, GM notified the NHTSA that they were expanding the recall described in paragraph 21 to cover 2007 Chevrolet Equinox and Pontiac Torrent vehicles, 2007 Chevrolet Cobalt, Pontiac G5, and Saturn ION vehicles, 2008 Chevrolet Cobalt and Pontiac G5 vehicles, and 2009 Chevrolet Cobalt and Pontiac G5 vehicles, but again geographically limited the recall, providing no recourse or notification to vehicle owners outside Arizona, Arkansas, California, Nevada, Oklahoma and Texas.

23.	Since at least October 29, 2009, GM has been aware that the fuel pumps in Plaintiffs' and class members' vehicles are defective because of their propensity to fail when exposed to high temperatures, which can occur in any car regardless of what state it is registered in. Failure of the fuel pump threatens the kind of fuel leakage that Plaintiffs and class members have detected, and creates an unreasonable danger of fire, personal injury and/or property damage. GM continues to conceal the safety defect and risk of death or severe personal and property damage from vehicle owners outside the recall states. GM has failed to

21

notify Plaintiffs, class members, and governmental officials of the full scope of the defect, nor has it rectified the defect, as required by law.

24.      Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must disclose the defect to appropriate government officials and registered owners of the vehicle in question.

25.      Upon its inception, New GM instituted and continued policies and practices intended to conceal safety related defects in GM products from Plaintiffs, class members, investors, litigants, courts, law enforcement officials, the NHTSA, and other governmental officials. In furtherance of its illegal scheme, New GM trained and directed its employees and dealers to take various measures to avoid exposure of safety related product defects:

a)      GM mandated that its personnel avoid exposing GM to the risk of having to recall vehicles with safety-related defects by limiting the action that GM would take with respect to such defects to the issuance of a Technical Service Bulletin or an Information Service Bulletin.

b)      New GM directed its engineers and other employees to falsely characterize safety-related defects – including the defects described in this complaint – in their reports, business and technical records as "customer convenience" issues, to avoid being forced to recall vehicles as the relevant law requires.

c)      New GM trained its engineers and other employees in the use of euphemisms to avoid disclosure to the NHTSA and others of the safety risks posed by defects in GM products.

22

d)      New GM directed its employees to avoid the word "stall" in describing vehicles experiencing a moving stall, because it was a "hot word" that could alert the NHTSA and others to safety risks associated with GM products, and force GM to incur the costs of a recall.

    i.      A "moving stall" is a particularly dangerous condition because the driver of a moving vehicle in such circumstances no longer has control over key components of steering and/or braking, and air bags will not deploy in any, increasingly likely, serious accident.

e)      New GM directed its engineering and other personnel to avoid the word "problem," and instead use a substitute terms, such as "issue," "concern," or "matter," with the intent of deceiving plaintiffs and the public.

f)      New GM instructed its engineers and other employees not to use the term "safety" and refer instead to "potential safety implications."

g)      New GM instructed its engineers and other employees to avoid the term "defect" and substitute the phrase "does not perform to design."

h)      New GM instituted and/or continued managerial practices designed to ensure that its employees and officials would not investigate or respond to safety-related defects, and thereby avoid creating a record that could be detected by governmental officials, litigants or the public. In a practice New GM management labeled "the GM nod," GM managers were trained to feign engagement in safety related product defects issues in meetings by nodding in response to suggestions about steps that they company should take. Protocol dictated that, upon leaving the meeting room, the managers would not respond to or follow up on the safety issues raised therein.

23

i)      New GM's lawyers discouraged note-taking at critical product safety meetings to avoid creation of a written record and thus avoid outside detection of safety-related defects and GM's refusal to respond to and/or GM's continuing concealment of those defects. New GM employees understood that no notes should be taken during meetings about safety related issues, and existing employees instructed new employees in this policy.  New GM did not describe the "no-notes policy" in writing to evade detection of their campaign of concealment.

j)      New GM would change part design without a corresponding change in part number, in an attempt to conceal the fact that the original part design was defective. New GM concealed the fact that it manufactured cars with intentionally mislabeled part numbers, making the parts difficult for New GM, Plaintiffs, class members, law enforcement officials, the NHTSA, and other governmental officials to identify. New GM knew from its inception that the part number irregularity was intended to conceal the faulty ignition switches in Plaintiffs' and class members' vehicles.

26.      New GM followed a practice and policy of intentionally mischaracterizing safety issues as "customer convenience" issues to avoid recall costs, and it enlisted its dealership network in its campaign of concealment by minimizing the safety aspects of the "technical service bulletins" and "information service bulletins" it sent to dealers.  New GM directed dealers to misrepresent the safety risks associated with the product defects of its vehicles.  New GM followed this practice with respect to the defective ignition switches from its inception in October 2009 until its campaign of concealment of the ignition switch defect began to unravel in February 2014.

27.      New GM followed a practice or policy of minimizing and mischaracterizing safety related defects in its cars in its communications with Plaintiffs, class members, law

24

enforcement officials, the NHTSA, and other governmental officials.  New GM followed these

practices and procedures when it wrongfully limited the geographic reach of its October 2009

recall of defective fuel pumps in Plaintiffs and class members cars to drivers in a small number

of states, even though GM knew that the fuel pump defect threatened the safety and posed

unreasonable risks of death, serious bodily injury, and property damage in all vehicles

containing the fuel pump regardless of the state in which the vehicle was registered. GM

concealed the fact that vehicle owners and drivers who are residents of Maryland and the

District of Columbia and other states face the same or similar unreasonable risks of fuel

leakage and subsequent fire as drivers in the recall states.

28.    Upon the inception of New GM in October 2009, New GM and Delphi agreed

to conceal safety related defects from Plaintiffs, class members, law enforcement officials,

other governmental officials, litigants, courts, and investors. Both New GM and Delphi knew

since October 2009 that the design of the faulty ignition switch in Plaintiffs and class

members' cars had been altered without a corresponding change in part number, in gross

violation of normal engineering practices and standards. Part labeling fraud is particularly

dangerous in vehicle parts potentially related to safety because it makes tracing and identifying

faulty parts very difficult, and will delay the detection of critical safety defects.

29.    Since New GM's inception in October 2009, both New GM and Delphi have

known that the faulty ignition switch in the Plaintiffs' Cobalts and class members' vehicles

posed a serious safety and public health hazard because the faulty ignition switch caused

moving stalls. Each Defendant had legal duties to disclose the safety related defects. Rather

than notifying the NHTSA, Defendants instead decided that Plaintiffs and class members, and

millions of drivers and pedestrians should face imminent risk of injury and death due to the

defective ignition switches in Plaintiffs' and class members' vehicles. Delphi and GM entered

into an agreement to conceal the alteration of the part without simultaneously changing the part number, and concealed the risks associated with the defective ignition switches.

30.    In 2012, more GM employees learned that the ignition switches in vehicles from model years 2003, 2004, 2005, 2006, and 2007 exhibited torque performance below the specifications originally established by GM. Rather than notify Plaintiffs, class members, or the NHTSA, GM continued to conceal the nature of the defect.

31.    In April 2013, GM hired an outside engineering-consulting firm to investigate the defective ignition switch system. The resulting report concluded that the ignition switches in early model Cobalt and Ion vehicles did not meet GM's torque specification. Rather than notify Plaintiffs, class members, or the NHTSA, GM still continued to conceal the nature of the Ignition Switch Defect until 2014.

32.    NHTSA's Fatal Analysis Reporting System (FARS) reveals 303 deaths of front seat occupants in 2005-07 Cobalts and 2003-07 Ions where the airbags failed to deploy in non-rear impact crashes.

33.    While GM has finally admitted that the ignition switch in millions of vehicles poses an unreasonable safety risk to Plaintiffs, class members, and to the public, it continues to deny and conceal that fact that the fuel pump design on Plaintiffs' and class members' vehicles is also defective and poses its own imminent and unreasonable risk of death or serious bodily injury.

34.    New GM explicitly directed its lawyers and any outside counsel it engaged to act to avoid disclosure of safety related defects – including the ignition switch defect – in GM products.  These actions included settling cases raising safety issues, demanding that GM's victims agree to keep their settlements secret, threatening and intimidating potential litigants into not bringing litigation against New GM by falsely claiming such suits are barred by Order

of the Bankruptcy Court, and settling cases for amounts of money that did not require GM

managerial approval, so management officials could maintain their false veneer of ignorance

concerning the safety related defects. In one case, GM threatened the family of an accident

victim with liability for GM's legal fees if the family did not withdraw its lawsuit,

misrepresenting to the family that their lawsuit was barred by Order of GM's Bankruptcy

Court. In another case, GM communicated by means of mail and wire to the family of the

victim of a fatal accident caused by the faulty ignition switch that their claim has no basis, even

though GM knew that its communication was false and designed to further GM's campaign of

concealment and deceit. In other cases, GM falsely claimed that accidents or injuries were due

to the driver when it knew the accidents were likely caused by the dangerous product defects

GM concealed.

## TOLLING OF THE STATUTE OF LIMITATIONS

37.    Any applicable statute of limitation has been tolled by Defendants' knowledge, active

concealment, and denial of the facts alleged herein, which behavior is ongoing.

38.    The causes of action alleged herein did not accrue until Plaintiffs and Class

Members discovered that their vehicles had the safety related defects described herein.

39.    Plaintiffs and Class Members had no reason to know that their products were

defective and dangerous because of Defendants' active concealment.

## CLASS ACTION ALLEGATIONS

40.    Plaintiffs bring this lawsuit as a class action on their own behalves and on

behalf of all other persons similarly situated as members of the proposed Class pursuant to

Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action

satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority

09-50026-reg   Doc 13889-1   Filed 03/22/15   Entered 03/23/15 18:09:55   Exhibit A
Pg 46 of 154

requirements of those provisions. All proposed Class and Subclass periods run from the inception of New GM in October 2009 and continue until judgment or settlement of this case.

41.     Plaintiffs bring this action on behalf of a proposed nationwide class defined as follows: All persons in the United States who, since the inception of New GM in October 2009, hold or have held a legal or equitable interest in a GM vehicle with a defective ignition switch manufactured by Delphi and/or a defective fuel pump. As of the time of the filing of this First Amended Complaint, Plaintiffs are aware that the following GM models contain dangerous ignition switches:

- 2005-2011 Chevrolet Cobalt

- 2006-2011 Chevrolet HHR

- 2006-2010 Pontiac Solstice

- 2007-2010 Pontiac G5

- 2003-2007 Saturn Ion

- 2007-2010 Saturn Sky

- 2005-2009 Buick Lacrosse

- 2006-2011 Buick Lucerne

- 2004-2005 Buick Regal LS & GS

- 2006-2014 Chevrolet Impala

- 2006-2008 Chevrolet Monte Carlo

- 2000-2005 Cadillac Deville

- 2004-2011 Cadillac DTS

As of the time of the filing of this First Amended Complaint, Plaintiffs are aware that the following GM models contain dangerously defective fuel pumps:

28

- 2006-2010 Chevrolet Cobalt

- 2006-2007 Saturn Ion

- 2007-2009 Pontiac G5

- 2007 Chevrolet Equinox

42.     Plaintiffs also bring this action on behalf of the following Subclasses:

  a.  The Elliotts bring this action on behalf of all persons in the District of
      Columbia who, since October 2009, hold or have held a legal or equitable
      interest in a GM vehicle with a defective ignition switch or defective fuel
      pump as described above. The GM models include those listed in the
      preceding paragraph (the "District of Columbia" Subclass);

  b.  Ms. Summerville brings this action on behalf of all persons in the State of
      Maryland who, since October 2009, purchased or hold or have held a legal
      or equitable interest in a GM vehicle with a defective ignition switch and/or
      fuel pump (the "Maryland Subclass");

  c.  Ms. Summerville brings this action on behalf of residents of the District of
      Columbia, Alaska, Arkansas, Delaware, Hawaii, Indiana, Kansas, Louisiana,
      Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi,
      Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, North
      Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Texas,
      Utah, West Virginia, and Wyoming, who, since New GM's inception in
      October 2009, purchased a GM vehicle containing the defective ignition
      switch manufactured by Delphi and/or the defective fuel pump (the "Multi-
      State Warranty Subclass");

29

d.   Plaintiffs also bring this action on behalf of residents of the District of

Columbia and the States of California, Florida, Maryland, New Jersey and

Ohio who, since October 2009, hold or have held a legal or equitable

interest in a GM vehicle with a defective ignition switch and/or fuel pump

(the "Multi-State Negligence Subclass").

43.    Excluded from the Class are: (1) Defendants, any entity or division in which

Defendants have a controlling interest, and their legal representatives, officers, directors,

assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3)

governmental entities; and (4) those persons who have suffered personal injuries as a result of

the facts alleged herein.

## NUMEROSITY AND ASCERTAINABILITY

44.    Although the exact number of Class Members is uncertain and can only be

ascertained through appropriate discovery, the number is great enough such that joinder for

each Class or Subclass is impracticable. The disposition of the claims of these Class Members

in a single action will provide substantial benefits to all parties and to the Court. Class

Members are readily identifiable from information and records in GM's possession, custody, or

control, and/or from public vehicular registration records.

## TYPICALITY

45.    The claims of the Plaintiffs are typical of the claims of each member of the

class and subclasses in that the representative Plaintiffs, like all class members, legally or

equitably own or owned a GM vehicle during the Class Period that contained a defective

ignition switch manufactured by Delphi and/or a defective fuel pump. Plaintiffs, like all class

and subclass members, have been damaged by Defendants' misconduct, namely, in being

wrongfully exposed to an increased risk of death or serious bodily injury, in suffering

30

diminished use and enjoyment of their vehicles, and in suffering the diminished market value of their vehicles. Furthermore, the factual bases of Defendants' misconduct are common to all class and subclass members.

## ADEQUATE REPRESENTATION

46. Plaintiffs will fairly and adequately represent and protect the interests of the class and subclasses. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions and in prosecuting complex federal litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class and subclasses, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the class of subclasses.

## PREDOMINANCE OF COMMON ISSUES

47. There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include:

a. Whether the vehicles owned by class or subclass members during the class periods suffer from the defective ignition switch and/or defective fuel pump described herein?

b. Whether the defective ignition switch and/or fuel pump posed an unreasonable danger of death or serious bodily injury?

c. Whether GM and/or Delphi imposed an increased risk of death or serious bodily injury on Plaintiffs and class and subclass members during the Class period?

d. Whether GM and/or Delphi caused Plaintiffs and class and subclass members to suffer economic loss during the Class period?

31

e.      Whether GM and/or Delphi caused Plaintiffs and class and subclass members to

suffer the loss of the use and enjoyment of their vehicles during the class period?

f.      Whether GM and Delphi had a legal duty to disclose the ignition switch danger

to class and subclass members?

g.      Whether GM and/or Delphi had a legal duty to disclose the ignition switch

danger to the NHTSA?

h.      Whether either GM and/or Delphi breached duties to disclose the ignition

switch defect?

i.      Whether class and subclass members suffered legally compensable harm?

j.      Whether the defective nature of the Class Vehicles constitutes a material fact

reasonable consumers would have considered in deciding whether to purchase a GM

Vehicle during the class period?

k.      Whether Defendants violated the consumer protection statutes of the District of

Columbia and Maryland by concealing the ignition switch defect and/or the fuel pump

defect from Plaintiffs and governmental officials?

l.      Whether Defendants violated Maryland's consumer protection statute by

concealing material facts about and making affirmative misrepresentations about GM

cars in connection with sales made since the inception of the New GM?

m.      Whether the fact that the ignition switch was defective was a material fact?

n.      Whether Ms. Summervilles and the Multi-State Warranty Subclass members'

vehicles were merchantable?

o.      Whether Plaintiffs and Class Members are entitled to a declaratory judgment

stating that the ignition switches and/or fuel pumps in their vehicles are defective

and/or not merchantable?

32

p.    Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction?

q.    Whether GM should be declared responsible for notifying all Class Members of the Defect and ensuring that all GM vehicles with the Ignition Switch Defect are recalled and repaired?

r.    Whether Defendants conducted a criminal enterprise in violation of RICO?

s.    Whether Defendants engaged in a pattern or practice of racketeering?

t.    Whether Defendants committed mail or wire fraud in connection with their concealment of the defective ignition switch.

u.    Whether class members were harmed by Defendants' violations of RICO?

v.    Whether class and subclass members are entitled to recover punitive damages from Defendants, and, if so, what amount would be sufficient to deter Defendants from engaging in such conduct in the future and to punish Defendants for their recklessness regarding the public health and safety and their campaign of concealment?

## SUPERIORITY

48.    Plaintiffs and class and subclass members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, most class and subclass members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual class and subclass member's claims, it is likely that few could afford to seek legal redress for Defendants' misconduct. Absent a class action, class and subclass members will continue to incur damages, and Defendants' misconduct will continue without remedy. Class treatment of common questions of law and

33

09-50026-reg   Doc 13889-3K   Filed 04/07/15   Entered 04/23/15 13:49:59   Exhibit A
Pg 52 of 154

fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication. The class action is superior for defendants as well, who otherwise could be forced to litigate thousands of separate actions.

49.     Defendants have acted in a uniform manner with respect to the Plaintiffs and class and subclass members. Class and subclass wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of class and subclass members to protect their interests. Class and subclass wide relief assures fair, consistent, and equitable treatment and protection of all class and subclass members.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF RACKETEER INFLUENCED**
**AND CORRUPT ORGANIZATIONS ACT**
**(18 U.S.C. § 1962(c) and (d))**

50.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth at length herein.

51.     This claim is brought by all Plaintiffs on behalf of the nationwide Class.

52.      Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the "RICO Enterprise" through a "pattern of racketeering activity." Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate § 1962(c).

53.     At all times relevant, GM, Delphi, its associates-in-fact, Plaintiffs, and the Class and Subclass members are each a "person," as that term is defined in 18 U.S.C. § 1961(3).

54.     At all times relevant, Plaintiff and each class and subclass member were and are "a person injured in his or her business or property" by reason of a violation of RICO within the meaning of 18 U.S.C. § 1964(c).

55.     At all times relevant, GM and Delphi are and were each a "person" who participated in or conducted the affairs of the RICO Enterprise through the pattern of racketeering activity described below. While GM and Delphi each participated in the RICO Enterprise, they each exist separately and distinctly from the Enterprise. Further, the RICO Enterprise is separate and distinct from the pattern of racketeering activity in which GM and Delphi have engaged and are engaging.

56.     At all times relevant, GM and Delphi were associated with, operated or controlled, the RICO Enterprise, and participated in the operation and management of the affairs of the RICO Enterprise, through a variety of actions described herein. Defendants' participation in the RICO Enterprise was necessary for the successful operation of its scheme to defraud.

## The RICO Enterprise

57.     Defendants participated in the operation and management of an association-in-fact enterprise whose aim was to conceal safety related defects in Delphi products installed in GM vehicles from Plaintiffs, class members, the NHTSA, litigants, courts, law enforcement officials, consumers, and investors. The Enterprise was motivated by the common design of concealing the true value of the defendant companies and their products, and it constituted an unlawful, continuing enterprise calculated to gain an unfair advantage over competitor automakers who conduct their business within the bounds of the law. The Enterprise was partly embodied in practices and procedures intended to mischaracterize safety related defects – such as the ignition switch – as "customer convenience issues" to avoid incurring the costs of a

35

recall, and minimizing the significance of disclosures that were made by limiting the scope of their gas-pump recall to five and then seven states.

58.    The RICO Enterprise began with the inception of New GM, on October 19, 2009. The following persons, and others presently unknown, have been members of and constitute the association-in-fact enterprise with the following roles:

a)    New GM, which mandated its employees take the various measures, described above at paragraph 26, to conceal safety related defects, including the ignition switch and the fuel pump defects.

b)    GM's engineers (including but not limited to Ray DeGiorgio, Gary Altman, a program engineering manager, Michael Robinson, vice president for environmental sustainability and regulatory affairs, Gay Kent, general director of product investigations and safety regulations) who have carried out GM's directives since the inception of New GM in October 2009 by minimizing and misrepresenting the safety aspects of the ignition switch defect – enabling GM to avoid its legal obligations to recall vehicles with safety related defects. GM's engineers (including but not limited to Mr. DeGiorgio, Mr. Altman, Mr. Robinson and Ms. Kent) have also concealed the part-number-labeling fraud of which they have known since New GM's inception in October 2009.

c)    GM's in-house lawyers (including but not limited to Jaclyn Palmer, Ron Porter, William Kemp, Lawrence Buonomo, and Jennifer Sevigny), who knowingly assisted GM in evading its legal responsibilities by taking measures allowing GM management to claim ignorance about the increasing number of accidents and personal injuries that the ignition switches were causing throughout the Class period. GM's in-house lawyers,

36

as described in Paragraph 36, also took measures to ensure that lawsuits filed by victims of the ignition switch defect and their surviving families were settled confidentially – preventing them from revealing the defect to other Plaintiffs, class members, law enforcement officials, or other government authorities, including the NHTSA – for amounts below the threshold that would trigger closer scrutiny within GM.

d)    GM's outside lawyers, retained to defend the Company against lawsuits filed by victims with injuries allegedly caused by the ignition switch defect, who were directed to play, and played, the same roles as those of in-house counsel described above – taking analagous measures to help GM conceal the ignition switch defect.

e)    Delphi, who, since the inception of the new GM in October 2009, has participated in the Enterprise to conceal the defective ignition switch system and its knowledge that ignition switch part numbers on vehicles driven by class members during the class period were misleading or fraudulent and would hinder any attempt to investigate or learn about the ignition switch defect.

f)    GM's Dealers, including but not limited to Ourisman of Marlow Heights, whom New GM instructed, explicitly or implicitly, to present false and misleading information regarding the ignition switch and fuel pump defects to Plaintiffs and Class members, through, *inter alia*, Technical Service Bulletins and Information Service Bulletins, and who did, in fact, present such false and misleading information to Plaintiffs and Class members during the Class period.

58.    GM and Delphi conducted and participated in the affairs of this RICO Enterprise through a continuous pattern of racketeering activity that began with the inception

37

of the New GM in October 2009, and that consisted of numerous and repeated violations of the

federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, and 18 U.S.C. § 1512

(tampering with witnesses and victims).

### Predicate Acts of Wire and Mail Fraud

59.     Since its inception in October 2009 and in furtherance of its scheme to defraud,

GM, its engineers and its lawyers communicated with Delphi on a regular basis via the mail

and/or wires regarding the defective ignition switch. Through those communications, GM

instructed Delphi to continue concealing the ignition switch defect and to continue to produce

ignition mislabeled or fraudulently labeled switches to help GM evade detection of New GM's

unlawful failure to recall vehicles with defective ignition switches by the NHTSA or other law

enforcement officials. GM's and Delphi's communications constitute repeated violations of 18

U.S.C. §§ 1341 and 1343.

60.     Since GM's inception in October 2009, in furtherance of its scheme to defraud,

GM's lawyers communicated with those claiming injuries caused by the ignition switch defects

on a regular basis via the mail and/or wires. Upon information and belief, GM's lawyers

utilized the mail and wires to insist that litigants agree to confidentiality agreements forbidding

disclosure that the ignition switch defects caused their injuries, and to communicate with

supervisors and each other about ensuring that the cases settled below the threshold that would

trigger scrutiny that might endanger Defendants' concealment of the ignition switch defects.

61.     Since its inception in October 2009, GM has routinely used the wires and mail

to disseminate false and fraudulent advertising about Plaintiffs' and Class members' vehicles,

misrepresenting the vehicles as safe and dependable and failing to disclose the ignition switch

or fuel pump defects in its advertising.

### Predicate Acts of Tampering With Witnesses and Victims

38

62. New GM engaged in an ongoing scheme to tamper with witnesses and victims as described in 18 U.S.C. § 1512(b) by using misleading conduct to influence, delay and prevent the testimony of victims in official proceedings and by entering into a campaign of intimidation and false statements to discourage victims from pursuing their claims against GM, as described elsewhere in the complaint. New GM's in-house legal office played an integral role in the RICO Enterprise by instituting and/or continuing policies and practices with respect to potential and ongoing legal proceedings designed to intimidate victims from utilizing the courts to seek legal protection and to prevent outsiders from becoming aware of the number of victims of safety related defects in GM cars and the severity of injuries those defects were causing.  GM instructed its counsel to deny to victims and their families the existence of the ignition switch defect, and to place blame for any injuries on driver error or irresponsible driving. GM instructed its counsel to prepare its corporate and fact witnesses by encouraging them to deny that they remember anything about any topic on which they were questioned. GM's lawyers actively discouraged GM personnel from taking any notes at safety related meetings. In furtherance of its scheme to conceal its wrongful behavior, GM insisted as a condition of providing any compensation to victims that they agree to confidentiality agreements designed to prevent detection of the safety related defect at issue by Plaintiffs, Class and Subclass members, the NHTSA, courts, litigants, and investors.  New GM also corruptly encouraged its employees and engaged in misleading conduct to prevent said employees from reporting safety defects and therefore delay or prevent their testimony about said defects. GM accomplished this by, *inter alia*, punishing employees who raised red flags about safety defects, thus intentionally intimidating and threatening employees who otherwise could have raised red flags. Jaclyn Palmer, Ron Porter, William Kemp, Lawrence Buonomo,

39

and Jennifer Sevigny, five of GM's in-house lawyers responsible for carrying the tasks described herein, were fired by GM in June 2014, after the Enterprise came to light.

63.     Defendants' conduct in furtherance of this scheme to conceal and/or minimize the significance of the ignition switch defect and fuel pump defect was intentional. Plaintiff, Class and Subclass members were harmed in that they were forced to endure increased risk of death or serious bodily injury, they lost use and enjoyment of their vehicles, and their vehicles' values have diminished because of Defendants' participation in conducting the RICO Enterprise. The predicate acts committed in furtherance of the enterprise each had a significant impact on interstate commerce.

## COUNT II
### Asserted on Behalf of Plaintiffs and the Nationwide Class
### (Common Law Fraud)

64.     Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs of this Complaint.

65.     At the time of New GM's inception in 2009, Defendants knew that the ignition switch used or which would be placed in the Plaintiffs' and class members' vehicles could inadvertently move from "run" to "accessory" or "off," under regular driving conditions. This fact was material to Plaintiffs and class members.

66.     In late October 2009, Defendants also knew that the fuel pump design in the Chevrolet Cobalt was prone to cause fuel leakage and fires.

67.     Between October 2009 and February 2014, Defendants actively and intentionally concealed and/or suppressed the existence and true nature of the ignition switch and fuel pump defects, and minimized the extent of the danger they posed in direct and indirect communications with Plaintiffs, class and subclass members, dealers, the NHTSA, and others.

40

68.     Plaintiffs and class members reasonably relied on GM's communications and material omissions to their detriment. As a result of the concealment and/or suppression of facts, Plaintiffs and Class Members have sustained and will continue to sustain injuries, consisting of the diminished value of their GM vehicles and the lost use and enjoyment of the vehicles that Defendants actions have caused, and exposure to increased risk of death or serious bodily injury.

69.     Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and with reckless disregard to Plaintiffs' and Class Members' rights and well-being, in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT III
### Asserted on Behalf of Ms. Summerville and the Nationwide Subclass of Class Members Who Purchased their Vehicles after New GM's Incorporation on October 19, 2009
### (Common Law Fraud)

70.     Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs of this Complaint.

71.     This Claim is brought on behalf of Berenice Summerville and the subclass of consumers who purchased their vehicles after New GM's incorporation on October 19, 2009.

72.     Upon incorporation of New GM, Defendants knew that ignition switch used in the 2010 Chevrolet Cobalt and other Class Vehicles purchased after October 10, 2009 could inadvertently move from "run" to "accessory" or "off," under regular driving conditions, and that the fuel pump was dangerously defective and posed an unreasonable risk of death or serious bodily injury.

41

73.     Prior to November 2009, Defendants also knew that the fuel pump design in the Chevrolet Cobalt was improperly placed and prone to leakage and even fire.

74.     Between October 2009 and February 2014, Defendants actively and intentionally concealed and/or suppressed the existence and true nature of the ignition switch and fuel pump defects, and minimized the extent of the danger they posed. Concealment of the fuel pump defect continues to the present.

75.     Because Defendants were in exclusive control of the material facts concerning the ignition switch and fuel pump defects, Plaintiffs' and Class Members' actions in purchasing and driving the dangerous vehicles were justified because they had no way of knowing that material facts had been concealed. Plaintiffs and Class Members would not have acted as they did in purchasing and driving their cars if they had known of the concealed and/or suppressed facts.

76.     In the alternative, even if a class member would still have made the vehicle purchase had the defects been known, they would have paid less for their vehicles but for the concealment of the defect. The concealment of the defects artificially increased the market price of the vehicles.

77.     As a result of the concealment and/or suppression of facts, Plaintiffs and Class Members have sustained, and continue to sustain, damages arising from the difference in value between the prices they were induced to pay for their vehicles, and the true value of a vehicle with a defective ignition switch or fuel pump.

78.     Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and well-being, in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive

42

damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV
### Asserted on Behalf of Plaintiffs and on Behalf of the Multi-State Negligence Subclass
### (Negligent Infliction of Economic Loss and Increased Risk under the Common Law of the District of Columbia and Florida, Maryland, New Jersey, and Ohio)

79.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

80.     This claim is brought on behalf of Plaintiffs and the District of Columbia and Maryland Classes and, with respect to the fuel pump defect, the District of Columbia and Maryland subclasses of consumers whose vehicles also suffer from the fuel pump defect described in Paragraph 21.

81.     Because the defective ignition switches and fuel pumps created a foreseeable risk of severe personal and property injury to drivers, passengers, other motorists, and the public at large, Defendants had a duty to warn consumers about, and fix, the defect as soon as soon as they learned of the problem – upon the inception of New GM in October 2009.

82.     Rather than alerting vehicle owners to the danger, Defendants actively concealed and suppressed knowledge of the problems.

83.     Defendants created an unreasonable risk of death or serious bodily injury to Plaintiffs and Subclass members. Plaintiffs and Subclass members were particularly identifiable and foreseeable victims of Defendants' negligence, and their injuries in terms of the diminution in the value of their vehicles and the loss of use and enjoyment of the vehicles was particularly foreseeable.

84.     Defendants created an unreasonable risk of death or serious bodily injury through a pattern and practice of negligent hiring and training of its employees, and by creating

43

and allowing to continue a culture at GM which encouraged the minimizing and hiding of
safety defects from the public. GM negligently increased this risk by firing or otherwise
retaliating against employees who did attempt to convince GM to fix safety problems.

85.    As a result of Defendants' failure to warn them about the defects or repair their
vehicles, Plaintiffs and Class Members sustained, and continue to sustain, damages arising
from the increased risk of driving vehicles with safety related defects, from the loss of use and
enjoyment of their vehicles, and from the diminished value of their vehicles attributable to
Defendants' wrongful acts.

86.    Plaintiffs and class members seek compensatory damages in an amount to be
proved at trial, including compensation for any pain and suffering they endured.

## COUNT V
### Asserted on Behalf of Mr. and Mrs. Elliott, for themselves, as representatives of the public, and on behalf of the District of Columbia Subclass
### (Violation of the District of Columbia's Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq.*)

87.    Plaintiffs hereby incorporate by reference the allegations contained in the
preceding paragraphs of this Complaint.

88.    This Count is brought on behalf of Mr. and Mrs. Elliott and the District of
Columbia Subclass.

89.    Plaintiffs are "consumers" within the meaning of the CPPA, § 28-3901(a)(2).

90.    Defendants are "persons" within the meaning of the CPPA, § 28-3901(a)(1).

91.    Upon the inception of GM in 2009, Defendants knew the Elliotts' and Subclass
members' vehicles, due to the ignition switch defect, are prone to engine and electrical failure
during normal and expected driving conditions. The potential concurrent loss of control of the
vehicle and shut down of safety mechanisms such as air bags and anti-lock brakes makes

44

Subclass Vehicles less reliable, less safe, and less suitable for normal driving activities inhibiting their proper and safe use of their vehicles, reducing their protections from injury during reasonably foreseeable driving conditions, and endangering Subclass members, other vehicle occupants, and bystanders.  GM knew that the defective fuel pumps in the vehicles posed unreasonable risks of death, serious bodily injury, and property damage to the Elliotts, Subclass members, and bystanders. Because of the life threatening nature of these defects, their existence was a material fact that Defendants concealed from plaintiffs and class members.

92.    Subclass members had no reason to believe that their vehicles possessed distinctive shortcomings; throughout the Class Period, they relied on Defendants to identify latent features that distinguished Plaintiffs' and Subclass members' vehicles from similar vehicles without the ignition switch and fuel pump defects, and the Defendants' failure to do so tended to mislead consumers into believing the Class Vehicles were safe to drive.

93.    Defendants violated D.C. Code § 28-3904(f) by failing to state a material fact, the omission of which tended to mislead consumers.

94.    Defendants violated the District of Columbia's consumer protection act generally by violating the common law governing fraud and negligence of the District of Columbia.

95.    Defendants violated the CPPA because any violation of any state or federal regulation of any trade practice is also a violation of the CPPA, so each complaint of each violation of federal law described above, including allegations of GM's violations of the Tread Act, "), 49 U.S.C. §§ 30101-30170, is also a predicate violation of the CPPA.

96.    Plaintiffs seek treble damages, or $1,500 per violation, whichever is greater, payable to the consumer, an order enjoining Defendants' unfair or deceptive acts or practices, attorneys' fees, punitive damages, and any other just and proper relief available under D.C.

45

Code § 28-3905(k)(2), including preliminary and permanent injunctive relief aimed at providing protection for the People of the District of Columbia from Defendants' reckless endangerment of the public health and their wanton disregard for the law.

## COUNT VI
### Asserted on Behalf of Ms. Summerville and the Maryland Subclass
### (Violation of Maryland's Consumer Protection Act ("MDCPA"), Md. Code, Comm. Law § 13-101 *et seq.*)

97.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

98.     This Count is brought on behalf of Ms. Summerville, the Maryland Class generally with respect to the alleged violations of MDCPA § 13-301(3) and the portion of the Maryland Class who purchased vehicles after October 19, 2009, with respect to violations of MDCPA §§ 13-301(2)(i), 13-301(2)(iv), and 13-301(3).

99.     Plaintiffs are "consumers" within the meaning of MDCPA, § 13-101(c)(1).

100.     Defendants are "merchants" within the meaning of MDCPA, § 13-101(g)(1).

101.     Upon the inception of GM in 2009, Defendants knew the Elliotts' and Subclass members' vehicles, due to the ignition switch defect, are prone to engine and electrical failure during normal and expected driving conditions. The potential concurrent loss of control of the vehicle and shut down of safety mechanisms such as air bags and anti-lock brakes makes Subclass Vehicles less reliable, less safe, and less suitable for normal driving activities inhibiting their proper and safe use of their vehicles, reducing their protections from injury during reasonably foreseeable driving conditions, and endangering Subclass members, other vehicle occupants, and bystanders.  GM knew that the defective fuel pumps in the vehicles posed unreasonable risks of death, serious bodily injury, and property damage to the Elliotts,

46

Subclass members, and bystanders. Because of the life threatening nature of these defects, their existence was a material fact that Defendants concealed from plaintiffs and class members in violation of Md. Code, Comm. Laws § 13-301(3).  Plaintiffs were injured thereby having to endure unreasonable risk of death, serious bodily imjury, and diminution of the value of each of their vehicles.

102.    At no time during the Class Period did Ms. Summerville and Subclass members have access to the pre-release design, manufacturing, and field-testing data, and they had no reason to believe that their vehicles possessed distinctive shortcomings. Throughout the Class Period, they relied on Defendants to identify any latent features that distinguished their vehicles from similar vehicles without the ignition switch and fuel pump defects, and the Defendants' failure to do so tended to mislead consumers into believing no distinctive defect was present in their vehicles.

103.    With respect to Maryland Subclass members like Ms. Summerville who purchased their defective vehicles since October 19, 2009, Defendants violated Md. Code, Comm. Laws § 13-301(2)(i) by falsely representing, through advertising, warranties, and other express representations, that the Class Vehicles had characteristics and benefits which they did not actually have, namely, reasonably safe design and component parts.

104.    With respect to Maryland Subclass members like Ms. Summerville who purchased their defective vehicles since October 19, 2009, Defendants violated Md. Code, Comm. Laws § 13-301(2)(iv) by falsely representing through advertising, warranties, and other express representations, that the Class Vehicles met a certain standard or quality which they did not.

105.    With respect to the Subclass generally without regard to whether they purchased their vehicle after October 129, 2009, Defendants violated Md. Code, Comm. Laws § 13-

47

301(3) throughout the Class Period by failing to state a material fact, the omission of which tended to mislead consumers, by concealing the ignition switch and fuel pump defects from Ms. Summerville and Subclass members.

106. Plaintiffs seek an order enjoining Defendants' unfair or deceptive acts or practices, and attorney's fees, and any other just and proper relief available under Md. Code, Com. Laws § 13-408.

## COUNT VII
### Asserted on behalf of Ms. Summerville and the Multi-State Class
### (Breach of Implied Warranty of Merchantability Under § 2-314 of the UCC)

107. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

108. This Count is brought on behalf of Ms. Summerville and the Multi-State Warranty Class.

109. Plaintiffs are "buyers" within the meaning of the Uniform Commercial Code.

110. Defendants GM and Delphi are "sellers" within the meaning of the Uniform Commercial Code because the Multi-State class members' jurisdictions do not require privity with the buyer for a breach of the implied warranty of merchantability claim.

111. Subclass members who purchased Class Vehicles from Defendants since October 19, 2009, did so under an implied warranty that the vehicles would be merchantable. Because of the poor design of the fuel pump, which made leakage and fire more likely, and because of the ignition switch defect, their vehicles are not fit for ordinary purposes for which such vehicles are generally used and are therefore not merchantable.

112. Defendants sold goods that were not merchantable, because those goods are not fit for the ordinary purposes for which such goods are used – the vehicles were marketed and intended to be driven, but become unsafe under ordinary driving conditions.

48

113.     Ms. Summerville and the Multi-State Class members were injured in that they did not receive the full benefits of their bargains with Defendants and seek to recover an amount to make them whole, or seek to exercise their contractual rights of rescission and return to the *status quo ante* by allowing them to return their vehicles to GM for a full refund, and to seek any other rights and remedies afforded them under the Uniform Commercial Code as buyers injured by the total breach of the seller in failing to tender a merchantable product as promised.

## COUNT VIII
### Asserted on Behalf of Plaintiffs and the Nationwide and all Subclasses
### (<u>Civil Conspiracy and Joint Action or Aiding and Abetting</u>)

114.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

115.     This Count is brought on behalf of the nationwide Class and all Subclasses.

116.     Defendants are jointly and severally liable for Plaintiffs' and Class and Subclass members' injuries because they acted in concert to cause those injuries.

117.     Defendants are also liable for Plaintiffs' and class and subclass members' injuries because they entered into specific agreement, explicit and implied, with each other and with others, including but not limited to the other defendants, dealers, engineers, accountants and lawyers (the co-conspirators) described in the preceding paragraphs of this First Amended Complaint, to inflict those injuries and to conceal their actions from Plaintiffs, Class and Subclass members and others.  By these agreements, Defendants conspired to violate each of the laws that form the basis for the claims in the preceding Counts of this Complaint.

118.     Defendants each committed overt acts in furtherance of the conspiracy.

49

119.    Defendants knew that the conduct of the co-conspirators constituted a breach of duties to the plaintiffs.

120.    Defendants gave substantial assistance and encouragement to the co-conspirators in their course of conduct in violation of the rights of the plaintiffs.

121.    Defendants were aware that their assistance and encouragement of the wrongful acts herein complained of substantially assisted the wrongful acts herein complained of.

122.    The wrongful acts herein complained of harmed plaintiffs.

123.    All defendants are therefore liable under civil conspiracy and civil aiding and abetting for all harm to plaintiffs and class members as described in this complaint.

## ALLEGATIONS IN SUPPORT OF
## PRELIMINARY RELIEF

124.    As of the date of the filing of this Complaint, GM concedes that some 6.5 million GM products have safety related defects that create an unreasonable danger of death or serious bodily harm to their drivers, vehicle occupants, nearby drivers, and bystanders.

125.    Despite purporting to come clean about its campaign of concealment and deceit in February 2014, GM has failed to take measures to ensure that these vehicles do not remain on the roads as a source of further death and injury.  Tens of thousands of GM vehicles with safety related defect threatening moving stalls and other dangerous conditions are driven within the District of Columbia by D.C. resident and commuters.

126.    GM has recklessly endangered the public health and safety of the People of the District of Columbia.

127.    One of the main purposes of the "representative action" authorized by the law of the District of Columbia is to allow private citizens such has Mr. and Mrs. Elliott to who are

entitled to relief in this representative action to assist public authorities in protecting the public

interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated,

respectfully request that this Court enter a judgment against GM and Delphi, and grant the

following relief:

E.    Determine that the Elliotts may act as representatives of the public on behalf of

the People of the District of Columbia;

F.    Declare, adjudge and decree that Defendants have recklessly endangered the

public safety of the People of the District of Columbia and order specific steps that Defendants

must take to restore public safety, including but not limited to preliminary relief aimed at

removing the unreasonably dangerous GM vehicles from the public streets and thoroughfares

of the District forthwith; providing safe replacement vehicles for Plaintiffs and Class and

Subclass members that do not contain safety related defects; and, in light of the nature of GM's

wrongdoing, the substantial threat to the public health it has wrongfully caused, its apparent

management recalcitrance or incompetence as evidenced by GM's failure to take significant

remedial steps for the past six months since it has publicly admitted its years-long campaign of

concealment and deceit,  the appointment of a Special Master with expertise in the automobile

industry and ethical risk management practices to assist in the judicial supervision of GM's

management reforms designed to ensure that the Company does not continue to threaten the

public safety in the future; and permanent injunctive relief aimed at ensuring that GM deploys

reasonable  and responsible management controls with respect to safety or cease its business of

manufacturing for sale to the public complex products that can so easily be a threat of death of

serious bodily injury if not manufactured properly.

51

G.      Determine that this action may be maintained as a Class action and certify it as such under Fed. R. Civ. P. 23(a) and 23(b)(3) and/or Fed. R. Civ. P. 23(b)(2), and/or Fed. R. Civ. 23(c)(2), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiffs as Class and Subclass Representatives and Plaintiffs' chosen counsel as Class Counsel;

H.      Declare, adjudge and decree that the ignition switches in Plaintiffs' and Class and Subclass Members vehicles are defective;

I.      Declare, adjudge and decree that the fuel pumps in Plaintiffs' and Class and Subclass Members' vehicles are defective;

J.      Declare, adjudge and decree that Defendants violated 18 U.S.C. §§ 1962(c) and (d) by conducting the affairs of the RICO Enterprise through a pattern of racketeering activity and conspiring to do so;

K.      Declare, adjudge and decree the conduct of Defendants as alleged herein to be unlawful, unfair, and/or deceptive, enjoin any such future conduct, and direct Defendants to permanently, expeditiously, and completely repair the Plaintiffs', Class and Subclass Members' vehicles to eliminate the ignition switch and fuel pump defects or, in the case of Class and Subclass Members who purchased their vehicles after October 9, 2009, declare GM in total breach of contract for its failure to tender a merchantable vehicle, and order GM to return the full purchase price paid upon surrender of the vehicle at the election of the Class and Subclass member;

L.      Declare, adjudge and decree that Defendants are financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

M.      Declare, adjudge and decree that Defendants must disgorge, for the benefit of Plaintiffs, Class Members, and Subclass Members all or part of the ill-gotten gains it received

from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class

Members;

      N.      Award Plaintiffs, Class Members, and Subclass Members the greater of actual,

compensatory damages or statutory damages, or treble damages under the CPPA, as proven at

trial;

      O.      Award Plaintiff and the nation-wide Class Members treble damages pursuant to

18 U.S.C. § 1964(c);

      P.      Award Plaintiff, Class Members, and Subclass Members punitive damages in

such amount as proven at trial;

      Q.      Award Plaintiff, Class Members and Subclass Members their reasonable

attorneys' fees, costs, and prejudgment and postjudgment interest; and

      R.      Award Plaintiff, Class Members, and Subclass Members such other further and

different relief as the case may require or as determined to be just, equitable, and proper by this

Court.

## JURY TRIAL DEMAND

      Plaintiffs request a trial by jury on all the legal claims alleged in this Complaint.


Respectfully submitted,

_____/s/_____
Daniel Hornal
Talos Law
D.C Bar #1005381
705 4th St. NW #403
Washington, DC 20001
(202) 709-9662
daniel@taloslaw.com
Attorney for Plaintiffs

09-50026-mg    Doc 13400-41    Filed 09/23/15    Entered 09/23/15 15:00:09    Exhibit D
Pg 2 of 15

# Exhibit D

CAUSE NO. 2014CCV-6078802

| DIDRA DE LOS SANTOS, | § | IN THE COUNTY COURT |
| *Plaintiff* | § | |
| | § | |
| *vs.* | § | |
| | § | |
| | § | AT LAW NO. 2 |
| | § | |
| MELINA GABRIELLE ORTEGA | § | |
| GENERAL MOTORS, LLC, and | § | |
| RAYMOND DEGIORGIO, GARY | § | |
| ALTMAN, LORI QUEEN, JIM | § | |
| QUEEN, MARK LANEVE, | § | |
| *Defendants* | § | NUECES COUNTY, TEXAS |

## PLAINTIFF'S FIRST AMENDED PETITION

COMES NOW Plaintiff Didra De Los Santos (hereinafter, "Didra" or "Plaintiff") and files her Original Petition and Application for Temporary Restraining Order and Injunction complaining of Melina Gabrielle Ortega, General Motors, LLC, Raymond DeGiorgio, Gary Altman, Lori Queen, Jim Queen, Mark LaNeve (together, "Defendants") and in support of this petition would show the Court as follows:

### I.
### DISCOVERY LEVEL

1.    Discovery shall be conducted in this case according to a Level III discovery control plan.

### II.
### PARTIES

2.    Plaintiff Didra De Los Santos is an individual residing in Corpus Christi, Nueces County, Texas.

Plaintiff's First Amended Petition

1.

3.      Defendant Melina Gabrielle Ortega ("Defendant Ortega") is an individual who resides in Nueces County, Texas. Defendant Ortega has been served at her residence, 8201 Azimuth Ct., Corpus Christi, Nueces County, Texas 78414.

4.      Defendant General Motors, LLC ("New GM") is a Delaware limited liability company. With respect to the facts alleged and claims asserted in this Petition, New GM is the corporate successor of General Motors Corporation ("Old GM"), which filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code on June 1, 2009. On July 10, 2009, New GM acquired substantially all of the assets and assumed certain liabilities of Old GM by way of a Section 363 sale under Chapter 11 of the Bankruptcy Code. Plaintiff's causes of action in this lawsuit are brought against New GM, and Plaintiff does not assert any causes of action against Old GM. Although this Petition references facts against Old GM, it is for background and reference purposes only. At all times relevant to the claims in this lawsuit, New GM has been in the business of developing, manufacturing, and marketing cars throughout the State of Texas. New GM has a network of authorized retailers that sells New GM vehicles and parts throughout Texas. General Motors, LLC has been served with process through its registered agent for service of process in the State of Texas, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-4234, and has appeared and answered in this case.

5.      Defendant Raymond DeGiorgio ("Defendant DeGiorgio") was the lead design engineer on Chevrolet Cobalt ignition switches. In 2006, DeGiorgio approved a design change to the faulty ignition switch that is the subject of GM's recent recall, and which caused Plaintiff's vehicle to stall immediately before the collision which is the subject of this lawsuit. Defendant DeGiorgio designed an improvement for the ignition switch in 2007, although he later denied,

**Plaintiff's First Amended Petition**

2.

under oath, that he had done so. He did this in what can only be described as an attempt to conceal a defective condition that GM knew about in the 2006 Chevrolet Cobalt, the vehicle owned by Plaintiff. Defendant DeGiorgio has recently been suspended, with pay, by the New GM for his role in the cover up at GM of the ignition switch defect. In fact, he was accused by at least one United States Senator of being actively involved in participation of a cover up by the New GM of the defective condition of the Chevrolet Cobalt and the extent of New GM's knowledge of the defective condition and the dangers such condition presented to Plaintiff and others. Defendant DeGiorgio has been served through the Texas Secretary of State in accordance with the Texas Long-Arm Statute, by service on him at his residence, 4085 Wildwood Court, Commerce, Michigan 48382.

6.     Defendant Gary Altman ("Defendant Altman") was Chief Development Engineer at GM from 2000 to 2005, and programming engineering manager for the Chevrolet Cobalt. In 2013, Defendant Altman admitted that in 2005 GM made a conscious decision not to fix the Chevrolet Cobalt. Defendant Altman has recently been suspended, with pay, by the New GM for his role in the cover up at GM of the ignition switch defect. Defendant Altman was involved in the cover up at GM concerning the extent of New GM's knowledge of the defective switch and the dangers it posed to Plaintiff and others. Defendant Altman has been served through the Texas Secretary of State in accordance with the Texas Long-Arm Statute, by service on him at his residence, 62935 Tournament Drive, Washington, Michigan 48094.

7.     Defendant James E. Queen ("Defendant J. Queen") served as Group Vice President of Global Engineering of Motors Liquidation Company (formerly known as General Motors Corporation) from 2007 to July 2009. Mr. Queen served as Vice President of vehicle systems of GM North America Car Group since January 2001, and also served as its Vice

**Plaintiff's First Amended Petition**

3.

President and Group Director since 1999. He served as Group Director of engineering of the GM Small Car Group since 1997. Mr. Queen was one of the engineers at GM that was responsible for the design of the Chevrolet Cobalt. Defendant J. Queen was involved in the cover up at GM concerning the extent of General Motor's knowledge of the defective switch and the dangers it posed to Plaintiff and others. Defendant J. Queen resides at 59 Wicklow Dr., Hilton Head Island, SC 29928, and may be served through the Secretary of State.

8.     Defendant Lori Queen ("Defendant L. Queen") was GM's vehicle line executive for small cars, including the Chevrolet Cobalt, including from 2005 to 2009.  E-mail communications have been discovered that demonstrate that Defendant L. Queen and GM had personal knowledge of the existence of a defective switch in the Chevrolet Cobalt since at September 2005. Defendant L. Queen was involved in the cover up at GM concerning the extent of GM's knowledge of the defective switch and the dangers it posed to Plaintiff and others. Defendant L. Queen has been served through the Texas Secretary of State in accordance with the Texas Long-Arm Statute, by service on her at his residence, 59 Wicklow Dr., Hilton Head Island, SC 29928.

9.     Defendant Mark LaNeve ("Defendant LaNeve") was the head of GM Sales, Service, and Marketing from 2004 to 2009. Defendant LaNeve was involved in the cover up at GM concerning the extent of GM's knowledge of the defective switch and the dangers it posed to Plaintiff and others. Defendant LaNeve's has been served through the Texas Secretary of State in accordance with the Texas Long-Arm Statute, by service on him at his residence, 47610 Bellagio Drive, Northville, Michigan 48167.

**Plaintiff's First Amended Petition**

4.

### III.
### VENUE AND JURISDICTION

10.    Venue is proper in Nueces County because all or a substantial part of the events giving rise to the claims brought by this lawsuit occurred in Nueces County, Texas, and Defendant Ortega resides in Nueces County, Texas.[1]

11.    The Court has jurisdiction over Defendant Ortega because she is domiciled in this State.

12.    The Court has jurisdiction over New GM, Raymond DeGiorgio, Gary Altman, Lori Queen, James E. Queen, Mark LaNeve (together, "GM Defendants") under the long-arm statute of the State of Texas.[2]

### IV.
### FACTS

**A.    This Lawsuit Arises Out Of A Collision In Nueces County, Texas**

13.    Didra owns a 2006 Chevrolet Cobalt, which she purchased from Oasis Motor Company in Nueces County, Texas. Didra purchased the 2006 Cobalt because of the vehicle's quality, reliability, and safety features.

14.    During the early morning hours on September 4, 2013, Didra was traveling southbound on Weber Road on her way to work as a care provider to special needs children within Corpus Christi Independent School District. As she traveled through the intersection of

---

1.    *See* TEX. CIV. PRAC. & REM. CODE §§ 15.002 (a)(1)-(a)(2).

2.    *See* TEX. CIV. PRAC. & REM. CODE §17.042.

Plaintiff's First Amended Petition

5.

Weber Road and Tiger Lane, a vehicle driven by Defendant Ortega, traveling in the opposite direction on Weber Road, made an illegal left-hand turn in front of Didra.

15.    When Didra saw Defendant Ortega's vehicle turning in front of her she immediately applied her brakes.    As she applied her brakes, her vehicle stalled, and she collided with Defendant Ortega's vehicle. The force of the impact was significant. The entire front end of Didra's 2006 Chevrolet Cobalt was crushed, which included significant damage to her bumper, hood, and both front quarter panels.



16.    As shown in the picture taken of Didra's 2006 Cobalt after the collision, the airbags on Plaintiff's 2006 Cobalt did not deploy.  The airbags should have deployed because this was a "deployable event," meaning a collision in which the airbags should have opened given the change in velocity of the vehicle caused by the collision.

17.    As a result of the failed airbags, there was nothing to stop Didra's forward momentum except her steering wheel and her seat belt, neither of which adequately prevented injury to Didra's spine. As Didra was thrown around in her vehicle, she suffered severe and permanent spinal injuries, as more fully described below.

**B.    The Airbags On Plaintiff's Vehicle Did Not Deploy Because Of A Defective Condition That GM Knew Existed**

**1.    Plaintiff's vehicle was one of the vehicles subject to a recent recall.**

Plaintiff's First Amended Petition

6.

18.     The problem with Plaintiff's vehicle was not unique.  To the contrary, it is a problem that resulted in a recall notice being issued by New GM for certain of its vehicles, including Plaintiff's 2006 Chevrolet Cobalt.  Initially, on February 7, 2014, New GM filed a Defect Notice to recall 2005-2007 Model Year Chevrolet Cobalt and 2007 Pontiac G5 vehicles. The Defect Notice stated that the ignition switch torque performance in these vehicles might not meet specifications, resulting in the nondeployment of airbags in crash events. The notice called for the recall of approximately six hundred thousand vehicles.

19.     Seventeen days later, on February 24, 2014, New GM issued a notice to the National Highway Traffic Safety Administration ("NHTSA"), expanding the recall to include 2003-2007 Saturn Ions, 2006-2007 Chevrolet HHRs, 2006-2007 Pontiac Solstices, and 2007 Saturn Skys, bringing the number of vehicles affected by the recall to 1,367,146. This NHTSA notice furnished information dating back 10 years, and dealt directly with New GM's recall obligations and product warranties, which have been known to New GM since July 2009. The notice dated February 24, 2014, provided a chronology that, at a minimum, demonstrates GM's knowledge and actions related to the ignition switch.

20.     On March 28, 2014, the recall was expanded to include the following vehicles: 2008-2010 Pontiac Solstices; 2008-2010 Pontiac G5s; 2008-2010 Saturn Skys; 2008-2010 Chevrolet Cobalts; and 2008-2011 Chevrolet HHRs (collectively, the "defective vehicles").

21.     Throughout 2005, Old GM received similar field reports of vehicles losing engine power when the key moved out of the "run" position. A proposal was approved to redesign the key head, but later cancelled. Instead of recalling the vehicles to replace the defective ignition switches, Old GM issued a Service Bulletin (the "Bulletin"). The Bulletin recognized that there

was a potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort.

22.     Although Old GM developed an insert for the key ring that changed it from a slot design to a hole design, to prevent the key from easily jogging the ignition switch out of the run position, the redesigned ignition switch was not installed in vehicles until the 2007 model year.

23.     The defective ignition switch has been linked to numerous crashes and fatalities.

24.     Given the vast number of instances of sudden engine power loss and nondeployment of airbags related to the defective ignition switch and New GM's discovery or knowledge of many or all of the instances beginning with its inception in July 2009, New GM should have aggressively taken remedial measures to address these defects. New GM failed to do so. In fact, this first recall was not implemented until 2014 – nearly ten years after the first instances of engine power loss.

25.     The ignition switch defect in GM vehicles has adversely affected the company's reputation as a manufacturer of safe, reliable vehicles with high resale value, as compared to vehicles made by its competitors. In the wake of the news reports about this serious problem, GM customers and consumers generally are – as they should be – skeptical about the quality and safety of GM vehicles.

26.     In the wake of the news about the ignition defects, consumers have also become rightfully skeptical about whether New GM is coming forth with truthful information about the sudden loss of power defect. Likewise, GM customers, including Plaintiff, and the general public are left to wonder whether safety concerns about GM vehicles are limited to this particular problem.

**Plaintiff's First Amended Petition**

8.

**2. The recall notice is inaccurate because Plaintiff only had one key in the ignition switch at the time of the collision, and her vehicle still stalled.**

27.     In late March 2014, Plaintiff received a letter from New GM advising her that her vehicle was being recalled. In that letter, New GM advised Plaintiff that she should take all the weight off of her key chain and, by so doing, her car would not stall.

28.     New GM's statements in the recall notice are not accurate. At the time of her collision, Plaintiff only had one key, her ignition key – with no key fob, a small security hardware device used to unlock vehicles and set a vehicle's alarm – in the ignition switch of her 2006 Chevrolet Cobalt.

**3. The damage done….**

29.     As a direct and proximate result of the collision and the negligent conduct of Defendants, Plaintiff suffered severe bodily injuries to her cervical spine. The injuries are permanent in nature. The injuries have had a serious effect on the Plaintiff's health and well-being. Some of the effects are permanent and will abide with the Plaintiff for a long time into the future, if not for her entire life. These specific injuries and their ill effects have, in turn, caused the Plaintiff physical and mental condition to deteriorate generally and the specific injuries and ill effects alleged have caused and will, in all reasonable probability, cause the Plaintiff to suffer consequences and ill effects of this deterioration throughout her body for a long time in the future, if not for the balance of her natural life. As a further result of the nature and consequences of her injuries, the Plaintiff suffered great physical and mental pain, suffering and mental anguish and in all reasonable probability, will continue to suffer in this manner for a long time into the future, if not for the balance of her natural life.

30.     Additionally, as a direct and proximate result of the occurrence made the basis of

**Plaintiff's First Amended Petition**

9.

this lawsuit, Plaintiff was caused to incur the following damages:

- a. Reasonable medical care and expenses in the past. Plaintiff incurred these expenses for the necessary care and treatment of the injuries resulting from the accident complained of herein and such charges are reasonable and were usual and customary charges for such services in which county they were incurred;

- b. Reasonable and necessary medical care and expenses, which will, in all reasonable probability be incurred in the future;

- c. Physical pain and suffering in the past;

- d. Physical pain and suffering, which will, in all reasonable probability be suffered in the future;

- e. Physical impairment in the past;

- f. Physical impairment, which will, in all reasonable probability, be suffered in the future;

- g. Lost wages in the past, present and future;

- h. Loss of earning capacity, which will, in all reasonable probability, be incurred in the future;

- i. Mental anguish in the past;

- j. Mental anguish which will, in all reasonable probability be suffered in the future;

- k. Disfigurement; and

- l. Other special damages.

## V.
## CLAIMS AGAINST DEFENDANT ORTEGA

31.    Plaintiff hereby incorporates each of the foregoing paragraphs herein as if set forth in full in this section.

32.    Defendant Ortega had a duty to exercise the degree of care that a reasonably careful person would use to avoid harm to others under circumstances similar to those described herein.

Plaintiff's First Amended Petition

10.

33.     Plaintiff's injuries were proximately caused by Defendant Ortega's negligent, careless and reckless disregard of said duty.

34.     The negligent, careless and reckless disregard of duty of Defendant Ortega consisted of, but is not limited to, the following acts and omissions:

> a.     Defendant Ortega failed to keep a proper lookout for Plaintiff's safety that would have been maintained by a person of ordinary prudence under the same or similar circumstances;
>
> b.     Defendant Ortega failed to yield the right-of-way to Plaintiff's vehicle;
>
> c.     Defendant Ortega failed to timely apply the brakes of the vehicle in order to avoid the collision in question;
>
> d.     Defendant Ortega failed to turn her motor vehicle to the right or the left in an effort to avoid the collision complained of; and
>
> e.     Defendant Ortega failed to blow her horn to warn of imminent collision.

35.     Each of these acts and/or omissions, whether taken singularly or in any combination constitute negligence, negligence per se and gross negligence, which proximately caused the collision and injuries and other losses as specifically set forth herein, all of which Plaintiff suffered and which Plaintiff will continue to suffer in the future, if not for the remainder of her natural life, and the damage and other losses to Plaintiff.

## VI.
## CLAIMS AGAINST GM DEFENDANTS

### A.     Negligence And Gross Negligence

36.     Plaintiff re-alleges as if fully set forth, each and every allegation set forth herein.

Plaintiff's First Amended Petition

37.    Plaintiff hereby asserts a cause of action for negligence strictly and solely against "New GM" and the GM Defendants, as defined above to include Defendant J. Queen, Defendant L Queen, Defendant DeGiorgio, Defendant Altman, and Defendant LaNeve.

38.    Each and every act of negligence asserted herein by the Plaintiff is asserted against the New GM and the GM Defendants, only, and not the Old GM.

39.    The GM Defendants owed Plaintiff a duty to detect known safety defects in GM vehicles.

40.    The GM Defendants owed Plaintiff a duty, once it discovered the safety defects, such as the ignition switch defect, to provide thorough notice of the defect, including a warning that the defective vehicles should not be driven until an appropriate repair procedure is developed and performed.

41.    The GM Defendants owed Plaintiff a duty, once it discovered the ignition switch defect, to ensure that an appropriate repair procedure was developed and made available to drivers.

42.    The GM Defendants knew that their customers, such as Plaintiff, expect that the company will employ all reasonable efforts to detect safety defects, warn drivers of their existence, and develop and make available an appropriate repair procedure.

43.    The GM Defendants efforts to discover, provide notice of, and provide repair procedures for safety related defects exist for the benefit of Plaintiff and other drivers of GM vehicles. New GM was aware that by providing maintenance and repair information and assistance, including through its authorized dealerships, GM had a responsibility to Plaintiff and other drivers to take the reasonable measures listed above.

44.    Between July 10, 2009, and March 2014, the GM Defendants breached their

**Plaintiff's First Amended Petition**

12.

duties to Plaintiff by failing to provide appropriate notice of and repair procedures for the ignition switch defect in Plaintiff's vehicle. In doing so, New GM departed from the reasonable standard of care required of it.

45.     It was foreseeable that if the GM Defendants did not provide appropriate notice and repair procedure for the defect, that Plaintiff and other drivers would be endangered, and that when news of the defect became widespread, that the value of Plaintiff's vehicle and other defective vehicles would be diminished.

46.     Plaintiff has suffered injury by, among other things, being stuck with a defective vehicle with no known appropriate fix, and with a diminished value. Plaintiff is thus deprived of the use and enjoyment of her vehicle as well as the ability to sell her vehicle for the value it would have had if New GM had not concealed and failed to develop a repair procedure for the defect. In addition, Plaintiff and other drivers have been and continue to be endangered by New GM's refusal to state unequivocally that the vehicles should not be driven in their current state. New GM's failure to provide an appropriate notice and repair was the direct and proximate cause of Plaintiff's injuries, and led directly and predictably to the harm suffered.

47.     Plaintiff's injuries were reasonably foreseeable to New GM.

48.     Plaintiff could not through the exercise of reasonable diligence have prevented the injuries caused by New GM's negligence.

49.     Plaintiff seeks an order enjoining New GM from its continued negligence; including to require New GM to provide appropriate notice to drivers (including instructions to drivers to park the vehicle); to pay for a rental car while the necessary repairs are conducted; and to extend warranty coverage covering components of the ignition system.

**B.    Civil Conspiracy Against The GM Defendants**

Plaintiff's First Amended Petition

13.

50.    Plaintiff re-alleges as if fully set forth each and every allegation set forth above.

51.    The GM Defendants and the New GM were involved in a civil conspiracy, as two or more persons whose goal was to accomplish a cover up of the defective ignition switch at the New GM. The cover up was for the purpose of an unlawful act, to wit, the defective condition which proximately caused damage to Plaintiff.

### C.    Fraud by Non Disclosure

52.    Plaintiff re-alleges as if fully set forth, each and every allegation set forth herein.

53.    The Plaintiff hereby asserts a cause of action for fraud by non-disclosure strictly and solely against New GM. That is, each and every act constituting fraud by non-disclosure asserted herein by the Plaintiff are asserted against the New GM only and not the Old GM.

54.    As set forth above, from July 2009 to the present, New GM intentionally concealed or failed to disclose material facts from the Plaintiff, the public, and NHTSA.

55.    As early as 2001, during pre-production development of the Ion, Old GM became aware of issues relating to ignition switch "passlock" system. The 2001 report stated the problem included a "low detent plunger force" in the ignition switch.

56.    In 2003, before the launch of the 2005 Cobalt, Old GM became aware of incidents wherein the vehicle engine would suddenly lose power in the event the key moved out of the "run" position when the driver inadvertently contacted the key or steering column. An investigation was opened and, after consideration of lead-time required and the cost and effectiveness of potential solutions, the investigation was closed with no action taken.

57.    New GM had a duty to disclose the facts to the Plaintiff and New GM knew: (1) the Plaintiff was ignorant of the material facts that New GM did not disclose and/or intentionally

concealed; and (2) the plaintiff did not have an equal opportunity to discover the material facts that GM did not disclose and/or intentionally concealed.

58.     By failing to disclose these material facts, New GM intended to induce Plaintiff to take some action or refrain from acting.

59.     Plaintiff relied on New GM's non-disclosure and the Plaintiff was injured as a result of acting without knowledge of the undisclosed facts.

**D.     Intentional Infliction of Emotional Distress**

60.     Plaintiff re-alleges as if fully set forth, each and every allegation set forth herein.

61.     The Plaintiff hereby asserts a cause of action for intentional infliction of emotional distress strictly and solely against New GM. That is, each and every act constituting the intentional infliction of emotional distress asserted herein by the Plaintiff is asserted against the New GM only and not the Old GM.

62.     New GM's intentional and/or reckless conduct, outlined above, was both extreme and outrageous, causing Plaintiff to suffer severe emotional distress. Specifically, New GM's conduct, as described above, was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community, and the emotional distress suffered by Plaintiff was so severe that no reasonable person could be expected to endure it.

## VII.
## PREJUDGMENT AND POST-JUDGMENT INTEREST

65.     Plaintiff seeks prejudgment and post-judgment interest at the maximum rate permitted by law.

## VIII.
## JURY DEMAND

66.    In accordance with Rule 216 of the Texas Rules of Civil Procedure, Plaintiff hereby makes application for a jury trial and request that this cause be set on the Court's Jury Docket. In support of his application, the appropriate jury fee has been paid to the Clerk at least thirty (30) days in advance of the trial setting.

## XIII.
## PRAYER

For the foregoing reasons, Plaintiff Didra De Los Santos prays that the Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendants for actual damages, as alleged, and exemplary damages, in an amount within the jurisdictional limits of this Court; together with pre-judgment interest (from the date of injury through the date of judgment) at the maximum rate allowed by law; post-judgment interest at the legal rate, costs of court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

Respectfully submitted,

HILLIARD MUÑOZ GONZALES LLP

By: _____
Robert C. Hilliard
State Bar No. 09677700
bobh@hmglawfirm.com
Rudy Gonzales, Jr.
State Bar No. 08121700
rudyg@hmglawfirm.com
Catherine D. Tobin
State Bar No. 24013642
catherine@hmglawfirm.com

Plaintiff's First Amended Petition

16.

John B. Martinez
State Bar No. 24010212
john@hmglawfirm.com
T. Christopher Pinedo
State Bar No. 00788935
cpinedo@hmglawfirm.com
Kimberly Wilson
State Bar No. 24066035
kimberly@hmglawfirm.com
Marion Reilly
State Bar No. 24079195
marion@hmglawfirm.com
Neely Balko
State Bar No. 24082652
neely@hmglawfirm.com
Todd A. Hunter, Jr.
State Bar No. 24087774
todd@hmglawfirm.com

719 S. Shoreline Boulevard,
Suite 500
Corpus Christi, TX 78401
Telephone No.: (361) 882-1612
Facsimile No.:   (361) 882-3015

THE LAW OFFICE OF THOMAS J. HENRY
521 Starr St.
Corpus Christi, Texas 78401
Tel. (361) 985-0600
Fax. (361) 985-0601

Thomas J. Henry
State Bar No. 09484210
Greggory A. Teeter
State Bar No. 24033264
David A. Tijerina
State Bar No. 00791796
Bianca Martinez
State Bar No. 24076208
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned attorney does hereby certify that a true and correct copy of the foregoing instrument was forwarded to all counsel of record, listed below, pursuant to the Texas Rules of Civil Procedure on this the 19th day of May 2014.

Darrell L. Barger
HARTLINE DACUS BARGER DREYER
LLP
800 North Shoreline Blvd.
Suite 2000, North Tower
Corpus Christi, Texas 78401
361.866.8039 fax

Kyle H. Dreyer
HARTLINE DACUS BARGER DREYER
LLP
6688 N. Central Expressway, Suite 1000
Dallas, Texas 75206
214.267.4214 fax

Robert C. Hilliard

**Plaintiff's First Amended Petition**

18.

09-50026-mg   Doc 13488-5   Filed 09/23/15   Entered 09/23/15 15:06:09   Exhibit E
Pg 91 of 154

# Exhibit E

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY,
PENNSYLVANIA

CAROLYN RICKARD,
ADMINISTRATRIX OF THE ESTATE
OF WILLIAM J. RICKARD, Deceased,

                Plaintiff,

v.

WALSH CONSTRUCTION COMPANY,
an Illinois Business Corporation, t/d/b/a
Walsh Northeast;
SARGENT ELECTRIC COMPANY, a
Pennsylvania Business Corporation; CONCRETE
RESTORATION SPECIALISTS, LLC,
an Ohio Business Corporation; INDEPENDENCE
EXCAVATING, INC., an Ohio Business
Corporation; W.G. TOMKO, INC., a Pennsylvania
Business Corporation, PARKING LOT
PAINTING CO., LLC, a Pennsylvania Business
Corporation; MICHAEL BAKER JR., INC.,
a Pennsylvania Business Corporation;
BETH'S BARRICADES, a Pennsylvania Business
Corporation; COMMONWEALTH OF
PENNSYLVANIA, PENNSYLVANIA
DEPARTMENT OF TRANSPORTATION;
GENERAL MOTORS, LLC, a Delaware
Business Corporation f/k/a General Motors
Company; WOODLEY PAUL, an individual and
CHARLES PHILLIPS, an individual.

                Defendants.

CIVIL DIVISION

No.: GD-14-020549

Code:

**AMENDED COMPLAINT**

Filed By:
Plaintiffs

Counsel of Record for
This party:

Arthur Cutruzzula, Esquire
Pa. I.D. #27915

Walter J. Nalducci, Esquire
Pa. I.D. #69256

Julianne Cutruzzula Beil, Esquire
Pa. I.D. #315892

CUTRUZZULA & NALDUCCI
3300 Grant Building
Pittsburgh, PA 15219
(412) 391-4040

**A JURY TRIAL DEMANDED**

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY,
PENNSYLVANIA

| | | |
|---|---|---|
| CAROLYN RICKARD, | ) | CIVIL DIVISION |
| ADMINISTRATRIX OF THE ESTATE | ) | |
| OF WILLIAM J. RICKARD, Deceased | ) | |
|                    Plaintiff, | ) | |
| v. | ) | No.: GD-14-020549 |
| | ) | |
| WALSH CONSTRUCTION COMPANY, | ) | |
| an Illinois Business Corporation, t/d/b/a | ) | Code: |
|  Walsh Northeast; SARGENT ELECTRIC | ) | |
| COMPANY, a Pennsylvania Business Corporation; | ) | |
| CONCRETE RESTORATION SPECIALISTS, LLC, | ) | |
| an Ohio Business Corporation; INDEPENDENCE | ) | |
| EXCAVATING, INC., an Ohio Business | ) | |
| Corporation; W.G. TOMKO, INC., a Pennsylvania | ) | |
| Business Corporation, PARKING LOT | ) | |
| PAINTING CO., LLC, a Pennsylvania Business | ) | |
| Corporation; MICHAEL BAKER JR., INC., | ) | |
|  a Pennsylvania Business Corporation; | ) | |
| BETH'S BARRICADES, a Pennsylvania Business | ) | |
| Corporation; COMMONWEALTH OF | ) | |
| PENNSYLVANIA, PENNSYLVANIA | ) | |
| DEPARTMENT OF TRANSPORTATION; | ) | |
| GENERAL MOTORS, LLC, a Delaware | ) | |
| Business Corporation f/k/a General Motors | ) | |
| Company; WOODLEY PAUL, an individual and | ) | |
| CHARLES PHILLIPS, an individual, | ) | |
|                   Defendants. | ) | |

## NOTICE TO DEFEND

      You have been sued in Court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so, the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

      YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

ACBA LAWYER REFERRAL SERVICE
400 KOPPERS BUILDING – 436 SEVENTH AVENUE
PITTSBURGH, PA 15219
412-261-5555

2

# AMENDED COMPLAINT
## A JURY TRIAL DEMANDED

AND NOW, comes the Plaintiff, Carolyn Rickard, Administratrix of the Estate of

William J. Rickard, Deceased, by and through her attorneys, Arthur Cutruzzula, Esquire and

CUTRUZZULA & NALDUCCI, and files this action against the Defendants upon a set of

particulars of which the following is a statement:

1.      That Plaintiff, Carolyn Rickard, wife of Plaintiff's Decedent, William J. Rickard,

was duly appointed as the Administratrix of the Estate of William J. Rickard, Deceased by the

Register of Wills of Westmoreland County, Pennsylvania on October 29, 2014 at No. 6514-

2087 of 2014.

2.      That Plaintiff brings this action as the Administratrix of the Estate of William J.

Rickard, Deceased of 2075 Guinevere Drive, North Huntingdon, PA 15642.

3.      That Defendant, Walsh Construction Company t/d/b/a Walsh Northeast is an

Illinois Business Corporation with a principal place of business at 929 W. Adams Street,

Chicago, Illinois 60607, which is registered to do business in Pennsylvania and which regularly

conducts business in Western Pennsylvania, including Allegheny County.

4.      That Defendant, Sargent Electric Company is a Pennsylvania Business

Corporation with a principal place of business at 2767 Liberty Avenue, Pittsburgh, Pennsylvania

15222.

5.      That Defendant, Concrete Restoration Specialists, LLC is an Ohio Business

Corporation with a principal place of business at 388 S. Main Street, Suite 500 Akron, Ohio

44311, which is registered to do business in Pennsylvania and which regularly conducts business

in Western Pennsylvania, including Allegheny County.

6.  That Defendant, Independence Excavating, Inc. is an Ohio business corporation with a principal place of business at 5720 Schaff Road, Independence, Ohio 44131, which is registered to do business in Pennsylvania and which regularly conducts business in Western Pennsylvania, including Allegheny County.

7.  That Defendant, W.G. Tomko, Inc. is a Pennsylvania business corporation with a principal place of business at 2559 Library Road, Finleyville, Pennsylvania 15332.

8.  That Defendant, Parking Lot Painting Company, LLC, is a Pennsylvania business corporation with a principal place of business at 2991 Industrial Boulevard, Bethel Park, Pennsylvania 15102.

9.  That Defendant, Michael Baker Jr., Inc. is a Pennsylvania business corporation with a principal place of business at 100 Airside Drive, Moon Township, Pennsylvania 15108.

10.  That Defendant, Beth's Barricades, is a Pennsylvania business corporation with a principal place of business at 8260 Fox Ridge Road, Pittsburgh, PA 15237.

11.  That Defendant, Commonwealth of Pennsylvania, Pennsylvania Department of Transportation (hereinafter "PennDOT") is a governmental agency duly organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 301 Fifth Avenue, Suite 210, Pittsburgh, Pennsylvania 15222.

12.  That Defendant, General Motors LLC f/k/a General Motors Company is a Delaware Business Corporation with a principal place of business at 300 Renaissance Center, Detroit, Michigan 48090, and is registered to do business in Pennsylvania and which regularly conducts business in Western Pennsylvania, including Allegheny County.

13.  That Defendant, Woodley Paul, is an individual residing at 6036 A Street, Philadelphia, PA 19120.

4

14.     That Defendant, Charles Phillips, is an individual residing at 335 Ashton Street, Pittsburgh, PA 15207.

15.     That Defendant, Walsh Construction Company t/d/b/a Walsh Northeast, entered into a contract with PennDOT on January 30, 2012, for the rehabilitation of the Squirrel Hill Tunnel, located on Pittsburgh Pennsylvania's Parkway East, I-376, which rehabilitation continued onward through November 16, 2012.

16.     That at all times relevant to this action, Defendants, Sargent Electric Company, Concrete Restoration Specialists, LLC, Independence Excavating, Inc., W.G. Tomko, Inc. and Parking Lot Painting Co., LLC were engaged in work on that project being the rehabilitation of the Squirrel Hill Tunnel, located on Pittsburgh Pennsylvania's Parkway East, I-376, which rehabilitation continued through November 16, 2012.

17.     That Defendant, Michael Baker Jr., Inc. entered into a contract with PennDOT for construction inspection and management services during the aforesaid rehabilitation of the Squirrel Hill Tunnel, located on Pittsburgh Pennsylvania's Parkway East, I-376, which rehabilitation continued onward through November 16, 2012.

18.     That Defendant, Beth's Barricades entered into a contract with Defendant, Walsh Construction Company t/d/b/a Walsh Northeast, on February 20, 2012, to provide services relative to the protection and maintenance of traffic during the construction project for the rehabilitation of the Squirrel Hill Tunnel, located on Pittsburgh Pennsylvania's Parkway East, I-376, which rehabilitation continued onward through November 16, 2012, and was responsible for, inter alia, the installation, maintenance and removal of traffic control signs, changeable message signs, arrow panels, impact attenuating devices, traffic channelizing devices and portable camera units.

19.     That at all times relevant to this action, Defendant General Motors, LLC f/k/a

General Motors Company was engaged in the business of designing, manufacturing, assembling,

selling, supplying, preparing for delivery, recalling, retrofitting, repairing, inspecting, and/or

distributing, and did design, manufacture, assemble, sell, supply, prepare for delivery, recall,

retrofit, repair, inspect, and/or distribute, inter alia, Chevrolet S-10 automobiles and their

component parts, including their seats, seat backs, seat rails, headrests and related systems,

including the 2002 Chevrolet S-10 pickup, its seats, seat backs, seat rails, headrests and related

systems, devices and components, bearing vehicle identification number

1GCDT13W32K151405 involved in this accident.

20.     That on or about November 16, 2012, at or around 3:15 a.m., Plaintiff's decedent,

William J. Rickard, was traveling Westbound in the right hand lane on Pennsylvania Interstate

376, a four land divided highway, just prior to the Squirrel Hill Tunnel, in his 2002 Chevrolet S-

10 four-door pickup truck.

21.     That on and at the above stated date, time and place, Defendant, Woodley Paul,

was operating a 2005 Toyota Camry, owned by Defendant, Charles Phillips, also in the right

hand lane of west-bound I-376 prior to the Squirrel Hill Tunnel, behind Plaintiff's decedent's

vehicle.

22.     That on and at the above stated date, time and place, the left lane of travel prior to

the Squirrel Hill Tunnel was completely blocked off with cones and a stationary truck with a

mounted arrow board located in the closed left lane which was directing all traffic to the right

lane.

23.     That also on and at the above stated date, time and place, the Westbound Squirrel

Hill Tunnel was suddenly closed, blocking the one remaining lane of travel.

6

24.     That on and at the above stated date, time and place, Plaintiff's decedent, William

J. Rickard, due to the aforementioned traffic restrictions, was brought to an abrupt halt in the

right lane of I-376 West, just prior to the Squirrel Hill Tunnel.

25.     That on and at the above stated date, time and place, as Defendant, Woodley Paul

approached the closed tunnel he was unable to stop his vehicle, causing him to strike Mr.

Rickard's vehicle directly from behind.

26.     That during the aforementioned impact, Plaintiff's decedent, William J. Rickard's

2002 Chevrolet S-10 pickup driver's seat, seat back, seat rails, headrest and related systems

failed, such that the driver's seat and Plaintiff's decedent were propelled rearward into the

backseat area of the vehicle, resulting in the injuries hereinafter described.

27.     That as a result of the aforementioned accident, Plaintiff's decedent, William J.

Rickard, sustained, inter alia, the following injuries:

   a.   Bilateral jump-lock facets, C7-T1 with complete
        paraplegia;

   b.   Severe central canal stenosis;

   c.   Abnormal widening of T10-T9;

   d.   L2 spinous process fracture;

   e.   Posterior spinal fusion of C5-T2;

   f.   Posterior spinal fusion of T8-T11;

   g.   Tracheostomy;

   h.   Chronic respiratory failure;

   i.   Cardiac arrest;

   j.   Strep pneumo pneumonia;

   k.   Sepsis;

l.   Tracheal Stenosis;

m.   Decreased range of motion in upper extremities;

n.   Stage IV pressure ulcer;

o.   Left shoulder/scapular pain;

p.   Pain in upper extremities; and

q.   Other serious and severe injuries.

28.    That as a result of the aforementioned accident and injuries, Plaintiff's decedent,

after a long, slow, consciously painful and agonizing course, died.

## COUNT I

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Walsh Construction Company t/d/b/a Walsh Northeast, An Illinois Business Corporation, Defendant

### UNDER THE WRONGFUL DEATH ACT

29.    That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J.

Rickard, Deceased, hereby incorporates by reference each and every allegation contained in

Paragraph 1 through 28, inclusive, as fully as if the same had been set forth herein at length.

30.    That Plaintiff brings this action by virtue of the Act of July 9, 1976, P.L. 586 No.

142, 2, effective June 27, 1978, 42 Pa. C.S.A. 8301 and Pa. R.C.P. No. 2202(a).

31.    That Decedent left surviving him the following persons entitled to recover

damages for his death and on whose behalf this action is brought:

| NAME | RELATIONSHIP | ADDRESS |
|---|---|---|
| CAROLYN RICKARD | WIFE | 2075 Guinevere Drive<br>North Huntingdon, PA 15642 |
| SARAH RICKARD | DAUGHTER | 2075 Guinevere Drive<br>North Huntingdon, PA 15642 |

8

32.     That by reason of the death of Plaintiffs' decedent, the surviving beneficiaries have suffered pecuniary losses and incurred expenses resulting from the injuries and death of said Decedent, including the loss of nurture, care, training, advice, services, guidance, education, companionship, comfort, society, solace and protection.

33.     That, at all pertinent times, Walsh Construction Company t/d/b/a Walsh Northeast did perform work under a contract with PennDOT for the rehabilitation of the Squirrel Hill Tunnel, located on Pittsburgh Pennsylvania's Parkway East, I-376, which rehabilitation continued through November 16, 2012.

34.     That the above-described accident and resulting injuries and damages were caused solely and by and were the direct and proximate result of the negligence and/or strict liability and/or vicarious liability of the Defendant, Walsh Construction Company t/d/b/a Walsh Northeast, itself and acting through its agents, servants, workmen, and/or employees, including, Sargent Electric Company, Concrete Restoration Specialists, LLC, Independence Excavating, Inc., W.G. Tomko, Inc., Parking Lot Painting Co., LLC, Michael Baker Jr., Inc., Beth's Barricades and PennDOT, acting within the scope of their agency, servitude, workmanship and/or employment, said negligence consisting of <u>inter alia</u>, the following particulars:

<u>Negligence</u>

a.     In stopping traffic on Westbound I-376 at the time of the accident;

b.     In failing to follow PennDOT's work zone rules and regulations;

c.     In failing to supplement PennDOT's work zone rules and regulations when they knew or should have known the plan was inadequate;

9

d.    In failing to make necessary changes to the traffic controls and devices in the work zone, advanced warning area and approach when, during the progress of the project and prior to the subject accident, it knew or should have known of other accidents, events and traffic mishaps which rendered the traffic control regimen in place wholly inadequate;

e.    In negligently designing, planning and performing work on the roadway in question at the time of Plaintiff's decedent's accident;

f.    In failing to request a "cue" car from the Pennsylvania State Police;

g.    In failing to provide or arrange for a "cue" and/or escort or pilot car in advance of the work area, when it knew or should have known from other accidents, events and traffic mishaps that the situation required one;

h.    In failing to provide a "cue" and/or escort or pilot vehicle for the stopped and/or slowing traffic when it knew or should have known from other accidents, events and traffic mishaps that the situation required one;

i.    In failing to have "cue" and/or escort or pilot vehicles to slow/stop traffic, particularly at times of lane closures or complete tunnel closures and particularly when the project history had demonstrated the need for this and other enhanced traffic controls;

j.    In failing to adequately slow approaching traffic to the lane closure and tunnel closure points when it knew or should have known from other accidents, events and traffic mishaps that the situation required it;

k.    In failing to adequately notify and slow approaching traffic well in advance of the lane restriction and complete closure, both as to time and distance, when it knew or should have known from other accidents, events and traffic mishaps that the situation required it;

l.    In failing to provide proper lighting conditions in the work zone and advanced warning area when it knew or should have known from other accidents, events and traffic mishaps that the situation required it;

10

m.     In lighting the work zone and advanced warning area in a manner that was confusing and disorienting to drivers, causing them to stop abruptly;

n.     In failing to properly design, plan, and put in place adequate signs and safeguards for the work being performed on the roadway in question at the time of the accident;

o.     In failing to maintain such signs and safeguards on the subject roadway in an adequately visible and effective condition;

p.     In failing to adequately warn persons such as Plaintiff's decedent of the dangers associated with the roadway and work being performed on the roadway;

q.     In negligently hiring and supervising an independent contractor to design, erect and maintain traffic controls and devices and/or safeguards with respect to the subject roadway and the work being performed on the roadway;

r.     In failing to provide approaching vehicles with adequate warning of lane closure ahead when it knew or should have known from other accidents, events and traffic mishaps that the situation required it;

s.     In failing to provide approaching vehicles with adequate warning of stopped traffic ahead when it knew or should have known from other accidents, events and traffic mishaps that the situation required it;

t.     In failing to properly restrict traffic to a single lane and in failing to properly close the tunnel;

u.     In failing to properly place warning signs for lane restrictions; and

v.     In negligently restricting traffic and closing the tunnel at the aforementioned time.


WHERERFORE, Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J.

Rickard, Deceased, claims damages from the Defendant, Walsh Construction Company t/d/b/a

11

Walsh Northeast, in an amount in excess of Thirty Five Thousand and 00/100 ($35,000.00)

Dollars, exclusive of costs and interest.

## COUNT II

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Walsh Construction Company t/d/b/a Walsh Northeast, An Illinois Business Corporation, Defendant

### UNDER THE SURVIVAL ACT

35.     That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J.

Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs

1 through 28 and 33 and 34, inclusive, as fully as if the same had been set forth herein at length.

36.     The Plaintiff brings this action under and by virtue of the Act of July 9, 1976, P.L.

No. 142 2 effective June 27, 1978, 42 Pa.C.S.A. 8302.

37.     That no legal or court action for damages for the personal injuries sustained by

said Decedent that was brought during his lifetime remains active.

38.     That the Plaintiff claims damages on behalf of Decedent's Estate for the damage

suffered by said Estate as a result of the death of said Decedent as well as for his conscious pain,

suffering and inconvenience resulting from his above described accident and personal injuries.

WHEREFORE, Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J.

Rickard, Deceased, claims damages against Walsh Construction Company t/d/b/a Walsh

Northeast in an amount in excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars

exclusive of interest and costs.

## COUNT III

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Sargent Electric Company, a Pennsylvania Business Corporation, Defendant

### UNDER THE WRONGFUL DEATH ACT

39.     That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs 1 through 28, 30 through 32 inclusive, as fully as if the same had been set forth herein at length.

40.     That, at all pertinent times, Sargent Electric Company did perform work on the project that was for the rehabilitation of the Squirrel Hill Tunnel, located on Pittsburgh Pennsylvania's Parkway East, I-376, which rehabilitation continued through November 16, 2012.

41.     That the above-described accident and resulting injuries and damages were caused solely and by and were the direct and proximate result of the negligence of the Defendant, Sargent Electric Company , itself and acting through its agents, servants, workmen, and/or employees, including, Walsh Construction Company t/d/b/a Walsh Northeast, Concrete Restoration Specialists, LLC, Independence Excavating, Inc., W.G. Tomko, Inc., Parking Lot Painting Co., LLC, Michael Baker Jr., Inc., Beth's Barricades and PennDOT, acting within the scope of their agency, servitude, workmanship and/or employment, said negligence consisting of inter alia, the following particulars, being those contained in sub paragraphs (a) through (v) of Paragraph 34, above, which are incorporated herein by reference as fully as if the same had been set forth herein at length.

WHERERFORE, Plaintiff, Carolyn Rickard Administratrix of the Estate of William J. Rickard, Deceased, claims damages from the Defendant, Sargent Electric Company in an amount

13

in excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and

interest.

## COUNT IV

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Sargent Electric Company, a Pennsylvania Business Corporation, Defendant

### UNDER THE SURVIVAL ACT

42.    That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J.

Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs

1 through 28, 36 through 38, 40 and 41 inclusive, as fully as if the same had been set forth herein

at length.

WHERERFORE, Plaintiff, Carolyn Rickard Administratrix of the Estate of William J.

Rickard, Deceased, claims damages from the Defendant, Sargent Electric Company in an amount

in excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and

interest.

## COUNT V

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Concrete Restoration Specialists, LLC an Ohio Business Corporation, Defendant

### UNDER THE WRONGFUL DEATH ACT

43.    That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J.

Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs

1 through 28, 30 through 32 inclusive, as fully as if the same had been set forth herein at length.

44.    That, at all pertinent times, Concrete Restoration Specialists, LLC did perform

work on the project that was for the rehabilitation of the Squirrel Hill Tunnel, located on

Pittsburgh Pennsylvania's Parkway East, I-376, which rehabilitation continued through November 16, 2012.

45.    That the above-described accident and resulting injuries and damages were caused solely and by and were the direct and proximate result of the negligence of the Defendant, Concrete Restoration Specialists, LLC, itself and acting through its agents, servants, workmen, and/or employees, including, Walsh Construction Company t/d/b/a Walsh Northeast, Sargent Electric Company, Independence Excavating, Inc., W.G. Tomko, Inc., Parking Lot Painting Co., LLC, Michael Baker Jr., Inc., Beth's Barricades and PennDOT, acting within the scope of their agency, servitude, workmanship and/or employment, said negligence consisting of inter alia, the following particulars, being those contained in sub paragraphs (a) through (v) of Paragraph 34, above, which are incorporated herein by reference as fully as if the same had been set forth herein at length.

WHERERFORE, Plaintiff, Carolyn Rickard Administratrix of the Estate of William J. Rickard, Deceased, claims damages from the Defendant, Concrete Restoration Specialists in an amount in excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and interest.

## COUNT VI

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Concrete Restoration Specialists, LLC an Ohio Business Corporation, Defendant

### UNDER THE SURVIVAL ACT

46.    That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs 1 through 28, 36 through 38, 44 and 45 inclusive, as fully as if the same had been set forth herein at length.

15

WHERERFORE, Plaintiff, Carolyn Rickard Administratrix of the Estate of William J.

Rickard, Deceased, claims damages from the Defendant, Concrete Restoration Specialists in an

amount in excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs

and interest.

## COUNT VII

### Carolyn Rickard, Administratrix of the Estate of William J.  Rickard, Deceased, Plaintiff v. Independence Excavating, Inc. an Ohio Business Corporation, Defendant

### UNDER THE WRONGFUL DEATH ACT

47.    That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J.

Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs

1 through 28, 30 through 32 inclusive, as fully as if the same had been set forth herein at length.

48.    That, at all pertinent times, Independence Excavating, Inc. did perform work on

the project that was for the rehabilitation of the Squirrel Hill Tunnel, located on Pittsburgh

Pennsylvania's Parkway East, I-376, which rehabilitation continued through November 16, 2012.

49.    That the above-described accident and resulting injuries and damages were caused

solely and by and were the direct and proximate result of the negligence of the Defendant

Independence Excavating, Inc. itself and acting through its agents, servants, workmen, and/or

employees, including, Walsh Construction Company t/d/b/a Walsh Northeast, Sargent Electric

Company, Concrete Restoration Specialists, LLC, W.G. Tomko, Inc., Parking Lot Painting Co.,

LLC, Michael Baker Jr., Inc., Beth's Barricades and PennDOT, acting within the scope of their

agency, servitude, workmanship and/or employment, said negligence consisting of inter alia, the

following particulars, being those contained in sub paragraphs (a) through (v) of Paragraph 34,

above, which are incorporated herein by reference as fully as if the same had been set forth

herein at length.

16

WHERERFORE, Plaintiff, Carolyn Rickard Administratrix of the Estate of William J. Rickard, Deceased, claims damages from the Defendant, Independence Excavating, Inc. in an amount in excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and interest.

## COUNT VIII

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Independence Excavating, Inc. an Ohio Business Corporation, Defendant

### UNDER THE SURVIVAL ACT

50.     That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs 1 through 28, 36 through 38, 48 and 49 inclusive, as fully as if the same had been set forth herein at length.

WHERERFORE, Plaintiff, Carolyn Rickard Administratrix of the Estate of William J. Rickard, Deceased, claims damages from the Defendant, Independence Excavating, Inc. in an amount in excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and interest.

## COUNT IX

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. W.G. Tomko, Inc., a Pennsylvania Business Corporation, Defendant

### UNDER THE WRONGFUL DEATH ACT

51.     That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs 1 through 28, 30 through 32 inclusive, as fully as if the same had been set forth herein at length.

52.     That, at all pertinent times, W.G. Tomko, Inc. did perform work on the project
that was for the rehabilitation of the Squirrel Hill Tunnel, located on Pittsburgh Pennsylvania's
Parkway East, I-376, which rehabilitation continued through November 16, 2012.

53.     That the above-described accident and resulting injuries and damages were caused
solely and by and were the direct and proximate result of the negligence of the Defendant, W.G.
Tomko, Inc. itself and acting through its agents, servants, workmen, and/or employees,
including, Walsh Construction Company t/d/b/a Walsh Northeast, Sargent Electric Company,
Concrete Restoration Specialists, LLC, Independence Excavating, Inc., Parking Lot Painting Co.,
LLC, Michael Baker Jr., Inc., Beth's Barricades and PennDOT, acting within the scope of their
agency, servitude, workmanship and/or employment, said negligence consisting of inter alia, the
following particulars, being those contained in sub paragraphs (a) through (v) of Paragraph 34,
above, which are incorporated herein by reference as fully as if the same had been set forth
herein at length.

WHERERFORE, Plaintiff, Carolyn Rickard Administratrix of the Estate of William J.
Rickard, Deceased, claims damages from the Defendant, W.G. Tomko, Inc. in an amount in
excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and interest.

## COUNT X

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. W.G. Tomko, Inc., a Pennsylvania Business Corporation, Defendant

### UNDER THE SURVIVAL ACT

54.     That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J.
Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs

1 through 28, 36 through 38, 52 and 53 inclusive, as fully as if the same had been set forth herein

at length.

WHERERFORE, Plaintiff, Carolyn Rickard Administratrix of the Estate of William J.

Rickard, Deceased, claims damages from the Defendant, W.G. Tomko, Inc. in an amount in

excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and interest.

## COUNT XI

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Parking Lot Painting Company, LLC, a Pennsylvania Business Corporation, Defendant

### UNDER THE WRONGFUL DEATH ACT

55.    That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J.

Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs

1 through 28, 30 through 32 inclusive, as fully as if the same had been set forth herein at length.

56.    That, at all pertinent times, Parking Lot Painting Company, LLC did perform

work on the project that was for the rehabilitation of the Squirrel Hill Tunnel, located on

Pittsburgh Pennsylvania's Parkway East, I-376, which rehabilitation continued through

November 16, 2012.

57.    That the above-described accident and resulting injuries and damages were caused

solely and by and were the direct and proximate result of the negligence of the Defendant

Parking Lot Painting Company, LLC itself and acting through its agents, servants, workmen,

and/or employees, including, Walsh Construction Company t/d/b/a Walsh Northeast, Sargent

Electric Company, Concrete Restoration Specialists, LLC, Independence Excavating, Inc., W.G.

Tomko, Inc., LLC, Michael Baker Jr., Inc., Beth's Barricades and PennDOT, acting within the

scope of their agency, servitude, workmanship and/or employment, said negligence consisting of

19

inter alia, the following particulars, being those contained in sub paragraphs (a) through (v) of

Paragraph 34, above, which are incorporated herein by reference as fully as if the same had been

set forth herein at length.

WHERERFORE, Plaintiff, Carolyn Rickard Administratrix of the Estate of William J.

Rickard, Deceased, claims damages from the Defendant, Parking Lot Painting Company, LLC in

an amount in excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of

costs and interest.

## COUNT XII

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Parking Lot Painting Company, LLC, a Pennsylvania Business Corporation, Defendant

### UNDER THE SURVIVAL ACT

58.    That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J.

Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs

1 through 28, 36 through 38, 56 and 57 inclusive, as fully as if the same had been set forth herein

at length.

WHERERFORE, Plaintiff, Carolyn Rickard Administratrix of the Estate of William J.

Rickard, Deceased, claims damages from the Defendant, Parking Lot Painting Company, LLC in

an amount in excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of

costs and interest.

20

## COUNT XIII

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Michael Baker Jr., Inc., a Pennsylvania Business Corporation, Defendant

### UNDER THE WRONGFUL DEATH ACT

59.     That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs 1 through 28, 30 through 32 inclusive, as fully as if the same had been set forth herein at length.

60.     That, at all pertinent times, Michael Baker Jr., Inc. did perform work on the project that was for the rehabilitation of the Squirrel Hill Tunnel, located on Pittsburgh Pennsylvania's Parkway East, I-376, which rehabilitation continued through November 16, 2012.

61.     That the above-described accident and resulting injuries and damages were caused solely and by and were the direct and proximate result of the negligence of the Defendant Michael Baker Jr. Inc, itself and acting through its agents, servants, workmen, and/or employees, including, Walsh Construction Company t/d/b/a Walsh Northeast, Sargent Electric Company, Concrete Restoration Specialists, LLC, Independence Excavating, Inc., W.G. Tomko, Inc., Parking Lot Painting Co., LLC, Beth's Barricades and PennDOT, acting within the scope of their agency, servitude, workmanship and/or employment, said negligence consisting of inter alia, the following particulars, being those contained in sub paragraphs (a) through (v) of Paragraph 34, above, which are incorporated herein by reference as fully as if the same had been set forth herein at length.

WHERERFORE, Plaintiff, Carolyn Rickard Administratrix of the Estate of William J. Rickard, Deceased, claims damages from the Defendant, Michael Baker Jr., Inc. in an amount in excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and interest.

21

## COUNT XIV

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Michael Baker Jr., Inc., a Pennsylvania Business Corporation, Defendant

### UNDER THE SURVIVAL ACT

62.     That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J.

Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs

1 through 28, 36 through 38, 60 and 61 inclusive, as fully as if the same had been set forth herein

at length.

WHERERFORE, Plaintiff, Carolyn Rickard Administratrix of the Estate of William J.

Rickard, Deceased, claims damages from the Defendant, Michael Baker Jr., Inc. in an amount in

excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and interest.

### COUNT XV

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Beth's Barricades, a Pennsylvania Business Corporation, Defendant

### UNDER THE WRONGFUL DEATH ACT

63.     That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J.

Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs

1 through 28, 30 through 32 inclusive, as fully as if the same had been set forth herein at length.

64.     That, at all pertinent times, Beth's Barricades was responsible for the protection

and maintenance of traffic and did perform such duties on the project that was for the

rehabilitation of the Squirrel Hill Tunnel, located on Pittsburgh Pennsylvania's Parkway East, I-

376, which rehabilitation continued through November 16, 2012.

22

65.    That the above-described accident and resulting injuries and damages were caused solely and by and were the direct and proximate result of the negligence of the Defendant, Beth's Barricades, itself and acting through its agents, servants, workmen, and/or employees, including, Walsh Construction Company t/d/b/a Walsh Northeast, Sargent Electric Company, Concrete Restoration Specialists, LLC, Independence Excavating, Inc., W.G. Tomko, Inc., Parking Lot Painting Co., LLC, Michael Baker Jr., Inc. and PennDOT, acting within the scope of their agency, servitude, workmanship and/or employment, said negligence consisting of inter alia, the following particulars, being those contained in sub paragraphs (a) through (v) of Paragraph 34, above, which are incorporated herein by reference as fully as if the same had been set forth herein at length, and the following sub paragraphs (a) through (l) all of which caused Plaintiff's Decedent to stop suddenly and Defendant Mr. Paul to be unable to stop his vehicle, thereby hitting Plaintiff's Decedent's vehicle:

    a.   In failing to properly install and maintain the traffic control devices;

    b.   In failing to inspect whether it had properly installed signs for construction work on the day of Plaintiff's Decedent's accident;

    c.   In failing to alert vehicles that traffic was fully stopped ahead;

    d.   In failing to properly install and maintain traffic channelizing devices during a lane closure;

    e.   In failing to properly install and maintain traffic channelizing devices to adequately slow traffic when it knew or should have known that the set-up was inadequate;

    f.   In failing to make changes to the approved traffic control plan when it knew or should have known that it was assisting Walsh Construction and

23

PennDOT in the creation of a dangerous traffic
control area of the work zone;

g.  In failing to make recommendations to PennDOT
and/or Walsh Construction for changes to the early
approach to the work zone when it knew or should
have known that it was creating a dangerous traffic
control area of the work zone;

h.  In failing to train its workers in the installation and
maintenance of traffic control devices;

i.  In failing to require its foreman to drive through the
work zone to make certain that its laborers correctly
installed and maintained the traffic control devices;

j.  In failing to have its foreman supervise its workers
installation and maintenance of the traffic control
devices;

k.  In permitting hazardous defects of the traffic control
plan to exist; and

l.  In failing to maintain and update the traffic control
plan within the construction zone in a safe and
proper condition when it knew or should have
known that the plan was created a dangerous and/or
inadequate traffic control area.

WHERERFORE, Plaintiff, Carolyn Rickard Administratrix of the Estate of William J.

Rickard, Deceased, claims damages from the Defendant, Beth's Barricades in an amount in

excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and interest.

## COUNT XVI

### Carolyn Rickard, Administratrix of the Estate of William J.  Rickard, Deceased, Plaintiff v. Beth's Barricades, a Pennsylvania Business Corporation, Defendant

### UNDER THE SURVIVAL ACT

66.    That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J.

Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs

24

1 through 28, 36 through 38, 64 and 65 inclusive, as fully as if the same had been set forth herein

at length.

WHERERFORE, Plaintiff, Carolyn Rickard Administratrix of the Estate of William J.

Rickard, Deceased, claims damages from the Defendant, Beth's Barricades in an amount in

excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and interest.

## COUNT XVII

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Commonwealth of Pennsylvania, Pennsylvania Department of Transportation, Defendant

### UNDER THE WRONGFUL DEATH ACT

67.     That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J.

Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs

1 through 28, 30 through 32 inclusive, as fully as if the same had been set forth herein at length.

68.     That, at all pertinent times, Defendant, Commonwealth of Pennsylvania,

Department of Transportation was the owner and/or lessee and/or manager and was responsible

for the property where the accident occurred including the roadway surface and subsurface

located at Pittsburgh Pennsylvania's Parkway East, I-376, just prior to the Squirrel Hill Tunnel.

69.     That the above-described accident and resulting injuries and damages were caused

solely and by and were the direct and proximate result of the negligence of the Defendant,

Commonwealth of Pennsylvania, Pennsylvania Department of Transportation, itself and acting

through its agents, servants, workmen, and/or employees, including Walsh Construction

Company t/d/b/a Walsh Northeast, Sargent Electric Company, Concrete Restoration Specialists,

LLC, Independence Excavating, Inc., W.G. Tomko, Inc., Parking Lot Painting Co., LLC,

Michael Baker Jr., Inc. and Beth's Barricades acting within the scope of their agency, servitude,

25

09-50026-mg    Doc 13488-5    Filed 04/23/15    Entered 04/23/15 15:00:09    Exhibit A
Pg 117 of 154

workmanship and/or employment, said negligence consisting of <u>inter alia</u>, the following

particulars:

    a.    In negligently causing Plaintiff's Decedent's accident;

    b.    In maintaining the subject roadway in a dangerous condition;

    c.    In allowing a dangerous condition of the roadway to exist;

    d.    In permitting traffic to be stopped on Westbound I-376 at the time of the accident;

    e.    In negligently designing, planning and performing work on the roadway in question at the time of the accident;

    f.    In failing to do and in failing to require a contractor to do the following:

        i.    Request a "cue" car from the Pennsylvania State Police;

        ii.    Provide or arrange for a "cue" car in advance of the work area when it knew or should have known from other accidents, events and traffic mishaps that the situation required one;

        iii.    Provide a "cue" and/or escort or pilot vehicle for stopped and/or slowing traffic, when it knew or should have known from other accidents, events and traffic mishaps that the situation required one;

        iv.    Have "cue" and/or escort or pilot vehicles to slow traffic particularly at times of lane closure or complete tunnel closure and particularly when the project history had demonstrated the need for this and other enhanced traffic controls;

        v.    Maintain adequate rules and/or regulations regarding the stoppage of traffic on a 4 lane divided highway;

vi.     Enforce PennDOT work zone rules
        and/or regulations;

vii.    Follow PennDOT work zone rules
        and/or regulations;

viii.   Supplement or amend the PennDOT
        work zone rules and/or regulations when
        during the progress of the project and
        prior to the subject accident, it knew or
        should have known of other accidents,
        events and traffic mishaps which
        rendered them wholly inadequate;

ix.     Establish adequate rules and/or
        regulations regarding work zone
        lighting;

x.      Make necessary changes to the traffic
        controls and devices in the work zone,
        advanced warning area and approach
        when, during the progress of the project
        and prior to the subject accident, it knew
        or should have known of other accidents,
        events and traffic mishaps which
        rendered the traffic control regimen in
        place, wholly inadequate;

xi.     Properly design, erect, position and
        maintain adequate traffic and/or warning
        signs and/or safeguards for travel on the
        subject roadway and/or for the work
        being performed on the roadway;

xii.    Maintain such signs on the subject
        roadway in an adequately visible and
        effective condition;

xiii.   Adequately inspect the condition of the
        roadway, the work being performed on
        the roadway and the traffic and/or
        warning signs and/or safeguards of the
        subject roadway;

xiv.    Adequately warn persons such as
        Plaintiff's decedent of the dangers

27

related to the subject roadway and work being performed on the roadway;

xv.    Adequately slow approaching traffic to the lane closure and tunnel closure points when it knew or should have known from other accidents, events and traffic mishaps that the situation required it;

xvi.    Adequately notify and slow approaching traffic well in advance of the lane restriction and complete closure, both as to time and distance, when it knew or should have known from other accidents, events and traffic mishaps that the situation required it;

xvii.    Properly restrict traffic to a single lane and/or properly close the tunnel;

xviii.    Properly place warning signs for lane restrictions;

xix.    Provide approaching vehicles with adequate warning of lane closure ahead when it knew or should have known from other accidents, events and traffic mishaps that the situation required it;

xx.    Provide adequate warning to approaching vehicles of stopped traffic ahead; and

xxi.    Maintain lighting in the work zone in a manner that was not confusing or disorienting to drivers.

g.    In negligently hiring and supervising an independent contractor to maintain signs and safeguards with respect to the subject roadway and the work being performed on the roadway;

h.    In negligently designing, planning, and performing the work on the roadway in question at the time of Plaintiff's decedent's accident;

i.    In negligently closing the tunnel at the aforementioned time;

j.    In being vicariously liable for the negligent design, plan and performance of work on the roadway in question at the time of the accident;

k.    In being vicariously liable for the negligence of others in lighting the work zone in a manner that was confusing and disorienting to drivers on the roadway in question at the time of the accident;

l.    In being vicariously liable for the negligence of others in designing, erecting, positioning and maintaining signs and safeguards on the subject roadway at the time of the accident;

m.    In being vicariously liable for the negligence of others in restricting traffic to a single lane and stopping traffic on the subject roadway at the time of the aforementioned accident;

n.    In being vicariously liable for the failure of an independent contractor to properly restrict traffic to a single lane of travel and to properly stop traffic on the subject roadway at the time of the aforementioned accident;

o.    In being vicariously liable for the failure of an independent contractor to adequately warn approaching vehicles that all lanes of travel were closed on the subject roadway at the time of the aforementioned accident; and

p.    In being vicariously liable for the failure of others to request a "cue" car from the Pennsylvania State Police.

WHERERFORE, Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, claims damages from the Defendant, Commonwealth of Pennsylvania, Pennsylvania Department of Transportation, in an amount in excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and interest.

## COUNT XIII

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Commonwealth of Pennsylvania, Pennsylvania Department of Transportation, Defendant

### UNDER THE SURVIVAL ACT

70.     That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs 1 through 28, 36 through 38, 68 and 69 inclusive, as fully as if the same had been set forth herein at length.

WHERERFORE, Plaintiff, Carolyn Rickard Administratrix of the Estate of William J. Rickard, Deceased, claims damages from the Defendant, Commonwealth of Pennsylvania, Pennsylvania Department of Transportation in an amount in excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and interest.

## COUNT XIX

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. General Motors, LLC, f/k/a General Motors Company, a Delaware Business Corporation, Defendant

### UNDER THE WRONGFUL DEATH ACT

71.     That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs 1 through 28 and 30 through 32 inclusive, as fully as if the same had been set forth herein at length.

30

72.    That, at all pertinent times, Defendant, General Motors, LLC, f/k/a General Motors Company, did design, manufacture, assemble, sell, supply, prepare for delivery, recall, retrofit, repair, inspect and/or distribute the Chevrolet S-10 pickup truck, its seats, seat backs, seat rails, headrests and related systems involved in this case.

73.    That the above-described accident and resulting injuries and damages were caused solely and by and were the direct and proximate result of the negligence and/or strict and/or vicarious liability of the Defendant, General Motors, LLC, f/k/a General Motors Company, itself and acting through its agents, servants, workmen, and/or employees acting within the scope of their agency, servitude, workmanship and/or employment, said negligence consisting of <u>inter alia</u>, the following particulars:

<u>Negligence</u>

a.    In negligently designing, manufacturing, assembling, selling, supplying, leasing, maintaining, inspecting, approving, and/or distributing the 2002 Chevrolet S-10 including its seats, seat backs, seat rails, headrests and related systems, and materials comprising the same;

b.    In failing to adequately warn Plaintiff's decedent of any and all dangers and risks involved with the use of the 2002 Chevrolet S-10 including their seats, seat backs, seat rails, headrests and related systems;

c.    In supplying the 2002 Chevrolet S-10 to Plaintiff's decedent when it knew or should have known that the seats, seat backs, seat rails, headrests and related systems and materials comprising the same, would be dangerous, and when it knew or should have known that Plaintiff's decedent would fail to realize this dangerous condition, and in failing to use reasonable care to inform Plaintiff's decedent of this dangerous condition.

d.    In failing to adequately and properly test and inspect the 2002 Chevrolet S-10 including their

31

seats, seat backs, seat rails, headrests and related
systems;

e.    In negligently supervising the design, manufacture,
assembly, sale, supply, lease maintenance,
inspection, approval, and/or distribution of the 2002
Chevrolet S-10 including their seats, seat backs,
seat rails, headrests and related systems;

f.    In negligently recommending and selecting
contractors for the design, manufacture, assembly,
sale, supply, lease, maintenance, inspection,
approval and/or distribution of the 2002 Chevrolet
S-10 including their seats, seat backs, seat rails,
headrests and related systems;

g.    In being vicariously liable for the causal negligence
of others for the design, manufacture, assembly,
sale, supply, lease, maintenance, inspection,
approval and/or distribution of the 2002 Chevrolet
S-10 including their seats, seat backs, seat rails,
headrests and related systems;

h.    In failing to recall or retrofit the vehicle in question;

i.    In failing to assure that any recall or retrofit work
was done and/or done properly; and

j.    In otherwise being negligent under the
circumstances as more fully described hereinafter.


### Strict Liability, 402 A

aa.    The 2002 Chevrolet S-10 was defective in its design;

bb.    The 2002 Chevrolet S-10 was defective in its
construction and manufacture including recall and
retrofit work;

cc.    The 2002 Chevrolet S-10 was not accompanied by
adequate warning and instruction in regard to its
intended use; and

dd.    The 2002 Chevrolet S-10 was not designed and constructed with the proper materials or in the proper manner for its intended use.

### Strict Liability, 402 B

aaa.    That with regard the 2002 Chevrolet S-10, the Defendant misrepresented material facts to the public, including Plaintiff's decedent William J. Rickard, concerning the character and/or quality of the vehicle and all safety features, including the seats, seat backs, seat rails, headrests and related systems;

bbb.    That Plaintiff's decedent justifiably relied on such misrepresentations; and

ccc.    That such justified reliance caused Plaintiff's decedent to suffer physical harm.

WHERERFORE, Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, claims damages from General Motors, LLC f/k/a General Motors Company in an amount in excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and interest.

### COUNT XX

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. General Motors, LLC, f/k/a General Motors Company, a Delaware Business Corporation, Defendant

### UNDER THE SURVIVAL ACT

74.    That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs 1 through 28, 36 through 38, 72 and 73 inclusive, as fully as if the same had been set forth herein at length.

WHERERFORE, Plaintiff, Carolyn Rickard Administratrix of the Estate of William J.

Rickard, Deceased, claims damages from the Defendant, General Motors, LLC f/k/a General

Motors Company in an amount in excess of Thirty Five Thousand and 00/100 ($35,000.00)

Dollars, exclusive of costs and interest.

## COUNT XXI

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Woodley Paul, Defendant

### UNDER THE WRONGFUL DEATH ACT

75.    That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J.

Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs

1 through 28 and 30 through 32 inclusive, as fully as if the same had been set forth herein at

length.

76.    That the above-described accident and resulting injuries and damages were caused

solely and by and were the direct and proximate result of the negligence of the Defendant,

Woodley Paul, himself and acting through his agents, servants, workmen, and/or employees,

acting within the scope of their agency, servitude, workmanship and/or employment, said

negligence consisting of inter alia, the following particulars:

    a.  In negligently striking Plaintiff's decedent's vehicle;

    b.  In failing to operate the 2005 Toyota Camry at a safe
       speed and in a safe manner under the then existing
       conditions;

    c.  In failing to warn Plaintiff's decedent by sounding a
       horn or otherwise;

    d.  In being inattentive and failing to maintain a sharp
       lookout of the road for stopped vehicles;

34

e. In failing to take evasive action to prevent striking Plaintiff's decedent's vehicle;

f. In failing to operate the brakes in such a manner that the 2005 Toyota Camry could be stopped before the accident occurred;

g. In failing to have the 2005 Toyota Camry under proper control;

h. In negligently failing to maintain, repair and inspect the 2005 Toyota Camry;

i. In being vicariously liable for the failure of others to maintain, inspect and repair the 2005 Toyota Camry;

j. In that Defendant was not in proper physical condition to operate the vehicle;

k. In operating his vehicle in excess of the posted speed limit; and

l. In failing to slow the speed of his vehicle for a work zone.

WHERERFORE, Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, claims damages from the Defendant, Woodley Paul, in an amount in excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and interest.

## COUNT XXII

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Woodley Paul, Defendant

### UNDER THE SURVIVAL ACT

77. That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs

1 through 28, 36 through 38 and 76 inclusive, as fully as if the same had been set forth herein at length.

WHERERFORE, Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, claims damages from the Defendant, Woodley Paul, in an amount in excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and interest.

## COUNT XXIII

### Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Charles Phillips, Defendant

### UNDER THE WRONGFUL DEATH ACT

78.     That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs 1 through 28 and 30 through 32 inclusive, as fully as if the same had been set forth herein at length.

79.     That the above-described accident and resulting injuries and damages were caused solely and by and were the direct and proximate result of the negligence of the Defendant, Charles Phillips, himself and acting through his agents, servants, workmen, and/or employees, including Woodley Paul, acting within the scope of their agency, servitude, workmanship and/or employment, said negligence consisting of inter alia, the following particulars:

    a.    In negligently permitting Defendant, Woodley Paul to use his 2005 Toyota Camry when he knew or should have known that he was likely to use the 2005 Toyota Camry in such a manner as to create an unreasonable risk of harm to others; and

    b.    In negligently failing to maintain, repair and inspect the 2005 Toyota Camry.

36

WHERERFORE, Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, claims damages from the Defendant, Charles Phillips, in an amount in excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and interest.

<u>COUNT XXIV</u>

<u>Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, Plaintiff v. Charles Phillips, Defendant</u>

<u>UNDER THE SURVIVAL ACT</u>

80.     That Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, incorporates by reference each and every allegation contained in Paragraphs 1 through 28, 36 through 38 and 79 inclusive, as fully as if the same had been set forth herein at length.

WHERERFORE, Plaintiff, Carolyn Rickard, Administratrix of the Estate of William J. Rickard, Deceased, claims damages from the Defendant, Charles Phillips, in an amount in excess of Thirty Five Thousand and 00/100 ($35,000.00) Dollars, exclusive of costs and interest.

Respectfully submitted,

CUTRUZZULA & NALDUCCI

By: _____
Arthur Cutruzzula, Esquire
Attorney for Plaintiff

37

# AFFIDAVIT

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF ALLEGHENY

BEFORE ME, the undersigned authority, personally appeared _Carolyn M. Rickard_____ who, being first duly sworn according to law, deposes and says that the facts set forth in the foregoing _Amended Complaint_____ are true and correct to the best of his/her knowledge, information and belief.

x_Carolyn M. Rickard_

SWORN TO AND SUBSCRIBED
before me this _19th_ day
of _March_____, 20_15_.

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Kristina Baker, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires April 10, 2016
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

## CERTIFICATE OF SERVICE

I, Arthur Cutruzzula, Esquire, hereby certify that I served a true and correct copy of the foregoing Plaintiff's Amended Complaint upon the following by United States Mail, postage pre-paid, this date:

William J. Ricci, Esquire
RICCI TYRELL JOHNSON & GREY
1515 Market Street, Suite 700
Philadelphia, PA 19102
**(Attorney for Defendant General Motors,
LLC f/k/a General Motors Company)**

Thomas McGinnis, Esquire
THOMAS, THOMAS & HAFER
525 William Penn Place
37th Floor, Suite 3750
Pittsburgh, PA 15219
**(Attorney for Defendants Woodley Paul and
Charles Phillips)**

Miles A. Kirshner, Esquire
MARGOLIS EDELSTEIN
525 William Penn Place
Suite 3300
Pittsburgh, PA 15219
**(Attorney for Defendant, Parking Lot
Painting Company, LLC)**

Jason G. Wehrle, Esquire
MINTZER, SAROWITZ, ZERIS,
LEDVA & MEYERS, LLP
EQT Plaza
625 Liberty Avenue, Suite 390
Pittsburgh, PA 15222
**(Attorney for Defendant Walsh Construction
Company t/d/b/a Walsh Northeast)**

George M. Evan, Esquire
GROGAN GRAFFAM, P.C.
Four Gateway Center, 12th Floor
Pittsburgh, PA 15222
**(Attorney for Defendant,
Michael Baker Jr., Inc.)**

Mark R. Lane, Esquire
DELL, MOSER, LANE & LOUGHNEY, LLC
Two Chatham Center, Suite 1500
112 Washington Place
Pittsburgh, PA 15219
**(Attorney for Defendant W.G. Tomko, Inc.)**

John Argento, Esquire
SWARTZ CAMPBELL, LLC
4750 U.S. Steel Tower
600 Grant Street
Pittsburgh, PA 15219
**(Attorney for Defendant, Independence
Excavating, Inc.)**

Robert A. Weinheimer, Esquire
WEINHEIMER, SCHADEL & HABER
602 Law and Finance Building
429 Fourth Avenue
Pittsburgh, PA 15219
**(Attorney for Defendant Beth's Barricades)**

38

Edward W. Wertman, Esquire
WILLMAN & SILVAGGIO, LLP
One Corporate Center
5500 Corporate Drive, Suite 150
Pittsburgh, PA 15237
**(Attorney for Defendant, Sargent Electric
Company)**

Concrete Restoration Specialists, LLC
338 N. Main Street, Suite 500
Akron, OH 44311

John Benty, Esquire
Sr. Deputy Attorney General in-Charge
Office of Attorney General
Tort Litigation Unit
Manor Complex
564 Forbes Avenue
Pittsburgh, PA 15219
**(Attorney for Defendant Commonwealth of
Pennsylvania, Pennsylvania Department of
Transportation)**

Date: 3/19/15

By: _____
Arthur Cutruzzula, Esquire
Attorney for Plaintiff

39

09-50026-mg    Doc 13488-6    Filed 09/23/15    Entered 09/23/15 15:09:59    Exhibit A
Pg 1 of 154

# Exhibit F

# UNITED STATES DISTRICT COURT

## EASTERN DISTRCT OF LOUISIANA

| | | |
|---|---|---|
| YOLANDA COLEMAN and | * | |
| QUNSTON COLEMAN | * | CIVIL ACTION NO. |
| | * | |
| VERSUS | * | JURY TRIAL DEMAND |
| | * | |
| GENERAL MOTORS, LLC, | * | SECTION: |
| GENERAL MOTORS HOLDING, | * | |
| LLC, STONERIDGE, INC., | * | MAGISTRATE: |
| STONERIDGE, INC. d/b/a POLLAK | * | |
| ENGINEERED PRODUCTS, AND | * | |
| ABC MANUFACTURING COMPANY | * | |
| | * | |

**********************************************************************************

## COMPLAINT

**NOW INTO COURT,** through undersigned counsel, come plaintiffs, **YOLANDA COLEMAN**, hereinafter occasionally referred to as **"COLEMAN"** and **QUNSTON COLEMAN,** also sometimes referred to collectively as "Plaintiffs," who are domiciled in Houma, Louisiana respectfully file the following Complaint for Damages:

## VENUE AND JURISIDCTION

1.

This Honorable Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332. Venue is proper in accordance with 28 U.S.C. § 1391(b)(2).

2.

This case is brought pursuant to the Constitution and the laws of the United States of America, the Louisiana Products Liability Act (LA. R.S. 9:2800.51 *et seq.*), the Louisiana Unfair Trade Practices and Consumer Protection Law (LA R.S. 51:1401), the Transportation Recall

[1]

Enhancement, Accountability, and Documentation Act (49 U.S.C. § 30118 *et seq.*), Louisiana Civil Code Articles 2315, 2520, 2475, and 2524, and all other provisions of Louisiana Law which may have bearing on this proceeding.

## PARTIES

3.

**YOLANDA COLEMAN**, plaintiff, is a person of the full age of majority and a resident of Houma, Louisiana and the driver of the 2001 Pontiac Grand Am (hereinafter the "Defective Vehicle") at the time of the accident described in Paragraph 14 of this Complaint.

4.

**QUNSTON COLEMAN**, plaintiff, is a person of the full age of majority and a resident of Houma, Louisiana and the husband of **YOLANDA COLEMAN**.

5.

**GENERAL MOTORS CORPORATION** (hereinafter "**GM CORP.**") was a Delaware corporation with its headquarters in Detroit, Michigan. **GM CORP.** designed, manufactured, marketed, distributed and sold Pontiac, Saturn, Chevrolet and other brand automobiles in Louisiana and multiple other locations in the United States and worldwide.

6.

In 2009, **GM CORP.** filed for bankruptcy, and substantially all of its assets were sold pursuant to a Master Sales and Purchase Agreement ("Agreement") to **GENERAL MOTORS, LLC** (hereinafter "**GM LLC**").

7.

Under the Agreement, **GM LLC** also expressly assumed certain liabilities of **GM**

[2]

**CORP.**, including certain statutory requirements:

> From and after the Closing, Purchaser [**GM LLC**] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.

**GM LLC** also set forth that **GM LLC**:

> shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [**GM CORP.**] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre- owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.

8.

     **GM LLC** is liable through successor liability for the deceptive and unfair acts and omissions of **GM CORP.**, as alleged in this Complaint because **GM LLC** acquired and operated **GM CORP.** and ran it as a continuing business enterprise, and because **GM LLC** was aware from its inception of the Ignition Switch Defects in the Defective Vehicle driven by the Plaintiff.

9.

     **GM LLC** is a Delaware corporation with its headquarters in Detroit, Michigan. **GM LLC** is registered with the Secretary of State and conducts business in all fifty states (including the District of Columbia). **GM LLC** was incorporated in 2009 and on July 10, 2009, acquired substantially all assets and assumed certain liabilities of **GM CORP.** through a Section 363 sale

[3]

under Chapter 11 of the U.S. Bankruptcy Code.

10.

At all times relevant herein, **GM CORP.** and its successor in interest **GM LLC** were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Defective Vehicle driven by the Plaintiff, and other motor vehicles and motor vehicle components throughout the United States.

11.

**STONERIDGE, INC.** and **STONERIDGE, INC. d/b/a POLLAK ENGINEERED PRODUCTS and/or ABC MANUFACTURING COMPANY,** (hereinafter collectively **"STONERIDGE"**) is an Ohio corporation with its principal places of business in Ohio and Massachusetts. **STONERIDGE, INC.** is located at 9400 East Market Street, Warren OH 44484, and can be served with process through its Registered Agent listed by the Ohio Secretary of State's office at: CT Corporation System, 1300 East 9th Street, Cleveland, OH 44114. **STONERIDGE, INC. d/b/a POLLAK ENGINEERED PRODUCTS** is located at 300 Dan Road, Canton, MA 02021, and can be served with process through its Registered Agent listed by the Massachusetts Secretary of State's office, at: CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

12.

Upon information and belief, at all times relevant herein, **STONERIDGE**, through its various entities, designed, manufactured, and supplied **GM LLC** with motor vehicle components, including the subject ignition switches.

[4]

13.

**GM LLC**, **STONERIDGE,** and **ABC MANUFACTURING COMPANY** are collectively referred to in this Complaint as "Defendants."

## FACTUAL ALLEGATIONS

14.

On August 18, 2002, **COLEMAN** was driving the Defective Vehicle, on Louisiana Highway 24 in Houma, Louisiana when suddenly and without warning, she was sideswiped by another vehicle causing her steering column to lock and lose control of the vehicle. This malfunction caused his vehicle to travel off the highway and run into a utility pole. Additionally, the driver's side airbag failed to deploy. This accident caused **COLEMAN** to suffer severe and debilitating injuries, which require ongoing medical treatment.

15.

The defective vehicle should have been recalled because of the following defect in design, manufacture, and/or assembly later detailed in a recall notice:

> "If the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, it may unintentionally move the key away from the "run" position. If this occurs, engine power, power steering, and power braking may be affected, increasing the risk of a crash. If the ignition switch is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury or fatality."

16.

**GM LLC** failed to disclose this defect in a timely manner and effectively concealed this defect until after **COLEMAN**'s accident.

[5]

17.

A manufacturer that is aware of dangerous design defects that cause its vehicles to shut down during operation, or the vehicles' airbags not to deploy, must promptly disclose and remedy such defects.

18.

More importantly, the Ignition Switch Defect in **GM LLC**'s vehicles could have been easily avoided. From at least 2005 to the present, **GM LLC** received reports of crashes and injuries that put **GM LLC** on notice of the serious safety issues presented by its ignition switch system.

19.

Because of its faulty design and improper positioning, the ignition switch can unexpectedly and suddenly move from the "on" or "run" position while the vehicle is in operation to the "off" or "accessory" position (the "Ignition Switch Defect"). This can occur at any time during normal and proper operation of the Defective Vehicle, meaning the ignition can suddenly switch off while it is driving on the highway, as in **COLEMAN**'s case, leaving the driver unable to safely control the vehicle.

20.

The vehicle **COLEMAN** was driving was originally designed, manufactured, marketed, and placed into the stream of commerce by **GM CORP**. **GM CORP.** also violated these obligations and duties by designing and marketing vehicles with defective ignition switch systems, and then by failing to disclose that defect even after becoming aware that the ignition switch defect was causing fatal accidents. In addition to the liability arising out of the statutory obligations assumed by **GM LLC**, **GM LLC** also has successor liability for the deceptive and

[6]

unfair acts and omissions of **GM CORP.** because **GM LLC** has continued the business enterprise of **GM CORP.** with full knowledge of the Ignition Switch Defects.

21.

**GM LLC**'s predecessor, **GM CORP.** filed for bankruptcy in 2009. In July 2009, the bankruptcy court approved the sale of **GM CORP.** to **GM LLC**. Notwithstanding the prior bankruptcy or contractual obligations under the sale agreement, **GM LLC** is liable for its own conduct. From its inception in 2009 and while extolling the safety and reliability of its vehicles, **GM LLC** had its own independent knowledge of the defects in its vehicles, yet chose to conceal them.

22.

Specifically, **GM LLC** has actual knowledge that, because of the way in which the ignition was designed and integrated into the Defective Vehicle, the ignition switch can suddenly fail during normal operation, cutting off engine power and certain electrical systems in the cars, which, in turn, disables key vehicle components, safety features (like airbags), or other vehicle functions, leaving occupants vulnerable to crashes, serious injuries, and death.

## SUCCESSOR LIABILITY

23.

The defective ignition switch was manufactured by **STONERIDGE AUTOMOTIVE PLC** and/or **STONERIDGE AUTOMOTIVE SYSTEMS, LLC** (hereinafter "**STONERIDGE**").

[7]

24.

Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"),[1] and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defect.[2] If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect.[3]

25.

**GM LLC** also violated the TREAD Act by failing to timely inform NHTSA of the ignition switch defects and allowed cars to remain on the road with these defects.

26.

Upon information and belief, prior to the sale of the Defective Vehicle, **GM LLC** knew of the Ignition Switch Defect through sources such as pre-release design, manufacturing, and field testing data; in-warranty repair data; early consumer complaints made directly to **GM LLC**, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI") and/or posted on public online vehicle owner forums; field testing done in response to those complaints; aggregate data from **GM LLC** dealers; and accident data. Despite this knowledge, **GM LLC** failed to disclose and actively concealed the Ignition Switch Defect from Plaintiff and the public, and continued to market and advertise the Defective Vehicle as a reliable and safe vehicle, which it was not.

---

[1]    49 U.S.C. §§ 30101-30170
[2]    49 U.S.C. § 30118(c)(l) & (2).
[3]    49 U.S.C. § 30118(b)(2)(A) & (B)

[8]

## CLAIMS FOR RELIEF

## PRODUCTS LIABILITY CLAIMS

### 27.

Upon information and belief, at all material times, **GM LLC** was the manufacturer and distributor of the vehicle.

### 28.

At all material times, **GM LLC**, was engaged in the business of designing, manufacturing, assembling, and selling the Defective Vehicle.

### 29.

At all material times, **GM LLC** was responsible for the sale and marketing of the Defective Vehicle.

### 30.

At all material times, **GM LLC** was responsible for all warnings and labels which accompanied the Defective Vehicle.

### 31.

**COLEMAN**'s injuries were caused by the fault of **GM LLC, STONERIDGE and/or ABC MANUFACTURING COMPANY**, in that they manufactured and sold a defective product pursuant to Louisiana law.

### 32.

**COLEMAN**'s injuries were caused by the fault of **GM LLC, STONERIDGE and/or ABC MANUFACTURING COMPANY**, in that the vehicle's ignition switch was unreasonably dangerous in construction and/or composition.

[9]

33.

**COLEMAN**'s injuries were caused by the fault of **GM LLC, STONERIDGE and/or ABC MANUFACTURING COMPANY**, in that the vehicle's ignition switch was unreasonably dangerous in design.

34.

**COLEMAN**'s injuries were caused by the fault of **GM LLC, STONERIDGE and/or ABC MANUFACTURING COMPANY**, in that the ignition switch is unreasonably dangerous because an adequate warning about the ignition switch was not provided to Plaintiffs in a timely manner.

35.

**COLEMAN**'s injuries were caused by the fault of **GM LLC, STONERIDGE and/or ABC MANUFACTURING COMPANY**, in that the ignition switch is unreasonably dangerous because the ignition switch does not conform to an express warranty of the manufacturer.

**VIOLATION OF THE MAGNUUSON-MOSS WARRANTY ACT, 15 U.S.C. §§ 2301 et seq.**

36.

Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

37.

At all times relevant hereto, there was in full force and effect the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq.

38.

Plaintiffs are consumers as defined in 15 U.S.C. § 2301(3).  They are consumers because

they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranty.

39.

The Defective Vehicle is a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

40.

**GM LLC** is a supplier and warrantor as defined in 15 U.S.C. § 2301(4)-(5).

41.

15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by failure of a warrantor to comply with a written or implied warranty. **GM LLC** breached these warranties as described in more detail herein.

42.

In connection with its sales of the Defective Vehicle, **GM LLC** gave an implied warranty as defined in 15 U.S.C. § 2301(7); namely, the implied warranty of merchantability. As a part of the implied warranty of merchantability, **GM LLC** warranted that the Defective Vehicle was fit for its ordinary purpose as a safe passenger motor vehicle, would pass without objection in the trade as designed, manufactured, marketed, and was adequately contained, packaged, and labeled.

43.

**GM LLC** is liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1), because it breached the implied warranty of merchantability.

[11]

44.

**GM LLC** breached its implied warranty of merchantability to Plaintiffs because the Defective Vehicle was not fit for the ordinary purposes for which it is used—namely, as a safe passenger motor vehicle. The Ignition Switch Defect, which affects the ignition switch system in the Defective Vehicle, may, among other things, result in the vehicle's airbags not deploying in a crash event, increasing the potential for occupant injury or death. This safety defect makes the Defective Vehicle unfit for its ordinary purpose of providing safe transportation.

45.

**GM LLC** further breached its implied warranty of merchantability to Plaintiffs because the Defective Vehicle would not pass without objection in the trade, as it contained a defect that relates to motor vehicle safety due to the Ignition Switch Defect in the Defective Vehicle.

46.

**GM LLC** further breached its implied warranty of merchantability to Plaintiffs because the Defective Vehicle was not adequately contained, packaged, and labeled. The directions and warnings that accompanied the Defective Vehicle did not adequately instruct Plaintiffs on the proper use of the Defective Vehicle in light of the Ignition Switch Defect, or adequately warn Plaintiffs of the dangers of improper use of the Defective Vehicle.

47.

At the time of the delivery of the Defective Vehicle, **GM LLC** did not provide instructions and warnings to Plaintiffs to not place extra weight on the vehicle's key chains, including a fob or extra keys. According to **GM LLC**, placing extra weight on the vehicle's key chain increases the chances that the ignition switch will unintentionally move from the "on" position to the

"accessory" or "off" position.

48.

At the time of the delivery of the Defective Vehicle, **GM LLC** did not provide instructions and warnings to Plaintiffs to avoid rough, bumpy, and uneven terrain while driving his vehicle. Traveling across such terrain increases the chances that the ignition switch in the Defective Vehicle will unintentionally move from the "on" position and into the "accessory" or "off" position, especially when the key chains are weighted down with a fob, additional keys or other items.

49.

At the time of the delivery of the Defective Vehicle, **GM LLC** did not provide instructions and warnings to Plaintiffs to carefully avoid brushing or bumping up against his vehicle's key chain with a body part. According to **GM LLC**, brushing or bumping up against the Defective Vehicle's key chains increases the chances that the ignition switch in the Defective Vehicle will unintentionally move from the "on" position and into the "accessory" or "off" position.

50.

At the time of the delivery of the Defective Vehicle, **GM LLC** did not adequately warn Plaintiffs of the dangers of not taking the necessary steps outlined above to prevent the ignition switch in their vehicle from unintentionally moving from the "on" position and into the "accessory" or "off" position while in motion, including the loss of power and shut off of the engine resulting in an increased difficulty in maneuvering the vehicle, the lack of airbag deployment in the event of a crash and injury or death.

[13]

51.

Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiffs are entitled to recover the damages caused to them by **GM LLC**'s breach of the implied warranty of merchantability, which damages constitute the difference in value between the Defective Vehicle as warranted (its sales prices) and the Defective Vehicle as actually delivered (perhaps worth $0.00) (i.e., a total or partial refund of the full purchase prices of the Defective Vehicle), plus loss of use and other consequential damages arising after the date of delivery of the Defective Vehicle.

52.

Pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by Plaintiffs in connection with the commencement and prosecution of this action.

## BREACH OF WARRANTY OF FITNESS FOR ORDINARY USE

53.

**GM LLC, STONERIDGE and/or ABC MANUFACTURING COMPANY** also warranted that the Defective Vehicle was reasonably fit for its ordinary and intended use. La. C.C. Art. 2524.

54.

The Defective Vehicle was clearly not safe and contained a serious and life threatening defect. As a result, the Defective Vehicle was unfit and inherently dangerous for ordinary use.

[14]

55.

As a direct and proximate result of **GM LLC, STONERIDGE and/or ABC MANUFACTURING COMPANY's** actions in breaching their warranty of fitness for ordinary use, Plaintiffs have sustained serious and significant damages for which **GM LLC, STONERIDGE and/or ABC MANUFACTURING COMPANY** are liable.

## VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

56.

**GM LLC, STONERIDGE and/or ABC MANUFACTURING COMPANY's** acts and omissions as well as their failure to use reasonable care in this matter as alleged in this Complaint demonstrate unfair and deceptive methods.

57.

The unfair and deceptive acts and practices of **GM LLC, STONERIDGE and/or ABC MANUFACTURING COMPANY** violate the provisions of the Louisiana Unfair Trade Practices and Consumer Protection Law. As a result, Plaintiffs suffered actual damages for which they are entitled to relief.

58.

As a direct and proximate cause of **GM LLC, STONERIDGE and/or ABC MANUFACTURING COMPANY**'s acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages, including but not limited to, replacement and/or reimbursement for loss of value.

[15]

## BREACH OF IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS

### 59.

Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

### 60.

At all times relevant hereto, Defendants knew of the use for which the Defective Vehicle was intended and impliedly warranted the Defective Vehicle to be of merchantable quality and safe and fit for such use.

### 61.

Defendants were aware that a consumer, such as the Plaintiffs, would use the Defective Vehicle in the manner in which passenger vehicles are intended to be used.

### 62.

Plaintiffs reasonably relied upon the judgment and sensibility of Defendants to sell the Defective Vehicle only if it was indeed of merchantable quality and safe and fit for Plaintiffs' intended use. Defendants breached their implied warranty of merchantability to Plaintiffs because the Defective Vehicle was neither of merchantable quality nor fit for the ordinary purposes for which it is used—as a safe passenger vehicle. Specifically, and according to **GM LLC**'s representatives, the Defective Vehicle contained the Ignition Switch Defect, which makes the Defective Vehicle unfit for their ordinary purpose of providing safe transportation.

### 63.

Defendants further breached their implied warranty of merchantability to Plaintiffs because the Defective Vehicle was not adequately contained, packaged, and labeled in that

the directions and warnings that accompanied the Defective Vehicle did not adequately instruct Plaintiffs on the proper use of the Defective Vehicle in light of the Ignition Switch Defect.

64.

At the time of delivery of the Defective Vehicle, Defendants did not provide instructions and warnings to Plaintiffs to not place extra weight on their vehicles' key chains, including a fob or extra keys. On or around March of 2014, GM publicly stated that placing extra weight on the key chain of the Defective Vehicles increases the chances that the ignition switch in the Defective Vehicles will move from the "on" position and into the "accessory" or "off" position.

65.

At the time of the delivery of the Defective Vehicle, Defendants did not provide instructions and/or warnings to Plaintiffs to avoid rough, bumpy, and uneven terrain while driving. On or around March of 2014, GM publicly stated that traveling across such terrain increases the chances that the ignition switch in the Defective Vehicles will move from the "on" position to the "accessory" or "off" position.

66.

Additionally, at the time of delivery of the Defective Vehicle, Defendants did not adequately warn Plaintiffs of the dangers of not taking the necessary steps outlined above to prevent the ignition switch in the Defective Vehicles from moving from the "on" position to the "accessory" or "off" position while the Vehicle is in motion.

[17]

67.

It was not necessary for Plaintiffs to give Defendants notice of GM's breach of the implied warranty of merchantability because Defendants had actual notice of the Ignition Switch Defect. Prior to the filing of this action, GM issued a safety recall for the Defective Vehicles acknowledging the Ignition Switch Defect. Defendants admitted they had notice of the Ignition Switch Defect as early as 2004, and possibly as early as 2001. At the time of the safety recall, GM also acknowledged that numerous accidents and fatalities were caused by the Ignition Switch Defect. In addition to the above, the filing of this action is sufficient to provide Defendants notice of their breaches of the implied warranty of merchantability with respect to the Defective Vehicles.

68.

Plaintiffs' injuries were caused by the negligence of defendant, **GM LLC**, in the following non-exclusive particulars, to-wit:

a. Manufacturing and selling a product which is unreasonably dangerous in construction and/or composition;

b. Manufacturing and selling a product which is unreasonably dangerous in design;

c. Failing to provide adequate and timely warnings about the product;

d. Manufacturing and selling a product which is unreasonably dangerous because it does not conform to an express warranty;

e. Improperly installing the **STONERIDGE** ignition switch;

f. The vehicle and ignition switch were being used in a way that was intended and/or foreseeable;

g. The defendant, **GM LLC,** is engaged in the business of manufacturing or selling

[18]

vehicles; and

h.  Any other acts of negligence to be shown at the trial of this matter.

69.

Plaintiffs' injuries were caused by the negligence of defendant, **STONERIDGE and/or**

**ABC MANUFACTURING COMPANY**, in the following non-exclusive particulars, to-wit:

a.  Manufacturing and selling a product which is unreasonably dangerous in construction
    and/or composition;

b.  Manufacturing and selling a product which is unreasonably dangerous in design;

c.  Failing to provide adequate and timely warnings about the product;

d.  Manufacturing and selling a product which is unreasonably dangerous because it does not
    conform to an express warranty;

e.  The ignition switch was being used in a way that was intended and/or foreseeable;

f.  The defendant, **STONERIDGE,** is engaged in the business of manufacturing and selling
    ignition switches; and

g.  Any other acts of negligence to be shown at the trial of this matter.

70.

**YOLANDA COLEMAN** alleges the following general and specific damages for which

she is entitled to recover in an amount calculated to adequately compensate her for the injuries

and damages she sustained:

a.  Past, present, and future medical expenses;

b.  Past, present, and future physical pain and suffering and loss of function;

c.  Past, present, and future mental anguish and emotional distress;

d.  Past, present, and future lost wages and diminished earning capacity;

[19]

e.   Special care and services;

f.   Loss of enjoyment of life;

g.   Permanent partial disability;

h.   Travel expenses;

i.   Costs of these proceedings and experts fees, and

j.   Any other damages which will be shown through discovery, proven at trial, and are recoverable by law.

71.

**QUNSTON COLEMAN** alleges the following general and specific damages for which he is entitled to recover in an amount calculated to adequately compensate him for the damages he sustained:

a.   Loss of consortium;

b.   Loss of aid, assistance, companionship, affection, society, and service; and

c.   Any other damages which will be shown through discovery, proven at trial, and are recoverable by law.

72.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

**WHEREFORE,** plaintiffs, **YOLANDE COLEMAN and QUNSTON COLEMAN,** pray the defendants be cited and served with this complaint and after due proceedings are had, there be judgment in their favor and against defendants, **GENERAL MOTORS CORPORATION, GENERAL MOTORS, LLC, STONERIDGE AUTOMOTIVE PLC,**

[20]

**STONERIDGE AUTOMOTIVE SYSTEMS, LLC**, **and ABC MANUFACTURING COMPANY** severally, jointly and *in solido*, in a full and true sum calculated to compensate plaintiffs for the damages complained of herein, along with legal interest from the date of judicial demand until paid, for all costs of these proceedings, and for all other general and equitable relief.

Respectfully submitted,

SANGISETTY LAW FIRM, LLC

/s/ Michael Lillis_____
RAVI K. SANGISETTY (Bar No. 30709)
MICHAEL E. LILLIS (Bar No. 33245)
935 Gravier Street, Suite 835
New Orleans, La 70112
Telephone:     (504) 662-1016
Facsimile:     (504) 662-1318

and

BRIAN K. JEFFERSON (Bar No. 23143)
228 St. Charles Avenue, Ste. 1110
New Orleans, LA 70130
Telephone:     (504) 586-9395

**SERVICE INSTRUCTIONS:**

Service on all defendants will be completed by waiver pursuant to Rule 4(d) of the FRCP.

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
YOLANDA COLEMAN AND QUNSTON COLEMAN

**DEFENDANTS**
GENERAL MOTORS, LLC, GEBERAL MOTORS HOLDING, LLC, STONERIDGE, INC, STONERIDGE INC. DBA POLLAK ENGINEERING PRODUCTS, ABC MANUFACTURING COMPANY

**(b)** County of Residence of First Listed Plaintiff   **TERREBONNE**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   **DELAWARE**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
MICHAEL LILLIS AND RAVI SANGISETTY
935 GRAVIER ST., STE. 835
NEW ORLEANS, LA 70112 5046621016

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government<br>Plaintiff | ☐ 3  Federal Question<br>*(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government<br>Defendant | ☒ 4  Diversity<br>*(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>& Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>Student Loans<br>(Excludes Veterans)<br>☐ 153 Recovery of Overpayment<br>of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>Liability<br>☐ 320 Assault, Libel &<br>Slander<br>☐ 330 Federal Employers'<br>Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>Liability<br>☒ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>Product Liability<br>☐ 360 Other Personal<br>Injury<br>☐ 362 Personal Injury -<br>Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury -<br>Product Liability<br>☐ 367 Health Care/<br>Pharmaceutical<br>Personal Injury<br>Product Liability<br>☐ 368 Asbestos Personal<br>Injury Product<br>Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>Property Damage<br>☐ 385 Property Damage<br>Product Liability | ☐ 625 Drug Related Seizure<br>of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/<br>Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information<br>Act<br>☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure<br>Act/Review or Appeal of<br>Agency Decision<br>☐ 950 Constitutionality of<br>State Statutes |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>Accommodations<br>☐ 445 Amer. w/Disabilities -<br>Employment<br>☐ 446 Amer. w/Disabilities -<br>Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate<br>Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee -<br>Conditions of<br>Confinement | ☐ 710 Fair Labor Standards<br>Act<br>☐ 720 Labor/Management<br>Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical<br>Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement<br>Income Security Act | ☐ 870 Taxes (U.S. Plaintiff<br>or Defendant)<br>☐ 871 IRS—Third Party<br>26 USC 7609<br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration<br>Actions | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding
☐ 2 Removed from
State Court
☐ 3 Remanded from
Appellate Court
☐ 4 Reinstated or
Reopened
☐ 5 Transferred from
Another District
*(specify)*
☐ 6 Multidistrict
Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332
Brief description of cause:
FAULTY IGNITION SWITCH INJURY CASE

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____     DOCKET NUMBER _____

DATE
08/31/2015

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____