# Exhibit B

# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036-4003

Tel:  (212) 556-2100
Fax:  (212) 556-2222
www.kslaw.com
Arthur Steinberg
Direct Dial:  212-556-2158
asteinberg@kslaw.com

October 30, 2015

**VIA E-MAIL TRANSMISSION AND ECF FILING**

The Honorable Robert E. Gerber
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
Alexander Hamilton Custom House
One Bowling Green
New York, New York 10004

> Re:  **In re Motors Liquidation Company,** *et al.*
> **Case No. 09-50026 (REG)**
> **Explanatory Letter With Respect to Peller Clients Complaints**

Dear Judge Gerber:

Pursuant to Your Honor's October 19, 2015 Endorsed Order [Dkt. No. 13506], General Motors LLC ("**New GM**") submits this letter setting forth its position with respect to the Marked Peller Client Complaints (as defined in the Endorsed Order), attached hereto as Exhibits "A" through "C."[1] Initially, New GM notes that the *Elliott*, *Sesay* and *Bledsoe* lawsuits are currently stayed in MDL 2543, and the Peller Client Complaints raise substantially similar issues as those addressed by New GM in the Marked MDL Complaint and its accompanying explanatory letter. In this regard, just like the MDL Complaint, the Peller Client Complaints include parties, factual allegations and claims that violate this Court's Judgment, Decision, and Sale Order,[2] and are highlighted with different colors as follows:  (1) blue, for named plaintiffs and plaintiff classes/subclasses asserting claims based on Old GM vehicles; (2) green, for allegations based on Old GM conduct that support claims for Retained Liabilities; (3) yellow, for allegations seeking to impute wholesale Old GM's knowledge to New GM, and (4) pink, for allegations related to punitive damages, which were not assumed by New GM.

---

[1] New GM incorporates by reference (i) its Opening and Reply Briefs regarding the Punitive Damages Issue, dated September 13, 2015 and September 22, 2015, respectively [Dkt. Nos. 13437 and 13460]; (ii) its Opening and Reply Briefs regarding the Imputation Issue, dated September 18, 2015 and September 30, 2015, respectively [Dkt. No. 13451 and 13482]; and (iii) its explanatory letters regarding other marked complaints (*see* Dkt. Nos. 13456, 13466, 13469 and 13470).

[2] Judgment, entered on June 1, 2015 ("**Judgment**"); *In re Motors Liquidation Co.*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015) ("**Decision**"); and Order, dated July 5, 2009 ("**Sale Order**").

09-50026-mg    Doc 13288-8    Filed 10/30/15    Entered 10/30/15 16:11:26    Main Document
Pg 2 of 4

Honorable Robert E. Gerber
October 30, 2015
Page 2

If the Court agrees with New GM's arguments, all Old GM vehicle plaintiffs and all Old GM conduct allegations and corresponding causes of action will be stricken.[3]  **Every** cause of action in the Peller Client Complaints asserted by Old GM vehicle plaintiffs and/or arising from Old GM conduct—including but not limited to (a) violations of RICO, (b) fraud, (c) negligent infliction of economic loss and increased risk under common law, (d) violations of consumer protection statutes, (e) breach of implied warranty of merchantability, and (f) civil conspiracy and joint action or aiding and abetting—are Retained Liabilities and should be stricken. Therefore, assuming New GM's arguments prevail, the Peller Client Complaints will be properly narrowed to address only New GM vehicle plaintiffs, New GM conduct allegations, and corresponding causes of action.

*Blue Coded Allegations:* The Peller Client Complaints identify named plaintiffs and proposed classes of plaintiffs who purchased vehicles manufactured and sold by Old GM before the 363 Sale.[4]  Although plaintiffs assert that the Peller Client Complaints do not include successor liability claims, that is not the case.  The Judgment held that "all claims and/or causes of action that the Ignition Switch Plaintiffs may have against New GM concerning an Old GM vehicle or part seeking to impose liability or damages based in whole or in part on Old GM conduct (including, without limitation, on any successor liability theory of recovery) are barred and enjoined pursuant to the Sale Order."  Judgment, ¶ 9; *see also In re Motors Liquidation Co*, 534 B.R. 542, 553 (Bankr. S.D.N.Y. 2015) (stating, in connection with the *Bledsoe* Plaintiffs' motion to amend the Judgment, "[i]f it is to argue that successor liability claims can still be asserted, notwithstanding the Court's extensive analysis and conclusions to the contrary, that is not a matter the Court overlooked; it is a matter for appeal." (footnote omitted)).

Further, certain of the Peller Client Complaints identify named plaintiffs and portions of proposed classes who purchased used Old GM vehicles after the closing of the 363 Sale from third parties with no connection to New GM.  The inclusion of such plaintiffs' claims violates the Decision, which held that "if the Sale Order and Injunction would have applied to the original owner who purchased the vehicle prior to the 363 Sale, it equally applies to the current owner who purchased the vehicle after the 363 Sale."  Decision, 529 B.R. at 572.  The claims of plaintiffs who purchased Old GM vehicles from Old GM or from a third party unrelated to New GM—whether before or after the closing of the 363 Sale—should be stricken.

This is particularly true with regard to Non-Ignition Switch Plaintiffs in the Peller Client Complaints.  The Court held that with respect to Non-Ignition Switch Plaintiffs, the Sale Order prohibits all claims against New GM that are not Assumed Liabilities.  In other words, the Sale Order was modified to allow only Ignition Switch Plaintiffs (not Non-Ignition Switch Plaintiffs)

---

[3] The *Bledsoe* complaint appears to assert, among others, product liability claims resulting from accidents that took place before and after the closing of the sale from Old GM to New GM.  New GM assumed "Product Liabilities" (as defined in the Sale Agreement) for post-363 Sale accidents.  As such, to the extent the *Bledsoe* complaint asserts assumed Product Liabilities, those claims would not be barred by the Sale Order.  Note, however, that New GM disputes any and all liability for such claims.

[4] New GM did not mark every reference to "Plaintiffs", "Class members", "Class members' vehicle" and the like because it would have made the marked complaints overly cumbersome to review.  Nonetheless, because such terms include Old GM vehicle owners and Old GM vehicles, such terms should be deemed to be marked.

Honorable Robert E. Gerber
October 30, 2015
Page 3

to assert Independent Claims that would otherwise be barred by the Sale Order.[5]  In the absence of any exclusion for Independent Claims, there is no theory pursuant to which the Non-Ignition Switch Plaintiffs can pursue any claim premised on any Old GM vehicle.

*Green Coded Allegations:* The Peller Client Complaints identify numerous paragraphs containing improper allegations of Old GM conduct that are the basis for their Retained Liabilities claims.[6]  The Court unequivocally ruled that "[c]laims premised in any way on Old GM conduct are properly proscribed under the Sale Agreement and the Sale Order, and by reason of the Court's other rulings, the prohibitions against the assertion of such claims stand." Decision, 529 B.R. at 528; *see also* Judgment, ¶ 9.[7]  Furthermore, the Peller Client Complaints identify allegations containing improper references to GM—for example, "GM," "GM vehicles" and "Class Vehicles."  Plaintiffs' merging of Old GM and New GM in their defined terms was purposeful and violated the Court's prior rulings.  *See In re Motors Liquidation Co.*, 514 B.R. 377, 382 n.24 (Bankr. S.D.N.Y. 2014).  Ambiguous references to "GM" in the Peller Client Complaints should be modified to specify the proper entity.[8]

*Yellow Coded Allegations:*  The Peller Client Complaints seek to automatically impute Old GM's knowledge to New GM.  For the reasons described in New GM's Opening and Reply Briefs on the Imputation Issue, plaintiffs' attempt to impute to New GM, on a wholesale basis, knowledge of events that took place at Old GM, or information contained in Old GM's books and records, violates the Sale Order.

*Pink Coded Allegations:* The Peller Client Complaints seek punitive damages from New GM. For the reasons described in New GM's Opening and Reply Briefs on the Punitive Damages Issue, all requests for punitive damages based on Old GM conduct violate the Sale Order, and cannot be maintained against New GM.

---

[5] *See In re Motors Liquidation Co.*, 531 B.R. 354, 360 (Bank. S.D.N.Y. 2015) ("The Non–Ignition Switch Plaintiffs' claims remain stayed, and properly so; those Plaintiffs have not shown yet, if they ever will, that they were known claimants at the time of the 363 Sale, and that there was any kind of a due process violation with respect to them. ***And unless and until they do so, the provisions of the Sale Order, including its injunctive provisions, remain in effect.***") (emphasis added)).

[6] This Court has already found that the *Elliott* and *Sesay* complaints impermissibly contain allegations of Old GM conduct.  *See In re Motors Liquidation Co.*, 514 B.R. 377, 383 (Bankr. S.D.N.Y. 2015) ("And while the Elliott Plaintiffs' brief disclaims reliance on Old GM acts, their complaint doesn't bear that out."); *In re Motors Liquidation Co.*, 522 B.R. 13, 19 (Bankr. S.D.N.Y. 2015) ("The Sesay Plaintiffs' allegations concerned model years ranging from 2003 to 2011—addressing, significantly, both Old GM and New GM vehicles, and bringing their claims within the express coverage of the Sale Order.").

[7] *See also In re Motors Liquidation Co.*, 533 B.R. 46, 51 n. 10 (Bankr. S.D.N.Y. 2015) ("Presumably her counsel envisioned a theory based on a species of successor liability or other theory under which New GM would be responsible for Old GM's acts.  But theories of this character cannot be asserted under the Court's recent opinions . . . .").

[8] The Peller Client Complaints' class definitions, and concomitant causes of action, include both plaintiffs who purchased Old GM vehicles from Old GM (or an unrelated third party), and those that purchased New GM vehicles from New GM.  New GM did not mark entire causes of action that might relate to both Old GM vehicle owner plaintiffs and New GM vehicle owner plaintiffs.  If it had, almost every cause of action would have been marked.

Honorable Robert E. Gerber
October 30, 2015
Page 4

Respectfully submitted,

*/s/ Arthur Steinberg*

Arthur Steinberg

AJS/sd

cc:    Gary Peller
        Edward S. Weisfelner
        Howard Steel
        Sander L. Esserman
        Jonathan L. Flaxer
        S. Preston Ricardo
        Matthew J. Williams
        Lisa H. Rubin
        Keith Martorana
        Daniel Golden
        Deborah J. Newman
        William Weintraub
        Steve W. Berman
        Elizabeth J. Cabraser
        Robert C. Hilliard

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAWRENCE M. ELLIOTT, ) | |
| CELESTINE V. ELLIOTT, and ) | |
| BERENICE SUMMERVILLE, ) | |
| for themselves, on behalf ) | Case No. 1:14-cv-00691 (KBJ) |
| of all others similarly situated, ) | |
| and on behalf of the People of the ) | CLASS ACTION FOR DECLARATORY, |
| District of Columbia, ) | INJUNCTIVE, AND MONETARY RELIEF |
| ) | |
| ) | REPRESENTATIVE ACTION FOR |
| Plaintiffs, ) | DECLARATORY, INJUNCTIVE, AND |
| ) | MONETARY RELIEF |
| ) | PURSUANT TO THE |
| v. ) | D.C CONSUMER PROTECTION |
| ) | PROCEDURES ACT, D.C. Code § 28-3901 |
| GENERAL MOTORS LLC, ) | et seq. |
| DELPHI AUTOMOTIVE PLC, ) | |
| and DPH-DAS LLC f/k/a DELPHI ) | JURY TRIAL DEMANDED |
| AUTOMOTIVE SYSTEMS, LLC, ) | |
| ) | |
| Defendants. ) | |

FIRST AMENDED COMPLAINT

INTRODUCTORY STATEMENT

Plaintiffs LAWRENCE ELLIOTT, CELESTINE ELLIOTT and BERENICE

SUMMERVILLE bring this action for themselves, and on behalf of all persons similarly

situated who own or have owned the substandard and dangerous vehicles identified below at

any time since October 19, 2009.  The Elliotts also bring this action of behalf of the public as

representatives of the People of the District of Columbia.

1.    Mr. and Mrs. Elliott are 78 and 73 years of age respectively as of the date of

filing this Complaint. They have been married for forty-nine years. They are retired

commercial drivers with over twenty-five years of on-the-road experience.  After they retired

from professional driving, they paid the full manufacturer's suggested retail price for a new

2006 Chevrolet Cobalt at a now-defunct GM dealership in Washington, D.C. The Elliotts'
Cobalt has substantial safety related defects that render it dangerous to drive. The Elliotts'
Cobalt has substantial safety related defects that render it dangerous to drive; these same
defects are suspected of causing death or personal injury to hundreds of people across the
United States, according to the National Highway Traffic Safety Administration ("NHTSA).

2.      The Elliotts' Cobalt has a defective ignition switch that could, unexpectedly and
without warning, shut down the car's engine and electrical systems while the car is in motion -
rendering the power steering, anti-lock brakes and airbags inoperable.

3.      The Elliotts' Cobalt has a plastic fuel pump which is mounted on the top of the
gas tank. When the fuel pump leaks, gasoline flows down the side of the tank and can pool
under the car, dangerously close to the car's catalytic converter. The fuel pump is not designed
to withstand the reasonably foreseeable environmental and operating conditions to which a car
can be expected to be exposed. The fuel pump in the Elliotts' car has already failed to
withstand the heat to which it is exposed. After noticing a persistent fuel smell, the Elliotts
eventually discovered a two-foot in diameter pool of leaked gasoline under the car.
Subsequently, a GM dealer replaced the pump at New GM's direction, with, as far as Plaintiffs
can determine, a new plastic replica of the first pump - presenting the same defect and the same
unreasonable safety risk of personal injury and property damages to Plaintiffs and class
members due to the fire hazards associated with the pooling gas.

4.      The Elliotts, whose entire family – including their children, grandchildren, and
great-grandchildren – depended upon the Cobalt for transportation, are now extremely hesitant
to drive the vehicle. They fear for their own safety and, in particular, for the safety of their
great grandchildren (aged 6 and 8) who reside with them and were frequently driven to school
in the car before the Elliotts discovered the extent and nature of the Cobalt's defects.

5.      In December 2009, Ms. Berenice Summerville bought a 2010 Chevrolet Cobalt
as a Christmas gift for her mother, Louella Summerville, who is 80 years of age as of the date
of the filing of this First Amended Complaint. Like the Elliotts' 2006 Cobalt, Ms.
Summerville's vehicle contains a defective ignition switch and a defective fuel pump, both of
which posed and continue to pose risks of imminent death, personal injury or property damage.
Ms. Summerville first became aware of problems with the car when she noticed the smell of
gasoline when starting or switching off the car. She also noticed that the car had particularly
poor gas mileage, which she supposed was consistent with fuel leakage. When she took the car
in for maintenance, she asked the mechanic at Ourisman Chevrolet of Marlow Heights
("Ourisman"), a GM dealership, to inspect for fuel leakage, but the dealer refused to do so
without a fee. Because the odor and poor performance continued, she again requested that the
fuel system be inspected for leaks at her car's most recent service. After searching the vehicle
history, Ourisman representatives informed Ms. Summerville that although there had been a
recall on the fuel system, it was now closed. Ourisman again refused to inspect the fuel system
without a fee. Ms. Summerville also noticed that the airbag light was flickering on and off,
inexplicably, on both the passenger and driver sides of the car. She no longer drives the Cobalt
because of fear for her own and her mother's safety.

6.      GM admits that, since its incorporation on October 19, 2009, General Motors
LLC ("GM" or "New GM") has known and failed to disclose that the Plaintiffs' Cobalts and
class members' vehicles are substandard and pose significant and unreasonable risks of death,
serious personal injury, and property damage. GM could hardly deny these facts in any event.
New GM acquired all the books, records and accounts of General Motors Corporation ("Old
GM"), including records that document the unlawful concealment of defects in vehicles sold
by Old GM prior to New GM's existence. New GM also retained the engineering, legal and

14

management officials who were responsible for designing, engineering, and concealing safety-related defects at Old GM; those officials were immediately assigned to precisely the same tasks at New GM, and they implemented or continued identical policies and practices to conceal safety related defects in GM products.

7.     The National Highway Traffic Safety Administration (NHTSA) fined New GM $28,000,000, the maximum permissible under applicable law, for GM's failure to disclose defects related to the ignition switches in Plaintiffs' and class members' cars.

8.     For nearly five years after its inception, GM failed to disclose to, and actively concealed from, Plaintiffs, class members, investors, litigants, courts, law enforcement and other government officials including the NHTSA, the risks of death, personal injury, and property damage posed by its defective products.  Instead, conspiring with Delphi, Ourisman, GM's dealers nationwide, outside lawyers, and various others, GM engaged in, and may still be engaging in, an extensive, aggressive and complex campaign to conceal and minimize the safety-related defects that exist in Plaintiffs' and class members' vehicles. That campaign is designed to mislead Plaintiffs, class members, consumers, investors, courts, law enforcement officials, and other governmental officials, including the NHTSA, that the value of the company and the worth and safety of its products are greater than they are. With those same co-conspirators, GM directed an unlawful and continuing enterprise calculated to gain an unfair advantage over competitor automakers that conduct their business within the bounds of the law.

9.     Defendants first deployed their campaign of deception on the day that New GM began operating. The scheme continued at least until its exposure began in early 2014. Through their deception, Defendants recklessly endangered the safety of Plaintiffs, their families, and members of the public. Defendants' wrongful acts and omissions harmed Plaintiffs and class

15

members by exposing them to increased risk of death or serious bodily injury, by depriving

them of the full use and enjoyment of their vehicles, and by causing a substantial diminution in

the value of the vehicles to Plaintiffs and class members, and a substantial diminution in value

of their vehicles on the open automobile market.

10.    As of the date of the filing of this First Amended Complaint, the United States

Department of Justice has opened, and is pursuing, a criminal investigation into GM's

campaign of deceit.

11.    GM's Chief Executive Officer Mary Barra admitted on behalf of the company

that New GM employees knew about safety-related defects in millions of vehicles, including

the Elliotts' 2006 Cobalt and Ms. Summerville's 2010 Cobalt, and that GM did not disclose

those defects as it was required to do by law. Ms. Barra attributed New GM's "failure to

disclose critical pieces of information," in her words, to New GM's policies and practices that

mandated and rewarded the unreasonable elevation of cost concerns over safety risks. For

example, GM chose to use and then conceal defective ignition switches in Plaintiffs' and class

members' vehicles in order to save approximately $0.99 per vehicle.

12.    In executing their scheme to conceal the dangerous character of Plaintiffs'

vehicles, Defendants violated a multitude of laws:

a)    In furtherance of their common design to prevent Plaintiffs, class

members, other consumers, law enforcement and other governmental officials,

litigants, courts, and investors from learning of the safety defects in GM cars,

GM, Delphi, and GM's dealers conducted a racketeering enterprise and engaged

in a pattern of racketeering activities, including repeated and continuous acts of

mail and wire fraud, television and radio fraud, and tampering with witnesses

and victims in violation of the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, causing the harm to Plaintiffs and class members described above.

b)      By concealing the material fact of the dangerousness of the Plaintiffs' and class members' vehicles, by failing properly to repair the safety defects in the cars in a timely manner, and by engaging in other unconscionable and/or unlawful behavior, GM and Delphi violated the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901 *et seq.*, and the Maryland Consumer Protection Act,. Md. Code, Com. Law § 13-408 *et seq.*, causing the harm described above to Plaintiffs and class members.

c)      GM and Delphi also violated their duties to warn Plaintiffs and class members about the dangers that their vehicles posed, resulting in economic loss and increased risk of personal injury for which Defendants are liable to Plaintiffs and Class members under the common law of the District of Columbia and the States of Florida, Maryland, New Jersey and Ohio.

d)      Because they intentionally concealed a material fact from Plaintiffs and Class members, Defendants are liable to Plaintiffs for the harm Plaintiffs and class members have suffered and for punitive damages under the common law of fraud common to the several States.

e)      By civilly conspiring to conceal the safety-related defects of GM vehicles, both among themselves and among nonparties to this litigation, and because they acted jointly to harm Plaintiffs and class members, Defendants are jointly and severally liable for all harm they or any co-conspirator caused.

f)      Defendants aided and abetted the conduct of each other and of nonparties in concealing the safety-related defects of GM vehicles.

17

g)    With respect to the claims of Ms. Summerville and other purchasers of identified cars sold since New GM's inception, Defendants are also liable for breach of a sellers implied warranty of merchantability under the Uniform Commercial Code §2-314 of thirty-one States identified herein that have abolished vertical privity requirements for such suits. They are also liable under the common law of the several States to those purchasers for fraud in inducing the purchases through misrepresentations and material omissions upon which Plaintiffs and class members based their purchases.

**PARTIES**

13.    Plaintiffs Lawrence and Celestine Elliott are citizens and residents of the District of Columbia. Mr. and Mrs. Elliott jointly own a 2006 Chevrolet Cobalt SS. Although Mr. and Mrs. Elliott have always been the primary drivers of their cars, they have children, grand children, and great-grandchildren who live with them, and frequently ride in the cars as passengers and, on rare occasions, also drive the cars.

14.    Plaintiff Berenice Summerville is a citizen and resident of the State of Maryland. She purchased a 2010 Chevrolet Cobalt in December 2010 from a GM dealer in the State of Maryland, and she has been the primary driver of the vehicle for virtually the entire period since she purchased the car. She often drives in the District of Columbia, which is less than 5 miles from her home.

15.    General Motors LLC is a limited liability company formed under the laws of Delaware with its principal place of business in Detroit, Michigan. On October 19, 2009, it began conducting the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the vehicles of class members, and other motor vehicles and motor vehicle components throughout

the United States. Plaintiffs' claims and allegations against GM refer solely to this entity. In

this First Amended Complaint, Plaintiffs are not making any claim against Old GM (General

Motors Corporation) whatsoever, and Plaintiffs are not making any claim against New GM

based on its having purchased assets from Old GM or based on its having continued the

business or succeeded Old GM. Plaintiffs disavow any claim based on the design or sale of

vehicles by Old GM, or based on any retained liability of Old GM. Plaintiffs seek relief from

New GM solely for claims that have arisen after October 19, 2009, and solely based on actions

and omissions of New GM.

16.     Delphi Automotive PLC is headquartered in Gillingham, Kent, United

Kingdom, and is the parent company of Delphi Automotive Systems LLC, headquartered in

Troy, Michigan. At all times relevant herein, Delphi, through its various entities, designed,

manufactured, and supplied GM with motor vehicle components, including the defective

ignition switches contained in the Cobalts owned by Plaintiffs, and in at least 6.5 million other

vehicles.

17.     GM and Delphi are collectively referred to in this Complaint as "Defendants."

## JURISDICTION AND VENUE

18.     Jurisdiction is proper in this Court pursuant to 28 U.S.C § 1331, because the

claims under the Racketeer Influenced and Corrupt Organizations Act present a federal

question. Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act, 28

U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states

different from Defendants' home states, and the aggregate amount in controversy exceeds

$5,000,000, exclusive of interest and costs.

19.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to these claims occurred in this District, and Defendants have caused harm to plaintiffs and class members residing in this District.

## FACTUAL BACKGROUND

20.    GM has publicly admitted that the ignition switches in Plaintiffs' and class members' cars are defective and pose a safety hazard. It has also admitted that, from its inception in 2009, various New GM engineers, attorneys, and management officials knew of, and took measures to conceal, the ignition switch defect and/or diminish its significance. GM has been found guilty of failing to disclose the defect to Plaintiffs, class members, and governmental officials as required by law, and the NHTSA has fined New GM the maximum penalty that agency is authorized to impose.

21.    GM continues to conceal the defect in the design of the fuel pumps on Plaintiffs' and Class members' vehicles from Plaintiffs, class members, investors, and governmental officials. On October 29, 2009, GM notified the NHTSA that they were recalling 2006 Chevrolet Cobalt and Saturn Ion vehicles sold or registered in Arizona and Nevada, and 2007 Chevrolet Cobalt, Pontiac G5, and Saturn Ion vehicles sold or registered in Arizona, California, Florida, Nevada and Texas. The reason for the recall was that "the plastic supply or return port on the modular reservoir assembly may crack…[and] fuel will leak." (NHTSA Report Campaign No. 09V419000). The consequence of this defect was listed in the report as follows: "Fuel leakage, in the presence of an ignition source, could result in a fire." The recall was limited, however, to vehicles in the five aforementioned states. Special coverage – that is, GM would replace a noticeably leaking fuel pump if the issue was specifically brought to them by a customer – was provided in a limited number of additional states: 2006 vehicles registered in Alabama, Arkansas, California, Florida Georgia, Hawaii, Louisiana, Mississippi, North

Carolina, New Mexico, Oklahoma, South Carolina, Tennessee, and Texas, and 2007 vehicles registered in Alabama, Arkansas, Georgia, Hawaii, Louisiana, Mississippi, North Carolina, New Mexico, Oklahoma, South Carolina, and Tennessee. GM offered vehicle owners outside the listed recall states no recourse, even if their plastic fuel pumps, which were susceptible to exactly the same life-threatening defect, started noticeably leaking.  GM did not inform owners of identical vehicles outside of Arizona, California, Florida, Nevada and Texas that they were in danger of being seriously injured or killed by their defective and potentially leaking fuel pump, despite the fact that the defective fuel pump can cause fuel to pool very close to the catalytic converter, which can temperatures in excess of 1000 degrees Fahrenheit in some circumstances. A fuel leak in close proximity to such high temperatures is extremely unsafe.

22.    On September 19, 2012, GM notified the NHTSA that they were expanding the recall described in paragraph 21 to cover 2007 Chevrolet Equinox and Pontiac Torrent vehicles, 2007 Chevrolet Cobalt, Pontiac G5, and Saturn ION vehicles, 2008 Chevrolet Cobalt and Pontiac G5 vehicles, and 2009 Chevrolet Cobalt and Pontiac G5 vehicles, but again geographically limited the recall, providing no recourse or notification to vehicle owners outside Arizona, Arkansas, California, Nevada, Oklahoma and Texas.

23.    Since at least October 29, 2009, GM has been aware that the fuel pumps in Plaintiffs' and class members' vehicles are defective because of their propensity to fail when exposed to high temperatures, which can occur in any car regardless of what state it is registered in. Failure of the fuel pump threatens the kind of fuel leakage that Plaintiffs and class members have detected, and creates an unreasonable danger of fire, personal injury and/or property damage. GM continues to conceal the safety defect and risk of death or severe personal and property damage from vehicle owners outside the recall states. GM has failed to

21

notify Plaintiffs, class members, and governmental officials of the full scope of the defect, nor
has it rectified the defect, as required by law.

24.       Under the Transportation Recall Enhancement, Accountability and
Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, and its accompanying
regulations, when a manufacturer learns that a vehicle contains a safety defect, the
manufacturer must disclose the defect to appropriate government officials and registered
owners of the vehicle in question.

25.       Upon its inception, New GM instituted and continued policies and practices
intended to conceal safety related defects in GM products from Plaintiffs, class members,
investors, litigants, courts, law enforcement officials, the NHTSA, and other governmental
officials. In furtherance of its illegal scheme, New GM trained and directed its employees and
dealers to take various measures to avoid exposure of safety related product defects:

a)       GM mandated that its personnel avoid exposing GM to the risk of having to
recall vehicles with safety-related defects by limiting the action that GM would take
with respect to such defects to the issuance of a Technical Service Bulletin or an
Information Service Bulletin.

b)       New GM directed its engineers and other employees to falsely characterize
safety-related defects – including the defects described in this complaint – in their
reports, business and technical records as "customer convenience" issues, to avoid
being forced to recall vehicles as the relevant law requires.

c)       New GM trained its engineers and other employees in the use of euphemisms to
avoid disclosure to the NHTSA and others of the safety risks posed by defects in GM
products.

d)    New GM directed its employees to avoid the word "stall" in describing vehicles experiencing a moving stall, because it was a "hot word" that could alert the NHTSA and others to safety risks associated with GM products, and force GM to incur the costs of a recall.

    i.    A "moving stall" is a particularly dangerous condition because the driver of a moving vehicle in such circumstances no longer has control over key components of steering and/or braking, and air bags will not deploy in any, increasingly likely, serious accident.

e)    New GM directed its engineering and other personnel to avoid the word "problem," and instead use a substitute terms, such as "issue," "concern," or "matter," with the intent of deceiving plaintiffs and the public.

f)    New GM instructed its engineers and other employees not to use the term "safety" and refer instead to "potential safety implications."

g)    New GM instructed its engineers and other employees to avoid the term "defect" and substitute the phrase "does not perform to design."

h)    New GM instituted and/or continued managerial practices designed to ensure that its employees and officials would not investigate or respond to safety-related defects, and thereby avoid creating a record that could be detected by governmental officials, litigants or the public. In a practice New GM management labeled "the GM nod," GM managers were trained to feign engagement in safety related product defects issues in meetings by nodding in response to suggestions about steps that they company should take. Protocol dictated that, upon leaving the meeting room, the managers would not respond to or follow up on the safety issues raised therein.

i)      New GM's lawyers discouraged note-taking at critical product safety meetings to avoid creation of a written record and thus avoid outside detection of safety-related defects and GM's refusal to respond to and/or GM's continuing concealment of those defects. New GM employees understood that no notes should be taken during meetings about safety related issues, and existing employees instructed new employees in this policy.  New GM did not describe the "no-notes policy" in writing to evade detection of their campaign of concealment.

j)      New GM would change part design without a corresponding change in part number, in an attempt to conceal the fact that the original part design was defective. New GM concealed the fact that it manufactured cars with intentionally mislabeled part numbers, making the parts difficult for New GM, Plaintiffs, class members, law enforcement officials, the NHTSA, and other governmental officials to identify. New GM knew from its inception that the part number irregularity was intended to conceal the faulty ignition switches in Plaintiffs' and class members' vehicles.

26.     New GM followed a practice and policy of intentionally mischaracterizing safety issues as "customer convenience" issues to avoid recall costs, and it enlisted its dealership network in its campaign of concealment by minimizing the safety aspects of the "technical service bulletins" and "information service bulletins" it sent to dealers.  New GM directed dealers to misrepresent the safety risks associated with the product defects of its vehicles. New GM followed this practice with respect to the defective ignition switches from its inception in October 2009 until its campaign of concealment of the ignition switch defect began to unravel in February 2014.

27.     New GM followed a practice or policy of minimizing and mischaracterizing safety related defects in its cars in its communications with Plaintiffs, class members, law

24

enforcement officials, the NHTSA, and other governmental officials.  New GM followed these

practices and procedures when it wrongfully limited the geographic reach of its October 2009

recall of defective fuel pumps in Plaintiffs and class members cars to drivers in a small number

of states, even though GM knew that the fuel pump defect threatened the safety and posed

unreasonable risks of death, serious bodily injury, and property damage in all vehicles

containing the fuel pump regardless of the state in which the vehicle was registered. GM

concealed the fact that vehicle owners and drivers who are residents of Maryland and the

District of Columbia and other states face the same or similar unreasonable risks of fuel

leakage and subsequent fire as drivers in the recall states.

28.    Upon the inception of New GM in October 2009, New GM and Delphi agreed

to conceal safety related defects from Plaintiffs, class members, law enforcement officials,

other governmental officials, litigants, courts, and investors. Both New GM and Delphi knew

since October 2009 that the design of the faulty ignition switch in Plaintiffs and class

members' cars had been altered without a corresponding change in part number, in gross

violation of normal engineering practices and standards. Part labeling fraud is particularly

dangerous in vehicle parts potentially related to safety because it makes tracing and identifying

faulty parts very difficult, and will delay the detection of critical safety defects.

29.    Since New GM's inception in October 2009, both New GM and Delphi have

known that the faulty ignition switch in the Plaintiffs' Cobalts and class members' vehicles

posed a serious safety and public health hazard because the faulty ignition switch caused

moving stalls. Each Defendant had legal duties to disclose the safety related defects. Rather

than notifying the NHTSA, Defendants instead decided that Plaintiffs and class members, and

millions of drivers and pedestrians should face imminent risk of injury and death due to the

defective ignition switches in Plaintiffs' and class members' vehicles. Delphi and GM entered

25

into an agreement to conceal the alteration of the part without simultaneously changing the part number, and concealed the risks associated with the defective ignition switches.

30.     In 2012, more GM employees learned that the ignition switches in vehicles from model years 2003, 2004, 2005, 2006, and 2007 exhibited torque performance below the specifications originally established by GM. Rather than notify Plaintiffs, class members, or the NHTSA, GM continued to conceal the nature of the defect.

31.     In April 2013, GM hired an outside engineering-consulting firm to investigate the defective ignition switch system. The resulting report concluded that the ignition switches in early model Cobalt and Ion vehicles did not meet GM's torque specification. Rather than notify Plaintiffs, class members, or the NHTSA, GM still continued to conceal the nature of the Ignition Switch Defect until 2014.

32.     NHTSA's Fatal Analysis Reporting System (FARS) reveals 303 deaths of front seat occupants in 2005-07 Cobalts and 2003-07 Ions where the airbags failed to deploy in non-rear impact crashes.

33.     While GM has finally admitted that the ignition switch in millions of vehicles poses an unreasonable safety risk to Plaintiffs, class members, and to the public, it continues to deny and conceal that fact that the fuel pump design on Plaintiffs' and class members' vehicles is also defective and poses its own imminent and unreasonable risk of death or serious bodily injury.

34.     New GM explicitly directed its lawyers and any outside counsel it engaged to act to avoid disclosure of safety related defects – including the ignition switch defect – in GM products.  These actions included settling cases raising safety issues, demanding that GM's victims agree to keep their settlements secret, threatening and intimidating potential litigants into not bringing litigation against New GM by falsely claiming such suits are barred by Order

26

of the Bankruptcy Court, and settling cases for amounts of money that did not require GM

managerial approval, so management officials could maintain their false veneer of ignorance

concerning the safety related defects. In one case, GM threatened the family of an accident

victim with liability for GM's legal fees if the family did not withdraw its lawsuit,

misrepresenting to the family that their lawsuit was barred by Order of GM's Bankruptcy

Court. In another case, GM communicated by means of mail and wire to the family of the

victim of a fatal accident caused by the faulty ignition switch that their claim has no basis, even

though GM knew that its communication was false and designed to further GM's campaign of

concealment and deceit. In other cases, GM falsely claimed that accidents or injuries were due

to the driver when it knew the accidents were likely caused by the dangerous product defects

GM concealed.

## TOLLING OF THE STATUTE OF LIMITATIONS

37.    Any applicable statute of limitation has been tolled by Defendants' knowledge, active

concealment, and denial of the facts alleged herein, which behavior is ongoing.

38.    The causes of action alleged herein did not accrue until Plaintiffs and Class

Members discovered that their vehicles had the safety related defects described herein.

39.    Plaintiffs and Class Members had no reason to know that their products were

defective and dangerous because of Defendants' active concealment.

## CLASS ACTION ALLEGATIONS

40.    Plaintiffs bring this lawsuit as a class action on their own behalves and on

behalf of all other persons similarly situated as members of the proposed Class pursuant to

Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action

satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority

27

requirements of those provisions. All proposed Class and Subclass periods run from the inception of New GM in October 2009 and continue until judgment or settlement of this case.

41. Plaintiffs bring this action on behalf of a proposed nationwide class defined as follows: All persons in the United States who, since the inception of New GM in October 2009, hold or have held a legal or equitable interest in a GM vehicle with a defective ignition switch manufactured by Delphi and/or a defective fuel pump. As of the time of the filing of this First Amended Complaint, Plaintiffs are aware that the following GM models contain dangerous ignition switches:

- 2005-2011 Chevrolet Cobalt

- 2006-2011 Chevrolet HHR

- 2006-2010 Pontiac Solstice

- 2007-2010 Pontiac G5

- 2003-2007 Saturn Ion

- 2007-2010 Saturn Sky

- 2005-2009 Buick Lacrosse

- 2006-2011 Buick Lucerne

- 2004-2005 Buick Regal LS & GS

- 2006-2014 Chevrolet Impala

- 2006-2008 Chevrolet Monte Carlo

- 2000-2005 Cadillac Deville

- 2004-2011 Cadillac DTS

As of the time of the filing of this First Amended Complaint, Plaintiffs are aware that the following GM models contain dangerously defective fuel pumps:

28

- 2006-2010 Chevrolet Cobalt

- 2006-2007 Saturn Ion

- 2007-2009 Pontiac G5

- 2007 Chevrolet Equinox

42. Plaintiffs also bring this action on behalf of the following Subclasses:

   a. The Elliotts bring this action on behalf of all persons in the District of Columbia who, since October 2009, hold or have held a legal or equitable interest in a GM vehicle with a defective ignition switch or defective fuel pump as described above. The GM models include those listed in the preceding paragraph (the "District of Columbia" Subclass);

   b. Ms. Summerville brings this action on behalf of all persons in the State of Maryland who, since October 2009, purchased or hold or have held a legal or equitable interest in a GM vehicle with a defective ignition switch and/or fuel pump (the "Maryland Subclass");

   c. Ms. Summerville brings this action on behalf of residents of the District of Columbia, Alaska, Arkansas, Delaware, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, West Virginia, and Wyoming, who, since New GM's inception in October 2009, purchased a GM vehicle containing the defective ignition switch manufactured by Delphi and/or the defective fuel pump (the "Multi-State Warranty Subclass");

29

d.  Plaintiffs also bring this action on behalf of residents of the District of
Columbia and the States of California, Florida, Maryland, New Jersey and
Ohio who, since October 2009, hold or have held a legal or equitable
interest in a GM vehicle with a defective ignition switch and/or fuel pump
(the "Multi-State Negligence Subclass").

43.     Excluded from the Class are: (1) Defendants, any entity or division in which
Defendants have a controlling interest, and their legal representatives, officers, directors,
assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3)
governmental entities; and (4) those persons who have suffered personal injuries as a result of
the facts alleged herein.

## NUMEROSITY AND ASCERTAINABILITY

44.     Although the exact number of Class Members is uncertain and can only be
ascertained through appropriate discovery, the number is great enough such that joinder for
each Class or Subclass is impracticable. The disposition of the claims of these Class Members
in a single action will provide substantial benefits to all parties and to the Court. Class
Members are readily identifiable from information and records in GM's possession, custody, or
control, and/or from public vehicular registration records.

## TYPICALITY

45.     The claims of the Plaintiffs are typical of the claims of each member of the
class and subclasses in that the representative Plaintiffs, like all class members, legally or
equitably own or owned a GM vehicle during the Class Period that contained a defective
ignition switch manufactured by Delphi and/or a defective fuel pump. Plaintiffs, like all class
and subclass members, have been damaged by Defendants' misconduct, namely, in being
wrongfully exposed to an increased risk of death or serious bodily injury, in suffering

diminished use and enjoyment of their vehicles, and in suffering the diminished market value of their vehicles. Furthermore, the factual bases of Defendants' misconduct are common to all class and subclass members.

## ADEQUATE REPRESENTATION

46.     Plaintiffs will fairly and adequately represent and protect the interests of the class and subclasses. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions and in prosecuting complex federal litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class and subclasses, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the class of subclasses.

## PREDOMINANCE OF COMMON ISSUES

47.     There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include:

a.     Whether the vehicles owned by class or subclass members during the class periods suffer from the defective ignition switch and/or defective fuel pump described herein?

b.     Whether the defective ignition switch and/or fuel pump posed an unreasonable danger of death or serious bodily injury?

c.     Whether GM and/or Delphi imposed an increased risk of death or serious bodily injury on Plaintiffs and class and subclass members during the Class period?

d.     Whether GM and/or Delphi caused Plaintiffs and class and subclass members to suffer economic loss during the Class period?

31

e.      Whether GM and/or Delphi caused Plaintiffs and class and subclass members to suffer the loss of the use and enjoyment of their vehicles during the class period?

f.      Whether GM and Delphi had a legal duty to disclose the ignition switch danger to class and subclass members?

g.      Whether GM and/or Delphi had a legal duty to disclose the ignition switch danger to the NHTSA?

h.      Whether either GM and/or Delphi breached duties to disclose the ignition switch defect?

i.      Whether class and subclass members suffered legally compensable harm?

j.      Whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a GM Vehicle during the class period?

k.      Whether Defendants violated the consumer protection statutes of the District of Columbia and Maryland by concealing the ignition switch defect and/or the fuel pump defect from Plaintiffs and governmental officials?

l.      Whether Defendants violated Maryland's consumer protection statute by concealing material facts about and making affirmative misrepresentations about GM cars in connection with sales made since the inception of the New GM?

m.      Whether the fact that the ignition switch was defective was a material fact?

n.      Whether Ms. Summervilles and the Multi-State Warranty Subclass members' vehicles were merchantable?

o.      Whether Plaintiffs and Class Members are entitled to a declaratory judgment stating that the ignition switches and/or fuel pumps in their vehicles are defective and/or not merchantable?

32

p.    Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction?

q.    Whether GM should be declared responsible for notifying all Class Members of the Defect and ensuring that all GM vehicles with the Ignition Switch Defect are recalled and repaired?

r.    Whether Defendants conducted a criminal enterprise in violation of RICO?

s.    Whether Defendants engaged in a pattern or practice of racketeering?

t.    Whether Defendants committed mail or wire fraud in connection with their concealment of the defective ignition switch.

u.    Whether class members were harmed by Defendants' violations of RICO?

v.    Whether class and subclass members are entitled to recover punitive damages from Defendants, and, if so, what amount would be sufficient to deter Defendants from engaging in such conduct in the future and to punish Defendants for their recklessness regarding the public health and safety and their campaign of concealment?

## SUPERIORITY

48.    Plaintiffs and class and subclass members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, most class and subclass members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual class and subclass member's claims, it is likely that few could afford to seek legal redress for Defendants' misconduct. Absent a class action, class and subclass members will continue to incur damages, and Defendants' misconduct will continue without remedy. Class treatment of common questions of law and

33

fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication. The class action is superior for defendants as well, who otherwise could be forced to litigate thousands of separate actions.

49.     Defendants have acted in a uniform manner with respect to the Plaintiffs and class and subclass members. Class and subclass wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of class and subclass members to protect their interests. Class and subclass wide relief assures fair, consistent, and equitable treatment and protection of all class and subclass members.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (18 U.S.C. § 1962(c) and (d))

50.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth at length herein.

51.     This claim is brought by all Plaintiffs on behalf of the nationwide Class.

52.     Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the "RICO Enterprise" through a "pattern of racketeering activity." Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate § 1962(c).

53.     At all times relevant, GM, Delphi, its associates-in-fact, Plaintiffs, and the Class and Subclass members are each a "person," as that term is defined in 18 U.S.C. § 1961(3).

54.     At all times relevant, Plaintiff and each class and subclass member were and are "a person injured in his or her business or property" by reason of a violation of RICO within the meaning of 18 U.S.C. § 1964(c).

55.     At all times relevant, GM and Delphi are and were each a "person" who participated in or conducted the affairs of the RICO Enterprise through the pattern of racketeering activity described below. While GM and Delphi each participated in the RICO Enterprise, they each exist separately and distinctly from the Enterprise. Further, the RICO Enterprise is separate and distinct from the pattern of racketeering activity in which GM and Delphi have engaged and are engaging.

56.     At all times relevant, GM and Delphi were associated with, operated or controlled, the RICO Enterprise, and participated in the operation and management of the affairs of the RICO Enterprise, through a variety of actions described herein. Defendants' participation in the RICO Enterprise was necessary for the successful operation of its scheme to defraud.

### The RICO Enterprise

57.     Defendants participated in the operation and management of an association-in-fact enterprise whose aim was to conceal safety related defects in Delphi products installed in GM vehicles from Plaintiffs, class members, the NHTSA, litigants, courts, law enforcement officials, consumers, and investors. The Enterprise was motivated by the common design of concealing the true value of the defendant companies and their products, and it constituted an unlawful, continuing enterprise calculated to gain an unfair advantage over competitor automakers who conduct their business within the bounds of the law. The Enterprise was partly embodied in practices and procedures intended to mischaracterize safety related defects – such as the ignition switch – as "customer convenience issues" to avoid incurring the costs of a

recall, and minimizing the significance of disclosures that were made by limiting the scope of their gas-pump recall to five and then seven states.

58.    The RICO Enterprise began with the inception of New GM, on October 19, 2009. The following persons, and others presently unknown, have been members of and constitute the association-in-fact enterprise with the following roles:

a)    New GM, which mandated its employees take the various measures, described above at paragraph 26, to conceal safety related defects, including the ignition switch and the fuel pump defects.

b)    GM's engineers (including but not limited to Ray DeGiorgio, Gary Altman, a program engineering manager, Michael Robinson, vice president for environmental sustainability and regulatory affairs, Gay Kent, general director of product investigations and safety regulations) who have carried out GM's directives since the inception of New GM in October 2009 by minimizing and misrepresenting the safety aspects of the ignition switch defect – enabling GM to avoid its legal obligations to recall vehicles with safety related defects. GM's engineers (including but not limited to Mr. DeGiorgio, Mr. Altman, Mr. Robinson and Ms. Kent) have also concealed the part-number-labeling fraud of which they have known since New GM's inception in October 2009.

c)    GM's in-house lawyers (including but not limited to Jaclyn Palmer, Ron Porter, William Kemp, Lawrence Buonomo, and Jennifer Sevigny), who knowingly assisted GM in evading its legal responsibilities by taking measures allowing GM management to claim ignorance about the increasing number of accidents and personal injuries that the ignition switches were causing throughout the Class period. GM's in-house lawyers,

as described in Paragraph 36, also took measures to ensure that lawsuits filed by victims of the ignition switch defect and their surviving families were settled confidentially – preventing them from revealing the defect to other Plaintiffs, class members, law enforcement officials, or other government authorities, including the NHTSA – for amounts below the threshold that would trigger closer scrutiny within GM.

d)    GM's outside lawyers, retained to defend the Company against lawsuits filed by victims with injuries allegedly caused by the ignition switch defect, who were directed to play, and played, the same roles as those of in-house counsel described above – taking analagous measures to help GM conceal the ignition switch defect.

e)    Delphi, who, since the inception of the new GM in October 2009, has participated in the Enterprise to conceal the defective ignition switch system and its knowledge that ignition switch part numbers on vehicles driven by class members during the class period were misleading or fraudulent and would hinder any attempt to investigate or learn about the ignition switch defect.

f)    GM's Dealers, including but not limited to Ourisman of Marlow Heights, whom New GM instructed, explicitly or implicitly, to present false and misleading information regarding the ignition switch and fuel pump defects to Plaintiffs and Class members, through, *inter alia*, Technical Service Bulletins and Information Service Bulletins, and who did, in fact, present such false and misleading information to Plaintiffs and Class members during the Class period.

58.    GM and Delphi conducted and participated in the affairs of this RICO Enterprise through a continuous pattern of racketeering activity that began with the inception

37

of the New GM in October 2009, and that consisted of numerous and repeated violations of the

federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, and 18 U.S.C. § 1512

(tampering with witnesses and victims).

### Predicate Acts of Wire and Mail Fraud

59.     Since its inception in October 2009 and in furtherance of its scheme to defraud,

GM, its engineers and its lawyers communicated with Delphi on a regular basis via the mail

and/or wires regarding the defective ignition switch. Through those communications, GM

instructed Delphi to continue concealing the ignition switch defect and to continue to produce

ignition mislabeled or fraudulently labeled switches to help GM evade detection of New GM's

unlawful failure to recall vehicles with defective ignition switches by the NHTSA or other law

enforcement officials. GM's and Delphi's communications constitute repeated violations of 18

U.S.C. §§ 1341 and 1343.

60.     Since GM's inception in October 2009, in furtherance of its scheme to defraud,

GM's lawyers communicated with those claiming injuries caused by the ignition switch defects

on a regular basis via the mail and/or wires. Upon information and belief, GM's lawyers

utilized the mail and wires to insist that litigants agree to confidentiality agreements forbidding

disclosure that the ignition switch defects caused their injuries, and to communicate with

supervisors and each other about ensuring that the cases settled below the threshold that would

trigger scrutiny that might endanger Defendants' concealment of the ignition switch defects.

61.     Since its inception in October 2009, GM has routinely used the wires and mail

to disseminate false and fraudulent advertising about Plaintiffs' and Class members' vehicles,

misrepresenting the vehicles as safe and dependable and failing to disclose the ignition switch

or fuel pump defects in its advertising.

### Predicate Acts of Tampering With Witnesses and Victims

62.     New GM engaged in an ongoing scheme to tamper with witnesses and victims as described in 18 U.S.C. § 1512(b) by using misleading conduct to influence, delay and prevent the testimony of victims in official proceedings and by entering into a campaign of intimidation and false statements to discourage victims from pursuing their claims against GM, as described elsewhere in the complaint. New GM's in-house legal office played an integral role in the RICO Enterprise by instituting and/or continuing policies and practices with respect to potential and ongoing legal proceedings designed to intimidate victims from utilizing the courts to seek legal protection and to prevent outsiders from becoming aware of the number of victims of safety related defects in GM cars and the severity of injuries those defects were causing.  GM instructed its counsel to deny to victims and their families the existence of the ignition switch defect, and to place blame for any injuries on driver error or irresponsible driving. GM instructed its counsel to prepare its corporate and fact witnesses by encouraging them to deny that they remember anything about any topic on which they were questioned. GM's lawyers actively discouraged GM personnel from taking any notes at safety related meetings. In furtherance of its scheme to conceal its wrongful behavior, GM insisted as a condition of providing any compensation to victims that they agree to confidentiality agreements designed to prevent detection of the safety related defect at issue by Plaintiffs, Class and Subclass members, the NHTSA, courts, litigants, and investors.  New GM also corruptly encouraged its employees and engaged in misleading conduct to prevent said employees from reporting safety defects and therefore delay or prevent their testimony about said defects. GM accomplished this by, *inter alia*, punishing employees who raised red flags about safety defects, thus intentionally intimidating and threatening employees who otherwise could have raised red flags. Jaclyn Palmer, Ron Porter, William Kemp, Lawrence Buonomo,

and Jennifer Sevigny, five of GM's in-house lawyers responsible for carrying the tasks described herein, were fired by GM in June 2014, after the Enterprise came to light.

63.     Defendants' conduct in furtherance of this scheme to conceal and/or minimize the significance of the ignition switch defect and fuel pump defect was intentional. Plaintiff, Class and Subclass members were harmed in that they were forced to endure increased risk of death or serious bodily injury, they lost use and enjoyment of their vehicles, and their vehicles' values have diminished because of Defendants' participation in conducting the RICO Enterprise. The predicate acts committed in furtherance of the enterprise each had a significant impact on interstate commerce.

## COUNT II
### Asserted on Behalf of Plaintiffs and the Nationwide Class
### (Common Law Fraud)

64.     Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs of this Complaint.

65.     At the time of New GM's inception in 2009, Defendants knew that the ignition switch used or which would be placed in the Plaintiffs' and class members' vehicles could inadvertently move from "run" to "accessory" or "off," under regular driving conditions. This fact was material to Plaintiffs and class members.

66.     In late October 2009, Defendants also knew that the fuel pump design in the Chevrolet Cobalt was prone to cause fuel leakage and fires.

67.     Between October 2009 and February 2014, Defendants actively and intentionally concealed and/or suppressed the existence and true nature of the ignition switch and fuel pump defects, and minimized the extent of the danger they posed in direct and indirect communications with Plaintiffs, class and subclass members, dealers, the NHTSA, and others.

68.     Plaintiffs and class members reasonably relied on GM's communications and material omissions to their detriment. As a result of the concealment and/or suppression of facts, Plaintiffs and Class Members have sustained and will continue to sustain injuries, consisting of the diminished value of their GM vehicles and the lost use and enjoyment of the vehicles that Defendants actions have caused, and exposure to increased risk of death or serious bodily injury.

69.     Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and with reckless disregard to Plaintiffs' and Class Members' rights and well-being, in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT III**
**Asserted on Behalf of Ms. Summerville and the Nationwide Subclass of Class Members**
**Who Purchased their Vehicles after New GM's Incorporation on October 19, 2009**
**(Common Law Fraud)**

70.     Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs of this Complaint.

71.     This Claim is brought on behalf of Berenice Summerville and the subclass of consumers who purchased their vehicles after New GM's incorporation on October 19, 2009.

72.     Upon incorporation of New GM, Defendants knew that ignition switch used in the 2010 Chevrolet Cobalt and other Class Vehicles purchased after October 10, 2009 could inadvertently move from "run" to "accessory" or "off," under regular driving conditions, and that the fuel pump was dangerously defective and posed an unreasonable risk of death or serious bodily injury.

73.    Prior to November 2009, Defendants also knew that the fuel pump design in the Chevrolet Cobalt was improperly placed and prone to leakage and even fire.

74.    Between October 2009 and February 2014, Defendants actively and intentionally concealed and/or suppressed the existence and true nature of the ignition switch and fuel pump defects, and minimized the extent of the danger they posed. Concealment of the fuel pump defect continues to the present.

75.    Because Defendants were in exclusive control of the material facts concerning the ignition switch and fuel pump defects, Plaintiffs' and Class Members' actions in purchasing and driving the dangerous vehicles were justified because they had no way of knowing that material facts had been concealed. Plaintiffs and Class Members would not have acted as they did in purchasing and driving their cars if they had known of the concealed and/or suppressed facts.

76.    In the alternative, even if a class member would still have made the vehicle purchase had the defects been known, they would have paid less for their vehicles but for the concealment of the defect. The concealment of the defects artificially increased the market price of the vehicles.

77.    As a result of the concealment and/or suppression of facts, Plaintiffs and Class Members have sustained, and continue to sustain, damages arising from the difference in value between the prices they were induced to pay for their vehicles, and the true value of a vehicle with a defective ignition switch or fuel pump.

78.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and well-being, in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive

damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV
**Asserted on Behalf of Plaintiffs and on Behalf of the Multi-State Negligence Subclass**
(Negligent Infliction of Economic Loss and Increased Risk under the Common Law of the District of Columbia and Florida, Maryland, New Jersey, and Ohio)

79.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

80.     This claim is brought on behalf of Plaintiffs and the District of Columbia and Maryland Classes and, with respect to the fuel pump defect, the District of Columbia and Maryland subclasses of consumers whose vehicles also suffer from the fuel pump defect described in Paragraph 21.

81.     Because the defective ignition switches and fuel pumps created a foreseeable risk of severe personal and property injury to drivers, passengers, other motorists, and the public at large, Defendants had a duty to warn consumers about, and fix, the defect as soon as soon as they learned of the problem – upon the inception of New GM in October 2009.

82.     Rather than alerting vehicle owners to the danger, Defendants actively concealed and suppressed knowledge of the problems.

83.     Defendants created an unreasonable risk of death or serious bodily injury to Plaintiffs and Subclass members. Plaintiffs and Subclass members were particularly identifiable and foreseeable victims of Defendants' negligence, and their injuries in terms of the diminution in the value of their vehicles and the loss of use and enjoyment of the vehicles was particularly foreseeable.

84.     Defendants created an unreasonable risk of death or serious bodily injury through a pattern and practice of negligent hiring and training of its employees, and by creating

43

and allowing to continue a culture at GM which encouraged the minimizing and hiding of safety defects from the public. GM negligently increased this risk by firing or otherwise retaliating against employees who did attempt to convince GM to fix safety problems.

85.     As a result of Defendants' failure to warn them about the defects or repair their vehicles, Plaintiffs and Class Members sustained, and continue to sustain, damages arising from the increased risk of driving vehicles with safety related defects, from the loss of use and enjoyment of their vehicles, and from the diminished value of their vehicles attributable to Defendants' wrongful acts.

86.     Plaintiffs and class members seek compensatory damages in an amount to be proved at trial, including compensation for any pain and suffering they endured.

**COUNT V**
**Asserted on Behalf of Mr. and Mrs. Elliott, for themselves, as representatives of the public, and on behalf of the District of Columbia Subclass**
**(Violation of the District of Columbia's Consumer Protection Procedures Act ("CPPA"),**
**D.C. Code § 28-3901 *et seq.*)**

87.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

88.     This Count is brought on behalf of Mr. and Mrs. Elliott and the District of Columbia Subclass.

89.     Plaintiffs are "consumers" within the meaning of the CPPA, § 28-3901(a)(2).

90.     Defendants are "persons" within the meaning of the CPPA, § 28-3901(a)(1).

91.     Upon the inception of GM in 2009, Defendants knew the Elliotts' and Subclass members' vehicles, due to the ignition switch defect, are prone to engine and electrical failure during normal and expected driving conditions. The potential concurrent loss of control of the vehicle and shut down of safety mechanisms such as air bags and anti-lock brakes makes

44

Subclass Vehicles less reliable, less safe, and less suitable for normal driving activities inhibiting their proper and safe use of their vehicles, reducing their protections from injury during reasonably foreseeable driving conditions, and endangering Subclass members, other vehicle occupants, and bystanders.  GM knew that the defective fuel pumps in the vehicles posed unreasonable risks of death, serious bodily injury, and property damage to the Elliotts, Subclass members, and bystanders. Because of the life threatening nature of these defects, their existence was a material fact that Defendants concealed from plaintiffs and class members.

92.    Subclass members had no reason to believe that their vehicles possessed distinctive shortcomings; throughout the Class Period, they relied on Defendants to identify latent features that distinguished Plaintiffs' and Subclass members' vehicles from similar vehicles without the ignition switch and fuel pump defects, and the Defendants' failure to do so tended to mislead consumers into believing the Class Vehicles were safe to drive.

93.    Defendants violated D.C. Code § 28-3904(f) by failing to state a material fact, the omission of which tended to mislead consumers.

94.    Defendants violated the District of Columbia's consumer protection act generally by violating the common law governing fraud and negligence of the District of Columbia.

95.    Defendants violated the CPPA because any violation of any state or federal regulation of any trade practice is also a violation of the CPPA, so each complaint of each violation of federal law described above, including allegations of GM's violations of the Tread Act, "), 49 U.S.C. §§ 30101-30170, is also a predicate violation of the CPPA.

96.    Plaintiffs seek treble damages, or $1,500 per violation, whichever is greater, payable to the consumer, an order enjoining Defendants' unfair or deceptive acts or practices, attorneys' fees, punitive damages, and any other just and proper relief available under D.C.

45

Code § 28-3905(k)(2), including preliminary and permanent injunctive relief aimed at providing protection for the People of the District of Columbia from Defendants' reckless endangerment of the public health and their wanton disregard for the law.

## COUNT VI
### Asserted on Behalf of Ms. Summerville and the Maryland Subclass
### (Violation of Maryland's Consumer Protection Act ("MDCPA"),
### Md. Code, Comm. Law § 13-101 *et seq.*)

97.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

98.     This Count is brought on behalf of Ms. Summerville, the Maryland Class generally with respect to the alleged violations of MDCPA § 13-301(3) and the portion of the Maryland Class who purchased vehicles after October 19, 2009, with respect to violations of MDCPA §§ 13-301(2)(i), 13-301(2)(iv), and 13-301(3).

99.     Plaintiffs are "consumers" within the meaning of MDCPA, § 13-101(c)(1).

100.    Defendants are "merchants" within the meaning of MDCPA, § 13-101(g)(1).

101.    Upon the inception of GM in 2009, Defendants knew the Elliotts' and Subclass members' vehicles, due to the ignition switch defect, are prone to engine and electrical failure during normal and expected driving conditions. The potential concurrent loss of control of the vehicle and shut down of safety mechanisms such as air bags and anti-lock brakes makes Subclass Vehicles less reliable, less safe, and less suitable for normal driving activities inhibiting their proper and safe use of their vehicles, reducing their protections from injury during reasonably foreseeable driving conditions, and endangering Subclass members, other vehicle occupants, and bystanders. GM knew that the defective fuel pumps in the vehicles posed unreasonable risks of death, serious bodily injury, and property damage to the Elliotts,

Subclass members, and bystanders. Because of the life threatening nature of these defects, their existence was a material fact that Defendants concealed from plaintiffs and class members in violation of Md. Code, Comm. Laws § 13-301(3). Plaintiffs were injured thereby having to endure unreasonable risk of death, serious bodily injury, and diminution of the value of each of their vehicles.

102.    At no time during the Class Period did Ms. Summerville and Subclass members have access to the pre-release design, manufacturing, and field-testing data, and they had no reason to believe that their vehicles possessed distinctive shortcomings. Throughout the Class Period, they relied on Defendants to identify any latent features that distinguished their vehicles from similar vehicles without the ignition switch and fuel pump defects, and the Defendants' failure to do so tended to mislead consumers into believing no distinctive defect was present in their vehicles.

103.    With respect to Maryland Subclass members like Ms. Summerville who purchased their defective vehicles since October 19, 2009, Defendants violated Md. Code, Comm. Laws § 13-301(2)(i) by falsely representing, through advertising, warranties, and other express representations, that the Class Vehicles had characteristics and benefits which they did not actually have, namely, reasonably safe design and component parts.

104.    With respect to Maryland Subclass members like Ms. Summerville who purchased their defective vehicles since October 19, 2009, Defendants violated Md. Code, Comm. Laws § 13-301(2)(iv) by falsely representing through advertising, warranties, and other express representations, that the Class Vehicles met a certain standard or quality which they did not.

105.    With respect to the Subclass generally without regard to whether they purchased their vehicle after October 129, 2009, Defendants violated Md. Code, Comm. Laws § 13-

301(3) throughout the Class Period by failing to state a material fact, the omission of which tended to mislead consumers, by concealing the ignition switch and fuel pump defects from Ms. Summerville and Subclass members.

106.    Plaintiffs seek an order enjoining Defendants' unfair or deceptive acts or practices, and attorney's fees, and any other just and proper relief available under Md. Code, Com. Laws § 13-408.

### COUNT VII
**Asserted on behalf of Ms. Summerville and the Multi-State Class**
**(Breach of Implied Warranty of Merchantability Under § 2-314 of the UCC)**

107.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

108.    This Count is brought on behalf of Ms. Summerville and the Multi-State Warranty Class.

109.    Plaintiffs are "buyers" within the meaning of the Uniform Commercial Code.

110.    Defendants GM and Delphi are "sellers" within the meaning of the Uniform Commercial Code because the Multi-State class members' jurisdictions do not require privity with the buyer for a breach of the implied warranty of merchantability claim.

111.    Subclass members who purchased Class Vehicles from Defendants since October 19, 2009, did so under an implied warranty that the vehicles would be merchantable. Because of the poor design of the fuel pump, which made leakage and fire more likely, and because of the ignition switch defect, their vehicles are not fit for ordinary purposes for which such vehicles are generally used and are therefore not merchantable.

112.    Defendants sold goods that were not merchantable, because those goods are not fit for the ordinary purposes for which such goods are used – the vehicles were marketed and intended to be driven, but become unsafe under ordinary driving conditions.

48

113.    Ms. Summerville and the Multi-State Class members were injured in that they did not receive the full benefits of their bargains with Defendants and seek to recover an amount to make them whole, or seek to exercise their contractual rights of rescission and return to the *status quo ante* by allowing them to return their vehicles to GM for a full refund, and to seek any other rights and remedies afforded them under the Uniform Commercial Code as buyers injured by the total breach of the seller in failing to tender a merchantable product as promised.

**COUNT VIII**
**Asserted on Behalf of Plaintiffs and the Nationwide and all Subclasses**
**(Civil Conspiracy and Joint Action or Aiding and Abetting)**

114.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

115.    This Count is brought on behalf of the nationwide Class and all Subclasses.

116.    Defendants are jointly and severally liable for Plaintiffs' and Class and Subclass members' injuries because they acted in concert to cause those injuries.

117.    Defendants are also liable for Plaintiffs' and class and subclass members' injuries because they entered into specific agreement, explicit and implied, with each other and with others, including but not limited to the other defendants, dealers, engineers, accountants and lawyers (the co-conspirators) described in the preceding paragraphs of this First Amended Complaint, to inflict those injuries and to conceal their actions from Plaintiffs, Class and Subclass members and others.  By these agreements, Defendants conspired to violate each of the laws that form the basis for the claims in the preceding Counts of this Complaint.

118.    Defendants each committed overt acts in furtherance of the conspiracy.

119.    Defendants knew that the conduct of the co-conspirators constituted a breach of duties to the plaintiffs.

120.    Defendants gave substantial assistance and encouragement to the co-conspirators in their course of conduct in violation of the rights of the plaintiffs.

121.    Defendants were aware that their assistance and encouragement of the wrongful acts herein complained of substantially assisted the wrongful acts herein complained of.

122.    The wrongful acts herein complained of harmed plaintiffs.

123.    All defendants are therefore liable under civil conspiracy and civil aiding and abetting for all harm to plaintiffs and class members as described in this complaint.

### ALLEGATIONS IN SUPPORT OF
### PRELIMINARY RELIEF

124.    As of the date of the filing of this Complaint, GM concedes that some 6.5 million GM products have safety related defects that create an unreasonable danger of death or serious bodily harm to their drivers, vehicle occupants, nearby drivers, and bystanders.

125.    Despite purporting to come clean about its campaign of concealment and deceit in February 2014, GM has failed to take measures to ensure that these vehicles do not remain on the roads as a source of further death and injury.  Tens of thousands of GM vehicles with safety related defect threatening moving stalls and other dangerous conditions are driven within the District of Columbia by D.C. resident and commuters.

126.    GM has recklessly endangered the public health and safety of the People of the District of Columbia.

127.    One of the main purposes of the "representative action" authorized by the law of the District of Columbia is to allow private citizens such has Mr. and Mrs. Elliott to who are

entitled to relief in this representative action to assist public authorities in protecting the public

interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated,

respectfully request that this Court enter a judgment against GM and Delphi, and grant the

following relief:

E.     Determine that the Elliotts may act as representatives of the public on behalf of

the People of the District of Columbia;

F.     Declare, adjudge and decree that Defendants have recklessly endangered the

public safety of the People of the District of Columbia and order specific steps that Defendants

must take to restore public safety, including but not limited to preliminary relief aimed at

removing the unreasonably dangerous GM vehicles from the public streets and thoroughfares

of the District forthwith; providing safe replacement vehicles for Plaintiffs and Class and

Subclass members that do not contain safety related defects; and, in light of the nature of GM's

wrongdoing, the substantial threat to the public health it has wrongfully caused, its apparent

management recalcitrance or incompetence as evidenced by GM's failure to take significant

remedial steps for the past six months since it has publicly admitted its years-long campaign of

concealment and deceit,  the appointment of a Special Master with expertise in the automobile

industry and ethical risk management practices to assist in the judicial supervision of GM's

management reforms designed to ensure that the Company does not continue to threaten the

public safety in the future; and permanent injunctive relief aimed at ensuring that GM deploys

reasonable  and responsible management controls with respect to safety or cease its business of

manufacturing for sale to the public complex products that can so easily be a threat of death of

serious bodily injury if not manufactured properly.

51

G.      Determine that this action may be maintained as a Class action and certify it as such under Fed. R. Civ. P. 23(a) and 23(b)(3) and/or Fed. R. Civ. P. 23(b)(2), and/or Fed. R. Civ. 23(c)(2), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiffs as Class and Subclass Representatives and Plaintiffs' chosen counsel as Class Counsel;

H.      Declare, adjudge and decree that the ignition switches in Plaintiffs' and Class and Subclass Members vehicles are defective;

I.      Declare, adjudge and decree that the fuel pumps in Plaintiffs' and Class and Subclass Members' vehicles are defective;

J.      Declare, adjudge and decree that Defendants violated 18 U.S.C. §§ 1962(c) and (d) by conducting the affairs of the RICO Enterprise through a pattern of racketeering activity and conspiring to do so;

K.      Declare, adjudge and decree the conduct of Defendants as alleged herein to be unlawful, unfair, and/or deceptive, enjoin any such future conduct, and direct Defendants to permanently, expeditiously, and completely repair the Plaintiffs', Class and Subclass Members' vehicles to eliminate the ignition switch and fuel pump defects or, in the case of Class and Subclass Members who purchased their vehicles after October 9, 2009, declare GM in total breach of contract for its failure to tender a merchantable vehicle, and order GM to return the full purchase price paid upon surrender of the vehicle at the election of the Class and Subclass member;

L.      Declare, adjudge and decree that Defendants are financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

M.      Declare, adjudge and decree that Defendants must disgorge, for the benefit of Plaintiffs, Class Members, and Subclass Members all or part of the ill-gotten gains it received

52

from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class

Members;

     N.     Award Plaintiffs, Class Members, and Subclass Members the greater of actual,

compensatory damages or statutory damages, or treble damages under the CPPA, as proven at

trial;

     O.     Award Plaintiff and the nation-wide Class Members treble damages pursuant to

18 U.S.C. § 1964(c);

     P.     Award Plaintiff, Class Members, and Subclass Members punitive damages in

such amount as proven at trial;

     Q.     Award Plaintiff, Class Members and Subclass Members their reasonable

attorneys' fees, costs, and prejudgment and postjudgment interest; and

     R.     Award Plaintiff, Class Members, and Subclass Members such other further and

different relief as the case may require or as determined to be just, equitable, and proper by this

Court.

## JURY TRIAL DEMAND

     Plaintiffs request a trial by jury on all the legal claims alleged in this Complaint.


Respectfully submitted,

_____/s/_____
Daniel Hornal
Talos Law
D.C Bar #1005381
705 4th St. NW #403
Washington, DC 20001
(202) 709-9662
daniel@taloslaw.com
Attorney for Plaintiffs

53

09-50026-mg    Doc 13523-2    Filed 10/30/15    Entered 10/30/15 15:11:26    Exhibit B
Pg 49 of 124

# Exhibit  B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------------------X

IN RE:
**GENERAL MOTORS LLC IGNITION SWITCH LITIGATION**         14-MD-2543 (JMF)

------------------------------------------------------------------------------------X

------------------------------------------------------------------------------------X
**ISHMAIL SESAY**, and **JOANNE YEARWOOD**,                         14-cv-06018

**for themselves, on behalf of all others similarly situated,**                 CLASS ACTION  FOR
DECLARATORY,
INJUNCTIVE, AND
 **Plaintiffs,**                                                                                     MONETARY RELIEF

**v.**

**GENERAL MOTORS LLC,**                                                      **JURY TRIAL DEMANDED**
**DELPHI AUTOMOTIVE PLC,**
**and DPH-DAS LLC f/k/a DELPHI**
**AUTOMOTIVE SYSTEMS, LLC,**

**Defendants.**
------------------------------------------------------------------------------------X

<u>**FIRST AMENDED COMPLAINT**</u>

**INTRODUCTORY STATEMENT**

Plaintiffs ISHMAIL SESAY and JOANNE YEARWOOD bring this action for

themselves, and on behalf of all persons similarly situated who own or lease or have owned or

leased the substandard and dangerous vehicles identified below at any time since October 2009.

1.        Ishmail Sesay lives with his wife in Maryland. The couple own a single car: a

2007 Chevrolet Impala, purchased from a friend on December 20, 2012. Mr. Sesay and his wife

depend on the car to get to and from work, to run daily errands, and, most importantly, to provide

a safe means of transportation for their one-year-old son.

2.      Mr. Sesay has been alarmed that his car has been shutting off while he has been driving it. This has occurred at the rate of some three times per week for many months. These "moving stalls" are particularly dangerous because the Mr. Sesay loses control over power steering and brakes, and, because the electrical system is off, the airbags would not deploy in the event of a collision.

3.      Mr. Sesay's 2007 Chevrolet Impala has a dangerous ignition switch that could, unexpectedly and without warning, shut down the car's engine and electrical systems while the car is in motion - rendering the power steering, anti-lock brakes and airbags inoperable. This and the related ignition switch hazards in GM vehicles have already helped kill or seriously injure hundreds of people across the United States. Rather than disclose the risk, GM employees, lawyers, and others concealed it.

4.      General Motors LLC ("GM") knew but failed to disclose to him, governmental officials, or putative class members that Mr. Sesay's car was dangerous to operate, until it finally issued a recall for the car on June 23, 2014, NHTSA Campaign No. 14V355000.

5.      On June 20, 2014 GM issued a Stop-Delivery Order to dealers in preparation for an upcoming safety recall.  It instructed dealers to stop delivery in 2006-2014 Chevrolet Impala (Fleet Only) vehicles in new or used vehicle inventory.  It described the problem:  "The ignition switch on these vehicles may inadvertently move out of the "run" position if the key is carrying added weight and the vehicle goes off the road or experiences some other jarring event."

6.      On the same date GM issued notice of its decision to conduct a safety recall to the NHTSA.  However, GM failed to disclose the history of its awareness of the ignition key problem.  Instead, GM simply described the potential for the ignition key to move away from the "run" position should it the vehicle go off-road or experience a "jarring" event.  It warned that

should the key move away from the "run" position, "engine power, power steering and power
breaking will be affected, increasing the risk of crash."  More over, this could result in "airbags
not deploying increasing the potential for occupant injury in certain kinds of crashes."

7.     On June 24, 2014 the NHTSA acknowledged the recall in letter to the Director of
Field Product Investigations and Evaluations at General Motors, which carried the subject
"Ignition Switch may Turn Off."

8.     The NHTSA described the problem as concerning the "electrical system:
ignition."  It described the problem: "This defect can affect the safe operation of the airbag
system.  Until this recall is performed, customers should remove all items from their key rings,
leaving only the ignition key… In the affected vehicles, the weight on the key ring and/or road
conditions or some other jarring event may cause the ignition switch to move out of the run
position, turning off the engine."

9.     In "consequence," according to the recall papers, "if the key is not in the run
position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of
injury. Additionally, a key knocked out of the run position will cause loss of engine power,
power steering, and power braking, increasing the risk of a vehicle crash.

10.    The "Remedy" in the recall provides: "GM will notify owners, and dealers will
install two 13mm key rings and key insert into the vehicle's ignition keys, free of charge. The
manufacturer has not yet provided a notification schedule."

11.    On June 25, 2014 GM issued a notice to GM dealers explaining vehicles involved
in three upcoming safety recalls.  It listed the following: Recall 14172 – Ignition Switch recall
for 2003 – 2014 Cadillac CTS and 2004 -2006 Cadillac SRX, Recall 14299- Ignition Switch for,

among other vehicles, the 2014 Chevrolet Impala Limited (Fleet Only), and Recall 14250-Ignition Key for, among other vehicles, the 2005 – 2006 Chevrolet Impala.

12.      On July 2, 2014, in a letter meant to supersede its previous correspondence, GM notified the NHTSA that it had possession of information regarding the ignition key problem since its inception on July 10, 2009, that consisted of a reliable report that "the vehicle stalled after hitting a large bump when going from gravel road to pavement while driving at about 45 mph." Since October 2009, GM did not take appropriate measures to investigate the serious risk the information it possessed suggested, particularly when considered with other information GM possessed regarding ignition switch related risks.

13.      In the same July 2 letter, GM claimed that during a document review related to a Cobalt ignition switch problem in 2014, it discovered information in its possession that led it to the recall for Mr. Sesay's 2007 Impala and other vehicles with the same hazard.  GM revealed that the issue was brought to the Product Investigation group on April 30, 2014.  Between May 1, 2014 and June 6, 2014 "the investigator worked with GM subject matter experts to gather and analyze data relating to the ignition switch used on the 2006 Impala."  GM reported that "although ignition switches themselves performed below the target specification, the ignition switch system as a whole as installed in the vehicles' steering columns performed approximately at the target specification."  GM also reviewed its databases including its TREAD, warranty, customer satisfaction, and Engineering Analysis database, and NHTSA's Vehicle Owner's Questionnaire database; after which the investigator made a presentation regarding the ignition switch at an Open Investigation review meeting.

14.      In the same July 2nd letter, GM then revealed that only after the presentation and meeting did do road testing of  the Impala using the ignition switches under review.  These tests

revealed that: "when a slotted key is carrying added weight, the torque performance of the ignition system may be insufficient to resist energy generated when a vehicle goes off road or experiences some other jarring event, potentially resulting in the unintentional movement of the key away from the 'run' position." After review of GM and NHTSA data the investigator presented to the SFADA.  The SFAHA then "directed the investigator to work with other GM personnel to further refine the potential recall population so that it accurately included the vehicles using the identified ignition switches that were subject to the condition identified in the road tests.  On July 15, 2014 the SFASA decided to conduct a recall of that population.

15.    Finally, on June 14, 2014 GM announced its safety recall.  GM issued a 572 letter for the NHTSA on June 20, referenced above.

16.    On April 13, 2010, Joanne Yearwood purchased a new 2010 Chevrolet Cobalt from a dealership. Unbeknownst to her, the car contained an "ignition switch defect" that GM knew about but failed to disclose to her, governmental authorities, or putative class members until it began confessing its wrongdoing by bits and pieces since February 2014, issuing an ever expanding series of recalls related to the defective ignition switch like the one that appears to be in Ms. Yearwood's 2010 Cobalt amd Mr. Sesay's 2007 Impala.

17.    GM has recently begun to distinguish between ignition switch defects, such as the one in Mr. Sesay's car, that purportedly can be remedied with a replacement of keys, from ignition switch defects, such as the one in Ms. Yearwood's car, that require replacement of the entire ignition switch cylinder. Plaintiffs do not concede by their description of GM's recall that they agree that such a distinction exists.  Plaintiffs believe that the claims that ignition switch issues can be remedied by mere key replacement amy be another attmpt by GM to seek a cheap but ineffective response to the hazards in GM vehicles.

18.     GM has issued and failed to close three separate recalls on Ms. Yearwood's 2010 Chevrolet Cobalt. It failed to issue a recall for her car when it first confessed that it had known about the ignition switch defect in other vehicles in February 2014.

19.     On April 2, 2014, as part of its expansion of its initial ignition switch recall, NHTSA Recall Campaign 14V04700, GM issued a recall for Ms. Yearwood's car, claiming that defective ignition switches "may have been used as service replacement parts on [her] vehicle," and as a result General Motors is recalling certain model year 2008-2010 Chevrolet Cobalt.

20.     On April 10, 2014, however, GM then issued an additional recall for Ms. Yearwood's 2010 Cobalt (and over two million other vehicles), NHTSA Recall Campaign 14V17100, stating that the key could be removed from the ignition while the car remained on and that a new ignition cylinder would be necessary unless the vehicle already had a redesigned part, in which case only new keys would be made.

21.     On March 31, 2014, GM recalled Ms. Yearwood's 2010 Chevrolet Cobalt because "the affected vehicles, there may be a sudden loss of electric power steering (EPS) assist that could occur at any time while driving."  NHTSA Recall Campaign 14V15300. GM submitted papers in connection with the recall that detail its knowledge of this hazard from its first day of existence on July 10, 2009.

22.     In this Season of Shame, GM has publicly admitted, in many cases after years of knowingly false denials and active concealment by its engineers, lawyers, and other employees, that some 28 million GM vehicles are so dangerous that they must be recalled, and that it has, for every single day of its existence as a new entity that came into existence on July 10, 2009, systematically failed to disclose—and its employees and attorneys in fact actively concealed--the

09-50026-mg   Doc 13889-2   Filed 04/07/17   Entered 04/07/17 18:49:59   Exhibit B
Pg 56 of 124

==dangers that use of millions of GM vehicles entails to their drivers, passengers, and anyone unlucky enough to be in the vicinity when these risk manifest.==

23.     The begrudging admissions began in February 2014, when GM admitted that it had concealed an ignition switch hazard in some 1.6 million vehicles. The danger it concealed was that car could turn off without warning, rendering the brakes and steering and airbags inoperable. GM admits that the ignition switch hazard has killed or seriously injured hundreds while GM knew but failed to disclose its danger. Since purporting to come clean about its wrongdoing, and after promising to transform a culture that let greed trump the dictates of responsible corporate conduct, GM has been forced to admit that its wrongdoing was far more widespread than it initially confessed. The recall number for 2014 is now 28 million vehicles and counting, a boggling tally of corporate irresponsibility, and a frighteningly sharp reflection of how widespread GM's reckless endangerment of the public safety has been.  Now, beyond the some 16 million or so ignition-related recalls GM has begrudgingly finally issued since February 2014, GM has issued recalls for a range of other safety related defects described below.

24.     The National Highway Traffic Safety Administration (NHTSA) fined GM $28,000,000, the maximum permissible under applicable law, for GM's failure to disclose risks related to the ignition switches in Plaintiffs' and class members' cars.

25.     For nearly five years after its inception, GM failed to disclose to, and actively concealed from, Plaintiffs, class members, investors, litigants, courts, law enforcement and other government officials including the NHTSA, the risks of death, personal injury, and property damage posed by its products. Instead, conspiring with Delphi, GM's dealers nationwide, outside lawyers, and various others, GM engaged in, and may still be engaging in, an extensive, aggressive and complex campaign to conceal and minimalize the safety-related risks that exist in

Plaintiffs' and class members' vehicles. That campaign is designed to mislead Plaintiffs, class members, consumers, investors, courts, law enforcement officials, and other governmental officials, including the NHTSA, that the value of the company and the worth and safety of its products are greater than they are. With those same co-conspirators, GM directed an unlawful and continuing enterprise calculated to gain an unfair advantage over competitor automakers conducting their businesses within the bounds of the law. GM's corporate culture has engulfed GM's cost-containment approach to risk issues presented by GM vehicles: deny any hazard exists; if forced to concede the hazard, minimize its significance; and if nevertheless forced to act, insist on cheap rather than appropriate remediation

26.     Defendants first deployed their campaign of deception on the day that GM began operating. The scheme continued at least until its exposure began in early 2014. Through their deception, Defendants recklessly endangered the safety of Plaintiffs, their families, and members of the public. Defendants' wrongful acts and omissions harmed Plaintiffs and class members by exposing them to increased risk of death or serious bodily injury, by depriving them of the full use and enjoyment of their vehicles, and by causing a substantial diminution in the value of the vehicles to Plaintiffs and class members, and a substantial diminution in value of their vehicles on the open automobile market.

27.     The  ("NHTSA") has failed to carry out its statutory mandate to act for the public safety. Its failure to properly regulate GM's conduct with respect to the safety risks its vehicles pose provide reasonable grounds to doubt that the agency can be relied on to act to protect the public safety.

28.     As of the date of the filing of this Complaint, the United States Department of Justice has opened, and is pursuing, a criminal investigation into GM's campaign of deceit.

29.     GM's Chief Executive Officer Mary Barra admitted on behalf of the company that GM employees knew about safety-related risks in millions of vehicles, including Mr. Sesay's 2007 Impala and Ms. Yearwood's 2010 Cobalt, and that GM did not disclose those risks as it was required to do by law. Ms. Barra attributed GM's "failure to disclose critical pieces of information," in her words, to GM's policies and practices that mandated and rewarded the unreasonable elevation of cost concerns over safety risks.

30.     In executing their scheme to conceal the dangerous character of Plaintiffs' vehicles, Defendants violated a multitude of laws:

    a)     In furtherance of their common design to prevent Plaintiffs, class members, other consumers, law enforcement and other governmental officials, litigants, courts, and investors from learning of the safety risks in GM cars, GM, Delphi, and GM's dealers conducted a racketeering enterprise and engaged in a pattern of racketeering activities, including repeated and continuous acts of mail and wire fraud, television and radio fraud, and tampering with witnesses and victims in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, causing the harm to Plaintiffs and class members described above.

    b)     By concealing the material fact of the dangerousness of the Plaintiffs' and class members' vehicles, by failing properly to repair the safety risks in the cars in a timely manner, and by engaging in other unconscionable and/or unlawful behavior, GM and Delphi violated the Maryland Consumer Protection Act,. Md. Code, Com. Law § 13-408 *et seq.*, causing the harm described above to Plaintiffs and class members.

c)     GM and Delphi also violated their duties to warn Plaintiffs and class members about the dangers that their vehicles posed, resulting in economic loss and increased risk of personal injury for which Defendants are liable to Plaintiffs and Class members under the law of negligence common to the District of Columbia and the States of Maryland, California, Florida, Ohio, and New Jersey.

d)     Because they intentionally concealed a material fact from Plaintiffs and Class members, Defendants are liable to Plaintiffs for the harm Plaintiffs and class members have suffered and for punitive damages under the law of fraud common to the several States.

e)     By civilly conspiring to conceal the safety-related risks of GM vehicles, both among themselves and among nonparties to this litigation, and because they acted jointly to harm Plaintiffs and class members, Defendants are jointly and severally liable for all harm they or any co-conspirator caused.

f)     Defendants aided and abetted the conduct of each other and of nonparties in concealing the safety-related risks of GM vehicles.

## PARTIES

31.     Plaintiffs Ishmail Sesay and Joanne Yearwood are both citizens and residents of Maryland.

32.     Mr. Sesay owns a 2007 Chevrolet Impala he purchased second-hand in December 2010. Although Mr. Sesay is the primary driver of the vehicle, his wife depends upon the car for transportation to and from work, and the couple rely on the car to transport their one-year-old son..

33.     Ms. Yearwood owns a 2010 Chevrolet Cobalt purchased on April 13, 2010.

34.     General Motors LLC is a limited liability corporation. On July 10, 2009, it began conducting the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the vehicles of class members, and other motor vehicles and motor vehicle components throughout the United States. Plaintiffs' claims and allegations against GM refer solely to this entity. In this First Amended Complaint, Plaintiffs are not making any claim against General Motors Corporation ("Defunct GM") whatsoever, and Plaintiffs are not making any claim against GM based on its having purchased assets from Defunct GM or based on its having continued the business or succeeded Defunct GM. Plaintiffs disavow any claim based on the design or sale of vehicles by defunct  GM, or based on any retained liability of Defunct GM. Plaintiffs seek relief from GM solely for claims that have arisen after October 19, 2009, and solely based on actions and omissions of GM, the Non-Debtor entity that began operations on July 10, 2009.

35.     Delphi Automotive PLC is headquartered in Gillingham, Kent, United Kingdom, and is the parent company of Delphi Automotive Systems LLC, headquartered in Troy, Michigan. At all times relevant herein, Delphi, through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the dangerous ignition switches contained in the Cobalts owned by Plaintiffs, and millions of other vehicles.

36.     GM and Delphi are collectively referred to in this Complaint as "Defendants."

## JURISDICTION AND VENUE

37.     Jurisdiction is proper in this Court pursuant to 28 U.S.C § 1331, because the claims under the Racketeer Influenced and Corrupt Organizations Act present a federal question. Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from

Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000,

exclusive of interest and costs.

38.    Venue is proper in this Court pursuant to 28 U.S.C. § 1404, by the consent of both

parties.

## FACTUAL BACKGROUND

### GM's Commitment to Cost-cutting Over Safety

39.    GM has publicly admitted that the ignition switches in Plaintiffs' and class

members' cars are dangerous and pose a safety hazard. It has also admitted that, from its

inception in 2009, various GM engineers, attorneys, and management officials knew of, and took

measures to conceal, the ignition switch risk and/or diminish its significance. GM has been found

guilty of failing to disclose the risk to Plaintiffs, class members, and governmental officials as

required by law, and the NHTSA has fined GM the maximum penalty that agency is authorized

to impose.

40.    Under the Transportation Recall Enhancement, Accountability and

Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, and its accompanying

regulations, when a manufacturer learns that a vehicle contains a safety risk, the manufacturer

must disclose the risk to appropriate government officials and registered owners of the vehicle in

question.

41.    Upon its inception, GM maintained policies and practices intended to conceal

safety related risks in GM products from Plaintiffs, class members, investors, litigants, courts,

law enforcement officials, the NHTSA, and other governmental officials. In furtherance of its

illegal scheme, GM trained and directed its employees and dealers to take various measures to

avoid exposure of safety related product risks:

a)      GM mandated that its personnel avoid exposing GM to the risk of having to recall vehicles with safety-related risks by limiting the action that GM would take with respect to such risks to the issuance of a Technical Service Bulletin or an Information Service Bulletin.

b)      GM directed its engineers and other employees to falsely characterize safety-related risks – including the risks described in this complaint – in their reports, business and technical records as "customer convenience" issues, to avoid being forced to recall vehicles as the relevant law requires.

c)      GM trained its engineers and other employees in the use of euphemisms to avoid disclosure to the NHTSA and others of the safety risks posed by risks in GM products.

d)      GM directed its employees to avoid the word "stall" in describing vehicles experiencing a moving stall, because it was a "hot word" that could alert the NHTSA and others to safety risks associated with GM products, and force GM to incur the costs of a recall.

   i.      A "moving stall" is a particularly dangerous condition because the driver of a moving vehicle in such circumstances no longer has control over key components of steering and/or braking, and air bags will not deploy in any, increasingly likely, serious accident.

e)      GM directed its engineering and other personnel to avoid the word "problem," and instead use a substitute terms, such as "issue," "concern," or "matter," with the intent of deceiving plaintiffs and the public.

f)      GM instructed its engineers and other employees not to use the term "safety" and refer instead to "potential safety implications."

g)      GM instructed its engineers and other employees to avoid the term "defect" and substitute the phrase "does not perform to design."

h)      GM instituted and/or continued managerial practices designed to ensure that its employees and officials would not investigate or respond to safety-related risks, and thereby avoid creating a record that could be detected by governmental officials, litigants or the public. In a practice GM management labeled "the GM nod," GM managers were trained to feign engagement in safety related product risks issues in meetings by nodding in response to suggestions about steps that they company should take. Protocol dictated that, upon leaving the meeting room, the managers would not respond to or follow up on the safety issues raised therein.

i)      GM's lawyers discouraged note-taking at critical product safety meetings to avoid creation of a written record and thus avoid outside detection of safety-related risks and GM's refusal to respond to and/or GM's continuing concealment of those risks. GM employees understood that no notes should be taken during meetings about safety related issues, and existing employees instructed new employees in this policy. GM did not describe the "no-notes policy" in writing to evade detection of their campaign of concealment.

j)      GM would change part design without a corresponding change in part number, in an attempt to conceal the fact that the original part design was risk. GM concealed the fact that it manufactured cars with intentionally mislabeled part numbers, making the parts difficult for GM, Plaintiffs, class members, law enforcement officials, the NHTSA, and other governmental officials to identify. GM knew from its inception that the part

number irregularity was intended to conceal the faulty ignition switches in Plaintiffs' and class members' vehicles.

42.    GM followed a practice and policy of intentionally mischaracterizing safety issues as "customer convenience" issues to avoid recall costs, and it enlisted its dealership network in its campaign of concealment by minimizing the safety aspects of the "technical service bulletins" and "information service bulletins" it sent to dealers. GM directed dealers to misrepresent the safety risks associated with the product risks of its vehicles. GM followed this practice with respect to the dangerous ignition switches from its inception in October 2009 until its campaign of concealment of the ignition switch risk began to unravel in February 2014.

43.    GM followed a practice or policy of minimizing and mischaracterizing safety related risks in its cars in its communications with Plaintiffs, class members, law enforcement officials, the NHTSA, and other governmental officials

44.    Upon the inception of GM in October 2009, GM and Delphi agreed to conceal safety related risks from Plaintiffs, class members, law enforcement officials, other governmental officials, litigants, courts, and investors. Both GM and Delphi knew since October 2009 that the design of the faulty ignition switch in Plaintiffs and class members' cars had been altered without a corresponding change in part number, in gross violation of normal engineering practices and standards. Part labeling fraud is particularly dangerous in vehicle parts potentially related to safety because it makes tracing and identifying faulty parts very difficult, and will delay the detection of critical safety risks.

45.    Since GM's inception in October 2009, both GM and Delphi have known that the faulty ignition switch in the Plaintiffs' Impala and Cobalt and class members' vehicles posed a serious safety and public health hazard because the faulty ignition switch caused moving stalls.

Each Defendant had legal duties to disclose the safety related risks. Rather than notifying the NHTSA, Defendants instead decided that Plaintiffs and class members, and millions of drivers and pedestrians should face imminent risk of injury and death due to the dangerous ignition switches in Plaintiffs' and class members' vehicles. Delphi and GM entered into an agreement to conceal the alteration of the part without simultaneously changing the part number, and concealed the risks associated with the dangerous ignition switches.

46.     In 2012, more GM employees learned that the ignition switches in vehicles from model years 2003, 2004, 2005, 2006, and 2007 exhibited torque performance below the specifications originally established by GM. Rather than notify Plaintiffs, class members, or the NHTSA, GM continued to conceal the nature of the risk.

47.     In April 2013, GM hired an outside engineering-consulting firm to investigate the ignition switch system. The resulting report concluded that the ignition switches in early model Cobalt and Ion vehicles did not meet GM's torque specification. Rather than notify Plaintiffs, class members, or the NHTSA, GM still continued to conceal the nature of the Ignition Switch Risk until 2014.

48.     NHTSA's Fatal Analysis Reporting System (FARS) reveals 303 deaths of front seat occupants in 2005-07 Cobalts and 2003-07 Ions where the airbags failed to deploy in non-rear impact crashes.

49.     GM explicitly directed its lawyers and any outside counsel it engaged to act to avoid disclosure of safety related risks – including the ignition switch risk – in GM products. These actions included settling cases raising safety issues, demanding that GM's victims agree to keep their settlements secret, threatening and intimidating potential litigants into not bringing litigation against GM by falsely claiming such suits are barred by Order of the Bankruptcy Court,

and settling cases for amounts of money that did not require GM managerial approval, so management officials could maintain their veneer of ignorance concerning the safety related risks. In one case, GM threatened the family of an accident victim with liability for GM's legal fees if the family did not withdraw its lawsuit, misrepresenting to the family that their lawsuit was barred by Order of GM's Bankruptcy Court. In another case, GM communicated by means of mail and wire to the family of the victim of a fatal accident caused by the faulty ignition switch that their claim has no basis, even though GM knew that its communication was false and designed to further GM's campaign of concealment and deceit. In other cases, GM falsely claimed that accidents or injuries were due to the driver when it knew the accidents were likely caused by the dangerous product risks GM concealed.

50.     GM led the world and U.S. customers to believe that after bankruptcy it was a new company.  GM repeatedly proclaimed that it was a company committed to innovation, safety, and maintaining a strong brand.

51.     GM was successful.  Sales of all of its models went up and GM became profitable.  Seemingly, a GM was born and the GM brand once again stood strong in the eyes of consumers.

52.     GM's image was an illusion.  This case arises from GM's concerted and systematic practice and policy of denying, diminishing, and failing to remediate safety related hazards that GM vehicles pose. GM has now begun to admit to the egregious failure to disclose, and the affirmative concealment of, at least 35 separate known defects in GM-brand vehicles. By concealing the existence of the many known defects plaguing many models and years of GM-branded vehicles and the fact that GM values cost-cutting over safety, and concurrently marketing the GM brand as "safe" and "reliable," and claiming that it built the "world's best

vehicles," GM has caused the Plaintiffs' vehicles to diminish in value as the truth about the GM brand emerged, and a stigma has attached to all GM-branded vehicles.

53.    A vehicle made by a reputable manufacturer of safe and reliable products is worth more than an otherwise similar vehicle made by a disreputable manager that is known to devalue safety and conceal defects from consumers and regulators.  GM Vehicle Safety Chief, Jeff Boyer, recently stated that: "Nothing is more important than the safety of our customers in the vehicles they drive." Yet GM failed to live up to this commitment, instead choosing to conceal at least 35 serious defects in over 17 million GM branded vehicles sold in the United States. GM's concealment of those defects, and its seemingly never-ending series of recalls so far this year, evidence the degree of misconduct that passed, and may continue to pass, for standard procedure at the company.

54.    The systematic concealment of known defects was deliberate, as GM followed a consistent pattern of endless "investigation" and delay each time it became aware of a given defect.  Recently revealed documents show that GM valued cost-cutting over safety, trained its personnel to never use the word "defect" or other words suggesting that GM-branded vehicles are defective, routinely chose the cheapest part supplier without regard to safety, and discouraged employees from acting to address safety issues.

55.    GM has recently been forced to disclose that it had been concealing a staggering and unprecedented number of known safety defects in GM-branded vehicles ever since its inception in 2009, and that other defects arose on its watch apparently due in large measure to GM's focus on cost-cutting over safety.  It was further forced to disclose its discouragement of raising safety issues and its training of employees to avoid using language such as "defect" or "safety issue" in order to avoid attracting the attention of regulators.

56.    The array of defects is astounding and includes: (1) ignition switch  defect, (2) power steering defect, (3) airbag defect (4) brake light defect, (5) shift cable defect, (6) safety belt defect, (7) ignition lock cylinder defect, (8) key design defect, (9) ignition key defect, (10) transmission oil cooler line defect, (11) power management mode software defect, (12) substandard front passenger airbags, (13) light control module defect, (14) front axle shaft defect, (15) brake boost defect, (16) low-beam headlight defect, (17) vacuum line brake booster defect, (18) fuel gauge defect, (19) acceleration defect, (20) flexible flat cable airbag defect, (21) windshield wiper defect, (22) brake rotor defect, (23) passenger-side airbag defect, (24) electronic stability control defect, (25) steering tie-rod defect, (26) automatic transmission shift cable adjuster, (27) fuse block defect, (28) diesel transfer pump defect, (29) base radio defect, (30) shorting bar defect, (31) front passenger airbag end cap defect, (32) sensing and diagnostic module ("SDM") defect, (33) sonic turbine shaft, (34) electrical system defect, and (35) seatbelt tensioning system defect.

57.    GM has received reports of crashes and injuries that put GM on notice of the serious safety issues presented by many of these defects. GM was aware of the defects from the very date of its inception on July 10, 2009.

58.    Despite the dangerous nature of many of the defects and their effects on critical safety systems, GM concealed the existence of the defects and failed to remedy the problems in an appropriate or timely manner.

## TOLLING OF THE STATUTE OF LIMITATIONS

37.    Any applicable statute of limitation has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

38.     The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their vehicles had the safety related risks described herein.

39.     Plaintiffs and Class Members had no reason to know that their products were dangerous because of Defendants' active concealment.

## CLASS ACTION ALLEGATIONS

40.     Plaintiffs bring this lawsuit as a class action on their own behalves and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions. All proposed Class and Subclass periods run from the inception of GM in October 2009 and continue until judgment or settlement of this case.

41.     Plaintiffs bring this action on behalf of a proposed nationwide class defined as follows: All persons in the United States who, since the inception of GM in October 2009, hold or have held a legal or equitable interest in a GM vehicle with a dangerous ignition switch or steering hazard. As of the time of the filing of this First Amended Complaint, Plaintiffs are aware that the following GM models contain dangerous ignition switches, ignition related safety hazards or steering hazards:

- 2005-2011 Chevrolet Cobalt

- 2006-2011 Chevrolet HHR

- 2006-2010 Pontiac Solstice

- 2007-2010 Pontiac G5

- 2005-2006 Pontiac Pursuit

- 2003-2007 Saturn Ion

- 2007-2010 Saturn Sky

- 2005-2009 Buick Lacrosse

- 2006-2011 Buick Lucerne

- 2004-2005 Buick Regal LS & GS

- 2006-2014 Chevrolet Impala

- 2006-2008 Chevrolet Monte Carlo

- 2000-2005 Cadillac Deville

- 2004-2011 Cadillac DTS

- 2004-2006; 2008-2009 Chevrolet Malibu (steering)

- 2004-2—6 Malubu Marx (steering)

- 2009-2010 HHR (non-turbo) (steering)

- 2010 Chevrolet Cobalt (steering and ignition switch and key hazards)

- 2008-2009 Saturn Aura

- 2004-2007 Saturn Ion (steering and ignition switch)

- 2005-2009 Pontiac G6 (steering)

42.    Plaintiffs also bring this action on behalf of the following Subclasses:

a.    Mr. Sesay and Ms. Yearwood bring this action on behalf of all persons in the State of Maryland who, since October 2009, purchased or hold or have held a

legal or equitable interest in a GM vehicle with a dangerous ignition switch or steering related hazard (the "Maryland Subclass");

b.   Plaintiffs also bring this action on behalf of residents of the District of Columbia and the States of California, Florida, Maryland, New Jersey and Ohio who, since October 2009, hold or have held a legal or equitable interest in a GM vehicle with a dangerous ignition switch or steering related hazard(the "Multi-State Negligence Subclass").

43.    Excluded from the Class are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) governmental entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein.

## NUMEROSITY AND ASCERTAINABILITY

44.    Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder for each Class or Subclass is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in GM's possession, custody, or control, and/or from public vehicular registration records.

## TYPICALITY

45.    The claims of the Plaintiffs are typical of the claims of each member of the class and subclasses in that the representative Plaintiffs, like all class members, legally or equitably own or owned a GM vehicle during the Class Period that contained a dangerous ignition switch

manufactured by Delphi. Plaintiffs, like all class and subclass members, have been damaged by Defendants' misconduct, namely, in being wrongfully exposed to an increased risk of death or serious bodily injury, in suffering diminished use and enjoyment of their vehicles, and in suffering the diminished market value of their vehicles. Furthermore, the factual bases of Defendants' misconduct are common to all class and subclass members.

## ADEQUATE REPRESENTATION

46.    Plaintiffs will fairly and adequately represent and protect the interests of the class and subclasses. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions and in prosecuting complex federal litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class and subclasses, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the class of subclasses.

## PREDOMINANCE OF COMMON ISSUES

47.    There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include:

a.    Whether the vehicles owned by class or subclass members during the class periods suffer from the dangerous ignition switch or steering related hazard described herein?

b.    Whether the dangerous ignition switch or steering related hazard posed an unreasonable danger of death or serious bodily injury?

c.      Whether GM and/or Delphi imposed an increased risk of death or serious bodily injury on Plaintiffs and class and subclass members during the Class period?

d.      Whether GM and/or Delphi caused Plaintiffs and class and subclass members to suffer economic loss during the Class period?

e.      Whether GM and/or Delphi caused Plaintiffs and class and subclass members to suffer the loss of the use and enjoyment of their vehicles during the class period?

f.      Whether GM and Delphi had a legal duty to disclose the ignition switch danger to class and subclass members?

g.      Whether GM and/or Delphi had a legal duty to disclose the ignition switch danger to the NHTSA?

h.      Whether either GM and/or Delphi breached duties to disclose the ignition switch risk?

i.      Whether class and subclass members suffered legally compensable harm?

j.      Whether Defendants violated Maryland's consumer protection statute by concealing the ignition switch and/or steering related hazards from Plaintiffs and governmental officials?

k.      Whether the fact that the ignition switch and/or steering related hazard was dangerous was a material fact?

l.      Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction?

m.      Whether GM should be declared responsible for notifying all Class Members of the risk and ensuring that all GM vehicles with the ignition switch and/or steering related hazards are recalled and repaired?

n.    Whether a mandatory injunction should issue to direct GM to protect the public

safety in the interim until is repairs the vehicles described herein, to remove the

dangerous vehicles from the roadwats and to provide their owners with suitable substitute

transportation?

o.    Whether Defendants conducted a criminal enterprise in violation of RICO?

p.    Whether Defendants engaged in a pattern or practice of racketeering?

q.    Whether Defendants committed mail or wire fraud in connection with their

concealment of the dangerous ignition switch.

r.    Whether class members were harmed by Defendants' violations of RICO?

s.    Whether class and subclass members are entitled to recover punitive damages

from Defendants, and, if so, what amount would be sufficient to deter Defendants from

engaging in such conduct in the future and to punish Defendants for their recklessness

regarding the public health and safety and their campaign of concealment?

## SUPERIORITY

48.    Plaintiffs and class and subclass members have all suffered and will continue to

suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class

action is superior to other available methods for the fair and efficient adjudication of this

controversy. Absent a class action, most class and subclass members would likely find the cost

of litigating their claims prohibitively high and would therefore have no effective remedy.

Because of the relatively small size of the individual class and subclass member's claims, it is

likely that few could afford to seek legal redress for Defendants' misconduct. Absent a class

action, class and subclass members will continue to incur damages, and Defendants' misconduct

will continue without remedy. Class treatment of common questions of law and fact would also

be a superior method to multiple individual actions or piecemeal litigation in that class treatment

will conserve the resources of the courts and the litigants, and will promote consistency and

efficiency of adjudication. The class action is also superior for defendants, who could be forced

to litigate thousands of separate actions.

49.    Defendants have acted in a uniform manner with respect to the Plaintiffs and class

and subclass members. Class and subclass wide declaratory, equitable, and injunctive relief is

appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that

apply generally to the class, and inconsistent adjudications with respect to the Defendants'

liability would establish incompatible standards and substantially impair or impede the ability of

class and subclass members to protect their interests. Class and subclass wide relief assures fair,

consistent, and equitable treatment and protection of all class and subclass members.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF RACKETEER INFLUENCED
### AND CORRUPT ORGANIZATIONS ACT
### (18 U.S.C. § 1962(c) and (d))

50.    Plaintiff incorporates by reference each preceding paragraph as though fully set

forth at length herein.

51.    This claim is brought by all Plaintiffs on behalf of the nationwide Class.

52.    Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the

affairs of the "RICO Enterprise" through a "pattern of racketeering activity." Defendants

violated 18 U.S.C. § 1962(d) by conspiring to violate § 1962(c).

53.    At all times relevant, GM, Delphi, its associates-in-fact, Plaintiffs, and the Class

and Subclass members are each a "person," as that term is defined in 18 U.S.C. § 1961(3).

54. At all times relevant, Plaintiff and each class and subclass member were and are "a person injured in his or her business or property" by reason of a violation of RICO within the meaning of 18 U.S.C. § 1964(c).

55. At all times relevant, GM and Delphi are and were each a "person" who participated in or conducted the affairs of the RICO Enterprise through the pattern of racketeering activity described below. While GM and Delphi each participated in the RICO Enterprise, they each exist separately and distinctly from the Enterprise. Further, the RICO Enterprise is separate and distinct from the pattern of racketeering activity in which GM and Delphi have engaged and are engaging.

56. At all times relevant, GM and Delphi were associated with, operated or controlled, the RICO Enterprise, and participated in the operation and management of the affairs of the RICO Enterprise, through a variety of actions described herein. Defendants' participation in the RICO Enterprise was necessary for the successful operation of its scheme to defraud.

**The RICO Enterprise**

57. Defendants participated in the operation and management of an association-in-fact enterprise whose aim was to conceal safety related risks in Delphi products installed in GM vehicles from Plaintiffs, class members, the NHTSA, litigants, courts, law enforcement officials, consumers, and investors. The Enterprise was motivated by the common design of concealing the true value of the defendant companies and their products, and it constituted an unlawful, continuing enterprise calculated to gain an unfair advantage over competitor automakers who conduct their business within the bounds of the law. The Enterprise was partly embodied in practices and procedures intended to mischaracterize safety related risks – such as the ignition switch – as "customer convenience issues" to avoid incurring the costs of a recall.

58.     The RICO Enterprise began with the inception of GM, on October 19, 2009. The following persons, and others presently unknown, have been members of and constitute the association-in-fact enterprise with the following roles:

a)      GM, which mandated its employees take the various measures, described above at paragraph 26, to conceal safety related risks, including the ignition switch risks.

b)      GM's engineers (including but not limited to Ray DeGiorgio, Gary Altman, a program engineering manager, Michael Robinson, vice president for environmental sustainability and regulatory affairs, Gay Kent, general director of product investigations and safety regulations) who have carried out GM's directives since the inception of GM in October 2009 by minimizing and misrepresenting the safety aspects of the ignition switch risk – enabling GM to avoid its legal obligations to recall vehicles with safety related risks. GM's engineers (including but not limited to Mr. DeGiorgio, Mr. Altman, Mr. Robinson and Ms. Kent) have also concealed the part-number-labeling fraud of which they have known since GM's inception in October 2009.

c)      GM's in-house lawyers (including but not limited to Jaclyn Palmer, Ron Porter, William Kemp, Lawrence Buonomo, and Jennifer Sevigny), who knowingly assisted GM in evading its legal responsibilities by taking measures allowing GM management to claim ignorance about the increasing number of accidents and personal injuries that the ignition switches were causing throughout the Class period. GM's in-house lawyers, as described in Paragraph 36, also took measures to ensure that lawsuits filed by victims of the ignition switch risk and their surviving families were settled confidentially – preventing them from revealing the risk to other Plaintiffs, class members, law

enforcement officials, or other government authorities, including the NHTSA – for amounts below the threshold that would trigger closer scrutiny within GM.

d)      GM's outside lawyers, retained to defend the Company against lawsuits filed by victims with injuries allegedly caused by the ignition switch risk, who were directed to play, and played, the same roles as those of in-house counsel described above – taking analagous measures to help GM conceal the ignition switch risk.

e)      Delphi, who, since the inception of the GM in October 2009, has participated in the Enterprise to conceal the dangerous ignition switch system and its knowledge that ignition switch part numbers on vehicles driven by class members during the class period were misleading or fraudulent and would hinder any attempt to investigate or learn about the ignition switch risk.

f)      GM's Dealers, whom GM instructed, explicitly or implicitly, to present false and misleading information regarding the ignition switch risks to Plaintiffs and Class members, through, *inter alia*, Technical Service Bulletins and Information Service Bulletins, and who did, in fact, present such false and misleading information to Plaintiffs and Class members during the Class period.

58.      GM and Delphi conducted and participated in the affairs of this RICO Enterprise through a continuous pattern of racketeering activity that began with the inception of the GM in October 2009, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, and 18 U.S.C. § 1512 (tampering with witnesses and victims).

### Predicate Acts of Wire and Mail Fraud

59.     Since its inception in October 2009 and in furtherance of its scheme to defraud, GM, its engineers and its lawyers communicated with Delphi on a regular basis via the mail and/or wires regarding the dangerous ignition switch. Through those communications, GM instructed Delphi to continue concealing the ignition switch risk and to continue to produce ignition mislabeled or fraudulently labeled switches to help GM evade detection of GM's unlawful failure to recall vehicles with dangerous ignition switches by the NHTSA or other law enforcement officials. GM's and Delphi's communications constitute repeated violations of 18 U.S.C. §§ 1341 and 1343.

60.     Since GM's inception in October 2009, in furtherance of its scheme to defraud, GM's lawyers communicated with those claiming injuries caused by the ignition switch risks on a regular basis via the mail and/or wires. Upon information and belief, GM's lawyers utilized the mail and wires to insist that litigants agree to confidentiality agreements forbidding disclosure that the ignition switch risks caused their injuries, and to communicate with supervisors and each other about ensuring that the cases settled below the threshold that would trigger scrutiny that might endanger Defendants' concealment of the ignition switch risks.

61.     Since its inception in October 2009, GM has routinely used the wires and mail to disseminate false and fraudulent advertising about Plaintiffs' and Class members' vehicles, misrepresenting the vehicles as safe and dependable and failing to disclose the ignition switch risks in its advertising.

**Predicate Acts of Tampering With Witnesses and Victims**

62.     GM engaged in an ongoing scheme to tamper with witnesses and victims as described in 18 U.S.C. § 1512(b) by using misleading conduct to influence, delay and prevent the testimony of victims in official proceedings and by entering into a campaign of intimidation

and false statements to discourage victims from pursuing their claims against GM, as described elsewhere in the complaint. GM also corruptly encouraged its employees and engaged in misleading conduct to prevent said employees from reporting safety risks and therefore delay or prevent their testimony about said risks. GM accomplished this by, inter alia, punishing employees who raised red flags about safety risks, thus intentionally intimidating and threatening employees who otherwise could have raised red flags.

63.     Defendants' conduct in furtherance of this scheme to conceal and/or minimize the significance of the ignition switch risk was intentional. Plaintiff, Class and Subclass members were harmed in that they were forced to endure increased risk of death or serious bodily injury, they lost use and enjoyment of their vehicles, and their vehicles' values have diminished because of Defendants' participation in conducting the RICO Enterprise. The predicate acts committed in furtherance of the enterprise each had a significant impact on interstate commerce.

## COUNT II
### Asserted on Behalf of Plaintiffs and the Nationwide Class
### (Common Law Fraud)

64.     Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs of this Complaint.

65.     At the time of GM's inception in 2009, Defendants knew that the ignition switch used or which would be placed in the Plaintiffs' and class members' vehicles could inadvertently move from "run" to "accessory" or "off," under regular driving conditions. This fact was material to Plaintiffs and class members. GM also knew about the steering hazards described herein.

66.     Between October 2009 and February 2014, Defendants actively and intentionally concealed and/or suppressed the existence and true nature of the ignition switch and steering

related hazards, and minimized the extent of the danger they posed in direct and indirect
communications with Plaintiffs, class and subclass members, dealers, the NHTSA, and others.

67.    Plaintiffs and class members reasonably relied on GM's communications and
material omissions to their detriment. As a result of the concealment and/or suppression of facts,
Plaintiffs and Class Members have sustained and will continue to sustain injuries, consisting of
the diminished value of their GM vehicles and the lost use and enjoyment of the vehicles that
Defendants actions have caused, and exposure to increased risk of death or serious bodily injury.

68.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to
defraud, and with reckless disregard to Plaintiffs' and Class Members' rights and well-being, in
order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in
an amount sufficient to deter such conduct in the future, which amount is to be determined
according to proof.

### COUNT III
**Asserted on Behalf of Plaintiffs and on Behalf of the Multi-State Negligence Subclass**
**(Negligent Infliction of Economic Loss and Increased Risk under the Common Law of the
District of Columbia and Florida, Maryland, New Jersey, and Ohio)**

69.    Plaintiffs hereby incorporate by reference the allegations contained in the
preceding paragraphs of this Complaint.

70.    This claim is brought on behalf of Plaintiffs and the District of Columbia, Florida,
Maryland, New Jersey and Ohio Classes.

71.    Because the dangerous ignition switch and steering related hazards created a
foreseeable risk of severe personal and property injury to drivers, passengers, other motorists,
and the public at large, Defendants had a duty to warn consumers about, and fix, the risk as soon
as soon as they learned of the problem – upon the inception of GM in October 2009.

72.     Rather than alerting vehicle owners to the danger, Defendants actively concealed and suppressed knowledge of the problem.

73.     Defendants created an unreasonable risk of death or serious bodily injury to Plaintiffs and Subclass members. Plaintiffs and Subclass members were particularly identifiable and foreseeable victims of Defendants' negligence, and their injuries in terms of the diminution in the value of their vehicles and the loss of use and enjoyment of the vehicles was particularly foreseeable.

74.     Defendants created an unreasonable risk of death or serious bodily injury through a pattern and practice of negligent hiring and training of its employees, and by creating and allowing to continue a culture at GM which encouraged the minimizing and hiding of safety risks from the public. GM negligently increased this risk by firing or otherwise retaliating against employees who did attempt to convince GM to fix safety problems.

75.     As a result of Defendants' failure to warn them about the risks or repair their vehicles, Plaintiffs and Class Members sustained, and continue to sustain, damages arising from the increased risk of driving vehicles with safety related risks, from the loss of use and enjoyment of their vehicles, and from the diminished value of their vehicles attributable to Defendants' wrongful acts.

76.     Plaintiffs and class members seek compensatory damages in an amount to be proved at trial, including compensation for any pain and suffering they endured.

**COUNT IV**
**Asserted on Behalf of Mr. Sesay, Ms. Yearwood, and the Maryland Subclass**
**(Violation of Maryland's Consumer Protection Act ("MDCPA"),**
**Md. Code, Comm. Law § 13-101 *et seq.*)**

77.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

78.    This Count is brought on behalf of Plaintiffs, the Maryland Class generally with respect to the alleged violations of MDCPA § 13-301(3) and the portion of the Maryland Class who purchased vehicles after October 19, 2009, with respect to violations of MDCPA §§ 13-301(2)(i), 13-301(2)(iv), and 13-301(3).

79.    Plaintiffs are "consumers" within the meaning of MDCPA, § 13-101(c)(1).

80.    Defendants are "merchants" within the meaning of MDCPA, § 13-101(g)(1).

81.    Upon the inception of GM in 2009, Defendants knew the Plaintiffs and Subclass members' vehicles, due to the ignition switch risk, are prone to engine and electrical failure during normal and expected driving conditions. GM also knew since its inception of the steering hazards Plaintiffs' vehicles present. The potential concurrent loss of control of the vehicle and shut down of safety mechanisms such as air bags and anti-lock brakes makes Subclass Vehicles less reliable, less safe, and less suitable for normal driving activities inhibiting their proper and safe use of their vehicles, reducing their protections from injury during reasonably foreseeable driving conditions, and endangering Subclass members, other vehicle occupants, and bystanders. Because of the life threatening nature of the risk, its existence was a material fact that Defendants concealed from plaintiffs and class members in violation of Md. Code, Comm. Laws § 13-301(3).  Plaintiffs were injured thereby having to endure unreasonable risk of death, serious bodily injury, and diminution of the value of each of their vehicles.

82.    At no time during the Class Period did Mr. Sesay, Ms. Yearwood, or Subclass members have access to the pre-release design, manufacturing, and field-testing data, and they had no reason to believe that their vehicles possessed distinctive shortcomings. Throughout the Class Period, they relied on Defendants to identify any latent features that distinguished their

vehicles from similar vehicles without the ignition switch risk, and the Defendants' failure to do so tended to mislead consumers into believing no distinctive risk was present in their vehicles.

83.    With respect to the Subclass, Defendants violated Md. Code, Comm. Laws § 13-301(3) throughout the Class Period by failing to state a material fact, the omission of which tended to mislead consumers, by concealing the ignition switch risk from Plaintiffs and Subclass members.

84.    Plaintiffs seek an order enjoining Defendants' unfair or deceptive acts or practices, and attorney's fees, and any other just and proper relief available under Md. Code, Com. Laws § 13-408.

## COUNT V
### Asserted on Behalf of Plaintiffs and the Nationwide and all Subclasses
### (Civil Conspiracy and Joint Action or Aiding and Abetting)

85.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

86.    This Count is brought on behalf of the nationwide Class and all Subclasses.

87.    Defendants are jointly and severally liable for Plaintiffs' and Class and Subclass members' injuries because they acted in concert to cause those injuries.

88.    Defendants are liable for Plaintiffs' and class and subclass members' injuries because they entered into specific agreement, explicit and implied, with each other and with others, including but not limited to the other defendants, dealers, engineers, accountants and lawyers (the co-conspirators) described in the preceding paragraphs of this First Amended Complaint, to inflict those injuries and to conceal their actions from Plaintiffs, Class and Subclass members and others.  By these agreements, Defendants conspired to violate each of the laws that form the basis for the claims in the preceding Counts of this Complaint.

89.    Defendants each committed overt acts in furtherance of the conspiracy.

90.    Defendants knew that the conduct of the co-conspirators constituted a breach of duties to the plaintiffs.

91.    Defendants gave substantial assistance and encouragement to the co-conspirators in their course of conduct in violation of the rights of the plaintiffs.

92.    Defendants were aware that their assistance and encouragement of the wrongful acts herein complained of substantially assisted the wrongful acts herein complained of.

93.    The wrongful acts herein complained of harmed plaintiffs.

94.    All defendants are therefore liable under civil conspiracy and civil aiding and abetting for all harm to plaintiffs and class members as described in this complaint.

## ALLEGATIONS IN SUPPORT OF PRELIMINARY RELIEF

95.    As of the date of the filing of this Complaint, GM concedes that it knew but did not disclose that some 20 million GM products have safety related risks that create an unreasonable danger of death or serious bodily harm to their drivers, vehicle occupants, nearby drivers, and bystanders.

96.    Despite purporting to come clean about its campaign of concealment and deceit in February 2014, GM has failed to take measures to ensure that these vehicles do not remain on the roads as a source of further death and injury. GM has recklessly endangered the public safety and the safety of Plaintiffs and class members.  GM has not effectively remedied its policies and practices to ensure that this misconduct does not continue, and accordingly its business practices continue to threaten the public safety, warranting that this Court impose preliminary and permanent relief to ensure that all elements of the enterprise alleged in this Complaint are identified and eliminated.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter a judgment against GM and Delphi, and grant the following relief:

A.    Determine that this action may be maintained as a Class action and certify it as such under Fed. R. Civ. P. 23(a) and 23(b)(3) and/or Fed. R. Civ. P. 23(b)(2), and/or Fed. R. Civ. 23(c)(2), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiffs as Class and Subclass Representatives and Plaintiffs' chosen counsel as Class Counsel;

B.    Declare, adjudge and decree that Defendants have recklessly endangered the public safety and order specific steps that Defendants must take to restore public safety, including but not limited to preliminary relief aimed at removing unreasonably dangerous GM vehicles from the public streets and thoroughfares forthwith; providing safe replacement vehicles for Plaintiffs and Class and Subclass members that do not contain safety related risks; and, in light of the nature of GM's wrongdoing, the substantial threat to the public health it has wrongfully caused, its apparent management recalcitrance or incompetence as evidenced by GM's failure to take significant remedial steps for the past six months since it has publicly admitted its years-long campaign of concealment and deceit, providing continuing judicial management over GM through the appointment of a Special Master with expertise in the automobile industry and ethical risk management practices to assist in the judicial supervision of GM's management reforms designed to ensure that the Company does not continue to threaten the public safety in the future; and permanent injunctive relief aimed at ensuring that GM deploys reasonable and responsible management controls with respect to safety or cease its

business of marketing to the public complex products that can so easily be a threat of death or

serious bodily injury if not manufactured properly;

C.      Declare, adjudge and decree that the ignition switches in Plaintiffs' and Class

and Subclass Members vehicles are unreasonably dangerous, and/or that the vehicles themselves

are unreasonably dangerous;

D.      .Declare, adjudge and decree that Defendants violated 18 U.S.C. §§ 1962(c)

and (d) by conducting the affairs of the RICO Enterprise through a pattern of racketeering

activity and conspiring to do so;

E.      Declare, adjudge and decree the conduct of Defendants as alleged herein to be

unlawful, unfair, and/or deceptive, enjoin any such future conduct, and direct Defendants to

permanently, expeditiously, and completely repair the Plaintiffs', Class and Subclass Members'

vehicles to eliminate the ignition switch danger;

F.      Declare, adjudge and decree that Defendants are financially responsible for

notifying all Class Members about the dangerous nature of the Class Vehicles;

G.      Declare, adjudge and decree that Defendants must disgorge, for the benefit of

Plaintiffs, Class Members, and Subclass Members all or part of the ill-gotten gains it received

from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class

Members;

H.  Award Plaintiffs, Class Members, and Subclass Members the greater of actual

compensatory damages or statutory damages as proven at trial;

I.      Award Plaintiff and the nation-wide Class Members treble damages pursuant to

18 U.S.C. § 1964 (c);

J.      Award Plaintiff, Class Members, and Subclass Members punitive damages in

such amount as proven at trial;

K.      Award Plaintiff, Class Members and Subclass Members their reasonable

attorneys' fees, costs, and pre-judgment and post-judgment interest; and

L.      Award Plaintiff, Class Members, and Subclass Members such other further and

different relief as the case may require or as determined to be just, equitable, and proper by this

Court.

### JURY TRIAL DEMAND

Plaintiffs request a trial by jury on all the legal claims alleged in this First Amended Complaint.


Respectfully submitted


_____
 Gary Peller (GP0419)
 600 New Jersey Avenue, N.W.
 Washington, D.C. 2000
 (202) 662-9122 (voice)
 (202) 662-9680 (facsimile)
 peller@law.georgetown.edu

 Attorney for Plaintiffs Ishmail Sesay
  and Joanne Yearwood

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x
IN RE:                                                      :        14-MD-2543 (JMF)
GENERAL MOTORS LLC                                          :
IGNITION SWITCH LITIGATION                                  :
-----------------------------------------------------------------------x

-----------------------------------------------------------------------x        CASE NO.
_____
SHARON BLEDSOE, CELESTINE ELLIOTT,          :
LAWRENCE ELLIOTT, CINA FARMER, PAUL         :        CLASS ACTION FOR
FORDHAM, MOMOH KANU, TYNESIA                 :         DECLARATIVE, INJUNCTIVE,
MITCHELL, DIERRA THOMAS, and JAMES TIBBS, :        AND MONETARY RELIEF
                                                            :
Plaintiffs,                                                 :        REPRESENTATIVE
ACTION
                                                            :        FOR DECLARATIVE,
v.                                                          :        INJUNCTIVE, AND
                                                            :        MONETARY
                                                            :        RELIEF ON BEHALF OF THE
GENERAL MOTORS LLC,                                         :        PEOPLE OF THE DISTRICT
                                                            :         OF COLUMBIA
Defendant.                                                  :
-----------------------------------------------------------------------x        JURY TRIAL DEMANDED

## COMPLAINT

### INTRODUCTORY STATEMENT

Plaintiffs SHARON BLEDSOE, CELESTINE ELLIOTT, LAWRENCE ELLIOTT,

CINA FARMER, PAUL FORDHAM, MOMOH KANU, TYNESIA MITCHELL, DIERRA

THOMAS, and JAMES TIBBS (collectively "Plaintiffs") bring this action for themselves, and

on behalf of all persons similarly situated, who own or have owned the substandard and

dangerous vehicles identified below.

Lawrence Elliott, Celestine Elliott, and James Tibbs also bring this action as

representatives of the People of the District of Columbia ("the District"), to vindicate the

public interest in safety, to protect themselves and other residents of and commuters and other

1

visitors to the District from the unreasonable and imminent danger of death, serious bodily injury, and property damage that the historic misconduct of General Motors LLC ("GM") has loosed upon the City, as well as to seek all other available relief.

In February 2014, GM publicly admitted that--for every single day of its existence as a new entity, distinct from General Motors Corporation ("Old GM")—GM failed to disclose— and its engineers, lawyers, and other employees actively concealed--the dangers that use of millions of GM vehicles entails. GM's season of shame began with its admission that it had concealed an ignition switch defect in some 1.6 million vehicles, a defect, described in greater detail below, causing death serious injury to hundreds while GM knew but failed to disclose its danger. Since purporting to come clean about its wrongdoing, and after promising to transform a culture that let greed trump the dictates of responsible corporate conduct, GM has been forced to admit that its misconduct was far more widespread than its initial confession revealed. GM has since issued expanded recalls for more and more vehicles that present the same ignition switch danger. GM has also issued or expanded prior recalls for a wide range of other safety hazards that Plaintiffs' vehicles and others present and that GM had concealed or minimized, some 28 million vehicles since February 2014 and counting, a boggling tally of corporate irresponsibility, and a frighteningly sharp reflection of how widespread GM's reckless endangerment of the Plaintiffs and the public, in America and abroad, has been. Plaintiffs seek redress for GM's wrongdoing.

## PARTIES

1.      Plaintiffs Sharon Bledsoe, Cina Farmer, Paul Fordham, Momoh Kanu, Tynesia Mitchell, and Dierra Thomas, are each citizens and residents of Maryland.

2.      Plaintiffs Celestine Elliott, Lawrence Elliott, and James Tibbs are each citizens and residents of the District of Columbia.

2

3.      Ms Bledsoe owns a 2008 Chevrolet Cobalt that she purchased new from a Chevrolet dealer in December 2007, in the state of Georgia. As described below, she suffered personal injury, emotional distress, and property damage in two accidents caused by the dangerous ignition switch in the vehicle while driving in and a resident of Georgia.

4.      Mr. and Mrs. Elliott jointly own a 2006 Chevrolet Trailblazer that they purchased new in 2006 from a Chevrolet dealer in the District of Columbia.

5.      Ms. Farmer owns a 2005 Chevrolet Cobalt that she purchased new in 2007 in the state of Maryland. As described below, she suffered personal injury, emotional distress, and property damage in an accident in December 2013 caused by the dangerous ignition switch in her vehicle while driving in and a resident of the state of Maryland.

6.      Mr. Fordham owns a 2006 Pontiac G6 that he purchased used in November 2012 from a Chevrolet Dealership in Maryland.

7.      Mr. Kanu currently owns a 2000 Chevrolet Impala. He is a former owner of a 2006 Chevrolet Impala. He bought both cars from private parties in the state of Maryland. He suffered property damage and economic loss when he was involved an accident caused by the dangerous ignition switch in the 2006 Impala and he had to take a total loss on the car after the accident.

8.      Ms. Mitchell owns a 2007 Chevrolet HHR that she purchased in 2010 from a used car dealer in Maryland.

9.      Ms. Thomas owns a 2006 Chevrolet Cobalt that she purchased from a private party in 2006.

10.      Mr. Tibbs owns a 2007 Chevrolet Impala that he purchased in 2011 from a private party in the District of Columbia.  He was involved in an accident caused by the dangerous ignition related hazard that his car presents.

3

11.     General Motors LLC is a limited liability company formed under the laws of Delaware with its principal place of business in Detroit, Michigan. Each of its members is a citizen and/or resident of the state of Michigan. On July 10, 2009, it began conducting the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the vehicles of class members, and other motor vehicles and motor vehicle components throughout the United States. Plaintiffs' claims and allegations against GM refer solely to this entity.

## JURISDICTION AND VENUE

12.     Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendant's home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1404, by the consent of both parties.

## FACTUAL BACKGROUND

*1.     GM's Practice of Concealing and Minimizing Safety Risks*

14.     GM instituted its own and continued policies and practices of its predecessor intended to conceal and minimize safety related risks in GM products from Plaintiffs, class members, investors, litigants, courts, law enforcement officials, the NHTSA, and other governmental officials. In furtherance of its illegal scheme, GM trained and directed its employees and dealers to take various measures to avoid exposure of safety related product risks.

15.     Defendants first deployed their campaign of deception on the day that GM began operating. The scheme continued at least until its exposure began in early 2014. Through their deception, GM recklessly endangered the safety of Plaintiffs, their families, and members of

4

the public. Defendants' wrongful acts and omissions harmed and continues to harm Plaintiffs

and the public by exposing them to increased risk of death or serious bodily injury.

16.    As of the date of the filing of this Complaint, the United States Department of Justice

has opened, and is pursuing, a criminal investigation into GM's campaign of deceit.

17.    GM's Chief Executive Officer Mary Barra admitted on behalf of the company that GM

employees knew about safety-related defects in millions of vehicles and that GM did not

disclose those defects as it was required to do by law. Ms. Barra attributed GM's "failure to

disclose critical pieces of information," in her words, to GM's policies and practices that

mandated and rewarded the unreasonable elevation of cost concerns over safety risks. For

example, GM chose to use and then conceal defective ignition switches in vehicles in order to

save less than ten dollars per vehicle.

18.    This case arises from GM's concerted and systematic practice and policy of denying,

diminishing, and failing to remediate safety related hazards that GM vehicles pose.

19.    GM mandated that its personnel avoid exposing GM to the risk of having to recall

vehicles with safety-related risks by limiting the action that GM would take with respect to

such risks to the issuance of a Technical Service Bulletin or an Information Service Bulletin.

20.    GM directed its engineers and other employees to falsely characterize safety-related

risks – including the risks described in this complaint – in their reports, business and technical

records as "customer convenience" issues, to avoid being forced to recall vehicles as the

relevant law requires, and/or to issue narrower recalls than the circumstances warranted.

21.    GM trained its engineers and other employees in the use of euphemisms to avoid

disclosure to the NHTSA and others of the safety risks posed by risks in GM products.

5

22.    GM directed its employees to avoid the word "stall" in describing vehicles experiencing a moving stall, because it was a "hot word" that could alert the NHTSA and others to safety risks associated with GM products, and force GM to incur the costs of a recall.

      a.  A "moving stall" is a particularly dangerous condition because the driver of a moving vehicle in such circumstances no longer has control over key components of steering and/or braking, and air bags will not deploy in any, increasingly likely, serious accident.

23.    GM directed its engineering and other personnel to avoid the word "problem," and instead use a substitute terms, such as "issue," "concern," or "matter," with the intent of deceiving plaintiffs and the public.

24.    GM instructed its engineers and other employees not to use the term "safety" and refer instead to "potential safety implications."

25.    GM instructed its engineers and other employees to avoid the term "defect" and substitute the phrase "does not perform to design."

26.    GM's managerial practices were designed to ensure that its employees and officials would not investigate or respond to safety-related risks, and thereby avoid creating a record that could be detected by governmental officials, litigants or the public.

27.    In a practice GM management labeled "the GM nod," GM managers were trained to feign engagement in safety related product risks issues in meetings by nodding in response to suggestions about steps that they company should take. Protocol dictated that, upon leaving the meeting room, the managers would not respond to or follow up on the safety issues raised therein.

28.    GM's lawyers discouraged note-taking at critical product safety meetings to avoid creation of a written record and thus avoid outside detection of safety-related risks and GM's

6

refusal to respond to and/or GM's continuing concealment of those risks. GM employees understood that no notes should be taken during meetings about safety related issues, and existing employees instructed new employees in this policy. GM did not describe the "no-notes policy" in writing to evade detection of their campaign of concealment.

29.     GM would change part design without a corresponding change in part number, in an attempt to conceal the fact that the original part design was risk. GM concealed the fact that it manufactured cars with intentionally mislabeled part numbers, making the parts difficult for GM, Plaintiffs, class members, law enforcement officials, the NHTSA, and other governmental officials to identify. GM knew from its inception that the part number irregularity was intended to conceal the faulty ignition switches in Plaintiffs' and class members' vehicles.

30.     GM directed dealers to misrepresent the safety risks associated with the product risks of its vehicles.  New GM followed this practice with respect to the dangerous ignition switches from its inception in October 2009 until its campaign of concealment of the ignition switch risk began to unravel in February 2014.

31.     GM directed its lawyers and any outside counsel it engaged to act to avoid disclosure of safety related risks in GM products.  These actions included settling cases raising safety issues, demanding that GM's victims agree to keep their settlements secret, threatening and intimidating potential litigants into not bringing litigation against New GM by falsely claiming such suits are barred by Order of the Bankruptcy Court, and settling cases for amounts of money that did not require GM managerial approval, so management officials could maintain their veneer of ignorance concerning the safety related risks.

32.     In one case, GM threatened the family of an accident victim with liability for GM's legal fees if the family did not withdraw its lawsuit, misrepresenting to the family that their lawsuit was barred by Order of GM's Bankruptcy Court. In another case, GM communicated

to the family of the victim of a fatal accident caused by the faulty ignition switch that their

claim has no basis, even though GM knew that its communication was false and designed to

further GM's campaign of concealment and deceit. In other cases, GM falsely claimed that

accidents or injuries were due to the driver when it knew the accidents were likely caused by

the dangerous product risks GM concealed.

33.     The systematic concealment of known defects was deliberate, as GM followed a

consistent pattern of endless "investigation" and delay each time it became aware of a given

defect. GM routinely chose the cheapest part supplier without regard to safety, and discouraged

employees from acting to address safety issues.

34.     Under the Transportation Recall Enhancement, Accountability and Documentation Act,

49 U.S.C. § 30101, et seq. ("TREAD Act"), and its accompanying regulations, when a

manufacturer learns that a vehicle contains a safety defect, the manufacturer must properly

disclose the defect. If it is determined that the vehicle is defective, the manufacturer may be

required to notify vehicle owners, purchasers, and dealers of the defect, and may be required to

remedy the defect.

35.     When a manufacturer with TREAD Act responsibilities is aware of safety defects and

fails to disclose them as GM has done, the manufacturer's vehicles are not safe.

36.     The array of defects that GM had failed to disclose and has only in the past few months

revealed includes: (1) ignition switch  defect, (2) power steering defect, (3) airbag defect (4)

brake light defect, (5) shift cable defect, (6) safety belt defect, (7) ignition lock cylinder defect,

(8) key design defect, (9) ignition key defect, (10) transmission oil cooler line defect, (11)

power management mode software defect, (12) substandard front passenger airbags, (13) light

control module defect, (14) front axle shaft defect, (15) brake boost defect, (16) low-beam

headlight defect, (17) vacuum line brake booster defect, (18) fuel gauge defect, (19)

acceleration defect, (20) flexible flat cable airbag defect, (21) windshield wiper defect, (22)

brake rotor defect, (23) passenger-side airbag defect, (24) electronic stability control defect,

(25) steering tie-rod defect, (26) automatic transmission shift cable adjuster, (27) fuse block

defect, (28) diesel transfer pump defect, (29) base radio defect, (30) shorting bar defect, (31)

front passenger airbag end cap defect, (32) sensing and diagnostic module ("SDM") defect,

(33) sonic turbine shaft, (34) electrical system defect, (35) seatbelt tensioning system defect,

and (36) master power door switch defect.

37.    GM has received reports of crashes and injuries that put GM on notice of the serious

safety issues presented by many of these defects. Given the continuity of engineers, corporate

counsel, and other key personnel from Old GM to GM, GM was aware of many of the defects

from the very date of its inception on July 10, 2009.

38.    GM advanced its culture of concealment by actively denying liability for fatal

accidents. In 2005, Defunct GM customer Adam Powledge lost control of his vehicle,

slamming into a highway median and killing himself and his four children. In the ensuing suit

GM nefariously framed the incident as a suicide, disavowing any connection between the

accident and an electrical failure, despite GM's knowledge that the Malibu Mr. Powledge

drove had a steering defect that likely was the real cause of the tragedy. Then, in April 2014,

GM finally admitted that Adam Powledge's Chevrolet Malibu had a steering defect—the same

one that Mr. Fordham's vehicles possesses-that was consistent with the loss of control over the

vehicle that led to his death and that of his four children. The Powledge saga is but one

dramatic example of the lengths that GM, its attorneys, risk personnel, and others went to

further the GM campaign of denial and deceit.

39.    Despite the dangerous nature of many of the defects and their effects on critical safety

systems, GM concealed the existence of the defects and failed to remedy the problems in an

appropriate or timely manner. The continuation of GM's deceptive practices has created a public safety hazard. GM instituted and continued policies and practices intended to conceal safety related defects in GM products from Plaintiffs, the public, investors, litigants, courts, law enforcement officials, the NHTSA, and other governmental officials. In furtherance of its illegal scheme, GM trained and directed its employees and dealers to take various measures to avoid exposure of safety related product defects.

    2.    *Failure to Disclose and Concealment of Ignition Switch Hazard (Bledsoe, Farmer, Mitchell, Thomas vehicles; NHTSA Campaign Numbers 14V047000; 14V171000; 14E021000*

40.    GM has admitted that the ignition switches in the vehicles owned by Mses. Bledsoe, Farmer, Mitchell, and Thomas and models with the same design of ignition switch owned by class members are dangerous and pose a safety hazard.  It has recalled all the vehicles pursuant to NHTSA recall campaign 14V047000, covering models: CHEVROLET   COBALT   2005-2010; CHEVROLET   HHR   2006-2011; PONTIAC   G5   2007-2010; PONTIAC SOLSTICE   2006-2010; SATURN   ION   2003-2007; SATURN   SKY   2007-2010.

41.    GM has also admitted that, from its inception in 2009, various New GM engineers, attorneys, and management officials knew of, and took measures to conceal, the ignition switch risk and/or diminish its significance. GM has been found guilty of failing to disclose this risk to Plaintiffs, class members, and governmental officials as required by law, and the NHTSA has fined New GM the maximum penalty that agency is authorized to impose.

42.    GM has known since June 10, 2009, that the faulty ignition switch in the Plaintiffs' and class members' vehicles poses or posed a serious safety and public health hazard because the faulty ignition switch causes moving stalls in which the driver loses power steering, power brakes, and in the increased likelihood of an accident, the airbag will not deploy.

10

43.     Rather than notifying the NHTSA, GM instead decided that Plaintiffs and class members, and millions of drivers and pedestrians, would face imminent risk of injury and death due to the dangerous ignition switches in Plaintiffs' and class members' vehicles. GM and other parties associated with it, including parts suppliers, agreed to conceal safety related risks presented by the ignition switches from Plaintiffs, class members, law enforcement officials, other governmental officials, litigants, courts, and investors.

44.     GM and other parties associated with it knew that the design of the faulty ignition switch in Plaintiffs and class members' cars had been altered without a corresponding change in part number, in gross violation of normal engineering practices and standards. Part labeling fraud is particularly dangerous in vehicle parts potentially related to safety because it makes tracing and identifying faulty parts very difficult, and will delay the detection of critical safety risks.

45.     In 2012, more GM employees learned that the ignition switches in vehicles from model years 2003, 2004, 2005, 2006, and 2007 exhibited torque performance below the specifications originally established by GM. Rather than notify Plaintiffs, class members, or the NHTSA, GM continued to conceal the nature of the risk.

46.     In April 2013, GM hired an outside engineering-consulting firm to investigate the ignition switch system. The resulting report concluded that the ignition switches in early model Cobalt and Ion vehicles did not meet GM's torque specification. Rather than notify Plaintiffs, class members, or the NHTSA, GM still continued to conceal the nature of the Ignition Switch Risk until 2014.

47.     NHTSA's Fatal Analysis Reporting System (FARS) reveals 303 deaths of front seat occupants in 2005-07 Cobalts and 2003-07 Ions where the airbags failed to deploy in non-rear impact crashes, models of GM vehicles owned by Ms. Bledsoe, Farmer, Mitchell, and Thomas.

11

48.    On April 10, 2014, GM issued another recall for the same vehicles, this time because the ignition key can be removed while ignition is not in the off position, creating a risk of "rollaway" and risks to pedestrians and property damage. NHTSA Recall Campaign 14V171000.

49.    On April 30, 2014, GM issued yet another recall for these same vehicles, this time because the after-market ignition switches that were used to replace the faulty ignition switches pursuant to the prior recalls were themselves faulty and presented the same risks. NHTSA Recall Campaign 14E021000.

3.    *Failure to Disclose and Concealment of "Ignition Key" Hazard (Kanu, Tibbs 2007; 2006 Impala) NHTSA Recall Campaign 14V355000; (Kanu) (2000 Impala) NHTSA Recall Campaign 14V40000*

50.    Mr. Kanu's 2006 Chevrolet Impala and Mr. Tibbs' 2007 Chevrolet Impala have a dangerous ignition switch related hazard that could, unexpectedly and without warning, shut down the car's engine and electrical systems while the car is in motion - rendering the power steering, anti-lock brakes and airbags inoperable. This hazard is the subject of NHTSA Recall campaign 14V355000, and exists in the following models: BUICK  LACROSSE  2005-2009; BUICK  LUCERNE  2006-2011; CADILLAC DEVILLE  2000-2005; CADILLAC  DTS  2006-2011; CHEVROLET  IMPALA  2006-2014; CHEVROLET  MONTE CARLO  2006-2007.

51.    Mr. Tibbs has already been involved in an accident, in October 2013, in which his car turned off while he was driving when the vehicle hit a pothole in the road, and, because of the dangerous ignition switch related defect, Mr. Tibbs lost control of the vehicle and the vehicle only stopped when it hit a tree.  The airbag did not deploy despite the impact. This and the related ignition switch hazards in GM vehicles have already helped kill or seriously injure hundreds of people across the United States. Rather than disclose the risk, GM employees,

12

lawyers, and others concealed it.

52.   Mr. Kanu's 2000 Chevrolet Impala has a dangerous ignition switch related hazard that could, unexpectedly and without warning, shut down the car's engine and electrical systems while the car is in motion - rendering the power steering, anti-lock brakes and airbags inoperable. This hazard is the subject of NHTSA Recall campaign 14V40000, and covers the following models: CHEVROLET   IMPALA   2000-2005; CHEVROLET MALIBU CLASSIC   1997-2005; CHEVROLET   MONTE CARLO   2000-2005; OLDSMOBILE   ALERO   1999-2004; OLDSMOBILE INTRIGUE   1998-2002; PONTIAC   GRAND AM   2000-2005; PONTIAC GRAND PRIX   2004-2008.

53.   GM claims that this hazard is distinct from the "ignition switch" hazard described above and requires remediation of key replacement rather than ignition switch replacement.

54.   GM knew but failed to disclose to Mr. Tibbs, Mr. Kanu, governmental officials, or putative class members that their cars were dangerous to operate, until it finally issued the recalls described above.

55.   In connection with NHTSA Campaign No. 14V355000, on June 20, 2014 GM issued a Stop-Delivery Order to dealers in preparation for an upcoming safety recall.  It instructed dealers to stop delivery in 2006-2014 Chevrolet Impala (Fleet Only) vehicles in new or used vehicle inventory.  It described the problem:  "The ignition switch on these vehicles may inadvertently move out of the 'run' position if the key is carrying added weight and the vehicle goes off the road or experiences some other jarring event."

56.   On the same date GM issued notice of its decision to conduct a safety recall to the NHTSA.  However, GM failed to disclose the history of its awareness of the ignition key problem.  Instead, GM simply described the potential for the ignition key to move away from

the "run" position should it the vehicle go off-road or experience a "jarring" event.  It warned that should the key move away from the "run" position, "engine power, power steering and power breaking will be affected, increasing the risk of crash."  More over, this could result in "airbags not deploying increasing the potential for occupant injury in certain kinds of crashes."

57.    On June 24, 2014 the NHTSA acknowledged the recall in letter to the Director of Field Product Investigations and Evaluations at General Motors, which carried the subject "Ignition Switch may Turn Off."

58.    The NHTSA described the problem as concerning the "electrical system: ignition."  It described the problem: "This defect can affect the safe operation of the airbag system.  Until this recall is performed, customers should remove all items from their key rings, leaving only the ignition key… In the affected vehicles, the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine."

59.    In "consequence," according to the recall papers, "if the key is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury.  Additionally, a key knocked out of the run position will cause loss of engine power, power steering, and power braking, increasing the risk of a vehicle crash.

60.    The "Remedy" in the recall provides: "GM will notify owners, and dealers will install two 13mm key rings and key insert into the vehicle's ignition keys, free of charge. The manufacturer has not yet provided a notification schedule."

61.    On June 25, 2014 GM issued a notice to GM dealers explaining vehicles involved in three upcoming safety recalls.  It listed the following: Recall 14172 – Ignition Switch recall for 2003 – 2014 Cadillac CTS and 2004 -2006 Cadillac SRX. Recall 14299- Ignition Switch for,

among other vehicles, the 2014 Chevrolet Impala Limited (Fleet Only), and Recall 14250-Ignition Key for, among other vehicles, the 2005 – 2006 Chevrolet Impala.

62.     On July 2, 2014, in a letter meant to supersede its previous correspondence, GM notified the NHTSA that it had possession of information regarding the ignition key problem since its inception on July 10, 2009, that consisted of a reliable report that "the vehicle stalled after hitting a large bump when going from gravel road to pavement while driving at about 45 mph." Since October 2009, GM did not take appropriate measures to investigate the serious risk the information it possessed suggested, particularly when considered with other information GM possessed regarding ignition switch related risks.

63.     In the same July 2 letter, GM claimed that during a document review related to a Cobalt ignition switch problem in 2014, it discovered information in its possession that led it to the recall for Mr. Kanu's 2006 Impala and Mr. Tibbs's 2007 Impala and other vehicles with the same hazard. GM revealed that the issue was brought to the Product Investigation group on April 30, 2014. Between May 1, 2014 and June 6, 2014 "the investigator worked with GM subject matter experts to gather and analyze data relating to the ignition switch used on the 2006 Impala." GM reported that "although ignition switches themselves performed below the target specification, the ignition switch system as a whole as installed in the vehicles' steering columns performed approximately at the target specification." GM also reviewed its databases including its TREAD, warranty, customer satisfaction, and Engineering Analysis database, and NHTSA's Vehicle Owner's Questionnaire database; after which the investigator made a presentation regarding the ignition switch at an Open Investigation review meeting.

64.     In the same July 2nd letter, GM then revealed that only after the presentation and meeting did do road testing of the Impala using the ignition switches under review.  These tests revealed that: "when a slotted key is carrying added weight, the torque performance of the

15

ignition system may be insufficient to resist energy generated when a vehicle goes off road or experiences some other jarring event, potentially resulting in the unintentional movement of the key away from the 'run' position." After review of GM and NHTSA data the investigator presented to the SFADA.  The SFAHA then "directed the investigator to work with other GM personnel to further refine the potential recall population so that it accurately included the vehicles using the identified ignition switches that were subject to the condition identified in the road tests.  On July 15, 2014 the SFASA decided to conduct a recall of that population.

65.    Finally, on June 14, 2014 GM announced its safety recall. GM issued a 573 letter for the NHTSA on June 20, referenced above, admitting its knowledge of the hazard and its failure to disclose the risk to NHTSA.

66.    In a separate recall for an "ignition key" risk presenting identical hazards, on July 3, 2014, GM notified NHTSA that it was recalling Mr. Kanu's 2000 Impala and some 6.7 million other GM vehicles, encompassing the following models: CHEVROLET  IMPALA  2000-2005; CHEVROLET MALIBU CLASSIC  1997-2005; CHEVROLET MONTE CARLO  2000-2005;

  OLDSMOBILE  ALERO  1999-2004; OLDSMOBILE  INTRIGUE  1998-2002; PONTIAC GRAND AM  2000-2005; PONTIAC  GRAND PRIX  2004-2008.

67.    In this recall, NHTSA Recall Campaign 14V400, GM described the defect as involving the "detent plunger force on the ignition switch" and admitted that it had information regarding the hazard as soon as it began its business on July 10, 2009. GM failed to disclose, and actively concealed, this hazard from Plaintiffs and government officials. GM admits that in 2004 when the detent plunger force was redesigned, GM did not change the part number to reflect the change.

16

    4.    *Failure to Disclose and Concealment of Power Steering Defects (Fordham vehicle); NHTSA Recall Campaigns 14V15300; 14E04400*

68.    Mr. Fordham's 2006 Pontiac G6 vehicle has two dangerous power steering defects that are currently the subject of recalls. On March 21, 2014, GM issued a recall for and disclosed that Mr. Fordham's vehicle was subject to a sudden loss of power steering, increasing the risk of a crash.  NHTSA Campaign 14V15300 covers Mr. Fordham's car and the following models: CHEVROLET  COBALT  2010; CHEVROLET  HHR  2009-2010; CHEVROLET  MALIBU  2004-2006; 2008-2009; CHEVROLET  MALIBU MAXX  2004-2006; PONTIAC  G6  2005-2006, 2008-2009; SATURN  AURA  2008-2009; SATURN  ION  2004-2007. GM admits that it knew of the power steering defect in related models since its inception but it did not disclose the risks and issue a recall until March 2014.

69.    On July 21, 2014, GM issued another recall relating to dangers in Mr. Fordham's steering, this time for a yoke providing inadequate support for a u-joint bearing resulting in premature failure and a complete loss of steering control. The NHTSA Recall Campaign14E04400 encompasses Mr. Fordham's vehicle and the following models: CHEVROLET  MALIBU  2004-2012; PONTIAC  G6  2005-2010; SATURN  AURA  2007-2009.

    5.    *Failure to Disclose and Concealment of Transmission Shift Cable Defect (Fordham vehicle); NHTSA Recall Campaign 14V22400 (Fordham)*

70.    On April 30, 2014, GM disclosed that Mr. Fordham's vehicle has a defective transmission shift cable design that that poses a risk that the cable may fracture, resulting in driver loss of control or the risk of rollaways resulting in crashes. The related NHTSA Recall Campaign 14V22400 encompasses models CHEVROLET  MALIBU  2004-2008;

17

CHEVROLET  MALIBU MAXX  2004-2007; PONTIAC  G6  2005-2008;

SATURN  AURA  2007-2008.

GM admits that it knew of the risk of transmission cable fracture in similarly designed

models at least since May 2011.

> 6.    *Failure to Disclose and Concealment of Brake Light Defect (Fordham vehicle);
> NHTSA Recall Campaign 14V25200*

71.    On May 14, 2014, GM disclosed that Mr. Fordham's vehicle has an electrical system

defect resulting in the brake lights not functioning properly, affecting various systems and

increasing the likelihood of a crash.  The NHTSA Recall Campaign 14V25200 encompasses

models CHEVROLET  MALIBU  2004-2012; CHEVROLET  MALIBU MAXX  2004-

2007; PONTIAC  G6  2005-2010; SATURN  AURA  2007-2010.

72.    GM admits that it knew of brake light failures in these model cars since its inception.

> 7.    *Failure to Disclose and Concealment of Master Power Door Switch Defect
> (Elliotts' vehicle); NHTSA Campaign 14V404000)*

73.    Lawrence Elliott, 78 years of age, and Celestine Elliott, 73 years of age, own a 2006

Chevrolet Trailblazer for which they paid full sticker price when they purchased it from a now

defunct dealership in the District. The vehicles has had a host of problems, including two

dangerous and frightening "moving stalls," in which the Trailblazer's electrical system turned

off while Ms. Elliott was driving, resulting in loss of control over steering, braking, and the

loss of power to the airbag system

74.    The Trailblazer has a Master Power Door Module Switch that is so dangerous GM is

advising owners that the vehicles must be parked outdoors to avoid unreasonable risks of fire.

GM's treatment of the Trailblazer dangers has been consistent with the corporate culture that

has engulfed GM's cost-containment approach to risk issues presented by GM vehicles: deny

any hazard exists; if forced to concede the hazard, minimize its significance; and if nevertheless forced to act, insist on cheap rather than appropriate remediation.

75.    This is the third recall GM has conducted for this very same hazard, a process of denial and avoidance going back at least to 2012. In the previous two recalls, GM convinced governmental officials that its remediation—consisting of spraying the part with silicate rather than removing and replacing the dangerous part to eliminate the fire risk--would render the vehicles safe. GM failed to disclose the true nature of the risk to such officials, however. After years of denial, GM has finally admitted that the Elliotts' 2006 Chevrolet Trailblazer was and may remain dangerous because of the risk that its electrical components will short and start a fire inside the driver's door.

76.    After years of denial, then false claims that it had repaired the vehicles and rendered them safe to drive, GM has admitted to the NHTSA that its prior two recalls and purported repairs—when it tried to take the cheap way out, and spay the switch with a chemical coating rather than actually replace and repair the faulty switch—were failures. GM admits that the dangerous Master Power Door Switch rendered the Elliotts' SUV dangerous to drive or even to leave unattended after driving, because of the serious risk of a short in the switch causing a fire in the driver door. GM failed to disclose, concealed, and misrepresented the significant risk of electrical fires developing in the faulty Master Power Door Switch.

77.    On August 16, 2012, GM notified the NHTSA that it  was recalling "certain model year 2006 Chevrolet Trailblazer EXT and GMC Envoy XL and 2006-2007 Chevrolet Trailblazer, GMC Envoy, Buick Rainier, SAAB 9-7x, and Isuzu Ascender vehicles. originally sold or currently registered in Connecticut, Delaware, Illinois, Indiana, Iowa, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Vermont, West Virginia, Wisconsin, and the District of

19

Columbia" (NHTSA Report Campaign No. 12V406000). The reason for the recall was that "[f]luid may enter the driver's door module, causing corrosion that could result in a short in the circuit board." The consequence of this defect was listed in the report as follows: "A short may cause the power door lock and power window switches to function intermittently or become inoperative. The short may also cause overheating, which could melt components of the door module, producing odor, smoke, or a fire." Due to the fire risk created by the defect, GM recommended that owners park their vehicles outside. GM stated it would install a new door module if the switches did not function properly. If the switches did function properly, GM would apply a protective coating to the door module.

78.     The August 16, 2012 recall was limited to vehicles in the twenty aforementioned states and the District of Columbia. To owners outside of the aforementioned states, GM sent an Owner Notification Letter to owners of the affected vehicles instructing them to bring their vehicle to a GM service center only if they noticed switches that functioned "uncommanded, intermittently or become inoperative" or they noticed "an odor or overheated/hot switches." The letter stated that owners should seek not repairs unless they observed these symptoms their vehicle.

79.     The NHTSA was not satisfied with GM's geographic limitation of the August 16, 2012 driver door switch recall (NHTSA Action No. EA12004), and on June 13, 2013 GM notified the NHTSA that they were expanding the recall to cover the aforementioned vehicles in all states (NHTSA Report Campaign No. 13V248000).  As part of the expanded recall GM notified consumers that unattended vehicle fire may occur in rare instances, yet also stated that the affected vehicles remained safe to drive.

80.     On September 18, 2013, Plaintiffs' 2006 Trailblazer was serviced pursuant to the previously issued recalls and a "protective coating" was applied as an attempt to address the

20

defective driver door switch. The Plaintiffs' relied upon GM's assurance that the protective

coating would address the defect and eliminate the risk of personal injury or property damage.

On April 1, 2014, Plaintiffs filed a pro se complaint notifying GM that critical electrical

components of the car had continued to operate ineffectively and presented risk of personal

injury and property damage.

81.     On July 2, 2014, GM issued a third recall concerning the defective driver door switch in

the same vehicle models for the same defect and fire risk (NHTSA Campaign No.

14V404000). This new recall required additional remedy for vehicles "whose modules were

modified but not replaced" under the previous two recalls. GM conceded that "[v]ehicles that

were repaired by having a protective coating applied to the driver's door module may continue

to have a safety related defect." This recall encompasses the following models:

BUICK    RAINIER    2006-2007; CHEVROLET    TRAILBLAZER    2006-2007;

CHEVROLET    TRAILBLAZER EXT    2006; GMC    ENVOY    2006-2007; GMC    ENVOY

XL    2006; ISUZU    ASCENDER    2006-2007; SAAB    9-7X    2005-2007.

82.     Since at least August 16, 2012, GM has been aware that the driver door switches in

Plaintiffs' and consumers' vehicles are defective because of their propensity to experience

thermal events such as smoke, melting, and fire, which can occur in any car regardless of what

state it is registered in. Failure of the driver door switch threatens the kind of short-circuiting

and door lock malfunction that Plaintiffs and consumers have detected, and creates an

unreasonable danger of fire, personal injury and/or property damage. GM concealed the safety

defect and risk of death or severe personal and property damage from vehicle owners outside

the recall states. GM failed to notify Plaintiffs, consumers, and governmental officials of the

full scope of the defect, and materially misled consumers.

21

83.     NHTSA's Office of Defect Investigations (ODI) has received 170 reports alleging a thermal event in the driver door switch in vehicles identified by GM's August 2012 recall. GM acknowledged the receipt of 619 unique consumer complaints related to the driver door switch, 77 of which led to fire with flame.

## CLASS ACTION ALLEGATIONS

84.     Plaintiffs bring this lawsuit as a class action for themselves and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions. All proposed Class and Subclass periods run from the inception of GM in October 2009 and continue until judgment or settlement of this case.

85.     Plaintiffs bring this action on behalf of a proposed nationwide class defined as follows: All persons in the United States who, since the inception of GM in October 2009, hold or have held a legal or equitable interest in a GM vehicle with an ignition switch hazards, an ignition key hazard, a power steering hazard, a transmission cable hazard, a brake light failure hazard, and/or a master power door switch hazard, as described in the various recalls for these conditions above.

86.     Plaintiffs also bring this action on behalf of the following Subclasses:

    a.  Mses. Bledsoe, Farmer, Mitchell and Thomas, and Mrrs. Fordham and Kanu, bring this action on behalf of all persons in the State of Maryland who, since October 2009, purchased or hold or have held a legal or equitable interest in   the dangerous vehicles described above (the "Maryland Subclass");

22

b.  Mr. Tibbs and Mr. and Mrs. Elliott also bring this action on behalf of
residents of the District of Columbia who, since October 2009, hold or have
held a legal or equitable interest in the dangerous vehicles described above
(the "D.C. Subclass").

87.    Excluded from the Class are: (1) Defendants, any entity or division in which
Defendants have a controlling interest, and their legal representatives, officers, directors,
assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3)
governmental entities; and (4) those persons who have suffered personal injuries as a result of
the facts alleged herein.

## NUMEROSITY AND ASCERTAINABILITY

88.    Although the exact number of Class Members is uncertain and can only be ascertained
through appropriate discovery, the number is great enough such that joinder for each Class or
Subclass is impracticable. The disposition of the claims of these Class Members in a single
action will provide substantial benefits to all parties and to the Court. Class Members are
readily identifiable from information and records in GM's possession, custody, or control,
and/or from public vehicular registration records.

## TYPICALITY

89.    The claims of the Plaintiffs are typical of the claims of each member of the class and
subclasses in that the representative Plaintiffs, like all class members, legally or equitably own
or owned a dangerous GM vehicle during the Class Plaintiffs, like all class and subclass
members, have been damaged by Defendants' misconduct, namely, in being wrongfully
exposed to an increased risk of death or serious bodily injury, in suffering diminished use and
enjoyment of their vehicles, and in suffering the diminished market value of their vehicles.

23

Furthermore, the factual bases of Defendants' misconduct are common to all class and subclass members.

## ADEQUATE REPRESENTATION

90.    Plaintiffs will fairly and adequately represent and protect the interests of the class and subclasses. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions and in prosecuting complex federal litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class and subclasses, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the class of subclasses.

## PREDOMINANCE OF COMMON ISSUES

91.    There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include:

a.    Whether the vehicles owned by class or subclass members during the class periods suffer from the dangerous hazards described herein?

b.    Whether the hazards posed an unreasonable danger of death or serious bodily injury?

c.    Whether GM imposed an increased risk of death or serious bodily injury on Plaintiffs and class and subclass members during the Class period?

d.    Whether GM caused Plaintiffs and class and subclass members to suffer economic loss during the Class period?

e.    Whether GM caused Plaintiffs and class and subclass members to suffer the loss of the use and enjoyment of their vehicles during the class period?

24

f.      Whether GM had a legal duty to disclose the dangers described above to class and subclass members?

g.      Whether GM had a legal duty to disclose the dangers described above to the NHTSA?

h.      Whether class and subclass members suffered legally compensable harm?

i.      Whether GM violated Maryland's consumer protection statute by concealing safety related hazards from Plaintiffs and governmental officials?

j.      Whether GM violated the District's consumer protection law by concealing safety hazards in Plaintiffs' vehicles?

k.      Whether the safety related hazards were material?

l.      Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction?

m.      Whether GM should be declared responsible for notifying all Class Members of the risk and ensuring that all GM vehicles are recalled and repaired?

n.      Whether a mandatory injunction should issue to direct GM to protect the public safety in the interim until is repairs the vehicles described herein, to remove the dangerous vehicles from the roadways and to provide their owners with suitable substitute transportation?

o.      Whether class and subclass members are entitled to recover punitive damages from GM, and, if so, what amount would be sufficient to deter Defendants from engaging in such conduct in the future and to punish Defendants for their recklessness regarding the public health and safety and their campaign of concealment?

## SUPERIORITY

92.    Plaintiffs and class and subclass members have all suffered and will continue to suffer

harm and damages as a result of GMs' unlawful and wrongful conduct. A class action is

superior to other available methods for the fair and efficient adjudication of this controversy.

Absent a class action, most class and subclass members would likely find the cost of litigating

their claims prohibitively high and would therefore have no effective remedy. Because of the

relatively small size of the individual class and subclass member's claims, it is likely that few

could afford to seek legal redress for GMs' misconduct. Absent a class action, class and

subclass members will continue to incur damages, and GMs' misconduct will continue without

remedy. Class treatment of common questions of law and fact would also be a superior method

to multiple individual actions or piecemeal litigation in that class treatment will conserve the

resources of the courts and the litigants, and will promote consistency and efficiency of

adjudication. The class action is also superior for defendants, who could be forced to litigate

thousands of separate actions.

Defendants have acted in a uniform manner with respect to the Plaintiffs and class and subclass

members. Class and subclass wide declaratory, equitable, and injunctive relief is appropriate

under Rule 23(b)(1) and/or (b)(2) because GM has acted on grounds that apply generally to the

class, and inconsistent adjudications with respect to the Defendants' liability would establish

incompatible standards and substantially impair or impede the ability of class and subclass

members to protect their interests. Class and subclass wide relief assures fair, consistent, and

equitable treatment and protection of all class and subclass members

## COUNT I
### Asserted on Behalf of Plaintiffs and the Nationwide Class
### (Common Law Fraud)

93.    Plaintiffs hereby incorporate by reference all allegations contained in the preceding

paragraphs of this Complaint.

94.    At the time of its inception, GM knew that the ignition switch used or which would be

placed in the Plaintiffs' and class members' vehicles could inadvertently move from "run" to

"accessory" or "off," under regular driving conditions. GM also knew since its inception about

the ignition key hazard, steering hazards, and brake light hazards described above. GM knew

since August 2012 about the master power door switch hazard described above.  GM knew

since May 2011 about the transmission cable hazard described above.

95.    The facts that their vehicles presented the above described safety hazards was material

to Plaintiffs and class members. Plaintiffs and class member s had no reasonable way of learnig

of the hazards that GM knew about but failed to disclose.

96.    GM's failure to disclose the risks, and its affirmative misrepresentations regarding the

safety of Plaintiffs' and class members' vehicles, were intentional.

97.    Between October 2009 and February 2014, Defendants actively and intentionally

concealed and/or suppressed the existence and true nature of the ignition switch and steering

related hazards, and minimized the extent of the danger they posed in direct and indirect

communications with Plaintiffs, class and subclass members, dealers, the NHTSA, and others.

98.    Plaintiffs and class members reasonably relied on GM's communications and material

omissions to their detriment. As a result of the concealment and/or suppression of facts,

Plaintiffs and Class Members have sustained and will continue to sustain injuries, consisting of

the diminished value of their GM vehicles and the lost use and enjoyment of the vehicles that

Defendants actions have caused, and exposure to increased risk of death or serious bodily

injury.

99.     Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and with reckless disregard to Plaintiffs' and Class Members' rights and well-being, in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT II**
**Asserted on Behalf of Ms. Bledsoe, Farmer, Mitchell, Thomas, and**
**Mr. Fordham and Kanu and the Maryland Subclass**
**(Violation of Maryland's Consumer Protection Act ("MDCPA"),**
**Md. Code, Comm. Law § 13-101 *et seq.*)**

100.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

101.    This Count is brought on behalf of Plaintiffs and the Maryland Class generally with respect to the alleged violations of MDCPA § 13-301(3).

102.    Plaintiffs are "consumers" within the meaning of MDCPA, § 13-101(c)(1).

103.    Defendants are "merchants" within the meaning of MDCPA, § 13-101(g)(1).

104.    Defendants knew the Plaintiffs and Subclass members' vehicles were dangerous. Because of the life threatening nature of the risks, their existence was a material fact that GM concealed from plaintiffs and class members in violation of Md. Code, Comm. Laws § 13-301(3).  Plaintiffs were injured thereby having to endure unreasonable risk of death, serious bodily injury, and diminution of the value of each of their vehicles.

105.    At no time during the Class Period did Mr. Sesay, Ms. Yearwood, or Subclass members have access to the pre-release design, manufacturing, and field-testing data, and they had no reason to believe that their vehicles possessed distinctive shortcomings. Throughout the Class Period, they relied on Defendants to identify any latent features that distinguished their vehicles from similar vehicles without the ignition switch risk, and the Defendants' failure to

do so tended to mislead consumers into believing no distinctive risk was present in their

vehicles.

106.    With respect to the Subclass, Defendants violated Md. Code, Comm. Laws § 13-301(3)

throughout the Class Period by failing to state a material fact, the omission of which tended to

mislead consumers, by concealing the ignition switch risk from Plaintiffs and Subclass

members.

107.    Plaintiffs seek an order enjoining Defendants' unfair or deceptive acts or practices, and

attorney's fees, and any other just and proper relief available under Md. Code, Com. Laws §

13-408.


### COUNT III
**Asserted on Behalf of Mr. and Mrs. Elliott, for themselves,
and as representatives of the public, and for the D.C. Subclass**
**(Violation of the District of Columbia's Consumer Protection Procedures Act,
"CPPA", D.C. Code § 28-3901 et seq.)**

108.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding

paragraphs of this Complaint.

109.    This Count is brought on behalf of Mr. and Mrs. Elliott, Mr. Tibbs, and the people of

the District of Columbia.

110.    Plaintiffs are "consumers" within the meaning of the CPPA, § 28-3901(a)(2).

111.    GM is a "person" and a "merchant" within the meaning of the CPPA, § 28-3901(a)(1).

112.    The CPPA, § 28-3904(d), makes it unlawful for any merchant to represent that goods or

services are of a particular standard, quality, grade, style or model, if in fact they are another.

The CPPA, § 28-3904(e), makes it unlawful for any merchant to misrepresent as to a material

fact that has a tendency to mislead. The CPPA, § 28-3904(f), makes it unlawful for any

merchant to fail to state a material fact if such failure tends to mislead.

113.   Since its inception in 2009, GM violated § 28-3904 by representing that its vehicles were safe and adequately engineered when in fact GM failed to disclose and actively concealed an unprecedented number of safety defects due in large part to Defendant's focus on cost-cutting over safety. Plaintiffs had no reason to believe that their vehicles possessed distinctive shortcomings; they relied on GM to identify latent features that distinguished Plaintiffs' and consumers' vehicles from similar vehicles without the safety related defects, and the Defendant's failure to do so tended to mislead consumers into believing the Plaintiffs' and consumers' vehicles.

114.   Plaintiffs seek treble damages, or $1,500 per violation, whichever is greater, payable to the consumer, for each act in violation of the CPPA, an order enjoining GMs' unfair or deceptive acts, practices, and omissions, attorneys' fees, punitive damages, treble damages, and any other just and proper relief available under D.C. Code § 28-3905(k)(2), including preliminary and permanent injunctive relief aimed at providing protection for the People of the District of Columbia from Defendant's reckless endangerment of the public health and their wanton disregard for the law.

**COUNT IV**
**Asserted on Behalf of Plaintiffs and the Nationwide and all Subclasses**
**(Civil Conspiracy, Joint Action and Aiding and Abetting)**

115.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

116.   This Count is brought on behalf of the nationwide Class and all Subclasses.

117.   GM is liable for Plaintiffs' and class and subclass members' injuries because they entered into specific agreement, explicit and implied, with others, including but not limited to the dealers, engineers, accountants and lawyers (the co-conspirators) described in the preceding paragraphs of this Complaint, to inflict those injuries and to conceal their actions from

Plaintiffs, Class and Subclass members and others.  By these agreements, GM conspired to

violate each of the laws that form the basis for the claims in the preceding Counts of this

Complaint.

118.    GM committed overt acts in furtherance of the conspiracy.

119.    GM knew that the conduct of the co-conspirators constituted a breach of duties to the

plaintiffs.

120.    GM gave substantial assistance and encouragement to the co-conspirators in their

course of conduct in violation of the rights of the plaintiffs.

121.    The wrongful acts herein complained of harmed plaintiffs.

**COUNT V**
**Asserted on behalf of Plaintiffs Ms. Bledsoe, Ms. Farmer, and Mr. Kanu**
**(Negligence under the common law of Georgia, Maryland, and the District)**

122.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding

paragraphs of this Complaint.

123.    GM had a duty to use reasonable care in the manufacture of vehicles for sale, and in

warning Plaintiffs regarding the risks that use of their GM vehicles pose.

124.    By failing properly to consider and address safety risks posed by the hazards described

above, GM breached its duty to use reasonable care.

125.    GM's breach of its duty to use reasonable care caused Ms. Farmer to have an accident

on December 8, 2013, in which she suffered personal injury, property damage, and emotional

distress.

126.    GM's breach of its duty to use reasonable care caused Mr. Kanu to have an accident in

October 2013, in which he suffered property damage.

127.    GM's breach of its duty to use reasonable care caused Ms. Bledsoe to have two

accidents, both in the state of Georgia.  One accident occurred on February 1, 2008, in which

31

Ms. Bledsoe suffered personal injury, property damage, and emotional distress.  The second occurred on May 17, 2009, in which Ms. Bledsoe again suffered personal injury, property damage, and emotional distress.

128.    To the extent that any of the allegation of wrongdoing alleged in this count involve wrongdoing by Old GM, GM is responsible for that conduct because it is a successor in manufacturing to Old GM and liable for Old GM's wrongdoing.

## TOLLING OF THE STATUTE OF LIMITATIONS

129.    Any applicable statute of limitation has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

130.    The causes of action alleged herein did not accrue until Plaintiffs discovered that their vehicles had the safety related defects described herein.

131.    Plaintiffs had no reason to know that their products were defective and dangerous because of Defendants' active concealment.

## REPRESENTATIVE ACTION

132.    To remedy real and potential risks to public safety, the CPPA empowers the Plaintiffs to bring this civil action on behalf of themselves and the public against GM for its violation of District of Columbia consumer protection law. The relief Plaintiffs seek protects consumers and mitigates dangers posed by GM's reckless endangerment of the public safety. Plaintiffs bring this lawsuit as an action on their own behalves and as a representative action on behalf of the People of the District of Columbia exposed to life-threatening conditions made manifest by GM's concealment of the dangerousness of vehicles that carry a defective driver door switch.

## ALLEGATIONS IN SUPPORT OF PRELIMINARY RELIEF

133.    As of the date of the filing of this Complaint, GM concedes that it knew but did not disclose that some 20 million GM products have safety related risks that create an

unreasonable danger of death or serious bodily harm to their drivers, vehicle occupants, nearby

drivers, and bystanders.

134.    Despite purporting to come clean about its campaign of concealment and deceit

in February 2014, GM has failed to take measures to ensure that these vehicles do not remain

on the roads as a source of further death and injury. GM has recklessly endangered the public

safety and the safety of Plaintiffs and class members. GM has not effectively remedied its

policies and practices to ensure that this misconduct does not continue, and accordingly its

business practices continue to threaten the public safety, warranting that this Court impose

preliminary and permanent relief to ensure that all elements of the enterprise alleged in this

Complaint are identified and eliminated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated,

respectfully request that this Court enter a judgment against GM, and grant the following relief:

A.    Determine that this action may be maintained as a Class action and certify it as

such under Fed. R. Civ. P. 23(a) and 23(b)(3) and/or Fed. R. Civ. P. 23(b)(2), and/or Fed. R.

Civ. 23(c)(2), or alternatively certify all issues and claims that are appropriately certified; and

designate and appoint Plaintiffs as Class and Subclass Representatives and Plaintiffs' chosen

counsel as Class Counsel;

B.    Declare, adjudge and decree that Gm has recklessly endangered the

public safety and order specific steps that GM must take to restore public safety, including but

not limited to preliminary relief aimed at removing unreasonably dangerous GM vehicles from

the public streets and thoroughfares forthwith; providing safe replacement vehicles for

Plaintiffs and Class and Subclass members that do not contain safety related risks; and, in light

of the nature of GM's wrongdoing, the substantial threat to the public health it has wrongfully

caused, its apparent management recalcitrance or incompetence as evidenced by GM's failure

to take significant remedial steps for the past six months since it has publicly admitted its

years-long campaign of concealment and deceit, providing continuing judicial management

over GM through the appointment of a Special Master with expertise in the automobile

industry and ethical risk management practices to assist in the judicial supervision of GM's

management reforms designed to ensure that the Company does not continue to threaten the

public safety in the future; and permanent injunctive relief aimed at ensuring that GM deploys

reasonable and responsible management controls with respect to safety or cease its business of

marketing to the public complex products that can so easily be a threat of death or serious

bodily injury if not manufactured properly;

    C.    Declare, adjudge and decree the conduct of GM as alleged herein to be

unlawful, unfair, and/or deceptive, enjoin any such future conduct, and direct Defendants to

permanently, expeditiously, and completely repair the Plaintiffs', Class and Subclass

Members' vehicles to eliminate the dangers they pose;

    D.    Declare, adjudge and decree that GM is financially responsible for notifying all

Class Members about the dangerous nature of the Class Vehicles;

    E.    Declare, adjudge and decree that GM must disgorge, for the benefit of Plaintiffs,

Class Members, and Subclass Members, all or part of the ill-gotten gains it received from the

sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

    F.    Award Plaintiffs, Class Members, and Subclass Members the greater of actual

compensatory damages or statutory damages as proven at trial;

    G.    Award Plaintiff, Class Members, and Subclass Members punitive damages in

such amount as proven at trial;

34

H.    Award Plaintiff, Class Members and Subclass Members their reasonable
attorneys' fees, costs, and pre-judgment and post-judgment interest; and

I.    Award Plaintiff, Class Members, and Subclass Members such other further and
different relief as the case may require or as determined to be just, equitable, and proper by this
Court.

## JURY TRIAL DEMAND

Plaintiffs request a trial by jury on all the legal claims alleged in this Complaint.


Respectfully submitted


_____

Gary Peller (GP0419)
600 New Jersey Avenue, N.W.
Washington, D.C. 2000
(202) 662-9122 (voice)
(202) 662-9680 (facsimile)
peller@law.georgetown.edu
Attorney for Plaintiffs