# **<u>Exhibit A</u>**

# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

| | | |
|---|---|---|
| Andrew B. Bloomer, P.C.<br>To Call Writer Directly:<br>(312) 862-2482<br>andrew.bloomer@kirkland.com | 300 North LaSalle<br>Chicago, Illinois  60654<br><br>(312) 862-2000<br><br>www.kirkland.com | Facsimile:<br>(312) 862-2200 |

April 18, 2017

The Honorable Jesse M. Furman
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

      *Re:*  *In re: General Motors LLC Ignition Switch Litigation,* 14-MD-2543

Dear Judge Furman:

  New GM submits this supplemental letter brief in response to the Court's successor liability questions set forth in its April 10, 2017 Order (Docket No. 3826).

  For the first question, the economic loss claims of the pre-July 10, 2009 Delta Ignition Switch plaintiffs asserted in the Fourth Amended Consolidated Complaint ("FACC") should be determined to have been filed in the first instance in this District. Under the procedural history in this case, the FACC is a substantive complaint that supersedes all named plaintiffs' prior complaints. Because the FACC was filed in federal court in New York, and if federal choice-of-law rules for some reason do not apply, then the Court should apply New York choice-of-law rules to plaintiffs' successor liability claims under *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

  For the second question, a Bankruptcy Court ruling permitting plaintiffs to file late proofs of claim against Old GM would further support summary judgment for New GM, both in mere continuation/de facto merger states and in continuity-of-enterprise states. Nonetheless, for reasons already explained, the Court should grant New GM summary judgment regardless of whether the Bankruptcy Court allows late proofs of claims.

**I. NEW YORK CHOICE-OF-LAW RULES APPLY TO PRE-2009 DELTA IGNITION SWITCH FACC PLAINTIFFS' SUCCESSOR LIABILITY CLAIMS.**

  **A. Pre-2009 Delta Ignition Switch Plaintiffs' Claims Were Directly Filed In This District Via The FACC, Which Supersedes Plaintiffs' Prior Complaints.**

  Order No. 50 expressly provides that consolidated complaints such as the FACC are the operative complaints for the pre-2009 Delta Ignition Switch FACC plaintiffs: "The Consolidated Complaints have been, and will continue to be, critical tools to organize and conduct motion practice, both here and in the Bankruptcy Court, to address class certification, and to manage the

## KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
April 18, 2017
Page 2

discovery process. They are the operative pleadings for these purposes." Docket No. 875, Order No. 50 ¶ 2; *see also id.* ¶ 5 ("The Court has designated the Consolidated Complaints as the operative class action complaints in these MDL 2543 proceedings."). Furthermore, Order No. 50 dismissed any pre-transfer complaints that the pre-2009 Delta Ignition Switch FACC plaintiffs may have filed in other jurisdictions. *Id.* ¶ 5(a). Dismissed complaints are legal nullities. *See, e.g.*, *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994); *In re Crysen/Montenay Energy*, 226 F.3d 160, 162 (2d Cir. 2000); 6 Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 1476 (3d ed. 2017).

Explaining Order No. 50, this Court held that the FACC supersedes any economic loss complaints filed elsewhere but transferred here. *In re Gen. Motors LLC Ignition Switch Litig.*, 2015 WL 3619584 (S.D.N.Y. June 10, 2015). Specifically, "Order No. 50 is intended to facilitate management of the MDL by clarifying that the Consolidated Complaints do supersede individual complaints for purposes of pretrial proceedings (including motion practice) and ensuring that the parties do not have to file or litigate motions in hundreds of individual cases." *Id.* at *5; *see also id.* at *10 ("Order No. 50 makes clear that the Consolidated Complaints . . . are legally operative—that is, that they are intended to be superseding rather than administrative.").

In holding that the FACC is operative and supersedes prior complaints filed in other jurisdictions, this Court relied on *Gelboim v. Bank of Am.*, 135 S. Ct. 897 (2015). 2015 WL 3619584, at *7. *Gelboim* noted that "[c]ases consolidated for MDL pretrial proceedings ordinarily retain their separate identities," but the "[p]arties may elect to file a 'master complaint' and a corresponding 'consolidated answer,' which supersede prior individual pleadings." 135 S. Ct. 904 & n.3. "In such a case, the transferee court may treat the master pleadings as merging the discrete actions for the duration of the MDL pretrial proceedings." *Id.* at 904 n.3.

Plaintiffs agreed that the FACC supersedes prior complaints, stating that this "Complaint is not an administrative Complaint, but one that supersedes all MDL transferee complaints, and whose function is set forth in the Court's Orders, including Order No. 50 (Dkt. No. 875) and the Court's Opinion and Order dated June 10, 2015." (FACC at 1.) This acknowledgment comports with plaintiffs' agreements concerning previous consolidated complaints. *GM Ignition Switch*, 2015 WL 3619584, at *3 ("Lead Counsel agreed that the Consolidated Complaints were intended to have superseding rather than administrative effect . . . .").

Consequently, any complaints filed by the pre-2009 Delta Ignition Switch FACC plaintiffs in other jurisdictions have been dismissed and superseded, and thus have no legal effect. The pre-2009 Delta Ignition Switch FACC plaintiffs' only legally operative complaint is the FACC, which was filed in the first instance in this Court and in this federal district.

The FACC's allegation that "this Complaint is filed by each new Plaintiff as if they have filed in the district in which they reside" cannot overcome this Court's orders or the reality that

## KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
April 18, 2017
Page 3

the FACC was filed in this District. (FACC ¶ 39.) Plaintiffs' allegation is a mere legal conclusion, and need not (and should not) be considered. *E.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Mercer v. Gupta*, 712 F.3d 756, 758 (2d Cir. 2013). Furthermore, the FACC fails to identify any order in support of its assertion that "the Court's instructions" allow plaintiffs to treat the complaint as having been filed in another district. (FACC ¶ 39.) In fact, this Court's Order No. 1 provides that directly filed complaints will be transferred to a federal district court of proper venue after the completion of pretrial proceedings, not that direct filed cases will be treated as though filed in another district. Docket No. 19, Order No. 1, § III. The pre-2009 Delta Ignition Switch FACC plaintiffs filed the FACC in this Court and it is the operative complaint for pre-trial purposes. Claims by pre-2009 Delta Ignition Switch FACC plaintiffs should be treated as having been filed in the district—particularly given plaintiffs' agreement and admission concerning the superseding nature of their complaint.

### B. New York Choice Of Law Should Apply To The Pre-2009 Delta Ignition Switch FACC Plaintiffs' Successor Liability Claims.

Because pre-2009 Delta Ignition Switch plaintiffs filed the FACC asserting their successor liability claims in this district, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941), requires that New York choice of law apply to these claims. Under *Klaxon*, when "a federal district court sits in diversity, it generally applies the law of the state in which it sits, including that state's choice of law rules." *In re Coudert Bros. LLP*, 673 F.3d 180, 186 (2d Cir. 2012). *Klaxon's* rule applies in class actions. *In re Bridgestone/Firestone Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1015 (2d Cir. 2002); *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007); *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012). Accordingly, MDL courts apply the choice of law of the MDL forum where plaintiffs have filed a consolidated complaint that supersedes individual complaints. *E.g.*, *In re Bridgestone/Firestone, Inc.*, 155 F. Supp. 2d 1069, 1078 (S.D. Ind. July 27, 2011) (noting that "normally the transferee court must make an independent choice of law determination for each state from which a case was transferred into the MDL proceeding" but here, "[h]owever, the parties agree that this Court should be treated as the forum court because Plaintiffs filed their Master Complaint in this Court.");[1] *see also In re Vioxx*, 478 F. Supp.2d 897, 904 (E.D. La. 2007) (the "filing of these cases in this district also suggests that the Court should apply the law of the state in which it sits, including Louisiana's choice-of-law rules"); *In re Trasylol*, 2011 WL 1033650, at *3 (S.D. Fla. Jan. 18, 2011) ("Ms. Medlinger filed her Complaint against Bayer with this Court. Therefore, Florida choice of law rules apply.").

This result is correct because this Court has held, and both plaintiffs and New GM *have agreed*, that the FACC supersedes complaints filed in other districts. And the agreements of

---

[1] The Seventh Circuit reversed this decision because the district court improperly conducted the choice of law analysis for Indiana, but agreed that Indiana choice of law applied. *Bridgestone/Firestone*, 288 F.3d at 1015.

# KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
April 18, 2017
Page 4

counsel mean something; they cannot be disregarded for tactical purposes. Accordingly, *Van Dusen v. Barrack*, which holds that a case transferred for convenience of the parties is subject to the choice of law principles of the transferor court, does not apply here. 376 U.S. 612 (1964). The pre-2009 Delta Ignition Switch plaintiffs filed a new FACC in this Court that superseded any complaints filed elsewhere and transferred here.

Cases relying on *Van Dusen* are inapposite given the superseding FACC and Order No. 50. Certain MDL courts have ruled that where a case is transferred as part of an MDL, the transferee court applies the choice of law rules of the state in which each individual action was first filed. *E.g.*, *In re Rezulin*, 390 F. Supp. 2d at 329 n. 62; *In re Fresenius Granuflo/Naturalyte*, 76 F. Supp. 3d 294, 304-05 (D. Mass. 2015); *In re Guidant Corp.*, 489 F. Supp. 2d 932, 936 (D. Minn. 2007). But these decisions pre-date the Supreme Court's statement in *Gelboim* that a master complaint can "supersede prior individual pleadings" and "merg[e] the discrete actions for the duration of the MDL pretrial proceedings." 135 S. Ct. at 904 n.3. Moreover, these cases either stated or assumed that the consolidated complaints were administrative in nature and did not supersede the individual complaints. For example, *Rezulin* considered the cases before it to be individual actions that were consolidated before the court, such that each case retained its individual character despite the consolidated amended complaint. 390 F. Supp. 2d at 329 n.62.

Similarly, some MDL courts have opined that the choice-of-law rules of plaintiffs' home states should apply to claims filed directly in the MDL, but once again these cases involved administrative complaints that did not supersede individual complaints. *E.g.*, *Wahl v. Gen. Elec.* 786 F.3d 491 (6th Cir. 2015); *In re Yasmin & Yaz*, 2011 WL 1375011, at *6 (S.D. Ill. Apr. 12, 2011); *In re Zimmer*, 890 F. Supp. 2d 896, 901 (N.D. Ill. 2012). For example, the court in *Toyota Motor Corp. Unintended Acceleration* concluded that California choice of law principles could not apply to non-California plaintiffs who filed their complaints in the California MDL. 785 F. Supp. 2d 925 (C.D. Cal. 2011). That court, however, explained that its MDL proceeding was "merely a collection of individual cases" that maintain their "separate and distinct nature," and that the master complaint was "a procedural device rather than a substantive pleading with the power to alter the choice of law rules applicable to the plaintiffs' claims." *Id.* at 930-31. Similarly, the *Takata* court refused to apply Florida choice of law to all plaintiffs' claims, concluding that *Van Dusen's* "choice of law framework is not altered by the use of a consolidated complaint as a procedural device to streamline the litigation, unless the parties so consent" and, unlike here, there was no consent. 193 F. Supp. 3d 1324, 1332-33 (S.D. Fla. 2016). Thus, the cases transferred to the *Takata* MDL retained their "separate identities." *Id.*

By contrast, in this case pursuant to Order No. 50 and *Gelboim*, any prior complaints have been dismissed and the pre-2009 Delta Ignition Switch plaintiffs' successor liability claims are no longer separate. All such prior individual complaints were superseded by the new FACC

## KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
April 18, 2017
Page 5

filed in this Court to which *Klaxon* rather than *Van Dusen* applies.[2]  Indeed, the *Toyota* and *Takata* courts' reliance on consolidated complaints as mere procedural devices indicates that they would have reached a different conclusion if the consolidated complaints had been substantive and superseding.  Accordingly, New York choice of law should apply to pre-2009 Delta Ignition Switch FACC plaintiffs' successor liability claims.

Nor is there any inconsistency between applying New York choice of law to pre-2009 Delta Ignition Switch FACC plaintiffs' successor liability claims and *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).  *Lexecon* requires only that cases transferred to an MDL be remanded to the districts from which they originated after pretrial proceedings are complete.  *Id.* at 34-35.  Order No. 1 preserves this right, including for direct filing plaintiffs.  Docket No. 19, Order No. 1 § III.  But nothing in *Lexecon* prevents an MDL court from holding that the MDL forum state's choice of law applies.  MDL courts have the power to rule on plaintiffs' claims, including determining what choice of law applies.  *See In re WorldCom, Inc.*, 2005 WL 2403856, at *3 (S.D.N.Y. Sept. 30, 2005) (collecting cases holding that MDL courts may rule on dispositive pretrial motions).

In sum, the consequence of filing the new, substantive consolidated complaint in this District is that New York choice of law rules applies to the pre-2009 Delta Ignition Switch FACC plaintiffs' claims.  This is an entirely just and natural result.

**II.     AN ORDER ALLOWING PLAINTIFFS TO FILE LATE PROOFS OF CLAIM WOULD PROVIDE A FURTHER REASON TO GRANT SUMMARY JUDGMENT TO NEW GM.**

A ruling permitting plaintiffs to file late proofs of claim would provide a further reason to grant New GM summary judgment, both in mere continuation/de facto merger states and in continuity-of-enterprise states.  Nonetheless, regardless of whether the Bankruptcy Court allows late proofs of claims against Old GM, the Court should grant summary judgment in favor of New GM on plaintiffs' successor liability claims.

---

[2]  New GM notes that in a February 2015 brief, it argued that the "choice-of-law rules of the transferor states continue to apply even if the MDL plaintiffs file an amended, consolidated complaint" and that "the choice-of-law rules of plaintiffs' home states also apply to those plaintiffs who filed their claims directly in the MDL through the consolidated complaint." (Docket No. 597 at 22-23.)  But that brief was filed before the Court's June 2015 opinion holding that the Consolidated Complaints in this case were superseding rather than merely administrative.  Given the change in circumstances after that brief was filed, the February 2015 brief's conclusions do not apply to the superseding consolidated complaint that is operative in this MDL, especially given that plaintiffs agreed to the superseding effect of the consolidated complaint.

# KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
April 18, 2017
Page 6

    **A.    An Order Allowing Plaintiffs To File Late Proofs Of Claims Would Further Support Summary Judgment In States Where Plaintiffs Are Pursuing Mere Continuation Or De Facto Merger Theories.**

Mere continuation and de facto merger are "equitable doctrine[s]" designed to "protect creditors from having assets of a debtor entity put beyond their reach through manipulation of corporate forms." *In re Acme Sec.*, 484 B.R. 475, 492 (Bankr. N.D. Ga. 2012); *Cargo Partner v. Albatrans*, 207 F. Supp. 2d 86, 94-95 (S.D.N.Y. 2002). Thus, courts in mere continuation and de facto merger states often hold that successor liability is precluded by a debtor's continued existence and ability to be sued. *See, e.g.,* cases from various states collected at New GM Mem. at 51-53; New GM Reply at 6-8. As the court explained in *In re Polyurethane*, 86 F. Supp. 3d 769, 785 (N.D. Ohio 2015) (New York law):

> In this case, following the Asset Sale, Foamex remained in existence for a while as a corporate entity. Indeed, the undisputed facts show that *seven months after* the Asset Sale closed, the bankruptcy court directed the extant Foamex to *pay administrative priority claims and wind down expenses from its remaining $4 million in assets.* Under New York law, this fact precludes application of the "mere continuation" exception. *Id.* at 785 (emphasis added).

Although the *Polyurethane* debtor did not pay *plaintiffs*, the fact that the debtor continued to exist, paid *non-plaintiff creditor claims*, and dissolved approximately *seven months* after the sale precluded successor liability. Here, the fact that *plaintiffs themselves* are pursuing, and may be permitted by the Bankruptcy Court to assert, late claims against the still-extant MLC GUC Trust *eight years* after the Sale is a further compelling reason to grant summary judgment. Plaintiffs' arguments that their MLC GUC Trust claims are irrelevant—either because the MLC GUC Trust is not an "operating" entity or because it is a separate "trust" "or "entity" from the MLC entity that funded it[3]—are meritless. *E.g., Doktor v. Werner*, 762 F. Supp.2d 494, 499 (E.D.N.Y. 2011) ("[T]he corporate realities of the asset sale preclude a finding of liability under a 'de facto merger,' or 'mere continuation' theory" where "Old Ladder continues to exist as a distinct corporate entity, even after the consummation of the APA, *as a liquidated trust.* Where, as here, the predecessor corporation continues to exist after the transaction, in however gossamer a form, the mere continuation exception is not applicable.") (emphasis added) (internal quotations omitted).

---

[3] The MLC GUC Trust exists for the "purpose of resolving claims, distributing Distributable Cash (following the aforementioned liquidation of all New GM Securities) and *winding down the affairs of MLC*, all in *accordance with a plan of liquidation of MLC* approved by the Bankruptcy Court and the Liquidation Order." (Ex., A, MLC GUC Trust 2/13/17 10-Q, at 10 (of pdf)) (emphasis added). MLC did not dissolve until over two years after the Sale, *see* Ex. 35 to New GM Memo (MLC certificate of dissolution), after it had transferred its assets to the MLC GUC Trust to pay creditor claims, *see* Ex. 25 to New GM Memo., Bkr. Plan §§ 4.3, 5.2(a), 6.2(b), 6.2(c), 6.2(l), 6.10, 10.1; Ex. D hereto, Confirmation Order ¶¶ 1, 5, 6, 23.

## KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
April 18, 2017
Page 7

### B. Plaintiffs' Ability To File Late Proofs Of Claim Further Bars Plaintiffs' Claims In Continuity-Of-Enterprise States (Michigan And Alabama).

New GM does not believe that the continuity of enterprise theory is relevant to any plaintiff's successor liability claims because either Delaware or New York substantive law applies. (New GM Memo. at 19-32.) Plaintiffs claim that Michigan substantive law should apply in 16 states if federal choice of law rules apply, and in five states if federal choice of law rules do not apply. (Pls. Opp. 16-35.)

Under Michigan[4] law, "[w]hile failure of the predecessor to dissolve may not be fatal in every action for successor liability, especially, for example, where the predecessor continues as a shell or is otherwise underfunded, the fact that a predecessor remains a viable source for recourse is." *Foster v. Cone-Blanchard*, 460 Mich. 696, 701–06 (1999). In *C.T. Charlton v. Thule*, 541 F. App'x 549, 554 n.2 (6th Cir. 2013), the Sixth Circuit[5] defined "viable source for recourse":

> As *Foster* holds, even in products-liability cases, a plaintiff cannot recover from a successor corporation where the "predecessor remains a viable source for recourse." [Footnote] "Viable source for recourse" is not the same thing as solvent. *Creditors have recourse* (*i.e.*, a right to recovery) against insolvent companies, even though they may ultimately get *pennies on the dollar or nothing*.

*Id.* at 554 & n.2 (emphasis added). Thus, although plaintiffs' claims are barred regardless of the Bankruptcy Court's ruling on late claims, an order permitting plaintiffs to file such claims would independently bar their claims under *Charlton*, even if plaintiffs "ultimately get pennies on the dollar or nothing."[6] *Id.*

---

[4] Alabama's test is even more restrictive than Michigan's, and precludes successor liability because the MLC GUC Trust has not dissolved and because Old GM shareholders recovered nothing. (New GM Reply at 39.)

[5] As this Court has ruled, "some deference is due the [court of appeals'] interpretation of the state law of a state within its jurisdiction, given its familiarity with" the law of a state within its jurisdiction. *In re Gen. Motors LLC Ignition Switch*, 2016 WL 3920353, at *26-*27 (S.D.N.Y. 2016).

[6] Plaintiffs incorrectly argue that "[t]his case is a far cry from *Foster*," because "the plaintiff had already 'successfully pursued a remedy'. . . ." (Pls. Opp. 44.) But *Foster* did not hold that a "successful" claim was required for summary judgment. It held that successor liability claims fail if the predecessor is "viable" and "capable of being sued," and that therefore a "successful" claim "certainly" precludes liability. *Foster*, 460 Mich. 696 at 705-06. In any event, as the Sixth Circuit made clear in *Charlton*, plaintiffs' pursuit of bankruptcy claims independently forecloses Michigan successor liability, even if plaintiffs recover "nothing." *Charlton*, 541 F. App'x at 554 n.2. Moreover, plaintiffs' claims would be barred even if they had not pursued claims against the MLC GUC Trust, because it is "crystal clear" that the continuity of enterprise exception only applies when a plaintiff has "been deprived *by the asset transaction* of an effective remedy." *Santa Maria v. Owens-Illinois, Inc.*, 808 F.2d 848, 859 (1st Cir. 1986) (emphasis in original); *see also* New GM Memo. at 70-71, Reply at 37-38; *Section* E, *infra*.

## KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
April 18, 2017
Page 8

### C. Plaintiffs' Claim That The MLC GUC Trust Has No Assets To Distribute Is Legally Irrelevant And Factually Incorrect.

Plaintiffs have argued that their claims against the MLC GUC Trust are irrelevant to successor liability because "there are no GUC Trust assets left to distribute." (Pls. Opp. 41.) As an initial matter, this argument is legally irrelevant for two reasons: (i) under *Charlton*, even if plaintiffs recover "nothing," they have "recourse" and their successor liability claims are barred, *C.T. Charlton*, 541 F. App'x at 554 n.2; and (ii) unsecured creditors like plaintiffs would have recovered nothing ($0) in the Old GM bankruptcy *but for* the Sale (*see* Section E *infra*).

In any event, plaintiffs' argument is factually incorrect and belied by their filings in Bankruptcy Court a few months ago. As part of the Sale, New GM paid MLC 10% of New GM's shares, for the benefit of MLC's unsecured creditors.[7] MLC, in turn, funded the MLC GUC Trust using those shares (worth billions) and other assets, so that the MLC GUC Trust could pay MLC's creditors. (Ex. 25 to New GM Memo., Bkr. Plan §§ 4.3, 5.2(a), 6.2(b), 6.2(c), 6.2(l), 6.10, 10.1; Ex. D, Confirmation Order ¶¶ 1 (p. 17) (approving Plan), 5 (p. 18), 6 (p. 18), 23 (p. 32); Ex. 16 to New GM Memo., Worth Decl., at Ex. F, 14). As of December 31, 2016, the MLC GUC Trust had $533 million in assets and $46 million in estimated liabilities. (Ex. A, MLC GUC Trust 12/31/16 Form 10-Q, at 5). Moreover, "[a]s of December 31, 2016, the GUC Trust held as reserves . . . approximately $50.0 million in claim amount that is not associated with any particular claim, but which has been set aside by the GUC Trust Administrator as a general claim contingency," separate from administrative reserves (an additional $47.4 million). *Id.* at 12, 16. Furthermore, in connection with the term loan litigation, the MLC Avoidance Action Trust continues to pursue approximately $1.5 billion from certain banks.[8] An entity with a "$50 million in claim amount" reserved for "general claim contingency"—not to mention

---

[7] *See* Ex. 51 to New GM Memo, 7/1/2009 Tr. at 101 (Testimony of U.S. Treas. Representative Wilson) ("Q. How much of the common equity do unsecured creditors receive under the sale transaction? A. The *creditors* of OldCo as part of the sale transaction will receive ten percent of NewCo plus warrants in two tranches.") (emphasis added); Ex. D, Conf. Order, Par. N ("Equity Interests in MLC in Class 6 are not entitled to receive or retain any property under the Plan."); *In re Motors Liquidation*, 407 B.R. 463, 520 (Bankr. S.D.N.Y. Jul. 5 2009) ("nothing for stockholders").

[8] Regardless of the outcome of the term loan litigation, the amounts potentially available to creditors such as plaintiffs will increase as a result of that litigation. If the MLC Avoidance Action Trust prevails, plaintiffs here have claimed "exclusive access" to the Avoidance Action Trust share of the potential $1.5 billion recovery. (Ex. B, at ¶ 13, 55). Pursuant to a settlement between the DIP Lenders and the Avoidance Action Trust, after the repayment by the Avoidance Action Trust of certain cash advances, any distributable proceeds are to be paid as follows: 70% to holders of Allowed General Unsecured Claims and 30% to the DIP Lenders. (Ex. A, at 46.) If the banks prevail, then additional GUC Trust reserves will be freed for distribution to creditors including plaintiffs. (If the banks are determined not to be secured creditors and thus have to pay the $1.5 billion, as unsecured creditors they will then claim from the MLC GUC Trust the amount thus paid, and the MLC GUC Trust has reserved hundreds of millions for that possibility; if the banks prevail those reserves can be used for other creditors. (*See generally* Ex. A, GUC Trust 10-Q at 1, 42; *see also* New GM Memo. at n.6 (explanation of the approximate amount of distributions made to unsecured creditors).)

## KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
April 18, 2017
Page 9

additional amounts relating to the term-loan litigation—is a "viable" entity "capable of being sued"; this fact independently precludes Michigan successor liability. *See Foster,* 460 Mich. at 705 ("*Turner's* holding indicates that the 'continuity of enterprise' doctrine applies *only* when the transferor is *no longer viable and capable of being sued.*") (emphasis added).

Recognizing these sources of recovery, plaintiffs are seeking billions of dollars from the MLC GUC Trust. On December 22, 2016, plaintiffs told Judge Glenn they will seek: (i) "exclusive access" to the proceeds of the Avoidance Action Trust, (ii) clawbacks of billions of dollars in past distributions, (iii) recovery on a priority basis of the hundreds of millions of dollars now in the MLC GUC Trust, and (iv) to trigger New GM's alleged obligation under the accordion feature in the Sale Agreement. (Ex. B, ¶¶ 13, 55 (plaintiffs' late-claims motion: "A remedy for the Plaintiffs may be fashioned, even without upsetting distributions already made.")) Plaintiffs' claim to billions of dollars of MLC GUC Trust assets (including assets now in the MLC GUC Trust and assets from the term loan litigation) further undermines any argument that the MLC GUC Trust is "no longer viable and capable of being sued." *Foster,* 460 Mich. at 705.

### D. Plaintiffs Strategically Chose Not To Preserve GUC Trust Assets.

Under *Charlton*, even if plaintiffs recover "nothing," their pursuit of claims against the MLC GUC Trust provides a further reason to grant summary judgment for New GM. *C.T. Charlton*, 541 F. App'x at 554 n.2. But even if the *amount* of recovery mattered (and it does not matter, *see* Section II.B), and even if the MLC GUC Trust was non-"*viable*" (and it is viable, *see* Section II.C), plaintiffs have themselves to blame for not preserving MLC GUC Trust assets. Plaintiffs admitted that, after the recalls were announced, they chose for strategic reasons not to seek a stay of MLC GUC Trust distributions. (Ex. 64 to New GM Reply, 2/17/15 Hrg. at 112) (plaintiffs' counsel: "[Y]es[,] there was a strategic element to the decision that was taken on our side [not to block the GUC Trust distributions].") The MLC GUC Trust distributed approximately $486 million after the first recall, corresponding to approximately $1.6 billion in claim dollars. (Ex. C, Bankr. ECF. 13873 at 5-7; New GM Memo. n.6 (explaining relationship between distributions and claim dollars)). Plaintiffs' strategic election to delay seeking available remedies from the MLC GUC Trust further precludes their successor liability claims.[9]

### E. Any Speculation That Plaintiffs Would Have Obtained A Greater Recovery But For Old GM's Conduct Is Legally Irrelevant In All States.

Plaintiffs may speculate that, even if their late-claims motion is granted, they would have recovered more if "Old GM"[10] had not prevented them from filing proofs of claim in 2009. (Pls.

---

[9] *See LaFountain v. Webb*, 951 F.2d 544, 547 (3d Cir. 1991) (no successor liability where "claimant had a potential remedy against the original manufacturer, but failed to exercise all available means to assert his or her claim").

[10] Plaintiffs do not base their successor liability claims on any alleged misconduct by New GM. (Pls. Opp. at 2, 6).

## KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
April 18, 2017
Page 10

Opp. at 6 ("Old GM's failure prevented Plaintiffs from filing timely proofs of claims against Old GM in the bankruptcy.").) But as the unrebutted affidavits submitted with New GM's motion demonstrate (irrespective of the Sale Order), and as plaintiffs (who concede they bear the burden of proving exceptions to the general rule of asset purchaser non-liability) do not dispute, *but for the Sale* Old GM would have liquidated and plaintiffs would have recovered nothing in an Old GM bankruptcy. And plaintiffs cite no authority holding that they may pursue a successor liability claim not because the Sale *deprived* them of a recovery but instead simply due to a belief that the Sale should have provided them an *even greater* recovery. While plaintiffs' factually unsupported theory may be relevant to other claims, it is not relevant to establishing successor liability against New GM. Instead, successor liability arises from transactions that *deprive* creditors of recoveries that would have been available to them *but for* the transaction. *See* Restatement (Third) of Torts § 12 cmt. b (successor liability plaintiffs have "no legitimate claim that the transfer should increase those chances [of recovery] over what they would have been *if no transfer had occurred*") (emphasis added)[11]; *Santa Maria v. Owens-Illinois*, 808 F.2d 848, 859 (1st Cir. 1986) (even under continuity of enterprise exception, "it is *crystal clear* that [under *Turner*] it is absolutely essential for the broader exception to the rule of nonliability in products liability cases to come to bear that the injured plaintiff must have been deprived *by the asset transaction* of an effective remedy") (emphasis partly in original). Thus, regardless of whether the late claims motion is granted, the Court should grant New GM summary judgment.[12]

In sum, the successor liability doctrine is designed to protect creditors from transactions that deprive them of recoveries they would have had from the seller. It is undisputed that the Sale transaction did not make plaintiffs *worse* off than they would have been but for that transaction, and this fact alone requires summary judgment for New GM. An order permitting late claims against the MLC GUC Trust (with its substantial assets) would make plaintiffs *better* off than they would have been in an Old GM bankruptcy without the Sale, and that is a further reason to grant New GM summary judgment.

---

[11] *See also* Restatement (Third) of Torts § 12, cmt. b (exceptions (a)-(d), including mere continuation and de facto merger exceptions, do not create risk that the "transfer may give tort plaintiffs a windfall at the expense of companies that engage in asset transfers").

[12] Regardless of whether plaintiffs are permitted to file late claims, summary judgment should be granted for multiple additional reasons, including but not limited to: (1) the rationale for the mere continuation and de facto merger exceptions is to prevent "sham" transactions, California Practice Guide (Rutter Group): Corporations Ch. 8-D, Section § 8.656 (Feb. 2017 Revision) (section titled "Purchaser as 'mere continuation' of seller ('sham sale')"); *accord* Restatement (Third) of Torts § 12, cmt. b (discussing mere continuation and de facto merger: "If mere changes in form were allowed to control substance, corporations intending to continue operations could periodically wash themselves clean of potential liability at practically zero cost, in sham transactions"); (2) the $90 billion in consideration provided by New GM was adequate and has resulted in $32 billion in allowed creditor distributions to date; and (3) there was no continuity of shareholders.

# KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
April 18, 2017
Page 11

                                            Respectfully submitted,

                                            /s/ Richard C. Godfrey, P.C.
                                            /s/ Andrew B. Bloomer, P.C.

                                            *Counsel for Defendant General Motors LLC*

cc:       MDL Counsel of Record