UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | . | Case No. 09-50026-mg |
| IN RE: | . | Chapter 11 |
| | . | |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| et al., f/k/a GENERAL | . | |
| MOTORS CORP., et al, | . | One Bowling Green |
| | . | New York, NY 10004 |
| Debtors. | . | |
| | . | Thursday, April 20, 2017 |
| . . . . . . . . . . . . . . | . | 9:03 a.m. |

TRANSCRIPT OF HEARING RE: ORDER TO SHOW CAUSE
CC: DOC. NO. 13857, 13859, 13861,
13864, 13865, 13866, 13888, 13889)
**BEFORE THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

| | |
|---|---|
| For the Debtor: | King & Spalding LLP |
| | By:  ARTHUR STEINBERG, ESQ. |
| | SCOTT DAVIDSON, ESQ. |
| | 1185 Avenue of the Americas |
| | New York, New York 10036-4003 |
| | (212) 556-2158 |
| | |
| For the Ignition Switch | Brown Rudnick LLP |
| plaintiffs and certain | By:  HOWARD S. STEEL, ESQ. |
| non-Ignition Switch | 7 Times Square |
| plaintiffs: | New York, New York 10036 |
| | (212) 209-4917 |
| | |
| For Personal Injury | |
| Accident Plaintiffs: | Goodwin Procter LLP |
| | By:  WILLIAM P. WEINTRAUB, ESQ. |
| | The New York Times Building |
| | 620 Eighth Avenue |
| | New York, NY 10018-1405 |
| | (212) 813-8839 |

APPEARANCES CONTINUED.

| | |
|---|---|
| Audio Operator: | Michelle Brown, ECRO |
| | |
| Transcription Company: | Access Transcripts, LLC |
| | 517 Dell Road |
| | Landing, NJ 07850 |
| | (855) 873-2223 |
| | www.accesstranscripts.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (Continued):

For Participating
Unit Holders:                Akin Gump Strauss Hauer & Feld LLP
                             By:  DANIEL GOLDEN, ESQ.
                                  NAOMI MOSS, ESQ.
                             One Bryant Park
                             New York, NY 10036-6745
                             (212) 872-1000

For Bledsoe Plaintiffs:      GARY PELLER, ESQ.
                             600 New Jersey Avenue, NW
                             Washington, DC 20001
                             (202) 662-9122

For the Estate of
Kathleen Pillars,
Deceased:                    The Mastromarco Firm
                             By:  RUSSELL C. BABCOCK, ESQ.
                             1025 N. Michigan Ave.
                             Saginaw, MI 48602
                             (989) 752-1414

For Pilgrim Plaintiffs:      Klestadt & Winters, LLP
                             By:  BRENDAN M. SCOTT, ESQ.
                             200 West 41st Street, 17th Floor
                             New York, NY 10036-7203
                             (212) 972-3000

For the Ad Hoc Committee
of Asbestos Personal
Injury Claimants:            Stutzman, Bromberg, Esserman
                               & Plifka, P.C.
                             By:  SANDER L. ESSERMAN, ESQ.
                             2323 Bryan St., Ste. 2200
                             Dallas, TX 75201
                             (214) 969-4900

For Bernard Pitterman:       Adelman Hirsch & Connors LLP
                             By:  JORAM HIRSCH, ESQ.
                             1000 Lafayette Blvd.
                             Bridgeport, CT 06604
                             (203) 331-8888

TELEPHONIC APPEARANCES:

For Plaintiff                Ledford Law Firm PLLC
Christopher Pope:            By:  KRIS T. LEDFORD, ESQ.
                             Heritage Professional Plaza
                             425 E. 22nd Street, Suite 101
                             Owasso, OK 74055
                             (918) 376-4610

3

1   (Proceedings commence at 9:03 a.m.)

2     THE CLERK:  All rise.

3     THE COURT:  All right.  Please be seated.  We're here

4 in Motors Liquidation Company, 09-50026.  Good morning

5 everyone.

6     COUNSEL:  Good morning.

7     THE COURT:  So we're here on the 2016 threshold

8 issues.  Before we begin the argument, one of the things I

9 would like to make sure that I learn by the end of your

10 argument today is whether any of the 2016 threshold issues are

11 involved in any of the cases set for trial in state or federal

12 courts, let me say, in the next six or eight months or so.  I

13 think what Judge Furman has, what, his next trial I think is in

14 July if I'm not mistaken.

15     MR. STEINBERG:  That's correct, Your Honor.

16     THE COURT:  And I don't know whether -- I have no

17 idea what cases are scheduled for trial in state courts, and I

18 don't know what's backed up behind the first July trial before

19 Judge Furman.  So, I mean, it's possible, because of just the

20 number of things that I have backed up, that not all of the

21 threshold issues will be addressed in a single decision.

22     I don't know yet, but I just -- what I'm -- what I

23 want to get is a sense of if there is relative priorities among

24 the threshold issues and what that is, and I will listen to the

25 parties about that, but we don't actually have to get to that

4

1 right now.  I just want to make sure --

2         MR. STEINBERG:  I was going to say, Your Honor, to

3 cut the suspense, I don't personally know with respect to the

4 many people that are involved on the plaintiffs' side whether

5 things are imminently set or not.  I would have to report back

6 to the Court after the hearing.  I can tell the Court that I

7 think a motion to enforce was filed last week with respect to

8 something that's going to trial in July, and that lawyer

9 contacted my office.  So I may be appearing later next -- or I

10 guess early next month for that plaintiff, and that seems to

11 have a trial set.

12         THE COURT:  All right.  Thanks.  Thanks for the

13 information.

14         Okay.  Let's begin.  Mr. Steinberg, I -- yeah.  I

15 want to hear from New GM first.

16         MR. STEINBERG:  Thank you, Your Honor.  Your Honor,

17 we have a book that -- of basically pleadings that have been

18 filed that we thought it might be easier for me to refer to.

19 It may be just another piece of paper.

20         THE COURT:  Sure.

21         MR. STEINBERG:  We've given it out to the plaintiffs'

22 counsel table as well, too, but --

23         THE COURT:  That's fine.

24         MR. STEINBERG:  -- if Mr. Davidson could hand it up,

25 and I think we at least have --

1           THE COURT:  I'll add it to the binder that I already

2   have that has the pleadings for this morning.

3           MR. STEINBERG:  And, Your Honor --

4           THE COURT:  This is separate from what's in the big

5   binder that your office delivered?

6           MR. STEINBERG:  It is a subset of it.

7           THE COURT:  Because that has pleadings --

8           MR. STEINBERG:  Yeah.  I mean, it has the December

9   judgment, it has the decisions, and I will be referring to some

10  of that in my presentation.  So I thought it would be helpful

11  just to have it easier contained in one book.

12          Your Honor, if I can go out of order, most of the

13  briefing has been done with respect to issue number two.  So

14  I'd like to be able to start with that one, which is

15  essentially whether the non-ignition switch plaintiffs and the

16  non-ignition switch post-closing accident plaintiffs can plead

17  independent claims in light of the bankruptcy court's December

18  2015 judgment, and our argument that it is res judicata to

19  them.  And on tab nine, just so it's easy for you to see, it

20  is --

21          THE COURT:  In the binder or the --

22          MR. STEINBERG:  In the binder that we just handed

23  out.

24          THE COURT:  Yes.

25          MR. STEINBERG:  Tab nine is the December judgment,

6

1  and we believe that Judge Gerber actually decided this issue in

2  paragraph 14 of the judgment where he says:

3        "Plaintiffs of two types:  One, plaintiffs whose

4        claims arose in connection with vehicles without the

5        ignition-switch defect," which are the two sets of

6        plaintiffs that I've described, "and pre-closing

7        accident plaintiffs are not entitled to assert

8        independent claims against New GM with respect to

9        vehicles manufactured and first sold by Old GM, and

10       that to the extent such plaintiffs have attempted to

11       assert an independent claim against New GM in a

12       preexisting lawsuit with respect to an Old GM

13       vehicle, such claims are proscribed by the sale

14       order, the April decision, and the June judgment."

15       And so really a large part of the briefing in this

16 case is focused on the issue of whether the Second Circuit

17 ruling, which was reviewing a different judgment, and as I will

18 present to Your Honor, different topics, whether the Second

19 Circuit ruling affected, either through the wipe-out doctrine

20 or other types of formulations, affected --

21       THE COURT:  The mandate doctrine?

22       MR. STEINBERG:  -- the mandate doctrine affected

23 Judge Gerber's ruling.  And the significance about Judge

24 Gerber's December ruling is that it was not appealed with

25 respect to issue of paragraph 14.

7

1      We also think that it is relevant to the fourth

2  threshold issue because in paragraph six of the December

3  judgment, he decided specifically that New GM will not be

4  responsible for punitive damages, whether because they assumed

5  them or because of anything related to Old GM conduct.

6      And we believe that that ruling, anything related to

7  Old GM conduct pursuant to operation of law, which is another

8  phrase in paragraph six, essentially answers the fourth

9  question because successor liability is based on Old GM conduct

10  based on the common law.  And that when Judge Gerber decided

11  you can't get punitive damages on Old GM conduct, he

12  essentially said you can't do it on a successor liability

13  theory.

14      So I'll talk about threshold four in more detail

15  later, but I wanted to point out that we believe that a good

16  chunk of the 2016 threshold issues, where a large part of the

17  briefing has actually taken place, was decided by that

18  judgment, and our view is that res judicata applies.  And Judge

19  Gerber spent a lot of time getting to the December judgment.

20  The December judgment reflects essentially five months of

21  activity where he wrote a comprehensive decision in November.

22      He handled both sides giving competing judgments,

23  which is also contained in the binder book, and I'll be talking

24  about how both sides tried to present to the judge what it

25  thought the judgment should be based on his November decision.

8

1  And then he rendered a thorough judgment, and then they didn't

2  appeal the December judgment except for one ruling, the ruling

3  that they objected -- that they appealed to, and they appealed

4  that ruling to Judge Furman, not to Judge --

5          THE COURT:  Not (indiscernible) because he hasn't

6  decided that.

7          MR. STEINBERG:  That's correct.  Is whether New GM is

8  responsible for their failure to timely file proofs of claim in

9  the bankruptcy case.  There was one paragraph in the December

10 judgment that dealt with that.  That was the only issue that

11 they appealed, and therefore res judicata applies to all other

12 rulings in that December judgment.  Now --

13         THE COURT:  One question I have, you don't have to

14 deal with it immediately, but the plaintiffs' joint brief

15 raises the issue as to whether procedurally who was made a

16 party to the proceedings.

17         MR. STEINBERG:  I will be able to deal with that.

18         THE COURT:  Okay.

19         MR. STEINBERG:  I just want to get this --

20         THE COURT:  Because you would, I guess --

21         MR. STEINBERG:  I would agree that --

22         THE COURT:  It would have to follow that if someone

23 is not a party, they're not bound by res judicata.

24         MR. STEINBERG:  Right.  It could be stare decisis, it

25 could be precedential value, but it wouldn't be res judicata.

9

1    I agree with that.  I agree with that.

2              THE COURT:  Okay.

3              MR. STEINBERG:  And it could be the law of the case

4    doctrine as well, too.

5              THE COURT:  Yes.

6              MR. STEINBERG:  But it's not res judicata.  Their

7    appeal to Judge Furman for this singular issue had three

8    relevant points to this issue.  One, the fact that they

9    appealed the December judgment as of right meant that it was a

10   final order that was subject to appeal.  So the issue of

11   interlocutory wasn't there.  No one asked anybody to certify

12   the appeal on an interlocutory basis, which I find the thing --

13             THE COURT:  What is the status of -- I mean, is it

14   fully briefed and --

15             MR. STEINBERG:  Yes.

16             THE COURT:  -- has there been argument?

17             MR. STEINBERG:  I don't know if Judge Furman

18   necessarily hears argument as compared to just renders a

19   decision.

20             THE COURT:  All right.

21             MR. STEINBERG:  But it hasn't been scheduled to

22   provide it.

23             THE COURT:  Okay.

24             MR. STEINBERG:  And I -- the second point is that

25   they appealed one issue.  They didn't appeal anything else

1 related to this judgment, and therefore this was not an

2 oversight.  This was a specific strategic decision.  Now, I

3 can't speak as to why they made this strategic decision, but I

4 do know that if you have an array of ten issues to appeal and

5 you appeal only one, then you've made a strategic decision to

6 only carry the burden of that one and leave the other nine as a

7 firm ruling.

8         And then the third thing is they chose to appeal this

9 to Judge Furman.  This appeal, this decision was rendered at

10 the time that we were briefing the issues to the Second

11 Circuit.  This could have been consolidated with the Second

12 Circuit and they could have --

13         THE COURT:  That's above my pay grade.

14         MR. STEINBERG:  I understand.  I understand.  We

15 don't think it should have been consolidated, but neither did

16 they, and the fact that it was appealed --

17         THE COURT:  I think the only thing you can say is

18 that nobody asked the Second Circuit to consolidate an appeal

19 from any issue in the December judgment.

20         MR. STEINBERG:  That's correct.  I think that's the

21 only takeaway.  No one asked to do that.  No one tried to link

22 the December judgment to whatever happened to the June judgment

23 so that the Second Circuit could --

24         THE COURT:  I don't draw any conclusion one way or

25 the other from it.  There is no right of appeal direct -- they

11

1  have to get permission --

2         MR. STEINBERG:  That's correct.  And no one --

3         THE COURT:  I don't draw any inferences from the --

4  you know, the fact that nobody tried to -- you could have done

5  it, too.

6         MR. STEINBERG:  I could have, yes.  I didn't think it

7  was appropriate to do that because I do think -- and the

8  argument I'm trying to make is that it's indicative of the

9  separateness of the December judgment from the June judgment

10 and why the Second Circuit ruling didn't affect the December

11 judgment.  That's the only thing --

12        THE COURT:  Right.

13        MR. STEINBERG:  -- I'm trying to make on that point.

14 The issue, the designated counsel's position is that the Second

15 Circuit opinion, which should review the June judgment,

16 effectively wiped out the later bankruptcy court judgment never

17 presented to the Second Circuit for review, which is the

18 December judgment, and we don't believe that withstands

19 scrutiny.  And we think to best understand why, you need to

20 understand what Judge Gerber lived through in the procedures

21 leading to the June judgment and the procedures leading to the

22 December judgment, which will illustrate the separateness of

23 the two proceedings.

24        The June 2015 judgment decided the 2014 threshold

25 issues.  The one threshold issue that was not extensively

12

1  discussed by Judge Gerber in his lengthy opinion that he issued

2  in April 2015 was the third threshold issue.  The third

3  threshold issue, which was called the Old GM claim threshold

4  issue, was whether any of the claims asserted in the litigation

5  against New GM are in reality claims against the Old GM

6  bankruptcy estate.

7       In tab one, just so you have it as your reference,

8  his total analysis relating to the third threshold issue is on

9  pages 83 to 84.  So he did -- he only gave it a short shrift,

10  and he essentially didn't do the granular analysis that we had

11  all briefed, which was whether specific claims --

12       THE COURT:  Do you have that -- what page am I --

13       MR. STEINBERG:  Pages 83 to 84 on tab one.

14       THE COURT:  Let me look through this.  Point me to

15  the -- which -- I'm at page 83.  Which -- what am I supposed to

16  look at here?  Just point me out the language, okay?  I want to

17  be sure and follow.

18       MR. STEINBERG:  Do you have it?

19       THE COURT:  I've opened the binder to tab one,

20  page 83.

21       MR. STEINBERG:  I hope I gave the reference.  It's

22  the second column, Roman III, where it says "assumed

23  liabilities."

24       THE COURT:  Yes.  Okay.  And this is the language

25  you're --

13

 1          MR. STEINBERG:  Yes.

 2          THE COURT:  -- the operative language?

 3          MR. STEINBERG:  And then if you turn the page, you

 4  get to Roman IV, "equitable moots."

 5          THE COURT:  Yes.

 6          MR. STEINBERG:  So his total analysis for the third

 7  threshold issue comes under that paragraph of "assumed

 8  liabilities."

 9          THE COURT:  You don't have to write 20 pages to

10  resolve an issue sometimes, but --

11          MR. STEINBERG:  I agree with that, but the issue that

12  people were briefing was whether specific claims that had been

13  pled were assumed liabilities or retained liabilities.  And all

14  I want to illustrate by this is that, in the context of

15  resolving the 2014 threshold issues, he didn't do that granular

16  analysis.  He decided it in a different way.

17          THE COURT:  But he decided it?

18          MR. STEINBERG:  He decided it in a different way.  He

19  decided the threshold issues that he was going to enforce the

20  no successor liability rule, and he said that the parties

21  didn't seem to disagree about very much, and therefore that was

22  fine.  And what I will illustrate later on is that he had to

23  come back to the Old GM claim threshold issue in connection

24  with the December judgment because he hadn't fully in effect

25  plugged the holes of his analysis because, as things developed,

14

1  as issues developed, he saw that there were more things that he

2  had to deal with in his gatekeeper function in dealing with

3  issues relating to the 363 sale.

4        So the only thing I'm trying to illustrate here is

5  that it was a relatively macro analysis to deal with --

6        THE COURT:  Okay.  But just tell me what do you --

7        MR. STEINBERG:  -- an issue.

8        THE COURT:  -- believe -- I don't want to be dense.

9  What do you believe the takeaway is of Judge Gerber's ruling on

10 this 2014 threshold issue?  You know --

11       MR. STEINBERG:  I think he ruled that he was going to

12 enforce the no successor liability finding.  So then most of

13 the arguments that we had made that what the plaintiffs were

14 asserting were retained liabilities, he was accepting that and

15 said that there really wasn't an issue.  You have to

16 understand, Your Honor, and I apologize in the way that this is

17 coming out because it -- there's three years' worth of history

18 and I'm trying to give it to you in a logical order.  At the

19 time that Judge Gerber was hearing this thing, the extant

20 complaint that was filed in the MDL were two complaints.

21       There was something called the presale consolidated

22 complaint and the post-sale consolidated complaint.  The -- my

23 view -- I can't speak for them -- as I interpret it to be is

24 that they set it up as two complaints, because the first one,

25 the presale, was embedded with bankruptcy issues.  They were

15

1  basically asserting successor liability claims.  They were

2  saying that the New GM is responsible for everything that Old

3  GM had, and that once Judge Gerber decided that he was going to

4  enforce the no successor liability ruling, he effectively had

5  gotten rid of the presale consolidated complaint, and what was

6  left in the post-sale consolidated complaint were the vehicles

7  that New GM had sold after the 363 sale.

8          That's the way I think he thought he was dealing with

9  the issue, and as I explained, it got more complicated after

10 the judgment was issued, and that led to proceedings that

11 emanated to the December judgment.

12         And I go through this, Your Honor, just again to try

13 to explain to you why what was before the Second Circuit and

14 the June judgment was not the same thing, and not the same

15 issues that Judge Gerber was tackling in the proceedings that

16 led to the December judgment.  So you have the -- Judge Gerber

17 deciding the third threshold issue in sort of a narrow way, and

18 then he wrote his decision, and in his decision he introduced

19 the term "independent claim."

20         Now, the term "independent claim" is not in the sale

21 order.  It's not in the sale agreement.  It's a term that Judge

22 Gerber used to effectuate a remedy that he had in connection

23 with a due process violation that he had found in connection

24 with notice to the ignition switch plaintiffs and to the

25 presale ignition switch plaintiffs.  It wasn't something that

16

1  New GM was arguing that they shouldn't have a responsibility

2  for.  It was something that was just thrown out.

3          At the oral argument, Judge Gerber had asked me

4  whether there were post-sale acts that New GM committed that it

5  would be responsible for notwithstanding the sale agreement,

6  and I said yes, and I gave two examples at the oral argument.

7  One was certified pre-owned vehicles, that if a vehicle was

8  sold, an Old GM vehicle was sold after the sale and that it

9  contained a New GM warranty, certified pre-owned, that New GM

10 was standing behind that warranty and wasn't looking to use the

11 sale order as a basis to avoid that.

12         The second example that I gave was that on one of the

13 ignition switch defect recalls, there was an issue as to

14 whether an Old GM vehicle which had a good ignition switch

15 after the sale had been repaired using an old part that was

16 potentially defective, and no one knew which was the part.  So

17 there was a recall called for that, and we said that if we were

18 responsible for that action --

19         THE COURT:  You put a defective part in the car --

20         MR. STEINBERG:  Yeah.  Because --

21         THE COURT:  -- when you repaired it?

22         MR. STEINBERG:  -- we had a good car with a good part

23 and we put a bad part in it.  If we were the one responsible

24 for that, we weren't looking for the sale order to avoid

25 responsibility for that.

17

1           And I go through that, Your Honor, just so you

2    understand that it's never been New GM's position that it was

3    not responsible for viable and valid what the Second Circuit or

4    Judge Gerber has defined as independent claims.

5           Our argument, which was embedded into that third

6    threshold issue, was whether what was being asserted against

7    New GM was really a retained liability, was a dressed-up

8    successor liability claim, and that's what we were asking him

9    to enforce the sale order on, and that's what specifically

10   paragraph 71 of the sale order says.  It says that the

11   bankruptcy court retains its exclusive jurisdiction to ensure

12   that New GM will not be in effect sued for retained

13   liabilities.  And so that's what we had teed up the third

14   threshold --

15          THE COURT:  Yeah.  I know you -- in your briefs, on

16   at least the 2016 threshold issues, you argue that the

17   bankruptcy court should keep its --

18          MR. STEINBERG:  That's correct.

19          THE COURT:  -- gatekeeper role, and frankly, when I

20   read the plaintiffs' joint opening brief, they don't seem to

21   disagree with you about it.  I think at one point early on in

22   the brief, they seem to recognize that the bankruptcy court

23   does have a gatekeeping role with respect to determining

24   whether the pleading basically tries through the backdoor to

25   bring in Old GM conduct.  That will address that.

18

1          I don't -- but, I mean, I saw that.  It may not be

2  entirely consistent throughout the -- but early in the -- they

3  seemed to acknowledge the valid gatekeeping role of a

4  bankruptcy judge that's enforcing a sale order in making sure

5  they haven't stuck in allegations (indiscernible) did that

6  before.

7          I think Judge Bernstein still does that with respect

8  to Chrysler.  It doesn't come up as often, but as I understand

9  it, that gatekeeping function has arisen in Judge Bernstein, he

10 used to do that.

11         MR. STEINBERG:  So I'm sure they're going to -- they

12 will say whatever they have to say, and I have a part of my

13 presentation which does talk about the importance of keeping

14 the gatekeeping function and trying to explain --

15         THE COURT:  I'm thrilled.

16         MR. STEINBERG:  Well --

17         THE COURT:  Go ahead.  I'm teasing.

18         MR. STEINBERG:  Your Honor, the second thing that the

19 Second -- the June judgment did not decide and that the Second

20 Circuit therefore did not deal with was the rights of non-

21 ignition switch plaintiffs and non-ignition switch pre-closing

22 accident plaintiffs in a very general way.  The -- there were

23 three motions to enforce that New GM filed in 2014.  The first

24 one was addressed to the ignition switch defect issue, which

25 was the February and March 2014 recalls.

19

1           The second and third ones were filed on the same day.

2   The second one was a pre-closing accident plaintiff motion to

3   enforce, and that was filed on August 1, 2014.  And part of the

4   reason which Judge Gerber understood was that between the

5   announcement of these recalls and the time that we filed this

6   motion to enforce, we had instituted a program that was

7   administered through Ken Feinberg to try to pay the ignition

8   switch presale accident to whatever he determined was

9   appropriate to pay under the guidelines that he set, and we

10  wanted that program to roll out.

11          And most of -- many, I won't say -- many of the

12  presale accident ignition switch defect cases were resolved by

13  the Feinberg program, that which had not been resolved on the

14  presale ignition switch side and on the post-sale -- I'm sorry,

15  the presale non-ignition switch side were contained in that

16  August 1 motion to enforce.  We also filed --

17          THE COURT:  Let me ask you this.  I see that Judge

18  Gerber at -- in more than one place deferred consideration or

19  ruling on issues concerning non-ignition switch plaintiffs.  Do

20  you agree with that?

21          MR. STEINBERG:  I agree with that, yes, in the --

22  leading up to the June judgment.

23          THE COURT:  And in which opinion or judgments, in

24  your view, does Judge Gerber decide rather than defer issues

25  concerning the non-ignition switch plaintiffs?

20

1          MR. STEINBERG:  The November decision and the

2    December judgment, and that's the point that I'm trying to

3    illustrate, which is that he deferred it in the June

4    judgment --

5          THE COURT:  Yes.

6          MR. STEINBERG:  -- and he definitively decided issues

7    in the November/December judgment.  And I'll go through what he

8    definitively decided there which was not decided in the June

9    judgment, and therefore it was not implicated by the Second

10   Circuit decision.

11         THE COURT:  And other than Mr. Peller, who

12   represented non-ignition switch plaintiffs in connection with

13   the November/December proceedings?

14         MR. STEINBERG:  On the economic loss side?

15         THE COURT:  Yes.

16         MR. STEINBERG:  The Brown Rudnick firm and the -- and

17   Mr. Esserman's firm.

18         THE COURT:  Okay.

19         MR. STEINBERG:  They were the designated counsel in

20   the bankruptcy court to handle the economic loss cases, and all

21   of the pleadings were filed by lead counsel in the MDL, and so

22   the Hagens Berman firm and the Lieff Cabraser firm also would

23   have been in effect through them and directly were

24   participating in the --

25         THE COURT:  I'm sorry.  Go ahead.

21

1              MR. STEINBERG:  -- in those proceedings.  On the

2    post-closing accident side, just to round out the picture, I

3    think Mr. Weintraub's firm represented the ignition switch

4    post-closing accident plaintiffs, and we had separately noticed

5    out some I think 220 -- we had sent out 220 notices to

6    plaintiffs in the state and federal court to make them aware of

7    the September proceedings and to say that issues were going to

8    be resolved.

9              And in that September 2015 scheduling order that

10   Judge Gerber signed, he specifically authorized a letter that

11   went out to -- with the scheduling order to each of those 220

12   people.  That letter was approved as to form by the active

13   counsel participating in the bankruptcy case on the plaintiffs'

14   side.

15             THE COURT:  Is the letter sufficient?

16             MR. STEINBERG:  The -- what --

17             THE COURT:  Is a letter sufficient to bring in and

18   bind plaintiffs around the country who had not previously

19   appeared?

20             MR. STEINBERG:  It is, Your Honor.  If a letter

21   specifically says that this is the -- a letter that was

22   expressly authorized by the bankruptcy court to be issued in

23   connection with that, and it is the same procedure that we've

24   effectively used here in connection with these 2016 threshold

25   issues, and if the issue is whether you needed to have a motion

22

1  to enforce as compared to separately do these procedures, well,

2  this was the procedures that Judge Gerber evolved based on his

3  August case management order and what he ultimately ruled in

4  his September thing, and the goal and intention was to bind

5  everybody who was going to get notice of this thing, and I

6  think that that's what happened.

7       THE COURT:  But --

8       MR. STEINBERG:  And certainly, if someone wanted to

9  argue that this was not effective notice and I shouldn't be

10 bound, they were aware of the ruling and they could have

11 appealed to make sure that they would not be bound; otherwise,

12 they take that risk.

13      So, Your Honor, the second thing, just to sort of

14 summarize, was the rights of the non-ignition switch plaintiffs

15 which were generally not decided by the June judgment and

16 definitively decided by the December judgment.

17      And I'd like to just quickly tick off the events

18 since the June judgment that shows the development of what

19 happened to get to the November decision and the December

20 judgment.  For the most part, after the June judgment, the

21 pending lawsuits were not dismissed.  They were a stay.  Most

22 people agreed to a stay.

23      Designated counsel took a direct appeal of the June

24 judgment to the Second Circuit, and except for the plaintiffs

25 represented by Mr. Peller, non-ignition switch plaintiffs did

23

not appeal the June 2015 judgment to the Second Circuit, and

it's our position that they didn't have to because nothing was

decided by the June judgment that would have affected their

rights.  Mr. Peller made his own decision, but he was always

operating on his own separate track with his own pleadings, and

he made his own litigation decision to appeal.

         The designated counsel in response to the June

judgment modified its complaint in the MDL.  In June of 2015,

instead of having a presale complaint and a post-sale

complaint, they consolidated it into what they called the

second amended consolidated complaint.  But what they did was

that, instead of getting rid of all the Old GM purchasers that

bought before the sale, they just moved them into their second

amended consolidated complaint so that there was 62 people that

were originally named in their presale consolidated complaint,

and they were merged into the second amended consolidated

complaint.

         Now, when they did that, you can imagine we squawked.

We said, you're violating Judge Gerber's judgment.  Their

response was, you know what, we're filing a no strike pleading

in accordance with the June judgment to say why we're not bound

pursuant to our new second amended complaint, and we're not

going to let -- we don't want Judge Gerber to decide these

issues.  We're moving to withdraw the reference to Judge

Furman.

24

1          So we had a withdrawal of the reference proceeding,

2   and ultimately Judge Furman ruled that Judge Gerber should

3   handle these issues in the first moment.  So when Judge Gerber

4   got these issues back after Judge Furman had denied the motion

5   to withdraw the reference, he realized that he had to deal with

6   the second amended consolidated complaint and our argument that

7   this was still violative of what he had just ruled in the June

8   judgment.

9          We asked -- we were essentially asking him to do the

10  granular process of looking at the claims that were done, and

11  when you look at tab three of the book that we gave you, that's

12  his case management order, and when -- the case management

13  order has a few things that I want to point out to Your Honor.

14          On page two in paragraph C, Judge Gerber is asking

15  the active parties in this litigation how long it would take

16  for New GM to submit to the Court marked pleadings with respect

17  to each complaint as to which it has concerns, e.g., but not

18  totally, the second amended consolidated complaint, which

19  marked pleadings should show the particular individual

20  paragraphs to which New GM objects, and shorthand descriptions

21  of the grounds for objection.

22          And then just to round out because I've --

23          THE COURT:  Does this case management order deal with

24  non-ignition switch plaintiffs?

25          MR. STEINBERG:  It includes everything.

1          THE COURT:  Where is it, because this paragraph C,

2   e.g., the ignition switch plaintiffs' second amended

3   consolidated complaint --

4          MR. STEINBERG:  The second amended consolidated

5   complaint included non-ignition switch plaintiffs by itself.

6   So that was his way of shorthanding the second amended

7   consolidated complaint.  It is over 1,000 pages, and it

8   includes plaintiffs that are non-ignition switch plaintiffs as

9   economic loss as well as ignition switch economic loss.  He

10  also said as to which it has concern uses e.g., meaning that

11  that's an example.  He wanted us, and you will see later on, to

12  file marked pleadings for everything that we had a concern

13  with.

14          And then he says in paragraph E:

15          "Any alternative suggestions as to the best means for

16          this Court to provide the MDL court and other courts

17          with rulings of the level of specificity they might

18          need vis-à-vis issues yet to be decided by this

19          Court."

20          He wanted to get the parties' views on that.  And

21  then in paragraph G:

22          "Any other matters that need to be addressed by the

23          Court."

24          And then, in paragraph two, which is on page three of

25  this, he says:

26

1        "The Court is in particular need of information with

2        respect to the non-ignition switch plaintiffs'

3        claims, whether for injury or death or economic

4        loss."

5        So here he's now saying I want post-closing accident

6  as well as pre-closing accident, and pending and future matters

7  affecting them, but so long as such claims are satisfactorily

8  covered by the letters that come, they can be addressed in

9  connection therewith.

10        So Judge Gerber had basically said, all right, I see

11  I have to do a more particular analysis.  I thought I had ruled

12  on it better, but you're fighting over the second amended

13  consolidated complaint as to what I ruled, and therefore I have

14  to now decide these issues.  And so in response to that case

15  management order, there was a hearing the judge had.

16        THE COURT:  Who did that get served on?

17        MR. STEINBERG:  The case management order?

18        THE COURT:  Yes.

19        MR. STEINBERG:  I think it was probably the people

20  sitting at this table, the people that actively dealt with

21  this.  I don't -- it was entered on the docket, so anybody who

22  was following the proceedings would get it on the docket, but I

23  don't think the case management order was necessarily served on

24  everybody.

25        THE COURT:  All right.

27

1          MR. STEINBERG:  The scheduling order that was

2    ultimately entered, I was directed to serve the body, and

3    that's what went to everybody.  So this was his saying to the

4    active players, I need to now do something to get a handle on

5    the remaining part of the proceedings that I hadn't decided in

6    connection with the June judgment.

7          And so at that status conference, which I think was

8    on August 31st, designated counsel said "We perceive" -- and

9    this is I think the Brown Rudnick firm, "We perceive ourselves

10   as having taken the mantle of preserving and protecting the

11   rights of non-ignition switch plaintiffs in this court."

12         THE COURT:  It's always very nice when a lawyer

13   stands up and says, well, I'll take care of this for everybody,

14   but it doesn't mean that everybody's -- you know, has --

15         MR. STEINBERG:  No, no.

16         THE COURT:  -- agreed that they're my counsel.

17         MR. STEINBERG:  No.  That's exactly correct, Your

18   Honor, but he was looking for someone to be the representative

19   counsel, and then if anybody wanted to in effect supplement, go

20   it on their own, he was giving them, through the scheduling

21   order that was entered in September, the right to do that on

22   their own.  And I will show you that in their pleadings, but he

23   was saying who is going to -- because when we litigated the

24   2014 threshold issues, we had designated counsel as well, too.

25   And basically the designated counsel in the bankruptcy court

28

here are the bankruptcy representatives of the lead counsel in

the MDL.  So the Brown Rudnick firm basically, as I said, is

Hagens Berman and Lieff Cabraser's lawyer, and Mr. Weintraub is

Bob Hilliard's lawyer.  And the lead counsel in the MDL have

responsibility to -- as lead counsel in an MDL proceeding, to

be the representative counsel for the economic loss claims and

for the presale and post-sale accident claims that are in the

MDL.

THE COURT:  Not to be over -- overly hyper-technical,

and I'm not sure whether it would be dispositive in any event,

but is there a notice of appearance of designated counsel

indicating who they represent, purporting to identify the

plaintiffs who they represent?

MR. STEINBERG:  Not that I've seen, but you can ask

them.  I've never -- I've not seen that.  I think --

THE COURT:  I worry sometimes about those kinds of

issues.  Now, it's all well and good for a lawyer to stand

up --

MR. STEINBERG:  It is --

THE COURT:  -- and say I will take care of these

issues, but --

MR. STEINBERG:  No, no.  Your Honor, that's a --

THE COURT:  -- the issue is who is bound by it.

MR. STEINBERG:  Yeah.  But the issue is, is that it

wasn't like we served them and didn't serve all of the other

29

1  active counsel.  The other active counsel got the same

2  pleadings, got the opportunity to brief an issue or rely on

3  what was being filed by these other people, and Judge Gerber,

4  and the same way that Your Honor has in connection with the

5  2016 threshold issues, you've given -- I've noticed out a whole

6  bunch of people.  I think I was more assiduous in the notice

7  this time.

8             THE COURT:  I hope it works.

9             MR. STEINBERG:  Yeah.  But that was the procedure

10  that we had done.  So, Judge, in response, besides saying that

11  they have a -- the mantle of the bankruptcy court reminded

12  people at that hearing that the non-ignition switch plaintiffs'

13  inability or inaction to have yet established a due process

14  violation was a concern to him.  And the designated counsel

15  responded, and this is -- again, this is Mr. Weisfelner at the

16  hearing, and he said that:

17             "To the extent that remains an issue, then in terms

18             of triaging things, it seems that we need to get this

19             issue teed up quickly."

20             So Judge Gerber, in his case management order and at

21  the conference, was saying this is the time that I'm going to

22  be resolving the non-ignition switch plaintiff issues, which I

23  had not decided in the June judgment, and I'm going to decide

24  everything.  And if you've got something to say, then let me

25  know.

1          And I think right around this time most people became

2     aware that there -- not only did we have a curfew of the

3     bellwether trial, the first ignition switch product liability

4     case starting in January before Judge Furman, but we also had

5     the curfew of Judge Gerber having announced that he was leaving

6     the bench, and therefore he was trying to wrap up as many of

7     his matters as possible so that he wouldn't leave it to his

8     successor.  And I know he had the best of intentions, but this

9     obviously has been carried forward to his successor.

10         So after the case management order, we entered

11    into -- we -- the parties presented, but the Court asked us to

12    work through what it had wanted, and we presented a scheduling

13    order, which is tab four of our book, and I just wanted to

14    point out some issues with regard to the scheduling order.  The

15    first is on page one, where he basically defines the punitive

16    damage issue that was going to be briefed, and it's -- they

17    request punitive special exemplary damages against New GM based

18    in any way on the conduct of Old GM.

19         So he wasn't looking at it strictly as whether this

20    was a punitive damage that was subject to an assumed liability.

21    This was a broader concern as to whether you can get punitive

22    damages on anything related to Old GM.

23         THE COURT:  Yeah.  And in your view, this covers both

24    ignition switch and non-ignition switch?

25         MR. STEINBERG:  It would cover every --

31

1          THE COURT:  Perfect.

2          MR. STEINBERG:  It covered the litigation docket that

3  was active at the time that was suing New GM for what we

4  believed were violations of the sale order.  He approved --

5          THE COURT:  And there have been motions to enforce

6  with respect to non-ignition switch plaintiffs before the --

7  before this, right?

8          MR. STEINBERG:  Right.  There was a -- on the

9  economic law side, that was only -- that was the thing that we

10 filed in August of 2014.  We had a rolling schedule, right, so

11 that we filed the lawsuits that existed as of August 1, 2014,

12 and we had the right to supplement the schedules for the new

13 lawsuits because they just seemed to continue.

14         THE COURT:  And, sir, is there something in any of

15 these scheduling orders that deals with non-ignition switch

16 post-closing act personal injury, wrongful death plaintiffs?

17         MR. STEINBERG:  The 2014 motions to enforce did not

18 deal --

19         THE COURT:  No, I know.

20         MR. STEINBERG:  -- with post-closing.

21         THE COURT:  I know.  That's my --

22         MR. STEINBERG:  So the only extant that dealt with

23 that leading to the December judgment is this --

24         THE COURT:  So is the plaintiffs' position --

25         MR. STEINBERG:  -- is this schedule.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1          THE COURT:  -- there is nothing that Judge Gerber

2   decided with respect to non -- I think this is their position,

3   but there's nothing he decided with respect to post-closing act

4   non-ignition switch plaintiffs?

5          MR. STEINBERG:  That could be their position.  That

6   could be a position.  It's obviously wrong.  I pointed out to

7   you paragraph 14.  If you look at the language of paragraph 14

8   of his judgment, it is based on post -- it is anybody without

9   the ignition switch defect, which meant he was deciding issues

10  on non-ignition switch --

11         THE COURT:  Right

12         MR. STEINBERG:  -- plaintiffs.  So he could say that.

13  And I have here the dueling letters that went in connection

14  with the ultimate entry of the December judgment, and it's

15  evident from those dueling letters that they knew exactly what

16  was going to be entailed in the December judgment, and it

17  included post-closing accident cases.

18         THE COURT:  Let me just -- did the briefing before

19  Judge Gerber that led to the December judgment specifically

20  address issues with respect to non-ignition switch post-closing

21  accident cases?

22         MR. STEINBERG:  Yes.  The punitive damage issue

23  mostly comes up in the context of did we assume the punitive

24  damages when we assumed the --

25         THE COURT:  And assessed the --

1           MR. STEINBERG:  -- liabilities.

2           THE COURT:  Assumption of liability --

3           MR. STEINBERG:  -- for post-closing accidents.

4           THE COURT:  -- for post-closing, whether -- it didn't

5   matter whether it was ignition switch, non-ignition switch --

6           MR. STEINBERG:  That's correct.

7           THE COURT:  -- any other --

8           MR. STEINBERG:  Right.  Used car or non-used car.

9           THE COURT:  Yes.

10           MR. STEINBERG:  It didn't matter.  We had assumed

11   that liability, and so it applied for both ignition switch and

12   non --

13           THE COURT:  So the only issue with respect to post-

14   closing accident victims was punitive damages?

15           MR. STEINBERG:  No, there was more.

16           THE COURT:  Okay.

17           MR. STEINBERG:  For one, I'm sure they would take the

18   position, and we wouldn't disagree, the segment of the November

19   decision which talks about the imputation, it properly applies

20   for both.

21           THE COURT:  Right.

22           MR. STEINBERG:  And in the marked pleading section,

23   which we marked up non-ignition switch post-closing accident

24   complaints, and said to the judge, these complaints, and I

25   think there were three specific non-ignition switch post-

1  closing accident plaintiff complaints that we marked up and

2  said these complaints violate the sale order, and we said why

3  that was the case.  So we teed up those issues.  The MDL had

4  non-ignition switch economic loss cases, and Mr. Peller had

5  both economic loss and accident cases for non-ignition switch.

6      So those issues were before Judge Gerber.  So the

7  scheduling order also specifically approved the letter that was

8  going to accompany the scheduling order.  That was Judge

9  Gerber's way, similar to what I think Your Honor has ruled in

10 the 2016 issues, basically saying this is -- you send this to

11 everybody that you want to send this to.  They're going to be

12 bound unless they come in, and first he gave them the right

13 like you did.  If you object to this procedure, you think you

14 needed something more formal, you've got to come in and tell

15 me.

16      If you don't do that, the procedure holds, and

17 whatever I rule is going to end up being binding on you, and

18 you act on your peril if you sit to the side.  If you want to

19 file a brief, you could file a brief.  You can ask me about it,

20 but otherwise you can file a brief.  If there are issues you

21 want to raise, you can raise your issues.  If you think that

22 New GM is only presenting its issues and you want to raise your

23 issues, you can, but I'm going to hear it all and I'm going to

24 make a decision.  And if you know Judge Gerber, you can hear

25 his voice as he's telling the parties that that's how he's

1 going to deal with this issue.

2        So no one objected to the procedures.  Certainly, the

3 people on this side of the table who were active in the

4 process, they agreed with Judge Gerber that this was an

5 appropriate procedure.  They agreed with Judge Gerber that this

6 was -- that the letter in form was what should go out, and what

7 we attach as tab five is the letter that they sent to the

8 parties telling them, the plaintiffs, that you could be

9 potentially bound by this, and if you have any questions, you

10 can call me, which, you know, that would be the Hagens Berman,

11 the lead counsel in the MDL, and there's a specific reference I

12 think that Dawn Barrios in this letter.

13        Am I right?  Dawn Barrios, she's on the fourth line.

14 Dawn Barrios is the liaison counsel appointed in the MDL to

15 coordinate communications between the state court plaintiffs

16 suing GM and the people in the MDL.  So this was their way of

17 saying, because I didn't -- truthfully, I didn't want the

18 responsibility of communicating with -- if there was confusion,

19 let the people who were on the plaintiffs' side talk to each

20 other, and if they had any confusion after talking to them or

21 not talking to them, there was always the avenue of talking to

22 Judge Gerber to try to clarify what their confusion might be.

23        So that was the procedure that was done.  And, Your

24 Honor, the September scheduling order also instituted the

25 marked pleading process.  That's the granular analysis of the

36

1    specific compliance.  And we reviewed the second amended

2    consolidated complaint, which was over a thousand pages, the

3    California action, the Arizona action, Mr. Peller's complaints,

4    and then we had the opportunity to raise other complaints that

5    we thought were illustrative of issues that would -- that

6    predominate through multiple cases asking the judge to decide

7    that.

8            And we presented those other complaints, and those

9    other complaints had non-ignition switch plaintiff issues, and

10   the marking up reflected -- and we also reviewed the bellwether

11   complaints, which are the ignition switch post-closing accident

12   complaints, and the marking up reflected our view of what was

13   an independent claim and what we thought wasn't a valid

14   independent claim.

15           And certainly Judge Gerber on the ignition switch

16   side had said that they can assert independent claims.  And we

17   were trying to say to Judge Gerber, here are some issues on the

18   ignition switch side that we don't think are valid independent

19   claims, and then on the non-ignition switch side, we said these

20   are all dressed-up successor liability claims that should be

21   barred.

22           And Judge Gerber, and I think -- if I remember

23   correctly, I think we said we needed 90 days to do this because

24   we had lots of complaints, and we had a thousand pages to look

25   at.  Judge Gerber said, okay, I'm glad you want to have 90

1  days.  I'm giving you basically three weeks to do it, and I'll

2  let you stage it, and I don't want to be overwhelmed with

3  paper.  You give me what you have in a marked pleading process,

4  and he accelerated it to have it all done in September, and

5  then he had the oral argument in October.

6           And if you look at footnote two of the December

7  judgment, you will see how Judge Gerber ultimately wants to

8  deal with the issues of how to deal with a representative claim

9  that he decides in one case that would have application in

10 multiple cases.

11          THE COURT:  What page is footnote two?

12          MR. STEINBERG:  It's on the first page of the

13 judgment in tab nine.  He says:

14               "Any rulings set forth in this judgment that refers

15               to a particular lawsuit, complaint, and/or plaintiff

16               shall apply equally to all lawsuits and complaints

17               and plaintiffs where such ruling may be applicable."

18          So he didn't -- he excused me from marking up every

19 single of the 200 complaints that I wanted to do.  I marked up

20 where I thought there was a representative complaint, and

21 that's -- that other complaint, that markup, went out to the

22 entire list again.  So I sent it to the same 220 people when I

23 did the other complaints as well, too.

24          The judge rendered in his November decision, and I'll

25 talk about it a little later, but the November decision is on

38

1    -- is in tab six, and there's a lot of briefing that has gone

2    on as to what Judge Gerber meant by his footnote 70, which is

3    on page 29 of tab six.  But to us it was absolutely clear what

4    he meant, which was non-ignition switch plaintiffs, I gave you

5    the opportunity to allege a due process violation and to say

6    why you should not be bound by the sale order.  You didn't do

7    it, and now it's too late for you to do it.

8            THE COURT:  Which footnote are you talking about?

9            MR. STEINBERG:  It's footnote 70.

10           THE COURT:  This is the "but without showing a denial

11   of due process."  Is that the section?

12           MR. STEINBERG:  Right.  And Your Honor may recall

13   that part of the colloquy in the briefing on this footnote 70

14   was the reference to the language that was actually quoted in

15   footnote 70 that relates to his former judgment decision that

16   was in May.  And I think the clear view of that footnote 70 is

17   that he's giving the predicate saying, I don't know whether you

18   will ever prove a due process violation, but now five months

19   later, six months later, you didn't do anything, and I told you

20   to do something, and now it's too late for you to do something.

21   So that the language that they're quoting is based on a stale

22   decision that has been overtaken by his subsequent proceedings

23   and the failure to act.

24           And that footnote, if you can't bring a challenge to

25   the judgment for due process purposes, then effectively the no-

1 successor liability ruling will be effective to you, and

2 therefore that which I -- when I talk about the fourth issue

3 where they talk about punitive damages in connection with the

4 successor liability, non-ignition switch plaintiffs can't bring

5 a successor liability claim, can't challenge the sale order

6 because it's too late for them to do so, and therefore at least

7 the economic loss plaintiffs could never get to the issue

8 because of the ruling in the November decision.

9         THE COURT:  Just give me a second, okay?

10        So this footnote 70, where the language that begins

11 with:

12        "But without a showing of a denial of due process,

13        and the non-ignition switch plaintiffs have not shown

14        that they were victims of a denial of due process,

15        the critically important interests of finality," et

16        cetera, it goes on from there.

17        So is there a case management or scheduling order

18 that set a deadline for non-ignition switch plaintiffs to

19 challenge the binding effect of the sale order based on due

20 process?

21        MR. STEINBERG:  There is no scheduling order that

22 explicitly says that.  I went through the process of the case

23 management order where he asked people to tee up the issues.

24 He's expressed the concern that if you have a due process

25 issue, then you should raise it.  He gave people the

1  opportunity to raise it, and people didn't brief the issue.

2            THE COURT:  Well, that's -- I mean, this footnote, I

3  don't see language in the footnote that says that the non-

4  ignition switch plaintiffs had a deadline for waging their

5  challenge based on due process to the sale order.  It's a

6  statement that they haven't done it.  And he says:

7            "Without a showing of the denial of due process, and

8            the non-ignition switch plaintiffs have not shown

9            that they were the victims of a denial of due

10           process."

11           Is there -- what is it that you specifically rely on?

12           MR. STEINBERG:  Well, one thing is --

13           THE COURT:  Stop.  Let me finish.  I know I'm slow at

14 getting out --

15           MR. STEINBERG:  I apologize.

16           THE COURT:  -- but you need to wait for me to get it

17 out.  On what do you rely to show that the non-ignition switch

18 plaintiffs were on notice that if they had a due process

19 challenge to the sale order, they had to come forward with

20 evidence to establish it?  It's one thing to note that they

21 haven't done it, but it's another thing to say that they were

22 required to do it, because their position is they never were

23 required to do it, and in other words, it's timely to do it

24 now, okay?  And so I just want to understand clearly what it is

25 you are relying on to show that the non-ignition switch

41

1  plaintiffs were told that you've got a due process claim, so

2  let's get it out there.  Do you want discovery on it?  Take

3  your discovery on it.  If you want a contested hearing on it,

4  we'll have a contested hearing on it.  The first -- for the

5  June judgment was non-stipulated facts.  Was there a

6  stipulation of facts with respect that led to the December

7  judgment?

8          MR. STEINBERG:  No.

9          THE COURT:  Was there an evidentiary hearing that led

10 to the December judgment?  I just want -- I understand your

11 argument, and I think you make a persuasive argument, but on

12 the other hand, I'm trying to understand clearly, okay, due

13 process requires you to tell him what the issues are.  Here's

14 your chance.  Come forward with the evidence.  So you think

15 you've got a due process violation, show me.  And that's what

16 I'm not seeing.  I want you to show me where that is.

17         MR. STEINBERG:  All right.  There is the direct

18 answer to your question that there was no order that was

19 entered that set a deadline that was served on parties that

20 said you have a deadline to either raise the due process issue

21 or you are forever waiving it.  So there's nothing there that I

22 can point to that says that.  So all I can do is point to three

23 or four facts that I think gets you to the same spot.  One --

24         THE COURT:  See -- well, here's what bothers me,

25 Mr. Steinberg, or bother is the wrong word.  It's where I want

42

1  to get myself comfortable.  Judge Gerber in the April, May,

2  June, and what led to the June judgment had clearly told

3  parties in interest, I'll use that term, that I'm deferring

4  issues about the non-ignition switch plaintiffs, and I want to

5  be told what is it that told the non-ignition switch plaintiffs

6  that if you got a due -- if you think because of a due-process

7  violation the sale order doesn't apply to you, it's time to put

8  up or shut up.  That's what I want to see.

9          MR. STEINBERG:  Okay.  So there's three or four

10  things I could point out.  One was I went through the colloquy

11  of pointing out what the case management order had where he's

12  saying I need to deal with non-ignition switch plaintiffs --

13          THE COURT:  Well, people who won't -- or, you know,

14  in Iowa don't know what's said in the colloquy in a hearing

15  before Judge Gerber.

16          MR. STEINBERG:  I agree with that, but certainly this

17  side of the table understands that colloquy.

18          THE COURT:  That's why I asked is there -- you know,

19  did somebody file a notice of appearance and list who they're

20  appearing on behalf of?

21          MR. STEINBERG:  Well, certainly lead counsel in the

22  MDL on behalf of accident plaintiffs and on behalf of economic-

23  loss plaintiffs, for those cases that are there, have

24  responsibilities as the lead counsel.  Judge Gerber was saying

25  I need to deal with that, and the response was, I represent the

43

1  group and we're going to triage it.  And if we have to raise

2  something, if it becomes that we have to raise something, we

3  understand we need to raise it now.

4      He then sends out an order to the full group of

5  people saying, give me your issues.  This is -- these are the

6  issues that GM is going to brief.  Give me any of your other

7  issues, which includes, in my view, that if you're going to

8  raise a due process issue, you've got to say something.

9      THE COURT:  Let me ask you this.  Is there any piece

10 of paper filed before Judge Gerber by any of the plaintiffs'

11 lawyers that address the due process issue for non-ignition

12 switch plaintiffs as an issue before the Court to decide?

13     MR. STEINBERG:  I can't recall if there's any, but

14 there's been a ton of paper that's filed.

15     THE COURT:  I know, but I'm just trying to -- okay.

16     MR. STEINBERG:  I know that in --

17     THE COURT:  You're asking me to shut the door on

18 any -- you're arguing that the non-ignition switch plaintiffs

19 are bound by failing to either raise before Judge Gerber --

20 where does he decide the due process issue?  I see what he says

21 in places that you haven't shown me, and without doing it, you

22 can't -- you know, I'm not going to say that you can challenge

23 the sale order provision, but I don't -- does he say that that

24 issue was before me, that I was -- you know, the issues framed

25 for this -- that led to this December judgment included the

44

1  issue of whether the non-ignition switch plaintiffs -- whether

2  the sale order is res judicata as to the non-ignition switch

3  plaintiffs because they had to and had not shown a due process

4  violation?

5        MR. STEINBERG:  Two things.  One is the specific

6  language of the footnote 70 is that, after he quotes what he

7  said in the May decision and where it says, "Unless and until

8  they do so, the provisions of the sale order, including its

9  injunction provisions, remain in effect."

10        THE COURT:  Well, one could read that that they

11  haven't -- unless they haven't done it so far.  And until, what

12  does until mean?

13        MR. STEINBERG:  Well, until means, in May, is that

14  they haven't done it yet.  That's all he said there.  But then

15  he says in November, after referring to it, he said that ruling

16  stands that the April decision and the resulting judgment, the

17  Court modified a sale order on which the buyer --

18        THE COURT:  Well, you agree the April decision and

19  the June judgment don't cover non-ignition switch plaintiffs?

20        MR. STEINBERG:  That's correct.  That's correct.

21        THE COURT:  And what I'm looking for is --

22        MR. STEINBERG:  But --

23        THE COURT:  -- what binds the non --

24        MR. STEINBERG:  Right.

25        THE COURT:  What binds the non-ignition switch

45

1  plaintiffs, what prevents them --

2           MR. STEINBERG:  The next sentence --

3           THE COURT:  Why doesn't the "until" leave the door

4  open to come in and say we think we were denied due process,

5  you know, but the sale order doesn't -- can't bind us.

6           MR. STEINBERG:  All right.  Two things.  One is the

7  language, that ruling stands, and then the sentence that says:

8           "But without a showing of a denial of due process,

9           and the non-ignition switch plaintiffs have not shown

10          that they were victims of a denial of due process,

11          the critically important interest of finality," and

12          then he has a parenthesis, "in each of the 2009 sale

13          order and the form of judgment and the judgment, and

14          predictability must be respected, especially now more

15          than six years after the sale order."

16          THE COURT:  I agree with every word of that.  I agree

17  with every word of it, but the question is, well --

18          MR. STEINBERG:   All right.  There's two other --

19  there are two other things that I want to point out to you,

20  okay?  One is that the result of the December judgment was that

21  there was a third amended consolidated complaint that was

22  filed.  The third amended consolidated complaint took out all

23  non-ignition switch plaintiffs.  They interpreted this as

24  saying that they couldn't assert an independent claim for non-

25  ignition switch plaintiffs anymore, and that they were

46

1  otherwise barred by the sale order.  That's --

2           THE COURT:  They're mind reading.

3           MR. STEINBERG:  Well, then why do you think they

4  would have --

5           THE COURT:  I don't know.  I have no idea.

6           MR. STEINBERG:  Well, it's a good thing they're here.

7  They can give you an answer or you could ask that.  If Your

8  Honor thought it was an appropriate question to ask, you could

9  ask them.  I'm telling you I don't think it's a mind reader.  I

10 think it's both parties understood what the issue was.  But if

11 you don't look at it that way, then I think Your Honor is

12 looking at it in a -- in perhaps not the appropriate way, and

13 let me explain why.

14          THE COURT:  That's a nice way of telling me I've got

15 some, you know --

16          MR. STEINBERG:  You actually have the same issue on

17 the late filed claim issue which we've separately briefed.

18          THE COURT:  I did actually look at the letter briefs,

19 as you forwarded them to me, the letter briefs that were filed

20 before Judge Furman.  It almost looked like New GM was changing

21 its position on whether late filed claims should be permitted

22 or not, but anyway that's for another day.

23          MR. STEINBERG:  I don't think we were --

24          THE COURT:  You're arguing that, well, late filed

25 claims that show that we don't have successor liability claims

47

1  because they have a claim against Old GM.

2          MR. STEINBERG:  I think that that's true.  I think

3  that's always been our position.  The issue is, is whether

4  having -- and this is what --

5          THE COURT:  Well, you know, we'll deal -- let's deal

6  with it.

7          MR. STEINBERG:  Okay.  All right.  But let me tie it

8  in to why it's the same issue as the late claims issue.  If you

9  were aware of a circumstance that -- where you had missed a bar

10 date and you now want to come to the court and ask for

11 permission for a relaxation of the bar date, you want to in

12 effect change something that's an extant order, the burden is

13 not on --

14         THE COURT:  Okay.  Mr. Steinberg, we're going to deal

15 with late filed claims at another time.

16         MR. STEINBERG:  But I'm trying to -- then I'll say it

17 in just straight terms of due process.  The burden on a party

18 to raise a due process issue is on them.  It's not on the court

19 to set a deadline saying tell me when you have a due process

20 issue.  The recalls that were announced for non-ignition switch

21 plaintiffs were generally in the May/June 2014 issue.

22         Judge Gerber was deciding this 18 months later.  No

23 one had raised the due process issue with him.  He had asked

24 for information about it, and his view was there comes a point

25 when you're pregnant with the information and you don't do

48

1  something about it, and you can't anymore because you waited

2  too long.

3        THE COURT:  That's a different argument.

4        MR. STEINBERG:  That's what I think is embedded here.

5  You asked a question whether there's an order that said it.

6  Judge Gerber is saying, I told you to raise it if you want.

7  You didn't raise it.  It's 18 months after the recalls were

8  announced.

9        THE COURT:  Show me in a transcript, scheduling

10  order, or otherwise where Judge Gerber told counsel for

11  non-ignition switch plaintiffs, if you have a due process

12  issue, raise it before me because I'm going to resolve these

13  issues.  They're important, I'm going to resolve them, and the

14  door is going to shut.

15        MR. STEINBERG:  At the August 31 conference, and we

16  cite this in our -- is this our reply -- our opening brief on

17  page 18, we talk about the August 31 conference where Judge

18  Gerber says, quote:

19            "The non-ignition switch plaintiffs' inability or

20            inaction to have yet established a due process

21            violation to give them the benefits that the

22            remainder of your constituency got is in my view a

23            big issue."

24        And then Mr. Weisfelner responded at that hearing,

25  quote:

49

1          "To the extent that that remains an issue," so he

2          didn't say it was an issue.  "To the extent that it

3          remains an issue, then in terms of triaging things,

4          it seems to me that we need to get that issue teed up

5          quickly because, to the extent that people, either

6          New GM or us, depending on who loses, needs to appeal

7          that decision, they ought to get started."

8          So that's the colloquy after Judge Gerber's case

9  management order which says I want to deal with non-ignition

10  switch plaintiff issues, and I want to deal with it all.

11          THE COURT:  Okay.  And did the briefing that went on

12  after that specifically address due process with respect to

13  non-ignition switch plaintiffs?

14          MR. STEINBERG:  No, it didn't, and I think that's why

15  he ruled the way he did.

16          THE COURT:  Okay.  All right.  Go ahead.

17          MR. STEINBERG:  After -- and I think I just mentioned

18  that after the December judgment, for whatever it means, there

19  was a third amended complaint, and non-ignition switch

20  plaintiffs were taken out of the complaint, and that was done

21  -- that was amended to address the issues from the December

22  judgment.

23          So to tie it back to issue two, we believe that the

24  December judgment dealt with different issues and different

25  topics that were covered by the June judgment that was referred

50

1    by the Second Circuit, and I would like to quickly tick off

2    what those are.

3            One, the rights of post-closing accident plaintiffs

4    for all GM vehicle owners were raised and decided in the

5    December judgment and were not part of 2014 motions to enforce,

6    and therefore were not reviewed at all by the Second Circuit.

7    So all rulings --

8            THE COURT:  Let me just -- and just so I -- and I

9    apologize for this.  Show me where in the December judgment,

10   which I have open that's behind tab nine, show me where in the

11   December judgment Judge Gerber resolves the issue with respect

12   to non-ignition switch plaintiffs.  Does it specifically

13   address the due process issue with respect to this?  Does it

14   say you have failed -- you non-ignition switch plaintiffs have

15   failed to establish a violation of due process and consequently

16   you're bound by the sale order?

17           MR. STEINBERG:  The only way that you get there is by

18   the -- I think the first sentence of the judgment which

19   incorporates the November decision.

20           THE COURT:  So I guess what you're telling me and --

21           MR. STEINBERG:  No, but I actually have more to --

22           THE COURT:  Stop, stop, stop.  Let me ask it one more

23   time.  Show me exactly what in the December judgment you're

24   relying on to say that Judge Gerber resolved the due process

25   issue -- any due process issue with respect to non-ignition

1  switch plaintiffs.

2          MR. STEINBERG:  I actually have a different response

3  to that.  First, the correct answer --

4          THE COURT:  Is --

5          MR. STEINBERG:  No, the direct answer --

6          THE COURT:  I'll let you explain your point.

7          MR. STEINBERG:  The direct answer is it's not there.

8          THE COURT:  Okay.  All right

9          MR. STEINBERG:  Okay.  But that is part of my

10  presentation --

11          THE COURT:  Sure.

12          MR. STEINBERG:  -- because if you look at the

13  competing letters that went to get to the judgment, and this

14  goes into our parsing paragraph 14 of the December judgment,

15  because our parsing says two things.  One is the judge decided

16  this in his November decision, and it looks like he's deciding

17  this based on the fact that you haven't show a due process

18  violation, and therefore my interpretation of the sale order

19  which says that the sale order may have been over broad and

20  barred independent claims, you haven't shown a due process

21  violation.

22          I can't change the sale order because of the finality

23  principle, and therefore I'm ruling that independent -- that

24  non-ignition switch plaintiffs can't assert independent claims.

25  That's one aspect of what I think has got to be embedded in

52

1  Judge Gerber's ruling, but there's another aspect that was

2  there, too.

3          THE COURT:  And did you propose a form of judgment

4  for December that expressly addressed due process for non-

5  ignition switch plaintiffs?

6          MR. STEINBERG:  Yes.

7          THE COURT:  Is that in the binder?

8          MR. STEINBERG:  Yes.

9          THE COURT:  Where was it?

10          MR. STEINBERG:  If you look at tab eight, and this is

11  paragraph nine.

12          THE COURT:  I'm sorry, nine?

13          MR. STEINBERG:  If you look at tab eight, paragraph

14  nine.

15          THE COURT:  Okay.

16          MR. STEINBERG:  "Plaintiffs in vehicles without the

17  ignition switch defect and pre-closing accident plaintiffs have

18  not demonstrated a due-process violation with respect to the

19  sale, and therefore are not limited to -- are not entitled to

20  assert independent claims against New GM with respect to Old GM

21  vehicles."

22          THE COURT:  And the plaintiffs' counter-draft, did it

23  address non -- due process and non-ignition switch plaintiffs?

24          MR. STEINBERG:  I think the plaintiffs' counter-draft

25  to our paragraph nine, which is on tab seven, if you look at

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

53

1   page three --

2            THE COURT:  Of the judgment?

3            MR. STEINBERG:  Yeah.

4            THE COURT:  Okay.  There it is.

5            MR. STEINBERG:  Their comment on paragraph is

6   "Plaintiff" --

7            THE COURT:  Oh, what?  Whoa, whoa, whoa, wait.  Wait.

8   I'm sorry, which paragraph do you want me to look at?

9            MR. STEINBERG:  I had pointed to, where was it,

10  paragraph nine of our judgment.

11           THE COURT:  Yes.

12           MR. STEINBERG:  So if you looked at page three,

13  they're commenting on our paragraph nine, so it's their cover

14  letter written --

15           THE COURT:  Okay.  Let me -- I want to find exactly

16  where you're looking.  Yes.  Okay.  And their comment -- this

17  is the plaintiffs submit that this entire paragraph should be

18  stricken because it is not part of the judgment and

19  mischaracterizes the court's rule -- holdings?

20           MR. STEINBERG:  That's correct.  So that was --

21           THE COURT:  Let me finish reading it to myself.

22  Okay.

23           MR. STEINBERG:  So, Your Honor, there are -- there --

24  if you go back to -- to try to tie this in, and I know it's a

25  little cumbersome, but if you go back to the December judgment

54

1  on tab nine --

2          THE COURT:  Yes.

3          MR. STEINBERG:  -- all of this ultimately emerges

4  into paragraph 14.  So if you could look at the paragraph 14

5  language, there were three things I wanted to point out to you

6  because I think Judge Gerber is deciding this issue not just on

7  the due process independent claims issue.  He's actually doing

8  the granular analysis on our marked pleadings, and he's saying

9  that you haven't established an independent claim based on the

10 marked pleadings that I reviewed, which is a separate thing and

11 a separate way of approaching this issue.

12          And there are three reasons why I think that's the

13 case.  One is the second sentence of paragraph 14 which uses

14 the language "to assert an independent -- have attempted to

15 assert an independent claim against New GM in a preexisting

16 lawsuit."  That language indicates that he was looking at

17 something.  The second thing is, if you look to see what we did

18 in our proposed judgment, we stuck that due process language,

19 like that paragraph nine that I talked to you, we stuck that in

20 the punitive damage section of our proposed judgment.

21          He didn't want it there.  He put it in the marked

22 pleading section, which is the heading that starts with

23 paragraph 14, and we think --

24          THE COURT:  I don't know what he was thinking, but,

25 you know, I can only read what's on the page.

55

1           MR. STEINBERG:  I know.  We said it should be

2   somewhere; he put it somewhere else.

3           THE COURT:  Well --

4           MR. STEINBERG:  He made his own judgment.

5           THE COURT:  You said it should be put somewhere --

6   you specifically -- bear with me.  Tell me again which

7   paragraph is your draft?

8           MR. STEINBERG:  In our draft, it's paragraph nine.

9           THE COURT:  Got it.  Okay.  Hold on.

10          MR. STEINBERG:  In the punitive damage cite.

11          THE COURT:  Yeah.  Just -- okay.

12          MR. STEINBERG:  And the third point that I wanted to

13  make with regard to these dueling judgments and what actually

14  emerged in paragraph 14 of the December judgment was the fact

15  that he took out our due process language for that second

16  sentence.

17          THE COURT:  Yeah, he did.

18          MR. STEINBERG:  And he did because I think in that

19  second sentence, he's making the granular analysis of the

20  marked pleadings.  That he was saying that based on what I have

21  been shown, that you haven't asserted a viable independent

22  claim.  He had to be making -- this is the section where he's

23  making all of his marked pleading rulings and he's saying that,

24  for non-ignition switch plaintiffs and all GM vehicle owners

25  without the ignition switch defect, you didn't show me a viable

56

1   independent claim.  And our belief is that you can make this a

2   much simpler analysis by saying that he had ruled on the

3   granular claim analysis that they hadn't asserted a viable

4   independent claim.  Their failure to appeal meant that it's res

5   judicata for that -- for those types of claims.

6          THE COURT:  Okay.  Go ahead.

7          MR. STEINBERG:  The -- so just to illustrate, because

8   a large part of their argument is that paragraph 14 doesn't

9   apply because of the Second Circuit judgment, I want to

10  highlight the differences between what the Second Circuit did

11  and the separate analysis and separate topics covered by the

12  December judgment, sort of a summary fashion of what I've been

13  talking about before.

14          One is rights of post-closing accident plaintiffs not

15  in the June judgment, not referred to by the Second Circuit,

16  but part of the proceedings that led to the December judgment;

17  two, issues relating to punitive damages, not part of the June

18  judgment, part of the December judgment; three, the entire

19  marked pleading concept looking at specific claims, ruling on

20  specific claims, not part of the Second Circuit opinion.  It

21  wasn't really part of the June judgment.  That's why I pointed

22  out to you the short analysis on the Old GM claim threshold

23  issue, clearly a part of the December judgment.

24          The paragraph 28 of the December judgment on tab

25  nine --

57

1          THE COURT:  Wait a second.  I've just got to get

2   there.  Let's make it --

3          MR. STEINBERG:  Which is on page eight, page nine.

4          THE COURT:  Where's my copy --

5          MR. STEINBERG:  Of tab nine?

6          THE COURT:  The Peller complaints.

7          MR. STEINBERG:  The Peller complaints.  This is where

8   he says:

9          "The Peller complainants shall remain stayed and

10         until they are amended," and then in Roman III, "to

11         strike any purported, independent claims by the non-

12         ignition switch -- by non-ignition switch."

13         THE COURT:  Page ten is missing from my copy.  Let's

14  make sure --

15         MR. STEINBERG:  We'll substitute the case --

16         THE COURT:  -- it's not out of order, but it's not

17  here.

18         MR. STEINBERG:  Do you have page ten?

19         THE COURT:  We obviously can find it.  It's ECF

20  Docket Number 13-563.

21         MR. STEINBERG:  Right.  But it says the non-ignition

22  switch plaintiffs.  So he actually made a specific ruling on

23  the Peller complaints and the independent claims alleged in the

24  Peller complaints, which is reflected in paragraph 28.

25         Now, in paragraph 14, there are references to the

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

58

1  June judgment, the April decision, and the sale order.  And we

2  think that the obvious reason why those are put there is that

3  the April decision and the June judgment defined independent

4  claims.  He's now said -- and that was the first time where

5  they defined independent claims.  He's now said that these

6  aren't independent claims, so he's cross-referencing his prior

7  definition.

8          And on the reference to the sale order, he's

9  referring to that because the sale order proscribes plaintiffs

10  suing on retained liabilities or dressed-up retained

11  liabilities.

12          THE COURT:  So what -- I want to make sure I

13  understand this clearly.  Where he talks about purported

14  independent claims, a plaintiff can take the position that I've

15  asserted independent claims based solely on New GM's conduct.

16  And in a marked pleadings context, the Court can say no, I

17  think you're back-dooring in based on Old GM conduct, and

18  that's why I'm striking you.  Your argument is that truly

19  independent claims by non-ignition switch plaintiffs are barred

20  by the sale order, right?

21          MR. STEINBERG:  No.  That's why I said to you, I'm

22  going to stay by the same --

23          THE COURT:  Other than Mr. Peller?

24          MR. STEINBERG:  No.  No.  I'm staying by the same

25  statement I made in 20 -- when did I argue this?

59

1              THE COURT:  Just tell me now.

2              MR. STEINBERG:  No, no.

3              THE COURT:  Make it now.

4              MR. STEINBERG:  No, no.  I -- look, certified

5   pre-owned are an independent claim, right?  In the definition

6   of the Second Circuit, that is an independent claim.  It's the

7   New GM conduct.  It's dealing with an Old GM vehicle owner, and

8   it's certified a warranty.  That's an independent claim.

9              THE COURT:  So Judge Gerber doesn't decide, you know,

10  whether there's -- whether New GM had a duty to warn under

11  non-bankruptcy law?

12             MR. STEINBERG:  Judge Gerber, in the context of non-

13  ignition switch plaintiffs, may have decided that.  I think he

14  decided that.  He said that whatever has been asserted in him

15  in the marked-pleading process was not an independent claim.

16             THE COURT:  Yeah.  The -- I don't want to be dense.

17  If you had a pleading that alleged only conduct by New GM

18  because the law of XYZ state imposed a duty to warn on New GM,

19  and the allegation is it failed to do so, it failed -- it

20  had -- it knew of the problem and it failed to comply with its

21  non-bankruptcy law duty to warn, do you agree or disagree that

22  a non-ignition switch plaintiff can assert an independent claim

23  based on this state law duty to warn where the pleading does

24  not try to backdoor in through Old GM conduct?

25             MR. STEINBERG:  I would say that that is -- what

1 you've described now is not an independent claim, and that we

2 believe it would be barred by the sale order.

3           THE COURT:  Why do you say it's not an independent

4 claim?

5           MR. STEINBERG:  Because when New GM bought assets in

6 the 363 sale, it assumed only three liabilities, the glove box

7 warranty, the lemon law liability, and post-sale accident

8 liability.  All other liabilities, which includes duties and

9 obligations that Old GM had --

10          THE COURT:  I know, but I'm positing --

11          MR. STEINBERG:  -- to its customers.

12          THE COURT:  -- the circumstances where non-bankruptcy

13 law, applicable state law of XYZ state, concludes that New GM

14 had a duty to warn non-ignition switch plaintiffs of a -- they

15 all have subject vehicles.  They have another -- you know,

16 there was a later recall, but at -- let's assume hypothetically

17 New GM knew about the defect and state law would impose a duty

18 to warn them, you're -- what is it that bars -- you're saying

19 that's not an independent claim?

20          MR. STEINBERG:  Your Honor, the obvious problem that

21 I'm -- I have with your analysis is that --

22          THE COURT:  It's a hypothetical question.

23          MR. STEINBERG:  Yeah, your hypothetical.  The

24 hypothetical is that, that whatever state law may impose on a

25 purchaser of assets in our view doesn't apply to someone who

61

1    bought assets free and clear of liens and claims and

2    obligations that Old GM had.  So Old GM, if it had a post-sale

3    duty to warn under state law, we didn't take on that post-sale

4    duty to warn.

5            THE COURT:  I don't care about Old GM.  I agree, you

6    didn't take on Old GM -- you know, liability based on Old GM's

7    duty to warn.  Let's assume I agree with that.

8            MR. STEINBERG:  Okay.  So then you're asking me in

9    your hypothetical --

10            THE COURT:  What happens if state law imposes a duty

11   to warn --

12            MR. STEINBERG:  It's a good question, Your Honor, and

13   it's --

14            THE COURT:  Thank you.

15            MR. STEINBERG:  No, no.  It's the issue that has been

16   debated a lot, and some of it in front of Judge Furman in the

17   MDL in context of the post-closing accident plaintiffs.  The

18   issue is whether you have a -- when you bought free and clear,

19   and an independent claim under the Second Circuit definition

20   has to be based solely on New GM conduct and not based on a

21   right or payment that arose before the filing of the petition

22   or based on pre-petition conduct.

23            THE COURT:  What if the State of New Jersey adopts

24   the statute that says --

25            MR. STEINBERG:  I can --

62

1          THE COURT:  -- the other remaining factor of the

2    vehicle labeled as a Hummer, whenever it was manufactured, if

3    it has knowledge of a defect, it has a duty to warn, okay?  And

4    if a claim is asserted against the manufacturer for breach of

5    this affirmative -- this statute, that (indiscernible)

6    obligation you say that what?

7          MR. STEINBERG:  Can I ask you whether it makes a

8    difference whether it's an economic loss case or an accident

9    case?

10          THE COURT:  Well, to me the -- well, tell me the

11   answer as to both.  Tell me as to economic loss and tell me as

12   to accident.

13          MR. STEINBERG:  I think in an accident case, Judge

14   Gerber ruled in the December judgment that duty to warn could

15   be an assumed liability as part of an accident depending on

16   state law.  So in an accident case --

17          THE COURT:  No.  No.  In Grumman Olson, both Judge

18   Bernstein's decision and Judge Oetken's decision, you know, as

19   to the accident victims, good luck.  They're future claimants,

20   they were not know.  You can't -- I don't know if we'll get to

21   that discussion because they relied heavily on Grumman Olson.

22          MR. STEINBERG:  I don't think in the accident case it

23   matters when you assume the liability.

24          THE COURT:  Well, you -- that's right, you've assumed

25   the liability.

63

1          MR. STEINBERG:  Right.  So in the accident case, we

2   assume the liability.  We may have actually assumed the duty to

3   warn --

4          THE COURT:  Well, but that's --

5          MR. STEINBERG:  -- obligation as part of the assumed

6   liability.

7          THE COURT:  It does matter as to the potential

8   punitive damages, right?  If they say --

9          MR. STEINBERG:  If --

10         THE COURT:  -- punitive damages for a breach of a

11  duty to warn, conduct solely by New GM, can they assert that

12  punitive damage claim or not?

13         MR. STEINBERG:  Ignition switch or non-ignition

14  switch case?

15         THE COURT:  Non-ignition switch.

16         MR. STEINBERG:  I don't think so, not based on

17  paragraph 14 of the December judgment.

18         THE COURT:  All right.  And you're relying on

19  paragraph 14 of the December judgment, right?

20         MR. STEINBERG:  That's correct.

21         THE COURT:  Go ahead with your argument.

22         MR. STEINBERG:  I also have a more in-depth analysis,

23  but I don't want to -- I know you've been letting me talk for a

24  long time, and there are people probably itching, so I need

25  to --

64

1          THE COURT:  We're going to take a break soon, when

2    you decide you're done.

3          MR. STEINBERG:  So I pointed out the Peller aspect of

4    the December judgment.  I might as well complete the analysis

5    and point to paragraph 36 of the December judgment.

6          THE COURT:  All right.  Page 12.

7          MR. STEINBERG:  Paragraph 36, page 12.  So that's a

8    case where the Court is ruling on pre-closing accident cases.

9    Coleman happens to be a non-ignition switch pre-closing

10   accident case.  It's a 2002 accident for a 2001 Pontiac Grand

11   Am, a non-ignition switch case.  So this is a case where the

12   judgment is dealing with and trying to close the loop on non-

13   ignition switch pre-closing accident plaintiffs, which were

14   also not before the Second Circuit.

15         We did point out to Your Honor that in the cert

16   petition that was filed and the pleading that was filed in

17   opposition to our cert petition, in order to try to minimize

18   the importance of the case to the Supreme Court, the positions

19   taken by the plaintiffs' side was that the Second Circuit

20   opinion only dealt with 1.7 million vehicles.

21         THE COURT:  So has your petition for cert been

22   calendared for conference or was it already?

23         MR. STEINBERG:  It was conferenced in the third week

24   of March.  It was pushed to the fourth week of March, then

25   Gorsuch came on the panel, and it's scheduled again for the end

65

1  of this week.  So whether -- after three adjournments, whether

2  they're going to look at it or not, I don't know, but that's as

3  best as I can give you on that.

4          THE COURT:  They kicked the can down the road until

5  they were (indiscernible).

6          MR. STEINBERG:  And it may be that something will

7  happen soon, and that will shed light or not.  The -- anyway,

8  so when this -- when the plaintiffs say that the Second Circuit

9  opinion only affects 1.7 million vehicles, that's the ignition

10 switch side of the equation.  The non-ignition switch side is

11 10 or 11 million vehicles.  So they're saying whatever the

12 Second Circuit --

13         THE COURT:  All right.  They say it was a total of 21

14 million vehicles --

15         MR. STEINBERG:  Right.

16         THE COURT:  -- that were involved in recalls.

17         MR. STEINBERG:  So when they say that the Second

18 Circuit only was affecting a million and seven vehicles,

19 they're essentially saying the Second Circuit decision was only

20 an ignition switch case, not a non-ignition switch case, so

21 therefore Judge Gerber's rulings on non-ignition switch are

22 independent and separate from the June judgment.

23         THE COURT:  From the December judgment.

24         MR. STEINBERG:  From the -- I'm sorry, from the

25 December judgment.  Thank you, Your Honor.  The -- I have one

66

1  more short thing, and then maybe we'll take a break, if that's

2  okay with Your Honor.

3          THE COURT:  Yes, go ahead.

4          MR. STEINBERG:  The -- I just wanted to say that the

5  only thing that the Second Circuit said about independent

6  claims, and to me it was -- to be candid, it was not exactly

7  clear to me.  There were certain things that they were clear.

8  They were saying that with respect to independent claims, they

9  were outside the scope of the sale order, but other than

10 defining the term "independent claim" in a similar fashion to

11 the way the bankruptcy court defined independent claims, it did

12 not make any rulings other than to actually affirm the

13 bankruptcy court's independent claims rulings.

14         It didn't vacate.  It actually affirmed.  The only

15 thing that the bankruptcy court did with respect to independent

16 claims was to say that ignition switch plaintiffs' economic

17 loss can assert independent claims.  So you have your head

18 scratching as to what actually does the affirmance mean in the

19 context of his rulings.

20         Mr. Peller in his brief said, well, it's obviously a

21 mistake, but he never went on to sort of clarify the mistake,

22 and it is hard to act as the appellate court for the Second

23 Circuit and just say affirmance doesn't mean affirmance.  But

24 it -- I think it does have relevance when you talk about the

25 wipeout rule or the Rule 60.  If someone is affirming the lower

67

1  court on independent claims, it's hard to figure out what they

2  actually wiped out because they actually affirm.  Usually you

3  don't wipe out something when you're affirming the lower court.

4       The Second Circuit also made no rulings with respect

5  to the actual claims that were pled against New GM by either

6  the appellate plaintiffs or any other non-ignition switch

7  plaintiff, and there was no ruling on the Second Circuit as to

8  whether or not non-ignition switch plaintiffs had suffered a

9  due process violation.  And we believe that footnote 70, the

10  November decision, the colloquy, we had dealt with that.

11       So I'll conclude -- I don't -- I'm not concluding for

12  everything, but I'm concluding before the break.  Clearly, in

13  our view --

14       THE COURT:  How much more -- what do you have after

15  the break?  If I don't ask any more questions, how much longer

16  are you going to go?

17       MR. STEINBERG:  Probably about an hour, probably.  I

18  have the other parts of the second issue, the third, fourth,

19  first issues, and the separate responses by Pope, Peller,

20  Pillars, and Pilgrim, the Ps, the four Ps.  But I will gladly

21  take prompts by Your Honor to move this along, and during the

22  break, if it would be helpful, if you have scheduling issues

23  and other people will want to talk, I'll try to shorten my

24  presentation.  Thank you.

25       THE COURT:  I have scheduling issues.

68

1          MR. STEINBERG:  I will try to shorten.

2          THE COURT:  I have a calendar this afternoon, but go

3  ahead.

4          MR. STEINBERG:  Okay.  How long of a break would you

5  like, Your Honor?

6          THE COURT:  Let's take a ten-minute break.

7          MR. STEINBERG:  Okay.

8      (Recess at 10:38 a.m. until 10:48 a.m.)

9  (Proceedings resumed at 10:56 a.m.)

10          THE COURT:  Be seated.

11          Yeah, Mr. Weintraub, what do you want to say?

12          MR. WEINTRAUB:  Just wanted to hear my own voice,

13  Your Honor.  Your Honor, may I make a suggestion?

14          THE COURT:  Sure.

15          MR. WEINTRAUB:  For purpose of continuity, I think it

16  would make sense if when Mr. Steinberg is finished with issue

17  two, then we can respond to issue two?  And then move on to

18  issue three in the same way, and issue four in the same way?

19  Otherwise, I don't think we'll get to talk today.

20          THE COURT:  I think that's probably true.

21          MR. STEINBERG:  I go much faster on issues three and

22  four, Your Honor.

23          THE COURT:  Let's finish on issue two.

24          MR. STEINBERG:  All right.  So the -- what this comes

25  down to, the general argument is that we believe the December

69

1  judgment is res judicata to the people who were served with and

2  notice of the September 2015 scheduling order, and we cite in

3  our papers to <u>Travels v. Bailey</u>, and the <u>Manville IV</u> case to

4  illustrate that if you don't preserve issues on appeal, whether

5  it's subject matter jurisdiction, or due process.  If you don't

6  preserve those issues on appeal, then a reversal to someone

7  else won't give you the benefit of those things.  You need to

8  actively do that yourself.

9          And their failure to do so in connection with the

10 December judgment meant that those issues are res judicata to

11 them.  And even if the bankruptcy court had exceeded its

12 subject matter jurisdiction in rendering paragraph 14, the

13 failure to appeal that meant that they had waived the subject

14 matter jurisdiction defense in connection with that separate

15 ruling.  The attempt --

16         THE COURT:  Attorneys make mistakes.  If you're a

17 party to the action and you don't appeal, it's just tough.

18         MR. STEINBERG:  That's correct.  And, Your Honor, we

19 recognize that there are new lawsuits that were filed after

20 December judgment, that there may be different variations of

21 claims, different than what Judge Gerber looked at as part of

22 the marked pleading process.  And to the extent that those

23 issues come up, and they may be more theoretical than

24 practical, because remember I serve 660 people, this is the sum

25 total of what you have before you so far.  It may be more

70

1    theoretical, but if it is, then we think it's critical that you

2    maintain the gatekeeper so that you can orderly sort through

3    what needs to be done in order to move these cases along.

4         The argument that was made about the res judicata

5    also clearly applies to the marked pleading process, which is

6    that the bankruptcy court clearly entered rulings on

7    non-ignition switch plaintiffs through the marked pleading

8    process, which we never appealed, and therefore, that's res

9    judicata as well.

10        THE COURT:  And just -- how -- when Judge Gerber --

11   how did he deal with the marked pleadings?  This paragraphs's

12   good, this paragraph's bad.  Where's that reflected?

13        MR. STEINBERG:  The only thing you would see is

14   what's in the November decision, and then as reflected in the

15   December judgment.  There was not -- no other greater iteration

16   than that.  So the argument that designated counsel has made

17   that they didn't expect the bankruptcy court to make the due

18   process ruling, or the independent claims ruling, is

19   irrelevant, because the bankruptcy court did make those

20   rulings.  They were aware that the bankruptcy court made their

21   rulings, the exchange of judgment shows that they were aware.

22   And their choice was to appeal if they didn't like -- if they

23   thought that the bankruptcy court ruled on something that was

24   not properly teed up.

25        Those who were aware of the proceedings that led to

71

1  the November decision are bound by the fact that they didn't

2  appeal.   That's the whole purpose of finality and res judicata.

3  The mandate rule, the wipeout rule, Rule 60(b) --

4         THE COURT:  Well, what do they take from the fact

5  that Judge Gerber did not include the due process language that

6  you include in your draft judgment?

7         MR. STEINBERG:  I take it as the judge was making

8  findings on the granular pleadings, and therefore he wasn't

9  tying it into due process, he was actually ruling that that

10 which I have seen was not a viable and valid independent claim.

11 And that's part of -- I mean --

12        THE COURT:  That means that whatever he hadn't seen

13 is not -- they're not bound.

14        MR. STEINBERG:  Whatever he hadn't seen that was not

15 otherwise the type of claim that he had seen.  Because

16 remember, footnote two says that I'm making this ruling across

17 the board, and I think that those people where he's seeing it's

18 the same claim, and they wanted -- they filed their lawsuit

19 afterwards, I think they have the ability to come to Your Honor

20 and say something.  But if it's the same argument that was

21 defeated, then I think it is the law of the case.  If it's a

22 different argument, something that Judge Gerber didn't

23 consider, or a different claim, and they weren't served with

24 the scheduling order, then I think that that's an open game.

25 That's part of the gatekeeping function.  I actually don't

72

1  think there'll be a lot of those, but if there is, there is.

2          But clearly, the people who did know what was going

3  on was this side of the table, right?  They understood what was

4  being done, they understood what was being ruled.  Again --

5          THE COURT:  I can't wait to hear what they have to

6  say about it, but go ahead.

7          MR. STEINBERG:  The mandate rule, the wipeout rule,

8  all are predicated on the fact that the Second Circuit ruling

9  didn't affect the December judgment.  And so you don't have a

10  mandate to institute a ruling based on a different judgment

11  that was entered.  You don't wipe out --

12          THE COURT:  I understand your argument.

13          MR. STEINBERG:  Okay.  So we cite cases on the

14  mandate rule and the wipeout rule, we think the Supreme Court

15  case on <u>Federated Department Store</u>, the Second Circuit decision

16  on <u>Brotherhood of Maintenance Way Employees v. Saint Johnsbury</u>

17  are particularly relevant because there, the court is pointing

18  out that you could have an inconsistent result.  Because one

19  party appealed and another party didn't appeal, but that's just

20  the way it is, because finality is more important in getting

21  cases over or not.

22          The Rule 60(b)(5), we put our pleadings there as to

23  why we thought it was inappropriate.  I don't think the

24  threshold issues was a basis for separately introducing a

25  motion to vacate under Rule 60(b)(5).  But even it is, 60(b)(5)

73

1 is essentially the codification of the wipeout rule.  It was

2 nothing that the Second Circuit did that vacated or reversed,

3 in our view, the December judgment, and the 60(b)(5) remedy,

4 and the 60(b)(6) remedy are not excuses for not appealing.

5         The Cruikshank case, the Jardin case that we cite in

6 our papers, all go for the proposition that is, when you had a

7 chance to appeal the ruling, and you didn't.  You can't

8 collaterally attack it pursuant to Rule 60.

9         As far as the particular issues that post-closing

10 accident plaintiffs raise as to why the September proceedings

11 were either confusing or whatever, I point out the following:

12 One, for the people on this side of the table, they knew what

13 was going on.  They had approved the scheduling order, the form

14 of the scheduling order, the form of the letter, and the

15 procedures, and they -- and the briefing of the issues, and

16 they did the exchange of the dueling judgments, and they knew

17 what the judgments were, and they purposely decided to not

18 appeal those issues.  They don't have an excuse.

19         Those who were in the periphery, they were served,

20 the burden is on them to participate or not to participate.

21 That's the way it was structured.  The judgment was not just

22 limited to ignition switch post-closing accident plaintiffs.

23 We point it out to specific paragraphs, paragraph 14, the

24 Coleman paragraph, which showed that it dealt with non-ignition

25 switch plaintiffs.

74

1      The letter that went out, which Judge Gerber blessed

2  as the letter that would, in effect, be his ruling, is that if

3  you didn't participate in the briefing, you're going to be

4  bound by the ruling.  Same thing that happens here in 2016.

5  There was no mention of independent claims in the scheduling

6  order, but there clearly was a mention of independent claims as

7  part of the marked pleading process, because we specifically

8  said, this is not an independent claim, and Judge Gerber's

9  ruling talked about independent claims.  And certainly the

10 people who saw the judgment and understood -- who saw the

11 judgment or have access to the judgment, would know that that

12 was part of the ruling.

13      The letters that we sent that have been approved by

14 Judge Gerber were accurate.  The reference to independent

15 claims was to reflect what Judge Gerber had actually ruled in

16 June was being limited to independent -- to ignition switch

17 plaintiffs and no one else.  To say that you are in a similar

18 position to them is not to say you are them, it says that

19 you're similarly situated, and you're probably going to be

20 bound by the same ruling, but that was what was being teed up

21 to be litigated about.

22      The -- if there was confusion as to what was going

23 on, as I pointed out before, designated counsel, lead counsel,

24 have sent out a letter to all of these plaintiffs, saying if

25 you have a problem, talk to me.  The MDL has a structure with

75

1  liaison counsel.  If you have a problem, talk to me, and

2  certainly, Judge Gerber had his courtroom that was open to them

3  if they had any confusion.

4        The December judgment clearly is not an interlocutory

5  order.  They appealed it as a right on their one issue, and

6  there is no due process issue in connection with the December

7  judgment, because those who were aware of what was going on and

8  what was being ruled upon knew that that was the actual

9  determinations, and their decision to appeal or not to appeal

10  is what rises and falls on their rights.

11        The Court had ruled that a motion to enforce was not

12  needed in connection with the September proceedings, the exact

13  same thing that Your Honor ruled in connection with the

14  September proceedings, the exact same thing that Your Honor

15  ruled in connection with the 2016 threshold issues.  We have a

16  section in our brief -- I apologize for talking fast, but I'm

17  cognizant of the time.  The -- we had a section in our brief

18  about how the law of the case might -- may apply in this case,

19  in a similar way that you have a terminal litigation and people

20  weren't served with their complaints, but the ruling that you

21  had -- that had been made as to whether someone's perfected or

22  not perfected was going to apply unless they had a reason to

23  tell you something otherwise.  And we think the same thing

24  applies to those people who came in afterwards, that they have

25  the same claim that Judge Gerber had ruled on, and they don't

76

1  have any different reason to present to Your Honor, then I

2  think that that is the law of the case.

3        On the hypothetical that you had given me where you

4  had talked about a hypothetical where, under state law, it was

5  clear that this would be an independent claim, to the extent

6  that paragraph 14 would apply because they were served with the

7  scheduling order, and they had the opportunity to participate.

8  We think that any problem that they had was overridden by the

9  fact that they didn't appeal, and on res judicata principles.

10 Those who were not bound by it, those who weren't served with

11 it, then we can't impose res judicata on them, and they would

12 be free to argue whatever they had to argue.  But we certainly

13 think that dedicated counsel, lead counsel in the MDL, they

14 certainly -- the major players in this case, they certainly

15 don't have that argument.

16       And as what we've approached in the gatekeeping

17 function, we understand the burden of all these massive

18 lawsuits, and we are judicious in what we try to bring to

19 Your Honor to try to resolve them.  We can't resolve it

20 ourselves.  We just don't come to Your Honor every time we

21 think there's a technical default.  We try to work through with

22 it.  Your history as the gatekeeper, even since the December

23 judgment, has seemed that we file the motions, and by the time

24 we come to court, half of the complaints have been resolved

25 because we've been able to deal with it that way.  Others

77

1    can't, and then we ask for a ruling.

2            Most of the litigations, just to put it in a broad

3    bucket so you understand how limited it is, most of it is we're

4    coming to Your Honor to enforce the punitive damage ruling, and

5    to say that whatever they are asserting, it's not a valid and

6    viable independent claim, it's based on a --

7            THE COURT:  You know, it looks to me that the Second

8    Circuit, in interpreting this sale order, did so in a way so as

9    to avoid constitutional issues.  Do you agree with that?

10            MR. STEINBERG:  Yes.

11            THE COURT:  And so is that -- I mean, I'm being asked

12    to interpret the effect of the sale order, and I'm being told

13    that you interpret it one way, you -- a due process violation,

14    you ought to interpret it so as to -- in such a way as to avoid

15    a constitutional due process issue.

16            MR. STEINBERG:  I don't think we're taking the

17    position that because there was -- they didn't prove due

18    process, that the sale order is effective.  I think we're

19    taking the position that if you didn't appeal the December

20    judgment, you have a res judicata effect.  We think that the

21    Second Circuit's ruling effectively raise -- de-linked due

22    process to independent claims.

23            THE COURT:  Go ahead.

24            MR. STEINBERG:  The -- as far as the gatekeeping

25    role, clearly Your Honor has a rising in jurisdiction --

78

1          THE COURT:  Okay, let's -- I -- you know, I -- for

2     better or worse, I'm satisfied.  I've satisfied myself that the

3     Court needs to maintain a gatekeeping role.  How it works

4     exactly, we'll see, but --

5          MR. STEINBERG:  Okay.

6          THE COURT:  -- but go on from there.

7          MR. STEINBERG:  All right.  So then, Your Honor, I

8     did make substantial progress, and I am finished with issue

9     two.  I think I can cover issues three and four in 15 minutes.

10         THE COURT:  Go ahead.

11         MR. STEINBERG:  With regard to used car purchases,

12    our argument is really fairly simple.  One, the Second Circuit

13    defined what a used car purchaser was.  It defined it as a

14    subset of the ignition switch plaintiffs.  So when you look at

15    their ruling, you have to see what they effectively said.  They

16    said ignition switch plaintiffs who are used car purchasers,

17    who bought, you know, cars with the ignition switch defect

18    bought in the used car market are not going to be bound by the

19    sale order.  So we accept that.

20         Frankly, if they did a certified pre-owned, that

21    would be something that we would have accepted anyway, whether

22    they were ignition switch or non-ignition switch.  The real

23    issue that is here is not with respect to whether used car

24    people can assert independent claims based on a relationship

25    that they establish New GM after the sale.  The real issue is

79

1   whether a flip of a car after the sale is --

2           THE COURT:  You say their rights aren't increased,

3   that whatever the rights of the --

4           MR. STEINBERG:  Right.

5           THE COURT:  -- prior owner were, that's -- they can't

6   get anything more than that.

7           MR. STEINBERG:  That's correct.  And we point --

8           THE COURT:  Those bringing rights --

9           MR. STEINBERG:  Right.  And we -- and then -- and we

10  pointed out, you know, the plaintiff escrow in the fourth

11  amended consolidated complaint sheet was a non-ignition switch

12  plaintiff who bought her used car from her aunt's estate.  In

13  the Sesay case, which is one of Mr. Peller's case, they bought

14  a car from a friend.  That transfer didn't resurrect rights

15  that had -- otherwise, they only got what they had.  So Carew

16  was another example, which was the Takata cases.

17          So our argument on that is that the Second Circuit

18  was addressing this from a subject matter jurisdiction issue,

19  and didn't address the -- in effect, the granular issue that

20  Judge Gerber had addressed, which is that if you're trying to

21  assert a retained liability because you're a used car purchaser

22  against New GM, and all you're asserting is whatever rights

23  that were otherwise blocked by your seller, then you can't do

24  that.  That's a violation of the order, and I'm enforcing

25  paragraph 71 in my jurisdiction to protect New GM.

80

1           Issue four, which is the punitive damages, our

2    argument is that this was never -- the issue of successful

3    liability and whether future creditors could establish a due

4    process violation was never the -- in our view, what the fourth

5    threshold issue was about.  The fourth threshold issue was

6    whether you can assert punitive damages, assuming you can have

7    a -- have successful liability claim.  The reality is -- this

8    is framed only for post-closing accident plaintiffs.  The

9    reality is, is that for a post-closing accident plaintiff, once

10   we assume the claim, it is a form of successful liability.

11   When you -- you have the four common law elements of successor

12   liability is de factor merger, continuity of ownership,

13   fraudulent, and then if you assume the liability.  So we

14   actually had assumed the liability.  The question is whether,

15   in the context of assuming the liability, we assumed punitive

16   damages.

17           THE COURT:  Well, what if New Jersey's law on

18   successor liability would expose the successor to later claims

19   than the original company?

20           MR. STEINBERG:  The -- paragraph 6 of the December

21   judgment says that we're not responsible, New GM, for Old GM

22   conduct in the context of any punitive damage claim that's

23   asserted under operation of law or otherwise.  That's res

24   judicata to anybody who had notice of these proceedings, and

25   our answer is, is that that's what would apply.  The -- and

81

1  that's what we had understood the issue to be.  We thought this

2  issue was punitive damages.  If you really wanted to delve in

3  as to whether there's successor liability, the Grumman Olson

4  case, which they cite as the future predator case --

5          THE COURT:  But Judge Bernstein didn't decide whether

6  there was successor liability.

7          MR. STEINBERG:  Right, but the --

8          THE COURT:  So that's --

9          MR. STEINBERG:  Judge Bernstein also said GM -- the

10  GM case is not applicable, because GM assumed liability, and so

11  Grumman Olson was different.  It was the guy who hadn't --

12  wasn't even the owner of the vehicle, this guy got into an

13  accident, and there was no way to give him notice.  Most of the

14  -- most of these people who would be asserting these accidents

15  were actually either the owner of the vehicle as of the time of

16  the sale, or they bought from the owner of the vehicle's sale.

17          Second Circuit determined that if there was a latent

18  defect that you didn't know about, whether it was a latent

19  defect or you wanted to assert an economic loss, because all

20  the Second Circuit was dealing with was economic loss, if you

21  wanted to assert that claim, you would be subject to the sale

22  order.  Latent defects are -- creditors with latent defects are

23  bound by the sale order because they were an owner at the time.

24          THE COURT:  Let me ask you this.  The reason -- the

25  reasons, plural, why a debtor -- what -- why a -- why punitive

82

1   damages cannot be recovered against a debtor doesn't revolve

2   around what did they do wrong?  What's the nature of the claim,

3   whether punitive damages would be available against this

4   defendant if they weren't in bankruptcy?  It's -- Bankruptcy

5   Code and bankruptcy developed law that were not going to permit

6   punitive damages against an insolvent debtor, because of the

7   effects it has on the rest of the creditor body.  But if the

8   claim, absent the bankruptcy, would expose the defendant to

9   punitive damages, and if successor liability applies, why does

10  the successor get the benefit of the bankruptcy statute and

11  policy against punitive damages?

12        MR. STEINBERG:  Well, I think that there are two

13  reasons.  The nature of punitive damages, and the reason why it

14  is subordinated, or in many cases, disallowed in a bankruptcy

15  case, is because it's not a property right that any plaintiff

16  has.  It's done for two public policy reasons.  One is

17  remedial, to try to cure the behavior of the bad actor.  In

18  this case, it was the seller who was liquidating, and the

19  second is to punish the bad action done by the seller.  So when

20  we --

21        THE COURT:  So what you argue -- I mean, the -- you

22  know, Chapter 7 doesn't permit it, and you say that that

23  likewise applies, you know, to Chapter 11, at least if it's an

24  insolvent debtor.  I've applied it in other cases.  Not because

25  the claim itself, absent bankruptcy, wouldn't permit punitive

83

1    damages, but in bankruptcy, you don't do it because the

2    creditor and distributions, equality of distribution, you have

3    the punitive damages award.  But why do you -- why does New GM

4    benefit from that?  It's not -- I understand -- so with the

5    used car purchasers, I understand your argument, you know, the

6    buyer can't acquire any greater rights than the seller had.

7    Okay?  But that analogy doesn't seem to apply when you're

8    talking about limitations on punitive damages.

9         MR. STEINBERG:  The argument is that New GM's

10   liability, on successor liability, is derivative of what

11   Old GM's liability was.  Either -- Old GM bought from a debtor-

12   in-possession, so you have a -- it's two steps removed.  One

13   is, clearly the debtor-in-possession wasn't liable for punitive

14   damages.  The question is whether the Old GM debtor was --

15        THE COURT:  It -- would you agree that -- let's take

16   a hypothetical example.  What happens if you have a solvent

17   debtor?  Would a solvent debtor -- if the claim asserted

18   against a solvent debtor would permit recovery of punitive

19   damages, may the plaintiff seek, obtain punitive damages from

20   the solvent debtor?

21        MR. STEINBERG:  I guess if I had a solvent debtor,

22   they'd be suing the seller, not the purchaser.

23        THE COURT:  But do you agree that the claim for

24   punitive damages against a solvent debtor --

25        MR. STEINBERG:  Yeah, I would agree with you on your

84

1  hypothetical --

2          THE COURT:  Let me finish my question.  Do you agree

3  that a claim against a solvent debtor could result in a reward

4  of punitive damages?

5          MR. STEINBERG:  I do.

6          THE COURT:  All right.

7          MR. STEINBERG:  I do, but in this particular case,

8  you knew you didn't have a solvent debtor because you knew that

9  when you did the sale, that everything was going to the

10 creditors, and the equity was going to get wiped out, and that

11 you were going to have --

12         THE COURT:  I'm saying during the purchase.

13         MR. STEINBERG:  The -- so you have -- the first

14 argument done on this is that it was decided as res judicata in

15 the December judgment.  The second is, is that post-closing

16 accident plaintiffs never established a due process violation.

17 They have the right to do so, they never alleged it.  They

18 argue in their papers that it's automatic if they have it.  I

19 don't know where they got that from, there's nothing that they

20 could point to that says that there was a due process violation

21 for post-closing accident plaintiffs.

22         I've talked about the Grumman Olson, and I've talked

23 about the fact that if the Second Circuit said that economic

24 loss people would be subject to the sale order because of a

25 latent effect, then if you have an accident and you're asking

85

1  for personal injuries based on that latent defect, you're going

2  to be banned in the same way if you were either the owner, or

3  you bought from an owner where there was privity to someone who

4  was there at the sale.

5        The Second Circuit ruling clearly didn't affect

6  post-closing accident plaintiffs because they were not before

7  the Second Circuit in this ruling.  Post-closing accident

8  plaintiffs were a known group when all of the 2015 proceedings

9  occurred.  Those who were noticed with the proceedings had an

10  opportunity to participate are bound by the ruling that says

11  that New GM is not liable for anything to do with Old GM

12  conduct, including under operation of law, which necessarily

13  subsumes successor liability.

14        We have the argument in our papers, which I won't,

15  other than just to flag it -- is that you can't selectively try

16  to enforce the sale agreement to try to collect assumed product

17  liabilities, and then ignore the provision in the sale

18  agreement that says that New GM is not liable for successor

19  liability, which is section 919 of the sale agreement.  You

20  can't selectively enforce an agreement.  If you're going to

21  want the benefits of the agreement, you've got to take the

22  burdens of the agreement.

23        And we talked about the issue about the differences

24  between punitive damages, which Judge Gerber goes to -- goes

25  through in the November decision, that they're punitive,

86

1  they're not a property right, they're intended for a particular

2  policy purpose, and you don't visit punitive damages on a

3  person who paid fair consideration, and is a good faith

4  purchaser for value.  You just don't. I mean, there's not a

5  case that they can cite, and I can't conceive of a case where

6  you would have successful liability damages put on a good faith

7  purchaser under those circumstances.

8         Finally, Judge Furman in the <u>Cochran</u> case said, which

9  was the -- a bellwether case, said:

10         "New GM targets <u>Cochran</u> for independent claims, that

11         is, her claims based on New GM's own conduct, the

12         only claims that could have posed New GM to punitive

13         damages in light of Judge Gerber's earlier ruling."

14         So even Judge Furman was recognizing that successful

15  liability claims didn't apply here, but only for independent

16  claims.

17         So I am now finished with the third and fourth issue,

18  and I do have the four piece people -- maybe this would be a

19  good time to break, let people handle the second, third, and

20  fourth threshold issues, and I'll go back to address those

21  other three.

22         THE COURT:  All right.  Go ahead.  Who's going to

23  speak first for the plaintiffs?

24         MR. WEINTRAUB:  I will, Your Honor.

25         THE COURT:  Mr. Weintraub, go ahead.

87

1          MR. WEINTRAUB:  Still good morning, Your Honor.

2          THE COURT:  Still.

3          MR. WEINTRAUB:  William Weintraub of Goodwin Proctor

4   for certain post-closing non-ignition switch accident

5   plaintiffs.  My plan had been to stick to the notes that I had

6   prepared, and not rise to the bait and start answering specific

7   questions, but --

8          THE COURT:  But you're going to rise to the bait?

9          MR. WEINTRAUB:  I'm going to rise to the bait anyway,

10  Your Honor, I guess because I'm a scorpion.  The key question I

11  think here, and what Mr. Steinberg keeps saying is, they didn't

12  appeal.  The crux of the matter is, who is "they" and were they

13  parties to these proceedings, and I will get to that in my full

14  presentation.  A number of references were made to the class

15  action complaints in the MDL court.  Those are all economic

16  loss cases, they are not personal injury cases.

17          In terms of the repeated suggestion that we were

18  acting as designated counsel for the non-ignition switch

19  plaintiffs, we were not.  We never have been.  We have never

20  appeared for a non-ignition switch post-closing accident

21  plaintiff until we appeared in the fourth motion to enforce

22  which was --

23          THE COURT:  What was Mr. Weisfelner?

24          MR. WEINTRAUB:  Mr. Weisfelner represents economic

25  loss people, Your Honor.  There's been a very clear division of

88

1  labor all the way through this, and our role as counsel for the

2  co-leads with respect to bankruptcy issues relating to the MDL

3  was limited to pre-closing ignition switch accident plaintiffs.

4  When we did the briefing with respect to the September

5  scheduling order, that was only with respect to very specific

6  post-closing ignition switch accident plaintiffs.

7          Our brief has a list, a schedule of the people that

8  we were representing.  There were the six bellwether trials,

9  and I think there were four others.  They were all ignition

10 switch post-closing accident plaintiffs.  We never agreed to

11 any procedures for anyone, other than the procedures that we

12 knew applied to our clients.  Judge Furman had asked a specific

13 question as part of a pretrial motion with respect to the

14 bellwethers:  Can there be punitive damages in these post-

15 closing ignition switch accident cases?  That is the only issue

16 that we briefed with respect to the September scheduling order.

17         I'll come back to footnote 70 in my main

18 presentation, Your Honor, but I do want to emphasize that we

19 agree with -- we think what we heard the drift of your comments

20 were, that --

21         THE COURT:  Don't agree or disagree.  I asked

22 questions.  Okay?  It doesn't necessarily reflect that -- my

23 thoughts --

24         MR. WEINTRAUB:  We agree with what we agree with,

25 Your Honor.  Our view of footnote 70 is that all it said was,

89

1   you haven't showed a due process violation yet; until you do,

2   you continue to be stayed.

3          THE COURT:  Does that mean that ten years from now,

4   somebody could come in and say, well, now we want to take up

5   our chance to allege a due process violation?

6          MR. WEINTRAUB:  You know, that's a loaded question,

7   Your Honor, and I guess --

8          THE COURT:  It's intended to be.

9          MR. WEINTRAUB:  And I think that that would be a

10  factor that you would take into consideration if someone comes

11  in ten years later, but don't forget, the third motion to

12  enforce, even though it's only economic loss people, was for

13  non-ignition switch people.  That motion never went ahead, and

14  there was a discovery stay put into effect with respect to that

15  motion that was never lifted.  So the notion that it was ready,

16  set, go on September 3rd to prove a due process violation with

17  respect to what could have been 20 or 30 different defects

18  without a discovery schedule, without -- the first brief was

19  due on September 18th.  The scheduled order on September 3rd,

20  first brief on September 18th.  The notion that people were

21  prepared, or even aware that this due process issue was at the

22  forefront, it's just not correct, Your Honor.

23         There was a lot of discussion about failure to warn.

24  And I think Mr. Steinberg did a good job of dancing around the

25  issue.  And the issue is very clear.  Failure to warn has been

90

1  determined to be a viable and appropriate independent claim

2  that passed through the gate.  Judge Gerber decided that in

3  connection with the November opinion.  He decided, in fact, two

4  things.  He said that Old GM's duty to warn was part of assumed

5  liabilities, and he said that New GM's duty to the -- warn to

6  the extent it could be proven was a viable independent claim

7  that passed through the gates.

8          I think the position that GM is taking but trying

9  very hard not to acknowledge is that -- and I'll talk about

10 this in my main presentation.  Judge Gerber instituted what

11 I'll call the April 2015 paradigm, due process paradigm for

12 determining whether or not there is an appropriate independent

13 claim.  And what he ruled in the April decision, and I can read

14 it to Your Honor if you want me to, very clearly, he said, I

15 went farther than I should have, I didn't realize that I was

16 doing that.  There was a due process violation here with

17 respect to the ignition switch people.  They didn't get the

18 notice that the later due process requires.  Had they been

19 notified, and had they come into court, I would have said the

20 order was too broad, and I would have curtailed it.  And leave

21 it as a matter of speculation whether he would have, in

22 response to that objection, opened it up beyond ignition switch

23 defect claims, but what he decided was a construct that carried

24 through until the Second Circuit disregarded that construct and

25 came up with a different construct for independent claims.

91

1          So Your Honor, we believe as a matter of common sense

2   and constitutional due process that the bankruptcy court cannot

3   prospectively bar future claims by exonerating a buyer from its

4   own post-sale conduct before the conduct even occurs.

5          THE COURT:  The question is, what if it does?  It

6   makes -- assuming you're correct, the bankruptcy court has got

7   the parties before it and it makes a mistake.  And it says, you

8   know, I mean, we sometimes issue third party non-debtor

9   releases, and the issue is, does it affect the property of the

10  estate or does it not?  Sometimes we can do it, sometimes not.

11  What happens if we do it, and then there nobody -- and the

12  parties before you don't appeal?  Can you collaterally attack

13  the judgment at a later time?

14         MR. WEINTRAUB:  The answer to that question, Your

15  Honor, with respect to the sale order, and then I'll get to the

16  other stuff later, is remember, what we're talking about are

17  post-closing accidents.  These people had not yet been injured.

18  They had no idea that they would ever be injured, they were

19  unidentifiable, they were not yet --

20         THE COURT:  I understand your argument, but --

21         MR. WEINTRAUB:  So --

22         THE COURT:  -- you're standing there for post-closing

23  victims and --

24         MR. WEINTRAUB:  That's right.

25         THE COURT:  -- and you said Grumman Olson makes it

1  crystal clear --

2          MR. WEINTRAUB:  But --

3          THE COURT:  -- the sale order -- Judge Bernstein says

4  the sale order in <u>Grumman Olson</u>, it would have covered it; he

5  says no, it can't.

6          MR. WEINTRAUB:  Right.  So we rely on <u>Grumman Olson</u>,

7  but we also rely on <u>Manville</u>.  In <u>Manville</u>, what the court said

8  was people who did not get due process at the time of, in that

9  case, the entry of the original order approving the settlement

10 that purported to bar third party claims, Chubb was determined

11 not to have gotten notice of that.  And that permitted Chubb to

12 challenge that order 20 years later.

13         THE COURT:  But what happens if Chubb had appeared in

14 the case and argued that you shouldn't issue the injunction,

15 and the Court does it anyway, and Chubb doesn't do a direct

16 appeal?  Would Chubb, in that circumstance, be -- would

17 res judicata apply, and bar a collateral attack by Chubb later

18 on?

19         MR. WEINTRAUB:  I think that it would, Your Honor,

20 but we don't --

21         THE COURT:  You think what?  You think it would bar

22 -- res judicata would bar --

23         MR. WEINTRAUB:  Yes, that if it's submitted to

24 jurisdiction by opposing the --

25         THE COURT:  So Mr. Steinberg says -- I -- maybe not

93

1  you -- maybe you, maybe not.  Says people appeared --

2          MR. WEINTRAUB:  People did not appear.  Accident

3  victims, post-closing accident victims, did not appear.  They

4  hadn't been injured yet.  And we talk about, in our brief, and

5  I'll get to that in my presentation, that they were not parties

6  to the briefing in -- the briefing that resulted in the

7  November and December decisions.  So therefore, res judicata

8  should not apply to them, because they were not parties.

9          And one of the points I was going to make earlier,

10 and it may come up later, but I'll say it now so I don't

11 forget, Mr. Steinberg makes much of the letter that he sent.

12 If you look at that letter, and it's a letter that we have

13 referred to, that letter went beyond the two paragraphs in the

14 case management order, in the scheduling order.  That letter

15 had a whole explanation about independent claims.

16         But what that letter didn't say was that in the back

17 of General Motors' minds, where it said, all claims except

18 independent claims are barred, what they didn't explain to the

19 people who received the letter was that in General Motors' mind

20 and the position they were going to take is, well, that's not

21 all independent claims.  It's just independent claims for

22 ignition switch defects, because they had already proven a due

23 process violation.  And in the back of GM's mind, and you guys

24 have to do that, and you have to do it now.  Our response to

25 that is, where does it say that in the scheduling order?

94

1  Nowhere.  People were not warned, and in fact, we think that

2  they were lulled into complacency by that letter.

3        So, Your Honor, going back, we think it's well

4  established in this circuit that the bankruptcy court does not

5  have subject matter jurisdiction to preclude the assertion of

6  an independent claim by one non-debtor against a non-debtor.

7  As I said, we think that's the essence of the rulings in

8  Manville.  And we also just said that we believe that these

9  independent claims are a species of future claim, because

10  they're non-ignition switch, post-closing accident cases

11  concern --

12        THE COURT:  Does Manville say what happens if the

13  parties against whom the injunction is sought to be enforced

14  have appeared and contested -- have appeared before the

15  bankruptcy court, and it made a mistake?  It went beyond -- but

16  -- and they didn't appeal?  The -- but Manville doesn't say

17  that, does it?

18        MR. WEINTRAUB:  Well, and I don't think that was an

19  issue in Manville.

20        THE COURT:  Okay.

21        MR. WEINTRAUB:  But --

22        THE COURT:  But that's the point.  That's the point

23  I'm trying to raise.

24        MR. WEINTRAUB:  Yeah, but I --

25        THE COURT:  Manville does not decide the issue of

ACCESS TRANSCRIPTS, LLC        ⚖  1-855-USE-ACCESS (873-2223)

95

1  what is the preclusive effect, what's the res judicata effect,

2  of a judgment against parties who've appeared and don't

3  directly appeal the adverse ruling?  Can they collaterally

4  attack the judgment later on?

5          MR. WEINTRAUB:  And my position, Your Honor, and only

6  speaking for the people that I represent, Mr. Steel may have a

7  different view for a different client.  My clients did not

8  appear.

9          THE COURT:  They didn't know.

10         MR. WEINTRAUB:  They didn't know.

11         THE COURT:  They hadn't been hurt yet.

12         MR. WEINTRAUB:  They hadn't been hurt yet.

13         THE COURT:  I understand that.

14         MR. WEINTRAUB:  And I would go one step farther --

15  further?  Farther?

16         THE COURT:  Maybe these are questions for Mr. Steel.

17         MR. WEINTRAUB:  Well, I'm not trying to throw him

18  under the bus, but I -- the people that I represent, or the

19  Saturn, the people that I represent were not yet injured.

20         THE COURT:  I understand your argument.

21         MR. WEINTRAUB:  Okay.  The other issue is -- is it

22  the other issue?  In the traditional third-party release case,

23  the claim already exists.  In the plan context, what the debtor

24  is trying to do is release non-debtor claims against

25  non-debtors, where the claim has already arisen.  This claim

96

1  had not yet arisen insofar as the accident had not yet

2  occurred, so it's a different kind of construct than what you

3  see in a Chapter 11 third-party release.

4          We think that, for the reasons I just said, that

5  Melane's (phonetic) construct of known creditors having to

6  receive actual notice, and unknown creditors receiving

7  constructive notice has no application in this case, because

8  these creditors were not yet creditors of anyone.  There was no

9  effective way to reach them, number one, as future tort

10 claimants against old GM.  But this is doubly true with respect

11 to independent claims, which are future claims against New GM.

12 These are not claims against the debtor, they're independent

13 claims against the non-debtor.  We also think --

14          THE COURT:  Do you agree that the bankruptcy court

15 has a gatekeeping role to determine whether the so-called

16 independent claims really attempt to bootstrap, based on Old GM

17 conduct?

18          MR. WEINTRAUB:  I do, but not to the extent that

19 Mr. Steinberg does.  I think Mr. Steinberg wants to parade

20 every one of the 660 plaintiffs into this courtroom, to

21 multiply the expenses for each one of them.  And that --

22          THE COURT:  I think you overstate your -- trust me, I

23 wouldn't have the patience for that.

24          MR. WEINTRAUB:  I understand, I'm just saying what I

25 think he wants.  In terms of should the Court be looking at or

97

1  may the Court look at species of claims that are clearly just

2  successor liability claims, assuming that the successor

3  liability bar is effective for these future claimants, which is

4  something we can test an issue for, yes.  I think that --

5          THE COURT:  So in your brief, you joined in this

6  brief in page 4, just so we're clear, so the record's clear,

7  I'm talking about the plaintiff's joint opening brief on the

8  2016 threshold issues at page 4.  The first -- in the first

9  full paragraph, second sentence, as the bankruptcy court can

10  then recognize, once it determines whether independent claims

11  against New GM should get through the bankruptcy gate, and the

12  Second Circuit said that they all do, the question of whether

13  new GM is, in fact, liable should be determined by the non-

14  bankruptcy court overseeing the lawsuits.  I read that

15  sentences as acknowledging that the bankruptcy court has a gate

16  -- an appropriate gatekeeping role in deciding, does that

17  alleged independent claim get through the gate.

18          MR. WEINTRAUB:  Well, I think it -- the focus there

19  should be, "and the Second Circuit says that they do."

20          THE COURT:  On the specific ones that were involved

21  in the (indiscernible) cite in the Second Circuit.

22          MR. WEINTRAUB:  Well, and that's where Mr. Steinberg

23  and I disagree in terms of what the Second Circuit was doing.

24          THE COURT:  All right.

25          MR. WEINTRAUB:  We think -- and I'm being pulled out

98

1  of order here, but essentially we think that what the Second

2  Circuit did was it looked at independent claims in a completely

3  different way than the bankruptcy court did, and it discussed,

4  what is the nature of a claim in bankruptcy.  And it discussed

5  it in terms of claims against the debtor that would be covered

6  under 363(f), and claims against non-debtors.  And we think

7  that what the Second Circuit determined was that the bankruptcy

8  court doesn't have subject matter jurisdiction to use 363(f) to

9  prospectively exonerate a non-debtor from conduct that has not

10  yet occurred.  We don't think that the Second Circuit limited

11  that to ignition switch defect cases any more than 363(f) has a

12  subpart for ignition switch defects, any more than section 1334

13  or 157 has a subpart as with respect to ignition switch

14  defects.  They don't.

15      So our position, similar to <u>Manville</u>, is that because

16  there was no subject matter jurisdiction, and because there was

17  no ability to give due process to these future claimants at the

18  time of the 2009 sale, they can raise the due -- the subject

19  matter jurisdiction issue the same way that Chubb did 20 years

20  later in <u>Manville</u>.

21      THE COURT:  Mr. Weintraub, what happens if you appear

22  in a case before on behalf of a client, and you don't challenge

23  subject matter jurisdiction, and I rule against you?  Can you

24  come back later and say, oh, but the Court didn't have subject

25  matter jurisdiction?

99

1       MR. WEINTRAUB:  I think it depends.  And let me tie

2  it to this case.  We don't think that the sale order on its

3  face bars independent claims.

4       THE COURT:  Well, that's a different issue.

5       MR. WEINTRAUB:  But --

6       THE COURT:  That's how I go -- how should

7  Judge Gerber -- or how now should I interpret the sale order?

8  And that's why my question to Mr. Steinberg -- it seemed to me

9  that the Second Circuit was interpreting -- in part, was

10  interpreting the sale order so as to -- and they obviously did

11  find the due process violation, but was interpreting the sale

12  order with respect to independent claims, so as to minimize or

13  avoid the constitutional issue.

14       MR. WEINTRAUB:  I'm not sure that -- I agree with

15  that.  I think, in not so many words, they did raise a

16  constitutional issue.  They raised a constitutional issue by

17  saying that the sale order on its face didn't bar independent

18  claims, and that -- and the point I was going to make there

19  was, if I appear in the General Motors case sometime after the

20  sale order is entered and I argue something and then six months

21  later somebody says, you know, independent claims are barred,

22  that's part of the --

23       THE COURT:  But what if you appeared before the sale

24  order was entered?

25       MR. WEINTRAUB:  And I said that this order goes too

1  far and it should be revised and I don't appeal?  I think I'm

2  stuck.

3           THE COURT:  Okay.

4           MR. WEINTRAUB:  But I didn't do that, and I don't

5  think that any one of my future tort claimant clients did that.

6           THE COURT:  I may be questioning the wrong person

7  with you up there, because I may agree with you with respect to

8  the future tort claims, the post-sale accident victims that

9  Grumman Olson is.  Where -- that's what your -- that's -- those

10  are the folks you say you're representing.

11           MR. WEINTRAUB:  That's right.  Even though I'm not

12  wearing a hat, that's the hat that you should see over my head,

13  Your Honor; that's who I represent.

14           THE COURT:  Okay, I've got to pick on Mr. Steel,

15  then.

16           MR. WEINTRAUB:  So Your Honor, in addition, we don't

17  think that the contents of the sale notice mentioned

18  independent claims, or anything that would have alerted people

19  who were incapable of being alerted that their future

20  independent claims and their future successor liability claims

21  were going to be barred.

22           Your Honor, I was in this courtroom almost a year

23  ago, in June of 2016, on the fourth motion to enforce.  The

24  fourth motion to enforce was the first time individual personal

25  injury plaintiffs asserting post-closing non-ignition switch

1  defect accident claims were formally and clearly brought into

2  this court.  It's important to note that the non-ignition

3  switch post-closing accident plaintiffs are not part of the

4  MDL.  For the most part, these claims are toiling away in state

5  courts because principally they assume they include assumed

6  liabilities.  So what was going on here was of no interest to

7  them, and --

8           THE COURT:  I assume the damage issue was of great

9  interest to them.

10          MR. WEINTRAUB:  It is now, because it's been brought

11  up by General Motors, and I guess by us in raising that issue

12  in the 2016 threshold issues.  But before that time, people

13  were not involved in this case, and Mr. Steinberg kept pointing

14  to this side of the room saying, well, these guys were here.

15  These guys were here, but not for people with post-closing

16  non-ignition switch accident claims.  They were not part of the

17  MDL.  The most important thing --

18          THE COURT:  Mr. Peller was, wasn't he?

19          MR. WEINTRAUB:  I'm sorry?

20          THE COURT:  Mr. Peller was.

21          MR. WEINTRAUB:  Mr. Peller was here for economic loss

22  people and for ignition switch people.  I don't believe he was

23  here for non-ignition switch accident claims --

24          THE COURT:  All right.

25          MR. WEINTRAUB:  -- but he can -- you can -- he's

1  nodding his head, and he said, that's right.  But even if he

2  was -- but he says he was not.  That wasn't in a representative

3  capacity, because there's no class of non-ignition switch

4  post-closing accident plaintiffs.  There are one-off cases all

5  over the cases.  There was no designated counsel that was ever

6  appointed to speak for them.

7          THE COURT:  GM makes a major point.  Mr. Peller only

8  appeared for the specific plaintiffs and not for others.

9  That's one of their arguments.

10          MR. WEINTRAUB:  Well, I understand that.  But we have

11  other reasons why we win and they don't.  They're all in our --

12  just -- I'm not going to --

13          THE COURT:  They're all in your brief, yes, I know.

14          MR. WEINTRAUB:  I have something on my bulletin board

15  in my office, Your Honor, that I had taken off ECF.  It was

16  some pro per plaintiff, and I don't know why I looked at it,

17  but it was a letter to the Court, and it said, Your Honor, if

18  you will just read my brief, you'll see how totally right I am.

19          Most importantly, Your Honor, with respect to these

20  individual cases on the post-closing accidents, they were not

21  the focus, as we've said repeatedly, of the early proceedings

22  in this case.  The focus of the four threshold issues was the

23  first two motions to enforce, those were economic loss claims

24  concerning vehicles with the ignition switch defect, and the

25  pre-closing ignition switch accident cases.  Nothing in the

103

1  four thresholds issues briefing concerned post-closing personal

2  injury or wrongful death cases of any stripe, and none of it

3  included vehicles without the ignition switch defect.  The

4  post-closing accident cases, as I said, were not even on the

5  radar screen at this point, and the non-ignition switch

6  post-closing accident cases were even further off the radar

7  screen, because they were not part of the MDL.

8         So how did the independent claim ruling come out of

9  the four threshold issues briefing?  The independent claim

10  ruling resulted from the confluence of two points.  First, the

11  focus on the ignition switch cases, and second, the threshold

12  issue that asked the question, if there was a due process

13  violation concerning the ignition switch, what's the

14  appropriate remedy?  From these two points emerged what we

15  think was the central theme of independent claims that remain

16  unchanged until the Second Circuit's ruling, and that's what I

17  refer to as the 2015 due process paradigm for determining

18  whether or not you could assert an independent claim.

19         You have to first show a due process violation at the

20  time of the sale by showing that Old GM was aware of the

21  defect.  That was the construct adopted in the April decision,

22  and it was carried forward expressly in the June judgment.  I

23  can read the June judgment to Your Honor.  It's paragraph 4.

24         THE COURT:  Hold on.  Go ahead.

25         MR. WEINTRAUB:  "With respect to the independent

1            claims, the ignition switch plaintiffs were

2            prejudiced by the failure to give them the notice of

3            the 363 sale that due process required.  The ignition

4            switch plaintiffs established a due process violation

5            with respect to the independent claims.  The sale

6            order shall be deemed modified to permit the

7            assertion of independent claims."

8            And then the judge goes on to define independent

9    claims as being limited to claims and causes of action that

10   asserted by the ignition switch plaintiffs against New GM.

11           "Whether or not involving Old GM vehicle or parts

12           that are based solely on Old GM's own" --

13           THE COURT:  New GM's.  You said old.

14           MR. WEINTRAUB:  No, against New GM, whether or not

15   involving Old GM --

16           THE COURT:  Okay.

17           MR. WEINTRAUB:  -- vehicle or parts.

18           "They're based solely on New GM's own independent

19           post-closing acts or conduct.  Nothing set forth

20           herein shall be construed to set forth a view, or

21           imply whether or not ignition switch plaintiffs have

22           a viable -- have viable independent claims against

23           New GM."

24           So it's clear from the April decision and from the

25   June judgment that there's a predicate to establishing

1  independent claims, and that predicate is that you must first

2  show a due process violation, and as of this point in the case,

3  the only people who had done that were the ignition switch

4  people.

5          This ruling was issued, as we said earlier in the

6  proceedings that did not involve the post-sale acts of the

7  plaintiffs.  They had no notice of these proceedings, they were

8  not parties to the four threshold issue proceedings, and even

9  with the benefit of hindsight, the independent claim ruling did

10 not bar independent claims.  It only created a due process

11 hurdle.  So the notion that anyone should have -- any of the

12 non-ignition switch post-closing accident plaintiffs should

13 have appealed from the April decision and the June judgment is

14 just not correct, for the reasons that they weren't parties,

15 they had no notice, and in effect, there really wasn't even an

16 adverse ruling against their independent claims, because it

17 established what you needed to show to demonstrate an

18 independent claim.

19         THE COURT:  Well, what about the fact that

20 Judge Gerber seems to be saying, unless you establish a due

21 process violation, you can't assert independent claims?

22         MR. WEINTRAUB:  I think that that is what he's

23 saying, and our point is --

24         THE COURT:  And you don't think -- you think that's

25 wrong.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

106

1          MR. WEINTRAUB:  Well, I think it's wrong, and I think
2   the Second Circuit dispensed with that.  But up until the time
3   that the Second Circuit dispensed with that, the non-ignition
4   switch post-closing accident plaintiffs were largely unaware
5   that any of this was going on, if not completely unaware.  And
6   the third motion to enforce was not moving ahead, and the
7   discovery stay was still in effect.  And there had been no
8   deadline to raise the due process issue that we think the
9   Second Circuit dispensed with.

10          So we think that in New GM's universe, anything that
11  involved a vehicle manufactured by Old GM that wasn't an
12  assumed liability was a retained liability.  They were very
13  binary.  They didn't recognize the notion of independent
14  claims.  It's either assumed or it's retained.  Which would
15  necessarily mean if there's post-closing misconduct by New GM,
16  it creates a claim, their argument is, well, it's a claim
17  against Old GM, so maybe we have administrative claims, or we
18  have untold number of claims that are being piled up against
19  Old GM, while New GM, without any moral hazard whatsoever, is
20  doing whatever it wants.  We don't think that that's the law,
21  and we don't think that the Second Circuit basically condoned
22  that when it threw out the April 2015 due process paradigm and
23  substituted for it, basically what we think is a subject matter
24  jurisdiction paradigm.

25          The independent claim ruling was appealed.  The

1  appellants broadly challenged the independent claim ruling in

2  their statement of issues on appeal.  Our briefs recite the

3  identification of this issue by both the economic loss

4  plaintiffs, and the appellant plaintiffs on their statement of

5  issues on appeal.

6        Lest there be any confusion, New GM told this Court

7  that it was challenging the independent claims ruling, too, on

8  the grounds that bankruptcy court could not add a third

9  category of claim -- independent claims to assume liabilities

10  and retain liabilities.  As recently as June 23rd, 2016, in its

11  reply to the opposition that we filed to the motion to enforce,

12  GM in document 13648, which was its response to our opposition,

13  wrote in a footnote:

14        "Whether the bankruptcy court had authority to

15        create, in the June 2015 judgment, the concept of

16        'independent claims,' a new category of liabilities

17        associated with Old GM vehicles is one of the issues

18        New GM has raised on appeal in the Second Circuit."

19        New GM acknowledges to this Court at a time when the

20  briefs had been filed and oral argument had already occurred,

21  that it was challenging Judge Gerber's independent claim

22  ruling, and saying that there's no basis to create a third

23  category of claim.

24        When the Second Circuit ruled, we believe it broadly

25  and unequivocally endorsed the concept of independent claims.

1  The Second Circuit disregarded the April, 2015 paradigm for

2  requiring the claim at the first show of due process violation

3  at the time of the sale, based upon a demonstration of New GM's

4  -- I'm sorry, Old GM's, demonstration of Old GM's knowledge of

5  the defect at the time of the sale.  The Second Circuit took a

6  completely different tack.

7          As I said earlier, the Second Circuit went through a

8  thoughtful analysis of the nature of a bankruptcy claim, and

9  the scope of the bankruptcy court's jurisdiction to affect what

10 it called "bankruptcy claims."  And to find those as claims

11 against the debtor, and distinguish those from claims by

12 non-debtors, against non-debtors for the misconduct of a

13 non-debtor.

14         As I said, the analysis wasn't tied to the ignition

15 switch defect at all.  In layman's terms, we believe that what

16 the Second Circuit said was, the bankruptcy court can not do

17 what it thought that it inadvertently did in 2009.  The

18 Second Circuit also said, as I said earlier, that there was

19 nothing on the face of the sale order that seemed to bar

20 independent claims, but I guess history has proven that

21 Judge Gerber believes that that's what he did.

22         Anyway, the Second Circuit made a broad, yet succinct

23 ruling, and it's found at pages 155 and 156 of the

24 Second Circuit's opinion.  The Second Circuit says, "Third,

25 however, the independent claims do not meet the codes from" --

109

1    and by the way, "independent claims" is not upper-cased, it's

2    lower-cased.  "Third, however, the independent claims do not

3    meet the codes limitation on claims.  By definition,

4    independent claims" -- lower case -- "are claims based on New

5    GM's own post-closing wrongful conduct."

6            Then they go -- the court goes on to say,

7    interestingly:

8            "Though the parties do not lay out the whole universe

9            of possible independent claims, we can imagine that

10           some claims involve misrepresentations by New GM as

11           to the safety of Old GM cars.  These sorts of claims

12           are based on New GM's post-sale conduct, and are not

13           claims that are based on a right to payment that

14           arose before the filing of the petition, or that are

15           based on pre-petition conduct.  These claims are

16           outside the scope of the sale order's free and clear

17           provision."

18           We think that that is an unfettered and unbridled

19    ruling with respect to lower case independent claims.

20           THE COURT:  I -- that part is what I viewed as the

21    Second Circuit interpreting the sale order so as to avoid the

22    due process issue.

23           MR. WEINTRAUB:  Well, I --

24           THE COURT:  -- that's -- that is, I think, the

25    language I've referred Mr. Steinberg to, but that's the

ACCESS TRANSCRIPTS, LLC              1-855-USE-ACCESS (873-2223)

1  language that I had in mind about the Second Circuit

2  interpreting the sale order so as to avoid this issue.

3         MR. WEINTRAUB:  But I -- where the due process issue

4  comes back is if somebody's going to say that you are bound by

5  that sale order, and/or you're bound by the determination on

6  the four threshold issues briefing, with respect to

7  post-closing non-ignition switch plaintiffs who weren't around

8  in 2009 to say anything, and weren't made parties to the four

9  threshold issues briefing in the -- in 2014.  So that there

10 was, to the extent someone wants to say, you are barred from

11 raising the subject matter jurisdiction issue by res judicata,

12 I would point back to Manville and say, not if I was denied due

13 process.  And Manville makes it very clear that if I was denied

14 due process, that subject matter jurisdiction issue is alive.

15        THE COURT:  If you weren't a party to the earlier

16 proceeding, I would agree with you.  But if you were a party to

17 the earlier proceeding and there was a judgment against you, I

18 don't agree.  I don't know that I do agree.

19        MR. WEINTRAUB:  I understand.  That -- I -- but

20 that's tautology and obviously, we weren't parties to what

21 happened in 2009, and we were not parties to what happened in

22 the four threshold issues briefing, but it's by definition, the

23 first two --

24        THE COURT:  I understand.

25        MR. WEINTRAUB:  Right.  We think, Your Honor, that

1  the Second Circuit wiped out the prior ruling that required the

2  claimant to show the defect was known to Old GM at the time of

3  the sale.  It's a completely new construct.  Rather than

4  focusing on the nature of the defect, ignition switch versus

5  non-ignition switch, or the knowledge of Old GM about the

6  defect, we think that the Second Circuit's paradigm is to focus

7  on the nature of the claim and the conduct, the potential

8  culpability of the actor here, New GM.

9        We think the mandate to this Court is to give effect

10 to the Second Circuit's ruling on independent claims as it

11 relates to non-ignition switch defect cases.  Whether this

12 Court views what the Second Circuit held as law of the case, or

13 as a wipeout ruling, or as a change in paradigm, or as a broad

14 statement about the subject matter jurisdiction of the

15 bankruptcy court, this Court is not writing on a blank slate,

16 and you have to take into consideration what the Second Circuit

17 has said, and we think, how it said it, and the words that it

18 used.  We think that it's impossible to reconcile how the

19 Second Circuit analyzed independent claims as a category of

20 claims that are not "bankruptcy claims" with a result that

21 limits independent claims to a particular kind of defect.

22        Now I want to step back, Your Honor, and talk about

23 the state of play which I alluded to earlier in the case, when

24 the September 2015 scheduling order was issued.  State of play

25 was that the April 2015 decision and the June 2015 judgment are

1  on appeal.  I have walked the Court through the April decision

2  on independent claims.  The key provision of the June judgment

3  is paragraph 4, which I read to the Court about the due process

4  issue, and paragraph 5, I think basically, if I recall

5  correctly, just says everyone else is still stayed.  I will

6  just double check that so I don't misspeak.

7        THE COURT:  What are you reading from?

8        MR. WEINTRAUB:  Except for the --

9        THE COURT:  What are you reading from?

10        MR. WEINTRAUB:  I'm sorry?

11        THE COURT:  What are you reading from?

12        MR. WEINTRAUB:  Oh, I'm sorry, the June judgment,

13  paragraph 6:

14        "Except for the modification to permit the assertion

15        of independent claims by the ignition switch

16        plaintiffs, the sale order shall remain unmodified

17        and in full force and effect."

18        So again, our view is the door was open for the one

19  set of people that --

20        THE COURT:  The only question in my mind is whether

21  the December judgment closed the door.

22        MR. WEINTRAUB:  Exactly, and that's what I'm crawling

23  towards, Your Honor.

24        THE COURT:  We're doing -- just so -- we're stopping

25  at 12:30.

113

1            MR. WEINTRAUB:  Okay, Your Honor.

2            THE COURT:  Because I have a judges' -- the monthly

3 judges' lunch to attend.

4            MR. WEINTRAUB:  I think I will get through by 12:30.

5            THE COURT:  Okay, I'm just -- go ahead.

6            MR. WEINTRAUB:  Do the best I can.  So in other

7 words, we think the gravamen of the June judgment is

8 independent claims were opened up for ignition switch defect

9 claimants and everyone else was still bound by the supposed

10 restriction on independent claims until they demonstrated a due

11 process violation, because that was the construct that the

12 court came up with, and the Second Circuit hadn't yet ruled.

13            At this point in the case, the post-closing

14 non-ignition personal injury accident plaintiffs were still not

15 in the picture.  None of the schedules to the June judgment

16 list any post-closing accident cases.  At this point in the

17 case, there had been no discovery into Old GM's knowledge of

18 any other defect at the time of the sale, and as I said,

19 discovery under the third motion to enforce was stayed.

20            Broadly speaking, what the June judgment did was it

21 had a road map for what happened and what should happen next.

22 The June judgment basically showed what claims against New GM

23 were now permitted because certain ignition switch plaintiffs

24 were successful in the four threshold issues briefing, that

25 would be the independent claims, and show what claims against

1  New GM were still stayed by the sale order, because certain

2  ignition switch plaintiffs had been unsuccessful, and that

3  would be the pre-sale accident victims on the successor

4  liability issue, which was then up on appeal.  And it clarified

5  that all of the plaintiffs were still stayed by the sale order,

6  because those plaintiffs had not yet shown the due process

7  violation.

8         Anyone in the enumerated categories failing to show

9  why they should not be stayed, remained stayed pursuant to the

10  terms of the June judgment, repeatedly, without prejudice.  And

11  in section 13(e) of the June judgment, there was a revival

12  provision that in essence, brought back to life any claims that

13  were dismissed, and they were all dismissed, I believe, without

14  prejudice, but if an intervening statute had run, they were

15  brought back to life without regard to the running of the

16  statute if the judgment was reversed on appeal.

17         All of that said, the critical point here,

18  Your Honor, is that neither the April 15 decision nor the June

19  2015 judgment cover or mention or address post-sale accident

20  claims, and no post-sale accident claims were part of the

21  schedules.  After entry of the June 2015 judgments, two fights

22  broke out among the bankruptcy insiders.  And when I say "the

23  bankruptcy insiders," now I'm talking about this side of the

24  table, this table, and that table.

25         And bankruptcy insiders are the MDL co-leads, the

1  bankruptcy lawyers representing them on specific issues, and

2  General Motors and their bankruptcy counsel.  First, there were

3  three economic loss complaints that asserted or used language

4  that New GM contended violated the sale order.  One of them was

5  the master consolidated complaint in the MDL.  That was the

6  1,000-page complaint that Mr. Steinberg referred to.  That was

7  exclusively economic loss, the complaint by the state of

8  Arizona, which were consumer protection and economic loss, and

9  the complaint by the state of California, consumer protection

10 and economic loss.

11        All three of those complaints were being handled by

12 the Hagens Berman Firm in one form or another, and they are the

13 co-lead, one of the three co-leads in the MDL.  Not any of --

14 none of these cases involve accidents.  The second fight that

15 broke out had to do with the bellwether cases, which I

16 mentioned earlier.  Judge Furman had a specific question about

17 the bellwether cases that were getting ready for trial in the

18 MDL.  These were all post-closing ignition switch accident

19 cases, and the question was whether punitive damages could be

20 sought as an assumed liability, or as a part of an independent

21 claim.

22        Independent claims for ignition switch cases were

23 permitted, per se, because under the April paradigm, due

24 process violation had already been shown for the ignition

25 switch people, and no one questioned whether an independent

1  claim could be brought in the MDL by the ignition switch

2  post-closing accident plaintiffs, and indeed, Judge Furman

3  ruled, as we said in our brief, that failure to warn, duty to

4  warn, was, even though not an assumed liability, it's a viable

5  independent claim.  And we cited those Judge Furman opinions to

6  you.

7          So the two points here, Your Honor, are that as I

8  said earlier, my firm was not representing anyone other than

9  the post-closing ignition switch accident bellwether people.

10 And no one was representing the post-closing non-ignition

11 switch plaintiffs as a group, as a class, and none of the

12 individuals who were -- who are now tried to be bound by what

13 happened in November/December were present in the proceedings.

14 The scheduling order was issued by the court on September 3,

15 and opening briefs were due on September 18.  That date is

16 important when we look at footnote 70 in terms of the

17 observation by Judge Gerber that no one had yet proven the due

18 process violation that's still under the April, 2015 due

19 process construct, was a predicate to the assertion of an

20 independent claim.

21         As we said in our brief, Your Honor, the September

22 scheduling order lists categories of claims and claimants.  It

23 does not list non-ignition switch post-closing accident cases,

24 it does not list independent claims as defined in the

25 April, 2015 decision, it does not describe independent claims

1 in descriptive terms as a category of claims to be considered.

2 It does not refer to claims against New GM based upon New GM's

3 post-closing conduct.  The scheduling order does not mention

4 the April 2015 due process paradigm for independent claims.  It

5 doesn't say that there's a due process delve that has just gone

6 off.  It does not set a discovery schedule for determining

7 whether particular non-ignition switch defects were known to

8 Old GM at the time of the sal

9        Opening briefs were due just in two weeks after the

10 issuance of that order, and there was no designated counsel, as

11 I said earlier, for the non-ignition switch post-closing

12 accident plaintiffs, because they're not part of the MDL.  In

13 fact, Your Honor, nothing in the September 3 scheduling order

14 presages or forewarns non-ignition switch post-closing accident

15 plaintiffs that the scheduling order even applies to them.  Up

16 until that point, there had never been a motion to enforce

17 filed against any post-closing non-ignition switch accident

18 plaintiff.

19        With the benefit of hindsight, Your Honor, we think

20 that GM has pivoted position since the issuance of the Second

21 Circuit's ruling.  It's easy to see why the post-closing non-

22 ignition switch accident cases were not part of the earlier

23 proceedings.  As I said, they're all post-closing, they're all

24 in state court, they're all basically concerned assumed

25 liabilities.  They were out in the trenches being handled by

1  GM's local counsel, they were just not on anybody's radar

2  screen.

3          We think that somewhere along the line,

4  General Motors decided to change strategies and try to use the

5  June judgment, and the ruling on the four threshold issues as a

6  springboard to short circuit the rights of the non-ignition

7  switch post-closing accident plaintiffs.  And they've decided

8  to try to use the September scheduling order as the vehicle to

9  do that.  The scheduling order was seriously flawed and not the

10 proper vehicle for doing that.  It did not effectively raise

11 the independent claim issue, or the due process issue that I

12 mentioned earlier.  The categories in the scheduling order

13 don't apply to the non-ignition post-closing accident

14 plaintiffs.  There's no mention of independent claims, no

15 mention of due process.  There's no pending motion to enforce,

16 there was no process issued that compelled people to appear,

17 and we think that New GM compounded its own problems by sending

18 a seriously misleading letter, along with the pleadings that it

19 sent to people.  And as I said earlier, that letter went beyond

20 the two paragraphs in the scheduling order, and started talking

21 about independent claims without explaining the distinction

22 between ignition switch and non-ignition switch.  It said,

23 other than independent claims, your claims are barred.

24          By not describing the independent claim issue the way

25 Judge Gerber defined it, it didn't alert people to the due

119

1   process issue, it only told people that independent claims are

2   okay, and that, we think, is a serious defect in the entire

3   September 3 scheduling order procedure.  Briefing commenced on

4   September 18th.  The non-ignition switch post-closing accident

5   plaintiffs were not organized at that time.  Each one of their

6   defects was different.  There were probably dozens if not more

7   defects that were covered by those.  Discovery had been stayed.

8   There was no analogue, as I said earlier, to the Volucas

9   (phonetic) report.  The Volucas report was virtually the only

10  thing -- the main thing that let the fourth threshold issues

11  proceed as expeditiously as it did.  The parties entered into a

12  stipulated set of facts, based upon primarily the Volucas

13  report.  The Volucas report only dealt with the ignition

14  switch.  There was no equivalent, so that anybody who needed to

15  prove a due process violation as a predicate to the ability to

16  assert an independent claim was basically at ground zero.  And

17  they were at ground zero on September 3, when the scheduling

18  order came out, and they were on ground zero on September 18th

19  when the first brief was filed.

20          Despite all the handicaps, Your Honor, and

21  notwithstanding New GM's recent efforts to elevate the outcome

22  of the fall briefing to some kind of res judicata status, we

23  believe that nothing in the November 2015 decision, or December

24  2015 judgment directly addresses post-closing non-ignition

25  switch accident cases.  The November decision never mentions

1  personal injury cases.  Footnote 70 is the closest thing in the

2  opinion.  If you look at the definition in footnote 70, that's

3  limited to economic loss parties, it's not even -- it doesn't

4  even cover the post-closing accident plaintiffs.  I won't read

5  footnote 70 into the record, you've probably read it a dozen

6  times.  Our view is, it doesn't do anything other than

7  reiterate, based upon the April, 2015 due process paradigm that

8  you need to demonstrate a due process violation.  You haven't

9  done that yet, so you're still stayed.  And that takes us --

10        THE COURT:  Just a second, come back on that.  Could

11  you wait -- could plaintiffs wait ten years to say, well, now

12  we're ready to raise the issue of due process, and we want

13  discovery, and --

14        MR. WEINTRAUB:  I think it's a matter of degree, and

15  the farther away you get, the heavier the burden, I would

16  think, but --

17        THE COURT:  What are the legal principles that apply

18  to it?

19        MR. WEINTRAUB:  I'm sorry?

20        THE COURT:  What's the legal principle or principles

21  that you'd apply?

22        MR. WEINTRAUB:  Maybe laches.  However, we don't

23  believe that anyone waited.  This was not a patent issue, this

24  was a latent issue, and it only bubbled to the surface in

25  connection with really the fourth motion to enforce.  And we

1  raised the due process issues in our opposition to the fourth

2  motion to enforce, and we're raising them again now in

3  connection with this because the Court had not yet ruled on the

4  fourth motion to enforce.  So we think we've acted

5  expeditiously.  And I would go back to the point that GM filed

6  the third motion to enforce, and then it sat deferred.  They

7  didn't do anything to ignite it or instigate it or move it

8  forward, and there was a discovery stay in effect under the

9  third motion to -- I'm sorry, the third motion to enforce.

10         And that motion, even though it wasn't post-closing

11  accident people, it was non-ignition switch.  And had that been

12  moving forward in a fashion, perhaps people would have been

13  alerted.  But they were clearly alerted as a result of the

14  fourth motion to enforce.  So I don't think there was any kind

15  of laches or dilatory tactics here.  As I said earlier, they

16  are not bankruptcy insiders, they are not part of the MDL.

17  They are toiling away in the trenches in state court, and as I

18  think what actually happened is, as they got closer to trial

19  and people started looking at it, they said whoa, wait a

20  minute, these guys are going for punitive damages, we've got to

21  bring them into the bankruptcy court and shut this down.  And

22  that's what precipitated this, not people hanging back.

23         THE COURT:  So your -- just so we're clear, your view

24  is that the fourth motion to enforce is the first time that New

25  GM raised the issue of due process of the seller, barring

122

1  claims by the non-ignition switch --

2          MR. WEINTRAUB:  Yes.

3          THE COURT:  -- plaintiffs?

4          MR. WEINTRAUB:  And it --

5          THE COURT:  Accident.

6          MR. WEINTRAUB:  And you'll take me out of order

7  again, but why not?  We think that what GM said in the briefing

8  in connection with the fourth motion to enforce is also

9  instructive.  This goes to the pivot that I referred to earlier

10 of, oh, you know, due process was not really the issue anymore,

11 now it's the merits of the independent claims.  What New GM

12 says in document 13634, which is their initial motion to

13 enforce the fourth motion, paragraph 14:

14          "The sale order and injunction was modified in the

15          June, 2015 judgment because the bankruptcy court

16          found that ignition switch plaintiffs as defined

17          below, but not any other group of plaintiffs,

18          established a due process violation, and were

19          prejudiced in connection with GM's notice -- Old GM's

20          notice of the 363 sale.  The sale order and

21          injunction was modified solely to allow ignition

22          switch plaintiffs to assert independent claims, if

23          viable, under non-bankruptcy law, against New GM."

24          In their response to our opposition to the motion to

25 enforce, which is 13648, New GM says, in -- on page 12:

123

1    "The state court plaintiffs had never filed a motion

2    in this court, let alone proven that the sale order

3    and injunction should be modified then to assert

4    independent claims, based on an alleged due process

5    violation."

6   So these are pleadings filed well after the November

7 opinion, where they're still adhering to the construct of this

8 -- there are only two species of claims.  Assume liabilities or

9 retain liabilities.  Oh, by the way, Judge Gerber made this

10 ruling that there could be independent claims, but that's only

11 for ignition switch vehicles, and that's only if you show a due

12 process violation at the time of the sale, and Old GM's

13 awareness of that defect.

14   THE COURT:  Let me just ask you to do this.  Just --

15 and I know you can already, but just give me the ECF numbers of

16 the motion to enforce, your opposition to it, and their reply.

17   MR. WEINTRAUB:  13634 is their motion to enforce.

18   THE COURT:  Okay.

19   MR. WEINTRAUB:  13648 is their reply to our

20 opposition.  I don't have the opposition here --

21   THE COURT:  All right, I'll find it.  That's --

22   MR. WEINTRAUB:  Oh, actually, I do.  I do.  If --

23   THE COURT:  If you can give it to me, fine,

24 otherwise, I'll get it on the claims.  There's not a lot of ECF

25 numbers between 634 and 648.  I will find it.  It's --

124

1  Mr. Weintraub, it's okay, I will -- it really is okay.

2           MR. WEINTRAUB:  13642.

3           THE COURT:  Thank you very much.

4           MR. WEINTRAUB:  So and I was going to read to you

5  paragraph 14 of the December judgment, which GM spent a lot of

6  time on.

7           THE COURT:  All right.  It's 5 of 13 of ECF 13563.

8  Page 5 of 13.

9           MR. WEINTRAUB:  What Judge Gerber writes in

10 paragraph 14 -- and by the way, I would note, and I think it

11 was probably obvious to the Court, that the court did not put

12 in the due process language that New GM had asked for.

13          THE COURT:  Yes.  I had asked questions about that.

14          MR. WEINTRAUB:  Okay.  What paragraph 14 says is,

15 plaintiffs of two types:

16          "One, plaintiffs whose claims arise in connection

17          with vehicles without the ignition switch defect, and

18          two, pre-closing accident plaintiffs are not entitled

19          to assert independent claims against New GM with

20          respect to vehicles manufactured and first sold by

21          Old GM, an Old GM vehicle.

22          "To the extent such plaintiffs has attempted to

23          assert an independent claim against New GM, in a

24          preexisting lawsuit with respect to an Old GM

25          vehicle, such claims are proscribed by the sale order

125

1        April decision, and the judgment dated June 1, 2015,

2        the June judgment."

3        What Judge Gerber does not do is cite to any portion

4 of the December -- I'm sorry, the November decision.  He cites

5 back to the June judgment.  And the June judgment is what we

6 believe sets forth the due process paradigm that we talked

7 about earlier, that you must first show a due process violation

8 at the time of the 2009 sale by showing that Old GM knew of the

9 non-ignition switch defect in order to assert an independent

10 claim.  And that is consistent with what we believe was New

11 GM's position throughout, that it's either an assumed liability

12 or retained liability, except for this one little sliver of

13 independent claim for ignition switch people, and it's

14 inconsistent with, as I'll get to in a few minutes, the notion

15 that the September scheduling order was a call to arms for

16 everybody to come forward with their complaint and demonstrate

17 why their independent claim was valid.

18        And we think that, obviously, the reason that

19 paragraph 14 is constructed that way was precisely because of

20 footnote 70 and the failure to show a due process violation.

21 And the other thing I want to point out about paragraph 14 is

22 the language.  "Pre-closing accident plaintiffs" -- this is on

23 a little subpart 2 of 14 -- "are not entitled to assert

24 independent claims."  This is a broad and blanket statement.

25 It's not, well, the non-ignition switch people, maybe they have

126

1  some that are -- will pass muster, maybe they don't.  It says

2  not entitled.  And it's not tied to any specific complaint.

3  And we think that's because Judge Gerber is still following his

4  due process construct from the April decision.  They didn't do

5  what they needed to do yet, then none of them can assert

6  independent claims.

7       And if you look carefully at the judgment, what you

8  will see is that any independent claim by any claimant is not

9  discarded because it doesn't pass muster.  It's basically flat

10 out not permitted.  Because it's -- because of the failure to

11 show due process.  And in particular, it would explain how the

12 Peller complaints were handled at paragraph 28 of the December

13 judgment.

14      What the court says in paragraph 28 is, "With respect

15 to the Peller complaints, the ignition switch plaintiffs may

16 assert claims based on alleged duties of New GM relating to

17 post-closing sale" --

18           THE COURT:  Sale events.

19           MR. WEINTRAUB:  -- "events, relating to Old GM

20 vehicles, to the extent they are actionable as matters of

21 non-bankruptcy law, to be decided by non-bankruptcy courts,

22 provided, however, the Peller complaints remain stayed unless

23 and until they are amended to remove claims that rely on Old GM

24 conduct as a predicate for claims against New GM, and two, to

25 comply with the applicable provisions of the decision and this

1  judgment, including those with respect to claims that fail to

2  distinguish between Old GM and New GM, and three" -- and this

3  is the key one -- "to strike any purported independent claims

4  by non-ignition switch plaintiffs."

5         THE COURT:  And that's where the next page is missing

6  in my copy.

7         MR. WEINTRAUB:  Okay.

8         THE COURT:  But what does it read?  Do you have it?

9         MR. WEINTRAUB:  Yeah.

10        THE COURT:  What does it carry -- what does --

11        MR. WEINTRAUB:  Oh, the carry -- it's -- "to strike

12 any purported independent claims by non-ignition switch

13 plaintiffs, period."  And then the next sentence is:

14        "To the extent the Peller complaints assert claims

15         against New GM based on New GM manufactured vehicles.

16         Such claims are not proscribed by the sale order, the

17         April decision, and the June judgment."

18        So the key take away here for us, Your Honor, is sub

19 3, that the independent claims were just stricken, basically,

20 we believe, because of the failure at that point to show the

21 due process violation.  They were not permanently stricken with

22 just, he had them what he needed to do, so if you want to go

23 ahead, either show the due process violation, or drop the

24 independent claim, and then you can go ahead.

25        And this is to be contrasted with -- let's see.  One

1   second, Your Honor.  Paragraph 30 of the complaint -- of the

2   judgment.

3           THE COURT:  I don't have that page.

4           MR. WEINTRAUB:  Well, that's one --

5           THE COURT:  That page that I don't have.

6           MR. WEINTRAUB:  Well, that's the best page of the

7   judgment, Your Honor.  What paragraph 30 says, to contrast with

8   what Judge Gerber did with Judge -- Professor Peller, is:

9           "The Court does not decide whether there is the

10          requisite duty for New GM under non-bankruptcy law

11          for such Old GM vehicles, but allows this claim to be

12          asserted by the ignition switch plaintiffs, and the

13          post-closing accident plaintiffs, such has been

14          asserted by the plaintiff in Moore v. Ross, with

15          respect to the ignition switch, leaving the

16          termination of whether there is the requisite duty

17          under non-bankruptcy law to the non-bankruptcy court

18          hearing that action."

19          So in other words, consistent with our view of what

20  Judge Gerber was doing here, was he was implementing the

21  April, 2015 construct.  Independent claims are good for the

22  ignition switch people, because they prove the due process

23  violation that I said in April they had to prove as a

24  predicate.  Anyone else, they hadn't done that yet, your

25  independent claims are no good.

1           And Your Honor, if you go to the letter, which I

2   think is part of the record, that General Motors sent to the

3   Court where it described the other complaints, what it says, if

4   you look at that, each one of the other complaints, they were

5   all non-ignition switch, and it says, retain liability, retain

6   liability, retain liability, without analysis, just because it

7   doesn't fall into the bucket that was defined by Judge Gerber.

8   I can go on with this, Your Honor, there --

9           THE COURT:  Only for five minutes.

10          MR. WEINTRAUB:  Do I get to pick up at another point?

11          THE COURT:  You do.

12          MR. WEINTRAUB:  So the last point I'll make here --

13          THE COURT:  The question is clearing out when.

14          MR. WEINTRAUB:  Oh, okay.  One of the points that

15  New GM makes in its brief is that, you know, even though

16  independent claims words were not in the order, if you looked

17  at what we did with the first amended bar complaint, the

18  thousand page complaint, you would see that independent claims

19  are an issue there.

20          First of all, the fact that someone who's not been

21  made a party would even think to go and look through a

22  thousand-page complaint to try to figure out what was going on

23  is kind of silly.  But if you look at the letter that was filed

24  with the Court that accompanies the marked complaint, again,

25  what New GM focuses on is this due process issue.  It's not

130

1  focusing on the merit or the mettle of the independent claim.

2  It's focusing on, for non-ignition switch people that they had

3  not yet shown a due process violation.

4          Let me just get that letter as the last act before

5  lunch.  The letter is docket number 136 -- oh, I'm sorry.

6  13469.  And it's entitled, "Explanatory Letter With" --

7          THE COURT:  Give me that number again?  I'm sorry.

8          MR. WEINTRAUB:  13469.

9          THE COURT:  Thank you.

10          MR. WEINTRAUB:  It's entitled, "Explanatory Letter

11  With Respect To Marked MDL Complaint."  And it goes through the

12  coding, and on page 3, the first full paragraph and the second

13  full paragraph, this is what GM says:

14          "The claims of plaintiffs who purchased Old GM

15          vehicles from Old GM or from a third party unrelated

16          to GM, whether before or after the closing of the 363

17          sale should be stricken.  This is particularly true

18          with respect to the non-ignition switch plaintiffs."

19          Again, this is a defined term, and it's only the

20  economic loss people, not the personal injury people.

21          "The Court held with respect to non-ignition switch

22          plaintiffs, this sale order prohibits all claims

23          against New GM that are not assumed liabilities.  In

24          other words, the sale order was modified to allow

25          only ignition switch plaintiffs, and not non-ignition

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

131

1        switch plaintiffs, to assert independent claims that

2        would otherwise be barred by the sale order.

3        "Footnote: see In Re: Motors Liquidation Co., 531

4        B.R. 354(360).

5        "The non-ignition switch plaintiffs' claims were made

6        stayed, and properly so.  Those plaintiffs have not

7        yet shown, if they ever will, that they were known

8        claimants at the time of the 363 sale, and that there

9        was any kind of due process violation with respect to

10       them.  And unless and until they do so, the

11       provisions of the sale order, including its

12       injunctive provisions, remain in effect."

13       So again, they are adhering to a construct that was

14   in place before the Second Circuit ruled.

15       THE COURT:  Let's stop for now.  I'm -- we're up here

16   when you're going to resume with this.  In addition to that, I

17   haven't digested anything the Second Circuit, today, earlier

18   today issued an opinion in Tronics (phonetic).  Dismissed the

19   appeal for lack of jurisdiction, this is the appeal on whether

20   the injunction that was part of the Tronics land could be

21   enforced in district court.  They enforced it, but did he hold

22   people in contempt with a 60-page opinion, so it -- I have it

23   open on my screen, it just -- you know, Judge Wesley writes the

24   opinion.  I don't know whether it has a bearing on the issues

25   that we're dealing with or not, but I do want you all to look

132

1  at that, and let me know whether there should be any

2  supplemental letter briefs that deal with the Second Circuit's

3  decision today in <u>Tronics</u>.

4         This was the plan injunction against asserting

5  environmental claims, the issue was whether claims in the state

6  court in Pennsylvania uphold.

7         MR. WEINTRAUB:  Uh-huh.

8         MR. STEINBERG:  You've got a trial coming up, too.

9         THE COURT:  Oh, yeah, I have a trial coming up on --

10  starting on Monday, in Motors Liquidation on what the -- on

11  what's a fixture.

12         MR. WEINTRAUB:  I was told in law school if you hit

13  it with a hammer and it doesn't move, it's a fixture.

14         THE COURT:  Should I quote that in the --

15         MR. WEINTRAUB:  I'd get to be quoted somewhere, Your

16  Honor.

17         THE COURT:  Confer with your colleagues on that side

18  of the table, and how much -- I'm not trying to cut anybody

19  short, I mean, how much -- realistically, how much time do you

20  envision that you need to argue -- complete your argument, and

21  then I'm going to ask Mr. Steinberg the same thing.

22         MR. WEINTRAUB:  I'll be realistic for me, and I would

23  say under an hour.

24         THE COURT:  Okay.  And others?  I'm not trying to cut

25  anybody short.

133

1          MR. STEEL:  Similarly, under an hour, Your Honor.

2          MR. PELLER:  I'd say about 30 minutes for

3   Gary Peller, Your Honor.

4          MR. HIRSCH:  Your Honor, I'm here for the Pitterman

5   plaintiffs, and in light of Your Honor's instruction at the

6   beginning of the hearing, I want to advise the Court that our

7   case is scheduled for trial to start evidence July 5.

8          THE COURT:  Where?

9          MR. HIRSCH:  In district court in Connecticut.

10          THE COURT:  Okay.  And is it punitive damages?  Is

11   that the issue?

12          MR. HIRSCH:  No, sir, it's not.

13          THE COURT:  What's the -- how does it -- these

14   threshold issues affect your case?

15          MR. HIRSCH:  We have asserted two claims in our case.

16   One is failure to recall/retrofit, and one is failure to warn,

17   and General Motors has taken the position we're not entitled to

18   pursue those claims.  I've submitted a brief to this Court

19   indicating why we are.  We are not claiming punitive damages in

20   that case.  We -- and I have about ten minutes of argument on

21   that issue, if Your Honor please, at some --

22          THE COURT:  It isn't happening today.  I've got a

23   calendar this afternoon, and --

24          MR. STEINBERG:  Your Honor, I think Pitterman is part

25   of the -- one of the 2016 motions to enforce that we filed --

134

1          MR. HIRSCH:  It is.

2          MR. STEINBERG:  -- that's been --

3          MR. HIRSCH:  It is, it is one of the --

4          THE COURT:  I think you just filed.

5          MR. STEINBERG:  Excuse me?  Is that -- which file did

6    I mean -- the June -- is it June?

7          MR. HIRSCH:  June, 2016.

8          MR. STEINBERG:  Okay.

9          MR. HIRSCH:  So that is the subject of a motion to

10   enforce --

11         THE COURT:  So it's not -- it wasn't something that

12   anybody briefed in connection with these threshold issues, but

13   that he is raising an issue with regard to the motion to

14   enforce.

15         MR. HIRSCH:  It does come up, I thought, under the

16   threshold issues, number two, because it talks about we have a

17   right to pursue these claims.

18         THE COURT:  Well --

19         MR. HIRSCH:  I could -- and I know that the counsel,

20   it's an issue, but perhaps it might be in front of the court in

21   our case.

22         MR. STEINBERG:  He can argue if he -- whatever time

23   you want, Your Honor, and I'll say whatever it is that I want

24   to say.  If you want to entertain it.  And it is actual --

25   wait, was it sub judis?  Or --

1          MR. HIRSCH:  What do you mean?

2          MR. STEINBERG:  Our motion, did you have a chance to

3   argue it, or was it just filed and then just --

4          MR. HIRSCH:  Well, you filed your motion through --

5   excuse me, Your Honor.  You filed your motion to enforce; I

6   filed in response.

7          MR. STEINBERG:  Okay.

8          MR. HIRSCH:  So before -- there is a motion --

9          MR. STEINBERG:  So we haven't had an oral argument.

10          MR. HIRSCH:  We haven't had an oral argument motion,

11   or my response.

12          THE COURT:  Yeah, I didn't see the papers.

13          MR. HIRSCH:  And I thought it was part of the -- my

14   understanding is, it's part of threshold issue number two, even

15   though it doesn't deal with punitive damages.  I'm basically

16   the tail wagging the dog here, and it has to do with what

17   claims will be permitted to be -- the district court to

18   instruct a jury on in terms of the case.  It's fairly

19   straightforward and simple, Your Honor.

20          THE COURT:  But I haven't read the papers on the

21   motion to enforce, your opposition to it.  I've read the papers

22   for today.

23          MR. HIRSCH:  I understood -- I understand that, Your

24   Honor.

25          THE COURT:  Somebody else wants to say something

136

1  here.

2           MR. BABCOCK:  Your Honor --

3           THE COURT:  Identify yourself for the record.

4           MR. BABCOCK:  Yeah, Your Honor, Russell Babcock, I'm

5  here on behalf of Benjamin Pillars, and we don't expect to have

6  a very long presentation either, about 15 minutes, depending on

7  how many questions Your Honor has, so --

8           THE COURT:  Is it affecting an upcoming trial?

9           MR. BABCOCK:  No, it's about -- no it's about we're

10 here today, we're one --

11          THE COURT:  Yeah, no, no, no.

12          MR. BABCOCK:  Oh.

13          THE COURT:  My immediate question is --

14          MR. BABCOCK:  Oh, I'm sorry.

15          THE COURT:  -- does anything that's presently before

16 me affect an upcoming trial?

17          MR. STEINBERG:  Pillars is the threshold one issue,

18 and that's what Judge Furman asked in connection with the --

19          THE COURT:  Yes.  On that matter.

20          MR. STEINBERG:  -- Avis, and that's why you're --

21          MR. BABCOCK:  I'm sorry.

22          MR. HIRSCH:  We are not part of the MDL, Your Honor,

23 we're one of those --

24          THE COURT:  I know.

25          MR. HIRSCH:  -- outliers in the hinterlands.

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

137

1        THE COURT:  I understand.  Well, Connecticut's hardly

2   a hinterland.

3        (Pause)

4        THE COURT:  Can everybody come back on May 10th?  My

5   trial's supposed to last for two weeks, it starts Monday.  I

6   got a roomful of boxes of stuff that I still haven't reviewed.

7   If I thought that we really could get done tomorrow morning,

8   I'd say come back tomorrow morning, but it's -- you're all

9   shaking your head, but, you know, it's too bad, frankly.  I've

10  got stuff -- I've got a calendar that I have to deal with.  So

11  I can schedule you -- I'm hoping this trial really does only

12  last two weeks.

13       MR. STEINBERG:  Your Honor, we actually do have, I

14  think, a motion to enforce in connection with the <u>Hinds</u> matter,

15  but it's just filed returnable May 11th.  I'm not sure that

16  makes a difference to you as far as your calendar in this.

17       THE COURT:  Oh, I see it on there, two o'clock on May

18  11th.

19       MR. STEINBERG:  May 10th is a fine date with me, and

20  if you can tell us how much time it is, maybe we --

21       THE COURT:  It's not good?  It's not workable?

22       MR. WEINTRAUB:  I have some conflicts around that

23  time, Your Honor.

24       THE COURT:  All right.  Here's what we do.  We'll --

25  we're -- you all need to confer with my -- among yourselves and

138

1  my courtroom deputy and find a date that works.  I don't have a

2  time to deal with -- have you negotiate -- I don't mean this

3  pejoratively, to have you negotiating a schedule.  I want to

4  try and accommodate.  This was scheduled way in advance, I

5  understand that.  We're not done.  I've got important things on

6  the calendar this afternoon I've got to deal with, and --

7          MR. WEINTRAUB:  Your Honor, can you tell us what

8  dates work for you, and then we can pick among those dates?

9          MR. STEINBERG:  Well, why not just do it with the

10 clerk, I mean --

11          THE COURT:  Well, there's something on the calendar,

12 Mr. Steinberg points out, on May 11th in the afternoon.  We

13 could do it then.  Hold on.

14          MR. STEINBERG:  Are you booked up?  We can get in

15 that week, or --

16          THE COURT:  Hold on.

17    (Counsel confer)

18          THE COURT:  I can -- you know, I have something on

19 the morning of May 11th.  I'll move that.  I have a res cap

20 matter on the morning of May 11th, but I can book the whole day

21 on May 11th to this.

22          MR. WEINTRAUB:  Yeah, I can do that.  I'll just tell

23 my wife she doesn't get to see her grandson.

24          THE COURT:  Well, that's -- if I had to tell my wife

25 that, I'd be in trouble.

139

1          MR. WEINTRAUB:  Well, I'm going to be in that, she

2    might well hang me.  All right.

3          THE COURT:  Where's your grandson?

4          MR. WEINTRAUB:  Fort Wayne, Indiana.  I'm debating

5    Judge Gerber on successor liability issues in Detroit on the

6    evening of May 9th, so we thought we'd just hop over to

7    Fort Wayne.  Is there another date?

8          MR. PELLER:  Judge Glenn, would you be willing to

9    entertain a telephonic appearance --

10          THE COURT:  I would.

11          MR. PELLER:  -- instead of coming from Washington?

12          THE COURT:  Yes, I would.

13          MR. PELLER:  Thank you.

14      (Counsel confer)

15          THE COURT:  Let's -- I'm going to adjourn now, and if

16    you can see if you can work out the May 11th, I'll move what I

17    have in the morning, and devote the whole day to it.

18          MR. STEINBERG:  Your Honor, we're going to see if

19    there's another date that you might have that could accommodate

20    Mr. Weintraub's schedule --

21          THE COURT:  Yes, I'd like to.

22          MR. STEINBERG:  -- as best as we can.  So there's a

23    lot of people here who'll have to weigh in, but we'll try to

24    work with your clerk --

25          THE COURT:  May 17th, I have a few things I could

1  move.  Most of what I had on May 17th have been adjourned,

2  there are two small things.  I'll move those.

3       (Counsel confer)

4          THE COURT:  So, the 11th to the 17th, I'll move

5  whatever schedule -- the 11th, we already have the one GM

6  matter.  I'm willing to try and do that.  Mr. Weintraub, I --

7  you know, if the 17th will work for you, if we can do it on the

8  17th?

9          MR. WEINTRAUB:  That would.

10         THE COURT:  Talk --

11         MR. WEINTRAUB:  And could accommodate Mister --

12         MR. HIRSCH:  Hirsch.

13         MR. WEINTRAUB:  -- Hirsch on the 11th, since it's a

14  one-off matter.

15         MR. STEINBERG:  I'm happy to -- I'm going to be here

16  anyway, so.

17         THE COURT:  Okay.  Will that work for you?

18         MR. HIRSCH:  May 11th will work for me, I'm free,

19  Your Honor.

20         MR. STEINBERG:  And we'll file the papers, so you

21  don't have to look for it.

22         THE COURT:  Okay.

23         MR. STEINBERG:  So you'll have it.

24         THE COURT:  All right.  Let's do that.

25         MR. STEINBERG:  So <u>Pitterman</u> will be as part of <u>Hinds</u>

141

1   on May 11th?

2           THE COURT:  Yes.

3           MR. STEINBERG:  And --

4           THE COURT:  It's at two o'clock on May 11th.  We'll

5   leave it at that point.  Okay?

6           MR. HIRSCH:  Yes.  Thank you, Your Honor.

7           MR. STEINBERG:  And Your Honor, how much time do we

8   have on May 17th?

9           THE COURT:  I will -- I'll give you the whole day.

10  I've got two matters, one at ten, one at two; I will move both

11  of those.

12          MR. WEINTRAUB:  They'll give us a whole day.

13          THE COURT:  And I will move those.

14          MR. STEINBERG:  Your Honor, would it be helpful for

15  us to try to actually impose -- I know I've probably been the

16  guilty one today, because I spoke more, but to try to impose

17  time limits or do you want to just leave it free flowing, and

18  we'll -- you'll deal with it on May 17th?

19          THE COURT:  I'll leave it to you to try and work out.

20  These are really important issues, and I have lots of questions

21  in my mind about them, and that's why I didn't set -- I think

22  that somebody had asked my chambers about whether I was

23  imposing time limits today and I didn't.  Because these are

24  really important issues to them, and to you, I know.

25          MR. STEINBERG:  Your Honor, before we break, there

142

1  were two things that came up in the presentation, and we could

2  wait till the 17th, but -- and I'll raise it then as well, too.

3  Is that I think that what is happening in the MDL is different

4  than what has been described, and I could put in an affidavit

5  as to the number of non-ignition switch post-closing accident

6  cases that are in the MDL, as compared to someone saying

7  there's nothing there, it is what it is, but you need to have

8  that information.

9            THE COURT:  All right.

10            MR. WEINTRAUB:  I would say that's a distinction

11  without a difference, but I understand that --

12            THE COURT:  I'll let you both put it in letter

13  briefs, not to exceed five pages, and if you can do it shorter

14  than that.  Work out the timing on it.  You know when the

15  hearing's going to be.

16            MR. STEINBERG:  You know, it -- that's fine, Your

17  Honor.  I just think that there are a couple of things that --

18            THE COURT:  I said yes.

19            MR. STEINBERG:  Excuse me?

20            THE COURT:  I -- I've already said you can do it, you

21  can put it in --

22            MR. STEINBERG:  I appreciate it.

23            THE COURT:  -- and work out with Mr. Weintraub, and

24  you know, give him a chance to send in a letter in response.

25            MR. STEINBERG:  Okay.  We'll work it out.

143

1          THE COURT:  Keep them short.  The shorter the better,

2    okay?  All right.  I'm sorry we didn't get done today, I really

3    did -- I have lots of questions about this.  And I'll go find

4    page ten of the --

5          MR. STEINBERG:  Or we can give it to you as well.  We

6    really appreciate, by the way, the time that you gave us.

7          THE COURT:  Thank you very much, everybody.

8          MR. WEINTRAUB:  Thank you very much, Judge.

9          THE COURT:  Thank you.

10        (Proceedings concluded at 12:42 p.m.)

11                          *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

144

1                         **C E R T I F I C A T I O N**

2

3              I, Ilene Watson, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9    _____

10   ILENE WATSON, AAERT NO. 447      DATE:  April 24, 2017

11   ACCESS TRANSCRIPTS, LLC

12

13

14

15                        **C E R T I F I C A T I O N**

16

17             I, Lisa Luciano, court-approved transcriber, hereby

18   certify that the foregoing is a correct transcript from the

19   official electronic sound recording of the proceedings in the

20   above-entitled matter.

21

22

23   _____

24   LISA LUCIANO, AAERT NO. 327      DATE:  April 24, 2017

25   ACCESS TRANSCRIPTS, LLC

ACCESS TRANSCRIPTS, LLC              1-855-USE-ACCESS (873-2223)