**HEARING DATE AND TIME: June 30, 2017 at 11:00 a.m. (Eastern Time)**
**OBJECTION DEADLINE: June 23, 2017 at 4:00 p.m. (Eastern Time)**

**BINDER & SCHWARTZ LLP**
Eric B. Fisher
Neil S. Binder
Lindsay A. Bush
Lauren K. Handelsman
366 Madison Avenue, 6th Floor
New York, New York 10017
Telephone: (212) 510-7008

*Attorneys for the Motors Liquidation Company*
*Avoidance Action Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

In re:

MOTORS LIQUIDATION COMPANY, f/k/a
GENERAL MOTORS CORPORATION, *et al.*,

                                                Debtors.

------------------------------------------------------------------------x

Chapter 11

Case No. 09-50026 (MG)
(Jointly Administered)


**MOTION OF MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST
FOR ENTRY OF ORDER PURSUANT TO SECTIONS 105 AND 1142 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULE 3020(d) (I) APPROVING
AMENDMENTS TO THE SECOND AMENDED AND RESTATED AVOIDANCE
ACTION TRUST AGREEMENT, (II) AUTHORIZING THE AVOIDANCE ACTION
TRUST TO ENTER INTO A CAPITAL PROVISION AGREEMENT AND TO GRANT A
LIEN TO THE CAPITAL PROVIDERS, AND (III) AUTHORIZING THE AVOIDANCE
ACTION TRUST AND AVOIDANCE ACTION TRUST ADMINISTRATOR TO USE A
$1,750,759.93 SETTLEMENT HOLDBACK TO FUND NECESSARY FEES, COSTS
AND EXPENSES OF THE AVOIDANCE ACTION TRUST**

# TABLE OF CONTENTS

JURISDICTION AND VENUE ..................................................................................................2

PRELIMINARY STATEMENT ................................................................................................2

BACKGROUND ........................................................................................................................4

    A.    Old GM Files for Bankruptcy, the Term Loan Is Paid Off, and
the Committee Commences the Term Loan Avoidance Action ..........................4

    B.    The Plan Is Confirmed, and the Committee Transfers Prosecution
of the Term Loan Avoidance Action to the Avoidance Action Trust..................6

    C.    Resolution of the Dispute Between the DIP Lenders and the Committee
Regarding Entitlement to Any Proceeds of the Term Loan Avoidance Action ...7

    D.    The Avoidance Action Trust Does Not
Have Sufficient Funds to Prosecute the Litigation to Completion ....................10

    E.    The Avoidance Action Trust Sought Additional Funding.................................13

    F.    The Capital Provision Agreement......................................................................15

    G.    Prior Settlements have been Reached Resulting in Avoidance Action
Trust Proceeds of $1,750,759.93, which have been Reserved for Expenses......17

BASIS FOR REQUESTED RELIEF.........................................................................................18

    A.    The Avoidance Action Trust Amendment Should Be Approved ......................20

    B.    The Capital Provision Agreement Provides Critical Funding
to the Avoidance Action Trust and Should Be Approved .................................21

    C.    The Settlement Holdback may be Properly Used to Pay a Portion of Current
Fees, Costs and Expenses of the Trust...............................................................23

NOTICE.....................................................................................................................................24

CONCLUSION...........................................................................................................................25

TO:   **THE HONORABLE MARTIN GLENN**
       **UNITED STATES BANKRUPTCY JUDGE**

Wilmington Trust Company, solely in its capacity as trust administrator and trustee (the "**Avoidance Action Trust Administrator**") of the Motors Liquidation Company Avoidance Action Trust (the "**Avoidance Action Trust**"), as established under the Debtors' Second Amended Joint Chapter 11 Plan dated as of March 18, 2011 [Bankr. Dkt. No. 9836] (as confirmed, the "**Plan**") of the above-captioned post-effective date debtors (the "**Debtors**"), submits this motion (the "**Motion**"), pursuant to sections 105 and 1142 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 3020(d) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking entry of an order, substantially in the form attached hereto as Exhibit A (the "**Approval Order**"), (i) approving the capital provision agreement attached hereto as Exhibit B (the "**Capital Provision Agreement**") between the Avoidance Action Trust and private litigation funders Cynthania LLC and Earlham LLC (collectively, the "**Capital Providers**"), (ii) authorizing the Avoidance Action Trust and the Avoidance Action Trust Administrator to enter into the Third Amended and Restated Motors Liquidation Company Avoidance Action Trust Agreement (the "**Third Amended Avoidance Action Trust Agreement**") substantially in the form attached hereto as Exhibit C, which amends the Second Amended and Restated Motors Liquidation Company Avoidance Action Trust Agreement, dated as of August 25, 2016 and attached hereto as Exhibit D (the "**Second Amended Avoidance Action Trust Agreement**"),[1] (iii) authorizing the Avoidance Action Trust to take all actions necessary or appropriate to effectuate the Capital Provision Agreement, including the granting of a second-priority lien in favor of the Capital Providers on specified property of the Avoidance Action Trust;

---

[1]     A redline comparing the proposed Third Amended Avoidance Action Trust Agreement to the Second Amended Avoidance Action Trust Agreement is attached hereto as Exhibit E.

(iv) pursuant to Sections 6.1(b)(ii) and (iii) of the Second Amended Avoidance Action Trust Agreement, authorizing the Avoidance Action Trust and Avoidance Action Trust Administrator to use $1,750,759.93 in Proceeds from settlements between the Avoidance Action Trust and certain Term Loan Defendants, as defined below, entered into by these parties and paid to the Avoidance Action Trust prior to the execution of the Capital Provision Agreement (the "**Settlement Holdback**"), to satisfy a portion of the current fees, costs and expenses of the Avoidance Action Trust; and (v) granting such other and further relief as may be necessary.  In support of the foregoing, the Avoidance Action Trust Administrator respectfully states as follows:

## JURISDICTION AND VENUE

1.    The Bankruptcy Court has jurisdiction to consider this matter under 28 U.S.C. §§ 157 and 1334, paragraph II of the order of the Bankruptcy Court dated as of March 29, 2011, confirming the Plan [Bankr. Dkt. No. 9941], Article XI of the Plan, and Sections 6.1(b), 8.1 and 13.13 of the Second Amended Avoidance Action Trust Agreement.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. § 1409. The statutory predicates for the relief requested are sections 105 and 1142 of the Bankruptcy Code and Bankruptcy Rule 3020.

## PRELIMINARY STATEMENT

2.    The Capital Provision Agreement resolves the continuing funding needs of the Avoidance Action Trust to prosecute the Avoidance Action Trust's $1.5 billion action (the "**Term Loan Avoidance Action**") against JPMorgan Bank, N.A. ("**JPMorgan**") and hundreds of other defendants (collectively, the "**Term Loan Defendants**").  Since its formation, the Avoidance Action Trust has been prosecuting the Term Loan Avoidance Action with the goal of maximizing its value and distributing that value to the Avoidance Action Trust's beneficiaries.  Absent a

2

substantial infusion of funds, the Avoidance Action Trust will run out of money to prosecute the

Term Loan Avoidance Action against the Term Loan Defendants.    After the Court issues its

decision in the recently concluded trial on 40 representative assets, the parties anticipate engaging

in an intensive mediation process to resolve the case.    If the case is not resolved (or is resolved as

to some parties but not all), then there remains the possibility of appeals and follow-on collection

litigation in different jurisdictions well beyond 2017.    To the extent that the Avoidance Action

Trust obtains recoveries through settlement or litigation, then there will be necessary work related

to the distribution of any proceeds to the Avoidance Action Trust's beneficiaries.

        3.        The Avoidance Action Trust is currently party to a financing agreement

with the United States Department of the Treasury ("**Treasury**") and Export Development Canada

("**EDC**" and together with Treasury, the "**DIP Lenders**") pursuant to which the DIP Lenders

provided $15 million in financing (the "**DIP Lender Litigation Financing**") to allow the

Avoidance Action Trust to continue its prosecution of the Term Loan Avoidance Action.    It is

clear to the Avoidance Action Trust Administrator that the DIP Lender Trust Financing will be

insufficient to fund the Avoidance Action Trust's obligations through the final resolution of the

Term Loan Avoidance Action and the related proceedings.    In order to permit the Avoidance

Action Trust to complete its work, the Avoidance Action Trust Administrator has entered into a

Capital Provision Agreement with the Capital Providers, pursuant to which Capital Providers will

provide up to an additional $15 million of capital to the Avoidance Action Trust.    This Capital

Provision Agreement should be approved because it provides the Avoidance Action Trust with the

financial means to continue prosecuting the Term Loan Avoidance Action and maximize the value

of the Avoidance Action Trust's assets for its beneficiaries.

# BACKGROUND

A.    Old GM Files for Bankruptcy, the Term Loan Is Paid Off, and
the Committee Commences the Term Loan Avoidance Action

4.    General Motors Corporation ("**Old GM**") obtained a syndicated secured term loan (the "**Term Loan**") of approximately $1.5 billion pursuant to a term loan agreement, dated as of November 29, 2006, as amended on March 4, 2009 (the "**Term Loan Agreement**"). *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 777 F.3d 100, 101 (2d Cir. 2015) ("**Second Circuit 2015 Decision**").[2]    To secure repayment of the Term Loan, the Term Loan Lenders took security interests in a large number of Old GM's assets, including all of the equipment and fixtures at Old GM's facilities throughout the United States (the "**Collateral**"). *Id.*    JPMorgan, as administrative agent of the Term Loan, caused the filing of twenty-eight UCC-1 financing statements throughout the United States to perfect the Term Loan Lenders' security interests in the Collateral. *Id.*    One of the twenty-eight UCC-1 financing statements covered all the equipment and fixtures at the forty-two Old GM facilities and was filed with the Delaware Secretary of State and designated as file number 6416808 4 (the "**Main Lien**"). *Id.*

5.    In connection with its bankruptcy filing, Old GM sought the authority from the Court to use a portion of the $33 billion in post-petition financing (the "**DIP Financing**") from the DIP Lenders to repay the Term Loan in full.    Bankr. Dkt. No. 64 ¶¶ 75-78.    Old GM repaid the Term Loan Lenders in full, ahead of other creditors of Old GM, on the assumption that their claims arising under the Term Loan Agreement were fully secured.    Bankr. Dkt. No. 2529 ¶ 19.

---

[2]    All references to the Bankruptcy Docket are to *In re Motors Liquidation Company f/k/a General Motors Corporation*, Case No. 09-50026.  All references to the Adversary Docket are to *Motors Liquidation Company Avoidance Action Trust v. JPMorgan Chase Bank, N.A.*, Adv. Pro. No. 09-00504.

6.     However, days before entry of the Final Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (A) Approving a DIP Credit Facility and Authorizing the Debtors to Obtain Post-Petition Financing Pursuant Thereto, (B) Granting Related Liens and Super-Priority Status, (C) Authorizing the Use of Cash Collateral and (D) Granting Adequate Protection to Certain Pre-Petition Secured Parties (the "**DIP Order**") [Bankr. Dkt. No. 2529], which provided for the final approval of the DIP Financing, the Official Committee of Unsecured Creditors of Motors Liquidation Company f/k/a General Motors Corporation (the "**Committee**") learned that the Term Loan Lenders' security interests, in fact, may not all have been perfected as of the date that Old GM filed for bankruptcy on June 1, 2009 (the "**Petition Date**") due to the filing of a termination statement relating to the Main Lien (the "**2008 Termination Statement**") months before the Petition Date.  Second Circuit 2015 Decision, 777 F.3d at 102.  Therefore, the DIP Order, while conditionally approving Old GM's repayment of the Term Loan, expressly preserved the right of the Committee to investigate and bring actions based upon the purported perfection of the security interests related to the Term Loan.  Bankr. Dkt. No. 2529 ¶ 19(d).

7.     Following its investigation, the Committee determined that JPMorgan had authorized the filing of the 2008 Termination Statement, and that, as a result, the Term Loan Lenders' security interest with respect to the collateral secured by the Main Lien was not perfected as of the Petition Date; and, therefore, according to the Committee, the claims of the Term Loan Lenders arising under the Term Loan Agreement were substantially undersecured.  *Second Circuit 2015 Decision*, 777 F.3d at 102-3.  In order to recover amounts alleged to have been improperly paid by Old GM to the Term Loan Lenders after the Petition Date (and during the ninety-day prepetition preference period) (the "**Transfers**"), based on the erroneous assumption that the Term

Loan Lenders' security interests were perfected, and their claims fully secured, the Committee

commenced the Term Loan Avoidance Action by filing the adversary proceeding Complaint

captioned *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan*

*Chase Bank, N.A. (In re Motors Liquidation Co.), Adv. Pro. No. 09-00504* (Bankr. S.D.N.Y. July

31, 2009). Adv. Pro. Dkt. No. 1.

B.    The Plan Is Confirmed, and the Committee Transfers Prosecution
      of the Term Loan Avoidance Action to the Avoidance Action Trust

8.    As explained above, the Term Loan Avoidance Action was commenced by

the Committee on July 31, 2009. Adv. Pro. Dkt. No. 1. JPMorgan and the Committee agreed to

litigate the issue of whether the 2008 Termination Statement terminated the security interest in the

Collateral covered by the Main Lien ("**Phase I**"), before litigating any other issues in the case.

The Bankruptcy Court approved this bifurcation of the case and entered three orders, extending

the time of the Avoidance Action Trust Administrator to serve the summons and complaint on the

non-JPMorgan defendants until after the conclusion of the Term Loan Avoidance Action Phase I.

*See, e.g.*, Adv. Pro. Dkt. Nos. 10, 17 and 82.

9.    By August 2010, approximately one year after commencement of the Term

Loan Avoidance Action, the Avoidance Action Trust and JPMorgan had completed discovery, and

fully briefed cross-motions for summary judgment, in connection with Phase I of the Avoidance

Action. *See* Adv. Pro. Dkt. Nos. 17, 20, 23.

10.   On March 29, 2011, the Bankruptcy Court entered an order (the

"**Confirmation Order**") confirming the Plan. Bankr. Dkt. No. 9941. The effective date of the

Plan (the "**Effective Date**") was March 31, 2011. The Plan provided for, among other things, the

creation of the Avoidance Action Trust, which was established to liquidate and distribute its non-

administrative assets, which consist entirely of the proceeds, if any, of the Term Loan Avoidance

6

Action.  Bankr. Dkt. No. 9836 § 6.5 (Plan).  Thereafter the Committee was dissolved, and on

December 15, 2011, while the cross-motions for summary judgment relating to Phase I were

pending, prosecution of the Term Loan Avoidance Action was transferred to the Avoidance Action

Trust.  *See id.* § 6.5 (Plan); Ex. D (Second Amended Avoidance Action Trust Agreement).

C.      Resolution of the Dispute Between the DIP
        Lenders and the Committee Regarding Entitlement
        to Any Proceeds of the Term Loan Avoidance Action

        11.     As of the Effective Date, a dispute existed between the DIP Lenders and the

Committee, on behalf of the holders of Allowed General Unsecured Claims, regarding the proper

beneficiaries of the proceeds of the Term Loan Avoidance Action, with both claiming sole rights

to such proceeds (the "**Allocation Dispute**").  On June 6, 2011, the Committee commenced an

adversary proceeding seeking a declaratory judgment that: (i) the DIP Lenders were not entitled

to any proceeds of the Term Loan Avoidance Action and have no interests in the Avoidance Action

Trust, and (ii) the holders of Allowed General Unsecured Claims have the exclusive right to receive

any and all proceeds of the Term Loan Avoidance Action, and are the exclusive beneficiaries of

the Avoidance Action Trust.  *Official Comm. of Unsecured Creditors of Motors Liquidation Co.*

*v. U.S. Dep't of Treasury (In re Motors Liquidation Co.)*, Adv. Pro. No. 11-09406, Dkt. No. 1

(Bankr. S.D.N.Y. June 6, 2011).

        12.     On December 2, 2011, the Bankruptcy Court entered an order in favor of

the Committee, denying DIP Lenders' motion to dismiss and for summary judgment.  *Id.* ¶¶ 28-

29.  On December 16, 2011, the DIP Lenders appealed this and other related rulings and decisions

of the Bankruptcy Court.  *Id.* ¶ 31.  On July 3, 2012, the District Court for the Southern District of

New York vacated the Bankruptcy Court's judgment and remanded the case to the Bankruptcy

Court, with instructions for the Bankruptcy Court judge to dismiss the Committee's complaint

without prejudice for want of subject matter jurisdiction because the dispute was not yet ripe.  *U.S.*

*Dep't of Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co.*, 475 B.R.

347, 367 (S.D.N.Y. 2012).

13.     The Allocation Dispute was then resolved by that certain *Stipulation and*

*Agreed Order (I) Settling Disputed Entitlements of Debtor-in-Possession Lenders and Official*

*Committee of Unsecured Creditors to Potential Term Loan Avoidance Action Proceeds, and (II)*

*Modifying Avoidance Action Trust Agreement to Implement Settlement*, executed by the

Committee, the DIP Lenders and the Trust and dated July 14, 2016 (the "**Settlement Agreement**")

pursuant to which: (a) the DIP Lenders provided an interest-free $15 million DIP Lender Litigation

Financing to be repaid out of Distributable Trust Assets (as defined in the Settlement Agreement)

and (b) the DIP Lenders shall be entitled to receive thirty percent (30%) of all remaining

Distributable Trust Assets and the holders of Allowed General Unsecured Claims (or Units) shall

be entitled to receive seventy percent (70%) of all remaining Distributable Trust Assets (the

"**Allocation Settlement**"), with each such distribution to be made at or about the same time and

on a pari passu basis, as set forth more fully in the Settlement Agreement. Bankr. Dkt. No. 13688.

14.     One of the preconditions to the DIP Lenders' provision of the DIP Lender

Litigation Financing was the Avoidance Action Trust's agreement, as reflected in Section 6.1(d)(i)

of the Second Amended Avoidance Action Trust Agreement, that any additional litigation funding

provided to the Avoidance Action Trust would be (i) junior and subordinate to the DIP Lender

Litigation Financing and any other amounts owed to the DIP Lenders on account of prior funding

of the Avoidance Action Trust and (ii) subject to a form of subordination acceptable to the DIP

Lenders in all respects.

15.     On July 15, 2016, the Avoidance Action Trust, jointly with the Committee,

filed a motion with the Bankruptcy Court (the "**9019 Motion**") seeking approval of the Settlement

Agreement and the DIP Lender Litigation Financing. Bankr. Dkt. No. 13688.  Davidson Kempner

Capital Management LP ("**Davidson Kempner**") and River Birch Capital LLC ("**River Birch**")

objected to the 9019 Motion on the grounds, *inter alia*, that the DIP Lender Litigation Financing

was more expensive than the financing the Avoidance Action Trust had previously agreed to with

certain investors (including Davidson Kempner and River Birch) (the "**Private Litigation**

**Funding Agreement**") if the potential value transfer from the Allocation Settlement was

considered part of the cost of the DIP Lender Litigation Financing.  Davidson Kempner also

objected to the approval of the Settlement Agreement on the grounds that the Allocation Settlement

was not an appropriate resolution of the Allocation Dispute.

16.     On August 24, 2016, the Bankruptcy Court entered the *Memorandum*

*Opinion And Order Approving Motion For An Order Approving Stipulation Of Settlement And*

*Other Relief* [Bankr. Dkt. No. 13744] (the "**Memorandum Opinion**"), and on August 30, 2016,

the Bankruptcy Court entered an order approving the Settlement Agreement (the "**Stipulation and**

**Agreed Order**"). Bankr. Dkt. No. 13748.  The Memorandum Opinion rejected the objections of

Davidson Kempner and River Birch, holding that (a) the DIP Lender Litigation Financing was

(i) separate and distinct from the Allocation Settlement and (ii) clearly less expensive for the

Avoidance Action Trust than the Private Litigation Funding Agreement and (b) the Allocation

Settlement was within the range of reasonableness and should be approved. *Id.* at p. 24 (citing

*Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478

F.3d 452 (2d Cir. 2007).  On August 30, 2016, Davidson Kempner filed a Notice of Appeal with

respect to the Stipulation and Agreed Order (River Birch elected not to pursue an appeal). Bankr.

Dkt. No. 13749.  That appeal is *sub judice* before Judge Castel of the United States District Court

for the Southern District of New York.  See, *Davidson Kempner Capital Mgmt. v. Official Comm.*

*Of Unsecured Creditors of Motors Liquidation Co.*, 16-cv-06927 (S.D.N.Y.).

D.     The Avoidance Action Trust Does Not
       <u>Have Sufficient Funds to Prosecute the Litigation to Completion</u>

          17.     The initial administrative assets of the Avoidance Action Trust consisted of

approximately $1.6 million in cash to be held and maintained by the Avoidance Action Trust

Administrator for fees and expenses in connection with trust administration and prosecution of the

Term Loan Avoidance Action (the "**Avoidance Action Trust Administrative Cash**").  Bankr.

Dkt No. 11330 ¶ 18.[3]

          18.     The $1.6 million of Avoidance Action Trust Administrative Cash set aside

under the Plan proved to be insufficient to fund litigation costs related to the Term Loan Avoidance

Action and to satisfy the Avoidance Action Trust's general administrative costs.  *Id.* ¶¶ 18-21.

Accordingly, on January 20, 2012, the GUC Trust filed a motion seeking, *inter alia*, to liquidate

securities to fund additional Avoidance Action Trust fees, costs and expenses primarily related to

the prosecution of the Term Loan Avoidance Action.  *See generally id.*  The Court granted the

GUC Trust's motion and entered an Order, which, among other things, allocated an additional

$13,714,000 to the Avoidance Action Trust to satisfy the Avoidance Action Trust's estimated fees,

costs and expenses for 2012, 2013, and 2014 (the "**GUC Trust Supplemental Cash**").  Bankr.

Dkt. No. 11507.

---

[3]     The Avoidance Action Trust also received $500,000 of Avoidance Action Trust SEC Reporting Cash to be used solely for SEC Reporting Costs to the extent there is no other available source of funds to pay such costs.  Bankr. Dkt. No. 11330 ¶ 18.  Any unused portion of the Avoidance Action Trust SEC Reporting Cash will be returned to the GUC Trust.  Ex. D § 2.3(e) (Second Amended Avoidance Action Trust Agreement).

19.     On March 1, 2013, the Bankruptcy Court denied the Committee's motion for partial summary judgment and granted summary judgment in favor of JPMorgan, ruling that the filing of the 2008 Termination Statement was not effective and that the security interest covered by the Main Lien was therefore perfected as of the Petition Date.  Adv. Pro. Dkt. No. 71.

20.     The Avoidance Action Trust filed a motion seeking a direct, expedited appeal to the Second Circuit, which was granted.  The Avoidance Action Trust then timely appealed to the Second Circuit.  Adv. Pro. Dkt. 74.  A little less than two years later, on January 21, 2015, after receiving an answer to a Delaware UCC question that it certified to the Delaware Supreme Court, *see Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 755 F.3d 78, 86 (2d Cir. 2014) and *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*, 103 A.3d 1010 (Del. 2014), the Second Circuit reversed the Bankruptcy Court's grant of summary judgment and remanded the matter to the Bankruptcy Court with instructions to enter partial summary judgment in favor of plaintiff, the Avoidance Action Trust.  *Second Circuit 2015 Decision*, 777 F.3d at 101.  On February 4, 2015, JPMorgan filed a petition for rehearing en banc (2d Cir. Docket No. 149), which the Second Circuit subsequently denied on April 13, 2015 (2d Cir. Docket No. 179).

21.     On June 12, 2015, following issuance of the Second Circuit's mandate, the Bankruptcy Court entered partial summary judgment in favor of the Avoidance Action Trust as to the termination of the Main Lien.  Adv. Pro. Dkt. No. 96.  Thereafter, the Avoidance Action Trust filed an amended complaint and proceeded to serve it upon all the Term Loan Lenders.  Adv. Pro. Dkt. Nos. 91, 94, 95, 163, 164.  At the heart of the current phase of the Term Loan Avoidance Action is the Avoidance Action Trust's contention that, because the perfected security interest with

11

respect to the Main Lien was terminated, the Term Loan Lenders should not have been paid as fully secured creditors, and the value of the Transfers in excess of the value of any surviving collateral should be avoided and recovered for the benefit of the estate under Bankruptcy Code sections 547, 549 and 550.

22.    The second phase of the litigation primarily involves classification and valuation of the remaining collateral related to the Term Loan that was secured and perfected by filings other than the Main Lien.[4]  On May 4, 2016, the Court entered an Order Amending the August 17, 2015 'Order Regarding Discovery and Scheduling' to Provide for Proceedings Concerning Characterization and Valuation of Representative Assets, which provided for a schedule to streamline proceedings regarding fixture classification and valuation issues with regard to a total of forty "Representative Assets" to be selected by the parties.  Adv. Pro. Dkt. No. 547. On December 2, 2016, the Court entered the *Order Amending and Superseding Certain Prior Orders Regarding Discovery and Scheduling* scheduling a trial to commence on April 24, 2017, to determine (a) whether the Term Loan Defendants had perfected liens upon certain "Representative Assets" and (b) the value of such Representative Assets.  Adv. Pro. Dkt. No. 805. That trial (the "**Representative Assets Trial**") commenced on April 24, 2017, post-trial briefing was submitted on May 25, 2017, and closing arguments were heard by the Court on June 5, 2017.

---

[4]    In addition to their contention that, even after termination of the Main Lien, the Term Loan remains secured by valuable collateral, the Term Loan Defendants have asserted other defenses.  The various Term Loan Defendants also have filed cross-claims against JPMorgan based upon the filing of the Termination Statement.  Such cross-claims were governed by a separate discovery schedule, and fact depositions that were not taken by March 31, 2017, and written discovery not served by that date, have been stayed until after the termination of any mediation following a decision by the Court after the Representative Assets Trial.  *See* Adv. Pro. Dkt. No. 855.  Further, discovery concerning the circumstances of the filling of the Termination Statement was completed and the Court deferred summary judgment motions on this issue until after the completion of the Representative Assets Trial.

23.     The Avoidance Action Trust estimates that as of May 31, 2017, the Avoidance Action Trust had less than $204,000.00 to fund the fees and costs associated with prosecution of the Term Loan Avoidance Action, the administrative expenses of the Avoidance Action Trust, and the fees of the Trust Administrator and trust monitor (the "**Avoidance Action Trust Monitor**").   Declaration of Arthur J. Gonzalez, dated June 2, 2017 (the "**Gonzalez Declaration**") ¶ 4.  This amount is insufficient to fund the Term Loan Avoidance Action to its conclusion.  As explained below, the Avoidance Action Trust already owes amounts substantially in excess of this sum for services already rendered by the Avoidance Action Trust's professionals. In addition to litigating to final resolution the Term Loan Avoidance Action against the hundreds of Term Loan Defendants, including any appeals, the Avoidance Action Trust has also commenced two proceedings in Delaware seeking to nullify certificates of cancellation of two entities named as Defendants in the Term Loan Avoidance Action based on their failure to wind up and distribute their assets in accordance with Delaware law so that the Avoidance Action Trust can prosecute the Term Loan Avoidance Action against the reconstituted entities.

24.     Accordingly, the Avoidance Action Trust does not have sufficient funds to prosecute the Term Loan Avoidance Action to completion absent additional funding.

E.      The Avoidance Action Trust Sought Additional Funding

25.     Pursuant to the Avoidance Action Trust Agreement, the Avoidance Action Trust Administrator "shall at all times, to the extent practicable, retain … sufficient Avoidance Action Trust Administrative Cash and Supplemental Avoidance Action Trust Cash as the Trust Administrator shall determine, with the approval of the Trust Monitor and subject to the Budget, is necessary (x) to pay the reasonable incurred or anticipated fees and expenses of the Trust . . . and (y) to satisfy other liabilities incurred or anticipated by the Trust in accordance with the Plan,

13

the Confirmation Order and this Trust Agreement." Ex. D § 5.5(b) (Second Amended Avoidance

Action Trust Agreement).

26.    The Avoidance Action Trust Agreement specifically sets forth a mechanism

for the Avoidance Action Trust to seek additional funding in the event that the Avoidance Action

Trust Administrative Cash and the GUC Trust Supplemental Cash "is not reasonably likely to be

adequate to satisfy the current and projected future fees, costs and expenses" of the Avoidance

Action Trust.  *Id*. § 6.1(d).

27.    Specifically, the Avoidance Action Trust Agreement permits, upon

approval of the Bankruptcy Court, the granting of a lien on the Term Loan Avoidance Action or

other property of the Avoidance Action Trust in exchange for proceeds that may be used to satisfy

the fees, costs and expenses of the Avoidance Action Trust (the "**Other Supplemental Cash**").

*Id*.

28.    In accordance with its obligations under the Avoidance Action Trust

Agreement, the Avoidance Action Trust Administrator, in consultation with the Avoidance Action

Trust Monitor, made a determination that the cash available to the Avoidance Action Trust was

not sufficient to meet its projected fees and expenses.  *See* Gonzalez Decl. ¶ 4.  The Avoidance

Action Trust Administrator, through counsel, solicited and received litigation funding proposals

from potential third-party capital providers in order to obtain Other Supplemental Cash for the

Avoidance Action Trust.  *See id.* ¶¶ 5-6.

29.    After receipt and consideration of the litigation funding proposals, the

Avoidance Action Trust, through counsel and with the active participation of the Avoidance

Action Trust Administrator and the Avoidance Action Trust Monitor, engaged in negotiations with

the Capital Providers in order to obtain an agreement on terms that would ensure adequate litigation funding for the Avoidance Action Trust on the best economic terms.  *Id.*

30.    Ultimately, after these negotiations, the parties arrived at the Capital Provision Agreement that is the subject of this Motion.

F.    <u>The Capital Provision Agreement</u>[5]

31.    The Capital Provision Agreement provides that the Capital Providers will commit up to $15 million to the Avoidance Action Trust to cover all Claim Costs, which include the costs of litigation as well as the costs and expenses of the Avoidance Action Trust.  The Capital Providers shall provide the first $4,000,000 to the Avoidance Action Trust upon receipt of the Approvals, as defined in the Capital Provision Agreement.  The Avoidance Action Trust may draw the remaining $11 million at its sole discretion.  The full terms of the Capital Provision Agreement are set out in Exhibit B.

32.    Critically, the Capital Provision Agreement provides that the Capital Providers have no rights with respect to oversight of the Avoidance Action Trust's prosecution of the Term Loan Avoidance or any other action, nor do the Capital Providers have any rights with respect to any decision whether or not to settle any action.  Ex. B § 5.2(b) (Capital Provision Agreement).

33.    The key terms of the Capital Provision Agreement, all of which are consistent with Section 6.1(d) of the Avoidance Action Trust Agreement, are as follows:

- On the Effective Date, following, *inter alia*, this Court's approval of the Capital Provision Agreement, the Capital Providers shall provide the first $4,000,000 (the "**Initial Funding**") to the Avoidance Action Trust (*id.* § 2.1(a)(ii));

---

[5]    To the extent there is any conflict between this summary and the Capital Provision Agreement, the Capital Provision Agreement will govern in all respects.

- Thereafter, the Avoidance Action Trust may make further draws in tranches of not less than $1 million in its sole discretion (all funds advanced by the Capital Providers to the Avoidance Action Trust are collectively referred to as the "**Invested Amount**") (*id*. § 2.1);

- The Capital Providers shall be entitled (the "**Capital Providers Entitlement**") to a return calculated as (a) the product of (i) the Invested Amount and (ii) 1.9, plus (b) beginning on the 18-month anniversary of the date of the Initial Funding, an annual interest rate of 9% compounded annually, shall run on the amounts outstanding under clause (a) above, accruing until the Capital Provider's Entitlement is paid in full to the Capital Providers; such fee shall be payable from the Proceeds of the Avoidance Action Trust ahead of all other obligations and beneficiaries of, or investors in, the Avoidance Action Trust other than the DIP Lender Trust Financing (*id*. § 2.2(a)).

34.    In addition to the key terms summarized above, the Capital Provision Agreement contains other provisions, including but not limited to, those concerning conditions to consummating the Capital Provision Agreement, and termination events, rights, and procedures.

35.    To secure the Avoidance Action Trust's obligations under the Capital Provision Agreement, the Avoidance Action Trust and the Capital Providers will also execute a Security Agreement substantially in the form attached hereto as <u>Exhibit F</u> (the "**Security Agreement**") pursuant to which the Avoidance Action Trust will grant a second-priority security interest and lien to the Capital Providers on (i) the Avoidance Action Proceeds and (ii) the Capital Provider Funding Account and all Supplemental Capital therein (all terms in this paragraph shall retain the meanings ascribed thereto in the Security Agreement) (the "**Capital Provision Agreement Collateral**"). Security Agreement at § 2.1.

36.    On April 17, 2017, the date the Avoidance Action Trust reached an agreement in principle with the Capital Providers, it shared a copy of the term sheet outlining the terms of the Capital Provision Agreement with the DIP Lenders and, on June 2, 2017, provided the DIP Lenders a copy of the executed Capital Provision Agreement.

37.     The DIP Lenders subsequently gave their provisional consent to the Avoidance Action Trust's and the Capital Providers' entry into the Capital Provision Agreement, subject, however, to the condition that, pursuant to the DIP Lenders' consent rights under Section 6.1(d)(i) of the Second Amended Avoidance Action Trust Agreement, the Avoidance Action Trust and the Capital Providers must enter into a subordination agreement with the DIP Lenders (the "**Subordination Agreement**," and together with the Capital Provision Agreement and the Security Agreement, the "**Transaction Documents**") in the form attached hereto as <u>Exhibit G</u>.  Absent the Avoidance Action Trust's and the Capital Providers' entry into the Subordination Agreement, the DIP Lenders would not have consented to the Avoidance Action Trust's and the Capital Providers' entry into the Capital Provision Agreement.

38.     As required by Section 6.1(d)(ii) of the Second Amended Avoidance Action Trust Agreement, the Avoidance Action Trust Monitor has submitted a Declaration herewith setting forth his approval the Capital Provision Agreement and the other Transaction Documents. *See* Gonzalez Decl. ¶ 6.

G.     Prior Settlements have been Reached Resulting in Avoidance Action
        <u>Trust Proceeds of $1,750,759.93, which have been Reserved for Expenses</u>

39.     Between approximately January 2016 and prior to the execution of the Capital Provision Agreement, the Avoidance Action Trust reached settlements with 20 Term Loan Defendants, and, in these settlements, received the Settlement Holdback in the total amount of $1,750,759.93.  Pursuant to Section 6.1(b)(i) of the Amended and Restated Motors Liquidation Company Avoidance Action Trust Agreement, dated May 11, 2012 (the "**Amended Avoidance Action Trust Agreement**") and the Second Amended Avoidance Action Trust Agreements, this amount was reserved as a Settlement Holdback to satisfy "taxes, fees, costs and expenses" of the Avoidance Action Trust.  The present expenses of the Avoidance Action Trust far exceed this sum,

17

and it is anticipated that fees and expenses of the Avoidance Action Trust for services already incurred will exceed both the Settlement Holdback and the initial $4,000,000 provided pursuant to the Capital Provision Agreement. Thus it is in the interest of the Avoidance Action Trust both to use the Settlement Holdback to pay a portion of the current fees, costs and expenses, and to enter into the Capital Provision Agreement to pay additional current fees, costs and expenses, as well as to secure needed additional funding for the ongoing Term Loan Avoidance Action litigation.

40.    Section 6.1(b)(iii) of the Second Amended Avoidance Action Trust Agreement requires that this Motion state the position of the Trust Monitor on the use of the Settlement Holdback to pay current fees, costs and expenses.  It is the position of the Trust Monitor that it is appropriate both to use the Settlement Holdback to pay a portion of the current fees, costs and expenses of the Avoidance Action Trust, and to enter into the Capital Provision Agreement in order to pay the remaining current fees, costs and expenses and to secure needed additional funding.

**BASIS FOR REQUESTED RELIEF**

41.    This Court has the authority to enter the proposed order (a) authorizing the amendments to the Second Amended Avoidance Action Trust Agreement (the "**Avoidance Action Trust Amendment**") and execution of the Third Amended Avoidance Action Trust Agreement, (b) approving the Capital Provision Agreement and the other Transaction Documents under the terms of the Plan and under section 1142(b) of the Bankruptcy Code; and (c) authorizing the use of the Settlement Holdback to pay a portion of the current fees, costs and expenses of the Avoidance Action Trust.

42.    The Plan specifies that the Bankruptcy Court retains exclusive jurisdiction "of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant

18

to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code" and for, *inter alia*, the following purposes: (1) to "ensure that distributions to holders of Allowed Claims are accomplished as provided herein"; (2) to "hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, . . . the Avoidance Action Trust, . . . and the Avoidance Action Trust Agreement . . . ."; and (3) to "take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan to maintain the integrity of the Plan following consummation."  Bankr. Dkt. No. 9836 §§ 11.1(c), (i), (j) (Plan).

43.    Further, section 1142(b) of the Bankruptcy Code authorizes the Court to "direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act . . . that is necessary for the consummation of the plan."  11 U.S.C. § 1142(b); *see also Hosp. & Univ. Prop. Damage Claimants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 7 F.3d 32, 34 (2d Cir. 1993) (finding that bankruptcy courts retain postconfirmation jurisdiction in chapter 11 proceedings to the extent provided by the plan); *Penthouse Media Grp. v. Guccione (In re Gen. Media, Inc.)*, 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005) (finding that bankruptcy courts retain post-confirmation jurisdiction to matters related to the implementation of a plan); *In re Petition of Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*, 272 B.R 396, 407 n.11 (Bankr. S.D.N.Y. 2002) ("[T]he Court may direct parties to perform any act necessary to consummate the plan.") (citing 11 U.S.C. § 1142(b)); *LTV Corp. v. Back* (*In re Chateaugay Corp.*), 201 B.R. 48, 66 (Bankr. S.D.N.Y. 1996), *aff'd in part,* 213 B.R. 633 (S.D.N.Y. 1997) ("The clear intent of Section 1142(b) of the Bankruptcy Code is to assure that the terms and provisions of a confirmed chapter 11 plan are carried out until the plan is completed and the final

decree is entered closing the case."). In addition, Bankruptcy Rule 3020(d) provides that "[n]otwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate." Fed. R. Bankr. P. 3020(d).

A.    The Avoidance Action Trust Amendment Should Be Approved

44.    The Avoidance Action Trust Amendment is intended to implement the terms of the Capital Provision Agreement. While the Second Amended Avoidance Action Trust Agreement provided a mechanism for the Avoidance Action Trust to obtain additional funding from private litigation funders, it now needs specifically to implement the terms of the Capital Provision Agreement. In addition, the Second Amended Avoidance Action Trust Agreement needs to be amended to reflect the priority of payments to the Capital Providers and the other creditors and beneficiaries of the Avoidance Action Trust.

45.    The Second Amended Avoidance Action Trust Agreement permits that:

> The Trust Administrator may amend or supplement this Trust Agreement for any other purpose, but only on petition to, and with the approval of, the Bankruptcy Court; *provided* that (x) no amendment or supplement to this Trust Agreement shall be inconsistent with the purpose and intent of the Trust to dispose of in an expeditious but orderly manner the Avoidance Action Trust Assets in accordance with the terms of the Plan, the Confirmation Order and this Trust Agreement, and (y) this Trust Agreement shall not be amended in a manner that is inconsistent with the Plan in the form confirmed by the Bankruptcy Court, subject to any postconfirmation modifications to the Plan pursuant to Section 1127 of the Bankruptcy Code.

Ex. D § 13.13(b)).

46.    Pursuant to the Plan, the Avoidance Action Trust was established to liquidate and distribute its assets, which consist entirely of the proceeds, if any, of the Avoidance Action. Plan § 6.5. The additional funding provided to the Avoidance Action Trust through the Capital Provision Agreement is necessary to complete the recovery and liquidation of the "Avoidance Action Trust Assets" – the Term Loan Avoidance Action. While the Avoidance

Action Trust is working in good faith to prosecute the Term Loan Avoidance Action, the cash currently available to the Avoidance Action Trust is not sufficient to meet its projected fees and expenses to continue to prosecute the Term Loan Avoidance Action and/or to facilitate the successful resolution of the Term Loan Avoidance Action. Accordingly, the Avoidance Action Trust Amendment is consistent with the purpose and intent of the Avoidance Action Trust, as well as the Plan.

47.      As required by the Second Amended Avoidance Action Trust Agreement, the DIP Lenders were provided with the opportunity to provide additional litigation funding, declined to do so, and have provided their written consent to the Avoidance Action Trust Amendment, subject to the requirement, under Section 6.1(d)(i) of the Second Amended Avoidance Action Trust Agreement, that the Avoidance Action Trust and the Capital Providers enter into "a form of subordination acceptable to the DIP Lenders" in the form of the Subordination Agreement.  Ex. D § 13.13(d)).

48.      The Avoidance Action Trust Amendment has been narrowly tailored to implement only the terms of the Capital Provision Agreement and the other Transaction Documents and, for all the reasons stated above, should be approved.

B.      The Capital Provision Agreement and Other Transaction Documents
        Provide Critical Funding to the Avoidance Action Trust and Should Be Approved

49.      Here, the Capital Provision Agreement allows the Avoidance Action Trust to fulfill its basic purpose under the Plan.  The Plan specifies that the "sole purpose" of the Avoidance Action Trust is to liquidate and distribute its assets, which consist of the Term Loan Avoidance Action.  Bankr. Dkt. No. 9836 §§ 1.23, 6.5 (Plan).  The Capital Provision Agreement promotes this goal.

50.    Approval of the Capital Provision Agreement will provide necessary funding to the Avoidance Action Trust to prosecute the Term Loan Avoidance Action, in order to maximize its value for the Avoidance Action Trust's beneficiaries.

51.    As the Court is aware, the Representative Assets Trial in this matter recently concluded, which required a substantial commitment of resources by the Trust. Invoices related to the trial have not been paid, and cannot be paid without the additional funding provided for in the Capital Provision Agreement. Moreover, the Capital Provision Agreement has been drafted so that while the Capital Providers have committed to provide up to $15,000,000 in funding, the Trust is obligated only to draw $4,000,000, and then, in its sole discretion, may draw additional funding in $1,000,000 tranches. In this manner, the Trust may keep financing costs to a minimum, by drawing funds to pay litigation and administrative expenses, and incurring additional financing costs, only as needed. The terms of the Capital Provision Agreement also are beneficial to the Trust by permitting it to limit additional financing costs in the event of a negotiated settlement in the near term.

52.    In sum, the Capital Provision Agreement, which was the result of the solicitation of bids from private funders and good faith, arm's-length negotiations, resolves significant funding issues of the Avoidance Action Trust, fulfills the goals of the Plan, and benefits all affected parties. Accordingly, it should be approved.

53.    In addition, the Avoidance Action Trust's entry into the Subordination Agreement is necessary in order for the Avoidance Action Trust to obtain the DIP Lenders' consent to the Avoidance Action Trust's entry into the Capital Provision Agreement, and such consent is required under Section 6.1(d)(i) of the Second Amended Avoidance Action Trust Agreement. The Subordination Agreement should have no material impact on the Avoidance Action Trust or its

22

assets, as the Subordination Agreement merely documents and gives effect to the subordination of the claims and interests of the Capital Providers to the claims and interests of the DIP Lenders as provided in the Settlement Agreement and Second Amended Avoidance Action Trust Agreement. Because the Avoidance Action Trust's entry into the Subordination Agreement is necessary in order for the Avoidance Action Trust to obtain critical funding under the Capital Provision Agreement, the Subordination Agreement should be approved.

C.    The Settlement Holdback May Be Properly Used to Pay a
      Portion of Current Fees, Costs and Expenses of the Trust

54.    The Settlement Holdback was reserved by the Avoidance Action Trust Administrator pursuant to Section 6.1(b)(i) of the Avoidance Action Trust Agreement and Second Amended Avoidance Action Trust Agreement, for the purpose of satisfying anticipated "taxes, fees, costs and expenses" of the Avoidance Action Trust.    The expenses arising from the preparation and conducting of the Representative Assets Trial, along with additional litigation expenses incurred by the Avoidance Action Trust, have necessitated the commitment of resources by the Avoidance Action Trust well beyond the Settlement Holdback.    Accordingly, it is now appropriate, pursuant to Sections 6.1(b)(ii) and (iii) of the Second Amended Avoidance Action Trust Agreement, for these funds be used to pay a portion of the Avoidance Action Trust's current fees, costs and expenses.    The requirement in Section 6.1(b)(iii) of the Second Amended Avoidance Action Trust Agreement that the Avoidance Action Trust Monitor's position be stated in this Motion is met as well, and that position is that the Settlement Holdback should be used to pay a portion of the current fees, costs and expenses of the Avoidance Action Trust.    Thus, consistent with the position of the Avoidance Action Trust Monitor, it is respectfully submitted that it is in the interest of the Avoidance Action Trust both to use the Settlement Holdback to pay a portion of the current fees, costs and expenses, and to enter into the Capital Provision Agreement

to pay additional current fees, costs and expenses and to secure needed additional funding for the ongoing Avoidance Action litigation.

## NOTICE

55.    The Avoidance Action Trust has provided notice of this Motion to (a) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004; (b) the DIP Lenders; (c) the other parties in interest in accordance with the *Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c) and 9007 Establishing Notice and Case Management Procedures*, dated May 5, 2011 [Docket No. 10183]; (d) JPMorgan and each of the Term Loan Defendants, and (e) any other required notice parties under Section 6.1(b)(ii) of the Avoidance Action Trust Agreement.[6] The Avoidance Action Trust submits that such notice is sufficient and no other or further notice need be provided.

---

[6]    The Avoidance Action Trust Agreement requires notice to "the Trust Monitor, the holders of Units and the holders of Disputed General Unsecured Claims." Ex. D § 6.1(d)(ii) (Second Amended Avoidance Action Trust Agreement). However, because of the now-resolved dispute over who is entitled to the proceeds of the Term Loan Avoidance Action (*see supra* p. 6, n.2), no Units have been issued, and there are no holders of Units. Accordingly, notice has been provided to all potential Unit holders and/or beneficiaries of the Avoidance Action Trust and other interested parties, including the DIP Lenders; the Committee; the holders of Motors Liquidation Company (f/k/a General Motors Company) debentures and notes with the following CUSIP Nos.: 370ESCAN5; 370ESCAJ4; 370ESCAR6; 370ESCAG3; 370ESCAS7; 370ESCAT2; 370ESCAU9; 370ESCAV7; 370ESCAZ8; 370ESCBB0; 370ESCBQ7; 370ESCBT1; 370ESCBW4; 370ESCBS3; 370ESC816; 370ESC774; 370ESC766; 370ESC758; 370ESC741; 370ESC733; 370ESC725; 370ESC717; 370ESC121; 370ESC691; 616ESC AA2; 616ESC AB0; 349ESC AT1; 677ESC AU2; 677ESC BC2; 455ESC AB8; 594ESC AQ6; XS0171942757; XS0171943649; CH0008769264 (served through the Depository Trust Company (DTC)); the non-bondholder holders of Allowed General Unsecured Claims (as defined in the Second Amended Avoidance Action Trust Agreement); and any holders of disputed General Unsecured Claims.

24

## CONCLUSION

WHEREFORE, the Avoidance Action Trust respectfully requests that the Court enter an Order: (i) approving the Transaction Documents, (ii) authorizing the Avoidance Action Trust and the Avoidance Action Trust Administrator to enter into the Third Amended and Restated Motors Liquidation Company Avoidance Action Trust Agreement, (iii) authorizing the Avoidance Action Trust to take all actions necessary or appropriate to effectuate the Transaction Documents, including the granting of a second-priority lien (subject to the DIP Lenders' liens, interests and rights) on the Capital Provision Agreement Collateral; (iv) pursuant to Sections 6.1(b)(ii) and (iii) of the Second Amended Avoidance Action Trust Agreement, authorizing the Avoidance Action Trust and Avoidance Action Trust Administrator to use the Settlement Holdback in the amount of $1,750,759.93 to satisfy a portion of the current fees, costs and expenses of the Avoidance Action Trust; and (v) granting such other and further relief as may be necessary.

Dated:  June 7, 2017
        New York, New York

Respectfully submitted,

**BINDER & SCHWARTZ LLP**

/s/ Eric B. Fisher
Eric B. Fisher
Neil S. Binder
Lindsay A. Bush
Lauren K. Handelsman
366 Madison Avenue, 6th Floor
New York, New York 10017
Tel: (212) 510-7008

*Attorneys for the Motors Liquidation
Company Avoidance Action Trust*

25