# <u>Exhibit A</u>

```
 1                UNITED STATES DISTRICT COURT

 2                DISTRICT OF CONNECTICUT

 3     _____
       BERNARD PITTERMAN, ET AL, )
 4                 Plaintiffs ) NO: 3:14CV967(JCH)
                              )
 5                     vs. ) June 28, 2017
       GENERAL MOTORS, LLC,      ) 9:10 a.m.
 6                 Defendant )
       _____)
 7                                141 Church Street

 8                                New Haven, Connecticut

 9              PRETRIAL CONFERENCE

10              (EXCERPT OF HEARING)

11                     B E F O R E :

12              THE HONORABLE JANET C. HALL, U.S.D.J.

13     A P P E A R A N C E S :

14     For the Plaintiffs :JORAM HIRSCH
                           ROBERT ADELMAN
15                         Adelman, Hirsch & Newman
                           1000 Lafayette Blvd.
16                         Bridgeport, CT 06604

17

18     For the Defendant : KENT B. HANSON
                           PAUL E. D. DARSOW
19                         Hanson Bolkcom Law Group
                           527 Marquette Ave., Suite 2200
20                         Minneapolis, MN 55402

21

22

23

24

25
```

1              (Excerpt of hearing)

2              (Whereupon, a recess was taken at 12:33 p.m. to

3       12:54 p.m.)

4              THE COURT:  I think my clerk gave you a copy of an

5       order I would sign, if it is all right with everyone.

6              MR. ADELMAN:  Yes.

7              THE COURT:  And think it's sufficient.

8              MR. HANSON:  It is fine.  I just have one real

9       technical little question.

10             THE COURT:  Yes, sir.

11             MR. HANSON:  It says serve a copy on Mr. Strauss.  I

12      presume that means by any method that would satisfy the

13      federal requirement for service of a subpoena.  For example,

14      if he doesn't happen to be sitting in his office right there

15      when we show up, you leave it at his place of business or his

16      residence?

17             THE COURT:  I would be worried about that.

18             MR. HANSON:  What if he isn't there between now and

19      tomorrow?

20             THE COURT:  How does he get notice?

21             MR. HANSON:  I know, but what I'm saying is, is that

22      service, like you can serve a subpoena, you can commence an

23      action by leaving it with a person of age and discretion.

24             THE COURT:  At his home.

25             MR. HANSON:  I think that applies to a business as

1   well if he's --

2          THE COURT:  Well, am I serving Westport Family

3   Counseling or are you serving Mr. Strauss?

4          MR. HANSON:  Frankly, I think that's actually the

5   answer, that it should be directed to -- specifically to

6   them, to the entity.  And then that solves my issue with

7   what happens if he's not there.

8          THE COURT:  Then you leave it with an agent who can

9   accept service under Connecticut law.

10          MR. HANSON:  My only concern is because we have got

11   to get this done by tomorrow.  If he's not there --

12          THE COURT:  Well, I'm just trying to give these

13   people an ability to oppose it, you know.

14          MR. HANSON:  We understand.

15          THE COURT:  So I will take out -- I guess related to

16   have to be edited to the treatment of Grant O'Connor from

17   July through the present, by what I say Nicholas Strauss,

18   LCSW.  I could say there.  In other words, it would read,

19   Westport Family Counseling, address, is hereby ordered to

20   produce all records, including, but not limited to, treatment

21   notes related to the treatment of Grant O'Connor, date of

22   birth, from July through present, by Nicholas Strauss, LCSW.

23   Nobody else treated him at this location.

24          MR. ADELMAN:  Correct.  And the office has about

25   half a dozen counselors, so there will be somebody there.

1           THE COURT:  I understand, but it might be helpful

2    for them to know that he's a patient of Mr. Strauss's.

3    That's what I meant by including -- okay.  So we'll make

4    that edit, Alex, but otherwise, Diahann, I am going to sign

5    this.  It will have to be docketed under seal because it has

6    the date of birth and name.  But then if you would redact it

7    and docket it on the public record without the name showing

8    on the date of birth.  And then you need to give counsel a

9    copy of the Order, I guess, or you will get it on the CMCF,

10   or do you want a copy from the clerk?  Would it be helpful?

11          MR. HANSON:  It would be very helpful just to get a

12   copy so we can immediately arrange to have somebody go serve

13   it.

14          THE COURT:  That's fine.  You're attaching that to

15   the subpoena, I assume is what you plan.  You've got to serve

16   a subpoena on him, or you think the Order is sufficient?  I

17   guess it is.

18          MR. HANSON:  I think the Order.  I don't think we

19   need a subpoena with this.

20          THE COURT:  That's fine.  But I think I should have

21   you serve it.  It's not the plaintiff.  I agree with him he

22   doesn't have to do it.

23          I think the last thing I need to get done, which I'm

24   about to hit the bewitching hour, is to rule on the Motion to

25   Amend Docket Number 219 of the Pitterman plaintiffs, which

1    follows on the ruling of the bankruptcy court recently, early

2    June, by Judge Glenn -- I got that right, right -- Judge

3    Glenn, in effect, clarifying an issue of what causes of

4    action were possible against New GM as opposed to Old GM on

5    the issue of duty to recall and duty to warn.

6         And I think when I rule it will address the

7    Defendants' Motion in Limine Number 147-6 to preclude

8    arguments, evidence or statements offered to support claims

9    that violate the General Motors bankruptcy sale order and

10   injunction.  Now, this -- by my saying my ruling will resolve

11   147-6 does not suggest that I'm saying that you cannot go to

12   the bankruptcy court, ask the bankruptcy court whatever

13   questions you think are appropriate for the bankruptcy court.

14   And I leave it to the bankruptcy court to decide if they

15   think they are appropriate what its answer will be.  I don't

16   mean to suggest that in any way.  I am just saying that from

17   my point of view, the Motion in Limine 147-6 will be

18   addressed by my ruling on the Motion to Amend.

19        So I have reviewed the Proposed Amended Complaint,

20   General Motors' response  and the plaintiffs' Reply as well

21   as the bankruptcy's court ruling of June 7.  I had forgotten

22   the date.  For ease of reference, the Court -- in this

23   ruling, the Court will refer to the post-bankruptcy sale

24   entity as "new GM" and the pre-sale entity as "old GM".  It

25   is New GM that is the defendant in this case.

1          GM objects to two paragraphs in the Proposed Amended

2    Complaint, Paragraphs 27 and 28.  "GM, LLC would not object

3    to an amendment without the offending Paragraphs 27 and 28."

4    That's GM's response to the Motion to Amend at Page 7.  As I

5    read those complaints -- those paragraphs, they seek to

6    articulate a product liability claim against New GM sounding

7    in the theory of failure to warn and a theory of failure to

8    recall, respectively.  At the outset, the Court notes what it

9    believes its role to be in deciding the pending motion

10   vis-a-vis the bankruptcy court sitting in the Southern

11   District of New York and overseeing the bankruptcy

12   proceedings with respect to Old GM.

13          This Court is charged with an obligation to decide

14   the very disputed issues of Connecticut state law, as well as

15   whether the pleadings satisfy Rule 8 and Rule 12(b)(6) based

16   on the defendants' objection, while leaving for the

17   bankruptcy court, any decision as to whether these claims may

18   be pursued against New GM as a matter of bankruptcy law and

19   at a matter of the sale order.  Again, I'm not exactly sure

20   what further the bankruptcy court needs to do in that

21   respect, if anything.  But all I -- what I want to make clear

22   is what I am doing.  What I am doing today is ruling on

23   whether a cause of action, a duty to warn and duty to recall

24   may be asserted against New GM for actions arising subsequent

25   to June of 2009 under the Connecticut State Products

1    Liability Act.

2          The parties' briefing reflects the agreement with, I

3    think, reflects agreement with my conception of my role here,

4    which is to sit, in effect, as a state court and to decide

5    the state law.  And I will just -- I have looked at some

6    cases in this respect.  I have looked at -- there was a case

7    In Re: Motors Liquidation, and the bankruptcy decision was

8    from 2015 in the Second Circuit from 2016, you know, where

9    the bankruptcy court opined that it believed it shouldn't

10   leave for a non-bankruptcy court matters that require

11   interpretation of enforcement of the Court's earlier sale

12   order or call for a bankruptcy court's knowledge on the

13   bankruptcy law.

14         And on appeal, the Second Circuit said, "A

15   bankruptcy court's decision to interpret and enforce a prior

16   sale order falls under this formulation of 'arising in

17   jurisdiction.'  An order consummating a debtor sale of

18   property would not exist but for the code, and the Code

19   charges the bankruptcy court with carrying out its orders,

20   hence, the bankruptcy court plainly has jurisdiction to

21   interpret and enforce its own orders."

22         I hope I am acting in a manner consistent with my

23   recognition of that.  And my intention today is to rule

24   solely on the question of state law and the pleading before

25   me.  The Court understands General Motors -- new General

1   Motors to oppose the amendment of the Complaint on four but

2   related grounds.  First, that New GM is not subject to suit

3   under the Connecticut Product Liabilities Act because it is

4   not a "manufacturer" or "product seller."

5            Two, the Connecticut law does not recognize failure

6   to recall claims.

7            Three, that New GM owes no duties to those in

8   plaintiffs' position.

9            And Four, that even if such claims could be brought,

10  they are inadequately pled in the Proposed Amended Complaint.

11  The Court will return to each of these arguments in turn.

12           First is the question of whether New GM is a

13  "product seller" under the Connecticut Products Liability

14  Act, Connecticut General Statute Section 52-572m(a), which

15  provides the definition of product seller.  I will start with

16  what the parties agree on.  They seem to agree that the

17  Connecticut Product Liability Act is the exclusive remedy for

18  injury allegedly caused by defective products encompassing

19  actions of -- among others, of negligence and strict

20  liability.

21           The response at Page 3 of the Reply, at 5, and the

22  subpart (b) of the section I just cited all would support

23  that agreement.  And of course, Judge Cabranes' decision

24  going back now 25 years, which is really a seminal opinion on

25  the statute, interesting enough, describing the nature of the

1    Connecticut Product Liabilities Act as the exclusive remedy.

2    It appears to me that the paragraphs in question in the

3    plaintiffs' Complaint seek to articulate legal claims solely

4    under the CPLA.  See the Amended Complaint, 291-1 at Page 3,

5    Paragraph 19.

6         The CPLA recognizes product liability claims only

7    against "product sellers," making, obviously, the first and

8    relevant question whether New GM is a product seller for

9    purposes of this case and this claim.

10        Now, I think the best place to start is to look at

11   the statutory language.  And the definition of product seller

12   in the statute is, "Any person or entity, including a

13   manufacture, wholesaler, distributor or retailer, who is

14   engaged in the business of selling such products whether the

15   sale is for resale or for use or consumption.  The term

16   product seller also includes lessors or bailors of products

17   who are engaged in the business of leasing or bailment of

18   products."  That's 52-572m(a).

19        Now, whether a defendant is a product seller under

20   that definition is a question of law for the Court to decide,

21   and thus, appropriate in the context of a motion to amend

22   viewing it really as a motion to dismiss, in effect, the

23   standard.  It is the question for the Court.  I would cite in

24   support of that a colleague of mine in the case after Svege,

25   S-v-e-g-e, versus Mercedes Benz, 329 F.Supp.2d 272 at 278.

1   That's a District of Connecticut, 2004.  And that Court cited

2   a Superior Court decision known as Stanko versus Bader.

3          Now, Connecticut case law "Teaches that whether an

4   entity is sufficiently involved in the stream of commerce of

5   a product to be a 'product seller' under the CPLA requires a

6   fact-intensive case-by-case assessment."  That Svege at 280.

7          GM's argument essentially consists of assertions

8   that because GM did not "manufacture" or "sell" the product

9   that allegedly injured the plaintiffs and which is the basis

10  for this -- these causes of actions as pled in 27 and 28.

11  They are not claims cognizable under the CPLA because they

12  are not, therefore, a "product seller."

13         First, I would like to note that I disagree with the

14  plaintiffs' contention in response to that argument that

15  there is an inconsistency with GM's opposition on this point

16  and its admitted assumption of certain other products

17  liabilities.  Pursuant to the sale order, at least the

18  portions I have seen and pointed to, New GM expressly assumed

19  "product liability" claims arising out if the conduct of Old

20  GM, which clearly Old GM qualifies as a product seller under

21  the statute.  In opposing plaintiffs' motion to amend, GM

22  makes a different argument, namely that New GM is not a

23  product seller.  I don't see an inconsistency in New GM's

24  assumption of product liability claims related to the conduct

25  of Old GM, which is clearly a product seller, with their

1    disputing liability for such claims related solely to the

2    conduct of New GM by contending it is not a product seller.

3         By saying this, I don't mean to say that the

4    evidence about the assumption of causes of action might not

5    be probative on whether they are a product seller, but I

6    don't think it is an inconsistent position to say that they

7    are not a product seller just because they have assumed some

8    liabilities or, put another way, I don't think it follows

9    that because they assumed certain product liabilities that

10   that bars them from arguing in a different claim -- on an

11   unassumed claim that they are not a product seller.

12        Turning to General Motors' arguments, however, the

13   Court eventually concludes that it is unavailing on the issue

14   of being a product seller.  Here, whether or not New GM is

15   the "successor" as a matter of law to Old GM, the following I

16   believe is undisputed.  One, it bought significant portions

17   of Old GM's assets.  Two, it manufactures and sells cars

18   under the "GM" or "Chevrolet" name, including Suburbans.

19   And three, it did assume certain obligations for vehicles

20   manufactured by Old GM that were under warranty at the time

21   of sale, including provision of spare parts and service for

22   Old GM manufactured vehicles.

23        I am relying and I cite to In Re: General Motors,

24   LLC Ignition Switch Litigation, 154 F.Supp.3d 30, at 40,

25   Southern District 2015, by way of what would be otherwise a

1  footnote in a written opinion, I understand the Ignition

2  Switch Litigation involves an entirely different claim,

3  product liability claim, but I think that the recitation by

4  the Court in that opinion as to the general facts I have just

5  cited are -- to my understanding, are correct and, thus, I

6  cite from that opinion.

7       Of course, New GM did not manufacture the car that's

8  involved in this case and it doesn't now manufacture the

9  model year at issue.  However, New GM continues to

10 manufacture such products, quote unquote, within the meaning

11 of the CPLA by virtue of its ongoing production of Chevrolet

12 Suburbans and the use of the goodwill accruing to the GM name

13 as well as the assumption of some obligations with respect to

14 servicing and provision of parts for the model year in

15 question in this case.

16      I think it's -- this is a difficult question, and I

17 will just acknowledge that on the record, and I think that

18 defense counsel is quite right.  This is a question best

19 answered by the Connecticut Supreme Court.  And if I don't in

20 a post-trial motion context certify the question, I'm sure

21 the Second Circuit will certify it.  But the fact of the

22 matter is, this issue has been presented to me within -- I

23 don't know, what, 10 days of trial?  We are going to have a

24 trial and, therefore, I believe that I can't -- I can't

25 certify it, I guess, is the bottom line.

1        So my best judgment -- it is my opinion and

2   conclusion that the facts I have just pointed to leads to the

3   conclusion that as a matter of Connecticut state law, as best

4   I can predict the Connecticut Supreme Court, New GM qualifies

5   as a product seller within the meaning the CPLA with respect

6   to these claims -- well,  independently with respect to this

7   vehicle.  It's based solely -- I'm making this ruling based

8   solely on New GM's own post-sale conduct and business.

9        I reach this -- as I recognize it's a difficult

10  challenging question, but as I read the Connecticut statute,

11  the language used in the statute which has the word

12  "including" in the definition of product sellers, makes it

13  fairly clear to this Court, anyways, that the list set forth

14  is not exhaustive and, therefore, after a review of all of

15  the circumstances would include those in the position of New

16  GM pursuant to a fact-intensive inquiry.

17       So based on the pleadings, in any event, it is the

18  Court's conclusion and what I know from what I have cited,

19  based on New GM's own post-sale conduct and operations, that

20  it is within the scope as intended by the Connecticut

21  legislation of Subpart A of the Connecticut Product Liability

22  Act as a product seller.

23       The second question, of course -- that doesn't end

24  the inquiry here.  The second question is:  Does Connecticut

25  recognize a duty to recall or a duty to warn?  First, I will

1    note that I do not believe General Motors in their response

2    at this point pointed to any case that had rejected the

3    theory.  General Motors' counsel was correct there's not a

4    lot of authority to support the cause of action.  We have

5    only a Superior Court decision from 2000, which notes that

6    the CPLA does not state that manufacturers may be liable for

7    failure to recall, although that doesn't state it, the act

8    applies that such a theory is viable given the fact the list

9    is not exhaustive.  And similarly, my colleague in the Svege

10   case viewed the breach of a duty to warn as analogous to a

11   failure to recall and found the latter viable under

12   Connecticut law.

13           Again, I turn to the language of the statute,

14   particularly, in the absence of Connecticut Supreme Court

15   case law interpreting -- or telling me that such a cause of

16   action exists.  The CPLA includes -- again uses the words

17   "include" or "including" before enumerating the causes of

18   action that fall within its ambit.  That's 52-572m(b).  The

19   inclusion of the word "shall include but is not limited to"

20   suggests that the cause of actions that are iterated

21   following some variation of "include" should not be

22   exclusive.  For example, the Supreme Court of Connecticut has

23   instructed us in a case called Hurley versus Heart

24   Physicians, P.C., 278 Conn. 305, 325 (2006), "In addition, a

25   product liability claim is defined broadly to include but not

 1   be limited to"  and then it lists a series of causes of

 2   action.

 3         Similarly, the Connecticut Superior Court last year

 4   in Barry versus Greater Hartford Community Foundation had

 5   effectively made the same point.  Thus, the listing of the

 6   causes of action specifically at the time of the adoption of

 7   this statute in 1979 was not meant -- clearly was not meant

 8   to be exclusive.  Certainly, it talks about breach or failure

 9   to discharge a duty to warn or to instruct, so I think that's

10   pretty easy.  The question is the duty to recall.  And again,

11   there's not a lot of precedent, but what there is is

12   supportive of such a claim.  I think I'm in agreement with my

13   colleague in analogizing the duty to recall to the duty to

14   warn.  And it is my judgment, given the breadth of the

15   definition of the product liability claims in the Subpart B

16   that the Connecticut Supreme Court, if asked, and I may be

17   wrong, but it's my judgment today that if asked, they would

18   conclude that a duty to recall also that -- that that cause

19   of action exists under the CPLA and is cognizable.

20         Having concluded that New GM qualifies as a "product

21   seller," or "manufacturer" under the CPLA -- I think that

22   ends the inquiry other than the pleading inquiry because the

23   response of the New GM rests really -- and I'm looking at

24   Page 5 -- that it, therefore, cannot and does not have any

25   legal duties under Connecticut law with regard to Subject

1 2004 Connecticut Suburban manufactured by Old GM because "New

2 GM is not a product seller or manufacturer."  I have already

3 addressed that issue, so I think that that answers that

4 question and no independent argument was made as to why there

5 is no duty.

6   Also I just look -- cite you to Lawrence versus O&G

7 Industries, 319 Conn. 641, 650 from 2015 about a test for a

8 legal duty.  Obviously, that will be something that will be

9 part of the charge and the jury will have to find if that

10 existed here has the plaintiff proved it existed, has it

11 proved that the defendant breached it.  But as to the -- I

12 don't want to call at abstract, but the legal question of

13 whether there is a cause of action of duty to recall, duty to

14 warn also, but duty to recall is really what we're arguing

15 about, I think, here, such a cause of action in this Court's

16 opinion is cognizable.  And if properly alleged, can be

17 alleged against New GM, and the Court finds to fall within

18 the definition of product seller based solely on conduct

19 arising from and after June 2009.

20   I also had in my note here -- you know, that case I

21 just cited talks about two parts.  One is that whether

22 there's a test for a duty's determination of whether an

23 ordinary person in the defendants' position knowing what the

24 defendant knew or should have known would anticipate that a

25 harm of a general nature suffered was likely to result.  And

1    two, a determination on the basis of public policy analysis

2    of whether the defendants' responsibility for its negligent

3    conduct should extend to the particular consequences of

4    plaintiff in this case.  That's citing Ruiz versus Victory

5    Properties, 315 Conn. 320, at 328 through 329.

6           In addition, I have reviewed and thought about in

7    this context of whether there's such a cause of action an

8    earlier, Monk versus Temple Garage Associates,  273 Conn.

9    108, at 118, from 2005, which addressed the question of

10   policy issue.  We recognize that in considering whether

11   public policy suggests the imposition of a duty, we consider

12   four factors:

13          One, the normal expectations of the participants

14   involved.  Two, the public policy to encourage the

15   participation in the activity while weighing the safety of

16   the participants.  Three, the avoidance of increased

17   litigation.  And four, the decisions of other jurisdictions.

18          So I'm mindful of the context of the Supreme Court's

19   decisions in this area of duty and whether a duty to recall

20   exists as a cause of action under product liability claim.

21   While I recognize there is no Connecticut Supreme Court case

22   which has held that such a cause -- such a theory of a cause

23   of action exists under the Connecticut Product Liabilities

24   Act, it is my judgment based on what is before me at this

25   time that if this question were before the Connecticut

1    Supreme Court they would conclude there was such a theory of

2    liability under the Connecticut Product Liability Act.

3           So the last question remaining is whether the

4    Amended Complaint is adequate under the Federal Rules, in

5    effect Rule 12, Iqbal and Twombly and that line of cases.  I

6    think I already quoted from 27 and 28.  I am not going to

7    bother to read it into the record. It is what it is and I've

8    looked at it.  It alleges that GM had information and

9    knowledge, including knowledge of numerous roll-away

10   instances caused by defects described, in other words,

11   similar to the one in the Complaint on which numerous people,

12   especially children, were catastrophically injured or killed

13   and ties that to the ignition product that's defective.

14          It is the Court's conclusion that the Amended

15   Complaint as I read it, plausibly sets forth the plaintiffs'

16   theory of liability, which I have just found to exist in

17   Connecticut, as to the defect in the Suburban.  I could not

18   conclude that the amendment would be futile, or put a

19   different way would be dismissed under a Rule 12(b)(6)

20   standard.  Taking as true the allegation that New GM after

21   June of 2009, I can't emphasize that enough, that is how I

22   read the Complaint, at least paragraphs, had information and

23   knowledge of incidences resulting in serious physical injury.

24   That has to be taken as true.  I don't think it is a

25   conclusory sort of, you know, violative of Iqbal or Twombly

1    standards.  It is a pleading of an allegation, that's not

2    conclusory.  And if it's taken as true, in my view, it

3    renders plausible the imposition of a duty on New GM that I

4    have just previously found exists in a cause of action of

5    duty to warn and duty to recall.

6            There is before me in the -- I think the Amended

7    Complaint, 219-1, at 1 through 3, paragraphs 3 through 4, the

8    Complaint includes the allegation that New GM purchased

9    certain operating assets of New GM and assumed liability for

10   claims, not the ones we're addressing right now, but other

11   claims involving Old GM manufactured vehicles.  And at 219-1

12   at Page 4, Paragraph 25, there's an allegation of the

13   technical service bulletin that Old GM issued in May of '06

14   drawing all inferences in the favor of the plaintiffs the New

15   GM purchase assets of Old GM, which I would think it is

16   plausible to infer included this bulletin, and thus, that's

17   supportive of the allegation that they had knowledge and

18   information.

19           Further, I don't really see in the General Motors'

20   opposition beyond the argument that they are not the product

21   seller, but I don't see meaningful argument with Connecticut

22   law regarding the imposition of legal duties.  However, if GM

23   had done that, I would be skeptical because based on the

24   allegations in this Fourth Amended Complaint, it is my

25   conclusion, having looked at those cases on my own, that

1   plaintiffs -- I would be skeptical of the argument that they

2   had not plausibly alleged the existence of the duties and the

3   cause of action that we're discussing.

4          Therefore, it is the Court's conclusion the

5   plaintiffs have stated a plausible claim in Paragraphs each

6   27 and Paragraph 28 and that the amendment would not be

7   futile, and therefore the Motion to Amend is granted.

8          As I have said once I think, I do think -- I will

9   call it a challenging question.  I don't know whether it is

10  close or not because I -- it is my decision and I'm not

11  pulling any punches by saying this.  I do think it probably

12  will be decided by the Connecticut Supreme Court at some

13  point.  But faced with a jury selection tomorrow and a case

14  that would proceeding to a verdict -- to trial anyways, on

15  claims in addition and other than that.  And again, I don't

16  mean to suggest that I lack confidence in my conclusion.

17  This is my conclusion.  I think this is the right answer.

18         But I think even if I'm wrong, there will be --

19  given we're going to try the case, there will be

20  opportunities for someone to suggest, which hadn't been

21  suggested previously, that I certify the question to the

22  Connecticut Supreme Court.

23         So it is the conclusion of this Court that under

24  Connecticut State law, the plaintiffs have plausibly alleged

25  in their Fourth Amended Complaint, which I direct them now to

1    docket, in paragraphs particularly as related to 27 and 28,

2    the cause of action for Connecticut Products Liability Act

3    cause of action for a duty to warn, in 27, and a duty to

4    recall, in 28, against New GM based solely on their conduct

5    or lack of conduct from and after June of 2009.  I'm

6    finished.

7            MR. HANSON:  I need just for the sake of record --

8    I'm not arguing with you or asking you to change your ruling,

9    just a couple of things I need to be clear on.  I suggest,

10   respectfully, that it is error to find that a seller can be

11   -- that any product liability can arise from the sale of

12   other products subsequently.  I think it is fundamental tenet

13   of product liability law that the liability flows from the

14   manufacturer or sale of the product in question.  And I think

15   the Court has misconstrued what the words "such products"

16   mean in the CPLA.

17           I would suggest that that language is there to

18   distinguish a sale by an individual private seller, a person

19   who is not in the business of selling the products, because

20   otherwise anybody and everybody who sells a used car would be

21   a product seller under that reasoning.  So I think that's

22   error, and that's my record for the State Court here.

23           Second --

24           THE COURT:  I would agree with you that the reseller

25   would be probably not within the scope, but I will -- we'll

1    agree to disagree.  And I'm sure the issue will be get

2    readdressed if --

3              MR. HANSON:  The remaining thing there is New GM has

4    no warranty obligation of any kind with respect to this

5    vehicle.

6              THE COURT:  I'm aware of that, sir.

7              MR. HANSON:  It was over.  So I want to make sure

8    that I understand what the conduct is that the Court is

9    finding this liability to flow from.  I heard the Court say

10   that GM bought the assets of Old GM.  It manufacturers cars

11   now.  Am I right on both of those points?

12             THE COURT:  Using the GM Chevrolet name.

13             MR. HANSON:  So using the GM name now subsequent to

14   this product.  And if I understand correctly what the Court

15   just ruled in the latter part of your ruling --

16             THE COURT:  It also bought significant assets of Old

17   GM.

18             MR. HANSON:  Right.

19             THE COURT:  Not all.

20             MR. HANSON:  To make it clear that these are -- that

21   it's because of the purchase of assets that the Court is

22   making that finding.

23             THE COURT:  And it also assumes certain, not these,

24   but certain obligations, yes.

25             MR. HANSON:  Right.  Then lastly, what I need to

1    clarify here is, as I understand it, what the Court is

2    finding to be GM's sole conduct as alleged is merely having

3    knowledge of incidents.

4         THE COURT:  Well, I'm not sure I want to be -- have

5    you wrap me up with a bow on that one, sir, because I don't

6    think you really argued it.  So I'm not sure I need to

7    address it at all.  What I have said is what I have said and

8    I am going to let the record rest on that.

9         MR. HANSON:  Right.  And I'm just asking for

10   clarification.  And in part, this is because I am going to be

11   asking the reporter for your ruling, not the whole hearing --

12        THE COURT:  I understand.

13        MR. HANSON:  -- with the hope that then we can get

14   it to the bankruptcy counsel in time so they can decide what,

15   if anything, they wish to do in the Court in New York

16   tomorrow.

17        THE COURT:  Okay.

18        MR. HANSON:  So I'm just trying to make sure that

19   the record is as clear as I can help make it, which is not

20   suggesting that you didn't do your dead-level best to be

21   clear, but there are aspects of it that are not clear to me.

22   And that's why I was asking for that clarification.

23        THE COURT:  Okay.  And what's not clear to you?

24        MR. HANSON:  What's not clear to me is what is the

25   conduct of New GM after July of 2009, right, that is alleged

1    here to constitute a duty or breach of duty to warn or

2    recall.

3            THE COURT:  I think it is that knowledge, notice,

4    anticipation of harm that would flow from the circumstance

5    which is their similar claims, not facts proven, but notice

6    of circumstances resulting in harm.  That knowledge, if they

7    prove it.  And that it's, I think, a matter of law, not fact

8    or evidence, but that it is my conclusion rests on a finding

9    that Connecticut public policy would be that when a

10   manufacturer, assuming a product seller which I know you

11   contest you aren't, but if you are one, knows of a risk and

12   knows of possible consequences from that de facto situation

13   with the product, that -- that they would be responsible for

14   damages that flow from that.

15           MR. HANSON:  And the last point of clarification is

16   this knowledge that was acquired as of July 2009 or later or

17   is it inclusive of knowledge that came from Old GM?

18           THE COURT:  That could be an evidentiary question,

19   but my -- I think my inclination right now is to permit

20   evidence that was in the possession of New GM or the

21   knowledge of New GM employees, regardless of when the

22   information was created.  But it can only be based on what

23   New GM would know from and after June of '09.

24           MR. HANSON:  Okay.  Those were -- I think that's the

25   rest of what I had to try to make this as clear as we can

1    make it be so now the bankruptcy guys can do their --

2              THE COURT:  That's fine.

3              MR. HANSON:  Okay.

4              THE COURT:  And tell them to say I told the judge

5    hello, and I apologize to him if I have not made it clear.  I

6    guess the bottom line is my ruling is a ruling that, under

7    Connecticut State law, New GM would be viewed as a product

8    seller and that Connecticut would recognize a cause of action

9    under the Connecticut Product Liabilities Act for the duty to

10   warn and a duty to recall.  And that such causes of action

11   will go forward against New GM, but it is -- but I understand

12   that that cause of action -- no evidence is relevant to that

13   cause of action -- I'm sorry.  Strike that.  Let me start

14   that again.

15             That that cause of action against New GM must be

16   proven based upon evidence that shows, or tends to show, that

17   New GM, after June of '09, had knowledge of certain

18   situations and claims of what the consequences of what those

19   situations were and took no action.  That's a very -- taking

20   no action is a summary part of it.  It is the first part I

21   want the bankruptcy judge to understand.  I don't intend to

22   stray into pre-June of '09.  There may be things that

23   happened before June of '09, but they are only relevant to

24   this cause of action if it is shown that New GM knew of those

25   from and after June of '09.

1          Is that the plaintiffs' understanding of the claim

2     it wishes to pursue?

3          MR. ADELMAN:  Exactly, Your Honor.

4          THE COURT:  All right.

5          MR. ADELMAN:  Mr. Sultze, who is that deposition,

6     he was an employee way back and he's an employee now.

7          THE COURT:  I mean I'm sure he'll test it on a

8     motion for directed verdict whether you have shown this

9     post-'09, but I just want you to understand that I have

10    granted your motion, but this is what I understand your

11    Amended Complaint is seeking.  And it's also -- if understood

12    that way, I believe I have followed the bankruptcy court in

13    its pronouncements of bankruptcy law and this bankruptcy's

14    controlling agreements, et cetera.  And of course, we leave

15    it to another day whether I correctly anticipated the

16    Connecticut Supreme Court law -- I'm pretty confident on the

17    duty to recall.  I think Judge Arterton is right.  It is so

18    analogous to warning.  The question of the product seller, I

19    think -- I think there's sufficient basis there to conclude

20    New GM is, and in many respects may depend upon the evidence

21    that gets developed at trial, whether that rich factual basis

22    to make that finding is still there.

23          So I suspect that this will be the subject of

24    further motion practice by defendants even as properly

25    limited to post-'09, but that's my ruling for today as far as

1    what we're going to go to the jury on.

2         MR. HANSON:   Thank you, Your Honor.

3         MR. ADELMAN:   Your Honor, I have one question

4    tomorrow because we may be down in New York in bankruptcy.

5    Are we going to pick the jury and then go back to pretrial

6    motions or are we just going to pick the jury tomorrow?

7         THE COURT:   I think just pick the jury.  I need time

8    to look at a lot of the --

9         MR. ADELMAN:   That's better for us, Your Honor.

10   And in that regard --

11        THE COURT:   But I don't know how long it is going to

12   take.

13        MR. ADELMAN:   I was going to ask your guidance on

14   that just as an estimate.  Do you have --

15        THE COURT:   Well, you know to be here at 8:30.

16        MR. ADELMAN:   Yes.

17        THE COURT:   You know they are going to bring them in

18   at 9:00.

19        MR. ADELMAN:   Yes.

20        THE COURT:   I have picked a jury by 11:00, but it

21   would not be my judgment I'm going to pick this jury by

22   11:00.  We are going to have people, you know, had a lemon

23   from GM.  We're going to have people in accidents with GM

24   cars.  We're going to have people who don't want to be

25   involved in a case involving the death of an eight year old

1    girl.  Hopefully, everybody's been screened for summer

2    vacation, but our experience lately is most people don't read

3    the instructions.  So we're going to get some people who have

4    booked vacations.  I don't know.  I hope I can get it picked

5    by lunchtime.

6            MR. ADELMAN:  Okay.

7            THE COURT:  That would be my best guess, but I can't

8    promise.  It is going to be what it is.  I will say if we're

9    stuck, just so -- if anybody objects, you'll let me know.

10   But if we are down to picking a jury and I can't seat those

11   last two.  I mean, before you go to pick you will know this,

12   but it may be I am going to drop it back to eight because we

13   don't have enough people for you to have strikes to do a 10,

14   if that happens, rather than lose the jury and start this

15   whole thing all over again.

16           MR. HANSON:  Hopefully, we'll cross that bridge and

17   we won't have to.

18           THE COURT:  I think we are going to have a lot

19   brought in.  So I've got -- I think we're calling in over 90,

20   so we should have 70, 75.  Should be plenty.

21           MR. HANSON:  I do have a logistical issue just we

22   have some consultants that are going to help us.  They need

23   to bring the computers.  Is that a problem?

24           THE COURT:  No, that's not a problem.  And if --

25           MR. HANSON:  Sometimes the --

1           THE COURT:  I understand.  Right.

2           MR. HANSON:  That's why I'm asking.

3           THE COURT:  No, no, you are going to have a problem

4   when they come in, but I don't know, maybe you can go tell

5   the CSO that -- are they going to come in with you or how are

6   they going to know --

7           MR. HANSON:  I think they will come with me.

8           THE COURT:  If they are with you, tell them that any

9   staff can bring in their computers.  The problem is CSOs

10  rotate, but actually if I can have -- the officer in the

11  back, could you let the front know there's going to be people

12  coming in tomorrow with lawyers who are authorized to bring

13  in their computers.  Those people aren't lawyers, but I'm

14  saying it's all right for them to have computers with the

15  lawyers.  Just for tomorrow for this case.  Thanks very much.

16  And if there's any question, I will be here, you can ask.

17  Thanks very much.

18          (Off-the-record discussion.)

19          THE COURT:  The only thing I ask about people with

20  computers, Attorney Hanson -- this applies to the plaintiffs

21  too.  We have had problems with noisy keyboards.  A lot of

22  laptops have noisy keyboards.  And if that happens, I am

23  going to tell you, I know I told you could have a

24  computer, but you can't have that computer.

25          MR. HANSON:  I will tell them they need to be really

 1   careful about being noisy.

 2          THE COURT:  I mean, if they're pounding away, Terri

 3   is going to be having trouble, let alone me and everybody

 4   else.  Okay.  That's fine.

 5          I explained about jury selection.  I don't know if

 6   you are going to introduce everybody at your table?  Without

 7   saying why they are here, I guess, but you do need --

 8          MR. HANSON:  Who is there tomorrow, I may mention a

 9   few people who I know will be here.

10          THE COURT:  And then in addition -- right who will

11   be here from time to time.

12          MR. HANSON:  That reminds me you had said before to

13   have a list of people from Howd and Ludorf who live in this

14   district.

15          THE COURT:  Yes.

16          MR. HANSON:  Howd and Ludorf will not be present at

17   the trial.  Do we still need this list?

18          THE COURT:  No, because nothing will go to the jury

19   that mentions them, right, Attorney Adelman?

20          MR. ADELMAN:  No.  They would never know.

21          THE COURT:  So they'll never know.  That's fine as

22   long as they are not going to show up and walk in the

23   courtroom.

24          MR. ADELMAN:  I thought of one thing.  Well, after I

25   found out today that the defendant is withdrawing the claims

1   of comparative negligence against Maggie and Grant, the

2   minors, I think I'm going to submit as a statement of a party

3   a couple of paragraphs of the defendants' Answer where they

4   did allege that Maggie and Grant were negligent because I

5   think it is inconsistent with their new claim that Rose

6   O'Connor is solely negligent.  It is a statement of a party

7   and it is admissible, but I have to think about that.  If I

8   do, I will do it on Friday.  But that has a Howd and

9   Ludorf --

10          THE COURT:  Just white it out, cut it off.

11          MR. ADELMAN:  Okay.

12          THE COURT:  And cut and paste their signature up to

13   where they -- I assumed that they signed it, or do we have a

14   situation --

15          MR. ADELMAN:  It was signed by Mr. Hanson.

16          THE COURT:  Then just cut it out.  That's all.

17          MR. HANSON:  Respectfully, withdrawn claims don't

18   get to the jury.  They are not evidence.  It doesn't matter

19   what's in the pleading.  That is not a statement of client,

20   it's a statement of counsel.

21          MR. ADELMAN:  I disagree on the law  on that, Your

22   Honor. If I do it, I'll submit something on Friday.

23          MR. HANSON:  It is a tactical strategic decision.

24   They don't get to say that we changed our mind about it any

25   more than we can start talking about claims that they've

```
 1    withdrawn.
 2            MR. ADELMAN:  Your Honor, there's a case right on
 3    point.
 4            THE COURT:  Well, you'll brief it for me.
 5            MR. HANSON:  I disagree.
 6            THE COURT:  I'm not deciding it right now.  We'll
 7    stand in recess.  Adjourned.
 8            MR. HANSON:  Thank you, Your Honor.
 9            THE COURT:  And you don't -- by the way, I
10    appreciate you saying thank you, but I have a government
11    lawyer that does it every time I leave the bench.  And I've
12    been yelling at him.  He thinks I'm picking on him.  This is
13    my job.  I took an oath to do my duty.  I don't need to be
14    thanked.  You know, once in a while it is nice if somebody
15    says something in public about thank you for your service,
16    but from a party telling me thank you, it just -- I sentenced
17    a guy the other day and the defense lawyers thanked me.  It's
18    like I just want to cringe.  It doesn't feel right, you know.
19    It's kind of like the money is in the mail.  You know, I
20    don't know, it just doesn't feel right.  So it is fine.  I
21    know you appreciate my efforts, I'm sure, even when I rule
22    against me.  So you don't have to tell me.
23            Adjournment, Diahann.
24              (Whereupon, the above hearing adjourned at 1:45
25    p.m.)
```

1

2    COURT REPORTER'S TRANSCRIPT CERTIFICATE

3    I hereby certify that the within and foregoing is a true and

4    correct transcript taken from the proceedings in the

5    above-entitled matter.

6

7    /s/   Terri Fidanza

8    Terri Fidanza, RPR

9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25