# <u>Exhibit A</u>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
|  | . | Case No. 09-50026-mg |
| IN RE: | . | Chapter 11 |
|  | . |  |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| Et al., f/k/a GENERAL | . |  |
| MOTORS CORP., et al, | . | One Bowling Green |
|  | . | New York, NY 10004 |
| Debtors. | . |  |
|  | . | Wednesday, May 17, 2017 |
| . . . . . . . . . . . . . . . | . | 9:04 a.m. |

TRANSCRIPT OF HEARING RE:  ORDER TO SHOW CAUSE IN REFERENCE TO
THRESHOLD ISSUE.  (CC: DOC. NO. 13857, 13859, 13861, 13864,
13865, 13866, 13888, 13889);
HEARING RE:  ORDER TO SHOW CAUSE RE:  THE PITTERMAN MATTER.
(CC: DOC. NO. 13857, 13859, 13861, 13864, 13865,
13866, 13888, 13889)
**BEFORE THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

For General Motors LLC:   King & Spalding
                          By:  SCOTT DAVIDSON, ESQ.
                               ARTHUR STEINBERG, ESQ.
                          1185 Avenue of the Americas
                          New York, NY  10036-4003
                          (212) 556-2164

For the Non-Ignition      Goodwin Procter LLP
Switch Post-Closing       By:  WILLIAM P. WEINTRAUB, ESQ.
Accident Plaintiffs:      The New York Times Building
                          620 Eighth Avenue
                          New York, NY 10018-1405
                          (212) 813-8839

APPEARANCES CONTINUED.

Audio Operator:           Jonathan, ECR

Transcription Company:    Access Transcripts, LLC
                          517 Dell Road
                          Landing, NJ  07850
                          (855) 873-2223
                          www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES (Continued):

For Pitterman:                Adelman Hirsch & Connors LLP
                              By:  JORAM HIRSCH, ESQ.
                              1000 Lafayette Blvd.
                              Bridgeport, CT  06604
                              (203) 331-8888

For Ignition Switch           Brown Rudnick
Plaintiffs and certain        By:  HOWARD S. STEEL, ESQ.
Non-Ignition Switch                EDWARD WEISFELNER, ESQ.
Plaintiffs:                   7 Times Square
                              New York, NY  10036
                              (212) 209-4917

For Elliott, Sesay,
Bledsoe Plaintiffs:           GARY PELLER, ESQ.
                              600 New Jersey Avenue, N.W.
                              Washington, DC  20001
                              (202) 662-9122

For the Pilgrim
Plaintiffs:                   Klestadt Winters Jureller Southard &
                               Stevens, LLP
                              By:  BRENDAN M. SCOTT, ESQ.
                              200 West 41st Street, 17th Floor
                              New York, NY  10036-7203
                              (212) 972-3000

Also appearing:               The Mastromarco Firm
                              By:  RUSSELL C. BABCOCK
                              1024 N. Michigan Ave.
                              Saginaw, MI  48602
                              (989) 752-1414

TELEPHONIC APPEARANCES:

For Ignition Switch
Plaintiffs:                   Stutzman, Bromberg, Esserman & Plifka
                              By:  SANDER L. ESSERMAN, ESQ.
                              2323 Bryan Street, Suite 2200
                              Dallas, TX  75201-2689
                              (214) 969-4900

For Christopher Pope:         Ledford Law Firm
                              By:  KRIS T. LEDFORD
                              Heritage Professional Plaza
                              425 East 22nd Street, Suite 101
                              Owasso, OK  74055
                              (918) 376-4610



ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

3

1        (Proceedings commence at 9:04 a.m.)

2            THE COURT:  All right.  Please be seated.  We're here

3    in <u>Motors Liquidation Company</u>, 09-50026.  Good morning,

4    everybody.

5            Mr. Weintraub, I think you were up and arguing when

6    we ended last time.

7            MR. WEINTRAUB:  Thank you, Your Honor.  Good morning.

8    William Weintraub of Goodwin Proctor for the Non-Ignition

9    Switch Post-Closing Accident Plaintiffs.  Not quite sure

10   exactly where I left off last time, Your Honor, so I thought it

11   would be useful to very briefly recap and then resume.

12            THE COURT:  Go ahead.

13            MR. WEINTRAUB:  We already discussed, Your Honor, our

14   view that the four threshold issues set up in the two motions

15   to enforce of April 2014 and August 2014 did not involve the

16   post-closing non-ignition switch accident cases.  The April

17   2015 decision of the bankruptcy court established what we call

18   the due process paradigm for the assertion of independent

19   claims by requiring a predicate showing of the denial of due

20   process at the time of the sale in order to assert an

21   independent claim.

22            We talked about our view of the structure of the

23   September 3, 2015, scheduling order as being divided into

24   topics such as punitive damages imputation; bellwether

25   complaints; the marked second amended consolidated complaint,

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

4

1   which was the class action complaint on economic damages; the

2   California and Arizona complaints; and other complaints where

3   New GM served a marked pleading and a demand letter setting

4   forth its position on that particular complaint.

5          Our view is the scheduling order did not mention due

6   process or independent claims and that New GM's demand letter

7   exceeded the text authorized in the scheduling order by

8   confusingly and perhaps misleadingly stating that claims,

9   except for independent claims, were barred as a result of the

10  June 2015 judgment.  I think an illuminating example of that,

11  which I didn't discuss last time, was a series of letters

12  between New GMM and Mr. Tap Turner (phonetic) who is one of the

13  plaintiffs' lawyers that I represent here and had represented

14  in the June 2016 hearings.  Both of the letters I'm going to

15  refer to were put into the record by New GM in the compendium

16  of exhibits that was attached to their motion.

17         We've got a letter which is Document Number 13634-18

18  that was sent to Mr. Turner on September 1, 2015, right before

19  the scheduling order issued.  And then we have a letter to Mr.

20  Turner dated May 16, 2016, which is Document Number 13634-21.

21  In the September letter New General Motors uses the except-for-

22  independent-claims construct in the letter.  And I have a copy

23  of the letter with me if the Court would like --

24         THE COURT:  Sure.

25         MR. WEINTRAUB:  -- to see it.  I didn't bring a whole

5

1  bunch of copies, Your Honor.  May I approach?

2          THE COURT:  Absolutely.  Thank you.  Give me a chance

3  to read them before you start again.  Okay.

4          MR. WEINTRAUB:  Yes, Your Honor.  I've given you both

5  the September one and the May 16.

6          THE COURT:  Yes, thank you.

7      (Court reviews documents)

8          THE COURT:  Go ahead, Mr. Weintraub.

9          MR. WEINTRAUB:  So, Your Honor, my point -- and I'd

10 call your attention to page 2 --

11         THE COURT:  Which letter?

12         MR. WEINTRAUB:  -- of the September 1, 2015, letter

13 at the bottom.

14         THE COURT:  I just highlighted it.  I just

15 highlighted it.

16         MR. WEINTRAUB:  Okay.  So that --

17         THE COURT:  Go ahead.

18         MR. WEINTRAUB:  In that one, it's the except-for-

19 independent-claims construct.

20         THE COURT:  I highlighted that language.

21         MR. WEINTRAUB:  And then in the May 16, 2016, letter

22 at page 2 of the letter at the bottom of the page the paragraph

23 reads:

24             "The plaintiff in the lawsuit does not have a claim

25             based on the ignition switch defect and therefore is

6

```
1              prohibited from asserting an independent claim

2              against New GM."

3         And my point here is that the specificity morphed

4  from the letter that was sent in connection with the

5  September 3 or right in advance of the September 3 scheduling

6  order from the generic except-for-independent-claims to the

7  more specific, you don't have an ignition switch defect,

8  therefore, you can't assert --

9         THE COURT:  Am I correct that the plaintiffs read the

10 Second Circuit opinion as interpreting the sale order to carve

11 out any prohibition on the assertion of independent claims from

12 whatever defect or source?

13        MR. WEINTRAUB:  Yes, Your Honor.  It's --

14        THE COURT:  That's the position of the plaintiffs.

15 And that's why you say the May -- your -- what you're

16 contesting about this May 2016 letter is that, rather, it puts

17 an additional limit on the independent claims language that you

18 think is the operative.

19        MR. WEINTRAUB:  Well, keep in mind, Your Honor, I

20 mean, in a global sense, yes.  But in terms of the chronology,

21 in May 2016 the Second Circuit hadn't yet --

22        THE COURT:  I understand.

23        MR. WEINTRAUB:  -- ruled.  Right.

24        THE COURT:  I understand --

25        MR. WEINTRAUB:  So --
```

7

1          THE COURT:  -- they haven't ruled yet but --

2          MR. WEINTRAUB:  Right.  So our position always was

3 that we didn't think there was subject matter jurisdiction to

4 bar independent claims, especially prospective independent

5 claims.

6          THE COURT:  Let me ask you this.  Whether you agree

7 with Judge Gerber's decision or not, do you agree that

8 Judge Gerber expressly barred independent claims -- that he

9 expressly barred independent claims?

10          MR. WEINTRAUB:  I want to make sure I understand your

11 question.

12          THE COURT:  Well, what I'm hear --

13          MR. WEINTRAUB:  Well, in the April --

14          THE COURT:  Right.

15          MR. WEINTRAUB:  In the April 2015 --

16          THE COURT:  Yes.

17          MR. WEINTRAUB:  -- opinion, I think that what he did

18 in the April 2015 opinion was that he said the only thing in

19 front of me right now with respect to a due process violation

20 are --

21          THE COURT:  Is the ignition switch defect.

22          MR. WEINTRAUB:  -- are the ignition switch people.

23 And since he believed that the sale order barred all

24 independent claims, which we quibble with, but since he

25 believed that the sale order barred all independent claims, he

8

1  determined, in the context of the due process briefing, that

2  had someone been given appropriate notice and come to the sale

3  hearing and pointed out the over-extension of my jurisdiction,

4  I would have corrected that and cut that back.  The only people

5  who are here right now are the ignition switch people.  So in

6  essence -- and I think literally what he ruled was that

7  independent claims for people with an ignition switch defect

8  are not barred. Everyone else remains stayed by the original

9  sale order until they demonstrate a due process violation.

10          THE COURT:  And I take it, am I correct, that the

11  position of the plaintiffs, not just of the post -- the

12  non-ignition switch post-closing plaintiffs, but of all the

13  plaintiffs is that the Second Circuit interpreted the sale

14  order as not barring independent claims, full stop?

15          MR. WEINTRAUB:  I think the Court did two things.  I

16  think it indicated without ruling that the language of the sale

17  order was at least debatable as to whether or not it did that.

18  But then I think that it ruled as a matter of subject matter

19  jurisdiction that because this wasn't what the Second Circuit

20  called a "bankruptcy claim," it was claim against a non-debtor,

21  that you could not sell free and clear of that claim using

22  363(f), which we view as a subject matter jurisdiction issue.

23          THE COURT:  Okay.  All right.

24          MR. WEINTRAUB:  So, yes, to the --

25          THE COURT:  Go ahead.

9

1          MR. WEINTRAUB:  -- the Second Circuit's

2   interpretation of what the bankruptcy court could do under

3   363(f).  I won't belabor this point.  There are other documents

4   where New GM -- and I think we referred to one of them last

5   time, Document Number 13390, which was a letter to the

6   Bankruptcy Court dated August 26th, 2015, in which GM

7   reiterated its belief that unless you demonstrate a due process

8   violation, you cannot assert an independent claim.  And there

9   is yet another letter, which is Document Number 13523, which is

10  a letter --

11         THE COURT:  There's no question that New GM is

12  asserting the position that other than for ignition switch

13  defect plaintiffs versus the subject vehicles, their position

14  is that independent claims are barred.  I understand that's

15  their position, and the position of the plaintiffs is no

16  independent claims are barred.

17         MR. WEINTRAUB:  Right.  What I'm setting up, Your

18  Honor, is demonstrating the pivot in position by New General

19  Motors, that all throughout the fall of 2015 letters to the

20  bankruptcy court repeatedly emphasized the fact that

21  independent claims are barred unless and until the due process

22  violation has been demonstrated.  They seem to have abandoned

23  that position now, but I want to make it very clear that

24  letters in the record --

25         THE COURT:  If I had to review every letter I ever

10

1  wrote when I was representing usually defendants, sometimes

2  plaintiffs, you know, it might not necessarily be consistent

3  with my own view today about whether those positions were

4  correct or not.  So I -- you know, I don't put a lot of stock

5  in -- I know you're trying to show that their position morphed

6  over time.  I'm much more focused on what Judge Gerber ruled,

7  what the Second Circuit ruled, what other decisions -- you

8  know, rather than to a position they may have taken.

9              MR. WEINTRAUB:  All right.  So then I --

10             THE COURT:  Or that you may have taken.

11             MR. WEINTRAUB:  I've tried to be consistent.  I will,

12 again, not belabor the point.  I think it's in the record.  New

13 GM repeatedly emphasizes the due process paradigm, the quotes

14 from the decision.  And if you look at the -- there was a

15 ritual footnote that was dropped in many of the letters where

16 they italicized and bolded the due process part of the

17 independent claims.  I won't belabor that.

18             We discussed last time that -- our view that the

19 November and December 2015 rulings were not preclusive rulings,

20 forever barring anyone with a non-ignition switch defect from

21 asserting an independent claim.  We focused, in particular, on

22 footnote 70.  I won't belabor that point.  Again, we didn't

23 view footnote 70 as saying you've timed out, we viewed footnote

24 70 as saying you haven't done it yet.

25             In its reply brief, one of the things that New GM

11

1    tries to argue, that it's -- even though there's no reference

2    or discussion to independent claims in the scheduling order, if

3    the non-ignition switch post-closing accident plaintiffs had

4    been enterprising enough to go through the marked version of

5    the thousand-page master class action complaint, they would

6    have seen that independent claims were an issue for economic

7    loss plaintiffs.  And we think that that's doubtful.

8         But what we think is not doubtful, again returning to

9    this theme, if you look at the letter that was submitted to the

10    bankruptcy court, along with the marked complaint, New GM again

11    emphasizes the what we call the "due process paradigm."  So we

12    think that this is --

13         THE COURT:  Stop, stop, stop.  One of the things that

14    New GM argued in its opening brief at pages 39 and 40 -- I'll

15    just read from the last sentence on 39:

16         "Designated counsel acknowledged that due process was

17             an important issue, stating, 'To the extent that that

18             remains an issue, they would tee up the matter for

19             prompt determination.'"

20         And the citation is to an August 31, 2015 hearing

21    transcript at page 81, line 22 to page 82, line 2.  And then it

22    goes on then, "However, they never did that."

23         So one of the questions I asked at the last hearing

24    that's of concern is whether the non-ignition switch

25    plaintiffs, by virtue of what their designated counsel said or

12

1  by something that Judge Gerber said from this language, put the

2  impetus on the plaintiffs if they believed there was a due

3  process violation that impacted some, any, or all of the

4  non-ignition switch defect plaintiffs, that it was incumbent on

5  them to come forward with it.

6      So this transcript reference is from August.  Judge

7  Gerber, in November, wrote his November decision and entered

8  the December judgment, and it's a concern to me.  And I raised

9  this last time, that the April and -- April opinion, June

10  judgment was on stipulated facts.  There was, as I understand

11  it, no evidentiary hearing prior to the November decision and

12  December judgment.

13      And one of the things I'm focused on is whether the

14  non-ignition switch defect plaintiffs were on notice that if

15  they were going to contend that the sale order -- free-and-

16  clear sale order provisions didn't apply to them, they had to

17  come forward and show a due process violation.  And so Mr.

18  Steinberg, as I said, at pages 39 and 40 of the opening brief

19  quotes -- and I don't know who it was who said the words, it's

20  just a person "designated counsel" -- that knowledge was

21  important, and to the extent that that remains an issue, they

22  tee up -- teed the matter up.

23      MR. WEINTRAUB:  A couple of responses to that, Your

24  Honor.  I was not the speaker.  And I am not designated --

25      THE COURT:  Were you here?

13

 1          MR. WEINTRAUB:  I was there then, yes.  I was not the

 2  speaker.  I don't know --

 3          THE COURT:  Well, whether you're the speaker or

 4  not --

 5          MR. WEINTRAUB:  Well, I was going to get to that,

 6  Your Honor.

 7          THE COURT:  Go ahead.

 8          MR. WEINTRAUB:  I was there for ignition switch

 9  plaintiffs at that time.  I have never represented what I'll

10  call non-ignition switch, colloquial lower case non-ignition

11  switch plaintiffs before June of 2016.  I do not believe and

12  I've spoken with the co-leads.  I do not believe that there are

13  colloquial non-ignition switch defect cases in the MDL.  I

14  don't think that makes a difference, but the point --

15          THE COURT:  Nor do I.

16          MR. WEINTRAUB:  Right.  But the point is this.

17  Whatever was said in August of 2015, we had all been -- and

18  when I say "all," all of the lawyers in this room have been on

19  the treadmill from May of 2014.  Shortly after the August 2015

20  hearing we had the September 3 scheduling order which, in our

21  view, didn't set that kind of a deadline.  It didn't mention

22  due process or independent claims.  Anyone receiving that order

23  wasn't alerted to the fact that a bell -- in theory, we don't

24  think it did -- had gone off, saying here's the September 3

25  scheduling order, guess what, briefing begins in the middle of

14

1  this month, briefing will end at the end of this month.  That

2  doesn't give anybody enough time to go and put together that

3  kind of a case and --

4           THE COURT:  Well, whether it gives enough time to put

5  together the case --

6           MR. WEINTRAUB:  They also --

7           THE COURT:  -- it wouldn't -- let me finish.  I know

8  I'm a little slow sometimes.  Okay.  It would not have

9  prevented the plaintiffs' counsel from adding -- requesting

10 from Judge Gerber that whether there was a due process

11 violation affecting non-ignition switch plaintiffs, that the

12 issue be added to the scheduling order and that we believe

13 discovery is necessary to do that, et cetera.  I mean, just the

14 way I had every -- all of the lawyers here define the 2016

15 threshold issues, I think Judge Gerber was -- viewed it as a

16 collaborative effort by counsel from representing all the

17 insurance, to make sure that the issues necessary and

18 appropriate were framed and dealt with.

19          MR. WEINTRAUB:  Well --

20          MR. WEISFELNER:  Your Honor, might I be heard --

21          THE COURT:  Mr. Weisfelner, you'll get your chance.

22 Okay.

23          MR. WEISFELNER:  Okay.  Only because I think I was

24 the speaker.

25          THE COURT:  I assumed that.

15

1        MR. WEISFELNER:  That was spoken --

2        THE COURT:  I -- you'll get your chance.

3        MR. WEISFELNER:  Thank you.

4        MR. WEINTRAUB:  Your Honor, again, I think the

5  answers to that are several.  First, that colloquy in court was

6  not freely available to non-ignition switch post-closing

7  accident plaintiffs, whether or not they were in the MDL.  Of

8  course, they could have come hunting for that, but most of them

9  I think would have been completely unaware that this was going

10  on.

11        In terms of the impetus for the September 3

12  scheduling order, my recollection, and the reason that it was

13  on an expedited briefing schedule, is that the bellwether

14  trials were about to begin in January of 2016.

15        THE COURT:  Is a copy of that September 3 scheduling

16  order -- I got delivered two big binders --

17        MR. WEINTRAUB:  I --

18        THE COURT:  -- for today's hearing.  I'm just

19  wondering.  I'd like to look specifically at it while --

20        MR. WEINTRAUB:  It's Document Number 4 in the binder

21  that I had given at the last hearing.

22        THE COURT:  You know, two big fat binders showed up

23  in my chambers yesterday again.  Is it in there or not?

24        MR. DAVIDSON:  No, Your Honor.  It's from the binders

25  we handed out at the hearing the last time.

16

1        THE COURT:  Okay.  I didn't bring -- I have, you know

2   (indiscernible).  Does somebody have a copy they can hand up to

3   me?

4        (Counsel confer)

5        THE COURT:  Just let me read it.

6        (Court reviews document)

7        THE COURT:  Okay.  You can have it back, sir.

8        MR. WEINTRAUB:  Thank you.

9        THE COURT:  I must say the scheduling order would

10  appear to show the input of the counsel who, you know, on those

11  issues that were defined -- I give Judge Gerber lots of credit

12  for writing things, but that looks more like an order that was

13  tailored, perhaps adjusted by Judge Gerber, but tailored by

14  counsel.

15       MR. WEINTRAUB:  Well, to some degree, yes.  For the

16  people that I was representing, I was very involved in the

17  things that affected what I was doing.  I was much less

18  involved in things that are the responsibility of others.

19       The point that I was making was that my recollection

20  was the impetus for the scheduling order, and in particular the

21  expedited timing, was the fact that the bellwether trials were

22  beginning in front of Judge Furman.  And there were issues on

23  imputation and punitive damages.  And those bellwether trials

24  were six trials that related to post-closing accidents

25  involving the ignition switch defect.  So the briefing that

occurred was on the imputation issue and I think an extensive

breach -- brief was prepared by Brown Rudnick, and then on the

punitive damages issue, which was a brief that we wrote with

respect to the six bellwethers.

I don't recall that there was any other briefing on

any other topics.  There were marked complaints submitted and

the marked complaints feature into the November decision and

the December judgment as to those particular marked complaints.

A lot of what was addressed in the decision and in the judgment

had to do with perhaps sloppy drafting by some of the pleaders

where they would refer to GM without indicating old or new, or

say something like New GM designed and manufactured the Saturn.

We get all that.  And all of that was cleaned up.

Our view is that because the due process paradigm was

still in effect, if you look at what Judge --

THE COURT:  What do you mean, "due process paradigm"?

MR. WEINTRAUB:  This is the -- you must show a due

process violation in order to assert an independent claim, that

what Judge Gerber did in the decision and what Judge Gerber did

in the judgment was that ignition switch defect-related

independent claims by and large pass through what we call the

"bankruptcy gate," and independent claims for non-ignition

switch did not pass through the gate.  We believe they did not

--

THE COURT:  They continued to be -- I think what your

18

 1  side's brief acknowledged is that the non-ignition switch

 2  plaintiffs' claims remain stayed.

 3          MR. WEINTRAUB:  Yes.  Not barred, not --

 4          THE COURT:  They remained --

 5          MR. WEINTRAUB:  -- dismissed forever.

 6          THE COURT:  -- remain stayed.

 7          MR. WEINTRAUB:  Right.  So I think, given the timing

 8  -- and don't forget we were -- you know, we had gone from the

 9  briefing that led to the April and June decision to this whole

10  procedure on stay/no stay pleadings, extensive letters, and

11  briefing back and forth on the form of the judgment.  Then we

12  that took us up to September, a September 3 scheduling order.

13  Then we were addressing punitive damages and imputation on a

14  curtailed briefing schedule.

15          So my point is, Your Honor, that if there was a time,

16  and maybe there should've been a time, to address due process

17  with respect to non-ignition switch post-closing accidents, and

18  I'm using that in the lower case term, that was not the time

19  because that would have required extensive discovery of

20  multiple defects; not just recalls, but defects for which there

21  were not recalls.  And although it was not -- I wasn't

22  representing any of these people, I could see with the benefit

23  of hindsight why nobody said, hey, this would be a good time to

24  let's open it up for all discovery on all independent claims.

25  It just wasn't the right time, Your Honor, given the treadmill

1 we were on and the time constraints.  So I think that to

2 retroactively say, oh, that was the time, you're all out now,

3 would be manifestly unfair.

4         THE COURT:  Why don't we wait another ten years and

5 see what, you know, maybe somebody -- there was some other

6 defect.

7         MR. WEINTRAUB:  Obviously, we're not waiting another

8 ten years.  We're here now.  But I think the more important

9 point is during this period of time where the November,

10 December opinion were operative, and we don't think had told

11 people it's too late to make your due process argument in order

12 to assert an independent claim, the supervening event occurred,

13 which was the Second Circuit, which we think made the

14 requirement of showing a due process violation in order to

15 assert an independent claim an obsolete concept.  And we think

16 that the Second Circuit opinion basically covers the waterfront

17 on independent claims in terms of your ability or the ability

18 of a plaintiff to seek to assert it.  It doesn't determine that

19 independent claims are good.  That's for the trial court.

20         But in terms of asserting the independent claim, we

21 think that the Second Circuit which vacated it, the decision,

22 and remanded it to you for determination with respect to

23 non-ignition switch plaintiffs to make a ruling consistent with

24 the determination of the Second Circuit.

25         THE COURT:  Go ahead.

1           MR. WEINTRAUB:  Okay.  So, Your Honor, I think I'm

2    now back to where I was before.  So back on April 20th I

3    referred to New GM's recent pivot of position about the

4    September scheduling order.  In its reply brief New GM says,

5    for the first time, that the focus of the fall briefing was the

6    requirement that plaintiffs who wanted to assert independent

7    claims had to prove up their claims or be forever barred.

8           Despite all the contemporaneous correspondence from

9    New GM to the Court and others that adhered to what we call the

10   April 2015 due process paradigm for independent claims, and

11   despite the fact the Second Circuit had not yet ruled, New GM

12   seems to be arguing that Judge Gerber and New GM silently

13   changed the existing rules of the game as they then existed,

14   and that independent claims for everyone and every defect were

15   permitted.  And they seem to be taking this position even

16   before the Second Circuit ruled.  New GM flat out says in its

17   letter to this Court on <u>Tronox</u> that independent claims were

18   always good, which we think is not what actually happened back

19   in 2015.  We think, Your Honor, that --

20           THE COURT:  I think -- this is an aside.  I think

21   we'll be scheduling another hearing to deal with the <u>Tronox</u>

22   issues, but we're not doing that now.

23           MR. WEINTRAUB:  I'm sorry?

24           THE COURT:  We're going to schedule -- I'm going to

25   schedule a separate hearing to deal with the <u>Tronox</u> arguments.

1  That's not going to be today.

2          MR. WEINTRAUB:  Okay.  I was prepared to do --

3          THE COURT:  I'm not.  I don't want to hear any

4  argument about Tronox today.

5          MR. WEINTRAUB:  And you've saved everybody's lunch,

6  Your Honor.  I had a lot about Tronox.

7          THE COURT:  I'm not -- and the reason being, Mr.

8  Weintraub, that I don't feel that I'm prepared fully to deal

9  with the Tronox issues because, in addition, I've read -- I

10 read Tronox when it came down, not because of this case.  I

11 read Tronox as soon as it came down.  But I haven't read the

12 Third Circuit cases and which argue -- it's argued that Tronox

13 has adopted the Third Circuit view and -- anyway.  So that's

14 going to be a separate argument.  I'm not prepared to deal with

15 that today.

16         MR. WEINTRAUB:  At the risk of having something

17 thrown at me, what I would like to do, Your Honor, if there's

18 going to be a further hearing on Tronox, is to submit a short

19 letter brief.

20         THE COURT:  We'll talk about it at the end of this

21 hearing.

22         MR. WEINTRAUB:  Okay.

23         THE COURT:  Okay.  I'll -- I don't want to divert us.

24 I'm just letting everybody know.

25         MR. WEINTRAUB:  Okay.

22

1           THE COURT:  I'm not listening to <u>Tronox</u> arguments

2  today.

3           MR. WEINTRAUB:  So in effect, Your Honor, given this

4  pivot of position, we think that GM is speaking out of both

5  sides of its mouth.  If, as GM has consistently argued, there

6  are no independent claims other than for plaintiffs with an

7  ignition-switch-related claim, then New GM is still clinging to

8  the discredited notion that there are only two categories of

9  claims, assumed liabilities and retained liabilities, unless

10 the claimant can prove a due process violation.

11          Nothing in the November and December 2015 rulings

12 says that the due process ability had timed out.  And we

13 believe that New GM's original position fails because First and

14 Second Circuit, as I said, rejected the due process paradigm

15 set forth in the April 2015 decision.  And second, the December

16 2015 scheduling order we don't believe properly set up the due

17 process issues for adjudication.  And third, we don't think

18 that there was any adverse adjudication on the due process

19 issues that came out of the November and December rulings.

20          If, however, as a result of the pivot, New GM is now

21 trying to argue the marked pleading process heralded the need

22 for every plaintiff to defend the merits of its independent

23 claims in the fall of 2015, no order of the Court says that.

24 The notion that representative complaints were adequate to bind

25 parties that were not served with a marked version of their own

1  complaint --

2           THE COURT:  Do you agree that independent claims

3  cannot be based or predicated upon conduct of Old GM?

4           MR. WEINTRAUB:  I do, with a caveat.  And the caveat

5  is obviously these independent claims relate to defective

6  vehicles manufactured by Old GM.  And both --

7           THE COURT:  Other than that --

8           MR. WEINTRAUB:  Right.

9           THE COURT:  -- can the conduct of Old GM --

10          MR. WEINTRAUB:  No.

11          THE COURT:  -- any part of the basis for independent

12  claims?

13          MR. WEINTRAUB:  No.  So the failure to warn, the

14  fraudulent --

15          THE COURT:  Right.

16          MR. WEINTRAUB:  -- all of that is on New GM.  But as

17  I said, and as Judge Gerber and Judge Furman both acknowledged,

18  the root -- it has to deal with a vehicle manufactured by Old

19  GM.

20          The notion that representative complaints were

21  adequate to bind parties not served with a marked version of

22  their own complaint simply doesn't hold water, given the

23  differences between each complaint, the different flavors of

24  independent claims that could be asserted by the scores of

25  individual plaintiffs' lawyers who assert -- asserting

24

1   independent claims --

2           THE COURT:  You don't think it makes any difference

3   if Judge Gerber determined that particular language in a

4   representative complaint could not be asserted, that when --

5   that that doesn't bind the next case, that the complaint has

6   the precise identical language?

7           MR. WEINTRAUB:  Oh --

8           THE COURT:  I'm just using an example.

9           MR. WEINTRAUB:  -- I acknowledge that.  And I think I

10  acknowledged that earlier when I said that, you know,

11  complaints that were sloppy and didn't differentiate between

12  Old and New or said that New GM manufactured the Saturn, I --

13  we don't quibble with that.

14          THE COURT:  I think I said at the last hearing, for

15  better or worse, as Judge Bernstein continues to do in Old

16  Carco and as Judge Gerber was doing in Motors Liquidation, I do

17  believe it's the appropriate role of the bankruptcy court to

18  scrutinize the pleadings, if they're properly presented, to

19  determine whether particular allegations are or are not

20  permissible.  Not something I relish doing.  Hopefully it won't

21  come up very often but --

22          MR. WEINTRAUB:  And, yeah, we don't quite agree with

23  that, Your Honor.  But I understand --

24          THE COURT:  So be it.

25          MR. WEINTRAUB:  So be it.  But my point is that

ACCESS TRANSCRIPTS, LLC              1-855-USE-ACCESS (873-2223)

25

1  representative complaints with respect to something other than

2  sloppy language do not direct --

3          THE COURT:  Sloppy language in your eyes is probably

4  not sloppy language in the eyes of New GM.  But we don't need

5  to quibble about that today.

6          MR. WEINTRAUB:  No, I understand.  But my point would

7  be, more specifically, that failure to warn in one state may be

8  different than failure to warn in another state.  That goes to

9  the merits which is something that the trial court should

10  address.  I don't think that what you're -- Judge Gerber did

11  was say a non-ignition switch failure to warn, you can't assert

12  that because there's no such cause of action that you can

13  assert.  I think that anything that was barred or continued to

14  be stayed under the November and December rulings was because

15  of the due process predicate that was at that point the law of

16  the case and not because of the merits of the claims.

17          And it -- so we don't think that anyone that was not

18  served with a marked version of their own complaint which

19  highlighted something about their independent claim should be

20  barred because some other representative complaint was

21  continued to be stayed.

22          THE COURT:  That may be the case, Mr. Weintraub.  But

23  if somebody actually comes -- if New GM makes a motion with

24  respect to some new state court complaint that includes

25  language that Judge Gerber expressly struck want to know what's

26

1   going to happen.

2          MR. WEINTRAUB:  I think I know what's going to

3   happen.

4          THE COURT:  Okay.

5          MR. WEINTRAUB:  But --

6          THE COURT:  So I think your statement went too far.

7   It may not have preclusive effect as if they were here before

8   -- those parties were here before.  But unless there's

9   something in the Second Circuit opinion that would say that

10  what Judge Gerber did was erroneous with respect to striking

11  language from pleadings, it's like almost a certainty the same

12  result occurs again.  Changing a few words here or there is

13  probably not going to be the decider.  Go ahead.

14         MR. WEINTRAUB:  Well, the Second Circuit didn't

15  address any of that --

16         THE COURT:  I understand.

17         MR. WEINTRAUB:  -- because that wasn't up on appeal

18  at that time so --

19         THE COURT:  I'm not writing on a clean slate when I

20  write.

21         MR. WEINTRAUB:  No, I understand.  My point, Your

22  Honor, is that we don't believe that the September 3 scheduling

23  order told people if you don't show up with your independent

24  claim so that Judge Gerber can go thumbs up or thumbs down,

25  you're out forever.  Now it may be, and I don't disagree, that

27

1 New GM can bring somebody into this Court now and say this

2 should be thumbs down on this independent claim for this

3 reason, but at that point that plaintiff will know what's going

4 on.  And that plaintiff will be able to present its position to

5 you and --

6           THE COURT:  And I'm sure that Mr. Steinberg will do

7 what he's done with many of these others.  He writes letters to

8 people and he tells them what prior rulings were and why

9 particular language in a complaint is contrary to the prior

10 rulings.  And hopefully, more often than not, the plaintiffs

11 amend their pleading to take out the offending language and the

12 case goes off and proceeds.  And that's -- I think that's

13 happened quite a bit.

14           MR. WEINTRAUB:  And again, and I don't think we're

15 dancing around semantics, but I just want to be clear.  I'm not

16 talking about offending language.  And when I say "offending

17 language," it's the categories of things that I --

18           THE COURT:  Yeah, you call it sloppy and --

19           MR. WEINTRAUB:  Right.

20           THE COURT:  -- New GM doesn't call it sloppy.

21           MR. WEINTRAUB:  But I think there's a difference

22 between language and a cause of action.  And if the complaint

23 raises a cause of action that plaintiff should have the

24 opportunity to come into this Court and say this is a valid

25 cause of action, it's a valid independent claim.

28

1          THE COURT:  And they're basing the cause of action on

2   conduct of Old GM.  It's not an independent claim.

3          MR. WEINTRAUB:  I agree.  When I say "independent

4   claim" I mean independent claim --

5          THE COURT:  Right.

6          MR. WEINTRAUB:  -- in terms of the definition that

7   you and I are using.

8          THE COURT:  Go ahead.

9          MR. WEINTRAUB:  So in sum, Your Honor, turning back

10  to the four threshold issues briefing, for the reasons stated

11  in our briefs for the non-ignition switch post-closing accident

12  plaintiffs, none of the principles of res judicata, law of the

13  case, or failure to appeal are applicable to bar the

14  independent claims of these post-closing accident plaintiffs.

15  The first two motions to enforce did not apply to non-ignition

16  switch post-closing accident plaintiffs and they were not filed

17  against those parties.  The non-ignition switch post-closing

18  accident plaintiffs were not parties to the four threshold

19  issues briefing.  The non-ignition switch post-closing accident

20  plaintiffs did not participate in the four threshold issues

21  briefing.  There was no designated counsel for the non-ignition

22  switch post-closing accident plaintiffs in connection with the

23  four threshold issues briefing.  And we don't believe there

24  were any adverse determinations made against the rights of non

25  ignition switch post-closing accident plaintiffs with respect

1  to their accidents.

2         THE COURT:  Can you give me examples, not exhaustive,

3  but can you give me examples of allegations that post-closing-

4  act plaintiffs have alleged as a basis for independent claims

5  against New GM?

6         MR. WEINTRAUB:  Failure to warn.  You knew that this

7  vehicle was defective, you didn't warn me, and I ended up

8  having an accident, and I was injured.  Had you warned me, I

9  wouldn't have had the accident.  Had you recalled the vehicle

10 and repaired it, I wouldn't have had the accident.  I think

11 that those are the species of claims.

12        I'm not a personal injury lawyer so I don't know all

13 the ins and outs of other things that people could allege.  I

14 know that there are some fraud claims alleged which I think are

15 a species of, I was misled into thinking my vehicle was safe.

16 But again I -- I'm not capable of being exhaustive as I stand

17 here today.

18        THE COURT:  Okay.

19        MR. WEINTRAUB:  As I was saying, Your Honor, there

20 were no adverse determinations made against the rights of

21 non-ignition switch post-closing accident plaintiffs as to

22 their accidents, other than perhaps that their claims were

23 implicitly deferred because of the due process issue.  So

24 clearly, Your Honor, we believe that the absence of a motion to

25 enforce as to the non-ignition switch post-closing accident

30

1  plaintiffs, the lack of notice to them and the due-process-

2  related findings made concerning only the ignition switch

3  defect and subject vehicles, that none of the April and June

4  rulings were binding on these claimants and no order was

5  entered on the threshold issues that these claimants were

6  compelled to appeal from.

7          THE COURT:  Your position I think, very simply, is

8  that the issue of due process, of any due process violation

9  really isn't relevant to whether the non-ignition switch

10 plaintiffs can assert independent claims against New GM.

11         MR. WEINTRAUB:  That -- that's correct with one --

12 there's always a little caveat.  As you know, we contend that

13 as future claimants they cannot be barred by the sale orders

14 restriction on successor liability.  I'll get to that when I

15 get to issue four.  You know, there is a latent due process

16 issue there, but a different due process --

17         THE COURT:  That's a successor liability claim --

18         MR. WEINTRAUB:  Right.

19         THE COURT:  -- and not -- not a --

20         MR. WEINTRAUB:  Exactly.

21         THE COURT:  -- independent claim.  With respect to

22 the independent claim --

23         MR. WEINTRAUB:  Right.

24         THE COURT:  -- your view is that due process isn't --

25 finding a due process violation is not a necessary predicate to

31

1  any plaintiff, specifically your group of plaintiffs asserting

2  independent claims against New GM?

3        MR. WEINTRAUB:  That's correct, Your Honor.  Now

4  turning to the fall 2015 briefing under the September 2015

5  scheduling order, for the reasons stated in our briefs for the

6  non-ignition switch post-closing accident plaintiffs, again, we

7  don't believe that the principles of res judicata, law of the

8  case, or failure to appeal are applicable to their independent

9  claims.  The scheduling order did not effectively notify the

10  non-ignition switch post-closing accident plaintiffs that their

11  independent claims were under attack or that they had barely

12  three weeks to demonstrate a due process violation or come into

13  court.

14        THE COURT:  So in a letter to the Court,

15  Mr. Steinberg, in correcting statements that were made at the

16  last hearing, pointed to the involvement, participation,

17  attendance at hearings, of lawyers in representing clients with

18  non-ignition switch plaintiffs.  I guess the view from your

19  side of the courtroom is that appearance at hearings,

20  participation in hearings is not enough.  What's important is

21  whether the Court was presented with the issues and decided the

22  issues.

23        MR. WEINTRAUB:  That's correct, Your Honor.  I would

24  also quibble with the notion that non-ignition switch

25  post-closing accident plaintiffs were involved in these

32

1  proceedings.  I don't believe that they were.

2           THE COURT:  Okay.

3           MR. WEINTRAUB:  I certainly wasn't representing them.

4  Mr. Weisfelner only represents economic loss plaintiffs.  You

5  know, what was going on here, to borrow a phrase, was sort of

6  bankruptcy inside baseball, on very specific issues.

7           THE COURT:  It should be no surprise.  I mean I --

8  what's important to me -- I -- you know, frequently in some big

9  cases I get a courtroom full of lawyers representing lots of

10 different stakeholders and different interests.  What I focus

11 on is what are the issues presented to me and what did I

12 decide.

13          MR. WEINTRAUB:  Uh-huh.

14          THE COURT:  The fact that there may have been lawyers

15 with a totally -- you know, on a different issue, would take

16 entirely different positions, I -- you know, what was the

17 evidence before me, what were the arguments presented, and what

18 did I decide, not who was in the courtroom and who they may

19 have represented.

20          MR. WEINTRAUB:  I concur, Your Honor.  So continuing,

21 just without repeating but summing up, we don't think that the

22 September 3 scheduling order notified people either of a due

23 process deadline or of a show-up-with-your-complaint-and-get-a-

24 thumbs-up-or-thumbs-down deadline.  That's simply just not in

25 the order and it's clearly not baked into the time periods that

1 we were operating under.

2        THE COURT:  That's all well and good, but I -- I'm

3 going to expect to hear from both sides about that August

4 transcript where Judge Gerber was told that the issues would be

5 teed up.  Judge Gerber didn't draft the September scheduling

6 order on his own, counsel were heavily involved in doing it.

7 Yes, he signed an order.  Yes, I signed the order for the order

8 to show cause on the 2016 threshold issues.  But it was counsel

9 who defined the issues that they believed had to be decided and

10 I agreed I would address.

11        And so I have this question.  That August transcript

12 certainly appears to show recognition by counsel that if that

13 the due process issue is important, and we'll tee it up soon if

14 that's appropriate.  And of course, it wasn't.  Your position

15 is the September scheduling order, the November decision, and

16 the December judgment don't -- your position is they don't

17 expressly deal with it.  New GM may have a different view about

18 it.

19        But so, you know, I think one of the things I have to

20 decide is whether, based on what was said, maybe more than just

21 the August hearing, but certainly from that transcript of the

22 August hearing, was the failure to raise that issue, schedule

23 it for hearing and argument, if counsel believed they needed

24 discovery, put that on the table right then.  It -- you know,

25 sometimes it's time to fish or cut bait.  Okay.  That's what

I'm -- one of the things. And I -- you may not be the one to have to address that. But I'll let others --

MR. WEINTRAUB: Well, but I need to address it because now I represent those people. I didn't back then.

THE COURT: So go ahead.

MR. WEINTRAUB: So the way I would address it, Your Honor, is there's a difference between what was talked about, and I won't deny because it's in the transcript, that it was talked about. The issue is did it find its way into the order.

THE COURT: Well, why is that the issue? If -- I -- there's where I beg to differ with you, Mr. Weintraub. Where counsel acknowledges at the August hearing that due process is important and we'll tee it up soon if it needs to be addressed, and then counsel negotiate a scheduling order and don't identify the issue, why shouldn't the Court, me, conclude that counsel made an affirmative decision not to challenge due process with respect to non-ignition switch defects, and they had their chance; they didn't do it and it's too late, in 2017, to do it.

MR. WEINTRAUB: The answer to that, Your Honor, is if General Motors thought it should have been in there, they could've raised it. If Judge Gerber -- let me -- please let me -- if Judge Gerber thought it should have been in there, he could have raised it. And whatever happened in the bankruptcy court, what the non-ignition switch plaintiffs received was

35

1   that scheduling order.  That scheduling order did not tell them

2   now is the time to address due process issues.  And it would be

3   manifestly unfair and a violation of due process to say, guess

4   what, something that wasn't in the order was discussed at a

5   hearing that you weren't at, and even though you got the order

6   and it wasn't in the order, you're now barred forever.  That

7   would be an egregious violation of due process, Your Honor.

8           The second answer to that question is,

9   notwithstanding everything that you said about the August

10  hearing, Judge Gerber did not rule in the November decision

11  that people had timed out on due process.  That's not how I

12  read footnote 70.  That's not how I read the December opinion.

13  So if Judge Gerber felt that someone had stumbled, he did not

14  say it in the opinion.  It could -- it would have been very

15  easy to say all non-ignition switch plaintiffs are now barred

16  because they had their opportunity and they did not.  And

17  frankly, had he said that, someone would have appealed that.

18  But he didn't say that and you cannot basically read something

19  into the scheduling order and into the November/December

20  rulings that's just not there, especially to bind people who

21  weren't even in any of these proceedings at that time.

22          THE COURT:  Well, your view -- I think I'm correct in

23  this.  Your view is that non-ignition switch post-closing act

24  -- accident plaintiffs are future claimants and they can't be

25  bound anyway.

36

1          MR. WEINTRAUB:  That's true.

2          THE COURT:  So --

3          MR. WEINTRAUB:  And my --

4          THE COURT:  -- it's not really your issue.  Is it?  I

5     mean --

6          MR. WEINTRAUB:  Well, I've raised it.  It's --

7          THE COURT:  I know you're arguing it --

8          MR. WEINTRAUB:  Yes.

9          THE COURT:  -- but your main point is that they're

10    future claimants and they're not barred.

11         MR. WEINTRAUB:  Right.  So --

12         THE COURT:  Okay.

13         MR. WEINTRAUB:  -- but I also have the Second Circuit

14    opinion which I think renders obsolete the due process paradigm

15    which says the bankruptcy court didn't have subject matter

16    jurisdiction to bar independent claims.

17         THE COURT:  Yes, I understand that.

18         MR. WEINTRAUB:  And, you know, just to put a little

19    bit of a finer point on it, and it may have been a point I made

20    last time or in my brief.  This is not the traditional third-

21    party release-type issue because when you have a third-party

22    release, those claims already exist.  And the third party who

23    is being compelled to give the release has notice and an

24    opportunity to say, wait a minute, I have a good claim, don't

25    release the claim, or doesn't meet the Master Mortgage factors

37

1 or the -- I forget the Second Circuit factors in, and I should

2 know this -- but doesn't meet the factors.  That's not what

3 happened here.  New GM wasn't even operating yet.  Nobody had

4 had their accidents yet.  So this is completely a future claim

5 issue.

6          THE COURT:  So your view is I don't have to reach

7 this issue with respect to your clients?  Well, I say "this

8 issue."  I don't have to reach the issue of whether they did or

9 didn't have a due process violation.  Your position is very

10 simple, that they're future claimants, they can't be bound.

11 Right?

12          MR. WEINTRAUB:  Yes.

13          THE COURT:  Okay.

14          MR. WEINTRAUB:  But also the other -- the subject

15 matter jurisdiction issue as well.  One of the things that New

16 General Motors argues is that there's no difference between a

17 scheduling order and an order to show cause, and that my

18 acceptance of an order to show cause somehow means the

19 scheduling order was sufficient.  Now we've already talked

20 about the contents of the scheduling order and now I want to

21 talk about the differences between a scheduling order and an

22 order to show cause, and this scheduling order in particular

23 and your order to show cause in particular.

24          First, Your Honor, my view is that as a generic

25 matter a scheduling order tells people that are already parties

1  to a proceeding when something is going to happen.  A

2  scheduling order, in my view, doesn't create its own

3  jurisdiction.  And an order to show cause, on the other hand,

4  is what I would characterize as a brick through the window, in

5  the sense that order to show cause is if you don't show up and

6  show cause you could be held in contempt.  That tends to get

7  people's attentions.

8          Second, Your Honor, when I agreed to the scheduling

9  order in September of 2015, as I had said earlier, I had been

10 retained to address a specific question for specific clients

11 with respect to the upcoming trials in the MDL.  I was briefing

12 punitive damages for the bellwethers because that's what

13 Judge Furman asked Judge Gerber about, and asked it I think

14 somewhat urgently because of the upcoming trial.

15         In connection with the scheduling order, I knew

16 exactly what proceeding I was in for my clients and what I was

17 supposed to be doing.  I was in a pretrial proceeding that had

18 been instigated by Judge Furman.  I did not agree to any other

19 matters for anyone else.  I was focused on my bellwether

20 post-closing accident trials, period.  Nor did I read the

21 scheduling order the way that New GM would now like to read the

22 scheduling order.

23         The non-ignition switch post-closing accident

24 plaintiffs' issues were not, so far as I knew back then and so

25 far as I know right now, were not an issue in the MDL.  And

39

1  again, I'm talking about colloquial non-ignition switch.  I do

2  recognize and I conceded and I apologized to the Court.  I

3  didn't mean to speak loosely and use the technical term, I was

4  using the colloquial term.  I am well aware that there are many

5  vehicles other than the recall that was the subject vehicles

6  where you've got that rotation problem and the loss of power

7  and brakes and airbags.  And that's all being litigated in the

8  MDL and there has been discovery on that.

9        Again, I'm not trying to be pejorative but I think,

10  you know, the Court sort of indicated that, you know, myself

11  and Mr. Weisfelner, you know, you're here every day, you're

12  imbued with these issues, you know, why don't you say

13  something?  And I think the short answer is, if I had though,

14  Your Honor, even though that I was not representing any of

15  these plaintiffs, that there was something in that scheduling

16  order that basically set off a bell that said you have through,

17  you know, the end of this month or the end of next month to

18  demonstrate a due-process violation or your claims will be

19  barred.  I would have said something.

20        I would have tinkered with that order to say this

21  order is not clear.  It's got to be made clear.  I would have

22  suggested that those parties organize.  I know this all sounds

23  like 20/20 hindsight, but nobody saw this issue, Your Honor.

24  It wasn't raised by GM.  It wasn't raised by Judge Gerber.  It

25  wasn't raised by Mr. Weisfelner.  The scheduling order was what

40

1 it was, and I don't think it notified people.

2         THE COURT:  Can I ask this:  The clients who you do

3 represent --

4         MR. WEINTRAUB:  The ones now?

5         THE COURT:  Yes.

6         MR. WEINTRAUB:  Yes.

7         THE COURT:  -- are all of their vehicles -- at some

8 point, did all of that make and model year become subject to a

9 recall?

10         MR. WEINTRAUB:  I don't think so, Your Honor.  I

11 don't know particularly with respect to recalls.  I know that

12 Mr. Turner and Mr. Butler are not part of the MDL, that they

13 don't have ignition-switch, upper case or lower case issues.  I

14 know that Denny -- Denny's client is a rollover case.

15         It's not an ignition-switch case, however, that one

16 was brought into the MDL, I think counsel would say against

17 their wishes, in March of 2016, after all of this briefing,

18 because one of the elements in the wrecked vehicle indicated a

19 rotation, but I will tell you counsel does not consider it to

20 be an MDL case, and it does not consider it to be an ignition-

21 switch case.  So --

22         THE COURT:  So I think I have -- maybe you can tell

23 me.  It does not appear to me that there is any dispute among

24 the counsel who are here as to what an ignition switch, all

25 capital -- or initial capital, independent of what is an

41

1  ignition-switch defect?  Am I right in that?

2          MR. WEINTRAUB:  That's right, but, again, our crazy

3  nomenclature would be that non-ignition-switch defects

4  include --

5          THE COURT:   Just a second.  Let's take that one at a

6  time.

7          MR. WEINTRAUB:  Yes.

8          THE COURT:  There does not appear to be any dispute

9  as to what is an initial caps ignition-switch defect.

10          MR. WEINTRAUB:  Correct.

11          THE COURT:  And it relates to subject vehicles?

12          MR. WEINTRAUB:  Correct.

13          THE COURT:  All right.  I am quite confused about

14  what the range of alleged defects may be for non-ignition-

15  switch defects.

16          MR. WEINTRAUB:  I can --

17          THE COURT:  I know that some of them are ignition-

18  switch related, and that --

19          MR. WEINTRAUB:  I can answer the question in a simple

20  way, but it's -- it --

21          THE COURT:  Okay.  Let's just -- let me --

22          MR. WEINTRAUB:  -- covers a lot of ground.

23          THE COURT:  -- look through my notes.  Hold on.

24          MR. WEINTRAUB:  Maybe I can sit down.

25          THE COURT:  You know, in the summer of 2014, there

42

1  were some additional recalls that related to ignition switches,

2  and -- but those, for purposes of these proceedings, have been

3  included within the non-ignition-switch --

4        MR. WEINTRAUB:  Exactly.

5        THE COURT:  -- defects.

6        MR. WEINTRAUB:  Right.

7        THE COURT:  Even though they're ignition-switch

8  related --

9        MR. WEINTRAUB:  Right.

10        THE COURT:  -- they weren't in the first three

11  recalls.

12        MR. WEINTRAUB:  So non-ignition-switch defect, under

13  the unfortunate terminology that we've all adopted, is anything

14  other than an ignition-switch defect.  And an ignition-switch

15  defect --

16        THE COURT:  (Indiscernible)

17        MR. WEINTRAUB:  -- is a very specific defect of very

18  specific vehicles.  So there are lower case ignition-switch

19  cases that fall into the category of non-ignition switch,

20  right.  And, Your Honor, Turner and Butler, those cars were not

21  recalled.  Those were not subject to recalls.  There has been

22  some discovery in the MDL on defects that are not ignition-

23  switch related, lower case ignition switch.  My understand --

24        THE COURT:  But I find no basis in the Second Circuit

25  opinion to sort of open the floodgates or the doors to

43

1 successor liability claims.  Anytime somebody comes forward and

2 says, my car manufactured by Old GM had a defect, not an

3 initial caps ignition-switch defect, but some other problem,

4 and I am entitled to assert successor liability claims.  As the

5 record stands now, the sale order bars them, and I don't see

6 anything in the Second Circuit opinion or anything else that

7 alters that fact.  Do you agree or disagree?

8         MR. WEINTRAUB:  I'm not sure I follow you.  Are you

9 talking about people who had had accidents before the -- or

10 after?

11         THE COURT:  I missed the before what?

12         MR. WEINTRAUB:  Before the closing of the sale, or

13 after the closing of the sale?

14         THE COURT:  New GM assumed liability for post-closing

15 accidents.

16         MR. WEINTRAUB:  Right.

17         THE COURT:  And it's not tied to whether there was a

18 recall or not.

19         MR. WEINTRAUB:  Right.

20         THE COURT:  So --

21         MR. WEINTRAUB:  Well, this is our --

22         THE COURT:  I'm not including -- I mean, there are

23 assumed liabilities.  Nobody is disputing assumed liabilities.

24 They may be disputing whether punitive damages are available --

25         MR. WEINTRAUB:  Right.

44

1          THE COURT:  -- for assumed liability, but nobody is

2    disputing that New GM assumed liability for post-closing

3    accident --

4          MR. WEINTRAUB:  Right.

5          THE COURT:  -- plaintiffs, whatever, if they can show

6    there was a defect in their car.  That's correct, isn't it?

7          MR. WEINTRAUB:  That's correct.  However, assumed

8    liability is limited to how the purchase agreement defines

9    product liabilities.  So the argument is on the successor

10   liability issue that those people, as future claimants,

11   shouldn't be barred by an artificial curtailment of what

12   liabilities would be.

13         THE COURT:  Well, that's where I can't -- you know,

14   you're going to tell me that somebody ten years from now is

15   going to come in and say, oh, there was a problem with the

16   connecting rods, and I've got an expert that's going to say

17   that was a defect in the vehicle and it caused my car to go out

18   of control and hit a wall and I was injured, and so, I have a

19   successor liability claim against New GM.  I mean, I don't read

20   the Second Circuit as opening that door, and I don't see any

21   basis to do anything other than keep that door shut.

22         MR. WEINTRAUB:  I don't believe that the Second

23   Circuit shut that door.  I think that what the Second Circuit

24   said is, it's an open question in this Circuit as to whether

25   you can sell free and clear of future claims.  And then we rely

45

1  on <u>Grumman Olson</u>, which says --

2          THE COURT:  Yes.  I'm very familiar with <u>Grumman</u>

3  <u>Olson</u>.

4          MR. WEINTRAUB:  Okay.

5          THE COURT:  Both Judge Gerstein's decision and the

6  district court's decision.

7          MR. WEINTRAUB:  So that's the essence of our issue

8  four.

9          THE COURT:  Okay.  All right.

10          MR. WEINTRAUB:  So I'm not quite finished with

11  issue --

12          THE COURT:  Oh, no.

13          MR. WEINTRAUB:  -- two, but it sounds like I'll be

14  brief on issue four.

15          THE COURT:  Yes.

16          MR. WEINTRAUB:  So based upon -- we were talking

17  about this during the scheduling order and the order to show

18  cause, so based on my view of the difference between a

19  scheduling order and an order to show cause, I agreed to the

20  order to show cause in this process here, but my argument and

21  my agreement was not just based on the different labels.  This

22  time, it was clear who the target --

23          THE COURT:  Who is the other plaintiffs' counsel that

24  just agree to remain silent and not -- we're not going to raise

25  that due-process issue now if we can come back in a few years

46

1  and raise it then?

2          MR. WEINTRAUB:  Well, you're assuming that the non-

3  ignition switch, post-closing accident plaintiffs were aware of

4  the due-process issue, Your Honor, and I think that that's not

5  a fair assumption.  They were not involved in the proceedings

6  here.  They were not --

7          THE COURT:  Or economic loss?  Were -- were --

8          MR. WEINTRAUB:  I can't speak to that, Your Honor.

9          THE COURT:  -- non-ignition switch, economic loss

10  plaintiffs represented before Judge Gerber?

11          MR. WEINTRAUB:  I can't speak to that.  I defer to

12  counsel to say --

13          THE COURT:  Well, but you know.  You know the answer

14  to that.

15          MR. WEINTRAUB:  I actually don't.  I want to hear

16  what Mr. Weisfelner and Mr. Steel have to say.

17          THE COURT:  All right.  Fair enough.

18          MR. WEINTRAUB:  So this time, in the order to show

19  cause, I believe it was clear who the target audience was.

20  This time, as opposed to the scheduling order, the issues in

21  the order to show cause were spelled out with particularity.

22  This time, we used a glossary of terms and we actually used the

23  operative terms in the scheduling order.  The ball was not

24  hidden from anyone as to what was going to be decided here on

25  these 2016 issues.  I don't think there is any confusion by the

47

1  Plaintiffs, especially the non-ignition switch, post-closing

2  accident plaintiffs as to what was going to happen here.

3        Several of them reached out to ask me if I would

4  represent them, others appeared on their own.  Going to the

5  gatekeeper issue, I know that the Court is inclined to be a

6  gatekeeper and --

7        THE COURT:  I'm not thrilled about it, but --

8        MR. WEINTRAUB:  I can help you with that, Your Honor,

9  but I understand that.  I think that there's a difference

10  between being a gatekeeper on a category of claims, independent

11  versus non-independent and getting granular on the merits of a

12  claim, and I think that if something facially passes the gate

13  because it's truly an independent claim that your job should be

14  fairly easy and quick, and leave it to the trial court to

15  determine whether or not the claim is valid, which is exactly

16  what we believe Judge Gerber did several times, if you look at

17  the December --

18        THE COURT:  Well, it's just like Judge Bernstein.

19  Judge Bernstein has done in <u>Old Carco</u>.  I agree with that.

20  It's not my role to decide whether state law claims are

21  properly stated or not.  I do believe that as Judge Bernstein

22  has done and as Judge Gerber did, it's the appropriate role of

23  the bankruptcy court to make sure that those provisions of a

24  sale order which can be enforced are enforced.

25        MR. WEINTRAUB:  So, Your Honor, forging ahead.  We

48

1 already talked about the Second Circuit vacating the bankruptcy

2 court as to "non-ignition switch, lower-case defects," and

3 remanded the non-ignition switch issues to this court for

4 proceedings consistent with the opinion.  The language in the

5 Second Circuit opinion is found at 829 F.3d at 166.  In

6 vacating and remanding, the Second Circuit expressly cites to

7 Motors Liquidation Corp III, 531 B.R. at 360, which I believe

8 encapsulates the due-process paradigm of the April 2015

9 opinion.

10            If I could just read that --

11            THE COURT:  Go ahead.

12            MR. WEINTRAUB:  -- section into the record?  If I can

13 find it.  So, again, I'm quoting from 531 B.R. at 360, and what

14 the Second Circuit cited to was this -- I believe it was

15 referring to this language.  It just cited to the page.

16            "The non-ignition switch plaintiffs' claims remain

17 stayed."  And again, that's economic loss because of our crazy

18 terminology.

19            "The non-ignition switch plaintiffs' claims remain

20            stayed and properly so.  Those plaintiffs have not

21            yet shown, if they ever will, that they were known

22            claimants at the time of the 363 sale, and that there

23            was any kind of a due-process violation with respect

24            to them."

25            THE COURT:  And the date of that decision?

49

1          MR. WEINTRAUB:  The date of that decision is May 27,

2   2015, corrected on August 10, 2015.  So I believe that when the

3   Second Circuit said I'm vacating, and citing to that page and

4   saying for further proceedings, consistent with this opinion.

5   I think what the Second Circuit was saying is the due-process

6   predicate is not the standard, the standard is whether or not

7   there was subject-matter jurisdiction to bar future independent

8   claims.

9          My last point, before I move on, Your Honor, is that,

10  in addition to the vacation by the Second Circuit, there's a

11  provision of the June 2015 judgment found at paragraph

12  13(e)(2), which is a savings clause that would reinstate any

13  dismissed lawsuits if the second circuit reverses the April and

14  June judgment.

15         THE COURT:  I've re-read that this morning.

16         MR. WEINTRAUB:  Okay.  I will now save you an hour

17  and a half of _Tronox_ and move on to issue three, Your Honor,

18  which Mr. Steel is taking the labor or on -- I'll be brief on

19  that.  If I can just --

20         THE COURT:  Sure.  Go ahead.

21         We're going to take a recess at 10:30.

22         MR. WEINTRAUB:  I think I can address issue three

23  before 10:30, and then, I'll do a short back.  We believe the

24  Second Circuit used broad language concerning used car

25  purchasers.  These are all post-closing buyers with no prior

50

1  contact or relationship with old GM.  And, again, I'm speaking

2  for the accident plaintiffs, not the economic-loss plaintiffs.

3  We think these are the archetypical future claimants on all

4  fours with Grumman Olson.

5          There was no effective means to provide notice to

6  these future crash victims, that they're successor liability

7  claims, or they're independent claims who are about to be

8  barred.  So we don't believe the sale order can bind these

9  claimants.  There's no principal reason why the Second Circuit

10 ruling ought to be limited to ignition-switch plaintiffs,

11 either the claim is good or it's not good.  There's nothing in

12 the Second Circuit's expansive discussion of future claims that

13 would --

14         THE COURT:  Well, what's the language of the sale

15 order that is argued to bar post-closing, used-car purchaser,

16 accident claims?

17         MR. WEINTRAUB:  I don't think there's any language in

18 the sale order that addresses that.  I think that there is some

19 generic language that, you know, new GM will not be liable in

20 any way for anything that old GM did, and that's people who

21 have run 99 yards down the field with that.

22         THE COURT:  Okay.  Go ahead.

23         MR. WEINTRUAB:  We think that for used-car

24 purchasers, there was a due-process failure akin to the due-

25 process failure for the pre-closing ignition-accident

51

1  plaintiffs, and the consequences should be the same.

2          THE COURT:  Wait.  You're -- for accident claimants?

3          MR. WEINTRAUB:  Yeah.  I'm drawing maybe --

4          THE COURT:  As opposed to maybe --

5          MR. WEINTRAUB:  -- in a perfect analogy.

6          THE COURT:  Well, accident is --

7          MR. WEINTRAUB:  I'm not --

8          THE COURT:  You're -- you -- I'm sorry.

9          MR. WEINTRAUB:  Yes.  Yes.  I'm only speaking for

10 accident claims.

11         THE COURT:  Yes.  It's for accident claims?

12         MR. WEINTRAUB:  Yes.

13         THE COURT:  Used-car purchasers who were in

14 accidents?

15         MR. WEINTRAUB:  Yes.

16         THE COURT:  You're -- one separate prong of your

17 argument is they are future claimants, and they're not barred.

18 Due process doesn't really -- doesn't impact their ability to

19 assert those claims.

20         MR. WEINTRAUB:  Yes.

21         THE COURT:  Is that correct?

22         MR. WEINTRAUB:  Yes.  New GM argues that the used-car

23 buyer can have no greater rights than its seller.  We believe

24 this argument was rejected by the Second Circuit.

25         THE COURT:  Where does the Second Circuit reject that

52

1  argument?

2        MR. WEINTRAUB:  I think by saying that they can't be

3  bound by the sale order, and that they can assert their --

4        THE COURT:  Well, but that's -- that seems to me to

5  be different than --

6        MR. WEINTRAUB:  They have -- as an accident victim,

7  they have completely separate rights from their predecessor.

8  They were injured in an accident, in a car that they didn't own

9  at the time of the sale.  And an accident that didn't --

10        THE COURT:  If I accept your argument that they're

11  future claimants; they're not bound and they can assert?  First

12  off, GM's assumption of liability of personal injury, property

13  damage doesn't depend on whether it's an initial purchaser or a

14  used-car purchaser, correct?

15        MR. WEINTRAUB:  I think that's right.  And I think

16  that their no greater rights argument goes to the --

17        THE COURT:  Really?  I think it goes to the economic

18  losses.

19        MR. WEINTRAUB:  I think so too.  I think so too.

20        THE COURT:  And that's where I think they --

21        MR. WEINTRAUB:  That was my --

22        THE COURT:  I get -- you know, I think they have a

23  lot of traction with me at least with that argument that for

24  economic-loss plaintiffs, used-car purchasers can have no

25  greater rights than the initial owner of the vehicle would

53

1    have.  It didn't -- their argument is, it can't morph into

2    something greater just because the car passes -- well, I'm sure

3    I will hear plenty of argument of why they -- people don't

4    believe that's correct, but I understand GM's argument that for

5    economic-loss claim, used-car purchasers can't have any greater

6    rights than the party from whom they purchased the vehicle.

7            MR. WEINTRAUB:  And my only point in going maybe a

8    step further was to avoid being tarred by that brush.  I don't

9    think that argument applies to us.  I think we're --

10           THE COURT:  I understand your argument.  You're --

11   when you're dealing with accident, <u>Grumman Olson</u> that's not the

12   only case, but <u>Grumman Olson</u>, and I think -- you know, I

13   thought it was interesting that Judge Bernstein interpreted the

14   sale order in <u>Grumman Olson</u>.  You know, one possible

15   interpretation that he could bar those claims, but he

16   interpreted it, no, you can't -- it didn't bar those claims,

17   because you can't bar those claims --

18           MR. WEINTRAUB:  Right.

19           THE COURT:  -- because they're unknown, and --

20           MR. WEINTRAUB:  Right.

21           THE COURT:  But he engaged -- I think, somewhat

22   similar to what the Second Circuit did here is, Judge Bernstein

23   engaged in an interpretation of the sale order.  He did it

24   having in mind principals about future claims and things of

25   that nature.

54

 1          MR. WEINTRAUB:  And, again, I just don't want to get

 2  tarred with the -- with that brush.  We think that there was --

 3  to the extent there is no --

 4          THE COURT:  You're just going to let your colleagues

 5  be targeted, but --

 6          MR. WEINTRAUB:  Yeah, I actually believe that

 7  Mr. Weisfelner can take care of himself probably better than I

 8  can.  The -- to the extent there was any due-process issue at

 9  all, it's really the impossibility of reaching these people,

10  because they're not unknown creditors who can be bound by

11  constructive notice.  These are not yet creditors, and I think

12  that's a significant difference.

13          And with that, Your Honor, with five minutes to

14  spare, I will stop here, and then, resume with issue four after

15  the break.

16          THE COURT:  Okay.  Let's take a 15-minute recess, and

17  then we'll resume.

18      (Recess taken at 10:24 a.m.)

19      (Proceedings resumed at 10:40 a.m.)

20          THE COURT:  All right.  Please be seated.  We're back

21  on the record in Motors Liquidation.

22          Mr. Weintraub, are you done?

23          MR. WEINTRAUB:  No.  I have issue four.  Although you

24  indicated I may be doomed on issue four, but I'll --

25          THE COURT:  Go ahead.

55

1          MR. WEINTRAUB:  I thought I could briefly try anyway.

2  Thank you, Your Honor.  William Weintraub for the Non-Ignition

3  Switch Post-Closing Accident Plaintiffs now with respect to

4  issue four.  The non-ignition switch post-closing accident

5  plaintiffs are future creditors whose successor liability

6  claims cannot be barred by the sale order.  This circuit --

7  Second Circuit has not yet ruled on whether the bankruptcy

8  court can bar future tort creditors from asserting successful

9  liability claims.  We believe that future tort creditors

10 present a different due process issue than existing tort

11 creditors.

12          In this case, the ignition switch pre-closing

13 accident plaintiffs were known existing creditors denied due

14 process.  As a result, the Second Circuit held the sale order

15 could not bar their successor liability claims.  Mullane-style

16 publication notice only works for unknown creditors.  That is,

17 persons that have already been injured in an accident but who

18 are unknown to the debtor.  The due process issue for

19 non-ignition switch post-closing accident plaintiffs is that as

20 future tort claimants they were not yet creditors at all for

21 their future tort claims at the time of the sale.  As a result,

22 there was no notice that could have been effectively -- given

23 to them that would have effectively notified them that their

24 rights were about to be affected.

25          THE COURT:  Go ahead.

56

1          MR. WEINTRAUB:  Oh.  In this case, there was no

2   future claims representative appointed.  The Second Circuit

3   sidestepped --

4          THE COURT:  Let's just say I -- let's assume I agree

5   with all of that.  Okay?  The question in my mind, if you get

6   to the -- this is a punitive damage issue as part of issue

7   four.

8          MR. WEINTRAUB:  It's primarily punitive damages.  But

9   also, because of -- I assume the Court is going to say they've

10  assumed liability.  It's partially the punitive damages issue.

11  But also, the scope of the assumption of liability, I think, is

12  more narrow than if they were determined to be a successor,

13  which would be the full range of --

14         THE COURT:  Well, I --

15         MR. WEINTRAUB:  -- liability.

16         THE COURT:  I don't know about that.  That's the

17  point.  Are there any cases -- is -- are there any cases either

18  assume liability from a debtor of -- an insolvent debtor,

19  assume liability from an insolvent debtor or successor

20  liability based on an insolvent debtor that have permitted the

21  recovery of punitive damages?

22         MR. WEINTRAUB:  I don't know the answer to that

23  question, Your Honor.  Candidly, we didn't look to see if there

24  were any.  But we did talk about cases where the court makes it

25  clear that the successor stands in the shoes of the predecessor

57

1  and has the same liability.  And if --

2         THE COURT:  And if that liability -- if the -- well,

3  that's -- this is really the question, is with <u>Gary</u> (phonetic)

4  and the authority that supports it that if punitive damages

5  can't be recovered from the debtor, can they be recovered from

6  -- technical term using the word "successor."  Okay?  Because

7  of the assumed liability or successor liability theory, if the

8  debtor couldn't be liable for punitive damages, how could

9  that --

10         MR. WEINTRAUB:  Well, I want to distinguish between

11  bankruptcy dollars and real dollars.  Clearly, the debtor could

12  have been liable for punitive damages if it -- you know, the

13  requisites for the imposition of punitive damages had been met.

14  The fact that --

15         THE COURT:  -- liability in Chapter 7 you can't

16  recover punitive damages.

17         MR. WEINTRAUB:  Sure you can, if the debtor's

18  solvent.  It's only subordinated, it's not disallowed.

19         THE COURT:  Right.  Okay.  So you don't have any

20  question that Old GM was insolvent?

21         MR. WEINTRAUB:  No.  But I don't think that the fact

22  that this debtor was insolvent precludes the successor from --

23  precludes the plaintiff from recovering from the successor.

24         THE COURT:  That's what I want to see some authority

25  on.

58

1          MR. WEINTRAUB:  Well, Your Honor, but by --

2          THE COURT:  Is this a question of first impression?

3          MR. WEINTRAUB:  By that token -- not to give New GM

4    any ideas that they probably haven't thought about, but by that

5    token then on the assumed liabilities they'd only pay 30 cents

6    on the dollar.

7          THE COURT:  No.  I don't think that follows.  But if

8    an insolvent debtor can't be liable for punitive damages, how

9    does the successor, whether by assumption or a successor

10   liability theory, become liable for your damages?  What I want

11   to know is are there cases that address the issue or is this a

12   question of first impression?

13         MR. WEINTRAUB:  I think this may be a case -- a

14   question of first impression.  Because if --

15         THE COURT:  So it's clear then that you don't have

16   any authority that addresses the issue one way or the other?

17         MR. WEINTRAUB:  Nor does General Motors, we think.

18         THE COURT:  I --

19         MR. WEINTRAUB:  Yes?

20         THE COURT:  I'll -- we'll let Mr. Steinberg make his

21   argument.

22         MR. WEINTRAUB:  Right.

23         THE COURT:  But I -- my question is to you.  You have

24   no authority that addresses the issue whether New GM can be

25   liable for punitive damages if Old GM could not?

59

1          MR. WEINTRAUB:  I have no authority for that.  But

2  there is no negative authority that says it cannot be.  And

3  there is authority for the proposition that the liability, for

4  want of a better term, is derivative.  It's the same liability

5  that the debtor would have had.  The fact that this debtor is

6  unable --

7          THE COURT:  They may pay a hundred cents on the

8  dollar rather than ten cents on the dollar, but -- on the basic

9  claim.  You know, if you have a debtor that ultimately is going

10  to be 90 cents on the dollar, well, you'll get 90 cents on the

11  dollar but you won't get punitive damages on top of it.

12          MR. WEINTRAUB:  That's correct that if the debtor

13  were barely insolvent then no creditor would get a hundred

14  cents on the dollar.  But I don't think that the distribution

15  in the bankruptcy case would curtail the ability to recover

16  from the successor for whatever the liability of the

17  predecessor was.  And I want to distinguish between ability to

18  pay and whether or not there's a valid claim.  You could

19  litigate a claim against Old GM and get an award of punitive

20  damages that the Court would say, okay, but that's subordinated

21  so I don't need to give you any more than you would have -- I'm

22  talking about just a claim without successor liability, just a

23  claim against Old GM.

24          THE COURT:  You think the claim would go to a jury as

25  to whether punitive damages -- if there's no issue as to

60

1  solvency, it's insolvent, does the claim go to the jury for

2  punitive damages against Old GM?

3          MR. WEINTRAUB:  I actually don't know what an

4  individual judge might do in those circumstances.  But there is

5  certainly situations in bankruptcy cases where assets show up

6  or litigation claims turn into dollars so that a debtor that is

7  insolvent one minute can be solvent the next minute if it has a

8  litigation success.  So it doesn't moot the ability of a

9  creditor to prove up its claim.  And it shouldn't boot the

10  ability of a creditor to assert punitive damages.

11          THE COURT:  All right.  Go ahead.

12          MR. WEINTRAUB:  So we believe that Grumman Olson is

13  on point.  We don't think the fact that the plaintiff in

14  Grumman was not a pre-sale purchaser of the defective truck

15  parts, it was merely a driver for the post-sale purchaser of

16  the truck parts, is a distinction that makes a difference.  The

17  animating principle emphasized by the District Court in Grumman

18  was as follows.  And I'm quoting from Grumman but I'm replacing

19  names for personal injury plaintiffs and reading this abridged

20  quote:

21          "The personal injury plaintiffs did not receive

22          adequate notice of their potential claim in the

23          Grumman bankruptcy proceedings because at the time of

24          the bankruptcy there was no way for anyone to know

25          that the personal injury claimants would ever have a

61

1              claim.  Enforcing the sale order against the personal

2              injury plaintiffs to take away their right to address

3              under a state law theory of successor liability when

4              they did not have notice or an opportunity to

5              participate in the proceedings that resulted in that

6              order would deprive them of due process."

7         And that's 467 B.R. at 708, 709.  And the District

8   Court cites to the Schwinn case.  The Schwinn case is a

9   significant citation because factually in that case the

10  exercise bicycle that harmed the plaintiff in that case was

11  sold by the predecessor company before the bankruptcy sale.  So

12  this is -- Schwinn is analogous to what we're talking about in

13  General Motors where there was a pre-bankruptcy sale but no

14  injury until after the bankruptcy.  We believe that that is a

15  future claimant the same as the claimant was in Grumman.  The

16  focus in Grumman was not about when the victim acquired the

17  defective merchandise.  Instead, the focus was the

18  impossibility of getting meaningful notice to a future claimant

19  who at the time of the bankruptcy sale was not yet a creditor.

20        I already talked about the fact that constructive

21  notice doesn't work for future claimants because they're not

22  yet creditors under the Mullane construct.

23        Your Honor, we will -- we already had a colloquy

24  about the punitive damages aspect.

25        THE COURT:  Well, that's my biggest question --

62

1          MR. WEINTRAUB:  Yes.

2          THE COURT:  -- Mr. Weintraub --

3          MR. WEINTRAUB:  So I'm editing down as we -- as I

4   stand here.  So here and in every case the tort victims are

5   involuntary creditors.  They didn't volunteer to be injured.

6   Their permission was not sought when New GM assumed what it

7   contends is limited liability for post-sale accidents.  After

8   their sale -- after their post-sale crashes occurred, the

9   plaintiffs are simply looking to all available remedies.  One

10  available remedy, successor liability, we think is part of that

11  punitive damages.  And another available remedy is the assumed

12  liability by New GM.  The inability to pay issue that we talked

13  about in almost every case of successor liability, the

14  predecessor has an inability to pay because it's done --

15         THE COURT:  And that may or may not be true.  I don't

16  know.  I mean --

17         MR. WEINTRAUB:  Well, in most cases it's done a

18  transaction that's divested the assets that generated the

19  income that made it able to pay its debts when it was still

20  operating its business.  Obviously if --

21         THE COURT:  Most successor liability cases have

22  nothing to do with bankruptcy.

23         MR. WEINTRAUB:  Well, Your Honor, if the predecessor

24  was left solvent because it was paid $80 billion then you

25  wouldn't need to look to the successor.  So the law of

63

1  successor liability developed as an equitable remedy really at

2  the crossroads of, you know, legal principles in the general

3  proposition that a successor does not take on the liabilities

4  of its predecessor.  But successor liability is an equitable

5  remedy under appropriate circumstances.  And we think the

6  circumstances would be appropriate here depending upon what the

7  law of a particular jurisdiction is.  Which again, this gets

8  through the gate, but we're not asking you to decide that

9  they're a successor or that there should be punitive damages,

10 just the ability to seek to assert that claim.

11         In terms of deterrence, we think that even though New

12 General Motors is no longer in business -- I'm sorry, Old

13 General Motors is no longer in business, New General Motors is

14 populated by the same people that were at Old General Motors so

15 that we think that deterrence is a real issue here.  I also

16 would note that post-sale because of the ignition switch

17 defect, New General Motors paid a $900 million civil penalty

18 and entered into a deferred prosecution agreement precisely

19 because they delayed the recall on the ignition switch vehicle.

20 So deterrence is an effective tool with respect to New GM.

21         In terms of the prior briefing on punitive damages,

22 that was limited to whether or not punitive damages were an

23 assumed liability under 2.3(a)(9) with respect to the specific

24 clients that I represented.

25         THE COURT:  And Judge Gerber -- and he concluded

64

1 that --

2        MR. WEINTRAUB:  They were not.

3        THE COURT:  -- punitive damages was not an assumed

4 liability.

5        MR. WEINTRAUB:  That's correct.

6        THE COURT:  He said that New GM assumed liability for

7 extra values, not for --

8        MR. WEINTRAUB:  That's correct.  But we did prevail

9 on the imputation point and on the independent claim point so

10 that those are --

11       THE COURT:  Well, if you had punitive -- I haven't --

12 Judge Gerber -- I think he didn't bar the possibility under

13 state law for punitive damages on truly independent claims.

14       MR. WEINTRAUB:  No, I understand that.  This is just

15 another path to punitive damages for those who seek to assert

16 that claim under the appropriate circumstances.

17       THE COURT:  You will agree that punitive damages

18 against New GM are not available with respect to assumed

19 liabilities?

20       MR. WEINTRAUB:  Contractually, yes.  That was

21 litigated then and we were not successful for our specific

22 clients.  And the decision was made not to appeal that.  As to

23 whether or not that binds others, I'm not here to say yay or

24 nay.  But that's not the argument I'm making today.  I'm

25 talking about liability as a successor separate and apart from

65

1  what was assumed.

2          I talked about already that mere ownership of the

3  vehicle at the time of the sale is not enough of a connection

4  or relationship to bar future claims.  And to the extent that

5  these were known creditors because they had a repair right,

6  that we have a due process violation.  And we would say that

7  they should have the same rights as the ignition switch

8  plaintiffs.  But again, we're not litigating due process.  But

9  if the -- if counter argument was they were known creditors,

10  then that would be an acknowledgment of a due process

11  violation.

12          Whatever the notice was here was insufficient to

13  reach these people.  It was insufficient not just in terms of

14  the practical inability to warn people who had not yet been

15  injured but also the content of the notice itself didn't talk

16  about successor liability or independent claims.

17          THE COURT:  Your -- I said this before.  Your view is

18  that the due process issue is not relevant to the future

19  claimants?

20          MR. WEINTRAUB:  That's correct.  That's correct, Your

21  Honor.  But in the event someone --

22          THE COURT:  Yes.

23          MR. WEINTRAUB:  -- disagrees, then that would be my

24  point.  So, Your Honor, that, I think, concludes it.  I did

25  address the non-ignition switch colloquial upper case/lower

66

1  case point that was raised by New General Motors.  I thought

2  that our letter spoke for itself.  If you have any questions to

3  me about the letter, I'm -- I'd be happy to answer them.

4              THE COURT:  Yeah.  I guess -- I think -- no question.

5              MR. WEINTRAUB:  Thank you.

6              THE COURT:  Thanks.

7              Mr. Weisfelner?

8              MR. WEISFELNER:  Thank you, Judge.  And, Your Honor,

9  for the record, Edward Weisfelner together with my partner,

10 Howard Steel, of Brown Rudnick.  I want the record to reflect

11 clearly that I'm reading from Mr. Steel's notes and have

12 otherwise stolen the spotlight I promised to him.  He will

13 address a number of the other issues.  But since --

14             THE COURT:  So why are you doing it if he -- if

15 you --

16             MR. WEISFELNER:  Well, I guess because I can't help

17 myself, number one.  And number two --

18             THE COURT:  You could barely help yourself when you

19 were behind the table with --

20             MR. WEISFELNER:  And number two, because I do think,

21 without having had an opportunity to go back and check on it,

22 one of the issues Your Honor raised with regard to the August

23 transcript is probably my commentary.  And I thought it --

24             THE COURT:  I assumed it was, but --

25             MR. WEISFELNER:  And I thought it was important, Your

67

1  Honor, that --

2            THE COURT:  Can I ask you this question?

3            MR. WEISFELNER:  -- I address it.  Sure.

4            THE COURT:  Who do you represent?

5            MR. WEISFELNER:  Your Honor, we were retained by the

6  lead counsel in the MDL, all three of them, Messrs. Berman,

7  Ms. Cabrayas (phonetic), and -- I'm going to forget --

8            UNIDENTIFIED:  And Mr. Hilliard.

9            MR. WEISFELNER:  And Mr. Hilliard.  There was a

10 selection process that was made -- I guess it was after the

11 time that they were appointed as lead counsel by Judge

12 Furman -- appreciating that because of the processes that had

13 begun in the bankruptcy court, both with respect to motions to

14 enforce and an adversary proceeding that had been filed by

15 another's plaintiff's firm, that lead counsel wanted to have

16 bankruptcy lawyers representing them.  Originally, there were

17 three designated counsel, three firms: our firm, the firm of

18 Stutzman --

19           UNIDENTIFIED:  Esserman, Sandy Esserman.

20           MR. WEISFELNER:  Mr. Esserman's firm.  And then we

21 had -- the third firm was Caplin & Drysdale.  Subsequently,

22 Caplin & Drysdale dropped out.  And at some point in time

23 Mr. Hilliard retained Mr. Weintraub to represent accident

24 victims as opposed to economic loss parties.

25           THE COURT:  So let me ask you now, you say you were

68

1  retained by lead counsel in the MDL.  Who were their clients?

2          MR. WEISFELNER:  Your Honor, I presume that their

3  clients are the putative members of the class -- or classes,

4  actually, yet to be certified that are proceeding in the MDL

5  before Judge Furman.

6          THE COURT:  So --

7          MR. WEISFELNER:  But I should also add --

8          THE COURT:  -- derivatively do you represent

9  non-ignition switch economic loss plaintiffs?

10          MR. WEISFELNER:  I believe we do, Your Honor.  And --

11          THE COURT:  And have since the start?

12          MR. WEISFELNER:  And have since the start.  And what

13  I was going to do before I addressed your specific concerns

14  about what was the August commentary all about --

15          THE COURT:  First I'm trying to figure out when you

16  spoke in August who were you representing.

17          MR. WEISFELNER:  And I think it's fair enough to say

18  that we took on the mantle, both self -- we put the mantle on

19  ourselves.  But I think Judge Gerber in an effort to streamline

20  the process and make it more efficient recognized designated

21  counsel as the primary spokesperson for both ignition switch

22  and non-ignition switch economic loss parties, provided that

23  other people who thought that we weren't adequately addressing

24  their concerns had the opportunity to independently address the

25  court, but only after sort of assuring themselves that we were,

69

1  to adopt the colloquial, screwing up.

2          THE COURT:  Sure.

3          MR. WEISFELNER:  But, Your Honor, I wanted to again,

4  you know, address from my vantage point your concern about the

5  August statement.  The concern I felt coming from the Court

6  about the concept of laches or waiver or sitting on one's

7  rights with regard to due process concerns as they may impact

8  on this, why certain judgments of Judge Gerber weren't appealed

9  and what impact that has on the going forward ability to prove

10 up one's case.  I think in order to do this effectively, I want

11 to make sure -- as I'm sure Your Honor could research this on

12 your own.  But I thought it would be helpful just to tell you

13 who are the plaintiffs that are in the MDL in connection with

14 the FACC.  And I guess the FACC stands for the Fifth Amended --

15         UNIDENTIFIED:  Fourth.

16         MR. WEISFELNER:  -- Fourth Amended Consolidated

17 Complaint.  And, Your Honor, in category A or -- you know, who

18 are the non-ignition switch plaintiffs?  There are

19 nine-and-a-half million -- nine-and-a-half-plus million

20 vehicles that we internally refer to as the low-torque ignition

21 switch vehicles.  They involved recall numbers 14V-355, some

22 three-million-plus vehicles.  And if you look at the recall

23 itself, it talks about ignition key slot defect.

24         THE COURT:  When was that -- when was that recall?

25         MR. WEISFELNER:  They were all done in 2014 in the

70

1  summer.

2          THE COURT:  I understand.  But the defined term

3  "ignition switch plaintiffs" here refers to the February and

4  March 2014 --

5          MR. WEISFELNER:  Correct.  The subsequent recall,

6  recall number 14-355 was --

7          UNIDENTIFIED:  July.

8          MR. WEISFELNER:  -- in July, I believe.

9          THE COURT:  Of 2014?

10          MR. WEISFELNER:  Yes, Your Honor.  Second, you had

11  recall number 14V-394, involved a little over a half a million

12  vehicles.  And the recall talked about, and I'm quoting,

13  "Unintended ignition rotation defect."

14          THE COURT:  When was that one?

15          MR. WEISFELNER:  Also in --

16          UNIDENTIFIED:  July.

17          MR. WEISFELNER:  -- July of that same year.  And then

18  finally -- or penultimately you had recall number 14V-400, over

19  5.8 million vehicles.  And the recall spoke about again

20  "Unintended ignition rotation defect."

21          THE COURT:  When was that one?

22          MR. WEISFELNER:  July of same year.

23          THE COURT:  All right.  So there were three --

24          MR. WEISFELNER:  Almost done.

25          THE COURT:  -- recalls in February and March.

71

1           MR. WEISFELNER:  Almost done.

2           THE COURT:  Okay.

3           MR. WEISFELNER:  There's more than three.

4           THE COURT:  (Indiscernible)

5           MR. WEISFELNER:  You then had about a half million

6   vehicles involved in recall number 14V-346.  And the recall

7   talked about knee to knee Camaro defect vehicles.  These are

8   ignition-related defects that according to the recall could be

9   triggered by contact between the driver's knee and the ignition

10  switch.

11          THE COURT:  And when was that?

12          MR. WEISFELNER:  I believe it was also July or maybe

13  August, but within a month of the other recalls.  Now, those

14  are everything that in lower case terms are involved with

15  ignition switches in multiple vehicle lines and beyond the

16  initial ignition switch defect claims that only involved about

17  a million or a million-two vehicles.

18          THE COURT:  So one of the questions I wrote to

19  myself, are there any facts in the record that show a

20  relationship or nexus between the recalls covered by 14V-047

21  and any later recalls, ignition --

22          MR. WEISFELNER:  Tons --

23          THE COURT:  -- related --

24          MR. WEISFELNER:  -- and tons of material in the

25  record that deal with the manufacturer of the switch throughout

72

1   all of the different vehicle platforms.  Tons and tons of

2   information in the record that deals with when New GM knew or

3   should have known.

4           THE COURT:  Let me ask the rest of the question

5   (indiscernible).

6           MR. WEISFELNER:  Yes, sir.

7           THE COURT:  This -- when I went through them, which

8   apparently these were questions I wrote to myself, in -- with

9   respect to the same thing about a nexus or relationship, was

10  there any fact finding either by NHTSA or by Valukas or anyone

11  else that you contend shows that the defects other than 14V-047

12  were defects that were known to Old GM before the 363 sale?

13          MR. WEISFELNER:  Yes, Your Honor.  And in point of

14  fact, the fourth amended consolidated complaint does in fact

15  allege that New GM knew about all of these defects in Old GM

16  and New GM vehicles because some of the vehicles were in fact

17  manufactured by New GM, but that they concealed this material

18  information with the intent to deceive the plaintiffs.

19          THE COURT:  Has there been discovery on that?

20          MR. WEISFELNER:  Your Honor, they're in point of fact

21  has been discovery in front of Judge Furman in the MDL.  I

22  don't believe it's been completed, but I believe that discovery

23  has commenced with regard to those issues.

24          And, Your Honor, I also think it's important to note

25  two other recalls that are the subject of the fourth amended

73

1    complaint in front of Judge Furman.  And they involve about 1.2

2    million vehicles subject to recall number 14V-118.  I believe

3    the 14 is the year, 2014.  I'm not certain what the month was.

4    But that recall, 14V-118 for 1.2 million vehicles, involved

5    side airbag defects.  And then finally, the FACC asserts claims

6    on behalf of approximately 1.3 million vehicles involved in

7    recall number 14V-153.  And that recall involved power steering

8    defects.

9              I should also tell Your Honor that --

10             THE COURT:  Let me ask you with respect to 14V-118

11   and --

12             MR. WEISFELNER:  Yes, sir.

13             THE COURT:  -- 14V-153 --

14             MR. WEISFELNER:  Yes, sir.

15             THE COURT:  -- was there any fact finding by NHTSA or

16   Valukas or anyone else that you believe supports showing that

17   Old GM knew about those defects before the 363 sale?

18             MR. WEISFELNER:  Your Honor, I would -- I don't

19   believe that there was anything in the Valukas report or --

20             THE COURT:  Just on the ignition switch --

21             MR. WEISFELNER:  -- NHTSA as it related to power

22   steering.  As it related to the side airbag defect, since my

23   basic knowledge of the underlying facts is that if the ignition

24   switch is rotated out of the on position into either off or

25   accessory that that has an impact on the side airbags, I don't

74

1  know if they're related.  I just -- sitting here today I can't

2  tell you.  But I do know that there are facts that exist in the

3  FACC that assert that all of these defects were known by both

4  Old GM and New GM and certainly were known by New GM way in

5  advance of the recalls themselves.

6          THE COURT:  You say that discovery -- your

7  understanding is discovery is not complete on it?

8          MR. WEISFELNER:  Correct.

9          THE COURT:  Is that -- did Judge Furman identify

10  issue -- were these identified as issues as to which discovery

11  would go forward?

12          MR. WEISFELNER:  Yes.

13          THE COURT:  And is there a deadline when the

14  discovery is going to be completed on this, on the --

15          MR. WEISFELNER:  I don't know the answer to that.

16          UNIDENTIFIED:  September 1st.

17          MR. WEISFELNER:  I'm not being told by much smarter

18  people that it's September when discovery is intended to be

19  complete on these issues.

20          THE COURT:  And I'm far from making such a decision,

21  but if I decided that the Court had to have an evidentiary

22  hearing to determine whether Old GM knew about these defects

23  and concealed it such that there was a due process violation,

24  when will you be prepared to go to trial?

25          MR. WEISFELNER:  Your Honor, again, I think it's the

75

1 view of the plaintiffs -- and I think it's shared by New GM --

2 that determinations with regard to what Old GM knew and when it

3 knew it and the extent to which that knowledge, if any, can be

4 imputed to New GM, and what the consequences are as it relates

5 to the sale order, are all issues that Judge Furman intends,

6 either with or without input from this Court but based on the

7 record including the Second Circuit decision, he will determine

8 on his own.

9        THE COURT:  Okay.

10       MR. WEISFELNER:  Your Honor, I think it's also

11 important as we focus on independent claims that are being

12 asserted against --

13       THE COURT:  So why are we -- if Judge Furman is going

14 to address those, why am I even bothering to address whether

15 non-ignition switch plaintiffs, whether their claims are barred

16 by the sale order?

17       MR. WEISFELNER:  Well, I think, Your Honor, there are

18 two different parts to this, which in part goes to the answer

19 of what was I talking about in August and why didn't we appeal

20 and how long am I entitled to sit on my rights before I make an

21 issue out of it.

22       THE COURT:  Let's assume that I agree that

23 Judge Gerber did not expressly address the issue.  It's

24 debatable.  I could easily -- I could conclude he did and I

25 could conclude he didn't.  But let's assume that I agree he

76

1  didn't.  That's why I focused earlier on when you spoke in

2  August it seems that you were quite aware that there was this

3  potential due process issue.

4          MR. WEISFELNER:  And let me just address that head

5  on.

6          THE COURT:  Okay.

7          MR. WEISFELNER:  Your Honor, there were due process

8  considerations that impacted any number of potential claims and

9  causes of action that our plaintiffs were anxious to pursue.

10  On the one hand, you had questions about the extent to which

11  due process or a finding of due process violation -- and by the

12  way, under the rubric of Judge Gerber, it wasn't just a finding

13  of a violation of due process.  It was a coupling of a finding

14  of a due process violation --

15          THE COURT:  Sorry.  Just a second.  I caught the

16  wire.

17          MR. WEISFELNER:  -- together with a showing of harm

18  as a consequence of that due process violation.  To our mind,

19  that paradigm impacted most significantly the question of

20  whether or not you were bound by the sale order itself as it

21  related to pursuit of successor liability claims.  It had

22  always been our view -- when I say our view, I meant the

23  plaintiffs' view -- that there is nothing about a 363 sale --

24  in fact, there is no jurisdiction within the bankruptcy

25  court -- for that matter, I don't think there's any

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

77

1  jurisdiction within the federal court system, whether you're

2  talking about an Article 1 or an Article 3, Judge, that would

3  afford the buyer of assets in a sale protection into the future

4  for its own tortuous actionable conduct.

5  THE COURT:  The independent claims, you're talking

6  about?

7  MR. WEISFELNER:  The so-called independent claims.

8  THE COURT:  I understand your side's position on

9  that.

10  MR. WEISFELNER:  Of course, we had to -- and part of

11  what Judge Gerber did was take a look at the actual pleadings

12  that were stamped at that time, which I think was maybe the

13  second amended consolidated complaint, to determine whether or

14  not any of our independent claims as asserted crossed the line.

15  And by crossing the line, I mean generally speaking that you

16  were asserting claims against New GM that rested in whole or in

17  part on bad conduct by Old GM.  And as Judge Gerber determined

18  in that proceeding, most, if not all, of the independent

19  claims, so long as they were scrubbed and cleaned up, with

20  regard to your reference to Old GM, passed through the

21  proverbial bankruptcy gate and were matters to be determined on

22  the merits by the trial courts, including the MDL.

23  Now, Your Honor, there has been lots of proceedings

24  before Judge Furman on what constitutes an actionable

25  independent claim on the theory and the view that they've

78

1  already passed through the bankruptcy gate.  So for Your Honor,

2  what remains in the FACC is violations of Consumer Protection

3  Unfair and Deceptive Trade Practices Act; number two,

4  fraudulent concealment; number three, unjust enrichment,

5  although we're down to a very narrow number of jurisdictions in

6  which that cause of action may in fact apply; breach of implied

7  warranty of merchantability, and that's still alive for most

8  state laws; the Magnuson-Moss Warranty Act, still alive in most

9  state laws; the negligence --

10        THE COURT:  Wasn't that an assumed liability?

11        MR. WEISFELNER:  Excuse me?

12        THE COURT:  Wasn't that an assumed liability?

13        MR. WEISFELNER:  There were warranty assumptions.

14 And the Moss -- the Magnuson-Moss Warranty Act is only asserted

15 for owners or lessees of vehicles that were sold or leased as

16 new, certified pre-owned vehicles.  So in colloquial terms,

17 they had the stamp of New GM on them.

18        Negligence, which we've only asserted under the laws

19 of four jurisdictions.  A violation of RICO, which is a claim

20 that Judge Furman has already dispelled with, but it's been

21 asserted to preserve the claim for appeal.  That only applies

22 to certain plaintiffs.

23        My point being that when the general comment was made

24 about we recognize the need to tee up the issue, that was not

25 with respect to the ability to pursue independent claims.

79

1  Rather, it was with respect to the ability to pursue successful

2  liability.

3        Now, I will tell Your Honor that in terms of being

4  criticized for not teeing it up, I need to say a couple of

5  things.  Number one, it's been teed up and it's been teed up

6  before Judge Furman in the FACC.  That's why discovery is going

7  on with respect to those issues.  Number two, and perhaps more

8  importantly, it was clearly teed up, if you will, in connection

9  with the proofs of claim that the plaintiffs filed in this

10  court for both upper case ignition switch plaintiffs and lower

11  case ignition switch plaintiffs, as well as side airbag, as

12  well as the other defect.  So all of these issues, including

13  the question of whether or not there's a due process violation

14  that needs to be established as a prerequisite to the allowance

15  of the claim -- and remember this is a claim against Old GM,

16  not an independent claim -- and may be relevant to the extent

17  that successor liability exists.

18        The last thing I want to tell Your Honor --

19        THE COURT:  Let me -- you first -- tell me and then

20  I'll ask my question.

21        MR. WEISFELNER:  Okay.  The fact that this counsel

22  table was throughout the course of these proceedings occupied

23  by designated counsel of one flavor, variety, or another, did

24  not preclude the Greek chorus that sat behind us through most

25  of these proceedings --

1            THE COURT:  It's dwindling.

2            MR. WEISFELNER:  It is dwindling, but only because

3    we've invited the head Greek to sit up at our table, Professor

4    Peller.  But Mr. Peller, among others, made the point at

5    various times throughout the proceedings before Judge Gerber

6    that they wanted to stop the process and insisted on discovery.

7    And the massive discovery that they were looking for before any

8    other procedures or rulings could be determined was discovery

9    with regard to the underlying facts and circumstances that

10   could go into the due process argument, a known defect that was

11   hidden or a known defect that didn't give rise to the sort of

12   notice that would otherwise be necessary under the due process

13   case law.  And I had numerous conversations with new GM's

14   counsel, in particular Mr. Steinberg, about whether or not it

15   was in the best interests of both the plaintiffs through their

16   designated counsel and New GM for us to stop the clock and do

17   what we avoided the first time around, which was to take

18   stipulated facts primarily out of the Valukas report, Mary

19   Darrow's testimony.  We now had the deferred prosecution

20   agreement.  We now had the NHTSA, in effect, series of reports.

21           Given all of that, did we want to stop the processes

22   and engage in massive, expensive discovery in front of the

23   bankruptcy court on these due process issues?  Or should we

24   wait until it all wound it's way to the MDL and state courts?

25   And to the extent it remained an issue, especially as it

81

1  related to independent claims but even if it remained an issue

2  with regard to successor liability, there's a better time and

3  place to do all that.

4          At no point in time was there a disagreement between

5  us and New GM where New GM was of the view I want to start the

6  ball rolling now.  It's your obligation.  Undertake it.

7  Undertake it now or be forever barred.  Not even be forever

8  barred.  Be hit with the notion of laches or waiver or any

9  other issue preclusion.  We had always assumed that that sort

10 of discovery, if ever needed or required by any party, would

11 happen someplace else at some other time.

12         THE COURT:  I'm going to ask you this.  And do I

13 have -- I gather -- I didn't bring all the volumes out.  There

14 were volumes of documents from last time.  I brought the two

15 volumes that recently got delivered.  A copy of any scheduling

16 orders by Judge Furman where the due process issues or

17 non-ignition switch plaintiffs has -- where he has expressly

18 dealt with discovery will go forward and what the process will

19 be?  Because I -- it may be there.  I didn't -- I haven't

20 seen --

21         MR. WEISFELNER:  Your Honor, I do know that

22 Mr. Steinberg and his colleagues have been extraordinarily

23 diligent consistent with prior orders of both Judge Gerber and

24 by implication Your Honor to attempt to keep Your Honor advised

25 of all relevant developments in front of Judge Furman.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

82

1        THE COURT:  I wouldn't want you to think for a moment

2   that I don't read every piece of paper that comes across my

3   desk because --

4        MR. WEISFELNER:  And my next statement was going to

5   be I think it may be worthwhile process for the folks that know

6   a lot more about what goes on in front of Judge Furman on a

7   day-to-day basis to attempt to cull for you in a very short

8   period of time those orders, be they scheduling orders or

9   discovery orders, that demonstrate in point of fact what the

10  scope of discovery is that is currently proceeding before Judge

11  Furman with a September deadline.  And we would undertake,

12  together with help from Mr. Steinberg, to do just that.

13       THE COURT:  Yeah.

14       MR. WEISFELNER:  Your Honor --

15       THE COURT:  (Indiscernible).  Mr. Steinberg, do I

16  have any paper among the lot of paper that I have that reflects

17  what discovery is going forward, you know, where Judge -- where

18  Judge Furman has entered some order that specifies what the

19  issues that are subject to discovery in the September cutoff?

20       MR. STEINBERG:  I don't think Your Honor has the

21  complete set.  But in connection with the letter we filed to

22  correct those statements made at the last hearing, we attached

23  two of the discovery orders that demonstrated that discovery

24  was actually being taken at the MDL.

25       THE COURT:  Oh, I know.  You -- and I didn't so much

83

1  focus on where.  Your point was, I think, that -- my take away

2  from your letter, which I did read, was that there was an

3  arguably inaccurate statement made at the last hearing when I

4  inquired about participation of those or discovery with respect

5  to due process and non-ignition switch plaintiffs.  And you

6  did -- and I did note that you pointed out the discovery in the

7  MDL, not (indiscernible).

8          MR. STEINBERG:  Right.  There are over a hundred

9  orders that Judge Furman --

10          THE COURT:  I don't want a hundred orders.

11          MR. STEINBERG:  -- has entered on an interim basis --

12          THE COURT:  I don't want a hundred orders.

13          MR. STEINBERG:  -- some of which relate to discovery.

14  And there are status conference letters that indicate on a

15  monthly basis how much discovery has progressed in 2015 and

16  2016.

17          THE COURT:  I would like to see -- I don't want to

18  see a hundred orders.  If there are a few orders that make

19  clear that discovery is going forward in the District Court on

20  non-ignition switch plaintiff due process issues and that Judge

21  Furman is going to decide, that's what I'd like to see.

22          MR. STEINBERG:  Your Honor, if the specific question

23  that you're asking is whether there are discovery orders that

24  say that this is geared towards the due process issue for

25  non-ignition switch plaintiffs, I think we can probably give

84

1  you that zero set of papers right now.

2        MR. WEISFELNER:  Well, Your Honor, I think we can

3  certainly show you discovery orders and scheduling orders that

4  go to the issue of whether or not GM knew, should have known,

5  and when it knew of the defects that are the subject matter of

6  the fourth amended consolidated complaint.

7        THE COURT:  Okay.  So I -- that's why I asked you the

8  questions.  And you did identify by recall number it was the --

9  when I was preparing, I was certainly aware that relatively

10 close in time to the three recalls that are the -- that help

11 define the non -- that help define the ignition switch

12 plaintiffs, the February and March recalls, that there would --

13 the non-ignition switch plaintiffs include ignition switch

14 problems.  And you've gone through and identified those.

15        MR. WEISFELNER:  Not only that, but I think this --

16        THE COURT:  I have this question about, well, what's

17 the next issue?  Is it -- is there evidence that Old GM knew

18 about it and concealed it?

19        MR. WEISFELNER:  Your Honor, maybe this is helpful.

20 On May 4th of this year, Judge Furman entered a memorandum

21 opinion and order regarding New GM's motion in limine.  Their

22 motion in limine sought to categorically keep out evidence

23 concerning vehicles with the initial cap ignition switch

24 defect, including the Valukas report, statement of facts

25 accompanying the deferred prosecution agreement from the

85

1 bellwether trials concerning second wave ignition switch

2 plaintiffs --

3          THE COURT:  I think he deferred ruling on it, right?

4          MR. WEISFELNER:  No.  What they -- what Judge Furman

5 found was the plaintiffs have not had an opportunity to fully

6 develop the record on the similarities between the two kinds of

7 ignition switches.

8          MR. STEINBERG:  It was an accident, I guess.

9          THE COURT:  Mr. Steinberg, when it's your turn to

10 speak, speak.  And not before that.

11          MR. WEISFELNER:  In any event, Judge, what we

12 think --

13          THE COURT:  -- be clear, I'm not going to decide

14 things that Judge Furman is going to decide.

15          MR. WEISFELNER:  But again, Your Honor, I don't think

16 you need to.  And let me tell you why or let me introduce

17 Mr. Steel who is going to tell you why.

18          THE COURT:  You're finally going to let him talk?

19          MR. WEISFELNER:  I am going to finally let him talk.

20 But I'm going to preview for you because I know he's thinking

21 very carefully, listening very carefully as to what I expect

22 him to cover.  But the whole point of our position is that the

23 Second Circuit opinion --

24          THE COURT:  This is I'm going to tell you what I'm

25 going to tell you.  Then I'm going to tell it to you.

86

1          MR. WEISFELNER:  And then I'm going to tell it to

2 you.

3          THE COURT:  Then I'll tell you what I told you.

4          MR. WEISFELNER:  Well, that's what I was taught in

5 law school.  Anyway, the Second Circuit opinion based on the

6 scope of the sale order changed the due process construct that

7 Judge Gerber apparently relied on.  And you'll hear about the

8 mandate rule.  You'll hear about the wipeout doctrine.  You'll

9 hear about what Mr. Peller had up on appeal and for whose

10 benefit.  And if you need to, you can hear about Rule 60(b) and

11 all of its different variations: 60(b) itself, 60(b)(5), and

12 60(b)(6).

13          But for all of those reasons that Mr. Steel will go

14 into a lot more detail on, our view is that, to again use the

15 phraseology that Mr. Weintraub uses, the necessity for

16 demonstrating a due process violation -- and we seem to

17 conflate these issues -- that there was a due process violation

18 with regard to the economic loss plaintiffs writ large I think

19 is almost a foregone conclusion.  Whether you suffered any

20 damage as a consequence, the sort of added element that Judge

21 Gerber put onto it, I think is sort of an irrelevancy at this

22 point.  The question is what has the Second Circuit reaffirmed

23 for all of us about the ability of a bankruptcy court order on

24 a 363 sale that immunizes the purchaser from any of its own

25 independent non-derivative breaches of duties or violations of

1  law.  And as a consequence, we think the whole due process

2  paradigm is gone.  But if Your Honor wants to hear --

3          THE COURT:  Only as to independent claims.

4          MR. WEISFELNER:  Only as to independent claims.  And

5  that --

6          THE COURT:  I understand your argument on that,

7  but --

8          MR. WEISFELNER:  Okay.

9          THE COURT:  I'm not saying whether I agree or

10  disagree.  I understand.

11          MR. WEISFELNER:  But you understand it.  Well, just

12  to make sure, Mr. Steel will --

13          THE COURT:  Mr. Steel --

14          MR. WEISFELNER:  -- will address it.

15          MR. STEEL:  Thanks.

16          THE COURT:  Don't screw up, Mr. Steel.

17          MR. STEEL:  Oh, my goodness.  The pressure, the

18  pressure.  Howard Steel -- good morning, Your Honor -- of Brown

19  Rudnick.

20          THE COURT:  Maybe Mr. Weisfelner should be asked to

21  leave the room while you're -- because he'll be jumping up

22  otherwise when you --

23          MR. STEEL:  I'll try to pick up where Mr. Weisfelner

24  left off, not look over my shoulder, and be brief on this issue

25  number two.  I think the framework is that the fourth amended

88

1  consolidated complaint asserts independent claims on behalf of

2  the ignition switch plaintiffs and the exact claims on behalf

3  of non-ignition switch plaintiffs.  That's the state law

4  consumer protection claims, the fraudulent concealment claims

5  that Mr. Weisfelner detailed.

6         And Mr. Weisfelner also -- just some housekeeping

7  here -- detailed that Judge Gerber allowed these claims through

8  the gate for the ignition switch plaintiffs.  And that's at

9  541 B.R. 104, 130 to -32, where he held that whether New GM had

10 duties under non-bankruptcy law that formed the basis for

11 alleged independent claims is to be decided by the MDL court,

12 Judge Furman.

13        And Mr. Weisfelner also aptly described Judge

14 Furman's been working hard on this.  He's issued three

15 opinions.  And I just wanted to give you the citations for the

16 record.  There's the Cochram (phonetic) summary judgment

17 opinion at --

18        THE COURT:  And I have all of these.

19        MR. STEEL:  You have all those?  Okay.  Great.  So

20 then moving past that, Your Honor said you understood our

21 position in connection with the Second Circuit's decision

22 interpreting the sale order as carving out any independent

23 claims or, in other words, not --

24        THE COURT:  Well, Mr. Steinberg's probably going to

25 disagree with you on that, but --

1              MR. STEEL:  Agreed.  Agreed.

2              THE COURT:  -- I understand your position.

3              MR. STEEL:  And Mr. Weisfelner identified that this

4    is all formulated under 363(f) principles.  And I was going to

5    walk through and cite for the record the Second Circuit's

6    decision, but Your Honor --

7              THE COURT:  Go ahead.  Sure.

8              MR. STEEL:  -- definitely understands it.  I mean,

9    this is at --

10             THE COURT:  Don't assume.

11             MR. STEEL:  -- 157.  The Second Circuit goes:

12             "Independent claims are based on New GM's

13             post-petition conduct and are not claims that are

14             based on the right to payment that arose before the

15             filing of the petition or that are based on

16             pre-petition conduct."

17             THE COURT:  You have that quote in your brief.

18             MR. STEEL:  So you asked --

19             THE COURT:  -- that precise quote is in your brief.

20             MR. STEEL:  Yeah.  So, and you asked that question.

21   Yeah.  Independent claims by their nature are claims based on

22   post-sale conduct of New GM only, period, stop.  And the Second

23   Circuit held crystal clear these claims are outside the scope

24   of the sale order's free and clear provision.

25             THE COURT:  And that's essentially what Judge

1  Bernstein did in <u>Grumman Olson</u>.  He interpreted the sale order

2  in <u>Grumman Olson</u> as he was dealing with future claimants.  But

3  he carved out and said the sale order doesn't bar them.

4  Whether one -- someone else might read the sale order

5  differently, that's how he interpreted it.  He interpreted

6  it -- he interpreted a sale provisions on a sale order, having

7  in mind the law regarding future claims.  I'm going to stop

8  there.

9        MR. STEEL:  Right.  And that's entirely on point.

10  And I think that <u>Tronox</u> will save that.  But that's a good

11  preview for --

12        THE COURT:  We'll save <u>Tronox</u> for another day.

13        MR. STEEL:  Yeah.  Yeah.  And when you get into <u>Emoro</u>

14  (phonetic), I mean, we briefed that on cert.

15        THE COURT:  We'll --

16        MR. STEEL:  We were denied --

17        THE COURT:  -- save <u>Emoro</u> for --

18        MR. STEEL:  Yeah.  I'm saving it.  But I'm just

19  saying the force of the Second Circuit's logic as you just

20  framed it is pretty irrefutable.

21        THE COURT:  Well, I -- look, I mean, when you come

22  back to argue about <u>Tronox</u>, I have a hard time seeing how the

23  <u>Tronox</u> opinion, which is largely a decision that determines

24  that the Second Circuit lacks appellate jurisdiction because

25  there was no contempt ruling by the District Court, can in my

91

1  view supplant, replace, override the Second Circuit's decision

2  in Motors Liquidation as to what successor liability claims can

3  be carried forward.  But that's for another day.  Okay?  But I

4  think --

5          MR. STEEL:  And that -- yeah, that's an issue --

6          THE COURT:  -- we're not going to talk about Tronox

7  and Emoro today.

8          MR. STEEL:  Agreed.  Agreed.  And I was just talking

9  about the point that underpins the Second Circuit's decision

10  from a policy perspective.  Not only is it straight up on

11  363(f), it just makes a lot of sense because if you're going to

12  prospectively release future tortious conduct, I mean, that's

13  well beyond the jurisdiction --

14          THE COURT:  Well, I always learned from law school

15  and years of practice you can't release claims based on conduct

16  that has not yet occurred.

17          MR. STEEL:  Exactly.  That creates a moral hazard.

18  And that was the point where we thought it was a very

19  thoughtful and well-reasoned decision.  And then the Second

20  Circuit even goes beyond the examples that Mr. Weisfelner

21  articulated that's in the FACC.  The Second Circuit says:

22          "Though the parties do not lay out the whole universe

23          of possible independent claims, we can imagine that

24          some claims involve misrepresentations by New GM as

25          to the safety of Old GM cars."

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

92

1          That's what the FACC is asserting.  That's what Judge
2  Gerber, Judge Furman, the Second Circuit, New GM admits is fair
3  game for the ignition switch plaintiffs.  Well, why not the
4  ignition switch plaintiffs --

5          UNIDENTIFIED:  Non-ignition switch plaintiffs.

6          THE COURT:  Why not the --

7          MR. STEEL:  Why not the non-ignition switch
8  plaintiffs?  Exactly, Your Honor.  And our position is that the
9  Second Circuit decision clearly delineates that the
10 non-ignition switch plaintiffs should get the same benefits.

11          THE COURT:  And so New GM argues that the November
12 decision and December judgment bar those claims, was -- that
13 aspect was not appealed and therefore res judicata applies.
14 And why isn't that correct?

15          MR. STEEL:  Right.

16          THE COURT:  You have cases like Espinoza, you know,
17 that sometimes courts do things that are wrong.  But if they're
18 not appealed, you can't collaterally attack it.

19          MR. STEEL:  Understood.  And our position is that
20 that doctrine doesn't come into play here, and the way I frame
21 it is, I mean, I like to use -- and the coinage is was either
22 asked and answered at the Second Circuit or it's deferred and
23 still delayed --

24          THE COURT:  The asked and answered (indiscernible)
25 understand that.

93

1            MR. STEEL:  Yeah.  So my theme on asked and answered

2   is that back in April, the non-ignition switch defects --

3            THE COURT:  Talk to me about deferred, not asked and

4   answered.  Okay?

5            MR. STEEL:  Okay.  Well, that -- it all starts in

6   April, right?  So Judge Gerber set up in his decision that the

7   non-ISD claims would be stayed.

8            THE COURT:  He deferred it, that I don't have any

9   question about, in April, and the June judgment he deferred it.

10           MR. STEEL:  Right.

11           THE COURT:  The question is whether the November

12   decision and December judgment decided it.

13           MR. STEEL:  Right.  And it didn't.  Because first, I

14   mean, there's the practical answer to this where GM is

15   trumpeting an argument that Judge Gerber painstakingly looked

16   at the complaints and saw non-ISD and red penned it.  That's

17   not what happened.  I think we've established through a day and

18   a half of proceedings that he ruled on it from a due process

19   violation lens or paradigm, as Mr. Weintraub is espousing, and

20   just utilized footnote 70, which said they haven't proved the

21   due process violation, there's no ability to bring independent

22   claims under the due process lens.

23           So they were still only stayed.  And then the thing

24   where it goes to asked and answered is concurrently while

25   those -- the right to prove a due process violation was still

94

1   in play, well, we had an issue up on the Second Circuit.  And

2   the issue emanates from the April decision where Judge Gerber

3   decides that you had to prove a due process violation to get

4   relief from the sale order.  The issue was the subject matter

5   jurisdiction issue.  We formulated our statement of issues on

6   appeals and said, well, is that wrong?  Is it just that no

7   plaintiffs can be barred because the bankruptcy court can

8   interpret the sale order to bar independent claims?  All right?

9        So that was up on appeal.  We briefed it.  GM lost.

10  The Second Circuit found that the sale order -- these claims --

11  all independent claims are outside the scope of the sale order

12  under their 363 analysis.  So the asked and answered part is

13  the Second Circuit has definitively ruled on the issue.  And

14  that's where we get into, well, the non-ISD's benefit from the

15  mandate rule, the wipeout --

16        THE COURT:  Well, it's not clear to me that the

17  Second Circuit has decided any issues with respect to

18  non-ignition switch claims.  It's remanded, but they didn't --

19  it hasn't been decided with respect to it.

20        MR. STEEL:  Our position is then that this Court --

21        THE COURT:  It may be that the implication that the

22  opinion is -- that based on its analysis, independent claims,

23  truly independent claims, the sale order can't -- as the Court

24  interpreted it, doesn't bar independent claims.

25        MR. STEEL:  Right.  And our position is that's

95

1  supported by <u>Manville</u>, and that's supported by <u>Grumman Olson</u>,

2  <u>Cope</u> (phonetic).  I mean, there's a litany of case law that

3  we've put forth as saying that the Second Circuit correctly

4  decided, and if there is still an issue here on remand, that's

5  the spirit and essence of the Second Circuit ruling.  And under

6  the mandate rule, this Court should enforce what is a crystal

7  clear pronouncement that these claims are outside of the sale

8  order.

9           THE COURT:  Go ahead.

10          MR. STEEL:  Despite Mr. Weisfelner's promotion of

11  long presentation on the mandate rule, the wipeout rule, and

12  60(b), I think it's -- our papers are pretty clear that each of

13  these tenors or tenets provide an availability for the Court to

14  find that the non-ignition switch plaintiffs obtained the

15  benefit of the Second Circuit decision.  And just quickly I

16  would point the Court to, for the mandate rule, we cited the

17  <u>Argentina</u> case, the <u>Ivan Boesky</u> litigation, and <u>Coudert</u>

18  <u>Brothers</u>.

19          And it's just the position that I just articulated

20  that when you're on remand and the Second Circuit has issued a

21  decision, the mandate rule says that the bankruptcy court

22  should enforce the express terms or spirit of the mandate.  And

23  here you have a clear pronouncement that these claims are

24  outside the scope of the sale order.  So we do believe that

25  those cases support that proposition and application of the

96

1  Second Circuit opinions of the non-ignition switch defect

2  plaintiffs.

3          Similarly, the wipeout doctrine is applicable here,

4  and the line of cases, the <u>Barnett</u> case and the <u>Bank of China</u>

5  case.  And that could actually support the judge's -- this

6  Court's application of the Second Circuit decision to the

7  non-ignition switch defect plaintiffs, because the essence of

8  the wipeout doctrine is to avoid inequitable or even

9  nonsensical results from lower courts giving an erroneous

10 ruling continued legal effect.

11         And here you had the Second Circuit come to the

12 conclusion that any other opinion other than these claims are

13 being outside of the sale order would technically be absurd and

14 not in conformance with <u>Chateaugay</u>, so I think the Court has

15 ample authority under the wipeout doctrine to find that the

16 earlier rulings putting the successor -- the due process

17 framework has been wiped out and that the Second Circuit's

18 controlling precedent now is fully the subject matter

19 jurisdictional holding set forth in the opinion.

20         Finally, if -- because it is part of the preview

21 rule, if the Court does find that the November/December

22 judgments imperils the claims of the non-ignition switch

23 plaintiffs, their ability to bring independent claims, we do

24 think this is an appropriate exercise of Rule 60(b)(5) or

25 60(b)(6).  They were timely, two day after the Second Circuit

97

1 decision.  Your Honor marshaled in the parties for setting up

2 the order to show cause briefing, and we quickly teed up this

3 issue, so there was no unreasonable delay.

4         I think on 60(b)(5), the key case to look at, I'd

5 point the Court to the Laury case.  That's the Wind Insurance

6 Agent case, where a claim against an insurance agent for

7 negligently failing to obtain wind coverage was dismissed

8 because the Court found that there actually was coverage.  Then

9 on appeal, the Court found there was no coverage and reinstated

10 the claim for negligently obtaining wind coverage.  I think

11 it's very similar here that the non-ignition switch plaintiffs

12 should benefit from the Second Circuit's articulation of the

13 true scope of the sale order.

14         Likewise on 60(b)(6), we cite to the 9/11 terrorist

15 attack cases, and all these cites are in our brief.  Again,

16 this is -- 60(b)(6) is appropriate when there's inconsistent

17 results for similarly situated parties.  Here, in that case, it

18 was the application of the Foreign Sovereign Immunities Act.

19 One court found that it applied; another court found it didn't

20 apply.  Here, you have the same dilemma.  You have one court

21 that potentially, if we're saying that December/November sticks

22 to bar the non-ISPs, saying that they're out of luck, but you

23 have the Second Circuit saying that the ISPs are free to assert

24 the exact same claims.  So this is our last argument, as an

25 alternative, we do think the Court could utilize Rule 60(b)(5)

98

1   or 60(b)(6) if the Court thinks that the December and November

2   decisions still bar independent claims of the non-ignition

3   switch defect plaintiffs.

4        Circling it back, I think in some -- as

5   Mr. Weisfelner articulated, our position is that the Second

6   Circuit has established that the sale order cannot bar

7   independent claims of any stripe and that Judge Gerber, Judge

8   Furman, the Second Circuit, and even New GM admit that

9   independent claims of the ignition switch plaintiffs can pass

10  through the gate, and for non-ignition switch plaintiffs, it's

11  the exact same claims in the facts.  Therefore, the relief

12  we're looking for here is that the non-ignition switch defect

13  independent claims, in fact, proceed in front of Judge Furman

14  without any impediment.

15        THE COURT:  Okay.

16        MR. STEEL:  That's all I have on issue two.

17        THE COURT:  All right.

18        MR. STEEL:  Do you want me to dive into issue three,

19  Your Honor?

20        THE COURT:  Sure.

21        MR. STEEL:  Okay.  Issue three is the used car issue,

22  the used car purchasers' issue.  Again, we hang our hat, Your

23  Honor, on the Second Circuit's clear language of the decision,

24  and our position is that it applies equally to ignition switch

25  plaintiffs and non-ignition switch plaintiffs.

99

1          THE COURT:  Accident, what do -- you think it applies

2    to economic loss plaintiffs?

3          MR. STEEL:  Yes, sir.  And the -- sorry.

4          THE COURT:  Go ahead, Mr. Steel.

5          MR. STEEL:  The Second Circuit again frames this

6    decision through the lens of 363(f), and they said at 155-56,

7    claims can only qualify as interest if there's some pre-

8    petition contact or relationship between the claimant and the

9    debtor.  Accordingly, the used car purchasers' claims fall

10   outside the scope of the sale order and cannot be enjoined.

11   There was no --

12         THE COURT:  But they don't address what the scope of

13   any used car purchasers' claim would be, and so the part -- I

14   said this early, the part that I have some problem with is

15   trying to expand the rights of the used car purchaser,

16   certainly for economic loss claims, beyond what the seller of

17   the vehicle could have asserted.  For accident plaintiffs, I

18   understand it.  Your argument is they're future claimants,

19   they're not bound.  But that argument, I don't see how that

20   works for economic loss plaintiffs.  You acquired whatever --

21   when you acquire the car, you acquire whatever rights the

22   seller has.

23         MR. STEEL:  Right.

24         THE COURT:  Do you disagree with that?

25         MR. STEEL:  No.  Generally, I think that's a fair

1  proposition, but let me try to explain why I don't think it's

2  applicable here.  Here the Second Circuit -- Mr. Weintraub I

3  think mentioned this -- for lack of a better word, eviscerated

4  Judge Gerber's decision on the used car purchasers in its

5  entirety.  It's a strange section of the --

6          THE COURT:  Okay.  I don't have this -- I don't have

7  it.  I could just decide on my own --

8          MR. STEEL:  Right.

9          THE COURT:  -- that a used car purchaser can't -- on

10 economic loss claims, can't have any greater rights than the

11 seller had.  Do you agree with that proposition or not?

12         MR. STEEL:  I agree.  I --

13         THE COURT:  Okay.

14         MR. STEEL:  -- agree with the proposition, but I

15 don't think it's applicable for this issue that is in front of

16 Your Honor.

17         THE COURT:  Well, tell me why.  That's what I -- all

18 right.  I'm going to --

19         MR. STEEL:  Right.  I think that --

20         THE COURT:  -- give you a chance to tell me why it

21 doesn't apply here.

22         MR. STEEL:  Well, because the issue that you're

23 looking at, I guess again there's a modulation I think between

24 what a successor liability claim that could be raised by a used

25 car purchaser, so say a non-ISD claimant sells his car.  He's

1   not going to have greater rights to bring a successor liability

2   claim than the original owner.  The original owner would have

3   to prove the due process violation and be able to bring a

4   successor liability claim.

5          We're focused on independent claims, and the Second

6   Circuit sets the right outlook there when it says that you're

7   not focusing on the claim.  You're focused on the claimant, and

8   the claimant has no relationship with new or Old GM.

9          THE COURT:  But it doesn't say that the claimant has

10  any greater rights than -- on economic loss than the party who

11  sold it to them.  There's nothing in the opinion that says

12  that.

13         MR. STEEL:  Right.  It only says you're not enjoined

14  by the seller.  Right.  So I'm -- you don't necessarily need to

15  decide this issue on rights of the original purchaser or the

16  used car purchaser.  It's just whether the sale orders apply to

17  those claims.

18         THE COURT:  But I think I do.  I think I do because

19  if I conclude that, okay, used car purchaser can go ahead and

20  assert claims, but the bankruptcy court order bars them from

21  asserting claims for rights any greater than the seller had.

22  I'm not going to leave that to a state court somewhere else in

23  the country if I conclude that that's what the bankruptcy --

24  the effect of the bankruptcy is.

25         MR. STEEL:  Yeah.

1          THE COURT:  I'm not there yet, Mr. Steinberg, on the

2     whole used car issue.  I want to hear about it.  But at a

3     minimum, I think I haven't heard you -- on economic loss

4     claims, a used car purchaser can't acquire any greater rights

5     than the seller had.

6          MR. STEEL:  Right.  Because I don't think we are

7     taking that position.  What we're trying to -- the position

8     that we're taking is that if the seller had an independent

9     claim and then sold the car to the used car purchaser, that

10    can't be blocked by the sale order.  So we're not saying they

11    get any greater rights.  We're just --

12         THE COURT:  Well, if I accept the argument that the

13    sale order can't bar independent claims, full stop, and I'm not

14    there yet.  But if that were -- that would take care of this

15    issue.

16         MR. STEEL:  Right.  So my first argument --

17         THE COURT:  And I don't know what your argument is

18    about economic loss claims and New GM.  I understand what

19    Mr. Weisfelner said about tell me what the allegations of the

20    independent claims are.  But I don't see how that impacts on

21    economic loss claims.

22         MR. STEEL:  Okay.  So our position -- let me give it

23    a try.  Our position is, again, the scale and scope of the

24    Second Circuit decision, right, New GM --

25         THE COURT:  Don't talk -- I don't want to hear about

103

1  the Second Circuit decision.

2          MR. STEEL:  Yeah, okay.

3          THE COURT:  Tell me what you believe the independent

4  claims on behalf of used car purchasers, what's their -- what

5  are their allegations?

6          MR. STEEL:  Well, it's the same as the --

7          THE COURT:  Economic loss claims by used car

8  purchasers, what -- post-sale used car purchasers, what's their

9  claim?

10         MR. STEEL:  Right.  The diminution in the value or

11  the degradation of the benefit of the bargain at the time of

12  the purchase, so they have the same sort of claims as

13  articulated in the fact for fraudulent concealment for

14  misrepresentations, for breach of the consumer protections.  I

15  think we can appreciate that they're not getting any better

16  rights than the original purchaser, but they're also not being

17  foreclosed from bringing those same independent claims.

18         THE COURT:  All right.  Go ahead.

19         MR. STEEL:  All right.  And you, Your Honor, just

20  articulated the most viable basis is that it's all conditioned

21  on your ruling on issue two.  If you rule like you just

22  articulated, that the non-ignition switch defect plaintiffs can

23  bring independent claims, period, end of story, the used car

24  purchasers who bought and purchased cars with a non-ignition

25  switch defect likewise can bring those independent claims.

1          THE COURT:  Go ahead.

2          MR. STEEL:  The last vein that -- of mine on this is

3  the future claim.  The interpretation that these claimants are

4  free to proceed because the identity of the used car purchasers

5  were neither known nor ascertainable at the time of the sale

6  and therefore couldn't have been provided constitutionally

7  adequate notice, Mr. Weintraub touched on this as the Grumman

8  Olson line, the Cope line, Chateaugay.  And I think this is

9  what the --

10          THE COURT:  None of those deal with economic loss

11  claims, do they?

12          MR. STEEL:  Not directly.  I think they were personal

13  injury.

14          THE COURT:  Well, what's this not directly?  They

15  don't deal with it, correct?

16          MR. STEEL:  To my knowledge, correct.

17          THE COURT:  It's one thing to say that future claims

18  for personal injury or wrongful death or property damage can't

19  be barred for future claimants.  But it seems to me wholly

20  different to deal -- and I'm not sure how exactly how to deal

21  with it, but the economic loss claims seem very different to

22  me.

23          MR. STEEL:  I hear you but --

24          THE COURT:  Do you have any cases that deal with

25  solely economic loss claims that specify when or how or the

105

1  scope of those claims going forward after a sale, whether

2  they're barred by a sale order or not?

3        MR. STEEL:  Well, I think we would rely on the Second

4  Circuit opinion.  I know you said don't address it, but the

5  Second --

6        THE COURT:  Well, at that point --

7        MR. STEEL:  Yes.

8        THE COURT:  -- I wanted an answer with that regard.

9  But what in the Second Circuit opinion --

10       MR. STEEL:  Well, that identified in their discussion

11 on the used car purchaser claims that they said there's

12 enormous practical and perhaps constitutional problems with

13 enjoined claims of claimants with no relationship with the

14 debtor.  They don't make a distinction between people that were

15 subsequently in a personal -- in an accident versus having

16 economic loss.  They held completely on the relationship with

17 the debtor.

18       THE COURT:  What page are you looking at in the

19 opinion of the used car purchasers?

20       MR. STEEL:  This is all in 157 of the decision.  They

21 said more -- in more depth, as of the petition date, there was

22 an unknown number of unknown individuals who would one day

23 purchase Old GM vehicles second hand.  There could've been no

24 contact or relationship actual or presumed between Old GM and

25 these specific plaintiffs.  Accordingly, the sale order cannot

1 be read to cover their claims.  They don't make any distinction

2 between accident and economic loss claims.

3            THE COURT:  Okay.

4            MR. STEEL:  They just find that they're

5 non-creditors, that they don't have claims under 101 that can't

6 be affected by the sale order free and clear.  So we're pretty

7 reliant on the 363(f).

8            THE COURT:  Okay.

9            MR. STEEL:  That's basically what we have, Your

10 Honor.

11           THE COURT:  Thank you.

12           MR. STEEL:  Thank you.

13           THE COURT:  Mr. Peller, you can argue.

14           MR. PELLER:  Good morning, Your Honor.  I'm Gary

15 Peller representing the Elliott --

16           THE COURT:  You have 30 minutes until the afternoon.

17 Go ahead.

18           MR. PELLER:  The Elliott, Sesay, and Bledsoe

19 plaintiffs.  Before I get started, I didn't want to forget, I

20 want to disassociate myself from Mr. Weisfelner's statement

21 that Judge Furman has set forth the due process issues for

22 determination.  I don't believe that's correct.  The discovery

23 orders encompass discovery for -- that's listed by recalls, but

24 the issues to be decided by that discovery, I believe in my

25 review of the Judge Furman's orders, nowhere contained there.

1  I believe that Judge Furman is expecting this Court to resolve

2  the question whether non-ignition switch plaintiffs may assert

3  successor liability claims because of a due process violation

4  or not.

5          THE COURT:  May I ask you this, Mr. Peller?  Is there

6  a transcript?  Is there an order?  You obviously have a

7  disagreement with Mr. Weisfelner on this issue, and I asked him

8  whether there are any orders.  I would expand it to transcript.

9  Is there anything that you'll be able to point to in the record

10 in the district court, in an order or a transcript, that

11 indicates that Judge Furman is not going to decide the due

12 process issue?

13         MR. PELLER:  No, Your Honor, except the general drift

14 of all of his decisions saying he's waiting for Judge Gerber

15 and --

16         THE COURT:  Well, a general drift doesn't do a lot.

17         MR. PELLER:  Well, no, there's nothing -- the

18 discovery is going forward on those defects and --

19         THE COURT:  Well, why is the discovery going forward

20 if he is not going to be addressing the issue?

21         MR. PELLER:  Because the non-ignition switch

22 plaintiffs have been permitted in the fourth amended

23 consolidated complaint and in the Elliott, Sesay, and Bledsoe

24 complaints to assert independent claims under the Second

25 Circuit decision.  We've amended our complaints to comply with

1  the Second Circuit decision.  This independent claims are going

2  forward.

3         THE COURT:  So what does Old GM's knowledge of

4  non-ignition switch defects have to do with whether you can

5  assert independent claims?

6         MR. PELLER:  They're not -- the -- Judge Furman is

7  not deciding whether you can assert independent claims or not.

8  That was decided by the Second Circuit.  Judge Furman's

9  deciding -- Judge Furman's conducting discovery so those claims

10  can go forward, what's the nature of the claim, when did the

11  defendants learn, how did they learn, et cetera, and some of

12  that necessarily involves New GM learning from Old GM about

13  defects.

14         THE COURT:  I make the same invitation to you.  If

15  there are orders by Judge Furman or transcripts of hearings

16  before Judge Furman that address whether Judge Furman is going

17  to be presented with and asked to decide the due process issues

18  with respect to non-ignition switch plaintiffs, file it.  I

19  want to see it.

20         MR. PELLER:  Yes, sir.  I don't believe there are,

21  but I just wanted to disassociate myself from the

22  representation that there were.

23         Your Honor, the -- as I understand New GM's arguments

24  with respect to the Elliott, Sesay, and Bledsoe plaintiffs, who

25  I represent, we clearly did appeal the April decision and the

1  June judgment on behalf of both ignition switch and

2  non-ignition switch plaintiffs.  There's no question that we

3  are not precluded by a failure to appeal.  Not only did we

4  appeal, but we won on virtually every issue we appealed from.

5  So as I understand New GM's argument, it's that even though we

6  appealed from the April and June judgment, we are nevertheless

7  bound by our failure to appeal from the November 15th decision

8  and the December 15th judgment.

9          That is incorrect, Your Honor, because the November

10  15th decision and December 15th judgment were merely

11  enforcements of and applications of the April and June rulings.

12  There was no expectation that anything new was going to come

13  in, but, in fact, Judge Furman's request for the bellwether

14  claims came in as an additional issue, and because New GM was

15  able to serve its September -- the September scheduling order,

16  new parties came in.

17          But the very purpose of the post-judgment

18  proceedings, the November/December proceedings, was -- and I'll

19  quote from the beginning of the November decision:

20          "The Court must now determine the extent to which the

21          April decision and judgment bar particular claims and

22          particular allegations and complaints in court in

23          which claims are asserted against New GM, then

24          continuing.  The extent to which by reason of the

25          first issues or other matters allegations and

110

1              particular claims" --

2              THE COURT:  Just slow down a little bit.

3              MR. PELLER:  I'm sorry, reporter.

4              THE COURT:  It's not a reporter.  It's just the voice

5    recorder here, but it's me who needs you to slow down.

6              MR. PELLER:  I'm sorry, Your Honor.

7              "The extent to which allegations and particular

8              complaints run afoul of the April decision and

9              judgment and thus must be stricken before affected

10             actions may proceed."

11             So Judge Gerber made the general rulings.  He said

12   independent claims for ignition switch plaintiffs can go

13   forward.  Successor liability claims can't go forward for

14   anyone.  Independent claims for non-ignition switch cannot go

15   forward.  Those claims remain stayed.  That was all decided in

16   April and June.

17             Then according to the June judgment, the parties were

18   permitted to file no strike pleadings or objection pleadings

19   saying that, given this order, nevertheless, these claims can

20   go forward.  I filed on behalf of my client, so did the other

21   plaintiffs, and that developed into the marked pleadings

22   process.  This goes through.  This doesn't go through.  But all

23   that was application of what was already on appeal.

24             To the extent what's already on appeal gets reversed,

25   the application and enforcement of those rulings also get

reversed.  It would've been redundant for us to appeal the

November and December judgments when we already had the very

issues that we objected to on appeal, the independent claims

issue, the used car purchasers issue, and the due process issue

with respect to non-ignition switch plaintiffs.

Part of the confusion I think, Your Honor, is that

we've been talking about the appeal as only referring to the

April decision and the June judgment.  When I came into the

case, I called New GM and I was immediately told if you file

anything concerning a vehicle manufactured by Old GM, you will

be in contempt of court.  So I sat down with my clients and we

figured out what are we going to do about this.  And we read

Mansville and other relevant opinions and decided, well, we

would rather go faster than have our successor liability claim.

We're going to file our complaints exclusively with independent

claims and have no jurisdiction we thought of the bankruptcy

court to stop us.

So according to the procedures that were then in

place, we filed our complaints.  New GM moved to enforce

against us.  We filed no stay pleadings in each of the cases.

And in those no stay pleadings, we argued that the sale order

should not be construed to cover independent claims.

Independent claims are beyond the subject matter jurisdiction

of a bankruptcy court, and therefore the -- all our complaints

should be free of the stay.

1          Those no stay pleadings were each denied by Judge

2   Gerber, and we appealed each of those denials.  We also, after

3   the June judgment on behalf of the Bledsoe plaintiffs, filed a

4   motion for reconsideration where we explicitly said that Judge

5   Gerber's construction of the sale order to make independent

6   claims retained liabilities of Old GM was absurd.  That was a

7   wrong construction, and that also was denied.  We also appealed

8   from that.

9          So we had repeatedly argued in all our cases on

10  behalf of ignition switch and non-ignition switch claimants

11  that the sale order did not cover, could not constitutionally

12  cover, and should not be construed to cover independent claims.

13          THE COURT:  Are all of your clients accident

14  plaintiffs?

15          MR. PELLER:  No, I only have two accident plaintiffs,

16  Your Honor.  All my non-ignition switch plaintiffs are

17  non-accident economic loss claimants.

18          So New GM has set up its argument as if the November

19  and December proceedings, rulings, were just completely

20  separate from the April and June rulings, as if new issues were

21  being presented.  It's just not true, non-ignition switch

22  claims, that the sale order did not cover and could not

23  constitutionally cover independent claims were clearly before

24  Judge Gerber.  In fact, the June judgment lists in the appendix

25  the various claims, the various categories of complaints that

1  are covered by the judgment, and one of the categories is non-

2  ignition switch claims.

3        So Judge Gerber clearly did rule on non-ignition

4  switch claims.  He ruled that independent claims for -- by

5  non-ignition switch plaintiffs could not be asserted because he

6  construed the sale order to encompass those claims and held

7  that and deferred as to whether, like the ignition switch

8  plaintiffs, they also had a due process violation.  He also

9  ruled that used car purchasers were covered on the idea that

10 they couldn't have any greater rights than those who they

11 purchased from.  We objected to that on the basis that they are

12 future claims, and we won that as well.

13       So the image that Judge Gerber just deferred on all

14 the non-ignition switch claims arguments is incorrect.

15 Non-ignition switch claims arguments, some of our most

16 important were contained -- were made well before June, were

17 contained in the June judgment, and we properly appealed from

18 those rulings.  It would've been redundant and absurd to appeal

19 from the November/December judgments that were mere

20 implementations of that.  In fact, Your Honor, to the extent

21 that the November and December judgments would've decided new

22 things, the Court wouldn't have had jurisdiction.  The filing

23 of a notice of appeal withdraws the jurisdiction from the lower

24 court of the appeal except for enforcement of the judgment.

25 That's all that was going on, again, except for the expansion

1    for the bellwether issue that Judge Furman had asked to be

2    addressed regarding punitive damages.  In fact --

3          THE COURT:  Mr. Peller, did you raise before Judge

4    Gerber on behalf of non-ignition switch economic loss

5    plaintiffs the due process argument?

6          MR. PELLER:  Yes, Your Honor, we raised the due

7    process argument.  Our understanding was, and I think this is

8    the understanding until -- as my fellow counsel said, GM kind

9    of pivoted and has come up with kind of a new narrative of what

10   happened.  Everybody's understanding was Judge Gerber was --

11   ruling on the stipulated record that was available through the

12   Valukas report and some other sources, the parties agreed on

13   these facts.  He was going to make his ruling on due process

14   and the other claims on those facts.  It would go up on appeal.

15   The appeal would clarify the issues.  And then once the appeal

16   was over, then we would be dealing with whether the non-

17   ignition switch plaintiffs needed to make a due process

18   violation or -- and what --

19         THE COURT:  Let me ask a question.  You said -- and I

20   don't have the exact words -- that Judge Gerber did not defer

21   on oral non-ignition switch arguments.

22         MR. PELLER:  That's right.

23         THE COURT:  Okay.  And what I'm specifically trying

24   to understand is whether he was presented with non-ignition

25   switch plaintiff due process arguments.  Did he defer it?  Did

1  he decide it?

2       MR. PELLER:  We argued that the non-ignition switch

3  plaintiffs' due process rights had been violated by a lack of

4  notice.  That was our assertion and allegation.  It was clear

5  to everybody involved that in order to litigate, that much

6  discovery would be needed.  These non-ignition switch, there's

7  a bunch of different defects.  There's maybe 60 different

8  defects that we're talking about, power steering, door module,

9  air -- side airbags, ignition switch related but not

10 technically ignition switch, et cetera.  There was going to be

11 a load of discovery that was going to have to be done to

12 support those claims so the --

13      THE COURT:  Okay.  What --

14      MR. PELLER:  We -- I didn't ask for that to be ruled

15 on.  I did ask, Your Honor, prior to the entry of the June

16 judgment, for an opportunity to make other objections to the --

17 GM's motions to enforce besides the ones that had been

18 considered in the 2014 threshold issues.  Judge Gerber denied

19 that request to make other objections.  He made very clear, in

20 I think it was his fourth threat, to hold me in contempt, that

21 he'd heard enough from me.

22      So the flavor here, Your Honor, was not that we were

23 holding back.  The flavor was Judge Gerber just wanted to deal

24 with the ignition switch, the due process issues.  He would

25 defer on the question of whether the non-ignition switch

1  plaintiffs had a similar due process issue in that Old GM

2  knew --

3            THE COURT:  Because --

4            MR. PELLER:  -- but not on the question of the

5  construction of the sale order and its application to used car

6  purchasers.

7            THE COURT:  And what I am -- want to know, is there a

8  transcript or an order or something in one of Judge Gerber's

9  opinions where he says I'm deferring on whether there was a due

10  process violation that affects the non-ignition switch

11  plaintiffs?

12            MR. PELLER:  That's the way I understand footnote 70,

13  Your Honor, but except for the -- except for what the Court's

14  already looked at, I'm not aware of any.

15            THE COURT:  So you're -- that part of your argument

16  is based on footnote 70.

17            MR. PELLER:  Yes.

18            THE COURT:  Okay.  Go ahead.

19            MR. PELLER:  And my experience in the whole

20  proceedings.  I mean, you know --

21            THE COURT:  Well, I -- you know, I wasn't -- your --

22            MR. PELLER:  I understand.

23            THE COURT:  I have to decide -- I'm looking at

24  transcripts.  I'm looking at decisions.  I'm looking at

25  judgments and a lot of arguments from counsel.

1          MR. PELLER:  Yeah, I understand, Your Honor.  I'm

2  just trying to give you the narrative was that, because of the

3  Valukas report, those issues could be decided on stipulated

4  facts.  Everybody understood there was no parallel to the

5  Valukas report for non-ignition switch plaintiffs.  That

6  couldn't be decided on stipulated facts.  That would have a

7  whole mess of discovery and GM coming in here now and arguing,

8  oh, they wanted to go through discovery in the fall of 2015 is

9  disingenuous, Your Honor.  They were wanting to avoid discovery

10 in this court since I've been in the case.

11         THE COURT:  Go ahead.

12         MR. PELLER:  The other point, Your Honor, is that if

13 New GM's argument is right that the failure to appeal the

14 November and December decision and judgment was preclusive, res

15 judicata, for my clients, even though we appealed the earlier

16 judgment, why didn't they tell the Second Circuit that?

17 Because they ended up rendering moot a whole mess of Second

18 Circuit work on non-ignition switch plaintiffs.

19         The -- we made very explicit in the Second Circuit,

20 we are here for the ignition switch plaintiffs but also for

21 non-ignition switch plaintiffs.  These are our arguments for

22 non-ignition switch plaintiffs, and we won those arguments.

23 The oral argument didn't occur until months after the

24 November/December judgments.

25         If New GM really thought that our failure to appeal,

118

1   and our time for appeal had run out by then, mooted our ability

2   to challenge things in the Second Circuit, then they shouldn't

3   have -- they should have told the Second Circuit that.  This is

4   a late -- a very recently devised narrative that New GM has

5   made up, and it seems absurd, Your Honor.  We appealed and we

6   won the appeal with respect to ignition switch and non-ignition

7   switch claims with respect to independent claims not being part

8   of the sale order, the sale order being constructed not to

9   include independent claims, and with respect to the future

10  claims of used car purchasers.

11          Another comment Mr. Steinberg and his -- at the last

12  hearing also stated, I think also disingenuously, that New GM

13  has never had a problem with independent claims.  It's always

14  been open to independent claims if they're truly independent.

15  That's just not true, Your Honor.  New GM has fought, fought

16  every no stay pleading I filed seeking only to assert

17  independent claims.  And the very cross-appeal of New GM to the

18  Second Circuit was appealing from Judge Gerber's ruling

19  allowing independent claims of ignition switch plaintiffs to go

20  forward, so I hope you take with a grain a salt this

21  representation that they've never had any problem with claims

22  -- with independent claims going forward.

23          Your Honor, I think that is that it was very

24  significant that you asked Mr. Weisfelner who he represents

25  because I think that's a very important thing to keep in mind.

1  We've been talking about categories of plaintiffs, non-ignition

2  switch plaintiffs, ignition switch plaintiffs, but nobody here

3  -- none of us lawyers represent any categories of plaintiffs.

4  Mr. Weisfelner, incorrectly I think, said that lead counsel

5  represent the punitive class members.  Nobody represents

6  punitive class members in a class actions.

7         Until the class is certified, those lawyers only

8  represent the individuals that they retained.  In this case

9  what the means is that the lead counsel and then by virtue the

10  designated counsel that they've retained in this proceeding,

11  they represent the named plaintiffs in the second amended

12  consolidated complaint, which was what was the subject of the

13  June judgment, or the fourth amended consolidated complaint

14  now.  They represent those individuals.  The reason I'm

15  pointing this out, Your Honor, is I think it's very important.

16         If you do find that the failure of designated counsel

17  to appeal the June judgment in the April decision on behalf of

18  non-ignition switch plaintiffs precludes non-ignition switch

19  plaintiffs, I hope that -- I assume that you will be careful to

20  delineate that the only people that are precluded by that

21  failure to appear -- to appeal are the ones who actually were

22  represented and appeared in the proceeding leading up to that.

23  So my clients aren't precluded.  We appealed.  The clients

24  represented by designated counsel were only the named

25  plaintiffs in the second amended complaint.  No one else can be

1  precluded if they didn't participate, and now --

2         THE COURT:  The law, the case can apply, and if I

3  render a ruling that covers the named plaintiffs in the MDL and

4  that would ordinarily be bind -- not binding, it would --

5  ordinarily the persuasive authority to apply to everyone else

6  who's similarly situated.

7         MR. PELLER:  Absolutely.  But Judge Gerber's rulings

8  on non-ignition switch plaintiffs cannot be binding authority

9  or persuasive authority in any way.  They were reversed.

10         THE COURT:  Well, some of it was reversed.  Not all

11  of it was reversed.

12         MR. PELLER:  But the -- his holding to construe the

13  sale order to encompass independent claims was explicitly

14  reversed.

15         THE COURT:  I think -- are there any other points?  I

16  think I got the independent claims arguments down.

17         MR. PELLER:  Okay.  The other -- another point, and

18  I'll -- this is my last point on issue number two, threshold

19  issue number two, is Mr. Steinberg also represented at the last

20  hearing that in the November and December proceedings, Judge

21  Gerber went through the Peller-marked complaints and decided

22  that independent claims had not been stated.  That's absolutely

23  incorrect, and there's no need to quibble over it.

24         I'll just point the Judge -- the Court to Judge

25  Gerber's November decision where he goes through the Peller

1  complaint, says that they do assert independent claims, take

2  out all the language about Old GM, and these are valid

3  independent claims.  Even though they're valid independent --

4          THE COURT:  Take out language about Old GM, so he

5  didn't find that everything you said in the complaint was okay.

6          MR. PELLER:  Yes, he said the independent claims, the

7  way the claims were stated was okay, but I can't refer to

8  anything New GM -- Old GM did.

9          THE COURT:  That seems to me to say that he didn't

10  find that your complaint was -- passed the threshold.  It would

11  pass the threshold if you remove the references to Old GM.

12          MR. PELLER:  Well, then we did remove them, and we

13  filed --

14          THE COURT:  So don't tell me he said that your

15  complaint was okay.  He didn't.

16          MR. PELLER:  He said that the independent claims

17  asserted on behalf --

18          THE COURT:  If you removed certain language.

19          MR. PELLER:  Yes, Your Honor.

20          THE COURT:  Okay.

21          MR. PELLER:  Okay.  And then --

22          THE COURT:  I get your point.

23          MR. PELLER:  -- what he said about the independent

24  claims for non-ignition plaintiffs was that they must be

25  removed not because they mention Old GM but because my June

122

1  ruling said non-ignition switch plaintiffs can assert

2  independent claims.  It was all based on the June ruling.  It

3  wasn't based on any new finding of due process or any new

4  litigation that occurred as to whether non-ignition switch

5  plaintiffs presented a due process violation.

6          Your Honor, if I could move to question number three,

7  the used car purchasers.

8          THE COURT:  Do you represent used car purchasers?

9          MR. PELLER:  I do, Your Honor.

10          THE COURT:  Okay.

11          MR. PELLER:  I have 12 clients, Your Honor, in a kind

12  of mix of boxes as we refer to them.  You asked Mr. Steel

13  whether he agreed that a purchaser could have no greater rights

14  than the seller from whom they purchased --

15          THE COURT:  Economic loss claimants.

16          MR. PELLER:  Economic loss claimants.  I disagree

17  with the answer Mr. Steel gave to you.  The reason that a

18  purchaser can have greater rights than the seller, Your Honor,

19  is because under the Second Circuit ruling, the purchaser as a

20  future claimant is not bound by any of the restrictions of the

21  bankruptcy process.  The seller, to the extent the seller had a

22  relationship with Old GM, is -- and to the extent they were

23  notified properly, et cetera, and in some situations

24  publication notice will be sufficient, that seller is bound by

25  the bankruptcy restriction including the Chapter 7 restriction

123

1  on the recovery of punitive damages.

2         But what the Second Circuit said is despite whatever

3  might be true of the seller and the seller's rights, the buyer

4  is simply not bound by any of the restrictions on recovery from

5  Old GM that the seller might have had by virtue of being a

6  creditor of Old GM.

7         THE COURT:  Let me -- show me the language, tell me

8  the language in the Second Circuit opinion that supports what

9  you just told me.

10         MR. PELLER:  Well, I would just refer the same

11  language that Mr. Steel said.  The language is that because

12  they were -- they had no contact with Old GM, they were not a

13  creditor of Old GM.  Since they were not a creditor of Old GM,

14  they are not barred by the sale order or by any of the

15  proceedings that Old GM went through.  They are simply

16  independent of the bankruptcy rulings.

17         THE COURT:  Totally outside of bankruptcy.

18         MR. PELLER:  Yes.

19         THE COURT:  A seller can't convey more than he or she

20  has.  I don't think it has anything to do with bankruptcy.

21         MR. PELLER:  But the Second Circuit said --

22         THE COURT:  How can the seller -- stop -- how does

23  the seller convey more of its bundle of rights than he has --

24  he or she has?

25         MR. PELLER:  Because the seller might have a

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

124

1 particular disability from suing a particular defendant that

2 the buyer doesn't have.  That's what we have here, Your Honor.

3 The seller has a particular disability because he was a

4 creditor of an insolvent debtor, but the buyer is not a

5 creditor under the Second Circuit opinion and therefore --

6          THE COURT:  (Indiscernible - cross talk).

7          MR. PELLER:  -- the buyer is not governed by any of

8 the restrictions --

9          THE COURT:  Take it out of insolvency.  What is it

10 that permits a seller to convey economic rights greater than

11 the seller has?  Do you have a case that supports you?

12          MR. PELLER:  Your Honor, the --

13          THE COURT:  Do you have a case that supports you, yes

14 or no?

15          MR. PELLER:  Your Honor, I'm trying to think through

16 exactly what you're asking.  I'm trying to understand, Your

17 Honor.

18          THE COURT:  Let me make it crystal clear, if you

19 didn't understand my question.

20          MR. PELLER:  Okay.

21          THE COURT:  Forget about bankruptcy.  If I sell you

22 my car, can I convey to you any rights greater than the rights

23 that I have?

24          MR. PELLER:  Yes, Your Honor, you could've signed a

25 release with the manufacturer that I'm not subject to.  Of

125

1  course, Your Honor, different parties have different

2  relationships, different claims, and different defendants, and

3  particularly what we're talking about here is a particular

4  disability that a creditor --

5          THE COURT:  Do you have some basis that supports what

6  you've just told me?

7          MR. PELLER:  No, Your Honor, I'm using reasoning.

8          THE COURT:  Probably faulty reasoning.

9          MR. PELLER:  That's up to you to decide, Your Honor.

10 I --

11         THE COURT:  That's why I ask whether you have -- it's

12 one thing to make an argument, but it's another thing to give

13 me case law that supports your argument, and your answer is you

14 don't have any, right?

15         MR. PELLER:  Your Honor, we believe, as Mr. Steel --

16         THE COURT:  Do you have any case law to support your

17 argument?

18         MR. PELLER:  The Second Circuit decision in General

19 Motors, Your Honor.

20         THE COURT:  Okay.  Show me the -- I want -- whether

21 Mr. Steel read it or not, point me to the precise language in

22 the Second Circuit opinion that gives used buyers claims for

23 economic loss greater than what the seller of the vehicle has.

24         MR. PELLER:  There's not explicit language, Your

25 Honor.  It's the implication of the holding that used car

1 purchasers are not in any way bound by the bankruptcy

2 proceedings since they weren't creditors of the --

3          THE COURT:  I don't think it depends on the

4 bankruptcy proceeding.

5          MR. PELLER:  Okay.

6          THE COURT:  That's my point.

7          MR. PELLER:  Okay, Your Honor.  Your Honor, I don't

8 believe I'm going to convince you, and I'd like to move onto

9 issue number four, punitive damages.

10          THE COURT:  Yes, please.

11          MR. PELLER:  The punitive damage issue came in

12 because of the press of the bellwether trials that were coming

13 up in front of Judge Furman, and one part of the punitive

14 damage ruling was that this was not an assumed liability, and

15 none of the plaintiffs appealed that.  But the rest of the

16 punitive damages holding, again, depended on the June judgment

17 that was reversed so that Judge Gerber had held that successor

18 liability claims on behalf on ignition switch plaintiffs could

19 not go forward under his April 15th ruling, so, of course,

20 punitive damages for successor liability also could not go

21 forward.

22          Once the predicate for that holding is removed by the

23 reversal in the Second Circuit, the Second Circuit says, you

24 made a mistake, no, successor liability claims can go forward

25 for ignition switch plaintiffs, then that removes the predicate

127

1  for the bar on punitive damages with respect to those claims.

2          THE COURT:  Do you agree with everything in the

3  Second Circuit decision that addresses whether punitive damages

4  for ignition switch plaintiffs would've established a due

5  process violation, that punitive damages are available?

6  There's nothing in the opinion that addresses that specific

7  issue.

8          MR. PELLER:  That's right, Your Honor.

9          THE COURT:  Okay.  So go back to first principals

10 then.  How does -- what is it that gives rise to -- if no --

11 why don't I start again?  Do you agree that no punitive damages

12 could be recovered from the insolvent debtor, Old GM?

13         MR. PELLER:  In bankruptcy proceedings or -- yes.

14         THE COURT:  Okay.  And do you have a case that would

15 expose a buyer either on assumed liability -- there it's

16 expressly provided in the contract or on a successor liability

17 theory that would expose the successor to a punitive damage

18 claim where the entity from which it acquired would not be

19 subject to punitive damages?

20         MR. PELLER:  Well, that's our case, Your Honor.  I

21 mean, I think we're going back to the discussion we just had.

22         THE COURT:  Then do you agree then that this is a

23 question of first impression?  You have no authority that

24 decides the issue.  The Second Circuit didn't decide it, and

25 you don't have -- other than what we're dealing with now, you

1  have no authority to support that New GM is subject to punitive

2  damages on successor liability claims.

3          MR. PELLER:  I don't, Your Honor.

4          THE COURT:  Okay.

5          MR. PELLER:  Except for the general holding of the

6  Second Circuit that these claims --

7          THE COURT:  (Indiscernible - cross talk).

8          MR. PELLER:  -- are outside of the bankruptcy

9  process, they're outside of the sale order.

10         THE COURT:  Do you have any case law outside of

11 bankruptcy that would make an acquirer of assets subject to a

12 punitive damage liability when its seller could not be?

13         MR. PELLER:  I don't, Your Honor, but if the Court

14 doesn't mind, I'd like to --

15         THE COURT:  No, I --

16         MR. PELLER:  Okay.

17         THE COURT:  -- we've -- I've got stacks of briefs.

18         MR. PELLER:  Okay.

19         THE COURT:  Everybody has taken their best shot at

20 it.

21         MR. PELLER:  So --

22         THE COURT:  But what I've been looking for, I haven't

23 found, is one way or the other.  I'm giving you a hard time,

24 but I've given Mr. Steinberg a hard time about it as well.  I

25 don't have any guiding case law, including the Second Circuit

opinion, that addresses the issue of whether -- in here, it's

whether New GM can be subject to punitive damages on successor

liability claims.

        MR. PELLER:  I understand, Your Honor, and without

belaboring it, we believe that -- or I believe that the general

principle on behalf of my clients is that if a party's claim is

not within the scope of the sale order, then it's not

restricted by any of what would've been bankruptcy restrictions

otherwise applicable to prior predecessor parties.  And I

understand that if it's an issue of first impression, that that

might not be enough, Your Honor, but that's how I think it

should be decided.

        THE COURT:  Go ahead.

        MR. PELLER:  The -- two more points, Your Honor.

One, I just want to be -- just to finish up, so in the

November/December proceedings, we didn't appeal the no punitive

damages for assumed liability -- you know, GM didn't assume

liability for punitive damages, and we didn't appeal because we

essentially won the imputation issues.

        We did appeal the single issue that had not -- was

not contained in the April and June proceedings, and that was

the very particular question whether a claim that New GM was

liable for failing to disclose certain defects and causing

plaintiffs to miss the bar date, to be able to file a timely

claim, in bankruptcy, whether that was an independent claim or

130

1 not.  Judge Gerber held that it was not an independent claim.

2 It really depended on Old GM's wrongdoing with respect to the

3 bar date notice, and judge -- that's currently fully briefed in

4 awaiting Judge Furman's decision.

5        But the -- that's the only thing we appealed because

6 that was the only thing that was new except for the assumed

7 liability punitive damages that was separate from what we were

8 already appealing in the -- from the April and June rulings,

9 appeals that we prevailed on.

10        Finally, Your Honor, you asked about opening the door

11 to a whole bunch of discovery on behalf of non-ignition switch

12 plaintiffs seeking to be able to pursue successor liability

13 claims against Old GM by showing a due process --

14        THE COURT:  I think you misspoke.

15        MR. PELLER:  -- violation.  I'm sorry.

16        THE COURT:  I think you misspoke.  You want to be

17 able to pursue successor liability claims against New GM, not

18 Old GM.

19        MR. PELLER:  Yes, I'm sorry, against New GM.  And,

20 Your Honor, the -- some of these issues are being -- some of

21 the non-ignition switch claim issues are being subject to

22 discovery in front of Judge Furman, and Mr. Weisfelner has

23 listed some of that discovery, but not all of the non-ignition

24 switch claims.

25        So, for example, lead counsel, when they put the

1  consolidated complaint together, decided not to pursue all the

2  claims that my clients are pursuing for non-ignition switch

3  claims, so they did pursue a power steering defect, a side

4  airbag defect, as we also allege, but we also allege a master

5  door switch defect.  That is not currently subject to discovery

6  in the MDL case because the MDL discovery is only proceeding on

7  the basis of the consolidated complaint and not my individual

8  complaints that have not been consolidated.  So if that

9  discovery --

10        THE COURT:  Are you participating in the discovery?

11        MR. PELLER:  I am not actively participating.  I'm

12  participating to the extent of I have access to all the

13  discovery.  So the -- under the Second Circuit remand, Your

14  Honor, respectfully, I don't believe that this Court really has

15  a choice as to whether that door can be opened or not.  The

16  Second Circuit said with respect to non-ignition switch claims

17  that the stay that had been imposed, which is the only thing

18  that, as we've been through the June judgment had done is

19  stayed those claims, was vacated.  And so now these claims

20  formally are not stayed.  We should be able to just go

21  litigate.  We haven't gone and pressed that because we don't

22  want to cause unnecessary trouble, but they're not stayed.  The

23  stay was vacated, and then proceedings --

24        THE COURT:  Where in the opinion does it say that?

25        MR. PELLER:  It's the end of the opinion.

1           THE COURT:  Oh, I know it remands the non-ignition

2  switch --

3           MR. PELLER:  It says vacated.  It says vacated, the

4  rulings are vacated and then remanded, and --

5           THE COURT:  I could impose the stay again.

6           MR. PELLER:  Yes, absolutely, Your Honor, and our

7  claims are already stayed in the MDL court.  We're not going

8  anywhere.  But my point, Your Honor, is that the Second Circuit

9  has said its remanded to this court to make the due process

10 determinations for the non-ignition switch plaintiffs.

11          THE COURT:  Well, I don't know whether that -- it

12 clearly is remanded to this court.  It didn't address -- it

13 didn't decide -- other than with respect to your specific

14 claim, it didn't decide the non-ignition switch plaintiff

15 issues.  It's clearly on my plate, and hence my questions to

16 Mr. Weisfelner this morning about the statements of the August

17 hearing, how that gets into -- not how that gets into but how

18 the September scheduling order resulted and then the November

19 decision and the December judgment.  Any other points you want

20 to raise?

21          MR. PELLER:  Well, the reason we address that, Your

22 Honor, is because we understood that although there's that

23 issue with respect to the failure to appeal on behalf of other

24 parties, New GM is separately arguing that we are precluded by

25 the failure to appeal the November and December, and I just

133

1   wanted to make clear that -- our disagreement with that.

2           THE COURT:  I have your point on that.

3           MR. PELLER:  Thank you, Your Honor.  That's all I

4   have.

5           THE COURT:  Okay.

6           MR. WEISFELNER:  Your Honor, may I address real

7   quickly two points?

8           THE COURT:  Really quickly because we're going to

9   break for lunch and come back.

10          MR. WEISFELNER:  Very quickly.  Your Honor, first on

11  what's going on in front of Judge Furman, to the extent that my

12  comments were interpreted to mean that Judge Furman has ordered

13  or that the parties are conducting due process discovery,

14  that's not what I meant to say.  What I meant to say is what's

15  going on in front of Judge Furman is whether or not certain

16  defects were known defects by Old GM and when Old GM knew it.

17          What I conveyed was naturally that discovery goes on

18  and is the discovery necessary for a court -- not Judge Furman,

19  but a court -- to make a due process determination.  How to get

20  to a due process violation unless you know whether or not the

21  defect at issue was known and/or concealed, and therefore the

22  requisite notice, be it either direct or publication, was

23  appropriate.  So I agree with Mr. Peller to the extent that

24  Your Honor construed my commentary to mean that there is due

25  process discovery going on in front of Judge Furman.

1          THE COURT:  Well, I had understood you -- and maybe I

2    misunderstood you, but I had understood you to tell me that

3    Judge Furman was going to decide the issue of whether

4    non-ignition switch plaintiffs were denied due process because

5    Old GM knew about and concealed defects.

6          MR. WEISFELNER:  Your Honor, I do know that Judge

7    Furman is overseeing --

8          THE COURT:  I'm going to ask him.

9          MR. WEISFELNER:  Yes, I know that.

10         THE COURT:  I've said before, I don't call him

11   regularly, but I do -- we from time to time -- we don't speak

12   about the substance, but we speak about what issues are

13   percolating and who's going to decide them.

14         MR. WEISFELNER:  Certainly.  I do know that among the

15   discovery that Judge Furman is overseeing is discovery that

16   goes to the issue of what did Old GM know and when did it know

17   it about certain defects.  I reached the conclusion in my own

18   mind that the only reason why Judge Furman would be

19   orchestrating that discovery is so that parties either before

20   him or before you can make the argument about due process as it

21   relates to successor liability since I firmly believe, and I

22   think most of us with the exception of New GM believe, that

23   issue's not relevant with regard to independent claims.

24         THE COURT:  The other takeaway from what you told me

25   earlier is that that discovery cuts off in September.

135

1          MR. WEISFELNER:  Correct.  The last thing I wanted to

2     address, Your Honor, is the discrepancy between Mr. Steel's

3     statement with regard to used car purchasers and Mr. Peller's

4     statement and Your Honor's inquiry.  Your Honor, I can imagine

5     a hypothetical that would allow a used car purchaser economic

6     loss rights, but in the nature of independent claims that are

7     different than the claims of its seller, and here's the

8     hypothetical.

9          Someone owned a car, a GM, an Old GM car with an

10    ignition switch or non-ignition switch defect, up until some

11    time in 2013.  Having then sold that car to a new purchaser,

12    that purchaser had that car with a known but undisclosed defect

13    until such time as the recalls were done in 2014.  It's easier

14    to do it with an ignition switch first because we know that to

15    be true.  Under that hypothetical, I would assert that the used

16    car purchaser has an independent claim against New GM sounding

17    in the nature of economic loss that his predecessor seller did

18    not have.  So with that clarity, I have nothing else to add.

19          THE COURT:  Okay.  We're going to take -- is there

20    anybody else on your side of the table?

21          MR. SCOTT:  Your Honor, Brendan Scott.  I have about

22    five minutes at most.

23          THE COURT:  No, we'll do it after lunch then.

24          MR. SCOTT:  Okay.

25          THE COURT:  We'll be back at 2:00.

1           MR. WEINTRAUB:  Your Honor?

2           THE COURT:  Mr. Weintraub?

3           MR. WEINTRAUB:  You had asked for references to --

4  and orders to the deferral of discovery and deferral of --

5           THE COURT:  Tell me at 2:00.

6      (Recess taken at 12:38 p.m.)

7      (Proceedings resumed at 2:04 p.m.)

8           THE CLERK:  All rise.

9           THE COURT:  Please be seated.  Back on the record in

10 Motors Liquidation Company 09-50026.

11          Mr. Weintraub, briefly.

12          MR. WEINTRAUB:  Very briefly, Your Honor.  I thought

13 I heard the Court asking for citations to orders concerning the

14 deferral of certain issues in discovery, and I just so happen

15 to have two such orders with me.  One of them is actually the

16 April 15, 2015, decision of Judge Gerber.  I only have his

17 version, not the Westlaw version with me, but I'm going to be

18 reading from page 4 of the decision, which is page 8 of the

19 docket.  And it's Docket 13109.  The Court here is talking

20 about the non-ignition switch economic loss people, which are

21 the motion to enforce that did not go forward.  And the Court

22 writes:

23          "The other category of plaintiffs later coming into

24          the picture (the Non-Ignition Switch Plaintiffs)

25          brought actions asserting economic loss claims as to

1      GM branded vehicles that did not have Ignition Switch

2      Defects, including cars made by New GM and Old GM

3      alike.  In fact, most of their cars did not have

4      defects and/or were not the subject of recalls at

5      all.  But they contend, in substance, that the

6      Ignition Switch Defect caused damage to 'the brand'

7      resulting in economic loss to them.  New GM brought

8      still another motion to enforce the sale order with

9      respect to them, though this third motion has been

10      deferred pending the determination of the issues

11      here."

12      THE COURT:  Okay.

13      MR. WEINTRAUB:  So that's one citation.  The other

14  citation is the Court's scheduling order of September 15, 2014,

15  which is Document Number 12898, and that relates to this same

16  motion to enforce on non-ignition switch economic loss

17  claims --

18      THE COURT:  Can you just give me the date again?  I'm

19  sorry.

20      MR. WEINTRAUB:  I'm sorry, the date?

21      THE COURT:  Yes.

22      MR. WEINTRAUB:  September 15, 2014.

23      THE COURT:  Thank you.

24      MR. WEINTRAUB:  And the Court writes at page 2:

25      "Ordered that no discovery shall take place with

138

1          respect to the monetary relief motion to enforce,"

2          which is that motion, this motion, "until further

3          notice of this court."

4          THE COURT:  Thank you.

5          MR. WEINTRAUB:  Thank you, Your Honor.

6          THE COURT:  Is there anybody else on the plaintiffs'

7  side who wants to be heard?

8          MR. HIRSCH:  Yes, Your Honor.

9          You go first?  Okay.

10          MR. SCOTT:  Good afternoon, Your Honor.  Brendan

11  Scott, Klestadt Winters Jureller Southard & Stevens, on behalf

12  of the Pilgrim Plaintiffs.  I'll be very brief.

13          You know, we've covered a lot of ground thus far.

14  Some of it is applicable to my client group, some of it is not,

15  and that's the reason I stand to speak.  Our representative

16  group who is, in lower case, non-ignition switch plaintiff

17  group, they're not part of the MDL action, and they had no

18  representation in the bankruptcy case until January of 2016.

19  GM's arguments with respect to our -- my clients are

20  essentially the same, that you don't receive the benefit of the

21  Second Circuit decision because you weren't part of the appeal,

22  but you're bound by the November decision and the December

23  judgment even though we didn't have a legitimate opportunity to

24  participate in those proceedings.

25          So in order to understand that, I'll just very

139

briefly go through the timeline.  Our client group filed their

complaint on October 14th, 2015, the very same day that the

issues that led to the November decision were being argued.

Two weeks later, on October 28th --

THE COURT:  What court?

MR. SCOTT:  Pardon?

THE COURT:  What court?

MR. SCOTT:  Here in -- before Judge Gerber.  On

October 28th, we received a letter from GM, a demand letter,

demanding that we withdraw the complaint because it's stayed.

They also assert at that time the scheduling order, but of

course all briefing and oral argument had been completed at

that time.  They, you know, have taken the position that

regardless of that, because you didn't appeal from the December

judgment, you're bound by it and they interpret it to say that

you're not able, at this point, to establish a due process

violation because you failed to do so.  And in their papers,

they argue that we failed to do so in 2015.

Of course, we weren't part of this until October of

2015, and we didn't have an opportunity to engage in any

discovery related to due process violations.  We didn't first

appear in the bankruptcy court until February of 2016.  The --

GM filed a motion to enforce the sale order in January of 2016.

We filed a response wherein we raised the issue of due process

and the need for discovery.

1      The motion to enforce was stayed by way of

2  stipulation wherein we reserved the right, and it states that

3  the -- our entry into the stipulation is without prejudice to

4  our right to take discovery.  GM did insist upon the addition

5  of language that it also does not prejudice their position to

6  argue that we're not entitled to discovery.

7      But we did not -- we did not sit on our rights when

8  we were made aware of these proceedings.  In our first

9  appearance in this case, we made it known that we thought that

10  the due process issue needed to be resolved.  We were -- the

11  matter was stayed, and then we were rolled up into this

12  process.  So we haven't had an opportunity to take discovery on

13  the due process issue.

14      We think it's manifestly unjust if we're going to be

15  held to -- if we're going to be bound by the November decision

16  and the -- and the December judgment, we don't think that

17  prohibits us, or anyone, from establishing a due process

18  violation.  But to the extent the Court believe it does, we

19  think that we ought to be carved out from that because we had

20  no legitimate opportunity to participate in those proceedings.

21      THE COURT:  Just give me a few skeletal facts about

22  the Pilgrim Plaintiffs, please.

23      MR. SCOTT:  The Pilgrim Plaintiffs are a group of

24  Corvette owners.  They have -- the defect here is with the

25  engine.  It -- the defect causes an -- a hole to be blown,

141

1   potentially to be blown, into the engine.  Could be while the

2   car is driving down the road, could be when you -- when you

3   turn -- you know, turn on the ignition.

4          I think there was at least one personal injury case

5   where there was an accident.  The rest of them are essentially

6   economic loss.  It's about $15,000 to replace the engine.  And

7   we believe that Old GM knew about this before the sale order,

8   and we wanted to engage in discovery.

9          THE COURT:  What year are these vehicles?

10          MR. SCOTT:  They're -- there's a whole range of

11   vehicles.  They are pre-sale.

12          THE COURT:  Yeah.  But give me the years.

13          MR. SCOTT:  I don't know if I have that, Your Honor.

14   I apologize.  I want to say they start with 2006, but I really

15   -- I really don't have that information.

16          THE COURT:  Are any of the alleged defects covered by

17   recalls?

18          MR. SCOTT:  This defect, there was -- there was no

19   recall.  There were other recalls on these vehicles.  So that

20   Old GM --

21          THE COURT:  Well, I've had -- you know, I've had cars

22   that have had recalls for sure.

23          MR. SCOTT:  No.  The point is that Old GM --

24          THE COURT:  My question -- just so we have a clear

25   record.  Your -- the alleged defect that you described to me is

1  with respect to the engine and a particular aspect of the

2  engine.  And my question is have there been any recalls

3  relating to the defect that you allege?

4        MR. SCOTT:  There have not been, Your Honor.  But I

5  did point out that there had been other recalls --

6        THE COURT:  I don't care whether there have been

7  other recalls.

8        MR. SCOTT:  Only for the sake -- only for the sake

9  that --

10       THE COURT:  Stop.  I asked a specific question.

11 You've answered my question.

12       MR. SCOTT:  Yes.

13       THE COURT:  Anything else you want to say?

14       MR. SCOTT:  Yes.  I just want to say, Your Honor,

15 that the -- that the -- GM did know who the owners of these

16 vehicles were because they had made other recalls on these

17 vehicles.  That was the point I wanted to make.

18       THE COURT:  All right.

19       MR. SCOTT:  So they were aware of addresses and the

20 owners of these vehicles.

21       THE COURT:  Thank you.

22       MR. SCOTT:  Thank you, Your Honor.

23       THE COURT:  Thank you.

24       Come on up.

25       MR. HIRSCH:  Thank you, Your Honor.  Attorney Joram

143

1  Hirsch; I represent the Pitterman Plaintiffs.

2          THE COURT:  Yes.  What I thought, Mr. Hirsch --

3          MR. HIRSCH:  Your Honor, I'm having a little trouble

4  hearing you.  I apologize.

5          THE COURT:  What I wanted to do was finish on this

6  and then deal with the Pitterman Plaintiffs as a separate

7  matter.

8          Unless, I don't know, Mr. Steinberg, do you want to

9  deal with it all as part of one?

10          MR. HIRSCH:  However you want to do it, Your Honor.

11          THE COURT:  Just stay up there for a second.

12          Mr. Steinberg, what's your pleasure?

13          MR. SCOTT:  I'm prepared to respond after all the

14  plaintiffs have talked, so I'm prepared to just let Mr. Hirsch

15  say what he wants to say.

16          THE COURT:  All right.  Go ahead, Mr. Hirsch.

17          MR. HIRSCH:  Thank you, Your Honor.  So I represent

18  the Pitterman Plaintiffs.  This is a post-closing accident

19  case.  It involves a 2004 Suburban manufactured by Old GM.  The

20  incident occurred on July 13, 2011.  That's two years after the

21  sale date.  The case does not involve the same ignition switch

22  defect that's the subject of this proceeding.  The defect is a

23  defect in the design of what's called a brake transmission

24  shift interlock.  That's an interlock between the brake, the

25  transmission, and the ignition key such that you can't shift

144

1   out of park unless the key is in certain positions.

2           We commenced a product liability action under

3   Connecticut product liability law.  That's pending in the

4   United States District Court for the District of Connecticut,

5   and scheduled for trial July 5, 2017.  We have not -- we've

6   pled only a product liability action.  We have not pled a fraud

7   or any other misrepresentations or any claim under the Federal

8   Motor Vehicle Safety Standards recall provisions.  It's a

9   strict product liability action.  So --

10          THE COURT:  At least as -- at least as to

11  compensatory damages, this is assumed liability?

12          MR. HIRSCH:  I -- my belief is yes.

13          THE COURT:  Okay.

14          MR. HIRSCH:  But that's the subject of the debate

15  that's been ongoing for months now.  My position has always

16  been we're alleging a products liability action.  You've

17  assumed this liability.  As I get through it, you'll

18  understand, I think, where the argument is.

19          THE COURT:  Okay.  Go ahead.

20          MR. HIRSCH:  But we initially claimed punitive

21  damages.  We got a letter from counsel saying you can't do it,

22  and that letter came -- that was the first contact we had with

23  this bankruptcy proceeding.  And that letter came in August 26,

24  2015, and we amended our complaint to withdraw the punitive

25  damage claim.  Okay?

145

1          THE COURT:  Okay.  It's still out.  You haven't tried

2    to put it back?

3          MR. HIRSCH:  Nope.  Nope.  It's still out.  We're not

4    going to put it back in, and we're not trying to put it back

5    in.  It's -- we're not going that way.

6          THE COURT:  Okay.

7          MR. HIRSCH:  So our -- the issues that pertain to my

8    case fall into two categories, and there are four claims.  And

9    I have a graphic that I'd like to give to the Court, if you

10   don't mind, because I like to think in terms of graphics.  It

11   helps me.

12         THE COURT:  Thank you.

13         MR. HIRSCH:  Thank you.  So the issue -- the issues

14   that pertain to my case fall into four categories -- two

15   claims, failure to warn, failure to recall and retrofit.  And

16   two categories, one based on Old GM's pre-sale conduct, that's

17   prior to June 2009.  My car, remember, was built in 2004.  And

18   the second claim is against New GM based on New GM's post-sale

19   conduct where there was conduct between June 2009 and July

20   2011, the date of my accident.  That's what at issue here.

21   So --

22         THE COURT:  With respect to your -- and you allege

23   that the New GM post-sale conduct are independent claims?

24         MR. HIRSCH:  They are -- they are -- they are

25   independent in the -- in the sense that they are based solely

1 on New GM's post-sale conduct.  Pre-sale conduct, failure to --

2 for example, pre-sale conduct failure to warm -- failure to

3 warn, New GM has agreed they've assumed that.

4          THE COURT:  Okay.

5          MR. HIRSCH:  I --

6          THE COURT:  Is that correct, Mr. Steinberg?

7          MR. STEINBERG:  It is correct.

8          THE COURT:  Okay.

9          MR. HIRSCH:  So category 1 in the top left-hand

10 corner, that's not a problem.  They've assumed that.

11          THE COURT:  Okay.

12          MR. HIRSCH:  We've alleged, in addition, New GM's

13 post-sale conduct based on New GM's conduct.  Now maybe we

14 didn't say independent claim based solely on New GM's conduct,

15 but that's our claim, and I can state it for the record, if

16 you'd like.  Our claim is based on New GM's post-sale conduct

17 in terms of the claim against them for both failure to warn and

18 failure to recall.

19          THE COURT:  Which district judge is it pending

20 before?

21          MR. HIRSCH:  Judge Hall, Janet Hall.  So recently --

22          THE COURT:  And you told Judge Hall that --

23          MR. HIRSCH:  We'll be here today.  I told Judge Hall

24 I'm here today.

25          THE COURT:  Okay.

147

1          MR. HIRSCH:  We had a pretrial conference last

2    Monday.

3          THE COURT:  Okay.

4          MR. HIRSCH:  So she's looking for guidance from the

5    Court.

6          THE COURT:  But did you tell her that your -- that

7    this failure to warn claim against New GM is based solely on

8    New GM's conduct?

9          MR. HIRSCH:  Yes.

10         THE COURT:  Okay.  Go ahead.

11         MR. HIRSCH:  Yes.  Because we have two years' worth

12   of conduct from between June --

13         THE COURT:  The sale and the accident.

14         MR. HIRSCH:  Between June 2009, the sale, and June --

15   and July 2011, there's two years when GM was aware of this

16   problem.  New GM was aware of the -- what we claim is a defect.

17   They're obviously challenging it.  But we contend they're aware

18   of it and they didn't warn.  They didn't recall or retrofit.

19         THE COURT:  Go ahead.

20         MR. HIRSCH:  So in a recent letter to the Court from

21   Attorney Steinberg, I think they've clarified a lot of issues

22   respect to the claims based on New GM's conduct.  At -- it's

23   document 13929, page 204, second full paragraph.  It was just

24   recently sent.  It was in connection with the Tronox matter,

25   but I'm not going to deal with Tronox.  But in that letter, New

1  GM said quote:

2          "Various plaintiffs in this proceeding present

3          threshold issue number 2 as a theoretical question

4          whether plaintiffs and vehicles without Ignition

5          Switch Defect" -- and I don't have an Ignition Switch

6          Defect -- "can assert independent claims against New

7          GM in light of the Second Circuit opinion.  The

8          answer is and always has been 'yes' if the claim is

9          truly independent.  A valid Independent Claim must be

10         based solely on New GM duty incurred after the 363

11         Sale and predicated solely on New GM's conduct."

12         THE COURT:  And you believe you satisfy everything

13  that you just read?

14         MR. HIRSCH:  Yes.  I -- and I -- and if they believe

15  that I didn't say it in the pleadings, I'd be happy to amend my

16  complaint, if Judge Hall lets me, to say that.

17         THE COURT:  Okay.  Go ahead.

18         MR. HIRSCH:  Now, whether New GM had a duty to warn

19  or recall is not an issue for your court -- for you to decide,

20  Your Honor.

21         THE COURT:  I agree.

22         MR. HIRSCH:  With all due respect.

23         THE COURT:  I agree with that.

24         MR. HIRSCH:  Okay.

25         THE COURT:  You don't have to do that with respect or

149

1  our otherwise.  I agree.

2         MR. HIRSCH:  Okay.  So that issue, it's always been

3  our position, is Judge Hall's obligation to decide whether that

4  duty exists.  But if that duty exists, we are -- we are, in my

5  view, permitted to present that issue to Judge Hall for her to

6  decide and then charge the jury appropriately.

7         And I'd like some -- I'd like to ask Attorney

8  Steinberg through the Court if he agrees that we could --

9         THE COURT:  I'll ask Mr. Steinberg.

10        MR. HIRSCH:  Well, then you ask Mr. Steinberg if he

11 agrees that we could present the claim against New GM based

12 solely on New GM's post-sale conduct with respect to failure to

13 warn and failure to recall and retrofit.

14        THE COURT:  All right.  Continue with your argument.

15        MR. HIRSCH:  Okay.  So -- and if he doesn't agree, I

16 can go -- I have a big five-page analysis as to why I'm

17 permitted to do so under the November decision, if you'd like

18 to me to go through that.  But I think it's mooted out by what

19 Mr. Steinberg just told the Court.  That leaves for the -- that

20 leaves the only issue to be determined is whether or not we can

21 proceed on a claim of failure to recall retrofit based on Old

22 GM's conduct pre-sale.  In other words, Old GM's failure to

23 recall or retrofit the vehicle.

24        The vehicle was built, as I told the Court, in 2004.

25 The collision occurred that's the subject of my case in 2011.

1 GM -- Old GM was aware of this problem.  In fact, in 2007,

2 modified the vehicles, the Suburbans, for the model year 2007

3 to correct what the defect we claim existed.  But they didn't

4 recall the -- they didn't recall the car.

5        Now, we're not claiming that they had an obligation

6 under Federal Motor Vehicle Safety Standards without asserting

7 a private right of action under that section.  We're simply

8 saying you have a common law duty to recall when you're aware

9 that there's a problem with the car.  It's a voluntary recall

10 obligation.  The --

11        THE COURT:  And can I give recognize to such a claim?

12        MR. HIRSCH:  Yes.  And I included -- I included in my

13 most recent letter to the Court two cases.  I cited the Court

14 to two cases, and my letter to the Court was just -- it's

15 docket number -- if I could find it here -- 13937.  And the two

16 cases I cited to the Court are Arguetta v. Overhead Door Corp.,

17 and that was attached to my letter.  And I cited another

18 District Court case, Savage v. Scripto-Tokai Corp.  Both are in

19 my letter.  Our position is Connecticut recognizes as part of a

20 product liability claim negligent failure to recall or

21 retrofit.

22        THE COURT:  And I take it, then, it's your position

23 that Old GM's failure to recall and retrofit is an assumed

24 product liability claim?

25        MR. HIRSCH:  Exactly correct.  Because it's part of

151

1  the product liability claim as recognized in -- under

2  Connecticut law.  Now there's -- the decision by Judge Gerber

3  sort of confused the issue because I -- admittedly, there's a

4  paragraph in the judgment that seems to suggest that a duty to

5  recall or retrofit is not permitted based on Old GM's conduct,

6  and that was paragraph 29 of the judgment.

7        Now, I submit to the Court that that issue as to

8  whether or not a product liability claim that GM has assumed

9  includes a recall was not properly before the Court at the time

10  of the November decision and December judgment for a couple of

11  reasons.

12        One, we weren't given a notice that that issue was

13  going to be presented to the Court.  It wasn't -- it -- there

14  was a letter -- I have to go back through a little chronology,

15  Your Honor, unfortunately, Your Honor, to explain how this all

16  evolved.  So there was a letter that came to use in September

17  of 2015, and it's with -- it's Docket 13466.  This is a letter

18  to Judge Gerber, and it talks about the marked complaints,

19  which you've heard a lot about.   And we've -- we got that

20  letter because our case fell within the other complaints

21  categories.

22        And the other complaints categories that's referenced

23  in that letter -- and by the way, the first letter we got back

24  in August of -- August 26, 2015, only complained about the fact

25  that we've alleged punitive damages.  Didn't say anything about

1  any other claim, just punitive damages.  Then we got the

2  scheduling order, and the scheduling order directed King &

3  Spalding, you know, counsel, to submit a procedure for dealing

4  with things, and one of the procedures was to mark up other

5  plaintiffs' complaints, as Your Honor have seen.  So I fell

6  into the category of other plaintiffs' complaints.

7          So next I get a letter dated September 23 addressed

8  to Judge Gerber, and in that they talk about -- they discuss

9  six -- five, six categories, failure to recall, negligent

10  failure to identify, negligent infliction, civil conspiracy,

11  Section 402(b), and pre-sale accidents.  The only paragraph

12  that applies to me, because I've made none of those claims

13  other than product liability claim, is the failure to recall

14  and retrofit.

15          And if you look at that letter, that letter says

16  nothing about a claim based on Old GM's failure to recall or

17  retrofit.  It talks about New GM's failure to recall or

18  retrofit.  So there's nothing in that letter that alerted me or

19  the Court, I would say, that the Court would be dealing with

20  the issue of whether or not Old GM's duty to recall or retrofit

21  was -- comes within the umbrella of a products liability claim

22  as defined by state law.  Just wasn't there.

23          So now I get the -- and that -- and that letter

24  references a case Moore v. Ross as an example of the types of

25  claims that were prohibited.  That Moore v. Ross claim -- I'm

153

1  sure Your Honor has seen that, I have a copy here for the

2  Court, doesn't talk about Old GM's conduct.  It only talks

3  about New GM's conduct.  Doesn't -- it doesn't put up -- it

4  doesn't tee up the issue whether or not Old GM's failure to

5  recall or retrofit comes within the state law product liability

6  claim that's been assumed.  So it's our position that we

7  weren't given notice that this part of our claim was at issue

8  in the case.  That -- in other words, being challenged by Old

9  GM.

10        So the next thing that happens is we get the -- Judge

11 Gerber issues his November decision and December judgment.  We

12 didn't have an appearance in the file.  So we didn't get a copy

13 of it because we weren't in -- we weren't in the ECF system.

14 And we got a copy of it in May of 2016 when it was sent to us

15 by King & Spalding based on my review of my file.

16        And now for the first time, this -- all the claims

17 about you can't bring independent claims, blah, blah, blah,

18 they talk about in that case failure due to the obligation if

19 you don't like our -- that if we've alleged Old GM a successor

20 to New GM or vice versa.

21        THE COURT:  Reversed.

22        MR. HIRSCH:  Vice-versa, New GM a successor to Old

23 GM, I agreed to take out the word "successor."

24        THE COURT:  You're not asserting --

25        MR. HIRSCH:  No.

154

1              THE COURT:  -- a claim against New GM based on

2    successor liability?

3              MR. HIRSCH:  No.

4              THE COURT:  Okay.

5              MR. HIRSCH:  No.  As a straight product liability

6    claim.

7              THE COURT:  Okay.

8              MR. HIRSCH:  Because we're not seeking punitive

9    damages.  We're not seeking any -- you know, no other -- no

10   other claims.  They say that our claims based on alleged due to

11   the warn was inappropriate and alleged failure to recall and

12   retrofit are inappropriate.  And they don't distinguish between

13   claims based on Old GM's conduct and New GM's conduct.

14             THE COURT:  Just I know you'll probably get there,

15   but let me ask you now.  Are you asserting a claim against New

16   GM for failure to recall or retrofit?

17             MR. HIRSCH:  Yes.

18             THE COURT:  Okay.

19             MR. HIRSCH:  Based solely on New GM's conduct

20   post-June 2009.

21             THE COURT:  And is there Connecticut case law that

22   you believe would support the assertion of a claim for failure

23   to recall retrofit against New GM?

24             MR. HIRSCH:  Well, that's a difficult subject because

25   this type of situation has never come up before in Connecticut

155

1  in terms of a bankrupt, somebody's buying out of -- buying the

2  assets out of bankruptcy and whether or not a claim can be

3  asserted.

4          THE COURT:  Your position, though, that would be

5  purely a question of Connecticut state law?

6          MR. HIRSCH:  Absolutely.

7          THE COURT:  That Judge Hall would have to address.

8          MR. HIRSCH:  Correct.

9          THE COURT: Whether state law -- Connecticut state law

10  would recognize a cause of action against New GM based on

11  solely on its own conduct.

12          MR. HIRSCH:  After June 2009.  Yes.

13          THE COURT:  For -- right for failure to recall

14  retrofit.

15          MR. HIRSCH:   Yes.  And in Connecticut, duty is

16  defined as a combination of public policy and foreseeability.

17  Is it foreseeable if GM has notice -- New GM has notice of an

18  issue with their cars, which we have evidence that they did,

19  notice that there were incidents.  We have other evidence of

20  other similar incidents that New GM had knowledge.

21          THE COURT:  So you took discovery on this issue of

22  New GM's knowledge about the alleged defect in the Corvette?

23          MR. HIRSCH:  It's a Suburban.

24          THE COURT:  I'm sorry.

25          MR. HIRSCH:  That's Okay.

156

1          THE COURT:  You took discovery about New GM's

2    knowledge --

3          MR. HIRSCH:  Yes.

4          THE COURT:  -- about this alleged defect in the

5    Suburban.

6          MR. HIRSCH:  New GM knew about it.  There -- the

7    witnesses that -- the witnesses I deposed were employees then

8    and now.  They were aware -- and I will tell Your Honor that

9    this defect was remedied -- well, remedied -- there was a

10   change in the design in the 2000 model year.  There was

11   congressional action that required them to make the change.  GM

12   made -- had an agreement with Matsu to make the change.  It's

13   -- they -- it's all over their records that they knew about the

14   problem.

15         THE COURT:  There was no recall but they changed the

16   design.

17         MR. HIRSCH:  Correct.  Without a recall.  And so

18   their employees who we deposed, were employees then and now,

19   were aware of what we claim was a defective condition.  So it's

20   -- your statement is exactly correct.  It's our position that

21   it's up to Judge Hall to decide whether Connecticut law

22   recognizes a duty on New GM's part to warn and recall with

23   respect to owners of the Suburban.

24         THE COURT:  Let me you what facts do you intend to

25   rely upon to establish this failure to recall restorative claim

1  against New GM based on -- solely on New GM's conduct?

2         MR. HIRSCH:  Well, the facts, Your Honor, are very --

3  are straightforward.  New GM was continuing to get notices of

4  other similar incidents involving this defect.  And New GM's

5  employees, who are then -- who are Old GM's employees as well

6  as New GM's were aware that there were vehicles out there --

7         THE COURT:  I don't want to know what -- at this

8  point, what Old GM knew.  I want to know --

9         MR. HIRSCH:  New GM.

10        THE COURT:  -- what it is you're arguing that New GM

11 knew.

12        MR. HIRSCH:  New GM --

13        THE COURT:  And you're not doing this solely based on

14 imputation --

15        MR. HIRSCH:  No.

16        THE COURT:  -- with the people who work for Old GM

17 now are the New GM.  They knew or must have known about it.

18 You're saying you've established -- you believe you can

19 establish actual knowledge by employees of New GM about the

20 existence of this defect in pre-2007 Suburban.

21        MR. HIRSCH:  Well, I can say that the -- that the

22 employees who are employed by New GM were also employed by Old

23 GM, so they were New GM employees that were aware of this.

24        THE COURT:  Did you find -- do you have any documents

25 that were produced in discovery that show that New GM was aware

1  of this alleged defect in pre-2007 Suburban before your clients

2  had their accident?

3          MR. HIRSCH:  They were being sued for these kinds of

4  cases, and there were reports of other similar incidents after

5  2009 there were being reported to General -- to New GM about

6  defects in these pre-2007 cars.

7          THE COURT:  Do you believe that your -- that in light

8  of Judge Gerber's prior rulings that you're able to offer

9  evidence about what Old GM knew before the sale?  I'm trying --

10 what I'm trying to understand, Mr. Hirsch, is are you going to

11 be pure, clean as the driven snow, your whole case is going to

12 be based on what New GM knew --

13         MR. HIRSCH:  No.

14         THE COURT:  -- about this alleged defect in the

15 pre-2007 Suburban?

16         MR. HIRSCH:  No.  I can't say that.

17         THE COURT:  Okay.

18         MR. HIRSCH:  Because one of the claims I'm making is

19 Old GM's failure to warn, which is conceded is assumed product

20 liability claim.

21         THE COURT:  Let me ask you if Judge Hall does not

22 permit you to -- if she were to conclude that there is no

23 assumed liability for failure to recall and retrofit, do you

24 believe you would still be entitled to introduce evidence about

25 Old GM's knowledge about the defect?

159

1          MR. HIRSCH:  Yes.  Under the failure to warn claim.

2          THE COURT:  Okay.  Go ahead.  And there's no dispute

3  that the failure to warn claim -- well, let me ask, is there a

4  dispute between New GM and you as to whether the failure to

5  warn claim is an assumed liability?

6          MR. HIRSCH:  That's where we started this

7  conversation.  I think Attorney Steinberg said no.  That's --

8  he agrees that's an assumed claim.

9          THE COURT:  We'll argue from Mr. Steinberg --

10         MR. HIRSCH:  But that's what I thought we started --

11  that's how I started --

12         THE COURT:  Oh, Okay.

13         MR. HIRSCH:  -- the discussion.

14         THE COURT:  That's fine.

15         MR. HIRSCH:  The answer is, as far as I understand

16  it, there's no dispute that a failure to warn based on Old GM's

17  conduct --

18         THE COURT:  So you believe you get this evidence in

19  on the failure to warn.

20         MR. HIRSCH:  At a minimum.

21         THE COURT:  Okay.

22         MR. HIRSCH:  Correct.

23         THE COURT:  All right.

24         MR. HIRSCH:  So -- and I can go back to the failure

25  to retrofit because it's my position that Old GM's failure to

1  recall between 2004 and 2009 -- my car was built in 2004, is

2  also an assumed claim because it's part of a product liability

3  claim as -- we believe, as recognized in the state of

4  Connecticut.  So if you saw -- I think I established in the

5  letter regarding the marked-up complaints, that didn't address

6  Old GM's failure to recall.  That addressed New GM's failure to

7  recall.

8          So that marked-up -- that the judgment of -- the

9  November decision and the December judgment that was supposed

10  to be based on the marked-up complaints should not have

11  addressed Old -- any claim for a failure to recall based on Old

12  GM's conduct because that wasn't part of what was presented as

13  an issue that was going to be decided.

14          Nonetheless, for whatever reason, Judge Gerber made

15  that statement and so I -- you have to interpret what that

16  statement means.  And it's our position -- and I think I said

17  it, it's -- there doesn't appear to be any discussion in Judge

18  Gerber's decision regarding the basis for the statement that

19  New GM would not be responsible for Old GM's failure to recall.

20  There's no discussion whether it's a recognized under --

21  whether it is or isn't recognized under product liability law.

22  I don't think Judge Gerber intended, and I don't think you

23  intend to survey the law of 50 states and see what --

24          THE COURT:  That I can assure you on.

25          MR. HIRSCH:  I didn't think you would, and I didn't

161

1  think he was doing that, either.  So I have to -- and I would

2  also point out that there's nothing -- there's no explanation

3  why a product liability claim under state -- any particular

4  state law can't include a failure to recall.  There's nothing

5  in the definition of assumed liabilities that would exclude an

6  allegation of failure to recall or retrofit within the confines

7  of product liability claim recognized under state law.

8          I think you can interpret that statement in his

9  opinion and decision to apply to recall obligations under the

10 Federal Motor Vehicle Safety Standards and therefore

11 distinguish it from our case.  Because we're not making a claim

12 under the Federal Motor Vehicle Safety Standards.  Or you can

13 interpret it as dicta as not been having been properly before

14 the Court.

15         It's their -- it's our position that since GM has

16 assumed liability for product liability claims based on

17 vehicles manufactured by Old GM and because under Connecticut

18 law -- and it's up to -- if they disagree, it's up to Judge

19 Hall to decide -- the product liability claim includes a claim

20 for failure to recall or retrofit, then New GM has assumed

21 liability for the product liability claim we've asserted.  In

22 footnote 30 of the November decision, Judge Gerber stated:

23             "New GM assumed responsibility for product liability

24             claims, which would make it liable for compensatory

25             damages based on anything that even Old GM had done."

162

1           And that's what we're asserting.  And there's nothing

2    in the November decision or the December judgment that would

3    indicate New GM is entitled to carve out of a product liability

4    claim recognized under state law, a particular aspect of it.

5           THE COURT:  I understand your argument.

6           MR. HIRSCH:  Okay.  So what I'm looking for, Your

7    Honor, is hopefully, a ruling that would allow us to proceed in

8    the United States District Court subject to Judge Hall making

9    whatever decision she needs to make regarding what's permitted

10   under Connecticut state law with a claim based -- a claim

11   against Old GM -- or, I'm sorry, a claim based on Old GM's

12   failure to warn, failure to recall, and based solely on New

13   GM's post-sale conduct with respect to both warning and recall.

14          THE COURT:  Are there motions pending before Judge

15   Hall whether Connecticut law permits the failure to recall/

16   retrofit claim?

17          MR. HIRSCH:  No.  The -- GM has not made that motion

18   in state court.  They made a bunch of other motions relying on

19   the bankruptcy court order, including the fact that we can't

20   proceed with a claim based on New GM's failure to recall or

21   failure to warn.  But that's been precluded even solely based

22   on GM's -- New GM's conduct.

23          THE COURT:  Do you have a date for final pre-trial

24   conference?

25          MR. HIRSCH:  We had it.  We had the pretrial

1  conference on Monday.  The judge indicated she will probably

2  schedule another one because she did not reach all of the

3  pretrial motions, and it's unclear whether there's -- she's

4  going to rule on them with or without our further argument or

5  hearing.  So the answer is I don't know.  It's not scheduled.

6  There might be.

7          THE COURT:  Fine.  Thank you, Mr. Hirsch.

8          MR. HIRSCH:  Thank you, Your Honor.

9          THE COURT:  Anybody else on the plaintiffs' side who

10 wants to be heard?

11         MR. BABCOCK:  Russell Babcock here on behalf of

12 Benjamin Pillars.  Now, before I get going here, my -- the

13 primary focus of my oral discussion today is going to be on

14 issue 1, which hasn't really been addressed up to this in time.

15 And I think they kind of bypassed issue 1 and talked about

16 issues 2 through 4.

17         THE COURT:  Well --

18         MR. BABCOCK:  I mean I could go either go at this

19 point.  I --

20         THE COURT:  Yes.  Go.

21         MR. BABCOCK:  Okay.

22         THE COURT:  Go.

23         MR. BABCOCK:  All right.  So basically what we have

24 here is back in 2015, Judge Gerber issued a ruling which

25 basically, from our perspective, gave us a green light to

1  proceed forward with our ignition switch case against New GM.

2  They've -- they appealed that to Judge Furman.  Judge -- and

3  the issues were briefed, I believe, at the preliminary stage,

4  at least.  And during the process of being up on appeal, the

5  Second Circuit came down with this ruling.

6         Judge Furman had a conference call with the attorneys

7  suggest -- well, not suggest, he told us that he wanted us to

8  come back down to this court to find out what impact the Second

9  Circuit had on our claims above and beyond what was presently

10 before him.  He didn't want to make a ruling on that until he

11 knew where things stood.

12        THE COURT:  Tell me what your client's claims.

13        MR. BABCOCK:  Yeah.  We are -- we have brought an

14 ignition switch claim against New General Motors.  On argument

15 on appeal up for Your Honor is that New GM consistently took

16 the position that were an ignition switch plaintiff and that --

17 and we cited in our supplemental brief, which we provided to

18 the Court, excerpts from their response to our no stay -- no

19 stay pleading where they repeat on more than one occasion that

20 our claims are identical to the ignition switch pre-closing

21 accident plaintiffs' claims.  Now their argument now is that

22 no, we're not --

23        THE COURT:  Just tell me what it is that happened to

24 your clients that you're suing on.

25        MR. BABCOCK:  I see.  Back in 2005, my -- the

1  decedent was driving the vehicle.  The vehicle suddenly lost

2  control.  She was rendered incapacitated for the rest of her

3  life.  She passed away in 2012.  During the police

4  investigation, they noted that the ignition switch was -- had

5  turned onto the "off" position, and the airbags had not

6  deployed.  The onboard computer indicated that no collision had

7  -- it didn't register the collision having occurred.  All

8  indicators that this was obviously an ignition defect issue.

9          THE COURT:  What was -- what was the model year of

10  the car?

11          MR. BABCOCK:  It was, I believe, a 2004 -- one moment

12  here -- Pontiac Grand Am.

13          THE COURT:  Okay.  And is the subject vehicle under

14  the recalls?

15          MR. BABCOCK:  Yes.  We -- notification was sent

16  out --

17          THE COURT:  Mr. Steinberg is saying no, shaking his

18  head no.

19          MR. BABCOCK:  It was -- well, it was identified as

20  the defective ignition June of 2014.

21          THE COURT:  In the later, so --

22          MR. BABCOCK:  Yeah.

23          THE COURT:  -- it was all within the definitions --

24          MR. BABCOCK:  Yeah.

25          THE COURT:  Let me finish.  You know, calm down.

1          MR. BABCOCK:  That's Okay.  No.  It's been a long two

2    days, Your Honor.

3          THE COURT:  For me too.

4          MR. BABCOCK:  I know.  I know, Your Honor.

5          THE COURT:  Okay.  Your client's, the decedent's car,

6    the 2004 Pontiac, would not be a subject vehicle.  Is that

7    correct?

8          MR. BABCOCK:  Based upon the arguments that are now

9    being made and based upon Your Honor's comments at your

10   conclusions, that would appear to be the case.

11         THE COURT:  You know, there was a lot of -- there's a

12   lack of clarity about what non-ignition switch defects and

13   plaintiffs are.

14         MR. BABCOCK:  Yeah.

15         THE COURT:  But I didn't think there was any dispute

16   about what a initial caps "Ignition Switch Plaintiff" is,

17   ignition switch defect.  It's the first three recalls in

18   February and March 2014 were subject vehicle, and client's --

19   your -- the decedent's car was not one of those.

20         MR. BABCOCK:  The reason why there's --

21         THE COURT:  Is that correct?

22         MR. BABCOCK:  No.  No.  Not correct, Your Honor.

23   Because here's the problem, all the way through this litigation

24   up until the Second Circuit decision, New GM took the position

25   that we were an ignition switch pre-closing --

1           THE COURT:  Here today, we've got a Second Circuit

2    decision.  Do you agree that the decedent's vehicle is not one

3    of those subject vehicles that were subject to the February and

4    March 2014 recalls?

5           MR. BABCOCK:  It wasn't the beginning of the recalls.

6    No.  It was June 2014 recall.

7           THE COURT:  Give me a clear -- I think that was a

8    clear question.

9           MR. BABCOCK:  I'm sure.  What was the question?

10          THE COURT:  Listen carefully, and I want a clear

11   answer.

12          MR. BABCOCK:  Sure.

13          THE COURT:  Do you agree that the decedent's vehicle

14   was a subject vehicle as defined in this -- in this case that

15   was subject -- that was covered by the February and March 2014

16   recalls?

17          MR. BABCOCK:  I would agree it doesn't fit the

18   definition --

19          THE COURT:  Okay.

20          MR. BABCOCK:  -- that has been presented.

21          THE COURT:  That's what I wanted -- Okay.  You

22   believe that it was subject -- the vehicle was subject to one

23   of the later, two months later, recalls.

24          MR. BABCOCK:  It was the June or July 2014 recall.

25          THE COURT:  Right.  Okay.

168

1              MR. BABCOCK:  And the reason why we're here, Your

2    Honor, is that throughout the entire litigation leading up to

3    the Second Circuit, we were led to believe by New GM by their

4    admissions that we were a ignition switch defect.  In their

5    pleadings, and as we pointed out to the Court, admissions by a

6    party during litigation, they're bound by it.

7              THE COURT:  Where is your case pending?

8              MR. BABCOCK:  The -- where is the case pending now?

9              THE COURT:  Yes.

10             MR. BABCOCK:  Currently, it's in -- oh, currently,

11   it's in front of Judge Furman.

12             THE COURT:  Okay.  And do you have a trial date?

13             MR. BABCOCK:  No, Your Honor.  Everything's been

14   stayed, Your Honor.  Because the Court wanted Your Honor to --

15             THE COURT:  Fine.

16             MR. BABCOCK:  -- weigh in on this.

17             THE COURT:  Okay.  Go ahead.

18             MR. BABCOCK:  And so the reason --

19             THE COURT:  You're relying on estoppel based on prior

20   positions that New GM took?

21             MR. BABCOCK:  Well, admissions basically.  More

22   forcible than the admission, Your Honor.  These -- they took a

23   position, and very forcibly, that they -- that we were a

24   pre-ignition switch plaintiff.

25             THE COURT:  Okay.  But --

169

1          MR. BABCOCK:  And they said we were identical.

2          THE COURT:  You used a term that I'm not familiar

3 with.  You referred to it as a pre-ignition switch plaintiff.

4          MR. BABCOCK:  No.  I'll quote it exactly, Your Honor.

5 One second here.  I'll quote it to you exactly how they have

6 phrased it.  Okay.  This is what they said, and I can actually

7 tell you right where it's from.  It's from their GM's response

8 to no stay pleadings.  It's Record Number 13191, paragraph 3

9 and paragraph 24:

10          "Movant's claims are identical to the ignition

11          switch pre-closing accident plaintiffs' claims,

12          and the Court should find the rulings set forth

13          in the Judgment apply equally to movant."

14          So the point of the matter is they were taking the

15 position that our claims are exactly -- were not -- were not

16 exactly.

17          THE COURT:  Well, what --

18          MR. BABCOCK:  Now they're arguing that we're

19 non-ignition switch.

20          THE COURT:  What was the date of the accident?

21          MR. BABCOCK:  The accident took place, I believe, in

22 2005, Your Honor.

23          THE COURT:  Has New GM taken the position that this

24 was a retained liability to Old GM?

25          MR. BABCOCK:  No.  Because what they did -- this

170

1 takes us back to the original ruling from Judge Gerber.  They

2 quoted earlier language from the original sales -- I mean, I

3 don't mean to get into this earlier ruling because we're not

4 really here to talk about it.  But in the prior matter when we

5 were before Judge Gerber, they had admitted, and Judge Gerber

6 concluded as such, that the original sales agreement applied to

7 my client, and because it was the original sales agreement

8 language, therefore it was assumed liability.

9       And that's why it went up to -- and that's why Judge

10 Gerber ruled in my favor because of the fact that in their

11 answers to the complaints, notice of removals, they had made

12 affirmative representations and admissions relying upon the

13 original sales agreement.  That's, again, not why we're here

14 today, but to answer your question, that's why it is -- by

15 their representations previously, it is assumed liability.  But

16 that is not here today, Your Honor.  That's pending on appeal

17 before Judge Furman.  What we're here today is different

18 admissions.  This time they take -- the admissions we're

19 talking about are the fact that they -- what I just talked

20 about earlier, about them representing that we were identical.

21       THE COURT:  The fact that you say it's pending on

22 appeal before Judge Furman, at some point Judge Gerber ruled

23 against you.

24       MR. BABCOCK:  No.  No.  Judge Gerber -- no.  Judge

25 Gerber ruled in our favor.  They appealed it.  New GM appealed

171

1  it.

2         THE COURT:  Okay.  I see.

3         MR. BABCOCK:  So it's New GM's appeal, not ours.

4         THE COURT:  Okay.  Go ahead.

5         MR. BABCOCK:  And so we're all -- we're set there for

6  the time being.  The question before the Court today is whether

7  or not they're obligated now and are estopped through their

8  admissions to our view otherwise that we are not an ignition

9  switch pre-closing accident plaintiff.  Because they have

10  stated we were.

11        The only time that changed was when the Second

12  Circuit came down and suddenly their argument switched.  Now

13  they're claiming we are a non-ignition switch.  That's the

14  first time we were ever even hearing those terms by New GM in

15  the context of my client's claim was after the Second Circuit.

16  And that's the reason why Judge Furman presumably sent it back

17  down to here to decide whether or not their earlier

18  representations has a binding effect on GM.  That is our

19  position.

20        As far as the other arguments, I'm not -- it's been

21  argued at great length by other attorneys from the plaintiffs.

22  For purposes of this, I'm only -- I'm intending to supplement

23  to talk about what I discussed to Your Honor.  And unless Your

24  Honor has any questions, that's our position.

25        THE COURT:  I don't.  Okay.  Thank you.

1          Other plaintiffs who wish to be heard?

2          MR. BABCOCK:  By the way, Your Honor, do you

3 anticipate any further discussion about this particular issue?

4 I mean, or --

5          THE COURT:  I haven't heard from the other side yet.

6          MR. BABCOCK:  Okay.

7          THE COURT:  I'm sure I'll hear from Mr. Steinberg

8 about it.

9          MR. BABCOCK:  Thank you, Your Honor.

10         THE COURT:  He just raised his hand, so we'll hear

11 more about it.

12         Mr. Steinberg.  I know it's taking it out of order,

13 but could we deal with Pitterman first?

14         MR. STEINBERG:  Sure.

15         THE COURT:  Let me ask a couple questions.  Maybe it

16 will shorten it.  Maybe not.  I'm not precluding you from

17 arguing further, but do you agree that Pitterman can proceed

18 with its failure to warn by Old GM against New GM as an assumed

19 liability?

20         MR. STEINBERG:  I do.

21         THE COURT:  Okay.  Is there anything else you agree

22 with Mr. Hirsch about that he can proceed on?

23         MR. STEINBERG:  No.  Yeah.  I do agree with him.  He

24 hasn't moved for punitive damages.  His --

25         THE COURT:  Okay.  I figured that.  That was clear.

1  You said no punitive damages.  What's your position on the

2  failure to recall retrofit?  Distilled down, I understand his

3  argument to be that Connecticut law recognizes as a product

4  liability claim a failure to recall or retrofit, and his

5  argument is, subject to what Judge Hall decides is a matter of

6  state law, he's entitled to proceed with his failure to recall

7  retrofit by Old GM as an assumed liability of New GM.  Do you

8  agree or disagree?

9           MR. STEINBERG:  I disagree.

10          THE COURT:  Okay.

11          MR. STEINBERG:  First --

12          THE COURT:  Well, let's just make sure I've got the

13  table set.  Subject to what state law would permit in

14  Connecticut -- I guess it was probably automatically followed.

15  I was going to say a failure -- do you believe that Pitterman

16  has stated a claim against New GM as an independent claim for

17  failure to recall or retrofit?

18          MR. STEINBERG:  I do not.

19          THE COURT:  Okay.  All right.  At least I know

20  what -- I'll see what you have to say about this.

21          MR. STEINBERG:  Your Honor, with regard to Pitterman,

22  just to lay the groundwork, they got notice of the September

23  2015 scheduling order.  They're not seeking punitive damages.

24  They've agreed to, in effect, strike the reckless disregard

25  allegation in their complaint to the extent that it is for

174

1   purposes of seeking punitive damages.  They've agreed to strike

2   the successor allegation that's in their complaint.  Their car

3   was never the subject of a recall, and we have agreed that the

4   duty to warn can be an assumed liability.

5          Judge Gerber in the December judgment in paragraphs

6   21 and 29 determined that duty to recall is not an assumed

7   liability.  We believe that that is the final ruling on that

8   matter, and that the Pitterman Plaintiffs who were notified of

9   the scheduling order are bound by that ruling and they failed

10  to appeal, and it's res judicata to them.  Now the reason why -

11  - and I think the Pitterman Plaintiff --

12         THE COURT:  And you say that that's the answer no

13  matter what state law provides?

14         MR. STEINBERG:  That's correct.

15         THE COURT:  If 48 out of 50 states would recognize as

16  a products liability claim a failure to recall or retrofit,

17  it's too bad?

18         MR. STEINBERG:  That's correct.  And the reason why

19  is that New GM's obligation to assume product liabilities has

20  specific language.  And the only thing in the sale agreement

21  that references the duty to recall is Section 6.15, which is

22  the covenant to comply with the federal statute to recall Old

23  GM's vehicles if there's a safety defect.  That was taken out

24  of the assumed liability section.  So we have consistently

25  argued for the years in this case that the recall obligation

1  was never an assumed liability and therefore was never subsumed

2  as part of an assumed product liability case.

3         The second thing is is that Connecticut law actually

4  recognizes potentially misrepresentation as part of the assumed

5  -- as part of a product liability case.  Judge Gerber clearly

6  decided in the December decision that misrepresentation claims

7  are not assumed liabilities, either.  So when New GM assumed

8  product liabilities, it was to recompense accident victims

9  arising out of injuries, but that didn't mean that everything

10  that normally could be asserted in a product liability case can

11  be asserted here.  They have the ability to show that there was

12  a defect.  They have the ability to establish a duty to warn

13  for that defect.  They have the ability to get compensatory

14  damages for that.  This is an issue that permeates a lot of

15  other cases.

16         THE COURT:  Okay.  Let me, just so I'm clear and the

17  record is clear -- because I'm going to have again -- as I did

18  last time, I'm going to have you order a transcript from

19  today's hearings.  What provisions of the sale agreement are

20  you relying on as limiting the claims as to which New GM

21  assumed liability?

22         MR. STEINBERG:  Section 2.3(a) is the section of the

23  sale agreement that lists the assumed liabilities of New GM.

24  And the section -- the sales agreement is structured so that if

25  you're not specifically listed as an assumed liability,

1    everything else is a retained liability.  So unless there are

2    three -- they are identified in Section 2.3(a), it's our view

3    that it's a retained liability, putting aside the independent

4    claim issue.

5              The -- in context of these vehicle owners suing, the

6    three general areas that have been identified as assumed

7    products liabilities -- and I think either fortunately or

8    unfortunately the only assumed liability I think you need to

9    really deal with now is the product liability accident type

10   cases.  The other two provisions, which were more relevant at

11   the beginning of the period after the sale, was what we called

12   the glove box warranty.  It's the three years, 36,000 --

13             THE COURT:  I know.

14             MR. STEINBERG:  -- miles and the lemon law claims.

15   So if --

16             THE COURT:  Could you --

17             MR. STEINBERG:  -- fit within those three categories.

18             THE COURT:  Could you read to me Section 2.3(a)?

19   See, because your position is -- because what we're dealing

20   with now, what Mr. Hirsch is saying, he wants to proceed with

21   product liability claims where liability has expressly been

22   assumed by contract.  Your position is that only those things

23   specifically listed in 2.3(a) are assumed liabilities.

24   Everything else is retained liability, correct?

25             MR. STEINBERG:  That's correct.

177

1          THE COURT:  So read me the language.

2          MR. STEINBERG:  Your Honor, would it be easier if I

3  just handed it up --

4          THE COURT:  Probably would.

5          MR. STEINBERG:  -- the paragraph?  Because it is

6  about --

7          THE COURT:  Is it long?

8          MR. STEINBERG:  -- about 15 sentences.  So I think --

9          THE COURT:  Does Mr. Hirsch have that too?

10          MR. HIRSCH:  No.  That's not -- is that the agreement

11  or is that a brief?

12          MR. STEINBERG:  This is a sale agreement.  This is

13  the amended sale agreement.

14          MR. HIRSCH:  I'm looking at the sale agreement here.

15  So all right.  Let's see what you got.

16          THE COURT:  What page are we on, Mr. Steinberg?  Do

17  you know your page numbers?

18          MR. STEINBERG:  Counsel for Mr. Pillars is probably

19  smiling at this point.  It's the first amendment, amended and

20  restated master sale and purchase agreement dated as of June

21  30, 2009.  It is on page 2, and it's the specific language

22  amendment at 2.3(a)(ix) of the purchase agreement.

23          THE COURT:  2.3(a)(ix)?

24          MR. STEINBERG:  2.3(a)(ix).

25          THE COURT:  So is this document 2968-2 in the Court's

1  ECF system?

2          MR. STEINBERG:  I don't know exactly.

3          THE COURT:  That's what I have.

4      (Counsel confer)

5          THE COURT:  Just give me -- compare, Okay?

6          MR. STEINBERG:  All right.

7          THE COURT:  I want you on the same page.

8      (Pause)

9          MR. HIRSCH:  So, Your Honor --

10         THE COURT:  Do you have the page?

11         MR. STEINBERG:  I have a page.  It doesn't match that

12  page, so I don't which page is which.

13         THE COURT:  Let me see it, Mr. Steinberg.

14  Mr. Steinberg, you're representing that what you're showing me

15  is the sale agreement, which is ECF Docket Number 2968-2,

16  and --

17         MR. STEINBERG:  I'm representing, Your Honor, that

18  this is the version of the sale agreement that was attached to

19  the sale order which Judge Gerber approved.  And there's an

20  amendment to the specific section on product liability.

21         THE COURT:  Okay.  Just stop a second.  It's in this

22  ECF 2968-2, filed July 5th, 2009.  It's page 112 of 132 on the

23  ECF number.  Okay.  And you want me to read Romanette ix?

24         MR. STEINBERG:  That's correct.

25         THE COURT:  All right.

179

1      (Pause in proceedings)

2           THE COURT:  So I read it three times, and now you

3  need to explain your argument to me.  Because cutting through

4  some of the words, it looks like, "New GM assumed all

5  liabilities to third parties for death, personal injury, or

6  other injury to persons or damage to property caused by motor

7  vehicles designed by sellers, Old GM, collectively product

8  liabilities, which arise directly out of" -- GAP, et cetera --

9  "from such motor vehicle's operation or performance."

10 Those seem to me to be the operative words.  Do you disagree?

11          MR. STEINBERG:  No.

12          THE COURT:  So why doesn't Mr. Hirsch's assertion of

13 a failure to recall or retrofit -- if the car had a defect that

14 led to its -- allegedly resulted in this accident, I don't see

15 anything in this language you pointed me to that would --

16 certainly not by express terms.  It doesn't say what fits into

17 "products liability" -- you have a defined term, "product

18 liabilities."  But I don't see -- I thought you were going to

19 show me language that excluded certain types of claims from

20 product liabilities, and I don't see that.

21          MR. STEINBERG:  I don't think that there's language

22 that excludes certain assumed product liabilities.  There is

23 Section 6.15 of the sale agreement, which you would find in the

24 original version of the sale agreement, which is here, but I

25 can point --

180

1          THE COURT:  Okay.  Well, I guess what I'm saying,

2    Mr. Steinberg, is what you've shown me in Section 2.3(a)(ix)

3    doesn't appear to me to support your argument.  What are you

4    showing me now?

5          MR. STEINBERG:  Section 6.15(a) of the sale

6    agreement.

7          THE COURT:  Just stop.  For the record, I'm on ECF

8    Docket Number 2968-2, page 74 of 132, Section 6.15, "Product

9    Certification, Recall and Warranty Claims."  All right.  Do I

10   have to read all three, A, B and C?

11         MR. STEINBERG:  No, just A.

12      (Pause)

13         THE COURT:  Okay.  So, New GM was supposed to comply

14   with certification reporting and recall requirements of the

15   National Traffic and Motor Vehicle Safety Act and some other

16   acts?

17         MR. STEINBERG:  That's correct.  That's the recall

18   obligation.

19         THE COURT:  But it doesn't say that if state law

20   recognizes as a product liability claim the duty to

21   recall/retrofit that -- that's not part of assumed liabilities.

22         MR. STEINBERG:  State law only recognizes the duty to

23   recall on the manufacturer.

24         THE COURT:  Wait.  Wait, wait, wait.  I'm not going

25   to decide that, Mr. Steinberg.  Judge Hall is going to be the

1  one to decide what Connecticut law recognizes as a product

2  liability claim.  That ought to be crystal clear to everybody

3  here.  I am not determining what state law permits -- what the

4  elements of a state law cause of action.  I'll decide whether

5  something in the sale order -- sale agreement here or the sale

6  order says that's not an assumed liability.

7          But it seems to me entirely separate when you show me

8  something in paragraph 6 about New GM assuming responsibility

9  for certification, recall notices, under a whole variety of

10  statutes, and saying that that somehow prevents the assertion

11  of a recognized Connecticut state law cause of action for

12  product liability.  I don't know whether Connecticut recognizes

13  it or not.  You can go fight about that before Judge Hall.

14          MR. STEINBERG:  Judge Gerber did make that

15  determination, though, in the December judgment.  He did find

16  in paragraph 21 that --

17          THE COURT:  I'm going to go read paragraphs 21 and

18  29.

19          MR. STEINBERG:  Right.

20          THE COURT:  Those are the two paragraphs --

21          MR. STEINBERG:  Right.  So he did explicitly say

22  that, and there's a ruling on that and there's a failure to

23  appeal.  And I know Your Honor does not want to get into the

24  weeds of Connecticut law, and so I'm going to avoid that other

25  than to say that not all things under state law that would

182

1 otherwise be subsumed as product liability was something that

2 falls within that section.  If --

3         THE COURT:  Where am I supposed to find that?  It's

4 not there.  You're putting a -- you're seeking to give an

5 interpretation to the meaning of a defined term, "products

6 liability" -- "product liabilities" in Section 2.3(a)(ix)

7 that's not in there.

8         MR. STEINBERG:  Except for the structure of the

9 agreement which breaks out the recall covenant into a separate

10 section that's not in the assumed liability provision --

11         THE COURT:  It certainly seems to me that New GM

12 agreeing that it will comply with certification, recall

13 obligations under a variety of federal statutes is not the same

14 thing as saying whether it's assuming products liability claims

15 under state law.  Those are the two sections you're relying on.

16         MR. STEINBERG:  Right.  Paragraphs 21 and 29.  That

17 matter has been determined.

18         THE COURT:  Okay.  Go ahead.

19         MR. STEINBERG:  With regard to the demand letter that

20 we sent to Judge Gerber -- the demand letter.  With regard to

21 the other claims letter that we sent to Judge Gerber, under the

22 paragraph "Failure to Recall and Retrofit," and we said -- not

23 that we were only taking on New GM's obligations but not Old

24 GM's obligations.  The precise language was that:

25         "These claims allege that New GM had a duty to recall

1        or retrofit Old GM vehicles.  But such claims if they

2        exist as a matter of law at all are retained

3        liabilities once New GM purchased Old GM's assets

4        free and clear of claims and obligations relating to

5        Old GM vehicles.  New GM, an entity that did not

6        manufacture or sell the Old GM vehicle at issue, did

7        not have an ongoing duty to Old GM vehicle owners

8        other than specific assumed liabilities."

9        THE COURT:  Can your letter to Judge Gerber change

10  the terms of a contract?

11       MR. STEINBERG:  Oh, I think this was our position

12  with the interpretation of the --

13       THE COURT:  Yes, but my question to you is can a

14  letter to the -- did you serve Mr. Hirsch with that letter?

15       MR. STEINBERG:  Yes.

16       THE COURT:  Mr. Hirsch, did you get that letter?

17       MR. HIRSCH:  Yes, Your Honor, but that letter --

18       THE COURT:  I just asked if you got it.

19       I don't see how a letter to -- I get lots of letters.

20  I don't see how a letter to the court can alter contractual

21  terms that were approved by the court.

22       MR. STEINBERG:  I don't disagree.  All I was trying

23  to address was Mr. Hirsch's argument that the other claims

24  letter that we sent did not specifically address the issue as

25  to whether New GM would be liable for Old GM's failure to

184

1  recall.  I was reading you the language to say that the

2  language was broad enough to subsume that.  I wasn't trying to

3  say that that language changes any of the sale agreement, but

4  that what we had notified them of was the broader concept.  And

5  that's what I was trying to say when I wrote that letter.

6            THE COURT:  Okay.

7            MR. STEINBERG:  The other thing is that this case is

8  really on the duty to -- whether the recall was an assumed

9  liability was very much like the Old Carco case that we sent to

10 Your Honor which is the Grimstad v. FCA case, which is where

11 Judge Bernstein had ruled that there was no obligation to

12 recall unless New GM failed to satisfy its obligations under

13 the National Traffic and Motor Vehicle Safety Act or New GM

14 incurred a new duty post-sale to plaintiff when it fixed the

15 vehicle pursuant to the recall.  Neither of those things

16 happened --

17           THE COURT:  What state law was he deciding?

18           MR. STEINBERG:  I'm not sure.

19           THE COURT:  My question is -- and I read Judge

20 Bernstein's decision before you attached it, when he decided

21 it, so --

22           MR. STEINBERG:  I don't think --

23           THE COURT:  A characteristically good decision by

24 Judge Bernstein.  But the question I have is was he deciding

25 that it doesn't matter what state law provides?

1          MR. STEINBERG:  I think that's the case.  I think he

2   did that as an interpretation of the Chrysler sale agreement,

3   which in this respect was the same as the GM provision.

4          THE COURT:  You say the Chrysler language is exactly

5   the same as 2.3(a)(ix)?

6          MR. STEINBERG:  No, I doubt I would say that, because

7   that's a tortured language that if Your Honor struggled to read

8   it, then I understand that, because I've read that many times.

9   But it is not -- it is not the precise language, but in this

10  particular case the dynamic was Chrysler does its sale before

11  the GM sale, and then the provision for assuming accident cases

12  gets amended by Chrysler after the GM sale.

13         THE COURT:  Okay.  But I assume you would agree with

14  me that New GM could contractually agree to assume liability

15  for state law product liabilities claims.  And if the state

16  being Connecticut includes failure to recall/retrofit within

17  its state law of product liability, that New GM could agree to

18  do that?

19         MR. STEINBERG:  I agree.

20         THE COURT:  And so really the issue here, isn't it

21  whether New GM assumed -- agreed to assume liability for what

22  Connecticut defines as a product liability claim?

23         MR. STEINBERG:  I think with regard to an overall

24  recall obligation, as a matter of the interpretation of the

25  sale agreement, New GM agreed to comply with the federal

186

1  statute.  And that was the entirety of its obligation to the

2  recall --

3          THE COURT:  I don't see a disclaimer that it does not

4  assume liability for any other state law imposed duty to

5  recall.

6          MR. STEINBERG:  That's correct.  There is no

7  disclaimer.  It's just the structure -- it's just the structure

8  of an agreement --

9          THE COURT:  Okay.

10          MR. STEINBERG:  -- that parks the recall obligation

11  outside of the assumed liability section of the sale agreement.

12  And then it's a contractual interpretation of what the parties

13  intended -- parties between Old GM and New GM had intended.

14  What was the extent to which New GM had agreed with respect to

15  assumed product liabilities; in other words, picking up the

16  recall --

17          THE COURT:  I'm giving both sides a hard time here.

18  I understand your arguments.

19          MR. STEINBERG:  I think, Your Honor, though, that on

20  the independent claims argument, I think with regard to both

21  duty to recall and duty to warn, that the complaint that has

22  been filed in this case does not use in any way the words

23  "independent claim," but frankly, does not allege any New GM

24  conduct at all.

25          THE COURT:  You can order the transcript, but it

1  seems to me that Mr. Hirsch, at least before me, was quite

2  clear.  Whether Judge Hall was satisfied with it or not,

3  different issue.   But I thought he was quite clear that other

4  than the assumed liability claims, the claims against New GM

5  are based solely upon New GM's conduct.  You heard the same

6  thing that I did --

7        MR. STEINBERG:  I did, and I'm saying to Your Honor

8  that the complaint that was filed alleges no New GM conduct,

9  only alleges Old GM conduct, and specifically --

10        THE COURT:  Okay.  But I take it as a concession by

11  Mr. Hirsch that he is not going to and may not proceed on

12  claims against New GM other than assigned -- assumed claims,

13  other than assumed claims, and claims based solely on New GM

14  conduct.

15        Do I have that right, Mr. Hirsch?

16        MR. HIRSCH:  Your Honor, yes.  And what I would like

17  to point out --

18        THE COURT:  I understood you that way.  Go up to the

19  microphone so we have a clear -- there will be a transcript.

20        MR. HIRSCH:  So we have alleged, Your Honor, and

21  perhaps not --

22        THE COURT:  Stay there, Mr. Steinberg.

23        MR. HIRSCH:  We have alleged, and perhaps not as

24  eloquently as they would like, and I'm happy to amend it if

25  necessary, that despite this knowledge and the knowledge of

1  numerous roll-away incidents, GMC -- that's Old GM, and

2  defendant, that's New GM, took no steps to directly notify

3  and/or warn owners of the public of these defects.

4        THE COURT:  That strikes me that you're trying to

5  bootstrap a claim against New GM based on Old GM conduct.

6        MR. HIRSCH:  No, no.  And I'm happy to separate that

7  into two separate paragraphs.

8        THE COURT:  I'm going to leave it to Judge Hall to

9  decide whether you have adequately pleaded a claim against New

10  GM based solely on its own conduct without attempting to

11  bootstrap based on Old GM conduct.  I'm not getting into

12  rewriting your complaint.  What I'm saying is -- what you just

13  read to me certainly sounds as if this is another effort to

14  asset a claim against New GM based on Old GM conduct.  And you

15  agree, you're not going to do that.

16        MR. HIRSCH:  I'm not going to do that.  And I will

17  amend -- and with Judge Hall's permission, I would amend the

18  complaint to make it clear that against New GM, it's based on

19  New GM's conduct.

20        THE COURT:  Mr. Steinberg, are you satisfied with

21  that representation?

22        MR. STEINBERG:  Well, I understand the

23  representation --

24        THE COURT:  Come up a little closer to the

25  microphone.

189

1          MR. STEINBERG:  I understand the representation, but

2    his ability to amend the complaint that is prior -- like six

3    weeks before trial, is something that I'll let the state court

4    litigants deal with.  But I'm not going to --

5          THE COURT:  That's not for me to decide either.

6          MR. STEINBERG:  Right.  But --

7          THE COURT:  I always have qualms about permitting an

8    amendment to a complaint shortly before trial.

9          MR. STEINBERG:  But Your Honor was putting your

10   finger exactly on this.  There is no actual conduct that New GM

11   committed that he will even be able to say that New GM did

12   vis-a-vis this customer, other than they didn't act.  In the

13   same way that Old GM didn't act.  And that depends on whether

14   New GM actually had a duty to --

15         THE COURT:  Yes, it does.  And that seems to me to be

16   a question of state law.  Does Connecticut law impose a duty on

17   New GM if it has knowledge of a defect, to either give notice,

18   recall, whatever?  I'm not -- I have no clue whether

19   Connecticut law provides for that.  But I understand Mr. Hirsch

20   to be saying that's what -- that's the claim he wants to

21   proceed on against New GM, based solely on New GM conduct.

22   Whether Connecticut imposes that duty on New GM or not, I have

23   no idea whatsoever.

24         MR. STEINBERG:  The problem, Your Honor, in

25   approaching it this way is that New GM has assumed the product

190

1  liability claim, has assumed Old GM's conduct in the context --

2          THE COURT:  He's going to get his evidence in of Old

3  GM's conduct because of the duty to warn claim --

4          MR. STEINBERG:  That's correct.

5          THE COURT:  -- that we agree --

6          MR. STEINBERG:  That's correct.  And generally, by

7  the way, Your Honor, this whole issue about independent claims

8  is a back door to punitive damages.  That's the only reason why

9  anybody fights over it.  And that's not relevant to this case.

10 This dispute that we're having here is over the --

11         THE COURT:  But let's deal with the dispute we have

12 here and not the other --

13         MR. STEINBERG:  Right.  The dispute we're having here

14 is that technically he has not alleged anything that looks like

15 an independent claim.  The complaint, which I don't know

16 whether it's part of the record here, but I do have in my

17 mind --

18         THE COURT:  Let me ask you this.  Do you agree that

19 Mr. Hirsch on behalf of his clients would be entitled to

20 proceed on -- against New GM on independent claims --

21         MR. STEINBERG:  No.

22         THE COURT:  -- not based on Old GM conduct.  Do you

23 agree?

24         MR. STEINBERG:  Based on Old GM conduct?

25         MR. HIRSCH:  New GM.

191

1          THE COURT:  No, not based on Old GM conduct.

2          MR. STEINBERG:  No.

3          THE COURT:  Maybe I misspoke.

4          MR. STEINBERG:  He's a non-ignition switch

5    post-closing accident plaintiff, who under paragraph 14 of the

6    December judgment is not supposed to assert independent claims.

7          MR. HIRSCH:  This is the problem I'm having.  Ten

8    minutes ago I was told it wasn't an independent claim.  Now I'm

9    being told I can't assert an independent claim.  And I have a

10   Second Circuit that says I can assert an --

11         THE COURT:  Okay.  Stop.  I'll issue an order.

12   You're on shaky ground on independent claims after the Second

13   Circuit decision, Mr. Steinberg.  I'm not ruling from the

14   bench, and you'll address -- in response to the other

15   arguments, you'll have your chance to address it further, but

16   -- let me save it for that.

17         Thank you, Mr. Hirsch.  I'm going to -- I understand

18   the need -- I probably will issue a separate order with respect

19   to your case because of the imminent trial date.  And so it

20   will not await a decision on the -- more generally on the 2016

21   threshold issues.

22         MR. HIRSCH:  Thank you very much, Your Honor.

23         THE COURT:  Okay.

24         MR. HIRSCH:  May I make a 10-second comment?

25         THE COURT:  No.  I've heard enough about this.  Okay?

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

192

1  Thank you, Mr. Hirsch.

2           All right, Mr. Steinberg.  Go ahead and proceed with

3  the rest of your argument.

4           MR. STEINBERG:  Your Honor, I want to first talk

5  about the arguments that were made with regard to threshold

6  issue number two, which is the ability of non-ignition switch

7  plaintiffs to -- and non-ignition switch post-closing accident

8  plaintiffs, to assert an independent claim in light of the

9  paragraph 14 of the December judgment.  And paragraph 14 is

10 explicit on this point, and it's clear.  It says:

11              "Plaintiffs of two types, plaintiffs whose claims

12              arise in connection with vehicles without the

13              ignition switch defect, and pre-closing accident

14              plaintiffs, are not entitled to assert independent

15              claims against New GM with respect to vehicles

16              manufactured and first sold by Old GM."

17          That is a definitive ruling about the rights of

18 parties that were not involved in the April decision and the

19 June judgment.  Despite what Mr. Peller says, the bankruptcy

20 court ruled that it was deferring issues on non-ignition switch

21 plaintiffs, that being the economic loss plaintiffs, wasn't

22 even dealing with post-closing accident plaintiffs as part of

23 those decisions which ultimately went up to the Second Circuit.

24          The issues with regard to post-closing accident

25 plaintiffs are clearly outside of the June judgment; and,

1  frankly, the non-ignition switch plaintiffs rulings were

2  outside of what Bankruptcy Judge Gerber ruled, because he said

3  he was deferring ruling on those issues.

4        THE COURT:  From my comments at the last hearing, I

5  think you know that I'm -- a big problem I'm having is whether

6  he really decided issues with respect to non-ignition switch

7  plaintiffs, economic loss, accident whatever, in the November

8  decision and December judgment, and whether parties were given

9  notice that those issues were going to be addressed.  I'm

10 having -- that's what I'm really having problems with.

11       MR. STEINBERG:  I think I can address that as part of

12 my presentation, but the point that I was trying to make now

13 was that the June judgment did not deal with the rights of

14 non-ignition switch plaintiffs.

15       THE COURT:  That's clear.

16       MR. STEINBERG:  And so I will address shortly why I

17 thought -- why I believed that those rights were properly teed

18 up as part of the September scheduling order while everybody

19 knew about it.  Certainly the people on this side of the table

20 knew about it.  And certainly the lead counsel in the MDL knew

21 about that, and they clearly participated in all of those

22 proceedings, endorsed the procedures that have been set,

23 recognized the ruling, and failed to appear.

24       But let me try to take one step back to try to give

25 Your Honor a little better color about this issue.  In the June

194

1  judgment, Judge Gerber recognized that the issues of

2  non-ignition switch plaintiffs' economic loss had to be dealt

3  with.  And so the procedures that were set forth in the June

4  judgment tried to establish a process upon which what otherwise

5  would have been a stare decisis ruling, which is what he ruled

6  in the May 27th decision that I think Mr. Steel read to you,

7  how he can convert that into the same type of collateral

8  estoppel ruling that had been applied to ignition switch

9  plaintiffs.

10        THE COURT:  Correctly or incorrectly, what it seemed

11  to me Judge Gerber was doing was saying I'm going to deal with

12  the ignition switch plaintiffs first.  If I decide that they've

13  established a due process violation but they're not entitled to

14  any remedy, that's going to necessarily follow if they're

15  non-ignition switch plaintiffs as well.

16        So he said I'm going to defer the non-ignition switch

17  plaintiffs because I don't need to get to it.  I'll deal with

18  the -- let me deal with the ignition switch plaintiffs first

19  because, as he found there was a due process violation.  And

20  then the issue is what remedy.  And he concluded no remedy and

21  the Second Circuit disagreed.

22        But if that was -- that's the way I'm reading the

23  record of what happened --

24        MR. STEINBERG:  I don't think that's right.

25        THE COURT:  He said I don't have to deal with the

195

non-ignition switch plaintiffs until after I -- it makes sense
to deal with the ignition switch plaintiffs first.  If they get
no remedy, then clearly the non-ignition switch plaintiffs get
no remedy.

MR. STEINBERG:  I think that there is an element of
what you said that is true, the conclusion that you reach.  But
that's not the reason why Judge Gerber got the way -- he got --
that's not the reason why he got there.

THE COURT:  You've got to show me words and the
opinion --

MR. STEINBERG:  Yeah.  I think Judge Gerber decided
-- was concerned about whether he can decide this on a
stipulated factual record.  The stipulated factual record that
had been developed in this case only related to, or primarily
related to, the ignition switch plaintiff side of the equation.

There was a motion to enforce that was filed in April
of 2014, and then there were two motions to enforce that were
filed on August 1, 2014.  The definitions of ignition switch
plaintiff and non-ignition switch plaintiff are derived from
the fact that those motions were filed at different times.  The
first motion only dealt with the February/March recall.  That's
the defined term that everybody understood as ignition switch
plaintiffs --

THE COURT:  There doesn't seem to be a dispute about
that.

196

1                 MR. STEINBERG:  And that is the economic loss case.

2    Because that was the first cases that we brought.  The GM had

3    enacted a program that was monitored -- that was administered

4    by Ken Feinberg to try to deal with the pre-sale ignition

5    switch accident cases.  Many, in fact most, of those cases were

6    resolved, but not all.  Those that had not been resolved became

7    the subject of a pre-closing accident plaintiff, which applied

8    both to ignition switch and non-ignition switch.  That was one

9    of the August 1 motions.

10                The other was we were seeing additional economic loss

11   cases that were being filed based on the recalls that came

12   after March of 2014, and that was defined as the non-ignition

13   switch plaintiff cases.

14                The factual record that was developed in this case

15   was primarily developed through the Valukas report.  The

16   Valukas report was rendered towards the end of May of 2014, and

17   only dealt with the February and March 2014 recalls, didn't

18   deal with anything else.

19                One of the things that you heard this morning was

20   should there be discovery or not be discovery.  Mr. Weisfelner

21   and I both agreed that we could probably decide the threshold

22   issues relating to these cases without the need of further

23   discovery.  And the Groman plaintiffs, I don't think it was the

24   Peller plaintiffs, the Groman plaintiffs said we need to have

25   discovery.  And part of it was that they were trying to assert

1  the fraud on the court claim in their complaint, and they

2  thought we needed to have discovery on that, and Judge Gerber

3  said I'll only rule on the legal standard so you can avoid the

4  discovery issue.

5       When he said he was going to render his decision, he

6  said that I will see whether I can decide these -- make my

7  rulings on the threshold issues on the stipulated factual

8  record, almost like a summary judgment motion.  If I feel that

9  there are material disputed factual issues that would prevent

10 me from doing that, then I will tackle the discovery issue.

11 But otherwise I will try to rule on that based on your

12 stipulated factual record.  And we had thought, GM had thought,

13 that the factual record was broad enough to cover those issues

14 subsumed by non-ignition switch, whether it was pre-sale

15 accident or economic loss.

16      When Judge Gerber rendered his April 15 decision, he

17 decided that the factual record wasn't sufficiently developed.

18 And that's the reason why he broke out non-ignition switch

19 plaintiffs.  But it wasn't because he wasn't ultimately

20 concerned about getting final rulings for non-ignition switch

21 plaintiffs.

22      And that's why the June judgment has paragraph 13,

23 which is that he had determined that those rulings would

24 otherwise be stare decisis, because he thought they were in a

25 similar position, but he figured that if anybody else had a

1  concern, that it should not be stare decisis, he would let the

2  file in 17 business days an objection and pleading.

3         And we had a schedule and we sent out the June

4  judgment.  Some people raised the note -- the no strike

5  pleading.  Many of the non-ignition switch plaintiffs actually

6  didn't do anything.  And therefore, they recognized that

7  whatever the ruling is would have been stare decisis.  And

8  those people who were outside of the MDL actually did not

9  appeal.

10         But Judge Gerber wanted to get to a ruling on that.

11  And then what happened was the MDL economic loss plaintiffs

12  decided that they were going to try to comply with Judge

13  Gerber's decision by amending their complaint.  And that

14  became, instead of the first amended consolidated complaint,

15  that became the second amended consolidated complaint, and they

16  got rid of the pre-sale separate complaint and they merged it

17  into one, and they immediately moved to withdraw the reference

18  so that Judge Furman can effect take control of this case.

19         Judge Furman in a --

20         THE COURT:  Sounds like a good idea.

21         MR. STEINBERG:  In a litigated matter, Judge Furman

22  decided that these issues should be going back to the

23  bankruptcy court.  And so what happened was that you had a June

24  judgment which said I'm going to address the procedures for

25  non-ignition switch plaintiffs.  And what's significant about

the June judgment is that in paragraph 13© it specifically says

that if you're going to put, make and file a no-dismissal

pleading, I'd like you to tell me whether you need a designated

counsel to address your four threshold issues, and tell me

whether you need a briefing schedule, and tell me whether you

need discovery.

So, Judge Gerber was cognizant of the rights of

non-ignition switch plaintiffs and put the burden on the

non-ignition switches to say if you think you need discovery,

with respect to any issue that you think is appropriate to

determine whether you have rights or not, I need to know that.

So then you have the amendment of the complaint going

up to Judge Furman, and then coming back to Judge Gerber.  And

then Judge Gerber, when he gets it back from Judge Furman,

tenders his August 19th order.  It's his case management order.

And Judge Gerber says I need to know certain things from the

parties, about how I'm going to take control of this case based

on the relatively unsettled process of where we were at.

And specifically he said a couple of things in that

August 19th order.  And in the book that we gave you there's

the tab 3.  He asks specifically how long it would take to do

marked pleadings, because he wanted to deal with the

granularity of the complaints.  He wasn't prepared to deal with

this on a broad-brush issue.  He said in paragraph E on page 2

that:

200

1    "Any alternative suggestions beyond or instead of the

2    combination of briefs and marked pleadings that the

3    Court currently envisions as to the best means for

4    this Court to provide the MDL court and other court

5    with rulings of the level of specificity they might

6    need vis-a-vis yet to be decided by this Court."

7    So he wasn't trying to implement the June judgment.

8 He was trying to deal with the other issues that neded to be

9 decided.  And then he told all the parties and said if you have

10 any other matters that need to be addressed by this Court, I

11 need to know that.  And then he wasn't sufficient, because he

12 was concerned about the rights of the non-ignition switch

13 plaintiffs, accident and economic loss.

14    And in paragraph 2 of his August 19th case management

15 order, which he said to the parties I want you to appear and

16 give me an answer, he said:

17    "The Court is in particular need of information with

18    respect to the non-ignition switch plaintiffs'

19    claims, whether for injury or death or economic loss,

20    and pending in future matters affecting them.  But so

21    long as such claims are satisfactorily covered in the

22    letters to come, they can be addressed in connection

23    with other claims to the extent appropriate."

24    So Judge Gerber challenged the parties and said I

25 need you to tell me what issues you need to have resolved in

1 the non-ignition switch plaintiff context.  And it's in that

2 context that you had the colloquy that you referred to with Mr.

3 Weisfelner and Mr. Weintraub in the courtroom as to how are you

4 going to address the non-ignition switch plaintiffs.

5        And Judge Gerber said that he was particularly

6 concerned because while ignition switch plaintiffs have

7 established a due process violation, and therefore they can

8 assert independent claims, the non-ignition switch plaintiffs

9 weren't at that same level.  What are you going to do about it?

10       THE COURT:  Is there a transcript?

11       MR. STEINBERG:  Yes.

12       THE COURT:  Do I have it?

13       MR. STEINBERG:  I think you do.  I think we cite from

14 it.  It's on the ECF system.  But I'm happy to provide a

15 courtesy copy to Your Honor.

16       THE COURT:  I would like -- I'd request it.

17       MR. STEINBERG:  So Judge Gerber says --

18       THE COURT:  Do we have it here?  Is that the same

19 hearing that you quote Mr. --

20       MR. STEINBERG:  Yes.

21       THE COURT:  -- Weisfelner?

22       MR. STEINBERG:  Right.

23       THE COURT:  Court's designated counsel, but

24 Mr. Weisfelner has indicated it --

25       MR. STEINBERG:  So Judge Gerber says that I need to

1  know whether -- how you're going to deal with this thing.  And

2  Mr. Weisfelner said if I'm going to tee it up, I understand the

3  need to have it teed up soon.  That was what it was.

4         Now Your Honor put your finger on the scheduling

5  order.  That was actually drafted by the parties.  The reason

6  why it was drafted by the parties is that Judge Gerber made

7  rulings at the August 31 status conference and asked the

8  parties to draft an order that embodied his rulings.  And

9  that's what the parties submitted.

10         That participation and submission was made with

11  myself as counsel and with Mr. -- the designated counsel for

12  non-ignition switch plaintiffs, and ignition switch plaintiffs,

13  and whatever role Mr. Weintraub thought he had at that point in

14  time.  And with the participation of lead counsel in the MDL.

15  Because Mr. Weisfelner was candid, he represents Berman and

16  Cabraser, who are the economic loss parties in the MDL, and

17  Mr. Weintraub represents Mr. Hilliard, which are the accident

18  cases.  And where you heard a new phrase, because they don't

19  want to actually say what the real phrase is.

20         You heard colloquial ignition switch versus the

21  defined terms that were in the June judgment and in the

22  December judgment.  Colloquial ignition switch are non-ignition

23  switch cases.  That's what they are.  And those non-ignition

24  switch cases, accident cases, are in the MDL.  There are 600

25  and -- over 675 plaintiffs as of September of 2015 that were --

1 that were cases in the MDL for non-ignition switch pre-closing

2 accident plaintiffs.

3          When we set this procedure down, it was with Mr.

4 Hilliard through Mr. Weintraub and directly Mr. Hilliard --

5          THE COURT:  He filed a notice -- he filed a notice of

6 appearance?  Hilliard?

7          MR. STEINBERG:  Weintraub filed it on behalf of --

8 Mr. Weintraub filed it, saying that he was representing Mr.

9 Hilliards, and the entire structure of the MDL orders are that

10 Judge Furman had decided that I want my lead counsel to have

11 people with specialty in the bankruptcy law because there are

12 issues that will need to be decided in the bankruptcy case.

13 And the lead counsel in the MDL is vested with responsibilities

14 as lead counsel for the cases that are in the MDL to deal with

15 common issues.

16          Whether they decided they wanted to only protect the

17 rights of the ignition switch plaintiffs as compared to all of

18 the plaintiffs, I'm sure that is an issue that people can

19 quarrel with.  But the reality is that the right people were

20 notified to deal with these issues.  And that's what Judge

21 Gerber recognized.  Judge Gerber had recognized that he was

22 dealing with in effect the MDL counsel and with the people who

23 the MDL counsel had hired in order to appear in the bankruptcy

24 proceedings.  And that was the notice that went out.

25          We notified 220 plaintiffs.  Most of those plaintiffs

1 were not in the MDL.  Those were the state court plaintiffs

2 that were -- that had sued New GM on non-ignition switch

3 post-closing accident cases.  They were part of the

4 proceedings.

5        You cannot deal with the punitive damage issue

6 without dealing with non-ignition switch post-closing accident

7 plaintiffs, as well as ignition switch post-closing accident

8 plaintiffs, because one of the issues that was involved in

9 punitive damages was whether New GM had assumed for the

10 liability for accident cases.

11        So you need to bring in all the plaintiffs that were

12 part of the accident cases.  That's ignition switch and that's

13 non-ignition switch.  They were notified of the matter.  And

14 they got notice of it.  And I think it's -- I know Your Honor

15 is concerned about the notice that was given, and I'd like to

16 point out two things.  One is the scheduling order which Judge

17 Gerber signed, and then is the letter that the MDL counsel

18 prepared in order to tee up this process correctly.

19        And I alluded to that in my opening presentation, but

20 I do think we need to come back and visit it.  The letter that

21 -- the order that Judge Gerber said on page 4 said:

22        "Within two business days of the entry of the

23        scheduling order, New GM shall serve by either email,

24        facsimile, overnight or none of the foregoing

25        available regular mail, a copy of this scheduling

1          order on plaintiffs in any lawsuit where New GM has

2          previously sent a demand letter as authorized by the

3          judgment with a cover note that states as follows."

4      And then that's the cover note that everybody's been

5  referring to.  That cover note, which was court sanctioned,

6  said among other things:

7          "If you have any objection to the procedures set

8          forth in the scheduling order" -- meaning, if you

9          don't like what's going on in this case, same way

10          that you did in the 2016 threshold issues, "you must

11          file an objection in writing with the bankruptcy

12          court within three business days of receipt of this

13          notice.  Otherwise you will be bound by the terms of

14          the scheduling order and the determinations made

15          pursuant thereto.  If you believe there are other

16          issues that should be presented to the Court relating

17          to your lawsuit that will not otherwise be briefed

18          and argued in accordance with the scheduling order,

19          you must set forth that position with specificity in

20          your objection."

21      That required everybody getting the scheduling order

22  to say that if they had another issue, including due process,

23  because the June judgment and the procedures in paragraph 13

24  were somehow subsumed by this process in the scheduling order.

25  If you had a due process concern, you should say something.

1  MDL counsel chose not to do it.  It wasn't New GM's burden to

2  say, hey, by the way do you want to assert a due process.

3         Judge Gerber had said something to that.  And Judge

4  Gerber said are you going to tee it up.  And what Mr.

5  Weisfelner did not say was the explanation as to how he was

6  going to tee it up.  Judge Gerber had said to him if you're

7  going to tee it up, I need to know it now because I want to get

8  these issues resolved, and he never gave you an answer as to

9  why he didn't do it, other than they chose not to do it.

10        One of the arguments that we have made as the

11 corrections to the statements that were made on April 20th was

12 that there was active discovery going on in the MDL.  People

13 could have, if there was enough going on with regard to

14 non-ignition switch plaintiffs, that either could have asserted

15 the due process violation or said to the judge, "pause,

16 please," Judge Gerber's expression, I want to be able to

17 establish that.

18        But at the time of the September scheduling order,

19 there had been millions, millions of documents produced with

20 regard to non-ignition switch plaintiffs.  And through the end

21 of the year in 2015, there have been over 100 depositions taken

22 of New GM employees.  And that wasn't just limited to ignition

23 switch.  That was depositions that were taken.

24        THE COURT:  Let me ask you.  If I assume that Mr.

25 Weisfelner and the lawyers with whom he was working, the MDL

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1  lawyers, made an affirmative decision not to include

2  non-ignition switch plaintiff due process issues in the

3  September scheduling order, who is bound by it?  Who is bound

4  by that -- that's why I started today by asking who were his

5  clients, who are Mr. Weisfelner's clients?

6          MR. STEINBERG:  I think anybody in the MDL.

7          THE COURT:  Named plaintiffs.  But what about -- I

8  heard some discussion about what about putative class members?

9  They're not certified.  They're not -- would you agree with me

10 that other than the named plaintiffs no other putative

11 plaintiffs would be bound by a ruling that Judge Gerber

12 rendered?

13         MR. STEINBERG:  I think there's hundreds of

14 plaintiffs that are named as the named plaintiffs.  I think.  I

15 mean, there's certainly pages and pages of people who are

16 listed.  They list people in every state.

17         THE COURT:  Do you agree that anybody who was --

18 well, first off, is it your view Mr. Weisfelner was

19 representing every one of the named plaintiffs in every one of

20 those cases?

21         MR. STEINBERG:  I think Mr. Weisfelner was

22 representing Mr. Berman and Ms. Cabraser as lead counsel in the

23 MDL.

24         THE COURT:  But the question, who are their clients?

25 So you're saying derivatively Mr. Weisfelner represented

208

1  whoever Berman, Cabraser represented --

2         MR. STEINBERG:  And Berman and Cabraser were actively

3  involved in litigating these proceedings.

4         THE COURT:  But my question now is, is anyone other

5  than the named plaintiffs represented by Berman and Cabraser,

6  would they be bound by -- assuming -- and I know it's disputed,

7  but would they be bound by an affirmative decision by Mr.

8  Weisfelner not to raise the due -- the non-ignition switch

9  plaintiff due process issues in the September scheduling order?

10        MR. STEINBERG:  I think those plaintiffs plus those

11 people who either got notice of or were aware of the scheduled

12 order, they all would be bound.

13        THE COURT:  Why is that?  You referred to a colloquy

14 that Mr. Weisfelner and Judge Gerber had.  And Mr. Weisfelner

15 has clients, derivatively, he's got clients.  And he can bind

16 clients.  But how does he bind non-clients --

17        MR. STEINBERG:  Because we --

18        THE COURT:  -- to the extent that there are class

19 actions that haven't been certified.  I can see your argument,

20 assuming that I get there, that Mr. Weisfelner derivatively

21 represents every named plaintiff that Berman and Cabraser

22 represents.  So when he speaks in court before Judge Gerber,

23 that's who he's speaking for.  But how does he bind the rest of

24 the world, or may have cases pending in state courts around the

25 country.  They're not represented by Berman or Cabraser.  It

1  may be that the ruling that comes out of it is going to be law

2  of the case or it's persuasive authority, essentially what I

3  ruled in the other Motors Liquidation case in denying motions

4  to dismiss.

5          MR. STEINBERG:  I don't think that Mr. Weisfelner

6  could bind anything more than what Mr. Berman and Ms. Cabraser

7  could bind.

8          THE COURT:  All right.

9          MR. STEINBERG:  But the point is, is that other

10 lawyers who got notice of the scheduling order, the other 200

11 and some odd people, who were told in the notice that you're

12 going to be bound by the rulings, and if you fail to raise an

13 issue that is unique to your case, as something that I need to

14 consider, they're going to be bound by their failure to raise

15 those issues --

16         THE COURT:  You see, if the order had -- look.  If

17 the scheduled order had gone out and had said that I am going

18 to address the due process issue or based on the agreement of

19 designated counsel, there is no issue about due process, I'd

20 say sure.  If you're out there in the hinterlands and you get

21 that order, and you see it says something one way or the other

22 about due process, fine.  You better get off your duff and come

23 in and complain if you disagree.

24         But they get a scheduling order that is silent about

25 the due process.  These are the issues that are going to be

1   addressed.  This is a scheduling order for how things are going

2   to proceed.  And how is it that you expect lawyers who have not

3   appeared before Judge Gerber to receive a scheduling order that

4   says nothing about due process claims of non-ignition switch

5   plaintiffs and say you're going to be bound if Judge Gerber

6   decides those issues.  That's where I'm having --

7          MR. STEINBERG:  I think, Your Honor, the answer is

8   that the scheduling order says if you believe there are issues

9   that should be presented to the Court relating to your lawsuit,

10  there will otherwise be -- that will not otherwise be briefed

11  and argued in accordance with the scheduling order, you must

12  set forth that position with specificity in your objection.

13         So the burden was on anybody getting the scheduling

14  order that if they wanted to raise the due process issue, or

15  they wanted to raise any other issue that was not specifically

16  referenced in the scheduling order, they actually had to do

17  something.  That was the way it was state up.

18         The burden on raising a due process violation for a

19  recall that took place in June of 2014, you know, 14, 15 months

20  later, after the knowledge of the recall, that burden is on the

21  plaintiff.

22         THE COURT:  All right.  I'm looking forward to

23  getting the transcript of this August hearing and see exactly

24  -- you have part of it quoted -- you quote designated counsel

25  in your brief.  I've got to see the whole transcript.

1         MR. STEINBERG:  Okay.  The next thing is the letter

2    that went out by the MDL counsel in conjunction with the

3    scheduling order.  That letter said in the first line:

4              "This is a court-ordered notification about your case

5              involving General Motors, LLC.  The text in the

6              attached letter" -- which is the letter that I sent

7              out, which included the provisions of the scheduling

8              order -- "is required by the Honorable Robert Gerber

9              Bankruptcy Judge.  If you have any questions about

10             the procedures, please contact Dawn Barrios,

11             plaintiffs' liaison counsel to the MDL."

12         She was the person appointed to interface with cases

13    that were pending against New GM outside of the MDL.

14             "And/or co-lead plaintiff's counsel for the MDL,

15             Steve Berman, Elizabeth Cabraser and Bob Hilliard,

16             And they give the cite, and then it says that:

17             "The Bankruptcy Court has modified the deadline

18             imposed by the judgment dated June 1 to file in

19             effect the no strike pleading, unless you choose to

20             object to the procedures in the attached letter or

21             you wish to file your own papers, and notwithstanding

22             your right to be covered by the filing that

23             designated counsel will be making, you have no

24             required actions in the Bankruptcy Court at this

25             time."

212

1           So it told the parties you can rely on what we're

2    doing, or you need to be able to act.  And if you actually

3    review the transcript, you see the colloquy between Judge

4    Gerber and Mr. Weintraub who is saying I don't represent these

5    other people outside the MDL.  I only represent Mr. Hilliard.

6    And I don't want them taking up my pages that I have to write

7    to Judge Gerber about it.  They want to do something.  It's

8    incumbent on them.  They should file their briefs.

9           THE COURT:  This is in the same August transcript?

10          MR. STEINBERG:  Yes.  So this procedure was set up to

11   basically deal with that.  And you have to understand the MDL

12   procedures, that these types of bankruptcy orders work their

13   way onto the MDL leadership website so that people in the state

14   courts can monitor what is going on in the case.

15          The goal here by Judge Gerber on a procedure that had

16   been endorsed by the people who were appearing in front of him

17   at the time was that this was going to be a comprehensive

18   procedure that covered everybody.

19          Now I know Your Honor is struggling with the notion

20   that there was no deadline that said if you don't assert the

21   due process violation you're going to lose it.  But there was a

22   ruling about the due process violation --

23          THE COURT:  As to ignition switch plaintiffs.

24          MR. STEINBERG:  As to -- no.  As to non-ignition

25   switch --

213

1              THE COURT:  Where?

2              MR. STEINBERG:  Footnote number 70.

3              THE COURT:  Okay.

4              MR. STEINBERG:  Of the November decision.  And where

5   plaintiffs have distorted the Footnote 70 is that when Judge

6   Gerber references his former judgment decision, the May

7   20-something decision, he said that they may never be able to

8   prove it.  Now six months later, he's saying that's it, you

9   didn't prove it, and you can't assert it.

10             And the reason why that's just not my colloquy of an

11  interpretation of a judgment, but that actually was the ruling,

12  was that immediately after that ruling was made, the plaintiffs

13  in the MDL amended the second amended complaint and put in the

14  third amended complaint.  And the third amended complaint

15  dropped all non-ignition switch economic loss cases.  They knew

16  that that ruling had prevented them from asserting that, and

17  they did not appeal that ruling.

18             Your Honor doesn't have to sort of struggle as to did

19  people know.  MDL counsel knew.  And MDL counsel did not appeal

20  that ruling.  And that's the three plaintiffs.  And that

21  included also -- and they didn't -- and they didn't appeal not

22  just on the due process issue.  They didn't appeal the punitive

23  damage ruling.  And the punitive damage ruling was clear on its

24  face.  Punitive damage ruling said in paragraph 6 -- paragraph

25  6, that "New GM did not contractually assume liability for

1  punitive damages from Old GM."

2          But that's not where it stops.  That's what they

3  would like to say where it stops.  Next sentence:

4          "Nor is New GM liable for punitive damages based on

5          Old GM conduct under any other theories such as by

6          operation of law.  Therefore, punitive damages may

7          not be premised on Old GM knowledge or conduct or

8          anything else that took place at Old GM."

9          That is the fourth threshold issue, successor

10 liability is --

11         THE COURT:  That's in the judgment or --

12         MR. STEINBERG:  That's the December judgment,

13 paragraph 6.  That was not appealed.  That is a final ruling

14 that has nothing to do with the Second Circuit decision or the

15 June judgment punitive damages wasn't raised at that time.

16 Post-closing accident plaintiffs were not subject to the June

17 judgment.  They did not appeal.  They made the purposeful

18 decision, for whatever their reason was.  You don't have to try

19 to get into someone's head as to why they didn't do something.

20 That's what res judicata and finality is about, and they didn't

21 do that.  And it's the same answer with regard to paragraph --

22         THE COURT:  Just a second.  Is -- that issue was

23 briefed?

24         MR. STEINBERG:  Yes.

25         THE COURT:  For the November -- I know it's briefed

1   here, but was that issue briefed by the parties leading to the

2   November decision?

3           MR. STEINBERG:  The issue that was framed in the

4   September scheduling order --

5           THE COURT:  Yes.

6           MR. STEINBERG:  -- on punitive damages.

7           THE COURT:  Yes.

8           MR. STEINBERG:  On page 1 of the scheduling order:

9           "The briefing schedule with respect to the issue

10          (punitive damage issue) in complaints filed against

11          General Motors, LLC (New GM) that request

12          punitive/special/exemplary damages against New GM,

13          based in any way on the conduct of Motors Liquidation

14          Co., formerly known as General Motors Corporation

15          (Old GM) shall be as follows."

16          So the issue that was framed by the scheduling order

17  was not did you just assume product -- as when you assumed

18  product liability, did you assume product -- did you assume

19  punitive damages.  It was are you liable for anything relating

20  to Old GM conduct as punitive damages?  Is New GM liable for

21  Old GM conduct?  You don't get to successor liability, it's not

22  relevant, if you can't look to Old GM conduct.

23          THE COURT:  Okay.  We're going to take a 15-minute

24  recess.  We're going -- what issues do you still have to

25  address, Mr. Steinberg?

216

1            MR. STEINBERG:  I haven't responded to any of the

2    individuals, and I'm still on issue number 2.  I apologize for

3    the --

4            THE COURT:  Well, you just talked about issue

5    number 3.

6            MR. STEINBERG:  No.  Issue number 3 is used car

7    purchases.

8            THE COURT:  I'm sorry.  You just talked about issue

9    number 4, punitive damages.

10           MR. STEINBERG:  I have.  I have.

11           THE COURT:  You have more to say on issue 4?

12           MR. STEINBERG:  I have a few more things to say about

13   issue 4, but I understand the hour and I will try to accelerate

14   my --

15           THE COURT:  Just so we're clear, we're going to end

16   at 5:30.  We're taking a 15-minute break.  We're going to end

17   at 5:30.  As of now, I don't plan to hear any -- what I would

18   consider to be surrebuttal, because Mr. Steinberg started at

19   the last hearing and then Mr. Weintraub started but didn't

20   finish.  I've let everybody on the plaintiffs' side say

21   whatever they wanted to say today.  And I consider what Mr.

22   Steinberg is saying now to be the last word on it.  Just so

23   everybody is clear on what's happening.  So we're taking a

24   15-minute recess.

25           (Recess taken at 4:04 p.m.)

1          (Proceedings resumed at 4:23 p.m.)

2               THE COURT:  You may be seated.

3               Go ahead, Mr. Steinberg.

4               MR. STEINBERG:  Your Honor, there's been an

5     undercurrent of statements made in this case that in connection

6     with proceedings leading to the December judgment that

7     post-closing accident plaintiffs did not participate.  And that

8     clearly is not true, even on the face of looking at the

9     December judgment.

10              There is a lengthy section about the impact on the

11    bellwether complaints.  The bellwether complaints are ignition

12    switch post-closing accident plaintiff cases.  There are

13    references to non-ignition switch post-closing plaintiff cases

14    in the December judgment.

15              There was an issue raised as to whether anybody

16    briefed the punitive damage issue other than designated --

17    other than Mr. Weintraub.  The Moore plaintiffs briefed the

18    punitive damage issue for Judge Gerber as well, too.

19              There was a -- issues raised about "well, they didn't

20    make up my complaint, so I didn't really have sufficient

21    notice."  I'd just point out to Your Honor that Footnote 2 of

22    the December judgment specifically says that "any ruling set

23    forth in the judgment that refers to a particular lawsuit,

24    complaint and/or plaintiff shall apply equally to all lawsuits,

25    complaints and plaintiffs where such ruling may be applicable."

1              So, Judge Gerber recognized that there were too many

2    lawsuits for us to mark up, but there was a commonality of a

3    lot of the claims.  I think when you asked Mr. Weintraub as to

4    what other type of independent claims that are being asserted

5    in these post-closing accident cases, he said duty to warn and

6    duty to recall.  Those are -- and then there may be a consumer

7    protection statute claim.  Those are generally the claims that

8    are common to many of the post-sale accident cases.

9              I had referred to in the MDL the orders that spell

10   out the duties of lead counsel.  And I want to be able to give

11   those specific orders to Your Honor.  The MDL order number 5

12   says that lead counsel will act for plaintiffs and will focus

13   on substantive areas including bankruptcy.  MDL order 8 says

14   lead counsel should make sure to have counsel familiar with

15   bankruptcy law.  MDL order 13 lists Bob Hilliard on the MDL

16   website as the co-lead counsel with primary responsibility for

17   personal injury claims.

18             The reference to the fact that there were no

19   non-ignition switch post-closing accident plaintiffs in the

20   MDL, which is wrong, was made so that it would seem like there

21   was no participation.  And the fact of the matter was, just by

22   having the lead counsel involved, where there were 679

23   plaintiffs involved for non-ignition switch post-closing

24   accident plaintiffs meant that there was a large sample of

25   these cases there in addition to the separately noticed

1   200-and-so other parties.

2           Your Honor asked Mr. Weisfelner who he represented,

3   but -- either you had done it before but you didn't do it this

4   time with regard to who Mr. Weintraub represents.  And I think

5   that's significant.  He will tell you that he's not a

6   designated counsel for the post-closing accident plaintiffs.

7   He represented Mr. Hilliard for the six bellwether cases, and

8   then he has three other law firms who have brought litigations

9   against New GM, none of whom he was representing at the time of

10  the entry of the December judgment.

11          And when you think about all of the arguments that

12  he's making, and I assume he can only make arguments on behalf

13  of his clients, the three law firms that he is representing,

14  the Butler Wooten firm has two cases.  Mr. Butler got the

15  September scheduling order.  Mr. Weintraub wasn't representing

16  Mr. Butler at the time.  One case was -- of the two cases was

17  started after the December judgment.  Neither case involves a

18  recall.  And one of the Butler cases was in active discovery at

19  the time of the service of the scheduling order.

20          Tad Turner is the second client.  He has three cases.

21  One was commenced after the December judgment.  Mr. Turner also

22  got notice of the September scheduling order, and his cases

23  don't involve a recall either.

24          And then the third law firm is Denney & Barrett, also

25  not someone that he represented in the bankruptcy case.  Two

1  cases started both after the December judgment.  One is

2  involving a minor, but is in the process of being settled.  The

3  other one is extant.

4        So that his clients other than Mr. Hilliard, for

5  which all of these arguments are being made about what people

6  understood or didn't understand, are made on behalf of six

7  plaintiffs -- or six cases, and not anything greater than that.

8  A wide body of people didn't complain, haven't come before Your

9  Honor.  There have been a few.  I will deal with them here.

10 But my belief is that anybody who wants to make an assertion

11 that they were otherwise unaware or they shouldn't be bound

12 should be required on behalf of themselves to make those

13 pleadings before Your Honor, and that no one else who doesn't

14 represent them should be speaking on their behalf.

15       THE COURT:  This may be slightly out of order, but --

16 in terms of the argument.  Did New GM object to discovery in

17 the MDL of knowledge of Old GM of non-ignition switch defects?

18       MR. STEINBERG:  No.  New GM didn't object to -- but

19 discovery wasn't set up for that.  Discovery was set up was we

20 have a phase one discovery, a phase two discovery and a phase

21 three discovery.  Phase one discovery didn't involve the

22 ignition switch recall, but involved other recalls.  It was

23 general discovery.

24       THE COURT:  Yeah, but if you believe that Judge

25 Gerber resolved the issues precluding non-ignition switch

1  plaintiffs from proceeding against New GM, why haven't you

2  objected to the discovery before Judge Furman about who knew

3  what when, about the non-ignition switch --

4           MR. STEINBERG:  Most of that --

5           THE COURT:  Give us the recalls first.

6           MR. STEINBERG:  I think, Your Honor, the discovery

7  that's going on -- if I --

8           THE COURT:  You're the one who called that discovery

9  to my attention in your letter.

10          MR. STEINBERG:  Right.  You're right.  But I think,

11 Your Honor, that discovery relates to whether they can assert

12 an independent claim, and they're using the imputation

13 doctrine --

14          THE COURT:  What does Old GM's knowledge about the

15 defects identified in that list of recalls for so-called

16 non-ignition switch defects, most of which were ignition switch

17 related, what does that have to do with asserting independent

18 claims?

19          MR. STEINBERG:  They argue that as -- and I think

20 Your Honor put your finger on it as sort of a back door basis.

21 They argue the imputation doctrine, which is that Old GM's

22 knowledge when those people were then hired by New GM was

23 imputed to New GM, and therefore those people have -- those

24 people's knowledge will then constitute some kind of

25 independent claim based on a failure to warn and some other

222

1  sort of statute.  But on the non-ignition switch side, it's

2  asserted that way.

3           But Your Honor I think is sort of piecemealing it as

4  compared to what has actually happened in the MDL.  The MDL is

5  allowing discovery to go forward on certain recalls, and then

6  they're allowing -- they're allowing depositions to go forward

7  with certain recalls --

8           THE COURT:  Okay.  All right.  I pulled you off of

9  your argument --

10          MR. STEINBERG:  But I think, Your Honor, that that's

11 significant.  Your Honor has heard the date of September 1 for

12 discovery.  The phase three discovery is primarily New GM's

13 discovery of the plaintiffs.  The discovery about what was

14 being done for the defendants took place much earlier than

15 that.  The judge wanted to approach the discovery of New GM

16 before the discovery of the plaintiffs.  So --

17          THE COURT:  Since I pulled you out of the order of

18 your argument, --

19          MR. STEINBERG:  Okay.

20          THE COURT:  -- there seemed to be a disagreement

21 between Mr. Weisfelner and Mr. Peller about whether Judge

22 Furman is going to decide whether there was a due process

23 violation with respect to non-ignition switch plaintiff

24 recalls.  What's your view?

25          MR. STEINBERG:  I think Mr. Peller is correct, and I

223

1 think when Mr. Weintraub stood for his brief second, he

2 actually agreed with Mr. Peller.  Judge Furman --

3          THE COURT:  He's saying that you agreed with Mr.

4 Peller.  He's putting his hands by his ears.  He didn't hear

5 you.

6          MR. STEINBERG:  Yeah.  I think Mr. Peller's correct,

7 that Judge Furman has never identified that I'm going to decide

8 the due process issue.  Frankly, it's always been our view that

9 the due process issue for non-ignition switch economic loss

10 plaintiffs were decided in connection with December 2015

11 judgment --

12          THE COURT:  I know that's your view.

13          MR. STEINBERG:  Right.  So -- and that's the Footnote

14 70 of the decision, and the fact that the sack became the tack

15 (phonetic), and they took out non-ignition switch plaintiffs.

16          There was a reference to the discovery that is in the

17 MDL, and there it is not a needle in the haystack.  The

18 discovery that's done, if you look at it from the ignition

19 switch side, is whether there was a defect and when Old GM knew

20 about it.  I think to that extent Mr. Weisfelner was right,

21 that that's the same kind of discovery that you would have for

22 a due process violation.

23          That type of discovery for non-ignition switch

24 plaintiffs was actually extant.  I think I said millions of

25 documents?  Hundreds of thousands of documents is more accurate

224

1  with regard to non-ignition switch plaintiffs.

2         And Judge Furman has only really allowed one GM

3  employee to be deposed once.  So if you're going to depose GM

4  employee, it's going to have to be with regard to everything.

5  There was over 100 depositions that were taken of GM employees

6  in 2015.  Very active basis -- they had the ability -- and when

7  people talk about that Judge Gerber stayed discovery in the

8  bankruptcy court, and the reference to the September 2014

9  decision and Mr. Weisfelner's recollection of conversations

10 that he had with me, this is what I believe actually happened.

11        It is very much, like I said before the break, that

12 we wanted to see whether we could resolve the due process issue

13 on a stipulated record.  And anybody who wanted to take

14 discovery --

15        THE COURT:  As to ignition switch --

16        MR. STEINBERG:  As for ignition switch plaintiffs,

17 because they had the benefit of the extensive Valukas report.

18 And that anybody who wanted to challenge that, Judge Gerber

19 essentially said, "I'm going to see what's presented in front

20 of me.  And if I think you need discovery, I'll deal with it.

21 And if not, I'm going to make a ruling."  And that's what he

22 did.

23        After that, in -- when he rendered his ruling in

24 April, decision in June of 2015, there had been active

25 discovery already going on in the MDL with regard to the

225

1  non-ignition switch plaintiffs, and had been going on for a

2  while.  And plaintiffs never would have tolerated not allowing

3  their MDL case to go forward.  And New GM wasn't stopping the

4  discovery in connection with that case.

5        The only stay that was relevant was with regard to

6  the adjudication of the four threshold issues, if you thought

7  you needed discovery.  And the plaintiffs, other than the

8  Groman plaintiffs -- I don't even think it was Mr. Peller --

9  other than the Groman plaintiffs said, "I think we could decide

10 these issues without the benefit of discovery."

11       So there was no stopping of discovery.  They had the

12 ability to raise the issues.  And that's why Judge Gerber in

13 his June judgment said for non-ignition switch plaintiffs, "If

14 you think you need discovery as part of your no-objection

15 pleading, you really should tell me about it so that I could

16 deal with it, because I want to get closure on this issue.  I

17 don't want to put this off any further."

18       THE COURT:  There's a question I asked Mr. Weintraub

19 earlier this morning.  And I think it was -- I told you that

20 I'd be thinking about this, wrote it down.  Are there any facts

21 in the record that show the relationship or nexus in the

22 recalls covered by 14V-047 and the later recalls?  The

23 June/July -- or whether it was July/August, the summer recalls

24 also dealt with ignition switch problems, correct?

25       MR. STEINBERG:  Different cars, different platform --

1          THE COURT:  Yes.  But that raised -- the closeness --

2    the relative closeness in time of the first set of recalls and

3    the second set of recalls raised a question in my mind about

4    did Old GM know the facts about alleged defects that gave rise

5    to that second round of recalls.  And the reason I'm -- I'm

6    having trouble piecing this together in my own mind, what makes

7    sense.  All right?

8          I know that Judge Gerber deferred non-ignition switch

9    issues in April and June.  I've said it's unclear to me whether

10   or how he dealt with it in November and December.  And if -- I

11   would have a hard time believing that the plaintiffs would drop

12   -- the non-ignition switch plaintiffs would drop a due process

13   issue if there was a second set of recalls so close in time --

14   yes, involving different vehicles, but yes, involving ignition

15   switch -- alleged ignition switch problems.

16         And I'm trying to reconcile in my own mind -- I said

17   that look -- you know, part of my reaction in looking at this

18   is Judge Gerber decided that, quote, "We'll deal with due

19   process issues and ignition switch plaintiffs first.  If I

20   decide, yeah, there's a due process violation but not remedy,

21   well, then there's nothing to deal with respect to non-ignition

22   switch plaintiffs."  Okay?  And that's what, in my mind,

23   Mr. Steinberg, I'm asking myself this question.

24         If that second round of recalls, yes, different

25   vehicles, but yes, focused on ignition switch -- I'm putting

227

1  aside power steering and side panel and airbags and stuff.  I

2  don't know how similar were the problems that were being

3  experienced in these additional make and model years of cars.

4  And would it make sense if they would just not deal -- they

5  would just not even raise the issue.  We have to decide the due

6  process issue first.

7       MR. STEINBERG:  I think the answer is yes.  I think

8  it does make sense.

9       THE COURT:  Does it make sense?

10      MR. STEINBERG:  And the reason -- the reason why I

11 say that is that they clearly understood from Judge Gerber's

12 comments that he wanted it to have been raised.  And he told

13 them that if you're going to raise it, I need to have it teed

14 up now.  And they indicated if I'm going to do it, I will tee

15 it up now.

16      And in the same way, Judge, if you're perplexed about

17 that, you may scratch your head and say why didn't they appeal

18 the December judgment when you had the ruling on punitive

19 damages and you had the ruling on independent claims?  Why

20 didn't they appeal then?  Well, the appeal was a single

21 issue --

22      THE COURT:  Let me ask you the second part of the

23 question I asked Mr. Weintraub.  Was there any fact-finding by

24 NHTSA or Valukas or any other administrative body that shows

25 defects other than the ignition switch defects were known to

228

1   Old GM before the 363 sale?  They say yes.  What's your answer?

2              MR. STEINBERG:  The answer is no.  No, but -- but

3   there is an answer, right?  I mean this is --

4              THE COURT:  No, no.  I'm not disputing.

5              MR. STEINBERG:  No, no.

6              THE COURT:  One of you is right and one of you is

7   wrong.

8              MR. STEINBERG:  That's correct.

9              THE COURT:  That's what's called a factual --

10             MR. STEINBERG:  I agree.  The Valukas report was

11  rendered in May.  It dealt with only the February and March

12  recalls.  I don't think there's any --

13             THE COURT:  What about NHTSA, when they issue --

14             MR. STEINBERG:  When NHTSA fined GM, it was only

15  for --

16             THE COURT:  No, when the additional round of recalls

17  got issued, was there any -- is there any finding --

18             Come on, Mr. Weisfelner.  Can you --

19             MR. WEISFELNER:  I'm sorry.

20             THE COURT:  Was there any finding of any relationship

21  or connection?  Was there a reference back to the earlier

22  recalls?

23             MR. STEINBERG:  I don't -- I don't think so, Your

24  Honor.  I think GM recalled the vehicles and NHTSA fined New GM

25  for only the ignition switch recalls and the certified

1 pre-owned issue and said that you were aware that as of March

2 of -- the spring of 2012. So if --

3          THE COURT:  Not for the second round of --

4          MR. STEINBERG:  Well, those fines were limited to

5 ignition switch -- what I've been calling the ignition switch

6 recall anyway.  And everything else that developed was GM --

7 New GM announcing recalls and going to NHTSA and saying I'm

8 recalling these vehicles.  And there was nothing that tied with

9 the -- other than the notice that goes out to the vehicle

10 owner.  And the language may have said it's an ignition switch,

11 but every car has an ignition switch.  They sometimes have a

12 different platform, different wiring, different structure of

13 it, and not every GM brand vehicle has the same ignition

14 switch.

15          And so it's been a clear position that GM has

16 asserted in the MDL that the ignition switch recall, the --

17 what I think Mr. Weisfelner has recognized is less than two

18 million vehicles on the road, is only the ignition switch that

19 the Valukas report was talking about, and only the claim that

20 NHTSA had fined GM about.

21          THE COURT:  I diverted you from your --

22          MR. STEINBERG:  The --

23          THE COURT:  Tell me about used cars.

24          MR. STEINBERG:  I'm sorry?

25          THE COURT:  Tell me about the used car purchases.

1            MR. STEINBERG:  Okay.  I think that -- I found it

2    interesting, and Mr. Peller did say that he has, you know, 12

3    plaintiffs, right?  So he has a very small handful of what we

4    have involved here.  It doesn't mean that his rights shouldn't

5    be respected.  I just wanted to put it in perspective as

6    compared to others.

7            I think he either has one or two used car purchasers.

8    One of them, the Sesay plaintiff, actually bought a car from a

9    friend.  I mean, wasn't a GM involvement in the transaction at

10   all.

11           THE COURT:  I'm sure they weren't.

12           MR. STEINBERG:  I'm sorry?

13           THE COURT:  I'm sure GM wasn't involved.  I mean, if

14   it was not sold off of a GM --

15           MR. STEINBERG:  Right.  But that's the example that

16   we think illustrates the issue that people are trying to

17   extrapolate from the Second Circuit decision.  The Second

18   Circuit said that used car purchasers, defined as ignition

19   switch plaintiffs, right?  The Second Circuit opinion doesn't

20   say all used car purchasers.  It actually has a defined term.

21           So used car purchasers are a subset of the economic

22   loss ignition switch plaintiffs.  And there it said that those

23   plaintiffs can't be bound by a sale order, but did not rule on

24   the issue as to what rights they otherwise had.

25           Those are the type of decisions that Judge Bernstein

1  made in the <u>Burton</u> case, which said that the only rights you

2  have is what you acquired from.  If you want to assert GM --

3  obligations against GM.  Obviously if GM entered into a

4  certified pre-owned relationship with a used car purchaser,

5  New GM is independently liable for that, has never tried to

6  shirk that responsibility, and that is a form of an independent

7  claim --

8            THE COURT:  You think that <u>Burton</u> is the case that

9  provides strong support that used car purchasers have no

10  greater rights than the seller?

11            MR. STEINBERG:  That's correct.  And Judge Bernstein

12  made that determination.  And so you have that example.  We

13  gave in our papers the Carew (phonetic) plaintiff example.

14  That's a Takata person.  There's a lot of used car purchasers.

15  They're seeking to assert an economic loss claim based on the

16  Takata airbag, which was primarily installed by Old GM, into an

17  Old GM vehicle.

18            The fact that the cars may have sold after the sale,

19  it doesn't create new claims against New GM, where the original

20  purchaser didn't have a claim, they took subject to whatever

21  obligations New GM had under the sale order.  And in the Carew

22  case, they specifically allege Old GM conduct and an implied

23  warranty claim a the basis to say why New GM is liable, when

24  those claims are clearly barred by the sale order, no matter

25  who owns the car.

232

1            And so we think that <u>Burton</u> recognizes that issue,

2   and we think that the bankruptcy court retained jurisdiction to

3   enforce the sale order to protect New GM for that.  Other than

4   that, I don't think we were quarreling with the Second Circuit

5   decision.  We just think that the Second Circuit didn't deal

6   with the issue that Judge Gerber did in his opinion where he

7   talked about that a plaintiff only -- that a used car purchaser

8   only gets whatever rights that its seller had.  And if a seller

9   was bound by the sale order, so is the purchaser.

10            Now Your Honor had asked the question about accident

11  cases, right?  And I don't know why there was any confusion.

12  If you look at the tautology we've set up, we've assumed

13  product liability claims for accident cases no matter who was

14  the owner of the vehicle at the time of the accident, whether

15  it's the original purchaser or the used car purchaser, New GM

16  is liable.  So we weren't looking to change that result.

17            THE COURT:  Do you agree with Judge Bernstein's

18  decision in <u>Grumman Olson</u>?

19            MR. STEINBERG:  Yes.

20            THE COURT:  You believe that that correctly decides

21  the issues --

22            MR. STEINBERG:  I do.

23            THE COURT:  -- that Judge Bernstein addressed.

24            MR. STEINBERG:  I do.  But Judge Bernstein,

25  <u>Grumman Olson</u> specifically excepted out the GM case.

1           THE COURT:  I'm asking whether you -- he articulated

2    principles, which I don't think are particularly controversial,

3    frankly, regarding future claims; that they can't be

4    identified, you can't give them notice, they didn't get notice,

5    they're not bound by a sale order.  You agree that that applies

6    here too?

7           MR. STEINBERG:  Right, but in <u>Grumman Olson</u> you need

8    to focus in on who the plaintiff was in that case, who was not

9    the actual vehicle owner at the time of the sale --

10          THE COURT:  There should be a case that says

11   ownership of the vehicle determines whether the driver in an

12   accident because of the defect in the vehicle can or cannot

13   assert a claim.

14          MR. STEINBERG:  The Second Circuit decision in

15   <u>General Motors</u>, one of the few things that was I thought

16   helpful, was the court said, does the bankruptcy court have

17   jurisdiction to enforce its no successor liability for a latent

18   defect fix?  Not an accident case, but a latent defect.  The

19   person didn't know they had a problem, but years after the sale

20   it had developed a problem.  And the Second Circuit said the

21   answer was yes, you could bind those people with a latent

22   defect case --

23          THE COURT:  If I have the misfortune --

24          MR. STEINBERG:  -- because they have the relationship

25   -- because the definition of claim required a relationship

234

1   between the debtor and the person who you're trying to bind.

2   Anybody who was an owner of a vehicle at a time, whether they

3   got into an accident afterwards or a latent defect

4   afterwards --

5         THE COURT:  So you think that the passenger, who

6   happens to be in a vehicle owned by me, if I get into an

7   accident and I have a GM vehicle manufactured by Old GM, that

8   the passenger can bring a claim against New GM based on alleged

9   defect, but I can't?

10        MR. STEINBERG:  I actually think you both can.  I

11  assumed your liability.  You're the owner of the vehicle and

12  I've assumed all liabilities relating to the accident.  So the

13  passenger -- but you don't -- and that's why Judge Bernstein in

14  Grumman Olson said I don't have to deal with the due process

15  issue because you've assumed the liability for the accident.

16        And that's why Grumman Olson, and that's what we

17  argued before Judge Gerber.  Grumman Olson doesn't apply in

18  this case.  Not -- Grumman Olson applies in a circumstance

19  where your sale order is trying to wipe out these claims that

20  will emerge from an accident afterwards because the purchaser

21  hasn't assumed the liability.

22        When the purchaser assumes the liability, you finesse

23  the Grumman Olson issue.  That's why the 44 state attorney

24  generals at the sale hearing who were pushing this issue

25  dropped the issue and allowed the case to go forward and

1  allowed the sale order to be entered.  And that's why Judge

2  Bernstein in <u>Grumman Olson</u> excepts out the <u>General Motors</u> case.

3  He said <u>General Motors</u> is not the <u>Grumman Olson</u> paradigm.

4          So, yeah, I think that if -- there is a difference

5  between the passenger and the owner.  Because I think you could

6  bind the owner and you can't bind the passenger, and I don't

7  think it matters between owner and passenger when you assume

8  the liability for either one of them anyway.

9          And that's my answer.  And that's why I think there's

10  been a distortion of the four threshold issue, because the four

11  threshold issue wasn't for me to litigate <u>Grumman Olson</u> all

12  over again.  That was determined in 2009 as it went up on

13  appeal with regard to everybody who was there.

14          What was the four threshold issue was can I take the

15  path for punitive damages on a successor liability theory?  And

16  the answer is that the judgment that was entered in December

17  says you can't do it on Old GM conduct or any other theory of

18  law which took out successor liability.

19          And when you look at the proposed orders that we both

20  gave Judge Gerber, one of what the plaintiffs put in and

21  recognized is that you can't assert punitive damages based on

22  Old GM conduct.  That was in their order that they were asking

23  Judge Gerber to sign.  That's -- ultimately he didn't sign

24  exactly their order, but that is the language.

25          Mr. Peller in his brief recognizes that the December

1  judgment barred successor liability -- punitive damages based

2  on a successor liability.  It's another situation where

3  Mr. Peller, who's been somewhat of a gadfly in this case, has

4  actually agreed with GM in that particular circumstance.

5          THE COURT:  I don't see what was said about -- in my

6  notes I said, you know, the Second Circuit held a free and

7  clear sale provision could not be enforced against creditors

8  who establish a due process violation, right?

9          MR. STEINBERG:  Established a due process violation,

10 correct.

11         THE COURT:  Do any provisions of a sale order apply

12 to such creditors, other than the -- even with a due process

13 violation?  In other words, what's the provision in the sale

14 order that bars punitive damage claims against New GM?

15         MR. STEINBERG:  I think the provision in the sale

16 order was Judge Gerber's interpretation of the sale agreement.

17         THE COURT:  Okay.

18         MR. STEINBERG:  So there is no express language.  It

19 is --

20         THE COURT:  What's the language in the sale agreement

21 that you believe precludes punitive damages?

22         MR. STEINBERG:  I think Judge Gerber did a contract

23 interpretation.  It's reflected in the November decision.

24 There's a few pages on that.  But he basically said New GM

25 never would have assumed punitive damages for Old GM.  No

1  normal seller would have done that.  Talks about the difference

2  being punitive damages as to -- that it's not a property right.

3  It's to punish somebody.  And it's to deter behavior --

4          THE COURT:  All policies behind punitive damages

5  would appear to, in my view, disfavor imposing punitive damage

6  on either assumed liability or successor liability.  Because it

7  is intended to punish --

8          MR. STEINBERG:  That's correct.

9          THE COURT:  -- the conduct of someone.  And they're

10 not around to punish.

11         MR. STEINBERG:  And he was -- he was finding at the

12 same time of approving the sale, he was saying that the

13 purchaser was a good faith purchaser, so the -- who was

14 essentially, for reasons beyond just the pure value of the

15 assets, trying to save the domestic auto industry at a time of

16 the second worst recession since the -- the worst recession

17 since the Great Depression.

18         THE COURT:  In your view does the punitive damage

19 ruling survive the Second Circuit reversal?

20         MR. STEINBERG:  Well, the punitive damages wasn't

21 decided by the Second Circuit at all.  It wasn't an issue that

22 was before the Second Circuit.

23         THE COURT:  I just want to be clear on what your

24 argument is.

25         MR. STEINBERG:  Okay.  I'm not going to talk about

1 the gatekeeper role, because I think Your Honor has made his

2 views clear --

3          THE COURT:  Better or worse, I am going to be the

4 gatekeeper.

5          MR. STEINBERG:  I do want to talk a little about the

6 individual plaintiffs.  Your Honor, before I get to that,

7 though, our --

8          THE COURT:  I do want you to address any limitation

9 on assertion of independent claims, because your position is

10 that non-ignition switch plaintiffs can't assert independent

11 claims.  Right?  That's your position?

12          MR. STEINBERG:  That's correct.

13          THE COURT:  And I have a lot of trouble with that.

14 You need to address that specifically.

15          MR. STEINBERG:  I think, Your Honor, it falls into

16 two buckets.  One is the res judicata argument.  The December

17 judgment, not subject to the mandate rule, the wipe-out rule or

18 Rule 60, specifically says in paragraph 14 that non-ignition

19 switch plaintiffs and post-closing accident non-ignition switch

20 plaintiffs --

21          THE COURT:  Can res judicata apply when the Second

22 Circuit has reversed, and specifically as to non-ignition

23 switch plaintiffs remanded to this Court to decide issues with

24 respect to the non-ignition switch --

25          MR. STEINBERG:  I actually think the second -- this

1  was the ruling that the Second Circuit was asking for.  They

2  were saying I want to see whether there's a due process

3  violation that was rendered or not with respect to non-ignition

4  switch --

5           THE COURT:  Does it limit -- I didn't see where it

6  limited the remand.  I mean, this in some ways comes back to my

7  concerns about whether non-ignition switch issues were

8  deferred.  And to the extent that they were decided, the Second

9  Circuit reverses and remands.

10          Because I'll tell you, Mr. Steinberg, you may be -- I

11 am going to go back and look carefully at the res judicata

12 argument, but if Judge Gerber decided that non-ignition switch

13 plaintiffs can't bring truly independent claims, I think he's

14 wrong.  I just -- I mean, I'm telling you straight out.  I

15 mean, I don't think -- I read the Supreme Court's <u>Bailey</u>

16 decision.  I read the Second Circuit's series of <u>Manville</u>

17 decisions, as -- whether you do it in terms of I don't -- the

18 bankruptcy court wouldn't have subject matter jurisdiction to

19 do it -- it's I grew up believing, you know, as a lawyer that I

20 can't release -- I can't get a release for things that haven't

21 happened yet.

22          MR. STEINBERG:  Well, I think --

23          THE COURT:  And if it's truly an independent claim, I

24 don't see how the bankruptcy court can enjoin them.

25          MR. STEINBERG:  Well, I think that the argument on

1 the res judicata point is not a matter of whether if you were

2 deciding the case whether you would have come out that way.  It

3 is a matter that Judge Gerber decided that way.  And if you

4 fail to appeal, there are consequences for not appealing.

5          THE COURT:  That's why I -- did he decide that issue

6 with respect to non-ignition switch plaintiffs?

7          MR. STEINBERG:  I think it's -- I think Footnote 70

8 is -- oh, I'm sorry.  Paragraph 14 is absolutely clear.  And

9 when plaintiffs said that all he did was stay it but didn't

10 really actually rule on that, that may be what they wish, but

11 that was not any logical --

12          THE COURT:  So, look, where the judgment is vacated,

13 and the case is back before me, I can always change -- in a

14 case before me, I can change my mind.  I can say well, you

15 know, I've reflected further and I think I was wrong.

16          I understand your -- I'm not wiping out your res

17 judicata argument.  I have problems with it, in part because I

18 don't think -- if the case was before me, I don't think I could

19 bar anybody from asserting independent claims truly based on

20 post-sale conduct by New GM.  Whether it states a claim under

21 state law, I don't know.  But I don't see how I could enjoin

22 plaintiffs from -- any plaintiff from asserting independent

23 claims based exclusively on conduct by New GM.

24          I agree with you completely -- that was part of my

25 issue with Mr. Hirsch, you read the language of this complaint,

241

1  and it seemed to me he was trying to do through the back door

2  what others -- many others have tried to do before, and says

3  he's willing to amend it to take that out.  I agree that nobody

4  should be permitted from the guise of an independent claim to

5  base it on Old GM conduct.

6           MR. STEINBERG:  I think --

7           THE COURT:  But things that are based on New GM

8  conduct, I don't see how a bankruptcy judge has the authority

9  to say you can't do it.

10          MR. STEINBERG:  I think, Your Honor, where I would

11 like to take you in the argument, just to illustrate it, is

12 that at this point in time I am not going to argue with you as

13 to whether this might have exceeded the bankruptcy court's

14 subject matter jurisdiction to make its ruling to bar

15 independent claims.  For purposes of our colloquy, I will

16 concede that issue.

17          The question then becomes if you fail to appeal when

18 the lower court has exceeded its subject matter jurisdiction,

19 have you failed to appeal when the lower court did not

20 effectuate due process, but you didn't appeal it, what are the

21 consequences of not doing it?  And the Second Circuit did not

22 change at all the December judgment.  That was not before the

23 Second Circuit.  That cannot be subject to the wipeout rule.

24 And Rules 60(b)(5) and 60(b)(6) has clear authority that we

25 cite our briefs that say if you do not appeal, I don't care --

1  it doesn't matter anymore, because -- and Travelers v. Bailey

2  said, you know what, finality in a case trumps everything else

3  because we have to have cases with an end.  And I think our

4  papers actually have a more lengthy quote that says that.

5          So you're struggling with the notion as why did Judge

6  Gerber come to this conclusion.  And what I'm trying to say to

7  you, he did, and he was clear that he did.  Paragraph 14

8  doesn't say in any way that there should be a stay.  He was

9  unequivocal.  And you may say he was wrong.  But the burden was

10  on the plaintiffs to appeal and get another court to say that

11  he was wrong.  And if the plaintiffs, who appealed the order

12  but not that ruling, if they didn't do it, then they waived it.

13  And that's what Travelers v. Bailey said.

14          So if you ask me what my argument is on independent

15  claims, that is one of my arguments.  I do have other

16  arguments, but that is one.

17          THE COURT:  Would you agree that a state court

18  plaintiff in -- you pick a state -- who did not appear here,

19  they could assert independent claims against New GM?

20          MR. STEINBERG:  I think a state court plaintiff who

21  wasn't served with the scheduling order and started their

22  lawsuit in 2016, if they want to assert an independent claim,

23  then I don't necessarily have the same res judicata argument

24  or --

25          THE COURT:  What's the language in the scheduling

243

1  order that said that the issue of independent claims by

2  non-ignition switch plaintiffs was going to be decided by the

3  Court?

4          MR. STEINBERG:  I don't think there is language in

5  the scheduling order --

6          THE COURT:  So how are people in Hinterland supposed

7  to know that the Court was going to decide whether non-ignition

8  switch plaintiffs could assert independent claims against New

9  GM based solely on New GM --

10         MR. STEINBERG:  I think the simplest answer is they

11 get the order and then they see that it happens.  And therefore

12 they either appeal or move to reargue and say that my rights

13 are being impacted --

14         THE COURT:  I have a really hard time saying that

15 silence in a scheduling order binds anybody who gets it to a

16 decision on an issue that wasn't specifically identified in the

17 order.

18         If I enter an order -- I'm not perfect, but I try to

19 specifically identify the issues that are before me.  If I

20 enter a pretrial order, it's got to identify specifically the

21 issues that are going to be tried.  I don't want any confusion

22 about it.

23         MR. STEINBERG:  The entire marked pleading process --

24 the entire marked pleading process was dedicated as to whether

25 something was a retained liability, an assumed liability or an

244

1  independent claim, depending on the complaint.

2          THE COURT:  Okay.  Go ahead.  You said that --

3          MR. STEINBERG:  So -- so --

4          THE COURT:  -- the first prong of your argument is

5  res judicata.

6          MR. STEINBERG:  Right.

7          THE COURT:  What's next?

8          MR. STEINBERG:  And the second is a different

9  variation of res judicata, which is that we believe that Judge

10  Gerber actually determined on the complaints and the types of

11  causes of action, including, you know, duty to recall, which we

12  talked before.  He made determinations about that, and that is

13  also another failure to appeal res judicata.  And that doesn't

14  have any of the constitutional due process violation.  It is a

15  granular exercise to look at the claims and see whether they

16  are --

17          THE COURT:  But they only apply to the specific

18  complaints, that he said, no, this doesn't work in this

19  complaint.

20          MR. STEINBERG:  It would apply to not just the

21  specific claims, but any other complaint that had a similar

22  claim, duty to recall claim, an independent duty to warn claim,

23  or anything like that.  It would apply equally across the

24  board.  And that's the purpose of the judge's Footnote 2, which

25  is that we're going to apply this across the board.

1           Because he wasn't asking me to mark up 200

2   complaints, including the thousand-page MDL complaint, in a

3   two-week period of time.  He recognized that I can bring

4   representative cases that would embody the types of claims that

5   are symbolic of these post-closing accident plaintiffs, and

6   they would bind.  And I served my other claims letter on

7   everybody.  I mean -- and my complaint on the MDL complaint,

8   and the bellwether complaint, that was served on everybody and

9   it was also on the ECF system.  So --

10          THE COURT:  You're putting --

11          MR. STEINBERG:  And certainly, Your Honor, as we

12  think about this, --

13          THE COURT:  As paragraph 14 of the December judgment

14  that you're resting on for wiping out independent claims?

15          MR. STEINBERG:  Right.  Especially the last sentence

16  of paragraph 14.  We do have a greater explanation, and I'll

17  read.  It says that:

18              "To the extent the plaintiffs have attempted to

19              assert an independent claim in a pre-existing lawsuit

20              with respect to an Old GM vehicle, those claims are

21              proscribed by the sale order, April decision, and

22              June judgment."

23          So he actually ruled on that basis, and I believe

24  that's the granularity basis.  You can dismiss why we killed

25  ourselves doing the marked pleading, but Judge Gerber actually

246

1  went through the marked pleading process.  He went through the

2  -- you know, we had five different color-coded.  We had duty to

3  warn as one color.  Footnote, I think it's 9, of the November

4  decision has the listing of the different color coding on the

5  various complaints.

6          He looked at it.  We tried to deal with this in a

7  practical way so he could give good guidance.  And he was

8  prepared to let Judge Furman decide issues in the MDL; but on

9  the other courts and the other system, he was giving more firm,

10  precise rulings.

11          And one could say -- and scratch your head saying

12  what was Judge Gerber thinking?  Right?  You know, if I try to

13  tell you this is what Judge Gerber is thinking, you'd say,

14  "Well, how do you know?  You're not inside of his head."

15  Plaintiffs tried to do it before.  It's the same response.  The

16  reality is, is that there's an order.  The order reflects at

17  the end of the day what he was thinking.  And the order is

18  unequivocal.  The order said this is what it is.

19          The third thing, Your Honor, and this is what I would

20  say is that -- if Your Honor believed that the res judicata

21  argument doesn't work, then you could see from your history in

22  this case since Judge Gerber retired that plaintiffs are very

23  creative in trying to dance around the proscriptions of the

24  sale order and other rulings in order to try to assert

25  something as an independent claim.

1          One of the arguments that I had in connection with

2     Pitterman was that a duty to warn as an independent claim, when

3     I didn't have any relationship or contact with the plaintiff,

4     assumed that -- I mean, where is that based on?  It wasn't the

5     manufacturer or seller of the car.  It wasn't based on a

6     federal statute.  Where do you get that from?  Merely because

7     you put it in your words, want to sue in a state court, find a

8     friendly home forum, and now I have 42 different judges

9     weighing on the same type of claim?

10          Judge Gerber recognizes that part of the gatekeeping

11    function -- and Judge Bernstein recognized when he did the

12    Old Carco case, he said I'm getting rid of this duty to recall

13    claim as a global basis based on his interpretation of the sale

14    order.  And I think that's what needs to happen here.  I

15    I'm afraid, Judge, if I don't tackle --

16          THE COURT:  I'll stop you.  Go ahead.

17          MR. STEINBERG:  No, no, no.  I just think I need to

18    -- for fairness here, although we do have the Tronox opinion, I

19    assume you want to accomplish -- you want to be able to finish

20    this.  So let me try to deal with the individual plaintiffs.

21    Let me start with Pillars.  I think the June judgment and the

22    December judgment has defined terms.  The brief to the Second

23    Circuit had defined terms.  They were all consistent, and the

24    need for consistency, so people understand what you're talking

25    about.  Ignition switch plaintiff is --

248

 1             THE COURT:  So what is Mr. Babcock -- he's telling me

 2    that New GM, in its multiple pleadings, conceded that he had an

 3    ignition switch defect and that you're bound by it.

 4             MR. STEINBERG:  Right.  So he's wrong.

 5             THE COURT:  And you're going to tell me why he's

 6    wrong.

 7             MR. STEINBERG:  I am.  One, the easiest and clearest

 8    way is that if you look at the June 2015 judgment, and you look

 9    at Exhibit D which is --

10             THE COURT:  Exhibit B as in boy?

11             MR. STEINBERG:  Exhibit D as in dog.  Exhibit D where

12    we list in our June judgment who are the non-ignition switch

13    plaintiffs and the non-ignition switch pre-closing accident

14    plaintiffs, the Pillars case is listed there.  So we presented

15    to the judge the list of who we considered to be the non-

16    ignition switch plaintiffs.

17             The second thing is when Judge Gerber ruled that

18    ignition switch pre-closing accident plaintiffs were barred by

19    the sale order, we wrote to the non-ignition switch pre-closing

20    accident plaintiffs and said that you are essentially in the

21    same position as the ignition switch pre-closing accident

22    plaintiffs.  The sale order wiped out all pre-closing accident

23    plaintiffs, and Judge Gerber just said he didn't have enough

24    information for non-ignition switch plaintiffs' economic loss,

25    but he also carved out pre-sale accident non-ignition switch

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

1   plaintiffs.

2           So when we said to people in a letter that you are in

3   an identical position, we weren't saying you were those people.

4   We were saying you were in the same position as an ignition

5   switch plaintiff if you were a pre-closing accident plaintiff,

6   and all pre-closing accident plaintiffs are barred.  And that

7   same pleading that he's referring to also references

8   paragraph 36 of the December judgment which references the fact

9   that all pre-closing accident plaintiffs are barred by the sale

10  order.

11          We were consistent in our pleading before Judge

12  Furman that what Pillars --

13          THE COURT:  Keep -- the are wires under the desk that

14  can catch you.

15          MR. STEINBERG:  We were consistent with Judge Furman,

16  but Pillars is someone who did not have a subject vehicle,

17  which by definition means he's not an ignition switch party.

18  And we were consistent throughout, so that is the reason why

19  Pillars is wrong.  If you look at the context of what he

20  quoted, it was saying that they were in an identical position,

21  but that doesn't mean that you are that party.  You're actually

22  making an analogy, saying you're out for the same reason.  And

23  then if you need something concrete, it's the June 2015

24  judgment.

25          With regard to Pilgrim, I think the plaintiff

1  basically touched based and, you know, set forth the right

2  things.  They started a complaint on October 14, but they --

3  that complaint is a very lengthy complaint and is substantially

4  identical to what you would see in the MDL complaint.  So they

5  knew, I believe -- and if I had to take discovery on it, I

6  would be able to take discovery on it.  They knew about the

7  proceedings in the bankruptcy court, but as soon as they sued

8  us, we gave them a demand letter on October 28.  We gave them a

9  copy of the December judgment before the appeal period had

10 expired, and they failed to appeal or move for reconsideration,

11 and we believe that they should be bound.

12          The February 2016 stipulation that we entered in the

13 bankruptcy court said that the Second Circuit may have an

14 impact on this case, and therefore we were going to maintain

15 the status quo.  But that has nothing to do with the vitality

16 of the December judgment, and we believe they are bound.  They

17 are not a recall case.  Their vehicles were not subject to the

18 February and March 2015 recalls.  They are non-ignition switch

19 economic loss cases.  They have asserted a duty to recall in

20 their complaint.  The duty to recall is not an assumed

21 liability for the discussion that I had in Pitterman, which is

22 the paragraph --

23          THE COURT:  So you're -- okay.

24          MR. STEINBERG:  Yeah.

25          THE COURT:  That's a factual issue.

1          MR. STEINBERG:  And essentially when you read their

2    complaint, they're asserting a design defect, and New GM did

3    not assume a design defect liability in connection with an Old

4    GM vehicle, no matter on an economic loss basis, no matter how

5    you contort or change the words.  So on Pilgrim, we believe

6    that the answer is is they knew what was going on.  They can't

7    lie in wait and just say --

8          THE COURT:  You say they knew what was going on.

9    Mr. Scott told me Pilgrim had no representation in the

10   bankruptcy court until recently.

11         MR. STEINBERG:  They filed a --

12         THE COURT:  Do you agree or disagree?

13         MR. STEINBERG:  They --

14         THE COURT:  Were they served with the September

15   (indiscernible)?

16         MR. STEINBERG:  No, because they didn't bring

17   their --

18         THE COURT:  That's right.  You told me --

19         MR. STEINBERG:  They didn't bring their lawsuit until

20   October 14.

21         THE COURT:  So how can they be bound?  They -- you --

22   I take it then you agree they were not represented in this

23   court during those prior proceedings.

24         MR. STEINBERG:  They would -- they became aware of

25   the proceedings before the judge ruled on the matter.

252

1          THE COURT:  So you know what I ruled in the lien

2  release case, when I denied the motion to dismiss by everybody

3  who said that they -- you know, they're -- they weren't served.

4  You cite that -- you cite my decision in that case.

5          MR. STEINBERG:  Yeah.  And I would say to Your Honor,

6  think about a circumstance where someone wants to sue New GM,

7  knows that these proceedings are going on, and figures that if

8  New GM loses, I could then just sue because I can get

9  affirmative collateral estoppel.  And if New GM wins, I can say

10 that I lied in the weeds and I'm not bound by it because I

11 wasn't made a party to the proceeding on an event that took

12 place eight years, seven years before.

13         I mean, they're talking about cars that were

14 purchased in 2006.  They talked about, you know, bulletins that

15 were entered.  These people spent months I think before they

16 actually filed their complaint.  They knew what was going on in

17 the bankruptcy because they basically cribbed their complaint.

18 This is me testifying now, but I'm saying to you that for this

19 type of case, when someone emerged during the process, even

20 though they didn't get the scheduling order --

21         THE COURT:  Res judicata doesn't apply.

22         MR. STEINBERG:  Res judicata does not apply, but the

23 question is whether they should be bound otherwise.

24         THE COURT:  A good theory.  It may be that a prior

25 decision by Judge Gerber that is not -- that remains the

1  operative ruling is the persuasive authority that would bind --

2  that would be applied and would result in dismissing their

3  claim or enjoining their claim.  But it's not res judicata, so

4  what -- tell me the precise legal theory on which you say they

5  are precluded now.

6          MR. STEINBERG:  Your Honor, there was a sale order

7  that was entered, a sale motion that was entered, and someone

8  didn't get notice, written notice of the sale motion but were

9  otherwise aware of the sale motion and that their rights were

10 otherwise going to be impacted.  Is that party who didn't get

11 that written notice but was otherwise aware of the proceedings

12 going to be bound by the rulings by the Court?

13         THE COURT:  Can you point me to a case that supports

14 you --

15         MR. STEINBERG:  I cannot do it right now, but I'd

16 like to have the opportunity to submit something before the end

17 of the week.

18         THE COURT:  Okay.

19         MR. STEINBERG:  Okay.  That's -- that is the

20 argument, and that would be the argument that I would

21 establish, if I can establish the facts that I've been talking

22 about.

23         THE COURT:  Okay.  All right.

24         MR. STEINBERG:  On Mr. Peller, I will note that on

25 page 3 of his pleadings, he talks about an independent claim

254

1  asserted by Bledsoe, and that's relate -- Bledsoe is a pre-

2  petition accident case, so I don't know how he would get to an

3  independent claim notion.  But that's an -- that's really,

4  without trying to get to the roots of Bledsoe, that's an

5  indication of why the gatekeeper function needs to be dealt

6  with.

7          Paragraph 28 of the December judgment does not lead

8  the way Mr. Peller said it leads.  It says:

9          "With respect to the Peller complaints, the ignition

10         switch plaintiffs may assert claims based on alleged

11         duties of New GM relating to post-sale events

12         relating to Old GM vehicles to the extent that they

13         are actionable as matters of non-bankruptcy law to be

14         decided by non-bankruptcy courts.  Provided, however,

15         the Peller complaint shall remain stayed unless and

16         until they are amended."

17         And then there were three Romanettes.  The third

18 Romanette is to strike any purported independent claims by non-

19 ignition switch plaintiffs.

20         THE COURT:  Let's come back to the same issue.  What

21 -- but he prevails in the Second Circuit, right?

22         MR. STEINBERG:  He prevails in the Second Circuit

23 about that, as a theoretical matter, independent claims can't

24 be asserted.  He does not prevail in the context of a marked

25 pleading analysis where Judge Gerber reviews the Peller

1 complaints and says that these complaints aren't independent

2 claims, and he doesn't prevail to the extent that res judicata

3 would apply and say his failure to appeal here is going to be

4 binding on him.

5        And where I think Your Honor is struggling is that

6 you're essentially saying that the --

7        THE COURT:  Mr. Weisfelner.

8        MR. WEISFELNER:  Yeah, I apologize.

9        THE COURT:  Go ahead, Mr. Steinberg.

10        MR. STEINBERG:  Where Your Honor is struggling is

11 that you're basically saying that the Second Circuit either on

12 a mandate basis, a wipeout basis, or a Rule 60 basis changes

13 the December judgment.  And the answer we believe, and we -- I

14 think we briefed this, it says that that is not the case.

15        I think the Second Circuit actually affirmed the

16 ruling on independent claims.  And what was the independent

17 claims ruling by the lower court?  It was that ignition switch

18 plaintiffs can bring an independent claim.

19        Now, Mr. Peller says, well, that obviously was a

20 mistake.  They didn't really mean to do that if you read the

21 decision.  But they did do it, and the Second Circuit needs to

22 -- if you want to take the literal language, that's exactly

23 what they did.  And if you thought the Second Circuit made a

24 mistake, you were incumbent on making a motion, like we tried

25 to make on a number -- we thought the Second Circuit made a lot

1 of mistakes.  We made motions for rehearing.  We petitioned for

2 cert.  We were ultimately lost either way, but they had the

3 same burden.

4       THE COURT:  What do you believe the Second Circuit

5 decided with respect to independent claims?

6       MR. STEINBERG:  I think the Second Circuit decided

7 that, as a matter of subject matter jurisdiction, non-ignition

8 switch plaintiffs, defined only as the Pillar plaintiffs

9 because they were the only one there, and that they could

10 assert that -- that they can assert an independent claim.

11       THE COURT:  And so if your position is that -- and I

12 didn't go back to look at what Judge Gerber did with respect to

13 the strikeout from the specific complaint.  Let's assume I

14 agree with you that Mr. Peller's complaint is improper

15 allegations in the independent claim.  Doesn't he get to amend

16 it to take the language out, proceed with independent claims?

17       MR. STEINBERG:  Well, I think that if you look at

18 Mr. Peller's complaints, they aren't language issues.  He

19 asserts things like -- he asserts causes of action that I think

20 are clearly retained liability.  I think --

21       THE COURT:  Let's just -- we're just focusing on

22 independent claims.

23       MR. STEINBERG:  No, I'm say -- look, I can label

24 anything as an independent claim.  That's what the Second

25 Circuit said in the Madoff (indiscernible) type case, and

257

1 that's what the Second Circuit said in the case that I'm not
2 supposed to talk about, but basically said that you could label
3 anything, but we're not accepting form over substance, and
4 we're expecting people to look through what was written to see
5 whether it was enjoined or not enjoined.

6       And in this particular case, that's what Judge Gerber
7 was doing, and that is I think what Your Honor's job is as part
8 of the gatekeeping function, which is, you know, they could put
9 whatever words they want and say this now constitutes an
10 independent claim, but if it's not, if it's --

11       THE COURT:  Well, after the Second Circuit ruling, I
12 don't see why Mr. Peller is batter out.  It may be that what
13 he's pled so far doesn't cut it, but does that mean after the
14 Second Circuit reversed, that he can't assert truly independent
15 claims if he pleads it properly?

16       MR. STEINBERG:  Well, I think to the extent -- well,
17 to some extent, his complaints are in the MDL and they're not
18 really being dealt with.  But if your answer is whether he can
19 actually assert something, I think we'd have to see what he
20 asserts.

21       THE COURT:  Other issues you want to address in the
22 last five minutes?

23       MR. STEINBERG:  Your Honor, I don't think the Pope
24 plaintiffs are here.  I'll rest on our papers on the Pope
25 plaintiffs.

1          I think that Your Honor had asked about the punitive

2    damage -- Your Honor had asked about the punitive damage

3    ruling, was there anything that -- in the November decision

4    that talked about subordination of claims and stuff like that.

5    And there is, although not precisely the way I would have

6    written it, there is some language I think on page 10 of the

7    November decision.

8          THE COURT:  Rule 726(a)(4) talks about allowed

9    claims, including for punitive or exemplary damages.  That

10   suggest that the claims can be allowed.  It's a fourth priority

11   distribution.  You agree with that?

12         MR. STEINBERG:  I do.  I also think that when this

13   sale took place, everybody knew that that priority position was

14   not going to be paid.  I mean, there was a clear ruling that

15   the shareholders were wiped out and I think there was a clear

16   ruling -- I think there would be a clear ruling that the

17   punitive damage claims were wiped out.  I think Judge Gerber

18   rendered a decision in what is the Apartheid case where he

19   talked about advising under the General Motors case where he

20   talked about punitive damages and subordinations.

21         THE COURT:  Tell me what the authorities are that

22   that limitation on punitive or exemplary damages applies to

23   either assumed liabilities or successor liability.

24         MR. STEINBERG:  Well, Judge Gerber ruled that on

25   assumed liabilities that you couldn't get punitive damages, and

1 he did it as a matter of contract --

2          THE COURT:  Yes, okay.

3          MR. STEINBERG:  -- protection.

4          THE COURT:  And now with respect to successor

5 liability, is there any --

6          MR. STEINBERG:  On successor --

7          THE COURT:  -- is there any authority, case

8 authority, that would say that if the debtor couldn't be liable

9 for punitive damages, the successor can?

10          MR. STEINBERG:  There's general authority and it says

11 successor liability is derivative through what the seller had,

12 so if the seller was not liable, the purchaser is not going to

13 be liable on the successor liability theory.  So there's that

14 -- there's the general rule.

15          I think at the last hearing I also mentioned that we

16 bought not from Old GM debtor, we actually bought from the

17 debtor-in-possession.  I don't even think the debtor-in-

18 possession is responsible for the punitive damages of the

19 predecessor.  It's two steps removed.  But our argument is

20 strictly that this is a derivative claim and derivative claims

21 means you're only liable to the extent that the seller -- and

22 when this sale took place, they sold essentially everything of

23 value.  That's what the government took.  They knew that the

24 value of that was going to be roughly translated to somewhere

25 between 25 to 35 cents on the dollar, depending on where the

1  claims in.  They knew that no one was going to --

2          THE COURT:  Well, you don't pay, then, the devalued

3  currency of the debtor.

4          MR. STEINBERG:  That's correct.  You don't pay.  But

5  Judge Gerber actually talked -- in the decision he said,

6  "Punitive damage punished past conduct and deter future

7  wrongdoing" -- I'm leaving out the parentheticals -- "and

8  posing punitives for Old GM conduct would not be consistent

9  with punitive damages purposes.  Claims for punitive damage, if

10 asserted against Old GM, would have at least been subordinated,

11 if now disallowed, as they would only penalize innocent

12 creditors, and in any event, out of the money, given Old GM's

13 deep insolvency" --

14         THE COURT:  I have that (indiscernible).

15         MR. STEINBERG:  Okay.  So I think, Your Honor, I am

16 -- whether I've finished or not, I am finished by the 5:30.  I

17 thank you for the time that you've given us.

18         I will say as a sort of a housekeeping detail, and

19 not necessarily asking for a specific answer, but we are

20 probably fully submitted on the threshold late claims issue,

21 but there's been no oral argument that Your Honor has

22 scheduled.

23         THE COURT:  Discovery is done?

24         MR. STEINBERG:  Well, the discovery that you

25 authorized has been done.

261

1          THE COURT:  Okay.

2          MR. STEINBERG:  So I know you've been very busy

3  lately and you have a lot of things on your plate.  I just call

4  to your attention that I think that's --

5          THE COURT:  I wasn't aware there was all -- that it

6  was -- is it briefed and everything?

7          MR. STEINBERG:  It has been briefed.  The discovery

8  that you authorized were only -- was only interrogatories.

9  They had 60 days to respond and I think, if they haven't done

10  every one, they've done substantially every one, so I think

11  that discovery is done.

12          THE COURT:  Okay.  Is all of the letter briefing done

13  on Tronox?

14          MR. STEINBERG:  I think the -- all the letter

15  briefing on Tronox has been --

16          THE COURT:  -- trying to get out of his seat.

17          MR. STEINBERG:  Well, I think, Your Honor, in what

18  was negotiated between the parties as to the number of pages

19  and the issues to be discussed, that we both agreed to submit

20  four pages, and we submitted the four pages on a simultaneous

21  basis.

22          THE COURT:  And what is Judge Furman being asked to

23  do with respect to the Tronox issue?

24          MR. STEINBERG:  There's a pending motion for -- to

25  dismiss a part of their complaint on -- to the extent that they

1 were asserting successor liability, so the -- what we included

2 and we gave Your Honor was the letter that was written to Judge

3 Furman that said that, based on the <u>Tronox</u> decision, that the

4 plaintiff's successor liability falls down.  And that's --

5           THE COURT:  So should I wait for him to decide it?

6           MR. STEINBERG:  I think certainly on the successor

7 liability side, I think my view would be yes because I think

8 that's teed up before Judge Furman.  As far as whatever the

9 relevance is of the independent claims, I think letters that we

10 submitted speaks for itself, but I'm happy, if Your Honor

11 wanted to have another hearing, which I can't believe will last

12 as long as today's hearing, I'm prepared to speak as to what I

13 believe the relevance of <u>Tronox</u> is on the independent claims

14 issue.

15           THE COURT:  Okay.  Mr. Weintraub?

16           MR. WEINTRAUB:  Yes, Your Honor.  The agreement on

17 the submissions was limited to the independent claims issue.

18 There's also the successor liability issue, which relates --

19           THE COURT:  -- with that.

20           MR. WEINTRAUB:  -- but also relates to issues for

21 here.

22           What I would like to do, Your Honor, is submit a

23 short letter brief on the successor liability issue because the

24 two letters that were submitted to the Court were a letter

25 prepared by I think King -- was it King & Spalding or was it

1 Kirkland & Ellis?

2          UNIDENTIFIED:  I think Kirkland & Ellis.

3          MR. WEINTRAUB:  The co-counsel on all the pleadings

4 with King & Spalding, and Hagens Berman submitted the successor

5 liability to Judge Furman.  Hagens Berman is not a bankruptcy

6 firm, and I've seen that letter; I think it may be deficient in

7 some respects with respect to how I would have analyzed that

8 issue in a bankruptcy matter.

9          THE COURT:  I know, but Judge Furman is being asked

10 to decide the effect of Tronox and successor liability claims.

11 I have no intention of doing anything on that until he rules.

12 I mean, he -- it's been briefed to him.  I think it would be

13 inappropriate for me to try to jump the gun and decide the

14 issue before -- if it's been presented to him.

15          MR. WEINTRAUB:  Okay.  So would it be fair to say

16 that oral argument will not cover or will cover successor

17 liability?

18          THE COURT:  What I'm going to do, because I've told

19 you a few times before, I will inquire of Judge Furman how he

20 -- how we decide it ought to be dealt with, and I'll advise

21 you.  Okay?  It would be inappropriate for me unilaterally to

22 say I want to hear argument and therefore any supplemental

23 briefing on the effect of Tronox on successor liability claims.

24 It's been put before Judge Furman, and while he and I don't

25 discuss the merits of the issues, from time to time we do have

1    discussions about procedural posture, what hearings are coming

2    up, et cetera.  So I will inquire of Judge Furman about that

3    and let you know.

4             MR. WEINTRAUB:  Thank you, Your Honor.  It would

5    probably turn this from --

6             THE COURT:  But that's not getting you off the hook

7    about the effect of <u>Tronox</u> on independent claims.

8             MR. WEINTRAUB:  I understand.  My point is I think it

9    would be a much longer hearing if we were to talk about

10   successor liability as well.

11            THE COURT:  Sure.

12            MR. WEINTRAUB:  If I could make one other point, Your

13   Honor, just -- there was a colloquy during argument where I

14   think you attributed a comment that was made by Mr. Weisfelner

15   to me and just so --

16            THE COURT:  I apologize for the mistake.

17            MR. WEINTRAUB:  Okay.  I just -- so the record is

18   clear, with respect to the discovery in the MDL and what it

19   covered and whether or not there facts developed, either by

20   NHTSA or otherwise --

21            THE COURT:  -- saying that I thought it was you

22   but --

23            MR. WEINTRAUB:  It was him.  Thank you, Your Honor.

24            MR. WEISFELNER:  Your Honor, just briefly, I know

25   that you have a 5:30 cutoff.  On behalf of I think -- I know

1  myself, I think Mr. Peller, and maybe even Mr. Weintraub, we

2  would request an opportunity collectively to submit no more

3  than five pages just on issues that Mr. Steinberg raised for

4  the very first time in his argument today, as opposed to what

5  he covered for the first time at the last hearing.

6          And in particular, the focus would be on his, in our

7  view, inappropriate reliance on paragraph 14 of the December

8  decision.  Mr. Steinberg selectively read half of paragraph 14,

9  not all of it.

10          THE COURT:  I promise to read the whole paragraph.

11          MR. WEISFELNER:  Your Honor, you might also want to

12  take a look at those provisions of the decision that preceded

13  the judgment, in particular what Judge Gerber said about the

14  Groman plaintiffs' request for discovery.  And what he did say

15  there, you'll see, if you go back to the decision itself, is

16  that they requested discovery, the rest of the parties agreed

17  to oppose it.  It was opposed.  The request for discovery was

18  denied without prejudice pending its ability to be reasserted

19  after the Second Circuit rules on the appeal from the prior

20  decision.

21          THE COURT:  Has a transcript been requested?

22          MR. WEISFELNER:  You don't need the transcript, you

23  just need the order.  The order says just that.

24          THE COURT:  All right.

25          MR. WEISFELNER:  Not the order, I'm sorry, the

266

1  decision.

2          THE COURT:  What's the -- it's in the decision.

3          MR. WEISFELNER:  It's in the decision itself.

4          THE COURT:  I don't want any more briefs.  I don't

5  want any more letters.

6          MR. STEINBERG:  I only want to say one sentence, one

7  sentence.  The Groman plaintiffs are Ignition-Switch

8  plaintiffs, not Non-Ignition-Switch plaintiffs.

9          THE COURT:  How long -- how substantial are the

10  materials on the late train?  I'm just trying to think what I

11  -- how much time I need to prepare.

12          MR. WEISFELNER:  Your Honor, I think they're fairly

13  substantial, but I also should tell Your Honor, in terms of

14  your scheduling, that there are active discussions ongoing, at

15  least between the plaintiffs, the GUC Trust, and the GUC Trust

16  Unitholders that might or might not obviate a trial on the

17  papers that have been submitted on this issue to date.  And if

18  we do resolve it, we may very well have to have a hearing under

19  9019, but I think the paradigm for consideration will shift.

20          THE COURT:  What's the timing?

21          MR. WEISFELNER:  Your Honor, I'm hopeful that, if we

22  are going to have a deal, it's within the next certainly 30

23  days and maybe before that.

24          MR. STEINBERG:  Your Honor, just so it's clear, I

25  don't think the oral argument would last too long.  There are

267

1  actually only two issues that parties briefed.  One was to what

2  extent has there been a tolling provision agreed to for each of

3  the category of plaintiffs, so that's a defined date.  And the

4  second is whether the <u>Pioneer</u> factors apply in lieu of -- in

5  view of Judge Gerber's ruling and whatever the Second Circuit

6  said.

7          So you weren't dealing with anything with regard to

8  the merits or the trial, but these were truly threshold issues

9  as to whether they can file a claim without having to show the

10 <u>Pioneer</u> factors and to establish when a toll came into effect.

11 And I don't think you --

12         THE COURT:  Mr. Weisfelner, file a status letter on

13 or before 5 p.m. June -- by June 16th.

14         MR. WEISFELNER:  Yes, sir.

15         THE COURT:  I don't need -- obviously, I don't want

16 to know the details if you're still negotiating, I want to know

17 the status.

18         MR. WEISFELNER:  Yes.

19         THE COURT:  Okay.  And after I receive that, I'll

20 decide whether to schedule -- whether I'm going to schedule

21 argument on the late claim issues.  It will probably be

22 sometime in July.  I'm actually out of the country toward the

23 end of June, so we'll see.

24         Thank you very much, everybody.  We're adjourned.

25    (Proceedings concluded at 5:39 p.m.)

268

1            **C E R T I F I C A T I O N**

2

3            I, Lisa Luciano, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9    _____

10   LISA LUCIANO, AAERT NO. 327        DATE:  May 19, 2017

11   ACCESS TRANSCRIPTS, LLC

12

13

14

15           **C E R T I F I C A T I O N**

16

17           I, Ilene Watson, court-approved transcriber, hereby

18   certify that the foregoing is a correct transcript from the

19   official electronic sound recording of the proceedings in the

20   above-entitled matter.

21

22

23   _____

24   ILENE WATSON, AAERT NO. 447       DATE:  May 19, 2017

25   ACCESS TRANSCRIPTS, LLC

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)