# <u>EXHIBIT N</u>

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  IN RE:  GENERAL MOTORS LLC
   IGNITION SWITCH LITIGATION,
4
                                     14 MD 2543 (JMF)
5

6  ------------------------------x
                                  New York, N.Y.
7                                 August 11, 2017
                                  9:00 a.m.
8
   Before:
9
                    HON. JESSE M. FURMAN,
10
                                     District Judge
11
                         APPEARANCES
12

13 LIEFF CABRASER HEIMANN AND BERNSTEIN LLP
   BY:  ELIZABETH JOAN CABRASER
14           -AND-
   HAGENS BERMAN SOBOL SHAPIRO LLP (SEATTLE)
15 BY:  STEVE W. BERMAN
             -AND-
16 HILLIARD MUNOZ GONZALES LLP
   BY:  ROBERT HILLIARD
17           -AND-
   BROWN RUDNICK
18 BY:  HOWARD STEEL
        Attorneys for Plaintiffs
19
   KIRKLAND & ELLIS LLP
20 BY:  RICHARD CARTIER GODFREY
        ROBERT C. BROCK
21      ANDREW B. BLOOMER
        ALLAN PIXTON
22           -AND-
   KING & SPALDING
23 BY:  ARTHUR J. STEINBERG
        Attorneys for Defendant General Motors L.L.C.
24

25

 1              THE COURT:  Good morning.  We are here in the GM MDL

 2    matter.

 3              Counsel, why don't you just state your names for the

 4    record.

 5              MS. CABRASER:  Good morning, your Honor.  Elizabeth

 6    Cabraser for plaintiffs.

 7              MR. BERMAN:  Good morning, your Honor.  Steve Berman

 8    for plaintiffs.

 9              MR. HILLIARD:  Good morning, Judge.  Bob Hilliard for

10    plaintiffs.

11              MR. BERMAN:  Your Honor, we also have at our table our

12    bankruptcy counsel on the economic loss side, Mr. Steel, Howard

13    Steel.

14              MR. STEEL:  Good morning, your Honor.

15              THE COURT:  Good morning.

16              MR. GODFREY:  Good morning, your Honor.  Rick Godfrey

17    from New GM.  We also have New GM's bankruptcy counsel with us,

18    Arthur Steinberg; my colleague, Mr. Bloomer; Mr. Brock; and

19    Mr. Pixton, who once again is at the front table, your Honor.

20              THE COURT:  Thanks for being here earlier than our

21    usual start time.  I think Ms. Kumara may have told you I need

22    to get out of here pretty promptly today.  I have a medical

23    situation I need to attend to.  As you can see, Ms. Smallman is

24    out.  So Ms. Kumara is out front.  Just a reminder to speak

25    into the microphones loud and clear, and we will proceed with

1   the agenda.

2        I don't know if the presence of bankruptcy counsel

3   suggests that there is more to discuss on the bankruptcy front

4   than I thought there might be.  You're getting me nervous.

5   Let's start with the bankruptcy proceedings.

6        The letters I received from both parties suggested

7   that there wasn't much to talk about with respect to the

8   July 12 bankruptcy ruling at this point, that there may be down

9   the road.  I don't know if that's changed or what have you.

10        I confess I don't quite have a full grasp of what the

11   implications of that ruling are for the cases that are pending

12   before me, but I assume that will sort of flush itself out over

13   time.

14        I am curious what remains to be litigated in the

15   bankruptcy Court.  I think all but the late claims issue have

16   been resolved, at least of the threshold issues, but the word

17   "threshold" suggests that there is more to be done there, and

18   I'm sure there is.  So I would love some sense of that.

19        The last question is the letters, including the agenda

20   letter, have noted any number of appeals that have been filed

21   from the bankruptcy court's rulings, and I didn't know where

22   those appeals were filed or headed, which is another way of

23   saying I don't know if they're coming to me or if I should be

24   on the look out for them.  I'm not eager to get more work on my

25   plate.  I have enough from you guys, but that being said, I

1   don't know if there is something that I should be on the look

2   out for.

3         So I guess that's all just by way of saying if

4   somebody can help me out and help me understand what's going on

5   and what I should be expecting, that would be helpful.  I don't

6   know if Mr. Steel or Mr. Steinberg are the right folks or

7   counsel here.  Make sure you get a microphone though, please.

8         MR. STEEL:  Good morning, your Honor.  Howard Steel of

9   Brown Rudnick.

10        With respect to the 2016 threshold issues, Judge Glenn

11  has issued opinions on all of the 2016 threshold issues.

12        THE COURT:  Other than the late claims issue.

13        MR. STEEL:  Other than the late claims issue.  I'll

14  address that in a second.

15        There have been numerous appeals of the 2016 threshold

16  issue opinions.  Lead counsel for the economic loss plaintiffs,

17  personal injury plaintiffs, and certain other plaintiffs have

18  filed notices of appeal.  General Motors has also filed a

19  notice of appeal.  Those recently statements of issue on appeal

20  and designation of records have been filed.

21        THE COURT:  In what court?

22        MR. STEEL:  In the bankruptcy court.

23        THE COURT:  Where is the appeal being taken?  In this

24  court, or is it the Second Circuit?

25        MR. STEEL:  To the district court.  Certain plaintiffs

 1   have filed related case statements seeking to have it heard

 2   with your Honor.

 3          THE COURT:  When did that happen?  I haven't seen

 4   those.

 5          MR. STEEL:  They were filed within the last week.  We

 6   can send copies if your Honor desires.

 7          THE COURT:  That would probably be helpful, if only

 8   because it would alert me to what the docket numbers of those

 9   appeals are, I would think.

10          Do they have docket numbers in this court yet?

11          MR. STEEL:  I'm not aware that any of them have docket

12   numbers yet.

13          THE COURT:  I think better to have the information

14   than not, and I can then look into where those things are if

15   they were supposed to come to me, but I have not yet seen them.

16          So how many of those are we looking at?

17          MR. STEEL:  I'm looking at Mr. Steinberg.  I think

18   there are four or five.

19          MR. STEINBERG:  Good morning, your Honor.  Arthur

20   Steinberg.

21          The paperwork for the designation of record and

22   statement of issues was filed two days ago.  So the paperwork

23   itself hasn't gone from the clerk of the bankruptcy court up to

24   the district court yet.

25          The appeals that were filed by the plaintiffs' side

1    were with regard to the July 12, 2017, order entered by the

2    bankruptcy court.  New GM appealed a June order of the court

3    and a separate July order of the court.

4             THE COURT:  The June order was the Pitterman?

5             MR. STEINBERG:  The Pitterman.  Correct, your Honor.

6    The cover sheets that we filed -- I don't know what the

7    plaintiffs are, but I assume the same -- said the two appeals

8    that were filed are connected with each other, should be heard

9    by the same judge, and we referenced those appeals as being

10   related to the MDL.

11            So we would expect it ultimately to come to

12   your Honor, but the paperwork hasn't emerged from the

13   bankruptcy court to the district court yet.

14            THE COURT:  So it doesn't sound like it should yet be

15   on my radar or that I should have received the related case

16   statements, but I will be on the lookout for them.  If you

17   could send them to chambers just so I can have whatever

18   information I can have, that would be helpful.

19            MR. GODFREY:  Your Honor, would you prefer a letter,

20   just a cover letter, with the basic information on this from

21   both parties?  We can do that, if that would be helpful to the

22   Court.

23            THE COURT:  Sure.  Why don't you do that.  On the one

24   hand, the sooner the better.  On the other hand, it doesn't

25   need to be filed today.  I won't give you a deadline, but the

1   sooner the better.

2           Very good.  Anything else to say on that front?

3           MR. STEEL:  Nothing right now, your Honor.

4           THE COURT:  I'm mindful that I already have a few

5   bankruptcy appeals to resolve relating to this, and they are on

6   my to-do list.  So I guess that list just got longer.

7           The next items are coordination of related actions,

8   document production, and deposition updates.

9           Is there anything to discuss on those three?

10          MR. GODFREY:  Just one point, your Honor.  Just a note

11  for the Court.  The last time we were here in July, I had noted

12  that the Orange County trial was set to start on August 14,

13  which is this coming Monday.  That has been continued at the

14  request of the parties until October 23.

15          I want to make sure the Court was aware of that since

16  I had alerted the Court that there was a possibility of some

17  issues coming up that the Court might be interested in, but

18  that's two months down the road now.  So nothing to worry about

19  at the current time.

20          THE COURT:  Thank you.  I saw that in the July 31

21  related case update.  That timing is better for my purposes,

22  since I'll be in the country at that time preparing for the

23  next trial here.  Good to know.

24          Let's turn then to what may be the biggest ticket item

25  today, which is the economic loss motion practice and

1  discovery-related issues.  I don't know if intervening events,

2  that is, between your letters and today, have changed anything

3  as far as you're concerned, the big intervening event being my

4  granting of the motion for reconsideration that was filed by

5  plaintiffs.

6          Let me give you my thoughts, unless you have anything

7  you need to add before I give you my thoughts.  Good.

8          So first let me start with the areas of agreement.  It

9  seems like you're in agreement that discovery should not

10  proceed at this time with respect to the FACC plaintiffs whose

11  claims have been dismissed, and I'm in agreement with that as

12  well.

13         Second, on the issue of summary judgment motions, I

14  want to understand a little better what the proposal and idea

15  here is.  As I understand it, New GM is proposing to file a

16  summary judgment motion sooner rather than later but limited to

17  the issue of benefit of the bargain damages.  The idea would be

18  to bring a summary judgment motion on all other issues down the

19  road as to some or all states depending on my resolution of

20  that.

21         Mr. Godfrey is nodding his head.

22         MR. GODFREY:  Yes, your Honor.  The centrality of the

23  plaintiffs' case has shifted to the major contours of elements

24  of the benefit of the bargain.  That is a discreet legal issue

25  that the Court's guidance and ruling on will materially

1   expedite and define the case going forward, including whether

2   there can possibly be a class.

3        We have views on what "benefit of bargain" means in

4   various states.  I'm sure the plaintiffs would disagree with

5   some of those views, maybe all of them.  The Court will have to

6   decide that.

7        That issue, given the allegations with respect to the

8   16 states that the Court has already ruled upon, has become a

9   central question, the contours and outcome of which will be

10  very significant in terms of a class briefing.

11       We think it's helpful for the Court, indeed necessary

12  for the Court, to have a firm understanding of the differences

13  in state law, what the state law provides and doesn't provide,

14  and the meaning of that catch phrase "benefit of the bargain"

15  before we embark upon the class certification because it will

16  dictate, in many respects, how the Court views certain of the

17  class issues.

18       THE COURT:  I put a lot of trust in you guys in

19  determining how to proceed and what makes sense and doesn't.

20  So I'm inclined to accept the proposal.

21       I've written something in the neighborhood of 240

22  pages on the laws of 16 states already and addressed the issues

23  of benefit of the bargain.  I don't know what evidence has come

24  to light in discovery that would have meaning for you to sort

25  of shed light on this issue in a summary judgment motion or

1   what the story is.

2        This is partially because I'm, in general, not a fan

3   of piecemeal motion practice.  I obviously have made some

4   exceptions here for reasons of practicality and otherwise.

5        The idea of having a substantial motion this fall

6   followed by another one at some point down the line isn't

7   particularly attractive to me.  So I'm just trying to get a

8   better sense of what light could be shed that would be helpful

9   in terms of the class certification or settlement or otherwise.

10        MR. GODFREY:  We thought hard about this before

11   proposing it.  So this was not a late-night thought to burden

12   the Court.  The Court has accepted the notion advanced by

13   plaintiffs that they have benefit of the bargain, that they can

14   make a claim for benefit of the bargain damages.  The question

15   then becomes what is the nature and element of that definition.

16   What is benefit of the bargain damages.  What is the type of

17   evidence.

18        From the depositions, we think that the plaintiffs,

19   the representative plaintiffs, don't have it, but we also think

20   that it would be very illusory for the Court to understand

21   precisely what benefit of the bargain means and does not mean

22   as compared to the label that has thus far been applied.

23        This is similar to what happens in a lot of mass tort

24   cases where the Court will identify, for example, a particular

25   causation issue and have a separate summary judgment tract on

1   that particular issue because it can materially advance or

2   materially inform the parties.  So it's very analogous to what

3   is quite common in MDLs involving mass torts of a different

4   type.

5          So, from our perspective, we know what the deposition

6   discovery has shown.  We believe we know what the law is.  The

7   Court may or may not agree with us on that.  We think that the

8   law and the plaintiffs' claims do not mesh, but we also think

9   there are some overarching principles that if the Court agrees

10  with us, that means certain things for class certification.

11         If the Court disagrees with us, it will mean different

12  things for class certification.  It may be equally helpful from

13  our perspective, but we don't know until the Court actually

14  rules.

15         Otherwise, we are briefing class certification where

16  there is a central theory of recovery and a central theory of

17  measurement of the damages which is undefined for the Court and

18  undefined by the contours of the record thus far.

19         Therefore, we've analogized this to a classic

20  causation issue in certain types of mass tort, particularly Big

21  Pharma cases, for example.

22         THE COURT:  Do you anticipate that it would need to

23  engage in a state-by-state analysis of each of the 16 states?

24  Or could this be done at a level of generality that doesn't

25  require that?  Or is this some sort of grouping that could be

1   done where the parties, perhaps even in advance, agree to

2   different approaches to this and put the states in each of

3   those buckets?

4        MR. GODFREY:  We have not discussed this with the

5   plaintiffs, at least I haven't.  Maybe Mr. Bloomer has.  Our

6   contemplation was an omnibus motion but with the law from the

7   16 states that your Honor has addressed.

8        I don't think it will be materially different for

9   certain other states.  I didn't want to complicate this more

10  than it might otherwise be.  So it was an omnibus motion.

11       If there were particular state differences, we would

12  draw those out individually.  But from our reading of the law,

13  we think that there are common elements that will drive the

14  decision-making analysis of the Court that are overarching for

15  the 16 states on this particular issue.

16       There may be some differences.  As to those, we would

17  brief those separately with a subset.  So it is somewhat akin

18  to -- I hate to say this because we lost this motion, but it's

19  somewhat akin to the consequential damages issue where we had

20  an omnibus motion, and then we had as a fallback where there

21  were some individual state differences, and the Court did not

22  agree with us on the omnibus motion up until now but then gave

23  us the Court's views in terms of what to look for in individual

24  states, which was very, very helpful.

25       So that is how we envisioned it.  We did not envision

1  that we would have a brief that says the law of Alabama is X.

2  The law of New York is Y.  The law of Missouri is Z.

3         We envisioned it as here are the principles that the

4  courts follow when applying all of the states, and if there is

5  a difference in a particular state, then we would identify that

6  that says this particular state has the following additional

7  two elements or the following element to the claim.

8         So, from our perspective, we, frankly, focused on this

9  in connection with another case we're involved in where we were

10 discussing an overarching causation issue.  We thought we have

11 the same issue here, but it's on benefit of the bargain

12 damages.

13        Mr. Bloomer and I had a case on this years ago on a

14 damages issue similarly where we focused on the damages

15 question, and it became the determinative factor in the court's

16 analysis on class certification.

17        THE COURT:  Let me hear from someone at the front

18 table.

19        Mr. Berman, is that you?

20        MR. BERMAN:  That's me, your Honor.

21        THE COURT:  Just get a microphone, if you can.

22        MR. BERMAN:  You said you were relying on the wisdom

23 of the parties in coming up with this procedure.

24        THE COURT:  I get the sense it's more the parties at

25 the back table in this instance.

1          MR. BERMAN:  Exactly.  I've heard Mr. Godfrey and

2    Mr. Bloomer explain it.  I still don't understand exactly the

3    basis of the motion because you've already ruled in certain

4    states that benefit of the bargain damages are permissible.

5          Having said that, we didn't see a mechanism over the

6    rules where we can stop GM from moving for summary judgment at

7    any time they want to.  They apparently want to do it now.

8          So, unless the Court stops them and says, I only want

9    to do summary judgments once, not piecemeal, which is what

10   they're proposing, then we went along with the schedule with

11   the caveat that -- New GM seems to think that they've got this

12   magic bullet, but they want until December to file the brief.

13   If they've got the magic bullet and they've thought it out,

14   let's get it on the table like next week or something way

15   sooner than December.

16         THE COURT:  I hear you that it's coming more from the

17   back table than yours, and I certainly do think I have the

18   authority to say we're only going to have one round of summary

19   judgment briefing here and it won't be until X.

20         I will adopt the proposal and allow New GM to file its

21   motion on this front.  I'll adjust the scheduling in a few

22   minutes when we turn to issues where you don't agree, but

23   you'll find that I'm a little more in agreement with the

24   plaintiffs on that front, that we should get things moving more

25   quickly than New GM proposed.

1    The last point of agreement is that you will meet and

2    confer regarding essentially application of my two prior motion

3    to dismiss opinions to the 35 remaining states in an effort to

4    hopefully obviate the need for further motion practice, and

5    perhaps you could essentially resolve how the motions or the

6    decisions apply to those states.

7        I think that's optimistic.  I imagine there will be

8    some points of disagreement, but as I understand it, you'll

9    meet and confer by December 1 and submit something to me,

10   either an agreed-upon proposal or some sort of competing

11   proposals, by December 15.

12       So I'll look for that.  That's fine with me.  I would

13   just ask you to please confer in good faith and to be

14   reasonable.  In my experience, as you've probably seen, I think

15   in most of these jurisdictions you can find an outlier case or

16   two that say the opposite of what the weight of authority in

17   that state seems to say.

18       In that regard, I think in almost every one of these

19   issues in every one of these states, there is authority that

20   both parties can hang their hats on.

21       As you've seen, I tend to go with the majority

22   approach or the weight of the authority.  So I guess I'm just

23   saying that recognizing that you can probably make an

24   argument -- you're good lawyers.  You can make an argument for

25   anything.

1    Just pick your battles, and hopefully we can minimize

2    the amount of briefing that we need to do on the remaining 35

3    states, but obviously we'll see where that goes.

4    Now let's turn to the issues upon which you don't

5    agree.  First is the one that Mr. Berman referred to a moment

6    ago, which is the briefing schedule for this first summary

7    judgment motion.

8    As I understand it, Mr. Berman mentioned a December

9    date.  As I understood it, the competing proposals at this

10   point were only separated by two weeks, namely September 29 and

11   October 13.  Mr. Bloomer is nodding his head.  So I'm assuming

12   that's correct.

13   My proposal is to sort of split the difference and

14   take a little bit of time away so that it is still fully

15   submitted by the time that the plaintiffs have proposed.

16   On my proposal, I would have the motion due by

17   October 6, any opposition due by October 30, and then any reply

18   due by November 10, which is the date that the plaintiffs have

19   proposed.  I think that may be a court holiday, but I think I

20   would still have it due on that date notwithstanding that since

21   you can file on ECF.

22   That splits the difference and gives New GM an extra

23   week.  On the other hand, it gets the motion fully submitted by

24   the date the plaintiffs have proposed.

25   Any objections?

1    MR. GODFREY:  We're okay with that, your Honor.  Thank

2  you.

3        MR. BERMAN:  I guess my only concern is New GM has

4  been preparing this for quite a while, and it's August.  So

5  you're giving them another 45 days to get it ready.  You're

6  giving us 24 days to respond.  Maybe give us an extra week.

7        THE COURT:  I was trying to --

8        MR. BERMAN:  I hear you.

9        THE COURT:  -- give you something that you were asking

10  for.  On your proposal, they would have had until the end of

11  September anyway.  So it's only seven days beyond what you have

12  contemplated.

13        MR. BERMAN:  So how about if we get an three extra

14  days?

15        THE COURT:  So you would get until November 2?

16        MR. BERMAN:  Correct.

17        THE COURT:  That's fine with me.  We'll leave the

18  reply deadline as November 10, but I'll give plaintiffs until

19  November 2, which I think is the date we're starting the

20  Doddson trial, to file their opposition.

21        The second issue is the question of proposed

22  amendments to the 4th amended consolidated complaint.  I think

23  one of the biggest issues you're going to have to address is

24  what to call the next complaint because fifth starts with the

25  same letter as fourth.  I don't know if you have any thoughts

1    on that.  We've been pondering that.

2         MS. CABRASER:  Maybe the best amended consolidated

3    complaint.

4         THE COURT:  Or maybe the last.

5         MS. CABRASER:  That would be the lack, and we would

6    not want them to be characterized as lacking anything.

7         THE COURT:  Understood.  You can ponder what to call

8    it between now and then.

9         Let me tell you my thoughts on this.  I have to say

10   that I share New GM's skepticism about the appropriateness of

11   the proposed amendments, that is to say, I think the plaintiffs

12   have a bit of an uphill fight to show that there is good cause,

13   which I think is the relevant standard here.

14         Having said that, I don't see how I can categorically

15   preclude the amount based on the current record and the

16   parties' letters.  New GM's arguments against allowing the

17   amendment -- this is on page 7 of its letter, which is docket

18   number 4338 -- are really fact dependent based on who knew what

19   and when.

20         I don't know the answers to those questions, and I

21   also imagine that the answers might differ as to some of the,

22   say, proposed new plaintiffs versus others.  So I don't really

23   see how I can categorically preclude an amendment.

24         I think what may make more sense -- as you have heard,

25   I'm not eager to invite more motion practice, but I think what

1    would make more sense would be to have the plaintiffs file

2    their proposed amended complaint with essentially a motion for

3    leave to amend, and we can then adjudicate it based on what the

4    actual concrete proposals are and what showing they can make as

5    to the proposed changes.

6          So that's a little different than I think either side

7    had contemplated.  Maybe not.  The plaintiffs essentially made

8    that argument in their letter but didn't exactly frame it as a

9    motion for leave to amend.  It was more just a yes or no.  I

10   guess what I'm saying is I don't see how I can say yes or no

11   without knowing more.

12         Mr. Bloomer, it looks like you want to say something.

13         MR. BLOOMER:  Thank you, your Honor.  Andrew Bloomer

14   on behalf of New GM.

15         If the Court grants leave to amend and then there is

16   motion practice on that, I take it that the motion practice

17   would encompass either the proprietary of adding the new

18   plaintiffs and/or why their claims should be dismissed on the

19   merits, which is what I think the plaintiffs had in their

20   proposed schedule.

21         We objected to the addition of the plaintiffs but said

22   regardless, since you're filling slots that have already been

23   briefed, we want to reserve our client's right to move to

24   dismiss them on the merits, and I just want to understand the

25   scope of what would be contemplated in opposing a motion for

1   leave to amend.

2          THE COURT:  I hadn't really thought it all through.  I

3   think you raise an interesting question.  I was thinking that,

4   yes.  We would adjudicate the question of amendment, and then

5   certainly you would have an opportunity to make your

6   12(b)(6)-type arguments with respect to any new plaintiffs.  I

7   don't know if there are new claims, but I think it's more new

8   plaintiffs than anything else.

9          Having said that, what your comment points to is maybe

10  these two things can and should be consolidated.  Obviously

11  futility is a factor in the leave-to-amend analysis.  In that

12  regard, the 12(b)(6) arguments can be made in the context of

13  the leave-to-amend process, the only difference being really

14  who files the opening brief.

15         In the normal case, of course, in a motion for leave

16  to amend, the plaintiff would essentially file the opening

17  brief and say why the amendment is not futile, and then you

18  would have an opportunity to make your 12(b)(6) arguments in

19  opposing, and then they would have the reply, as opposed to I

20  think the way you guys had sort of proposed doing it, there

21  would be an amendment followed by 12(b)(6) practice where GM

22  would be the moving party and file the reply.

23         So I don't have a strong view either way, except that

24  the most efficient way we can do this and the faster we can get

25  it resolved I would think the better, particularly if we have a

1    summary judgment motion coming down the pike.

2         MS. CABRASER:  Your Honor, we hadn't thought of that

3    specifically, but we think that makes sense.  Certainly it

4    would be more efficient to combine those arguments.

5         We would be providing the plaintiffs' FACC sheets for

6    the additional plaintiffs.  There are ten or less of those.  So

7    the information would be in the proposed amended complaint.

8    The FACC sheet would be there.  We would be making our

9    arguments in our motion to amend opening brief.

10        As you know, futility is an argument against

11   amendment.  So this would really be any attack on this pleading

12   in terms of what is new or different in it, and then once we're

13   past that, we either have the amended complaint in whole or in

14   part or we don't, and we move on.

15        THE COURT:  Mr. Bloomer.

16        MR. BLOOMER:  I think both parties are trying to

17   figure out a way, your Honor, to try to streamline the

18   proceedings without kind of sacrificing rights, at least

19   certainly from our perspective, our right to move to dismiss.

20        If the plaintiffs want to move for leave to amend and

21   we raise an opposition that addresses both the leave and the

22   12(b)(6)-type arguments, to the extent we have them, I think we

23   can accept that.  I realize they'd get a reply.  I think,

24   depending on what happens, we may want to seek leave for a

25   surreply just to kind of --

1          THE COURT:  Get the last word?

2          MR. BLOOMER:  Get the last word and keep in line with

3     traditional motion practice on 12(b)(6).

4          THE COURT:  I think we can probably wait and see if

5     that proves to be necessary.  I think this is probably the way

6     to go, just thinking out loud.  I think it probably means

7     getting these things resolved even faster than you guys have

8     proposed in your competing schedules.  So why don't we plan on

9     proceeding that way.

10          I have been, I think, fairly reasonable, more than

11     aggressive, in granting requests to file surreplies because I

12     have generally trusted you guys and your assessment that that

13     is appropriate and necessary.  So, if you think it is here, you

14     can make an application, and I will consider it in the normal

15     course.

16          I'll leave it to you to propose deadlines for that.  I

17     think if plaintiffs can still file the proposed amendments by

18     August 25, that would be great.  If they weren't contemplating

19     doing that with a motion -- that may be ambitious, particularly

20     if we're now essentially consolidating the sort of contemplated

21     12(b)(6) motion practice with a motion for leave to amend.  It

22     may be that we can still push that deadline back a bit and have

23     that resolved quickly, if not more quickly than contemplated in

24     your proposed schedules.

25          So can I leave it to you to confer and come up with a

1    proposed schedule?

2             MS. CABRASER:  Yes, your Honor.  We'll confer on that,

3    and we'll come up with a schedule.  It will be somewhat later

4    than the August date, but I think it will end up being more

5    expeditious.

6             THE COURT:  Great.  I trust that you will, again, be

7    reasonable and proceed in good faith on the question of

8    futility and that you're not going to make arguments that

9    really amount to reconsideration of a decision that I've made

10   in the first two motions that I've resolved, which is another

11   way of saying that you can reserve your rights and the relevant

12   footnotes as you regularly do, but I don't expect to see

13   arguments that are really taking issue with rulings I've made.

14            It's one thing to make new arguments based on the

15   specific allegations concerning those plaintiffs.  It's another

16   thing to reargue points that as far as I'm concerned, are

17   settled.  So I trust that you will hear me loud and clear on

18   that front and not seek to re-litigate issues that I've already

19   decided.

20            So I'll look for your proposal on that.  If you can

21   incorporate it into the proposed order memorializing what we're

22   doing here today, great.  If you need additional time, that's

23   fine as well as far as I'm concerned, but I'll leave it to you

24   and trust that you'll submit it to me as soon as you can.

25            That leaves the bigger issue of sort of the structure

1    of future motion practice.  I did, number one, review other

2    MDLs and some of the decisions cited in your letters, I think

3    more plaintiffs' letter than New GM's letter, but I did review

4    other MDLs and spoke to other MDL judges to get a sense of

5    their experiences in these matters.

6        The bottom line is I do not intend to proceed in the

7    manner that New GM is proposing, that is to say, as I

8    understand it, briefing summary judgment and class

9    certification as to all 51 sates and D.C.

10       As I indicated before, I'm not a big fan of piecemeal

11   motion practice, but I think adopting that approach would

12   really involve a significant delay before we even got to motion

13   practice because of the need for discovery.

14       GM has made clear that it would take the position that

15   it's entitled to take discovery of every plaintiff in every

16   state that is subject to motion practice.  I think it would be

17   a while before we even got to motions.  Frankly, what those

18   motions would look like and what a ruling would require from me

19   are things that I shudder to think about.

20       I think it makes a lot more sense, as I think I had

21   intimated at the July conference, to adopt some sort of

22   bellwether-type approach along the lines of what I think I

23   suggested last month and what the plaintiffs have proposed, and

24   that does seem to be the way that, if not most other MDLs of

25   this sort facing similar issues have proceeded, but certainly

1   the way that many have with some success.

2           I think that a decision on essentially some number of

3   the states that I have already addressed on the motions to

4   dismiss would help inform the settlement discussions that I

5   assume are either ongoing or would be ongoing.  In any event, I

6   think it's likely that we would be able to apply those

7   decisions in some streamlined fashion to other states down the

8   road.

9           So that's a long way of saying that I agree with the

10  plaintiffs that some sort of bellwether approach is warranted

11  here, which raises the question of sort of how to choose the

12  bellwether states, if I can call them that.  I include D.C. as

13  a state, even though as every resident of D.C. would tell you,

14  it is certainly not a state.

15          I am inclined to pick two to be agreed upon jointly by

16  you, and I hope that you could agree jointly of the 16 that I

17  have addressed sort of the two that would make the most sense,

18  either from the perspective that the most plaintiffs are in

19  those or they're most representative of the 51 states or at

20  least the 16 states that I've resolved.

21          I just think that given the amount of briefing and the

22  decisions you already have from me, that you guys could

23  actually agree upon that.  If you can't, I'm inclined to think

24  that you should submit letter briefs to me, and then I'll

25  decide.

1    This is not like the personal injury/wrongful death

2    cases where I'm in the dark about the specifics of the cases

3    and, therefore, not in a good position to choose.  I obviously

4    know quite a bit about the 16 states that we're choosing among.

5        So, if you can't agree, I think you can submit your

6    views on which of those states we should adopt, and I could

7    then make that decision.  I would rather not have to do that,

8    but I'm certainly prepared to do that, if necessary.

9        So my inclination is to say two and leave it to you to

10   try and meet and confer and either submit something, an

11   agreed-upon kind of schedule and protocol identifying those two

12   states or competing proposals, and I'll then resolve things

13   that you don't resolve.

14       I would say in the mix of that if in the course of

15   talking about it, you guys decide, based on the particular

16   facts of either the number of plaintiffs or the categories of

17   state laws involved, if you think that a number other than two

18   makes sense -- I'm not interested in 16, but if three or four

19   would make more sense than two, I'm certainly open to that.  As

20   an opening bid, I would suggest two.

21       Mr. Berman.

22       MR. BERMAN:  Your Honor, Ms. Cabraser and I were

23   talking this morning, and coincidentally we came up with two as

24   well.  We bounced around four, five, six.  It doesn't matter.

25   We thought we could do one because that's going to guide a lot

1   of future thinking, but maybe there is a difference in law that

2   might be helpful.  So we came up with two.

3          We'll certainly try to agree with GM on which two.

4   The only thing I think we need to do is then have a timetable

5   for selection and more letter briefing on the issue.

6          THE COURT:  Let me hear from the back table.  If you

7   guys sit down and talk and look at the particular states and

8   decide that we could do this as to only one state -- and there

9   are several MDLs that have done that, and I think that it has

10  benefited the litigation even where it's been limited to one

11  state and bellwether trials limited to one state or what have

12  you -- I'm certainly open to that.

13         Two is sort of an abstract number.  I guess what I'm

14  intimating is the devil may be in the details.  If it turns out

15  that one can be as useful or three would be more useful, I'm

16  certainly open to that.  Again, two is the opening bid.

17         Mr. Bloomer, Mr. Godfrey.

18         MR. GODFREY:  I think we would like to reflect upon

19  it, your Honor.  The last time I did this in this court, that

20  is, the Southern District in front of Judge Scheindlin, we

21  settled on four.

22         I don't recall whether that was agreed to by the

23  parties or we each got two, in other words, the pick two

24  lottery.  The plaintiffs picked two, and we picked two.

25         I don't recall Ms. Cabraser was directly involved.  I

```
 1    believe it was one of her colleagues.  They had some

 2    advantages, both from a numeric perspective and geographic

 3    perspective that more appropriately canvassed the differences

 4    in the law.

 5         I'd like to reflect upon it.  I understand the Court's

 6    direction.  We will have this discussion.  I know that we do

 7    not think one is appropriate.  Two, three, or four -- we'll get

 8    together with the plaintiffs and see if we can agree.  If not,

 9    then we'll brief it for the Court's consideration.

10         THE COURT:  Great.  Sounds good.  Let me leave it to

11    you to try and hammer all this out.  In terms of a schedule,

12    I'm not prepared, for any number of reasons, to actually go

13    through each and every one of the dates.

14         I'd be inclined to leave that to you to try and hammer

15    out with the one statement from me that I'm more in agreement

16    with the plaintiffs' proposal than I am with New GM's in terms

17    of how to proceed with the actual schedule which I think gets

18    things done more quickly than New GM, but it may be that having

19    resolved the big-picture issue, you guys can reach some

20    agreement, even if it means modifying the plaintiffs' proposal

21    here and there.

22         So why don't I leave it to you in the first instance

23    and see if you can agree on a schedule that fits with the

24    overall structure that I have proposed, and we'll take it from

25    there.
```

1          How long do you want to confer and submit something to

2    me?  Would two weeks be sufficient?

3          MR. BERMAN:  Two weeks would be sufficient from our

4    perspective.

5          MR. GODFREY:  Yes, your Honor.

6          THE COURT:  So I'll give you two weeks from today to

7    submit something, either agreed upon -- and if not agreed upon,

8    then in the normal course with competing letter briefs.  That

9    exhausts that issue.

10          The last issue is the status of bellwether trial

11    number 9.  I like that you guys keep the numbers.  It makes my

12    colleagues think I'm trying many more cases than I am.

13          Is there anything to discuss on this front?  I have a

14    couple minor sort of administrative things that I would propose

15    based on lessons learned from the last trials.  I'm also open

16    to hearing if you guys think there are any ways that we could

17    proceed differently that would help you and make things run

18    more smoothly.  I think the last trial actually ran pretty

19    smoothly, all things considered.

20          Let me first just ask:  Is there anything sort of

21    substantive to discuss or any issues on that front?

22          Is Susman Godfrey trial counsel for plaintiff on that

23    case?

24          MR. HILLIARD:  Co-trial counsel.  My law firm is going

25    to co-try it with them.  So they will be here at probably the

 1  status conferences involving the Doddson trial, but we'll be

 2  co-lead counsel on that.

 3          THE COURT:  Good.  I was beginning to miss you,

 4  Mr. Hilliard.  I'm glad to hear that.

 5          Anything substantive to discuss, Mr. Brock?

 6  Mr. Hilliard?

 7          MR. BROCK:  The case is proceeding to trial in the way

 8  we would expect.  I don't think we have anything to discuss.

 9          MR. HILLIARD:  In discussing the last couple of

10  trials, specifically, the last one, and then reflecting on the

11  others, it seems that the streamlinedness is working, and the

12  amount of time that we think we need versus the amount of time

13  that we need is less.

14          Perhaps both sides have the courage now to say, we

15  only need a week and we can get it done in a week instead of

16  extending the proposed time.  It helps with the jury panel, as

17  well as helps with the preparation of experts.

18          THE COURT:  Yes.  I think that was all true.  I would

19  say to the amount of time you think you need and the amount of

20  time you actually need, I would actually add a third category,

21  which is the amount of time I'm going to give you.

22          MR. HILLIARD:  That should probably be category one.

23          THE COURT:  I can't remember if you were here or if it

24  was folks from Weitz & Luxenberg.  I think that the first

25  couple trials, with all due respect, were somewhat overtried.

1    I understand why that might have been the case and how

2    much is at stake in each of these cases.  I do think in the

3    last one we were sort of approaching a better equilibrium in

4    terms of paring it down and remembering that it's about an

5    individual accident.  So I would urge you to continue with

6    that, and I will do my part as well when the time comes.

7        A couple things that I wanted to note just in advance

8    and would invite you guys to also discuss with each other and

9    among yourselves, if there are ways to tweak the procedures

10   that we have been using, that would be helpful or make things

11   more efficient from your perspective.  That is to say, any

12   lessons learned from the last trial or two, if you have any

13   thoughts on that, feel free to propose them to me.  I'm

14   certainly open to changing the way we do things.

15       A couple things on that front.  One is I don't know to

16   what extent you guys have conferred in advance of the motion in

17   limine deadlines about motions in limine, but I get the sense

18   that more discussion might be beneficial, that is to say, that

19   in each trial I think there have been motions that have

20   essentially been mooted because they're not really disputed or

21   the disagreements turned out to be a lot narrower than the

22   opening brief seems to think.

23       I would think that you might save yourselves some

24   trouble and ultimately me some trouble in what I have to

25   ultimately read if you could kind of discuss that ahead of time

1    and figure out more precisely what you actually do need to

2    brief as opposed to what might be agreed upon.

3           Second, with respect to deposition designation

4    disputes, it would be helpful, when you file the sort of

5    omnibus letter and transcripts and so forth -- I think in the

6    past ones you have not identified which party is calling which

7    witness, and I think I mentioned in the last trial that I was

8    trying to get ahead of things and ended up reviewing, during

9    the plaintiffs' case, some witnesses that were actually GM

10   witnesses, and, therefore, I ended up needing to do that

11   anyway, but it would just be helpful in terms of me triaging

12   and knowing what I need to prioritize.

13          Third, because I think your resources exceed my

14   resources on this front, I would like one or the other of

15   you -- I would propose New GM -- to take on the task of copying

16   the jury questionnaires when we have a copy of the final

17   version of them and provide them to the jury department to

18   distribute to the jury pool.  Is that acceptable?

19          MR. BROCK:  Yes, your Honor.

20          THE COURT:  That's it from me on this, but I would

21   invite you to discuss among yourselves if you think there is

22   anything that I can do or should be doing differently that

23   would be helpful and make things run more smoothly.

24          The next item is the trial setting for bellwether

25   number 11.  I have to say I'm a little puzzled because I

1   understand that May 7 was a date that I came up with on my own,

2   in part, quite frankly, to protect my summer.

3        I looked back at your proposal on this front, which is

4   docket number 4298, and you guys had initially proposed June 25

5   as a trial date.  So I don't know why all of a sudden you're

6   not available until August, and part of what is animating my

7   asking that is, quite candidly, I can't try this case in August

8   for any number of reasons.

9        A, it would be hard to find a jury.  B, my own

10  schedule doesn't really permit it.  And then complicating

11  matters further, September really isn't an available option

12  either.

13       There are pretty much two days every week in September

14  that I would be off for Jewish holidays, and many jurors would

15  also be unavailable anyway, all of which is to say that if we

16  don't try it before I would say July or before, we're really

17  looking at an October trial date at the earliest, and that

18  doesn't strike me as ideal.

19       So I guess I wanted to get a sense of A, what's

20  changed; and B, what the conflicts are.  You guys have a pretty

21  large number of lawyers working on these things.  I understand

22  if one or the other person has a conflict.  I get it.  There is

23  a lot of time between now and then, and other people can fill

24  in.  So what's going on?

25       MR. BROCK:  Your Honor, the trial conflict -- this is

1    Mike Brock for GM.

2         The trial conflict is mine.  I have a case scheduled

3    for trial in Washington, D.C. on April 30.  It's expected to be

4    a three- to four-week trial.  I am available to try a case in

5    this court I really feel like June 11 or later.  The last case

6    I tried here I tried with a two-week break from a four-week

7    trial out in Kansas.  I feel like that's something that I can

8    do and can be available to do.

9         We did look at earlier dates.  We didn't know if

10   your Honor would have availability, say, in late March.  Allan

11   Pixton and I and others on our team tried to see if we could

12   work out a schedule that might work for March.  It just looked

13   like it would be very difficult to do, even if your Honor had a

14   date in March.  As it turns out, Mr. Hilliard had a trial

15   conflict I think in April anyway.

16        So that's the issue we face.  I have talked to my

17   client about having another lawyer lead a trial here in the

18   MDL.  They have expressed a strong preference that I lead the

19   cases here.  So, for better or worse, that's where we are.

20   That's why we were trying to find a way for me to be able to do

21   that.

22        THE COURT:  Mr. Hilliard, I don't know who is trying

23   it for the plaintiffs.

24        MR. HILLIARD:  Unlike Mr. Brock, we have more than one

25   rooster in the henhouse.  You pick the date, and we will be

1   there.  There are plenty of executive committee members that

2   would like to step up and try it.

3        There are the potential of the actual lawyers who

4   represent the plaintiffs that might be available, with

5   assistance, to try it.  I would not be available to do it

6   personally.  But, again, the Court and the case does fine

7   without me, as we've done twice already.

8        So whatever date that works for Mr. Brock and the

9   Court, I can represent that I am sure there is a trial team

10  that could be available and come and try it, given the Court's

11  comments that started this discussion.

12       THE COURT:  So give me one moment to figure out a

13  couple things on my end.

14       How is June 18, 2018?

15       MR. BROCK:  Yes for us.

16       MR. HILLIARD:  Yes, sir.

17       THE COURT:  June 11 would be challenging on my end.  I

18  think the 18th is better than your original proposal of the

19  25th because it's less risk that we would run into the July 4

20  holiday.  So we'll do that.

21       Why don't you guys look back at the schedule.  The

22  schedule was obviously predicated on a trial date of May 7.

23  Obviously the more time I have to do what I need to do, the

24  better.

25       Recognizing that we're now a month plus later, if you

1    want to give yourselves a little more time on some of the

2    things, that's fine with me.  If you have any proposed

3    modifications, why don't you talk about them to each other, and

4    we'll go from there.

5            Next is supplemental briefing on successor liability.

6    Sorry to give you more briefing.  I'm sorry to give myself more

7    briefs to read.  As you can see, I thought it was appropriate

8    for a couple reasons.

9            Without intimating whether I agree with the

10   plaintiffs' characterization of New GM's proposal as a fishing

11   tactic or not, I am inclined to agree with plaintiffs that it's

12   unnecessary to proceed in the manner that GM has proposed and

13   likely only to result in more delay, given the arguments made

14   by GM thus far, and they're summarized a bit in the agenda

15   letter but the portion attributable to the plaintiffs, but

16   certainly the arguments that have been made to me thus far.

17           I don't quite understand why we would need to proceed

18   in that manner and why GM couldn't make the arguments that it

19   thinks are to be made based on the information that it

20   currently has.

21           I think it would make more sense to stick with the

22   current plan, which is simultaneous briefing by August 24 with

23   the understanding, perhaps, or the caveat that New GM or the

24   plaintiffs, for that matter, could always seek leave to file a

25   supplemental brief, that is, supplemental supplemental brief.

1    If there is something in the declarations that are

2    filed in the first instance that changes the situation in some

3    material way, I think that enables us to stick with the current

4    schedule but allows GM, if it learns something from the factual

5    declarations that are filed that it changes things in some

6    meaningful way, it gives New GM an opportunity to tell me what

7    that is.  I would think that that would be a better way to

8    proceed.  That's what I would propose.

9         Thoughts.  No thoughts?

10        MR. GODFREY:  I have thoughts.  I thought Mr. Berman

11   was going to say something.

12        THE COURT:  It looks like he is.

13        MR. BERMAN:  I am.  On Wednesday we informed General

14   Motors that we plan on presenting papers in the bankruptcy

15   court next week, perhaps as early as Tuesday, that would ask

16   the bankruptcy court to issue a claims estimation order

17   pursuant to the sale agreement.

18        And under the sale agreement, your Honor, the Guc

19   Trust has the authority to go to the bankruptcy court and to

20   compromise claims.  In the event the Guc Trust makes a

21   determination that claims exceed $35,000,000, to ask the Court

22   to issue an estimation order that would require New GM to issue

23   stock that would be put into an account for the benefit of,

24   actually, our class.

25        And pursuant to that estimation order, we're going to

1    ask the bankruptcy court to issue that order which would

2    require GM to put up stock that's worth roughly a little over

3    $1,000,000,000.

4             THE COURT:  Correct me if my understanding of this is

5    wrong.  I take it this is the so-called "accordion feature";

6    that essentially the estimation order would trigger the

7    accordion feature?

8             MR. BERMAN:  That's correct.

9             THE COURT:  This might be what Mr. Godfrey was fearing

10   would be the --

11            MR. BERMAN:  Yes.  We gave GM a heads-up, as I said,

12   this week.  I don't think that this changes your briefing idea

13   because the fact of the matter is that you recognize the

14   positions New GM has taken with respect to successor liability.

15   We're not going to have a resolution of this proposed

16   settlement.  I suspect that GM is not going to just quietly

17   agree to issue $1,000,000,000 worth of stock.

18            THE COURT:  I'm pretty confident in sharing that

19   prediction.

20            MR. BERMAN:  I'm also pretty confident that the sale

21   agreement actually gives GM no rights to object, but we'll

22   fight that out.

23            THE COURT:  I intimate no view on that.

24            MR. BERMAN:  So I think that we should continue with

25   the briefing, but I wanted to give the Court a heads-up that

1   there will be some new facts on the table next week.

2          THE COURT:  I appreciate that heads-up.  I think, if

3   anything -- I understand from the grumpy looks at the back

4   table that you're not happy about the accordion feature issues

5   here.  Those are not my concern, at least in the

6   first instance.

7          I think to the extent that these implicate me, that

8   suggests to me that you'll have the information before the

9   deadline that I've imposed, and we can just proceed as I had

10   already planned.

11          Any reason otherwise, with the caveat, I suppose,

12   Mr. Godfrey and Mr. Bloomer, that if upon seeing what

13   plaintiffs file on Tuesday, you need additional time to sort

14   through what it all means, that you can always seek a

15   reasonable extension, and I would consider it.  Obviously the

16   sooner we can get briefing, the better, as far as I'm

17   concerned.

18          Your thoughts.  I don't want to hear your thoughts on

19   the accordion feature issue.  You'll have plenty of

20   opportunity, I'm sure, to air those, whether you have any right

21   to or not.  I'm sure you'll make those arguments but not to me,

22   at least in the first instance.

23          Any issues with what I have said on the successor

24   liability issues before me?

25          MR. GODFREY:  Well, both issues are going to be before

1    your Honor.  Let me address the first issue, which is the

2    successor liability briefing.

3         I think, in light of what your Honor has said with

4    respect to the option of having supplemental briefing if we

5    deem it necessary, then that is acceptable to New GM.

6         With respect to the second issue though, I have some

7    points that your Honor -- this is a marker.  This is not going

8    to be in the bankruptcy court.

9         At my age, I'm seldom surprised, and I'm never

10   shocked.  But a day and a half ago, I was both surprised and

11   shocked when we were given a bare-bones description of this

12   settlement agreement.

13        This is not a compromise by the Guc Trust or the

14   plaintiffs' claims in the bankruptcy court.  This is a complete

15   surrender and sellout using GM's money to pay for a settlement

16   that was not defended against, claims that were meritless that

17   were asserted.

18        Let me express, in no uncertain terms, how we view the

19   proposal.

20        THE COURT:  Let me stop you, only because I want to

21   get out of here as I suggested.  I don't mean to cut you off

22   and not give you an opportunity to be heard on this, but I

23   don't think this is the time or place to do it.

24        You'll have plenty of opportunity in the

25   first instance, I would think in front of the bankruptcy court,

1   even if it's ultimately an issue that I'll need to resolve or

2   even some higher court.

3          Am I wrong about that?

4          MR. GODFREY:  Yes.  We are going to file a motion to

5   withdraw as soon as permissible, withdraw the reference from

6   the bankruptcy court and this court.

7          The notion that they can settle for no material money

8   from the Guc Trust -- the Guc Trust has $400,000,000 in assets.

9   They're getting $15,000,000, as we understand it, assigning

10  rights, agreeing to a $10,000,000,000 claim.  And supposedly GM

11  has no rights when they take a billion dollars of our money.

12         That is not going to stand.  We're going to withdraw

13  the reference.  We're going to bring it to the Court.  This is

14  collusive.  There are cases on point that we can refer the

15  Court to.

16         This has got all the indicia of a collusive

17  settlement.  They are awaiting a time-barred defense.  We have

18  no idea upon what basis and what expert the Guc Trust had,

19  which I doubt, by which they are not contesting $10,000,000,000

20  in claims.

21         And that is the trigger mechanism by which they claim

22  New GM has no choice but putting up a billion dollars.  That is

23  not going to happen without this Court hearing and ruling on

24  the issues.

25         We have unfairness issues.  We have the indicia of

1    collusive issues.  We have the fact that General Motors has

2    been excluded.  And you heard this morning that supposedly we

3    have no rights to even object.  I don't think that in our

4    country when someone is told to give a billion dollars to

5    someone else, we have some rights to object, including notice

6    and opportunity to be heard.

7         So, from a marker perspective, we're going to file a

8    motion.  We're going to brief the motion.  We're going to

9    attack the settlement, and it's going to be before your Honor.

10   We're going to do it as soon as we can permissibly do it.

11        THE COURT:  The marker is laid.  I'll look for the

12   motion.  The question is your arguments seem to me to be more

13   geared towards the merits of the issue than the forum in which

14   it should be litigated, at least in the first instance.

15        In proposing that the reference be withdrawn may be

16   the fact that it's a collusive agreement, if it is -- I

17   intimate no view on the matter -- is a factor to consider in

18   that analysis.

19        The question that occurs to me, thinking out loud, is

20   why you can't make those arguments to the bankruptcy court in

21   the first instance, recognizing that they may ultimately come

22   to me.

23        MR. GODFREY:  That's a good question.  Since

24   your Honor said I should keep this short, but there is an

25   answer to that.

1      THE COURT:  I trust the answer will be clear from your

2   motion.

3      MR. GODFREY:  It will be very clear, but we can talk

4   about this further in the motion.  One simple point for

5   your Honor to consider.  This is on behalf of a putative class,

6   among other things.

7      Your Honor has got the class before the court.  This

8   Court is going to decide Rule 23 issues, not the bankruptcy

9   court and not some quasi class which has the same implications.

10      This has come up before in other cases where the court

11   has said, no.  That's the MDL's court's purview we think.  So

12   there is significant overlap between the issues, both in terms

13   of the merits of the claims and the class issues and in terms

14   of notice issues that this Court has the jurisdiction over and

15   that this Court should have the primary role over.

16      So we will lay this out for the Court, but make no

17   mistake.  General Motors objects to this.  We believe that it's

18   brought an indicia of collusiveness.  Frankly, what the few

19   facts we were told are, they've got $400,000,000 in assets from

20   the Guc Trust for $15,000,000.

21      They are released from all liability for this alleged

22   $10,000,000 claim, and General Motors is supposed to put up a

23   billion dollars to make it all right.  General Motors has been

24   excluded from the settlement negotiations and had no knowledge

25   of the terms of the settlement negotiations.

1    If you look at the terms of the accordion feature, we

2    don't believe that they can do this.

3    THE COURT:  Understood.  I will look for it.  If you

4    want to discuss with each other a briefing schedule for that

5    motion, you're certainly welcome to, and you can propose it to

6    me.

7    In the absence of that, it sounds like GM is planning

8    to file the motion at some point soon regardless.  Unless and

9    until I see otherwise, the local rules and default schedule

10   will apply.

11   As for the successor liability briefing, we'll stick

12   with the existing plan with the understanding that if there is

13   need for supplemental supplemental briefing, that is to say,

14   another round, then you'll let me know.

15   I want to say two notes on that.  That is not to give

16   you an opportunity to reply.  I am contemplating simultaneous

17   briefing.  So I would grant an additional round of briefs only

18   if there is something new learned from the submissions on that

19   date that changes things in some material fashion that you

20   think you need to address.  It's not an opportunity to reply to

21   the other side's arguments.

22   The second is that I'm not going to set a deadline

23   right now for that additional briefing or page limits for that

24   matter because I'm hoping and assuming that it won't be

25   necessary.

1      I do caution you that you're not going to have a lot

2   of time and you're not going to have a lot of pages.  If you do

3   propose another set of briefs, keep both of those in mind.

4      MR. GODFREY:  I think we understood that, your Honor.

5   At this point, I think we understand your views on supplemental

6   briefing.

7      THE COURT:  Good.

8      Let me also just say on the briefs that you will be

9   filing in the next couple weeks on this front, I would endeavor

10  to make them, as much as you can, sort of standalone briefs,

11  that is to say, on the one hand, you don't need to waste time

12  on the preliminaries, the background, etc.

13      I know what the issues are.  I have obviously

14  addressed a lot of the issues in the opinion that I handed down

15  a week or so.  You can cut to the chase and brief the issues

16  under that law, as I indicated, and address the effects, if

17  any, of the settlement with the Guc Trust.

18      Having said that, to the extent you can write it so

19  that my clerks and I don't need to keep looking back at the

20  prior set of briefs, that would be helpful for two reasons.

21      One is, as I'm going to tell you in a minute or two,

22  today is Ms. Kumar's last day with me.  Actually, last Friday

23  was.  She's actually just done me the courtesy of coming to

24  this to make things easier in transitioning.

25      She helped me on that motion and won't be around when

1    your supplemental briefs come in, which is to say that I'll

2    have another clerk without the same institutional memory and

3    background on this helping me.

4            The second is while I certainly have read all the

5    materials, it will be several months basically since I have

6    done so.  The less that I have to go back and reread things,

7    the better.  I would just ask you to keep those in mind in

8    terms of how you write those briefs.

9            MR. GODFREY:  Your Honor, I have a question on that.

10   Would it be helpful for us, if we are referring back to another

11   brief, to just attach as an exhibit the selected pages from

12   that brief?

13           THE COURT:  Yes.  I think that would be helpful

14   actually.

15           MR. GODFREY:  I think we'll do that, if that's

16   acceptable to the Court.

17           THE COURT:  I think that is.  Otherwise, leave my

18   remarks standing.  I gave you my guidance, but that would be

19   helpful, if you think it's necessary.

20           MR. GODFREY:  Thank you.

21           THE COURT:  Settlement.

22           Mr. Berman, did you have something else you wanted to

23   add?

24           MR. BERMAN:  Yes.  We've been silent at the front

25   table with respect to Mr. Godfrey's comments.

1      THE COURT:  I understand.  Certainly you'll have an

2 opportunity to be heard.

3      MR. BERMAN:  That's all I need to say.

4      THE COURT:  Understood.  Good.

5      On the issue of settlement, I received the first

6 monthly inventory of cases, which is very helpful and will be

7 helpful going forward.

8      On the question of the appointment of a mediator, I'm

9 happy to hear from both sides on that front.  I am of the view

10 that we are getting to the point where having somebody in place

11 who could be helpful certainly on the economic loss side but

12 perhaps even on the personal injury/wrongful death side,

13 recognizing that Judge Cott only has a limited amount of time

14 available on his calendar, that would probably make sense.

15      I'm open to suggestions on that.  I'm open to

16 suggestions on who that person could be.  I think in our

17 closed session last time, I threw out a couple names that I was

18 thinking of.

19      I know from looking at an order that Judge Selna

20 entered in the Toyota matter, which I also wanted to mention --

21 I gather that Patrick Juneau was appointed to him to serve as a

22 sort of mediator capacity in that litigation.

23      I don't know Mr. Juneau or what the experience was

24 like, but I mention his name as a possibility.  So I'm open to

25 your thoughts and suggestions here, both in terms of timing and

1  in terms of moving things forward.

2        The only other thing I wanted to throw out is I

3  referred to an order of Judge Selna that he issued, and I read

4  an order that established an "intensive settlement" process or

5  protocol.

6        I guess the question I have -- and this applies to

7  personal injury/wrongful death as much as anything -- whether

8  it might make sense now or sometime down the road to enter an

9  order along those lines.

10       I think thus far I've left this largely to you guys,

11  and I think it's largely been okay thus far.  I guess I'm just

12  throwing that out there as another possibility.

13       Mr. Berman, it looks like you want to say something.

14       MR. BERMAN:  Yes, your Honor.  You mentioned earlier

15  that you assumed settlement discussions were ongoing.  There

16  have been no settlement discussions since we made a demand on

17  GM.

18       We don't think settlement discussions are likely to

19  get started, unless a mediator gets the parties together.  We

20  don't think we should wait for the benefit of the bargain

21  briefing for several reasons.  A decision is three or four

22  months off at the earliest.

23       Second, it's my experience and Ms. Cabraser's

24  experience that so-called "important rulings" might make the

25  case harder to settle.  If GM loses that, which we think they

1    will, then the price of settlement goes up.  What that

2    typically forces a defendant to do is to look for the next big

3    ruling to get them out of the hard spot they're in.

4          So we think that you should appoint a settlement

5    mediator.  That mediator can then reach out and decide what the

6    appropriate steps are.  We think we should either agree or

7    submit names within a week.

8          This is not a complicated thing, to come up with a

9    potential mediator, and we've been raising this repeatedly, and

10   we've suggested a couple names to GM.

11         Ms. Cabraser and I were talking about this, and we

12   can't come up with an MDL that we've been involved in --

13   between of two of us it's been an embarrassing number of

14   MDLs -- where we didn't have a mediator appointed at this stage

15   of the case.  So I think now is the time, and I think

16   Ms. Cabraser wanted to talk about the intensive.

17         MS. CABRASER:  Yes.  Thank you, your Honor.

18         I do agree with Mr. Berman that the time is now.  The

19   procedure need not be a complicated one.  The parties should be

20   directed to meet and confer and either agree on a name or

21   submit names.

22         There is a very small universe of people who have the

23   experience and confidence of both sides.  You mentioned one

24   name that might be a possibility.  I don't think it will be a

25   problem, either agreeing on a name, if the parties are directed

1   to do that.

2          With respect to the intensive settlement program from

3   Toyota, your Honor, you're right.  That was a program to deal

4   with personal injury and wrongful death claims.  The economic

5   claims were settled through a class action settlement.

6   Mr. Juneau was the mediator for that process.

7          The intensive settlement program has been -- it's

8   taken some time, but it has been successful.  There are a

9   literal handful of personal injury cases left in that MDL to be

10  resolved.  Everything else is resolved.

11         It's not that different from the private ordering that

12  has gone on so far in GM for the injury claims.  What's

13  different is that everyone in the MDL or in the state court

14  cases has an opportunity to use the same procedure.

15         There is a protocol.  It's streamlined.  There is the

16  assistance of a settlement master if required, but the

17  experience has been that most of the claims settled in private

18  discussions between counsel for those plaintiffs and a

19  settlement counsel for Toyota.

20         We make reports -- we still do -- every month or so to

21  Judge Selna in writing and at a status conference, and that's

22  really provided the engine to resolve all of those claims.  I

23  think at this point there is one case that is headed to trial,

24  an individual case.  The rest are resolved.

25         THE COURT:  I'll tell you what.  In the interest of

1  time, let's table that until the next status conference, and

2  you guys can confer on it between now and then and essentially

3  tell me if there are any additional procedures, protocols,

4  processes, whatever word you want to use, that you think would

5  facilitate and help in the ongoing discussions that I know are

6  going on on the personal injury/wrongful death side,

7  particularly recognizing that we're going to be getting at some

8  point to a stage where New GM has to deal with lawyers who have

9  only one or a handful of cases as opposed to larger groups of

10  cases.  So, for now, let's just discuss the mediator issue.

11  Let me hear from Mr. Godfrey or Mr. Bloomer.

12         I am inclined to agree with Mr. Berman and

13  Ms. Cabraser and think that the time is ripe and we ought to

14  name someone and get that ball rolling, and that person can

15  sort of, you know, facilitate discussions and do what is

16  appropriate and what have you.  I'm inclined to think that the

17  time has come.

18         What are your thoughts on giving me a name or names by

19  let's say a week from now?  Hopefully you can agree.  If you

20  can't, I can pick someone from a short list that you guys can

21  agree upon.

22         MR. GODFREY:  I think the Court knows what our

23  position is.  I'm happy to provide Mr. Berman and Ms. Cabraser

24  a long list of MDLs where no mediator has been appointed at

25  this stage.

1      THE COURT:  I'm not interested in that.

2          MR. GODFREY:  I think we're beyond that, given the

3  Court's comments.  So I think we will come up with a

4  recommended procedure list.  It's a relatively small pool.

5  Some people are, frankly, disqualified for being in that pool

6  for various reasons.

7          Mr. Feinberg would be one.  The name you mentioned

8  would be another for various reasons.  So I think we will have

9  a conversation with them and see whether we can come up with an

10  agreed procedure.  And, if not, then I think we submit

11  competing short briefs.  This is not very complicated.  We are

12  not in favor of an intensive settlement program.  Part of the

13  issue here, frankly --

14      THE COURT:  Let's table that for the next conference.

15          MR. GODFREY:  I wasn't sure what was tabled and what

16  was not, given the Court's question to me.

17      THE COURT:  Let's just focus on the mediator.  Can you

18  get back to me within a week, either with an agreed-upon person

19  or, if you can't, submit competing proposals or what have you

20  on that date or at least a proposal of how we should proceed?

21  Is that reasonable?

22          MR. GODFREY:  I would prefer if we could have until

23  the following Monday.

24      THE COURT:  That's fine.

25          MR. GODFREY:  That's ten days or something I think, if

1   that's agreeable.

2           THE COURT:  That seems fine by me.

3           I think that's August 21, if I'm not mistaken,

4   Mr. Berman.

5           MR. BERMAN:  That's fine, your Honor.

6           THE COURT:  So August 21 I'll hear from you in some

7   form or fashion.  Obviously, the more you can agree upon, the

8   better.  I don't think this would warrant full-blown briefing

9   is my inclination.

10          MR. GODFREY:  No.  I think this is a one- or

11  two-pager, frankly, where we would either have agreement or,

12  here are the names that we propose.  There are the names that

13  they propose, and here is the procedure that we propose and

14  that they propose, and the Court should decide from the list.

15          THE COURT:  That sounds good in the abstract, but I'll

16  leave it to you to try and discuss.

17          Mr. Hilliard.

18          MR. HILLIARD:  This mediator is expected to also

19  potentially address the injury and death cases?  Is that what

20  the Court indicated?

21          THE COURT:  I think the focus should be on economic

22  loss, in part because things have been proceeding at pace on

23  the personal injury and wrongful death side.  I guess I'm open

24  to your thoughts on that question.  I think, in the ideal

25  world, having somebody who could assist on those but with the

1  primary focus being on the economic loss front would be

2  helpful.

3         MR. HILLIARD:  I'm not sure that we need it yet as

4  we're still talking and have not hit a loggerhead with regard

5  to the injury and death cases, as the entire docket seems to be

6  shrinking.

7         Mr. Berman and Ms. Cabraser just whispered that it was

8  four economic losses, which is just fine with me, but there

9  will be a point I think that there will be one-off cases that

10 will need to be addressed through some sort of process,

11 primarily not the focus of whatever mediator is appointed, but

12 should that mediator be directed to focus on these cases, then

13 maybe I'll have some input on who is selected.

14        THE COURT:  I think it would be nice to leave the door

15 open.  I'm inclined to agree that right now it seems less

16 necessary on that front, if only because things have been

17 proceeding relatively smoothly, and Judge Cott has some time

18 available certainly if there are one-off issues here or there.

19        I think the ideal would be if we name someone down the

20 road if the time comes when it would be helpful if that person

21 could be available for that purpose, and I can't think of

22 reasons why such a person would be precluded or conflicted from

23 doing it.

24        In any event, why don't you guys talk about that and

25 see if that makes sense or if there is something I'm not

1    thinking of.

2         MR. BROCK:  I know we're in a hurry, but I was just

3    going to mention that Mr. Kyle Dreyer, who you met at the first

4    trial -- he was my trial partner in that case, as well as Wendy

5    Bloom -- are working close to full time on settlement issues.

6         They are continuing to examine documents and dockets.

7    They are meeting with plaintiffs' counsel.  There have been a

8    few occasions where we thought a mediator might be beneficial,

9    and we actually would agree with an opposing party to have one

10   come in and actually mediate a docket.

11        I will talk to them about this, but I think that they

12   feel that the process is working pretty well in terms of what's

13   happening now.

14        THE COURT:  That's my sense as well.  It may also be

15   that if there are one-off cases where a mediation would be

16   helpful, but it wouldn't be hard to find someone just to step

17   in and be a mediator for that.

18        Let's take up the intensive settlement protocol-type

19   issues and whether there is anything else that can be done on

20   the personal injury/wrongful death side at the next conference.

21   Maybe Ms. Bloom should be here on that front, but I'll leave it

22   to you.

23        On the other issues that I flagged, given the time,

24   unless you think there is any urgency to it, I would propose

25   that we table the discussion of the 349 plaintiffs who have

1  asserted ignition-switch-related claims and non-ignition switch

2  recall claims for the next conference.  I think that may be

3  something that Ms. Bloom could also be helpful with respect to

4  anyway.

5          For that matter, I don't think there is any urgency to

6  the question posed about the Anglin case, whether there are any

7  other cases out there like that.  You could also let me know

8  also in a brief letter.

9          I just wanted to figure out if there was a need for

10  some sort of procedure to either identify or give notice to or

11  some such thing.  I don't know if there are a bunch of those

12  cases out there or if I was going to get motions of that sort

13  in other cases.

14          So let's just figure out when we're next reconvening,

15  and then we will wrap things up.

16          Any thoughts, given all the things going on, of when

17  it would be helpful to return?

18          MR. GODFREY:  We had had a discussion pursuant to the

19  Court's request, that is, Mr. Berman, Ms. Cabraser, and myself.

20  I think we settled on the first week of October time period.

21          MS. CABRASER:  That would work timing-wise I think for

22  plaintiffs, except for Tuesday, October 3, and Friday,

23  October 6, which leaves essentially the Wednesday and Thursday

24  of that week.

25          THE COURT:  The Thursday is a Jewish holiday.  So it's

1   out for me.

2         MS. CABRASER:  That is correct.

3         THE COURT:  I could do Wednesday, October 4.  Does

4   that work for everybody?

5         MR. GODFREY:  That does, your Honor.  Thank you.

6         THE COURT:  So we will set it for Wednesday,

7   October 4.  The normal starting time of 9:30 should work for

8   me.  So Wednesday October 4 at 9:30.

9         The last thing I want to say -- I referred to this

10  earlier -- is that this is Ms. Kumar's last day helping me out

11  on this case.  Number one, I wanted you to know that so you

12  could take an opportunity after the conference to say your

13  good-byes and thank her for all the work she has done because

14  she has done a tremendous amount to benefit you all.

15        I just want to say publicly, as I did on similar

16  occasions in the past, and thank her for all the work she has

17  done.  This is a tall order, as you can imagine, in my

18  chambers.

19        She has really done an incredible job of making sure

20  the case remains on the rails for the most part and that I'm

21  doing as good a job as I can do.  Whether you all agree that I

22  am doing a good job is not something I'll ask you, but I just

23  want to thank her for everything she has done to help.  It's

24  been a tremendous asset to me, and I will miss her, and we will

25  deal with the transition.

1           I also wanted to take a moment to introduce -- I have

2    a clerk who will be starting in September who, for reasons

3    within chambers, is going to be taking over the GM docket, if

4    you will, Kristen Loveland, who just arrived from Europe last

5    night but who has agreed to be here this morning to sit through

6    this and transition with Ms. Kumar.

7           In the meantime, Sam Adelsberg, who is also here and

8    is currently in my chambers, is going to be attending to the

9    docket between now and when Ms. Loveland starts.  So you can

10   introduce yourselves to her and him.

11          And Ms. Kumar will be sending an email to everyone to

12   just make sure you have the relevant contact information, but I

13   wanted to mainly thank her publicly and commend her publicly

14   for everything she has done to help.

15          With that, I wish you all a pleasant rest of your

16   summers.  I will see you in early October.  I'll be hearing

17   from you in various ways between now and then.  We are

18   adjourned.  Thank you and have a good day.

19          MR. GODFREY:  Thank you, your Honor.

20          MS. CABRASER:  Thank you, Your Honor.

21          (Adjourned)

22

23

24

25