**Objection Deadline: August 18, 2017 at 12:00 p.m. (ET)**
**Hearing Date and Time: August 29, 2017 at 3:00 p.m. (ET)**

James E. Butler, Jr.
Robert H. Snyder, Jr.
BUTLER WOOTEN & PEAK LLP
105 Thirteenth Street
Columbus, Georgia 31901
T: 706-322-1990
E: jim@butlerwooten.com
E: rob@butlerwooten.com
*Admitted pro hac vice*

*Counsel for Kaitlyn Reichwaldt*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                            :
In re:                                       :         Chapter 11
MOTORS LIQUIDATION COMPANY, et al.,          :         Case No.: 09-50026 (REG)
            f/k/a General Motors Corp., et al.,          :
                                                            :
                            Debtors.           :         (Jointly Administered)
------------------------------------------------------------X

**OBJECTION TO MOTION BY GENERAL MOTORS LLC PURSUANT TO 11 U.S.C. §§ 105 AND 363 TO ENFORCE THE BANKRUPTCY COURT'S JULY 5, 2009 SALE ORDER AND INJUNCTION, AND THE RULINGS IN CONNECTION THEREWITH, <u>WITH RESPECT TO THE REICHWALDT PLAINTIFF</u>**

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

OBJECTION ..................................................................................................................... 8

   I.  New GM expressly assumed liabilities for injuries suffered in Old GM's vehicles
      after the closing date of the 363 sale ................................................................... 8

     A.  Plaintiff's claims seeking compensatory damages for negligence, strict
        liability and failure to warn based on Old GM conduct................................. 8

     B.  Plaintiff's claim seeking punitive damages based on Old GM's misconduct ........... 10

        1.  New GM expressly assumed punitive damages as part of the Sale
           Agreement ...................................................................................... 10

        2.  Governing contract interpretation principles ........................................ 11

        3.  New GM expressly assumed liability for punitive damages ............................... 12

     C.  Plaintiff is not barred from arguing New GM contractually assumed claims for
        punitive damages based on Old GM's conduct .......................................... 19

   II.  Whether New GM is subject to a claim for failure to warn based on its own
      conduct is a question of state law ...................................................................... 21

  III.  Plaintiff's case should not be stayed.............................................................. 23

CONCLUSION.................................................................................................................. 24

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Avitia v. Metro. Club of Chicago, Inc.*,
  924 F.2d 689 (7th Cir. 1991). ............................................................................ 21

*Borcsok v. Early*,
  No. 9:03CV395 GLS RFT, 2007 WL 2454196 (N.D.N.Y. Aug. 23, 2007),
  *aff'd*, 299 F. App'x 76 (2d Cir. 2008) .............................................................. 20

*Castillo v. General Motors Co. (In re Motors Liquidation Co.)*,
  2012 WL 1339496 (Bankr. S.D.N.Y. Apr. 17, 2012). ......................................... 16

*Conrod v. Davis*,
  120 F.3d 92 (8th Cir. 1997). .............................................................................. 21

*In re Motors Liquidation Co.*,
  541 B.R. 104 (Bankr. S.D.N.Y. 2015). ............................................................... 19

*In re Motors Liquidation Co.*,
  829 F.3d 135 (2d Cir. 2016), *cert. denied sub nom.*
  *Gen. Motors LLC v. Elliott*, 137 S. Ct. 1813 (2017). ........................................ 21

*In re Motors Liquidation*,
  568 B.R. 217 (Bankr. S.D.N.Y. 2017). ............................................................... 23

*In re Motors Liquidation*, 568 B.R. 217, 219-21 (Bankr. S.D.N.Y. 2017) ................... 22

*Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*,
  595 F.3d 458 (2d Cir. 2010) ......................................................................... 17, 18

*Marvel Characters Inc. v. Simon*,
  310 F.3d 280 (2d Cir. 2002) .............................................................................. 20

*Moore-Sapp Inv'rs v. Richards*,
  522 S.E.2d 739 (Ga. Ct. App. 1999). ................................................................. 14

*Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp.*,
  269 F. Supp. 2d 206 (S.D.N.Y. 2003) ................................................................ 17

*New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*,
  352 F.3d 599 (2d Cir. 2003) .............................................................................. 21

*Soroof Trading Dev. Co. v. GE Fuel Cell Sys. LLC*,
    842 F. Supp. 2d 502 (S.D.N.Y. 2012)................................................................... 17

*Staten Island Rapid Transit Operating Auth. v. ICC.*,
    718 F.2d 533 (2d Cir. 1983)................................................................................. 20

*Vysyaraju v. Mgmt. Health Solutions, Inc.*,
    2013 U.S. Dist. LEXIS 118056 (S.D.N.Y. Aug. 10, 2013)................................... 15

**STATUTES**

O.C.G.A § 51-1-11............................................................................................... 9, 24

O.C.G.A. § 51-12-5.1................................................................................................ 24

**OTHER AUTHORITIES**

18 James W. Moore, et al., *Moore's Federal Practice* ¶ 132.04 .................................. 20

Butler Wooten & Peak LLP ("**BWP**") as counsel to the plaintiff in the Reichwaldt

Lawsuit pending in the United States District Court for the Northern District of Georgia

("**Reichwaldt Action**"), hereby respectfully submit this objection (the "**Objection**") to the

*Motion by General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the*

*Bankruptcy Court's July 5, 2009 Sale Order and Injunction, and the Rulings In Connection*

*Therewith, With Respect to the Reichwaldt Plaintiff* filed on July 28, 2017 [Docket No. 140146]

(the "**Motion**").  In support of this Objection, BWP respectfully states as follows:

## PRELIMINARY STATEMENT

On January 27, 2015, Kaitlyn Reichwaldt ("**Ms. Reichwaldt**" or "**Plaintiff**") was burned

over nearly half of her body when the 2003 Ford Taurus she was driving collided with a 1984

GM Corp. CK pickup truck.  GM Corp. ("**Old GM**") designed the CK trucks with gas tanks

located in a known "crush zone" on the side of the truck outside the frame rails with no

protection from side impact.[1]  Ms. Reichwaldt's Taurus struck the CK pickup truck at the truck's

passenger side gas tank, the tank ruptured and exploded and Ms. Reichwaldt suffered severe

burns.  If not for the heroic actions of a bystander, Ms. Reichwaldt likely would have burned to

death.

Ms. Reichwaldt's counsel at BWP know of at least 957 other instances where a person

has been burned (most to death) as a result of a collision involving a CK pickup truck.[2]  Old GM

---

[1] An Old GM engineer named Edward Ivey testified twenty-three years ago: "Q:  Can you name a worse place to put a fuel tank than outside the frame rail on the side? A:  Well, yes, you could put it on the front bumper."  *See* Pl.'s Compl. ¶ 1, n. 2 (1/9/94 Deposition of Edward Ivey, *Bishop v. GM Corp.  & Cameron v. GM Corp.* at 98/11-16.), attached as Ex. B to the Motion.

[2] *See* Exhibits A & B to Plaintiff's Complaint, attached as Ex. B to the Motion.  In 2015, GM LLC admitted that it had notice that there was a fire following a CK wreck in 718 of the incidents identified in Plaintiff's exhibits.  *See* Ex. C to Plaintiff's Complaint, attached as Ex. B to the Motion.

was sued hundreds of times in CK pickup truck product liability cases across the country, including more than a dozen cases handled by BWP.  Since July 10, 2009, GM LLC ("**New GM**") has also been sued a number of times in CK pickup truck product liability cases across the country, including two cases (counting the Reichwaldt Action) handled by BWP.

Ms. Reichwaldt seeks to recover from New GM only those damages that she is legally allowed to recover.  That fact has been made plain to both New GM and to Chief Judge Thrash in the Reichwaldt Action.  She repeats that point here.  Indeed, even though Plaintiff disagrees with many of New GM's contentions in its letters and in the Motion, Plaintiff drafted a proposed First Amended Complaint ("**Proposed FAC**") and filed a motion for leave to amend in the Reichwaldt Action attempting to address most of issues raised by New GM.  A true and correct copy of Plaintiff's Proposed FAC is attached hereto as Exhibit 1.

On May 23, 2016, Plaintiff filed her initial complaint in the state Court of Cobb County, Georgia, seeking to recover against New GM for claims based on Old GM's actions that were assumed by New GM as part of the 363 Sale and for claims based on New GM's own conduct after the closing of the 363 Sale ("**Independent Claims**").  Plaintiff's initial complaint is attached as Ex. B to New GM's Motion.  New GM removed the Reichwaldt Action to the Northern District of Georgia, where the case was assigned to the Chief Judge, the Honorable Judge Thomas Thrash, Jr.  *See* Doc. 1, Reichwaldt Action.[3]

New GM did not file a motion to dismiss in Chief Judge Thrash's court arguing that Ms. Reichwaldt was seeking to recover for claims barred by the Old GM bankruptcy.  New GM also

---

[3] Plaintiff has only attached those pleadings in the Reichwaldt Action that are necessary to this Courts' consideration of New GM's Motion.  If the Court would like her to download and provide any additional documents filed in the Reichwaldt Action that are not attached hereto, Plaintiff is happy to do so.

did not file a motion to enforce the bankruptcy Sale Order in this Court. Instead, New GM

moved to transfer the case to the District of Nebraska. *See* Doc. 6, Reichwaldt Action.

Throughout the entirety of New GM's briefing on the motion to transfer issue, New GM never

raised any alleged issues related to the Old GM bankruptcy. *See* Docs. 6, 26, 32, 33, 41, 42, and

44, Reichwaldt Action. While the parties were briefing the transfer motion, counsel for New

GM and Plaintiff met and conferred and decided on a join preliminary report and discovery plan.

*See* Doc. 27, Reichwaldt Action. During the process of meeting and conferring in order to agree

on and submit a joint preliminary report and discovery plan, New GM never raised any alleged

issues with regard to the Old GM bankruptcy that might affect the schedule. *Id.*

On March 27, 2017, Chief Judge Thrash denied New GM's motion to transfer noting that

the Atlanta District Court "is capable of applying whatever law applies to any case pending in

the Court … and Georgia has a strong interest in protecting its citizens from dangerous products

and allowing one of its citizens to recover for the injuries she suffered, regardless of where those

injuries were suffered." *See* Doc. 45, Reichwaldt Action. Thereafter, New GM and Plaintiff met

and conferred again with regard to a discovery schedule and then submitted proposed discovery

schedules to the court. *See* Docs. 49 and 50, Reichwaldt Action. Again, New GM said nothing

about any alleged issues with regard to the Old GM bankruptcy. *See* Doc. 50, Reichwaldt

Action.

On May 5, 2017, Chief Judge Thrash presided over an in-person discovery conference

with counsel for New GM and Plaintiff. During that in-person conference which lasted over an

hour, New GM raised no alleged issues with regard to the Old GM bankruptcy that might affect

the case schedule or discovery. *See* Doc. 56*,* Reichwaldt Action, Tr. of May 5 hearing. After the

in-person conference with Chief Judge Thrash, the parties again met and conferred at length

3

before Plaintiff filed a motion to compel certain documents from New GM.  *See* Doc. 61,

Reichwaldt Action. New GM responded to Plaintiff's motion to compel on June 29, 2017 – again

raising no alleged issues with regard to the Old GM bankruptcy.  *See* Doc. 65, Reichwaldt

Action.

It wasn't until Plaintiff's motion to compel was fully briefed and ***submitted*** to Chief

Judge Thrash that New GM raised, for the first time, any alleged issue with regard to the Old

GM bankruptcy.  In other words, once an Order on Plaintiff's motion to compel appeared

imminent, New GM suddenly contended it would be improper for Chief Judge Thrash to

consider the motion until New GM was given the opportunity to litigate issues in this Court.  *See*

Doc. 69, Reichwaldt Action, Ex. E to GM's Motion.

New GM's actions in connection with the Motion in this Court make it clear that New

GM's filings have nothing to do with allegedly improper claims and everything to do with

avoiding an Order in the Atlanta District Court.[4]  Even though Plaintiff had already agreed to

prepare an amended Complaint to address most of New GM's alleged issues, New GM filed its

Motion in this Court before it had even received Plaintiff's proposed amendment.  New GM first

raised its alleged issues in a letter sent to Plaintiff's counsel on July 14.  New GM's letter was

attached as Ex. D to its Motion.  In its July 14 letter, New GM raised a number of purported

issues with Plaintiff's Complaint, asked Plaintiff to strike the paragraphs of her Complaint New

GM deemed offensive, and asked Plaintiff to tell New GM by July 21, 2017, whether she would

---

[4] This is not the first time New GM has made a filing in this Court in an attempt to avoid a ruling
in a case where BWP was representing a plaintiff.  Last year, New GM filed a similar motion to
enforce against a different client of BWP's named Veronica Fox.  In the Fox Case, New GM
waited nearly two years after the case was filed and until the case was on the eve of trial before it
made a filing in this Court.  As a result, Ms. Fox was forced to agree to forego claims against
New GM case in order to avoid losing her trial date.

comply with GM's demands.  *Id.*  Before the week to respond had run, New GM filed a motion

for leave to file a supplemental brief in opposition to Plaintiff's motion to compel, asking Chief

Judge Thrash to delay entry of an Order on the motion to compel until the newly raised

bankruptcy "issues" were worked out.  *See* Ex. E to New GM's Motion.

On July 20, 2017, Plaintiff's counsel responded to New GM's letter, stating that Plaintiff

would carefully consider New GM's criticisms of her Complaint and complete a redline version

of the Complaint for New GM's review.  *See* Ex. H to the Motion.   Because lead counsel for

Plaintiff was going to be out of town on a family vacation trip from July 21 – 30, Plaintiff

explained she would send her redlined version of the Complaint as soon as possible after lead

counsel returned.  *Id.*  Plaintiff noted in her July 20 response letter that she would attempt to

address all of New GM's "issues" in her redlined Complaint save one – Plaintiff's contention

that New GM contractually assumed liability for punitive damages based on Old GM's conduct

as part of the 363 Sale.  Plaintiff noted she had never had the opportunity to present that

argument to any Court and would use New GM's threatened filing as a means to present that

issue to this Court.  *Id.*

Without waiting to see the changes Plaintiff proposed to make, GM filed the Motion in

this Court on July 28.  Notwithstanding New GM's filing and in an attempt to narrow the issues

that this Court may decide, Plaintiff sent her Proposed FAC to New GM on August 2, 2017.  *See*

Aug. 2, 2017, email from Snyder to Davidson, attached hereto as Ex. 2.  As Plaintiff noted in her

cover letter to New GM, she attempted to satisfy all of New GM's purported issues with regard

to the Complaint, save the contractual assumption issue that Plaintiff noted "is an issue for Judge

Glenn to decide."  *Id.*  Plaintiff asked New GM to provide any additional comments to the

Proposed FAC promptly and to advise this Court that New GM was "withdrawing all of its

motion to enforce except that part thereof that asks for a ruling from Judge Glenn regarding the contract assumption." *Id.*

GM did not respond, so on August 7, 2017, Plaintiff filed her Motion for Leave to File her First Amended Complaint.  Doc. 76, Reichwaldt Action, attached hereto as Ex. 3.  In her motion, Plaintiff noted she had "modified the language of the Complaint so that it is clear in each reference to 'GM' whether Plaintiff is referring to conduct of New GM or GM Corp … and separated the claims into two groups: one group for liabilities assumed by New GM and one group for claims against New GM based on its own post-bankruptcy conduct." *Id.* at 4.  Plaintiff also noted that the contractual assumption issue remained in dispute and that she had included the claim in her Proposed FAC so the issue could be preserved and fully litigated.  *Id.*

After Plaintiff filed her motion for leave to amend, New GM finally responded to Plaintiff's August 2, 2017 letter.  Rather than providing a detailed discussion of alleged infirmities in Plaintiff's Proposed FAC, New GM sent a purposefully vague nine-sentence letter that does not specifically address issues with the Proposed FAC or provide any way for Plaintiff to try to comply with any additional New GM demands.  *See* Aug. 8, 2017 Letter from Davidson to Snyder, attached hereto as Ex. 4.

New GM's conduct is problematic, to say the least.  Plaintiff has been fully forthright with New GM and the Atlanta District Court.   She has made clear that, with the exception of the contractual assumption issue (which the parties cannot agree on), she has no desire to litigate any issue in this Court and would attempt to resolve all issues that could be resolved.  But New GM has not attempted to resolve its alleged disputes with Plaintiff in good faith.  Instead New GM is attempting to play "hide the ball" so Plaintiff is left guessing as to what possible issues New GM might still have with her Proposed FAC.

6

Chief Judge Thrash has not ruled on Plaintiff's motion for leave to amend and the time for New GM to respond to the motion has not yet run. Once amended, Plaintiff believes that everything but the question of whether New GM contractually assumed liability for punitive damages for Old GM's conduct has been resolved. All of Plaintiff's other claims unquestionably constitute (i) "Product Liabilities" [5] that New GM expressly assumed under the Sale Agreement approved by this Court on July 5, 2009 or (ii) claims seeking to hold New GM liable on theories of negligence and failure to warn for <u>New GM's own actions and inactions</u> following its acquisition of Old GM's assets, employees, and books and records upon the closing of the 363 Sale (*i.e.*, "Independent Claims").[6]

Thus, the only question for this Court to resolve is whether New GM assumed liability for punitive damages based on Old GM's conduct as part of the Sale Agreement. Plaintiff recognizes that issue was briefed by other parties in 2015 and that Judge Gerber ruled in New GM's favor on that issue. But Judge Gerber's ruling on that issue was not appealed and Ms. Reichwaldt did not take part in that briefing because she had not even filed a case against New GM at that time. She respectfully disagrees with Judge Gerber's ruling and if she could have

---

[5] As defined in the Sale Agreement, "Products Liability" means "***all Liabilities*** to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by [Old GM] ("**Product Liabilities**"), which arise directly out of death, personal injury or other injury to Persons or damage to property caused by accidents or incidents first occurring on or after the Closing Date and arising from such motor vehicles' operation or performance." *See* Motion at Ex. A (Sale Order), at First Amendment to Sale Agreement, dated as of June 30, 2009 at § 2.3(a)(ix) (emphasis added).

[6] As defined in the December 2015 Judgment, an "Independent Claim" is "a claim or cause of action asserted against New GM that is based solely on New GM's own independent post-Closing acts or conduct" and does not include "(a) Assumed Liabilities, or (b) Retained Liabilities, which are any Liabilities that Old GM had prior to the closing of the 363 Sale that are not Assumed Liabilities." December 15 Judgment at ¶ 4 n.3.

taken part in the briefing on that issue in the fall of 2015, she would have appealed.  Ms.

Reichwaldt is not barred by any doctrine (collateral estoppel or law of the case) from raising

arguments that have not been fully and finally litigated as to her.  When this Court rules on her

arguments, she will then make a decision *for herself* whether to pursue an appeal.

## OBJECTION

In her Proposed FAC, Plaintiff separated her claims into two sections – those based on

the assumed liabilities of New GM and those based on New GM's own actions.  *See* Sections III

and IV of Pl.'s Proposed FAC, Ex. A.  Section I of this Objection discusses Plaintiff's assumed

liability claims against New GM.  Section II discusses Plaintiff's Independent Claims against

GM.  Section III discusses the reasons why Plaintiff's case should be not be stayed.

## I.  NEW GM EXPRESSLY ASSUMED LIABILITIES FOR INJURIES SUFFERED IN OLD GM'S VEHICLES AFTER THE CLOSING DATE OF THE 363 SALE

It is undisputed New GM voluntarily agreed to assume "all Liabilities" for injuries

suffered in Old GM vehicles after the closing date of the 363 Sale "arising from such motor

vehicles' operation or performance." ["**Product Liabilities**"].  *See* Motion at Ex. A (Sale Order),

at First Amendment to Sale Agreement, dated as of June 30, 2009 at § 2.3(a)(ix).  Plaintiff

asserts several claims against New GM based on its assumption of Product Liabilities in the Sale

Agreement, each of which constitutes an assumed liability of New GM.

### A.  Plaintiff's claims seeking compensatory damages for negligence, strict liability and failure to warn based on Old GM conduct

Count One of Ms. Reichwaldt's Proposed FAC asserts a claim for negligence and strict

liability based on Old GM's conduct.  *See* Count One, ¶¶ 57-68, Pl.'s Proposed FAC, Ex. 1.  As

specifically alleged, Old GM affirmatively decided (in violation of its own internal design

directives) to place the gas tank on the subject 1984 CK pickup truck outside of the steel frame rails, in known crush zone.  By doing so, Old GM failed to exercise reasonable care to design, engineer, test, manufacture, inspect, market, distribute, and sell a safe vehicle so as not to subject consumers or motorists to an unreasonable risk of harm.  *Id.*  In addition, the 1984 CK pickup truck had a defectively designed gas system when it was sold and distributed by Old GM which caused the subject pickup to explode, which explosion and fire engulfed the subject pickup, causing the burn injuries to Ms. Reichwaldt.  *Id.*  As a result, Old GM was negligent and was strictly liable for the injuries caused to Ms. Reichwaldt.  *Id.*  Plaintiff is aware of no ruling by any Court suggesting that claims seeking compensatory damages for negligence and strict liability based on Old GM's actions are not part of the "Product Liabilities" assumed by New GM in the Sale Agreement.

Count Two of Ms. Reichwaldt's Proposed FAC asserts that Old GM's conduct in designing and selling the 1984 CK pickup truck rose to the level reckless and wanton misconduct.  *See* Count Two, ¶¶ 69-73, Pl.'s Proposed FAC, Ex. 1.  Contrary to New GM's position in its letter to Plaintiff and in its filings to this Court, Count Two is not a request for punitive damages based on Old GM's conduct.  Instead, Count Two is based on Georgia's product liability statute of repose.  Under Georgia law, no action may be brought to recover for injuries caused by personal property more than ten years after the date of the first sale of the personal property, ***unless*** the claim arises out of conduct which manifests a reckless or wanton disregard for life or property or the manufacturer failed to warn of a known danger.  O.C.G.A. § 51-1-11(b)(2) and (c).[7]  Because the 1984 Old GM CK pickup truck was sold more than ten

---

[7] Georgia law also provides an exception to the statute of repose for willful conduct.  Plaintiff has not alleged that Old GM's conduct was "willful."

years before Ms. Reichwaldt's injuries, Plaintiff specifically included Count Two in her

Complaint to make clear she contends the exceptions to the Georgia statute of repose apply to

her claims. New GM has asserted the statute of repose as a defense to Plaintiff's claims. *See*

Doc. 4 at 19, Aff. Def. 2, Reichwaldt Action. If New GM agrees to withdraw its statute of

repose defense, then Plaintiff will amend her complaint to withdraw Count Two. Because New

GM has not indicated it intends to forego that defense, Count Two is proper and does nothing

more than seek to recover for negligence and strict liability claims based on Old GM's conduct –

which claims New GM expressly assumed in the Sale Agreement.

Count Three of Ms. Reichwaldt's Proposed FAC asserts a claim for Old GM's failure to

warn. As alleged in Plaintiff's Proposed FAC, Old GM knew that the 1984 CK pickup truck was

dangerous and defective when it sold the truck and at all points thereafter. *See* Count Three, ¶¶

74-80, Pl.'s Proposed FAC, Ex 1. Old GM never issued any warning about the dangers posed by

the 1984 CK pickup truck's design and that failure to warn was a direct cause of Plaintiff's

injuries. *Id.* New GM has conceded and this Court has held that "[f]ailure to warn claims [based

on Old GM actions] are properly considered Product Liability claims under the terms of the Sale

Agreement, and are therefore Assumed Liabilities." *See* Doc. 13955 at 19. As a result,

Plaintiff's Count Three is appropriate.

### B.      Plaintiff's claim seeking punitive damages based on Old GM's misconduct

#### 1.      New GM expressly assumed punitive damages as part of the Sale Agreement

The Sale Agreement, which was drafted by some of the most experienced bankruptcy and

transactional attorneys in the country, does not exclude punitive damages from the "Product

Liabilities" assumed by New GM, but instead states that New GM assumes "<u>all</u> Liabilities"–

which includes "***any and all liabilities and obligations of every kind and description***

*whatsoever*"[8] – in connection with those claims.  New GM could have easily carved out punitive

damages from its assumption of Product Liabilities.  Its decision not to expressly do so is fatal to

any argument that punitive damages were not assumed.  Notably, when the post-bankruptcy

Chrysler entity entered into its own agreement to assume similar product liability claims it did

the precise thing New GM chose not to do: it accepted "Product Liability Claims … solely to the

extent such Product Liability Claims … ***do not include any claim for exemplary or punitive***

***damages***."  *See* Amendment No. 4 to the Master Transaction Agreement, In re Old Carco LLC

(f/ka/ Chrysler  LLC), Case No. 09-500002 (AJG), Doc. 5988-1, amending Section 2.08(h) of

MTA, attached hereto as Ex. 5 (emphasis added).  Because the unambiguous language of section

2.3(a)(ix) of the Sale Agreement and the defined terms used therein do not exclude punitive

damages from the assumed "Product Liabilities," New GM assumed any and all liability for

punitive damages that could have been asserted against Old GM for these types of injuries.

### 2.  Governing contract interpretation principles

When a contract is unambiguous, "the obligations it imposes are to be determined

without reference to extrinsic evidence."  *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d

1274, 1277 (2d Cir. 1989).[9]  "[T]he objective of contract interpretation is to give effect to the

expressed intentions of the parties*"* and "the best evidence of what parties to a written agreement

intend is what they say in their writing."  *Law Debenture Trust Co. of N.Y. v. Maverick Tube*

*Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (quotations omitted).  "Evidence outside the four

corners of the document as to what was really intended but unstated or misstated is generally

---

[8] Sale Agreement at § 1.1 (Defined Terms)(emphasis added).

[9] The Sale Agreement was made in New York and expressly states that it is to be interpreted
using New York law.  Sale Agreement at § 9.12, Ex A. to the Motion.

inadmissible to add to or vary the writing." *Id.* at 466, 467 (quotations omitted).  Finally, "courts

may not by construction add or excise terms, nor distort the meaning of those used and thereby

make a new contract for the parties under the guise of interpreting the writing." *Id.* at 468.

A contract is only ambiguous if it "could suggest more than one meaning when viewed

objectively by a reasonably intelligent person who has examined the context of the entire

integrated agreement and who is cognizant of the customs, practices, usages and terminology as

generally understood in the particular trade or business." *Law Debenture Trust Co. of N.Y.* at

466 (quotations omitted).  "Language whose meaning is otherwise plain does not become

ambiguous merely because the parties urge different interpretations in the litigation, unless each

is a 'reasonable' interpretation." *Id.* at 467.  A "court should not find [a] contract ambiguous

where the interpretation urged by one party would 'strain[] the contract language beyond its

reasonable and ordinary meaning.'" *Id.* (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2

N.Y.2d 456, 459 (1957)).  "In cases of doubt or ambiguity, a contract must be construed ***most***

***strongly against the party who prepared it***, and favorably to a party who had no voice in the

selection of its language." *Jacobson v. Sassower*, 66 N.Y.2d 991, 993 (1985) (emphasis added).

Here, the language of section 2.3(a)(ix) of the Sale Agreement ***unambiguously*** provides

that New GM expressly assumed "all Liabilities" for post-Sale accidents in Old GM vehicles

without any exclusion for punitive damages.

### 3.    New GM expressly assumed liability for punitive damages

Section 2.3(a)(ix) of the Sale Agreement states that among the "Assumed Liabilities"

(*i.e.*, Old GM liabilities for which New GM would be held responsible) were:

> (ix)    all Liabilities to third parties for death, personal injury, or other injury to
> Persons or damage to property caused by motor vehicles designed for operation
> on public roadways or by the component parts of such motor vehicles and, in each
> case, manufactured, sold or delivered by [Old GM] ("Product Liabilities"), which

12

arise directly out of death, personal injury or other injury to Persons or damage to property caused by accidents or incidents first occurring on or after the Closing Date and arising from such motor vehicles' operation or performance ....

First Amendment to Sale Agreement, dated as of June 30, 2009 (the "<u>First Amendment</u>") at

§ 2.3(a)(ix) (emphasis added).  The capitalized term "Liabilities" included in section 2.3(a)(ix) is

broadly defined to mean:

> <u>any and all liabilities and obligations of every kind and description whatsoever</u>, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those <u>arising under any Law, Claim, Order, Contract or otherwise</u>.

Sale Agreement at § 1.1 (Defined Terms) (emphasis added).  Because punitive damages are not

excluded from the definition of Liabilities, punitive damages are not excluded from the "Product

Liabilities" that New GM assumed pursuant to section 2.3(a)(ix).  It really is as simple as that.

Every argument made by New GM is an improper, post-hoc attempt to rewrite the Sale

Agreement.

By agreeing to be subject to "<u>all</u> Liabilities" that arise directly out of death, personal

injury or other injury to Persons or damage to property" in Old GM cars, New GM agreed to a

complete conveyance of those liabilities.  *See Am. Home Prods. Corp. v. CAMBR Co.,* 2001 U.S.

Dist. LEXIS 716, *7-9 (S.D.N.Y. Jan. 29, 2001) (noting that "'All,' of course, means 'every',

'the whole amount or quantity of'" and "is 'one of the least ambiguous [words] in the English

language,' and one that leaves 'no room for uncertainty'").  In addition, punitive damages are

within those liabilities that "arise directly out of death, personal injury or other injury to Persons"

in Old GM cars.  In nearly all states, there cannot be an award of punitive damages without a

threshold award of compensatory damages.  *See* PROSSER AND KEETON ON THE LAW OF TORTS §

2, at 14 (W. Page Keeton et al. eds., 5th ed. 1984); *Virgillo v. City of N.Y.*, 407 F.3d 105,117 (2d

Cir. 2005) ("A demand or request for punitive damages … possesses no viability absent its

attachment to a substantive cause of action") (quoting *Rocanova v. Equitable Life Assurance*

*Soc'y of U.S.*, 83 N.Y.2d 603, 616 (1961)). The same is true under Georgia law – a claim for

punitive damages cannot stand on its own without an underlying award of compensatory

damages. *See Moore-Sapp Inv'rs v. Richards*, 522 S.E.2d 739, 742 (Ga. Ct. App. 1999)

("Punitive damages are awardable only when other damages, compensatory in nature, are

awarded."). The fact that punitive damages may serve a different purpose than solely to

compensate injured plaintiffs (e.g., to punish or deter a wrongful defendant)[10] is irrelevant –

because the claims for punitive damage "arise directly" out of the injuries suffered by those

plaintiffs, they were assumed.

There is no question that the sophisticated drafters of the Sale Agreement knew exactly

how to exclude certain liabilities from the Product Liabilities assumed in section 2.3(a)(ix). The

drafters did just that. In section 2.3(a)(ix) there is a parenthetical that states:

> (for the avoidance of doubt, Purchaser shall not assume, or become liable to pay,
> perform or discharge, any Liability arising or contended to arise by reason of
> exposure to materials utilized in the assembly or fabrication of motor vehicles
> manufactured by Sellers and delivered prior to the Closing Date, including
> asbestos, silicates or fluids, regardless of when such alleged exposure occurs).

Sale Agreement at § 2.3(a)(ix). If the parties to the Sale Agreement intended to exclude punitive

damages from the assumed Product Liabilities, they would have done so (as Chrysler later did)

by explicitly excluding punitive damages in Section 2.3(a)(ix). By not specifically excluding

punitive damages (as asbestos claims were excluded) it is clear that the parties intended that

---

[10] In addition to punishment, punitive damages serve as retribution to the victim for the
defendant's reprehensible conduct. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S.
408, 416 (2003) (collecting cases and stating "punitive damages serve a broader function; they
are aimed at deterrence ***and*** retribution").

punitive damages be included.  *See Pathmark Stores, Inc. v. United Food & Commercial Workers Local 342-50, AFL-CIO*, 204 F. Supp. 2d 500, 505-06 (E.D.N.Y. 2002) ("[T]he CBA does not expressly exempt employer-initiated disputes from arbitration.  In contrast, there is one specific category of exclusion in the arbitration article, demonstrating that the parties knew how to expressly exclude certain disputes from arbitration when they so intended …."*); see also Vysyaraju v. Mgmt. Health Solutions, Inc.*, 2013 U.S. Dist. LEXIS 118056, *21-22 (S.D.N.Y. Aug. 10, 2013) (where explicit contract language contained a "consistent with past practices" exception to strict GAAP compliance for one calculation but not for a different calculation, court held "[w]here the parties wanted revenue calculated through procedures other than those provided by GAAP they knew how to do that, and … it is therefore an unreasonable interpretation of the contract to add the qualification that GAAP be applied 'consistent with past practice' where that has not been specified").

There also is no question that the sophisticated authors of the Sale Agreement could have carved punitive damages out from the Assumed Liabilities by including the upper-case, defined term "Damages" in section 2.3.  In the Sale Agreement's definitions, "Damages" is defined as "any and all Losses, other than punitive damages."  Sale Agreement at § 1.1 (Defined Terms).[11] The defined, upper-case term "Damages" was not included in section 2.3 or in the defined terms "Liabilities" or "Product Liabilities" used therein.  The drafters' decision not to include "Damages" in section 2.3 was intentional and is dispositive.

Not only are punitive damages not ***excluded*** from Assumed Liabilities, they are not ***included*** as a "Retained Liability."  *See* Sale Agreement at § 2.3(b).  The list of ***sixteen***

---

[11] "Damages" is used in section 2.4(c) of the Sale Agreement in connection with New GM's indemnification obligations towards Old GM for liabilities relating to "Non-Assignable Assets." *See* Sale Agreement at § 2.4(c).

*categories of liabilities* retained by Old GM contained in the definition of "Retained Liabilities" in section 2.3(b) does not include punitive damages. The parties' decision not to list punitive damages as a "Retained Liability" demonstrates punitive damages were not retained but were, instead, assumed. *See Castillo v. General Motors Co. (In re Motors Liquidation Co.)*, 2012 WL 1339496, *10 (Bankr. S.D.N.Y. Apr. 17, 2012) ("[T]he matters for which New GM took on liability under the Sale Agreement are stated with great specificity – in several lines of text following the words 'arising under.' Additionally, while strictly speaking, 'Retained Liabilities,' the subject of the next relevant section, are Old GM's problem, and not New GM's concern, they shed light on the liabilities that former GM and the Auto Task Force determined that New GM would not assume.").

Because the Sale Agreement is unambiguous, there is no need to go beyond the four corners of the document and any appeal to parol evidence related to the alleged "commercial necessity" of a decision to take on punitive damages claims is improper.[12] The Sale Agreement is explicit about that point. Section 9.17 provides that:

> This Agreement (together with the Ancillary Agreements, the Sellers' Disclosure Schedule and the Exhibits) contains the final, exclusive and entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, among the Parties with respect to the subject matter hereof and thereof. Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or

---

[12] Any argument that compensatory damages serve a commercial necessity while punitive damages do not is wholly unsupported by evidence. Indeed, compensatory damages in many cases far exceed punitive damages awards, particularly in the instance of catastrophic injuries requiring long term care in states with capped punitive damages awards. *See, e.g.,* Fla. Stat. § 768.73 (capping punitive damages awards in most cases at three times compensatory amount or $500,000 whichever is greater).

therein, and none shall be deemed to exist or be inferred with respect to the
subject matter hereof.

Sale Agreement at § 9.17.  *See Soroof Trading Dev. Co. v. GE Fuel Cell Sys. LLC*, 842 F. Supp.

2d 502, 512 (S.D.N.Y. 2012) ("Parol evidence is properly excluded where, as here, a contract is

clear, unambiguous, complete on its face and, moreover, ***contains an explicit integration***

***clause***.") (emphasis added) (citing *Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming*

*Corp.*, 269 F. Supp. 2d 206, 214-15 (S.D.N.Y. 2003)).

The Second Circuit has found in a very similar circumstance that it is not appropriate to

rewrite a contract simply because one party argues that failing to do so would be a commercially

"unreasonable" result.  In *Maverick Tube Corp.*, a contract provided that certain notes issued by

an obligor ("Maverick") were convertible to cash or stock upon acquisition of Maverick by a

"Public Acquirer," which was defined as an acquiring entity that "has a class of common stock

traded on a United States national securities exchange."  *Law Debenture Tr. Co. of N.Y. v.*

*Maverick Tube Corp.*, 595 F.3d 458, 463 (2d Cir. 2010).  A dispute arose as to whether a foreign

acquirer, whose ordinary shares did not trade on a United States exchange, fell within the

definition of "Public Acquirer."  *Id.* at 462-63.  Judge Sullivan of the Southern District of New

York and the Second Circuit Court of Appeals agreed that, although certain depository shares

("ADS" shares) of the acquirer have similar characteristics to common shares, the shares are not

the same thing, and, therefore the acquiring entity was not a "Public Acquirer."  The Second

Circuit stated as follows:

> The parties could easily have included in the Indenture a definition of common
> stock in general with a parenthetical phrase expressly including ADSs, such as the
> parenthetical in the definition of "Capital Stock"; or they could have included
> such a parenthetical after "common stock" in the "a class of common stock traded
> on a United States national securities exchange" clause of the Public Acquirer
> definition.  They did neither.  Given that the parties ***defined more than 100 terms***
> ***in the Indenture*** and made explicit reference to ADSs in the "Capital Stock"
> definition that informs the rights of noteholders to require Maverick to purchase

17

their notes, the Indenture as a whole does not suggest that the undefined term
"common stock," in the Public Acquirer definition that informs noteholders'
conversion rights, includes ADSs implicitly.

*Id*. at 469 (emphasis added).  Importantly, the Second Circuit also rejected the invitation to

include the depository shares in the undefined term "common stock" because to not do so would

be "commercially unreasonable."  Specifically, the Second Circuit wrote:

> Any suggestion that the Indenture should be read to accomplish what the Trustee
> views as "commercial[ly]" "reasonable" essentially asks us to rewrite the
> Indenture's Public Acquirer definition.  ***Instead, we are required to give effect to
> the intentions expressed in the agreement's own language.***  Given the pains
> taken by the parties to have the Indenture set out detailed definitions of numerous
> terms and to have its definition of Capital Stock make explicit reference to ADSs-
> -a reference we are not entitled to regard as superfluous--we conclude that the
> district court properly declined to read ADSs into the undefined term "common
> stock," as used in the clause "common stock traded on a United States national
> securities exchange" without elaboration.

*Id*. at 472 (internal citations omitted) (emphasis added).  New GM asks this Court to do precisely

what the Second Circuit rejected in *Maverick Tube* – to rewrite the Sale Agreement to exclude

punitive damages because New GM contends that it was not "commercially necessary" for New

GM to take on claims for punitive damages.

Finally, because the Sale Agreement is unambiguous, there is no reason to even consider

New GM's policy-based argument that punitive damages were not assumed because awarding

such damages would serve no deterrent effect on "New GM."  Putting aside the fact that New

GM's argument ignores reality (nearly all of "Old GM's" employees who made the decisions

that would form the basis for a punitive damages claim became employees of "New GM" after

the Sale), a conclusion that the agreement would not serve an important public policy is

irrelevant in the face of New GM's agreement to assume "all Liabilities" without carving

punitive damages out of that express assumption.

Words in a contract matter.  The words in the Sale Agreement demonstrate that New GM expressly agreed to be subject to claims for punitive damages based on Old GM's conduct.

### C.    Plaintiff is not barred from arguing New GM contractually assumed claims for punitive damages based on Old GM's conduct

The question of whether New GM assumed liability for punitive damages based on Old GM's conduct as part of the Sale Agreement has been briefed and argued only one time that Plaintiff is aware of: in September 2015 as part of the briefing that led to the November 9, 2015 Decision, *In re Motors Liquidation Co.,* 541 B.R. 104 (Bankr. S.D.N.Y. 2015), and the December 4, 2015 Judgment, Doc. 13563.[13]  The portion of Judge Gerber's Order finding that New GM had not contractually assumed liability for punitive damages was never appealed, so no appellate court has ever considered Judge Gerber's reasoning with regard to that issue.  *See* Docs. 13576, 13578 and 13579.  The briefing that led to the November Decision and the December Judgment and the decision not to appeal those rulings occurred months before Ms. Reichwaldt filed her case on May 23, 2016.  Ms.  Reichwaldt therefore had no opportunity to take part in the briefing and, importantly, the decision not to appeal Judge Gerber's ruling.

In addition, the briefing on the 2016 Threshold Issues had nothing to do with the issue of whether New GM had contractually assumed liability for punitive damages.[14]  Instead, as this

---

[13] This Court has concluded that "the holdings of the holdings of the November 2015 Decision and December 2015 Judgment were … limited to Ignition Switch Plaintiffs."  Doc. 13992 at 6, n.2.  Because Ms. Reichwaldt is not an "Ignition Switch Plaintiff," it is not clear that any portion of the November and December rulings of this Court have direct application to her.

[14] Ms. Reichwaldt took no active part in the briefing of the 2016 Threshold Issues.  She does not dispute that she was served with the December 2016 Show Cause Order or that she is bound by the Court's June and July rulings, which did not consider the punitive damage contractual assumption issue.   Mr. Weintraub, who represented a group of law firms (including BWP) in connection with the 2016 Threshold Issues, has never entered an appearance on behalf of Ms. Reichwaldt, but instead stayed in the case on behalf of BWP's client Veronica Fox, who he had previously represented in connection with New GM's 2016 Motion to Enforce filed against her.

Court is well aware, the most recent punitive damage briefing related to whether "Post-Closing

Accident Plaintiffs" are "bound by the Sale Order or may … bring ***successor liability*** claims

against New GM and seek punitive damages in connection therewith notwithstanding the Court's

rulings in the November 2015/ December 2015 Judgment?."  Doc. 13802, Dec. 13, 2016 Show

Cause Order (emphasis added).  Neither New GM nor any of the other parties filing briefs

argued or even mentioned the contractual assumption issue in their briefing on the 2016

Threshold Issues.

 In short, this Objection is the first opportunity Ms. Reichwaldt has had to argue that New

GM contractually assumed liability for punitive damages based on Old GM's conduct.

 New GM may argue that Ms. Reichwaldt is legally precluded from raising the contractual

assumption issue in connection with this filing.  That is not the case.  Ms. Reichwaldt is not an

Ignition Switch Plaintiff and was not in privity with any party who had notice of or who took

part in the 2015 briefing.  *See, e.g.*, *Borcsok v. Early*, No. 9:03CV395 GLS RFT, 2007 WL

2454196, at *10 (N.D.N.Y. Aug. 23, 2007) (quoting 18 James W. Moore, et al., *Moore's Federal

Practice* ¶ 132.04(1)(b)(ii)), *aff'd*, 299 F. App'x 76 (2d Cir. 2008) ("The term privity signifies

that the relationship between two or more persons is such that a judgment involving one of them

may justly be conclusive on the others."); *Staten Island Rapid Transit Operating Auth. v. ICC.,*

718 F.2d 533, 542-43 (2d Cir. 1983) (privity exists when there "concurrent relationship to the

same right of property; successive relationship to the same right of property; or representation of

interests of the same person.").  Thus, Ms. Reichwaldt is not collaterally estopped from raising

these issues.  *See Marvel Characters Inc. v. Simon*, 310 F.3d 280, 288-89 (2d Cir. 2002)

(collateral estoppel only "prevents ***parties or their privies*** from relitigating in a subsequent

action an issue of fact or law that was fully and fairly litigated in a prior proceeding") (emphasis

added).  In addition, the "law of the case" doctrine does not bar Ms. Reichwaldt from raising

issues in front of this Court so that they can be ruled on as to her and, if necessary, challenged on

appeal.  *See New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 606

(2d Cir. 2003) ("Put simply, the law of the case does not extend to issues an appellate court did

not address."); *see also Avitia v. Metro. Club of Chicago, Inc.*, 924 F.2d 689, 690–91 (7th Cir.

1991) ("Law of the case, however, does not block a superior court from examining the

correctness of an earlier decision."); *Conrod v. Davis*, 120 F.3d 92, 95 (8th Cir. 1997) ("[E]ven if

the 'law of the case' doctrine had precluded the district court from considering the merits of

Davis's motion, we [the 8th Cir.] have the authority to review the denial of that motion.").

Ms. Reichwaldt seeks only to be heard on this very important issue to her case and, if

necessary, to have the opportunity to pursue an appeal.

## II.    WHETHER NEW GM IS SUBJECT TO A CLAIM FOR FAILURE TO WARN BASED ON ITS OWN CONDUCT IS A QUESTION OF STATE LAW

New GM has never filed a dispositive motion in the Atlanta District Court alleging that

Plaintiff has not adequately pleaded her claim for New GM's own failure to warn.  Instead, New

GM asks this Court to resolve that issue.  What New GM is attempting is an end-run around this

Court's prior rulings that truly Independent Claims may be asserted and should be assessed under

the applicable state law by the non-bankruptcy courts where those claims are pending.  That is

improper.

Both this Court and the Second Circuit have expressly ruled that nothing in the Sale

Order specifically or bankruptcy law generally precludes an injured plaintiff from suing New

GM for its own post-sale wrongful conduct.  *See In re Motors Liquidation Co.*, 829 F.3d 135,

157 (2d Cir. 2016) (independent claims "are based on New GM's post-petition conduct, and are

not claims that are based on a right to payment that arose before the filing of petition or that are

based on pre-petition conduct. Thus, these claims are outside the scope of the Sale Order's 'free and clear' provision."), *cert. denied sub nom. Gen. Motors LLC v. Elliott*, 137 S. Ct. 1813 (2017); *In re Motors Liquidation*, 568 B.R. 217, 219-21 (Bankr. S.D.N.Y. 2017); Doc. 13992 at 6, n.2 ("Non-Ignition Switch Plaintiffs are not barred from asserting Independent Claims against New GM based solely on post-closing conduct of New GM.").

Plaintiff seeks to recover compensatory and punitive damages against New GM based on its own post-Sale failure to warn of the dangers of the 1984 CK pickup truck.  *See* Pl.'s Proposed FAC at Section IV, Counts Five and Six, Ex. 1.  Plaintiff's Proposed FAC, and her initial Complaint before it, contain specific allegations with regard to New GM's own knowledge of the dangers of the 1984 CK pickup truck and New GM's own failure to warn of those dangers.  As specifically alleged in Plaintiff's Proposed FAC: New GM purchased the assets of Old GM, including Old GM's books and records; New GM profited from entering into service maintenance and repair relationships with purchasers of Old GM products, and from manufacturing and selling parts and accessories for Old GM products (including the subject 1984 CK truck); after the bankruptcy sale, New GM employed nearly all Old GM employees and acquired all specific knowledge about the subject pickup previously possessed by Old GM; as a result, New GM could have reasonably foreseen and did, in fact, foresee the occurrence of side impact collisions resulting in fires; and New GM failed at the time of the bankruptcy sale—and all times since—to warn the public of the dangers in a foreseeable wreck caused by the design of the CK trucks.  *See* Pl.'s Proposed FAC ¶¶ 49-54; 85-89, Ex. 1.

Plaintiff has more than adequately alleged a claim for failure to warn against New GM based on its own conduct.  But the sufficiency of Plaintiff's pleading as to her failure to warn claim is not an issue for this Court.  *See In re Motors Liquidation*, 568 B.R. 217, 219–21 (Bankr.

S.D.N.Y. 2017) ("Assuming that Connecticut state law recognizes such claims and that such claims are properly pleaded (issues to be decided by the Connecticut District Court), the Pitterman Plaintiffs may proceed ....").

Plaintiff's Proposed FAC removes any ambiguity in her complaint about which GM entity it is discussing and expressly separates allegations about Old GM and New GM into different counts.  Thus, to the extent there were *any* issues with the language of Plaintiff's initial Complaint, those issues are resolved by her Proposed FAC.  The only issue left is whether New GM had a duty to warn of the dangers of the CK pickup truck at issue and breached that duty to warn.  Plaintiff contends New GM had a state law duty to warn and breached that duty.  This Court has already held that is a question to be resolved by non-bankruptcy courts.  As a result any additional "issues" New GM has with the alleged sufficiency of Plaintiff's claims against New GM should be decided by Chief Judge Thrash in the Atlanta District Court.  *Id.*

## III.    PLAINTIFF'S CASE SHOULD NOT BE STAYED

The Reichwaldt Action is still in its very early stages.  Plaintiff has served document requests, interrogatories and requests for admission and Chief Judge Thrash is considering Plaintiff's motion to compel with regard to that written discovery.  No depositions have been taken or even scheduled at this point.  There likely will be additional motions practice with regard to Plaintiff's requested depositions.  No trial has been scheduled, or even discussed. There is, in short, much work to be done before any trial could take place. That work is likely to take a year or more.

As discussed above, Ms. Reichwaldt's Proposed FAC asserts several claims that should unquestionably pass through the "bankruptcy gate" – claims for compensatory damages based on Old GM's negligence and strict liability and Independent Claims seeking compensatory and

punitive damages against New GM based on New GM's own post-sale conduct.  The discovery

into the admittedly assumed claims based on Old GM's conduct is the exact same discovery that

Plaintiff would seek to support her claim for punitive damages based on Old GM's conduct.

That is because, as discussed previously, Plaintiff must prove that an exception to the Georgia

statute of repose applies which requires a showing that Old GM was reckless, *or* wanton, *or*

failed to warn. O.C.G.A § 51-1-11.  That evidence is the exact same evidence Plaintiff would

obtain and present to demonstrate that Old GM's actions "showed willful misconduct, malice,

fraud, wantonness, oppression, or that entire want of care which would raise the presumption of

conscious indifference to consequences" and therefore justifies the imposition of punitive

damages.  *See* O.C.G.A. § 51-12-5.1(b).

Thus, even if this Court disagrees with Plaintiff's arguments and orders Plaintiff to

refrain from asserting a claim for punitive damages based on Old GM conduct, there is no reason

for the other claims against New GM to be stayed while they are still in discovery.  To the extent

New GM contends any discovery sought by Plaintiff relates solely to her punitive damage claim

based on Old GM conduct, that argument should be made to Chief Judge Thrash who has already

spent a considerable amount of time determining the appropriate scope of discovery into

Plaintiff's claims.  All of that discovery is driven by the Georgia statute of repose and will be

necessary, regardless of the outcome of this Motion.

## **<u>CONCLUSION</u>**

For the foregoing reasons, BWP respectfully requests that this Court deny the relief New

GM seeks in its Motion and permit them to prosecute the Reichwaldt Action without requiring

any further amendments to the complaint filed in that case.

Dated: August 18, 2017                         Respectfully submitted,

                                               BY: s/  Robert H. Snyder
                                               JAMES E. BUTLER, JR. (admitted *pro hac vice*)
                                               Georgia Bar No. 099625
                                               ROBERT H. SNYDER, JR. (admitted *pro hac vice*)
                                               Georgia Bar No. 404522
                                               Butler Wooten & Peak LLP
                                               105 13th Street
                                               Post Office Box 2766
                                               Columbus, Georgia 31902
                                               (706) 322-1990
                                               (706) 323-2962 (fax)

                                               Attorneys for Kaitlyn Reichwaldt

## CERTIFICATE OF SERVICE

This is to certify that on August 18, 2017, I electronically filed OBJECTION TO MOTION BY GENERAL MOTORS LLC PURSUANT TO 11 U.S.C. §§ 105 AND 363 TO ENFORCE THE BANKRUPTCY COURT'S JULY 5, 2009 SALE ORDER AND INJUNCTION, AND THE RULINGS INCONNECTION THEREWITH, WITH RESPECT TO THE REICHWALDT PLAINTIFF with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036

Richard C. Godfrey, P.C.
Andrew B. Bloomer, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654

This 18th day of August, 2017.

BY: s/  Robert H. Snyder
JAMES E. BUTLER, JR. (admitted *pro hac vice*)
  Georgia Bar No. 099625
ROBERT H. SNYDER (admitted *pro hac vice*)
  Georgia Bar No. 404522
Butler Wooten & Peak LLP
105 13th Street
Post Office Box 2766
Columbus, Georgia 31902
(706) 322-1990
(706) 323-2962 (fax)