UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
|  | . | Case No. 09-50026-mg |
| IN RE: | . | Chapter 11 |
|  | . |  |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| et al., f/k/a GENERAL | . |  |
| MOTORS CORP., et al, | . | One Bowling Green |
|  | . | New York, NY 10004 |
| Debtors. | . |  |
|  | . | Thursday, August 17, 2017 |
| . . . . . . . . . . . . . . | . | 3:05 p.m. |

TRANSCRIPT OF IN COURT CONFERENCE
(CC: DOC NOS. 14053, 14056)
BEFORE THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:                 King & Spalding LLP
                                By:  ARTHUR STEINBERG, ESQ.
                                     SCOTT DAVIDSON, ESQ.
                                1185 Avenue of the Americas
                                New York, New York 10036-4003
                                (212) 556-2158


For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs:                     Brown Rudnick LLP
                                By:  EDWARD S. WEISFELNER, ESQ.
                                     HOWARD S. STEEL, ESQ.
                                7 Times Square
                                New York, New York 10036
                                (212) 209-4917



Audio Operator:                 Timothy Wilson, ECRO


Transcription Company:          Access Transcripts, LLC
                                10110 Youngwood Lane
                                Fishers, IN 46038
                                (855) 873-2223
                                www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES (Continued):

For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs and states
of California and
Arizona:                    Hagens Berman Sobol Shapiro LLP
                            By:  STEVE W. BERMAN, ESQ.
                            1918 Eighth Ave.
                            Suite 3300
                            Seattle, Washington 98101
                            (206) 623-7292

For Personal Injury
Accident Plaintiffs:        Goodwin Procter LLP
                            By:  WILLIAM P. WEINTRAUB, ESQ.
                                 GREGORY FOX, ESQ.
                            The New York Times Building
                            620 Eighth Avenue
                            New York, NY 10018-1405
                            (212) 813-8839

For Participating
Unitholders:                Akin Gump Strauss Hauer & Feld LLP
                            By:  DANIEL GOLDEN, ESQ.
                            One Bryant Park
                            New York, NY 10036-6745
                            (212) 872-1000

For Certain Personal
Injury/Death Plaintiffs:    Hilliard Munoz & Gonzales LLP
                            By:  BOB HILLIARD, ESQ.
                            719 South Shoreline Boulevard #500
                            Corpus Christi, Texas  78401
                            (361) 882-1612

For Plaintiffs'             Otterbourg
Executive Committee:        By:  MELANIE L. CYGANOWSKI, ESQ.
                            230 Park Avenue
                            New York, NY  10169
                            (212) 905-3622

```
APPEARANCES (Continued):

For Motors Liquidation
GUC Trust:                    Gibson, Dunn & Crutcher LLP
                              By:  KEITH R. MARTORANA, ESQ.
                              200 Park Avenue
                              New York, NY 10166-0193
                              (212) 351-4000

For Additional Ignition
Switch  Pre-Closing
Accident Plaintiffs:          Andrews Myers
                              By:  LISA M. NORMAN, ESQ.
                              1885 Saint James Place, 15th Floor
                              Houston, TX  77056-4110
                              (713) 850-4200

TELEPHONIC APPEARANCES:

For Takata Plaintiffs:        Stutzman, Bromberg, Esserman & Plifka
                              By:  SANDER L. ESSERMAN, ESQ.
                              2323 Bryan Street
                              Suite 2200
                              Dallas, TX  75201-2689
                              (214) 969-4900
```

4

1          (Proceedings commence at 3:05 p.m.)

2          THE COURT:  Please be seated.  We're here in <u>Motors</u>

3  <u>Liquidation Company</u>, 09-50026.  This is a status conference

4  scheduled at the request of certain parties in interest.  The

5  Court has received a flurry of letters and attachments over the

6  last few days relating to this matter.

7          Mr. Weisfelner, I'm going to ask you to start.

8          MR. WEISFELNER:  Thank you, Judge.  Your Honor, first

9  of all, welcome back from vacation.

10         THE COURT:  It's been a while, actually, but --

11         MR. WEISFELNER:  I'm assuming that like us, you

12 anticipated this status conference was going to have a

13 different tone and tenor.  In any event, Ed Weisfelner from

14 Brown Rudnick, together with my partner, Howard Steel.  Your

15 Honor, also on our side of the courtroom, William Weintraub and

16 Gregory Fox from Goodwin Procter.

17         Your Honor, we have all three co-leads from the MDL

18 who were also, in different capacities, signatories to the

19 settlement agreement or intended signatories to the settlement

20 agreement.  Steve Berman, Elizabeth Cabraser, Robert Hilliard

21 were all in transit when we heard that this hearing was going

22 to take a different turn.  Lisa Norman, I believe, is also in

23 court to round out the -- what I'll call plaintiffs' side of

24 the question, all intended signatories to the settlement

25 agreement, the drafts of which were provided to Your Honor.

5

1          Your Honor, as you know, based on the announcement I

2    made in open court way back in May, the parties, defined as

3    everyone on this side of the table, the GUC Trust and, to a

4    very important extent, the GUC Trust beneficiaries, some 66

5    percent of all the beneficiaries represented by the Akin Gump

6    firm, have been involved, frankly, since before May in

7    discussing the contours of a potential resolution of any number

8    of open matters that are on Your Honor's docket or could be put

9    on Your Honor's docket, including late-filed claims, a

10   propriety of late-filed claims, and the extent to which those

11   claims could or should be allowed.

12          Your Honor, following the May announcement in court,

13   we spent many, many months of discussion among the parties.

14   And as I think Your Honor can see through the email chains that

15   we provided early this morning, no later than late July, early

16   August, there was a final deal among the parties that was

17   subject to some additional fine-tuning of the documentation.

18   And I'll get back to that in a minute, but there were lots and

19   lots of submissions that crossed between the GUC Trust and the

20   unit holders on the one hand and the plaintiffs' side on the

21   other hand, including, in particular, expert reports submitted

22   both by economic loss plaintiffs' retained experts and personal

23   injury/wrongful death retained experts as to the value of their

24   claims.

25          THE COURT:  Is the pre-closing at --

6

1        MR. WEISFELNER:  Yes, pre-closing.

2        THE COURT:  -- injury or death plaintiffs?

3        MR. WEISFELNER:  Correct, Your Honor.  There were

4   declarations from Mr. Hilliard, from Mr. Berman, from

5   Ms. Cabraser, from Ms. Norman.  There was even a declaration

6   that was provided by Wilmington, the GUC Trust trustee, by a

7   woman by the name of Beth Andrews.  And again, from our

8   perspective -- well, before I get there, we also spent a ton of

9   time on the parties with noticed experts, in particular, with

10  the Epoch firm, trying to devise a notice procedure for this

11  settlement that would involve both direct mail notice in the

12  form of a postcard with reference to an appropriate website for

13  the longer version of the agreement, and we also worked quite

14  hard on social media and other methodologies for ensuring that

15  adequate notice went out to the world.

16        Now, Your Honor, no one on our side -- no one in the

17  world, I suspect -- thought that New GM was going to welcome

18  the development of a settlement with open arms.  We thought

19  they'd squeal.  And, in fact, they started to squeal before

20  Judge Furman this past Friday.

21        THE COURT:  Well, actually, I think at an earlier

22  hearing before me, Mr. Steinberg, when I advised that I had

23  received a telephone call from Magistrate Judge Cott about his

24  acting as a mediator, I think Mr. Steinberg, in substance,

25  indicated that New GM had not been a party to any discussions.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

7

1 So I was aware of that, at least as of that time if not --

2          MR. WEISFELNER:  Certainly.  And just to be more

3 specific, the involvement of Magistrate -- and I continuously

4 mispronounce his name, it's Cott, I think --

5          THE COURT:  Cott.

6          MR. WEISFELNER:  -- Cott, really involved a

7 down-the-road step as between plaintiffs on --

8          THE COURT:  He mentioned that it was mentioned at

9 allocation.

10          MR. WEISFELNER:  -- how to allocate.  That's right.

11          THE COURT:  We didn't talk any further than that

12 about it, but he advised me.

13          MR. WEISFELNER:  My point being that we heard from GM

14 as recently -- not to suggest that we didn't hear from them

15 before that, but as recently as Friday during the status

16 conference before Judge Furman in the MDL.

17          THE COURT:  Yes.  I first heard about it when I read

18 the Bankruptcy 360 report of what Judge Furman was told last

19 Friday, I guess.  When the request came for a conference this

20 week here, I wasn't told why, but I did read the Bankruptcy 360

21 report.

22          MR. WEISFELNER:  And again, you know, this side of

23 the courtroom, together with the GUC Trust, were accused of all

24 sorts of collusive bad-faith conduct, and GM announced to Judge

25 Furman it was their intent, I think, that day or soon as our

8

1 papers got filed with this Court to immediately seek withdrawal

2 of the reference.

3          And, Your Honor, again everyone I think anticipated

4 that New GM would take every available opportunity it had to

5 contest all or any portion of the settlement agreement when it

6 came before an appropriate court of jurisdiction, shall we say.

7 They could have raised collusion.  They could have raised

8 impropriety.  They could have raised that the estimation

9 amounts were outrageous and not supported by the evidence.

10          They didn't choose to do any of that.  They didn't

11 choose to afford anyone, including victims, their due process

12 day in court.  They instead, from what we currently understand,

13 insisted on a meeting with the GUC trustee, which happened I

14 think, if today is Thursday, apparently on Tuesday of this

15 week, a meeting to which the GUC Trust beneficiaries,

16 represented by Mr. Goldman at Akin Gump were excluded.

17          And somehow, during the course of that meeting

18 between GM and the GUC Trust, the GUC Trust purported to

19 abandon not only its fiduciary duties, but a settlement that it

20 already agreed to and to announce to us, not before 3:30

21 yesterday, that they were, quote, "taking a different tack."

22          Now, Your Honor, this is all still fresh news to us.

23 We've only had a couple of hours to consult with our clients

24 and our colleagues, but I can tell Your Honor what we currently

25 contemplate being the way forward.  We know that what's on the

1  calendar are the late claims filings, and I would ask Your

2  Honor to give us a couple of weeks to figure out how we proceed

3  on those.

4        But frankly I think there may very well need to be

5  some preliminary inquiries.  And like many in the media, it's

6  important to us that we gather the facts before we speak.  But

7  some things we could speak to immediately, and that is we

8  firmly believe that what we had with the GUC Trust was an

9  enforceable agreement under New York law, notwithstanding the

10  fact that signatures had not been appended to those agreements.

11        THE COURT:  I didn't read -- you appended to your

12  letter a unsigned copy of the agreement, and I can't say that

13  I've studied every aspect.  I did read through it this morning,

14  the --

15        MR. WEISFELNER:  Sure.  And that's absolutely true.

16  The signatures of the GUC Trust never got appended.

17  Mr. Golden, for the GUC Trust beneficiaries, indicated that

18  they were done and they would sign as soon as they got word

19  that the GUC Trust signed.  We were all in possession of

20  execution copies and ready to sign, which would have been the

21  first step before we submitted documents to you.

22        But, Your Honor, I think as you can see from the

23  email traffic, this wasn't a question of whether we had a deal.

24  This was a question of finalizing documents, and in point of

25  fact, Gibson Dunn clearly indicated they were done with all of

10

1 the operative documents, many of them they had the proverbial

2 pin on, and that they were merely awaiting their clients' final

3 consent to the form of the documents.

4         And again, Your Honor ,I don't want to argue the

5 merits, but I firmly believe, based on everything we know and

6 everything we've researched in the relative short period of

7 time we have, that if we chose to, we could require the GUC

8 Trust to perform under the agreement they had -- we think is

9 enforceable under New York law.

10         We also believe that New GM may have liability for

11 what I'll generally refer to as tortious interference.  We are

12 told, but have no reason to know for a fact, that the GUC

13 Trust's about face was the subject of or occasioned by some

14 very direct, very serious threats issued either by New GM or

15 New GM's professionals to the GUC Trust, the administrator of

16 the GUC Trust and their professionals.

17         And, Your Honor, in an effort to understand all the

18 facts before we move any further forward, we are going to seek

19 discovery from the GUC Trust, from New GM, in terms of

20 understanding who all attended this very critical meeting this

21 week, what discussions preceded that meeting, what, if any,

22 inducements were made, what, if any, threats were extended, and

23 whether the inducements crossed the line of Title 18.

24         Your Honor, that's really all I had to tell you by

25 way of update.  We are -- devastated is the wrong word.  We are

11

1   shocked and amazed that after months of collective work by the

2   only party that -- under the plan of reorganization for Old GM

3   and under the GUC Trust agreement approved by new GM as the

4   buyer, the only party in interest that has standing to

5   deliberate on late claims and the only party authorized to take

6   a position with regard to the allowance or estimation of late

7   claims, the GUC Trust, after working with us for months,

8   somehow was convinced virtually overnight to back out.  And we

9   intend to get to the bottom of that.  Whether it takes efforts

10  to discovery, whether the unitholders themselves exercised

11  their rights under the trust agreement to replace the trustee,

12  all remains to be seen.

13        There are a couple of other things that I think are

14  preliminary, but I'll put them on the table in any event.  The

15  GUC Trust is possessed of material.  I don't remember the exact

16  dollar amount, 4- or $500 million.  Once upon a time, we had a

17  proceeding before your predecessor with regard to injunctive

18  relief, seeking to ensure that until the late claims

19  controversy were resolved, no further distributions got made

20  out of the GUC Trust.  The record will reflect that Judge

21  Gerber found in our favor.  However, he required us to post a

22  very significant supersedeas bond.

23        One of the interesting aspects of the reported

24  agreement between New GM and the GUC Trust that's the subject

25  of the letter you got from King & Spalding, I think it was

12

1  yesterday, is that New GM, in effect, will guarantee a rate of

2  return.  Well, that means, I presume, that if we press forward

3  again, the supersedeas bond has, thanks to our good sponsor,

4  New GM, been taken off the table.  But, Your Honor, we can't

5  see or stand still for subsequent distributions out of this

6  trust under the present facts and circumstances.

7            So, Your Honor, I hope you'll give us some time to

8  get our ducks in a row, figure out where do we go from here.

9  I'm hearing rumors of the fact that the GUC Trust administrator

10 wants to take a meeting with the GUC Trust beneficiaries and

11 maybe they'll have second thoughts about abandoning this deal

12 or second thoughts about entering into this new deal that's

13 been offered by New GM.  So there are still a lot of balls in

14 the air.  And, Your Honor, I know all of us want to get on with

15 late claims and estimation and allowance, but if you'd give us

16 a couple of weeks just to get our act together, we'd appreciate

17 it.

18            THE COURT:  Thank you, Mr. Weisfelner.

19            MR. WEISFELNER:  Thank you, Judge.

20            THE COURT:  I'd like to hear from the GUC Trust

21 counsel next.

22            MR. MARTORANA:  Good afternoon, Your Honor.  Keith

23 Martorana of Gibson, Dunn & Crutcher on behalf of Wilmington

24 Trust Company as GUC Trust administrator.

25            THE COURT:  Can I ask you why you were smirking when

13

1 Mr. Weisfelner was delivering his remarks to the Court?

2        MR. MARTORANA: Well, Your Honor, the reason why I

3 was smirking was because, frankly, I was at the meetings. And

4 to be totally candid with Your Honor, the only people that were

5 at the meetings were counsel for New GM and counsel for the GUC

6 Trust. There were no principals at the meeting, although we,

7 of course, spoke with principals afterwards.

8        The concept that any of this discovery, which, I

9 mean, to the extent we file a motion, which I think was

10 anticipated, certainly might be acceptable, I mean, with

11 reservation of --

12        THE COURT: What motion are you going to file?

13        MR. MARTORANA: We're -- our intention is to file a

14 9019 motion seeking approval of the deal, the proposed deal

15 with New General Motors. That deal, Your Honor, was outlined

16 in a letter that we filed yesterday.

17        THE COURT: I read the letter.

18        MR. MARTORANA: Okay. So just to get back to your

19 question, Your Honor, I was obviously -- I was at that meeting.

20 The concept that there was any untoward threats or anything

21 that was illicit that happened at that meeting, in my view, is,

22 I mean -- well, I guess the discovery will show it, if we have

23 discovery, but it just frankly didn't happen. So that is why I

24 was smirking, Your Honor. At the end of the day --

25        THE COURT: It didn't seem very funny to me, but you

14

1  seemed to think so.

2          MR. MARTORANA:  What's that?

3          THE COURT:  I was watching you as Mr. Weisfelner was

4  delivering his remarks, and you seemed to think it was funny.

5          MR. MARTORANA:  Well, Your Honor, I mean, I didn't

6  think -- I thought it was --

7          THE COURT:  This is a serious matter.

8          MR. MARTORANA:  I agree it's a serious matter, Your

9  Honor.  I definitely do not disagree with that.  I just did

10  not, frankly, understand.  I think that it's a stretch -- I

11  mean, obviously he wasn't there, but I think it's a stretch to

12  think that that --

13          THE COURT:  When was the meeting?

14          MR. MARTORANA:  The meeting was on, I believe,

15  Tuesday, Tuesday of this past week.

16          THE COURT:  And who was present?

17          MR. MARTORANA:  Mr. Steinberg, Mr. Davidson, myself,

18  Mr. Williams, and Mr. Gillette, who are over in the corner.

19  Those were the only participants in the meeting.

20          THE COURT:  And --

21          MR. MARTORANA:  Oh, and I'm sorry, there was someone

22  on the phone from Kirkland & Ellis, as well, Mark Nomellini

23  from Kirkland & Ellis.

24          So, Your Honor, the fact of the matter is, you know,

25  obviously we have -- I don't disagree with Mr. Weisfelner's

1  statements that we had been working with him --

2          THE COURT:  It just happened -- you know, as I said

3  earlier, I didn't read the proposed settlement agreement in

4  detail.  It's a very lengthy --

5          MR. MARTORANA:  It is.

6          THE COURT:  -- exhibit, but it would seem to have

7  reflected a very considerable amount of time in negotiating the

8  agreement in the various --

9          MR. MARTORANA:  It did.

10          THE COURT:  -- exhibits.  Can you tell me --

11          MR. MARTORANA:  It did.  I do not disagree with that.

12          THE COURT:  Can you tell me approximately how long

13  the negotiations were going on.

14          MR. MARTORANA:  Well, I think I would say that the

15  concept of negotiations had been going on for, I mean, probably

16  close to a year, I think.

17          THE COURT:  Well, without the concept.  These were

18  very --

19          MR. MARTORANA:  The actual true --

20          THE COURT:  Stop.  Wait until I finish my questions.

21          Attached to Mr. Weisfelner's letter as -- are various

22  exhibits, voluminous exhibits, but the settlement agreement is

23  -- and its immediate exhibits are quite voluminous.  Can you

24  tell me how long the negotiations and drafting of the actual

25  settlement documents went on for?

16

1          MR. MARTORANA:  I would say about two months I think

2    is probably accurate, but --

3          THE COURT:  And you had one meeting with New GM this

4    week that caused Wilmington Trust to abandon the settlement

5    agreement?

6          MR. MARTORANA:  We did, Your Honor.

7          THE COURT:  One meeting.  Okay.

8          MR. MARTORANA:  One meeting.  Yes, we did, Your

9    Honor.  In our view, as a fiduciary, we were initially willing

10   to go forward with the deal, with the settlement as presented.

11   Obviously it was --

12         THE COURT:  And what is it --

13         MR. MARTORANA:  -- never signed off on.

14         THE COURT:  And what is it that New GM said that

15   persuaded your client to abandon the deal that had been under

16   discussion for considerable time and negotiation of documents

17   for quite a long time?

18         MR. MARTORANA:  Well, certainly they reminded of many

19   of the things we already knew, which was the risk --

20         THE COURT:  Go ahead.  None of this is privileged, so

21   tell -- I want to hear what you have.

22         MR. MARTORANA:  Sure.  They reminded us of all the

23   risks that were associated with the proposed settlement, in

24   particular the execution risks, which I can get into if you'd

25   like.  But there were certainly numerous execution risks.

17

1          THE COURT:  Well, there's going to be discovery, so I

2    would like to hear now -- and it probably will inform the

3    discovery.

4          MR. MARTORANA:  Sure.

5          THE COURT:  And I'm sure you'll be complete in

6    telling me what was -- how long did the meeting last?

7          MR. MARTORANA:  Maybe two hours --

8          THE COURT:  Okay.

9          MR. MARTORANA:  -- at most, I would say.

10         THE COURT:  And were documents circulated to you in

11   advance of the meeting?

12         MR. MARTORANA:  No, there were no documents

13   circulated.

14         THE COURT:  Was the decision to abandon the

15   settlement made at the meeting?

16         MR. MARTORANA:  The -- well, again, there were no

17   principals there, so there was no decision that could be made

18   at that meeting.  There was an offer that was floated, which

19   was tentative.  We followed up with our principals.  They

20   followed up with their principals.  And then, over the next day

21   or so, that proposal was boiled down to something more

22   concrete.

23         THE COURT:  And tell me what the proposals that New

24   GM made to you at the meeting.

25         MR. MARTORANA:  Well, the proposal that they made at

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

18

1  -- the first proposal that they made was continuing litigating

2  and we will pay your litigation costs against the plaintiffs.

3  That was the initial proposal that they made.  We ultimately

4  said, it's interesting, that sounds like something that we

5  might be able to work with, but at the end of the day, what our

6  two main concerns here are, that we're continuing a litigation

7  really for the benefit of New GM.  We feel like we've been

8  pulled into this, so obviously we're worried about spending

9  trust -- unitholder money for those purposes.

10        But then the -- a secondary or perhaps even bigger

11  issue is that at some point, probably after the term loan

12  litigation is fully and finally resolved, the GUC Trust will be

13  in a position to make a distribution to unitholders.  At this

14  point the GUC Trust cannot make a distribution to unitholders

15  until we figure out whether or not the 502(h) claim of the term

16  loan defendants is legitimate.  But at some point that will be

17  resolved, our mediation settlement or otherwise, and then we'll

18  be in a position to make a distribution.  And to the extent --

19        THE COURT:  Anybody who negotiates a settlement with

20  you better be careful because they may spend months doing it,

21  only to have you pull the rug out from under them at the last

22  hour.  You're smiling again.

23        MR. MARTORANA:  I'm sorry, I guess the question was I

24  didn't -- I don't understand --

25        THE COURT:  My comment was that anybody who

19

1  negotiates a settlement with you better be careful because you

2  may well pull the rug out from under them after months of

3  negotiation.  That was my comment as to which you had your big

4  grin on your face again.

5         MR. MARTORANA:  Well, I apologize, Your Honor.  But

6  at the end of the day, we are a fiduciary and we're going to

7  act in our fiduciary capacity.  And if that means abandoning a

8  proposal --

9         THE COURT:  And what other proposals did New GM make

10 to you that you considered in, I assume -- well, I won't ask

11 you what you recommended to your client.  What other proposals

12 did New GM make to you in the form of consideration for

13 abandoning the deal with the plaintiffs?

14        MR. MARTORANA:  Sure.  So again, getting back to the

15 point about a distribution, we said our two main concerns were

16 that we're continuing a litigation.  It's -- there's been a

17 number of costs that have been associated with that obviously.

18 It's continuing to pull down on trust assets.

19        And then the secondary aspect is that if we are in a

20 position to make a distribution and these claims continue to be

21 out there, there is no way that we're going to -- well, we

22 probably would not be able to make a distribution over the

23 existence of those claims.  And we would therefore -- currently

24 we're investing our assets -- required to invest our assets in

25 treasuries, and that is not really going to be a sufficient

20

1  rate of return that we could otherwise get if this deal were to

2  go forward, and this deal -- the plaintiffs' deal, and if we

3  were able to get the releases that we would be hoping for under

4  that -- under the plaintiffs' deal.

5          So the offer after further discussion that was made

6  was that New GM would be potentially willing to provide us with

7  a rate of return.  We don't know what that would be.  We've

8  agreed that we would enter into good-faith negotiations to

9  determine what that rate of return would be because, among

10 other things, we don't know what the corpus of the trust will

11 be at that time.  So it's hard to come to something -- to that

12 kind of agreement today.

13         But those -- we felt that those two things,

14 particularly given the fact that we believe on the merits we

15 have very strong arguments against the late claims, on Pioneer,

16 on equitable mootness, on tolling arrangements, that this offer

17 from New GM dealt with the main concerns that we were -- that

18 we had.  And as a fiduciary, we felt that we needed to do that.

19 We felt that you don't necessarily go for -- I understand that

20 hedge funds want to go for the absolute home run at the risk of

21 $21 million and everything else out there, but we represent

22 all --

23         THE COURT:  What's the $21 million?

24         MR. MARTORANA:  So the way that the plaintiffs'

25 proposal would work is that the GUC Trust would, up front, pay

21

1 $6 million for purposes of noticing.  So that would be out the

2 door before we even really get in front of Your Honor.  That

3 would just be a sunk cost for postcards.  And then it would be

4 followed by a $15 million payment and our agreement to support

5 a $10 billion claim as against New GM.  And we felt, among

6 other things, that there was a significant amount of execution

7 risk associated with that.  And, frankly, among other things,

8 that proposal, what we were really hoping to get out of it was

9 a release, get a true release from all the plaintiffs.

10      Given the fact that that proposal did not contemplate

11 and the plaintiffs would not agree to a Rule 23 settlement

12 certification, I think there's a potential execution risk

13 associated with actually accomplishing what it was that we

14 wanted to accomplish.

15      THE COURT:  Okay.  Anything else you want to tell me

16 now?

17      MR. MARTORANA:  No.  Thank you, Your Honor.

18      THE COURT:  All right.

19      Mr. Golden, I'd like to hear from you next.

20      MR. GOLDEN:  Yes.  Good afternoon, Your Honor.

21 Daniel H. Golden, Akin, Gump, Strauss, Hauer & Feld, counsel

22 for what's known as the participating unitholders.

23      Your Honor, this is really unfortunate that we find

24 ourselves in this situation where everybody now, in open court,

25 has to air their dirty laundry about a settlement that I think

22

1  was agreed to in principle.  I will say for the record I can

2  confirm the factual recitation that Mr. Weisfelner made as to

3  the facts leading up to the announcement by New GM and the GUC

4  Trust of their -- of GUC Trust's disavowal of that settlement

5  agreement and their intention to enter into a purported new

6  agreement with New GM.

7          Your Honor, I think it's clear something very odd is

8  going on here.  We worked arm in arm, shoulder to shoulder,

9  with the GUC Trust, Wilmington Trust as the trustee and the

10 trust administrator, and with its counsel, Gibson Dunn, over

11 several months to negotiate and document a settlement.  We had

12 many, many, many conversations, drafting sessions, redrafting

13 sessions to get to a point where we were, as of last Friday, to

14 get to a settlement, a global settlement as between the

15 plaintiff class, the GUC Trust, and the unitholders.

16         So let's talk a minute about who we represent.  We

17 represent 65 percent of the unitholders.  That is the

18 shareholders of the trust.  They are the only beneficiaries of

19 the trust should the reserves be freed up.  That's the reserves

20 of the 4- or 500 million that Mr. Weisfelner referred to, and

21 we represent 65 percent.

22         Look, I've worked really closely with the Gibson Dunn

23 lawyers.  I like them.  But to hear them talk about that they

24 have fiduciary duties, yes, they do.  Wilmington Trust has

25 fiduciary duties.  They have fiduciary duties to my clients.

23

1  Now, we don't represent all of the unitholders, but everyone

2  who has raised their hand and said, "I'm here and I want to get

3  involved," we represent them.

4         We worked really hard to get to this global

5  settlement, which would have had the benefit or the result of

6  eliminating all the late-claim litigation and all the

7  underlying allowance of those claims.  We think that that's a

8  settlement that this Court would have welcomed.  And that's

9  why, in part, we worked so hard to get there.  But in a blink,

10 in really literally a blink, without any conversation to the

11 unitholders or their counsel, without any invitation by Gibson

12 Dunn or Wilmington Trust to say, we've met with GM, they have

13 an alternative proposal on the table, we'd like to get your

14 views on it.

15        We certainly shared views with them for months and

16 months, but when it came to the point where they were willing

17 to disavow that settlement and consider a new settlement which

18 does not work for the participating unitholders, we sent a

19 letter to Your Honor this morning so that there's no mistake.

20 All of the unitholders we represent will not and do not support

21 the proposed settlement with GM.

22        So you have to ask the question, what is Wilmington

23 Trust thinking about when they want to go forward with a

24 settlement that has the disapproval of every fiduciary that it

25 represents who's weighed in on the subject?  Now, I'm not

24

1    saying that Wilmington Trust, who as an institution we worked

2    with for years.  Frankly, I'm just surprised we find ourselves

3    in this situation given our prior relationship and experience

4    with Wilmington Trust.  But what are they thinking about going

5    forward with a settlement over what will be active opposition

6    by the unitholders?  Something --

7            THE COURT:  Well, active opposition by New GM to the

8    proposed settlement that was --

9            MR. GOLDEN:  That's right.

10           THE COURT:  I mean, one way or the other, there's

11   going to be active opposition.

12           MR. GOLDEN:  That's absolutely right.  But the one

13   difference is the trust has no fiduciary obligations to New GM.

14   They do have fiduciary obligations to our client.  And I

15   confirm or reaffirm what Mr. Weisfelner said, that we did

16   expect active opposition from New GM.  We've had active

17   opposition from New GM almost throughout the inception of these

18   matters, so that's not a total surprise.  But what is

19   shockingly surprising to us is what was the motivation, what

20   was the rationale, what happened at that two-hour meeting to

21   have this absolute sea change.

22           Now, look, everybody's imagination can run wild.

23   Were there threats?  Were there inducements?  But there was

24   something there that caused, in two hours, for Wilmington Trust

25   and its counsel just to disavow five months of hard work, and

25

1  we intend to find out what it is.  It's odd to us that we had

2  been originally -- when I said "we," the participating holders,

3  through their counsel, had been invited to the meeting that GM

4  had scheduled with Wilmington Trust, and then promptly

5  disinvited.

6          THE COURT:  Who disinvited you?

7          MR. GOLDEN:  We were advised by counsel for

8  Wilmington Trust that we were not -- we were no longer invited

9  to it.  I didn't question them.  I accepted that at face value.

10  I don't know who demanded it, but that's where the

11  communication came from.

12          Your Honor, I don't want to make this situation

13  worse.  We intend, to the best of our ability, still to work

14  with our trustee.  But if we can't, then we're going to

15  consider our alternatives, and that is not a threat, but it

16  just -- it's a recognition of the reality of the situation that

17  we find ourselves in.

18          This case, this overhang of the plaintiffs' claim,

19  have held this trust in abeyance for a very long time.  The

20  goal of this settlement was to, once and for all, be done with

21  the plaintiffs, get an absolute, full-bore release from the

22  plaintiffs in exchange for us doing the $6 million of noticing

23  costs -- and I'll come back to that in a second -- and a

24  $15 million payment.  Part and parcel of that overall

25  settlement agreement, but not interdependent upon getting the

26

1  release, was the agreement of the GUC Trust, supported by the

2  participating holders, to estimate the totality of the

3  plaintiffs' claims at somewhere around $10 billion, which would

4  have the effect of triggering what's known as the accordion

5  shares.  I know that's the part that GM doesn't like.  But they

6  would have every opportunity to object to that estimated

7  settlement of $10 billion.  We weren't looking to deprive them

8  of their ability to do that.

9          This conference, because Your Honor remarked that it

10  wasn't originally made clear to Your Honor what the purpose of

11  this conference was, was to preview that settlement proposal

12  with you.  We were certainly going to invite New GM, and we

13  thought it would be professionally courteous of us to advise

14  New GM in advance of the terms of our proposed settlement,

15  which Mr. Weisfelner and I did in a telephone call with

16  Mr. Steinberg and a partner whose name I forget at Kirkland and

17  Ellis last Wednesday.

18          Well, what did they do with that courtesy?  They

19  turned around, without any notice to us, and complained to

20  Judge Furman.  Why Judge Furman?  I'm not sure.  These matters

21  aren't before Judge Furman.  This settlement certainly wasn't

22  going to be before Judge Furman.  But it was their attempt, I

23  surmise, to attempt to start to poison the well.  Well, I was

24  very glad that Judge Furman's reaction was, take that up with

25  the bankruptcy court.

 1            THE COURT:  I should say I -- whenever I've had a

 2   conversation with Judge Furman, I've disclosed that I have.

 3   And I had a brief telephone conversation with Judge Furman on

 4   Tuesday morning.  He left a voicemail for me on Monday evening

 5   and I -- we spoke on Tuesday.  I -- he wanted me to be -- he

 6   wanted to be sure that I knew that there had been a

 7   presentation before him, or statements before him, that a

 8   settlement had been reached.  I told him that I read the

 9   Bankruptcy 360 report about it.  I told him that there had been

10   a request for a conference here, I had scheduled it, I hadn't

11   been informed at the time what the conference was about, but I

12   had scheduled it.  And that was the substance of the phone

13   conversation that I had with Judge Furman.

14            So I've tried to make a point, whenever he and I have

15   spoken, I've put it on the record.  We do not talk about the

16   merits of anything, but we informed --

17            MR. GOLDEN:  So --

18            THE COURT:  -- each other of procedural posture of

19   things.

20            MR. GOLDEN:  So continuing, we had had the

21   conversation with Mr. Steinberg and his colleague.  The purpose

22   of scheduling a status conference with you, Your Honor, was to

23   preview the settlement, not to argue the merits, but really to

24   preview the noticing procedures that we intend to follow

25   because this settlement contemplated a global release from all

28

1  the claims.  And we were going to do -- when I say "we," the

2  GUC Trust was going to do and spend $6 million on noticing to

3  make sure the plaintiffs -- something that Old GM never really

4  got around to doing, and that's why we find ourselves in this

5  mess.  But we were going to give direct notice to every party

6  who was the subject of a recall notice, so that's over

7  12 million parties, as well as notice to every party who has

8  started a lawsuit against Old GM/New GM based upon a presale

9  accident claim, so that nobody could complain this time that

10  the world has been put on notice as to the proposed settlement.

11           But we wanted to get a sense from Your Honor before

12  we went out and spent $6 million whether Your Honor thought

13  that would be an appropriate scope of notice.  That's all we

14  had originally intended to do at the status conference.  Well,

15  obviously events and facts have overtaken it, and we are where

16  we are.

17           Again, I'm here representing economic players.

18  They're not looking to go for the home run, as Mr. Martorana

19  said.  What they're looking for is peace in the valley.  They

20  want to get rid of the plaintiffs' claims and the plaintiffs'

21  claims against the trust for all time so that when the

22  avoidance action is settled or finally resolved, a final

23  distribution could be made.

24           THE COURT:  What's the face amount of the

25  approximately 65 percent of the unitholders -- of the claims of

29

1  the unitholders you represent?

2          MR. GOLDEN:  So it's not in dollar amount; it's

3  number of units.

4          THE COURT:  Units.

5          MR. GOLDEN:  Can I confer with my colleagues?

6          THE COURT:  Yeah, go ahead, sure.

7      (Counsel confer)

8          MR. GOLDEN:  It's 21 million units out of

9  approximately 31 million units.

10         THE COURT:  Okay.  All right.  Thank you, Mr. Golden.

11         MR. GOLDEN:  Thank you, Your Honor.

12         THE COURT:  Mr. Steinberg.

13         MR. STEINBERG:  Your Honor, Arthur Steinberg from

14 King & Spalding on behalf of New GM.

15         Mr. Weisfelner, in his presentation, said that he did

16 not want to speak prematurely until he gathered the facts, and

17 then he proceeded to speculate as to what the facts may be.

18 And there's a temptation that I have to be able to try to

19 respond to each and every time that he misstated what happened.

20 However --

21         THE COURT:  Let me say first, I thought your letter

22 to the Court was intemperate and inappropriate.  You could have

23 raised the issues that you raised.  So I know that there's very

24 strong feelings on -- there's more than two sides here -- on

25 all sides, but I didn't appreciate the tone of your letter.

30

1  But go ahead.

2          MR. STEINBERG:  Your Honor, you're referring to the

3  letter that I sent on Tuesday as --

4          THE COURT:  Yes, I am.

5          MR. STEINBERG:  The reason why -- just to explain

6  that letter on Tuesday is that, as Mr. Golden said, that on

7  August 9th, we had a telephone call with Mr. Weisfelner and

8  Mr. Golden.  What Mr. Golden left out was that on the agenda

9  letter for the MDL on August 11th, under the section under

10 successor liability, the specific question of whether late

11 claims are being sought in the bankruptcy court would have

12 relevance to the briefing on successor liability, and the judge

13 wanted to know whether something had to be done or not.  So if

14 there was going to be a resolution of the late claims --

15         THE COURT:  Well, the fact that you raised it with

16 Judge Furman doesn't bother me in the least.  What I'm

17 complaining -- what I'm commenting on is I thought the tone of

18 your letter to me was inappropriate.

19         MR. STEINBERG:  Your Honor, it's never my intention

20 to write an inappropriate toned letter to Your Honor.  And to

21 the extent that we did, then we apologize.  The reason for the

22 letter was that this status conference was scheduled without

23 our participation, without being in compliance with Your

24 Honor's rules as to scheduling a status conference, and because

25 I expected that what was going to happen at the scheduling --

31

1   at the status conference was that they were going to try, in

2   effect, to get an advanced blessing on a notice provision in

3   connection with --

4          THE COURT:  Well, that wouldn't -- I can assure you

5   that that would not happen.

6          MR. STEINBERG:  But that's what I was essentially

7   told on August 9th and that they were going to ask Your Honor

8   to compel New GM to produce information so they can comply with

9   their notice obligation, and they were all going to try to do

10  that in a chambers conference with Your Honor, presumably off

11  the record.  And that was why I wanted to write to Your Honor

12  that if there was going to be a chambers conference, it really

13  should be in open court, it should be recorded, and that if

14  they wanted to have specific relief that they were going to

15  request at the conference, that I should be able to see that in

16  writing and to have the ability, Your Honor, to give you our

17  version of why you should not be able to do that so Your Honor

18  would be able to make a ruling on an informed record.  And that

19  was the motivation --

20         THE COURT:  I don't make rulings at chambers

21  conferences.  I don't have chambers conferences if any parties

22  in interest object to having chambers conferences.  I do them

23  in open court as we're doing today on the record.  So I very

24  rarely -- occasionally I will have a chambers conference, but

25  only if all parties in interest affected by the discussion are

1  present.  I just want to assure you of that, Mr. Steinberg.

2  And I don't grant relief in a chambers conference.  Everything

3  happens in court on the record.

4          MR. STEINBERG:  Now, Your Honor, I think that -- to

5  some extent that there will be a motion filed, presumably by

6  the GUC Trust, to reference the arrangement that was agreed to

7  with New GM, and there will be a pleading that will be filed.

8  There will be an opportunity to object.  We will have the

9  opportunity to put in what really happened and why the GUC

10 Trust had changed its position.  And it wasn't because anybody

11 induced anything.  It was because what they had proposed was

12 what Mr. Martorana described as execution risk.  Our belief was

13 it was impossible to get to that point in time.

14         The reality was -- is that they were proposing a

15 settlement where a person who was paying the liability was New

16 GM on account of a $10 billion claim which we thought had no

17 basis in reality in connection with primarily time-barred

18 claims where the plaintiffs had purposefully not pursued

19 remedies against Old GM for years after the recalls were

20 announced, and that they had rolled over on those defenses on

21 late claims without giving any credence to that value.

22         THE COURT:  Well, Judge Gerber had determined that

23 there was equitable mootness, and it wasn't until the Second

24 Circuit reversed and specifically referenced the accordion

25 provision in its opinion that at the first conference I had, I

1  think, after the Second Circuit opinion, I raised the question

2  about late claims because it seemed clear to me, A, the Second

3  Circuit had reversed with respect to equitable mootness, that

4  there was the potential for substantial new value.  I asked the

5  question -- I think I asked the question of you, I asked the

6  question of Mr. Weisfelner, how close to the $35 billion

7  threshold of allowed unsecured claims were you.

8         And because that's -- as I -- I didn't go back and

9  read it again, but my recollection is that was the trigger

10  point for additional New GM shares.  So I think it must have

11  been very close to the first hearing when I presided after the

12  Second Circuit opinion that I raised those questions.  And

13  we've had a discussion since then about motion for late claim.

14  You wanted to take discovery about the <u>Pioneer</u> factors.  I

15  authorized discovery regarding the <u>Pioneer</u> factors.

16         So there's a history here, Mr. Steinberg.  You don't

17  have it quite right.  All right.  I don't know whether the

18  settlement that was proposed that's unsigned -- Mr. Weisfelner

19  believes it's enforceable under New York law.  There's a whole

20  body of law about when an agreement can be enforceable.  I'm

21  not taking any position about it at all, whether it's

22  enforceable or not.  I don't know whether it would have been

23  approved over New GM's objection.  Not taking a position about

24  that.  It just -- the events of the last week, I've had a

25  couple of letters that indicated that the plaintiffs believed

34

1  they were making progress with the GUC Trust in its settlement

2  negotiations.  But I stay out of settlement negotiations.

3  Okay?  When Magistrate Judge Cott called and asked if I

4  objected to his being a mediator, I made clear I didn't, and I

5  informed everybody in court about that call.

6          So there's a history, not quite what you describe it

7  as.  I want -- go ahead and finish, and then I'll say what I --

8          MR. STEINBERG:  Your Honor, the history that you may

9  not be aware of that preceded your handling of this case was

10  that Judge Gerber, in connection with the first distribution

11  that was made by the GUC Trust in 2014, did not see anybody

12  trying to block that distribution.  And when he confronted on

13  the oral argument on the four threshold issues, when he asked

14  Mr. Weisfelner, why didn't you do anything to block the

15  distribution, why didn't you sue Old GM for your Old GM

16  liabilities, why did you only sue New GM under a successor

17  liability, he said it was a tactical decision that they had

18  made to only pursue New GM.

19          In Judge Gerber's April 2015 sale decision, he

20  specifically references the tactical decision made by the

21  plaintiffs not to sue Old GM, but only to sue New GM as one of

22  the bases to support his equitable mootness finding, that they

23  had, in effect, precipitated what went on.

24          The two threshold issues, Your Honor, that you asked

25  us to brief in connection with the late claims issue was, one,

1  was there a tolling agreement and when -- if there was, when

2  did the tolling agreement take place.  And that was one of the

3  issues because one of our arguments is that even after the

4  announcement of the recalls and before the equitable mootness

5  issue was even raised by Mr. Golden to add as a threshold

6  issue, the plaintiffs had tactically decided not to sue Old GM

7  in the face and the knowledge of the recalls.  That is an

8  argument.  They have always had the ability to file late

9  claims --

10         THE COURT:  We may get there, Mr. Steinberg, because

11  if I have to go on and address the late claim motion as a class

12  claim, I will.  Okay?

13         MR. STEINBERG:  Your Honor, I --

14         THE COURT:  It's premature for me to hear the

15  arguments now.

16         MR. STEINBERG:  Right.  Your Honor, it's -- the only

17  thing I would like to say to you is that there is a large

18  portion of things that were said to you today that are either

19  misleading or would benefit from context, written context,

20  written pleadings to be able to understand it.  I have a list

21  of things that I jotted down.  I don't think necessarily a

22  conference is the time to do it, but I do want to say one issue

23  as long as I have Mr. Berman here in court because Mr. Berman

24  said in the MDL, and Mr. Weisfelner repeated it at the

25  conference, on page 38, he said, "I'm pretty confident that the

36

1  sale agreement actually gives New GM no rights to object."

2  Now, you heard Mr. Golden say, "Of course, New GM always would

3  have the right to object."  But Mr. Berman's lawyer in this

4  case is Mr. Weisfelner.

5          And before Your Honor was -- took over this case in

6  2015, at the status conference before Judge Gerber on

7  July 16th, Mr. Weisfelner said if we were -- meaning as, on the

8  one hand, GUC Trust unitholders and on the other hand able to

9  consummate a settlement, it would be brought to the Court's

10 attention under Rule 9019, I presume either in this court or to

11 Judge Furman, depending on the resolutions of the motions to

12 withdraw the reference on notice to New GM.  And New GM will

13 have an opportunity to oppose that 9019, take the position

14 that, as Your Honor indicated, we colluded, in effect, to stick

15 it to New GM, and they'll be entitled to be heard on the merits

16 with regard to that contention, and the settlement will not be

17 effective unless and until the Court overrules the objection.

18          So Mr. Berman told Judge --

19          THE COURT:  Well, the settlement isn't going to be

20 effective until I approve it unless --

21          MR. STEINBERG:  That's correct.

22          THE COURT:  -- the reference is withdrawn and Judge

23 Furman deals with it.

24          MR. STEINBERG:  But this is --

25          THE COURT:  So whether -- you know, the issue of New

1  GM's standing can be dealt with at an appropriate time.

2          MR. STEINBERG:  The only thing that I --

3          THE COURT:  Today is not the time.

4          MR. STEINBERG:  Right.  The only thing I just wanted

5  to highlight was that you heard Mr. Weisfelner say today and

6  Mr. Berman say in the MDL conference that New GM would not have

7  standing, and all I wanted to do is provide --

8          THE COURT:  I didn't hear anybody tell me that New GM

9  doesn't have standing.  I called you to the podium, and we'll

10 see.

11         MR. STEINBERG:  No, no.  Mr. Weisfelner I think

12 actually alluded to that, as well, too, but --

13         THE COURT:  I don't think he did.  I don't think he

14 did.

15         MR. STEINBERG:  But certainly Mr. Berman did on the

16 MDL conference.

17         THE COURT:  Perhaps he did before Judge Furman.  I

18 haven't read the transcript of what took place before Judge --

19         MR. STEINBERG:  It's attached to one of the letters.

20         THE COURT:  Yes, I know.  There's a voluminous stack

21 of papers that --

22         MR. STEINBERG:  And so, Your Honor, I go through

23 this --

24         THE COURT:  I read as much of it as I could.

25         MR. STEINBERG:  I go through this not to be able to

38

1   argue New GM's standing in connection with a proposed

2   settlement.  That is not before Your Honor.  I only do that for

3   one reason, which is that what you've heard today is -- to some

4   extent needs to be put in context, needs the benefit of written

5   pleadings to be able to make a presentation to Your Honor so

6   that you're able to think about it before you take to the bench

7   instead of having it presented in a disjointed way.

8           THE COURT:  Here's how we're going -- well, first,

9   all right, anything else, Mr. Steinberg?

10          MR. STEINBERG:  Only that -- I think that's it, Your

11  Honor.  Thanks.

12          THE COURT:  Okay.  Anybody else wish to be heard?

13          All right.  Mr. Martorana indicated that he

14  anticipates making a 9019 motion asking the Court to approve

15  the settlement between the GUC Trust and New GM.

16          Mr. Weisfelner articulated a position that he

17  believes that the plaintiffs have an enforceable agreement

18  under -- was the written agreement governed by New York law?

19          MR. WEISFELNER:  Yes, Your Honor.

20          THE COURT:  Okay.  He believes that the plaintiffs

21  have an enforceable agreement, even though there's nothing

22  signed, against the GUC Trust.  I'm not going to -- I may well

23  hear both motions at the same time.  It's clear that discovery

24  needs to take place.  I direct that counsel meet and confer

25  promptly and discuss discovery and set forth, hopefully, an

39

1  agreed plan of discovery that will cover both proposed

2  settlements.  To the extent there are disagreements, they can

3  be presented to me.  With respect to discovery disputes

4  generally, I don't require formal motions.  We can schedule

5  another conference fairly soon.  I want you to meet and confer

6  and see if you can resolve issues about discovery within the

7  next week.  I understand people have vacations and -- you know,

8  within two weeks you ought to be able to resolve those issues.

9        Get a date from Deanna for another conference in

10 court, open court status conference.  If you have a stipulation

11 on a plan of discovery, you can present it to me without a

12 hearing.  If not, we'll take it up in early September and try

13 and get that resolved.

14       I've heard a lot of things in a short amount of time

15 today.  I don't know whether the trust agreement includes

16 provisions on threshold levels to change the trustee, for

17 example.  I don't know how that works, and at this stage I

18 don't really want to know how it works.  But certainly that was

19 an issue that was raised today as to the possibility that

20 unitholders are going to seek to replace the trustee.  I'm not

21 advocating at all.  Any matters that Wilmington Trust has been

22 involved in that I've presided over, they've done a very

23 professional job.  I have no reason to think that they didn't

24 do so here.  But there are a lot of moving parts.  So at a

25 status conference in early September, I would like to know

40

1  quite specifically how the parties collectively propose to

2  proceed.

3       So what I've heard is at least two -- and I'm not

4  setting a deadline for the GUC Trust to file a 9019 motion.  I

5  want fairly soon.  It doesn't have to be before we have a

6  conference in early September, but I do want that fairly soon.

7  This has got to get -- you know, if there's no settlement, if

8  the GUC Trust's proposed settlement with New GM is rejected, if

9  there's no enforceable settlement by the plaintiffs with the

10 GUC Trust, we'll go forward with the contested motion for leave

11 to file a late class claim and we'll just head down that

12 litigation road if that's the direction it's going to go.

13      There may be other issues that some or all of you

14 wish to raise, and I want to make clear to all of you any

15 pleadings or correspondence with the Court needs to be civil in

16 tone and identify those issues which, in good faith, people

17 believe there needs to be discovery or needs to be presented to

18 the Court in an appropriate context, motion, I assume.

19      Anything else anybody wants to raise today?

20 Mr. Steinberg?

21      MR. STEINBERG:  Your Honor, I understand clearly the

22 notion about discovery and working with -- on a meet and

23 confer, but right now we presumably will have a pleading by the

24 GUC Trust, I presume to put forth the New GM agreement.  We

25 don't have anything on the other side.

41

1        THE COURT:  Well, you only pulled the rug out from

2   under them yesterday.  Why am I not surprised?  They thought

3   they had an agreement with the GUC Trust --

4        MR. STEINBERG:  No, no, Your --

5        THE COURT:  -- Mr. Steinberg.  And they have a very

6   voluminous set of documents.  Are you going to give notice to

7   the same group of people that they propose and in the same

8   manner that they propose to give notice?  And who's going to

9   pay for that?

10        MR. STEINBERG:  Well, there's a clear reason why we

11   would not do that, because there's no giving up of any rights.

12   There's no -- there's nothing that plaintiffs are giving up.

13   The plaintiffs are going to have their day in court to -- set

14   to litigate their matter.

15        THE COURT:  Well, I don't know.  I'm not sure.

16   That's going to be an issue the Court's going to have to

17   address as to what notice must be given, and it may be that

18   Wilmington Trust, as the trustee, is going to be required by

19   the Court to give notice to every one of the unitholders of a

20   proposal for the Court to approve a 9019 settlement.

21        And, of course, if they want to make that motion for

22   approval of the settlement and -- the parties better address

23   who has to have notice of it.  And if they want to make the

24   motion, they're either going to pay for it or New GM is going

25   to pay for it.

ACCESS TRANSCRIPTS, LLC          ⚖  1-855-USE-ACCESS (873-2223)

                                                              42

1            MR. STEINBERG:  Well, Your --

2            THE COURT:  Okay.  And -- well, we'll see.  Okay.

3            MR. STEINBERG:  But my --

4            THE COURT:  So don't think, Mr. Martorana, that by

5    the fact that you're not going to have to do the notice program

6    that would have been required by the plaintiffs, that you're

7    not going to have to do exactly the same thing in order to get

8    the Court to consider the 9019 motion that you're talking

9    about.

10           MR. MARTORANA:  May I speak, Your Honor?

11           THE COURT:  Not yet.

12           MR. MARTORANA:  Okay.

13           MR. STEINBERG:  Your Honor, so that my comments are

14   hopefully better put into context, I wasn't criticizing the

15   plaintiffs for not having a pleading as of today.

16           THE COURT:  It sounded that you were.

17           MR. STEINBERG:  No, no.  Your Honor, I was saying

18   that we were talking about a discovery program without the

19   framework of a pleading.

20           THE COURT:  Well, you know exactly what the framework

21   is.  There's a fairly voluminous set of papers that they've

22   presented.  You can sit down and you can negotiate.  If you

23   can't -- you can work out the discovery plan, and they'll tell

24   you what it is they want.  And if you're opposing it or you

25   can't resolve it, you'll be back to me very shortly.

43

1         I'm assuming that the plaintiffs contemplate making a

2    motion to enforce what they believe is an enforceable

3    settlement, so I will have before me at the same hearing two

4    proposed conflicting settlements.  Okay?  And an evidentiary

5    hearing is undoubtedly going to be required.  Okay?  And I'm

6    not going to do them separately or seriatim.  And if Wilmington

7    Trust beats the plaintiffs to the punch in making the motion,

8    that's not going to make a difference because I'm going to

9    schedule them together, and there's going to be discovery

10   beforehand.

11        So I'm directing you to meet and confer and try and

12   agree on a proposed discovery plan.  If you can't agree, you're

13   going to be back to me very shortly and I'll resolve the

14   differences.  I'd also like to know from both sides when they

15   contemplate filing pleadings in support of their positions, the

16   9019 that Wilmington Trust wants to present, the -- it's not a

17   9019 -- well, I guess it is.  It's -- you think you have an

18   enforceable settlement.  It'll be presented as a 9019.

19            MR. STEINBERG:  I think it was --

20            THE COURT:  So I will have competing settlements.

21            MR. STEINBERG:  I think, Your Honor, you answered my

22   question, which was that at some point there needed to be a

23   pleading --

24            THE COURT:  Yes.

25            MR. STEINBERG:  -- to tie it into the discovery, and

44

1 all I was standing and rising is that --

2          THE COURT:  Well, I'm not sure, Mr. Steinberg,

3 because even if they didn't, I think that they'd be entitled to

4 that same discovery with respect to any 9019 proposal from

5 Wilmington Trust.

6          MR. STEINBERG:  I agree with that.  The only question

7 is, is that if there's going to be an evidentiary hearing as to

8 whether there was an enforceable agreement with the plaintiffs,

9 there needed to be a pleading on that.  That's not on the

10 record.  And all I was saying is that --

11          THE COURT:  Okay.  We'll be left with no man's world

12 with neither settlement being approved, but that's the way

13 it'll be.

14          MR. STEINBERG:  I understand.

15          THE COURT:  Okay.

16          MR. STEINBERG:  That was the only --

17          THE COURT:  But you all -- specifically I am asking

18 that you need to address who would need to receive notice of

19 Wilmington Trust's 9019.

20          So let's -- any other issues that need to be

21 addressed today?  Mr. Weisfelner?

22          MR. WEISFELNER:  Your Honor, I promise we'll be

23 quick.  I want to get out of here, and I presume Your Honor

24 would like to do the same.  I just find it strange that in

25 contemplation of discovery on a motion by the plaintiffs to

45

1  enforce Wilmington's obligations under the settlement

2  agreement, New GM's counsel stands up to tell you, well, we're

3  going to take discovery on that because they haven't filed a

4  motion yet.

5              THE COURT:  Well, let's --

6              MR. WEISFELNER:  If anyone would have said it --

7              THE COURT:  Mr. Weisfelner, I think I've addressed

8  the discovery issue.  I don't need to hear any more.

9              MR. WEISFELNER:  You're right.  But here's my only

10 other concern in terms of an orderly procedure where we meet

11 and confer and do our best as professionals to work out a

12 consensual arrangement.  New GM is already on the record that

13 any consideration of our settlement, whether compelled under

14 New York law or otherwise, that New GM insists that that matter

15 be before Judge Furman, insists they intend to withdraw the

16 reference.

17             I just point that out because it would be I think

18 very difficult, if not impossible, to work out a scheduling

19 motion where the motion to compromise between New GM and the

20 GUC Trust stays here and the motion to settle, as obligated

21 under New York law, as threatened by New GM, goes upstairs.

22             THE COURT:  Mr. Weisfelner --

23             MR. WEISFELNER:  We'll try --

24             THE COURT:  Mr. Weisfelner, the filing of a motion to

25 withdraw the reference does not stay the action before the

46

1    bankruptcy court.  I have always, in every matter before me,

2    made clear that when a motion to withdraw the reference is

3    filed, I continue on.  The case continues forward.  I do not

4    stay matters because of a motion to withdraw the reference.

5              Judge Furman can do what he believes is appropriate

6    under the circumstances.  What -- and I suspect at an

7    appropriate time it'll be briefed.  The claims allowance

8    process is so clearly part of the core bankruptcy function.

9    Okay?

10             MR. WEISFELNER:  Thank you, Judge.

11             THE COURT:  So what Judge Furman decides is up to

12   Judge Furman.  I am pushing forward.  And with either a

13   litigated motion for leave to file a late class claim or one or

14   more settlements that might alter that -- I mean, if the

15   settlement with Wilmington Trust is approved -- if Wilmington

16   Trust's settlement with New GM is approved, the litigation

17   still goes forward before me.  Okay?  It doesn't alter that.

18   So one way or the other, we're pushing forward.  If Judge

19   Furman wishes to withdraw the reference, if he believes it's

20   appropriate to do it, he'll do that.  But unless and until he

21   does, we go forward.

22             You know, there have been a few occasions where

23   literally it was crystal clear because of jury trial demands,

24   et cetera, there was an absolute right to a jury trial.  With

25   other judges I've just -- you know, we went forward.  It was a

1 signed case -- you know, there was a signed pretrial order.

2 The matter went to the district court, and it's funny that

3 within a matter of days it settled.  Nobody wanted the trial

4 anymore.

5          But -- so we will push forward and I will resolve

6 whatever is before me.  I read in, you know, I think, Mister --

7 one of Mr. Steinberg's letters an issue about 157(b)(5).  I

8 don't think that affects estimation, which as I understand was

9 the approach that the proposed settlement of the plaintiffs

10 had.  We'll see what we get to.

11          First step is what discovery is going to take place.

12 I want to know, when we meet next, when you're each going to

13 file pleadings in support of your respective motions.  They are

14 going to be heard together.  Anything else anybody wants to

15 raise today?

16          Mr. Golden?

17          MR. GOLDEN:  Just one last thing, Your Honor.  I --

18 it would be helpful to the unitholders, no one else, that we

19 don't leave today's court session with an absolute certainty

20 that the New GM/GUC Trust arrangement is actually going to be

21 signed and finalized.  I --

22          THE COURT:  I can't effect that, Mr. Golden.

23          MR. GOLDEN:  No.  I understand that, but I want to

24 say that the unitholders are optimistic in having further

25 discussions with its trustee, its fiduciary, to make it clear

48

1 what the unitholders' position is.  So there may be an

2 eventuality where the proposed New GM/GUC Trust settlement does

3 not actually go forward.

4          THE COURT:  One or the other may not go forward.

5          MR. GOLDEN:  Thank you, Your Honor.

6          THE COURT:  Okay.  We'll take it as it comes, but in

7 the meantime, I've got to deal with the situation that's

8 presented to me.

9          MR. GOLDEN:  Thank you, Your Honor.

10          THE COURT:  We're adjourned.

11      (Proceedings concluded at 4:13 p.m.)

12                        * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

49

1      **C E R T I F I C A T I O N**

2

3          I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9    

10   _____

11   ALICIA JARRETT, AAERT NO. 428      DATE:  August 20, 2017

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25