UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | . | Case No. 09-50026-mg |
| IN RE: | . | Chapter 11 |
| | . | |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| et al., f/k/a GENERAL | . | |
| MOTORS CORP., et al, | . | One Bowling Green |
| | . | New York, NY 10004 |
| Debtors. | . | |
| | . | Tuesday, August 29, 2017 |
| . . . . . . . . . . . . . . | . | 3:04 p.m. |


TRANSCRIPT OF MOTION BY GENERAL MOTORS LLC TO ENFORCE THE
BANKRUPTCY COURT'S JULY 5, 2009 SALE ORDER AND INJUNCTION AND
THE RULINGS IN CONNECTION THEREWITH, WITH RESPECT TO THE
REICHWALDT PLAINTIFF (CC: DOC# 14016, 14068, 14081)
BEFORE THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For New General Motors:    King & Spalding LLP
                           By:  ARTHUR STEINBERG, ESQ.
                           1185 Avenue of the Americas
                           New York, New York 10036-4003
                           (212) 556-2158

                           Dykema Gossett PLLC
                           By:  JILL M. WHEATON, ESQ.
                           2723 South State Street
                           Suite 400
                           Ann Arbor, MI 48104
                           (734) 214-7629


For Kaitlyn Reichwaldt:    Butler Wooten & Peak LLP
                           By:  ROBERT H. SNYDER, ESQ.
                           2719 Buford Highway
                           Atlanta, GA 30324
                           (404) 321-1700

Audio Operator:            Timothy Wilson, ECRO


Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46038
                           (855) 873-2223
                           www.accesstranscripts.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

1       (Proceedings commence at 3:04 p.m.)

2           THE COURT:  All right.  Please be seated.  We're here

3    in <u>Motors Liquidation Company</u>, number 09-50026.  It's New GM's

4    motion to enforce the sale order, et cetera.  Let me get the

5    appearances of counsel, please.

6           MR. STEINBERG:  Good afternoon, Your Honor.  Arthur

7    Steinberg from King & Spalding on behalf of New General Motors,

8    and with me is trial counsel Jill Wheaton from the Dykema firm.

9           THE COURT:  I'm sorry, her last name?

10          MR. STEINBERG:  Jill Wheaton, W-H-E-A-T-O-N.

11          THE COURT:  All right, thank you.

12          MR. SNYDER:  Good afternoon, Your Honor.  Rob Snyder

13   for the plaintiff, Kaitlyn Reichwaldt.

14          THE COURT:  Okay.  Mr. Steinberg.

15          MR. STEINBERG:  Again, good afternoon, Your Honor.

16   This motion was filed on July 28th, and it was primarily done

17   to enforce Your Honor's punitive damage ruling, which arises in

18   two contexts.  The first is that New GM did not assume punitive

19   damages when it assumed product liabilities for post-sale

20   accidents directly arising from the operation of Old GM

21   vehicles.  The bankruptcy court made this ruling on two

22   occasions.  Most recently, Your Honor made this ruling in

23   connection with the July 2017 opinion that you issued.  The

24   second context is that in order for New GM to be responsible

25   for punitive damages on account of an independent claim -- in

1  this case, it's the failure to warn claim -- there needs to be

2  alleged a viable independent claim, and here, there is not

3  alleged a viable independent claim.

4         Now, Reichwaldt tried to evade these inevitable

5  conclusions by arguing in the Georgia trial court three things.

6  First, they argued that the July 2017 opinion was different

7  than the ruling with regard to contractual assumption of

8  liabilities, and that clearly is not true.  The second thing

9  they argued in the Georgia court is that the issue of whether

10 contractually-assumed punitive damages were assumed or not is

11 an ongoing dispute, and that also is not true.  This issue has

12 been determined by this Court, and Reichwaldt has chosen to

13 ignore the ruling.  There is a dispute.  The dispute relates to

14 Reichwaldt's violation of an existing order of this Court for

15 which she is bound.

16        The Court had the same issue with regard to another

17 Butler Wooten client, Veronica Fox, in connection with a 2016

18 motion to enforce that was filed.  There, like here, the

19 plaintiff claimed not to be bound by a ruling of the bankruptcy

20 court.  In 2016 was the ruling by Judge Gerber in the December

21 2016 judgment.  Ultimately, Fox backed down and withdrew her

22 punitive damage request pursuant to a court-approved

23 stipulation that Your Honor signed.

24        Reichwaldt argues -- and the third argument that they

25 make in the Georgia court is that Reichwaldt argued that she

4

1  was never a participant in the litigation leading to the July

2  2017 opinion.  That assertion seems strange since Goodwin

3  Proctor told this Court that they were representing the clients

4  of Butler Wooten.

5          THE COURT:  Tell me who did you serve with the order

6  to show cause on the 2016 threshold issues.

7          MR. STEINBERG:  Reichwaldt.  Reichwaldt, as well as

8  Weintraub --

9          THE COURT:  Was --

10         MR. STEINBERG:  Butler Wooten on behalf of the

11 Reichwaldt plaintiffs.

12         THE COURT:  It specifically identified the <u>Reichwaldt</u>

13 action?

14         MR. STEINBERG:  Yes.  Yes.  And, in fact, in the

15 objection that was filed by Reichwaldt, they admit that they

16 were served with the December show cause order in 2016 and that

17 they are bound by the rulings that Your Honor made in both June

18 and July of 2017.  So I'm not sure why they start with the

19 dalliance that somehow the Goodwin Proctor firm represented

20 Veronica Fox in connection with the 2016 threshold issues while

21 they, on notice of the proceedings, didn't do anything about

22 it.  And it seems very unusual as an explanation since Veronica

23 Fox had withdrawn her punitive damages request while Goodwin

24 Proctor is writing a thresholds brief on issue number four,

25 punitive damages.  But be that as it may, as I've said before,

5

1  they have admitted in their objection that they were served and

2  they considered themselves bound by Your Honor's ruling.

3         THE COURT:  Let me ask you this, Mr. Steinberg.  Are

4  there any issues other than punitive damages that remain here?

5  I kind of -- I had a little bit of difficulty in reviewing the

6  papers and understanding the allegations that the plaintiff

7  agreed to remove from the complaint.  And is there anything

8  other than punitive damages that remains an issue?

9         MR. STEINBERG:  Yes.  Let me deal with the easiest

10 one first, which are the allegation issues.  They responded to

11 our original demand letter and amended their -- and then

12 tried --

13        THE COURT:  Their proposed amended complaint.

14        MR. STEINBERG:  Proposed amended complaint, which I

15 think ultimately will be an issue for the Georgia court to

16 determine, but they tried to address those issues.  But in

17 addition to addressing those issues, they actually added some

18 additional allegations.  So in our reply, we point out --

19        THE COURT:  You complain about successor liability

20 allegation.

21        MR. STEINBERG:  -- we point out that in paragraph 2

22 and 87, they call Old GM the predecessor to New GM, and in

23 paragraph 28, they say that New GM emerged from bankruptcy.

24 Both of those things were contrary to the rulings in the

25 December judgment.  Other than that allegations bucket, the

6

1  only other thing that we have is a punitive damage issue which

2  relates to the independent claim, failure to warn.  And

3  frankly, it's conceded that New GM assumed failure to warn as

4  part of the assumed product liability.  So the only relevance

5  to this fight is that if it's an independent claim, they look

6  at that as a separate portal to assert punitive damages.

7          THE COURT:  May I ask this?  And maybe Ms. Wheaton

8  wants to address it.  This is not something I'm going to decide

9  because the state -- seems to me it's a state law issue.  But I

10 don't understand what the basis for a failure to warn

11 independent claim against New GM could be in this case because

12 Reichwaldt -- it wasn't her vehicle.  She had no connection

13 with Old GM or New GM.  And who were -- who is New GM supposed

14 to warn?  I mean, it's one thing if it was the person who

15 bought the vehicle from -- in Pitterman, it was an Old GM

16 vehicle that was involved in an accident and was still owned by

17 the representatives of the plaintiff.  And I'm just curious, is

18 that something that was tested in either the state court or in

19 the federal district court as to whether there could be a duty

20 to warn claim against New GM?

21         MR. STEINBERG:  Well, Your Honor, I think they're at

22 the early stages of discovery, so things have not been really

23 tested yet.  But, Your Honor --

24         THE COURT:  And that's not for me to decide, but I

25 was just --

7

1          MR. STEINBERG:  I understand.

2          THE COURT:  -- sort of curious about it.

3          MS. WHEATON:  Right.  And if you want me to

4  elaborate, I'll just state that --

5          THE COURT:  Yeah, go ahead.  Just identify yourself

6  for the record.

7          MS. WHEATON:  Yeah.  Jill Wheaton.  So we were

8  dealing with the old complaint first and what jurisdiction the

9  court should be in, and then discovery started, and then we got

10  here.  So that's definitely something we're going to address,

11  but it's not been brought up with the court yet.  First, we

12  wanted to clean up the complaint if we could.

13         THE COURT:  Okay.

14         MR. STEINBERG:  Right.

15         MS. WHEATON:  But I hear you, and I like what you're

16  saying.

17         THE COURT:  No, it's a question.  I'm not deciding

18  one way or other.  It seems to me that if an independent claim

19  was properly asserted, and that's part of the issues you raise,

20  Mr. Steinberg, it'd be for the trial court, now the federal

21  district court, to determine whether the claim states a claim

22  under applicable bankruptcy law.  But I just -- it was curious.

23  I mean, I -- fundamentally, this is what I said.  The state

24  court complaint that the plaintiff filed is -- and I don't mean

25  to underestimate the seriousness of the case, but it's the

8

1  garden-variety product design defect products liability case,

2  the allegation that the 1984 pickup truck, with its fuel tank

3  in the so-called crash zone, is a design defect.  And I, you

4  know, just remember from years ago, this wasn't -- they were

5  not involving GM-related vehicles.  They were -- the Pinto

6  cases were design defect case about where the gas tank was

7  placed.  And there were others.

8         So I, you know, I read it and I appreciated that this

9  looks and sounds like a product defect case, and you agree that

10 New GM contractually assumed liability for products liability

11 claims, and you don't dispute that a plaintiff can state a

12 product liability claim based on a design defect on an Old GM

13 vehicle.  I'm right so far, right?

14         MR. STEINBERG:  You are correct, Your Honor.

15         THE COURT:  Okay.

16         MR. STEINBERG:  There is an issue, because this car

17 is so old, whether the statute of limitations or statute of

18 repose applies, but you are absolutely correct that New GM, in

19 the context of assuming product liabilities, assumed the type

20 of claim that would come within the general umbrella of a

21 design defect.

22         THE COURT:  Okay.  All right.

23         MR. STEINBERG:  And New GM will defend that in the

24 Georgia court.  The issue is the failure to warn claim.  And

25 there, I think this is a, I think, type of cause of action that

9

has caused a lot of litigation, and this is the extreme case.
This is a case, as Your Honor pointed out, where the car was
manufactured in 1984.  The car model was -- Old GM stopped
designing that car model in 1987.  So, you know, 22 years
before the sale, this ended.  There is no allegation in this
complaint that New GM had any affirmative relationship or
conduct with either Ms. Reichwaldt or her father, who owned the
car, or even the Old GM vehicle owner.  These cars were, you
know, 25 years old at the time of the sale.

          So there was nothing that was there that established
relationship.  All that they've essentially alleged is that Old
GM people knew something, Old GM people had some conduct that,
based on the imputation doctrine, when New GM hired those
people, that knowledge, as a general matter on a wholesale
basis, transferred to New GM.  But that's where the analysis
ends.

          THE COURT:  Let me ask you some other questions.
Your motion here was styled as a motion to enforce the sale
order.  Mr. and Mrs. Reichwaldt, you agree, was a future
claimant?  This is a post-closing accident case.

          MR. STEINBERG:  Correct.

          THE COURT:  And in the _Pitterman_ opinion that I
wrote, I addressed the issue of Grumman Olson and future
claimants.  Would you agree that Ms. Reichwaldt falls into the
same category as the _Pitterman_ plaintiff, where I addressed the

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

10

1  issue of Grumman Olson and its effect?

2           MR. STEINBERG:  I think Ms. Reichwaldt actually falls

3  into the category of Grumman Olson.  I'm not sure if Pitterman

4  was the --

5           THE COURT:  Okay.

6           MR. STEINBERG:  -- was the owner of the vehicle.

7           THE COURT:  She falls into the Grumman Olson --

8           MR. STEINBERG:  That's correct.

9           THE COURT:  -- category.

10          MR. STEINBERG:  But the --

11          THE COURT:  Grumman Olson was a driver of a truck,

12 and she didn't own the truck.  And here, Ms. Reichwaldt was in

13 a vehicle, not a GM -- no allegation it was a GM vehicle, but

14 was in a collision with a Old GM-manufactured pickup truck --

15          MR. STEINBERG:  But I would --

16          THE COURT:  -- with the alleged design defect.

17          MR. STEINBERG:  But I would argue that the sale order

18 addressed the Grumman Olson issue.  In fact, I think Grumman

19 Olson is a footnote in the opinion that says this doesn't

20 really apply to GM because GM assumed product liability claims.

21          THE COURT:  That's the -- the portion of the sale

22 order that Reichwaldt seeks to enforce is the provision

23 regarding assumption of product liability claims.

24          MR. STEINBERG:  Right.

25          THE COURT:  Right.

11

1        MR. STEINBERG:  But once New GM assumes -- see, the

2    issue for us, and it's a very important issue for GM, is that

3    duty to warn is part of the assumed product liability claim.

4    We're not running away from it.

5        THE COURT:  Right.

6        MR. STEINBERG:  We will defend it in connection with

7    Old GM's obligation.  But what makes it New GM's obligation?

8    Why isn't this a restatement of Old GM's obligation?  How did

9    they connect the dots to get to New GM?  What is it that they

10   put in their pleading that does that?  And the answer is, in

11   this case, they do not.

12       THE COURT:  Yeah, I agree.

13       MR. STEINBERG:  They allege that New GM bought assets

14   pursuant to the sale agreement.

15       THE COURT:  But the -- and I realize both sides have

16   appealed, I guess, both of my -- the June and July 2017

17   opinions.

18       MR. STEINBERG:  Yes and no.  Both sides -- being New

19   GM has appealed the June order, and designated counsel for the

20   economic loss plaintiffs and some others have appealed the July

21   order.  Both have been consolidated, will be heard by Judge

22   Furman.  The only reason why I said the no is that Reichwaldt

23   technically has not appealed that order.

24       THE COURT:  Right.

25       MR. STEINBERG:  Reichwaldt was bound by the order.

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

12

1  Reichwaldt claims that Goodwin Proctor, who did appeal it,

2  didn't appeal it for them, and therefore res judicata applies.

3  In our view --

4          THE COURT:  It wouldn't matter whether -- res

5  judicata would apply --

6          MR. STEINBERG:  No matter whether there's an appeal

7  or not.

8          THE COURT:  -- whether it's final or not, in my view,

9  but --

10         MR. STEINBERG:  No.  Res judicata applied whether

11 they appealed or not.  It just makes it a more --

12         THE COURT:  Right.

13         MR. STEINBERG:  -- a more extreme case.  And in our

14 view, what is happening here is that Reichwaldt is manipulating

15 the process in that they didn't appear and they didn't appeal,

16 so the issue is finished for them.  So what they do is that

17 they violate the sale order, and in order to defend their

18 actions where they're not supposed to assert a contractual

19 assumption of liabilities, they raised this as a defense, and

20 then if Your Honor rules against them, they will then try to

21 appeal it if they can and then say, I now have a live issue,

22 when the issue is technically not live for them at all.

23         THE COURT:  Well, you'll deal with that if and when

24 this comes to past, right?

25         MR. STEINBERG:  So --

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

13

1            THE COURT:  The other part of the <u>Pitterman</u> ruling

2   was -- and not the other part -- another part of the <u>Pitterman</u>

3   ruling was that the priority scheme of the Bankruptcy Code does

4   not permit the assertion of a punitive damage claim against New

5   GM based on Old GM's conduct.

6            MR. STEINBERG:  Right.

7            THE COURT:  That portion of it, it seems to me,

8   didn't hinge on the contract -- unless there was an affirmative

9   acceptance of an assumed punitive damage liability, which

10  there, there was not, the priority scheme portion of the lien

11  was separate, but anyway --

12           MR. STEINBERG:  For purposes of clarity, I always

13  view that <u>Pitterman</u> opinion as the June opinion --

14           THE COURT:  Okay.

15           MR. STEINBERG:  -- which is threshold issue two.

16  What you're referring to is --

17           THE COURT:  And the punitive damage issue is the --

18           MR. STEINBERG:  -- is your July opinion --

19           THE COURT:  -- July opinion.

20           MR. STEINBERG:  -- which decided --

21           THE COURT:  Yeah, because --

22           MR. STEINBERG:  -- threshold issue four.

23           THE COURT:  -- Pitterman had dropped the punitive

24  damage claim.

25           MR. STEINBERG:  That's correct.

14

1          THE COURT:  I stand corrected.

2          MR. STEINBERG:  But Your Honor is absolutely correct

3 that in your July opinion, you not only decided this based on

4 the law of the case doctrine --

5          THE COURT:  Right.

6          MR. STEINBERG:  -- but you went further than that.

7 You looked at the priority scheme in the Bankruptcy Code.  You

8 said that Old GM couldn't be liable for punitive damages, so

9 the new -- New GM couldn't have assumed that liability anyway.

10 You said that New GM is not liable for punitive damages based

11 on Old GM conduct.  By definition, a contractual assumption of

12 liability involves Old GM conduct.

13          THE COURT:  Okay.

14          MR. STEINBERG:  And therefore, you made a clear

15 ruling on it beyond the law of the case.  Their failure to

16 appear, their failure to appeal has consequences to them.  And

17 to say to the Georgia court --

18          THE COURT:  The order to show cause, in bold

19 language, I think, stated that, you know, everybody who got

20 served with it is going to be bound.

21          MR. STEINBERG:  Right.  And they don't quarrel with

22 that, eventually.  They got to that point.  They wrote it in

23 their objection.  We agree that we've bound by whatever that

24 ruling is.

25          THE COURT:  Let me come back to a question I asked.

15

1   Let's assume that I agree with you that Reichwaldt can't seek

2   to recover punitive damages against New GM.  Tell me again -- I

3   asked this before, and I think you did, but you know, it seems

4   to me you should have been able to work out all the other

5   issues about what the allegations of the complaint are that you

6   think are improper.  I understand the -- you raised a question

7   about the allegations of successor liability, for example.  So

8   I agree with you with that because I'm just trying to think --

9   I don't have -- what I'd be inclined to do is send the two of

10  you back.  Let's assume I rule in your favor on the punitive

11  damage issue.  I'd send you back to meet and confer and try and

12  agree on a strike pleading the language that their complaint

13  will go forward with in federal district court in Georgia, and

14  that Court can decide if there's a motion to dismiss for

15  failure to state a claim.  That court will decide that state

16  law issue.

17          But I'm not inclined, at this stage, to sit down with

18  a pen in my hand and redline through specific language.  Do you

19  think you can work out with Mr. Snyder and his colleagues -- I

20  assume I'm going to have to decide the punitive damage issue.

21  I'm just trying to figure out what to do about the other

22  things.

23          MR. STEINBERG:  Your Honor --

24          THE COURT:  You substantially narrowed the

25  differences.  Then, they threw in a couple of miscellaneous

16

1  things.

2          MR. STEINBERG:  The allegations that were originally

3  inferred were substantially corrected by the amended -- the

4  proposed amended complaint.  If they hadn't added any other

5  allegations, we wouldn't have had an allegations issue to talk

6  to Your Honor any further.  They will have cured the problem.

7  So the only allegation issues we have left to discuss with them

8  are in three paragraphs.  We told them the specific language.

9  It is almost consistent to what they had done before.  I'm

10 fairly confident that we would be able to address the

11 allegations issue.

12         The independent claim issue, Your Honor, where

13 there's a link to punitive damage is an important issue because

14 our view is that this case is the <u>Holland</u> case.  There was

15 nothing that was alleged that New GM did after the sale.  The

16 argument that --

17         THE COURT:  Yeah, they quote Mary Barra's testimony

18 in Congress, which I wasn't all that impressed with.

19         MR. STEINBERG:  But Mary Barra was talking about the

20 ignition switch issue in there, and --

21         THE COURT:  Yes.

22         MR. STEINBERG:  But the one thing that they said was

23 New GM makes, you know, sells parts for Old GM vehicles as a

24 general matter.  What that has to do with failure to warn or a

25 design defect is irrelevant.  And they say nothing that Old GM

17

1   sold -- New GM sold parts to this vehicle owner.  So that is a

2   -- as far as I'm concerned, that doesn't advance the ball

3   anywhere.  Clearly, there were accidents that took place prior

4   to the sale, and clearly, there were people at Old GM that knew

5   about that, and some of those people moved over to New GM.  But

6   that knowledge that was in someone's head has to translate to a

7   duty, a duty that is different than the assumed liability

8   failure to warn claim.  That duty has to be based on New GM

9   conduct.  If there is no New GM conduct, then all that they

10  ever are asserting are the Old GM failure to warn claim.  The

11  Holland case said knowledge not coupled with a duty doesn't

12  establish the duty.  Knowledge, by itself, doesn't establish

13  the duty.  I'm not going to recognize that there was a claim

14  against Chrysler in the District Court of Ohio.  Here, we're

15  saying that there was nothing that they are alleging.

16          They alleged three facts, that New GM bought assets

17  -- that is actually a successor liability-type claim, and if we

18  didn't assume the liability, it would be retained liability.

19  But because we assumed the liability, it's an assumed

20  liability, by definition, not an independent claim.  New GM

21  hired employees.  That's true.  The sale agreement required us

22  to hire employees.  It was actually a purpose of the sale, to

23  preserve employment during the middle of the severe recession.

24  That is part predicated on the sale agreement itself.  Anything

25  that's predicated on the agreement is an assumed liability.

18

1    It's not an independent claim.  Or that New GM acquired Old

2    GM's failure to warn when the assumed product liabilities.

3           All of those facts are predicated on the sale

4    agreement.  There is nothing else.  There is nothing else on

5    the specific facts.  On the generalized facts, we're dealing

6    with a vehicle that is 33 years old, that Old GM stopped

7    producing, and it's a design defect.  It's not an operational

8    problem where you could warn somebody, don't do this.  This was

9    a car that jumped a divider and hit -- and the claim is that

10   the design of the car had a problem with it and that should

11   have been recalled.  This car was never recalled.

12          THE COURT:  May I ask you this?  Are there any

13   recorded decisions that conclude that for the 1984 model

14   Chevrolet pickup truck that was involved, similar to the one

15   involved in this accident, that there was a product defect

16   because the fuel tank was located in the crush zone?

17          MR. STEINBERG:  I don't know the answer to that.  My

18   colleague does not know the answer to it either.  I do know

19   there were a lot of lawsuits, and attached to the objection,

20   there may be 780 lawsuits, something like that.  When you look

21   at the dates of when they say the accident occurred, probably

22   95 to 98 percent were presale accident situations.  The reality

23   is, is that cars that are on the road for 25 years go off the

24   road at some point in time.  They don't last this long.

25          THE COURT:  All right.  Let me hear from Mr. Snyder.

19

1    Thank you.

2             Go ahead, Mr. Snyder.

3             MR. SNYDER:  Good afternoon, Your Honor.  I'm happy

4    to address specific issues, but I do have an argument outlined.

5             With regard to the state law issue of whether a

6    failure to warn claim is cognizable in the instance where the

7    plaintiff is not the owner of the car, that's a proximate cause

8    issue under Georgia law.  It's a negligence claim.  We do have

9    evidence to support that.  I'm not -- whether --

10            THE COURT:  I'm not deciding it.  I just -- I was

11   curious.

12            MR. SNYDER:  The Court's question about that, it is

13   not a claim that is not uncommon.  We have represented six or

14   seven plaintiffs in GMC pickup truck cases who are not in the

15   C/K pickup truck.

16            THE COURT:  Uh-huh.

17            MR. SNYDER:  It's not uncommon, and it is something

18   that happens a reasonable amount.  With regard to --

19            THE COURT:  And has a court ruled in your failure on

20   the duty to warn claim?

21            MR. SNYDER:  They have not filed any motions to

22   dismiss.  They filed a motion to transfer the case to the

23   District Court of Nebraska.

24            THE COURT:  I don't mean in this case.  You say

25   you've handled others.

20

 1          MR. SNYDER:  The last -- not that I'm aware of

 2 offhand, but before 2009, the last C/K pickup truck case we

 3 handled was in '99.  That was long before I was with the firm,

 4 so I don't know whether that was an issue in that case.  I'm

 5 sorry I don't know that offhand.

 6          THE COURT:  That's okay.  I'm not deciding that

 7 issue.

 8          MR. SNYDER:  And I --

 9          THE COURT:  As a matter of state law, you can

10 assert --

11          MR. SNYDER:  And I agree with that, and I think that

12 that is what drives a lot of the argument on this failure to

13 warn, duty to warn question that GM's lawyers were just talking

14 about.  The question of whether New GM, as a result of its

15 possession of the books and records of Old GM with regard to

16 the C/K pickup truck case and --

17          THE COURT:  Mr. Snyder?

18          MR. SNYDER:  Yes, sir?

19          THE COURT:  The one thing I can assure you about is

20 that's not sufficient in light of the rulings that Judge Gerber

21 entered and that I've entered.  You're not going to be able to

22 bootstrap an independent claim against New GM based on Old GM

23 conduct or what you think may be in the books and records or

24 you think some employee may know about.  I thought I -- you

25 know, Mr. Steinberg's paper that supported this motion quotes

1  extensively from the _Pitterman_ transcript and we have the

2  transcript, and then there was a follow-on hearing.  And I'm

3  not moving away from that, okay.  I believe I was correct.

4  There may be appeals pending.  Some higher court may determine

5  whether I was wrong or right, but independent claims have to be

6  based solely on the conduct of New GM.  There's no recall with

7  respect to the fuel tank in this 1984 pickup truck.  That, in

8  itself, makes it unlike the ignition switch defect, as to which

9  there were multiple recalls.

10        So what -- and I reviewed your first amended

11 complaint.  I reviewed the original complaint.  What seems to

12 me to be utterly lacking are any specific allegations of

13 misconduct by New GM after the 363 sale and bankruptcy relating

14 to the vehicle that's involved in this accident.  So, you know,

15 so far, I've only had to review a handful of complaints.  Judge

16 Gerber reviewed more when he had the case.  But I don't doubt

17 the attempted ingenuity of plaintiff's counsel to try to allege

18 facts that will reach out to try and bring independent claims

19 then against New GM.  And what I read so far in this case

20 doesn't do it.

21        MR. SNYDER:  I understand, Your Honor, and we do

22 believe that our pleadings are sufficient under Federal Rule 8

23 for notice pleading purposes, but what we can do is, with leave

24 of this Court, seek leave to add more specific allegations.

25 One of the allegations that we would add is that General

22

1   Motors, LLC, New GM, still maintains a 300,000-page document

2   depository with regard solely to the C/K pickup truck.  And in

3   addition to that -- and this is -- I'm quoting from a discovery

4   response in our case, Your Honor, where it says General Motors,

5   LLC provides its own staff access to the document repository to

6   assist in performing searches and locating documents.  The

7   document repository presents documents related to the design of

8   the fuel storage system and GM 1973 to '86 C/K pickup trucks in

9   an organized fashion and as they are now kept in the ordinary

10  course of GM, LLC business.

11          In addition to maintaining this -- it's called --

12  it's been referred throughout the course of this litigation as

13  the GM reading room on the C/K trucks.

14          THE COURT:  I'm sorry, say it again.

15          MR. SNYDER:  The GM reading room.  One of the tactics

16  in all of these C/K pickup truck cases is the plaintiff serves

17  document requests, and GM says, come to our facility, we have

18  300,000 pages of documents that are organized, stored,

19  categorized, and we have our own employees who will help you

20  find whatever you're looking for.  So GM can't run away --

21          THE COURT:  So did you go and do it?

22          MR. SNYDER:  No.  Actually, we got an order from

23  Judge Thrash in the Northern District of Georgia saying that

24  that was improper under the federal rules and that GM had to

25  produce the documents to us.  But we have done it in prior

23

1  cases.

2          THE COURT:  Have they produced the documents to you

3  yet?

4          MR. SNYDER:  They have produced some of the

5  documents.  There is still the pending motion to compel, which

6  GM concedes was essentially the reason it was filed.

7          THE COURT:  Well, they concede that the discovery

8  regarding punitive damages was the reason for the filing.  At

9  least that's what I read.

10          MR. SNYDER:  The discovery -- I'm sorry, I don't mean

11  to interrupt, Your Honor, but --

12          THE COURT:  No, go ahead.

13          MR. SNYDER:  Discovery with regard to punitive

14  damages that GM was talking about was served in May 2016 with

15  our complaint.  Discovery was essentially stayed for that

16  period.  But what we would ask for leave of this Court is an

17  opportunity to make more specific allegations with regard to

18  actual GM employees who have knowledge of the defect in this

19  case, actual books and records that New GM concedes it has with

20  regard to the C/K pickup truck case.  The argument -- this

21  argument about whether New GM has a duty to warn and whether

22  it's really a bootstrapped assumed liability claim, frankly I'm

23  not that clever, Your Honor.  What we are trying to argue is a

24  position that's been argued and litigated extensively in the

25  MDL cases that under the restatement of products liability

24

1  section 13, when a asset purchaser buys assets out of a

2  bankruptcy sale or just in connection with the sale of a

3  business, if they had -- if it was reasonable for them to warn

4  and they enter into relationships with the old entity's

5  customers or they profited from products sold to those

6  customers, then under state law, the new entity, the asset

7  purchaser entity, can have a duty to warn.  There have been

8  five or six orders that I'm aware of in the MDL court trying to

9  determine whether under a specific state's law, that

10 restatement 13 claim is cognizable.

11      THE COURT:  Has Judge Furman written any opinions

12 sustaining duty to warn claims under section 13 of the

13 restatement of products liability?

14      MR. SNYDER:  Not under Georgia law, Your Honor, but

15 he has, and he has found that it doesn't exist in some states

16 and it does exist in others.  And what Judge Furman has been

17 doing is going and looking at other decisions of the court to

18 try to decide -- of that state's courts to determine whether

19 it's been decided by the state supreme court or whether, based

20 on other lower court rulings, he reaches the conclusion that

21 the supreme court would recognize a state law duty to warn.

22 That's the claim we're trying to assert.

23      THE COURT:  Has the Georgia Supreme Court addressed

24 that issue?

25      MR. SNYDER:  They have not, but the restatement

25

1  section 13 has been cited approvingly by two Georgia Court of

2  Appeals court decisions, usually in a context where they say

3  the plaintiff is arguing this, you know, provision of the

4  restatement, we've read it, they need provisions there for

5  other reasons.  It's never been directly addressed.  We do

6  believe we're going to have a good argument in front of Judge

7  Thrash on that question.  And that's what we were trying, in

8  our amended complaint, to tee up.  Now --

9        THE COURT:  I'm not going to have -- it's not this

10  Court's role to deal with amended complaints, what you might

11  add.  I deal with what I have in front of me.  And what I have

12  in front of me, with -- I haven't ruled yet, but I'm strongly

13  inclined of the view that what's in the first amended complaint

14  is impermissible based on prior rulings by Judge Gerber and

15  prior rulings by me.

16        I'm not going to get into a series of back and forth

17  about what might conceivably pass through the gate.  I talked

18  about the gate.  I don't give advisory opinions.  I deal with

19  what I have in front of me.  What I have in front of me as part

20  of your papers is the proposed first amended complaint.  And it

21  seems to me -- I'm not ruling yet, but it seemed to me that

22  that runs afoul of prior rulings of Judge Gerber and of --

23  rulings by me.  And I'm not going to get into a hypothetical

24  about what would or wouldn't work if a complaint was amended to

25  do something.

26

1           I am -- and let me change subjects a little bit.  At

2    first, you seemed to take the position in your papers that your

3    client wasn't bound by anything that either Judge Gerber did or

4    I did, and you seem to have moved away from that.  I understand

5    that at the time Judge Gerber rendered his 2015 decisions, the

6    accident had not yet occurred and no litigation had been --

7    obviously had been brought by your client.  And I understand

8    your argument that res judicata couldn't apply to her.  But

9    that's not true with respect to my decisions on the 2016

10   threshold issues.  You seem to come around and acknowledge that

11   you were properly served with your order to show cause on the

12   threshold issues, and you didn't respond.  And the order to

13   show cause said in clearest terms that anybody who's properly

14   served is going to be bound.

15          Now, what's your position?  Do you agree you're bound

16   or not?

17          MR. SNYDER:  We agree that we're bound, Your Honor.

18   Our position is -- and we've never taken the position that we

19   weren't served with the show cause order or weren't aware of

20   it.  We obviously were aware of it.

21          THE COURT:  Well, you were taking the position you

22   weren't bound by anything that the bankruptcy court had done

23   and you could --

24          MR. SNYDER:  If that's the message that our papers

25   conveyed, Your Honor, that's not the message that we attempted

27

1  to convey.  Our point with regard to this contractual

2  assumption issue is -- the Court seems to understand the

3  argument with regard to the 2015 briefing.  Our client could

4  not have taken part in that.  The question for res judicata

5  purposes now is whether, as a result of being served with the

6  order to show cause, our client should have affirmatively

7  entered the 2016 threshold briefing issues and said, I'd like

8  to make this argument.  And the language in the -- I'm sorry, I

9  don't --

10          THE COURT:  No, go ahead.

11          MR. SNYDER:  The language in the order to show cause

12 says, unless there is an objection, the terms of this order to

13 show cause and the rulings made by the court with respect to

14 the 2016 threshold issues set forth herein will be binding on

15 the noticed parties and all persons and entities.

16          THE COURT:  Okay.  So what was the 2016 threshold

17 issue with regard to whether punitive damages could be sought

18 by post-closing plaintiffs?  You agree your client's a

19 post-closing plaintiff.

20          MR. SNYDER:  Yes, Your Honor.  The issues, as I -- as

21 we understood them, with regard to punitive damages in the 2016

22 threshold issue was it's essentially issue number four, "Are

23 post-closing accident plaintiffs bound by the sale order or may

24 they bring successor liability claims" -- I'm reading from the

25 order right now, Your Honor -- "against New GM and seek

28

1  punitive damages in connection therewith."  This is not a

2  question of successor liability.  This is a question of

3  contractual assumption of punitive damages.  We do not dispute

4  that we are bound by the Court's July order finding that

5  successor liability -- that punitive damages could have never

6  been part of a successor liability claim, excuse me.

7          THE COURT:  Well, it was more than just successor

8  liability claims.  I concluded that punitive damages could not

9  be recovered by plaintiffs, either on assumed liabilities or

10 successor liability.  Agreed?

11         MR. SNYDER:  That is what the order said, Your Honor.

12 And I don't mean to cut you off.

13         THE COURT:  No.

14         MR. SNYDER:  Our position is, is that the question --

15 the contractual question was -- it wasn't part of these issues

16 that were laid out for Ms. Reichwaldt, and it wasn't briefed by

17 the parties.  So when the -- the question of the contractual

18 assumption of punitive damages was not briefed.  It certainly

19 wasn't briefed by Goodwin Proctor, and I don't --

20         THE COURT:  Could you read me that issue again?

21         MR. SNYDER:  "Are post-closing accident plaintiffs

22         bound by the sale order or may they bring successor

23         liability claims against New GM and seek punitive

24         damages in connection therewith, notwithstanding the

25         court's rulings in the November 2015

29

1       decision/December 2015 decision?"

2       THE COURT:  And what were the court's rulings in the

3  November/December rulings?  The Court specifically -- Judge

4  Gerber specifically decided, and your papers address the

5  assumed liability.  You argue it was wrong, but you

6  specifically address -- now, you address the assumed liability

7  question.  Your papers are -- your state and federal court

8  papers acknowledge assumed liability.  You just argue that,

9  well, they assumed liability for punitive damages.

10       MR. SNYDER:  That's correct, Your Honor.  And our

11 position is that with regard to a binding ruling on

12 Ms. Reichwaldt, she was not a party and could not have been a

13 party to the 2015 briefing in front of Judge Gerber.

14       THE COURT:  She could have been a party to the 2016

15 threshold issues before me, and she wasn't.  Well, whether she

16 was or she wasn't may depend on what I -- if I had to reach the

17 issue of Goodwin Proctor -- because frankly, their designation

18 of who they represent didn't exclude or specifically include

19 named plaintiffs, but they were acting on behalf of -- it sure

20 said they were acting on behalf of your firm.

21       MR. SNYDER:  Your Honor, we don't -- we do not

22 dispute that we are bound by the July order.  The question,

23 from our perspective, is whether being bound by the Court's

24 ruling on these threshold issues precludes us from making this

25 contract argument in response to GM's motion to enforce.  With

30

1  regard to res judicata, you know, the -- that -- I think that

2  the original GM filing discussed, I think, law of the case and

3  collateral estoppel, which we addressed in our objection.  This

4  res judicata argument wasn't in their -- I don't believe it was

5  in their first pleading.  I may be wrong about --

6  　　　　　THE COURT:  It is in their reply.

7  　　　　　MR. SNYDER:  It is in the reply.  That's -- my point

8  is, is that we did some research over the weekend, and --

9  　　　　　THE COURT:  Look, unless I get reversed, do you think

10 you're not bound by -- after I put the world on notice that

11 anybody who gets served with this order to show cause is going

12 to be bound by law, I reached the decisions I reached.  You

13 were served.  I ruled.  It's on appeal.  If I get reversed,

14 well, I get reversed.  But federal rule on res judicata

15 certainly applies.  Would you agree that res judicata applies

16 to the order I entered unless and until it's reversed?

17 　　　　　MR. SNYDER:  Yes, Your Honor.  The question from res

18 judicata purposes is whether the issue was or could have been

19 raised.  It's our position that as a result of the statement of

20 the threshold issues, it wasn't something that we could have

21 raised.  If we had asked New GM to brief the issue --

22 　　　　　THE COURT:  Really?

23 　　　　　MR. SNYDER:  -- presumably, they would have said no.

24 　　　　　THE COURT:  Really?  You think that I just made it up

25 somewhere?

31

1        MR. SNYDER:  No, Your Honor.  As we read your

2   opinion, you know, we didn't expect to see a ruling on that

3   issue in that -- on the contractual assumption of liability

4   because it was not briefed in connection with the 2016

5   threshold issues.

6        THE COURT:  All right.  Anything else you want to add

7   at this point?

8        MR. SNYDER:  Let me look through my notes quickly,

9   Your Honor, and I will try to wrap this up.  One thing that I

10  would say with regard to the Court's order on this contract

11  issue, we don't expect any different ruling on that issue than

12  the orders that have been previously issued.  It's our position

13  that our client has not had an opportunity to appeal that

14  issue.  If she had chosen to appeal that portion of your

15  opinion in July, we didn't see that as an issue.  That was live

16  at the time, and it would have gone out to the district court

17  without benefit of any of the parties' briefing on the issue.

18       THE COURT:  I guess if I rule against you and you

19  file notice of appeal and Mr. Steinberg moves to dismiss the

20  appeal, some other court will decide that issue, but --

21       MR. SNYDER:  Well, and one thing that we would say

22  for judicial economy purposes, if the Court is going to enter

23  -- the Court will enter the order that it thinks is

24  appropriate.  If there's a one-line order that says it's the

25  law of the case based on Judge Gerber's order, it goes up on

32

1  both questions.  And if the Second Circuit enters an order on

2  this, the issue is settled forever for any participant in any

3  future GM case.  They can't come in.  If we have a C/K case in

4  two years --

5          THE COURT:  You know, Mr. Snyder, if you go to the

6  transcript of -- before me, the one thing -- before the order

7  to show cause was entered, the one thing I made crystal clear

8  is I wanted a procedure that raised the issues before me once,

9  that everyone who could be affected by it was given notice and

10  an opportunity to appear and participate, and I was going to

11  rule, and that was going to dispose of the issues.  That's not

12  the precise words I used, but that -- I mean, that's the

13  genesis of the 2016 -- the order to show cause of the 2016

14  threshold issues.

15          I gave direction to counsel from both sides,

16  including Goodwin Proctor, to go back and negotiate -- attempt

17  to negotiate the terms of an order.  The first effort was

18  unsuccessful.  And I sent them back again, and they did.  And

19  the order to show cause, I signed it, but it was drafted by

20  counsel for plaintiffs and defendant, including issue number

21  four on punitive damages.  And I made clear I was only doing

22  this -- I only wanted to do this once.  And so to the fullest

23  extent possible, everybody receiving notice was going to be

24  bound, and that's what happened.

25          I will enter an order or decision here resolving

33

1  issues.  I haven't ruled yet.  I'll try and do it -- you -- I

2  think what you said, the judge in Georgia adjourned hearings

3  until sometime in early September?  I don't remember the

4  precise date.

5           MR. STEINBERG:  September 7th.

6           MR. SNYDER:  That's when General Motors's response to

7  our motion to amend is due.  There are no hearings set.

8           MS. WHEATON:  Right.  A week from tomorrow, we have

9  to file our response in Georgia.

10          THE COURT:  Well --

11          MR. SNYDER:  Well, and, Your Honor, one suggestion

12  that you did make was the possibility of attempting to meet and

13  confer with Mr. Steinberg to try to resolve some of these

14  disputes, and we're not averse to that.  We -- our -- we

15  understand that we're not going to agree on the contract issue

16  and it's going to be up to the Court to decide whether we're

17  allowed to make that argument, but I think that -- and I'm not

18  sure, after hearing Mr. Steinberg's argument, that we're going

19  to be able to agree on the independent claims issue, but we

20  might be able to come together and work on a proposed amended

21  complaint that resolves every single issue that can be

22  resolved.  That's what we had hoped to do before we were here,

23  and that's why we sent the marked-up complaint to them.

24          THE COURT:  All right.

25          MR. SNYDER:  And I'm not accusing anyone of anything,

34

1  but I do think that that's not a process that we're averse to.

2  What we want to do is to get Ms. Reichwaldt's case moving, and

3  if it means that we have to leave behind some of these claims,

4  then we'll do what this Court orders.  We have not been

5  intentionally attempting to evade the orders of the Court.

6          THE COURT:  You know, this is not the basis for any

7  ruling on that, but frankly -- I understand the punitive

8  damages issue, okay?  But other than punitive damages, I don't

9  know what you're fighting about on duty to warn.  If there's

10 assumed, Mr. Steinberg's agreed there's assumed liability with

11 respect to duty to warn.  If you prevail on your duty to warn,

12 you're prevailing on your duty to warn.  There's only single

13 recovery.  You're not going to -- I understand the punitive

14 damage issue, but other than that, I don't know what this

15 fight's about.  I'm concerned that it was that -- it was the

16 same issue in Pitterman, and Pitterman got a jury verdict, but

17 I -- and I know I didn't see the jury verdict.  I don't know

18 whether -- you know, if there's a -- if punitive damages aren't

19 an issue, Pitterman, they've withdrawn that claim.  I don't

20 know what you gain by duty to warn against New GM, but

21 that's --

22         MR. SNYDER:  The Court has identified it.  It's a

23 punitive damages issue.  It is our position that --

24         THE COURT:  And I'm going to rule on the punitive

25 damages.

35

1          MR. SNYDER:  And I understand, Your Honor.  It's our

2   position --

3          THE COURT:  I've already ruled on the punitive damage

4   issue --

5          MR. SNYDER:  Yes, Your Honor.

6          THE COURT:  -- in the July 2012 opinion, believe I

7   ruled on it.  Okay.  Let me hear from Mr. Steinberg --

8          MR. SNYDER:  Thank you.

9          THE COURT:  -- briefly.

10          MR. STEINBERG:  Your Honor, I'll be very brief

11   because I think we're near the end of the hearing.  The only

12   thing that I think would make sense is that so -- that Your

13   Honor can rule on this in an orderly fashion, we actually had

14   asked for an extension of time to respond to their amended

15   complaint.  Figuring that whatever Your Honor ruled will have

16   impact on us, we might as well wait for Your Honor to rule.

17          THE COURT:  I don't want to have to spend Labor Day

18   weekend writing an opinion.

19          MR. STEINBERG:  They refused to give us an

20   adjournment request after we had given them a two-week

21   adjournment request.  If counsel would be prepared to give us a

22   little more time to allow Your Honor to rule, then it would

23   make more sense because then everybody will understand what

24   they have to do to amend the complaint.  So I throw that out as

25   a suggestion.

1           The only other thing I wanted to say is that I've

2   been trying to be very polite in what has gone on here, but --

3           THE COURT:  Stay polite.

4           MR. STEINBERG:  Okay.  Then, Your Honor, thank you

5   for your time.

6           THE COURT:  Okay.  Mr. Snyder, you know, you're going

7   to force me to work Labor Day weekend to get an opinion out so

8   that --

9           MR. SNYDER:  Absolutely not, Your Honor.  We're happy

10  to discuss with Mr. Steinberg an extension so we can reach this

11  decision.

12          THE COURT:  First of all, you know what, you ought to

13  know I usually don't waste a lot of time before I get opinions

14  out, so I'm not talking -- this is not months.  It's -- you

15  know, two weeks would be more than sufficient to --

16          MR. SNYDER:  So two weeks from today?

17          THE COURT:  Well, two weeks --

18          MR. STEINBERG:  Two weeks from September 7th is what

19  he's saying.

20          THE COURT:  -- from the date that you've agreed on,

21  you know, the next hearing.

22          MR. SNYDER:  Okay.  So I'm just trying to follow what

23  the Court's saying.  So you're suggesting we should give them

24  another two weeks to respond so that an order can come out in

25  the interim.

1            THE COURT:  Correct.  Correct.  I'm not forcing you

2    to do it, but I just --

3            MR. STEINBERG:  Are you prepared to do that?

4            MR. SNYDER:  Well, how about we --

5            MR. STEINBERG:  Okay.

6            MR. SNYDER:  We have each other's emails.  We'll

7    discuss it, Your Honor, and --

8            THE COURT:  Could you notify me tomorrow whether --

9            MR. SNYDER:  Absolutely, as soon as we can.  We

10   should be able to agree on it after the hearing.  I'd just like

11   to discuss it.

12           THE COURT:  If you can agree on it before you leave

13   the courtroom, knock on my chambers door.

14           MR. SNYDER:  Certainly, Your Honor.

15           THE COURT:  I just -- hopefully, you understand what

16   I'm saying.  I will rule.  I don't want to have -- you know,

17   cause the judge in Georgia to go forward with a hearing while I

18   still haven't ruled.  He ought to have my ruling at hand when

19   the hearing goes forward.  Okay?

20           MR. SNYDER:  Yes, Your Honor.

21           THE COURT:  All right.  Thanks very much.

22           MR. STEINBERG:  Thank you, Judge.

23           THE COURT:  Okay.  We're adjourned.

24           (Proceedings concluded at 3:57 p.m.)

25                          * * * * *

38

1       **C E R T I F I C A T I O N**

2

3            I, Alicia Jarrett, court-approved transcriber, hereby

4   certify that the foregoing is a correct transcript from the

5   official electronic sound recording of the proceedings in the

6   above-entitled matter.

7

8

9

10  _____

11  ALICIA JARRETT, AAERT NO. 428      DATE:  August 31, 2017

12  ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

