**OBJECTION DEADLINE: TO BE DETERMINED**
**HEARING DATE AND TIME: TO BE DETERMINED**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
:
In re:                                                 :                    Chapter 11
MOTORS LIQUIDATION COMPANY, et al.,    :                    Case No.: 09-50026 (MG)
     f/k/a General Motors Corp., et al.,        :
:
                    Debtors.    :                    (Jointly Administered)
------------------------------------------------------------X


**MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**
**BY AND AMONG THE SIGNATORY PLAINTIFFS AND THE GUC TRUST**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION ................................................................................................................. 2

THE RELEVANT FACTUAL BACKGROUND ........................................................... 3

I.    The Parties Reached Agreement On All Material Terms ................................. 3

II.   The Negotiation Process Was Lengthy And Culminated In A Detailed And
      Complete Agreement That Was Embodied In Many Documents That
      Were Finalized ................................................................................................... 4

III.  The GUC Trust Inexplicably Abandoned The Agreement Without
      Justification ....................................................................................................... 9

RELIEF REQUESTED ..................................................................................................... 11

ARGUMENT ...................................................................................................................... 11

I.    The Settlement Is Enforceable ........................................................................ 11

      A.   The GUC Trust Manifested Acceptance Of The Settlement. ............... 13

      B.   The Parties Reached Agreement On All Material Terms And
           Conditions. ............................................................................................ 15

      C.   The GUC Trust Did Not Express A Reservation Of A Right Not
           To Be Bound. ......................................................................................... 17

      D.   There Was Partial Performance. ........................................................... 19

      E.   The Agreement Was Committed To Writing. ....................................... 20

      F.   Court Have Enforced Agreements In Similar Circumstances. ............. 20

II.   There Is No Basis To Invalidate The Settlement After-The-Fact .................. 24

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aharoni v. Meer (In re Actrade Fin. Techs. Ltd.)*,
  Nos. 09 Civ. 4479 (RMB), 09 Civ. 4480 (RMB) (S.D.N.Y. Jan. 25, 2010)...........................25

*Alvarez v. City of New York*,
  146 F. Supp. 2d 327 (S.D.N.Y. 2001)......................................................................................16

*Americu Credit Union v. Cumis Ins. Soc'y, Inc.*,
  Civ. A. No. 6:06-CV-1348 (DEP), 2008 WL 3930122 (N.D.N.Y. Aug. 21,
  2008) ........................................................................................................................................12

*Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*,
  447 F. Supp. 2d 329 (S.D.N.Y. 2006).....................................................................................13

*Conway v. Brooklyn Union Gas Co.*,
  236 F. Supp. 2d 241 (E.D.N.Y. 2002) ...............................................................................15, 20

*Delyanis v. Dyna-Empire, Inc.*,
  465 F. Supp. 2d 170 (E.D.N.Y. 2006) ............................................................................. *passim*

*Ehrheart v. Verizon Wireless*,
  609 F.3d 590 (3d Cir. 2010)....................................................................................................24

*Forcelli v. Gelco Corp.*,
  972 N.Y.S.2d 570 (N.Y. App. Div. 2013) ..........................................................................12, 13

*Gaglia v. Nash*,
  778 N.Y.S.2d 595 (N.Y. App. Div. 2004) ...............................................................................14

*Galanis v. The Harmonie Club of the City of New York*,
  No. 1:13-cv-4344-GHW, 2014 WL 4928962 (S.D.N.Y. Oct. 2, 2014)...................................20

*The Guardian Life Ins. Co. of Am. v. Calkins*,
  No. 12 Civ. 8863 (JGK), 2014 WL 61475 (S.D.N.Y. Jan. 6, 2014)..................................15, 19

*In re Johns-Manville Corp.*,
  440 B.R. 604 (Bankr. S.D.N.Y. 2010).....................................................................................24

*Kowalchuk v. Stroup*,
  61 A.D.3d 118 (N.Y. App. Div. 2009) ............................................................................. *passim*

*In re Lehman Bros. Holdings Inc.*,
  No. 17 Civ. 03424 (DLC), 2017 WL 3278933 (S.D.N.Y. Aug. 2, 2017) ...................... *passim*

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Liberty Towers Realty, LLC v. Richmond Liberty, LLC*,
   569 B.R. 534 (E.D.N.Y. 2017) ........................................................................24, 25

*Lopez v. Podgurski*,
   959 N.Y.S.2d 396 (N.Y. Cty. Ct. 2013)...................................................................24

*Meetings & Expositions, Inc. v. Tandy Corp.*,
   490 F.2d 714 (2d Cir. 1974)........................................................................11, 13

*Myers v. Martin (In re Martin)*,
   91 F.3d 389 (3d Cir. 1996)...................................................................................25

*Oparah v. New York City Dep't of Educ.*,
   No. 12 CV 8347 (JGK) (SN), 2015 WL 4240733 (S.D.N.Y. July 10, 2015)..........12

*Powell v. Omnicon*,
   497 F.3d 124 (2d Cir. 2007).........................................................................13, 19, 24

*Providers Benefit Life Ins. Co. v. Tidewater Grp., Inc. (In re Tidewater Grp., Inc.)*,
   8 B.R. 930 (Bankr. N.D. Ga. 1981) .......................................................................25

*Rohm & Haas Elec. Materials, LLC v. Honeywell Int'l*,
   C.A. No. 06-297-GMS, 2009 WL 1033651 (D. Del. Apr. 16, 2009) ................................22, 23

*Shabtai v. Honeywell, Inc.*,
   No. 94 Civ. 0524 (KMW) (RLE), 1998 WL 823617 (S.D.N.Y. Nov. 25, 1998) ...................11

*Stonehill Capital Mgmt. LLC v. Bank of the W.*,
   28 N.Y.3d 439 (N.Y. 2016) ....................................................................12, 17, 18

*Winston v. Mediafare Entm't Corp.*,
   777 F.2d 78 (2d Cir. 1985)...................................................................... *passim*

*Wronka v. GEM Cmty. Mgmt.*,
   854 N.Y.S.2d 474 (N.Y. App. Div. 2008) ...........................................................15

**Rule and Statutes**

28 U.S.C. § 157...........................................................................................2, 3

28 U.S.C. § 1334..............................................................................................2

Fed. R. Bankr. P. 9019.................................................................................11, 24, 25

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

N.Y. C.P.L.R. 2104................................................................................................................13


**Other Authorities**

Brenda Pierson, GM Blasts $1 Billion Deal Between Ignition Switch Plaintiffs,
    Creditor Trust, REUTERS, https://www.reuters.com/article/us-gm-ignition/gm-
    blasts-1-billion-deal-between-ignition-switch-plaintiffs-creditor-trust-
    idUSKBN1AR23Q (Aug. 11, 2017) (last viewed on Sept. 1, 2017).........................................6

Erik Larson, GM Accuses Bankruptcy Trust of Secret $1 Billion Stock Plot,
    BLOOMBERG, https://www.bloomberg.com/news/articles/2017-08-11/old-gm-
    settlement-plan-sets-up-court-fight-with-successor (Aug. 11, 2017) (last
    viewed on Sept. 1, 2017)......................................................................................................6, 7

Faulty Ignition Switches, THE STREET.COM,
    https://www.thestreet.com/story/14268879/1/gm-criticizes-1-billion-
    settlement-related-to-faulty-ignition-switches.html (Aug. 11, 2017) (last
    viewed Sept. 1, 2017)...............................................................................................................7

Mark Colias and Mike Spector, Lawyers Seek Another $1 Billion From General
    Motors Over Ignition Switch Defect, WALL STREET JOURNAL,
    https://www.wsj.com/articles/lawyers-seek-another-1-billion-from-general-
    motors-over-ignition-switch-defect-1502476402 (Aug. 11, 2017) (last viewed
    on Aug. 28, 2017) ....................................................................................................................7

The Ignition Switch Plaintiffs,[1] certain Non-Ignition Switch Plaintiffs,[2] and certain Pre-Closing Accident Plaintiffs[3] (collectively, the "**Signatory Plaintiffs**") hereby submit this *Motion to Enforce the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust* (the "**Motion**").[4]  In support of the Motion, the Signatory Plaintiffs rely on the *Declaration of Edward S. Weisfelner in Support of the Motion to Enforce the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust* filed contemporaneously herewith (the "**Decl.**").  In further support of this Motion, the Signatory Plaintiffs respectfully state as follows:

## INTRODUCTION

1.      The Signatory Plaintiffs and the GUC Trust[5] dedicated significant time, care and resources negotiating, drafting, and ultimately finalizing a settlement agreement (the "**Settlement**") between them.

2.      The Settlement is a fair and efficient resolution of complex and protracted litigation that has engendered years of uncertainty and risk for a number of stakeholders, and illustrates exactly why there is a strong judicial policy in favor of settlements.

3.      Notwithstanding the beneficial and final nature of the Settlement, after a brief, clandestine meeting with New GM, the GUC Trust sought to revoke the Settlement mere hours

---

[1] The term "**Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 the "**Ignition Switch Defect**").

[2] The term "**Non-Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540, 14V-118 and 14V-153.

[3] The term "**Pre-Closing Accident Plaintiffs**" shall mean those plaintiffs asserting personal injury or wrongful death claims or persons who suffered a personal injury or wrongful death arising from an accident involving an Old GM vehicle that occurred prior to the closing of the Section 363 Sale.  Collectively, the Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Pre-Closing Accident Plaintiffs are the "**Plaintiffs**."

[4] Except where otherwise indicated, references to "ECF No. _" are to docket entries in the Bankruptcy Court proceedings: *In re Motors Liquidation Co*., Bankr. Case No. 09-50026 (MG).

[5] The term "**GUC Trust**" refers to the Motors Liquidation Company GUC Trust.

before its presentation to the Bankruptcy Court.[6]  Neither the equities nor the law provide support for the GUC Trust's last-minute attempt to withdraw from its obligations under the Settlement.  ***Rather, New York law enforces settlement agreements where, as here, the parties agree on all materials terms and the facts and circumstances indicate mutual assent.***

4.     Any argument by the GUC Trust that the Settlement is not final because it was not signed is without merit.  Under New York law, a settlement agreement does not need to be signed to be enforceable.  Courts routinely enforce settlement agreements with far fewer objective indicia of finality than this one.  Even in the context of oral agreements, which typically involve far more limited negotiation and introduce the prospect of far less certainty over material terms, a court will enforce a settlement under circumstances similar to those here.

5.     Here, the completed, detailed, heavily pored-over, and exhaustively edited agreement was signed-off on by the GUC Trust no later than August 12, 2017, and agreement on the material terms existed well before that.  It is undisputed that the parties took steps to present the Settlement to this Court for judicial approval and shared it with New GM as a courtesy, underscoring that the Settlement was no longer merely a draft.  It was final.

6.     The Signatory Plaintiffs thus respectfully request that the Court enforce the Settlement Agreement based on the Declaration of Edward S. Weisfelner and the documents attached thereto, given that objective material facts are undisputed or undisputable.

## <u>JURISDICTION</u>

7.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  The parties have agreed and consented to the jurisdiction of this Court to resolve disputes

---

[6]  Whatever occurred at the short meeting between New GM and the GUC Trust to cause the latter to breach the Settlement Agreement (which expedited discovery will reveal), it does not satisfy the standards for revocation of the Settlement.  *See, e.g.*, Decl. Ex. T at 16:22-23 and 17:9 (GUC Trust counsel stating the meeting was two hours "at most," apparently consisting in good part of New GM reciting risks that the GUC Trust concedes it "already knew").

related to the Settlement Agreement, which is governed by New York law.  This is a core

proceeding within the meaning of 28 U.S.C. § 157(b).

## THE RELEVANT FACTUAL BACKGROUND

## I.    The Parties Reached Agreement On All Material Terms.[7]

8.    The Settlement Agreement provides for the GUC Trust to pay Plaintiffs $15

million (the "**Settlement Amount**") and cover up to $6 million of the cost of providing extensive

notice of the Settlement to Plaintiffs and other affected parties.  Following an independent

analysis of expert reports and proffers of evidence regarding the nature and value of Plaintiffs'

asserted claims against the Old GM estate and/or GUC Trust, the GUC Trust agreed to support

entry of an order (the "**Claims Estimate Order**") estimating Plaintiffs' claims in an amount

necessary to trigger New GM's obligation to issue the maximum amount of additional shares of

New GM common stock (the "**Adjustment Shares**") under the terms of the Sale Agreement.[8]

These shares and the Settlement Amount would be placed in a fund for the benefit of Plaintiffs.[9]

9.    In exchange, if the Settlement is approved by the Bankruptcy Court, Plaintiffs will

be deemed to waive and release any rights or claims against the GUC Trust, the Wilmington

Trust Company as Administrator and Trustee of the GUC Trust, the Motors Liquidation

Company Avoidance Action Trust, and the holders of beneficial units in the GUC Trust (the

"**Unitholders**"), including a release of any rights to past or present GUC Trust Assets.  This

---

[7]  This summary of the Settlement Agreement is qualified in its entirety by the terms and provisions of the Settlement Agreement attached to the Decl. as Ex. H.  To the extent that there are any inconsistencies between the description of the Settlement Agreement contained in the Motion and the terms and provisions of the Settlement Agreement, the Settlement Agreement shall control.

[8]  Section 3.2(c) of the Amended Master Sale and Purchase Agreement requires New GM to issue 30 million Adjustment Shares—the maximum amount—if the Bankruptcy Court enters a Claims Estimate Order estimating the aggregate allowed general unsecured claims against the Old GM estate at or exceeding $42 billion.

[9]  The Settlement provides that the Signatory Plaintiffs will subsequently determine the allocation of the value of the Settlement Amount and the Adjustment Shares between economic loss claims and personal injury/wrongful death claims and the eligibility and criteria for payment, subject to notice and an opportunity for Plaintiffs to be heard.

release is binding regardless of whether the Claims Estimate Order is entered.

10.    Before any release would be imposed, the parties agreed to provide extensive notice pursuant to procedures to be approved by the Court. The contemplated notice procedures included notice of the Settlement by postcard to: (A) all persons in the United States who, as of July 10, 2009, owned or leased a defective vehicle manufactured by Old GM included in the recalls at issue in the Settlement; and (B) all Pre-Closing Accident Plaintiffs who have filed a lawsuit against New GM or filed or joined a motion for authority to file late claims against the GUC Trust, as of the date of the Settlement Agreement. This actual notice to Plaintiffs would be supplemented by paid media, including digital banner advertisements, sponsored search listings, a press release, and a settlement website.

11.    As the parties describe it in the motion to approve the Settlement, the mutually-beneficial Settlement eliminates litigation uncertainty around the pending motions seeking authority to file late claims (the "**Late Claims Motions**"),[10] protects against the risk of claw-backs of past distributions of GUC Trust Assets, eliminates delay in the wind-down process and distribution of GUC Trust Assets, and "provides a streamlined process for allowing Plaintiffs' claims and provid[es] a source of recovery from the Settlement Amount and the Adjustment Shares." Decl. Ex. K ¶¶ 5, 7-8.

## II.    The Negotiation Process Was Lengthy And Culminated In A Detailed And Complete Agreement That Was Embodied In Many Documents That Were Finalized.

12.    The parties began their negotiation over the Settlement in earnest in June 2017,

---

[10]    The Late Claims Motions include the *Motion for an Order Granting Authority to File Late Class Proofs of Claims*, dated Dec. 22, 2016 [ECF No. 13806] and any joinders thereto; the *Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Dec. 22, 2016 [ECF No. 13807] and any joinders thereto; and the *Motion by Additional Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated July 28, 2017 [ECF No. 14018].

exchanged numerous red-lined drafts during June, and reached agreement on certain core terms by the beginning of July, during which time they worked toward finalization.  *See* Decl. ¶ 4.

13.     Well before those negotiations began in earnest, the GUC Trust had raised concerns about proceeding to seek approval of any agreement in the Bankruptcy Court without certifying a settlement class.  *See id.* ¶ 3.  Certain Signatory Plaintiffs took the position that such certification was not necessary, and made this position known to the GUC Trust and Participating Unitholders.  *See id.*  The GUC Trust and Participating Unitholders both continued to negotiate the Settlement despite knowing and ultimately conceding this position.  *See id.*

14.     By the beginning of August, the documents were in substantially final form.  *See id.* ¶ 5.  As early as August 3, counsel for the GUC Trust characterized any remaining issues as "minor" or "clean-up."  *See id.*; Decl. Ex. A.

15.     The final Settlement documents negotiated by all parties, down to precise wording and phrasing, included:

- a 20-page Settlement Agreement, Decl. Ex. H;

- a Settlement Order, Decl. Ex. I;

- a Claims Estimate Order, Decl. Ex. J;

- a fully composed, 30-page motion to approve the Settlement and estimate the aggregate allowed general unsecured claims against the Old GM estate pursuant to Bankruptcy Rule 9019, Decl. Ex. K;

- four supporting declarations from Wilmington Trust Company, as administrator of the GUC Trust, and counsel to the parties, Decl. Exs. L-O;

- a fully composed Notice Procedures Motion, Decl. Ex. P;

- short- and long-form notices to Plaintiffs, and notice to Unitholders, Decl. Exs. Q-S; and

- a finalized declaration from the notice provider setting forth a comprehensive multi-million-dollar notice plan that included mailed notice, paid media, internet-sponsored search listings, and press releases, Decl. Ex. B.

16.    With the full knowledge and consent of the GUC Trust, on August 9, 2017, bankruptcy counsel for the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs and counsel for the holders of approximately 65% of the GUC Trust Units outstanding (the "**Participating Unitholders**") called New GM's counsel to inform New GM of the plan to present the Settlement to this Court and that they were seeking a Claims Estimate Order, and determine New GM's availability for such a conference. *See* Decl. ¶ 7.  By August 14, 2017, the parties had secured a conference with this Court for August 17, 2017.  *See id.*

17.    In response to the MDL Court's request for a report on settlement activity as a regular item on the Status Conference agenda, on August 11, 2017, Steve Berman, counsel for certain Signatory Plaintiffs, informed Judge Furman during a status conference in the MDL that "we plan on presenting papers in the bankruptcy court next week, perhaps as early as Tuesday, that would ask the bankruptcy court to issue a claims estimation order pursuant to the sale agreement."  Decl. Ex. C at 37:13-17.  He further stated, "we're going to ask the bankruptcy court to issue that order which would require GM to put up stock that's worth roughly a little over $1,000,000,000," and "I wanted to give the court a heads-up that there will be some new facts on the table next week."  *Id.* at 37:25-39:1.

18.    On August 11, 2017, Mr. Berman's statements, and New GM's response to those statements, were widely reported in the news media as evidence that the Signatory Plaintiffs had reached a settlement with the GUC Trust.  Bloomberg, for example, reported that:

> The settlement between the plaintiffs and the trust for Old GM is due to be signed Aug. 15, attorney Steve Berman said in a phone call.  The deal will resolve hundreds of personal-injury cases stemming from GM's faulty ignition switches, as well as a class-action suit over millions of vehicles that allegedly lost value due to a series of recalls in 2014, he said.[11]

---

[11] Erik Larson, *GM Accuses Bankruptcy Trust of Secret $1 Billion Stock Plot*, BLOOMBERG, https://www.bloomberg.com/news/articles/2017-08-11/old-gm-settlement-plan-sets-up-court-fight-with-successor (Aug. 11, 2017) (last viewed on Sept. 1, 2017); *see also* Brenda Pierson, *GM Blasts $1 Billion Deal Between*

19.    New GM made its objections to the parties' agreement clear and unmistakable, and made it clear that it understood that the GUC Trust had settled with the parties.  At the hearing on August 11, New GM's counsel stated, "[t]his has got all the indicia of a collusive settlement."  Decl. Ex. C at 41:16-:17.  New GM also issued a statement that the media reported as follows:  "'The contrived scheme won't work,' the company said in a statement.  'We will aggressively protect our rights and our shareholders and will work to hold the GUC Trust and plaintiffs accountable for their bad faith and improper actions.'"[12]

20.    The GUC Trust never indicated any disagreement with the characterizations of either Mr. Berman or the press, and continued to finalize the last steps necessary to enact the agreement.  Directly after the MDL status conference on August 11 during which Mr. Berman informed Judge Furman of the Settlement, the parties, including the GUC Trust, had an "all-hands," finalization, page-by-page review call to flag and resolve any final word-smith issues.  *See* Decl. ¶¶ 8-9.  This meeting had been set by all parties in response to a request made by the Participating Unitholders to "schedule an all hands call . . . to finalize all of the settlement documentation and motions."  *Id.* ¶ 9; Decl. Ex. D.

21.    During the final page turn call, the GUC Trust conveyed that they were done with comments to the documents and expressed no objection to the Signatory Plaintiffs' preview of the Settlement to Judge Furman.  *See* Decl. ¶ 10.

---

Ignition Switch Plaintiffs, Creditor  Trust, REUTERS,  https://www.reuters.com/article/us-gm-ignition/gm-blasts-1-billion-deal-between-ignition-switch-plaintiffs-creditor-trust-idUSKBN1AR23Q  (Aug.  11,  2017)  (last  viewed  on Sept. 1, 2017) ("Berman said the settlement would resolve about 11.9 million economic loss claims and between 400 and 500 personal injury and wrongful death claims.");  Mark Colias and Mike Spector, Lawyers Seek Another $1  Billion  From  General  Motors  Over  Ignition  Switch  Defect,  WALL  STREET  JOURNAL, https://www.wsj.com/articles/lawyers-seek-another-1-billion-from-general-motors-over-ignition-switch-defect-1502476402 (Aug. 11, 2017) (last viewed on Aug. 28, 2017); GM Criticizes $1 Billion Settlement Related to Faulty Ignition  Switches,  THE  STREET.COM,  https://www.thestreet.com/story/14268879/1/gm-criticizes-1-billion-settlement-related-to-faulty-ignition-switches.html (Aug. 11, 2017) (last viewed Sept. 1, 2017).

[12]  Larson,      https://www.bloomberg.com/news/articles/2017-08-11/old-gm-settlement-plan-sets-up-court-fight-with-successor (Aug. 11, 2017) (last viewed on Sept. 1, 2017); *see also* additional articles cited in footnote 11.

22.     The Signatory Plaintiffs' counsel disseminated final versions of all of the documentation that same afternoon, and, less than 24 hours later, on August 12, 2017, the GUC Trust's counsel confirmed in an email that "[f]rom the GUC Trust perspective, all of the documents sent over by Howie [Steel] (subject to one item we are discussing with Akin in the Settlement Agreement) are fine." *See id.* ¶ 11; Decl. Ex. E.  This email contained no reservation that counsel's comments were subject to client review or approval. *See id.*  Counsel confirmed that resolution of this issue occurred on the morning of August 14.  *See* Decl. ¶ 12; Decl. Ex. F.

23.     On August 14, 2017, counsel for all parties confirmed that the Settlement documents were final and agreed upon, and that they could be sent to counsel for New GM to review.  Counsel for the GUC Trust stated as follows:  "We are waiting for final approval from client, but unlikely to come tonight.  You are, however, authorized to send current versions to New GM this evening."  Decl. ¶ 12; Decl. Ex. F.  Thereafter, on August 14, 2017, at 9:14 p.m. (EST), Brown Rudnick sent the final versions of the Settlement documents to counsel for New GM, cc'ing counsel for the GUC Trust.  *See* Decl. ¶¶ 13-14; Decl. Ex. G.

24.     At no point during the finalization of the Settlement documents in August 2017 did the GUC Trust or its counsel indicate that the GUC Trust's approval of the Settlement would not be final until the Settlement Agreement had been signed, or that the GUC Trust would not approve the Settlement unless the Signatory Plaintiffs sought certification of a settlement class as part of the process of seeking approval of the Settlement from the Court.  *See* Decl. ¶ 15.

25.     In the agreed-upon text of its declaration, the GUC Trust stated, *inter alia*, that "the Settlement is a prudent and reasonable exercise of business judgment because it presents the best option for the GUC Trust to maximize recovery for the benefit of the GUC Trust

Beneficiaries while minimizing the substantial risk posed by the Late Claims Motions."  Decl.

Ex. L ¶ 28.  Those risks include:

> the litigation risk of having multiple disputed issues that remain to be resolved by the Bankruptcy Court, the likelihood that those issues would be subject to appeals, the corresponding risk of re-litigating those issues after an appeal, the corresponding uncertainty, and both the cost to operate the GUC Trust during the pendency of the litigation and the time-value of money lost while the GUC Trust cannot distribute funds to its beneficiaries . . . .

*Id.* ¶ 22.

26.    As counsel for the GUC Trust admitted to this Court on August 17, 2017, when attempting to explain why it had abandoned the Settlement suddenly:  "In our view, as a fiduciary, we were initially willing to go forward with the deal, with the settlement as presented." Decl. Ex. T, 16:9-:10.  As counsel for the GUC Trust further admitted, prior to the August 15, 2017, meeting between the GUC Trust and New GM which caused the sudden abandonment (discussed below), the GUC Trust "already knew" of the "numerous execution risks" involved in the Settlement, *id.* 16:18-25, including that the Settlement "did not contemplate and that plaintiffs would not agree to a Rule 23 settlement certification."  *Id.* at 21:10-14.

## III.    <u>The GUC Trust Inexplicably Abandoned The Agreement Without Justification</u>.

27.    On August 15, the day after counsel for all parties to the Agreement confirmed that the Settlement documents were final and agreed upon, New GM filed a letter with the Court requesting cancellation of the conference scheduled for August 17.  In that letter, New GM claimed that "based on a preliminary review" of the Settlement documentation that had been provided to it, "the proposed settlement is legally improper, collusive and in bad faith."[13]

---

[13]    *See Letter Regarding New GM's Position on Chambers Conference Scheduled for August 17, 2017 at 3:00 p.m. Regarding Proposed Settlement of Late Claim Motions*, dated Aug. 15, 2017 [ECF No. 14053].

28.     As the Court is aware, the following day (August 16), the GUC Trust informed both the Signatory Plaintiffs and the Participating Unitholders that it was abandoning the Settlement following a brief meeting with New GM that occurred on August 15.[14]   In other words, less than a day after New GM received the Settlement documentation, it arranged and held a brief meeting with the GUC Trust.  The Participating Unitholders were initially invited to and then excluded from this meeting, and now stand "confounded as to why [the GUC Trust] suddenly disavowed" the Settlement, which the Participating Unitholders continue to support.[15]

29.     While no new information was apparently discussed in the meeting, New GM somehow convinced the GUC Trust to completely abandon the Settlement and flout its fiduciary duties in the process.  *See, e.g.*, Decl. Ex. T at 16:22-23 and 17:9 (GUC Trust counsel noting the meeting was two hours "at most," apparently consisting in good part of New GM's reciting risks that the GUC Trust concedes it "already knew").

30.     From what the Signatory Plaintiffs understand in this pre-discovery posture and without the benefit of discovery, New GM has offered to pay the GUC Trust's fees and expenses in ongoing litigation against the Plaintiffs.[16]  Further, New GM also apparently agreed to discuss paying a rate of return to the GUC Trust to essentially insure against losses associated with the delay of future distributions.  *See id.*

31.     The proposal, which does not settle any claim or ligation, appears nothing more than a buy-out by New GM of the GUC Trust's exclusive right to settle claims against the Old

---

[14]    *See* Decl. Ex. T at 8:18-21.

[15]    *See Letter Related to Chambers Conference Scheduled for August 17th*, dated Aug. 17, 2017 (ECF No. 14063); Decl. Ex. T at 22:7-9, 25:18-26:5, 23:20-25 ("All of the unitholders we represent will not and do not support the proposed settlement with GM.  So you have to ask the question, what is Wilmington Trust thinking about when they want to go forward with a settlement that has the disapproval of every fiduciary that it represents who's weighed in on the subject?").

[16]    *See Letter Regarding Update on Matters Related to the Late Claims Motions and the Chambers Conference Scheduled for August 17, 2017 at 3:00 p.m.*, dated Aug. 16, 2017 (ECF No. 14060).

GM estate.  Although the Signatory Plaintiffs have not yet had the opportunity, and do not have

the information, to analyze any New GM proposal to the GUC Trust, it appears doubtful that this

proposal is permissible, to say nothing of whether it can even be described as a real compromise

of a dispute or settlement within the ambit of Bankruptcy Rule 9019, even if cloaked as a

"forbearance" agreement.  Rather than alleviating uncertainty, New GM is incentivizing—in fact

*ensuring*—its continuation, as well as additional litigation, such as potential claims of tortious

interference against New GM.

### RELIEF REQUESTED

32.    By this Motion, the Parties respectfully request that this Court enter an order,

substantially in the form attached hereto as **Exhibit A**, enforcing the Settlement Agreement.

### ARGUMENT

33.    The Signatory Plaintiffs seek an order from the Court enforcing the Settlement

under the Court's inherent authority to enforce a settlement in a case pending before it.  *See*

*Meetings & Expositions, Inc. v. Tandy Corp.,* 490 F.2d 714, 717 (2d Cir. 1974); *Shabtai v.*

*Honeywell, Inc.*, No. 94 Civ. 0524 (KMW) (RLE), 1998 WL 823617, at *1 (S.D.N.Y. Nov. 25,

1998).  The Court should exercise this authority to enforce the Settlement and order the GUC

Trust to comply with its terms.  As set forth in further detail below, all of the factors that courts

consider to determine whether a settlement is enforceable under New York law weigh in favor of

enforceability and there is no basis to invalidate the Settlement.

**I.    The Settlement Is Enforceable.**

34.    The enforceability of the Settlement is governed by New York law.  *See* Decl. Ex.

H § 3.16 (providing for application of New York law).[17]  The intent of the parties determines

---

[17]    A small line of cases applies federal common law to the question of settlement enforceability under some
circumstances involving federal claims, typically in federal law civil rights cases.  Those are inapposite and, in any

whether a contract was formed. *See Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d

Cir. 1985). "To discern that intent a court must look to 'the words and deeds [of the parties]

which constitute objective signs in a given set of circumstances.'" *Id.* (quoting *R.G. Group*, *Inc.*

*v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984)); *see also Stonehill Capital Mgmt. LLC v.*

*Bank of the W.*, 28 N.Y.3d 439, 448-49 (N.Y. 2016).

35.    To determine whether a settlement is enforceable, as with other contracts, courts

examine whether "all material terms [are] set forth" and whether there is a "manifestation of

mutual assent" as determined by looking to the totality of the parties' expressed words and

deeds. *See Forcelli v. Gelco Corp.*, 972 N.Y.S.2d 570, 573 (N.Y. App. Div. 2013); *Stonehill*

*Capital Mgmt. LLC*, 28 N.Y.3d at 448-49. To determine whether parties intend to be bound by a

settlement agreement in the absence of an executed document, courts examine additional factors

that include:  (i) whether there has been an express reservation of the right not to be bound in the

absence of a writing; (ii) whether there was partial performance; (iii) whether all of the terms of

the alleged contract have been agreed upon; and (iv) whether the agreement is the type of

contract that is usually committed to writing. *See Winston*, 777 F.2d at 80. No single factor is

decisive. *See Delyanis v. Dyna-Empire, Inc.*, 465 F. Supp. 2d 170, 175 (E.D.N.Y. 2006).

36.    Notably, once a valid settlement is reached, it is binding on all parties, even if one

party changes its mind *before* a written agreement is finalized. *See Oparah v. New York City*

*Dep't of Educ.*, No. 12 CV 8347 (JGK) (SN), 2015 WL 4240733, at *4 (S.D.N.Y. July 10,

---

event, "federal common law and New York State principles governing interpretation and enforcement of settlements
do not appear to differ materially." *Americu Credit Union v. Cumis Ins. Soc'y, Inc.*, Civ. A. No. 6:06-CV-1348
(DEP), 2008 WL 3930122, at *2 n.1 (N.D.N.Y. Aug. 21, 2008) (citing *Ciaramella v. Reader's Digest Ass'n, Inc.*,
131 F.3d 320, 322 (2d Cir. 1997)).

2015); *Powell v. Omnicon*, 497 F.3d 124, 129 (2d Cir. 2007).[18]  Further, under New York law, "[s]tipulations of settlement are judicially favored, will not lightly be set aside, and are to be enforced with rigor and without a searching examination into their substance as long as they are clear, final and the product of mutual accord."  *Forcelli*, 972 N.Y.S.2d at 573 (enforcing out-of-court oral settlement that was later confirmed by an email and noting that emails constitute "writings" and email was subscribed because the attorney's name was on it, rather than an automatic signature) (internal quotation omitted).[19]

37.    Here, the parties manifested an intent to bound, reached agreement on all material terms, and reduced the same to an agreed writing without countervailing, objectively manifested reservations of a right not to be bound.  Accordingly, the Settlement is enforceable.[20]

### A.    The GUC Trust Manifested Acceptance Of The Settlement.

38.    The GUC Trust treated the terms of the Settlement as final and acted in accordance with an agreement to be bound.  The GUC Trust objectively manifested its intent to be bound by, among other things:

- participating in a final walk-through of the Settlement documentation, *see* Decl. ¶ 9;

- circulating a declaration from the GUC Trust stating that "the Settlement is a prudent and reasonable exercise of business judgment because it presents the best option for the GUC Trust to maximize recovery for the benefit of the GUC Trust Beneficiaries while minimizing the substantial risk posed by the Late Claims Motions," Ex. L ¶ 28;

---

[18]    The party seeking to enforce the agreement bears the "burden of demonstrating that the parties had a 'meeting of the minds' as to all material terms of a settlement agreement."  *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006).

[19]    *Forcelli* analyzed enforceability under N.Y. C.P.L.R. 2104, which provides that "[a]n agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered."  Other courts examine the enforceability of settlements without reference to the C.P.L.R., referring to a court's summary power to enforce.  *See, e.g.*, *Meetings & Expositions, Inc.*, 490 F.2d at 714.

[20]    The Court may adjudicate questions of enforceability based only on party declarations.  *See Delyanis*, 465 F. Supp. 2d at 170; *Powell*, 497 F.3d at 129.

- agreeing to a court conference to present the Settlement to this Court, *see* Decl. ¶ 7;

- permitting certain Signatory Plaintiffs to advise Judge Furman in open court in the MDL that an agreement had been reached and previewing certain terms of the Settlement (which certain Signatory Plaintiffs did, without the GUC Trust objecting thereto), *see id.* ¶¶ 8-10;

- stating in an email dated August 12 about the *Execution Version* that "[f]rom the GUC Trust perspective, all of the documents sent over by Howie [Steel] (subject to one item we are discussing with Akin in the Settlement Agreement) are fine," *see id.* ¶ 11; Decl. Ex. E;

- confirming that resolution of this last issue occurred on the morning of August 14, 2017, *see* Decl. ¶ 12;

- allowing the Settlement documentation (including the GUC Trust Declaration in support) to be shared with New GM, stating on August 14, 2017 that "[w]e are waiting for final approval from client, but unlikely to come tonight.  You are, however, authorized to send current versions to New GM this evening," *see id.*; Decl. Ex. F; and

- planning to present the Settlement to this Court three days later, including after it was determined that the hearing was to be in open court rather than chambers.

39.     The only remaining step was to actually sign the final, agreed-to "Execution Version" of the Settlement Agreement.  It is well-settled that "an unsigned contract may be enforceable, provided [that] there is objective evidence establishing that the parties intended to be bound."  *Kowalchuk v. Stroup*, 61 A.D.3d 118, 123-125 (N.Y. App. Div. 2009) (enforcing settlement where e-mails "evidence[d] the existence of a contract" and "the formal written document signed just by defendant would have sufficed to establish the existence of the parties' agreement") (internal quotations omitted).

40.     Here, the Settlement was final, following months of intensive negotiations, and the remaining step of signatures was a mere formality given that the GUC Trust did not indicate that any issues remained.  *See*, *e.g.*, *Gaglia v. Nash*, 778 N.Y.S.2d 595, 596 (N.Y. App. Div. 2004) (enforcing settlement even though defendant's attorney had not countersigned the letter

where the terms of the settlement were set forth and subsequent letters acknowledged the settlement); *Wronka v. GEM Cmty. Mgmt.*, 854 N.Y.S.2d 474, 477 (N.Y. App. Div. 2008) (exchange of correspondence between counsel was sufficient to "constitute [an] enforceable stipulation").

41.    Overall, "[t]he *only* essential prerequisite for a valid settlement agreement is that the parties assent to the terms and conditions of the settlement, and . . . intend to be bound by it." *Delyanis*, 465 F. Supp. 2d at 174.  Nonetheless, the other factors elucidated by the *Winston* court provide additional support for enforcing the Settlement.

### B.    The Parties Reached Agreement On All Material Terms And Conditions.

42.    There is no colorable dispute that the Signatory Plaintiffs and the GUC Trust agreed to all material terms and conditions, and, in fact, even all non-material dotting of i's and crossing of t's.  The Settlement was done.  Thus, this *Winston* factor weighs heavily in favor of enforcing the Agreement.  *See The Guardian Life Ins. Co. of Am. v. Calkins*, No. 12 Civ. 8863 (JGK), 2014 WL 61475, at *2 (S.D.N.Y. Jan. 6, 2014) (holding that this factor weighed in favor of enforcement where the settlement terms had been reduced to writing and "[a]ll that remained to be done was for the parties to sign the documents"); *Conway v. Brooklyn Union Gas Co.*, 236 F. Supp. 2d 241, 251 (E.D.N.Y. 2002) (recommending enforcement of settlement agreement where "there was agreement to each term of the settlement and . . . the parties recognized there were no additional terms remaining to be negotiated").

43.    The material terms entailed Plaintiffs' full release of claims in exchange for the GUC Trust's (i) payment of the $15 million Settlement Amount; (ii) payment of notice costs up to $6 million; and (iii) agreement to support entry of a Claims Estimate Order that would trigger New GM's obligation to issue the maximum amount of Adjustment Shares.

44.     The parties did not reach these material terms lightly or hastily.  For example, during negotiations over the Claims Estimate Order, the Signatory Plaintiffs provided to the GUC Trust extensive expert analyses of claims values and proffers of evidence describing in detail the viability of the asserted claims, including how Old GM violated the due process rights of certain Non-Ignition Switch Plaintiffs.

45.     The negotiations over notice costs involved the retention of a professional notice provider, Cameron R. Azari, Esq., the Director of Legal Notice for Hilsoft Notifications, which is a business unit of Epiq Systems Class Action and Claims Solutions.  *See* Decl. Ex. B.  The parties agreed not only on notice costs, but also on the form and content of both long-form and short-form notices to Plaintiffs, as well as notice to Unitholders.  *See* Decl. Exs. Q-S.

46.     Further, the parties agreed on the material terms of the Settlement as early as August 3, and *all* terms of the Settlement were finally agreed on as of August 12, with execution a mere formality.  *See* Decl. ¶¶ 3, 11-12; *cf. Alvarez v. City of New York*, 146 F. Supp. 2d 327, 336 (S.D.N.Y. 2001) (rejecting the plaintiff's argument that three material terms had not been resolved where plaintiff had agreed to the monetary amount during a conference and did not earlier raise outstanding issues).

47.     Any supposed open discussion points, such as obtaining client signatures, related to performance of the Settlement and have no bearing on the enforceability of the Settlement under recent controlling jurisprudence from the District Court for the Southern District of New York and the New York Court of Appeals.  *See In re Lehman Bros. Holdings Inc.*, No. 17 Civ. 03424 (DLC), 2017 WL 3278933, at *3-4 (S.D.N.Y. Aug. 2, 2017) (holding that agreement was enforceable once agreement on all material terms—a sum of money in exchange for a release—was reached regardless of continued negotiations over the performance of the settlement);

-16-

*Stonehill Capital Mgmt. LLC*, 28 N.Y.3d at 452 (holding that agreement to sell subject to execution of a signed writing and deposit was enforceable because the writing and deposit were "conditions precedent to performance," not "prefatory to the formation of a binding agreement").

### C.    The GUC Trust Did Not Express A Reservation Of A Right Not To Be Bound.

48.    The *Winston* factor of "whether there has been an express reservation of the right not to be bound in the absence of a writing" also supports the Signatory Plaintiffs' argument.  A party must give "forthright, reasonable signals" that "remove[s] any doubt of the parties' intent not to be bound absent a writing."  *Stonehill Capital Mgmt. LLC*, 28 N.Y.3d at 451.  Here, there was a detailed writing and no reservation of rights by the GUC Trust.

49.    The standard language in the Settlement that "[t]his Agreement shall become effective and binding on the Parties on the date on which this Agreement is fully executed by each of the Parties," Decl. Ex. H § 3.1, does not amount to an express reservation of the right not to be bound.  As the *Kowalchuk* court explained:

> [T]he inclusion, in the formal document intended to encompass the terms of an agreement, of the language that "[t]he Agreement is complete and binding upon its execution by all signatories" is simply insufficient to be treated as an explicit reservation that the parties should not be bound by the terms of their agreement until the written agreement is fully executed.

*Kowalchuk*, 61 A.D.3d at 124;[21] *see also In re Lehman Bros. Holdings Inc.*, 2017 WL 3278933, at *3 (holding that language in unexecuted agreement that the agreement "shall become effective upon execution hereof by each of the Parties" did not amount to a reservation of rights not to be bound); *Stonehill Capital Mgmt. LLC*, 28 N.Y.3d at 450-51 (holding that formulaic language that

---

[21] The *Kowalchuk* court further explained that the provision that "'[t]he Agreement is complete and binding upon its execution by all signatories' is not the equivalent of a provision that it is *not* binding *until* it has been so executed." *Id.* at 125.

a sale was "subject to" mutual execution of a sale agreement failed to express an intent not to be bound absent a writing).

50.     The reservation must be expressed in unambiguous, "certain language . . . necessary to remove any doubt of the parties' intent not to be bound absent a writing." *Id.* at 451. Such a certain, unambiguous reservation is absent here; the GUC Trust did not objectively manifest an intent not to be bound in the absence of a fully completed and executed settlement agreement. To reiterate, at no point during the finalization of the Settlement documents did the GUC Trust or its counsel indicate that the GUC Trust's approval of the Settlement would not be final until the Settlement Agreement had been signed. *See* Decl. ¶ 15.

51.     Furthermore, all of the GUC Trust's objectively manifested actions were comprised of taking the steps necessary to effectuate the Settlement that was made. Those steps included: (i) participating in the drafting of a 20-page Settlement Agreement, Settlement Order, Claims Estimate Order, a 30-page motion to approve the Settlement, four supporting declarations from the GUC Trust, a Notice Procedures Motion, notices to Plaintiffs and Unitholders, and a finalized declaration from the notice provider setting forth a comprehensive multi-million-dollar notice plan; (ii) agreeing to a court conference to present the Settlement to this Court; (iii) permitting the Signatory Plaintiffs to preview certain terms of the Settlement in open court in the MDL before Judge Furman; (iv) confirming that all of the Settlement documents were agreed to; and (v) authorizing the Settlement documentation to be sent to New GM. Nor did the GUC Trust object to, or seek to correct, any of the many press reports announcing that a deal had been done.

52.     Thus, rather than reserving its right not to be bound absent execution, the GUC Trust objectively manifested an intent to be bound by the Settlement. Courts look to, *inter alia*,

-18-

emails, statements made before a judge, and reducing the terms of an oral agreement to writing to determine whether a party intends to be bound.  *See Delyanis*, 465 F. Supp. 2d at 170 (attorney's e-mail to mediator and counsel for the counterparty to the settlement was affirmative acceptance of written settlement agreement reached during mediation, and accordingly settlement would be enforced); *Kowalchuk*, 61 A.D.3d at 124 (enforcing settlement where the defendant had reached out to inform the NASD that a settlement had been reached and emails evidenced the settlement); *Guardian Life Ins. Co. of Am. v. Calkins*, 2014 WL 61475, at *2-3 (finding agreement enforceable where there was no indication that issues were left unresolved, the terms were committed to written documents, and the parties had represented to the Magistrate Judge during a settlement conference that they agreed to enter into a written agreement at a future point in time).  As demonstrated *supra* Section I.A, the GUC Trust manifested an intent to be bound.

### D.      There Was Partial Performance.

53.      This *Winston* factor supports enforceability because there was partial performance of the Settlement.  The parties prepared the "Settlement Motion" as required by Section 2.2 of the Settlement Agreement, a motion seeking an order approving proposed notice procedures as required by Section 2.9(a) of the Settlement Agreement, and started the process of securing Court approval by arranging to present the Settlement to this Court.  *See Powell*, 497 F.3d at 130 (holding that there was partial performance of settlement where employer drafted a reference letter as it had agreed to under the settlement with the only remaining detail being whether the letter would describe the former employee's performance as "fully satisfactory" or "exemplary").  This joint action to present the Settlement to this Court and begin the process of obtaining Court approval could not have been taken unless and until the parties had reached agreement upon all of the Settlement terms.

-19-

E.    **The Agreement Was Committed To Writing**.

54.    The last *Winston* factor favors enforceability.  The Settlement was reduced to a detailed and carefully-negotiated *final* writing.  *See In re Lehman Bros. Holdings Inc.*, 2017 WL 3278933, at *4 (enforcing written agreement that was unsigned due to party's own delay); *Conway*, 236 F. Supp. 2d at 251 (holding that this factor weighed in favor of enforcement where "even if the agreement is the type that is typically reduced to writing, the written draft of the settlement had essentially been finalized").  The GUC Trust communicated in writing (at the conclusion of extensive and ongoing e-mail exchanges) that such Execution Version documents were "fine."  *See* Decl. ¶ 11; Decl. Ex. E.  All that was left to accomplish was the ministerial act of obtaining signatures.  This makes this case different and stronger than most instances where enforceability is at issue.  *See, e.g.*, *Galanis v. The Harmonie Club of the City of New York*, No. 1:13-cv-4344-GHW, 2014 WL 4928962, at *6 (S.D.N.Y. Oct. 2, 2014) (observing that arguably the Court could enforce the agreement based solely on the existence of emails agreeing to settlement terms because "[a]greements that address all negotiated terms in an email are generally enforceable in the same manner as more formal written agreement").[22]

55.    Therefore, each and every one of the factors that courts use in a variety of contexts to determine whether a settlement is final, and thus enforceable, under New York law show that this Settlement is enforceable.

F.    **Courts Have Enforced Agreements In Similar Circumstances**.

56.    In *Delyanis*, a mediator drafted a handwritten term sheet that was signed by the mediator, the plaintiff, plaintiff's counsel, and defense counsel.  The term sheet contained the

---

[22]    That the settlement agreement at issue in *Lehman* was "uncomplicated," *see In re Lehman Bros. Holdings Inc.*, 2017 WL 3278933, at *4, is a distinction without a difference given that the terms of the Settlement Agreement here were reduced to a mutually-acceptable, detailed writing, with only the mere formality of obtaining signatures left to be accomplished.

essential terms of an agreement and a statement that "[w]hile not intended to be a legally enforceable settlement agreement, the parties have agreed to resolve the case . . . ." *Delyanis*, 465 F. Supp. 2d at 172. Subsequently, and in response to the mediator's request as to whether he could inform the court of the settlement, the plaintiff's counsel confirmed by email that a settlement had been reached. *Id.* The parties then negotiated the details of a formal settlement agreement and exchanged drafts. *Id.* A written agreement was never finalized because the plaintiff, upon discovering that the settlement sum was taxable, demanded more money and attempted to back out of the deal. *Id.* at 172-73. Although the court found that the term sheet was not enforceable because of the provision specifying that it was not intended to be a legally enforceable contract, the court ruled that plaintiff's counsel's email acknowledging agreement to settle and authorizing the mediator to inform the court represented an affirmative, binding acceptance of the settlement. *Id.* at 174. This objective manifestation of intent, coupled with agreement as to the settlement's essential terms during the mediation, caused the court to enforce the settlement. *Id.* at 175-76. Here, the circumstances are even more compelling because not only did the GUC Trust authorize certain Signatory Plaintiffs to advise Judge Furman that agreement had been reached, but also a detailed written agreement and associated documents had been approved by the parties and finalized.

57.     In *Kowalchuk*, the essential terms of an agreement to settle a securities arbitration proceeding before the National Association of Securities Dealers (NASD) were contained in an email that the plaintiff's counsel sent to the defense. 61 A.D.3d at 119. After a settlement agreement was drafted, the plaintiff requested defense counsel to notify the NASD of the settlement, which he did by fax. *Id.* at 120. The defendant then signed the agreement and forwarded it to the plaintiff for signature. *Id.* Unbeknownst to the parties, the NASD had

already issued its arbitration decision, but had sent it via regular mail. *Id.* After receiving the decision, which awarded plaintiff damages in an amount much lower than the settlement amount, the defendant refused to consummate the settlement. *Id.* at 120-21. The court applied the *Winston* factors and enforced the settlement. *Id.* at 122. It found that the defendant never indicated an intent not to be bound until an agreement was fully executed, and that the defendant had notified the NASD that a settlement had been reached. *Id.* at 124-25. Similar circumstances are at play here: the GUC Trust never indicated an intent not to be bound prior to signing what it agreed was a finalized Settlement Agreement, and the GUC Trust authorized counsel to advise Judge Furman of the Settlement.

58.    In *Lehman Brothers*, while a motion to dismiss was pending, Lehman and Shinhan agreed to settle the litigation—an agreement that was confirmed by an email to both parties. 2017 WL 3278933, at *1. Next, the parties negotiated a written settlement agreement and agreed to an "execution copy" that was then signed by Lehman. *Id.* Shinhan delayed signing, although its counsel confirmed that Shinhan had completed its internal approval process. *Id.* at *2. Before Shinhan signed the agreement, the court entered an order dismissing Lehman's claims, and Shinhan refused to sign. *Id.* Applying the *Winston* factors to Lehman's motion to enforce, Judge Cote affirmed Judge Chapman's decision to enforce the agreement. *Id.* at *2-4. Notwithstanding an absence of partial performance, Shinhan did not express any reservation not to be bound before signing (language in the unexecuted agreement that the agreement "shall become effective upon execution hereof by each of the Parties" did not amount to a reservation of rights not to be bound); the material terms of the settlement were agreed (a sum of money in exchange for a release); and a formal writing was finalized even if it wasn't signed by Shinhan. *Id.* at *3-4. Just like in *Lehman Brothers*, the GUC Trust here indicated approval of an execution

copy of the agreement, even if it had not yet signed that agreement.

59.    And the circumstances here are strikingly similar to those in *Rohm & Haas Elec. Materials*, *LLC v. Honeywell Int'l, Inc.*, in which the court enforced a settlement between sophisticated parties.  C.A. No. 06-297-GMS, 2009 WL 1033651 (D. Del. Apr. 16, 2009).  The parties informed the court on a joint telephone call and by letter that a settlement had been reached; the parties exchanged multiple drafts of that agreement during the negotiation process; and, after plaintiff's counsel sent an email attaching a version referred to as the "final version," defendant's counsel did not object or make any corrections to the "final version."  *See id.* at *1-6.  But before signing, Honeywell learned of proceedings before the U.S. Patent and Trademark Office that affected the claims, and refused to sign.  *Id.* at *3.  The court rejected defendant's argument that the parties were not bound until the formal document was executed, holding that the defendant corporation's counsel "unequivocally agreed to and entered in to a binding agreement to settlement" as reflected by the record.  *See id.* at *5-6 (applying Delaware law that, in this regard, is identical to New York law).[23]    Likewise, the Settlement Agreement is enforceable.

60.    In each of these cases, the court did not permit intervening events—the related patent reexamination in *Honeywell*, the arbitration decision in *Kowalchuk*, the tax realization in *Delyanis*, and the dismissal order in *Lehman Brothers*—to serve as trip wires to abrogate settlements where there was an objectively manifested intent to be bound by an agreement.  The same result should obtain here, notwithstanding the GUC Trust's decision to try and walk away from a final agreement that it believed was a "prudent and reasonable exercise of business

---

[23]    "Under Delaware law a contract 'comes into existence if a reasonable person would conclude, based on the objective manifestations of assent and the surrounding circumstances, that the parties intended to be bound by their agreement on all essential terms.'"  *Id.* at *5 (internal citations omitted).

judgment" and the "best option for the GUC Trust to maximize recovery for the benefit of the GUC Trust Beneficiaries." Decl. Ex. L ¶ 28.[24]

## II.    There Is No Basis To Invalidate The Settlement After-The-Fact.

61.    There is no basis for the GUC Trust to revoke its acceptance of the Settlement. "It is well settled policy of all the courts of the State of New York to encourage agreements of compromise and settlement; therefore a stipulation of settlement will not be set aside absent a showing of such good cause as would invalidate a contract.  Such good cause could include fraud, collusion, mistake, accident, or some other ground of the same nature that would open the door to possible abuse and make litigation interminable." *Lopez v. Podgurski*, 959 N.Y.S.2d 396, 400 (N.Y. Cty. Ct. 2013) (citations omitted).

62.    Notably, a party's revised view of a settlement post-agreement is not a basis to invalidate a settlement contract. *See Powell*, 497 F.3d at 128 (courts will not relieve a party of a settlement they have made a "deliberate, strategic choice" to enter into "simply because his assessment of the consequences was incorrect"); *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595-96 (3d Cir. 2010) (holding that party was bound by settlement even though later changes in the law "could have altered the settlement calculus"); *cf. In re Lehman Bros. Holdings Inc.*, 2017 WL 3278933, at *2, *4 (enforcing settlement agreement after defendant attempted to renege following court's issuance of an order granting the defendant's motion to dismiss).[25]

63.    Even where a trustee receives a better offer prior to obtaining court approval of a settlement under Bankruptcy Rule 9019 (which did not occur here), the trustee must "abide by its

---

[24]    The requirement to obtain court approval of settlements under Bankruptcy Rule 9019 has no bearing on the binding nature of the Settlement. *See Liberty Towers Realty, LLC v. Richmond Liberty, LLC*, 569 B.R. 534, 541-42 (E.D.N.Y. 2017) (holding that settlements "are binding on all parties to the extent allowable under state law" and requirement of court approval provides no mechanism for a debtor to "act on its buyer's remorse").

[25]    *In re Johns-Manville Corp.*, 440 B.R. 604, 613 (Bankr. S.D.N.Y. 2010) (holding that settlement whereby insurer agreed to make payments in exchange for an injunction barring claims against the insurer remained intact despite a ruling that a company with potential claims against the insurer was not bound by the injunction).

obligations under the settlement agreement, including, if necessary, filing a motion for settlement approval." *Liberty Towers Realty, LLC*, 569 B.R. at 542; *see also Providers Benefit Life Ins. Co. v. Tidewater Grp., Inc. (In re Tidewater Grp., Inc.)*, 8 B.R. 930, 933 (Bankr. N.D. Ga. 1981) (upon determining that settlement was enforceable under state law, ordering debtor to execute settlement documents and file an application seeking approval of the settlement).[26]

64.     Here, the GUC Trust has already confirmed that it will be unable to make any colorable argument for invalidation: its counsel did not invoke any mistake or accident or similar excuse, instead acknowledging that at the meeting at which New GM either convinced or had a role in convincing the GUC Trust to back out of the Settlement, New GM and the GUC Trust discussed risks about which the GUC Trust was already aware. *See* Decl. Ex. T at 16:22-23.

65.     Whether the "execution risks" that the GUC Trust suddenly claims to be so problematic are in fact risks at all, and/or whether the risks can be addressed, is beyond the scope of this Motion, but suffice to say for present purposes that the GUC Trust's invocation of perceived risks rings hollow in light of the months of careful negotiation between sophisticated parties. ***There is no way around it:  the Settlement is final and there is no basis to revoke it.***

## CONCLUSION

WHEREFORE, the Signatory Plaintiffs respectfully request that this Court enter an Order, substantially in the form attached hereto as **Exhibit A**, enforcing the Settlement Agreement and granting such other and further relief as the Court deems just and proper.

---

[26] Although post-settlement events may be relevant in connection with Rule 9019 proceedings, courts have denied approval of settlements based on post-settlement events where, unlike here, there was concrete value to the debtor's estate that would be lost if the proposed agreement was approved. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996) (rejecting a settlement of state court lawsuit where, following entry into settlement, the lawsuit resulted in a verdict in favor of the debtors for $150,500); Order, *Aharoni v. Meer (In re Actrade Fin. Techs. Ltd.)*, Nos. 09 Civ. 4479 (RMB), 09 Civ. 4480 (RMB) (S.D.N.Y. Jan. 25, 2010) (rejecting settlement that would release claims against company's former chairman following discovery that he had misappropriated up to $31 million of funds).

Dated: September 11, 2017          Respectfully submitted,
        New York, New York

                                  /s/ Edward S. Weisfelner
                                  Edward S. Weisfelner
                                  Howard S. Steel
                                  BROWN RUDNICK LLP
                                  Seven Times Square
                                  New York, New York 10036
                                  Tel: 212-209-4800
                                  eweisfelner@brownrudnick.com
                                  hsteel@brownrudnick.com

                                  Sander L. Esserman
                                  STUTZMAN, BROMBERG, ESSERMAN &
                                  PLIFKA, A PROFESSIONAL
                                  CORPORATION
                                  2323 Bryan Street, Ste. 2200
                                  Dallas, Texas 75201
                                  Tel: 214-969-4900
                                  esserman@sbep-law.com

                                  *Designated Counsel for the Ignition Switch
                                  Plaintiffs and Certain Non-Ignition Switch
                                  Plaintiffs in the Bankruptcy Court*

                                  Steve W. Berman (admitted *pro hac vice*)
                                  HAGENS BERMAN SOBOL SHAPIRO LLP
                                  1918 Eighth Avenue, Suite 3300
                                  Seattle, WA 98101
                                  Tel: 206-623-7292
                                  steve@hbsslaw.com

                                  Elizabeth J. Cabraser
                                  LIEFF CABRASER HEIMANN &
                                  BERNSTEIN, LLP
                                  275 Battery Street, 29th Floor
                                  San Francisco, California 94111
                                  Tel: 414-956-1000
                                  ecabraser@lchb.com

                                  *Co-Lead Counsel for the Ignition Switch
                                  Plaintiffs and Certain Non-Ignition Switch
                                  Plaintiffs in the MDL Court*

William P. Weintraub
Gregory W. Fox
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: 212-813-8800
wweintraub@goodwinlaw.com
gfox@goodwinlaw.com

*Counsel to Those Certain Pre-Closing
Accident Plaintiffs Represented By Hilliard
Muñoz Gonzales L.L.P. and the Law Offices
of Thomas J. Henry*

Robert Hilliard, Esq.
HILLIARD MUÑOZ GONZALES LLP
719 South Shoreline
Suite 500
Corpus Christi, TX 78401
Tel: 361-882-1612
bobh@hmglawfirm.com

*Counsel to certain Pre-Closing Accident
Plaintiffs*

Thomas J. Henry, Esq.
THE LAW OFFICES OF THOMAS J.
HENRY
4715 Fredricksburg, Suite 507
San Antonio, TX 78229

*Counsel to Certain Pre-Closing Accident
Plaintiffs*

Lisa M. Norman (admitted *pro hac vice*)
T. Joshua Judd (admitted *pro hac vice*)
ANDREWS MYERS, P.C.
1885 St. James Place, 15th Floor
Houston, Texas 77056
Tel: 713-850-4200
Lnorman@andrewsmyers.com
Jjudd@andrewsmyers.com

*Counsel to Certain Pre-Closing Accident
Plaintiffs*

-27-