# EXHIBIT H

**EXECUTION VERSION**

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "**Agreement**"), dated as of August __, 2017 among:

Wilmington Trust Company, solely in its capacity as trustee for and administrator of the Motors Liquidation Company General Unsecured Creditors Trust (the "**GUC Trust**")

-and-

The Signatory Plaintiffs, as hereinafter defined (the Signatory Plaintiffs and the GUC Trust, the "**Parties**").

## PREAMBLE[1]

**Background: The Old GM Bankruptcy.**

A.    Beginning on June 1, 2009 (the "**Petition Date**"), Motors Liquidation Company f/k/a General Motors Corporation, a Delaware Corporation ("**Old GM**"), and certain of its affiliated companies (together with Old GM, the "**Debtors**") commenced cases (the "**Old GM Bankruptcy Case**") under chapter 11 of the Bankruptcy Code;

B.    Also on the Petition Date, Old GM and certain other affiliated entities (collectively, the "**Sellers**") entered into a Master Sale and Purchase Agreement (the "**MSPA**") pursuant to which certain assets of the Sellers, including the brand "General Motors," were to be sold to NGMCO, Inc., n/k/a General Motors LLC, a Delaware corporation ("**New GM**");

C.    As of July 5, 2009, the MSPA, which had been previously amended and restated, was further and finally amended pursuant to a Second Amendment to the Amended and Restated Master Sale Purchase Agreement (the Master Sale and Purchase Agreement, as so amended and restated through the aforesaid Second Amendment, the "**AMSPA**") to, among other things, modify provisions in the AMSPA relating to the issuance by New GM of shares (the "**Adjustment Shares**") of New GM Common Stock in respect of Allowed General Unsecured Claims;

D.    Pursuant to the AMSPA, if the Bankruptcy Court issues an order estimating the aggregate Allowed General Unsecured Claims against the Sellers (the "**Claims Estimate Order**") at an amount exceeding thirty-five billion dollars ($35,000,000,000), then New GM must, within five (5) business days of entry of the Claims Estimate Order, issue the Adjustment Shares;

E.    If the Bankruptcy Court issues a Claims Estimate Order estimating the aggregate Allowed General Unsecured Claims against the Sellers at an amount at or exceeding forty-two

---

[1] Capitalized terms used, but otherwise not defined in the Preamble shall have the meanings ascribed to such terms in the Definitions section of this Agreement.

billion dollars ($42,000,000,000), New GM must issue the maximum amount of Adjustment Shares (30,000,000 shares);

F.      On July 5, 2009, the AMSPA was approved pursuant to a Bankruptcy Code section 363 order (the "**Sale Order**");

G.      Pursuant to the Sale Order, New GM became vested in substantially all of the material assets of the Sellers;

H.      On July 10, 2009 (the "**Closing Date**"), the transactions approved pursuant to the Sale Order were consummated (the "**363 Sale**");

I.      On September 16, 2009, the Bar Date Order was entered establishing November 30, 2009 (the "**Bar Date**") as the deadline to file proofs of claim against the Debtors;

J.      On March 29, 2011, the Bankruptcy Court issued an order (the "**Confirmation Order**") confirming the Debtors' Second Amended Joint Chapter 11 Plan (the "**Plan**");

K.      The Plan created the GUC Trust pursuant to an agreement, as it has been and may be further amended from time to time (the "**GUC Trust Agreement**"), as a post-confirmation successor to Old GM pursuant to Section 1145 of the Bankruptcy Code, to, *inter alia*, administer assets held or to be held by the GUC Trust (the "**GUC Trust Assets**");

L.      Pursuant to the Plan and a side letter (the "**Side Letter**"), attached hereto as Exhibit A, by and between the GUC Trust, the Debtors, New GM, and FTI Consulting (as trust monitor of the GUC Trust) dated September 23, 2011, the GUC Trust is exclusively authorized to seek the issuance of Adjustment Shares for satisfaction of Allowed General Unsecured Claims at any time; provided, however, that it was the GUC Trust's then intention to delay seeking issuance of the Adjustment Shares until such time (if any) that the GUC Trust determined, in its sole and absolute discretion, that the aggregate Allowed General Unsecured Claims were, in the GUC Trust's estimation, likely to exceed $35 billion, at which time the GUC Trust is entitled to seek the issuance of Adjustment Shares;

M.      The Plan, GUC Trust Agreement, and Side Letter provided the GUC Trust with the sole, exclusive right to object to General Unsecured Claims, pursue a Claims Estimate Order, and receive the Adjustment Shares;

N.      On March 31, 2011 (the "**Effective Date**"), the Plan was declared effective;

**The Recalls and the Multi-District Litigation.**

O.      In or around February and March of 2014, New GM issued a recall, NHTSA Recall Number 14V-047, pertaining to 2,191,525 vehicles with an ignition switch defect (the "**Ignition Switch Defect**");

P.      In or around June, July and September of 2014, New GM issued five additional recalls pertaining to over 10 million vehicles with defective ignition switches, NHTSA Recall Numbers 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540;

Q.      In or around March of 2014, New GM issued a recall, NHTSA Recall Number 14V-118, pertaining to approximately 1.2 million vehicles with defective side airbags;

R.      In or around March of 2014, New GM issued a recall, NHTSA Recall Number 14V-153, pertaining to over 1.3 million vehicles with defective power steering;

S.      Commencing after the issuance of the recalls, numerous lawsuits were filed against New GM, individually or on behalf of putative classes of persons, by, *inter alia*,:

a.      plaintiffs asserting economic loss claims who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 (the "**Ignition Switch Plaintiffs**");

b.      plaintiffs asserting economic loss claims who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags, or power steering included in NHTSA Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346, 14V-540, 14V-118 and 14V-153 (the "**Non-Ignition Switch Plaintiffs**"); and

c.      plaintiffs asserting personal injury or wrongful death claims based on or arising from an accident involving an Old GM vehicle that occurred prior to the Closing Date (the "**Pre-Closing Accident Plaintiffs**"), including a subset asserting claims involving an Old GM vehicle with the Ignition Switch Defect (the "**Ignition Switch Pre-Closing Accident Plaintiffs**");

T.      Many of the cases commenced against New GM were consolidated in a multi-district litigation (the "**GM MDL**") pending in the United States District Court for the Southern District of New York before the Hon. Jesse M. Furman (the "**District Court**");

**The Motions to Enforce Litigation.**

U.      In or around April and August of 2014, New GM sought to enjoin such lawsuits against New GM by filing motions to enforce the Sale Order with respect to: (i) Ignition Switch Plaintiffs; (ii) Ignition Switch Pre-Closing Accident Plaintiffs; and (iii) Non-Ignition Switch Plaintiffs (the "**Motions to Enforce**");

V.      Following the filing of the Motions to Enforce, the Bankruptcy Court identified initial issues to be addressed on the Motions to Enforce with respect to the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs;

W.      Following briefing and argument, the Bankruptcy Court issued its decision (the "**Decision**") on April 15, 2015, and a judgment implementing the Decision (the "**Judgment**") on June 1, 2015;

X.    In the Decision and the Judgment, the Bankruptcy Court ruled that "based on the doctrine of equitable mootness, in no event shall assets of the GUC Trust held at any time in the past, now or in the future (collectively, the 'GUC Trust Assets') (as defined in the Plan) be used to satisfy any claims of the Plaintiffs";

Y.    On July 13, 2016, the Second Circuit issued an opinion on direct appeal of the Decision and Judgment, vacating the Bankruptcy Court's equitable mootness ruling as an advisory opinion;

Z.    Following the issuance of the Second Circuit's mandate, the Bankruptcy Court identified initial issues to be addressed on remand, including whether the Pre-Closing Accident Plaintiffs, the Ignition Switch Plaintiffs and/or Non-Ignition Switch Plaintiffs satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust and/or are such claims equitably moot;

AA.    On December 22, 2016, the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs and certain Pre-Closing Accident Plaintiffs filed motions for authority to file late proofs of claim, including late class proofs of claim (the "**Late Claims Motions**");

BB.    On or around February 16, 2017, counsel for the GUC Trust served counsel for the Ignition Switch Plaintiffs and counsel for certain Ignition Switch Pre-Closing Accident Plaintiffs with interrogatories (the "**Late Claims Interrogatories**") in connection with the Late Claims Motions;

CC.    An Ignition Switch Plaintiff and certain Ignition Switch Pre-Closing Accident Plaintiffs have responded to the Late Claims Interrogatories;

DD.    In or around March 2017, additional briefs were filed by Ignition Switch Plaintiffs, certain Ignition Switch Pre-Closing Accident Plaintiffs, New GM, and jointly by the GUC Trust and certain unaffiliated holders of beneficial units of the GUC Trust    (the "**Participating Unitholders**") on the Applicability of *Pioneer* Issue and the Tolling Issue (as those terms are defined in the *Order Establishing, Inter Alia, Briefing Schedule for Certain Issues Arising From Late Claim Motions Filed by Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Certain Ignition Switch Pre-Closing Accident Plaintiffs* [ECF No. 13869]);

EE.    On July 15, 2016 and June 30, 2017, Judge Furman issued opinions in the GM MDL explaining that the "benefit-of-the-bargain defect theory" of economic loss damages "compensates a plaintiff for the fact that he or she overpaid, at the time of sale, for a defective vehicle.  That form of injury has been recognized by many jurisdictions."  See In re General Motors LLC Ignition Switch Litig., 14-MD-2543 (JMF) (S.D.N.Y. June 30, 2017) [ECF Nos. 3119, 4175].

FF.    Counsel for the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs and certain Pre-Closing Accident Plaintiffs have provided counsel for the GUC Trust with expert reports and proffers of evidence indicating that the amount of damages for the Ignition Switch Plaintiffs', certain Non-Ignition Switch Plaintiffs', and certain Pre-Closing Accident Plaintiffs' asserted claims, if ultimately determined to be Allowed General Unsecured Claims against Old

GM and/or the GUC Trust, would be greater than that amount necessary to trigger New GM's obligation to issue the Adjustment Shares in the maximum amount under the AMSPA;

GG.    The Signatory Plaintiffs, on the one hand, and the GUC Trust, on the other hand, disagree regarding whether the proponents of the Late Claims Motions satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust, and whether such asserted claims are equitably moot;

HH.    The Signatory Plaintiffs, on the one hand, and the GUC Trust, on the other hand, disagree regarding whether any GUC Trust Assets currently in the GUC Trust could be used to satisfy Plaintiffs' (as hereinafter defined) asserted claims against the GUC Trust and Old GM;

II.    The Signatory Plaintiffs, on the one hand, and the GUC Trust, on the other hand, disagree regarding whether any GUC Trust Assets previously distributed are subject to claw-back or recapture by the GUC Trust and/or the Plaintiffs to satisfy Plaintiffs' asserted claims against the GUC Trust and Old GM;

JJ.    The Signatory Plaintiffs, on the one hand, and the GUC Trust, on the other hand, disagree regarding the ultimate amount of Allowed General Unsecured Claims of the Plaintiffs;

KK.    The GUC Trust desires to complete the distribution of the GUC Trust Assets held by the GUC Trust as soon as practicable and, to such purpose, desires to resolve the Late Claims Motions and the Plaintiffs' asserted claims against the GUC Trust and Old GM;

LL.    The GUC Trust acknowledges the key objectives of the Signatory Plaintiffs in entering into this Agreement are to (i) achieve the funding of the Settlement Fund; (ii) avoid the risk, delay, uncertainty and costs of litigation with the GUC Trust; and (iii) take or to cause to be taken all steps necessary to require New GM to issue the maximum amount of Adjustment Shares and to make the value of the Settlement Fund and the Adjustment Shares available to satisfy, in part, the Plaintiffs' claims.  In connection with those objectives, the GUC Trust, based upon its review of the expert report and proffer of evidence provided by Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs and the expert report and proffer of evidence  provided by certain Pre-Closing Accident Plaintiffs, agrees to provide the cooperation and assistance provided for herein relating to the issuance of a Claims Estimate Order, as provided for pursuant to Section 3.2(c) of the AMSPA and the Side Letter, and to seek to estimate for allowance purposes, and not dispute the amount of estimated claims thereunder;

MM.    The Signatory Plaintiffs acknowledge the key objectives of the GUC Trust in entering into this Agreement are: (i) to minimize any delay in the distribution of any remaining GUC Trust Assets; (ii) avoid any claw-back or recapture of prior distributions of GUC Trust Assets; and (iii) otherwise avoid the risk, delay, uncertainty and costs of litigation.

### **AGREEMENT**

The GUC Trust and the Signatory Plaintiffs propose to resolve their dispute as follows:

**1.    DEFINITIONS.**  The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

**1.1**    **Adjustment Shares** shall have the meaning ascribed to such term in the Preamble.

**1.2**    **Adjustment Shares Waiver Provision** shall have the meaning ascribed to such term in Section 2.3 hereto.

**1.3**    **Allowed General Unsecured Claims** means General Unsecured Claims against the Debtors that have been allowed through the date of entry of the Claims Estimate Order, including, to the extent such order is entered by the Bankruptcy Court, the claims in the Claims Estimate Order.

**1.4**    **AMPSA** shall have the meaning ascribed to such term in the Preamble.

**1.5**    **Bar Date Order** means that *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim (Including Claims Under Bankruptcy Code Section 503(B)(9)) and Procedures Relating Thereto and Approving the Form and Manner of Notice Thereof*, dated Sept. 16, 2009 [ECF No. 4079] entered by the Bankruptcy Court establishing the Bar Date.

**1.6**    **Bar Date** shall have the meaning ascribed to such term in the Preamble.

**1.7**    **Bankruptcy Code** means title 11 of the United States Code.

**1.8**    **Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of New York and shall have the meaning ascribed to such term in the Preamble.

**1.9**    **Claims Estimate Order** shall mean an order of the Bankruptcy Court estimating the aggregate Allowed General Unsecured Claims against the Sellers, inclusive of the claims of the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, and certain Pre-Closing Accident Plaintiffs, entered pursuant to Section 3.2(c) of the AMSPA.

**1.10**    **Closing Date** shall have the meaning ascribed to such term in the Preamble.

**1.11**    **Co-Lead Counsel** means, for purposes of this Agreement, Steve W. Berman of Hagens Berman Sobol Shapiro LLP and Elizabeth Cabraser of Lieff, Cabraser, Heimann & Bernstein, LLP, who were individually and collectively appointed to represent all economic loss plaintiffs in the GM MDL by Order No. 8, In re Gen. Motors LLC Ignition Switch Litig., No. 14-MD-2543 (S.D.N.Y. Aug. 15, 2014) [ECF No. 249], or any other or replacement counsel appointed to represent any Ignition Switch or Non-Ignition Switch Plaintiffs in the GM MDL.

**1.12**    **Communication** shall have the meaning ascribed to such term in Section 3.15.

**1.13**    **Confirmation Order** shall have the meaning ascribed to such term in the Preamble.

**1.14**    **Debtors** shall have the meaning ascribed to such term in the Preamble.

6

**1.15**    **Decision** means *Decision on Motion to Enforce Sale Order*, entered April 15, 2015 [ECF No. 13109] by Judge Robert E. Gerber in the Bankruptcy Court, published as In re Motors Liquidation Company, 529 B.R. 510 (Bankr. S.D.N.Y. 2015), as corrected in *Errata Order RE: Decision on Motion to Enforce Sale Order*, In re Motors Liquidation Co., No. 09-50026, dated July 13, 2015 [ECF No. 13290].

**1.16**    **District Court** shall have the meaning ascribed to such term in the Preamble.

**1.17**    **Effective Date** shall have the meaning ascribed to such term in the Preamble.

**1.18**    **Final Order** has the meaning ascribed to it in the Plan.

**1.19**    **General Unsecured Claim** has the meaning ascribed to it in the Plan.

**1.20**    **GM MDL** shall have the meaning ascribed to such term in the Preamble.

**1.21**    **GUC Trust** means the trust created by the GUC Trust Agreement in the form approved as Exhibit D to the Plan, as the same has been and may further be amended from time to time.

**1.22**    **GUC Trust Agreement** means the *Second Amended and Restated Motors Liquidation Company GUC Trust Agreement*, by and among Wilmington Trust Company, as trust administrator and trustee of the GUC Trust, and FTI Consulting, as trust monitor of the GUC Trust, dated July 30, 2015, as it may be amended from time to time.

**1.23**    **GUC Trust Assets** means assets that have been held, are held, or may be held in the future by the GUC Trust.  Solely in the event that the Bankruptcy Court enters the Claims Estimate Order, the term "GUC Trust Assets" as used herein shall be deemed to exclude the Adjustment Shares.

**1.24**    **GUC Waiver Provision** shall have the meaning ascribed to such term in Section 2.3 hereto.

**1.25**    **Ignition Switch Defect** shall have the meaning ascribed to such term in the Preamble.

**1.26**    **Ignition Switch Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.27**    **Ignition Switch Pre-Closing Accident Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.28**    **Judgment** means the Judgment, entered June 1, 2015 [ECF No. 13177] by Judge Robert E. Gerber in the Old GM Bankruptcy Case.

**1.29**    **Key Objectives** means the objectives of the Parties in entering into this Agreement as stated in Paragraphs LL and MM of the Preamble.

**1.30    Late Claims Motions** shall have the meaning ascribed to such term in the Preamble.

**1.31    Motions to Enforce** means, collectively, the (i) *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, dated April 21, 2014 [ECF No. 12620]; (ii) *Motion of General Motors LLC Pursuant to 11 U.S.C §§ 105 and 363 to Enforce this Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits*, dated August 1, 2014 [ECF No. 12807]; and (iii) *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)*, dated August 1, 2014 [ECF No. 12808].

**1.32    New GM** means General Motors LLC (F/K/A NGMCO, Inc.).

**1.33    New GM Common Stock** means the common stock of New GM (NYSE: GM).

**1.34    NHTSA** means the National Highway Traffic Safety Administration.

**1.35    Non-Ignition Switch Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.36    Notice Cost Cap Amount** shall have the meaning ascribed to such term in Section 2.9.

**1.37    Notice Order** shall have the meaning ascribed to such term in Section 2.9.

**1.38    Old GM** means Motors Liquidation Company, formerly known as General Motors Corporation.

**1.39    Old GM Bankruptcy Case** means those proceedings commenced on June 1, 2009 in the Bankruptcy Court captioned *In re Motors Liquidation Company, et al., f/k/a General Motors Corp.*, Bankr. No. 09-50026.

**1.40    Outside Date** shall have the meaning ascribed to such term in Section 3.2.

**1.41    Parties** means the Signatory Plaintiffs and the GUC Trust.

**1.42    PIWD** means claims for personal injury and wrongful death.

**1.43    PIWD Counsel** means (i) Robert C. Hilliard of Hilliard Muñoz Gonzalez, LLP and Thomas J. Henry of the Law Offices of Thomas J. Henry, but solely for the Pre-Closing Accident Plaintiffs represented by those two law firms; and (ii) Lisa M. Norman of Andrews Myers, P.C., but solely for the Pre-Closing Accident Plaintiffs represented by that law firm.

**1.44    PIWD Plaintiffs** means those certain Ignition Switch Pre-Closing Accident Plaintiffs represented by PIWD Counsel.

**1.45** **Plaintiffs** means the Ignition Switch Plaintiffs, the Non-Ignition Switch Plaintiffs, and the Pre-Closing Accident Plaintiffs, including all plaintiffs (whether named or unnamed, including unnamed members of a putative class) covered by any of the Late Claims Motions, all plaintiffs represented by counsel that is signatory hereto and any other party who, (i) as of July 10, 2009, suffered an economic loss claim by reason of their ownership or lease of an Old GM vehicle with an ignition switch defect included in Recall No. 14V-047; (ii) as of July 10, 2009 suffered an economic loss claim by reason of their ownership or lease of an Old GM vehicle with defects in ignition switches, side airbags, or power steering included in NHTSA Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346, 14V-540, 14V-118 and 14V-153, and/or (iii) suffered a personal injury or wrongful death based on or arising from an accident involving an Old GM vehicle that occurred prior to the Closing Date; it being understood however that the covenants and agreements to be performed by the Signatory Plaintiffs are to be performed by Co-Lead Counsel and PIWD Counsel and that no action or failure to act by any Plaintiff (other than the Signatory Plaintiffs) shall constitute a breach of this Agreement or shall excuse the performance of any other Party.

**1.46** **Plan** means Debtors' Second Amended Joint Chapter 11 Plan, filed March 18, 2011 [ECF No. 9836] by Motors Liquidation Company in the Bankruptcy Proceeding.

**1.47** **Pre-Closing** means any time before July 10, 2009, the date on which the 363 Sale between Sellers and New GM closed.

**1.48** **Pre-Closing Accident Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.49** **Recalls** means NHTSA Recall Numbers 14V-047, 14V-355, 14V-394, 14V-400, 14V-346, 14V-540, 14V-118 and 14V-153.

**1.50** **Sale Order** means the *Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief*, dated July 5, 2009 [ECF No. 2968] and the supporting *Decision on Debtors' Motion for Approval of (1) Sale of Assets to Vehicle Acquisition Holdings, LLC; (2) Assumption and Assignment of Related Executory Contracts; and (3) Entry into UAW Retiree Settlement Agreement*, dated July 5, 2009 [ECF No. 2967].

**1.51** **Sellers** means Motors Liquidation Company, formerly known as General Motors Corporation, together with three of its debtor subsidiaries, Chevrolet-Saturn of Harlem, Inc.; Saturn, LLC; and Saturn Distribution Corporation.

**1.52** **Settlement** means the settlement of the Parties' disputes as provided for by this Agreement.

**1.53** **Settlement Amount** shall have the meaning ascribed to such term in Section 2.3 hereto.

**1.54** **Settlement Effective Date** shall have the meaning ascribed to such term in Section 3.1 hereto.

**1.55**    **Settlement Fund** shall have the meaning ascribed to such term in Section 2.3 hereto.

**1.56**    **Settlement Motion** shall have the meaning ascribed to such term in Section 2.2 hereto.

**1.57**    **Settlement Order** shall have the meaning ascribed to such term in Section 2.2.

**1.58**    **Signatory Plaintiffs** means PIWD Counsel on behalf of the PIWD Plaintiffs, and Co-Lead Counsel on behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs.

**1.59**    **Term Loan Avoidance Action** shall mean the action captioned *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. et al.*, Adv. Pro. No. 09-00504 (Bankr. S.D.N.Y. July 31, 2009).

**1.60**    **Term Loan Avoidance Action Claims** shall have the meaning ascribed to such term in the GUC Trust Agreement.

**1.61**    **Waiver** shall have the meaning ascribed to such term in Section 2.3.

**1.62**    **Waiver Provision** shall have the meaning ascribed to such term in Section 2.3.

**2.**    **MUTUAL AGREEMENTS OF THE PARTIES.**

**2.1**    The Preamble constitutes an essential part of the Agreement and is incorporated herein.

**2.2**    As soon as practicable following the execution of this Agreement, the Parties shall prepare and file a motion in the Bankruptcy Court (the "**Settlement Motion**") seeking entry of (i) an order (the "**Settlement Order**") substantially in the form of Exhibit B attached hereto, and otherwise on terms acceptable to the GUC Trust, Co-Lead Counsel and PIWD Counsel, each in their sole and absolute discretion, approving the Settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, and (ii) a Claims Estimate Order substantially in the form of Exhibit C attached hereto, and otherwise on terms acceptable to the GUC Trust, Co-Lead Counsel and PIWD Counsel, each in their sole and absolute discretion.

**2.3**    In furtherance of the Key Objectives and as an inducement to the GUC Trust's entry into this Agreement and willingness to be bound by the terms of the Settlement Order and the Claims Estimate Order, provided notice has been given in a form and manner approved by the Bankruptcy Court, the Signatory Plaintiffs agree that they shall support the entry of a Settlement Order that:

(a)    directs the GUC Trust to, within five (5) business days of the Settlement Effective Date, irrevocably pay fifteen million dollars ($15,000,000) in cash (the "**Settlement Amount**") to a trust, fund or other vehicle (the "**Settlement Fund**") established and designated by the Signatory Plaintiffs (for purposes of administration of Plaintiffs' claims reconciliation and/or distributions to Plaintiffs under a subsequent allocation

methodology); provided that, in the event the Signatory Plaintiffs have not designated such Settlement Fund within two (2) business days following the Settlement Effective Date, the GUC Trust shall place the Settlement Amount into an third party escrow account established by the GUC Trust;

(b)      contains a provision which, effective upon (i) the Settlement Order becoming a Final Order (unless the GUC Trust waives the requirement that the Settlement Order be a Final Order in accordance with Section 3.1 hereof) and (ii) payment of the Settlement Amount, imposes a complete and irrevocable waiver and release on the part of all Plaintiffs with respect to any and all rights, claims and causes of action (including but not limited to any claims and causes of action with respect to Allowed General Unsecured Claims of the Plaintiffs arising under, or that may arise under, the Claims Estimate Order), now existing or arising in the future, that any Plaintiff might directly or indirectly assert against the Debtors, their estates, the GUC Trust, the trust administrator of the GUC Trust, the GUC Trust Assets, the Motors Liquidation Company Avoidance Action Trust and the holders of beneficial units in the GUC Trust, and channels all such claims or potential claims to the Settlement Fund for administration and satisfaction (the "**Waiver Provision**," and the waiver and release contemplated thereby, the "**Waiver**");

(c)      contains a provision which, effective upon (i) the Settlement Order becoming a Final Order (unless the GUC Trust waives the requirement that the Settlement Order be a Final Order in accordance with Section 3.1 hereof) and (ii) payment of the Settlement Amount, imposes a complete and irrevocable waiver and release on the part of all holders of units of beneficial interest in the GUC Trust, all defendants in the Term Loan Avoidance Action, and holders of Allowed General Unsecured Claims, other than the Plaintiffs, with respect to any rights to the Settlement Fund, including the Settlement Amount (the "**GUC Waiver Provision**"); and

(d)      contains a provision which, effective upon (i) the Settlement Order becoming a Final Order (unless the GUC Trust waives the requirement that the Settlement Order be a Final Order in accordance with Section 3.1 hereof), (ii) payment of the Settlement Amount, and (iii) entry of the Claims Estimate Order by the Bankruptcy Court, imposes a complete and irrevocable waiver and release on the part of the GUC Trust, all holders of units of beneficial interest in the GUC Trust, all defendants in the Term Loan Avoidance Action, and all holders of Allowed General Unsecured Claims, other than the Plaintiffs, with respect to any rights to any Adjustment Shares (the "**Adjustment Shares Waiver Provision**").

**2.4**      In furtherance of the Key Objectives and as an inducement to the Signatory Plaintiffs' entry into this Agreement and willingness to be bound by the terms of Settlement Order, including but not limited to the Waiver Provision, the GUC Trust, based upon its review of the expert report and proffer of evidence provided by Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs, and the expert report and proffer of evidence provided by the PIWD Plaintiffs, agrees that it shall support the entry of a Claims Estimate Order that:

(a)     estimates the aggregate Allowed General Unsecured Claims (inclusive of the claims of the Plaintiffs, but excluding Term Loan Avoidance Action Claims) against the Sellers and/or the GUC Trust pursuant to Section 7.3 of the Plan, Section 3.2(c) of the AMSPA and the Side Letter in an amount that, as of the date of the Claims Estimate Order, equals or exceeds $42 billion, thus triggering the issuance of the maximum amount of Adjustment Shares; and

(b)     directs that any such Adjustment Shares issued as a result of a Claims Estimate Order, or the value of such Adjustment Shares, be promptly delivered by New GM to the Settlement Fund.

**2.5**     Following the Settlement Order becoming a Final Order (unless the GUC Trust waives the requirement that the Settlement Order be a Final Order in accordance with Section 3.1 hereof), contemporaneously with the payment of the Settlement Amount by the GUC Trust to the Settlement Fund, the Waiver Provision shall become immediately and automatically effective and binding on all Plaintiffs, and the GUC Waiver Provision shall become immediately and automatically effective and binding on the GUC Trust, all holders of units of beneficial interest in the GUC Trust, all defendants in the Term Loan Avoidance Action, and holders of Allowed General Unsecured Claims, other than the Plaintiffs.

**2.6**     Provided that the Settlement Order has become a Final Order (unless the GUC Trust waives the requirement that the Settlement Order be a Final Order in accordance with Section 3.1 hereof), then, contemporaneously upon the entry of the Claims Estimate Order (i) the Adjustment Shares Waiver Provision shall become immediately and automatically effective and binding on the GUC Trust, all holders of units of beneficial interest in the GUC Trust, all defendants in the Term Loan Avoidance Action, and holders of Allowed General Unsecured Claims, other than the Plaintiffs, and (ii) the GUC Trust shall be prohibited from, at any time, objecting to the allowance of the estimated claims at the amount set forth in the Claims Estimate Order.

**2.7**     The Parties shall use commercially reasonable efforts to have the Claims Estimate Order entered on the same date as the Settlement Order, provided that, (i) regardless of whether or not the Claims Estimate Order is entered on or after such date (and regardless of whether the request to enter the Claims Estimate Order is approved or denied), this Agreement (including, but not limited to Sections 2.2, 2.3(a), 2.3(b), 2.3(c), and 2.5 hereof) and the Settlement Order shall remain binding upon the Parties; (ii) the Settlement Amount shall not be returned to the GUC Trust under any circumstances; and (iii) the GUC Trust shall not be required to incur costs (other than the costs of notice as set forth in Paragraph 2.9 hereof) in excess of a reasonable amount in connection with prosecuting the Settlement Motion with respect to the Claims Estimate Order, or any appeals thereof.

**2.8**     Notwithstanding Sections 157(b)(2)(B) and (b)(2)(O) of Title 28, in connection with the Settlement Motion, to the extent (if any) consent is required, the Pre-Closing Accident Plaintiffs represented by PIWD Counsel consent to the Bankruptcy Court estimating their personal injury and wrongful death claims against the Sellers and/or the GUC Trust for purposes of determining whether the Allowed General Unsecured Claims in the aggregate exceed thirty-five billion dollars ($35,000,000,000). The Pre-Closing Accident Plaintiffs represented by

PIWD Counsel do not consent to estimation of their personal injury and wrongful death claims by the Bankruptcy Court for any other purpose or in connection with any other proceeding. If further adjudication of their personal injury and wrongful death claims is necessary notwithstanding entry of the Claims Estimate Order, the Pre-Closing Accident Plaintiffs represented by PIWD Counsel expressly reserve their rights to have their claims tried (pursuant to Section 157(b)(5) of Title 28) or estimated in the district court in which Old GM's bankruptcy case is pending, or in the district court in which the claim arose, as determined by the district court in which Old GM's bankruptcy case is pending.

### 2.9  Notice.

(a)    The Parties shall be responsible for providing notice in connection with the Settlement Motion in accordance with notice procedures approved by an order of the Bankruptcy Court. Based on notice plan proposals from leading notice administrators, the Parties have budgeted and the GUC Trust agrees to pay the reasonable costs and expenses for notice of the Settlement Motion in an amount up to $6,000,000 (the "**Notice Cost Cap Amount**"). As soon as practicable following the execution of this Agreement, the Parties shall seek an order (the "**Notice Order**") of the Bankruptcy Court approving the proposed notice procedures for notice of the Settlement Motion. The requested notice procedures shall include (i) publication notice by multimedia channels that may include social media, e-mail, online car and consumer publications, and a settlement website (which, for the avoidance of doubt, may be the GUC Trust's website at www.mlcguctrust.com) posting all relevant documents and long-form notice; (ii) notice by postcard to: (A) all persons in the United States who, as of July 10, 2009, owned or leased a vehicle manufactured by Old GM included in the Recalls; (B) all Pre-Closing Accident Plaintiffs who have filed a lawsuit against New GM as of the date of this Agreement; and (C) all Pre-Closing Accident Plaintiffs who have filed or joined a motion for authorization to file late claims against the GUC Trust; (iii) notice to all defendants in the Term Loan Avoidance Action via the Bankruptcy Court's ECF system and, to the extent a defendant is not registered to receive notice via the ECF system, via postcard, and (iv) notice via DTC's LENSNOTICE system to holders of beneficial units of the GUC Trust. The Signatory Plaintiffs agree to pay any amounts in excess of the Notice Cost Cap Amount.

(b)    Allocation of the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund between the Plaintiffs asserting economic loss claims and the Plaintiffs asserting PIWD claims shall be determined and approved by the District Court. Notice of any agreement as to the proposed allocation of the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund as between the group of Plaintiffs asserting claims for economic loss, on the one hand, and the group of Plaintiffs asserting claims for personal injury and wrongful death, on the other hand, along with information about the hearing date and how and when to assert any objections, will be provided by, and at the sole cost of, Signatory Plaintiffs (and not the GUC Trust) via a settlement website to all known Plaintiffs whose rights might be affected by such allocation and such Plaintiffs shall have an opportunity to object to the proposed allocation at a hearing, as when and if such agreement is reached.

(c)    Approval of the qualifications and criteria for Plaintiffs to be eligible to receive distributions from the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund shall be done by the Bankruptcy Court.  Notice of any proposed criteria for determining the right or ability of each Plaintiff to receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund on account of a claim against Old GM based upon economic loss or for personal injury or wrongful death arising or occurring before the Bar Date, along with information about the hearing date and how and when to assert any objections, will be provided by, and at the sole cost of, Signatory Plaintiffs (and not the GUC Trust) via a settlement website to all known Plaintiffs whose rights might be affected by the establishment of criteria for the payment of such claims and such Plaintiffs shall have an opportunity to object to the proposed criteria at a hearing, as when and if such criteria is developed.  Being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), or any other consideration contained in the Settlement Fund.

**2.10**    The Parties agree that all of the value of the Settlement Fund shall be reserved for the exclusive benefit of the Plaintiffs, subject only to costs associated with the administration of the Settlement Fund.  For the avoidance of doubt, the GUC Trust, any holders of beneficial units of the GUC Trust, defendants in the Term Loan Avoidance Action, or holders of Allowed General Unsecured Claims, other than the Plaintiffs (i) shall have no rights or entitlements with respect to the Settlement Fund (including, when and if deposited, the Adjustment Shares or the value thereof) or the funds therein, and (ii) solely to the extent that the Settlement Order has become a Final Order (or the requirement that the Settlement Order be a Final Order has been waived by the GUC Trust in accordance with Section 3.1 hereof) and the Claims Estimate Order is entered by the Bankruptcy Court, shall have no rights or entitlements to the Adjustment Shares issued pursuant to the Claims Estimate Order, or to the value of such Adjustment Shares.

**2.11**    The Signatory Plaintiffs or, in the alternative, an administrator appointed by the Signatory Plaintiffs, shall establish the Settlement Fund (at the sole cost of the Signatory Plaintiffs) and the procedures for the administration and allocation to Plaintiffs of the Settlement Fund, including the criteria for Plaintiffs to assert a claim against the Settlement Fund on account of an Allowed General Unsecured Claim, methodology for allocating the Settlement Fund to Plaintiffs, and procedures for payment of Plaintiffs' attorneys' fees.

**2.12**    Nothing in the Settlement Agreement is intended to waive any claims against New GM or to be an election of remedies against New GM; nor does the Settlement Agreement or any payments made in connection therewith represent full satisfaction of any claims against Old GM,  unless and until such claims are in fact paid in full from every available source; provided, however, that in no event shall any Plaintiff be permitted to seek any further payment or compensation from the GUC Trust in respect of their claims or otherwise, other than the Settlement Amount and the Adjustment Shares.  Except as mandated otherwise under applicable law, nothing in the Settlement Agreement shall waive any claims that any Plaintiff may have against New GM or constitute an election of remedies by any Plaintiff, and neither the Settlement Amount nor the Adjustment Shares (nor any distribution thereof to any Plaintiff) shall represent full and final satisfaction of any claim that any Plaintiff may have against New GM, all

of which are expressly reserved. The Bankruptcy Court's estimate of the aggregate Allowed General Unsecured Claims in the Claims Estimate Order shall not operate as a cap on any of the claims of any of the Plaintiffs against New GM.

**3.    MISCELLANEOUS PROVISIONS
APPLICABLE TO THIS AGREEMENT.**

**3.1    Settlement Effective Date.**  This Agreement shall become effective and binding on the Parties on the date on which this Agreement is fully executed by each of the Parties.  The Settlement set forth in this agreement (including but not limited to the required payment of the Settlement Amount, the delivery of the Waiver as set forth herein, the GUC Waiver Provision, and to the extent provided in section 2.3(d) hereof, the Adjustment Shares Waiver Provision) shall become effective on the date that the Settlement Order becomes a Final Order (the "**Settlement Effective Date**"), provided, however, that from and after the date the Settlement Order is entered by the Bankruptcy Court, the GUC Trust may waive the requirement that the Settlement Order be a Final Order.

**3.2    Termination.**

(A) <u>Automatic Termination.</u>  This Agreement shall immediately terminate as to all Parties in the event that the Bankruptcy Court denies approval of the Notice Order (or enters a Notice Order different from that set forth in Section 2.9 hereof that is not otherwise reasonably acceptable to the Parties) or denies approval of the Settlement Motion as it relates to the Settlement Order (for the avoidance of doubt, this Agreement shall not immediately terminate if the Bankruptcy Court denies approval of the Settlement Motion solely as it relates to the Claims Estimate Order).  In the event of such automatic termination, this Agreement shall be null and void, and each of the Parties' respective interests, rights, remedies and defenses shall be fully restored without prejudice as if this Agreement (except as set forth in Sections 3.3, 3.4, 3.5, 3.13, 3.15, and 3.19) had never existed and the Parties shall be returned to their respective positions status quo ante.

(B) <u>Termination by the GUC Trust.</u>  This Agreement shall be terminable at the option of the GUC Trust in the event that (a) the Notice Order is not entered on or before 30 days after execution of this Settlement Agreement, or (b) the Settlement Effective Date does not occur on or before 60 days after notice of the Settlement Motion has been provided pursuant to Section 2.9 hereto and the Notice Order (each of (a) and (b) the "**Outside Date**").  Following the passage of the Outside Date, the GUC Trust shall be entitled to send a notice of termination to the Signatory Plaintiffs in accordance with Section 3.15 hereof, with the Agreement automatically terminating on the date that such notice is received by the Signatory Plaintiffs.  In the event of such termination, this Agreement shall be null and void, and each of the Parties' respective interests, rights, remedies and defenses shall be fully restored without prejudice as if this Agreement (except as set forth in Sections 3.3, 3.4, 3.5, 3.13, 3.15, and 3.19) had never existed and the Parties shall be returned to their respective positions status quo ante.

(C) <u>Termination by Any Party for Cause.</u>  In the event of any material breach of the terms of this Agreement, the non-breaching Party may elect (in addition to any other remedies available to the non-breaching party hereunder or under applicable law) to terminate this Agreement by (i) providing a Communication to the breaching party as set forth in Section 3.15 below, and affording the breaching party a five (5) business day period in which to cure the purported breach, and (ii) absent such cure or the commencement of an action in the Bankruptcy Court with respect to the existence of any such breach, by providing a follow-up Communication to the breaching Party as set forth in Section 3.15 below, that declares the Agreement to be terminated.  Following such termination for cause, the terms of the Agreement shall no longer be binding on the non-breaching Party (except as set forth in Sections 3.3, 3.4, 3.5, 3.13, 3.15, and 3.19).

**3.3    Attorneys' Fees.**  Except as otherwise provided for herein, each of the Parties shall pay its own court costs, attorneys' fees, and all other expenses, costs, and fees incurred relating to this Agreement and any related litigation, including but not limited to the GM MDL and Motions to Enforce litigation.  If any lawsuit or proceeding is required to enforce the terms of this Agreement, the prevailing party in any such lawsuit or proceeding shall be entitled to reasonable attorney's fees and costs.

**3.4    No Admission.**  Nothing in this Agreement shall be deemed an admission of any kind.  To the extent provided by Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than in support of the Settlement Motion and proposed entry of the Settlement Order and Claims Estimate Order or in a proceeding to enforce the terms of this Agreement.

**3.5    Remedies.**  Each of the Parties retain all remedies available in law or equity for breach of this Agreement by any Party, including, without limitation, the right of a non-breaching Party to seek specific performance and injunctive or other equitable relief as a remedy for any such breach.

**3.6    No Litigation.**  Except as may be necessary to enforce the terms of this Agreement, the Parties and any other person who is an intended beneficiary hereunder, agree that she or he shall not commence or proceed with any action, claim, suit, proceeding or litigation against any other Party, directly or indirectly, regarding or relating to the matters described in this Agreement, or take any action inconsistent with the terms of the Agreement.

**3.7    Further Assurances.**  Each of the Parties covenant to, from time to time, execute and deliver such further documents and instruments and take such other actions as may be reasonably required or appropriate to evidence, effectuate, or carry out the intent and purposes of this Agreement or to perform its obligations under this Agreement and the transactions contemplated thereby.

**3.8    Cooperation.**  The Parties agree to reasonably cooperate with one another to effectuate an efficient and equitable implementation of this Agreement.

**3.9    Counterparts; Facsimile; Signatures.**  This Agreement may be executed in any number of counterparts and by different Parties to this Agreement on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement.  Any signature delivered by any of the Parties by facsimile or electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement, shall be deemed to be an original signature hereto, and shall be admissible as such in any legal proceeding to enforce this Agreement.

**3.10    Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective agents, partners, attorneys, employees, representatives, officers, directors, shareholders, divisions, subsidiaries, affiliates, transferees, heirs, executors, administrators, personal representatives, legal representatives, successors, and assigns, consistent with the other provisions of this Agreement.

**3.11    Integration.**  This Agreement constitutes the entire agreement and understanding among the Parties hereto relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements, representations and understandings between or among any of the Parties hereto relating to such subject matter.  In entering into this Agreement, the Parties and each of them acknowledge that they are not relying on any statement, representation, warranty, covenant or agreement of any kind made by any other party hereto or any employee or agent of any other party hereto, except for the representations, warranties, covenants and agreements of the Parties expressly set forth herein.

**3.12    Amendment.**  Except as otherwise specifically provided in this Agreement, no amendment, modification, rescission, waiver or release of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Parties.

**3.13    Interpretation.**  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, and the Parties agree to take any and all steps which are necessary in order to enforce the provisions hereof.

**3.14    Severability.**  The terms and conditions of this Agreement are not severable. However, if any provision or part of any provision of this Agreement is for any reason declared or determined by a court to be invalid, unenforceable, or contrary to public policy, law, statute, or ordinance, the validity of the remaining parts, terms, or provisions of this Agreement shall not be affected thereby and shall remain valid and fully enforceable, and such invalid, unenforceable, or illegal part or provision shall not be deemed to be part of this Agreement.

**3.15    Notices.**  Any notice, demand, request, consent, approval, declaration or other communication (a "**Communication**") under this Agreement shall be in writing and shall be given or delivered (i) by a nationally recognized private overnight courier service addressed as indicated in Schedule 1 annexed hereto or to such other address as such party may indicate by a notice delivered to the other Parties hereto in accordance with the provisions hereof; or (ii) to the extent that such Communication has been filed with the Bankruptcy Court, via the electronic distribution means used by the Bankruptcy Court.  Any Communication shall be deemed to have been effectively delivered and received, if sent by a nationally recognized

private overnight courier service, on the first business day following the date upon which it is
delivered for overnight delivery to such courier service.

**3.16    Choice of Law and Forum; Consent to Jurisdiction.**  This Agreement shall be
governed by and construed in accordance with the laws of the State of New York, without
reference to its conflict of laws principles.  The District Court and the Bankruptcy Court shall
have jurisdiction to resolve any dispute arising out of, related to or in connection with this
Agreement to the exclusion of any other court, and the Parties hereby consent to the jurisdiction
of the District Court and the Bankruptcy Court for resolution of such disputes and agree that they
shall not attempt to litigate any such dispute in any other court.

**3.17    Advice of Counsel.**  Each Party represents and acknowledges that it has been
represented by an attorney with respect to this Agreement and any and all matters covered by or
related to such Agreement.  Each Party further represents and warrants to each other that the
execution and delivery of this Agreement has been duly authorized by each of the Parties after
consultation with counsel, that the persons signing this Agreement on their behalf below have
been fully authorized by their respective Parties to do so, and that the undersigned do fully
understand the terms of this Agreement and have the express authority to enter into this
Agreement.

**3.18    Assignment.**  No assignment of this Agreement or of any rights or obligations
hereunder may be made by any party hereto without the prior written consent of the other Parties
hereto, and any attempted assignment without such prior consent shall be null and void.  No
assignment of any obligations hereunder shall relieve any of the Parties hereto liable therefore of
any such obligations.

**3.19    Waiver.**  Except as otherwise specifically provided in this Agreement, any
provision of this Agreement may be waived only by a written instrument signed by the Party
against whom enforcement of such waiver is sought.

**3.20    Headings, Number, and Gender.**  The descriptive headings of the sections of
this Agreement are included for convenience of reference only and shall have no force or effect
in the interpretation or construction of this Agreement.  As used in this Agreement, the singular
shall include the plural, and the masculine shall include the feminine and neutral genders, and
vice versa.

**3.21    Waiver of Jury Trial.**  Each of the Parties hereby irrevocably waives its rights, if
any, to a jury trial for any claim or cause of action based upon or arising out of this Agreement.

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

BROWN RUDNICK LLP

On behalf of the Plaintiffs

By: _____
Name:  Edward S. Weisfelner
Name:  Howard S. Steel

Title:  Designated Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the Bankruptcy Court


STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

On behalf of the Plaintiffs

By: _____
Name:  Sander L. Esserman

Title: Designated Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the Bankruptcy Court


HAGENS BERMAN SOBOL SHAPIRO LLP

On behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Steve W. Berman

Title: Co-Lead Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the MDL Court


LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

On behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Elizabeth J. Cabraser

Title: Co-Lead Counsel for the Ignition Switch

GIBSON, DUNN & CRUTCHER, LLP

On behalf of the GUC Trust

By: _____
Name:  Matthew Williams
Name:  Keith R. Martorana
Name:  Gabriel Gillett

Title:  Counsel for Wilmington Trust Company, as Administrator and Trustee of the GUC Trust

Plaintiffs and certain Non-Ignition Switch
Plaintiffs in the MDL Court

GOODWIN PROCTER LLP

On behalf of the PIWD Plaintiffs Represented
By Hilliard Muñoz Gonzales L.L.P. and the
Law Offices of Thomas J. Henry


By: _____
Name:  William P. Weintraub
Name:  Gregory W. Fox

Title: Counsel to the PIWD Plaintiffs
Represented By Hilliard Muñoz Gonzales
L.L.P. and the Law Offices of Thomas J.
Henry

HILLIARD MUÑOZ GONZALES LLP

On behalf of the PIWD Plaintiffs

By: _____
Name:  Robert Hilliard

Title: Counsel to the PIWD Plaintiffs

THE LAW OFFICES OF THOMAS J.
HENRY

On behalf of the PIWD Plaintiffs

By: _____
Name:  Thomas J. Henry

Title: Counsel to the PIWD Plaintiffs

ANDREWS MYERS, P.C.

On behalf of the PIWD Plaintiffs

By: _____
Name:  Lisa M. Norman

Title: Counsel to the PIWD Plaintiffs

**EXHIBIT A**

**EXHIBIT B**

**EXHIBIT C**

<u>Schedule 1</u>

<u>If to the GUC Trust</u>:

c/o Gibson Dunn & Crutcher, LLP
200 Park Avenue
New York, New York 10166
Attn:  Matthew J. Williams, Esq.
       Keith R. Martorana, Esq.

<u>If to the PIWD Plaintiffs represented by Hilliard Muñoz Gonazlez, LLP and the Law Offices of
Thomas J. Henry</u>:

c/o Hilliard Muñoz Gonazlez, LLP              c/o The Law Offices of Thomas J. Henry
719 South Shoreline                           4715 Fredricksburg, Suite 507
Suite 500                                     San Antonio, TX 78229
Corpus Christi, TX 78401                      Attn:  Thomas J. Henry, Esq.
Attn:  Robert C. Hilliard, Esq.

c/o Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Attn:  William P. Weintraub
       Gregory W. Fox

<u>If to the PIWD Plaintiffs represented by Andrews Myers, P.C.</u>:

c/o Andrews Myers, P.C.
1885 St. James Place, 15th Floor
Houston, Texas 77056
Attn:  Lisa M. Norman

<u>If to the Ignition Switch Plaintiffs and/or certain Non-Ignition Switch Plaintiffs (or Co-Lead
Counsel on their behalf)</u>:

c/o Hagens Berman Sobol Shapiro LLP           c/o Lieff Cabraser Heimann & Bernstein, LLP
1918 Eighth Avenue, Suite 3300                275 Battery Street, 29th Floor
Seattle, WA 98101                             San Francisco, California 94111
Attn:  Steve W. Berman, Esq.                  Attn:  Elizabeth J. Cabraser, Esq.

c/o Brown Rudnick LLP                         c/o Stutzman, Bromberg, Esserman & Plifka,
Seven Times Square                            a Professional Corporation
New York, New York 10036                      2323 Bryan Street, Ste 2200
Attn:  Edward S. Weisfelner                   Dallas, Texas 75201
       Howard S. Steel                        Attn:  Sander L. Esserman