# <u>EXHIBIT K</u>

**HEARING DATE AND TIME: [ ], 2017 at [ ] (EST)**
**OBJECTION DEADLINE: [ ], 2017 at 4:00 p.m. (EST)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
                                                    :
In re:                                              :          Chapter 11
MOTORS LIQUIDATION COMPANY, et al.,                 :          Case No.: 09-50026 (MG)
          f/k/a General Motors Corp., et al.,       :
                                                    :
                                     Debtors.       :          (Jointly Administered)
---------------------------------------------------------------X

**JOINT MOTION PURSUANT TO BANKRUPTCY**
**CODE SECTIONS 105, 363, 502(C) AND 1142 AND**
**BANKRUPTCY RULES 3020 AND 9019 TO APPROVE**
**THE SETTLEMENT AGREEMENT BY AND AMONG THE SIGNATORY**
**PLAINTIFFS AND THE GUC TRUST, AND TO ESTIMATE THE PLAINTIFFS'**
**AGGREGATE ALLOWED GENERAL UNSECURED CLAIMS AGAINST THE DEBTORS**

## TABLE OF CONTENTS

## TABLE OF AUTHORITIES

By and through their undersigned counsel, the Ignition Switch Plaintiffs,[1] certain Non-Ignition Switch Plaintiffs,[2] certain Pre-Closing Accident Plaintiffs[3] (collectively, the "**Signatory Plaintiffs**"), and the GUC Trust[4] (together with the Signatory Plaintiffs, the "**Parties**") respectfully submit this *Joint Motion Pursuant to Bankruptcy Code Sections 105, 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019 to Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors* (the "**Motion**").[5]  In support of this Motion, the Parties respectfully state as follows:

## PRELIMINARY STATEMENT

1.      Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs have sought leave to file late proposed class claims against the GUC Trust seeking relief for economic losses related to Old GM's alleged concealment of safety defects in ignition switches (including the Ignition Switch Defect and similarly defective ignition switches), side airbags, and power steering.  Certain Ignition Switch Pre-Closing Accident Plaintiffs have likewise sought leave to

---

[1]     The term "**Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 the "**Ignition Switch Defect**").

[2]     The term "**Non-Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540, 14V-118 and 14V-153.

[3]     The term "**Pre-Closing Accident Plaintiffs**" shall mean those plaintiffs asserting personal injury or wrongful death claims or persons who suffered a personal injury or wrongful death arising from an accident involving an Old GM vehicle that occurred prior to the closing of the Section 363 Sale.  The Pre-Closing Accident Plaintiffs are comprised of a subset asserting claims or who suffered an injury or death involving an Old GM vehicle with an Ignition Switch Defect (the "**Ignition Switch Pre-Closing Accident Plaintiffs**"), and a subset asserting claims or who suffered an injury or death involving vehicles with other defects (the "**Non-Ignition Switch Pre-Closing Accident Plaintiffs**").  Collectively, the Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Pre-Closing Accident Plaintiffs are the "**Plaintiffs**."

[4]     The term "**GUC Trust**" shall mean the Motors Liquidation Company GUC Trust.

[5]     Except where otherwise indicated, references to "ECF No. _" are to docket entries in the Bankruptcy Court proceedings: In re Motors Liquidation Co., Bankr. Case No. 09-50026 (MG).

file late personal injury and wrongful death claims against the GUC Trust related to Old GM
vehicles subject to the Recalls.

2.      These efforts implicate numerous complex, disputed issues, including, *inter alia*,
whether Plaintiffs should be granted authority to file late proofs of claim (and whether such
authority can be granted solely on due process grounds), whether Plaintiffs' asserted claims are
equitably moot, whether additional grounds exist to object to Plaintiffs' asserted claims, and the
allowable amount of said claims.

3.      Litigation related to these issues has been ongoing for several years, consuming
large amounts of time, money and resources, and failing to resolve key disputes between the
Parties.  For example, in the April 2015 Decision, the Bankruptcy Court ruled that Old GM
failed to provide Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs
with constitutionally proper notice of the Bar Date.[6]  While the Bankruptcy Court ruled that
assets of the GUC Trust could not be tapped to pay any late claims that might be allowed under
the doctrine of equitable mootness, the Second Circuit vacated this holding as an advisory
opinion—leaving open the question of the applicability of equitable mootness.[7]  In addition,
there is an on-going dispute whether an additional showing under the Pioneer factors is required
for Plaintiffs to obtain leave to file late claims.  Continuation of protracted litigation on these
issues will only serve to deplete remaining GUC Trust Assets and subject the Parties to uncertain
results.

4.      The Settlement Agreement resulted from extensive, good faith negotiations
between experienced counsel to reasonably resolve these issues in the interest of the estate.

---

[6]     See In re Motors Liquidation Co., 529 B.R. 510, 573-74, 583 (Bankr. S.D.N.Y. 2015), aff'd in part, rev'd in
part, vacated in part sub nom. Elliott v. General Motors LLC (In re Motors Liquidation Co.), 829 F.3d 135 (2d
Cir. 2016) (the "**April 2015 Decision**").

[7]     See In re Motors Liquidation Co., 529 B.R. at 529; Elliott, 829 F.3d at 168-69.

5.      The Settlement Agreement provides for the GUC Trust to pay Plaintiffs $15 million (the "**Settlement Amount**").  In exchange for the Settlement Amount and the promise by the GUC Trust to support entry of the Claims Estimate Order as set forth below, and following extensive notice designed to reach every potentially affected Plaintiff and an opportunity to object and be heard, upon entry of the Settlement Order all Plaintiffs will be deemed to have waived and released any rights or claims against the GUC Trust, Wilmington Trust Company as trust administrator and trustee of the GUC Trust (the "**GUC Trust Administrator**"), the Motors Liquidation Company Avoidance Action Trust (the "**Avoidance Action Trust**") and holders of beneficial interest in the GUC Trust (the "**Unitholders**"), including a release of any rights to past or present GUC Trust Assets and to distributions by the Avoidance Action Trust.  This waiver provides finality and certainty to the GUC Trust and Unitholders (regardless of whether or not the Claims Estimate Order is entered), protects against the risk of claw-back or recapture of prior distributions of GUC Trust Assets and eliminates delay in the wind-down process and distribution of assets.

6.      In addition to the payment of the Settlement Amount, the GUC Trust has agreed to support the entry of an order (the "**Claims Estimate Order**") estimating the amount of Plaintiffs' claims in an amount necessary to trigger New GM's obligation to issue the maximum amount of additional shares of New GM common stock (the "**Adjustment Shares**") under the terms of the Sale Agreement.  Upon entry of the Claims Estimate Order, all Adjustment Shares will be placed in a fund for the exclusive benefit of Plaintiffs.  The Signatory Plaintiffs will subsequently determine the allocation of the value of the Settlement Amount and the Adjustment Shares between economic loss claims and personal injury/wrongful death claims and the eligibility and criteria for payment, subject to notice and an opportunity for Plaintiffs to object.

3

Being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), if any, or any other consideration contained in the Settlement Fund.

7.    Unitholders, defendants in the Term Loan Avoidance Action, and holders of Allowed General Unsecured Claims, other than Plaintiffs, waive any rights to the Settlement Amount and the Adjustment Shares.  In this way, the Settlement Agreement provides a streamlined process for allowing Plaintiffs' claims and providing a source of recovery from the Settlement Amount and the Adjustment Shares.  Notably, regardless of whether the Claims Estimate Order is ultimately entered, the waiver and releases set forth in the Settlement will be binding on all parties subject only to approval of the Settlement Order and payment of the Settlement Amount.

8.    The Settlement will massively reduce costs and resources, eliminate uncertain litigation outcomes, and prevent delay in distributions of remaining GUC Trust Assets, without disturbing recovery expectations of other creditors and Unitholders.   In light of the inherent risks and costs associated with litigation, the Settlement Agreement is fair and well within the range of reasonableness.

9.    Accordingly, the Court should approve the Settlement Agreement pursuant to Bankruptcy Rule 9019 as a fair and equitable resolution of the on-going litigation between the Parties.

10.    In addition, the Court should enter the Claims Estimate Order estimating the aggregate Allowed General Unsecured Claims, including Plaintiffs' claims, against the GUC Trust in an amount equal to or exceeding $42 billion.  The evidence and expert reports proffered by the Signatory Plaintiffs will demonstrate to the Court that the damages for Plaintiffs' claims

4

could well exceed the amount required for this determination.  Indeed, after reviewing those reports and considering the benefits provided by the Settlement as a whole, the GUC Trust – the sole entity charged with objecting to and resolving disputed claims in order to maximize recoveries to GUC Trust Beneficiaries pursuant to the Plan – fully supports entry of the Claims Estimate Order.  The GUC Trust also believes that the Settlement is in the best interests of the estate and well within the lowest range of reasonableness as mandated by Rule 9019 of the Bankruptcy Code.

## JURISDICTION

11.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

12.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

13.    The statutory predicates for the relief sought in this Motion are Bankruptcy Code Sections 105(a), 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019.

## BACKGROUND

**I.    Old GM's Bankruptcy And The Creation Of The GUC Trust.**

14.    On June 1, 2009, General Motors Corporation ("**Old GM**") and certain of its affiliates (collectively, "**Debtors**") filed for chapter 11 bankruptcy with this Court and entered into an agreement to sell substantially of its assets (the "**Sale Agreement**") to NGMCO, Inc. ("**New GM**") in exchange for, *inter alia*, New GM common stock and warrants.  See In re Motors Liquidation Co., 529 B.R. at 535.

15.    The Sale Agreement was amended on July 5, 2009 to, *inter alia*, add a feature requiring New GM to provide additional New GM common stock in the event that the amount of allowed general unsecured claims against the Old GM estate exceeds a threshold amount.  See

AMSPA § 3.2(c).[8]  Specifically, the AMSPA provides that if the Bankruptcy Court issues an order finding that the estimated aggregate allowed general unsecured claims against the Old GM estate exceeds $35 billion, then within five business days thereof New GM will issue Adjustment Shares to the GUC Trust.  See id.  If such order estimates the aggregate allowed general unsecured claims at or in excess of $42 billion, New GM must issue 30 million Adjustment Shares, the maximum amount of Adjustment Shares.  See id.

16.    On July 5, 2009, the sale was approved by the Bankruptcy Court.  See In re Motors Liquidation Co., 529 B.R. at 146-47.

17.    In September 2009, the Court established November 30, 2009 (the "**Bar Date**") as the deadline for filing proofs of claim against Old GM.  See id. at 535.

18.    On March 29, 2011, the Court entered an order confirming the Plan, which, among other things, authorized the creation of the GUC Trust pursuant to the terms set forth in the GUC Trust Agreement.  See id. at 536.

19.    Pursuant to the Plan and GUC Trust Agreement, the GUC Trust was granted exclusive authority to object to the allowance of general unsecured claims, seek estimation of the amount of allowed general unsecured claims, and seek Adjustment Shares from New GM.  See Plan §§ 7.1(b), 7.3; GUC Trust Agreement § 5.1.

20.    In addition, pursuant to the Plan and a side letter by and between the GUC Trust, the Debtors, New GM, and FTI Consulting (as trust monitor of the GUC Trust) dated September 23, 2011 (the "**Side Letter**"), the GUC Trust is exclusively authorized to seek the issuance of Adjustment Shares under the terms of the AMPSA for satisfaction of Allowed General Unsecured Claims when the GUC Trust determines, in its sole and absolute discretion, that the

---

[8]    See *Second Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers, and NGMCO, Inc., as Purchaser, dated as of June 26, 2009* (the "**AMSPA**").

aggregate Allowed General Unsecured Claims are, in the GUC Trust's estimation, likely to
exceed $35 billion.  See Side Letter; Plan, Background § E(i); GUC Trust Agreement § 2.3(d).

21.    In February 2012, the Court entered an order providing that any claims filed after
entry of the order would be deemed disallowed unless, *inter alia*, the claimant obtained leave of
the Court or written consent of the GUC Trust.[9]

22.    As of June 30, 2017, the total amount of Allowed General Unsecured Claims
against the Debtors' estate was $31,855,381,054, approximately $3.15 billion below the
threshold for triggering the issuance of Adjustment Shares under the AMSPA.[10]

## II.    The Recalls And Subsequent Proceedings
## In The Bankruptcy Court And Second Circuit.

23.    In February and March 2014, over four years after the Bar Date, New GM
publicly disclosed the existence of the Ignition Switch Defect and issued a recall, NHTSA Recall
Number 14V-047, impacting approximately 2.1 million vehicles.

24.    After this first wave of recalls, New GM issued five additional recalls in June,
July and September of 2014 concerning defective ignition switches affecting over 10 million
vehicles, NHTSA Recall Numbers 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540.

25.    New GM issued a multitude of other recalls for safety defects throughout 2014.
These included a recall issued in March pertaining to approximately 1.2 million vehicles with
defective side airbags, NHTSA Recall Number 14V-118, and another recall issued in March
pertaining to over 1.3 million vehicles with defective power steering, NHTSA Recall Number
14V-153.

---

[9]    See *Order Approving Motion Pursuant to Bankruptcy Rule 3003 and Section 105(a) of the Bankruptcy Code for
an Order Disallowing Certain Late Filed Claims*, dated February 8, 2012 [ECF No. 11394] (the "**Late Filed
Claims Order**").

[10]    See *Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as
of June 30, 2017*, dated July 21, 2017 [ECF No. 13994].

26.     After the issuance of these recalls, owners and lessees of defective Old GM and

New GM vehicles filed lawsuits against New GM, which New GM sought to enjoin by filing

motions to enforce the Sale Order in the Bankruptcy Court.[11]   To resolve these motions, the

Bankruptcy Court first identified four threshold issues (the "**2014 Threshold Issues**") to be

determined.[12]   These issues included whether any of the claims in these actions were claims

against Old GM and, if so, whether such claims should "nevertheless be disallowed/dismissed on

grounds of equitable mootness . . . ." Id.

27.     In its April 2015 Decision on the 2014 Threshold Issues, the Bankruptcy Court

held that the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs were

known creditors who did not receive constitutionally adequate notice of the Sale or Bar Date.

28.     The Bankruptcy Court further held that while "late claims filed by the Plaintiffs

might still be allowed, assets transferred to the GUC Trust under the Plan could not now be

tapped to pay them" under the doctrine of equitable mootness.  In re Motors Liquidation Co., 529

B.R. at 529; see also June 2015 Judgment ¶ 6.  On direct appeal, the Second Circuit vacated this

equitable mootness ruling as an advisory opinion.  See Elliott, 829 F.3d at 168-69.

29.     The Non-Ignition Switch Plaintiffs Motion to Enforce was deferred pending

resolution of the Ignition Switch Plaintiffs' and Ignition Switch Pre-Closing Accident Plaintiffs'

Motions to Enforce.  See In re Motors Liquidation Co., 529 B.R. at 523.  It has not yet been

---

[11]   See *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, dated April 21, 2014 [ECF No. 12620] (the "**Ignition Switch Plaintiffs Motion to Enforce**"); *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits*, dated Aug. 1, 2014 [ECF No. 12807] (the "**Ignition Switch Pre-Closing Accident Plaintiffs Motion to Enforce**"), *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)*, dated Aug. 1, 2014 [ECF No. 12808] (the "**Non-Ignition Switch Plaintiffs Motion to Enforce**");

[12]   See *Supplemental Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 To Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect thereto, and (III) Adversary Proceeding No. 14-01929*, dated July 11, 2014 [ECF No. 12770].

determined whether any Non-Ignition Switch Plaintiffs or Non-Ignition Switch Pre-Closing Accident Plaintiffs suffered a due process violation in connection with the Bar Date.

**III.     Developments In The Bankruptcy Court Following The Second Circuit Opinion.**

30.     On remand from the Second Circuit's opinion vacating the equitable mootness ruling, the Bankruptcy Court issued an order identifying initial issues to be addressed (the "**2016 Threshold Issues**").  Relevant here is the issue of whether "the Ignition Switch Plaintiffs and/or Non-Ignition Switch Plaintiffs satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust and/or are such claims equitably moot ('**Late Proof of Claim Issue**')."[13]

31.     The procedures in the Order to Show Cause for resolution of the Late Proof of Claim Issue permitted Plaintiffs to file motions seeking authority to file late claims ("**Late Claims Motions**").  See Order to Show Cause at 5 ¶ 1.  No additional issues (such as class certification, discovery, or the merits of a late proof of claim) would be addressed in these motions.  See id.  In addition, the procedures provided that briefing and adjudication of any Late Claims Motions filed by Non-Ignition Switch Plaintiffs would be stayed pending resolution of the other 2016 Threshold Issues.  See id. at 5 ¶ 2.

32.     In accordance with the Order to Show Cause, on December 22, 2016, the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, and certain Ignition Switch Pre-Closing Accident Plaintiffs filed Late Claims Motions.[14]  The motions attached proposed proofs of claim, including proposed class proofs of claim asserted on behalf of purported class representatives for

---

[13]     *Order to Show Cause Regarding Certain Issues Arising from Lawsuits with Claims Asserted Against General Motors LLC ("New GM") that Involve Vehicles Manufactured by General Motors Corporation ("Old GM")*, dated Dec. 13, 2016 [ECF No. 13802], at 2-3 (emphasis added).

[14]     See *Motion for an Order Granting Authority to File Late Class Proofs of Claim*, dated Dec. 22, 2016 [ECF No. 13806] (the "**Economic Loss Late Claim Motion**"); *Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Dec. 22, 2016 [ECF No. 13807].

Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs, and 175 individual proofs of claim on behalf of certain Ignition Switch Pre-Closing Accident Plaintiffs. See id. Certain other Plaintiffs subsequently filed joinders to the Late Claims Motions pursuant to the terms of the Order to Show Cause.

33.    Thereafter, in connection with the Ignition Switch Plaintiffs' and Ignition Switch Pre-Closing Accident Plaintiffs' Late Claims Motions, the Parties participated in two status conferences before the Bankruptcy Court, engaged in preliminary rounds of discovery, and filed briefs addressing two preliminary issues raised in the Late Claims Motion: (i) whether relief can be granted absent a showing of excusable neglect under the Pioneer factors; and (ii) the applicability of any purported agreements with the GUC Trust or other tolling arrangements to toll timeliness objections (the "**Initial Late Claims Motions Issues**").[15]  Subsequent to such briefing, certain Plaintiffs who had not previously appeared before the Bankruptcy Court filed motions seeking authority to file late proofs of claim.

## IV.    Plaintiffs' Claims Against Old GM.

34.    The Proposed Class Claims allege that Old GM knew about the Ignition Switch Defect, other defects in ignition switches, defects in side airbags, and defects in power steering for years prior to the Bar Date.[16]  The Proposed Class Claims further allege that Old GM concealed the existence of these defects, causing Plaintiffs to overpay for defective vehicles and

---

[15]    See *Order Establishing, Inter Alia, Briefing Schedule for Certain issues Arising from Late Claim Motions Filed by Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Certain Ignition Switch Pre-Closing Accident Plaintiffs*, dated Mar. 2, 2017 [ECF No. 13869]; *Opening Brief by General Motors LLC with Respect to Initial Late Claim Motions Issues*, dated Mar. 6, 2017 [ECF No. 13871]; *The Ignition Switch Plaintiffs' Brief on the Initial Late Claim Motions Issues*, dated Mar. 6, 2017 [ECF No. 13872]; *Opening Brief of GUC Trust Administrator and Participating Unitholders on the Applicability of Pioneer and Tolling to Plaintiffs' Motions to File Late Claims*, dated Mar. 6, 2017 [ECF No. 13873]; *Brief on Applicability of Pioneer and Tolling Issues in Connection with Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Mar. 6, 2017 [ECF No. 13874].

[16]    See Exhibit A to the Economic Loss Late Claim Motion  (the "**Proposed Ignition Switch Class Claim**"), ¶¶ 9-258; Exhibit B to the Economic Loss Late Claim Motion (the "**Proposed Non-Ignition Switch Class Claim**"), ¶¶ 9-146.

bear the costs of repairs while Old GM reaped the benefit of selling defective vehicles at inflated prices and avoiding the costs of a recall.[17]

35.    Based on these allegations, the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs assert claims against the Old GM estate under the laws of each of the 50 states and the District of Columbia for: (i) fraudulent concealment; (ii) unjust enrichment; (iii) consumer protection claims; (iv) breach of the implied warranty of merchantability; and (v) negligence.[18]

36.    In turn, the Ignition Switch Pre-Closing Accident Plaintiffs assert personal injury and wrongful death claims arising from accidents they assert were caused by the Ignition Switch Defect.[19]

37.    For over three years, New GM has consistently taken the position that any such claims are properly asserted against the GUC Trust and not against New GM.[20]

38.    Subsequent to filing the Late Claims Motions, the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs and certain Pre-Closing Accident Plaintiffs provided the GUC Trust with materials and expert reports describing in detail the alleged viability of the asserted claims, the alleged violation of due process rights in connection with the Bar Date and the alleged amount of damages (the "**Proffered Evidence**").[21]

---

[17]    See, e.g., Proposed Ignition Switch Class Claim ¶ 332; Proposed Non-Ignition Switch Class Claim ¶ 249.

[18]    See Proposed Ignition Switch Class Claim ¶¶ 316-418; Proposed Non-Ignition Switch Class Claim ¶¶ 233-337.

[19]    See, e.g., *Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Dec. 22, 2016 [ECF No. 13807].

[20]    The record is replete with attempts by New GM to saddle the Old GM estate with these potentially massive claims. "To the extent Plaintiffs can prove that they are entitled to any relief, the appropriate remedy is to permit them to seek allowance of an unsecured claim against the Old GM bankruptcy estate." Dkt. 12981 (New GM's 2014 Threshold Issues Br.) at 53; "To the extent they had any claim, it was against Old GM and they retained that claim after the 363 Sale." Id. at 36; "Every one of their claims, the economic loss plaintiffs' claims, is a claim that's assertable against Old GM as it relates to an Old GM vehicle." Hr'g Tr. Feb. 17, 2015 at 59:17-19 (New GM counsel Arthur Steinberg).

[21]    The Proffered Evidence is attached hereto as **Exhibit B**, **Exhibit C**, and **Exhibit D**.

39.     The Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs provided a proffer of evidence laying out the factual background for their claims and the amount of damages alleged.  In addition, they provided a report by Stephen Boedeker, an expert on surveys and statistical sampling, analyzing the amount of alleged damages for the Ignition Switch Plaintiffs' and certain Non-Ignition Switch Plaintiffs' claims based on a conjoint analysis conducted by Mr. Boedeker and Berkeley Research Group.

40.     The Signatory Plaintiffs will show at a hearing on the Motion that conjoint analysis is a set of econometric and statistical techniques developed to study consumer preferences and is widely used as a market research tool.  In a conjoint analysis, study participants review a set of products with different attributes (such as a vehicle shown in different colors) and choose which product they would prefer to purchase.  The collected data can be used to determine market preferences and the value consumers place on particular attributes of a product.  Here, the alleged amount of damages for economic loss claims was determined by using a conjoint analysis to evaluate the difference in value that consumers placed on an Old GM vehicle without a defect as compared to an identical vehicle with a defect.

41.     Certain Pre-Closing Accident Plaintiffs provided materials describing the personal injury and wrongful death claims of certain plaintiffs and demonstrating the alleged value of these claims based on exemplar verdict amounts.  The valuation of damages was assessed and approved by W. Mark Lanier, an experienced trial attorney recognized as a leader in the field.  In addition, these Pre-Closing Accident Plaintiffs also provided an expert report of Dr. Keith Leffler in which he valued these plaintiffs' claims based on a conjoint analysis and data regarding market preferences and the value consumers place on the risk of being injured or killed in a vehicle.

42.    The valuation of these plaintiffs' asserted damages in the Proffered Evidence is well in excess of the amount necessary to trigger New GM's obligation to issue the maximum amount of Adjustment Shares under the AMSPA.  The GUC Trust recognizes that it may, should it choose, contest the level of damages.  There is no guarantee that the GUC Trust would prevail and reduce or limit the damages.[22]  After reviewing the Proffered Evidence and considering the benefits of the Settlement as a whole to the Unitholders to whom it owes a fiduciary duty, the GUC Trust recognizes that, if such claims are allowed, the aggregate general unsecured claims (including already allowed claims) could well exceed $42 billion, and thus has agreed to fully support entry of the Claims Estimate Order as part of the Settlement that the GUC Trust believes is within the range of reasonableness.

## V.    The Settlement Agreement.

43.    Following the filing of the Late Claims Motions, the Parties engaged in extensive negotiations to resolve the numerous complex issues raised by Plaintiffs' claims against the Old

---

[22]    For example, the Proffered Evidence provided by the Pre-Closing Accident Plaintiffs contains an estimate of punitive damages, which the GUC Trust believes would be disallowed in its entirety in a claims objection proceeding.  In addition, the Proffered Evidence does not identify which, if any, economic loss Plaintiffs who purchased their vehicles pre-Sale sold those vehicles prior to New GM's 2014 recalls.  There is an ongoing dispute about whether any economic loss Plaintiffs who sold their vehicles before those recalls suffered any cognizable economic loss.  See Memorandum Opinion and Order Regarding Plaintiffs' Motion for Reconsideration and/or Clarification of the Court's Order Dismissing the Claims of "Pre-Recall Plaintiffs", In re Gen. Motors LLC Ignition Switch Litig., Case Nos. 14-MD-2543 (JMF), 14-MC-2543 (JMF) (S.D.N.Y. Aug. 9, 2017).  Nonetheless, even discounting the damages calculations in the Proffered Evidence to account for the absence of punitive damages and economic loss Plaintiffs who sold their vehicles before the recalls, Plaintiffs' asserted damages are well in excess of the amount necessary to trigger New GM's obligation to issue the maximum amount of Adjustment Shares under the AMSPA.

GM estate and the assets held by the GUC Trust.[23]

44.    After good faith, arm's-length negotiations, the Parties entered into the Settlement
Agreement resolving the Late Claims Motions (including the Initial Late Claim Motions Issues),
the Late Proof of Claim Issue, the allowance of Plaintiffs' claims, and Plaintiffs' rights to GUC
Trust Assets.  The key terms of the Settlement Agreement are as follows:[24]

a.    The GUC Trust agrees to pay the reasonable costs and expense for Court-approved notice of the Motion in an amount not to exceed $6 million.  The Signatory Plaintiffs agree to pay any amounts in excess of $6 million.

b.    The Settlement Agreement becomes effective on the date the order approving the Settlement pursuant to Bankruptcy Rule 9019 becomes a Final Order (the "**Settlement Effective Date**"), provided, however, that from and after the date the Settlement Order is entered by the Bankruptcy Court, the GUC Trust may waive the requirement that the Settlement Order be a Final Order.

c.    Within five (5) business days of the Settlement Effective Date, the GUC Trust will irrevocably pay $15,000,000 (the "**Settlement Amount**") into a trust, fund or other vehicle (the "**Settlement Fund**") for the exclusive benefit of Plaintiffs.  All Unitholders, all defendants in the Term Loan Avoidance Action, and all holders of Allowed General Unsecured Claims, other than the Plaintiffs, will be deemed to irrevocably waive and release any and all rights to the Settlement Amount (the "**GUC Waiver Provision**").

d.    Contemporaneously with payment of the Settlement Amount, the Plaintiffs will be deemed to irrevocably waive and release all claims against the GUC Trust,

---

[23]    See *Joint Declaration of Steve W. Berman and Elizabeth J. Cabraser in Support of Joint Motion Pursuant to Bankruptcy Code Sections 105, 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019 to Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors* (the "**Co-Lead Counsel Decl.**") ¶ 5; *Declaration of Robert C. Hilliard in Support Joint Motion Pursuant to Bankruptcy Code Sections 105, 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019 to Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors* (the "**Hilliard Decl.**") ¶ 3; *Declaration of Lisa M. Norman in Support of Joint Motion Pursuant to Bankruptcy Code Sections 105, 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019 to Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors* (the "**Norman Decl.**") ¶ 3;*Declaration of Beth Andrews in Support of the Joint Motion Pursuant to Bankruptcy Code Sections 105, 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019 to Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors* (the "**Andrews Decl.**") ¶ 26.

[24]    This summary of the Settlement Agreement is qualified in its entirety by the terms and provisions of the Settlement Agreement.  To the extent that there are any inconsistencies between the description of the Settlement Agreement contained in the Motion and the terms and provisions of the Settlement Agreement, the Settlement Agreement shall control.

including a release of any rights to prior distributions of or current GUC Trust Assets and any rights to distributions by the Motors Liquidation Company Avoidance Action Trust (the "**Waiver Provision**").  For the avoidance of doubt, the Settlement Agreement and Settlement Order define "Plaintiffs" to include all persons who now have, or in the future could have, claims against the Old GM estate related to any of the recalls, such that the Waiver Provision shall be applicable to all such parties whether or not they have asserted any claims against the Old GM estate or the GUC Trust to date.  However, being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), if any, or any other consideration contained in the Settlement Fund.

e.  In light of the benefits of the Settlement and after the GUC Trust's review of the Proffered Evidence, the GUC Trust agrees to seek a Claims Estimate Order: (i) finding that the allowable amount of Plaintiffs' claims against Old GM and/or the GUC Trust, when combined with all of the other Allowed General Unsecured Claims against the Old GM bankruptcy estate, equals or exceeds $42,000,000,000, thus triggering the maximum amount of Adjustment Shares; and (ii) directing that the Adjustment Shares, or the value of the Adjustment Shares, be promptly delivered to the Settlement Fund.  Certain Pre-Closing Accident Plaintiffs consent to estimation of their personal injury and wrongful death claims by this Court solely for the purposes of determining the aggregate Allowed General Unsecured Claims for a Claims Estimate Order.

f.  Contemporaneously with payment of the Settlement Amount, all Unitholders, all defendants in the Term Loan Avoidance Action, and all holders of Allowed General Unsecured Claims, other than the Plaintiffs, will be deemed to irrevocably waive and release any and all rights to the Adjustment Shares, provided that such waiver and release shall not become operative unless and until the Bankruptcy Court enters the Claims Estimate Order (the "**Adjustment Shares Waiver Provision**").

g.  Subject to notice and an opportunity for Plaintiffs to object, the Signatory Plaintiffs will determine the overall allocation of the value of the Settlement Fund between economic loss claims and personal injury/wrongful death claims, and the eligibility and criteria for payment.  Notice of the proposed allocation and proposed eligibility and criteria for payment will be posted on a settlement website, along with information about the hearing date and how and when to assert any objections.

h.  Nothing in the Settlement Agreement is intended to waive any claims against New GM or to be an election of remedies against New GM; nor does the Settlement Agreement or any payments made in connection therewith represent full satisfaction of any claims against Old GM, unless and until such claims are in fact paid in full from every available source; provided, however, that in no event shall any Plaintiff be permitted to seek any further payment or compensation from the GUC Trust in respect of their claims or otherwise, other than the Settlement Amount and the Adjustment Shares.  Except as mandated otherwise under

15

applicable law, nothing in the Settlement Agreement shall waive any claims that any Plaintiff may have against New GM or constitute an election of remedies by any Plaintiff, and neither the Settlement Amount nor the Adjustment Shares (nor any distribution thereof to any Plaintiff) shall represent full and final satisfaction of any claim that any Plaintiff may have against New GM, all of which are expressly reserved. The Bankruptcy Court's estimate of the aggregate Allowed General Unsecured Claims in the Claims Estimate Order shall not operate as a cap on any of the claims of any of the Plaintiffs against New GM.

## RELIEF REQUESTED

45.    By this Motion, the Parties respectfully request that this Court enter orders approving the Settlement Agreement and claims estimation substantially in the forms attached to this Motion as **Exhibit E** and **Exhibit F**.

## BASIS FOR RELIEF REQUESTED

### I.    The Court Should Approve The Settlement Agreement Pursuant To Bankruptcy Rule 9019.

46.    Bankruptcy Rule 9019(a) provides, in part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  This Court also has authority to approve a settlement under Bankruptcy Code Section 105(a), which empowers it to issue any order that is "necessary or appropriate."  11 U.S.C. § 105(a).

47.    The authority to approve a compromise or settlement is within the sound discretion of the Court.  See Newman v. Stein, 464 F.2d 689, 692 (2d Cir. 1972).  The Court should exercise its discretion "in light of the general public policy favoring settlements."  In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (citation omitted); see also Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("[T]he general rule [is] that settlements are favored and, in fact, encouraged . . . ." (citation omitted)).

48.    When exercising its discretion, the Court must determine whether the settlement is fair and equitable, reasonable, and in the best interests of the estate.  See, e.g., Airline Pilots

Ass'n, Int'l v. Am. Nat'l Bank & Tr. Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426
(S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994); In re Purofied Down Prods. Corp., 150 B.R.
519, 523 (S.D.N.Y. 1993).  Where "the integrity of the negotiation process is preserved, a strong
initial presumption of fairness attaches to the proposed settlement . . . ." In re Hibbard, 217 B.R.
at 46.

49.    The Court need not decide the numerous issues of law and fact raised in the
underlying dispute, "but must only 'canvass the issues and see whether the settlement falls below
the lowest point in the range of reasonableness.'" In re Adelphia Commn'cs Corp., 327 B.R.
143, 159 (Bankr. S.D.N.Y. 2005) (quoting In re W.T. Grant, Co., 699 F.2d 599, 608 (2d Cir.
1983)); see also Purofied, 150 B.R. at 522 ("[T]he court need not conduct a 'mini-trial' to
determine the merits of the underlying [dispute] . . . .").

50.    The Court evaluates whether the Settlement Agreement is fair and equitable based
on "the probabilities of ultimate success should the claim be litigated," and "an educated
estimate of the complexity, expense, and likely duration of . . . litigation, the possible difficulties
of collecting on any judgment which might be obtained, and all other factors relevant to a full
and fair assessment of the wisdom of the proposed compromise." Protective Comm. for Indep.
Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968).

51.    Courts in this jurisdiction consider the following Iridium factors in determining
whether approval of a settlement is warranted:

> (1) the balance between the litigation's possibility of success and the settlement's
> future benefits; (2) the likelihood of complex and protracted litigation, "with its
> attendant expense, inconvenience, and delay," including the difficulty in
> collecting on the judgment; (3) "the paramount interests of the creditors,"
> including each affected class's relative benefits "and the degree to which creditors
> either do not object to or affirmatively support the proposed settlement"; (4)
> whether other  parties in interest support the settlement; (5) the "competency and
> experience of counsel" supporting, and "[t]he experience and knowledge of the

bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining."

Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. 2007) (citations omitted).

52.     The Settlement Agreement falls within the range of reasonableness and satisfies the Iridium factors as set forth below.   Thus, the Settlement Agreement should be approved under Bankruptcy Rule 9019.

**A.      The Settlement's Benefits Outweigh The Likelihood Of Success In Protracted Litigation Over Numerous, Complex Issues.**

53.     The first two Iridium factors—(1) the balance between the litigation's likelihood of success and the settlement's benefits; and (2) the likelihood of complex and protracted litigation—are easily met.  As detailed below, continued litigation over Plaintiffs' claims raises significant, complex issues, has an uncertain outcome, and would be costly and time consuming. The benefits of near-term, certain resolution are clear.

**1.      Litigation Over Plaintiffs' Claims Raises Numerous Complex Issues.**

54.     One complex, contentious issue raised by the litigation over Plaintiffs' claims is whether the Court should grant Plaintiffs authority to file late claims as permitted by the *Order Approving Motion Pursuant to Bankruptcy Rule 3003 and Section 105(a) of the Bankruptcy Code for an Order Disallowing Certain Late Filed Claims* [ECF No. 11394] (the "**Late Filed Claims Order**").  See Late Filed Claims Order at 1-2.

55.     As an initial matter, there is a dispute over the standard for obtaining leave to file late claims.  Certain Plaintiffs have argued that creditors may assert late claims based solely on a

18

showing that they have suffered a due process violation related to the bar date.[25]  The GUC Trust

has taken the position that a demonstration of excusable neglect under the <u>Pioneer</u> factors is

required regardless of a due process violation.[26]

56.    Then, there is a dispute whether leave should be granted under the appropriate

standard.  Most notably, in the April 2015 Decision, the Bankruptcy Court stated that the Ignition

Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs suffered a due process

violation when they failed to receive constitutionally adequate notice of the Bar Date, and that

leave to file late claims was the "obvious" remedy for this violation.  <u>See</u> <u>In re Motors</u>

<u>Liquidation Co.</u>, 529 B.R. at 573-74, 583.  The Plaintiffs assert that this statement is a binding

ruling that is no longer subject to appeal, the GUC Trust asserts it is merely nonbinding *dicta* that

the Second Circuit implicitly found was an advisory opinion.

57.    The Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs

also assert that they can meet the <u>Pioneer</u> factors for demonstrating excusable neglect.  Of the

four <u>Pioneer</u> factors, the one given the most weight is the reason for the delay in filing claims,

including whether the delay was in the reasonable control of the movant.  <u>See</u> <u>In re Residential</u>

<u>Capital, LLC</u>, Case No. 12-12020 (MG), 2015 WL 515387, at *5 (Bankr. S.D.N.Y. Feb. 6,

2015).  The Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs will

argue that a debtor's failure to provide actual notice to a known creditor is evidence that any

delay was not in control of the creditor.  The GUC Trust, in turn, will argue that the delay here is

attributable to Plaintiffs' voluntary strategic decision to pursue New GM and not the GUC Trust.

---

[25]   <u>See, e.g.</u>, *The Ignition Switch Plaintiffs' Brief on the Initial Late Claim Motions Issues*, dated Mar. 6, 2017
[ECF No. 13872]; *Brief on Applicability of Pioneer and Tolling Issues in Connection with Omnibus Motion by
Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal
Injuries and Wrongful Deaths*, dated Mar. 6, 2017 [ECF No. 13874].

[26]   <u>See</u> *Opening Brief of GUC Trust Administrator and Participating Unitholders on the Applicability of Pioneer
and Tolling to Plaintiffs' Motions to File Late Claims*, dated Mar. 6, 2017 [ECF No. 13873].

58.     Although Non-Ignition Switch Plaintiffs and Non-Ignition Switch Pre-Closing
Accident Plaintiffs have not yet demonstrated a due process violation, many of these plaintiffs
allege that their claims are substantially similar to the Ignition Switch Defect—defects that
involve the same condition (low torque switches that move out of the "run" position) and have
the same effects (loss of power to steering, brakes, and airbags).  The Plaintiffs will argue that
these plaintiffs can demonstrate a violation of their due process rights in connection with the Bar
Date.

59.     Further, the Plaintiffs will argue that excusable neglect can exist in the absence of
a due process violation.  For example, Plaintiffs have asserted that excusable neglect can be
found where the debtors failed to comply with bankruptcy procedures in providing notice of a
bar date and where a claimant, through no fault of its own, was unaware of its claim prior to the
bar date.  See In re Arts de Provinces de France, Inc., 153 B.R. 144, 147 (Bankr. S.D.N.Y. 1993);
In re PT-1 Commc'ns, Inc., 292 B.R. 482, 489 (Bankr. E.D.N.Y. 2003).  This issue, too, would
have to be litigated.

60.     Another complex issue is whether the doctrine of equitable mootness is applicable
to bar Plaintiffs' claims.  See In re Chateaugay Corp., 10 F.3d 944, 952-53 (2d Cir. 1993).

61.     In the April 2015 Decision, the Bankruptcy Court applied the five Chateaugay
factors[27] and determined that if the Ignition Switch Plaintiffs' or Ignition Switch Pre-Closing
Accident Plaintiffs' late claims were allowed, GUC Trust Assets could not be tapped to pay them

---

[27]    These five factors are: (i) the court can still order some effective relief; (ii) such relief will not affect "the re-
emergence of the debtor as a revitalized corporate entity"; (iii) such relief will not unravel intricate transactions
so as to "knock the props out from under the authorization for every transaction that has taken place" and
"create an unmanageable, uncontrollable situation for the Bankruptcy Court"; (iv) the "parties who would be
adversely affected by the modification have notice of the appeal and an opportunity to participate in the
proceedings;" and (v) the appellant "pursue[d] with diligence all available remedies to obtain a stay of
execution of the objectionable order . . . if the failure to do so creates a situation rendering it inequitable to
reverse the orders appealed from."  In re Chateaugay Corp., 10 F.3d at 952-53.

under the doctrine of equitable mootness.  See In re Motors Liquidation Co., 529 B.R. at 598.

The Bankruptcy Court found, *inter alia*, that any relief would "knock the props out" from the

transactions under which Unitholders acquired their units.  See id. at 587-88, 592.

62.    On appeal, the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing

Accident Plaintiffs argued that the Bankruptcy Court erred because, *inter alia*, effective relief

could be fashioned without disturbing any transactions or having an adverse impact on

Unitholders by providing Plaintiffs with exclusive access to any Adjustment Shares that may be

issued under the AMSPA.[28]  Plaintiffs will argue that where any relief is available, even partial

relief, equitable mootness should not be applied.  See, e.g., Chateaugay, 10 F.3d at 954.  In

addition, the Ignition Switch Plaintiffs argued that equitable mootness was only applicable in the

context of bankruptcy appeals.[29]

63.    The Second Circuit vacated the Bankruptcy Court's equitable mootness ruling as

advisory, neither affirming nor reversing that decision.  The Second Circuit pointed out that all

of the Circuit's equitable mootness cases to-date had involved an appellate court applying the

doctrine in the first instance.  See Elliott, 829 F.3d at 167 n.30.  However, the Second Circuit

specified that it was not resolving whether it is appropriate for a bankruptcy court, as opposed to

an appellate court, to apply the equitable mootness doctrine.  See id.

64.    Additional complex issues would certainly arise from continued litigation of

Plaintiffs' claims.  The Bankruptcy Court would need to decide whether class certification for

---

[28]    See Br. for Appellant Ignition Switch Plaintiffs, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Appeal Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Nov. 16, 2015) (ECF No. 235), 49-52; Br. for Ignition Switch Pre-Closing Accident Plaintiffs, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Appeal Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Nov. 16, 2015) (ECF No. 183), 4, 52 n.18 (incorporating the arguments on the application of equitable mootness in the Ignition Switch Plaintiffs' brief).

[29]    See Response and Reply Br. for Appellant-Cross-Appellee Ignition Switch Plaintiffs, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Appeal Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Feb. 1, 2016) (ECF No. 315), at 40-43.

the economic loss Plaintiffs' proposed class proofs of claims would be appropriate.  In addition, the GUC Trust could raise objections to allowance of these class claims, as well as to the separate proofs of claim filed by Ignition Switch Pre-Closing Accident Plaintiffs.  This could lead to the need to resolve issues under the varied laws of the fifty states and the District of Columbia.

65.    Plaintiffs have also asserted that litigation over similar claims asserted by economic loss plaintiffs against New GM in the MDL Court demonstrates the viability of many of Plaintiffs' claims.  For example, in the MDL Court, consumer fraud, common law fraud, and implied warranty claims considered under the laws of sixteen states largely survived partial motions to dismiss.[30]  In addition, the MDL Court held that plaintiffs could assert injuries under the "benefit-of-the-bargain defect theory," *i.e.*, amounts plaintiffs overpaid at the time of sale for a defective vehicle, and injuries for lost time, to the extent such damages are available under state law.  See FACC Opinion at 13-14, 18; TACC Opinion at 24.  Many jurisdictions recognize damages under the benefit-of-the-bargain theory.  See TACC Opinion at 24.

66.    In sum, while the GUC Trust believes that it has meritorious defenses to the claims of all Plaintiffs, the GUC Trust's likelihood of success in the resolution of the numerous, complex issues raised by the litigation over Plaintiffs' claims is uncertain.

### 2.    The Terms Of The Settlement Agreement Weigh The Risks Of Continued Litigation Against The Benefits Of A Consensual Resolution Of Plaintiffs' Claims.

67.    Litigation of these complex issues has been ongoing for years, consuming large sums of money and countless hours of labor.  In the absence of settlement, there is a high

---

[30]    See Opinion and Order Regarding New GM's Partial Motion to Dismiss the Forth Amended Consolidated Complaint, In re General Motors LLC Ignition Switch Litig., Case No. 14-MD-2543 (JMF) (S.D.N.Y. June 30, 2017), 23 (the "**FACC Opinion**"); Opinion and Order Regarding New GM's Partial Motion to Dismiss the Third Amended Consolidated Complaint, In re General Motors LLC Ignition Switch Litig., Case No. 14-MD-2543 (JMF) (S.D.N.Y. July 15, 2016), 5-6 (the "**TACC Opinion**").

likelihood of even more expensive, protracted and contentious litigation that will consume significant estate funds and expose the estate to significant risks and uncertainty. In addition, resolution of these issues may require the added time and expense of discovery. For example, the Pioneer analysis is fact intensive and, to date, only limited discovery, restricted to a proposed class representative of the Ignition Switch Plaintiffs and certain Ignition Switch Pre-Closing Accident Plaintiffs, has occurred on this issue.

68.      By comparison, settling the litigation provides the Parties with greater certainty and eliminates the significant risk, cost and delay of litigation. In addition, the Settlement Agreement provides several benefits beyond avoiding continued litigation.

69.      First, the Parties' determination to seek a Claims Estimate Order allowing and estimating Plaintiffs' claims in an amount, when combined with all of the other Allowed General Unsecured Claims against the Old GM estate, that equals or exceeds $42 billion, provides an efficient and reasonable resolution of the allowable amount of Plaintiffs' claims. The reasonableness of this amount is supported by the Proffered Evidence.

70.      Under the Settlement, any Adjustment Shares issued by New GM under this Claims Estimate Order will be for the exclusive benefit of Plaintiffs. Based on the amount of allowed and disputed unsecured claims against Old GM, New GM's obligation to issue these shares would not be triggered absent allowance of Plaintiffs' claims.[31] In other words, absent the Plaintiffs' claims, the Unitholders have no expectation to receive Adjustment Shares. Thus, this provision potentially paves the way for Plaintiffs to obtain a recovery on their claims without disturbing other creditors' past or future recoveries.

---

[31]    See *Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as of June 30, 2017*, dated July 21, 2017 [ECF No. 13994].

71.     Second, the Settlement removes a major impediment to winding down the Old
GM estate.   The resolution of Plaintiffs' claims and waiver of certain rights and claims
eliminates the likelihood of complex and protracted litigation, prevents delay in distributing
remaining GUC Trust Assets and protects Unitholders from the risk of claw-back or recapture of
prior distributions.

72.     The terms of the Settlement Agreement reflect a reasonable assessment of the
substantial time and expense of litigating Plaintiffs' claims, balanced against the benefits of more
near term, efficient and certain resolution of the allowable amount of Plaintiffs' claims and
sources of recovery.   The benefits of the Settlement in the near term outweigh the likelihood of
long-term success in protracted litigation of complex issues.

### B.     The Settlement Agreement Is Beneficial To Creditors And Supported By Interested Parties.

73.     With respect to the third and fourth Iridium factors—the paramount interests of
the creditors and whether other interested parties support the settlement—prolonging the
litigation will increase costs and decrease the amount of GUC Trust Assets available to satisfy
creditors.   Approving the Settlement Agreement, on the other hand, avoids the significant
expense and uncertainty associated with continued litigation, and maximizes and expedites
distributions to current GUC Trust beneficiaries.   The release of Plaintiffs' rights and claims with
respect to the GUC Trust's prior distributions and current GUC Trust Assets allows the GUC
Trust to complete the orderly wind-down of the Old GM estate.

74.     Moreover, providing Plaintiffs with the exclusive right to proceed against a
settlement fund containing the Settlement Amount and the Adjustment Shares potentially opens
an avenue for Plaintiffs to recover on their claims against the GUC Trust without disturbing
recovery expectations of other creditors or Unitholders.   Plaintiffs' rights concerning the

Adjustment Shares are protected because notice of any agreement by the Signatory Plaintiffs on proposed criteria to assert a claim against the Settlement Fund and a proposed methodology of allocation of the Settlement Fund between economic loss claims and personal injury/wrongful death claims will be provided to Plaintiffs, who will be provided with an opportunity to object.

75.     Not surprisingly, the key interested parties—the GUC Trust (who has sole authority under the Late Filed Claims Order to consent to late filed claims and is the only party under the Plan provided with standing to object to the allowance of claims), Signatory Plaintiffs and the Participating Unitholders—all support the Settlement Agreement.  Accordingly, for all of the reasons set forth above, the Settlement easily meets the Iridium Factors and allows the GUC Trust to implement the express purpose of the GUC Trust Agreement.  GUC Trust Agreement § 2.2 (stating that the "sole purpose of the GUC Trust is to implement the Plan on behalf of, and for the benefit of the GUC Trust Beneficiaries"); GUC Trust Agreement § 4.2 (stating that "in no event shall the GUC Trust Administrator unduly prolong the duration of the GUC Trust, and the GUC Trust Administrator shall, in the exercise of its reasonable business judgment and in the interests of all GUC Trust Beneficiaries, at all times endeavor to terminate the GUC Trust as soon as practicable in accordance with the purposes and provisions of this Trust Agreement and the Plan.").

**C.     The Settlement Agreement Satisfies The Remaining *Iridium* Factors.**

76.     With respect to the sixth factor, "the nature and breadth of releases to be obtained by officers and directors," in exchange for the payment of $15 million, the Settlement Agreement releases any and all rights, claims and causes of action that any Plaintiff may assert against the GUC Trust, the GUC Trust Administrator, the GUC Trust Assets, the Avoidance Action Trust and Unitholders.

77.    With respect to the fifth and seventh <u>Iridium</u> factors, competent and experienced counsel to the Parties who have been litigating these issues for years actively engaged in arms' length, good faith negotiations to formulate the Settlement Agreement.[32]   The Parties, having considered the uncertainties, delay and cost that would be incurred by further litigation, submit that the Settlement Agreement is fair, reasonable and appropriate, and in the best interests of the Parties.

78.    Based on the foregoing, the Settlement Agreement is in the best interests of the estate and its creditors and falls well within the range of reasonableness.  Therefore, entry into and approval of the Settlement Agreement pursuant to Bankruptcy Rule 9019 is warranted and the Settlement Agreement should be approved.[33]

**II.    The Court Should Approve The Parties' Estimation
Of The Aggregate Allowed General Unsecured Claims,
<u>Including Plaintiffs' Claims, As Equal To Or Exceeding $42 Billion</u>.**

79.    As part of the Settlement, the Parties agree to support entry of a Claims Estimate Order providing that the aggregate Allowed General Unsecured Claims, including Plaintiffs' claims, against the Old GM estate equals or exceeds $42 billion.  Pursuant to the terms of the AMSPA, the GUC Trust Agreement and the Side Letter, as well as Bankruptcy Rule 9019 and Bankruptcy Code Sections 105(a) and 502(c), the Parties request that the Court approve the Parties' estimation and enter a Claims Estimate Order estimating the aggregate Allowed General Unsecured Claims at an amount equal to or exceeding $42 billion.

80.    A provision in the Sale Agreement requires New GM to issue Adjustment Shares to the GUC Trust if and when the aggregate amount of Allowed General Unsecured Claims, as

---

[32]    <u>See</u> Co-Lead Counsel Decl. ¶ 5; Hilliard Decl. ¶ 3; Norman Decl. ¶ 3; Andrews Decl. ¶ 26.

[33]    In the event that the Settlement Agreement is not approved by the Court or the Settlement Agreement does not become binding and enforceable for any reason, the Parties reserve all their rights and nothing herein shall be deemed or construed as an admission of any fact, liability, stipulation, or waiver, but rather as a statement made in furtherance of settlement discussions.

estimated by the Bankruptcy Court, exceeds $35 billion.  See AMSPA § 3.2(c).  If the estimated amount equals or exceeds $42 billion, then New GM must issue 30 million shares, the maximum amount of Adjustment Shares.  See id.

81.    Under the AMSPA, GUC Trust Agreement, and Side Letter, the GUC Trust (and only the GUC Trust) "may, at any time, seek an Order of the Bankruptcy Court . . . estimating the aggregate allowed general unsecured claims" against the Old GM estate.  See AMSPA § 3.2(c); GUC Trust Agreement § 2.3(d); Side Letter.[34]

82.    Bankruptcy Code Section 502(c) authorizes the Court to estimate "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case."   11 U.S.C. § 502(c).  Estimation "provides a means for a bankruptcy court to achieve reorganization, and/or distributions of claims, without awaiting the results of [potentially protracted] legal proceedings."  In re Adelphia Bus. Solutions, Inc., 341 B.R. 415, 422 (Bankr. S.D.N.Y. 2003) (citing In re Continental Airlines, Inc., 981 F.2d 1450, 1461 (5th Cir. 1993)); see In re Lionel LLC, No. 04-17324, 2007 WL 2261539, at *2 (Bankr. S.D.N.Y. Aug. 3, 2007) (noting that, without estimation, lengthy proceedings result in "delayed distributions, which in turn, greatly devalue the claim of all creditors as they cannot use the assets until they receive them" (citation omitted)).

83.    In fact, "the Code requires estimation of all contingent or unliquidated claims which unduly delay the administration of the case."  In re Nat'l Gypsum Co., 139 B.R. 397, 405 (N.D. Tex. 1992) (internal quotes omitted).  Even absent a finding of undue delay, it is within a court's sound discretion to estimate a claim.  See In re RNI Wind Down Corp., 369 B.R. 174, 191 (Bankr. D. Del. 2007).

---

[34]    In addition, the GUC Trust has the sole, exclusive authority to request that the Bankruptcy Court estimate any contingent, unliquidated disputed claims pursuant to Bankruptcy Code Section 502(c).  See Plan § 7.3; GUC Trust Agreement § 5.1(e).

84.    Here, it is within the sound discretion of the Court to estimate the aggregate Allowed General Unsecured Claims, including Plaintiffs' claims, as contemplated by the AMSPA, Plan, GUC Trust Agreement and the Settlement Agreement.[35]

85.    Estimation requires only "sufficient evidence on which to base a reasonable estimate of the claim." Bittner v. Borne Chem. Co., 691 F.2d 134, 135 (3d Cir. 1982); see also In re Windsor Plumbing Supply Co., 170 B.R. 503, 521 (Bankr. E.D.N.Y. 1994) (advocating use of probabilities in estimation of claims). The Bankruptcy Court has discretion to select the valuation model that best suits the circumstances of the case at hand when estimating the value of claims. See In re Adelphia Commc'ns Corp., 368 B.R. 140, 278 (Bankr. S.D.N.Y. 2007); Maxwell v. Seaman Furniture Co. (In re Seaman Furniture Co.), 160 B.R. 40, 41 (S.D.N.Y. 1993).

86.    As of March 31, 2017, the total amount of Allowed General Unsecured Claims—exclusive of Plaintiffs' claims—was $31,855,381,054.[36] Thus, if Plaintiffs' claims are allowable in an amount of approximately $3.145 billion, then New GM's obligation to issue Adjustment Shares is triggered. If Plaintiffs' claims are allowable in an amount of approximately $10.145 billion, then the aggregate Allowed General Unsecured Claims will exceed $42 billion, requiring the issuance of the maximum amount of Adjustment Shares.

87.    Pursuant to the Settlement Agreement, the claims are being pursued with the consent of the GUC Trust, which has the sole authority to permit the filing of late claims. See Late Filed Claims Order at 1-2. In addition, the GUC Trust is the only party with standing to

---

[35]    Counsel for certain Pre-Closing Accident Plaintiffs consent to estimation of their personal injury and wrongful death claims by this Court solely for the purposes of determining whether the Allowed General Unsecured Claims in the aggregate exceed $35 billion.

[36]    See Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as of June 30, 2017, dated July 21, 2017 [ECF No. 13994].

object to the allowance of claims and has the authority to settle, withdraw or otherwise resolve
any objections to disputed claims.  See Plan §§ 7.1(b) ("[T]he GUC Trust Administrator shall
have the exclusive right to object . . . to General Unsecured Claims . . . ."); GUC Trust
Agreement § 5.1(d) ("[T]he GUC Trust Administrator shall have the authority to compromise,
settle, otherwise resolve or withdraw any objections to Disputed General Unsecured Claims
against the Debtors . . . .").  Accordingly, the GUC Trust's decision to seek entry of the Claims
Estimate Order should be upheld by the Court under Bankruptcy Rule 9019 and Bankruptcy
Code Section 502(c).

88.    In the course of negotiations, the GUC Trust was provided with the Proffered
Evidence indicating that the damages for these plaintiffs' claims could exceed $10.15 billion.
Based on the evidence, the expense and delay of litigation, and the benefits of the Settlement as a
whole, the GUC Trust agreed to support an estimate of the allowed amount of Plaintiffs'
Allowed General Unsecured Claims against the Debtors and/or the GUC Trust, when combined
with all of the other Allowed General Unsecured Claims against the Debtors, equal to or
exceeding $42 billion.  Accordingly, the requested Claims Estimate Order is well within the
range of reasonableness and should be granted under Bankruptcy Rule 9019.  See In re Iridium
Operating LLC, 478 F.3d at 462; In re Adelphia Commn'cs Corp., 327 B.R. at 159.[37]

89.    Based on the foregoing, $42 billion is a reasonable estimate of the aggregate
Allowed General Unsecured Claims against the GUC Trust.

---

[37]    Rulings in the MDL Court provide additional support for the viability of Plaintiffs' claims.  Similar economic
loss claims have been asserted in a consolidated class actions complaint in the MDL.  Consumer fraud, common
law fraud, and implied warranty claims largely survived partial motions to dismiss.  See FACC Opinion at 23;
TACC Opinion at 5-6.  In addition, the MDL Court recognized that the laws of several jurisdictions permit the
assertion of damages under the "benefit-of-the-bargain defect theory," i.e., amounts plaintiffs overpaid at the
time of sale for a defective vehicle, and injuries for lost time.  See FACC Opinion at 13-14, 18; TACC Opinion
at 24.

## NOTICE

90.     Notice of this Motion has been provided in accordance with the Court-approved notice procedures.  See [Order Approving Notice Procedures].  The Parties submit that no other or further notice need be provided.

## NO PRIOR REQUEST

No previous application for the relief sought in this Motion has been made to this or any other Court.

## CONCLUSION

WHEREFORE, the Parties respectfully request that the Court: (i) enter an order substantially in the form attached hereto as **Exhibit E** approving the Settlement Agreement, attached hereto as **Exhibit A**, pursuant to Bankruptcy Rule 9019; (ii) enter a Claims Estimate Order substantially in the form attached hereto as **Exhibit F**, pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 502(c); and (iii) grant such other relief as is just and equitable.

[*Remainder of the page intentionally left blank*]

Dated:  August [ ], 2017
      New York, New York

Respectfully submitted,

 */s/ Draft*
Edward S. Weisfelner
Howard S. Steel
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
Tel: 212-209-4800
eweisfelner@brownrudnick.com
hsteel@brownrudnick.com

Sander L. Esserman
STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, A PROFESSIONAL CORPORATION
2323 Bryan Street, Ste 2200
Dallas, Texas 75201
Tel: 214-969-4900
esserman@sbep-law.com

*Designated Counsel for the Ignition Switch
Plaintiffs and Certain Non-Ignition Switch
Plaintiffs in the Bankruptcy Court*

Steve W. Berman (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel: 206-623-7292
steve@hbsslaw.com

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
Tel: 414-956-1000
ecabraser@lchb.com

*Co-Lead Counsel for the Ignition Switch
Plaintiffs and Certain Non-Ignition Switch
Plaintiffs in the MDL Court*

31

William P. Weintraub
Gregory W. Fox
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: 212-813-8800
wweintraub@goodwinlaw.com
gfox@goodwinlaw.com

*Counsel to Those Certain Pre-Closing
Accident Plaintiffs Represented By Hilliard
Muñoz Gonzales L.L.P. and the Law Offices
of Thomas J. Henry*

Robert Hilliard, Esq.
HILLIARD MUÑOZ GONZALES LLP
719 South Shoreline
Suite 500
Corpus Christi, TX 78401
Tel: 361-882-1612
bobh@hmglawfirm.com

*Counsel to certain Pre-Closing Accident Plaintiffs*

Thomas J. Henry, Esq.
THE LAW OFFICES OF THOMAS J. HENRY
4715 Fredricksburg, Suite 507
San Antonio, TX 78229

*Counsel to Certain Pre-Closing Accident Plaintiffs*

Lisa M. Norman (admitted *pro hac vice*)
T. Joshua Judd (admitted *pro hac vice*)
ANDREWS MYERS, P.C.
1885 St. James Place, 15th Floor
Houston, Texas 77056
Tel: 713-850-4200
Lnorman@andrewsmyers.com
Jjudd@andrewsmyers.com

*Counsel to Certain Pre-Closing Accident Plaintiffs*

32

Matthew Williams
Keith R. Martorana
Gabriel Gillett
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166
Tel: 212-351-400
mwilliams@gibsondunn.com
kmartorana@gibsondunn.com
ggillett@gibsondunn.com

*Counsel for Wilmington Trust Company, as
Administrator and Trustee of the GUC Trust*