# EXHIBIT T

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | . | Case No. 09-50026-mg |
| IN RE: | . | Chapter 11 |
| | . | |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| et al., f/k/a GENERAL | . | |
| MOTORS CORP., et al, | . | One Bowling Green |
| | . | New York, NY 10004 |
| Debtors. | . | |
| | . | Thursday, August 17, 2017 |
| . . . . . . . . . . . . . . | . | 3:05 p.m. |

TRANSCRIPT OF IN COURT CONFERENCE
(CC: DOC NOS. 14053, 14056)
BEFORE THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:                    King & Spalding LLP
                                   By:  ARTHUR STEINBERG, ESQ.
                                        SCOTT DAVIDSON, ESQ.
                                   1185 Avenue of the Americas
                                   New York, New York 10036-4003
                                   (212) 556-2158


For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs:                        Brown Rudnick LLP
                                   By:  EDWARD S. WEISFELNER, ESQ.
                                        HOWARD S. STEEL, ESQ.
                                   7 Times Square
                                   New York, New York 10036
                                   (212) 209-4917



Audio Operator:                    Timothy Wilson, ECRO


Transcription Company:             Access Transcripts, LLC
                                   10110 Youngwood Lane
                                   Fishers, IN 46038
                                   (855) 873-2223
                                   www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

```
APPEARANCES (Continued):

For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs and states
of California and
Arizona:                     Hagens Berman Sobol Shapiro LLP
                             By:  STEVE W. BERMAN, ESQ.
                             1918 Eighth Ave.
                             Suite 3300
                             Seattle, Washington 98101
                             (206) 623-7292


For Personal Injury
Accident Plaintiffs:         Goodwin Procter LLP
                             By:  WILLIAM P. WEINTRAUB, ESQ.
                                  GREGORY FOX, ESQ.
                             The New York Times Building
                             620 Eighth Avenue
                             New York, NY 10018-1405
                             (212) 813-8839


For Participating
Unitholders:                 Akin Gump Strauss Hauer & Feld LLP
                             By:  DANIEL GOLDEN, ESQ.
                             One Bryant Park
                             New York, NY 10036-6745
                             (212) 872-1000


For Certain Personal
Injury/Death Plaintiffs:  Hilliard Munoz & Gonzales LLP
                             By:  BOB HILLIARD, ESQ.
                             719 South Shoreline Boulevard #500
                             Corpus Christi, Texas  78401
                             (361) 882-1612


For Plaintiffs'              Otterbourg
Executive Committee:         By:  MELANIE L. CYGANOWSKI, ESQ.
                             230 Park Avenue
                             New York, NY  10169
                             (212) 905-3622
```

09-50026-mg   Doc 14093-20   Filed 09/11/17   Entered 09/11/17 18:46:54   Exhibit T -
Excerpts of August 17   2017 Status Conference   Pg 4 of 28

3

APPEARANCES (Continued):

For Motors Liquidation
GUC Trust:                       Gibson, Dunn & Crutcher LLP
                                 By:  KEITH R. MARTORANA, ESQ.
                                 200 Park Avenue
                                 New York, NY 10166-0193
                                 (212) 351-4000

For Additional Ignition
Switch  Pre-Closing
Accident Plaintiffs:             Andrews Myers
                                 By:  LISA M. NORMAN, ESQ.
                                 1885 Saint James Place, 15th Floor
                                 Houston, TX  77056-4110
                                 (713) 850-4200

TELEPHONIC APPEARANCES:

For Takata Plaintiffs:           Stutzman, Bromberg, Esserman & Plifka
                                 By:  SANDER L. ESSERMAN, ESQ.
                                 2323 Bryan Street
                                 Suite 2200
                                 Dallas, TX  75201-2689
                                 (214) 969-4900

4

1        (Proceedings commence at 3:05 p.m.)

2            THE COURT:  Please be seated.  We're here in Motors

3    Liquidation Company, 09-50026.  This is a status conference

4    scheduled at the request of certain parties in interest.  The

5    Court has received a flurry of letters and attachments over the

6    last few days relating to this matter.

7            Mr. Weisfelner, I'm going to ask you to start.

8            MR. WEISFELNER:  Thank you, Judge.  Your Honor, first

9    of all, welcome back from vacation.

10            THE COURT:  It's been a while, actually, but --

11            MR. WEISFELNER:  I'm assuming that like us, you

12    anticipated this status conference was going to have a

13    different tone and tenor.  In any event, Ed Weisfelner from

14    Brown Rudnick, together with my partner, Howard Steel.  Your

15    Honor, also on our side of the courtroom, William Weintraub and

16    Gregory Fox from Goodwin Procter.

17            Your Honor, we have all three co-leads from the MDL

18    who were also, in different capacities, signatories to the

19    settlement agreement or intended signatories to the settlement

20    agreement.  Steve Berman, Elizabeth Cabraser, Robert Hilliard

21    were all in transit when we heard that this hearing was going

22    to take a different turn.  Lisa Norman, I believe, is also in

23    court to round out the -- what I'll call plaintiffs' side of

24    the question, all intended signatories to the settlement

25    agreement, the drafts of which were provided to Your Honor.

5

1          Your Honor, as you know, based on the announcement I

2     made in open court way back in May, the parties, defined as

3     everyone on this side of the table, the GUC Trust and, to a

4     very important extent, the GUC Trust beneficiaries, some 66

5     percent of all the beneficiaries represented by the Akin Gump

6     firm, have been involved, frankly, since before May in

7     discussing the contours of a potential resolution of any number

8     of open matters that are on Your Honor's docket or could be put

9     on Your Honor's docket, including late-filed claims, a

10    propriety of late-filed claims, and the extent to which those

11    claims could or should be allowed.

12          Your Honor, following the May announcement in court,

13    we spent many, many months of discussion among the parties.

14    And as I think Your Honor can see through the email chains that

15    we provided early this morning, no later than late July, early

16    August, there was a final deal among the parties that was

17    subject to some additional fine-tuning of the documentation.

18    And I'll get back to that in a minute, but there were lots and

19    lots of submissions that crossed between the GUC Trust and the

20    unit holders on the one hand and the plaintiffs' side on the

21    other hand, including, in particular, expert reports submitted

22    both by economic loss plaintiffs' retained experts and personal

23    injury/wrongful death retained experts as to the value of their

24    claims.

25          THE COURT:  Is the pre-closing at --

09-50026-mg   Doc 14093-20   Filed 09/11/17   Entered 09/11/17 18:46:54   Exhibit T -
Excerpts of August 17   2017 Status Conference   Pg 7 of 28

6

1    MR. WEISFELNER:  Yes, pre-closing.

2    THE COURT:  -- injury or death plaintiffs?

3    MR. WEISFELNER:  Correct, Your Honor.  There were

4 declarations from Mr. Hilliard, from Mr. Berman, from

5 Ms. Cabraser, from Ms. Norman.  There was even a declaration

6 that was provided by Wilmington, the GUC Trust trustee, by a

7 woman by the name of Beth Andrews.  And again, from our

8 perspective -- well, before I get there, we also spent a ton of

9 time on the parties with noticed experts, in particular, with

10 the Epoch firm, trying to devise a notice procedure for this

11 settlement that would involve both direct mail notice in the

12 form of a postcard with reference to an appropriate website for

13 the longer version of the agreement, and we also worked quite

14 hard on social media and other methodologies for ensuring that

15 adequate notice went out to the world.

16    Now, Your Honor, no one on our side -- no one in the

17 world, I suspect -- thought that New GM was going to welcome

18 the development of a settlement with open arms.  We thought

19 they'd squeal.  And, in fact, they started to squeal before

20 Judge Furman this past Friday.

21    THE COURT:  Well, actually, I think at an earlier

22 hearing before me, Mr. Steinberg, when I advised that I had

23 received a telephone call from Magistrate Judge Cott about his

24 acting as a mediator, I think Mr. Steinberg, in substance,

25 indicated that New GM had not been a party to any discussions.

09-50026-mg   Doc 14093-20   Filed 09/11/17   Entered 09/11/17 18:46:54   Exhibit T - Excerpts of August 17   2017 Status Conference   Pg 8 of 28

7

1 So I was aware of that, at least as of that time if not --

2          MR. WEISFELNER:  Certainly.  And just to be more

3 specific, the involvement of Magistrate -- and I continuously

4 mispronounce his name, it's Cott, I think --

5          THE COURT:  Cott.

6          MR. WEISFELNER:  -- Cott, really involved a

7 down-the-road step as between plaintiffs on --

8          THE COURT:  He mentioned that it was mentioned at

9 allocation.

10          MR. WEISFELNER:  -- how to allocate.  That's right.

11          THE COURT:  We didn't talk any further than that

12 about it, but he advised me.

13          MR. WEISFELNER:  My point being that we heard from GM

14 as recently -- not to suggest that we didn't hear from them

15 before that, but as recently as Friday during the status

16 conference before Judge Furman in the MDL.

17          THE COURT:  Yes.  I first heard about it when I read

18 the Bankruptcy 360 report of what Judge Furman was told last

19 Friday, I guess.  When the request came for a conference this

20 week here, I wasn't told why, but I did read the Bankruptcy 360

21 report.

22          MR. WEISFELNER:  And again, you know, this side of

23 the courtroom, together with the GUC Trust, were accused of all

24 sorts of collusive bad-faith conduct, and GM announced to Judge

25 Furman it was their intent, I think, that day or soon as our

09-50026-mg    Doc 14093-20    Filed 09/11/17    Entered 09/11/17 18:46:54    Exhibit T -
Excerpts of August 17    2017 Status Conference    Pg 9 of 28

8

1 papers got filed with this Court to immediately seek withdrawal

2 of the reference.

3         And, Your Honor, again everyone I think anticipated

4 that New GM would take every available opportunity it had to

5 contest all or any portion of the settlement agreement when it

6 came before an appropriate court of jurisdiction, shall we say.

7 They could have raised collusion.  They could have raised

8 impropriety.  They could have raised that the estimation

9 amounts were outrageous and not supported by the evidence.

10        They didn't choose to do any of that.  They didn't

11 choose to afford anyone, including victims, their due process

12 day in court.  They instead, from what we currently understand,

13 insisted on a meeting with the GUC trustee, which happened I

14 think, if today is Thursday, apparently on Tuesday of this

15 week, a meeting to which the GUC Trust beneficiaries,

16 represented by Mr. Goldman at Akin Gump were excluded.

17        And somehow, during the course of that meeting

18 between GM and the GUC Trust, the GUC Trust purported to

19 abandon not only its fiduciary duties, but a settlement that it

20 already agreed to and to announce to us, not before 3:30

21 yesterday, that they were, quote, "taking a different tack."

22        Now, Your Honor, this is all still fresh news to us.

23 We've only had a couple of hours to consult with our clients

24 and our colleagues, but I can tell Your Honor what we currently

25 contemplate being the way forward.  We know that what's on the

09-50026-mg   Doc 14093-20   Filed 09/11/17   Entered 09/11/17 18:46:54   Exhibit T -
Excerpts of August 17   2017 Status Conference   Pg 10 of 28

9

1   calendar are the late claims filings, and I would ask Your

2   Honor to give us a couple of weeks to figure out how we proceed

3   on those.

4          But frankly I think there may very well need to be

5   some preliminary inquiries.  And like many in the media, it's

6   important to us that we gather the facts before we speak.  But

7   some things we could speak to immediately, and that is we

8   firmly believe that what we had with the GUC Trust was an

9   enforceable agreement under New York law, notwithstanding the

10  fact that signatures had not been appended to those agreements.

11         THE COURT:  I didn't read -- you appended to your

12  letter a unsigned copy of the agreement, and I can't say that

13  I've studied every aspect.  I did read through it this morning,

14  the --

15         MR. WEISFELNER:  Sure.  And that's absolutely true.

16  The signatures of the GUC Trust never got appended.

17  Mr. Golden, for the GUC Trust beneficiaries, indicated that

18  they were done and they would sign as soon as they got word

19  that the GUC Trust signed.  We were all in possession of

20  execution copies and ready to sign, which would have been the

21  first step before we submitted documents to you.

22         But, Your Honor, I think as you can see from the

23  email traffic, this wasn't a question of whether we had a deal.

24  This was a question of finalizing documents, and in point of

25  fact, Gibson Dunn clearly indicated they were done with all of

09-50026-mg   Doc 14093-20   Filed 09/11/17   Entered 09/11/17 18:46:54   Exhibit T -
Excerpts of August 17   2017 Status Conference   Pg 11 of 28

10

1  the operative documents, many of them they had the proverbial

2  pin on, and that they were merely awaiting their clients' final

3  consent to the form of the documents.

4       And again, Your Honor ,I don't want to argue the

5  merits, but I firmly believe, based on everything we know and

6  everything we've researched in the relative short period of

7  time we have, that if we chose to, we could require the GUC

8  Trust to perform under the agreement they had -- we think is

9  enforceable under New York law.

10      We also believe that New GM may have liability for

11 what I'll generally refer to as tortious interference.  We are

12 told, but have no reason to know for a fact, that the GUC

13 Trust's about face was the subject of or occasioned by some

14 very direct, very serious threats issued either by New GM or

15 New GM's professionals to the GUC Trust, the administrator of

16 the GUC Trust and their professionals.

17      And, Your Honor, in an effort to understand all the

18 facts before we move any further forward, we are going to seek

19 discovery from the GUC Trust, from New GM, in terms of

20 understanding who all attended this very critical meeting this

21 week, what discussions preceded that meeting, what, if any,

22 inducements were made, what, if any, threats were extended, and

23 whether the inducements crossed the line of Title 18.

24      Your Honor, that's really all I had to tell you by

25 way of update.  We are -- devastated is the wrong word.  We are

*[this page is intentionally left blank]*

09-50026-mg   Doc 14093-20   Filed 09/11/17   Entered 09/11/17 18:46:54   Exhibit T -
Excerpts of August 17   2017 Status Conference   Pg 13 of 28

15

1  statements that we had been working with him --

2          THE COURT:  It just happened -- you know, as I said

3  earlier, I didn't read the proposed settlement agreement in

4  detail.  It's a very lengthy --

5          MR. MARTORANA:  It is.

6          THE COURT:  -- exhibit, but it would seem to have

7  reflected a very considerable amount of time in negotiating the

8  agreement in the various --

9          MR. MARTORANA:  It did.

10          THE COURT:  -- exhibits.  Can you tell me --

11          MR. MARTORANA:  It did.  I do not disagree with that.

12          THE COURT:  Can you tell me approximately how long

13  the negotiations were going on.

14          MR. MARTORANA:  Well, I think I would say that the

15  concept of negotiations had been going on for, I mean, probably

16  close to a year, I think.

17          THE COURT:  Well, without the concept.  These were

18  very --

19          MR. MARTORANA:  The actual true --

20          THE COURT:  Stop.  Wait until I finish my questions.

21          Attached to Mr. Weisfelner's letter as -- are various

22  exhibits, voluminous exhibits, but the settlement agreement is

23  -- and its immediate exhibits are quite voluminous.  Can you

24  tell me how long the negotiations and drafting of the actual

25  settlement documents went on for?

09-50026-mg   Doc 14093-20   Filed 09/11/17   Entered 09/11/17 18:46:54   Exhibit T -
Excerpts of August 17   2017 Status Conference   Pg 14 of 28

16

1          MR. MARTORANA:  I would say about two months I think

2    is probably accurate, but --

3          THE COURT:  And you had one meeting with New GM this

4    week that caused Wilmington Trust to abandon the settlement

5    agreement?

6          MR. MARTORANA:  We did, Your Honor.

7          THE COURT:  One meeting.  Okay.

8          MR. MARTORANA:  One meeting.  Yes, we did, Your

9    Honor.  In our view, as a fiduciary, we were initially willing

10   to go forward with the deal, with the settlement as presented.

11   Obviously it was --

12         THE COURT:  And what is it --

13         MR. MARTORANA:  -- never signed off on.

14         THE COURT:  And what is it that New GM said that

15   persuaded your client to abandon the deal that had been under

16   discussion for considerable time and negotiation of documents

17   for quite a long time?

18         MR. MARTORANA:  Well, certainly they reminded of many

19   of the things we already knew, which was the risk --

20         THE COURT:  Go ahead.  None of this is privileged, so

21   tell -- I want to hear what you have.

22         MR. MARTORANA:  Sure.  They reminded us of all the

23   risks that were associated with the proposed settlement, in

24   particular the execution risks, which I can get into if you'd

25   like.  But there were certainly numerous execution risks.

09-50026-mg   Doc 14093-20   Filed 09/11/17   Entered 09/11/17 18:46:54   Exhibit T -
Excerpts of August 17   2017 Status Conference   Pg 15 of 28

17

1          THE COURT:  Well, there's going to be discovery, so I

2     would like to hear now -- and it probably will inform the

3     discovery.

4          MR. MARTORANA:  Sure.

5          THE COURT:  And I'm sure you'll be complete in

6     telling me what was -- how long did the meeting last?

7          MR. MARTORANA:  Maybe two hours --

8          THE COURT:  Okay.

9          MR. MARTORANA:  -- at most, I would say.

10          THE COURT:  And were documents circulated to you in

11     advance of the meeting?

12          MR. MARTORANA:  No, there were no documents

13     circulated.

14          THE COURT:  Was the decision to abandon the

15     settlement made at the meeting?

16          MR. MARTORANA:  The -- well, again, there were no

17     principals there, so there was no decision that could be made

18     at that meeting.  There was an offer that was floated, which

19     was tentative.  We followed up with our principals.  They

20     followed up with their principals.  And then, over the next day

21     or so, that proposal was boiled down to something more

22     concrete.

23          THE COURT:  And tell me what the proposals that New

24     GM made to you at the meeting.

25          MR. MARTORANA:  Well, the proposal that they made at

09-50026-mg   Doc 14093-20   Filed 09/11/17   Entered 09/11/17 18:46:54   Exhibit T -
Excerpts of August 17   2017 Status Conference   Pg 16 of 28

18

1  -- the first proposal that they made was continuing litigating

2  and we will pay your litigation costs against the plaintiffs.

3  That was the initial proposal that they made.  We ultimately

4  said, it's interesting, that sounds like something that we

5  might be able to work with, but at the end of the day, what our

6  two main concerns here are, that we're continuing a litigation

7  really for the benefit of New GM.  We feel like we've been

8  pulled into this, so obviously we're worried about spending

9  trust -- unitholder money for those purposes.

10         But then the -- a secondary or perhaps even bigger

11  issue is that at some point, probably after the term loan

12  litigation is fully and finally resolved, the GUC Trust will be

13  in a position to make a distribution to unitholders.  At this

14  point the GUC Trust cannot make a distribution to unitholders

15  until we figure out whether or not the 502(h) claim of the term

16  loan defendants is legitimate.  But at some point that will be

17  resolved, our mediation settlement or otherwise, and then we'll

18  be in a position to make a distribution.  And to the extent --

19         THE COURT:  Anybody who negotiates a settlement with

20  you better be careful because they may spend months doing it,

21  only to have you pull the rug out from under them at the last

22  hour.  You're smiling again.

23         MR. MARTORANA:  I'm sorry, I guess the question was I

24  didn't -- I don't understand --

25         THE COURT:  My comment was that anybody who

09-50026-mg   Doc 14093-20   Filed 09/11/17   Entered 09/11/17 18:46:54   Exhibit T -
Excerpts of August 17   2017 Status Conference   Pg 17 of 28

19

1  negotiates a settlement with you better be careful because you

2  may well pull the rug out from under them after months of

3  negotiation.  That was my comment as to which you had your big

4  grin on your face again.

5          MR. MARTORANA:  Well, I apologize, Your Honor.  But

6  at the end of the day, we are a fiduciary and we're going to

7  act in our fiduciary capacity.  And if that means abandoning a

8  proposal --

9          THE COURT:  And what other proposals did New GM make

10  to you that you considered in, I assume -- well, I won't ask

11  you what you recommended to your client.  What other proposals

12  did New GM make to you in the form of consideration for

13  abandoning the deal with the plaintiffs?

14          MR. MARTORANA:  Sure.  So again, getting back to the

15  point about a distribution, we said our two main concerns were

16  that we're continuing a litigation.  It's -- there's been a

17  number of costs that have been associated with that obviously.

18  It's continuing to pull down on trust assets.

19          And then the secondary aspect is that if we are in a

20  position to make a distribution and these claims continue to be

21  out there, there is no way that we're going to -- well, we

22  probably would not be able to make a distribution over the

23  existence of those claims.  And we would therefore -- currently

24  we're investing our assets -- required to invest our assets in

25  treasuries, and that is not really going to be a sufficient

09-50026-mg   Doc 14093-20   Filed 09/11/17   Entered 09/11/17 18:46:54   Exhibit T -
Excerpts of August 17   2017 Status Conference   Pg 18 of 28

20

1 rate of return that we could otherwise get if this deal were to

2 go forward, and this deal -- the plaintiffs' deal, and if we

3 were able to get the releases that we would be hoping for under

4 that -- under the plaintiffs' deal.

5       So the offer after further discussion that was made

6 was that New GM would be potentially willing to provide us with

7 a rate of return.  We don't know what that would be.  We've

8 agreed that we would enter into good-faith negotiations to

9 determine what that rate of return would be because, among

10 other things, we don't know what the corpus of the trust will

11 be at that time.  So it's hard to come to something -- to that

12 kind of agreement today.

13       But those -- we felt that those two things,

14 particularly given the fact that we believe on the merits we

15 have very strong arguments against the late claims, on Pioneer,

16 on equitable mootness, on tolling arrangements, that this offer

17 from New GM dealt with the main concerns that we were -- that

18 we had.  And as a fiduciary, we felt that we needed to do that.

19 We felt that you don't necessarily go for -- I understand that

20 hedge funds want to go for the absolute home run at the risk of

21 $21 million and everything else out there, but we represent

22 all --

23       THE COURT:  What's the $21 million?

24       MR. MARTORANA:  So the way that the plaintiffs'

25 proposal would work is that the GUC Trust would, up front, pay

09-50026-mg   Doc 14093-20   Filed 09/11/17   Entered 09/11/17 18:46:54   Exhibit T -
Excerpts of August 17   2017 Status Conference   Pg 19 of 28

21

1  $6 million for purposes of noticing.  So that would be out the

2  door before we even really get in front of Your Honor.  That

3  would just be a sunk cost for postcards.  And then it would be

4  followed by a $15 million payment and our agreement to support

5  a $10 billion claim as against New GM.  And we felt, among

6  other things, that there was a significant amount of execution

7  risk associated with that.  And, frankly, among other things,

8  that proposal, what we were really hoping to get out of it was

9  a release, get a true release from all the plaintiffs.

10         Given the fact that that proposal did not contemplate

11  and the plaintiffs would not agree to a Rule 23 settlement

12  certification, I think there's a potential execution risk

13  associated with actually accomplishing what it was that we

14  wanted to accomplish.

15         THE COURT:  Okay.  Anything else you want to tell me

16  now?

17         MR. MARTORANA:  No.  Thank you, Your Honor.

18         THE COURT:  All right.

19         Mr. Golden, I'd like to hear from you next.

20         MR. GOLDEN:  Yes.  Good afternoon, Your Honor.

21  Daniel H. Golden, Akin, Gump, Strauss, Hauer & Feld, counsel

22  for what's known as the participating unitholders.

23         Your Honor, this is really unfortunate that we find

24  ourselves in this situation where everybody now, in open court,

25  has to air their dirty laundry about a settlement that I think

22

1  was agreed to in principle.  I will say for the record I can

2  confirm the factual recitation that Mr. Weisfelner made as to

3  the facts leading up to the announcement by New GM and the GUC

4  Trust of their -- of GUC Trust's disavowal of that settlement

5  agreement and their intention to enter into a purported new

6  agreement with New GM.

7       Your Honor, I think it's clear something very odd is

8  going on here.  We worked arm in arm, shoulder to shoulder,

9  with the GUC Trust, Wilmington Trust as the trustee and the

10 trust administrator, and with its counsel, Gibson Dunn, over

11 several months to negotiate and document a settlement.  We had

12 many, many, many conversations, drafting sessions, redrafting

13 sessions to get to a point where we were, as of last Friday, to

14 get to a settlement, a global settlement as between the

15 plaintiff class, the GUC Trust, and the unitholders.

16      So let's talk a minute about who we represent.  We

17 represent 65 percent of the unitholders.  That is the

18 shareholders of the trust.  They are the only beneficiaries of

19 the trust should the reserves be freed up.  That's the reserves

20 of the 4- or 500 million that Mr. Weisfelner referred to, and

21 we represent 65 percent.

22      Look, I've worked really closely with the Gibson Dunn

23 lawyers.  I like them.  But to hear them talk about that they

24 have fiduciary duties, yes, they do.  Wilmington Trust has

25 fiduciary duties.  They have fiduciary duties to my clients.

09-50026-mg   Doc 14093-20   Filed 09/11/17   Entered 09/11/17 18:46:54   Exhibit T -
Excerpts of August 17   2017 Status Conference   Pg 21 of 28

23

1  Now, we don't represent all of the unitholders, but everyone

2  who has raised their hand and said, "I'm here and I want to get

3  involved," we represent them.

4       We worked really hard to get to this global

5  settlement, which would have had the benefit or the result of

6  eliminating all the late-claim litigation and all the

7  underlying allowance of those claims.  We think that that's a

8  settlement that this Court would have welcomed.  And that's

9  why, in part, we worked so hard to get there.  But in a blink,

10 in really literally a blink, without any conversation to the

11 unitholders or their counsel, without any invitation by Gibson

12 Dunn or Wilmington Trust to say, we've met with GM, they have

13 an alternative proposal on the table, we'd like to get your

14 views on it.

15      We certainly shared views with them for months and

16 months, but when it came to the point where they were willing

17 to disavow that settlement and consider a new settlement which

18 does not work for the participating unitholders, we sent a

19 letter to Your Honor this morning so that there's no mistake.

20 All of the unitholders we represent will not and do not support

21 the proposed settlement with GM.

22      So you have to ask the question, what is Wilmington

23 Trust thinking about when they want to go forward with a

24 settlement that has the disapproval of every fiduciary that it

25 represents who's weighed in on the subject?  Now, I'm not

24

1 saying that Wilmington Trust, who as an institution we worked

2 with for years.  Frankly, I'm just surprised we find ourselves

3 in this situation given our prior relationship and experience

4 with Wilmington Trust.  But what are they thinking about going

5 forward with a settlement over what will be active opposition

6 by the unitholders?  Something --

7         THE COURT:  Well, active opposition by New GM to the

8 proposed settlement that was --

9         MR. GOLDEN:  That's right.

10         THE COURT:  I mean, one way or the other, there's

11 going to be active opposition.

12         MR. GOLDEN:  That's absolutely right.  But the one

13 difference is the trust has no fiduciary obligations to New GM.

14 They do have fiduciary obligations to our client.  And I

15 confirm or reaffirm what Mr. Weisfelner said, that we did

16 expect active opposition from New GM.  We've had active

17 opposition from New GM almost throughout the inception of these

18 matters, so that's not a total surprise.  But what is

19 shockingly surprising to us is what was the motivation, what

20 was the rationale, what happened at that two-hour meeting to

21 have this absolute sea change.

22         Now, look, everybody's imagination can run wild.

23 Were there threats?  Were there inducements?  But there was

24 something there that caused, in two hours, for Wilmington Trust

25 and its counsel just to disavow five months of hard work, and

09-50026-mg   Doc 14093-20   Filed 09/11/17   Entered 09/11/17 18:46:54   Exhibit T - Excerpts of August 17   2017 Status Conference   Pg 23 of 28

25

1  we intend to find out what it is.  It's odd to us that we had

2  been originally -- when I said "we," the participating holders,

3  through their counsel, had been invited to the meeting that GM

4  had scheduled with Wilmington Trust, and then promptly

5  disinvited.

6         THE COURT:  Who disinvited you?

7         MR. GOLDEN:  We were advised by counsel for

8  Wilmington Trust that we were not -- we were no longer invited

9  to it.  I didn't question them.  I accepted that at face value.

10 I don't know who demanded it, but that's where the

11 communication came from.

12        Your Honor, I don't want to make this situation

13 worse.  We intend, to the best of our ability, still to work

14 with our trustee.  But if we can't, then we're going to

15 consider our alternatives, and that is not a threat, but it

16 just -- it's a recognition of the reality of the situation that

17 we find ourselves in.

18        This case, this overhang of the plaintiffs' claim,

19 have held this trust in abeyance for a very long time.  The

20 goal of this settlement was to, once and for all, be done with

21 the plaintiffs, get an absolute, full-bore release from the

22 plaintiffs in exchange for us doing the $6 million of noticing

23 costs -- and I'll come back to that in a second -- and a

24 $15 million payment.  Part and parcel of that overall

25 settlement agreement, but not interdependent upon getting the

09-50026-mg    Doc 14093-20    Filed 09/11/17    Entered 09/11/17 18:46:54    Exhibit T -
Excerpts of August 17    2017 Status Conference    Pg 24 of 28

26

1  release, was the agreement of the GUC Trust, supported by the

2  participating holders, to estimate the totality of the

3  plaintiffs' claims at somewhere around $10 billion, which would

4  have the effect of triggering what's known as the accordion

5  shares.  I know that's the part that GM doesn't like.  But they

6  would have every opportunity to object to that estimated

7  settlement of $10 billion.  We weren't looking to deprive them

8  of their ability to do that.

9          This conference, because Your Honor remarked that it

10 wasn't originally made clear to Your Honor what the purpose of

11 this conference was, was to preview that settlement proposal

12 with you.  We were certainly going to invite New GM, and we

13 thought it would be professionally courteous of us to advise

14 New GM in advance of the terms of our proposed settlement,

15 which Mr. Weisfelner and I did in a telephone call with

16 Mr. Steinberg and a partner whose name I forget at Kirkland and

17 Ellis last Wednesday.

18         Well, what did they do with that courtesy?  They

19 turned around, without any notice to us, and complained to

20 Judge Furman.  Why Judge Furman?  I'm not sure.  These matters

21 aren't before Judge Furman.  This settlement certainly wasn't

22 going to be before Judge Furman.  But it was their attempt, I

23 surmise, to attempt to start to poison the well.  Well, I was

24 very glad that Judge Furman's reaction was, take that up with

25 the bankruptcy court.

09-50026-mg    Doc 14093-20    Filed 09/11/17    Entered 09/11/17 18:46:54    Exhibit T -
Excerpts of August 17    2017 Status Conference    Pg 25 of 28

27

 1              THE COURT:  I should say I -- whenever I've had a

 2    conversation with Judge Furman, I've disclosed that I have.

 3    And I had a brief telephone conversation with Judge Furman on

 4    Tuesday morning.  He left a voicemail for me on Monday evening

 5    and I -- we spoke on Tuesday.  I -- he wanted me to be -- he

 6    wanted to be sure that I knew that there had been a

 7    presentation before him, or statements before him, that a

 8    settlement had been reached.  I told him that I read the

 9    Bankruptcy 360 report about it.  I told him that there had been

10    a request for a conference here, I had scheduled it, I hadn't

11    been informed at the time what the conference was about, but I

12    had scheduled it.  And that was the substance of the phone

13    conversation that I had with Judge Furman.

14              So I've tried to make a point, whenever he and I have

15    spoken, I've put it on the record.  We do not talk about the

16    merits of anything, but we informed --

17              MR. GOLDEN:  So --

18              THE COURT:  -- each other of procedural posture of

19    things.

20              MR. GOLDEN:  So continuing, we had had the

21    conversation with Mr. Steinberg and his colleague.  The purpose

22    of scheduling a status conference with you, Your Honor, was to

23    preview the settlement, not to argue the merits, but really to

24    preview the noticing procedures that we intend to follow

25    because this settlement contemplated a global release from all

09-50026-mg   Doc 14093-20   Filed 09/11/17   Entered 09/11/17 18:46:54   Exhibit T -
Excerpts of August 17   2017 Status Conference   Pg 26 of 28

28

1  the claims.  And we were going to do -- when I say "we," the

2  GUC Trust was going to do and spend $6 million on noticing to

3  make sure the plaintiffs -- something that Old GM never really

4  got around to doing, and that's why we find ourselves in this

5  mess.  But we were going to give direct notice to every party

6  who was the subject of a recall notice, so that's over

7  12 million parties, as well as notice to every party who has

8  started a lawsuit against Old GM/New GM based upon a presale

9  accident claim, so that nobody could complain this time that

10 the world has been put on notice as to the proposed settlement.

11       But we wanted to get a sense from Your Honor before

12 we went out and spent $6 million whether Your Honor thought

13 that would be an appropriate scope of notice.  That's all we

14 had originally intended to do at the status conference.  Well,

15 obviously events and facts have overtaken it, and we are where

16 we are.

17       Again, I'm here representing economic players.

18 They're not looking to go for the home run, as Mr. Martorana

19 said.  What they're looking for is peace in the valley.  They

20 want to get rid of the plaintiffs' claims and the plaintiffs'

21 claims against the trust for all time so that when the

22 avoidance action is settled or finally resolved, a final

23 distribution could be made.

24       THE COURT:  What's the face amount of the

25 approximately 65 percent of the unitholders -- of the claims of

09-50026-mg    Doc 14093-20    Filed 09/11/17    Entered 09/11/17 18:46:54    Exhibit T -
Excerpts of August 17    2017 Status Conference    Pg 27 of 28

29

1   the unitholders you represent?

2           MR. GOLDEN:  So it's not in dollar amount; it's

3   number of units.

4           THE COURT:  Units.

5           MR. GOLDEN:  Can I confer with my colleagues?

6           THE COURT:  Yeah, go ahead, sure.

7       (Counsel confer)

8           MR. GOLDEN:  It's 21 million units out of

9   approximately 31 million units.

10          THE COURT:  Okay.  All right.  Thank you, Mr. Golden.

11          MR. GOLDEN:  Thank you, Your Honor.

12          THE COURT:  Mr. Steinberg.

13          MR. STEINBERG:  Your Honor, Arthur Steinberg from

14  King & Spalding on behalf of New GM.

15          Mr. Weisfelner, in his presentation, said that he did

16  not want to speak prematurely until he gathered the facts, and

17  then he proceeded to speculate as to what the facts may be.

18  And there's a temptation that I have to be able to try to

19  respond to each and every time that he misstated what happened.

20  However --

21          THE COURT:  Let me say first, I thought your letter

22  to the Court was intemperate and inappropriate.  You could have

23  raised the issues that you raised.  So I know that there's very

24  strong feelings on -- there's more than two sides here -- on

25  all sides, but I didn't appreciate the tone of your letter.

49

1             **C E R T I F I C A T I O N**

2

3            I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9

10   _____

11   ALICIA JARRETT, AAERT NO. 428      DATE:  August 20, 2017

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25