# **Exhibit C**

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| KAITLYN REICHWALDT | * | |
| | * | |
| Plaintiff, | * | CIVIL ACTION FILE NO. |
| | * | |
| vs. | * | 1:16-CV-02171-twt |
| | * | |
| GENERAL MOTORS LLC, | * | |
| | * | **JURY TRIAL DEMANDED** |
| Defendant. | * | |

---

**REVISED FIRST AMENDED COMPLAINT**

---

James E. Butler, Jr.
Robert H. Snyder
Joseph M. Colwell

BUTLER WOOTEN & PEAK, LLP
105 13th Street
Post Office Box 2766
Columbus, Georgia 31902
706-322-1990

*Attorneys for Plaintiff*

## PREFACE

This Revised First Amended Complaint against Defendant General Motors LLC ("GM LLC") is filed by Plaintiff Kaitlyn Reichwaldt as a result of litigation instituted by GM LLC in the United States Bankruptcy Court for the Southern District of New York.

As an initial matter it is necessary to make clear that Plaintiff asserts claims against GM LLC both for the breach of the duty to warn by GM Corp. and against GM LLC for its breach of its own duty to warn.

Plaintiff's claim based on GM Corp.'s breach of the duty to warn is a product liability claim expressly assumed by GM LLC. It is undisputed that Defendant GM LLC expressly assumed liability for compensatory damages for product liability claims involving vehicles manufactured by GM Corp. before the bankruptcy sale resulting in injuries arising from wrecks occurring after the bankruptcy sale. That claim is not barred by the statute of repose. O.C.G.A. §51-1-11 (c).

Under Georgia law, GM LLC itself has had a duty to warn of the known danger posed by the "CK" pickup trucks manufactured and sold by GM Corp., both as a result of GM LLC's own knowledge of the defect and as a result of repeated notice to GM LLC itself of the specific and horrific danger posed by that

- 1 -

**Comment [DS1]:** This new "Preface" is inappropriate. The purpose of the proceedings before the Bankruptcy Court was not to give the Plaintiff an opportunity to add new allegations and arguments to the complaint. It was to "remov[e] impermissible allegations and clarify[] the allegations against New GM." Opinion, at 17.

**Comment [DS2]:** For the reasons set forth below, this version of the FAC still does not assert a valid Independent Claim against New GM. The general knowledge by New GM of accidents involving CK pickup trucks is not sufficient to state an Independent Claim given that there was no relationship between the plaintiff (or the Old GM vehicle owner) and New GM that give rise to a duty. New GM was not the manufacturer or seller of the Old GM vehicle and is not the successor to Old GM. You have essentially restated the alleged Old GM failure to warn claim.

defect.  GM LLC's knowledge of the danger was not based merely upon the fact

GM LLC possessed all the knowledge of GM Corp. about the defect in the GM

Corp. CK pickup trucks, although that *is* a fact.[1]  In addition to that knowledge and

notice, since July 10, 2009, people have continued to be burned and killed by fire

in post collision fuel fed fires in wrecks involving the GM Corp. "CK" pickup

trucks, and GM LLC was well aware of that fact long before Plaintiff was burned.

GM LLC has itself been sued as a result of such injuries and deaths, claims have

been made against GM LLC as a result thereof, and GM LLC has itself spent its

own money to settle such claims.  GM LLC is so aware that the subject defect is

indefensible that it has been unwilling to take any of those claims to trial.  GM

LLC also has its own considerable expertise with respect to fuel system design and

---

[1] *For example*, (a) the GM Corp. employees, including engineers, executives, and
in-house legal personnel who had extensive knowledge of the defect, were hired by
GM LLC to perform the same jobs for GM LLC that they had previously
performed for GM Corp, including the defense of product liability claims
involving the CK pickups and (b) GM LLC is itself in possession of all the GM
Corp. books and records that GM LLC acquired as part of its purchase of GM
Corp. assets, including an "extremely well organized" "Document Repository"
containing "over 300,000 pages of documents" that was created "to consolidate
and organize[ ] documents relating to the design, testing, manufacture and
performance of the fuel storage system in the [GM Corp.] 1973-86 C/K pickup
trucks." GM LLC "provides its own staff . . . to assist in performing searches and
locating documents" within that "Document Repository."  Jun. 2, 20117 GM
LLC's Suppl. Resp. to Pl.'s 1st Interrogs 1-2 (preliminary statement).

Comment [DS3]: Knowledge by itself does not create a duty to warn against a non-manufacturer, non-seller, non-successor.

Comment [DS4]: New GM has never denied that post-Sale accidents could lead to Assumed Liabilities, which are not Independent Claims.

- 2 -

knows, itself, that the fuel system on the subject GM Corp. "CK" trucks is so defective and dangerous it is indefensible.

> **Comment [DS5]:** Same comment as in No. 2 above.

Plaintiff asserts a claim for punitive damages against GM LLC under Georgia law based on GM LLC's own independent misconduct in failing to warn of the danger posed by the subject GM Corp. "CK" pickup trucks with side-mounted gas tanks. That claim for punitive damages is separate and apart from and *unrelated to* any claim Plaintiff might make for punitive damages against GM LLC based on the conduct of GM Corp., as distinguished from the conduct of GM LLC itself.[3] That GM LLC was on notice of the danger and therefore had its own independent duty to warn of a danger for which it admits it had assumed responsibility cannot be denied.

> **Comment [DS6]:** This is an Assumed Liability claim.

Plaintiff asserts that GM LLC's own breach of its own duty to warn was reckless and wanton and amounted to such conscious indifference as to warrant

---

[3] Plaintiff has revised this First Amended Complaint so that it is consistent with Bankruptcy Judge Glenn's August 31, 2017 Order. In doing so, Plaintiff has removed her request for punitive damages based on GM Corp. conduct. Plaintiff will appeal Judge Glenn's August 31, 2017 ruling that GM LLC did not contractually assume claims for punitive damages based on GM Corp.'s conduct. That dispute is not an issue to be resolved by this Court, but will instead be resolved by the Bankruptcy Court and the Second Circuit. By removing her request for punitive damages based on GM Corp.'s conduct, Plaintiff does not waive her right to seek leave at a later date to add that claim back into this Complaint if Judge Glenn's August 31, 2017 Order is reversed.

- 3 -

and demand the imposition of punitive damages against GM LLC under Georgia law. O.C.G.A. § 51-12-5.1

**Comment [DS7]:** Plaintiff's claim for punitive damages is inappropriate as no valid Independent Claim exists against New GM.

## I. INTRODUCTION

1.

This is yet another case for another victim of GM Corp.'s "CK" pickup trucks with gas tanks located *on the side* of the truck outside the frame rails with no protection from side impact.  The gas tanks were located in a known "crush zone"—in an area GM Corp. knew was vulnerable to side impact.  GM Corp. sold those GM Corp. CK pickups for 15 years, from 1973 until 1987.  Hundreds of Americans have burned, most to death, as a result of that design.  The design is *indefensible*.  As GM Corp. engineer Edward Ivey testified *twenty-two years ago*:

> Q:  Can you name a worse place to put a fuel tank than outside the frame rail on the side?
> A:  Well, yes, you could put it on the front bumper.[3]

2.

Despite actual knowledge of the defect and of the danger, despite settling countless cases, despite the long-concealed crash tests that proved the tanks were vulnerable to rupture and explosion, GM Corp. continuously denied the obvious—

---

[3] 1/9/94 Deposition of Edward Ivey, *Bishop v. GM Corp. & Cameron v. GM Corp.*, at 98/11-16.

that the design is indefensible—and refused to warn Americans of the danger.

3.

The litigation about GM Corp.'s CK pickups has been fought in courtrooms all across America for decades now, involved the concealment of evidence and the alleged destruction of documents,[4] and embroiled law firms from around the country, including from Atlanta.

4.

This particular case involves severe burn injuries suffered on January 27, 2015 by then-19-year-old Kaitlyn Reichwaldt as a result of a 1984 GM Corp. CK pickup truck sliding into her 2003 Taurus. The GM Corp. CK pickup had a gas tank mounted *on the side* of the vehicle outside the frame rails, unprotected by anything but body side sheet metal, and affixed to the rigid steel frame rail.

5.

Kaitlyn Reichwaldt was driving on Salt Creek Roadway, a divided four-lane road near the University of Nebraska in the city of Lincoln, Nebraska, with a raised median separating the lanes going eastbound and the lanes going westbound. A 1984 GM Corp. CK pickup truck with a side-mounted gas tank spun out of control

---

[4] In a 1992 deposition, engineer Theodore Kashmerick testified that documents retrieved from him were "shredded." *Elwell v. GM Corp.*, 91-115946-NZ, Circuit Court of Wayne County, Michigan, 12/29/92 at pp. 13/3-7, 24/5-20.

- 5 -

and crossed the median.  The side of the GM Corp. CK pickup struck the front of

Ms. Reichwaldt's vehicle—right at the side-mounted gas tank.  The gas tank was

crushed against the steel frame rail, gas sprayed over Ms. Reichwaldt's vehicle

including into the passenger compartment, the gas exploded, and she was severely

burned.  But for the heroic actions of a bystander who pulled her from her burning

car, Kaitlyn Reichwaldt surely would have burned to death.  Kaitlyn Reichwaldt

did nothing wrong; she was entirely innocent.  But for the burns, Ms. Reichwaldt

would have been uninjured in the wreck.

6.

The first CK pickup sold by GM Corp. was the model year 1973 pickup.

GM Corp. knew before that first CK pickup was sold that it posed a singular and

unique danger to occupants and to others on the road, because the gas tanks were

located on the side of the truck outside the frame rail, *in the crush zone,* and

affixed to rigid steel frame rails—against which the gas tanks could be crushed if

the side of the truck was hit by or hit another car or any other object.  That gas tank

design is indisputably vulnerable to side impact.

7.

The risk of post collision fuel fed fire is, of course, horrific—as the history

of GM Corp. CK pickup trucks proves.  Far too often people who should not have

- 6 -

been seriously injured at all in wrecks have been burned, or have burned to death, because GM Corp. chose to put its gas tanks on the side of the GM Corp. CK pickups.

8.

That gas tanks located in a known crush zone make occupants and others vulnerable to horrific injuries or death has long been well known in the automotive industry.[5]

9.

GM Corp. knew that gas tanks must not be located where they are unprotected from impact—and especially should not be located *outside* the frame rail:

(a) In *1930*, GM Corp. published an ad for a Chevrolet stating the gas "tank is thoroughly protected by the wide rear cross member and heavy frame side members."

---

[5] *See*, *e.g.*, June 3, 2013 NHTSA "recall request letter," sent to Chrysler: "The vulnerability of tanks located behind solid rear axles in rear impacts became well known following a series of fiery crashes involving the Ford Pinto. . . . It was a well-publicized, terrible tragedy that people burned to death in these vehicles." GM Corp.'s side-mounted gas tanks were even *more* vulnerable—they were closer to a striking vehicle than most rear-mounted gas tanks, and even less protected. "In June 1978, Ford agreed to recall the Pinto and Bobcat. The defect was that the fuel tanks installed on these vehicles are subject to failure when the vehicles are struck from the rear." *Id*.

- 7 -

(b) In *1932*, the Society of Automotive Engineers ("SAE") published a paper stating that the gas tank "should be protected by the body and the frame."

(c) In *1964*, a GM Corp. Executive Engineer wrote a "Design Directive" stating "the fuel tank must be mounted as near to the center of the vehicle (truck) as practical."

(d) In *1974* the SAE published another paper stating that truck gas tanks should be located *inside* "rugged *frame* channels."

(e) In *1978*, a "jury" of GM Corp. engineers studying "alternative fuel tank locations" for trucks recommended the inside the frame rails location.

(f) In *1981*, GM Corp. conducted its own secret and long-concealed vehicle-to-vehicle side-impact collision tests on GM Corp. CK pickups.  The results gave GM Corp. actual notice and knowledge that gas tanks mounted on the side outside the frame rails were vulnerable to rupture in side impact.

(g) In *1981*, GM Corp. advertised about its new S-10 pickups, "fuel tank is located *inside* the left hand *frame rail* for protection from side impacts."

(h) In *1982*, a GM Corp. engineer estimated the cost to "relocate" the GM Corp. CK side-mounted gas tanks to an inside the frame rails location would be only $1.33 per tank.

- 8 -

(i) By *1983*, GM Corp. was already designing the new 1988 pickup with the gas tank located inside the frame rail for "added protection" in side impacts, and a GM Corp. engineer's presentation about the new pickup stated the inside the frame rail location is "much less vulnerable."

(j) In *1985,* a GM Corp. engineer made a presentation to the President of GM Corp., stating that the GM Corp. CK pickup "is subject to intense pressure as a result of litigation due to PCFFF [post collision fuel fed fire]," and noted that the planned new design with an inside the frame rail gas tank will "reduce this concern."

(k) When finally, in *1988*, GM Corp. moved the gas tank to the inside the frame rail location, GM Corp. issued a "confidential" directive to its sales staff stating "fuel tank is located *inside the frame rail* to reduce the chance of fuel spillage on side impact."

10.

Despite all that knowledge and notice, GM Corp. elected to manufacture and sell the 1984 GM Corp. CK pickup with side-mounted gas tanks that struck Plaintiff's car on January 27, 2015.

11.

In May 1972, one of GM Corp.'s testifying engineers prepared a memo—

before the GM Corp. CK trucks were first sold as model year 1973 vehicles—

attesting to the fact that a gas leak "should not occur" unless the impact itself was

great enough to cause fatalities.

12.

GM Corp. put the gas tank on the side of its CK pickups solely for

marketing reasons—so GM Corp. could advertise that the pickup had a larger gas

tank and greater range.

13.

It was feasible and practical for GM Corp. to design and build the subject

pickups with gas tanks located inside the frame rail.

14.

GM Corp.'s awareness of the horrific risk is reflected by its preparation in

1973—the first model year GM Corp. sold its CK pickups—of a "cost-benefit

analysis" which concluded that it was cheaper for GM Corp. to settle post collision

fuel fed fire cases than to eliminate all post collision fuel fed fires in GM Corp.

vehicles.  That "cost benefit analysis" came to be known as the "Ivey

memorandum," named after the engineer who prepared it for GM Corp. at the

- 10 -

direction of his superiors.[6]

15.

For years GM Corp. actively concealed the "Ivey memorandum" from plaintiffs, courts, and juries. When it was finally discovered, Ivey was deposed. His sworn testimony was totally contrary to what he had told GM Corp.'s lawyers about the memorandum prior to that deposition. That ultimately resulted in a Court Order finding that "GM [Corp.] in fact acted [to] commit crimes and frauds" and that GM Corp. had, by concealing the Ivey memorandum, violated Court Orders in other cases.[7]

16.

In 1973—the year they were first sold—GM Corp. claimed its first GM Corp. CK truck fire victim: Ernest Leon Smith of Columbus, Muscogee County, Georgia.

17.

Initially, GM Corp. defended some CK lawsuits, trying a few cases, but

---

[6] Ivey calculated that if GM Corp. paid an average of $200,000.00 per claim for those claims alleging death by fire, the cost to GM Corp. would be $2.40 per vehicle sold. Ivey calculated it would be worth $2.20 per vehicle for GM Corp. to prevent all deaths by fire in GM Corp. vehicles.
[7] *Bampoe-Parry v. GM Corp.*, State Court of Fulton County, Ga., Civil Action File Nos. 98V50138297J & 98V50138298J, Sept. 9, 1999.

settling far more.  In 1993, GM Corp. was forced to try the case of *Moseley v. GM.* in Atlanta, Georgia.  That trial resulted in a widely publicized $105 million verdict, including punitive damages.[8]  The *Moseley* case arose after seventeen year old Shannon Moseley of Snellville, Georgia was burned to death when his GM Corp. CK pickup was hit in the side.  His parents refused to settle.  After the $105 million verdict in the trial of *Moseley v. GM*, GM Corp. tried only two CK cases: both were cases where the impact forces were so great the alternative gas tank location was also severely compromised.  Those were cases GM Corp. should not have been able to lose.

18.

For many years in the 1970s and 1980s, GM Corp.'s principal testifying in-house engineer for fire cases was Ronald Elwell.  He defended the GM Corp. CK truck in depositions.  He testified under oath that GM Corp. had conducted no vehicle-to-vehicle crash testing of the GM Corp. CK trucks.  Then, in 1983, Elwell was told by GM Corp. Executive Vice President Alexander McKeen that he ought to go out to the GM Corp. proving grounds – that he might find something interesting there.  Elwell did so, and found "over 20" GM Corp. CK trucks that had

---

[8] *Moseley v. GM Corp.* was reversed on appeal and then settled by GM Corp. just before retrial, along with three other CK cases.

been subjected to vehicle-to-vehicle side impact crash testing.  Elwell subsequently

testified, in the *Moseley* trial, about the gas tanks on those pickups: "they were

badly smashed. There were holes in them as big as melons.  They were split open."

McKeen told Elwell those crash tests were done starting in 1981 after GM Corp.

Assistant General Counsel Babcock told McKeen "they could no longer defend the

product."  The existence of those crash tests had never been revealed by GM Corp.

to any court, jury, or plaintiff.[9]  1981 was three years before GM Corp. built and

sold the 1984 GM Corp. CK pickup that struck Plaintiff's car, and 34 years before

Plaintiff was burned as a result of the gas tank design on that 1984 GM Corp. CK

pickup.

19.

After seeing those crashed GM Corp. CKs, Elwell complained to his

superior that he might have unintentionally committed perjury.  GM Corp. never

again had him testify in a GM Corp. CK fire case.[10]

20.

By 1982, fire cases were causing GM Corp. so much trouble that then-CEO

Roger Smith ordered a roundup of all internal documents that might be subject to

---

[9] *Moseley v. GM Corp.,* 1-14-93 Trial Transcript Vol. 13 (Elwell) at 126/9-127/1,
127/16-134/20.

[10] *Moseley v. GM Corp.*, 1-14-93 Trial Transcript Vol. 13 (Elwell) at 135/12-22.

- 13 -

requests for documents in fire cases.  Initially the search was for documents

relating to passenger cars; by 1983 the search was expanded to include trucks.  GM

Corp. called upon its various "regional counsel" law firms to send young lawyers

to Detroit to review all the collected documents.  Internally, GM Corp. staff

referred to the young lawyers as the "firebabies."[11]

21.

GM Corp. was sued in hundreds of cases as a result of people being burned

in post collision fuel fed fires involving GM Corp. CK pickups with outside the

frame rail gas tanks.

22.

What happened on January 27, 2015—a post collision fuel fed fire involving

a GM Corp. CK pickup that causes injuries to an innocent person—had happened

many times before.  Plaintiffs' counsel are aware of some 957 other incidents

involving post collision fuel fed fire in GM Corp. CK pickups with outside the

frame rail gas tanks.[12]

---

[11] Dep. of GM Corp. lawyer Brian Eyres, 93 1083 CBM, US District Court,
Central Dist. of CA, 9/29/93 at pp. 202/21-203/6.

[12] *See* Exhibit A hereto:  Plaintiffs' list of 782 other such incidents, *Byrd v. GM
Corp.*, M.D. Mt, 1998, CV-98-168-M-DWM.   In 2015, GM LLC acknowledged
another 175 such incidents since the *Byrd* case was settled.  *See* Exhibit B hereto,
*Williams v. GM LLC,* N.D. Ga. Case No. 1:14-CV-02908.  In *Williams v. GM LLC,*

- 14 -

23.

GM Corp. quit making the CK pickups after model year 1987, and for model year 1988, GM Corp. finally moved the gas tank to the alternative location advocated by safety experts for decades—to an inside the frame rail location, where the gas tank is protected from side impacts.

24.

In addition to Kaitlyn Reichwaldt, many other victims who were not even occupants of GM Corp. CK pickups have been burned when a crash ruptured the side-mounted gas tank of a GM Corp. CK.  Examples include but are not limited to:

(a) On December 5, 1973, Ernest Leon Smith of Columbus, Georgia was driving a Nash Rambler station wagon when a 1973 GM Corp. CK truck turned left in front of his car, causing Mr. Smith's car to strike the right side of the truck, rupturing the gas tank and causing a fire.  The whole left side of Mr. Smith's face and torso were burned; he suffered a stroke while in the hospital after seeing himself in the mirror and never fully recovered prior to his death in 1997.

---

GM LLC admitted that it had notice that there was a fire following a CK wreck in 718 of the incidents identified in Exhibit A.  *See* Exhibit C hereto.

- 15 -

(b) On October 29, 1992, thirty year old Calvin Cockrum of Altoona, Kansas was burned to death when his motorcycle slid and hit the side-mounted gas tank on a GM Corp. CK, dousing him with gas which exploded.

(c) On October 8, 1995, Jerome Dalton of Greene County, Georgia was burned to death when his motorcycle slid and hit the side-mounted gas tank on a GM Corp. CK, dousing him with gas which exploded.

(d) On August 31, 1996, Denise Barnes of Columbia, South Carolina was burned to death when her 1994 Saturn struck the side of a GM Corp. CK.

(e) On May 26, 2000, Corinne Gallagher of Flathead, Montana and all three of her sons, Thomas (8), Anthony (10), and Patrick (12), burned to death when the Hyundai she was driving was struck by a GM Corp.   CK resulting in gas tank rupture and post collision fuel fed fire.

25.

Many families have suffered multiple losses as a result of post collision fuel fed fire after a GM Corp. CK's outside the frame rail gas tank was ruptured.  In addition to Corinne Gallagher and all three of her sons, examples include:

(a)  On May 20, 1990, a car ran a stop sign in Elfrida, Arizona and hit Daniel Hannah's GM Corp. CK in the side.  Mr. Hannah was severely burned trying to save his two sons, Nathan 16 and Gabriel 17, who were trapped

- 16 -

inside the pickup.  Mr. Hannah testified that the flames were "as high as trees."  He was unable to get his sons out of the vehicle, and saw them burn to death.

(b) On July 15, 1995, Steven Seebeck of Bryan County, Georgia along with his young son Michael Seebeck were traveling in a 1979 GM Corp. CK pickup in Fort Stewart, Georgia when a car crossed the center line and collided with the pickup rupturing the gas tank and causing a post collision fuel fed fire.  Both father and son burned to death.

(c) On December 22, 1997, Darrell Byrd and Angela Byrd along with their two sons, Timothy and Samuel, were traveling from Fortine, Montana to North Carolina to visit family for Christmas.  Near Russell, Kansas, the 1985 GM Corp. CK truck they were traveling in collided with a tractor trailer.  Darrell, Angela, and Timothy all burned to death.  Samuel was burned, but survived.

26.

That the problem with the GM Corp. CK trucks and post collision fuel fed fire was in fact the gas tank location *was admitted* by the very first witness *GM Corp. itself called* to testify at the *Moseley* trial, a professional engineer and Georgia Tech graduate who was then County Engineer for Gwinnett County,

- 17 -

George W. Black.[13]  Black investigated the Moseley wreck, which GM Corp. claimed was a "high speed" wreck.  Black testified to a wreck involving a GM Corp. CK truck in a parking lot where the gas tank ruptured, and admitted that it was "reasonable to say that when you get failures at high speed and failures at low speed that tends to indicate the problem isn't the speed, the problem is the location of the fuel tank."[14]  Mr. Black also confessed that he had told the plaintiffs' accident reconstruction engineer that "you don't have to be a rocket scientist to understand that the fuel tank should not be outside the frame."[15]

27.

Today, hundreds of thousands of GM Corp. CK pickups capable of causing the mayhem visited upon Kaitlyn Reichwaldt in January 2015 are still on the roads of America.  The terrible defect of the gas tank location on GM Corp. CK pickups continues to put American citizens at risk of horrible injuries and death, and continues to cause injuries and deaths due to fire.  ~~These facts are well known to GM LLC.~~

**Comment [DS8]:** Generalized knowledge by New GM is insufficient to assert an Independent Claim given that there is no relationship between the plaintiff (or the Old GM vehicle owner) and New GM that gave rise to a duty.

**Facts Related to GM Corp.'s Bankruptcy**

---

[13] Mr. Black subsequently was appointed by President Clinton as a member of the National Transportation Safety Board, where he served two terms.  Mr. Black died in 2015.

[14] *Moseley v. GM Corp.*, 1-22-93 Trial Transcript (Black) Vol. 20 at 112/7-23.

[15] *Moseley v. GM Corp.*, 1-22-93 Trial Transcript (Black) Vol. 20 at 107/14-18.

- 18 -

28.

On June 1, 2009, GM Corp. filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of New York.  On July 5, 2009, the bankruptcy court approved the sale of substantially all of GM Corp.'s assets pursuant to an Amended and Restated Master Sale Purchase Agreement ("Sale Agreement").  That Sale Agreement became effective on July 10, 2009.

29.

The Sale Agreement provides that part of the "Purchased Assets" GM LLC got from GM Corp. included:

> (xiv) all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials, reports and other materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data; [and]

Sale Agreement § 2.2.[16]

---

[16] The Sale Agreement is attached as an exhibit to the bankruptcy court's Sale Order. The Sale Agreement along with the first and second amendments to that agreement are available via PACER.  *In re Gen. Motors Corp.*, No. 09-50026-REG (Bankr. S.D.N.Y. July 5, 2009), ECF No. 2968-2.

- 19 -

30.

Along with the Purchased Assets, GM LLC also expressly assumed certain

liabilities of GM Corp. including, among others:

> (vii) (A) all Liabilities arising under express written warranties of Sellers [GM Corp.] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers [GM Corp.] or Purchaser [Defendant GM LLC] prior to or after the Closing and (B) all obligations under Lemon Laws;

> . . .

> (ix) all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers [GM Corp.] (collectively, "Product Liabilities"), which arise directly out of death, personal injury or other injury to Persons or damage to property caused by accidents or incidents first occurring on or after the Closing Date and arising from such motor vehicles' operation or performance (for avoidance of doubt, Purchaser [Defendant GM LLC] shall not assume, or become liable to pay, perform or discharge, any Liability arising or contended to arise by reason of exposure to materials utilized in the assembly or fabrication of motor vehicles manufactured by Sellers [GM Corp.] and delivered prior to the Closing Date, including asbestos, silicates or fluids, regardless of when such alleged exposure occurs);

> . . .

> (xi) all Liabilities arising out of, relating to, in respect of, or in connection with the use ownership or sale of the Purchased Assets after the Closing.

Sale Agreement § 2.3(a)

31.

GM LLC also undertook contractual responsibility for compliance with an

array of laws and other regulations, including:

> (a) From and after the Closing, Purchaser [Defendant GM LLC] shall
> comply with the certification, reporting, and recall requirements of the
> National Traffic and Motor Vehicle Safety Act, the Transportation
> Recall Enhancement, Accountability and Documentation Act, the
> Clean Air Act, the California Health and Safety Code and similar
> Laws, in each case, to the extent applicable in respect of vehicles and
> vehicle parts manufactured or distributed by Seller [GM Corp.].

> (b) From and after the Closing, Purchaser [Defendant GM LLC] shall
> be responsible for the administration, management and payment of all
> Liabilities arising under (i) express written warranties of Sellers [GM
> Corp.] . . . (ii) Lemon Laws.

Sale Agreement § 6.15

32.

Pursuant to the Sale Agreement and orders of the bankruptcy court,

Defendant GM LLC purchased assets of GM Corp. and hired most of GM Corp.'s

employees, including many of its senior-level managers, officers, and directors.

## II.  PARTIES, JURISDICTION, VENUE, AND SERVICE OF PROCESS

33.

Plaintiff Kaitlyn Reichwaldt resides at 5162 Running Doe Drive, Suwannee,

- 21 -

GA 30024, is subject to the jurisdiction of this Court, and is a resident of the State of Georgia.

34.

Defendant GM LLC is a limited liability company organized and incorporated under the laws of Delaware, with a principal place of business located at 300 Renaissance Center, Detroit, Michigan 48265. GM LLC is engaged in the business of designing, manufacturing, marketing, promoting, advertising, distributing, and selling automobiles, trucks, SUVs, and other types of vehicles in the State of Georgia, throughout the United States, and elsewhere.

35.

GM LLC is subject to the jurisdiction of this Court because it transacts business in, has registered as a foreign LLC transacting business in and maintains a registered agent in the State of Georgia. The registered agent for GM LLC is: CSC of Cobb County, Inc., 192 Anderson Street S.E., Suite 125, Marietta, Georgia 30060, where GM LLC may be served with legal process. By registering to do business and appointing a registered agent for service of process in Georgia, GM LLC has consented to jurisdiction in this state. GM LLC has admitted that it is subject to the jurisdiction of this Court. Doc. 27.

36.

GM LLC also is subject to general personal jurisdiction in the state of Georgia because GM LLC is essentially at home in the State of Georgia.  In 2012, GM LLC purchased property and invested more than $25 million in this state to build an Information Technology Innovation Center ("IT Innovation Center") in Roswell, Georgia.  The IT Innovation Center, which is one of only four such centers nationwide, coordinates, facilitates and runs information technology services including research and design functions for GM LLC's nationwide and worldwide business operations.  In a press release announcing the decision to locate the IT Innovation Center in Georgia, the GM LLC Chief Information Officer, Randy Mott, referred to the IT Innovation Center as "critical to [GM's] overall business strategy."  In exchange for selecting Georgia as the home of an IT Innovation Center, GM LLC asked for and received more than $20 million in tax incentives from the state of Georgia.  In total, GM LLC employs more than 1,000 Georgia residents as employees at the IT Innovation Center.  As a result of the foregoing, GM LLC has chosen to be essentially at home in the state of Georgia and is subject to general personal jurisdiction in this state.

37.

Venue is proper in this Court because the Northern District of Georgia is the federal district Court for Cobb County, Georgia, the county from which this case

was removed by GM LLC.

### III. OPERATIVE FACTS

38.

The excruciating thermal burns suffered by Kaitlyn Reichwaldt were the direct and proximate result of the explosion and fire.

39.

Consumed by the fire and smoke engulfing her car, Ms. Reichwaldt consciously suffered and endured shock, terror, fright, physical and mental pain, suffering, and injuries.

40.

The fire and fire-related injuries of Kaitlyn Reichwaldt were caused by design defects in the 1984 GM Corp. CK pickup.

### **Facts Related to GM Corp.'s Liability**

41.

Before it designed, built, and sold the subject pickup, GM Corp. knew that the fuel system design of the subject pickup was defective and vulnerable to side impact. GM Corp. also knew that a midship gas tank located inside the frame rails and between the axles would be a much less vulnerable location than the side-mounted gas tank outside the frame rails.

- 24 -

42.

Before it designed, built, and sold the subject pickup, GM Corp. knew that locating the gas tank inside the frame rails and between the axles would provide much greater protection during side impacts, resulting in increased protection for occupants of the pickups and anyone whose vehicle is hit by or hits a GM Corp. CK.

43.

Before and after it designed, built and sold the subject pickup and before Kaitlyn Reichwaldt's injuries, GM Corp. knew that a vehicle with a gas tank mounted on the side, *outside* of the frame rail, was more likely to leak gas as a result of a rupture in a side-impact collision than a vehicle with a gas tank mounted *inside* of the frame rail.

44.

Before and after it designed built and sold the subject pickup and before Kaitlyn Reichwaldt's injuries, GM Corp. knew that when a vehicle with a gas tank mounted on the side, outside of the frame rail, was struck during a side-impact collision, a deadly post-collision fuel fed fire was a clear risk.

45.

GM Corp. affirmatively tried to keep citizens and potential victims ignorant

of dangers posed by GM Corp.'s side-mounted gas tanks.

46.

As a direct result of GM Corp.'s conduct outlined above, Kaitlyn Reichwaldt

was severely burned by fire.

**Facts Related to GM LLC's Liability for Plaintiff's Claims Based on the
Conduct of GM Corp. (Count One & Count Two)**

47.

As part of its 2009 bankruptcy purchase of assets of GM Corp., Defendant

GM LLC expressly assumed liability for compensatory damages for product

liability claims involving vehicles manufactured by GM Corp. before the

bankruptcy sale resulting in injuries arising from wrecks occurring after the

bankruptcy sale.  Sale Agreement § 2.3(a)(ix) (as amended).

~~**Facts Related to GM LLC's Liability for Plaintiff's Independent Georgia Law
Claims Based on the Conduct of GM LLC Itself (Count Three & Count Four)**~~

~~48.~~

~~*In summary*, GM LLC did not merely acquire the knowledge about the~~

~~subject defect possessed by GM Corp. from the books and records of GM Corp.~~

~~and from hiring GM Corp. employees intimately familiar with the defect and the~~

~~history of the defect.   GM LLC is itself expert with respect to fuel system design~~

~~and knows, itself, that the fuel system on the subject GM Corp. CK trucks is~~

- 26 -

~~defective and dangerous.  In addition, GM admits that it has been *repeatedly* put on~~

~~notice, since July 10, 2009, that citizens have burned, often to death, following side~~

~~impacts into a GM Corp. CK pickup with side-mounted gas tanks.  GM LLC~~

~~admits that it has defended numerous such claims since July 10, 2009, and settled~~

~~them all, paying to claimants GM LLC's own money.  GM LLC has declined to~~

~~take any such claims to trial.  GM admits that as part of the sale agreement it~~

~~expressly assumed the continuing duty to monitor the performance of vehicles~~

~~manufactured by GM Corp. and to notify owners of vehicles manufactured by GM~~

~~Corp. of defects in those vehicles, as required by law.[17]~~

~~49.~~

~~*In this Court*, in the case of *Williams v. GM LLC*, No. 1:14-cv-2908-WBH~~

~~(filed N.D. Ga. Sept. 10, 2014), defendant GM LLC admitted to eight lawsuits it~~

~~defended claiming burn injuries and/or deaths following GM Corp. CK pickup~~

~~truck wrecks and fuel tank failure, none of which GM LLC was willing to take to~~

---

~~[17] *See* Sale Agreement, §6.15 "(a) From and after the Closing, Purchaser [Defendant GM LLC] shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [GM Corp.].~~

trial, all of which GM LLC settled, paying GM LLC's own money to settle those cases. Those lawsuits arose from five wrecks that occurred on these dates in these states: 9/29/12 Oklahoma; 11/11/12 South Carolina; 7/27/13 Missouri; 2/12/14 Georgia; 4/25/14 Arkansas. *See* Exh. B, attached hereto.

50.

GM LLC has a legal duty to monitor, and does in fact monitor, the field performance of vehicles manufactured by GM Corp., including the GM Corp. CK pickup trucks. A primary source available to an automaker monitoring field performance is the "Fatality Analysis Reporting System" ("FARS") database maintained by the federal National Highway Transportation Safety Administration ("NHTSA"). *In addition to* the eight lawsuits involving five wrecks to which GM LLC admitted in *Williams v. GM LLC*, NHTSA's FARS database shows *another* eleven reported incidents since July 10, 2009 involving wrecks of GM Corp. CK pickup trucks where fire was reported as the "most harmful event":

| | | | | |
|---|---|---|---|---|
| 08-18-09[F] | FARS Case 481667 | Marshall TX | 1 Death, 3 Injuries | 1987 Chevy R10 1GCER14K7HS1 |
| 08-20-09[F] | FARS Case 61613 | Mendocino Co. CA | 1 Death | 1986 Chevy C10 1GCDC14F0GJ1 |
| 10-26-09[F] | FARS Case 90157 | Durham NC | 1 Death | 1987 GMC R15 1GTDR14H7HF7 |

| 08-04-11[F] | FARS Case<br>FARS 481652 | Houston, TX | 1 Death | 1984 Chevy C20<br>1GCGC24M8ES |
|---|---|---|---|---|
| 02-23-12[F] | James Swain<br>FARS 120238 | Calhoun Co. FL | 1 Death | 1986 Chevy K10<br>1GCEK14H6GF |
| 05-13-12[F] | Demetrius Suggs<br>Porscha Suggs<br>Mercedes Davis<br>Raneisha Powell<br>FARS 120869 | Martin Co. FL | 4 Deaths, 1 Injury | 1982 Chevy C10<br>1GCDC14H2CF |
| 09-29-12[F] | Laurie Murphy Palmer<br>Macie Grace Palmer<br>Kenneth Ransom Myers<br>Janelle Virgin Myers<br>FARS 400508 | Pottawatomie Co. OK | 4 Deaths | 1978 Chevy C10<br>CCL448S1359 |
| 12-24-12[F] | Joshua Peavley<br>Gary Mefford<br>Brenda Mefford<br>FARS 470907 | Campbell Co. TN | 3 Deaths, 3 Injuries | 1985 Chevy C10<br>1GCDC14H7FF |
| 09-29-13[F] | Bo Dylan Sturgell<br>FARS 390696 | Pickaway Co. OH | 1 Death | 1987 Chevy R10<br>1GCDR14H7HF3 |
| 11-19-13[F] | Robert Johnson<br>Shirley Johnson<br>340430 | Jackson, NJ | 2 Deaths | 1985 Chevy C30<br>1GBHC34W9FJ1 |
| 05-25-14[F] | Nathan Mosley<br>220219 | Red River Par. LA | 1 Death | 1987 Chevy R10<br>1GCDR14K8HS1 |
| 03-09-15[F] | Bobby Goodman<br>470146 | Weakley Co. TN | 1 Death | 1984 Chevy C10<br>1GCDC14H7EF3 |

Those wrecks occurred in nine states:  Texas, California, North Carolina, Florida, Oklahoma, Tennessee, Ohio, New Jersey, and Louisiana.   GM LLC was on notice of all those other incidents.

51.

GM LLC is surely aware of other incidents where people burned after a GM Corp. CK truck wreck in which the side-mounted tank failed resulting in post collision fuel fed fire. This Plaintiff's efforts, and the efforts of the Williams family in *Williams v. GM*, have thus far been unsuccessful in establishing the full extent of GM LLC's knowledge of other such incidents. But eight known lawsuits relating to five known wrecks and eleven other incidents posted on NHTSA's FARS database with fire as the "most harmful event" is a lot of notice to GM LLC since July 10, 2009. From such notice GM LLC has gained additional knowledge of its own about the defect at issue in this case and the dangers of that defect.

52.

In addition, in the 2009 bankruptcy sale, GM LLC acquired the books and records previously maintained by GM Corp. related to the defect in the GM Corp. CK pickup trucks with side-mounted gas tanks. Those books and records included the entire history of GM Corp. getting notice of other similar incidents, defending hundreds of lawsuits, and paying hundreds of millions of dollars to settle lawsuits and claims while rarely being willing to take to trial any claim that the fuel system on the GM Corp. CK pickups was defective. GM Corp. had, and GM LLC now owns, so many books and records relating to the GM Corp. CK pickup truck fuel

system and alleging that it was defective that GM Corp. organized those books and

records into what it called, and GM LLC now calls, the GM Corp. CK pickup

"Document Repository" or "Reading Room."   That "Repository" now owned by

GM LLC contains "over 300,000 pages of documents" that was created "to

consolidate and organize[ ] documents relating to the design, testing, manufacture

and performance of the fuel storage system in the [GM Corp.] 1973-86 C/K pickup

trucks."  GM LLC "provides its own staff . . . to assist in performing searches and

locating documents"[18] within its "Document Repository."  Through its ownership

of the GM Corp. CK pickup truck "Document Depository" and its own employees'

knowledge of the contents of those documents contained therein, GM LLC itself

acquired a complete and encyclopedic knowledge of the defect in the subject

pickup trucks.

53.

       In addition, after the 2009 bankruptcy sale GM LLC hired as its own

employees persons who had worked in GM Corp.'s engineering, legal, and

corporate departments who had knowledge of the defect in GM Corp. CK pickups

with side-mounted gas tanks to do the same work they had been doing for GM

_____

[18] 06/02/17 GM LLC's Suppl. Resp. to Pl.'s 1st Interrogs 1-2 (preliminary
statement).

- 31 -

Corp.  Under general agency principles, GM LLC acquired the knowledge of the defect in the subject pickup possessed by its employees.

54.

Since the 2009 bankruptcy sale, GM LLC has profited from entering into service, maintenance and repair relationships with purchasers of GM Corp. vehicles.

55.

Since the 2009 bankruptcy sale, GM LLC has continued to profit and benefit financially from its relationship with the owners of GM Corp. vehicles by manufacturing and selling spare parts for those vehicles, including replacement parts for GM Corp. cars and trucks, such as an engine for the 1984 GM Corp. CK pickup truck.

56.

As a result of all the foregoing, GM LLC has itself obtained, since July 10, 2009,  the specific knowledge that a gas tank located on the side of a pickup in a known crush zone is vulnerable to side impact, and that the result can be, and often has been, fires that seriously burn or kill vehicle occupants and others.

57.

As a result of the foregoing, since July 10, 2009, GM has in fact foreseen

- 32 -

that GM Corp. CK pickups involved in collisions, especially side impact wrecks, pose a serious danger of death by fire or severe burn injuries to both occupants of such GM Corp. CK pickups and occupants of other vehicles involved in the wrecks.

58.

Any reasonable automaker with knowledge and notice of the defect and the danger described above has a duty, at a minimum, to warn citizens of the existence of the defect and of the danger.

59.

As a result of the facts alleged herein GM LLC had its own independent duty to warn of the defect in the GM Corp. CK pickups and of the danger posed by that defect.

60.

GM LLC knows precisely who to warn: Since July 10, 2009 GM LLC has had access to databases that contain current information about the registration of every GM Corp. CK pickup truck in America, including the subject pickup.

**Comment [DS9]:** This entire section should be deleted because the current proceedings in the Bankruptcy Court was not an invitation to Plaintiff to add a number of new, additional allegations regarding New GM.

In any event, the new allegations added (which are impermissible) are not sufficient to allow the complaint to get through the bankruptcy gate because the Plaintiff has not alleged any specific New GM conduct that gave rise to a duty to warn on the part of New GM. *See* Opinion, at 9 ("the only way for a plaintiff to obtain punitive damages from New GM is to bring a claim based on conduct of *New GM itself*, not conduct of Old GM. Reichwaldt's failure to warn claim against New GM is a faulty attempt to bring just such a claim. As explained below, Reichwaldt fails to allege—other than in conclusory allegations and generalities—"truly independent claims based solely on New GM's wrongful conduct," which this Court has previously held is required to state an Independent Claim against New GM."); *id.* at 14-15 ("The Proposed FAC's allegations that New GM purchased Old GM's books and records and has profited from maintenance, repair, and selling parts for Old GM vehicles—without a specific tie to the truck model or alleged design defect at issue here—are impermissible bases for an Independent Claim.").  Plaintiff has merely alleged generalized knowledge by New GM of other accidents involving the CK pickup trucks and the alleged defect, and has not alleged any specific conduct which would give rise to a duty to Plaintiff as New GM did not have any relationship with her or the Old GM vehicle owner.

## IV.  LIABILITY OF DEFENDANT GM LLC.

## COUNT ONE—NEGLIGENCE OF GM CORP.

61.

Plaintiff realleges and reincorporates the foregoing paragraphs as if fully set forth herein verbatim.

62.

The subject pickup was designed, manufactured, marketed, and distributed by GM Corp.

63.

GM Corp. had a duty to exercise reasonable care to design, engineer, test, manufacture, inspect, market, distribute, and sell safe vehicles so as not to subject consumers or motorists to an unreasonable risk of harm.  GM Corp. breached its duty to exercise reasonable care with respect to the subject pickup.

64.

The subject pickup, when distributed by GM Corp., had a defectively designed gas system which caused the subject pickup to explode, which explosion and fire engulfed the subject pickup.  The defective design of the fuel system proximately caused the injuries to Kaitlyn Reichwaldt.

65.

Despite GM Corp.'s knowledge that the gas tank on its pickup trucks must be mounted as near the center of the vehicle as practical, GM Corp. made the decision to place the gas tank outside the frame rail on the subject pickup for marketing reasons.

66.

GM Corp. violated its own internal design directive by placing the gas tank in a known crush zone.

67.

GM Corp. violated its own internal design directive by not properly eliminating or shielding the gas tank from all objects which could result in cutting or puncturing of the gas tank.

68.

GM Corp. failed to design a fuel system whereby the gas tank was protected from rupture due to side impact or sharp objects, despite the fact it was technologically feasible and economically practicable to so design the fuel system.

69.

GM Corp. elected not to implement technologically feasible, economically practicable, and fundamentally safer alternative designs for the gas tank location

- 35 -

and design on the subject pickups.

70.

GM Corp. instead elected a design and gas tank location that it absolutely knew would result in fires, injuries, and deaths in foreseeable side-impacts.

71.

GM Corp.'s negligence proximately caused the injuries to Kaitlyn Reichwaldt.

72.

GM Corp.'s misconduct was a reckless and wanton disregard for the lives and wellbeing of the public, and of untold numbers of victims, including Kaitlyn Reichwaldt.

73.

The reckless and wanton misconduct by GM Corp. proximately caused the burn injuries to Kaitlyn Reichwaldt.

74.

Plaintiff's negligence claim based on the conduct of GM Corp. is not barred by the statute of repose.   O.C.G.A. §51-1-11(c).

75.

- 36 -

Defendant GM LLC expressly assumed liability for compensatory damages for product liability claims involving vehicles manufactured by GM Corp. before the bankruptcy sale resulting in injuries arising from wrecks occurring after the bankruptcy sale.  Therefore Plaintiff's negligence claim against GM Corp. is properly asserted against GM LLC.

### COUNT TWO—FAILURE TO WARN BY GM CORP.

76.

Plaintiff realleges and reincorporates the foregoing paragraphs as if fully set forth herein verbatim.

77.

As the manufacturer of vehicles distributed and sold to the public, GM Corp. had a duty to adequately warn the public about dangers it knew to exist in its vehicles.

78.

By failing to warn of the danger, GM. Corp. breached its duty and obligations to the public, including Kaitlyn Reichwaldt.

79.

GM Corp.'s failure to warn citizens about the dangers of its side-mounted gas tanks, but to instead profess for decades that no such danger exists, was itself

- 37 -

reckless and wanton.

80.

GM Corp.'s election not to warn of the known defective and unreasonably

dangerous conditions in the subject pickup proximately caused the injuries to

Kaitlyn Reichwaldt.

81.

Plaintiff's failure to warn claim is not barred by the statute of repose.

O.C.G.A. § 51-1-11(c).

82.

Defendant GM LLC expressly assumed liability for compensatory damages

for product liability claims against GM Corp. involving vehicles manufactured by

GM Corp. and injuries arising from wrecks occurring after the sale.  Plaintiff's

failure to warn claim against GM Corp. is a product liability claim and is properly

asserted against GM LLC.

**COUNT THREE – FAILURE TO WARN BY GM LLC**

83.

Plaintiff realleges and reincorporates the preface and paragraphs 4-5, 27-40,

and 48-60 as if fully set forth herein verbatim.

- 38 -

84.

Since GM LLC purchased substantially all of the assets of GM Corp. in the 2009 bankruptcy sale, and at all times since, GM LLC could reasonably have foreseen and did, in fact, foresee the occurrence of post collision fuel fed fires like the one that burned Kaitlyn Reichwaldt.  GM LLC knew, and reasonably should have known, that the subject GM Corp. CK pickup could cause injuries like those Kaitlyn Reichwaldt suffered.

85.

GM LLC had its own independent duty to warn of defects in the subject pickup.

86.

Despite having knowledge of the defect in the subject GM Corp. CK pickups and the dangers of that defect, a duty to warn about that defect, and the ability to warn owners and others of that defect and danger, GM LLC failed to warn of the dangers posed by the design of the GM Corp. CK pickup trucks in foreseeable wrecks.

87.

By failing to warn of the danger, GM LLC breached its duty and obligations to the public, including Kaitlyn Reichwaldt.

- 39 -

88.

GM LLC's failure to warn citizens about the dangers of the GM Corp. CK side-mounted gas tanks, while professing that no such danger exists, was itself reckless and wanton.

89.

GM LLC's election not to warn of the known defective and unreasonably dangerous conditions in the subject pickup proximately caused the injuries to Kaitlyn Reichwaldt.

90.

Recovery by Plaintiff for the breach by GM LLC of its duty to warn of known dangers is not barred by the statute of repose.  O.C.G.A. § 51-1-11(c).

**COUNT FOUR—PUNITIVE DAMAGES**

91.

Plaintiff realleges and reincorporates the preface and paragraphs 4-5, 27-40, and 48-60 as if fully set forth herein verbatim.

92.

GM LLC's failure to warn was reckless, wanton, and constituted disregard for the life and safety of Kaitlyn Reichwaldt and the lives and safety of the motoring public generally.  GM LLC's reckless and wanton conduct also manifests

- 40 -

a conscious indifference to the foreseeable consequences of that conduct to people like Kaitlyn Reichwaldt.

93.

GM LLC, by failing to warn of known dangers, is guilty of such willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care that its misconduct is sufficient to raise the presumption of conscious indifference to the consequences.

94.

GM LLC's misconduct is so aggravating it authorizes, warrants, *and demands* the imposition of substantial punitive damages against GM LLC pursuant to O.C.G.A. § 51-12-5.1.

## COUNT FIVE—EXPENSES OF LITIGATION

95.

Plaintiff realleges and reincorporates the foregoing paragraphs as if fully set forth herein verbatim.

96.

GM LLC has acted in bad faith, has been stubbornly litigious, and has caused the Plaintiff unnecessary trouble and expense, entitling Plaintiff to recover from Defendant all costs of litigation, including attorneys' fees and expenses,

- 41 -

---

**Formatted:** Indent: Left: 0", First line: 0"

**Formatted:** Indent: First line: 0"

**Formatted:** Left

**Formatted:** Indent: First line: 0"

**Comment [DS11]:** As a valid Independent Claim has not been alleged, Plaintiff's request for punitive damages must be stricken. *See* Opinion at 9 ("Accordingly, the only way for a plaintiff to obtain punitive damages from New GM is to bring a claim based on conduct of *New GM itself*, not conduct of Old GM.") (emphasis in original)).

pursuant to O.C.G.A. § 13-6-11 and other applicable law.

## V. DAMAGES SOUGHT

97.

Plaintiff realleges and reincorporates the foregoing paragraphs as if fully set forth herein verbatim.

98.

The damages claimed by Plaintiff were proximately caused by the tortious acts and omissions of GM Corp. and GM LLC.

> **Comment [DS12]:** As no Independent Claim has been alleged, this language must be stricken.

99.

Plaintiff Kaitlyn Reichwaldt seeks all damages allowed by law, including the following:

(a) Compensatory damages for shock, fright, and terror experienced from the time of the wreck, for mental and physical pain and suffering endured from the time of the wreck and for the rest of her mortal life, and for past and future medical bills;

(b) Punitive damages to punish and deter GM LLC for its own misconduct pursuant to O.C.G.A. § 51-12-5.1; and

> **Comment [DS13]:** As a valid Independent Claim has not been alleged, Plaintiff's request for punitive damages must be stricken.

(c) Attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11 and other applicable law.

## VI.  PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for the following relief:

(a)    That Plaintiff have and recover all damages for all losses compensable

under Georgia law as set forth above;

(b)    That Plaintiff have a trial by jury; and

(c)    For such other and further relief as the Court shall deem just and

proper.

This _____ day of September, 2017.

BUTLER WOOTEN & PEAK LLP

BY:    _____

JAMES E. BUTLER, JR.
Georgia Bar No. 099625
ROBERT H. SNYDER
Georgia Bar No. 404522
DAVID T. ROHWEDDER
Georgia Bar No. 104056
JOSEPH M. COLWELL
Georgia Bar No. 531527

105 13th Street
Post Office Box 2766
Columbus, Georgia 31902
(706) 322-1990
(706) 323-2962 (fax)

**ATTORNEYS FOR PLAINTIFF**

- 43 -