# Exhibit A

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

300 North LaSalle
Chicago, IL 60654

Richard C. Godfrey, P.C.
To Call Writer Directly:
(312) 862-2391
richard.godfrey@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

September 26, 2017

The Honorable Jesse M. Furman
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

      **Re:**    *MDL Order No. 8:  Gen. Motors LLC Ignition Switch Litig.*, 14-MD-2543

Dear Judge Furman:

      Pursuant to Order No. 130 Section II (Docket No. 4443), counsel for New GM write concerning the upcoming October 4 Status Conference to raise an issue of representational authority in a related matter, specifically, the purported settlement that the MDL Lead Plaintiffs' Counsel appointed by this Court claim to have reached with the GUC Trust.  As Your Honor will recall, shortly before the August 11 Status Conference, Lead Plaintiffs' Counsel informed New GM of a potential settlement of their purported late claims.  Based upon the limited and incomplete information disclosed to New GM at that time, New GM provided the Court with its perspective that the purported settlement appeared to be fundamentally improper and collusive.  (Ex. 1, 8/11/2017 Status Conference Hr'g Tr. at 39:25–44:2.)

      Following the August 11 Status Conference, Brown Rudnick, as bankruptcy counsel for Co-Lead Counsel, Mr. Berman and Ms. Cabraser, provided New GM's counsel with copies of an unexecuted settlement agreement draft, along with certain related draft motions and some of the supporting papers.  This Court also received these unexecuted partial draft documents via email as attachments to the August 16 letter Brown Rudnick filed with the Bankruptcy Court.  (Ex. 2, 8/16/2017 Letter to Judge Glenn and Attachments A–N.)

      On September 11, 2017, Co-Lead Plaintiffs' Counsel filed a motion in the Bankruptcy Court seeking to enforce the unexecuted settlement agreement draft.  The next day, September 12, New GM and the GUC Trust entered into a "Forbearance Agreement," and the GUC Trust filed a motion to approve the Forbearance Agreement in the Bankruptcy Court.  Consequently, the Bankruptcy Court now has before it two primary issues:  (i) did the lawyers appointed by this Court as MDL Co-Lead Plaintiffs' Counsel enter into a binding settlement agreement with the

Beijing   Boston   Hong Kong   Houston   London   Los Angeles   Munich   New York   Palo Alto   San Francisco   Shanghai   Washington, D.C.

# KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
September 26, 2017
Page 2

GUC Trust; and (ii) if not, should the Forbearance Agreement between New GM and the GUC Trust be approved. Those questions are not currently before this Court.[1]

The critical issue for this Court is that the unexecuted settlement agreement drafts provided to New GM, this Court, and the Bankruptcy Court rely upon and make assertions regarding the meaning of this Court's Order No. 8 appointing Plaintiffs' Co-Lead Counsel in MDL 2543 and the authority of Co-Lead Counsel to represent and settle the purported claims of millions of non-party individuals based on that Order.[2] Accordingly, New GM is asking for this Court's guidance (at the October 4 Status or at another time in this Court) regarding the specific issue of representational authority resulting from this Court's appointment of the Co-Lead Plaintiffs' Counsel in MDL No. 2543. We believe that this is an important matter for this Court's consideration and coordination because it involves the interpretation of this Court's prior Order and ultimately may provide guidance to Judge Glenn in the Bankruptcy Court if representational issues become relevant in determining whether a binding agreement exists or whether the Forbearance Agreement should be approved.[3]

## Background

To understand the precise representational issue New GM is raising, a basic understanding of the purported settlement between Co-Lead Counsel and the GUC Trust is necessary. In overview, the purported settlement addresses certain Motions for Authority to File Late Proofs of Claim against the GUC Trust pending in the Bankruptcy Court, as follows:

1.      527 individual plaintiffs filed Late Proof of Claim forms in the Bankruptcy Court, seeking permission to pursue claims against the GUC Trust for Old GM's conduct. 525 of those

---

[1]   If the Bankruptcy Court concludes that Co-Lead Counsel did enter into a binding settlement agreement with the GUC Trust, a third issue will have to be addressed, either by this Court and/or the Bankruptcy Court; specifically, would that purported settlement be valid and enforceable? That issue, however, is not yet and may never become ripe for judicial consideration.

[2]   To be clear, New GM is not asking the Court to interfere with the proceedings in the Bankruptcy Court or to deprive that Court of jurisdiction to adjudicate the threshold issues before it; rather, New GM seeks this Court's guidance with respect to the representational authority (or lack thereof) conferred by this Court's Order. That guidance, we respectfully submit, will assist the parties and Bankruptcy Court in connection with the proceedings pending in that Court, and serves the purpose of this MDL Court in coordinating with related actions.

[3]   This Court has jurisdiction over and is the most appropriate venue for the interpretation and enforcement of its own orders. *See, e.g., United States v. Spallone*, 399 F.3d 415, 418 (2d Cir. 2005) (noting district court's "inherent authority to interpret ambiguities in its own orders and judgments."); *In re Old Carco LLC*, 2014 WL 6790781, at *3 (S.D.N.Y. Dec. 1, 2014) ("the Bankruptcy Court plainly had jurisdiction to clarify and enforce its own order"); *In re AMR Corp.*, 567 B.R. 247, 257 (Bankr. S.D.N.Y. 2017) (citing *Spallone* in discussing bankruptcy court's right to interpret its own orders); *In re Frankel*, 192 B.R. 623, 630 (Bankr. S.D.N.Y. 1996) ("all courts, whether created pursuant to Article I or Article III of the Constitution, do have inherent civil contempt power to enforce compliance with their lawful judicial orders" (quoting *In re Miller*, 81 B.R. 669, 676 (Bankr. M.D. Fla. 1988))); *see also Gupta v. Quincy Med. Ctr.*, 858 F.3d 657, 663 (1st Cir. 2017) ("all federal courts [] may retain jurisdiction to interpret and enforce their prior orders"); *Common Cause v. Fed. Election Comm'n*, 692 F. Supp. 1397, 1399 (D.D.C. 1988) ("court has inherent jurisdiction to interpret and enforce its prior orders, jurisdiction recognized in the federal courts' statutory authority to issue all writs 'necessary or appropriate in aid of their respective jurisdiction'" (quoting 28 U.S.C. § 1651(a))); *D.C. Hosp. Ass'n v. D.C.*, 73 F. Supp. 2d 8, 13 (D.D.C. 1999), *aff'd sub nom. D.C. Hosp. Ass'n. v. D.C.*, 224 F.3d 776 (D.C. Cir. 2000) ("court could rely on its inherent power to vindicate its authority and effectuate its prior order").

# KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
September 26, 2017
Page 3

claim forms were filed by pre-closing accident personal injury or wrongful death claimants;[4] only two of the claim forms—filed by individual plaintiffs named Patricia Barker and Yvonne James-Bivins—seek alleged economic loss damages.[5]

    2.    In addition to their own individual claims, both Barker and James-Bivins purported to file Rule 23 class claims for alleged economic loss damages on behalf of millions of non-parties, specifically, other Old GM vehicle owners, and thus seek to be appointed as class representatives for classes to be certified under Rule 23.[6]  Barker and James-Bivins were also named putative class representatives with economic loss class claims in the MDL 2543 proceedings in this Court, although both of their individual claims have been dismissed.

    3.    Mr. Hilliard, whom the Court appointed as one of the three Co-Lead Counsel, has made clear in the purported settlement with the GUC Trust that he only represents those individual plaintiffs who actually retained him and his law firm.  He does not claim to represent an alleged class of personal injury or wrongful death persons.  Nor does Mr. Hilliard claim to represent anyone else for whom he has not filed an individual proof of claim form.  So too with the other personal injury lawyers who have filed late proofs of claim—all state that they only represent the individual plaintiffs who have retained them.

    4.    The draft settlement papers tell a different story for the other two Co-Lead Counsel, that is, Mr. Berman and Ms. Cabraser.  In their case, the draft settlement papers, as we read them, provide that they represent not only Barker and James-Bivins individually, but also the millions of non-party, putative absent class members described by Barker and James-Bivins in their late proof of claim forms as putative economic loss class members.

    5.    The draft settlement agreement that MDL Plaintiffs' Co-Lead Counsel claim to have with the GUC Trust is not a Rule 23 class settlement and does not seek Rule 23 certification. In fact, Plaintiffs' Co-Lead Counsel told the GUC Trust that "plaintiffs would not agree to a Rule 23 settlement certification…." (Ex. 3, 8/17/2017 Bankr. Tr. at 21:10–14; *see also* Ex. 4, Decl. of Edward S. Weisfelner, Bankr. Doc. Case No. 09-50026 (MG) (Docket No. 14093) at ¶ 3 ("Counsel for the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs took the position

---

[4]    At the time that Co-Lead Counsel filed their motion in the Bankruptcy Court seeking to enforce the unexecuted settlement agreement draft, there were 461 claim forms filed by pre-closing accident personal injury or wrongful death claimants; however, on September 19, 2017, Lisa Norman of the Andrews Myers law firm sought authority to file late proofs for 64 additional pre-closing accident personal injury or wrongful death claimants represented by her firm.  Thus, there are currently 525 pre-closing accident personal injury or wrongful death claimants that have filed Late Proof of Claim forms in the Bankruptcy Court.

[5]    On January 3, 2017, Gary Peller filed a joinder to "the motions filed by other parties for leave to file late proofs of claim in these proceedings." (Bledstoe Plaintiffs' Motion, Bankr. Doc. Case No. 09-50026 (MG) (Docket No. 13811 at 1).)  On January 4, 2017, Golenbock Eiseman Assor Bell & Peskoe LLP and Wolf Haldenstein Adler Freeman & Herz LLP filed a joinder to the Late Claims Motion.  (Groman Plaintiffs' Motion, Bankr. Doc. Case No. 09-50026 (MG) (Docket No. 13818).)  To date, plaintiffs identified in those motions have not filed Proof of Claim forms in the Bankruptcy Court.

[6]    Patricia Barker's proof of claim form seeks certification of a class of ignition switch plaintiffs, while Yvonne James-Bivins' proof of claim form seeks a class of non-ignition switch plaintiffs.

Case 1:14-md-02543-JMF   Document 4639   Filed 09/26/17   Page 4 of 11

# KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
September 26, 2017
Page 4

that such [settlement class] certification was not necessary, and we made this position known to the GUC Trust and the Participating Unitholders.").)  Moreover, in the draft motion to approve the purported settlement, Co-Lead Counsel argue that one reason the Bankruptcy Court should approve it is because, otherwise, "[t]he Bankruptcy Court would need to decide whether class certification for the economic loss Plaintiffs' proposed class proofs of claims would be appropriate." (Ex. 2, Ex. D, Draft Motion to Approve the Settlement at 21–22, ¶ 64.)

6.      Although Co-Lead Counsel expressly seek to avoid class certification for the putative class claims filed by actual clients, the terms of the proposed draft GUC Trust settlement purport to bind not only the 527 individual plaintiffs, but also millions of unidentified, individual non-parties not before the Bankruptcy Court or this Court—specifically, every single one of the millions of vehicle owners in the United States covered by the proposed classes alleged in the late proof of claim forms filed by Barker and James-Bivins, *and many of the same people for whom Co-Lead Counsel are seeking certified classes against New GM in this MDL.*  As such, the proposed draft settlement agreement purports to treat Co-Lead Counsel as if they have been appointed "counsel" or *de facto* "class counsel" having the representational authority to bind millions of non-parties as if each of these non-parties either had filed late proofs of claim or were absent members of a certified class.  In addition, the purported settlement with the GUC Trust would seek to bind every potential personal injury or wrongful death plaintiff in the United States, whether represented by Mr. Hilliard and his personal injury counsel colleagues or not.

7.      Under the terms of the draft settlement that Co-Lead Counsel are seeking to compel the GUC Trust to sign in the Bankruptcy Court, all *potential* plaintiffs—that is the millions of non-party persons who might have potential claims for economic loss, personal injury or wrongful death—would be bound by the draft settlement.  In addition, while such non-parties would have an opportunity to object to the draft settlement, they would have no right to opt-out from it.  Instead, if the draft settlement were to be approved, millions of fictional plaintiffs—non-parties and alleged absent class members—would be bound by and would give up rights under the settlement, even though they may never receive any benefits under it.  Moreover, the millions of non-party fictional plaintiffs also would be enjoined and barred from prosecuting their own claims, if they had any.

8.      As to New GM's role in all of this, the purported draft settlement provides that because the millions of alleged absent putative class members and other unknown persons are parties to the alleged agreement and thus would be deemed to have timely filed millions of "claims," the value of such claims justifies the fictional claims "estimation" amount set forth in the draft purported "Claims Estimate Order" sought by Plaintiffs' Co-Lead Counsel. (Ex. 2, Ex. C, Draft "Claims Estimate Order.")  In other words, Plaintiffs' Co-Lead Counsel seek to rely on millions of unfiled, non-existent claims on behalf of unidentified individuals for whom the Court has no *in personam* jurisdiction to justify a purported claims estimate devised by Plaintiffs' Co-Lead Counsel.  According to Plaintiffs' Co-Lead Counsel, New GM's only role in all of this allegedly is to fund the purported settlement for eventual distribution to unknown potential

Case 1:14-md-02543-JMF    Document 4639    Filed 09/26/17    Page 5 of 11

# KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
September 26, 2017
Page 5

plaintiffs who have never asserted claims against the GUC Trust in the Bankruptcy Court.  (Ex. 1, 8/11/2017 Status Conference Hr'g Tr. at 37:13–38:22.)  And in their draft motion papers in support of the purported settlement with the GUC Trust, Plaintiffs' Co-Lead Counsel say the same thing, that is, that New GM's only role supposedly is to provide the funding for the settlement fund for which it will not even get a release from the purported claimants to the fund.

9.      Finally, by its terms, the 2009 Sale Agreement requires actual allowed claims filed by real individual claimants.  Under the Sale Agreement, for a claims estimation to occur, the GUC Trust must consider the "aggregate allowed general unsecured claims" (Ex. 5, Sale Agreement at § 3.2(c)(i); Ex. 6, Plaintiffs' Motion to Enforce the Settlement, Bankr. Doc. Case No. 09-50026 (MG) (Docket No. 14092) at 3 n.8), not some collection of fictional claims or potential claims that might be but are not made.[7]  In this case, even if all 527 of the individual plaintiffs' late proof of claim forms that actually have been filed were allowed by the Bankruptcy Court, it is mathematically impossible for such claims collectively to amount to the figure set forth in Plaintiffs' Co-Lead Counsel's draft purported "Claims Estimate Order."[8]  That is apparently why Plaintiffs' MDL Co-Lead Counsel initially planned to pursue Rule 23 class certification in the Bankruptcy Court, as the Barker and James-Bivins late proof of claim forms allege.  Recognizing the fundamental difficulties facing their request for nationwide class certification, however, it appears based upon the draft settlement papers that Co-Lead Counsel made the tactical decision to forgo Rule 23's requirements and, instead, negotiated the purported settlement as though Co-Lead Counsel represent the millions of non-parties covered by the class definitions in the late proof of claim forms.  Plaintiffs' Co-Lead Counsel then presented during settlement negotiations purported "expert" class-wide proof to the GUC Trust relating to these millions of fictional and non-existent claims to argue that they amounted to the claims estimation figure set forth in Plaintiffs' Co-Lead Counsel's draft purported "Claims Estimate Order."  This scheme is further confirmed on page 12 of the draft Joint Settlement Approval Motion, where the proffers of expert proof are outlined, explaining how the purported claims estimation figure was determined—*i.e.*, based upon a "conjoint analysis" for all putative class members included as putative class claims in the late proof of claims forms filed by Barker and James-Bivins.  (The

---

[7]      The fact is that only two individual plaintiffs have filed late proofs of claim asserting alleged economic loss claims; the only means by which one can aggregate the potential "claims" of millions of potential but not actual plaintiffs is to accord to the two plaintiffs and Co-Lead Counsel who filed late proofs of claim the representational authority to speak on behalf of millions of other potential plaintiffs who have never filed such claims.  This also is confirmed by the draft GUC Trust Andrews Declaration, where she states that:  "They [the plaintiffs who filed the Late Claims Motion] have asserted late claims that, based on the evidence they have proffered and that WTC has reviewed in its capacity as GUC Trust Administrator, could be valued at tens of billions of dollars." (Ex. 2, Ex. E, Draft Andrews Decl. at ¶ 25.)  What is most important in connection with this statement in the draft Andrews' Declaration is her further explanation that, "[t]o date, creditors have filed [$31.854] billion in general unsecured claims that have been Allowed." (*Id.* at ¶ 10.)  The key words in her draft Declaration are "filed" and "allowed" with respect to "claims," as it is obvious that for purposes of claims estimation, Co-Lead Counsel propose to treat the filing of late proof of claim forms by only two individuals as equivalent to having the representational authority to speak for and *file* the same "claims" on behalf of millions of non-party fictional plaintiffs who may or may not ever make a real claim that is allowed.

[8]      Significantly, we know from simple math as well as the draft Declaration of Mr. Berman and Ms. Cabraser, and as confirmed by the draft Joint Motion to Approve the Settlement and the draft Declaration of Ms. Andrews for the GUC Trust, that the evidentiary proffer made to the GUC Trust was on behalf of *all potential economic loss plaintiffs*—the many millions of them, which is how they arrived at the claims "estimation" figure set forth in Plaintiffs' Co-Lead Counsel's draft purported "Claims Estimate Order."  (*See* Ex. 2, Ex. F, Draft Berman/Cabraser Decl. at ¶¶ 9–10; Ex. 2, Ex. E, Draft Andrews Decl. at ¶ 25.  *See also supra* note 7 and accompanying text.)

# KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
September 26, 2017
Page 6

"conjoint analysis" was performed by Stefan Boedeker, the supposed expert for Plaintiffs' MDL Co-Lead Counsel; as will be detailed at the appropriate time, Mr. Boedeker's analysis has many flaws, not the least of which is that he does not measure economic loss.)[9]

## New GM Seeks the Court's Guidance and Direction for Addressing the Representational Authority Issue

It will come as no surprise to the Court that New GM strongly disagrees with all of this, and intends to vigorously oppose what Co-Lead Counsel are attempting to do with respect to the 2009 Sale Agreement, its Adjustment Shares Provision, and the purported settlement they demand that the GUC Trust sign. But those objections and issues are for another day. What New GM is raising for this Court now is a narrow, but important representational authority issue, specifically:

> Under what authority do MDL Plaintiffs' Co-Lead Counsel purport to negotiate a settlement on behalf of millions of non-parties, and then bind those millions of non-parties to a proposed settlement that does not seek class certification under Rule 23?

The answer to this question has implications not only with respect to proceedings in the Bankruptcy Court—to the extent any continue after the Bankruptcy Court rules on whether the unexecuted agreement is binding—but also for the future of the MDL litigation.

Under settled law, a lawyer cannot represent a person who has not retained him or her. No surprise there. The law, of course, does provide for limited and defined exceptions to this rule, such as in the case of a guardianship appointment, or when the Court under Rule 23 appoints counsel to represent a certified class. Again, nothing unusual about that. But New GM is unaware of any legal authority pursuant to which Co-Lead Counsel can purport to act as counsel for millions of non-parties and then negotiate and bind those persons to a settlement and release when they are not their clients, where no Court has appointed counsel to represent such absent non-parties, and where the purported settlement strips those non-parties of any rights they might have.[10] Equally

---

[9]    According to the same draft Joint Motion to Approve the Settlement, the mechanism for being able to avoid Rule 23 is simply to allow plaintiffs to file the two late proof of claim forms, which once done, Co-Lead Counsel assert, would mean that the millions of people allegedly covered by the late proof of claims filings would now have their "claims" before the Court. That assertion, of course, ignores the strict representational requirements and limitations imposed both by Rule 23 and the authorities—*i.e.*, a class representative must be appointed by the Court under Rule 23; counsel cannot speak or bind anyone whom counsel do not represent; and a putative absent class member is not represented by counsel unless and until the Court appoints Class Counsel to represent them under Rule 23. (For further discussion of this point, see *infra* notes 10–12 and accompanying text.)

[10]    *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14 (2000) ("A relationship of client and lawyer arises when: (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; . . .; or (2) a tribunal with power to do so appoints the lawyer to provide the services."); *id.* cmt. (b) ("A client ordinarily should not be forced to put important legal matters into the hands of another or to accept unwanted legal services"); *Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 529 (S.D.N.Y. 2013) ("'[an attorney-client] relationship arises when one contacts an attorney in his capacity as such for the purpose of obtaining legal advice or services'" (quoting *Priest v. Hennessy*, 5431 N.Y.S.2d 511, 514 (1980))); *Cal. Union Ins. Co. v. Nat'l Union Fire Ins. Co.*, 1989 WL 48413, at *1 (N.D.N.Y. Apr. 27, 1989) (same); *Doe v. Poe*, 189 A.D.2d 132, 134 (N.Y. App. Div. 1993) (same); *see also Keech v. Young*, 200 A.D.2d 559, 559 (N.Y. App. Div. 1994) (granting defendant's motion to vacate judgment where she "did not authorize any attorney . . . to act on her behalf in this litigation"); *Skyline Agency, Inc. v. Ambrose Coppotelli, Inc.*, 117 A.D.2d 135, 148 (N.Y. App. Div. 1986) (defendant who "neither expressly

## KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
September 26, 2017
Page 7

important, it is settled law that a non-party cannot be bound by a court that has no *in personam* jurisdiction over him or her, in which counsel does not represent the non-party, and in which he or she has never appeared.[11]  Nor is there any "bankruptcy exception" to this well-settled law where the relief sought is not part of a bankruptcy plan and plaintiffs and the GUC Trust do not seek certification of a class or sub-classes.[12]

Given this, the MDL Plaintiffs' Co-Lead Counsel do not have the representational authority to do what they purport to have done with respect to the draft settlement they demand the GUC Trust sign.  The source of this authority is not Rule 23.  Instead, according to their draft settlement papers, the source for their authority *is this Court, specifically, Your Honor's appointment of them as the Lead Counsel in MDL 2543*.  Thus, in the draft purported settlement agreement, there are several definitions that expressly identify this MDL as the source of Co-Lead Counsel's claimed representational authority.  Specifically:

---

nor implicitly conferred authority on the attorney" is not bound by attorney's action); *In re Wingate, Russotti, Shapiro & Halperin LLP*, 50 Misc. 3d 1224(A), at *1–2 (N.Y. Sur. Mar. 1, 2016) (stating "an attorney can not [*sic*] settle a case absent authority from a client" and refusing to "coerce [fiduciary of decedent] to settle th[e] matter simply so an insurance carrier can close its file"); NEW YORK RULES OF PROF'L CONDUCT Rule 1.2(a) ("A lawyer shall abide by a client's decision whether to settle a matter."); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 22 (2000) (question of whether and on what terms to settle are reserved to the client).

[11]  *See Taylor v. Sturgell*, 553 U.S. 880, 892–93 (2008) ("A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit.  The application of claim and issue preclusion to nonparties thus runs up against the 'deep-rooted historic tradition that everyone should have his own day in court.'" (quoting *Richards v. Jefferson Cty. Ala.*, 517 U.S. 793, 798 (1996))); *Martin v. Wilks*, 490 U.S. 755, 762 (1989) ("A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings"), *superseded by statute on other grounds*, CIVIL RIGHTS ACT OF 1991 § 108; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110 (1969) ("It is elementary that one is not bound by a judgment in personam resulting from litigation in which he is not designated as a party or to which he has not been made a party by service of process."); *Hansberry v. Lee*, 311 U.S. 32, 40 (1940) ("It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process."); *Chase Nat'l Bank v. City of Norwalk, Ohio*, 291 U.S. 431, 441 (1934) ("The law does not impose upon any person absolutely entitled to a hearing the burden of voluntary intervention in a suit to which he is a stranger . . . .  Unless duly summoned to appear in a legal proceeding, a person not a privy may rest assured that a judgment recovered therein will not affect his legal rights."); *BlackRock Fin. Mgmt. Inc. v. Segregated Account of Ambac Assur. Corp.*, 673 F.3d 169, 177–78 (2d Cir. 2012) ("As a procedural matter, it is elementary that a court cannot bind a non-party absent special circumstances, and neither Countrywide nor Bank of America is a party to the Article 77 proceeding."); *Briscoe v. City of New Haven*, 654 F.3d 200, 203 (2d Cir. 2011) ("The general principle in Anglo-American jurisprudence is 'that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.'" (quoting *Hansberry*, 311 U.S. at 40)); *Esquire Trade & Fin., Inc. v. CBQ, Inc.*, 562 F.3d 516, 520–22 (2d Cir. 2009) (citing *Hansberry* in reversing district court, holding that applying *res judicata* against nonparty for which privity with parties to release of claims agreement had not been established would violate due process); *Cobalt Multifamily Inv'rs I, LLC v. Shapiro*, 2013 WL 5418588, at *2 (S.D.N.Y. Sept. 27, 2013) ("Other courts to consider the issue have similarly concluded that they lacked the authority to issue bar orders extinguishing nonparty claims . . . .  The Settling Parties have not cited a single decision holding that a court may issue a bar order against nonparty claims."); *Straight-Out Promotions, LLC v. Warren*, 467 B.R. 684, 694 n.1 (S.D.N.Y. 2012), *aff'd sub nom. In re Tyson*, 511 F. App'x 120 (2d Cir. 2013) ("appellants cite to no case in which an individual was held liable on a judgment in which he was not a party . . . ."); *Zimmermann v. R. Harris, Inc.*, 1997 WL 257478, at *2 (S.D.N.Y. May 15, 1997) ("Due process considerations mandate that nonparties should have a full and fair opportunity to be heard in court."); *Pure Love Music v. JMC Entm't, Inc.*, 2010 WL 550114, at *3 (E.D.N.Y. Feb. 12, 2010) (holding settlement agreement unenforceable against a party who "remains a nonparty to this action and as such cannot be bound by a judgment").

[12]  *See In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 735–39 (2d Cir. 1992), *opinion modified on reh'g*, 993 F.2d 7 (2d Cir. 1993) (rejecting proposed settlement class in bankruptcy given absence of adequate Rule 23 sub-classes; discussing only class certification as an alternative to a bankruptcy plan to safeguard the rights of non-parties; and even acknowledging "substantial question whether a class action may be used to adjust claims against an insolvent entity that is eligible for bankruptcy protection").

Case 1:14-md-02543-JMF    Document 4639    Filed 09/26/17    Page 9 of 11

# KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
September 26, 2017
Page 8

- The draft GUC settlement document says that the **"Parties"** to the purported settlement are the GUC Trust and the "Signatory Plaintiffs." (Ex. 2, Ex. A, Draft Settlement at 1.)

- **"Signatory Plaintiffs"** are defined as "PIWD Counsel on behalf of the PIWD Plaintiffs, and Co-Lead Counsel on behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs." (*Id.* at § 1.58.)

- **"PIWD"** in turn is defined as "claims for personal injury and wrongful death." (*Id.* at § 1.42.) **"PIWD Counsel"** is then defined as "(i) Robert C. Hilliard of Hilliard Muñoz Gonzales, LLP and Thomas Jr. Henry of the Law Offices of Thomas J. Henry, but solely for the Pre-Closing Accident plaintiffs represented by those two law firms; and (ii) Lisa M. Norman of Andrews Myers, P.C., but solely for the Pre-Closing Accident Plaintiffs represented by that law firm." (*Id.* at § 1.43.) Finally, the term **"PIWD Plaintiffs"** is defined to mean: "those certain Ignition Switch Pre-Closing Accident Plaintiffs represented by PIWD Counsel." (*Id.* at § 1.44.) In sum, the personal injury/wrongful death counsel involved in negotiating the draft settlement only claim to represent actual plaintiffs who filed late proof of claim forms and who retained them as their counsel.[13]

- The definition for **"Co-Lead Counsel"** states: "for purposes of this Agreement, Steve W. Berman of Hagens Berman Sobol Shapiro LLP and Elizabeth Cabraser of Lieff, Cabraser, Heimann & Bernstein, LLP, who were individually and collectively appointed to represent all economic loss plaintiffs in the GM MDL by Order No. 8, In re Gen. Motors LLC Ignition Switch Litig., No. 14-MD-2543 (S.D.N.Y. August 15, 2014 [ECF No. 249], or any other or replacement counsel appointed to represent any Ignition Switch or Non-Ignition Switch Plaintiffs in the GM MDL." (*Id.* at § 1.11.)

- **"Plaintiffs"** in the draft Settlement is very broadly defined as: "the Ignition Switch Plaintiffs, the Non-Ignition Switch Plaintiffs, and the Pre-Closing Accident Plaintiffs, including all plaintiffs (whether named or unnamed, including unnamed members of a putative class), covered by any of the Late Clams Motions, all plaintiffs represented by counsel that is signatory hereto and any other party who, (i) as of July 10, 2009, suffered an economic loss by reason of their ownership or lease of an Old GM vehicle . . . included in NHTSA Recall No[s] . .

---

[13]    This limited representational authority point is further confirmed by the draft PIWD Counsel Declarations of Mr. Hilliard and Ms. Norman. The draft Hilliard Declaration states: "I am a partner with the law firm of Hilliard Muñoz Gonzales LLP and am co-counsel with the Law Offices of Thomas J. Henry to certain Pre-Closing Accident Plaintiffs"; and "I provided the GUC Trust with a proffer of evidence and expert report concerning the claims of the Pre-Closing Accident Plaintiffs my firm represents." (Ex. 2, Ex. G, Draft Hilliard Decl. at ¶¶ 1, 7; *see also* Ex. 7, 9/12/17 Email from Fornecker (Anne Fornecker, partner at Hilliard Muñoz Gonzales LLP, specifically identified that her firm only represents 175 clients.) Similarly, Ms. Norman's draft Declaration states: "I am Senior Counsel with the law firm of Andrews Myers, PC and I represent certain Ignition Switch Pre-Closing Accident Plaintiffs…." (Ex. 2, Ex. H, Draft Norman Decl. at ¶ 1.) Having said this, however, while the personal injury/wrongful death counsel appear to be signing for only those clients they actually have and represent, the draft settlement itself and proposed Notice Plan apparently purport to bind any and all potential personal injury and wrongful death plaintiffs in the United States.

# KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
September 26, 2017
Page 9

. and/or (iii) suffered a personal injury or wrongful death based on or arising from an accident involving an Old GM vehicle that occurred prior to the Closing Date . . . ."  (*Id.* at § 1.45.)

      •    The proposed Settlement defines **"Ignition Switch Plaintiffs"** by incorporated reference to the Settlement's Preamble, which defines the term as those "plaintiffs asserting economic loss claims who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 . . . ."  (*Id.* at § 1.26 and Preamble § S(a).)  The term **"Non-Ignition Switch Plaintiffs"** is also defined by incorporated reference to the Settlement's Preamble, which defines the term as those "plaintiffs asserting economic loss claims who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags, or power steering included in NHTSA Recall Nos 14V-355, 14V-394, 14V-400, 14V-346, 14V-540, 14V-118 and 14V-153 . . . ."[14]  (*Id.* at § 1.35 and Preamble § S(b).)

      •    Finally, that MDL Plaintiffs' Co-Lead Counsel appear to be relying upon this Court's MDL appointment as the source for their broadly claimed authority to represent millions of non-parties is further reinforced by the **signature blocks** on the various draft motion papers they prepared.  Thus, there are two signature block variations for economic loss counsel to sign on the draft settlement:  (i) "On behalf of the Plaintiffs," and (ii) "On behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs."[15]  (*Id.* at 19.)

      In addition, the signature blocks for the economic loss counsel in their draft Motion for Settlement Approval use the phrase:  "Designated Counsel for the Ignition Switch Plaintiffs and Certain Non-Ignition Switch Plaintiffs in the Bankruptcy Court," as well as "Co-Lead Counsel for the Ignition Switch Plaintiffs and Certain Non-Ignition Switch Plaintiffs in the MDL Court."  (Ex. 2, Ex. D, Draft Motion to Approve the Settlement at 31–32.)

      To sum up:  (i) Mr. Hilliard and the other PIWD Counsel claim in the draft purported settlement agreement to represent only those PIWD plaintiffs who actually have retained them;

---

[14]    Plaintiffs' Motion to Enforce includes similar, but even broader, definitions of "Ignition Switch Plaintiffs" and "Non-Ignition Switch Plaintiffs":  "'**Ignition Switch Plaintiffs**' shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047" and "'**Non-Ignition Switch Plaintiffs**' shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540, 14V-118 and 14V153."  (Ex. 6, Plaintiffs' Motion to Enforce the Settlement, Bankr. Doc. Case No. 09-50026 (MG) (Docket No. 14092) at 1 n.1, 2.)

[15]    The "On behalf of the Plaintiffs" signature block is for the signatures of Edward S. Weisfelner, Howard S. Steel, and Sander L. Esserman, all of whom are identified as "Designated Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the Bankruptcy Court," whereas the "On behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs" signature block is for the signatures of Steve W. Berman and Elizabeth J. Cabraser, both of whom are identified as "Co-Lead Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the MDL Court."  (Ex. 2, Ex. A, Draft Settlement at 19–20.)

Economic loss counsel's signature blocks on their Motion to Enforce the Settlement are equally broad:  Edward S. Weisfelner, Howard S. Steel, and Sander L. Esserman are identified as "Designated Counsel for the Ignition Switch Plaintiffs and Certain Non-Ignition Switch Plaintiffs in the Bankruptcy Court," and Steve W. Berman and Elizabeth J. Cabraser are identified as "Co-Lead Counsel for the Ignition Switch Plaintiffs and Certain Non-Ignition Switch Plaintiffs in the MDL Court."  (Ex. 6, Plaintiffs' Motion to Enforce the Settlement, Bankr. Doc. Case No. 09-50026 (MG) (Docket No. 14092) at 26.)

## KIRKLAND & ELLIS LLP

The Honorable Jesse M. Furman
September 26, 2017
Page 10

but (ii) the other MDL Plaintiffs' Co-Lead Counsel appear to be relying upon their MDL appointment by this Court to act as counsel for and with the power to bind millions of non-parties who have never retained them, who have not submitted to the jurisdiction of this or the Bankruptcy Court, and who have never asserted any economic loss claims.[16]

New GM submits that it is settled law that an MDL appointment to act as lead plaintiffs' counsel does not and cannot—absent class certification under Rule 23 and an order specifically appointing counsel with the authority to represent a class—empower or authorize the appointed MDL Co-Lead Plaintiffs' Counsel to represent and bind millions of non-parties, the vast majority of whom the Court does not even have *in personam* jurisdiction over. To be sure, it is common that appointed MDL plaintiffs' counsel *can negotiate a proposed Rule 23 class settlement*, reach such a class settlement, and then present that proposed class settlement to the Court, requesting (i) certification of the settlement class, (ii) appointment as class counsel, and also (iii) to have the proposed settlement class preliminarily and then finally approved—all as set forth in Rule 23. But that is not what has taken place in the Bankruptcy Court. Instead, as set forth in the terms of the draft GUC Trust settlement agreement and its accompanying motion papers and draft declarations, MDL Co-Lead Counsel purport to act as counsel for millions of non-parties who have never retained them, over whom this Court has no *in personam* jurisdiction and, according to the language of the draft settlement, do so based upon this Court's MDL appointment order, Order No. 8. (Ex. 2, Ex. A, Draft Settlement at § 1.11.)

The Court's MDL appointment Order and its powers and limitations are clear. But if there was any doubt about the limited scope of this Court's MDL appointment, that was settled by this Court during the Status Conference of November 10, 2016, when the Court explained to Plaintiffs' Co-Lead Counsel that they did not represent the absent putative class members. (Ex. 8, 11/10/2016 Status Conference Hr'g Tr. at 20:19–21 ("Well, strictly speaking, I don't think that you represent them because they're absent class members and there is no class yet.").) That explanation, of course, should have come as no surprise, as the matter of their representational authority limited to actual plaintiffs who have retained them is settled.[17]

---

[16]   In their draft joint Declaration, Mr. Berman and Ms. Cabraser state: "We are Co-Lead Counsel appointed in the General Motors LLC Ignition Switch Litigation Multidistrict Litigation, currently pending in the United States District Court for the Southern District of New York, Judge Furman presiding, Case No. 14-MD-2543 (JMF)." (*See* Ex. 2, Ex. F, Draft Berman/Cabraser Decl. at ¶ 1.) They further state: "The Settlement Agreement was negotiated by the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, certain Pre-Closing Accident Plaintiffs (collectively, the "Signatory Plaintiffs")." (*See id.* at ¶ 5.) And they later state: "We provided the GUC Trust with a proffer of evidence and expert report concerning the claims of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs, Certain Pre-closing Accident Plaintiffs also provided a proffer of evidence and expert report." (*See id.* at ¶ 9.) That "proffer," of course, was for the millions of non-parties who are included in the proposed class definitions of the Barker and James-Bivins late proof of claim forms.

[17]   *See, e.g., Standard Fire Ins. Co. v. Knowles,* 568 U.S. 588, 593 (2013) ("[A] plaintiff who files a proposed class action cannot legally bind members of the proposed class before the class is certified."); *Schick v. Berg,* 430 F.3d 112, 117 (2d Cir. 2005) (under Texas law, "'[u]ntil a trial court determines that all prerequisites to certification are satisfied, . . . attorneys for named class members have no authority to represent or otherwise act on behalf of the unnamed class members'" (quoting *Gillespie v. Scherr,* 987 S.W.2d 129, 132 (Tex. App. 1998))); *In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.,* 835 F.3d 1195, 1203 (10th Cir. 2016) ("And the great weight of authority . . . is that the attorneys in the putative class action do not represent [absent class members] as class counsel."); *Parks v. Eastwood Ins. Servs., Inc.,* 235 F. Supp. 2d 1082, 1084 (C.D. Cal. 2002) ("The Second Circuit, state and federal district courts in California, and a leading treatise conclude Rule 23 pre-certification communication is permissible because no attorney-client relationship yet exists."); 2 MCLAUGHLIN ON

**KIRKLAND & ELLIS LLP**

The Honorable Jesse M. Furman
September 26, 2017
Page 11

        In summary, New GM is raising representational authority issues now and in this Court because of the important overlap between the issues here and those in the Old GM bankruptcy litigation and because this Court has jurisdiction over its own Orders, such as its appointment order (Order No. 8), including what they mean, what they do not mean, and how they are to be applied. Again, that is standard fare and settled law.[18]  Accordingly, we respectfully request that the Court provide guidance for the parties regarding the scope of Co-Lead Counsel's representational authority during the October 4 Status Conference.

                                    Respectfully submitted,

                                    /s/ Richard C. Godfrey, P.C.
                                    /s/ Andrew B. Bloomer, P.C.

                                    *Counsel for Defendant General Motors LLC*


cc:     The Honorable Martin Glenn
        MDL Counsel of Record
        Plaintiffs' Bankruptcy Counsel of Record
        New GM Bankruptcy Counsel of Record

---

[18]  CLASS ACTIONS § 11:1 (13th ed.) ("[W]hile named plaintiffs are clients of class counsel precertification, absent class members are not represented parties prior to class certification and the expiration of any opt-out period, and thus neither the ethical rules governing communications with represented parties nor the attorney-client privilege, are applicable precertification."); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 99 cmt. 1 (Am. Law Inst. 2000) ("[A]ccording to the majority of decisions, once the proceeding has been certified as a class action, the members of the class are considered clients of the lawyer for the class; prior to certification, only those class members with whom the lawyer maintains a personal client-lawyer relationship are clients."). *See also Smith v. Bayer Corp.*, 564 U.S. 299, 313–15 (2011) ("'[A] nonnamed class member is [not] a party to the class-action litigation *before the class is certified*'. . . .  Neither a proposed, nor a rejected, class action may bind nonparties." (quoting *Devlin v. Scardelletti*, 536 U.S. 1, 16 n.1 (2002))); *cf. In re Dynegy, Inc.*, 770 F.3d 1064, 1071 (2d Cir. 2014) ("Lucas' status as lead plaintiff of the putative class in the district court securities litigation did not automatically extend to the bankruptcy proceedings.  In order to have opted out or objected on behalf of the class, Lucas first must have sought the application of Rule 23 in bankruptcy court.  Because he did not, Lucas represented no one but himself.").

[18]    *See supra* note 3 and accompanying text.

# Exhibit 1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   IN RE:  GENERAL MOTORS LLC
     IGNITION SWITCH LITIGATION,
 4
                                         14 MD 2543 (JMF)
 5

 6   ------------------------------x
                                         New York, N.Y.
 7                                       August 11, 2017
                                         9:00 a.m.
 8
     Before:
 9
                         HON. JESSE M. FURMAN,
10
                                         District Judge
11
                            APPEARANCES
12

13   LIEFF CABRASER HEIMANN AND BERNSTEIN LLP
     BY:  ELIZABETH JOAN CABRASER
14           -AND-
     HAGENS BERMAN SOBOL SHAPIRO LLP (SEATTLE)
15   BY:  STEVE W. BERMAN
             -AND-
16   HILLIARD MUNOZ GONZALES LLP
     BY:  ROBERT HILLIARD
17           -AND-
     BROWN RUDNICK
18   BY:  HOWARD STEEL
          Attorneys for Plaintiffs
19
     KIRKLAND & ELLIS LLP
20   BY:  RICHARD CARTIER GODFREY
          ROBERT C. BROCK
21        ANDREW B. BLOOMER
          ALLAN PIXTON
22           -AND-
     KING & SPALDING
23   BY:  ARTHUR J. STEINBERG
          Attorneys for Defendant General Motors L.L.C.
24

25
```

1          If there is something in the declarations that are

2    filed in the first instance that changes the situation in some

3    material way, I think that enables us to stick with the current

4    schedule but allows GM, if it learns something from the factual

5    declarations that are filed that it changes things in some

6    meaningful way, it gives New GM an opportunity to tell me what

7    that is.  I would think that that would be a better way to

8    proceed.  That's what I would propose.

9          Thoughts.  No thoughts?

10         MR. GODFREY:  I have thoughts.  I thought Mr. Berman

11   was going to say something.

12         THE COURT:  It looks like he is.

13         MR. BERMAN:  I am.  On Wednesday we informed General

14   Motors that we plan on presenting papers in the bankruptcy

15   court next week, perhaps as early as Tuesday, that would ask

16   the bankruptcy court to issue a claims estimation order

17   pursuant to the sale agreement.

18         And under the sale agreement, your Honor, the Guc

19   Trust has the authority to go to the bankruptcy court and to

20   compromise claims.  In the event the Guc Trust makes a

21   determination that claims exceed $35,000,000, to ask the Court

22   to issue an estimation order that would require New GM to issue

23   stock that would be put into an account for the benefit of,

24   actually, our class.

25         And pursuant to that estimation order, we're going to

1    ask the bankruptcy court to issue that order which would

2    require GM to put up stock that's worth roughly a little over

3    $1,000,000,000.

4             THE COURT:  Correct me if my understanding of this is

5    wrong.  I take it this is the so-called "accordion feature";

6    that essentially the estimation order would trigger the

7    accordion feature?

8             MR. BERMAN:  That's correct.

9             THE COURT:  This might be what Mr. Godfrey was fearing

10   would be the --

11            MR. BERMAN:  Yes.  We gave GM a heads-up, as I said,

12   this week.  I don't think that this changes your briefing idea

13   because the fact of the matter is that you recognize the

14   positions New GM has taken with respect to successor liability.

15   We're not going to have a resolution of this proposed

16   settlement.  I suspect that GM is not going to just quietly

17   agree to issue $1,000,000,000 worth of stock.

18            THE COURT:  I'm pretty confident in sharing that

19   prediction.

20            MR. BERMAN:  I'm also pretty confident that the sale

21   agreement actually gives GM no rights to object, but we'll

22   fight that out.

23            THE COURT:  I intimate no view on that.

24            MR. BERMAN:  So I think that we should continue with

25   the briefing, but I wanted to give the Court a heads-up that

1    there will be some new facts on the table next week.

2        THE COURT:  I appreciate that heads-up.  I think, if

3    anything -- I understand from the grumpy looks at the back

4    table that you're not happy about the accordion feature issues

5    here.  Those are not my concern, at least in the

6    first instance.

7        I think to the extent that these implicate me, that

8    suggests to me that you'll have the information before the

9    deadline that I've imposed, and we can just proceed as I had

10   already planned.

11       Any reason otherwise, with the caveat, I suppose,

12   Mr. Godfrey and Mr. Bloomer, that if upon seeing what

13   plaintiffs file on Tuesday, you need additional time to sort

14   through what it all means, that you can always seek a

15   reasonable extension, and I would consider it.  Obviously the

16   sooner we can get briefing, the better, as far as I'm

17   concerned.

18       Your thoughts.  I don't want to hear your thoughts on

19   the accordion feature issue.  You'll have plenty of

20   opportunity, I'm sure, to air those, whether you have any right

21   to or not.  I'm sure you'll make those arguments but not to me,

22   at least in the first instance.

23       Any issues with what I have said on the successor

24   liability issues before me?

25       MR. GODFREY:  Well, both issues are going to be before

 1   your Honor.  Let me address the first issue, which is the

 2   successor liability briefing.

 3          I think, in light of what your Honor has said with

 4   respect to the option of having supplemental briefing if we

 5   deem it necessary, then that is acceptable to New GM.

 6          With respect to the second issue though, I have some

 7   points that your Honor -- this is a marker.  This is not going

 8   to be in the bankruptcy court.

 9          At my age, I'm seldom surprised, and I'm never

10   shocked.  But a day and a half ago, I was both surprised and

11   shocked when we were given a bare-bones description of this

12   settlement agreement.

13          This is not a compromise by the Guc Trust or the

14   plaintiffs' claims in the bankruptcy court.  This is a complete

15   surrender and sellout using GM's money to pay for a settlement

16   that was not defended against, claims that were meritless that

17   were asserted.

18          Let me express, in no uncertain terms, how we view the

19   proposal.

20          THE COURT:  Let me stop you, only because I want to

21   get out of here as I suggested.  I don't mean to cut you off

22   and not give you an opportunity to be heard on this, but I

23   don't think this is the time or place to do it.

24          You'll have plenty of opportunity in the

25   first instance, I would think in front of the bankruptcy court,

1   even if it's ultimately an issue that I'll need to resolve or

2   even some higher court.

3           Am I wrong about that?

4           MR. GODFREY:  Yes.  We are going to file a motion to

5   withdraw as soon as permissible, withdraw the reference from

6   the bankruptcy court and this court.

7           The notion that they can settle for no material money

8   from the Guc Trust -- the Guc Trust has $400,000,000 in assets.

9   They're getting $15,000,000, as we understand it, assigning

10  rights, agreeing to a $10,000,000,000 claim.  And supposedly GM

11  has no rights when they take a billion dollars of our money.

12          That is not going to stand.  We're going to withdraw

13  the reference.  We're going to bring it to the Court.  This is

14  collusive.  There are cases on point that we can refer the

15  Court to.

16          This has got all the indicia of a collusive

17  settlement.  They are awaiting a time-barred defense.  We have

18  no idea upon what basis and what expert the Guc Trust had,

19  which I doubt, by which they are not contesting $10,000,000,000

20  in claims.

21          And that is the trigger mechanism by which they claim

22  New GM has no choice but putting up a billion dollars.  That is

23  not going to happen without this Court hearing and ruling on

24  the issues.

25          We have unfairness issues.  We have the indicia of

1    collusive issues.  We have the fact that General Motors has

2    been excluded.  And you heard this morning that supposedly we

3    have no rights to even object.  I don't think that in our

4    country when someone is told to give a billion dollars to

5    someone else, we have some rights to object, including notice

6    and opportunity to be heard.

7            So, from a marker perspective, we're going to file a

8    motion.  We're going to brief the motion.  We're going to

9    attack the settlement, and it's going to be before your Honor.

10   We're going to do it as soon as we can permissibly do it.

11           THE COURT:  The marker is laid.  I'll look for the

12   motion.  The question is your arguments seem to me to be more

13   geared towards the merits of the issue than the forum in which

14   it should be litigated, at least in the first instance.

15           In proposing that the reference be withdrawn may be

16   the fact that it's a collusive agreement, if it is -- I

17   intimate no view on the matter -- is a factor to consider in

18   that analysis.

19           The question that occurs to me, thinking out loud, is

20   why you can't make those arguments to the bankruptcy court in

21   the first instance, recognizing that they may ultimately come

22   to me.

23           MR. GODFREY:  That's a good question.  Since

24   your Honor said I should keep this short, but there is an

25   answer to that.

1      THE COURT:  I trust the answer will be clear from your

2  motion.

3      MR. GODFREY:  It will be very clear, but we can talk

4  about this further in the motion.  One simple point for

5  your Honor to consider.  This is on behalf of a putative class,

6  among other things.

7      Your Honor has got the class before the court.  This

8  Court is going to decide Rule 23 issues, not the bankruptcy

9  court and not some quasi class which has the same implications.

10     This has come up before in other cases where the court

11  has said, no.  That's the MDL's court's purview we think.  So

12  there is significant overlap between the issues, both in terms

13  of the merits of the claims and the class issues and in terms

14  of notice issues that this Court has the jurisdiction over and

15  that this Court should have the primary role over.

16     So we will lay this out for the Court, but make no

17  mistake.  General Motors objects to this.  We believe that it's

18  brought an indicia of collusiveness.  Frankly, what the few

19  facts we were told are, they've got $400,000,000 in assets from

20  the Guc Trust for $15,000,000.

21     They are released from all liability for this alleged

22  $10,000,000 claim, and General Motors is supposed to put up a

23  billion dollars to make it all right.  General Motors has been

24  excluded from the settlement negotiations and had no knowledge

25  of the terms of the settlement negotiations.

 1            If you look at the terms of the accordion feature, we

 2    don't believe that they can do this.

 3            THE COURT:  Understood.  I will look for it.  If you

 4    want to discuss with each other a briefing schedule for that

 5    motion, you're certainly welcome to, and you can propose it to

 6    me.

 7            In the absence of that, it sounds like GM is planning

 8    to file the motion at some point soon regardless.  Unless and

 9    until I see otherwise, the local rules and default schedule

10    will apply.

11            As for the successor liability briefing, we'll stick

12    with the existing plan with the understanding that if there is

13    need for supplemental supplemental briefing, that is to say,

14    another round, then you'll let me know.

15            I want to say two notes on that.  That is not to give

16    you an opportunity to reply.  I am contemplating simultaneous

17    briefing.  So I would grant an additional round of briefs only

18    if there is something new learned from the submissions on that

19    date that changes things in some material fashion that you

20    think you need to address.  It's not an opportunity to reply to

21    the other side's arguments.

22            The second is that I'm not going to set a deadline

23    right now for that additional briefing or page limits for that

24    matter because I'm hoping and assuming that it won't be

25    necessary.

# Exhibit 2

**BROWN RUDNICK**

EDWARD S WEISFELNER
direct dial: (212) 209-4900
fax: (212) 209-4801
eweisfelner@brownrudnick.com

Seven
Times
Square
New York
New York
10036
tel 212.209.4800
fax 212.209.4801

August 16, 2017

**VIA EMAIL AND ECF FILING**

The Honorable Martin Glenn
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
Alexander Hamilton Custom House
One Bowling Green
New York, New York 10004

RE:    **In re Motors Liquidation Company, et al., Case No. 09-50026 (MG)**

Dear Judge Glenn:

In an astonishing and improper, last-minute about-face, the GUC Trust first informed the Plaintiffs at 3:30 p.m. (Eastern) today that the GUC Trust was now callously backing out of its settlement agreement with the Plaintiffs, and thus turning tomorrow's conference agenda on its head. This surprising development comes after months of painstaking and intensive efforts that culminated in a settlement agreement between the Plaintiffs and the GUC Trust, fully documented and approved by the GUC Trust on August 14, 2017. The relevant deal documentation, including the GUC Trust's declaration in support of the settlement agreement is attached hereto as **Exhibit A – Exhibit M**.

The facts and circumstances under which the GUC Trust apparently choose a last minute betrayal and abdication of its fiduciary duties have yet to fully come to light and the Plaintiffs reserve all rights accordingly. However, it appears that New GM, in flagrant violation of the GUC Trust's exclusive authority to administer Plaintiffs' claims, undertook a secret, contrived scheme to undermine the settlement agreement through a campaign of threats, intimidation and payoff to the GUC Trust and its professionals. That this occurred immediately after New GM audaciously and broadly criticized the GUC Trust and Plaintiffs with repeated unfounded allegations of "collusion," including on the record before Judge Furman at the August 11, 2017 Status Conference, raises questions of integrity, ethics and potential statutory and contract violations. At a minimum it is the "pot calling the kettle black," and an unfortunate development for an entity with a history of placing profits over human well-being, and choosing harmful conduct over fair dealing. A copy of the transcript of the Status Conference before Judge Furman is attached hereto as **Exhibit N**.

That the GUC Trust may have been bought off and provided blank check financing from New GM to now do an about face and oppose Plaintiffs to whom the GUC Trust owes fiduciary duties raises numerous issues as to both the GUC Trust and New GM's collusion and resulting liability and goes to the heart of the GUC Trust's and its professionals' ability to continue to serve as honorable stewards of the Old GM estate.

At a minimum, Plaintiffs need some additional time to recalibrate next steps and we apologize to the Court for any burden that the last minute, improper and wildly unexpected developments may engender. Indeed, Lead Counsel in the MDL Proceeding were all on planes heading East for tomorrow's conference when the GUC Trust selectively chose to drop its bombshell and reveal its duplicity. Notwithstanding being whipsawed at the last minute, Plaintiffs' counsel will be prepared to address the Court tomorrow as best as possible under these unique and unsettling circumstances.

We look forward to seeing Your Honor at the conference.

Respectfully submitted,

_/s/ Edward S. Weisfelner_____

Edward S. Weisfelner
Howard S. Steel
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
Tel: 212-209-4800
eweisfelner@brownrudnick.com
hsteel@brownrudnick.com

Sander L. Esserman
STUTZMAN, BROMBERG, ESSERMAN & PLIFKA,
A PROFESSIONAL CORPORATION
2323 Bryan Street, Ste 2200
Dallas, Texas 75201
Tel: 214-969-4900
esserman@sbep-law.com

*Designated Counsel for the Ignition Switch*
*Plaintiffs and Certain Non-Ignition Switch*
*Plaintiffs in the Bankruptcy Court*

Steve W. Berman (admitted pro hac vice)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101

Tel: 206-623-7292
steve@hbsslaw.com
Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
Tel: 414-956-1000
ecabraser@lchb.com

*Co-Lead Counsel for the Ignition Switch
Plaintiffs and Certain Non-Ignition Switch
Plaintiffs in the MDL Court*

William P. Weintraub
Gregory W. Fox
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: 212-813-8800
wweintraub@goodwinlaw.com
gfox@goodwinlaw.com

*Counsel to Ignition Switch Pre-Closing Accident
Plaintiffs Represented By Hilliard Muñoz Gonzales
L.L.P.*

Robert Hilliard
HILLIARD MUÑOZ GONZALES LLP
719 South Shoreline, Suite 500
Corpus Christi, Texas 78401
Tel: 361-882-1612
bobh@hmglawfirm.com

*Counsel for Certain Ignition Switch Pre-Closing
Accident Plaintiffs*

cc: Honorable Jesse M. Furman
    Counsel of Record via CM/ECF

09-50026-reg    Doc 14054-31    Filed 06/24/15    Entered 06/24/15 22:52:95    Exhibit A
Exhibit A    Pg 27 of 516

# EXHIBIT A

EXECUTION VERSION

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "**Agreement**"), dated as of August __, 2017 among:

Wilmington Trust Company, solely in its capacity as trustee for and administrator of the Motors Liquidation Company General Unsecured Creditors Trust (the "**GUC Trust**")

-and-

The Signatory Plaintiffs, as hereinafter defined (the Signatory Plaintiffs and the GUC Trust, the "**Parties**").

## PREAMBLE[1]

### Background: The Old GM Bankruptcy.

A.     Beginning on June 1, 2009 (the "**Petition Date**"), Motors Liquidation Company f/k/a General Motors Corporation, a Delaware Corporation ("**Old GM**"), and certain of its affiliated companies (together with Old GM, the "**Debtors**") commenced cases (the "**Old GM Bankruptcy Case**") under chapter 11 of the Bankruptcy Code;

B.     Also on the Petition Date, Old GM and certain other affiliated entities (collectively, the "**Sellers**") entered into a Master Sale and Purchase Agreement (the "**MSPA**") pursuant to which certain assets of the Sellers, including the brand "General Motors," were to be sold to NGMCO, Inc., n/k/a General Motors LLC, a Delaware corporation ("**New GM**");

C.     As of July 5, 2009, the MSPA, which had been previously amended and restated, was further and finally amended pursuant to a Second Amendment to the Amended and Restated Master Sale Purchase Agreement (the Master Sale and Purchase Agreement, as so amended and restated through the aforesaid Second Amendment, the "**AMSPA**") to, among other things, modify provisions in the AMSPA relating to the issuance by New GM of shares (the "**Adjustment Shares**") of New GM Common Stock in respect of Allowed General Unsecured Claims;

D.     Pursuant to the AMSPA, if the Bankruptcy Court issues an order estimating the aggregate Allowed General Unsecured Claims against the Sellers (the "**Claims Estimate Order**") at an amount exceeding thirty-five billion dollars ($35,000,000,000), then New GM must, within five (5) business days of entry of the Claims Estimate Order, issue the Adjustment Shares;

E.     If the Bankruptcy Court issues a Claims Estimate Order estimating the aggregate Allowed General Unsecured Claims against the Sellers at an amount at or exceeding forty-two

---

[1] Capitalized terms used, but otherwise not defined in the Preamble shall have the meanings ascribed to such terms in the Definitions section of this Agreement.

billion dollars ($42,000,000,000), New GM must issue the maximum amount of Adjustment Shares (30,000,000 shares);

F.     On July 5, 2009, the AMSPA was approved pursuant to a Bankruptcy Code section 363 order (the "**Sale Order**");

G.     Pursuant to the Sale Order, New GM became vested in substantially all of the material assets of the Sellers;

H.     On July 10, 2009 (the "**Closing Date**"), the transactions approved pursuant to the Sale Order were consummated (the "**363 Sale**");

I.     On September 16, 2009, the Bar Date Order was entered establishing November 30, 2009 (the "**Bar Date**") as the deadline to file proofs of claim against the Debtors;

J.     On March 29, 2011, the Bankruptcy Court issued an order (the "**Confirmation Order**") confirming the Debtors' Second Amended Joint Chapter 11 Plan (the "**Plan**");

K.     The Plan created the GUC Trust pursuant to an agreement, as it has been and may be further amended from time to time (the "**GUC Trust Agreement**"), as a post-confirmation successor to Old GM pursuant to Section 1145 of the Bankruptcy Code, to, *inter alia*, administer assets held or to be held by the GUC Trust (the "**GUC Trust Assets**");

L.     Pursuant to the Plan and a side letter (the "**Side Letter**"), attached hereto as Exhibit A, by and between the GUC Trust, the Debtors, New GM, and FTI Consulting (as trust monitor of the GUC Trust) dated September 23, 2011, the GUC Trust is exclusively authorized to seek the issuance of Adjustment Shares for satisfaction of Allowed General Unsecured Claims at any time; provided, however, that it was the GUC Trust's then intention to delay seeking issuance of the Adjustment Shares until such time (if any) that the GUC Trust determined, in its sole and absolute discretion, that the aggregate Allowed General Unsecured Claims were, in the GUC Trust's estimation, likely to exceed $35 billion, at which time the GUC Trust is entitled to seek the issuance of Adjustment Shares;

M.     The Plan, GUC Trust Agreement, and Side Letter provided the GUC Trust with the sole, exclusive right to object to General Unsecured Claims, pursue a Claims Estimate Order, and receive the Adjustment Shares;

N.     On March 31, 2011 (the "**Effective Date**"), the Plan was declared effective;

**The Recalls and the Multi-District Litigation.**

O.     In or around February and March of 2014, New GM issued a recall, NHTSA Recall Number 14V-047, pertaining to 2,191,525 vehicles with an ignition switch defect (the "**Ignition Switch Defect**");

P.	In or around June, July and September of 2014, New GM issued five additional recalls pertaining to over 10 million vehicles with defective ignition switches, NHTSA Recall Numbers 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540;

Q.	In or around March of 2014, New GM issued a recall, NHTSA Recall Number 14V-118, pertaining to approximately 1.2 million vehicles with defective side airbags;

R.	In or around March of 2014, New GM issued a recall, NHTSA Recall Number 14V-153, pertaining to over 1.3 million vehicles with defective power steering;

S.	Commencing after the issuance of the recalls, numerous lawsuits were filed against New GM, individually or on behalf of putative classes of persons, by, *inter alia*,:

a.	plaintiffs asserting economic loss claims who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 (the "**Ignition Switch Plaintiffs**");

b.	plaintiffs asserting economic loss claims who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags, or power steering included in NHTSA Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346, 14V-540, 14V-118 and 14V-153 (the "**Non-Ignition Switch Plaintiffs**"); and

c.	plaintiffs asserting personal injury or wrongful death claims based on or arising from an accident involving an Old GM vehicle that occurred prior to the Closing Date (the "**Pre-Closing Accident Plaintiffs**"), including a subset asserting claims involving an Old GM vehicle with the Ignition Switch Defect (the "**Ignition Switch Pre-Closing Accident Plaintiffs**");

T.	Many of the cases commenced against New GM were consolidated in a multi-district litigation (the "**GM MDL**") pending in the United States District Court for the Southern District of New York before the Hon. Jesse M. Furman (the "**District Court**");

**The Motions to Enforce Litigation.**

U.	In or around April and August of 2014, New GM sought to enjoin such lawsuits against New GM by filing motions to enforce the Sale Order with respect to: (i) Ignition Switch Plaintiffs; (ii) Ignition Switch Pre-Closing Accident Plaintiffs; and (iii) Non-Ignition Switch Plaintiffs (the "**Motions to Enforce**");

V.	Following the filing of the Motions to Enforce, the Bankruptcy Court identified initial issues to be addressed on the Motions to Enforce with respect to the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs;

W.	Following briefing and argument, the Bankruptcy Court issued its decision (the "**Decision**") on April 15, 2015, and a judgment implementing the Decision (the "**Judgment**") on June 1, 2015;

X.    In the Decision and the Judgment, the Bankruptcy Court ruled that "based on the doctrine of equitable mootness, in no event shall assets of the GUC Trust held at any time in the past, now or in the future (collectively, the 'GUC Trust Assets') (as defined in the Plan) be used to satisfy any claims of the Plaintiffs";

Y.    On July 13, 2016, the Second Circuit issued an opinion on direct appeal of the Decision and Judgment, vacating the Bankruptcy Court's equitable mootness ruling as an advisory opinion;

Z.    Following the issuance of the Second Circuit's mandate, the Bankruptcy Court identified initial issues to be addressed on remand, including whether the Pre-Closing Accident Plaintiffs, the Ignition Switch Plaintiffs and/or Non-Ignition Switch Plaintiffs satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust and/or are such claims equitably moot;

AA.    On December 22, 2016, the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs and certain Pre-Closing Accident Plaintiffs filed motions for authority to file late proofs of claim, including late class proofs of claim (the "**Late Claims Motions**");

BB.    On or around February 16, 2017, counsel for the GUC Trust served counsel for the Ignition Switch Plaintiffs and counsel for certain Ignition Switch Pre-Closing Accident Plaintiffs with interrogatories (the "**Late Claims Interrogatories**") in connection with the Late Claims Motions;

CC.    An Ignition Switch Plaintiff and certain Ignition Switch Pre-Closing Accident Plaintiffs have responded to the Late Claims Interrogatories;

DD.    In or around March 2017, additional briefs were filed by Ignition Switch Plaintiffs, certain Ignition Switch Pre-Closing Accident Plaintiffs, New GM, and jointly by the GUC Trust and certain unaffiliated holders of beneficial units of the GUC Trust    (the "**Participating Unitholders**") on the Applicability of *Pioneer* Issue and the Tolling Issue (as those terms are defined in the *Order Establishing, Inter Alia, Briefing Schedule for Certain Issues Arising From Late Claim Motions Filed by Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Certain Ignition Switch Pre-Closing Accident Plaintiffs* [ECF No. 13869]);

EE.    On July 15, 2016 and June 30, 2017, Judge Furman issued opinions in the GM MDL explaining that the "benefit-of-the-bargain defect theory" of economic loss damages "compensates a plaintiff for the fact that he or she overpaid, at the time of sale, for a defective vehicle.  That form of injury has been recognized by many jurisdictions."  See In re General Motors LLC Ignition Switch Litig., 14-MD-2543 (JMF) (S.D.N.Y. June 30, 2017) [ECF Nos. 3119, 4175].

FF.    Counsel for the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs and certain Pre-Closing Accident Plaintiffs have provided counsel for the GUC Trust with expert reports and proffers of evidence indicating that the amount of damages for the Ignition Switch Plaintiffs', certain Non-Ignition Switch Plaintiffs', and certain Pre-Closing Accident Plaintiffs' asserted claims, if ultimately determined to be Allowed General Unsecured Claims against Old

GM and/or the GUC Trust, would be greater than that amount necessary to trigger New GM's obligation to issue the Adjustment Shares in the maximum amount under the AMSPA;

GG.     The Signatory Plaintiffs, on the one hand, and the GUC Trust, on the other hand, disagree regarding whether the proponents of the Late Claims Motions satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust, and whether such asserted claims are equitably moot;

HH.     The Signatory Plaintiffs, on the one hand, and the GUC Trust, on the other hand, disagree regarding whether any GUC Trust Assets currently in the GUC Trust could be used to satisfy Plaintiffs' (as hereinafter defined) asserted claims against the GUC Trust and Old GM;

II.     The Signatory Plaintiffs, on the one hand, and the GUC Trust, on the other hand, disagree regarding whether any GUC Trust Assets previously distributed are subject to claw-back or recapture by the GUC Trust and/or the Plaintiffs to satisfy Plaintiffs' asserted claims against the GUC Trust and Old GM;

JJ.     The Signatory Plaintiffs, on the one hand, and the GUC Trust, on the other hand, disagree regarding the ultimate amount of Allowed General Unsecured Claims of the Plaintiffs;

KK.     The GUC Trust desires to complete the distribution of the GUC Trust Assets held by the GUC Trust as soon as practicable and, to such purpose, desires to resolve the Late Claims Motions and the Plaintiffs' asserted claims against the GUC Trust and Old GM;

LL.     The GUC Trust acknowledges the key objectives of the Signatory Plaintiffs in entering into this Agreement are to (i) achieve the funding of the Settlement Fund; (ii) avoid the risk, delay, uncertainty and costs of litigation with the GUC Trust; and (iii) take or to cause to be taken all steps necessary to require New GM to issue the maximum amount of Adjustment Shares and to make the value of the Settlement Fund and the Adjustment Shares available to satisfy, in part, the Plaintiffs' claims.  In connection with those objectives, the GUC Trust, based upon its review of the expert report and proffer of evidence provided by Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs and the expert report and proffer of evidence  provided by certain Pre-Closing Accident Plaintiffs, agrees to provide the cooperation and assistance provided for herein relating to the issuance of a Claims Estimate Order, as provided for pursuant to Section 3.2(c) of the AMSPA and the Side Letter, and to seek to estimate for allowance purposes, and not dispute the amount of estimated claims thereunder;

MM.     The Signatory Plaintiffs acknowledge the key objectives of the GUC Trust in entering into this Agreement are: (i) to minimize any delay in the distribution of any remaining GUC Trust Assets; (ii) avoid any claw-back or recapture of prior distributions of GUC Trust Assets; and (iii) otherwise avoid the risk, delay, uncertainty and costs of litigation.

## **AGREEMENT**

The GUC Trust and the Signatory Plaintiffs propose to resolve their dispute as follows:

**1.     DEFINITIONS.**  The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

1.1     **Adjustment Shares** shall have the meaning ascribed to such term in the Preamble.

1.2     **Adjustment Shares Waiver Provision** shall have the meaning ascribed to such term in Section 2.3 hereto.

1.3     **Allowed General Unsecured Claims** means General Unsecured Claims against the Debtors that have been allowed through the date of entry of the Claims Estimate Order, including, to the extent such order is entered by the Bankruptcy Court, the claims in the Claims Estimate Order.

1.4     **AMPSA** shall have the meaning ascribed to such term in the Preamble.

1.5     **Bar Date Order** means that *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim (Including Claims Under Bankruptcy Code Section 503(B)(9)) and Procedures Relating Thereto and Approving the Form and Manner of Notice Thereof*, dated Sept. 16, 2009 [ECF No. 4079] entered by the Bankruptcy Court establishing the Bar Date.

1.6     **Bar Date** shall have the meaning ascribed to such term in the Preamble.

1.7     **Bankruptcy Code** means title 11 of the United States Code.

1.8     **Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of New York and shall have the meaning ascribed to such term in the Preamble.

1.9     **Claims Estimate Order** shall mean an order of the Bankruptcy Court estimating the aggregate Allowed General Unsecured Claims against the Sellers, inclusive of the claims of the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, and certain Pre-Closing Accident Plaintiffs, entered pursuant to Section 3.2(c) of the AMSPA.

1.10    **Closing Date** shall have the meaning ascribed to such term in the Preamble.

1.11    **Co-Lead Counsel** means, for purposes of this Agreement, Steve W. Berman of Hagens Berman Sobol Shapiro LLP and Elizabeth Cabraser of Lieff, Cabraser, Heimann & Bernstein, LLP, who were individually and collectively appointed to represent all economic loss plaintiffs in the GM MDL by Order No. 8, In re Gen. Motors LLC Ignition Switch Litig., No. 14-MD-2543 (S.D.N.Y. Aug. 15, 2014) [ECF No. 249], or any other or replacement counsel appointed to represent any Ignition Switch or Non-Ignition Switch Plaintiffs in the GM MDL.

1.12    **Communication** shall have the meaning ascribed to such term in Section 3.15.

1.13    **Confirmation Order** shall have the meaning ascribed to such term in the Preamble.

1.14    **Debtors** shall have the meaning ascribed to such term in the Preamble.

**1.15    Decision** means *Decision on Motion to Enforce Sale Order*, entered April 15, 2015 [ECF No. 13109] by Judge Robert E. Gerber in the Bankruptcy Court, published as In re Motors Liquidation Company, 529 B.R. 510 (Bankr. S.D.N.Y. 2015), as corrected in *Errata Order RE: Decision on Motion to Enforce Sale Order*, In re Motors Liquidation Co., No. 09-50026, dated July 13, 2015 [ECF No. 13290].

**1.16    District Court** shall have the meaning ascribed to such term in the Preamble.

**1.17    Effective Date** shall have the meaning ascribed to such term in the Preamble.

**1.18    Final Order** has the meaning ascribed to it in the Plan.

**1.19    General Unsecured Claim** has the meaning ascribed to it in the Plan.

**1.20    GM MDL** shall have the meaning ascribed to such term in the Preamble.

**1.21    GUC Trust** means the trust created by the GUC Trust Agreement in the form approved as Exhibit D to the Plan, as the same has been and may further be amended from time to time.

**1.22    GUC Trust Agreement** means the *Second Amended and Restated Motors Liquidation Company GUC Trust Agreement*, by and among Wilmington Trust Company, as trust administrator and trustee of the GUC Trust, and FTI Consulting, as trust monitor of the GUC Trust, dated July 30, 2015, as it may be amended from time to time.

**1.23    GUC Trust Assets** means assets that have been held, are held, or may be held in the future by the GUC Trust.  Solely in the event that the Bankruptcy Court enters the Claims Estimate Order, the term "GUC Trust Assets" as used herein shall be deemed to exclude the Adjustment Shares.

**1.24    GUC Waiver Provision** shall have the meaning ascribed to such term in Section 2.3 hereto.

**1.25    Ignition Switch Defect** shall have the meaning ascribed to such term in the Preamble.

**1.26    Ignition Switch Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.27    Ignition Switch Pre-Closing Accident Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.28    Judgment** means the Judgment, entered June 1, 2015 [ECF No. 13177] by Judge Robert E. Gerber in the Old GM Bankruptcy Case.

**1.29    Key Objectives** means the objectives of the Parties in entering into this Agreement as stated in Paragraphs LL and MM of the Preamble.

**1.30**    **Late Claims Motions** shall have the meaning ascribed to such term in the Preamble.

**1.31**    **Motions to Enforce** means, collectively, the (i) *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, dated April 21, 2014 [ECF No. 12620]; (ii) *Motion of General Motors LLC Pursuant to 11 U.S.C §§ 105 and 363 to Enforce this Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits*, dated August 1, 2014 [ECF No. 12807]; and (iii) *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)*, dated August 1, 2014 [ECF No. 12808].

**1.32**    **New GM** means General Motors LLC (F/K/A NGMCO, Inc.).

**1.33**    **New GM Common Stock** means the common stock of New GM (NYSE: GM).

**1.34**    **NHTSA** means the National Highway Traffic Safety Administration.

**1.35**    **Non-Ignition Switch Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.36**    **Notice Cost Cap Amount** shall have the meaning ascribed to such term in Section 2.9.

**1.37**    **Notice Order** shall have the meaning ascribed to such term in Section 2.9.

**1.38**    **Old GM** means Motors Liquidation Company, formerly known as General Motors Corporation.

**1.39**    **Old GM Bankruptcy Case** means those proceedings commenced on June 1, 2009 in the Bankruptcy Court captioned *In re Motors Liquidation Company, et al., f/k/a General Motors Corp.*, Bankr. No. 09-50026.

**1.40**    **Outside Date** shall have the meaning ascribed to such term in Section 3.2.

**1.41**    **Parties** means the Signatory Plaintiffs and the GUC Trust.

**1.42**    **PIWD** means claims for personal injury and wrongful death.

**1.43**    **PIWD Counsel** means (i) Robert C. Hilliard of Hilliard Muñoz Gonzalez, LLP and Thomas J. Henry of the Law Offices of Thomas J. Henry, but solely for the Pre-Closing Accident Plaintiffs represented by those two law firms; and (ii) Lisa M. Norman of Andrews Myers, P.C., but solely for the Pre-Closing Accident Plaintiffs represented by that law firm.

**1.44**    **PIWD Plaintiffs** means those certain Ignition Switch Pre-Closing Accident Plaintiffs represented by PIWD Counsel.

1.45    **Plaintiffs** means the Ignition Switch Plaintiffs, the Non-Ignition Switch Plaintiffs, and the Pre-Closing Accident Plaintiffs, including all plaintiffs (whether named or unnamed, including unnamed members of a putative class) covered by any of the Late Claims Motions, all plaintiffs represented by counsel that is signatory hereto and any other party who, (i) as of July 10, 2009, suffered an economic loss claim by reason of their ownership or lease of an Old GM vehicle with an ignition switch defect included in Recall No. 14V-047; (ii) as of July 10, 2009 suffered an economic loss claim by reason of their ownership or lease of an Old GM vehicle with defects in ignition switches, side airbags, or power steering included in NHTSA Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346, 14V-540, 14V-118 and 14V-153, and/or (iii) suffered a personal injury or wrongful death based on or arising from an accident involving an Old GM vehicle that occurred prior to the Closing Date; it being understood however that the covenants and agreements to be performed by the Signatory Plaintiffs are to be performed by Co-Lead Counsel and PIWD Counsel and that no action or failure to act by any Plaintiff (other than the Signatory Plaintiffs) shall constitute a breach of this Agreement or shall excuse the performance of any other Party.

1.46    **Plan** means Debtors' Second Amended Joint Chapter 11 Plan, filed March 18, 2011 [ECF No. 9836] by Motors Liquidation Company in the Bankruptcy Proceeding.

1.47    **Pre-Closing** means any time before July 10, 2009, the date on which the 363 Sale between Sellers and New GM closed.

1.48    **Pre-Closing Accident Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

1.49    **Recalls** means NHTSA Recall Numbers 14V-047, 14V-355, 14V-394, 14V-400, 14V-346, 14V-540, 14V-118 and 14V-153.

1.50    **Sale Order** means the *Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief*, dated July 5, 2009 [ECF No. 2968] and the supporting *Decision on Debtors' Motion for Approval of (1) Sale of Assets to Vehicle Acquisition Holdings, LLC; (2) Assumption and Assignment of Related Executory Contracts; and (3) Entry into UAW Retiree Settlement Agreement*, dated July 5, 2009 [ECF No. 2967].

1.51    **Sellers** means Motors Liquidation Company, formerly known as General Motors Corporation, together with three of its debtor subsidiaries, Chevrolet-Saturn of Harlem, Inc.; Saturn, LLC; and Saturn Distribution Corporation.

1.52    **Settlement** means the settlement of the Parties' disputes as provided for by this Agreement.

1.53    **Settlement Amount** shall have the meaning ascribed to such term in Section 2.3 hereto.

1.54    **Settlement Effective Date** shall have the meaning ascribed to such term in Section 3.1 hereto.

**1.55**   **Settlement Fund** shall have the meaning ascribed to such term in Section 2.3 hereto.

**1.56**   **Settlement Motion** shall have the meaning ascribed to such term in Section 2.2 hereto.

**1.57**   **Settlement Order** shall have the meaning ascribed to such term in Section 2.2.

**1.58**   **Signatory Plaintiffs** means PIWD Counsel on behalf of the PIWD Plaintiffs, and Co-Lead Counsel on behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs.

**1.59**   **Term Loan Avoidance Action** shall mean the action captioned *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. et al.*, Adv. Pro. No. 09-00504 (Bankr. S.D.N.Y. July 31, 2009).

**1.60**   **Term Loan Avoidance Action Claims** shall have the meaning ascribed to such term in the GUC Trust Agreement.

**1.61**   **Waiver** shall have the meaning ascribed to such term in Section 2.3.

**1.62**   **Waiver Provision** shall have the meaning ascribed to such term in Section 2.3.

## 2.   **MUTUAL AGREEMENTS OF THE PARTIES.**

**2.1**   The Preamble constitutes an essential part of the Agreement and is incorporated herein.

**2.2**   As soon as practicable following the execution of this Agreement, the Parties shall prepare and file a motion in the Bankruptcy Court (the "**Settlement Motion**") seeking entry of (i) an order (the "**Settlement Order**") substantially in the form of Exhibit B attached hereto, and otherwise on terms acceptable to the GUC Trust, Co-Lead Counsel and PIWD Counsel, each in their sole and absolute discretion, approving the Settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, and (ii) a Claims Estimate Order substantially in the form of Exhibit C attached hereto, and otherwise on terms acceptable to the GUC Trust, Co-Lead Counsel and PIWD Counsel, each in their sole and absolute discretion.

**2.3**   In furtherance of the Key Objectives and as an inducement to the GUC Trust's entry into this Agreement and willingness to be bound by the terms of the Settlement Order and the Claims Estimate Order, provided notice has been given in a form and manner approved by the Bankruptcy Court, the Signatory Plaintiffs agree that they shall support the entry of a Settlement Order that:

(a)   directs the GUC Trust to, within five (5) business days of the Settlement Effective Date, irrevocably pay fifteen million dollars ($15,000,000) in cash (the "**Settlement Amount**") to a trust, fund or other vehicle (the "**Settlement Fund**") established and designated by the Signatory Plaintiffs (for purposes of administration of Plaintiffs' claims reconciliation and/or distributions to Plaintiffs under a subsequent allocation

methodology); provided that, in the event the Signatory Plaintiffs have not designated such Settlement Fund within two (2) business days following the Settlement Effective Date, the GUC Trust shall place the Settlement Amount into an third party escrow account established by the GUC Trust;

(b)      contains a provision which, effective upon (i) the Settlement Order becoming a Final Order (unless the GUC Trust waives the requirement that the Settlement Order be a Final Order in accordance with Section 3.1 hereof) and (ii) payment of the Settlement Amount, imposes a complete and irrevocable waiver and release on the part of all Plaintiffs with respect to any and all rights, claims and causes of action (including but not limited to any claims and causes of action with respect to Allowed General Unsecured Claims of the Plaintiffs arising under, or that may arise under, the Claims Estimate Order), now existing or arising in the future, that any Plaintiff might directly or indirectly assert against the Debtors, their estates, the GUC Trust, the trust administrator of the GUC Trust, the GUC Trust Assets, the Motors Liquidation Company Avoidance Action Trust and the holders of beneficial units in the GUC Trust, and channels all such claims or potential claims to the Settlement Fund for administration and satisfaction (the "**Waiver Provision**," and the waiver and release contemplated thereby, the "**Waiver**");

(c)      contains a provision which, effective upon (i) the Settlement Order becoming a Final Order (unless the GUC Trust waives the requirement that the Settlement Order be a Final Order in accordance with Section 3.1 hereof) and (ii) payment of the Settlement Amount, imposes a complete and irrevocable waiver and release on the part of all holders of units of beneficial interest in the GUC Trust, all defendants in the Term Loan Avoidance Action, and holders of Allowed General Unsecured Claims, other than the Plaintiffs, with respect to any rights to the Settlement Fund, including the Settlement Amount (the "**GUC Waiver Provision**"); and

(d)      contains a provision which, effective upon (i) the Settlement Order becoming a Final Order (unless the GUC Trust waives the requirement that the Settlement Order be a Final Order in accordance with Section 3.1 hereof), (ii) payment of the Settlement Amount, and (iii) entry of the Claims Estimate Order by the Bankruptcy Court, imposes a complete and irrevocable waiver and release on the part of the GUC Trust, all holders of units of beneficial interest in the GUC Trust, all defendants in the Term Loan Avoidance Action, and all holders of Allowed General Unsecured Claims, other than the Plaintiffs, with respect to any rights to any Adjustment Shares (the "**Adjustment Shares Waiver Provision**").

**2.4**      In furtherance of the Key Objectives and as an inducement to the Signatory Plaintiffs' entry into this Agreement and willingness to be bound by the terms of Settlement Order, including but not limited to the Waiver Provision, the GUC Trust, based upon its review of the expert report and proffer of evidence provided by Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs, and the expert report and proffer of evidence provided by the PIWD Plaintiffs, agrees that it shall support the entry of a Claims Estimate Order that:

(a)     estimates the aggregate Allowed General Unsecured Claims (inclusive of the claims of the Plaintiffs, but excluding Term Loan Avoidance Action Claims) against the Sellers and/or the GUC Trust pursuant to Section 7.3 of the Plan, Section 3.2(c) of the AMSPA and the Side Letter in an amount that, as of the date of the Claims Estimate Order, equals or exceeds $42 billion, thus triggering the issuance of the maximum amount of Adjustment Shares; and

(b)     directs that any such Adjustment Shares issued as a result of a Claims Estimate Order, or the value of such Adjustment Shares, be promptly delivered by New GM to the Settlement Fund.

2.5     Following the Settlement Order becoming a Final Order (unless the GUC Trust waives the requirement that the Settlement Order be a Final Order in accordance with Section 3.1 hereof), contemporaneously with the payment of the Settlement Amount by the GUC Trust to the Settlement Fund, the Waiver Provision shall become immediately and automatically effective and binding on all Plaintiffs, and the GUC Waiver Provision shall become immediately and automatically effective and binding on the GUC Trust, all holders of units of beneficial interest in the GUC Trust, all defendants in the Term Loan Avoidance Action, and holders of Allowed General Unsecured Claims, other than the Plaintiffs.

2.6     Provided that the Settlement Order has become a Final Order (unless the GUC Trust waives the requirement that the Settlement Order be a Final Order in accordance with Section 3.1 hereof), then, contemporaneously upon the entry of the Claims Estimate Order (i) the Adjustment Shares Waiver Provision shall become immediately and automatically effective and binding on the GUC Trust, all holders of units of beneficial interest in the GUC Trust, all defendants in the Term Loan Avoidance Action, and holders of Allowed General Unsecured Claims, other than the Plaintiffs, and (ii) the GUC Trust shall be prohibited from, at any time, objecting to the allowance of the estimated claims at the amount set forth in the Claims Estimate Order.

2.7     The Parties shall use commercially reasonable efforts to have the Claims Estimate Order entered on the same date as the Settlement Order, provided that, (i) regardless of whether or not the Claims Estimate Order is entered on or after such date (and regardless of whether the request to enter the Claims Estimate Order is approved or denied), this Agreement (including, but not limited to Sections 2.2, 2.3(a), 2.3(b), 2.3(c), and 2.5 hereof) and the Settlement Order shall remain binding upon the Parties; (ii) the Settlement Amount shall not be returned to the GUC Trust under any circumstances; and (iii) the GUC Trust shall not be required to incur costs (other than the costs of notice as set forth in Paragraph 2.9 hereof) in excess of a reasonable amount in connection with prosecuting the Settlement Motion with respect to the Claims Estimate Order, or any appeals thereof.

2.8     Notwithstanding Sections 157(b)(2)(B) and (b)(2)(O) of Title 28, in connection with the Settlement Motion, to the extent (if any) consent is required, the Pre-Closing Accident Plaintiffs represented by PIWD Counsel consent to the Bankruptcy Court estimating their personal injury and wrongful death claims against the Sellers and/or the GUC Trust for purposes of determining whether the Allowed General Unsecured Claims in the aggregate exceed thirty-five billion dollars ($35,000,000,000). The Pre-Closing Accident Plaintiffs represented by

PIWD Counsel do not consent to estimation of their personal injury and wrongful death claims by the Bankruptcy Court for any other purpose or in connection with any other proceeding. If further adjudication of their personal injury and wrongful death claims is necessary notwithstanding entry of the Claims Estimate Order, the Pre-Closing Accident Plaintiffs represented by PIWD Counsel expressly reserve their rights to have their claims tried (pursuant to Section 157(b)(5) of Title 28) or estimated in the district court in which Old GM's bankruptcy case is pending, or in the district court in which the claim arose, as determined by the district court in which Old GM's bankruptcy case is pending.

**2.9    Notice.**

(a)    The Parties shall be responsible for providing notice in connection with the Settlement Motion in accordance with notice procedures approved by an order of the Bankruptcy Court. Based on notice plan proposals from leading notice administrators, the Parties have budgeted and the GUC Trust agrees to pay the reasonable costs and expenses for notice of the Settlement Motion in an amount up to $6,000,000 (the "**Notice Cost Cap Amount**"). As soon as practicable following the execution of this Agreement, the Parties shall seek an order (the "**Notice Order**") of the Bankruptcy Court approving the proposed notice procedures for notice of the Settlement Motion. The requested notice procedures shall include (i) publication notice by multimedia channels that may include social media, e-mail, online car and consumer publications, and a settlement website (which, for the avoidance of doubt, may be the GUC Trust's website at www.mlcguctrust.com) posting all relevant documents and long-form notice; (ii) notice by postcard to: (A) all persons in the United States who, as of July 10, 2009, owned or leased a vehicle manufactured by Old GM included in the Recalls; (B) all Pre-Closing Accident Plaintiffs who have filed a lawsuit against New GM as of the date of this Agreement; and (C) all Pre-Closing Accident Plaintiffs who have filed or joined a motion for authorization to file late claims against the GUC Trust; (iii) notice to all defendants in the Term Loan Avoidance Action via the Bankruptcy Court's ECF system and, to the extent a defendant is not registered to receive notice via the ECF system, via postcard, and (iv) notice via DTC's LENSNOTICE system to holders of beneficial units of the GUC Trust. The Signatory Plaintiffs agree to pay any amounts in excess of the Notice Cost Cap Amount.

(b)    Allocation of the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund between the Plaintiffs asserting economic loss claims and the Plaintiffs asserting PIWD claims shall be determined and approved by the District Court. Notice of any agreement as to the proposed allocation of the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund as between the group of Plaintiffs asserting claims for economic loss, on the one hand, and the group of Plaintiffs asserting claims for personal injury and wrongful death, on the other hand, along with information about the hearing date and how and when to assert any objections, will be provided by, and at the sole cost of, Signatory Plaintiffs (and not the GUC Trust) via a settlement website to all known Plaintiffs whose rights might be affected by such allocation and such Plaintiffs shall have an opportunity to object to the proposed allocation at a hearing, as when and if such agreement is reached.

(c)     Approval of the qualifications and criteria for Plaintiffs to be eligible to receive distributions from the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund shall be done by the Bankruptcy Court.  Notice of any proposed criteria for determining the right or ability of each Plaintiff to receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund on account of a claim against Old GM based upon economic loss or for personal injury or wrongful death arising or occurring before the Bar Date, along with information about the hearing date and how and when to assert any objections, will be provided by, and at the sole cost of, Signatory Plaintiffs (and not the GUC Trust) via a settlement website to all known Plaintiffs whose rights might be affected by the establishment of criteria for the payment of such claims and such Plaintiffs shall have an opportunity to object to the proposed criteria at a hearing, as when and if such criteria is developed.  Being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), or any other consideration contained in the Settlement Fund.

2.10    The Parties agree that all of the value of the Settlement Fund shall be reserved for the exclusive benefit of the Plaintiffs, subject only to costs associated with the administration of the Settlement Fund.  For the avoidance of doubt, the GUC Trust, any holders of beneficial units of the GUC Trust, defendants in the Term Loan Avoidance Action, or holders of Allowed General Unsecured Claims, other than the Plaintiffs (i) shall have no rights or entitlements with respect to the Settlement Fund (including, when and if deposited, the Adjustment Shares or the value thereof) or the funds therein, and (ii) solely to the extent that the Settlement Order has become a Final Order (or the requirement that the Settlement Order be a Final Order has been waived by the GUC Trust in accordance with Section 3.1 hereof) and the Claims Estimate Order is entered by the Bankruptcy Court, shall have no rights or entitlements to the Adjustment Shares issued pursuant to the Claims Estimate Order, or to the value of such Adjustment Shares.

2.11    The Signatory Plaintiffs or, in the alternative, an administrator appointed by the Signatory Plaintiffs, shall establish the Settlement Fund (at the sole cost of the Signatory Plaintiffs) and the procedures for the administration and allocation to Plaintiffs of the Settlement Fund, including the criteria for Plaintiffs to assert a claim against the Settlement Fund on account of an Allowed General Unsecured Claim, methodology for allocating the Settlement Fund to Plaintiffs, and procedures for payment of Plaintiffs' attorneys' fees.

2.12    Nothing in the Settlement Agreement is intended to waive any claims against New GM or to be an election of remedies against New GM; nor does the Settlement Agreement or any payments made in connection therewith represent full satisfaction of any claims against Old GM,  unless and until such claims are in fact paid in full from every available source; provided, however, that in no event shall any Plaintiff be permitted to seek any further payment or compensation from the GUC Trust in respect of their claims or otherwise, other than the Settlement Amount and the Adjustment Shares.  Except as mandated otherwise under applicable law, nothing in the Settlement Agreement shall waive any claims that any Plaintiff may have against New GM or constitute an election of remedies by any Plaintiff, and neither the Settlement Amount nor the Adjustment Shares (nor any distribution thereof to any Plaintiff) shall represent full and final satisfaction of any claim that any Plaintiff may have against New GM, all

14

of which are expressly reserved. The Bankruptcy Court's estimate of the aggregate Allowed General Unsecured Claims in the Claims Estimate Order shall not operate as a cap on any of the claims of any of the Plaintiffs against New GM.

3.    **MISCELLANEOUS PROVISIONS APPLICABLE TO THIS AGREEMENT.**

**3.1    Settlement Effective Date.**  This Agreement shall become effective and binding on the Parties on the date on which this Agreement is fully executed by each of the Parties.  The Settlement set forth in this agreement (including but not limited to the required payment of the Settlement Amount, the delivery of the Waiver as set forth herein, the GUC Waiver Provision, and to the extent provided in section 2.3(d) hereof, the Adjustment Shares Waiver Provision) shall become effective on the date that the Settlement Order becomes a Final Order (the "**Settlement Effective Date**"), provided, however, that from and after the date the Settlement Order is entered by the Bankruptcy Court, the GUC Trust may waive the requirement that the Settlement Order be a Final Order.

**3.2    Termination.**

(A) <u>Automatic Termination.</u>  This Agreement shall immediately terminate as to all Parties in the event that the Bankruptcy Court denies approval of the Notice Order (or enters a Notice Order different from that set forth in Section 2.9 hereof that is not otherwise reasonably acceptable to the Parties) or denies approval of the Settlement Motion as it relates to the Settlement Order (for the avoidance of doubt, this Agreement shall not immediately terminate if the Bankruptcy Court denies approval of the Settlement Motion solely as it relates to the Claims Estimate Order).  In the event of such automatic termination, this Agreement shall be null and void, and each of the Parties' respective interests, rights, remedies and defenses shall be fully restored without prejudice as if this Agreement (except as set forth in Sections 3.3, 3.4, 3.5, 3.13, 3.15, and 3.19) had never existed and the Parties shall be returned to their respective positions status quo ante.

(B) <u>Termination by the GUC Trust.</u>  This Agreement shall be terminable at the option of the GUC Trust in the event that (a) the Notice Order is not entered on or before 30 days after execution of this Settlement Agreement, or (b) the Settlement Effective Date does not occur on or before 60 days after notice of the Settlement Motion has been provided pursuant to Section 2.9 hereto and the Notice Order (each of (a) and (b) the "**Outside Date**").  Following the passage of the Outside Date, the GUC Trust shall be entitled to send a notice of termination to the Signatory Plaintiffs in accordance with Section 3.15 hereof, with the Agreement automatically terminating on the date that such notice is received by the Signatory Plaintiffs.  In the event of such termination, this Agreement shall be null and void, and each of the Parties' respective interests, rights, remedies and defenses shall be fully restored without prejudice as if this Agreement (except as set forth in Sections 3.3, 3.4, 3.5, 3.13, 3.15, and 3.19) had never existed and the Parties shall be returned to their respective positions status quo ante.

(C) <u>Termination by Any Party for Cause.</u>  In the event of any material breach of the terms of this Agreement, the non-breaching Party may elect (in addition to any other remedies available to the non-breaching party hereunder or under applicable law) to terminate this Agreement by (i) providing a Communication to the breaching party as set forth in Section 3.15 below, and affording the breaching party a five (5) business day period in which to cure the purported breach, and (ii) absent such cure or the commencement of an action in the Bankruptcy Court with respect to the existence of any such breach, by providing a follow-up Communication to the breaching Party as set forth in Section 3.15 below, that declares the Agreement to be terminated.  Following such termination for cause, the terms of the Agreement shall no longer be binding on the non-breaching Party (except as set forth in Sections 3.3, 3.4, 3.5, 3.13, 3.15, and 3.19).

**3.3     Attorneys' Fees.**  Except as otherwise provided for herein, each of the Parties shall pay its own court costs, attorneys' fees, and all other expenses, costs, and fees incurred relating to this Agreement and any related litigation, including but not limited to the GM MDL and Motions to Enforce litigation.  If any lawsuit or proceeding is required to enforce the terms of this Agreement, the prevailing party in any such lawsuit or proceeding shall be entitled to reasonable attorney's fees and costs.

**3.4     No Admission.**  Nothing in this Agreement shall be deemed an admission of any kind.  To the extent provided by Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than in support of the Settlement Motion and proposed entry of the Settlement Order and Claims Estimate Order or in a proceeding to enforce the terms of this Agreement.

**3.5     Remedies.**  Each of the Parties retain all remedies available in law or equity for breach of this Agreement by any Party, including, without limitation, the right of a non-breaching Party to seek specific performance and injunctive or other equitable relief as a remedy for any such breach.

**3.6     No Litigation.**  Except as may be necessary to enforce the terms of this Agreement, the Parties and any other person who is an intended beneficiary hereunder, agree that she or he shall not commence or proceed with any action, claim, suit, proceeding or litigation against any other Party, directly or indirectly, regarding or relating to the matters described in this Agreement, or take any action inconsistent with the terms of the Agreement.

**3.7     Further Assurances.**  Each of the Parties covenant to, from time to time, execute and deliver such further documents and instruments and take such other actions as may be reasonably required or appropriate to evidence, effectuate, or carry out the intent and purposes of this Agreement or to perform its obligations under this Agreement and the transactions contemplated thereby.

**3.8     Cooperation.**  The Parties agree to reasonably cooperate with one another to effectuate an efficient and equitable implementation of this Agreement.

**3.9     Counterparts; Facsimile; Signatures.**  This Agreement may be executed in any number of counterparts and by different Parties to this Agreement on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement.  Any signature delivered by any of the Parties by facsimile or electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement, shall be deemed to be an original signature hereto, and shall be admissible as such in any legal proceeding to enforce this Agreement.

**3.10     Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective agents, partners, attorneys, employees, representatives, officers, directors, shareholders, divisions, subsidiaries, affiliates, transferees, heirs, executors, administrators, personal representatives, legal representatives, successors, and assigns, consistent with the other provisions of this Agreement.

**3.11     Integration.**  This Agreement constitutes the entire agreement and understanding among the Parties hereto relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements, representations and understandings between or among any of the Parties hereto relating to such subject matter.  In entering into this Agreement, the Parties and each of them acknowledge that they are not relying on any statement, representation, warranty, covenant or agreement of any kind made by any other party hereto or any employee or agent of any other party hereto, except for the representations, warranties, covenants and agreements of the Parties expressly set forth herein.

**3.12     Amendment.**  Except as otherwise specifically provided in this Agreement, no amendment, modification, rescission, waiver or release of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Parties.

**3.13     Interpretation.**  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, and the Parties agree to take any and all steps which are necessary in order to enforce the provisions hereof.

**3.14     Severability.**  The terms and conditions of this Agreement are not severable. However, if any provision or part of any provision of this Agreement is for any reason declared or determined by a court to be invalid, unenforceable, or contrary to public policy, law, statute, or ordinance, the validity of the remaining parts, terms, or provisions of this Agreement shall not be affected thereby and shall remain valid and fully enforceable, and such invalid, unenforceable, or illegal part or provision shall not be deemed to be part of this Agreement.

**3.15     Notices.**  Any notice, demand, request, consent, approval, declaration or other communication (a "**Communication**") under this Agreement shall be in writing and shall be given or delivered (i) by a nationally recognized private overnight courier service addressed as indicated in Schedule 1 annexed hereto or to such other address as such party may indicate by a notice delivered to the other Parties hereto in accordance with the provisions hereof; or (ii) to the extent that such Communication has been filed with the Bankruptcy Court, via the electronic distribution means used by the Bankruptcy Court.  Any Communication shall be deemed to have been effectively delivered and received, if sent by a nationally recognized

private overnight courier service, on the first business day following the date upon which it is delivered for overnight delivery to such courier service.

3.16    **Choice of Law and Forum; Consent to Jurisdiction.**  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to its conflict of laws principles.  The District Court and the Bankruptcy Court shall have jurisdiction to resolve any dispute arising out of, related to or in connection with this Agreement to the exclusion of any other court, and the Parties hereby consent to the jurisdiction of the District Court and the Bankruptcy Court for resolution of such disputes and agree that they shall not attempt to litigate any such dispute in any other court.

3.17    **Advice of Counsel.**  Each Party represents and acknowledges that it has been represented by an attorney with respect to this Agreement and any and all matters covered by or related to such Agreement.  Each Party further represents and warrants to each other that the execution and delivery of this Agreement has been duly authorized by each of the Parties after consultation with counsel, that the persons signing this Agreement on their behalf below have been fully authorized by their respective Parties to do so, and that the undersigned do fully understand the terms of this Agreement and have the express authority to enter into this Agreement.

3.18    **Assignment.**  No assignment of this Agreement or of any rights or obligations hereunder may be made by any party hereto without the prior written consent of the other Parties hereto, and any attempted assignment without such prior consent shall be null and void.  No assignment of any obligations hereunder shall relieve any of the Parties hereto liable therefore of any such obligations.

3.19    **Waiver.**  Except as otherwise specifically provided in this Agreement, any provision of this Agreement may be waived only by a written instrument signed by the Party against whom enforcement of such waiver is sought.

3.20    **Headings, Number, and Gender.**  The descriptive headings of the sections of this Agreement are included for convenience of reference only and shall have no force or effect in the interpretation or construction of this Agreement.  As used in this Agreement, the singular shall include the plural, and the masculine shall include the feminine and neutral genders, and vice versa.

3.21    **Waiver of Jury Trial.**  Each of the Parties hereby irrevocably waives its rights, if any, to a jury trial for any claim or cause of action based upon or arising out of this Agreement.

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

BROWN RUDNICK LLP

On behalf of the Plaintiffs

By: _____
Name:  Edward S. Weisfelner
Name:  Howard S. Steel

Title:  Designated Counsel for the Ignition
Switch Plaintiffs and certain Non-Ignition
Switch Plaintiffs in the Bankruptcy Court


STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, P.C.

On behalf of the Plaintiffs

By: _____
Name:  Sander L. Esserman

Title: Designated Counsel for the Ignition
Switch Plaintiffs and certain Non-Ignition
Switch Plaintiffs in the Bankruptcy Court


HAGENS BERMAN SOBOL SHAPIRO LLP

On behalf of the Ignition Switch Plaintiffs and
certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Steve W. Berman

Title: Co-Lead Counsel for the Ignition Switch
Plaintiffs and certain Non-Ignition Switch
Plaintiffs in the MDL Court


LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

On behalf of the Ignition Switch Plaintiffs and
certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Elizabeth J. Cabraser

Title: Co-Lead Counsel for the Ignition Switch

GIBSON, DUNN & CRUTCHER, LLP

On behalf of the GUC Trust

By: _____
Name:  Matthew Williams
Name:  Keith R. Martorana
Name:  Gabriel Gillett

Title:  Counsel for Wilmington Trust
Company, as Administrator and Trustee of the
GUC Trust

19

Plaintiffs and certain Non-Ignition Switch
Plaintiffs in the MDL Court

GOODWIN PROCTER LLP

On behalf of the PIWD Plaintiffs Represented
By Hilliard Muñoz Gonzales L.L.P. and the
Law Offices of Thomas J. Henry

By: _____
Name:  William P. Weintraub
Name:  Gregory W. Fox

Title: Counsel to the PIWD Plaintiffs
Represented By Hilliard Muñoz Gonzales
L.L.P. and the Law Offices of Thomas J.
Henry

HILLIARD MUÑOZ GONZALES LLP

On behalf of the PIWD Plaintiffs

By: _____
Name:  Robert Hilliard

Title: Counsel to the PIWD Plaintiffs

THE LAW OFFICES OF THOMAS J.
HENRY

On behalf of the PIWD Plaintiffs

By: _____
Name:  Thomas J. Henry

Title: Counsel to the PIWD Plaintiffs

ANDREWS MYERS, P.C.

On behalf of the PIWD Plaintiffs

By: _____
Name:  Lisa M. Norman

Title: Counsel to the PIWD Plaintiffs

**EXHIBIT A**

09-50026-mg  Doc 14130-1  Filed 09/26/17  Entered 09/26/17 23:24:43  Exhibit
Exhibit A  Pg 25 of 25

**EXHIBIT B**

09-50026-mg   Doc 14084-1   Filed 09/26/17   Entered 09/26/17 23:24:43   Exhibit
Exhibit A    Pg 50 of 516

# EXHIBIT C

Schedule 1

If to the GUC Trust:

c/o Gibson Dunn & Crutcher, LLP
200 Park Avenue
New York, New York 10166
Attn:  Matthew J. Williams, Esq.
        Keith R. Martorana, Esq.

If to the PIWD Plaintiffs represented by Hilliard Muñoz Gonazlez, LLP and the Law Offices of
Thomas J. Henry:

c/o Hilliard Muñoz Gonazlez, LLP               c/o The Law Offices of Thomas J. Henry
719 South Shoreline                            4715 Fredricksburg, Suite 507
Suite 500                                      San Antonio, TX 78229
Corpus Christi, TX 78401                       Attn:  Thomas J. Henry, Esq.
Attn:  Robert C. Hilliard, Esq.

c/o Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Attn:  William P. Weintraub
        Gregory W. Fox

If to the PIWD Plaintiffs represented by Andrews Myers, P.C.:

c/o Andrews Myers, P.C.
1885 St. James Place, 15th Floor
Houston, Texas 77056
Attn:  Lisa M. Norman

If to the Ignition Switch Plaintiffs and/or certain Non-Ignition Switch Plaintiffs (or Co-Lead
Counsel on their behalf):

c/o Hagens Berman Sobol Shapiro LLP            c/o Lieff Cabraser Heimann & Bernstein, LLP
1918 Eighth Avenue, Suite 3300                 275 Battery Street, 29th Floor
Seattle, WA 98101                              San Francisco, California 94111
Attn:  Steve W. Berman, Esq.                   Attn:  Elizabeth J. Cabraser, Esq.

c/o Brown Rudnick LLP                          c/o Stutzman, Bromberg, Esserman & Plifka,
Seven Times Square                             a Professional Corporation
New York, New York 10036                       2323 Bryan Street, Ste 2200
Attn:  Edward S. Weisfelner                    Dallas, Texas 75201
        Howard S. Steel                        Attn:  Sander L. Esserman

09-50026-mg   Doc 14130-1   Filed 09/26/17   Entered 09/26/17 23:24:43   Exhibit B
Exhibit A   Pg 1 of 53   of 516

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MOTORS LIQUIDATION COMPANY, *et al.*, | ) | Bankruptcy Case No.: 09-50026 (MG) |
| f/k/a General Motors Corporation, *et al.*, | ) |  |
|  | ) | (Jointly Administered) |
| Debtors. | ) |  |
|  | ) |  |

**ORDER PURSUANT TO SECTIONS 105, 363**
**AND 1142 OF THE BANKRUPTCY CODE AND**
**BANKRUPTCY RULES 3020 AND 9019, AUTHORIZING**
**AND APPROVING THE SETTLEMENT AGREEMENT BY AND**
**AMONG THE GUC TRUST AND THE SIGNATORY PLAINTIFFS**

Upon the joint motion of the Motors Liquidation Company GUC Trust (the "**GUC Trust**"), PIWD Counsel[1] on behalf of the PIWD Plaintiffs, and Co-Lead Counsel on behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs (collectively, the "**Signatory Plaintiffs**") filed on August ___, 2017 [ECF No. _____] (the "**Motion**") for entry of an order authorizing and approving the settlement embodied in the agreement attached thereto as Exhibit 1 (the "**Settlement Agreement**"), by and among (i) the GUC Trust and (ii) the Signatory Plaintiffs; and the Bankruptcy Court having considered the Motion; and a hearing on the Motion having been held before this Bankruptcy Court on _____, 2017 (the "**Hearing**") to consider the relief requested in the Motion; and the Bankruptcy Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Plan; and the Bankruptcy Court having considered the statements of counsel on the record of the Hearing and the filings of the parties in connection with the Motion; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Settlement Agreement.

the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and upon the record of the Hearing; and it appearing that proper and adequate notice of the Motion has been given in accordance with the *Order Approving Notice Procedures With Respect to Proposed Settlement by and Among the Signatory Plaintiffs and the GUC Trust* [ECF No. _____] (the "**Notice Order**") and that no other or further notice is necessary; and after due deliberation and sufficient cause appearing therefor,

**THE BANKRUPTCY COURT HEREBY FINDS AND DETERMINES THAT:**[2]

A. This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

B. The statutory predicates for the relief requested in the Motion are Sections 105, 363 and 1142 of the Bankruptcy Code and Bankruptcy Rules 3020 and 9019.

C. As evidenced by the affidavits of service filed with this Court, and in accordance with the Notice Order, notice has been given and a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to (i) all persons in the United States who, as of July 10, 2009, owned or leased a vehicle manufactured by Old GM included in the Recalls; (ii) all Pre-Closing Accident Plaintiffs who have filed a lawsuit against New GM as of the date of the Settlement Agreement; (iii) all Plaintiffs who have filed or joined a motion for authority to file late claims against the GUC Trust; (iv) holders of units of beneficial interest in the GUC Trust; (v) the defendants to the Term Loan Avoidance Action; and (vi) the parties in interest in accordance with the *Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rules 1015(c) and 9007 Establishing Notice and Case Management Procedures*, dated May 5, 2011 [ECF No. 10183]. Additional publication notice of the Motion has been

---

[2] The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

given by the GUC Trust as set forth in the Notice Order.  The notice was good, sufficient and appropriate in light of the circumstances and the nature of the relief requested, and no other or further notice is or shall be required.

D.      The GUC Trust has demonstrated good, sufficient and sound business purposes, causes and justifications for the relief requested in the Motion and the approval of the Settlement Agreement and the transactions contemplated thereby.

E.      The GUC Trust has demonstrated that the relief requested in the Motion is necessary for the prompt and efficient administration of the Old GM Bankruptcy Case and is in the best interests of the GUC Trust, its beneficiaries and other parties-in-interest.

F.      After due diligence by the Parties, the Settlement Agreement was negotiated and entered into by and among the Parties in good faith and from arm's length bargaining positions.

G.      The GUC Trust has demonstrated that continued litigation of the matters resolved by the Settlement Agreement would be complex, costly and delay the closing of the Old GM Bankruptcy Case and the distribution of GUC Trust Assets in accordance with the Plan.

H.      The Settlement Agreement resolves multiple disputes, claims and issues to which the Parties are involved in varying degrees, and in related but not necessarily identical ways, such that each Party's overall obligations to one or more other Parties constitutes good and sufficient consideration for the overall benefits each Party is to receive from one or more of the other Parties.

I.      The settlements, compromises, releases and transfers contemplated in the Settlement Agreement are fair, reasonable and given in exchange for valuable and reasonably equivalent consideration.

J.       The GUC Trust's entry into the Settlement Agreement, including the compromises and releases embodied therein, is a prudent and reasonable exercise of business judgment that is in the best interests of the GUC Trust and its beneficiaries.

K.       The Settlement Agreement represents a multi-party resolution of a number of complex factual and legal issues, and the releases and acknowledgments contained therein and herein, and the injunction and findings provided by this Order, are a necessary element of the consideration received by the Parties, and a condition to the effectiveness of the Settlement Agreement.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.       The relief requested by the Motion is GRANTED and the Settlement Agreement and each of its terms are approved in their entirety as set forth herein.

2.       Any and all objections to the Motion that have not been withdrawn, resolved, waived or settled as reflected on the record of the Hearing are overruled on the merits.

3.       In accordance with Paragraph 3.1 of the Settlement Agreement, the Settlement shall be effective and binding on all persons upon the Settlement Effective Date, including, but not limited to, all Plaintiffs, any past or present holder of units of beneficial interests in the GUC Trust, any past or present holder of an Allowed General Unsecured Claim, and all defendants in the Term Loan Avoidance Action.

4.       The GUC Trust is authorized to perform all of its obligations pursuant to the terms of the Settlement Agreement, and to take any and all actions necessary or appropriate to effectuate the Settlement Agreement and to enforce its terms.

5.       On or before the date that is five (5) business days following the Settlement Effective Date (the "**Cash Distribution Date**"), in full settlement of the Parties' disputes as contemplated in the Settlement Agreement, and in contemplation of, among other things, the

-4-

releases and waivers set forth in Paragraph 2.3 of the Settlement Agreement and Paragraph 6 hereof (collectively, the "**Release and Waiver**"), the GUC Trust is hereby directed to pay the total sum of fifteen million U.S. Dollars (USD $15,000,000) (the "**Settlement Amount**") to an account established and designated by the Signatory Plaintiffs (the "**Settlement Fund**"); provided that, in the event that Signatory Plaintiffs have not established and designated such Settlement Fund within two (2) business days following the Settlement Effective Date, the GUC Trust shall place the Settlement Amount into a third party escrow account established by the GUC Trust.

6.      Provided that the Settlement Effective Date has occurred, contemporaneously with the payment of the Settlement Amount by the GUC Trust, and in consideration of the promises and covenants contained in the Settlement Agreement and/or the notice provided by the Settlement Agreement, all Plaintiffs, for themselves, and on behalf of their respective agents, employees, officers, directors, shareholders, successors, assigns, assignors, predecessors, members, beneficiaries, representatives (in their capacity as such) and any subsidiary or affiliate thereof (the "**Releasing Parties**"), shall be deemed to completely and irrevocably release, waive (including a waiver under California Civil Code Section 1542) and forever discharge the GUC Trust, the trust administrator and trustee of the GUC Trust, the Motors Liquidation Company Avoidance Action Trust, and the holders of beneficial units in the GUC Trust, and all of their subsidiaries and affiliates, and all of their respective past, present and future agents, attorneys, employees, officers, directors, shareholders, successors, assigns, members, representatives (in their capacity as such) (the "**Released Parties**"), from any and all, actions, attorneys' fees, charges, claims (including but not limited to General Unsecured Claims and claims for injunctive and/or declaratory relief), costs, demands, expenses, judgments, liabilities and causes of action of

any kind, nature or description, whether matured or unmatured, contingent or absolute, liquidated or unliquidated, known or unknown, direct or derivative, preliminary or final, which the Releasing Parties may now have, ever had, or may in the future have against the Released Parties, the GUC Trust Assets, the Debtors, or their estates, arising out of or based on any facts, circumstances, issues, services, advice, or the like, occurring from the beginning of time through the date hereof that relate to, could relate to, arise under, or concern the Recalls, the Old GM Bankruptcy Case, the GM MDL, the Plan, the Late Claims Motions, the AMPSA, the Sale Order or any matter associated with any of the foregoing (collectively, the "**Released Claims**"); provided, however, that the Releasing Parties shall retain all remedies available in law or equity for breach of the Settlement Agreement by the GUC Trust; and provided further that solely in the event that the Bankruptcy Court enters the Claims Estimate Order as contemplated by the Settlement Agreement, the foregoing Release and Waiver shall not apply to the Adjustment Shares, which shall be issued by New GM to the Settlement Fund for the exclusive benefit of Plaintiffs pursuant to the terms of the entered Claims Estimate Order (if any); and provided further that, nothing in the Settlement Agreement, Motion or this Order is intended to waive any claims against New GM or be an election of remedies against New GM; nor does the Settlement Agreement, Motion or this Order, or any payments made in connection therewith, represent full satisfaction of any claims against Old GM, unless and until such claims are in fact paid in full for every available source (provided, however, that in no event shall any Plaintiff be permitted to seek any further payment or compensation from the GUC Trust in respect of their claims or otherwise, other than the Settlement Amount and the Adjustment Shares) and, except as mandated otherwise by applicable law, nothing in the Settlement Agreement, Motion or this Order shall waive or impair any claims that Plaintiffs may have against New GM, the Settlement

shall not be an election of remedies by any Plaintiff, and the Settlement Fund shall not represent full and final satisfaction of any claims that Plaintiffs may have against New GM, which claims are expressly reserved. Nor shall the Settlement or any estimation or payment or distribution made in connection therewith constitute a cap on any claims by any of the Plaintiffs against New GM. In addition, the Releasing Parties shall be deemed to have agreed not to make any claim, commence or continue any action, lawsuit, adversary proceeding or other legal, equitable or administrative proceeding that asserts any such Released Claims against the Released Parties, the GUC Trust Assets, the Debtors, or their estates, or to seek any further funding from the Released Parties in connection with the Released Claims, and the Released Parties are released and discharged of any further obligation to provide such funding, it being the intent of the Parties that (other than the rights of the Plaintiffs to the Adjustment Shares following entry of the Claims Estimate Order) the payment of the Settlement Amount is the last and only payment the Released Parties or any of their subsidiaries or affiliates will make to the Plaintiffs in connection with the Released Claims.

7. The Releasing Parties shall be permanently stayed, restrained, enjoined and forever barred from taking any action against any of the Released Parties, the GUC Trust Assets, the Debtors, or their estates for the purpose of, directly or indirectly, collecting, recovering, or receiving payment or recovery with respect to, relating to, arising out of, or in any way connected with any Released Claim, whenever and wherever arising or asserted, all of which shall be resolved and satisfied by the Settlement Fund as set forth in the Settlement Fund Procedures (as defined below).

8. The Released Parties and FTI Consulting, Inc. as trust monitor of the GUC Trust (in such capacity, the "**GUC Trust Monitor**"): (a) shall have no liability whatsoever to any

holder or purported holder of a claim, equity interest or unit of beneficial interest in the GUC

Trust, or any other party-in-interest, or any of their respective agents, employees, representatives,

financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or

omission in connection with, or arising out of, the settlement of the claims addressed by the

Settlement Agreement, or the pursuit of approval of the Settlement Agreement or the Claims

Estimate Order, the administration of the Settlement Agreement, or any transaction contemplated

by the Settlement Agreement, or in furtherance thereof, or any obligations that they have under

or in connection with the Settlement Agreement or the transactions contemplated by the

Settlement Agreement (collectively, the "**Exculpated Claims**"), except (i) for any act or

omission that constitutes willful misconduct or gross negligence as determined by a final order,

and (ii) for any contractual obligation that is owed to a Party under the Settlement Agreement or

this Order; and (b) in all respects, shall be entitled to rely upon the advice of counsel with respect

to their duties and responsibilities under the Settlement Agreement.  No holder of any claim,

interest or unit of beneficial interest in the GUC Trust, or other party-in-interest, none of their

respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no

successors or assigns of the foregoing, shall have any right of action against the Released Parties

or the GUC Trust Monitor with respect to the Exculpated Claims.  This exculpation shall be in

addition to, and not in limitation of, all other releases, indemnities, exculpations and any other

applicable law or rules protecting such Released Parties and the GUC Trust Monitor from

liability.

9.      All of the value of the Settlement Fund, including the Settlement Amount (and, if

issued pursuant to the Claims Estimate Order, the Adjustment Shares or their value), shall be

reserved for the exclusive benefit of the Plaintiffs, subject only to costs associated with the administration of the Settlement Fund.

10.      Provided that the Settlement Effective Date has occurred, contemporaneously with the payment of the Settlement Amount by the GUC Trust, and in consideration of the promises and covenants contained in the Settlement Agreement, the GUC Trust, all holders of beneficial units of the GUC Trust, all defendants in the Term Loan Avoidance Action and all holders of Allowed General Unsecured Claims, other than Plaintiffs, for themselves, and on behalf of their respective agents, employees, officers, directors, shareholders, successors, assigns, assignors, predecessors, members, beneficiaries, representatives (in their capacity as such) and any subsidiary or affiliate thereof (the "**GUC Releasing Parties**"), shall be deemed to completely and irrevocably release and waive any and all rights or interests they may now have, ever had, or may in the future have with respect to the Settlement Amount.  In addition, the GUC Releasing Parties shall be deemed to have agreed not to make any claim, commence or continue any action, lawsuit, adversary proceeding or other legal, equitable or administrative proceeding that seeks to share in or recover from the Settlement Amount.  Further, the GUC Releasing Parties shall be enjoined and forever barred from directly or indirectly bringing, commencing, initiating, instituting, maintaining, prosecuting or otherwise aiding, in any action of any kind or nature, whether in the United States, Canada or elsewhere, that seeks to share in or recover from the Settlement Amount.

11.      Provided that the Settlement Effective Date has occurred, contemporaneously with the payment of the Settlement Amount by the GUC Trust and entry of the Claims Estimate Order by the Bankruptcy Court, and in consideration of the promises and covenants contained in the Settlement Agreement, the GUC Releasing Parties shall be deemed to completely and

irrevocably release and waive any and all rights or interests they may now have, ever had, or

may in the future have with respect to the Adjustment Shares, which shall be issued by New GM

to the Settlement Fund for the exclusive benefit of Plaintiffs pursuant to the terms of the entered

Claims Estimate Order (if any).  In addition, the GUC Releasing Parties shall be deemed to have

agreed not to make any claim, commence or continue any action, lawsuit, adversary proceeding

or other legal, equitable or administrative proceeding that seeks to share in or recover from the

Adjustment Shares.  Further, the GUC Releasing Parties shall be enjoined and forever barred

from directly or indirectly bringing, commencing, initiating, instituting, maintaining, prosecuting

or otherwise aiding, in any action of any kind or nature, whether in the United States, Canada or

elsewhere, that seeks to share in or recover from the Adjustment Shares.

      12.     The Signatory Plaintiffs or, in the alternative, an administrator appointed by the

Signatory Plaintiffs, shall establish the Settlement Fund (at the sole costs of the Signatory

Plaintiffs).  Being defined as a Plaintiff does not assure any party that he, she, or it will receive a

distribution from the Settlement Amount, the Adjustment Shares (or their value), if any, or any

other consideration contained in the Settlement Fund.  Subject to notice and an opportunity for

Plaintiffs to object, the Signatory Plaintiffs will determine the overall allocation of the value of

the Settlement Fund between economic loss claims and personal injury/wrongful death claims,

and the eligibility and criteria for payment (the "**Settlement Fund Procedures**").  Notice of the

proposed allocation and proposed eligibility and criteria for payment will be posted on a

settlement website, along with information about the hearing date and how and when to assert

any objections.

      13.     Solely in the event that the Bankruptcy Court denies entry of the Claims Estimate

Order or the Claims Estimate Order is entered but subsequently reversed by a reviewing court on

a final basis, then the Late Claims Motions shall automatically be deemed withdrawn with prejudice, without any action required on the part of the GUC Trust, the Plaintiffs or any other party in interest.  For the avoidance of doubt, this Order shall not be affected by the entry or non-entry of any Claims Estimate Order, or any subsequent reversal of any Claims Estimate Order on appeal or on remand.

14.    The Settlement Agreement, including any term, condition or other provision therein, may not be waived, modified, amended or supplemented, except as provided in the Settlement Agreement.

15.    The failure to specifically describe or include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Settlement Agreement be authorized and approved in its entirety.

16.    If there is any conflict between the terms of the Motion and the Settlement Agreement, the terms of the Settlement Agreement shall control, and if there is any conflict between the terms of this Order and the Settlement Agreement, the terms of this Order shall control.

17.    Notwithstanding the possible applicability of Bankruptcy Rules 3020, 6004, 6006, 7062, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

18.    The Bankruptcy Court shall have exclusive jurisdiction to interpret and enforce the Settlement Agreement and to resolve any disputes relating to or concerning the Settlement Agreement.

Dated: _____, 2017

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT

09-50026-mg    Doc 13406-19    Filed 08/06/15    Entered 08/06/15 22:12:43    Exhibit C
Exhibit C    Pg 65 of 516

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X
                                       :

In re:                              :             Chapter 11

MOTORS LIQUIDATION COMPANY, et al.,    :             Case No.: 09-50026 (MG)

          f/k/a General Motors Corp., et al.,    :

                                         :

                  Debtors.             :             (Jointly Administered)

----------------------------------------------------------X

## CLAIMS ESTIMATE ORDER

Upon the motion (the "**Motion**")[1] of the Signatory Plaintiffs and the GUC Trust pursuant to Bankruptcy Code Section 502(c) and Bankruptcy Rule 9019 for entry of an order estimating the aggregate Allowed General Unsecured Claims for purposes of issuance of the Adjustment Shares by New GM under Section 3.2(c) of the AMSPA and the Side Letter; and due and proper notice of the Motion having been provided and it appearing that no other or further notice need be given; and the Court having found and determined the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore;

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as provided herein.

2.      Any and all objections to the Motion that have not been withdrawn, resolved, waived or settled as reflected on the record of the hearing are overruled on the merits.

3.      The Pre-Closing Accident Plaintiffs' claims shall be estimated solely for the purposes of estimating the aggregate Allowed General Unsecured Claims in this Order. If further adjudication of their personal injury and wrongful death claims are necessary notwithstanding entry of this Order, the Pre-Closing Accident Plaintiffs' rights under Section

---

[1]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1

157(b)(5) of Title 28 to have their claims tried in the district court in which Old GM's bankruptcy case is pending, or in the district court in which the claim arose, as determined by the district court in which Old GM's bankruptcy case is pending, are expressly reserved.

4.      The aggregate Allowed General Unsecured Claims, including the allowed amount of Plaintiffs' claims, are hereby estimated for purposes of the issuance of the Adjustment Shares in an amount that is no less than $42 billion.[2]

5.      Within five (5) business days of entry of this Order, New GM shall issue 30 million shares of New GM common stock (the "**Adjustment Shares**") or the value of the Adjustment Shares, to an account designated by the Signatory Plaintiffs (the "**Settlement Fund**").

6.      Nothing in this Order is intended to waive any claims against New GM or to be an election of remedies against New GM; nor does this Order or any payments made in connection with this Order represent full satisfaction of any claims against Old GM, unless and until such claims are in fact paid in full from every available source; provided, however, that in no event shall any Plaintiff be permitted to seek any further payment or compensation from the GUC Trust in respect of their claims or otherwise, other than the Settlement Amount and the Adjustment Shares.  Except as mandated otherwise under applicable law, nothing in this Order shall waive any claims that any Plaintiff may have against New GM or constitute an election of remedies by any Plaintiff, and the Adjustment Shares (and any distribution thereof to any Plaintiff) shall not represent full and final satisfaction of any claim that any Plaintiff may have against New GM, all of which are expressly reserved.  The estimate of the aggregate Allowed

---

[2]      Notwithstanding anything to the contrary set forth herein, the estimation of the aggregate Allowed General Unsecured Claims is solely for the purposes of issuance of the Adjustment Shares, and shall not, among other things, constitute an estimation of any claims or potential claims of the defendants in the Term Loan Avoidance Action.

General Unsecured Claims herein shall not operate as a cap on any of the claims of any of the Plaintiffs against New GM.

7.      Provided that the Settlement Order has been entered and is a Final Order (or the GUC Trust has waived the requirement that the Settlement Order be a Final Order) (i) the Adjustment Shares, or the value thereof, shall be reserved for the exclusive benefit of the Plaintiffs, subject only to costs associated with the administration of the Settlement Fund, and (ii) the GUC Trust, holders of beneficial units of the GUC Trust, holders of Allowed General Unsecured Claims other than Plaintiffs, and the defendants in the Term Loan Avoidance Action, and all of their subsidiaries and affiliates, and all of their respective past, present and future agents, attorneys, employees, officers, directors, shareholders, successors, assigns, members, or representatives (in their capacity as such), shall have no rights or entitlements with respect to the Settlement Fund and are deemed to completely and irrevocably release and waive any and all rights or interests they may now have, ever had, or may in the future have with respect to the Settlement Fund.

8.      As provided under Sections 2.9(b), 2.9(c), and 2.11 of the Settlement Agreement, the Signatory Plaintiffs are specifically authorized and directed to establish an allocation methodology for the Settlement Fund and proposed criteria for determining the right or ability of each Plaintiff to receive a distribution from the Settlement Fund.  Notice of any agreement as to the proposed allocation of Adjustment Shares (or their value) and proposed criteria for eligibility, along with information about the hearing date and how and when to assert any objections, shall be provided via a settlement website to all known Plaintiffs whose rights might be affected by such allocation and such Plaintiffs shall have an opportunity to object at a hearing to be held before the appropriate court.  Being defined as a Plaintiff does not assure any party that he, she,

or it will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), or any other consideration contained in the Settlement Fund.

9.      The Signatory Plaintiffs are specifically authorized and directed to administer, allocate and distribute the proceeds of the Settlement Fund to Plaintiffs.  Proceeds from the Settlement Fund may be used to cover the costs associated with administration and distribution of the Settlement Fund.  The GUC Trust shall have no obligations associated with the funding (other than the payment of the Settlement Amount), administration, allocation and distribution of the Settlement Fund.

10.     Notwithstanding the possible applicability of Bankruptcy Rule 7062, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

11.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2017
          New York, New York

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT

09-50026-mg    Doc 12466-14    Filed 04/07/39    Entered 06/26/17 22:53:48    Exhibit D
Pg 70 of 516

# EXHIBIT D

HEARING DATE AND TIME: [ ], 2017 at [ ] (EST)
OBJECTION DEADLINE: [ ], 2017 at 4:00 p.m. (EST)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------------X
                                          :
In re:                                    :         Chapter 11
MOTORS LIQUIDATION COMPANY, et al.,       :         Case No.: 09-50026 (MG)
        f/k/a General Motors Corp., et al., :
                                          :
                              Debtors.    :         (Jointly Administered)
---------------------------------------------------------------X
```

**JOINT MOTION PURSUANT TO BANKRUPTCY**
**CODE SECTIONS 105, 363, 502(C) AND 1142 AND**
**BANKRUPTCY RULES 3020 AND 9019 TO APPROVE**
**THE SETTLEMENT AGREEMENT BY AND AMONG THE SIGNATORY**
**PLAINTIFFS AND THE GUC TRUST, AND TO ESTIMATE THE PLAINTIFFS'**
**AGGREGATE ALLOWED GENERAL UNSECURED CLAIMS AGAINST THE DEBTORS**

09-50026-mg   Doc 12460-14   Filed 06/30/13   Entered 06/30/13 22:54:38   Exhibit D
Part 32   Page 72 of 516

# TABLE OF CONTENTS

09-50026-mg   Doc 13864-1   Filed 04/27/17   Entered 04/27/17 22:52:53   Exhibit D
Exhibit A   Pg 73 of 516

# TABLE OF AUTHORITIES

By and through their undersigned counsel, the Ignition Switch Plaintiffs,[1] certain Non-Ignition Switch Plaintiffs,[2] certain Pre-Closing Accident Plaintiffs[3] (collectively, the "**Signatory Plaintiffs**"), and the GUC Trust[4] (together with the Signatory Plaintiffs, the "**Parties**") respectfully submit this *Joint Motion Pursuant to Bankruptcy Code Sections 105, 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019 to Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors* (the "**Motion**").[5]  In support of this Motion, the Parties respectfully state as follows:

## PRELIMINARY STATEMENT

1.     Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs have sought leave to file late proposed class claims against the GUC Trust seeking relief for economic losses related to Old GM's alleged concealment of safety defects in ignition switches (including the Ignition Switch Defect and similarly defective ignition switches), side airbags, and power steering.  Certain Ignition Switch Pre-Closing Accident Plaintiffs have likewise sought leave to

---

[1]     The term "**Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 the "**Ignition Switch Defect**").

[2]     The term "**Non-Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540, 14V-118 and 14V-153.

[3]     The term "**Pre-Closing Accident Plaintiffs**" shall mean those plaintiffs asserting personal injury or wrongful death claims or persons who suffered a personal injury or wrongful death arising from an accident involving an Old GM vehicle that occurred prior to the closing of the Section 363 Sale.  The Pre-Closing Accident Plaintiffs are comprised of a subset asserting claims or who suffered an injury or death involving an Old GM vehicle with an Ignition Switch Defect (the "**Ignition Switch Pre-Closing Accident Plaintiffs**"), and a subset asserting claims or who suffered an injury or death involving vehicles with other defects (the "**Non-Ignition Switch Pre-Closing Accident Plaintiffs**").  Collectively, the Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Pre-Closing Accident Plaintiffs are the "**Plaintiffs**."

[4]     The term "**GUC Trust**" shall mean the Motors Liquidation Company GUC Trust.

[5]     Except where otherwise indicated, references to "ECF No. _" are to docket entries in the Bankruptcy Court proceedings: In re Motors Liquidation Co., Bankr. Case No. 09-50026 (MG).

file late personal injury and wrongful death claims against the GUC Trust related to Old GM
vehicles subject to the Recalls.

2.      These efforts implicate numerous complex, disputed issues, including, *inter alia*,
whether Plaintiffs should be granted authority to file late proofs of claim (and whether such
authority can be granted solely on due process grounds), whether Plaintiffs' asserted claims are
equitably moot, whether additional grounds exist to object to Plaintiffs' asserted claims, and the
allowable amount of said claims.

3.      Litigation related to these issues has been ongoing for several years, consuming
large amounts of time, money and resources, and failing to resolve key disputes between the
Parties.  For example, in the April 2015 Decision, the Bankruptcy Court ruled that Old GM
failed to provide Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs
with constitutionally proper notice of the Bar Date.[6]  While the Bankruptcy Court ruled that
assets of the GUC Trust could not be tapped to pay any late claims that might be allowed under
the doctrine of equitable mootness, the Second Circuit vacated this holding as an advisory
opinion—leaving open the question of the applicability of equitable mootness.[7]  In addition,
there is an on-going dispute whether an additional showing under the Pioneer factors is required
for Plaintiffs to obtain leave to file late claims.  Continuation of protracted litigation on these
issues will only serve to deplete remaining GUC Trust Assets and subject the Parties to uncertain
results.

4.      The Settlement Agreement resulted from extensive, good faith negotiations
between experienced counsel to reasonably resolve these issues in the interest of the estate.

---

[6]      See In re Motors Liquidation Co., 529 B.R. 510, 573-74, 583 (Bankr. S.D.N.Y. 2015), aff'd in part, rev'd in
part, vacated in part sub nom. Elliott v. General Motors LLC (In re Motors Liquidation Co.), 829 F.3d 135 (2d
Cir. 2016) (the "**April 2015 Decision**").

[7]      See In re Motors Liquidation Co., 529 B.R. at 529; Elliott, 829 F.3d at 168-69.

5.      The Settlement Agreement provides for the GUC Trust to pay Plaintiffs $15 million (the "**Settlement Amount**").  In exchange for the Settlement Amount and the promise by the GUC Trust to support entry of the Claims Estimate Order as set forth below, and following extensive notice designed to reach every potentially affected Plaintiff and an opportunity to object and be heard, upon entry of the Settlement Order all Plaintiffs will be deemed to have waived and released any rights or claims against the GUC Trust, Wilmington Trust Company as trust administrator and trustee of the GUC Trust (the "**GUC Trust Administrator**"), the Motors Liquidation Company Avoidance Action Trust (the "**Avoidance Action Trust**") and holders of beneficial interest in the GUC Trust (the "**Unitholders**"), including a release of any rights to past or present GUC Trust Assets and to distributions by the Avoidance Action Trust.  This waiver provides finality and certainty to the GUC Trust and Unitholders (regardless of whether or not the Claims Estimate Order is entered), protects against the risk of claw-back or recapture of prior distributions of GUC Trust Assets and eliminates delay in the wind-down process and distribution of assets.

6.      In addition to the payment of the Settlement Amount, the GUC Trust has agreed to support the entry of an order (the "**Claims Estimate Order**") estimating the amount of Plaintiffs' claims in an amount necessary to trigger New GM's obligation to issue the maximum amount of additional shares of New GM common stock (the "**Adjustment Shares**") under the terms of the Sale Agreement.  Upon entry of the Claims Estimate Order, all Adjustment Shares will be placed in a fund for the exclusive benefit of Plaintiffs.  The Signatory Plaintiffs will subsequently determine the allocation of the value of the Settlement Amount and the Adjustment Shares between economic loss claims and personal injury/wrongful death claims and the eligibility and criteria for payment, subject to notice and an opportunity for Plaintiffs to object.

Being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), if any, or any other consideration contained in the Settlement Fund.

7.      Unitholders, defendants in the Term Loan Avoidance Action, and holders of Allowed General Unsecured Claims, other than Plaintiffs, waive any rights to the Settlement Amount and the Adjustment Shares.  In this way, the Settlement Agreement provides a streamlined process for allowing Plaintiffs' claims and providing a source of recovery from the Settlement Amount and the Adjustment Shares.  Notably, regardless of whether the Claims Estimate Order is ultimately entered, the waiver and releases set forth in the Settlement will be binding on all parties subject only to approval of the Settlement Order and payment of the Settlement Amount.

8.      The Settlement will massively reduce costs and resources, eliminate uncertain litigation outcomes, and prevent delay in distributions of remaining GUC Trust Assets, without disturbing recovery expectations of other creditors and Unitholders.   In light of the inherent risks and costs associated with litigation, the Settlement Agreement is fair and well within the range of reasonableness.

9.      Accordingly, the Court should approve the Settlement Agreement pursuant to Bankruptcy Rule 9019 as a fair and equitable resolution of the on-going litigation between the Parties.

10.      In addition, the Court should enter the Claims Estimate Order estimating the aggregate Allowed General Unsecured Claims, including Plaintiffs' claims, against the GUC Trust in an amount equal to or exceeding $42 billion.  The evidence and expert reports proffered by the Signatory Plaintiffs will demonstrate to the Court that the damages for Plaintiffs' claims

4

could well exceed the amount required for this determination. Indeed, after reviewing those reports and considering the benefits provided by the Settlement as a whole, the GUC Trust – the sole entity charged with objecting to and resolving disputed claims in order to maximize recoveries to GUC Trust Beneficiaries pursuant to the Plan – fully supports entry of the Claims Estimate Order. The GUC Trust also believes that the Settlement is in the best interests of the estate and well within the lowest range of reasonableness as mandated by Rule 9019 of the Bankruptcy Code.

## JURISDICTION

11.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

12.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

13.      The statutory predicates for the relief sought in this Motion are Bankruptcy Code Sections 105(a), 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019.

## BACKGROUND

### I.      Old GM's Bankruptcy And The Creation Of The GUC Trust.

14.      On June 1, 2009, General Motors Corporation ("**Old GM**") and certain of its affiliates (collectively, "**Debtors**") filed for chapter 11 bankruptcy with this Court and entered into an agreement to sell substantially of its assets (the "**Sale Agreement**") to NGMCO, Inc. ("**New GM**") in exchange for, *inter alia*, New GM common stock and warrants. See In re Motors Liquidation Co., 529 B.R. at 535.

15.      The Sale Agreement was amended on July 5, 2009 to, *inter alia*, add a feature requiring New GM to provide additional New GM common stock in the event that the amount of allowed general unsecured claims against the Old GM estate exceeds a threshold amount. See

AMSPA § 3.2(c).[8]  Specifically, the AMSPA provides that if the Bankruptcy Court issues an order finding that the estimated aggregate allowed general unsecured claims against the Old GM estate exceeds $35 billion, then within five business days thereof New GM will issue Adjustment Shares to the GUC Trust.  See id.  If such order estimates the aggregate allowed general unsecured claims at or in excess of $42 billion, New GM must issue 30 million Adjustment Shares, the maximum amount of Adjustment Shares.  See id.

16.     On July 5, 2009, the sale was approved by the Bankruptcy Court.  See In re Motors Liquidation Co., 529 B.R. at 146-47.

17.      In September 2009, the Court established November 30, 2009 (the "**Bar Date**") as the deadline for filing proofs of claim against Old GM.  See id. at 535.

18.     On March 29, 2011, the Court entered an order confirming the Plan, which, among other things, authorized the creation of the GUC Trust pursuant to the terms set forth in the GUC Trust Agreement.  See id. at 536.

19.     Pursuant to the Plan and GUC Trust Agreement, the GUC Trust was granted exclusive authority to object to the allowance of general unsecured claims, seek estimation of the amount of allowed general unsecured claims, and seek Adjustment Shares from New GM.  See Plan §§ 7.1(b), 7.3; GUC Trust Agreement § 5.1.

20.     In addition, pursuant to the Plan and a side letter by and between the GUC Trust, the Debtors, New GM, and FTI Consulting (as trust monitor of the GUC Trust) dated September 23, 2011 (the "**Side Letter**"), the GUC Trust is exclusively authorized to seek the issuance of Adjustment Shares under the terms of the AMPSA for satisfaction of Allowed General Unsecured Claims when the GUC Trust determines, in its sole and absolute discretion, that the

---

[8]      See *Second Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers, and NGMCO, Inc., as Purchaser, dated as of June 26, 2009* (the "**AMSPA**").

aggregate Allowed General Unsecured Claims are, in the GUC Trust's estimation, likely to exceed $35 billion.  See Side Letter; Plan, Background § E(i); GUC Trust Agreement § 2.3(d).

21.    In February 2012, the Court entered an order providing that any claims filed after entry of the order would be deemed disallowed unless, *inter alia*, the claimant obtained leave of the Court or written consent of the GUC Trust.[9]

22.    As of June 30, 2017, the total amount of Allowed General Unsecured Claims against the Debtors' estate was $31,855,381,054, approximately $3.15 billion below the threshold for triggering the issuance of Adjustment Shares under the AMSPA.[10]

## II.    The Recalls And Subsequent Proceedings In The Bankruptcy Court And Second Circuit.

23.    In February and March 2014, over four years after the Bar Date, New GM publicly disclosed the existence of the Ignition Switch Defect and issued a recall, NHTSA Recall Number 14V-047, impacting approximately 2.1 million vehicles.

24.    After this first wave of recalls, New GM issued five additional recalls in June, July and September of 2014 concerning defective ignition switches affecting over 10 million vehicles, NHTSA Recall Numbers 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540.

25.    New GM issued a multitude of other recalls for safety defects throughout 2014. These included a recall issued in March pertaining to approximately 1.2 million vehicles with defective side airbags, NHTSA Recall Number 14V-118, and another recall issued in March pertaining to over 1.3 million vehicles with defective power steering, NHTSA Recall Number 14V-153.

---

[9]    See *Order Approving Motion Pursuant to Bankruptcy Rule 3003 and Section 105(a) of the Bankruptcy Code for an Order Disallowing Certain Late Filed Claims*, dated February 8, 2012 [ECF No. 11394] (the "**Late Filed Claims Order**").

[10]    See *Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as of June 30, 2017*, dated July 21, 2017 [ECF No. 13994].

26.     After the issuance of these recalls, owners and lessees of defective Old GM and

New GM vehicles filed lawsuits against New GM, which New GM sought to enjoin by filing

motions to enforce the Sale Order in the Bankruptcy Court.[11]   To resolve these motions, the

Bankruptcy Court first identified four threshold issues (the "**2014 Threshold Issues**") to be

determined.[12]   These issues included whether any of the claims in these actions were claims

against Old GM and, if so, whether such claims should "nevertheless be disallowed/dismissed on

grounds of equitable mootness . . . ."  Id.

27.     In its April 2015 Decision on the 2014 Threshold Issues, the Bankruptcy Court

held that the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs were

known creditors who did not receive constitutionally adequate notice of the Sale or Bar Date.

28.     The Bankruptcy Court further held that while "late claims filed by the Plaintiffs

might still be allowed, assets transferred to the GUC Trust under the Plan could not now be

tapped to pay them" under the doctrine of equitable mootness.  In re Motors Liquidation Co., 529

B.R. at 529; see also June 2015 Judgment ¶ 6.  On direct appeal, the Second Circuit vacated this

equitable mootness ruling as an advisory opinion.  See Elliott, 829 F.3d at 168-69.

29.     The Non-Ignition Switch Plaintiffs Motion to Enforce was deferred pending

resolution of the Ignition Switch Plaintiffs' and Ignition Switch Pre-Closing Accident Plaintiffs'

Motions to Enforce.  See In re Motors Liquidation Co., 529 B.R. at 523.  It has not yet been

---

[11]   See Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, dated April 21, 2014 [ECF No. 12620] (the "**Ignition Switch Plaintiffs Motion to Enforce**"); Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits, dated Aug. 1, 2014 [ECF No. 12807] (the "**Ignition Switch Pre-Closing Accident Plaintiffs Motion to Enforce**"), Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions), dated Aug. 1, 2014 [ECF No. 12808] (the "**Non-Ignition Switch Plaintiffs Motion to Enforce**");

[12]   See Supplemental Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 To Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect thereto, and (III) Adversary Proceeding No. 14-01929, dated July 11, 2014 [ECF No. 12770].

determined whether any Non-Ignition Switch Plaintiffs or Non-Ignition Switch Pre-Closing Accident Plaintiffs suffered a due process violation in connection with the Bar Date.

## III.   **Developments In The Bankruptcy Court Following The Second Circuit Opinion.**

30.   On remand from the Second Circuit's opinion vacating the equitable mootness ruling, the Bankruptcy Court issued an order identifying initial issues to be addressed (the "**2016 Threshold Issues**").  Relevant here is the issue of whether "the Ignition Switch Plaintiffs and/or Non-Ignition Switch Plaintiffs satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust and/or are such claims equitably moot ('**Late Proof of Claim Issue**')."[13]

31.   The procedures in the Order to Show Cause for resolution of the Late Proof of Claim Issue permitted Plaintiffs to file motions seeking authority to file late claims ("**Late Claims Motions**").  See Order to Show Cause at 5 ¶ 1.  No additional issues (such as class certification, discovery, or the merits of a late proof of claim) would be addressed in these motions.  See id.  In addition, the procedures provided that briefing and adjudication of any Late Claims Motions filed by Non-Ignition Switch Plaintiffs would be stayed pending resolution of the other 2016 Threshold Issues.  See id. at 5 ¶ 2.

32.   In accordance with the Order to Show Cause, on December 22, 2016, the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, and certain Ignition Switch Pre-Closing Accident Plaintiffs filed Late Claims Motions.[14]  The motions attached proposed proofs of claim, including proposed class proofs of claim asserted on behalf of purported class representatives for

---

[13]   *Order to Show Cause Regarding Certain Issues Arising from Lawsuits with Claims Asserted Against General Motors LLC ("New GM") that Involve Vehicles Manufactured by General Motors Corporation ("Old GM")*, dated Dec. 13, 2016 [ECF No. 13802], at 2-3 (emphasis added).

[14]   See *Motion for an Order Granting Authority to File Late Class Proofs of Claim*, dated Dec. 22, 2016 [ECF No. 13806] (the "**Economic Loss Late Claim Motion**"); *Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Dec. 22, 2016 [ECF No. 13807].

Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs, and 175 individual proofs of claim on behalf of certain Ignition Switch Pre-Closing Accident Plaintiffs.  See id.  Certain other Plaintiffs subsequently filed joinders to the Late Claims Motions pursuant to the terms of the Order to Show Cause.

33.     Thereafter, in connection with the Ignition Switch Plaintiffs' and Ignition Switch Pre-Closing Accident Plaintiffs' Late Claims Motions, the Parties participated in two status conferences before the Bankruptcy Court, engaged in preliminary rounds of discovery, and filed briefs addressing two preliminary issues raised in the Late Claims Motion: (i) whether relief can be granted absent a showing of excusable neglect under the Pioneer factors; and (ii) the applicability of any purported agreements with the GUC Trust or other tolling arrangements to toll timeliness objections (the "**Initial Late Claims Motions Issues**").[15]  Subsequent to such briefing, certain Plaintiffs who had not previously appeared before the Bankruptcy Court filed motions seeking authority to file late proofs of claim.

## IV.    Plaintiffs' Claims Against Old GM.

34.     The Proposed Class Claims allege that Old GM knew about the Ignition Switch Defect, other defects in ignition switches, defects in side airbags, and defects in power steering for years prior to the Bar Date.[16]  The Proposed Class Claims further allege that Old GM concealed the existence of these defects, causing Plaintiffs to overpay for defective vehicles and

---

[15]   See Order Establishing, Inter Alia, Briefing Schedule for Certain issues Arising from Late Claim Motions Filed by Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Certain Ignition Switch Pre-Closing Accident Plaintiffs, dated Mar. 2, 2017 [ECF No. 13869]; Opening Brief by General Motors LLC with Respect to Initial Late Claim Motions Issues, dated Mar. 6, 2017 [ECF No. 13871]; The Ignition Switch Plaintiffs' Brief on the Initial Late Claim Motions Issues, dated Mar. 6, 2017 [ECF No. 13872]; Opening Brief of GUC Trust Administrator and Participating Unitholders on the Applicability of Pioneer and Tolling to Plaintiffs' Motions to File Late Claims, dated Mar. 6, 2017 [ECF No. 13873]; Brief on Applicability of Pioneer and Tolling Issues in Connection with Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths, dated Mar. 6, 2017 [ECF No. 13874].

[16]   See Exhibit A to the Economic Loss Late Claim Motion  (the "**Proposed Ignition Switch Class Claim**"), ¶¶ 9-258; Exhibit B to the Economic Loss Late Claim Motion (the "**Proposed Non-Ignition Switch Class Claim**"), ¶¶ 9-146.

bear the costs of repairs while Old GM reaped the benefit of selling defective vehicles at inflated prices and avoiding the costs of a recall.[17]

35.      Based on these allegations, the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs assert claims against the Old GM estate under the laws of each of the 50 states and the District of Columbia for: (i) fraudulent concealment; (ii) unjust enrichment; (iii) consumer protection claims; (iv) breach of the implied warranty of merchantability; and (v) negligence.[18]

36.      In turn, the Ignition Switch Pre-Closing Accident Plaintiffs assert personal injury and wrongful death claims arising from accidents they assert were caused by the Ignition Switch Defect.[19]

37.      For over three years, New GM has consistently taken the position that any such claims are properly asserted against the GUC Trust and not against New GM.[20]

38.      Subsequent to filing the Late Claims Motions, the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs and certain Pre-Closing Accident Plaintiffs provided the GUC Trust with materials and expert reports describing in detail the alleged viability of the asserted claims, the alleged violation of due process rights in connection with the Bar Date and the alleged amount of damages (the "**Proffered Evidence**").[21]

---

[17]    See, e.g., Proposed Ignition Switch Class Claim ¶ 332; Proposed Non-Ignition Switch Class Claim ¶ 249.

[18]    See Proposed Ignition Switch Class Claim ¶¶ 316-418; Proposed Non-Ignition Switch Class Claim ¶¶ 233-337.

[19]    See, e.g., *Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Dec. 22, 2016 [ECF No. 13807].

[20]    The record is replete with attempts by New GM to saddle the Old GM estate with these potentially massive claims.  "To the extent Plaintiffs can prove that they are entitled to any relief, the appropriate remedy is to permit them to seek allowance of an unsecured claim against the Old GM bankruptcy estate."  Dkt. 12981 (New GM's 2014 Threshold Issues Br.) at 53; "To the extent they had any claim, it was against Old GM and they retained that claim after the 363 Sale."  Id. at 36; "Every one of their claims, the economic loss plaintiffs' claims, is a claim that's assertable against Old GM as it relates to an Old GM vehicle."  Hr'g Tr. Feb. 17, 2015 at 59:17-19 (New GM counsel Arthur Steinberg).

[21]    The Proffered Evidence is attached hereto as **Exhibit B**, **Exhibit C**, and **Exhibit D**.

39.     The Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs provided a proffer of evidence laying out the factual background for their claims and the amount of damages alleged.  In addition, they provided a report by Stephen Boedeker, an expert on surveys and statistical sampling, analyzing the amount of alleged damages for the Ignition Switch Plaintiffs' and certain Non-Ignition Switch Plaintiffs' claims based on a conjoint analysis conducted by Mr. Boedeker and Berkeley Research Group.

40.     The Signatory Plaintiffs will show at a hearing on the Motion that conjoint analysis is a set of econometric and statistical techniques developed to study consumer preferences and is widely used as a market research tool.  In a conjoint analysis, study participants review a set of products with different attributes (such as a vehicle shown in different colors) and choose which product they would prefer to purchase.  The collected data can be used to determine market preferences and the value consumers place on particular attributes of a product.  Here, the alleged amount of damages for economic loss claims was determined by using a conjoint analysis to evaluate the difference in value that consumers placed on an Old GM vehicle without a defect as compared to an identical vehicle with a defect.

41.     Certain Pre-Closing Accident Plaintiffs provided materials describing the personal injury and wrongful death claims of certain plaintiffs and demonstrating the alleged value of these claims based on exemplar verdict amounts.  The valuation of damages was assessed and approved by W. Mark Lanier, an experienced trial attorney recognized as a leader in the field.  In addition, these Pre-Closing Accident Plaintiffs also provided an expert report of Dr. Keith Leffler in which he valued these plaintiffs' claims based on a conjoint analysis and data regarding market preferences and the value consumers place on the risk of being injured or killed in a vehicle.

42. The valuation of these plaintiffs' asserted damages in the Proffered Evidence is well in excess of the amount necessary to trigger New GM's obligation to issue the maximum amount of Adjustment Shares under the AMSPA. The GUC Trust recognizes that it may, should it choose, contest the level of damages. There is no guarantee that the GUC Trust would prevail and reduce or limit the damages.[22] After reviewing the Proffered Evidence and considering the benefits of the Settlement as a whole to the Unitholders to whom it owes a fiduciary duty, the GUC Trust recognizes that, if such claims are allowed, the aggregate general unsecured claims (including already allowed claims) could well exceed $42 billion, and thus has agreed to fully support entry of the Claims Estimate Order as part of the Settlement that the GUC Trust believes is within the range of reasonableness.

## V. The Settlement Agreement.

43. Following the filing of the Late Claims Motions, the Parties engaged in extensive negotiations to resolve the numerous complex issues raised by Plaintiffs' claims against the Old

---

[22] For example, the Proffered Evidence provided by the Pre-Closing Accident Plaintiffs contains an estimate of punitive damages, which the GUC Trust believes would be disallowed in its entirety in a claims objection proceeding. In addition, the Proffered Evidence does not identify which, if any, economic loss Plaintiffs who purchased their vehicles pre-Sale sold those vehicles prior to New GM's 2014 recalls. There is an ongoing dispute about whether any economic loss Plaintiffs who sold their vehicles before those recalls suffered any cognizable economic loss. See Memorandum Opinion and Order Regarding Plaintiffs' Motion for Reconsideration and/or Clarification of the Court's Order Dismissing the Claims of "Pre-Recall Plaintiffs", In re Gen. Motors LLC Ignition Switch Litig., Case Nos. 14-MD-2543 (JMF), 14-MC-2543 (JMF) (S.D.N.Y. Aug. 9, 2017). Nonetheless, even discounting the damages calculations in the Proffered Evidence to account for the absence of punitive damages and economic loss Plaintiffs who sold their vehicles before the recalls, Plaintiffs' asserted damages are well in excess of the amount necessary to trigger New GM's obligation to issue the maximum amount of Adjustment Shares under the AMSPA.

GM estate and the assets held by the GUC Trust.[23]

44.    After good faith, arm's-length negotiations, the Parties entered into the Settlement Agreement resolving the Late Claims Motions (including the Initial Late Claim Motions Issues), the Late Proof of Claim Issue, the allowance of Plaintiffs' claims, and Plaintiffs' rights to GUC Trust Assets.  The key terms of the Settlement Agreement are as follows:[24]

a.    The GUC Trust agrees to pay the reasonable costs and expense for Court-approved notice of the Motion in an amount not to exceed $6 million.  The Signatory Plaintiffs agree to pay any amounts in excess of $6 million.

b.    The Settlement Agreement becomes effective on the date the order approving the Settlement pursuant to Bankruptcy Rule 9019 becomes a Final Order (the "**Settlement Effective Date**"), provided, however, that from and after the date the Settlement Order is entered by the Bankruptcy Court, the GUC Trust may waive the requirement that the Settlement Order be a Final Order.

c.    Within five (5) business days of the Settlement Effective Date, the GUC Trust will irrevocably pay $15,000,000 (the "**Settlement Amount**") into a trust, fund or other vehicle (the "**Settlement Fund**") for the exclusive benefit of Plaintiffs.  All Unitholders, all defendants in the Term Loan Avoidance Action, and all holders of Allowed General Unsecured Claims, other than the Plaintiffs, will be deemed to irrevocably waive and release any and all rights to the Settlement Amount (the "**GUC Waiver Provision**").

d.    Contemporaneously with payment of the Settlement Amount, the Plaintiffs will be deemed to irrevocably waive and release all claims against the GUC Trust,

---

[23]    See *Joint Declaration of Steve W. Berman and Elizabeth J. Cabraser in Support of Joint Motion Pursuant to Bankruptcy Code Sections 105, 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019 to Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors* (the "**Co-Lead Counsel Decl.**") ¶ 5; *Declaration of Robert C. Hilliard in Support Joint Motion Pursuant to Bankruptcy Code Sections 105, 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019 to Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors* (the "**Hilliard Decl.**") ¶ 3; *Declaration of Lisa M. Norman in Support of Joint Motion Pursuant to Bankruptcy Code Sections 105, 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019 to Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors* (the "**Norman Decl.**") ¶ 3; *Declaration of Beth Andrews in Support of the Joint Motion Pursuant to Bankruptcy Code Sections 105, 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019 to Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors* (the "**Andrews Decl.**") ¶ 26.

[24]    This summary of the Settlement Agreement is qualified in its entirety by the terms and provisions of the Settlement Agreement.  To the extent that there are any inconsistencies between the description of the Settlement Agreement contained in the Motion and the terms and provisions of the Settlement Agreement, the Settlement Agreement shall control.

including a release of any rights to prior distributions of or current GUC Trust Assets and any rights to distributions by the Motors Liquidation Company Avoidance Action Trust (the "**Waiver Provision**"). For the avoidance of doubt, the Settlement Agreement and Settlement Order define "Plaintiffs" to include all persons who now have, or in the future could have, claims against the Old GM estate related to any of the recalls, such that the Waiver Provision shall be applicable to all such parties whether or not they have asserted any claims against the Old GM estate or the GUC Trust to date. However, being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), if any, or any other consideration contained in the Settlement Fund.

e.   In light of the benefits of the Settlement and after the GUC Trust's review of the Proffered Evidence, the GUC Trust agrees to seek a Claims Estimate Order: (i) finding that the allowable amount of Plaintiffs' claims against Old GM and/or the GUC Trust, when combined with all of the other Allowed General Unsecured Claims against the Old GM bankruptcy estate, equals or exceeds $42,000,000,000, thus triggering the maximum amount of Adjustment Shares; and (ii) directing that the Adjustment Shares, or the value of the Adjustment Shares, be promptly delivered to the Settlement Fund. Certain Pre-Closing Accident Plaintiffs consent to estimation of their personal injury and wrongful death claims by this Court solely for the purposes of determining the aggregate Allowed General Unsecured Claims for a Claims Estimate Order.

f.   Contemporaneously with payment of the Settlement Amount, all Unitholders, all defendants in the Term Loan Avoidance Action, and all holders of Allowed General Unsecured Claims, other than the Plaintiffs, will be deemed to irrevocably waive and release any and all rights to the Adjustment Shares, provided that such waiver and release shall not become operative unless and until the Bankruptcy Court enters the Claims Estimate Order (the "**Adjustment Shares Waiver Provision**").

g.   Subject to notice and an opportunity for Plaintiffs to object, the Signatory Plaintiffs will determine the overall allocation of the value of the Settlement Fund between economic loss claims and personal injury/wrongful death claims, and the eligibility and criteria for payment. Notice of the proposed allocation and proposed eligibility and criteria for payment will be posted on a settlement website, along with information about the hearing date and how and when to assert any objections.

h.   Nothing in the Settlement Agreement is intended to waive any claims against New GM or to be an election of remedies against New GM; nor does the Settlement Agreement or any payments made in connection therewith represent full satisfaction of any claims against Old GM, unless and until such claims are in fact paid in full from every available source; provided, however, that in no event shall any Plaintiff be permitted to seek any further payment or compensation from the GUC Trust in respect of their claims or otherwise, other than the Settlement Amount and the Adjustment Shares. Except as mandated otherwise under

applicable law, nothing in the Settlement Agreement shall waive any claims that any Plaintiff may have against New GM or constitute an election of remedies by any Plaintiff, and neither the Settlement Amount nor the Adjustment Shares (nor any distribution thereof to any Plaintiff) shall represent full and final satisfaction of any claim that any Plaintiff may have against New GM, all of which are expressly reserved. The Bankruptcy Court's estimate of the aggregate Allowed General Unsecured Claims in the Claims Estimate Order shall not operate as a cap on any of the claims of any of the Plaintiffs against New GM.

## RELIEF REQUESTED

45.     By this Motion, the Parties respectfully request that this Court enter orders approving the Settlement Agreement and claims estimation substantially in the forms attached to this Motion as **Exhibit E** and **Exhibit F**.

## BASIS FOR RELIEF REQUESTED

### I.     The Court Should Approve The Settlement Agreement Pursuant To Bankruptcy Rule 9019.

46.     Bankruptcy Rule 9019(a) provides, in part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  This Court also has authority to approve a settlement under Bankruptcy Code Section 105(a), which empowers it to issue any order that is "necessary or appropriate."  11 U.S.C. § 105(a).

47.     The authority to approve a compromise or settlement is within the sound discretion of the Court.  See Newman v. Stein, 464 F.2d 689, 692 (2d Cir. 1972).  The Court should exercise its discretion "in light of the general public policy favoring settlements."  In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (citation omitted); see also Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("[T]he general rule [is] that settlements are favored and, in fact, encouraged . . . ." (citation omitted)).

48.     When exercising its discretion, the Court must determine whether the settlement is fair and equitable, reasonable, and in the best interests of the estate.  See, e.g., Airline Pilots

16

Ass'n, Int'l v. Am. Nat'l Bank & Tr. Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994); In re Purofied Down Prods. Corp., 150 B.R. 519, 523 (S.D.N.Y. 1993).  Where "the integrity of the negotiation process is preserved, a strong initial presumption of fairness attaches to the proposed settlement . . . ."  In re Hibbard, 217 B.R. at 46.

49.      The Court need not decide the numerous issues of law and fact raised in the underlying dispute, "but must only 'canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'"  In re Adelphia Commn'cs Corp., 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005) (quoting In re W.T. Grant, Co., 699 F.2d 599, 608 (2d Cir. 1983)); see also Purofied, 150 B.R. at 522 ("[T]he court need not conduct a 'mini-trial' to determine the merits of the underlying [dispute] . . . .").

50.      The Court evaluates whether the Settlement Agreement is fair and equitable based on "the probabilities of ultimate success should the claim be litigated," and "an educated estimate of the complexity, expense, and likely duration of . . . litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968).

51.      Courts in this jurisdiction consider the following Iridium factors in determining whether approval of a settlement is warranted:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other  parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the

17

bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining."

Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. 2007) (citations omitted).

52.     The Settlement Agreement falls within the range of reasonableness and satisfies the Iridium factors as set forth below.  Thus, the Settlement Agreement should be approved under Bankruptcy Rule 9019.

**A.     The Settlement's Benefits Outweigh The Likelihood Of Success In Protracted Litigation Over Numerous, Complex Issues.**

53.     The first two Iridium factors—(1) the balance between the litigation's likelihood of success and the settlement's benefits; and (2) the likelihood of complex and protracted litigation—are easily met.  As detailed below, continued litigation over Plaintiffs' claims raises significant, complex issues, has an uncertain outcome, and would be costly and time consuming. The benefits of near-term, certain resolution are clear.

**1.     Litigation Over Plaintiffs' Claims Raises Numerous Complex Issues.**

54.     One complex, contentious issue raised by the litigation over Plaintiffs' claims is whether the Court should grant Plaintiffs authority to file late claims as permitted by the *Order Approving Motion Pursuant to Bankruptcy Rule 3003 and Section 105(a) of the Bankruptcy Code for an Order Disallowing Certain Late Filed Claims* [ECF No. 11394] (the "**Late Filed Claims Order**").  See Late Filed Claims Order at 1-2.

55.     As an initial matter, there is a dispute over the standard for obtaining leave to file late claims.  Certain Plaintiffs have argued that creditors may assert late claims based solely on a

showing that they have suffered a due process violation related to the bar date.[25]  The GUC Trust has taken the position that a demonstration of excusable neglect under the <u>Pioneer</u> factors is required regardless of a due process violation.[26]

56.    Then, there is a dispute whether leave should be granted under the appropriate standard.  Most notably, in the April 2015 Decision, the Bankruptcy Court stated that the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs suffered a due process violation when they failed to receive constitutionally adequate notice of the Bar Date, and that leave to file late claims was the "obvious" remedy for this violation.  <u>See</u> <u>In re Motors Liquidation Co.</u>, 529 B.R. at 573-74, 583.  The Plaintiffs assert that this statement is a binding ruling that is no longer subject to appeal, the GUC Trust asserts it is merely nonbinding *dicta* that the Second Circuit implicitly found was an advisory opinion.

57.    The Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs also assert that they can meet the <u>Pioneer</u> factors for demonstrating excusable neglect.  Of the four <u>Pioneer</u> factors, the one given the most weight is the reason for the delay in filing claims, including whether the delay was in the reasonable control of the movant.  <u>See</u> <u>In re Residential Capital, LLC</u>, Case No. 12-12020 (MG), 2015 WL 515387, at *5 (Bankr. S.D.N.Y. Feb. 6, 2015).  The Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs will argue that a debtor's failure to provide actual notice to a known creditor is evidence that any delay was not in control of the creditor.  The GUC Trust, in turn, will argue that the delay here is attributable to Plaintiffs' voluntary strategic decision to pursue New GM and not the GUC Trust.

---

[25]   <u>See, e.g.</u>, *The Ignition Switch Plaintiffs' Brief on the Initial Late Claim Motions Issues*, dated Mar. 6, 2017 [ECF No. 13872]; *Brief on Applicability of Pioneer and Tolling Issues in Connection with Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Mar. 6, 2017 [ECF No. 13874].

[26]   <u>See</u> *Opening Brief of GUC Trust Administrator and Participating Unitholders on the Applicability of Pioneer and Tolling to Plaintiffs' Motions to File Late Claims*, dated Mar. 6, 2017 [ECF No. 13873].

58.     Although Non-Ignition Switch Plaintiffs and Non-Ignition Switch Pre-Closing Accident Plaintiffs have not yet demonstrated a due process violation, many of these plaintiffs allege that their claims are substantially similar to the Ignition Switch Defect—defects that involve the same condition (low torque switches that move out of the "run" position) and have the same effects (loss of power to steering, brakes, and airbags).  The Plaintiffs will argue that these plaintiffs can demonstrate a violation of their due process rights in connection with the Bar Date.

59.     Further, the Plaintiffs will argue that excusable neglect can exist in the absence of a due process violation.  For example, Plaintiffs have asserted that excusable neglect can be found where the debtors failed to comply with bankruptcy procedures in providing notice of a bar date and where a claimant, through no fault of its own, was unaware of its claim prior to the bar date.  See In re Arts de Provinces de France, Inc., 153 B.R. 144, 147 (Bankr. S.D.N.Y. 1993); In re PT-1 Commc'ns, Inc., 292 B.R. 482, 489 (Bankr. E.D.N.Y. 2003).  This issue, too, would have to be litigated.

60.     Another complex issue is whether the doctrine of equitable mootness is applicable to bar Plaintiffs' claims.  See In re Chateaugay Corp., 10 F.3d 944, 952-53 (2d Cir. 1993).

61.     In the April 2015 Decision, the Bankruptcy Court applied the five Chateaugay factors[27] and determined that if the Ignition Switch Plaintiffs' or Ignition Switch Pre-Closing Accident Plaintiffs' late claims were allowed, GUC Trust Assets could not be tapped to pay them

---

[27]   These five factors are: (i) the court can still order some effective relief; (ii) such relief will not affect "the re-emergence of the debtor as a revitalized corporate entity"; (iii) such relief will not unravel intricate transactions so as to "knock the props out from under the authorization for every transaction that has taken place" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court"; (iv) the "parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings;" and (v) the appellant "pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."  In re Chateaugay Corp., 10 F.3d at 952-53.

under the doctrine of equitable mootness. See In re Motors Liquidation Co., 529 B.R. at 598. The Bankruptcy Court found, *inter alia*, that any relief would "knock the props out" from the transactions under which Unitholders acquired their units. See id. at 587-88, 592.

62.     On appeal, the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs argued that the Bankruptcy Court erred because, *inter alia*, effective relief could be fashioned without disturbing any transactions or having an adverse impact on Unitholders by providing Plaintiffs with exclusive access to any Adjustment Shares that may be issued under the AMSPA.[28]  Plaintiffs will argue that where any relief is available, even partial relief, equitable mootness should not be applied.  See, e.g., Chateaugay, 10 F.3d at 954.  In addition, the Ignition Switch Plaintiffs argued that equitable mootness was only applicable in the context of bankruptcy appeals.[29]

63.     The Second Circuit vacated the Bankruptcy Court's equitable mootness ruling as advisory, neither affirming nor reversing that decision.  The Second Circuit pointed out that all of the Circuit's equitable mootness cases to-date had involved an appellate court applying the doctrine in the first instance.  See Elliott, 829 F.3d at 167 n.30.  However, the Second Circuit specified that it was not resolving whether it is appropriate for a bankruptcy court, as opposed to an appellate court, to apply the equitable mootness doctrine.  See id.

64.     Additional complex issues would certainly arise from continued litigation of Plaintiffs' claims.  The Bankruptcy Court would need to decide whether class certification for

---

[28]     See Br. for Appellant Ignition Switch Plaintiffs, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Appeal Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Nov. 16, 2015) (ECF No. 235), 49-52; Br. for Ignition Switch Pre-Closing Accident Plaintiffs, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Appeal Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Nov. 16, 2015) (ECF No. 183), 4, 52 n.18 (incorporating the arguments on the application of equitable mootness in the Ignition Switch Plaintiffs' brief).

[29]     See Response and Reply Br. for Appellant-Cross-Appellee Ignition Switch Plaintiffs, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Appeal Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Feb. 1, 2016) (ECF No. 315), at 40-43.

the economic loss Plaintiffs' proposed class proofs of claims would be appropriate. In addition,
the GUC Trust could raise objections to allowance of these class claims, as well as to the
separate proofs of claim filed by Ignition Switch Pre-Closing Accident Plaintiffs. This could
lead to the need to resolve issues under the varied laws of the fifty states and the District of
Columbia.

65.     Plaintiffs have also asserted that litigation over similar claims asserted by
economic loss plaintiffs against New GM in the MDL Court demonstrates the viability of many
of Plaintiffs' claims. For example, in the MDL Court, consumer fraud, common law fraud, and
implied warranty claims considered under the laws of sixteen states largely survived partial
motions to dismiss.[30]  In addition, the MDL Court held that plaintiffs could assert injuries under
the "benefit-of-the-bargain defect theory," *i.e.*, amounts plaintiffs overpaid at the time of sale for
a defective vehicle, and injuries for lost time, to the extent such damages are available under
state law. See FACC Opinion at 13-14, 18; TACC Opinion at 24. Many jurisdictions recognize
damages under the benefit-of-the-bargain theory. See TACC Opinion at 24.

66.     In sum, while the GUC Trust believes that it has meritorious defenses to the
claims of all Plaintiffs, the GUC Trust's likelihood of success in the resolution of the numerous,
complex issues raised by the litigation over Plaintiffs' claims is uncertain.

### 2.     The Terms Of The Settlement Agreement
Weigh The Risks Of Continued Litigation Against The
Benefits Of A Consensual Resolution Of Plaintiffs' Claims.

67.     Litigation of these complex issues has been ongoing for years, consuming large
sums of money and countless hours of labor. In the absence of settlement, there is a high

---

[30]  See Opinion and Order Regarding New GM's Partial Motion to Dismiss the Forth Amended Consolidated
Complaint, In re General Motors LLC Ignition Switch Litig., Case No. 14-MD-2543 (JMF) (S.D.N.Y. June 30,
2017), 23 (the "**FACC Opinion**"); Opinion and Order Regarding New GM's Partial Motion to Dismiss the
Third Amended Consolidated Complaint, In re General Motors LLC Ignition Switch Litig., Case No. 14-MD-
2543 (JMF) (S.D.N.Y. July 15, 2016), 5-6 (the "**TACC Opinion**").

likelihood of even more expensive, protracted and contentious litigation that will consume significant estate funds and expose the estate to significant risks and uncertainty. In addition, resolution of these issues may require the added time and expense of discovery. For example, the <u>Pioneer</u> analysis is fact intensive and, to date, only limited discovery, restricted to a proposed class representative of the Ignition Switch Plaintiffs and certain Ignition Switch Pre-Closing Accident Plaintiffs, has occurred on this issue.

68.    By comparison, settling the litigation provides the Parties with greater certainty and eliminates the significant risk, cost and delay of litigation. In addition, the Settlement Agreement provides several benefits beyond avoiding continued litigation.

69.    First, the Parties' determination to seek a Claims Estimate Order allowing and estimating Plaintiffs' claims in an amount, when combined with all of the other Allowed General Unsecured Claims against the Old GM estate, that equals or exceeds $42 billion, provides an efficient and reasonable resolution of the allowable amount of Plaintiffs' claims. The reasonableness of this amount is supported by the Proffered Evidence.

70.    Under the Settlement, any Adjustment Shares issued by New GM under this Claims Estimate Order will be for the exclusive benefit of Plaintiffs. Based on the amount of allowed and disputed unsecured claims against Old GM, New GM's obligation to issue these shares would not be triggered absent allowance of Plaintiffs' claims.[31] In other words, absent the Plaintiffs' claims, the Unitholders have no expectation to receive Adjustment Shares. Thus, this provision potentially paves the way for Plaintiffs to obtain a recovery on their claims without disturbing other creditors' past or future recoveries.

---

[31] <u>See</u> *Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as of June 30, 2017*, dated July 21, 2017 [ECF No. 13994].

23

71.     Second, the Settlement removes a major impediment to winding down the Old
GM estate.  The resolution of Plaintiffs' claims and waiver of certain rights and claims
eliminates the likelihood of complex and protracted litigation, prevents delay in distributing
remaining GUC Trust Assets and protects Unitholders from the risk of claw-back or recapture of
prior distributions.

72.     The terms of the Settlement Agreement reflect a reasonable assessment of the
substantial time and expense of litigating Plaintiffs' claims, balanced against the benefits of more
near term, efficient and certain resolution of the allowable amount of Plaintiffs' claims and
sources of recovery.  The benefits of the Settlement in the near term outweigh the likelihood of
long-term success in protracted litigation of complex issues.

**B.      The Settlement Agreement Is Beneficial To
Creditors And Supported By Interested Parties.**

73.     With respect to the third and fourth Iridium factors—the paramount interests of
the creditors and whether other interested parties support the settlement—prolonging the
litigation will increase costs and decrease the amount of GUC Trust Assets available to satisfy
creditors.  Approving the Settlement Agreement, on the other hand, avoids the significant
expense and uncertainty associated with continued litigation, and maximizes and expedites
distributions to current GUC Trust beneficiaries.  The release of Plaintiffs' rights and claims with
respect to the GUC Trust's prior distributions and current GUC Trust Assets allows the GUC
Trust to complete the orderly wind-down of the Old GM estate.

74.     Moreover, providing Plaintiffs with the exclusive right to proceed against a
settlement fund containing the Settlement Amount and the Adjustment Shares potentially opens
an avenue for Plaintiffs to recover on their claims against the GUC Trust without disturbing
recovery expectations of other creditors or Unitholders.  Plaintiffs' rights concerning the

Adjustment Shares are protected because notice of any agreement by the Signatory Plaintiffs on proposed criteria to assert a claim against the Settlement Fund and a proposed methodology of allocation of the Settlement Fund between economic loss claims and personal injury/wrongful death claims will be provided to Plaintiffs, who will be provided with an opportunity to object.

75. Not surprisingly, the key interested parties—the GUC Trust (who has sole authority under the Late Filed Claims Order to consent to late filed claims and is the only party under the Plan provided with standing to object to the allowance of claims), Signatory Plaintiffs and the Participating Unitholders—all support the Settlement Agreement. Accordingly, for all of the reasons set forth above, the Settlement easily meets the Iridium Factors and allows the GUC Trust to implement the express purpose of the GUC Trust Agreement. GUC Trust Agreement § 2.2 (stating that the "sole purpose of the GUC Trust is to implement the Plan on behalf of, and for the benefit of the GUC Trust Beneficiaries"); GUC Trust Agreement § 4.2 (stating that "in no event shall the GUC Trust Administrator unduly prolong the duration of the GUC Trust, and the GUC Trust Administrator shall, in the exercise of its reasonable business judgment and in the interests of all GUC Trust Beneficiaries, at all times endeavor to terminate the GUC Trust as soon as practicable in accordance with the purposes and provisions of this Trust Agreement and the Plan.").

    **C.**     **The Settlement Agreement Satisfies The Remaining _Iridium_ Factors.**

76. With respect to the sixth factor, "the nature and breadth of releases to be obtained by officers and directors," in exchange for the payment of $15 million, the Settlement Agreement releases any and all rights, claims and causes of action that any Plaintiff may assert against the GUC Trust, the GUC Trust Administrator, the GUC Trust Assets, the Avoidance Action Trust and Unitholders.

77.    With respect to the fifth and seventh <u>Iridium</u> factors, competent and experienced counsel to the Parties who have been litigating these issues for years actively engaged in arms' length, good faith negotiations to formulate the Settlement Agreement.[32]   The Parties, having considered the uncertainties, delay and cost that would be incurred by further litigation, submit that the Settlement Agreement is fair, reasonable and appropriate, and in the best interests of the Parties.

78.    Based on the foregoing, the Settlement Agreement is in the best interests of the estate and its creditors and falls well within the range of reasonableness.  Therefore, entry into and approval of the Settlement Agreement pursuant to Bankruptcy Rule 9019 is warranted and the Settlement Agreement should be approved.[33]

## II.    The Court Should Approve The Parties' Estimation Of The Aggregate Allowed General Unsecured Claims, Including Plaintiffs' Claims, As Equal To Or Exceeding $42 Billion.

79.    As part of the Settlement, the Parties agree to support entry of a Claims Estimate Order providing that the aggregate Allowed General Unsecured Claims, including Plaintiffs' claims, against the Old GM estate equals or exceeds $42 billion.  Pursuant to the terms of the AMSPA, the GUC Trust Agreement and the Side Letter, as well as Bankruptcy Rule 9019 and Bankruptcy Code Sections 105(a) and 502(c), the Parties request that the Court approve the Parties' estimation and enter a Claims Estimate Order estimating the aggregate Allowed General Unsecured Claims at an amount equal to or exceeding $42 billion.

80.    A provision in the Sale Agreement requires New GM to issue Adjustment Shares to the GUC Trust if and when the aggregate amount of Allowed General Unsecured Claims, as

---

[32]   <u>See</u> Co-Lead Counsel Decl. ¶ 5; Hilliard Decl. ¶ 3; Norman Decl. ¶ 3; Andrews Decl. ¶ 26.

[33]   In the event that the Settlement Agreement is not approved by the Court or the Settlement Agreement does not become binding and enforceable for any reason, the Parties reserve all their rights and nothing herein shall be deemed or construed as an admission of any fact, liability, stipulation, or waiver, but rather as a statement made in furtherance of settlement discussions.

estimated by the Bankruptcy Court, exceeds $35 billion. See AMSPA § 3.2(c). If the estimated amount equals or exceeds $42 billion, then New GM must issue 30 million shares, the maximum amount of Adjustment Shares. See id.

81.    Under the AMSPA, GUC Trust Agreement, and Side Letter, the GUC Trust (and only the GUC Trust) "may, at any time, seek an Order of the Bankruptcy Court . . . estimating the aggregate allowed general unsecured claims" against the Old GM estate. See AMSPA § 3.2(c); GUC Trust Agreement § 2.3(d); Side Letter.[34]

82.    Bankruptcy Code Section 502(c) authorizes the Court to estimate "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c). Estimation "provides a means for a bankruptcy court to achieve reorganization, and/or distributions of claims, without awaiting the results of [potentially protracted] legal proceedings." In re Adelphia Bus. Solutions, Inc., 341 B.R. 415, 422 (Bankr. S.D.N.Y. 2003) (citing In re Continental Airlines, Inc., 981 F.2d 1450, 1461 (5th Cir. 1993)); see In re Lionel LLC, No. 04-17324, 2007 WL 2261539, at *2 (Bankr. S.D.N.Y. Aug. 3, 2007) (noting that, without estimation, lengthy proceedings result in "delayed distributions, which in turn, greatly devalue the claim of all creditors as they cannot use the assets until they receive them" (citation omitted)).

83.    In fact, "the Code requires estimation of all contingent or unliquidated claims which unduly delay the administration of the case." In re Nat'l Gypsum Co., 139 B.R. 397, 405 (N.D. Tex. 1992) (internal quotes omitted). Even absent a finding of undue delay, it is within a court's sound discretion to estimate a claim. See In re RNI Wind Down Corp., 369 B.R. 174, 191 (Bankr. D. Del. 2007).

---

[34]    In addition, the GUC Trust has the sole, exclusive authority to request that the Bankruptcy Court estimate any contingent, unliquidated disputed claims pursuant to Bankruptcy Code Section 502(c). See Plan § 7.3; GUC Trust Agreement § 5.1(e).

84.     Here, it is within the sound discretion of the Court to estimate the aggregate Allowed General Unsecured Claims, including Plaintiffs' claims, as contemplated by the AMSPA, Plan, GUC Trust Agreement and the Settlement Agreement.[35]

85.     Estimation requires only "sufficient evidence on which to base a reasonable estimate of the claim."  Bittner v. Borne Chem. Co., 691 F.2d 134, 135 (3d Cir. 1982); see also In re Windsor Plumbing Supply Co., 170 B.R. 503, 521 (Bankr. E.D.N.Y. 1994) (advocating use of probabilities in estimation of claims).  The Bankruptcy Court has discretion to select the valuation model that best suits the circumstances of the case at hand when estimating the value of claims.  See In re Adelphia Commc'ns Corp., 368 B.R. 140, 278 (Bankr. S.D.N.Y. 2007); Maxwell v. Seaman Furniture Co. (In re Seaman Furniture Co.), 160 B.R. 40, 41 (S.D.N.Y. 1993).

86.     As of March 31, 2017, the total amount of Allowed General Unsecured Claims—exclusive of Plaintiffs' claims—was $31,855,381,054.[36]  Thus, if Plaintiffs' claims are allowable in an amount of approximately $3.145 billion, then New GM's obligation to issue Adjustment Shares is triggered.  If Plaintiffs' claims are allowable in an amount of approximately $10.145 billion, then the aggregate Allowed General Unsecured Claims will exceed $42 billion, requiring the issuance of the maximum amount of Adjustment Shares.

87.     Pursuant to the Settlement Agreement, the claims are being pursued with the consent of the GUC Trust, which has the sole authority to permit the filing of late claims.  See Late Filed Claims Order at 1-2.  In addition, the GUC Trust is the only party with standing to

---

[35]    Counsel for certain Pre-Closing Accident Plaintiffs consent to estimation of their personal injury and wrongful death claims by this Court solely for the purposes of determining whether the Allowed General Unsecured Claims in the aggregate exceed $35 billion.

[36]    See Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as of June 30, 2017, dated July 21, 2017 [ECF No. 13994].

object to the allowance of claims and has the authority to settle, withdraw or otherwise resolve any objections to disputed claims.  See Plan §§ 7.1(b) ("[T]he GUC Trust Administrator shall have the exclusive right to object . . . to General Unsecured Claims . . . ."); GUC Trust Agreement § 5.1(d) ("[T]he GUC Trust Administrator shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Disputed General Unsecured Claims against the Debtors . . . .").  Accordingly, the GUC Trust's decision to seek entry of the Claims Estimate Order should be upheld by the Court under Bankruptcy Rule 9019 and Bankruptcy Code Section 502(c).

88.     In the course of negotiations, the GUC Trust was provided with the Proffered Evidence indicating that the damages for these plaintiffs' claims could exceed $10.15 billion. Based on the evidence, the expense and delay of litigation, and the benefits of the Settlement as a whole, the GUC Trust agreed to support an estimate of the allowed amount of Plaintiffs' Allowed General Unsecured Claims against the Debtors and/or the GUC Trust, when combined with all of the other Allowed General Unsecured Claims against the Debtors, equal to or exceeding $42 billion.  Accordingly, the requested Claims Estimate Order is well within the range of reasonableness and should be granted under Bankruptcy Rule 9019.  See In re Iridium Operating LLC, 478 F.3d at 462; In re Adelphia Commn'cs Corp., 327 B.R. at 159.[37]

89.     Based on the foregoing, $42 billion is a reasonable estimate of the aggregate Allowed General Unsecured Claims against the GUC Trust.

---

[37]   Rulings in the MDL Court provide additional support for the viability of Plaintiffs' claims.  Similar economic loss claims have been asserted in a consolidated class actions complaint in the MDL.  Consumer fraud, common law fraud, and implied warranty claims largely survived partial motions to dismiss.  See FACC Opinion at 23; TACC Opinion at 5-6.  In addition, the MDL Court recognized that the laws of several jurisdictions permit the assertion of damages under the "benefit-of-the-bargain defect theory," i.e., amounts plaintiffs overpaid at the time of sale for a defective vehicle, and injuries for lost time.  See FACC Opinion at 13-14, 18; TACC Opinion at 24.

## NOTICE

90.     Notice of this Motion has been provided in accordance with the Court-approved notice procedures.  See [Order Approving Notice Procedures].  The Parties submit that no other or further notice need be provided.

## NO PRIOR REQUEST

No previous application for the relief sought in this Motion has been made to this or any other Court.

## CONCLUSION

WHEREFORE, the Parties respectfully request that the Court: (i) enter an order substantially in the form attached hereto as **Exhibit E** approving the Settlement Agreement, attached hereto as **Exhibit A**, pursuant to Bankruptcy Rule 9019; (ii) enter a Claims Estimate Order substantially in the form attached hereto as **Exhibit F**, pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 502(c); and (iii) grant such other relief as is just and equitable.

*[Remainder of the page intentionally left blank]*

Dated: August [ ], 2017
      New York, New York

            Respectfully submitted,

             */s/ Draft*             
            Edward S. Weisfelner
            Howard S. Steel
            BROWN RUDNICK LLP
            Seven Times Square
            New York, New York 10036
            Tel: 212-209-4800
            eweisfelner@brownrudnick.com
            hsteel@brownrudnick.com

            Sander L. Esserman
            STUTZMAN, BROMBERG, ESSERMAN &
            PLIFKA, A PROFESSIONAL CORPORATION
            2323 Bryan Street, Ste 2200
            Dallas, Texas 75201
            Tel: 214-969-4900
            esserman@sbep-law.com

            *Designated Counsel for the Ignition Switch*
            *Plaintiffs and Certain Non-Ignition Switch*
            *Plaintiffs in the Bankruptcy Court*

            Steve W. Berman (admitted *pro hac vice*)
            HAGENS BERMAN SOBOL SHAPIRO LLP
            1918 Eighth Avenue, Suite 3300
            Seattle, WA 98101
             Tel: 206-623-7292
            steve@hbsslaw.com

            Elizabeth J. Cabraser
            LIEFF CABRASER HEIMANN & BERNSTEIN,
            LLP
            275 Battery Street, 29th Floor
            San Francisco, California 94111
            Tel: 414-956-1000
            ecabraser@lchb.com

            *Co-Lead Counsel for the Ignition Switch*
            *Plaintiffs and Certain Non-Ignition Switch*
            *Plaintiffs in the MDL Court*

William P. Weintraub
Gregory W. Fox
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: 212-813-8800
wweintraub@goodwinlaw.com
gfox@goodwinlaw.com

*Counsel to Those Certain Pre-Closing
Accident Plaintiffs Represented By Hilliard
Muñoz Gonzales L.L.P. and the Law Offices
of Thomas J. Henry*

Robert Hilliard, Esq.
HILLIARD MUÑOZ GONZALES LLP
719 South Shoreline
Suite 500
Corpus Christi, TX 78401
Tel: 361-882-1612
bobh@hmglawfirm.com

*Counsel to certain Pre-Closing Accident Plaintiffs*

Thomas J. Henry, Esq.
THE LAW OFFICES OF THOMAS J. HENRY
4715 Fredricksburg, Suite 507
San Antonio, TX 78229

*Counsel to Certain Pre-Closing Accident Plaintiffs*

Lisa M. Norman (admitted *pro hac vice*)
T. Joshua Judd (admitted *pro hac vice*)
ANDREWS MYERS, P.C.
1885 St. James Place, 15th Floor
Houston, Texas 77056
Tel: 713-850-4200
Lnorman@andrewsmyers.com
Jjudd@andrewsmyers.com

*Counsel to Certain Pre-Closing Accident Plaintiffs*

Matthew Williams
Keith R. Martorana
Gabriel Gillett
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166
Tel: 212-351-400
mwilliams@gibsondunn.com
kmartorana@gibsondunn.com
ggillett@gibsondunn.com

*Counsel for Wilmington Trust Company, as
Administrator and Trustee of the GUC Trust*

# EXHIBIT E

09-50026-mg   Doc 14083-1   Filed 08/04/17   Entered 08/04/17 22:18:50   Exhibit
Exhibit A   Pg 3 of 516

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                 :

In re:                               :                Chapter 11 Case No.

                                 :

MOTORS LIQUIDATION COMPANY, *et al.*,    :                09-50026 (MG)
f/k/a General Motors Corp., *et al.*         :

                                 :                (Jointly Administered)

                 Debtors.                 :

                                 :
------------------------------------------------------------------x

### DECLARATION OF BETH ANDREWS IN SUPPORT OF THE JOINT MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363, 502(C) AND 1142 AND BANKRUPTCY RULES 3020 AND 9019 TO APPROVE THE SETTLEMENT AGREEMENT BY AND AMONG THE SIGNATORY PLAINTIFFS AND THE GUC TRUST, AND TO ESTIMATE THE PLAINTIFFS' AGGREGATE ALLOWED GENERAL UNSECURED CLAIMS AGAINST THE DEBTORS

I, Beth Andrews, declare:

1.        I am a Vice President of Wilmington Trust Company ("**WTC**"), located at Rodney Square North, 1110 North Market Street, Wilmington, Delaware, 19890-1615, and am duly authorized to submit this declaration (the "**Declaration**") on behalf of WTC in its capacity as trustee for and administrator of the Motors Liquidation Company GUC Trust (the "**GUC Trust**").[1]

2.        I submit this Declaration in support of the *Joint Motion Pursuant To Bankruptcy Code Sections 105, 363, 502(C) And 1142 And Bankruptcy Rules 3020 And 9019 To Approve The Settlement Agreement By And Among The Signatory Plaintiffs And The GUC Trust, And To Estimate The Plaintiffs' Aggregate Allowed General Unsecured Claims Against The Debtors* (the "**Settlement Motion**"), dated August [__], 2017, filed concurrently with this declaration.

---

[1]    Unless otherwise defined in this declaration, capitalized terms shall have the meanings noted in the Second Amended and Restated Motors Liquidation Company GUC Trust Agreement, dated as of July 30, 2015 (the "**GUC Trust Agreement**") [ECF No. 13332].

3.     Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would competently testify thereto.

**Background**

4.     I am a Vice President of WTC with over 5 years of experience in its financial services group, including in *In re General Motors Corporation.*

5.     WTC's initial role in the Old GM bankruptcy was serving as the successor Indenture Trustee for approximately $23 billion in U.S. dollar denominated unsecured notes, bonds and debentures issued by Motors Liquidation Company, formerly known as General Motors Corporation.  During the bankruptcy, WTC served as chair of the Official Committee of Unsecured Creditors of Motors Liquidation Company.

6.     I currently serve as the lead representative of WTC in its capacity as trustee for and administrator of the GUC Trust.

**The GUC Trust's Creation and Current State**

7.     The GUC Trust was formed to implement the Plan.  The GUC Trust is a liquidating trust with the primary purpose of resolving disputed claims and distributing GUC Trust Assets and GUC Trust Units to the GUC Trust's defined beneficiaries (**"GUC Trust Beneficiaries,"** or **"Beneficiaries"**).  GUC Trust Beneficiaries include holders of Allowed General Unsecured Claims as of March 31, 2011, holders of disputed claims as of March 31, 2011 that were later allowed, and holders of freely transferable Units in the GUC Trust.

8.     The GUC Trust operates for the benefit of GUC Trust Beneficiaries and has a fiduciary duty to maximize the recoveries of the GUC Trust Beneficiaries.  Under the GUC Trust Agreement, which governs the Trust, the GUC Trust Administrator shall deliver distributions to unitholders "as promptly as practicable," and "not unduly prolong the existence of the GUC Trust."

9.      Under the GUC Trust Agreement, the GUC Trust "shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Disputed General Unsecured Claims."  Dkt. 13332 § 5.1(d).  If the amount to be Allowed exceeds $10 million, then the GUC Trust Monitor must review and approve "[a]ny decision to settle or otherwise resolve any objections to Disputed General Unsecured Claims against the Debtors."  *Id.* § 11.3(a)(i).

10.     To date, creditors have filed [$31.854] billion in general unsecured claims that have been Allowed.

11.     As of November 2016, the GUC Trust had distributed approximately 94% of its initial assets in the form of New GM stock, warrants, and cash, to holders of allowed claims and to holders of Units.  As of June 30, 3017, the GUC Trust had distributed 137,330,481 shares of New GM common stock, 124,846,029 Series A warrants, 124,846,029 Series B warrants and $245,817,332 in cash on behalf of resolved allowed general unsecured claims and units.

### New GM's Recalls and Resulting Litigation

12.     In 2014, New GM recalled more than 30 million vehicles, including millions of vehicles due to a defective ignition switch as part of NHTSA Recall Number 14V-047 (the "**Ignition Switch Defect**"), millions of vehicles due to other defects related to the ignition switch, and millions of vehicles due to defective side airbags, power steering, and other defects.

13.     Hundreds of plaintiffs responded to the revelations by filing individual and putative class actions against New GM seeking damages, under various theories, for alleged economic loss, personal injury, and wrongful death.  After filing motions to enforce the Sale Order's injunction, New GM suggested that plaintiffs look to the GUC Trust for recovery insofar as such claims allegedly constituted general unsecured claims.

14.     On a stipulated record related to the Ignition Switch Defect, the Bankruptcy Court

found, *inter alia*, that Old GM knew or should have known about the Ignition Switch Defect and

therefore gave inadequate notice to plaintiffs, but that any claims against the GUC Trust were

nonetheless barred by the doctrine of equitable mootness.

15.     On appeal, the Second Circuit affirmed in part, reversed in part, and vacated in

part.  Most relevant for purposes of the joint motion, the Second Circuit held that plaintiffs had

suffered a due process violation and thus were free from the Sale Order's injunction, and that the

issue of equitable mootness was not ripe because no plaintiff had sought permission to file late

claims.

### The Late Claims Motions

16.     Upon remand, the parties began addressing whether plaintiffs could satisfy the

requirements for authorization to file late proofs of claim against the GUC Trust, and whether

such claims are equitably moot.

17.     On December 22, 2016, counsel for certain Ignition Switch Pre-Closing Accident

Plaintiffs filed a motion for authority to file late proofs of claim on behalf of 175 plaintiffs

alleging personal injury and wrongful death claims arising from the Ignition Switch Defect.

Separately, Designated Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition

Switch Plaintiffs filed a motion for authority to file one late putative class proof of claim for

economic losses on behalf of Ignition Switch Plaintiffs, and another for economic losses on

behalf of certain Non-Ignition Switch Plaintiffs.

18.     On January 4, 2017 counsel for the *Groman* Plaintiffs and counsel for the Peller

Plaintiffs filed a joinder to the late claims motions filed by Designated Counsel.  On July 28,

2017 counsel for Additional Ignition Switch Pre-Closing Accident Plaintiffs filed a motion for

authority to file late proofs of claim on behalf of 171 plaintiffs alleging personal injury and

wrongful death claims arising from the Ignition Switch Defect (collectively, the "**Late Claims Motions**").

19. Per the Bankruptcy Court's order, the GUC Trust received limited discovery from certain putative late claimants regarding when they knew or reasonably could have known that they potentially had claims against the GUC Trust.  In addition, the parties briefed disputed questions about whether the plaintiffs would be required to show excusable neglect under *Pioneer Investment Services Co. v. Brunswick Associates Ltd.*, 507 U.S. 380 (1992) in order to obtain permission to file late claims, and the applicability of any agreements with the GUC Trust or other tolling arrangements to toll the time to file late claims (the "***Pioneer* Briefing**").

20. To date, the Court has not set a schedule for hearing argument or deciding the disputed issues raised in the *Pioneer* briefing.  The Court also has not set a schedule for briefing, arguing, or deciding the merits of the Late Claims Motions.

### The Settlement

21. Based on consultation with counsel, and my experience with the many aspects of the complex and protracted litigations related to New GM's 2014 recalls, it is my view that it is substantially likely that, absent settlement, the GUC Trust will continue to be involved in litigating this complex and protracted case for the foreseeable future.

22. Given the litigation risk of having multiple disputed issues that remain to be resolved by the Bankruptcy Court, the likelihood that those issues would be subject to appeals, the corresponding risk of re-litigating those issues after an appeal, the corresponding uncertainty, and both the cost to operate the GUC Trust during the pendency of the litigation and the time-value of money lost while the GUC Trust cannot distribute funds to its beneficiaries, I believe that the GUC Trust has ample business reason and justification for seeking the relief requested in the Settlement Motion.

23.     Specifically, litigation related to the disputed issues addressed in the *Pioneer*
Briefing, and the fact-intensive and complicated legal questions implicated by the merits of
Plaintiffs' Late Claims Motions, is likely to be complex and protracted.  In addition, the ultimate
resolution of the Late Claims Motions may be impacted by the overlay of multiple additional
complex legal and factual questions that are at issue before the multi-district litigation that is
currently pending before Judge Furman in the Southern District of New York that is related to
New GM's 2014 recalls.

24.     The GUC Trust believes that it has a strong position on both the *Pioneer* issues
and the merits of the Late Claims Motions.  But the ultimate outcome of those motions in the
Bankruptcy Court is uncertain.  And even if the GUC Trust were to prevail before the
Bankruptcy Court, any decision would likely be subject to an appeal (if not multiple appeals),
and thus would not likely be finally determined for the foreseeable future.  Meanwhile the GUC
Trust would be required to incur litigation costs and administrative costs to continue operating,
and GUC Trust Beneficiaries would not be able to receive distributions of GUC Trust Assets and
invest them as they see fit.

25.     Moreover, plaintiffs have shown to be highly committed litigants represented by
skilled and experienced counsel.  The plaintiffs who filed the Late Claims Motion believe that
they have a strong position on both the *Pioneer* issues and the merits of the Late Claims Motions.
They have asserted late claims that, based on the evidence they have proffered and that WTC has
reviewed in its capacity as GUC Trust Administrator, could be valued at tens of billions of
dollars.  As a result, if plaintiffs ultimately prevail in both obtaining permission to file late claims
and having their purported multi-billion dollar claims allowed, then current GUC Trust

Beneficiaries could be forced to surrender rights to future distributions. Plaintiffs have also reserved the right to seek to claw back previously distributed funds.

26.     Due to the significant risks that the Late Claims Motions present to the GUC Trust Beneficiaries, and the fluid nature of this litigation, the GUC Trust agreed to enter settlement negotiations with certain Plaintiffs beginning in Spring 2017. Those negotiations have been at arms-length and in good faith. Notably, all parties to the negotiations were represented and advised by experienced counsel, and negotiations proceeded at a high level of intensity over multiple months, with the parties (or their attorneys) engaging in several in-person and teleconference meetings and exchanging numerous drafts of the Settlement Agreement and ancillary documents.

27.     The primary terms of the Settlement are essentially as follows: 1) the GUC Trust agrees to pay $15 million (the "**Settlement Amount**") to a settlement fund and up to another $[6] million for providing notice; 2) the GUC Trust agrees to support entry of a Claims Estimate Order estimating the aggregate Allowed General Unsecured Claims (including the claims of the Plaintiffs) in an amount that equals or exceeds $42 billion; 3) the GUC Trust Beneficiaries agree to waive any claim to the Settlement Amount and, if the Claims Estimate Order is entered, the Adjustment Shares, and any Adjustment Shares issued will be deposited into the settlement fund for the sole benefit of Plaintiffs; 4) all Plaintiffs agree (or will be deemed to agree) to waive all current and future claims against the GUC Trust, the Avoidance Action Trust and certain other parties, and instead seek satisfaction of such claims from the settlement fund.

28.     I believe that the Settlement is a prudent and reasonable exercise of business judgment because it presents the best option for the GUC Trust to maximize recovery for the

benefit of the GUC Trust Beneficiaries while minimizing the substantial risk posed by the Late Claims Motions.

29.    The Settlement is in the best interests of the GUC Trust, the Old GM estates and the GUC Trust Beneficiaries because it provides such parties with substantial benefits.  For example, the Settlement offers the concrete benefit of resolving a long-standing dispute related to the Late Claims Motions.  Settlement eliminates the risk of claw-backs of previously distributed assets and potentially clears the way for future distributions to GUC Trust Beneficiaries in the near term.  It eliminates substantial uncertainty and saves the GUC Trust from substantial litigation costs.  It will foster the ability of the GUC Trust to expeditiously wind-down the affairs of the Debtors in accordance with the Plan.  And it preserves the distributable assets for the GUC Trust Beneficiaries.  In short, the Settlement maximizes recoveries for GUC Trust Beneficiaries, which is the primary function of the GUC Trust and the GUC Trust Administrator.

30.    To be sure, Settlement comes at a cost to Beneficiaries.  In the Settlement, the GUC Trust has agreed to pay up to $6 million to distribute notice of the Settlement and $15 million to establish the Settlement Fund, funds that would otherwise potentially be available to Beneficiaries if the GUC Trust ultimately prevailed in the Late Claim Motion litigation.  But given the substantial benefits of the Settlement, these costs are reasonable and prudent.

31.    In consideration of all these issues, it is my opinion that the Settlement falls within the range of reasonableness—well above the lowest point in the range of reasonableness—and provides the best outcome for the GUC Trust Beneficiaries.

32.    Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: Wilmington, Delaware
August ▆▆, 2017

/s/ [Draft]
Beth Andrews

09-50026-mg    Doc 14120-1    Filed 09/26/17    Entered 09/26/17 23:21:43    Exhibit
Exhibit A    Pg 117 of 516

# EXHIBIT F

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------X

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, et al., | : | Case No.: 09-50026 (MG) |
|     f/k/a General Motors Corp., et al., | : |  |
|  | : |  |
| Debtors. | : | (Jointly Administered) |

--------------------------------------------------------------X

**JOINT DECLARATION OF STEVE W. BERMAN AND
ELIZABETH J. CABRASER IN SUPPORT OF THE JOINT MOTION PURSUANT
TO BANKRUPTCY CODE SECTIONS 105, 363, 502(C) AND 1142 AND
BANKRUPTCY RULES 3020 AND 9019 TO APPROVE THE SETTLEMENT
AGREEMENT BY AND AMONG THE SIGNATORY PLAINTIFFS AND THE
GUC TRUST, AND TO ESTIMATE THE PLAINTIFFS' AGGREGATE
ALLOWED GENERAL UNSECURED CLAIMS AGAINST THE DEBTORS**

Steve W. Berman and Elizabeth J. Cabraser hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of their knowledge, information and belief:

1.      Steve W. Berman is a partner with the law firm of Hagens Berman Sobol Shapiro LLP.

2.      Elizabeth J. Cabraser is a partner with the law firm of Lieff Cabraser Heimann & Bernstein, LLP.

3.      We are Co-Lead Counsel appointed in the General Motors LLC Ignition Switch Litigation Multidistrict Litigation, currently pending in the United States District Court for the Southern District of New York, Judge Furman presiding, Case No. 14-MD-2543 (JMF).

4.      We submit this declaration in support of the *Joint Motion Pursuant to Bankruptcy Code Sections 105 and 502(c) and Bankruptcy Rule 9019 to Approve the Settlement Agreement by and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs'*

*Aggregate Allowed General Unsecured Claims Against the Debtors*, dated [ ], 2017 (the "**Motion**").  This declaration is based on our personal knowledge.

## I.    Settlement Agreement

5.    The Settlement Agreement was negotiated by the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, certain Pre-Closing Accident Plaintiffs (collectively, the "**Signatory Plaintiffs**"), the Motors Liquidation Company GUC Trust (the "**GUC Trust**"), and counsel to certain unaffiliated holders of beneficial units of the GUC Trust (the "**Participating Unitholders**") (together with the GUC Trust and Signatory Plaintiffs, the "**Parties**") in good faith and at arm's length.  After due diligence, the Signatory Plaintiffs and the GUC Trust entered into the Settlement Agreement.

6.    Continued litigation of the matters resolved by the Settlement Agreement would be complex and costly.

7.    The Settlement Agreement resolves multiple disputes, claims and issues to which the Parties are involved in varying degrees, and in related but not necessarily identical ways, such that each Party's overall obligations to one or more other Parties constitutes good and sufficient consideration for the overall benefits each Party is to receive from one or more of the other Parties.

8.    The settlements, compromises, releases and transfers contemplated in the Settlement Agreement are fair, reasonable and given in exchange for valuable and reasonably equivalent consideration.

## II.    Claims Estimate Order

9.    We provided the GUC Trust with a proffer of evidence and expert report concerning the claims of the Ignition Switch Plaintiffs and certain Non-Ignition Switch

Plaintiffs.  Certain Pre-Closing Accident Plaintiffs also provided a proffer of evidence and expert report.

10.    Based upon the proffers of evidence and expert reports, Plaintiffs' claims, when combined with all of the other Allowed General Unsecured Claims against the Debtors' bankruptcy estates, equals or exceeds $42 billion.

Dated: [ ], 2017

_Draft_ _____
Steve W. Berman

Dated: [ ], 2017

_Draft_ _____
Elizabeth J. Cabraser

09-50026-mg   Doc 14130-1   Filed 09/26/17   Entered 09/26/17 23:24:43   Exhibit
Exhibit A   Pg 121 of 516

# <u>EXHIBIT G</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                                              :

In re:                              :                  Chapter 11

MOTORS LIQUIDATION COMPANY, et al.,   :                  Case No.: 09-50026 (MG)

        f/k/a General Motors Corp., et al.,   :

                                  :

                        Debtors.     :                  (Jointly Administered)

-------------------------------------------------------------X

**DECLARATION OF ROBERT C. HILLIARD IN SUPPORT OF THE JOINT MOTION**
**PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363, 502(C) AND 1142 AND**
**BANKRUPTCY RULES 3020 AND 9019 TO APPROVE THE SETTLEMENT**
**AGREEMENT BY AND AMONG THE SIGNATORY PLAINTIFFS AND THE**
**GUC TRUST, AND TO ESTIMATE THE PLAINTIFFS' AGGREGATE**
**ALLOWED GENERAL UNSECURED CLAIMS AGAINST THE DEBTORS**

Robert C. Hilliard hereby declares under penalty of perjury, pursuant to 28 U.S.C. §

1746, that the following is true and correct to the best of his knowledge, information and belief:

        1.       I am a partner with the law firm of Hilliard Muñoz Gonzales LLP and am co-

counsel with the Law Offices of Thomas J. Henry to certain Pre-Closing Accident Plaintiffs.[1]

        2.       I submit this declaration in support of the *Joint Motion Pursuant to Bankruptcy*

*Code Sections 105 and 502(c) and Bankruptcy Rule 9019 to Approve the Settlement Agreement*

*by and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs'*

*Aggregate Allowed General Unsecured Claims Against the Debtors*, dated [ ], 2017 (the

"**Motion**").  This declaration is based on my personal knowledge.

**I.**       **Settlement Agreement**

        3.       The Settlement Agreement was negotiated by the Ignition Switch Plaintiffs,

certain Non-Ignition Switch Plaintiffs, certain Pre-Closing Accident Plaintiffs (collectively, the

"**Signatory Plaintiffs**"), the Motors Liquidation Company GUC Trust (the "**GUC Trust**"), and

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Motion (defined below).

counsel to certain unaffiliated holders of beneficial units of the GUC Trust (the "**Participating Unitholders**") (together with the GUC Trust and Signatory Plaintiffs, the "**Parties**") in good faith and at arm's length.  After due diligence, the Signatory Plaintiffs and the GUC Trust entered into the Settlement Agreement.

4.      Continued litigation of the matters resolved by the Settlement Agreement would be complex and costly.

5.      The Settlement Agreement resolves multiple disputes, claims and issues to which the Parties are involved in varying degrees, and in related but not necessarily identical ways, such that each Party's overall obligations to one or more other Parties constitutes good and sufficient consideration for the overall benefits each Party is to receive from one or more of the other Parties.

6.      The settlements, compromises, releases and transfers contemplated in the Settlement Agreement are fair, reasonable and given in exchange for valuable and reasonably equivalent consideration.

## II.    Claims Estimate Order

7.      I provided the GUC Trust with a proffer of evidence and expert report concerning the claims of the Pre-Closing Accident Plaintiffs my firm represents.  Steve Berman and Elizabeth Cabraser also provided the GUC Trust with a proffer of evidence and expert report concerning the claims of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs.

8.      Based upon the proffers of evidence and expert reports provided to the GUC Trust, Plaintiffs' claims, when combined with all of the other Allowed General Unsecured Claims against the Debtors' bankruptcy estates, equal or exceed $42 billion.

Dated: [ ], 2017

_Draft_____
Robert C. Hilliard

# EXHIBIT H

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
:
In re:                                                         :          Chapter 11
MOTORS LIQUIDATION COMPANY, et al.,              :          Case No.: 09-50026 (MG)
      f/k/a General Motors Corp., et al.,        :
:
                   Debtors.        :          (Jointly Administered)
-------------------------------------------------------------X

### DECLARATION OF LISA M. NORMAN IN SUPPORT OF THE JOINT MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363, 502(C) AND 1142 AND BANKRUPTCY RULES 3020 AND 9019 TO APPROVE THE SETTLEMENT AGREEMENT BY AND AMONG THE SIGNATORY PLAINTIFFS AND THE GUC TRUST, AND TO ESTIMATE THE PLAINTIFFS' AGGREGATE ALLOWED GENERAL UNSECURED CLAIMS AGAINST THE DEBTORS

       Lisa M. Norman hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746,

that the following is true and correct to the best of her knowledge, information and belief:

       1.      I am Senior Counsel with the law firm of Andrews Myers, PC and I represent

certain Ignition Switch Pre-Closing Accident Plaintiffs in conjunction with the following law

firms: Avram Blair & Associates, PC; The Buckley Law Group; The Meyer Law Firm; The Potts

Law Firm; Bailey Peavy Bailey Cowan Heckaman; Onder Law; Junell & Associates; Limandri

& Jonna; Kirkendall Dwyer, LLP.

       2.      I submit this declaration in support of the *Joint Motion Pursuant to Bankruptcy*

*Code Sections 105 and 502(c) and Bankruptcy Rule 9019 to Approve the Settlement Agreement*

*by and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs'*

*Aggregate Allowed General Unsecured Claims Against the Debtors*, dated [ ], 2017 (the

"**Motion**").  This declaration is based on our personal knowledge.

## I.    <u>Settlement Agreement</u>

3.    The Settlement Agreement was negotiated by the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, certain Pre-Closing Accident Plaintiffs (collectively, the "**Signatory Plaintiffs**"), the Motors Liquidation Company GUC Trust (the "**GUC Trust**"), and counsel for certain unaffiliated holders of beneficial units of the GUC Trust (the "**Participating Unitholders**") (together with the GUC Trust and Signatory Plaintiffs, the "**Parties**") in good faith and at arm's length.  After due diligence, the Signatory Plaintiffs and the GUC Trust entered into the Settlement Agreement.

4.    Continued litigation of the matters resolved by the Settlement Agreement would be complex and costly.

5.    The Settlement Agreement resolves multiple disputes, claims and issues to which the Parties are involved in varying degrees, and in related but not necessarily identical ways, such that each Party's overall obligations to one or more other Parties constitutes good and sufficient consideration for the overall benefits each Party is to receive from one or more of the other Parties.

6.    The settlements, compromises, releases and transfers contemplated in the Settlement Agreement are fair, reasonable and given in exchange for valuable and reasonably equivalent consideration.

## II.    <u>Claims Estimate Order</u>

7.    The GUC Trust has been provided with proffers of evidence and expert reports by certain Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, and certain Pre-Closing Accident Plaintiffs.  Based upon the proffers of evidence and expert reports provided to the GUC

Trust, Plaintiffs' claims, when combined with all of the other Allowed General Unsecured

Claims against the Debtors' bankruptcy estates, equal or exceed $42 billion.

Dated: [ ], 2017

*Draft*_____
Lisa M. Norman

09-50026-mg   Doc 14129-1   Filed 09/26/17   Entered 09/26/17 22:25:37   Exhibit
Exhibit A   Pg 1 of 22

# <u>EXHIBIT I</u>

**HEARING DATE AND TIME: [ ], 2017 at [ ] (EST)**
**OBJECTION DEADLINE: [ ], 2017 at 4:00 p.m. (EST)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------X
                                       :
In re:                                 :        Chapter 11
MOTORS LIQUIDATION COMPANY, et al.,    :        Case No.: 09-50026 (MG)
        f/k/a General Motors Corp., et al.,    :
                                       :
                    Debtors.           :        (Jointly Administered)
------------------------------------------------------------X
```

## MOTION FOR ORDER APPROVING NOTICE PROCEDURES WITH RESPECT TO PROPOSED SETTLEMENT BY AND AMONG THE SIGNATORY PLAINTIFFS AND THE GUC TRUST

The Ignition Switch Plaintiffs,[1] certain Non-Ignition Switch Plaintiffs,[2] certain Pre-Closing Accident Plaintiffs[3] (collectively, the "**Signatory Plaintiffs**") and the Motors Liquidation Company GUC Trust (the "**GUC Trust**," together with the Signatory Plaintiffs, the "**Parties**") hereby submit this *Motion for Order Approving Notice Procedures with Respect to Proposed Settlement by and Among the Signatory Plaintiffs and the GUC Trust* (the "**Motion**"). In support of this Motion, the Parties respectfully state as follows:

---

[1]  The term "**Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047.

[2]  The term "**Non-Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540, 14V-118 and 14V-153.

[3]  The term "**Pre-Closing Accident Plaintiffs**" shall mean those plaintiffs asserting personal injury or wrongful death claims or persons who suffered a personal injury or wrongful death on or arising from an accident involving an Old GM vehicle that occurred prior to the closing of the Section 363 Sale.  Collectively, all Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Pre-Closing Accident Plaintiffs are referred to as "**Plaintiffs**."

1

## PRELIMINARY STATEMENT

1.      On August [ ], 2017, after good faith, arm's-length negotiation, the Signatory Plaintiffs and the GUC Trust entered into the Settlement Agreement.

2.      Following the Court's consideration and approval of this Motion, the Parties intend to file and serve (in the manner contemplated by the proposed Notice Procedures herein) a motion (the "**9019 Motion**") requesting the Court's approval of the Settlement Agreement and Claims Estimate Order.

3.      The Settlement Agreement resolves numerous longstanding, disputed issues including, *inter alia*:  (i) whether Plaintiffs should be granted authority to file late proofs of claim (and whether such authority can be granted solely on due process grounds); (ii) whether Plaintiffs' asserted claims are equitably moot; (iii) whether additional grounds exist to object to Plaintiffs' asserted claims; and (iv) the allowable amount of the Signatory Plaintiffs' claims (if any).

4.      Generally, under the Settlement Agreement,[4] the GUC Trust agrees to irrevocably pay $15,000,000 (the "**Settlement Amount**") into a trust, fund or other vehicle (the "**Settlement Fund**") for the exclusive benefit of Plaintiffs.

5.      In exchange, upon payment of the Settlement Amount, all Plaintiffs with claims against the GUC Trust (whether asserted or unasserted, contingent, or otherwise) arising from New GM's 2014 recalls, including those who did not execute the Settlement Agreement, are deemed to irrevocably waive and release all claims (other than those arising under the Settlement Agreement) against Old GM, the Old GM estate, the GUC Trust, the GUC Trust Administrator,

---

[4]    This summary of the Settlement Agreement is qualified in its entirety by the terms and provisions of the Settlement Agreement.  To the extent that there are any inconsistencies between the description of the Settlement Agreement contained in the Motion and the terms and provisions of the Settlement Agreement, the Settlement Agreement shall control.

holders of beneficial units in the GUC Trust (the "**Unitholders**") and the Motors Liquidation Company Avoidance Action Trust, including a release of any rights to prior or future distributions of or current GUC Trust assets and any rights to distributions by the Motors Liquidation Company Avoidance Action Trust.

6.      In addition, the GUC Trust agrees to provide reasonable assistance and cooperation in obtaining an order from the Court (the "**Claims Estimate Order**"): (i) finding that the estimated aggregate amount of Plaintiffs' claims, together with all other allowed claims, against the estates meet or exceed $42 billion, triggering the provision of the Sale Agreement[5] requiring New GM to issue additional New GM common stock (the "**Adjustment Shares**"); and (ii) directing that those Adjustment Shares be promptly delivered to the Settlement Fund by New GM.

7.      All Unitholders, all defendants in the action captioned *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. et al.*, Adv. Pro. No. 09-00504 (Bankr. S.D.N.Y. July 31, 2009) (the "**Term Loan Avoidance Action**"), and all holders of Allowed General Unsecured Claims, other than Plaintiffs, will be deemed to irrevocably waive and release any and all rights to these Adjustment Shares, as well as the Settlement Amount.

8.      Subject to notice and an opportunity for Plaintiffs to object, the Signatory Plaintiffs will determine the overall allocation of the value of the Settlement Fund between economic loss claims and personal injury/wrongful death claims, and the eligibility and criteria for payment.  Being defined as a Plaintiff will not assure any party that he, she, or it will receive

---

[5]    *See Second Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers, and NGMCO, Inc., as Purchaser*, dated as of June 26, 2009 (the "**AMSPA**"), § 3.2(c).

a distribution from the Settlement Amount, the Adjustment Shares (or their value), if any, or any other consideration contained in the Settlement Fund.

9.      Nothing in the Settlement Agreement is intended to waive any claims against New GM or to be an election of remedies against New GM; nor does the Settlement Agreement or any payments made in connection therewith represent full satisfaction of any claims against Old GM, unless and until such claims are in fact paid in full from every available source; provided, however, that in no event shall any Plaintiff be permitted to seek any further payment or compensation from the GUC Trust in respect of their claims or otherwise, other than the Settlement Amount and the Adjustment Shares.  Except as mandated otherwise under applicable law, nothing in the Settlement Agreement shall waive any claims that any Plaintiff may have against New GM or constitute an election of remedies by any Plaintiff, and neither the Settlement Amount nor the Adjustment Shares (nor any distribution thereof to any Plaintiff) shall represent full and final satisfaction of any claim that any Plaintiff may have against New GM, all of which are expressly reserved. The Bankruptcy Court's estimate of the aggregate Allowed General Unsecured Claims in the Claims Estimate Order shall not operate as a cap on any of the claims of any of the Plaintiffs against New GM.

10.     As part of the Settlement Agreement, the Parties by this Motion, request that the Court enter an Order approving and establishing Notice Procedures for notice of the 9019 Motion.

## JURISDICTION

11.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

12.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

09-50026-reg   Doc 13529-2   Filed 06/16/17   Entered 06/16/17 22:36:53   Exhibit
Exhibit A   Pg 134 of 516

## NOTICE PROCEDURES

13. Pursuant to the Settlement Agreement, the Parties propose that they provide notice of the 9019 Motion, and the hearing date to consider approval of the Settlement Agreement and Claims Estimate Order, pursuant to the below "**Notice Procedures**":

i. paid media including (1) digital banner advertisements targeted specifically to owners or lessees of the defective vehicles manufactured by Old GM included in the Recalls; (2) pre-roll video ads placed on YouTube and other sites with YouTube embedded videos; (3) sponsored search listings on the three most highly-visited Internet search engines, Google, Yahoo! and Bing; (4) a party-neutral informational press release issued to online press outlets throughout the United States; and (5) a settlement website;

ii. notice by postcard in the form attached hereto as **Exhibit C** to: (A) all persons in the United States who, as of July 10, 2009, owned or leased a defective vehicle manufactured by Old GM included in the Recalls; and (B) all Pre-Closing Accident Plaintiffs who have filed a lawsuit against New GM or filed or joined a motion for authority to file late claims against the GUC Trust, as of the date of the Settlement Agreement;[6]

iii. notice to all defendants in the Term Loan Avoidance Action via the Bankruptcy Court's ECF system and, to the extent a defendant is not registered to receive notice via the ECF system, via postcard in the form attached hereto as **Exhibit C**;

iv. notice via DTC's LENSNOTICE system to holders of beneficial units of the GUC Trust in the form attached hereto as **Exhibit D**; and

v. notice via ECF to all entities, including New GM, that receive electronic notice from the Court's ECF system.

14. Pursuant to the Settlement Agreement, the GUC Trust shall be responsible for funding the cost of the notice contemplated hereby, up to an amount of $6,000,000 (the "**Notice**

---

[6] The Parties request that the Court order New GM to turn over the names and addresses of individuals in category (ii).

5

**Cost Cap Amount**").[7]   As described further below, the GUC Trust respectfully requests authority to "hold back" and reallocate for use up to $6,000,000 from otherwise distributable assets of the GUC Trust for use in funding the Notice Procedures.

15.     The Parties request that this Court:  (i) schedule the hearing to consider approval of the 9019 Motion for [ ], 2017 at [ ] (EST) (the "**Hearing**"); and (ii) establish [ ], 2017 at [ ] (EST), as the deadline by which all responses and objections to the 9019 Motion must be filed and served.

16.     The Parties respectfully submit that the foregoing Notice Procedures, and requested hearing date and objection deadline, will provide comprehensive notice to all affected parties of the terms and the relief to be sought at the hearing to consider approval of the 9019 Motion, and that no other or further notice is necessary or required.

## RELIEF REQUESTED

17.     By this Motion, the Parties respectfully request that the Court enter an order approving the Notice Procedures substantially in the form attached to this Motion as **Exhibit A**.

## BASIS FOR RELIEF

18.     Bankruptcy Code Section 105(a) provides a bankruptcy court with broad powers in its administration of a case.  See 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").  Pursuant to Section 105(a), the Bankruptcy Court has expansive equitable powers to achieve fairness and

---

[7]   Based upon proposals received from vendors, the cost of the notice contemplated hereby is approximately $6 million.  Specifically, the parties requested proposals for the notice program from three vendors: (1) Epiq Class Action & Claims Solutions, Inc./Hilsoft Notifications ("**Epiq/Hilsoft**"); (2) Rust Consulting/Kinsella Media; and (3) Kurtzman Carson Consultants.  Based on the responses, the parties selected Epiq as the Notice Administrator, based both on the cost estimate, as well as their comprehensive notice plan, which is explained in detail in the Declaration of Cameron R. Azari, Esq., on Implementation and Adequacy of General Motors Bankruptcy Settlement Class Notice Program ("**Azari Decl.**"), annexed hereto as **Exhibit E**.

justice in the reorganization process.  See, e.g., Croton River Club, Inc. v. Half Moon Bay
Homeowners Ass'n (In re Croton River Club, Inc.), 52 F.3d 41 (2d Cir. 1994) (holding that
bankruptcy courts have broad equity power to manage affairs of debtors).

19.    In addition, the Court has the authority and discretion under Bankruptcy Code
Section 105(d) to issue and prescribe procedures and conditions as the Court deems appropriate
to ensure that matters before it are handled expeditiously and economically.  See 11 U.S.C. §
105(d); In re Fletcher Int'l, Ltd., 536 B.R. 551, 560 (S.D.N.Y. 2015), aff'd, 661 F. App'x 124
(2d Cir. 2016).  Under Bankruptcy Rule 2002, no less than 21 days' notice must be provided for
proposed settlements under Bankruptcy Rule 9019.  Epiq/Hilsoft estimates that it will take 35
days to complete the mailing of the postcard notice.

20.    Entry of the Proposed Order is appropriate under Bankruptcy Code Sections
105(a) and 105(d), as complemented by Bankruptcy Rule 9019, because it will allow the Parties
to:  (i) comply with the terms of the Settlement Agreement (which specifically require the Parties
to receive an order from this Court approving the Notice Procedures); and (ii) implement a
process in which appropriate notice will be given to all relevant parties in interest so that this
Court can consider the appropriateness of the 9019 Motion at the Hearing.

21.    To ensure that the Notice Procedures are sufficient, Eqip/Hilsoft, a firm that
specializes in designing, developing, analyzing and implementing large-scale, un-biased, legal
notification plans, was engaged.[8]  Epiq/Hilsoft analyzed the individual notice options and the
media audience data to determine the most effective mixture of media required to reach the
greatest practicable number of included parties.[9]

---

[8]    See Azari Decl. ¶ 3.

[9]    Id. ¶ 8.

22.     Rather than incurring the prohibitive cost and expense of mailing a long form of notice to Plaintiffs, the Parties will serve the postcard notice attached hereto as **Exhibit C** (the "**Direct Mail Notice**") that clearly and concisely summarizes the Settlement.  The Direct Mail Notice will direct the recipients to a website dedicated specifically to the Settlement where they can access additional information.  The Direct Mail Notices will be sent by United States Postal Service first class mail.[10]

23.     This comprehensive individual notice effort will be supplemented by moderate paid media selected to both notify Plaintiffs who may not see the Direct Mail Notice and remind Plaintiffs to act if they so choose.  Paid media will include digital banner advertisements targeted specifically to owners and lessees of the vehicle makes and models included in the Settlement along with online video advertisements targeted to adults aged 18 and over.[11]

24.     To build additional reach and extend exposures, a party-neutral informational release will be issued to approximately 5,000 general media (print and broadcast) outlets and 5,400 online databases and websites throughout the United States.[12]

25.     A dedicated website will be created for the Settlement.  Plaintiffs will be able to obtain detailed information about the case and review documents including the Long Form Notice attached hereto as **Exhibit B** (in English and Spanish), Settlement Agreement, Settlement Order and answers to frequently asked questions and any other documents the Court may require.  Once the plan for allocation between economic loss claims and personal injury/wrongful death claims is determined it will be posted prominently on the Settlement website.  Any criteria on eligibility to recover from the Settlement Fund will also be posted

---

10  Id. ¶ 16.

11  Id. ¶¶ 20-25.

12  Id. ¶ 28.

prominently on the Settlement website.  To facilitate locating the case website, sponsored search listings will be acquired on the three most highly-visited internet search engines:  *Google*, *Yahoo!* and *Bing*.[13]

26.    The Notice Procedures presented here are similar to the procedures proposed by the debtors in In re TK Holdings Inc., Case No. 17-11375 (BLS) (Bank. D. Del. July 7, 2017) to provide notice to individuals who own, or may have owned, vehicles equipped with recalled airbag inflators—serving a postcard via first-class mail, utilizing digital banner advertising and paid internet search listings, distributing an informational release, and creating a dedicated website.[14]

27.    The Parties believe these Notice Procedures will keep costs reasonable under the circumstances while also reaching the greatest practicable number of Plaintiffs.[15]

28.    As noted above, the GUC Trust shall be responsible for funding the cost of the Notice Procedures up to the Notice Cost Cap Amount.  Pursuant to Section 6.1(b) of the Second Amended and Restated GUC Trust Agreement dated as of July 30, 2015 (the "**GUC Trust Agreement**"), the GUC Trust Administrator is afforded the flexibility to "hold back" from distributions (with the approval of FTI Consulting, Inc. as monitor of the GUC Trust (in such capacity, the "**GUC Trust Monitor**"))[16] otherwise distributable assets for the purposes of,

---

13    Id. ¶¶ 26, 29.

14    See Motion of Debtors Pursuant to 11 U.S.C. §§ 502(b)(9) and 105(a), Fed. R. Bankr. P. 2002, 3003(c)(3), 5005, and 9007, and Local Rules 2002-1(e), 3001-1, and 3003-1 for Authority to (I) Establish Deadlines for Filing Proofs of Claim, (II) Establish the Form and Manner of Notice Thereof, and (III) Approve Procedures for Providing Notice of Bar Date and Other Important Deadlines and Information to Potential PSAN Inflator Claimants ¶¶ 24-28, In re TK Holdings Inc., Case No. 17-11375 (BLS) (Bankr. D. Del. July 7, 2017).

15    Id. ¶ 12.

16    As required by Section 6.1 of the GUC Trust Agreement, the GUC Trust Administrator has consulted with the GUC Trust Monitor with respect to the proposed reallocation and use of distributable cash.  GUC Trust Agreement § 6.1.  The GUC Trust Monitor has indicated that it supports the relief requested herein.

9

among other things, funding fees, costs and expenses of the GUC Trust to the extent that such

fees, costs and expenses are not otherwise contemplated by the GUC Trust's budget.  *See* GUC

Trust Agreement § 6.1(b).   The GUC Trust Agreement further permits the GUC Trust

Administrator to seek Bankruptcy Court authority to reallocate and use the "held back" funds for

the purposes of satisfying such fees, costs and expenses as incurred (such funds, as reallocated,

"**Other GUC Trust Administrative Cash**").   *Id.*   Section 6.13 of the GUC Trust Agreement

provides that to the extent any "expenses, costs, liabilities, obligations or fees [are] incurred by

the GUC Trust… in connection with the wind-down of the Debtors' affairs… [such liabilities]

shall be satisfied… from the applicable portion of Other GUC Trust Administrative Cash."  *See*

GUC Trust Agreement § 6.13.

29.     The GUC Trust's agreement to pay up to $6 million for the notice contemplated

hereby is not currently budgeted by the GUC Trust and falls well within the types of "expenses,

costs, liabilities, obligations or fees" that may be "held back" and reallocated for use by the GUC

Trust pursuant to Section 6.13 of the GUC Trust Agreement.   Accordingly, the GUC Trust

submits that, pursuant to Section 6.1(b) of the GUC Trust Agreement, the request to reallocate up

to $6 million of otherwise distributable assets for the purposes of funding the Notice Procedures

is warranted.

## NOTICE

30.     Notice of this Motion has been provided to all entities that receive electronic

notice from the Court's ECF system and otherwise in accordance with the *Sixth Amended Order*

*Pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rules 1015(c) and 9007 establishing Notice and*

*Case Management Procedures*, dated May 5, 2011 (Bankr. Dkt. No. 10183).

10

31.     No previous application for the relief sought in this Motion has been made to this
or any other Court.

<strong><u>CONCLUSION</u></strong>

WHEREFORE the Parties respectfully request entry of the Proposed Order, substantially
in the form attached hereto as **<u>Exhibit A</u>**, granting the relief requested herein and such other
relief as is just and equitable.

Dated:  August [ ], 2017                          Respectfully submitted,
        New York, New York

                                                  _/s/ Draft_____
                                                  Edward S. Weisfelner
                                                  Howard S. Steel
                                                  BROWN RUDNICK LLP
                                                  Seven Times Square
                                                  New York, New York 10036
                                                  Tel: 212-209-4800
                                                  eweisfelner@brownrudnick.com
                                                  hsteel@brownrudnick.com

                                                  Sander L. Esserman
                                                  STUTZMAN, BROMBERG, ESSERMAN
                                                  &PLIFKA, A PROFESSIONAL
                                                  CORPORATION
                                                  2323 Bryan Street, Ste 2200
                                                  Dallas, Texas 75201
                                                  Tel: 214-969-4900
                                                  esserman@sbep-law.com

                                                  *Designated Counsel for the Ignition Switch
                                                  Plaintiffs and Certain Non-Ignition Switch
                                                  Plaintiffs in the Bankruptcy Court*

                                                  Steve W. Berman (admitted *pro hac vice*)
                                                  HAGENS BERMAN SOBOL SHAPIRO
                                                  LLP
                                                  1918 Eighth Avenue, Suite 3300
                                                  Seattle, WA 98101
                                                  Tel: 206-623-7292
                                                  steve@hbsslaw.com

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
Tel: 414-956-1000
ecabraser@lchb.com

*Co-Lead Counsel for the Ignition Switch
Plaintiffs and Certain Non-Ignition Switch
Plaintiffs in the MDL Court*

William P. Weintraub
Gregory W. Fox
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: 212-813-8800
wweintraub@goodwinlaw.com
gfox@goodwinlaw.com

*Counsel to Those Certain Pre-Closing
Accident Plaintiffs Represented By Hilliard
Muñoz Gonzales L.L.P. and the Law Offices
of Thomas J. Henry*

Robert Hilliard, Esq.
HILLIARD MUÑOZ GONZALES LLP
719 South Shoreline
Suite 500
Corpus Christi, TX 78401
Tel: 361-882-1612
bobh@hmglawfirm.com

*Counsel to Certain Pre-Closing Accident
Plaintiffs*
Thomas J. Henry, Esq.
THE LAW OFFICES OF THOMAS J.
HENRY
4715 Fredericksburg, Suite 507
San Antonio, TX 78229

*Counsel to Certain Pre-Closing Accident
Plaintiffs*

12

Lisa M. Norman (admitted pro hac vice)
T. Joshua Judd (admitted pro hac vice)
ANDREWS MYERS, P.C.
1885 St. James Place, 15th Floor
Houston, Texas 77056
Tel: 713-850-4200
Lnorman@andrewsmyers.com
Jjudd@andrewsmyers.com

*Counsel to Certain Pre-Closing Accident*
*Plaintiffs*

Matthew Williams
Keith R. Martorana
Gabriel Gillett
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166
Tel: 212-351-400

*Counsel for Wilmington Trust Company, as*
*Administrator and Trustee of the GUC Trust*

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                             :

In re:                           :          Chapter 11

MOTORS LIQUIDATION COMPANY, et al.,   :          Case No.: 09-50026 (MG)

           f/k/a General Motors Corp., et al.,   :

                             :

                    Debtors.    :          (Jointly Administered)

-------------------------------------------------------------X

## ORDER APPROVING NOTICE PROCEDURES
## WITH RESPECT TO PROPOSED SETTLEMENT BY AND
## <u>AMONG THE SIGNATORY PLAINTIFFS AND THE GUC TRUST</u>

Upon the *Motion for Order Approving Notice Procedures with Respect to Proposed Settlement by and Among the Signatory Plaintiffs and the GUC Trust*, dated [ ], 2017 (the "**Motion**"),[17] of the Ignition Switch Plaintiffs, Certain Non-Ignition Switch Plaintiffs, Certain Pre-Closing Accident Plaintiffs and the GUC Trust (collectively the "**Parties**") for approval of the Notice Procedures with respect to the 9019 Motion, all as more fully described in the Motion; and the Bankruptcy Court having considered the Motion; and a hearing on the Motion having been held before this Bankruptcy Court on _____, 2017 (the "**Hearing**") to consider the relief requested in the Motion; and the Bankruptcy Court having found that it has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Plan; and the Bankruptcy Court having considered the statements of counsel on the record of the Hearing and the filings of the parties in connection the Motion; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and upon the record of the Hearing; and it appearing that proper and adequate notice of the Motion has been given and that

---

17   Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

09-50026-mg    Doc 13484-9    Filed 08/14/19    Entered 08/14/19 22:52:28    Exhibit
Exhibit A    Pg 145 of 516

no other or further notice is necessary; and after due deliberation and sufficient cause appearing therefor, it is

**ORDERED** that the Motion is granted as set forth herein; and it is further

**ORDERED** that the Notice Procedures are approved; and it is further

**ORDERED** that notice of the 9019 Motion in accordance with the Notice Procedures will be sufficient and effective notice in satisfaction of federal and state due process requirements and other applicable law to put the parties in interest in these Chapter 11 cases, all Plaintiffs, and others on notice of the 9019 Motion; and it is further

**ORDERED** that, pursuant to Section 6.1(b) of the GUC Trust Agreement, the GUC Trust is authorized to reallocate and use up to $6,000,000 of otherwise distributable assets to satisfy the costs of the Notice Procedures.

**ORDERED** that, no later than two (2) days after the entry of this Order, New GM shall turn over to the Parties the names and addresses of (A) all persons in the United States who, as of July 10, 2009, owned or leased a defective vehicle manufactured by Old GM included in the Recalls; and (B) all Pre-Closing Accident Plaintiffs who have filed a lawsuit against New GM as of the date of this Order;

**ORDERED** that, all responses and objections to the 9019 Motion must be filed and served so as to be received by [ ], 2017 at [ ] (EST); and it is further

**ORDERED** that the hearing on the 9019 Motion shall take place in the Bankruptcy Court on [ ], 2017 at [ ] (EST); and it is further

**ORDERED** that notice of the 9019 Motion as provided herein shall be deemed good and sufficient notice of the 9019 Motion; and it is further

**ORDERED** that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2017
      New York, New York

                                      _____
                                        THE HONORABLE MARTIN GLENN
                                        UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

**(Long Form Notice)**

# EXHIBIT C

**(Short Form Postcard Notice)**

# EXHIBIT D

**(DTC Notice)**

09-50026-mg   Doc 14601-5   Filed 06/16/17   Entered 06/16/17 22:45:38   Exhibit
Exhibit E   Pg 22 of 22

# EXHIBIT E

**(Azari Declaration)**

09-50026-mg    Doc 14061-25    Filed 07/07/17    Entered 09/26/17 23:21:43    Exhibit U
Exhibit A    Pg 1 of 9

# EXHIBIT J

## United States Bankruptcy Court for the Southern District of New York

### NOTICE OF PROPOSED SETTLEMENT AND ORDER

**Current and former owners and lessees of certain General Motors vehicles may have their rights affected by a settlement and proposed order, including the release of claims, and may be entitled to a payment from the settlement.**

*The Bankruptcy Court authorized this Notice. This is not a solicitation from a lawyer.*

**If you are an Affected Person (as defined below), your legal rights may be affected whether you act or do not act.**

**Please Read this Notice Carefully**

This Notice provides information about a proposed settlement (the "Settlement") and related proposed order ("Order") regarding claims in the bankruptcy cases titled *In re Motors Liquidation Company, et al., f/k/a General Motors Corp.*, Bankr. No. 09-50026, pending before Judge Martin Glenn of the United States Bankruptcy Court for the Southern District of New York (the "Old GM Bankruptcy Case") against the Motors Liquidation Company General Unsecured Creditors Trust (the "GUC Trust") by owners and lessees of General Motors Corporation ("Old GM") vehicles. The claims include allegations that consumers overpaid when they bought cars on or before July 10, 2009 with undisclosed defects in ignition switches, side airbags, or power steering that were included in certain National Highway Traffic Safety Administration ("NHTSA") recalls listed below. The claims also include allegations that consumers suffered personal injury or wrongful death based on or arising from an accident involving certain of these vehicles that occurred prior to July 10, 2009. A motion (the "Settlement Motion") seeking entry of the Order has been filed in the Bankruptcy Court, along with the Settlement Agreement, and can be found at the case website at **www._____.com** (the "Settlement Website").

| SUMMARY OF YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **The Settlement Agreement and Order** | • Affected Persons (defined below) can write to the Court about why you do not like the Settlement or the Order. <br><br> • More information about how to object can be found in paragraph __ and at the Settlement Website at **www._____.com**. <br><br> • The Court will hold a hearing on **_____, 2017 at _____** to determine whether to approve the Settlement Agreement and enter the Order. Please note that the date and time of the hearing is subject to change without further notice other than an announcement on the Settlement Website. |

QUESTIONS? VISIT WWW._____.COM

| | |
|---|---|
| **Distributions** | • The Settlement and Order provide Affected Persons with the exclusive benefit of the Settlement Fund (defined below). Procedures for the administration and allocation to Affected Persons of the Settlement Fund, including criteria for Affected Persons to assert a claim against the Settlement Fund and the allocation methodology, will be established, subject to notice and an opportunity for Affected Persons to object. |

## WHAT THIS NOTICE CONTAINS

### {INSERT TOC}

### BASIC INFORMATION

#### 1. What is this Notice and why should I read it?

This Notice is to inform you of the proposed Settlement and Order regarding claims in the Old GM Bankruptcy Case. The Bankruptcy Court has scheduled a hearing on the Settlement Motion on _____, 2017 at __:__ a.m./p.m. in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004-1408, Courtroom 523. Please note that the date of the hearing may be changed without notice, other than an announcement on the Settlement Website. Affected Persons are encouraged to visit www._____.com for future updates.

This Notice explains the terms of the Settlement, the Order, and your legal rights.

#### 2. What are the Settlement and Order about?

In the Old GM Bankruptcy Case, Ignition Switch Plaintiffs[1] and certain Non-Ignition Switch Plaintiffs[2] sought leave to file late proposed class claims against the GUC Trust seeking relief for alleged economic losses related to Old GM's alleged concealment of serious safety defects in ignition switches, side airbags, and power steering. Certain Pre-Closing Accident Plaintiffs[3] have likewise sought leave to file late personal injury and wrongful death claims against the GUC Trust related to Old GM vehicles.

The Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, certain Pre-Closing Accident Plaintiffs (collectively, the "Signatory Plaintiffs"), and the GUC Trust (together with the Signatory Plaintiffs, the "Parties") negotiated the Settlement Agreement to resolve these claims, and to provide a fund to pay for these and other claims that have been or may be

---

[1]   The term "Ignition Switch Plaintiffs" shall mean those plaintiffs asserting economic loss claims who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047.

[2]   The term "Non-Ignition Switch Plaintiffs" shall mean those plaintiffs asserting economic loss claims who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540, 14V-118 and 14V-153.

[3]   The term "Pre-Closing Accident Plaintiffs" shall mean those plaintiffs asserting personal injury or wrongful death claims based on or arising from an accident involving an Old GM vehicle that occurred prior to the closing of the Section 363 Sale.

asserted by other parties against the GUC Trust (which other claims will similarly be resolved by the Order).

The Settlement avoids the risk and cost of a trial, but still provides relief to the Affected Persons. The Signatory Plaintiffs and their attorneys think that the Settlement is in the best interests of Affected Persons and that it is fair, adequate, and reasonable.

### WHO IS INCLUDED IN THE SETTLEMENT AND ORDER?

To see if you are affected by the proposed Settlement or Order, you first have to determine if you are an Affected Person.

**3. How do I know if I am part of the Settlement or Order?  What is the definition of Affected Person?**

If you fall under one of the categories below, you are an Affected Person whose claims against Old GM, the GUC Trust, the GUC Trust's current and previously distributed assets and certain other parties will be waived and released as part of the proposed Order (and in exchange you will be entitled to assert your claims against the Settlement Fund).

A. All persons in the United States who, as of July 10, 2009, owned or leased a vehicle manufactured by Old GM included in the following recalls:

(1) Delta Ignition Switch Vehicles included in Recall No. 14v047: 2005-2010: Chevy Cobalt, 2006-2011 Chevy HHR, 2007-2010 Pontiac G5, 2007-2010 Saturn Sky, 2003-2007 Saturn ION, and 2006-2010 Pontiac Solstice;

(2) Low Torque Ignition Switch Vehicles, which are included in Recall Nos. 14v355, 14v394, and 14v400: 2005-2009:  Buick Lacrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2006-2011 Cadillac DTS, 2006-2011 Buick Lucerne, and 2006-2008 Chevrolet Monte Carlo; 2003-2014 Cadillac CTS and the 2004-2006 Cadillac SRX; and 1997-2005 Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-2004 Oldsmobile Alero;

(3) Other Vehicles with defective ignition switches in Recall Nos. 14V-346, and 14V-540: 2010-2014 Chevrolet Camaro, 2011-2013 Chevrolet Caprice, and 2008-2009 Pontiac G8;

(4) Side Airbag Defect Vehicles included in Recall No. 14v118: 2008-2013 Buick Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn Outlook; and

(5) Power Steering Defect Vehicles included in Recall No. 14v153: 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura.

B.  All persons who have suffered personal injury or wrongful death claims based on or arising from an accident involving an Old GM vehicle that occurred prior to July 10, 2009.

## THE TERMS OF THE SETTLEMENT AGREEMENT AND ORDER

**4.  What would happen to my claim under the proposed Order?**

Under the proposed Order, each Affected Person will be deemed to have waived and released (the "Waiver") any claims that the Affected Person might otherwise directly or indirectly assert against the GUC Trust, the trust administrator of the GUC Trust, the current and previously distributed assets of the GUC Trust, the Motors Liquidation Company Avoidance Action Trust, the holders of beneficial units in the GUC Trust and certain other related parties (the "Released Parties").

If approved by the Bankruptcy Court, the Order will prohibit you from suing or being part of any other lawsuit or claim against the Released Parties that relate to the recalls, the Old GM Bankruptcy Case, or the multi-district litigation pending before Judge Furman in the United States District Court for the Southern District of New York, Case No. 14-md-2543 (JMF) (the "GM MDL"). The Released Parties do NOT include General Motors LLC ("New GM").  The specifics of the Waiver are set out in more detail in the proposed Order, which is posted at **www._____.com**.  The proposed Order describes the Waiver in specific legal terminology. Talk to your own lawyer if you have questions about the Waiver or what it means.

Nothing in the Settlement Agreement is intended to waive any claims against New GM or to be an election of remedies against New GM; nor does the Settlement Agreement or any payments made in connection therewith represent full satisfaction of any claims against Old GM, unless and until such claims are in fact paid in full from every available source; provided, however, that in no event shall any Affected Person be permitted to seek any further payment or compensation from the GUC Trust in respect of their claims or otherwise, other than the Settlement Amount and the Adjustment Shares.  Except as mandated otherwise under applicable law, nothing in the Settlement Agreement shall waive any claims that any Affected Person may have against New GM or constitute an election of remedies by any Affected Person.

**5.  What will I receive if the Bankruptcy Court enters the proposed Order?**

The proposed Order allows Affected Persons to assert claims against a Settlement Fund for administration and potential satisfaction.  The Settlement Fund will consist of the Settlement Amount and may include the Adjustment Shares, as detailed below.  Being defined as an Affected Person does not assure that you will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), or any other consideration contained in the Settlement Fund.  Eligibility and criteria for payment will be approved by the Bankruptcy Court at a later date and will be subject to notice on the Settlement Website and an opportunity to object.

Neither the Settlement Amount nor the Adjustment Shares (nor any distribution thereof to any Affected Person) shall represent full and final satisfaction of any claim that any Affected Person may have against New GM, all of which claims are expressly reserved.

**A.   The Settlement Amount**

In exchange for the Waiver, the GUC Trust will pay $15,000,000 (the "Settlement Amount") to the Settlement Fund, subject to the Order becoming a final order (unless the GUC Trust waives the final order requirement).

### B. The Adjustment Shares

The Amended Master Sale and Purchase Agreement pursuant to which New GM purchased substantially all of the assets of Old GM provides that if the Bankruptcy Court issues an order ("Claims Estimate Order") finding that the estimated aggregate allowed general unsecured claims against the Old GM estate exceeds $35 billion, then New GM must issue additional shares of New GM common stock (the "Adjustment Shares").  If the estimate reaches or exceeds $42 billion, New GM must issue the maximum amount of Adjustment Shares (30 million shares).

As part of the Settlement Agreement, the GUC Trust, following a review of evidence and expert reports provided by the Signatory Plaintiffs, agreed to support entry of a Claims Estimate Order: (i) finding that the allowable amount of Affected Persons' claims against the GUC Trust, when combined with all of the other allowed general unsecured claims against the Old GM bankruptcy estate, equals or exceeds $42 billion, thus triggering the maximum amount of Adjustment Shares (30 million shares); and (ii) directing that the Adjustment Shares, or the value of the Adjustment Shares, be promptly delivered to the Settlement Fund by New GM.

The Parties have sought entry of the Claims Estimate Order as part of the Settlement Motion.  The current value of 30 million shares of New GM common stock is approximately $1.08 billion.  Regardless of whether the Claims Estimate Order is entered, the Order would remain binding, including the Waiver and the payment of the Settlement Amount.

The Bankruptcy Court's estimate of the aggregate allowed claims in the Claims Estimate Order shall not operate as a cap on any of the claims of any of the Affected Persons against New GM.

### C. How will the Settlement Fund be allocated and distributed?

The Settlement Fund is for the exclusive benefit of Affected Persons.  The allocation of the value of the Settlement Fund between the economic-loss claims and the personal injury/wrongful death claims will be done by the lawyers for the Signatory Plaintiffs with the assistance of a court-appointed mediator.  Thereafter, the economic loss lawyer lead counsel and the personal injury lawyer lead counsel will determine the specifics for distribution within each pool, including the criteria for determining eligibility for payment.  Any agreement on the allocation process and the distribution procedure will be described at www._____.com when determined and Affected Persons will be provided with an opportunity to object.

## LEGAL REPRESENTATION

### 6. Do I have a lawyer in this case?

The counsel to the Signatory Plaintiffs, listed below, negotiated the Settlement Agreement and jointly filed the Settlement Motion.  You will not be charged for services performed by this counsel in negotiating the Settlement Agreement. If you want to be represented by your own lawyer, you may hire one at your own expense, but you do not need to have a lawyer to participate in the Settlement or exercise any of your options with respect to the Settlement.

If you want to contact the counsel for the Signatory Plaintiffs, they can be reached by <mark>sending an email to</mark> **info@_____.com** or as follows:

| | |
|---|---|
| Steve W. Berman<br>**HAGENS BERMAN SOBOL SHAPIRO LLP**<br>1918 Eighth Avenue, Suite 3300<br>Seattle, WA 98101<br>Telephone: (206) 623-7292<br>steve@hbsslaw.com<br><br>Elizabeth J. Cabraser<br>**LIEFF CABRASER HEIMANN & BERNSTEIN**<br>275 Battery Street, 29th Floor<br>San Francisco, California 94111<br>Telephone: (414) 956-1000<br>ecabraser@lchb.com<br><br>Co-Lead Counsel for the Economic Loss Plaintiffs in the MDL Court<br><br>Edward S. Weisfelner<br>BROWN RUDNICK LLP<br>BROWN RUDNICK LLP<br>Seven Times Square<br>New York, New York 10036<br>Tel: 212-209-4800<br>eweisfelner@brownrudnick.com<br><br>Sander L. Esserman<br>STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.<br>2323 Bryan Street, Ste 2200<br>Dallas, Texas 75201<br>Tel: 214-969-4900<br>esserman@sbep-law.com<br><br>Designated Counsel for the Economic Loss Plaintiffs in the Bankruptcy Court | Robert C. Hilliard<br>HILLIARD MUNOZ GONZALES LLP<br>719 S Shoreline Blvd., # 500<br>Corpus Christi, TX 78401<br>Telephone: (361) 882-1612<br>bobh@hmglawfirm.com<br><br>Counsel for Certain Pre-Closing Accident Plaintiffs<br><br>Thomas J. Henry, Esq.<br>THE LAW OFFICES OF THOMAS J. HENRY<br>4715 Fredricksburg, Suite 507<br>San Antonio, TX 78229<br><br>Counsel for Certain Pre-Closing Accident Plaintiffs<br><br>William P. Weintraub<br>GOODWIN PROCTER LLP<br>The New York Times Building<br>620 Eighth Avenue<br>New York, New York 10018<br>Tel: 212-813-8800<br>wweintraub@goodwinlaw.com<br><br>Counsel to Those Certain Pre-Closing Accident Plaintiffs Represented By Hilliard Muñoz Gonzales L.L.P. and the Law Offices of Thomas J. Henry |

## 7. How will the lawyers be paid?

Procedures for the payment of attorneys' fees for counsel to the Signatory Plaintiffs from the Settlement Fund will be established, subject to notice and an opportunity for Affected Persons to object.

## OBJECTING TO THE SETTLEMENT OR ORDER

### 8. How do I tell the Court I do not like the Settlement or Order?

If you are an Affected Person, you can object to the proposed Settlement or proposed Order if you don't like it. You can give reasons why you think the Court should not approve any or all of these items, and the Court will consider your views.

To object, you must file your objection with the Court. To be timely, your objection must be filed with the Court by no later than \_\_\_\_ \_\_, **2017 at 4:00 p.m. (Eastern Time)** at the following addresses:

| **The Court** | Judge Martin Glenn |
| --- | --- |
| | United States Bankruptcy Court for the Southern District of New York |
| | One Bowling Green |
| | New York, NY 10004-1408 |
| | Courtroom: 523 |

**NOTE:** You may mail your objection to the Court, but it must be received by the Court and filed by \_\_\_\_ \_\_, **2017, at 4:00 p.m. (Eastern Time)**. See **www._____.com** for more information on how to object to the Settlement.

## THE COURT'S APPROVAL HEARING

### 9. When and where will the Court decide whether to approve the Settlement and issue the Order?

The Court will hold a hearing to decide whether to approve the proposed Settlement and Order. The hearing will be on _____, \_\_, **2017, at \_\_: \_\_.m.** before Judge Martin Glenn, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004-1408, Courtroom 523. Please note that the date of the hearing may be changed without notice other than an announcement on the Settlement Website. Affected Persons are encouraged to visit **www._____.com** for future updates.

At the hearing, the Court will consider whether the proposed Settlement and all of its terms falls within the range of reasonableness required for approval of the Settlement and whether to issue the proposed Order. If there are objections, the Court will consider them. The Court may listen to people who have asked for permission to speak at the hearing and have complied with the other requirements for objections explained in Section __.

At or after the hearing, the Court will decide whether to approve the proposed Settlement and issue the Order. There may be appeals after that. There is no set timeline for either the Court's final approval decision, or for any appeals that may be brought from that decision, so it is impossible to know exactly when and if the Settlement and Order will become final.

The Court may change deadlines listed in this Notice without further notice. To keep up on any changes in the deadlines, please visit **www._____.com**.

### 10. Do I have to go to the hearing?

No. Counsel to the Signatory Plaintiffs will appear at the hearing in support of the Settlement and Order and will answer any questions asked by the Court.

QUESTIONS? VISIT WWW._____.COM

If you send an objection, you don't have to come to Court to talk about it. So long as you filed your written objection on time and complied with the other requirements for a proper objection, the Court will consider it. You may also pay another lawyer to attend, but it's not required.

### 11. May I speak at the hearing?

Yes. If you submitted a proper written objection to the Settlement or Order, you or your lawyer may, at your own expense, come to the hearing and speak.

## GETTING MORE INFORMATION

### 12. How do I get more information about the Settlement and Order?

This Notice summarizes the proposed Settlement and proposed Order. For the precise terms and conditions of the Settlement and Order, please see the Settlement Agreement and proposed Order, available at www._____.com.

| YOU MAY OBTAIN ADDITIONAL INFORMATION BY | |
|---|---|
| **VISITING THE SETTLEMENT WEBSITE** | Please go to www._____.com, where you will find answers to common questions and other detailed information to help you. |
| **REVIEWING LEGAL DOCUMENTS** | You can review the legal documents that have been filed with the Clerk of Court in these cases at: United States Bankruptcy Court for the Southern District of New York<br><br>One Bowling Green<br><br>New York, NY 10004-1408.<br><br>You can access the Court dockets in these cases through the court documents and claims register website at http://www.motorsliquidationdocket.com/ or through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.cand.uscourts.gov. |

**PLEASE DO NOT CALL THE JUDGE OR THE COURT CLERK TO ASK QUESTIONS ABOUT THE LAWSUITS, THE SETTLEMENT, THE PROPOSED ORDER OR THIS NOTICE.**

QUESTIONS? VISIT WWW._____.COM

# **<u>EXHIBIT K</u>**

# If you owned or leased a GM vehicle on or before July 10, 2009 your rights may be affected by a proposed settlement and you may be entitled to a payment

A proposed settlement (the "Settlement") has been reached involving claims of owners and lessees of General Motors Corporation ("Old GM") vehicles. The claims include allegations that consumers overpaid when they bought cars on or before July 10, 2009 with undisclosed defects in ignition switches, side airbags, or power steering included in the following recalls: 14V-047, 4V-355, 14V-394, 14V-400, 14V-346, 14V-540, 14V-118 and 14V-153 (the "Recalls"). The claims also include allegations that consumers suffered personal injury or wrongful death from accidents involving Old GM vehicles that occurred before July 10, 2009. If approved, the Settlement will affect your right to bring your own lawsuit against Old GM about these claims and also will offer payments and other benefits. **The purpose of this notice is to inform you of the proposed Settlement and your legal rights.**

**Who is Included?  General Motors LLC's ("New GM") records indicate that you may be affected by the Settlement.** The Settlement includes all persons in the United States who, as of July 10, 2009, (i) owned or leased a vehicle manufactured by Old GM included in one of the Recalls involving Chevrolet, Pontiac, Saturn, Buick, Cadillac, Oldsmobile and GMC model vehicles; and/or (ii) suffered personal injury or wrongful death in an accident involving an Old GM vehicle. Those included are called an "Affected Person." You can go to the Settlement Website, www.XXXXXXXXXXX.com to confirm if your vehicle is included.

**What are the Settlement Terms?** If the Settlement is approved and the related proposed Settlement Order is entered, each Affected Person will be deemed to provide a waiver and release of any claims they might otherwise directly or indirectly assert against the GUC Trust, the trust administrator of the GUC Trust, the past and present assets of the GUC Trust, the Motors Liquidation Company Avoidance Action Trust and/or the holders of beneficial units in the GUC Trust (collectively, the "Related Parties"). This means that if you have an existing lawsuit against Old GM or the Related Parties that includes the same claims that this Settlement resolves, your lawsuit will end. Also, you will not be able to bring a new lawsuit against Old GM or the Related Parties about these issues in the future. Unless applicable law says otherwise, the Settlement or any payment you may receive under it, does not affect any claim you may have against New GM. In exchange, the GUC Trust will pay $15 million into the Settlement Fund and support entry of an order estimating the aggregate allowed claims against the Old GM bankruptcy estate, including all Affected Persons' claims, at no less than $42 billion (the "Claims Estimate Order").  If the Claims Estimate Order is entered, New GM may be required to issue up to 30 million shares of New GM common stock to the Settlement Fund.  The current value of 30 million shares of New GM common stock is approximately $1.08 billion.  For details about the Settlement, the money that may be available to Affected Persons, your eligibility, how the money will be divided, and the waiver and release of claims, you should visit www.XXXXXXXXXX.com and review the Long Form Notice, Settlement Agreement and the proposed Settlement Order.

**How Can I Get a Payment?** Being defined as an Affected Person does not assure you will receive a distribution from the Settlement Fund.  Overall allocation between economic loss and personal injury plaintiffs will be negotiated by counsel to the Signatory Plaintiffs and approved by the appropriate court.

- 1 -

Eligibility and criteria for payment will be approved by the Court.  The details will be posted on the Settlement Website and you will be given an opportunity to object.

**Your Other Options.**  You can object to the proposed Settlement and the proposed Settlement Order.  The Long Form Notice available on the Settlement Website listed below explains how to object to the Settlement.  The Court will hold a hearing **on _____ __, 2017 at _____[a][p]m** to consider whether to approve the Settlement.  You may appear at the hearing, either yourself or through an attorney hired by you, but you do not have to.  Please note that the date and time of the hearing is subject to change without further notice other than an announcement on the Settlement Website.  For more information, call or visit the Settlement Website below.

**1-8xx-xxx-xxxx**                              **www._____.com**


[On the back of the postcard will be the plaintiff's name and address, and court logo:]

Important Court-Approved Legal Notice from the United States Bankruptcy Court for the Southern District of New York



Plaintiff John Doe
123 45th Street
Anytown, USA. _____

General Motors Bankruptcy Settlement Information

- 2 -

09-50026-mg   Doc 14061-2   Filed 08/16/17   Entered 09/16/17 22:35:51   Exhibit L
Pg 163

# <u>EXHIBIT L</u>

**ALL DEPOSITORIES, NOMINEES, BROKERS AND OTHERS:**
**PLEASE FACILITATE THE TRANSMISSION OF THIS NOTICE**
**TO ALL BENEFICIAL OWNERS.**

**NOTICE**
**TO HOLDERS OF**

**MOTORS LIQUIDATION COMPANY**
**GUC TRUST UNITS (CUSIP NO. 62010U101)**[1]

**August ___, 2017**

Reference is made to (i) the Second Amended Joint Chapter 11 Plan dated as of March 18, 2011 of Motors Liquidation Company and certain of its affiliates, which was confirmed by an order of the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered on March 29, 2011 (as so confirmed, the "Plan") and which became effective on March 31, 2011, and (ii) the Second Amended and Restated Motors Liquidation Company GUC Trust Agreement dated as of July 30, 2015 (the "GUC Trust Agreement").[2] The above-described units representing contingent beneficial interests in the GUC Trust (the "Trust Units") were issued pursuant to the terms of the Plan and the GUC Trust Agreement.  Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

The Plan provides for the establishment of the Motors Liquidation Company GUC Trust (the "GUC Trust") to implement the Plan, including by distributing GUC Trust Distributable Assets (as defined in the GUC Trust Agreement) and resolving outstanding Disputed General Unsecured Claims.

As previously disclosed in the GUC Trust's public reports filed with the U.S. Securities and Exchange Commission, the GUC Trust is involved in litigations (collectively, the "Recall Litigation") concerning purported economic losses, personal injuries and/or death suffered by certain lessees and owners of vehicles (persons who have suffered such losses or injuries, regardless of whether they are currently involved in the Recall Litigation, "Potential Plaintiffs") manufactured by General Motors Corporation prior to its sale of substantially all of its assets to NGMCO, Inc., n/k/a General Motors LLC ("New GM") on July 10, 2009.  Certain of the Potential Plaintiffs have filed lawsuits against New GM, filed motions seeking authority from the Bankruptcy Court to file claims against the GUC Trust, or are members of a putative class covered by those actions.

---

[1] The CUSIP number appearing herein has been included solely for the convenience of the holders of the Trust Units.  Wilmington Trust Company assumes no responsibility for the selection or use of such number and makes no representations as to the correctness of the CUSIP number appearing herein.

[2] Information on the bankruptcy proceedings, including a copy of the Plan, can be found at: http://www.motorsliquidationdocket.com/.   Information can also be found on the website maintained by the trust administrator and trustee of the Motors Liquidation Company GUC Trust at https://www.mlcguctrust.com/.

On August ___, 2017 the GUC Trust announced that it had reached an agreement (the "Proposed Agreement") with certain of the Potential Plaintiffs (the "Signatory Plaintiffs") which, if approved by the Bankruptcy Court, would result in a waiver and release of all claims that are held, or could be held, by all Potential Plaintiffs against the GUC Trust in exchange for (i) a payment by the GUC Trust of $15 million to a settlement fund to be established by the Signatory Plaintiffs (the "Settlement Fund"), and (ii) an agreement by the GUC Trust to support entry of an order (the "Claims Estimate Order") estimating the total claims of the Potential Plaintiffs in an amount that, when combined with all other general unsecured claims that were previously allowed against the GUC Trust, would equal or exceed $42 billion.  If the Proposed Agreement is approved, holders of Trust Units will be deemed to provide a waiver and release of any rights they may have to the Settlement Fund and, if the Claims Estimate Order is entered, any rights they may have to additional shares of New GM common stock issued thereunder.  Based on the current amount of allowed and disputed unsecured claims against Old GM, New GM's obligation to issue these additional shares would not be triggered absent Plaintiffs' claims and the holders of Trust Units would have no expectation to receive these shares.  Counsel to certain holders of 65% of the Trust Units was actively involved in negotiating the Proposed Agreement.

Wilmington Trust Company, as trust administrator and trustee of the GUC Trust (in such capacity, the "GUC Trust Administrator"), hereby informs you that, on August ___, 2017, the GUC Trust filed a joint motion (the "Motion") with the Bankruptcy Court seeking, among other things, approval of the Proposed Agreement and authority to pay $15 million to the Settlement Fund.  A copy of the Motion is available on the website maintained by the GUC Trust: www.mlcguctrust.com.

The Motion is currently scheduled to be heard by the Bankruptcy Court on _____, 2017 at _____ _.m. (Eastern), with an objection deadline of _____, 2017 at ____ _.m. (Eastern).[3]

Wilmington Trust Company has prepared this communication in its capacity as GUC Trust Administrator, based upon information supplied to it without independent investigation.  You should not rely on Wilmington Trust Company as your sole source of information.  Wilmington Trust Company makes no recommendations and gives no investment or legal advice herein, and holders of Trust Units are urged to consult with their own advisors concerning the Trust Units, the Plan and the Motion.

Should any holder of Trust Units have any questions regarding this notice, please contact Wilmington Trust Company as follows:

> Wilmington Trust Company
> Rodney Square North
> 1110 North Market Street
> Wilmington, Delaware, 19890-1615
> Phone No.: (866) 521-0079
> Fax No.: (302) 636-4140

---

[3] Please note the times and dates set forth herein are subject to change without further notice.

Wilmington Trust Company may conclude that a specific response to particular inquiries from individual holders of Trust Units is not consistent with its duties to provide equal and full dissemination to all holders of Trust Units.

Very Truly Yours,

Wilmington Trust Company,
solely in its capacity as GUC Trust Administrator

09-50026-mg    Doc 14120-1    Filed 09/26/17    Entered 09/26/17 23:21:48    Exhibit
Exhibit A    Pg 167 of 516

# EXHIBIT M

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al.*, | : | No. 09-50026 (MG) |
| f/k/a GENERAL MOTORS CORP., *et al.*, | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF CAMERON R. AZARI, ESQ.,
### ON IMPLEMENTATION AND ADEQUACY OF GENERAL
### MOTORS BANKRUPTCY SETTLEMENT NOTICE PROGRAM

I, Cameron R. Azari, Esq., hereby declare and state as follows:

1.      My name is Cameron R. Azari, Esq.  I have personal knowledge of the matters set forth herein, and I believe them to be true and correct.

2.      I am a nationally recognized expert in the field of legal notice and I have served as an expert in dozens of federal and state cases involving class action notice plans.

3.      I am the Director of Legal Notice for Hilsoft Notifications ("Hilsoft"); a firm that specializes in designing, developing, analyzing and implementing large-scale, un-biased, legal notification plans.  Hilsoft is a business unit of Epiq Systems Class Action and Claims Solutions ("ECA").

4.      Hilsoft has been involved with some of the most complex and significant notices and notice programs in recent history.  With experience in more than 300 cases, notices prepared by Hilsoft have appeared in 53 languages with distribution in almost every country, territory and dependency in the world.  Judges, including in published decisions, have recognized and approved numerous notice plans developed by Hilsoft, which decisions have always withstood collateral reviews by other courts and appellate challenges.

## EXPERIENCE RELEVANT TO THIS CASE

5.     I have served as a notice expert and have been recognized and appointed by courts

to design and provide notice in many of the largest and most significant cases, including: *In re*

*Takata Airbag Products Liability Litigation,* Case No. 1:15-md-02599-FAM (Settlements with

Toyota, BMW, Mazda and Subaru) (Comprehensive notice effort in the Takata airbag litigation

with individual mailed notice to over 19.5 million vehicle owners/lessees and nationwide media

campaign including radio, consumer print and online banner advertisements. Final approval

pending); *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices and Product Liability*

*Litigation (Bosch Settlement)*, MDL No. 2672 (N.D. Cal.) (Comprehensive notice program

within the Volkswagen Emissions Litigation that provided individual notice to more than

946,000 vehicle owners via first class mail and to more than 855,000 via email.  A targeted

internet campaign further enhanced the notice effort); *In re: Energy Future Holdings Corp., et.*

*al. (Asbestos Claims Bar Date Notice),* 14-10979 (CSS) (Bankr. D. Del.) (Large asbestos bar

date notice effort, which included individual notice, national consumer publications and

newspapers, hundreds of local newspapers, Spanish newspapers, union labor publications, and

digital media to reach the target audience); *In re: Payment Card Interchange Fee and Merchant*

*Discount Antitrust Litigation*, MDL 1720 (E.D.N.Y.) ($7.2 billion settlement reached with Visa

and MasterCard.  The intensive notice program involved over 19.8 million direct mail notices

together with insertions in over 1,500 newspapers, consumer magazines, national business

publications, trade & specialty publications, and language & ethnic targeted publications, as

well as online banner notices, which generated more than 770 million adult impressions and a

case website in eight languages); *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the*

*Gulf of Mexico, on April 20, 2010*, MDL 2179 (E.D. La.) (Dual landmark settlement notice

programs to separate "Economic and Property Damages" and "Medical Benefits" settlement classes. Notice effort included over 7,900 television spots, over 5,200 radio spots, and over 5,400 print insertions and reached over 95% of Gulf Coast residents); *In Re American Express Anti-Steering Rules Antitrust Litigation (II)* ("Italian Colors"), MDL No. 2221 (E.D.N.Y.) (Momentous injunctive settlement regarding merchant payment card processing. Notice program provided individual notice to more than 3.8 million merchants as well as coverage in national and local business publications, retail trade publications and placement in the largest circulation newspaper in each of the U.S. territories and possessions); and *In Re: Checking Account Overdraft Litigation*, MDL 2036 (S.D. Fla.) (Multiple bank settlements between 2010-2016 involving direct mail and email to millions of class members and publication in relevant local newspapers. Representative banks include Fifth Third Bank, National City Bank, Bank of Oklahoma, Webster Bank, Harris Bank, M & I Bank, Community Bank, PNC Bank, Compass Bank, Commerce Bank, Citizens Bank, Great Western Bank, TD Bank, Bancorp, Whitney Bank, Associated Bank, and Susquehanna Bank).

6.    Numerous other court opinions and comments as to our testimony, and opinions on the adequacy of our notice efforts, are included in Hilsoft's curriculum vitae included as **Attachment 1**.

7.    In forming my expert opinion, I and my staff drew from our in-depth class action case experience, as well as our educational and related work experiences. I am an active member of the Oregon State Bar, receiving my Bachelor of Science from Willamette University and my Juris Doctor from Northwestern School of Law at Lewis and Clark College. I have served as the Director of Legal Notice for Hilsoft since 2008 and have overseen the detailed planning of virtually all of our court-approved notice programs since that time. Prior to

assuming my current role with Hilsoft, I served in a similar role as Director of Epiq Legal Noticing (previously called Huntington Legal Advertising). Overall, I have over 17 years of experience in the design and implementation of legal notification and claims administration programs and have been personally involved in well over one hundred successful notice programs.

8. I have been directly and personally responsible for designing all of the notice planning here for notice to Plaintiffs, including analysis of the individual notice options and the media audience data and determining the most effective mixture of media required to reach the greatest practicable number of included parties. The facts in this declaration are based on what I personally know, as well as information provided to me in the ordinary course of my business by my colleagues at Hilsoft and ECA.

9. I have been involved in reviewing or drafting the various forms of Notice described below. Each form is noticeable and written in plain language.

## OVERVIEW

10. This declaration will describe the Settlement Notice Plan ("Notice Plan" or "Plan") and notices (the "Notice" or "Notices") designed by Hilsoft Notifications and proposed here for providing notice of the Settlement in *In Re: Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.,* Case No. 09-50026 (MG) in the United States Bankruptcy Court for the Southern District of New York to Plaintiffs.

11. Hilsoft has reviewed the lists of vehicles included in the Settlement. For the Notice Plan, data may need to be obtained from HIS Automotive, driven by Polk ("Polk") and New GM. All lists will be combined and de-duplicated in order to find the most likely current address for each Plaintiff. The individual notice effort will be supplemented by a targeted

media campaign.  The media potion of the Notice Plan outlined below is targeted to owners and lessees of the makes and models included in the Settlement.

12.  In my opinion, the proposed Notice Plan is designed to reach the greatest practicable number of Plaintiffs through the use of individual notice and paid and earned media. In my opinion, the Notice Plan is comprehensive, reasonable and satisfies the requirements of due process, including its "desire to actually inform" requirement.[1]

13.  Notice shall be disseminated pursuant to the plan and details set forth below and referred to as the "Notice Plan."  The Notice Plan was designed to provide notice to the following included group of Plaintiffs:

A.  All persons in the United States who, as of July 10, 2009, owned or leased a vehicle manufactured by GM included in the following recalls:

(1) Delta Ignition Switch Vehicles included in Recall No. 14v047: 2005-2010: Chevy Cobalt, 2006-2011 Chevy HHR, 2007-2010 Pontiac G5, 2007-2010 Saturn Sky, 2003-2007 Saturn ION, and 2006-2010 Pontiac Solstice;

(2) Low Torque Ignition Switch Vehicles, which are included in Recall Nos. 14v355, 14v394, and 14v400: 2005-2009:  Buick Lacrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2006-2011 Cadillac DTS, 2006-2011 Buick Lucerne, and 2006-2008 Chevrolet Monte Carlo; 2003-2014 Cadillac CTS and the 2004-2006 Cadillac SRX; and 1997-2005 Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand

---

[1]  "But when notice is a person's due, process which is a mere gesture is not due process.  The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.  The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected . . ."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950).

Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-

2004 Oldsmobile Alero;

(**3**) Other Vehicles with defective ignition switches in Recall Nos. 14V-346 and

14V-540: 2010-2014 Chevrolet Camaro, 2011-2013 Chevrolet Caprice, and 2008-

2009 Pontiac G8;

(**4**) Side Airbag Defect Vehicles included in Recall No. 14v118: 2008-2013 Buick

Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010

Saturn Outlook; and

(**5**) Power Steering Defect Vehicles included in Recall No. 14v153: 2004-2006

and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010

Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6,

2004-2007 Saturn Ion, and 2008-2009 Saturn Aura.

B.   Plaintiffs asserting personal injury or wrongful death claims based on or arising from an

accident involving a vehicle manufactured and sold by Old GM that occurred prior to

July 10, 2009 who have (i) filed a lawsuit against New GM as of the date of the

Settlement Agreement, or (ii) filed or joined a motion for authorization to file late claims

against the GUC Trust.

## NOTICE PLAN

### *Individual Notice – Direct Mail*

14.      A Direct Mail Notice tailored to the potential owners/lessees of the included Old

GM vehicles will be sent via First Class mail.  Address updating (both prior to mailing and on

undeliverable pieces) and re-mailing protocols will meet or exceed those used in other complex

litigation settlements.

15.   I understand that a comprehensive list of potential Plaintiffs exists – consisting of the current and former owners and lessees of the Old GM vehicles included in the Settlement. The database will be acquired from Polk and New GM and, if available, supplemented by other sources.  All data may be de-duplicated and updated in order to find the most likely current address for each current and former vehicle owner/lessee. This data will be used to provide individual notice to virtually all Plaintiffs.

16.   The mailed notice will consist of a large format, 2-image postcard notice (the "Direct Mail Notice") that clearly and concisely summarizes the Settlement.  The Direct Mail Notice will direct the recipients to a website dedicated specifically to the Settlement where they can access additional information and learn about how to participate.  The Direct Mail Notices will be sent by United States Postal Service ("USPS") first class mail.

17.   Prior to mailing, all mailing addresses provided will be checked against the National Change of Address ("NCOA") database maintained by the United States Postal Service ("USPS").[2]  Any addresses that are returned by the NCOA database as invalid will be updated through a third-party address search service.  In addition, the addresses will be certified via the Coding Accuracy Support System ("CASS") to ensure the quality of the zip code, and verified through Delivery Point Validation ("DPV") to verify the accuracy of the addresses. This address updating process is standard for the industry and for the majority of promotional mailings that occur today.

18.   Direct Mail Notices returned as undeliverable will be re-mailed to any new address available through postal service information, for example, to the address provided by the postal

---

[2] The NCOA database contains records of all permanent change of address submissions received by the USPS for the last four years.  The USPS makes this data available to mailing firms and lists submitted to it are automatically updated with any reported move based on a comparison with the person's name and known address.

service on returned pieces for which the automatic forwarding order has expired, but which is still during the period in which the postal service returns the piece with the address indicated, or to better addresses that may be found using a third-party lookup service ("ALLFIND", maintained by LexisNexis).  Upon successfully locating better addresses, Notices will be promptly re-mailed.

19.   Additionally, a Long Form Notice will be mailed to all persons who request one via the toll-free phone number or by mail. The Long Form Notices will also be available for download or printing at the website (in both English and Spanish).  Copies of the proposed Direct Mail Notice and Long Form Notice are included with the materials filed by the Parties.

*Paid Media*

20.   Due to the comprehensive individual notice effort described above only moderate supplemental paid media will be provided for the Settlement.  The media selected is designed to both notify Plaintiffs who may not see the Direct Mail Notice and also to support and remind Plaintiffs to act if they so choose.

21.   The Notice Plan will include digital banner advertisements targeted specifically to owners and lessees of the vehicle makes and models included in the Settlement along with online video advertisements targeted to adults 18+.  The Banner and Video Notice will provide Plaintiffs with additional opportunities to be apprised of the Settlement and their rights under it. Anyone who sees the Banner or Video Notice can click on it and instantly be routed to the Settlement website for detailed information about the Settlement.

22.   The targeted internet campaign will include banner notices measuring 300x250 pixels, 728x90 pixels, and 320x50 pixels purchased through the *Conversant Ad Network*, which represents thousands of digital properties – including inventory on both desktop and mobile

devices – across all major content categories.  Banner notices would be purchased through two hyper-targeted strategies and run for a 45-day period of time.

23.    First, banner notices will be targeted using a "list activation" strategy.  This is accomplished by matching the actual names and physical/email addresses of known Plaintiffs with current consumer profiles.  This strategy ensures individuals receiving direct notice are also provided reminder messaging online via banner ads.

24.    Second, banner notices will be targeted using household-level automotive data.  This information will include purchasers/owners of specific vehicles makes, models, and years to which banner notices will then be served.  While this will be partially duplicative of the first strategy, this group of individuals would also include potential former owners and anyone for which an address is unknown.

25.    The online video advertisements include pre-roll video ads that will be viewable on *YouTube* and other sites with *YouTube* embedded videos. The video ads will appear prior to the viewer's main video. 15-second and 30-second video ads will be purchased and targeted to adults nationwide.

### Internet Sponsored Search Listings

26.    To facilitate locating the case website, sponsored search listings will be acquired on the three most highly-visited internet search engines:  *Google*, *Yahoo!* and *Bing*.  When search engine visitors search on common keyword combinations such as "GM Car Settlement," "General Motors Settlement," or "GM Ignition Settlement," the sponsored search listing will generally be displayed at the top of the page prior to the search results or in the upper right hand column.

27.     The Sponsored Search Listings will be provided to search engine visitors across the United States, and will assist Plaintiffs in finding and accessing the Case Website.

### Informational Release

28.     To build additional reach and extend exposures, a party-neutral Informational Release will be issued to approximately 5,000 general media (print and broadcast) outlets and 5,400 online databases and websites throughout the United States.  The Informational Release will serve a valuable role by providing additional notice exposures beyond that which will be provided by the paid media.  There is no guarantee that any news stories will result, but if they do, potential Plaintiffs will have additional opportunities to learn that their rights are at stake in credible news media, adding to their understanding.  The Informational Release will include the toll free number and Case Website address.

### Case Website, Toll-free Telephone Number and Postal Mailing Address

29.     A dedicated website will be created for the Settlement.  Plaintiffs will be able to obtain detailed information about the case and review documents including the Long Form Notices (in English and Spanish), Settlement Agreement, Settlement Order, and answers to frequently asked questions (FAQs) and any other documents the Court may require.  Once the allocation plan is determined it will be posted prominently on the Settlement Website.  If Plaintiffs will need to file a claim, the website may be configured to allow filing online.  Any claim forms would also be available to download and print for filing via mail.

30.     The Case Website address will be displayed prominently on all notice documents. The Banner Notices will link directly to the Case Website.

31.     A toll-free phone number will be established to allow Plaintiffs to call for additional information, listen to answers to FAQs and request that a Long Form Notice be

mailed to them.  Live operators will be available as needed.  The toll-free number will be prominently displayed in the Notice documents as appropriate.

32.    A post office box will also be used for the Settlement, allowing Plaintiffs to contact the claims administrator by mail with any specific requests or questions.

## **PLAIN LANGUAGE NOTICE DESIGN**

33.    The proposed Notices are designed to be "noticed," reviewed, and—by presenting the information in plain language—understood by Plaintiffs.  The Notices contain substantial, albeit easy-to-read, summaries of all of the key information about Plaintiffs' rights and options to encourage readership and comprehension.

34.    The Direct Mail Notice features a prominent headline and is clearly identified as a notice from the Bankruptcy Court.  It includes a color logo from the Court to add credibility to the notice.  The postcard is printed in a larger 8 by 5.5 inch size on heavier postcard stock.  These design elements alert recipients and readers that the Notice is an important document authorized by a court and that the content may affect them, thereby supplying reasons to read the Notice.

35.    The Long Form Notices provide substantial information to Plaintiffs.  It begins with a summary section, which provides a concise overview of important information about the Settlements.  A table of contents, categorized into logical sections, helps to organize the information, while a question and answer format makes it easy to find answers to common questions by breaking the information into simple headings.

36.    The Direct Mail Notices and the Long Form Notices will be available in English and Spanish at the website.

## CONCLUSION

37.    In complex litigation notice planning, execution, and analysis, we are guided by due process considerations under the United States Constitution, by federal and local rules and statutes, and further by case law pertaining to notice.  In this matter we are operating under Federal Rules of Bankruptcy Procedure 2002 and 9008.  The general premise set forth in Rule 2002 is that notice must be provided by mail.  We are in full compliance with that here.  The supplemental media plan is in compliance with Rule 9008.

38.    The Notice Plan described above is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action."[3] The Notice Plan schedule will afford enough time to provide full and proper notice to Plaintiffs before the objection deadline.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 14th, 2017.

Cameron R. Azari, Esq.

© 2017 Hilsoft Notifications

---

[3] *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950).

# <u>EXHIBIT N</u>

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   IN RE:  GENERAL MOTORS LLC
     IGNITION SWITCH LITIGATION,
 4
                                      14 MD 2543 (JMF)
 5

 6   ------------------------------x
                                      New York, N.Y.
 7                                    August 11, 2017
                                      9:00 a.m.
 8
     Before:
 9
                      HON. JESSE M. FURMAN,
10
                                      District Judge
11
                        APPEARANCES
12

13   LIEFF CABRASER HEIMANN AND BERNSTEIN LLP
     BY:  ELIZABETH JOAN CABRASER
14             -AND-
     HAGENS BERMAN SOBOL SHAPIRO LLP (SEATTLE)
15   BY:  STEVE W. BERMAN
               -AND-
16   HILLIARD MUNOZ GONZALES LLP
     BY:  ROBERT HILLIARD
17             -AND-
     BROWN RUDNICK
18   BY:  HOWARD STEEL
          Attorneys for Plaintiffs
19
     KIRKLAND & ELLIS LLP
20   BY:  RICHARD CARTIER GODFREY
          ROBERT C. BROCK
21        ANDREW B. BLOOMER
          ALLAN PIXTON
22             -AND-
     KING & SPALDING
23   BY:  ARTHUR J. STEINBERG
          Attorneys for Defendant General Motors L.L.C.
24

25
```

```
 1                 THE COURT:  Good morning.  We are here in the GM MDL
 2     matter.
 3                 Counsel, why don't you just state your names for the
 4     record.
 5                 MS. CABRASER:  Good morning, your Honor.  Elizabeth
 6     Cabraser for plaintiffs.
 7                 MR. BERMAN:  Good morning, your Honor.  Steve Berman
 8     for plaintiffs.
 9                 MR. HILLIARD:  Good morning, Judge.  Bob Hilliard for
10     plaintiffs.
11                 MR. BERMAN:  Your Honor, we also have at our table our
12     bankruptcy counsel on the economic loss side, Mr. Steel, Howard
13     Steel.
14                 MR. STEEL:  Good morning, your Honor.
15                 THE COURT:  Good morning.
16                 MR. GODFREY:  Good morning, your Honor.  Rick Godfrey
17     from New GM.  We also have New GM's bankruptcy counsel with us,
18     Arthur Steinberg; my colleague, Mr. Bloomer; Mr. Brock; and
19     Mr. Pixton, who once again is at the front table, your Honor.
20                 THE COURT:  Thanks for being here earlier than our
21     usual start time.  I think Ms. Kumara may have told you I need
22     to get out of here pretty promptly today.  I have a medical
23     situation I need to attend to.  As you can see, Ms. Smallman is
24     out.  So Ms. Kumara is out front.  Just a reminder to speak
25     into the microphones loud and clear, and we will proceed with
```

1    the agenda.

2          I don't know if the presence of bankruptcy counsel

3    suggests that there is more to discuss on the bankruptcy front

4    than I thought there might be.  You're getting me nervous.

5    Let's start with the bankruptcy proceedings.

6          The letters I received from both parties suggested

7    that there wasn't much to talk about with respect to the

8    July 12 bankruptcy ruling at this point, that there may be down

9    the road.  I don't know if that's changed or what have you.

10          I confess I don't quite have a full grasp of what the

11    implications of that ruling are for the cases that are pending

12    before me, but I assume that will sort of flush itself out over

13    time.

14          I am curious what remains to be litigated in the

15    bankruptcy Court.  I think all but the late claims issue have

16    been resolved, at least of the threshold issues, but the word

17    "threshold" suggests that there is more to be done there, and

18    I'm sure there is.  So I would love some sense of that.

19          The last question is the letters, including the agenda

20    letter, have noted any number of appeals that have been filed

21    from the bankruptcy court's rulings, and I didn't know where

22    those appeals were filed or headed, which is another way of

23    saying I don't know if they're coming to me or if I should be

24    on the look out for them.  I'm not eager to get more work on my

25    plate.  I have enough from you guys, but that being said, I

1    don't know if there is something that I should be on the look

2    out for.

3           So I guess that's all just by way of saying if

4    somebody can help me out and help me understand what's going on

5    and what I should be expecting, that would be helpful.  I don't

6    know if Mr. Steel or Mr. Steinberg are the right folks or

7    counsel here.  Make sure you get a microphone though, please.

8           MR. STEEL:  Good morning, your Honor.  Howard Steel of

9    Brown Rudnick.

10          With respect to the 2016 threshold issues, Judge Glenn

11   has issued opinions on all of the 2016 threshold issues.

12          THE COURT:  Other than the late claims issue.

13          MR. STEEL:  Other than the late claims issue.  I'll

14   address that in a second.

15          There have been numerous appeals of the 2016 threshold

16   issue opinions.  Lead counsel for the economic loss plaintiffs,

17   personal injury plaintiffs, and certain other plaintiffs have

18   filed notices of appeal.  General Motors has also filed a

19   notice of appeal.  Those recently statements of issue on appeal

20   and designation of records have been filed.

21          THE COURT:  In what court?

22          MR. STEEL:  In the bankruptcy court.

23          THE COURT:  Where is the appeal being taken?  In this

24   court, or is it the Second Circuit?

25          MR. STEEL:  To the district court.  Certain plaintiffs

```
 1   have filed related case statements seeking to have it heard

 2   with your Honor.

 3            THE COURT:  When did that happen?  I haven't seen

 4   those.

 5            MR. STEEL:  They were filed within the last week.  We

 6   can send copies if your Honor desires.

 7            THE COURT:  That would probably be helpful, if only

 8   because it would alert me to what the docket numbers of those

 9   appeals are, I would think.

10            Do they have docket numbers in this court yet?

11            MR. STEEL:  I'm not aware that any of them have docket

12   numbers yet.

13            THE COURT:  I think better to have the information

14   than not, and I can then look into where those things are if

15   they were supposed to come to me, but I have not yet seen them.

16            So how many of those are we looking at?

17            MR. STEEL:  I'm looking at Mr. Steinberg.  I think

18   there are four or five.

19            MR. STEINBERG:  Good morning, your Honor.  Arthur

20   Steinberg.

21            The paperwork for the designation of record and

22   statement of issues was filed two days ago.  So the paperwork

23   itself hasn't gone from the clerk of the bankruptcy court up to

24   the district court yet.

25            The appeals that were filed by the plaintiffs' side
```

1    were with regard to the July 12, 2017, order entered by the

2    bankruptcy court.  New GM appealed a June order of the court

3    and a separate July order of the court.

4              THE COURT:  The June order was the Pitterman?

5              MR. STEINBERG:  The Pitterman.  Correct, your Honor.

6    The cover sheets that we filed -- I don't know what the

7    plaintiffs are, but I assume the same -- said the two appeals

8    that were filed are connected with each other, should be heard

9    by the same judge, and we referenced those appeals as being

10   related to the MDL.

11             So we would expect it ultimately to come to

12   your Honor, but the paperwork hasn't emerged from the

13   bankruptcy court to the district court yet.

14             THE COURT:  So it doesn't sound like it should yet be

15   on my radar or that I should have received the related case

16   statements, but I will be on the lookout for them.  If you

17   could send them to chambers just so I can have whatever

18   information I can have, that would be helpful.

19             MR. GODFREY:  Your Honor, would you prefer a letter,

20   just a cover letter, with the basic information on this from

21   both parties?  We can do that, if that would be helpful to the

22   Court.

23             THE COURT:  Sure.  Why don't you do that.  On the one

24   hand, the sooner the better.  On the other hand, it doesn't

25   need to be filed today.  I won't give you a deadline, but the

1  sooner the better.

2  Very good.  Anything else to say on that front?

3  MR. STEEL:  Nothing right now, your Honor.

4  THE COURT:  I'm mindful that I already have a few

5  bankruptcy appeals to resolve relating to this, and they are on

6  my to-do list.  So I guess that list just got longer.

7  The next items are coordination of related actions,

8  document production, and deposition updates.

9  Is there anything to discuss on those three?

10  MR. GODFREY:  Just one point, your Honor.  Just a note

11  for the Court.  The last time we were here in July, I had noted

12  that the Orange County trial was set to start on August 14,

13  which is this coming Monday.  That has been continued at the

14  request of the parties until October 23.

15  I want to make sure the Court was aware of that since

16  I had alerted the Court that there was a possibility of some

17  issues coming up that the Court might be interested in, but

18  that's two months down the road now.  So nothing to worry about

19  at the current time.

20  THE COURT:  Thank you.  I saw that in the July 31

21  related case update.  That timing is better for my purposes,

22  since I'll be in the country at that time preparing for the

23  next trial here.  Good to know.

24  Let's turn then to what may be the biggest ticket item

25  today, which is the economic loss motion practice and

1    discovery-related issues.  I don't know if intervening events,

2    that is, between your letters and today, have changed anything

3    as far as you're concerned, the big intervening event being my

4    granting of the motion for reconsideration that was filed by

5    plaintiffs.

6         Let me give you my thoughts, unless you have anything

7    you need to add before I give you my thoughts.  Good.

8         So first let me start with the areas of agreement.  It

9    seems like you're in agreement that discovery should not

10   proceed at this time with respect to the FACC plaintiffs whose

11   claims have been dismissed, and I'm in agreement with that as

12   well.

13        Second, on the issue of summary judgment motions, I

14   want to understand a little better what the proposal and idea

15   here is.  As I understand it, New GM is proposing to file a

16   summary judgment motion sooner rather than later but limited to

17   the issue of benefit of the bargain damages.  The idea would be

18   to bring a summary judgment motion on all other issues down the

19   road as to some or all states depending on my resolution of

20   that.

21        Mr. Godfrey is nodding his head.

22        MR. GODFREY:  Yes, your Honor.  The centrality of the

23   plaintiffs' case has shifted to the major contours of elements

24   of the benefit of the bargain.  That is a discreet legal issue

25   that the Court's guidance and ruling on will materially

1    expedite and define the case going forward, including whether

2    there can possibly be a class.

3            We have views on what "benefit of bargain" means in

4    various states.  I'm sure the plaintiffs would disagree with

5    some of those views, maybe all of them.  The Court will have to

6    decide that.

7            That issue, given the allegations with respect to the

8    16 states that the Court has already ruled upon, has become a

9    central question, the contours and outcome of which will be

10   very significant in terms of a class briefing.

11           We think it's helpful for the Court, indeed necessary

12   for the Court, to have a firm understanding of the differences

13   in state law, what the state law provides and doesn't provide,

14   and the meaning of that catch phrase "benefit of the bargain"

15   before we embark upon the class certification because it will

16   dictate, in many respects, how the Court views certain of the

17   class issues.

18           THE COURT:  I put a lot of trust in you guys in

19   determining how to proceed and what makes sense and doesn't.

20   So I'm inclined to accept the proposal.

21           I've written something in the neighborhood of 240

22   pages on the laws of 16 states already and addressed the issues

23   of benefit of the bargain.  I don't know what evidence has come

24   to light in discovery that would have meaning for you to sort

25   of shed light on this issue in a summary judgment motion or

1   what the story is.

2          This is partially because I'm, in general, not a fan

3   of piecemeal motion practice.  I obviously have made some

4   exceptions here for reasons of practicality and otherwise.

5          The idea of having a substantial motion this fall

6   followed by another one at some point down the line isn't

7   particularly attractive to me.  So I'm just trying to get a

8   better sense of what light could be shed that would be helpful

9   in terms of the class certification or settlement or otherwise.

10         MR. GODFREY:  We thought hard about this before

11  proposing it.  So this was not a late-night thought to burden

12  the Court.  The Court has accepted the notion advanced by

13  plaintiffs that they have benefit of the bargain, that they can

14  make a claim for benefit of the bargain damages.  The question

15  then becomes what is the nature and element of that definition.

16  What is benefit of the bargain damages.  What is the type of

17  evidence.

18         From the depositions, we think that the plaintiffs,

19  the representative plaintiffs, don't have it, but we also think

20  that it would be very illusory for the Court to understand

21  precisely what benefit of the bargain means and does not mean

22  as compared to the label that has thus far been applied.

23         This is similar to what happens in a lot of mass tort

24  cases where the Court will identify, for example, a particular

25  causation issue and have a separate summary judgment tract on

1    that particular issue because it can materially advance or

2    materially inform the parties.  So it's very analogous to what

3    is quite common in MDLs involving mass torts of a different

4    type.

5         So, from our perspective, we know what the deposition

6    discovery has shown.  We believe we know what the law is.  The

7    Court may or may not agree with us on that.  We think that the

8    law and the plaintiffs' claims do not mesh, but we also think

9    there are some overarching principles that if the Court agrees

10   with us, that means certain things for class certification.

11        If the Court disagrees with us, it will mean different

12   things for class certification.  It may be equally helpful from

13   our perspective, but we don't know until the Court actually

14   rules.

15        Otherwise, we are briefing class certification where

16   there is a central theory of recovery and a central theory of

17   measurement of the damages which is undefined for the Court and

18   undefined by the contours of the record thus far.

19        Therefore, we've analogized this to a classic

20   causation issue in certain types of mass tort, particularly Big

21   Pharma cases, for example.

22        THE COURT:  Do you anticipate that it would need to

23   engage in a state-by-state analysis of each of the 16 states?

24   Or could this be done at a level of generality that doesn't

25   require that?  Or is this some sort of grouping that could be

1    done where the parties, perhaps even in advance, agree to

2    different approaches to this and put the states in each of

3    those buckets?

4             MR. GODFREY:  We have not discussed this with the

5    plaintiffs, at least I haven't.  Maybe Mr. Bloomer has.  Our

6    contemplation was an omnibus motion but with the law from the

7    16 states that your Honor has addressed.

8             I don't think it will be materially different for

9    certain other states.  I didn't want to complicate this more

10   than it might otherwise be.  So it was an omnibus motion.

11            If there were particular state differences, we would

12   draw those out individually.  But from our reading of the law,

13   we think that there are common elements that will drive the

14   decision-making analysis of the Court that are overarching for

15   the 16 states on this particular issue.

16            There may be some differences.  As to those, we would

17   brief those separately with a subset.  So it is somewhat akin

18   to -- I hate to say this because we lost this motion, but it's

19   somewhat akin to the consequential damages issue where we had

20   an omnibus motion, and then we had as a fallback where there

21   were some individual state differences, and the Court did not

22   agree with us on the omnibus motion up until now but then gave

23   us the Court's views in terms of what to look for in individual

24   states, which was very, very helpful.

25            So that is how we envisioned it.  We did not envision

1   that we would have a brief that says the law of Alabama is X.

2   The law of New York is Y.  The law of Missouri is Z.

3          We envisioned it as here are the principles that the

4   courts follow when applying all of the states, and if there is

5   a difference in a particular state, then we would identify that

6   that says this particular state has the following additional

7   two elements or the following element to the claim.

8          So, from our perspective, we, frankly, focused on this

9   in connection with another case we're involved in where we were

10  discussing an overarching causation issue.  We thought we have

11  the same issue here, but it's on benefit of the bargain

12  damages.

13         Mr. Bloomer and I had a case on this years ago on a

14  damages issue similarly where we focused on the damages

15  question, and it became the determinative factor in the court's

16  analysis on class certification.

17         THE COURT:  Let me hear from someone at the front

18  table.

19         Mr. Berman, is that you?

20         MR. BERMAN:  That's me, your Honor.

21         THE COURT:  Just get a microphone, if you can.

22         MR. BERMAN:  You said you were relying on the wisdom

23  of the parties in coming up with this procedure.

24         THE COURT:  I get the sense it's more the parties at

25  the back table in this instance.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    MR. BERMAN:  Exactly.  I've heard Mr. Godfrey and

2    Mr. Bloomer explain it.  I still don't understand exactly the

3    basis of the motion because you've already ruled in certain

4    states that benefit of the bargain damages are permissible.

5         Having said that, we didn't see a mechanism over the

6    rules where we can stop GM from moving for summary judgment at

7    any time they want to.  They apparently want to do it now.

8         So, unless the Court stops them and says, I only want

9    to do summary judgments once, not piecemeal, which is what

10   they're proposing, then we went along with the schedule with

11   the caveat that -- New GM seems to think that they've got this

12   magic bullet, but they want until December to file the brief.

13   If they've got the magic bullet and they've thought it out,

14   let's get it on the table like next week or something way

15   sooner than December.

16        THE COURT:  I hear you that it's coming more from the

17   back table than yours, and I certainly do think I have the

18   authority to say we're only going to have one round of summary

19   judgment briefing here and it won't be until X.

20        I will adopt the proposal and allow New GM to file its

21   motion on this front.  I'll adjust the scheduling in a few

22   minutes when we turn to issues where you don't agree, but

23   you'll find that I'm a little more in agreement with the

24   plaintiffs on that front, that we should get things moving more

25   quickly than New GM proposed.

1          The last point of agreement is that you will meet and

2    confer regarding essentially application of my two prior motion

3    to dismiss opinions to the 35 remaining states in an effort to

4    hopefully obviate the need for further motion practice, and

5    perhaps you could essentially resolve how the motions or the

6    decisions apply to those states.

7          I think that's optimistic.  I imagine there will be

8    some points of disagreement, but as I understand it, you'll

9    meet and confer by December 1 and submit something to me,

10    either an agreed-upon proposal or some sort of competing

11    proposals, by December 15.

12          So I'll look for that.  That's fine with me.  I would

13    just ask you to please confer in good faith and to be

14    reasonable.  In my experience, as you've probably seen, I think

15    in most of these jurisdictions you can find an outlier case or

16    two that say the opposite of what the weight of authority in

17    that state seems to say.

18          In that regard, I think in almost every one of these

19    issues in every one of these states, there is authority that

20    both parties can hang their hats on.

21          As you've seen, I tend to go with the majority

22    approach or the weight of the authority.  So I guess I'm just

23    saying that recognizing that you can probably make an

24    argument -- you're good lawyers.  You can make an argument for

25    anything.

1     Just pick your battles, and hopefully we can minimize

2   the amount of briefing that we need to do on the remaining 35

3   states, but obviously we'll see where that goes.

4     Now let's turn to the issues upon which you don't

5   agree.  First is the one that Mr. Berman referred to a moment

6   ago, which is the briefing schedule for this first summary

7   judgment motion.

8     As I understand it, Mr. Berman mentioned a December

9   date.  As I understood it, the competing proposals at this

10  point were only separated by two weeks, namely September 29 and

11  October 13.  Mr. Bloomer is nodding his head.  So I'm assuming

12  that's correct.

13    My proposal is to sort of split the difference and

14  take a little bit of time away so that it is still fully

15  submitted by the time that the plaintiffs have proposed.

16    On my proposal, I would have the motion due by

17  October 6, any opposition due by October 30, and then any reply

18  due by November 10, which is the date that the plaintiffs have

19  proposed.  I think that may be a court holiday, but I think I

20  would still have it due on that date notwithstanding that since

21  you can file on ECF.

22    That splits the difference and gives New GM an extra

23  week.  On the other hand, it gets the motion fully submitted by

24  the date the plaintiffs have proposed.

25    Any objections?

1      MR. GODFREY:  We're okay with that, your Honor.  Thank

2  you.

3      MR. BERMAN:  I guess my only concern is New GM has

4  been preparing this for quite a while, and it's August.  So

5  you're giving them another 45 days to get it ready.  You're

6  giving us 24 days to respond.  Maybe give us an extra week.

7      THE COURT:  I was trying to --

8      MR. BERMAN:  I hear you.

9      THE COURT:  -- give you something that you were asking

10  for.  On your proposal, they would have had until the end of

11  September anyway.  So it's only seven days beyond what you have

12  contemplated.

13      MR. BERMAN:  So how about if we get an three extra

14  days?

15      THE COURT:  So you would get until November 2?

16      MR. BERMAN:  Correct.

17      THE COURT:  That's fine with me.  We'll leave the

18  reply deadline as November 10, but I'll give plaintiffs until

19  November 2, which I think is the date we're starting the

20  Doddson trial, to file their opposition.

21      The second issue is the question of proposed

22  amendments to the 4th amended consolidated complaint.  I think

23  one of the biggest issues you're going to have to address is

24  what to call the next complaint because fifth starts with the

25  same letter as fourth.  I don't know if you have any thoughts

1  on that.  We've been pondering that.

2         MS. CABRASER:  Maybe the best amended consolidated

3  complaint.

4         THE COURT:  Or maybe the last.

5         MS. CABRASER:  That would be the lack, and we would

6  not want them to be characterized as lacking anything.

7         THE COURT:  Understood.  You can ponder what to call

8  it between now and then.

9         Let me tell you my thoughts on this.  I have to say

10  that I share New GM's skepticism about the appropriateness of

11  the proposed amendments, that is to say, I think the plaintiffs

12  have a bit of an uphill fight to show that there is good cause,

13  which I think is the relevant standard here.

14         Having said that, I don't see how I can categorically

15  preclude the amount based on the current record and the

16  parties' letters.  New GM's arguments against allowing the

17  amendment -- this is on page 7 of its letter, which is docket

18  number 4338 -- are really fact dependent based on who knew what

19  and when.

20         I don't know the answers to those questions, and I

21  also imagine that the answers might differ as to some of the,

22  say, proposed new plaintiffs versus others.  So I don't really

23  see how I can categorically preclude an amendment.

24         I think what may make more sense -- as you have heard,

25  I'm not eager to invite more motion practice, but I think what

1    would make more sense would be to have the plaintiffs file

2    their proposed amended complaint with essentially a motion for

3    leave to amend, and we can then adjudicate it based on what the

4    actual concrete proposals are and what showing they can make as

5    to the proposed changes.

6         So that's a little different than I think either side

7    had contemplated.  Maybe not.  The plaintiffs essentially made

8    that argument in their letter but didn't exactly frame it as a

9    motion for leave to amend.  It was more just a yes or no.  I

10   guess what I'm saying is I don't see how I can say yes or no

11   without knowing more.

12        Mr. Bloomer, it looks like you want to say something.

13        MR. BLOOMER:  Thank you, your Honor.  Andrew Bloomer

14   on behalf of New GM.

15        If the Court grants leave to amend and then there is

16   motion practice on that, I take it that the motion practice

17   would encompass either the proprietary of adding the new

18   plaintiffs and/or why their claims should be dismissed on the

19   merits, which is what I think the plaintiffs had in their

20   proposed schedule.

21        We objected to the addition of the plaintiffs but said

22   regardless, since you're filling slots that have already been

23   briefed, we want to reserve our client's right to move to

24   dismiss them on the merits, and I just want to understand the

25   scope of what would be contemplated in opposing a motion for

 1   leave to amend.

 2          THE COURT:  I hadn't really thought it all through.  I

 3   think you raise an interesting question.  I was thinking that,

 4   yes.  We would adjudicate the question of amendment, and then

 5   certainly you would have an opportunity to make your

 6   12(b)(6)-type arguments with respect to any new plaintiffs.  I

 7   don't know if there are new claims, but I think it's more new

 8   plaintiffs than anything else.

 9          Having said that, what your comment points to is maybe

10   these two things can and should be consolidated.  Obviously

11   futility is a factor in the leave-to-amend analysis.  In that

12   regard, the 12(b)(6) arguments can be made in the context of

13   the leave-to-amend process, the only difference being really

14   who files the opening brief.

15          In the normal case, of course, in a motion for leave

16   to amend, the plaintiff would essentially file the opening

17   brief and say why the amendment is not futile, and then you

18   would have an opportunity to make your 12(b)(6) arguments in

19   opposing, and then they would have the reply, as opposed to I

20   think the way you guys had sort of proposed doing it, there

21   would be an amendment followed by 12(b)(6) practice where GM

22   would be the moving party and file the reply.

23          So I don't have a strong view either way, except that

24   the most efficient way we can do this and the faster we can get

25   it resolved I would think the better, particularly if we have a

1    summary judgment motion coming down the pike.

2           MS. CABRASER:  Your Honor, we hadn't thought of that

3    specifically, but we think that makes sense.  Certainly it

4    would be more efficient to combine those arguments.

5           We would be providing the plaintiffs' FACC sheets for

6    the additional plaintiffs.  There are ten or less of those.  So

7    the information would be in the proposed amended complaint.

8    The FACC sheet would be there.  We would be making our

9    arguments in our motion to amend opening brief.

10          As you know, futility is an argument against

11   amendment.  So this would really be any attack on this pleading

12   in terms of what is new or different in it, and then once we're

13   past that, we either have the amended complaint in whole or in

14   part or we don't, and we move on.

15          THE COURT:  Mr. Bloomer.

16          MR. BLOOMER:  I think both parties are trying to

17   figure out a way, your Honor, to try to streamline the

18   proceedings without kind of sacrificing rights, at least

19   certainly from our perspective, our right to move to dismiss.

20          If the plaintiffs want to move for leave to amend and

21   we raise an opposition that addresses both the leave and the

22   12(b)(6)-type arguments, to the extent we have them, I think we

23   can accept that.  I realize they'd get a reply.  I think,

24   depending on what happens, we may want to seek leave for a

25   surreply just to kind of --

1    THE COURT:  Get the last word?

2    MR. BLOOMER:  Get the last word and keep in line with

3  traditional motion practice on 12(b)(6).

4    THE COURT:  I think we can probably wait and see if

5  that proves to be necessary.  I think this is probably the way

6  to go, just thinking out loud.  I think it probably means

7  getting these things resolved even faster than you guys have

8  proposed in your competing schedules.  So why don't we plan on

9  proceeding that way.

10    I have been, I think, fairly reasonable, more than

11  aggressive, in granting requests to file surreplies because I

12  have generally trusted you guys and your assessment that that

13  is appropriate and necessary.  So, if you think it is here, you

14  can make an application, and I will consider it in the normal

15  course.

16    I'll leave it to you to propose deadlines for that.  I

17  think if plaintiffs can still file the proposed amendments by

18  August 25, that would be great.  If they weren't contemplating

19  doing that with a motion -- that may be ambitious, particularly

20  if we're now essentially consolidating the sort of contemplated

21  12(b)(6) motion practice with a motion for leave to amend.  It

22  may be that we can still push that deadline back a bit and have

23  that resolved quickly, if not more quickly than contemplated in

24  your proposed schedules.

25    So can I leave it to you to confer and come up with a

1    proposed schedule?

2              MS. CABRASER:  Yes, your Honor.  We'll confer on that,

3    and we'll come up with a schedule.  It will be somewhat later

4    than the August date, but I think it will end up being more

5    expeditious.

6              THE COURT:  Great.  I trust that you will, again, be

7    reasonable and proceed in good faith on the question of

8    futility and that you're not going to make arguments that

9    really amount to reconsideration of a decision that I've made

10   in the first two motions that I've resolved, which is another

11   way of saying that you can reserve your rights and the relevant

12   footnotes as you regularly do, but I don't expect to see

13   arguments that are really taking issue with rulings I've made.

14             It's one thing to make new arguments based on the

15   specific allegations concerning those plaintiffs.  It's another

16   thing to reargue points that as far as I'm concerned, are

17   settled.  So I trust that you will hear me loud and clear on

18   that front and not seek to re-litigate issues that I've already

19   decided.

20             So I'll look for your proposal on that.  If you can

21   incorporate it into the proposed order memorializing what we're

22   doing here today, great.  If you need additional time, that's

23   fine as well as far as I'm concerned, but I'll leave it to you

24   and trust that you'll submit it to me as soon as you can.

25             That leaves the bigger issue of sort of the structure

 1  of future motion practice.  I did, number one, review other

 2  MDLs and some of the decisions cited in your letters, I think

 3  more plaintiffs' letter than New GM's letter, but I did review

 4  other MDLs and spoke to other MDL judges to get a sense of

 5  their experiences in these matters.

 6       The bottom line is I do not intend to proceed in the

 7  manner that New GM is proposing, that is to say, as I

 8  understand it, briefing summary judgment and class

 9  certification as to all 51 sates and D.C.

10       As I indicated before, I'm not a big fan of piecemeal

11  motion practice, but I think adopting that approach would

12  really involve a significant delay before we even got to motion

13  practice because of the need for discovery.

14       GM has made clear that it would take the position that

15  it's entitled to take discovery of every plaintiff in every

16  state that is subject to motion practice.  I think it would be

17  a while before we even got to motions.  Frankly, what those

18  motions would look like and what a ruling would require from me

19  are things that I shudder to think about.

20       I think it makes a lot more sense, as I think I had

21  intimated at the July conference, to adopt some sort of

22  bellwether-type approach along the lines of what I think I

23  suggested last month and what the plaintiffs have proposed, and

24  that does seem to be the way that, if not most other MDLs of

25  this sort facing similar issues have proceeded, but certainly

1   the way that many have with some success.

2        I think that a decision on essentially some number of

3   the states that I have already addressed on the motions to

4   dismiss would help inform the settlement discussions that I

5   assume are either ongoing or would be ongoing.  In any event, I

6   think it's likely that we would be able to apply those

7   decisions in some streamlined fashion to other states down the

8   road.

9        So that's a long way of saying that I agree with the

10  plaintiffs that some sort of bellwether approach is warranted

11  here, which raises the question of sort of how to choose the

12  bellwether states, if I can call them that.  I include D.C. as

13  a state, even though as every resident of D.C. would tell you,

14  it is certainly not a state.

15       I am inclined to pick two to be agreed upon jointly by

16  you, and I hope that you could agree jointly of the 16 that I

17  have addressed sort of the two that would make the most sense,

18  either from the perspective that the most plaintiffs are in

19  those or they're most representative of the 51 states or at

20  least the 16 states that I've resolved.

21       I just think that given the amount of briefing and the

22  decisions you already have from me, that you guys could

23  actually agree upon that.  If you can't, I'm inclined to think

24  that you should submit letter briefs to me, and then I'll

25  decide.

```
 1              This is not like the personal injury/wrongful death

 2      cases where I'm in the dark about the specifics of the cases

 3      and, therefore, not in a good position to choose.  I obviously

 4      know quite a bit about the 16 states that we're choosing among.

 5              So, if you can't agree, I think you can submit your

 6      views on which of those states we should adopt, and I could

 7      then make that decision.  I would rather not have to do that,

 8      but I'm certainly prepared to do that, if necessary.

 9              So my inclination is to say two and leave it to you to

10      try and meet and confer and either submit something, an

11      agreed-upon kind of schedule and protocol identifying those two

12      states or competing proposals, and I'll then resolve things

13      that you don't resolve.

14              I would say in the mix of that if in the course of

15      talking about it, you guys decide, based on the particular

16      facts of either the number of plaintiffs or the categories of

17      state laws involved, if you think that a number other than two

18      makes sense -- I'm not interested in 16, but if three or four

19      would make more sense than two, I'm certainly open to that.  As

20      an opening bid, I would suggest two.

21              Mr. Berman.

22              MR. BERMAN:  Your Honor, Ms. Cabraser and I were

23      talking this morning, and coincidentally we came up with two as

24      well.  We bounced around four, five, six.  It doesn't matter.

25      We thought we could do one because that's going to guide a lot
```

 1    of future thinking, but maybe there is a difference in law that

 2    might be helpful.  So we came up with two.

 3            We'll certainly try to agree with GM on which two.

 4    The only thing I think we need to do is then have a timetable

 5    for selection and more letter briefing on the issue.

 6            THE COURT:  Let me hear from the back table.  If you

 7    guys sit down and talk and look at the particular states and

 8    decide that we could do this as to only one state -- and there

 9    are several MDLs that have done that, and I think that it has

10    benefited the litigation even where it's been limited to one

11    state and bellwether trials limited to one state or what have

12    you -- I'm certainly open to that.

13            Two is sort of an abstract number.  I guess what I'm

14    intimating is the devil may be in the details.  If it turns out

15    that one can be as useful or three would be more useful, I'm

16    certainly open to that.  Again, two is the opening bid.

17            Mr. Bloomer, Mr. Godfrey.

18            MR. GODFREY:  I think we would like to reflect upon

19    it, your Honor.  The last time I did this in this court, that

20    is, the Southern District in front of Judge Scheindlin, we

21    settled on four.

22            I don't recall whether that was agreed to by the

23    parties or we each got two, in other words, the pick two

24    lottery.  The plaintiffs picked two, and we picked two.

25            I don't recall Ms. Cabraser was directly involved.  I

09-50026-mg Doc 14120-1 Filed 09/26/17 Entered 09/26/17 23:21:48 Exhibit N
Exhibit A Pg 209 of 516

1    believe it was one of her colleagues.  They had some

2    advantages, both from a numeric perspective and geographic

3    perspective that more appropriately canvassed the differences

4    in the law.

5            I'd like to reflect upon it.  I understand the Court's

6    direction.  We will have this discussion.  I know that we do

7    not think one is appropriate.  Two, three, or four -- we'll get

8    together with the plaintiffs and see if we can agree.  If not,

9    then we'll brief it for the Court's consideration.

10           THE COURT:  Great.  Sounds good.  Let me leave it to

11   you to try and hammer all this out.  In terms of a schedule,

12   I'm not prepared, for any number of reasons, to actually go

13   through each and every one of the dates.

14           I'd be inclined to leave that to you to try and hammer

15   out with the one statement from me that I'm more in agreement

16   with the plaintiffs' proposal than I am with New GM's in terms

17   of how to proceed with the actual schedule which I think gets

18   things done more quickly than New GM, but it may be that having

19   resolved the big-picture issue, you guys can reach some

20   agreement, even if it means modifying the plaintiffs' proposal

21   here and there.

22           So why don't I leave it to you in the first instance

23   and see if you can agree on a schedule that fits with the

24   overall structure that I have proposed, and we'll take it from

25   there.

1            How long do you want to confer and submit something to

2       me?  Would two weeks be sufficient?

3            MR. BERMAN:  Two weeks would be sufficient from our

4       perspective.

5            MR. GODFREY:  Yes, your Honor.

6            THE COURT:  So I'll give you two weeks from today to

7       submit something, either agreed upon -- and if not agreed upon,

8       then in the normal course with competing letter briefs.  That

9       exhausts that issue.

10           The last issue is the status of bellwether trial

11      number 9.  I like that you guys keep the numbers.  It makes my

12      colleagues think I'm trying many more cases than I am.

13           Is there anything to discuss on this front?  I have a

14      couple minor sort of administrative things that I would propose

15      based on lessons learned from the last trials.  I'm also open

16      to hearing if you guys think there are any ways that we could

17      proceed differently that would help you and make things run

18      more smoothly.  I think the last trial actually ran pretty

19      smoothly, all things considered.

20           Let me first just ask:  Is there anything sort of

21      substantive to discuss or any issues on that front?

22           Is Susman Godfrey trial counsel for plaintiff on that

23      case?

24           MR. HILLIARD:  Co-trial counsel.  My law firm is going

25      to co-try it with them.  So they will be here at probably the

 1   status conferences involving the Doddson trial, but we'll be

 2   co-lead counsel on that.

 3           THE COURT:  Good.  I was beginning to miss you,

 4   Mr. Hilliard.  I'm glad to hear that.

 5           Anything substantive to discuss, Mr. Brock?

 6   Mr. Hilliard?

 7           MR. BROCK:  The case is proceeding to trial in the way

 8   we would expect.  I don't think we have anything to discuss.

 9           MR. HILLIARD:  In discussing the last couple of

10   trials, specifically, the last one, and then reflecting on the

11   others, it seems that the streamlinedness is working, and the

12   amount of time that we think we need versus the amount of time

13   that we need is less.

14           Perhaps both sides have the courage now to say, we

15   only need a week and we can get it done in a week instead of

16   extending the proposed time.  It helps with the jury panel, as

17   well as helps with the preparation of experts.

18           THE COURT:  Yes.  I think that was all true.  I would

19   say to the amount of time you think you need and the amount of

20   time you actually need, I would actually add a third category,

21   which is the amount of time I'm going to give you.

22           MR. HILLIARD:  That should probably be category one.

23           THE COURT:  I can't remember if you were here or if it

24   was folks from Weitz & Luxenberg.  I think that the first

25   couple trials, with all due respect, were somewhat overtried.

1    I understand why that might have been the case and how

2    much is at stake in each of these cases.  I do think in the

3    last one we were sort of approaching a better equilibrium in

4    terms of paring it down and remembering that it's about an

5    individual accident.  So I would urge you to continue with

6    that, and I will do my part as well when the time comes.

7    A couple things that I wanted to note just in advance

8    and would invite you guys to also discuss with each other and

9    among yourselves, if there are ways to tweak the procedures

10   that we have been using, that would be helpful or make things

11   more efficient from your perspective.  That is to say, any

12   lessons learned from the last trial or two, if you have any

13   thoughts on that, feel free to propose them to me.  I'm

14   certainly open to changing the way we do things.

15   A couple things on that front.  One is I don't know to

16   what extent you guys have conferred in advance of the motion in

17   limine deadlines about motions in limine, but I get the sense

18   that more discussion might be beneficial, that is to say, that

19   in each trial I think there have been motions that have

20   essentially been mooted because they're not really disputed or

21   the disagreements turned out to be a lot narrower than the

22   opening brief seems to think.

23   I would think that you might save yourselves some

24   trouble and ultimately me some trouble in what I have to

25   ultimately read if you could kind of discuss that ahead of time

1   and figure out more precisely what you actually do need to

2   brief as opposed to what might be agreed upon.

3          Second, with respect to deposition designation

4   disputes, it would be helpful, when you file the sort of

5   omnibus letter and transcripts and so forth -- I think in the

6   past ones you have not identified which party is calling which

7   witness, and I think I mentioned in the last trial that I was

8   trying to get ahead of things and ended up reviewing, during

9   the plaintiffs' case, some witnesses that were actually GM

10  witnesses, and, therefore, I ended up needing to do that

11  anyway, but it would just be helpful in terms of me triaging

12  and knowing what I need to prioritize.

13         Third, because I think your resources exceed my

14  resources on this front, I would like one or the other of

15  you -- I would propose New GM -- to take on the task of copying

16  the jury questionnaires when we have a copy of the final

17  version of them and provide them to the jury department to

18  distribute to the jury pool.  Is that acceptable?

19         MR. BROCK:  Yes, your Honor.

20         THE COURT:  That's it from me on this, but I would

21  invite you to discuss among yourselves if you think there is

22  anything that I can do or should be doing differently that

23  would be helpful and make things run more smoothly.

24         The next item is the trial setting for bellwether

25  number 11.  I have to say I'm a little puzzled because I

1     understand that May 7 was a date that I came up with on my own,

2     in part, quite frankly, to protect my summer.

3            I looked back at your proposal on this front, which is

4     docket number 4298, and you guys had initially proposed June 25

5     as a trial date. So I don't know why all of a sudden you're

6     not available until August, and part of what is animating my

7     asking that is, quite candidly, I can't try this case in August

8     for any number of reasons.

9            A, it would be hard to find a jury. B, my own

10     schedule doesn't really permit it. And then complicating

11     matters further, September really isn't an available option

12     either.

13            There are pretty much two days every week in September

14     that I would be off for Jewish holidays, and many jurors would

15     also be unavailable anyway, all of which is to say that if we

16     don't try it before I would say July or before, we're really

17     looking at an October trial date at the earliest, and that

18     doesn't strike me as ideal.

19            So I guess I wanted to get a sense of A, what's

20     changed; and B, what the conflicts are. You guys have a pretty

21     large number of lawyers working on these things. I understand

22     if one or the other person has a conflict. I get it. There is

23     a lot of time between now and then, and other people can fill

24     in. So what's going on?

25            MR. BROCK: Your Honor, the trial conflict -- this is

1    Mike Brock for GM.

2              The trial conflict is mine.  I have a case scheduled

3    for trial in Washington, D.C. on April 30.  It's expected to be

4    a three- to four-week trial.  I am available to try a case in

5    this court I really feel like June 11 or later.  The last case

6    I tried here I tried with a two-week break from a four-week

7    trial out in Kansas.  I feel like that's something that I can

8    do and can be available to do.

9              We did look at earlier dates.  We didn't know if

10   your Honor would have availability, say, in late March.  Allan

11   Pixton and I and others on our team tried to see if we could

12   work out a schedule that might work for March.  It just looked

13   like it would be very difficult to do, even if your Honor had a

14   date in March.  As it turns out, Mr. Hilliard had a trial

15   conflict I think in April anyway.

16             So that's the issue we face.  I have talked to my

17   client about having another lawyer lead a trial here in the

18   MDL.  They have expressed a strong preference that I lead the

19   cases here.  So, for better or worse, that's where we are.

20   That's why we were trying to find a way for me to be able to do

21   that.

22             THE COURT:  Mr. Hilliard, I don't know who is trying

23   it for the plaintiffs.

24             MR. HILLIARD:  Unlike Mr. Brock, we have more than one

25   rooster in the henhouse.  You pick the date, and we will be

 1  there.  There are plenty of executive committee members that

 2  would like to step up and try it.

 3      There are the potential of the actual lawyers who

 4  represent the plaintiffs that might be available, with

 5  assistance, to try it.  I would not be available to do it

 6  personally.  But, again, the Court and the case does fine

 7  without me, as we've done twice already.

 8      So whatever date that works for Mr. Brock and the

 9  Court, I can represent that I am sure there is a trial team

10  that could be available and come and try it, given the Court's

11  comments that started this discussion.

12      THE COURT:  So give me one moment to figure out a

13  couple things on my end.

14      How is June 18, 2018?

15      MR. BROCK:  Yes for us.

16      MR. HILLIARD:  Yes, sir.

17      THE COURT:  June 11 would be challenging on my end.  I

18  think the 18th is better than your original proposal of the

19  25th because it's less risk that we would run into the July 4

20  holiday.  So we'll do that.

21      Why don't you guys look back at the schedule.  The

22  schedule was obviously predicated on a trial date of May 7.

23  Obviously the more time I have to do what I need to do, the

24  better.

25      Recognizing that we're now a month plus later, if you

1    want to give yourselves a little more time on some of the

2    things, that's fine with me.  If you have any proposed

3    modifications, why don't you talk about them to each other, and

4    we'll go from there.

5           Next is supplemental briefing on successor liability.

6    Sorry to give you more briefing.  I'm sorry to give myself more

7    briefs to read.  As you can see, I thought it was appropriate

8    for a couple reasons.

9           Without intimating whether I agree with the

10   plaintiffs' characterization of New GM's proposal as a fishing

11   tactic or not, I am inclined to agree with plaintiffs that it's

12   unnecessary to proceed in the manner that GM has proposed and

13   likely only to result in more delay, given the arguments made

14   by GM thus far, and they're summarized a bit in the agenda

15   letter but the portion attributable to the plaintiffs, but

16   certainly the arguments that have been made to me thus far.

17          I don't quite understand why we would need to proceed

18   in that manner and why GM couldn't make the arguments that it

19   thinks are to be made based on the information that it

20   currently has.

21          I think it would make more sense to stick with the

22   current plan, which is simultaneous briefing by August 24 with

23   the understanding, perhaps, or the caveat that New GM or the

24   plaintiffs, for that matter, could always seek leave to file a

25   supplemental brief, that is, supplemental supplemental brief.

1          If there is something in the declarations that are

2    filed in the first instance that changes the situation in some

3    material way, I think that enables us to stick with the current

4    schedule but allows GM, if it learns something from the factual

5    declarations that are filed that it changes things in some

6    meaningful way, it gives New GM an opportunity to tell me what

7    that is.  I would think that that would be a better way to

8    proceed.  That's what I would propose.

9          Thoughts.  No thoughts?

10         MR. GODFREY:  I have thoughts.  I thought Mr. Berman

11   was going to say something.

12         THE COURT:  It looks like he is.

13         MR. BERMAN:  I am.  On Wednesday we informed General

14   Motors that we plan on presenting papers in the bankruptcy

15   court next week, perhaps as early as Tuesday, that would ask

16   the bankruptcy court to issue a claims estimation order

17   pursuant to the sale agreement.

18         And under the sale agreement, your Honor, the Guc

19   Trust has the authority to go to the bankruptcy court and to

20   compromise claims.  In the event the Guc Trust makes a

21   determination that claims exceed $35,000,000, to ask the Court

22   to issue an estimation order that would require New GM to issue

23   stock that would be put into an account for the benefit of,

24   actually, our class.

25         And pursuant to that estimation order, we're going to

1    ask the bankruptcy court to issue that order which would

2    require GM to put up stock that's worth roughly a little over

3    $1,000,000,000.

4             THE COURT:  Correct me if my understanding of this is

5    wrong.  I take it this is the so-called "accordion feature";

6    that essentially the estimation order would trigger the

7    accordion feature?

8             MR. BERMAN:  That's correct.

9             THE COURT:  This might be what Mr. Godfrey was fearing

10   would be the --

11            MR. BERMAN:  Yes.  We gave GM a heads-up, as I said,

12   this week.  I don't think that this changes your briefing idea

13   because the fact of the matter is that you recognize the

14   positions New GM has taken with respect to successor liability.

15   We're not going to have a resolution of this proposed

16   settlement.  I suspect that GM is not going to just quietly

17   agree to issue $1,000,000,000 worth of stock.

18            THE COURT:  I'm pretty confident in sharing that

19   prediction.

20            MR. BERMAN:  I'm also pretty confident that the sale

21   agreement actually gives GM no rights to object, but we'll

22   fight that out.

23            THE COURT:  I intimate no view on that.

24            MR. BERMAN:  So I think that we should continue with

25   the briefing, but I wanted to give the Court a heads-up that

1  there will be some new facts on the table next week.

2       THE COURT:  I appreciate that heads-up.  I think, if

3  anything -- I understand from the grumpy looks at the back

4  table that you're not happy about the accordion feature issues

5  here.  Those are not my concern, at least in the

6  first instance.

7       I think to the extent that these implicate me, that

8  suggests to me that you'll have the information before the

9  deadline that I've imposed, and we can just proceed as I had

10  already planned.

11      Any reason otherwise, with the caveat, I suppose,

12  Mr. Godfrey and Mr. Bloomer, that if upon seeing what

13  plaintiffs file on Tuesday, you need additional time to sort

14  through what it all means, that you can always seek a

15  reasonable extension, and I would consider it.  Obviously the

16  sooner we can get briefing, the better, as far as I'm

17  concerned.

18      Your thoughts.  I don't want to hear your thoughts on

19  the accordion feature issue.  You'll have plenty of

20  opportunity, I'm sure, to air those, whether you have any right

21  to or not.  I'm sure you'll make those arguments but not to me,

22  at least in the first instance.

23      Any issues with what I have said on the successor

24  liability issues before me?

25      MR. GODFREY:  Well, both issues are going to be before

1    your Honor.  Let me address the first issue, which is the

2    successor liability briefing.

3         I think, in light of what your Honor has said with

4    respect to the option of having supplemental briefing if we

5    deem it necessary, then that is acceptable to New GM.

6         With respect to the second issue though, I have some

7    points that your Honor -- this is a marker.  This is not going

8    to be in the bankruptcy court.

9         At my age, I'm seldom surprised, and I'm never

10   shocked.  But a day and a half ago, I was both surprised and

11   shocked when we were given a bare-bones description of this

12   settlement agreement.

13        This is not a compromise by the Guc Trust or the

14   plaintiffs' claims in the bankruptcy court.  This is a complete

15   surrender and sellout using GM's money to pay for a settlement

16   that was not defended against, claims that were meritless that

17   were asserted.

18        Let me express, in no uncertain terms, how we view the

19   proposal.

20        THE COURT:  Let me stop you, only because I want to

21   get out of here as I suggested.  I don't mean to cut you off

22   and not give you an opportunity to be heard on this, but I

23   don't think this is the time or place to do it.

24        You'll have plenty of opportunity in the

25   first instance, I would think in front of the bankruptcy court,

1    even if it's ultimately an issue that I'll need to resolve or

2    even some higher court.

3            Am I wrong about that?

4            MR. GODFREY:  Yes.  We are going to file a motion to

5    withdraw as soon as permissible, withdraw the reference from

6    the bankruptcy court and this court.

7            The notion that they can settle for no material money

8    from the Guc Trust -- the Guc Trust has $400,000,000 in assets.

9    They're getting $15,000,000, as we understand it, assigning

10   rights, agreeing to a $10,000,000,000 claim.  And supposedly GM

11   has no rights when they take a billion dollars of our money.

12           That is not going to stand.  We're going to withdraw

13   the reference.  We're going to bring it to the Court.  This is

14   collusive.  There are cases on point that we can refer the

15   Court to.

16           This has got all the indicia of a collusive

17   settlement.  They are awaiting a time-barred defense.  We have

18   no idea upon what basis and what expert the Guc Trust had,

19   which I doubt, by which they are not contesting $10,000,000,000

20   in claims.

21           And that is the trigger mechanism by which they claim

22   New GM has no choice but putting up a billion dollars.  That is

23   not going to happen without this Court hearing and ruling on

24   the issues.

25           We have unfairness issues.  We have the indicia of

1   collusive issues.  We have the fact that General Motors has

2   been excluded.  And you heard this morning that supposedly we

3   have no rights to even object.  I don't think that in our

4   country when someone is told to give a billion dollars to

5   someone else, we have some rights to object, including notice

6   and opportunity to be heard.

7           So, from a marker perspective, we're going to file a

8   motion.  We're going to brief the motion.  We're going to

9   attack the settlement, and it's going to be before your Honor.

10  We're going to do it as soon as we can permissibly do it.

11          THE COURT:  The marker is laid.  I'll look for the

12  motion.  The question is your arguments seem to me to be more

13  geared towards the merits of the issue than the forum in which

14  it should be litigated, at least in the first instance.

15          In proposing that the reference be withdrawn may be

16  the fact that it's a collusive agreement, if it is -- I

17  intimate no view on the matter -- is a factor to consider in

18  that analysis.

19          The question that occurs to me, thinking out loud, is

20  why you can't make those arguments to the bankruptcy court in

21  the first instance, recognizing that they may ultimately come

22  to me.

23          MR. GODFREY:  That's a good question.  Since

24  your Honor said I should keep this short, but there is an

25  answer to that.

1      THE COURT:  I trust the answer will be clear from your

2 motion.

3      MR. GODFREY:  It will be very clear, but we can talk

4 about this further in the motion.  One simple point for

5 your Honor to consider.  This is on behalf of a putative class,

6 among other things.

7      Your Honor has got the class before the court.  This

8 Court is going to decide Rule 23 issues, not the bankruptcy

9 court and not some quasi class which has the same implications.

10      This has come up before in other cases where the court

11 has said, no.  That's the MDL's court's purview we think.  So

12 there is significant overlap between the issues, both in terms

13 of the merits of the claims and the class issues and in terms

14 of notice issues that this Court has the jurisdiction over and

15 that this Court should have the primary role over.

16      So we will lay this out for the Court, but make no

17 mistake.  General Motors objects to this.  We believe that it's

18 brought an indicia of collusiveness.  Frankly, what the few

19 facts we were told are, they've got $400,000,000 in assets from

20 the Guc Trust for $15,000,000.

21      They are released from all liability for this alleged

22 $10,000,000 claim, and General Motors is supposed to put up a

23 billion dollars to make it all right.  General Motors has been

24 excluded from the settlement negotiations and had no knowledge

25 of the terms of the settlement negotiations.

1          If you look at the terms of the accordion feature, we

2   don't believe that they can do this.

3          THE COURT:  Understood.  I will look for it.  If you

4   want to discuss with each other a briefing schedule for that

5   motion, you're certainly welcome to, and you can propose it to

6   me.

7          In the absence of that, it sounds like GM is planning

8   to file the motion at some point soon regardless.  Unless and

9   until I see otherwise, the local rules and default schedule

10  will apply.

11         As for the successor liability briefing, we'll stick

12  with the existing plan with the understanding that if there is

13  need for supplemental supplemental briefing, that is to say,

14  another round, then you'll let me know.

15         I want to say two notes on that.  That is not to give

16  you an opportunity to reply.  I am contemplating simultaneous

17  briefing.  So I would grant an additional round of briefs only

18  if there is something new learned from the submissions on that

19  date that changes things in some material fashion that you

20  think you need to address.  It's not an opportunity to reply to

21  the other side's arguments.

22         The second is that I'm not going to set a deadline

23  right now for that additional briefing or page limits for that

24  matter because I'm hoping and assuming that it won't be

25  necessary.

1          I do caution you that you're not going to have a lot

2     of time and you're not going to have a lot of pages.  If you do

3     propose another set of briefs, keep both of those in mind.

4          MR. GODFREY:  I think we understood that, your Honor.

5     At this point, I think we understand your views on supplemental

6     briefing.

7          THE COURT:  Good.

8          Let me also just say on the briefs that you will be

9     filing in the next couple weeks on this front, I would endeavor

10    to make them, as much as you can, sort of standalone briefs,

11    that is to say, on the one hand, you don't need to waste time

12    on the preliminaries, the background, etc.

13         I know what the issues are.  I have obviously

14    addressed a lot of the issues in the opinion that I handed down

15    a week or so.  You can cut to the chase and brief the issues

16    under that law, as I indicated, and address the effects, if

17    any, of the settlement with the Guc Trust.

18         Having said that, to the extent you can write it so

19    that my clerks and I don't need to keep looking back at the

20    prior set of briefs, that would be helpful for two reasons.

21         One is, as I'm going to tell you in a minute or two,

22    today is Ms. Kumar's last day with me.  Actually, last Friday

23    was.  She's actually just done me the courtesy of coming to

24    this to make things easier in transitioning.

25         She helped me on that motion and won't be around when

1  your supplemental briefs come in, which is to say that I'll

2  have another clerk without the same institutional memory and

3  background on this helping me.

4        The second is while I certainly have read all the

5  materials, it will be several months basically since I have

6  done so.  The less that I have to go back and reread things,

7  the better.  I would just ask you to keep those in mind in

8  terms of how you write those briefs.

9        MR. GODFREY:  Your Honor, I have a question on that.

10  Would it be helpful for us, if we are referring back to another

11  brief, to just attach as an exhibit the selected pages from

12  that brief?

13        THE COURT:  Yes.  I think that would be helpful

14  actually.

15        MR. GODFREY:  I think we'll do that, if that's

16  acceptable to the Court.

17        THE COURT:  I think that is.  Otherwise, leave my

18  remarks standing.  I gave you my guidance, but that would be

19  helpful, if you think it's necessary.

20        MR. GODFREY:  Thank you.

21        THE COURT:  Settlement.

22        Mr. Berman, did you have something else you wanted to

23  add?

24        MR. BERMAN:  Yes.  We've been silent at the front

25  table with respect to Mr. Godfrey's comments.

1          THE COURT:  I understand.  Certainly you'll have an

2     opportunity to be heard.

3          MR. BERMAN:  That's all I need to say.

4          THE COURT:  Understood.  Good.

5          On the issue of settlement, I received the first

6     monthly inventory of cases, which is very helpful and will be

7     helpful going forward.

8          On the question of the appointment of a mediator, I'm

9     happy to hear from both sides on that front.  I am of the view

10    that we are getting to the point where having somebody in place

11    who could be helpful certainly on the economic loss side but

12    perhaps even on the personal injury/wrongful death side,

13    recognizing that Judge Cott only has a limited amount of time

14    available on his calendar, that would probably make sense.

15         I'm open to suggestions on that.  I'm open to

16    suggestions on who that person could be.  I think in our

17    closed session last time, I threw out a couple names that I was

18    thinking of.

19         I know from looking at an order that Judge Selna

20    entered in the Toyota matter, which I also wanted to mention --

21    I gather that Patrick Juneau was appointed to him to serve as a

22    sort of mediator capacity in that litigation.

23         I don't know Mr. Juneau or what the experience was

24    like, but I mention his name as a possibility.  So I'm open to

25    your thoughts and suggestions here, both in terms of timing and

 1 in terms of moving things forward.

 2        The only other thing I wanted to throw out is I

 3 referred to an order of Judge Selna that he issued, and I read

 4 an order that established an "intensive settlement" process or

 5 protocol.

 6        I guess the question I have -- and this applies to

 7 personal injury/wrongful death as much as anything -- whether

 8 it might make sense now or sometime down the road to enter an

 9 order along those lines.

10        I think thus far I've left this largely to you guys,

11 and I think it's largely been okay thus far.  I guess I'm just

12 throwing that out there as another possibility.

13        Mr. Berman, it looks like you want to say something.

14        MR. BERMAN:  Yes, your Honor.  You mentioned earlier

15 that you assumed settlement discussions were ongoing.  There

16 have been no settlement discussions since we made a demand on

17 GM.

18        We don't think settlement discussions are likely to

19 get started, unless a mediator gets the parties together.  We

20 don't think we should wait for the benefit of the bargain

21 briefing for several reasons.  A decision is three or four

22 months off at the earliest.

23        Second, it's my experience and Ms. Cabraser's

24 experience that so-called "important rulings" might make the

25 case harder to settle.  If GM loses that, which we think they

1   will, then the price of settlement goes up.  What that

2   typically forces a defendant to do is to look for the next big

3   ruling to get them out of the hard spot they're in.

4           So we think that you should appoint a settlement

5   mediator.  That mediator can then reach out and decide what the

6   appropriate steps are.  We think we should either agree or

7   submit names within a week.

8           This is not a complicated thing, to come up with a

9   potential mediator, and we've been raising this repeatedly, and

10  we've suggested a couple names to GM.

11          Ms. Cabraser and I were talking about this, and we

12  can't come up with an MDL that we've been involved in --

13  between of two of us it's been an embarrassing number of

14  MDLs -- where we didn't have a mediator appointed at this stage

15  of the case.  So I think now is the time, and I think

16  Ms. Cabraser wanted to talk about the intensive.

17          MS. CABRASER:  Yes.  Thank you, your Honor.

18          I do agree with Mr. Berman that the time is now.  The

19  procedure need not be a complicated one.  The parties should be

20  directed to meet and confer and either agree on a name or

21  submit names.

22          There is a very small universe of people who have the

23  experience and confidence of both sides.  You mentioned one

24  name that might be a possibility.  I don't think it will be a

25  problem, either agreeing on a name, if the parties are directed

 1    to do that.

 2           With respect to the intensive settlement program from

 3    Toyota, your Honor, you're right.  That was a program to deal

 4    with personal injury and wrongful death claims.  The economic

 5    claims were settled through a class action settlement.

 6    Mr. Juneau was the mediator for that process.

 7           The intensive settlement program has been -- it's

 8    taken some time, but it has been successful.  There are a

 9    literal handful of personal injury cases left in that MDL to be

10    resolved.  Everything else is resolved.

11           It's not that different from the private ordering that

12    has gone on so far in GM for the injury claims.  What's

13    different is that everyone in the MDL or in the state court

14    cases has an opportunity to use the same procedure.

15           There is a protocol.  It's streamlined.  There is the

16    assistance of a settlement master if required, but the

17    experience has been that most of the claims settled in private

18    discussions between counsel for those plaintiffs and a

19    settlement counsel for Toyota.

20           We make reports -- we still do -- every month or so to

21    Judge Selna in writing and at a status conference, and that's

22    really provided the engine to resolve all of those claims.  I

23    think at this point there is one case that is headed to trial,

24    an individual case.  The rest are resolved.

25           THE COURT:  I'll tell you what.  In the interest of

```
 1    time, let's table that until the next status conference, and

 2    you guys can confer on it between now and then and essentially

 3    tell me if there are any additional procedures, protocols,

 4    processes, whatever word you want to use, that you think would

 5    facilitate and help in the ongoing discussions that I know are

 6    going on on the personal injury/wrongful death side,

 7    particularly recognizing that we're going to be getting at some

 8    point to a stage where New GM has to deal with lawyers who have

 9    only one or a handful of cases as opposed to larger groups of

10    cases.  So, for now, let's just discuss the mediator issue.

11    Let me hear from Mr. Godfrey or Mr. Bloomer.

12            I am inclined to agree with Mr. Berman and

13    Ms. Cabraser and think that the time is ripe and we ought to

14    name someone and get that ball rolling, and that person can

15    sort of, you know, facilitate discussions and do what is

16    appropriate and what have you.  I'm inclined to think that the

17    time has come.

18            What are your thoughts on giving me a name or names by

19    let's say a week from now?  Hopefully you can agree.  If you

20    can't, I can pick someone from a short list that you guys can

21    agree upon.

22            MR. GODFREY:  I think the Court knows what our

23    position is.  I'm happy to provide Mr. Berman and Ms. Cabraser

24    a long list of MDLs where no mediator has been appointed at

25    this stage.
```

09-50026-mg Doc 14120-1 Filed 09/26/17 Entered 09/26/17 23:21:43 Exhibit N Pg 53 of 339

Case 1:14-md-02543-JMF Document 4069-2 Filed 09/26/17 Page 530 of 516 52

```
 1              THE COURT:  I'm not interested in that.

 2              MR. GODFREY:  I think we're beyond that, given the

 3   Court's comments.  So I think we will come up with a

 4   recommended procedure list.  It's a relatively small pool.

 5   Some people are, frankly, disqualified for being in that pool

 6   for various reasons.

 7              Mr. Feinberg would be one.  The name you mentioned

 8   would be another for various reasons.  So I think we will have

 9   a conversation with them and see whether we can come up with an

10   agreed procedure.  And, if not, then I think we submit

11   competing short briefs.  This is not very complicated.  We are

12   not in favor of an intensive settlement program.  Part of the

13   issue here, frankly --

14              THE COURT:  Let's table that for the next conference.

15              MR. GODFREY:  I wasn't sure what was tabled and what

16   was not, given the Court's question to me.

17              THE COURT:  Let's just focus on the mediator.  Can you

18   get back to me within a week, either with an agreed-upon person

19   or, if you can't, submit competing proposals or what have you

20   on that date or at least a proposal of how we should proceed?

21   Is that reasonable?

22              MR. GODFREY:  I would prefer if we could have until

23   the following Monday.

24              THE COURT:  That's fine.

25              MR. GODFREY:  That's ten days or something I think, if
```

1    that's agreeable.

2           THE COURT:  That seems fine by me.

3           I think that's August 21, if I'm not mistaken,

4    Mr. Berman.

5           MR. BERMAN:  That's fine, your Honor.

6           THE COURT:  So August 21 I'll hear from you in some

7    form or fashion.  Obviously, the more you can agree upon, the

8    better.  I don't think this would warrant full-blown briefing

9    is my inclination.

10          MR. GODFREY:  No.  I think this is a one- or

11   two-pager, frankly, where we would either have agreement or,

12   here are the names that we propose.  There are the names that

13   they propose, and here is the procedure that we propose and

14   that they propose, and the Court should decide from the list.

15          THE COURT:  That sounds good in the abstract, but I'll

16   leave it to you to try and discuss.

17          Mr. Hilliard.

18          MR. HILLIARD:  This mediator is expected to also

19   potentially address the injury and death cases?  Is that what

20   the Court indicated?

21          THE COURT:  I think the focus should be on economic

22   loss, in part because things have been proceeding at pace on

23   the personal injury and wrongful death side.  I guess I'm open

24   to your thoughts on that question.  I think, in the ideal

25   world, having somebody who could assist on those but with the

1    primary focus being on the economic loss front would be

2    helpful.

3         MR. HILLIARD:  I'm not sure that we need it yet as

4    we're still talking and have not hit a loggerhead with regard

5    to the injury and death cases, as the entire docket seems to be

6    shrinking.

7         Mr. Berman and Ms. Cabraser just whispered that it was

8    four economic losses, which is just fine with me, but there

9    will be a point I think that there will be one-off cases that

10   will need to be addressed through some sort of process,

11   primarily not the focus of whatever mediator is appointed, but

12   should that mediator be directed to focus on these cases, then

13   maybe I'll have some input on who is selected.

14        THE COURT:  I think it would be nice to leave the door

15   open.  I'm inclined to agree that right now it seems less

16   necessary on that front, if only because things have been

17   proceeding relatively smoothly, and Judge Cott has some time

18   available certainly if there are one-off issues here or there.

19        I think the ideal would be if we name someone down the

20   road if the time comes when it would be helpful if that person

21   could be available for that purpose, and I can't think of

22   reasons why such a person would be precluded or conflicted from

23   doing it.

24        In any event, why don't you guys talk about that and

25   see if that makes sense or if there is something I'm not

1  thinking of.

2        MR. BROCK:  I know we're in a hurry, but I was just

3  going to mention that Mr. Kyle Dreyer, who you met at the first

4  trial -- he was my trial partner in that case, as well as Wendy

5  Bloom -- are working close to full time on settlement issues.

6        They are continuing to examine documents and dockets.

7  They are meeting with plaintiffs' counsel.  There have been a

8  few occasions where we thought a mediator might be beneficial,

9  and we actually would agree with an opposing party to have one

10  come in and actually mediate a docket.

11        I will talk to them about this, but I think that they

12  feel that the process is working pretty well in terms of what's

13  happening now.

14        THE COURT:  That's my sense as well.  It may also be

15  that if there are one-off cases where a mediation would be

16  helpful, but it wouldn't be hard to find someone just to step

17  in and be a mediator for that.

18        Let's take up the intensive settlement protocol-type

19  issues and whether there is anything else that can be done on

20  the personal injury/wrongful death side at the next conference.

21  Maybe Ms. Bloom should be here on that front, but I'll leave it

22  to you.

23        On the other issues that I flagged, given the time,

24  unless you think there is any urgency to it, I would propose

25  that we table the discussion of the 349 plaintiffs who have

1  asserted ignition-switch-related claims and non-ignition switch

2  recall claims for the next conference.  I think that may be

3  something that Ms. Bloom could also be helpful with respect to

4  anyway.

5        For that matter, I don't think there is any urgency to

6  the question posed about the Anglin case, whether there are any

7  other cases out there like that.  You could also let me know

8  also in a brief letter.

9        I just wanted to figure out if there was a need for

10  some sort of procedure to either identify or give notice to or

11  some such thing.  I don't know if there are a bunch of those

12  cases out there or if I was going to get motions of that sort

13  in other cases.

14        So let's just figure out when we're next reconvening,

15  and then we will wrap things up.

16        Any thoughts, given all the things going on, of when

17  it would be helpful to return?

18        MR. GODFREY:  We had had a discussion pursuant to the

19  Court's request, that is, Mr. Berman, Ms. Cabraser, and myself.

20  I think we settled on the first week of October time period.

21        MS. CABRASER:  That would work timing-wise I think for

22  plaintiffs, except for Tuesday, October 3, and Friday,

23  October 6, which leaves essentially the Wednesday and Thursday

24  of that week.

25        THE COURT:  The Thursday is a Jewish holiday.  So it's

```
 1    out for me.

 2                MS. CABRASER:  That is correct.

 3                THE COURT:  I could do Wednesday, October 4.  Does

 4    that work for everybody?

 5                MR. GODFREY:  That does, your Honor.  Thank you.

 6                THE COURT:  So we will set it for Wednesday,

 7    October 4.  The normal starting time of 9:30 should work for

 8    me.  So Wednesday October 4 at 9:30.

 9                The last thing I want to say -- I referred to this

10    earlier -- is that this is Ms. Kumar's last day helping me out

11    on this case.  Number one, I wanted you to know that so you

12    could take an opportunity after the conference to say your

13    good-byes and thank her for all the work she has done because

14    she has done a tremendous amount to benefit you all.

15                I just want to say publicly, as I did on similar

16    occasions in the past, and thank her for all the work she has

17    done.  This is a tall order, as you can imagine, in my

18    chambers.

19                She has really done an incredible job of making sure

20    the case remains on the rails for the most part and that I'm

21    doing as good a job as I can do.  Whether you all agree that I

22    am doing a good job is not something I'll ask you, but I just

23    want to thank her for everything she has done to help.  It's

24    been a tremendous asset to me, and I will miss her, and we will

25    deal with the transition.
```

 1              I also wanted to take a moment to introduce -- I have

 2     a clerk who will be starting in September who, for reasons

 3     within chambers, is going to be taking over the GM docket, if

 4     you will, Kristen Loveland, who just arrived from Europe last

 5     night but who has agreed to be here this morning to sit through

 6     this and transition with Ms. Kumar.

 7              In the meantime, Sam Adelsberg, who is also here and

 8     is currently in my chambers, is going to be attending to the

 9     docket between now and when Ms. Loveland starts.  So you can

10     introduce yourselves to her and him.

11              And Ms. Kumar will be sending an email to everyone to

12     just make sure you have the relevant contact information, but I

13     wanted to mainly thank her publicly and commend her publicly

14     for everything she has done to help.

15              With that, I wish you all a pleasant rest of your

16     summers.  I will see you in early October.  I'll be hearing

17     from you in various ways between now and then.  We are

18     adjourned.  Thank you and have a good day.

19              MR. GODFREY:  Thank you, your Honor.

20              MS. CABRASER:  Thank you, Your Honor.

21              (Adjourned)

22

23

24

25

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK


|                                        |   |                         |
|----------------------------------------|---|-------------------------|
|                                        | . | Case No. 09-50026-mg    |
| IN RE:                                 | . | Chapter 11              |
|                                        | . |                         |
| MOTORS LIQUIDATION COMPANY,            | . | (Jointly administered)  |
| et al., f/k/a GENERAL                  | . |                         |
| MOTORS CORP., et al,                   | . | One Bowling Green        |
|                                        | . | New York, NY 10004      |
|                      Debtors.          | . |                         |
|                                        | . | Thursday, August 17, 2017 |
| . . . . . . . . . . . . . . . .        | . | 3:05 p.m.               |


TRANSCRIPT OF IN COURT CONFERENCE
(CC: DOC NOS. 14053, 14056)
BEFORE THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            King & Spalding LLP
                           By:  ARTHUR STEINBERG, ESQ.
                                SCOTT DAVIDSON, ESQ.
                           1185 Avenue of the Americas
                           New York, New York 10036-4003
                           (212) 556-2158


For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs:                Brown Rudnick LLP
                           By:  EDWARD S. WEISFELNER, ESQ.
                                HOWARD S. STEEL, ESQ.
                           7 Times Square
                           New York, New York 10036
                           (212) 209-4917



Audio Operator:            Timothy Wilson, ECRO


Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46038
                           (855) 873-2223
                           www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

09-50026-mg   Doc 14120-1   Filed 09/26/17   Entered 09/26/17 23:21:43   Exhibit
Case 1:14-md-02543-JMF   Document 4639-3   Filed 09/26/17   Page 3 of 4
Exhibit A   Pg 241 of 516

20

1  rate of return that we could otherwise get if this deal were to

2  go forward, and this deal -- the plaintiffs' deal, and if we

3  were able to get the releases that we would be hoping for under

4  that -- under the plaintiffs' deal.

5         So the offer after further discussion that was made

6  was that New GM would be potentially willing to provide us with

7  a rate of return.  We don't know what that would be.  We've

8  agreed that we would enter into good-faith negotiations to

9  determine what that rate of return would be because, among

10  other things, we don't know what the corpus of the trust will

11  be at that time.  So it's hard to come to something -- to that

12  kind of agreement today.

13         But those -- we felt that those two things,

14  particularly given the fact that we believe on the merits we

15  have very strong arguments against the late claims, on Pioneer,

16  on equitable mootness, on tolling arrangements, that this offer

17  from New GM dealt with the main concerns that we were -- that

18  we had.  And as a fiduciary, we felt that we needed to do that.

19  We felt that you don't necessarily go for -- I understand that

20  hedge funds want to go for the absolute home run at the risk of

21  $21 million and everything else out there, but we represent

22  all --

23         THE COURT:  What's the $21 million?

24         MR. MARTORANA:  So the way that the plaintiffs'

25  proposal would work is that the GUC Trust would, up front, pay

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

1    $6 million for purposes of noticing.  So that would be out the

2    door before we even really get in front of Your Honor.  That

3    would just be a sunk cost for postcards.  And then it would be

4    followed by a $15 million payment and our agreement to support

5    a $10 billion claim as against New GM.  And we felt, among

6    other things, that there was a significant amount of execution

7    risk associated with that.  And, frankly, among other things,

8    that proposal, what we were really hoping to get out of it was

9    a release, get a true release from all the plaintiffs.

10           Given the fact that that proposal did not contemplate

11   and the plaintiffs would not agree to a Rule 23 settlement

12   certification, I think there's a potential execution risk

13   associated with actually accomplishing what it was that we

14   wanted to accomplish.

15           THE COURT:  Okay.  Anything else you want to tell me

16   now?

17           MR. MARTORANA:  No.  Thank you, Your Honor.

18           THE COURT:  All right.

19           Mr. Golden, I'd like to hear from you next.

20           MR. GOLDEN:  Yes.  Good afternoon, Your Honor.

21   Daniel H. Golden, Akin, Gump, Strauss, Hauer & Feld, counsel

22   for what's known as the participating unitholders.

23           Your Honor, this is really unfortunate that we find

24   ourselves in this situation where everybody now, in open court,

25   has to air their dirty laundry about a settlement that I think

Case 1:14-md-02543-JMF    Document 4689-4    Filed 09/26/17    Page 1 of 229

# Exhibit 4

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
                                   :

In re:                                :            Chapter 11

MOTORS LIQUIDATION COMPANY, et al.,    :            Case No.: 09-50026 (MG)

        f/k/a General Motors Corp., et al.,     :

                                   :

                        Debtors.      :            (Jointly Administered)
------------------------------------------------------------X

### DECLARATION OF EDWARD S. WEISFELNER IN SUPPORT
### OF THE MOTION TO ENFORCE THE SETTLEMENT AGREEMENT
### BY AND AMONG THE SIGNATORY PLAINTIFFS AND THE GUC TRUST

I, Edward S. Weisfelner, hereby declare as follows:

1.      I am a partner with the law firm of Brown Rudnick LLP, Designated Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the Bankruptcy Court.

2.      I respectfully submit this declaration in support of the *Motion to Enforce the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust* (the "**Motion**"), filed contemporaneously herewith.[1]  This declaration is based on my own personal knowledge.

3.      Well before negotiations over the Settlement began in earnest, the GUC Trust raised concerns about proceeding to seek approval of any agreement in the Bankruptcy Court without certifying a settlement class for the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs.  Counsel for the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs took the position that such certification was not necessary, and we made this position known to the GUC Trust and the Participating Unitholders.  The GUC Trust and the Participating Unitholders both continued to negotiate the Settlement despite knowing and ultimately conceding this position.

4.      The parties began their negotiation over the Settlement in earnest in June 2017. The parties exchanged numerous red-lined drafts in June and reached agreement on certain core

---

[1]    Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Motion.

terms—such as a settlement payment of 15 million dollars by the GUC Trust and the agreement
to seek the Claim Estimate Order—by the beginning of July.  At that time, the parties worked
towards finalizing the Settlement and related documentation.

5.      By the beginning of August, the Settlement documentation was in substantially
final form.  Counsel for the GUC Trust characterized many of the remaining issues as "minor" or
"clean-up" in a communication of August 3.  A true and correct copy of this August 3 e-mail
communication is attached hereto as **Exhibit A**.

6.      Perhaps the most negotiated point in early August related to notice and notice
costs.  To resolve these points, the parties worked with a notice provider, Cameron R. Azari, Esq,
the Director of Legal Notice for Hilsoft Notifications, which is a business unit of Epiq Systems
Class Action and Claims Solutions.  Mr. Azari issued a declaration in support of the notice plan
for the settlement.  A true and correct copy of the Declaration of Cameron R. Azari, Esq. on
Implementation and Adequacy of General Motors Bankruptcy Settlement Notice Program is
attached hereto as **Exhibit B**.

7.      With the full knowledge and consent of the GUC Trust, on August 9, 2017,
Daniel Golden, counsel to the Participating Unitholders, and I called Arthur Steinberg, counsel to
New GM, to inform New GM of the plan to present settlement papers to this Court and seek a
Claims Estimate Order and determine New GM's availability for such a conference.  By August
14, the parties had secured a conference with this Court for August 17.

8.      On August 11, certain of the Signatory Plaintiffs previewed certain of the terms of
the Settlement in open court at a status conference before Judge Furman in the MDL.  A true and
correct copy of excerpts of the relevant portions of the transcript of the MDL status conference is
attached hereto as **Exhibit C**.

9.      Following the conclusion of the MDL status conference, the parties had an "all-hands" page-by-page review call to flag and resolve any final word-smith issues.  This meeting had been set by all parties in response to a request made by the Participating Unitholders on August 9, 2017 to "schedule an all hands call . . . to finalize all of the settlement documentation and motions."  A true and correct copy of this August 9 e-mail communication is attached hereto as **Exhibit D**.

10.     Notably, on the final page-turn call, the GUC Trust conveyed that they were done with comments to the documents and expressed no objection to the Signatory Plaintiffs' preview of the settlement to Judge Furman.

11.     Brown Rudnick disseminated final versions of the main documents that same afternoon, and, less than 24 hours later, on August 12, the GUC Trust's counsel confirmed that "[f]rom the GUC Trust perspective, all of the documents sent over by Howie [Steel] (subject to one item we are discussing with Akin in the Settlement Agreement) are fine."  This email contained no reservation that the counsel's comments were subject to client review or approval. A true and correct copy of this August 12 e-mail communication is attached hereto as **Exhibit E**.

12.     Counsel confirmed that resolution of the one item occurred on the morning of August 14.  That same day, counsel for the GUC Trust stated that "[w]e are waiting for final approval from client, but unlikely to come tonight.  You are, however, authorized to send current versions to New GM this evening."  A true and correct copy of this August 14 e-mail communication is attached hereto as **Exhibit F**.

13.     On August 14, at 9:14 p.m., Brown Rudnick sent the final versions of the Settlement documents to counsel for New GM, cc'ing counsel for the GUC Trust.  A true and correct copy of this August 14 e-mail communication is attached hereto as **Exhibit G**.

14.     The Settlement documents are attached hereto in the form in which they were shared with New GM on August 14, 2017: (a) the Settlement Agreement, attached hereto as **Exhibit H**; (b) a Settlement Order, attached hereto as **Exhibit I**; (c) a Claims Estimate Order, attached hereto as **Exhibit J**; (d) a motion to approve the settlement and estimate the aggregate allowed unsecured claims against the Old GM estate pursuant to Bankruptcy Rule 9019, attached hereto as **Exhibit K**; (e) supporting declarations from Wilmington Trust Company as administrator of the GUC Trust and counsel to the parties, attached hereto as **Exhibits L-O**; (f) a Notice Procedures Motion, attached hereto as **Exhibit P**; (f) short- and long-form notice to Plaintiffs, and notice to Unitholders; attached hereto as **Exhibits Q-S**; and (g) a finalized declaration from the notice provider, attached hereto as **Exhibit B**.   On August 16, 2017, these Settlement documents were submitted to the Bankruptcy Court as attachments to the *Letter to Judge Glenn in Response to GM's Letter Update on Matters Related to the Late Claim Motions and the Chambers Conference Scheduled for August 17, 2017 at 3:00 p.m.*, dated Aug. 16, 2017 [ECF No. 14061].

15.     At no point during the finalization of the Settlement documents in August 2017 did the GUC Trust or its counsel indicate that the GUC Trust's approval of the Settlement would not be final until the Settlement Agreement had been signed, or that the GUC Trust would not approve the Settlement unless the Signatory Plaintiffs sought certification of a settlement class as part of the process of seeking approval of the Settlement from the Court.

16.     A true and correct copy of excerpts of the relevant portions of the transcript of the August 17, 2017 status conference is attached hereto as **Exhibit T**.

I declare under penalty of perjury that to the best of my knowledge, information and belief, the foregoing is true and correct.

Dated: September 11, 2017
      New York, New York

                    /s/ Edward S. Weisfelner
                    Edward S. Weisfelner

09-50026-mg    Doc 13463-11    Filed 08/11/16    Entered 08/26/16 18:46:47    Exhibit A - August 3, 2017 e-mail    Pg 249 of 516

# EXHIBIT A

## Forster, Jill L.

| | |
|---|---|
| **From:** | Martorana, Keith R. <KMartorana@gibsondunn.com> |
| **Sent:** | Thursday, August 03, 2017 3:22 PM |
| **To:** | Steel, Howard S.; 'Weintraub, William P'; Forster, Jill L.; Daniel H. Golden - Akin Gump Strauss Hauer & Feld LLP (dgolden@akingump.com); dnewman@akingump.com; Moss, Naomi; Williams, Matt J.; Gillett, Gabriel K.; Chorba, Christopher; Fox, Gregory W.; Bob Hilliard; Steve Shadowen; Thomas J. Henry |
| **Cc:** | Weisfelner, Edward S.; Steve Berman; Chris O'Hara (ChrisO@hbsslaw.com); Elizabeth Cabraser (ecabraser@lchb.com); Geman, Rachel; esserman@sbep-law.com |
| **Subject:** | RE: Motors - GUC Settlement (FRE 408) |
| **Attachments:** | 102316378_14 _GM - GUC Trust Settlement Agreement.DOCX; Redline_102316378v13 _GM - GUC Trust Settlement Agreement - 102316378v14_....pdf; 102319562_7 _GM - Proposed Ignition Switch Settlement Order.DOCX; Redline_102319562v6_GM - Proposed Ignition Switch Settlement Order - 102....pdf; 102337954_4 _GM - Claims Estimate Order.DOC; Redline_102337954v3_GM - Claims Estimate Order - 102337954v4_GM - Claims....pdf; GM - Long Form Notice for Settlement (GDC-AG Comments).docx; Redline_GM - Long Form Notice for Settlement - GM - Long Form Notice for....pdf; GM - Short Form Notice for Settlement (GDC-AG Comments).docx; Redline_GM - Short Form Notice for Settlement - GM - Short Form Notice f....pdf; 102341374_3 _GM - 9019 Motion re GUC Trust Settlement.DOCX; Redline_ 102341374v1_GM - 9019 Motion re GUC Trust Settlement - 102341374....pdf |

**External E-mail. Use caution accessing links or attachments.**

SUBJECT TO FRE 408

All – attached please find the following, each of which remains subject to the ongoing review and comment of our clients:

- A revised settlement agreement (new version incorporates the comments of GP and minor clean-ups);
- A revised settlement order (minor clean-ups);
- A revised claims estimate order (minor clean-ups);
- A revised long-form notice (slight changes);
- A revised short-form notice (slight changes);
- A revised Settlement Motion.

I believe that is all of the documents that GDC/AG held the pen on. I believe we are awaiting a return draft of the notice motion/order from you. Please let us know if you would like to discuss any of the attached.

**Keith Martorana**
Of Counsel

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
200 Park Avenue, New York, NY 10166-0193
Tel +1 212.351.3991 • Fax +1 212.351.6391
KMartorana@gibsondunn.com • www.gibsondunn.com

**From:** Steel, Howard S. [mailto:HSteel@brownrudnick.com]
**Sent:** Thursday, August 3, 2017 10:35 AM
**To:** 'Weintraub, William P' <WWeintraub@goodwinlaw.com>; Martorana, Keith R. <KMartorana@gibsondunn.com>; Forster, Jill L. <JForster@brownrudnick.com>; Daniel H. Golden - Akin Gump Strauss Hauer & Feld LLP (dgolden@akingump.com) <dgolden@akingump.com>; dnewman@akingump.com; Moss, Naomi <nmoss@akingump.com>; Williams, Matt J. <MJWilliams@gibsondunn.com>; Gillett, Gabriel K. <GGillett@gibsondunn.com>; Chorba, Christopher <CChorba@gibsondunn.com>; Fox, Gregory W. <GFox@goodwinlaw.com>; Bob Hilliard <bobh@hmglawfirm.com>; Steve Shadowen <steve@hilliardshadowenlaw.com>; Thomas J. Henry <tjh@tjhlaw.com>
**Cc:** Weisfelner, Edward S. <EWeisfelner@brownrudnick.com>; Steve Berman <Steve@hbsslaw.com>; Chris O'Hara (ChrisO@hbsslaw.com) <ChrisO@hbsslaw.com>; Elizabeth Cabraser (ecabraser@lchb.com) <ecabraser@lchb.com>; Geman, Rachel <rgeman@lchb.com>; esserman@sbep-law.com
**Subject:** RE: Motors - GUC Settlement (FRE 408)


Please see attached updated notices (incorporating EL and PI comments) - cleans and blacklines from last GD / Akin circulation.

Happy to organize a page turn this afternoon or please send final comments / sign-off.

Leaving settlement agreement revisions per Bill's comments to GD.  Thanks.


Howard S. Steel
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
212.209.4917 (direct)
732.757.1898 (cell)
212.938.2806 (direct fax)
hsteel@brownrudnick.com


**From:** Weintraub, William P [mailto:WWeintraub@goodwinlaw.com]
**Sent:** Thursday, August 03, 2017 8:07 AM
**To:** Martorana, Keith R.; Steel, Howard S.; Forster, Jill L.; Daniel H. Golden - Akin Gump Strauss Hauer & Feld LLP (dgolden@akingump.com); dnewman@akingump.com; Moss, Naomi; Williams, Matt J.; Gillett, Gabriel K.; Chorba, Christopher; Fox, Gregory W.; Bob Hilliard; Steve Shadowen; Thomas J. Henry
**Cc:** Weisfelner, Edward S.
**Subject:** RE: Motors - GUC Settlement (FRE 408)

**External E-mail. Use caution accessing links or attachments.**

FRE 408:

Whoops.  Items 3 and 4 resolve the EL / PIWD open issues with each other.  Bill

**From:** Weintraub, William P
**Sent:** Thursday, August 03, 2017 7:54 AM
**To:** 'Martorana, Keith R.'; Steel, Howard S.; Forster, Jill L.; Daniel H. Golden - Akin Gump Strauss Hauer & Feld LLP (dgolden@akingump.com); dnewman@akingump.com; Moss, Naomi; Williams, Matt J.; Gillett, Gabriel K.; Chorba, Christopher; Fox, Gregory W.; Bob Hilliard; Steve Shadowen; Thomas J. Henry

**Cc:** Weisfelner, Edward S.
**Subject:** RE: Motors - GUC Settlement (FRE 408)

**FRE 408**

Hello All:

For the sake of good order, I want to repeat here the edits the PIWD Plaintiffs want made to the Settlement Agreement and the two forms of Notice (short and long). Items 2 and 3 under the heading "Settlement Agreement" resolve the gating issue between EL and PIWD and enables us to move ahead. EL has seen the language and it my understanding they have approved it.

**Settlement Agreement:**

1.    Section 1.43.  Please add the words "those certain" to the definition **PIWD Plaintiffs** means those certain Ignition Switch Pre-Closing Accident Plaintiffs represented by PIWD Counsel.  **[This was done yesterday.]**

2.    Section 2.8.  in the first sentence please add the underscored language as follows: "Notwithstanding Sections 157(b)(2)(B) and (b)(2)(O) of Title 28, in connection with the Settlement Motion, to the extent (if any)consent is required, the Pre-Closing Accident Plaintiffs represented by PIWD Counsel consent to the Bankruptcy Court….."

3.    Section 2.9(b).  Add a new first sentence as follows: "Allocation of the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund between the Plaintiffs asserting economic loss claims and the Plaintiffs asserting PIWD claims shall be determined and approved in the first instance by District Judge Furman or Magistrate Cote, as applicable."

4.    Section 2.9(c).  Add a new first sentence as follows: "Approval of the qualifications and criteria for Plaintiffs to be eligible to receive distributions from the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund shall be done by the Bankruptcy Court in the first instance."

5.    Section 2.9(c).  Add new last sentence as follows: "Being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), or any other consideration contained in the Settlement Fund."

**Forms of Notice:**

1.    Please add to both the long and short form notices the following:  "Being defined as an Affected Party does not assure you will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), or any other consideration contained in the Settlement Fund.  Eligibility and criteria for payment will be approved by the Bankruptcy Court at a later date and will be subject to notice and an opportunity to object."

2.    Please be specific in the forms of Notice that the releases and waivers that are contemplated under the Settlement Agreement to go into effect upon entry of the Settlement Order, and the channeling of claims to the Settlement Fund and to any other settlement consideration that will be done as contemplated by the Waiver Provision, will be solely the function of entry of the Settlement Order.  **[We have shared a mark-up of the  Notices with Brown Rudnick in this regard.  It is our understanding that Brown Rudnick is drafting revisions to the Notices that will be circulated shortly.]**

We are ready to move ahead, subject to acceptance of these points and our review of any additional changes to the documents.

Bill

**William P Weintraub**



Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
o  +1 212 813 8839
m +1 917 861 7200
f   +1 212 419 0964
WWeintraub@goodwinlaw.com | goodwinlaw.com



\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of
the individual or entity named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any
dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify Brown
Rudnick LLP, (617) 856-8200 (if dialing from outside the US, 001-(617)-856-8200) and purge the communication immediately without making any copy
or distribution.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message may contain confidential and privileged information. If it has been sent to you in error, please
reply to advise the sender of the error and then immediately delete this message.

09-50026-mg   Doc 14099-4   Filed 09/11/17   Entered 09/12/17 18:48:42   Exhibit B -
Exhibit A   Pg 254 of 516   Pg 1 of 13

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al.*, | : | No. 09-50026 (MG) |
| f/k/a GENERAL MOTORS CORP., *et al.*, | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF CAMERON R. AZARI, ESQ.,
### ON IMPLEMENTATION AND ADEQUACY OF GENERAL
### MOTORS BANKRUPTCY SETTLEMENT NOTICE PROGRAM

I, Cameron R. Azari, Esq., hereby declare and state as follows:

1.     My name is Cameron R. Azari, Esq.  I have personal knowledge of the matters set forth herein, and I believe them to be true and correct.

2.     I am a nationally recognized expert in the field of legal notice and I have served as an expert in dozens of federal and state cases involving class action notice plans.

3.     I am the Director of Legal Notice for Hilsoft Notifications ("Hilsoft"); a firm that specializes in designing, developing, analyzing and implementing large-scale, un-biased, legal notification plans.  Hilsoft is a business unit of Epiq Systems Class Action and Claims Solutions ("ECA").

4.     Hilsoft has been involved with some of the most complex and significant notices and notice programs in recent history.  With experience in more than 300 cases, notices prepared by Hilsoft have appeared in 53 languages with distribution in almost every country, territory and dependency in the world.  Judges, including in published decisions, have recognized and approved numerous notice plans developed by Hilsoft, which decisions have always withstood collateral reviews by other courts and appellate challenges.

## EXPERIENCE RELEVANT TO THIS CASE

5.    I have served as a notice expert and have been recognized and appointed by courts to design and provide notice in many of the largest and most significant cases, including: *In re Takata Airbag Products Liability Litigation,* Case No. 1:15-md-02599-FAM (Settlements with Toyota, BMW, Mazda and Subaru) (Comprehensive notice effort in the Takata airbag litigation with individual mailed notice to over 19.5 million vehicle owners/lessees and nationwide media campaign including radio, consumer print and online banner advertisements. Final approval pending); *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices and Product Liability Litigation (Bosch Settlement)*, MDL No. 2672 (N.D. Cal.) (Comprehensive notice program within the Volkswagen Emissions Litigation that provided individual notice to more than 946,000 vehicle owners via first class mail and to more than 855,000 via email. A targeted internet campaign further enhanced the notice effort); *In re: Energy Future Holdings Corp., et. al. (Asbestos Claims Bar Date Notice),* 14-10979 (CSS) (Bankr. D. Del.) (Large asbestos bar date notice effort, which included individual notice, national consumer publications and newspapers, hundreds of local newspapers, Spanish newspapers, union labor publications, and digital media to reach the target audience); *In re: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL 1720 (E.D.N.Y.) ($7.2 billion settlement reached with Visa and MasterCard.  The intensive notice program involved over 19.8 million direct mail notices together with insertions in over 1,500 newspapers, consumer magazines, national business publications, trade & specialty publications, and language & ethnic targeted publications, as well as online banner notices, which generated more than 770 million adult impressions and a case website in eight languages); *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL 2179 (E.D. La.) (Dual landmark settlement notice

programs to separate "Economic and Property Damages" and "Medical Benefits" settlement classes. Notice effort included over 7,900 television spots, over 5,200 radio spots, and over 5,400 print insertions and reached over 95% of Gulf Coast residents); *In Re American Express Anti-Steering Rules Antitrust Litigation (II)* ("Italian Colors"), MDL No. 2221 (E.D.N.Y.) (Momentous injunctive settlement regarding merchant payment card processing. Notice program provided individual notice to more than 3.8 million merchants as well as coverage in national and local business publications, retail trade publications and placement in the largest circulation newspaper in each of the U.S. territories and possessions); and *In Re: Checking Account Overdraft Litigation*, MDL 2036 (S.D. Fla.) (Multiple bank settlements between 2010-2016 involving direct mail and email to millions of class members and publication in relevant local newspapers. Representative banks include Fifth Third Bank, National City Bank, Bank of Oklahoma, Webster Bank, Harris Bank, M & I Bank, Community Bank, PNC Bank, Compass Bank, Commerce Bank, Citizens Bank, Great Western Bank, TD Bank, Bancorp, Whitney Bank, Associated Bank, and Susquehanna Bank).

6.  Numerous other court opinions and comments as to our testimony, and opinions on the adequacy of our notice efforts, are included in Hilsoft's curriculum vitae included as **Attachment 1**.

7.  In forming my expert opinion, I and my staff drew from our in-depth class action case experience, as well as our educational and related work experiences. I am an active member of the Oregon State Bar, receiving my Bachelor of Science from Willamette University and my Juris Doctor from Northwestern School of Law at Lewis and Clark College. I have served as the Director of Legal Notice for Hilsoft since 2008 and have overseen the detailed planning of virtually all of our court-approved notice programs since that time. Prior to

assuming my current role with Hilsoft, I served in a similar role as Director of Epiq Legal Noticing (previously called Huntington Legal Advertising). Overall, I have over 17 years of experience in the design and implementation of legal notification and claims administration programs and have been personally involved in well over one hundred successful notice programs.

8.    I have been directly and personally responsible for designing all of the notice planning here for notice to Plaintiffs, including analysis of the individual notice options and the media audience data and determining the most effective mixture of media required to reach the greatest practicable number of included parties. The facts in this declaration are based on what I personally know, as well as information provided to me in the ordinary course of my business by my colleagues at Hilsoft and ECA.

9.    I have been involved in reviewing or drafting the various forms of Notice described below. Each form is noticeable and written in plain language.

## OVERVIEW

10.    This declaration will describe the Settlement Notice Plan ("Notice Plan" or "Plan") and notices (the "Notice" or "Notices") designed by Hilsoft Notifications and proposed here for providing notice of the Settlement in *In Re: Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.,* Case No. 09-50026 (MG) in the United States Bankruptcy Court for the Southern District of New York to Plaintiffs.

11.    Hilsoft has reviewed the lists of vehicles included in the Settlement. For the Notice Plan, data may need to be obtained from HIS Automotive, driven by Polk ("Polk") and New GM. All lists will be combined and de-duplicated in order to find the most likely current address for each Plaintiff. The individual notice effort will be supplemented by a targeted

media campaign.  The media potion of the Notice Plan outlined below is targeted to owners and

lessees of the makes and models included in the Settlement.

12.    In  my  opinion,  the  proposed  Notice  Plan  is  designed  to  reach  the  greatest

practicable number of Plaintiffs through the use of individual notice and paid and earned media.

In  my  opinion,  the  Notice  Plan  is  comprehensive,  reasonable  and  satisfies  the  requirements  of

due process, including its "desire to actually inform" requirement.[1]

13.   Notice  shall  be  disseminated  pursuant  to  the  plan  and  details  set  forth  below  and

referred  to  as  the  "Notice  Plan."    The  Notice  Plan  was  designed  to  provide  notice  to  the

following included group of Plaintiffs:

A.  All  persons  in  the  United  States  who,  as  of  July  10,  2009,  owned  or  leased  a  vehicle

manufactured by GM included in the following recalls:

(1) Delta Ignition Switch Vehicles included in Recall No. 14v047: 2005-2010:

Chevy Cobalt, 2006-2011 Chevy HHR, 2007-2010 Pontiac G5, 2007-2010 Saturn

Sky, 2003-2007 Saturn ION, and 2006-2010 Pontiac Solstice;

(2) Low Torque Ignition Switch Vehicles, which are included in Recall Nos.

14v355, 14v394, and 14v400: 2005-2009:  Buick Lacrosse, 2006-2014 Chevrolet

Impala, 2000-2005 Cadillac Deville, 2006-2011 Cadillac DTS, 2006-2011 Buick

Lucerne, and 2006-2008 Chevrolet Monte Carlo; 2003-2014 Cadillac CTS and

the 2004-2006 Cadillac SRX; and 1997-2005 Chevrolet Malibu, 2000-2005

Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand

_____

[1]  "But when notice is a person's due, process which is a mere gesture is not due process.  The means employed
must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.   The
reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is
in itself reasonably certain to inform those affected . . ."  *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306,
315 (1950).

Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-2004 Oldsmobile Alero;

**(3)** Other Vehicles with defective ignition switches in Recall Nos. 14V-346 and 14V-540: 2010-2014 Chevrolet Camaro, 2011-2013 Chevrolet Caprice, and 2008-2009 Pontiac G8;

**(4)** Side Airbag Defect Vehicles included in Recall No. 14v118: 2008-2013 Buick Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn Outlook; and

**(5)** Power Steering Defect Vehicles included in Recall No. 14v153: 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura.

B.  Plaintiffs asserting personal injury or wrongful death claims based on or arising from an accident involving a vehicle manufactured and sold by Old GM that occurred prior to July 10, 2009 who have (i) filed a lawsuit against New GM as of the date of the Settlement Agreement, or (ii) filed or joined a motion for authorization to file late claims against the GUC Trust.

## NOTICE PLAN

### *Individual Notice – Direct Mail*

14.     A Direct Mail Notice tailored to the potential owners/lessees of the included Old GM vehicles will be sent via First Class mail.  Address updating (both prior to mailing and on undeliverable pieces) and re-mailing protocols will meet or exceed those used in other complex litigation settlements.

15.    I understand that a comprehensive list of potential Plaintiffs exists – consisting of
the current and former owners and lessees of the Old GM vehicles included in the Settlement.
The database will be acquired from Polk and New GM and, if available, supplemented by other
sources.  All data may be de-duplicated and updated in order to find the most likely current
address for each current and former vehicle owner/lessee. This data will be used to provide
individual notice to virtually all Plaintiffs.

16.    The mailed notice will consist of a large format, 2-image postcard notice (the
"Direct Mail Notice") that clearly and concisely summarizes the Settlement.  The Direct Mail
Notice will direct the recipients to a website dedicated specifically to the Settlement where they
can access additional information and learn about how to participate.  The Direct Mail Notices
will be sent by United States Postal Service ("USPS") first class mail.

17.    Prior to mailing, all mailing addresses provided will be checked against the
National Change of Address ("NCOA") database maintained by the United States Postal
Service ("USPS").[2]  Any addresses that are returned by the NCOA database as invalid will be
updated through a third-party address search service.  In addition, the addresses will be certified
via the Coding Accuracy Support System ("CASS") to ensure the quality of the zip code, and
verified through Delivery Point Validation ("DPV") to verify the accuracy of the addresses.
This address updating process is standard for the industry and for the majority of promotional
mailings that occur today.

18.    Direct Mail Notices returned as undeliverable will be re-mailed to any new address
available through postal service information, for example, to the address provided by the postal

_____

[2] The NCOA database contains records of all permanent change of address submissions received by the USPS for
the last four years.  The USPS makes this data available to mailing firms and lists submitted to it are automatically
updated with any reported move based on a comparison with the person's name and known address.

7

service on returned pieces for which the automatic forwarding order has expired, but which is still during the period in which the postal service returns the piece with the address indicated, or to better addresses that may be found using a third-party lookup service ("ALLFIND", maintained by LexisNexis).   Upon successfully locating better addresses, Notices will be promptly re-mailed.

19.   Additionally, a Long Form Notice will be mailed to all persons who request one via the toll-free phone number or by mail. The Long Form Notices will also be available for download or printing at the website (in both English and Spanish).   Copies of the proposed Direct Mail Notice and Long Form Notice are included with the materials filed by the Parties.

### *Paid Media*

20.   Due to the comprehensive individual notice effort described above only moderate supplemental paid media will be provided for the Settlement.   The media selected is designed to both notify Plaintiffs who may not see the Direct Mail Notice and also to support and remind Plaintiffs to act if they so choose.

21.   The Notice Plan will include digital banner advertisements targeted specifically to owners and lessees of the vehicle makes and models included in the Settlement along with online video advertisements targeted to adults 18+.   The Banner and Video Notice will provide Plaintiffs with additional opportunities to be apprised of the Settlement and their rights under it. Anyone who sees the Banner or Video Notice can click on it and instantly be routed to the Settlement website for detailed information about the Settlement.

22.   The targeted internet campaign will include banner notices measuring 300x250 pixels, 728x90 pixels, and 320x50 pixels purchased through the *Conversant Ad Network*, which represents thousands of digital properties – including inventory on both desktop and mobile

devices – across all major content categories.  Banner notices would be purchased through two
hyper-targeted strategies and run for a 45-day period of time.

23.    First, banner notices will be targeted using a "list activation" strategy.  This is
accomplished by matching the actual names and physical/email addresses of known Plaintiffs
with current consumer profiles.  This strategy ensures individuals receiving direct notice are
also provided reminder messaging online via banner ads.

24.    Second, banner notices will be targeted using household-level automotive data.
This information will include purchasers/owners of specific vehicles makes, models, and years
to which banner notices will then be served.  While this will be partially duplicative of the first
strategy, this group of individuals would also include potential former owners and anyone for
which an address is unknown.

25.    The online video advertisements include pre-roll video ads that will be viewable
on *YouTube* and other sites with *YouTube* embedded videos. The video ads will appear prior to
the viewer's main video. 15-second and 30-second video ads will be purchased and targeted to
adults nationwide.

### *Internet Sponsored Search Listings*

26.    To facilitate locating the case website, sponsored search listings will be acquired
on the three most highly-visited internet search engines:  *Google*, *Yahoo!* and *Bing*.  When
search engine visitors search on common keyword combinations such as "GM Car Settlement,"
"General Motors Settlement," or "GM Ignition Settlement," the sponsored search listing will
generally be displayed at the top of the page prior to the search results or in the upper right hand
column.

27.   The Sponsored Search Listings will be provided to search engine visitors across the United States, and will assist Plaintiffs in finding and accessing the Case Website.

***Informational Release***

28.   To build additional reach and extend exposures, a party-neutral Informational Release will be issued to approximately 5,000 general media (print and broadcast) outlets and 5,400 online databases and websites throughout the United States.  The Informational Release will serve a valuable role by providing additional notice exposures beyond that which will be provided by the paid media.  There is no guarantee that any news stories will result, but if they do, potential Plaintiffs will have additional opportunities to learn that their rights are at stake in credible news media, adding to their understanding.  The Informational Release will include the toll free number and Case Website address.

***Case Website, Toll-free Telephone Number and Postal Mailing Address***

29.   A dedicated website will be created for the Settlement.  Plaintiffs will be able to obtain detailed information about the case and review documents including the Long Form Notices (in English and Spanish), Settlement Agreement, Settlement Order, and answers to frequently asked questions (FAQs) and any other documents the Court may require.  Once the allocation plan is determined it will be posted prominently on the Settlement Website.  If Plaintiffs will need to file a claim, the website may be configured to allow filing online.  Any claim forms would also be available to download and print for filing via mail.

30.   The Case Website address will be displayed prominently on all notice documents. The Banner Notices will link directly to the Case Website.

31.   A toll-free phone number will be established to allow Plaintiffs to call for additional information, listen to answers to FAQs and request that a Long Form Notice be

10

mailed to them.  Live operators will be available as needed.  The toll-free number will be prominently displayed in the Notice documents as appropriate.

32.    A post office box will also be used for the Settlement, allowing Plaintiffs to contact the claims administrator by mail with any specific requests or questions.

## PLAIN LANGUAGE NOTICE DESIGN

33.    The proposed Notices are designed to be "noticed," reviewed, and—by presenting the information in plain language—understood by Plaintiffs.  The Notices contain substantial, albeit easy-to-read, summaries of all of the key information about Plaintiffs' rights and options to encourage readership and comprehension.

34.    The Direct Mail Notice features a prominent headline and is clearly identified as a notice from the Bankruptcy Court.  It includes a color logo from the Court to add credibility to the notice.  The postcard is printed in a larger 8 by 5.5 inch size on heavier postcard stock. These design elements alert recipients and readers that the Notice is an important document authorized by a court and that the content may affect them, thereby supplying reasons to read the Notice.

35.    The Long Form Notices provide substantial information to Plaintiffs.  It begins with a summary section, which provides a concise overview of important information about the Settlements.  A table of contents, categorized into logical sections, helps to organize the information, while a question and answer format makes it easy to find answers to common questions by breaking the information into simple headings.

36.    The Direct Mail Notices and the Long Form Notices will be available in English and Spanish at the website.

## CONCLUSION

37.    In complex litigation notice planning, execution, and analysis, we are guided by due process considerations under the United States Constitution, by federal and local rules and statutes, and further by case law pertaining to notice.   In this matter we are operating under Federal Rules of Bankruptcy Procedure 2002 and 9008.   The general premise set forth in Rule 2002 is that notice must be provided by mail.   We are in full compliance with that here.   The supplemental media plan is in compliance with Rule 9008.

38.    The Notice Plan described above is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action."[3] The Notice Plan schedule will afford enough time to provide full and proper notice to Plaintiffs before the objection deadline.

I declare under penalty of perjury that the foregoing is true and correct.   Executed on August 14th, 2017.

Cameron R. Azari, Esq.

© 2017 Hilsoft Notifications

---

[3] *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950).

09-50026-mg    Doc 14130-1    Filed 09/26/17    Entered 09/26/17 22:31:43    Exhibit C -
Exhibit A    Pg 267 of 516

# EXHIBIT C

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  IN RE:  GENERAL MOTORS LLC
    IGNITION SWITCH LITIGATION,
 4
                                    14 MD 2543 (JMF)
 5

 6  ------------------------------x
                                    New York, N.Y.
 7                                  August 11, 2017
                                    9:00 a.m.
 8
    Before:
 9
                    HON. JESSE M. FURMAN,
10
                                    District Judge
11
                          APPEARANCES
12

13  LIEFF CABRASER HEIMANN AND BERNSTEIN LLP
    BY:  ELIZABETH JOAN CABRASER
14            -AND-
    HAGENS BERMAN SOBOL SHAPIRO LLP (SEATTLE)
15  BY:  STEVE W. BERMAN
              -AND-
16  HILLIARD MUNOZ GONZALES LLP
    BY:  ROBERT HILLIARD
17            -AND-
    BROWN RUDNICK
18  BY:  HOWARD STEEL
         Attorneys for Plaintiffs
19
    KIRKLAND & ELLIS LLP
20  BY:  RICHARD CARTIER GODFREY
         ROBERT C. BROCK
21       ANDREW B. BLOOMER
         ALLAN PIXTON
22            -AND-
    KING & SPALDING
23  BY:  ARTHUR J. STEINBERG
         Attorneys for Defendant General Motors L.L.C.
24

25
```

1    want to give yourselves a little more time on some of the

2    things, that's fine with me.  If you have any proposed

3    modifications, why don't you talk about them to each other, and

4    we'll go from there.

5        Next is supplemental briefing on successor liability.

6    Sorry to give you more briefing.  I'm sorry to give myself more

7    briefs to read.  As you can see, I thought it was appropriate

8    for a couple reasons.

9        Without intimating whether I agree with the

10    plaintiffs' characterization of New GM's proposal as a fishing

11    tactic or not, I am inclined to agree with plaintiffs that it's

12    unnecessary to proceed in the manner that GM has proposed and

13    likely only to result in more delay, given the arguments made

14    by GM thus far, and they're summarized a bit in the agenda

15    letter but the portion attributable to the plaintiffs, but

16    certainly the arguments that have been made to me thus far.

17        I don't quite understand why we would need to proceed

18    in that manner and why GM couldn't make the arguments that it

19    thinks are to be made based on the information that it

20    currently has.

21        I think it would make more sense to stick with the

22    current plan, which is simultaneous briefing by August 24 with

23    the understanding, perhaps, or the caveat that New GM or the

24    plaintiffs, for that matter, could always seek leave to file a

25    supplemental brief, that is, supplemental supplemental brief.

1           If there is something in the declarations that are

2 filed in the first instance that changes the situation in some

3 material way, I think that enables us to stick with the current

4 schedule but allows GM, if it learns something from the factual

5 declarations that are filed that it changes things in some

6 meaningful way, it gives New GM an opportunity to tell me what

7 that is.  I would think that that would be a better way to

8 proceed.  That's what I would propose.

9           Thoughts.  No thoughts?

10           MR. GODFREY:  I have thoughts.  I thought Mr. Berman

11 was going to say something.

12           THE COURT:  It looks like he is.

13           MR. BERMAN:  I am.  On Wednesday we informed General

14 Motors that we plan on presenting papers in the bankruptcy

15 court next week, perhaps as early as Tuesday, that would ask

16 the bankruptcy court to issue a claims estimation order

17 pursuant to the sale agreement.

18           And under the sale agreement, your Honor, the Guc

19 Trust has the authority to go to the bankruptcy court and to

20 compromise claims.  In the event the Guc Trust makes a

21 determination that claims exceed $35,000,000, to ask the Court

22 to issue an estimation order that would require New GM to issue

23 stock that would be put into an account for the benefit of,

24 actually, our class.

25           And pursuant to that estimation order, we're going to

1  ask the bankruptcy court to issue that order which would

2  require GM to put up stock that's worth roughly a little over

3  $1,000,000,000.

4          THE COURT:  Correct me if my understanding of this is

5  wrong.  I take it this is the so-called "accordion feature";

6  that essentially the estimation order would trigger the

7  accordion feature?

8          MR. BERMAN:  That's correct.

9          THE COURT:  This might be what Mr. Godfrey was fearing

10  would be the --

11          MR. BERMAN:  Yes.  We gave GM a heads-up, as I said,

12  this week.  I don't think that this changes your briefing idea

13  because the fact of the matter is that you recognize the

14  positions New GM has taken with respect to successor liability.

15  We're not going to have a resolution of this proposed

16  settlement.  I suspect that GM is not going to just quietly

17  agree to issue $1,000,000,000 worth of stock.

18          THE COURT:  I'm pretty confident in sharing that

19  prediction.

20          MR. BERMAN:  I'm also pretty confident that the sale

21  agreement actually gives GM no rights to object, but we'll

22  fight that out.

23          THE COURT:  I intimate no view on that.

24          MR. BERMAN:  So I think that we should continue with

25  the briefing, but I wanted to give the Court a heads-up that

1    there will be some new facts on the table next week.

2            THE COURT:  I appreciate that heads-up.  I think, if

3    anything -- I understand from the grumpy looks at the back

4    table that you're not happy about the accordion feature issues

5    here.  Those are not my concern, at least in the

6    first instance.

7            I think to the extent that these implicate me, that

8    suggests to me that you'll have the information before the

9    deadline that I've imposed, and we can just proceed as I had

10   already planned.

11           Any reason otherwise, with the caveat, I suppose,

12   Mr. Godfrey and Mr. Bloomer, that if upon seeing what

13   plaintiffs file on Tuesday, you need additional time to sort

14   through what it all means, that you can always seek a

15   reasonable extension, and I would consider it.  Obviously the

16   sooner we can get briefing, the better, as far as I'm

17   concerned.

18           Your thoughts.  I don't want to hear your thoughts on

19   the accordion feature issue.  You'll have plenty of

20   opportunity, I'm sure, to air those, whether you have any right

21   to or not.  I'm sure you'll make those arguments but not to me,

22   at least in the first instance.

23           Any issues with what I have said on the successor

24   liability issues before me?

25           MR. GODFREY:  Well, both issues are going to be before

```
 1    your Honor.  Let me address the first issue, which is the
 2    successor liability briefing.
 3          I think, in light of what your Honor has said with
 4    respect to the option of having supplemental briefing if we
 5    deem it necessary, then that is acceptable to New GM.
 6          With respect to the second issue though, I have some
 7    points that your Honor -- this is a marker.  This is not going
 8    to be in the bankruptcy court.
 9          At my age, I'm seldom surprised, and I'm never
10    shocked.  But a day and a half ago, I was both surprised and
11    shocked when we were given a bare-bones description of this
12    settlement agreement.
13          This is not a compromise by the Guc Trust or the
14    plaintiffs' claims in the bankruptcy court.  This is a complete
15    surrender and sellout using GM's money to pay for a settlement
16    that was not defended against, claims that were meritless that
17    were asserted.
18          Let me express, in no uncertain terms, how we view the
19    proposal.
20          THE COURT:  Let me stop you, only because I want to
21    get out of here as I suggested.  I don't mean to cut you off
22    and not give you an opportunity to be heard on this, but I
23    don't think this is the time or place to do it.
24          You'll have plenty of opportunity in the
25    first instance, I would think in front of the bankruptcy court,
```

 1    even if it's ultimately an issue that I'll need to resolve or

 2    even some higher court.

 3         Am I wrong about that?

 4         MR. GODFREY:  Yes.  We are going to file a motion to

 5    withdraw as soon as permissible, withdraw the reference from

 6    the bankruptcy court and this court.

 7         The notion that they can settle for no material money

 8    from the Guc Trust -- the Guc Trust has $400,000,000 in assets.

 9    They're getting $15,000,000, as we understand it, assigning

10    rights, agreeing to a $10,000,000,000 claim.  And supposedly GM

11    has no rights when they take a billion dollars of our money.

12         That is not going to stand.  We're going to withdraw

13    the reference.  We're going to bring it to the Court.  This is

14    collusive.  There are cases on point that we can refer the

15    Court to.

16         This has got all the indicia of a collusive

17    settlement.  They are awaiting a time-barred defense.  We have

18    no idea upon what basis and what expert the Guc Trust had,

19    which I doubt, by which they are not contesting $10,000,000,000

20    in claims.

21         And that is the trigger mechanism by which they claim

22    New GM has no choice but putting up a billion dollars.  That is

23    not going to happen without this Court hearing and ruling on

24    the issues.

25         We have unfairness issues.  We have the indicia of

1   collusive issues.  We have the fact that General Motors has

2   been excluded.  And you heard this morning that supposedly we

3   have no rights to even object.  I don't think that in our

4   country when someone is told to give a billion dollars to

5   someone else, we have some rights to object, including notice

6   and opportunity to be heard.

7            So, from a marker perspective, we're going to file a

8   motion.  We're going to brief the motion.  We're going to

9   attack the settlement, and it's going to be before your Honor.

10  We're going to do it as soon as we can permissibly do it.

11           THE COURT:  The marker is laid.  I'll look for the

12  motion.  The question is your arguments seem to me to be more

13  geared towards the merits of the issue than the forum in which

14  it should be litigated, at least in the first instance.

15           In proposing that the reference be withdrawn may be

16  the fact that it's a collusive agreement, if it is -- I

17  intimate no view on the matter -- is a factor to consider in

18  that analysis.

19           The question that occurs to me, thinking out loud, is

20  why you can't make those arguments to the bankruptcy court in

21  the first instance, recognizing that they may ultimately come

22  to me.

23           MR. GODFREY:  That's a good question.  Since

24  your Honor said I should keep this short, but there is an

25  answer to that.

1       THE COURT:  I trust the answer will be clear from your

2   motion.

3       MR. GODFREY:  It will be very clear, but we can talk

4   about this further in the motion.  One simple point for

5   your Honor to consider.  This is on behalf of a putative class,

6   among other things.

7       Your Honor has got the class before the court.  This

8   Court is going to decide Rule 23 issues, not the bankruptcy

9   court and not some quasi class which has the same implications.

10      This has come up before in other cases where the court

11  has said, no.  That's the MDL's court's purview we think.  So

12  there is significant overlap between the issues, both in terms

13  of the merits of the claims and the class issues and in terms

14  of notice issues that this Court has the jurisdiction over and

15  that this Court should have the primary role over.

16      So we will lay this out for the Court, but make no

17  mistake.  General Motors objects to this.  We believe that it's

18  brought an indicia of collusiveness.  Frankly, what the few

19  facts we were told are, they've got $400,000,000 in assets from

20  the Guc Trust for $15,000,000.

21      They are released from all liability for this alleged

22  $10,000,000 claim, and General Motors is supposed to put up a

23  billion dollars to make it all right.  General Motors has been

24  excluded from the settlement negotiations and had no knowledge

25  of the terms of the settlement negotiations.

1    If you look at the terms of the accordion feature, we

2    don't believe that they can do this.

3    THE COURT:  Understood.  I will look for it.  If you

4    want to discuss with each other a briefing schedule for that

5    motion, you're certainly welcome to, and you can propose it to

6    me.

7    In the absence of that, it sounds like GM is planning

8    to file the motion at some point soon regardless.  Unless and

9    until I see otherwise, the local rules and default schedule

10   will apply.

11   As for the successor liability briefing, we'll stick

12   with the existing plan with the understanding that if there is

13   need for supplemental supplemental briefing, that is to say,

14   another round, then you'll let me know.

15   I want to say two notes on that.  That is not to give

16   you an opportunity to reply.  I am contemplating simultaneous

17   briefing.  So I would grant an additional round of briefs only

18   if there is something new learned from the submissions on that

19   date that changes things in some material fashion that you

20   think you need to address.  It's not an opportunity to reply to

21   the other side's arguments.

22   The second is that I'm not going to set a deadline

23   right now for that additional briefing or page limits for that

24   matter because I'm hoping and assuming that it won't be

25   necessary.

1    I do caution you that you're not going to have a lot

2    of time and you're not going to have a lot of pages.  If you do

3    propose another set of briefs, keep both of those in mind.

4        MR. GODFREY:  I think we understood that, your Honor.

5    At this point, I think we understand your views on supplemental

6    briefing.

7        THE COURT:  Good.

8        Let me also just say on the briefs that you will be

9    filing in the next couple weeks on this front, I would endeavor

10   to make them, as much as you can, sort of standalone briefs,

11   that is to say, on the one hand, you don't need to waste time

12   on the preliminaries, the background, etc.

13       I know what the issues are.  I have obviously

14   addressed a lot of the issues in the opinion that I handed down

15   a week or so.  You can cut to the chase and brief the issues

16   under that law, as I indicated, and address the effects, if

17   any, of the settlement with the Guc Trust.

18       Having said that, to the extent you can write it so

19   that my clerks and I don't need to keep looking back at the

20   prior set of briefs, that would be helpful for two reasons.

21       One is, as I'm going to tell you in a minute or two,

22   today is Ms. Kumar's last day with me.  Actually, last Friday

23   was.  She's actually just done me the courtesy of coming to

24   this to make things easier in transitioning.

25       She helped me on that motion and won't be around when

 1    your supplemental briefs come in, which is to say that I'll

 2    have another clerk without the same institutional memory and

 3    background on this helping me.

 4            The second is while I certainly have read all the

 5    materials, it will be several months basically since I have

 6    done so.  The less that I have to go back and reread things,

 7    the better.  I would just ask you to keep those in mind in

 8    terms of how you write those briefs.

 9            MR. GODFREY:  Your Honor, I have a question on that.

10    Would it be helpful for us, if we are referring back to another

11    brief, to just attach as an exhibit the selected pages from

12    that brief?

13            THE COURT:  Yes.  I think that would be helpful

14    actually.

15            MR. GODFREY:  I think we'll do that, if that's

16    acceptable to the Court.

17            THE COURT:  I think that is.  Otherwise, leave my

18    remarks standing.  I gave you my guidance, but that would be

19    helpful, if you think it's necessary.

20            MR. GODFREY:  Thank you.

21            THE COURT:  Settlement.

22            Mr. Berman, did you have something else you wanted to

23    add?

24            MR. BERMAN:  Yes.  We've been silent at the front

25    table with respect to Mr. Godfrey's comments.

# <u>EXHIBIT D</u>

## Forster, Jill L.

| | |
|---|---|
| **From:** | Golden, Daniel <dgolden@AkinGump.com> |
| **Sent:** | Wednesday, August 09, 2017 12:35 PM |
| **To:** | Martorana, Keith R.; Steel, Howard S.; 'Weintraub, William P'; Forster, Jill L.; Newman, Deborah; Moss, Naomi; Williams, Matt J.; Gillett, Gabriel K.; Chorba, Christopher; Fox, Gregory W.; Bob Hilliard; Steve Shadowen; Thomas J. Henry; Lnorman@andrewsmyers.com |
| **Cc:** | Weisfelner, Edward S.; Steve Berman; Chris O'Hara (ChrisO@hbsslaw.com); Elizabeth Cabraser (ecabraser@lchb.com); Geman, Rachel (External); esserman@sbep-law.com |
| **Subject:** | RE: Motors - GUC Settlement (FRE 408) |

**External E-mail. Use caution accessing links or attachments.**

All:  I would like to see if can schedule an all hands call for tomorrow to finalize all of the settlement documentation and motions.  This morning Ed Weisfelner and I had a call with Arthur Steinberg and an attorney from Kirkland giving them a heads up on the proposed settlement and our desire to have a chambers conference with Judge Glenn for some day next week.  We committed to giving Steinberg and the Kirkland attorney a final set of the pleadings sufficiently in advance of a to be scheduled chambers conference.  It seems to me we need a final call to finalize the documents so we can schedule that chambers conference.  At this call please have the requisite people necessary to bind your respective clients.  Please advise if 2 30 pm Eastern tomorrow works this call.  If so, we can circulate a call in number.

#### Daniel H. Golden
**AKIN GUMP STRAUSS HAUER & FELD** LLP
One Bryant Park  |  New York, NY 10036-6745  |  USA  |  Direct: +1 212.872.8010  |  Internal: 38010
Fax: +1 212.872.1002  |  dgolden@akingump.com  |  akingump.com  |  Bio

**From:** Martorana, Keith R. [mailto:KMartorana@gibsondunn.com]
**Sent:** Tuesday, August 08, 2017 8:52 PM
**To:** Steel, Howard S.; 'Weintraub, William P'; Forster, Jill L.; Golden, Daniel; Newman, Deborah; Moss, Naomi; Williams, Matt J.; Gillett, Gabriel K.; Chorba, Christopher; Fox, Gregory W.; Bob Hilliard; Steve Shadowen; Thomas J. Henry
**Cc:** Weisfelner, Ed (External); Steve Berman; Chris O'Hara (ChrisO@hbsslaw.com); Elizabeth Cabraser (ecabraser@lchb.com); Geman, Rachel (External); esserman@sbep-law.com
**Subject:** RE: Motors - GUC Settlement (FRE 408)

**SUBJECT TO FRE 408**

All – attached please find combined GDC/AG comments to the following:

1. Settlement Agreement
2. Settlement Order
3. Claims Estimate Order
4. 9019 Motion
5. Notice Motion
6. Long Form Notice
7. Cam Azari Declaration

We had no comments to the short form notice or Berman / Cabraser / Hilliard Declaration (the most recent versions have been reattached for the sake of completeness).  Please note that we have been engaged in discussions with Lisa Norman who is counsel to the "Additional Ignition Switch Pre-Closing Accident Plaintiffs," and we understand that they are amenable to becoming signatories to the Settlement Agreement.  Accordingly, the attached Settlement Agreement

1

includes her firm as a PIWD Counsel. In addition, we understand from Akin that BR will be providing the back-up for the new cost of the Noticing Plan – please provide this document when possible.

Please note that the attached remains subject to the ongoing review and comment of our clients. Please let us know if you would like to discuss the attached.

**Keith Martorana**
Of Counsel

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP
200 Park Avenue, New York, NY 10166-0193
Tel +1 212.351.3991 • Fax +1 212.351.6391
KMartorana@gibsondunn.com • www.gibsondunn.com

---

**From:** Steel, Howard S. [mailto:HSteel@brownrudnick.com]
**Sent:** Monday, August 7, 2017 12:58 PM
**To:** Martorana, Keith R. <KMartorana@gibsondunn.com>; 'Weintraub, William P' <WWeintraub@goodwinlaw.com>; Forster, Jill L. <JForster@brownrudnick.com>; Daniel H. Golden - Akin Gump Strauss Hauer & Feld LLP (dgolden@akingump.com) <dgolden@akingump.com>; dnewman@akingump.com; Moss, Naomi <nmoss@akingump.com>; Williams, Matt J. <MJWilliams@gibsondunn.com>; Gillett, Gabriel K. <GGillett@gibsondunn.com>; Chorba, Christopher <CChorba@gibsondunn.com>; Fox, Gregory W. <GFox@goodwinlaw.com>; Bob Hilliard <bobh@hmglawfirm.com>; Steve Shadowen <steve@hilliardshadowenlaw.com>; Thomas J. Henry <tjh@tjhlaw.com>
**Cc:** Weisfelner, Edward S. <EWeisfelner@brownrudnick.com>; Steve Berman <Steve@hbsslaw.com>; Chris O'Hara (ChrisO@hbsslaw.com) <ChrisO@hbsslaw.com>; Elizabeth Cabraser (ecabraser@lchb.com) <ecabraser@lchb.com>; Geman, Rachel <rgeman@lchb.com>; esserman@sbep-law.com
**Subject:** RE: Motors - GUC Settlement (FRE 408)


**SUBJECT TO FRE 408**

All - attached please find combined EL and PI comments to all docs.

Index:
1. Settlement Agreement
2. Settlement Order
3. Claims Estimate Order
4. 9019 Motion
5. Notice Motion
6. Short Form Notice
7. Long Form Notice
8. Berman / Cabraser / Hilliard Declaration
9. Cam Azari Declaration

Please let us know where we are final, and any comments / anything you would like to discuss. Thanks.


Howard S. Steel
Brown Rudnick LLP

Seven Times Square
New York, New York 10036
212.209.4917 (direct)
732.757.1898 (cell)
212.938.2806 (direct fax)
hsteel@brownrudnick.com

---

**From:** Martorana, Keith R. [mailto:KMartorana@gibsondunn.com]
**Sent:** Thursday, August 03, 2017 3:22 PM
**To:** Steel, Howard S.; 'Weintraub, William P'; Forster, Jill L.; Daniel H. Golden - Akin Gump Strauss Hauer & Feld
LLP (dgolden@akingump.com); dnewman@akingump.com; Moss, Naomi; Williams, Matt J.; Gillett, Gabriel K.;
Chorba, Christopher; Fox, Gregory W.; Bob Hilliard; Steve Shadowen; Thomas J. Henry
**Cc:** Weisfelner, Edward S.; Steve Berman; Chris O'Hara (ChrisO@hbsslaw.com); Elizabeth Cabraser
(ecabraser@lchb.com); Geman, Rachel; esserman@sbep-law.com
**Subject:** RE: Motors - GUC Settlement (FRE 408)

External E-mail. Use caution accessing links or attachments.

SUBJECT TO FRE 408

All – attached please find the following, each of which remains subject to the ongoing review and comment of
our clients:

- A revised settlement agreement (new version incorporates the comments of GP and minor clean-ups);
- A revised settlement order (minor clean-ups);
- A revised claims estimate order (minor clean-ups);
- A revised long-form notice (slight changes);
- A revised short-form notice (slight changes);
- A revised Settlement Motion.

I believe that is all of the documents that GDC/AG held the pen on.  I believe we are awaiting a return draft of
the notice motion/order from you.  Please let us know if you would like to discuss any of the attached.

**Keith Martorana**
Of Counsel

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
200 Park Avenue, New York, NY 10166-0193
Tel +1 212.351.3991 • Fax +1 212.351.6391
KMartorana@gibsondunn.com • www.gibsondunn.com

---

**From:** Steel, Howard S. [mailto:HSteel@brownrudnick.com]
**Sent:** Thursday, August 3, 2017 10:35 AM
**To:** 'Weintraub, William P' <WWeintraub@goodwinlaw.com>; Martorana, Keith R.
<KMartorana@gibsondunn.com>; Forster, Jill L. <JForster@brownrudnick.com>; Daniel H. Golden - Akin Gump
Strauss Hauer & Feld LLP (dgolden@akingump.com) <dgolden@akingump.com>; dnewman@akingump.com;
Moss, Naomi <nmoss@akingump.com>; Williams, Matt J. <MJWilliams@gibsondunn.com>; Gillett, Gabriel K.
<GGillett@gibsondunn.com>; Chorba, Christopher <CChorba@gibsondunn.com>; Fox, Gregory W.
<GFox@goodwinlaw.com>; Bob Hilliard <bobh@hmglawfirm.com>; Steve Shadowen

<steve@hilliardshadowenlaw.com>; Thomas J. Henry <tjh@tjhlaw.com>

**Cc:** Weisfelner, Edward S. <EWeisfelner@brownrudnick.com>; Steve Berman <Steve@hbsslaw.com>; Chris O'Hara (ChrisO@hbsslaw.com) <ChrisO@hbsslaw.com>; Elizabeth Cabraser (ecabraser@lchb.com) <ecabraser@lchb.com>; Geman, Rachel <rgeman@lchb.com>; esserman@sbep-law.com

**Subject:** RE: Motors - GUC Settlement (FRE 408)

Please see attached updated notices (incorporating EL and PI comments) - cleans and blacklines from last GD / Akin circulation.

Happy to organize a page turn this afternoon or please send final comments / sign-off.

Leaving settlement agreement revisions per Bill's comments to GD.  Thanks.

Howard S. Steel
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
212.209.4917 (direct)
732.757.1898 (cell)
212.938.2806 (direct fax)
hsteel@brownrudnick.com

---

**From:** Weintraub, William P [mailto:WWeintraub@goodwinlaw.com]
**Sent:** Thursday, August 03, 2017 8:07 AM
**To:** Martorana, Keith R.; Steel, Howard S.; Forster, Jill L.; Daniel H. Golden - Akin Gump Strauss Hauer & Feld LLP (dgolden@akingump.com); dnewman@akingump.com; Moss, Naomi; Williams, Matt J.; Gillett, Gabriel K.; Chorba, Christopher; Fox, Gregory W.; Bob Hilliard; Steve Shadowen; Thomas J. Henry
**Cc:** Weisfelner, Edward S.
**Subject:** RE: Motors - GUC Settlement (FRE 408)

**External E-mail. Use caution accessing links or attachments.**

---

FRE 408:

Whoops.  Items 3 and 4 resolve the EL / PIWD open issues with each other.  Bill

---

**From:** Weintraub, William P
**Sent:** Thursday, August 03, 2017 7:54 AM
**To:** 'Martorana, Keith R.'; Steel, Howard S.; Forster, Jill L.; Daniel H. Golden - Akin Gump Strauss Hauer & Feld LLP (dgolden@akingump.com); dnewman@akingump.com; Moss, Naomi; Williams, Matt J.; Gillett, Gabriel K.; Chorba, Christopher; Fox, Gregory W.; Bob Hilliard; Steve Shadowen; Thomas J. Henry
**Cc:** Weisfelner, Edward S.
**Subject:** RE: Motors - GUC Settlement (FRE 408)

**FRE 408**

Hello All:

For the sake of good order, I want to repeat here the edits the PIWD Plaintiffs want made to the Settlement Agreement and the two forms of Notice (short and long).  Items 2 and 3 under the heading

"Settlement Agreement" resolve the gating issue between EL and PIWD and enables us to move ahead.  EL has seen the language and it my understanding they have approved it.

**Settlement Agreement:**

1.   Section 1.43.  Please add the words "those certain" to the definition **PIWD Plaintiffs** means <u>those certain</u> Ignition Switch Pre-Closing Accident Plaintiffs represented by PIWD Counsel.  **[This was done yesterday.]**

2.   Section 2.8.  in the first sentence please add the underscored language as follows: "Notwithstanding Sections 157(b)(2)(B) and (b)(2)(O) of Title 28, in connection with the Settlement Motion, <u>to the extent (if any)consent is required,</u> the Pre-Closing Accident Plaintiffs represented by PIWD Counsel consent to the Bankruptcy Court….."

3.   Section 2.9(b).  Add a new first sentence as follows: "Allocation of the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund between the Plaintiffs asserting economic loss claims and the Plaintiffs asserting PIWD claims shall be determined and approved in the first instance by District Judge Furman or Magistrate Cote, as applicable."

4.   Section 2.9(c).  Add a new first sentence as follows: "Approval of the qualifications and criteria for Plaintiffs to be eligible to receive distributions from the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund shall be done by the Bankruptcy Court in the first instance."

5.   Section 2.9(c).  Add new last sentence as follows: "Being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), or any other consideration contained in the Settlement Fund."

**Forms of Notice:**

1.   Please add to both the long and short form notices the following:  "Being defined as an Affected Party does not assure you will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), or any other consideration contained in the Settlement Fund.  Eligibility and criteria for payment will be approved by the Bankruptcy Court at a later date and will be subject to notice and an opportunity to object."

2.   Please be specific in the forms of Notice that the releases and waivers that are contemplated under the Settlement Agreement to go into effect upon entry of the Settlement Order, and the channeling of claims to the Settlement Fund and to any other settlement consideration that will be done as contemplated by the Waiver Provision, will be solely the function of entry of the Settlement Order.  **[We have shared a mark-up of the  Notices with Brown Rudnick in this regard.  It is our understanding that Brown Rudnick is drafting revisions to the Notices that will be circulated shortly.]**

We are ready to move ahead, subject to acceptance of these points and our review of any additional changes to the documents.

Bill

William P Weintraub



GOODWIN

Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
o  +1 212 813 8839
m +1 917 861 7200
f   +1 212 419 0964

*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of the individual or entity named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify Brown Rudnick LLP, (617) 856-8200 (if dialing from outside the US, 001-(617)-856-8200) and purge the communication immediately without making any copy or distribution.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of the individual or entity named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify Brown Rudnick LLP, (617) 856-8200 (if dialing from outside the US, 001-(617)-856-8200) and purge the communication immediately without making any copy or distribution.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

09-50026-mg   Doc 14085-5   Filed 09/13/16   Entered 09/13/16 18:46:45   Exhibit E -
August 12, 2017 email   Pg 1 of 8

# <u>EXHIBIT E</u>

## Forster, Jill L.

| | |
|---|---|
| **From:** | Martorana, Keith R. <KMartorana@gibsondunn.com> |
| **Sent:** | Saturday, August 12, 2017 1:41 PM |
| **To:** | Steel, Howard S.; Weintraub, William P; Forster, Jill L.; Daniel H. Golden - Akin Gump Strauss Hauer & Feld LLP (dgolden@akingump.com); dnewman@akingump.com; Moss, Naomi; Williams, Matt J.; Gillett, Gabriel K.; Chorba, Christopher; Fox, Gregory W.; Bob Hilliard; Steve Shadowen; Thomas J. Henry; Michael E. Henry; Lnorman@andrewsmyers.com; kelly@hmglawfirm.com |
| **Cc:** | Weisfelner, Edward S.; Steve Berman; Chris O'Hara (ChrisO@hbsslaw.com); Elizabeth Cabraser (ecabraser@lchb.com); Geman, Rachel; esserman@sbep-law.com |
| **Subject:** | RE: Motors - GUC Settlement (FRE 408) |
| **Attachments:** | 102348354_1 _GM - DTC Notice to Unitholders re_ Settlement Motion.DOCX; GUC Trust - Andrews Declaration for Settlement (8.8).docx |

SUBJECT TO FRE 408

From the GUC Trust perspective, all of the documents sent over by Howie (subject to one item we are discussing with Akin in the Settlement Agreement) are fine.  In addition, please find (i) the DTC Notice that would be attached as an exhibit to the Notice Motion, and (ii) the Beth Andrews Declaration in support of the Settlement Motion.

Please let us know if you have any questions regarding the attached.


**Keith Martorana**
Of Counsel

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
200 Park Avenue, New York, NY 10166-0193
Tel +1 212.351.3991 • Fax +1 212.351.6391
KMartorana@gibsondunn.com • www.gibsondunn.com

---

**From:** Steel, Howard S. [mailto:HSteel@brownrudnick.com]
**Sent:** Friday, August 11, 2017 3:09 PM
**To:** Martorana, Keith R. <KMartorana@gibsondunn.com>; 'Weintraub, William P' <WWeintraub@goodwinlaw.com>; Forster, Jill L. <JForster@brownrudnick.com>; Daniel H. Golden - Akin Gump Strauss Hauer & Feld LLP (dgolden@akingump.com) <dgolden@akingump.com>; dnewman@akingump.com; Moss, Naomi <nmoss@akingump.com>; Williams, Matt J. <MJWilliams@gibsondunn.com>; Gillett, Gabriel K. <GGillett@gibsondunn.com>; Chorba, Christopher <CChorba@gibsondunn.com>; Fox, Gregory W. <GFox@goodwinlaw.com>; Bob Hilliard <bobh@hmglawfirm.com>; Steve Shadowen <steve@hilliardshadowenlaw.com>; Thomas J. Henry <tjh@tjhlaw.com>; Michael E. Henry <mehenry@thomasjhenrylaw.com>; Lnorman@andrewsmyers.com; kelly@hmglawfirm.com
**Cc:** Weisfelner, Edward S. <EWeisfelner@brownrudnick.com>; Steve Berman <Steve@hbsslaw.com>; Chris O'Hara (ChrisO@hbsslaw.com) <ChrisO@hbsslaw.com>; Elizabeth Cabraser (ecabraser@lchb.com) <ecabraser@lchb.com>; Geman, Rachel <rgeman@lchb.com>; esserman@sbep-law.com
**Subject:** RE: Motors - GUC Settlement (FRE 408)

**SUBJECT TO FRE 408**

Updated docs per today's all-hands.  Hoping these are final and we can schedule signatures.  Please let us know if we missed anything.  Thanks and have a nice weekend.

1. Settlement Agreement and Redline
2. Settlement Order
3. Claims Estimate Order and redline
4. 9019 Motion and redline
5. Berman/Cabraser Declaration
6. Notice Motion and redline
7. Long Form Notice
8. Short Form Notice
9. Cam Azari Declaration

Howard S. Steel
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
212.209.4917 (direct)
732.757.1898 (cell)
212.938.2806 (direct fax)
hsteel@brownrudnick.com

---

**From:** Martorana, Keith R. [mailto:KMartorana@gibsondunn.com]
**Sent:** Tuesday, August 08, 2017 8:52 PM
**To:** Steel, Howard S.; 'Weintraub, William P'; Forster, Jill L.; Daniel H. Golden - Akin Gump Strauss Hauer & Feld LLP (dgolden@akingump.com); dnewman@akingump.com; Moss, Naomi; Williams, Matt J.; Gillett, Gabriel K.; Chorba, Christopher; Fox, Gregory W.; Bob Hilliard; Steve Shadowen; Thomas J. Henry
**Cc:** Weisfelner, Edward S.; Steve Berman; Chris O'Hara (ChrisO@hbsslaw.com); Elizabeth Cabraser (ecabraser@lchb.com); Geman, Rachel; esserman@sbep-law.com
**Subject:** RE: Motors - GUC Settlement (FRE 408)

**External E-mail. Use caution accessing links or attachments.**

---

**SUBJECT TO FRE 408**

All – attached please find combined GDC/AG comments to the following:

1. Settlement Agreement
2. Settlement Order
3. Claims Estimate Order
4. 9019 Motion
5. Notice Motion
6. Long Form Notice
7. Cam Azari Declaration

We had no comments to the short form notice or Berman / Cabraser / Hilliard Declaration (the most recent versions have been reattached for the sake of completeness).  Please note that we have been engaged in discussions with Lisa Norman who is counsel to the "Additional Ignition Switch Pre-Closing Accident Plaintiffs,"

and we understand that they are amenable to becoming signatories to the Settlement Agreement. Accordingly, the attached Settlement Agreement includes her firm as a PIWD Counsel. In addition, we understand from Akin that BR will be providing the back-up for the new cost of the Noticing Plan – please provide this document when possible.

Please note that the attached remains subject to the ongoing review and comment of our clients. Please let us know if you would like to discuss the attached.

**Keith Martorana**
Of Counsel

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
200 Park Avenue, New York, NY 10166-0193
Tel +1 212.351.3991 • Fax +1 212.351.6391
KMartorana@gibsondunn.com • www.gibsondunn.com

---

**From:** Steel, Howard S. [mailto:HSteel@brownrudnick.com]
**Sent:** Monday, August 7, 2017 12:58 PM
**To:** Martorana, Keith R. <KMartorana@gibsondunn.com>; 'Weintraub, William P' <WWeintraub@goodwinlaw.com>; Forster, Jill L. <JForster@brownrudnick.com>; Daniel H. Golden - Akin Gump Strauss Hauer & Feld LLP (dgolden@akingump.com) <dgolden@akingump.com>; dnewman@akingump.com; Moss, Naomi <nmoss@akingump.com>; Williams, Matt J. <MJWilliams@gibsondunn.com>; Gillett, Gabriel K. <GGillett@gibsondunn.com>; Chorba, Christopher <CChorba@gibsondunn.com>; Fox, Gregory W. <GFox@goodwinlaw.com>; Bob Hilliard <bobh@hmglawfirm.com>; Steve Shadowen <steve@hilliardshadowenlaw.com>; Thomas J. Henry <tjh@tjhlaw.com>
**Cc:** Weisfelner, Edward S. <EWeisfelner@brownrudnick.com>; Steve Berman <Steve@hbsslaw.com>; Chris O'Hara (ChrisO@hbsslaw.com) <ChrisO@hbsslaw.com>; Elizabeth Cabraser (ecabraser@lchb.com) <ecabraser@lchb.com>; Geman, Rachel <rgeman@lchb.com>; esserman@sbep-law.com
**Subject:** RE: Motors - GUC Settlement (FRE 408)

**SUBJECT TO FRE 408**

All - attached please find combined EL and PI comments to all docs.

Index:
1. Settlement Agreement
2. Settlement Order
3. Claims Estimate Order
4. 9019 Motion
5. Notice Motion
6. Short Form Notice
7. Long Form Notice
8. Berman / Cabraser / Hilliard Declaration
9. Cam Azari Declaration

Please let us know where we are final, and any comments / anything you would like to discuss. Thanks.

Howard S. Steel
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
212.209.4917 (direct)
732.757.1898 (cell)
212.938.2806 (direct fax)
hsteel@brownrudnick.com

---

**From:** Martorana, Keith R. [mailto:KMartorana@gibsondunn.com]
**Sent:** Thursday, August 03, 2017 3:22 PM
**To:** Steel, Howard S.; 'Weintraub, William P'; Forster, Jill L.; Daniel H. Golden - Akin Gump Strauss Hauer
& Feld LLP (dgolden@akingump.com); dnewman@akingump.com); Moss, Naomi; Williams, Matt J.; Gillett,
Gabriel K.; Chorba, Christopher; Fox, Gregory W.; Bob Hilliard; Steve Shadowen; Thomas J. Henry
**Cc:** Weisfelner, Edward S.; Steve Berman; Chris O'Hara (ChrisO@hbsslaw.com); Elizabeth Cabraser
(ecabraser@lchb.com); Geman, Rachel; esserman@sbep-law.com
**Subject:** RE: Motors - GUC Settlement (FRE 408)

**External E-mail. Use caution accessing links or attachments.**

---

SUBJECT TO FRE 408

All – attached please find the following, each of which remains subject to the ongoing review and
comment of our clients:

- A revised settlement agreement (new version incorporates the comments of GP and minor
  clean-ups);
- A revised settlement order (minor clean-ups);
- A revised claims estimate order (minor clean-ups);
- A revised long-form notice (slight changes);
- A revised short-form notice (slight changes);
- A revised Settlement Motion.

I believe that is all of the documents that GDC/AG held the pen on.  I believe we are awaiting a return
draft of the notice motion/order from you.  Please let us know if you would like to discuss any of the
attached.

**Keith Martorana**
Of Counsel

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP
200 Park Avenue, New York, NY 10166-0193
Tel +1 212.351.3991 • Fax +1 212.351.6391
KMartorana@gibsondunn.com • www.gibsondunn.com

---

**From:** Steel, Howard S. [mailto:HSteel@brownrudnick.com]
**Sent:** Thursday, August 3, 2017 10:35 AM
**To:** 'Weintraub, William P' <WWeintraub@goodwinlaw.com>; Martorana, Keith R.
<KMartorana@gibsondunn.com>; Forster, Jill L. <JForster@brownrudnick.com>; Daniel H. Golden - Akin

Gump Strauss Hauer & Feld LLP (dgolden@akingump.com) <dgolden@akingump.com>;
dnewman@akingump.com; Moss, Naomi <nmoss@akingump.com>; Williams, Matt J.
<MJWilliams@gibsondunn.com>; Gillett, Gabriel K. <GGillett@gibsondunn.com>; Chorba, Christopher
<CChorba@gibsondunn.com>; Fox, Gregory W. <GFox@goodwinlaw.com>; Bob Hilliard
<bobh@hmglawfirm.com>; Steve Shadowen <steve@hilliardshadowenlaw.com>; Thomas J. Henry
<tjh@tjhlaw.com>
**Cc:** Weisfelner, Edward S. <EWeisfelner@brownrudnick.com>; Steve Berman <Steve@hbsslaw.com>;
Chris O'Hara (ChrisO@hbsslaw.com) <ChrisO@hbsslaw.com>; Elizabeth Cabraser (ecabraser@lchb.com)
<ecabraser@lchb.com>; Geman, Rachel <rgeman@lchb.com>; esserman@sbep-law.com
**Subject:** RE: Motors - GUC Settlement (FRE 408)


Please see attached updated notices (incorporating EL and PI comments) - cleans and blacklines from
last GD / Akin circulation.

Happy to organize a page turn this afternoon or please send final comments / sign-off.

Leaving settlement agreement revisions per Bill's comments to GD.  Thanks.


Howard S. Steel
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
212.209.4917 (direct)
732.757.1898 (cell)
212.938.2806 (direct fax)
hsteel@brownrudnick.com

---

**From:** Weintraub, William P [mailto:WWeintraub@goodwinlaw.com]
**Sent:** Thursday, August 03, 2017 8:07 AM
**To:** Martorana, Keith R.; Steel, Howard S.; Forster, Jill L.; Daniel H. Golden - Akin Gump Strauss
Hauer & Feld LLP (dgolden@akingump.com); dnewman@akingump.com; Moss, Naomi; Williams,
Matt J.; Gillett, Gabriel K.; Chorba, Christopher; Fox, Gregory W.; Bob Hilliard; Steve Shadowen;
Thomas J. Henry
**Cc:** Weisfelner, Edward S.
**Subject:** RE: Motors - GUC Settlement (FRE 408)

**External E-mail. Use caution accessing links or attachments.**

---

FRE 408:

Whoops.  Items 3 and 4 resolve the EL / PIWD open issues with each other.  Bill

---

**From:** Weintraub, William P
**Sent:** Thursday, August 03, 2017 7:54 AM
**To:** 'Martorana, Keith R.'; Steel, Howard S.; Forster, Jill L.; Daniel H. Golden - Akin Gump Strauss
Hauer & Feld LLP (dgolden@akingump.com); dnewman@akingump.com; Moss, Naomi; Williams,
Matt J.; Gillett, Gabriel K.; Chorba, Christopher; Fox, Gregory W.; Bob Hilliard; Steve Shadowen;
Thomas J. Henry
**Cc:** Weisfelner, Edward S.
**Subject:** RE: Motors - GUC Settlement (FRE 408)

FRE 408

Hello All:

For the sake of good order, I want to repeat here the edits the PIWD Plaintiffs want made to the Settlement Agreement and the two forms of Notice (short and long).  Items 2 and 3 under the heading "Settlement Agreement" resolve the gating issue between EL and PIWD and enables us to move ahead.  EL has seen the language and it my understanding they have approved it.

**Settlement Agreement:**

1.  Section 1.43.  Please add the words "those certain" to the definition **PIWD Plaintiffs** means those certain Ignition Switch Pre-Closing Accident Plaintiffs represented by PIWD Counsel.  **[This was done yesterday.]**
2.  Section 2.8.  in the first sentence please add the underscored language as follows: "Notwithstanding Sections 157(b)(2)(B) and (b)(2)(O) of Title 28, in connection with the Settlement Motion, to the extent (if any) consent is required, the Pre-Closing Accident Plaintiffs represented by PIWD Counsel consent to the Bankruptcy Court….."
3.  Section 2.9(b).  Add a new first sentence as follows: "Allocation of the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund between the Plaintiffs asserting economic loss claims and the Plaintiffs asserting PIWD claims shall be determined and approved in the first instance by District Judge Furman or Magistrate Cote, as applicable."
4.  Section 2.9(c).  Add a new first sentence as follows: "Approval of the qualifications and criteria for Plaintiffs to be eligible to receive distributions from the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund shall be done by the Bankruptcy Court in the first instance."
5.  Section 2.9(c).  Add new last sentence as follows: "Being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), or any other consideration contained in the Settlement Fund."

**Forms of Notice:**

1.  Please add to both the long and short form notices the following:  "Being defined as an Affected Party does not assure you will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), or any other consideration contained in the Settlement Fund.  Eligibility and criteria for payment will be approved by the Bankruptcy Court at a later date and will be subject to notice and an opportunity to object."
2.  Please be specific in the forms of Notice that the releases and waivers that are contemplated under the Settlement Agreement to go into effect upon entry of the Settlement Order, and the channeling of claims to the Settlement Fund and to any other settlement consideration that will be done as contemplated by the Waiver Provision, will be solely the function of entry of the Settlement Order.  **[We have shared a mark-up of the  Notices with Brown Rudnick in this regard.  It is our understanding that Brown Rudnick is drafting revisions to the Notices that will be circulated shortly.]**

We are ready to move ahead, subject to acceptance of these points and our review of any additional changes to the documents.

Bill

**William P Weintraub**



Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
o  +1 212 813 8839
m +1 917 861 7200
f  +1 212 419 0964
WWeintraub@goodwinlaw.com | goodwinlaw.com


\*

*************************************************************************

The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of the individual or entity named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify Brown Rudnick LLP, (617) 856-8200 (if dialing from outside the US, 001-(617)-856-8200) and purge the communication immediately without making any copy or distribution.

*************************************************************************

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

*************************************************************************

The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of the individual or entity named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify Brown Rudnick LLP, (617) 856-8200 (if dialing from outside the US, 001-(617)-856-8200) and purge the communication immediately without making any copy or distribution.

*************************************************************************

*************************************************************************

The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of the individual or entity named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify Brown Rudnick LLP, (617) 856-8200 (if dialing from outside the US, 001-(617)-856-8200) and purge the communication immediately without making any copy or distribution.

*************************************************************************

09-50026-mg Doc 13486-1 Filed 09/16/14 Entered 09/16/14 18:46:43 Exhibit -
August 14 2017 email Pg 1 of 6

# <u>EXHIBIT F</u>

## Forster, Jill L.

| | |
|---|---|
| **Subject:** | Re: Motors - GUC Trust Settlement Agreement - SUBJECT TO FRE 408 |

**From:** Martorana, Keith R. [mailto:KMartorana@gibsondunn.com]
**Sent:** Monday, August 14, 2017 7:30 PM
**To:** Steel, Howard S.
**Subject:** Re: Motors - GUC Trust Settlement Agreement - SUBJECT TO FRE 408

**External E-mail. Use caution accessing links or attachments.**

You can send now. Nothing to add in the note

On Aug 14, 2017, at 7:27 PM, Steel, Howard S. <HSteel@brownrudnick.com> wrote:

> Thanks, want me to send now or wait?
>
> Want any language added to the note to Arthur?
>
>> **From:** Martorana, Keith R. [mailto:KMartorana@gibsondunn.com]
>> **Sent:** Monday, August 14, 2017 7:26 PM
>> **To:** Steel, Howard S.
>> **Subject:** Re: Motors - GUC Trust Settlement Agreement - SUBJECT TO FRE 408
>>
>> **External E-mail. Use caution accessing links or attachments.**
>>
>> We are waiting for final approval from client, but unlikely to come tonight. You are, however,
>> authorized to send current versions to New GM this evening
>>
>> On Aug 14, 2017, at 6:44 PM, Steel, Howard S. <HSteel@brownrudnick.com> wrote:
>>
>>> How's the trust looking on sign off?
>>>
>>>> **From:** Golden, Daniel [mailto:dgolden@AkinGump.com]
>>>> **Sent:** Monday, August 14, 2017 4:10 PM
>>>> **To:** Steel, Howard S.; Martorana, Keith R.; Weintraub, William P; Fox, Gregory
>>>> W.; Newman, Deborah; Moss, Naomi; Williams, Matt J.; Gillett, Gabriel K.;
>>>> Chorba, Christopher; bobh@hmglawfirm.com; steve@hilliardshadowenlaw.com;
>>>> tjh@tjhlaw.com; mehenry@thomasjhenrylaw.com;
>>>> Lnorman@andrewsmyers.com; kelly@hmglawfirm.com
>>>> **Cc:** Weisfelner, Edward S.; Steve@hbsslaw.com; ChrisO@hbsslaw.com;
>>>> ecabraser@lchb.com; Geman, Rachel (External); esserman@sbep-law.com;
>>>> Forster, Jill L.
>>>> **Subject:** RE: Motors - GUC Trust Settlement Agreement - SUBJECT TO FRE 408

External E-mail. Use caution accessing links or attachments.

---

I think that is right; participating holders are signed off subject to guc trust being signed off


**Daniel H. Golden**

**AKIN GUMP STRAUSS HAUER & FELD** LLP

One Bryant Park | New York, NY 10036-6745 | USA | Direct: +1 212.872.8010 | Internal: 38010
Fax: +1 212.872.1002 | dgolden@akingump.com | akingump.com | Bio

---

**From:** Steel, Howard S. [mailto:HSteel@brownrudnick.com]
**Sent:** Monday, August 14, 2017 4:06 PM
**To:** Golden, Daniel; Martorana, Keith R.; Weintraub, William P; Fox, Gregory W.;
Newman, Deborah; Moss, Naomi; Williams, Matt J.; Gillett, Gabriel K.; Chorba,
Christopher; bobh@hmglawfirm.com; steve@hilliardshadowenlaw.com;
tjh@tjhlaw.com; mehenry@thomasjhenrylaw.com;
Lnorman@andrewsmyers.com; kelly@hmglawfirm.com
**Cc:** Weisfelner, Ed (External); Steve@hbsslaw.com; ChrisO@hbsslaw.com;
ecabraser@lchb.com; Geman, Rachel (External); esserman@sbep-law.com;
Forster, Jill L.
**Subject:** RE: Motors - GUC Trust Settlement Agreement - SUBJECT TO FRE 408


We can send to him when everyone signed off - please advise if you have not already

To confirm will send to him:  all of docs circulated to this group this morning.  will not be sending him proffered evidence and expert reports

---

**From:** Golden, Daniel [mailto:dgolden@AkinGump.com]
**Sent:** Monday, August 14, 2017 3:48 PM
**To:** Martorana, Keith R.; Steel, Howard S.; Weintraub, William P; Fox,
Gregory W.; Newman, Deborah; Moss, Naomi; Williams, Matt J.; Gillett,
Gabriel K.; Chorba, Christopher; bobh@hmglawfirm.com;
steve@hilliardshadowenlaw.com; tjh@tjhlaw.com;
mehenry@thomasjhenrylaw.com; Lnorman@andrewsmyers.com;
kelly@hmglawfirm.com
**Cc:** Weisfelner, Edward S.; Steve@hbsslaw.com; ChrisO@hbsslaw.com;
ecabraser@lchb.com; Geman, Rachel (External); esserman@sbep-
law.com; Forster, Jill L.
**Subject:** RE: Motors - GUC Trust Settlement Agreement - SUBJECT TO
FRE 408

External E-mail. Use caution accessing links or attachments.

---

Can someone please advise me who will be in a position to send the
final documentation to Arthur by cob today.  We need to do this so he
doesn't use this as an excuse at the Thursday chambers conference.


**Daniel H. Golden**

**AKIN GUMP STRAUSS HAUER & FELD** LLP

One Bryant Park | New York, NY 10036-6745 | USA | Direct: +1 212.872.8010
Internal: 38010
Fax: +1 212.872.1002 | dgolden@akingump.com | akingump.com | Bio

---

**From:** Martorana, Keith R. [mailto:KMartorana@gibsondunn.com]
**Sent:** Monday, August 14, 2017 3:46 PM
**To:** Steel, Howard S.; Weintraub, William P; Fox, Gregory W.; Golden,
Daniel; Newman, Deborah; Moss, Naomi; Williams, Matt J.; Gillett,
Gabriel K.; Chorba, Christopher; bobh@hmglawfirm.com;
steve@hilliardshadowenlaw.com; tjh@tjhlaw.com;
mehenry@thomasjhenrylaw.com; Lnorman@andrewsmyers.com;
kelly@hmglawfirm.com
**Cc:** Weisfelner, Ed (External); Steve@hbsslaw.com;
ChrisO@hbsslaw.com; ecabraser@lchb.com; Geman, Rachel (External);
esserman@sbep-law.com; Forster, Jill L.
**Subject:** RE: Motors - GUC Trust Settlement Agreement - SUBJECT TO
FRE 408

On the DTC Notice, the percentage of Unitholders represented by Akin
should be 65%.  If you are controlling the final versions of the
documents, can you please make that change?

At this point we do not have any further comments, but are obtaining
final sign-off from our client.

**Keith Martorana**
Of Counsel

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
200 Park Avenue, New York, NY 10166-0193
Tel +1 212.351.3991 • Fax +1 212.351.6391
KMartorana@gibsondunn.com • www.gibsondunn.com

---

**From:** Steel, Howard S. [mailto:HSteel@brownrudnick.com]
**Sent:** Monday, August 14, 2017 1:32 PM
**To:** Weintraub, William P <WWeintraub@goodwinlaw.com>; Fox,
Gregory W. <GFox@goodwinlaw.com>; dgolden@akingump.com;
dnewman@akingump.com; nmoss@akingump.com; Williams, Matt J.
<MJWilliams@gibsondunn.com>; Gillett, Gabriel K.
<GGillett@gibsondunn.com>; Chorba, Christopher
<CChorba@gibsondunn.com>; bobh@hmglawfirm.com;
steve@hilliardshadowenlaw.com; tjh@tjhlaw.com;
mehenry@thomasjhenrylaw.com; Lnorman@andrewsmyers.com;
kelly@hmglawfirm.com; Martorana, Keith R.
<KMartorana@gibsondunn.com>
**Cc:** Weisfelner, Edward S. <EWeisfelner@brownrudnick.com>;
Steve@hbsslaw.com; ChrisO@hbsslaw.com; ecabraser@lchb.com;
rgeman@lchb.com; esserman@sbep-law.com; Forster, Jill L.
<JForster@brownrudnick.com>
**Subject:** Motors - GUC Trust Settlement Agreement - SUBJECT TO FRE
408

**SUBJECT TO FRE 408**

Please see attached proposed final execution versions of all of the documents.  Redlines are to versions circulated Friday.

Please let us know any comments or questions and confirm when you are signed off.  Thanks.

Howard S. Steel
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
212.209.4917 (direct)
732.757.1898 (cell)
212.938.2806 (direct fax)
hsteel@brownrudnick.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of the individual or entity named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly proh bited. If you have received this communication in error, please notify Brown Rudnick LLP, (617) 856-8200 (if dialing from outside the US, 001-(617)-856-8200) and purge the communication immediately without making any copy or distribution.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of the individual or entity named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify Brown Rudnick LLP, (617) 856-8200 (if dialing from outside the US, 001-(617)-856-8200) and purge the communication immediately without making any copy or distribution.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

***********************************************************************************

The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of the individual or entity named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify Brown Rudnick LLP, (617) 856-8200 (if dialing from outside the US, 001-(617)-856-8200) and purge the communication immediately without making any copy or distribution.

***********************************************************************************



***********************************************************************************

The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of the individual or entity named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify Brown Rudnick LLP, (617) 856-8200 (if dialing from outside the US, 001-(617)-856-8200) and purge the communication immediately without making any copy or distribution.

***********************************************************************************

# EXHIBIT G

---

**Forster, Jill L.**

---

| | |
|---|---|
| **From:** | Steel, Howard S. |
| **Sent:** | Monday, August 14, 2017 9:14 PM |
| **To:** | asteinberg@kslaw.com |
| **Cc:** | Davidson, Scott; Weisfelner, Edward S.; Steve Berman; Elizabeth Cabraser (ecabraser@lchb.com); Bob Hilliard; Daniel H. Golden - Akin Gump Strauss Hauer & Feld LLP (dgolden@akingump.com); dnewman@akingump.com; Moss, Naomi; Keith Martorana - Gibson, Dunn & Crutcher (kmartorana@gibsondunn.com); Matt J. Williams (mjwilliams@gibsondunn.com); Lnorman@andrewsmyers.com; Weintraub, William P (WWeintraub@goodwinlaw.com); esserman@sbep-law.com; Thomas J. Henry (tjh@tjhlaw.com); steve@hilliardshadowenlaw.com |
| **Subject:** | FW: GM |
| **Attachments:** | Motors - Settlement Agreement 8.14.17.pdf; Motors - Settlement Order 8.14.17.pdf; Motors - Claims Estimate Order 8.14.17.pdf; Motors - 9019 Motion 8.14.17.pdf; Motors - Berman Cabraser Declaration 8.14.17.pdf; Motors - Hilliard Decl. 8.14.17.pdf; Motors - Norman Declaration 8.14.17.pdf; Motors - Andrews Declaration 8.14.17.pdf; Motors - Motion for Order Approving Notice Procedures 8.14.17.pdf; Motors - Short Form Notice 8.14.17.pdf; Motors - Long Form Notice 8.14.17.pdf; Motors - Azari Declaration 8.14.17.pdf; Motors - DTC Notice 8.14.17.pdf |

Arthur:  Per below, please see attached; sent to you as a courtesy.  Please keep confidential until it is filed.

Howard S. Steel
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
212.209.4917 (direct)
732.757.1898 (cell)
212.938.2806 (direct fax)
hsteel@brownrudnick.com

---

**From:** Golden, Daniel [mailto:dgolden@AkinGump.com]
**Sent:** Monday, August 14, 2017 10:12 AM
**To:** Steinberg, Arthur (External)
**Cc:** Weisfelner, Edward S.; Steel, Howard S.; Newman, Deborah; Moss, Naomi; Martorana, Keith R.; Williams, Matt J.; Lnorman@andrewsmyers.com; 'Weintraub, William P'
**Subject:** GM

**External E-mail. Use caution accessing links or attachments.**

---

Arthur:  As we discussed late last week, we have now scheduled a chambers conference with J Glenn for this Thursday at 3 pm to preview with J Glenn the proposed settlement as between the GUC trust, on the one hand, and counsel for the economic loss plaintiffs and counsel for pre sale personal injury/wrongful death claimants, on the other hand.  You had previously indicated you were free that day.  As I mentioned on last week's call we will be asking new GM to turn over to the noticing agent for the GUC trust all of the names and addressed of those parties to whom new GM issued the recalls to as well as the names and addresses of those parties/counsel who have instituted suit against new GM based on alleged recall related defects.  It is our

1

expectation to send to you the final draft of the settlement documents at some point today.  Please reach out if you have any questions.

**Daniel H. Golden**
**AKIN GUMP STRAUSS HAUER & FELD** LLP

One Bryant Park  |  New York, NY 10036-6745  |  USA  |  Direct: +1 212.872.8010  |  Internal: 38010
Fax: +1 212.872.1002  |  dgolden@akingump.com  |  akingump.com  |  Bio

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

09-50026-mg    Doc 14203-1    Filed 09/11/17    Entered 09/11/17 18:48:32    Exhibit H -
Exhibit A    Pg 304 of 516

# <u>EXHIBIT H</u>

# SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "**Agreement**"), dated as of August __, 2017 among:

Wilmington Trust Company, solely in its capacity as trustee for and administrator of the Motors Liquidation Company General Unsecured Creditors Trust (the "**GUC Trust**")

-and-

The Signatory Plaintiffs, as hereinafter defined (the Signatory Plaintiffs and the GUC Trust, the "**Parties**").

## PREAMBLE[1]

**Background: The Old GM Bankruptcy.**

     A.     Beginning on June 1, 2009 (the "**Petition Date**"), Motors Liquidation Company f/k/a General Motors Corporation, a Delaware Corporation ("**Old GM**"), and certain of its affiliated companies (together with Old GM, the "**Debtors**") commenced cases (the "**Old GM Bankruptcy Case**") under chapter 11 of the Bankruptcy Code;

     B.     Also on the Petition Date, Old GM and certain other affiliated entities (collectively, the "**Sellers**") entered into a Master Sale and Purchase Agreement (the "**MSPA**") pursuant to which certain assets of the Sellers, including the brand "General Motors," were to be sold to NGMCO, Inc., n/k/a General Motors LLC, a Delaware corporation ("**New GM**");

     C.     As of July 5, 2009, the MSPA, which had been previously amended and restated, was further and finally amended pursuant to a Second Amendment to the Amended and Restated Master Sale Purchase Agreement (the Master Sale and Purchase Agreement, as so amended and restated through the aforesaid Second Amendment, the "**AMSPA**") to, among other things, modify provisions in the AMSPA relating to the issuance by New GM of shares (the "**Adjustment Shares**") of New GM Common Stock in respect of Allowed General Unsecured Claims;

     D.     Pursuant to the AMSPA, if the Bankruptcy Court issues an order estimating the aggregate Allowed General Unsecured Claims against the Sellers (the "**Claims Estimate Order**") at an amount exceeding thirty-five billion dollars ($35,000,000,000), then New GM must, within five (5) business days of entry of the Claims Estimate Order, issue the Adjustment Shares;

     E.     If the Bankruptcy Court issues a Claims Estimate Order estimating the aggregate Allowed General Unsecured Claims against the Sellers at an amount at or exceeding forty-two

---

[1] Capitalized terms used, but otherwise not defined in the Preamble shall have the meanings ascribed to such terms in the Definitions section of this Agreement.

billion dollars ($42,000,000,000), New GM must issue the maximum amount of Adjustment Shares (30,000,000 shares);

F.    On July 5, 2009, the AMSPA was approved pursuant to a Bankruptcy Code section 363 order (the "**Sale Order**");

G.    Pursuant to the Sale Order, New GM became vested in substantially all of the material assets of the Sellers;

H.    On July 10, 2009 (the "**Closing Date**"), the transactions approved pursuant to the Sale Order were consummated (the "**363 Sale**");

I.    On September 16, 2009, the Bar Date Order was entered establishing November 30, 2009 (the "**Bar Date**") as the deadline to file proofs of claim against the Debtors;

J.    On March 29, 2011, the Bankruptcy Court issued an order (the "**Confirmation Order**") confirming the Debtors' Second Amended Joint Chapter 11 Plan (the "**Plan**");

K.    The Plan created the GUC Trust pursuant to an agreement, as it has been and may be further amended from time to time (the "**GUC Trust Agreement**"), as a post-confirmation successor to Old GM pursuant to Section 1145 of the Bankruptcy Code, to, *inter alia*, administer assets held or to be held by the GUC Trust (the "**GUC Trust Assets**");

L.    Pursuant to the Plan and a side letter (the "**Side Letter**"), attached hereto as Exhibit A, by and between the GUC Trust, the Debtors, New GM, and FTI Consulting (as trust monitor of the GUC Trust) dated September 23, 2011, the GUC Trust is exclusively authorized to seek the issuance of Adjustment Shares for satisfaction of Allowed General Unsecured Claims at any time; provided, however, that it was the GUC Trust's then intention to delay seeking issuance of the Adjustment Shares until such time (if any) that the GUC Trust determined, in its sole and absolute discretion, that the aggregate Allowed General Unsecured Claims were, in the GUC Trust's estimation, likely to exceed $35 billion, at which time the GUC Trust is entitled to seek the issuance of Adjustment Shares;

M.    The Plan, GUC Trust Agreement, and Side Letter provided the GUC Trust with the sole, exclusive right to object to General Unsecured Claims, pursue a Claims Estimate Order, and receive the Adjustment Shares;

N.    On March 31, 2011 (the "**Effective Date**"), the Plan was declared effective;

**The Recalls and the Multi-District Litigation.**

O.    In or around February and March of 2014, New GM issued a recall, NHTSA Recall Number 14V-047, pertaining to 2,191,525 vehicles with an ignition switch defect (the "**Ignition Switch Defect**");

2

P.   In or around June, July and September of 2014, New GM issued five additional recalls pertaining to over 10 million vehicles with defective ignition switches, NHTSA Recall Numbers 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540;

Q.   In or around March of 2014, New GM issued a recall, NHTSA Recall Number 14V-118, pertaining to approximately 1.2 million vehicles with defective side airbags;

R.   In or around March of 2014, New GM issued a recall, NHTSA Recall Number 14V-153, pertaining to over 1.3 million vehicles with defective power steering;

S.   Commencing after the issuance of the recalls, numerous lawsuits were filed against New GM, individually or on behalf of putative classes of persons, by, *inter alia*,:

   a.   plaintiffs asserting economic loss claims who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 (the "**Ignition Switch Plaintiffs**");

   b.   plaintiffs asserting economic loss claims who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags, or power steering included in NHTSA Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346, 14V-540, 14V-118 and 14V-153 (the "**Non-Ignition Switch Plaintiffs**"); and

   c.   plaintiffs asserting personal injury or wrongful death claims based on or arising from an accident involving an Old GM vehicle that occurred prior to the Closing Date (the "**Pre-Closing Accident Plaintiffs**"), including a subset asserting claims involving an Old GM vehicle with the Ignition Switch Defect (the "**Ignition Switch Pre-Closing Accident Plaintiffs**");

T.   Many of the cases commenced against New GM were consolidated in a multi-district litigation (the "**GM MDL**") pending in the United States District Court for the Southern District of New York before the Hon. Jesse M. Furman (the "**District Court**");

**The Motions to Enforce Litigation.**

U.   In or around April and August of 2014, New GM sought to enjoin such lawsuits against New GM by filing motions to enforce the Sale Order with respect to: (i) Ignition Switch Plaintiffs; (ii) Ignition Switch Pre-Closing Accident Plaintiffs; and (iii) Non-Ignition Switch Plaintiffs (the "**Motions to Enforce**");

V.   Following the filing of the Motions to Enforce, the Bankruptcy Court identified initial issues to be addressed on the Motions to Enforce with respect to the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs;

W.   Following briefing and argument, the Bankruptcy Court issued its decision (the "**Decision**") on April 15, 2015, and a judgment implementing the Decision (the "**Judgment**") on June 1, 2015;

X.      In the Decision and the Judgment, the Bankruptcy Court ruled that "based on the doctrine of equitable mootness, in no event shall assets of the GUC Trust held at any time in the past, now or in the future (collectively, the 'GUC Trust Assets') (as defined in the Plan) be used to satisfy any claims of the Plaintiffs";

Y.      On July 13, 2016, the Second Circuit issued an opinion on direct appeal of the Decision and Judgment, vacating the Bankruptcy Court's equitable mootness ruling as an advisory opinion;

Z.      Following the issuance of the Second Circuit's mandate, the Bankruptcy Court identified initial issues to be addressed on remand, including whether the Pre-Closing Accident Plaintiffs, the Ignition Switch Plaintiffs and/or Non-Ignition Switch Plaintiffs satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust and/or are such claims equitably moot;

AA.     On December 22, 2016, the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs and certain Pre-Closing Accident Plaintiffs filed motions for authority to file late proofs of claim, including late class proofs of claim (the "**Late Claims Motions**");

BB.     On or around February 16, 2017, counsel for the GUC Trust served counsel for the Ignition Switch Plaintiffs and counsel for certain Ignition Switch Pre-Closing Accident Plaintiffs with interrogatories (the "**Late Claims Interrogatories**") in connection with the Late Claims Motions;

CC.     An Ignition Switch Plaintiff and certain Ignition Switch Pre-Closing Accident Plaintiffs have responded to the Late Claims Interrogatories;

DD.     In or around March 2017, additional briefs were filed by Ignition Switch Plaintiffs, certain Ignition Switch Pre-Closing Accident Plaintiffs, New GM, and jointly by the GUC Trust and certain unaffiliated holders of beneficial units of the GUC Trust   (the "**Participating Unitholders**") on the Applicability of *Pioneer* Issue and the Tolling Issue (as those terms are defined in the *Order Establishing, Inter Alia, Briefing Schedule for Certain Issues Arising From Late Claim Motions Filed by Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Certain Ignition Switch Pre-Closing Accident Plaintiffs* [ECF No. 13869]);

EE.     On July 15, 2016 and June 30, 2017, Judge Furman issued opinions in the GM MDL explaining that the "benefit-of-the-bargain defect theory" of economic loss damages "compensates a plaintiff for the fact that he or she overpaid, at the time of sale, for a defective vehicle.  That form of injury has been recognized by many jurisdictions."  See In re General Motors LLC Ignition Switch Litig., 14-MD-2543 (JMF) (S.D.N.Y. June 30, 2017) [ECF Nos. 3119, 4175].

FF.     Counsel for the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs and certain Pre-Closing Accident Plaintiffs have provided counsel for the GUC Trust with expert reports and proffers of evidence indicating that the amount of damages for the Ignition Switch Plaintiffs', certain Non-Ignition Switch Plaintiffs', and certain Pre-Closing Accident Plaintiffs' asserted claims, if ultimately determined to be Allowed General Unsecured Claims against Old

GM and/or the GUC Trust, would be greater than that amount necessary to trigger New GM's obligation to issue the Adjustment Shares in the maximum amount under the AMSPA;

GG.    The Signatory Plaintiffs, on the one hand, and the GUC Trust, on the other hand, disagree regarding whether the proponents of the Late Claims Motions satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust, and whether such asserted claims are equitably moot;

HH.    The Signatory Plaintiffs, on the one hand, and the GUC Trust, on the other hand, disagree regarding whether any GUC Trust Assets currently in the GUC Trust could be used to satisfy Plaintiffs' (as hereinafter defined) asserted claims against the GUC Trust and Old GM;

II.    The Signatory Plaintiffs, on the one hand, and the GUC Trust, on the other hand, disagree regarding whether any GUC Trust Assets previously distributed are subject to claw-back or recapture by the GUC Trust and/or the Plaintiffs to satisfy Plaintiffs' asserted claims against the GUC Trust and Old GM;

JJ.    The Signatory Plaintiffs, on the one hand, and the GUC Trust, on the other hand, disagree regarding the ultimate amount of Allowed General Unsecured Claims of the Plaintiffs;

KK.    The GUC Trust desires to complete the distribution of the GUC Trust Assets held by the GUC Trust as soon as practicable and, to such purpose, desires to resolve the Late Claims Motions and the Plaintiffs' asserted claims against the GUC Trust and Old GM;

LL.    The GUC Trust acknowledges the key objectives of the Signatory Plaintiffs in entering into this Agreement are to (i) achieve the funding of the Settlement Fund; (ii) avoid the risk, delay, uncertainty and costs of litigation with the GUC Trust; and (iii) take or to cause to be taken all steps necessary to require New GM to issue the maximum amount of Adjustment Shares and to make the value of the Settlement Fund and the Adjustment Shares available to satisfy, in part, the Plaintiffs' claims.  In connection with those objectives, the GUC Trust, based upon its review of the expert report and proffer of evidence provided by Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs and the expert report and proffer of evidence  provided by certain Pre-Closing Accident Plaintiffs, agrees to provide the cooperation and assistance provided for herein relating to the issuance of a Claims Estimate Order, as provided for pursuant to Section 3.2(c) of the AMSPA and the Side Letter, and to seek to estimate for allowance purposes, and not dispute the amount of estimated claims thereunder;

MM.    The Signatory Plaintiffs acknowledge the key objectives of the GUC Trust in entering into this Agreement are: (i) to minimize any delay in the distribution of any remaining GUC Trust Assets; (ii) avoid any claw-back or recapture of prior distributions of GUC Trust Assets; and (iii) otherwise avoid the risk, delay, uncertainty and costs of litigation.

## AGREEMENT

The GUC Trust and the Signatory Plaintiffs propose to resolve their dispute as follows:

**1.    DEFINITIONS.**  The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

09-50026-reg   Doc 14065-1   Filed 09/18/17   Entered 09/18/17 18:48:48   Exhibit -
August 14   2017 Settlement Agreement   Pg 7 of 25

**1.1**    **Adjustment Shares** shall have the meaning ascribed to such term in the Preamble.

**1.2**    **Adjustment Shares Waiver Provision** shall have the meaning ascribed to such term in Section 2.3 hereto.

**1.3**    **Allowed General Unsecured Claims** means General Unsecured Claims against the Debtors that have been allowed through the date of entry of the Claims Estimate Order, including, to the extent such order is entered by the Bankruptcy Court, the claims in the Claims Estimate Order.

**1.4**    **AMPSA** shall have the meaning ascribed to such term in the Preamble.

**1.5**    **Bar Date Order** means that *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim (Including Claims Under Bankruptcy Code Section 503(B)(9)) and Procedures Relating Thereto and Approving the Form and Manner of Notice Thereof*, dated Sept. 16, 2009 [ECF No. 4079] entered by the Bankruptcy Court establishing the Bar Date.

**1.6**    **Bar Date** shall have the meaning ascribed to such term in the Preamble.

**1.7**    **Bankruptcy Code** means title 11 of the United States Code.

**1.8**    **Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of New York and shall have the meaning ascribed to such term in the Preamble.

**1.9**    **Claims Estimate Order** shall mean an order of the Bankruptcy Court estimating the aggregate Allowed General Unsecured Claims against the Sellers, inclusive of the claims of the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, and certain Pre-Closing Accident Plaintiffs, entered pursuant to Section 3.2(c) of the AMSPA.

**1.10**    **Closing Date** shall have the meaning ascribed to such term in the Preamble.

**1.11**    **Co-Lead Counsel** means, for purposes of this Agreement, Steve W. Berman of Hagens Berman Sobol Shapiro LLP and Elizabeth Cabraser of Lieff, Cabraser, Heimann & Bernstein, LLP, who were individually and collectively appointed to represent all economic loss plaintiffs in the GM MDL by Order No. 8, In re Gen. Motors LLC Ignition Switch Litig., No. 14-MD-2543 (S.D.N.Y. Aug. 15, 2014) [ECF No. 249], or any other or replacement counsel appointed to represent any Ignition Switch or Non-Ignition Switch Plaintiffs in the GM MDL.

**1.12**    **Communication** shall have the meaning ascribed to such term in Section 3.15.

**1.13**    **Confirmation Order** shall have the meaning ascribed to such term in the Preamble.

**1.14**    **Debtors** shall have the meaning ascribed to such term in the Preamble.

**1.15    Decision** means *Decision on Motion to Enforce Sale Order*, entered April 15, 2015 [ECF No. 13109] by Judge Robert E. Gerber in the Bankruptcy Court, published as In re Motors Liquidation Company, 529 B.R. 510 (Bankr. S.D.N.Y. 2015), as corrected in *Errata Order RE: Decision on Motion to Enforce Sale Order*, In re Motors Liquidation Co., No. 09-50026, dated July 13, 2015 [ECF No. 13290].

**1.16    District Court** shall have the meaning ascribed to such term in the Preamble.

**1.17    Effective Date** shall have the meaning ascribed to such term in the Preamble.

**1.18    Final Order** has the meaning ascribed to it in the Plan.

**1.19    General Unsecured Claim** has the meaning ascribed to it in the Plan.

**1.20    GM MDL** shall have the meaning ascribed to such term in the Preamble.

**1.21    GUC Trust** means the trust created by the GUC Trust Agreement in the form approved as Exhibit D to the Plan, as the same has been and may further be amended from time to time.

**1.22    GUC Trust Agreement** means the *Second Amended and Restated Motors Liquidation Company GUC Trust Agreement*, by and among Wilmington Trust Company, as trust administrator and trustee of the GUC Trust, and FTI Consulting, as trust monitor of the GUC Trust, dated July 30, 2015, as it may be amended from time to time.

**1.23    GUC Trust Assets** means assets that have been held, are held, or may be held in the future by the GUC Trust.  Solely in the event that the Bankruptcy Court enters the Claims Estimate Order, the term "GUC Trust Assets" as used herein shall be deemed to exclude the Adjustment Shares.

**1.24    GUC Waiver Provision** shall have the meaning ascribed to such term in Section 2.3 hereto.

**1.25    Ignition Switch Defect** shall have the meaning ascribed to such term in the Preamble.

**1.26    Ignition Switch Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.27    Ignition Switch Pre-Closing Accident Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.28    Judgment** means the Judgment, entered June 1, 2015 [ECF No. 13177] by Judge Robert E. Gerber in the Old GM Bankruptcy Case.

**1.29    Key Objectives** means the objectives of the Parties in entering into this Agreement as stated in Paragraphs LL and MM of the Preamble.

**1.30    Late Claims Motions** shall have the meaning ascribed to such term in the Preamble.

**1.31    Motions to Enforce** means, collectively, the (i) *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, dated April 21, 2014 [ECF No. 12620]; (ii) *Motion of General Motors LLC Pursuant to 11 U.S.C §§ 105 and 363 to Enforce this Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits*, dated August 1, 2014 [ECF No. 12807]; and (iii) *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)*, dated August 1, 2014 [ECF No. 12808].

**1.32    New GM** means General Motors LLC (F/K/A NGMCO, Inc.).

**1.33    New GM Common Stock** means the common stock of New GM (NYSE: GM).

**1.34    NHTSA** means the National Highway Traffic Safety Administration.

**1.35    Non-Ignition Switch Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.36    Notice Cost Cap Amount** shall have the meaning ascribed to such term in Section 2.9.

**1.37    Notice Order** shall have the meaning ascribed to such term in Section 2.9.

**1.38    Old GM** means Motors Liquidation Company, formerly known as General Motors Corporation.

**1.39    Old GM Bankruptcy Case** means those proceedings commenced on June 1, 2009 in the Bankruptcy Court captioned *In re Motors Liquidation Company, et al., f/k/a General Motors Corp.*, Bankr. No. 09-50026.

**1.40    Outside Date** shall have the meaning ascribed to such term in Section 3.2.

**1.41    Parties** means the Signatory Plaintiffs and the GUC Trust.

**1.42    PIWD** means claims for personal injury and wrongful death.

**1.43    PIWD Counsel** means (i) Robert C. Hilliard of Hilliard Muñoz Gonzalez, LLP and Thomas J. Henry of the Law Offices of Thomas J. Henry, but solely for the Pre-Closing Accident Plaintiffs represented by those two law firms; and (ii) Lisa M. Norman of Andrews Myers, P.C., but solely for the Pre-Closing Accident Plaintiffs represented by that law firm.

**1.44    PIWD Plaintiffs** means those certain Ignition Switch Pre-Closing Accident Plaintiffs represented by PIWD Counsel.

1.45    **Plaintiffs** means the Ignition Switch Plaintiffs, the Non-Ignition Switch Plaintiffs, and the Pre-Closing Accident Plaintiffs, including all plaintiffs (whether named or unnamed, including unnamed members of a putative class) covered by any of the Late Claims Motions, all plaintiffs represented by counsel that is signatory hereto and any other party who, (i) as of July 10, 2009, suffered an economic loss claim by reason of their ownership or lease of an Old GM vehicle with an ignition switch defect included in Recall No. 14V-047; (ii) as of July 10, 2009 suffered an economic loss claim by reason of their ownership or lease of an Old GM vehicle with defects in ignition switches, side airbags, or power steering included in NHTSA Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346, 14V-540, 14V-118 and 14V-153, and/or (iii) suffered a personal injury or wrongful death based on or arising from an accident involving an Old GM vehicle that occurred prior to the Closing Date; it being understood however that the covenants and agreements to be performed by the Signatory Plaintiffs are to be performed by Co-Lead Counsel and PIWD Counsel and that no action or failure to act by any Plaintiff (other than the Signatory Plaintiffs) shall constitute a breach of this Agreement or shall excuse the performance of any other Party.

1.46    **Plan** means Debtors' Second Amended Joint Chapter 11 Plan, filed March 18, 2011 [ECF No. 9836] by Motors Liquidation Company in the Bankruptcy Proceeding.

1.47    **Pre-Closing** means any time before July 10, 2009, the date on which the 363 Sale between Sellers and New GM closed.

1.48    **Pre-Closing Accident Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

1.49    **Recalls** means NHTSA Recall Numbers 14V-047, 14V-355, 14V-394, 14V-400, 14V-346, 14V-540, 14V-118 and 14V-153.

1.50    **Sale Order** means the *Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief*, dated July 5, 2009 [ECF No. 2968] and the supporting *Decision on Debtors' Motion for Approval of (1) Sale of Assets to Vehicle Acquisition Holdings, LLC; (2) Assumption and Assignment of Related Executory Contracts; and (3) Entry into UAW Retiree Settlement Agreement*, dated July 5, 2009 [ECF No. 2967].

1.51    **Sellers** means Motors Liquidation Company, formerly known as General Motors Corporation, together with three of its debtor subsidiaries, Chevrolet-Saturn of Harlem, Inc.; Saturn, LLC; and Saturn Distribution Corporation.

1.52    **Settlement** means the settlement of the Parties' disputes as provided for by this Agreement.

1.53    **Settlement Amount** shall have the meaning ascribed to such term in Section 2.3 hereto.

1.54    **Settlement Effective Date** shall have the meaning ascribed to such term in Section 3.1 hereto.

**1.55    Settlement Fund** shall have the meaning ascribed to such term in Section 2.3 hereto.

**1.56    Settlement Motion** shall have the meaning ascribed to such term in Section 2.2 hereto.

**1.57    Settlement Order** shall have the meaning ascribed to such term in Section 2.2.

**1.58    Signatory Plaintiffs** means PIWD Counsel on behalf of the PIWD Plaintiffs, and Co-Lead Counsel on behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs.

**1.59    Term Loan Avoidance Action** shall mean the action captioned *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. et al.*, Adv. Pro. No. 09-00504 (Bankr. S.D.N.Y. July 31, 2009).

**1.60    Term Loan Avoidance Action Claims** shall have the meaning ascribed to such term in the GUC Trust Agreement.

**1.61    Waiver** shall have the meaning ascribed to such term in Section 2.3.

**1.62    Waiver Provision** shall have the meaning ascribed to such term in Section 2.3.

## 2.    MUTUAL AGREEMENTS OF THE PARTIES.

**2.1**    The Preamble constitutes an essential part of the Agreement and is incorporated herein.

**2.2**    As soon as practicable following the execution of this Agreement, the Parties shall prepare and file a motion in the Bankruptcy Court (the "**Settlement Motion**") seeking entry of (i) an order (the "**Settlement Order**") substantially in the form of Exhibit B attached hereto, and otherwise on terms acceptable to the GUC Trust, Co-Lead Counsel and PIWD Counsel, each in their sole and absolute discretion, approving the Settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, and (ii) a Claims Estimate Order substantially in the form of Exhibit C attached hereto, and otherwise on terms acceptable to the GUC Trust, Co-Lead Counsel and PIWD Counsel, each in their sole and absolute discretion.

**2.3**    In furtherance of the Key Objectives and as an inducement to the GUC Trust's entry into this Agreement and willingness to be bound by the terms of the Settlement Order and the Claims Estimate Order, provided notice has been given in a form and manner approved by the Bankruptcy Court, the Signatory Plaintiffs agree that they shall support the entry of a Settlement Order that:

(a)    directs the GUC Trust to, within five (5) business days of the Settlement Effective Date, irrevocably pay fifteen million dollars ($15,000,000) in cash (the "**Settlement Amount**") to a trust, fund or other vehicle (the "**Settlement Fund**") established and designated by the Signatory Plaintiffs (for purposes of administration of Plaintiffs' claims reconciliation and/or distributions to Plaintiffs under a subsequent allocation

methodology); provided that, in the event the Signatory Plaintiffs have not designated such Settlement Fund within two (2) business days following the Settlement Effective Date, the GUC Trust shall place the Settlement Amount into an third party escrow account established by the GUC Trust;

(b)      contains a provision which, effective upon (i) the Settlement Order becoming a Final Order (unless the GUC Trust waives the requirement that the Settlement Order be a Final Order in accordance with Section 3.1 hereof) and (ii) payment of the Settlement Amount, imposes a complete and irrevocable waiver and release on the part of all Plaintiffs with respect to any and all rights, claims and causes of action (including but not limited to any claims and causes of action with respect to Allowed General Unsecured Claims of the Plaintiffs arising under, or that may arise under, the Claims Estimate Order), now existing or arising in the future, that any Plaintiff might directly or indirectly assert against the Debtors, their estates, the GUC Trust, the trust administrator of the GUC Trust, the GUC Trust Assets, the Motors Liquidation Company Avoidance Action Trust and the holders of beneficial units in the GUC Trust, and channels all such claims or potential claims to the Settlement Fund for administration and satisfaction (the "**Waiver Provision**," and the waiver and release contemplated thereby, the "**Waiver**");

(c)      contains a provision which, effective upon (i) the Settlement Order becoming a Final Order (unless the GUC Trust waives the requirement that the Settlement Order be a Final Order in accordance with Section 3.1 hereof) and (ii) payment of the Settlement Amount, imposes a complete and irrevocable waiver and release on the part of all holders of units of beneficial interest in the GUC Trust, all defendants in the Term Loan Avoidance Action, and holders of Allowed General Unsecured Claims, other than the Plaintiffs, with respect to any rights to the Settlement Fund, including the Settlement Amount (the "**GUC Waiver Provision**"); and

(d)      contains a provision which, effective upon (i) the Settlement Order becoming a Final Order (unless the GUC Trust waives the requirement that the Settlement Order be a Final Order in accordance with Section 3.1 hereof), (ii) payment of the Settlement Amount, and (iii) entry of the Claims Estimate Order by the Bankruptcy Court, imposes a complete and irrevocable waiver and release on the part of the GUC Trust, all holders of units of beneficial interest in the GUC Trust, all defendants in the Term Loan Avoidance Action, and all holders of Allowed General Unsecured Claims, other than the Plaintiffs, with respect to any rights to any Adjustment Shares (the "**Adjustment Shares Waiver Provision**").

**2.4**      In furtherance of the Key Objectives and as an inducement to the Signatory Plaintiffs' entry into this Agreement and willingness to be bound by the terms of Settlement Order, including but not limited to the Waiver Provision, the GUC Trust, based upon its review of the expert report and proffer of evidence provided by Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs, and the expert report and proffer of evidence provided by the PIWD Plaintiffs, agrees that it shall support the entry of a Claims Estimate Order that:

(a)    estimates the aggregate Allowed General Unsecured Claims (inclusive of the claims of the Plaintiffs, but excluding Term Loan Avoidance Action Claims) against the Sellers and/or the GUC Trust pursuant to Section 7.3 of the Plan, Section 3.2(c) of the AMSPA and the Side Letter in an amount that, as of the date of the Claims Estimate Order, equals or exceeds $42 billion, thus triggering the issuance of the maximum amount of Adjustment Shares; and

(b)    directs that any such Adjustment Shares issued as a result of a Claims Estimate Order, or the value of such Adjustment Shares, be promptly delivered by New GM to the Settlement Fund.

2.5    Following the Settlement Order becoming a Final Order (unless the GUC Trust waives the requirement that the Settlement Order be a Final Order in accordance with Section 3.1 hereof), contemporaneously with the payment of the Settlement Amount by the GUC Trust to the Settlement Fund, the Waiver Provision shall become immediately and automatically effective and binding on all Plaintiffs, and the GUC Waiver Provision shall become immediately and automatically effective and binding on the GUC Trust, all holders of units of beneficial interest in the GUC Trust, all defendants in the Term Loan Avoidance Action, and holders of Allowed General Unsecured Claims, other than the Plaintiffs.

2.6    Provided that the Settlement Order has become a Final Order (unless the GUC Trust waives the requirement that the Settlement Order be a Final Order in accordance with Section 3.1 hereof), then, contemporaneously upon the entry of the Claims Estimate Order (i) the Adjustment Shares Waiver Provision shall become immediately and automatically effective and binding on the GUC Trust, all holders of units of beneficial interest in the GUC Trust, all defendants in the Term Loan Avoidance Action, and holders of Allowed General Unsecured Claims, other than the Plaintiffs, and (ii) the GUC Trust shall be prohibited from, at any time, objecting to the allowance of the estimated claims at the amount set forth in the Claims Estimate Order.

2.7    The Parties shall use commercially reasonable efforts to have the Claims Estimate Order entered on the same date as the Settlement Order, provided that, (i) regardless of whether or not the Claims Estimate Order is entered on or after such date (and regardless of whether the request to enter the Claims Estimate Order is approved or denied), this Agreement (including, but not limited to Sections 2.2, 2.3(a), 2.3(b), 2.3(c), and 2.5 hereof) and the Settlement Order shall remain binding upon the Parties; (ii) the Settlement Amount shall not be returned to the GUC Trust under any circumstances; and (iii) the GUC Trust shall not be required to incur costs (other than the costs of notice as set forth in Paragraph 2.9 hereof) in excess of a reasonable amount in connection with prosecuting the Settlement Motion with respect to the Claims Estimate Order, or any appeals thereof.

2.8    Notwithstanding Sections 157(b)(2)(B) and (b)(2)(O) of Title 28, in connection with the Settlement Motion, to the extent (if any) consent is required, the Pre-Closing Accident Plaintiffs represented by PIWD Counsel consent to the Bankruptcy Court estimating their personal injury and wrongful death claims against the Sellers and/or the GUC Trust for purposes of determining whether the Allowed General Unsecured Claims in the aggregate exceed thirty-five billion dollars ($35,000,000,000). The Pre-Closing Accident Plaintiffs represented by

PIWD Counsel do not consent to estimation of their personal injury and wrongful death claims by the Bankruptcy Court for any other purpose or in connection with any other proceeding. If further adjudication of their personal injury and wrongful death claims is necessary notwithstanding entry of the Claims Estimate Order, the Pre-Closing Accident Plaintiffs represented by PIWD Counsel expressly reserve their rights to have their claims tried (pursuant to Section 157(b)(5) of Title 28) or estimated in the district court in which Old GM's bankruptcy case is pending, or in the district court in which the claim arose, as determined by the district court in which Old GM's bankruptcy case is pending.

### 2.9 Notice.

(a)     The Parties shall be responsible for providing notice in connection with the Settlement Motion in accordance with notice procedures approved by an order of the Bankruptcy Court. Based on notice plan proposals from leading notice administrators, the Parties have budgeted and the GUC Trust agrees to pay the reasonable costs and expenses for notice of the Settlement Motion in an amount up to $6,000,000 (the "**Notice Cost Cap Amount**"). As soon as practicable following the execution of this Agreement, the Parties shall seek an order (the "**Notice Order**") of the Bankruptcy Court approving the proposed notice procedures for notice of the Settlement Motion. The requested notice procedures shall include (i) publication notice by multimedia channels that may include social media, e-mail, online car and consumer publications, and a settlement website (which, for the avoidance of doubt, may be the GUC Trust's website at www.mlcguctrust.com) posting all relevant documents and long-form notice; (ii) notice by postcard to: (A) all persons in the United States who, as of July 10, 2009, owned or leased a vehicle manufactured by Old GM included in the Recalls; (B) all Pre-Closing Accident Plaintiffs who have filed a lawsuit against New GM as of the date of this Agreement; and (C) all Pre-Closing Accident Plaintiffs who have filed or joined a motion for authorization to file late claims against the GUC Trust; (iii) notice to all defendants in the Term Loan Avoidance Action via the Bankruptcy Court's ECF system and, to the extent a defendant is not registered to receive notice via the ECF system, via postcard, and (iv) notice via DTC's LENSNOTICE system to holders of beneficial units of the GUC Trust. The Signatory Plaintiffs agree to pay any amounts in excess of the Notice Cost Cap Amount.

(b)     Allocation of the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund between the Plaintiffs asserting economic loss claims and the Plaintiffs asserting PIWD claims shall be determined and approved by the District Court. Notice of any agreement as to the proposed allocation of the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund as between the group of Plaintiffs asserting claims for economic loss, on the one hand, and the group of Plaintiffs asserting claims for personal injury and wrongful death, on the other hand, along with information about the hearing date and how and when to assert any objections, will be provided by, and at the sole cost of, Signatory Plaintiffs (and not the GUC Trust) via a settlement website to all known Plaintiffs whose rights might be affected by such allocation and such Plaintiffs shall have an opportunity to object to the proposed allocation at a hearing, as when and if such agreement is reached.

13

(c)    Approval of the qualifications and criteria for Plaintiffs to be eligible to receive distributions from the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund shall be done by the Bankruptcy Court.  Notice of any proposed criteria for determining the right or ability of each Plaintiff to receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund on account of a claim against Old GM based upon economic loss or for personal injury or wrongful death arising or occurring before the Bar Date, along with information about the hearing date and how and when to assert any objections, will be provided by, and at the sole cost of, Signatory Plaintiffs (and not the GUC Trust) via a settlement website to all known Plaintiffs whose rights might be affected by the establishment of criteria for the payment of such claims and such Plaintiffs shall have an opportunity to object to the proposed criteria at a hearing, as when and if such criteria is developed.  Being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), or any other consideration contained in the Settlement Fund.

2.10    The Parties agree that all of the value of the Settlement Fund shall be reserved for the exclusive benefit of the Plaintiffs, subject only to costs associated with the administration of the Settlement Fund.  For the avoidance of doubt, the GUC Trust, any holders of beneficial units of the GUC Trust, defendants in the Term Loan Avoidance Action, or holders of Allowed General Unsecured Claims, other than the Plaintiffs (i) shall have no rights or entitlements with respect to the Settlement Fund (including, when and if deposited, the Adjustment Shares or the value thereof) or the funds therein, and (ii) solely to the extent that the Settlement Order has become a Final Order (or the requirement that the Settlement Order be a Final Order has been waived by the GUC Trust in accordance with Section 3.1 hereof) and the Claims Estimate Order is entered by the Bankruptcy Court, shall have no rights or entitlements to the Adjustment Shares issued pursuant to the Claims Estimate Order, or to the value of such Adjustment Shares.

2.11    The Signatory Plaintiffs or, in the alternative, an administrator appointed by the Signatory Plaintiffs, shall establish the Settlement Fund (at the sole cost of the Signatory Plaintiffs) and the procedures for the administration and allocation to Plaintiffs of the Settlement Fund, including the criteria for Plaintiffs to assert a claim against the Settlement Fund on account of an Allowed General Unsecured Claim, methodology for allocating the Settlement Fund to Plaintiffs, and procedures for payment of Plaintiffs' attorneys' fees.

2.12    Nothing in the Settlement Agreement is intended to waive any claims against New GM or to be an election of remedies against New GM; nor does the Settlement Agreement or any payments made in connection therewith represent full satisfaction of any claims against Old GM,  unless and until such claims are in fact paid in full from every available source; provided, however, that in no event shall any Plaintiff be permitted to seek any further payment or compensation from the GUC Trust in respect of their claims or otherwise, other than the Settlement Amount and the Adjustment Shares.  Except as mandated otherwise under applicable law, nothing in the Settlement Agreement shall waive any claims that any Plaintiff may have against New GM or constitute an election of remedies by any Plaintiff, and neither the Settlement Amount nor the Adjustment Shares (nor any distribution thereof to any Plaintiff) shall represent full and final satisfaction of any claim that any Plaintiff may have against New GM, all

14

of which are expressly reserved. The Bankruptcy Court's estimate of the aggregate Allowed General Unsecured Claims in the Claims Estimate Order shall not operate as a cap on any of the claims of any of the Plaintiffs against New GM.

**3. MISCELLANEOUS PROVISIONS APPLICABLE TO THIS AGREEMENT.**

    **3.1 Settlement Effective Date.** This Agreement shall become effective and binding on the Parties on the date on which this Agreement is fully executed by each of the Parties. The Settlement set forth in this agreement (including but not limited to the required payment of the Settlement Amount, the delivery of the Waiver as set forth herein, the GUC Waiver Provision, and to the extent provided in section 2.3(d) hereof, the Adjustment Shares Waiver Provision) shall become effective on the date that the Settlement Order becomes a Final Order (the "**Settlement Effective Date**"), provided, however, that from and after the date the Settlement Order is entered by the Bankruptcy Court, the GUC Trust may waive the requirement that the Settlement Order be a Final Order.

    **3.2 Termination.**

    (A) <u>Automatic Termination.</u> This Agreement shall immediately terminate as to all Parties in the event that the Bankruptcy Court denies approval of the Notice Order (or enters a Notice Order different from that set forth in Section 2.9 hereof that is not otherwise reasonably acceptable to the Parties) or denies approval of the Settlement Motion as it relates to the Settlement Order (for the avoidance of doubt, this Agreement shall not immediately terminate if the Bankruptcy Court denies approval of the Settlement Motion solely as it relates to the Claims Estimate Order). In the event of such automatic termination, this Agreement shall be null and void, and each of the Parties' respective interests, rights, remedies and defenses shall be fully restored without prejudice as if this Agreement (except as set forth in Sections 3.3, 3.4, 3.5, 3.13, 3.15, and 3.19) had never existed and the Parties shall be returned to their respective positions status quo ante.

    (B) <u>Termination by the GUC Trust.</u> This Agreement shall be terminable at the option of the GUC Trust in the event that (a) the Notice Order is not entered on or before 30 days after execution of this Settlement Agreement, or (b) the Settlement Effective Date does not occur on or before 60 days after notice of the Settlement Motion has been provided pursuant to Section 2.9 hereto and the Notice Order (each of (a) and (b) the "**Outside Date**"). Following the passage of the Outside Date, the GUC Trust shall be entitled to send a notice of termination to the Signatory Plaintiffs in accordance with Section 3.15 hereof, with the Agreement automatically terminating on the date that such notice is received by the Signatory Plaintiffs. In the event of such termination, this Agreement shall be null and void, and each of the Parties' respective interests, rights, remedies and defenses shall be fully restored without prejudice as if this Agreement (except as set forth in Sections 3.3, 3.4, 3.5, 3.13, 3.15, and 3.19) had never existed and the Parties shall be returned to their respective positions status quo ante.

(C) <u>Termination by Any Party for Cause.</u>  In the event of any material breach of the terms of this Agreement, the non-breaching Party may elect (in addition to any other remedies available to the non-breaching party hereunder or under applicable law) to terminate this Agreement by (i) providing a Communication to the breaching party as set forth in Section 3.15 below, and affording the breaching party a five (5) business day period in which to cure the purported breach, and (ii) absent such cure or the commencement of an action in the Bankruptcy Court with respect to the existence of any such breach, by providing a follow-up Communication to the breaching Party as set forth in Section 3.15 below, that declares the Agreement to be terminated.  Following such termination for cause, the terms of the Agreement shall no longer be binding on the non-breaching Party (except as set forth in Sections 3.3, 3.4, 3.5, 3.13, 3.15, and 3.19).

**3.3** **Attorneys' Fees.**  Except as otherwise provided for herein, each of the Parties shall pay its own court costs, attorneys' fees, and all other expenses, costs, and fees incurred relating to this Agreement and any related litigation, including but not limited to the GM MDL and Motions to Enforce litigation.  If any lawsuit or proceeding is required to enforce the terms of this Agreement, the prevailing party in any such lawsuit or proceeding shall be entitled to reasonable attorney's fees and costs.

**3.4** **No Admission.**  Nothing in this Agreement shall be deemed an admission of any kind.  To the extent provided by Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than in support of the Settlement Motion and proposed entry of the Settlement Order and Claims Estimate Order or in a proceeding to enforce the terms of this Agreement.

**3.5** **Remedies.**  Each of the Parties retain all remedies available in law or equity for breach of this Agreement by any Party, including, without limitation, the right of a non-breaching Party to seek specific performance and injunctive or other equitable relief as a remedy for any such breach.

**3.6** **No Litigation.**  Except as may be necessary to enforce the terms of this Agreement, the Parties and any other person who is an intended beneficiary hereunder, agree that she or he shall not commence or proceed with any action, claim, suit, proceeding or litigation against any other Party, directly or indirectly, regarding or relating to the matters described in this Agreement, or take any action inconsistent with the terms of the Agreement.

**3.7** **Further Assurances.**  Each of the Parties covenant to, from time to time, execute and deliver such further documents and instruments and take such other actions as may be reasonably required or appropriate to evidence, effectuate, or carry out the intent and purposes of this Agreement or to perform its obligations under this Agreement and the transactions contemplated thereby.

**3.8** **Cooperation.**  The Parties agree to reasonably cooperate with one another to effectuate an efficient and equitable implementation of this Agreement.

**3.9    Counterparts; Facsimile; Signatures.**  This Agreement may be executed in any number of counterparts and by different Parties to this Agreement on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement.  Any signature delivered by any of the Parties by facsimile or electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement, shall be deemed to be an original signature hereto, and shall be admissible as such in any legal proceeding to enforce this Agreement.

**3.10    Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective agents, partners, attorneys, employees, representatives, officers, directors, shareholders, divisions, subsidiaries, affiliates, transferees, heirs, executors, administrators, personal representatives, legal representatives, successors, and assigns, consistent with the other provisions of this Agreement.

**3.11    Integration.**  This Agreement constitutes the entire agreement and understanding among the Parties hereto relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements, representations and understandings between or among any of the Parties hereto relating to such subject matter.  In entering into this Agreement, the Parties and each of them acknowledge that they are not relying on any statement, representation, warranty, covenant or agreement of any kind made by any other party hereto or any employee or agent of any other party hereto, except for the representations, warranties, covenants and agreements of the Parties expressly set forth herein.

**3.12    Amendment.**  Except as otherwise specifically provided in this Agreement, no amendment, modification, rescission, waiver or release of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Parties.

**3.13    Interpretation.**  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, and the Parties agree to take any and all steps which are necessary in order to enforce the provisions hereof.

**3.14    Severability.**  The terms and conditions of this Agreement are not severable. However, if any provision or part of any provision of this Agreement is for any reason declared or determined by a court to be invalid, unenforceable, or contrary to public policy, law, statute, or ordinance, the validity of the remaining parts, terms, or provisions of this Agreement shall not be affected thereby and shall remain valid and fully enforceable, and such invalid, unenforceable, or illegal part or provision shall not be deemed to be part of this Agreement.

**3.15    Notices.**  Any notice, demand, request, consent, approval, declaration or other communication (a "**Communication**") under this Agreement shall be in writing and shall be given or delivered (i) by a nationally recognized private overnight courier service addressed as indicated in Schedule 1 annexed hereto or to such other address as such party may indicate by a notice delivered to the other Parties hereto in accordance with the provisions hereof; or (ii) to the extent that such Communication has been filed with the Bankruptcy Court, via the electronic distribution means used by the Bankruptcy Court.  Any Communication shall be deemed to have been effectively delivered and received, if sent by a nationally recognized

private overnight courier service, on the first business day following the date upon which it is delivered for overnight delivery to such courier service.

**3.16    Choice of Law and Forum; Consent to Jurisdiction.**  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to its conflict of laws principles.  The District Court and the Bankruptcy Court shall have jurisdiction to resolve any dispute arising out of, related to or in connection with this Agreement to the exclusion of any other court, and the Parties hereby consent to the jurisdiction of the District Court and the Bankruptcy Court for resolution of such disputes and agree that they shall not attempt to litigate any such dispute in any other court.

**3.17    Advice of Counsel.**  Each Party represents and acknowledges that it has been represented by an attorney with respect to this Agreement and any and all matters covered by or related to such Agreement.  Each Party further represents and warrants to each other that the execution and delivery of this Agreement has been duly authorized by each of the Parties after consultation with counsel, that the persons signing this Agreement on their behalf below have been fully authorized by their respective Parties to do so, and that the undersigned do fully understand the terms of this Agreement and have the express authority to enter into this Agreement.

**3.18    Assignment.**  No assignment of this Agreement or of any rights or obligations hereunder may be made by any party hereto without the prior written consent of the other Parties hereto, and any attempted assignment without such prior consent shall be null and void.  No assignment of any obligations hereunder shall relieve any of the Parties hereto liable therefore of any such obligations.

**3.19    Waiver.**  Except as otherwise specifically provided in this Agreement, any provision of this Agreement may be waived only by a written instrument signed by the Party against whom enforcement of such waiver is sought.

**3.20    Headings, Number, and Gender.**  The descriptive headings of the sections of this Agreement are included for convenience of reference only and shall have no force or effect in the interpretation or construction of this Agreement.  As used in this Agreement, the singular shall include the plural, and the masculine shall include the feminine and neutral genders, and vice versa.

**3.21    Waiver of Jury Trial.**  Each of the Parties hereby irrevocably waives its rights, if any, to a jury trial for any claim or cause of action based upon or arising out of this Agreement.

09-50026-mg    Doc 14130-1    Filed 09/26/17    Entered 09/26/17 32:31:43    Exhibit -
Exhibit A    Pg 323 of 516

09-50026-mg    Doc 14039-4    Filed 09/22/17    Entered 09/22/17 18:46:43    Exhibit 4 -
August 14    2017 Settlement Agreement    Pg 20 of 25

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

| | |
|---|---|
| BROWN RUDNICK LLP | GIBSON, DUNN & CRUTCHER, LLP |

On behalf of the Plaintiffs                         On behalf of the GUC Trust

By: _____         By: _____
Name:  Edward S. Weisfelner                Name:  Matthew Williams
Name:  Howard S. Steel                        Name:  Keith R. Martorana
                                                        Name:  Gabriel Gillett
Title:  Designated Counsel for the Ignition
Switch Plaintiffs and certain Non-Ignition   Title:  Counsel for Wilmington Trust
Switch Plaintiffs in the Bankruptcy Court   Company, as Administrator and Trustee of the
                                                        GUC Trust

STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, P.C.

On behalf of the Plaintiffs

By: _____
Name:  Sander L. Esserman

Title: Designated Counsel for the Ignition
Switch Plaintiffs and certain Non-Ignition
Switch Plaintiffs in the Bankruptcy Court

HAGENS BERMAN SOBOL SHAPIRO LLP

On behalf of the Ignition Switch Plaintiffs and
certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Steve W. Berman

Title: Co-Lead Counsel for the Ignition Switch
Plaintiffs and certain Non-Ignition Switch
Plaintiffs in the MDL Court

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

On behalf of the Ignition Switch Plaintiffs and
certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Elizabeth J. Cabraser

Title: Co-Lead Counsel for the Ignition Switch

Plaintiffs and certain Non-Ignition Switch
Plaintiffs in the MDL Court

GOODWIN PROCTER LLP

On behalf of the PIWD Plaintiffs Represented
By Hilliard Muñoz Gonzales L.L.P. and the
Law Offices of Thomas J. Henry

By: _____
Name:  William P. Weintraub
Name:  Gregory W. Fox

Title: Counsel to the PIWD Plaintiffs
Represented By Hilliard Muñoz Gonzales
L.L.P. and the Law Offices of Thomas J.
Henry

HILLIARD MUÑOZ GONZALES LLP

On behalf of the PIWD Plaintiffs

By: _____
Name:  Robert Hilliard

Title: Counsel to the PIWD Plaintiffs

THE LAW OFFICES OF THOMAS J.
HENRY

On behalf of the PIWD Plaintiffs

By: _____
Name:  Thomas J. Henry

Title: Counsel to the PIWD Plaintiffs

ANDREWS MYERS, P.C.

On behalf of the PIWD Plaintiffs

By: _____
Name:  Lisa M. Norman

Title: Counsel to the PIWD Plaintiffs

09-50026-mg   Doc 14409-3   Filed 01/19/18   Entered 09/26/17 18:46:43   Exhibit H -
August 14   2017 Settlement Agreement   Pg 325 of 516

# EXHIBIT A

**EXHIBIT B**

09-50026-mg    Doc 14120-1    Filed 09/26/17    Entered 09/26/17 23:21:43    Exhibit -
Exhibit A    Pg 327 of 516

09-50026-reg    Doc 12465-10    Filed 08/14/13    Entered 08/14/13 18:46:49    Exhibit H -
August 14    2012 Settlement Agreement    Pg 24 of 25

**EXHIBIT C**

<u>Schedule 1</u>

<u>If to the GUC Trust</u>:

c/o Gibson Dunn & Crutcher, LLP
200 Park Avenue
New York, New York 10166
Attn:  Matthew J. Williams, Esq.
     Keith R. Martorana, Esq.

<u>If to the PIWD Plaintiffs represented by Hilliard Muñoz Gonazlez, LLP and the Law Offices of
Thomas J. Henry</u>:

c/o Hilliard Muñoz Gonazlez, LLP
719 South Shoreline
Suite 500
Corpus Christi, TX 78401
Attn:  Robert C. Hilliard, Esq.

c/o The Law Offices of Thomas J. Henry
4715 Fredricksburg, Suite 507
San Antonio, TX 78229
Attn:  Thomas J. Henry, Esq.

c/o Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Attn:  William P. Weintraub
     Gregory W. Fox

<u>If to the PIWD Plaintiffs represented by Andrews Myers, P.C.</u>:

c/o Andrews Myers, P.C.
1885 St. James Place, 15th Floor
Houston, Texas 77056
Attn:  Lisa M. Norman

<u>If to the Ignition Switch Plaintiffs and/or certain Non-Ignition Switch Plaintiffs (or Co-Lead
Counsel on their behalf)</u>:

c/o Hagens Berman Sobol Shapiro LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Attn:  Steve W. Berman, Esq.

c/o Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
Attn:  Elizabeth J. Cabraser, Esq.

c/o Brown Rudnick LLP
Seven Times Square
New York, New York 10036
Attn:  Edward S. Weisfelner
     Howard S. Steel

c/o Stutzman, Bromberg, Esserman & Plifka,
a Professional Corporation
2323 Bryan Street, Ste 2200
Dallas, Texas 75201
Attn:  Sander L. Esserman

09-50026-mg   Doc 13089-4   Filed 04/11/14   Entered 04/11/14 19:46:56   Exhibit I -
Exhibit A   Pg 329 of 516

# EXHIBIT I

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| MOTORS LIQUIDATION COMPANY, *et al.*, | ) Bankruptcy Case No.:  09-50026 (MG) |
| f/k/a General Motors Corporation, *et al.*, | ) |
|  | ) (Jointly Administered) |
| Debtors. | ) |
|  | ) |

## ORDER PURSUANT TO SECTIONS 105, 363 AND 1142 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3020 AND 9019, AUTHORIZING AND APPROVING THE SETTLEMENT AGREEMENT BY AND AMONG THE GUC TRUST AND THE SIGNATORY PLAINTIFFS

Upon the joint motion of the Motors Liquidation Company GUC Trust (the "**GUC Trust**"), PIWD Counsel[1] on behalf of the PIWD Plaintiffs, and Co-Lead Counsel on behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs (collectively, the "**Signatory Plaintiffs**") filed on August ___, 2017 [ECF No. _____] (the "**Motion**") for entry of an order authorizing and approving the settlement embodied in the agreement attached thereto as Exhibit 1 (the "**Settlement Agreement**"), by and among (i) the GUC Trust and (ii) the Signatory Plaintiffs; and the Bankruptcy Court having considered the Motion; and a hearing on the Motion having been held before this Bankruptcy Court on _____, 2017 (the "**Hearing**") to consider the relief requested in the Motion; and the Bankruptcy Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Plan; and the Bankruptcy Court having considered the statements of counsel on the record of the Hearing and the filings of the parties in connection with the Motion; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Settlement Agreement.

the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and upon the

record of the Hearing; and it appearing that proper and adequate notice of the Motion has been

given in accordance with the *Order Approving Notice Procedures With Respect to Proposed*

*Settlement by and Among the Signatory Plaintiffs and the GUC Trust* [ECF No. _____] (the

"**Notice Order**") and that no other or further notice is necessary; and after due deliberation and

sufficient cause appearing therefor,

**THE BANKRUPTCY COURT HEREBY FINDS AND DETERMINES THAT:**[2]

    A.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

    B.      The statutory predicates for the relief requested in the Motion are Sections 105,

363 and 1142 of the Bankruptcy Code and Bankruptcy Rules 3020 and 9019.

    C.      As evidenced by the affidavits of service filed with this Court, and in accordance

with the Notice Order, notice has been given and a reasonable opportunity to object or be heard

with respect to the Motion and the relief requested therein has been afforded to (i) all persons in

the United States who, as of July 10, 2009, owned or leased a vehicle manufactured by Old GM

included in the Recalls; (ii) all Pre-Closing Accident Plaintiffs who have filed a lawsuit against

New GM as of the date of the Settlement Agreement; (iii) all Plaintiffs who have filed or joined a

motion for authority to file late claims against the GUC Trust; (iv) holders of units of beneficial

interest in the GUC Trust; (v) the defendants to the Term Loan Avoidance Action; and (vi) the

parties in interest in accordance with the *Sixth Amended Order Pursuant to 11 U.S.C. § 105(a)*

*and Bankruptcy Rules 1015(c) and 9007 Establishing Notice and Case Management Procedures*,

dated May 5, 2011 [ECF No. 10183]. Additional publication notice of the Motion has been

---

[2] The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

given by the GUC Trust as set forth in the Notice Order. The notice was good, sufficient and appropriate in light of the circumstances and the nature of the relief requested, and no other or further notice is or shall be required.

D. The GUC Trust has demonstrated good, sufficient and sound business purposes, causes and justifications for the relief requested in the Motion and the approval of the Settlement Agreement and the transactions contemplated thereby.

E. The GUC Trust has demonstrated that the relief requested in the Motion is necessary for the prompt and efficient administration of the Old GM Bankruptcy Case and is in the best interests of the GUC Trust, its beneficiaries and other parties-in-interest.

F. After due diligence by the Parties, the Settlement Agreement was negotiated and entered into by and among the Parties in good faith and from arm's length bargaining positions.

G. The GUC Trust has demonstrated that continued litigation of the matters resolved by the Settlement Agreement would be complex, costly and delay the closing of the Old GM Bankruptcy Case and the distribution of GUC Trust Assets in accordance with the Plan.

H. The Settlement Agreement resolves multiple disputes, claims and issues to which the Parties are involved in varying degrees, and in related but not necessarily identical ways, such that each Party's overall obligations to one or more other Parties constitutes good and sufficient consideration for the overall benefits each Party is to receive from one or more of the other Parties.

I. The settlements, compromises, releases and transfers contemplated in the Settlement Agreement are fair, reasonable and given in exchange for valuable and reasonably equivalent consideration.

J.      The GUC Trust's entry into the Settlement Agreement, including the compromises and releases embodied therein, is a prudent and reasonable exercise of business judgment that is in the best interests of the GUC Trust and its beneficiaries.

K.      The Settlement Agreement represents a multi-party resolution of a number of complex factual and legal issues, and the releases and acknowledgments contained therein and herein, and the injunction and findings provided by this Order, are a necessary element of the consideration received by the Parties, and a condition to the effectiveness of the Settlement Agreement.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The relief requested by the Motion is GRANTED and the Settlement Agreement and each of its terms are approved in their entirety as set forth herein.

2.      Any and all objections to the Motion that have not been withdrawn, resolved, waived or settled as reflected on the record of the Hearing are overruled on the merits.

3.      In accordance with Paragraph 3.1 of the Settlement Agreement, the Settlement shall be effective and binding on all persons upon the Settlement Effective Date, including, but not limited to, all Plaintiffs, any past or present holder of units of beneficial interests in the GUC Trust, any past or present holder of an Allowed General Unsecured Claim, and all defendants in the Term Loan Avoidance Action.

4.      The GUC Trust is authorized to perform all of its obligations pursuant to the terms of the Settlement Agreement, and to take any and all actions necessary or appropriate to effectuate the Settlement Agreement and to enforce its terms.

5.      On or before the date that is five (5) business days following the Settlement Effective Date (the "**Cash Distribution Date**"), in full settlement of the Parties' disputes as contemplated in the Settlement Agreement, and in contemplation of, among other things, the

releases and waivers set forth in Paragraph 2.3 of the Settlement Agreement and Paragraph 6 hereof (collectively, the "**Release and Waiver**"), the GUC Trust is hereby directed to pay the total sum of fifteen million U.S. Dollars (USD $15,000,000) (the "**Settlement Amount**") to an account established and designated by the Signatory Plaintiffs (the "**Settlement Fund**"); provided that, in the event that Signatory Plaintiffs have not established and designated such Settlement Fund within two (2) business days following the Settlement Effective Date, the GUC Trust shall place the Settlement Amount into a third party escrow account established by the GUC Trust.

6.      Provided that the Settlement Effective Date has occurred, contemporaneously with the payment of the Settlement Amount by the GUC Trust, and in consideration of the promises and covenants contained in the Settlement Agreement and/or the notice provided by the Settlement Agreement, all Plaintiffs, for themselves, and on behalf of their respective agents, employees, officers, directors, shareholders, successors, assigns, assignors, predecessors, members, beneficiaries, representatives (in their capacity as such) and any subsidiary or affiliate thereof (the "**Releasing Parties**"), shall be deemed to completely and irrevocably release, waive (including a waiver under California Civil Code Section 1542) and forever discharge the GUC Trust, the trust administrator and trustee of the GUC Trust, the Motors Liquidation Company Avoidance Action Trust, and the holders of beneficial units in the GUC Trust, and all of their subsidiaries and affiliates, and all of their respective past, present and future agents, attorneys, employees, officers, directors, shareholders, successors, assigns, members, representatives (in their capacity as such) (the "**Released Parties**"), from any and all, actions, attorneys' fees, charges, claims (including but not limited to General Unsecured Claims and claims for injunctive and/or declaratory relief), costs, demands, expenses, judgments, liabilities and causes of action of

-5-

any kind, nature or description, whether matured or unmatured, contingent or absolute, liquidated or unliquidated, known or unknown, direct or derivative, preliminary or final, which the Releasing Parties may now have, ever had, or may in the future have against the Released Parties, the GUC Trust Assets, the Debtors, or their estates, arising out of or based on any facts, circumstances, issues, services, advice, or the like, occurring from the beginning of time through the date hereof that relate to, could relate to, arise under, or concern the Recalls, the Old GM Bankruptcy Case, the GM MDL, the Plan, the Late Claims Motions, the AMPSA, the Sale Order or any matter associated with any of the foregoing (collectively, the "**Released Claims**"); provided, however, that the Releasing Parties shall retain all remedies available in law or equity for breach of the Settlement Agreement by the GUC Trust; and provided further that solely in the event that the Bankruptcy Court enters the Claims Estimate Order as contemplated by the Settlement Agreement, the foregoing Release and Waiver shall not apply to the Adjustment Shares, which shall be issued by New GM to the Settlement Fund for the exclusive benefit of Plaintiffs pursuant to the terms of the entered Claims Estimate Order (if any); and provided further that, nothing in the Settlement Agreement, Motion or this Order is intended to waive any claims against New GM or be an election of remedies against New GM; nor does the Settlement Agreement, Motion or this Order, or any payments made in connection therewith, represent full satisfaction of any claims against Old GM, unless and until such claims are in fact paid in full for every available source (provided, however, that in no event shall any Plaintiff be permitted to seek any further payment or compensation from the GUC Trust in respect of their claims or otherwise, other than the Settlement Amount and the Adjustment Shares) and, except as mandated otherwise by applicable law, nothing in the Settlement Agreement, Motion or this Order shall waive or impair any claims that Plaintiffs may have against New GM, the Settlement

shall not be an election of remedies by any Plaintiff, and the Settlement Fund shall not represent full and final satisfaction of any claims that Plaintiffs may have against New GM, which claims are expressly reserved.  Nor shall the Settlement or any estimation or payment or distribution made in connection therewith constitute a cap on any claims by any of the Plaintiffs against New GM.  In addition, the Releasing Parties shall be deemed to have agreed not to make any claim, commence or continue any action, lawsuit, adversary proceeding or other legal, equitable or administrative proceeding that asserts any such Released Claims against the Released Parties, the GUC Trust Assets, the Debtors, or their estates, or to seek any further funding from the Released Parties in connection with the Released Claims, and the Released Parties are released and discharged of any further obligation to provide such funding, it being the intent of the Parties that (other than the rights of the Plaintiffs to the Adjustment Shares following entry of the Claims Estimate Order) the payment of the Settlement Amount is the last and only payment the Released Parties or any of their subsidiaries or affiliates will make to the Plaintiffs in connection with the Released Claims.

7.      The Releasing Parties shall be permanently stayed, restrained, enjoined and forever barred from taking any action against any of the Released Parties, the GUC Trust Assets, the Debtors, or their estates for the purpose of, directly or indirectly, collecting, recovering, or receiving payment or recovery with respect to, relating to, arising out of, or in any way connected with any Released Claim, whenever and wherever arising or asserted, all of which shall be resolved and satisfied by the Settlement Fund as set forth in the Settlement Fund Procedures (as defined below).

8.      The Released Parties and FTI Consulting, Inc. as trust monitor of the GUC Trust (in such capacity, the "**GUC Trust Monitor**"): (a) shall have no liability whatsoever to any

holder or purported holder of a claim, equity interest or unit of beneficial interest in the GUC

Trust, or any other party-in-interest, or any of their respective agents, employees, representatives,

financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or

omission in connection with, or arising out of, the settlement of the claims addressed by the

Settlement Agreement, or the pursuit of approval of the Settlement Agreement or the Claims

Estimate Order, the administration of the Settlement Agreement, or any transaction contemplated

by the Settlement Agreement, or in furtherance thereof, or any obligations that they have under

or in connection with the Settlement Agreement or the transactions contemplated by the

Settlement Agreement (collectively, the "**Exculpated Claims**"), except (i) for any act or

omission that constitutes willful misconduct or gross negligence as determined by a final order,

and (ii) for any contractual obligation that is owed to a Party under the Settlement Agreement or

this Order; and (b) in all respects, shall be entitled to rely upon the advice of counsel with respect

to their duties and responsibilities under the Settlement Agreement.  No holder of any claim,

interest or unit of beneficial interest in the GUC Trust, or other party-in-interest, none of their

respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no

successors or assigns of the foregoing, shall have any right of action against the Released Parties

or the GUC Trust Monitor with respect to the Exculpated Claims.  This exculpation shall be in

addition to, and not in limitation of, all other releases, indemnities, exculpations and any other

applicable law or rules protecting such Released Parties and the GUC Trust Monitor from

liability.

9.       All of the value of the Settlement Fund, including the Settlement Amount (and, if

issued pursuant to the Claims Estimate Order, the Adjustment Shares or their value), shall be

reserved for the exclusive benefit of the Plaintiffs, subject only to costs associated with the administration of the Settlement Fund.

10.     Provided that the Settlement Effective Date has occurred, contemporaneously with the payment of the Settlement Amount by the GUC Trust, and in consideration of the promises and covenants contained in the Settlement Agreement, the GUC Trust, all holders of beneficial units of the GUC Trust, all defendants in the Term Loan Avoidance Action and all holders of Allowed General Unsecured Claims, other than Plaintiffs, for themselves, and on behalf of their respective agents, employees, officers, directors, shareholders, successors, assigns, assignors, predecessors, members, beneficiaries, representatives (in their capacity as such) and any subsidiary or affiliate thereof (the "**GUC Releasing Parties**"), shall be deemed to completely and irrevocably release and waive any and all rights or interests they may now have, ever had, or may in the future have with respect to the Settlement Amount.  In addition, the GUC Releasing Parties shall be deemed to have agreed not to make any claim, commence or continue any action, lawsuit, adversary proceeding or other legal, equitable or administrative proceeding that seeks to share in or recover from the Settlement Amount.  Further, the GUC Releasing Parties shall be enjoined and forever barred from directly or indirectly bringing, commencing, initiating, instituting, maintaining, prosecuting or otherwise aiding, in any action of any kind or nature, whether in the United States, Canada or elsewhere, that seeks to share in or recover from the Settlement Amount.

11.     Provided that the Settlement Effective Date has occurred, contemporaneously with the payment of the Settlement Amount by the GUC Trust and entry of the Claims Estimate Order by the Bankruptcy Court, and in consideration of the promises and covenants contained in the Settlement Agreement, the GUC Releasing Parties shall be deemed to completely and

irrevocably release and waive any and all rights or interests they may now have, ever had, or may in the future have with respect to the Adjustment Shares, which shall be issued by New GM to the Settlement Fund for the exclusive benefit of Plaintiffs pursuant to the terms of the entered Claims Estimate Order (if any). In addition, the GUC Releasing Parties shall be deemed to have agreed not to make any claim, commence or continue any action, lawsuit, adversary proceeding or other legal, equitable or administrative proceeding that seeks to share in or recover from the Adjustment Shares. Further, the GUC Releasing Parties shall be enjoined and forever barred from directly or indirectly bringing, commencing, initiating, instituting, maintaining, prosecuting or otherwise aiding, in any action of any kind or nature, whether in the United States, Canada or elsewhere, that seeks to share in or recover from the Adjustment Shares.

12.      The Signatory Plaintiffs or, in the alternative, an administrator appointed by the Signatory Plaintiffs, shall establish the Settlement Fund (at the sole costs of the Signatory Plaintiffs). Being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), if any, or any other consideration contained in the Settlement Fund. Subject to notice and an opportunity for Plaintiffs to object, the Signatory Plaintiffs will determine the overall allocation of the value of the Settlement Fund between economic loss claims and personal injury/wrongful death claims, and the eligibility and criteria for payment (the "**Settlement Fund Procedures**"). Notice of the proposed allocation and proposed eligibility and criteria for payment will be posted on a settlement website, along with information about the hearing date and how and when to assert any objections.

13.      Solely in the event that the Bankruptcy Court denies entry of the Claims Estimate Order or the Claims Estimate Order is entered but subsequently reversed by a reviewing court on

a final basis, then the Late Claims Motions shall automatically be deemed withdrawn with prejudice, without any action required on the part of the GUC Trust, the Plaintiffs or any other party in interest.  For the avoidance of doubt, this Order shall not be affected by the entry or non-entry of any Claims Estimate Order, or any subsequent reversal of any Claims Estimate Order on appeal or on remand.

14.    The Settlement Agreement, including any term, condition or other provision therein, may not be waived, modified, amended or supplemented, except as provided in the Settlement Agreement.

15.    The failure to specifically describe or include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Settlement Agreement be authorized and approved in its entirety.

16.    If there is any conflict between the terms of the Motion and the Settlement Agreement, the terms of the Settlement Agreement shall control, and if there is any conflict between the terms of this Order and the Settlement Agreement, the terms of this Order shall control.

17.    Notwithstanding the possible applicability of Bankruptcy Rules 3020, 6004, 6006, 7062, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

18.    The Bankruptcy Court shall have exclusive jurisdiction to interpret and enforce the Settlement Agreement and to resolve any disputes relating to or concerning the Settlement Agreement.

Dated: _____, 2017

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT

# EXHIBIT J

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                                          :
In re:                                    :        Chapter 11
MOTORS LIQUIDATION COMPANY, et al.,       :        Case No.: 09-50026 (MG)
         f/k/a General Motors Corp., et al.,   :
                                          :
              Debtors.                    :        (Jointly Administered)
-----------------------------------------------------------X

## CLAIMS ESTIMATE ORDER

Upon the motion (the "**Motion**")[1] of the Signatory Plaintiffs and the GUC Trust
pursuant to Bankruptcy Code Section 502(c) and Bankruptcy Rule 9019 for entry of an order
estimating the aggregate Allowed General Unsecured Claims for purposes of issuance of the
Adjustment Shares by New GM under Section 3.2(c) of the AMSPA and the Side Letter; and due
and proper notice of the Motion having been provided and it appearing that no other or further
notice need be given; and the Court having found and determined the legal and factual bases set
forth in the Motion establish just cause for the relief granted herein; and after due deliberation
and sufficient cause appearing therefore;

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as provided herein.

2.      Any and all objections to the Motion that have not been withdrawn, resolved,
waived or settled as reflected on the record of the hearing are overruled on the merits.

3.      The Pre-Closing Accident Plaintiffs' claims shall be estimated solely for the
purposes of estimating the aggregate Allowed General Unsecured Claims in this Order.  If
further adjudication of their personal injury and wrongful death claims are necessary
notwithstanding entry of this Order, the Pre-Closing Accident Plaintiffs' rights under Section

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1

157(b)(5) of Title 28 to have their claims tried in the district court in which Old GM's bankruptcy case is pending, or in the district court in which the claim arose, as determined by the district court in which Old GM's bankruptcy case is pending, are expressly reserved.

4.     The aggregate Allowed General Unsecured Claims, including the allowed amount of Plaintiffs' claims, are hereby estimated for purposes of the issuance of the Adjustment Shares in an amount that is no less than $42 billion.[2]

5.     Within five (5) business days of entry of this Order, New GM shall issue 30 million shares of New GM common stock (the "**Adjustment Shares**") or the value of the Adjustment Shares, to an account designated by the Signatory Plaintiffs (the "**Settlement Fund**").

6.     Nothing in this Order is intended to waive any claims against New GM or to be an election of remedies against New GM; nor does this Order or any payments made in connection with this Order represent full satisfaction of any claims against Old GM, unless and until such claims are in fact paid in full from every available source; provided, however, that in no event shall any Plaintiff be permitted to seek any further payment or compensation from the GUC Trust in respect of their claims or otherwise, other than the Settlement Amount and the Adjustment Shares.  Except as mandated otherwise under applicable law, nothing in this Order shall waive any claims that any Plaintiff may have against New GM or constitute an election of remedies by any Plaintiff, and the Adjustment Shares (and any distribution thereof to any Plaintiff) shall not represent full and final satisfaction of any claim that any Plaintiff may have against New GM, all of which are expressly reserved.  The estimate of the aggregate Allowed

---

[2]     Notwithstanding anything to the contrary set forth herein, the estimation of the aggregate Allowed General Unsecured Claims is solely for the purposes of issuance of the Adjustment Shares, and shall not, among other things, constitute an estimation of any claims or potential claims of the defendants in the Term Loan Avoidance Action.

General Unsecured Claims herein shall not operate as a cap on any of the claims of any of the Plaintiffs against New GM.

7.     Provided that the Settlement Order has been entered and is a Final Order (or the GUC Trust has waived the requirement that the Settlement Order be a Final Order) (i) the Adjustment Shares, or the value thereof, shall be reserved for the exclusive benefit of the Plaintiffs, subject only to costs associated with the administration of the Settlement Fund, and (ii) the GUC Trust, holders of beneficial units of the GUC Trust, holders of Allowed General Unsecured Claims other than Plaintiffs, and the defendants in the Term Loan Avoidance Action, and all of their subsidiaries and affiliates, and all of their respective past, present and future agents, attorneys, employees, officers, directors, shareholders, successors, assigns, members, or representatives (in their capacity as such), shall have no rights or entitlements with respect to the Settlement Fund and are deemed to completely and irrevocably release and waive any and all rights or interests they may now have, ever had, or may in the future have with respect to the Settlement Fund.

8.     As provided under Sections 2.9(b), 2.9(c), and 2.11 of the Settlement Agreement, the Signatory Plaintiffs are specifically authorized and directed to establish an allocation methodology for the Settlement Fund and proposed criteria for determining the right or ability of each Plaintiff to receive a distribution from the Settlement Fund.  Notice of any agreement as to the proposed allocation of Adjustment Shares (or their value) and proposed criteria for eligibility, along with information about the hearing date and how and when to assert any objections, shall be provided via a settlement website to all known Plaintiffs whose rights might be affected by such allocation and such Plaintiffs shall have an opportunity to object at a hearing to be held before the appropriate court.  Being defined as a Plaintiff does not assure any party that he, she,

or it will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), or any other consideration contained in the Settlement Fund.

9.    The Signatory Plaintiffs are specifically authorized and directed to administer, allocate and distribute the proceeds of the Settlement Fund to Plaintiffs.  Proceeds from the Settlement Fund may be used to cover the costs associated with administration and distribution of the Settlement Fund.  The GUC Trust shall have no obligations associated with the funding (other than the payment of the Settlement Amount), administration, allocation and distribution of the Settlement Fund.

10.    Notwithstanding the possible applicability of Bankruptcy Rule 7062, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

11.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2017
      New York, New York

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT

09-50026-mg Doc 00894931-1 Pleaded 09/14/09-4 Entered 09/14/17 18:48:39 Exhibit K -
Exhibit A Pg 347 of 516

# EXHIBIT K

HEARING DATE AND TIME: [ ], 2017 at [ ] (EST)
OBJECTION DEADLINE: [ ], 2017 at 4:00 p.m. (EST)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X
                                                  :

In re:                                   :         Chapter 11

MOTORS LIQUIDATION COMPANY, et al.,    :         Case No.: 09-50026 (MG)

      f/k/a General Motors Corp., et al.,   :

                                   :

                           Debtors.    :         (Jointly Administered)

--------------------------------------------------------------X

**JOINT MOTION PURSUANT TO BANKRUPTCY
CODE SECTIONS 105, 363, 502(C) AND 1142 AND
BANKRUPTCY RULES 3020 AND 9019 TO APPROVE
THE SETTLEMENT AGREEMENT BY AND AMONG THE SIGNATORY
PLAINTIFFS AND THE GUC TRUST, AND TO ESTIMATE THE PLAINTIFFS'
AGGREGATE ALLOWED GENERAL UNSECURED CLAIMS AGAINST THE DEBTORS**

Case 1:17-cv-09934-VM  Document 39-4  Entered 09/13/17  Page 349 of 516  Exhibit K - Exhibit A  Pg 349 of 516

## TABLE OF CONTENTS

09-50026-mg    Doc 14120-1    Filed 09/26/17    Entered 09/26/17 22:31:43    Exhibit -
August 15, 2017 9019 Motion    Pg 4 of 37

## TABLE OF AUTHORITIES

By and through their undersigned counsel, the Ignition Switch Plaintiffs,[1] certain Non-Ignition Switch Plaintiffs,[2] certain Pre-Closing Accident Plaintiffs[3] (collectively, the "**Signatory Plaintiffs**"), and the GUC Trust[4] (together with the Signatory Plaintiffs, the "**Parties**") respectfully submit this *Joint Motion Pursuant to Bankruptcy Code Sections 105, 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019 to Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors* (the "**Motion**").[5]   In support of this Motion, the Parties respectfully state as follows:

## PRELIMINARY STATEMENT

1.      Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs have sought leave to file late proposed class claims against the GUC Trust seeking relief for economic losses related to Old GM's alleged concealment of safety defects in ignition switches (including the Ignition Switch Defect and similarly defective ignition switches), side airbags, and power steering.  Certain Ignition Switch Pre-Closing Accident Plaintiffs have likewise sought leave to

---

[1]     The term "**Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 the "**Ignition Switch Defect**").

[2]     The term "**Non-Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540, 14V-118 and 14V-153.

[3]     The term "**Pre-Closing Accident Plaintiffs**" shall mean those plaintiffs asserting personal injury or wrongful death claims or persons who suffered a personal injury or wrongful death arising from an accident involving an Old GM vehicle that occurred prior to the closing of the Section 363 Sale.  The Pre-Closing Accident Plaintiffs are comprised of a subset asserting claims or who suffered an injury or death involving an Old GM vehicle with an Ignition Switch Defect (the "**Ignition Switch Pre-Closing Accident Plaintiffs**"), and a subset asserting claims or who suffered an injury or death involving vehicles with other defects (the "**Non-Ignition Switch Pre-Closing Accident Plaintiffs**").  Collectively, the Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Pre-Closing Accident Plaintiffs are the "**Plaintiffs**."

[4]     The term "**GUC Trust**" shall mean the Motors Liquidation Company GUC Trust.

[5]     Except where otherwise indicated, references to "ECF No. _" are to docket entries in the Bankruptcy Court proceedings: In re Motors Liquidation Co., Bankr. Case No. 09-50026 (MG).

file late personal injury and wrongful death claims against the GUC Trust related to Old GM vehicles subject to the Recalls.

2.      These efforts implicate numerous complex, disputed issues, including, *inter alia*, whether Plaintiffs should be granted authority to file late proofs of claim (and whether such authority can be granted solely on due process grounds), whether Plaintiffs' asserted claims are equitably moot, whether additional grounds exist to object to Plaintiffs' asserted claims, and the allowable amount of said claims.

3.      Litigation related to these issues has been ongoing for several years, consuming large amounts of time, money and resources, and failing to resolve key disputes between the Parties.  For example, in the April 2015 Decision, the Bankruptcy Court ruled that Old GM failed to provide Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs with constitutionally proper notice of the Bar Date.[6]  While the Bankruptcy Court ruled that assets of the GUC Trust could not be tapped to pay any late claims that might be allowed under the doctrine of equitable mootness, the Second Circuit vacated this holding as an advisory opinion—leaving open the question of the applicability of equitable mootness.[7]  In addition, there is an on-going dispute whether an additional showing under the Pioneer factors is required for Plaintiffs to obtain leave to file late claims.  Continuation of protracted litigation on these issues will only serve to deplete remaining GUC Trust Assets and subject the Parties to uncertain results.

4.      The Settlement Agreement resulted from extensive, good faith negotiations between experienced counsel to reasonably resolve these issues in the interest of the estate.

---

[6]      See In re Motors Liquidation Co., 529 B.R. 510, 573-74, 583 (Bankr. S.D.N.Y. 2015), aff'd in part, rev'd in part, vacated in part sub nom. Elliott v. General Motors LLC (In re Motors Liquidation Co.), 829 F.3d 135 (2d Cir. 2016) (the "**April 2015 Decision**").

[7]      See In re Motors Liquidation Co., 529 B.R. at 529; Elliott, 829 F.3d at 168-69.

5.     The Settlement Agreement provides for the GUC Trust to pay Plaintiffs $15 million (the "**Settlement Amount**").  In exchange for the Settlement Amount and the promise by the GUC Trust to support entry of the Claims Estimate Order as set forth below, and following extensive notice designed to reach every potentially affected Plaintiff and an opportunity to object and be heard, upon entry of the Settlement Order all Plaintiffs will be deemed to have waived and released any rights or claims against the GUC Trust, Wilmington Trust Company as trust administrator and trustee of the GUC Trust (the "**GUC Trust Administrator**"), the Motors Liquidation Company Avoidance Action Trust (the "**Avoidance Action Trust**") and holders of beneficial interest in the GUC Trust (the "**Unitholders**"), including a release of any rights to past or present GUC Trust Assets and to distributions by the Avoidance Action Trust.  This waiver provides finality and certainty to the GUC Trust and Unitholders (regardless of whether or not the Claims Estimate Order is entered), protects against the risk of claw-back or recapture of prior distributions of GUC Trust Assets and eliminates delay in the wind-down process and distribution of assets.

6.     In addition to the payment of the Settlement Amount, the GUC Trust has agreed to support the entry of an order (the "**Claims Estimate Order**") estimating the amount of Plaintiffs' claims in an amount necessary to trigger New GM's obligation to issue the maximum amount of additional shares of New GM common stock (the "**Adjustment Shares**") under the terms of the Sale Agreement.  Upon entry of the Claims Estimate Order, all Adjustment Shares will be placed in a fund for the exclusive benefit of Plaintiffs.  The Signatory Plaintiffs will subsequently determine the allocation of the value of the Settlement Amount and the Adjustment Shares between economic loss claims and personal injury/wrongful death claims and the eligibility and criteria for payment, subject to notice and an opportunity for Plaintiffs to object.

Being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), if any, or any other consideration contained in the Settlement Fund.

7.      Unitholders, defendants in the Term Loan Avoidance Action, and holders of Allowed General Unsecured Claims, other than Plaintiffs, waive any rights to the Settlement Amount and the Adjustment Shares.  In this way, the Settlement Agreement provides a streamlined process for allowing Plaintiffs' claims and providing a source of recovery from the Settlement Amount and the Adjustment Shares.  Notably, regardless of whether the Claims Estimate Order is ultimately entered, the waiver and releases set forth in the Settlement will be binding on all parties subject only to approval of the Settlement Order and payment of the Settlement Amount.

8.      The Settlement will massively reduce costs and resources, eliminate uncertain litigation outcomes, and prevent delay in distributions of remaining GUC Trust Assets, without disturbing recovery expectations of other creditors and Unitholders.  In light of the inherent risks and costs associated with litigation, the Settlement Agreement is fair and well within the range of reasonableness.

9.      Accordingly, the Court should approve the Settlement Agreement pursuant to Bankruptcy Rule 9019 as a fair and equitable resolution of the on-going litigation between the Parties.

10.      In addition, the Court should enter the Claims Estimate Order estimating the aggregate Allowed General Unsecured Claims, including Plaintiffs' claims, against the GUC Trust in an amount equal to or exceeding $42 billion.  The evidence and expert reports proffered by the Signatory Plaintiffs will demonstrate to the Court that the damages for Plaintiffs' claims

could well exceed the amount required for this determination. Indeed, after reviewing those reports and considering the benefits provided by the Settlement as a whole, the GUC Trust – the sole entity charged with objecting to and resolving disputed claims in order to maximize recoveries to GUC Trust Beneficiaries pursuant to the Plan – fully supports entry of the Claims Estimate Order. The GUC Trust also believes that the Settlement is in the best interests of the estate and well within the lowest range of reasonableness as mandated by Rule 9019 of the Bankruptcy Code.

## JURISDICTION

11.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

12.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

13.    The statutory predicates for the relief sought in this Motion are Bankruptcy Code Sections 105(a), 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019.

## BACKGROUND

**I.    Old GM's Bankruptcy And The Creation Of The GUC Trust.**

14.    On June 1, 2009, General Motors Corporation ("**Old GM**") and certain of its affiliates (collectively, "**Debtors**") filed for chapter 11 bankruptcy with this Court and entered into an agreement to sell substantially of its assets (the "**Sale Agreement**") to NGMCO, Inc. ("**New GM**") in exchange for, *inter alia*, New GM common stock and warrants. See In re Motors Liquidation Co., 529 B.R. at 535.

15.    The Sale Agreement was amended on July 5, 2009 to, *inter alia*, add a feature requiring New GM to provide additional New GM common stock in the event that the amount of allowed general unsecured claims against the Old GM estate exceeds a threshold amount. See

AMSPA § 3.2(c).[8]  Specifically, the AMSPA provides that if the Bankruptcy Court issues an order finding that the estimated aggregate allowed general unsecured claims against the Old GM estate exceeds $35 billion, then within five business days thereof New GM will issue Adjustment Shares to the GUC Trust.  See id.  If such order estimates the aggregate allowed general unsecured claims at or in excess of $42 billion, New GM must issue 30 million Adjustment Shares, the maximum amount of Adjustment Shares.  See id.

16.     On July 5, 2009, the sale was approved by the Bankruptcy Court.  See In re Motors Liquidation Co., 529 B.R. at 146-47.

17.      In September 2009, the Court established November 30, 2009 (the "**Bar Date**") as the deadline for filing proofs of claim against Old GM.  See id. at 535.

18.     On March 29, 2011, the Court entered an order confirming the Plan, which, among other things, authorized the creation of the GUC Trust pursuant to the terms set forth in the GUC Trust Agreement.  See id. at 536.

19.     Pursuant to the Plan and GUC Trust Agreement, the GUC Trust was granted exclusive authority to object to the allowance of general unsecured claims, seek estimation of the amount of allowed general unsecured claims, and seek Adjustment Shares from New GM.  See Plan §§ 7.1(b), 7.3; GUC Trust Agreement § 5.1.

20.     In addition, pursuant to the Plan and a side letter by and between the GUC Trust, the Debtors, New GM, and FTI Consulting (as trust monitor of the GUC Trust) dated September 23, 2011 (the "**Side Letter**"), the GUC Trust is exclusively authorized to seek the issuance of Adjustment Shares under the terms of the AMPSA for satisfaction of Allowed General Unsecured Claims when the GUC Trust determines, in its sole and absolute discretion, that the

---

[8]     See *Second Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers, and NGMCO, Inc., as Purchaser, dated as of June 26, 2009* (the "**AMSPA**").

aggregate Allowed General Unsecured Claims are, in the GUC Trust's estimation, likely to exceed $35 billion.  See Side Letter; Plan, Background § E(i); GUC Trust Agreement § 2.3(d).

21.     In February 2012, the Court entered an order providing that any claims filed after entry of the order would be deemed disallowed unless, *inter alia*, the claimant obtained leave of the Court or written consent of the GUC Trust.[9]

22.      As of June 30, 2017, the total amount of Allowed General Unsecured Claims against the Debtors' estate was $31,855,381,054, approximately $3.15 billion below the threshold for triggering the issuance of Adjustment Shares under the AMSPA.[10]

## II.     The Recalls And Subsequent Proceedings In The Bankruptcy Court And Second Circuit.

23.     In February and March 2014, over four years after the Bar Date, New GM publicly disclosed the existence of the Ignition Switch Defect and issued a recall, NHTSA Recall Number 14V-047, impacting approximately 2.1 million vehicles.

24.     After this first wave of recalls, New GM issued five additional recalls in June, July and September of 2014 concerning defective ignition switches affecting over 10 million vehicles, NHTSA Recall Numbers 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540.

25.     New GM issued a multitude of other recalls for safety defects throughout 2014. These included a recall issued in March pertaining to approximately 1.2 million vehicles with defective side airbags, NHTSA Recall Number 14V-118, and another recall issued in March pertaining to over 1.3 million vehicles with defective power steering, NHTSA Recall Number 14V-153.

---

[9]     See *Order Approving Motion Pursuant to Bankruptcy Rule 3003 and Section 105(a) of the Bankruptcy Code for an Order Disallowing Certain Late Filed Claims*, dated February 8, 2012 [ECF No. 11394] (the "**Late Filed Claims Order**").

[10]    See *Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as of June 30, 2017*, dated July 21, 2017 [ECF No. 13994].

26.     After the issuance of these recalls, owners and lessees of defective Old GM and
New GM vehicles filed lawsuits against New GM, which New GM sought to enjoin by filing
motions to enforce the Sale Order in the Bankruptcy Court.[11]   To resolve these motions, the
Bankruptcy Court first identified four threshold issues (the "**2014 Threshold Issues**") to be
determined.[12]   These issues included whether any of the claims in these actions were claims
against Old GM and, if so, whether such claims should "nevertheless be disallowed/dismissed on
grounds of equitable mootness . . . ." Id.

27.     In its April 2015 Decision on the 2014 Threshold Issues, the Bankruptcy Court
held that the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs were
known creditors who did not receive constitutionally adequate notice of the Sale or Bar Date.

28.     The Bankruptcy Court further held that while "late claims filed by the Plaintiffs
might still be allowed, assets transferred to the GUC Trust under the Plan could not now be
tapped to pay them" under the doctrine of equitable mootness.  In re Motors Liquidation Co., 529
B.R. at 529; see also June 2015 Judgment ¶ 6.  On direct appeal, the Second Circuit vacated this
equitable mootness ruling as an advisory opinion.  See Elliott, 829 F.3d at 168-69.

29.     The Non-Ignition Switch Plaintiffs Motion to Enforce was deferred pending
resolution of the Ignition Switch Plaintiffs' and Ignition Switch Pre-Closing Accident Plaintiffs'
Motions to Enforce.  See In re Motors Liquidation Co., 529 B.R. at 523.  It has not yet been

---

[11]   See *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, dated April 21, 2014 [ECF No. 12620] (the "**Ignition Switch Plaintiffs Motion to Enforce**"); *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits*, dated Aug. 1, 2014 [ECF No. 12807] (the "**Ignition Switch Pre-Closing Accident Plaintiffs Motion to Enforce**"), *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)*, dated Aug. 1, 2014 [ECF No. 12808] (the "**Non-Ignition Switch Plaintiffs Motion to Enforce**");

[12]   See *Supplemental Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 To Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect thereto, and (III) Adversary Proceeding No. 14-01929*, dated July 11, 2014 [ECF No. 12770].

determined whether any Non-Ignition Switch Plaintiffs or Non-Ignition Switch Pre-Closing Accident Plaintiffs suffered a due process violation in connection with the Bar Date.

**III.**     **Developments In The Bankruptcy Court Following The Second Circuit Opinion.**

30.     On remand from the Second Circuit's opinion vacating the equitable mootness ruling, the Bankruptcy Court issued an order identifying initial issues to be addressed (the "**2016 Threshold Issues**").  Relevant here is the issue of whether "the Ignition Switch Plaintiffs and/or Non-Ignition Switch Plaintiffs satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust and/or are such claims equitably moot ('**Late Proof of Claim Issue**')."[13]

31.     The procedures in the Order to Show Cause for resolution of the Late Proof of Claim Issue permitted Plaintiffs to file motions seeking authority to file late claims ("**Late Claims Motions**").  See Order to Show Cause at 5 ¶ 1.  No additional issues (such as class certification, discovery, or the merits of a late proof of claim) would be addressed in these motions.  See id.  In addition, the procedures provided that briefing and adjudication of any Late Claims Motions filed by Non-Ignition Switch Plaintiffs would be stayed pending resolution of the other 2016 Threshold Issues.  See id. at 5 ¶ 2.

32.     In accordance with the Order to Show Cause, on December 22, 2016, the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, and certain Ignition Switch Pre-Closing Accident Plaintiffs filed Late Claims Motions.[14]  The motions attached proposed proofs of claim, including proposed class proofs of claim asserted on behalf of purported class representatives for

---

[13]     *Order to Show Cause Regarding Certain Issues Arising from Lawsuits with Claims Asserted Against General Motors LLC ("New GM") that Involve Vehicles Manufactured by General Motors Corporation ("Old GM")*, dated Dec. 13, 2016 [ECF No. 13802], at 2-3 (emphasis added).

[14]     See *Motion for an Order Granting Authority to File Late Class Proofs of Claim*, dated Dec. 22, 2016 [ECF No. 13806] (the "**Economic Loss Late Claim Motion**"); *Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Dec. 22, 2016 [ECF No. 13807].

Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs, and 175 individual proofs of claim on behalf of certain Ignition Switch Pre-Closing Accident Plaintiffs. See id. Certain other Plaintiffs subsequently filed joinders to the Late Claims Motions pursuant to the terms of the Order to Show Cause.

33.     Thereafter, in connection with the Ignition Switch Plaintiffs' and Ignition Switch Pre-Closing Accident Plaintiffs' Late Claims Motions, the Parties participated in two status conferences before the Bankruptcy Court, engaged in preliminary rounds of discovery, and filed briefs addressing two preliminary issues raised in the Late Claims Motion: (i) whether relief can be granted absent a showing of excusable neglect under the Pioneer factors; and (ii) the applicability of any purported agreements with the GUC Trust or other tolling arrangements to toll timeliness objections (the "**Initial Late Claims Motions Issues**").[15]   Subsequent to such briefing, certain Plaintiffs who had not previously appeared before the Bankruptcy Court filed motions seeking authority to file late proofs of claim.

## IV.    Plaintiffs' Claims Against Old GM.

34.     The Proposed Class Claims allege that Old GM knew about the Ignition Switch Defect, other defects in ignition switches, defects in side airbags, and defects in power steering for years prior to the Bar Date.[16]   The Proposed Class Claims further allege that Old GM concealed the existence of these defects, causing Plaintiffs to overpay for defective vehicles and

---

[15]     See Order Establishing, Inter Alia, Briefing Schedule for Certain issues Arising from Late Claim Motions Filed by Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Certain Ignition Switch Pre-Closing Accident Plaintiffs, dated Mar. 2, 2017 [ECF No. 13869]; Opening Brief by General Motors LLC with Respect to Initial Late Claim Motions Issues, dated Mar. 6, 2017 [ECF No. 13871]; The Ignition Switch Plaintiffs' Brief on the Initial Late Claim Motions Issues, dated Mar. 6, 2017 [ECF No. 13872]; Opening Brief of GUC Trust Administrator and Participating Unitholders on the Applicability of Pioneer and Tolling to Plaintiffs' Motions to File Late Claims, dated Mar. 6, 2017 [ECF No. 13873]; Brief on Applicability of Pioneer and Tolling Issues in Connection with Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths, dated Mar. 6, 2017 [ECF No. 13874].

[16]     See Exhibit A to the Economic Loss Late Claim Motion  (the "**Proposed Ignition Switch Class Claim**"), ¶¶ 9-258; Exhibit B to the Economic Loss Late Claim Motion (the "**Proposed Non-Ignition Switch Class Claim**"), ¶¶ 9-146.

10

bear the costs of repairs while Old GM reaped the benefit of selling defective vehicles at inflated prices and avoiding the costs of a recall.[17]

35.     Based on these allegations, the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs assert claims against the Old GM estate under the laws of each of the 50 states and the District of Columbia for: (i) fraudulent concealment; (ii) unjust enrichment; (iii) consumer protection claims; (iv) breach of the implied warranty of merchantability; and (v) negligence.[18]

36.     In turn, the Ignition Switch Pre-Closing Accident Plaintiffs assert personal injury and wrongful death claims arising from accidents they assert were caused by the Ignition Switch Defect.[19]

37.     For over three years, New GM has consistently taken the position that any such claims are properly asserted against the GUC Trust and not against New GM.[20]

38.     Subsequent to filing the Late Claims Motions, the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs and certain Pre-Closing Accident Plaintiffs provided the GUC Trust with materials and expert reports describing in detail the alleged viability of the asserted claims, the alleged violation of due process rights in connection with the Bar Date and the alleged amount of damages (the "**Proffered Evidence**").[21]

---

[17]    See, e.g., Proposed Ignition Switch Class Claim ¶ 332; Proposed Non-Ignition Switch Class Claim ¶ 249.

[18]    See Proposed Ignition Switch Class Claim ¶¶ 316-418; Proposed Non-Ignition Switch Class Claim ¶¶ 233-337.

[19]    See, e.g., *Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Dec. 22, 2016 [ECF No. 13807].

[20]    The record is replete with attempts by New GM to saddle the Old GM estate with these potentially massive claims.  "To the extent Plaintiffs can prove that they are entitled to any relief, the appropriate remedy is to permit them to seek allowance of an unsecured claim against the Old GM bankruptcy estate." Dkt. 12981 (New GM's 2014 Threshold Issues Br.) at 53; "To the extent they had any claim, it was against Old GM and they retained that claim after the 363 Sale." Id. at 36; "Every one of their claims, the economic loss plaintiffs' claims, is a claim that's assertable against Old GM as it relates to an Old GM vehicle."  Hr'g Tr. Feb. 17, 2015 at 59:17-19 (New GM counsel Arthur Steinberg).

[21]    The Proffered Evidence is attached hereto as **Exhibit B**, **Exhibit C**, and **Exhibit D**.

39.     The Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs provided a proffer of evidence laying out the factual background for their claims and the amount of damages alleged.  In addition, they provided a report by Stephen Boedeker, an expert on surveys and statistical sampling, analyzing the amount of alleged damages for the Ignition Switch Plaintiffs' and certain Non-Ignition Switch Plaintiffs' claims based on a conjoint analysis conducted by Mr. Boedeker and Berkeley Research Group.

40.     The Signatory Plaintiffs will show at a hearing on the Motion that conjoint analysis is a set of econometric and statistical techniques developed to study consumer preferences and is widely used as a market research tool.  In a conjoint analysis, study participants review a set of products with different attributes (such as a vehicle shown in different colors) and choose which product they would prefer to purchase.  The collected data can be used to determine market preferences and the value consumers place on particular attributes of a product.  Here, the alleged amount of damages for economic loss claims was determined by using a conjoint analysis to evaluate the difference in value that consumers placed on an Old GM vehicle without a defect as compared to an identical vehicle with a defect.

41.     Certain Pre-Closing Accident Plaintiffs provided materials describing the personal injury and wrongful death claims of certain plaintiffs and demonstrating the alleged value of these claims based on exemplar verdict amounts.  The valuation of damages was assessed and approved by W. Mark Lanier, an experienced trial attorney recognized as a leader in the field.  In addition, these Pre-Closing Accident Plaintiffs also provided an expert report of Dr. Keith Leffler in which he valued these plaintiffs' claims based on a conjoint analysis and data regarding market preferences and the value consumers place on the risk of being injured or killed in a vehicle.

42. The valuation of these plaintiffs' asserted damages in the Proffered Evidence is well in excess of the amount necessary to trigger New GM's obligation to issue the maximum amount of Adjustment Shares under the AMSPA. The GUC Trust recognizes that it may, should it choose, contest the level of damages. There is no guarantee that the GUC Trust would prevail and reduce or limit the damages.[22] After reviewing the Proffered Evidence and considering the benefits of the Settlement as a whole to the Unitholders to whom it owes a fiduciary duty, the GUC Trust recognizes that, if such claims are allowed, the aggregate general unsecured claims (including already allowed claims) could well exceed $42 billion, and thus has agreed to fully support entry of the Claims Estimate Order as part of the Settlement that the GUC Trust believes is within the range of reasonableness.

## V. The Settlement Agreement.

43. Following the filing of the Late Claims Motions, the Parties engaged in extensive negotiations to resolve the numerous complex issues raised by Plaintiffs' claims against the Old

---

[22]  For example, the Proffered Evidence provided by the Pre-Closing Accident Plaintiffs contains an estimate of punitive damages, which the GUC Trust believes would be disallowed in its entirety in a claims objection proceeding. In addition, the Proffered Evidence does not identify which, if any, economic loss Plaintiffs who purchased their vehicles pre-Sale sold those vehicles prior to New GM's 2014 recalls. There is an ongoing dispute about whether any economic loss Plaintiffs who sold their vehicles before those recalls suffered any cognizable economic loss. See Memorandum Opinion and Order Regarding Plaintiffs' Motion for Reconsideration and/or Clarification of the Court's Order Dismissing the Claims of "Pre-Recall Plaintiffs", In re Gen. Motors LLC Ignition Switch Litig., Case Nos. 14-MD-2543 (JMF), 14-MC-2543 (JMF) (S.D.N.Y. Aug. 9, 2017). Nonetheless, even discounting the damages calculations in the Proffered Evidence to account for the absence of punitive damages and economic loss Plaintiffs who sold their vehicles before the recalls, Plaintiffs' asserted damages are well in excess of the amount necessary to trigger New GM's obligation to issue the maximum amount of Adjustment Shares under the AMSPA.

GM estate and the assets held by the GUC Trust.[23]

44.     After good faith, arm's-length negotiations, the Parties entered into the Settlement

Agreement resolving the Late Claims Motions (including the Initial Late Claim Motions Issues),

the Late Proof of Claim Issue, the allowance of Plaintiffs' claims, and Plaintiffs' rights to GUC

Trust Assets.  The key terms of the Settlement Agreement are as follows:[24]

a.     The GUC Trust agrees to pay the reasonable costs and expense for Court-approved notice of the Motion in an amount not to exceed $6 million.  The Signatory Plaintiffs agree to pay any amounts in excess of $6 million.

b.     The Settlement Agreement becomes effective on the date the order approving the Settlement pursuant to Bankruptcy Rule 9019 becomes a Final Order (the "**Settlement Effective Date**"), provided, however, that from and after the date the Settlement Order is entered by the Bankruptcy Court, the GUC Trust may waive the requirement that the Settlement Order be a Final Order.

c.     Within five (5) business days of the Settlement Effective Date, the GUC Trust will irrevocably pay $15,000,000 (the "**Settlement Amount**") into a trust, fund or other vehicle (the "**Settlement Fund**") for the exclusive benefit of Plaintiffs.  All Unitholders, all defendants in the Term Loan Avoidance Action, and all holders of Allowed General Unsecured Claims, other than the Plaintiffs, will be deemed to irrevocably waive and release any and all rights to the Settlement Amount (the "**GUC Waiver Provision**").

d.     Contemporaneously with payment of the Settlement Amount, the Plaintiffs will be deemed to irrevocably waive and release all claims against the GUC Trust,

---

[23]     See *Joint Declaration of Steve W. Berman and Elizabeth J. Cabraser in Support of Joint Motion Pursuant to Bankruptcy Code Sections 105, 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019 to Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors* (the "**Co-Lead Counsel Decl.**") ¶ 5; *Declaration of Robert C. Hilliard in Support Joint Motion Pursuant to Bankruptcy Code Sections 105, 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019 to Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors* (the "**Hilliard Decl.**") ¶ 3; *Declaration of Lisa M. Norman in Support of Joint Motion Pursuant to Bankruptcy Code Sections 105, 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019 to Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors* (the "**Norman Decl.**") ¶ 3; *Declaration of Beth Andrews in Support of the Joint Motion Pursuant to Bankruptcy Code Sections 105, 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019 to Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors* (the "**Andrews Decl.**") ¶ 26.

[24]     This summary of the Settlement Agreement is qualified in its entirety by the terms and provisions of the Settlement Agreement.  To the extent that there are any inconsistencies between the description of the Settlement Agreement contained in the Motion and the terms and provisions of the Settlement Agreement, the Settlement Agreement shall control.

including a release of any rights to prior distributions of or current GUC Trust Assets and any rights to distributions by the Motors Liquidation Company Avoidance Action Trust (the "**Waiver Provision**"). For the avoidance of doubt, the Settlement Agreement and Settlement Order define "Plaintiffs" to include all persons who now have, or in the future could have, claims against the Old GM estate related to any of the recalls, such that the Waiver Provision shall be applicable to all such parties whether or not they have asserted any claims against the Old GM estate or the GUC Trust to date. However, being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), if any, or any other consideration contained in the Settlement Fund.

e.   In light of the benefits of the Settlement and after the GUC Trust's review of the Proffered Evidence, the GUC Trust agrees to seek a Claims Estimate Order: (i) finding that the allowable amount of Plaintiffs' claims against Old GM and/or the GUC Trust, when combined with all of the other Allowed General Unsecured Claims against the Old GM bankruptcy estate, equals or exceeds $42,000,000,000, thus triggering the maximum amount of Adjustment Shares; and (ii) directing that the Adjustment Shares, or the value of the Adjustment Shares, be promptly delivered to the Settlement Fund. Certain Pre-Closing Accident Plaintiffs consent to estimation of their personal injury and wrongful death claims by this Court solely for the purposes of determining the aggregate Allowed General Unsecured Claims for a Claims Estimate Order.

f.   Contemporaneously with payment of the Settlement Amount, all Unitholders, all defendants in the Term Loan Avoidance Action, and all holders of Allowed General Unsecured Claims, other than the Plaintiffs, will be deemed to irrevocably waive and release any and all rights to the Adjustment Shares, provided that such waiver and release shall not become operative unless and until the Bankruptcy Court enters the Claims Estimate Order (the "**Adjustment Shares Waiver Provision**").

g.   Subject to notice and an opportunity for Plaintiffs to object, the Signatory Plaintiffs will determine the overall allocation of the value of the Settlement Fund between economic loss claims and personal injury/wrongful death claims, and the eligibility and criteria for payment. Notice of the proposed allocation and proposed eligibility and criteria for payment will be posted on a settlement website, along with information about the hearing date and how and when to assert any objections.

h.   Nothing in the Settlement Agreement is intended to waive any claims against New GM or to be an election of remedies against New GM; nor does the Settlement Agreement or any payments made in connection therewith represent full satisfaction of any claims against Old GM, unless and until such claims are in fact paid in full from every available source; provided, however, that in no event shall any Plaintiff be permitted to seek any further payment or compensation from the GUC Trust in respect of their claims or otherwise, other than the Settlement Amount and the Adjustment Shares. Except as mandated otherwise under

15

applicable law, nothing in the Settlement Agreement shall waive any claims that any Plaintiff may have against New GM or constitute an election of remedies by any Plaintiff, and neither the Settlement Amount nor the Adjustment Shares (nor any distribution thereof to any Plaintiff) shall represent full and final satisfaction of any claim that any Plaintiff may have against New GM, all of which are expressly reserved. The Bankruptcy Court's estimate of the aggregate Allowed General Unsecured Claims in the Claims Estimate Order shall not operate as a cap on any of the claims of any of the Plaintiffs against New GM.

## RELIEF REQUESTED

45.     By this Motion, the Parties respectfully request that this Court enter orders approving the Settlement Agreement and claims estimation substantially in the forms attached to this Motion as **Exhibit E** and **Exhibit F**.

## BASIS FOR RELIEF REQUESTED

### I.     The Court Should Approve The Settlement Agreement Pursuant To Bankruptcy Rule 9019.

46.     Bankruptcy Rule 9019(a) provides, in part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  This Court also has authority to approve a settlement under Bankruptcy Code Section 105(a), which empowers it to issue any order that is "necessary or appropriate."  11 U.S.C. § 105(a).

47.     The authority to approve a compromise or settlement is within the sound discretion of the Court.  See Newman v. Stein, 464 F.2d 689, 692 (2d Cir. 1972).  The Court should exercise its discretion "in light of the general public policy favoring settlements."  In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (citation omitted); see also Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("[T]he general rule [is] that settlements are favored and, in fact, encouraged . . . ." (citation omitted)).

48.     When exercising its discretion, the Court must determine whether the settlement is fair and equitable, reasonable, and in the best interests of the estate.  See, e.g., Airline Pilots

Ass'n, Int'l v. Am. Nat'l Bank & Tr. Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426

(S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994); In re Purofied Down Prods. Corp., 150 B.R.

519, 523 (S.D.N.Y. 1993).  Where "the integrity of the negotiation process is preserved, a strong

initial presumption of fairness attaches to the proposed settlement . . . ."  In re Hibbard, 217 B.R.

at 46.

49.     The Court need not decide the numerous issues of law and fact raised in the

underlying dispute, "but must only 'canvass the issues and see whether the settlement falls below

the lowest point in the range of reasonableness.'"  In re Adelphia Commn's Corp., 327 B.R.

143, 159 (Bankr. S.D.N.Y. 2005) (quoting In re W.T. Grant, Co., 699 F.2d 599, 608 (2d Cir.

1983)); see also Purofied, 150 B.R. at 522 ("[T]he court need not conduct a 'mini-trial' to

determine the merits of the underlying [dispute] . . . .").

50.     The Court evaluates whether the Settlement Agreement is fair and equitable based

on "the probabilities of ultimate success should the claim be litigated," and "an educated

estimate of the complexity, expense, and likely duration of . . . litigation, the possible difficulties

of collecting on any judgment which might be obtained, and all other factors relevant to a full

and fair assessment of the wisdom of the proposed compromise."  Protective Comm. for Indep.

Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968).

51.     Courts in this jurisdiction consider the following Iridium factors in determining

whether approval of a settlement is warranted:

> (1) the balance between the litigation's possibility of success and the settlement's
> future benefits; (2) the likelihood of complex and protracted litigation, "with its
> attendant expense, inconvenience, and delay," including the difficulty in
> collecting on the judgment; (3) "the paramount interests of the creditors,"
> including each affected class's relative benefits "and the degree to which creditors
> either do not object to or affirmatively support the proposed settlement"; (4)
> whether other  parties in interest support the settlement; (5) the "competency and
> experience of counsel" supporting, and "[t]he experience and knowledge of the

17

bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining."

Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. 2007) (citations omitted).

52.     The Settlement Agreement falls within the range of reasonableness and satisfies the Iridium factors as set forth below.  Thus, the Settlement Agreement should be approved under Bankruptcy Rule 9019.

### A.     The Settlement's Benefits Outweigh The Likelihood Of Success In Protracted Litigation Over Numerous, Complex Issues.

53.     The first two Iridium factors—(1) the balance between the litigation's likelihood of success and the settlement's benefits; and (2) the likelihood of complex and protracted litigation—are easily met.  As detailed below, continued litigation over Plaintiffs' claims raises significant, complex issues, has an uncertain outcome, and would be costly and time consuming. The benefits of near-term, certain resolution are clear.

### 1.     Litigation Over Plaintiffs' Claims Raises Numerous Complex Issues.

54.     One complex, contentious issue raised by the litigation over Plaintiffs' claims is whether the Court should grant Plaintiffs authority to file late claims as permitted by the *Order Approving Motion Pursuant to Bankruptcy Rule 3003 and Section 105(a) of the Bankruptcy Code for an Order Disallowing Certain Late Filed Claims* [ECF No. 11394] (the "**Late Filed Claims Order**").  See Late Filed Claims Order at 1-2.

55.     As an initial matter, there is a dispute over the standard for obtaining leave to file late claims.  Certain Plaintiffs have argued that creditors may assert late claims based solely on a

18

showing that they have suffered a due process violation related to the bar date.[25]  The GUC Trust

has taken the position that a demonstration of excusable neglect under the <u>Pioneer</u> factors is

required regardless of a due process violation.[26]

56.    Then, there is a dispute whether leave should be granted under the appropriate

standard.  Most notably, in the April 2015 Decision, the Bankruptcy Court stated that the Ignition

Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs suffered a due process

violation when they failed to receive constitutionally adequate notice of the Bar Date, and that

leave to file late claims was the "obvious" remedy for this violation.  <u>See</u> <u>In re Motors</u>

<u>Liquidation Co.</u>, 529 B.R. at 573-74, 583.  The Plaintiffs assert that this statement is a binding

ruling that is no longer subject to appeal, the GUC Trust asserts it is merely nonbinding *dicta* that

the Second Circuit implicitly found was an advisory opinion.

57.    The Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs

also assert that they can meet the <u>Pioneer</u> factors for demonstrating excusable neglect.  Of the

four <u>Pioneer</u> factors, the one given the most weight is the reason for the delay in filing claims,

including whether the delay was in the reasonable control of the movant.  <u>See</u> <u>In re Residential</u>

<u>Capital, LLC</u>, Case No. 12-12020 (MG), 2015 WL 515387, at *5 (Bankr. S.D.N.Y. Feb. 6,

2015).  The Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs will

argue that a debtor's failure to provide actual notice to a known creditor is evidence that any

delay was not in control of the creditor.  The GUC Trust, in turn, will argue that the delay here is

attributable to Plaintiffs' voluntary strategic decision to pursue New GM and not the GUC Trust.

---

[25]    <u>See, e.g.</u>, *The Ignition Switch Plaintiffs' Brief on the Initial Late Claim Motions Issues*, dated Mar. 6, 2017
[ECF No. 13872]; *Brief on Applicability of Pioneer and Tolling Issues in Connection with Omnibus Motion by
Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal
Injuries and Wrongful Deaths*, dated Mar. 6, 2017 [ECF No. 13874].

[26]    <u>See</u> *Opening Brief of GUC Trust Administrator and Participating Unitholders on the Applicability of Pioneer
and Tolling to Plaintiffs' Motions to File Late Claims*, dated Mar. 6, 2017 [ECF No. 13873].

58.     Although Non-Ignition Switch Plaintiffs and Non-Ignition Switch Pre-Closing Accident Plaintiffs have not yet demonstrated a due process violation, many of these plaintiffs allege that their claims are substantially similar to the Ignition Switch Defect—defects that involve the same condition (low torque switches that move out of the "run" position) and have the same effects (loss of power to steering, brakes, and airbags).  The Plaintiffs will argue that these plaintiffs can demonstrate a violation of their due process rights in connection with the Bar Date.

59.     Further, the Plaintiffs will argue that excusable neglect can exist in the absence of a due process violation.  For example, Plaintiffs have asserted that excusable neglect can be found where the debtors failed to comply with bankruptcy procedures in providing notice of a bar date and where a claimant, through no fault of its own, was unaware of its claim prior to the bar date.  See In re Arts de Provinces de France, Inc., 153 B.R. 144, 147 (Bankr. S.D.N.Y. 1993); In re PT-1 Commc'ns, Inc., 292 B.R. 482, 489 (Bankr. E.D.N.Y. 2003).  This issue, too, would have to be litigated.

60.     Another complex issue is whether the doctrine of equitable mootness is applicable to bar Plaintiffs' claims.  See In re Chateaugay Corp., 10 F.3d 944, 952-53 (2d Cir. 1993).

61.     In the April 2015 Decision, the Bankruptcy Court applied the five Chateaugay factors[27] and determined that if the Ignition Switch Plaintiffs' or Ignition Switch Pre-Closing Accident Plaintiffs' late claims were allowed, GUC Trust Assets could not be tapped to pay them

---

[27]   These five factors are: (i) the court can still order some effective relief; (ii) such relief will not affect "the re-emergence of the debtor as a revitalized corporate entity"; (iii) such relief will not unravel intricate transactions so as to "knock the props out from under the authorization for every transaction that has taken place" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court"; (iv) the "parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings;" and (v) the appellant "pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."  In re Chateaugay Corp., 10 F.3d at 952-53.

under the doctrine of equitable mootness.  See In re Motors Liquidation Co., 529 B.R. at 598.

The Bankruptcy Court found, *inter alia*, that any relief would "knock the props out" from the

transactions under which Unitholders acquired their units.  See id. at 587-88, 592.

62.     On appeal, the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing

Accident Plaintiffs argued that the Bankruptcy Court erred because, *inter alia*, effective relief

could be fashioned without disturbing any transactions or having an adverse impact on

Unitholders by providing Plaintiffs with exclusive access to any Adjustment Shares that may be

issued under the AMSPA.[28]  Plaintiffs will argue that where any relief is available, even partial

relief, equitable mootness should not be applied.  See, e.g., Chateaugay, 10 F.3d at 954.  In

addition, the Ignition Switch Plaintiffs argued that equitable mootness was only applicable in the

context of bankruptcy appeals.[29]

63.     The Second Circuit vacated the Bankruptcy Court's equitable mootness ruling as

advisory, neither affirming nor reversing that decision.  The Second Circuit pointed out that all

of the Circuit's equitable mootness cases to-date had involved an appellate court applying the

doctrine in the first instance.  See Elliott, 829 F.3d at 167 n.30.  However, the Second Circuit

specified that it was not resolving whether it is appropriate for a bankruptcy court, as opposed to

an appellate court, to apply the equitable mootness doctrine.  See id.

64.     Additional complex issues would certainly arise from continued litigation of

Plaintiffs' claims.  The Bankruptcy Court would need to decide whether class certification for

---

[28]   See Br. for Appellant Ignition Switch Plaintiffs, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Appeal Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Nov. 16, 2015) (ECF No. 235), 49-52; Br. for Ignition Switch Pre-Closing Accident Plaintiffs, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Appeal Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Nov. 16, 2015) (ECF No. 183), 4, 52 n.18 (incorporating the arguments on the application of equitable mootness in the Ignition Switch Plaintiffs' brief).

[29]   See Response and Reply Br. for Appellant-Cross-Appellee Ignition Switch Plaintiffs, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Appeal Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Feb. 1, 2016) (ECF No. 315), at 40-43.

the economic loss Plaintiffs' proposed class proofs of claims would be appropriate. In addition, the GUC Trust could raise objections to allowance of these class claims, as well as to the separate proofs of claim filed by Ignition Switch Pre-Closing Accident Plaintiffs. This could lead to the need to resolve issues under the varied laws of the fifty states and the District of Columbia.

65.     Plaintiffs have also asserted that litigation over similar claims asserted by economic loss plaintiffs against New GM in the MDL Court demonstrates the viability of many of Plaintiffs' claims. For example, in the MDL Court, consumer fraud, common law fraud, and implied warranty claims considered under the laws of sixteen states largely survived partial motions to dismiss.[30] In addition, the MDL Court held that plaintiffs could assert injuries under the "benefit-of-the-bargain defect theory," *i.e.*, amounts plaintiffs overpaid at the time of sale for a defective vehicle, and injuries for lost time, to the extent such damages are available under state law. See FACC Opinion at 13-14, 18; TACC Opinion at 24. Many jurisdictions recognize damages under the benefit-of-the-bargain theory. See TACC Opinion at 24.

66.     In sum, while the GUC Trust believes that it has meritorious defenses to the claims of all Plaintiffs, the GUC Trust's likelihood of success in the resolution of the numerous, complex issues raised by the litigation over Plaintiffs' claims is uncertain.

## 2.     The Terms Of The Settlement Agreement Weigh The Risks Of Continued Litigation Against The Benefits Of A Consensual Resolution Of Plaintiffs' Claims.

67.     Litigation of these complex issues has been ongoing for years, consuming large sums of money and countless hours of labor. In the absence of settlement, there is a high

---

[30]   See Opinion and Order Regarding New GM's Partial Motion to Dismiss the Forth Amended Consolidated Complaint, In re General Motors LLC Ignition Switch Litig., Case No. 14-MD-2543 (JMF) (S.D.N.Y. June 30, 2017), 23 (the "**FACC Opinion**"); Opinion and Order Regarding New GM's Partial Motion to Dismiss the Third Amended Consolidated Complaint, In re General Motors LLC Ignition Switch Litig., Case No. 14-MD-2543 (JMF) (S.D.N.Y. July 15, 2016), 5-6 (the "**TACC Opinion**").

likelihood of even more expensive, protracted and contentious litigation that will consume significant estate funds and expose the estate to significant risks and uncertainty. In addition, resolution of these issues may require the added time and expense of discovery. For example, the Pioneer analysis is fact intensive and, to date, only limited discovery, restricted to a proposed class representative of the Ignition Switch Plaintiffs and certain Ignition Switch Pre-Closing Accident Plaintiffs, has occurred on this issue.

68. By comparison, settling the litigation provides the Parties with greater certainty and eliminates the significant risk, cost and delay of litigation. In addition, the Settlement Agreement provides several benefits beyond avoiding continued litigation.

69. First, the Parties' determination to seek a Claims Estimate Order allowing and estimating Plaintiffs' claims in an amount, when combined with all of the other Allowed General Unsecured Claims against the Old GM estate, that equals or exceeds $42 billion, provides an efficient and reasonable resolution of the allowable amount of Plaintiffs' claims. The reasonableness of this amount is supported by the Proffered Evidence.

70. Under the Settlement, any Adjustment Shares issued by New GM under this Claims Estimate Order will be for the exclusive benefit of Plaintiffs. Based on the amount of allowed and disputed unsecured claims against Old GM, New GM's obligation to issue these shares would not be triggered absent allowance of Plaintiffs' claims.[31] In other words, absent the Plaintiffs' claims, the Unitholders have no expectation to receive Adjustment Shares. Thus, this provision potentially paves the way for Plaintiffs to obtain a recovery on their claims without disturbing other creditors' past or future recoveries.

---

[31] See *Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as of June 30, 2017*, dated July 21, 2017 [ECF No. 13994].

71.     Second, the Settlement removes a major impediment to winding down the Old
GM estate.  The resolution of Plaintiffs' claims and waiver of certain rights and claims
eliminates the likelihood of complex and protracted litigation, prevents delay in distributing
remaining GUC Trust Assets and protects Unitholders from the risk of claw-back or recapture of
prior distributions.

72.     The terms of the Settlement Agreement reflect a reasonable assessment of the
substantial time and expense of litigating Plaintiffs' claims, balanced against the benefits of more
near term, efficient and certain resolution of the allowable amount of Plaintiffs' claims and
sources of recovery.  The benefits of the Settlement in the near term outweigh the likelihood of
long-term success in protracted litigation of complex issues.

**B.      The Settlement Agreement Is Beneficial To**
        **Creditors And Supported By Interested Parties.**

73.     With respect to the third and fourth Iridium factors—the paramount interests of
the creditors and whether other interested parties support the settlement—prolonging the
litigation will increase costs and decrease the amount of GUC Trust Assets available to satisfy
creditors.   Approving the Settlement Agreement, on the other hand, avoids the significant
expense and uncertainty associated with continued litigation, and maximizes and expedites
distributions to current GUC Trust beneficiaries.  The release of Plaintiffs' rights and claims with
respect to the GUC Trust's prior distributions and current GUC Trust Assets allows the GUC
Trust to complete the orderly wind-down of the Old GM estate.

74.     Moreover, providing Plaintiffs with the exclusive right to proceed against a
settlement fund containing the Settlement Amount and the Adjustment Shares potentially opens
an avenue for Plaintiffs to recover on their claims against the GUC Trust without disturbing
recovery expectations of other creditors or Unitholders.   Plaintiffs' rights concerning the

Adjustment Shares are protected because notice of any agreement by the Signatory Plaintiffs on proposed criteria to assert a claim against the Settlement Fund and a proposed methodology of allocation of the Settlement Fund between economic loss claims and personal injury/wrongful death claims will be provided to Plaintiffs, who will be provided with an opportunity to object.

75.     Not surprisingly, the key interested parties—the GUC Trust (who has sole authority under the Late Filed Claims Order to consent to late filed claims and is the only party under the Plan provided with standing to object to the allowance of claims), Signatory Plaintiffs and the Participating Unitholders—all support the Settlement Agreement.  Accordingly, for all of the reasons set forth above, the Settlement easily meets the Iridium Factors and allows the GUC Trust to implement the express purpose of the GUC Trust Agreement.  GUC Trust Agreement § 2.2 (stating that the "sole purpose of the GUC Trust is to implement the Plan on behalf of, and for the benefit of the GUC Trust Beneficiaries"); GUC Trust Agreement § 4.2 (stating that "in no event shall the GUC Trust Administrator unduly prolong the duration of the GUC Trust, and the GUC Trust Administrator shall, in the exercise of its reasonable business judgment and in the interests of all GUC Trust Beneficiaries, at all times endeavor to terminate the GUC Trust as soon as practicable in accordance with the purposes and provisions of this Trust Agreement and the Plan.").

**C.     The Settlement Agreement Satisfies The Remaining *Iridium* Factors.**

76.     With respect to the sixth factor, "the nature and breadth of releases to be obtained by officers and directors," in exchange for the payment of $15 million, the Settlement Agreement releases any and all rights, claims and causes of action that any Plaintiff may assert against the GUC Trust, the GUC Trust Administrator, the GUC Trust Assets, the Avoidance Action Trust and Unitholders.

25

77. With respect to the fifth and seventh <u>Iridium</u> factors, competent and experienced counsel to the Parties who have been litigating these issues for years actively engaged in arms' length, good faith negotiations to formulate the Settlement Agreement.[32] The Parties, having considered the uncertainties, delay and cost that would be incurred by further litigation, submit that the Settlement Agreement is fair, reasonable and appropriate, and in the best interests of the Parties.

78. Based on the foregoing, the Settlement Agreement is in the best interests of the estate and its creditors and falls well within the range of reasonableness. Therefore, entry into and approval of the Settlement Agreement pursuant to Bankruptcy Rule 9019 is warranted and the Settlement Agreement should be approved.[33]

## II. The Court Should Approve The Parties' Estimation Of The Aggregate Allowed General Unsecured Claims, <u>Including Plaintiffs' Claims, As Equal To Or Exceeding $42 Billion</u>.

79. As part of the Settlement, the Parties agree to support entry of a Claims Estimate Order providing that the aggregate Allowed General Unsecured Claims, including Plaintiffs' claims, against the Old GM estate equals or exceeds $42 billion. Pursuant to the terms of the AMSPA, the GUC Trust Agreement and the Side Letter, as well as Bankruptcy Rule 9019 and Bankruptcy Code Sections 105(a) and 502(c), the Parties request that the Court approve the Parties' estimation and enter a Claims Estimate Order estimating the aggregate Allowed General Unsecured Claims at an amount equal to or exceeding $42 billion.

80. A provision in the Sale Agreement requires New GM to issue Adjustment Shares to the GUC Trust if and when the aggregate amount of Allowed General Unsecured Claims, as

---

[32] <u>See</u> Co-Lead Counsel Decl. ¶ 5; Hilliard Decl. ¶ 3; Norman Decl. ¶ 3; Andrews Decl. ¶ 26.

[33] In the event that the Settlement Agreement is not approved by the Court or the Settlement Agreement does not become binding and enforceable for any reason, the Parties reserve all their rights and nothing herein shall be deemed or construed as an admission of any fact, liability, stipulation, or waiver, but rather as a statement made in furtherance of settlement discussions.

estimated by the Bankruptcy Court, exceeds $35 billion.  See AMSPA § 3.2(c).  If the estimated
amount equals or exceeds $42 billion, then New GM must issue 30 million shares, the maximum
amount of Adjustment Shares.  See id.

81.    Under the AMSPA, GUC Trust Agreement, and Side Letter, the GUC Trust (and
only the GUC Trust) "may, at any time, seek an Order of the Bankruptcy Court . . . estimating
the aggregate allowed general unsecured claims" against the Old GM estate.  See AMSPA §
3.2(c); GUC Trust Agreement § 2.3(d); Side Letter.[34]

82.    Bankruptcy Code Section 502(c) authorizes the Court to estimate "any contingent
or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay
the administration of the case."   11 U.S.C. § 502(c).   Estimation "provides a means for a
bankruptcy court to achieve reorganization, and/or distributions of claims, without awaiting the
results of [potentially protracted] legal proceedings."   In re Adelphia Bus. Solutions, Inc., 341
B.R. 415, 422 (Bankr. S.D.N.Y. 2003) (citing In re Continental Airlines, Inc., 981 F.2d 1450,
1461 (5th Cir. 1993)); see In re Lionel LLC, No. 04-17324, 2007 WL 2261539, at *2 (Bankr.
S.D.N.Y. Aug. 3, 2007) (noting that, without estimation, lengthy proceedings result in "delayed
distributions, which in turn, greatly devalue the claim of all creditors as they cannot use the
assets until they receive them" (citation omitted)).

83.    In fact, "the Code requires estimation of all contingent or unliquidated claims
which unduly delay the administration of the case."   In re Nat'l Gypsum Co., 139 B.R. 397, 405
(N.D. Tex. 1992) (internal quotes omitted).  Even absent a finding of undue delay, it is within a
court's sound discretion to estimate a claim.  See In re RNI Wind Down Corp., 369 B.R. 174,
191 (Bankr. D. Del. 2007).

---

[34]   In addition, the GUC Trust has the sole, exclusive authority to request that the Bankruptcy Court estimate any
contingent, unliquidated disputed claims pursuant to Bankruptcy Code Section 502(c).  See Plan § 7.3; GUC
Trust Agreement § 5.1(e).

27

84.     Here, it is within the sound discretion of the Court to estimate the aggregate Allowed General Unsecured Claims, including Plaintiffs' claims, as contemplated by the AMSPA, Plan, GUC Trust Agreement and the Settlement Agreement.[35]

85.     Estimation requires only "sufficient evidence on which to base a reasonable estimate of the claim." Bittner v. Borne Chem. Co., 691 F.2d 134, 135 (3d Cir. 1982); see also In re Windsor Plumbing Supply Co., 170 B.R. 503, 521 (Bankr. E.D.N.Y. 1994) (advocating use of probabilities in estimation of claims). The Bankruptcy Court has discretion to select the valuation model that best suits the circumstances of the case at hand when estimating the value of claims. See In re Adelphia Commc'ns Corp., 368 B.R. 140, 278 (Bankr. S.D.N.Y. 2007); Maxwell v. Seaman Furniture Co. (In re Seaman Furniture Co.), 160 B.R. 40, 41 (S.D.N.Y. 1993).

86.     As of March 31, 2017, the total amount of Allowed General Unsecured Claims—exclusive of Plaintiffs' claims—was $31,855,381,054.[36] Thus, if Plaintiffs' claims are allowable in an amount of approximately $3.145 billion, then New GM's obligation to issue Adjustment Shares is triggered. If Plaintiffs' claims are allowable in an amount of approximately $10.145 billion, then the aggregate Allowed General Unsecured Claims will exceed $42 billion, requiring the issuance of the maximum amount of Adjustment Shares.

87.     Pursuant to the Settlement Agreement, the claims are being pursued with the consent of the GUC Trust, which has the sole authority to permit the filing of late claims. See Late Filed Claims Order at 1-2. In addition, the GUC Trust is the only party with standing to

---

[35]   Counsel for certain Pre-Closing Accident Plaintiffs consent to estimation of their personal injury and wrongful death claims by this Court solely for the purposes of determining whether the Allowed General Unsecured Claims in the aggregate exceed $35 billion.

[36]   See Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as of June 30, 2017, dated July 21, 2017 [ECF No. 13994].

object to the allowance of claims and has the authority to settle, withdraw or otherwise resolve any objections to disputed claims.  See Plan §§ 7.1(b) ("[T]he GUC Trust Administrator shall have the exclusive right to object . . . to General Unsecured Claims . . . ."); GUC Trust Agreement § 5.1(d) ("[T]he GUC Trust Administrator shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Disputed General Unsecured Claims against the Debtors . . . .").  Accordingly, the GUC Trust's decision to seek entry of the Claims Estimate Order should be upheld by the Court under Bankruptcy Rule 9019 and Bankruptcy Code Section 502(c).

88.     In the course of negotiations, the GUC Trust was provided with the Proffered Evidence indicating that the damages for these plaintiffs' claims could exceed $10.15 billion. Based on the evidence, the expense and delay of litigation, and the benefits of the Settlement as a whole, the GUC Trust agreed to support an estimate of the allowed amount of Plaintiffs' Allowed General Unsecured Claims against the Debtors and/or the GUC Trust, when combined with all of the other Allowed General Unsecured Claims against the Debtors, equal to or exceeding $42 billion.  Accordingly, the requested Claims Estimate Order is well within the range of reasonableness and should be granted under Bankruptcy Rule 9019.  See In re Iridium Operating LLC, 478 F.3d at 462; In re Adelphia Commn'cs Corp., 327 B.R. at 159.[37]

89.     Based on the foregoing, $42 billion is a reasonable estimate of the aggregate Allowed General Unsecured Claims against the GUC Trust.

---

[37]  Rulings in the MDL Court provide additional support for the viability of Plaintiffs' claims.  Similar economic loss claims have been asserted in a consolidated class actions complaint in the MDL.  Consumer fraud, common law fraud, and implied warranty claims largely survived partial motions to dismiss.  See FACC Opinion at 23; TACC Opinion at 5-6.  In addition, the MDL Court recognized that the laws of several jurisdictions permit the assertion of damages under the "benefit-of-the-bargain defect theory," i.e., amounts plaintiffs overpaid at the time of sale for a defective vehicle, and injuries for lost time.  See FACC Opinion at 13-14, 18; TACC Opinion at 24.

## NOTICE

90.    Notice of this Motion has been provided in accordance with the Court-approved notice procedures.  See [Order Approving Notice Procedures].  The Parties submit that no other or further notice need be provided.

## NO PRIOR REQUEST

No previous application for the relief sought in this Motion has been made to this or any other Court.

## CONCLUSION

WHEREFORE, the Parties respectfully request that the Court: (i) enter an order substantially in the form attached hereto as **Exhibit E** approving the Settlement Agreement, attached hereto as **Exhibit A**, pursuant to Bankruptcy Rule 9019; (ii) enter a Claims Estimate Order substantially in the form attached hereto as **Exhibit F**, pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 502(c); and (iii) grant such other relief as is just and equitable.

[*Remainder of the page intentionally left blank*]

Dated:  August [ ], 2017
        New York, New York

Respectfully submitted,

 */s/ Draft*
Edward S. Weisfelner
Howard S. Steel
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
Tel: 212-209-4800
eweisfelner@brownrudnick.com
hsteel@brownrudnick.com

Sander L. Esserman
STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, A PROFESSIONAL CORPORATION
2323 Bryan Street, Ste 2200
Dallas, Texas 75201
Tel: 214-969-4900
esserman@sbep-law.com

*Designated Counsel for the Ignition Switch
Plaintiffs and Certain Non-Ignition Switch
Plaintiffs in the Bankruptcy Court*

Steve W. Berman (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel: 206-623-7292
steve@hbsslaw.com

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
Tel: 414-956-1000
ecabraser@lchb.com

*Co-Lead Counsel for the Ignition Switch
Plaintiffs and Certain Non-Ignition Switch
Plaintiffs in the MDL Court*

William P. Weintraub
Gregory W. Fox
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: 212-813-8800
wweintraub@goodwinlaw.com
gfox@goodwinlaw.com

*Counsel to Those Certain Pre-Closing
Accident Plaintiffs Represented By Hilliard
Muñoz Gonzales L.L.P. and the Law Offices
of Thomas J. Henry*

Robert Hilliard, Esq.
HILLIARD MUÑOZ GONZALES LLP
719 South Shoreline
Suite 500
Corpus Christi, TX 78401
Tel: 361-882-1612
bobh@hmglawfirm.com

*Counsel to certain Pre-Closing Accident Plaintiffs*

Thomas J. Henry, Esq.
THE LAW OFFICES OF THOMAS J. HENRY
4715 Fredricksburg, Suite 507
San Antonio, TX 78229

*Counsel to Certain Pre-Closing Accident Plaintiffs*

Lisa M. Norman (admitted *pro hac vice*)
T. Joshua Judd (admitted *pro hac vice*)
ANDREWS MYERS, P.C.
1885 St. James Place, 15th Floor
Houston, Texas 77056
Tel: 713-850-4200
Lnorman@andrewsmyers.com
Jjudd@andrewsmyers.com

*Counsel to Certain Pre-Closing Accident Plaintiffs*

Matthew Williams
Keith R. Martorana
Gabriel Gillett
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166
Tel: 212-351-400
mwilliams@gibsondunn.com
kmartorana@gibsondunn.com
ggillett@gibsondunn.com

*Counsel for Wilmington Trust Company, as Administrator and Trustee of the GUC Trust*

# **EXHIBIT L**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                            :

In re:                                      :                 Chapter 11 Case No.

MOTORS LIQUIDATION COMPANY, *et al.*,   :
f/k/a General Motors Corp., *et al.*        :                 09-50026 (MG)

               Debtors.          :                 (Jointly Administered)

                                              :
-----------------------------------------------------------------x

**DECLARATION OF BETH ANDREWS IN SUPPORT OF THE
JOINT MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363, 502(C)
AND 1142 AND BANKRUPTCY RULES 3020 AND 9019 TO APPROVE
THE SETTLEMENT AGREEMENT BY AND AMONG THE SIGNATORY
PLAINTIFFS AND THE GUC TRUST, AND TO ESTIMATE THE PLAINTIFFS'
AGGREGATE ALLOWED GENERAL UNSECURED CLAIMS AGAINST THE DEBTORS**

I, Beth Andrews, declare:

1.       I am a Vice President of Wilmington Trust Company ("**WTC**"), located at

Rodney Square North, 1110 North Market Street, Wilmington, Delaware, 19890-1615, and am

duly authorized to submit this declaration (the "**Declaration**") on behalf of WTC in its capacity

as trustee for and administrator of the Motors Liquidation Company GUC Trust (the "**GUC**

**Trust**").[1]

2.       I submit this Declaration in support of the *Joint Motion Pursuant To Bankruptcy*

*Code Sections 105, 363, 502(C) And 1142 And Bankruptcy Rules 3020 And 9019 To Approve*

*The Settlement Agreement By And Among The Signatory Plaintiffs And The GUC Trust, And To*

*Estimate The Plaintiffs' Aggregate Allowed General Unsecured Claims Against The Debtors* (the

"**Settlement Motion**"), dated August [  ], 2017, filed concurrently with this declaration.

---

[1]     Unless otherwise defined in this declaration, capitalized terms shall have the meanings noted in the Second
       Amended and Restated Motors Liquidation Company GUC Trust Agreement, dated as of July 30, 2015 (the
       "**GUC Trust Agreement**") [ECF No. 13332].

3.      Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would competently testify thereto.

### Background

4.      I am a Vice President of WTC with over 5 years of experience in its financial services group, including in *In re General Motors Corporation.*

5.      WTC's initial role in the Old GM bankruptcy was serving as the successor Indenture Trustee for approximately $23 billion in U.S. dollar denominated unsecured notes, bonds and debentures issued by Motors Liquidation Company, formerly known as General Motors Corporation.  During the bankruptcy, WTC served as chair of the Official Committee of Unsecured Creditors of Motors Liquidation Company.

6.      I currently serve as the lead representative of WTC in its capacity as trustee for and administrator of the GUC Trust.

### The GUC Trust's Creation and Current State

7.      The GUC Trust was formed to implement the Plan.  The GUC Trust is a liquidating trust with the primary purpose of resolving disputed claims and distributing GUC Trust Assets and GUC Trust Units to the GUC Trust's defined beneficiaries (**"GUC Trust Beneficiaries,"** or **"Beneficiaries")**.  GUC Trust Beneficiaries include holders of Allowed General Unsecured Claims as of March 31, 2011, holders of disputed claims as of March 31, 2011 that were later allowed, and holders of freely transferable Units in the GUC Trust.

8.      The GUC Trust operates for the benefit of GUC Trust Beneficiaries and has a fiduciary duty to maximize the recoveries of the GUC Trust Beneficiaries.  Under the GUC Trust Agreement, which governs the Trust, the GUC Trust Administrator shall deliver distributions to unitholders "as promptly as practicable," and "not unduly prolong the existence of the GUC Trust."

2

9.      Under the GUC Trust Agreement, the GUC Trust "shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Disputed General Unsecured Claims." Dkt. 13332 § 5.1(d).  If the amount to be Allowed exceeds $10 million, then the GUC Trust Monitor must review and approve "[a]ny decision to settle or otherwise resolve any objections to Disputed General Unsecured Claims against the Debtors." *Id.* § 11.3(a)(i).

10.     To date, creditors have filed [$31.854] billion in general unsecured claims that have been Allowed.

11.     As of November 2016, the GUC Trust had distributed approximately 94% of its initial assets in the form of New GM stock, warrants, and cash, to holders of allowed claims and to holders of Units.  As of June 30, 3017, the GUC Trust had distributed 137,330,481 shares of New GM common stock, 124,846,029 Series A warrants, 124,846,029 Series B warrants and $245,817,332 in cash on behalf of resolved allowed general unsecured claims and units.

### New GM's Recalls and Resulting Litigation

12.     In 2014, New GM recalled more than 30 million vehicles, including millions of vehicles due to a defective ignition switch as part of NHTSA Recall Number 14V-047 (the "**Ignition Switch Defect**"), millions of vehicles due to other defects related to the ignition switch, and millions of vehicles due to defective side airbags, power steering, and other defects.

13.     Hundreds of plaintiffs responded to the revelations by filing individual and putative class actions against New GM seeking damages, under various theories, for alleged economic loss, personal injury, and wrongful death.  After filing motions to enforce the Sale Order's injunction, New GM suggested that plaintiffs look to the GUC Trust for recovery insofar as such claims allegedly constituted general unsecured claims.

14.     On a stipulated record related to the Ignition Switch Defect, the Bankruptcy Court

found, *inter alia*, that Old GM knew or should have known about the Ignition Switch Defect and

therefore gave inadequate notice to plaintiffs, but that any claims against the GUC Trust were

nonetheless barred by the doctrine of equitable mootness.

15.     On appeal, the Second Circuit affirmed in part, reversed in part, and vacated in

part.  Most relevant for purposes of the joint motion, the Second Circuit held that plaintiffs had

suffered a due process violation and thus were free from the Sale Order's injunction, and that the

issue of equitable mootness was not ripe because no plaintiff had sought permission to file late

claims.

### The Late Claims Motions

16.     Upon remand, the parties began addressing whether plaintiffs could satisfy the

requirements for authorization to file late proofs of claim against the GUC Trust, and whether

such claims are equitably moot.

17.     On December 22, 2016, counsel for certain Ignition Switch Pre-Closing Accident

Plaintiffs filed a motion for authority to file late proofs of claim on behalf of 175 plaintiffs

alleging personal injury and wrongful death claims arising from the Ignition Switch Defect.

Separately, Designated Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition

Switch Plaintiffs filed a motion for authority to file one late putative class proof of claim for

economic losses on behalf of Ignition Switch Plaintiffs, and another for economic losses on

behalf of certain Non-Ignition Switch Plaintiffs.

18.     On January 4, 2017 counsel for the *Groman* Plaintiffs and counsel for the Peller

Plaintiffs filed a joinder to the late claims motions filed by Designated Counsel.  On July 28,

2017 counsel for Additional Ignition Switch Pre-Closing Accident Plaintiffs filed a motion for

authority to file late proofs of claim on behalf of 171 plaintiffs alleging personal injury and

wrongful death claims arising from the Ignition Switch Defect (collectively, the "**Late Claims Motions**").

19.    Per the Bankruptcy Court's order, the GUC Trust received limited discovery from certain putative late claimants regarding when they knew or reasonably could have known that they potentially had claims against the GUC Trust.  In addition, the parties briefed disputed questions about whether the plaintiffs would be required to show excusable neglect under *Pioneer Investment Services Co. v. Brunswick Associates Ltd.*, 507 U.S. 380 (1992) in order to obtain permission to file late claims, and the applicability of any agreements with the GUC Trust or other tolling arrangements to toll the time to file late claims (the "***Pioneer* Briefing**").

20.    To date, the Court has not set a schedule for hearing argument or deciding the disputed issues raised in the *Pioneer* briefing.  The Court also has not set a schedule for briefing, arguing, or deciding the merits of the Late Claims Motions.

### The Settlement

21.    Based on consultation with counsel, and my experience with the many aspects of the complex and protracted litigations related to New GM's 2014 recalls, it is my view that it is substantially likely that, absent settlement, the GUC Trust will continue to be involved in litigating this complex and protracted case for the foreseeable future.

22.    Given the litigation risk of having multiple disputed issues that remain to be resolved by the Bankruptcy Court, the likelihood that those issues would be subject to appeals, the corresponding risk of re-litigating those issues after an appeal, the corresponding uncertainty, and both the cost to operate the GUC Trust during the pendency of the litigation and the time-value of money lost while the GUC Trust cannot distribute funds to its beneficiaries, I believe that the GUC Trust has ample business reason and justification for seeking the relief requested in the Settlement Motion.

23.     Specifically, litigation related to the disputed issues addressed in the *Pioneer*
Briefing, and the fact-intensive and complicated legal questions implicated by the merits of
Plaintiffs' Late Claims Motions, is likely to be complex and protracted.  In addition, the ultimate
resolution of the Late Claims Motions may be impacted by the overlay of multiple additional
complex legal and factual questions that are at issue before the multi-district litigation that is
currently pending before Judge Furman in the Southern District of New York that is related to
New GM's 2014 recalls.

24.     The GUC Trust believes that it has a strong position on both the *Pioneer* issues
and the merits of the Late Claims Motions.  But the ultimate outcome of those motions in the
Bankruptcy Court is uncertain.  And even if the GUC Trust were to prevail before the
Bankruptcy Court, any decision would likely be subject to an appeal (if not multiple appeals),
and thus would not likely be finally determined for the foreseeable future.  Meanwhile the GUC
Trust would be required to incur litigation costs and administrative costs to continue operating,
and GUC Trust Beneficiaries would not be able to receive distributions of GUC Trust Assets and
invest them as they see fit.

25.     Moreover, plaintiffs have shown to be highly committed litigants represented by
skilled and experienced counsel.  The plaintiffs who filed the Late Claims Motion believe that
they have a strong position on both the *Pioneer* issues and the merits of the Late Claims Motions.
They have asserted late claims that, based on the evidence they have proffered and that WTC has
reviewed in its capacity as GUC Trust Administrator, could be valued at tens of billions of
dollars.  As a result, if plaintiffs ultimately prevail in both obtaining permission to file late claims
and having their purported multi-billion dollar claims allowed, then current GUC Trust

Beneficiaries could be forced to surrender rights to future distributions.  Plaintiffs have also reserved the right to seek to claw back previously distributed funds.

26.     Due to the significant risks that the Late Claims Motions present to the GUC Trust Beneficiaries, and the fluid nature of this litigation, the GUC Trust agreed to enter settlement negotiations with certain Plaintiffs beginning in Spring 2017.  Those negotiations have been at arms-length and in good faith.  Notably, all parties to the negotiations were represented and advised by experienced counsel, and negotiations proceeded at a high level of intensity over multiple months, with the parties (or their attorneys) engaging in several in-person and teleconference meetings and exchanging numerous drafts of the Settlement Agreement and ancillary documents.

27.     The primary terms of the Settlement are essentially as follows: 1) the GUC Trust agrees to pay $15 million (the "**Settlement Amount**") to a settlement fund and up to another $[6] million for providing notice; 2) the GUC Trust agrees to support entry of a Claims Estimate Order estimating the aggregate Allowed General Unsecured Claims (including the claims of the Plaintiffs) in an amount that equals or exceeds $42 billion; 3) the GUC Trust Beneficiaries agree to waive any claim to the Settlement Amount and, if the Claims Estimate Order is entered, the Adjustment Shares, and any Adjustment Shares issued will be deposited into the settlement fund for the sole benefit of Plaintiffs; 4) all Plaintiffs agree (or will be deemed to agree) to waive all current and future claims against the GUC Trust, the Avoidance Action Trust and certain other parties, and instead seek satisfaction of such claims from the settlement fund.

28.     I believe that the Settlement is a prudent and reasonable exercise of business judgment because it presents the best option for the GUC Trust to maximize recovery for the

benefit of the GUC Trust Beneficiaries while minimizing the substantial risk posed by the Late Claims Motions.

29.     The Settlement is in the best interests of the GUC Trust, the Old GM estates and the GUC Trust Beneficiaries because it provides such parties with substantial benefits.  For example, the Settlement offers the concrete benefit of resolving a long-standing dispute related to the Late Claims Motions.  Settlement eliminates the risk of claw-backs of previously distributed assets and potentially clears the way for future distributions to GUC Trust Beneficiaries in the near term.  It eliminates substantial uncertainty and saves the GUC Trust from substantial litigation costs.  It will foster the ability of the GUC Trust to expeditiously wind-down the affairs of the Debtors in accordance with the Plan.  And it preserves the distributable assets for the GUC Trust Beneficiaries.  In short, the Settlement maximizes recoveries for GUC Trust Beneficiaries, which is the primary function of the GUC Trust and the GUC Trust Administrator.

30.     To be sure, Settlement comes at a cost to Beneficiaries.  In the Settlement, the GUC Trust has agreed to pay up to $6 million to distribute notice of the Settlement and $15 million to establish the Settlement Fund, funds that would otherwise potentially be available to Beneficiaries if the GUC Trust ultimately prevailed in the Late Claim Motion litigation.  But given the substantial benefits of the Settlement, these costs are reasonable and prudent.

31.     In consideration of all these issues, it is my opinion that the Settlement falls within the range of reasonableness—well above the lowest point in the range of reasonableness—and provides the best outcome for the GUC Trust Beneficiaries.

32.     Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  Wilmington, Delaware
        August ☐ , 2017

                                        /s/ [Draft]
                                        Beth Andrews

Case 1:14-md-02543-JMF    Document 4639-4    Filed 02/11/17    Page 452 of 516    Exhibit A - Pg 394 of 516

# EXHIBIT M

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
                               :

In re:                              :          Chapter 11

MOTORS LIQUIDATION COMPANY, et al.,    :          Case No.: 09-50026 (MG)

       f/k/a General Motors Corp., et al.,    :

                              :

                  Debtors.      :          (Jointly Administered)

---------------------------------------------------------------X

**JOINT DECLARATION OF STEVE W. BERMAN AND
ELIZABETH J. CABRASER IN SUPPORT OF THE JOINT MOTION PURSUANT
TO BANKRUPTCY CODE SECTIONS 105, 363, 502(C) AND 1142 AND
BANKRUPTCY RULES 3020 AND 9019 TO APPROVE THE SETTLEMENT
AGREEMENT BY AND AMONG THE SIGNATORY PLAINTIFFS AND THE
GUC TRUST, AND TO ESTIMATE THE PLAINTIFFS' AGGREGATE
<u>ALLOWED GENERAL UNSECURED CLAIMS AGAINST THE DEBTORS</u>**

Steve W. Berman and Elizabeth J. Cabraser hereby declare under penalty of perjury,

pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of their

knowledge, information and belief:

      1.      Steve W. Berman is a partner with the law firm of Hagens Berman Sobol Shapiro

LLP.

      2.      Elizabeth J. Cabraser is a partner with the law firm of Lieff Cabraser Heimann &

Bernstein, LLP.

      3.      We are Co-Lead Counsel appointed in the General Motors LLC Ignition Switch

Litigation Multidistrict Litigation, currently pending in the United States District Court for the

Southern District of New York, Judge Furman presiding, Case No. 14-MD-2543 (JMF).

      4.      We submit this declaration in support of the *Joint Motion Pursuant to Bankruptcy*

*Code Sections 105 and 502(c) and Bankruptcy Rule 9019 to Approve the Settlement Agreement*

*by and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs'*

*Aggregate Allowed General Unsecured Claims Against the Debtors*, dated [ ], 2017 (the
"**Motion**").  This declaration is based on our personal knowledge.

## I.   **Settlement Agreement**

5.     The Settlement Agreement was negotiated by the Ignition Switch Plaintiffs,
certain Non-Ignition Switch Plaintiffs, certain Pre-Closing Accident Plaintiffs (collectively, the
"**Signatory Plaintiffs**"), the Motors Liquidation Company GUC Trust (the "**GUC Trust**"), and
counsel to certain unaffiliated holders of beneficial units of the GUC Trust (the "**Participating
Unitholders**") (together with the GUC Trust and Signatory Plaintiffs, the "**Parties**") in good
faith and at arm's length.  After due diligence, the Signatory Plaintiffs and the GUC Trust
entered into the Settlement Agreement.

6.     Continued litigation of the matters resolved by the Settlement Agreement would
be complex and costly.

7.     The Settlement Agreement resolves multiple disputes, claims and issues to which
the Parties are involved in varying degrees, and in related but not necessarily identical ways,
such that each Party's overall obligations to one or more other Parties constitutes good and
sufficient consideration for the overall benefits each Party is to receive from one or more of the
other Parties.

8.     The settlements, compromises, releases and transfers contemplated in the
Settlement Agreement are fair, reasonable and given in exchange for valuable and reasonably
equivalent consideration.

## II.   **Claims Estimate Order**

9.     We provided the GUC Trust with a proffer of evidence and expert report
concerning the claims of the Ignition Switch Plaintiffs and certain Non-Ignition Switch

Plaintiffs.  Certain Pre-Closing Accident Plaintiffs also provided a proffer of evidence and expert report.

10.    Based upon the proffers of evidence and expert reports, Plaintiffs' claims, when combined with all of the other Allowed General Unsecured Claims against the Debtors' bankruptcy estates, equals or exceeds $42 billion.

Dated: [ ], 2017

_Draft_ _____
Steve W. Berman

Dated: [ ], 2017

_Draft_ _____
Elizabeth J. Cabraser

09-50026-mg    Doc 13489-4    Filed 09/14/17    Entered 09/14/17 18:42:35    Exhibit A    Pg 398 of 516

# <u>EXHIBIT N</u>

09-50026-mg    Doc 14049-4    Filed 09/18/17    Entered 09/18/17 18:48:57    Exhibit A - Pg 399 of 516

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                                    :

In re:                               :                  Chapter 11

MOTORS LIQUIDATION COMPANY, et al.,   :                  Case No.: 09-50026 (MG)

       f/k/a General Motors Corp., et al.,    :

                                    :

                        Debtors.    :             (Jointly Administered)

-------------------------------------------------------------X

**DECLARATION OF ROBERT C. HILLIARD IN SUPPORT OF THE JOINT MOTION**
**PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363, 502(C) AND 1142 AND**
**BANKRUPTCY RULES 3020 AND 9019 TO APPROVE THE SETTLEMENT**
**AGREEMENT BY AND AMONG THE SIGNATORY PLAINTIFFS AND THE**
**GUC TRUST, AND TO ESTIMATE THE PLAINTIFFS' AGGREGATE**
**ALLOWED GENERAL UNSECURED CLAIMS AGAINST THE DEBTORS**

Robert C. Hilliard hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of his knowledge, information and belief:

1.      I am a partner with the law firm of Hilliard Muñoz Gonzales LLP and am co-counsel with the Law Offices of Thomas J. Henry to certain Pre-Closing Accident Plaintiffs.[1]

2.      I submit this declaration in support of the *Joint Motion Pursuant to Bankruptcy Code Sections 105 and 502(c) and Bankruptcy Rule 9019 to Approve the Settlement Agreement by and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors*, dated [ ], 2017 (the "**Motion**").  This declaration is based on my personal knowledge.

**I.**      **Settlement Agreement**

3.      The Settlement Agreement was negotiated by the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, certain Pre-Closing Accident Plaintiffs (collectively, the "**Signatory Plaintiffs**"), the Motors Liquidation Company GUC Trust (the "**GUC Trust**"), and

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Motion (defined below).

1

counsel to certain unaffiliated holders of beneficial units of the GUC Trust (the "**Participating Unitholders**") (together with the GUC Trust and Signatory Plaintiffs, the "**Parties**") in good faith and at arm's length.  After due diligence, the Signatory Plaintiffs and the GUC Trust entered into the Settlement Agreement.

4.      Continued litigation of the matters resolved by the Settlement Agreement would be complex and costly.

5.      The Settlement Agreement resolves multiple disputes, claims and issues to which the Parties are involved in varying degrees, and in related but not necessarily identical ways, such that each Party's overall obligations to one or more other Parties constitutes good and sufficient consideration for the overall benefits each Party is to receive from one or more of the other Parties.

6.      The settlements, compromises, releases and transfers contemplated in the Settlement Agreement are fair, reasonable and given in exchange for valuable and reasonably equivalent consideration.

## II.     Claims Estimate Order

7.      I provided the GUC Trust with a proffer of evidence and expert report concerning the claims of the Pre-Closing Accident Plaintiffs my firm represents.  Steve Berman and Elizabeth Cabraser also provided the GUC Trust with a proffer of evidence and expert report concerning the claims of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs.

8.      Based upon the proffers of evidence and expert reports provided to the GUC Trust, Plaintiffs' claims, when combined with all of the other Allowed General Unsecured Claims against the Debtors' bankruptcy estates, equal or exceed $42 billion.

09-50026-mg   Doc 14120-1   Filed 09/26/17   Entered 09/26/17 23:31:43   Exhibit N -
Exhibit A   Pg 401 of 516

Dated: [ ], 2017

*Draft* _____
Robert C. Hilliard

# EXHIBIT O

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                      :

In re:                                 :          Chapter 11

MOTORS LIQUIDATION COMPANY, et al.,   :          Case No.: 09-50026 (MG)

       f/k/a General Motors Corp., et al.,   :

                                 :

                      Debtors.   :          (Jointly Administered)

------------------------------------------------------------X

### DECLARATION OF LISA M. NORMAN IN SUPPORT OF THE JOINT MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363, 502(C) AND 1142 AND BANKRUPTCY RULES 3020 AND 9019 TO APPROVE THE SETTLEMENT AGREEMENT BY AND AMONG THE SIGNATORY PLAINTIFFS AND THE GUC TRUST, AND TO ESTIMATE THE PLAINTIFFS' AGGREGATE ALLOWED GENERAL UNSECURED CLAIMS AGAINST THE DEBTORS

Lisa M. Norman hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of her knowledge, information and belief:

1.      I am Senior Counsel with the law firm of Andrews Myers, PC and I represent certain Ignition Switch Pre-Closing Accident Plaintiffs in conjunction with the following law firms: Avram Blair & Associates, PC; The Buckley Law Group; The Meyer Law Firm; The Potts Law Firm; Bailey Peavy Bailey Cowan Heckaman; Onder Law; Junell & Associates; Limandri & Jonna; Kirkendall Dwyer, LLP.

2.      I submit this declaration in support of the *Joint Motion Pursuant to Bankruptcy Code Sections 105 and 502(c) and Bankruptcy Rule 9019 to Approve the Settlement Agreement by and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors*, dated [ ], 2017 (the "**Motion**").  This declaration is based on our personal knowledge.

## I.   <u>Settlement Agreement</u>

3.      The Settlement Agreement was negotiated by the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, certain Pre-Closing Accident Plaintiffs (collectively, the "**<u>Signatory Plaintiffs</u>**"), the Motors Liquidation Company GUC Trust (the "**<u>GUC Trust</u>**"), and counsel for certain unaffiliated holders of beneficial units of the GUC Trust (the "**<u>Participating</u> <u>Unitholders</u>**") (together with the GUC Trust and Signatory Plaintiffs, the "**<u>Parties</u>**") in good faith and at arm's length.   After due diligence, the Signatory Plaintiffs and the GUC Trust entered into the Settlement Agreement.

4.      Continued litigation of the matters resolved by the Settlement Agreement would be complex and costly.

5.      The Settlement Agreement resolves multiple disputes, claims and issues to which the Parties are involved in varying degrees, and in related but not necessarily identical ways, such that each Party's overall obligations to one or more other Parties constitutes good and sufficient consideration for the overall benefits each Party is to receive from one or more of the other Parties.

6.      The settlements, compromises, releases and transfers contemplated in the Settlement Agreement are fair, reasonable and given in exchange for valuable and reasonably equivalent consideration.

## II.   <u>Claims Estimate Order</u>

7.      The GUC Trust has been provided with proffers of evidence and expert reports by certain Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, and certain Pre-Closing Accident Plaintiffs.   Based upon the proffers of evidence and expert reports provided to the GUC

Trust, Plaintiffs' claims, when combined with all of the other Allowed General Unsecured

Claims against the Debtors' bankruptcy estates, equal or exceed $42 billion.

Dated: [ ], 2017

*Draft*_____
Lisa M. Norman

# <u>EXHIBIT P</u>

HEARING DATE AND TIME: [ ], 2017 at [ ] (EST)
OBJECTION DEADLINE: [ ], 2017 at 4:00 p.m. (EST)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                 :

In re:                              :          Chapter 11

MOTORS LIQUIDATION COMPANY, et al.,   :          Case No.: 09-50026 (MG)

        f/k/a General Motors Corp., et al.,    :

                              :

                      Debtors.     :          (Jointly Administered)

------------------------------------------------------------X

**MOTION FOR ORDER APPROVING NOTICE**
**PROCEDURES WITH RESPECT TO PROPOSED SETTLEMENT**
**BY AND AMONG THE SIGNATORY PLAINTIFFS AND THE GUC TRUST**

The Ignition Switch Plaintiffs,[1] certain Non-Ignition Switch Plaintiffs,[2] certain Pre-Closing Accident Plaintiffs[3] (collectively, the "**Signatory Plaintiffs**") and the Motors Liquidation Company GUC Trust (the "**GUC Trust**," together with the Signatory Plaintiffs, the "**Parties**") hereby submit this *Motion for Order Approving Notice Procedures with Respect to Proposed Settlement by and Among the Signatory Plaintiffs and the GUC Trust* (the "**Motion**"). In support of this Motion, the Parties respectfully state as follows:

---

[1]   The term "**Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047.

[2]   The term "**Non-Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540, 14V-118 and 14V-153.

[3]   The term "**Pre-Closing Accident Plaintiffs**" shall mean those plaintiffs asserting personal injury or wrongful death claims or persons who suffered a personal injury or wrongful death on or arising from an accident involving an Old GM vehicle that occurred prior to the closing of the Section 363 Sale. Collectively, all Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Pre-Closing Accident Plaintiffs are referred to as "**Plaintiffs**."

1

## PRELIMINARY STATEMENT

1.       On August [ ], 2017, after good faith, arm's-length negotiation, the Signatory

Plaintiffs and the GUC Trust entered into the Settlement Agreement.

2.       Following the Court's consideration and approval of this Motion, the Parties

intend to file and serve (in the manner contemplated by the proposed Notice Procedures herein) a

motion (the "**9019 Motion**") requesting the Court's approval of the Settlement Agreement and

Claims Estimate Order.

3.       The Settlement Agreement resolves numerous longstanding, disputed issues

including, *inter alia*:  (i) whether Plaintiffs should be granted authority to file late proofs of claim

(and whether such authority can be granted solely on due process grounds); (ii) whether

Plaintiffs' asserted claims are equitably moot; (iii) whether additional grounds exist to object to

Plaintiffs' asserted claims; and (iv) the allowable amount of the Signatory Plaintiffs' claims (if

any).

4.       Generally, under the Settlement Agreement,[4] the GUC Trust agrees to irrevocably

pay $15,000,000 (the "**Settlement Amount**") into a trust, fund or other vehicle (the "**Settlement**

**Fund**") for the exclusive benefit of Plaintiffs.

5.       In exchange, upon payment of the Settlement Amount, all Plaintiffs with claims

against the GUC Trust (whether asserted or unasserted, contingent, or otherwise) arising from

New GM's 2014 recalls, including those who did not execute the Settlement Agreement, are

deemed to irrevocably waive and release all claims (other than those arising under the Settlement

Agreement) against Old GM, the Old GM estate, the GUC Trust, the GUC Trust Administrator,

---

[4]    This summary of the Settlement Agreement is qualified in its entirety by the terms and provisions of the
Settlement Agreement.  To the extent that there are any inconsistencies between the description of the
Settlement Agreement contained in the Motion and the terms and provisions of the Settlement Agreement, the
Settlement Agreement shall control.

holders of beneficial units in the GUC Trust (the "**Unitholders**") and the Motors Liquidation Company Avoidance Action Trust, including a release of any rights to prior or future distributions of or current GUC Trust assets and any rights to distributions by the Motors Liquidation Company Avoidance Action Trust.

6.      In addition, the GUC Trust agrees to provide reasonable assistance and cooperation in obtaining an order from the Court (the "**Claims Estimate Order**"): (i) finding that the estimated aggregate amount of Plaintiffs' claims, together with all other allowed claims, against the estates meet or exceed $42 billion, triggering the provision of the Sale Agreement[5] requiring New GM to issue additional New GM common stock (the "**Adjustment Shares**"); and (ii) directing that those Adjustment Shares be promptly delivered to the Settlement Fund by New GM.

7.      All Unitholders, all defendants in the action captioned *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. et al.*, Adv. Pro. No. 09-00504 (Bankr. S.D.N.Y. July 31, 2009) (the "**Term Loan Avoidance Action**"), and all holders of Allowed General Unsecured Claims, other than Plaintiffs, will be deemed to irrevocably waive and release any and all rights to these Adjustment Shares, as well as the Settlement Amount.

8.      Subject to notice and an opportunity for Plaintiffs to object, the Signatory Plaintiffs will determine the overall allocation of the value of the Settlement Fund between economic loss claims and personal injury/wrongful death claims, and the eligibility and criteria for payment.  Being defined as a Plaintiff will not assure any party that he, she, or it will receive

---

[5]   See *Second Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers, and NGMCO, Inc., as Purchaser*, dated as of June 26, 2009 (the "**AMSPA**"), § 3.2(c).

a distribution from the Settlement Amount, the Adjustment Shares (or their value), if any, or any other consideration contained in the Settlement Fund.

9.      Nothing in the Settlement Agreement is intended to waive any claims against New GM or to be an election of remedies against New GM; nor does the Settlement Agreement or any payments made in connection therewith represent full satisfaction of any claims against Old GM, unless and until such claims are in fact paid in full from every available source; provided, however, that in no event shall any Plaintiff be permitted to seek any further payment or compensation from the GUC Trust in respect of their claims or otherwise, other than the Settlement Amount and the Adjustment Shares.  Except as mandated otherwise under applicable law, nothing in the Settlement Agreement shall waive any claims that any Plaintiff may have against New GM or constitute an election of remedies by any Plaintiff, and neither the Settlement Amount nor the Adjustment Shares (nor any distribution thereof to any Plaintiff) shall represent full and final satisfaction of any claim that any Plaintiff may have against New GM, all of which are expressly reserved. The Bankruptcy Court's estimate of the aggregate Allowed General Unsecured Claims in the Claims Estimate Order shall not operate as a cap on any of the claims of any of the Plaintiffs against New GM.

10.      As part of the Settlement Agreement, the Parties by this Motion, request that the Court enter an Order approving and establishing Notice Procedures for notice of the 9019 Motion.

## JURISDICTION

11.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

12.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4

09-50026-mg    Doc 14039-4    Filed 09/14/17    Entered 09/14/17 18:46:56    Exhibit P -
Exhibit A    Pg 411 of 516

## NOTICE PROCEDURES

13.    Pursuant to the Settlement Agreement, the Parties propose that they provide
notice of the 9019 Motion, and the hearing date to consider approval of the Settlement
Agreement and Claims Estimate Order, pursuant to the below "**Notice Procedures**":

     i.    paid media including (1) digital banner advertisements targeted specifically to
owners or lessees of the defective vehicles manufactured by Old GM included in
the Recalls; (2) pre-roll video ads placed on YouTube and other sites with
YouTube embedded videos; (3) sponsored search listings on the three most
highly-visited Internet search engines, Google, Yahoo! and Bing; (4) a party-
neutral informational press release issued to online press outlets throughout the
United States; and (5) a settlement website;

     ii.    notice by postcard in the form attached hereto as **Exhibit C** to: (A) all persons in
the United States who, as of July 10, 2009, owned or leased a defective vehicle
manufactured by Old GM included in the Recalls; and (B) all Pre-Closing
Accident Plaintiffs who have filed a lawsuit against New GM or filed or joined a
motion for authority to file late claims against the GUC Trust, as of the date of the
Settlement Agreement;[6]

     iii.    notice to all defendants in the Term Loan Avoidance Action via the Bankruptcy
Court's ECF system and, to the extent a defendant is not registered to receive
notice via the ECF system, via postcard in the form attached hereto as **Exhibit C**;

     iv.    notice via DTC's LENSNOTICE system to holders of beneficial units of the GUC
Trust in the form attached hereto as **Exhibit D**; and

     v.    notice via ECF to all entities, including New GM, that receive electronic notice
from the Court's ECF system.

14.    Pursuant to the Settlement Agreement, the GUC Trust shall be responsible for
funding the cost of the notice contemplated hereby, up to an amount of $6,000,000 (the "**Notice**

---

[6]    The Parties request that the Court order New GM to turn over the names and addresses of individuals in
category (ii).

09-50026-mg   Doc 14089-4   Filed 09/13/17   Entered 09/13/17 18:46:54   Exhibit P -
Exhibit A   Pg 413 of 516

**Cost Cap Amount**").[7]   As described further below, the GUC Trust respectfully requests authority to "hold back" and reallocate for use up to $6,000,000 from otherwise distributable assets of the GUC Trust for use in funding the Notice Procedures.

15.     The Parties request that this Court:  (i) schedule the hearing to consider approval of the 9019 Motion for [ ], 2017 at [ ] (EST) (the "**Hearing**"); and (ii) establish [ ], 2017 at [ ] (EST), as the deadline by which all responses and objections to the 9019 Motion must be filed and served.

16.     The Parties respectfully submit that the foregoing Notice Procedures, and requested hearing date and objection deadline, will provide comprehensive notice to all affected parties of the terms and the relief to be sought at the hearing to consider approval of the 9019 Motion, and that no other or further notice is necessary or required.

## RELIEF REQUESTED

17.     By this Motion, the Parties respectfully request that the Court enter an order approving the Notice Procedures substantially in the form attached to this Motion as **Exhibit A**.

## BASIS FOR RELIEF

18.     Bankruptcy Code Section 105(a) provides a bankruptcy court with broad powers in its administration of a case.  See 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").  Pursuant to Section 105(a), the Bankruptcy Court has expansive equitable powers to achieve fairness and

---

[7]   Based upon proposals received from vendors, the cost of the notice contemplated hereby is approximately $6 million.  Specifically, the parties requested proposals for the notice program from three vendors: (1) Epiq Class Action & Claims Solutions, Inc./Hilsoft Notifications ("**Epiq/Hilsoft**"); (2) Rust Consulting/Kinsella Media; and (3) Kurtzman Carson Consultants.  Based on the responses, the parties selected Epiq as the Notice Administrator, based both on the cost estimate, as well as their comprehensive notice plan, which is explained in detail in the Declaration of Cameron R. Azari, Esq., on Implementation and Adequacy of General Motors Bankruptcy Settlement Class Notice Program ("**Azari Decl.**"), annexed hereto as **Exhibit E**.

justice in the reorganization process.  See, e.g., Croton River Club, Inc. v. Half Moon Bay Homeowners Ass'n (In re Croton River Club, Inc.), 52 F.3d 41 (2d Cir. 1994) (holding that bankruptcy courts have broad equity power to manage affairs of debtors).

19.    In addition, the Court has the authority and discretion under Bankruptcy Code Section 105(d) to issue and prescribe procedures and conditions as the Court deems appropriate to ensure that matters before it are handled expeditiously and economically.  See 11 U.S.C. § 105(d); In re Fletcher Int'l, Ltd., 536 B.R. 551, 560 (S.D.N.Y. 2015), aff'd, 661 F. App'x 124 (2d Cir. 2016).  Under Bankruptcy Rule 2002, no less than 21 days' notice must be provided for proposed settlements under Bankruptcy Rule 9019.  Epiq/Hilsoft estimates that it will take 35 days to complete the mailing of the postcard notice.

20.    Entry of the Proposed Order is appropriate under Bankruptcy Code Sections 105(a) and 105(d), as complemented by Bankruptcy Rule 9019, because it will allow the Parties to:  (i) comply with the terms of the Settlement Agreement (which specifically require the Parties to receive an order from this Court approving the Notice Procedures); and (ii) implement a process in which appropriate notice will be given to all relevant parties in interest so that this Court can consider the appropriateness of the 9019 Motion at the Hearing.

21.    To ensure that the Notice Procedures are sufficient, Eqip/Hilsoft, a firm that specializes in designing, developing, analyzing and implementing large-scale, un-biased, legal notification plans, was engaged.[8]  Epiq/Hilsoft analyzed the individual notice options and the media audience data to determine the most effective mixture of media required to reach the greatest practicable number of included parties.[9]

---

[8]    See Azari Decl. ¶ 3.

[9]    Id. ¶ 8.

22.     Rather than incurring the prohibitive cost and expense of mailing a long form of notice to Plaintiffs, the Parties will serve the postcard notice attached hereto as **Exhibit C** (the "**Direct Mail Notice**") that clearly and concisely summarizes the Settlement.  The Direct Mail Notice will direct the recipients to a website dedicated specifically to the Settlement where they can access additional information.  The Direct Mail Notices will be sent by United States Postal Service first class mail.[10]

23.     This comprehensive individual notice effort will be supplemented by moderate paid media selected to both notify Plaintiffs who may not see the Direct Mail Notice and remind Plaintiffs to act if they so choose.  Paid media will include digital banner advertisements targeted specifically to owners and lessees of the vehicle makes and models included in the Settlement along with online video advertisements targeted to adults aged 18 and over.[11]

24.     To build additional reach and extend exposures, a party-neutral informational release will be issued to approximately 5,000 general media (print and broadcast) outlets and 5,400 online databases and websites throughout the United States.[12]

25.     A dedicated website will be created for the Settlement.  Plaintiffs will be able to obtain detailed information about the case and review documents including the Long Form Notice attached hereto as **Exhibit B** (in English and Spanish), Settlement Agreement, Settlement Order and answers to frequently asked questions and any other documents the Court may require.   Once the plan for allocation between economic loss claims and personal injury/wrongful death claims is determined it will be posted prominently on the Settlement website.   Any criteria on eligibility to recover from the Settlement Fund will also be posted

---

[10]  Id. ¶ 16.

[11]  Id. ¶¶ 20-25.

[12]  Id. ¶ 28.

prominently on the Settlement website.  To facilitate locating the case website, sponsored search

listings will be acquired on the three most highly-visited internet search engines:  *Google*,

*Yahoo!* and *Bing*.[13]

26.     The Notice Procedures presented here are similar to the procedures proposed by

the debtors in In re TK Holdings Inc., Case No. 17-11375 (BLS) (Bank. D. Del. July 7, 2017) to

provide notice to individuals who own, or may have owned, vehicles equipped with recalled

airbag inflators—serving a postcard via first-class mail, utilizing digital banner advertising and

paid internet search listings, distributing an informational release, and creating a dedicated

website.[14]

27.     The Parties believe these Notice Procedures will keep costs reasonable under the

circumstances while also reaching the greatest practicable number of Plaintiffs.[15]

28.     As noted above, the GUC Trust shall be responsible for funding the cost of the

Notice Procedures up to the Notice Cost Cap Amount.  Pursuant to Section 6.1(b) of the Second

Amended and Restated GUC Trust Agreement dated as of July 30, 2015 (the "**GUC Trust**

**Agreement**"), the GUC Trust Administrator is afforded the flexibility to "hold back" from

distributions (with the approval of FTI Consulting, Inc. as monitor of the GUC Trust (in such

capacity, the "**GUC Trust Monitor**"))[16] otherwise distributable assets for the purposes of,

---

13   Id. ¶¶ 26, 29.

14   See Motion of Debtors Pursuant to 11 U.S.C. §§ 502(b)(9) and 105(a), Fed. R. Bankr. P. 2002, 3003(c)(3),
5005, and 9007, and Local Rules 2002-1(e), 3001-1, and 3003-1 for Authority to (I) Establish Deadlines for
Filing Proofs of Claim, (II) Establish the Form and Manner of Notice Thereof, and (III) Approve Procedures for
Providing Notice of Bar Date and Other Important Deadlines and Information to Potential PSAN Inflator
Claimants ¶¶ 24-28, In re TK Holdings Inc., Case No. 17-11375 (BLS) (Bankr. D. Del. July 7, 2017).

15   Id. ¶ 12.

16   As required by Section 6.1 of the GUC Trust Agreement, the GUC Trust Administrator has consulted with the
GUC Trust Monitor with respect to the proposed reallocation and use of distributable cash.  GUC Trust
Agreement § 6.1.  The GUC Trust Monitor has indicated that it supports the relief requested herein.

among other things, funding fees, costs and expenses of the GUC Trust to the extent that such fees, costs and expenses are not otherwise contemplated by the GUC Trust's budget. *See* GUC Trust Agreement § 6.1(b). The GUC Trust Agreement further permits the GUC Trust Administrator to seek Bankruptcy Court authority to reallocate and use the "held back" funds for the purposes of satisfying such fees, costs and expenses as incurred (such funds, as reallocated, "**Other GUC Trust Administrative Cash**"). *Id.* Section 6.13 of the GUC Trust Agreement provides that to the extent any "expenses, costs, liabilities, obligations or fees [are] incurred by the GUC Trust… in connection with the wind-down of the Debtors' affairs… [such liabilities] shall be satisfied… from the applicable portion of Other GUC Trust Administrative Cash." *See* GUC Trust Agreement § 6.13.

29.    The GUC Trust's agreement to pay up to $6 million for the notice contemplated hereby is not currently budgeted by the GUC Trust and falls well within the types of "expenses, costs, liabilities, obligations or fees" that may be "held back" and reallocated for use by the GUC Trust pursuant to Section 6.13 of the GUC Trust Agreement. Accordingly, the GUC Trust submits that, pursuant to Section 6.1(b) of the GUC Trust Agreement, the request to reallocate up to $6 million of otherwise distributable assets for the purposes of funding the Notice Procedures is warranted.

## NOTICE

30.    Notice of this Motion has been provided to all entities that receive electronic notice from the Court's ECF system and otherwise in accordance with the *Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rules 1015(c) and 9007 establishing Notice and Case Management Procedures*, dated May 5, 2011 (Bankr. Dkt. No. 10183).

31.     No previous application for the relief sought in this Motion has been made to this

or any other Court.

## **CONCLUSION**

WHEREFORE the Parties respectfully request entry of the Proposed Order, substantially

in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other

relief as is just and equitable.

Dated: August [ ], 2017                         Respectfully submitted,
        New York, New York

                                                 */s/ Draft*
                                                Edward S. Weisfelner
                                                Howard S. Steel
                                                BROWN RUDNICK LLP
                                                Seven Times Square
                                                New York, New York 10036
                                                Tel: 212-209-4800
                                                eweisfelner@brownrudnick.com
                                                hsteel@brownrudnick.com

                                                Sander L. Esserman
                                                STUTZMAN, BROMBERG, ESSERMAN
                                                &PLIFKA, A PROFESSIONAL
                                                CORPORATION
                                                2323 Bryan Street, Ste 2200
                                                Dallas, Texas 75201
                                                Tel: 214-969-4900
                                                esserman@sbep-law.com

                                                *Designated Counsel for the Ignition Switch
                                                Plaintiffs and Certain Non-Ignition Switch
                                                Plaintiffs in the Bankruptcy Court*

                                                Steve W. Berman (admitted *pro hac vice*)
                                                HAGENS BERMAN SOBOL SHAPIRO
                                                LLP
                                                1918 Eighth Avenue, Suite 3300
                                                Seattle, WA 98101
                                                Tel: 206-623-7292
                                                steve@hbsslaw.com

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
Tel: 414-956-1000
ecabraser@lchb.com

*Co-Lead Counsel for the Ignition Switch
Plaintiffs and Certain Non-Ignition Switch
Plaintiffs in the MDL Court*

William P. Weintraub
Gregory W. Fox
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: 212-813-8800
wweintraub@goodwinlaw.com
gfox@goodwinlaw.com

*Counsel to Those Certain Pre-Closing
Accident Plaintiffs Represented By Hilliard
Muñoz Gonzales L.L.P. and the Law Offices
of Thomas J. Henry*

Robert Hilliard, Esq.
HILLIARD MUÑOZ GONZALES LLP
719 South Shoreline
Suite 500
Corpus Christi, TX 78401
Tel: 361-882-1612
bobh@hmglawfirm.com

*Counsel to Certain Pre-Closing Accident
Plaintiffs*
Thomas J. Henry, Esq.
THE LAW OFFICES OF THOMAS J.
HENRY
4715 Fredricksburg, Suite 507
San Antonio, TX 78229

*Counsel to Certain Pre-Closing Accident
Plaintiffs*

12

Lisa M. Norman (admitted pro hac vice)
T. Joshua Judd (admitted pro hac vice)
ANDREWS MYERS, P.C.
1885 St. James Place, 15th Floor
Houston, Texas 77056
Tel: 713-850-4200
Lnorman@andrewsmyers.com
Jjudd@andrewsmyers.com

*Counsel to Certain Pre-Closing Accident Plaintiffs*

Matthew Williams
Keith R. Martorana
Gabriel Gillett
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166
Tel: 212-351-400

*Counsel for Wilmington Trust Company, as Administrator and Trustee of the GUC Trust*

# **EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
:
In re: : Chapter 11
MOTORS LIQUIDATION COMPANY, et al., : Case No.: 09-50026 (MG)
       f/k/a General Motors Corp., et al., :
:
               Debtors. : (Jointly Administered)
------------------------------------------------------------X

## ORDER APPROVING NOTICE PROCEDURES
## WITH RESPECT TO PROPOSED SETTLEMENT BY AND
## AMONG THE SIGNATORY PLAINTIFFS AND THE GUC TRUST

Upon the *Motion for Order Approving Notice Procedures with Respect to Proposed Settlement by and Among the Signatory Plaintiffs and the GUC Trust*, dated [ ], 2017 (the "**Motion**"),[17] of the Ignition Switch Plaintiffs, Certain Non-Ignition Switch Plaintiffs, Certain Pre-Closing Accident Plaintiffs and the GUC Trust (collectively the "**Parties**") for approval of the Notice Procedures with respect to the 9019 Motion, all as more fully described in the Motion; and the Bankruptcy Court having considered the Motion; and a hearing on the Motion having been held before this Bankruptcy Court on _____, 2017 (the "**Hearing**") to consider the relief requested in the Motion; and the Bankruptcy Court having found that it has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Plan; and the Bankruptcy Court having considered the statements of counsel on the record of the Hearing and the filings of the parties in connection the Motion; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and upon the record of the Hearing; and it appearing that proper and adequate notice of the Motion has been given and that

---

[17] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

1

no other or further notice is necessary; and after due deliberation and sufficient cause appearing

therefor, it is

**ORDERED** that the Motion is granted as set forth herein; and it is further

**ORDERED** that the Notice Procedures are approved; and it is further

**ORDERED** that notice of the 9019 Motion in accordance with the Notice Procedures

will be sufficient and effective notice in satisfaction of federal and state due process

requirements and other applicable law to put the parties in interest in these Chapter 11 cases, all

Plaintiffs, and others on notice of the 9019 Motion; and it is further

**ORDERED** that, pursuant to Section 6.1(b) of the GUC Trust Agreement, the GUC

Trust is authorized to reallocate and use up to $6,000,000 of otherwise distributable assets to

satisfy the costs of the Notice Procedures.

**ORDERED** that, no later than two (2) days after the entry of this Order, New GM shall

turn over to the Parties the names and addresses of (A) all persons in the United States who, as of

July 10, 2009, owned or leased a defective vehicle manufactured by Old GM included in the

Recalls; and (B) all Pre-Closing Accident Plaintiffs who have filed a lawsuit against New GM as

of the date of this Order;

**ORDERED** that, all responses and objections to the 9019 Motion must be filed and

served so as to be received by [ ], 2017 at [ ] (EST); and it is further

**ORDERED** that the hearing on the 9019 Motion shall take place in the Bankruptcy Court

on [ ], 2017 at [ ] (EST); and it is further

**ORDERED** that notice of the 9019 Motion as provided herein shall be deemed good and

sufficient notice of the 9019 Motion; and it is further

2

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2017
New York, New York

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT B**

**(Long Form Notice)**

Case 1:17-md-02543-JMF    Document 4139-4    Filed 09/13/17    Page 543    Exhibit P -
Exhibit A    Pg 425 of 516

# EXHIBIT C

**(Short Form Postcard Notice)**

# EXHIBIT D

**(DTC Notice)**

# EXHIBIT E

**(Azari Declaration)**

# <u>EXHIBIT Q</u>

# If you owned or leased a GM vehicle on or before July 10, 2009 your rights may be affected by a proposed settlement and you may be entitled to a payment

A proposed settlement (the "Settlement") has been reached involving claims of owners and lessees of General Motors Corporation ("Old GM") vehicles. The claims include allegations that consumers overpaid when they bought cars on or before July 10, 2009 with undisclosed defects in ignition switches, side airbags, or power steering included in the following recalls: 14V-047, 4V-355, 14V-394, 14V-400, 14V-346, 14V-540, 14V-118 and 14V-153 (the "Recalls"). The claims also include allegations that consumers suffered personal injury or wrongful death from accidents involving Old GM vehicles that occurred before July 10, 2009. If approved, the Settlement will affect your right to bring your own lawsuit against Old GM about these claims and also will offer payments and other benefits. **The purpose of this notice is to inform you of the proposed Settlement and your legal rights.**

**Who is Included?  General Motors LLC's ("New GM") records indicate that you may be affected by the Settlement.**  The Settlement includes all persons in the United States who, as of July 10, 2009, (i) owned or leased a vehicle manufactured by Old GM included in one of the Recalls involving Chevrolet, Pontiac, Saturn, Buick, Cadillac, Oldsmobile and GMC model vehicles; and/or (ii) suffered personal injury or wrongful death in an accident involving an Old GM vehicle. Those included are called an "Affected Person." You can go to the Settlement Website, www.XXXXXXXXXXX.com to confirm if your vehicle is included.

**What are the Settlement Terms?**  If the Settlement is approved and the related proposed Settlement Order is entered, each Affected Person will be deemed to provide a waiver and release of any claims they might otherwise directly or indirectly assert against the GUC Trust, the trust administrator of the GUC Trust, the past and present assets of the GUC Trust, the Motors Liquidation Company Avoidance Action Trust and/or the holders of beneficial units in the GUC Trust (collectively, the "Related Parties"). This means that if you have an existing lawsuit against Old GM or the Related Parties that includes the same claims that this Settlement resolves, your lawsuit will end.  Also, you will not be able to bring a new lawsuit against Old GM or the Related Parties about these issues in the future. Unless applicable law says otherwise, the Settlement or any payment you may receive under it, does not affect any claim you may have against New GM. In exchange, the GUC Trust will pay $15 million into the Settlement Fund and support entry of an order estimating the aggregate allowed claims against the Old GM bankruptcy estate, including all Affected Persons' claims, at no less than $42 billion (the "Claims Estimate Order").  If the Claims Estimate Order is entered, New GM may be required to issue up to 30 million shares of New GM common stock to the Settlement Fund.  The current value of 30 million shares of New GM common stock is approximately $1.08 billion.  For details about the Settlement, the money that may be available to Affected Persons, your eligibility, how the money will be divided, and the waiver and release of claims, you should visit www.XXXXXXXXXX.com and review the Long Form Notice, Settlement Agreement and the proposed Settlement Order.

**How Can I Get a Payment?**  Being defined as an Affected Person does not assure you will receive a distribution from the Settlement Fund.  Overall allocation between economic loss and personal injury plaintiffs will be negotiated by counsel to the Signatory Plaintiffs and approved by the appropriate court.

Eligibility and criteria for payment will be approved by the Court. The details will be posted on the Settlement Website and you will be given an opportunity to object.

**Your Other Options.** You can object to the proposed Settlement and the proposed Settlement Order. The Long Form Notice available on the Settlement Website listed below explains how to object to the Settlement. The Court will hold a hearing **on _____ __, 2017 at _____[a][p]m** to consider whether to approve the Settlement. You may appear at the hearing, either yourself or through an attorney hired by you, but you do not have to. Please note that the date and time of the hearing is subject to change without further notice other than an announcement on the Settlement Website. For more information, call or visit the Settlement Website below.

**1-8xx-xxx-xxxx**                         **www._____.com**


[On the back of the postcard will be the plaintiff's name and address, and court logo:]

<u>Important Court-Approved Legal Notice from the United States Bankruptcy Court for the Southern District of New York</u>



Plaintiff John Doe
123 45th Street
Anytown, USA. _____

General Motors Bankruptcy Settlement Information

09-50026-mg   Doc 14093-45   Filed 08/14/17   Entered 08/13/17 18:48:59   Exhibit R -
Exhibit A   Pg 431 of 516

# <u>EXHIBIT R</u>

## United States Bankruptcy Court for the Southern District of New York

## NOTICE OF PROPOSED SETTLEMENT AND ORDER

> **Current and former owners and lessees of certain General Motors vehicles may have their rights affected by a settlement and proposed order, including the release of claims, and may be entitled to a payment from the settlement.**

*The Bankruptcy Court authorized this Notice. This is not a solicitation from a lawyer.*

### If you are an Affected Person (as defined below), your legal rights may be affected whether you act or do not act.

### Please Read this Notice Carefully

This Notice provides information about a proposed settlement (the "Settlement") and related proposed order ("Order") regarding claims in the bankruptcy cases titled *In re Motors Liquidation Company, et al., f/k/a General Motors Corp.*, Bankr. No. 09-50026, pending before Judge Martin Glenn of the United States Bankruptcy Court for the Southern District of New York (the "Old GM Bankruptcy Case") against the Motors Liquidation Company General Unsecured Creditors Trust (the "GUC Trust") by owners and lessees of General Motors Corporation ("Old GM") vehicles. The claims include allegations that consumers overpaid when they bought cars on or before July 10, 2009 with undisclosed defects in ignition switches, side airbags, or power steering that were included in certain National Highway Traffic Safety Administration ("NHTSA") recalls listed below. The claims also include allegations that consumers suffered personal injury or wrongful death based on or arising from an accident involving certain of these vehicles that occurred prior to July 10, 2009. A motion (the "Settlement Motion") seeking entry of the Order has been filed in the Bankruptcy Court, along with the Settlement Agreement, and can be found at the case website at **www._____.com** (the "Settlement Website").

| SUMMARY OF YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **The Settlement Agreement and Order** | • Affected Persons (defined below) can write to the Court about why you do not like the Settlement or the Order. |
| | • More information about how to object can be found in paragraph \_\_ and at the Settlement Website at **www._____.com**. |
| | • The Court will hold a hearing on **_____ \_\_, 2017 at _____ to** determine whether to approve the Settlement Agreement and enter the Order. Please note that the date and time of the hearing is subject to change without further notice other than an announcement on the Settlement Website. |

QUESTIONS? VISIT WWW._____.COM

| | |
|---|---|
| **Distributions** | • The Settlement and Order provide Affected Persons with the exclusive benefit of the Settlement Fund (defined below). Procedures for the administration and allocation to Affected Persons of the Settlement Fund, including criteria for Affected Persons to assert a claim against the Settlement Fund and the allocation methodology, will be established, subject to notice and an opportunity for Affected Persons to object. |

## WHAT THIS NOTICE CONTAINS

### {INSERT TOC}

### BASIC INFORMATION

**1. What is this Notice and why should I read it?**

This Notice is to inform you of the proposed Settlement and Order regarding claims in the Old GM Bankruptcy Case. The Bankruptcy Court has scheduled a hearing on the Settlement Motion on _____, 2017 at __:__ a.m./p.m. in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004-1408, Courtroom 523. Please note that the date of the hearing may be changed without notice, other than an announcement on the Settlement Website. Affected Persons are encouraged to visit www._____.com for future updates.

This Notice explains the terms of the Settlement, the Order, and your legal rights.

**2. What are the Settlement and Order about?**

In the Old GM Bankruptcy Case, Ignition Switch Plaintiffs[1] and certain Non-Ignition Switch Plaintiffs[2] sought leave to file late proposed class claims against the GUC Trust seeking relief for alleged economic losses related to Old GM's alleged concealment of serious safety defects in ignition switches, side airbags, and power steering. Certain Pre-Closing Accident Plaintiffs[3] have likewise sought leave to file late personal injury and wrongful death claims against the GUC Trust related to Old GM vehicles.

The Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, certain Pre-Closing Accident Plaintiffs (collectively, the "Signatory Plaintiffs"), and the GUC Trust (together with the Signatory Plaintiffs, the "Parties") negotiated the Settlement Agreement to resolve these claims, and to provide a fund to pay for these and other claims that have been or may be

---

[1]   The term "Ignition Switch Plaintiffs" shall mean those plaintiffs asserting economic loss claims who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047.

[2]   The term "Non-Ignition Switch Plaintiffs" shall mean those plaintiffs asserting economic loss claims who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540, 14V-118 and 14V-153.

[3]   The term "Pre-Closing Accident Plaintiffs" shall mean those plaintiffs asserting personal injury or wrongful death claims based on or arising from an accident involving an Old GM vehicle that occurred prior to the closing of the Section 363 Sale.

QUESTIONS?  VISIT WWW._____.COM

asserted by other parties against the GUC Trust (which other claims will similarly be resolved by the Order).

The Settlement avoids the risk and cost of a trial, but still provides relief to the Affected Persons. The Signatory Plaintiffs and their attorneys think that the Settlement is in the best interests of Affected Persons and that it is fair, adequate, and reasonable.

### WHO IS INCLUDED IN THE SETTLEMENT AND ORDER?

To see if you are affected by the proposed Settlement or Order, you first have to determine if you are an Affected Person.

**3. How do I know if I am part of the Settlement or Order?  What is the definition of Affected Person?**

If you fall under one of the categories below, you are an Affected Person whose claims against Old GM, the GUC Trust, the GUC Trust's current and previously distributed assets and certain other parties will be waived and released as part of the proposed Order (and in exchange you will be entitled to assert your claims against the Settlement Fund).

A. All persons in the United States who, as of July 10, 2009, owned or leased a vehicle manufactured by Old GM included in the following recalls:

**(1)** Delta Ignition Switch Vehicles included in Recall No. 14v047: 2005-2010: Chevy Cobalt, 2006-2011 Chevy HHR, 2007-2010 Pontiac G5, 2007-2010 Saturn Sky, 2003-2007 Saturn ION, and 2006-2010 Pontiac Solstice;

**(2)** Low Torque Ignition Switch Vehicles, which are included in Recall Nos. 14v355, 14v394, and 14v400: 2005-2009:  Buick Lacrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2006-2011 Cadillac DTS, 2006-2011 Buick Lucerne, and 2006-2008 Chevrolet Monte Carlo; 2003-2014 Cadillac CTS and the 2004-2006 Cadillac SRX; and 1997-2005 Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-2004 Oldsmobile Alero;

**(3)** Other Vehicles with defective ignition switches in Recall Nos. 14V-346, and 14V-540: 2010-2014 Chevrolet Camaro, 2011-2013 Chevrolet Caprice, and 2008-2009 Pontiac G8;

**(4)** Side Airbag Defect Vehicles included in Recall No. 14v118: 2008-2013 Buick Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn Outlook; and

**(5)** Power Steering Defect Vehicles included in Recall No. 14v153: 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura.

B.  All persons who have suffered personal injury or wrongful death claims based on or arising from an accident involving an Old GM vehicle that occurred prior to July 10, 2009.

## THE TERMS OF THE SETTLEMENT AGREEMENT AND ORDER

**4.  What would happen to my claim under the proposed Order?**

Under the proposed Order, each Affected Person will be deemed to have waived and released (the "Waiver") any claims that the Affected Person might otherwise directly or indirectly assert against the GUC Trust, the trust administrator of the GUC Trust, the current and previously distributed assets of the GUC Trust, the Motors Liquidation Company Avoidance Action Trust, the holders of beneficial units in the GUC Trust and certain other related parties (the "Released Parties").

If approved by the Bankruptcy Court, the Order will prohibit you from suing or being part of any other lawsuit or claim against the Released Parties that relate to the recalls, the Old GM Bankruptcy Case, or the multi-district litigation pending before Judge Furman in the United States District Court for the Southern District of New York, Case No. 14-md-2543 (JMF) (the "GM MDL"). The Released Parties do NOT include General Motors LLC ("New GM").  The specifics of the Waiver are set out in more detail in the proposed Order, which is posted at **WWW.              .COM**.  The proposed Order describes the Waiver in specific legal terminology. Talk to your own lawyer if you have questions about the Waiver or what it means.

Nothing in the Settlement Agreement is intended to waive any claims against New GM or to be an election of remedies against New GM; nor does the Settlement Agreement or any payments made in connection therewith represent full satisfaction of any claims against Old GM, unless and until such claims are in fact paid in full from every available source; provided, however, that in no event shall any Affected Person be permitted to seek any further payment or compensation from the GUC Trust in respect of their claims or otherwise, other than the Settlement Amount and the Adjustment Shares.  Except as mandated otherwise under applicable law, nothing in the Settlement Agreement shall waive any claims that any Affected Person may have against New GM or constitute an election of remedies by any Affected Person.

**5.  What will I receive if the Bankruptcy Court enters the proposed Order?**

The proposed Order allows Affected Persons to assert claims against a Settlement Fund for administration and potential satisfaction.  The Settlement Fund will consist of the Settlement Amount and may include the Adjustment Shares, as detailed below.  Being defined as an Affected Person does not assure that you will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), or any other consideration contained in the Settlement Fund.  Eligibility and criteria for payment will be approved by the Bankruptcy Court at a later date and will be subject to notice on the Settlement Website and an opportunity to object.

Neither the Settlement Amount nor the Adjustment Shares (nor any distribution thereof to any Affected Person) shall represent full and final satisfaction of any claim that any Affected Person may have against New GM, all of which claims are expressly reserved.

### A.   The Settlement Amount

In exchange for the Waiver, the GUC Trust will pay $15,000,000 (the "Settlement Amount") to the Settlement Fund, subject to the Order becoming a final order (unless the GUC Trust waives the final order requirement).

### B.   The Adjustment Shares

The Amended Master Sale and Purchase Agreement pursuant to which New GM purchased substantially all of the assets of Old GM provides that if the Bankruptcy Court issues an order ("Claims Estimate Order") finding that the estimated aggregate allowed general unsecured claims against the Old GM estate exceeds $35 billion, then New GM must issue additional shares of New GM common stock (the "Adjustment Shares").  If the estimate reaches or exceeds $42 billion, New GM must issue the maximum amount of Adjustment Shares (30 million shares).

As part of the Settlement Agreement, the GUC Trust, following a review of evidence and expert reports provided by the Signatory Plaintiffs, agreed to support entry of a Claims Estimate Order: (i) finding that the allowable amount of Affected Persons' claims against the GUC Trust, when combined with all of the other allowed general unsecured claims against the Old GM bankruptcy estate, equals or exceeds $42 billion, thus triggering the maximum amount of Adjustment Shares (30 million shares); and (ii) directing that the Adjustment Shares, or the value of the Adjustment Shares, be promptly delivered to the Settlement Fund by New GM.

The Parties have sought entry of the Claims Estimate Order as part of the Settlement Motion. The current value of 30 million shares of New GM common stock is approximately $1.08 billion.  Regardless of whether the Claims Estimate Order is entered, the Order would remain binding, including the Waiver and the payment of the Settlement Amount.

The Bankruptcy Court's estimate of the aggregate allowed claims in the Claims Estimate Order shall not operate as a cap on any of the claims of any of the Affected Persons against New GM.

### C.   How will the Settlement Fund be allocated and distributed?

The Settlement Fund is for the exclusive benefit of Affected Persons.  The allocation of the value of the Settlement Fund between the economic-loss claims and the personal injury/wrongful death claims will be done by the lawyers for the Signatory Plaintiffs with the assistance of a court-appointed mediator.  Thereafter, the economic loss lawyer lead counsel and the personal injury lawyer lead counsel will determine the specifics for distribution within each pool, including the criteria for determining eligibility for payment.  Any agreement on the allocation process and the distribution procedure will be described at www._____.com when determined and Affected Persons will be provided with an opportunity to object.

## LEGAL REPRESENTATION

### 6.   Do I have a lawyer in this case?

The counsel to the Signatory Plaintiffs, listed below, negotiated the Settlement Agreement and jointly filed the Settlement Motion.  You will not be charged for services performed by this counsel in negotiating the Settlement Agreement. If you want to be represented by your own lawyer, you may hire one at your own expense, but you do not need to have a lawyer to participate in the Settlement or exercise any of your options with respect to the Settlement.

If you want to contact the counsel for the Signatory Plaintiffs, they can be reached by ==sending
an email to **info@_____.com**== or as follows:

| | |
|---|---|
| Steve W. Berman<br>HAGENS BERMAN SOBOL SHAPIRO LLP<br>1918 Eighth Avenue, Suite 3300<br>Seattle, WA 98101<br>Telephone: (206) 623-7292<br>steve@hbsslaw.com | Robert C. Hilliard<br>HILLIARD MUNOZ GONZALES LLP<br>719 S Shoreline Blvd., # 500<br>Corpus Christi, TX 78401<br>Telephone: (361) 882-1612<br>bobh@hmglawfirm.com |
| Elizabeth J. Cabraser<br>LIEFF CABRASER HEIMANN &<br>BERNSTEIN<br>275 Battery Street, 29th Floor<br>San Francisco, California 94111<br>Telephone: (414) 956-1000<br>ecabraser@lchb.com | Counsel for Certain Pre-Closing<br>Accident Plaintiffs<br><br>Thomas J. Henry, Esq.<br>THE LAW OFFICES OF THOMAS J.<br>HENRY<br>4715 Fredricksburg, Suite 507<br>San Antonio, TX 78229 |
| Co-Lead Counsel for the Economic Loss<br>Plaintiffs in the MDL Court<br><br>Edward S. Weisfelner<br>BROWN RUDNICK LLP<br>BROWN RUDNICK LLP<br>Seven Times Square<br>New York, New York 10036<br>Tel: 212-209-4800<br>eweisfelner@brownrudnick.com | Counsel for Certain Pre-Closing<br>Accident Plaintiffs<br><br>William P. Weintraub<br>GOODWIN PROCTER LLP<br>The New York Times Building<br>620 Eighth Avenue<br>New York, New York 10018<br>Tel: 212-813-8800<br>wweintraub@goodwinlaw.com |
| Sander L. Esserman<br>STUTZMAN, BROMBERG, ESSERMAN &<br>PLIFKA, P.C.<br>2323 Bryan Street, Ste 2200<br>Dallas, Texas 75201<br>Tel: 214-969-4900<br>esserman@sbep-law.com<br><br>Designated Counsel for the Economic Loss<br>Plaintiffs in the Bankruptcy Court | Counsel to Those Certain Pre-Closing<br>Accident Plaintiffs Represented By Hilliard<br>Muñoz Gonzales L.L.P. and the Law Offices<br>of Thomas J. Henry |

**7. How will the lawyers be paid?**

Procedures for the payment of attorneys' fees for counsel to the Signatory Plaintiffs from the
Settlement Fund will be established, subject to notice and an opportunity for Affected Persons
to object.

## OBJECTING TO THE SETTLEMENT OR ORDER

**8. How do I tell the Court I do not like the Settlement or Order?**

If you are an Affected Person, you can object to the proposed Settlement or proposed Order if you don't like it. You can give reasons why you think the Court should not approve any or all of these items, and the Court will consider your views.

To object, you must file your objection with the Court. To be timely, your objection must be filed with the Court by no later than ____ __, **2017** at 4:00 p.m. (Eastern Time) at the following addresses:

| **The Court** | Judge Martin Glenn |
| --- | --- |
| | United States Bankruptcy Court for the Southern District of New York |
| | One Bowling Green |
| | New York, NY 10004-1408 |
| | Courtroom: 523 |

**NOTE:** You may mail your objection to the Court, but it must be received by the Court and filed by ____ __, **2017**, at 4:00 p.m. (Eastern Time). See www._____.com for more information on how to object to the Settlement.

### THE COURT'S APPROVAL HEARING

**9. When and where will the Court decide whether to approve the Settlement and issue the Order?**

The Court will hold a hearing to decide whether to approve the proposed Settlement and Order. The hearing will be on _____, __, **2017, at __: __.m.** before Judge Martin Glenn, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004-1408, Courtroom 523. Please note that the date of the hearing may be changed without notice other than an announcement on the Settlement Website. Affected Persons are encouraged to visit www._____.com for future updates.

At the hearing, the Court will consider whether the proposed Settlement and all of its terms falls within the range of reasonableness required for approval of the Settlement and whether to issue the proposed Order. If there are objections, the Court will consider them. The Court may listen to people who have asked for permission to speak at the hearing and have complied with the other requirements for objections explained in Section __.

At or after the hearing, the Court will decide whether to approve the proposed Settlement and issue the Order. There may be appeals after that. There is no set timeline for either the Court's final approval decision, or for any appeals that may be brought from that decision, so it is impossible to know exactly when and if the Settlement and Order will become final.

The Court may change deadlines listed in this Notice without further notice. To keep up on any changes in the deadlines, please visit www._____.com.

**10. Do I have to go to the hearing?**

No. Counsel to the Signatory Plaintiffs will appear at the hearing in support of the Settlement and Order and will answer any questions asked by the Court.

QUESTIONS? VISIT WWW._____.COM

If you send an objection, you don't have to come to Court to talk about it. So long as you filed your written objection on time and complied with the other requirements for a proper objection, the Court will consider it. You may also pay another lawyer to attend, but it's not required.

### 11. May I speak at the hearing?

Yes. If you submitted a proper written objection to the Settlement or Order, you or your lawyer may, at your own expense, come to the hearing and speak.

## GETTING MORE INFORMATION

### 12. How do I get more information about the Settlement and Order?

This Notice summarizes the proposed Settlement and proposed Order. For the precise terms and conditions of the Settlement and Order, please see the Settlement Agreement and proposed Order, available at **www._____.com**.

| YOU MAY OBTAIN ADDITIONAL INFORMATION BY | |
|---|---|
| **VISITING THE SETTLEMENT WEBSITE** | Please go to **www._____.com**, where you will find answers to common questions and other detailed information to help you. |
| **REVIEWING LEGAL DOCUMENTS** | You can review the legal documents that have been filed with the Clerk of Court in these cases at: United States Bankruptcy Court for the Southern District of New York<br><br>One Bowling Green<br><br>New York, NY 10004-1408.<br><br>You can access the Court dockets in these cases through the court documents and claims register website at http://www.motorsliquidationdocket.com/ or through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.cand.uscourts.gov. |

**PLEASE DO NOT CALL THE JUDGE OR THE COURT CLERK TO ASK QUESTIONS ABOUT THE LAWSUITS, THE SETTLEMENT, THE PROPOSED ORDER OR THIS NOTICE.**

QUESTIONS? VISIT WWW._____.COM

09-50026-mg    Doc 13493-15    Filed 09/14/15    Entered 09/14/15 18:43:58    Exhibit A    Pg 440 of 516

# <u>EXHIBIT S</u>

**ALL DEPOSITORIES, NOMINEES, BROKERS AND OTHERS:
PLEASE FACILITATE THE TRANSMISSION OF THIS NOTICE
TO ALL BENEFICIAL OWNERS.**

**NOTICE
TO HOLDERS OF**

**MOTORS LIQUIDATION COMPANY
GUC TRUST UNITS (CUSIP NO. 62010U101)[1]**

**August ___, 2017**

Reference is made to (i) the Second Amended Joint Chapter 11 Plan dated as of March 18, 2011 of Motors Liquidation Company and certain of its affiliates, which was confirmed by an order of the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered on March 29, 2011 (as so confirmed, the "Plan") and which became effective on March 31, 2011, and (ii) the Second Amended and Restated Motors Liquidation Company GUC Trust Agreement dated as of July 30, 2015 (the "GUC Trust Agreement").[2] The above-described units representing contingent beneficial interests in the GUC Trust (the "Trust Units") were issued pursuant to the terms of the Plan and the GUC Trust Agreement. Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

The Plan provides for the establishment of the Motors Liquidation Company GUC Trust (the "GUC Trust") to implement the Plan, including by distributing GUC Trust Distributable Assets (as defined in the GUC Trust Agreement) and resolving outstanding Disputed General Unsecured Claims.

As previously disclosed in the GUC Trust's public reports filed with the U.S. Securities and Exchange Commission, the GUC Trust is involved in litigations (collectively, the "Recall Litigation") concerning purported economic losses, personal injuries and/or death suffered by certain lessees and owners of vehicles (persons who have suffered such losses or injuries, regardless of whether they are currently involved in the Recall Litigation, "Potential Plaintiffs") manufactured by General Motors Corporation prior to its sale of substantially all of its assets to NGMCO, Inc., n/k/a General Motors LLC ("New GM") on July 10, 2009. Certain of the Potential Plaintiffs have filed lawsuits against New GM, filed motions seeking authority from the Bankruptcy Court to file claims against the GUC Trust, or are members of a putative class covered by those actions.

---

[1]   The CUSIP number appearing herein has been included solely for the convenience of the holders of the Trust Units. Wilmington Trust Company assumes no responsibility for the selection or use of such number and makes no representations as to the correctness of the CUSIP number appearing herein.

[2]   Information on the bankruptcy proceedings, including a copy of the Plan, can be found at: http://www.motorsliquidationdocket.com/. Information can also be found on the website maintained by the trust administrator and trustee of the Motors Liquidation Company GUC Trust at https://www.mlcguctrust.com/.

On August ____, 2017 the GUC Trust announced that it had reached an agreement (the "Proposed Agreement") with certain of the Potential Plaintiffs (the "Signatory Plaintiffs") which, if approved by the Bankruptcy Court, would result in a waiver and release of all claims that are held, or could be held, by all Potential Plaintiffs against the GUC Trust in exchange for (i) a payment by the GUC Trust of $15 million to a settlement fund to be established by the Signatory Plaintiffs (the "Settlement Fund"), and (ii) an agreement by the GUC Trust to support entry of an order (the "Claims Estimate Order") estimating the total claims of the Potential Plaintiffs in an amount that, when combined with all other general unsecured claims that were previously allowed against the GUC Trust, would equal or exceed $42 billion. If the Proposed Agreement is approved, holders of Trust Units will be deemed to provide a waiver and release of any rights they may have to the Settlement Fund and, if the Claims Estimate Order is entered, any rights they may have to additional shares of New GM common stock issued thereunder. Based on the current amount of allowed and disputed unsecured claims against Old GM, New GM's obligation to issue these additional shares would not be triggered absent Plaintiffs' claims and the holders of Trust Units would have no expectation to receive these shares. Counsel to certain holders of 65% of the Trust Units was actively involved in negotiating the Proposed Agreement.

Wilmington Trust Company, as trust administrator and trustee of the GUC Trust (in such capacity, the "GUC Trust Administrator"), hereby informs you that, on August ___, 2017, the GUC Trust filed a joint motion (the "Motion") with the Bankruptcy Court seeking, among other things, approval of the Proposed Agreement and authority to pay $15 million to the Settlement Fund. A copy of the Motion is available on the website maintained by the GUC Trust: www.mlcguctrust.com.

The Motion is currently scheduled to be heard by the Bankruptcy Court on _____, 2017 at _____ _.m. (Eastern), with an objection deadline of _____, 2017 at _____ _.m. (Eastern).[3]

Wilmington Trust Company has prepared this communication in its capacity as GUC Trust Administrator, based upon information supplied to it without independent investigation. You should not rely on Wilmington Trust Company as your sole source of information. Wilmington Trust Company makes no recommendations and gives no investment or legal advice herein, and holders of Trust Units are urged to consult with their own advisors concerning the Trust Units, the Plan and the Motion.

Should any holder of Trust Units have any questions regarding this notice, please contact Wilmington Trust Company as follows:

> Wilmington Trust Company
> Rodney Square North
> 1110 North Market Street
> Wilmington, Delaware, 19890-1615
> Phone No.: (866) 521-0079
> Fax No.: (302) 636-4140

---

[3] Please note the times and dates set forth herein are subject to change without further notice.

09-50026-mg    Doc 14089-4    Filed 09/13/17    Entered 09/13/17 18:46:54    Exhibit S -
Notice to Unitholders    Pg 4 of 4

Wilmington Trust Company may conclude that a specific response to particular inquiries from individual holders of Trust Units is not consistent with its duties to provide equal and full dissemination to all holders of Trust Units.


Very Truly Yours,


Wilmington Trust Company,
solely in its capacity as GUC Trust Administrator

# **EXHIBIT T**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
                                .   Case No. 09-50026-mg
IN RE:                          .   Chapter 11
                                .
MOTORS LIQUIDATION COMPANY,     .   (Jointly administered)
et al., f/k/a GENERAL           .
MOTORS CORP., et al,            .   One Bowling Green
                                .   New York, NY 10004
             Debtors.           .
                                .   Thursday, August 17, 2017
. . . . . . . . . . . . . . .   .   3:05 p.m.
```

TRANSCRIPT OF IN COURT CONFERENCE
(CC: DOC NOS. 14053, 14056)
BEFORE THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:              King & Spalding LLP
                             By:  ARTHUR STEINBERG, ESQ.
                                  SCOTT DAVIDSON, ESQ.
                             1185 Avenue of the Americas
                             New York, New York 10036-4003
                             (212) 556-2158


For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs:                  Brown Rudnick LLP
                             By:  EDWARD S. WEISFELNER, ESQ.
                                  HOWARD S. STEEL, ESQ.
                             7 Times Square
                             New York, New York 10036
                             (212) 209-4917



Audio Operator:              Timothy Wilson, ECRO


Transcription Company:       Access Transcripts, LLC
                             10110 Youngwood Lane
                             Fishers, IN 46038
                             (855) 873-2223
                             www.accesstranscripts.com

        Proceedings recorded by electronic sound recording,
           transcript produced by transcription service.

09-50026-mg Doc 14129-1 Filed 09/26/17 Entered 09/26/17 23:21:43 Exhibit -
Excerpts of August 17, 2017 Status Conference Pg 3 of 28

2

APPEARANCES (Continued):

For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs and states
of California and
Arizona:                    Hagens Berman Sobol Shapiro LLP
                            By:  STEVE W. BERMAN, ESQ.
                            1918 Eighth Ave.
                            Suite 3300
                            Seattle, Washington 98101
                            (206) 623-7292


For Personal Injury
Accident Plaintiffs:        Goodwin Procter LLP
                            By:  WILLIAM P. WEINTRAUB, ESQ.
                                 GREGORY FOX, ESQ.
                            The New York Times Building
                            620 Eighth Avenue
                            New York, NY 10018-1405
                            (212) 813-8839


For Participating
Unitholders:                Akin Gump Strauss Hauer & Feld LLP
                            By:  DANIEL GOLDEN, ESQ.
                            One Bryant Park
                            New York, NY 10036-6745
                            (212) 872-1000


For Certain Personal
Injury/Death Plaintiffs:    Hilliard Munoz & Gonzales LLP
                            By:  BOB HILLIARD, ESQ.
                            719 South Shoreline Boulevard #500
                            Corpus Christi, Texas  78401
                            (361) 882-1612


For Plaintiffs'
Executive Committee:        Otterbourg
                            By:  MELANIE L. CYGANOWSKI, ESQ.
                            230 Park Avenue
                            New York, NY  10169
                            (212) 905-3622

3

APPEARANCES (Continued):

For Motors Liquidation
GUC Trust:                    Gibson, Dunn & Crutcher LLP
                              By:  KEITH R. MARTORANA, ESQ.
                              200 Park Avenue
                              New York, NY 10166-0193
                              (212) 351-4000

For Additional Ignition
Switch  Pre-Closing
Accident Plaintiffs:          Andrews Myers
                              By:  LISA M. NORMAN, ESQ.
                              1885 Saint James Place, 15th Floor
                              Houston, TX  77056-4110
                              (713) 850-4200

TELEPHONIC APPEARANCES:

For Takata Plaintiffs:        Stutzman, Bromberg, Esserman & Plifka
                              By:  SANDER L. ESSERMAN, ESQ.
                              2323 Bryan Street
                              Suite 2200
                              Dallas, TX  75201-2689
                              (214) 969-4900

09-50026-mg    Doc 14129-1    Filed 09/26/17    Entered 09/26/17 23:21:43    Exhibit -
Excerpts of August 17, 2017 Status Conference    Pg 5 of 28
09-50026-mg    Doc 14139-4    Filed 09/28/17    Page 306 of Exhibit
Exhibit 26    Pg 448 of 516

4

1          (Proceedings commence at 3:05 p.m.)

2          THE COURT:  Please be seated.  We're here in <u>Motors</u>

3   <u>Liquidation Company</u>, 09-50026.  This is a status conference

4   scheduled at the request of certain parties in interest.  The

5   Court has received a flurry of letters and attachments over the

6   last few days relating to this matter.

7          Mr. Weisfelner, I'm going to ask you to start.

8          MR. WEISFELNER:  Thank you, Judge.  Your Honor, first

9   of all, welcome back from vacation.

10          THE COURT:  It's been a while, actually, but --

11          MR. WEISFELNER:  I'm assuming that like us, you

12   anticipated this status conference was going to have a

13   different tone and tenor.  In any event, Ed Weisfelner from

14   Brown Rudnick, together with my partner, Howard Steel.  Your

15   Honor, also on our side of the courtroom, William Weintraub and

16   Gregory Fox from Goodwin Procter.

17          Your Honor, we have all three co-leads from the MDL

18   who were also, in different capacities, signatories to the

19   settlement agreement or intended signatories to the settlement

20   agreement.  Steve Berman, Elizabeth Cabraser, Robert Hilliard

21   were all in transit when we heard that this hearing was going

22   to take a different turn.  Lisa Norman, I believe, is also in

23   court to round out the -- what I'll call plaintiffs' side of

24   the question, all intended signatories to the settlement

25   agreement, the drafts of which were provided to Your Honor.

ACCESS TRANSCRIPTS, LLC            ⚖            1-855-USE-ACCESS (873-2223)

5

```
 1          Your Honor, as you know, based on the announcement I
 2   made in open court way back in May, the parties, defined as
 3   everyone on this side of the table, the GUC Trust and, to a
 4   very important extent, the GUC Trust beneficiaries, some 66
 5   percent of all the beneficiaries represented by the Akin Gump
 6   firm, have been involved, frankly, since before May in
 7   discussing the contours of a potential resolution of any number
 8   of open matters that are on Your Honor's docket or could be put
 9   on Your Honor's docket, including late-filed claims, a
10   propriety of late-filed claims, and the extent to which those
11   claims could or should be allowed.
12          Your Honor, following the May announcement in court,
13   we spent many, many months of discussion among the parties.
14   And as I think Your Honor can see through the email chains that
15   we provided early this morning, no later than late July, early
16   August, there was a final deal among the parties that was
17   subject to some additional fine-tuning of the documentation.
18   And I'll get back to that in a minute, but there were lots and
19   lots of submissions that crossed between the GUC Trust and the
20   unit holders on the one hand and the plaintiffs' side on the
21   other hand, including, in particular, expert reports submitted
22   both by economic loss plaintiffs' retained experts and personal
23   injury/wrongful death retained experts as to the value of their
24   claims.
25          THE COURT:  Is the pre-closing at --
```

09-50026-mg    Doc 14139-4    Filed 09/26/17    Entered 09/26/17    Exhibit
Exhibit 7A    Pg 450 of 516

6

 1          MR. WEISFELNER:  Yes, pre-closing.

 2          THE COURT:  -- injury or death plaintiffs?

 3          MR. WEISFELNER:  Correct, Your Honor.  There were

 4  declarations from Mr. Hilliard, from Mr. Berman, from

 5  Ms. Cabraser, from Ms. Norman.  There was even a declaration

 6  that was provided by Wilmington, the GUC Trust trustee, by a

 7  woman by the name of Beth Andrews.  And again, from our

 8  perspective -- well, before I get there, we also spent a ton of

 9  time on the parties with noticed experts, in particular, with

10  the Epoch firm, trying to devise a notice procedure for this

11  settlement that would involve both direct mail notice in the

12  form of a postcard with reference to an appropriate website for

13  the longer version of the agreement, and we also worked quite

14  hard on social media and other methodologies for ensuring that

15  adequate notice went out to the world.

16          Now, Your Honor, no one on our side -- no one in the

17  world, I suspect -- thought that New GM was going to welcome

18  the development of a settlement with open arms.  We thought

19  they'd squeal.  And, in fact, they started to squeal before

20  Judge Furman this past Friday.

21          THE COURT:  Well, actually, I think at an earlier

22  hearing before me, Mr. Steinberg, when I advised that I had

23  received a telephone call from Magistrate Judge Cott about his

24  acting as a mediator, I think Mr. Steinberg, in substance,

25  indicated that New GM had not been a party to any discussions.

7

```
 1    So I was aware of that, at least as of that time if not --

 2             MR. WEISFELNER:  Certainly.  And just to be more

 3    specific, the involvement of Magistrate -- and I continuously

 4    mispronounce his name, it's Cott, I think --

 5             THE COURT:  Cott.

 6             MR. WEISFELNER:  -- Cott, really involved a

 7    down-the-road step as between plaintiffs on --

 8             THE COURT:  He mentioned that it was mentioned at

 9    allocation.

10             MR. WEISFELNER:  -- how to allocate.  That's right.

11             THE COURT:  We didn't talk any further than that

12    about it, but he advised me.

13             MR. WEISFELNER:  My point being that we heard from GM

14    as recently -- not to suggest that we didn't hear from them

15    before that, but as recently as Friday during the status

16    conference before Judge Furman in the MDL.

17             THE COURT:  Yes.  I first heard about it when I read

18    the Bankruptcy 360 report of what Judge Furman was told last

19    Friday, I guess.  When the request came for a conference this

20    week here, I wasn't told why, but I did read the Bankruptcy 360

21    report.

22             MR. WEISFELNER:  And again, you know, this side of

23    the courtroom, together with the GUC Trust, were accused of all

24    sorts of collusive bad-faith conduct, and GM announced to Judge

25    Furman it was their intent, I think, that day or soon as our
```

09-50026-mg  Doc 14129-1  Filed 09/26/17  Entered 09/26/17 23:21:43  Exhibit -
Excerpts of August 17, 2017 Status Conference    Pg 9 of 28

8

1  papers got filed with this Court to immediately seek withdrawal

2  of the reference.

3          And, Your Honor, again everyone I think anticipated

4  that New GM would take every available opportunity it had to

5  contest all or any portion of the settlement agreement when it

6  came before an appropriate court of jurisdiction, shall we say.

7  They could have raised collusion.  They could have raised

8  impropriety.  They could have raised that the estimation

9  amounts were outrageous and not supported by the evidence.

10          They didn't choose to do any of that.  They didn't

11  choose to afford anyone, including victims, their due process

12  day in court.  They instead, from what we currently understand,

13  insisted on a meeting with the GUC trustee, which happened I

14  think, if today is Thursday, apparently on Tuesday of this

15  week, a meeting to which the GUC Trust beneficiaries,

16  represented by Mr. Goldman at Akin Gump were excluded.

17          And somehow, during the course of that meeting

18  between GM and the GUC Trust, the GUC Trust purported to

19  abandon not only its fiduciary duties, but a settlement that it

20  already agreed to and to announce to us, not before 3:30

21  yesterday, that they were, quote, "taking a different tack."

22          Now, Your Honor, this is all still fresh news to us.

23  We've only had a couple of hours to consult with our clients

24  and our colleagues, but I can tell Your Honor what we currently

25  contemplate being the way forward.  We know that what's on the

09-50026-mg   Doc 14139-1   Filed 09/26/17   Entered 09/26/17 23:21:43   Exhibit -
Excerpts of August 1, 2017 Status Conference   Pg 10 of 28

09-50026-mg   Doc 14039-4   Filed 09/18/17   Page 341 of xxx
Exhibit A   Pg 453 of 516

9

1   calendar are the late claims filings, and I would ask Your

2   Honor to give us a couple of weeks to figure out how we proceed

3   on those.

4          But frankly I think there may very well need to be

5   some preliminary inquiries.  And like many in the media, it's

6   important to us that we gather the facts before we speak.  But

7   some things we could speak to immediately, and that is we

8   firmly believe that what we had with the GUC Trust was an

9   enforceable agreement under New York law, notwithstanding the

10  fact that signatures had not been appended to those agreements.

11          THE COURT:  I didn't read -- you appended to your

12  letter a unsigned copy of the agreement, and I can't say that

13  I've studied every aspect.  I did read through it this morning,

14  the --

15          MR. WEISFELNER:  Sure.  And that's absolutely true.

16  The signatures of the GUC Trust never got appended.

17  Mr. Golden, for the GUC Trust beneficiaries, indicated that

18  they were done and they would sign as soon as they got word

19  that the GUC Trust signed.  We were all in possession of

20  execution copies and ready to sign, which would have been the

21  first step before we submitted documents to you.

22          But, Your Honor, I think as you can see from the

23  email traffic, this wasn't a question of whether we had a deal.

24  This was a question of finalizing documents, and in point of

25  fact, Gibson Dunn clearly indicated they were done with all of

09-50026-mg   Doc 14139-4   Filed 09/18/17   Page 342 of Main
Exhibit A   Pg 454 of 516

10

1  the operative documents, many of them they had the proverbial

2  pin on, and that they were merely awaiting their clients' final

3  consent to the form of the documents.

4         And again, Your Honor ,I don't want to argue the

5  merits, but I firmly believe, based on everything we know and

6  everything we've researched in the relative short period of

7  time we have, that if we chose to, we could require the GUC

8  Trust to perform under the agreement they had -- we think is

9  enforceable under New York law.

10        We also believe that New GM may have liability for

11 what I'll generally refer to as tortious interference.  We are

12 told, but have no reason to know for a fact, that the GUC

13 Trust's about face was the subject of or occasioned by some

14 very direct, very serious threats issued either by New GM or

15 New GM's professionals to the GUC Trust, the administrator of

16 the GUC Trust and their professionals.

17        And, Your Honor, in an effort to understand all the

18 facts before we move any further forward, we are going to seek

19 discovery from the GUC Trust, from New GM, in terms of

20 understanding who all attended this very critical meeting this

21 week, what discussions preceded that meeting, what, if any,

22 inducements were made, what, if any, threats were extended, and

23 whether the inducements crossed the line of Title 18.

24        Your Honor, that's really all I had to tell you by

25 way of update.  We are -- devastated is the wrong word.  We are

09-50026-mg    Doc 14039-4    Filed 09/14/17    Entered 09/14/17 18:49:54    Exhibit
Exhibit A    Pg 455 of 516

*[this page is intentionally left blank]*

15

1    statements that we had been working with him --

2            THE COURT:  It just happened -- you know, as I said

3    earlier, I didn't read the proposed settlement agreement in

4    detail.  It's a very lengthy --

5            MR. MARTORANA:  It is.

6            THE COURT:  -- exhibit, but it would seem to have

7    reflected a very considerable amount of time in negotiating the

8    agreement in the various --

9            MR. MARTORANA:  It did.

10           THE COURT:  -- exhibits.  Can you tell me --

11           MR. MARTORANA:  It did.  I do not disagree with that.

12           THE COURT:  Can you tell me approximately how long

13   the negotiations were going on.

14           MR. MARTORANA:  Well, I think I would say that the

15   concept of negotiations had been going on for, I mean, probably

16   close to a year, I think.

17           THE COURT:  Well, without the concept.  These were

18   very --

19           MR. MARTORANA:  The actual true --

20           THE COURT:  Stop.  Wait until I finish my questions.

21           Attached to Mr. Weisfelner's letter as -- are various

22   exhibits, voluminous exhibits, but the settlement agreement is

23   -- and its immediate exhibits are quite voluminous.  Can you

24   tell me how long the negotiations and drafting of the actual

25   settlement documents went on for?

09-50026-mg    Doc 14139-1    Filed 09/26/17    Entered 09/26/17 23:21:43    Exhibit -
Excerpts of August 11, 2017 Status Conference    Pg 14 of 28

16

1    MR. MARTORANA:  I would say about two months I think

2    is probably accurate, but --

3    THE COURT:  And you had one meeting with New GM this

4    week that caused Wilmington Trust to abandon the settlement

5    agreement?

6    MR. MARTORANA:  We did, Your Honor.

7    THE COURT:  One meeting.  Okay.

8    MR. MARTORANA:  One meeting.  Yes, we did, Your

9    Honor.  In our view, as a fiduciary, we were initially willing

10   to go forward with the deal, with the settlement as presented.

11   Obviously it was --

12   THE COURT:  And what is it --

13   MR. MARTORANA:  -- never signed off on.

14   THE COURT:  And what is it that New GM said that

15   persuaded your client to abandon the deal that had been under

16   discussion for considerable time and negotiation of documents

17   for quite a long time?

18   MR. MARTORANA:  Well, certainly they reminded of many

19   of the things we already knew, which was the risk --

20   THE COURT:  Go ahead.  None of this is privileged, so

21   tell -- I want to hear what you have.

22   MR. MARTORANA:  Sure.  They reminded us of all the

23   risks that were associated with the proposed settlement, in

24   particular the execution risks, which I can get into if you'd

25   like.  But there were certainly numerous execution risks.

09-50026-mg    Doc 14139-1    Filed 09/26/17    Entered 09/26/17 23:31:43    Exhibit -
Excerpts of August 11 2017 Status Conference    Pg 15 of 28

Exhibit A   Pg 458 of 516

17

 1          THE COURT:  Well, there's going to be discovery, so I

 2    would like to hear now -- and it probably will inform the

 3    discovery.

 4          MR. MARTORANA:  Sure.

 5          THE COURT:  And I'm sure you'll be complete in

 6    telling me what was -- how long did the meeting last?

 7          MR. MARTORANA:  Maybe two hours --

 8          THE COURT:  Okay.

 9          MR. MARTORANA:  -- at most, I would say.

10          THE COURT:  And were documents circulated to you in

11    advance of the meeting?

12          MR. MARTORANA:  No, there were no documents

13    circulated.

14          THE COURT:  Was the decision to abandon the

15    settlement made at the meeting?

16          MR. MARTORANA:  The -- well, again, there were no

17    principals there, so there was no decision that could be made

18    at that meeting.  There was an offer that was floated, which

19    was tentative.  We followed up with our principals.  They

20    followed up with their principals.  And then, over the next day

21    or so, that proposal was boiled down to something more

22    concrete.

23          THE COURT:  And tell me what the proposals that New

24    GM made to you at the meeting.

25          MR. MARTORANA:  Well, the proposal that they made at

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

09-50026-reg    Doc 2254-5    Filed 09/14/17    Entered 09/14/17    Exhibit A    Pg 459 of 516

18

1   -- the first proposal that they made was continuing litigating

2   and we will pay your litigation costs against the plaintiffs.

3   That was the initial proposal that they made.  We ultimately

4   said, it's interesting, that sounds like something that we

5   might be able to work with, but at the end of the day, what our

6   two main concerns here are, that we're continuing a litigation

7   really for the benefit of New GM.  We feel like we've been

8   pulled into this, so obviously we're worried about spending

9   trust -- unitholder money for those purposes.

10          But then the -- a secondary or perhaps even bigger

11  issue is that at some point, probably after the term loan

12  litigation is fully and finally resolved, the GUC Trust will be

13  in a position to make a distribution to unitholders.  At this

14  point the GUC Trust cannot make a distribution to unitholders

15  until we figure out whether or not the 502(h) claim of the term

16  loan defendants is legitimate.  But at some point that will be

17  resolved, our mediation settlement or otherwise, and then we'll

18  be in a position to make a distribution.  And to the extent --

19          THE COURT:  Anybody who negotiates a settlement with

20  you better be careful because they may spend months doing it,

21  only to have you pull the rug out from under them at the last

22  hour.  You're smiling again.

23          MR. MARTORANA:  I'm sorry, I guess the question was I

24  didn't -- I don't understand --

25          THE COURT:  My comment was that anybody who

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

09-50026-mg   Doc 14069-4   Filed 09/14/17   Entered 09/14/17 18:52:54   Exhibit
Exhibit A   Pg 460 of 516

19

1   negotiates a settlement with you better be careful because you

2   may well pull the rug out from under them after months of

3   negotiation.  That was my comment as to which you had your big

4   grin on your face again.

5           MR. MARTORANA:  Well, I apologize, Your Honor.  But

6   at the end of the day, we are a fiduciary and we're going to

7   act in our fiduciary capacity.  And if that means abandoning a

8   proposal --

9           THE COURT:  And what other proposals did New GM make

10   to you that you considered in, I assume -- well, I won't ask

11   you what you recommended to your client.  What other proposals

12   did New GM make to you in the form of consideration for

13   abandoning the deal with the plaintiffs?

14           MR. MARTORANA:  Sure.  So again, getting back to the

15   point about a distribution, we said our two main concerns were

16   that we're continuing a litigation.  It's -- there's been a

17   number of costs that have been associated with that obviously.

18   It's continuing to pull down on trust assets.

19           And then the secondary aspect is that if we are in a

20   position to make a distribution and these claims continue to be

21   out there, there is no way that we're going to -- well, we

22   probably would not be able to make a distribution over the

23   existence of those claims.  And we would therefore -- currently

24   we're investing our assets -- required to invest our assets in

25   treasuries, and that is not really going to be a sufficient

09-50026-mg    Doc 14129-1    Filed 09/26/17    Entered 09/26/17 23:21:43    Exhibit -
Excerpts of August 2017 Status Conference    Pg 18 of 28

20

1    rate of return that we could otherwise get if this deal were to

2    go forward, and this deal -- the plaintiffs' deal, and if we

3    were able to get the releases that we would be hoping for under

4    that -- under the plaintiffs' deal.

5             So the offer after further discussion that was made

6    was that New GM would be potentially willing to provide us with

7    a rate of return.  We don't know what that would be.  We've

8    agreed that we would enter into good-faith negotiations to

9    determine what that rate of return would be because, among

10   other things, we don't know what the corpus of the trust will

11   be at that time.  So it's hard to come to something -- to that

12   kind of agreement today.

13            But those -- we felt that those two things,

14   particularly given the fact that we believe on the merits we

15   have very strong arguments against the late claims, on Pioneer,

16   on equitable mootness, on tolling arrangements, that this offer

17   from New GM dealt with the main concerns that we were -- that

18   we had.  And as a fiduciary, we felt that we needed to do that.

19   We felt that you don't necessarily go for -- I understand that

20   hedge funds want to go for the absolute home run at the risk of

21   $21 million and everything else out there, but we represent

22   all --

23            THE COURT:  What's the $21 million?

24            MR. MARTORANA:  So the way that the plaintiffs'

25   proposal would work is that the GUC Trust would, up front, pay

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

09-50026-mg Doc 14132-1 Filed 09/26/17 Entered 09/26/17 23:31:43 Exhibit -
Excerpts of August 11 2017 Status Conference Pg 19 of 28

09-50026-mg Doc 14093-4 Filed 09/14/17 Entered 09/14/17 18:43:40 Exhibit
Exhibit A Pg 462 of 516

21

1   $6 million for purposes of noticing.  So that would be out the

2   door before we even really get in front of Your Honor.  That

3   would just be a sunk cost for postcards.  And then it would be

4   followed by a $15 million payment and our agreement to support

5   a $10 billion claim as against New GM.  And we felt, among

6   other things, that there was a significant amount of execution

7   risk associated with that.  And, frankly, among other things,

8   that proposal, what we were really hoping to get out of it was

9   a release, get a true release from all the plaintiffs.

10          Given the fact that that proposal did not contemplate

11  and the plaintiffs would not agree to a Rule 23 settlement

12  certification, I think there's a potential execution risk

13  associated with actually accomplishing what it was that we

14  wanted to accomplish.

15          THE COURT:  Okay.  Anything else you want to tell me

16  now?

17          MR. MARTORANA:  No.  Thank you, Your Honor.

18          THE COURT:  All right.

19          Mr. Golden, I'd like to hear from you next.

20          MR. GOLDEN:  Yes.  Good afternoon, Your Honor.

21  Daniel H. Golden, Akin, Gump, Strauss, Hauer & Feld, counsel

22  for what's known as the participating unitholders.

23          Your Honor, this is really unfortunate that we find

24  ourselves in this situation where everybody now, in open court,

25  has to air their dirty laundry about a settlement that I think

09-50026-mg    Doc 14039-4    Filed 09/18/17    Page 342 Exhibit -
Exhibit A    Pg 463 of 516

22

1    was agreed to in principle.  I will say for the record I can

2    confirm the factual recitation that Mr. Weisfelner made as to

3    the facts leading up to the announcement by New GM and the GUC

4    Trust of their -- of GUC Trust's disavowal of that settlement

5    agreement and their intention to enter into a purported new

6    agreement with New GM.

7            Your Honor, I think it's clear something very odd is

8    going on here.  We worked arm in arm, shoulder to shoulder,

9    with the GUC Trust, Wilmington Trust as the trustee and the

10   trust administrator, and with its counsel, Gibson Dunn, over

11   several months to negotiate and document a settlement.  We had

12   many, many, many conversations, drafting sessions, redrafting

13   sessions to get to a point where we were, as of last Friday, to

14   get to a settlement, a global settlement as between the

15   plaintiff class, the GUC Trust, and the unitholders.

16           So let's talk a minute about who we represent.  We

17   represent 65 percent of the unitholders.  That is the

18   shareholders of the trust.  They are the only beneficiaries of

19   the trust should the reserves be freed up.  That's the reserves

20   of the 4- or 500 million that Mr. Weisfelner referred to, and

21   we represent 65 percent.

22           Look, I've worked really closely with the Gibson Dunn

23   lawyers.  I like them.  But to hear them talk about that they

24   have fiduciary duties, yes, they do.  Wilmington Trust has

25   fiduciary duties.  They have fiduciary duties to my clients.

09-50026-mg    Doc 14089-4    Filed 09/14/17    Entered 09/14/17 18:49:42    Exhibit
Exhibit A    Pg 464 of 516

23

1  Now, we don't represent all of the unitholders, but everyone

2  who has raised their hand and said, "I'm here and I want to get

3  involved," we represent them.

4       We worked really hard to get to this global

5  settlement, which would have had the benefit or the result of

6  eliminating all the late-claim litigation and all the

7  underlying allowance of those claims.  We think that that's a

8  settlement that this Court would have welcomed.  And that's

9  why, in part, we worked so hard to get there.  But in a blink,

10  in really literally a blink, without any conversation to the

11  unitholders or their counsel, without any invitation by Gibson

12  Dunn or Wilmington Trust to say, we've met with GM, they have

13  an alternative proposal on the table, we'd like to get your

14  views on it.

15       We certainly shared views with them for months and

16  months, but when it came to the point where they were willing

17  to disavow that settlement and consider a new settlement which

18  does not work for the participating unitholders, we sent a

19  letter to Your Honor this morning so that there's no mistake.

20  All of the unitholders we represent will not and do not support

21  the proposed settlement with GM.

22       So you have to ask the question, what is Wilmington

23  Trust thinking about when they want to go forward with a

24  settlement that has the disapproval of every fiduciary that it

25  represents who's weighed in on the subject?  Now, I'm not

1    saying that Wilmington Trust, who as an institution we worked

2    with for years.  Frankly, I'm just surprised we find ourselves

3    in this situation given our prior relationship and experience

4    with Wilmington Trust.  But what are they thinking about going

5    forward with a settlement over what will be active opposition

6    by the unitholders?  Something --

7            THE COURT:  Well, active opposition by New GM to the

8    proposed settlement that was --

9            MR. GOLDEN:  That's right.

10           THE COURT:  I mean, one way or the other, there's

11   going to be active opposition.

12           MR. GOLDEN:  That's absolutely right.  But the one

13   difference is the trust has no fiduciary obligations to New GM.

14   They do have fiduciary obligations to our client.  And I

15   confirm or reaffirm what Mr. Weisfelner said, that we did

16   expect active opposition from New GM.  We've had active

17   opposition from New GM almost throughout the inception of these

18   matters, so that's not a total surprise.  But what is

19   shockingly surprising to us is what was the motivation, what

20   was the rationale, what happened at that two-hour meeting to

21   have this absolute sea change.

22           Now, look, everybody's imagination can run wild.

23   Were there threats?  Were there inducements?  But there was

24   something there that caused, in two hours, for Wilmington Trust

25   and its counsel just to disavow five months of hard work, and

09-50026-mg Doc 14129-1 Filed 09/26/17 Entered 09/26/17 23:31:43 Exhibit -
Excerpts of August 11, 2017 Status Conference Pg 23 of 28

09-50026-mg Doc 14093-26 Filed 09/14/17 Entered 09/14/17 18:42:34 Exhibit -
Exhibit A Pg 466 of 516

25

1  we intend to find out what it is.  It's odd to us that we had

2  been originally -- when I said "we," the participating holders,

3  through their counsel, had been invited to the meeting that GM

4  had scheduled with Wilmington Trust, and then promptly

5  disinvited.

6           THE COURT:  Who disinvited you?

7           MR. GOLDEN:  We were advised by counsel for

8  Wilmington Trust that we were not -- we were no longer invited

9  to it.  I didn't question them.  I accepted that at face value.

10 I don't know who demanded it, but that's where the

11 communication came from.

12          Your Honor, I don't want to make this situation

13 worse.  We intend, to the best of our ability, still to work

14 with our trustee.  But if we can't, then we're going to

15 consider our alternatives, and that is not a threat, but it

16 just -- it's a recognition of the reality of the situation that

17 we find ourselves in.

18          This case, this overhang of the plaintiffs' claim,

19 have held this trust in abeyance for a very long time.  The

20 goal of this settlement was to, once and for all, be done with

21 the plaintiffs, get an absolute, full-bore release from the

22 plaintiffs in exchange for us doing the $6 million of noticing

23 costs -- and I'll come back to that in a second -- and a

24 $15 million payment.  Part and parcel of that overall

25 settlement agreement, but not interdependent upon getting the

09-50026-mg    Doc 14139-4    Filed 09/14/17    Entered 09/14/17 18:48:42    Exhibit A    Pg 467 of 516

26

1  release, was the agreement of the GUC Trust, supported by the

2  participating holders, to estimate the totality of the

3  plaintiffs' claims at somewhere around $10 billion, which would

4  have the effect of triggering what's known as the accordion

5  shares.  I know that's the part that GM doesn't like.  But they

6  would have every opportunity to object to that estimated

7  settlement of $10 billion.  We weren't looking to deprive them

8  of their ability to do that.

9          This conference, because Your Honor remarked that it

10  wasn't originally made clear to Your Honor what the purpose of

11  this conference was, was to preview that settlement proposal

12  with you.  We were certainly going to invite New GM, and we

13  thought it would be professionally courteous of us to advise

14  New GM in advance of the terms of our proposed settlement,

15  which Mr. Weisfelner and I did in a telephone call with

16  Mr. Steinberg and a partner whose name I forget at Kirkland and

17  Ellis last Wednesday.

18          Well, what did they do with that courtesy?  They

19  turned around, without any notice to us, and complained to

20  Judge Furman.  Why Judge Furman?  I'm not sure.  These matters

21  aren't before Judge Furman.  This settlement certainly wasn't

22  going to be before Judge Furman.  But it was their attempt, I

23  surmise, to attempt to start to poison the well.  Well, I was

24  very glad that Judge Furman's reaction was, take that up with

25  the bankruptcy court.

09-50026-mg   Doc 14139-1   Filed 09/26/17   Entered 09/26/17 22:21:43   Exhibit -
Excerpts of August 11 2017 Status Conference   Pg 25 of 28

09-50026-mg   Doc 14039-4   Filed 09/14/17   Page 34 6 exhibit -
Exhibit A   Pg 468 of 516

```
 1              THE COURT:  I should say I -- whenever I've had a
 2   conversation with Judge Furman, I've disclosed that I have.
 3   And I had a brief telephone conversation with Judge Furman on
 4   Tuesday morning.  He left a voicemail for me on Monday evening
 5   and I -- we spoke on Tuesday.  I -- he wanted me to be -- he
 6   wanted to be sure that I knew that there had been a
 7   presentation before him, or statements before him, that a
 8   settlement had been reached.  I told him that I read the
 9   Bankruptcy 360 report about it.  I told him that there had been
10   a request for a conference here, I had scheduled it, I hadn't
11   been informed at the time what the conference was about, but I
12   had scheduled it.  And that was the substance of the phone
13   conversation that I had with Judge Furman.
14              So I've tried to make a point, whenever he and I have
15   spoken, I've put it on the record.  We do not talk about the
16   merits of anything, but we informed --
17              MR. GOLDEN:  So --
18              THE COURT:  -- each other of procedural posture of
19   things.
20              MR. GOLDEN:  So continuing, we had had the
21   conversation with Mr. Steinberg and his colleague.  The purpose
22   of scheduling a status conference with you, Your Honor, was to
23   preview the settlement, not to argue the merits, but really to
24   preview the noticing procedures that we intend to follow
25   because this settlement contemplated a global release from all
```

09-50026-mg    Doc 14129-1    Filed 09/26/17    Entered 09/26/17 23:21:43    Exhibit -
09-50026-reg    Doc 14039-4    Filed 09/13/17    Page 342 of Main
Exhibit A    Pg 469 of 516
Excerpts of August 1, 2017 Status Conference    Pg 26 of 28

28

1  the claims.  And we were going to do -- when I say "we," the

2  GUC Trust was going to do and spend $6 million on noticing to

3  make sure the plaintiffs -- something that Old GM never really

4  got around to doing, and that's why we find ourselves in this

5  mess.  But we were going to give direct notice to every party

6  who was the subject of a recall notice, so that's over

7  12 million parties, as well as notice to every party who has

8  started a lawsuit against Old GM/New GM based upon a presale

9  accident claim, so that nobody could complain this time that

10 the world has been put on notice as to the proposed settlement.

11        But we wanted to get a sense from Your Honor before

12 we went out and spent $6 million whether Your Honor thought

13 that would be an appropriate scope of notice.  That's all we

14 had originally intended to do at the status conference.  Well,

15 obviously events and facts have overtaken it, and we are where

16 we are.

17        Again, I'm here representing economic players.

18 They're not looking to go for the home run, as Mr. Martorana

19 said.  What they're looking for is peace in the valley.  They

20 want to get rid of the plaintiffs' claims and the plaintiffs'

21 claims against the trust for all time so that when the

22 avoidance action is settled or finally resolved, a final

23 distribution could be made.

24        THE COURT:  What's the face amount of the

25 approximately 65 percent of the unitholders -- of the claims of

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

09-53826-mg    Doc 14129-1    Filed 09/26/17    Entered 09/26/17 23:21:43    Exhibit -
Excerpts of August 11, 2017 Status Conference    Pg 27 of 28

29

1  the unitholders you represent?

2          MR. GOLDEN:  So it's not in dollar amount; it's

3  number of units.

4          THE COURT:  Units.

5          MR. GOLDEN:  Can I confer with my colleagues?

6          THE COURT:  Yeah, go ahead, sure.

7      (Counsel confer)

8          MR. GOLDEN:  It's 21 million units out of

9  approximately 31 million units.

10          THE COURT:  Okay.  All right.  Thank you, Mr. Golden.

11          MR. GOLDEN:  Thank you, Your Honor.

12          THE COURT:  Mr. Steinberg.

13          MR. STEINBERG:  Your Honor, Arthur Steinberg from

14  King & Spalding on behalf of New GM.

15          Mr. Weisfelner, in his presentation, said that he did

16  not want to speak prematurely until he gathered the facts, and

17  then he proceeded to speculate as to what the facts may be.

18  And there's a temptation that I have to be able to try to

19  respond to each and every time that he misstated what happened.

20  However --

21          THE COURT:  Let me say first, I thought your letter

22  to the Court was intemperate and inappropriate.  You could have

23  raised the issues that you raised.  So I know that there's very

24  strong feelings on -- there's more than two sides here -- on

25  all sides, but I didn't appreciate the tone of your letter.

09-50026-mg    Doc 14128-1    Filed 09/26/17    Entered 09/26/17 23:21:43    Exhibit -
Excerpts of August 17, 2017 Status Conference    Pg 28 of 28

09-50026-reg    Doc 3249-4    Filed 09/14/17    Entered 09/14/17 18:43:34    Exhibit -
Exhibit A    Pg 471 of 516

49

1           **C E R T I F I C A T I O N**

2

3           I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9

10

11   ALICIA JARRETT, AAERT NO. 428      DATE:  August 20, 2017

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25



# Exhibit 5

09-50026-reg  Doc 2968-2  Filed 07/05/09  Entered 07/05/09 23:21:23  Exhibit MSPA
Pg 473 of 516

**EXECUTION COPY**

AMENDED AND RESTATED

MASTER SALE AND PURCHASE AGREEMENT

BY AND AMONG

GENERAL MOTORS CORPORATION,

SATURN LLC,

SATURN DISTRIBUTION CORPORATION

AND

CHEVROLET-SATURN OF HARLEM, INC.,

*as Sellers*

AND

NGMCO, INC.,

*as Purchaser*

DATED AS OF

JUNE 26, 2009

(a)    The purchase price (the "Purchase Price") shall be equal to the sum of:

(i)    a Bankruptcy Code Section 363(k) credit bid in an amount equal to:  (A) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing pursuant to the UST Credit Facilities, and (B) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing under the DIP Facility, less $8,247,488,605 of Indebtedness under the DIP Facility (such amount, the "UST Credit Bid Amount");

(ii)    the UST Warrant (which the Parties agree has a value of no less than $1,000);

(iii)    the valid issuance by Purchaser to Parent of (A) 50,000,000 shares of Common Stock (collectively, the "Parent Shares") and (B) the Parent Warrants; and

(iv)    the assumption by Purchaser or its designated Subsidiaries of the Assumed Liabilities.

For the avoidance of doubt, immediately following the Closing, the only indebtedness for borrowed money (or any guarantees thereof) of Sellers and their Subsidiaries to Sponsor, Canada and Export Development Canada is amounts under the Wind Down Facility.

(r)    **Section 3.2(c)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(c)

(i)    Sellers may, at any time, seek an Order of the Bankruptcy Court (the "Claims Estimate Order"), which Order may be the Order confirming Sellers' Chapter 11 plan, estimating the aggregate allowed general unsecured claims against Sellers' estates. If in the Claims Estimate Order, the Bankruptcy Court makes a finding that the estimated aggregate allowed general unsecured claims against Sellers' estates exceed $35,000,000,000, then Purchaser will, within five (5) Business Days of entry of the Claims Estimate Order, issue additional shares of Common Stock (the "Adjustment Shares") to Parent, as an adjustment to the Purchase Price, based on the extent by which such estimated aggregate general unsecured claims exceed $35,000,000,000 (such amount, the "Excess Estimated Unsecured Claim Amount;" in the event this amount exceeds $7,000,000,000 the Excess Estimated Unsecured Claim Amount will be reduced to a cap of $7,000,000,000).  The number of Adjustment Shares to be issued will be equal to the number of shares, rounded up to the next whole share, calculated by multiplying (i) 10,000,000 shares of Common Stock (adjusted to take into account any stock dividend, stock split, combination of shares, recapitalization, merger, consolidation, reorganization or similar transaction with respect to the

Common Stock, effected from and after the Closing and before issuance of the Adjustment Shares) and (ii) a fraction, (A) the numerator of which is Excess Estimated Unsecured Claim Amount (capped at $7,000,000,000) and (B) the denominator of which is $7,000,000,000.

(ii)    At the Closing, Purchaser will have authorized and, thereafter, will reserve for issuance the maximum number of shares of Common Stock issuable as Adjustment Shares.

(s)    **Section 6.9(b)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(b)    Sellers shall use reasonable best efforts to agree with Sponsor on the terms of a restructuring of $1,175,000,000 of Indebtedness accrued under the DIP Facility (as restructured, the "Wind Down Facility") to provide for such Wind Down Facility to be non-recourse, to accrue payment-in-kind interest at the Eurodollar Rate (as defined in the Wind-Down Facility) plus 300 basis points, to be secured by all assets of Sellers (other than the Parent Shares, Adjustment Shares, Parent Warrants and any securities or proceeds received in respect thereof). Sellers shall use reasonable best efforts to enter into definitive financing agreements with respect to the Wind Down Facility so that such agreements are in effect as promptly as practicable but in any event no later than the Closing.

(t)    **Section 6.17(e)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(e)    *Assumption of Certain Parent Employee Benefit Plans and Policies*. As of the Closing Date, Purchaser or one of its Affiliates shall assume (i) the Parent Employee Benefit Plans and Policies set forth on Section 6.17(e) of the Sellers' Disclosure Schedule as modified thereon, and all assets, trusts, insurance policies and other Contracts relating thereto, except for any that do not comply in all respects with TARP or as otherwise provided in **Section 6.17(h)** and (ii) all employee benefit plans, programs, policies, agreements or arrangements (whether written or oral) in which Employees who are covered by the UAW Collective Bargaining Agreement participate and all assets, trusts, insurance and other Contracts relating thereto (collectively, the "Assumed Plans"), and Sellers and Purchaser shall cooperate with each other to take all actions and execute and deliver all documents and furnish all notices necessary to establish Purchaser or one of its Affiliates as the sponsor of such Assumed Plans including all assets, trusts, insurance policies and other Contracts relating thereto. Other than with respect to any Employee who was or is covered by the UAW Collective Bargaining Agreement, Purchaser shall have no Liability with respect to any modifications or changes to Benefit Plans contemplated by Section 6.17(e) of the Sellers' Disclosure Schedule, or changes made by Parent prior to the Closing Date, and Purchaser shall not assume any Liability with respect to any such decisions or actions related thereto, and Purchaser shall only assume the Liabilities for benefits provided pursuant to the written terms and conditions of

# Exhibit 6

09-50026-reg    Doc 14024-3    Filed 09/26/17    Entered 09/26/17 23:21:43    Main Document
Pg 477 of 516

**OBJECTION DEADLINE: TO BE DETERMINED**
**HEARING DATE AND TIME: TO BE DETERMINED**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                                          :
In re:                                                    :          Chapter 11
MOTORS LIQUIDATION COMPANY, et al.,                       :          Case No.: 09-50026 (MG)
        f/k/a General Motors Corp., et al.,               :
                                                          :
                                 Debtors.                 :          (Jointly Administered)
------------------------------------------------------------X


**MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**
**BY AND AMONG THE SIGNATORY PLAINTIFFS AND THE GUC TRUST**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

JURISDICTION .................................................................................................... 2

THE RELEVANT FACTUAL BACKGROUND ....................................................... 3

I.      The Parties Reached Agreement On All Material Terms ................................. 3

II.     The Negotiation Process Was Lengthy And Culminated In A Detailed And
        Complete Agreement That Was Embodied In Many Documents That
        Were Finalized .............................................................................................. 4

III.    The GUC Trust Inexplicably Abandoned The Agreement Without
        Justification .................................................................................................. 9

RELIEF REQUESTED........................................................................................... 11

ARGUMENT ....................................................................................................... 11

I.      The Settlement Is Enforceable ...................................................................... 11

        A.    The GUC Trust Manifested Acceptance Of The Settlement. ............... 13

        B.    The Parties Reached Agreement On All Material Terms And
              Conditions. ..................................................................................... 15

        C.    The GUC Trust Did Not Express A Reservation Of A Right Not
              To Be Bound. .................................................................................. 17

        D.    There Was Partial Performance. ....................................................... 19

        E.    The Agreement Was Committed To Writing....................................... 20

        F.    Court Have Enforced Agreements In Similar Circumstances. ............. 20

II.     There Is No Basis To Invalidate The Settlement After-The-Fact.................... 24

CONCLUSION..................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aharoni v. Meer (In re Actrade Fin. Techs. Ltd.)*,
    Nos. 09 Civ. 4479 (RMB), 09 Civ. 4480 (RMB) (S.D.N.Y. Jan. 25, 2010)..........................25

*Alvarez v. City of New York*,
    146 F. Supp. 2d 327 (S.D.N.Y. 2001) ..........................................................................16

*Americu Credit Union v. Cumis Ins. Soc'y, Inc.*,
    Civ. A. No. 6:06-CV-1348 (DEP), 2008 WL 3930122 (N.D.N.Y. Aug. 21,
    2008) ..........................................................................................................................12

*Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*,
    447 F. Supp. 2d 329 (S.D.N.Y. 2006)...........................................................................13

*Conway v. Brooklyn Union Gas Co.*,
    236 F. Supp. 2d 241 (E.D.N.Y. 2002) ......................................................................15, 20

*Delyanis v. Dyna-Empire, Inc.*,
    465 F. Supp. 2d 170 (E.D.N.Y. 2006) ............................................................... *passim*

*Ehrheart v. Verizon Wireless*,
    609 F.3d 590 (3d Cir. 2010)........................................................................................24

*Forcelli v. Gelco Corp.*,
    972 N.Y.S.2d 570 (N.Y. App. Div. 2013) ...................................................................12, 13

*Gaglia v. Nash*,
    778 N.Y.S.2d 595 (N.Y. App. Div. 2004) ......................................................................14

*Galanis v. The Harmonie Club of the City of New York*,
    No. 1:13-cv-4344-GHW, 2014 WL 4928962 (S.D.N.Y. Oct. 2, 2014)...............................20

*The Guardian Life Ins. Co. of Am. v. Calkins*,
    No. 12 Civ. 8863 (JGK), 2014 WL 61475 (S.D.N.Y. Jan. 6, 2014)................................15, 19

*In re Johns-Manville Corp.*,
    440 B.R. 604 (Bankr. S.D.N.Y. 2010)..........................................................................24

*Kowalchuk v. Stroup*,
    61 A.D.3d 118 (N.Y. App. Div. 2009) ............................................................... *passim*

*In re Lehman Bros. Holdings Inc.*,
    No. 17 Civ. 03424 (DLC), 2017 WL 3278933 (S.D.N.Y. Aug. 2, 2017) ...................... *passim*

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Liberty Towers Realty, LLC v. Richmond Liberty, LLC*,
    569 B.R. 534 (E.D.N.Y. 2017) .......................................................................24, 25

*Lopez v. Podgurski*,
    959 N.Y.S.2d 396 (N.Y. Cty. Ct. 2013)...................................................................24

*Meetings & Expositions, Inc. v. Tandy Corp.*,
    490 F.2d 714 (2d Cir. 1974)...........................................................................11, 13

*Myers v. Martin (In re Martin)*,
    91 F.3d 389 (3d Cir. 1996)......................................................................................25

*Oparah v. New York City Dep't of Educ.*,
    No. 12 CV 8347 (JGK) (SN), 2015 WL 4240733 (S.D.N.Y. July 10, 2015).........12

*Powell v. Omnicon*,
    497 F.3d 124 (2d Cir. 2007).......................................................................13, 19, 24

*Providers Benefit Life Ins. Co. v. Tidewater Grp., Inc. (In re Tidewater Grp., Inc.)*,
    8 B.R. 930 (Bankr. N.D. Ga. 1981) .......................................................................25

*Rohm & Haas Elec. Materials, LLC v. Honeywell Int'l*,
    C.A. No. 06-297-GMS, 2009 WL 1033651 (D. Del. Apr. 16, 2009) ...............22, 23

*Shabtai v. Honeywell, Inc.*,
    No. 94 Civ. 0524 (KMW) (RLE), 1998 WL 823617 (S.D.N.Y. Nov. 25, 1998) ...................11

*Stonehill Capital Mgmt. LLC v. Bank of the W.*,
    28 N.Y.3d 439 (N.Y. 2016) ............................................................................12, 17, 18

*Winston v. Mediafare Entm't Corp.*,
    777 F.2d 78 (2d Cir. 1985)........................................................................... *passim*

*Wronka v. GEM Cmty. Mgmt.*,
    854 N.Y.S.2d 474 (N.Y. App. Div. 2008) ..............................................................15

**Rule and Statutes**

28 U.S.C. § 157............................................................................................................2, 3

28 U.S.C. § 1334.............................................................................................................2

Fed. R. Bankr. P. 9019.......................................................................................11, 24, 25

## TABLE OF AUTHORITIES
### (continued)

Page(s)

N.Y. C.P.L.R. 2104 .............................................................................................................13

### Other Authorities

Brenda Pierson, *GM Blasts $1 Billion Deal Between Ignition Switch Plaintiffs,
    Creditor Trust*, REUTERS, https://www.reuters.com/article/us-gm-ignition/gm-
    blasts-1-billion-deal-between-ignition-switch-plaintiffs-creditor-trust-
    idUSKBN1AR23Q (Aug. 11, 2017) (last viewed on Sept. 1, 2017) ........................................6

Erik Larson, *GM Accuses Bankruptcy Trust of Secret $1 Billion Stock Plot*,
    BLOOMBERG, https://www.bloomberg.com/news/articles/2017-08-11/old-gm-
    settlement-plan-sets-up-court-fight-with-successor (Aug. 11, 2017) (last
    viewed on Sept. 1, 2017) ..................................................................................................6, 7

*Faulty Ignition Switches*, THE STREET.COM,
    https://www.thestreet.com/story/14268879/1/gm-criticizes-1-billion-
    settlement-related-to-faulty-ignition-switches.html (Aug. 11, 2017) (last
    viewed Sept. 1, 2017) .............................................................................................................7

Mark Colias and Mike Spector, *Lawyers Seek Another $1 Billion From General
    Motors Over Ignition Switch Defect*, WALL STREET JOURNAL,
    https://www.wsj.com/articles/lawyers-seek-another-1-billion-from-general-
    motors-over-ignition-switch-defect-1502476402 (Aug. 11, 2017) (last viewed
    on Aug. 28, 2017) ...................................................................................................................7

The Ignition Switch Plaintiffs,[1] certain Non-Ignition Switch Plaintiffs,[2] and certain Pre-Closing Accident Plaintiffs[3] (collectively, the "**Signatory Plaintiffs**") hereby submit this *Motion to Enforce the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust* (the "**Motion**").[4]  In support of the Motion, the Signatory Plaintiffs rely on the *Declaration of Edward S. Weisfelner in Support of the Motion to Enforce the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust* filed contemporaneously herewith (the "**Decl.**").  In further support of this Motion, the Signatory Plaintiffs respectfully state as follows:

## INTRODUCTION

1.    The Signatory Plaintiffs and the GUC Trust[5] dedicated significant time, care and resources negotiating, drafting, and ultimately finalizing a settlement agreement (the "**Settlement**") between them.

2.    The Settlement is a fair and efficient resolution of complex and protracted litigation that has engendered years of uncertainty and risk for a number of stakeholders, and illustrates exactly why there is a strong judicial policy in favor of settlements.

3.    Notwithstanding the beneficial and final nature of the Settlement, after a brief, clandestine meeting with New GM, the GUC Trust sought to revoke the Settlement mere hours

---

[1]  The term "**Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 (the "**Ignition Switch Defect**").

[2]  The term "**Non-Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540, 14V-118 and 14V-153.

[3]  The term "**Pre-Closing Accident Plaintiffs**" shall mean those plaintiffs asserting personal injury or wrongful death claims or persons who suffered a personal injury or wrongful death arising from an accident involving an Old GM vehicle that occurred prior to the closing of the Section 363 Sale.  Collectively, the Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Pre-Closing Accident Plaintiffs are the "**Plaintiffs**."

[4]  Except where otherwise indicated, references to "ECF No. _" are to docket entries in the Bankruptcy Court proceedings: *In re Motors Liquidation Co.*, Bankr. Case No. 09-50026 (MG).

[5]  The term "**GUC Trust**" refers to the Motors Liquidation Company GUC Trust.

before its presentation to the Bankruptcy Court.[6]   Neither the equities nor the law provide

support for the GUC Trust's last-minute attempt to withdraw from its obligations under the

Settlement.  ***Rather, New York law enforces settlement agreements where, as here, the parties***

***agree on all materials terms and the facts and circumstances indicate mutual assent.***

4.     Any argument by the GUC Trust that the Settlement is not final because it was

not signed is without merit.  Under New York law, a settlement agreement does not need to be

signed to be enforceable.   Courts routinely enforce settlement agreements with far fewer

objective indicia of finality than this one.   Even in the context of oral agreements, which

typically involve far more limited negotiation and introduce the prospect of far less certainty

over material terms, a court will enforce a settlement under circumstances similar to those here.

5.     Here, the completed, detailed, heavily pored-over, and exhaustively edited

agreement was signed-off on by the GUC Trust no later than August 12, 2017, and agreement on

the material terms existed well before that.  It is undisputed that the parties took steps to present

the Settlement to this Court for judicial approval and shared it with New GM as a courtesy,

underscoring that the Settlement was no longer merely a draft.  It was final.

6.     The Signatory Plaintiffs thus respectfully request that the Court enforce the

Settlement Agreement based on the Declaration of Edward S. Weisfelner and the documents

attached thereto, given that objective material facts are undisputed or undisputable.

## JURISDICTION

7.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and

1334.  The parties have agreed and consented to the jurisdiction of this Court to resolve disputes

---

[6]   Whatever occurred at the short meeting between New GM and the GUC Trust to cause the latter to breach the
Settlement Agreement (which expedited discovery will reveal), it does not satisfy the standards for revocation of the
Settlement.  *See, e.g.*, Decl. Ex. T at 16:22-23 and 17:9 (GUC Trust counsel stating the meeting was two hours "at
most," apparently consisting in good part of New GM reciting risks that the GUC Trust concedes it "already knew").

related to the Settlement Agreement, which is governed by New York law.  This is a core
proceeding within the meaning of 28 U.S.C. § 157(b).

## THE RELEVANT FACTUAL BACKGROUND

**I.**     **The Parties Reached Agreement On All Material Terms.**[7]

8.     The Settlement Agreement provides for the GUC Trust to pay Plaintiffs $15
million (the "**Settlement Amount**") and cover up to $6 million of the cost of providing extensive
notice of the Settlement to Plaintiffs and other affected parties.  Following an independent
analysis of expert reports and proffers of evidence regarding the nature and value of Plaintiffs'
asserted claims against the Old GM estate and/or GUC Trust, the GUC Trust agreed to support
entry of an order (the "**Claims Estimate Order**") estimating Plaintiffs' claims in an amount
necessary to trigger New GM's obligation to issue the maximum amount of additional shares of
New GM common stock (the "**Adjustment Shares**") under the terms of the Sale Agreement.[8]
These shares and the Settlement Amount would be placed in a fund for the benefit of Plaintiffs.[9]

9.     In exchange, if the Settlement is approved by the Bankruptcy Court, Plaintiffs will
be deemed to waive and release any rights or claims against the GUC Trust, the Wilmington
Trust Company as Administrator and Trustee of the GUC Trust, the Motors Liquidation
Company Avoidance Action Trust, and the holders of beneficial units in the GUC Trust (the
"**Unitholders**"), including a release of any rights to past or present GUC Trust Assets.  This

---

[7] This summary of the Settlement Agreement is qualified in its entirety by the terms and provisions of the
Settlement Agreement attached to the Decl. as Ex. H.  To the extent that there are any inconsistencies between the
description of the Settlement Agreement contained in the Motion and the terms and provisions of the Settlement
Agreement, the Settlement Agreement shall control.

[8] Section 3.2(c) of the Amended Master Sale and Purchase Agreement requires New GM to issue 30 million
Adjustment Shares—the maximum amount—if the Bankruptcy Court enters a Claims Estimate Order estimating the
aggregate allowed general unsecured claims against the Old GM estate at or exceeding $42 billion.

[9] The Settlement provides that the Signatory Plaintiffs will subsequently determine the allocation of the value of
the Settlement Amount and the Adjustment Shares between economic loss claims and personal injury/wrongful
death claims and the eligibility and criteria for payment, subject to notice and an opportunity for Plaintiffs to be
heard.

release is binding regardless of whether the Claims Estimate Order is entered.

10.     Before any release would be imposed, the parties agreed to provide extensive notice pursuant to procedures to be approved by the Court.  The contemplated notice procedures included notice of the Settlement by postcard to: (A) all persons in the United States who, as of July 10, 2009, owned or leased a defective vehicle manufactured by Old GM included in the recalls at issue in the Settlement; and (B) all Pre-Closing Accident Plaintiffs who have filed a lawsuit against New GM or filed or joined a motion for authority to file late claims against the GUC Trust, as of the date of the Settlement Agreement.  This actual notice to Plaintiffs would be supplemented by paid media, including digital banner advertisements, sponsored search listings, a press release, and a settlement website.

11.     As the parties describe it in the motion to approve the Settlement, the mutually-beneficial Settlement eliminates litigation uncertainty around the pending motions seeking authority to file late claims (the "**Late Claims Motions**"),[10] protects against the risk of claw-backs of past distributions of GUC Trust Assets, eliminates delay in the wind-down process and distribution of GUC Trust Assets, and "provides a streamlined process for allowing Plaintiffs' claims and provid[es] a source of recovery from the Settlement Amount and the Adjustment Shares."  Decl. Ex. K ¶¶ 5, 7-8.

## II.     The Negotiation Process Was Lengthy And Culminated In A Detailed And Complete Agreement That Was Embodied In Many Documents That Were Finalized.

12.     The parties began their negotiation over the Settlement in earnest in June 2017,

---

[10]  The Late Claims Motions include the *Motion for an Order Granting Authority to File Late Class Proofs of Claims*, dated Dec. 22, 2016 [ECF No. 13806] and any joinders thereto; the *Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Dec. 22, 2016 [ECF No. 13807] and any joinders thereto; and the *Motion by Additional Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated July 28, 2017 [ECF No. 14018].

09-50026-reg   Doc 14092-3   Filed 09/26/17   Entered 09/26/17 23:41:43   Main Document
Exhibit A   Pg 10 of 92

exchanged numerous red-lined drafts during June, and reached agreement on certain core terms by the beginning of July, during which time they worked toward finalization.  *See* Decl. ¶ 4.

13.     Well before those negotiations began in earnest, the GUC Trust had raised concerns about proceeding to seek approval of any agreement in the Bankruptcy Court without certifying a settlement class.  *See id.* ¶ 3.  Certain Signatory Plaintiffs took the position that such certification was not necessary, and made this position known to the GUC Trust and Participating Unitholders.  *See id.*  The GUC Trust and Participating Unitholders both continued to negotiate the Settlement despite knowing and ultimately conceding this position.  *See id.*

14.     By the beginning of August, the documents were in substantially final form.  *See id.* ¶ 5.  As early as August 3, counsel for the GUC Trust characterized any remaining issues as "minor" or "clean-up."  *See id.*; Decl. Ex. A.

15.     The final Settlement documents negotiated by all parties, down to precise wording and phrasing, included:

- a 20-page Settlement Agreement, Decl. Ex. H;

- a Settlement Order, Decl. Ex. I;

- a Claims Estimate Order, Decl. Ex. J;

- a fully composed, 30-page motion to approve the Settlement and estimate the aggregate allowed general unsecured claims against the Old GM estate pursuant to Bankruptcy Rule 9019, Decl. Ex. K;

- four supporting declarations from Wilmington Trust Company, as administrator of the GUC Trust, and counsel to the parties, Decl. Exs. L-O;

- a fully composed Notice Procedures Motion, Decl. Ex. P;

- short- and long-form notices to Plaintiffs, and notice to Unitholders, Decl. Exs. Q-S; and

- a finalized declaration from the notice provider setting forth a comprehensive multi-million-dollar notice plan that included mailed notice, paid media, internet-sponsored search listings, and press releases, Decl. Ex. B.

16.    With the full knowledge and consent of the GUC Trust, on August 9, 2017, bankruptcy counsel for the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs and counsel for the holders of approximately 65% of the GUC Trust Units outstanding (the "**Participating Unitholders**") called New GM's counsel to inform New GM of the plan to present the Settlement to this Court and that they were seeking a Claims Estimate Order, and determine New GM's availability for such a conference. *See* Decl. ¶ 7.  By August 14, 2017, the parties had secured a conference with this Court for August 17, 2017.  *See id.*

17.    In response to the MDL Court's request for a report on settlement activity as a regular item on the Status Conference agenda, on August 11, 2017, Steve Berman, counsel for certain Signatory Plaintiffs, informed Judge Furman during a status conference in the MDL that "we plan on presenting papers in the bankruptcy court next week, perhaps as early as Tuesday, that would ask the bankruptcy court to issue a claims estimation order pursuant to the sale agreement."  Decl. Ex. C at 37:13-17.  He further stated, "we're going to ask the bankruptcy court to issue that order which would require GM to put up stock that's worth roughly a little over $1,000,000,000," and "I wanted to give the court a heads-up that there will be some new facts on the table next week."  *Id.* at 37:25-39:1.

18.    On August 11, 2017, Mr. Berman's statements, and New GM's response to those statements, were widely reported in the news media as evidence that the Signatory Plaintiffs had reached a settlement with the GUC Trust.  Bloomberg, for example, reported that:

> The settlement between the plaintiffs and the trust for Old GM is due to be signed Aug. 15, attorney Steve Berman said in a phone call.  The deal will resolve hundreds of personal-injury cases stemming from GM's faulty ignition switches, as well as a class-action suit over millions of vehicles that allegedly lost value due to a series of recalls in 2014, he said.[11]

---

[11]  Erik Larson, *GM Accuses Bankruptcy Trust of Secret $1 Billion Stock Plot*, BLOOMBERG, https://www.bloomberg.com/news/articles/2017-08-11/old-gm-settlement-plan-sets-up-court-fight-with-successor (Aug. 11, 2017) (last viewed on Sept. 1, 2017); *see also* Brenda Pierson, *GM Blasts $1 Billion Deal Between*

09-50026-mg    Doc 14120-1    Filed 09/26/17    Entered 09/26/17 23:21:43    Exhibit
09-50026-reg    Doc 14094-3    Filed 09/26/17    Main Document    Filed 09/26/17 23:41:43    Pg 489 of 516    Document
Exhibit A    Pg 12 of 32    Pg 488 of 516

19.    New GM made its objections to the parties' agreement clear and unmistakable, and made it clear that it understood that the GUC Trust had settled with the parties.  At the hearing on August 11, New GM's counsel stated, "[t]his has got all the indicia of a collusive settlement."  Decl. Ex. C at 41:16-:17.  New GM also issued a statement that the media reported as follows:  "'The contrived scheme won't work,' the company said in a statement.  'We will aggressively protect our rights and our shareholders and will work to hold the GUC Trust and plaintiffs accountable for their bad faith and improper actions.'"[12]

20.    The GUC Trust never indicated any disagreement with the characterizations of either Mr. Berman or the press, and continued to finalize the last steps necessary to enact the agreement.  Directly after the MDL status conference on August 11 during which Mr. Berman informed Judge Furman of the Settlement, the parties, including the GUC Trust, had an "all-hands," finalization, page-by-page review call to flag and resolve any final word-smith issues. *See* Decl. ¶¶ 8-9.  This meeting had been set by all parties in response to a request made by the Participating Unitholders to "schedule an all hands call . . . to finalize all of the settlement documentation and motions." *Id.* ¶ 9; Decl. Ex. D.

21.    During the final page turn call, the GUC Trust conveyed that they were done with comments to the documents and expressed no objection to the Signatory Plaintiffs' preview of the Settlement to Judge Furman. *See* Decl. ¶ 10.

---

Ignition Switch Plaintiffs, Creditor Trust, REUTERS, https://www.reuters.com/article/us-gm-ignition/gm-blasts-1-billion-deal-between-ignition-switch-plaintiffs-creditor-trust-idUSKBN1AR23Q (Aug. 11, 2017) (last viewed on Sept. 1, 2017) ("Berman said the settlement would resolve about 11.9 million economic loss claims and between 400 and 500 personal injury and wrongful death claims."); Mark Colias and Mike Spector, Lawyers Seek Another $1 Billion From General Motors Over Ignition Switch Defect, WALL STREET JOURNAL, https://www.wsj.com/articles/lawyers-seek-another-1-billion-from-general-motors-over-ignition-switch-defect-1502476402 (Aug. 11, 2017) (last viewed on Aug. 28, 2017); GM Criticizes $1 Billion Settlement Related to Faulty Ignition Switches, THE STREET.COM, https://www.thestreet.com/story/14268879/1/gm-criticizes-1-billion-settlement-related-to-faulty-ignition-switches html (Aug. 11, 2017) (last viewed Sept. 1, 2017).

[12]  Larson, https://www.bloomberg.com/news/articles/2017-08-11/old-gm-settlement-plan-sets-up-court-fight-with-successor (Aug. 11, 2017) (last viewed on Sept. 1, 2017); *see also* additional articles cited in footnote 11.

22.    The Signatory Plaintiffs' counsel disseminated final versions of all of the documentation that same afternoon, and, less than 24 hours later, on August 12, 2017, the GUC Trust's counsel confirmed in an email that "[f]rom the GUC Trust perspective, all of the documents sent over by Howie [Steel] (subject to one item we are discussing with Akin in the Settlement Agreement) are fine." *See id.* ¶ 11; Decl. Ex. E.  This email contained no reservation that counsel's comments were subject to client review or approval. *See id.*  Counsel confirmed that resolution of this issue occurred on the morning of August 14.  *See* Decl. ¶ 12; Decl. Ex. F.

23.    On August 14, 2017, counsel for all parties confirmed that the Settlement documents were final and agreed upon, and that they could be sent to counsel for New GM to review.  Counsel for the GUC Trust stated as follows:  "We are waiting for final approval from client, but unlikely to come tonight.  You are, however, authorized to send current versions to New GM this evening."  Decl. ¶ 12; Decl. Ex. F.  Thereafter, on August 14, 2017, at 9:14 p.m. (EST), Brown Rudnick sent the final versions of the Settlement documents to counsel for New GM, cc'ing counsel for the GUC Trust.  *See* Decl. ¶¶ 13-14; Decl. Ex. G.

24.    At no point during the finalization of the Settlement documents in August 2017 did the GUC Trust or its counsel indicate that the GUC Trust's approval of the Settlement would not be final until the Settlement Agreement had been signed, or that the GUC Trust would not approve the Settlement unless the Signatory Plaintiffs sought certification of a settlement class as part of the process of seeking approval of the Settlement from the Court.  *See* Decl. ¶ 15.

25.    In the agreed-upon text of its declaration, the GUC Trust stated, *inter alia*, that "the Settlement is a prudent and reasonable exercise of business judgment because it presents the best option for the GUC Trust to maximize recovery for the benefit of the GUC Trust

Beneficiaries while minimizing the substantial risk posed by the Late Claims Motions." Decl.

Ex. L ¶ 28. Those risks include:

> the litigation risk of having multiple disputed issues that remain to be resolved by
> the Bankruptcy Court, the likelihood that those issues would be subject to appeals,
> the corresponding risk of re-litigating those issues after an appeal, the
> corresponding uncertainty, and both the cost to operate the GUC Trust during the
> pendency of the litigation and the time-value of money lost while the GUC Trust
> cannot distribute funds to its beneficiaries . . . .

*Id.* ¶ 22.

26.     As counsel for the GUC Trust admitted to this Court on August 17, 2017, when

attempting to explain why it had abandoned the Settlement suddenly: "In our view, as a

fiduciary, we were initially willing to go forward with the deal, with the settlement as presented."

Decl. Ex. T, 16:9-:10. As counsel for the GUC Trust further admitted, prior to the August 15,

2017, meeting between the GUC Trust and New GM which caused the sudden abandonment

(discussed below), the GUC Trust "already knew" of the "numerous execution risks" involved in

the Settlement, *id.* 16:18-25, including that the Settlement "did not contemplate and that

plaintiffs would not agree to a Rule 23 settlement certification." *Id.* at 21:10-14.

## III.   **The GUC Trust Inexplicably Abandoned The Agreement Without Justification.**

27.     On August 15, the day after counsel for all parties to the Agreement confirmed

that the Settlement documents were final and agreed upon, New GM filed a letter with the Court

requesting cancellation of the conference scheduled for August 17. In that letter, New GM

claimed that "based on a preliminary review" of the Settlement documentation that had been

provided to it, "the proposed settlement is legally improper, collusive and in bad faith."[13]

---

[13]     *See Letter Regarding New GM's Position on Chambers Conference Scheduled for August 17, 2017 at 3:00
p.m. Regarding Proposed Settlement of Late Claim Motions*, dated Aug. 15, 2017 [ECF No. 14053].

28.     As the Court is aware, the following day (August 16), the GUC Trust informed both the Signatory Plaintiffs and the Participating Unitholders that it was abandoning the Settlement following a brief meeting with New GM that occurred on August 15.[14]  In other words, less than a day after New GM received the Settlement documentation, it arranged and held a brief meeting with the GUC Trust.  The Participating Unitholders were initially invited to and then excluded from this meeting, and now stand "confounded as to why [the GUC Trust] suddenly disavowed" the Settlement, which the Participating Unitholders continue to support.[15]

29.     While no new information was apparently discussed in the meeting, New GM somehow convinced the GUC Trust to completely abandon the Settlement and flout its fiduciary duties in the process.  *See, e.g.*, Decl. Ex. T at 16:22-23 and 17:9 (GUC Trust counsel noting the meeting was two hours "at most," apparently consisting in good part of New GM's reciting risks that the GUC Trust concedes it "already knew").

30.     From what the Signatory Plaintiffs understand in this pre-discovery posture and without the benefit of discovery, New GM has offered to pay the GUC Trust's fees and expenses in ongoing litigation against the Plaintiffs.[16]  Further, New GM also apparently agreed to discuss paying a rate of return to the GUC Trust to essentially insure against losses associated with the delay of future distributions.  *See id.*

31.     The proposal, which does not settle any claim or ligation, appears nothing more than a buy-out by New GM of the GUC Trust's exclusive right to settle claims against the Old

---

[14]     *See* Decl. Ex. T at 8:18-21.

[15]     *See Letter Related to Chambers Conference Scheduled for August 17th*, dated Aug. 17, 2017 (ECF No. 14063); Decl. Ex. T at 22:7-9, 25:18-26:5, 23:20-25 ("All of the unitholders we represent will not and do not support the proposed settlement with GM.  So you have to ask the question, what is Wilmington Trust thinking about when they want to go forward with a settlement that has the disapproval of every fiduciary that it represents who's weighed in on the subject?").

[16]     *See Letter Regarding Update on Matters Related to the Late Claims Motions and the Chambers Conference Scheduled for August 17, 2017 at 3:00 p.m.*, dated Aug. 16, 2017 (ECF No. 14060).

GM estate.  Although the Signatory Plaintiffs have not yet had the opportunity, and do not have the information, to analyze any New GM proposal to the GUC Trust, it appears doubtful that this proposal is permissible, to say nothing of whether it can even be described as a real compromise of a dispute or settlement within the ambit of Bankruptcy Rule 9019, even if cloaked as a "forbearance" agreement.  Rather than alleviating uncertainty, New GM is incentivizing—in fact *ensuring*—its continuation, as well as additional litigation, such as potential claims of tortious interference against New GM.

## RELIEF REQUESTED

32.     By this Motion, the Parties respectfully request that this Court enter an order, substantially in the form attached hereto as **Exhibit A**, enforcing the Settlement Agreement.

## ARGUMENT

33.     The Signatory Plaintiffs seek an order from the Court enforcing the Settlement under the Court's inherent authority to enforce a settlement in a case pending before it.  *See Meetings & Expositions, Inc. v. Tandy Corp.,* 490 F.2d 714, 717 (2d Cir. 1974); *Shabtai v. Honeywell, Inc.*, No. 94 Civ. 0524 (KMW) (RLE), 1998 WL 823617, at *1 (S.D.N.Y. Nov. 25, 1998).  The Court should exercise this authority to enforce the Settlement and order the GUC Trust to comply with its terms.  As set forth in further detail below, all of the factors that courts consider to determine whether a settlement is enforceable under New York law weigh in favor of enforceability and there is no basis to invalidate the Settlement.

## I.      The Settlement Is Enforceable.

34.     The enforceability of the Settlement is governed by New York law.  *See* Decl. Ex. H § 3.16 (providing for application of New York law).[17]   The intent of the parties determines

---

[17]     A small line of cases applies federal common law to the question of settlement enforceability under some circumstances involving federal claims, typically in federal law civil rights cases.  Those are inapposite and, in any

whether a contract was formed.  *See Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985).  "To discern that intent a court must look to 'the words and deeds [of the parties] which constitute objective signs in a given set of circumstances.'"  *Id.* (quoting *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984)); *see also Stonehill Capital Mgmt. LLC v. Bank of the W.*, 28 N.Y.3d 439, 448-49 (N.Y. 2016).

35.     To determine whether a settlement is enforceable, as with other contracts, courts examine whether "all material terms [are] set forth" and whether there is a "manifestation of mutual assent" as determined by looking to the totality of the parties' expressed words and deeds.  *See Forcelli v. Gelco Corp.*, 972 N.Y.S.2d 570, 573 (N.Y. App. Div. 2013); *Stonehill Capital Mgmt. LLC*, 28 N.Y.3d at 448-49.  To determine whether parties intend to be bound by a settlement agreement in the absence of an executed document, courts examine additional factors that include:  (i) whether there has been an express reservation of the right not to be bound in the absence of a writing; (ii) whether there was partial performance; (iii) whether all of the terms of the alleged contract have been agreed upon; and (iv) whether the agreement is the type of contract that is usually committed to writing.  *See Winston*, 777 F.2d at 80.  No single factor is decisive.  *See Delyanis v. Dyna-Empire, Inc.*, 465 F. Supp. 2d 170, 175 (E.D.N.Y. 2006).

36.     Notably, once a valid settlement is reached, it is binding on all parties, even if one party changes its mind *before* a written agreement is finalized.  *See Oparah v. New York City Dep't of Educ.*, No. 12 CV 8347 (JGK) (SN), 2015 WL 4240733, at *4 (S.D.N.Y. July 10,

---

event, "federal common law and New York State principles governing interpretation and enforcement of settlements do not appear to differ materially."  *Americu Credit Union v. Cumis Ins. Soc'y, Inc.*, Civ. A. No. 6:06-CV-1348 (DEP), 2008 WL 3930122, at *2 n.1 (N.D.N.Y. Aug. 21, 2008) (citing *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 322 (2d Cir. 1997)).

2015); *Powell v. Omnicon*, 497 F.3d 124, 129 (2d Cir. 2007).[18]  Further, under New York law,

"[s]tipulations of settlement are judicially favored, will not lightly be set aside, and are to be

enforced with rigor and without a searching examination into their substance as long as they are

clear, final and the product of mutual accord."  *Forcelli*, 972 N.Y.S.2d at 573 (enforcing out-of-

court oral settlement that was later confirmed by an email and noting that emails constitute

"writings" and email was subscribed because the attorney's name was on it, rather than an

automatic signature) (internal quotation omitted).[19]

　　37.　　Here, the parties manifested an intent to bound, reached agreement on all material

terms, and reduced the same to an agreed writing without countervailing, objectively manifested

reservations of a right not to be bound.  Accordingly, the Settlement is enforceable.[20]

## A.　　The GUC Trust Manifested Acceptance Of The Settlement.

　　38.　　The GUC Trust treated the terms of the Settlement as final and acted in

accordance with an agreement to be bound.  The GUC Trust objectively manifested its intent to

be bound by, among other things:

- participating in a final walk-through of the Settlement documentation, *see* Decl. ¶ 9;

- circulating a declaration from the GUC Trust stating that "the Settlement is a prudent and reasonable exercise of business judgment because it presents the best option for the GUC Trust to maximize recovery for the benefit of the GUC Trust Beneficiaries while minimizing the substantial risk posed by the Late Claims Motions," Ex. L ¶ 28;

---

[18]　　The party seeking to enforce the agreement bears the "burden of demonstrating that the parties had a 'meeting of the minds' as to all material terms of a settlement agreement."  *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006).

[19]　　*Forcelli* analyzed enforceability under N.Y. C.P.L.R. 2104, which provides that "[a]n agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered."  Other courts examine the enforceability of settlements without reference to the C.P.L.R., referring to a court's summary power to enforce.  *See, e.g.*, *Meetings & Expositions, Inc.*, 490 F.2d at 714.

[20]　　The Court may adjudicate questions of enforceability based only on party declarations.  *See Delyanis*, 465 F. Supp. 2d at 170; *Powell*, 497 F.3d at 129.

-13-

09-50026-reg    Doc 4007045-2    Filed 09/23/17    Entered 09/23/17 23:41:43    Main Document
Pg 19 of 52

- agreeing to a court conference to present the Settlement to this Court, *see* Decl. ¶ 7;

- permitting certain Signatory Plaintiffs to advise Judge Furman in open court in the MDL that an agreement had been reached and previewing certain terms of the Settlement (which certain Signatory Plaintiffs did, without the GUC Trust objecting thereto), *see id.* ¶¶ 8-10;

- stating in an email dated August 12 about the *Execution Version* that "[f]rom the GUC Trust perspective, all of the documents sent over by Howie [Steel] (subject to one item we are discussing with Akin in the Settlement Agreement) are fine," *see id.* ¶ 11; Decl. Ex. E;

- confirming that resolution of this last issue occurred on the morning of August 14, 2017, *see* Decl. ¶ 12;

- allowing the Settlement documentation (including the GUC Trust Declaration in support) to be shared with New GM, stating on August 14, 2017 that "[w]e are waiting for final approval from client, but unlikely to come tonight. You are, however, authorized to send current versions to New GM this evening," *see id.*; Decl. Ex. F; and

- planning to present the Settlement to this Court three days later, including after it was determined that the hearing was to be in open court rather than chambers.

39.    The only remaining step was to actually sign the final, agreed-to "Execution Version" of the Settlement Agreement.  It is well-settled that "an unsigned contract may be enforceable, provided [that] there is objective evidence establishing that the parties intended to be bound."  *Kowalchuk v. Stroup*, 61 A.D.3d 118, 123-125 (N.Y. App. Div. 2009) (enforcing settlement where e-mails "evidence[d] the existence of a contract" and "the formal written document signed just by defendant would have sufficed to establish the existence of the parties' agreement") (internal quotations omitted).

40.    Here, the Settlement was final, following months of intensive negotiations, and the remaining step of signatures was a mere formality given that the GUC Trust did not indicate that any issues remained.  *See, e.g., Gaglia v. Nash*, 778 N.Y.S.2d 595, 596 (N.Y. App. Div. 2004) (enforcing settlement even though defendant's attorney had not countersigned the letter

-14-

where the terms of the settlement were set forth and subsequent letters acknowledged the settlement); *Wronka v. GEM Cmty. Mgmt.*, 854 N.Y.S.2d 474, 477 (N.Y. App. Div. 2008) (exchange of correspondence between counsel was sufficient to "constitute [an] enforceable stipulation").

41.     Overall, "[t]he *only* essential prerequisite for a valid settlement agreement is that the parties assent to the terms and conditions of the settlement, and . . .  intend to be bound by it." *Delyanis*, 465 F. Supp. 2d at 174.  Nonetheless, the other factors elucidated by the *Winston* court provide additional support for enforcing the Settlement.

**B.      The Parties Reached Agreement On All Material Terms And Conditions.**

42.     There is no colorable dispute that the Signatory Plaintiffs and the GUC Trust agreed to all material terms and conditions, and, in fact, even all non-material dotting of i's and crossing of t's.  The Settlement was done.  Thus, this *Winston* factor weighs heavily in favor of enforcing the Agreement.  *See The Guardian Life Ins. Co. of Am. v. Calkins*, No. 12 Civ. 8863 (JGK), 2014 WL 61475, at *2 (S.D.N.Y. Jan. 6, 2014) (holding that this factor weighed in favor of enforcement where the settlement terms had been reduced to writing and "[a]ll that remained to be done was for the parties to sign the documents"); *Conway v. Brooklyn Union Gas Co.*, 236 F. Supp. 2d 241, 251 (E.D.N.Y. 2002) (recommending enforcement of settlement agreement where "there was agreement to each term of the settlement and . . . the parties recognized there were no additional terms remaining to be negotiated").

43.     The material terms entailed Plaintiffs' full release of claims in exchange for the GUC Trust's (i) payment of the $15 million Settlement Amount; (ii) payment of notice costs up to $6 million; and (iii) agreement to support entry of a Claims Estimate Order that would trigger New GM's obligation to issue the maximum amount of Adjustment Shares.

44.    The parties did not reach these material terms lightly or hastily.  For example, during negotiations over the Claims Estimate Order, the Signatory Plaintiffs provided to the GUC Trust extensive expert analyses of claims values and proffers of evidence describing in detail the viability of the asserted claims, including how Old GM violated the due process rights of certain Non-Ignition Switch Plaintiffs.

45.    The negotiations over notice costs involved the retention of a professional notice provider, Cameron R. Azari, Esq., the Director of Legal Notice for Hilsoft Notifications, which is a business unit of Epiq Systems Class Action and Claims Solutions.  *See* Decl. Ex. B.  The parties agreed not only on notice costs, but also on the form and content of both long-form and short-form notices to Plaintiffs, as well as notice to Unitholders.  *See* Decl. Exs. Q-S.

46.    Further, the parties agreed on the material terms of the Settlement as early as August 3, and *all* terms of the Settlement were finally agreed on as of August 12, with execution a mere formality.  *See* Decl. ¶¶ 3, 11-12; *cf. Alvarez v. City of New York*, 146 F. Supp. 2d 327, 336 (S.D.N.Y. 2001) (rejecting the plaintiff's argument that three material terms had not been resolved where plaintiff had agreed to the monetary amount during a conference and did not earlier raise outstanding issues).

47.    Any supposed open discussion points, such as obtaining client signatures, related to performance of the Settlement and have no bearing on the enforceability of the Settlement under recent controlling jurisprudence from the District Court for the Southern District of New York and the New York Court of Appeals.  *See In re Lehman Bros. Holdings Inc.*, No. 17 Civ. 03424 (DLC), 2017 WL 3278933, at *3-4 (S.D.N.Y. Aug. 2, 2017) (holding that agreement was enforceable once agreement on all material terms—a sum of money in exchange for a release— was reached regardless of continued negotiations over the performance of the settlement);

*Stonehill Capital Mgmt. LLC*, 28 N.Y.3d at 452 (holding that agreement to sell subject to execution of a signed writing and deposit was enforceable because the writing and deposit were "conditions precedent to performance," not "prefatory to the formation of a binding agreement").

### C.    The GUC Trust Did Not Express A
### Reservation Of A Right Not To Be Bound.

48.    The *Winston* factor of "whether there has been an express reservation of the right not to be bound in the absence of a writing" also supports the Signatory Plaintiffs' argument.  A party must give "forthright, reasonable signals" that "remove[s] any doubt of the parties' intent not to be bound absent a writing."  *Stonehill Capital Mgmt. LLC*, 28 N.Y.3d at 451.  Here, there was a detailed writing and no reservation of rights by the GUC Trust.

49.    The standard language in the Settlement that "[t]his Agreement shall become effective and binding on the Parties on the date on which this Agreement is fully executed by each of the Parties," Decl. Ex. H § 3.1, does not amount to an express reservation of the right not to be bound.  As the *Kowalchuk* court explained:

> [T]he inclusion, in the formal document intended to encompass the terms of an agreement, of the language that "[t]he Agreement is complete and binding upon its execution by all signatories" is simply insufficient to be treated as an explicit reservation that the parties should not be bound by the terms of their agreement until the written agreement is fully executed.

*Kowalchuk*, 61 A.D.3d at 124;[21] *see also In re Lehman Bros. Holdings Inc.*, 2017 WL 3278933, at *3 (holding that language in unexecuted agreement that the agreement "shall become effective upon execution hereof by each of the Parties" did not amount to a reservation of rights not to be bound); *Stonehill Capital Mgmt. LLC*, 28 N.Y.3d at 450-51 (holding that formulaic language that

---

[21] The *Kowalchuk* court further explained that the provision that "'[t]he Agreement is complete and binding upon its execution by all signatories' is not the equivalent of a provision that it is *not* binding *until* it has been so executed." *Id.* at 125.

-17-

a sale was "subject to" mutual execution of a sale agreement failed to express an intent not to be
bound absent a writing).

50.    The reservation must be expressed in unambiguous, "certain language . . .
necessary to remove any doubt of the parties' intent not to be bound absent a writing."  *Id.* at
451.  Such a certain, unambiguous reservation is absent here; the GUC Trust did not objectively
manifest an intent not to be bound in the absence of a fully completed and executed settlement
agreement.  To reiterate, at no point during the finalization of the Settlement documents did the
GUC Trust or its counsel indicate that the GUC Trust's approval of the Settlement would not be
final until the Settlement Agreement had been signed.  *See* Decl. ¶ 15.

51.    Furthermore, all of the GUC Trust's objectively manifested actions were
comprised of taking the steps necessary to effectuate the Settlement that was made.  Those steps
included: (i) participating in the drafting of a 20-page Settlement Agreement, Settlement Order,
Claims Estimate Order, a 30-page motion to approve the Settlement, four supporting declarations
from the GUC Trust, a Notice Procedures Motion, notices to Plaintiffs and Unitholders, and a
finalized declaration from the notice provider setting forth a comprehensive multi-million-dollar
notice plan; (ii) agreeing to a court conference to present the Settlement to this Court;
(iii) permitting the Signatory Plaintiffs to preview certain terms of the Settlement in open court
in the MDL before Judge Furman; (iv) confirming that all of the Settlement documents were
agreed to; and (v) authorizing the Settlement documentation to be sent to New GM.  Nor did the
GUC Trust object to, or seek to correct, any of the many press reports announcing that a deal had
been done.

52.    Thus, rather than reserving its right not to be bound absent execution, the GUC
Trust objectively manifested an intent to be bound by the Settlement.  Courts look to, *inter alia*,

emails, statements made before a judge, and reducing the terms of an oral agreement to writing

to determine whether a party intends to be bound. *See Delyanis*, 465 F. Supp. 2d at 170

(attorney's e-mail to mediator and counsel for the counterparty to the settlement was affirmative

acceptance of written settlement agreement reached during mediation, and accordingly

settlement would be enforced); *Kowalchuk*, 61 A.D.3d at 124 (enforcing settlement where the

defendant had reached out to inform the NASD that a settlement had been reached and emails

evidenced the settlement); *Guardian Life Ins. Co. of Am. v. Calkins*, 2014 WL 61475, at *2-3

(finding agreement enforceable where there was no indication that issues were left unresolved,

the terms were committed to written documents, and the parties had represented to the

Magistrate Judge during a settlement conference that they agreed to enter into a written

agreement at a future point in time). As demonstrated *supra* Section I.A, the GUC Trust

manifested an intent to be bound.

### D.      There Was Partial Performance.

53.      This *Winston* factor supports enforceability because there was partial performance

of the Settlement. The parties prepared the "Settlement Motion" as required by Section 2.2 of

the Settlement Agreement, a motion seeking an order approving proposed notice procedures as

required by Section 2.9(a) of the Settlement Agreement, and started the process of securing

Court approval by arranging to present the Settlement to this Court. *See Powell*, 497 F.3d at 130

(holding that there was partial performance of settlement where employer drafted a reference

letter as it had agreed to under the settlement with the only remaining detail being whether the

letter would describe the former employee's performance as "fully satisfactory" or "exemplary").

This joint action to present the Settlement to this Court and begin the process of obtaining Court

approval could not have been taken unless and until the parties had reached agreement upon all

of the Settlement terms.

-19-

09-50026-mg    Doc 14095-3    Filed 09/26/17    Entered 09/26/17 23:41:48    Agreement Document
Pg 25 of 32

E.        **The Agreement Was Committed To Writing**.

54.        The last *Winston* factor favors enforceability.  The Settlement was reduced to a detailed and carefully-negotiated *final* writing.  *See In re Lehman Bros. Holdings Inc.*, 2017 WL 3278933, at *4 (enforcing written agreement that was unsigned due to party's own delay); *Conway*, 236 F. Supp. 2d at 251 (holding that this factor weighed in favor of enforcement where "even if the agreement is the type that is typically reduced to writing, the written draft of the settlement had essentially been finalized").  The GUC Trust communicated in writing (at the conclusion of extensive and ongoing e-mail exchanges) that such Execution Version documents were "fine."  *See* Decl. ¶ 11; Decl. Ex. E.  All that was left to accomplish was the ministerial act of obtaining signatures.  This makes this case different and stronger than most instances where enforceability is at issue.  *See, e.g.*, *Galanis v. The Harmonie Club of the City of New York*, No. 1:13-cv-4344-GHW, 2014 WL 4928962, at *6 (S.D.N.Y. Oct. 2, 2014) (observing that arguably the Court could enforce the agreement based solely on the existence of emails agreeing to settlement terms because "[a]greements that address all negotiated terms in an email are generally enforceable in the same manner as more formal written agreement").[22]

55.        Therefore, each and every one of the factors that courts use in a variety of contexts to determine whether a settlement is final, and thus enforceable, under New York law show that this Settlement is enforceable.

F.        **Courts Have Enforced Agreements In Similar Circumstances**.

56.        In *Delyanis*, a mediator drafted a handwritten term sheet that was signed by the mediator, the plaintiff, plaintiff's counsel, and defense counsel.  The term sheet contained the

---

[22]        That the settlement agreement at issue in *Lehman* was "uncomplicated," *see In re Lehman Bros. Holdings Inc.*, 2017 WL 3278933, at *4, is a distinction without a difference given that the terms of the Settlement Agreement here were reduced to a mutually-acceptable, detailed writing, with only the mere formality of obtaining signatures left to be accomplished.

09-50026-mg   Doc 14120-3   Filed 09/26/17   Entered 09/26/17 23:41:43   Main Document
Pg 502 of 516

essential terms of an agreement and a statement that "[w]hile not intended to be a legally enforceable settlement agreement, the parties have agreed to resolve the case . . . ." *Delyanis*, 465 F. Supp. 2d at 172.  Subsequently, and in response to the mediator's request as to whether he could inform the court of the settlement, the plaintiff's counsel confirmed by email that a settlement had been reached.  *Id.*  The parties then negotiated the details of a formal settlement agreement and exchanged drafts.  *Id.*  A written agreement was never finalized because the plaintiff, upon discovering that the settlement sum was taxable, demanded more money and attempted to back out of the deal.  *Id.* at 172-73.  Although the court found that the term sheet was not enforceable because of the provision specifying that it was not intended to be a legally enforceable contract, the court ruled that plaintiff's counsel's email acknowledging agreement to settle and authorizing the mediator to inform the court represented an affirmative, binding acceptance of the settlement.  *Id.* at 174.  This objective manifestation of intent, coupled with agreement as to the settlement's essential terms during the mediation, caused the court to enforce the settlement.  *Id.* at 175-76.  Here, the circumstances are even more compelling because not only did the GUC Trust authorize certain Signatory Plaintiffs to advise Judge Furman that agreement had been reached, but also a detailed written agreement and associated documents had been approved by the parties and finalized.

57.     In *Kowalchuk*, the essential terms of an agreement to settle a securities arbitration proceeding before the National Association of Securities Dealers (NASD) were contained in an email that the plaintiff's counsel sent to the defense.  61 A.D.3d at 119.   After a settlement agreement was drafted, the plaintiff requested defense counsel to notify the NASD of the settlement, which he did by fax.  *Id.* at 120.  The defendant then signed the agreement and forwarded it to the plaintiff for signature.  *Id.*  Unbeknownst to the parties, the NASD had

already issued its arbitration decision, but had sent it via regular mail. *Id.* After receiving the decision, which awarded plaintiff damages in an amount much lower than the settlement amount, the defendant refused to consummate the settlement. *Id.* at 120-21. The court applied the *Winston* factors and enforced the settlement. *Id.* at 122. It found that the defendant never indicated an intent not to be bound until an agreement was fully executed, and that the defendant had notified the NASD that a settlement had been reached. *Id.* at 124-25. Similar circumstances are at play here: the GUC Trust never indicated an intent not to be bound prior to signing what it agreed was a finalized Settlement Agreement, and the GUC Trust authorized counsel to advise Judge Furman of the Settlement.

58.    In *Lehman Brothers*, while a motion to dismiss was pending, Lehman and Shinhan agreed to settle the litigation—an agreement that was confirmed by an email to both parties. 2017 WL 3278933, at *1. Next, the parties negotiated a written settlement agreement and agreed to an "execution copy" that was then signed by Lehman. *Id.* Shinhan delayed signing, although its counsel confirmed that Shinhan had completed its internal approval process. *Id.* at *2. Before Shinhan signed the agreement, the court entered an order dismissing Lehman's claims, and Shinhan refused to sign. *Id.* Applying the *Winston* factors to Lehman's motion to enforce, Judge Cote affirmed Judge Chapman's decision to enforce the agreement. *Id.* at *2-4. Notwithstanding an absence of partial performance, Shinhan did not express any reservation not to be bound before signing (language in the unexecuted agreement that the agreement "shall become effective upon execution hereof by each of the Parties" did not amount to a reservation of rights not to be bound); the material terms of the settlement were agreed (a sum of money in exchange for a release); and a formal writing was finalized even if it wasn't signed by Shinhan. *Id.* at *3-4. Just like in *Lehman Brothers*, the GUC Trust here indicated approval of an execution

copy of the agreement, even if it had not yet signed that agreement.

59.    And the circumstances here are strikingly similar to those in *Rohm & Haas Elec. Materials*, *LLC v. Honeywell Int'l, Inc.*, in which the court enforced a settlement between sophisticated parties.  C.A. No. 06-297-GMS, 2009 WL 1033651 (D. Del. Apr. 16, 2009).  The parties informed the court on a joint telephone call and by letter that a settlement had been reached; the parties exchanged multiple drafts of that agreement during the negotiation process; and, after plaintiff's counsel sent an email attaching a version referred to as the "final version," defendant's counsel did not object or make any corrections to the "final version."   *See id.* at *1-6.  But before signing, Honeywell learned of proceedings before the U.S. Patent and Trademark Office that affected the claims, and refused to sign.   *Id.* at *3.  The court rejected defendant's argument that the parties were not bound until the formal document was executed, holding that the defendant corporation's counsel "unequivocally agreed to and entered in to a binding agreement to settlement" as reflected by the record.  *See id.* at *5-6 (applying Delaware law that, in this regard, is identical to New York law).[23]   Likewise, the Settlement Agreement is enforceable.

60.    In each of these cases, the court did not permit intervening events—the related patent reexamination in *Honeywell*, the arbitration decision in *Kowalchuk*, the tax realization in *Delyanis*, and the dismissal order in *Lehman Brothers*—to serve as trip wires to abrogate settlements where there was an objectively manifested intent to be bound by an agreement.  The same result should obtain here, notwithstanding the GUC Trust's decision to try and walk away from a final agreement that it believed was a "prudent and reasonable exercise of business

---

[23]    "Under Delaware law a contract 'comes into existence if a reasonable person would conclude, based on the objective manifestations of assent and the surrounding circumstances, that the parties intended to be bound by their agreement on all essential terms.'"  *Id.* at *5 (internal citations omitted).

judgment" and the "best option for the GUC Trust to maximize recovery for the benefit of the

GUC Trust Beneficiaries."  Decl. Ex. L ¶ 28.[24]

## II.    There Is No Basis To Invalidate The Settlement After-The-Fact.

61.    There is no basis for the GUC Trust to revoke its acceptance of the Settlement.

"It is well settled policy of all the courts of the State of New York to encourage agreements of

compromise and settlement; therefore a stipulation of settlement will not be set aside absent a

showing of such good cause as would invalidate a contract.  Such good cause could include

fraud, collusion, mistake, accident, or some other ground of the same nature that would open the

door to possible abuse and make litigation interminable."  *Lopez v. Podgurski*, 959 N.Y.S.2d

396, 400 (N.Y. Cty. Ct. 2013) (citations omitted).

62.    Notably, a party's revised view of a settlement post-agreement is not a basis to

invalidate a settlement contract.  *See Powell*, 497 F.3d at 128 (courts will not relieve a party of a

settlement they have made a "deliberate, strategic choice" to enter into "simply because his

assessment of the consequences was incorrect"); *Ehrheart v. Verizon Wireless*, 609 F.3d 590,

595-96 (3d Cir. 2010) (holding that party was bound by settlement even though later changes in

the law "could have altered the settlement calculus"); *cf. In re Lehman Bros. Holdings Inc.*, 2017

WL 3278933, at *2, *4 (enforcing settlement agreement after defendant attempted to renege

following court's issuance of an order granting the defendant's motion to dismiss).[25]

63.    Even where a trustee receives a better offer prior to obtaining court approval of a

settlement under Bankruptcy Rule 9019 (which did not occur here), the trustee must "abide by its

---

[24]    The requirement to obtain court approval of settlements under Bankruptcy Rule 9019 has no bearing on the binding nature of the Settlement.  *See Liberty Towers Realty, LLC v. Richmond Liberty, LLC*, 569 B.R. 534, 541-42 (E.D.N.Y. 2017) (holding that settlements "are binding on all parties to the extent allowable under state law" and requirement of court approval provides no mechanism for a debtor to "act on its buyer's remorse").

[25]    *In re Johns-Manville Corp.*, 440 B.R. 604, 613 (Bankr. S.D.N.Y. 2010) (holding that settlement whereby insurer agreed to make payments in exchange for an injunction barring claims against the insurer remained intact despite a ruling that a company with potential claims against the insurer was not bound by the injunction).

obligations under the settlement agreement, including, if necessary, filing a motion for settlement approval." *Liberty Towers Realty, LLC*, 569 B.R. at 542; *see also Providers Benefit Life Ins. Co. v. Tidewater Grp., Inc. (In re Tidewater Grp., Inc.)*, 8 B.R. 930, 933 (Bankr. N.D. Ga. 1981) (upon determining that settlement was enforceable under state law, ordering debtor to execute settlement documents and file an application seeking approval of the settlement).[26]

64.     Here, the GUC Trust has already confirmed that it will be unable to make any colorable argument for invalidation: its counsel did not invoke any mistake or accident or similar excuse, instead acknowledging that at the meeting at which New GM either convinced or had a role in convincing the GUC Trust to back out of the Settlement, New GM and the GUC Trust discussed risks about which the GUC Trust was already aware. *See* Decl. Ex. T at 16:22-23.

65.     Whether the "execution risks" that the GUC Trust suddenly claims to be so problematic are in fact risks at all, and/or whether the risks can be addressed, is beyond the scope of this Motion, but suffice to say for present purposes that the GUC Trust's invocation of perceived risks rings hollow in light of the months of careful negotiation between sophisticated parties. ***There is no way around it:  the Settlement is final and there is no basis to revoke it.***

## CONCLUSION

WHEREFORE, the Signatory Plaintiffs respectfully request that this Court enter an Order, substantially in the form attached hereto as **Exhibit A**, enforcing the Settlement Agreement and granting such other and further relief as the Court deems just and proper.

---

[26] Although post-settlement events may be relevant in connection with Rule 9019 proceedings, courts have denied approval of settlements based on post-settlement events where, unlike here, there was concrete value to the debtor's estate that would be lost if the proposed agreement was approved. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996) (rejecting a settlement of state court lawsuit where, following entry into settlement, the lawsuit resulted in a verdict in favor of the debtors for $150,500); Order, *Aharoni v. Meer (In re Actrade Fin. Techs. Ltd.)*, Nos. 09 Civ. 4479 (RMB), 09 Civ. 4480 (RMB) (S.D.N.Y. Jan. 25, 2010) (rejecting settlement that would release claims against company's former chairman following discovery that he had misappropriated up to $31 million of funds).

-25-

Dated: September 11, 2017          Respectfully submitted,
        New York, New York

        /s/ Edward S. Weisfelner
        Edward S. Weisfelner
        Howard S. Steel
        BROWN RUDNICK LLP
        Seven Times Square
        New York, New York 10036
        Tel: 212-209-4800
        eweisfelner@brownrudnick.com
        hsteel@brownrudnick.com

        Sander L. Esserman
        STUTZMAN, BROMBERG, ESSERMAN &
        PLIFKA, A PROFESSIONAL
        CORPORATION
        2323 Bryan Street, Ste. 2200
        Dallas, Texas 75201
        Tel: 214-969-4900
        esserman@sbep-law.com

        *Designated Counsel for the Ignition Switch*
        *Plaintiffs and Certain Non-Ignition Switch*
        *Plaintiffs in the Bankruptcy Court*

        Steve W. Berman (admitted *pro hac vice*)
        HAGENS BERMAN SOBOL SHAPIRO LLP
        1918 Eighth Avenue, Suite 3300
        Seattle, WA 98101
        Tel: 206-623-7292
        steve@hbsslaw.com

        Elizabeth J. Cabraser
        LIEFF CABRASER HEIMANN &
        BERNSTEIN, LLP
        275 Battery Street, 29th Floor
        San Francisco, California 94111
        Tel: 414-956-1000
        ecabraser@lchb.com

        *Co-Lead Counsel for the Ignition Switch*
        *Plaintiffs and Certain Non-Ignition Switch*
        *Plaintiffs in the MDL Court*

William P. Weintraub
Gregory W. Fox
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: 212-813-8800
wweintraub@goodwinlaw.com
gfox@goodwinlaw.com

*Counsel to Those Certain Pre-Closing
Accident Plaintiffs Represented By Hilliard
Muñoz Gonzales L.L.P. and the Law Offices
of Thomas J. Henry*

Robert Hilliard, Esq.
HILLIARD MUÑOZ GONZALES LLP
719 South Shoreline
Suite 500
Corpus Christi, TX 78401
Tel: 361-882-1612
bobh@hmglawfirm.com

*Counsel to certain Pre-Closing Accident
Plaintiffs*

Thomas J. Henry, Esq.
THE LAW OFFICES OF THOMAS J.
HENRY
4715 Fredricksburg, Suite 507
San Antonio, TX 78229

*Counsel to Certain Pre-Closing Accident
Plaintiffs*

Lisa M. Norman (admitted *pro hac vice*)
T. Joshua Judd (admitted *pro hac vice*)
ANDREWS MYERS, P.C.
1885 St. James Place, 15th Floor
Houston, Texas 77056
Tel: 713-850-4200
Lnorman@andrewsmyers.com
Jjudd@andrewsmyers.com

*Counsel to Certain Pre-Closing Accident
Plaintiffs*

09-50026-mg  Doc 14026-31  Filed 08/10/15  Entered 09/26/17 18:19:54  Exhibit A -
Exhibit A  Pg 509 of 163

# EXHIBIT A

09-50026-mg  Doc 14065-9  Filed 09/18/17  Entered 09/18/17 18:22:45  Exhibit A -
Proposed Order  Pg 1 of 3

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                  :
In re:                                            :       Chapter 11
MOTORS LIQUIDATION COMPANY, et al.,               :       Case No.: 09-50026 (MG)
      f/k/a General Motors Corp., et al.,       :
                                                  :
           Debtors.                 :       (Jointly Administered)
------------------------------------------------------------X

## ORDER GRANTING MOTION
## TO ENFORCE THE SETTLEMENT AGREEMENT
## BY AND AMONG THE SIGNATORY PLAINTIFFS AND THE GUC TRUST

Upon the *Motion to Enforce the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust* (the "**Motion**");[1] and due and proper notice of the Motion having been provided and it appearing that no other or further notice need be given; and the Court having found and determined the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore;

**IT IS HEREBY ORDERED THAT:**

1.     The Motion is GRANTED.

2.     The Court finds that the Settlement Agreement is enforceable in the form in which it was attached to the Motion as Exhibit A.

3.     The GUC Trust shall promptly deliver an executed copy of the Settlement Agreement to the Signatory Plaintiffs.

4.     The GUC Trust and the Signatory Plaintiffs shall promptly file a joint application for approval of the Settlement Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019 substantially in the form in which it was attached to the Motion as Exhibit D.

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1

5.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

6.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2017
          New York, New York

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT

Case 1:14-md-02543-JMF    Document 4639    Filed 09/26/17    Page 1 of 2

# Exhibit 7

| | |
|---|---|
| **From:** | Anne Fornecker |
| **To:** | Karlan, Mitchell A.; jamestecce@quinnemanuel.com |
| **Cc:** | Bob Hilliard; William Weintraub; Gregory Fox; Howard Steel; *eweisfelner@brownrudnick.com; Steve Berman; "Sean Matt"; *ecabraser@lchb.com; Rachel Geman; *dgolden@akingump.com; Sander L. Esserman; cioni; TJH; Lnorman@andrewsmyers.com; dnewman@AkinGump.com; *nmoss@akingump.com; Godfrey, Richard C.; Bloomer, Andrew B.; Feller, Leonid; *sdavidson@kslaw.com; Eggleston, W. Neil; Lesley C. Paniszczyn; Michael Henry; Julia Beskin; jforster@brownrudnick.com; MEggenberger@gibsondunn.com; susheelkirpalani@quinnemanuel.com |
| **Subject:** | GM - HMG/TJH response to briefing and discovery protocol |
| **Date:** | Tuesday, September 12, 2017 11:05:37 AM |

Mitch and James:

Thanks for the new draft. We needed more time to consider before participating in the meet and confer that was scheduled for yesterday morning. Before responding to the specifics and after further reflection, we need to raise some big picture issues with you.

First, we do not believe that GM should participate in discovery about whether the agreement between the plaintiffs and GUC is enforceable. GM was not a party to those negotiations or that agreement. While GM may have standing to object to the plaintiff/GUC agreement if the Court rules that it is binding, the parties have agreed to defer whether the Court should approve the plaintiffs/GUC agreement until the second phase.

Second, the discovery served is largely directed to counsel and seeks information about the subject of negotiations that our clients did not participate in and could only know through communications with counsel. Accordingly, we will not be responding on behalf of any specific client, let alone all 175 of our clients. I understand that Mitch disagrees. Our ability to respond to discovery by the dates included in the current proposal is contingent on how the Court resolves this issue. If the Court rules that we must respond on behalf of each client, we will need longer than the current proposal allows. Given our large number of clients, the Court gave us 60 days to respond to <u>Pioneer</u> discovery.

Third, we object to the proposal to the extent it assumes that there will be depositions of any of our clients. We do not think it is appropriate for any client-specific discovery to occur. However, should we be required to produce any of our clients for deposition, the timing of the depositions may depend on the timing of responses to written discovery. See above.

Mitch suggested to me that we meet and confer on the second issue once we respond to the discovery served. Rather than wait, we think it may make more sense to file competing letters with the Court addressing the above issues prior to the discovery response due date. Please let us know when you are available to discuss.

Thanks,
Anne

--

A<small>NNE</small> K. F<small>ORNECKER</small>