# EXHIBIT A

  

<div align="center">October 2, 2017</div>

***VIA ELECTRONIC COURT FILING***

The Honorable Jesse M. Furman
United States District Court
Southern District of New York

     Re:     *In re: General Motors LLC Ignition Switch Litig.*,
            14-MD-2543 (JMF); 14-MC-2543

Dear Judge Furman:

     Co-Lead Counsel respectfully submit this response to GM's September 26, 2017 letter brief purporting to request "guidance for the parties regarding the scope of Co-Lead Counsel's representational authority" in the Bankruptcy Court.[1]  As demonstrated below, no such guidance is necessary.  GM has simply tried to force an issue that does not exist.

## A.     Introduction

     GM has vociferously objected to the proposed Settlement in which the GUC Trust will request a Claims Estimate Order from the Bankruptcy Court, which may, in turn, require GM to provide approximately $1.08 billion in GM Stock.  The Settlement, if approved by the Bankruptcy Court following an extensive notice program, provides for a $15 million payment by the GUC Trust in exchange for a release of claims against the GUC Trust's remaining assets and a waiver of any rights to seek to claw back past distributions of GUC Trust Assets.  It also commits the GUC Trust to seek approval under Bankruptcy Rule 9019 of the Claims Estimate Order.  In requesting a Claims Estimate Order, the GUC Trust will be following the exact procedure and process expressly set forth in the Plan, the GUC Trust Agreement, and the Amended Master Purchase and Sale Agreement to which New GM is a party (and under which GM has accepted benefits for years).[2]  With the GUC Trust's permission, our bankruptcy counsel contacted Judge Glenn to obtain a date

---

    [1] GM's Sept. 26, 2017 Letter (the GM Letter) at 11.

    [2] Section 3.2(c) of the Sale Agreement requires GM to issue additional shares of GM common stock (the "Adjustment Shares") when the Bankruptcy Court issues an order (a "Claims Estimate Order") estimating the allowed general unsecured claims against the Old GM estate in an amount exceeding $35 billion, with a ceiling of issuing 30 million shares if the estimated amount equals or exceeds $42 billion.  Under the Plan and the GUC Trust Agreement, the GUC Trust has the exclusive authority to object to, settle, or seek estimation of general unsecured claims, and to seek issuance of the Adjustment Shares.  *See* Plan §§ 7.1(b), 7.3; GUC Trust Agreement §§ 5.1, 2.3(d).  Under the governing documents, GM does not have standing to object to, settle, or seek estimation of general unsecured claims, and is obligated to issue the Adjustment Shares once a Claims Estimate Order is entered.

The Honorable Jesse M. Furman
October 2, 2017
Page 2

to present the Settlement Agreement.  Judge Glenn set a status conference for this purpose on August 17, 2017.

Within hours of our announcing the plan to present the Settlement Agreement to the Bankruptcy Court, GM issued a press release denouncing the Agreement as "collusive." Notwithstanding that the Settlement Agreement seeks and would withstand careful scrutiny from affected stakeholders and the Bankruptcy Court, which has jurisdiction over this core matter, GM wrongly (and likely unlawfully) took matters into its own hands and interfered with the Settlement. At the August 17th hearing, the GUC Trust revealed that, after a "two-hour meeting"[3] with GM, the GUC Trust decided to withdraw from the Agreement.[4]  Judge Glenn appeared skeptical that months of work, reflected in the detailed documents presented as part of the Settlement,[5] could be undone in two hours and ordered discovery as to how this unraveling occurred.[6]

A Motion to Enforce the Agreement is now pending before Judge Glenn.[7]  A status conference before the Bankruptcy Court is scheduled for October 3, 2017.  In our view, the Motion to Enforce is solidly backed by case law and the evidence submitted.  GM knows this.  Hence, fearful of the likely outcome of the Motion to Enforce, GM seeks to mar the proceedings before the Bankruptcy Court through a strategic end run-around to this Court by raising unfounded allegations about the actions and authority of Co-Lead Counsel in obtaining a Settlement Agreement with widespread benefits that is supported by plaintiffs and approximately 65% of GUC Trust Unitholders.

GM's allegations are based on a flawed premise—that the Settlement Agreement relies on Co-Lead Counsel purporting to represent a class in connection with the Settlement Agreement—and ignores core facts about the Settlement Agreement.  Under the Settlement, no releases are given nor plaintiffs' rights affected until Bankruptcy Court approval of the Settlement Agreement is obtained under Bankruptcy Rule 9019.  The Settlement Agreement provides for the parties to first obtain Bankruptcy Court approval of notice procedures that would include providing notice by mail, augmented by wide-spread publication notice to all potentially affected plaintiffs.[8]  The GUC Trust would cover up to $6 million of the cost of that notice.  If Bankruptcy Court approval of the Settlement Agreement is obtained following this notice and an opportunity to be heard, then plaintiffs—who at this point either did not object or had their objections overruled by the

---

[3] Ex. 1, Aug. 17, 2017 Hr'g Tr. at 17.

[4] *Id*. at 14-17.

[5] *Id*. at 14-19.

[6] *Id.* at 17, 38.

[7] Motion to Enforce the Settlement Agreement by and Among the Signatory Plaintiffs and the GUC Trust, dated Sept. 11, 2017 [Bankr. ECF No. 14092].

[8] Specifically, mail notice would be provided to (i) all persons in the United States who, as of July 10, 2009, owned or leased a defective vehicle manufactured by Old GM included in the recalls at issue in the Settlement; and (ii) all Pre-Closing Accident Plaintiffs who have filed a lawsuit against New GM or filed or joined a motion for authority to file late claims against the GUC Trust, as of the date of the Settlement Agreement.

The Honorable Jesse M. Furman
October 2, 2017
Page 3

Bankruptcy Court—would be barred from seeking remaining GUC Trust Assets or a claw back of past distributions of GUC Trust Assets. Instead, their claims against the GUC Trust, if any, would be channeled to the settlement fund. The subsequent administration of the settlement fund and determination of eligibility and criteria to obtain payment from the settlement fund (including potentially under Rule 23 before this Court) is subject to further notice and opportunity for plaintiffs to object. In short, we do not purport to act as class counsel in effectuating the Settlement before the Bankruptcy Court. Therefore, there is no need for the Court to make rulings about "the scope of Co-Lead Counsel's representational authority."

## B.    Background Regarding the Non-Class Nature of the Settlement

To quote GM: "To understand the precise representational issue New GM is raising, a basic understanding of the purported settlement between Co-Lead Counsel and the GUC Trust is necessary."[9] We agree. The Settlement Agreement was reached under Bankruptcy Rule 9019 and *not* in the context of a proposed class under Rule 23 of the Rules of Civil Procedure. Here are the salient points describing the non-class nature of the Settlement.

1.    GM has incorrectly stated that we are settling a class of millions of claimants without authority.

2.    Rather than a settlement evaluated under Rule 23, the Settlement Agreement will be implemented pursuant to Bankruptcy Rule 9019. Rule 9019(a) provides: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct." Settlements in bankruptcy proceedings are regularly approved using Bankruptcy Rule 9019.

3.    Pursuant to the notice procedures required by the Settlement Agreement, notice will be sent to all potential claimants, informing them of the details of the proposed Settlement and their rights to object and appear at the approval hearing.[10] The GUC Trust agreed to pay up to $6,000,000 in order to effectuate proper notice.[11] This procedure provides due process to potential claimants and fully complies with Bankruptcy Rule 9019.

4.    The notice attached to the proposed settlement does not purport to be a class notice under Rule 23 because it is not such a notice.[12] The notice does not identify us as class counsel but rather as "Counsel to the Signatory Plaintiffs" and "Co-Lead Counsel for the Economic Loss Plaintiffs in the MDL Court," and the notice informs claimants that they can contact "Counsel for

---

[9] GM Letter at 2.

[10] *See* Notice of Proposed Settlement and Order (the Notice) (attached as Exhibit J to the Settlement Agreement).

[11] *See* GM Letter, Ex. A, p. 13.

[12] GM Letter, Exs. Q, J.

Case 1:14-md-02543-JMF    Document 4657    Filed 10/02/17    Page 4 of 8

The Honorable Jesse M. Furman
October 2, 2017
Page 4

the Signatory Plaintiffs."[13]   We are identified in the Notice as Co-Lead Counsel in the MDL in order to advise claimants why we have the background to participate in the Settlement.

5.     We do not contend that this Court ordered us to be Lead Counsel in the Bankruptcy Court or appointed us as class counsel there; nor have we taken any actions in such a capacity. Rather, counsel for various plaintiffs designated us and our designated bankruptcy counsel to take the lead in the bankruptcy proceedings, as the Bankruptcy Court recognized as early as May 2014 and has continually recognized to date.[14]   By agreeing to a Settlement on behalf of plaintiffs who sought authority to file and prosecute late  proofs of claim, all we have done is set in motion a process by which the due process rights of those with claims against the GUC Trust can be protected while they are offered the benefits of the Settlement.

6.     GM has correctly stated that Plaintiffs, Ms. Barker and Mrs. James-Bivens, have sought authority to file late proofs of claims in the bankruptcy proceedings on behalf of proposed classes.  But there is nothing improper about such a filing.

7.     Likewise, there was nothing improper in providing the GUC Trust with expert reports estimating the GUC Trust's exposure if there was no settlement.  Those reports were not "fictional," as GM contends.   Rather, the claims estimate is supported by well-established methodologies and a sophisticated conjoint analysis.  And the GUC Trust's potential exposure is a very material and important fact to be considered in the bankruptcy proceedings.

8.     In light of this exposure, the GUC Trust decided to settle.  And it agreed to do so without seeking certification of a Rule 23 class.

9.     The GUC Trust had sound reasons for settling.  In exchange for its payment of $15 million and its agreement to seek a Claims Estimate Order, the GUC Trust receives a release of claims to current GUC Trust Assets and the right to seek to claw back past distributions of GUC Trust Assets.

## C.     Because the Proposed Settlement is Not a Class Action Settlement Under Rule 23, the Court Need Not Take Any Action in Response to GM's Letter

The premise of GM's Letter is that we are attempting to use our appointment to improperly bind a class that we do not represent.  GM is wrong.  A key component of the Settlement is to obtain court approval of procedures to provide potential claimants with Bankruptcy Court-approved notice of the Settlement and the opportunity to be heard on the motion to approve the Settlement under Bankruptcy Rule 9019.  If these plaintiffs did not object after receiving notice, or had their objections overruled, their rights to seek GUC Trust Assets or to claw back past distributions of

---

13 Notice at 5-6.

14 *See* Response to New GM's Proposed Conference Agenda, dated May 1, 2014 [Bankr. ECF No. 12677]; Ex. 5, May 2, 2014 Hr'g Tr. at 45:17-46:4, 48:1-7, 96:9-14, 99:22-100:2.

The Honorable Jesse M. Furman
October 2, 2017
Page 5

GUC Trust Assets would be waived.[15]  This structure—not any "representational authority"—is what would bind plaintiffs.[16]  Further, the waiver is given in exchange for a considerable benefit—the settlement fund with $15 million and the potential triggering of the Adjustment Shares, to which plaintiffs' claims are channeled.  Plaintiffs will receive notice and an opportunity to be heard on eligibility and criteria for receiving a distribution from the settlement fund.

The touchstone for a valid settlement is that the notice satisfies due process.  *See*, *e.g.*, *In re Infotechnology, Inc.*, 89 F.3d 825, at *1 (2d Cir. 1995) (unpublished) (rejecting objections of former directors of the debtor when notice of the preliminarily-approved settlement was provided to the former directors well in advance of the final plan confirmation hearing and holding that "compliance with Rule 9019 provides all the process that is due"); *In re Sullivan*, 567 B.R. 348, 354-55 (Bankr. N.D. Ill. 2017) (debtors were not denied due process because they never received notice of a settlement motion, where the trustee had mailed notice per Rule 9019(a) to the addresses provided by the debtors); *In re Magna Corp.*, No. 01-80763C-7D, 2003 WL 22078082, at *6 (Bankr. M.D.N.C. Aug. 29, 2003) (full compliance with Rule 9019 satisfied due process where the motion for approval included "considerable detail" and was part of a "well-developed record," where "creditors and parties in interest were afforded adequate notice and an opportunity for hearing regarding the proposed settlement," and where the objecting party was in fact permitted to submit additional evidence and an opposition memorandum); *cf. In re Kong*, No. BAP CC-15-1371-

---

[15] The majority of the GUC Trust Assets were distributed years ago, *see In re Motors Liquidation Co.*, 529 B.R. 510, 537 (Bankr. S.D.N.Y. 2015), and it would be extremely difficult and costly to claw back distributions.  Preserving the remaining GUC Trust Assets as a recovery source pending the litigation of claims would require a stay of further distributions, conditioned on a hefty bond.  When we previously tried to block distributions of GUC Trust Assets, the Bankruptcy Court granted a stay, but it was conditioned on posting a $10.6 million bond that was not available.  *See* Decision and Order on Request for Stay, dated Oct. 14, 2015 [Bankr. ECF No. 13501].

[16] Courts routinely hold that parties-in-interest waive objections that they fail to raise at a hearing if they received proper notice and bind parties-in-interest to a court order following notice and an opportunity to be heard.  *See*, *e.g.*, *In re Optical Techs.*, 425 F.3d 1294, 1301 (11th Cir. 2005) (finding that creditors who were served with a confirmation plan and disclosure statement but made no objection to confirmation waived their objections to the terms of the confirmation plan); *In re USA United Fleet Inc.*, 496 B.R. 79, 89 (Bankr. E.D.N.Y. 2013) (holding that "party on notice" of proposed sale of assets was bound by the sale order); *In re Johns-Manville Corp.*, 600 F.3d 135, 147 (2d Cir. 2010) (party who failed to raise argument in first round of appeal forfeited that argument); Ex. 6, Nov. 16, 2016 Hr'g Tr. at 43:19-23 (holding that a group of threshold issues on New GM's motions to enforce the Sale Order and late proofs of claim against the GUC Trust could properly be brought before the Bankruptcy Court by providing plaintiffs with notice via an order to show cause).  Indeed, GM has sought to bind plaintiffs to court orders in the same way in the Bankruptcy Court proceedings.  *See* Ex. 2, May 17, 2017 Hr'g Tr. at 203:7-208:12 (arguing that all plaintiffs served with a scheduling order identifying certain issues to be briefed were bound by the rulings on those issues and had waived any arguments that were not raised in connection with that briefing).  However, the binding nature of the Settlement following notice, an opportunity to be heard, and court approval is not an issue before the Bankruptcy Court at this time (and is premature until the Bankruptcy Court rules on the motion to enforce and a motion seeking to approve the Settlement Agreement is filed in the Bankruptcy Court).  Plaintiffs reserve all rights to respond to New GM's arguments that go to the merits of Bankruptcy Court approval of the Settlement Agreement and the Claims Estimate Order at the appropriate time.

The Honorable Jesse M. Furman
October 2, 2017
Page 6

KITAL, 2016 WL 3267588, at *7-9 (B.A.P. 9th Cir. June 6, 2016) (bankruptcy court erred by dispensing with notice of a settlement under Rule 9019).

The notice procedures established by the Settlement Agreement fully satisfy the due process requirements of the foregoing authorities.

Thus, the entire premise of GM's Letter is incorrect.  We are not improperly seeking to bind a class that we do not represent.  Under the terms of the Settlement, notice to claimants is sent under well-established bankruptcy procedure.  No abuse of the authority granted to us by Order No. 8 has occurred.

**D.    Until The GUC Trust Settlement, GM *Never* Objected to Co-Lead Counsel's Role in the Bankruptcy Court**

Shortly after this MDL was assigned to the Court, GM brought stay and enforcement motions in the Bankruptcy Court.  Given the overlap of claims before this Court and the Bankruptcy Court, Co-Lead Counsel retained bankruptcy counsel.    Counsel for various plaintiffs designated them to take the lead in the bankruptcy proceedings, as the Bankruptcy Court recognized,[17] and they became known as "Designated Counsel" as reflected, among other places, in scheduling orders issued by the Bankruptcy Court.  Here are three examples:

> **May 16, 2014 Scheduling Order** (Bankr. ECF No. 12697) at 2 n.3:  "Certain Plaintiffs designated the law firms Brown Rudnick LLP; Caplin & Drysdale Chartered; and Stutzman, Bromberg, Esserman & Plifka, PC (collectively 'Designated Counsel') to speak on their behalf at the Conference."

> **Sept. 14, 2014 Scheduling Order re Pre-Closing Accidents** (Bankr. ECF No. 12897) at 1 n.2:  "Certain plaintiffs in the Ignition Switch Actions designated the law firms Brown Rudnick, LLP; Caplin & Drysdale, Chartered; and Stutzman, Bromberg, Esserman & Plifka, PC (collectively, 'Designated Counsel') to speak on their behalf in connection with the Ignition Switch Motion to Enforce."

> **Sept. 15, 2014 Scheduling Order re Monetary Relief Actions** (Bankr. ECF No. 12898) at 1 n.2 (same).

---

[17]    *See* Response to New GM's Proposed Conference Agenda, dated May 1, 2014 [Bankr. ECF No. 12677]; Ex. 5, May 2, 2014 Hr'g Tr. at 45:17-46:4, 48:1-7, 96:9-14, 99:22-100:2.

Case 1:14-md-02543-JMF   Document 4657   Filed 10/02/17   Page 7 of 8

The Honorable Jesse M. Furman
October 2, 2017
Page 7

GM welcomed this organization, as it wanted a small group of lawyers with which to coordinate.  And GM did not object when Co-Lead Counsel informed the Bankruptcy Court that they were acting pursuant to this Court's Order No. 13 to work with Designated Counsel in the Bankruptcy Court *and were doing so in their capacity as MDL Co-Lead Counsel.*  Here is what we said in a December 2014 filing in the Bankruptcy Court:

> **Dec. 16, 2014 Threshold Issue Brief** (Bankr. ECF No. 13025) at 1, n.1: "Lead Counsel appointed in the General Motors LLC Ignition Switch Litigation Multidistrict Litigation ... have retained the undersigned Designated Counsel, pursuant to Lead Counsel's authority under *Order No. 13 (Organization of Plaintiffs' Counsel, Protocols for Common Benefit Work and Expenses)*, dated September 16, 2014 [MDL Proceeding ECF No. 304], to brief the Threshold Issues with respect to plaintiffs who have asserted actions consolidated for pre-trial purposes in the MDL Proceedings ('Plaintiffs')."

Indeed, at a May 17, 2017 hearing, GM's bankruptcy lawyer acknowledged the role of Co-Lead Counsel and informed Judge Gerber that claimants would be bound by our actions in the Bankruptcy Court once they received notice (***exactly as contemplated under the Settlement Agreement***):

> MR. WEISFELNER:  I think Judge Gerber in an effort to streamline the process and make it more efficient recognized designated counsel as the primary spokesperson for both ignition switch and non-ignition switch economic loss parties, provided that other people who thought we weren't adequately addressing their concerns had the opportunity to independently address the court, but only after sort of assuring themselves that we were, to adopt the colloquial, screwing up. May 17, 2017 Hr'g Tr. at 68:19-69:1.[18]

> THE COURT: [I]s anyone other than the name plaintiffs represented by Berman and Cabraser, would they be bound by -- assuming -- and I know it's disputed, but would they be bound by an affirmative decision by Mr. Weisfelner not to raise the clue -- the non-ignition switch plaintiff due process issues in the September scheduling order?

> MR. STEINBERG: I think those plaintiffs plus those people who either got notice of or were aware of the schedul[ing] order, they all would be bound. May 17, 2017 Hr'g Tr. at 208:4-12.

As briefing in the Bankruptcy Court intensified, Co-Lead Counsel filed pleadings in the Bankruptcy Court with the designation that they were doing so as MDL Co-Lead Counsel.[19] GM never objected to such a designation and indeed regularly forwarded such pleadings to this Court in its status reports.

---

[18] Ex. 2.

[19] *See e.g.*, 9/18/15 Brief with Co-Lead Counsel's signatures on cover page and signature page. Ex. 3 at p. 1 and p. 21.

Case 1:14-md-02543-JMF    Document 4465    Filed 10/02/17    Page 8 of 8

The Honorable Jesse M. Furman
October 2, 2017
Page 8

And in the Second Circuit, Co-Lead Counsel filed briefs with the same designation that GM is just now challenging.[20]  GM never questioned that Co-Lead Counsel were acting as Co-Lead Counsel in the MDL while successfully pursuing an appeal from a Bankruptcy Court order.

Thus, through the many years of the bankruptcy GM has known that (i) Co-Lead Counsel deemed it their obligation to protect the interests of economic loss plaintiffs in the Bankruptcy Court; (ii) Co-Lead Counsel designated counsel in the Bankruptcy Court to work with us; and (iii) Co-Lead Counsel directly participated in the Bankruptcy Court proceedings in our capacity as Co-Lead Counsel in the MDL.  During this entire process, GM never questioned Co-Lead Counsels' authority—until now while under threat of having to make a substantial payment pursuant to the express terms of the Sale Agreement, Plan, and GUC Trust Agreement.

**E.      Conclusion**

GM agreed to a specific process for resolution of claims against the GUC Trust as part of the protection it received in the bankruptcy.  Plaintiffs properly invoked that process.  GM's Letter is yet another attempt to evade the consequences of a bankruptcy procedure that it long ago agreed to.  GM has made unfounded accusations of collusion; interfered with effectuation of the Settlement Agreement; and now, after years of watching and assenting to Co-Lead Counsel's participation in the bankruptcy proceedings, questions the basis for our doing so.  Co-Lead Counsel submit there is no action for the Court to take.  If anything, the Court should be pleased that Co-Lead Counsel is vigorously and creatively fighting in multiple venues to seek compensation for the Ignition Switch Plaintiffs and the Non-Ignition Switch Plaintiffs.

Respectfully,

/s/ Steve W. Berman                                          /s/ Elizabeth J. Cabraser
Steve W. Berman                                              Elizabeth J. Cabraser
**Hagens Berman Sobol Shapiro LLP**             **Lieff Cabraser Heimann & Bernstein, LLP**
1918 Eighth Ave.                                              275 Battery Street
Suite 3300                                                         29th Floor
Seattle, WA  98101                                          San Francisco, CA  94111-3339

                            -and-                                                          -and-

555 Fifth Avenue                                             250 Hudson Street
Suite 1700                                                        8th Floor
New York, NY 10017                                       New York, NY  10013-1413

cc:  GM Defense Counsel

---

[20] *See* Ex. 4 cover page and p. 59.

HB010440-11 988447 V1

# Exhibit 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
|  | . | Case No. 09-50026-mg |
| IN RE: | . | Chapter 11 |
|  | . |  |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| et al., f/k/a GENERAL | . |  |
| MOTORS CORP., et al, | . | One Bowling Green |
|  | . | New York, NY 10004 |
| Debtors. | . |  |
|  | . | Thursday, August 17, 2017 |
| . . . . . . . . . . . . . . | . | 3:05 p.m. |

TRANSCRIPT OF IN COURT CONFERENCE
(CC: DOC NOS. 14053, 14056)
BEFORE THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:              King & Spalding LLP
                             By:  ARTHUR STEINBERG, ESQ.
                                  SCOTT DAVIDSON, ESQ.
                             1185 Avenue of the Americas
                             New York, New York 10036-4003
                             (212) 556-2158


For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs:                  Brown Rudnick LLP
                             By:  EDWARD S. WEISFELNER, ESQ.
                                  HOWARD S. STEEL, ESQ.
                             7 Times Square
                             New York, New York 10036
                             (212) 209-4917



Audio Operator:              Timothy Wilson, ECRO


Transcription Company:       Access Transcripts, LLC
                             10110 Youngwood Lane
                             Fishers, IN 46038
                             (855) 873-2223
                             www.accesstranscripts.com

        Proceedings recorded by electronic sound recording,
           transcript produced by transcription service.

2

APPEARANCES (Continued):

For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs and states
of California and
Arizona:                     Hagens Berman Sobol Shapiro LLP
                             By:  STEVE W. BERMAN, ESQ.
                             1918 Eighth Ave.
                             Suite 3300
                             Seattle, Washington 98101
                             (206) 623-7292


For Personal Injury
Accident Plaintiffs:         Goodwin Procter LLP
                             By:  WILLIAM P. WEINTRAUB, ESQ.
                                   GREGORY FOX, ESQ.
                             The New York Times Building
                             620 Eighth Avenue
                             New York, NY 10018-1405
                             (212) 813-8839


For Participating
Unitholders:                 Akin Gump Strauss Hauer & Feld LLP
                             By:  DANIEL GOLDEN, ESQ.
                             One Bryant Park
                             New York, NY 10036-6745
                             (212) 872-1000


For Certain Personal
Injury/Death Plaintiffs: Hilliard Munoz & Gonzales LLP
                             By:  BOB HILLIARD, ESQ.
                             719 South Shoreline Boulevard #500
                             Corpus Christi, Texas  78401
                             (361) 882-1612


For Plaintiffs'             Otterbourg
Executive Committee:         By:  MELANIE L. CYGANOWSKI, ESQ.
                             230 Park Avenue
                             New York, NY  10169
                             (212) 905-3622

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657    Filed 10/02/17    Page 4 of 90
Pg 13 of 728

3

APPEARANCES (Continued):

For Motors Liquidation
GUC Trust:                      Gibson, Dunn & Crutcher LLP
                                By:  KEITH R. MARTORANA, ESQ.
                                200 Park Avenue
                                New York, NY 10166-0193
                                (212) 351-4000

For Additional Ignition
Switch  Pre-Closing
Accident Plaintiffs:            Andrews Myers
                                By:  LISA M. NORMAN, ESQ.
                                1885 Saint James Place, 15th Floor
                                Houston, TX  77056-4110
                                (713) 850-4200

TELEPHONIC APPEARANCES:

For Takata Plaintiffs:          Stutzman, Bromberg, Esserman & Plifka
                                By:  SANDER L. ESSERMAN, ESQ.
                                2323 Bryan Street
                                Suite 2200
                                Dallas, TX  75201-2689
                                (214) 969-4900

4

1          (Proceedings commence at 3:05 p.m.)

2          THE COURT:  Please be seated.  We're here in <u>Motors</u>

3  <u>Liquidation Company</u>, 09-50026.  This is a status conference

4  scheduled at the request of certain parties in interest.  The

5  Court has received a flurry of letters and attachments over the

6  last few days relating to this matter.

7          Mr. Weisfelner, I'm going to ask you to start.

8          MR. WEISFELNER:  Thank you, Judge.  Your Honor, first

9  of all, welcome back from vacation.

10          THE COURT:  It's been a while, actually, but --

11          MR. WEISFELNER:  I'm assuming that like us, you

12  anticipated this status conference was going to have a

13  different tone and tenor.  In any event, Ed Weisfelner from

14  Brown Rudnick, together with my partner, Howard Steel.  Your

15  Honor, also on our side of the courtroom, William Weintraub and

16  Gregory Fox from Goodwin Procter.

17          Your Honor, we have all three co-leads from the MDL

18  who were also, in different capacities, signatories to the

19  settlement agreement or intended signatories to the settlement

20  agreement.  Steve Berman, Elizabeth Cabraser, Robert Hilliard

21  were all in transit when we heard that this hearing was going

22  to take a different turn.  Lisa Norman, I believe, is also in

23  court to round out the -- what I'll call plaintiffs' side of

24  the question, all intended signatories to the settlement

25  agreement, the drafts of which were provided to Your Honor.

5

1          Your Honor, as you know, based on the announcement I

2    made in open court way back in May, the parties, defined as

3    everyone on this side of the table, the GUC Trust and, to a

4    very important extent, the GUC Trust beneficiaries, some 66

5    percent of all the beneficiaries represented by the Akin Gump

6    firm, have been involved, frankly, since before May in

7    discussing the contours of a potential resolution of any number

8    of open matters that are on Your Honor's docket or could be put

9    on Your Honor's docket, including late-filed claims, a

10   propriety of late-filed claims, and the extent to which those

11   claims could or should be allowed.

12          Your Honor, following the May announcement in court,

13   we spent many, many months of discussion among the parties.

14   And as I think Your Honor can see through the email chains that

15   we provided early this morning, no later than late July, early

16   August, there was a final deal among the parties that was

17   subject to some additional fine-tuning of the documentation.

18   And I'll get back to that in a minute, but there were lots and

19   lots of submissions that crossed between the GUC Trust and the

20   unit holders on the one hand and the plaintiffs' side on the

21   other hand, including, in particular, expert reports submitted

22   both by economic loss plaintiffs' retained experts and personal

23   injury/wrongful death retained experts as to the value of their

24   claims.

25          THE COURT:  Is the pre-closing at --

1          MR. WEISFELNER:  Yes, pre-closing.

2          THE COURT:  -- injury or death plaintiffs?

3          MR. WEISFELNER:  Correct, Your Honor.  There were

4  declarations from Mr. Hilliard, from Mr. Berman, from

5  Ms. Cabraser, from Ms. Norman.  There was even a declaration

6  that was provided by Wilmington, the GUC Trust trustee, by a

7  woman by the name of Beth Andrews.  And again, from our

8  perspective -- well, before I get there, we also spent a ton of

9  time on the parties with noticed experts, in particular, with

10 the Epoch firm, trying to devise a notice procedure for this

11 settlement that would involve both direct mail notice in the

12 form of a postcard with reference to an appropriate website for

13 the longer version of the agreement, and we also worked quite

14 hard on social media and other methodologies for ensuring that

15 adequate notice went out to the world.

16         Now, Your Honor, no one on our side -- no one in the

17 world, I suspect -- thought that New GM was going to welcome

18 the development of a settlement with open arms.  We thought

19 they'd squeal.  And, in fact, they started to squeal before

20 Judge Furman this past Friday.

21         THE COURT:  Well, actually, I think at an earlier

22 hearing before me, Mr. Steinberg, when I advised that I had

23 received a telephone call from Magistrate Judge Cott about his

24 acting as a mediator, I think Mr. Steinberg, in substance,

25 indicated that New GM had not been a party to any discussions.

7

1    So I was aware of that, at least as of that time if not --

2              MR. WEISFELNER:  Certainly.  And just to be more

3    specific, the involvement of Magistrate -- and I continuously

4    mispronounce his name, it's Cott, I think --

5              THE COURT:  Cott.

6              MR. WEISFELNER:  -- Cott, really involved a

7    down-the-road step as between plaintiffs on --

8              THE COURT:  He mentioned that it was mentioned at

9    allocation.

10             MR. WEISFELNER:  -- how to allocate.  That's right.

11             THE COURT:  We didn't talk any further than that

12   about it, but he advised me.

13             MR. WEISFELNER:  My point being that we heard from GM

14   as recently -- not to suggest that we didn't hear from them

15   before that, but as recently as Friday during the status

16   conference before Judge Furman in the MDL.

17             THE COURT:  Yes.  I first heard about it when I read

18   the Bankruptcy 360 report of what Judge Furman was told last

19   Friday, I guess.  When the request came for a conference this

20   week here, I wasn't told why, but I did read the Bankruptcy 360

21   report.

22             MR. WEISFELNER:  And again, you know, this side of

23   the courtroom, together with the GUC Trust, were accused of all

24   sorts of collusive bad-faith conduct, and GM announced to Judge

25   Furman it was their intent, I think, that day or soon as our

1   papers got filed with this Court to immediately seek withdrawal

2   of the reference.

3         And, Your Honor, again everyone I think anticipated

4   that New GM would take every available opportunity it had to

5   contest all or any portion of the settlement agreement when it

6   came before an appropriate court of jurisdiction, shall we say.

7   They could have raised collusion.  They could have raised

8   impropriety.  They could have raised that the estimation

9   amounts were outrageous and not supported by the evidence.

10        They didn't choose to do any of that.  They didn't

11  choose to afford anyone, including victims, their due process

12  day in court.  They instead, from what we currently understand,

13  insisted on a meeting with the GUC trustee, which happened I

14  think, if today is Thursday, apparently on Tuesday of this

15  week, a meeting to which the GUC Trust beneficiaries,

16  represented by Mr. Goldman at Akin Gump were excluded.

17        And somehow, during the course of that meeting

18  between GM and the GUC Trust, the GUC Trust purported to

19  abandon not only its fiduciary duties, but a settlement that it

20  already agreed to and to announce to us, not before 3:30

21  yesterday, that they were, quote, "taking a different tack."

22        Now, Your Honor, this is all still fresh news to us.

23  We've only had a couple of hours to consult with our clients

24  and our colleagues, but I can tell Your Honor what we currently

25  contemplate being the way forward.  We know that what's on the

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Pg 19 of 728
Case 1:14-md-02543-JMF    Document 4657-1    Filed 10/02/17    Page 10 of 50

9

1  calendar are the late claims filings, and I would ask Your

2  Honor to give us a couple of weeks to figure out how we proceed

3  on those.

4       But frankly I think there may very well need to be

5  some preliminary inquiries.  And like many in the media, it's

6  important to us that we gather the facts before we speak.  But

7  some things we could speak to immediately, and that is we

8  firmly believe that what we had with the GUC Trust was an

9  enforceable agreement under New York law, notwithstanding the

10 fact that signatures had not been appended to those agreements.

11      THE COURT:  I didn't read -- you appended to your

12 letter a unsigned copy of the agreement, and I can't say that

13 I've studied every aspect.  I did read through it this morning,

14 the --

15      MR. WEISFELNER:  Sure.  And that's absolutely true.

16 The signatures of the GUC Trust never got appended.

17 Mr. Golden, for the GUC Trust beneficiaries, indicated that

18 they were done and they would sign as soon as they got word

19 that the GUC Trust signed.  We were all in possession of

20 execution copies and ready to sign, which would have been the

21 first step before we submitted documents to you.

22      But, Your Honor, I think as you can see from the

23 email traffic, this wasn't a question of whether we had a deal.

24 This was a question of finalizing documents, and in point of

25 fact, Gibson Dunn clearly indicated they were done with all of

10

1  the operative documents, many of them they had the proverbial

2  pin on, and that they were merely awaiting their clients' final

3  consent to the form of the documents.

4         And again, Your Honor ,I don't want to argue the

5  merits, but I firmly believe, based on everything we know and

6  everything we've researched in the relative short period of

7  time we have, that if we chose to, we could require the GUC

8  Trust to perform under the agreement they had -- we think is

9  enforceable under New York law.

10        We also believe that New GM may have liability for

11 what I'll generally refer to as tortious interference.  We are

12 told, but have no reason to know for a fact, that the GUC

13 Trust's about face was the subject of or occasioned by some

14 very direct, very serious threats issued either by New GM or

15 New GM's professionals to the GUC Trust, the administrator of

16 the GUC Trust and their professionals.

17        And, Your Honor, in an effort to understand all the

18 facts before we move any further forward, we are going to seek

19 discovery from the GUC Trust, from New GM, in terms of

20 understanding who all attended this very critical meeting this

21 week, what discussions preceded that meeting, what, if any,

22 inducements were made, what, if any, threats were extended, and

23 whether the inducements crossed the line of Title 18.

24        Your Honor, that's really all I had to tell you by

25 way of update.  We are -- devastated is the wrong word.  We are

11

1    shocked and amazed that after months of collective work by the
2    only party that -- under the plan of reorganization for Old GM
3    and under the GUC Trust agreement approved by new GM as the
4    buyer, the only party in interest that has standing to
5    deliberate on late claims and the only party authorized to take
6    a position with regard to the allowance or estimation of late
7    claims, the GUC Trust, after working with us for months,
8    somehow was convinced virtually overnight to back out.  And we
9    intend to get to the bottom of that.  Whether it takes efforts
10   to discovery, whether the unitholders themselves exercised
11   their rights under the trust agreement to replace the trustee,
12   all remains to be seen.

13        There are a couple of other things that I think are
14   preliminary, but I'll put them on the table in any event.  The
15   GUC Trust is possessed of material.  I don't remember the exact
16   dollar amount, 4- or $500 million.  Once upon a time, we had a
17   proceeding before your predecessor with regard to injunctive
18   relief, seeking to ensure that until the late claims
19   controversy were resolved, no further distributions got made
20   out of the GUC Trust.  The record will reflect that Judge
21   Gerber found in our favor.  However, he required us to post a
22   very significant supersedeas bond.

23        One of the interesting aspects of the reported
24   agreement between New GM and the GUC Trust that's the subject
25   of the letter you got from King & Spalding, I think it was

12

1  yesterday, is that New GM, in effect, will guarantee a rate of

2  return.  Well, that means, I presume, that if we press forward

3  again, the supersedeas bond has, thanks to our good sponsor,

4  New GM, been taken off the table.  But, Your Honor, we can't

5  see or stand still for subsequent distributions out of this

6  trust under the present facts and circumstances.

7         So, Your Honor, I hope you'll give us some time to

8  get our ducks in a row, figure out where do we go from here.

9  I'm hearing rumors of the fact that the GUC Trust administrator

10 wants to take a meeting with the GUC Trust beneficiaries and

11 maybe they'll have second thoughts about abandoning this deal

12 or second thoughts about entering into this new deal that's

13 been offered by New GM.  So there are still a lot of balls in

14 the air.  And, Your Honor, I know all of us want to get on with

15 late claims and estimation and allowance, but if you'd give us

16 a couple of weeks just to get our act together, we'd appreciate

17 it.

18         THE COURT:  Thank you, Mr. Weisfelner.

19         MR. WEISFELNER:  Thank you, Judge.

20         THE COURT:  I'd like to hear from the GUC Trust

21 counsel next.

22         MR. MARTORANA:  Good afternoon, Your Honor.  Keith

23 Martorana of Gibson, Dunn & Crutcher on behalf of Wilmington

24 Trust Company as GUC Trust administrator.

25         THE COURT:  Can I ask you why you were smirking when

13

1  Mr. Weisfelner was delivering his remarks to the Court?

2          MR. MARTORANA:  Well, Your Honor, the reason why I

3  was smirking was because, frankly, I was at the meetings.  And

4  to be totally candid with Your Honor, the only people that were

5  at the meetings were counsel for New GM and counsel for the GUC

6  Trust.  There were no principals at the meeting, although we,

7  of course, spoke with principals afterwards.

8          The concept that any of this discovery, which, I

9  mean, to the extent we file a motion, which I think was

10  anticipated, certainly might be acceptable, I mean, with

11  reservation of --

12          THE COURT:  What motion are you going to file?

13          MR. MARTORANA:  We're -- our intention is to file a

14  9019 motion seeking approval of the deal, the proposed deal

15  with New General Motors.  That deal, Your Honor, was outlined

16  in a letter that we filed yesterday.

17          THE COURT:  I read the letter.

18          MR. MARTORANA:  Okay.  So just to get back to your

19  question, Your Honor, I was obviously -- I was at that meeting.

20  The concept that there was any untoward threats or anything

21  that was illicit that happened at that meeting, in my view, is,

22  I mean -- well, I guess the discovery will show it, if we have

23  discovery, but it just frankly didn't happen.  So that is why I

24  was smirking, Your Honor.  At the end of the day --

25          THE COURT:  It didn't seem very funny to me, but you

14

1  seemed to think so.

2          MR. MARTORANA:  What's that?

3          THE COURT:  I was watching you as Mr. Weisfelner was

4  delivering his remarks, and you seemed to think it was funny.

5          MR. MARTORANA:  Well, Your Honor, I mean, I didn't

6  think -- I thought it was --

7          THE COURT:  This is a serious matter.

8          MR. MARTORANA:  I agree it's a serious matter, Your

9  Honor.  I definitely do not disagree with that.  I just did

10 not, frankly, understand.  I think that it's a stretch -- I

11 mean, obviously he wasn't there, but I think it's a stretch to

12 think that that --

13         THE COURT:  When was the meeting?

14         MR. MARTORANA:  The meeting was on, I believe,

15 Tuesday, Tuesday of this past week.

16         THE COURT:  And who was present?

17         MR. MARTORANA:  Mr. Steinberg, Mr. Davidson, myself,

18 Mr. Williams, and Mr. Gillette, who are over in the corner.

19 Those were the only participants in the meeting.

20         THE COURT:  And --

21         MR. MARTORANA:  Oh, and I'm sorry, there was someone

22 on the phone from Kirkland & Ellis, as well, Mark Nomellini

23 from Kirkland & Ellis.

24         So, Your Honor, the fact of the matter is, you know,

25 obviously we have -- I don't disagree with Mr. Weisfelner's

15

1    statements that we had been working with him --

2            THE COURT:  It just happened -- you know, as I said

3    earlier, I didn't read the proposed settlement agreement in

4    detail.  It's a very lengthy --

5            MR. MARTORANA:  It is.

6            THE COURT:  -- exhibit, but it would seem to have

7    reflected a very considerable amount of time in negotiating the

8    agreement in the various --

9            MR. MARTORANA:  It did.

10           THE COURT:  -- exhibits.  Can you tell me --

11           MR. MARTORANA:  It did.  I do not disagree with that.

12           THE COURT:  Can you tell me approximately how long

13   the negotiations were going on.

14           MR. MARTORANA:  Well, I think I would say that the

15   concept of negotiations had been going on for, I mean, probably

16   close to a year, I think.

17           THE COURT:  Well, without the concept.  These were

18   very --

19           MR. MARTORANA:  The actual true --

20           THE COURT:  Stop.  Wait until I finish my questions.

21           Attached to Mr. Weisfelner's letter as -- are various

22   exhibits, voluminous exhibits, but the settlement agreement is

23   -- and its immediate exhibits are quite voluminous.  Can you

24   tell me how long the negotiations and drafting of the actual

25   settlement documents went on for?

1          MR. MARTORANA:  I would say about two months I think

2   is probably accurate, but --

3          THE COURT:  And you had one meeting with New GM this

4   week that caused Wilmington Trust to abandon the settlement

5   agreement?

6          MR. MARTORANA:  We did, Your Honor.

7          THE COURT:  One meeting.  Okay.

8          MR. MARTORANA:  One meeting.  Yes, we did, Your

9   Honor.  In our view, as a fiduciary, we were initially willing

10  to go forward with the deal, with the settlement as presented.

11  Obviously it was --

12         THE COURT:  And what is it --

13         MR. MARTORANA:  -- never signed off on.

14         THE COURT:  And what is it that New GM said that

15  persuaded your client to abandon the deal that had been under

16  discussion for considerable time and negotiation of documents

17  for quite a long time?

18         MR. MARTORANA:  Well, certainly they reminded of many

19  of the things we already knew, which was the risk --

20         THE COURT:  Go ahead.  None of this is privileged, so

21  tell -- I want to hear what you have.

22         MR. MARTORANA:  Sure.  They reminded us of all the

23  risks that were associated with the proposed settlement, in

24  particular the execution risks, which I can get into if you'd

25  like.  But there were certainly numerous execution risks.

Case 1:14-md-02543-JMF   Document 4657-1   Filed 10/02/17   Page 18 of 50

17

1          THE COURT:  Well, there's going to be discovery, so I

2   would like to hear now -- and it probably will inform the

3   discovery.

4          MR. MARTORANA:  Sure.

5          THE COURT:  And I'm sure you'll be complete in

6   telling me what was -- how long did the meeting last?

7          MR. MARTORANA:  Maybe two hours --

8          THE COURT:  Okay.

9          MR. MARTORANA:  -- at most, I would say.

10          THE COURT:  And were documents circulated to you in

11   advance of the meeting?

12          MR. MARTORANA:  No, there were no documents

13   circulated.

14          THE COURT:  Was the decision to abandon the

15   settlement made at the meeting?

16          MR. MARTORANA:  The -- well, again, there were no

17   principals there, so there was no decision that could be made

18   at that meeting.  There was an offer that was floated, which

19   was tentative.  We followed up with our principals.  They

20   followed up with their principals.  And then, over the next day

21   or so, that proposal was boiled down to something more

22   concrete.

23          THE COURT:  And tell me what the proposals that New

24   GM made to you at the meeting.

25          MR. MARTORANA:  Well, the proposal that they made at

18

1    -- the first proposal that they made was continuing litigating

2    and we will pay your litigation costs against the plaintiffs.

3    That was the initial proposal that they made.  We ultimately

4    said, it's interesting, that sounds like something that we

5    might be able to work with, but at the end of the day, what our

6    two main concerns here are, that we're continuing a litigation

7    really for the benefit of New GM.  We feel like we've been

8    pulled into this, so obviously we're worried about spending

9    trust -- unitholder money for those purposes.

10          But then the -- a secondary or perhaps even bigger

11   issue is that at some point, probably after the term loan

12   litigation is fully and finally resolved, the GUC Trust will be

13   in a position to make a distribution to unitholders.  At this

14   point the GUC Trust cannot make a distribution to unitholders

15   until we figure out whether or not the 502(h) claim of the term

16   loan defendants is legitimate.  But at some point that will be

17   resolved, our mediation settlement or otherwise, and then we'll

18   be in a position to make a distribution.  And to the extent --

19          THE COURT:  Anybody who negotiates a settlement with

20   you better be careful because they may spend months doing it,

21   only to have you pull the rug out from under them at the last

22   hour.  You're smiling again.

23          MR. MARTORANA:  I'm sorry, I guess the question was I

24   didn't -- I don't understand --

25          THE COURT:  My comment was that anybody who

1  negotiates a settlement with you better be careful because you

2  may well pull the rug out from under them after months of

3  negotiation.  That was my comment as to which you had your big

4  grin on your face again.

5          MR. MARTORANA:  Well, I apologize, Your Honor.  But

6  at the end of the day, we are a fiduciary and we're going to

7  act in our fiduciary capacity.  And if that means abandoning a

8  proposal --

9          THE COURT:  And what other proposals did New GM make

10  to you that you considered in, I assume -- well, I won't ask

11  you what you recommended to your client.  What other proposals

12  did New GM make to you in the form of consideration for

13  abandoning the deal with the plaintiffs?

14          MR. MARTORANA:  Sure.  So again, getting back to the

15  point about a distribution, we said our two main concerns were

16  that we're continuing a litigation.  It's -- there's been a

17  number of costs that have been associated with that obviously.

18  It's continuing to pull down on trust assets.

19          And then the secondary aspect is that if we are in a

20  position to make a distribution and these claims continue to be

21  out there, there is no way that we're going to -- well, we

22  probably would not be able to make a distribution over the

23  existence of those claims.  And we would therefore -- currently

24  we're investing our assets -- required to invest our assets in

25  treasuries, and that is not really going to be a sufficient

Case 1:14-md-02543-JMF    Document 4657-1    Filed 10/02/17    Page 21 of 50

20

1  rate of return that we could otherwise get if this deal were to

2  go forward, and this deal -- the plaintiffs' deal, and if we

3  were able to get the releases that we would be hoping for under

4  that -- under the plaintiffs' deal.

5          So the offer after further discussion that was made

6  was that New GM would be potentially willing to provide us with

7  a rate of return.  We don't know what that would be.  We've

8  agreed that we would enter into good-faith negotiations to

9  determine what that rate of return would be because, among

10 other things, we don't know what the corpus of the trust will

11 be at that time.  So it's hard to come to something -- to that

12 kind of agreement today.

13         But those -- we felt that those two things,

14 particularly given the fact that we believe on the merits we

15 have very strong arguments against the late claims, on Pioneer,

16 on equitable mootness, on tolling arrangements, that this offer

17 from New GM dealt with the main concerns that we were -- that

18 we had.  And as a fiduciary, we felt that we needed to do that.

19 We felt that you don't necessarily go for -- I understand that

20 hedge funds want to go for the absolute home run at the risk of

21 $21 million and everything else out there, but we represent

22 all --

23         THE COURT:  What's the $21 million?

24         MR. MARTORANA:  So the way that the plaintiffs'

25 proposal would work is that the GUC Trust would, up front, pay

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-1    Filed 10/02/17    Page 22 of 50
Pg 31 of 728

21

1  $6 million for purposes of noticing.  So that would be out the

2  door before we even really get in front of Your Honor.  That

3  would just be a sunk cost for postcards.  And then it would be

4  followed by a $15 million payment and our agreement to support

5  a $10 billion claim as against New GM.  And we felt, among

6  other things, that there was a significant amount of execution

7  risk associated with that.  And, frankly, among other things,

8  that proposal, what we were really hoping to get out of it was

9  a release, get a true release from all the plaintiffs.

10      Given the fact that that proposal did not contemplate

11  and the plaintiffs would not agree to a Rule 23 settlement

12  certification, I think there's a potential execution risk

13  associated with actually accomplishing what it was that we

14  wanted to accomplish.

15      THE COURT:  Okay.  Anything else you want to tell me

16  now?

17      MR. MARTORANA:  No.  Thank you, Your Honor.

18      THE COURT:  All right.

19      Mr. Golden, I'd like to hear from you next.

20      MR. GOLDEN:  Yes.  Good afternoon, Your Honor.

21  Daniel H. Golden, Akin, Gump, Strauss, Hauer & Feld, counsel

22  for what's known as the participating unitholders.

23      Your Honor, this is really unfortunate that we find

24  ourselves in this situation where everybody now, in open court,

25  has to air their dirty laundry about a settlement that I think

Case 1:14-md-02543-JMF    Document 4657-1    Filed 10/02/17    Page 23 of 50

22

1    was agreed to in principle.  I will say for the record I can

2    confirm the factual recitation that Mr. Weisfelner made as to

3    the facts leading up to the announcement by New GM and the GUC

4    Trust of their -- of GUC Trust's disavowal of that settlement

5    agreement and their intention to enter into a purported new

6    agreement with New GM.

7            Your Honor, I think it's clear something very odd is

8    going on here.  We worked arm in arm, shoulder to shoulder,

9    with the GUC Trust, Wilmington Trust as the trustee and the

10    trust administrator, and with its counsel, Gibson Dunn, over

11    several months to negotiate and document a settlement.  We had

12    many, many, many conversations, drafting sessions, redrafting

13    sessions to get to a point where we were, as of last Friday, to

14    get to a settlement, a global settlement as between the

15    plaintiff class, the GUC Trust, and the unitholders.

16            So let's talk a minute about who we represent.  We

17    represent 65 percent of the unitholders.  That is the

18    shareholders of the trust.  They are the only beneficiaries of

19    the trust should the reserves be freed up.  That's the reserves

20    of the 4- or 500 million that Mr. Weisfelner referred to, and

21    we represent 65 percent.

22            Look, I've worked really closely with the Gibson Dunn

23    lawyers.  I like them.  But to hear them talk about that they

24    have fiduciary duties, yes, they do.  Wilmington Trust has

25    fiduciary duties.  They have fiduciary duties to my clients.

23

1  Now, we don't represent all of the unitholders, but everyone

2  who has raised their hand and said, "I'm here and I want to get

3  involved," we represent them.

4         We worked really hard to get to this global

5  settlement, which would have had the benefit or the result of

6  eliminating all the late-claim litigation and all the

7  underlying allowance of those claims.  We think that that's a

8  settlement that this Court would have welcomed.  And that's

9  why, in part, we worked so hard to get there.  But in a blink,

10 in really literally a blink, without any conversation to the

11 unitholders or their counsel, without any invitation by Gibson

12 Dunn or Wilmington Trust to say, we've met with GM, they have

13 an alternative proposal on the table, we'd like to get your

14 views on it.

15        We certainly shared views with them for months and

16 months, but when it came to the point where they were willing

17 to disavow that settlement and consider a new settlement which

18 does not work for the participating unitholders, we sent a

19 letter to Your Honor this morning so that there's no mistake.

20 All of the unitholders we represent will not and do not support

21 the proposed settlement with GM.

22        So you have to ask the question, what is Wilmington

23 Trust thinking about when they want to go forward with a

24 settlement that has the disapproval of every fiduciary that it

25 represents who's weighed in on the subject?  Now, I'm not

24

 1  saying that Wilmington Trust, who as an institution we worked

 2  with for years.  Frankly, I'm just surprised we find ourselves

 3  in this situation given our prior relationship and experience

 4  with Wilmington Trust.  But what are they thinking about going

 5  forward with a settlement over what will be active opposition

 6  by the unitholders?  Something --

 7          THE COURT:  Well, active opposition by New GM to the

 8  proposed settlement that was --

 9          MR. GOLDEN:  That's right.

10          THE COURT:  I mean, one way or the other, there's

11  going to be active opposition.

12          MR. GOLDEN:  That's absolutely right.  But the one

13  difference is the trust has no fiduciary obligations to New GM.

14  They do have fiduciary obligations to our client.  And I

15  confirm or reaffirm what Mr. Weisfelner said, that we did

16  expect active opposition from New GM.  We've had active

17  opposition from New GM almost throughout the inception of these

18  matters, so that's not a total surprise.  But what is

19  shockingly surprising to us is what was the motivation, what

20  was the rationale, what happened at that two-hour meeting to

21  have this absolute sea change.

22          Now, look, everybody's imagination can run wild.

23  Were there threats?  Were there inducements?  But there was

24  something there that caused, in two hours, for Wilmington Trust

25  and its counsel just to disavow five months of hard work, and

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Case 1:14-mc-02543-0MF    Document 4657-1    Filed 10/02/17    Page 26 of 50

25

1  we intend to find out what it is.  It's odd to us that we had

2  been originally -- when I said "we," the participating holders,

3  through their counsel, had been invited to the meeting that GM

4  had scheduled with Wilmington Trust, and then promptly

5  disinvited.

6           THE COURT:  Who disinvited you?

7           MR. GOLDEN:  We were advised by counsel for

8  Wilmington Trust that we were not -- we were no longer invited

9  to it.  I didn't question them.  I accepted that at face value.

10 I don't know who demanded it, but that's where the

11 communication came from.

12          Your Honor, I don't want to make this situation

13 worse.  We intend, to the best of our ability, still to work

14 with our trustee.  But if we can't, then we're going to

15 consider our alternatives, and that is not a threat, but it

16 just -- it's a recognition of the reality of the situation that

17 we find ourselves in.

18          This case, this overhang of the plaintiffs' claim,

19 have held this trust in abeyance for a very long time.  The

20 goal of this settlement was to, once and for all, be done with

21 the plaintiffs, get an absolute, full-bore release from the

22 plaintiffs in exchange for us doing the $6 million of noticing

23 costs -- and I'll come back to that in a second -- and a

24 $15 million payment.  Part and parcel of that overall

25 settlement agreement, but not interdependent upon getting the

26

1   release, was the agreement of the GUC Trust, supported by the

2   participating holders, to estimate the totality of the

3   plaintiffs' claims at somewhere around $10 billion, which would

4   have the effect of triggering what's known as the accordion

5   shares.  I know that's the part that GM doesn't like.  But they

6   would have every opportunity to object to that estimated

7   settlement of $10 billion.  We weren't looking to deprive them

8   of their ability to do that.

9           This conference, because Your Honor remarked that it

10  wasn't originally made clear to Your Honor what the purpose of

11  this conference was, was to preview that settlement proposal

12  with you.  We were certainly going to invite New GM, and we

13  thought it would be professionally courteous of us to advise

14  New GM in advance of the terms of our proposed settlement,

15  which Mr. Weisfelner and I did in a telephone call with

16  Mr. Steinberg and a partner whose name I forget at Kirkland and

17  Ellis last Wednesday.

18          Well, what did they do with that courtesy?  They

19  turned around, without any notice to us, and complained to

20  Judge Furman.  Why Judge Furman?  I'm not sure.  These matters

21  aren't before Judge Furman.  This settlement certainly wasn't

22  going to be before Judge Furman.  But it was their attempt, I

23  surmise, to attempt to start to poison the well.  Well, I was

24  very glad that Judge Furman's reaction was, take that up with

25  the bankruptcy court.

27

 1              THE COURT:  I should say I -- whenever I've had a
 2    conversation with Judge Furman, I've disclosed that I have.
 3    And I had a brief telephone conversation with Judge Furman on
 4    Tuesday morning.  He left a voicemail for me on Monday evening
 5    and I -- we spoke on Tuesday.  I -- he wanted me to be -- he
 6    wanted to be sure that I knew that there had been a
 7    presentation before him, or statements before him, that a
 8    settlement had been reached.  I told him that I read the
 9    Bankruptcy 360 report about it.  I told him that there had been
10    a request for a conference here, I had scheduled it, I hadn't
11    been informed at the time what the conference was about, but I
12    had scheduled it.  And that was the substance of the phone
13    conversation that I had with Judge Furman.

14              So I've tried to make a point, whenever he and I have
15    spoken, I've put it on the record.  We do not talk about the
16    merits of anything, but we informed --

17              MR. GOLDEN:  So --

18              THE COURT:  -- each other of procedural posture of
19    things.

20              MR. GOLDEN:  So continuing, we had had the
21    conversation with Mr. Steinberg and his colleague.  The purpose
22    of scheduling a status conference with you, Your Honor, was to
23    preview the settlement, not to argue the merits, but really to
24    preview the noticing procedures that we intend to follow
25    because this settlement contemplated a global release from all

28

1  the claims.  And we were going to do -- when I say "we," the

2  GUC Trust was going to do and spend $6 million on noticing to

3  make sure the plaintiffs -- something that Old GM never really

4  got around to doing, and that's why we find ourselves in this

5  mess.  But we were going to give direct notice to every party

6  who was the subject of a recall notice, so that's over

7  12 million parties, as well as notice to every party who has

8  started a lawsuit against Old GM/New GM based upon a presale

9  accident claim, so that nobody could complain this time that

10 the world has been put on notice as to the proposed settlement.

11        But we wanted to get a sense from Your Honor before

12 we went out and spent $6 million whether Your Honor thought

13 that would be an appropriate scope of notice.  That's all we

14 had originally intended to do at the status conference.  Well,

15 obviously events and facts have overtaken it, and we are where

16 we are.

17        Again, I'm here representing economic players.

18 They're not looking to go for the home run, as Mr. Martorana

19 said.  What they're looking for is peace in the valley.  They

20 want to get rid of the plaintiffs' claims and the plaintiffs'

21 claims against the trust for all time so that when the

22 avoidance action is settled or finally resolved, a final

23 distribution could be made.

24        THE COURT:  What's the face amount of the

25 approximately 65 percent of the unitholders -- of the claims of

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-1    Filed 10/02/17    Page 30 of 50
Pg 39 of 728

29

 1  the unitholders you represent?

 2          MR. GOLDEN:  So it's not in dollar amount; it's

 3  number of units.

 4          THE COURT:  Units.

 5          MR. GOLDEN:  Can I confer with my colleagues?

 6          THE COURT:  Yeah, go ahead, sure.

 7      (Counsel confer)

 8          MR. GOLDEN:  It's 21 million units out of

 9  approximately 31 million units.

10          THE COURT:  Okay.  All right.  Thank you, Mr. Golden.

11          MR. GOLDEN:  Thank you, Your Honor.

12          THE COURT:  Mr. Steinberg.

13          MR. STEINBERG:  Your Honor, Arthur Steinberg from

14  King & Spalding on behalf of New GM.

15          Mr. Weisfelner, in his presentation, said that he did

16  not want to speak prematurely until he gathered the facts, and

17  then he proceeded to speculate as to what the facts may be.

18  And there's a temptation that I have to be able to try to

19  respond to each and every time that he misstated what happened.

20  However --

21          THE COURT:  Let me say first, I thought your letter

22  to the Court was intemperate and inappropriate.  You could have

23  raised the issues that you raised.  So I know that there's very

24  strong feelings on -- there's more than two sides here -- on

25  all sides, but I didn't appreciate the tone of your letter.

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-1    Filed 10/02/17    Page 31 of 50
Pg 40 of 728

30

1  But go ahead.

2           MR. STEINBERG:  Your Honor, you're referring to the

3  letter that I sent on Tuesday as --

4           THE COURT:  Yes, I am.

5           MR. STEINBERG:  The reason why -- just to explain

6  that letter on Tuesday is that, as Mr. Golden said, that on

7  August 9th, we had a telephone call with Mr. Weisfelner and

8  Mr. Golden.  What Mr. Golden left out was that on the agenda

9  letter for the MDL on August 11th, under the section under

10  successor liability, the specific question of whether late

11  claims are being sought in the bankruptcy court would have

12  relevance to the briefing on successor liability, and the judge

13  wanted to know whether something had to be done or not.  So if

14  there was going to be a resolution of the late claims --

15           THE COURT:  Well, the fact that you raised it with

16  Judge Furman doesn't bother me in the least.  What I'm

17  complaining -- what I'm commenting on is I thought the tone of

18  your letter to me was inappropriate.

19           MR. STEINBERG:  Your Honor, it's never my intention

20  to write an inappropriate toned letter to Your Honor.  And to

21  the extent that we did, then we apologize.  The reason for the

22  letter was that this status conference was scheduled without

23  our participation, without being in compliance with Your

24  Honor's rules as to scheduling a status conference, and because

25  I expected that what was going to happen at the scheduling --

31

1  at the status conference was that they were going to try, in

2  effect, to get an advanced blessing on a notice provision in

3  connection with --

4        THE COURT:  Well, that wouldn't -- I can assure you

5  that that would not happen.

6        MR. STEINBERG:  But that's what I was essentially

7  told on August 9th and that they were going to ask Your Honor

8  to compel New GM to produce information so they can comply with

9  their notice obligation, and they were all going to try to do

10 that in a chambers conference with Your Honor, presumably off

11 the record.  And that was why I wanted to write to Your Honor

12 that if there was going to be a chambers conference, it really

13 should be in open court, it should be recorded, and that if

14 they wanted to have specific relief that they were going to

15 request at the conference, that I should be able to see that in

16 writing and to have the ability, Your Honor, to give you our

17 version of why you should not be able to do that so Your Honor

18 would be able to make a ruling on an informed record.  And that

19 was the motivation --

20       THE COURT:  I don't make rulings at chambers

21 conferences.  I don't have chambers conferences if any parties

22 in interest object to having chambers conferences.  I do them

23 in open court as we're doing today on the record.  So I very

24 rarely -- occasionally I will have a chambers conference, but

25 only if all parties in interest affected by the discussion are

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-1    Filed 10/02/17    Page 33 of 50
Pg 42 of 728

32

1 present.  I just want to assure you of that, Mr. Steinberg.

2 And I don't grant relief in a chambers conference.  Everything

3 happens in court on the record.

4      MR. STEINBERG:  Now, Your Honor, I think that -- to

5 some extent that there will be a motion filed, presumably by

6 the GUC Trust, to reference the arrangement that was agreed to

7 with New GM, and there will be a pleading that will be filed.

8 There will be an opportunity to object.  We will have the

9 opportunity to put in what really happened and why the GUC

10 Trust had changed its position.  And it wasn't because anybody

11 induced anything.  It was because what they had proposed was

12 what Mr. Martorana described as execution risk.  Our belief was

13 it was impossible to get to that point in time.

14      The reality was -- is that they were proposing a

15 settlement where a person who was paying the liability was New

16 GM on account of a $10 billion claim which we thought had no

17 basis in reality in connection with primarily time-barred

18 claims where the plaintiffs had purposefully not pursued

19 remedies against Old GM for years after the recalls were

20 announced, and that they had rolled over on those defenses on

21 late claims without giving any credence to that value.

22      THE COURT:  Well, Judge Gerber had determined that

23 there was equitable mootness, and it wasn't until the Second

24 Circuit reversed and specifically referenced the accordion

25 provision in its opinion that at the first conference I had, I

33

1 think, after the Second Circuit opinion, I raised the question

2 about late claims because it seemed clear to me, A, the Second

3 Circuit had reversed with respect to equitable mootness, that

4 there was the potential for substantial new value. I asked the

5 question -- I think I asked the question of you, I asked the

6 question of Mr. Weisfelner, how close to the $35 billion

7 threshold of allowed unsecured claims were you.

8 And because that's -- as I -- I didn't go back and

9 read it again, but my recollection is that was the trigger

10 point for additional New GM shares. So I think it must have

11 been very close to the first hearing when I presided after the

12 Second Circuit opinion that I raised those questions. And

13 we've had a discussion since then about motion for late claim.

14 You wanted to take discovery about the <u>Pioneer</u> factors. I

15 authorized discovery regarding the <u>Pioneer</u> factors.

16 So there's a history here, Mr. Steinberg. You don't

17 have it quite right. All right. I don't know whether the

18 settlement that was proposed that's unsigned -- Mr. Weisfelner

19 believes it's enforceable under New York law. There's a whole

20 body of law about when an agreement can be enforceable. I'm

21 not taking any position about it at all, whether it's

22 enforceable or not. I don't know whether it would have been

23 approved over New GM's objection. Not taking a position about

24 that. It just -- the events of the last week, I've had a

25 couple of letters that indicated that the plaintiffs believed

34

1  they were making progress with the GUC Trust in its settlement

2  negotiations.  But I stay out of settlement negotiations.

3  Okay?  When Magistrate Judge Cott called and asked if I

4  objected to his being a mediator, I made clear I didn't, and I

5  informed everybody in court about that call.

6          So there's a history, not quite what you describe it

7  as.  I want -- go ahead and finish, and then I'll say what I --

8          MR. STEINBERG:  Your Honor, the history that you may

9  not be aware of that preceded your handling of this case was

10  that Judge Gerber, in connection with the first distribution

11  that was made by the GUC Trust in 2014, did not see anybody

12  trying to block that distribution.  And when he confronted on

13  the oral argument on the four threshold issues, when he asked

14  Mr. Weisfelner, why didn't you do anything to block the

15  distribution, why didn't you sue Old GM for your Old GM

16  liabilities, why did you only sue New GM under a successor

17  liability, he said it was a tactical decision that they had

18  made to only pursue New GM.

19          In Judge Gerber's April 2015 sale decision, he

20  specifically references the tactical decision made by the

21  plaintiffs not to sue Old GM, but only to sue New GM as one of

22  the bases to support his equitable mootness finding, that they

23  had, in effect, precipitated what went on.

24          The two threshold issues, Your Honor, that you asked

25  us to brief in connection with the late claims issue was, one,

35

 1  was there a tolling agreement and when -- if there was, when

 2  did the tolling agreement take place.  And that was one of the

 3  issues because one of our arguments is that even after the

 4  announcement of the recalls and before the equitable mootness

 5  issue was even raised by Mr. Golden to add as a threshold

 6  issue, the plaintiffs had tactically decided not to sue Old GM

 7  in the face and the knowledge of the recalls.  That is an

 8  argument.  They have always had the ability to file late

 9  claims --

10          THE COURT:  We may get there, Mr. Steinberg, because

11  if I have to go on and address the late claim motion as a class

12  claim, I will.  Okay?

13          MR. STEINBERG:  Your Honor, I --

14          THE COURT:  It's premature for me to hear the

15  arguments now.

16          MR. STEINBERG:  Right.  Your Honor, it's -- the only

17  thing I would like to say to you is that there is a large

18  portion of things that were said to you today that are either

19  misleading or would benefit from context, written context,

20  written pleadings to be able to understand it.  I have a list

21  of things that I jotted down.  I don't think necessarily a

22  conference is the time to do it, but I do want to say one issue

23  as long as I have Mr. Berman here in court because Mr. Berman

24  said in the MDL, and Mr. Weisfelner repeated it at the

25  conference, on page 38, he said, "I'm pretty confident that the

36

1  sale agreement actually gives New GM no rights to object."

2  Now, you heard Mr. Golden say, "Of course, New GM always would

3  have the right to object."  But Mr. Berman's lawyer in this

4  case is Mr. Weisfelner.

5          And before Your Honor was -- took over this case in

6  2015, at the status conference before Judge Gerber on

7  July 16th, Mr. Weisfelner said if we were -- meaning as, on the

8  one hand, GUC Trust unitholders and on the other hand able to

9  consummate a settlement, it would be brought to the Court's

10  attention under Rule 9019, I presume either in this court or to

11  Judge Furman, depending on the resolutions of the motions to

12  withdraw the reference on notice to New GM.  And New GM will

13  have an opportunity to oppose that 9019, take the position

14  that, as Your Honor indicated, we colluded, in effect, to stick

15  it to New GM, and they'll be entitled to be heard on the merits

16  with regard to that contention, and the settlement will not be

17  effective unless and until the Court overrules the objection.

18          So Mr. Berman told Judge --

19          THE COURT:  Well, the settlement isn't going to be

20  effective until I approve it unless --

21          MR. STEINBERG:  That's correct.

22          THE COURT:  -- the reference is withdrawn and Judge

23  Furman deals with it.

24          MR. STEINBERG:  But this is --

25          THE COURT:  So whether -- you know, the issue of New

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-1    Filed 10/02/17    Page 38 of 50
Pg 47 of 728

37

1  GM's standing can be dealt with at an appropriate time.

2            MR. STEINBERG:  The only thing that I --

3            THE COURT:  Today is not the time.

4            MR. STEINBERG:  Right.  The only thing I just wanted

5  to highlight was that you heard Mr. Weisfelner say today and

6  Mr. Berman say in the MDL conference that New GM would not have

7  standing, and all I wanted to do is provide --

8            THE COURT:  I didn't hear anybody tell me that New GM

9  doesn't have standing.  I called you to the podium, and we'll

10 see.

11           MR. STEINBERG:  No, no.  Mr. Weisfelner I think

12 actually alluded to that, as well, too, but --

13           THE COURT:  I don't think he did.  I don't think he

14 did.

15           MR. STEINBERG:  But certainly Mr. Berman did on the

16 MDL conference.

17           THE COURT:  Perhaps he did before Judge Furman.  I

18 haven't read the transcript of what took place before Judge --

19           MR. STEINBERG:  It's attached to one of the letters.

20           THE COURT:  Yes, I know.  There's a voluminous stack

21 of papers that --

22           MR. STEINBERG:  And so, Your Honor, I go through

23 this --

24           THE COURT:  I read as much of it as I could.

25           MR. STEINBERG:  I go through this not to be able to

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-1    Filed 10/02/17    Page 39 of 50
Pg 48 of 728

38

 1  argue New GM's standing in connection with a proposed

 2  settlement.  That is not before Your Honor.  I only do that for

 3  one reason, which is that what you've heard today is -- to some

 4  extent needs to be put in context, needs the benefit of written

 5  pleadings to be able to make a presentation to Your Honor so

 6  that you're able to think about it before you take to the bench

 7  instead of having it presented in a disjointed way.

 8          THE COURT:  Here's how we're going -- well, first,

 9  all right, anything else, Mr. Steinberg?

10          MR. STEINBERG:  Only that -- I think that's it, Your

11  Honor.  Thanks.

12          THE COURT:  Okay.  Anybody else wish to be heard?

13          All right.  Mr. Martorana indicated that he

14  anticipates making a 9019 motion asking the Court to approve

15  the settlement between the GUC Trust and New GM.

16          Mr. Weisfelner articulated a position that he

17  believes that the plaintiffs have an enforceable agreement

18  under -- was the written agreement governed by New York law?

19          MR. WEISFELNER:  Yes, Your Honor.

20          THE COURT:  Okay.  He believes that the plaintiffs

21  have an enforceable agreement, even though there's nothing

22  signed, against the GUC Trust.  I'm not going to -- I may well

23  hear both motions at the same time.  It's clear that discovery

24  needs to take place.  I direct that counsel meet and confer

25  promptly and discuss discovery and set forth, hopefully, an

39

1   agreed plan of discovery that will cover both proposed

2   settlements.  To the extent there are disagreements, they can

3   be presented to me.  With respect to discovery disputes

4   generally, I don't require formal motions.  We can schedule

5   another conference fairly soon.  I want you to meet and confer

6   and see if you can resolve issues about discovery within the

7   next week.  I understand people have vacations and -- you know,

8   within two weeks you ought to be able to resolve those issues.

9          Get a date from Deanna for another conference in

10  court, open court status conference.  If you have a stipulation

11  on a plan of discovery, you can present it to me without a

12  hearing.  If not, we'll take it up in early September and try

13  and get that resolved.

14         I've heard a lot of things in a short amount of time

15  today.  I don't know whether the trust agreement includes

16  provisions on threshold levels to change the trustee, for

17  example.  I don't know how that works, and at this stage I

18  don't really want to know how it works.  But certainly that was

19  an issue that was raised today as to the possibility that

20  unitholders are going to seek to replace the trustee.  I'm not

21  advocating at all.  Any matters that Wilmington Trust has been

22  involved in that I've presided over, they've done a very

23  professional job.  I have no reason to think that they didn't

24  do so here.  But there are a lot of moving parts.  So at a

25  status conference in early September, I would like to know

40

1  quite specifically how the parties collectively propose to

2  proceed.

3         So what I've heard is at least two -- and I'm not

4  setting a deadline for the GUC Trust to file a 9019 motion.  I

5  want fairly soon.  It doesn't have to be before we have a

6  conference in early September, but I do want that fairly soon.

7  This has got to get -- you know, if there's no settlement, if

8  the GUC Trust's proposed settlement with New GM is rejected, if

9  there's no enforceable settlement by the plaintiffs with the

10 GUC Trust, we'll go forward with the contested motion for leave

11 to file a late class claim and we'll just head down that

12 litigation road if that's the direction it's going to go.

13        There may be other issues that some or all of you

14 wish to raise, and I want to make clear to all of you any

15 pleadings or correspondence with the Court needs to be civil in

16 tone and identify those issues which, in good faith, people

17 believe there needs to be discovery or needs to be presented to

18 the Court in an appropriate context, motion, I assume.

19        Anything else anybody wants to raise today?

20 Mr. Steinberg?

21        MR. STEINBERG:  Your Honor, I understand clearly the

22 notion about discovery and working with -- on a meet and

23 confer, but right now we presumably will have a pleading by the

24 GUC Trust, I presume to put forth the New GM agreement.  We

25 don't have anything on the other side.

1    THE COURT:  Well, you only pulled the rug out from

2    under them yesterday.  Why am I not surprised?  They thought

3    they had an agreement with the GUC Trust --

4         MR. STEINBERG:  No, no, Your --

5         THE COURT:  -- Mr. Steinberg.  And they have a very

6    voluminous set of documents.  Are you going to give notice to

7    the same group of people that they propose and in the same

8    manner that they propose to give notice?  And who's going to

9    pay for that?

10        MR. STEINBERG:  Well, there's a clear reason why we

11   would not do that, because there's no giving up of any rights.

12   There's no -- there's nothing that plaintiffs are giving up.

13   The plaintiffs are going to have their day in court to -- set

14   to litigate their matter.

15        THE COURT:  Well, I don't know.  I'm not sure.

16   That's going to be an issue the Court's going to have to

17   address as to what notice must be given, and it may be that

18   Wilmington Trust, as the trustee, is going to be required by

19   the Court to give notice to every one of the unitholders of a

20   proposal for the Court to approve a 9019 settlement.

21        And, of course, if they want to make that motion for

22   approval of the settlement and -- the parties better address

23   who has to have notice of it.  And if they want to make the

24   motion, they're either going to pay for it or New GM is going

25   to pay for it.

42

```
 1            MR. STEINBERG:  Well, Your --

 2            THE COURT:  Okay.  And -- well, we'll see.  Okay.

 3            MR. STEINBERG:  But my --

 4            THE COURT:  So don't think, Mr. Martorana, that by

 5   the fact that you're not going to have to do the notice program

 6   that would have been required by the plaintiffs, that you're

 7   not going to have to do exactly the same thing in order to get

 8   the Court to consider the 9019 motion that you're talking

 9   about.

10            MR. MARTORANA:  May I speak, Your Honor?

11            THE COURT:  Not yet.

12            MR. MARTORANA:  Okay.

13            MR. STEINBERG:  Your Honor, so that my comments are

14   hopefully better put into context, I wasn't criticizing the

15   plaintiffs for not having a pleading as of today.

16            THE COURT:  It sounded that you were.

17            MR. STEINBERG:  No, no.  Your Honor, I was saying

18   that we were talking about a discovery program without the

19   framework of a pleading.

20            THE COURT:  Well, you know exactly what the framework

21   is.  There's a fairly voluminous set of papers that they've

22   presented.  You can sit down and you can negotiate.  If you

23   can't -- you can work out the discovery plan, and they'll tell

24   you what it is they want.  And if you're opposing it or you

25   can't resolve it, you'll be back to me very shortly.
```

43

 1           I'm assuming that the plaintiffs contemplate making a

 2   motion to enforce what they believe is an enforceable

 3   settlement, so I will have before me at the same hearing two

 4   proposed conflicting settlements.  Okay?  And an evidentiary

 5   hearing is undoubtedly going to be required.  Okay?  And I'm

 6   not going to do them separately or seriatim.  And if Wilmington

 7   Trust beats the plaintiffs to the punch in making the motion,

 8   that's not going to make a difference because I'm going to

 9   schedule them together, and there's going to be discovery

10   beforehand.

11           So I'm directing you to meet and confer and try and

12   agree on a proposed discovery plan.  If you can't agree, you're

13   going to be back to me very shortly and I'll resolve the

14   differences.  I'd also like to know from both sides when they

15   contemplate filing pleadings in support of their positions, the

16   9019 that Wilmington Trust wants to present, the -- it's not a

17   9019 -- well, I guess it is.  It's -- you think you have an

18   enforceable settlement.  It'll be presented as a 9019.

19           MR. STEINBERG:  I think it was --

20           THE COURT:  So I will have competing settlements.

21           MR. STEINBERG:  I think, Your Honor, you answered my

22   question, which was that at some point there needed to be a

23   pleading --

24           THE COURT:  Yes.

25           MR. STEINBERG:  -- to tie it into the discovery, and

44

 1  all I was standing and rising is that --

 2          THE COURT:  Well, I'm not sure, Mr. Steinberg,

 3  because even if they didn't, I think that they'd be entitled to

 4  that same discovery with respect to any 9019 proposal from

 5  Wilmington Trust.

 6          MR. STEINBERG:  I agree with that.  The only question

 7  is, is that if there's going to be an evidentiary hearing as to

 8  whether there was an enforceable agreement with the plaintiffs,

 9  there needed to be a pleading on that.  That's not on the

10  record.  And all I was saying is that --

11          THE COURT:  Okay.  We'll be left with no man's world

12  with neither settlement being approved, but that's the way

13  it'll be.

14          MR. STEINBERG:  I understand.

15          THE COURT:  Okay.

16          MR. STEINBERG:  That was the only --

17          THE COURT:  But you all -- specifically I am asking

18  that you need to address who would need to receive notice of

19  Wilmington Trust's 9019.

20          So let's -- any other issues that need to be

21  addressed today?  Mr. Weisfelner?

22          MR. WEISFELNER:  Your Honor, I promise we'll be

23  quick.  I want to get out of here, and I presume Your Honor

24  would like to do the same.  I just find it strange that in

25  contemplation of discovery on a motion by the plaintiffs to

45

1    enforce Wilmington's obligations under the settlement

2    agreement, New GM's counsel stands up to tell you, well, we're

3    going to take discovery on that because they haven't filed a

4    motion yet.

5                 THE COURT:  Well, let's --

6                 MR. WEISFELNER:  If anyone would have said it --

7                 THE COURT:  Mr. Weisfelner, I think I've addressed

8    the discovery issue.  I don't need to hear any more.

9                 MR. WEISFELNER:  You're right.  But here's my only

10   other concern in terms of an orderly procedure where we meet

11   and confer and do our best as professionals to work out a

12   consensual arrangement.  New GM is already on the record that

13   any consideration of our settlement, whether compelled under

14   New York law or otherwise, that New GM insists that that matter

15   be before Judge Furman, insists they intend to withdraw the

16   reference.

17                I just point that out because it would be I think

18   very difficult, if not impossible, to work out a scheduling

19   motion where the motion to compromise between New GM and the

20   GUC Trust stays here and the motion to settle, as obligated

21   under New York law, as threatened by New GM, goes upstairs.

22                THE COURT:  Mr. Weisfelner --

23                MR. WEISFELNER:  We'll try --

24                THE COURT:  Mr. Weisfelner, the filing of a motion to

25   withdraw the reference does not stay the action before the

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-1    Filed 10/02/17    Page 47 of 50
Pg 56 of 728

46

1  bankruptcy court.  I have always, in every matter before me,

2  made clear that when a motion to withdraw the reference is

3  filed, I continue on.  The case continues forward.  I do not

4  stay matters because of a motion to withdraw the reference.

5         Judge Furman can do what he believes is appropriate

6  under the circumstances.  What -- and I suspect at an

7  appropriate time it'll be briefed.  The claims allowance

8  process is so clearly part of the core bankruptcy function.

9  Okay?

10         MR. WEISFELNER:  Thank you, Judge.

11         THE COURT:  So what Judge Furman decides is up to

12  Judge Furman.  I am pushing forward.  And with either a

13  litigated motion for leave to file a late class claim or one or

14  more settlements that might alter that -- I mean, if the

15  settlement with Wilmington Trust is approved -- if Wilmington

16  Trust's settlement with New GM is approved, the litigation

17  still goes forward before me.  Okay?  It doesn't alter that.

18  So one way or the other, we're pushing forward.  If Judge

19  Furman wishes to withdraw the reference, if he believes it's

20  appropriate to do it, he'll do that.  But unless and until he

21  does, we go forward.

22         You know, there have been a few occasions where

23  literally it was crystal clear because of jury trial demands,

24  et cetera, there was an absolute right to a jury trial.  With

25  other judges I've just -- you know, we went forward.  It was a

47

 1  signed case -- you know, there was a signed pretrial order.

 2  The matter went to the district court, and it's funny that

 3  within a matter of days it settled.  Nobody wanted the trial

 4  anymore.

 5          But -- so we will push forward and I will resolve

 6  whatever is before me.  I read in, you know, I think, Mister --

 7  one of Mr. Steinberg's letters an issue about 157(b)(5).  I

 8  don't think that affects estimation, which as I understand was

 9  the approach that the proposed settlement of the plaintiffs

10  had.  We'll see what we get to.

11          First step is what discovery is going to take place.

12  I want to know, when we meet next, when you're each going to

13  file pleadings in support of your respective motions.  They are

14  going to be heard together.  Anything else anybody wants to

15  raise today?

16          Mr. Golden?

17          MR. GOLDEN:  Just one last thing, Your Honor.  I --

18  it would be helpful to the unitholders, no one else, that we

19  don't leave today's court session with an absolute certainty

20  that the New GM/GUC Trust arrangement is actually going to be

21  signed and finalized.  I --

22          THE COURT:  I can't effect that, Mr. Golden.

23          MR. GOLDEN:  No.  I understand that, but I want to

24  say that the unitholders are optimistic in having further

25  discussions with its trustee, its fiduciary, to make it clear

48

1    what the unitholders' position is.  So there may be an

2    eventuality where the proposed New GM/GUC Trust settlement does

3    not actually go forward.

4              THE COURT:  One or the other may not go forward.

5              MR. GOLDEN:  Thank you, Your Honor.

6              THE COURT:  Okay.  We'll take it as it comes, but in

7    the meantime, I've got to deal with the situation that's

8    presented to me.

9              MR. GOLDEN:  Thank you, Your Honor.

10              THE COURT:  We're adjourned.

11          (Proceedings concluded at 4:13 p.m.)

12                              *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:14-md-02543-JMF   Document 4657-1   Filed 10/02/17   Page 50 of 50

49

# C E R T I F I C A T I O N

1

2

3          I, Alicia Jarrett, court-approved transcriber, hereby

4   certify that the foregoing is a correct transcript from the

5   official electronic sound recording of the proceedings in the

6   above-entitled matter.

7

8

9



10

11   ALICIA JARRETT, AAERT NO. 428      DATE:  August 20, 2017

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE: | .   Case No. 09-50026-mg<br>.   Chapter 11 |
|  | . |
| MOTORS LIQUIDATION COMPANY,<br>Et al., f/k/a GENERAL<br>MOTORS CORP., et al, | .   (Jointly administered)<br>. |
|  | .   One Bowling Green |
| Debtors. | .   New York, NY 10004<br>. |
|  | .   Wednesday, May 17, 2017 |
| . . . . . . . . . . . . . . . | .   9:04 a.m. |

TRANSCRIPT OF HEARING RE:  ORDER TO SHOW CAUSE IN REFERENCE TO
THRESHOLD ISSUE.  (CC: DOC. NO. 13857, 13859, 13861, 13864,
13865, 13866, 13888, 13889);
HEARING RE:  ORDER TO SHOW CAUSE RE:  THE PITTERMAN MATTER.
(CC: DOC. NO. 13857, 13859, 13861, 13864, 13865,
13866, 13888, 13889)
**BEFORE THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

For General Motors LLC:   King & Spalding
                          By:  SCOTT DAVIDSON, ESQ.
                               ARTHUR STEINBERG, ESQ.
                          1185 Avenue of the Americas
                          New York, NY  10036-4003
                          (212) 556-2164

For the Non-Ignition       Goodwin Procter LLP
Switch Post-Closing        By:  WILLIAM P. WEINTRAUB, ESQ.
Accident Plaintiffs:       The New York Times Building
                          620 Eighth Avenue
                          New York, NY 10018-1405
                          (212) 813-8839

APPEARANCES CONTINUED.

Audio Operator:            Jonathan, ECR

Transcription Company:     Access Transcripts, LLC
                          517 Dell Road
                          Landing, NJ  07850
                          (855) 873-2223
                          www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES (Continued):

For Pitterman:              Adelman Hirsch & Connors LLP
                           By:  JORAM HIRSCH, ESQ.
                           1000 Lafayette Blvd.
                           Bridgeport, CT  06604
                           (203) 331-8888

For Ignition Switch        Brown Rudnick
Plaintiffs and certain     By:  HOWARD S. STEEL, ESQ.
Non-Ignition Switch             EDWARD WEISFELNER, ESQ.
Plaintiffs:                7 Times Square
                           New York, NY  10036
                           (212) 209-4917

For Elliott, Sesay,
Bledsoe Plaintiffs:        GARY PELLER, ESQ.
                           600 New Jersey Avenue, N.W.
                           Washington, DC  20001
                           (202) 662-9122

For the Pilgrim
Plaintiffs:                Klestadt Winters Jureller Southard &
                            Stevens, LLP
                           By:  BRENDAN M. SCOTT, ESQ.
                           200 West 41st Street, 17th Floor
                           New York, NY  10036-7203
                           (212) 972-3000

Also appearing:            The Mastromarco Firm
                           By:  RUSSELL C. BABCOCK
                           1024 N. Michigan Ave.
                           Saginaw, MI  48602
                           (989) 752-1414

TELEPHONIC APPEARANCES:

For Ignition Switch
Plaintiffs:                Stutzman, Bromberg, Esserman & Plifka
                           By:  SANDER L. ESSERMAN, ESQ.
                           2323 Bryan Street, Suite 2200
                           Dallas, TX  75201-2689
                           (214) 969-4900

For Christopher Pope:      Ledford Law Firm
                           By:  KRIS T. LEDFORD
                           Heritage Professional Plaza
                           425 East 22nd Street, Suite 101
                           Owasso, OK  74055
                           (918) 376-4610



1          (Proceedings commence at 9:04 a.m.)

2          THE COURT:  All right.  Please be seated.  We're here

3   in Motors Liquidation Company, 09-50026.  Good morning,

4   everybody.

5          Mr. Weintraub, I think you were up and arguing when

6   we ended last time.

7          MR. WEINTRAUB:  Thank you, Your Honor.  Good morning.

8   William Weintraub of Goodwin Proctor for the Non-Ignition

9   Switch Post-Closing Accident Plaintiffs.  Not quite sure

10  exactly where I left off last time, Your Honor, so I thought it

11  would be useful to very briefly recap and then resume.

12         THE COURT:  Go ahead.

13         MR. WEINTRAUB:  We already discussed, Your Honor, our

14  view that the four threshold issues set up in the two motions

15  to enforce of April 2014 and August 2014 did not involve the

16  post-closing non-ignition switch accident cases.  The April

17  2015 decision of the bankruptcy court established what we call

18  the due process paradigm for the assertion of independent

19  claims by requiring a predicate showing of the denial of due

20  process at the time of the sale in order to assert an

21  independent claim.

22         We talked about our view of the structure of the

23  September 3, 2015, scheduling order as being divided into

24  topics such as punitive damages imputation; bellwether

25  complaints; the marked second amended consolidated complaint,

4

1  which was the class action complaint on economic damages; the

2  California and Arizona complaints; and other complaints where

3  New GM served a marked pleading and a demand letter setting

4  forth its position on that particular complaint.

5          Our view is the scheduling order did not mention due

6  process or independent claims and that New GM's demand letter

7  exceeded the text authorized in the scheduling order by

8  confusingly and perhaps misleadingly stating that claims,

9  except for independent claims, were barred as a result of the

10 June 2015 judgment.  I think an illuminating example of that,

11 which I didn't discuss last time, was a series of letters

12 between New GMM and Mr. Tap Turner (phonetic) who is one of the

13 plaintiffs' lawyers that I represent here and had represented

14 in the June 2016 hearings.  Both of the letters I'm going to

15 refer to were put into the record by New GM in the compendium

16 of exhibits that was attached to their motion.

17         We've got a letter which is Document Number 13634-18

18 that was sent to Mr. Turner on September 1, 2015, right before

19 the scheduling order issued.  And then we have a letter to Mr.

20 Turner dated May 16, 2016, which is Document Number 13634-21.

21 In the September letter New General Motors uses the except-for-

22 independent-claims construct in the letter.  And I have a copy

23 of the letter with me if the Court would like --

24         THE COURT:  Sure.

25         MR. WEINTRAUB:  -- to see it.  I didn't bring a whole

5

1   bunch of copies, Your Honor.  May I approach?

2            THE COURT:  Absolutely.  Thank you.  Give me a chance

3   to read them before you start again.  Okay.

4            MR. WEINTRAUB:  Yes, Your Honor.  I've given you both

5   the September one and the May 16.

6            THE COURT:  Yes, thank you.

7       (Court reviews documents)

8            THE COURT:  Go ahead, Mr. Weintraub.

9            MR. WEINTRAUB:  So, Your Honor, my point -- and I'd

10  call your attention to page 2 --

11           THE COURT:  Which letter?

12           MR. WEINTRAUB:  -- of the September 1, 2015, letter

13  at the bottom.

14           THE COURT:  I just highlighted it.  I just

15  highlighted it.

16           MR. WEINTRAUB:  Okay.  So that --

17           THE COURT:  Go ahead.

18           MR. WEINTRAUB:  In that one, it's the except-for-

19  independent-claims construct.

20           THE COURT:  I highlighted that language.

21           MR. WEINTRAUB:  And then in the May 16, 2016, letter

22  at page 2 of the letter at the bottom of the page the paragraph

23  reads:

24               "The plaintiff in the lawsuit does not have a claim

25               based on the ignition switch defect and therefore is

 1          prohibited from asserting an independent claim

 2          against New GM."

 3          And my point here is that the specificity morphed

 4   from the letter that was sent in connection with the

 5   September 3 or right in advance of the September 3 scheduling

 6   order from the generic except-for-independent-claims to the

 7   more specific, you don't have an ignition switch defect,

 8   therefore, you can't assert --

 9          THE COURT:  Am I correct that the plaintiffs read the

10   Second Circuit opinion as interpreting the sale order to carve

11   out any prohibition on the assertion of independent claims from

12   whatever defect or source?

13          MR. WEINTRAUB:  Yes, Your Honor.  It's --

14          THE COURT:  That's the position of the plaintiffs.

15   And that's why you say the May -- your -- what you're

16   contesting about this May 2016 letter is that, rather, it puts

17   an additional limit on the independent claims language that you

18   think is the operative.

19          MR. WEINTRAUB:  Well, keep in mind, Your Honor, I

20   mean, in a global sense, yes.  But in terms of the chronology,

21   in May 2016 the Second Circuit hadn't yet --

22          THE COURT:  I understand.

23          MR. WEINTRAUB:  -- ruled.  Right.

24          THE COURT:  I understand --

25          MR. WEINTRAUB:  So --

7

1           THE COURT:  -- they haven't ruled yet but --

2           MR. WEINTRAUB:  Right.  So our position always was

3   that we didn't think there was subject matter jurisdiction to

4   bar independent claims, especially prospective independent

5   claims.

6           THE COURT:  Let me ask you this.  Whether you agree

7   with Judge Gerber's decision or not, do you agree that

8   Judge Gerber expressly barred independent claims -- that he

9   expressly barred independent claims?

10          MR. WEINTRAUB:  I want to make sure I understand your

11  question.

12          THE COURT:  Well, what I'm hear --

13          MR. WEINTRAUB:  Well, in the April --

14          THE COURT:  Right.

15          MR. WEINTRAUB:  In the April 2015 --

16          THE COURT:  Yes.

17          MR. WEINTRAUB:  -- opinion, I think that what he did

18  in the April 2015 opinion was that he said the only thing in

19  front of me right now with respect to a due process violation

20  are --

21          THE COURT:  Is the ignition switch defect.

22          MR. WEINTRAUB:  -- are the ignition switch people.

23  And since he believed that the sale order barred all

24  independent claims, which we quibble with, but since he

25  believed that the sale order barred all independent claims, he

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

8

1    determined, in the context of the due process briefing, that

2    had someone been given appropriate notice and come to the sale

3    hearing and pointed out the over-extension of my jurisdiction,

4    I would have corrected that and cut that back.  The only people

5    who are here right now are the ignition switch people.  So in

6    essence -- and I think literally what he ruled was that

7    independent claims for people with an ignition switch defect

8    are not barred. Everyone else remains stayed by the original

9    sale order until they demonstrate a due process violation.

10           THE COURT:  And I take it, am I correct, that the

11   position of the plaintiffs, not just of the post -- the

12   non-ignition switch post-closing plaintiffs, but of all the

13   plaintiffs is that the Second Circuit interpreted the sale

14   order as not barring independent claims, full stop?

15           MR. WEINTRAUB:  I think the Court did two things.  I

16   think it indicated without ruling that the language of the sale

17   order was at least debatable as to whether or not it did that.

18   But then I think that it ruled as a matter of subject matter

19   jurisdiction that because this wasn't what the Second Circuit

20   called a "bankruptcy claim," it was claim against a non-debtor,

21   that you could not sell free and clear of that claim using

22   363(f), which we view as a subject matter jurisdiction issue.

23           THE COURT:  Okay.  All right.

24           MR. WEINTRAUB:  So, yes, to the --

25           THE COURT:  Go ahead.

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

9

1        MR. WEINTRAUB:  -- the Second Circuit's

2   interpretation of what the bankruptcy court could do under

3   363(f).  I won't belabor this point.  There are other documents

4   where New GM -- and I think we referred to one of them last

5   time, Document Number 13390, which was a letter to the

6   Bankruptcy Court dated August 26th, 2015, in which GM

7   reiterated its belief that unless you demonstrate a due process

8   violation, you cannot assert an independent claim.  And there

9   is yet another letter, which is Document Number 13523, which is

10  a letter --

11        THE COURT:  There's no question that New GM is

12  asserting the position that other than for ignition switch

13  defect plaintiffs versus the subject vehicles, their position

14  is that independent claims are barred.  I understand that's

15  their position, and the position of the plaintiffs is no

16  independent claims are barred.

17        MR. WEINTRAUB:  Right.  What I'm setting up, Your

18  Honor, is demonstrating the pivot in position by New General

19  Motors, that all throughout the fall of 2015 letters to the

20  bankruptcy court repeatedly emphasized the fact that

21  independent claims are barred unless and until the due process

22  violation has been demonstrated.  They seem to have abandoned

23  that position now, but I want to make it very clear that

24  letters in the record --

25        THE COURT:  If I had to review every letter I ever

09-50026-mg   Doc 14127-1   Filed 10/02/17   Entered 10/02/17 12:32:50   Exhibit A
Case 1:14-md-02543-JMF   Document 4657-2   Filed 10/02/17   Page 71 of 209
Pg 70 of 728

10

1   wrote when I was representing usually defendants, sometimes

2   plaintiffs, you know, it might not necessarily be consistent

3   with my own view today about whether those positions were

4   correct or not.  So I -- you know, I don't put a lot of stock

5   in -- I know you're trying to show that their position morphed

6   over time.  I'm much more focused on what Judge Gerber ruled,

7   what the Second Circuit ruled, what other decisions -- you

8   know, rather than to a position they may have taken.

9           MR. WEINTRAUB:  All right.  So then I --

10          THE COURT:  Or that you may have taken.

11          MR. WEINTRAUB:  I've tried to be consistent.  I will,

12  again, not belabor the point.  I think it's in the record.  New

13  GM repeatedly emphasizes the due process paradigm, the quotes

14  from the decision.  And if you look at the -- there was a

15  ritual footnote that was dropped in many of the letters where

16  they italicized and bolded the due process part of the

17  independent claims.  I won't belabor that.

18          We discussed last time that -- our view that the

19  November and December 2015 rulings were not preclusive rulings,

20  forever barring anyone with a non-ignition switch defect from

21  asserting an independent claim.  We focused, in particular, on

22  footnote 70.  I won't belabor that point.  Again, we didn't

23  view footnote 70 as saying you've timed out, we viewed footnote

24  70 as saying you haven't done it yet.

25          In its reply brief, one of the things that New GM

11

1  tries to argue, that it's -- even though there's no reference

2  or discussion to independent claims in the scheduling order, if

3  the non-ignition switch post-closing accident plaintiffs had

4  been enterprising enough to go through the marked version of

5  the thousand-page master class action complaint, they would

6  have seen that independent claims were an issue for economic

7  loss plaintiffs.  And we think that that's doubtful.

8           But what we think is not doubtful, again returning to

9  this theme, if you look at the letter that was submitted to the

10 bankruptcy court, along with the marked complaint, New GM again

11 emphasizes the what we call the "due process paradigm."  So we

12 think that this is --

13          THE COURT:  Stop, stop, stop.  One of the things that

14 New GM argued in its opening brief at pages 39 and 40 -- I'll

15 just read from the last sentence on 39:

16          "Designated counsel acknowledged that due process was

17           an important issue, stating, 'To the extent that that

18           remains an issue, they would tee up the matter for

19           prompt determination.'"

20          And the citation is to an August 31, 2015 hearing

21 transcript at page 81, line 22 to page 82, line 2.  And then it

22 goes on then, "However, they never did that."

23          So one of the questions I asked at the last hearing

24 that's of concern is whether the non-ignition switch

25 plaintiffs, by virtue of what their designated counsel said or

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

12

 1  by something that Judge Gerber said from this language, put the

 2  impetus on the plaintiffs if they believed there was a due

 3  process violation that impacted some, any, or all of the

 4  non-ignition switch defect plaintiffs, that it was incumbent on

 5  them to come forward with it.

 6          So this transcript reference is from August.  Judge

 7  Gerber, in November, wrote his November decision and entered

 8  the December judgment, and it's a concern to me.  And I raised

 9  this last time, that the April and -- April opinion, June

10  judgment was on stipulated facts.  There was, as I understand

11  it, no evidentiary hearing prior to the November decision and

12  December judgment.

13          And one of the things I'm focused on is whether the

14  non-ignition switch defect plaintiffs were on notice that if

15  they were going to contend that the sale order -- free-and-

16  clear sale order provisions didn't apply to them, they had to

17  come forward and show a due process violation.  And so Mr.

18  Steinberg, as I said, at pages 39 and 40 of the opening brief

19  quotes -- and I don't know who it was who said the words, it's

20  just a person "designated counsel" -- that knowledge was

21  important, and to the extent that that remains an issue, they

22  tee up -- teed the matter up.

23          MR. WEINTRAUB:  A couple of responses to that, Your

24  Honor.  I was not the speaker.  And I am not designated --

25          THE COURT:  Were you here?

13

1          MR. WEINTRAUB:  I was there then, yes.  I was not the

2   speaker.  I don't know --

3          THE COURT:  Well, whether you're the speaker or

4   not --

5          MR. WEINTRAUB:  Well, I was going to get to that,

6   Your Honor.

7          THE COURT:  Go ahead.

8          MR. WEINTRAUB:  I was there for ignition switch

9   plaintiffs at that time.  I have never represented what I'll

10  call non-ignition switch, colloquial lower case non-ignition

11  switch plaintiffs before June of 2016.  I do not believe and

12  I've spoken with the co-leads.  I do not believe that there are

13  colloquial non-ignition switch defect cases in the MDL.  I

14  don't think that makes a difference, but the point --

15         THE COURT:  Nor do I.

16         MR. WEINTRAUB:  Right.  But the point is this.

17  Whatever was said in August of 2015, we had all been -- and

18  when I say "all," all of the lawyers in this room have been on

19  the treadmill from May of 2014.  Shortly after the August 2015

20  hearing we had the September 3 scheduling order which, in our

21  view, didn't set that kind of a deadline.  It didn't mention

22  due process or independent claims.  Anyone receiving that order

23  wasn't alerted to the fact that a bell -- in theory, we don't

24  think it did -- had gone off, saying here's the September 3

25  scheduling order, guess what, briefing begins in the middle of

14

 1  this month, briefing will end at the end of this month.  That

 2  doesn't give anybody enough time to go and put together that

 3  kind of a case and --

 4          THE COURT:  Well, whether it gives enough time to put

 5  together the case --

 6          MR. WEINTRAUB:  They also --

 7          THE COURT:  -- it wouldn't -- let me finish.  I know

 8  I'm a little slow sometimes.  Okay.  It would not have

 9  prevented the plaintiffs' counsel from adding -- requesting

10  from Judge Gerber that whether there was a due process

11  violation affecting non-ignition switch plaintiffs, that the

12  issue be added to the scheduling order and that we believe

13  discovery is necessary to do that, et cetera.  I mean, just the

14  way I had every -- all of the lawyers here define the 2016

15  threshold issues, I think Judge Gerber was -- viewed it as a

16  collaborative effort by counsel from representing all the

17  insurance, to make sure that the issues necessary and

18  appropriate were framed and dealt with.

19          MR. WEINTRAUB:  Well --

20          MR. WEISFELNER:  Your Honor, might I be heard --

21          THE COURT:  Mr. Weisfelner, you'll get your chance.

22  Okay.

23          MR. WEISFELNER:  Okay.  Only because I think I was

24  the speaker.

25          THE COURT:  I assumed that.

15

1          MR. WEISFELNER:  That was spoken --

2          THE COURT:  I -- you'll get your chance.

3          MR. WEISFELNER:  Thank you.

4          MR. WEINTRAUB:  Your Honor, again, I think the

5    answers to that are several.  First, that colloquy in court was

6    not freely available to non-ignition switch post-closing

7    accident plaintiffs, whether or not they were in the MDL.  Of

8    course, they could have come hunting for that, but most of them

9    I think would have been completely unaware that this was going

10   on.

11         In terms of the impetus for the September 3

12   scheduling order, my recollection, and the reason that it was

13   on an expedited briefing schedule, is that the bellwether

14   trials were about to begin in January of 2016.

15         THE COURT:  Is a copy of that September 3 scheduling

16   order -- I got delivered two big binders --

17         MR. WEINTRAUB:  I --

18         THE COURT:  -- for today's hearing.  I'm just

19   wondering.  I'd like to look specifically at it while --

20         MR. WEINTRAUB:  It's Document Number 4 in the binder

21   that I had given at the last hearing.

22         THE COURT:  You know, two big fat binders showed up

23   in my chambers yesterday again.  Is it in there or not?

24         MR. DAVIDSON:  No, Your Honor.  It's from the binders

25   we handed out at the hearing the last time.

1          THE COURT:  Okay.  I didn't bring -- I have, you know
2    (indiscernible).  Does somebody have a copy they can hand up to
3    me?
4          (Counsel confer)
5          THE COURT:  Just let me read it.
6          (Court reviews document)
7          THE COURT:  Okay.  You can have it back, sir.
8          MR. WEINTRAUB:  Thank you.
9          THE COURT:  I must say the scheduling order would
10   appear to show the input of the counsel who, you know, on those
11   issues that were defined -- I give Judge Gerber lots of credit
12   for writing things, but that looks more like an order that was
13   tailored, perhaps adjusted by Judge Gerber, but tailored by
14   counsel.
15         MR. WEINTRAUB:  Well, to some degree, yes.  For the
16   people that I was representing, I was very involved in the
17   things that affected what I was doing.  I was much less
18   involved in things that are the responsibility of others.
19         The point that I was making was that my recollection
20   was the impetus for the scheduling order, and in particular the
21   expedited timing, was the fact that the bellwether trials were
22   beginning in front of Judge Furman.  And there were issues on
23   imputation and punitive damages.  And those bellwether trials
24   were six trials that related to post-closing accidents
25   involving the ignition switch defect.  So the briefing that

17

 1  occurred was on the imputation issue and I think an extensive

 2  breach -- brief was prepared by Brown Rudnick, and then on the

 3  punitive damages issue, which was a brief that we wrote with

 4  respect to the six bellwethers.

 5       I don't recall that there was any other briefing on

 6  any other topics.  There were marked complaints submitted and

 7  the marked complaints feature into the November decision and

 8  the December judgment as to those particular marked complaints.

 9  A lot of what was addressed in the decision and in the judgment

10  had to do with perhaps sloppy drafting by some of the pleaders

11  where they would refer to GM without indicating old or new, or

12  say something like New GM designed and manufactured the Saturn.

13  We get all that.  And all of that was cleaned up.

14       Our view is that because the due process paradigm was

15  still in effect, if you look at what Judge --

16       THE COURT:  What do you mean, "due process paradigm"?

17       MR. WEINTRAUB:  This is the -- you must show a due

18  process violation in order to assert an independent claim, that

19  what Judge Gerber did in the decision and what Judge Gerber did

20  in the judgment was that ignition switch defect-related

21  independent claims by and large pass through what we call the

22  "bankruptcy gate," and independent claims for non-ignition

23  switch did not pass through the gate.  We believe they did not

24  --

25       THE COURT:  They continued to be -- I think what your

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1 side's brief acknowledged is that the non-ignition switch

2 plaintiffs' claims remain stayed.

3          MR. WEINTRAUB:  Yes.  Not barred, not --

4          THE COURT:  They remained --

5          MR. WEINTRAUB:  -- dismissed forever.

6          THE COURT:  -- remain stayed.

7          MR. WEINTRAUB:  Right.  So I think, given the timing

8 -- and don't forget we were -- you know, we had gone from the

9 briefing that led to the April and June decision to this whole

10 procedure on stay/no stay pleadings, extensive letters, and

11 briefing back and forth on the form of the judgment.  Then we

12 that took us up to September, a September 3 scheduling order.

13 Then we were addressing punitive damages and imputation on a

14 curtailed briefing schedule.

15          So my point is, Your Honor, that if there was a time,

16 and maybe there should've been a time, to address due process

17 with respect to non-ignition switch post-closing accidents, and

18 I'm using that in the lower case term, that was not the time

19 because that would have required extensive discovery of

20 multiple defects; not just recalls, but defects for which there

21 were not recalls.  And although it was not -- I wasn't

22 representing any of these people, I could see with the benefit

23 of hindsight why nobody said, hey, this would be a good time to

24 let's open it up for all discovery on all independent claims.

25 It just wasn't the right time, Your Honor, given the treadmill

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:59    Exhibit A
Pg 79 of 728
Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 20 of 209

19

1   we were on and the time constraints.  So I think that to

2   retroactively say, oh, that was the time, you're all out now,

3   would be manifestly unfair.

4         THE COURT:  Why don't we wait another ten years and

5   see what, you know, maybe somebody -- there was some other

6   defect.

7         MR. WEINTRAUB:  Obviously, we're not waiting another

8   ten years.  We're here now.  But I think the more important

9   point is during this period of time where the November,

10   December opinion were operative, and we don't think had told

11   people it's too late to make your due process argument in order

12   to assert an independent claim, the supervening event occurred,

13   which was the Second Circuit, which we think made the

14   requirement of showing a due process violation in order to

15   assert an independent claim an obsolete concept.  And we think

16   that the Second Circuit opinion basically covers the waterfront

17   on independent claims in terms of your ability or the ability

18   of a plaintiff to seek to assert it.  It doesn't determine that

19   independent claims are good.  That's for the trial court.

20         But in terms of asserting the independent claim, we

21   think that the Second Circuit which vacated it, the decision,

22   and remanded it to you for determination with respect to

23   non-ignition switch plaintiffs to make a ruling consistent with

24   the determination of the Second Circuit.

25         THE COURT:  Go ahead.

Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 21 of 209

20

1    MR. WEINTRAUB:  Okay.  So, Your Honor, I think I'm

2  now back to where I was before.  So back on April 20th I

3  referred to New GM's recent pivot of position about the

4  September scheduling order.  In its reply brief New GM says,

5  for the first time, that the focus of the fall briefing was the

6  requirement that plaintiffs who wanted to assert independent

7  claims had to prove up their claims or be forever barred.

8        Despite all the contemporaneous correspondence from

9  New GM to the Court and others that adhered to what we call the

10  April 2015 due process paradigm for independent claims, and

11  despite the fact the Second Circuit had not yet ruled, New GM

12  seems to be arguing that Judge Gerber and New GM silently

13  changed the existing rules of the game as they then existed,

14  and that independent claims for everyone and every defect were

15  permitted.  And they seem to be taking this position even

16  before the Second Circuit ruled.  New GM flat out says in its

17  letter to this Court on <u>Tronox</u> that independent claims were

18  always good, which we think is not what actually happened back

19  in 2015.  We think, Your Honor, that --

20        THE COURT:  I think -- this is an aside.  I think

21  we'll be scheduling another hearing to deal with the <u>Tronox</u>

22  issues, but we're not doing that now.

23        MR. WEINTRAUB:  I'm sorry?

24        THE COURT:  We're going to schedule -- I'm going to

25  schedule a separate hearing to deal with the <u>Tronox</u> arguments.

21

 1  That's not going to be today.

 2          MR. WEINTRAUB:  Okay.  I was prepared to do --

 3          THE COURT:  I'm not.  I don't want to hear any

 4  argument about <u>Tronox</u> today.

 5          MR. WEINTRAUB:  And you've saved everybody's lunch,

 6  Your Honor.  I had a lot about <u>Tronox</u>.

 7          THE COURT:  I'm not -- and the reason being, Mr.

 8  Weintraub, that I don't feel that I'm prepared fully to deal

 9  with the <u>Tronox</u> issues because, in addition, I've read -- I

10  read <u>Tronox</u> when it came down, not because of this case.  I

11  read <u>Tronox</u> as soon as it came down.  But I haven't read the

12  Third Circuit cases and which argue -- it's argued that <u>Tronox</u>

13  has adopted the Third Circuit view and -- anyway.  So that's

14  going to be a separate argument.  I'm not prepared to deal with

15  that today.

16          MR. WEINTRAUB:  At the risk of having something

17  thrown at me, what I would like to do, Your Honor, if there's

18  going to be a further hearing on <u>Tronox</u>, is to submit a short

19  letter brief.

20          THE COURT:  We'll talk about it at the end of this

21  hearing.

22          MR. WEINTRAUB:  Okay.

23          THE COURT:  Okay.  I'll -- I don't want to divert us.

24  I'm just letting everybody know.

25          MR. WEINTRAUB:  Okay.

ACCESS TRANSCRIPTS, LLC            ⚖            1-855-USE-ACCESS (873-2223)

1          THE COURT:  I'm not listening to <u>Tronox</u> arguments

2     today.

3          MR. WEINTRAUB:  So in effect, Your Honor, given this

4     pivot of position, we think that GM is speaking out of both

5     sides of its mouth.  If, as GM has consistently argued, there

6     are no independent claims other than for plaintiffs with an

7     ignition-switch-related claim, then New GM is still clinging to

8     the discredited notion that there are only two categories of

9     claims, assumed liabilities and retained liabilities, unless

10    the claimant can prove a due process violation.

11         Nothing in the November and December 2015 rulings

12    says that the due process ability had timed out.  And we

13    believe that New GM's original position fails because First and

14    Second Circuit, as I said, rejected the due process paradigm

15    set forth in the April 2015 decision.  And second, the December

16    2015 scheduling order we don't believe properly set up the due

17    process issues for adjudication.  And third, we don't think

18    that there was any adverse adjudication on the due process

19    issues that came out of the November and December rulings.

20         If, however, as a result of the pivot, New GM is now

21    trying to argue the marked pleading process heralded the need

22    for every plaintiff to defend the merits of its independent

23    claims in the fall of 2015, no order of the Court says that.

24    The notion that representative complaints were adequate to bind

25    parties that were not served with a marked version of their own

23

 1  complaint --

 2          THE COURT:  Do you agree that independent claims

 3  cannot be based or predicated upon conduct of Old GM?

 4          MR. WEINTRAUB:  I do, with a caveat.  And the caveat

 5  is obviously these independent claims relate to defective

 6  vehicles manufactured by Old GM.  And both --

 7          THE COURT:  Other than that --

 8          MR. WEINTRAUB:  Right.

 9          THE COURT:  -- can the conduct of Old GM --

10          MR. WEINTRAUB:  No.

11          THE COURT:  -- any part of the basis for independent

12  claims?

13          MR. WEINTRAUB:  No.  So the failure to warn, the

14  fraudulent --

15          THE COURT:  Right.

16          MR. WEINTRAUB:  -- all of that is on New GM.  But as

17  I said, and as Judge Gerber and Judge Furman both acknowledged,

18  the root -- it has to deal with a vehicle manufactured by Old

19  GM.

20          The notion that representative complaints were

21  adequate to bind parties not served with a marked version of

22  their own complaint simply doesn't hold water, given the

23  differences between each complaint, the different flavors of

24  independent claims that could be asserted by the scores of

25  individual plaintiffs' lawyers who assert -- asserting

Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 25 of 269

24

1  independent claims --

2          THE COURT:  You don't think it makes any difference

3  if Judge Gerber determined that particular language in a

4  representative complaint could not be asserted, that when --

5  that that doesn't bind the next case, that the complaint has

6  the precise identical language?

7          MR. WEINTRAUB:  Oh --

8          THE COURT:  I'm just using an example.

9          MR. WEINTRAUB:  -- I acknowledge that.  And I think I

10  acknowledged that earlier when I said that, you know,

11  complaints that were sloppy and didn't differentiate between

12  Old and New or said that New GM manufactured the Saturn, I --

13  we don't quibble with that.

14          THE COURT:  I think I said at the last hearing, for

15  better or worse, as Judge Bernstein continues to do in Old

16  Carco and as Judge Gerber was doing in Motors Liquidation, I do

17  believe it's the appropriate role of the bankruptcy court to

18  scrutinize the pleadings, if they're properly presented, to

19  determine whether particular allegations are or are not

20  permissible.  Not something I relish doing.  Hopefully it won't

21  come up very often but --

22          MR. WEINTRAUB:  And, yeah, we don't quite agree with

23  that, Your Honor.  But I understand --

24          THE COURT:  So be it.

25          MR. WEINTRAUB:  So be it.  But my point is that

1  representative complaints with respect to something other than

2  sloppy language do not direct --

3        THE COURT:  Sloppy language in your eyes is probably

4  not sloppy language in the eyes of New GM.  But we don't need

5  to quibble about that today.

6        MR. WEINTRAUB:  No, I understand.  But my point would

7  be, more specifically, that failure to warn in one state may be

8  different than failure to warn in another state.  That goes to

9  the merits which is something that the trial court should

10  address.  I don't think that what you're -- Judge Gerber did

11  was say a non-ignition switch failure to warn, you can't assert

12  that because there's no such cause of action that you can

13  assert.  I think that anything that was barred or continued to

14  be stayed under the November and December rulings was because

15  of the due process predicate that was at that point the law of

16  the case and not because of the merits of the claims.

17        And it -- so we don't think that anyone that was not

18  served with a marked version of their own complaint which

19  highlighted something about their independent claim should be

20  barred because some other representative complaint was

21  continued to be stayed.

22        THE COURT:  That may be the case, Mr. Weintraub.  But

23  if somebody actually comes -- if New GM makes a motion with

24  respect to some new state court complaint that includes

25  language that Judge Gerber expressly struck want to know what's

Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 87 of 209

26

1  going to happen.

2          MR. WEINTRAUB:  I think I know what's going to

3  happen.

4          THE COURT:  Okay.

5          MR. WEINTRAUB:  But --

6          THE COURT:  So I think your statement went too far.

7  It may not have preclusive effect as if they were here before

8  -- those parties were here before.  But unless there's

9  something in the Second Circuit opinion that would say that

10 what Judge Gerber did was erroneous with respect to striking

11 language from pleadings, it's like almost a certainty the same

12 result occurs again.  Changing a few words here or there is

13 probably not going to be the decider.  Go ahead.

14         MR. WEINTRAUB:  Well, the Second Circuit didn't

15 address any of that --

16         THE COURT:  I understand.

17         MR. WEINTRAUB:  -- because that wasn't up on appeal

18 at that time so --

19         THE COURT:  I'm not writing on a clean slate when I

20 write.

21         MR. WEINTRAUB:  No, I understand.  My point, Your

22 Honor, is that we don't believe that the September 3 scheduling

23 order told people if you don't show up with your independent

24 claim so that Judge Gerber can go thumbs up or thumbs down,

25 you're out forever.  Now it may be, and I don't disagree, that

1   New GM can bring somebody into this Court now and say this

2   should be thumbs down on this independent claim for this

3   reason, but at that point that plaintiff will know what's going

4   on.  And that plaintiff will be able to present its position to

5   you and --

6           THE COURT:  And I'm sure that Mr. Steinberg will do

7   what he's done with many of these others.  He writes letters to

8   people and he tells them what prior rulings were and why

9   particular language in a complaint is contrary to the prior

10  rulings.  And hopefully, more often than not, the plaintiffs

11  amend their pleading to take out the offending language and the

12  case goes off and proceeds.  And that's -- I think that's

13  happened quite a bit.

14          MR. WEINTRAUB:  And again, and I don't think we're

15  dancing around semantics, but I just want to be clear.  I'm not

16  talking about offending language.  And when I say "offending

17  language," it's the categories of things that I --

18          THE COURT:  Yeah, you call it sloppy and --

19          MR. WEINTRAUB:  Right.

20          THE COURT:  -- New GM doesn't call it sloppy.

21          MR. WEINTRAUB:  But I think there's a difference

22  between language and a cause of action.  And if the complaint

23  raises a cause of action that plaintiff should have the

24  opportunity to come into this Court and say this is a valid

25  cause of action, it's a valid independent claim.

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Pg 88 of 728
Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 29 of 209

28

 1              THE COURT:  And they're basing the cause of action on

 2    conduct of Old GM.  It's not an independent claim.

 3              MR. WEINTRAUB:  I agree.  When I say "independent

 4    claim" I mean independent claim --

 5              THE COURT:  Right.

 6              MR. WEINTRAUB:  -- in terms of the definition that

 7    you and I are using.

 8              THE COURT:  Go ahead.

 9              MR. WEINTRAUB:  So in sum, Your Honor, turning back

10    to the four threshold issues briefing, for the reasons stated

11    in our briefs for the non-ignition switch post-closing accident

12    plaintiffs, none of the principles of res judicata, law of the

13    case, or failure to appeal are applicable to bar the

14    independent claims of these post-closing accident plaintiffs.

15    The first two motions to enforce did not apply to non-ignition

16    switch post-closing accident plaintiffs and they were not filed

17    against those parties.  The non-ignition switch post-closing

18    accident plaintiffs were not parties to the four threshold

19    issues briefing.  The non-ignition switch post-closing accident

20    plaintiffs did not participate in the four threshold issues

21    briefing.  There was no designated counsel for the non-ignition

22    switch post-closing accident plaintiffs in connection with the

23    four threshold issues briefing.  And we don't believe there

24    were any adverse determinations made against the rights of non

25    ignition switch post-closing accident plaintiffs with respect

29

1 to their accidents.

2          THE COURT:  Can you give me examples, not exhaustive,

3 but can you give me examples of allegations that post-closing-

4 act plaintiffs have alleged as a basis for independent claims

5 against New GM?

6          MR. WEINTRAUB:  Failure to warn.  You knew that this

7 vehicle was defective, you didn't warn me, and I ended up

8 having an accident, and I was injured.  Had you warned me, I

9 wouldn't have had the accident.  Had you recalled the vehicle

10 and repaired it, I wouldn't have had the accident.  I think

11 that those are the species of claims.

12          I'm not a personal injury lawyer so I don't know all

13 the ins and outs of other things that people could allege.  I

14 know that there are some fraud claims alleged which I think are

15 a species of, I was misled into thinking my vehicle was safe.

16 But again I -- I'm not capable of being exhaustive as I stand

17 here today.

18          THE COURT:  Okay.

19          MR. WEINTRAUB:  As I was saying, Your Honor, there

20 were no adverse determinations made against the rights of

21 non-ignition switch post-closing accident plaintiffs as to

22 their accidents, other than perhaps that their claims were

23 implicitly deferred because of the due process issue.  So

24 clearly, Your Honor, we believe that the absence of a motion to

25 enforce as to the non-ignition switch post-closing accident

30

1   plaintiffs, the lack of notice to them and the due-process-

2   related findings made concerning only the ignition switch

3   defect and subject vehicles, that none of the April and June

4   rulings were binding on these claimants and no order was

5   entered on the threshold issues that these claimants were

6   compelled to appeal from.

7            THE COURT:  Your position I think, very simply, is

8   that the issue of due process, of any due process violation

9   really isn't relevant to whether the non-ignition switch

10  plaintiffs can assert independent claims against New GM.

11           MR. WEINTRAUB:  That -- that's correct with one --

12  there's always a little caveat.  As you know, we contend that

13  as future claimants they cannot be barred by the sale orders

14  restriction on successor liability.  I'll get to that when I

15  get to issue four.  You know, there is a latent due process

16  issue there, but a different due process --

17           THE COURT:  That's a successor liability claim --

18           MR. WEINTRAUB:  Right.

19           THE COURT:  -- and not -- not a --

20           MR. WEINTRAUB:  Exactly.

21           THE COURT:  -- independent claim.  With respect to

22  the independent claim --

23           MR. WEINTRAUB:  Right.

24           THE COURT:  -- your view is that due process isn't --

25  finding a due process violation is not a necessary predicate to

31

1  any plaintiff, specifically your group of plaintiffs asserting

2  independent claims against New GM?

3      MR. WEINTRAUB:  That's correct, Your Honor.  Now

4  turning to the fall 2015 briefing under the September 2015

5  scheduling order, for the reasons stated in our briefs for the

6  non-ignition switch post-closing accident plaintiffs, again, we

7  don't believe that the principles of res judicata, law of the

8  case, or failure to appeal are applicable to their independent

9  claims.  The scheduling order did not effectively notify the

10 non-ignition switch post-closing accident plaintiffs that their

11 independent claims were under attack or that they had barely

12 three weeks to demonstrate a due process violation or come into

13 court.

14     THE COURT:  So in a letter to the Court,

15 Mr. Steinberg, in correcting statements that were made at the

16 last hearing, pointed to the involvement, participation,

17 attendance at hearings, of lawyers in representing clients with

18 non-ignition switch plaintiffs.  I guess the view from your

19 side of the courtroom is that appearance at hearings,

20 participation in hearings is not enough.  What's important is

21 whether the Court was presented with the issues and decided the

22 issues.

23     MR. WEINTRAUB:  That's correct, Your Honor.  I would

24 also quibble with the notion that non-ignition switch

25 post-closing accident plaintiffs were involved in these

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Case 1:14-md-02543-JMF   Document 4657-2   Filed 10/02/17   Page 93 of 209

32

1   proceedings.  I don't believe that they were.

2            THE COURT:  Okay.

3            MR. WEINTRAUB:  I certainly wasn't representing them.

4   Mr. Weisfelner only represents economic loss plaintiffs.  You

5   know, what was going on here, to borrow a phrase, was sort of

6   bankruptcy inside baseball, on very specific issues.

7            THE COURT:  It should be no surprise.  I mean I --

8   what's important to me -- I -- you know, frequently in some big

9   cases I get a courtroom full of lawyers representing lots of

10  different stakeholders and different interests.  What I focus

11  on is what are the issues presented to me and what did I

12  decide.

13           MR. WEINTRAUB:  Uh-huh.

14           THE COURT:  The fact that there may have been lawyers

15  with a totally -- you know, on a different issue, would take

16  entirely different positions, I -- you know, what was the

17  evidence before me, what were the arguments presented, and what

18  did I decide, not who was in the courtroom and who they may

19  have represented.

20           MR. WEINTRAUB:  I concur, Your Honor.  So continuing,

21  just without repeating but summing up, we don't think that the

22  September 3 scheduling order notified people either of a due

23  process deadline or of a show-up-with-your-complaint-and-get-a-

24  thumbs-up-or-thumbs-down deadline.  That's simply just not in

25  the order and it's clearly not baked into the time periods that

Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 94 of 209

33

1    we were operating under.

2           THE COURT:  That's all well and good, but I -- I'm

3    going to expect to hear from both sides about that August

4    transcript where Judge Gerber was told that the issues would be

5    teed up.  Judge Gerber didn't draft the September scheduling

6    order on his own, counsel were heavily involved in doing it.

7    Yes, he signed an order.  Yes, I signed the order for the order

8    to show cause on the 2016 threshold issues.  But it was counsel

9    who defined the issues that they believed had to be decided and

10   I agreed I would address.

11          And so I have this question.  That August transcript

12   certainly appears to show recognition by counsel that if that

13   the due process issue is important, and we'll tee it up soon if

14   that's appropriate.  And of course, it wasn't.  Your position

15   is the September scheduling order, the November decision, and

16   the December judgment don't -- your position is they don't

17   expressly deal with it.  New GM may have a different view about

18   it.

19          But so, you know, I think one of the things I have to

20   decide is whether, based on what was said, maybe more than just

21   the August hearing, but certainly from that transcript of the

22   August hearing, was the failure to raise that issue, schedule

23   it for hearing and argument, if counsel believed they needed

24   discovery, put that on the table right then.  It -- you know,

25   sometimes it's time to fish or cut bait.  Okay.  That's what

Case 1:14-md-02543-JMF Document 4657-2 Filed 10/02/17 Page 35 of 269

I'm -- one of the things. And I -- you may not be the one to have to address that. But I'll let others --

MR. WEINTRAUB: Well, but I need to address it because now I represent those people. I didn't back then.

THE COURT: So go ahead.

MR. WEINTRAUB: So the way I would address it, Your Honor, is there's a difference between what was talked about, and I won't deny because it's in the transcript, that it was talked about. The issue is did it find its way into the order.

THE COURT: Well, why is that the issue? If -- I -- there's where I beg to differ with you, Mr. Weintraub. Where counsel acknowledges at the August hearing that due process is important and we'll tee it up soon if it needs to be addressed, and then counsel negotiate a scheduling order and don't identify the issue, why shouldn't the Court, me, conclude that counsel made an affirmative decision not to challenge due process with respect to non-ignition switch defects, and they had their chance; they didn't do it and it's too late, in 2017, to do it.

MR. WEINTRAUB: The answer to that, Your Honor, is if General Motors thought it should have been in there, they could've raised it. If Judge Gerber -- let me -- please let me -- if Judge Gerber thought it should have been in there, he could have raised it. And whatever happened in the bankruptcy court, what the non-ignition switch plaintiffs received was

35

 1   that scheduling order.  That scheduling order did not tell them

 2   now is the time to address due process issues.  And it would be

 3   manifestly unfair and a violation of due process to say, guess

 4   what, something that wasn't in the order was discussed at a

 5   hearing that you weren't at, and even though you got the order

 6   and it wasn't in the order, you're now barred forever.  That

 7   would be an egregious violation of due process, Your Honor.

 8          The second answer to that question is,

 9   notwithstanding everything that you said about the August

10   hearing, Judge Gerber did not rule in the November decision

11   that people had timed out on due process.  That's not how I

12   read footnote 70.  That's not how I read the December opinion.

13   So if Judge Gerber felt that someone had stumbled, he did not

14   say it in the opinion.  It could -- it would have been very

15   easy to say all non-ignition switch plaintiffs are now barred

16   because they had their opportunity and they did not.  And

17   frankly, had he said that, someone would have appealed that.

18   But he didn't say that and you cannot basically read something

19   into the scheduling order and into the November/December

20   rulings that's just not there, especially to bind people who

21   weren't even in any of these proceedings at that time.

22          THE COURT:  Well, your view -- I think I'm correct in

23   this.  Your view is that non-ignition switch post-closing act

24   -- accident plaintiffs are future claimants and they can't be

25   bound anyway.

1          MR. WEINTRAUB:  That's true.

2          THE COURT:  So --

3          MR. WEINTRAUB:  And my --

4          THE COURT:  -- it's not really your issue.  Is it?  I

5   mean --

6          MR. WEINTRAUB:  Well, I've raised it.  It's --

7          THE COURT:  I know you're arguing it --

8          MR. WEINTRAUB:  Yes.

9          THE COURT:  -- but your main point is that they're

10  future claimants and they're not barred.

11         MR. WEINTRAUB:  Right.  So --

12         THE COURT:  Okay.

13         MR. WEINTRAUB:  -- but I also have the Second Circuit

14  opinion which I think renders obsolete the due process paradigm

15  which says the bankruptcy court didn't have subject matter

16  jurisdiction to bar independent claims.

17         THE COURT:  Yes, I understand that.

18         MR. WEINTRAUB:  And, you know, just to put a little

19  bit of a finer point on it, and it may have been a point I made

20  last time or in my brief.  This is not the traditional third-

21  party release-type issue because when you have a third-party

22  release, those claims already exist.  And the third party who

23  is being compelled to give the release has notice and an

24  opportunity to say, wait a minute, I have a good claim, don't

25  release the claim, or doesn't meet the Master Mortgage factors

37

 1  or the -- I forget the Second Circuit factors in, and I should

 2  know this -- but doesn't meet the factors.  That's not what

 3  happened here.  New GM wasn't even operating yet.  Nobody had

 4  had their accidents yet.  So this is completely a future claim

 5  issue.

 6          THE COURT:  So your view is I don't have to reach

 7  this issue with respect to your clients?  Well, I say "this

 8  issue."  I don't have to reach the issue of whether they did or

 9  didn't have a due process violation.  Your position is very

10  simple, that they're future claimants, they can't be bound.

11  Right?

12          MR. WEINTRAUB:  Yes.

13          THE COURT:  Okay.

14          MR. WEINTRAUB:  But also the other -- the subject

15  matter jurisdiction issue as well.  One of the things that New

16  General Motors argues is that there's no difference between a

17  scheduling order and an order to show cause, and that my

18  acceptance of an order to show cause somehow means the

19  scheduling order was sufficient.  Now we've already talked

20  about the contents of the scheduling order and now I want to

21  talk about the differences between a scheduling order and an

22  order to show cause, and this scheduling order in particular

23  and your order to show cause in particular.

24          First, Your Honor, my view is that as a generic

25  matter a scheduling order tells people that are already parties

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1  to a proceeding when something is going to happen.  A

2  scheduling order, in my view, doesn't create its own

3  jurisdiction.  And an order to show cause, on the other hand,

4  is what I would characterize as a brick through the window, in

5  the sense that order to show cause is if you don't show up and

6  show cause you could be held in contempt.  That tends to get

7  people's attentions.

8          Second, Your Honor, when I agreed to the scheduling

9  order in September of 2015, as I had said earlier, I had been

10  retained to address a specific question for specific clients

11  with respect to the upcoming trials in the MDL.  I was briefing

12  punitive damages for the bellwethers because that's what

13  Judge Furman asked Judge Gerber about, and asked it I think

14  somewhat urgently because of the upcoming trial.

15          In connection with the scheduling order, I knew

16  exactly what proceeding I was in for my clients and what I was

17  supposed to be doing.  I was in a pretrial proceeding that had

18  been instigated by Judge Furman.  I did not agree to any other

19  matters for anyone else.  I was focused on my bellwether

20  post-closing accident trials, period.  Nor did I read the

21  scheduling order the way that New GM would now like to read the

22  scheduling order.

23          The non-ignition switch post-closing accident

24  plaintiffs' issues were not, so far as I knew back then and so

25  far as I know right now, were not an issue in the MDL.  And

1  again, I'm talking about colloquial non-ignition switch.  I do

2  recognize and I conceded and I apologized to the Court.  I

3  didn't mean to speak loosely and use the technical term, I was

4  using the colloquial term.  I am well aware that there are many

5  vehicles other than the recall that was the subject vehicles

6  where you've got that rotation problem and the loss of power

7  and brakes and airbags.  And that's all being litigated in the

8  MDL and there has been discovery on that.

9          Again, I'm not trying to be pejorative but I think,

10  you know, the Court sort of indicated that, you know, myself

11  and Mr. Weisfelner, you know, you're here every day, you're

12  imbued with these issues, you know, why don't you say

13  something?  And I think the short answer is, if I had though,

14  Your Honor, even though that I was not representing any of

15  these plaintiffs, that there was something in that scheduling

16  order that basically set off a bell that said you have through,

17  you know, the end of this month or the end of next month to

18  demonstrate a due-process violation or your claims will be

19  barred.  I would have said something.

20          I would have tinkered with that order to say this

21  order is not clear.  It's got to be made clear.  I would have

22  suggested that those parties organize.  I know this all sounds

23  like 20/20 hindsight, but nobody saw this issue, Your Honor.

24  It wasn't raised by GM.  It wasn't raised by Judge Gerber.  It

25  wasn't raised by Mr. Weisfelner.  The scheduling order was what

40

1   it was, and I don't think it notified people.

2            THE COURT:  Can I ask this:  The clients who you do

3   represent --

4            MR. WEINTRAUB:  The ones now?

5            THE COURT:  Yes.

6            MR. WEINTRAUB:  Yes.

7            THE COURT:  -- are all of their vehicles -- at some

8   point, did all of that make and model year become subject to a

9   recall?

10           MR. WEINTRAUB:  I don't think so, Your Honor.  I

11  don't know particularly with respect to recalls.  I know that

12  Mr. Turner and Mr. Butler are not part of the MDL, that they

13  don't have ignition-switch, upper case or lower case issues.  I

14  know that Denny -- Denny's client is a rollover case.

15           It's not an ignition-switch case, however, that one

16  was brought into the MDL, I think counsel would say against

17  their wishes, in March of 2016, after all of this briefing,

18  because one of the elements in the wrecked vehicle indicated a

19  rotation, but I will tell you counsel does not consider it to

20  be an MDL case, and it does not consider it to be an ignition-

21  switch case.  So --

22           THE COURT:  So I think I have -- maybe you can tell

23  me.  It does not appear to me that there is any dispute among

24  the counsel who are here as to what an ignition switch, all

25  capital -- or initial capital, independent of what is an

41

1   ignition-switch defect?  Am I right in that?

2          MR. WEINTRAUB:  That's right, but, again, our crazy

3   nomenclature would be that non-ignition-switch defects

4   include --

5          THE COURT:   Just a second.  Let's take that one at a

6   time.

7          MR. WEINTRAUB:  Yes.

8          THE COURT:  There does not appear to be any dispute

9   as to what is an initial caps ignition-switch defect.

10          MR. WEINTRAUB:  Correct.

11          THE COURT:  And it relates to subject vehicles?

12          MR. WEINTRAUB:  Correct.

13          THE COURT:  All right.  I am quite confused about

14   what the range of alleged defects may be for non-ignition-

15   switch defects.

16          MR. WEINTRAUB:  I can --

17          THE COURT:  I know that some of them are ignition-

18   switch related, and that --

19          MR. WEINTRAUB:  I can answer the question in a simple

20   way, but it's -- it --

21          THE COURT:  Okay.  Let's just -- let me --

22          MR. WEINTRAUB:  -- covers a lot of ground.

23          THE COURT:  -- look through my notes.  Hold on.

24          MR. WEINTRAUB:  Maybe I can sit down.

25          THE COURT:  You know, in the summer of 2014, there

42

1  were some additional recalls that related to ignition switches,

2  and -- but those, for purposes of these proceedings, have been

3  included within the non-ignition-switch --

4           MR. WEINTRAUB:  Exactly.

5           THE COURT:  -- defects.

6           MR. WEINTRAUB:  Right.

7           THE COURT:  Even though they're ignition-switch

8  related --

9           MR. WEINTRAUB:  Right.

10          THE COURT:  -- they weren't in the first three

11  recalls.

12          MR. WEINTRAUB:  So non-ignition-switch defect, under

13  the unfortunate terminology that we've all adopted, is anything

14  other than an ignition-switch defect.  And an ignition-switch

15  defect --

16          THE COURT:  (Indiscernible)

17          MR. WEINTRAUB:  -- is a very specific defect of very

18  specific vehicles.  So there are lower case ignition-switch

19  cases that fall into the category of non-ignition switch,

20  right.  And, Your Honor, Turner and Butler, those cars were not

21  recalled.  Those were not subject to recalls.  There has been

22  some discovery in the MDL on defects that are not ignition-

23  switch related, lower case ignition switch.  My understand --

24          THE COURT:  But I find no basis in the Second Circuit

25  opinion to sort of open the floodgates or the doors to

43

1   successor liability claims.  Anytime somebody comes forward and

2   says, my car manufactured by Old GM had a defect, not an

3   initial caps ignition-switch defect, but some other problem,

4   and I am entitled to assert successor liability claims.  As the

5   record stands now, the sale order bars them, and I don't see

6   anything in the Second Circuit opinion or anything else that

7   alters that fact.  Do you agree or disagree?

8             MR. WEINTRAUB:  I'm not sure I follow you.  Are you

9   talking about people who had had accidents before the -- or

10  after?

11            THE COURT:  I missed the before what?

12            MR. WEINTRAUB:  Before the closing of the sale, or

13  after the closing of the sale?

14            THE COURT:  New GM assumed liability for post-closing

15  accidents.

16            MR. WEINTRAUB:  Right.

17            THE COURT:  And it's not tied to whether there was a

18  recall or not.

19            MR. WEINTRAUB:  Right.

20            THE COURT:  So --

21            MR. WEINTRAUB:  Well, this is our --

22            THE COURT:  I'm not including -- I mean, there are

23  assumed liabilities.  Nobody is disputing assumed liabilities.

24  They may be disputing whether punitive damages are available --

25            MR. WEINTRAUB:  Right.



ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

44

1    THE COURT:  -- for assumed liability, but nobody is
2  disputing that New GM assumed liability for post-closing
3  accident --
4          MR. WEINTRAUB:  Right.
5          THE COURT:  -- plaintiffs, whatever, if they can show
6  there was a defect in their car.  That's correct, isn't it?
7          MR. WEINTRAUB:  That's correct.  However, assumed
8  liability is limited to how the purchase agreement defines
9  product liabilities.  So the argument is on the successor
10 liability issue that those people, as future claimants,
11 shouldn't be barred by an artificial curtailment of what
12 liabilities would be.
13         THE COURT:  Well, that's where I can't -- you know,
14 you're going to tell me that somebody ten years from now is
15 going to come in and say, oh, there was a problem with the
16 connecting rods, and I've got an expert that's going to say
17 that was a defect in the vehicle and it caused my car to go out
18 of control and hit a wall and I was injured, and so, I have a
19 successor liability claim against New GM.  I mean, I don't read
20 the Second Circuit as opening that door, and I don't see any
21 basis to do anything other than keep that door shut.
22         MR. WEINTRAUB:  I don't believe that the Second
23 Circuit shut that door.  I think that what the Second Circuit
24 said is, it's an open question in this Circuit as to whether
25 you can sell free and clear of future claims.  And then we rely

45

1   on Grumman Olson, which says --

2              THE COURT:  Yes.  I'm very familiar with Grumman

3   Olson.

4              MR. WEINTRAUB:  Okay.

5              THE COURT:  Both Judge Gerstein's decision and the

6   district court's decision.

7              MR. WEINTRAUB:  So that's the essence of our issue

8   four.

9              THE COURT:  Okay.  All right.

10             MR. WEINTRAUB:  So I'm not quite finished with

11  issue --

12             THE COURT:  Oh, no.

13             MR. WEINTRAUB:  -- two, but it sounds like I'll be

14  brief on issue four.

15             THE COURT:  Yes.

16             MR. WEINTRAUB:  So based upon -- we were talking

17  about this during the scheduling order and the order to show

18  cause, so based on my view of the difference between a

19  scheduling order and an order to show cause, I agreed to the

20  order to show cause in this process here, but my argument and

21  my agreement was not just based on the different labels.  This

22  time, it was clear who the target --

23             THE COURT:  Who is the other plaintiffs' counsel that

24  just agree to remain silent and not -- we're not going to raise

25  that due-process issue now if we can come back in a few years

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

46

 1   and raise it then?

 2           MR. WEINTRAUB:  Well, you're assuming that the non-

 3   ignition switch, post-closing accident plaintiffs were aware of

 4   the due-process issue, Your Honor, and I think that that's not

 5   a fair assumption.  They were not involved in the proceedings

 6   here.  They were not --

 7           THE COURT:  Or economic loss?  Were -- were --

 8           MR. WEINTRAUB:  I can't speak to that, Your Honor.

 9           THE COURT:  -- non-ignition switch, economic loss

10   plaintiffs represented before Judge Gerber?

11           MR. WEINTRAUB:  I can't speak to that.  I defer to

12   counsel to say --

13           THE COURT:  Well, but you know.  You know the answer

14   to that.

15           MR. WEINTRAUB:  I actually don't.  I want to hear

16   what Mr. Weisfelner and Mr. Steel have to say.

17           THE COURT:  All right.  Fair enough.

18           MR. WEINTRAUB:  So this time, in the order to show

19   cause, I believe it was clear who the target audience was.

20   This time, as opposed to the scheduling order, the issues in

21   the order to show cause were spelled out with particularity.

22   This time, we used a glossary of terms and we actually used the

23   operative terms in the scheduling order.  The ball was not

24   hidden from anyone as to what was going to be decided here on

25   these 2016 issues.  I don't think there is any confusion by the

47

1  Plaintiffs, especially the non-ignition switch, post-closing

2  accident plaintiffs as to what was going to happen here.

3          Several of them reached out to ask me if I would

4  represent them, others appeared on their own.  Going to the

5  gatekeeper issue, I know that the Court is inclined to be a

6  gatekeeper and --

7          THE COURT:  I'm not thrilled about it, but --

8          MR. WEINTRAUB:  I can help you with that, Your Honor,

9  but I understand that.  I think that there's a difference

10 between being a gatekeeper on a category of claims, independent

11 versus non-independent and getting granular on the merits of a

12 claim, and I think that if something facially passes the gate

13 because it's truly an independent claim that your job should be

14 fairly easy and quick, and leave it to the trial court to

15 determine whether or not the claim is valid, which is exactly

16 what we believe Judge Gerber did several times, if you look at

17 the December --

18         THE COURT:  Well, it's just like Judge Bernstein.

19 Judge Bernstein has done in <u>Old Carco</u>.  I agree with that.

20 It's not my role to decide whether state law claims are

21 properly stated or not.  I do believe that as Judge Bernstein

22 has done and as Judge Gerber did, it's the appropriate role of

23 the bankruptcy court to make sure that those provisions of a

24 sale order which can be enforced are enforced.

25         MR. WEINTRAUB:  So, Your Honor, forging ahead.  We

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

48

 1  already talked about the Second Circuit vacating the bankruptcy

 2  court as to "non-ignition switch, lower-case defects," and

 3  remanded the non-ignition switch issues to this court for

 4  proceedings consistent with the opinion.  The language in the

 5  Second Circuit opinion is found at 829 F.3d at 166.  In

 6  vacating and remanding, the Second Circuit expressly cites to

 7  Motors Liquidation Corp III, 531 B.R. at 360, which I believe

 8  encapsulates the due-process paradigm of the April 2015

 9  opinion.

10           If I could just read that --

11           THE COURT:  Go ahead.

12           MR. WEINTRAUB:  -- section into the record?  If I can

13  find it.  So, again, I'm quoting from 531 B.R. at 360, and what

14  the Second Circuit cited to was this -- I believe it was

15  referring to this language.  It just cited to the page.

16           "The non-ignition switch plaintiffs' claims remain

17  stayed."  And again, that's economic loss because of our crazy

18  terminology.

19           "The non-ignition switch plaintiffs' claims remain

20           stayed and properly so.  Those plaintiffs have not

21           yet shown, if they ever will, that they were known

22           claimants at the time of the 363 sale, and that there

23           was any kind of a due-process violation with respect

24           to them."

25           THE COURT:  And the date of that decision?

49

1            MR. WEINTRAUB:  The date of that decision is May 27,

2    2015, corrected on August 10, 2015.  So I believe that when the

3    Second Circuit said I'm vacating, and citing to that page and

4    saying for further proceedings, consistent with this opinion.

5    I think what the Second Circuit was saying is the due-process

6    predicate is not the standard, the standard is whether or not

7    there was subject-matter jurisdiction to bar future independent

8    claims.

9            My last point, before I move on, Your Honor, is that,

10   in addition to the vacation by the Second Circuit, there's a

11   provision of the June 2015 judgment found at paragraph

12   13(e)(2), which is a savings clause that would reinstate any

13   dismissed lawsuits if the second circuit reverses the April and

14   June judgment.

15           THE COURT:  I've re-read that this morning.

16           MR. WEINTRAUB:  Okay.  I will now save you an hour

17   and a half of <u>Tronox</u> and move on to issue three, Your Honor,

18   which Mr. Steel is taking the labor or on -- I'll be brief on

19   that.  If I can just --

20           THE COURT:  Sure.  Go ahead.

21           We're going to take a recess at 10:30.

22           MR. WEINTRAUB:  I think I can address issue three

23   before 10:30, and then, I'll do a short back.  We believe the

24   Second Circuit used broad language concerning used car

25   purchasers.  These are all post-closing buyers with no prior

50

1  contact or relationship with old GM.  And, again, I'm speaking

2  for the accident plaintiffs, not the economic-loss plaintiffs.

3  We think these are the archetypical future claimants on all

4  fours with Grumman Olson.

5          There was no effective means to provide notice to

6  these future crash victims, that they're successor liability

7  claims, or they're independent claims who are about to be

8  barred.  So we don't believe the sale order can bind these

9  claimants.  There's no principal reason why the Second Circuit

10 ruling ought to be limited to ignition-switch plaintiffs,

11 either the claim is good or it's not good.  There's nothing in

12 the Second Circuit's expansive discussion of future claims that

13 would --

14         THE COURT:  Well, what's the language of the sale

15 order that is argued to bar post-closing, used-car purchaser,

16 accident claims?

17         MR. WEINTRAUB:  I don't think there's any language in

18 the sale order that addresses that.  I think that there is some

19 generic language that, you know, new GM will not be liable in

20 any way for anything that old GM did, and that's people who

21 have run 99 yards down the field with that.

22         THE COURT:  Okay.  Go ahead.

23         MR. WEINTRUAB:  We think that for used-car

24 purchasers, there was a due-process failure akin to the due-

25 process failure for the pre-closing ignition-accident

51

1    plaintiffs, and the consequences should be the same.

2            THE COURT:  Wait.  You're -- for accident claimants?

3            MR. WEINTRAUB:  Yeah.  I'm drawing maybe --

4            THE COURT:  As opposed to maybe --

5            MR. WEINTRAUB:  -- in a perfect analogy.

6            THE COURT:  Well, accident is --

7            MR. WEINTRAUB:  I'm not --

8            THE COURT:  You're -- you -- I'm sorry.

9            MR. WEINTRAUB:  Yes.  Yes.  I'm only speaking for

10   accident claims.

11           THE COURT:  Yes.  It's for accident claims?

12           MR. WEINTRAUB:  Yes.

13           THE COURT:  Used-car purchasers who were in

14   accidents?

15           MR. WEINTRAUB:  Yes.

16           THE COURT:  You're -- one separate prong of your

17   argument is they are future claimants, and they're not barred.

18   Due process doesn't really -- doesn't impact their ability to

19   assert those claims.

20           MR. WEINTRAUB:  Yes.

21           THE COURT:  Is that correct?

22           MR. WEINTRAUB:  Yes.  New GM argues that the used-car

23   buyer can have no greater rights than its seller.  We believe

24   this argument was rejected by the Second Circuit.

25           THE COURT:  Where does the Second Circuit reject that

52

1  argument?

2          MR. WEINTRAUB:  I think by saying that they can't be

3  bound by the sale order, and that they can assert their --

4          THE COURT:  Well, but that's -- that seems to me to

5  be different than --

6          MR. WEINTRAUB:  They have -- as an accident victim,

7  they have completely separate rights from their predecessor.

8  They were injured in an accident, in a car that they didn't own

9  at the time of the sale.  And an accident that didn't --

10         THE COURT:  If I accept your argument that they're

11 future claimants; they're not bound and they can assert?  First

12 off, GM's assumption of liability of personal injury, property

13 damage doesn't depend on whether it's an initial purchaser or a

14 used-car purchaser, correct?

15         MR. WEINTRAUB:  I think that's right.  And I think

16 that their no greater rights argument goes to the --

17         THE COURT:  Really?  I think it goes to the economic

18 losses.

19         MR. WEINTRAUB:  I think so too.  I think so too.

20         THE COURT:  And that's where I think they --

21         MR. WEINTRAUB:  That was my --

22         THE COURT:  I get -- you know, I think they have a

23 lot of traction with me at least with that argument that for

24 economic-loss plaintiffs, used-car purchasers can have no

25 greater rights than the initial owner of the vehicle would

53

1  have.  It didn't -- their argument is, it can't morph into
2  something greater just because the car passes -- well, I'm sure
3  I will hear plenty of argument of why they -- people don't
4  believe that's correct, but I understand GM's argument that for
5  economic-loss claim, used-car purchasers can't have any greater
6  rights than the party from whom they purchased the vehicle.
7          MR. WEINTRAUB:  And my only point in going maybe a
8  step further was to avoid being tarred by that brush.  I don't
9  think that argument applies to us.  I think we're --
10          THE COURT:  I understand your argument.  You're --
11  when you're dealing with accident, Grumman Olson that's not the
12  only case, but Grumman Olson, and I think -- you know, I
13  thought it was interesting that Judge Bernstein interpreted the
14  sale order in Grumman Olson.  You know, one possible
15  interpretation that he could bar those claims, but he
16  interpreted it, no, you can't -- it didn't bar those claims,
17  because you can't bar those claims --
18          MR. WEINTRAUB:  Right.
19          THE COURT:  -- because they're unknown, and --
20          MR. WEINTRAUB:  Right.
21          THE COURT:  But he engaged -- I think, somewhat
22  similar to what the Second Circuit did here is, Judge Bernstein
23  engaged in an interpretation of the sale order.  He did it
24  having in mind principals about future claims and things of
25  that nature.

54

1           MR. WEINTRAUB:  And, again, I just don't want to get
2    tarred with the -- with that brush.  We think that there was --
3    to the extent there is no --
4           THE COURT:  You're just going to let your colleagues
5    be targeted, but --
6           MR. WEINTRAUB:  Yeah, I actually believe that
7    Mr. Weisfelner can take care of himself probably better than I
8    can.  The -- to the extent there was any due-process issue at
9    all, it's really the impossibility of reaching these people,
10   because they're not unknown creditors who can be bound by
11   constructive notice.  These are not yet creditors, and I think
12   that's a significant difference.
13          And with that, Your Honor, with five minutes to
14   spare, I will stop here, and then, resume with issue four after
15   the break.
16          THE COURT:  Okay.  Let's take a 15-minute recess, and
17   then we'll resume.
18       (Recess taken at 10:24 a.m.)
19       (Proceedings resumed at 10:40 a.m.)
20          THE COURT:  All right.  Please be seated.  We're back
21   on the record in Motors Liquidation.
22          Mr. Weintraub, are you done?
23          MR. WEINTRAUB:  No.  I have issue four.  Although you
24   indicated I may be doomed on issue four, but I'll --
25          THE COURT:  Go ahead.

55

1          MR. WEINTRAUB:  I thought I could briefly try anyway.

2   Thank you, Your Honor.  William Weintraub for the Non-Ignition

3   Switch Post-Closing Accident Plaintiffs now with respect to

4   issue four.  The non-ignition switch post-closing accident

5   plaintiffs are future creditors whose successor liability

6   claims cannot be barred by the sale order.  This circuit --

7   Second Circuit has not yet ruled on whether the bankruptcy

8   court can bar future tort creditors from asserting successful

9   liability claims.  We believe that future tort creditors

10  present a different due process issue than existing tort

11  creditors.

12          In this case, the ignition switch pre-closing

13  accident plaintiffs were known existing creditors denied due

14  process.  As a result, the Second Circuit held the sale order

15  could not bar their successor liability claims.  Mullane-style

16  publication notice only works for unknown creditors.  That is,

17  persons that have already been injured in an accident but who

18  are unknown to the debtor.  The due process issue for

19  non-ignition switch post-closing accident plaintiffs is that as

20  future tort claimants they were not yet creditors at all for

21  their future tort claims at the time of the sale.  As a result,

22  there was no notice that could have been effectively -- given

23  to them that would have effectively notified them that their

24  rights were about to be affected.

25          THE COURT:  Go ahead.

56

 1          MR. WEINTRAUB:  Oh.  In this case, there was no

 2   future claims representative appointed.  The Second Circuit

 3   sidestepped --

 4          THE COURT:  Let's just say I -- let's assume I agree

 5   with all of that.  Okay?  The question in my mind, if you get

 6   to the -- this is a punitive damage issue as part of issue

 7   four.

 8          MR. WEINTRAUB:  It's primarily punitive damages.  But

 9   also, because of -- I assume the Court is going to say they've

10   assumed liability.  It's partially the punitive damages issue.

11   But also, the scope of the assumption of liability, I think, is

12   more narrow than if they were determined to be a successor,

13   which would be the full range of --

14          THE COURT:  Well, I --

15          MR. WEINTRAUB:  -- liability.

16          THE COURT:  I don't know about that.  That's the

17   point.  Are there any cases -- is -- are there any cases either

18   assume liability from a debtor of -- an insolvent debtor,

19   assume liability from an insolvent debtor or successor

20   liability based on an insolvent debtor that have permitted the

21   recovery of punitive damages?

22          MR. WEINTRAUB:  I don't know the answer to that

23   question, Your Honor.  Candidly, we didn't look to see if there

24   were any.  But we did talk about cases where the court makes it

25   clear that the successor stands in the shoes of the predecessor

57

1  and has the same liability.  And if --

2         THE COURT:  And if that liability -- if the -- well,

3  that's -- this is really the question, is with Gary (phonetic)

4  and the authority that supports it that if punitive damages

5  can't be recovered from the debtor, can they be recovered from

6  -- technical term using the word "successor."  Okay?  Because

7  of the assumed liability or successor liability theory, if the

8  debtor couldn't be liable for punitive damages, how could

9  that --

10        MR. WEINTRAUB:  Well, I want to distinguish between

11 bankruptcy dollars and real dollars.  Clearly, the debtor could

12 have been liable for punitive damages if it -- you know, the

13 requisites for the imposition of punitive damages had been met.

14 The fact that --

15        THE COURT:  -- liability in Chapter 7 you can't

16 recover punitive damages.

17        MR. WEINTRAUB:  Sure you can, if the debtor's

18 solvent.  It's only subordinated, it's not disallowed.

19        THE COURT:  Right.  Okay.  So you don't have any

20 question that Old GM was insolvent?

21        MR. WEINTRAUB:  No.  But I don't think that the fact

22 that this debtor was insolvent precludes the successor from --

23 precludes the plaintiff from recovering from the successor.

24        THE COURT:  That's what I want to see some authority

25 on.

1          MR. WEINTRAUB:  Well, Your Honor, but by --

2          THE COURT:  Is this a question of first impression?

3          MR. WEINTRAUB:  By that token -- not to give New GM

4   any ideas that they probably haven't thought about, but by that

5   token then on the assumed liabilities they'd only pay 30 cents

6   on the dollar.

7          THE COURT:  No.  I don't think that follows.  But if

8   an insolvent debtor can't be liable for punitive damages, how

9   does the successor, whether by assumption or a successor

10  liability theory, become liable for your damages?  What I want

11  to know is are there cases that address the issue or is this a

12  question of first impression?

13         MR. WEINTRAUB:  I think this may be a case -- a

14  question of first impression.  Because if --

15         THE COURT:  So it's clear then that you don't have

16  any authority that addresses the issue one way or the other?

17         MR. WEINTRAUB:  Nor does General Motors, we think.

18         THE COURT:  I --

19         MR. WEINTRAUB:  Yes?

20         THE COURT:  I'll -- we'll let Mr. Steinberg make his

21  argument.

22         MR. WEINTRAUB:  Right.

23         THE COURT:  But I -- my question is to you.  You have

24  no authority that addresses the issue whether New GM can be

25  liable for punitive damages if Old GM could not?

59

1    MR. WEINTRAUB:  I have no authority for that.  But
2  there is no negative authority that says it cannot be.  And
3  there is authority for the proposition that the liability, for
4  want of a better term, is derivative.  It's the same liability
5  that the debtor would have had.  The fact that this debtor is
6  unable --

7    THE COURT:  They may pay a hundred cents on the
8  dollar rather than ten cents on the dollar, but -- on the basic
9  claim.  You know, if you have a debtor that ultimately is going
10  to be 90 cents on the dollar, well, you'll get 90 cents on the
11  dollar but you won't get punitive damages on top of it.

12    MR. WEINTRAUB:  That's correct that if the debtor
13  were barely insolvent then no creditor would get a hundred
14  cents on the dollar.  But I don't think that the distribution
15  in the bankruptcy case would curtail the ability to recover
16  from the successor for whatever the liability of the
17  predecessor was.  And I want to distinguish between ability to
18  pay and whether or not there's a valid claim.  You could
19  litigate a claim against Old GM and get an award of punitive
20  damages that the Court would say, okay, but that's subordinated
21  so I don't need to give you any more than you would have -- I'm
22  talking about just a claim without successor liability, just a
23  claim against Old GM.

24    THE COURT:  You think the claim would go to a jury as
25  to whether punitive damages -- if there's no issue as to

60

1  solvency, it's insolvent, does the claim go to the jury for

2  punitive damages against Old GM?

3         MR. WEINTRAUB:  I actually don't know what an

4  individual judge might do in those circumstances.  But there is

5  certainly situations in bankruptcy cases where assets show up

6  or litigation claims turn into dollars so that a debtor that is

7  insolvent one minute can be solvent the next minute if it has a

8  litigation success.  So it doesn't moot the ability of a

9  creditor to prove up its claim.  And it shouldn't boot the

10  ability of a creditor to assert punitive damages.

11         THE COURT:  All right.  Go ahead.

12         MR. WEINTRAUB:  So we believe that Grumman Olson is

13  on point.  We don't think the fact that the plaintiff in

14  Grumman was not a pre-sale purchaser of the defective truck

15  parts, it was merely a driver for the post-sale purchaser of

16  the truck parts, is a distinction that makes a difference.  The

17  animating principle emphasized by the District Court in Grumman

18  was as follows.  And I'm quoting from Grumman but I'm replacing

19  names for personal injury plaintiffs and reading this abridged

20  quote:

21         "The personal injury plaintiffs did not receive

22          adequate notice of their potential claim in the

23          Grumman bankruptcy proceedings because at the time of

24          the bankruptcy there was no way for anyone to know

25          that the personal injury claimants would ever have a

61

1          claim.  Enforcing the sale order against the personal
2          injury plaintiffs to take away their right to address
3          under a state law theory of successor liability when
4          they did not have notice or an opportunity to
5          participate in the proceedings that resulted in that
6          order would deprive them of due process."
7          And that's 467 B.R. at 708, 709.  And the District
8   Court cites to the Schwinn case.  The Schwinn case is a
9   significant citation because factually in that case the
10  exercise bicycle that harmed the plaintiff in that case was
11  sold by the predecessor company before the bankruptcy sale.  So
12  this is -- Schwinn is analogous to what we're talking about in
13  General Motors where there was a pre-bankruptcy sale but no
14  injury until after the bankruptcy.  We believe that that is a
15  future claimant the same as the claimant was in Grumman.  The
16  focus in Grumman was not about when the victim acquired the
17  defective merchandise.  Instead, the focus was the
18  impossibility of getting meaningful notice to a future claimant
19  who at the time of the bankruptcy sale was not yet a creditor.
20         I already talked about the fact that constructive
21  notice doesn't work for future claimants because they're not
22  yet creditors under the Mullane construct.
23         Your Honor, we will -- we already had a colloquy
24  about the punitive damages aspect.
25         THE COURT:  Well, that's my biggest question --

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

62

 1          MR. WEINTRAUB:  Yes.

 2          THE COURT:  -- Mr. Weintraub --

 3          MR. WEINTRAUB:  So I'm editing down as we -- as I

 4  stand here.  So here and in every case the tort victims are

 5  involuntary creditors.  They didn't volunteer to be injured.

 6  Their permission was not sought when New GM assumed what it

 7  contends is limited liability for post-sale accidents.  After

 8  their sale -- after their post-sale crashes occurred, the

 9  plaintiffs are simply looking to all available remedies.  One

10  available remedy, successor liability, we think is part of that

11  punitive damages.  And another available remedy is the assumed

12  liability by New GM.  The inability to pay issue that we talked

13  about in almost every case of successor liability, the

14  predecessor has an inability to pay because it's done --

15          THE COURT:  And that may or may not be true.  I don't

16  know.  I mean --

17          MR. WEINTRAUB:  Well, in most cases it's done a

18  transaction that's divested the assets that generated the

19  income that made it able to pay its debts when it was still

20  operating its business.  Obviously if --

21          THE COURT:  Most successor liability cases have

22  nothing to do with bankruptcy.

23          MR. WEINTRAUB:  Well, Your Honor, if the predecessor

24  was left solvent because it was paid $80 billion then you

25  wouldn't need to look to the successor.  So the law of

63

1    successor liability developed as an equitable remedy really at

2    the crossroads of, you know, legal principles in the general

3    proposition that a successor does not take on the liabilities

4    of its predecessor.  But successor liability is an equitable

5    remedy under appropriate circumstances.  And we think the

6    circumstances would be appropriate here depending upon what the

7    law of a particular jurisdiction is.  Which again, this gets

8    through the gate, but we're not asking you to decide that

9    they're a successor or that there should be punitive damages,

10    just the ability to seek to assert that claim.

11            In terms of deterrence, we think that even though New

12    General Motors is no longer in business -- I'm sorry, Old

13    General Motors is no longer in business, New General Motors is

14    populated by the same people that were at Old General Motors so

15    that we think that deterrence is a real issue here.  I also

16    would note that post-sale because of the ignition switch

17    defect, New General Motors paid a $900 million civil penalty

18    and entered into a deferred prosecution agreement precisely

19    because they delayed the recall on the ignition switch vehicle.

20    So deterrence is an effective tool with respect to New GM.

21            In terms of the prior briefing on punitive damages,

22    that was limited to whether or not punitive damages were an

23    assumed liability under 2.3(a)(9) with respect to the specific

24    clients that I represented.

25            THE COURT:  And Judge Gerber -- and he concluded

64

1    that --

2              MR. WEINTRAUB:  They were not.

3              THE COURT:  -- punitive damages was not an assumed

4    liability.

5              MR. WEINTRAUB:  That's correct.

6              THE COURT:  He said that New GM assumed liability for

7    extra values, not for --

8              MR. WEINTRAUB:  That's correct.  But we did prevail

9    on the imputation point and on the independent claim point so

10   that those are --

11             THE COURT:  Well, if you had punitive -- I haven't --

12   Judge Gerber -- I think he didn't bar the possibility under

13   state law for punitive damages on truly independent claims.

14             MR. WEINTRAUB:  No, I understand that.  This is just

15   another path to punitive damages for those who seek to assert

16   that claim under the appropriate circumstances.

17             THE COURT:  You will agree that punitive damages

18   against New GM are not available with respect to assumed

19   liabilities?

20             MR. WEINTRAUB:  Contractually, yes.  That was

21   litigated then and we were not successful for our specific

22   clients.  And the decision was made not to appeal that.  As to

23   whether or not that binds others, I'm not here to say yay or

24   nay.  But that's not the argument I'm making today.  I'm

25   talking about liability as a successor separate and apart from

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

65

1  what was assumed.

2           I talked about already that mere ownership of the

3  vehicle at the time of the sale is not enough of a connection

4  or relationship to bar future claims.  And to the extent that

5  these were known creditors because they had a repair right,

6  that we have a due process violation.  And we would say that

7  they should have the same rights as the ignition switch

8  plaintiffs.  But again, we're not litigating due process.  But

9  if the -- if counter argument was they were known creditors,

10 then that would be an acknowledgment of a due process

11 violation.

12          Whatever the notice was here was insufficient to

13 reach these people.  It was insufficient not just in terms of

14 the practical inability to warn people who had not yet been

15 injured but also the content of the notice itself didn't talk

16 about successor liability or independent claims.

17          THE COURT:  Your -- I said this before.  Your view is

18 that the due process issue is not relevant to the future

19 claimants?

20          MR. WEINTRAUB:  That's correct.  That's correct, Your

21 Honor.  But in the event someone --

22          THE COURT:  Yes.

23          MR. WEINTRAUB:  -- disagrees, then that would be my

24 point.  So, Your Honor, that, I think, concludes it.  I did

25 address the non-ignition switch colloquial upper case/lower

66

1   case point that was raised by New General Motors.  I thought

2   that our letter spoke for itself.  If you have any questions to

3   me about the letter, I'm -- I'd be happy to answer them.

4            THE COURT:  Yeah.  I guess -- I think -- no question.

5            MR. WEINTRAUB:  Thank you.

6            THE COURT:  Thanks.

7            Mr. Weisfelner?

8            MR. WEISFELNER:  Thank you, Judge.  And, Your Honor,

9   for the record, Edward Weisfelner together with my partner,

10  Howard Steel, of Brown Rudnick.  I want the record to reflect

11  clearly that I'm reading from Mr. Steel's notes and have

12  otherwise stolen the spotlight I promised to him.  He will

13  address a number of the other issues.  But since --

14           THE COURT:  So why are you doing it if he -- if

15  you --

16           MR. WEISFELNER:  Well, I guess because I can't help

17  myself, number one.  And number two --

18           THE COURT:  You could barely help yourself when you

19  were behind the table with --

20           MR. WEISFELNER:  And number two, because I do think,

21  without having had an opportunity to go back and check on it,

22  one of the issues Your Honor raised with regard to the August

23  transcript is probably my commentary.  And I thought it --

24           THE COURT:  I assumed it was, but --

25           MR. WEISFELNER:  And I thought it was important, Your

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1    Honor, that --

2                THE COURT:  Can I ask you this question?

3                MR. WEISFELNER:  -- I address it.  Sure.

4                THE COURT:  Who do you represent?

5                MR. WEISFELNER:  Your Honor, we were retained by the

6    lead counsel in the MDL, all three of them, Messrs. Berman,

7    Ms. Cabrayas (phonetic), and -- I'm going to forget --

8                UNIDENTIFIED:  And Mr. Hilliard.

9                MR. WEISFELNER:  And Mr. Hilliard.  There was a

10   selection process that was made -- I guess it was after the

11   time that they were appointed as lead counsel by Judge

12   Furman -- appreciating that because of the processes that had

13   begun in the bankruptcy court, both with respect to motions to

14   enforce and an adversary proceeding that had been filed by

15   another's plaintiff's firm, that lead counsel wanted to have

16   bankruptcy lawyers representing them.  Originally, there were

17   three designated counsel, three firms: our firm, the firm of

18   Stutzman --

19               UNIDENTIFIED:  Esserman, Sandy Esserman.

20               MR. WEISFELNER:  Mr. Esserman's firm.  And then we

21   had -- the third firm was Caplin & Drysdale.  Subsequently,

22   Caplin & Drysdale dropped out.  And at some point in time

23   Mr. Hilliard retained Mr. Weintraub to represent accident

24   victims as opposed to economic loss parties.

25               THE COURT:  So let me ask you now, you say you were

68

1   retained by lead counsel in the MDL.  Who were their clients?

2           MR. WEISFELNER:  Your Honor, I presume that their

3   clients are the putative members of the class -- or classes,

4   actually, yet to be certified that are proceeding in the MDL

5   before Judge Furman.

6           THE COURT:  So --

7           MR. WEISFELNER:  But I should also add --

8           THE COURT:  -- derivatively do you represent

9   non-ignition switch economic loss plaintiffs?

10          MR. WEISFELNER:  I believe we do, Your Honor.  And --

11          THE COURT:  And have since the start?

12          MR. WEISFELNER:  And have since the start.  And what

13  I was going to do before I addressed your specific concerns

14  about what was the August commentary all about --

15          THE COURT:  First I'm trying to figure out when you

16  spoke in August who were you representing.

17          MR. WEISFELNER:  And I think it's fair enough to say

18  that we took on the mantle, both self -- we put the mantle on

19  ourselves.  But I think Judge Gerber in an effort to streamline

20  the process and make it more efficient recognized designated

21  counsel as the primary spokesperson for both ignition switch

22  and non-ignition switch economic loss parties, provided that

23  other people who thought that we weren't adequately addressing

24  their concerns had the opportunity to independently address the

25  court, but only after sort of assuring themselves that we were,

69

1    to adopt the colloquial, screwing up.

2            THE COURT:  Sure.

3            MR. WEISFELNER:  But, Your Honor, I wanted to again,

4    you know, address from my vantage point your concern about the

5    August statement.  The concern I felt coming from the Court

6    about the concept of laches or waiver or sitting on one's

7    rights with regard to due process concerns as they may impact

8    on this, why certain judgments of Judge Gerber weren't appealed

9    and what impact that has on the going forward ability to prove

10   up one's case.  I think in order to do this effectively, I want

11   to make sure -- as I'm sure Your Honor could research this on

12   your own.  But I thought it would be helpful just to tell you

13   who are the plaintiffs that are in the MDL in connection with

14   the FACC.  And I guess the FACC stands for the Fifth Amended --

15           UNIDENTIFIED:  Fourth.

16           MR. WEISFELNER:  -- Fourth Amended Consolidated

17   Complaint.  And, Your Honor, in category A or -- you know, who

18   are the non-ignition switch plaintiffs?  There are

19   nine-and-a-half million -- nine-and-a-half-plus million

20   vehicles that we internally refer to as the low-torque ignition

21   switch vehicles.  They involved recall numbers 14V-355, some

22   three-million-plus vehicles.  And if you look at the recall

23   itself, it talks about ignition key slot defect.

24           THE COURT:  When was that -- when was that recall?

25           MR. WEISFELNER:  They were all done in 2014 in the

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

70

 1  summer.

 2          THE COURT:  I understand.  But the defined term

 3  "ignition switch plaintiffs" here refers to the February and

 4  March 2014 --

 5          MR. WEISFELNER:  Correct.  The subsequent recall,

 6  recall number 14-355 was --

 7          UNIDENTIFIED:  July.

 8          MR. WEISFELNER:  -- in July, I believe.

 9          THE COURT:  Of 2014?

10          MR. WEISFELNER:  Yes, Your Honor.  Second, you had

11  recall number 14V-394, involved a little over a half a million

12  vehicles.  And the recall talked about, and I'm quoting,

13  "Unintended ignition rotation defect."

14          THE COURT:  When was that one?

15          MR. WEISFELNER:  Also in --

16          UNIDENTIFIED:  July.

17          MR. WEISFELNER:  -- July of that same year.  And then

18  finally -- or penultimately you had recall number 14V-400, over

19  5.8 million vehicles.  And the recall spoke about again

20  "Unintended ignition rotation defect."

21          THE COURT:  When was that one?

22          MR. WEISFELNER:  July of same year.

23          THE COURT:  All right.  So there were three --

24          MR. WEISFELNER:  Almost done.

25          THE COURT:  -- recalls in February and March.



71

1          MR. WEISFELNER:  Almost done.

2          THE COURT:  Okay.

3          MR. WEISFELNER:  There's more than three.

4          THE COURT:  (Indiscernible)

5          MR. WEISFELNER:  You then had about a half million

6    vehicles involved in recall number 14V-346.  And the recall

7    talked about knee to knee Camaro defect vehicles.  These are

8    ignition-related defects that according to the recall could be

9    triggered by contact between the driver's knee and the ignition

10   switch.

11         THE COURT:  And when was that?

12         MR. WEISFELNER:  I believe it was also July or maybe

13   August, but within a month of the other recalls.  Now, those

14   are everything that in lower case terms are involved with

15   ignition switches in multiple vehicle lines and beyond the

16   initial ignition switch defect claims that only involved about

17   a million or a million-two vehicles.

18         THE COURT:  So one of the questions I wrote to

19   myself, are there any facts in the record that show a

20   relationship or nexus between the recalls covered by 14V-047

21   and any later recalls, ignition --

22         MR. WEISFELNER:  Tons --

23         THE COURT:  -- related --

24         MR. WEISFELNER:  -- and tons of material in the

25   record that deal with the manufacturer of the switch throughout

72

1  all of the different vehicle platforms.  Tons and tons of

2  information in the record that deals with when New GM knew or

3  should have known.

4          THE COURT:  Let me ask the rest of the question

5  (indiscernible).

6          MR. WEISFELNER:  Yes, sir.

7          THE COURT:  This -- when I went through them, which

8  apparently these were questions I wrote to myself, in -- with

9  respect to the same thing about a nexus or relationship, was

10 there any fact finding either by NHTSA or by Valukas or anyone

11 else that you contend shows that the defects other than 14V-047

12 were defects that were known to Old GM before the 363 sale?

13         MR. WEISFELNER:  Yes, Your Honor.  And in point of

14 fact, the fourth amended consolidated complaint does in fact

15 allege that New GM knew about all of these defects in Old GM

16 and New GM vehicles because some of the vehicles were in fact

17 manufactured by New GM, but that they concealed this material

18 information with the intent to deceive the plaintiffs.

19         THE COURT:  Has there been discovery on that?

20         MR. WEISFELNER:  Your Honor, they're in point of fact

21 has been discovery in front of Judge Furman in the MDL.  I

22 don't believe it's been completed, but I believe that discovery

23 has commenced with regard to those issues.

24         And, Your Honor, I also think it's important to note

25 two other recalls that are the subject of the fourth amended

73

1    complaint in front of Judge Furman.  And they involve about 1.2

2    million vehicles subject to recall number 14V-118.  I believe

3    the 14 is the year, 2014.  I'm not certain what the month was.

4    But that recall, 14V-118 for 1.2 million vehicles, involved

5    side airbag defects.  And then finally, the FACC asserts claims

6    on behalf of approximately 1.3 million vehicles involved in

7    recall number 14V-153.  And that recall involved power steering

8    defects.

9             I should also tell Your Honor that --

10            THE COURT:  Let me ask you with respect to 14V-118

11   and --

12            MR. WEISFELNER:  Yes, sir.

13            THE COURT:  -- 14V-153 --

14            MR. WEISFELNER:  Yes, sir.

15            THE COURT:  -- was there any fact finding by NHTSA or

16   Valukas or anyone else that you believe supports showing that

17   Old GM knew about those defects before the 363 sale?

18            MR. WEISFELNER:  Your Honor, I would -- I don't

19   believe that there was anything in the Valukas report or --

20            THE COURT:  Just on the ignition switch --

21            MR. WEISFELNER:  -- NHTSA as it related to power

22   steering.  As it related to the side airbag defect, since my

23   basic knowledge of the underlying facts is that if the ignition

24   switch is rotated out of the on position into either off or

25   accessory that that has an impact on the side airbags, I don't

74

1  know if they're related.  I just -- sitting here today I can't

2  tell you.  But I do know that there are facts that exist in the

3  FACC that assert that all of these defects were known by both

4  Old GM and New GM and certainly were known by New GM way in

5  advance of the recalls themselves.

6          THE COURT:  You say that discovery -- your

7  understanding is discovery is not complete on it?

8          MR. WEISFELNER:  Correct.

9          THE COURT:  Is that -- did Judge Furman identify

10 issue -- were these identified as issues as to which discovery

11 would go forward?

12         MR. WEISFELNER:  Yes.

13         THE COURT:  And is there a deadline when the

14 discovery is going to be completed on this, on the --

15         MR. WEISFELNER:  I don't know the answer to that.

16         UNIDENTIFIED:  September 1st.

17         MR. WEISFELNER:  I'm not being told by much smarter

18 people that it's September when discovery is intended to be

19 complete on these issues.

20         THE COURT:  And I'm far from making such a decision,

21 but if I decided that the Court had to have an evidentiary

22 hearing to determine whether Old GM knew about these defects

23 and concealed it such that there was a due process violation,

24 when will you be prepared to go to trial?

25         MR. WEISFELNER:  Your Honor, again, I think it's the

75

 1  view of the plaintiffs -- and I think it's shared by New GM --

 2  that determinations with regard to what Old GM knew and when it

 3  knew it and the extent to which that knowledge, if any, can be

 4  imputed to New GM, and what the consequences are as it relates

 5  to the sale order, are all issues that Judge Furman intends,

 6  either with or without input from this Court but based on the

 7  record including the Second Circuit decision, he will determine

 8  on his own.

 9            THE COURT:  Okay.

10            MR. WEISFELNER:  Your Honor, I think it's also

11  important as we focus on independent claims that are being

12  asserted against --

13            THE COURT:  So why are we -- if Judge Furman is going

14  to address those, why am I even bothering to address whether

15  non-ignition switch plaintiffs, whether their claims are barred

16  by the sale order?

17            MR. WEISFELNER:  Well, I think, Your Honor, there are

18  two different parts to this, which in part goes to the answer

19  of what was I talking about in August and why didn't we appeal

20  and how long am I entitled to sit on my rights before I make an

21  issue out of it.

22            THE COURT:  Let's assume that I agree that

23  Judge Gerber did not expressly address the issue.  It's

24  debatable.  I could easily -- I could conclude he did and I

25  could conclude he didn't.  But let's assume that I agree he

76

1  didn't.  That's why I focused earlier on when you spoke in

2  August it seems that you were quite aware that there was this

3  potential due process issue.

4          MR. WEISFELNER:  And let me just address that head

5  on.

6          THE COURT:  Okay.

7          MR. WEISFELNER:  Your Honor, there were due process

8  considerations that impacted any number of potential claims and

9  causes of action that our plaintiffs were anxious to pursue.

10  On the one hand, you had questions about the extent to which

11  due process or a finding of due process violation -- and by the

12  way, under the rubric of Judge Gerber, it wasn't just a finding

13  of a violation of due process.  It was a coupling of a finding

14  of a due process violation --

15          THE COURT:  Sorry.  Just a second.  I caught the

16  wire.

17          MR. WEISFELNER:  -- together with a showing of harm

18  as a consequence of that due process violation.  To our mind,

19  that paradigm impacted most significantly the question of

20  whether or not you were bound by the sale order itself as it

21  related to pursuit of successor liability claims.  It had

22  always been our view -- when I say our view, I meant the

23  plaintiffs' view -- that there is nothing about a 363 sale --

24  in fact, there is no jurisdiction within the bankruptcy

25  court -- for that matter, I don't think there's any

77

1   jurisdiction within the federal court system, whether you're

2   talking about an Article 1 or an Article 3, Judge, that would

3   afford the buyer of assets in a sale protection into the future

4   for its own tortuous actionable conduct.

5            THE COURT:  The independent claims, you're talking

6   about?

7            MR. WEISFELNER:  The so-called independent claims.

8            THE COURT:  I understand your side's position on

9   that.

10            MR. WEISFELNER:  Of course, we had to -- and part of

11   what Judge Gerber did was take a look at the actual pleadings

12   that were stamped at that time, which I think was maybe the

13   second amended consolidated complaint, to determine whether or

14   not any of our independent claims as asserted crossed the line.

15   And by crossing the line, I mean generally speaking that you

16   were asserting claims against New GM that rested in whole or in

17   part on bad conduct by Old GM.  And as Judge Gerber determined

18   in that proceeding, most, if not all, of the independent

19   claims, so long as they were scrubbed and cleaned up, with

20   regard to your reference to Old GM, passed through the

21   proverbial bankruptcy gate and were matters to be determined on

22   the merits by the trial courts, including the MDL.

23            Now, Your Honor, there has been lots of proceedings

24   before Judge Furman on what constitutes an actionable

25   independent claim on the theory and the view that they've

78

1   already passed through the bankruptcy gate.  So for Your Honor,

2   what remains in the FACC is violations of Consumer Protection

3   Unfair and Deceptive Trade Practices Act; number two,

4   fraudulent concealment; number three, unjust enrichment,

5   although we're down to a very narrow number of jurisdictions in

6   which that cause of action may in fact apply; breach of implied

7   warranty of merchantability, and that's still alive for most

8   state laws; the Magnuson-Moss Warranty Act, still alive in most

9   state laws; the negligence --

10              THE COURT:  Wasn't that an assumed liability?

11              MR. WEISFELNER:  Excuse me?

12              THE COURT:  Wasn't that an assumed liability?

13              MR. WEISFELNER:  There were warranty assumptions.

14   And the Moss -- the Magnuson-Moss Warranty Act is only asserted

15   for owners or lessees of vehicles that were sold or leased as

16   new, certified pre-owned vehicles.  So in colloquial terms,

17   they had the stamp of New GM on them.

18              Negligence, which we've only asserted under the laws

19   of four jurisdictions.  A violation of RICO, which is a claim

20   that Judge Furman has already dispelled with, but it's been

21   asserted to preserve the claim for appeal.  That only applies

22   to certain plaintiffs.

23              My point being that when the general comment was made

24   about we recognize the need to tee up the issue, that was not

25   with respect to the ability to pursue independent claims.


ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

79

1  Rather, it was with respect to the ability to pursue successful

2  liability.

3           Now, I will tell Your Honor that in terms of being

4  criticized for not teeing it up, I need to say a couple of

5  things.  Number one, it's been teed up and it's been teed up

6  before Judge Furman in the FACC.  That's why discovery is going

7  on with respect to those issues.  Number two, and perhaps more

8  importantly, it was clearly teed up, if you will, in connection

9  with the proofs of claim that the plaintiffs filed in this

10 court for both upper case ignition switch plaintiffs and lower

11 case ignition switch plaintiffs, as well as side airbag, as

12 well as the other defect.  So all of these issues, including

13 the question of whether or not there's a due process violation

14 that needs to be established as a prerequisite to the allowance

15 of the claim -- and remember this is a claim against Old GM,

16 not an independent claim -- and may be relevant to the extent

17 that successor liability exists.

18          The last thing I want to tell Your Honor --

19          THE COURT:  Let me -- you first -- tell me and then

20 I'll ask my question.

21          MR. WEISFELNER:  Okay.  The fact that this counsel

22 table was throughout the course of these proceedings occupied

23 by designated counsel of one flavor, variety, or another, did

24 not preclude the Greek chorus that sat behind us through most

25 of these proceedings --

1        THE COURT:  It's dwindling.

2        MR. WEISFELNER:  It is dwindling, but only because

3   we've invited the head Greek to sit up at our table, Professor

4   Peller.  But Mr. Peller, among others, made the point at

5   various times throughout the proceedings before Judge Gerber

6   that they wanted to stop the process and insisted on discovery.

7   And the massive discovery that they were looking for before any

8   other procedures or rulings could be determined was discovery

9   with regard to the underlying facts and circumstances that

10  could go into the due process argument, a known defect that was

11  hidden or a known defect that didn't give rise to the sort of

12  notice that would otherwise be necessary under the due process

13  case law.  And I had numerous conversations with new GM's

14  counsel, in particular Mr. Steinberg, about whether or not it

15  was in the best interests of both the plaintiffs through their

16  designated counsel and New GM for us to stop the clock and do

17  what we avoided the first time around, which was to take

18  stipulated facts primarily out of the Valukas report, Mary

19  Darrow's testimony.  We now had the deferred prosecution

20  agreement.  We now had the NHTSA, in effect, series of reports.

21        Given all of that, did we want to stop the processes

22  and engage in massive, expensive discovery in front of the

23  bankruptcy court on these due process issues?  Or should we

24  wait until it all wound it's way to the MDL and state courts?

25  And to the extent it remained an issue, especially as it

81

1  related to independent claims but even if it remained an issue

2  with regard to successor liability, there's a better time and

3  place to do all that.

4       At no point in time was there a disagreement between

5  us and New GM where New GM was of the view I want to start the

6  ball rolling now.  It's your obligation.  Undertake it.

7  Undertake it now or be forever barred.  Not even be forever

8  barred.  Be hit with the notion of laches or waiver or any

9  other issue preclusion.  We had always assumed that that sort

10  of discovery, if ever needed or required by any party, would

11  happen someplace else at some other time.

12       THE COURT:  I'm going to ask you this.  And do I

13  have -- I gather -- I didn't bring all the volumes out.  There

14  were volumes of documents from last time.  I brought the two

15  volumes that recently got delivered.  A copy of any scheduling

16  orders by Judge Furman where the due process issues or

17  non-ignition switch plaintiffs has -- where he has expressly

18  dealt with discovery will go forward and what the process will

19  be?  Because I -- it may be there.  I didn't -- I haven't

20  seen --

21       MR. WEISFELNER:  Your Honor, I do know that

22  Mr. Steinberg and his colleagues have been extraordinarily

23  diligent consistent with prior orders of both Judge Gerber and

24  by implication Your Honor to attempt to keep Your Honor advised

25  of all relevant developments in front of Judge Furman.

82

1          THE COURT:  I wouldn't want you to think for a moment

2     that I don't read every piece of paper that comes across my

3     desk because --

4          MR. WEISFELNER:  And my next statement was going to

5     be I think it may be worthwhile process for the folks that know

6     a lot more about what goes on in front of Judge Furman on a

7     day-to-day basis to attempt to cull for you in a very short

8     period of time those orders, be they scheduling orders or

9     discovery orders, that demonstrate in point of fact what the

10    scope of discovery is that is currently proceeding before Judge

11    Furman with a September deadline.  And we would undertake,

12    together with help from Mr. Steinberg, to do just that.

13          THE COURT:  Yeah.

14          MR. WEISFELNER:  Your Honor --

15          THE COURT:  (Indiscernible).  Mr. Steinberg, do I

16    have any paper among the lot of paper that I have that reflects

17    what discovery is going forward, you know, where Judge -- where

18    Judge Furman has entered some order that specifies what the

19    issues that are subject to discovery in the September cutoff?

20          MR. STEINBERG:  I don't think Your Honor has the

21    complete set.  But in connection with the letter we filed to

22    correct those statements made at the last hearing, we attached

23    two of the discovery orders that demonstrated that discovery

24    was actually being taken at the MDL.

25          THE COURT:  Oh, I know.  You -- and I didn't so much

ACCESS TRANSCRIPTS, LLC                     1-855-USE-ACCESS (873-2223)

1  focus on where.  Your point was, I think, that -- my take away

2  from your letter, which I did read, was that there was an

3  arguably inaccurate statement made at the last hearing when I

4  inquired about participation of those or discovery with respect

5  to due process and non-ignition switch plaintiffs.  And you

6  did -- and I did note that you pointed out the discovery in the

7  MDL, not (indiscernible).

8         MR. STEINBERG:  Right.  There are over a hundred

9  orders that Judge Furman --

10         THE COURT:  I don't want a hundred orders.

11         MR. STEINBERG:  -- has entered on an interim basis --

12         THE COURT:  I don't want a hundred orders.

13         MR. STEINBERG:  -- some of which relate to discovery.

14  And there are status conference letters that indicate on a

15  monthly basis how much discovery has progressed in 2015 and

16  2016.

17         THE COURT:  I would like to see -- I don't want to

18  see a hundred orders.  If there are a few orders that make

19  clear that discovery is going forward in the District Court on

20  non-ignition switch plaintiff due process issues and that Judge

21  Furman is going to decide, that's what I'd like to see.

22         MR. STEINBERG:  Your Honor, if the specific question

23  that you're asking is whether there are discovery orders that

24  say that this is geared towards the due process issue for

25  non-ignition switch plaintiffs, I think we can probably give

84

1    you that zero set of papers right now.

2              MR. WEISFELNER:  Well, Your Honor, I think we can

3    certainly show you discovery orders and scheduling orders that

4    go to the issue of whether or not GM knew, should have known,

5    and when it knew of the defects that are the subject matter of

6    the fourth amended consolidated complaint.

7              THE COURT:  Okay.  So I -- that's why I asked you the

8    questions.  And you did identify by recall number it was the --

9    when I was preparing, I was certainly aware that relatively

10   close in time to the three recalls that are the -- that help

11   define the non -- that help define the ignition switch

12   plaintiffs, the February and March recalls, that there would --

13   the non-ignition switch plaintiffs include ignition switch

14   problems.  And you've gone through and identified those.

15             MR. WEISFELNER:  Not only that, but I think this --

16             THE COURT:  I have this question about, well, what's

17   the next issue?  Is it -- is there evidence that Old GM knew

18   about it and concealed it?

19             MR. WEISFELNER:  Your Honor, maybe this is helpful.

20   On May 4th of this year, Judge Furman entered a memorandum

21   opinion and order regarding New GM's motion in limine.  Their

22   motion in limine sought to categorically keep out evidence

23   concerning vehicles with the initial cap ignition switch

24   defect, including the Valukas report, statement of facts

25   accompanying the deferred prosecution agreement from the

85

1  bellwether trials concerning second wave ignition switch

2  plaintiffs --

3         THE COURT:  I think he deferred ruling on it, right?

4         MR. WEISFELNER:  No.  What they -- what Judge Furman

5  found was the plaintiffs have not had an opportunity to fully

6  develop the record on the similarities between the two kinds of

7  ignition switches.

8         MR. STEINBERG:  It was an accident, I guess.

9         THE COURT:  Mr. Steinberg, when it's your turn to

10 speak, speak.  And not before that.

11        MR. WEISFELNER:  In any event, Judge, what we

12 think --

13        THE COURT:  -- be clear, I'm not going to decide

14 things that Judge Furman is going to decide.

15        MR. WEISFELNER:  But again, Your Honor, I don't think

16 you need to.  And let me tell you why or let me introduce

17 Mr. Steel who is going to tell you why.

18        THE COURT:  You're finally going to let him talk?

19        MR. WEISFELNER:  I am going to finally let him talk.

20 But I'm going to preview for you because I know he's thinking

21 very carefully, listening very carefully as to what I expect

22 him to cover.  But the whole point of our position is that the

23 Second Circuit opinion --

24        THE COURT:  This is I'm going to tell you what I'm

25 going to tell you.  Then I'm going to tell it to you.

1           MR. WEISFELNER:  And then I'm going to tell it to

2      you.

3           THE COURT:  Then I'll tell you what I told you.

4           MR. WEISFELNER:  Well, that's what I was taught in

5      law school.  Anyway, the Second Circuit opinion based on the

6      scope of the sale order changed the due process construct that

7      Judge Gerber apparently relied on.  And you'll hear about the

8      mandate rule.  You'll hear about the wipeout doctrine.  You'll

9      hear about what Mr. Peller had up on appeal and for whose

10     benefit.  And if you need to, you can hear about Rule 60(b) and

11     all of its different variations: 60(b) itself, 60(b)(5), and

12     60(b)(6).

13          But for all of those reasons that Mr. Steel will go

14     into a lot more detail on, our view is that, to again use the

15     phraseology that Mr. Weintraub uses, the necessity for

16     demonstrating a due process violation -- and we seem to

17     conflate these issues -- that there was a due process violation

18     with regard to the economic loss plaintiffs writ large I think

19     is almost a foregone conclusion.  Whether you suffered any

20     damage as a consequence, the sort of added element that Judge

21     Gerber put onto it, I think is sort of an irrelevancy at this

22     point.  The question is what has the Second Circuit reaffirmed

23     for all of us about the ability of a bankruptcy court order on

24     a 363 sale that immunizes the purchaser from any of its own

25     independent non-derivative breaches of duties or violations of

87

```
 1  law.  And as a consequence, we think the whole due process
 2  paradigm is gone.  But if Your Honor wants to hear --
 3              THE COURT:  Only as to independent claims.
 4              MR. WEISFELNER:  Only as to independent claims.  And
 5  that --
 6              THE COURT:  I understand your argument on that,
 7  but --
 8              MR. WEISFELNER:  Okay.
 9              THE COURT:  I'm not saying whether I agree or
10  disagree.  I understand.
11              MR. WEISFELNER:  But you understand it.  Well, just
12  to make sure, Mr. Steel will --
13              THE COURT:  Mr. Steel --
14              MR. WEISFELNER:  -- will address it.
15              MR. STEEL:  Thanks.
16              THE COURT:  Don't screw up, Mr. Steel.
17              MR. STEEL:  Oh, my goodness.  The pressure, the
18  pressure.  Howard Steel -- good morning, Your Honor -- of Brown
19  Rudnick.
20              THE COURT:  Maybe Mr. Weisfelner should be asked to
21  leave the room while you're -- because he'll be jumping up
22  otherwise when you --
23              MR. STEEL:  I'll try to pick up where Mr. Weisfelner
24  left off, not look over my shoulder, and be brief on this issue
25  number two.  I think the framework is that the fourth amended
```

1  consolidated complaint asserts independent claims on behalf of

2  the ignition switch plaintiffs and the exact claims on behalf

3  of non-ignition switch plaintiffs.  That's the state law

4  consumer protection claims, the fraudulent concealment claims

5  that Mr. Weisfelner detailed.

6       And Mr. Weisfelner also -- just some housekeeping

7  here -- detailed that Judge Gerber allowed these claims through

8  the gate for the ignition switch plaintiffs.  And that's at

9  541 B.R. 104, 130 to -32, where he held that whether New GM had

10 duties under non-bankruptcy law that formed the basis for

11 alleged independent claims is to be decided by the MDL court,

12 Judge Furman.

13      And Mr. Weisfelner also aptly described Judge

14 Furman's been working hard on this.  He's issued three

15 opinions.  And I just wanted to give you the citations for the

16 record.  There's the Cochram (phonetic) summary judgment

17 opinion at --

18      THE COURT:  And I have all of these.

19      MR. STEEL:  You have all those?  Okay.  Great.  So

20 then moving past that, Your Honor said you understood our

21 position in connection with the Second Circuit's decision

22 interpreting the sale order as carving out any independent

23 claims or, in other words, not --

24      THE COURT:  Well, Mr. Steinberg's probably going to

25 disagree with you on that, but --

89

1              MR. STEEL:  Agreed.  Agreed.

2              THE COURT:  -- I understand your position.

3              MR. STEEL:  And Mr. Weisfelner identified that this

4    is all formulated under 363(f) principles.  And I was going to

5    walk through and cite for the record the Second Circuit's

6    decision, but Your Honor --

7              THE COURT:  Go ahead.  Sure.

8              MR. STEEL:  -- definitely understands it.  I mean,

9    this is at --

10             THE COURT:  Don't assume.

11             MR. STEEL:  -- 157.  The Second Circuit goes:

12             "Independent claims are based on New GM's

13             post-petition conduct and are not claims that are

14             based on the right to payment that arose before the

15             filing of the petition or that are based on

16             pre-petition conduct."

17             THE COURT:  You have that quote in your brief.

18             MR. STEEL:  So you asked --

19             THE COURT:  -- that precise quote is in your brief.

20             MR. STEEL:  Yeah.  So, and you asked that question.

21   Yeah.  Independent claims by their nature are claims based on

22   post-sale conduct of New GM only, period, stop.  And the Second

23   Circuit held crystal clear these claims are outside the scope

24   of the sale order's free and clear provision.

25             THE COURT:  And that's essentially what Judge

90

1  Bernstein did in <u>Grumman Olson</u>.  He interpreted the sale order

2  in <u>Grumman Olson</u> as he was dealing with future claimants.  But

3  he carved out and said the sale order doesn't bar them.

4  Whether one -- someone else might read the sale order

5  differently, that's how he interpreted it.  He interpreted

6  it -- he interpreted a sale provisions on a sale order, having

7  in mind the law regarding future claims.  I'm going to stop

8  there.

9          MR. STEEL:  Right.  And that's entirely on point.

10  And I think that <u>Tronox</u> will save that.  But that's a good

11  preview for --

12          THE COURT:  We'll save <u>Tronox</u> for another day.

13          MR. STEEL:  Yeah.  Yeah.  And when you get into <u>Emoro</u>

14  (phonetic), I mean, we briefed that on cert.

15          THE COURT:  We'll --

16          MR. STEEL:  We were denied --

17          THE COURT:  -- save <u>Emoro</u> for --

18          MR. STEEL:  Yeah.  I'm saving it.  But I'm just

19  saying the force of the Second Circuit's logic as you just

20  framed it is pretty irrefutable.

21          THE COURT:  Well, I -- look, I mean, when you come

22  back to argue about <u>Tronox</u>, I have a hard time seeing how the

23  <u>Tronox</u> opinion, which is largely a decision that determines

24  that the Second Circuit lacks appellate jurisdiction because

25  there was no contempt ruling by the District Court, can in my

91

1   view supplant, replace, override the Second Circuit's decision

2   in Motors Liquidation as to what successor liability claims can

3   be carried forward. But that's for another day. Okay? But I

4   think --

5            MR. STEEL: And that -- yeah, that's an issue --

6            THE COURT: -- we're not going to talk about Tronox

7   and Emoro today.

8            MR. STEEL: Agreed. Agreed. And I was just talking

9   about the point that underpins the Second Circuit's decision

10  from a policy perspective. Not only is it straight up on

11  363(f), it just makes a lot of sense because if you're going to

12  prospectively release future tortious conduct, I mean, that's

13  well beyond the jurisdiction --

14           THE COURT: Well, I always learned from law school

15  and years of practice you can't release claims based on conduct

16  that has not yet occurred.

17           MR. STEEL: Exactly. That creates a moral hazard.

18  And that was the point where we thought it was a very

19  thoughtful and well-reasoned decision. And then the Second

20  Circuit even goes beyond the examples that Mr. Weisfelner

21  articulated that's in the FACC. The Second Circuit says:

22               "Though the parties do not lay out the whole universe

23               of possible independent claims, we can imagine that

24               some claims involve misrepresentations by New GM as

25               to the safety of Old GM cars."

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

1          That's what the FACC is asserting.  That's what Judge
2   Gerber, Judge Furman, the Second Circuit, New GM admits is fair
3   game for the ignition switch plaintiffs.  Well, why not the
4   ignition switch plaintiffs --
5          UNIDENTIFIED:  Non-ignition switch plaintiffs.
6          THE COURT:  Why not the --
7          MR. STEEL:  Why not the non-ignition switch
8   plaintiffs?  Exactly, Your Honor.  And our position is that the
9   Second Circuit decision clearly delineates that the
10  non-ignition switch plaintiffs should get the same benefits.
11         THE COURT:  And so New GM argues that the November
12  decision and December judgment bar those claims, was -- that
13  aspect was not appealed and therefore res judicata applies.
14  And why isn't that correct?
15         MR. STEEL:  Right.
16         THE COURT:  You have cases like Espinoza, you know,
17  that sometimes courts do things that are wrong.  But if they're
18  not appealed, you can't collaterally attack it.
19         MR. STEEL:  Understood.  And our position is that
20  that doctrine doesn't come into play here, and the way I frame
21  it is, I mean, I like to use -- and the coinage is was either
22  asked and answered at the Second Circuit or it's deferred and
23  still delayed --
24         THE COURT:  The asked and answered (indiscernible)
25  understand that.

93

 1           MR. STEEL: Yeah. So my theme on asked and answered
 2    is that back in April, the non-ignition switch defects --
 3           THE COURT: Talk to me about deferred, not asked and
 4    answered. Okay?
 5           MR. STEEL: Okay. Well, that -- it all starts in
 6    April, right? So Judge Gerber set up in his decision that the
 7    non-ISD claims would be stayed.
 8           THE COURT: He deferred it, that I don't have any
 9    question about, in April, and the June judgment he deferred it.
10           MR. STEEL: Right.
11           THE COURT: The question is whether the November
12    decision and December judgment decided it.
13           MR. STEEL: Right. And it didn't. Because first, I
14    mean, there's the practical answer to this where GM is
15    trumpeting an argument that Judge Gerber painstakingly looked
16    at the complaints and saw non-ISD and red penned it. That's
17    not what happened. I think we've established through a day and
18    a half of proceedings that he ruled on it from a due process
19    violation lens or paradigm, as Mr. Weintraub is espousing, and
20    just utilized footnote 70, which said they haven't proved the
21    due process violation, there's no ability to bring independent
22    claims under the due process lens.
23           So they were still only stayed. And then the thing
24    where it goes to asked and answered is concurrently while
25    those -- the right to prove a due process violation was still

94

 1 in play, well, we had an issue up on the Second Circuit.  And

 2 the issue emanates from the April decision where Judge Gerber

 3 decides that you had to prove a due process violation to get

 4 relief from the sale order.  The issue was the subject matter

 5 jurisdiction issue.  We formulated our statement of issues on

 6 appeals and said, well, is that wrong?  Is it just that no

 7 plaintiffs can be barred because the bankruptcy court can

 8 interpret the sale order to bar independent claims?  All right?

 9         So that was up on appeal.  We briefed it.  GM lost.

10 The Second Circuit found that the sale order -- these claims --

11 all independent claims are outside the scope of the sale order

12 under their 363 analysis.  So the asked and answered part is

13 the Second Circuit has definitively ruled on the issue.  And

14 that's where we get into, well, the non-ISD's benefit from the

15 mandate rule, the wipeout --

16         THE COURT:  Well, it's not clear to me that the

17 Second Circuit has decided any issues with respect to

18 non-ignition switch claims.  It's remanded, but they didn't --

19 it hasn't been decided with respect to it.

20         MR. STEEL:  Our position is then that this Court --

21         THE COURT:  It may be that the implication that the

22 opinion is -- that based on its analysis, independent claims,

23 truly independent claims, the sale order can't -- as the Court

24 interpreted it, doesn't bar independent claims.

25         MR. STEEL:  Right.  And our position is that's

Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 96 of 209

95

 1  supported by Manville, and that's supported by Grumman Olson,

 2  Cope (phonetic).  I mean, there's a litany of case law that

 3  we've put forth as saying that the Second Circuit correctly

 4  decided, and if there is still an issue here on remand, that's

 5  the spirit and essence of the Second Circuit ruling.  And under

 6  the mandate rule, this Court should enforce what is a crystal

 7  clear pronouncement that these claims are outside of the sale

 8  order.

 9          THE COURT:  Go ahead.

10          MR. STEEL:  Despite Mr. Weisfelner's promotion of

11  long presentation on the mandate rule, the wipeout rule, and

12  60(b), I think it's -- our papers are pretty clear that each of

13  these tenors or tenets provide an availability for the Court to

14  find that the non-ignition switch plaintiffs obtained the

15  benefit of the Second Circuit decision.  And just quickly I

16  would point the Court to, for the mandate rule, we cited the

17  Argentina case, the Ivan Boesky litigation, and Coudert

18  Brothers.

19          And it's just the position that I just articulated

20  that when you're on remand and the Second Circuit has issued a

21  decision, the mandate rule says that the bankruptcy court

22  should enforce the express terms or spirit of the mandate.  And

23  here you have a clear pronouncement that these claims are

24  outside the scope of the sale order.  So we do believe that

25  those cases support that proposition and application of the

Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 97 of 209

96

1  Second Circuit opinions of the non-ignition switch defect

2  plaintiffs.

3          Similarly, the wipeout doctrine is applicable here,

4  and the line of cases, the <u>Barnett</u> case and the <u>Bank of China</u>

5  case.  And that could actually support the judge's -- this

6  Court's application of the Second Circuit decision to the

7  non-ignition switch defect plaintiffs, because the essence of

8  the wipeout doctrine is to avoid inequitable or even

9  nonsensical results from lower courts giving an erroneous

10 ruling continued legal effect.

11         And here you had the Second Circuit come to the

12 conclusion that any other opinion other than these claims are

13 being outside of the sale order would technically be absurd and

14 not in conformance with <u>Chateaugay</u>, so I think the Court has

15 ample authority under the wipeout doctrine to find that the

16 earlier rulings putting the successor -- the due process

17 framework has been wiped out and that the Second Circuit's

18 controlling precedent now is fully the subject matter

19 jurisdictional holding set forth in the opinion.

20         Finally, if -- because it is part of the preview

21 rule, if the Court does find that the November/December

22 judgments imperils the claims of the non-ignition switch

23 plaintiffs, their ability to bring independent claims, we do

24 think this is an appropriate exercise of Rule 60(b)(5) or

25 60(b)(6).  They were timely, two day after the Second Circuit

97

1  decision.  Your Honor marshaled in the parties for setting up

2  the order to show cause briefing, and we quickly teed up this

3  issue, so there was no unreasonable delay.

4        I think on 60(b)(5), the key case to look at, I'd

5  point the Court to the Laury case.  That's the Wind Insurance

6  Agent case, where a claim against an insurance agent for

7  negligently failing to obtain wind coverage was dismissed

8  because the Court found that there actually was coverage.  Then

9  on appeal, the Court found there was no coverage and reinstated

10  the claim for negligently obtaining wind coverage.  I think

11  it's very similar here that the non-ignition switch plaintiffs

12  should benefit from the Second Circuit's articulation of the

13  true scope of the sale order.

14        Likewise on 60(b)(6), we cite to the 9/11 terrorist

15  attack cases, and all these cites are in our brief.  Again,

16  this is -- 60(b)(6) is appropriate when there's inconsistent

17  results for similarly situated parties.  Here, in that case, it

18  was the application of the Foreign Sovereign Immunities Act.

19  One court found that it applied; another court found it didn't

20  apply.  Here, you have the same dilemma.  You have one court

21  that potentially, if we're saying that December/November sticks

22  to bar the non-ISPs, saying that they're out of luck, but you

23  have the Second Circuit saying that the ISPs are free to assert

24  the exact same claims.  So this is our last argument, as an

25  alternative, we do think the Court could utilize Rule 60(b)(5)

98

 1  or 60(b)(6) if the Court thinks that the December and November

 2  decisions still bar independent claims of the non-ignition

 3  switch defect plaintiffs.

 4          Circling it back, I think in some -- as

 5  Mr. Weisfelner articulated, our position is that the Second

 6  Circuit has established that the sale order cannot bar

 7  independent claims of any stripe and that Judge Gerber, Judge

 8  Furman, the Second Circuit, and even New GM admit that

 9  independent claims of the ignition switch plaintiffs can pass

10  through the gate, and for non-ignition switch plaintiffs, it's

11  the exact same claims in the facts.  Therefore, the relief

12  we're looking for here is that the non-ignition switch defect

13  independent claims, in fact, proceed in front of Judge Furman

14  without any impediment.

15          THE COURT:  Okay.

16          MR. STEEL:  That's all I have on issue two.

17          THE COURT:  All right.

18          MR. STEEL:  Do you want me to dive into issue three,

19  Your Honor?

20          THE COURT:  Sure.

21          MR. STEEL:  Okay.  Issue three is the used car issue,

22  the used car purchasers' issue.  Again, we hang our hat, Your

23  Honor, on the Second Circuit's clear language of the decision,

24  and our position is that it applies equally to ignition switch

25  plaintiffs and non-ignition switch plaintiffs.

Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 100 of 269

99

1          THE COURT:  Accident, what do -- you think it applies

2     to economic loss plaintiffs?

3          MR. STEEL:  Yes, sir.  And the -- sorry.

4          THE COURT:  Go ahead, Mr. Steel.

5          MR. STEEL:  The Second Circuit again frames this

6     decision through the lens of 363(f), and they said at 155-56,

7     claims can only qualify as interest if there's some pre-

8     petition contact or relationship between the claimant and the

9     debtor.  Accordingly, the used car purchasers' claims fall

10    outside the scope of the sale order and cannot be enjoined.

11    There was no --

12         THE COURT:  But they don't address what the scope of

13    any used car purchasers' claim would be, and so the part -- I

14    said this early, the part that I have some problem with is

15    trying to expand the rights of the used car purchaser,

16    certainly for economic loss claims, beyond what the seller of

17    the vehicle could have asserted.  For accident plaintiffs, I

18    understand it.  Your argument is they're future claimants,

19    they're not bound.  But that argument, I don't see how that

20    works for economic loss plaintiffs.  You acquired whatever --

21    when you acquire the car, you acquire whatever rights the

22    seller has.

23         MR. STEEL:  Right.

24         THE COURT:  Do you disagree with that?

25         MR. STEEL:  No.  Generally, I think that's a fair

100

1  proposition, but let me try to explain why I don't think it's
2  applicable here.  Here the Second Circuit -- Mr. Weintraub I
3  think mentioned this -- for lack of a better word, eviscerated
4  Judge Gerber's decision on the used car purchasers in its
5  entirety.  It's a strange section of the --
6          THE COURT:  Okay.  I don't have this -- I don't have
7  it.  I could just decide on my own --
8          MR. STEEL:  Right.
9          THE COURT:  -- that a used car purchaser can't -- on
10  economic loss claims, can't have any greater rights than the
11  seller had.  Do you agree with that proposition or not?
12          MR. STEEL:  I agree.  I --
13          THE COURT:  Okay.
14          MR. STEEL:  -- agree with the proposition, but I
15  don't think it's applicable for this issue that is in front of
16  Your Honor.
17          THE COURT:  Well, tell me why.  That's what I -- all
18  right.  I'm going to --
19          MR. STEEL:  Right.  I think that --
20          THE COURT:  -- give you a chance to tell me why it
21  doesn't apply here.
22          MR. STEEL:  Well, because the issue that you're
23  looking at, I guess again there's a modulation I think between
24  what a successor liability claim that could be raised by a used
25  car purchaser, so say a non-ISD claimant sells his car.  He's

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

101

 1  not going to have greater rights to bring a successor liability

 2  claim than the original owner.  The original owner would have

 3  to prove the due process violation and be able to bring a

 4  successor liability claim.

 5          We're focused on independent claims, and the Second

 6  Circuit sets the right outlook there when it says that you're

 7  not focusing on the claim.  You're focused on the claimant, and

 8  the claimant has no relationship with new or Old GM.

 9          THE COURT:  But it doesn't say that the claimant has

10  any greater rights than -- on economic loss than the party who

11  sold it to them.  There's nothing in the opinion that says

12  that.

13          MR. STEEL:  Right.  It only says you're not enjoined

14  by the seller.  Right.  So I'm -- you don't necessarily need to

15  decide this issue on rights of the original purchaser or the

16  used car purchaser.  It's just whether the sale orders apply to

17  those claims.

18          THE COURT:  But I think I do.  I think I do because

19  if I conclude that, okay, used car purchaser can go ahead and

20  assert claims, but the bankruptcy court order bars them from

21  asserting claims for rights any greater than the seller had.

22  I'm not going to leave that to a state court somewhere else in

23  the country if I conclude that that's what the bankruptcy --

24  the effect of the bankruptcy is.

25          MR. STEEL:  Yeah.

102

1          THE COURT:  I'm not there yet, Mr. Steinberg, on the

2   whole used car issue.  I want to hear about it.  But at a

3   minimum, I think I haven't heard you -- on economic loss

4   claims, a used car purchaser can't acquire any greater rights

5   than the seller had.

6          MR. STEEL:  Right.  Because I don't think we are

7   taking that position.  What we're trying to -- the position

8   that we're taking is that if the seller had an independent

9   claim and then sold the car to the used car purchaser, that

10  can't be blocked by the sale order.  So we're not saying they

11  get any greater rights.  We're just --

12         THE COURT:  Well, if I accept the argument that the

13  sale order can't bar independent claims, full stop, and I'm not

14  there yet.  But if that were -- that would take care of this

15  issue.

16         MR. STEEL:  Right.  So my first argument --

17         THE COURT:  And I don't know what your argument is

18  about economic loss claims and New GM.  I understand what

19  Mr. Weisfelner said about tell me what the allegations of the

20  independent claims are.  But I don't see how that impacts on

21  economic loss claims.

22         MR. STEEL:  Okay.  So our position -- let me give it

23  a try.  Our position is, again, the scale and scope of the

24  Second Circuit decision, right, New GM --

25         THE COURT:  Don't talk -- I don't want to hear about

103

 1   the Second Circuit decision.

 2              MR. STEEL:  Yeah, okay.

 3              THE COURT:  Tell me what you believe the independent

 4   claims on behalf of used car purchasers, what's their -- what

 5   are their allegations?

 6              MR. STEEL:  Well, it's the same as the --

 7              THE COURT:  Economic loss claims by used car

 8   purchasers, what -- post-sale used car purchasers, what's their

 9   claim?

10              MR. STEEL:  Right.  The diminution in the value or

11   the degradation of the benefit of the bargain at the time of

12   the purchase, so they have the same sort of claims as

13   articulated in the fact for fraudulent concealment for

14   misrepresentations, for breach of the consumer protections.  I

15   think we can appreciate that they're not getting any better

16   rights than the original purchaser, but they're also not being

17   foreclosed from bringing those same independent claims.

18              THE COURT:  All right.  Go ahead.

19              MR. STEEL:  All right.  And you, Your Honor, just

20   articulated the most viable basis is that it's all conditioned

21   on your ruling on issue two.  If you rule like you just

22   articulated, that the non-ignition switch defect plaintiffs can

23   bring independent claims, period, end of story, the used car

24   purchasers who bought and purchased cars with a non-ignition

25   switch defect likewise can bring those independent claims.

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 105 of 269
Pg 164 of 728

104

1          THE COURT:  Go ahead.

2          MR. STEEL:  The last vein that -- of mine on this is

3     the future claim.  The interpretation that these claimants are

4     free to proceed because the identity of the used car purchasers

5     were neither known nor ascertainable at the time of the sale

6     and therefore couldn't have been provided constitutionally

7     adequate notice, Mr. Weintraub touched on this as the Grumman

8     Olson line, the Cope line, Chateaugay.  And I think this is

9     what the --

10          THE COURT:  None of those deal with economic loss

11     claims, do they?

12          MR. STEEL:  Not directly.  I think they were personal

13     injury.

14          THE COURT:  Well, what's this not directly?  They

15     don't deal with it, correct?

16          MR. STEEL:  To my knowledge, correct.

17          THE COURT:  It's one thing to say that future claims

18     for personal injury or wrongful death or property damage can't

19     be barred for future claimants.  But it seems to me wholly

20     different to deal -- and I'm not sure how exactly how to deal

21     with it, but the economic loss claims seem very different to

22     me.

23          MR. STEEL:  I hear you but --

24          THE COURT:  Do you have any cases that deal with

25     solely economic loss claims that specify when or how or the

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

 1  scope of those claims going forward after a sale, whether

 2  they're barred by a sale order or not?

 3          MR. STEEL:  Well, I think we would rely on the Second

 4  Circuit opinion.  I know you said don't address it, but the

 5  Second --

 6          THE COURT:  Well, at that point --

 7          MR. STEEL:  Yes.

 8          THE COURT:  -- I wanted an answer with that regard.

 9  But what in the Second Circuit opinion --

10          MR. STEEL:  Well, that identified in their discussion

11  on the used car purchaser claims that they said there's

12  enormous practical and perhaps constitutional problems with

13  enjoined claims of claimants with no relationship with the

14  debtor.  They don't make a distinction between people that were

15  subsequently in a personal -- in an accident versus having

16  economic loss.  They held completely on the relationship with

17  the debtor.

18          THE COURT:  What page are you looking at in the

19  opinion of the used car purchasers?

20          MR. STEEL:  This is all in 157 of the decision.  They

21  said more -- in more depth, as of the petition date, there was

22  an unknown number of unknown individuals who would one day

23  purchase Old GM vehicles second hand.  There could've been no

24  contact or relationship actual or presumed between Old GM and

25  these specific plaintiffs.  Accordingly, the sale order cannot

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 107 of 269
Pg 166 of 728

106

1  be read to cover their claims.  They don't make any distinction

2  between accident and economic loss claims.

3          THE COURT:  Okay.

4          MR. STEEL:  They just find that they're

5  non-creditors, that they don't have claims under 101 that can't

6  be affected by the sale order free and clear.  So we're pretty

7  reliant on the 363(f).

8          THE COURT:  Okay.

9          MR. STEEL:  That's basically what we have, Your

10  Honor.

11         THE COURT:  Thank you.

12         MR. STEEL:  Thank you.

13         THE COURT:  Mr. Peller, you can argue.

14         MR. PELLER:  Good morning, Your Honor.  I'm Gary

15  Peller representing the Elliott --

16         THE COURT:  You have 30 minutes until the afternoon.

17  Go ahead.

18         MR. PELLER:  The Elliott, Sesay, and Bledsoe

19  plaintiffs.  Before I get started, I didn't want to forget, I

20  want to disassociate myself from Mr. Weisfelner's statement

21  that Judge Furman has set forth the due process issues for

22  determination.  I don't believe that's correct.  The discovery

23  orders encompass discovery for -- that's listed by recalls, but

24  the issues to be decided by that discovery, I believe in my

25  review of the Judge Furman's orders, nowhere contained there.

107

1   I believe that Judge Furman is expecting this Court to resolve

2   the question whether non-ignition switch plaintiffs may assert

3   successor liability claims because of a due process violation

4   or not.

5           THE COURT:  May I ask you this, Mr. Peller?  Is there

6   a transcript?  Is there an order?  You obviously have a

7   disagreement with Mr. Weisfelner on this issue, and I asked him

8   whether there are any orders.  I would expand it to transcript.

9   Is there anything that you'll be able to point to in the record

10  in the district court, in an order or a transcript, that

11  indicates that Judge Furman is not going to decide the due

12  process issue?

13          MR. PELLER:  No, Your Honor, except the general drift

14  of all of his decisions saying he's waiting for Judge Gerber

15  and --

16          THE COURT:  Well, a general drift doesn't do a lot.

17          MR. PELLER:  Well, no, there's nothing -- the

18  discovery is going forward on those defects and --

19          THE COURT:  Well, why is the discovery going forward

20  if he is not going to be addressing the issue?

21          MR. PELLER:  Because the non-ignition switch

22  plaintiffs have been permitted in the fourth amended

23  consolidated complaint and in the Elliott, Sesay, and Bledsoe

24  complaints to assert independent claims under the Second

25  Circuit decision.  We've amended our complaints to comply with

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1  the Second Circuit decision.  This independent claims are going

2  forward.

3          THE COURT:  So what does Old GM's knowledge of

4  non-ignition switch defects have to do with whether you can

5  assert independent claims?

6          MR. PELLER:  They're not -- the -- Judge Furman is

7  not deciding whether you can assert independent claims or not.

8  That was decided by the Second Circuit.  Judge Furman's

9  deciding -- Judge Furman's conducting discovery so those claims

10 can go forward, what's the nature of the claim, when did the

11 defendants learn, how did they learn, et cetera, and some of

12 that necessarily involves New GM learning from Old GM about

13 defects.

14         THE COURT:  I make the same invitation to you.  If

15 there are orders by Judge Furman or transcripts of hearings

16 before Judge Furman that address whether Judge Furman is going

17 to be presented with and asked to decide the due process issues

18 with respect to non-ignition switch plaintiffs, file it.  I

19 want to see it.

20         MR. PELLER:  Yes, sir.  I don't believe there are,

21 but I just wanted to disassociate myself from the

22 representation that there were.

23         Your Honor, the -- as I understand New GM's arguments

24 with respect to the Elliott, Sesay, and Bledsoe plaintiffs, who

25 I represent, we clearly did appeal the April decision and the

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 110 of 269
Pg 169 of 728

109

1    June judgment on behalf of both ignition switch and
2    non-ignition switch plaintiffs.  There's no question that we
3    are not precluded by a failure to appeal.  Not only did we
4    appeal, but we won on virtually every issue we appealed from.
5    So as I understand New GM's argument, it's that even though we
6    appealed from the April and June judgment, we are nevertheless
7    bound by our failure to appeal from the November 15th decision
8    and the December 15th judgment.
9            That is incorrect, Your Honor, because the November
10   15th decision and December 15th judgment were merely
11   enforcements of and applications of the April and June rulings.
12   There was no expectation that anything new was going to come
13   in, but, in fact, Judge Furman's request for the bellwether
14   claims came in as an additional issue, and because New GM was
15   able to serve its September -- the September scheduling order,
16   new parties came in.
17           But the very purpose of the post-judgment
18   proceedings, the November/December proceedings, was -- and I'll
19   quote from the beginning of the November decision:
20           "The Court must now determine the extent to which the
21           April decision and judgment bar particular claims and
22           particular allegations and complaints in court in
23           which claims are asserted against New GM, then
24           continuing.  The extent to which by reason of the
25           first issues or other matters allegations and

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1.14-mc-02543-JMF    Document 4637-2    Filed 10/02/17    Page 111 of 269
Pg 170 of 728

110

1          particular claims" --

2          THE COURT:  Just slow down a little bit.

3          MR. PELLER:  I'm sorry, reporter.

4          THE COURT:  It's not a reporter.  It's just the voice

5  recorder here, but it's me who needs you to slow down.

6          MR. PELLER:  I'm sorry, Your Honor.

7          "The extent to which allegations and particular

8          complaints run afoul of the April decision and

9          judgment and thus must be stricken before affected

10         actions may proceed."

11         So Judge Gerber made the general rulings.  He said

12  independent claims for ignition switch plaintiffs can go

13  forward.  Successor liability claims can't go forward for

14  anyone.  Independent claims for non-ignition switch cannot go

15  forward.  Those claims remain stayed.  That was all decided in

16  April and June.

17         Then according to the June judgment, the parties were

18  permitted to file no strike pleadings or objection pleadings

19  saying that, given this order, nevertheless, these claims can

20  go forward.  I filed on behalf of my client, so did the other

21  plaintiffs, and that developed into the marked pleadings

22  process.  This goes through.  This doesn't go through.  But all

23  that was application of what was already on appeal.

24         To the extent what's already on appeal gets reversed,

25  the application and enforcement of those rulings also get

111

1  reversed.  It would've been redundant for us to appeal the

2  November and December judgments when we already had the very

3  issues that we objected to on appeal, the independent claims

4  issue, the used car purchasers issue, and the due process issue

5  with respect to non-ignition switch plaintiffs.

6       Part of the confusion I think, Your Honor, is that

7  we've been talking about the appeal as only referring to the

8  April decision and the June judgment.  When I came into the

9  case, I called New GM and I was immediately told if you file

10  anything concerning a vehicle manufactured by Old GM, you will

11  be in contempt of court.  So I sat down with my clients and we

12  figured out what are we going to do about this.  And we read

13  Mansville and other relevant opinions and decided, well, we

14  would rather go faster than have our successor liability claim.

15  We're going to file our complaints exclusively with independent

16  claims and have no jurisdiction we thought of the bankruptcy

17  court to stop us.

18       So according to the procedures that were then in

19  place, we filed our complaints.  New GM moved to enforce

20  against us.  We filed no stay pleadings in each of the cases.

21  And in those no stay pleadings, we argued that the sale order

22  should not be construed to cover independent claims.

23  Independent claims are beyond the subject matter jurisdiction

24  of a bankruptcy court, and therefore the -- all our complaints

25  should be free of the stay.

Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 113 of 269

112

1          Those no stay pleadings were each denied by Judge

2    Gerber, and we appealed each of those denials.  We also, after

3    the June judgment on behalf of the Bledsoe plaintiffs, filed a

4    motion for reconsideration where we explicitly said that Judge

5    Gerber's construction of the sale order to make independent

6    claims retained liabilities of Old GM was absurd.  That was a

7    wrong construction, and that also was denied.  We also appealed

8    from that.

9          So we had repeatedly argued in all our cases on

10   behalf of ignition switch and non-ignition switch claimants

11   that the sale order did not cover, could not constitutionally

12   cover, and should not be construed to cover independent claims.

13         THE COURT:  Are all of your clients accident

14   plaintiffs?

15         MR. PELLER:  No, I only have two accident plaintiffs,

16   Your Honor.  All my non-ignition switch plaintiffs are

17   non-accident economic loss claimants.

18         So New GM has set up its argument as if the November

19   and December proceedings, rulings, were just completely

20   separate from the April and June rulings, as if new issues were

21   being presented.  It's just not true, non-ignition switch

22   claims, that the sale order did not cover and could not

23   constitutionally cover independent claims were clearly before

24   Judge Gerber.  In fact, the June judgment lists in the appendix

25   the various claims, the various categories of complaints that

113

1  are covered by the judgment, and one of the categories is non-

2  ignition switch claims.

3       So Judge Gerber clearly did rule on non-ignition

4  switch claims.  He ruled that independent claims for -- by

5  non-ignition switch plaintiffs could not be asserted because he

6  construed the sale order to encompass those claims and held

7  that and deferred as to whether, like the ignition switch

8  plaintiffs, they also had a due process violation.  He also

9  ruled that used car purchasers were covered on the idea that

10 they couldn't have any greater rights than those who they

11 purchased from.  We objected to that on the basis that they are

12 future claims, and we won that as well.

13      So the image that Judge Gerber just deferred on all

14 the non-ignition switch claims arguments is incorrect.

15 Non-ignition switch claims arguments, some of our most

16 important were contained -- were made well before June, were

17 contained in the June judgment, and we properly appealed from

18 those rulings.  It would've been redundant and absurd to appeal

19 from the November/December judgments that were mere

20 implementations of that.  In fact, Your Honor, to the extent

21 that the November and December judgments would've decided new

22 things, the Court wouldn't have had jurisdiction.  The filing

23 of a notice of appeal withdraws the jurisdiction from the lower

24 court of the appeal except for enforcement of the judgment.

25 That's all that was going on, again, except for the expansion

1  for the bellwether issue that Judge Furman had asked to be

2  addressed regarding punitive damages.  In fact --

3          THE COURT:  Mr. Peller, did you raise before Judge

4  Gerber on behalf of non-ignition switch economic loss

5  plaintiffs the due process argument?

6          MR. PELLER:  Yes, Your Honor, we raised the due

7  process argument.  Our understanding was, and I think this is

8  the understanding until -- as my fellow counsel said, GM kind

9  of pivoted and has come up with kind of a new narrative of what

10 happened.  Everybody's understanding was Judge Gerber was --

11 ruling on the stipulated record that was available through the

12 Valukas report and some other sources, the parties agreed on

13 these facts.  He was going to make his ruling on due process

14 and the other claims on those facts.  It would go up on appeal.

15 The appeal would clarify the issues.  And then once the appeal

16 was over, then we would be dealing with whether the non-

17 ignition switch plaintiffs needed to make a due process

18 violation or -- and what --

19         THE COURT:  Let me ask a question.  You said -- and I

20 don't have the exact words -- that Judge Gerber did not defer

21 on oral non-ignition switch arguments.

22         MR. PELLER:  That's right.

23         THE COURT:  Okay.  And what I'm specifically trying

24 to understand is whether he was presented with non-ignition

25 switch plaintiff due process arguments.  Did he defer it?  Did

115

1  he decide it?

2         MR. PELLER:  We argued that the non-ignition switch

3  plaintiffs' due process rights had been violated by a lack of

4  notice.  That was our assertion and allegation.  It was clear

5  to everybody involved that in order to litigate, that much

6  discovery would be needed.  These non-ignition switch, there's

7  a bunch of different defects.  There's maybe 60 different

8  defects that we're talking about, power steering, door module,

9  air -- side airbags, ignition switch related but not

10 technically ignition switch, et cetera.  There was going to be

11 a load of discovery that was going to have to be done to

12 support those claims so the --

13        THE COURT:  Okay.  What --

14        MR. PELLER:  We -- I didn't ask for that to be ruled

15 on.  I did ask, Your Honor, prior to the entry of the June

16 judgment, for an opportunity to make other objections to the --

17 GM's motions to enforce besides the ones that had been

18 considered in the 2014 threshold issues.  Judge Gerber denied

19 that request to make other objections.  He made very clear, in

20 I think it was his fourth threat, to hold me in contempt, that

21 he'd heard enough from me.

22        So the flavor here, Your Honor, was not that we were

23 holding back.  The flavor was Judge Gerber just wanted to deal

24 with the ignition switch, the due process issues.  He would

25 defer on the question of whether the non-ignition switch

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4637-2    Filed 10/02/17    Page 117 of 269
Pg 176 of 728

116

1  plaintiffs had a similar due process issue in that Old GM

2  knew --

3          THE COURT:  Because --

4          MR. PELLER:  -- but not on the question of the

5  construction of the sale order and its application to used car

6  purchasers.

7          THE COURT:  And what I am -- want to know, is there a

8  transcript or an order or something in one of Judge Gerber's

9  opinions where he says I'm deferring on whether there was a due

10 process violation that affects the non-ignition switch

11 plaintiffs?

12         MR. PELLER:  That's the way I understand footnote 70,

13 Your Honor, but except for the -- except for what the Court's

14 already looked at, I'm not aware of any.

15         THE COURT:  So you're -- that part of your argument

16 is based on footnote 70.

17         MR. PELLER:  Yes.

18         THE COURT:  Okay.  Go ahead.

19         MR. PELLER:  And my experience in the whole

20 proceedings.  I mean, you know --

21         THE COURT:  Well, I -- you know, I wasn't -- your --

22         MR. PELLER:  I understand.

23         THE COURT:  I have to decide -- I'm looking at

24 transcripts.  I'm looking at decisions.  I'm looking at

25 judgments and a lot of arguments from counsel.

117

1          MR. PELLER:  Yeah, I understand, Your Honor.  I'm

2   just trying to give you the narrative was that, because of the

3   Valukas report, those issues could be decided on stipulated

4   facts.  Everybody understood there was no parallel to the

5   Valukas report for non-ignition switch plaintiffs.  That

6   couldn't be decided on stipulated facts.  That would have a

7   whole mess of discovery and GM coming in here now and arguing,

8   oh, they wanted to go through discovery in the fall of 2015 is

9   disingenuous, Your Honor.  They were wanting to avoid discovery

10  in this court since I've been in the case.

11          THE COURT:  Go ahead.

12          MR. PELLER:  The other point, Your Honor, is that if

13  New GM's argument is right that the failure to appeal the

14  November and December decision and judgment was preclusive, res

15  judicata, for my clients, even though we appealed the earlier

16  judgment, why didn't they tell the Second Circuit that?

17  Because they ended up rendering moot a whole mess of Second

18  Circuit work on non-ignition switch plaintiffs.

19          The -- we made very explicit in the Second Circuit,

20  we are here for the ignition switch plaintiffs but also for

21  non-ignition switch plaintiffs.  These are our arguments for

22  non-ignition switch plaintiffs, and we won those arguments.

23  The oral argument didn't occur until months after the

24  November/December judgments.

25          If New GM really thought that our failure to appeal,

Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 119 of 269

118

1   and our time for appeal had run out by then, mooted our ability
2   to challenge things in the Second Circuit, then they shouldn't
3   have -- they should have told the Second Circuit that.  This is
4   a late -- a very recently devised narrative that New GM has
5   made up, and it seems absurd, Your Honor.  We appealed and we
6   won the appeal with respect to ignition switch and non-ignition
7   switch claims with respect to independent claims not being part
8   of the sale order, the sale order being constructed not to
9   include independent claims, and with respect to the future
10  claims of used car purchasers.

11          Another comment Mr. Steinberg and his -- at the last
12  hearing also stated, I think also disingenuously, that New GM
13  has never had a problem with independent claims.  It's always
14  been open to independent claims if they're truly independent.
15  That's just not true, Your Honor.  New GM has fought, fought
16  every no stay pleading I filed seeking only to assert
17  independent claims.  And the very cross-appeal of New GM to the
18  Second Circuit was appealing from Judge Gerber's ruling
19  allowing independent claims of ignition switch plaintiffs to go
20  forward, so I hope you take with a grain a salt this
21  representation that they've never had any problem with claims
22  -- with independent claims going forward.

23          Your Honor, I think that is that it was very
24  significant that you asked Mr. Weisfelner who he represents
25  because I think that's a very important thing to keep in mind.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 120 of 269

119

We've been talking about categories of plaintiffs, non-ignition
switch plaintiffs, ignition switch plaintiffs, but nobody here
-- none of us lawyers represent any categories of plaintiffs.
Mr. Weisfelner, incorrectly I think, said that lead counsel
represent the punitive class members.  Nobody represents
punitive class members in a class actions.

        Until the class is certified, those lawyers only
represent the individuals that they retained.  In this case
what the means is that the lead counsel and then by virtue the
designated counsel that they've retained in this proceeding,
they represent the named plaintiffs in the second amended
consolidated complaint, which was what was the subject of the
June judgment, or the fourth amended consolidated complaint
now.  They represent those individuals.  The reason I'm
pointing this out, Your Honor, is I think it's very important.

        If you do find that the failure of designated counsel
to appeal the June judgment in the April decision on behalf of
non-ignition switch plaintiffs precludes non-ignition switch
plaintiffs, I hope that -- I assume that you will be careful to
delineate that the only people that are precluded by that
failure to appear -- to appeal are the ones who actually were
represented and appeared in the proceeding leading up to that.
So my clients aren't precluded.  We appealed.  The clients
represented by designated counsel were only the named
plaintiffs in the second amended complaint.  No one else can be

120

1   precluded if they didn't participate, and now --

2           THE COURT:  The law, the case can apply, and if I

3   render a ruling that covers the named plaintiffs in the MDL and

4   that would ordinarily be bind -- not binding, it would --

5   ordinarily the persuasive authority to apply to everyone else

6   who's similarly situated.

7           MR. PELLER:  Absolutely.  But Judge Gerber's rulings

8   on non-ignition switch plaintiffs cannot be binding authority

9   or persuasive authority in any way.  They were reversed.

10          THE COURT:  Well, some of it was reversed.  Not all

11  of it was reversed.

12          MR. PELLER:  But the -- his holding to construe the

13  sale order to encompass independent claims was explicitly

14  reversed.

15          THE COURT:  I think -- are there any other points?  I

16  think I got the independent claims arguments down.

17          MR. PELLER:  Okay.  The other -- another point, and

18  I'll -- this is my last point on issue number two, threshold

19  issue number two, is Mr. Steinberg also represented at the last

20  hearing that in the November and December proceedings, Judge

21  Gerber went through the Peller-marked complaints and decided

22  that independent claims had not been stated.  That's absolutely

23  incorrect, and there's no need to quibble over it.

24          I'll just point the Judge -- the Court to Judge

25  Gerber's November decision where he goes through the Peller

121

1    complaint, says that they do assert independent claims, take

2    out all the language about Old GM, and these are valid

3    independent claims.  Even though they're valid independent --

4              THE COURT:  Take out language about Old GM, so he

5    didn't find that everything you said in the complaint was okay.

6              MR. PELLER:  Yes, he said the independent claims, the

7    way the claims were stated was okay, but I can't refer to

8    anything New GM -- Old GM did.

9              THE COURT:  That seems to me to say that he didn't

10   find that your complaint was -- passed the threshold.  It would

11   pass the threshold if you remove the references to Old GM.

12             MR. PELLER:  Well, then we did remove them, and we

13   filed --

14             THE COURT:  So don't tell me he said that your

15   complaint was okay.  He didn't.

16             MR. PELLER:  He said that the independent claims

17   asserted on behalf --

18             THE COURT:  If you removed certain language.

19             MR. PELLER:  Yes, Your Honor.

20             THE COURT:  Okay.

21             MR. PELLER:  Okay.  And then --

22             THE COURT:  I get your point.

23             MR. PELLER:  -- what he said about the independent

24   claims for non-ignition plaintiffs was that they must be

25   removed not because they mention Old GM but because my June

122

1   ruling said non-ignition switch plaintiffs can assert
2   independent claims.  It was all based on the June ruling.  It
3   wasn't based on any new finding of due process or any new
4   litigation that occurred as to whether non-ignition switch
5   plaintiffs presented a due process violation.
6           Your Honor, if I could move to question number three,
7   the used car purchasers.
8           THE COURT:  Do you represent used car purchasers?
9           MR. PELLER:  I do, Your Honor.
10          THE COURT:  Okay.
11          MR. PELLER:  I have 12 clients, Your Honor, in a kind
12  of mix of boxes as we refer to them.  You asked Mr. Steel
13  whether he agreed that a purchaser could have no greater rights
14  than the seller from whom they purchased --
15          THE COURT:  Economic loss claimants.
16          MR. PELLER:  Economic loss claimants.  I disagree
17  with the answer Mr. Steel gave to you.  The reason that a
18  purchaser can have greater rights than the seller, Your Honor,
19  is because under the Second Circuit ruling, the purchaser as a
20  future claimant is not bound by any of the restrictions of the
21  bankruptcy process.  The seller, to the extent the seller had a
22  relationship with Old GM, is -- and to the extent they were
23  notified properly, et cetera, and in some situations
24  publication notice will be sufficient, that seller is bound by
25  the bankruptcy restriction including the Chapter 7 restriction

123

1    on the recovery of punitive damages.

2              But what the Second Circuit said is despite whatever

3    might be true of the seller and the seller's rights, the buyer

4    is simply not bound by any of the restrictions on recovery from

5    Old GM that the seller might have had by virtue of being a

6    creditor of Old GM.

7              THE COURT:  Let me -- show me the language, tell me

8    the language in the Second Circuit opinion that supports what

9    you just told me.

10             MR. PELLER:  Well, I would just refer the same

11   language that Mr. Steel said.  The language is that because

12   they were -- they had no contact with Old GM, they were not a

13   creditor of Old GM.  Since they were not a creditor of Old GM,

14   they are not barred by the sale order or by any of the

15   proceedings that Old GM went through.  They are simply

16   independent of the bankruptcy rulings.

17             THE COURT:  Totally outside of bankruptcy.

18             MR. PELLER:  Yes.

19             THE COURT:  A seller can't convey more than he or she

20   has.  I don't think it has anything to do with bankruptcy.

21             MR. PELLER:  But the Second Circuit said --

22             THE COURT:  How can the seller -- stop -- how does

23   the seller convey more of its bundle of rights than he has --

24   he or she has?

25             MR. PELLER:  Because the seller might have a

1  particular disability from suing a particular defendant that

2  the buyer doesn't have.  That's what we have here, Your Honor.

3  The seller has a particular disability because he was a

4  creditor of an insolvent debtor, but the buyer is not a

5  creditor under the Second Circuit opinion and therefore --

6          THE COURT:  (Indiscernible - cross talk).

7          MR. PELLER:  -- the buyer is not governed by any of

8  the restrictions --

9          THE COURT:  Take it out of insolvency.  What is it

10 that permits a seller to convey economic rights greater than

11 the seller has?  Do you have a case that supports you?

12         MR. PELLER:  Your Honor, the --

13         THE COURT:  Do you have a case that supports you, yes

14 or no?

15         MR. PELLER:  Your Honor, I'm trying to think through

16 exactly what you're asking.  I'm trying to understand, Your

17 Honor.

18         THE COURT:  Let me make it crystal clear, if you

19 didn't understand my question.

20         MR. PELLER:  Okay.

21         THE COURT:  Forget about bankruptcy.  If I sell you

22 my car, can I convey to you any rights greater than the rights

23 that I have?

24         MR. PELLER:  Yes, Your Honor, you could've signed a

25 release with the manufacturer that I'm not subject to.  Of

125

 1  course, Your Honor, different parties have different

 2  relationships, different claims, and different defendants, and

 3  particularly what we're talking about here is a particular

 4  disability that a creditor --

 5          THE COURT:  Do you have some basis that supports what

 6  you've just told me?

 7          MR. PELLER:  No, Your Honor, I'm using reasoning.

 8          THE COURT:  Probably faulty reasoning.

 9          MR. PELLER:  That's up to you to decide, Your Honor.

10  I --

11          THE COURT:  That's why I ask whether you have -- it's

12  one thing to make an argument, but it's another thing to give

13  me case law that supports your argument, and your answer is you

14  don't have any, right?

15          MR. PELLER:  Your Honor, we believe, as Mr. Steel --

16          THE COURT:  Do you have any case law to support your

17  argument?

18          MR. PELLER:  The Second Circuit decision in General

19  Motors, Your Honor.

20          THE COURT:  Okay.  Show me the -- I want -- whether

21  Mr. Steel read it or not, point me to the precise language in

22  the Second Circuit opinion that gives used buyers claims for

23  economic loss greater than what the seller of the vehicle has.

24          MR. PELLER:  There's not explicit language, Your

25  Honor.  It's the implication of the holding that used car

126

1  purchasers are not in any way bound by the bankruptcy

2  proceedings since they weren't creditors of the --

3         THE COURT:  I don't think it depends on the

4  bankruptcy proceeding.

5         MR. PELLER:  Okay.

6         THE COURT:  That's my point.

7         MR. PELLER:  Okay, Your Honor.  Your Honor, I don't

8  believe I'm going to convince you, and I'd like to move onto

9  issue number four, punitive damages.

10        THE COURT:  Yes, please.

11        MR. PELLER:  The punitive damage issue came in

12 because of the press of the bellwether trials that were coming

13 up in front of Judge Furman, and one part of the punitive

14 damage ruling was that this was not an assumed liability, and

15 none of the plaintiffs appealed that.  But the rest of the

16 punitive damages holding, again, depended on the June judgment

17 that was reversed so that Judge Gerber had held that successor

18 liability claims on behalf on ignition switch plaintiffs could

19 not go forward under his April 15th ruling, so, of course,

20 punitive damages for successor liability also could not go

21 forward.

22        Once the predicate for that holding is removed by the

23 reversal in the Second Circuit, the Second Circuit says, you

24 made a mistake, no, successor liability claims can go forward

25 for ignition switch plaintiffs, then that removes the predicate

127

1  for the bar on punitive damages with respect to those claims.

2          THE COURT:  Do you agree with everything in the

3  Second Circuit decision that addresses whether punitive damages

4  for ignition switch plaintiffs would've established a due

5  process violation, that punitive damages are available?

6  There's nothing in the opinion that addresses that specific

7  issue.

8          MR. PELLER:  That's right, Your Honor.

9          THE COURT:  Okay.  So go back to first principals

10  then.  How does -- what is it that gives rise to -- if no --

11  why don't I start again?  Do you agree that no punitive damages

12  could be recovered from the insolvent debtor, Old GM?

13          MR. PELLER:  In bankruptcy proceedings or -- yes.

14          THE COURT:  Okay.  And do you have a case that would

15  expose a buyer either on assumed liability -- there it's

16  expressly provided in the contract or on a successor liability

17  theory that would expose the successor to a punitive damage

18  claim where the entity from which it acquired would not be

19  subject to punitive damages?

20          MR. PELLER:  Well, that's our case, Your Honor.  I

21  mean, I think we're going back to the discussion we just had.

22          THE COURT:  Then do you agree then that this is a

23  question of first impression?  You have no authority that

24  decides the issue.  The Second Circuit didn't decide it, and

25  you don't have -- other than what we're dealing with now, you

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

128

 1  have no authority to support that New GM is subject to punitive

 2  damages on successor liability claims.

 3           MR. PELLER:  I don't, Your Honor.

 4           THE COURT:  Okay.

 5           MR. PELLER:  Except for the general holding of the

 6  Second Circuit that these claims --

 7           THE COURT:  (Indiscernible - cross talk).

 8           MR. PELLER:  -- are outside of the bankruptcy

 9  process, they're outside of the sale order.

10           THE COURT:  Do you have any case law outside of

11  bankruptcy that would make an acquirer of assets subject to a

12  punitive damage liability when its seller could not be?

13           MR. PELLER:  I don't, Your Honor, but if the Court

14  doesn't mind, I'd like to --

15           THE COURT:  No, I --

16           MR. PELLER:  Okay.

17           THE COURT:  -- we've -- I've got stacks of briefs.

18           MR. PELLER:  Okay.

19           THE COURT:  Everybody has taken their best shot at

20  it.

21           MR. PELLER:  So --

22           THE COURT:  But what I've been looking for, I haven't

23  found, is one way or the other.  I'm giving you a hard time,

24  but I've given Mr. Steinberg a hard time about it as well.  I

25  don't have any guiding case law, including the Second Circuit

Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 190 of 269

129

1   opinion, that addresses the issue of whether -- in here, it's

2   whether New GM can be subject to punitive damages on successor

3   liability claims.

4          MR. PELLER:  I understand, Your Honor, and without

5   belaboring it, we believe that -- or I believe that the general

6   principle on behalf of my clients is that if a party's claim is

7   not within the scope of the sale order, then it's not

8   restricted by any of what would've been bankruptcy restrictions

9   otherwise applicable to prior predecessor parties.  And I

10  understand that if it's an issue of first impression, that that

11  might not be enough, Your Honor, but that's how I think it

12  should be decided.

13         THE COURT:  Go ahead.

14         MR. PELLER:  The -- two more points, Your Honor.

15  One, I just want to be -- just to finish up, so in the

16  November/December proceedings, we didn't appeal the no punitive

17  damages for assumed liability -- you know, GM didn't assume

18  liability for punitive damages, and we didn't appeal because we

19  essentially won the imputation issues.

20         We did appeal the single issue that had not -- was

21  not contained in the April and June proceedings, and that was

22  the very particular question whether a claim that New GM was

23  liable for failing to disclose certain defects and causing

24  plaintiffs to miss the bar date, to be able to file a timely

25  claim, in bankruptcy, whether that was an independent claim or

130

1    not.  Judge Gerber held that it was not an independent claim.

2    It really depended on Old GM's wrongdoing with respect to the

3    bar date notice, and judge -- that's currently fully briefed in

4    awaiting Judge Furman's decision.

5         But the -- that's the only thing we appealed because

6    that was the only thing that was new except for the assumed

7    liability punitive damages that was separate from what we were

8    already appealing in the -- from the April and June rulings,

9    appeals that we prevailed on.

10        Finally, Your Honor, you asked about opening the door

11   to a whole bunch of discovery on behalf of non-ignition switch

12   plaintiffs seeking to be able to pursue successor liability

13   claims against Old GM by showing a due process --

14        THE COURT:  I think you misspoke.

15        MR. PELLER:  -- violation.  I'm sorry.

16        THE COURT:  I think you misspoke.  You want to be

17   able to pursue successor liability claims against New GM, not

18   Old GM.

19        MR. PELLER:  Yes, I'm sorry, against New GM.  And,

20   Your Honor, the -- some of these issues are being -- some of

21   the non-ignition switch claim issues are being subject to

22   discovery in front of Judge Furman, and Mr. Weisfelner has

23   listed some of that discovery, but not all of the non-ignition

24   switch claims.

25        So, for example, lead counsel, when they put the

131

1  consolidated complaint together, decided not to pursue all the

2  claims that my clients are pursuing for non-ignition switch

3  claims, so they did pursue a power steering defect, a side

4  airbag defect, as we also allege, but we also allege a master

5  door switch defect.  That is not currently subject to discovery

6  in the MDL case because the MDL discovery is only proceeding on

7  the basis of the consolidated complaint and not my individual

8  complaints that have not been consolidated.  So if that

9  discovery --

10             THE COURT:  Are you participating in the discovery?

11             MR. PELLER:  I am not actively participating.  I'm

12  participating to the extent of I have access to all the

13  discovery.  So the -- under the Second Circuit remand, Your

14  Honor, respectfully, I don't believe that this Court really has

15  a choice as to whether that door can be opened or not.  The

16  Second Circuit said with respect to non-ignition switch claims

17  that the stay that had been imposed, which is the only thing

18  that, as we've been through the June judgment had done is

19  stayed those claims, was vacated.  And so now these claims

20  formally are not stayed.  We should be able to just go

21  litigate.  We haven't gone and pressed that because we don't

22  want to cause unnecessary trouble, but they're not stayed.  The

23  stay was vacated, and then proceedings --

24             THE COURT:  Where in the opinion does it say that?

25             MR. PELLER:  It's the end of the opinion.

Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 183 of 269

```
 1            THE COURT:  Oh, I know it remands the non-ignition
 2   switch --
 3            MR. PELLER:  It says vacated.  It says vacated, the
 4   rulings are vacated and then remanded, and --
 5            THE COURT:  I could impose the stay again.
 6            MR. PELLER:  Yes, absolutely, Your Honor, and our
 7   claims are already stayed in the MDL court.  We're not going
 8   anywhere.  But my point, Your Honor, is that the Second Circuit
 9   has said its remanded to this court to make the due process
10   determinations for the non-ignition switch plaintiffs.
11            THE COURT:  Well, I don't know whether that -- it
12   clearly is remanded to this court.  It didn't address -- it
13   didn't decide -- other than with respect to your specific
14   claim, it didn't decide the non-ignition switch plaintiff
15   issues.  It's clearly on my plate, and hence my questions to
16   Mr. Weisfelner this morning about the statements of the August
17   hearing, how that gets into -- not how that gets into but how
18   the September scheduling order resulted and then the November
19   decision and the December judgment.  Any other points you want
20   to raise?
21            MR. PELLER:  Well, the reason we address that, Your
22   Honor, is because we understood that although there's that
23   issue with respect to the failure to appeal on behalf of other
24   parties, New GM is separately arguing that we are precluded by
25   the failure to appeal the November and December, and I just
```

133

 1  wanted to make clear that -- our disagreement with that.

 2          THE COURT:  I have your point on that.

 3          MR. PELLER:  Thank you, Your Honor.  That's all I

 4  have.

 5          THE COURT:  Okay.

 6          MR. WEISFELNER:  Your Honor, may I address real

 7  quickly two points?

 8          THE COURT:  Really quickly because we're going to

 9  break for lunch and come back.

10          MR. WEISFELNER:  Very quickly.  Your Honor, first on

11  what's going on in front of Judge Furman, to the extent that my

12  comments were interpreted to mean that Judge Furman has ordered

13  or that the parties are conducting due process discovery,

14  that's not what I meant to say.  What I meant to say is what's

15  going on in front of Judge Furman is whether or not certain

16  defects were known defects by Old GM and when Old GM knew it.

17          What I conveyed was naturally that discovery goes on

18  and is the discovery necessary for a court -- not Judge Furman,

19  but a court -- to make a due process determination.  How to get

20  to a due process violation unless you know whether or not the

21  defect at issue was known and/or concealed, and therefore the

22  requisite notice, be it either direct or publication, was

23  appropriate.  So I agree with Mr. Peller to the extent that

24  Your Honor construed my commentary to mean that there is due

25  process discovery going on in front of Judge Furman.

134

1          THE COURT:  Well, I had understood you -- and maybe I

2     misunderstood you, but I had understood you to tell me that

3     Judge Furman was going to decide the issue of whether

4     non-ignition switch plaintiffs were denied due process because

5     Old GM knew about and concealed defects.

6          MR. WEISFELNER:  Your Honor, I do know that Judge

7     Furman is overseeing --

8          THE COURT:  I'm going to ask him.

9          MR. WEISFELNER:  Yes, I know that.

10         THE COURT:  I've said before, I don't call him

11    regularly, but I do -- we from time to time -- we don't speak

12    about the substance, but we speak about what issues are

13    percolating and who's going to decide them.

14         MR. WEISFELNER:  Certainly.  I do know that among the

15    discovery that Judge Furman is overseeing is discovery that

16    goes to the issue of what did Old GM know and when did it know

17    it about certain defects.  I reached the conclusion in my own

18    mind that the only reason why Judge Furman would be

19    orchestrating that discovery is so that parties either before

20    him or before you can make the argument about due process as it

21    relates to successor liability since I firmly believe, and I

22    think most of us with the exception of New GM believe, that

23    issue's not relevant with regard to independent claims.

24         THE COURT:  The other takeaway from what you told me

25    earlier is that that discovery cuts off in September.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Pg 195 of 728
Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 186 of 269

135

          MR. WEISFELNER:  Correct.  The last thing I wanted to
1

2   address, Your Honor, is the discrepancy between Mr. Steel's

3   statement with regard to used car purchasers and Mr. Peller's

4   statement and Your Honor's inquiry.  Your Honor, I can imagine

5   a hypothetical that would allow a used car purchaser economic

6   loss rights, but in the nature of independent claims that are

7   different than the claims of its seller, and here's the

8   hypothetical.

9         Someone owned a car, a GM, an Old GM car with an

10  ignition switch or non-ignition switch defect, up until some

11  time in 2013.  Having then sold that car to a new purchaser,

12  that purchaser had that car with a known but undisclosed defect

13  until such time as the recalls were done in 2014.  It's easier

14  to do it with an ignition switch first because we know that to

15  be true.  Under that hypothetical, I would assert that the used

16  car purchaser has an independent claim against New GM sounding

17  in the nature of economic loss that his predecessor seller did

18  not have.  So with that clarity, I have nothing else to add.

19         THE COURT:  Okay.  We're going to take -- is there

20  anybody else on your side of the table?

21         MR. SCOTT:  Your Honor, Brendan Scott.  I have about

22  five minutes at most.

23         THE COURT:  No, we'll do it after lunch then.

24         MR. SCOTT:  Okay.

25         THE COURT:  We'll be back at 2:00.

136

1            MR. WEINTRAUB:  Your Honor?

2            THE COURT:  Mr. Weintraub?

3            MR. WEINTRAUB:  You had asked for references to --

4    and orders to the deferral of discovery and deferral of --

5            THE COURT:  Tell me at 2:00.

6        (Recess taken at 12:38 p.m.)

7        (Proceedings resumed at 2:04 p.m.)

8            THE CLERK:  All rise.

9            THE COURT:  Please be seated.  Back on the record in

10   Motors Liquidation Company 09-50026.

11           Mr. Weintraub, briefly.

12           MR. WEINTRAUB:  Very briefly, Your Honor.  I thought

13   I heard the Court asking for citations to orders concerning the

14   deferral of certain issues in discovery, and I just so happen

15   to have two such orders with me.  One of them is actually the

16   April 15, 2015, decision of Judge Gerber.  I only have his

17   version, not the Westlaw version with me, but I'm going to be

18   reading from page 4 of the decision, which is page 8 of the

19   docket.  And it's Docket 13109.  The Court here is talking

20   about the non-ignition switch economic loss people, which are

21   the motion to enforce that did not go forward.  And the Court

22   writes:

23           "The other category of plaintiffs later coming into

24           the picture (the Non-Ignition Switch Plaintiffs)

25           brought actions asserting economic loss claims as to

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

137

1          GM branded vehicles that did not have Ignition Switch
2          Defects, including cars made by New GM and Old GM
3          alike.  In fact, most of their cars did not have
4          defects and/or were not the subject of recalls at
5          all.  But they contend, in substance, that the
6          Ignition Switch Defect caused damage to 'the brand'
7          resulting in economic loss to them.  New GM brought
8          still another motion to enforce the sale order with
9          respect to them, though this third motion has been
10         deferred pending the determination of the issues
11         here."

12         THE COURT:  Okay.

13         MR. WEINTRAUB:  So that's one citation.  The other
14  citation is the Court's scheduling order of September 15, 2014,
15  which is Document Number 12898, and that relates to this same
16  motion to enforce on non-ignition switch economic loss
17  claims --

18         THE COURT:  Can you just give me the date again?  I'm
19  sorry.

20         MR. WEINTRAUB:  I'm sorry, the date?

21         THE COURT:  Yes.

22         MR. WEINTRAUB:  September 15, 2014.

23         THE COURT:  Thank you.

24         MR. WEINTRAUB:  And the Court writes at page 2:
25         "Ordered that no discovery shall take place with

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4637-2    Filed 10/02/17    Page 189 of 269
Pg 198 of 728

138

1             respect to the monetary relief motion to enforce,"

2             which is that motion, this motion, "until further

3             notice of this court."

4             THE COURT:  Thank you.

5             MR. WEINTRAUB:  Thank you, Your Honor.

6             THE COURT:  Is there anybody else on the plaintiffs'

7   side who wants to be heard?

8             MR. HIRSCH:  Yes, Your Honor.

9             You go first?  Okay.

10             MR. SCOTT:  Good afternoon, Your Honor.  Brendan

11   Scott, Klestadt Winters Jureller Southard & Stevens, on behalf

12   of the Pilgrim Plaintiffs.  I'll be very brief.

13             You know, we've covered a lot of ground thus far.

14   Some of it is applicable to my client group, some of it is not,

15   and that's the reason I stand to speak.  Our representative

16   group who is, in lower case, non-ignition switch plaintiff

17   group, they're not part of the MDL action, and they had no

18   representation in the bankruptcy case until January of 2016.

19   GM's arguments with respect to our -- my clients are

20   essentially the same, that you don't receive the benefit of the

21   Second Circuit decision because you weren't part of the appeal,

22   but you're bound by the November decision and the December

23   judgment even though we didn't have a legitimate opportunity to

24   participate in those proceedings.

25             So in order to understand that, I'll just very

139

1  briefly go through the timeline.  Our client group filed their

2  complaint on October 14th, 2015, the very same day that the

3  issues that led to the November decision were being argued.

4  Two weeks later, on October 28th --

5              THE COURT:  What court?

6              MR. SCOTT:  Pardon?

7              THE COURT:  What court?

8              MR. SCOTT:  Here in -- before Judge Gerber.  On

9  October 28th, we received a letter from GM, a demand letter,

10 demanding that we withdraw the complaint because it's stayed.

11 They also assert at that time the scheduling order, but of

12 course all briefing and oral argument had been completed at

13 that time.  They, you know, have taken the position that

14 regardless of that, because you didn't appeal from the December

15 judgment, you're bound by it and they interpret it to say that

16 you're not able, at this point, to establish a due process

17 violation because you failed to do so.  And in their papers,

18 they argue that we failed to do so in 2015.

19             Of course, we weren't part of this until October of

20 2015, and we didn't have an opportunity to engage in any

21 discovery related to due process violations.  We didn't first

22 appear in the bankruptcy court until February of 2016.  The --

23 GM filed a motion to enforce the sale order in January of 2016.

24 We filed a response wherein we raised the issue of due process

25 and the need for discovery.

1          The motion to enforce was stayed by way of

2    stipulation wherein we reserved the right, and it states that

3    the -- our entry into the stipulation is without prejudice to

4    our right to take discovery.  GM did insist upon the addition

5    of language that it also does not prejudice their position to

6    argue that we're not entitled to discovery.

7          But we did not -- we did not sit on our rights when

8    we were made aware of these proceedings.  In our first

9    appearance in this case, we made it known that we thought that

10   the due process issue needed to be resolved.  We were -- the

11   matter was stayed, and then we were rolled up into this

12   process.  So we haven't had an opportunity to take discovery on

13   the due process issue.

14          We think it's manifestly unjust if we're going to be

15   held to -- if we're going to be bound by the November decision

16   and the -- and the December judgment, we don't think that

17   prohibits us, or anyone, from establishing a due process

18   violation.  But to the extent the Court believe it does, we

19   think that we ought to be carved out from that because we had

20   no legitimate opportunity to participate in those proceedings.

21          THE COURT:  Just give me a few skeletal facts about

22   the Pilgrim Plaintiffs, please.

23          MR. SCOTT:  The Pilgrim Plaintiffs are a group of

24   Corvette owners.  They have -- the defect here is with the

25   engine.  It -- the defect causes an -- a hole to be blown,

141

1    potentially to be blown, into the engine.  Could be while the

2    car is driving down the road, could be when you -- when you

3    turn -- you know, turn on the ignition.

4            I think there was at least one personal injury case

5    where there was an accident.  The rest of them are essentially

6    economic loss.  It's about $15,000 to replace the engine.  And

7    we believe that Old GM knew about this before the sale order,

8    and we wanted to engage in discovery.

9            THE COURT:  What year are these vehicles?

10           MR. SCOTT:  They're -- there's a whole range of

11   vehicles.  They are pre-sale.

12           THE COURT:  Yeah.  But give me the years.

13           MR. SCOTT:  I don't know if I have that, Your Honor.

14   I apologize.  I want to say they start with 2006, but I really

15   -- I really don't have that information.

16           THE COURT:  Are any of the alleged defects covered by

17   recalls?

18           MR. SCOTT:  This defect, there was -- there was no

19   recall.  There were other recalls on these vehicles.  So that

20   Old GM --

21           THE COURT:  Well, I've had -- you know, I've had cars

22   that have had recalls for sure.

23           MR. SCOTT:  No.  The point is that Old GM --

24           THE COURT:  My question -- just so we have a clear

25   record.  Your -- the alleged defect that you described to me is

142

1    with respect to the engine and a particular aspect of the

2    engine.  And my question is have there been any recalls

3    relating to the defect that you allege?

4                MR. SCOTT:  There have not been, Your Honor.  But I

5    did point out that there had been other recalls --

6                THE COURT:  I don't care whether there have been

7    other recalls.

8                MR. SCOTT:  Only for the sake -- only for the sake

9    that --

10               THE COURT:  Stop.  I asked a specific question.

11   You've answered my question.

12               MR. SCOTT:  Yes.

13               THE COURT:  Anything else you want to say?

14               MR. SCOTT:  Yes.  I just want to say, Your Honor,

15   that the -- that the -- GM did know who the owners of these

16   vehicles were because they had made other recalls on these

17   vehicles.  That was the point I wanted to make.

18               THE COURT:  All right.

19               MR. SCOTT:  So they were aware of addresses and the

20   owners of these vehicles.

21               THE COURT:  Thank you.

22               MR. SCOTT:  Thank you, Your Honor.

23               THE COURT:  Thank you.

24               Come on up.

25               MR. HIRSCH:  Thank you, Your Honor.  Attorney Joram

143

1  Hirsch; I represent the Pitterman Plaintiffs.

2          THE COURT:  Yes.  What I thought, Mr. Hirsch --

3          MR. HIRSCH:  Your Honor, I'm having a little trouble

4  hearing you.  I apologize.

5          THE COURT:  What I wanted to do was finish on this

6  and then deal with the Pitterman Plaintiffs as a separate

7  matter.

8          Unless, I don't know, Mr. Steinberg, do you want to

9  deal with it all as part of one?

10         MR. HIRSCH:  However you want to do it, Your Honor.

11         THE COURT:  Just stay up there for a second.

12         Mr. Steinberg, what's your pleasure?

13         MR. SCOTT:  I'm prepared to respond after all the

14  plaintiffs have talked, so I'm prepared to just let Mr. Hirsch

15  say what he wants to say.

16         THE COURT:  All right.  Go ahead, Mr. Hirsch.

17         MR. HIRSCH:  Thank you, Your Honor.  So I represent

18  the Pitterman Plaintiffs.  This is a post-closing accident

19  case.  It involves a 2004 Suburban manufactured by Old GM.  The

20  incident occurred on July 13, 2011.  That's two years after the

21  sale date.  The case does not involve the same ignition switch

22  defect that's the subject of this proceeding.  The defect is a

23  defect in the design of what's called a brake transmission

24  shift interlock.  That's an interlock between the brake, the

25  transmission, and the ignition key such that you can't shift

144

1  out of park unless the key is in certain positions.

2          We commenced a product liability action under

3  Connecticut product liability law.  That's pending in the

4  United States District Court for the District of Connecticut,

5  and scheduled for trial July 5, 2017.  We have not -- we've

6  pled only a product liability action.  We have not pled a fraud

7  or any other misrepresentations or any claim under the Federal

8  Motor Vehicle Safety Standards recall provisions.  It's a

9  strict product liability action.  So --

10          THE COURT:  At least as -- at least as to

11  compensatory damages, this is assumed liability?

12          MR. HIRSCH:  I -- my belief is yes.

13          THE COURT:  Okay.

14          MR. HIRSCH:  But that's the subject of the debate

15  that's been ongoing for months now.  My position has always

16  been we're alleging a products liability action.  You've

17  assumed this liability.  As I get through it, you'll

18  understand, I think, where the argument is.

19          THE COURT:  Okay.  Go ahead.

20          MR. HIRSCH:  But we initially claimed punitive

21  damages.  We got a letter from counsel saying you can't do it,

22  and that letter came -- that was the first contact we had with

23  this bankruptcy proceeding.  And that letter came in August 26,

24  2015, and we amended our complaint to withdraw the punitive

25  damage claim.  Okay?

09-50026-mg   Doc 14127-1   Filed 10/02/17   Entered 10/02/17 12:32:50   Exhibit A
Case 1:14-md-02543-JMF   Document 4637-2   Filed 10/02/17   Page 146 of 269
Pg 205 of 728

145

1          THE COURT:  Okay.  It's still out.  You haven't tried
2     to put it back?
3          MR. HIRSCH:  Nope.  Nope.  It's still out.  We're not
4     going to put it back in, and we're not trying to put it back
5     in.  It's -- we're not going that way.
6          THE COURT:  Okay.
7          MR. HIRSCH:  So our -- the issues that pertain to my
8     case fall into two categories, and there are four claims.  And
9     I have a graphic that I'd like to give to the Court, if you
10    don't mind, because I like to think in terms of graphics.  It
11    helps me.
12         THE COURT:  Thank you.
13         MR. HIRSCH:  Thank you.  So the issue -- the issues
14    that pertain to my case fall into four categories -- two
15    claims, failure to warn, failure to recall and retrofit.  And
16    two categories, one based on Old GM's pre-sale conduct, that's
17    prior to June 2009.  My car, remember, was built in 2004.  And
18    the second claim is against New GM based on New GM's post-sale
19    conduct where there was conduct between June 2009 and July
20    2011, the date of my accident.  That's what at issue here.
21    So --
22         THE COURT:  With respect to your -- and you allege
23    that the New GM post-sale conduct are independent claims?
24         MR. HIRSCH:  They are -- they are -- they are
25    independent in the -- in the sense that they are based solely

146

1  on New GM's post-sale conduct.  Pre-sale conduct, failure to --

2  for example, pre-sale conduct failure to warm -- failure to

3  warn, New GM has agreed they've assumed that.

4              THE COURT:  Okay.

5              MR. HIRSCH:  I --

6              THE COURT:  Is that correct, Mr. Steinberg?

7              MR. STEINBERG:  It is correct.

8              THE COURT:  Okay.

9              MR. HIRSCH:  So category 1 in the top left-hand

10  corner, that's not a problem.  They've assumed that.

11             THE COURT:  Okay.

12             MR. HIRSCH:  We've alleged, in addition, New GM's

13  post-sale conduct based on New GM's conduct.  Now maybe we

14  didn't say independent claim based solely on New GM's conduct,

15  but that's our claim, and I can state it for the record, if

16  you'd like.  Our claim is based on New GM's post-sale conduct

17  in terms of the claim against them for both failure to warn and

18  failure to recall.

19             THE COURT:  Which district judge is it pending

20  before?

21             MR. HIRSCH:  Judge Hall, Janet Hall.  So recently --

22             THE COURT:  And you told Judge Hall that --

23             MR. HIRSCH:  We'll be here today.  I told Judge Hall

24  I'm here today.

25             THE COURT:  Okay.

```
 1            MR. HIRSCH:  We had a pretrial conference last
 2   Monday.
 3            THE COURT:  Okay.
 4            MR. HIRSCH:  So she's looking for guidance from the
 5   Court.
 6            THE COURT:  But did you tell her that your -- that
 7   this failure to warn claim against New GM is based solely on
 8   New GM's conduct?
 9            MR. HIRSCH:  Yes.
10            THE COURT:  Okay.  Go ahead.
11            MR. HIRSCH:  Yes.  Because we have two years' worth
12   of conduct from between June --
13            THE COURT:  The sale and the accident.
14            MR. HIRSCH:  Between June 2009, the sale, and June --
15   and July 2011, there's two years when GM was aware of this
16   problem.  New GM was aware of the -- what we claim is a defect.
17   They're obviously challenging it.  But we contend they're aware
18   of it and they didn't warn.  They didn't recall or retrofit.
19            THE COURT:  Go ahead.
20            MR. HIRSCH:  So in a recent letter to the Court from
21   Attorney Steinberg, I think they've clarified a lot of issues
22   respect to the claims based on New GM's conduct.  At -- it's
23   document 13929, page 204, second full paragraph.  It was just
24   recently sent.  It was in connection with the Tronox matter,
25   but I'm not going to deal with Tronox.  But in that letter, New
```

1  GM said quote:

2          "Various plaintiffs in this proceeding present

3          threshold issue number 2 as a theoretical question

4          whether plaintiffs and vehicles without Ignition

5          Switch Defect" -- and I don't have an Ignition Switch

6          Defect -- "can assert independent claims against New

7          GM in light of the Second Circuit opinion.  The

8          answer is and always has been 'yes' if the claim is

9          truly independent.  A valid Independent Claim must be

10         based solely on New GM duty incurred after the 363

11         Sale and predicated solely on New GM's conduct."

12         THE COURT:  And you believe you satisfy everything

13  that you just read?

14         MR. HIRSCH:  Yes.  I -- and I -- and if they believe

15  that I didn't say it in the pleadings, I'd be happy to amend my

16  complaint, if Judge Hall lets me, to say that.

17         THE COURT:  Okay.  Go ahead.

18         MR. HIRSCH:  Now, whether New GM had a duty to warn

19  or recall is not an issue for your court -- for you to decide,

20  Your Honor.

21         THE COURT:  I agree.

22         MR. HIRSCH:  With all due respect.

23         THE COURT:  I agree with that.

24         MR. HIRSCH:  Okay.

25         THE COURT:  You don't have to do that with respect or

149

1  our otherwise.  I agree.

2          MR. HIRSCH:  Okay.  So that issue, it's always been

3  our position, is Judge Hall's obligation to decide whether that

4  duty exists.  But if that duty exists, we are -- we are, in my

5  view, permitted to present that issue to Judge Hall for her to

6  decide and then charge the jury appropriately.

7          And I'd like some -- I'd like to ask Attorney

8  Steinberg through the Court if he agrees that we could --

9          THE COURT:  I'll ask Mr. Steinberg.

10         MR. HIRSCH:  Well, then you ask Mr. Steinberg if he

11 agrees that we could present the claim against New GM based

12 solely on New GM's post-sale conduct with respect to failure to

13 warn and failure to recall and retrofit.

14         THE COURT:  All right.  Continue with your argument.

15         MR. HIRSCH:  Okay.  So -- and if he doesn't agree, I

16 can go -- I have a big five-page analysis as to why I'm

17 permitted to do so under the November decision, if you'd like

18 to me to go through that.  But I think it's mooted out by what

19 Mr. Steinberg just told the Court.  That leaves for the -- that

20 leaves the only issue to be determined is whether or not we can

21 proceed on a claim of failure to recall retrofit based on Old

22 GM's conduct pre-sale.  In other words, Old GM's failure to

23 recall or retrofit the vehicle.

24         The vehicle was built, as I told the Court, in 2004.

25 The collision occurred that's the subject of my case in 2011.

150

1  GM -- Old GM was aware of this problem.  In fact, in 2007,

2  modified the vehicles, the Suburbans, for the model year 2007

3  to correct what the defect we claim existed.  But they didn't

4  recall the -- they didn't recall the car.

5         Now, we're not claiming that they had an obligation

6  under Federal Motor Vehicle Safety Standards without asserting

7  a private right of action under that section.  We're simply

8  saying you have a common law duty to recall when you're aware

9  that there's a problem with the car.  It's a voluntary recall

10 obligation.  The --

11        THE COURT:  And can I give recognize to such a claim?

12        MR. HIRSCH:  Yes.  And I included -- I included in my

13 most recent letter to the Court two cases.  I cited the Court

14 to two cases, and my letter to the Court was just -- it's

15 docket number -- if I could find it here -- 13937.  And the two

16 cases I cited to the Court are Arquetta v. Overhead Door Corp.,

17 and that was attached to my letter.  And I cited another

18 District Court case, Savage v. Scripto-Tokai Corp.  Both are in

19 my letter.  Our position is Connecticut recognizes as part of a

20 product liability claim negligent failure to recall or

21 retrofit.

22        THE COURT:  And I take it, then, it's your position

23 that Old GM's failure to recall and retrofit is an assumed

24 product liability claim?

25        MR. HIRSCH:  Exactly correct.  Because it's part of

1  the product liability claim as recognized in -- under

2  Connecticut law.  Now there's -- the decision by Judge Gerber

3  sort of confused the issue because I -- admittedly, there's a

4  paragraph in the judgment that seems to suggest that a duty to

5  recall or retrofit is not permitted based on Old GM's conduct,

6  and that was paragraph 29 of the judgment.

7          Now, I submit to the Court that that issue as to

8  whether or not a product liability claim that GM has assumed

9  includes a recall was not properly before the Court at the time

10  of the November decision and December judgment for a couple of

11  reasons.

12          One, we weren't given a notice that that issue was

13  going to be presented to the Court.  It wasn't -- it -- there

14  was a letter -- I have to go back through a little chronology,

15  Your Honor, unfortunately, Your Honor, to explain how this all

16  evolved.  So there was a letter that came to use in September

17  of 2015, and it's with -- it's Docket 13466.  This is a letter

18  to Judge Gerber, and it talks about the marked complaints,

19  which you've heard a lot about.  And we've -- we got that

20  letter because our case fell within the other complaints

21  categories.

22          And the other complaints categories that's referenced

23  in that letter -- and by the way, the first letter we got back

24  in August of -- August 26, 2015, only complained about the fact

25  that we've alleged punitive damages.  Didn't say anything about

152

1  any other claim, just punitive damages.  Then we got the

2  scheduling order, and the scheduling order directed King &

3  Spalding, you know, counsel, to submit a procedure for dealing

4  with things, and one of the procedures was to mark up other

5  plaintiffs' complaints, as Your Honor have seen.  So I fell

6  into the category of other plaintiffs' complaints.

7           So next I get a letter dated September 23 addressed

8  to Judge Gerber, and in that they talk about -- they discuss

9  six -- five, six categories, failure to recall, negligent

10 failure to identify, negligent infliction, civil conspiracy,

11 Section 402(b), and pre-sale accidents.  The only paragraph

12 that applies to me, because I've made none of those claims

13 other than product liability claim, is the failure to recall

14 and retrofit.

15          And if you look at that letter, that letter says

16 nothing about a claim based on Old GM's failure to recall or

17 retrofit.  It talks about New GM's failure to recall or

18 retrofit.  So there's nothing in that letter that alerted me or

19 the Court, I would say, that the Court would be dealing with

20 the issue of whether or not Old GM's duty to recall or retrofit

21 was -- comes within the umbrella of a products liability claim

22 as defined by state law.  Just wasn't there.

23          So now I get the -- and that -- and that letter

24 references a case Moore v. Ross as an example of the types of

25 claims that were prohibited.  That Moore v. Ross claim -- I'm

153

1  sure Your Honor has seen that, I have a copy here for the

2  Court, doesn't talk about Old GM's conduct.  It only talks

3  about New GM's conduct.  Doesn't -- it doesn't put up -- it

4  doesn't tee up the issue whether or not Old GM's failure to

5  recall or retrofit comes within the state law product liability

6  claim that's been assumed.  So it's our position that we

7  weren't given notice that this part of our claim was at issue

8  in the case.  That -- in other words, being challenged by Old

9  GM.

10        So the next thing that happens is we get the -- Judge

11  Gerber issues his November decision and December judgment.  We

12  didn't have an appearance in the file.  So we didn't get a copy

13  of it because we weren't in -- we weren't in the ECF system.

14  And we got a copy of it in May of 2016 when it was sent to us

15  by King & Spalding based on my review of my file.

16        And now for the first time, this -- all the claims

17  about you can't bring independent claims, blah, blah, blah,

18  they talk about in that case failure due to the obligation if

19  you don't like our -- that if we've alleged Old GM a successor

20  to New GM or vice versa.

21        THE COURT:  Reversed.

22        MR. HIRSCH:  Vice-versa, New GM a successor to Old

23  GM, I agreed to take out the word "successor."

24        THE COURT:  You're not asserting --

25        MR. HIRSCH:  No.

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1.14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 155 of 269
Pg 214 of 728

154

          1              THE COURT:  -- a claim against New GM based on

          2    successor liability?

          3              MR. HIRSCH:  No.

          4              THE COURT:  Okay.

          5              MR. HIRSCH:  No.  As a straight product liability

          6    claim.

          7              THE COURT:  Okay.

          8              MR. HIRSCH:  Because we're not seeking punitive

          9    damages.  We're not seeking any -- you know, no other -- no

         10    other claims.  They say that our claims based on alleged due to

         11    the warn was inappropriate and alleged failure to recall and

         12    retrofit are inappropriate.  And they don't distinguish between

         13    claims based on Old GM's conduct and New GM's conduct.

         14              THE COURT:  Just I know you'll probably get there,

         15    but let me ask you now.  Are you asserting a claim against New

         16    GM for failure to recall or retrofit?

         17              MR. HIRSCH:  Yes.

         18              THE COURT:  Okay.

         19              MR. HIRSCH:  Based solely on New GM's conduct

         20    post-June 2009.

         21              THE COURT:  And is there Connecticut case law that

         22    you believe would support the assertion of a claim for failure

         23    to recall retrofit against New GM?

         24              MR. HIRSCH:  Well, that's a difficult subject because

         25    this type of situation has never come up before in Connecticut

155

1  in terms of a bankrupt, somebody's buying out of -- buying the

2  assets out of bankruptcy and whether or not a claim can be

3  asserted.

4          THE COURT:  Your position, though, that would be

5  purely a question of Connecticut state law?

6          MR. HIRSCH:  Absolutely.

7          THE COURT:  That Judge Hall would have to address.

8          MR. HIRSCH:  Correct.

9          THE COURT: Whether state law -- Connecticut state law

10  would recognize a cause of action against New GM based on

11  solely on its own conduct.

12          MR. HIRSCH:  After June 2009.  Yes.

13          THE COURT:  For -- right for failure to recall

14  retrofit.

15          MR. HIRSCH:  Yes.  And in Connecticut, duty is

16  defined as a combination of public policy and foreseeability.

17  Is it foreseeable if GM has notice -- New GM has notice of an

18  issue with their cars, which we have evidence that they did,

19  notice that there were incidents.  We have other evidence of

20  other similar incidents that New GM had knowledge.

21          THE COURT:  So you took discovery on this issue of

22  New GM's knowledge about the alleged defect in the Corvette?

23          MR. HIRSCH:  It's a Suburban.

24          THE COURT:  I'm sorry.

25          MR. HIRSCH:  That's Okay.

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

156

1          THE COURT:  You took discovery about New GM's

2    knowledge --

3          MR. HIRSCH:  Yes.

4          THE COURT:  -- about this alleged defect in the

5    Suburban.

6          MR. HIRSCH:  New GM knew about it.  There -- the

7    witnesses that -- the witnesses I deposed were employees then

8    and now.  They were aware -- and I will tell Your Honor that

9    this defect was remedied -- well, remedied -- there was a

10   change in the design in the 2000 model year.  There was

11   congressional action that required them to make the change.  GM

12   made -- had an agreement with Matsu to make the change.  It's

13   -- they -- it's all over their records that they knew about the

14   problem.

15         THE COURT:  There was no recall but they changed the

16   design.

17         MR. HIRSCH:  Correct.  Without a recall.  And so

18   their employees who we deposed, were employees then and now,

19   were aware of what we claim was a defective condition.  So it's

20   -- your statement is exactly correct.  It's our position that

21   it's up to Judge Hall to decide whether Connecticut law

22   recognizes a duty on New GM's part to warn and recall with

23   respect to owners of the Suburban.

24         THE COURT:  Let me you what facts do you intend to

25   rely upon to establish this failure to recall restorative claim

157

1  against New GM based on -- solely on New GM's conduct?

2         MR. HIRSCH:  Well, the facts, Your Honor, are very --

3  are straightforward.  New GM was continuing to get notices of

4  other similar incidents involving this defect.  And New GM's

5  employees, who are then -- who are Old GM's employees as well

6  as New GM's were aware that there were vehicles out there --

7         THE COURT:  I don't want to know what -- at this

8  point, what Old GM knew.  I want to know --

9         MR. HIRSCH:  New GM.

10        THE COURT:  -- what it is you're arguing that New GM

11 knew.

12        MR. HIRSCH:  New GM --

13        THE COURT:  And you're not doing this solely based on

14 imputation --

15        MR. HIRSCH:  No.

16        THE COURT:  -- with the people who work for Old GM

17 now are the New GM.  They knew or must have known about it.

18 You're saying you've established -- you believe you can

19 establish actual knowledge by employees of New GM about the

20 existence of this defect in pre-2007 Suburban.

21        MR. HIRSCH:  Well, I can say that the -- that the

22 employees who are employed by New GM were also employed by Old

23 GM, so they were New GM employees that were aware of this.

24        THE COURT:  Did you find -- do you have any documents

25 that were produced in discovery that show that New GM was aware

158

1  of this alleged defect in pre-2007 Suburban before your clients

2  had their accident?

3        MR. HIRSCH:  They were being sued for these kinds of

4  cases, and there were reports of other similar incidents after

5  2009 there were being reported to General -- to New GM about

6  defects in these pre-2007 cars.

7        THE COURT:  Do you believe that your -- that in light

8  of Judge Gerber's prior rulings that you're able to offer

9  evidence about what Old GM knew before the sale?  I'm trying --

10  what I'm trying to understand, Mr. Hirsch, is are you going to

11  be pure, clean as the driven snow, your whole case is going to

12  be based on what New GM knew --

13        MR. HIRSCH:  No.

14        THE COURT:  -- about this alleged defect in the

15  pre-2007 Suburban?

16        MR. HIRSCH:  No.  I can't say that.

17        THE COURT:  Okay.

18        MR. HIRSCH:  Because one of the claims I'm making is

19  Old GM's failure to warn, which is conceded is assumed product

20  liability claim.

21        THE COURT:  Let me ask you if Judge Hall does not

22  permit you to -- if she were to conclude that there is no

23  assumed liability for failure to recall and retrofit, do you

24  believe you would still be entitled to introduce evidence about

25  Old GM's knowledge about the defect?

1          MR. HIRSCH:  Yes.  Under the failure to warn claim.

2          THE COURT:  Okay.  Go ahead.  And there's no dispute

3   that the failure to warn claim -- well, let me ask, is there a

4   dispute between New GM and you as to whether the failure to

5   warn claim is an assumed liability?

6          MR. HIRSCH:  That's where we started this

7   conversation.  I think Attorney Steinberg said no.  That's --

8   he agrees that's an assumed claim.

9          THE COURT:  We'll argue from Mr. Steinberg --

10         MR. HIRSCH:  But that's what I thought we started --

11  that's how I started --

12         THE COURT:  Oh, Okay.

13         MR. HIRSCH:  -- the discussion.

14         THE COURT:  That's fine.

15         MR. HIRSCH:  The answer is, as far as I understand

16  it, there's no dispute that a failure to warn based on Old GM's

17  conduct --

18         THE COURT:  So you believe you get this evidence in

19  on the failure to warn.

20         MR. HIRSCH:  At a minimum.

21         THE COURT:  Okay.

22         MR. HIRSCH:  Correct.

23         THE COURT:  All right.

24         MR. HIRSCH:  So -- and I can go back to the failure

25  to retrofit because it's my position that Old GM's failure to

160

1   recall between 2004 and 2009 -- my car was built in 2004, is

2   also an assumed claim because it's part of a product liability

3   claim as -- we believe, as recognized in the state of

4   Connecticut.  So if you saw -- I think I established in the

5   letter regarding the marked-up complaints, that didn't address

6   Old GM's failure to recall.  That addressed New GM's failure to

7   recall.

8          So that marked-up -- that the judgment of -- the

9   November decision and the December judgment that was supposed

10  to be based on the marked-up complaints should not have

11  addressed Old -- any claim for a failure to recall based on Old

12  GM's conduct because that wasn't part of what was presented as

13  an issue that was going to be decided.

14         Nonetheless, for whatever reason, Judge Gerber made

15  that statement and so I -- you have to interpret what that

16  statement means.  And it's our position -- and I think I said

17  it, it's -- there doesn't appear to be any discussion in Judge

18  Gerber's decision regarding the basis for the statement that

19  New GM would not be responsible for Old GM's failure to recall.

20  There's no discussion whether it's a recognized under --

21  whether it is or isn't recognized under product liability law.

22  I don't think Judge Gerber intended, and I don't think you

23  intend to survey the law of 50 states and see what --

24         THE COURT:  That I can assure you on.

25         MR. HIRSCH:  I didn't think you would, and I didn't

161

1  think he was doing that, either.  So I have to -- and I would

2  also point out that there's nothing -- there's no explanation

3  why a product liability claim under state -- any particular

4  state law can't include a failure to recall.  There's nothing

5  in the definition of assumed liabilities that would exclude an

6  allegation of failure to recall or retrofit within the confines

7  of product liability claim recognized under state law.

8          I think you can interpret that statement in his

9  opinion and decision to apply to recall obligations under the

10 Federal Motor Vehicle Safety Standards and therefore

11 distinguish it from our case.  Because we're not making a claim

12 under the Federal Motor Vehicle Safety Standards.  Or you can

13 interpret it as dicta as not been having been properly before

14 the Court.

15         It's their -- it's our position that since GM has

16 assumed liability for product liability claims based on

17 vehicles manufactured by Old GM and because under Connecticut

18 law -- and it's up to -- if they disagree, it's up to Judge

19 Hall to decide -- the product liability claim includes a claim

20 for failure to recall or retrofit, then New GM has assumed

21 liability for the product liability claim we've asserted.  In

22 footnote 30 of the November decision, Judge Gerber stated:

23             "New GM assumed responsibility for product liability

24             claims, which would make it liable for compensatory

25             damages based on anything that even Old GM had done."

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

162

1          And that's what we're asserting.  And there's nothing

2    in the November decision or the December judgment that would

3    indicate New GM is entitled to carve out of a product liability

4    claim recognized under state law, a particular aspect of it.

5          THE COURT:  I understand your argument.

6          MR. HIRSCH:  Okay.  So what I'm looking for, Your

7    Honor, is hopefully, a ruling that would allow us to proceed in

8    the United States District Court subject to Judge Hall making

9    whatever decision she needs to make regarding what's permitted

10   under Connecticut state law with a claim based -- a claim

11   against Old GM -- or, I'm sorry, a claim based on Old GM's

12   failure to warn, failure to recall, and based solely on New

13   GM's post-sale conduct with respect to both warning and recall.

14         THE COURT:  Are there motions pending before Judge

15   Hall whether Connecticut law permits the failure to recall/

16   retrofit claim?

17         MR. HIRSCH:  No.  The -- GM has not made that motion

18   in state court.  They made a bunch of other motions relying on

19   the bankruptcy court order, including the fact that we can't

20   proceed with a claim based on New GM's failure to recall or

21   failure to warn.  But that's been precluded even solely based

22   on GM's -- New GM's conduct.

23         THE COURT:  Do you have a date for final pre-trial

24   conference?

25         MR. HIRSCH:  We had it.  We had the pretrial

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

163

conference on Monday.  The judge indicated she will probably

schedule another one because she did not reach all of the

pretrial motions, and it's unclear whether there's -- she's

going to rule on them with or without our further argument or

hearing.  So the answer is I don't know.  It's not scheduled.

There might be.

            THE COURT:  Fine.  Thank you, Mr. Hirsch.

            MR. HIRSCH:  Thank you, Your Honor.

            THE COURT:  Anybody else on the plaintiffs' side who

wants to be heard?

            MR. BABCOCK:  Russell Babcock here on behalf of

Benjamin Pillars.  Now, before I get going here, my -- the

primary focus of my oral discussion today is going to be on

issue 1, which hasn't really been addressed up to this in time.

And I think they kind of bypassed issue 1 and talked about

issues 2 through 4.

            THE COURT:  Well --

            MR. BABCOCK:  I mean I could go either go at this

point.  I --

            THE COURT:  Yes.  Go.

            MR. BABCOCK:  Okay.

            THE COURT:  Go.

            MR. BABCOCK:  All right.  So basically what we have

here is back in 2015, Judge Gerber issued a ruling which

basically, from our perspective, gave us a green light to

164

 1  proceed forward with our ignition switch case against New GM.

 2  They've -- they appealed that to Judge Furman.  Judge -- and

 3  the issues were briefed, I believe, at the preliminary stage,

 4  at least.  And during the process of being up on appeal, the

 5  Second Circuit came down with this ruling.

 6          Judge Furman had a conference call with the attorneys

 7  suggest -- well, not suggest, he told us that he wanted us to

 8  come back down to this court to find out what impact the Second

 9  Circuit had on our claims above and beyond what was presently

10  before him.  He didn't want to make a ruling on that until he

11  knew where things stood.

12          THE COURT:  Tell me what your client's claims.

13          MR. BABCOCK:  Yeah.  We are -- we have brought an

14  ignition switch claim against New General Motors.  On argument

15  on appeal up for Your Honor is that New GM consistently took

16  the position that were an ignition switch plaintiff and that --

17  and we cited in our supplemental brief, which we provided to

18  the Court, excerpts from their response to our no stay -- no

19  stay pleading where they repeat on more than one occasion that

20  our claims are identical to the ignition switch pre-closing

21  accident plaintiffs' claims.  Now their argument now is that

22  no, we're not --

23          THE COURT:  Just tell me what it is that happened to

24  your clients that you're suing on.

25          MR. BABCOCK:  I see.  Back in 2005, my -- the

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

1   decedent was driving the vehicle.  The vehicle suddenly lost

2   control.  She was rendered incapacitated for the rest of her

3   life.  She passed away in 2012.  During the police

4   investigation, they noted that the ignition switch was -- had

5   turned onto the "off" position, and the airbags had not

6   deployed.  The onboard computer indicated that no collision had

7   -- it didn't register the collision having occurred.  All

8   indicators that this was obviously an ignition defect issue.

9           THE COURT:  What was -- what was the model year of

10  the car?

11          MR. BABCOCK:  It was, I believe, a 2004 -- one moment

12  here -- Pontiac Grand Am.

13          THE COURT:  Okay.  And is the subject vehicle under

14  the recalls?

15          MR. BABCOCK:  Yes.  We -- notification was sent

16  out --

17          THE COURT:  Mr. Steinberg is saying no, shaking his

18  head no.

19          MR. BABCOCK:  It was -- well, it was identified as

20  the defective ignition June of 2014.

21          THE COURT:  In the later, so --

22          MR. BABCOCK:  Yeah.

23          THE COURT:  -- it was all within the definitions --

24          MR. BABCOCK:  Yeah.

25          THE COURT:  Let me finish.  You know, calm down.

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 167 of 269
Pg 226 of 728

166

1              MR. BABCOCK:  That's Okay.  No.  It's been a long two

2      days, Your Honor.

3              THE COURT:  For me too.

4              MR. BABCOCK:  I know.  I know, Your Honor.

5              THE COURT:  Okay.  Your client's, the decedent's car,

6      the 2004 Pontiac, would not be a subject vehicle.  Is that

7      correct?

8              MR. BABCOCK:  Based upon the arguments that are now

9      being made and based upon Your Honor's comments at your

10     conclusions, that would appear to be the case.

11             THE COURT:  You know, there was a lot of -- there's a

12     lack of clarity about what non-ignition switch defects and

13     plaintiffs are.

14             MR. BABCOCK:  Yeah.

15             THE COURT:  But I didn't think there was any dispute

16     about what a initial caps "Ignition Switch Plaintiff" is,

17     ignition switch defect.  It's the first three recalls in

18     February and March 2014 were subject vehicle, and client's --

19     your -- the decedent's car was not one of those.

20             MR. BABCOCK:  The reason why there's --

21             THE COURT:  Is that correct?

22             MR. BABCOCK:  No.  No.  Not correct, Your Honor.

23     Because here's the problem, all the way through this litigation

24     up until the Second Circuit decision, New GM took the position

25     that we were an ignition switch pre-closing --

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 168 of 269
Pg 227 of 728

167

 1              THE COURT:  Here today, we've got a Second Circuit

 2    decision.  Do you agree that the decedent's vehicle is not one

 3    of those subject vehicles that were subject to the February and

 4    March 2014 recalls?

 5              MR. BABCOCK:  It wasn't the beginning of the recalls.

 6    No.  It was June 2014 recall.

 7              THE COURT:  Give me a clear -- I think that was a

 8    clear question.

 9              MR. BABCOCK:  I'm sure.  What was the question?

10              THE COURT:  Listen carefully, and I want a clear

11    answer.

12              MR. BABCOCK:  Sure.

13              THE COURT:  Do you agree that the decedent's vehicle

14    was a subject vehicle as defined in this -- in this case that

15    was subject -- that was covered by the February and March 2014

16    recalls?

17              MR. BABCOCK:  I would agree it doesn't fit the

18    definition --

19              THE COURT:  Okay.

20              MR. BABCOCK:  -- that has been presented.

21              THE COURT:  That's what I wanted -- Okay.  You

22    believe that it was subject -- the vehicle was subject to one

23    of the later, two months later, recalls.

24              MR. BABCOCK:  It was the June or July 2014 recall.

25              THE COURT:  Right.  Okay.

1          MR. BABCOCK:  And the reason why we're here, Your

2     Honor, is that throughout the entire litigation leading up to

3     the Second Circuit, we were led to believe by New GM by their

4     admissions that we were a ignition switch defect.  In their

5     pleadings, and as we pointed out to the Court, admissions by a

6     party during litigation, they're bound by it.

7          THE COURT:  Where is your case pending?

8          MR. BABCOCK:  The -- where is the case pending now?

9          THE COURT:  Yes.

10          MR. BABCOCK:  Currently, it's in -- oh, currently,

11     it's in front of Judge Furman.

12          THE COURT:  Okay.  And do you have a trial date?

13          MR. BABCOCK:  No, Your Honor.  Everything's been

14     stayed, Your Honor.  Because the Court wanted Your Honor to --

15          THE COURT:  Fine.

16          MR. BABCOCK:  -- weigh in on this.

17          THE COURT:  Okay.  Go ahead.

18          MR. BABCOCK:  And so the reason --

19          THE COURT:  You're relying on estoppel based on prior

20     positions that New GM took?

21          MR. BABCOCK:  Well, admissions basically.  More

22     forcible than the admission, Your Honor.  These -- they took a

23     position, and very forcibly, that they -- that we were a

24     pre-ignition switch plaintiff.

25          THE COURT:  Okay.  But --

169

1            MR. BABCOCK:  And they said we were identical.

2            THE COURT:  You used a term that I'm not familiar

3    with.  You referred to it as a pre-ignition switch plaintiff.

4            MR. BABCOCK:  No.  I'll quote it exactly, Your Honor.

5    One second here.  I'll quote it to you exactly how they have

6    phrased it.  Okay.  This is what they said, and I can actually

7    tell you right where it's from.  It's from their GM's response

8    to no stay pleadings.  It's Record Number 13191, paragraph 3

9    and paragraph 24:

10               "Movant's claims are identical to the ignition

11               switch pre-closing accident plaintiffs' claims,

12               and the Court should find the rulings set forth

13               in the Judgment apply equally to movant."

14           So the point of the matter is they were taking the

15   position that our claims are exactly -- were not -- were not

16   exactly.

17           THE COURT:  Well, what --

18           MR. BABCOCK:  Now they're arguing that we're

19   non-ignition switch.

20           THE COURT:  What was the date of the accident?

21           MR. BABCOCK:  The accident took place, I believe, in

22   2005, Your Honor.

23           THE COURT:  Has New GM taken the position that this

24   was a retained liability to Old GM?

25           MR. BABCOCK:  No.  Because what they did -- this

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1  takes us back to the original ruling from Judge Gerber.  They

2  quoted earlier language from the original sales -- I mean, I

3  don't mean to get into this earlier ruling because we're not

4  really here to talk about it.  But in the prior matter when we

5  were before Judge Gerber, they had admitted, and Judge Gerber

6  concluded as such, that the original sales agreement applied to

7  my client, and because it was the original sales agreement

8  language, therefore it was assumed liability.

9          And that's why it went up to -- and that's why Judge

10  Gerber ruled in my favor because of the fact that in their

11  answers to the complaints, notice of removals, they had made

12  affirmative representations and admissions relying upon the

13  original sales agreement.  That's, again, not why we're here

14  today, but to answer your question, that's why it is -- by

15  their representations previously, it is assumed liability.  But

16  that is not here today, Your Honor.  That's pending on appeal

17  before Judge Furman.  What we're here today is different

18  admissions.  This time they take -- the admissions we're

19  talking about are the fact that they -- what I just talked

20  about earlier, about them representing that we were identical.

21          THE COURT:  The fact that you say it's pending on

22  appeal before Judge Furman, at some point Judge Gerber ruled

23  against you.

24          MR. BABCOCK:  No.  No.  Judge Gerber -- no.  Judge

25  Gerber ruled in our favor.  They appealed it.  New GM appealed

171

1  it.

2          THE COURT:  Okay.  I see.

3          MR. BABCOCK:  So it's New GM's appeal, not ours.

4          THE COURT:  Okay.  Go ahead.

5          MR. BABCOCK:  And so we're all -- we're set there for

6  the time being.  The question before the Court today is whether

7  or not they're obligated now and are estopped through their

8  admissions to our view otherwise that we are not an ignition

9  switch pre-closing accident plaintiff.  Because they have

10 stated we were.

11         The only time that changed was when the Second

12 Circuit came down and suddenly their argument switched.  Now

13 they're claiming we are a non-ignition switch.  That's the

14 first time we were ever even hearing those terms by New GM in

15 the context of my client's claim was after the Second Circuit.

16 And that's the reason why Judge Furman presumably sent it back

17 down to here to decide whether or not their earlier

18 representations has a binding effect on GM.  That is our

19 position.

20         As far as the other arguments, I'm not -- it's been

21 argued at great length by other attorneys from the plaintiffs.

22 For purposes of this, I'm only -- I'm intending to supplement

23 to talk about what I discussed to Your Honor.  And unless Your

24 Honor has any questions, that's our position.

25         THE COURT:  I don't.  Okay.  Thank you.

172

1          Other plaintiffs who wish to be heard?

2          MR. BABCOCK:  By the way, Your Honor, do you

3  anticipate any further discussion about this particular issue?

4  I mean, or --

5          THE COURT:  I haven't heard from the other side yet.

6          MR. BABCOCK:  Okay.

7          THE COURT:  I'm sure I'll hear from Mr. Steinberg

8  about it.

9          MR. BABCOCK:  Thank you, Your Honor.

10          THE COURT:  He just raised his hand, so we'll hear

11  more about it.

12          Mr. Steinberg.  I know it's taking it out of order,

13  but could we deal with Pitterman first?

14          MR. STEINBERG:  Sure.

15          THE COURT:  Let me ask a couple questions.  Maybe it

16  will shorten it.  Maybe not.  I'm not precluding you from

17  arguing further, but do you agree that Pitterman can proceed

18  with its failure to warn by Old GM against New GM as an assumed

19  liability?

20          MR. STEINBERG:  I do.

21          THE COURT:  Okay.  Is there anything else you agree

22  with Mr. Hirsch about that he can proceed on?

23          MR. STEINBERG:  No.  Yeah.  I do agree with him.  He

24  hasn't moved for punitive damages.  His --

25          THE COURT:  Okay.  I figured that.  That was clear.

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 174 of 269
Pg 233 of 728

173

 1  You said no punitive damages.  What's your position on the

 2  failure to recall retrofit?  Distilled down, I understand his

 3  argument to be that Connecticut law recognizes as a product

 4  liability claim a failure to recall or retrofit, and his

 5  argument is, subject to what Judge Hall decides is a matter of

 6  state law, he's entitled to proceed with his failure to recall

 7  retrofit by Old GM as an assumed liability of New GM.  Do you

 8  agree or disagree?

 9            MR. STEINBERG:  I disagree.

10            THE COURT:  Okay.

11            MR. STEINBERG:  First --

12            THE COURT:  Well, let's just make sure I've got the

13  table set.  Subject to what state law would permit in

14  Connecticut -- I guess it was probably automatically followed.

15  I was going to say a failure -- do you believe that Pitterman

16  has stated a claim against New GM as an independent claim for

17  failure to recall or retrofit?

18            MR. STEINBERG:  I do not.

19            THE COURT:  Okay.  All right.  At least I know

20  what -- I'll see what you have to say about this.

21            MR. STEINBERG:  Your Honor, with regard to Pitterman,

22  just to lay the groundwork, they got notice of the September

23  2015 scheduling order.  They're not seeking punitive damages.

24  They've agreed to, in effect, strike the reckless disregard

25  allegation in their complaint to the extent that it is for

174

1  purposes of seeking punitive damages.  They've agreed to strike

2  the successor allegation that's in their complaint.  Their car

3  was never the subject of a recall, and we have agreed that the

4  duty to warn can be an assumed liability.

5       Judge Gerber in the December judgment in paragraphs

6  21 and 29 determined that duty to recall is not an assumed

7  liability.  We believe that that is the final ruling on that

8  matter, and that the Pitterman Plaintiffs who were notified of

9  the scheduling order are bound by that ruling and they failed

10 to appeal, and it's res judicata to them.  Now the reason why -

11 - and I think the Pitterman Plaintiff --

12      THE COURT:  And you say that that's the answer no

13 matter what state law provides?

14      MR. STEINBERG:  That's correct.

15      THE COURT:  If 48 out of 50 states would recognize as

16 a products liability claim a failure to recall or retrofit,

17 it's too bad?

18      MR. STEINBERG:  That's correct.  And the reason why

19 is that New GM's obligation to assume product liabilities has

20 specific language.  And the only thing in the sale agreement

21 that references the duty to recall is Section 6.15, which is

22 the covenant to comply with the federal statute to recall Old

23 GM's vehicles if there's a safety defect.  That was taken out

24 of the assumed liability section.  So we have consistently

25 argued for the years in this case that the recall obligation

175

 1  was never an assumed liability and therefore was never subsumed

 2  as part of an assumed product liability case.

 3          The second thing is is that Connecticut law actually

 4  recognizes potentially misrepresentation as part of the assumed

 5  -- as part of a product liability case.  Judge Gerber clearly

 6  decided in the December decision that misrepresentation claims

 7  are not assumed liabilities, either.  So when New GM assumed

 8  product liabilities, it was to recompense accident victims

 9  arising out of injuries, but that didn't mean that everything

10  that normally could be asserted in a product liability case can

11  be asserted here.  They have the ability to show that there was

12  a defect.  They have the ability to establish a duty to warn

13  for that defect.  They have the ability to get compensatory

14  damages for that.  This is an issue that permeates a lot of

15  other cases.

16          THE COURT:  Okay.  Let me, just so I'm clear and the

17  record is clear -- because I'm going to have again -- as I did

18  last time, I'm going to have you order a transcript from

19  today's hearings.  What provisions of the sale agreement are

20  you relying on as limiting the claims as to which New GM

21  assumed liability?

22          MR. STEINBERG:  Section 2.3(a) is the section of the

23  sale agreement that lists the assumed liabilities of New GM.

24  And the section -- the sales agreement is structured so that if

25  you're not specifically listed as an assumed liability,

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1.14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 177 of 269
Pg 236 of 728

176

1  everything else is a retained liability.  So unless there are

2  three -- they are identified in Section 2.3(a), it's our view

3  that it's a retained liability, putting aside the independent

4  claim issue.

5         The -- in context of these vehicle owners suing, the

6  three general areas that have been identified as assumed

7  products liabilities -- and I think either fortunately or

8  unfortunately the only assumed liability I think you need to

9  really deal with now is the product liability accident type

10 cases.  The other two provisions, which were more relevant at

11 the beginning of the period after the sale, was what we called

12 the glove box warranty.  It's the three years, 36,000 --

13         THE COURT:  I know.

14         MR. STEINBERG:  -- miles and the lemon law claims.

15 So if --

16         THE COURT:  Could you --

17         MR. STEINBERG:  -- fit within those three categories.

18         THE COURT:  Could you read to me Section 2.3(a)?

19 See, because your position is -- because what we're dealing

20 with now, what Mr. Hirsch is saying, he wants to proceed with

21 product liability claims where liability has expressly been

22 assumed by contract.  Your position is that only those things

23 specifically listed in 2.3(a) are assumed liabilities.

24 Everything else is retained liability, correct?

25         MR. STEINBERG:  That's correct.

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 178 of 269
Pg 237 of 728

177

1          THE COURT:  So read me the language.

2          MR. STEINBERG:  Your Honor, would it be easier if I

3   just handed it up --

4          THE COURT:  Probably would.

5          MR. STEINBERG:  -- the paragraph?  Because it is

6   about --

7          THE COURT:  Is it long?

8          MR. STEINBERG:  -- about 15 sentences.  So I think --

9          THE COURT:  Does Mr. Hirsch have that too?

10         MR. HIRSCH:  No.  That's not -- is that the agreement

11   or is that a brief?

12         MR. STEINBERG:  This is a sale agreement.  This is

13   the amended sale agreement.

14         MR. HIRSCH:  I'm looking at the sale agreement here.

15   So all right.  Let's see what you got.

16         THE COURT:  What page are we on, Mr. Steinberg?  Do

17   you know your page numbers?

18         MR. STEINBERG:  Counsel for Mr. Pillars is probably

19   smiling at this point.  It's the first amendment, amended and

20   restated master sale and purchase agreement dated as of June

21   30, 2009.  It is on page 2, and it's the specific language

22   amendment at 2.3(a)(ix) of the purchase agreement.

23         THE COURT:  2.3(a)(ix)?

24         MR. STEINBERG:  2.3(a)(ix).

25         THE COURT:  So is this document 2968-2 in the Court's

178

 1  ECF system?

 2          MR. STEINBERG:  I don't know exactly.

 3          THE COURT:  That's what I have.

 4      (Counsel confer)

 5          THE COURT:  Just give me -- compare, Okay?

 6          MR. STEINBERG:  All right.

 7          THE COURT:  I want you on the same page.

 8      (Pause)

 9          MR. HIRSCH:  So, Your Honor --

10          THE COURT:  Do you have the page?

11          MR. STEINBERG:  I have a page.  It doesn't match that

12  page, so I don't which page is which.

13          THE COURT:  Let me see it, Mr. Steinberg.

14  Mr. Steinberg, you're representing that what you're showing me

15  is the sale agreement, which is ECF Docket Number 2968-2,

16  and --

17          MR. STEINBERG:  I'm representing, Your Honor, that

18  this is the version of the sale agreement that was attached to

19  the sale order which Judge Gerber approved.  And there's an

20  amendment to the specific section on product liability.

21          THE COURT:  Okay.  Just stop a second.  It's in this

22  ECF 2968-2, filed July 5th, 2009.  It's page 112 of 132 on the

23  ECF number.  Okay.  And you want me to read Romanette ix?

24          MR. STEINBERG:  That's correct.

25          THE COURT:  All right.

179

1          (Pause in proceedings)

2          THE COURT:  So I read it three times, and now you

3    need to explain your argument to me.  Because cutting through

4    some of the words, it looks like, "New GM assumed all

5    liabilities to third parties for death, personal injury, or

6    other injury to persons or damage to property caused by motor

7    vehicles designed by sellers, Old GM, collectively product

8    liabilities, which arise directly out of" -- GAP, et cetera --

9    "from such motor vehicle's operation or performance."

10   Those seem to me to be the operative words.  Do you disagree?

11          MR. STEINBERG:  No.

12          THE COURT:  So why doesn't Mr. Hirsch's assertion of

13   a failure to recall or retrofit -- if the car had a defect that

14   led to its -- allegedly resulted in this accident, I don't see

15   anything in this language you pointed me to that would --

16   certainly not by express terms.  It doesn't say what fits into

17   "products liability" -- you have a defined term, "product

18   liabilities."  But I don't see -- I thought you were going to

19   show me language that excluded certain types of claims from

20   product liabilities, and I don't see that.

21          MR. STEINBERG:  I don't think that there's language

22   that excludes certain assumed product liabilities.  There is

23   Section 6.15 of the sale agreement, which you would find in the

24   original version of the sale agreement, which is here, but I

25   can point --

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

180

1              THE COURT:  Okay.  Well, I guess what I'm saying,

2    Mr. Steinberg, is what you've shown me in Section 2.3(a)(ix)

3    doesn't appear to me to support your argument.  What are you

4    showing me now?

5              MR. STEINBERG:  Section 6.15(a) of the sale

6    agreement.

7              THE COURT:  Just stop.  For the record, I'm on ECF

8    Docket Number 2968-2, page 74 of 132, Section 6.15, "Product

9    Certification, Recall and Warranty Claims."  All right.  Do I

10   have to read all three, A, B and C?

11             MR. STEINBERG:  No, just A.

12        (Pause)

13             THE COURT:  Okay.  So, New GM was supposed to comply

14   with certification reporting and recall requirements of the

15   National Traffic and Motor Vehicle Safety Act and some other

16   acts?

17             MR. STEINBERG:  That's correct.  That's the recall

18   obligation.

19             THE COURT:  But it doesn't say that if state law

20   recognizes as a product liability claim the duty to

21   recall/retrofit that -- that's not part of assumed liabilities.

22             MR. STEINBERG:  State law only recognizes the duty to

23   recall on the manufacturer.

24             THE COURT:  Wait.  Wait, wait, wait.  I'm not going

25   to decide that, Mr. Steinberg.  Judge Hall is going to be the

1   one to decide what Connecticut law recognizes as a product

2   liability claim.  That ought to be crystal clear to everybody

3   here.  I am not determining what state law permits -- what the

4   elements of a state law cause of action.  I'll decide whether

5   something in the sale order -- sale agreement here or the sale

6   order says that's not an assumed liability.

7         But it seems to me entirely separate when you show me

8   something in paragraph 6 about New GM assuming responsibility

9   for certification, recall notices, under a whole variety of

10  statutes, and saying that that somehow prevents the assertion

11  of a recognized Connecticut state law cause of action for

12  product liability.  I don't know whether Connecticut recognizes

13  it or not.  You can go fight about that before Judge Hall.

14        MR. STEINBERG:  Judge Gerber did make that

15  determination, though, in the December judgment.  He did find

16  in paragraph 21 that --

17        THE COURT:  I'm going to go read paragraphs 21 and

18  29.

19        MR. STEINBERG:  Right.

20        THE COURT:  Those are the two paragraphs --

21        MR. STEINBERG:  Right.  So he did explicitly say

22  that, and there's a ruling on that and there's a failure to

23  appeal.  And I know Your Honor does not want to get into the

24  weeds of Connecticut law, and so I'm going to avoid that other

25  than to say that not all things under state law that would

182

1   otherwise be subsumed as product liability was something that

2   falls within that section.  If --

3        THE COURT:  Where am I supposed to find that?  It's

4   not there.  You're putting a -- you're seeking to give an

5   interpretation to the meaning of a defined term, "products

6   liability" -- "product liabilities" in Section 2.3(a)(ix)

7   that's not in there.

8        MR. STEINBERG:  Except for the structure of the

9   agreement which breaks out the recall covenant into a separate

10  section that's not in the assumed liability provision --

11       THE COURT:  It certainly seems to me that New GM

12  agreeing that it will comply with certification, recall

13  obligations under a variety of federal statutes is not the same

14  thing as saying whether it's assuming products liability claims

15  under state law.  Those are the two sections you're relying on.

16       MR. STEINBERG:  Right.  Paragraphs 21 and 29.  That

17  matter has been determined.

18       THE COURT:  Okay.  Go ahead.

19       MR. STEINBERG:  With regard to the demand letter that

20  we sent to Judge Gerber -- the demand letter.  With regard to

21  the other claims letter that we sent to Judge Gerber, under the

22  paragraph "Failure to Recall and Retrofit," and we said -- not

23  that we were only taking on New GM's obligations but not Old

24  GM's obligations.  The precise language was that:

25            "These claims allege that New GM had a duty to recall

183

1        or retrofit Old GM vehicles.  But such claims if they

2        exist as a matter of law at all are retained

3        liabilities once New GM purchased Old GM's assets

4        free and clear of claims and obligations relating to

5        Old GM vehicles.  New GM, an entity that did not

6        manufacture or sell the Old GM vehicle at issue, did

7        not have an ongoing duty to Old GM vehicle owners

8        other than specific assumed liabilities."

9        THE COURT:  Can your letter to Judge Gerber change

10 the terms of a contract?

11        MR. STEINBERG:  Oh, I think this was our position

12 with the interpretation of the --

13        THE COURT:  Yes, but my question to you is can a

14 letter to the -- did you serve Mr. Hirsch with that letter?

15        MR. STEINBERG:  Yes.

16        THE COURT:  Mr. Hirsch, did you get that letter?

17        MR. HIRSCH:  Yes, Your Honor, but that letter --

18        THE COURT:  I just asked if you got it.

19        I don't see how a letter to -- I get lots of letters.

20 I don't see how a letter to the court can alter contractual

21 terms that were approved by the court.

22        MR. STEINBERG:  I don't disagree.  All I was trying

23 to address was Mr. Hirsch's argument that the other claims

24 letter that we sent did not specifically address the issue as

25 to whether New GM would be liable for Old GM's failure to

184

1  recall.  I was reading you the language to say that the

2  language was broad enough to subsume that.  I wasn't trying to

3  say that that language changes any of the sale agreement, but

4  that what we had notified them of was the broader concept.  And

5  that's what I was trying to say when I wrote that letter.

6           THE COURT:  Okay.

7           MR. STEINBERG:  The other thing is that this case is

8  really on the duty to -- whether the recall was an assumed

9  liability was very much like the Old Carco case that we sent to

10 Your Honor which is the Grimstad v. FCA case, which is where

11 Judge Bernstein had ruled that there was no obligation to

12 recall unless New GM failed to satisfy its obligations under

13 the National Traffic and Motor Vehicle Safety Act or New GM

14 incurred a new duty post-sale to plaintiff when it fixed the

15 vehicle pursuant to the recall.  Neither of those things

16 happened --

17          THE COURT:  What state law was he deciding?

18          MR. STEINBERG:  I'm not sure.

19          THE COURT:  My question is -- and I read Judge

20 Bernstein's decision before you attached it, when he decided

21 it, so --

22          MR. STEINBERG:  I don't think --

23          THE COURT:  A characteristically good decision by

24 Judge Bernstein.  But the question I have is was he deciding

25 that it doesn't matter what state law provides?

1          MR. STEINBERG:  I think that's the case.  I think he

2    did that as an interpretation of the Chrysler sale agreement,

3    which in this respect was the same as the GM provision.

4          THE COURT:  You say the Chrysler language is exactly

5    the same as 2.3(a)(ix)?

6          MR. STEINBERG:  No, I doubt I would say that, because

7    that's a tortured language that if Your Honor struggled to read

8    it, then I understand that, because I've read that many times.

9    But it is not -- it is not the precise language, but in this

10   particular case the dynamic was Chrysler does its sale before

11   the GM sale, and then the provision for assuming accident cases

12   gets amended by Chrysler after the GM sale.

13         THE COURT:  Okay.  But I assume you would agree with

14   me that New GM could contractually agree to assume liability

15   for state law product liabilities claims.  And if the state

16   being Connecticut includes failure to recall/retrofit within

17   its state law of product liability, that New GM could agree to

18   do that?

19         MR. STEINBERG:  I agree.

20         THE COURT:  And so really the issue here, isn't it

21   whether New GM assumed -- agreed to assume liability for what

22   Connecticut defines as a product liability claim?

23         MR. STEINBERG:  I think with regard to an overall

24   recall obligation, as a matter of the interpretation of the

25   sale agreement, New GM agreed to comply with the federal

186

1   statute.  And that was the entirety of its obligation to the

2   recall --

3            THE COURT:  I don't see a disclaimer that it does not

4   assume liability for any other state law imposed duty to

5   recall.

6            MR. STEINBERG:  That's correct.  There is no

7   disclaimer.  It's just the structure -- it's just the structure

8   of an agreement --

9            THE COURT:  Okay.

10           MR. STEINBERG:  -- that parks the recall obligation

11  outside of the assumed liability section of the sale agreement.

12  And then it's a contractual interpretation of what the parties

13  intended -- parties between Old GM and New GM had intended.

14  What was the extent to which New GM had agreed with respect to

15  assumed product liabilities; in other words, picking up the

16  recall --

17           THE COURT:  I'm giving both sides a hard time here.

18  I understand your arguments.

19           MR. STEINBERG:  I think, Your Honor, though, that on

20  the independent claims argument, I think with regard to both

21  duty to recall and duty to warn, that the complaint that has

22  been filed in this case does not use in any way the words

23  "independent claim," but frankly, does not allege any New GM

24  conduct at all.

25           THE COURT:  You can order the transcript, but it

187

1   seems to me that Mr. Hirsch, at least before me, was quite

2   clear.  Whether Judge Hall was satisfied with it or not,

3   different issue.  But I thought he was quite clear that other

4   than the assumed liability claims, the claims against New GM

5   are based solely upon New GM's conduct.  You heard the same

6   thing that I did --

7           MR. STEINBERG:  I did, and I'm saying to Your Honor

8   that the complaint that was filed alleges no New GM conduct,

9   only alleges Old GM conduct, and specifically --

10          THE COURT:  Okay.  But I take it as a concession by

11  Mr. Hirsch that he is not going to and may not proceed on

12  claims against New GM other than assigned -- assumed claims,

13  other than assumed claims, and claims based solely on New GM

14  conduct.

15          Do I have that right, Mr. Hirsch?

16          MR. HIRSCH:  Your Honor, yes.  And what I would like

17  to point out --

18          THE COURT:  I understood you that way.  Go up to the

19  microphone so we have a clear -- there will be a transcript.

20          MR. HIRSCH:  So we have alleged, Your Honor, and

21  perhaps not --

22          THE COURT:  Stay there, Mr. Steinberg.

23          MR. HIRSCH:  We have alleged, and perhaps not as

24  eloquently as they would like, and I'm happy to amend it if

25  necessary, that despite this knowledge and the knowledge of

188

1  numerous roll-away incidents, GMC -- that's Old GM, and

2  defendant, that's New GM, took no steps to directly notify

3  and/or warn owners of the public of these defects.

4       THE COURT:  That strikes me that you're trying to

5  bootstrap a claim against New GM based on Old GM conduct.

6       MR. HIRSCH:  No, no.  And I'm happy to separate that

7  into two separate paragraphs.

8       THE COURT:  I'm going to leave it to Judge Hall to

9  decide whether you have adequately pleaded a claim against New

10 GM based solely on its own conduct without attempting to

11 bootstrap based on Old GM conduct.  I'm not getting into

12 rewriting your complaint.  What I'm saying is -- what you just

13 read to me certainly sounds as if this is another effort to

14 asset a claim against New GM based on Old GM conduct.  And you

15 agree, you're not going to do that.

16      MR. HIRSCH:  I'm not going to do that.  And I will

17 amend -- and with Judge Hall's permission, I would amend the

18 complaint to make it clear that against New GM, it's based on

19 New GM's conduct.

20      THE COURT:  Mr. Steinberg, are you satisfied with

21 that representation?

22      MR. STEINBERG:  Well, I understand the

23 representation --

24      THE COURT:  Come up a little closer to the

25 microphone.

 1          MR. STEINBERG:  I understand the representation, but

 2    his ability to amend the complaint that is prior -- like six

 3    weeks before trial, is something that I'll let the state court

 4    litigants deal with.  But I'm not going to --

 5          THE COURT:  That's not for me to decide either.

 6          MR. STEINBERG:  Right.  But --

 7          THE COURT:  I always have qualms about permitting an

 8    amendment to a complaint shortly before trial.

 9          MR. STEINBERG:  But Your Honor was putting your

10    finger exactly on this.  There is no actual conduct that New GM

11    committed that he will even be able to say that New GM did

12    vis-a-vis this customer, other than they didn't act.  In the

13    same way that Old GM didn't act.  And that depends on whether

14    New GM actually had a duty to --

15          THE COURT:  Yes, it does.  And that seems to me to be

16    a question of state law.  Does Connecticut law impose a duty on

17    New GM if it has knowledge of a defect, to either give notice,

18    recall, whatever?  I'm not -- I have no clue whether

19    Connecticut law provides for that.  But I understand Mr. Hirsch

20    to be saying that's what -- that's the claim he wants to

21    proceed on against New GM, based solely on New GM conduct.

22    Whether Connecticut imposes that duty on New GM or not, I have

23    no idea whatsoever.

24          MR. STEINBERG:  The problem, Your Honor, in

25    approaching it this way is that New GM has assumed the product

190

1    liability claim, has assumed Old GM's conduct in the context --

2        THE COURT:  He's going to get his evidence in of Old

3    GM's conduct because of the duty to warn claim --

4        MR. STEINBERG:  That's correct.

5        THE COURT:  -- that we agree --

6        MR. STEINBERG:  That's correct.  And generally, by

7    the way, Your Honor, this whole issue about independent claims

8    is a back door to punitive damages.  That's the only reason why

9    anybody fights over it.  And that's not relevant to this case.

10   This dispute that we're having here is over the --

11       THE COURT:  But let's deal with the dispute we have

12   here and not the other --

13       MR. STEINBERG:  Right.  The dispute we're having here

14   is that technically he has not alleged anything that looks like

15   an independent claim.  The complaint, which I don't know

16   whether it's part of the record here, but I do have in my

17   mind --

18       THE COURT:  Let me ask you this.  Do you agree that

19   Mr. Hirsch on behalf of his clients would be entitled to

20   proceed on -- against New GM on independent claims --

21       MR. STEINBERG:  No.

22       THE COURT:  -- not based on Old GM conduct.  Do you

23   agree?

24       MR. STEINBERG:  Based on Old GM conduct?

25       MR. HIRSCH:  New GM.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

191

1           THE COURT:  No, not based on Old GM conduct.

2           MR. STEINBERG:  No.

3           THE COURT:  Maybe I misspoke.

4           MR. STEINBERG:  He's a non-ignition switch

5    post-closing accident plaintiff, who under paragraph 14 of the

6    December judgment is not supposed to assert independent claims.

7           MR. HIRSCH:  This is the problem I'm having.  Ten

8    minutes ago I was told it wasn't an independent claim.  Now I'm

9    being told I can't assert an independent claim.  And I have a

10   Second Circuit that says I can assert an --

11          THE COURT:  Okay.  Stop.  I'll issue an order.

12   You're on shaky ground on independent claims after the Second

13   Circuit decision, Mr. Steinberg.  I'm not ruling from the

14   bench, and you'll address -- in response to the other

15   arguments, you'll have your chance to address it further, but

16   -- let me save it for that.

17          Thank you, Mr. Hirsch.  I'm going to -- I understand

18   the need -- I probably will issue a separate order with respect

19   to your case because of the imminent trial date.  And so it

20   will not await a decision on the -- more generally on the 2016

21   threshold issues.

22          MR. HIRSCH:  Thank you very much, Your Honor.

23          THE COURT:  Okay.

24          MR. HIRSCH:  May I make a 10-second comment?

25          THE COURT:  No.  I've heard enough about this.  Okay?

ACCESS TRANSCRIPTS, LLC              1-855-USE-ACCESS (873-2223)

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 193 of 269
Pg 252 of 728

192

1    Thank you, Mr. Hirsch.

2             All right, Mr. Steinberg.  Go ahead and proceed with

3    the rest of your argument.

4             MR. STEINBERG:  Your Honor, I want to first talk

5    about the arguments that were made with regard to threshold

6    issue number two, which is the ability of non-ignition switch

7    plaintiffs to -- and non-ignition switch post-closing accident

8    plaintiffs, to assert an independent claim in light of the

9    paragraph 14 of the December judgment.  And paragraph 14 is

10   explicit on this point, and it's clear.  It says:

11                 "Plaintiffs of two types, plaintiffs whose claims

12                 arise in connection with vehicles without the

13                 ignition switch defect, and pre-closing accident

14                 plaintiffs, are not entitled to assert independent

15                 claims against New GM with respect to vehicles

16                 manufactured and first sold by Old GM."

17            That is a definitive ruling about the rights of

18   parties that were not involved in the April decision and the

19   June judgment.  Despite what Mr. Peller says, the bankruptcy

20   court ruled that it was deferring issues on non-ignition switch

21   plaintiffs, that being the economic loss plaintiffs, wasn't

22   even dealing with post-closing accident plaintiffs as part of

23   those decisions which ultimately went up to the Second Circuit.

24            The issues with regard to post-closing accident

25   plaintiffs are clearly outside of the June judgment; and,

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

193

1    frankly, the non-ignition switch plaintiffs rulings were

2    outside of what Bankruptcy Judge Gerber ruled, because he said

3    he was deferring ruling on those issues.

4            THE COURT:  From my comments at the last hearing, I

5    think you know that I'm -- a big problem I'm having is whether

6    he really decided issues with respect to non-ignition switch

7    plaintiffs, economic loss, accident whatever, in the November

8    decision and December judgment, and whether parties were given

9    notice that those issues were going to be addressed.  I'm

10   having -- that's what I'm really having problems with.

11           MR. STEINBERG:  I think I can address that as part of

12   my presentation, but the point that I was trying to make now

13   was that the June judgment did not deal with the rights of

14   non-ignition switch plaintiffs.

15           THE COURT:  That's clear.

16           MR. STEINBERG:  And so I will address shortly why I

17   thought -- why I believed that those rights were properly teed

18   up as part of the September scheduling order while everybody

19   knew about it.  Certainly the people on this side of the table

20   knew about it.  And certainly the lead counsel in the MDL knew

21   about that, and they clearly participated in all of those

22   proceedings, endorsed the procedures that have been set,

23   recognized the ruling, and failed to appear.

24           But let me try to take one step back to try to give

25   Your Honor a little better color about this issue.  In the June

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

194

1  judgment, Judge Gerber recognized that the issues of

2  non-ignition switch plaintiffs' economic loss had to be dealt

3  with.  And so the procedures that were set forth in the June

4  judgment tried to establish a process upon which what otherwise

5  would have been a stare decisis ruling, which is what he ruled

6  in the May 27th decision that I think Mr. Steel read to you,

7  how he can convert that into the same type of collateral

8  estoppel ruling that had been applied to ignition switch

9  plaintiffs.

10        THE COURT:  Correctly or incorrectly, what it seemed

11 to me Judge Gerber was doing was saying I'm going to deal with

12 the ignition switch plaintiffs first.  If I decide that they've

13 established a due process violation but they're not entitled to

14 any remedy, that's going to necessarily follow if they're

15 non-ignition switch plaintiffs as well.

16        So he said I'm going to defer the non-ignition switch

17 plaintiffs because I don't need to get to it.  I'll deal with

18 the -- let me deal with the ignition switch plaintiffs first

19 because, as he found there was a due process violation.  And

20 then the issue is what remedy.  And he concluded no remedy and

21 the Second Circuit disagreed.

22        But if that was -- that's the way I'm reading the

23 record of what happened --

24        MR. STEINBERG:  I don't think that's right.

25        THE COURT:  He said I don't have to deal with the

1  non-ignition switch plaintiffs until after I -- it makes sense

2  to deal with the ignition switch plaintiffs first.  If they get

3  no remedy, then clearly the non-ignition switch plaintiffs get

4  no remedy.

5          MR. STEINBERG:  I think that there is an element of

6  what you said that is true, the conclusion that you reach.  But

7  that's not the reason why Judge Gerber got the way -- he got --

8  that's not the reason why he got there.

9          THE COURT:  You've got to show me words and the

10 opinion --

11         MR. STEINBERG:  Yeah.  I think Judge Gerber decided

12 -- was concerned about whether he can decide this on a

13 stipulated factual record.  The stipulated factual record that

14 had been developed in this case only related to, or primarily

15 related to, the ignition switch plaintiff side of the equation.

16         There was a motion to enforce that was filed in April

17 of 2014, and then there were two motions to enforce that were

18 filed on August 1, 2014.  The definitions of ignition switch

19 plaintiff and non-ignition switch plaintiff are derived from

20 the fact that those motions were filed at different times.  The

21 first motion only dealt with the February/March recall.  That's

22 the defined term that everybody understood as ignition switch

23 plaintiffs --

24         THE COURT:  There doesn't seem to be a dispute about

25 that.

1          MR. STEINBERG:  And that is the economic loss case.

2    Because that was the first cases that we brought.  The GM had

3    enacted a program that was monitored -- that was administered

4    by Ken Feinberg to try to deal with the pre-sale ignition

5    switch accident cases.  Many, in fact most, of those cases were

6    resolved, but not all.  Those that had not been resolved became

7    the subject of a pre-closing accident plaintiff, which applied

8    both to ignition switch and non-ignition switch.  That was one

9    of the August 1 motions.

10         The other was we were seeing additional economic loss

11   cases that were being filed based on the recalls that came

12   after March of 2014, and that was defined as the non-ignition

13   switch plaintiff cases.

14         The factual record that was developed in this case

15   was primarily developed through the Valukas report.  The

16   Valukas report was rendered towards the end of May of 2014, and

17   only dealt with the February and March 2014 recalls, didn't

18   deal with anything else.

19         One of the things that you heard this morning was

20   should there be discovery or not be discovery.  Mr. Weisfelner

21   and I both agreed that we could probably decide the threshold

22   issues relating to these cases without the need of further

23   discovery.  And the Groman plaintiffs, I don't think it was the

24   Peller plaintiffs, the Groman plaintiffs said we need to have

25   discovery.  And part of it was that they were trying to assert

197

1 the fraud on the court claim in their complaint, and they

2 thought we needed to have discovery on that, and Judge Gerber

3 said I'll only rule on the legal standard so you can avoid the

4 discovery issue.

5      When he said he was going to render his decision, he

6 said that I will see whether I can decide these -- make my

7 rulings on the threshold issues on the stipulated factual

8 record, almost like a summary judgment motion.  If I feel that

9 there are material disputed factual issues that would prevent

10 me from doing that, then I will tackle the discovery issue.

11 But otherwise I will try to rule on that based on your

12 stipulated factual record.  And we had thought, GM had thought,

13 that the factual record was broad enough to cover those issues

14 subsumed by non-ignition switch, whether it was pre-sale

15 accident or economic loss.

16      When Judge Gerber rendered his April 15 decision, he

17 decided that the factual record wasn't sufficiently developed.

18 And that's the reason why he broke out non-ignition switch

19 plaintiffs.  But it wasn't because he wasn't ultimately

20 concerned about getting final rulings for non-ignition switch

21 plaintiffs.

22      And that's why the June judgment has paragraph 13,

23 which is that he had determined that those rulings would

24 otherwise be stare decisis, because he thought they were in a

25 similar position, but he figured that if anybody else had a

1  concern, that it should not be stare decisis, he would let the

2  file in 17 business days an objection and pleading.

3          And we had a schedule and we sent out the June

4  judgment.  Some people raised the note -- the no strike

5  pleading.  Many of the non-ignition switch plaintiffs actually

6  didn't do anything.  And therefore, they recognized that

7  whatever the ruling is would have been stare decisis.  And

8  those people who were outside of the MDL actually did not

9  appeal.

10          But Judge Gerber wanted to get to a ruling on that.

11  And then what happened was the MDL economic loss plaintiffs

12  decided that they were going to try to comply with Judge

13  Gerber's decision by amending their complaint.  And that

14  became, instead of the first amended consolidated complaint,

15  that became the second amended consolidated complaint, and they

16  got rid of the pre-sale separate complaint and they merged it

17  into one, and they immediately moved to withdraw the reference

18  so that Judge Furman can effect take control of this case.

19          Judge Furman in a --

20          THE COURT:  Sounds like a good idea.

21          MR. STEINBERG:  In a litigated matter, Judge Furman

22  decided that these issues should be going back to the

23  bankruptcy court.  And so what happened was that you had a June

24  judgment which said I'm going to address the procedures for

25  non-ignition switch plaintiffs.  And what's significant about

199

1  the June judgment is that in paragraph 13© it specifically says

2  that if you're going to put, make and file a no-dismissal

3  pleading, I'd like you to tell me whether you need a designated

4  counsel to address your four threshold issues, and tell me

5  whether you need a briefing schedule, and tell me whether you

6  need discovery.

7        So, Judge Gerber was cognizant of the rights of

8  non-ignition switch plaintiffs and put the burden on the

9  non-ignition switches to say if you think you need discovery,

10  with respect to any issue that you think is appropriate to

11  determine whether you have rights or not, I need to know that.

12        So then you have the amendment of the complaint going

13  up to Judge Furman, and then coming back to Judge Gerber.  And

14  then Judge Gerber, when he gets it back from Judge Furman,

15  tenders his August 19th order.  It's his case management order.

16  And Judge Gerber says I need to know certain things from the

17  parties, about how I'm going to take control of this case based

18  on the relatively unsettled process of where we were at.

19        And specifically he said a couple of things in that

20  August 19th order.  And in the book that we gave you there's

21  the tab 3.  He asks specifically how long it would take to do

22  marked pleadings, because he wanted to deal with the

23  granularity of the complaints.  He wasn't prepared to deal with

24  this on a broad-brush issue.  He said in paragraph E on page 2

25  that:

200

1              "Any alternative suggestions beyond or instead of the
2              combination of briefs and marked pleadings that the
3              Court currently envisions as to the best means for
4              this Court to provide the MDL court and other court
5              with rulings of the level of specificity they might
6              need vis-a-vis yet to be decided by this Court."
7         So he wasn't trying to implement the June judgment.
8    He was trying to deal with the other issues that needed to be
9    decided.  And then he told all the parties and said if you have
10   any other matters that need to be addressed by this Court, I
11   need to know that.  And then he wasn't sufficient, because he
12   was concerned about the rights of the non-ignition switch
13   plaintiffs, accident and economic loss.
14        And in paragraph 2 of his August 19th case management
15   order, which he said to the parties I want you to appear and
16   give me an answer, he said:
17             "The Court is in particular need of information with
18             respect to the non-ignition switch plaintiffs'
19             claims, whether for injury or death or economic loss,
20             and pending in future matters affecting them.  But so
21             long as such claims are satisfactorily covered in the
22             letters to come, they can be addressed in connection
23             with other claims to the extent appropriate."
24        So Judge Gerber challenged the parties and said I
25   need you to tell me what issues you need to have resolved in

201

1  the non-ignition switch plaintiff context.  And it's in that

2  context that you had the colloquy that you referred to with Mr.

3  Weisfelner and Mr. Weintraub in the courtroom as to how are you

4  going to address the non-ignition switch plaintiffs.

5        And Judge Gerber said that he was particularly

6  concerned because while ignition switch plaintiffs have

7  established a due process violation, and therefore they can

8  assert independent claims, the non-ignition switch plaintiffs

9  weren't at that same level.  What are you going to do about it?

10        THE COURT:  Is there a transcript?

11        MR. STEINBERG:  Yes.

12        THE COURT:  Do I have it?

13        MR. STEINBERG:  I think you do.  I think we cite from

14  it.  It's on the ECF system.  But I'm happy to provide a

15  courtesy copy to Your Honor.

16        THE COURT:  I would like -- I'd request it.

17        MR. STEINBERG:  So Judge Gerber says --

18        THE COURT:  Do we have it here?  Is that the same

19  hearing that you quote Mr. --

20        MR. STEINBERG:  Yes.

21        THE COURT:  -- Weisfelner?

22        MR. STEINBERG:  Right.

23        THE COURT:  Court's designated counsel, but

24  Mr. Weisfelner has indicated it --

25        MR. STEINBERG:  So Judge Gerber says that I need to

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 203 of 269
Pg 262 of 728

202

1  know whether -- how you're going to deal with this thing.  And

2  Mr. Weisfelner said if I'm going to tee it up, I understand the

3  need to have it teed up soon.  That was what it was.

4         Now Your Honor put your finger on the scheduling

5  order.  That was actually drafted by the parties.  The reason

6  why it was drafted by the parties is that Judge Gerber made

7  rulings at the August 31 status conference and asked the

8  parties to draft an order that embodied his rulings.  And

9  that's what the parties submitted.

10         That participation and submission was made with

11  myself as counsel and with Mr. -- the designated counsel for

12  non-ignition switch plaintiffs, and ignition switch plaintiffs,

13  and whatever role Mr. Weintraub thought he had at that point in

14  time.  And with the participation of lead counsel in the MDL.

15  Because Mr. Weisfelner was candid, he represents Berman and

16  Cabraser, who are the economic loss parties in the MDL, and

17  Mr. Weintraub represents Mr. Hilliard, which are the accident

18  cases.  And where you heard a new phrase, because they don't

19  want to actually say what the real phrase is.

20         You heard colloquial ignition switch versus the

21  defined terms that were in the June judgment and in the

22  December judgment.  Colloquial ignition switch are non-ignition

23  switch cases.  That's what they are.  And those non-ignition

24  switch cases, accident cases, are in the MDL.  There are 600

25  and -- over 675 plaintiffs as of September of 2015 that were --

203

1  that were cases in the MDL for non-ignition switch pre-closing
2  accident plaintiffs.
3          When we set this procedure down, it was with Mr.
4  Hilliard through Mr. Weintraub and directly Mr. Hilliard --
5          THE COURT:  He filed a notice -- he filed a notice of
6  appearance?  Hilliard?
7          MR. STEINBERG:  Weintraub filed it on behalf of --
8  Mr. Weintraub filed it, saying that he was representing Mr.
9  Hilliards, and the entire structure of the MDL orders are that
10 Judge Furman had decided that I want my lead counsel to have
11 people with specialty in the bankruptcy law because there are
12 issues that will need to be decided in the bankruptcy case.
13 And the lead counsel in the MDL is vested with responsibilities
14 as lead counsel for the cases that are in the MDL to deal with
15 common issues.
16         Whether they decided they wanted to only protect the
17 rights of the ignition switch plaintiffs as compared to all of
18 the plaintiffs, I'm sure that is an issue that people can
19 quarrel with.  But the reality is that the right people were
20 notified to deal with these issues.  And that's what Judge
21 Gerber recognized.  Judge Gerber had recognized that he was
22 dealing with in effect the MDL counsel and with the people who
23 the MDL counsel had hired in order to appear in the bankruptcy
24 proceedings.  And that was the notice that went out.
25         We notified 220 plaintiffs.  Most of those plaintiffs

204

1    were not in the MDL.  Those were the state court plaintiffs

2    that were -- that had sued New GM on non-ignition switch

3    post-closing accident cases.  They were part of the

4    proceedings.

5           You cannot deal with the punitive damage issue

6    without dealing with non-ignition switch post-closing accident

7    plaintiffs, as well as ignition switch post-closing accident

8    plaintiffs, because one of the issues that was involved in

9    punitive damages was whether New GM had assumed for the

10   liability for accident cases.

11          So you need to bring in all the plaintiffs that were

12   part of the accident cases.  That's ignition switch and that's

13   non-ignition switch.  They were notified of the matter.  And

14   they got notice of it.  And I think it's -- I know Your Honor

15   is concerned about the notice that was given, and I'd like to

16   point out two things.  One is the scheduling order which Judge

17   Gerber signed, and then is the letter that the MDL counsel

18   prepared in order to tee up this process correctly.

19          And I alluded to that in my opening presentation, but

20   I do think we need to come back and visit it.  The letter that

21   -- the order that Judge Gerber said on page 4 said:

22              "Within two business days of the entry of the

23              scheduling order, New GM shall serve by either email,

24              facsimile, overnight or none of the foregoing

25              available regular mail, a copy of this scheduling

205

1              order on plaintiffs in any lawsuit where New GM has

2              previously sent a demand letter as authorized by the

3              judgment with a cover note that states as follows."

4         And then that's the cover note that everybody's been

5    referring to.  That cover note, which was court sanctioned,

6    said among other things:

7              "If you have any objection to the procedures set

8              forth in the scheduling order" -- meaning, if you

9              don't like what's going on in this case, same way

10             that you did in the 2016 threshold issues, "you must

11             file an objection in writing with the bankruptcy

12             court within three business days of receipt of this

13             notice.  Otherwise you will be bound by the terms of

14             the scheduling order and the determinations made

15             pursuant thereto.  If you believe there are other

16             issues that should be presented to the Court relating

17             to your lawsuit that will not otherwise be briefed

18             and argued in accordance with the scheduling order,

19             you must set forth that position with specificity in

20             your objection."

21        That required everybody getting the scheduling order

22   to say that if they had another issue, including due process,

23   because the June judgment and the procedures in paragraph 13

24   were somehow subsumed by this process in the scheduling order.

25   If you had a due process concern, you should say something.

1  MDL counsel chose not to do it.  It wasn't New GM's burden to

2  say, hey, by the way do you want to assert a due process.

3        Judge Gerber had said something to that.  And Judge

4  Gerber said are you going to tee it up.  And what Mr.

5  Weisfelner did not say was the explanation as to how he was

6  going to tee it up.  Judge Gerber had said to him if you're

7  going to tee it up, I need to know it now because I want to get

8  these issues resolved, and he never gave you an answer as to

9  why he didn't do it, other than they chose not to do it.

10        One of the arguments that we have made as the

11  corrections to the statements that were made on April 20th was

12  that there was active discovery going on in the MDL.  People

13  could have, if there was enough going on with regard to

14  non-ignition switch plaintiffs, that either could have asserted

15  the due process violation or said to the judge, "pause,

16  please," Judge Gerber's expression, I want to be able to

17  establish that.

18        But at the time of the September scheduling order,

19  there had been millions, millions of documents produced with

20  regard to non-ignition switch plaintiffs.  And through the end

21  of the year in 2015, there have been over 100 depositions taken

22  of New GM employees.  And that wasn't just limited to ignition

23  switch.  That was depositions that were taken.

24        THE COURT:  Let me ask you.  If I assume that Mr.

25  Weisfelner and the lawyers with whom he was working, the MDL

1    lawyers, made an affirmative decision not to include

2    non-ignition switch plaintiff due process issues in the

3    September scheduling order, who is bound by it?  Who is bound

4    by that -- that's why I started today by asking who were his

5    clients, who are Mr. Weisfelner's clients?

6            MR. STEINBERG:  I think anybody in the MDL.

7            THE COURT:  Named plaintiffs.  But what about -- I

8    heard some discussion about what about putative class members?

9    They're not certified.  They're not -- would you agree with me

10   that other than the named plaintiffs no other putative

11   plaintiffs would be bound by a ruling that Judge Gerber

12   rendered?

13           MR. STEINBERG:  I think there's hundreds of

14   plaintiffs that are named as the named plaintiffs.  I think.  I

15   mean, there's certainly pages and pages of people who are

16   listed.  They list people in every state.

17           THE COURT:  Do you agree that anybody who was --

18   well, first off, is it your view Mr. Weisfelner was

19   representing every one the named plaintiffs in every one of

20   those cases?

21           MR. STEINBERG:  I think Mr. Weisfelner was

22   representing Mr. Berman and Ms. Cabraser as lead counsel in the

23   MDL.

24           THE COURT:  But the question, who are their clients?

25   So you're saying derivatively Mr. Weisfelner represented

208

1   whoever Berman, Cabraser represented --

2         MR. STEINBERG:  And Berman and Cabraser were actively

3   involved in litigating these proceedings.

4         THE COURT:  But my question now is, is anyone other

5   than the named plaintiffs represented by Berman and Cabraser,

6   would they be bound by -- assuming -- and I know it's disputed,

7   but would they be bound by an affirmative decision by Mr.

8   Weisfelner not to raise the due -- the non-ignition switch

9   plaintiff due process issues in the September scheduling order?

10        MR. STEINBERG:  I think those plaintiffs plus those

11  people who either got notice of or were aware of the scheduled

12  order, they all would be bound.

13        THE COURT:  Why is that?  You referred to a colloquy

14  that Mr. Weisfelner and Judge Gerber had.  And Mr. Weisfelner

15  has clients, derivatively, he's got clients.  And he can bind

16  clients.  But how does he bind non-clients --

17        MR. STEINBERG:  Because we --

18        THE COURT:  -- to the extent that there are class

19  actions that haven't been certified.  I can see your argument,

20  assuming that I get there, that Mr. Weisfelner derivatively

21  represents every named plaintiff that Berman and Cabraser

22  represents.  So when he speaks in court before Judge Gerber,

23  that's who he's speaking for.  But how does he bind the rest of

24  the world, or may have cases pending in state courts around the

25  country.  They're not represented by Berman or Cabraser.  It

ACCESS TRANSCRIPTS, LLC                      1-855-USE-ACCESS (873-2223)

209

1  may be that the ruling that comes out of it is going to be law

2  of the case or it's persuasive authority, essentially what I

3  ruled in the other Motors Liquidation case in denying motions

4  to dismiss.

5          MR. STEINBERG:  I don't think that Mr. Weisfelner

6  could bind anything more than what Mr. Berman and Ms. Cabraser

7  could bind.

8          THE COURT:  All right.

9          MR. STEINBERG:  But the point is, is that other

10 lawyers who got notice of the scheduling order, the other 200

11 and some odd people, who were told in the notice that you're

12 going to be bound by the rulings, and if you fail to raise an

13 issue that is unique to your case, as something that I need to

14 consider, they're going to be bound by their failure to raise

15 those issues --

16         THE COURT:  You see, if the order had -- look.  If

17 the scheduled order had gone out and had said that I am going

18 to address the due process issue or based on the agreement of

19 designated counsel, there is no issue about due process, I'd

20 say sure.  If you're out there in the hinterlands and you get

21 that order, and you see it says something one way or the other

22 about due process, fine.  You better get off your duff and come

23 in and complain if you disagree.

24         But they get a scheduling order that is silent about

25 the due process.  These are the issues that are going to be

210

1  addressed.  This is a scheduling order for how things are going

2  to proceed.  And how is it that you expect lawyers who have not

3  appeared before Judge Gerber to receive a scheduling order that

4  says nothing about due process claims of non-ignition switch

5  plaintiffs and say you're going to be bound if Judge Gerber

6  decides those issues.  That's where I'm having --

7           MR. STEINBERG:  I think, Your Honor, the answer is

8  that the scheduling order says if you believe there are issues

9  that should be presented to the Court relating to your lawsuit,

10  there will otherwise be -- that will not otherwise be briefed

11  and argued in accordance with the scheduling order, you must

12  set forth that position with specificity in your objection.

13           So the burden was on anybody getting the scheduling

14  order that if they wanted to raise the due process issue, or

15  they wanted to raise any other issue that was not specifically

16  referenced in the scheduling order, they actually had to do

17  something.  That was the way it was state up.

18           The burden on raising a due process violation for a

19  recall that took place in June of 2014, you know, 14, 15 months

20  later, after the knowledge of the recall, that burden is on the

21  plaintiff.

22           THE COURT:  All right.  I'm looking forward to

23  getting the transcript of this August hearing and see exactly

24  -- you have part of it quoted -- you quote designated counsel

25  in your brief.  I've got to see the whole transcript.

1        MR. STEINBERG:  Okay.  The next thing is the letter

2   that went out by the MDL counsel in conjunction with the

3   scheduling order.  That letter said in the first line:

4            "This is a court-ordered notification about your case

5            involving General Motors, LLC.  The text in the

6            attached letter" -- which is the letter that I sent

7            out, which included the provisions of the scheduling

8            order -- "is required by the Honorable Robert Gerber

9            Bankruptcy Judge.  If you have any questions about

10           the procedures, please contact Dawn Barrios,

11           plaintiffs' liaison counsel to the MDL."

12           She was the person appointed to interface with cases

13   that were pending against New GM outside of the MDL.

14           "And/or co-lead plaintiff's counsel for the MDL,

15           Steve Berman, Elizabeth Cabraser and Bob Hilliard,

16           And they give the cite, and then it says that:

17           "The Bankruptcy Court has modified the deadline

18           imposed by the judgment dated June 1 to file in

19           effect the no strike pleading, unless you choose to

20           object to the procedures in the attached letter or

21           you wish to file your own papers, and notwithstanding

22           your right to be covered by the filing that

23           designated counsel will be making, you have no

24           required actions in the Bankruptcy Court at this

25           time."

212

 1          So it told the parties you can rely on what we're

 2     doing, or you need to be able to act.  And if you actually

 3     review the transcript, you see the colloquy between Judge

 4     Gerber and Mr. Weintraub who is saying I don't represent these

 5     other people outside the MDL.  I only represent Mr. Hilliard.

 6     And I don't want them taking up my pages that I have to write

 7     to Judge Gerber about it.  They want to do something.  It's

 8     incumbent on them.  They should file their briefs.

 9          THE COURT:  This is in the same August transcript?

10          MR. STEINBERG:  Yes.  So this procedure was set up to

11     basically deal with that.  And you have to understand the MDL

12     procedures, that these types of bankruptcy orders work their

13     way onto the MDL leadership website so that people in the state

14     courts can monitor what is going on in the case.

15          The goal here by Judge Gerber on a procedure that had

16     been endorsed by the people who were appearing in front of him

17     at the time was that this was going to be a comprehensive

18     procedure that covered everybody.

19          Now I know Your Honor is struggling with the notion

20     that there was no deadline that said if you don't assert the

21     due process violation you're going to lose it.  But there was a

22     ruling about the due process violation --

23          THE COURT:  As to ignition switch plaintiffs.

24          MR. STEINBERG:  As to -- no.  As to non-ignition

25     switch --

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

213

1           THE COURT:  Where?

2           MR. STEINBERG:  Footnote number 70.

3           THE COURT:  Okay.

4           MR. STEINBERG:  Of the November decision.  And where

5    plaintiffs have distorted the Footnote 70 is that when Judge

6    Gerber references his former judgment decision, the May

7    20-something decision, he said that they may never be able to

8    prove it.  Now six months later, he's saying that's it, you

9    didn't prove it, and you can't assert it.

10          And the reason why that's just not my colloquy of an

11   interpretation of a judgment, but that actually was the ruling,

12   was that immediately after that ruling was made, the plaintiffs

13   in the MDL amended the second amended complaint and put in the

14   third amended complaint.  And the third amended complaint

15   dropped all non-ignition switch economic loss cases.  They knew

16   that that ruling had prevented them from asserting that, and

17   they did not appeal that ruling.

18          Your Honor doesn't have to sort of struggle as to did

19   people know.  MDL counsel knew.  And MDL counsel did not appeal

20   that ruling.  And that's the three plaintiffs.  And that

21   included also -- and they didn't -- and they didn't appeal not

22   just on the due process issue.  They didn't appeal the punitive

23   damage ruling.  And the punitive damage ruling was clear on its

24   face.  Punitive damage ruling said in paragraph 6 -- paragraph

25   6, that "New GM did not contractually assume liability for

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4637-2    Filed 10/02/17    Page 215 of 269
Pg 274 of 728

214

1  punitive damages from Old GM."

2         But that's not where it stops.  That's what they

3  would like to say where it stops.  Next sentence:

4         "Nor is New GM liable for punitive damages based on

5         Old GM conduct under any other theories such as by

6         operation of law.  Therefore, punitive damages may

7         not be premised on Old GM knowledge or conduct or

8         anything else that took place at Old GM."

9         That is the fourth threshold issue, successor

10 liability is --

11        THE COURT:  That's in the judgment or --

12        MR. STEINBERG:  That's the December judgment,

13 paragraph 6.  That was not appealed.  That is a final ruling

14 that has nothing to do with the Second Circuit decision or the

15 June judgment punitive damages wasn't raised at that time.

16 Post-closing accident plaintiffs were not subject to the June

17 judgment.  They did not appeal.  They made the purposeful

18 decision, for whatever their reason was.  You don't have to try

19 to get into someone's head as to why they didn't do something.

20 That's what res judicata and finality is about, and they didn't

21 do that.  And it's the same answer with regard to paragraph --

22        THE COURT:  Just a second.  Is -- that issue was

23 briefed?

24        MR. STEINBERG:  Yes.

25        THE COURT:  For the November -- I know it's briefed

215

1  here, but was that issue briefed by the parties leading to the

2  November decision?

3          MR. STEINBERG:  The issue that was framed in the

4  September scheduling order --

5          THE COURT:  Yes.

6          MR. STEINBERG:  -- on punitive damages.

7          THE COURT:  Yes.

8          MR. STEINBERG:  On page 1 of the scheduling order:

9              "The briefing schedule with respect to the issue

10             (punitive damage issue) in complaints filed against

11             General Motors, LLC (New GM) that request

12             punitive/special/exemplary damages against New GM,

13             based in any way on the conduct of Motors Liquidation

14             Co., formerly known as General Motors Corporation

15             (Old GM) shall be as follows."

16         So the issue that was framed by the scheduling order

17  was not did you just assume product -- as when you assumed

18  product liability, did you assume product -- did you assume

19  punitive damages.  It was are you liable for anything relating

20  to Old GM conduct as punitive damages?  Is New GM liable for

21  Old GM conduct?  You don't get to successor liability, it's not

22  relevant, if you can't look to Old GM conduct.

23         THE COURT:  Okay.  We're going to take a 15-minute

24  recess.  We're going -- what issues do you still have to

25  address, Mr. Steinberg?

216

 1          MR. STEINBERG:  I haven't responded to any of the

 2    individuals, and I'm still on issue number 2.  I apologize for

 3    the --

 4          THE COURT:  Well, you just talked about issue

 5    number 3.

 6          MR. STEINBERG:  No.  Issue number 3 is used car

 7    purchases.

 8          THE COURT:  I'm sorry.  You just talked about issue

 9    number 4, punitive damages.

10          MR. STEINBERG:  I have.  I have.

11          THE COURT:  You have more to say on issue 4?

12          MR. STEINBERG:  I have a few more things to say about

13    issue 4, but I understand the hour and I will try to accelerate

14    my --

15          THE COURT:  Just so we're clear, we're going to end

16    at 5:30.  We're taking a 15-minute break.  We're going to end

17    at 5:30.  As of now, I don't plan to hear any -- what I would

18    consider to be surrebuttal, because Mr. Steinberg started at

19    the last hearing and then Mr. Weintraub started but didn't

20    finish.  I've let everybody on the plaintiffs' side say

21    whatever they wanted to say today.  And I consider what Mr.

22    Steinberg is saying now to be the last word on it.  Just so

23    everybody is clear on what's happening.  So we're taking a

24    15-minute recess.

25        (Recess taken at 4:04 p.m.)

1          (Proceedings resumed at 4:23 p.m.)

2               THE COURT:  You may be seated.

3               Go ahead, Mr. Steinberg.

4               MR. STEINBERG:  Your Honor, there's been an

5     undercurrent of statements made in this case that in connection

6     with proceedings leading to the December judgment that

7     post-closing accident plaintiffs did not participate.  And that

8     clearly is not true, even on the face of looking at the

9     December judgment.

10              There is a lengthy section about the impact on the

11    bellwether complaints.  The bellwether complaints are ignition

12    switch post-closing accident plaintiff cases.  There are

13    references to non-ignition switch post-closing plaintiff cases

14    in the December judgment.

15              There was an issue raised as to whether anybody

16    briefed the punitive damage issue other than designated --

17    other than Mr. Weintraub.  The Moore plaintiffs briefed the

18    punitive damage issue for Judge Gerber as well, too.

19              There was a -- issues raised about "well, they didn't

20    make up my complaint, so I didn't really have sufficient

21    notice."  I'd just point out to Your Honor that Footnote 2 of

22    the December judgment specifically says that "any ruling set

23    forth in the judgment that refers to a particular lawsuit,

24    complaint and/or plaintiff shall apply equally to all lawsuits,

25    complaints and plaintiffs where such ruling may be applicable."

218

1    So, Judge Gerber recognized that there were too many

2    lawsuits for us to mark up, but there was a commonality of a

3    lot of the claims.  I think when you asked Mr. Weintraub as to

4    what other type of independent claims that are being asserted

5    in these post-closing accident cases, he said duty to warn and

6    duty to recall.  Those are -- and then there may be a consumer

7    protection statute claim.  Those are generally the claims that

8    are common to many of the post-sale accident cases.

9    I had referred to in the MDL the orders that spell

10   out the duties of lead counsel.  And I want to be able to give

11   those specific orders to Your Honor.  The MDL order number 5

12   says that lead counsel will act for plaintiffs and will focus

13   on substantive areas including bankruptcy.  MDL order 8 says

14   lead counsel should make sure to have counsel familiar with

15   bankruptcy law.  MDL order 13 lists Bob Hilliard on the MDL

16   website as the co-lead counsel with primary responsibility for

17   personal injury claims.

18   The reference to the fact that there were no

19   non-ignition switch post-closing accident plaintiffs in the

20   MDL, which is wrong, was made so that it would seem like there

21   was no participation.  And the fact of the matter was, just by

22   having the lead counsel involved, where there were 679

23   plaintiffs involved for non-ignition switch post-closing

24   accident plaintiffs meant that there was a large sample of

25   these cases there in addition to the separately noticed

219

1  200-and-so other parties.

2           Your Honor asked Mr. Weisfelner who he represented,

3  but -- either you had done it before but you didn't do it this

4  time with regard to who Mr. Weintraub represents.  And I think

5  that's significant.  He will tell you that he's not a

6  designated counsel for the post-closing accident plaintiffs.

7  He represented Mr. Hilliard for the six bellwether cases, and

8  then he has three other law firms who have brought litigations

9  against New GM, none of whom he was representing at the time of

10  the entry of the December judgment.

11          And when you think about all of the arguments that

12  he's making, and I assume he can only make arguments on behalf

13  of his clients, the three law firms that he is representing,

14  the Butler Wooten firm has two cases.  Mr. Butler got the

15  September scheduling order.  Mr. Weintraub wasn't representing

16  Mr. Butler at the time.  One case was -- of the two cases was

17  started after the December judgment.  Neither case involves a

18  recall.  And one of the Butler cases was in active discovery at

19  the time of the service of the scheduling order.

20          Tad Turner is the second client.  He has three cases.

21  One was commenced after the December judgment.  Mr. Turner also

22  got notice of the September scheduling order, and his cases

23  don't involve a recall either.

24          And then the third law firm is Denney & Barrett, also

25  not someone that he represented in the bankruptcy case.  Two

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

1   cases started both after the December judgment.  One is

2   involving a minor, but is in the process of being settled.  The

3   other one is extant.

4          So that his clients other than Mr. Hilliard, for

5   which all of these arguments are being made about what people

6   understood or didn't understand, are made on behalf of six

7   plaintiffs -- or six cases, and not anything greater than that.

8   A wide body of people didn't complain, haven't come before Your

9   Honor.  There have been a few.  I will deal with them here.

10  But my belief is that anybody who wants to make an assertion

11  that they were otherwise unaware or they shouldn't be bound

12  should be required on behalf of themselves to make those

13  pleadings before Your Honor, and that no one else who doesn't

14  represent them should be speaking on their behalf.

15         THE COURT:  This may be slightly out of order, but --

16  in terms of the argument.  Did New GM object to discovery in

17  the MDL of knowledge of Old GM of non-ignition switch defects?

18         MR. STEINBERG:  No.  New GM didn't object to -- but

19  discovery wasn't set up for that.  Discovery was set up was we

20  have a phase one discovery, a phase two discovery and a phase

21  three discovery.  Phase one discovery didn't involve the

22  ignition switch recall, but involved other recalls.  It was

23  general discovery.

24         THE COURT:  Yeah, but if you believe that Judge

25  Gerber resolved the issues precluding non-ignition switch

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1.14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 222 of 269
Pg 281 of 728

221

1  plaintiffs from proceeding against New GM, why haven't you

2  objected to the discovery before Judge Furman about who knew

3  what when, about the non-ignition switch --

4            MR. STEINBERG:  Most of that --

5            THE COURT:  Give us the recalls first.

6            MR. STEINBERG:  I think, Your Honor, the discovery

7  that's going on -- if I --

8            THE COURT:  You're the one who called that discovery

9  to my attention in your letter.

10           MR. STEINBERG:  Right.  You're right.  But I think,

11 Your Honor, that discovery relates to whether they can assert

12 an independent claim, and they're using the imputation

13 doctrine --

14           THE COURT:  What does Old GM's knowledge about the

15 defects identified in that list of recalls for so-called

16 non-ignition switch defects, most of which were ignition switch

17 related, what does that have to do with asserting independent

18 claims?

19           MR. STEINBERG:  They argue that as -- and I think

20 Your Honor put your finger on it as sort of a back door basis.

21 They argue the imputation doctrine, which is that Old GM's

22 knowledge when those people were then hired by New GM was

23 imputed to New GM, and therefore those people have -- those

24 people's knowledge will then constitute some kind of

25 independent claim based on a failure to warn and some other

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 223 of 269
Pg 282 of 728

222

1   sort of statute.  But on the non-ignition switch side, it's

2   asserted that way.

3          But Your Honor I think is sort of piecemealing it as

4   compared to what has actually happened in the MDL.  The MDL is

5   allowing discovery to go forward on certain recalls, and then

6   they're allowing -- they're allowing depositions to go forward

7   with certain recalls --

8          THE COURT:  Okay.  All right.  I pulled you off of

9   your argument --

10         MR. STEINBERG:  But I think, Your Honor, that that's

11  significant.  Your Honor has heard the date of September 1 for

12  discovery.  The phase three discovery is primarily New GM's

13  discovery of the plaintiffs.  The discovery about what was

14  being done for the defendants took place much earlier than

15  that.  The judge wanted to approach the discovery of New GM

16  before the discovery of the plaintiffs.  So --

17         THE COURT:  Since I pulled you out of the order of

18  your argument, --

19         MR. STEINBERG:  Okay.

20         THE COURT:  -- there seemed to be a disagreement

21  between Mr. Weisfelner and Mr. Peller about whether Judge

22  Furman is going to decide whether there was a due process

23  violation with respect to non-ignition switch plaintiff

24  recalls.  What's your view?

25         MR. STEINBERG:  I think Mr. Peller is correct, and I

223

1  think when Mr. Weintraub stood for his brief second, he

2  actually agreed with Mr. Peller.  Judge Furman --

3          THE COURT:  He's saying that you agreed with Mr.

4  Peller.  He's putting his hands by his ears.  He didn't hear

5  you.

6          MR. STEINBERG:  Yeah.  I think Mr. Peller's correct,

7  that Judge Furman has never identified that I'm going to decide

8  the due process issue.  Frankly, it's always been our view that

9  the due process issue for non-ignition switch economic loss

10 plaintiffs were decided in connection with December 2015

11 judgment --

12         THE COURT:  I know that's your view.

13         MR. STEINBERG:  Right.  So -- and that's the Footnote

14 70 of the decision, and the fact that the sack became the tack

15 (phonetic), and they took out non-ignition switch plaintiffs.

16         There was a reference to the discovery that is in the

17 MDL, and there it is not a needle in the haystack.  The

18 discovery that's done, if you look at it from the ignition

19 switch side, is whether there was a defect and when Old GM knew

20 about it.  I think to that extent Mr. Weisfelner was right,

21 that that's the same kind of discovery that you would have for

22 a due process violation.

23         That type of discovery for non-ignition switch

24 plaintiffs was actually extant.  I think I said millions of

25 documents?  Hundreds of thousands of documents is more accurate

224

1   with regard to non-ignition switch plaintiffs.

2           And Judge Furman has only really allowed one GM

3   employee to be deposed once.  So if you're going to depose GM

4   employee, it's going to have to be with regard to everything.

5   There was over 100 depositions that were taken of GM employees

6   in 2015.  Very active basis -- they had the ability -- and when

7   people talk about that Judge Gerber stayed discovery in the

8   bankruptcy court, and the reference to the September 2014

9   decision and Mr. Weisfelner's recollection of conversations

10  that he had with me, this is what I believe actually happened.

11          It is very much, like I said before the break, that

12  we wanted to see whether we could resolve the due process issue

13  on a stipulated record.  And anybody who wanted to take

14  discovery --

15          THE COURT:  As to ignition switch --

16          MR. STEINBERG:  As for ignition switch plaintiffs,

17  because they had the benefit of the extensive Valukas report.

18  And that anybody who wanted to challenge that, Judge Gerber

19  essentially said, "I'm going to see what's presented in front

20  of me.  And if I think you need discovery, I'll deal with it.

21  And if not, I'm going to make a ruling."  And that's what he

22  did.

23          After that, in -- when he rendered his ruling in

24  April, decision in June of 2015, there had been active

25  discovery already going on in the MDL with regard to the

225

1   non-ignition switch plaintiffs, and had been going on for a
2   while.  And plaintiffs never would have tolerated not allowing
3   their MDL case to go forward.  And New GM wasn't stopping the
4   discovery in connection with that case.

5           The only stay that was relevant was with regard to
6   the adjudication of the four threshold issues, if you thought
7   you needed discovery.  And the plaintiffs, other than the
8   Groman plaintiffs -- I don't even think it was Mr. Peller --
9   other than the Groman plaintiffs said, "I think we could decide
10  these issues without the benefit of discovery."

11          So there was no stopping of discovery.  They had the
12  ability to raise the issues.  And that's why Judge Gerber in
13  his June judgment said for non-ignition switch plaintiffs, "If
14  you think you need discovery as part of your no-objection
15  pleading, you really should tell me about it so that I could
16  deal with it, because I want to get closure on this issue.  I
17  don't want to put this off any further."

18          THE COURT:  There's a question I asked Mr. Weintraub
19  earlier this morning.  And I think it was -- I told you that
20  I'd be thinking about this, wrote it down.  Are there any facts
21  in the record that show the relationship or nexus in the
22  recalls covered by 14V-047 and the later recalls?  The
23  June/July -- or whether it was July/August, the summer recalls
24  also dealt with ignition switch problems, correct?

25          MR. STEINBERG:  Different cars, different platform --

1          THE COURT:  Yes.  But that raised -- the closeness --

2    the relative closeness in time of the first set of recalls and

3    the second set of recalls raised a question in my mind about

4    did Old GM know the facts about alleged defects that gave rise

5    to that second round of recalls.  And the reason I'm -- I'm

6    having trouble piecing this together in my own mind, what makes

7    sense.  All right?

8          I know that Judge Gerber deferred non-ignition switch

9    issues in April and June.  I've said it's unclear to me whether

10   or how he dealt with it in November and December.  And if -- I

11   would have a hard time believing that the plaintiffs would drop

12   -- the non-ignition switch plaintiffs would drop a due process

13   issue if there was a second set of recalls so close in time --

14   yes, involving different vehicles, but yes, involving ignition

15   switch -- alleged ignition switch problems.

16         And I'm trying to reconcile in my own mind -- I said

17   that look -- you know, part of my reaction in looking at this

18   is Judge Gerber decided that, quote, "We'll deal with due

19   process issues and ignition switch plaintiffs first.  If I

20   decide, yeah, there's a due process violation but not remedy,

21   well, then there's nothing to deal with respect to non-ignition

22   switch plaintiffs."  Okay?  And that's what, in my mind,

23   Mr. Steinberg, I'm asking myself this question.

24         If that second round of recalls, yes, different

25   vehicles, but yes, focused on ignition switch -- I'm putting

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 228 of 269
Pg 287 of 728

227

 1  aside power steering and side panel and airbags and stuff.  I

 2  don't know how similar were the problems that were being

 3  experienced in these additional make and model years of cars.

 4  And would it make sense if they would just not deal -- they

 5  would just not even raise the issue.  We have to decide the due

 6  process issue first.

 7          MR. STEINBERG:  I think the answer is yes.  I think

 8  it does make sense.

 9          THE COURT:  Does it make sense?

10          MR. STEINBERG:  And the reason -- the reason why I

11  say that is that they clearly understood from Judge Gerber's

12  comments that he wanted it to have been raised.  And he told

13  them that if you're going to raise it, I need to have it teed

14  up now.  And they indicated if I'm going to do it, I will tee

15  it up now.

16          And in the same way, Judge, if you're perplexed about

17  that, you may scratch your head and say why didn't they appeal

18  the December judgment when you had the ruling on punitive

19  damages and you had the ruling on independent claims?  Why

20  didn't they appeal then?  Well, the appeal was a single

21  issue --

22          THE COURT:  Let me ask you the second part of the

23  question I asked Mr. Weintraub.  Was there any fact-finding by

24  NHTSA or Valukas or any other administrative body that shows

25  defects other than the ignition switch defects were known to

228

1  Old GM before the 363 sale?  They say yes.  What's your answer?

2              MR. STEINBERG:  The answer is no.  No, but -- but

3  there is an answer, right?  I mean this is --

4              THE COURT:  No, no.  I'm not disputing.

5              MR. STEINBERG:  No, no.

6              THE COURT:  One of you is right and one of you is

7  wrong.

8              MR. STEINBERG:  That's correct.

9              THE COURT:  That's what's called a factual --

10              MR. STEINBERG:  I agree.  The Valukas report was

11  rendered in May.  It dealt with only the February and March

12  recalls.  I don't think there's any --

13              THE COURT:  What about NHTSA, when they issue --

14              MR. STEINBERG:  When NHTSA fined GM, it was only

15  for --

16              THE COURT:  No, when the additional round of recalls

17  got issued, was there any -- is there any finding --

18              Come on, Mr. Weisfelner.  Can you --

19              MR. WEISFELNER:  I'm sorry.

20              THE COURT:  Was there any finding of any relationship

21  or connection?  Was there a reference back to the earlier

22  recalls?

23              MR. STEINBERG:  I don't -- I don't think so, Your

24  Honor.  I think GM recalled the vehicles and NHTSA fined New GM

25  for only the ignition switch recalls and the certified

ACCESS TRANSCRIPTS, LLC                1-855-USE-ACCESS (873-2223)

229

1  pre-owned issue and said that you were aware that as of March

2  of -- the spring of 2012. So if --

3        THE COURT: Not for the second round of --

4        MR. STEINBERG: Well, those fines were limited to

5  ignition switch -- what I've been calling the ignition switch

6  recall anyway. And everything else that developed was GM --

7  New GM announcing recalls and going to NHTSA and saying I'm

8  recalling these vehicles. And there was nothing that tied with

9  the -- other than the notice that goes out to the vehicle

10  owner. And the language may have said it's an ignition switch,

11  but every car has an ignition switch. They sometimes have a

12  different platform, different wiring, different structure of

13  it, and not every GM brand vehicle has the same ignition

14  switch.

15        And so it's been a clear position that GM has

16  asserted in the MDL that the ignition switch recall, the --

17  what I think Mr. Weisfelner has recognized is less than two

18  million vehicles on the road, is only the ignition switch that

19  the Valukas report was talking about, and only the claim that

20  NHTSA had fined GM about.

21        THE COURT: I diverted you from your --

22        MR. STEINBERG: The --

23        THE COURT: Tell me about used cars.

24        MR. STEINBERG: I'm sorry?

25        THE COURT: Tell me about the used car purchases.

230

1          MR. STEINBERG:  Okay.  I think that -- I found it

2     interesting, and Mr. Peller did say that he has, you know, 12

3     plaintiffs, right?  So he has a very small handful of what we

4     have involved here.  It doesn't mean that his rights shouldn't

5     be respected.  I just wanted to put it in perspective as

6     compared to others.

7          I think he either has one or two used car purchasers.

8     One of them, the Sesay plaintiff, actually bought a car from a

9     friend.  I mean, wasn't a GM involvement in the transaction at

10    all.

11         THE COURT:  I'm sure they weren't.

12         MR. STEINBERG:  I'm sorry?

13         THE COURT:  I'm sure GM wasn't involved.  I mean, if

14    it was not sold off of a GM --

15         MR. STEINBERG:  Right.  But that's the example that

16    we think illustrates the issue that people are trying to

17    extrapolate from the Second Circuit decision.  The Second

18    Circuit said that used car purchasers, defined as ignition

19    switch plaintiffs, right?  The Second Circuit opinion doesn't

20    say all used car purchasers.  It actually has a defined term.

21         So used car purchasers are a subset of the economic

22    loss ignition switch plaintiffs.  And there it said that those

23    plaintiffs can't be bound by a sale order, but did not rule on

24    the issue as to what rights they otherwise had.

25         Those are the type of decisions that Judge Bernstein

09-50026-mg   Doc 14127-1   Filed 10/02/17   Entered 10/02/17 12:32:50   Exhibit A
Case 1:14-md-02543-JMF   Document 4657-2   Filed 10/02/17   Page 282 of 269
Pg 291 of 728

231

1   made in the <u>Burton</u> case, which said that the only rights you

2   have is what you acquired from.  If you want to assert GM --

3   obligations against GM.  Obviously if GM entered into a

4   certified pre-owned relationship with a used car purchaser,

5   New GM is independently liable for that, has never tried to

6   shirk that responsibility, and that is a form of an independent

7   claim --

8           THE COURT:  You think that <u>Burton</u> is the case that

9   provides strong support that used car purchasers have no

10   greater rights than the seller?

11           MR. STEINBERG:  That's correct.  And Judge Bernstein

12   made that determination.  And so you have that example.  We

13   gave in our papers the Carew (phonetic) plaintiff example.

14   That's a Takata person.  There's a lot of used car purchasers.

15   They're seeking to assert an economic loss claim based on the

16   Takata airbag, which was primarily installed by Old GM, into an

17   Old GM vehicle.

18           The fact that the cars may have sold after the sale,

19   it doesn't create new claims against New GM, where the original

20   purchaser didn't have a claim, they took subject to whatever

21   obligations New GM had under the sale order.  And in the Carew

22   case, they specifically allege Old GM conduct and an implied

23   warranty claim a the basis to say why New GM is liable, when

24   those claims are clearly barred by the sale order, no matter

25   who owns the car.

232

1          And so we think that <u>Burton</u> recognizes that issue,

2     and we think that the bankruptcy court retained jurisdiction to

3     enforce the sale order to protect New GM for that.  Other than

4     that, I don't think we were quarreling with the Second Circuit

5     decision.  We just think that the Second Circuit didn't deal

6     with the issue that Judge Gerber did in his opinion where he

7     talked about that a plaintiff only -- that a used car purchaser

8     only gets whatever rights that its seller had.  And if a seller

9     was bound by the sale order, so is the purchaser.

10          Now Your Honor had asked the question about accident

11    cases, right?  And I don't know why there was any confusion.

12    If you look at the tautology we've set up, we've assumed

13    product liability claims for accident cases no matter who was

14    the owner of the vehicle at the time of the accident, whether

15    it's the original purchaser or the used car purchaser, New GM

16    is liable.  So we weren't looking to change that result.

17          THE COURT:  Do you agree with Judge Bernstein's

18    decision in <u>Grumman Olson</u>?

19          MR. STEINBERG:  Yes.

20          THE COURT:  You believe that that correctly decides

21    the issues --

22          MR. STEINBERG:  I do.

23          THE COURT:  -- that Judge Bernstein addressed.

24          MR. STEINBERG:  I do.  But Judge Bernstein,

25    <u>Grumman Olson</u> specifically excepted out the GM case.

233

```
 1          THE COURT:  I'm asking whether you -- he articulated
 2   principles, which I don't think are particularly controversial,
 3   frankly, regarding future claims; that they can't be
 4   identified, you can't give them notice, they didn't get notice,
 5   they're not bound by a sale order.  You agree that that applies
 6   here too?
 7          MR. STEINBERG:  Right, but in Grumman Olson you need
 8   to focus in on who the plaintiff was in that case, who was not
 9   the actual vehicle owner at the time of the sale --
10          THE COURT:  There should be a case that says
11   ownership of the vehicle determines whether the driver in an
12   accident because of the defect in the vehicle can or cannot
13   assert a claim.
14          MR. STEINBERG:  The Second Circuit decision in
15   General Motors, one of the few things that was I thought
16   helpful, was the court said, does the bankruptcy court have
17   jurisdiction to enforce its no successor liability for a latent
18   defect fix?  Not an accident case, but a latent defect.  The
19   person didn't know they had a problem, but years after the sale
20   it had developed a problem.  And the Second Circuit said the
21   answer was yes, you could bind those people with a latent
22   defect case --
23          THE COURT:  If I have the misfortune --
24          MR. STEINBERG:  -- because they have the relationship
25   -- because the definition of claim required a relationship
```

234

1   between the debtor and the person who you're trying to bind.

2   Anybody who was an owner of a vehicle at a time, whether they

3   got into an accident afterwards or a latent defect

4   afterwards --

5           THE COURT:  So you think that the passenger, who

6   happens to be in a vehicle owned by me, if I get into an

7   accident and I have a GM vehicle manufactured by Old GM, that

8   the passenger can bring a claim against New GM based on alleged

9   defect, but I can't?

10          MR. STEINBERG:  I actually think you both can.  I

11  assumed your liability.  You're the owner of the vehicle and

12  I've assumed all liabilities relating to the accident.  So the

13  passenger -- but you don't -- and that's why Judge Bernstein in

14  Grumman Olson said I don't have to deal with the due process

15  issue because you've assumed the liability for the accident.

16          And that's why Grumman Olson, and that's what we

17  argued before Judge Gerber.  Grumman Olson doesn't apply in

18  this case.  Not -- Grumman Olson applies in a circumstance

19  where your sale order is trying to wipe out these claims that

20  will emerge from an accident afterwards because the purchaser

21  hasn't assumed the liability.

22          When the purchaser assumes the liability, you finesse

23  the Grumman Olson issue.  That's why the 44 state attorney

24  generals at the sale hearing who were pushing this issue

25  dropped the issue and allowed the case to go forward and

235

1  allowed the sale order to be entered.  And that's why Judge

2  Bernstein in <u>Grumman Olson</u> excepts out the <u>General Motors</u> case.

3  He said <u>General Motors</u> is not the <u>Grumman Olson</u> paradigm.

4        So, yeah, I think that if -- there is a difference

5  between the passenger and the owner.  Because I think you could

6  bind the owner and you can't bind the passenger, and I don't

7  think it matters between owner and passenger when you assume

8  the liability for either one of them anyway.

9        And that's my answer.  And that's why I think there's

10  been a distortion of the four threshold issue, because the four

11  threshold issue wasn't for me to litigate <u>Grumman Olson</u> all

12  over again.  That was determined in 2009 as it went up on

13  appeal with regard to everybody who was there.

14        What was the four threshold issue was can I take the

15  path for punitive damages on a successor liability theory?  And

16  the answer is that the judgment that was entered in December

17  says you can't do it on Old GM conduct or any other theory of

18  law which took out successor liability.

19        And when you look at the proposed orders that we both

20  gave Judge Gerber, one of what the plaintiffs put in and

21  recognized is that you can't assert punitive damages based on

22  Old GM conduct.  That was in their order that they were asking

23  Judge Gerber to sign.  That's -- ultimately he didn't sign

24  exactly their order, but that is the language.

25        Mr. Peller in his brief recognizes that the December

236

1    judgment barred successor liability -- punitive damages based

2    on a successor liability.  It's another situation where

3    Mr. Peller, who's been somewhat of a gadfly in this case, has

4    actually agreed with GM in that particular circumstance.

5            THE COURT:  I don't see what was said about -- in my

6    notes I said, you know, the Second Circuit held a free and

7    clear sale provision could not be enforced against creditors

8    who establish a due process violation, right?

9            MR. STEINBERG:  Established a due process violation,

10   correct.

11           THE COURT:  Do any provisions of a sale order apply

12   to such creditors, other than the -- even with a due process

13   violation?  In other words, what's the provision in the sale

14   order that bars punitive damage claims against New GM?

15           MR. STEINBERG:  I think the provision in the sale

16   order was Judge Gerber's interpretation of the sale agreement.

17           THE COURT:  Okay.

18           MR. STEINBERG:  So there is no express language.  It

19   is --

20           THE COURT:  What's the language in the sale agreement

21   that you believe precludes punitive damages?

22           MR. STEINBERG:  I think Judge Gerber did a contract

23   interpretation.  It's reflected in the November decision.

24   There's a few pages on that.  But he basically said New GM

25   never would have assumed punitive damages for Old GM.  No

normal seller would have done that. Talks about the difference being punitive damages as to -- that it's not a property right. It's to punish somebody. And it's to deter behavior --

THE COURT: All policies behind punitive damages would appear to, in my view, disfavor imposing punitive damage on either assumed liability or successor liability. Because it is intended to punish --

MR. STEINBERG: That's correct.

THE COURT: -- the conduct of someone. And they're not around to punish.

MR. STEINBERG: And he was -- he was finding at the same time of approving the sale, he was saying that the purchaser was a good faith purchaser, so the -- who was essentially, for reasons beyond just the pure value of the assets, trying to save the domestic auto industry at a time of the second worst recession since the -- the worst recession since the Great Depression.

THE COURT: In your view does the punitive damage ruling survive the Second Circuit reversal?

MR. STEINBERG: Well, the punitive damages wasn't decided by the Second Circuit at all. It wasn't an issue that was before the Second Circuit.

THE COURT: I just want to be clear on what your argument is.

MR. STEINBERG: Okay. I'm not going to talk about

1  the gatekeeper role, because I think Your Honor has made his

2  views clear --

3         THE COURT:  Better or worse, I am going to be the

4  gatekeeper.

5         MR. STEINBERG:  I do want to talk a little about the

6  individual plaintiffs.  Your Honor, before I get to that,

7  though, our --

8         THE COURT:  I do want you to address any limitation

9  on assertion of independent claims, because your position is

10  that non-ignition switch plaintiffs can't assert independent

11  claims.  Right?  That's your position?

12         MR. STEINBERG:  That's correct.

13         THE COURT:  And I have a lot of trouble with that.

14  You need to address that specifically.

15         MR. STEINBERG:  I think, Your Honor, it falls into

16  two buckets.  One is the res judicata argument.  The December

17  judgment, not subject to the mandate rule, the wipe-out rule or

18  Rule 60, specifically says in paragraph 14 that non-ignition

19  switch plaintiffs and post-closing accident non-ignition switch

20  plaintiffs --

21         THE COURT:  Can res judicata apply when the Second

22  Circuit has reversed, and specifically as to non-ignition

23  switch plaintiffs remanded to this Court to decide issues with

24  respect to the non-ignition switch --

25         MR. STEINBERG:  I actually think the second -- this

239

1  was the ruling that the Second Circuit was asking for.  They

2  were saying I want to see whether there's a due process

3  violation that was rendered or not with respect to non-ignition

4  switch --

5          THE COURT:  Does it limit -- I didn't see where it

6  limited the remand.  I mean, this in some ways comes back to my

7  concerns about whether non-ignition switch issues were

8  deferred.  And to the extent that they were decided, the Second

9  Circuit reverses and remands.

10         Because I'll tell you, Mr. Steinberg, you may be -- I

11 am going to go back and look carefully at the res judicata

12 argument, but if Judge Gerber decided that non-ignition switch

13 plaintiffs can't bring truly independent claims, I think he's

14 wrong.  I just -- I mean, I'm telling you straight out.  I

15 mean, I don't think -- I read the Supreme Court's Bailey

16 decision.  I read the Second Circuit's series of Manville

17 decisions, as -- whether you do it in terms of I don't -- the

18 bankruptcy court wouldn't have subject matter jurisdiction to

19 do it -- it's I grew up believing, you know, as a lawyer that I

20 can't release -- I can't get a release for things that haven't

21 happened yet.

22         MR. STEINBERG:  Well, I think --

23         THE COURT:  And if it's truly an independent claim, I

24 don't see how the bankruptcy court can enjoin them.

25         MR. STEINBERG:  Well, I think that the argument on

240

1  the res judicata point is not a matter of whether if you were

2  deciding the case whether you would have come out that way.  It

3  is a matter that Judge Gerber decided that way.  And if you

4  fail to appeal, there are consequences for not appealing.

5          THE COURT:  That's why I -- did he decide that issue

6  with respect to non-ignition switch plaintiffs?

7          MR. STEINBERG:  I think it's -- I think Footnote 70

8  is -- oh, I'm sorry.  Paragraph 14 is absolutely clear.  And

9  when plaintiffs said that all he did was stay it but didn't

10 really actually rule on that, that may be what they wish, but

11 that was not any logical --

12         THE COURT:  So, look, where the judgment is vacated,

13 and the case is back before me, I can always change -- in a

14 case before me, I can change my mind.  I can say well, you

15 know, I've reflected further and I think I was wrong.

16         I understand your -- I'm not wiping out your res

17 judicata argument.  I have problems with it, in part because I

18 don't think -- if the case was before me, I don't think I could

19 bar anybody from asserting independent claims truly based on

20 post-sale conduct by New GM.  Whether it states a claim under

21 state law, I don't know.  But I don't see how I could enjoin

22 plaintiffs from -- any plaintiff from asserting independent

23 claims based exclusively on conduct by New GM.

24         I agree with you completely -- that was part of my

25 issue with Mr. Hirsch, you read the language of this complaint,

241

1  and it seemed to me he was trying to do through the back door

2  what others -- many others have tried to do before, and says

3  he's willing to amend it to take that out.  I agree that nobody

4  should be permitted from the guise of an independent claim to

5  base it on Old GM conduct.

6            MR. STEINBERG:  I think --

7            THE COURT:  But things that are based on New GM

8  conduct, I don't see how a bankruptcy judge has the authority

9  to say you can't do it.

10           MR. STEINBERG:  I think, Your Honor, where I would

11 like to take you in the argument, just to illustrate it, is

12 that at this point in time I am not going to argue with you as

13 to whether this might have exceeded the bankruptcy court's

14 subject matter jurisdiction to make its ruling to bar

15 independent claims.  For purposes of our colloquy, I will

16 concede that issue.

17           The question then becomes if you fail to appeal when

18 the lower court has exceeded its subject matter jurisdiction,

19 have you failed to appeal when the lower court did not

20 effectuate due process, but you didn't appeal it, what are the

21 consequences of not doing it?  And the Second Circuit did not

22 change at all the December judgment.  That was not before the

23 Second Circuit.  That cannot be subject to the wipeout rule.

24 And Rules 60(b)(5) and 60(b)(6) has clear authority that we

25 cite our briefs that say if you do not appeal, I don't care --

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1.14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 243 of 269
Pg 302 of 728

242

1  it doesn't matter anymore, because -- and Travelers v. Bailey

2  said, you know what, finality in a case trumps everything else

3  because we have to have cases with an end.  And I think our

4  papers actually have a more lengthy quote that says that.

5       So you're struggling with the notion as why did Judge

6  Gerber come to this conclusion.  And what I'm trying to say to

7  you, he did, and he was clear that he did.  Paragraph 14

8  doesn't say in any way that there should be a stay.  He was

9  unequivocal.  And you may say he was wrong.  But the burden was

10  on the plaintiffs to appeal and get another court to say that

11  he was wrong.  And if the plaintiffs, who appealed the order

12  but not that ruling, if they didn't do it, then they waived it.

13  And that's what Travelers v. Bailey said.

14       So if you ask me what my argument is on independent

15  claims, that is one of my arguments.  I do have other

16  arguments, but that is one.

17       THE COURT:  Would you agree that a state court

18  plaintiff in -- you pick a state -- who did not appear here,

19  they could assert independent claims against New GM?

20       MR. STEINBERG:  I think a state court plaintiff who

21  wasn't served with the scheduling order and started their

22  lawsuit in 2016, if they want to assert an independent claim,

23  then I don't necessarily have the same res judicata argument

24  or --

25       THE COURT:  What's the language in the scheduling

 1   order that said that the issue of independent claims by

 2   non-ignition switch plaintiffs was going to be decided by the

 3   Court?

 4          MR. STEINBERG:  I don't think there is language in

 5   the scheduling order --

 6          THE COURT:  So how are people in Hinterland supposed

 7   to know that the Court was going to decide whether non-ignition

 8   switch plaintiffs could assert independent claims against New

 9   GM based solely on New GM --

10          MR. STEINBERG:  I think the simplest answer is they

11   get the order and then they see that it happens.  And therefore

12   they either appeal or move to reargue and say that my rights

13   are being impacted --

14          THE COURT:  I have a really hard time saying that

15   silence in a scheduling order binds anybody who gets it to a

16   decision on an issue that wasn't specifically identified in the

17   order.

18          If I enter an order -- I'm not perfect, but I try to

19   specifically identify the issues that are before me.  If I

20   enter a pretrial order, it's got to identify specifically the

21   issues that are going to be tried.  I don't want any confusion

22   about it.

23          MR. STEINBERG:  The entire marked pleading process --

24   the entire marked pleading process was dedicated as to whether

25   something was a retained liability, an assumed liability or an

244

1  independent claim, depending on the complaint.

2           THE COURT:  Okay.  Go ahead.  You said that --

3           MR. STEINBERG:  So -- so --

4           THE COURT:  -- the first prong of your argument is

5  res judicata.

6           MR. STEINBERG:  Right.

7           THE COURT:  What's next?

8           MR. STEINBERG:  And the second is a different

9  variation of res judicata, which is that we believe that Judge

10 Gerber actually determined on the complaints and the types of

11 causes of action, including, you know, duty to recall, which we

12 talked before.  He made determinations about that, and that is

13 also another failure to appeal res judicata.  And that doesn't

14 have any of the constitutional due process violation.  It is a

15 granular exercise to look at the claims and see whether they

16 are --

17          THE COURT:  But they only apply to the specific

18 complaints, that he said, no, this doesn't work in this

19 complaint.

20          MR. STEINBERG:  It would apply to not just the

21 specific claims, but any other complaint that had a similar

22 claim, duty to recall claim, an independent duty to warn claim,

23 or anything like that.  It would apply equally across the

24 board.  And that's the purpose of the judge's Footnote 2, which

25 is that we're going to apply this across the board.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 246 of 269
Pg 305 of 728

245

 1          Because he wasn't asking me to mark up 200

 2   complaints, including the thousand-page MDL complaint, in a

 3   two-week period of time.  He recognized that I can bring

 4   representative cases that would embody the types of claims that

 5   are symbolic of these post-closing accident plaintiffs, and

 6   they would bind.  And I served my other claims letter on

 7   everybody.  I mean -- and my complaint on the MDL complaint,

 8   and the bellwether complaint, that was served on everybody and

 9   it was also on the ECF system.  So --

10          THE COURT:  You're putting --

11          MR. STEINBERG:  And certainly, Your Honor, as we

12   think about this, --

13          THE COURT:  As paragraph 14 of the December judgment

14   that you're resting on for wiping out independent claims?

15          MR. STEINBERG:  Right.  Especially the last sentence

16   of paragraph 14.  We do have a greater explanation, and I'll

17   read.  It says that:

18              "To the extent the plaintiffs have attempted to

19              assert an independent claim in a pre-existing lawsuit

20              with respect to an Old GM vehicle, those claims are

21              proscribed by the sale order, April decision, and

22              June judgment."

23          So he actually ruled on that basis, and I believe

24   that's the granularity basis.  You can dismiss why we killed

25   ourselves doing the marked pleading, but Judge Gerber actually

246

1  went through the marked pleading process.  He went through the

2  -- you know, we had five different color-coded.  We had duty to

3  warn as one color.  Footnote, I think it's 9, of the November

4  decision has the listing of the different color coding on the

5  various complaints.

6           He looked at it.  We tried to deal with this in a

7  practical way so he could give good guidance.  And he was

8  prepared to let Judge Furman decide issues in the MDL; but on

9  the other courts and the other system, he was giving more firm,

10 precise rulings.

11          And one could say -- and scratch your head saying

12 what was Judge Gerber thinking?  Right?  You know, if I try to

13 tell you this is what Judge Gerber is thinking, you'd say,

14 "Well, how do you know?  You're not inside of his head."

15 Plaintiffs tried to do it before.  It's the same response.  The

16 reality is, is that there's an order.  The order reflects at

17 the end of the day what he was thinking.  And the order is

18 unequivocal.  The order said this is what it is.

19          The third thing, Your Honor, and this is what I would

20 say is that -- if Your Honor believed that the res judicata

21 argument doesn't work, then you could see from your history in

22 this case since Judge Gerber retired that plaintiffs are very

23 creative in trying to dance around the proscriptions of the

24 sale order and other rulings in order to try to assert

25 something as an independent claim.

247

 1          One of the arguments that I had in connection with

 2   Pitterman was that a duty to warn as an independent claim, when

 3   I didn't have any relationship or contact with the plaintiff,

 4   assumed that -- I mean, where is that based on?  It wasn't the

 5   manufacturer or seller of the car.  It wasn't based on a

 6   federal statute.  Where do you get that from?  Merely because

 7   you put it in your words, want to sue in a state court, find a

 8   friendly home forum, and now I have 42 different judges

 9   weighing on the same type of claim?

10          Judge Gerber recognizes that part of the gatekeeping

11   function -- and Judge Bernstein recognized when he did the

12   Old Carco case, he said I'm getting rid of this duty to recall

13   claim as a global basis based on his interpretation of the sale

14   order.  And I think that's what needs to happen here.  I

15   I'm afraid, Judge, if I don't tackle --

16          THE COURT:  I'll stop you.  Go ahead.

17          MR. STEINBERG:  No, no, no.  I just think I need to

18   -- for fairness here, although we do have the Tronox opinion, I

19   assume you want to accomplish -- you want to be able to finish

20   this.  So let me try to deal with the individual plaintiffs.

21   Let me start with Pillars.  I think the June judgment and the

22   December judgment has defined terms.  The brief to the Second

23   Circuit had defined terms.  They were all consistent, and the

24   need for consistency, so people understand what you're talking

25   about.  Ignition switch plaintiff is --

1          THE COURT:  So what is Mr. Babcock -- he's telling me

2     that New GM, in its multiple pleadings, conceded that he had an

3     ignition switch defect and that you're bound by it.

4          MR. STEINBERG:  Right.  So he's wrong.

5          THE COURT:  And you're going to tell me why he's

6     wrong.

7          MR. STEINBERG:  I am.  One, the easiest and clearest

8     way is that if you look at the June 2015 judgment, and you look

9     at Exhibit D which is --

10          THE COURT:  Exhibit B as in boy?

11          MR. STEINBERG:  Exhibit D as in dog.  Exhibit D where

12     we list in our June judgment who are the non-ignition switch

13     plaintiffs and the non-ignition switch pre-closing accident

14     plaintiffs, the Pillars case is listed there.  So we presented

15     to the judge the list of who we considered to be the non-

16     ignition switch plaintiffs.

17          The second thing is when Judge Gerber ruled that

18     ignition switch pre-closing accident plaintiffs were barred by

19     the sale order, we wrote to the non-ignition switch pre-closing

20     accident plaintiffs and said that you are essentially in the

21     same position as the ignition switch pre-closing accident

22     plaintiffs.  The sale order wiped out all pre-closing accident

23     plaintiffs, and Judge Gerber just said he didn't have enough

24     information for non-ignition switch plaintiffs' economic loss,

25     but he also carved out pre-sale accident non-ignition switch

1  plaintiffs.

2          So when we said to people in a letter that you are in

3  an identical position, we weren't saying you were those people.

4  We were saying you were in the same position as an ignition

5  switch plaintiff if you were a pre-closing accident plaintiff,

6  and all pre-closing accident plaintiffs are barred.  And that

7  same pleading that he's referring to also references

8  paragraph 36 of the December judgment which references the fact

9  that all pre-closing accident plaintiffs are barred by the sale

10  order.

11          We were consistent in our pleading before Judge

12  Furman that what Pillars --

13          THE COURT:  Keep -- the are wires under the desk that

14  can catch you.

15          MR. STEINBERG:  We were consistent with Judge Furman,

16  but Pillars is someone who did not have a subject vehicle,

17  which by definition means he's not an ignition switch party.

18  And we were consistent throughout, so that is the reason why

19  Pillars is wrong.  If you look at the context of what he

20  quoted, it was saying that they were in an identical position,

21  but that doesn't mean that you are that party.  You're actually

22  making an analogy, saying you're out for the same reason.  And

23  then if you need something concrete, it's the June 2015

24  judgment.

25          With regard to Pilgrim, I think the plaintiff

250

1  basically touched based and, you know, set forth the right

2  things.  They started a complaint on October 14, but they --

3  that complaint is a very lengthy complaint and is substantially

4  identical to what you would see in the MDL complaint.  So they

5  knew, I believe -- and if I had to take discovery on it, I

6  would be able to take discovery on it.  They knew about the

7  proceedings in the bankruptcy court, but as soon as they sued

8  us, we gave them a demand letter on October 28.  We gave them a

9  copy of the December judgment before the appeal period had

10  expired, and they failed to appeal or move for reconsideration,

11  and we believe that they should be bound.

12       The February 2016 stipulation that we entered in the

13  bankruptcy court said that the Second Circuit may have an

14  impact on this case, and therefore we were going to maintain

15  the status quo.  But that has nothing to do with the vitality

16  of the December judgment, and we believe they are bound.  They

17  are not a recall case.  Their vehicles were not subject to the

18  February and March 2015 recalls.  They are non-ignition switch

19  economic loss cases.  They have asserted a duty to recall in

20  their complaint.  The duty to recall is not an assumed

21  liability for the discussion that I had in Pitterman, which is

22  the paragraph --

23       THE COURT:  So you're -- okay.

24       MR. STEINBERG:  Yeah.

25       THE COURT:  That's a factual issue.

251

1          MR. STEINBERG:  And essentially when you read their

2     complaint, they're asserting a design defect, and New GM did

3     not assume a design defect liability in connection with an Old

4     GM vehicle, no matter on an economic loss basis, no matter how

5     you contort or change the words.  So on Pilgrim, we believe

6     that the answer is is they knew what was going on.  They can't

7     lie in wait and just say --

8          THE COURT:  You say they knew what was going on.

9     Mr. Scott told me Pilgrim had no representation in the

10    bankruptcy court until recently.

11         MR. STEINBERG:  They filed a --

12         THE COURT:  Do you agree or disagree?

13         MR. STEINBERG:  They --

14         THE COURT:  Were they served with the September

15    (indiscernible)?

16         MR. STEINBERG:  No, because they didn't bring

17    their --

18         THE COURT:  That's right.  You told me --

19         MR. STEINBERG:  They didn't bring their lawsuit until

20    October 14.

21         THE COURT:  So how can they be bound?  They -- you --

22    I take it then you agree they were not represented in this

23    court during those prior proceedings.

24         MR. STEINBERG:  They would -- they became aware of

25    the proceedings before the judge ruled on the matter.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

252

1          THE COURT:  So you know what I ruled in the lien

2     release case, when I denied the motion to dismiss by everybody

3     who said that they -- you know, they're -- they weren't served.

4     You cite that -- you cite my decision in that case.

5          MR. STEINBERG:  Yeah.  And I would say to Your Honor,

6     think about a circumstance where someone wants to sue New GM,

7     knows that these proceedings are going on, and figures that if

8     New GM loses, I could then just sue because I can get

9     affirmative collateral estoppel.  And if New GM wins, I can say

10    that I lied in the weeds and I'm not bound by it because I

11    wasn't made a party to the proceeding on an event that took

12    place eight years, seven years before.

13          I mean, they're talking about cars that were

14    purchased in 2006.  They talked about, you know, bulletins that

15    were entered.  These people spent months I think before they

16    actually filed their complaint.  They knew what was going on in

17    the bankruptcy because they basically cribbed their complaint.

18    This is me testifying now, but I'm saying to you that for this

19    type of case, when someone emerged during the process, even

20    though they didn't get the scheduling order --

21          THE COURT:  Res judicata doesn't apply.

22          MR. STEINBERG:  Res judicata does not apply, but the

23    question is whether they should be bound otherwise.

24          THE COURT:  A good theory.  It may be that a prior

25    decision by Judge Gerber that is not -- that remains the

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

1  operative ruling is the persuasive authority that would bind --

2  that would be applied and would result in dismissing their

3  claim or enjoining their claim.  But it's not res judicata, so

4  what -- tell me the precise legal theory on which you say they

5  are precluded now.

6        MR. STEINBERG:  Your Honor, there was a sale order

7  that was entered, a sale motion that was entered, and someone

8  didn't get notice, written notice of the sale motion but were

9  otherwise aware of the sale motion and that their rights were

10 otherwise going to be impacted.  Is that party who didn't get

11 that written notice but was otherwise aware of the proceedings

12 going to be bound by the rulings by the Court?

13       THE COURT:  Can you point me to a case that supports

14 you --

15       MR. STEINBERG:  I cannot do it right now, but I'd

16 like to have the opportunity to submit something before the end

17 of the week.

18       THE COURT:  Okay.

19       MR. STEINBERG:  Okay.  That's -- that is the

20 argument, and that would be the argument that I would

21 establish, if I can establish the facts that I've been talking

22 about.

23       THE COURT:  Okay.  All right.

24       MR. STEINBERG:  On Mr. Peller, I will note that on

25 page 3 of his pleadings, he talks about an independent claim

254

1 asserted by Bledsoe, and that's relate -- Bledsoe is a pre-

2 petition accident case, so I don't know how he would get to an

3 independent claim notion.  But that's an -- that's really,

4 without trying to get to the roots of Bledsoe, that's an

5 indication of why the gatekeeper function needs to be dealt

6 with.

7         Paragraph 28 of the December judgment does not lead

8 the way Mr. Peller said it leads.  It says:

9         "With respect to the Peller complaints, the ignition

10        switch plaintiffs may assert claims based on alleged

11        duties of New GM relating to post-sale events

12        relating to Old GM vehicles to the extent that they

13        are actionable as matters of non-bankruptcy law to be

14        decided by non-bankruptcy courts.  Provided, however,

15        the Peller complaint shall remain stayed unless and

16        until they are amended."

17        And then there were three Romanettes.  The third

18 Romanette is to strike any purported independent claims by non-

19 ignition switch plaintiffs.

20        THE COURT:  Let's come back to the same issue.  What

21 -- but he prevails in the Second Circuit, right?

22        MR. STEINBERG:  He prevails in the Second Circuit

23 about that, as a theoretical matter, independent claims can't

24 be asserted.  He does not prevail in the context of a marked

25 pleading analysis where Judge Gerber reviews the Peller

255

1    complaints and says that these complaints aren't independent

2    claims, and he doesn't prevail to the extent that res judicata

3    would apply and say his failure to appeal here is going to be

4    binding on him.

5            And where I think Your Honor is struggling is that

6    you're essentially saying that the --

7            THE COURT:  Mr. Weisfelner.

8            MR. WEISFELNER:  Yeah, I apologize.

9            THE COURT:  Go ahead, Mr. Steinberg.

10            MR. STEINBERG:  Where Your Honor is struggling is

11    that you're basically saying that the Second Circuit either on

12    a mandate basis, a wipeout basis, or a Rule 60 basis changes

13    the December judgment.  And the answer we believe, and we -- I

14    think we briefed this, it says that that is not the case.

15            I think the Second Circuit actually affirmed the

16    ruling on independent claims.  And what was the independent

17    claims ruling by the lower court?  It was that ignition switch

18    plaintiffs can bring an independent claim.

19            Now, Mr. Peller says, well, that obviously was a

20    mistake.  They didn't really mean to do that if you read the

21    decision.  But they did do it, and the Second Circuit needs to

22    -- if you want to take the literal language, that's exactly

23    what they did.  And if you thought the Second Circuit made a

24    mistake, you were incumbent on making a motion, like we tried

25    to make on a number -- we thought the Second Circuit made a lot

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 257 of 269
Pg 316 of 728

256

1  of mistakes.  We made motions for rehearing.  We petitioned for

2  cert.  We were ultimately lost either way, but they had the

3  same burden.

4          THE COURT:  What do you believe the Second Circuit

5  decided with respect to independent claims?

6          MR. STEINBERG:  I think the Second Circuit decided

7  that, as a matter of subject matter jurisdiction, non-ignition

8  switch plaintiffs, defined only as the Pillar plaintiffs

9  because they were the only one there, and that they could

10  assert that -- that they can assert an independent claim.

11          THE COURT:  And so if your position is that -- and I

12  didn't go back to look at what Judge Gerber did with respect to

13  the strikeout from the specific complaint.  Let's assume I

14  agree with you that Mr. Peller's complaint is improper

15  allegations in the independent claim.  Doesn't he get to amend

16  it to take the language out, proceed with independent claims?

17          MR. STEINBERG:  Well, I think that if you look at

18  Mr. Peller's complaints, they aren't language issues.  He

19  asserts things like -- he asserts causes of action that I think

20  are clearly retained liability.  I think --

21          THE COURT:  Let's just -- we're just focusing on

22  independent claims.

23          MR. STEINBERG:  No, I'm say -- look, I can label

24  anything as an independent claim.  That's what the Second

25  Circuit said in the Madoff (indiscernible) type case, and

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

257

1  that's what the Second Circuit said in the case that I'm not

2  supposed to talk about, but basically said that you could label

3  anything, but we're not accepting form over substance, and

4  we're expecting people to look through what was written to see

5  whether it was enjoined or not enjoined.

6         And in this particular case, that's what Judge Gerber

7  was doing, and that is I think what Your Honor's job is as part

8  of the gatekeeping function, which is, you know, they could put

9  whatever words they want and say this now constitutes an

10 independent claim, but if it's not, if it's --

11        THE COURT:  Well, after the Second Circuit ruling, I

12 don't see why Mr. Peller is batter out.  It may be that what

13 he's pled so far doesn't cut it, but does that mean after the

14 Second Circuit reversed, that he can't assert truly independent

15 claims if he pleads it properly?

16        MR. STEINBERG:  Well, I think to the extent -- well,

17 to some extent, his complaints are in the MDL and they're not

18 really being dealt with.  But if your answer is whether he can

19 actually assert something, I think we'd have to see what he

20 asserts.

21        THE COURT:  Other issues you want to address in the

22 last five minutes?

23        MR. STEINBERG:  Your Honor, I don't think the Pope

24 plaintiffs are here.  I'll rest on our papers on the Pope

25 plaintiffs.

1          I think that Your Honor had asked about the punitive

2    damage -- Your Honor had asked about the punitive damage

3    ruling, was there anything that -- in the November decision

4    that talked about subordination of claims and stuff like that.

5    And there is, although not precisely the way I would have

6    written it, there is some language I think on page 10 of the

7    November decision.

8          THE COURT:  Rule 726(a)(4) talks about allowed

9    claims, including for punitive or exemplary damages.  That

10   suggest that the claims can be allowed.  It's a fourth priority

11   distribution.  You agree with that?

12         MR. STEINBERG:  I do.  I also think that when this

13   sale took place, everybody knew that that priority position was

14   not going to be paid.  I mean, there was a clear ruling that

15   the shareholders were wiped out and I think there was a clear

16   ruling -- I think there would be a clear ruling that the

17   punitive damage claims were wiped out.  I think Judge Gerber

18   rendered a decision in what is the Apartheid case where he

19   talked about advising under the General Motors case where he

20   talked about punitive damages and subordinations.

21         THE COURT:  Tell me what the authorities are that

22   that limitation on punitive or exemplary damages applies to

23   either assumed liabilities or successor liability.

24         MR. STEINBERG:  Well, Judge Gerber ruled that on

25   assumed liabilities that you couldn't get punitive damages, and

259

1  he did it as a matter of contract --

2          THE COURT:  Yes, okay.

3          MR. STEINBERG:  -- protection.

4          THE COURT:  And now with respect to successor

5  liability, is there any --

6          MR. STEINBERG:  On successor --

7          THE COURT:  -- is there any authority, case

8  authority, that would say that if the debtor couldn't be liable

9  for punitive damages, the successor can?

10         MR. STEINBERG:  There's general authority and it says

11 successor liability is derivative through what the seller had,

12 so if the seller was not liable, the purchaser is not going to

13 be liable on the successor liability theory.  So there's that

14 -- there's the general rule.

15         I think at the last hearing I also mentioned that we

16 bought not from Old GM debtor, we actually bought from the

17 debtor-in-possession.  I don't even think the debtor-in-

18 possession is responsible for the punitive damages of the

19 predecessor.  It's two steps removed.  But our argument is

20 strictly that this is a derivative claim and derivative claims

21 means you're only liable to the extent that the seller -- and

22 when this sale took place, they sold essentially everything of

23 value.  That's what the government took.  They knew that the

24 value of that was going to be roughly translated to somewhere

25 between 25 to 35 cents on the dollar, depending on where the

260

1  claims in.  They knew that no one was going to --

2          THE COURT:  Well, you don't pay, then, the devalued

3  currency of the debtor.

4          MR. STEINBERG:  That's correct.  You don't pay.  But

5  Judge Gerber actually talked -- in the decision he said,

6  "Punitive damage punished past conduct and deter future

7  wrongdoing" -- I'm leaving out the parentheticals -- "and

8  posing punitives for Old GM conduct would not be consistent

9  with punitive damages purposes.  Claims for punitive damage, if

10 asserted against Old GM, would have at least been subordinated,

11 if now disallowed, as they would only penalize innocent

12 creditors, and in any event, out of the money, given Old GM's

13 deep insolvency" --

14         THE COURT:  I have that (indiscernible).

15         MR. STEINBERG:  Okay.  So I think, Your Honor, I am

16 -- whether I've finished or not, I am finished by the 5:30.  I

17 thank you for the time that you've given us.

18         I will say as a sort of a housekeeping detail, and

19 not necessarily asking for a specific answer, but we are

20 probably fully submitted on the threshold late claims issue,

21 but there's been no oral argument that Your Honor has

22 scheduled.

23         THE COURT:  Discovery is done?

24         MR. STEINBERG:  Well, the discovery that you

25 authorized has been done.

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 262 of 269
Pg 321 of 728

261

```
 1              THE COURT:  Okay.

 2              MR. STEINBERG:  So I know you've been very busy

 3   lately and you have a lot of things on your plate.  I just call

 4   to your attention that I think that's --

 5              THE COURT:  I wasn't aware there was all -- that it

 6   was -- is it briefed and everything?

 7              MR. STEINBERG:  It has been briefed.  The discovery

 8   that you authorized were only -- was only interrogatories.

 9   They had 60 days to respond and I think, if they haven't done

10   every one, they've done substantially every one, so I think

11   that discovery is done.

12              THE COURT:  Okay.  Is all of the letter briefing done

13   on Tronox?

14              MR. STEINBERG:  I think the -- all the letter

15   briefing on Tronox has been --

16              THE COURT:  -- trying to get out of his seat.

17              MR. STEINBERG:  Well, I think, Your Honor, in what

18   was negotiated between the parties as to the number of pages

19   and the issues to be discussed, that we both agreed to submit

20   four pages, and we submitted the four pages on a simultaneous

21   basis.

22              THE COURT:  And what is Judge Furman being asked to

23   do with respect to the Tronox issue?

24              MR. STEINBERG:  There's a pending motion for -- to

25   dismiss a part of their complaint on -- to the extent that they
```

262

1  were asserting successor liability, so the -- what we included

2  and we gave Your Honor was the letter that was written to Judge

3  Furman that said that, based on the Tronox decision, that the

4  plaintiff's successor liability falls down.  And that's --

5          THE COURT:  So should I wait for him to decide it?

6          MR. STEINBERG:  I think certainly on the successor

7  liability side, I think my view would be yes because I think

8  that's teed up before Judge Furman.  As far as whatever the

9  relevance is of the independent claims, I think letters that we

10 submitted speaks for itself, but I'm happy, if Your Honor

11 wanted to have another hearing, which I can't believe will last

12 as long as today's hearing, I'm prepared to speak as to what I

13 believe the relevance of Tronox is on the independent claims

14 issue.

15         THE COURT:  Okay.  Mr. Weintraub?

16         MR. WEINTRAUB:  Yes, Your Honor.  The agreement on

17 the submissions was limited to the independent claims issue.

18 There's also the successor liability issue, which relates --

19         THE COURT:  -- with that.

20         MR. WEINTRAUB:  -- but also relates to issues for

21 here.

22         What I would like to do, Your Honor, is submit a

23 short letter brief on the successor liability issue because the

24 two letters that were submitted to the Court were a letter

25 prepared by I think King -- was it King & Spalding or was it

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1.14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 264 of 269
Pg 323 of 728

263

1  Kirkland & Ellis?

2          UNIDENTIFIED:  I think Kirkland & Ellis.

3          MR. WEINTRAUB:  The co-counsel on all the pleadings

4  with King & Spalding, and Hagens Berman submitted the successor

5  liability to Judge Furman.  Hagens Berman is not a bankruptcy

6  firm, and I've seen that letter; I think it may be deficient in

7  some respects with respect to how I would have analyzed that

8  issue in a bankruptcy matter.

9          THE COURT:  I know, but Judge Furman is being asked

10  to decide the effect of Tronox and successor liability claims.

11  I have no intention of doing anything on that until he rules.

12  I mean, he -- it's been briefed to him.  I think it would be

13  inappropriate for me to try to jump the gun and decide the

14  issue before -- if it's been presented to him.

15          MR. WEINTRAUB:  Okay.  So would it be fair to say

16  that oral argument will not cover or will cover successor

17  liability?

18          THE COURT:  What I'm going to do, because I've told

19  you a few times before, I will inquire of Judge Furman how he

20  -- how we decide it ought to be dealt with, and I'll advise

21  you.  Okay?  It would be inappropriate for me unilaterally to

22  say I want to hear argument and therefore any supplemental

23  briefing on the effect of Tronox on successor liability claims.

24  It's been put before Judge Furman, and while he and I don't

25  discuss the merits of the issues, from time to time we do have

264

1  discussions about procedural posture, what hearings are coming

2  up, et cetera.  So I will inquire of Judge Furman about that

3  and let you know.

4          MR. WEINTRAUB:  Thank you, Your Honor.  It would

5  probably turn this from --

6          THE COURT:  But that's not getting you off the hook

7  about the effect of Tronox on independent claims.

8          MR. WEINTRAUB:  I understand.  My point is I think it

9  would be a much longer hearing if we were to talk about

10  successor liability as well.

11          THE COURT:  Sure.

12          MR. WEINTRAUB:  If I could make one other point, Your

13  Honor, just -- there was a colloquy during argument where I

14  think you attributed a comment that was made by Mr. Weisfelner

15  to me and just so --

16          THE COURT:  I apologize for the mistake.

17          MR. WEINTRAUB:  Okay.  I just -- so the record is

18  clear, with respect to the discovery in the MDL and what it

19  covered and whether or not there facts developed, either by

20  NHTSA or otherwise --

21          THE COURT:  -- saying that I thought it was you

22  but --

23          MR. WEINTRAUB:  It was him.  Thank you, Your Honor.

24          MR. WEISFELNER:  Your Honor, just briefly, I know

25  that you have a 5:30 cutoff.  On behalf of I think -- I know

Case 1:14-md-02543-JMF    Document 4657-2    Filed 10/02/17    Page 266 of 269

265

1  myself, I think Mr. Peller, and maybe even Mr. Weintraub, we

2  would request an opportunity collectively to submit no more

3  than five pages just on issues that Mr. Steinberg raised for

4  the very first time in his argument today, as opposed to what

5  he covered for the first time at the last hearing.

6         And in particular, the focus would be on his, in our

7  view, inappropriate reliance on paragraph 14 of the December

8  decision.  Mr. Steinberg selectively read half of paragraph 14,

9  not all of it.

10        THE COURT:  I promise to read the whole paragraph.

11        MR. WEISFELNER:  Your Honor, you might also want to

12  take a look at those provisions of the decision that preceded

13  the judgment, in particular what Judge Gerber said about the

14  Groman plaintiffs' request for discovery.  And what he did say

15  there, you'll see, if you go back to the decision itself, is

16  that they requested discovery, the rest of the parties agreed

17  to oppose it.  It was opposed.  The request for discovery was

18  denied without prejudice pending its ability to be reasserted

19  after the Second Circuit rules on the appeal from the prior

20  decision.

21        THE COURT:  Has a transcript been requested?

22        MR. WEISFELNER:  You don't need the transcript, you

23  just need the order.  The order says just that.

24        THE COURT:  All right.

25        MR. WEISFELNER:  Not the order, I'm sorry, the

266

1  decision.

2          THE COURT:  What's the -- it's in the decision.

3          MR. WEISFELNER:  It's in the decision itself.

4          THE COURT:  I don't want any more briefs.  I don't

5  want any more letters.

6          MR. STEINBERG:  I only want to say one sentence, one

7  sentence.  The Groman plaintiffs are Ignition-Switch

8  plaintiffs, not Non-Ignition-Switch plaintiffs.

9          THE COURT:  How long -- how substantial are the

10 materials on the late train?  I'm just trying to think what I

11 -- how much time I need to prepare.

12         MR. WEISFELNER:  Your Honor, I think they're fairly

13 substantial, but I also should tell Your Honor, in terms of

14 your scheduling, that there are active discussions ongoing, at

15 least between the plaintiffs, the GUC Trust, and the GUC Trust

16 Unitholders that might or might not obviate a trial on the

17 papers that have been submitted on this issue to date.  And if

18 we do resolve it, we may very well have to have a hearing under

19 9019, but I think the paradigm for consideration will shift.

20         THE COURT:  What's the timing?

21         MR. WEISFELNER:  Your Honor, I'm hopeful that, if we

22 are going to have a deal, it's within the next certainly 30

23 days and maybe before that.

24         MR. STEINBERG:  Your Honor, just so it's clear, I

25 don't think the oral argument would last too long.  There are

267

1    actually only two issues that parties briefed.  One was to what

2    extent has there been a tolling provision agreed to for each of

3    the category of plaintiffs, so that's a defined date.  And the

4    second is whether the <u>Pioneer</u> factors apply in lieu of -- in

5    view of Judge Gerber's ruling and whatever the Second Circuit

6    said.

7         So you weren't dealing with anything with regard to

8    the merits or the trial, but these were truly threshold issues

9    as to whether they can file a claim without having to show the

10   <u>Pioneer</u> factors and to establish when a toll came into effect.

11   And I don't think you --

12        THE COURT:  Mr. Weisfelner, file a status letter on

13   or before 5 p.m. June -- by June 16th.

14        MR. WEISFELNER:  Yes, sir.

15        THE COURT:  I don't need -- obviously, I don't want

16   to know the details if you're still negotiating, I want to know

17   the status.

18        MR. WEISFELNER:  Yes.

19        THE COURT:  Okay.  And after I receive that, I'll

20   decide whether to schedule -- whether I'm going to schedule

21   argument on the late claim issues.  It will probably be

22   sometime in July.  I'm actually out of the country toward the

23   end of June, so we'll see.

24        Thank you very much, everybody.  We're adjourned.

25        (Proceedings concluded at 5:39 p.m.)

268

1               **C E R T I F I C A T I O N**

2

3          I, Lisa Luciano, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9    _____

10   LISA LUCIANO, AAERT NO. 327      DATE:  May 19, 2017

11   ACCESS TRANSCRIPTS, LLC

12

13

14

15              **C E R T I F I C A T I O N**

16

17         I, Ilene Watson, court-approved transcriber, hereby

18   certify that the foregoing is a correct transcript from the

19   official electronic sound recording of the proceedings in the

20   above-entitled matter.

21

22

23   _____

24   ILENE WATSON, AAERT NO. 447      DATE:  May 19, 2017

25   ACCESS TRANSCRIPTS, LLC

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

# Exhibit 3

Reply Deadline: September 30, 2015
Hearing Date and Time: October 14, 2015 at 9:45 a.m. (ET)

Steve W. Berman
steve@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: 206-623-7292

*Co-Lead Counsel in the MDL Proceeding for the
Ignition Switch Plaintiffs and Certain Non-
Ignition Switch Plaintiffs; and Counsel for the
People of the State of California, acting by and
through Orange County District Attorney Tony
Rackauckas and the State of Arizona*

Edward S. Weisfelner
eweisfelner@brownrudnick.com
Howard S. Steel
hsteel@brownrudnick.com
**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
Telephone: 212-209-4800

*Designated Counsel in the Bankruptcy
Proceeding for the Ignition Switch Plaintiffs and
Certain Non-Ignition Switch Plaintiffs*

*[Additional Counsel on Signature Page]*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al.*, | : | No. 09-50026 (REG) |
| f/k/a GENERAL MOTORS CORP., *et al.*, | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OPENING BRIEF ON IMPUTATION ISSUE ON BEHALF OF THE IGNITION
SWITCH PLAINTIFFS, THE NON-IGNITION SWITCH PLAINTIFFS, THE STATE OF
ARIZONA, THE PEOPLE OF THE STATE OF CALIFORNIA, THE POST-CLOSING
IGNITION SWITCH ACCIDENT PLAINTIFFS AND THE ADAMS PLAINTIFFS**

**REDACTED VERSION**

09-50026-reg    Doc 13423-1    Filed 08/04/15    Entered 08/04/15 12:59:53    Main Document
Pg 2 of 23

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................1

II.  FACTUAL BACKGROUND ......................................................................................5

    A.  No provisions in the Sale Order bar charging New GM with knowledge of pre-363 Sale facts..............................................................5

    B.  New GM has always had the same TREAD Act duties with respect to the same Old GM vehicles as did Old GM.........................................5

    C.  The same critical mass of employees worked at New GM in the same capacity with the same authority and the same knowledge they had while working at Old GM.....................................7

III.  ARGUMENT .............................................................................................................12

    A.  New GM can be sued for its own acts and omissions in light of its knowledge without violating the Sale Order, *regardless* of how New GM obtained that knowledge. ......................................................12

    B.  Because large numbers of Old GM employees brought knowledge of pre-363 Sale events with them to New GM and/or learned about pre-363 Sale events from reviewing relevant records, New GM may be charged with knowledge of those pre-363 Sale events. ............13

    C.  New GM's arguments against charging it with knowledge of pre-Sale events are misplaced. .......................................................16

        1.  New GM's argument against imputing the knowledge its employees obtained while working at Old GM is irrelevant and incorrect. ......................................................16

        2.  The language of the Sale Agreement does not bar allegations that New GM had knowledge of pre-Sale facts.....................19

IV.  CONCLUSION...........................................................................................................20

# TABLE OF AUTHORITIES

                                                                                    **Page(s)**

**Cases**

*Allard v. Arthur Andersen & Co. (USA)*,
    924 F. Supp. 488 (S.D.N.Y. 1996)...........................................................................14

*Chamberlain Group, Inc. v. Nassimi*,
    2010 WL 1875923 (W.D. Wash. May 10, 2010)............................................17, 18

*Columbia Pictures Corp. v. De Toth*,
    87 Cal. App. 2d 620 (1948) ......................................................................................18

*Conmar Prods. Corp. v. Universal Slide Fastener Co.*,
    172 F.2d 150 (2d Cir. 1949)......................................................................................17

*Forest Labs., Inc. v. The Pillsbury Co.*,
    452 F. 2d 621 (7th Cir. 1971) ..................................................................................18

*First Ala. Bank of Montgomery, N.A. v. First State Ins. Co.*,
    899 F.2d 1045 (11th Cir. 1990) ...............................................................................15

*Fridena v. Evans*,
    622 P.2d 463 (Ariz. 1980)........................................................................14, 15, 18

*Goodman v. Boeing Co.*,
    75 Wash. App. 60 (1994) ..........................................................................................18

*Interstate Power Co. v. Kansas City Power & Light Co.*,
    909 F. Supp. 1241 (N.D. Iowa 1993).......................................................................19

*In re Motors Liquidation Co.*,
    2015 Bankr. LEXIS 2406 (Bankr. S.D.N.Y. July 22, 2015) .....................................2

*In re Motors Liquidation Corp.*,
    529 B.R. 510 (Bankr. S.D.N.Y. 2015) .......................................................... *passim*

*O'Riordan v. Federal Kemper Life Assurance Co.*,
    114 P.3d 753 (Cal. 2005) ..........................................................................................14

*Weisfelner v. Fund 1 (In re Lyondell Chemical Co.)*,
    503 B.R. 348 (Bankr. S.D.N.Y. 2014) (Gerber, J.)..................................................14

09-50026-reg    Doc 13452    Filed 08/08/17    Entered 08/08/17 21:35:46    Main Document
Pg 333 of 728

## Statutes

49 U.S.C. § 30118(c) ............................................................................................... 5

49 U.S.C. § 30166(m)(3) ........................................................................................ 6

Cal. Civ. Code § 2332 ............................................................................................ 14

## Other Authorities

49 C.F.R. §§ 576.5-576.6 ......................................................................................... 6

49 C.F.R. § 579.21 .................................................................................................. 6

The Ignition Switch Plaintiffs,[1] certain Non-Ignition Switch Plaintiffs,[2] the State of Arizona *ex. rel.* Mark Brnovich, the Attorney General, the People of the State of California, by and through Orange County District Attorney Tony Rackauckas, the Post-Closing Ignition Switch Accident Plaintiffs,[3] and the Adams Plaintiffs[4] (collectively, "Plaintiffs") hereby submit their Opening Brief on the "Imputation Issue" pursuant to the *Scheduling Order Regarding Case Management Order re: No-Strike, No Stay, Objection, and GUC Trust Asset Pleading*, dated September 3, 2015 [ECF No. 13416].

## I.    INTRODUCTION

The issue before this Court is whether Plaintiffs' Complaints violate the Sale Order's ban on claims based on the actions of Old GM by alleging that New GM had knowledge of pre-363 Sale events (whether through imputation or otherwise).  The answer is, simply, no:  whenever

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Decision on Motion to Enforce Sale Order, In re Motors Liquidation Co.*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015).  Except where otherwise indicated, references to "ECF No. _" are to docket entries in the Bankruptcy Court proceedings: *In re Motors Liquidation Co.*, Bankr. Case No. 09-50026 (REF).

[2] The term "Non-Ignition Switch Plaintiffs" shall mean all plaintiffs that have commenced a lawsuit against New GM asserting economic losses based on or arising from an alleged defect, other than the Ignition Switch in the vehicles subject to Recall No. 14-V-047, or based on or arising from economic losses and diminution in value of their GM-branded vehicles based on the Ignition Switch Defect or other alleged defects in Old and New GM vehicles.

[3] As defined in the Post-Closing Ignition Switch Accident Plaintiffs' Memorandum of Law With Respect to Punitive Damages Issue, filed on September 13, 2015 [ECF No. 13434], the Post-Closing Ignition Switch Accident Plaintiffs are the plaintiffs in the "Bellwether Cases" and certain additional plaintiffs with personal injury, wrongful death, and property damage claims arising from post-Closing Date accidents and incidents in vehicles manufactured by Old GM.

[4] As defined in the Adams Plaintiffs' No Dismissal Pleading, filed on August 11, 2015 [ECF No. 13359], the Adams Plaintiffs are individuals with personal injury and wrongful death claims arising from pre-Closing Date accidents and incidents in vehicles manufactured by Old GM. Their complaint alleges a single count of liability against New GM for negligence, gross negligence, recklessness and/or fraud by concealment of the right to file a claim against Old GM in bankruptcy.

- 1 -

New GM's knowledge is part of the basis for a claim against New GM for its own misconduct, neither the source nor content of that knowledge can convert the claim into one based on the conduct of Old GM. As this Court recognized at the August 31 Status Conference, it has already resolved the issue.[5] As this Court has stated, "knowledge New GM personnel had when acting for New GM (even if those personnel acquired that knowledge while acting for Old GM) would be fair game" in litigation against New GM.[6] That statement is itself unassailable. So long as Plaintiffs seek to hold New GM liable solely for its own acts (and failures to act) in light of the knowledge that it had, the source of that knowledge does not change the claim into a "dressed-up" claim based on the actions of Old GM on a successorship or any other impermissible theory.

Indeed, New GM has just **conclusively admitted** its knowledge of the Ignition Switch Defect and its deadly consequences in a detailed Statement of Facts in a Deferred Prosecution Agreement with the United States Department of Justice ("DOJ").[7] As New GM has admitted for **all** litigation purposes,[8] it "failed to disclose a deadly safety defect to its U.S. regulator," and "falsely represented to consumers that vehicles containing the defect posed no safety concern."[9] Regardless of the source of New GM's knowledge, the Deferred Prosecution Agreement stands

---

[5] *In re Motors Liquidation Co.*, Bankr. Case No. 09-50026 (REF), *Transcript of Notice of Hearing/Notice of Status Conference to be Held in Connection with the Court's Case Management Order,* dated August 19, 2015 [Dkt. No. 13383], and the *Letters Filed in Response Thereto (Related Document(s) 13383)* [Dkt. No. 13396] (Aug. 31, 2015) (misdated Apr. 29, 2015), at 5:23-6:2.

[6] *In re Motors Liquidation Co.*, 2015 Bankr. LEXIS 2406, at *9 n.16 (Bankr. S.D.N.Y. July 22, 2015).

[7] A copy of the Deferred Prosecution Agreement and related documents is attached hereto as Exhibit 1.

[8] *See* Ex. A to the Deferred Prosecution Agreement at p. 6, ¶ 13.

[9] *See* Ex. C to Deferred Prosecution Agreement at ¶ 3.

- 2 -

as conclusive proof that New GM *itself* had knowledge of the Ignition Switch Defect and breached its clear legal obligations to disclose and remedy the defect, and to refrain from false and misleading statements to consumers.

Similar to the DOJ's claims that gave rise to the Deferred Prosecution Agreement, many of the claims Plaintiffs bring against New GM rely on New GM's knowledge of the Ignition Switch Defect (and the myriad other safety defects plaguing many models and years of GM-branded vehicles.) So, for example, Plaintiffs claim that New GM violated state consumer protection laws by, among other things, concealing and failing to disclose its knowledge of the Ignition Switch Defect and other safety defects in GM-branded vehicles in derogation of New GM's clear obligation under the Sale Agreement in which it voluntarily agreed to abide by the manufacturer's obligations under the Safety Act with respect to Old GM vehicles and parts.[10] The States assert that conduct by New GM subjects New GM to liability for civil penalties in connection with the sale of New GM vehicles,[11] and the Plaintiffs in the Second Amended Consolidated Complaint assert that the conduct subjects New GM to liability both in connection with the sale of New GM vehicles and by causing the value of *all* GM vehicles to diminish.[12] Plaintiffs claim that New GM can be held liable for its own actions in concealing that

---

[10] The "Safety Act" refers to the National Traffic Vehicle and Motor Vehicle Safety Act, 49 U.S.C. §§ 30101 *et seq.*, as amended by the Transportation Recall, Enhancement, Accountability and Documentation Act (the "TREAD Act"). In § 6.15 of the Sales Agreement, New GM agreed to abide by all Safety Act obligations with respect to vehicles and parts manufactured by Old GM.

[11] For the Court's convenience, the claims from the Arizona Action (¶¶ 494-511) and the California Action (¶¶ 253-273) are attached as Exhibits 2 and 3.

[12] By way of illustrative example, a copy Plaintiffs' claim for violations of the California Consumer Legal Remedies Act (¶¶ 1466-1492) is attached as Exhibit 4.

knowledge.[13]  Once again, the source of that knowledge is simply irrelevant to the issues before

this Court.

New GM can cite no language in the Sale Agreement or Sale Order that poses any bar to

(or even mentions) charging New GM with knowledge of pre-363 Sale facts.  Instead, New GM

makes the circular argument that Plaintiffs cannot salvage a barred claim based on the **conduct**

of Old GM by imputing **knowledge** of pre-Sale facts to New GM.  New GM does not explain

why basing a claim, in part, on knowledge of pre-Sale facts means that the claim is based on pre-

Sale **conduct**.  Again, Plaintiffs' claims are based on New GM's acts in light of New GM's

knowledge (including knowledge of pre-363 Sale events), and are not based on pre-Sale conduct.

New GM also makes two additional arguments that are simply not relevant to any of the

issues before this Court.  First, New GM argues that Plaintiffs may not be able to prove New

GM's knowledge of certain pre-Sale events (whether through imputation by agency, or

otherwise).[14]  Similarly, New GM argues, even if Plaintiffs prove its knowledge of pre-Sale

events, Plaintiffs still might not make out claims under governing state or federal law.[15]  If New

GM's arguments are correct on the merits, it might prevail on at least some of the claims in the

courts in which Plaintiffs' complaints will be adjudicated.  However, the issue before this Court

---

[13] New GM's argument that consumer protection statutes in certain states may not provide a claim with respect to cars sold pre-Sale is an argument on the merits for resolution by Judge Furman in the MDL litigation and other courts where the claims are pending, and is irrelevant to this Court's gatekeeper determination as to whether the claims are barred by the Sale Order.

[14] *See Omnibus Response by General Motors LLC to the No Strike Pleadings Filed by the States of Arizona and California* [ECF No. 13286 (July 10, 2015)] ("GM Omnibus Resp.") at 21-22; *Response by General Motors LLC to the Ignition Switch Plaintiffs' No Strike Pleading with Regard to the Second Amended Consolidated Complaint; and the Non-Ignition Switch Plaintiffs' Objection Pleading with Regard to the Second Amended Consolidated Complaint* [ECF No. 13316 (July 23, 2015)] ("GM Response re: MDL Complaint").

[15] GM Omnibus Resp. at 22 n.12.

- 4 -

is not whether Plaintiffs will ultimately prevail on their claims, but rather whether the Sale Order prevents them from asserting the claims in the first place. New GM's merits-based attacks pose no bankruptcy bar to claims charging New GM with knowledge of pre-363 Sale facts.

In resolving the Plaintiffs' "No Strike" and related Pleadings, this Court should find that alleging New GM's knowledge of pre-363 Sale facts does not violate the Sale Order.

## II.     FACTUAL BACKGROUND

### A.     No provisions in the Sale Order bar charging New GM with knowledge of pre-363 Sale facts.

Because New GM asserts that alleging its knowledge of pre-Sale facts somehow violates the Sale Order, it is incumbent on New GM to identify precisely which language in the Sale Order bars such allegations. New GM cannot do so, as no provisions in either the Sale Order or the Sale Agreement even mention charging New GM with pre-Sale knowledge, whether through imputation or otherwise.

### B.     New GM has always had the same TREAD Act duties with respect to the same Old GM vehicles as did Old GM.

New GM had ongoing obligations under the TREAD Act (as well as under various state consumer protection statutes) to monitor GM-branded vehicles on the road, to make quarterly reports to NHTSA, and to maintain all relevant records for five years. New GM explicitly assumed this duty in § 6.15 of the Sale Agreement, and hence stood in the role of "manufacturer,"[16] with respect to Old GM cars and parts.

As the Court is aware, the TREAD Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including incidents involving death or

---

[16] The TREAD Act on its face imposes recall and reporting obligations only on the "manufacturer" of a vehicle. 49 U.S.C. § 30118(c).

injury, claims relating to property damage received by the manufacturer, warranty claims paid by

the manufacturer, consumer complaints, and field reports prepared by the manufacturer's

employees or representatives concerning failure, malfunction, lack of durability, or other

performance issues.  49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.  Manufacturers must retain

for five years all underlying records on which the early warning reports are based and all records

containing information on malfunctions that may be related to motor vehicle safety.  49 C.F.R.

§§ 576.5-576.6.

Old and New GM used several processes to identify safety issues, including the TREAD

database and Problem Resolution Tracking System ("PRTS").  *See* Valukas Report at 282-313

(available at http://www.nhtsa.gov/staticfiles/nvs/pdf/Valukas-report-on-gm-redacted.pdf).  The

TREAD database, used to store the data required for the quarterly NHTSA early warning reports,

was the principal database used by Old and New GM to track incidents related to GM-branded

vehicles.  *Id.* at 306.  The database included information from (i) customer service requests; (ii)

repair orders from dealers; (iii) internal and external surveys; (iv) field reports from employees

who bought GM-branded vehicles and from Captured Test Fleet reports;[17] (v) complaints from

the OnStar call center; and (vi) a database maintained by GM legal staff to track data concerning

complaints filed in court.  *Id.*  A TREAD reporting team, headed up for both Old and New GM

by Dwayne F. Davidson, conducted monthly database searches and prepared scatter graphs to

identify spikes in the number of accidents or complaints related to various GM-branded vehicles.

*Id.* at 307.  Because the same employees carried out the TREAD Act obligations at Old and New

---

[17] Captured Test Fleet reports were submitted by employees who were given vehicles and
asked to document any problems that arose while driving.  Valukas Report at 300.  The Quality
Group would review, summarize, and group these reports into categories.  *Id.*

09-50026-reg   Doc 14453-1   Filed 05/04/18   Entered 05/04/18 15:38:50   Main Document
Pg 340 of 727

GM, *see infra* at 8, they not only had knowledge of pre-Sale events—they were required to act on that knowledge under the Sale Agreement in which New GM undertook to monitor Old GM vehicles for safety defects and promptly disclose and remedy any such defects.[18]

## C.     The same critical mass of employees worked at New GM in the same capacity with the same authority and the same knowledge they had while working at Old GM.

New GM essentially continued the operations of Old GM—building the same makes of cars in the same factories with essentially the same personnel.  New GM has conceded that "substantially all of Old GM's employees" were hired by New GM. [19]  New GM had TREAD Act responsibilities with respect to all vehicles and parts manufactured by Old GM,[20] as well as those made by New GM.  And discovery in the MDL to date has confirmed that—apart from the name of the company—precious little changed after the 363 Sale when Old GM became New GM.[21] ██████████████████████████████████████████████████

██████████████████████████████████████████[22]

---

[18] New GM admitted that it violated these duties with respect to the Ignition Switch Defect. *See* Consent Order, *available at* http://www.nhtsa.gov/staticfiles/communications/pdf/May-16-2014-TQ14-001-Consent-Order.pdf, at 4.  While New GM may repeat its specious assertion that certain Plaintiffs improperly assert private causes of action under the TREAD Act, not a single count in any of the Plaintiffs' Complaints does so.  In any event, such an argument is merely another merits-based attack to be heard by the court adjudicating Plaintiffs' Complaints, and can have no bearing on any issue properly before this Court in performing its gate-keeping role.

[19] GM Omnibus Resp. at 20.

[20] Sales Agreement, § 6.15.

[21] *See, e.g.,* May 7, 2015 Deposition of Mark Beauregard at 18:10-19:14 (Exhibit 5); May 15, 2015 Deposition of Dwayne Davidson at 204:21-207:24 ("Davidson Dep.") (Exhibit 6); June 1, 2015 Deposition of Vipul Modi at 20:18-21:12 (Exhibit 7); June 8, 2015 Deposition of Steven Oakley at 274:1-20 (Exhibit 8); July 15, 2015 Deposition of Deborah Nowak-Vanderhoef at 90:21-92:5 (Exhibit 9); August 26, 2015 Deposition of Douglas Parks at 174:15-175:6 (Exhibit 10); August 26, 2015 Deposition of Peter Judis at 16:6-17:6 (Exhibit 11).

[22] *See id.*



Typical is the testimony of Mr. Davidson, who ███████████████████████
███████████ Mr. Davidson testified that ████████████████████████
████████████[23] According to Mr. Davidson, ██████████████████████
████████████████[4] ████████████████████████████████
████████████████████████ ██ .[25] ███████████
████████████████████████████████
████████████████████████[26] █████████████
████████████████████████████████████████
████████████████████████████████████████
███ .[27] ████████████████████████████
████████████████████████[28] ████████████
████████████████████████████████████████
████████████████████████████████████ █
████████████████████████,,[30] ████████████████
████████████████████████████[31]

---

[23] Davidson Dep. at 205:4-10.

[24] *Id.* at 205:17-25.

[25] *Id.* at 206:2-12.

[26] *Id.* at 206:13-23.

[27] *Id.* at 207:10-22.

[28] *Id.* at 210:16-211:2.

[29] *Id.* at 209:1-23.

[30] *Id.* at 209:24-210:5.

[31] *Id.* at 210:9-11.

- 8 -

New GM's legal department was also comprised of the same personnel as in the days of Old GM. ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████ [32]  Jacyln C. Palmer, Michael Gruskin and Doug Brown were among those who were in-house attorneys at both Old and New GM, and attended the Roundtable meetings during which the company discussed whether (and for how much) cases against GM should be settled—including cases involving the Ignition Switch Defect.[33]  Although the main function of the Roundtable was to evaluate claims and generate settlement forecasts, the Roundtable "had a second function as well: to spot trends indicating safety issues."[34]  Palmer has stated that "attorneys discussed potential safety or accident trends at Roundtable on occasion, and the Roundtable Committee referred issues to GM engineers for a follow-up investigation."[35]  The Ignition Switch Defect was discussed at Roundtables both before and after the 363 Sale.[36]  At Old GM, lawyers were told that "if you as an attorney are aware of any threatened, on-going or past violation of a federal, state or local law or regulation . . . it is your responsibility to respond appropriately." [37]  At New GM, the same lawyers had the same responsibility.  Indeed, General Counsel for GM North America, Lucy Clark-Dougherty, recently testified ██████████████

---

[32] *See, e.g.*, May 19, 2015 Deposition of Jaclyn Palmer at 231:15-19, 247:12-248:5, 267:14-20 (Exhibit 12).

[33] Valukas Report, 106-07.

[34] Valukas Report, 108.

[35] Valukas Report, 108.

[36] *See* Valukas Report at 110-112 (2006 Roundtable discussions of accidents caused by Ignition Switch Defect); *id.* at 130 (2008 Roundtable discussion of accident caused by Ignition Switch Defect); *id.* at 148 (2011 Roundtable discussion of accident caused by Ignition Switch Defect); *id.* at 163 (2012 Roundtable discussion of accident caused by Ignition Switch Defect).

[37] Valukas Report, 109.

010440-11 809504 V1

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ [38]

Likewise, the same engineering personnel who were involved with investigating the Ignition Switch Defect performed the same functions at both Old and New GM. For example, both Old and New GM used Field Performance Assessment ("FPA") engineers to assist in defending product claims.[39] "FPA engineers are assigned to gather information and assess technical issues in lawsuits and [not-in-suit matters.]"[40] Their assessments "are the lawyers' primary source of technical information for the early case evaluations...."[41] While at Old GM, FPA engineer Kathy Anderson was assigned to fatal crashes involving the Ignition Switch Defect and airbag nondeployment.[42] Anderson was then involved in the investigation of other fatal airbag nondeployment cases in 2010 and 2011.[43] John Sprague was another FPA engineer at Old and New GM; while at Old GM, he investigated at least one crash involving the Ignition Switch Defect.[44] In 2007, Sprague was tasked with compiling information on Cobalt and Ion not-in-suit matters and lawsuits.[45] After a meeting with airbag manufacturer Continental in May

---

[38] Aug. 13, 2015 Deposition of Lucy Clark-Dougherty at 31:11-33:1, 34:24-35:11, 80:12-23, 121:10-22, 123:1-21 (Exhibit 13).

[39] Valukas Report, 105.

[40] Valukas Report, 106.

[41] Valukas Report, 106.

[42] Pltfs' Stip. Facts, ¶ 14(C); Valukas Report, 112.

[43] Valukas Report, 140, 148.

[44] Pltfs' Stip. Facts, ¶ 14(X).

[45] *Id.*

- 10 -

09-50026-reg    Doc 13533-1    Filed 10/02/17    Entered 10/02/17 12:51:58    Main Document
Pg 11 of 22

of 2009, Sprague collected information regarding power mode status, added it to his spreadsheet of airbag nondeployment not-in-suit matters and lawsuits, and discovered that the power mode was recorded as Off or Accessory in a number of accidents.[46]  Sprague continued adding to his spreadsheet, and continued his involvement in investigating the Ignition Switch Defect, after he began working for New GM.[47]  In fact, Sprague was involved in the 2011 meeting that "kicked-off" the Field Performance Evaluation process in connection with Cobalt airbag nondeployments, at which he expressed "a theory that the airbag non-deployments were connected to [the sensing diagnostic module] receiving a message that the vehicle power mode was in Accessory or Off," and that "these power-mode messages might be connected to the Ignition Switch."[48]

As this Court has ruled based on the stipulated factual record:

> [A]t least 24 Old GM engineers, senior managers and attorneys knew of the Ignition Switch Defect and the need to send out recall notices—and of the reasons why recall notices had to go out, here. And it is uncontroverted that Old GM had enough knowledge of the Ignition Switch Defect to be required, under the Safety Act, to send out mailed recall notices to owners of affected Old GM vehicles ….
>
> …24 Old GM personnel knew of the need to conduct a recall (and with that, of the need to fix the cars); and, in addition, a critical safety situation….[49]

---

[46] Valukas Report, 135.

[47] *See, e.g.,* Valukas Report, 148 (Sprague involved in investigating post-Sale crashes involving Ignition Switch Defect).

[48] Valukas Report, 150-154.

[49] *In re Motors Liquidation Corp.*, 529 B.R. at 557.

- 11 -

Based on this "critical mass" of personnel with knowledge of the Ignition Switch Defect, this

Court found that the Ignition Switch Defect was known to Old GM such that owners of the

vehicles with the Ignition Switch Defect were "known creditors" to Old GM for the purposes of

Due Process.[50]  As this Court also found, all of these personnel transferred to New GM.[51]  There

is nothing to suggest they left their knowledge of pre-363 Sale events behind—and it is

undisputed that they (and New GM) had the responsibility to act on **all** relevant knowledge,

including knowledge of pre-363 Sale events.

## III.   ARGUMENT

**A.    New GM can be sued for its own acts and omissions in light of its knowledge without violating the Sale Order, *regardless* of how New GM obtained that knowledge.**

Many of the causes of action pled in the Plaintiffs' Complaints depend, at least in part, on

New GM's knowledge of pre-363 Sale facts—including knowledge of the Ignition Switch Defect

and a host of other pre-Sale defects.  In general terms, the Plaintiffs allege that, rather than

disclose and remedy those defects, New GM knowingly concealed them from regulators,

consumers and the public at large.[52]  To the extent that it is necessary for Plaintiffs to prove New

GM's knowledge of pre-363 Sale facts, Plaintiffs will have to do so in order to prevail in the

---

[50] *Id.* at 558 n.154.

[51] *Id.* at 537.

[52]  *See The Ignition Switch Plaintiffs' No Strike Pleading with Regard to the Second Amended Consolidated Complaint; and the Non-Ignition Switch Plaintiffs' (I) Objection Pleading with Regard to the Second Amended Consolidated Complaint and (II) GUC Trust Asset Pleading* [ECF No. 13247 (June 24, 2015)] at 9-12, 23-28 (summarizing claims in the Second Amended Consolidated Complaint); *State of Arizona's "No Strike" Pleading* [ECF No. 13211 (June 16, 2015) (Arizona No Strike Pleading")] at 4-7 (summarizing claims in State of Arizona's Complaint); *People of the State of California's "No Strike" Pleading* [ECF No. 13210 (June 16, 2015) ("California No Strike Pleading)] at 4-7 (summarizing claims in California's First Amended Complaint).

- 12 -

Courts in which their Complaints are pending—whether by showing that a "critical mass" of New GM employees were aware of the defect, or through imputation by agency, or otherwise.  If Plaintiffs cannot prove knowledge of certain facts, and that knowledge is necessary to prevail on their claims, they will not prevail.  ***But the simple fact that Plaintiffs allege that New GM had knowledge of pre-Sale facts does not convert their claims to impermissible claims based on the conduct of Old GM.***

**B.    Because large numbers of Old GM employees brought knowledge of pre-363 Sale events with them to New GM and/or learned about pre-363 Sale events from reviewing relevant records, New GM may be charged with knowledge of those pre-363 Sale events.**

This Court found based on the stipulated factual record that the Ignition Switch Plaintiffs were known creditors to Old GM because a "'critical mass' of Old GM personnel had the requisite knowledge" of the defect.  529 B.R. at 558 n.154.  Under the logic of this Court's ruling, the pre-Sale knowledge of employees who worked first at Old GM and then at New GM is charged to New GM.  This Court based its conclusion that Old GM had knowledge of the Ignition Switch Defect in part on the fact that Old GM—and later New GM—engineers, senior managers, and attorneys who knew of the Ignition Switch Defect were part of "a group large in size and relatively senior in position."  *Id.*  In this Court's opinion, "a group of this size is sufficient for the Court to conclude that a 'critical mass' of Old GM personnel had the requisite knowledge—*i.e.*, were in a position to influence the noticing process."  *Id.* (citing *cf. Weisfelner v. Fund 1 (In re Lyondell Chemical Co.),* 503 B.R. 348, 389 (Bankr. S.D.N.Y. 2014) (Gerber,

J.)).[53]  Necessarily, given the presence of this same "critical mass" at New GM, 529 B.R. at 537,

New GM had knowledge of the Ignition Switch Defect.

      Alternatively, under the law of agency in California, Arizona, Michigan, New York and

elsewhere, Plaintiffs believe they will be able to show that the knowledge that New GM

employees obtained while working at Old GM is attributable to New GM—even if there was not

a "critical mass" of personnel with knowledge.  Indeed, the law in Arizona, California and across

the country broadly imputes an employee's knowledge to its corporate employer where, as here,

the employees are acting in the scope of their employment and that knowledge is germane to

their responsibilities.  *See, e.g., Fridena v. Evans*, 622 P.2d 463, 466 (Ariz. 1980); Cal. Civ.

Code § 2332 ("As against a principal, both principal and agent are deemed to have notice of

whatever either has notice of, and ought, in good faith and the exercise of ordinary care and

diligence, to communicate to the other."); *O'Riordan v. Federal Kemper Life Assurance Co.*,

114 P.3d 753, 757 (Cal. 2005);  *Allard v. Arthur Andersen & Co. (USA)*, 924 F. Supp. 488, 494-

95 (S.D.N.Y. 1996) (applying New York and Michigan law).  Again, each of the 24 Old GM

employees that this Court found to be aware of the Ignition Switch Defect remained at New GM

in the same or similar roles because New GM chose to keep them there.  To impute the

knowledge of those employees to New GM does not somehow convert Plaintiffs' claims into

successor liability claims (or any other barred claims based on the acts of Old GM).  If New GM

or those employees had acted appropriately upon their hiring by New GM to address (rather than

---

[53] Plaintiffs note that, unlike this case, *Weisfelner* was an adversary proceeding in which this Court was adjudicating whether or not a claim was stated on the merits.  No party in *Weisfelner* argued that imputing knowledge was in violation of any "free and clear" provisions in a sale order.

conceal) the known problems, Plaintiffs would not be seeking to hold New GM liable for its own misconduct.

Contrary to New GM's argument, under agency principles, the knowledge of these employees and counsel may be imputed to New GM.[54] So, for example, under Arizona law, "a corporation is bound by the knowledge acquired by, or notice given to, its agents ... which is within the scope of their authority and which is in reference to a matter to which their authority extends."[55] And employees' knowledge within the scope of their employment is imputed to the corporation even if it is never communicated because Courts impose a conclusive presumption that the agent has discharged his duty to impart to the principal all the knowledge which is necessary for the principal's protection or guidance.[56] Here, it is undisputed that New GM assumed ongoing obligations under the TREAD Act to monitor Old GM vehicles, disclose known defects and order recalls if dictated by safety concerns. Plaintiffs allege that many GM attorneys, engineers, managers, and other personnel who worked at both Old and New GM acquired knowledge of the Ignition Switch Defect and other defects while performing their duties, using systems and procedures that Old and then New GM maintained to comply with Safety Act obligations. *See supra* at 5-12. These facts distinguish this case from the cases cited by New GM declining to find "automatic imputation." *See infra* at 17-19. Hence, while the issue of whether or not Plaintiffs can meet the standards for imputation under agency principles

---

[54] *See* Arizona No Strike Pleading at 14-17; California No Strike Pleading at 16-18 (discussing imputation under the law of Arizona, California, New York, and Michigan).

[55] *Fridena v. Evans,* 622 P.2d at 466.

[56] *See, e.g., First Ala. Bank of Montgomery, N.A. v. First State Ins. Co.*, 899 F.2d 1045, 1061 n.8 (11th Cir. 1990).

- 15 -

is not before this Court, Plaintiffs believe they will be able to do so when the issue is properly

joined in the courts adjudicating their Complaints.

**C.**     **New GM's arguments against charging it with knowledge of pre-Sale events are
        misplaced.**

> **1.**     **New GM's argument against imputing the knowledge its employees obtained
>         while working at Old GM is irrelevant and incorrect.**

New GM argues that "allegations regarding the knowledge of Old GM employees who

became New GM employees" should be stricken from Plaintiffs' Complaints because Plaintiffs

cannot meet the requirements for imputation under governing state or federal law. [57] But that

argument misses the mark, since the issue before this Court is ***not*** whether Plaintiffs will be

successful in charging New GM with the knowledge of its employees (whether by imputation or

otherwise), but whether Plaintiffs are allowed to make the attempt.[58]

The issues of what knowledge New GM had, and whether New GM's conduct in light of

that knowledge subjects it to liability, are ultimately for the courts adjudicating Plaintiffs' claims

on the merits.  Plaintiffs will nonetheless address New GM's argument that "the knowledge of

Old GM's employees cannot be automatically imputed to New GM simply because they went to

work for New GM after the closing of the 363 Sale."[59]  Whether or not New GM's "automatic

imputation" argument is correct under the law of any relevant jurisdiction, Plaintiffs do ***not*** seek

---

[57] *See Response by General Motors LLC to Adams Plaintiffs' No Dismissal Pleading* [ECF
No. 13422 (Sept. 3. 2015) ("*Adams* Resp.")] at 14-16.

[58] New GM puts the cart before the horse when it states: "That New GM hired many of Old
GM's employees who may have knowledge of something does not change the fact that … the
underlying claim is based on Old GM's conduct…."  *Adams* Resp. at 15.   New GM's
argument—that a barred claim cannot be saved by imputation—does not logically advance its
claim that imputation is automatically barred.

[59] *Adams* Resp. at 15.

to attribute knowledge of the Ignition Switch Defect to New GM *merely because* Old GM employees continued on at New GM.  In fact a "critical mass" of high level Old GM employees with knowledge of the defects stayed on at New GM.  Moreover, they worked in the same capacities for a company with the same TREAD Act responsibilities for monitoring and remedying safety defects in GM-branded vehicles, and with access to the same information which they necessarily used to perform the same job functions with respect to those same vehicles.  None of New GM's authorities involve remotely similar facts.

New GM's leading case, *Conmar Prods. Corp. v. Universal Slide Fastener Co.*, 172 F.2d 150 (2d Cir. 1949),[60] is wholly inapposite.  In order to prevail on its trade secrets claim in *Conmar*, the plaintiff was required to prove that the defendants knew that plaintiff's former employees had executed contracts promising not to divulge plaintiff's methods, and that defendants "induced the men to divulge the secrets they had learned."  *Id.* at 154.  In other words, "the [alleged] wrong consist[ed] in inducing [the employee] to break his contract" by disclosing the secret. *Id.* at 155.  Because the Second Circuit affirmed the district court's finding that defendants "had no knowledge of the secrecy contract," *id.* at 154, it ruled in favor of the defendants: "[h]aving acquired the secrets innocently, they were entitled to exploit them."  *Id.* at 157.  Because it was undisputed that the defendants *did* acquire the knowledge its employees obtained in their former employ, *Conmar* provides no support for New GM here.

*Chamberlain Group, Inc. v. Nassimi,* 2010 WL 1875923 (W.D. Wash. May 10, 2010), is also readily distinguishable.  There, the plaintiff Chamberlain sought rescission of the purchase of defendant Nassimi's company based on a claim of fraudulent inducement.  Nassimi defended

---

[60] Cited in *Adams* Resp. at 15.

09-50026-reg Doc 13443-7 Filed 08/11/15 Entered 08/11/15 13:18:56 Main Document
Pg 22 of 27

on the grounds that one of his prior employees, Crider, was aware of the alleged fraud before he became an employee of Chamberlain. *Id.* at *2. Under governing Washington agency law, "knowledge may be imputed if it relates to the subject matter of the agency, and the agent acquired it while acting within the scope of his or her authority." *Goodman v. Boeing Co.*, 75 Wash. App. 60, 86 (1994). Hence, the *Chamberlain* court found, "Crider's knowledge … cannot be imputed … because Crider … acquired knowledge of the alleged fraud before being hired by Chamberlain." *Nassimi*, 2010 WL 1875923, at *6. Here, in stark contrast, the same "critical mass" of Old GM employees continued on in their same roles with New GM—hence, they had and used knowledge of pre-Sale events while acting within the scope of their authority at New GM.[61] Moreover, to the extent *Nassimi* accurately describes Washington law as disallowing imputation of knowledge acquired prior to the agency relationship, Plaintiffs note that the law in other jurisdictions differs. So, for example, in California, the principal is "charged with knowledge which his agent acquires before the commencement of the relationship when that knowledge can reasonably be said to be present in the mind of the agent while acting for the principal,"[62] and in Arizona a corporation is bound by the knowledge of its agents so long as the knowledge is "within the scope of their authority and … is in reference to a matter to which their authority extends."[63]

---

[61] *Forest Labs., Inc. v. The Pillsbury Co.*, 452 F. 2d 621, 626 (7th Cir. 1971), likewise holds merely that "the knowledge of the [seller's] employees cannot properly be imputed to [the purchaser] just because they went to work for the [the purchaser]." Once again, the critical mass of employees with knowledge here necessarily had, and were required to act on, that knowledge given their duties and New GM's ongoing TREAD Act obligations.

[62] *Columbia Pictures Corp. v. De Toth,* 87 Cal. App. 2d 620, 631 (1948).

[63] *Fridena,* 622 P.2d at 466.

Finally, New GM can draw no support from its citation to *Interstate Power Co. v. Kansas City Power & Light Co.*, 909 F. Supp. 1241, 1272 (N.D. Iowa 1993).  While that decision indeed rejected the argument that "the knowledge of [the seller's] employees … should be imputed to [the purchaser]," the court did so because "[a]t best the evidence shows that a handful of [the seller's] employees had knowledge [of the relevant issue] and none of them had any reason to raise the issue after becoming employees of [the buyer.]"  *Id.*  Here, in stark contrast, a "critical mass" of New GM employees had knowledge of the Ignition Switch Defect and, acting within the scope of their authority in carrying out New GM's TREAD Act obligations, they had every reason and obligation to raise the issues after they became employees of New GM.

In sum, under the facts of this case, Plaintiffs will be able to satisfy the requirements for imputation under the agency law of most or all relevant jurisdictions.

### 2. The language of the Sale Agreement does not bar allegations that New GM had knowledge of pre-Sale facts.

New GM argues that imputation of pre-bankruptcy facts is somehow barred because "the Sale Agreement contemplated that (a) substantially all of Old GM's employees would be hired by New GM … (*see* Sale Agreement § 6.17(a)), and (b) the hiring of such employees would not transform Retained Liabilities based on Old GM's knowledge and conduct into, essentially, a new and unexpressed category of Assumed Liabilities of New GM."[64]  But New GM's argument here is circular at best.

New GM simply assumes (without explaining why) claims based in part on New GM's knowledge of pre-Sale events are "Retained Liabilities based on Old GM's knowledge and conduct…."  But claims based on New GM's knowledge (and its actions and failures to act in

---

[64] GM Omnibus Resp. at 20.

- 19 -

09-50026-reg Doc 13443-7 Filed 09/18/15 Entered 09/18/15 20:29:36 Main Document
Pg 24 of 27

light of that knowledge) cannot be converted into Retained Liabilities merely because New

GM's knowledge relates to facts that occurred prior to the 363 Sale. Instead, as this Court held,

it is claims based on "wrongful **conduct** by Old GM" that are "actually claims against Old GM"

and therefore generally proscribed by the Sale Agreement, the Sale Order and the Decision. *See*

529 B.R. at 528.

Differently put, suppose that New GM had chosen to terminate each of the 24 employees

with knowledge of the Ignition Switch Defect, and assume (contrary to reality) that those were

the only 24 employees with knowledge of the Ignition Switch Defect. Further suppose that,

shortly after New GM came into existence, its new TREAD team reviewed all the relevant

records of Old GM and became fully aware of the Ignition Switch Defect. In that scenario, not

even New GM could claim that attempts to hold it liable for its subsequent actions and inactions

in connection with the Ignition Switch Defect were barred by the Sale Order. And New GM has

offered no reason why the result should be different simply because it kept those 24 employees

(and their knowledge) through the changeover to New GM.

## IV.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully submit that the knowledge of New

GM employees can be charged to New GM without violating the Sale Order, regardless of

whether that knowledge was gained while working for Old GM, reviewing Old GM records

while working at New GM, or independently acquired at New GM.

Dated:  September 18, 2015

- 20 -

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Steve W. Berman*
Steve W. Berman
steve@hbsslaw.com
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:  206-623-7292

*Co-Lead Counsel in the MDL Proceeding
for the Ignition Switch Plaintiffs and Certain Non-
Ignition Switch Plaintiffs; and Counsel for the
People of the State of California, acting by and
through Orange County District Attorney Tony
Rackauckas and the State of Arizona*

-and-

Elizabeth J. Cabraser
ecabraser@lchb.com
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, California 94111
Telephone: 414-956-1000

*Co-Lead Counsel in the MDL Proceeding for the
Ignition Switch Plaintiffs and Certain Non-Ignition
Switch Plaintiffs*

-and-

Mark P. Robinson Jr.
mrobinson@rcrlaw.net
**ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.**
19 Corporate Plaza Drive
Newport Beach, California 92660
Telephone: 949-720-1288

*Counsel for the People of the State of California,
acting by and through Orange County District
Attorney Tony Rackauckas*

- 21 -

-and-

Edward S. Weisfelner
eweisfelner@brownrudnick.com
Howard S. Steel
hsteel@brownrudnick.com
**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
Telephone: 212-209-4800

-and-

Sander L. Esserman
esserman@sbep-law.com
**STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, A PROFESSIONAL CORPORATION**
2323 Bryan Street, Ste 2200
Dallas, Texas 75201
Telephone: 214-969-4900

*Designated Counsel in the Bankruptcy Proceeding
for the Ignition Switch Plaintiffs and Certain Non-
Ignition Switch Plaintiffs*

-and-

William P. Weintraub
wweintraub@goodwinprocter.com
**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Telephone: 212-813-8800

*Counsel for Post-Closing Accident Switch Plaintiffs
and the Adams Plaintiffs*

- 22 -

## CERTIFICATE OF SERVICE

       I hereby certify that on September 18, 2015, I caused the foregoing to be filed and served

upon all parties receiving notice via the Court's ECF system.

Dated:  September 18, 2015              /s/ Steve W. Berman
                                     Steve W. Berman (pro hac vice)
                                     HAGENS BERMAN SOBOL SHAPIRO LLP
                                     1918 Eighth Avenue, Suite 3300
                                     Seattle, Washington  98101
                                     Tel.:  206-623-7292
                                     steve@hbsslaw.com

09-50026-reg-mg-mbc-23452-MF    Filed 09/15/46-57-Entered 09/02/15 14:32:29 dExhibit A
Pg 357 of 728

# Exhibit 1

PREET BHARARA
United States Attorney for the
Southern District of New York
By:  JASON H. COWLEY
     ALEXANDER J. WILSON

Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,                    :

                    Plaintiff,               :        VERIFIED COMPLAINT

           -v.-                              :        15 Civ. ____

$900,000,000 in United States               :
Currency,
                                             :
                    Defendant in rem.
- - - - - - - - - - - - - - - - - - -x

        Plaintiff United States of America, by its attorney, PREET

BHARARA, United States Attorney for the Southern District of New

York, for its Verified Complaint (the "Complaint") alleges, upon

information and belief, as follows:

                    I.    JURISDICTION AND VENUE

        1.    This action is brought by the United States of

America pursuant to 18 U.S.C. § 981(a)(1)(C), seeking the

forfeiture of $900,000,000 in United States Currency (the

"Defendant Funds" or the "defendant-in-rem").

2.     This Court has jurisdiction pursuant to 28 U.S.C.
§ 1355.

3.     Venue is proper pursuant to 28 U.S.C. §
1355(b)(1)(A) because certain acts and omissions giving rise to
the forfeiture took place in the Southern District of New York,
and pursuant to Title 28, United States Code, Section 1395
because the defendant-in-rem shall be transferred to the
Southern District of New York.

4.     The Defendant Funds represent property
constituting and derived from proceeds of wire fraud in
violation of Title 18, United States Code, Sections 1343, and
property traceable to such property; and are thus subject to
forfeiture to the United States pursuant to Title 18, United
States Code, Section 981(a)(1)(C).

## II.   PROBABLE CAUSE FOR FORFEITURE

5.     General Motors Company ("GM"), an automotive
company headquartered in Detroit, Michigan, entered into a
Deferred Prosecution Agreement with the United States, wherein,
*inter alia*, GM agreed to forfeit a total of $900,000,000, i.e.,
the Defendant Funds, to the United States.  GM agrees that the
Defendant Funds are substitute *res* for the proceeds of GM's wire
fraud offense.  The Deferred Prosecution Agreement, with the

2

accompanying Statement of Facts and Information, is attached as
Exhibit A and incorporated herein.

### III. CLAIM FOR FORFEITURE

6.  The allegations contained in paragraphs one
through five of this Verified Complaint are incorporated by
reference herein.

7.  Title 18, United States Code, Section
981(a)(1)(C) subjects to forfeiture "[a]ny property, real or
personal, which constitutes or is derived from proceeds
traceable to a violation of . . . any offense constituting
'specified unlawful activity' (as defined in section 1956(c)(7)
of this title), or a conspiracy to commit such offense."

8.  "Specified unlawful activity" is defined in 18
U.S.C. § 1956(c)(7) to include any offense under 18 U.S.C. §
1961(1). Section 1961(1) lists, among others offenses,
violations of Title 18, United States Code, Section 1343
(relating to wire fraud).

9.  By reason of the foregoing, the defendant-in-rem
is subject to forfeiture to the United States of America
pursuant to Title 18, United States Code, Section 981(a)(1)(C),
as it is substitute *res* for property derived from wire fraud, in
violation of Title 18, United States Code, Section 1343.

3

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the defendant-in-rem and that all persons having an interest in the defendant-in-rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the defendant-in-rem to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated:     New York, New York
           September 16, 2015

                              PREET BHARARA
                              United States Attorney for
                              Plaintiff United States of America

          By:    _____
                 JASON H. COWLEY
                 ALEXANDER J. WILSON
                 Assistant United States Attorneys
                 One St. Andrew's Plaza
                 New York, New York 10007
                 (212) 637-2200

VERIFICATION

STATE OF NEW YORK            )
COUNTY OF NEW YORK           :
SOUTHERN DISTRICT OF NEW YORK )

KENNETH W. JACOUTOT, being duly sworn, deposes and says that he is a Special Agent with the United States Department of Transportation, Office of Inspector General; that he has read the foregoing Verified Complaint and knows the contents thereof; and that the same is true to the best of his knowledge, information and belief.

The sources of deponent's information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

Kenneth W. Jacoutot
Special Agent
Department of Transportation,
Office of Inspector General

Sworn to before me this
16 th day of September, 2015

Notary Public

NAEEM A. CONWAY
Notary Public, State of New York
No. 01CO6110667
Qualified in New York County
Commission Expires June 01, 2016

# Exhibit
# A



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York New York 10007*

September 16, 2015

Anton R. Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
Jenner & Block LLP
919 Third Avenue
New York, NY 10022

## Re: General Motors Company – Deferred Prosecution Agreement

Dear Messrs. Valukas, Schar, and Barkow:

Pursuant to the understandings specified below, the Office of the United States Attorney for the Southern District of New York (the "Office") and the defendant General Motors Company ("GM"),[1] under authority granted by its Board of Directors in the form of the written authorization attached as Exhibit A, hereby enter into this Deferred Prosecution Agreement (the "Agreement").

## The Criminal Information

1.      GM consents to the filing of a two-count Information (the "Information") in the United States District Court for the Southern District of New York (the "Court"), charging GM with engaging in a scheme to conceal a deadly safety defect from its U.S. regulator, in violation of Title 18, United States Code, Section 1001, and committing wire fraud, in violation of Title 18, United States Code, Section 1343. A copy of the Information is attached as Exhibit B. This Agreement shall take effect upon its execution by both parties.

---

[1]   For the purposes of this Deferred Prosecution Agreement, to the extent any conduct, statement, actions, or documents occurred on or are dated before July 10, 2009, references to "GM" shall mean and are intended to mean solely "Motors Liquidation Company," previously known as General Motors Corporation ("Old GM"). Although New GM in the Statement of Facts attached as Exhibit C hereto admits certain facts about Old GM's acts, conduct, or knowledge prior to July 10, 2009 based on New GM's current knowledge, New GM does not intend those admissions to imply or suggest that New GM is responsible for any acts, conduct or knowledge of Old GM, or that such acts, conduct, and knowledge of Old GM can be imputed to New GM.  The Statement of Facts is not intended to alter, modify, expand, or otherwise affect any provision of the July 5, 2009 Sale Order that was issued by the U.S. Bankruptcy Court for the Southern District of New York, or the rights, protections, and responsibilities of New GM under the Sale Order..

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

## Acceptance of Responsibility

2.      GM admits and stipulates that the facts set forth in the Statement of Facts attached as Exhibit C and incorporated herein are true and accurate.  In sum, GM admits that it failed to disclose to its U.S. regulator and the public a potentially lethal safety defect that caused airbag non-deployment in certain GM model cars, and that GM further affirmatively misled consumers about the safety of GM cars afflicted by the defect.

## Forfeiture

3.      As a result of the conduct described in the Information and the Statement of Facts, GM agrees to pay to the United States $900 million (the "Stipulated Forfeiture Amount") representing the proceeds resulting from such conduct.  GM agrees that the allegations contained in the Information and the facts set forth in the Statement of Facts are sufficient to establish that the Stipulated Forfeiture Amount is subject to civil forfeiture to the United States and that this Agreement, Information, and Statement of Facts may be attached to and incorporated into the Civil Forfeiture Complaint to be filed against the Stipulated Forfeiture Amount, a copy of which is attached as Exhibit D hereto.  By this Agreement, GM specifically waives service of said Civil Forfeiture Complaint and agrees that a Final Order of Forfeiture may be entered against the Stipulated Forfeiture Amount.  Upon payment of the Stipulated Forfeiture Amount, GM shall release any and all claims it may have to such funds and execute such documents as necessary to accomplish the forfeiture of the funds.  GM agrees that it will not file a claim with the Court or otherwise contest the civil forfeiture of the Stipulated Forfeiture Amount and will not assist a third party in asserting any claim to the Stipulated Forfeiture Amount.  GM agrees that the Stipulated Forfeiture Amount shall be treated as a penalty paid to the United States government for all purposes, including all tax purposes.  GM agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, local, or foreign tax for any fine or forfeiture paid pursuant to this Agreement.

4.      GM shall transfer $900 million to the United States by no later than September 24, 2015 (or as otherwise directed by the Office following such date).  Such payment shall be made by wire transfer to the United States Marshals Service, pursuant to wire instructions provided by the Office.  If GM fails to timely make the payment required under this paragraph, interest (at the rate specified in Title 28, United States Code, Section 1961) shall accrue on the unpaid balance through the date of payment, unless the Office, in its sole discretion, chooses to reinstate prosecution pursuant to paragraphs 10 and 11 below.

## Obligation to Cooperate

5.      GM has cooperated with this Office's criminal investigation and agrees to cooperate fully and actively with the Office, the Federal Bureau of Investigation ("FBI"), the Department of Transportation ("DOT"), the Office of the Special Inspector General  for the Troubled  Asset  Relief  Program  ("SIGTARP"),  the  National  Highway  Traffic  Safety Administration ("NHTSA"), and any other agency of the government designated by the Office

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

regarding any matter relating to the Office's investigation about which GM has knowledge or information.

6.      It is understood that GM shall (a) truthfully and completely disclose all information with respect to the activities of itself and its subsidiaries, as well as with respect to the activities of officers, agents, and employees of GM and its subsidiaries, concerning all matters about which the Office inquires of it, which information can be used for any purpose; (b) cooperate fully with the Office, FBI, DOT, SIGTARP, NHTSA, and any other law enforcement agency designated by the Office; (c) attend all meetings at which the Office requests its presence and use its best efforts to secure the attendance and truthful statements or testimony of any past or current officers, agents, or employees of GM or its subsidiaries at any meeting or interview or before the grand jury or at trial or at any other court proceeding; (d) provide to the Office upon request any document, record, or other tangible evidence relating to matters about which the Office or any designated law enforcement agency inquires of it; (e) assemble, organize, and provide in a responsive and prompt fashion, and upon request, on an expedited schedule, all documents, records, information and other evidence in GM's possession, custody or control as may be requested by the Office, FBI, DOT, SIGTARP, NHTSA, or designated law enforcement agency; (f) volunteer and provide to the Office any information and documents that come to GM's attention that may be relevant to the Office's investigation of this matter, any issue related to the Statement of Facts, and any issue that would fall within the scope of the duties of the independent monitor (the "Monitor") as set forth in paragraph 15; (g) provide testimony or information necessary to identify or establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any criminal or other proceeding as requested by the Office, FBI, DOT, SIGTARP, NHTSA, or designated law enforcement agency, including but not limited to information and testimony concerning the conduct set forth in the Information and Statement of Facts; (h) bring to the Office's attention all criminal conduct by or criminal investigations of GM or any of its agents or employees acting within the scope of their employment related to violations of the federal laws of the United States, as to which GM's Board of Directors, senior management, or United States legal and compliance personnel are aware; (i) bring to the Office's attention any administrative or regulatory proceeding or civil action brought by or investigation conducted by any U.S. governmental authority that alleges fraud by GM; and (j) commit no crimes whatsoever under the federal laws of the United States subsequent to the execution of this Agreement. In the event the Office determines that information it receives from GM pursuant to this provision should be shared with DOT and/or NHTSA, the Office may request that GM provide such information to DOT and/or NHTSA directly. GM will submit such information to DOT and/or NHTSA consistent with the regulatory provisions related to the protection of confidential business information contained in 49 C.F.R. Part 512 and 49 C.F.R. Part 7. Nothing in this Agreement shall be construed to require GM to provide any information, documents or testimony protected by the attorney-client privilege, work product doctrine, or any other applicable privilege.

7.      GM agrees that its obligations pursuant to this Agreement, which shall commence upon the signing of this Agreement, will continue for three years from the date of the

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

Court's acceptance of this Agreement, unless otherwise extended pursuant to paragraph 12 below. GM's obligation to cooperate is not intended to apply in the event that a prosecution against GM by this Office is pursued and not deferred.

## Deferral of Prosecution

8.      In consideration of GM's entry into this Agreement, the actions it has taken to date to demonstrate acceptance and acknowledgement of responsibility for its conduct (including, among other things, conducting a swift and robust internal investigation, furnishing this Office with a continuous flow of unvarnished facts gathered during the course of that internal investigation, voluntarily providing, without prompting, certain documents and information otherwise protected by the attorney-client privilege, providing timely and meaningful cooperation more generally in the investigation conducted by this Office, terminating wrongdoers, and establishing a full and independent victim compensation program that has to date paid out hundreds of millions of dollars in awards), and its commitment to: (a) continue to accept and acknowledge responsibility for its conduct; (b) continue to cooperate with the Office, FBI, DOT, SIGTARP, NHTSA, and any other law enforcement agency designated by this Office; (c) make the payments specified in this Agreement; (d) comply with Federal criminal laws; and (e) otherwise comply with all of the terms of this Agreement, the Office shall recommend to the Court that prosecution of GM on the Information be deferred for three years from the date of the signing of this Agreement. GM shall expressly waive indictment and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of New York for the period during which this Agreement is in effect. GM shall expressly waive any objection to venue with respect to any charges arising out of the conduct described in the Statement of Facts and shall expressly consent to the filing of the Information in the Southern District of New York.

9.      It is understood that this Office cannot, and does not, agree not to prosecute GM for criminal tax violations. However, if GM fully complies with the terms of this Agreement, no testimony given or other information provided by GM (or any other information directly or indirectly derived therefrom) will be used against GM in any criminal tax prosecution. In addition, the Office agrees that, if GM is in compliance with all of its obligations under this Agreement, the Office will, within thirty (30) days after the expiration of the period of deferral (including any extensions thereof), seek dismissal with prejudice as to GM of the Information filed against GM pursuant to this Agreement. Except in the event of a violation by GM of any term of this Agreement, the Office will bring no additional charges against GM, except for criminal tax violations, relating to its conduct as described in the admitted Statement of Facts. This Agreement does not provide any protection against prosecution for any crimes except as set forth above and does not apply to any individual or entity other than GM and its subsidiaries. GM and the Office understand that the Agreement to defer prosecution of GM must be approved by the Court, in accordance with 18 U.S.C. § 3161(h)(2). Should the Court decline to approve the Agreement to defer prosecution for any reason, both the Office and GM are released from any

4

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

obligation imposed upon them by this Agreement, and this Agreement shall be null and void, except for the tolling provision set forth in paragraph 10.

10.    It is further understood that should the Office in its sole discretion determine based on facts learned subsequent to the execution of this Agreement that GM has: (a) knowingly given false, incomplete or misleading information to the Office, FBI, DOT, SIGTARP, or NHTSA, either during the term of this Agreement or in connection with the Office's investigation of the conduct described in the Information and Statement of Facts, (b) committed any crime under the federal laws of the United States subsequent to the execution of this Agreement, or (c) otherwise violated any provision of this Agreement, GM shall, in the Office's sole discretion, thereafter be subject to prosecution for any federal criminal violation of which the Office has knowledge, including but not limited to a prosecution based on the Information, the Statement of Facts, or the conduct described therein. Any such prosecution may be premised on any information provided by or on behalf of GM to the Office and/or FBI, DOT, SIGTARP, or NHTSA at any time. In any such prosecution, no charge would be time-barred provided that such prosecution is brought within the applicable statute of limitations period, excluding (a) any period subject to any prior or existing tolling agreement between the Office and GM and (b) the period from the execution of this Agreement until its termination. GM agrees to toll, and exclude from any calculation of time, the running of the applicable criminal statute of limitations for the length of this Agreement starting from the date of the execution of this Agreement and including any extension of the period of deferral of prosecution pursuant to paragraph 12 below. By this Agreement, GM expressly intends to and hereby does waive its rights in the foregoing respects, including any right to make a claim premised on the statute of limitations, as well as any constitutional, statutory, or other claim concerning pre-indictment delay. Such waivers are knowing, voluntary, and in express reliance on the advice of GM's counsel.

11.    It is further agreed that in the event that the Office, in its sole discretion, determines that GM has violated any provision of this Agreement, including by failure to meet its obligations under this Agreement: (a) all statements made by or on behalf of GM to the Office, FBI, DOT, SIGTARP, and/or NHTSA, including but not limited to the Statement of Facts, or any testimony given by GM or by any agent of GM before a grand jury, or elsewhere, whether before or after the date of this Agreement, or any leads from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings hereinafter brought by the Office against GM; and (b) GM shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of GM before or after the date of this Agreement, or any leads derived therefrom, should be suppressed or otherwise excluded from evidence. It is the intent of this Agreement to waive any and all rights in the foregoing respects.

12.    GM agrees that, in the event that the Office determines during the period of deferral of prosecution described in paragraph 8 above (or any extensions thereof) that GM has violated any provision of this Agreement, an extension of the period of deferral of prosecution

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

may be imposed in the sole discretion of the Office, up to an additional one year, but in no event shall the total term of the deferral-of-prosecution period of this Agreement exceed four (4) years.

13.    GM, having truthfully admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement.    Consistent with this provision, GM may raise defenses and/or assert affirmative claims and defenses in any proceedings brought by private and/or public parties as long as doing so does not contradict the Statement of Facts or such representations.    Any such contradictory statement by GM, its present or future attorneys, agents, or employees shall constitute a violation of this Agreement and GM thereafter shall be subject to prosecution as specified in paragraphs 8 through 11, above, or the deferral-of-prosecution period shall be extended pursuant to paragraph 12, above.    The decision as to whether any such contradictory statement will be imputed to GM for the purpose of determining whether GM has violated this Agreement shall be within the sole discretion of the Office.    Upon the Office's notifying GM of any such contradictory statement, GM may avoid a finding of violation of this Agreement by repudiating such statement both to the recipient of such statement and to the Office within two business days after having been provided notice by the Office.    GM consents to the public release by the Office, in its sole discretion, of any such repudiation.    Nothing in this Agreement is meant to affect the obligation of GM or its officers, directors, agents or employees to testify truthfully to the best of their personal knowledge and belief in any proceeding.

14.    GM agrees that it is within the Office's sole discretion to choose, in the event of a violation, the remedies contained in paragraphs 10 and 11 above, or instead to choose to extend the period of deferral of prosecution pursuant to paragraph 12.    GM understands and agrees that the exercise of the Office's discretion under this Agreement is unreviewable by any court.    Should the Office determine that GM has violated this Agreement, the Office shall provide notice to GM of that determination and provide GM with an opportunity to make a presentation to the Office to demonstrate that no violation occurred, or, to the extent applicable, that the violation should not result in the exercise of those remedies or in an extension of the period of deferral of prosecution, including because the violation has been cured by GM.

**Independent Monitor**

15.    GM agrees to retain a Monitor upon selection by the Office and approval by the Office of the Deputy Attorney General, whose powers, rights and responsibilities shall be as set forth below.

(a).    Jurisdiction, Powers, and Oversight Authority.    To address issues related to the Statement of Facts and Information, the Monitor shall have the authorities and duties defined below.    The scope of the Monitor's authority is to review and assess GM's policies, practices or procedures as set forth below, and is not intended to include substantive review of the correctness of any of GM's prior, present, or future decisions relating to compliance with NHTSA's regulatory regime, including the National Traffic and Motor Vehicle

6

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

Safety Act, its implementing regulations, and related policies. Nor is it intended to supplant NHTSA's authority over decisions related to motor vehicle safety. Except as expressly set forth below, the authority granted below shall not include the authority to exercise oversight, or to participate in, decisions by GM about product offerings, decisions relating to product development, engineering of GM vehicles, capital allocation, and investment decisions.

(1).    Review and assess the efficacy of GM's current policies, practices, and procedures in ensuring that GM corrects prior statements and assurances concerning motor vehicle safety;

(2).    Review and assess the effectiveness of GM's current policies, practices, or procedures for sharing allegations and engineering analyses associated with lawsuits and not-in-suit matters with those responsible for recall decisions;

(3).    Review and assess GM's current compliance with its stated recall processes; and

(4).    Review and assess the adequacy of GM's current procedures for addressing known defects in certified pre-owned vehicles.

It is the intent of this Agreement that the provisions regarding the Monitor's jurisdiction, powers, and oversight authority and duties be broadly construed, subject to the following limitation: the Monitor's responsibilities shall be limited to GM's activities in the United States, and to the extent the Monitor seeks information outside the United States, compliance with such requests shall be consistent with the applicable legal principles in that jurisdiction. GM shall adopt all recommendations submitted by the Monitor unless GM objects to any recommendation and the Office agrees that adoption of such recommendation should not be required.

(b).    Access to Information.  The Monitor shall have the authority to take such reasonable steps, in the Monitor's view, as necessary to be fully informed about those operations of GM within or relating to his or her jurisdiction.  To that end, the Monitor shall have:

(1).    Access to, and the right to make copies of, any and all non-privileged books, records, accounts, correspondence, files, and any and all other documents or electronic records, including e-mails, of GM and its subsidiaries, and of officers, agents, and employees of GM and its subsidiaries, within or relating to his or her jurisdiction that are located in the United States; and

(2).    The right to interview any officer, employee, agent, or consultant of GM conducting business in or present in the United States and to participate in any meeting in the United States concerning any matter within or relating to the Monitor's jurisdiction.

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

To the extent that the Monitor seeks access to information contained within privileged documents or materials, GM shall use its best efforts to provide the Monitor with the information without compromising the asserted privilege.

(c).   Confidentiality.

(1).   The Monitor shall maintain the confidentiality of any non-public information entrusted or made available to the Monitor.   The Monitor shall share such information only with the Office, FBI and SIGTARP.  The Monitor may also determine that such information should be shared with DOT and/or NHTSA.  In the event of such a determination, the Monitor may request that GM provide the subject information directly to DOT and/or NHTSA.  GM will submit such information to DOT or NHTSA consistent with the regulatory provisions related to the protection of confidential business information contained in 49 C.F.R. Part 512 and 49 C.F.R. Part 7.

(2).   The Monitor shall sign a non-disclosure agreement with GM prohibiting disclosure of information received from GM to anyone other than to the Office, FBI, DOT, SIGTARP or NHTSA, and anyone hired by the Monitor.  Within thirty days after the end of the Monitor's term, the Monitor shall either return anything obtained from GM, or certify that such information has been destroyed.  Anyone hired by the Monitor shall also sign a non-disclosure agreement with similar return or destruction requirements as set forth in this sub-paragraph.

(d).   Hiring Authority.  The Monitor shall have the authority to employ legal counsel, consultants, investigators, experts, and any other personnel necessary to assist in the proper discharge of the Monitor's duties.

(e).   Implementing Authority.  The Monitor shall have the authority to take any other actions in the United States that are necessary to effectuate the Monitor's oversight and monitoring responsibilities.

(f).   Miscellaneous Provisions.

(1).   Term.  The Monitor's authority set forth herein shall extend for a period of three years from the commencement of the Monitor's duties, except that (a) in the event the Office determines during the period of the Monitorship (or any extensions thereof) that GM has violated any provision of this Agreement, an extension of the period of the Monitorship may be imposed in the sole discretion of the Office, up to an additional one-year extension, but in no event shall the total term of the Monitorship exceed the term of the Agreement; and (b) in the event the Office, in its sole discretion, determines during the period of the Monitorship that the employment of a Monitor is no longer necessary to carry out the purposes of this Agreement, the Office may shorten the period of the Monitorship.

8

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

(2). <u>Selection of the Monitor.</u>   The Office shall consult with GM, including soliciting nominations from GM, using its best efforts to select and appoint a mutually acceptable Monitor (and any replacement Monitors, if required) as promptly as possible. In the event that the Office is unable to select a Monitor acceptable to GM, the Office shall have the sole right to select a monitor (and any replacement Monitors, if required). To ensure the integrity of the Monitorship, the Monitor must be independent and objective and the following persons shall not be eligible as either a Monitor or an agent, consultant or employee of the Monitor: (a) any person previously employed by GM; or (b) any person who has been directly adverse to GM in any proceeding. The selection of the Monitor must be approved by the Deputy Attorney General.

(3). <u>Notice regarding the Monitor; Monitor's Authority to Act on Information received from Employees; No Penalty for Reporting.</u>   GM shall establish an independent, toll-free answering service to facilitate communication anonymously or otherwise with the Monitor. Within 10 days of the commencement of the Monitor's duties, GM shall advise its employees of the appointment of the Monitor, the Monitor's powers and duties as set forth in this Agreement, the toll-free number established for contacting the Monitor, and email and mail addresses designated by the Monitor. Such notice shall inform employees that they may communicate with the Monitor anonymously or otherwise, and that no agent, consultant, or employee of GM shall be penalized in any way for providing information to the Monitor. In addition, such notice shall direct that, if an employee is aware of any violation of any law or any unethical conduct that has not been reported to an appropriate federal, state or municipal agency, the employee is obligated to report such violation or conduct to GM's compliance office in the United States or the Monitor. The Monitor shall have access to all communications made using this toll-free number. The Monitor has the sole discretion to determine whether the toll-free number is sufficient to permit confidential and/or anonymous communications or whether the establishment of an additional toll-free number is required. Further, the Monitor shall inform GM of communications made to the Monitor regarding motor vehicle safety so that GM can address any allegations consistent with its Code of Conduct and related policies and procedures.

(4). <u>Reports to the Office.</u> The Monitor shall keep records of his or her activities, including copies of all correspondence and telephone logs, as well as records relating to actions taken in response to correspondence or telephone calls. If potentially illegal or unethical conduct is reported to the Monitor, the Monitor may, at his or her option, conduct an investigation, and/or refer the matter to the Office. The Monitor should, at his or her option, refer any potentially illegal or unethical conduct to GM's compliance office. The Monitor may report to the Office whenever the Monitor deems fit but, in any event, shall file a written report not less often than every four months regarding: the Monitor's activities; whether GM is complying with the terms of this Agreement; and any changes that are necessary to foster GM's compliance with any applicable laws, regulations and standards related to the Monitor's jurisdiction as set forth in paragraph 15(a). Such periodic written reports are to be provided to GM and the Office. The Office may, in its sole discretion, provide to FBI and SIGTARP all or part of any such periodic written report, or other information provided to the Office by the Monitor. The Office may also

9

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

determine that all or part of any such periodic report, or other information provided to the Office by the Monitor, be provided to DOT and/or NHTSA. In the event of such a determination, the Office may request that GM transmit such report, part of a report, and/or non-public information to DOT and/or NHTSA directly. GM will submit such report, part of a report, and/or non-public information to DOT and/or NHTSA consistent with the regulatory provisions related to the protection of confidential business information contained in 49 C.F.R. Part 512 and 49 C.F.R. Part 7. GM may provide all or part of any periodic written reports to NHTSA or other federal agencies or governmental entities. Should the Monitor determine that it appears that GM has violated any law, has violated any provision of this Agreement, or has engaged in any conduct that could warrant the modification of his or her jurisdiction, the Monitor shall promptly notify the Office, and when appropriate, GM.

(5). <u>Cooperation with the Monitor</u>. GM and all of its officers, directors, employees, agents, and consultants, and all of the officers, directors, employees, agents, and consultants of GM's subsidiaries shall have an affirmative duty to cooperate with and assist the Monitor in the execution of his or her duties provided in this Agreement and shall inform the Monitor of any non-privileged information that may relate to the Monitor's duties or lead to information that relates to his or her duties. Failure of any GM officer, director, employee, or agent to cooperate with the Monitor may, in the sole discretion of the Monitor, serve as a basis for the Monitor to recommend dismissal or other disciplinary action.

(6). <u>Compensation and Expenses</u>. Although the Monitor shall operate under the supervision of the Office, the compensation and expenses of the Monitor, and of the persons hired under his or her authority, shall be paid by GM. The Monitor, and any persons hired by the Monitor, shall be compensated in accordance with their respective typical hourly rates. GM shall pay bills for compensation and expenses promptly, and in any event within 30 days. In addition, within one week after the selection of the Monitor, GM shall make available office space, telephone service and clerical assistance sufficient for the Monitor to carry out his or her duties.

(7). <u>Indemnification</u>. GM shall provide an appropriate indemnification agreement to the Monitor with respect to any claims arising out of the performance of the Monitor's duties.

(8). <u>No Affiliation</u>. The Monitor is not, and shall not be treated for any purpose, as an officer, employee, agent, or affiliate of GM.

## Limits of this Agreement

16.     It is understood that this Agreement is binding on the Office but does not bind any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities. However, if requested by GM or its attorneys, the Office will bring to the attention of any such agencies, including but not limited to any regulators,

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

as applicable, this Agreement, the cooperation of GM, and GM's compliance with its obligations under this Agreement.

## Public Filing

17.    GM and the Office agree that, upon the submission of this Agreement (including the Statement of Facts and other attachments) to the Court, this Agreement and its attachments shall be filed publicly in the proceedings in the United States District Court for the Southern District of New York.

18.    The parties understand that this Agreement reflects the unique facts of this case and is not intended as precedent for other cases.

## Execution in Counterparts

19.    This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

### Integration Clause

20.     This Agreement sets forth all the terms of the Deferred Prosecution Agreement between GM and the Office.  No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, GM's attorneys, and a duly authorized representative of GM.

PREET BHARARA
United States Attorney
Southern District of New York

By:     BONNIE JONAS
SARAH EDDY MCCALLUM
EDWARD A. IMPERATORE
Assistant United States Attorneys

DANIEL L. STEIN
Chief, Criminal Division

Accepted and agreed to:

Craig Glidden, Esq.

General Counsel and Chief Legal Officer,
General Motors Company

Anton R. Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.

Attorneys for General Motors Company

# Exhibit A
# to the Deferred
# Prosecution Agreement

## GENERAL MOTORS COMPANY
### RESOLUTIONS OF THE BOARD OF DIRECTORS

The following resolutions were duly adopted at a meeting of the Board of Directors of General Motors Company held on September 16, 2015:

WHEREAS, the Company has been engaged in discussions with the U.S. Attorney's Office for the Southern District of New York (the "U.S. Attorney's Office") in connection with an investigation being conducted by the U.S. Attorney's Office of the Company's recalls of vehicles equipped with a defective ignition switch and related matters (the "Investigation"); and

WHEREAS, the Board has determined that it is in the best interest of the Company to enter into a Deferred Prosecution Agreement with the U.S. Attorney's Office that would resolve the Investigation on the terms that have been presented by and discussed with the U.S. Attorney's Office (the "DPA").

RESOLVED that the Board hereby authorizes the Company to resolve the Investigation by entering into the DPA on substantially the same terms set forth in materials provided to the Board in advance of the meeting and described to and reviewed with the Board on September 16, 2015;

RESOLVED that the Board hereby authorizes the Company to disclose the DPA, as appropriate, and the Authorized Officers (defined below) are hereby authorized to take all steps necessary to carry out the disclosure of the DPA; and

RESOLVED that the Board hereby authorizes Mr. Craig B. Glidden, General Counsel for the Company, and outside counsel representing the Company from Jenner & Block LLP, acting together, to execute and deliver the DPA on behalf of the Company and further authorizes them and other appropriate officers of the Company, any one of which acting alone (individually and collectively, the "Authorized Officers"), to take any and all other actions as may be necessary or appropriate to effectuate and finalize the DPA.


_Craig B. Glidden_
Craig B. Glidden
General Counsel

# Exhibit B
# to the Deferred
# Prosecution Agreement

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,          :        INFORMATION

           -v.-                    :

GENERAL MOTORS COMPANY,            :        15 Cr. __

           Defendant.              :

- - - - - - - - - - - - - - - - - -x

COUNT ONE
(Scheme to Conceal Material Facts
from a Government Regulator)

The United States Attorney charges:

1.    GENERAL MOTORS COMPANY ("GM" or the "Company"),
the defendant, is an automotive company headquartered in
Detroit, Michigan.  In 2012, GM was the largest automotive
company in the world.

2.    At all times relevant to this Information, GM
designed, manufactured, assembled, and sold Chevrolet brand
vehicles.  From the earliest date relevant to this Information
until in or about 2010, GM designed, manufactured, assembled,
and sold Pontiac brand vehicles.  From the earliest date
relevant to this Information until in or about 2009, GM
designed, manufactured, assembled, and sold Saturn brand
vehicles.  And from the earliest date relevant to this
Information until in or about the spring of 2013, GM promoted

sales of "pre-owned" (*i.e.*, used) Chevrolet, Pontiac, and Saturn brand vehicles by GM dealerships nationwide.

3.    At all times relevant to this Information, GM was required to disclose to its U.S. regulator, the National Highway Traffic Safety Administration ("NHTSA"), any defect in its cars "related to motor vehicle safety" within five business days of identifying said defect.  See 49 U.S.C. § 30118(c) & 49 C.F.R. § 573.6.

4.    From in or about the spring of 2012 through in or about February 2014, GM, through its agents and employees, concealed a potentially deadly safety defect from NHTSA and the public.  The defect related to an ignition switch that had been designed and manufactured with too-low torque (the "Defective Switch").  As GM knew by no later than 2005, the Defective Switch was prone to too-easy movement from the "Run" to the "Accessory" or "Off" position.  And as GM personnel well knew no later than the spring of 2012, when that movement occurred, the driver would lose not only the assistance of power steering and power brakes but also the protection afforded by the vehicle's frontal airbags in the event of a crash.

5.    Rather than remedy the Defective Switch when its torque deficiencies and attendant stalling consequences became clear no later than in or about 2005, GM continued to sell and manufacture new cars equipped with the Defective Switch.

Moreover, although the public was made aware, through media reports, of the Defective Switch's existence, GM affirmatively assured consumers in or about June 2005 that the Defective Switch presented no "safety" problem.

6. In or about April 2006, a GM engineer directed that the Defective Switch no longer be used in new cars, and that it be replaced with another, non-defective switch that would bear the same part number as the Defective Switch. Nothing was done at this time to remedy the cars equipped with the Defective Switch that were already on the road.

7. When the fact that the Defective Switch could cause airbag non-deployment -- and therefore undeniably presented a *safety* defect -- became plain no later than in or about the spring of 2012, GM did not correct its earlier assurance that the Defective Switch posed no "safety" concern. Nor did it recall the affected vehicles. Instead, it concealed the defect from NHTSA and the public, taking the matter "offline," outside the normal recall process, so that the Company could buy time to package, present, explain, and manage the issue. Fearing an adverse impact on the Company's business, GM engineers and executives wanted to have answers to all questions that NHTSA, the media, and consumers might pose about the defect before alerting the regulator and the public to it.

8.    GM did not recall the vehicles equipped with the Defective Switch until February 2014.  In the meantime, in or about October 2012 and again in or about November 2013, GM personnel gave presentations to NHTSA in which they touted the robustness of GM's internal recall process and gave the misleading impression that GM worked promptly and efficiently to resolve known safety defects, including, specifically, defects related to airbag non-deployment.

### Statutory Allegations

9.    From in or about the spring of 2012 through in or about February 2014, GM, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, willfully and knowingly did falsify, conceal, and cover up by trick, scheme, and device material facts, and made materially false, fictitious, and fraudulent statements and representations, to wit, GM engaged in a scheme to conceal from its federal U.S. regulator, NHTSA, a potentially deadly safety defect that GM was required to disclose within five business days of discovery thereof.

(Title 18, United States Code, Sections 1001 and 2.)

4

## COUNT TWO
### (Wire Fraud)

The United States Attorney further charges:

10.   The allegations contained in Paragraphs 1 through 8 are repeated and realleged as though fully set forth herein.

11.   From in or about the spring of 2012 through in or about the spring of 2013, GM dealerships continued to sell GM-certified pre-owned Chevrolet, Pontiac, and Saturn brand vehicles equipped with the Defective Switch.  To promote these sales and give customers assurance about the safety of the cars subject to its certified pre-owned program, GM made representations by means of interstate wires -- that is, over the Internet -- falsely assuring customers of the safety of the used cars they were purchasing.  In particular, GM certified that used vehicles sold pursuant to this program had been checked for safety of their ignition systems and keys.  In truth and in fact, and as GM well knew, cars equipped with the Defective Switch posed a potentially deadly safety threat related to the cars' ignition switches and keys.

12.   In addition to making these false representations as part of its certified pre-owned program, GM, more generally, failed to disclose a material fact that it had a duty to disclose -- namely, that cars equipped with the Defective Switch presented a safety defect.  GM's duty to disclose this fact

derived from two sources: (a) its false June 2005 representation

that the Defective Switch presented no safety concern; and (b)

its obligation under applicable regulations to inform NHTSA of

any known safety defect within five business days of discovery

thereof.

<u>Statutory Allegation</u>

13.   From in or about the spring of 2012 through in

or about February 2014, in the Southern District of New York and

elsewhere, GM, the defendant, willfully and knowingly, having

devised and intending to devise a scheme and artifice to

defraud, and for obtaining money and property by means of false

and fraudulent pretenses, representations, and promises, did

transmit and cause to be transmitted and aid and abet the

transmission, by means of wire, radio, and television

communication in interstate and foreign commerce, writings,

signs, signals, pictures, and sounds for the purpose of

executing such scheme and artifice, to wit, GM defrauded U.S.

consumers into purchasing its products by concealing information

and making misleading statements about the safety of vehicles

equipped with the Defective Switch.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATION

14.  As a result of committing the wire fraud offense alleged in Count Two of this Information, GM, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any property, real or personal, which constitutes or is derived from proceeds traceable to such offense.

## Substitute Asset Provision

15.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)   cannot be located upon the exercise of due diligence;

(b)   has been transferred or sold to, or deposited with, a third person;

(c)   has been placed beyond the jurisdiction of the Court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and Title 21, United States Code, Section 853(p), to seek forfeiture of any

other property of said defendant up to the value of the

above forfeitable property.

   (Title 18, United States Code, Sections 981 and 982; Title 21
         United States Code, Section 853; and
      Title 28, United States Code, Section 2461.)

PREET BHARARA
United States Attorney

# Exhibit C
# to the Deferred
# Prosecution Agreement

Statement of Facts

## Overview

1.    GENERAL MOTORS COMPANY ("GM" or the "Company"), which in 2012 was the largest automotive manufacturer in the world, is headquartered in Detroit, Michigan.[1]

2.    At all times relevant to this Statement of Facts, GM designed, manufactured, assembled, and sold Chevrolet brand vehicles. From the earliest date relevant to this Statement of Facts until in or about 2010, GM designed, manufactured, assembled, and sold Pontiac brand vehicles. From the earliest date relevant to this Statement of Facts until in or about 2009, GM designed, manufactured, assembled, and sold Saturn brand vehicles. And from the earliest date relevant to this Statement of Facts until in or about the spring of 2013, GM promoted sales of "pre-owned" (*i.e.*, used) Chevrolet, Pontiac, and Saturn brand vehicles by GM dealerships nationwide.

3.    As set forth in more detail below, from in or about the spring of 2012 through in or about February 2014, GM failed to disclose a deadly safety defect to its U.S. regulator, the National Highway Traffic Safety Administration ("NHTSA"). It also falsely represented to consumers that vehicles containing the defect posed no safety concern.

4.    The defect at issue is a low-torque ignition switch installed in many of the vehicles identified below, which, under certain circumstances, may move out of the "Run" position (the "Defective Switch"). If this movement occurs, the driver loses the assistance of power steering and power brakes. And if a collision occurs while the switch is in the Accessory or Off position, the vehicle's safety airbags may fail to deploy—increasing the risk of death and serious injury in certain types of crashes in which the airbag was otherwise designed to deploy. The model year cars which may have been equipped with the Defective Switch are the 2005, 2006, and 2007 Chevrolet Cobalt; the 2005, 2006, and 2007 Pontiac G5; the 2003, 2004, 2005, 2006, and 2007 Saturn Ion; the 2006 and 2007 Chevrolet HHR; the 2007 Saturn Sky; and the

---

[1] For the purposes of this Statement of Facts, to the extent any conduct, statement, actions, or documents occurred on or are dated before July 10, 2009, references to "GM" shall mean and are intended to mean solely "Motors Liquidation Company," previously known as General Motors Corporation ("Old GM"). Although New GM in this Statement of Facts admits certain facts about Old GM's acts, conduct, or knowledge prior to July 10, 2009 based on New GM's current knowledge, New GM does not intend those admissions to imply or suggest that New GM is responsible for any acts, conduct or knowledge of Old GM, or that such acts, conduct, and knowledge of Old GM can be imputed to New GM. This Statement of Facts is not intended to alter, modify, expand, or otherwise affect any provision of the July 5, 2009 Sale Order that was issued by the U.S. Bankruptcy Court for the Southern District of New York, or the rights, protections, and responsibilities of New GM under the Sale Order.

2006 and 2007 Pontiac Solstice. To date, GM has acknowledged a total of 15 deaths, as well as a number of serious injuries, that occurred in crashes in which the Defective Switch may have caused or contributed to frontal airbag non-deployment.

5.    Before the Defective Switch went into production in 2002, certain GM engineers knew that it was prone to movement out of the Run position; testing of a prototype showed that the torque return between the Run and Accessory positions fell below GM's own internal specifications. But the engineer in charge of the Defective Switch approved its production anyway.

6.    In or about 2004 and 2005, as GM employees, media representatives, and GM customers began to experience sudden stalls and engine shutoffs caused by the Defective Switch, GM considered fixing the problem. However, having decided that the switch did not pose a safety concern, and citing cost and other factors, engineers responsible for decision-making on the issue opted to leave the Defective Switch as it was and simply promulgate an advisory to dealerships with tips on how to minimize the risk of unexpected movement out of the Run position. GM even rejected a simple improvement to the head of the key that would have significantly reduced unexpected shutoffs at a price of less than a dollar a car. At the same time, in or about June 2005, GM issued a statement that acknowledged circumstances where the ignition key could inadvertently move to the Accessory or Off position when the car was running. In response to a further inquiry, GM informed a newspaper that GM did not believe the inadvertent rotation of the ignition key was a safety issue.

7.    From approximately the spring of 2012, certain GM personnel knew that the Defective Switch presented a safety defect because it could cause airbag non-deployment associated with death and serious injury.

8.    Yet not until approximately 20 months later, in February 2014, did GM first notify NHTSA and the public of the connection between the Defective Switch and fatal airbag non-deployment incidents. This announcement accompanied an initial recall of approximately 700,000 vehicles—a population that would, by March 2014, grow to more than 2 million.

9.    Inside GM, certain personnel responsible for shepherding safety defects through GM's internal recall process delayed this recall until GM could fully package, present, explain, and handle the deadly problem, taking affirmative steps to keep the Defective Switch matter outside the normal process. On at least two occasions while the Defective Switch condition was well known by some within GM but not disclosed to the public or NHTSA, certain GM personnel made incomplete and therefore misleading presentations to NHTSA assuring the regulator that GM would and did act promptly, effectively, and in accordance with its formal recall policy to respond to safety problems—including airbag-related safety defects.

10.    Moreover, for much of the period during which GM failed to disclose this safety defect, it not only failed to correct its June 2005 assurance that the Defective Switch posed no safety concern but also actively touted the reliability and safety of cars equipped with the Defective Switch, with a view to promoting sales of used GM cars. Although GM sold no *new* cars equipped with the Defective Switch during this period, GM dealers were still, from in or about the spring of 2012 through in or about the spring of 2013, selling pre-owned Chevrolet, Pontiac, and Saturn brand cars that would later become subject to the February 2014 recalls. These sales were accompanied by certifications from GM, assuring the unwitting consumers that the vehicles' components, including their ignition systems and keys, met all safety standards.

11.    After the spring of 2012 but before the recall was announced, the fifteenth Company-acknowledged death associated with the Defective Switch occurred.

Regulatory Framework and GM's Formal Recall Process

12.    Under regulations applicable to GM at all relevant times, the Company was required to disclose to NHTSA any "defect . . . related to motor vehicle safety." "Motor vehicle safety" was defined as "performance of a motor vehicle . . . in a way that protects the public against unreasonable risk of accidents . . . and against unreasonable risk of death or injury in an accident." 49 U.S.C. §§ 30118(c)(1); 30102(a)(8). Such disclosure had to be "submitted not more than 5 working days after a defect in a vehicle or item of equipment ha[d] been determined to be safety related." *See* 49 U.S.C. § 30118(c) and 49 C.F.R. § 573.6.[2]

13.    The required disclosure was to be made by filing a "Defect Information Report" or "DIR." An auto manufacturer's filing of a DIR with NHTSA is commonly referred to as a "recall."

14.    At all times relevant to this Statement of Facts, GM had a formal recall decision-making process, called the Field Performance Evaluation or "FPE" process, the steps of which were well documented. According to Company policy, the FPE process was supposed to be initiated by dedicated engineers in the Product Investigations ("PI") group. PI, which was at all relevant times headed by GM's Director of Safety & Crashworthiness or Director of Product Investigations, was responsible for identifying and investigating suspected safety and compliance problems with GM cars.

15.    Once PI had completed its investigation of a suspected safety problem, it would, according to GM policy, hand the matter off from the engineering side of the house to the

---

[2] Congress has adopted no criminal penalty for violating this regulatory disclosure requirement. Instead, in order for a company to be held criminally liable under federal law for even an egregious failure to report a known safety defect, its conduct must have independently violated some other federal law to which criminal penalties do attach.

"Quality" organization—specifically, to the "FPE Director." This entailed presenting the problem at a weekly Investigation Status Review ("ISR") meeting attended by the FPE Director, GM's Director of Safety & Crashworthiness or Director of Product Investigations, and a member of GM's legal department.

16. If, based on PI's presentation at the ISR, these three individuals believed that the matter involved a potential safety defect, they were to advance it for consideration by the Field Performance Evaluation Team ("FPET"). The FPET had no recall decision-making authority but was tasked with gathering information needed to execute a potential recall.

17. At roughly the same time that the FPET was apprised of the issue, the matter was also supposed to go before the Field Performance Evaluation Review Committee ("FPERC"). The FPERC would make a preliminary decision about whether the issue under consideration qualified as a "defect . . . related to motor vehicle safety" under the applicable regulations and thus warranted a recall. It would then transmit its recommendation to the ultimate recall decision-making body, the Executive Field Action Decision Committee ("EFADC"). The EFADC was at all relevant times made up of three GM Vice Presidents.

18. Typically, the EFADC's decision would have followed within approximately a week of the FPET's and the FPERC's consideration of the matter. If the EFADC voted for a recall, that decision would be reported to NHTSA within five business days, at which time a DIR would also be filed.

## GM Equips Cars with a Defective Switch

19. In the early 2000s, GM launched a series of compact cars that it marketed as affordable, safe, and fuel-efficient—features particularly attractive to young, first-time car owners. One of these small cars was the Saturn Ion, first launched in 2002. Another was the Chevrolet Cobalt, launched in 2004. These two models belonged to GM's "Delta" platform, and, from their respective launches until around late 2006, both were equipped with the same defective ignition switch (the Defective Switch). The Defective Switch would also be installed in other, less popular Chevrolet, Saturn, and Pontiac models from in or about 2004 through in or about late 2006.

20. Development of the switch that would end up first in the Ion and then in the Cobalt and other models began in the late 1990s. By March 2001, the GM design release engineer then in charge of the Ion's switch (the "Switch DRE") had finalized the applicable design specifications and communicated them to the supplier in charge of testing and manufacturing the component (the "Switch Supplier"). Among the specifications communicated to the Switch Supplier was that the torque necessary to move the switch from Run to Accessory must be no less than 15 Newton centimeters ("N-cm") (the "Torque Specification").

Mechanically, this torque performance was to be maintained by a detent plunger and spring within the switch.

21.    Testing conducted by the Switch Supplier in 2001 and early 2002 revealed that an early version of the pre-production Defective Switch was not meeting the Torque Specification; it repeatedly scored "Not OK." A July 2001 pre-production report for the Ion within GM made the same observation: the switch had "low detent plunger force."

22.    In email correspondence between the Switch DRE and the Switch Supplier in early 2002, the Switch Supplier confirmed that an early version of the Defective Switch was not meeting the Torque Specification and outlined the problems that might arise if the part were brought into compliance—including pressure on other switch components, delay, and increased costs. Saying that he was "tired of the switch from hell" and did not want to either compromise the electrical performance of the switch or slow the production schedule, the Switch DRE directed the Switch Supplier to "maintain present course" notwithstanding that there was "still too soft of a detent." Accordingly, the Defective Switch was put into production and installed into the first model year of the Ion (model year 2003), which was first sold to the public in 2002.

23.    By email dated March 28, 2002, the Switch DRE recommended that the Defective Switch also be used in the Cobalt, which was to launch the next year. GM followed that recommendation.

24.    Almost immediately, customers began to report problems with cars equipped with the Defective Switch. Meanwhile, GM employees tasked with driving early production versions of the Ion and then the Cobalt were reporting stalls while driving, and some of them were able to attribute the problem to the easy rotation of the key within the Defective Switch.

25.    Members of the press covering the Cobalt's launch also experienced the unexpected shutoff problem. Alerted by one of the press reports, two executives in charge of safety at GM[3] determined to experience for themselves the complained-of phenomenon. In June 2005, they test drove a Cobalt and found that, as reported, the Cobalt could be easily keyed off by contact with the driver's knee.

26.    Shortly afterward, GM issued a press statement acknowledging the problem as it pertained to the Cobalt, which had the greatest number of consumer complaints: "In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running." The press release further recommended that drivers remove "nonessential material from their key rings." Before its public release, this statement was reviewed and approved by the

---

[3] The two executives were GM's then-Director of Vehicle Safety & Crashworthiness and the Senior Manager of the PI group (the "PI Senior Manager").

PI Senior Manager and by the senior GM attorney who advised engineers about safety- and recall-related issues (the "GM Safety Attorney"). In a response to further media inquiry, GM stated that it did not believe this condition presented a safety concern.

27.    A June 2005 *Cleveland Plain Dealer* article reporting on the ignition switch problem marveled at GM's public statement, commenting "you have to admit it is pretty funny to hear somebody pretend that turning off the engine by mistake isn't a safety issue."

28.    Just days before this article was published, GM engineers working on the Pontiac Solstice, another new car equipped with the Defective Switch, learned of a complaint about a Solstice that had experienced the same inadvertent shutoff problem as had been reported in the Ion and the Cobalt.

<u>GM Considers a Fix</u>

29.    In November 2004, the Company opened the first of six engineering inquiries that would be initiated in the ensuing five years to consider ameliorative engineering changes for new cars being rolled off the production line. This first inquiry was closed "with no action" in March 2005. Fixes such as improving the torque performance of the Defective Switch itself and changing the head of the associated key to reduce the likelihood of inadvertent movement from Run to Accessory were rejected as not representing "an acceptable business case." Having decided that the switch did not pose a safety concern, GM engineers concluded that each proposed solution would take too long to implement, would cost too much, and would not fully fix "the possibility of the key being turned (ignition turn off) during driving."

30.    Accordingly, GM decided to keep producing and selling new Cobalts, Ions, Solstices, Skys, G5s, and HHRs equipped with the Defective Switch.

31.    Not all involved in the November 2004 engineering inquiry agreed with this outcome at the time. The Vehicle Performance Manager for the Cobalt believed that the Defective Switch presented a potential safety problem because it could cause sudden loss of power steering and power brakes. (This engineer did not have in mind at the time the loss of power to the airbag system.) He therefore thought a remedy should have been implemented without regard to cost concerns. His views did not prevail.

32.    Meanwhile, in February 2005, while the November 2004 engineering inquiry was still open, the Company released a "Preliminary Information" to its dealers aimed at helping them diagnose and address the Defective Switch problem if a customer experienced it in a 2005 Cobalt or 2005 Pontiac Pursuit.[4] This publication explained that the Defective Switch's too-low "key ignition cylinder torque/effort" could cause "Engine Stalls" and "Loss of Electrical

---

[4] The Ion was not covered by this Preliminary Information.

Systems." It advised dealers to tell customers to remove non-essential items from their key chains. It offered no other fixes.

33. In May 2005, just two months after the November 2004 engineering inquiry into the Defective Switch was closed without action, a GM brand quality manager opened a second inquiry to consider fixing the problem for new cars. This manager cited a customer complaint that the "vehicle ignition will turn off while driving," and noted that GM was having to buy back Cobalts as a result of the Defective Switch.

34. Still not believing this was a safety issue, GM engineers closed this inquiry too, without issuing a recall. Although GM engineers involved in the inquiry initially resolved to ameliorate the low torque problem for newly produced 2007 Cobalts by changing the design of the key head so that the key ring would sit in a "hole" rather than a "slot" (thus reducing the lever arm and attendant potential torque), they ultimately rejected this solution.

35. GM continued producing and selling new cars equipped with the Defective Switch and accompanying slot-head key.

36. Meanwhile, GM's PI group, which was responsible for addressing problems with cars already on the road, began in the summer of 2005 to study the low torque issue. Like the engineering inquiries targeted at yet-to-be-manufactured cars, this investigation essentially went nowhere. Although PI engineers presented the matter to the ISR (the first stage of the potential recall process) in the summer of 2005, decision-makers who attended that ISR decided that the problem did not present a safety concern and thus did not warrant further consideration for recall. At the time, neither PI nor any member of the ISR seems to have appreciated that one of the electronic systems shut off by an inadvertent movement of the Defective Switch out of the Run position was the airbag system.

37. Having determined that the problem did not pose a safety concern and thus need not be considered further for recall, GM simply replaced the February 2005 Preliminary Information with a more formal "Service Bulletin" to its dealers (the "2005 Service Bulletin"), alerting them to an "inadvertent turning off" problem and instructing them to provide any complaining customers with inserts for their key heads that would transform the slot into a hole and thus reduce the lever arm. Unlike the Preliminary Information, which accurately described the condition caused by the Defective Switch as (among other things) a "stall," the 2005 Service Bulletin omitted that word. Thus, a dealer responding to a customer inquiry or complaint would not locate the bulletin if he or she only used the word "stall" in the search.

38. The omission of the word "stall" from the 2005 Service Bulletin was deliberate. The PI Senior Manager, who oversaw and could control the wording of GM service bulletins, directed that the word be kept out of this bulletin even though he knew customers would naturally describe the problem as "stalling." The reason for the omission was to avoid attracting

the attention of GM's regulator, NHTSA. As it had happened, in the interim between the February 2005 Preliminary Information and the 2005 Service Bulletin, some within GM had been meeting with representatives of NHTSA to try to persuade them that defects causing vehicles to stall were not necessarily safety defects warranting recall action. NHTSA agreed that stalls were not necessarily safety issues, but certain GM personnel were also aware of the regulator's sensitivity to stalling problems throughout this period.

39.     Although the bulletin referenced not just the Cobalt but also the HHR, the Ion, the Solstice, and the Pursuit, and although it was updated in October 2006 to cover the model year 2007 versions of these cars and the 2007 Saturn Sky, the customers who would ultimately receive the bulletin's recommended key-head inserts between 2005 and 2014 numbered only about 430.

<u>The Changes to the Switch and the Key</u>

40.     As of the spring of 2006, the 2005 Service Bulletin was the lone measure in place to address the Defective Switch. There were no systematic efforts to provide key modifications for all owners of affected cars—or even all owners who came into dealerships for service. And every day more and more new cars with the Defective Switch were being manufactured and sold to unwary customers.

41.     In April 2006, that changed. The Switch DRE, who had received numerous complaints about the Defective Switch from other GM employees, authorized replacement of the Defective Switch in new cars with a different one that had a longer detent plunger and therefore significantly greater torque. The Switch DRE further directed, in contravention of accepted GM practice, that this change be implemented without a corresponding part number change. As a result, no one looking at the switch would be able, without taking it apart, to tell the difference between the old, Defective Switch and the new, non-defective one.

42.     Although it was effectuated without a part number change, the switch change that the Switch DRE approved was documented internally, and other engineers were aware of it at the time and afterward. For example, a March 2007 note logged in connection with an engineering inquiry into another matter related to the Ion specifically observed that "[t]he detent plunger torque force was increased" by the Switch DRE in April 2006.

43.     Another relevant change to the Cobalt was made in 2009. Having previously rejected the slot-to-hole alteration to the key head design, GM finally decided to implement that change. An engineer involved in the decision wrote at the time: "This issue has been around since man first lumbered out of [the] sea and stood on two feet." The long-overdue change went into effect for the model year 2010 Cobalt.

## The Defective Switch's Deadly Consequences[5]

44.    As noted, the too-easy movement of the Defective Switch from the Run to the Accessory or Off position resulted in an unexpected shutoff of the engine and—as both the February 2005 Preliminary Information and the 2005 Service Bulletin properly described—a "loss of electrical system[s]." These electrical systems included power steering and power brakes. They also included the sensing diagnostic module or "SDM," which controlled airbag deployment. Internal GM documents reflect that although the impact of an engine shutoff on the SDM was not on GM engineers' minds, certain employees within GM understood no later than 2001 the natural connection between a loss of electrical systems and non-deployment of airbags: if the ignition switch turned to Off or Accessory, the SDM would "drop," and the airbags would therefore be disabled. If a crash then ensued, neither the driver nor any passengers could have the protection of an airbag.

45.    And, indeed, the deadly effects of the Defective Switch on airbag non-deployment began manifesting themselves early on, in crashes about which GM was made aware contemporaneously. In July 2004, the 37 year-old driver of a 2004 Ion, a mother of three children and two step-children, died in a crash after her airbags failed to deploy. A few months later, in November 2004, the passenger of a 2004 Ion died in another crash where the airbags failed to deploy. The driver was charged with, and ultimately pled guilty to, negligent homicide. Then, in June 2005, a 40-year-old man suffered serious injuries after his 2005 Ion crashed and the airbags failed to deploy.

46.    For each of these Ion crashes in which the subject vehicles evidently lost power before impact, the SDM data recovered from the crashed vehicles was unilluminating. Unlike the SDM installed in the Cobalt, the Ion's SDM was incapable of recording data—including power mode status—after the vehicle had lost power.

47.    The Cobalt SDM data, by contrast, reflected a number of non-deployments accompanied by a power mode status recording of Accessory or Off.

48.    In July 2005, just months after GM closed its first engineering inquiry into the Defective Switch, a 16-year-old driver died in Maryland when the airbags in her 2005 Cobalt failed to deploy. The power mode status recorded for that vehicle at the time of the crash was Accessory.

49.    In October 2006, two more teenagers died, also in a 2005 Cobalt, in Wisconsin. The airbags in the vehicle failed to deploy when they should have, and the police officer who

---

[5]  GM has acknowledged 15 deaths occurring in crashes in which the Defective Switch may have caused or contributed to airbag non-deployment, not all of which are described herein. Many other deaths have been alleged to have been associated with the Defective Switch.

examined the crashed vehicle noted in a February 2007 report on the incident that the ignition switch "appeared to have been in the accessory position . . . preventing the airbags from deploying." An April 2007 report about the same crash by Indiana University likewise posited that the airbags had failed to deploy because the key was in the Accessory position. This report even specifically referenced the October 2006 version of the 2005 Service Bulletin, which described the Defective Switch.

50.    In the spring of 2007, NHTSA approached certain GM personnel to express concern about a high number of airbag non-deployment complaints in Cobalts and Ions, and to ask questions about the July 2005 Cobalt crash resulting in the death of the 16-year-old girl. Around this same time, and as a result of NHTSA's inquiries, a GM field performance assessment engineer with expertise in airbags who worked principally with GM lawyers (the "Airbag FPA Engineer") began, at the request of his supervisors, to track reports of crashes in Cobalts where the airbags failed to deploy. And, in May 2007, the PI group even placed the issue of Cobalt airbag non-deployment into the first stage of GM's recall process, the ISR. But the PI group, under the supervision of the PI Senior Manager, conducted no follow-up at the time.

51.    In September 2008, another crash, this one involving a 2006 Cobalt, killed two people. The airbags failed to deploy when they should have. GM sent the crashed car's SDM to the Company's SDM supplier for examination. In May 2009, the SDM supplier reported that the power mode status was at one point during the crash recorded as Off, and that this was one of two possible explanations for the failure of the airbags to deploy. This report was provided in writing, but also in person, at a meeting attended by several GM employees—including a member of the PI group, in-house counsel, and the Airbag FPA Engineer who had been tracking the Cobalt non-deploy incidents.

52.    In April 2009, a 73-year-old grandmother and her 13-year-old granddaughter were killed in rural Pennsylvania in a crash when the ignition switch in the grandmother's 2005 Cobalt slipped into the Accessory position, thereby disabling the frontal airbags and preventing their deployment. The grandmother and her 13-year-old granddaughter, who was in the front passenger seat, both died at the scene. A 12-month-old great grandson, the sole survivor, was paralyzed from the waist down. He was hospitalized for 33 days following the crash.

53.    In December 2009, a 35-year-old Virginia woman crashed her 2005 Cobalt, sustaining serious head injuries and rib fractures (hereinafter, the "Virginia Crash"). The airbags failed to deploy, and, as the Airbag FPA Engineer noted, the power mode at the time of the crash was recorded as Accessory.

54.    Two weeks later, a 25-year-old nursing student died in Tennessee following a head-on collision in her 2006 Cobalt (hereinafter, the "Tennessee Crash"). Again, the airbags failed to deploy when they should have, and the power mode status was recorded as Off at the time of the crash.

55.    In March 2010, a 29 year-old woman was killed in Georgia after her 2005 Cobalt crashed (hereinafter, the "Georgia Crash"). Although there was no allegation that the frontal airbag should have deployed, there was an allegation that loss of power steering caused the crash. The SDM from the vehicle showed that the power mode status was recorded as Accessory at the time of the crash.

56.    Notably, just nine days before the Georgia Crash, GM had conducted a safety recall for a power steering problem in the Cobalt unrelated to the Defective Switch, in which it acknowledged that loss of power steering, standing alone, constituted a "defect . . . relate[d] to motor vehicle safety" and thus warranted recall action. The Defective Switch, of course, caused more than just loss of power steering; it also caused loss of other electrical systems. This was known by many within GM by no later than 2004—even if they did not appreciate precisely what electrical system components were affected (e.g., the airbag SDM). Yet at no time before February 2014 did GM announce a recall for cars associated with the Defective Switch.

## GM Identifies the Connection Between the Ignition Switch and Airbag Non-Deployment and Initiates a Formal Investigation

57.    Many of the deaths and serious injuries associated with airbag non-deployment discussed in the foregoing paragraphs became the subject of legal claims—formal and informal—against GM. Certain GM lawyers, aided by the Airbag FPA Engineer and others like him who assisted in evaluating causes of crashes, realized by no later than early 2011 that a number of these non-deployment cases involved some sort of "anomaly" in the ignition switch. Specifically, in connection with the Tennessee Crash, discussed above, a GM engineer explained to legal staff that when the ignition switch power mode status is in Off (as it was in that case), the SDM "powers down," and the airbags fail to deploy. The engineer further opined that the "a crash sensing system 'anomaly'" resulting in a power mode status of Off had indeed caused non-deployment in the Tennessee Crash case.

58.    This crash sensing "anomaly" risked the prospect of punitive damages. Three months later, GM settled the Tennessee Crash case.

59.    Just days before that settlement, a 15-year-old girl in South Carolina crashed her mother's 2007 Cobalt and suffered significant injuries when the airbag did not deploy. The power mode status was recorded as Accessory at the time of the crash. GM engineers evaluating the crash theorized that, as in the case of the Tennessee Crash, the non-deployment here may have been caused by a crash sensing "anomaly" related to the ignition switch.

60.    Meanwhile, the GM attorney principally responsible for airbag non-deployment claims (the "GM Airbag Attorney"), who had become familiar with a number of Cobalt non-deployment incidents, grew concerned that the "anomaly" identified in these cases was getting insufficient attention from the PI group, which was supposed to investigate and work toward

remedying safety problems with cars on the road. At the time, no one within GM had yet sourced the "anomaly" to the Defective Switch's torque.

61.     Certain members of the legal department took the unusual step of arranging a meeting with PI. The meeting, which took place on July 27, 2011, was attended not just by the PI Senior Manager, who ran the PI group on a day-to-day basis, but also by his boss, the GM Director of Product Investigations (the "GM Safety Director"). Also present were the Airbag FPA Engineer, the GM Airbag Attorney, and the GM Safety Attorney. In advance of the meeting, the PI Senior Manager wrote to a colleague that the Cobalt airbag non-deployment problem was "ugly" and would make for "a difficult investigation."

62.     At the July 27, 2011 meeting, the Airbag FPA Engineer showed photographs of three of the most serious non-deployment crashes he had seen involving Cobalts, including photographs of the Tennessee Crash, and specifically highlighted his observations that many of these Cobalt non-deployment crashes had occurred while the power mode was in Accessory or Off.

63.     After the meeting, the PI Senior Manager assigned an investigator (the "PI Investigator") to examine the matter.

<u>GM Identifies the Defective Switch as the Likely Cause of Airbag Non-Deployment in</u>
<u>2005-2007 Model Year Cobalts</u>

64.     One of the first steps the PI Investigator took, in or about August 2011, was to gather learning and materials from the Airbag FPA Engineer who had been tracking non-deployment incidents in Cobalts since 2007, and who had been involved in evaluating a number of crashes that were the subject of Cobalt non-deployment legal claims. The Airbag FPA Engineer explained to the PI Investigator that he had observed that in some of these cases the power mode was recorded as either Accessory or Off at the time of the subject crashes. The Airbag FPA Engineer further noted that the non-deployment problem appeared to be limited to 2005-2007 model years of the Cobalt and appeared not to affect model years 2008 and later.

65.     By March 2012, more than six months after he had been assigned to the matter, the PI Investigator had done little to advance the investigation. The GM Airbag Attorney called another meeting with PI for March 15, 2012. Attendees at this meeting included the GM Safety Attorney, the GM Airbag Attorney, the GM Safety Director, the PI Investigator, the PI Senior Manager, and the Airbag FPA Engineer. During the meeting, the PI Investigator complained that he needed more support from GM's electrical engineering group to investigate a potential electrical (as opposed to mechanical) explanation for the Accessory and Off power mode recordings in many of the subject crashes.

66.     Two weeks later, the Airbag FPA Engineer, members of GM's electrical engineering group, and others travelled to an auto salvage yard to examine potential electric problems related to the ignition switch—to see whether, as the PI Investigator and others had posited, the Accessory and Off power mode status recordings within the SDMs of the subject vehicles were attributable to an electrical "bounce" in the ignition switch.

67.     At the yard, one of the engineers noticed that the effort needed to turn the ignition switch of the 2006 Cobalt they were examining was low. The group immediately dispatched one of their members to retrieve fish scales from a local bait and tackle shop to measure the rotational force in this and other salvage yard Cobalts. A GM electrical engineer involved in the exercise (the "GM Electrical Engineer") recorded the findings, noted the unusually low force needed to move the examined switches out of Run, searched and found records of customer complaints about the low torque issue, and located the 2005 Service Bulletin addressing the issue.

68.     The next day, the GM Electrical Engineer reported to his own boss these findings and his view that a probable root cause of the non-deployment problem was the Defective Switch moving out of Run to Accessory or Off. And that same day, the boss reported all of this to the PI Senior Manager and to the GM Safety Attorney.

69.     At around the same time, the plaintiffs in a lawsuit stemming from the Virginia Crash, referenced above, located the 2005 Service Bulletin and identified the Defective Switch described therein as the cause of non-deployment in the vehicle at issue in that case. The GM Airbag Attorney identified the 2005 Service Bulletin as potentially related to the Virginia Crash.

70.     In an April 23, 2012 email responding to a query about an ignition switch turning too easily from Run to Off, the PI Senior Manager wrote to colleagues claiming—inexplicably—that he had "not heard of" complaints about low torque in the "Cobalt or other models" since 2005, when the first PI examination was conducted and closed with the issuance of the 2005 Service Bulletin. The PI Investigator, meanwhile, pressed electrical engineers to continue to look into other possible causes of non-deployment, beyond the low torque problem.

71.     No one from PI ushered the matter into the first stage of the formal recall process, the ISR, at this time. This approach represented a stark contrast even to the way in which the Defective Switch itself had been handled in 2005. Back then, *before* the dangerous connection to airbag non-deployment had been drawn, PI had promptly introduced the matter into the ISR.

72.     In May 2012, the GM Safety Attorney asked a GM Vice President to act as an "Executive Champion" in order to propel the matter forward. During the first meeting chaired by this Executive Champion, on May 15, 2012, the GM Electrical Engineer presented his view that the Defective Switch was the cause of non-deployment in the affected Cobalt models. Those in attendance included the GM Safety Attorney, the GM Safety Director, the PI Senior Manager,

the PI Investigator, and others. The Executive Champion encouraged confirmation of this hypothesis through more scientific study.

73.      Days later, on May 22, 2012, such confirmation was obtained. The GM Electrical Engineer, the PI Investigator, and others traveled once more to an auto salvage yard and, using equipment much more sophisticated than fish scales, conducted a thorough study of torque in the ignition switches of several model years of Cobalt, Ion, and other cars. The results confirmed that the majority of vehicles from model years 2003 through 2007 exhibited torque performance below the Torque Specification that GM had adopted in 2001. They also showed that starting somewhere in model year 2007 (that is, for vehicles produced at some point in 2006), the torque values were higher and within specification.

74.      The observed discrepancy was, of course, due to the ignition switch part change that the Switch DRE had ordered in April 2006. But neither anyone from PI nor others working on the airbag non-deployment investigation in the spring of 2012 knew yet about that change; the part number was the same for the Defective Switch and the new one. Indeed, when the PI Investigator asked the Switch DRE in early 2012 to detail any changes that might account for the discrepancy observed at the salvage yard, the Switch DRE denied any of relevance. This was baffling to the PI Investigator and others.

75.      Still, the engineers involved knew that studied cars built before a certain point in 2006 were equipped with low-torque ignition switches, and that low torque in an ignition switch could result in airbag non-deployment. At this time, no further engineering tests were conducted to explore any other purported root cause of the observed non-deployment pattern or to compare the 2005 through 2007 model year Cobalt ignition switches with those of later model years.

76.      On June 12, 2012, three weeks after the May 2012 salvage yard expedition, an expert retained by the Virginia Crash plaintiffs issued a report. Noting both the 2005 Service Bulletin and the Indiana University study from 2007 that had identified a connection between the Defective Switch and non-deployment of an airbag in a fatal Cobalt crash, the expert opined that the Defective Switch was indeed responsible for non-deployment in the Virginia Crash. In early July, outside counsel for GM forwarded the Virginia Crash expert's report to the GM Airbag Attorney. In late July, the GM Airbag Attorney forwarded the Indiana University study to the PI Senior Manager, the GM Safety Attorney, and the Airbag FPA Engineer.

77.      At a meeting among GM lawyers in late July 2012 in which the Virginia Crash expert's report was discussed, a newly hired GM attorney asked the group why the Cobalt had not been recalled for the Defective Switch. Those present explained that the engineers had yet to devise a solution to the problem but that engineering was looking into it. The new attorney took from this that the GM legal department had done all it could do.

78.    The PI Investigator, the PI Senior Manager, the GM Safety Attorney, the GM Safety Director, and others met at lengthy intervals through the summer and fall of 2012 and early 2013 to consider potential solutions and further explore why the defect condition appeared to be limited to earlier model years. As one of the several Executive Champions who would be tasked with overseeing these meetings from early 2012 through 2013 has explained, the purpose of the meetings was *not* to identify the root cause of the problem, which had by approximately the spring of 2012 been traced to the Defective Switch, but rather to develop the optimal remedy for the defect condition and set with precision the scope of the anticipated recall. Certain GM personnel wanted to be sure that the fix adopted for the problem would be affordable and yet appeal to consumers; that GM would have sufficient parts on hand to address the recall; and that GM representatives would be able to fully articulate to NHTSA and the public a "complete root cause" accounting for the discrepancy between the earlier and later vehicle populations.

## GM's Representations to NHTSA About Its Recall Process

79.    At the same time, the manner in which the responsible GM personnel were approaching the Defective Switch and its deadly consequences in 2012 contrasted with the picture the Company was presenting to NHTSA about its recall process.

80.    On October 22, 2012, certain GM personnel, including the GM Safety Director, met with NHTSA officials in Washington, D.C., and gave a description of the Company's recall process intended to assure the regulator that safety issues were routinely addressed in a methodical and efficient fashion. The presentation, which touted a "common global process" with "standard work templates," explained that the first step toward potential recall involved investigation by PI of the suspected safety problem. Then, according to the presentation, the matter would be placed promptly into the FPE process, which was controlled not by engineers but by personnel in charge of Quality. At this stage, GM further explained, the FPET would consider the logistics of implementing the proposed recall or other contemplated action; the FPERC would recommend the particular field action to be taken (recall or, for example, a customer advisory); and, in short order thereafter, the EFADC would either make the final decision concerning that recommended field action or order "further study." According to individuals who attended this meeting and others in 2012 and 2013, GM gave the impression that its recall process was linear, robust, uniform, and prompt.

81.    To the extent this presentation may have accurately described GM's general recall process and handling of other defects, it did not accurately describe GM's handling of the Defective Switch (about which NHTSA would remain unaware until 2014). By approximately

five months prior to this presentation, certain GM personnel had identified what they knew to be a dangerous safety defect and had not started it into the first phase of the recall process.[6]

### GM Delays Recall After Learning of the 2006 Switch Change

82.     By early 2013, the Defective Switch *still* had not been introduced into the FPE process. GM was exploring optimal remedies and trying to understand why the defect appeared to affect only a limited population. Those involved remained unaware of the part change that the Switch DRE had made back in April 2006—the change that explained why cars built after around late 2006 seemed not to be affected.

83.     Meanwhile, during this same period, GM lawyers were engaged in heavy litigation related to the Georgia Crash, referenced above. The Georgia Crash plaintiffs' attorney had learned about the 2005 Service Bulletin, and had developed a theory that the Defective Switch caused the driver to lose control of her vehicle. The attorney was seeking discovery related to the bulletin and the Defective Switch more generally. He was also asking about any design changes that had been made to the switch.

84.     GM denied that any such design changes had been made that would affect the amount of torque it takes to move the key from Run to Accessory.

85.     Then, on April 29, 2013, the Georgia Crash plaintiffs' attorney took the deposition of the Switch DRE. During that deposition, the plaintiffs' attorney showed x-ray photographs of the ignition switch from the subject vehicle (the Defective Switch) and another switch from a later model year Cobalt (one installed after implementation of the Switch DRE's April 2006 part change directive). The photographs showed that the detent plunger in the Georgia Crash car was much shorter—and therefore would have had much lower torque performance—than the one in the later model year Cobalt. The Switch DRE, confronted with these photographs, continued to deny knowledge of any change to the switch that would have accounted for this difference.

86.     But, as the Switch DRE has acknowledged, he knew almost immediately following his deposition that there had been a design change to the switch following production of the model year 2005 Cobalt, and that he must have been the engineer responsible for that design change. He knew as much because, the day after the April 29, 2013 deposition, he

---

[6] As NHTSA and GM understood, GM's regulatory obligation to disclose safety defects within five days of their discovery was an obligation of the Company and not of any individual employee. Indeed, as NHTSA further understood, neither the GM Safety Director nor any other GM employee was authorized to disclose a safety defect to NHTSA without a decision from the EFADC that such a defect existed.

personally collected and took apart switches from a 2005 Cobalt and a later model year Cobalt and observed the difference in lengths of their respective detent plungers.

87.    The Switch DRE has said that he recalls communicating these observations to his boss and to another supervisor and being advised to let the legal department handle the matter.

88.    The GM Safety Attorney learned what transpired during the Switch DRE's deposition. Having previously received a request from the PI group for retention of an outside expert (the "Switch Expert") to help determine why the Defective Switch seemed to affect only a limited vehicle population, the GM Safety Attorney, on or about May 2, 2013, authorized retention of the Switch Expert in connection with the Georgia Crash case. The PI Investigator and the PI Senior Manager did not participate in meetings with the Switch Expert until the Switch Expert presented his conclusions following the settlement of the Georgia Crash case. The PI Investigator understood that he was to put his own investigation on hold pending the Switch Expert's evaluation.

89.    Of course, by the time the Switch Expert had been retained, certain GM personnel had already learned from the Georgia Crash plaintiffs' attorney about the design change to the Defective Switch, and the Switch DRE had already confirmed that the change had in fact occurred. GM thus had an explanation for why the defect condition did not appear to affect cars built after the middle of 2006. And, indeed, some within GM had known for approximately a year that a confirmed population of GM's compact cars was equipped with the Defective Switch. Yet *still* there was no recall; indeed, still there was no move to even place the matter into the FPE process. Instead, GM personnel awaited the study and conclusions of the Switch Expert.

90.    Meanwhile, on June 22, 2013, a 23-year-old man was killed in a crash on a highway near Roxton Pond, Quebec after his 2007 Cobalt left the road and ran into some trees. The driver-side airbag in the Cobalt failed to deploy. The power mode status was recorded as Accessory.

<u>GM Receives Documentary Evidence of the Part Change and Finally Begins the Recall Process</u>

91.    By July 2013, the Switch Expert had confirmed what the Georgia Crash plaintiffs' expert and the Switch DRE had known since no later than April 2013: Cobalts from model years 2008 through 2010 had longer detent plungers and springs than those from model years 2005 and 2006. GM's outside counsel in the Georgia Crash case urged GM in-house lawyers to settle it: "[T]here is little doubt that a jury here will find that the ignition switch used on [the Georgia Crash car] was defective and unreasonably dangerous, and that it did not meet GM's own torque specifications. In addition, the [engineering inquiry documents about the Defective Switch from 2004 and 2005] and the on-going FPE investigation have enabled plaintiffs' counsel to develop a record from which he can compellingly argue that GM has known about this safety defect from the time the first 2005 Cobalts rolled off the assembly line and essentially has done nothing to

correct the problem for the last nine years."

92.    GM followed its outside counsel's advice and settled the Georgia Crash case at the end of August 2013, agreeing to pay $5 million.

93.    Then, in late October 2013, GM received documentary confirmation from the Switch Supplier that the Switch DRE had in fact directed a part change to fix the Defective Switch in April 2006. This evidence further showed that the part was changed without a corresponding change to the part number.

94.    Only at this point did GM finally place the Defective Switch matter into the formal FPE process. An ISR was scheduled for November 5, 2013. Meanwhile, on October 30, the PI Investigator, who was by now back working on the matter and helping to lay the practical groundwork for a recall, asked an employee in charge of ordering vehicle parts what the costs of new ignition switch components would be for the 2005 through 2007 Cobalts.

<u>GM Makes Further Statements to NHTSA About Its Recall Process</u>

95.    On July 23, 2013, one day after GM's outside counsel had advised GM to settle the Georgia Crash case and noted that plaintiffs' counsel could make a "compelling" argument that GM "essentially has done nothing to correct" the Defective Switch "for the last nine years," the GM Safety Director received an email from NHTSA's Director of Defects Investigation accusing GM of being "slow to communicate" and "slow to act" in the face of safety defects—including defects unrelated to the Defective Switch (about which NHTSA remained unaware) but related to non-deployment of airbags.

96.    Two days later, certain GM personnel, including the GM Safety Director, met with NHTSA to try to quell the agency's concerns. According to notes taken by the GM Safety Director at that meeting, NHTSA agreed with GM that the Company appeared to have a "robust and rigorous process" for evaluating and addressing safety issues, but worried that it "tend[ed] to focus on proving the issue [wa]s not a safety defect."

97.    On November 7, 2013, two days after the ISR concerning the Defective Switch, certain GM personnel met again with NHTSA, this time to give a more in-depth presentation targeted at assuring the regulator that GM was "responsive" and "customer focused" when it came to safety concerns. Although the presentation did not specifically address the Defective Switch-related airbag non-deployment problem—which, having just entered the recall process within GM, remained unknown to NHTSA—it did address concerns related to airbag non-deployment more generally.

98.    First, certain GM personnel showed NHTSA slides that touted the increasing swiftness with which GM had addressed safety defects from 2008 through 2012. One graph

reflected that the average time taken from identification of the issue through to execution of the recall was 160 days in 2008 and 84 days in 2012. It further showed that the average time an issue remained in the "pre-FPE" stage was 105 days in 2008 and 33 days in 2012. And the average number of days between entry into the FPE process and recall decision was 15 days in 2008 and 13 days in 2012.

99.    Other portions of GM's presentation suggested that any airbag defect that presented with a failure to warn the driver and/or certain other aggravating factors would be recalled swiftly.

<u>GM Delays Recall for Three More Months</u>

100.    Although the Defective Switch matter entered the ISR on November 5, 2013, after approximately *804 days* of formal investigation, and although GM had at the November 7 meeting with NHTSA touted an average lag of just 13 days between entry into the FPE process and recall approval by the EFADC, GM would not ultimately decide to conduct a recall for the Defective Switch until January 31, 2014. The recall was announced to NHTSA seven days later, on February 7, 2014.

101.    The individual principally responsible for shepherding the matter through the FPE process was GM's FPE Director, who worked closely with the GM Safety Director, the GM Safety Attorney, and a member of the EFADC responsible for deciding whether to recall.

102.    As a general matter, EFADCs were scheduled weekly. The Defective Switch matter was initially contemplated for inclusion on the agenda of an EFADC scheduled for November 18. Citing the issue's "complex[ity]," however, an assistant to the FPE Director recommended—and the FPE Director agreed—that the matter be put off until an EFADC scheduled for December 3.

103.    The matter did not go to the EFADC on December 3, however. Instead, it was pushed to December 17. On December 2, the FPE Director met with the GM Safety Director, the PI Investigator, the GM Safety Attorney, and a few others in yet another "offline" meeting to discuss the matter. Then, on December 16, the issue was the subject of an FPERC meeting that had been scheduled to occur right before the December 17 EFADC meeting.

104.    After that meeting, the FPE Director expressed concern about "execution details" of the recall. She explained to one of the three EFADC decision-makers that "[t]he absolute last thing we need to do from a customer perspective is to rush a decision, post it on the NHTSA website that [sic] we have a safety decision but we cannot fix the customer vehicles for some period of time." The FPE Director informed this decision-maker that "we aren't ready for a decision" because there were "[t]oo many items on how we know how the fix will perform and

the competitive solutions." The decision-maker pledged to "push [to] do additional follow up on this prior to a decision."

105.   The EFADC meeting on December 17, 2013 yielded no decision, and further "study" was directed.

106.   By this time, all involved understood—and some had for a period of time understood—that a Cobalt recall was inevitable.

107.   Some within GM—including the GM Safety Director and the GM Safety Attorney—openly expressed concern about how the "timeline" of GM's response to the Defective Switch would look to NHTSA. As noted, a manufacturer must, under applicable regulations, report a known safety defect to NHTSA within five business days of its discovery. Here, certain GM personnel knew by approximately the spring of 2012 that the Defective Switch posed a serious safety issue because it disabled airbags in situations when they should have deployed. Yet more than a year and a half after that discovery, GM still had not conducted a recall.

<u>Recall</u>

108.   On January 31, the voting members agreed that a recall of the affected model year Cobalts, G5s, and Pursuits was warranted. On February 7, 2014, GM announced the recall to the public and NHTSA.

109.   Although other models—the Ion, most notably—were likewise equipped with the Defective Switch, these were not recalled on February 7. The stated reasons for not including these other models varied. Some believed there were differences in electronic architecture and physical switch placement between the unrecalled cars and the recalled cars, such that the risk of switch movement and/or airbag non-deployment was reduced. Others cited an error by the PI Investigator in collecting incident data about the Ion, which they said gave the erroneous impression that there was no comparable problem with the Ion.

110.   In any event, following intense criticism from the press about the limited scope of the February 7 recall, GM held another EFADC meeting on February 24, 2014 to consider the affected model years of the Ion, Sky, HHR, and Solstice. Voting members agreed that the February 7 recall should be expanded to encompass these other models. The next day, GM announced that decision.

<u>GM's Certifications for Pre-Owned Vehicles</u>

111.   All of the cars subject to the February and March 2014 airbag non-deployment recalls were relatively old. GM stopped manufacturing the Ion in 2006; stopped manufacturing

the Cobalt, the G5, the Sky, and the Solstice in 2009; and stopped manufacturing the HHR in 2010.

112.    From in or about the spring of 2012, when certain GM personnel knew that the Defective Switch could cause airbag non-deployment, through at least in or about May of 2013, GM dealerships (which GM had not made aware of the issue) continued to sell "certified pre-owned" cars equipped with the Defective Switch. GM, which profited indirectly from these sales, certified the safety of the vehicles to the public, explaining that the certification process involved testing of over a hundred components, including, specifically, the ignition system.

113.    But the safety certification was made despite there being no change or alteration to either the ignition switch itself or the accompanying key in these cars. The Defective Switch was left intact and unremedied.

114.    Approximately 800 consumers purchased certified pre-owned vehicles equipped with the Defective Switch. The GM dealer certifications thus may have caused consumers who relied on the certifications to buy vehicles that they may incorrectly have believed to be safe.

Conclusion

115.    As detailed above, starting no later than 2003, GM knowingly manufactured and sold several models of vehicles equipped with the Defective Switch. By approximately the spring of 2012, certain GM personnel knew that the Defective Switch could cause frontal airbag non-deployment in at least some model years of the Cobalt, and were aware of several fatal incidents and serious injuries that occurred as a result of accidents in which the Defective Switch may have caused or contributed to airbag non-deployment. This knowledge extended well above the ranks of investigating engineers to certain supervisors and attorneys at the Company—including GM's Safety Director and the GM Safety Attorney. Yet, GM overshot the five-day regulatory reporting requirement for safety defects by approximately 20 months. And throughout this 20-month period, GM failed to correct its 2005 statement that the Defective Switch posed no "safety" problem.

# Exhibit D
# to the Deferred
# Prosecution Agreement

PREET BHARARA
United States Attorney for the
Southern District of New York
By:   JASON H. COWLEY
      ALEXANDER J. WILSON

Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,                    :

                Plaintiff,                   :        VERIFIED COMPLAINT

            -v.-                             :        15 Civ. _____

$900,000,000 in United States               :
Currency,
                                             :
                Defendant *in rem.*
- - - - - - - - - - - - - - - - - - -x

    Plaintiff United States of America, by its attorney, PREET

BHARARA, United States Attorney for the Southern District of New

York, for its Verified Complaint (the "Complaint") alleges, upon

information and belief, as follows:

## I.    JURISDICTION AND VENUE

    1.    This action is brought by the United States of

America pursuant to 18 U.S.C. § 981(a)(1)(C), seeking the

forfeiture of $900,000,000 in United States Currency (the

"Defendant Funds" or the "defendant-in-rem").

2.    This Court has jurisdiction pursuant to 28 U.S.C. § 1355.

3.    Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because certain acts and omissions giving rise to the forfeiture took place in the Southern District of New York, and pursuant to Title 28, United States Code, Section 1395 because the defendant-in-rem shall be transferred to the Southern District of New York.

4.    The Defendant Funds represent property constituting and derived from proceeds of wire fraud in violation of Title 18, United States Code, Sections 1343, and property traceable to such property; and are thus subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C).

## II.    PROBABLE CAUSE FOR FORFEITURE

5.    General Motors Company ("GM"), an automotive company headquartered in Detroit, Michigan, entered into a Deferred Prosecution Agreement with the United States, wherein, *inter alia*, GM agreed to forfeit a total of $900,000,000, i.e., the Defendant Funds, to the United States.  GM agrees that the Defendant Funds are substitute *res* for the proceeds of GM's wire fraud offense.  The Deferred Prosecution Agreement, with the

2

accompanying Statement of Facts and Information, is attached as
Exhibit A and incorporated herein.

### III. CLAIM FOR FORFEITURE

6.    The allegations contained in paragraphs one
through five of this Verified Complaint are incorporated by
reference herein.

7.    Title 18, United States Code, Section
981(a)(1)(C) subjects to forfeiture "[a]ny property, real or
personal, which constitutes or is derived from proceeds
traceable to a violation of . . . any offense constituting
'specified unlawful activity' (as defined in section 1956(c)(7)
of this title), or a conspiracy to commit such offense."

8.    "Specified unlawful activity" is defined in 18
U.S.C. § 1956(c)(7) to include any offense under 18 U.S.C. §
1961(1).  Section 1961(1) lists, among others offenses,
violations of Title 18, United States Code, Section 1343
(relating to wire fraud).

9.    By reason of the foregoing, the defendant-in-rem
is subject to forfeiture to the United States of America
pursuant to Title 18, United States Code, Section 981(a)(1)(C),
as it is substitute *res* for property derived from wire fraud, in
violation of Title 18, United States Code, Section 1343.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the defendant-in-rem and that all persons having an interest in the defendant-in-rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the defendant-in-rem to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated:    New York, New York
          September 16, 2015

                         PREET BHARARA
                         United States Attorney for
                         Plaintiff United States of America


          By:    _____
                 JASON H. COWLEY
                 ALEXANDER J. WILSON
                 Assistant United States Attorneys
                 One St. Andrew's Plaza
                 New York, New York 10007
                 (212) 637-2200

4

VERIFICATION

STATE OF NEW YORK              )
COUNTY OF NEW YORK             :
SOUTHERN DISTRICT OF NEW YORK  )

      KENNETH W. JACOUTOT, being duly sworn, deposes and
says that he is a Special Agent with the United States
Department of Transportation, Office of Inspector General; that
he has read the foregoing Verified Complaint and knows the
contents thereof; and that the same is true to the best of his
knowledge, information and belief.

      The sources of deponent's information and the grounds
of his belief are his personal involvement in the investigation,
and conversations with and documents prepared by law enforcement
officers and others.

                                      _____
                                      Kenneth W. Jacoutot
                                      Special Agent
                                      Department of Transportation,
                                      Office of Inspector General

Sworn to before me this
16 th day of September, 2015

_____
Notary Public

NAEEM A. CONWAY
Notary Public, State of New York
No. 01CO6110667
Qualified in New York County
Commission Expires June 01, 2016

09-50026-reg-mg-mbp02548-JMF Filed 09/11/16/2657 Entered 09/02/15 14:38:297 Exhibit 2
Pg 415 of 728

# Exhibit 2



COPY

**THOMAS C. HORNE**
**Attorney General**
Firm State Bar No. 14000
BRAD K. KEOGH (SBA #010321)
DANA R. VOGEL (SBA # 030748)
Assistant Attorneys General
Office of the Attorney General
1275 West Washington Street
Phoenix, Arizona 85007
Telephone: (602) 542-3702
Facsimile: (602) 542-4377

NOV 1 9 2014

MICHAEL K. JEANES, CLERK
C. CARABAJAL
DEPUTY CLERK

[Additional Counsel on Signature Page]

*Attorneys for Plaintiff*
*State of Arizona*

## THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, *ex rel*. THOMAS C. HORNE, Attorney General,<br><br>                      Plaintiff,<br><br>    vs.<br><br>GENERAL MOTORS LLC,<br><br>                      Defendant. | Case No. CV2014-014090<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**<br><br>(Non-classified Civil; Consumer Fraud) |

the New GM brand that no rational consumer would pay what otherwise would have been fair

market value for their GM-branded vehicles purchased on or after July 11, 2009.

<div align="center">

**IV.    CLAIM FOR RELIEF**

**<u>ARIZONA CONSUMER FRAUD ACT (A.R.S. § 44-1521, <em>et seq.</em>)</u>**

</div>

494.    The State  realleges and incorporates by reference all paragraphs as though fully

set forth herein.

495.    New GM is a "person" within the meaning of  A.R.S. § 44-1521(6).

496.    GM-branded vehicles sold or leased on or after July 11, 2009  are "merchandise"

within the meaning of A.R.S.§ 44-1521(5).

497.    The Arizona Consumer Fraud Act  provides that "[t]he act, use or employment by

any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false

promise, misrepresentation, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale or advertisement of any merchandise whether or not any person has in fact been misled,

deceived or damaged thereby, is declared to be an unlawful practice."  A.R.S.  § 44-1522(A).

498.    In the course of its business, New GM systematically devalued safety and

concealed a plethora of defects in GM-branded vehicles as described herein and otherwise

engaged in activities with a tendency or capacity to deceive.  New GM also engaged in unlawful

practices by employing deception, deceptive or unfair acts or practices, fraud, false pretenses,

false promises, misrepresentations, or concealment, suppression or omission of material facts

with intent that others rely upon such concealment, suppression or omission, in connection with

the sale and lease of GM-branded vehicles on or after July 11, 2009.

499.    From the date of its inception on July 11, 2009, New GM knew of many serious

defects affecting many models and years of GM-branded vehicles, both because of the

<div align="center">

- 120 -

</div>

knowledge of Old GM personnel who remained at New GM, and continuous reports, investigations, and notifications from regulatory authorities. New GM became aware of other serious defects and systemic safety issues years ago, but concealed all of that information until recently.

500.    New GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to promptly disclose and remedy defects in all GM-branded vehicles. New GM concealed this information as well.

501.    By failing to disclose and by actively concealing the many defects in GM-branded vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, New GM engaged in deceptive and unlawful business practices in violation of the Arizona Consumer Fraud Act.

502.    In the course of New GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above. New GM compounded the deception by repeatedly asserting that its vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

503.    New GM's unlawful, unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Arizona consumers, about the true safety and reliability of GM-branded vehicles, the quality of the New GM brand, the devaluing of safety at New GM, and the true value of GM-branded vehicles sold or leased on or after July 11, 2009.

504.    New GM intentionally and knowingly misrepresented material facts regarding GM-branded vehicles with an intent to mislead Arizona consumers.

505.    New GM knew or should have known that its conduct was of the nature prohibited by and violative of the Arizona Consumer Fraud Act.

506.    As alleged above, New GM made material statements about the safety and reliability of GM-branded vehicles that were either false or misleading.

507.    New GM owed purchasers of New GM vehicles a duty to disclose the true safety and reliability of GM-branded vehicles and the devaluing of safety at New GM, because New GM:

      a.      Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

      b.      Intentionally concealed the foregoing from the public, including Arizona residents; and/or

      c.      Made incomplete representations about the safety and reliability of GM-branded vehicles generally, and the ignition switch in particular, while purposefully withholding material facts from the public, including Arizona residents, that contradicted these representations.

508.    Because New GM fraudulently concealed the many defects in GM-branded vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of GM-branded vehicles sold on or after July 11, 2009, has greatly diminished.  In light of the stigma attached to those vehicles by New GM's conduct, they are now worth significantly less than they otherwise would be.

509.    New GM's systemic devaluation of safety and its concealment of a plethora of defects in GM-branded vehicles were material to Arizona residents.  A vehicle made by a

reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

510.    New GM's violations present a continuing risk to owners of GM-branded vehicles, as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

511.    While engaging in the unlawful acts and practices alleged in this Complaint, New GM was at all times acting willfully as defined by A.R.S. § 44-1531.

DATED:  November 19, 2014

THOMAS C. HORNE
ATTORNEY GENERAL

By: _____   by permission
   Brad K. Keogh
   Dana R. Vogel
   Office of Attorney General
   1275 West Washington Street
   Phoenix, Arizona 85007
   Brad.Keogh@azag.gov
   Dana.Vogel@azag.gov
   Telephone:  (602) 542-3702
   Facsimile:  (602) 542-4377

HAGENS BERMAN SOBOL SHAPIRO LLP

By: _____
   Robert B. Carey
   Leonard Aragon
   Rachel E. Freeeman
   11 West Jefferson Street, Ste. 1000
   Phoenix, AZ  85003
   Telephone: (602) 840-5900
   Facsimile: (602) 840-3012
   rob@hbsslaw.com
   leonard@hbsslaw.com
   rachelf@hbsslaw.com
   Telephone: (602) 840-5900
   Facsimile: (602) 840-3012

   and

   Steve W. Berman *(Pro Hac Vice)*
   Sean R. Matt *(Pro Hac Vice)*
   Andrew M. Volk *(Pro Hac Vice)*
   1918 Eighth Avenue, Suite 3300
   Seattle, Washington  98101
   steve@hbsslaw.com
   sean@hbsslaw.com
   andrew@hbsslaw.com
   Telephone:  206) 623-7292
   Facsimile:  (206) 623-0594

   Attorneys for Plaintiff
   State of Arizona

- 125 -

# Exhibit 3

1  ORANGE COUNTY DISTRICT ATTORNEY
   Tony Rackauckas, District Attorney
2  Joseph D'Agostino, Senior Assistant District Attorney
3  401 Civil Center Drive
   Santa Ana, CA 92701-4575
4  Tel: (714) 834-3600
   Fax: (714) 648-3636
5
6  – In association with –

7  Mark P. Robinson, Jr., SBN 05442          Steve W. Berman (*Pro Hac Vice* Pending)
   Kevin F. Calcagnie, SBN 108994           Andrew Volk (*Pro Hac Vice* Pending)
8  Scot D. Wilson, SBN 223367               HAGENS BERMAN SOBOL
   ROBINSON CALCAGNIE ROBINSON                SHAPIRO LLP
9    SHAPIRO DAVIS, INC.                    1918 Eighth Avenue, Suite 3300
   19 Corporate Plaza Drive                 Seattle, WA 98101
10 Newport Beach, CA 92660                  Tel: (206) 623-7292
   Tel: (949) 720-1288                      Fax: (206) 623-0594
11 Fax: (949) 720-1292                      steve@hbsslaw.com
12 mrobinson@rcrlaw.net

13 *Attorneys for Plaintiff*
   *THE PEOPLE OF THE STATE OF CALIFORNIA*
14

ELECTRONICALLY FILED
Superior Court of California,
County of Orange
**07/01/2014** at 12:58:00 PM
Clerk of the Superior Court
By Irma Cook, Deputy Clerk

15          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

16   **IN AND FOR THE COUNTY OF ORANGE – COMPLEX LITIGATION DIVISION**

17  THE PEOPLE OF THE STATE OF          Case No. 30-2014-00731038-CU-BT-CXC
18  CALIFORNIA, acting by and through Orange
    County District Attorney Tony Rackauckas,    **FIRST AMENDED COMPLAINT FOR**
19                                               **VIOLATIONS OF CALIFORNIA**
                            Plaintiff,           **UNFAIR COMPETITION LAW AND**
20                                               **FALSE ADVERTISING LAW**
21          v.

22  GENERAL MOTORS LLC
23                          Defendant.
24
25
26
27
28

vehicles have been supplied in accordance with a previous representation when they have not; and (5) selling Defective Vehicles in violation of the TREAD Act.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200

253.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

254.    GM has engaged in, and continues to engage in, acts or practices that constitute unfair competition, as that term is defined in section 17200 of the California Business and Professions Code.

255.    GM has violated, and continues to violate, Business and Professions Code section 17200 through its unlawful, unfair, fraudulent, and/or deceptive business acts and/or practices. GM uniformly concealed, failed to disclose, and omitted important safety-related material information that was known only to GM and that could not reasonably have been discovered by California consumers.  Based on GM's concealment, half-truths, and omissions, California consumers agreed to purchase or lease one or more (i) new or used GM vehicles sold on or after July 10, 2009; (ii) "GM certified" Defective Vehicles sold on or after July 10, 2009; (iii) and/or to have their vehicles repaired using GM's defective ignition switches.  GM also repeatedly and knowingly made untrue and misleading statements in California regarding the purported reliability and safety of its vehicles, and the importance of safety to the Company.  The true information about the many serious defects in GM-branded vehicles, and GM's disdain for safety, was known only to GM and could not reasonably have been discovered by California consumers.

256.    As a direct and proximate result of GM's concealment and failure to disclose the many defects and the Company's institutionalized devaluation of safety, GM intended that consumers would be misled into believing that that GM was a reputable manufacturer of reliable and safe vehicles when in fact GM was an irresponsible manufacture of unsafe, unreliable  and often dangerously defective vehicles.

1  **UNLAWFUL**

2      257.   The unlawful acts and practices of GM alleged above constitute unlawful business

3  acts and/or practices within the meaning of California Business and Professions Code section

4  17200.  GM's unlawful business acts and/or practices as alleged herein have violated numerous

5  federal, state, statutory, and/or common laws – and said predicate acts are therefore per se

6  violations of section 17200.  These predicate unlawful business acts and/or practices include, but

7  are not limited to, the following:  California Business and Professions Code section 17500 (False

8  Advertising), California Civil Code section 1572 (Actual Fraud – Omissions), California Civil

9  Code section 1573 (Constructive Fraud by Omission), California Civil Code section 1710 (Deceit),

10  California Civil Code section 1770 (the Consumers Legal Remedies Act – Deceptive Practices),

11  California Civil Code section 1793.2 *et seq.* (the Consumer Warranties Act), and other California

12  statutory and common law; the National Traffic and Motor Vehicle Safety Act (49 U.S.C. § 30101

13  *et. seq.*), as amended by the Transportation Recall Enhancement, Accountability and

14  Documentation TREAD Act, (49 U.S.C. §§ 30101-30170) including, but not limited to 49 U.S.C.

15  §§ 30112, 30115, 30118 and 30166, Federal Motor Vehicle Safety Standard 124 (49 C.F.R. §

16  571.124), and 49 CFR §§ 573.6, 579.11, 579.12, and 579.21.

17  **UNFAIR**

18      258.   GM's concealment, omissions, and misconduct as alleged in this action constitute

19  negligence and other tortious conduct and gave GM an unfair competitive advantage over its

20  competitors who did not engage in such practices.  Said misconduct, as alleged herein, also

21  violated established law and/or public policies which seek to promote prompt disclosure of

22  important safety-related information.  Concealing and failing to disclose the nature and extent of

23  the numerous safety defects to California consumers, before (on or after July 10, 2009) those

24  consumers (i) purchased one or more GM vehicles; (ii) purchased used "GM certified" Defective

25  Vehicles; or (iii) had their vehicles repaired with defective ignition switches, as alleged herein, was

26  and is directly contrary to established legislative goals and policies promoting safety and the

27  prompt disclosure of such defects, prior to purchase.  Therefore GM's acts and/or practices alleged

28  herein were and are unfair within the meaning of Business and Professions Code section 17200.

259.    The harm to California consumers outweighs the utility, if any, of GM's acts and/or practices as alleged herein.  Thus, GM's deceptive business acts and/or practices, as alleged herein, were unfair within the meaning of Business and Professions Code section 17200.

260.    As alleged herein, GM's business acts and practices offend established public policies, including, but not limited to, public policies against making partial half-truths and failing to disclose important material facts to consumers.

261.    In addition, as alleged herein, GM intended that California consumers would be misled and/or deceived into believing that they would be purchasing a safe and reliable vehicle built by a reputable manufacturer that values safety and stands behind its vehicles after they are sold, when, in fact, they were in many cases obtaining a vehicle that had defects that had the potential to cause serious bodily injury and/or death, and, in every case, obtaining a vehicle made by an irresponsible manufacturer that does not value safety and was concealing myriad known safety defects in millions of GM-branded vehicles.  This practice is and was immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and thus unfair within the meaning of Business and Professions Code section 17200.

262.    At all times relevant, GM's misconduct and omissions alleged herein:  (a) caused substantial injury to the Public; (b) had no countervailing benefit to consumers or to competition that could possibly outweigh this substantial injury; and (c) caused injury that could not have been avoided or even discovered by ordinary consumers, because it resulted from GM's concealment, failure to disclose and/or omission of important safety related material information that only the Defendant knew or could have known.  Thus, GM's acts and/or practices as alleged herein were unfair within the meaning of Business and Professions Code section 17200.

**FRAUDULENT**

263.    GM's acts and practices, as alleged herein, were likely to, and did, deceive the Public.  GM's concealment, material omissions, acts, practices and non-disclosures, as alleged herein, therefore constitute fraudulent business acts and/or practices within the meaning of California Business and Professions Code section 17200.

1    264.    California consumers have been, and continue to be, deceived by GM's

2    concealment and material omissions as alleged herein.  California consumers have suffered injury

3    and lost money as a direct result of the deceptive conduct as alleged herein.  The unlawful, unfair,

4    deceptive, and/or fraudulent business acts and practices of GM, as fully described herein, present a

5    continuing threat to the citizens of California to be misled and/or deceived by GM as alleged

6    herein, and/or to be substantially injured by these dangerously defective cars.

**SECOND CAUSE OF ACTION**

**VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17500**

9    265.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

10    266.    California Business and Professions Code § 17500 states: "It is unlawful for any ...

11    corporation ... with intent directly or indirectly to dispose of real or personal property ... to induce

12    the public to enter into any obligation relating thereto, to make or disseminate or cause to be made

13    or disseminated ... from this state before the public in any state, in any newspaper or other

14    publication, or any advertising device, ... or in any other manner or means whatever, including over

15    the Internet, any statement ... which is untrue or misleading, and which is known, or which by the

16    exercise of reasonable care should be known, to be untrue or misleading."

17    267.    GM caused to be made or disseminated through California and the United States,

18    through advertising, marketing, and other publications, statements that were untrue or misleading,

19    and which were known, or which by the exercise of reasonable care should have been known to

20    GM, to be untrue and misleading to consumers.

21    268.    GM has violated section 17500 because the misrepresentations and omissions

22    regarding the safety and reliability of its vehicles and the importance of safety to the Company as

23    set forth in this First Amended Complaint were material and likely to deceive a reasonable

24    consumer.

25    269.    California consumers were exposed to and saw advertisements for GM vehicles on

26    television, in magazines, on billboards, in brochures at dealerships, and on the Internet before

27    purchasing GM vehicles.  Had those advertisements, window stickers, or any other materials

28    disclosed that millions of GM-branded vehicles contained serious safety defects and that GM did

1    not value safety, consumers would not have purchased new GM vehicles on or after July 10, 2009

2    and would not have purchased "GM certified" Defective Vehicles on or after July 10, 2009.

3          270.    Despite notice of the serious safety defects in so many its vehicles, GM did not

4    disclose to consumers that its vehicles – which GM for years had advertised as "safe" and

5    "reliable" – were in fact not as safe or reliable as a reasonable consumer expected due to the risks

6    created by the many known defects, and GM's focus on cost-cutting at the expense of safety and

7    the resultant concealment of numerous safety defects.  GM never disclosed what it knew about the

8    defects.  Rather than disclose the truth, GM concealed the existence of the defects, and claimed to

9    be a reputable manufacturer of safe and reliable vehicles.

10         271.    GM, by the acts and misconduct alleged herein, violated Business & Professions

11   Code section 17500, and GM has engaged in, and continues to engage in, acts or practices that

12   constitute false advertising.

13         272.    GM has violated, and continues to violate, Business and Professions Code section

14   17500 by disseminating untrue and misleading statements as defined by Business and Professions

15   Code 17500.  GM has engaged in acts and practices with intent to induce members of the public to

16   purchase its vehicles by publicly disseminated advertising which contained statements which were

17   untrue or misleading, and which GM knew, or in the exercise of reasonable care should have

18   known, were untrue or misleading, and which concerned the real or personal property or services

19   or their disposition or performance.

20         273.    GM repeatedly and knowingly made untrue and misleading statements in California

21   regarding the purported reliability and safety of its vehicles.  The true information was known only

22   to GM and could not reasonably have been discovered by California consumers.  GM uniformly

23   concealed, failed to disclose and omitted important safety-related material information that was

24   known only to GM and that could not reasonably have been discovered by California consumers.

25   Based on GM's concealment, half-truths, and omissions, California consumers agreed (on or after

26   July 10, 2009) (i) to purchase GM vehicles; (ii) to purchase used "GM certified" Defective

27   Vehicles; and/or (iii) to have their vehicles repaired using defective ignition switches,

28

274.     As a direct and proximate result of GM's concealment and failure to disclose the many safety defects, GM intended that consumers would be misled into believing that they would be purchasing a safe and reliable vehicle built by a reputable manufacturer that values safety, when in fact they were purchasing vehicles that were in many cases dangerously defective and were in every case overpriced because they were in fact built by an irresponsible manufacturer that valued cost-cutting over safety and routinely concealed a myriad of serious defects from regulators and the public.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against GM as follows:

A.     Pursuant to Business and Professions Code sections 17203 and 17535, that GM, its employees, agents, representatives, successors, assigns, and all persons who act in concert with them be permanently enjoined from committing any acts of unfair competition, including the violations alleged herein.

B.     Pursuant to Business and Professions Code sections 17206 and 17536, that GM be ordered to pay a civil penalty in the amount of Two Thousand Five Hundred dollars ($2,500.00) for each violation of Business and Professions Code section 17200 and for Five Thousand dollars ($5,000) for each violation of Business and Professions Code section 17500 by GM in an amount according to proof.

C.     That Plaintiff recover its costs of suit, including costs of investigation.

D.     For reasonable attorneys' fees pursuant to Code of Civil Procedure section 1021.5, or other applicable law; and

E.     For such other equitable relief as is just and proper.

///

///

///

///

///

| 1 | Dated: July 1, 2014 | Respectfully submitted, |
|---|---|---|

2

TONY RACKAUCKAS, DISTRICT ATTORNEY
COUNTY OF ORANGE, STATE OF CALIFORNIA

3

4

By: _Tony Rackauckas_
    TONY RACKAUCKAS

5

Joseph D'Agostino, Senior Assistant District Attorney
401 Civil Center Drive

6

Santa Ana, CA 92701-4575
Tel: (714) 834-3600

7

Fax: (714) 648-3636

8

Dated: July 1, 2014

ROBINSON, CALCAGNIE AND ROBINSON

9

By: _Mark P. Robinson, Jr._

10

    MARK P. ROBINSON, JR., SBN 06442
Kevin F. Calcagnie, SBN. 108994

11

Scot D. Wilson, SBN. 223367
ROBINSON CALCAGNIE ROBINSON

12

  SHAPIRO DAVIS, INC.
19 Corporate Plaza Drive

13

Newport Beach, California 92660
Tel.: (949) 720-1288

14

Fax: (949) 720-1292
mrobinson@rcrlaw.net

15

16

Dated: July 1, 2014

HAGENS BERMAN SOBOL SHAPIRO LLP

17

Steve W. Berman (Pro Hac Vice Pending)
Andrew Volk (Pro Hac Vice Pending)

18

HAGENS BERMAN SOBOL
  SHAPIRO LLP

19

1918 Eighth Avenue, Suite 3300
Seattle, WA 98101

20

Telephone: (206) 623-7292
Facsimile: (206) 623-0594

21

steve@hbsslaw.com

22

*Attorneys for Plaintiff*

23

*THE PEOPLE OF THE STATE OF CALIFORNIA*

24

25

26

27

28

010440-12 692229 V1

- 58 -

FIRST AMENDED COMPLAINT

# Exhibit 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

IN RE:                                                    14-MD-2543 (JMF)

GENERAL MOTORS LLC IGNITION          **[CORRECTED] SECOND AMENDED**
SWITCH LITIGATION                    **CONSOLIDATED COMPLAINT**

*This Document Relates to All Actions*           [REDACTED]

-------------------------------------------------------------x

which New GM had unjustly and unlawfully determined not to recall, New GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of New GM.

1461.   Thus, all Arkansas Unjust Enrichment Class Members conferred a benefit on New GM.

1462.   It is inequitable for New GM to retain these benefits.

1463.   Plaintiffs were not aware about the true facts about GM-branded vehicles, and did not benefit from GM's conduct.

1464.   New GM knowingly accepted the benefits of its unjust conduct.

1465.   As a result of New GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

<div align="center">

**CALIFORNIA**

**COUNT I**

**VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT**

**(CAL. CIV. CODE § 1750, *et seq.*)**

</div>

1466.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1467.   This claim is brought only on behalf of Nationwide Class Members who are California residents.

1468.   New GM is a "person" under CAL. CIV. CODE § 1761(c).

1469.   Plaintiffs and the California Class are "consumers," as defined by CAL. CIVIL CODE § 1761(d), who purchased or leased one or more Affected Vehicles.

1470.   The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the

<div align="center">

- 424 -

</div>

sale or lease of goods or services to any consumer[.]" CAL. CIV. CODE § 1770(a). New GM has

engaged in unfair or deceptive acts or practices that violated CAL. CIV. CODE § 1750, *et seq*., as

described above and below, by among other things, representing that Affected Vehicles have

characteristics, uses, benefits, and qualities which they do not have; representing that Affected

Vehicles are of a particular standard, quality, and grade when they are not; advertising Affected

Vehicles with the intent not to sell or lease them as advertised; and representing that the subject

of a transaction involving Affected Vehicles has been supplied in accordance with a previous

representation when it has not.

1471.   In the course of its business, New GM systematically devalued safety and

concealed a plethora of defects in GM-branded vehicles as described herein and otherwise

engaged in activities with a tendency or capacity to deceive. New GM also engaged in unlawful

trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

concealment, suppression or omission of any material fact with intent that others rely upon such

concealment, suppression or omission, in connection with the sale of Affected Vehicles.

1472.   From the date of its inception on July 11, 2009, New GM knew of many serious

defects affecting many models and years of GM-branded vehicles, because of (i) the knowledge

of Old GM personnel who remained at New GM; (ii) continuous reports, investigations, and

notifications from regulatory authorities; and (iii) ongoing performance of New GM's TREAD

Act obligations, as discussed above. New GM became aware of other serious defects and

systemic safety issues years ago, but concealed all of that information until recently.

1473.   New GM was also aware that it valued cost-cutting over safety, selected parts

from the cheapest supplier regardless of quality, and actively discouraged employees from

finding and flagging known safety defects, and that this approach would necessarily cause the

existence of more defects in the vehicles it designed and manufactured and the failure to disclose

and remedy defects in all GM-branded vehicles.  New GM concealed this information as well.

1474.  According to one report from the Center for Auto Safety, some 2,004 deaths and

injuries are connected with recently recalled GM-branded vehicles, and New GM should have

recalled the vehicles years ago.

1475.  By failing to disclose and by actively concealing the many defects in GM-branded

vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself

as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,

New GM engaged in unfair and deceptive business practices in violation of the CLRA.

1476.  In the course of New GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the many safety issues and serious defects discussed

above.  New GM compounded the deception by repeatedly asserting that GM-branded vehicles

were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that

valued safety and stood behind its vehicles once they are on the road.

1477.  New GM's unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of GM-

branded vehicles, the quality of the GM brand, the devaluing of safety at New GM, and the true

value of the Affected Vehicles.

1478.  New GM intentionally and knowingly misrepresented material facts regarding the

Affected Vehicles with an intent to mislead Plaintiffs and the California Class.

1479.  New GM knew or should have known that its conduct violated the CLRA.

1480.  As alleged above, New GM made material statements about the safety and

reliability of the Affected Vehicles and the GM brand that were either false or misleading.

010440-11  789697 V1

1481.   New GM owed Plaintiffs a duty to disclose the true safety and reliability of the

Affected Vehicles and the devaluing of safety at New GM, because New GM:

a.      Possessed exclusive knowledge that it valued cost-cutting
over safety, selected parts from the cheapest supplier
regardless of quality, and actively discouraged employees
from finding and flagging known safety defects, and that
this approach would necessarily cause the existence of
more defects in the vehicles it designed and manufactured;

b.      Intentionally concealed the foregoing from Plaintiffs;
and/or

c.      Made incomplete representations about the safety and
reliability of the Affected Vehicles generally, and the
ignition switch  and other defects in particular, while
purposefully withholding material facts from Plaintiffs that
contradicted these representations.

1482.   Because New GM fraudulently concealed the many defects in GM-branded

vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed,

the value of the Affected Vehicles has greatly diminished.  In light of the stigma attached to

those vehicles by New GM's conduct, they are now worth significantly less than they otherwise

would be.

1483.   New GM's systemic devaluation of safety and its concealment of a plethora of

defects in GM-branded vehicles were material to Plaintiffs and the California Class.  A vehicle

made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects

rather than promptly remedies them.

1484.   Plaintiffs and the California Class suffered ascertainable loss caused by

New GM's misrepresentations and its concealment of and failure to disclose material

information.  Plaintiffs who purchased GM-branded vehicles after the date of New GM's

inception either would have paid less for their vehicles or would not have purchased or leased

them at all.  For Plaintiffs who purchased Old GM Defective Ignition Switch Vehicles that were sold as "Certified Pre-Owned," they too either would have paid less for their vehicles or would not have purchased them but for New GM's violations of the CLRA.

1485.   Regardless of time of purchase or lease, no Plaintiffs would have maintained and continued to drive their vehicles had they been aware of New GM's misconduct.  By contractually assuming TREAD Act responsibilities with respect to Old GM vehicles, New GM effectively assumed the role of manufacturer of those vehicles because the TREAD Act on its face only applies to vehicle manufacturers.  49 U.S.C. § 30118(c).  New GM had an ongoing duty to all GM vehicle owners to refrain from unfair and deceptive acts or practices under the CLRA.  And, in any event, all GM vehicle owners suffered ascertainable loss of the diminished value of their vehicles as a result of New GM's deceptive and unfair acts and practices made in the course of New GM's business.

1486.   New GM's violations present a continuing risk to Plaintiffs as well as to the general public.  New GM's unlawful acts and practices complained of herein affect the public interest.

1487.   As a direct and proximate result of New GM's violations of the CLRA, Plaintiffs and the California Class have suffered injury-in-fact and/or actual damage.

1488.   Under CAL. CIV. CODE § 1780(a), Plaintiffs and the California Class seek monetary relief against New GM measured as the diminution of the value of their vehicles caused by New GM's violations of the CLRA as alleged herein.

1489.   Under CAL. CIV. CODE § 1780(b), Plaintiffs seek an additional award against New GM of up to $5,000 for each California Class member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  New GM knew or should have known that its conduct was

directed to one or more California Class Members who are senior citizens or disabled persons. New GM's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more California Class Members who are senior citizens or disabled persons are substantially more vulnerable to New GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from New GM's conduct.

1490.   Plaintiffs also seek punitive damages against New GM because it carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the California Class to potential cruel and unjust hardship as a result. New GM intentionally and willfully deceived Plaintiffs on life-or-death matters, and concealed material facts that only New GM knew.  New GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under CAL. CIV. CODE § 3294.

1491.   Plaintiffs further seek an order enjoining New GM's unfair or deceptive acts or practices, restitution, punitive damages, costs of court, attorneys' fees under CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

1492.   Certain Plaintiffs have sent a letter complying with CAL. CIV. CODE § 1780(b).

## COUNT II

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

### (CAL. BUS. & PROF. CODE § 17200, *et seq.*)

1493.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

DATED: June 12, 2015          HAGENS BERMAN SOBOL SHAPIRO LLP

By: _____ */s/ Steve W. Berman*_____
       Steve W. Berman
*steve@hbsslaw.com*
Sean R. Matt
*sean@hbsslaw.com*
Andrew M. Volk
*andrew@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

DATED: June 12, 2015          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By: _____ */s/ Elizabeth J. Cabraser*_____
       Elizabeth J. Cabraser
*ecabraser@lchb.com*
Steven E. Fineman
*sfineman@lchb.com*
Rachel Geman
*rgeman@lchb.com*
Annika K. Martin
*akmartin@lchb.com*
275 Battery St., 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Co-Lead Counsel with Primary Focus on Economic
Loss Cases*

DATED: June 12, 2015          HILLIARD MUÑOZ GONZALES L.L.P.

By: _____ */s/ Robert Hilliard*_____
       Robert Hilliard
*bobh@hmglawfirm.com*
719 S Shoreline Blvd, Suite #500
Corpus Christi, TX 78401
Telephone: (361) 882-1612
Facsimile: (361) 882-3015

*Co-Lead Counsel with Primary Focus on Personal
Injury Cases*

010440-11 789697 V1

# Exhibit 5

# FILED UNDER SEAL

# Exhibit 6

# FILED UNDER SEAL

Pg 442 of 728

# Exhibit 7

# FILED UNDER SEAL

# Exhibit 8

# FILED UNDER SEAL

09-50026-reg-mbdo2339451v3    Filed 09/03/13-Entered 09/08/13  16:33:516 Exhibit 9
Pg 4 of 1

# Exhibit 9

# FILED UNDER SEAL

# Exhibit 10

# FILED UNDER SEAL

# Exhibit 11

# FILED UNDER SEAL

09-50026-reg   Doc 13452-12   Filed 09/24/15   Entered 09/24/15   Exhibit 12
Pg 1 of 18

# Exhibit 12

# FILED UNDER SEAL

# Exhibit 13

# FILED UNDER SEAL

# Exhibit 4

# 15-2844(L),
## 15-2847(XAP), 15-2848(XAP)

# United States Court of Appeals
*for the*
# Second Circuit

———————◆———————

In the Matter of: Motors Liquidation Company,

*Debtor*.

———————————————

*(For Continuation of Caption See Inside Cover)*

———————————————

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLANT IGNITION SWITCH PLAINTIFFS

STEVEN W. BERMAN
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
(206) 623-7292

ELIZABETH J. CABRASER
LIEFF CABRASER HEIMANN
  & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
(415) 956-1000

*Attorneys for Appellant Ignition Switch Plaintiffs and Co-Lead Counsel
for Ignition Switch Plaintiffs in the MDL Court*

EDWARD S. WEISFELNER
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
(212) 209-4800

SANDER L. ESSERMAN
STUTZMAN, BROMBERG, ESSERMAN
  & PLIFKA, P.C.
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
(214) 969-4900

*Attorneys for Appellant Ignition Switch Plaintiffs and Designated Counsel for
Ignition Switch Plaintiffs in the Bankruptcy Court*

---

CELESTINE ELLIOTT, LAWRENCE ELLIOTT,
BERENICE SUMMERVILLE,

*Creditors-Appellants-Cross-Appellees,*

SESAY AND BLEDSOE PLAINTIFFS,

*Appellants-Cross-Appellees,*

IGNITION SWITCH PLAINTIFFS, IGNITION SWITCH PRE-CLOSING
ACCIDENT PLAINTIFFS, THE STATE OF ARIZONA, PEOPLE OF
THE STATE OF CALIFORNIA, GROMAN PLAINTIFFS,

*Appellants,*

– v. –

GENERAL MOTORS LLC,

*Appellee-Cross-Appellant,*

WILMINGTON TRUST COMPANY,

*Trustee-Appellee-Cross-Appellant,*

PARTICIPATING UNITHOLDERS,

*Creditor-Appellee-Cross-Appellant.*

---

Case 1:14-md-02543-JMF    Document 4657    Filed 10/02/17    Page 4 of 73

# CORPORATE DISCLOSURE STATEMENT

No corporate disclosure statement is required for the Ignition Switch

Plaintiffs, all of whom are individuals.

Case 14-4658, Document 657, Filed 10/02/17, Page 5 of 73

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF JURISDICTION ........................................................ 1

II.   STATEMENT OF ISSUES PRESENTED ON APPEAL .......................... 2

III.  STATEMENT OF THE CASE ............................................................... 3

      A.   Old GM initiates a chapter 11 bankruptcy and files the Sale
           Motion. ..................................................................................... 7

      B.   The ISPs were deprived of notice of the Sale and an
           opportunity to be heard in connection with the Sale Order. .............. 8

      C.   The Sale Agreement and Sale Order imposed recall
           obligations on New GM with respect to Old GM cars and
           parts, and the GUC Trust was established to distribute the
           assets of the bankruptcy estate. .......................................... 8

      D.   Consistent with their culture of hiding safety problems, both
           Old and New GM concealed the Ignition Switch Defect and
           did not conduct federally-mandated recalls. ................................... 10

      E.   Disposition below. ........................................................ 11

IV.   SUMMARY OF ARGUMENT ......................................................... 13

V.    STANDARD OF REVIEW .................................................................. 17

VI.   ARGUMENT.................................................................................... 17

      A.   The Bankruptcy Court erred in holding that the ISPs must
           demonstrate prejudice in order to establish a due process
           violation. ................................................................................. 17

      B.   The Bankruptcy Court erred in holding that the ISPs failed
           to demonstrate prejudice in connection with the entry and/or
           enforcement of the Sale Order where no one knew of the
           fraudulent concealment of the Ignition Switch Defect at the
           time of the Sale. ............................................................ 25

C.    In enforcing the Sale Order, the Bankruptcy Court erred by failing to take into account the concealment of the Ignition Switch Defect by both Old and New GM and the resulting prejudice to Plaintiffs. ..................................... 30

D.    Consistent with the Due Process clause and the Bankruptcy Code, the Sale Order cannot be enforced against Used Car Purchasers who did not own their Old GM vehicles at the time of the Sale. ............................................. 33

E.    The Bankruptcy Court erred by finding that the Sale Order bars any Plaintiff's direct claims arising exclusively from New GM's violations of its own independent legal duties.............. 39

F.    The Bankruptcy Court erred in applying the doctrine of equitable mootness to preclude recovery on Plaintiffs' claims. ........................................... 44

       1.    The Bankruptcy Court erred by finding equitable mootness applicable to Plaintiffs' claims. ............................ 44

       2.    The Bankruptcy Court erred by finding that Plaintiffs cannot satisfy three of the *Chateaugay* factors. ..................... 46

              a.    The Bankruptcy Court misapplied the first *Chateaugay* factor. ...................................... 51

              b.    The Bankruptcy Court misapplied the third *Chateaugay* factor. ...................................... 52

              c.    The Bankruptcy Court misapplied the fifth *Chateaugay* factor. ...................................... 55

VII.    CONCLUSION ................................................. 58

010440-11 827752 V1

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re 1031 Tax Grp., LLC,*
   2011 U.S. Dist. LEXIS 33755 (S.D.N.Y. Mar. 29, 2011) ...............................43

*Bangor Punta Operations, Inc. v. Bangor & A. R. Co.,*
   417 U.S. 703 (1974) ......................................................................................32

*In re Barnet,*
   737 F.3d 238 (2d Cir. 2013) .........................................................................17

*Begier v. Internal Rev. Serv.,*
   496 U.S. 53 (1990) ........................................................................................50

*In re BGI, Inc.,*
   2013 WL 10822966 (S.D.N.Y. May 22, 2013), *aff'd,* 772 F.3d 102
   (2d Cir. 2014) ...............................................................................................54

*In re BGI, Inc.,*
   772 F.3d 102 (2d Cir. 2014), *cert. denied,* __ U.S. __, 193 L. Ed.
   2d 44 (2015) ...................................................................................17, 53, 54

*Blonder-Tongue Labs., Inc. v. University of Illinois Found.,*
   402 U.S. 313 (1971) ......................................................................................26

*Boddie v. Connecticut,*
   401 U.S. 371 (1971) ......................................................................................18

*Brock v. Dow Chem. U.S.A.,*
   801 F.2d 926 (7th Cir. 1986) ........................................................................24

*In re Caldor, Inc.,*
   240 B.R. 180 (Bankr. S.D.N.Y. 1999), *aff'd sub nom.,* 266 B.R.
   575 (S.D.N.Y. 2001) .....................................................................................24

*Call Ctr. Techs., Inc. v. Grand Adventures Tour,*
   635 F.3d 48 (2d Cir. 2011) .....................................................................30, 31

010440-11 827752 V1

*Carey v. Piphus*,
    435 U.S. 247 (1978)................................................................................19

*Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*,
    2 F.3d 24 (2d Cir. 1993)........................................................................32

*Cedar Bluff Broad., Inc. v. Rasnake*,
    940 F.2d 651 (4th Cir. 1991)............................................................23, 24

*In re Charter Commc'ns, Inc.*,
    691 F.3d 476 (2d Cir. 2012).................................................................45

*In re Chateaugay Corp.*,
    10 F.3d 944 (2d Cir. 1993)............................................................*passim*

*In re Chateaugay Corp.*,
    944 F.2d 997 (2d Cir. 1991).........................................................*passim*

*Cleveland Bd. of Educ. v. Loudermill*,
    470 U.S. 532 (1985)........................................................................17, 18

*Consolidation Coal Co. v. Borda*,
    171 F.3d 175 (4th Cir. 1999)...............................................................28

*In re Cuyahoga Equip. Corp.*,
    980 F.2d 110 (2d Cir. 1992).................................................................42

*In re Duplan Corp.*,
    212 F.3d 144 (2d Cir. 2000).................................................................17

*In re Engels*7
    536 B.R. 529 (Bankr. N.D.N.Y. 2015)................................................31

*In re Flanagan¸*
    415 B.R. 29 (D. Conn. 2009)..........................................................37, 38

*Fuentes v. Shevin*,
    407 U.S. 67 (1972)........................................................................18, 19

*In re Gen. Dev. Corp.*,
    165 B.R. 685 (S.D. Fla. 1994).............................................................24

010440-11 827752 V1

*In re Global Energies, LLC,*
  763 F.3d 1341 (11th Cir. 2014) ................................................................. 31

*In re Grumman Olson Indus.,*
  467 B.R. 694 (Bankr. S.D.N.Y. 2012) .......................................... 33, 34, 35, 36

*In re Gucci,*
  126 F.3d 380 (2d Cir. 1997) ....................................................................... 31

*Hansberry v. Lee,*
  311 U.S. 32 (1940) ............................................................................... 25, 26

*In re Johns-Manville Corp.,*
  517 F.3d 52 (2d Cir. 2008) ................................................................... 40, 41

*In re Johns-Manville Corp.,*
  534 B.R. 553 (Bankr. S.D.N.Y. 2015) ........................................................ 21

*In re Johns-Manville Corp.,*
  600 F.3d 135 (2d Cir. 2010) ........................................................... 20, 21, 43

*In re KB Toys, Inc.,*
  736 F.3d 247 (3d Cir. 2013) ....................................................................... 38

*Koepp v. Holland,*
  593 F. App'x (2d Cir. 2014) ....................................................................... 34

*Lane Hollow Coal Co. v. Dir., Office of Workers' Comp. Programs
  DOL,*
  137 F.3d 799 (4th Cir. 1998) ................................................................ 19, 22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  132 S. Ct. 1377 (2014) ............................................................................... 45

*In re Magnesium Corp. of Am.,*
  399 B.R. 722 (Bankr. S.D.N.Y. 2009) ........................................................ 38

*In re Metromedia Fiber Network, Inc.,*
  416 F.3d 136 (2d Cir. 2005) ....................................................................... 45

010440-11 827752 V1

*In re Motors Liquidation Co.*,
    428 B.R. 43 (Bankr. S.D.N.Y. 2010)................................................................46

*In re Motors Liquidation Co.*,
    529 B.R. 510 (Bankr. S.D.N.Y. 2015)......................................................*passim*

*In re Motors Liquidation Co.*,
    531 B.R. 354 (Bankr. S.D.N.Y. 2015)......................................................12, 39

*In re Motors Liquidation Co.*,
    2015 Bankr. LEXIS 3836 (Bankr. S.D.N.Y. Nov. 9, 2015)............................32

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950)........................................................................................27

*N.J. Div. of Youth & Family Servs. v. R.D.*,
    23 A.3d 352 (N.J. 2011)..................................................................................22

*Nelson v. Adams USA, Inc.*,
    529 U.S. 460 (2000)........................................................................................22

*In re New Concept Housing, Inc.*,
    951 F.2d 932 (9th Cir. 1991)................................................................. 20, 24

*In re Old Carco LLC*,
    492 B.R. 392 (Bankr. S.D.N.Y. 2013)......................................................38, 39

*In re One2One Commc'ns, LLC*,
    No. 13-3410, 2015 WL 4430302 (3d Cir. July 21, 2015) ...............................45

*In re Parcel Consultants, Inc.*,
    58 F. App'x 946 (3d Cir. 2003)......................................................................23

*Pension Benefit Guar. Corp. v. Oneida Ltd.*,
    562 F.3d 154 (2d Cir. 2009)............................................................................17

*Peralta v. Heights Med. Ctr., Inc.*,
    485 U.S. 80 (1988)..........................................................................................21

*Perry v. Blum*,
    629 F.3d 1 (1st Cir. 2010) ..............................................................................24

010440-11 827752 V1

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ................................................................26

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ships*,
    507 U.S. 380 (1993) ................................................................55

*In re Polycel Liquidation, Inc.*,
    2006 WL 4452982 (Bankr. D.N.J. Apr. 18, 2006), *aff'd*, 2007 WL
    77336 (D.N.J. Jan. 8, 2007) ................................................31

*In re Polycel Liquidation, Inc.*,
    2007 WL 77336 (D.N.J. Jan. 8, 2007) ................................46

*In re Quigley Co., Inc.*,
    676 F.3d 45 (2d Cir. 2012) ...........................................40, 42

*Rapp v. U.S. Dep't of Treasury, Office of Thrift Supervision*,
    52 F.3d 1510 (10th Cir. 1995) ............................................23

*Republic Nat'l Bank v. Crippen*,
    224 F.2d 565 (5th Cir. 1955) ..............................................22

*In re Savage Indus., Inc.*,
    43 F.3d 714 (1st Cir. 1994) ................................................31

*Savina Home Indus., Inc. v. Secretary of Labor*,
    594 F.2d 1358 (10th Cir. 1979) ..........................................24

*In re Thorpe Insulation Co.*,
    677 F.3d 869 (9th Cir. 2012) ..............................................56

*USX Corp. v. Champlin*,
    992 F.2d 1380 (5th Cir. 1993) ............................................22

*Zerand-Bernal Grp. v. Cox*,
    23 F.3d 159 (7th Cir. 1994) ..........................40, 41, 42, 43

## STATUTES

11 U.S.C. § 101 ............................................................................35

010440-11 827752 V1

11 U.S.C. § 363 ....................................................................................................*passim*

11 U.S.C. § 502 .............................................................................................................38

11 U.S.C. § 541 .............................................................................................................37

11 U.S.C. § 726 .............................................................................................................51

28 U.S.C. § 157 ...............................................................................................................2

28 U.S.C. § 158 ...............................................................................................................2

28 U.S.C. § 1334 ......................................................................................................2, 41

49 U.S.C. § 30101 ...........................................................................................................9

## OTHER

BANKR. RULE 8006 ...........................................................................................................2

Case 14-md-2543-JMF    Document 4057    Filed 10/03/17    Page 13 of 73

# I.    STATEMENT OF JURISDICTION[1]

The Ignition Switch Plaintiffs ("ISPs") are owners and lessees of cars manufactured by Old GM seeking to recover economic losses after the revelations that first Old GM and then New GM intentionally concealed the Ignition Switch Defect that caused cars to stall and disabled their airbags, and also concealed a plethora of other safety defects resulting from the companies' systemic devaluation of safety.

The ISPs appeal from the April 15, 2015 Opinion (Joint Special Appendix ("SPA")-277-417) and the June 1, 2015 Judgment (SPA-253-73) of the United States Bankruptcy Court for the Southern District of New York (Robert E. Gerber, *Bankruptcy Judge*) which held that the "Free and Clear Provisions" of the Sale Order which gave rise to New GM would be applied against the ISPs to bar many of their claims against New GM even though, as the Bankruptcy Court found, the ISPs were deprived of the notice and opportunity to be heard that the Due Process clause requires.  The Bankruptcy Court's Opinion is reported at 529 B.R. 510.  The Bankruptcy Court had subject matter jurisdiction to issue the Judgment pursuant to

---

[1] For ease of reference, the Ignition Switch Plaintiffs adopt the definitions of capitalized terms in the Glossary that appears at the beginning of the *Brief for Ignition Switch Pre-Closing Accident Plaintiffs*, also filed today.  Other capitalized terms are defined herein.

-1-

28 U.S.C. §§ 157(a), (b), and 1334, but, for the reasons stated herein, it lacked

jurisdiction to enjoin direct claims against New GM arising solely from its post-

Sale violations of its independent legal duties.  The Judgment is a final order that

disposes of the ISPs' successor liability claims against New GM, and bars the ISPs

from recovery from the assets of the GUC Trust established to administer the Old

GM estate.  The ISPs filed a timely notice of appeal from the Opinion and

Judgment on June 2, 2015 (A-10987-990).

On June 1, 2015, the Bankruptcy Court certified the Judgment for direct

appeal pursuant to 28 U.S.C. § 158(d) and Bankruptcy Rule 8006(e) (SPA-274-

76).  This Court granted the petition of certain parties to appeal on September 9,

2015.  SPA-456-57.  On October 8, 2015, this Court designated the ISPs as

appellants.  This Court has jurisdiction over this appeal under 28 U.S.C.

§ 158(d)(1).

## II.    STATEMENT OF ISSUES PRESENTED ON APPEAL

1.    Did the Bankruptcy Court err in holding that prejudice, beyond the

deprivation of notice and the opportunity to be heard, must be shown to entitle a

victim of a due process violation to a remedy?

2.    Assuming that a show of prejudice is required, did the Bankruptcy

Court err in finding that the ISPs did not show prejudice when the lack of notice

and the opportunity to be heard resulted in the Bankruptcy Court enjoining the

ISPs' claims under the Sale Order where neither the Bankruptcy Court, the U.S.

government nor the ISPs had any knowledge of the Ignition Switch Defect at the

time of the Sale Hearing?

3.      Did the Bankruptcy Court err in failing to consider Old and New

GM's improper concealment of the Ignition Switch Defect in connection with the

enforcement of the Sale Order?

4.      Did the Bankruptcy Court err in enforcing the Sale Order against

Used Car Purchasers who bought their Old GM vehicles after the Sale?

5.      Did the Bankruptcy Court err in holding the Sale Order's injunctive

provisions remain in effect to bar direct and independent claims against New GM

unless a due process violation is shown?

6.      Did the Bankruptcy Court err in applying the doctrine of equitable

mootness to prevent recovery on the claims of the ISPs?

### III.   STATEMENT OF THE CASE

The Sale Order through which New GM acquired substantially all of the

assets of Old GM provided New GM immunity against successor liability claims.

A-1648-50, ¶¶ 46-47.  The Bankruptcy Court upheld the successor liability bar

against the ISPs despite holding that the ISPs were deprived of their due process

010440-11 827752 V1

rights to notice and the opportunity to be heard at the Sale Hearing.  Opinion, 529

B.R. 510.  However, for years before the entry of the Sale Order, a "critical mass"

of Old GM employees (including lawyers, engineers and senior managers) knew,

but concealed, that scores of GM vehicles contained the deadly Ignition Switch

Defect, which caused sudden stalls and disabled the Subject Vehicles' airbags.

Opinion, 529 B.R. at 557-58.  When Old GM became New GM via the Sale, New

GM inherited Old GM's books and records and employees with knowledge of the

Ignition Switch Defect.  *Id.* at 538.  Old GM's longstanding concealment of the

Ignition Switch Defect was over—and New GM's cover-up of the Ignition Switch

Defect began.  A-5976-6008.  For over 12 years Old GM and then New GM hid

the truth from the public, federal safety monitors and the Plaintiffs—safety

concerns were being sacrificed for profit.  *Id.*  Under the Sale Order as enforced by

the Bankruptcy Court, New GM benefits from a bar against successor liability

claims notwithstanding the concealment of the Ignition Switch Defect.

The Ignition Switch Defect causes a vehicle's ignition switch to move from

the "Run" position to the "Accessory" or "Off" position during ordinary driving,

causing the vehicle to lose power steering and power brakes and disabling the

airbags.  A-5977, ¶ 1.

Old GM knew of the Ignition Switch Defect for more than five years before the Sale Hearing. A-5978-79, ¶¶ 5-8. In 2004, the first of many otherwise preventable fatal and serious accidents occurred, and many followed during the five years before the Sale. A-5984, ¶ 14(C)(1); A-5988-89, ¶ 14(H)(1); A-5992-93, ¶ 14(L). *See also* A-9761-62, A-9772, A-9778, A-9780.

The cover-up of the Ignition Switch Defect began as soon as Old GM discovered the problem: starting in 2005, Old GM issued original and then updated Service Bulletins to its dealers about the problem that purposefully did not contain the word "stall" or warn of the actual danger inherent in the Subject Vehicles. A-5979-80, ¶ 10. Then, in 2006, based on its knowledge of the Ignition Switch Defect, Old GM redesigned the Ignition Switch *without fixing the defect* in some two million cars that were on the road. A-5991, ¶ 14(I)(v). For years leading up to the bankruptcy filing, Old GM knew of the Ignition Switch Defect, but it chose to do nothing to protect the public safety. Opinion, 529 B.R. at 538, 557.

Consumers who purchased or leased cars with the Ignition Switch Defect had no way of knowing of the illegally concealed defect. *Id.* at 538 ("there is no evidence in the record … that any Plaintiff knew of the Ignition Switch Defect before … 2014"). The ISPs received no direct notice of the Sale Hearing, the

-5-

Ignition Switch Defect, or the impending bar of successor liability claims. *Id.* at 525.

Nothing changed for five years after the Sale Hearing, as the culture of cover-up and the elevation of costs over safety continued at New GM. A-9787-9906. Not until 2014 did New GM make its long-overdue and federally mandated revelations of the massive and deadly defect and institute recalls for an estimated 2.1 million Subject Vehicles. Opinion, 529 B.R. at 521; *see also* A-5929; A-8796. The adverse publicity occasioned by these massive recalls and the resulting firestorm of investigations belied New GM's contentions that the GM brand was synonymous with safety and reliability. *See, e.g.*, A-9969-10035; A-9639-9963. As soon as they learned of the Ignition Switch Defect, the ISPs brought a number of lawsuits against New GM for its conduct in hiding the Ignition Switch Defect and dozens of other defects while at the same time assuring customers of the safety of its brand, causing significant economic losses; these lawsuits were transferred to the MDL Court. Opinion, 529 B.R. at 521-22.

Following the transfer, the ISPs' filed Consolidated Complaints in the MDL action. A-6347-7735. Among other things, the Complaints seek damages in the form of diminution in value of all Old and New GM vehicles caused by the Ignition Switch Defect and dozens of other defects concealed by New GM until

2014, Old and New GM's respective roles in concealing these defects, and the

resulting negative publicity generated by the recall of 27 million vehicles in 2014

(including 13 million vehicles with the Ignition Switch Defect and other similar

ignition switch defects). *Id.*

      The Bankruptcy Court formulated several "Threshold Issues" to be

adjudicated in connection with New GM's Motions to Enforce. A-5778-83. After

briefing on these issues, the Bankruptcy Court issued its Opinion, dated April 15,

2015, 529 B.R. 510, and thereafter entered its June 1, 2015 Judgment, SPA-253-

73. The Bankruptcy Court's rulings are detailed below in Section E. Immediately

below is a brief summary of relevant facts and background.

**A.**     **Old GM initiates a chapter 11 bankruptcy and files the Sale Motion.**

      On June 1, 2009, Old GM and three affiliates commenced jointly

administered chapter 11 cases before the Bankruptcy Court, and Old GM filed the

Sale Motion seeking approval of, *inter alia*, the Sale Procedures and the Sale.

Opinion, 529 B.R. at 530.

      In its Sale Motion, Old GM sought authority to sell substantially all of its

assets to New GM "free and clear of all other 'liens, claims, encumbrances and

other interests,' including, specifically, 'all successor liability claims.'" *Id.*

(citations omitted).

010440-11 827752 V1

On June 2, 2009, the Bankruptcy Court entered its Sale Procedures Order. *Id.* at 531.

**B.    The ISPs were deprived of notice of the Sale and an opportunity to be heard in connection with the Sale Order.**

The Sale Procedures Order provided for actual notice to 25 categories of persons who were considered known creditors. *See* A-385-86, ¶¶ 9(a)(i)-(xxv), 9(b)(i)-(ii). The Sale Procedures Order also provided for publication notice of the Sale. A-386, ¶ 9(e). Despite being known creditors of Old GM, the ISPs did not receive actual notice of the Sale Hearing. Opinion, 529 B.R. at 525. Neither direct nor publication notice disclosed the Ignition Switch Defect or that the ISPs' resultant claims were to be foreclosed under the Sale Order. *Id*.

**C.    The Sale Agreement and Sale Order imposed recall obligations on New GM with respect to Old GM cars and parts, and the GUC Trust was established to distribute the assets of the bankruptcy estate.**

The Sale Agreement, originally filed with the Sale Motion on June 1, 2009, was thereafter amended, *inter alia*, to provide that New GM would assume: (i) liabilities under state Lemon Laws; and (ii) responsibility for any and all accidents or incidents giving rise to death, personal injury, or property damage after the date of closing of the Sale, irrespective of whether the vehicle was manufactured by Old or New GM. Opinion, 529 B.R. at 534.

-8-

Notably, the Sale Agreement and Sale Order required New GM to comply
with recall obligations imposed by federal law, even for cars or parts manufactured
by Old GM.  In particular, the Sale Order provided that "the Purchaser shall
comply with the certification, reporting, and recall requirements of the National
Traffic and Motor Vehicle Safety Act, as amended and recodified, including by the
Transportation Recall Enhancement, Accountability and Documentation Act,[2] …,
and similar Laws, in each case, to the extent applicable in respect of motor
vehicles, vehicles, motor vehicle equipment, and vehicle parts manufactured or
distributed by the Sellers prior to the Closing."  *Id.* at 535; *see also* A-1633-34,
¶ 17.

On March 29, 2011, Old GM's chapter 11 plan of liquidation (the "Plan")
was confirmed.  Opinion, 529 B.R. at 535.  The Confirmation Order authorized the
creation of the GUC Trust to distribute assets of the Old GM estate and object to
claims.  *Id.* at 536.  The GUC Trust has distributed assets worth billions of dollars
to holders of Allowed General Unsecured Claims under the Plan, currently holds
many hundreds of millions of dollars of assets and may obtain additional shares of

---

[2]  The "Safety Act," 49 U.S.C. §§ 30101, *et seq.*, mandates, among other things,
that car manufacturers monitor vehicles for safety defects, and conduct recalls
when necessary.

010440-11  827752 V1

New GM common stock (potentially worth a billion dollars) through the exercise

of an "Accordion Feature" under the Sale Agreement.  *See infra* at 49-50.

**D.      Consistent with their culture of hiding safety problems, both Old and New GM concealed the Ignition Switch Defect and did not conduct federally-mandated recalls.**

New GM's extraordinary delay in conducting its massive 2014 recalls was,

in no small part, the result of a culture marked by a "not me" attitude, typified by

the notorious "GM Salute" and "GM Nod" where employees were taught to avoid

responsibility and passively agree to action that they had no intention of following

up on, and exemplified by the practice of training employees to avoid plain safety

and defect-related language.  A-9903-04.

The result was that at least 24 Old GM personnel (***all of whom were***

***transferred to New GM***), including engineers, senior managers and attorneys, were

aware of the Ignition Switch Defect prior to the Sale Motion, but did nothing until

New GM finally issued the recalls in 2014.[3]  The corporate culture that placed

profits over safety ran deep at Old and New GM.  *Id.*

It is undisputed that Old GM personnel knew enough as of the time of Old

GM's June 2009 bankruptcy filing such that Old GM was obligated, under the

---

[3] *See* A-5981, ¶ 14; Opinion, 529 B.R. at 538, 557-58.

Safety Act, to conduct a recall of the vehicles with the Ignition Switch Defect.

Opinion, 529 B.R. at 557.

**E. Disposition below.**

The Bankruptcy Court correctly held that Plaintiffs who owned or leased

cars with the Ignition Switch Defect were "known" creditors at the time of the

Sale, and that they were therefore entitled to *actual* notice of the Sale and the Bar

Date for filing proofs of claim against the Old GM estate before their rights could

be extinguished. Opinion, 529 B.R. at 525. However, the Bankruptcy Court found

that "the failure to provide the notice that due process requires" was not enough to

"establish[] a due process violation." *Id*. Instead, Plaintiffs were required to show

"that they have sustained prejudice as a result" of the lack of notice. *Id*. at 526.

In finding that the Plaintiffs failed to demonstrate prejudice, the Bankruptcy

Court relied on the fact that other parties had made arguments against the successor

liability bar at the Sale Hearing and that those arguments were properly considered

and rejected. *Id*. Consequently, "while the Plaintiffs established a failure to

provide them with the notice due process requires, they did not establish a due

process violation" with respect to the Sale Order, and "[t]he Free and Clear

Provisions stand." *Id*.

-11-

However, the Bankruptcy Court found that the Plaintiffs *were* prejudiced in one respect because no party at the Sale Hearing "argued a point that they argue now: that the proposed Sale Order was overly broad, and that it should have allowed them to assert claims involving Old GM vehicles and parts so long as they were basing their claims *solely on New GM* conduct, and not based on any kind of successor liability or any other act by Old GM." *Id.* at 526-27 (emphasis in original). The Judgment terms these "Independent Claims." SPA-254, ¶ 4. Accordingly, the Judgment allows owners and lessees of vehicles with the Ignition Switch Defect to bring Independent Claims. *Id.* But other Old GM vehicle owners are *not* permitted to assert Independent Claims. *Id. See also* SPA-441-55 (Form of Judgment Decision), *In re Motors Liquidation Co.*, 531 B.R. 354, 360 (Bankr. S.D.N.Y. 2015).

The Bankruptcy Court held that "Plaintiffs were plainly prejudiced" by the lack of notice of the Bar Date. Judgment, SPA-254-55, ¶ 6. Accordingly, Plaintiffs would be permitted to seek to file late proofs of claim against the Old GM bankruptcy estate. *Id.* However, the Bankruptcy Court made any such "remedy" illusory since, "based on the doctrine of equitable mootness, in no event shall assets of the GUC Trust held at any time in past, now, or in the future … be used to satisfy any claims of the Plaintiffs." *Id.*

-12-

## IV.    SUMMARY OF ARGUMENT

The Bankruptcy Court properly found that:  (i) the ISPs were known creditors entitled to direct notice of the Sale Hearing and the prospective elimination of their successor liability claims against New GM; and (ii) the publication notice provided by Old GM (which failed to disclose the existence of the Ignition Switch Defect) was insufficient for due process purposes.  However, the Bankruptcy Court erred in finding that (i) the ISPs needed to show prejudice in order to be entitled to a remedy for the denial of due process, and (ii) no such prejudice had been demonstrated.[4]

When there is neither notice nor an opportunity to be heard, no additional showing of prejudice is required:  the denial *is* the prejudice.  Because due process guarantees the right to be heard, not the right to win, an order issued without providing notice and the right to be heard is unenforceable against the party deprived of that right.  There is no way to determine, some five years later, what the outcome would have been had the bombshell of Old GM's concealment of the Ignition Switch Defect been made known to the Bankruptcy Court, the Treasury, Congress, the public, the press and the various objectors.  That is precisely why the

---

[4] These points are discussed more fully in the *Brief for Ignition Switch Pre-Closing Accident Plaintiffs*, also filed today, whose arguments relating to due process are incorporated herein by reference.

case law is so clear that when there is a denial of due process, the resulting order cannot be enforced against the parties so deprived.

Even assuming that prejudice is required, the ISPs *were* prejudiced.  When New GM sought to enforce the Sale Order's successor liability bar, the Bankruptcy Court erred by failing to consider the overwhelming evidence that (i) Old GM and then New GM illegally concealed the Ignition Switch Defect, and (ii) New GM intended from day one to continue to unlawfully suppress information regarding the Ignition Switch Defect.  Enforcing the Sale Order's successor liability bar prejudices the ISPs because the Bankruptcy Court did not know in 2009 what the evidence shows now:  Old GM concealed the Ignition Switch Defect at the time of the Sale and New GM continued the illegal concealment and caused the ISPs' massive economic losses.  It is impossible to believe that the successor liability ban against the ISPs would have been approved as written in the Sale Order had Plaintiffs, the U.S. government and the Bankruptcy Court been aware of the Ignition Switch Defect and its horrific consequences prior to the Sale Hearing.  Given that New GM retained Old GM's books and records and the same employees with knowledge of the Ignition Switch Defect, the only inference is that New GM was effectively "born" with the same bad intent to cover-up the Ignition Switch Defect that motivated Old GM.  The enforcement of a Sale Order

-14-

protecting a purchaser born with illegal motivations is unwarranted. In sum, Plaintiffs' arguments would likely have resulted in the narrowing or elimination of the successor liability bar in the Sale Order based on a finding that the Ignition Switch Defect was improperly concealed or that New GM was not a "good faith purchaser." The Bankruptcy Court failed to consider the impact of New GM's unclean hands and unlawful conduct in connection with the enforcement of the Sale Order's successor liability bar and therefore committed reversible error.

In addition to its errors relating to the successor liability claims of pre-Sale purchasers and lessees of cars with the Ignition Switch Defect, the Bankruptcy Court erred by enforcing the Sale Order against post-Sale purchasers of Old GM vehicles ("Used Car Purchasers") in violation of their due process rights. Used Car Purchasers were, at the time of entry of the Sale Order, "future claimants" to whom no notice was possible.

Likewise, the Bankruptcy Court erred in holding that only Old GM car owners who suffered a due process violation may bring claims against New GM based solely on New GM's own independent post-Sale conduct. The Bankruptcy Court lacks jurisdiction to enjoin such claims or to condition third-party non-successor liability claims against New GM on a finding of a due process violation.

-15-

Finally, the Bankruptcy Court erred by finding equitable mootness applicable as a bar to Plaintiffs' right to recovery against the Old GM estate/GUC Trust (separate and distinct from Plaintiffs' claims against New GM). The Bankruptcy Court properly found a due process violation in connection with the notice of the Bar Date for filing proofs of claim against Old GM and, accordingly, that Plaintiffs should be allowed to file late proofs of claim against the GUC Trust. The doctrine of equitable mootness cannot properly be expanded to bar recovery for creditors who were deprived of due process. However, the Bankruptcy Court found that, based on equitable mootness, none of the past, present or future assets of the GUC Trust may be used to satisfy any subsequently allowed claims of Plaintiffs. The Bankruptcy Court abused its discretion by employing the constitutionally suspect and disfavored doctrine of equitable mootness, without any precedent, to effectuate a complete bar to bankruptcy claims recoveries for Plaintiffs whose due process rights were violated. Furthermore, to the extent they are applicable, the Bankruptcy Court erred by holding that Plaintiffs cannot satisfy three of the five *Chateaugay* factors, and in doing so abused its discretion. Accordingly, the Plaintiffs who were deprived of due process should be allowed to seek a remedy from the GUC Trust separate and distinct from the Plaintiffs' claims against New GM.

# V.    STANDARD OF REVIEW

On direct appeal, this Court "undertakes an independent examination of the factual findings and legal conclusions of the bankruptcy court." *In re Duplan Corp.*, 212 F.3d 144, 151 (2d Cir. 2000).  The Bankruptcy Court's conclusions of law are reviewed *de novo* and its findings of fact are reviewed for clear error.  *See In re Barnet*, 737 F.3d 238, 246 (2d Cir. 2013); *Pension Benefit Guar. Corp. v. Oneida Ltd.*, 562 F.3d 154, 156 (2d Cir. 2009).  The Bankruptcy Court's equitable mootness ruling is reviewed "for abuse of discretion, under which [the Court] examine[s] conclusions of law *de novo* and findings of fact for clear error."  *In re BGI, Inc.*, 772 F.3d 102, 107 (2d Cir. 2014) ("*BGI II*"), *cert. denied*, __ U.S. __, 193 L. Ed. 2d 44 (2015).

# VI.    ARGUMENT

## A.    The Bankruptcy Court erred in holding that the ISPs must demonstrate prejudice in order to establish a due process violation.

The Fifth Amendment to the United States Constitution provides that the federal government cannot deprive a person of life, liberty or property without due process of law.  "An essential principle of due process is that a deprivation of … property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'"  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542

(1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).

The Supreme Court has called notice and an opportunity to be heard the "root requirement" of due process. *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971). The purpose of this "root requirement" is "to minimize substantively unfair … deprivations of property." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).

The Bankruptcy Court ruled that the ISPs were entitled to, but did not receive, either notice or an opportunity to be heard in connection with the Sale Hearing.[5] The Bankruptcy Court nonetheless held that, because the ISPs could not show they were prejudiced by this deprivation, they could not prevail on their due process claims.[6] By minimizing the "root requirement" of due process—notice and an opportunity to be heard—and by interposing a prejudice requirement, the Bankruptcy Court committed legal error.

The Supreme Court has repeatedly held that the denial of notice and an opportunity to be heard is a *per se* constitutional violation that entitles the injured party to relief—even where (unlike here) the underlying claim is without merit.

---

[5] *See* Opinion, 529 B.R. at 554-55, 560.

[6] *See id.* at 560-68. "Prejudice," according to the Bankruptcy Court, required the ISPs to show that the denial of due process would have changed the outcome of the Sale Order proceedings.

010440-11  827752 V1

*See, e.g.*, *Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("[T]he right to procedural due process is 'absolute' in the sense that it does not depend on the merits of a claimant's substantive assertions[.]"); *Fuentes v. Shevin*, 407 U.S. at 87 (assuming that the defendant had no valid defenses to an action, but nonetheless concluding that "[t]he right to be heard does not depend upon an advance showing that one will surely prevail at the hearing").

It is for good reason that no additional prejudice is required to obtain a remedy for the deprivation of notice and the opportunity to be heard. The absolute nature of the Due Process clause means that "the risk of error" arising when a person is deprived of valuable rights without notice "was more than the Framers would tolerate. We can prevent erroneous deprivations from some only by providing a process to all." *Lane Hollow Coal Co. v. Dir., Office of Workers' Comp. Programs DOL*, 137 F.3d 799, 806 (4th Cir. 1998). "If there has been no fair day in court, the reliability of the result is irrelevant, because a fair day in court is how we assure the reliability of results." *Id.* at 808. The impropriety of a prejudice requirement is amply illustrated on the facts of this case, where the lack of notice and the concealment of the Ignition Switch Defect prevented *anyone* from apprising the Bankruptcy Court of the egregious conduct of Old GM in connection with the defect and the resultant severe damage inflicted on Plaintiffs.

*See In re New Concept Housing, Inc.*, 951 F.2d 932, 942 (9th Cir. 1991)

(dismissing as "sheer improper speculation" and "hindsight rationalization[]" the

argument that an improperly noticed debtor's objection would not have made any

difference in approval of settlement).  The Due Process clause simply does not

permit Monday-morning quarterbacking in connection with a game that Plaintiffs

were precluded from playing in real time.

This Court recently rejected a prejudice requirement in *In re Johns-Manville

Corp.*, 600 F.3d 135 (2d Cir. 2010) (*per curiam*) ("*Manville IV*"), where it ruled

that an entity was not bound by a series of bankruptcy orders when it had never

received notice or an opportunity to be heard.  *Id.* at 154-56.  In *Manville IV*, this

Court did not consider whether the complaining party suffered prejudice ***other

than*** denial of notice and an opportunity to be heard; rather, this Court's decision

was focused squarely (and exclusively) on the denial of those core due process

rights.  *See id.* at 157.  Having determined that the appellant was denied notice and

an opportunity to be heard, this Court concluded that the bankruptcy court's orders

were not binding on the appellant.[7]

---

[7] The Bankruptcy Court dismissed application of *Manville IV* to this case,
speculating that "prejudice" to the appellant in *Manville IV* was so "obvious" that
this Court's opinion neglected to discuss it.  *See* Opinion, 529 B.R. at 560 n.161.
However, *Manville IV* does not mention the word "prejudice" because the inquiry
would have been inapplicable and superfluous:  the *Manville IV* appellant was

*Peralta v. Heights Med. Ctr., Inc.*, 485 U.S. 80 (1988), is another case in point.  There, a debtor defaulted in a collection suit and his creditor obtained a default judgment.  *Id.* at 81-82.  Two years later, the debtor challenged the entry of default because the debtor was never served.  *Id.* at 82.  The creditor conceded that service was deficient, but claimed that the debtor suffered no prejudice because he had no defense on the merits and the outcome, with or without proper service, would have been the same.  *Id.* at 82-84.  The *Peralta* Court assumed that the debtor would have lost on the merits.  It nonetheless called the creditor's argument "untenable," and stated, "[f]ailure to give notice violates 'the most rudimentary demands of due process of law.'" *Id.* at 84 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965)).  The Court reversed the state-court orders affirming entry of default against the debtor.  *See id.* at 87.

---

deprived of notice and an opportunity to be heard, so it could not be bound by the bankruptcy court's prior orders.  Indeed, this is precisely how lower courts, other than the Bankruptcy Court here, have interpreted the *Manville IV* decision.  *See, e.g.*, *In re Johns-Manville Corp.*, 534 B.R. 553, 561 (Bankr. S.D.N.Y. 2015) (interpreting *Manville IV* as holding that "the Second Circuit held that at least one objecting party … was not bound by the 1986 Orders because it had not received constitutionally sufficient notice of the proceedings").  The *Manville IV* decision also cuts against the Bankruptcy Court's justification for elevating the parties' expectations in finality above due process concerns.  *See* Opinion, 529 B.R. at 564. *Manville IV* concerned a bankruptcy proceeding whose "magnitude and complexity … are unparalleled." *Manville IV*, 600 F.3d at 138.  Nonetheless, this Court held that due process is critical, and the parties' expectations, even in a complex commercial arrangement, are not sufficient to usurp that bedrock right.  *Id.*

010440-11 827752 V1

In and outside of the bankruptcy context, it is a bedrock principle that the lack of notice and an opportunity to be heard constitutes a due process injury, even when the outcome would have been the same. *See, e.g.*, *USX Corp. v. Champlin*, 992 F.2d 1380, 1384-85 (5th Cir. 1993) (holding that lienholder's due process rights were violated even if adequate notice would likely not have affected outcome of foreclosure sale). *See also N.J. Div. of Youth & Family Servs. v. R.D.*, 23 A.3d 352, 370-72 (N.J. 2011).

A complete deprivation of notice and opportunity to be heard is *per se* prejudice. *See, e.g.*, *Lane Hollow Coal Co.*, 137 F.3d at 806 ("[T]here must be a *process* of some kind; a just result is not enough."); *see also Republic Nat'l Bank v. Crippen*, 224 F.2d 565, 566 (5th Cir. 1955) (reversing bankruptcy court denial of fees—without notice or opportunity to object—to creditor class and observing that denial of notice and an opportunity to be heard is "***never*** harmless error") (emphasis added).

Notably, this precept holds even when others with the same claims as the person who was deprived of notice are given proper notice. *See Nelson v. Adams USA, Inc.*, 529 U.S. 460, 469-72 (2000) (where individual owner of a one-person corporation was determined to be eligible for suit in his individual capacity, the failure to provide him notice and an opportunity to defend was not harmless error

-22-

even when individual and corporate party purportedly had the same claims and defenses).

    In reaching its determination that prejudice must be shown before a remedy for a due process violation is warranted, the Bankruptcy Court relied on ten cases, eight from outside the Second Circuit, each of which contain the generalized statement that "a party who claims to be aggrieved by a violation of procedural due process must show prejudice."[8] However, these cases neither refute the authority set forth above nor establish that Plaintiffs must prove anything beyond the complete deprivation of notice and an opportunity to be heard to prevail on their due process claim.

    Most of the cases relied on by the Bankruptcy Court stand for the unremarkable proposition that if a party is provided with *some* notice, and the party has an *actual* opportunity to be heard, it has not suffered a due process violation unless the procedural imperfections caused actual prejudice.[9] In the

---

[8] Opinion, 529 B.R. at 560 & n.162 (quoting *Perry v. Blum*, 629 F.3d 1, 17 (1st Cir. 2010)).

[9] *See In re Parcel Consultants, Inc.*, 58 F. App'x 946, 950-51 (3d Cir. 2003) (party claimed it was denied due process when district court did not permit briefing, but party was permitted full briefing and argument on appeal); *Rapp v. U.S. Dep't of Treasury, Office of Thrift Supervision*, 52 F.3d 1510, 1519-20 (10th Cir. 1995) (party received notice of regulatory violations, appeared at hearing to defend, but claimed notice was not sufficiently clear); *Cedar Bluff Broad., Inc. v.*

principal case cited by the Bankruptcy Court, *Perry v. Blum*, 629 F.3d 1 (1st Cir.

2010), the complaining parties had actual notice of the proceedings, were named

parties and testified. *Id.* at 16-17. The complainants' argument was not that they

had been completely deprived of notice and an opportunity to be heard, but rather

that they were not joined as parties to the suit at an earlier time. *Id.* at 17. In none

of the cases relied on by the Bankruptcy Court was the complaining party denied

all notice and opportunity to be heard. In each case, the party had an opportunity

to participate in the proceedings and argue the substantive issues present before the

adjudicating body. The ISPs received no such process.

---

*Rasnake*, 940 F.2d 651 (4th Cir. 1991) (although all parties did not have notice that
a chapter 11 confirmation hearing would also entertain other motions, all interested
parties participated in the hearing and had an opportunity to present argument);
*Brock v. Dow Chem. U.S.A.*, 801 F.2d 926, 928-30 (7th Cir. 1986) (defendant
received notice of OSHA violations and had opportunity to be heard before ALJ,
but claimed the notice lacked sufficient specificity); *Savina Home Indus., Inc. v.
Secretary of Labor*, 594 F.2d 1358, 1365-66 (10th Cir. 1979) (defendant received
notice of OSHA violations and had opportunity to be heard but claimed notice was
deficient because it contained wrong docket number and Secretary did not serve
defendant with copies of standards violated); *In re Caldor, Inc.*, 240 B.R. 180, 188
(Bankr. S.D.N.Y. 1999) (objector not given notice but provided full opportunity to
present its arguments during course of hearing), *aff'd sub nom. Pearl-Phil GMT
(Far E.) Ltd. v. Caldor*, 266 B.R. 575, 583-84 (S.D.N.Y. 2001); *In re Gen. Dev.
Corp.*, 165 B.R. 685, 688-89 (S.D. Fla. 1994) (party was initially denied notice and
an opportunity to be heard, but court vacated order to allow parties who did not
receive notice to participate during a rehearing). One of the ten cases relied upon
by the Bankruptcy Court did not even involve a due process claim. *See In re New
Concept Housing, Inc.*, 951 F.2d at 937 n.7 (finding no due process claim where
party had no property interest and thus no constitutional entitlement to notice).

-24-

**B.    The Bankruptcy Court erred in holding that the ISPs failed to demonstrate prejudice in connection with the entry and/or enforcement of the Sale Order where no one knew of the fraudulent concealment of the Ignition Switch Defect at the time of the Sale.**

The Bankruptcy Court erroneously concluded that the ISPs "were not prejudiced" with respect to successor liability on the sole basis that other creditors received notice and an opportunity to be heard, and those creditors made all of the arguments and raised all of the objections that the ISPs could have raised. Opinion, 529 B.R. at 568.  The Bankruptcy Court reasoned that the ISPs "offer[ed] no legally based arguments as to why they would have, or even ***could have***, succeeded on the successor liability legal argument when all of the other objectors failed." *Id.* at 567 (emphasis in original).  The Bankruptcy Court's conclusion is wrong in several respects.

The participation of other known creditors does not supply due process, nor does it afford preclusive effect.  Preclusion of the ISPs' claims was constitutionally permissible only through their inclusion in the proceedings, through service of process or notice calculated to fairly inform them of the matters that were instead concealed.  *See Hansberry v. Lee*, 311 U.S. 32, 40-41 (1940).  The law does not countenance preclusion by proxy.

Without notice and an opportunity to be heard, no one can be bound by decisions made in their absence.  "Nor without more, and with the due regard for

-25-

the protection of the rights of absent parties which due process exacts, can some be

permitted to stand in judgment for all." *Id.* at 44.  Class actions afford preclusion

by representation, but only upon a showing of "best practicable" notice (usually

with a right to opt-out), and a determination that the representative parties'

interests fully align with those of the absent members.  *See, e.g.*, *Phillips*

*Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985).  Nothing remotely

approaching these indispensable requisites occurred here.  The Supreme Court has

put it bluntly:

> Some litigants-those who never appeared in a prior
> action-may not be collaterally estopped without litigating
> the issue.  They have never had a chance to present their
> evidence or arguments on the claim. Due process
> prohibits estopping them despite one or more existing
> adjudications of the identical issue which stand squarely
> against their position.

*Blonder-Tongue Labs., Inc. v. University of Illinois Found.*, 402 U.S. 313, 329

(1971).

The Bankruptcy Court therefore committed legal error when it concluded

that the failure to afford the ISPs notice and an opportunity to be heard was

somehow cured by the appearance of consumer groups and certain creditors.

Opinion, 529 B.R. at 567.  The simple fact is that none of the parties arguing

against a successor liability ban raised or could have raised issues of intentional

concealment of the deadly Ignition Switch Defect.  According to the Bankruptcy

Court, "*Mullane* recognizes that where notice is imperfect, the ability of others to

argue the point would preclude the prejudice that might result if none could."[10]

This reading of *Mullane* is unsound.  The *Mullane* decision had nothing to do with

prejudice; it was a case wholly concerned with the adequacy of notice.  *See*

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 307 (1950).

Though the trust beneficiaries in *Mullane* were not personally served, they

were deemed to have received constitutionally sufficient notice given the role

played by their trustee.  *Id.* at 318-19.  *Mullane* does not stand for the proposition

that notice may be denied to some parties so long as someone with similar interests

is capable of being heard.  Rather, *Mullane* holds that in certain scenarios, noticing

a trustee on behalf of its beneficiaries may be constitutionally sufficient.  *See id.*

Here, creditors and consumer groups that appeared at the Sale Hearing had

no obligation or authority to speak for the ISPs.  Moreover, none of them could

have made the arguments advanced below by the Plaintiffs in opposition to the

enforcement of the Sale Order because none of them knew that Old GM and then

New GM were unlawfully concealing the fact that GM cars were dangerously

defective.

---

[10]  Opinion, 529 B.R. at 566.

010440-11 827752 V1

The ISPs, equipped with an unprecedented set of facts and saddled with
millions of vehicles containing life-threatening defects, surely **would have**
confronted the Bankruptcy Court, Old GM and the U.S. Treasury with highly
unique circumstances that demanded a specifically-tailored response.[11]  Indeed, the
Bankruptcy Court based its no prejudice determination on its speculative hindsight
only on what *it* might have done, Opinion, 529 B.R. at 567, ignoring that there
were other significant actors—Plaintiffs, Old GM, Treasury, the political branches
(Congress and the White House), the press and public opinion—whose reactions
and actions would have impacted the issue of whether the ISPs' claims would be
barred by the Sale Order.  That these actors would have acted is clear from the
uproar that ensued among the public, in the halls of elected government and in the
courts when New GM finally disclosed the Ignition Switch Defect in 2014.  *See
supra* at 6.

---

[11] Requiring parties to show prejudice, even after their right to notice and an
opportunity to be heard has been denied, invites this sort of speculation.  This is yet
another reason why a complete deprivation of notice and an opportunity to be
heard does not require a litigant to show prejudice—to do so is to speculate.  *See
Consolidation Coal Co. v. Borda*, 171 F.3d 175, 184 (4th Cir. 1999) (finding that a
16-year delay in providing notice of a claim stripped the claimant of a full and fair
opportunity to defend itself and refusing to speculate on whether the claimant
would have been successful on the merits).

010440-11 827752 V1

Finally, as the ISPs argued below, multiple outcomes may have resulted had Old GM disclosed the Ignition Switch Defect prior to the Sale Hearing.[12]  The outcome was not limited to (i) extinguishment of Plaintiffs' claims, or (ii) liquidation of Old GM.  Treasury may well have conceded, or the Court may have imposed, *some* modification to the Sale Order as a prerequisite for effectuating the Sale.  Under the circumstances, a real-time recall should have occurred.  And, of course, there is no reason a recall should not have happened five years before it did, particularly given the express finding by the Bankruptcy Court (based on, among other things, a "critical mass" of Old GM personnel knowing about the Ignition Switch Defect at the time of the Sale) that, as of the Sale Hearing in 2009:

> Old GM had enough knowledge of the Ignition Switch Defect to be required, under Safety Act, to send out mailed recall notices to owners of affected Old GM vehicles.[13]

The Bankruptcy Court offers no justification for ignoring the harms to the ISPs.  The economic losses (in the form of diminution of value as well as out-of-pocket costs) caused by the delayed vehicle recall—a recall that Old GM should

---

[12] *See* Designated Counsel's Opposition to New GM's Motions For Enforcement of Sale Order and Injunction, No. 09-50026-reg, Dkt. No. 13025 at 59 (Dec. 16, 2014) (arguing that Old GM and Treasury may have "chosen to deal with objections from Plaintiffs in the same way it chose to deal with objections from consumer safety groups, by adding Plaintiffs' claims to assumed liabilities").

[13] Opinion, 529 B.R. at 557-558 n.154.

have, as a matter of fact, initiated before 2009—squarely constitute prejudice under any analysis.

**C.      In enforcing the Sale Order, the Bankruptcy Court erred by failing to take into account the concealment of the Ignition Switch Defect by both Old and New GM and the resulting prejudice to Plaintiffs.**

In enforcing the Sale Order's successor liability bar against the ISPs, the Bankruptcy Court erred by failing to take into account facts now known. Unlike at the time of the Sale in 2009, by 2014 when New GM sought to enforce the Sale Order's successor liability bar, it was accepted and widespread knowledge that Old GM had illegally concealed the Ignition Switch Defect and New GM did the same for five additional years.

As a consequence, when evaluating the propriety of enforcing the Sale Order's bar on successor liability claims, the Bankruptcy Court was required to evaluate the conduct of the seller Old GM and the purchaser New GM—with the true facts revealed. Under that lens, prejudice to ISPs is vividly demonstrated. The record shows that Old GM knew of the Ignition Switch Defect and unlawfully concealed it to evade liability. *See supra* Section III. New GM did the same. *See id.* Based on that record, the successor liability bar in the Sale Order may have been denied or materially scaled back and enforcement of the successor liability bar against the ISPs as it stands is entirely improper. *See Call Ctr. Techs., Inc. v.*

*Grand Adventures Tour*, 635 F.3d 48, 52 (2d Cir. 2011); *In re Savage Indus., Inc.*,

43 F.3d 714, 719 (1st Cir. 1994). It strains belief to imagine that had it been

known that two million Old GM cars were on the road with a known, but hidden,

life-threatening safety defect, there would have been no change to the Sale Order.

Instead, it is more than likely that had Old GM made proper disclosures, the Sale

Order would not have included Free and Clear Provisions regarding the Ignition

Switch Defect. At a minimum, entry of the Sale Order may have been conditioned

on either New GM's assumption of ignition switch liabilities or a materially

increased contribution to the GUC Trust. Furthermore, New GM's unlawful

concealment of the Ignition Switch Defect should have precluded enforcement of

the Sale Order or necessitated revocation or modification of the Sale Order's "good

faith purchaser" finding. *See, e.g.*, *In re Gucci*, 126 F.3d 380, 389 (2d Cir. 1997);

*In re Engels*, 536 B.R. 529, 536 (Bankr. N.D.N.Y. 2015).[14]

---

[14] When it is discovered that a bankruptcy sale was tainted by unlawful conduct,
or that the purchaser was otherwise not acting in good faith, a bankruptcy court is
empowered to "fashion[] [a] remed[y] based upon the unique factual matrices"
present in a given case. *In re Polycel Liquidation, Inc.*, 2006 WL 4452982, at *11
(Bankr. D.N.J. Apr. 18, 2006), *aff'd*, 2007 WL 77336 (D.N.J. Jan. 8, 2007).
(internal quotations and citations omitted). The bankruptcy court may, for
example, decline to enter a sale order or to enforce any bar on successor liability.
*See In re Global Energies, LLC*, 763 F.3d 1341, 1350 (11th Cir. 2014).

Furthermore, the Bankruptcy Court committed error by failing to consider the record that conclusively shows that New GM inherited the same operative management charged with the same responsibilities for safety and knowledge of the Ignition Switch Defect that beset Old GM. Opinion, 529 B.R. at 538. That knowledge may be imputed to New GM starting with the first day of its existence.[15] The facts known to the Bankruptcy Court as of New GM's Motion to Enforce indisputably prove that New GM inherited the bad motives and intent to conceal the Ignition Switch Defect that Old GM spawned. In other words, at the precise moment the Sale closed, the knowledge and intent of Old GM became the knowledge and intent of New GM (*i.e.*, the knowledge of at least 24 Old GM employees of the Ignition Switch Defect and the books and records identifying the defect were transferred and may be imputed to New GM) and the propriety of the Sale Order's successor liability bar must be evaluated in that context. *See Bangor Punta Operations, Inc. v. Bangor & A. R. Co.*, 417 U.S. 703, 713 (1974) (fiction of corporate separateness "may be disregarded in the interests of justice where it is used to defeat an overriding public policy"); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) (courts may ignore fiction of

---

[15]  *See In re Motors Liquidation Co.*, 2015 Bankr. LEXIS 3836, at *28 (Bankr. S.D.N.Y. Nov. 9, 2015) ("New GM's knowledge may be imputed to it starting with its first day of existence.").

corporate separateness, *inter alia*, "to prevent fraud or other wrong"). That the

Bankruptcy Court failed to do so was an abuse of discretion.

Old and New GM's concealment of the Ignition Switch Defect, taken

together with Old GM's failure to provide the Plaintiffs with adequate notice of the

Sale, foreclosed the Plaintiffs from making unique arguments against the Sale

Order's successor liability bar (or the scope thereof). In ignoring Plaintiffs'

allegations of improper concealment and instead concluding that Plaintiffs could

not have made an argument that would have affected the successor liability bar, the

Bankruptcy Court abused its discretion.

**D.    Consistent with the Due Process clause and the Bankruptcy Code, the Sale Order cannot be enforced against Used Car Purchasers who did not own their Old GM vehicles at the time of the Sale.**

The claims of the post-Sale purchasers of Old GM vehicles (the "Used Car

Purchasers") did not exist at the time of the Sale Hearing. The Used Car

Purchasers were neither known nor ascertainable, and their eventual claims did not

exist. Accordingly, the Used Car Purchasers were "future claimants." *See In re*

*Grumman Olson Indus.*, 467 B.R. 694, 703 (Bankr. S.D.N.Y. 2012) (future

claimants are holders of "a claim against a purchaser that is based on pre-

bankruptcy conduct of the debtor that did not cause any harm to an identifiable

claimant until after the bankruptcy closed"). Because the Used Car Purchasers'

claims had not arisen at the time of the Sale, neither due process nor the

Bankruptcy Code permits the enforcement of the Sale Order against them.

Because future claimants cannot possibly be provided notice of a

bankruptcy, "for due process reasons, their claims cannot be discharged" by an

order of a bankruptcy court. *Grumman*, 467 B.R. at 707; *see also id.* at 704-05

("Generally, courts have held that future claims cannot be considered 'claims' that

are dealt with and discharged.") (collecting cases in support of same).

*Grumman* is directly on point. There, the bankruptcy court order approving

a sale included an injunction against tort claims brought against the purchaser

based on allegedly defective products manufactured and sold by the debtor prior to

the sale, including any claims based on a successor liability theory. *Id.* at 697.

Post-sale, the plaintiff was injured while driving a truck with the debtor's defective

product parts, and brought personal injury claims based on theories of state law

successor liability against the purchaser.

The district court found that the sale order could not be enforced to enjoin

plaintiff's claims, reasoning that enforcing such an injunction against the plaintiff,

whose identity was unknown and unknowable at the time of the sale, would violate

both the Bankruptcy Code and due process. *Id.* at 696; *see also Koepp v. Holland*,

593 F. App'x 20, 23 (2d Cir. 2014) ("Bankruptcy courts cannot extinguish the

interests of parties who lacked notice of or did not participate in the proceedings."); *In re Chateaugay Corp.*, 944 F.2d 997, 1003 (2d Cir. 1991) (analyzing appropriate notice to be given to claimants who are not only unidentified, but unidentifiable, and noting that "[t]o expect 'claims' to be filed by those who have not yet had any contact whatever with the tort-feasor has been characterized as 'absurd'") (citations omitted).  So too here.  There was no way Old GM could have provided Used Car Purchasers with constitutionally adequate notice of the Sale Hearing and, therefore, the Sale Order cannot be enforced to bar their state law successor liability claims against New GM.

Enjoining the claims of the Used Car Purchasers is also inconsistent with Section 363(f) of the Bankruptcy Code, which authorizes an order selling property "free and clear ***of any interest***" of any third party (emphasis added).  Accordingly, "free and clear" provisions of a sale order can only impact persons who have some "interest" at the time of the sale order; or, as the *Grumman* court put it, a sale order can only extinguish a cause of action that "fall[s] under the definition of 'claim' under the Bankruptcy Code.'"  467 B.R. at 704.  A "claim" is defined as "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured or unsecured."  11 U.S.C. § 101(5)(A).  Even under this broad definition of

-35-

"claim," it simply cannot be said that the Used Car Purchasers had claims of any sort as of the date of the Sale Hearing—before they ever owned their vehicles. *See Chateauguay*, 944 F.2d at 1003-05 (there is only a contingent "claim" under the Bankruptcy Code when the claimant has a pre-petition relationship with the debtor *and* the cause of action was "within the actual or presumed contemplation" of the claimant and the debtor at the time of the petition). The Bankruptcy Code simply does not provide the authority to enjoin the Used Car Purchasers' claims.

The Bankruptcy Court agreed that applying the "Free and Clear Provisions" of the Sale Order to bar the Used Car Purchasers' claims was a violation of their due process rights. *See* Opinion, 529 B.R. at 571. As discussed *supra* at Section VI.A., the remedy for this due process violation is that the Used Car Purchasers are not bound by the Sale Order and may proceed with their claims. *Grumman*, 467 B.R. 694. But the Bankruptcy Court backtracked, and found that due process does not "give Used Car Plaintiffs a do-over" to make "arguments they might have made" at the time of the Sale. Opinion, 529 B.R. at 571. However, the Used Car Purchasers by definition could not have "done" anything at the time of Sale. The arguments they now wish to make (and that due process entitles them to make) concern the wrongdoing of Old and New GM, and their resultant harm.

-36-

The Bankruptcy Court also erred in cutting off the claims of Used Car
Purchasers because they purportedly sought "greater rights" than the original
owners of their vehicles.  Opinion, 529 B.R. at 571-72.  Not so.  In fact, unlike the
people who sold their Old GM vehicles before the fraud was revealed, the Used
Car Purchasers have economic loss injuries relating to diminution of value and are
entitled to remedies.  The Bankruptcy Court cited no relevant authority for the
proposition that the rights of future claimants (such as the Used Car Purchasers)
can permissibly be defined or circumscribed by claimants existing at the time of a
§ 363 sale.

The theory adopted by the Bankruptcy Court—that Used Car Purchasers are
bound by the Free and Clear Provisions as the "successors-in-interest" to the
original owners—cannot apply on the facts of this case.  While the Bankruptcy
Court quoted *In re Flanagan*, 415 B.R. 29, 42 (D. Conn. 2009), for the proposition
that the acquiror from a trustee could "only prevail on its claims if, and to the
extent that, the Trustee would have prevailed on those claims at the time of the
assignment," the Used Car Purchasers' claims simply did not exist prior to the time
they purchased their cars.  In any event, *Flanagan* is inapposite, as it applied the
wholly distinct rule that a trustee acting pursuant to 11 U.S.C. § 541 is subject to
all of the same defenses as the debtor pre-bankruptcy and held that the trustee's §

-37-

541 claims to recover assets was barred by *in pari delicto.  Flanagan*, 415 B.R. at

33-34.  To the same effect is *In re Magnesium Corp. of Am.*, 399 B.R. 722, 757-58

(Bankr. S.D.N.Y. 2009) (Gerber, J.) (dismissing Trustee's § 541 claims against

third parties on *in pari delicto* grounds because "the trustee stands in the shoes of

the debtor and can only assert those causes of action possessed by the debtor").

The other authority relied on by the Bankruptcy Court, *In re KB Toys, Inc.*, 736

F.3d 247, 251-52 (3d Cir. 2013), is also off-point.  *KB Toys* merely applied 11

U.S.C. § 502(d), which disallows "any claim of any entity" who received an

avoidable transfer.  *Id.*  Because the transferor had a claim it knew to be

disallowed, creating an incentive to sell bad claims was plainly contrary to the

wording and purpose of 11 U.S.C. § 502(d).  *See KB Toys,* 736 F.3d at 252.  And,

unlike here, there were no due process concerns at issue; indeed, the purchasers of

the bad claims were on notice of the risks of purchasing a claim in bankruptcy, and

could easily have learned the claims were avoidable by reading the debtors'

publically available filings.  *Id.* at 254-55.[16]

---

[16] The Bankruptcy Court erred in relying on *In re Old Carco LLC*, 492 B.R.
392, 403 (Bankr. S.D.N.Y. 2013) ("*Burton*"), for the proposition that the Used Car
Purchasers' claims were properly expunged by the Sale Order since "their
predecessor (the previous owners of the vehicles) had a pre-petition relationship
with [the debtor-manufacturer], and the design flaws that they now point to existed
pre-petition."  Opinion, 529 B.R. at 571.  But in *Burton*, the plaintiffs and their
predecessors had knowledge of the design defects at issue given that a recall had

Finally, contrary to the Bankruptcy Court's ruling, the Used Car Purchasers do not "assert that they have special rights—to assert claims for successor liability when nobody else can.…"  Opinion, 529 B.R. at 570.  Rather, as discussed above, the Pre-Sale Purchasers who still own their cars should also be permitted to bring successor liability claims despite the Sale Order because their due process rights were violated.

**E.     The Bankruptcy Court erred by finding that the Sale Order bars any Plaintiff's direct claims arising exclusively from New GM's violations of its own independent legal duties.**

The Bankruptcy Court found that, ***only*** as a remedy for the violation of the ISPs' due process rights, could the ISPs assert "Independent Claims," defined in the Judgment as "claims or causes of action asserted by the ISPs against New GM (whether or not involving Old GM vehicles or parts) that are based solely on New GM's own, independent, post-Closing acts or conduct."  SPA-254, ¶ 4.  Inexplicably, however, the Bankruptcy Court held that Plaintiffs who purchased Old GM cars ***without*** the Ignition Switch Defect cannot bring Independent Claims unless they prove due process violations.  *See* Judgment, SPA-254, ¶ 4; Form of Judgment Decision, 531 B.R. at 360 (Under the Opinion and Judgment, Old GM

---

occurred.  492 B.R. at 403.  In stark contrast, neither the Used Car Purchasers nor their predecessors were aware of the Ignition Switch Defect given Old and New GM's intentional cover-up.

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 13:32:50    Exhibit A
Pg 500 of 728

car purchasers cannot bring Independent Claims unless they show "that they were
known claimants at the time of the 363 Sale, and that there was any kind of a due
process violation with respect to them."). This was plain error.

Assuming that the Sale Order was even intended to bar claims against New
GM for its own conduct, such an injunction would extend beyond the jurisdiction
of the Bankruptcy Court. Subject matter jurisdiction in a bankruptcy proceeding
over third-party claims (such as the Plaintiffs' Independent Claims) can extend
only to actions affecting the *res* of the bankruptcy estate. *In re Johns-Manville
Corp.*, 517 F.3d 52, 66-68 (2d Cir. 2008) (holding that, despite a "common nucleus
of operative facts involving" the debtor and the insurer, bankruptcy order enjoining
third-party claims against insurers predicated on insurer's independent misconduct
were unrelated to *res* of the estate and outside the scope of the bankruptcy court's
injunction power); s*ee also In re Quigley Co., Inc*., 676 F.3d 45, 61-62 (2d Cir.
2012) (bankruptcy court lacks jurisdiction to enjoin a claim against a third party
where such claim would not have an effect on the *res* of the bankruptcy estate).

While a bankruptcy court assuredly has jurisdiction to interpret and enforce
its own orders, that ancillary jurisdiction exists only to the extent that the court has
the jurisdiction to enter the order itself. *See Zerand-Bernal Grp. v. Cox*, 23 F.3d
159, 164 (7th Cir. 1994) (affirming the bankruptcy court's holding that it "lacked

jurisdiction" to enjoin a post-363 sale claim against a non-debtor: "[T]he fact that the bankruptcy court, in the order approving the bankruptcy sale and later in the plan of reorganization, purported expressly to assume jurisdiction … could not confer jurisdiction.  A court cannot write its own jurisdictional ticket."); *see also In re Johns-Manville Corp.*, 517 F.3d at 65 n.22 ("The ancillary jurisdiction courts possess to enforce their own orders 'is itself limited by the jurisdictional limits of the order sought to be enforced.'").

The Bankruptcy Court did not have subject matter jurisdiction to protect the non-debtor New GM by limiting the rights of any Plaintiffs to bring suit against New GM for New GM's own post-Sale misconduct in breach of New GM's own independent legal duties.  Subject matter jurisdiction of bankruptcy courts is limited to "civil proceedings arising under Title 11, or arising in or related to cases under Title 11."  28 U.S.C. § 1334(b).  Because Plaintiffs' Independent Claims are based solely on the non-debtor New GM's post-Sale conduct, the claims cannot be said to "arise in" or "under" Title 11.  *See Zerand-Bernal Grp.*, 23 F.3d at 162 ("arising under" jurisdiction "is limited to questions that arise during the bankruptcy proceeding and concern the administration of the bankrupt estate, such as whether to discharge a debtor").  And Plaintiffs' claims are not "related to" Title 11, since the outcome of the Plaintiffs' action can have no conceivable effect on

-41-

the bankrupt estate.  *See In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992); *see also In re Quigley Co., Inc.*, 676 F.3d at 61-62 (bankruptcy court lacks jurisdiction to enjoin a claim against a third party where such claim would not have an effect on the *res* of the bankruptcy estate).

This Court should reject any argument that New GM should get immunity for its own post-Sale misconduct because immunity for the non-debtor increases the value of the estate.  That a broad injunction against future claims against a purchaser might result in a buyer paying a higher price for assets in a 363 transaction is pure speculation, and in any event cannot confer jurisdiction over future claims against the purchaser arising from its independent misconduct.  *See Zerand-Bernal Grp.*, 23 F.3d at 164 (rejecting the argument that bankruptcy courts may immunize a purchaser from state or federal law in the interests of increasing the value of a debtor's assets).  As the *Zerand-Bernal Grp.* court reasoned, the argument that "the price received in a bankruptcy sale will be lower if a court is free to disregard a condition in the sale agreement enjoining claims against the purchaser based on the seller's misconduct" should be rejected because it "proves too much":

> It implies, what no one believes, that by virtue of the arising-under jurisdiction a bankruptcy court enjoys a blanket power to enjoin all future lawsuits against a buyer at a bankruptcy sale in order to maximize the sale

> price; more, that the court could in effect immunize such
> buyers from all state and federal laws that might reduce
> the value of the assets bought from the bankrupt[.][17]

There is no sound reason to encourage non-debtors to pay a purchase price in a 363

transaction that reflects a belief that they are forever immunized from liability for

breaches of their *own* independent legal duties.

Thus, as this Court reiterated in *Manville IV*, 600 F.3d at 153, bankruptcy

courts do not have jurisdiction to enjoin "claims against non-debtor third parties"

where those claims are based on the non-derivative misconduct of the non-debtor

and the claims do not impact the bankruptcy estate. *See also In re 1031 Tax Grp.,*

*LLC*, 2011 U.S. Dist. LEXIS 33755, at *7 (S.D.N.Y. Mar. 29, 2011) ("federal

courts are without jurisdiction to enjoin actions against third-parties not in

bankruptcy when those actions are premised upon an 'independent legal duty'").

Here, Plaintiffs' claims are based on New GM's fraudulent concealment of the

scores of defects plaguing GM-branded vehicles; New GM's culture, which

systematically devalued safety; and New GM's misrepresentations concerning the

safety and reliability of GM vehicles—all in violation of New GM's independent

legal duties to refrain from unfair and deceptive trade practices. *See* A-6347-7735.

A bankruptcy court simply does not have jurisdiction to enjoin such claims.

---

[17] *Zerand-Bernal Grp.*, 23 F.3d at 163.

Accordingly, the Sale Order may not be read to bar *any* Plaintiff's'

Independent Claims—and no Plaintiff need prove up a due process violation as a

pre-requisite for bringing those claims.

## F. The Bankruptcy Court erred in applying the doctrine of equitable mootness to preclude recovery on Plaintiffs' claims.

### 1. The Bankruptcy Court erred by finding equitable mootness applicable to Plaintiffs' claims.

Separate and distinct from Plaintiffs' claims against New GM, the

Bankruptcy Court reviewed Plaintiffs' recovery potential on any claims they may

have against the Old GM bankruptcy estate/GUC Trust. The Bankruptcy Court

correctly found that Plaintiffs were prejudiced by the failure to receive

constitutionally adequate notice of the Bar Date. *See* Opinion, 529 B.R. at 574.

Likewise, it correctly found the appropriate remedy was to allow the Plaintiffs to

seek to file late claims against the GUC Trust. *See id.* at 583. However, the

Bankruptcy Court then erred by finding that, based on the doctrine of equitable

mootness, in no event shall assets of the GUC Trust held at any time in the past,

now, or in the future be used to satisfy any subsequently allowed claims of the

Plaintiffs. *See id.* at 584, 598. The Opinion precludes Plaintiffs from obtaining

any recovery from the Old GM estate and, therefore, the filing of late claims would

be a fruitless endeavor. By applying equitable mootness as a complete block to

recovery on any allowed claims the Plaintiffs may be entitled to, the Bankruptcy

Court abused its discretion.

Equitable mootness is a judge-made doctrine without constitutional footing.

*See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005).  It is

increasingly disfavored among the Circuits.  *See, e.g.*, *In re One2One Commc'ns,*

*LLC*, No. 13-3410, 2015 WL 4430302, at *7 (3d Cir. July 21, 2015) (Krause, J.

concurring) (urging the Third Circuit to consider eliminating, or at the very least

reforming, equitable mootness).  Courts across the country identify it as an

"exception" to their responsibility to exercise their jurisdictional mandate that must

be used sparingly and construed narrowly.  *See, e.g.*, *In re One2One Commc'ns,*

*LLC*, 2015 WL 4430302, at *3-4.[18]  It must be applied, if at all, with a scalpel

rather than an axe.  *See In re Charter Commc'ns, Inc.*, 691 F.3d 476, 482 (2d Cir.

2012).

The doctrine originated to prevent chaos if the requested relief would

eviscerate a complex and fully consummated bankruptcy plan of reorganization.

*See In re Chateaugay Corp.*, 10 F.3d 944, 952-53 (2d Cir. 1993); *see also In re*

*Metromedia Fiber Network, Inc.*, 416 F.3d at 144.  The doctrine was not developed

---

[18] *Cf. Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 132 S. Ct. 1377,
1386 (2014) (disapproving of abstention doctrines as in tension with the federal
courts' obligation to hear and decide cases).

as a complete bar to bankruptcy claims recoveries and has never been employed to

thwart a creditor whose due process rights were violated.  Indeed, there is no

support to expand the disfavored doctrine to bankruptcy claims adjudication,

particularly where a creditor has been deprived of due process.[19]  Because any

other conclusion would amount to an abuse of discretion, this Court should reverse

the Opinion and remand to the Bankruptcy Court for adjudication of any late-filed

claims by Plaintiffs.  If such claims are allowed, the Bankruptcy Court can and

should craft appropriate relief that balances the rights of Plaintiffs and the

reasonable expectations of GUC Trust beneficiaries.

### 2.    The Bankruptcy Court erred by finding that Plaintiffs cannot satisfy three of the *Chateaugay* factors.

Consideration of the prudential *Chateaugay* factors also demonstrates that

the Bankruptcy Court abused its discretion.  *See In re Chateaugay Corp.*, 10 F.3d

---

[19] None of the cases cited by the Bankruptcy Court in support of its equitable mootness holding involved due process violations.  All the cases cited by the Bankruptcy Court involve situations where the appellant either appeared in the proceedings or was provided adequate notice.  Given that Plaintiffs were denied due process, the application of equitable mootness is itself inequitable and constitutes an abuse of discretion.  *See In re Polycel Liquidation, Inc.*, 2007 WL 77336, at *2-8 (D.N.J. Jan. 8, 2007) (affirming bankruptcy court's determination that equitable and statutory mootness did not require dismissal of Rule 60(b)(4) motion for relief from sale order where appellant had no notice of the sale motion); *In re Motors Liquidation Co.*, 428 B.R. 43, 57 n.18 (Bankr. S.D.N.Y. 2010) (noting in *dicta* that "due process concerns render[] mootness and *res judicata* doctrines inapplicable").

at 952-53.  Plaintiffs meet all five *Chateaugay* factors and the Bankruptcy Court

erred by holding that Plaintiffs cannot satisfy three of the five factors.  *See*

Opinion, 529 B.R. at 592.[20]

Without adequate notice to the ISPs, Old GM's chapter 11 plan of

liquidation was confirmed; the Plan provided equal treatment for allowed claims of

the same priority.  A-3890-3985.  Years later, a Late Claims Order was entered to

efficiently manage the influx of late claims.  A-4809-10.  The Late Claims Order

expressly stated that nothing in the order shall prevent any claimant from seeking

to have its late claim deemed timely filed.  A-4810.

Likewise, the Plan, Confirmation Order and GUC Trust Agreement do not

prohibit or prejudice late-filed claims.  A late proof of claim may be subsequently

adjudicated as an Allowed General Unsecured Claim.  *See* Plan § 1.79, A-3914.

Indeed, both before and after the Plan Effective Date, late proofs of claim against

---

[20] These five factors are:  (i) the court can still order some effective relief; (ii) such relief will not affect "the re-emergence of the debtor as a revitalized corporate entity"; (iii) such relief will not unravel intricate transactions so as to "knock the props out from under the authorization for every transaction that has taken place" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court"; (iv) the "parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings;" and (v) the appellant "pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order … if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."  *In re Chateaugay Corp.*, 10 F.3d at 952-53.

the Old GM estate were deemed timely filed, and subsequently allowed. *See* Opinion, 529 B.R. at 537. Those creditors received equal treatment under the Plan as all other Allowed General Unsecured Creditors. *See* Plan § 4.3, A-3928.

Both before and after consummation of the Plan, sophisticated investors bought and sold claims against Old GM and GUC Trust Units. They were keenly aware of the prospects of late-filed claims and dilution of recoveries. Unitholders were aware that supplemental distributions to them were only appropriate under Section 6.2(*l*) of the Plan "to the extent there are sufficient assets available for distribution," and then at the "appropriate amount." *See* Plan § 6.2(*l*), A-3948. Further, it was common market knowledge that under the GUC Trust Agreement, the GUC Trust Administrator is required to consider previously unknown potential Allowed General Unsecured Claims when assessing whether distributions to Unitholders should be made. *See* GUC Trust Agreement § 5.4(d), A-4583.

Against this backdrop, Plaintiffs' potential distributions would ordinarily be a function of past, present and future GUC Trust Assets. As of the Opinion, the Old GM estate and the GUC Trust had distributed GUC Trust Assets valued at approximately $9 billion[21] (the "Past GUC Trust Assets") to Allowed General

---

[21] By March 31, 2015, the GUC Trust distributed 137,330,625 shares of New GM common stock, 124,846,071 Series A warrants, 124,846,071 Series B warrants and $3,354,600 in cash on behalf of resolved allowed general unsecured claims

-48-

Unsecured Creditors and Unitholders holding aggregate Allowed General

Unsecured Claims of approximately $32 billion, for recoveries of roughly 28 cents

on the dollar. *See* A-10927-944. As of the Opinion, the GUC Trust held assets not

yet distributed worth approximately $945 million (the "Remaining GUC Trust

Assets"). A-10930.

Finally, the GUC Trust Assets stand to be augmented upon allowance of

Plaintiffs' claims against the GUC Trust through an "Accordion Feature" in the

Sale Agreement. *See* Sale Agreement § 3.2(c), A-1699-1700. Under the

Accordion Feature, New GM must provide additional consideration in the form of

additional shares of stock if the aggregate amount of Allowed General Unsecured

Claims exceeds $35 billion. *See id.*[22] If the aggregate value of Allowed General

Unsecured Claims reaches $42 billion, New GM would be required to contribute

the full value available pursuant to the Accordion Feature, which is 30 million

---

and units. *See* A-10931. Valuing the initial distribution based on the price of New GM common stock and warrants at the time of the initial distribution, and the remaining distributions based on the historical average price of New GM common stock and warrants, approximately $9 billion in GUC Trust Assets had been distributed at the time of the Opinion.

[22] As of March 31, 2015, the aggregate value of Allowed General Unsecured Claims is approximately $32 billion. *See* A-1029-42. Based on the claims resolved to date, and the one disputed $20 claim that is still pending, the Allowed General Unsecured Claims will not reach $35 billion without Plaintiffs' claims.

shares of New GM Common Stock, worth approximately $1.029 billion as of market-close on November 13, 2015 (the "Accordion Feature Value").[23]

Without adverse impact on Unitholders, Plaintiffs could receive exclusive access to any Accordion Feature Value. In addition, the Remaining GUC Trust Assets could be earmarked to satisfy Plaintiffs' subsequently allowed claims. Even if the entire balance of the Remaining GUC Trust Assets went to satisfy $10 billion of allowed claims, Plaintiffs would obtain materially less than similarly situated creditors received from the GUC Trust.[24] Finally, Past GUC Trust Assets conceivably could be clawed back and reallocated, especially from known Unitholders.[25] The Bankruptcy Court failed to appropriately consider the above facts and its ability to effectively fashion relief for Plaintiffs. The result was an

_____

[23] Plaintiffs seek approximately $7-$10 billion in damages. Opinion, 529 B.R. at 521. If claims against the GUC Trust were allowed in that amount, those claims would push the overall amount of Allowed General Unsecured Claims over the $35 billion level and could trigger all or substantially all of the Accordion Feature Value.

[24] Plaintiffs would obtain approximately nine cents on the dollar as compared to a recovery for other similarly situated creditors of approximately 28 cents on the dollar.

[25] Were the Plaintiffs' claims to be allowed at $7 billion, fashioning relief for the Plaintiffs with Accordion Feature Value and Remaining GUC Trust Assets would likely obviate the need to claw-back any distributions of Past GUC Trust Assets. It would closely approximate the equal treatment of similarly situated creditors that is the hallmark of the Bankruptcy Code. *See Begier v. Internal Rev. Serv.*, 496 U.S. 53, 58 (1990).

010440-11 827752 V1

abuse of discretion, a holding despite clear precedent to the contrary, that Plaintiffs

could not meet three of the *Chateaugay* factors. *See* Opinion, 529 B.R. at 592.

### a.    The Bankruptcy Court misapplied the first *Chateaugay* factor.

The first *Chateaugay* factor looks to whether "at least some effective relief

could be granted." *In re Chateaugay Corp.*, 10 F.3d at 954. The Second Circuit

has recognized that "[a] claimant should not be out of court on grounds of

mootness solely because its injury is too great for the debtor to satisfy in full." *Id.*

Contrary to the Bankruptcy Court's holding, it would be neither inequitable nor

impossible for the Bankruptcy Court to fashion relief for the Plaintiffs with regard

to either the (i) Accordion Feature Value; (ii) Remaining GUC Trust Assets; and/or

(iii) Past GUC Trust Assets.

The Opinion's misreading of Plan documents separately warrants reversal.

The Plaintiffs may file late proofs of claim. *See* Opinion, 529 B.R. at 598. Those

claims may be allowed and Plaintiffs adjudicated as holders of Allowed General

Unsecured Claims under the Plan. *See* Plan § 1.79, A-3914. As holders of

Allowed General Unsecured Claims, Plaintiffs would be entitled to distributions of

GUC Trust Assets in the same percentage as other Allowed General Unsecured

Creditors under the Plan and Bankruptcy Code. *See* Plan § 4.3, A-3928-29; 11

U.S.C. § 726. Accordingly, relief can be afforded to Plaintiffs against GUC Trust

Assets without modifying the Confirmation Order or unraveling the Plan.

Therefore, Plaintiffs meet the first *Chateaugay* factor.

### b.    The Bankruptcy Court misapplied the third *Chateaugay* factor.

The Third *Chateaugay* factor asks whether the relief would inequitably

impact third parties.  *See In re Chateaugay Corp.*, 10 F.3d at 953.  In an abuse of

discretion, the Bankruptcy Court found that granting Plaintiffs relief would "knock

the props out" from the transactions under which Units were acquired.  *See*

Opinion, 529 B.R. at 587-88.  Because there is no support for this conclusion it

requires reversal.

The Bankruptcy Court found that purchasers of Units based their

expectations on the then-known universe of claims and the assumption that those

claims could only go down via subsequent claim objections.  *See id.* at 587.  The

Bankruptcy Court did not discuss how this unsubstantiated expectation, even if

true, impedes providing Plaintiffs relief via the Accordion Feature Value.  Since

the Accordion Feature Value only comes into play upon allowance of Plaintiffs'

claims, Unitholders did not have any expectations about this value to dash.

Accordingly, the Bankruptcy Court's conclusion that Plaintiffs cannot meet the

third *Chateaugay* factor was an abuse of discretion at least as it pertains to the

Accordion Feature Value.

-52-

The Bankruptcy Court also erroneously found that Unitholders had a reasonable expectation that the total universe of claims filed against Old GM would not increase. *See id.* at 587-89. That conclusion is without basis and the evidence cuts directly against it. Late claims against the GUC Trust have been allowed and have tapped GUC Trust Assets for recoveries. *See id.* at 537. Thus, Unitholders were well aware of the risk of dilution by late-filed claims that are subsequently allowed. Section 6.2(l) of the Plan provides recoveries to Unitholders only "to the extent there are sufficient assets available for distribution," and then only for an "appropriate amount." *See* Plan § 6.2(l), A-3944. Upon disclosure of the Ignition Switch Defect, Unitholders were well aware of potential dilution by Plaintiffs' claims. *See* Opinion, 529 B.R. at 537. The GUC Trust Administrator disclosed in its SEC filings as early as May 16, 2014 that Plaintiffs' claims could impact Unitholders' recoveries. *See* A-13791-95.

The Bankruptcy Court strained *BGI II* to find that Plaintiffs did not meet the third *Chateaugay* factor. *BGI II* is inapplicable since the tardy creditors there had notice, but did not object to the bar date or plan. *See BGI II*, 772 F.3d at 106, 110-11. The subject creditors' appeal was found to be equitably moot. *See id.* Unlike *BGI II*, the Plaintiffs here suffered a violation of their due process rights and the Bankruptcy Court found that the appropriate remedy was filing late proofs of

claim. *See* Opinion, 529 B.R. at 574, 583, 598. Additionally, allowing the late proofs of claim in *BGI* would have eviscerated recoveries to all other general unsecured creditors. *See In re BGI, Inc.*, 2013 WL 10822966, at *7-8 (S.D.N.Y. May 22, 2013) ("*BGI I*"), *aff'd*, 772 F.3d 102 (2d Cir. 2014). Here, at a minimum, Plaintiffs could receive exclusive access to the Accordion Feature Value without *any* dilution of other creditors' recoveries. In *BGI II*, allowing the class of gift card holders to file late claims and access the remaining $61 million in the estate would have had a disastrous effect on distributions under the Plan because *BGI II* unsecured creditors were projected to receive as little as four cents on the dollar and would be entirely swamped by the gift card class' claims of about $210 million. *See BGI II*, 772 F.3d at 105 n.2, 110 & n.15. Allowing Plaintiffs to recover from Current GUC Trust Assets (realizing approximately 13 cents on the dollar if all Remaining GUC Trust Assets were made available to Plaintiffs and their claims are allowed at $7 billion) will not reduce recoveries to Allowed General Unsecured Creditors (who will retain payment of 28 cents on the dollar). Even clawing back Past GUC Trust Assets would not have the "disastrous effect" at issue in *BGI*.

Finally, the Bankruptcy Court found that class litigation should not delay distributions to other creditors and that Unitholders would be prejudiced even if

Plaintiffs' claims were ultimately disallowed. *See* Opinion, 529 B.R. at 589.

There is no support for this conclusion. Filing class proofs of claim in bankruptcy

is commonplace. Adjudicating the bona fides of a late-filed claim under the

*Pioneer*[26] factors (including class proofs of claim) is not an unmanageable situation

and should not cause undue delay. In fact, aside from the $135 million distribution

by the GUC Trust anticipated in November 2015, the GUC Trust does not

anticipate distributing any other Remaining GUC Trust Assets until November

2016.

      **c.**     **The Bankruptcy Court misapplied the fifth *Chateaugay*
                  factor.**

      The fifth *Chateaugay* factor considers whether an appellant pursued a stay of

the objectionable order with diligence. *See In re Chateaugay*, 10 F.3d at 953. As a

threshold matter, the Bankruptcy Court erred applying this *Chateaugay* factor

because the Plaintiffs are not seeking a stay of any order and thus by its terms this

factor is inapplicable. The Plaintiffs were not provided constitutionally adequate

notice and were deprived of the ability to seek a stay of the Sale, Bar Date or

Confirmation Orders. The Ninth Circuit has found that where a party has done

nothing by its own inactions to encourage or permit developments to proceed

---

[26] *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380,
395 (1993).

-55-

without its participation, courts should be cautious about reaching a conclusion of equitable mootness. *See In re Thorpe Insulation Co.*, 677 F.3d 869, 881 (9th Cir. 2012). This Court should likewise determine that the Bankruptcy Court abused its discretion in considering the fifth *Chateaugay* factor.

Even if this Court finds the fifth *Chateaugay* factor applicable, the Bankruptcy Court abused its discretion by finding that Plaintiffs did not pursue relief with diligence. *See* Opinion, 529 B.R. at 590-92. The Bankruptcy Court erred in focusing its analysis solely on the GUC Trust's November 2014 distribution which amounted to 2.45% of total Old GM estate value distributed. *See id.*

The Bankruptcy Court abused its discretion because Plaintiffs have pursued their claims with diligence. The Plaintiffs promptly filed suits following disclosure of the Ignition Switch Defect. *See id.* at 538. They immediately contested New GM's Motion to Enforce Sale Order, filing an objection the day after its filing. *See Objection to Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, *In re Motors Liquidation Co.*, No. 09-50026 (REG) (Apr. 22, 2014), ECF No. 12629. The Plaintiffs have actively participated in the Bankruptcy Court's case conferences.

The GUC Trust Administrator has disclosed the risk of Plaintiffs' claims diluting and delaying GUC Trust distributions. *See, e.g.*, A-13791-98.

Indeed, within a week of the GUC Trust's disclosure that it intended to make the November 2014 distribution and well in advance of the distribution, Plaintiffs sent counsel for the GUC Trust Administrator a letter advising that Plaintiffs were known contingent beneficiaries of the GUC Trust and reserves should be established for their claims before any further distributions. A-10360-62. Under Section 5.4(d) of the GUC Trust Agreement, the GUC Trust Administrator was required to consider the Plaintiffs' claims prior to making the November 2014 distribution. A-4583. Undeterred, the GUC Trust Administrator made that distribution in contravention of the GUC Trust's governing documentation. *See Id.* Under the May 16, 2014 Scheduling Order, the Plaintiffs have until final determination of the Threshold Issues to file claims against the GUC Trust and can still seek to clawback the November 2014 and other distributions of Past GUC Trust Assets. A-5691. Accordingly, the Bankruptcy Court abused its discretion in finding that Plaintiffs should have done more than they have, and are consequently shut out of GUC Trust Assets.

010440-11 827752 V1

## VII.   CONCLUSION

The ISPs respectfully request that this Court reverse the Bankruptcy Court's Opinion and Judgment finding that (i) the Pre-Sale Plaintiffs and the Used Car Purchasers cannot bring successor liability claims even though their due process rights were violated; (ii) Plaintiffs' Independent Claims against New GM cannot proceed unless they show a due process violation; and (iii) the Pre-Sale Plaintiffs are barred by the doctrine of equitable mootness from recovering against the debtor's estate.

010440-11 827752 V1

Dated:  November 16, 2015  Respectfully submitted,

         By: */s/ Steve W. Berman*

         **HAGENS BERMAN SOBOL
SHAPIRO LLP**
Steve W. Berman
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
206-623-7292
steve@hbsslaw.com

         -and-

         **LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
Elizabeth J. Cabraser
275 Battery Street, 29th Floor
San Francisco, California 94111
415-956-1000
ecabraser@lchb.com

          -and-

         Rachel J. Geman
250 Hudson Street, 8th Floor
New York, New York 10013
212-955-3500
rgeman@lchb.com

         *Counsel for Appellant Ignition Switch Plaintiffs
and Co-Lead Counsel for Plaintiffs in the MDL
Court.*

010440-11 827752 V1

**BROWN RUDNICK LLP**
Edward S. Weisfelner
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
212-209-4800
eweisfelner@brownrudnick.com

-and-

**STUTZMAN, BROMBERG,
ESSERMAN & PLIFKA, P.C.**
Sander L. Esserman
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
214-969-4900
esserman@sbep-law.com

*Counsel for Appellant Ignition Switch Plaintiffs
and Designated Counsel for The Ignition Swtich
Plaintiffs in the Bankruptcy Court*

010440-11 827752 V1

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C), the opening brief is proportionally spaced, has a typeface of 14 points and contains 13,824 words (excluding the cover page, table of contents, table of authorities, certificate of service, and certificate of compliance). In preparing this Certificate, I relied on the word-count program of Microsoft Word 2010.

DATED: November 16, 2015

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
Steve W. Berman
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
206-623-7292
steve@hbsslaw.com

*Counsel for Appellant the Ignition Switch
Plaintiffs*

Case 1:14-md-02543-JMF    Document 4657-5    Filed 10/02/17    Page 1 of 128

# Exhibit 5

```
                                                 Page 1

  1    UNITED STATES BANKRUPTCY COURT

  2    SOUTHERN DISTRICT OF NEW YORK

  3    - - - - - - - - - - - - - - - - - - - - - - - - - - x

  4    In the Matter of:

  5                                        Chapter 11

  6    MOTORS LIQUIDATION COMPANY,         Case No.: 09-50026(REG)

  7    et al, f/k/a General Motors         (Jointly Administered)

  8    Corp., et al.,

  9

 10           Debtors.

 11    - - - - - - - - - - - - - - - - - - - - - - - - - - x

 12    STEVEN GROMAN, ROBIN DELUCO,

 13    ELIZABETH Y. GRUMET, ABC

 14    FLOORING, INC., MARCUS

 15    SULLIVAN, KATELYN SAXSON,           Adv. Pro. No.:

 16    AMY C. CLINTON, AND ALLISON         14-01929(REG)

 17    C. CLINTON, on behalf of

 18    themselves, and all other

 19    similarly situated,

 20                  Plaintiffs,

 21           v.

 22    GENERAL MOTORS LLC,

 23                  Defendant.

 24    - - - - - - - - - - - - - - - - - - - - - - - - - - x

 25
```

Page 2

```
 1              U.S. Bankruptcy Court

 2              One Boling Green

 3              New York, New York

 4

 5              May 2, 2014

 6              9:46 AM

 7

 8

 9   B E F O R E :

10   HON ROBERT E. GERBER

11   U.S. BANKRUPTCY JUDGE

12

13

14   Hearing re:  Status Conference

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Dawn South and Sheila Orms
```

Page 3

```
 1   A P P E A R A N C E S :

 2   KING & SPALDING LLP

 3        Attorneys for General Motors LLC

 4        1185 Avenue of the Americas

 5        New York, NY 10036-4003

 6

 7   BY:  ARTHUR J. STEINBERG, ESQ.

 8        SCOTT DAVIDSON, ESQ.

 9

10   KIRKLAND & ELLIS

11        Attorney for New GM

12        300 North LaSalle

13        Chicago, IL 60654

14

15   BY:  RICHARD C. GODFREY, P.C., ESQ.

16

17   GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP

18        Attorneys for the Plaintiffs

19        437 Madison Avenue

20        New York, NY 10022

21

22   BY:  JONATHAN FLAXER, ESQ.

23        S. PRESTON RICARDO, ESQ.

24

25
```

Page 4

1    GIBSON, DUNN & CRUTCHER LLP

2         Attorney for Motors Liquidation GUC Trust

3         200 Park Avenue

4         New York, NY 10166-0193

5

6    BY:  KEITH R. MARTORANA, ESQ.

7

8    ROBINSON CALCAGNIE ROBINSON SHAPIRO DAVIS, INC.

9         Attorney for Ratzlaff, et al.

10        19 Corporate Plaza Drive

11        Newport Beach, CA 92660

12

13   BY:  MARK P. ROBINSON, JR., ESQ.

14

15   GOODWIN ROCTER LLP

16        Attorneys for the South Texas Plaintiffs

17        The New York Times Building

18        620 Eighth Avenue

19        New York, NY 10018

20

21   BY:  WILLIAM P. WEINTRAUB, ESQ.

22        EAMONN O'HAGAN, ESQ.

23

24

25

Page 5

```
 1   BROWN RUDNICK LLP
 2        Attorneys for Ratzlaff, et al.
 3        Seven Times Square
 4        New York, NY 10036
 5
 6   BY:  EDWARD WEISFELNER, ESQ.
 7        DAVID J. MOLTON, ESQ.
 8        HOWARD STEEL, ESQ.
 9
10   AKIN GUMP STRAUSS HAUER & FELD LLP
11        Attorneys for Holders of Units in the GUC Trust
12        One Bryant Park
13        New York, NY 10036-6745
14
15   BY:  NAOMI MOSS, ESQ.
16        DANIEL GOLDEN, ESQ.
17
18   OTTERBOURG
19        230 Park Avenue
20        New York, NY 10169
21
22   BY:  DAVID M. POSNER, ESQ.
23
24
25
```

Page 6

```
 1   LOWENSTEIN SANDLER LLP
 2        Attorney for Plaintiffs Darby and Jones
 3        65 Livingston Avenue
 4        Roseland, NJ 07068
 5
 6   BY:  JOHN K. SHERWOOD, ESQ.
 7
 8   LOWENSTEIN SANDLER LLP
 9        Attorney for Plaintiffs Darby and Jones
10        1251 Avenue of the Americas
11        New York, NY 10020
12
13   BY:  MICHAEL S. ETKIN, ESQ.
14
15   UNITED STATES DEPARTMENT OF JUSTICE
16        Attorney for the U.S. Trustee
17        U.S. Federal Office Building
18        201 Varick Street
19        Suite 1006
20        New York, NY 10014
21
22   BY:  BRIAN MASUMOTO, ESQ.
23
24
25
```

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF   Document 4657-5   Filed 10/02/17   Page 8 of 120
Pg 529 of 728

```
 1   CAPLIN & DRYSDALE, CHARTERED
 2         One Thomas Circle, NW
 3         Suite 1100
 4         Washington, DC 20005
 5
 6   BY:  PETER VAN N. LOCKWOOD, ESQ.
 7
 8   CAPLIN & DRYSDALE, CHARTERED
 9         600 Lexington Avenue
10         21st Floor
11         New York, NY 10022-7619
12
13   BY:  ELIHU INSELBUCH, ESQ.
14
15   STUZMAN, BROMBERG, ESSERMAN & PLIFKA
16         2323 Bryan Street
17         Suite 2200
18         Dallas, TX 75201-2689
19
20   BY:  SANDER L. ESSERMAN, ESQ.
21
22
23
24
25
```

Page 8

```
 1   KELLEY DRYE & WARREN LLP

 2         101 Park Avenue

 3         New York, NY 10178

 4

 5   BY:  BENJAMIN D. FEDER, ESQ.

 6

 7   PACHULSKI STANG ZIEHL & JONES

 8         Attorney for Plaintiffs

 9         780 Third Avenue

10         36th Floor

11         New York, NY 10017-2024

12

13   BY:  MARIA A. BOVE, ESQ.

14

15   BECNEL LAW FIRM, LLC

16         Attorney for Jomaka Coleman, et al.

17         425 West Airline Highway

18         Suite B

19         Laplace, LA 70068

20

21   BY:  DANIEL BECNEL, JR., ESQ. (TELEPHONIC)

22

23

24

25
```

09-50026-mg   Doc 14127-1   Filed 10/02/17   Entered 10/02/17 12:32:50   Exhibit A
Case 1:14-md-02543-JMF   Document 4657-5   Filed 10/02/17   Page 20 of 128
Pg 531 of 728

Page 9

```
  1                    P R O C E E D I N G S

  2              THE COURT:  Good morning, have seats, please.  I

  3     know most of you at the counsel table.  Mr. Steinberg, with

  4     you is whom?

  5              MR. STEINBERG:  With me is -- well, you can

  6     introduce yourself.

  7              MR. GODREY:  Richard Godfrey, Your Honor.

  8              MR. STEINBERG:  From Kirkland.

  9              THE COURT:  Mr. Godfrey?  Okay.  Thank you.

 10              MR. GODREY:  Good morning, Your Honor.

 11              THE COURT:  I know Mr. Weisfelner, Mr. Inselbuch,

 12     Mr. Esserman, and Mr. Flaxer.  As others want to be heard

 13     I'll give them that opportunity as we go along.

 14              Within limits I'm going allow parties to be heard

 15     as they see fit, but I have some preliminary comments.

 16              I haven't read all 3,500 pages of the filings that

 17     have come in in the last ten days, but I've read New GM's

 18     motion, Mr. Flaxer's complaint, Mr. Weisfelner's objection,

 19     and have also read all of counsel's letters and the various

 20     proposed agenda items.

 21              I think I have a pretty decent handle on the

 22     issues that are going to need to be addressed today and the

 23     issues that are going to need to be addressed in the

 24     upcoming several months, but I'm less clear as to the extent

 25     to which all of the issues are already on the table.
```

1        Identifying the issues that are going to need to

2    be teed up for judicial determination, or more exactly

3    figuring out how and when they're going to be put on the

4    table, is one of the primary purposes of the conference

5    today.

6        I think everybody understands or should that today

7    is not the day to argue the merits of any of your respective

8    positions or especially calling either side names.  It's

9    instead to, as I said, identify the issues that need to be

10   addressed and to establish a fair means for getting the

11   issues judicially determined.

12       I appreciate the efforts of Mr. Steinberg and

13   Mr. Weisfelner and Mr. Inselbuch, Esserman, and Flaxer in

14   conferring before we got here to avoid inefficiencies and to

15   set up the orderly process for teeing these issues up.  You

16   got pretty far and I'll take care of the rest.

17       As you'll hear momentarily I have a number of

18   tentatives, as that expression is used in California and

19   elsewhere in the Ninth Circuit, which are my inclinations as

20   to how to proceed, subject to your rights to be heard, but I

21   have some expectations as to an orderly discussion, no

22   histrionics, no repetition.  I also have some questions and

23   concerns that I want you to address when it's your turn.

24       Starting with my questions.

25       I gather there are now about 60 class actions and

09-50026-mg   Doc 14127-1   Filed 10/02/17   Entered 10/02/17 12:32:50   Exhibit A
Case 1:14-md-02543-JMF   Document 4657-5   Filed 10/02/17   Page 32 of 128
Pg 533 of 728

Page 11

```
 1   a couple of individual actions pending against New GM in

 2   various parts of the country with respect to the ignition

 3   switches in some way, but I have only a partial

 4   understanding of what the claims typically characterized as

 5   for economic loss are.

 6            I'd understood, rightly or wrongly, that New GM

 7   voluntarily assumed liability for wrongful death, personal

 8   injury, and property damage with respect to any "incidents

 9   or occurrences," which I understood to be things like wrecks

10   or fires or of course death or injury, that took place after

11   the sale in July of 2009.

12            I also understood that New GM had undertaken

13   responsibility for satisfying the glove box warranty and for

14   complying with state lemon laws.

15            But I need to get a handle on what's left.  What

16   is left that has engendered 60 class actions across the

17   country?  And obviously I'll hear your respective views on

18   that.  I got a pretty good sense of the legal theories that

19   were invoked, vis-à-vis that economic loss, but I still

20   don't understand exactly what we're talking about.

21            Mr. Inselbuch's April 24th letter identifies an

22   issue as to whether claims against New GM, statutory or

23   otherwise, based on post-sale conduct of New GM are subject

24   to my orders.  Mr. Esserman's April 23rd letter and

25   Mr. Weinberg's -- I don't see Mr. Weinberg, is he here
```

Page 12

 1   somewhere?  Oh, yeah there is he, okay.  April 30 letters

 2   raise whey I understand to be the same issue.

 3           To what extent, and I guess this is mainly for

 4   you, Mr. Steinberg, is there a dispute on that?  Or is the

 5   devil in the details turning on the whether the alleged

 6   wrongful conduct is wholly past sale or there's some other

 7   nuance that would make the question harder than it would

 8   appear at first blush?  Help me get a better handle on what

 9   we're talking about in that regard.

10           A similar issue exists with respect to the lemon

11   laws as mentioned in Mr. Esserman's April 23rd letter.

12   Please address that as well.

13           Next, each of the Steinberg and Weisfelner letters

14   talk about getting a sense as to how the majority of the

15   class action plaintiffs are prepared to proceed.  I

16   underscore the word majority.  When each of you use that

17   term it suggested to me, rightly or wrongly, that the

18   plaintiffs referred to were less than all of them.  I think

19   what you were able to accomplish was very, very helpful, but

20   have some difficulty in seeing how that by itself would get

21   me across the goal line.

22           The fact that all plaintiffs couldn't get behind

23   three law firms -- and on this limited issue I think I can

24   take judicial notice -- have some proven track record in

25   addressing the interface between tort liability and

1    bankruptcy law causes me some concern.  Because as I said, I

2    don't want repetition, and that includes making the same

3    point in different ways.  I need to hear from anybody who

4    thinks those three firms aren't good enough why that's so,

5    or conversely why they're not raising issues that need to be

6    addressed.  That's not to say that anybody who thinks up

7    anything those firms couldn't can't be heard, but I need to

8    know why and what's the problem.

9            I also want to hear from Mr. Flaxer, since he was

10   the first and he was the only one that brought an adversary,

11   and I don't put him in the category that I put all the

12   others.

13           Next, Mr. Esserman speaks in his April 23rd

14   letter, paragraph 5, of teeing up procedures for plaintiffs.

15   I don't know if this is the class action plaintiffs he

16   represents or all prospective plaintiffs, to show cause

17   whether they have any claims against New GM not otherwise

18   barred by the sale order and injunction.

19           You wrote that letter, Mr. Esserman, back on

20   April 23rd and I gather you've had discussions with other

21   folks since that time.  I'd like you or Mr. Weisfelner, let

22   me know whether you have any needs and concerns to get

23   rulings on this that haven't been subsequently rolled into

24   what needs to be addressed, and I'd like to ask the same

25   with respect to the item you listed as number 7 in your

1   letter, procedures under which, assuming the sale order

2   stands without modification, under which plaintiffs might

3   seek amendments to it.

4           Okay, now for my tentatives.  I apologize to you

5   all for speaking at such length.

6           As I said these are California tentatives, which

7   are views I formed on a preliminary basis after reading the

8   briefs and the letters but which are subject to your rights

9   to be heard and which I'll obviously consider in the way of

10  modifications based on whatever you tell me verbally.

11          First.  Now that fraud on the Court has been taken

12  off the list of threshold issues I'm not sure if there's a

13  material difference in views or for that matter any

14  difference in views on the threshold issues that need to be

15  addressed at least insofar as the majority of the plaintiffs

16  are concerned.

17          I'm inclined to consider as threshold issues the

18  two remaining issues that were shown on Mr. Weisfelner's

19  black line, and I'm also amenable and inclined to allow any

20  other purely legal issues to be raised along with the so-

21  called threshold issues, such as the discrimination

22  argument, that is the argument that creditors with personal

23  injury claims, death claims, property claims would be

24  addressed by New GM whereas those with the so-called

25  economic damage claims would not.

```
 1            It seems to me, again subject to your rights to be

 2    heard, that the more appropriate means of demarcation

 3    between claims that can and should be considered as

 4    threshold issues and those that can be put and should put to

 5    a later time is to separate issues that can be addressed

 6    without discovery from those that can only be addressed with

 7    discovery and potentially a very burdensome or at least

 8    lengthy discovery process.

 9            The principal players as I read the letters, New

10    GM and the class action plaintiff steering committee seem to

11    feel that they can win without discovery, and whether or not

12    either side is right in that regard that seems to me, that

13    is to deal with issues without discovery, to be the logical

14    place to start since even if issues need to be further

15    addressed or refined the early work that's accomplished

16    would set the table for the work, if any, that needs to be

17    considered next.

18            The corollary of that would seem to be that I need

19    to reject the contentions of a couple of you, and I'm

20    thinking of Mr. Esserman, your first -- your April 23rd

21    letter and Mr. Etkin's April 30 letter, that we should now

22    have discovery, and as I read your early letter,

23    Mr. Esserman, what would seem to be pretty massive discovery

24    early on and that such discovery should proceed on an

25    expedited basis.
```

1          Once again I note that you, Mr. Esserman, are a

2     member of the steering committee and your views may have

3     evolved since April 23rd when you wrote that early letter.

4          Two.  My tentative is not to interfere with the

5     MDL's hearing now scheduled for May 29th, I think that's the

6     date, and to permit the judicial panel and multidistrict

7     litigation to rule on where pretrial proceedings with

8     respect to any future litigation should proceed, but that

9     would be under the understanding, at least under my

10    understanding -- that's why I wanted you guys to be heard on

11    it -- that everyone understands that to the extent I

12    hereafter rule in a way that some or more than some of those

13    now pending litigations before the MDL panel need to be put

14    on hold or stopped in some other fashion, that I would be

15    free to do that, including vis-à-vis, the multidistrict

16    panel irrespective of what the MDL panel had accomplished up

17    to that point in time.

18          Three.  I share your view that anyone who's

19    unwilling to agree to a temporary standstill that the

20    majority seems to agree upon should come forward within a

21    time certain either on the date that's already proposed,

22    which I think was May 10, or some alternate date.  More

23    likely close to that, but if fairness requires a little more

24    time that to my thinking would be okay.

25          Reading the submissions so far it's obvious that

09-50026-mg   Doc 14127-4   Filed 10/02/17   Entered 10/02/17 12:32:50   Exhibit A
Case 1:14-md-02543-JMF   Document 4657-5   Filed 10/02/17   Page 28 of 128
Pg 539 of 728

Page 17

```
 1    these are serious issues, and my general view -- call it a

 2    tentative or not -- is that rushing by a few days or even a

 3    few weeks on issues of this importance isn't in anybody's

 4    interest.

 5              Fourth.  I think we need to ascertain by a date to

 6    be agreed upon or set all of the issues that are on the

 7    table or that are to be decided even if they're not

 8    addressed as what I call Phrase I issues.  I need your

 9    recommendation as to the best way to do that, and what

10    deadline I should impose for parties to get their

11    contentions on the table.

12              That wouldn't necessarily mean that they should

13    all be briefed at that early time, and in fact my

14    expectation would be that they wouldn't be, but I want to

15    get the lay of the land on the issues that I'm going to be

16    asked to rule upon.

17              Related to that was Mr. Flaxer's suggestion that a

18    date should be set by which any and all interested parties

19    should commence adversaries similar to the one he brought if

20    they were of a mind to.  My tentative is to agree with

21    Mr. Flaxer's point in that regard.

22              Fifth.  I want to accomplish as much as we can

23    before we get bogged down in discovery.  I like the idea of

24    you guys agreeing on a stipulated record, but I don't like

25    the variant of that, which I think was proposed by
```

1    Mr. Weisfelner, which was request for admissions.  If things

2    would be admitted they'd be stipulated to, and if they're

3    not admitted they're going to result in disputed issues of

4    fact as to which we're going to have to come up with some

5    other mechanism, and Rule 35 requests for admissions is

6    really nothing more than a cost shifting device any way.

7            So I want you guys when the time comes to really

8    try to agree on everything you can agree upon consistent

9    with your professional responsibilities and then identify

10   issues as to which you agree to disagree and I'll decide

11   then what to do about it.

12           Six.  We have one adversary proceeding on file and

13   one contested matter.  Other adversaries may be filed

14   consistent with the point Mr. Flaxer made, but at this point

15   I have these two, we need to think about the possibility of

16   more.

17           My tentative to consolidate the contested matter

18   and any adversaries for procedural purposes.  Mr. Steinberg,

19   your letter cited decisions by Judge Lifland and Judge

20   Walrath indicating pretty clearly holding that when you're

21   enforcing an earlier court order you don't need to bring an

22   adversary to do that, but many observers might agree with

23   the judgment that Mr. Flaxer presumably made that when he

24   wanted a declaratory judgment and he wanted some of the

25   stuff that he asked for in there an adversary proceeding was

Case 1:14-md-02543-JMF   Document 4657-5   Filed 10/02/17   Page 20 of 128

Page 19

1      appropriate.

2              I guess the issue is whether others who are

3      looking for things similar to what Mr. Flaxer did would need

4      to either climb onto his adversary or bring their own

5      adversaries.  It might be appropriate for separate

6      adversaries to be brought, although my thought would be that

7      they would be procedurally consolidated and jointly

8      administered as well, but I need people to focus on that.

9              If those adversaries are to be brought -- and many

10     might regard that as a good idea, but I'm not forming a

11     tentative on that -- Mr. Flaxer's point that it should

12     happen by a fairly early date certain seems to me to be

13     pretty persuasive.  But again, that's a tentative.

14             Seven.  While these issues mainly involve New GM

15     some also appear to also involve Old GM or the GUC Trust,

16     the general unsecured creditors trust, that's Old GM's

17     successor.

18             It would seem to me that there's an issue as to

19     whether there might be excusable neglect to file late claims

20     against Old GM to the extent that I ruled that any of the

21     claims being asserting are prepetition claims rather than

22     post-petition claims if the ability to assert those claims

23     wasn't known by the time that the Old GM case bar date

24     expired.

25             When I was preparing for today I speculated that

Page 20

1    issues of that character were why Mr. Golden wanted to have

2    the opportunity to be heard.

3             To the extent any issues involving Old GM or the

4    GUC Trust can be heard as matters of law my tentative is

5    that they should be considered along with the other

6    threshold issues and that anybody who cares about those

7    kinds of issues should have a chance to weigh in on them.

8             Lastly, eight.  In his April 24th letter

9    Mr. Flaxer raised the issue of mediation.  Obviously the

10   idea or the prospect of meeting the two sides needs and

11   concerns without this monstrous battle is attractive to me.

12            When I was a practicing lawyer a district judge in

13   Delaware, Joe Farnan, some of you may know him, made an

14   impression on me and I think a bunch of other lawyers when

15   he said that the guy in the robe would do his job but

16   parties' needs and concerns could be better addressed by

17   negotiation than by forcing a judge to decide issues within

18   the four corners of what judges are allowed to decide.

19            And frankly it would be great if whatever money is

20   available for injured people could go to them and not to

21   litigation costs and attorneys' fees.  I have no tentative

22   on this, but I want people to address it by the time they're

23   done.

24            So we're ready to continue.  Mr. Steinberg, I'm

25   going hear from you first, then Mr. Weisfelner, then from

```
 1    anybody who has any non-repetitive remarks to make after
 2    that.  Oh, Mr. Flaxer, can I hear from you, please, after I
 3    hear from Mr. Weisfelner if you care to be heard.
 4              Mr. Steinberg.
 5              MR. STEINBERG:  Thank you very much, Your Honor,
 6    and thank you for the careful consideration of the issues
 7    that have been presented.
 8              I'd like to be able to address the tentatives and
 9    then go back to the questions and then maybe find the script
10    that I had started in connection with this hearing.
11              Your Honor had identified the demarcation for
12    threshold issues as that which could be done with either no
13    discovery or very little discovery versus something that
14    would lead to much more complex discovery, and we agree that
15    that is a proper formulation.
16              The one thing that we would ask Your Honor to
17    consider, and I understand the balance here, is that we had
18    suggested as well as I think Mr. Flaxer, that fraud on the
19    Court would be a threshold issue.
20              Generally we were lumping all the Rule 60 issues
21    together, and many times when someone argues 60(d)(1), which
22    is whether there's an equitable remedy that should be
23    fashioned, or even the 610(b)(4), which is the procedural
24    due process, they usually throw in 60(d)(3), which is the
25    fraud on the court, whether it's proper or not, but that's
```

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-5    Filed 10/02/17    Page 23 of 128
Pg 544 of 728

Page 22

1    -- but they assert those in.  And so I understand that fraud

2    on the Court may require some additional discovery, but the

3    issue is how much additional discovery and should it be

4    considered as well as a threshold issue?

5              THE COURT:  You read my mind, Mr. Steinberg,

6    because when I thought about fraud on the Court in trying to

7    put myself in the role of a plaintiff's lawyer then I would

8    have thought that the plaintiff's lawyer would want to get

9    into GM's files or communications to ascertain the extent to

10   which behind the scenes Old GM was thinking about this

11   liability and not making a disclosure to me.  You think

12   that's only modest discovery or can be limited in that

13   fashion or were you thinking about a different kind of

14   discovery that might be undertaken, vis-à-vis, that issue?

15             MR. STEINBERG:  Well the issue about whether the

16   Old GM professionals or the people in charge of negotiating

17   the MSPA or the people in charge of presenting evidence to

18   Your Honor, that would be a fairly discreet time period.  I

19   mean the bankruptcy was filed on June 1, the order approving

20   the sale was July 5.  So we don't think that necessarily the

21   discovery from a time span is as significant.  We're also

22   fairly confident what the result would be of that -- of any

23   of that type of discovery.

24             But, Your Honor, as you outline the issue if the

25   choice that we had was to effectively piecemeal the 60(d)(3)

1   issue and the trade off would be a much more streamline

2   procedure to present the legal issues -- so either there'd

3   be no discovery or very, very little discovery -- that may

4   be something that we're prepared to do, because we

5   understand the logic of that.  And though it's piecemealing

6   a Rule 60 issue it may make sense under the circumstances to

7   be able to present as many of the pure legal issues as

8   possible.

9           I probably would need, and I'm sure this side of

10   the table probably needs the opportunity to talk to their

11   other people as well too to see whether they agree with my

12   formulation, but I certainly understand the logic of it and

13   if there was an agreement that there would be little or no

14   discovery and we would just try to stipulate as much as we

15   could to a stipulated record that may be a good avenue to go

16   forward.

17           Your Honor, in trying to address one of your other

18   tentatives, because I think it ties into a number of

19   different issues, you'll see that -- that in our agenda

20   letter we had said that the people who brought the adversary

21   proceeding could file an amendment to the complaint by

22   May 14th, provided that it doesn't object to the substance

23   of what we agree to as the procedure going forward today.

24   So if they want to restate what they think their claims are

25   and perhaps try to make sure that it was more inclusive of

1    other people then that's fine.

2              And you see that in Mr. Weisfelner's letter that

3    he talked about filing an amended complaint in the -- in the

4    MDL action as a procedural issue, which we don't think is a

5    procedural issue, we actually think it's a substantive

6    issue.  But both things -- both of those issues evolve

7    around one of the tentative --

8              THE COURT:  Forgive me, Mr. Steinberg, I lost you

9    there.  I thought you said filing an amended complaint in

10   the MDL action.  I thought that my only connection with the

11   MDL action is I guess I have the power to put it on hold,

12   but what else do I have to do with the MDL action?

13             MR. STEINBERG:  No, Your Honor, I was trying to

14   lead to a point, but I was merely saying that there was a

15   point of disagreement in the letters as to whether the

16   agreement to allow them to go forward on the May 29th

17   hearing and that it wouldn't be stayed and that it would be

18   for purely administrative matters, and we were disagreeing

19   as to whether the filing of an amended complaint in the MDL

20   action would be an administrative matter or a substantive

21   matter.

22             But the point that I was trying to connect between

23   these things is that -- is that the filing of an amended

24   complaint by Mr. Flaxer or a recitation to file a

25   consolidated complaint to try to get all those theories

Page 25

```
 1    together is really trying to address Your Honor's tentative

 2    ruling about wanting to know what are the bankruptcy-related

 3    issues, what is -- what is it that they think that they can

 4    go forward on that -- that would not otherwise be foreclosed

 5    by the sale order?

 6              All of those things are touching the same thing,

 7    and my suggestion in light of your -- the tentatives and in

 8    thinking about it and the reviewing the letters is that the

 9    issue of whether they should file a complaint in the MDL

10    action or not should be -- should in effect be deferred

11    until the next status conference, and that one of the things

12    that we should be doing between this status conference and

13    the next status conference is to try to decide what we had

14    called in our agenda letter the bankruptcy-related issues

15    that are not the threshold issues, to try to define what it

16    is that we ultimately are going ask Your Honor to set forth,

17    because that's the exercise that's imbedded in doing either

18    the amended complaint to the adversary proceeding or the

19    amended complaint to try to coalesce all of these

20    complaints.  Those are the issues that someone will have to

21    decide are bankruptcy-related issues or survive and should

22    go forward without, and that's the exercise that I think

23    should be done, and I don't think we should reach a firm

24    decision as to whether they should be doing anything more

25    than -- on the MDL proceeding to go forward on May 29th, do
```

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:59    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-5    Filed 10/02/17    Page 27 of 129
Pg 548 of 728

Page 26

1    the things like selection of lead counsel, the things that

2    we can agree are purely administrative, and we should defer

3    consideration of the amended complaint issue until the next

4    status conference.

5            THE COURT:  But matters of the character that the

6    MDL could appropriately determine in your view could include

7    whether the pretrial proceedings take place in say

8    California on the one hand or New York on the other?

9            MR. STEINBERG:  For the MDL I think the MDL should

10   be able to select which forum is going to go forward on

11   generally the MDL action to the extent that the MDL action

12   will ever go forward.

13           THE COURT:  Okay.  Continue, please.

14           MR. STEINBERG:  The -- Your Honor, with regard to

15   the -- your tentative ruling on the stipulated record and

16   that we don't do admissions, that is essentially what we

17   have been trying to urge on the plaintiffs.

18           One of the issues was that we had discussions

19   separately with one group versus another group and they had

20   differing views on certain issues.  And even with the group

21   that had a larger issue what we were getting to some extent

22   was the lowest common denominator.  When you have 15 people

23   having suggestions sometimes you get 15 suggestions because

24   no one really wants to whittle it down and they leave it up

25   to us to do it.

Page 27

```
 1            We urge to do a stipulated record under the theory
 2     that it's too early to do admissions, it is a -- really just
 3     a cost shifting issue as Your Honor had identified, and it
 4     leads to a dialogue.  If they -- if they propose that they
 5     want us to agree to something instead of me answering as I
 6     would answer an admission I'd be sitting there saying I
 7     can't do that but I can do something different and then we
 8     would have an iterative dialogue to be able to try to
 9     present what the issues are and then I wouldn't have to try
10     to do the reflexive issue, which is that if you want
11     admissions then maybe I have admissions that I want to ask
12     of you.  Did you know of the bankruptcy proceeding?  Did you
13     know of a problem with your car?  Those things and try to
14     identify those issues, which may be relevant to certain of
15     the issues whether it's -- that they may tangentially relate
16     to the fraud on the Court issue, which may be off the table
17     now, but -- so I said stay with the stipulation and if we
18     can't agree to it we'll have a status conference in June and
19     we'll tell the judge this is as far as we could get and we
20     couldn't get all the way there, and if we couldn't agree on
21     everything then you could propose what kind of limited
22     discovery you think you need to conclude those facts that
23     are necessary to determine the purely legal issue.  We'll be
24     able to evaluate it.  And then if we can't agree with that
25     we'd be before Your Honor on something specific and
```

1    concrete.

2              And the problem that we were having between now

3    and May 2nd is that there was a lot of general propositions

4    that were asserted and many times the devil is in the

5    detail, and you need to know when someone says it's purely

6    administrative it's not substantive you really need to know

7    what they are talking about.  When people say we can agree

8    to some facts and it's not going to be big, it's going to be

9    narrowly tailored you need to know what someone means when

10   they say narrowly tailored, because when actually try to pin

11   it down it becomes a lot more difficult.

12             So what we were proposing -- and I think there was

13   a lot of receptivity on it from the other side -- was a walk

14   and then run, which is give us a chance to try to do an

15   exchange and we'll see how good we are, and give us a chance

16   if we can't fill in all the gaps to how to complete the

17   discovery and we'll see how good we are, and if we can't do

18   it then I know that you're going to bridge the gap for us

19   and then we'll both live with whatever Your Honor rules.

20   And we're only looking to defer that consideration where we

21   otherwise couldn't agree for like a six or seven-week

22   period.

23             And the reason why we think that time period going

24   a little longer versus shorter is better -- and I think Your

25   Honor eluded to that as one of your tentative rulings that

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:11-md-02543-JMF    Document 4657-5    Filed 10/02/17    Page 90 of 128
Pg 551 of 728

Page 29

 1    sometimes things take a little longer and these serious

 2    issues -- is that until we know how they've organized -- and

 3    it's really their job to organize, but it's our burden to

 4    make sure that we're dealing with 2 groups of people,

 5    4 groups of people, or 20 groups of people, because it

 6    becomes harder to figure out briefing schedules, potential

 7    discovery, stipulation of facts if we don't know who the

 8    people are that we're dealing with you may need to have a

 9    little more time until they get better organized to be able

10    to do that.  That's why we actually suggest in our agenda

11    letter is just tell us if you formed a group.  That has the

12    salutary effect of at least we know who we're dealing with

13    and Your Honor will know whether they actually formed the

14    group, and those who decide they want to be outliers well

15    then they will have to stand up and tell Your Honor why they

16    need to be an outlier and the liaison groups couldn't

17    properly be formed.

18            But that's all we were trying to say on that

19    issue, which is give them an opportunity to get themselves

20    organized and let us know how successful you were, and where

21    you were not fully successful just let us know because we --

22    we on our side of the table procedurally have to deal if

23    they're not fully organized and then ultimately Your Honor

24    will have that same issue about how things are being

25    presented to Your Honor.

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-5    Filed 10/02/17    Page 91 of 128
Pg 552 of 728

Page 30

1          With regard to -- so that's why we thought we

2     needed a little more time.  And by the way, the dates that

3     we selected in our letter were given to us by one of the

4     plaintiff groups, and the other plaintiff group actually

5     said, while they shortened our dates, they also said in

6     their letter that they're flexible about the dates.  So I

7     don't think ultimately at the end of the day we're going to

8     disagree about dates, about when we're going to be here.

9          I think the general proposition is that between

10    now and some time in mid to late June when we'll have

11    another status conference we're going to try to accomplish a

12    stipulated record for briefing the threshold issues and to

13    see whether there's any discovery that is it warranted or

14    not with regard to that stipulated record.

15         And I would suggest also, and this is off my

16    agenda letter, but picking off on the tentative ruling,

17    trying to identify during that period of time the other

18    issues which are not threshold issues, the other bankruptcy-

19    related issues that we'd ask Your Honor to consider, and

20    we'd be doing all of that presentation at the next status

21    conference.  And at that next status conference, to the

22    extent that the defendants are not fully organized, that we

23    would try to -- and it wouldn't be me, but it would be Your

24    Honor and the plaintiffs -- try to figure out how they can,

25    you know, get to the end to themselves more fully organized.

```
 1            The tentative that you had about the GUC Trust,

 2    late-filed claims, excusable neglect, we actually think that

 3    this is an issue that should be dealt with.  It is not our

 4    issue, but to the extent that they've raised or some of them

 5    have raised a procedural due process issue relating to the

 6    bar order, which was after the sale order had taken place

 7    and they're saying that they don't have a remedy -- an

 8    effective remedy against Old GM, well there is a GUC Trust,

 9    there are a number of -- there's a number of values still

10    left in the GUC Trust.  Whether they actually are a

11    creditor, where they actually have excusable neglect I'm not

12    trying to prejudge it, but we were urging that they

13    shouldn't just assume that there was nothing there when

14    there is potentially something there and they should be able

15    to and should be almost in fact required to at least explore

16    that as an alternative to try to get a recovery, if they're

17    entitled to a recovery.  I wasn't trying to say that they

18    were or not.

19            As far as the suggestion of mediation, it is

20    always hard to say that you're against mediation.  The only

21    thing that I would say, Your Honor, is that New GM has hired

22    Ken Feinberg, who is a very well known person who tries to

23    figure out how to deal with circumstances and to how to

24    adjust situations on a non-legal base, but to try to

25    negotiate a resolution.
```

1          Mr. Feinberg is working on the matter but he

2     hasn't -- while studying what to do he hasn't taken it to

3     the next step.  And my own feeling about mediation is that

4     we would like to see whether Mr. Feinberg -- what

5     Mr. Feinberg will do and not do and let's see where the

6     legal issues lie, but understand that the overall sentiment

7     that Your Honor expressed, which is that at the end of the

8     day if there's going to be a negotiated resolution you

9     better do it -- you're better off doing and being able to

10    pay the people who claim to have suffered injury, better off

11    paying them than to end up building up a big load star and

12    paying other people.

13          Your Honor had asked what the -- to confirm what

14    these lawsuits were about.  Your Honor was absolutely

15    correct that under the MSPA, the asset purchase agreement

16    upon which New GM took assets, that New GM assumed the

17    liability for the glove box warranty, the lemon law

18    liability, and for accidents, incidents that led to the loss

19    of life, personal injury, or property damage for anything

20    that took place after the sale.  So if there was an Old GM

21    vehicle that was -- got into an accident after the sale and

22    that led to an injury issue that was something that New GM

23    assumed the responsibility for.

24          These lawsuits are not those cases, and we didn't

25    move by the way just so it's clear -- we did not move to

Page 33

1    enforce Your Honor's injunction for the presale accidents,

2    which were actually retained liabilities under the MSPA.  We

3    purposely carved out the accident victims whether it's

4    presale retained liability or post-sale assumed liability,

5    because we wanted to focus in as to what these lawsuits were

6    about.  These lawsuits are about a claimed economic loss,

7    the value of a car which is six, seven, eight, nine, ten

8    years old for the loss in value because of the announcement

9    that there was going to be an ignition switch recall and

10   that that car had lost its value until the time that it is

11   being repaired through the recall or not.  I'm not sure if I

12   can figure that out.

13             THE COURT:  Pause please.  Maybe this question is

14   better directed at your opponents.  But is this before or

15   after the cars were fixed?

16             MR. STEINBERG:  This --

17             THE COURT:  I mean the loss in value, because I

18   would assume that if a car hasn't been fixed it would lose

19   value, but I'm not sure what the view of --

20             MR. STEINBERG:  This has --

21             THE COURT:  -- parties would be after it's been

22   fixed.

23             MR. STEINBERG:  This I don't think has anything to

24   do with the cars being fixed or not, because by virtue of

25   the recall New GM is committed to fixing the cars, replacing

Page 34

1    the ignition switches, and to doing it tentatively now they

2    think they'd be able to complete it by the end of October of

3    this year.  So everybody is going to have their car fixed

4    and so the ignition switch is going to be fixed.  This is a

5    perceived loss in value of a car that has some history on it

6    for the -- because of the announced recall for whatever that

7    loss of value is.

8             So frankly in one of the individual cases that was

9    brought in Texas where we were involved in a litigation as

10   to whether all of the cars with the ignition switch issued

11   should be parked.  The actual lawsuit was about a 2006

12   Cobalt -- Chevy Cobalt which had 165,000 miles on it, and

13   the issue was the deterioration in value of that car by

14   virtue of the announcement of the ignition switch recall.

15   That was what that lawsuit was about.

16            The injunctive relief was whether all cars should

17   be parked because of a perceived defect between now and

18   until it was repaired.

19            But that was the nature of that lawsuit, and I

20   know that if I'm not properly characterizing how the

21   economic losses are I'm sure that the people who'll follow

22   me at this rostrum will be able to -- be able to do that,

23   but that's my understanding of it.

24            These are people who have not had any accident,

25   any property damage, or personal injury, this is for the --

09-50026-mg Doc 14127-4 Filed 10/02/17 Entered 10/02/17 12:32:59 Exhibit A
Case 1:14-md-02543-JMF Document 4657-5 Filed 10/02/17 Page 96 of 128
Pg 557 of 728

Page 35

1   and they are going to get compensated for -- they are going

2   to get their -- the repair of the ignition switch by virtue

3   of the recall, and I think that to the extent that they had

4   to do it themselves before the recall has a provision about

5   whether they get compensated for that as well, but this is

6   for the perceived deterioration in the value of their car by

7   virtue of this announcement.

8           Now just to make it clear too because it deals

9   with the issue, Your Honor, as to what's, you know, the New

10  GM conduct versus the Old GM conduct.  I think Your Honor

11  had talked about that.  All of the -- all of the cars with

12  an ignition switch issue, all of them were Old GM vehicles.

13  By the time of the sale the ignition switch had been

14  corrected in the cars.  The recall --

15          THE COURT:  By that you mean new cars then being

16  constructed?

17          MR. STEINBERG:  Right.

18          THE COURT:  Okay.

19          MR. STEINBERG:  The issue why the recall involves

20  some post-sale cars is a nuance difference.

21          What happened was someone with a new car, which

22  had a good ignition switch, would go in to have their car

23  repaired and there was a possibility that the person who

24  repaired that car, which may have been a GM dealer or may

25  have been someone totally different, they may have actually

09-50026-mg   Doc 14127-1   Filed 10/02/17   Entered 10/02/17 12:32:50   Exhibit A
Case 1:14-md-02543-JMF   Document 4657-5   Filed 10/02/17   Page 97 of 128
Pg 558 of 728

Page 36

1    put in an old ignition switch part.  They may have taken a

2    good part out and put a bad part in.  And since New GM

3    didn't know whether -- whether that -- which cars that

4    occurred to it announced the recall for some post-sale cars.

5    But the cars that would ever be impacted by this is a very,

6    very small element, but New GM is repairing all of those

7    ignition switches.

8           So the issue in our view is that we believe that

9    everything they're talking about relates to Old GM conduct,

10   Old GM manufactured cars, and that -- and that what they're

11   trying to build on is the fact that under the sale order and

12   the MSPA New GM accepted as a covenant, not an assumed

13   liability, but a covenant, to comply with -- with the

14   federal laws relating to recall, and they're saying that

15   that somehow creates claims because New GM didn't recall

16   these vehicles fast enough and that they should have done it

17   faster.  And we believe that all of that relates to -- all

18   of those claims whether they could ever assert that as a

19   private right of action, which we don't think is correct, we

20   think all of that is an Old GM retained liability issue.

21          Now, I don't expect them to agree with my

22   recitation of that, but that is the nuance, right, that is

23   the issue as to why it's not a clear demarcation.

24          What is clear is that if New GM manufactured and

25   sold the vehicle and anything happen to do that vehicle that

1    is not a retained liability, that is a --

2             THE COURT:  An ordinary liability.

3             MR. STEINBERG:  -- that is an ordinary New GM

4    liability.  And if there was an accident that has taken

5    place based on an Old GM vehicle, that is not before Your

6    Honor, that is not part of the list of ignition switch

7    actions that we brought before Your Honor, that's going to

8    go forward in New GM, understands that New GM is defending

9    that.  It's not also part of the MDL.  So that is -- that is

10   why I think --

11            THE COURT:  Pause please, Mr. Steinberg, I'm

12   trying to keep up with you.

13            What was the very last thing you said, the nuance

14   you were making on what would still be going forward?

15            MR. STEINBERG:  What is going forward is if

16   there's an accident relating to an Old GM car and if there's

17   an accident relating to a New GM manufactured car.

18            THE COURT:  Any kind of accident.

19            MR. STEINBERG:  Any kind of accidents are going

20   forward.

21            With regard to just the glove box warranty and the

22   lemon law, just so Your Honor understands the nuance that we

23   put in our papers, is that lemon law is defined in the MSPA,

24   it's defined as that you need to have brought it more than

25   one time to have a repair and it wasn't done.  And our

1    argument is that while we did assume lemon laws none of

2    these ignition switch actions that have been pled to date

3    talk about having brought it once to have it repaired and it

4    wasn't repaired and the second time it wasn't repaired to

5    qualify within the definition of what a lemon law means for

6    purposes of our assumption.

7            So I think it's correct that we did agree to

8    assume lemon laws, but -- a lemon law type claim, but none

9    of what is being asserted here fits within that paradigm.

10           If I'm wrong and there's a particular nuance out

11   of all the lawsuits that have been brought that was one of

12   the elements that we had asked for in our motion to enforce

13   which is in effect to show cause, tell us why you think

14   you're not otherwise bound, that you fit within the lemon

15   law that we assume because of your particular fact

16   circumstance and then we would evaluate it.  Because I can

17   make the general statement, but there may be a specific

18   exception that I haven't accounted for, but the general

19   statement is as far as I'm aware, based on the general

20   pleadings that have been done, is that no one asked to have

21   this being repaired a second time.  And as far as the glove

22   box warranty we're -- for all of these vehicles we're -- or

23   almost all these vehicles we're outside of the glove box

24   warranty, it's expired by this point in time.

25           So I think, Your Honor, with regard to the issue

09-50026-mg  Doc 14127-1  Filed 10/02/17  Entered 10/02/17 12:32:50  Exhibit A
Case 1:14-md-02543-JMF  Document 4657-5  Filed 10/02/17  Page 40 of 128
Pg 561 of 728

Page 39

```
 1    that you had raised about the threshold issues we actually

 2    had thought that the issues that had been raised in the

 3    adversary proceeding under Rule 60 were all threshold

 4    issues.  We understand the differences, and if it turns out

 5    we can streamline discovery significantly by taking out

 6    fraud on the Court that may be a better way to go, and we do

 7    agree also that the discrimination issue that was raised by

 8    Mr. Weisfelner in his papers is a pure legal issue.  I

 9    frankly think Your Honor has decided the legal issue before,

10    but it's a pure legal issue and we think it should be taken

11    off the table.  And frankly there's a practical reason why

12    it should be taken off the table and we eluded to it in our

13    papers.

14          One of the things that Mr. Feinberg has been hired

15    to do is to evaluate whether there's something that should

16    be done to these prepetition accident victims, people who

17    have actually had an accident to which are a retained

18    liability should New GM --

19          THE COURT:  That would mean people who were

20    injured in prepetition accidents who were only getting 30

21    cents on the dollar who had filed claims --

22          MR. STEINBERG:  That's correct.

23          THE COURT:  -- or who had blown the bar date but

24    were actually hurt?

25          MR. STEINBERG:  Right.  That's why Mr. -- that was
```

09-50026-mg    Doc 14127-4    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-5    Filed 10/02/17    Page 41 of 128
Pg 562 of 728

Page 40

1    one of the primary reasons why Mr. Feinberg has been hired,

2    to see whether there's something that should be done as a

3    general basis.

4            If someone is going to say that if we did someone

5    on a voluntary basis for those victims, those people who

6    actually suffered an injury from an accident that we're

7    somehow picking up liabilities for a bunch of people who are

8    worried about the deterioration and the value of their car

9    then I think we need to know that, and so therefore we want

10    to put this as an earlier issue and not a later issue.  And

11    if they want to abandon it because they don't think it's a

12    proper issue to raise then that's okay too.  We're not

13    trying to litigate something that they're prepared to

14    abandon, but it has been raised.

15            If you actually read the pleading filed by -- on

16    this issue it makes it seem like it's a very important issue

17    and we're prepared to meet it head on and to -- and I don't

18    think it requires any discovery at all.

19            If you just bear with me just one second, Your

20    Honor, just to go through the rest of my notes.

21            I think that Your Honor when we -- when I came

22    into court and I think Your Honor summarized it correctly we

23    had actually agreed in many concepts with the people that we

24    had spoken with, and so there was a general understanding

25    that they would stand down on litigation and that those who

Page 41

1    didn't -- who weren't prepared to stand down would have to

2    show cause as to why they think they shouldn't stand down.

3            And there was a recognition on our part that to

4    the extent that we got bogged down for some reason that we

5    couldn't envision on the threshold issues and the other

6    bankruptcy-related issues needed to be brought to attention

7    or that they thought that there were issues that were not

8    bankruptcy-related issues but they had decided to in effect

9    wait on and that they would otherwise be a part of the MDL

10   we had agreed, and I think the date differences were end of

11   July versus beginning of September, we would have an

12   effective grace period but then we thought they had to come

13   to Your Honor.  If they wanted to relax the stay because

14   they thought they were otherwise being aggrieved because

15   this process wasn't playing out the way that they had

16   envisioned or that they thought they --

17           THE COURT:  You mean the process before me in

18   terms of --

19           MR. STEINBERG:  That's correct.

20           THE COURT:  -- getting these issues --

21           MR. STEINBERG:  That's right.

22           THE COURT:  -- judicially decided?

23           MR. STEINBERG:  They then could try to make their

24   case before Your Honor, and we thought that that was okay.

25   I mean no one -- no one could quite envision exactly how

1    this is going to go, we wanted to have a breathing spell to

2    make sure that this is going along in the direction that

3    everybody thinks it's going along, but we were not looking

4    to permanently foreclose anybody's rights if they thought an

5    adjustment had to be made.  And so if they needed to have

6    that explicit as part of their agreement up front to stay

7    their litigation then we were prepared to do it, and I think

8    there was just a difference in a month, and I think our date

9    was -- probably made more sense because of the inherent

10   delays that we'd have in the system.

11          I think, Your Honor, we had agreed on most of the

12   threshold issues and Your Honor's tentatives had addressed

13   the rest.  We had actually agreed to in effect do this in

14   two steps, and Your Honor has properly identified that while

15   doing it in the two steps we should make progress and try to

16   identify what will be litigated in the second step.  And I

17   think Your Honor's tentative addressed the differences we

18   had on stipulations of facts versus admissions and the

19   timing of submissions.

20          So I think Your Honor's tentatives have bridged

21   the gap where we differed and we were fairly close coming

22   into the courtroom, and I think you for that and I'll turn

23   over the rostrum to other people.

24          THE COURT:  Before you do, please, Mr. Steinberg.

25          The day after you wrote your letter, I think yours

Page 43

1    was on April 30th, I got both a letter and a black line from

2    Mr. Weisfelner where he'd massaged what had been one of your

3    paragraphs and he gave me a black line articulating issues

4    that would be decided as threshold issues.  Is there any

5    difference between you and Mr. Weisfelner, that is between

6    your thinking and his black line mark up?

7             MR. STEINBERG:  Yes.  The --

8             THE COURT:  On that point, how so?  I didn't

9    follow that.

10            MR. STEINBERG:  Well our original proposal

11   included fraud on the Court being a threshold issue and they

12   had crossed that out, so that is one difference.

13            The second difference was that we thought the

14   discrimination argument was a threshold issue and they had

15   said they didn't think it should be a threshold issue.

16            THE COURT:  So he wanted to drop fraud on the

17   Court from the first phase and you leaned in favor, although

18   I thought you -- the way I heard you you didn't think of it

19   as something you felt strongly about, you thought that with

20   limited discovery it could be considered as a Phase I issue

21   and you favored inclusion of the discrimination argument and

22   you understood him to prefer not to deal with that now.

23            MR. STEINBERG:  I think he crossed that out and

24   asked to not deal with that, yes.

25            THE COURT:  Okay.

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-5    Filed 10/02/17    Page 45 of 128
Pg 566 of 728

Page 44

```
 1              MR. STEINBERG:  So --

 2              THE COURT:  Thank you.

 3              MR. STEINBERG:  -- and so just to be clear, while

 4      I thought fraud on the Court should be a threshold issue

 5      because it's a Rule 60 issue, to the extent that we can

 6      accomplish something significant on the discovery front in

 7      curtailing it then I understand clearly the logic of making

 8      that a secondary issue.

 9              THE COURT:  Okay.  Thank you.

10              Mr. Weisfelner.

11              MR. WEISFELNER:  Judge, thank you, I don't know

12      what Your Honor's preference is.

13              Not only have some of our thoughts matured and

14      changed over time but based on Your Honor's tentatives and

15      the questions you asked they may change even further.

16              I don't know that we can accomplish a lot in a

17      ten-minute recess, but one of my colleagues passed me the

18      note to ask if you thought it would be appropriate.  If not

19      I can start and go forward and take a break whenever Your

20      Honor thinks is good.

21              THE COURT:  Well if you think it would be

22      productive I'm not going to stand in the way of that,

23      Mr. Weisfelner.  I don't want to use up what is relatively

24      limited time that we have if it drifts, and there are a lot

25      of people both on the phone in this courtroom and presumably
```

Page 45

1    in overflow courtrooms, but if you think you can usefully

2    use ten minutes I think that's a good investment.

3              MR. WEISFELNER:  And, Your Honor, I think ten

4    minutes is the right -- we're either going to make progress

5    in ten minutes or we're not.

6              THE COURT:  Okay.

7              MR. WEISFELNER:  So I wouldn't want anymore than a

8    ten-minute adjournment.

9              THE COURT:  Then let's recess until five to 11:00

10   on the clock up there.

11             MR. WEISFELNER:  Thank you, Judge.

12             THE COURT:  Thank you.

13        (Recess at 10:44 a.m.)

14             THE COURT:  Have seats everybody.

15             MR. WEISFELNER:  Your Honor, thank you for the

16   time, I think it was well spent.

17             Judge, for the record, Edward Weisfelner, Brown

18   Rudnick LLP appearing on behalf of the Robinson Calcagnie

19   firm, and I have Mark Robinson of the firm with us in court

20   today as well as Haigins Berman (ph), and as Your Honor has

21   indicated while they reserve the right obviously to correct

22   me where I go wrong we are working closely together with

23   Sander Esserman of Stutzman, Bromberg, Esserman & Plifka, as

24   well as Elihu Inselbuch of Caplin & Drysdale, and as I think

25   Your Honor knows the collective plaintiff group has also

1    asked the three of us to coordinate our activities as we

2    deem necessary with Ms. Siganowski (ph) of the Otterbourg

3    firm, and we will utilize her services as appropriate and

4    necessary.

5            Judge, I want to as Mr. Steinberg did address your

6    tentatives, move on to your questions and avoid merits, name

7    calling, and the other no-noes that Your Honor laid out, but

8    I would like to note a couple of factors that I think are

9    relevant and bleed directly interest your tentative ands

10   your questions.

11           What one may characterize as part of the good news

12   there's lots of information in the public domain regarding

13   the defect that's the subject of the recall.  Lots in the

14   public domain about who knew what when.

15           I characterize that as good news to the extent

16   that, and as Mr. Robinson has indicated to me, in his many,

17   many years of litigating in the auto products field both in

18   terms of Toyota, the Ford Pinto, claims against GM, it's

19   rare that you see this level of information already in the

20   public domain before discovery or formal discovery between

21   the parties necessarily starts.  That's part of the good

22   news.

23           Part of the bad news is, depending on your

24   perspective, but I think it's a relevant factor in

25   understanding how the parties can or can't get together in

1    terms of the timing of the resolution of the issues, the

2    fact of the matter is that New GM, as we understand it, is

3    the subject of a -- it's a term of art -- boatload of

4    regulatory investigations.  We are aware of congressional

5    investigations, and maybe there's more than one, at least

6    one attorney general investigation, an SEC investigation.

7    We understand that New GM has commenced its own internal

8    investigation, and I may have run out of fingers to count

9    just how many investigations they're currently the subject

10   of.

11           I mention those because one could imagine a

12   sensitivity on the part of a corporate entity to necessarily

13   engage in discovery during the pendency and/or before

14   investigations of both civil and potential criminal

15   consequences are concluded.  And I can only advise Your

16   Honor that I think it behooves both sides to take the

17   reality of what's going on in the marketplace into

18   consideration with regard to the timing of discovery or the

19   narrowing of issues between the parties.  There are other

20   factors that might influence either side of the tables'

21   speed with regard to those issues.

22           Your Honor, to address the tentatives.

23           First of all I think from a starting perspective,

24   and I was unavailable for another meeting among plaintiffs

25   that took place yesterday in New York, but I've gotten a

Page 48

 1   download, and I'm not blaming Mr. Steinberg, Your Honor

 2   ought to know that with one outlier, and only one outlier

 3   that I'm aware of, the plaintiffs as a group are on the same

 4   page and intend, unless I or Elihu or Sander slip up, to

 5   allow one or the other of us to speak for the group, and I

 6   presume that outlier will speak for him or herself at an

 7   appropriate time.

 8           And I also understand that the difference of

 9   opinion between all of the plaintiffs and this one single

10   plaintiff really comes down to what ought the threshold

11   issues be that the parties work towards preparing and

12   presenting to Your Honor for as efficient resolution as is

13   possible.  And it boils down to a distinction between

14   whether or not we focus our collective attention on the what

15   we think is the right threshold issue, whether or not

16   parties impacted by this ignition switch problem were denied

17   due process, and if so what's the appropriate remedy?

18           They would, the outliers would like to put on the

19   table as part of the threshold issue a determination of

20   whether or not there was fraud on the Court.  And, Your

21   Honor, again, for reasons that we can delve into I don't

22   think they're necessarily appropriate for today because

23   there'll be another status conference where I think whatever

24   remaining differences there are between the plaintiffs taken

25   as a group and New GM can and will be resolved down to the

Page 49

1   details of timing for discovery, briefing, and subsequent

2   hearings.

3          Your Honor, the next tentative you talked about

4   was the MDL proceedings and I'd like to unpack that just as

5   a matter of fact into two parts, because I think as to part

6   number one there is unanimity in the entirety of the

7   courtroom.  All plaintiffs and New GM as to what happens in

8   step one, and as I understand it only a very narrow

9   disagreement on what I'll call step number two.

10         And, Your Honor, please forgive me because the one

11  thing I'm not is a class action or tort lawyer, I'm just a

12  measly bankruptcy lawyer, but this is what I understand the

13  two parts to be.

14         Part number one, on May 29th in Chicago before a

15  joint panel on multidistrict litigation, which I understand

16  consists of some seven Article III judges, that panel will

17  determine the venue for any further multidistrict litigation

18  consideration, and I've been told that the panel has under

19  consideration --

20         THE COURT:  Pause.  When you put it that way I

21  wasn't clear on whether you were talking about it consistent

22  with my understanding of what would be done by the judicial

23  panel and multidistrict litigation.  Is this 28 U.S.C. 1407?

24         MR. WEISFELNER:  Yes, it is, Your Honor.

25         THE COURT:  Which as I understood it addresses the

1    locale for pretrial proceedings in multiple litigation after

2    which when the pretrial proceedings end they're farmed back

3    to whatever districts, venue would otherwise be appropriate?

4            MR. WEISFELNER:  Correct.  So --

5            THE COURT:  Now were you meaning -- forgive me.

6    Were you meaning to say something different than my -- what

7    I just said?

8            MR. WEISFELNER:  No, other that where I think we

9    all agree is that nothing is going to interfere with, and

10   none of the parties or the Court, nor will the Court be

11   asked to interfere with the activities of the joint panel on

12   the 29th, which we all understand to mean that they'll pick

13   an ultimate venue for MDL proceedings as between Michigan,

14   California, New York, or some other jurisdiction.

15           Where we appear to have a difference of view, as I

16   heard Mr. Steinberg discuss the issues before Your Honor,

17   was how far should the MDL go once it receives the case some

18   time after May 29th?

19           THE COURT:  By that you mean the temporary

20   transferee court after it's been transferred by the panel?

21           MR. WEISFELNER:  Correct.

22           THE COURT:  Okay.

23           MR. WEISFELNER:  And as I understand it what that

24   court will do is procedural, it will among other things

25   select lead and/or liaison counsel not for bankruptcy

09-50026-mg   Doc 14127-1   Filed 10/02/17   Entered 10/02/17 12:32:50   Exhibit A
Case 1:14-md-02543-JMF   Document 4657-5   Filed 10/02/17   Page 92 of 128
Pg 573 of 728

Page 51

1   purposes but for purposes of actually trying the case, and

2   as typically happens would require that the many complaints

3   filed against New GM -- and as I understand it they're up to

4   some 60 plus different class action complaints -- be

5   procedurally consolidated into a single complaint, a process

6   that my guess will take a period of time, and certainly a

7   period of time beyond what we anticipate to be the next

8   status conference before Your Honor.

9          But we wouldn't want the record of this or any

10  other proceeding before Your Honor to be used or cited for

11  the proposition that from Your Honor's perspective getting

12  the complaints narrowed down to a single complaint, doing

13  whatever else it is that the MDL judge typically does, which

14  is figure out which counsel they're going to for lack of a

15  better word lead the fray, there should be nothing that

16  impacts that procedural mechanism from moving forward.  It's

17  going to in our view at least get the parties or -- and the

18  issues that may ultimately be tried narrowed and get the

19  disbursed plaintiffs' groups better organized on the merits

20  should they ever get to the merits.

21          THE COURT:  Pause, please, Mr. Weisfelner.

22          MR. WEISFELNER:  Certainly.

23          THE COURT:  Can you envision a scenario under

24  which rulings by me might affect the extent to which claims

25  remain which would then be the subject of gathering up and

Page 52

1    bundling in that amended complaint?

2            MR. WEISFELNER:  Certainly, and again, this is

3    just my opinion, but when viewed from the perspective of

4    judicial economy if there is a single complaint and Your

5    Honor were then to determine what's kosha (ph) and what's

6    unkosha (ph) about that amended complaint one has an easier

7    vehicle to start making chops to.

8            As opposed to, and it sort of bleeds into some of

9    your other tentatives and some of your other questions, have

10   a multiplicity of lawsuits and then having to parse each and

11   every one of them to determine what portion of the

12   allegations, the complaints, the prayers for relief does or

13   doesn't violate or do violence to Your Honor's directive as

14   it currently stands or as it may ultimately morph after this

15   procedure currently before you develops.

16           THE COURT:  You said what I had anticipated that

17   you would say.  The corollary of that would at least

18   seemingly be that after the panel sends it wherever it's

19   supposed to go, and I'll call it the transferee judge, even

20   though it may eventually go back somewhere or to different

21   places, that there simply be a stop, look, and listen, vis-

22   à-vis, interfering or not interfering with the acts of the

23   transferee judge after determinations have been made in this

24   court and everybody in this room has had his chance to speak

25   his peace.

Case 1:14-md-02543-JMF    Document 4657-5    Filed 10/02/17    Page 94 of 128

1          MR. WEISFELNER:  And, Your Honor, I think like

2    many things in life it's all a matter of timing.  Because I

3    anticipate the transferee court is never going to get around

4    to the job of figuring out what's the next procedural steps

5    to narrow the issues that may be before him or her.  I think

6    we'll be further advanced on the issues that need to be

7    resolved by Your Honor, and the coordination between Your

8    Honor's decision making process and what does or doesn't

9    happen in the MDL will be much further advanced.

10          So while I'm not sure that it benefits anyone to

11    pursue this in any greater detail, my only point with regard

12    to this is I detected a difference between where we come

13    out, where I thought New GM was coming out on this, and what

14    I heard Mr. Steinberg say earlier this morning, which is we

15    have to leave open the possibility that the MDL proceedings

16    may be put on ice simply because this process is still

17    ongoing without a resolution.

18          THE COURT:  Well stand by.  Mr. Steinberg, come on

19    up and take Mr. Weisfelner's place for a second.

20          Is there a substantive disagreement here?  Because

21    I thought I was hearing consensus that we'd let the MDL

22    panel decide who the transferee district should be and then

23    we're going to have stuff that goes on here.

24          Would you have a substantive or procedural problem

25    with doing a stop, look, and listen in this court to then

Page 54

1    decide whether I should enjoin the transferee judge from

2    doing anything more, or should not do so?

3             MR. STEINBERG:  Your Honor, I would agree with

4    everything that you say except that I would assume that you

5    would be enjoining the parties not the court from moving

6    forward.

7             THE COURT:  Correct.  And I don't think in 13 and

8    a half years I've ever enjoined a court, but I enjoin

9    parties all the time.

10            MR. STEINBERG:  Then other than that, Your Honor,

11   I agree with exactly what you said.

12            THE COURT:  Okay.

13            All right, Mr. Weisfelner, I think that issue just

14   went away so come on up and let's proceed.

15            MR. WEISFELNER:  Great.

16            Your Honor, we take your points to heart with

17   regard to tentatives three and four both with regard to the

18   propriety of standstill agreements and your admonition that

19   we don't necessarily -- we shouldn't necessarily be rushing

20   in favor of getting it right.

21            One area where I think the parties may need some

22   additional time with each other but maybe we could explore

23   in a little bit more detail Your Honor's tentative with

24   regard to new complaints along the lines of what Mr. Flaxer

25   filed.

1           And I will tell Your Honor frankly that before

2     Mr. Flaxer hit the docket with his complaint I know I and my

3     shop and I venture to guess many other shops were working on

4     similar complaints.

5           Viewed from our perspective is the right

6     procedural mechanism for bringing the issue before Your

7     Honor; however, once we had the advent of New GM's motion

8     frankly I'm not sure what the procedural advantage is of

9     moving forward with that adversary proceeding complaint much

10    less inviting other parties to replicate it or to file

11    additional or add-on adversary proceeding complaints.  It

12    may -- it may involve some interesting work by a bunch of

13    bankruptcy and/or class action firms.  I think it's just

14    going to clog the docket here, and I think procedurally we

15    were of the view that rather than lose any of the

16    allegations or procedural advantages that are perceived or

17    actually exist in the adversary proceeding they all ought to

18    be subsumed within the contested matter.  Parties ought to

19    be afforded an opportunity to file their own objections to

20    the motion, join in our objection to the motion, or anything

21    in between.

22           But I'm not sure, nor do my colleagues feel, that

23    there's necessarily a substantive or procedural advantage to

24    separating the adversary proceeding and giving it a life of

25    its own even for the purposes of inviting other people to

Page 56

1    file new adversary proceedings.

2              THE COURT:  I partly lost you with the negative

3    that was in your last sentence.  In other words you're

4    saying the formalities aren't important, put it in a big

5    bundle and just decide it all together or am I --

6              MR. WEISFELNER:  That's exactly --

7              THE COURT:  -- stating it too crudely?

8              MR. WEISFELNER:  No, that's -- well, you couldn't

9    have stated it any cruder than I would have had I thought

10   about it, but that's exactly our sentiment, you know, let's

11   have one bundle and not have separate adversary proceedings

12   and separate contested matters, let along invite people to

13   file new adversary proceedings that address the same issue.

14   And I think the parties did intend on conferring with each

15   other on appropriate procedural mechanisms to allow that

16   ball of wax to form without violating anybody's procedural

17   or substantive rights.  And I think we can come up with in

18   very short order, certainly before the next status

19   conference, the procedural mechanism that we think is

20   appropriate.  But what we would like to avoid is either the

21   necessity or the thought out there that people better rush

22   to file, you know, identical or new or expanded adversary

23   proceedings.

24             THE COURT:  Now that's a different point than the

25   separate -- at least in your mind from the separate point

1    that I thought I was making that if there are any

2    substantive issues on the table that haven't been

3    potentially to be put on the table that I want to hear what

4    those points are.

5            MR. WEISFELNER:  And I think that can be readily

6    accommodated by virtue of setting a date by which parties

7    will want to respond to the motion that New GM has filed.  I

8    mean we obviously filed within, and I think before the

9    expiration of 24 hours.  Obviously there may be people out

10   there with further reflection that come up with better,

11   different, more expansive responses and we don't want to

12   preclude that.  We just don't want to get into a

13   (indiscernible - 01:19:05) of a separate docket for an

14   adversary proceeding, a separate docket for contested motion

15   practice, and any possibility that, you know, the resolution

16   of those issues shouldn't be at some point joined.  And

17   again, I think the parties can work out a proposal for Your

18   Honor's consideration that deals with melding together the

19   adversary proceeding and the contested matter.

20           Number five, Your Honor, which I guess was the

21   issue between stipulations and admissions.  And, Your Honor,

22   I think the answer is we get it and the parties will work as

23   best they can on stipulations and will only elevate the heat

24   intention as we have to both in terms of narrowing discovery

25   and avoiding unnecessary contests that have to be determined

Page 58

1    by this Court.  And again, you know, I'm focusing on all of

2    this from the perspective of the what we've referred to as

3    the gaiting issue.

4            And this -- and I want to sort of then flip to the

5    questions that Your Honor asked, and either attempt to

6    respond to them or tell you why I'd like to evade them as

7    best I can.

8

9        And again, you know, I'm focusing on all of this from

10    the perspective of the what we've referred to as the gaiting

11    issue.  And this -- and I want to sort of then flip to the

12    questions that Your Honor asked, and either attempt to

13    respond to them or tell you why I'd like to abade them as

14    best I can.

15            THE COURT:  Before you move on to those, please,

16    Mr. Weisfelner, the one issue that I still see as open

17    between you and Mr. Steinberg is with respect to two issues

18    that might or might not be addressed as part of Phase I, the

19    most classic threshold issues, fraud on the Court and

20    discrimination amongst different kinds of creditors.

21            My preference would be in terms of meeting my own

22    responsibilities would be to get issues on the table and

23    teed up for judicial determination, and to the extent

24    practical decided sooner rather than later, which would

25    cause me to come to the view that on fraud on the Court, if

Page 59

1    we could deal with that without having the associated

2    discovery bog us all down, it would be handled sooner rather

3    than later and the same thing with discrimination, which

4    doesn't seem to involve discovery issues.

5           I sense that you would prefer to defer fraud on

6    the Court, but would you be of the same mind to defer it if

7    just the limited discovery of the type that Mr. Steinberg

8    recommended were undertaken so that issue could be teed up

9    with the others?

10          MR. WEISFELNER:  Your Honor, we would be opposed

11   to it and let me explain why.

12          First of all we share Your Honor's perspective

13   that issues that could resolve matters from the perspective

14   of either side where discovery can be limited ought to be

15   preferred on issues that potentially don't decide the matter

16   even if they don't require a lot of discovery.

17          So let me take the easier example first, the

18   discrimination issue, raised in retrospect unfortunately in

19   my papers as opposed to anybody else's.  And, Your Honor, it

20   seems to me that we could brief that issue at whatever cost

21   is required.  It doesn't require discovery.  Your Honor

22   could make a ruling.

23          And notwithstanding how you rule I don't think it

24   gets the plaintiffs any closer to trying claims against New

25   GM or for that matter New GM any closer to preventing the

Page 60

```
 1    plaintiffs' claims from moving forward based on their

 2    reliance on the injunction and the sale order.  It's an

 3    interesting issue but it's in no event dispositive of either

 4    parties' position on the fundamental issue.

 5             For that reason, even though I was the one who

 6    first raised it and frankly raised it before I understood

 7    the entire history behind the metamorphous that the final

 8    sale order took on the carve out for wrongful death, injury,

 9    and property damage, which as I understood it originally

10    what New GM was purporting to assume was wrongful death,

11    personal injury, property damage solely with regard to cars

12    that it sold post-petition or post-sale rather, and it

13    morphed at the direction in part of various attorneys

14    generals and consumer advocates.

15             THE COURT:  In the middle of the trial.

16             MR. WEISFELNER:  Sorry?

17             THE COURT:  In the middle of the sale trial.

18             MR. WEISFELNER:  Right.

19             THE COURT:  Yeah, I remember the history.

20             MR. WEISFELNER:  Okay.

21             THE COURT:  Oh, by the way I'm going to interrupt

22    you.  I want each side not to tell me today but to think

23    about the extent to which I'm allowed to use my knowledge of

24    what happened back then in connection with the findings of

25    fact.
```

Page 61

1              MR. WEISFELNER:  Well, Your Honor, I could tell

2      you now without even consulting with my colleagues, unless

3      Your Honor were to be willing to undergo a lobotomy I don't

4      know how anyone could take the position that Your Honor

5      cannot, should not, or may not take into account your

6      knowledge and familiarity with what transpired during the

7      bankruptcy proceeding and in fact during post-reorganization

8      or post-restructuring matters that were brought to Your

9      Honor's attention.

10              But I want to sort of get back to --

11              THE COURT:  Pause.

12              MR. STEINBERG:  I was going to -- without

13      inferring whether there should be a lobotomy or not -- I was

14      going to say that we agree with Mr. Weisfelner as well, that

15      you should be able to take into account your position.

16              THE COURT:  Okay.  Fair enough.

17              Go on then, please, Mr. Weisfelner.

18              MR. WEISFELNER:  Any way, Your Honor, I'm sort of

19      getting back to what we ought to be collectively spending

20      time and attention on.

21              From the plaintiffs' perspective we ought to be

22      spending time and attention, which converts into money and

23      effort, in dealing with as narrow a set of facts that we

24      have to deal with to determine whether or not the sale order

25      applies to our underlying clients.

```
 1              The discrimination argument, Your Honor, may be

 2     left on the table in the unlikely from my perspective and

 3     unfortunate event that we lose the threshold issue.  But why

 4     it needs to be determined today, even though it's an issue

 5     of law and not a matter to discovery, it's not dispositive

 6     from either sides' perspective, it doesn't get us closer to

 7     where either one of us wants to get to.

 8              And if I could then turn to the fraud on the Court

 9     issue.

10              Your Honor, there are subtleties on top of

11     subtleties on top of details that suggest to us that you

12     could not make a determination with regard to fraud on the

13     Court with anywhere close to the narrow discovery that

14     Mr. Steinberg suggests.  And it's sort of all subsumed I

15     think or fear in the whole due process argument, and without

16     in any way trying to argue the merits but just to lay out

17     what the issues are as objectively as I can without tilting

18     them in either direction, remembering again that there's a

19     lot of information in the public record about what GM knew

20     when they knew it with regard to the ignition switch.

21              I think that New GM would say, well, wait a

22     second, determining GM's -- Old GM's knowledge and for that

23     matter New GM's knowledge isn't necessarily determined --

24     and I use this very bad analogy but I'll give it to you any

25     way -- by focusing on the guy in the test laboratory who's
```

1    got grease up to his elbows and is wearing overalls.  That

2    person may have knowledge, but it may not necessarily be

3    imputed to someone sitting in a conference room who has the

4    luxury of wearing a suit and tie every day.  And I think New

5    GM may ultimately argue that Joe the mechanic's knowledge

6    isn't to be imputed into an executive office let along a

7    board room.

8          Now frankly we're encouraged by the fact that

9    plenty of people who wore suits and white collars have

10   already put their position on the record or it's otherwise

11   discoverable through things that the National Highway Safety

12   Council has made available or the Congress has made

13   available or what we can read and report on in the press,

14   but to suggest that we can or should pursue fraud on the

15   Court to my mind and gender is a discovery dispute at three

16   different levels by the way.  Old GM, New GM, and based on

17   not my intuitions, but my discussions, I think we're going

18   to get into a discussion of what treasury in its role as the

19   intermediary between Old GM and New GM knew or didn't know.

20         And as much as I like spending time with Matt

21   Feldman and Jim Milstein (ph) and Harry Wilson, I don't know

22   that I necessarily want to get involved in discovery of what

23   any of those people knew or should have known in the context

24   of proving --

25              THE COURT:  You used the word should have known.

Page 64

1    Since when is should have known an element of a claim of

2    fraud against the Court?

3             MR. WEISFELNER:  Your Honor, I'm not sure that it

4    is, which is another reason why when I think about this, and

5    maybe I think about it in an overly simplistic fashion, but

6    I have the comfort of knowing that my co-counsel thinks

7    about it the exact same way, in fact all of the plaintiffs

8    think about it exactly the same way with the exception of

9    one possibly outlier, and that is if I start with the

10   proposition, understanding that it's a proposition and not a

11   proven fact, that the consumers of this product were known

12   to have had a defective product and that Old GM did nothing

13   to let those people know that they had a defective product,

14   didn't give them notice of the bankruptcy, didn't give them

15   notice of the sale, and didn't give them notice of the

16   extent to which the sale could affect their rights, if our

17   contentions are accurate isn't it the case that these

18   individuals were deprived of due process?

19             In that context should the sale order apply to

20   them or should some portion of the sale order apply to them?

21   Not a revocation of the sale order, we're not going cut it

22   up and carve it out and chop it up as it relates to anybody

23   else other than people who prove to you that they were

24   denied due process.

25             Why we need to then get into at this stage the

Page 65

1    other elements of fraud on the Court, Your Honor, we

2    respectfully suggest is beyond what we ought to be doing if

3    we want to do something efficient and effective from the

4    perspective of these injured parties.

5          THE COURT:  Do you think that for the purposes

6    solely of my case management discretionary calls, as

7    contrasted to the merits in figuring out how we should tee

8    these things up, it's appropriate for me to assume that

9    there might be a difference between defrauding the driving

10   public on the one hand and defrauding the Court on the

11   other?

12         MR. WEISFELNER:  Yes.  And, Your Honor, I'd make

13   the distinction though, we're not defrauding the driving

14   public, that's not our contention.  Our contention is that

15   the number of people who bought, leased, or owned these

16   cars, and to my knowledge, the number is something below 3

17   million, I could be wrong, so it's not the driving public,

18   it's these specific people that were sold cars with this

19   ignition switch problem.

20         And again, this is not the place or time to get

21   into this, so then I won't, I just want to get back to your

22   issue.  I do think that it's a matter of Your Honor's

23   discretion in setting our own calendar in terms of dealing

24   with dispositive issues first.

25         If Your Honor were to decide that these people

1   were denied due process, and therefore, the injunction that

2   New GM bargained for should not apply to them, case over,

3   from our perspective.

4           It's only if Your Honor were to decide there was

5   no denial of due process, that we may want to ask Your Honor

6   to tee up and consider other issues.  Until that time, I

7   think it's a matter of case management and Your Honor's

8   discretion, that's the right way to go.  And I say that

9   because we've thought about it, and we think it's the right

10  way to go, not to be determinative of what Your Honor

11  decides in terms of exercising your own discretion.

12          But we clearly think it's the easy way to go, and

13  I'm not sure I understand how expanding either the factual

14  issue or the legal issue into fraud on the Court serves the

15  purpose of narrowing the issues and letting the parties and

16  the Court get to the -- a resolution in the most cost-

17  effective manner possible.

18          Now, Your Honor, I'm happy to sort of move on to

19  the questions that Your Honor had.

20          THE COURT:  Go ahead.  And I'm going to do this in

21  such a fashion as I possibly can, so as not to insult the

22  Court.  But you asked what's left its engendered so much

23  heat, and with all -- in other words, what are the damages

24  that people could possibly be concerned about here, since

25  wrongful death, personal injury, and property damage are off

09-50026-mg   Doc 14127-1   Filed 10/02/17   Entered 10/02/17 12:32:50   Exhibit A
Case 1:14-md-02543-JMF   Document 4657-5   Filed 10/02/17   Page 598 of 129
Pg 589 of 728

Page 67

1    the table.

2              And Mr. Steinberg in his opening tried to -- or

3    talked to you about five, six, seven, eight-year old cars

4    driven a lot of miles that have a broken switch that GM's

5    prepared to fix, so what are the damages.

6              Oh, and I think he mixed in the fact that we're

7    talking about a pretty cheap set of vehicles, Chevy Cobalts

8    and other such cars.  And, Your Honor, in the simplest

9    terms, it's our view that the measure of damages that

10   plaintiffs could prove were they permitted to pursue claims

11   against New GM, notwithstanding your injunction, is a matter

12   for determination by a court of competent jurisdiction who

13   doesn't have New GM waving the injunction in front of it.

14             Once that injunction is gone, Your Honor's

15   question is really within the bailiwick of Court's

16   interpreting state law, federal --

17             THE COURT:  Forgive me, with respect to you, Mr.

18   Weisfelner, that isn't the purpose of my question.  The

19   purpose of my question is to ascertain the extent to which

20   claims your guys want to bring, is or is not within the

21   scope of the existing sale order, which is the question

22   which we start with after which we then determine the extent

23   to which the provisions of that sale order are in whole or

24   in part unenforceable against your constituency.

25             MR. WEISFELNER:  Ah.

Page 68

1              THE COURT:  So please do not restate or

2     misunderstand my question.

3              MR. WEISFELNER:  Thank you, Your Honor.  I did --

4     I misunderstood it completely.

5              I should call to Your Honor's attention, and I'm

6     hoping that this is in the process of being fixed, because

7     I've been told that's in the process of being fixed, but one

8     would hope that as this process moves forward and the

9     parties reach consensus on how to form and present the

10    issues in the most effective way, that we don't have

11    exacerbation of the problem or the issue.

12             We were told the story about an individual who in

13    connection with the recall went to his or her dealer to have

14    this ignition switch fixed, and was presented by the dealer

15    with a form that she was being told she had to sign before

16    the work could be done on her car.

17             And the form, while I haven't seen it, I'm told,

18    either had the individual consenting to arbitration of any

19    issue that may arise in connection with the work that was

20    being done and/or contained a waiver of any claims that

21    could be asserted in connection with any of the work that's

22    being done.

23             Now, I'm told that these issues were brought to

24    New GM's attention and New GM has or is in the process of

25    ensuring through communication with its dealers that the

1    fixing of the switch is not to be conditioned on parties

2    signing anything that may impact their claims or causes of

3    action going forward, and that to the extent that people

4    have already signed anything as a precondition to having

5    their car dealt with on a recall, that it won't be enforced

6    or sought to be enforced by New GM.

7            The other thing I want to bring to Your Honor's

8    attention, and again, it's not within my bailiwick, except

9    that I've heard enough about it from underlying plaintiffs'

10   lawyers and have read enough about it is, there is not an

11   agreement between this side of the courtroom, meaning the

12   plaintiff's side --

13           THE COURT:  Pause please, Mr. Weisfelner.

14           Right after you told me that anecdote, which

15   troubled me, as it would trouble most folks I think, you

16   said that when GM, New GM heard about it, it pulled the plug

17   on that deal -- issue acting that way, and told them, you

18   didn't use these words, you, jerk, you can't do that.  So

19   why did you tell me that?

20           MR. WEISFELNER:  I told you that for at least two

21   reasons.  Having New GM tell the dealers to stop acting like

22   jerks may or may not cause the new dealers -- the underlying

23   dealers and the fixers, guys who are dealing with the

24   recall, to stop acting like jerks.  And I just wanted to let

25   Your Honor know that we are concerned about people acting

1        like jerks on a going forward basis.

2                The second reason I brought it to Your Honor's

3        attention is, to the extent that people have historically

4        signed the pieces of paper that the jerks gave them to

5        review, I haven't seen anything in the record other than an

6        oral communication that said New GM will not hold those

7        releases or agreements to arbitrate against the plaintiffs,

8        I raise it now only because for all of our benefit, we'd

9        like to see something about this in writing at some point.

10               I brought it up in the context of Your Honor's

11       concern about presale conduct and post-sale conduct, and

12       Your Honor, the plaintiffs very much agree that to the

13       extent that one could readily distinguish between actions

14       that go to New GM's conduct, that they can't, as Mr.

15       Steinberg indicated, properly be the subject of the

16       injunction.

17               But the devil is also in the details on this one

18       because we're not --

19               THE COURT:  Pause for a second.  Mr. Steinberg,

20       I'm going to give you another chance to be heard, why don't

21       you sit down for now.

22               MR. WEISFELNER:  In terms of what constitutes New

23       GM's actions versus Old GM's actions, you heard at least one

24       example of how it's difficult, and that is New GM does a

25       recall and could arguably be replacing the ignition switch,

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-5    Filed 10/02/17    Page 592 of 728
Pg 593 of 728

Page 71

1    not with a new ignition switch, but with an old ignition

2    switch, or that parties are concerned that, you know, they

3    went to their dealer, they got a new ignition switch, they

4    don't know now whether it was a recalled ignition switch or

5    an old switch.

6          But, Your Honor, and again, I just mention this,

7    not because I think it needs to be resolved, or because I

8    have any evidence to prove it's true, but a lot of what

9    we're reading suggests that calling this an ignition switch

10   defect is an impermissible narrowing of what the issues are.

11         The ignition switch may or may not have been the

12   cause of air bag failure to deploy.  The fixing of the

13   ignition switch, given the electronic calibrations between

14   the switch and the air bags may or may not address the air

15   bag problem.  I don't know the answer to any of this.

16         Other than to tell you again, when we parse out or

17   attempt to parse out actions against New GM for New GM

18   conduct, or things that New GM definitively agreed to assume

19   as part of the sale process, versus actions that could

20   arguably or do, in fact, implicate the injunction that's

21   part of the sale order is, for lack of a better term, easier

22   said than done.

23         Nevertheless, the plaintiffs as a whole do reserve

24   the right if this process gets bogged down or takes too

25   long, to say, you know what, maybe the quickest thing to do

Case 1:14-md-02543-JMF    Document 4657-5    Filed 10/02/17    Page 593 of 126

Page 72

```
 1    is to spend the time and energy that hopefully we won't have

 2    to, to parse through whatever's been filed, and to

 3    demonstrate to Your Honor that the allegations that are

 4    being made, the liability that's being ascribed, and the

 5    damages sought to be obtained as they relate to New GM

 6    conduct do not implicate Your Honor's injunction.

 7              For now, however, we'd prefer not to get into all

 8    of those potentially dicey issues, as to what does and what

 9    doesn't constitute a direct claim against New GM that is

10    outside of the injunction, at least until the parties work

11    hard on trying to get to a position where the due process

12    issue gets teed up for Your Honor's consideration.

13              And if we can do that in an effective vehicle and

14    quickly, then all of the other noise that may be necessary

15    down the road could be avoided.  Because whether it's

16    actions against New GM or actions that New GM contends

17    they're not liable for because of the injunction, if the

18    injunction is dissolved as to this group, because of lack of

19    fundamental due process, it doesn't matter.

20              So I'd prefer, we collectively would prefer to

21    deal with that issue as, when and if it does matter.

22              I'm going to skip over the lemon law issues,

23    because I don't think we have much difference of view with

24    regard to the answer that you got from Mr. Steinberg.  I do

25    want to stress on your question number four, the inability
```

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-5    Filed 10/02/17    Page 94 of 128
Pg 595 of 728

Page 73

 1    to get together.

 2          The plaintiffs are together, and with the

 3    exception of again one outlier on the issue of what ought to

 4    be part of the threshold and what not be part of the

 5    threshold, there's not a plaintiff group that we're aware of

 6    that isn't prepared to have their interests in the first

 7    instance, represented by one of the three of us, with

 8    consultation with Ms. Cyganowski, subject, of course, their

 9    ability to stand up and say, hey, they didn't present my

10    issue.  But we have a commonality of position, a commonality

11    of interest, and a desire to work collectively through these

12    three lawyers.

13          I'm just trying to see if there was anything else.

14    You've heard our views with regard to an adversary

15    proceeding versus motion practice.  I didn't touch on the

16    impact on Old GM and the GUC Trust.  And I liked Your Honor

17    took comfort in the fact that Mr. Golden is here, as I do

18    take comfort any time Mr. Golden shows up anywhere.

19          Look, Your Honor, it's obvious, and you get it,

20    that one of the arguments that New GM may make is if these

21    individuals were damaged or deprived of due process, let's

22    not jump to the conclusion that the right remedy is to have

23    the injunction not apply to them.

24          Instead let's consider the alternative remedy of

25    having them all get shifted into the category of late filed

1    claims, judicially acknowledged late filed claims, will now,

2    as part of a bankruptcy process, go through a procedure for

3    determining what those claims might be worth individually or

4    on some class basis.

5            And when that process is all over, then we can let

6    the GUC Trust and its beneficiaries know that their expected

7    future dividends may have to be adjusted or wiped out in

8    order to allow these new beneficiaries of the trust to, in

9    effect, catch up on distributions that have already been

10   made, if in fact, that can be done as a matter of

11   practicality.

12           And I anticipate that holders of the units

13   including Mr. Golden's clients and others may very well have

14   an opinion about that.

15           Again, it seems to me that before we ever get near

16   that thorny issue, where lots of people are going to be

17   impacted, and it may not be practical, if we resolve the

18   threshold issue of whether, because of lack of due process

19   the injunction ought not to apply, then we never get into

20   this issue.  Unless someone were to argue that

21   notwithstanding the denial of due process the right remedy

22   is not let the injunction dissolve, but the right remedy is

23   somehow to treat these people as if they had late filed

24   claims, and will now just dilute all of the other

25   beneficiaries of the GUC Trust.

09-50026-mg   Doc 14127-4   Filed 10/02/17   Entered 10/02/17 12:32:50   Exhibit A
Case 1:14-md-02543-JMF   Document 4657-5   Filed 10/02/17   Page 6 of 128
Pg 597 of 728

Page 75

1          Your last point was on mediation, and like Mr.

2     Steinberg, I agree that litigation is inherently wasteful,

3     time consuming, and not a very efficient way of resolving

4     matters, and that whenever possible, mediation is the way to

5     go.

6          I just am concerned that given where I started,

7     which is to identify, as I'm sure Your Honor knows, the

8     multiplicity of investigations that are currently underway.

9     Just what the role of Ken Fineberg is, just how much money

10    Mr. Fineberg may have at his disposal to attempt to resolve

11    issues, while we would collectively prefer to mediate than

12    litigate, I'm not sure that the environment is such today

13    that we're presented with that effective choice.

14         Should circumstances change, as I think Your Honor

15    knows very well, the plaintiffs are as willing to attempt to

16    resolve issues notwithstanding how prepared they'll be to

17    prove their cases and collect their appropriate damages.

18    Thank you, Judge.

19         THE COURT:  All right.  Thank you.  Mr. Flaxer.

20         MR. FLAXER:  Thank you, Your Honor.  I note that

21    I'm working in conjunction as co-counsel with the firm of

22    Wolf Halthenstein (ph) which is here by counsel.

23         Perhaps, Your Honor, I should jump right into an

24    issue that was maybe the only area where the plaintiff group

25    wasn't able to come to complete consensus.  And Your Honor

Page 76

1    added some thoughts to it that I think shed a lot of light

2    and were actually extremely helpful in my own thinking about

3    it.  Which is in identifying the threshold issues what the

4    sort of philosophical line of demarcation should be and if I

5    heard correctly one notion that Your Honor suggested was

6    things that can be decided on a legal basis, without the

7    necessity for discovery, but that's -- I'm going to sort of

8    pause there, and say discovery, we've talked about a

9    possibility of limited discovery as opposed to more

10   extensive discovery.

11            So -- and I think that's an important point to

12   keep in mind.  Our view has been that the claim of fraud on

13   the Court, which the objection to the motion and which our

14   adversary proceeding both assert, our concern has been that

15   it's difficult to separate it out from the lack of due

16   process point because although superficially I suggest it

17   might be a -- maybe that's not the right word, but it might

18   be -- it may seem that since fraud on the Court is sort of a

19   more broad remedy or has more prongs to it that maybe need

20   to be established that the discovery in establishing that

21   claim would be much broader and take a lot more time.

22            As I step back from it, and think about it, if

23   there's going to be discovery on a due process violation, I

24   think when the actual discovery process gets going, the

25   discovery on those two claims will be basically the same.

1          And I think Your Honor got into --

2          THE COURT:  Wait.  I was keeping up with you, Mr.

3    Flaxer, until you said basically the same.  Obviously under

4    the covers of all this, is that fraud generally is subject

5    to a time limitation, if I recall correctly, it's one of

6    your words, fraud on the Court, it's not, and that's the

7    difference between 60(b) and 60(d).

8          But I wasn't clear after that what the distinction

9    you were making was.

10         MR. FLAXER:  The distinction I'm making is that if

11   a due process violation is going to be a threshold issue,

12   and we're going to wind up taking discovery on that issue,

13   then as a matter of judicial economy, it may be wiser to

14   include fraud on the Court at that point, because the

15   discovery is likely to be I think extraordinarily similar if

16   not identical.

17         THE COURT:  I'm not inclined to differ with you in

18   that regard, Mr. Flaxer, but I thought the consensus until

19   you spoke was that other folks in the room who spoke before

20   me thought that due process could be addressed at least in

21   major respects without any discovery.

22         MR. FLAXER:  And if -- and my view on that is, I'm

23   -- what I would say is, that may or may not be right.  So

24   maybe what we ought to do here to sort of resolve everything

25   for today at least, is let's proceed with the process of

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-5    Filed 10/02/17    Page 99 of 228
Pg 600 of 728

Page 78

1    developing stipulations of facts, and lawyers from both

2    sides will work together on that.  And when we come back for

3    the next time, I think the parties will be able to advise

4    the Court whether or not they think that based on what's

5    stipulated, we should just put the due process issue to the

6    Court, and put fraud on the Court, perhaps to the side for

7    the moment.

8           But I don't think we ought to decide that one

9    today, nor do I think we need to.  So I don't think there's

10   any need for any difference of opinion going forward from

11   today to the next status conference.

12          I will confess some skepticism about whether

13   stipulations of fact will be sufficient to address the

14   alleged lack of due process issue, but I'm happy to keep an

15   open mind about it, because as events develop, we all have

16   to be prepared to have an open mind and change.

17          So our view for today is, we don't have to decide

18   whether or not fraud on the Court should be a threshold

19   issue or not.  Let's kick that to the next status conference

20   and let's see how the process goes with developing

21   stipulations of fact.

22          And I would add as Mr. Weisfelner very eloquently

23   observed, there are a number of government investigations

24   ongoing.  I understand that GM's internal report is due

25   fairly soon, I think in early June.  That may shed a lot of

1    light on a lot of issues, and that's another fact on the

2    ground that may affect our thinking when we get to the next

3    status conference.

4           Trying to focus on your threshold issues, and

5    trying not to repeat, I don't have anything to add to the

6    MDL, that's all been said.

7           As to the dates for when events should happen, we

8    agree that, you know, on the one hand we want to get in and

9    out of this court as fast as we can.  On the other hand, we

10    don't want to rush or we're going to wind up right back

11    before you asking for more time, so we think the dates that

12    were in Mr. Steinberg's agenda letter are fine, and we're

13    fine with those.

14           As to a deadline for amending -- I mean, I'm

15    sorry, for filing additional adversary proceedings or

16    joining in ours, it was never our intention to encourage

17    more adversary proceedings, but we did think it was

18    important that there be a time when the Court be able to

19    know that.  I now know the universe of what the pleadings

20    are.

21           THE COURT:  What people want to assert.

22           MR. FLAXER:  Yes.  So we're fine with picking a

23    date for that, maybe a date in mid to late May would be

24    fine.  Mr. Steinberg's agenda letter suggested May 14th as a

25    date for us to amend our complaint.  We are considering

1    three amendments, which we don't think would have any effect

2    on the process that's being developed here, but we're okay

3    with that date.

4             Mr. Weisfelner discussed sort of the interplay

5    between adversary proceedings and the contested matter.  I

6    think that there is agreement here that for discovery

7    purposes and for the scheduling we're doing here today, they

8    should be treated as consolidated and run contemporaneously,

9    and there's no need at this point to have any distinction

10   that's meaningful that I can think of.

11            I mentioned to Mr. Steinberg this morning in the

12   hallway that, you know, because we filed a complaint, a

13   summons has been issued, and there's a date to answer, which

14   backs into a date for a Rule 26(f) conference.  But I think

15   those dates can be just sort of rolled into this process so

16   we don't have to have any, you know, separate concerns about

17   other dates that sort of automatically come with a filing of

18   an adversary proceeding.

19            THE COURT:  I think my understanding then might

20   flow from what you just said, but you're also equally

21   amenable to any procedural consolidation, including briefs

22   to cover the field in both.

23            MR. FLAXER:  Correct.

24            THE COURT:  Okay.

25            MR. FLAXER:  And I think the last point that I

Page 81

1    have to mention since everything's been so, I must say, very

2    efficiently covered is we're the ones who did raise the

3    possibility of mediation.  I think I agree with what both

4    counsel have said before me.  I would just urge that we

5    don't lose sight of it and as much as we'd like to avoid

6    extensive discovery here, and as much as I'd hope we can

7    avoid it, but I fear it may not be avoidable, the mediation

8    alternative may wind up being much more productive and

9    better for the victims we're all seeking to serve than

10   extensive litigation.

11            THE COURT:  Okay.  Thank you.

12            MR. FLAXER:  Thank you, Your Honor.

13            THE COURT:  Is there anybody else who hasn't had a

14   chance to be heard for the first time who would like to be?

15   Come on up, please.

16            I'm taking someone in the courtroom first, and

17   then I'll ask about the phone.

18            MR. MARTORANA:  Good morning, Your Honor, Keith

19   Martorana of Gibson Dunn & Crutcher on behalf of the GUC

20   Trust.

21            THE COURT:  Did you say Marona?

22            MR. MARTORANA:  Martorana.

23            THE COURT:  Martorana.

24            MR. MARTORANA:  Yes.

25            THE COURT:  I'm sorry.

09-50026-mg   Doc 14127-1   Filed 10/02/17   Entered 10/02/17 12:32:50   Exhibit A
Pg 604 of 728
Case 1:14-md-02543-JMF   Document 4657-5   Filed 10/02/17   Page 93 of 128

Page 82

```
 1            MR. MARTORANA:  Your Honor, I stand because you

 2   had suggested at the outset of this hearing the possibility

 3   that issues related to the GUC Trust and claims against the

 4   GUC Trust might be better addressed as a threshold issue to

 5   start.

 6            Based upon what I'm hearing today, it sounds like

 7   there's a consensus among the parties here at least, that

 8   this is something that should not be addressed as a

 9   threshold issue.

10            THE COURT:  Well, that depends on who you're

11   including within that consensus, Mr. Martorana.

12            MR. MARTORANA:  I meant just these parties over

13   here.  Don't -- you would like to have it addressed to the

14   threshold issue?

15            UNIDENTIFIED:  I'll address it later.

16            MR. MARTORANA:  Okay.  All right.  Then I guess

17   there is no consensus on that, but I will tell you that from

18   our perspective, we believe that it should not be addressed

19   as a threshold issue.

20            We do believe that first off it will require at

21   least some discovery, probably substantial discovery.  We

22   also believe, you know, particularly because as it relates

23   to issues of excusable neglect, which are fact sensitive.

24            We also believe that it's not dispositive of -- as

25   Mr. Weisfelner said the -- you know, the fundamental issue
```

Page 83

1   here which is whether or not claims can be asserted against

2   New GM.

3          Moving off it being a threshold issue, we also

4   don't believe that this is an issue frankly that needs to be

5   addressed at any point during this hearing -- during this

6   proceeding.

7          No claimants, none of the plaintiffs, no claimants

8   or potential claimants had raised this as a possibility.  No

9   one has filed a motion to lift the bar date.  The only

10  person that has raised it has been New GM, based upon, you

11  know, some statements of fact in some pleadings.  But the

12  only person that has actually moved forward with it is New

13  GM, and frankly, you know, it's our view that this is

14  essentially a way to deflect liability away, and you know,

15  the attention away from New GM and put it on to a third

16  party.

17         To the extent that Your Honor is inclined to rule

18  against us and have it either be dealt with as a threshold

19  issue or as a -- I guess, a subsequent issue, we would

20  request to participate in any of the discovery that does

21  transpire.  And then to the extent that there are any claims

22  against New GM to be resolved, we would also ask to

23  participate in any mediation.

24         THE COURT:  Okay.  Thank you.

25         MR. FLAXER:  Thank you.

Page 84

1                    THE COURT:  Let's see, Mr. Golden, Mr. Posner.

2        First you, Mr. Golden, then I'll hear from you, Mr. Posner.

3                    MR. GOLDEN:  Thank you, Your Honor, Daniel Golden,

4        Akin Gump Strauss Hauer and Feld, counsel for certain

5        publically traded public -- publically traded unit trust

6        holders.

7                    Your Honor, I do take your admonition not to pile

8        on, although my name was used in vain, so I figured I'd

9        stand for a minute or two, we agree with the position just

10       advocated by counsel for the GUC Trust.

11                   We think it interesting that none of the potential

12       plaintiffs who might have asserted late claims against a GUC

13       Trust have indicated an intention to do so.  It's only New

14       GM that has raised that issue.

15                   THE COURT:  Well, pause please, Mr. Golden.

16                   MR. GOLDEN:  Yes.

17                   THE COURT:  You've been around the block a couple

18       of times.

19                   MR. GOLDEN:  Too many times.

20                   THE COURT:  If you were a plaintiff's lawyer,

21       would you rather collect a hundred cents on the dollar or 30

22       cents on the dollar?  And if I'm allowed to ask a compound

23       question, would you prefer to try to shoot the moon with a

24       claim for punitive damages or would you prefer to assert

25       that punitive damages claim in a bankruptcy where punitive

Page 85

1    damages come at the expense of the remainder of the creditor

2    community?

3              MR. GOLDEN:  So I'm assuming both of those

4    compound -- both parts of that compound question were

5    rhetorical.

6              THE COURT:  Yes.

7              MR. GOLDEN:  I understand, Your Honor.  I

8    understand the strategy involved, but I think Mr. Weisfelner

9    is correct.  There is a looming threshold issue here.  I'm

10   not here to argue pro or con on that threshold issue, but

11   that issue once resolved will determine whether there needs

12   to be claims asserted or attempted to be asserted against

13   the GUC Trust.

14             I think Mr. Weisfelner was entirely correct, we

15   actually debated among ourselves whether to either --

16   whether to even file a letter seeking to participate at this

17   hearing, because none of this hearing had anything to do

18   with the Trust or the beneficial interest holders of the

19   Trust.

20             I was, however, concerned on April 30th, that

21   somehow some way the GUC Trust was going to be injected into

22   those proceedings, and therefore, we sent the letter asking

23   to participate.

24             Sure enough, seven hours later, New GM filed their

25   letter.  And for the first time injected that issue into

1   these proceedings.  We don't think it's appropriate.  We're

2   frankly strangers to these proceedings.  There may come a

3   time when the plaintiffs and the claims that the plaintiffs

4   represent, seek to assert those claims against the GUC

5   Trust, it's not now.  They haven't done so, they haven't

6   indicated an intention to do so.

7           Furthermore, Your Honor --

8           THE COURT:  Pause please, Mr. Golden.  Put

9   yourself -- I made you put yourself in the shoes of the

10  plaintiffs' lawyers, now I want you to put yourself in my

11  shoes.

12          Can you see how a judge might be uncomfortable

13  with a scenario under which there's no claim against

14  anybody, assuming solely for the purpose of discussion, that

15  the claim otherwise has merit?

16          MR. GOLDEN:  Absolutely, Your Honor.  I've said to

17  my colleagues that you must be struggling at night with

18  these issues, whether to proceed, allow these claims to be

19  filed against New GM.  If so, then there's no need for the

20  GUC Trust.  But if not, does there -- is there another

21  remedy available by going against the GUC Trust.  I

22  understand the discomfort of the Court, but that discomfort

23  was caused by actions taken by other parties.

24          There's often times unfortunate circumstances when

25  people are deprived of their ability.  They fail to assert

1    their rights, they fail to a -- timely assert their rights.

2    Unfortunate things happen in bankruptcy, Your Honor is well

3    aware of that, and I understand the discomfort level.  But

4    it doesn't change the fact that to adjudicate whether or not

5    these claims should be allowed against the GUC Trust will

6    require a significant amount of discovery.

7             The Pioneer standards themselves that regulate or

8    determine whether or not there is excusable neglect is ripe

9    with discovery and evidentiary rationales.

10            So, Your Honor, I think I agree with Mr.

11   Weisfelner's suggestion, hold this off, it won't be

12   permanently held off.  If Your Honor is to determine that

13   the plaintiffs can proceed against New GM, that will

14   probably be the end of it as it relates to the GUC Trust.

15   If that's not the Court's ruling, we can revisit the issue

16   if and when it becomes appropriate.

17            But to do it as a threshold issue, when there are

18   already so many issues on the table, we think is a mistake.

19            THE COURT:  Okay.  Thank you.

20            MR. GOLDEN:  Thank you, Your Honor.

21            THE COURT:  All right.  Mr. Posner, come on up,

22   please.  Now, I understand that you and your partner, Ms.

23   Cyganowski are acting as liaison between Mr. Weisfelner, and

24   Mr. Esserman and Mr. Inselbuch on the one hand, and the

25   other, I guess it's, I don't know, 50 to a hundred other

09-50026-mg   Doc 14127-1   Filed 10/02/17   Entered 10/02/17 12:32:50   Exhibit A
Case 1:14-md-02543-JMF   Document 4657-5   Filed 10/02/17   Page 99 of 128
Pg 610 of 728

Page 88

1    class action lawyers, do you have some points that you need

2    to make that Mr. Weisfelner didn't satisfactorily make?

3              MR. POSNER:  No, Your Honor, just briefly, David

4    -- for the record, David Posner from Otterbourg, and as you

5    pointed out, and as Mr. Weisfelner mentioned I think twice,

6    Ms. Cyganowski, my partner, has -- is working with that

7    group as a consultant and a liaison counsel-type role.

8              She asked me to convey to the Court that to the

9    extent that she can be helpful in harmonizing any discord in

10   connection with the plaintiffs' group, she stands ready to

11   assist in that regard.  And I would be remiss, Your Honor,

12   if I didn't say I'm working with co-counsel, Harley Tropin

13   of the Kozyak Tropin firm who's here today in the court.

14             THE COURT:  Okay.

15             MR. POSNER:  Thank you, Your Honor.

16             THE COURT:  Thank you, Mr. Posner.  Mr. Etkin.

17             MR. ETKIN:  Your Honor, Michael Etkin, Lowenstein

18   Sandler for the plaintiffs in two pending class actions.

19             I rise only to talk about an issue that has been

20   raised and was raised in Mr. Weisfelner's letter of

21   yesterday, just so I have some clarity.

22             First of all, given the time frame, the number of

23   lawsuits, the number of lawyers, I think it's extraordinary

24   that the plaintiffs' side has been able to achieve this

25   level of cooperation so quickly for purposes of today's

Page 89

1    hearing.  And having dealt in the class action realm for

2    many years, it is not the usual.

3              Second of all, I have enormous respect for Mr.

4    Inselbuch and his firm, Mr. Esserman, and his firm and Mr.

5    Weisfelner and his firm, that goes without say.  However, I

6    just want to quote from the second to last bullet point of

7    Mr. Weisfelner's letter as it related to the question of

8    liaison counsel for plaintiffs.  And that's --

9              THE COURT:  The letter of May 1?

10             MR. ETKIN:  His letter of May 1, yes.  And that's

11   what I thought and assumed the state of play was as we

12   walked into the courtroom today.  And it's short.

13             Mr. Weisfelner says, "A majority of plaintiffs has

14   designated counsel as lead counsel for the May 2nd

15   conference.  Counsel will endeavor to further a continued

16   coordination amongst plaintiffs.  The May 2nd conference

17   agenda should not include debate about the appropriate

18   procedures for such coordination, and if necessary, it can

19   be addressed at a later conference."

20             I agree with that.  I think that there's

21   coordination that still needs to be discussed as we move

22   forward.  These three esteemed counsel were designated to

23   appear on behalf of a majority of the plaintiffs for

24   purposes of today's hearing, and I just want to make sure

25   that I understand the state of play correctly.

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-5    Filed 10/02/17    Page 91 of 128
Pg 612 of 728

Page 90

1          THE COURT:  Well, I take it you're not asking me

2     for a ruling on that.

3          MR. ETKIN:  No.  I'm not asking you for a ruling

4     at all.  It's not something that really was placed on the

5     agenda, and it's really something for the plaintiffs'

6     counsel and their respective bankruptcy counsel to work out,

7     to the extent more coordination is necessary.

8          THE COURT:  Okay.  All right.  Anybody else -- oh,

9     there was a gentleman on the phone if I'm not mistaken.

10         MR. BECNEL:  Yes, Your Honor, Daniel Becnel of

11    Becnel Law Firm.  I have since filed in the Eastern District

12    of Louisiana --

13         THE COURT:  Okay.  Pause please.  Was it Becnel?

14         MR. BECNEL:  Becnel, B-e-c-n-e-l.

15         THE COURT:  And did you give me a letter, Mr.

16    Becnel?  My prep didn't reflect that letter.

17         MR. BECNEL:  No, we did not submit a letter.

18    We've been on all of the conferences though.

19         THE COURT:  I beg your pardon?

20         MR. BECNEL:  We've been with all of the conference

21    calls that all of the lawyers have had together.

22         THE COURT:  Well, forgive me, Mr. Becnel, I asked

23    another attorney to put himself in my shoes, and I'm going

24    to do the same with you.  But frankly I'm not looking for

25    your understanding.  I'm looking for you to understand my

Page 91

 1    ruling.

 2              I have before me one full courtroom here, and I

 3    believe I have two overflow courtrooms.  And I issued an

 4    order to obviate this exact situation, which every one of

 5    the other lawyers in this entire case was fully able to

 6    comply with, and when I issue an administrative order to

 7    avoid conduct that results in chaos in a case on my watch, I

 8    need the legal community to understand that when I issue

 9    orders, I mean them.

10              So respectfully, I am denying you the opportunity

11    to be heard.  If you have concerns, I'm sure that Mr.

12    Weisfelner or his colleagues will return your phone calls.

13    And as you've undoubtedly heard, they're fairly capable

14    advocates.

15              So I think my ruling is clear.  I'm denying you

16    the opportunity to be heard for failure to comply with the

17    requirements of my case management order.

18              Mr. Stein -- is there anybody else on the phone,

19    of course, a person on the phone who has complied with the

20    requirements of the order?

21         (No response)

22              THE COURT:  Mr. Steinberg, you can reply.

23              MR. STEINBERG:  Your Honor, I'm going to be very

24    brief.  One, to the extent there was a discussion about

25    mediation and Ken Feinberg, I want to just make it

Page 92

1    absolutely clear that Mr. Feinberg has not been retained to

2    examine the economic losses which are inherent in these

3    lawsuits.  His focus has been on the accident victims.

4            Second, that the accident victims, while not a

5    part of our motion to enforce, it does not mean that there

6    -- that our position is not that they are retaining

7    liability at this point in time for the pre-sale accident

8    victims only.

9            Third, that I agree with Mr. Weisfelner and Mr.

10   Flaxer that I think as far as melding the two procedures and

11   making sure that the adversary proceeding, the contested

12   matter are all dealt with efficiently, I think we'll be able

13   to do that and work with each other to do that.

14           I did think Mr. Flaxer had actually a very good

15   suggestion on the fraud and the court issue, is that once we

16   go through the stipulated facts and the -- whether there

17   will be discovery and if so, what narrowly tailored

18   discovery there will be, then we will be able to evaluate

19   whether it's still efficient to deal with fraud on the Court

20   or not as a threshold issue.

21           And so our suggestion would be as Mr. Flaxer has

22   modified it, is to let us go through the process of

23   stipulated facts and if we do want to put on fraud on the

24   Court as a threshold issue because we actually think we can

25   get rid of it based on a legal theory, and whatever facts we

Page 93

1   stipulated to, we want to reserve the right to do it.  We're

2   not asking Your Honor to rule on that now or not, but we

3   would take that up at the next hearing if we're at that

4   stage.

5           As far as the GUC Trust, the late filed claim, the

6   reality is that the person who raised this issue was not me

7   in my letter.  The person who raised the issue was the

8   objector, and I think it was Mr. Weisfelner who claimed a

9   denial of procedural due process for failure to get notice

10  of the bar order, and saying that he had no other remedy,

11  and the only remedy that he could possibly look to is New

12  GM.

13          The other person who put it on the calendar was

14  Mr. Flaxer's client, because we've agreed that a threshold

15  issue is three -- I'm sorry, 60(d)(1), which is that if

16  there was some kind of a violation, is there -- should there

17  be an equitable remedy that's fashioned against New GM for

18  Old GM's conduct.

19          So he's put on the issue as to whether -- because

20  there's no other opportunity to get any kind of recovery,

21  that you have to look to New GM.

22          Now, when I said that I didn't concede that this

23  was a threshold issue or not, it was because it was more

24  nuanced.  I'm not trying to suggest that as a threshold

25  issue we brief the Pioneer issues.  What I am suggesting is

1    that the plaintiffs here cannot make a legitimate procedural

2    due process argument relating to the bar order if they want

3    to sleep on their rights and not go against Old GM while Old

4    GM is still sitting with securities.  And I thought that

5    that needed to be flabbed (ph).

6            And that if it's inherent in the 60(d)(1) issue

7    that they're going to look to us because they otherwise have

8    no other remedy, then I think that that is an issue that has

9    to be dealt with.  Having said that, and I don't say

10   anything more on that issue.

11           I do think, Your Honor, and I wasn't sure why Mr.

12   Weisfelner went into it, but his concerns with regard to an

13   issue that I think Your Honor dealt with adequately, which

14   is dealers who may have tried to put conditions on fixing an

15   ignition switch, and Your Honor asked essentially, why are

16   you asking me that, I think New GM clarified that.  And as

17   far as we know, it was one dealer, and it was immediately

18   dealt with, and when they asked whether there were other

19   dealers involved, we never got a list for anything else.

20           So I only say that not because it's relevant to

21   anything here, except that there is press that is listening

22   to this issue, and everybody likes to say in a very broad

23   brushed way, New GM is acting irresponsibly.  On this

24   particular issue, we did act responsibly, and on all the

25   issues I think we're trying to act responsibly.

1          And to the extent that Mr. Weisfelner conceded

2     that he wasn't a class action lawyer, or a negligence

3     lawyer, he's probably also not a scientist or an engineer

4     who could decide whether the air bag issue is one thing or

5     another thing.

6          I only say that again because the people listening

7     here, that it should be absolutely clear that you can say

8     whatever you want to say, but at the end of the day, it

9     ultimately has to be grounded in fact and a probable claim.

10          Other than that, Your Honor, we appreciate the

11     time you've given us today.

12          THE COURT:  All right.  Ladies and gentlemen, I

13     want you to take a lengthy bathroom break, but hopefully no

14     more than that.  I would like people who are interested in

15     my resulting directions to be back in 15 minutes.  That

16     would be 25 to 1 on the clock up there.

17          I can't guarantee you that I'll have it buttoned

18     up all then, but I don't want to impose on you to wait any

19     more than you need to.  We're in recess.

20          (Recessed at 12:21 p.m.; reconvened at 1:10 p.m.)

21          THE COURT:  Have seats, please.  I apologize for

22     keeping you all waiting.  Here's what we're going to do.  In

23     most respects, it will be similar to my tentatives, but with

24     some refinements.

25          One, I want to leave as much time for thoughtful

09-50026-mg   Doc 14127-1   Filed 10/02/17   Entered 10/02/17 12:32:50   Exhibit A
Case 1:14-md-02543-JMF   Document 4657   Filed 10/02/17   Page 97 of 128
Pg 618 of 728

Page 96

1    briefing and thought by the Court as possible.  But at the

2    same time, I want this to proceed as expeditiously as I can

3    consistent with fairness.  So we're going to consider as

4    threshold issues the two remaining issues shown on Mr.

5    Weisfelner's blackline, the discrimination argument, the

6    possibility that the claims now being asserted may be claims

7    against Old GM or the GUC Trust, and subject to what I say

8    momentarily, even the fraud on the Court contentions.

9            Messrs. Steinberg, Weisfelner, Flaxer, Martorana,

10   and Golden, or their designees, are to confer and to prepare

11   an order then to be settled on three business days' notice

12   or overnight mail, consistent with these determinations that

13   I'm dictating now, but putting meat on the bones, and

14   providing for agreed upon dates.

15           Two, you're to meet and confer to agree upon facts

16   to the maximum extent possible, consistent with your

17   professional duties to your clients.  To the extent you need

18   to agree to disagree, you're to identify the matters that

19   you can't agree upon and jointly present those identified

20   matters to me, after which I'll determine the materiality of

21   what's not agreed on and how it should affect further

22   proceedings, either by way of authorizing limited discovery,

23   or by taking issues off the table for now, and determining

24   them later.

25           As a general matter, we're going to get as far as

Page 97

1    we can without discovery.  And notwithstanding what my case

2    management order otherwise provides, there will be no

3    discovery in either the adversary proceeding or the

4    contested matter until and unless I order otherwise.

5            Three, I consider it preferable to consider the

6    fraud on the Court claims as early as possible, and at this

7    juncture, I'm including it as an issue to bring before me as

8    one of the threshold issues.

9            But I recognize or at least assume that the fraud

10   on the Court claim is likely to require at least some

11   discovery.  You're to confer and see if you can agree on

12   limited discovery that will meet your respective needs on

13   this.  I hope, but I'm not sure that you'll be successful.

14           If after good faith discussion, agreeing on

15   limited discovery is impossible, either side will be

16   permitted to take the fraud on the Court issues off the

17   table as threshold matters, and to defer them for

18   consideration until a later time, assuming that you first

19   identified the problem to me and gotten my green light to do

20   so.

21           Four, I agree with Mr. Martorana and Mr. Golden

22   that the matters involved in compliance with Pioneer are

23   fact intensive, and are not appropriately threshold issues.

24   But any party will be free to assert that claims now being

25   asserted against New GM are prepetition and not post-

Page 98

1    petition claims.

2            Before any decision is made on the extent to which

3    the GUC Trust might have to satisfy any of those claims,

4    each of Wilmington Trust and any holders of GUC Trust units

5    will have full opportunity to be heard on any and all

6    issues.

7            Each of Wilmington Trust and any holders of GUC

8    Trust units, though in the latter case, with the same kinds

9    of coordination that I expect from the plaintiffs' side,

10   will have unlimited standing to be heard on not just GUC

11   Trust related issues, but on any of the issues that we're

12   considering as part of this exercise; either in the

13   adversary proceeding or the contested matter.

14           Likewise, in the Wilmington Trust and any holders

15   of GUC Trust units, again subject to the coordination

16   requirement, will be free to participate in any discovery I

17   authorize in connection with the remainder of the issues,

18   even though I'm not authorizing any such discovery now.

19           But related to that, to the extent Wilmington

20   Trust told me in our discussion that it had a desire for

21   discovery, its request for that is denied at this time,

22   without prejudice to renewal at a time when it's more

23   appropriate.

24           Five, I will not interfere with the MDL panel's

25   hearing now scheduled for May 29 and will permit the

Case 1-14-ma-02543-3ML    Document 467-5    Filed 10/02/17    Page 100 of 120

Page 99

1    judicial panel and multi-district litigation to rule on

2    where pretrial proceedings with respect to any of the

3    underlying actions might proceed.

4            But this ruling is without prejudice to the rights

5    of any party to ask me to stay further proceedings before

6    the transferee judge based on rulings in this Chapter 11

7    case, or based on any perceived delay in my issuing rulings

8    in this Chapter 11 case.

9            Six, anyone who is unwilling to agree to the

10   temporary stand still that the majority seems to agree upon

11   must come forward before me within a time certain, either on

12   the date proposed in the Steinberg and Weisfelner letters,

13   or an alternative date they might agree upon, in

14   consultation with the other parties that I've allowed to

15   participate in the formation of the order, with a motion

16   asking me to rule on whether I should force such a

17   standstill on the dissenter by TRO or preliminary

18   injunction.

19           Nothing in the scheduling order will, however,

20   change the usual burdens associated with getting a TRO or

21   preliminary injunction relief.

22           Seven, parties are to identify any and all issues

23   they want me to decide by a date certain to be proposed by

24   that team who I've designated for that purpose, the same one

25   that's preparing the proposed form of order, and to state

1    whether or not their issues to be addressed as threshold

2    issues or not.

3            They are then to confer with the others as to when

4    any such issues are best decided, whether as threshold

5    issues or as later issues.  If any such additional issues

6    are to be presented as threshold issues, briefing on them

7    should be rolled into the briefing, otherwise authorized.

8    But if they're not perceived to be threshold issues, they

9    can be deferred with a full reservation of rights.

10           Eight, matters in the adversary proceeding and in

11   the contested matter will be jointly administered.  For the

12   avoidance of doubt, this will include joint briefing and

13   joint discovery, if and when any discovery is authorized.

14           Parties should agree upon a preferred place for a

15   single docket to file all of the documents in connection

16   with this controversy, and to provide for that in the

17   proposed order.  As far as I'm concerned, either the

18   adversary or the contested matter will be equally

19   satisfactory.

20           Nine, other than as I stated, I don't think that I

21   intended to disapprove anything that had been agreed upon

22   between Mr. Steinberg and the class action plaintiff

23   steering committee.  But for the avoidance of doubt, if you

24   think I left something out, or was inconsistent in my

25   rulings, I would ask that you tell me that now.

Page 101

 1            Ten, the matter of mediation is deferred without

 2      prejudice to anyone's right to raise the issue at a later

 3      time.

 4            So, folks, you can take the weekend off, but after

 5      that, please get together as soon as practical to get me an

 6      agreed upon form of order, at least agreed upon between the

 7      people I mentioned, then to be settled.  That order should

 8      take care of details, such as proposed dates, which I've

 9      intentionally left out of the rulings I just announced.  I

10      think you can and should meet your needs and concerns on

11      that.

12            Now, not by way of reargument, I suspect that

13      there may be some details I failed to address or some loose

14      ends, and I'll allow people to be heard on that.

15            Mr. Steinberg?

16            MR. STEINBERG:  Your Honor, I think I can deal

17      with everything you said.  The only thing is, do we talk to

18      your chambers about the next status conference date, or do

19      you want to give us the date and we'll try to back into to

20      the sum of the requirements before then?

21            THE COURT:  My preference, I think, Mr. Steinberg,

22      is that we do it as an iterative process.  You guys, after

23      you've figured out the time you need, tell me what you would

24      recommend as far as a date within a zone.  Thereupon my

25      courtroom deputy, Ms. Calderone will see how it fits into

Page 102

1    the schedule.  She'll advise you what we're in a position to

2    do, and then you can either massage your dates, or plug the

3    date we give you into the order that you settle.

4            MR. STEINBERG:  That's acceptable, thank you.

5            THE COURT:  Okay.  Anything else?  Mr. Esserman,

6    were you rising to be heard in any way?

7            MR. ESSERMAN:  No, thank you, Your Honor.

8            THE COURT:  Oh, okay.  All right.  Does anybody

9    have anything else?

10       (No response)

11           THE COURT:  No.  Okay.  Thank you very much.

12   We're adjourned.

13   (Proceedings concluded at 1:22 PM)

14                       * * * * *

15

16

17

18

19

20

21

22

23

24

25

Page 103

1                    I N D E X

2

3                    R U L I N G S

4    IDENTIFICATION                                    PAGE

5    Judge's ruling                                    95

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 104

1                    C E R T I F I C A T I O N

2

3        I, Dawn South, certify that the foregoing transcript

4    is a true and accurate record of the proceedings.

5

6    Dawn South          Digitally signed by Dawn South
                         DN: cn=Dawn South, o=Veritext, ou,
7                        email=digital@veritext.com, c=US
                         Date: 2014.05.05 13:12:50 -04'00'

8    AAERT Certified Electronic Transcriber CET**D-408

9

10        I, Sheila G. Orms, certify that the foregoing is a

11    correct transcript from the official electronic sound

12    recording of the proceedings in the above-entitled matter.

13

14    Dated:  May 3, 2014

15

16    Shelia G. Orms        Digitally signed by Shelia G. Orms
                           DN: cn=Shelia G. Orms, o=Veritext, ou,
17                          email=digital@veritext.com, c=US
                           Date: 2014.05.05 13:13:22 -04'00'

18      Signature of Approved Transcriber

19    Veritext

20    330 Old Country Road

21    Suite 300

22    Mineola, NY 11501

23

24

25

[& - addressed]                                                                    Page 1

| & | 2 | 6 | |
|---|---|---|---|

**&**

**&** 3:2,10,17 4:1
5:10 7:1,8,15 8:1,7
45:23,24 81:19

**0**

**01:19:05** 57:13
**07068** 6:4
**09-50026** 1:6

**1**

**1** 21:21 22:19 89:9
89:10 93:15 94:6
95:16
**10** 16:22
**10014** 6:20
**10017-2024** 8:11
**10018** 4:19
**10020** 6:11
**10022** 3:20
**10022-7619** 7:11
**10036** 5:4
**10036-4003** 3:5
**10036-6745** 5:13
**1006** 6:19
**101** 8:2
**10166-0193** 4:4
**10169** 5:20
**10178** 8:3
**10:44** 45:13
**11** 1:5 99:6,8
**1100** 7:3
**11501** 104:22
**1185** 3:4
**1251** 6:10
**12:21** 95:20
**13** 54:7
**14-01929** 1:16
**1407** 49:23
**14th** 23:22 79:24
**15** 26:22,23 95:15
**165,000** 34:12
**19** 4:10
**1:10** 95:20
**1:22** 102:13

**2**

**2** 2:5 29:4
**20** 29:5
**200** 4:3
**20005** 7:4
**2006** 34:11
**2009** 11:11
**201** 6:18
**2014** 2:5 104:14
**21st** 7:10
**2200** 7:17
**230** 5:19
**2323** 7:16
**23rd** 11:24 12:11
13:13,20 15:20 16:3
**24** 57:9
**24th** 11:21 20:8
**25** 95:16
**26** 80:14
**28** 49:23
**29** 98:25
**29th** 16:5 24:16
25:25 49:14 50:12
50:18
**2nd** 28:3 89:14,16

**3**

**3** 21:24 22:25 65:16
104:14
**3,500** 9:16
**30** 12:1 15:21 39:20
84:21
**300** 3:12 104:21
**30th** 43:1 85:20
**330** 104:20
**35** 18:5
**36th** 8:10

**4**

**4** 21:23 29:5
**408** 104:8
**425** 8:17
**437** 3:19

**5**

**5** 13:14 22:20
**50** 87:25

**6**

**60** 10:25 11:16
21:20,21,24 22:25
23:6 39:3 44:5 51:4
77:7,7 93:15 94:6
**600** 7:9
**60654** 3:13
**610** 21:23
**620** 4:18
**65** 6:3

**7**

**7** 13:25
**70068** 8:19
**75201-2689** 7:18
**780** 8:9

**9**

**92660** 4:11
**95** 103:5
**9:46** 2:6

**a**

**a.m.** 45:13
**aaert** 104:8
**abade** 58:13
**abandon** 40:11,14
**abc** 1:13
**ability** 19:22 73:9
86:25
**able** 12:19 21:8
23:7 26:10 27:8,24
29:9 31:14 32:9
34:2,22,22 61:15
75:25 78:3 79:18
88:24 91:5 92:12,18
**absolutely** 32:14
86:16 92:1 95:7
**acceptable** 102:4
**accepted** 36:12
**accident** 32:21 33:3
34:24 37:4,16,17,18
39:16,17 40:6 92:3
92:4,7
**accidents** 32:18
33:1 37:19 39:20
**accommodated**
57:6

**accomplish** 12:19
17:22 30:11 44:6,16
**accomplished** 15:15
16:16
**account** 61:5,15
**accounted** 38:18
**accurate** 64:17
104:4
**achieve** 88:24
**acknowledged** 74:1
**act** 94:24,25
**acting** 69:17,21,24
69:25 87:23 94:23
**action** 12:15 13:15
15:10 24:4,10,11,12
24:20 25:10 26:11
26:11 36:19 49:11
51:4 55:13 69:3
88:1 89:1 95:2
100:22
**actions** 10:25 11:1
11:16 37:7 38:2
70:13,23,23 71:17
71:19 72:16,16
86:23 88:18 99:3
**activities** 46:1 50:11
**acts** 52:22
**actual** 34:11 76:24
**add** 55:11 78:22
79:5
**added** 76:1
**additional** 22:2,3
54:22 55:11 79:15
100:5
**address** 10:23 12:12
20:22 21:8 23:17
25:1 46:5 47:22
56:13 71:14 78:13
82:15 101:13
**addressed** 9:22,23
10:10 13:6,24 14:15
14:24 15:5,6,15
17:8 20:16 42:12,17
58:18 77:20 82:4,8
82:13,18 83:5 89:19
100:1

| | | | |
|---|---|---|---|
| addresses 49:25 | 79:12,24 89:17 90:5 | amend 79:25 | 98:23 |
| addressing 12:25 | aggrieved 41:14 | amended 24:3,9,19 | appropriately 26:6 |
| adequately 94:13 | agree 16:19,20 | 24:23 25:18,19 26:3 | 97:23 |
| adjourned 102:12 | 17:20 18:8,8,10,22 | 52:1,6 | approved 104:18 |
| adjournment 45:8 | 21:14 23:11,23 26:2 | amending 79:14 | approving 22:19 |
| adjudicate 87:4 | 27:5,18,20,24 28:7 | amendment 23:21 | april 11:21,24 12:1 |
| adjust 31:24 | 28:21 36:21 38:7 | amendments 14:3 | 12:11 13:13,20 |
| adjusted 74:7 | 39:7 50:9 54:3,11 | 80:1 | 15:20,21 16:3 20:8 |
| adjustment 42:5 | 61:14 70:12 75:2 | americas 3:4 6:10 | 43:1 85:20 |
| administered 1:7 | 79:8 81:3 84:9 | amount 87:6 | arbitrate 70:7 |
| 19:8 100:11 | 87:10 89:20 92:9 | amy 1:16 | arbitration 68:18 |
| administrative | 96:15,18,19 97:11 | analogy 62:24 | area 54:21 75:24 |
| 24:18,20 26:2 28:6 | 97:21 99:9,10,13 | ands 46:9 | arguably 70:25 |
| 91:6 | 100:14 | anecdote 69:14 | 71:20 |
| admission 27:6 | agreed 17:6 40:23 | announced 34:6 | argue 10:7 62:16 |
| admissions 18:1,5 | 41:10 42:11,13 | 36:4 101:9 | 63:5 74:20 85:10 |
| 26:16 27:2,11,11 | 71:18 93:14 96:14 | announcement 33:8 | argues 21:21 |
| 42:18 57:21 | 96:21 100:21 101:6 | 34:14 35:7 | argument 14:22,22 |
| admitted 18:2,3 | 101:6 | answer 27:6 57:22 | 38:1 43:14,21 62:1 |
| admonition 54:18 | agreeing 17:24 | 71:15 72:24 80:13 | 62:15 94:2 96:5 |
| 84:7 | 97:14 | answering 27:5 | arguments 73:20 |
| adv 1:15 | agreement 23:13 | anticipate 51:7 53:3 | art 47:3 |
| advanced 53:6,9 | 24:16 32:15 42:6 | 74:12 | arthur 3:7 |
| advantage 55:8,23 | 69:11 80:6 | anticipated 52:16 | article 49:16 |
| advantages 55:16 | agreements 54:18 | anybody 13:3,6 | articulating 43:3 |
| advent 55:7 | 70:7 | 20:6 21:1 59:19 | ascertain 17:5 22:9 |
| adversaries 17:19 | ah 67:25 | 64:22 81:13 86:14 | 67:19 |
| 18:13,18 19:5,6,9 | ahead 66:20 | 90:8 91:18 102:8 | ascribed 72:4 |
| adversary 13:10 | air 71:12,14,14 95:4 | anybody's 17:3 | asked 17:16 18:25 |
| 18:12,22,25 19:4 | airline 8:17 | 42:4 56:16 | 32:13 38:12,20 |
| 23:20 25:18 39:3 | akin 5:10 84:4 | anymore 45:7 | 43:24 44:15 46:1 |
| 55:9,11,17,24 56:1 | al 1:7,8 4:9 5:2 8:16 | anyone's 101:2 | 50:11 58:5,12 66:22 |
| 56:11,13,22 57:14 | allegations 52:12 | apologize 14:4 | 88:8 90:22 94:15,18 |
| 57:19 73:14 76:14 | 55:16 72:3 | 95:21 | asking 79:11 85:22 |
| 79:15,17 80:5,18 | alleged 12:5 78:14 | appear 12:8 19:15 | 90:1,3 93:2 94:16 |
| 92:11 97:3 98:13 | allison 1:16 | 50:15 89:23 | 99:16 |
| 100:10,18 | allow 9:14 14:19 | appearing 45:18 | assert 19:22 22:1 |
| advise 47:15 78:3 | 24:16 48:5 56:15 | applies 61:25 | 36:18 76:14 79:21 |
| 102:1 | 74:8 86:18 101:14 | apply 64:19,20 66:2 | 84:24 86:4,25 87:1 |
| advocated 84:10 | allowed 20:18 60:23 | 73:23 74:19 | 97:24 |
| advocates 60:14 | 84:22 87:5 99:14 | appreciate 10:12 | asserted 28:4 38:9 |
| 91:14 | alternate 16:22 | 95:10 | 68:21 83:1 84:12 |
| affect 51:24 64:16 | alternative 31:16 | appropriate 15:2 | 85:12,12 96:6 97:25 |
| 79:2 96:21 | 73:24 81:8 99:13 | 19:1,5 44:18 46:3 | asserting 19:21 |
| afforded 55:19 | amenable 14:19 | 48:7,17,22 50:3 | asset 32:15 |
| agenda 9:20 23:19 | 80:21 | 56:15,20 65:8 75:17 | assets 32:16 |
| 25:14 29:10 30:16 | | 86:1 87:16 89:17 | |

**assist** 88:11
**associated** 59:1
99:20
**assor** 3:17
**assume** 31:13 33:18
38:1,8,15 54:4
60:10 65:8 71:18
97:9
**assumed** 11:7 32:16
32:23 33:4 36:12
89:11
**assuming** 14:1 85:3
86:14 97:18
**assumption** 38:6
**attempt** 58:5,12
71:17 75:10,15
**attempted** 85:12
**attention** 41:6
48:14 61:9,20,22
68:5,24 69:8 70:3
83:15
**attorney** 3:11 4:2,9
6:2,9,16 8:8,16 47:6
90:23
**attorneys** 3:3,18
4:16 5:2,11 20:21
60:13
**attractive** 20:11
**authorize** 98:17
**authorized** 100:7
100:13
**authorizing** 96:22
98:18
**auto** 46:17
**automatically** 80:17
**available** 20:20
63:12,13 86:21
**avenue** 3:4,19 4:3
4:18 5:19 6:3,10
7:9 8:2,9 23:15
**avoid** 10:14 46:6
56:20 81:5,7 91:7
**avoidable** 81:7
**avoidance** 100:12
100:23
**avoided** 72:15

**avoiding** 57:25
**aware** 38:19 47:4
48:3 73:5 87:3

**b**

**b** 2:9 8:18 21:23
77:7 90:14
**back** 13:19 21:9
50:2 52:20 60:24
61:10,19 65:21
76:22 78:2 79:10
95:15 101:19
**backs** 80:14
**bad** 36:2 46:23
62:24
**bag** 71:12,15 95:4
**bags** 71:14
**bailiwick** 67:15
69:8
**balance** 21:17
**ball** 56:16
**bankruptcy** 1:1 2:1
2:11 13:1 22:19
25:2,14,21 27:12
30:18 41:6,8 49:12
50:25 55:13 61:7
64:14 74:2 84:25
87:2 90:6
**bar** 19:23 31:6
39:23 83:9 93:10
94:2
**bargained** 66:2
**barred** 13:18
**base** 31:24
**based** 11:23 14:10
37:5 38:19 44:14
60:1 63:16 78:4
82:6 83:10 92:25
99:6,7
**basically** 76:25 77:3
**basis** 14:7 15:25
40:3,5 70:1 74:4
76:6
**bathroom** 95:13
**battle** 20:11
**beach** 4:11
**bear** 40:19

**becnel** 8:15,21
90:10,10,11,13,14
90:14,16,17,20,22
**beg** 90:19
**beginning** 41:11
**behalf** 1:17 45:18
81:19 89:23
**behooves** 47:16
**believe** 36:8,17
82:18,20,22,24 83:4
91:3
**bell** 3:17
**beneficial** 85:18
**beneficiaries** 74:6,8
74:25
**benefit** 70:8
**benefits** 53:10
**benjamin** 8:5
**berman** 45:20
**best** 17:9 57:23 58:7
58:14 100:4
**better** 12:8 20:16
28:24 29:9 32:9,9
32:10 33:14 39:6
51:15,19 56:21
57:10 71:21 81:9
82:4
**beyond** 51:7 65:2
**big** 28:8 32:11 56:4
**bit** 54:23
**black** 14:19 43:1,3
43:6
**blackline** 96:5
**blaming** 48:1
**bleed** 46:9
**bleeds** 52:8
**block** 84:17
**blown** 39:23
**blush** 12:8
**board** 63:7
**boatload** 47:3
**bog** 59:2
**bogged** 17:23 41:4
71:24
**boils** 48:13
**boling** 2:2

**bones** 96:13
**bought** 65:15
**bound** 38:14
**bove** 8:13
**box** 11:13 32:17
37:21 38:22,23
**break** 44:19 95:13
**breathing** 42:1
**brian** 6:22
**bridge** 28:18
**bridged** 42:20
**brief** 59:20 91:24
93:25
**briefed** 17:13
**briefing** 29:6 30:12
49:1 96:1 100:6,7
100:12
**briefly** 88:3
**briefs** 14:8 80:21
**bring** 18:21 19:4
67:20 69:7 97:7
**bringing** 55:6
**broad** 76:19 94:22
**broader** 76:21
**broken** 67:4
**bromberg** 7:15
45:23
**brought** 13:10
17:19 19:6,9 23:20
34:9 37:7,24 38:3
38:11 41:6 61:8
68:23 70:2,10
**brown** 5:1 45:17
**brushed** 94:23
**bryan** 7:16
**bryant** 5:12
**build** 36:11
**building** 4:17 6:17
32:11
**bullet** 89:6
**bunch** 20:14 40:7
55:12
**bundle** 56:5,11
**bundling** 52:1
**burden** 29:3
**burdens** 99:20

[burdensome - complaint]                                                    Page 4

**burdensome** 15:7
**business** 96:11
**buttoned** 95:17

**c**

**c** 1:16,17 3:1,15 9:1
  90:14 104:1,1
**ca** 4:11
**calcagnie** 4:8 45:18
**calderone** 101:25
**calendar** 65:23
  93:13
**calibrations** 71:13
**california** 10:18
  14:6 26:8 50:14
**call** 17:1,8 49:9
  52:19 68:5
**called** 14:21,24
  25:14
**calling** 10:8 46:7
  71:9
**calls** 65:6 90:21
  91:12
**can't** 69:18 70:14
  95:17 96:19
**capable** 91:13
**caplin** 7:1,8 45:24
**car** 27:13 33:7,10
  33:18 34:3,5,13
  35:6,21,22,24 37:16
  37:17 40:8 68:16
  69:5
**care** 10:16 21:3
  101:8
**careful** 21:6
**cares** 20:6
**cars** 33:15,24,25
  34:10,16 35:11,14
  35:15,20 36:3,4,5
  36:10 60:11 65:16
  65:18 67:3,8
**carve** 60:8 64:22
**carved** 33:3
**case** 1:6 19:23
  41:24 50:17 51:1
  64:17 65:6 66:2,7
  91:5,7,17 97:1 98:8
  99:7,8

**cases** 32:24 34:8
  75:17
**catch** 74:9
**category** 13:11
  73:25
**cause** 13:16 38:13
  41:2 58:25 69:22
  71:12
**caused** 86:23
**causes** 13:1 69:2
**cents** 39:21 84:21
  84:22
**certain** 16:21 19:12
  26:20 27:14 84:4
  99:11,23
**certainly** 23:12 51:6
  51:22 52:2 56:18
**certified** 104:8
**certify** 104:3,10
**cet** 104:8
**chambers** 101:18
**chance** 20:7 28:14
  28:15 52:24 70:20
  81:14
**change** 44:15 75:14
  78:16 87:4 99:20
**changed** 44:14
**chaos** 91:7
**chapter** 1:5 99:6,8
**character** 20:1 26:5
**characterize** 46:11
  46:15
**characterized** 11:4
**characterizing**
  34:20
**charge** 22:16,17
**chartered** 7:1,8
**cheap** 67:7
**chevy** 34:12 67:7
**chicago** 3:13 49:14
**choice** 22:25 75:13
**chop** 64:22
**chops** 52:7
**circle** 7:2
**circuit** 10:19
**circumstance** 38:16

**circumstances** 23:6
  31:23 75:14 86:24
**cited** 18:19 51:10
**civil** 47:14
**claim** 32:10 38:8
  64:1 72:9 76:12,21
  84:24,25 86:13,15
  93:5 95:9 97:10
**claimants** 83:7,7,8
**claimed** 33:6 93:8
**claims** 11:4,22
  13:17 14:23,23,23
  14:25 15:3 19:19,21
  19:21,22,22 23:24
  31:2 36:15,18 39:21
  46:18 51:24 59:24
  60:1 67:10,20 68:20
  69:2 74:1,1,3,24
  76:25 82:3 83:1,21
  84:12 85:12 86:3,4
  86:18 87:5 96:6,6
  97:6,24 98:1,3
**clarified** 94:16
**clarity** 88:21
**class** 10:25 11:16
  12:15 13:15 15:10
  49:11 51:4 55:13
  74:4 88:1,18 89:1
  95:2 100:22
**classic** 58:19
**clear** 9:24 32:25
  35:8 36:23,24 44:3
  49:21 77:8 91:15
  92:1 95:7
**clearly** 18:20 44:7
  66:12
**client** 93:14
**clients** 61:25 74:13
  96:17
**climb** 19:4
**clinton** 1:16,17
**clock** 45:10 95:16
**clog** 55:14
**close** 16:23 42:21
  62:13
**closely** 45:22

**closer** 59:24,25 62:6
**coalesce** 25:19
**cobalt** 34:12,12
**cobalts** 67:7
**coleman** 8:16
**collars** 63:9
**colleagues** 44:17
  55:22 61:2 86:17
  91:12
**collect** 75:17 84:21
**collective** 45:25
  48:14
**collectively** 61:19
  72:20 73:11 75:11
**come** 9:17 16:20
  18:4 41:12 53:12,18
  54:14 56:17 57:10
  58:25 75:25 78:2
  80:17 81:15 85:1
  86:2 87:21 99:11
**comes** 18:7 48:10
**comfort** 64:6 73:17
  73:18
**coming** 42:21 53:13
**commence** 17:19
**commenced** 47:7
**comments** 9:15
**committed** 33:25
**committee** 15:10
  16:2 100:23
**common** 26:22
**commonality** 73:10
  73:10
**communication**
  68:25 70:6
**communications**
  22:9
**community** 85:2
  91:8
**company** 1:6
**compensated** 35:1,5
**competent** 67:12
**complaint** 9:18
  23:21 24:3,9,19,24
  24:25 25:9,18,19
  26:3 51:5,12 52:1,4
  52:6 55:2,9 79:25

Case 1:14-mc-02543-JMF    Document 4637-5    Filed 10/02/17    Page 10 of 128

[complaint - court]                                                                                    Page 5

80:12
**complaints** 25:20
  51:2,4,12 52:12
  54:24 55:4,11
**complete** 28:16
  34:2 75:25
**completely** 68:4
**complex** 21:14
**compliance** 97:22
**complied** 91:19
**comply** 36:13 91:6
  91:16
**complying** 11:14
**compound** 84:22
  85:4,4
**con** 85:10
**concede** 93:22
**conceded** 95:1
**concepts** 40:23
**concern** 13:1 70:11
  76:14
**concerned** 14:16
  66:24 69:25 71:2
  75:6 85:20 100:17
**concerns** 10:23
  13:22 20:11,16
  80:16 91:11 94:12
  101:10
**conclude** 27:22
**concluded** 47:15
  102:13
**conclusion** 73:22
**concrete** 28:1
**conditioned** 69:1
**conditions** 94:14
**conduct** 11:23 12:6
  35:10,10 36:9 70:11
  70:11,14 71:18 72:6
  91:7 93:18
**confer** 96:10,15
  97:11 100:3
**conference** 2:14
  10:4 25:11,12,13
  26:4 27:18 30:11,21
  30:21 48:23 51:8
  56:19 63:3 78:11,19
  79:3 80:14 89:15,16

89:19 90:20 101:18
**conferences** 90:18
**conferring** 10:14
  56:14
**confess** 78:12
**confident** 22:22
**confirm** 32:13
**congress** 63:12
**congressional** 47:4
**conjunction** 75:21
**connect** 24:22
**connection** 21:10
  24:10 60:24 68:13
  68:19,21 88:10
  98:17 100:15
**consensus** 53:21
  68:9 75:25 77:18
  82:7,11,17
**consenting** 68:18
**consequences** 47:15
**consider** 14:9,17
  21:17 30:19 66:6
  73:24 96:3 97:5,5
**consideration** 21:6
  26:3 28:20 47:18
  49:18,19 57:18
  72:12 97:18
**considered** 15:3,17
  20:5 22:4 43:20
**considering** 79:25
  98:12
**consistent** 18:8,14
  49:21 96:3,12,16
**consists** 49:16
**consolidate** 18:17
**consolidated** 19:7
  24:25 51:5 80:8
**consolidation** 80:21
**constituency** 67:24
**constitute** 72:9
**constitutes** 70:22
**constructed** 35:16
**consultant** 88:7
**consultation** 73:8
  99:14
**consulting** 61:2

**consumer** 60:14
**consumers** 64:11
**consuming** 75:3
**contained** 68:20
**contemporaneously**
  80:8
**contends** 72:16
**contention** 65:14,14
**contentions** 15:19
  17:11 64:17 96:8
**contested** 18:13,17
  55:18 56:12 57:14
  57:19 80:5 92:11
  97:4 98:13 100:11
  100:18
**contests** 57:25
**context** 63:23 64:19
  70:10
**continue** 20:24
  26:13
**continued** 89:15
**contrasted** 65:7
**controversy** 100:16
**conversely** 13:5
**converts** 61:22
**convey** 88:8
**cooperation** 88:25
**coordinate** 46:1
**coordination** 53:7
  89:16,18,21 90:7
  98:9,15
**corners** 20:18
**corollary** 15:18
  52:17
**corp** 1:8
**corporate** 4:10
  47:12
**correct** 32:15 36:19
  38:7 39:22 41:19
  45:21 50:4,21 54:7
  80:23 85:9,14
  104:11
**corrected** 35:14
**correctly** 40:22
  76:5 77:5 89:25
**cost** 18:6 27:3 59:20
  66:16

**costs** 20:21
**council** 63:12
**counsel** 9:3 26:1
  50:25 51:14 64:6
  75:21,22 81:4 84:4
  84:10 88:7,12 89:8
  89:14,14,15,22 90:6
  90:6
**counsel's** 9:19
**count** 47:8
**country** 11:2,17
  104:20
**couple** 11:1 15:19
  46:8 84:17
**course** 11:10 73:8
  91:19
**court** 1:1 2:1 9:2,9
  9:11 14:11 18:21
  21:19,25 22:2,5,6
  24:8 26:5,13 27:16
  33:13,17,21 35:15
  35:18 37:2,11,18
  39:6,19,23 40:22
  41:17,20,22 42:24
  43:8,11,16,17,25
  44:2,4,9,21 45:6,9
  45:12,14,19 48:20
  49:20,25 50:5,10,10
  50:19,20,22,24
  51:21,23 52:16,24
  53:3,18,25 54:5,7,8
  54:12 56:2,7,24
  58:1,15,19,25 59:6
  60:15,17,19,21
  61:11,16 62:8,13
  63:15,25 64:2 65:1
  65:5,10 66:14,16,20
  66:22 67:12,17 68:1
  69:13 70:19 75:19
  76:13,18 77:2,6,14
  77:17 78:4,6,6,18
  79:9,18,21 80:19,24
  81:11,13,21,23,25
  82:10 83:24 84:1,15
  84:17,20 85:6 86:8
  86:22 87:19,21 88:8
  88:13,14,16 89:9

90:1,8,13,15,19,22
91:22 92:15,19,24
95:12,21 96:1,8
97:6,10,16 101:21
102:5,8,11
**courtroom** 42:22
44:25 49:7 69:11
81:16 89:12 91:2
101:25
**courtrooms** 45:1
91:3
**court's** 67:15 87:15
**covenant** 36:12,13
**cover** 80:22
**covered** 81:2
**covers** 77:4
**creates** 36:15
**creditor** 31:11 85:1
**creditors** 14:22
19:16 58:20
**criminal** 47:14
**crossed** 43:12,23
**crudely** 56:7
**cruder** 56:9
**crutcher** 4:1 81:19
**currently** 47:9
52:14,15 75:8
**curtailing** 44:7
**cut** 64:21
**cyganowski** 73:8
87:23 88:6

**d**

**d** 8:5 9:1 21:21,24
22:25 77:7 93:15
94:6 103:1 104:8
**dallas** 7:18
**damage** 11:8 14:25
32:19 34:25 60:9,11
66:25
**damaged** 73:21
**damages** 66:23 67:5
67:9 72:5 75:17
84:24,25 85:1
**daniel** 5:16 8:21
84:3 90:10
**darby** 6:2,9

**date** 16:6,21,22
17:5,18 19:12,23
38:2 39:23 41:10
42:8 57:6 79:23,23
79:25 80:3,13,14
83:9 99:12,13,23
101:18,19,24 102:3
**dated** 104:14
**dates** 30:2,5,6,8
79:7,11 80:15,17
96:14 101:8 102:2
**david** 5:7,22 88:3,4
**davidson** 3:8
**davis** 4:8
**dawn** 2:25 104:3
**day** 10:7 30:7 32:8
42:25 63:4 95:8
**days** 9:17 17:2
**days'** 96:11
**dc** 7:4
**deadline** 17:10
79:14
**deal** 15:13 29:22
31:23 43:22,24 59:1
61:24 69:17 72:21
92:19 101:16
**dealer** 35:24 68:13
68:14 71:3 94:17
**dealers** 68:25 69:21
69:22,23 94:14,19
**dealing** 29:4,8,12
61:23 65:23 69:23
**deals** 35:8 57:18
**dealt** 31:3 69:5
83:18 89:1 92:12
94:9,13,18
**death** 11:7,10 14:23
60:8,10 66:25
**debate** 89:17
**debated** 85:15
**debtors** 1:10
**decent** 9:21
**decide** 18:10 20:17
20:18 25:13,21
29:14 53:22 54:1
56:5 59:15 65:25
66:4 78:8,17 95:4

99:23
**decided** 17:7 39:9
41:8,22 43:4 58:24
76:6 100:4
**decides** 66:11
**decision** 25:24 53:8
98:2
**decisions** 18:19
**declaratory** 18:24
**deem** 46:2
**defect** 34:17 46:13
71:10
**defective** 64:12,13
**defendant** 1:23
**defendants** 30:22
**defending** 37:8
**defer** 26:2 28:20
59:5,6 97:17
**deferred** 25:10
100:9 101:1
**define** 25:15
**defined** 37:23,24
**definition** 38:5
**definitively** 71:18
**deflect** 83:14
**defrauding** 65:9,10
65:13
**delaware** 20:13
**delay** 99:7
**delays** 42:10
**deluco** 1:12
**delve** 48:21
**demarcation** 15:2
21:11 36:23 76:4
**demonstrate** 72:3
**denial** 66:5 74:21
93:9
**denied** 48:16 64:24
66:1 98:21
**denominator** 26:22
**denying** 91:10,15
**department** 6:15
**depending** 46:23
**depends** 82:10
**deploy** 71:12
**deprived** 64:18
73:21 86:25

**deputy** 101:25
**designated** 89:14,22
99:24
**designees** 96:10
**desire** 73:11 98:20
**detail** 28:5 53:11
54:23
**details** 12:5 49:1
62:11 70:17 101:8
101:13
**detected** 53:12
**deterioration** 34:13
35:6 40:8
**determination** 10:2
48:19 58:23 62:12
67:12
**determinations**
52:23 96:12
**determinative**
66:10
**determine** 26:6
27:23 49:17 52:5,11
61:24 67:22 85:11
87:8,12 96:20
**determined** 10:11
57:25 62:4,23
**determining** 62:22
74:3 96:23
**develop** 78:15
**developed** 80:2
**developing** 78:1,20
**develops** 52:15
**device** 18:6
**devil** 12:5 28:4
70:17
**dialogue** 27:4,8
**dicey** 72:8
**dictating** 96:13
**didn't** 69:18 73:9
73:15 88:2,12 90:16
93:22
**differ** 77:17
**differed** 42:21
**difference** 14:13,14
35:20 42:8 43:5,12
43:13 48:8 50:15
53:12 65:9 72:23

77:7 78:10

**differences** 39:4 41:10 42:17 48:24

**different** 13:3 22:13 23:19 27:7 35:25 50:6 51:4 52:20 56:24 57:11 58:20 63:16

**differing** 26:20

**difficult** 28:11 70:24 76:15

**difficulty** 12:20

**dilute** 74:24

**direct** 72:9

**directed** 33:14

**direction** 42:2 60:13 62:18

**directions** 95:15

**directive** 52:13

**directly** 46:9

**disagree** 18:10 30:8 96:18

**disagreeing** 24:18

**disagreement** 24:15 49:9 53:20

**disapprove** 100:21

**disbursed** 51:19

**disclosure** 22:11

**discomfort** 86:22 86:22 87:3

**discord** 88:9

**discoverable** 63:11

**discovery** 15:6,7,8 15:11,13,22,23,24 17:23 21:13,13,14 22:2,3,12,14,21,23 23:3,3,14 27:22 28:17 29:7 30:13 39:5 40:18 43:20 44:6 46:20,20 47:13 47:18 49:1 57:24 59:2,4,7,14,16,21 62:5,13 63:15,22 76:7,8,9,10,20,23 76:24,25 77:12,15 77:21 80:6 81:6 82:21,21 83:20 87:6

87:9 92:17,18 96:22 97:1,3,11,12,15 98:16,18,21 100:13 100:13

**discreet** 22:18

**discretion** 65:23 66:8,11

**discretionary** 65:6

**discrimination** 14:21 39:7 43:14,21 58:20 59:3,18 62:1 96:5

**discuss** 50:16

**discussed** 80:4 89:21

**discussion** 10:21 63:18 86:14 91:24 97:14 98:20

**discussions** 13:20 26:18 63:17

**disposal** 75:10

**dispositive** 60:3 62:5 65:24 82:24

**dispute** 12:4 63:15

**disputed** 18:3

**dissenter** 99:17

**dissolve** 74:22

**dissolved** 72:18

**distinction** 48:13 65:13 77:8,10 80:9

**distinguish** 70:13

**distributions** 74:9

**district** 1:2 20:12 53:22 90:11 99:1

**districts** 50:3

**dividends** 74:7

**docket** 55:2,14 57:13,14 100:15

**documents** 100:15

**doesn't** 67:13 72:9 72:19 87:4

**doing** 25:12,17,24 30:20 32:9 34:1 42:15 51:12 53:25 54:2 65:2 80:7

**dollar** 39:21 84:21 84:22

**domain** 46:12,14,20

**don't** 68:10 70:20 71:4,15 72:23 78:8 78:9,17 79:5,10 80:1,16 81:5 82:13 83:4 86:1 87:25 94:9 95:18 100:20

**doubt** 100:12,23

**download** 48:1

**drifts** 44:24

**drive** 4:10

**driven** 67:4

**driving** 65:9,13,17

**drop** 43:16

**drye** 8:1

**drysdale** 7:1,8 45:24

**due** 21:24 31:5 48:17 62:15 64:18 64:24 66:1,5 72:11 72:19 73:21 74:18 74:21 76:15,23 77:11,20 78:5,14,24 93:9 94:2

**dunn** 4:1 81:19

**duties** 96:17

**e**

**e** 2:9,9,10 3:1,1 9:1 9:1 90:14,14 103:1 104:1

**eamonn** 4:22

**earlier** 18:21 40:10 53:14

**early** 15:15,22,24 16:3 17:13 19:12 27:2 78:25 97:6

**easier** 52:6 59:17 71:21

**eastern** 90:11

**easy** 66:12

**economic** 11:5,19 14:25 33:6 34:21 92:2

**economy** 52:4 77:13

**edward** 5:6 45:17

**effect** 25:10 29:12 38:13 41:8 42:13

74:9 80:1

**effective** 31:8 41:12 65:3 66:17 68:10 72:13 75:13

**effectively** 22:25

**efficient** 48:12 65:3 75:3 92:19

**efficiently** 81:2 92:12

**effort** 61:23

**efforts** 10:12

**eight** 20:8 33:7 67:3 100:10

**eighth** 4:18

**eiseman** 3:17

**either** 10:8 15:12 16:21 19:4 21:12 23:2 25:17 45:4 47:20 56:20 58:5,12 59:14 60:3 62:6,7 62:18 66:13 68:18 83:18 85:15 96:22 97:3,15 98:12 99:11 100:17 102:2

**elbows** 63:1

**electronic** 71:13 104:8,11

**element** 36:6 64:1

**elements** 38:12 65:1

**elevate** 57:23

**elihu** 7:13 45:24 48:4

**elizabeth** 1:13

**ellis** 3:10

**eloquently** 78:22

**else's** 59:19

**eluded** 28:25 39:12

**encourage** 79:16

**encouraged** 63:8

**endeavor** 89:15

**ends** 101:14

**energy** 72:1

**enforce** 33:1 38:12 92:5

**enforced** 69:5,6

**enforcing** 18:21

Case 1:14-mc-02543-JMF    Document 4637-5    Filed 10/02/17    Page 513 of 128

engage 47:13
engendered 11:16
  66:22
engineer 95:3
enjoin 54:1,8
enjoined 54:8
enjoining 54:5
enormous 89:3
ensuring 68:25
entire 60:7 91:5
entirely 85:14
entirety 49:6
entitled 31:17
  104:12
entity 47:12
environment 75:12
envision 41:5,25
  51:23
envisioned 41:16
equally 80:20
  100:18
equitable 21:22
  93:17
especially 10:8
esq 3:7,8,15,22,23
  4:6,13,21,22 5:6,7,8
  5:15,16,22 6:6,13
  6:22 7:6,13,20 8:5
  8:13,21
essentially 26:16
  83:14 94:15
esserman 7:15,20
  9:12 10:13 13:13,19
  15:20,23 16:1 45:23
  45:23 87:24 89:4
  102:5,7
esserman's 11:24
  12:11
establish 10:10
established 76:20
establishing 76:20
esteemed 89:22
et 1:7,8 4:9 5:2 8:16
etkin 6:13 88:16,17
  88:17 89:10 90:3
etkin's 15:21

evade 58:6
evaluate 27:24
  38:16 39:15 92:18
event 60:3 62:3
events 78:15 79:7
eventually 52:20
everybody 10:6
  34:3 42:3 45:14
  52:24 94:22
everything's 81:1
evidence 22:17 71:8
evidentiary 87:9
evolve 24:6
evolved 16:3
exacerbation 68:11
exact 64:7 91:4
exactly 10:2 11:20
  41:25 54:11 56:6,10
  64:8
examine 92:2
example 59:17
  70:24
exception 38:18
  64:8 73:3
exchange 28:15
excusable 19:19
  31:2,11 82:23 87:8
executive 63:6
exercise 25:17,22
  98:12
exercising 66:11
exist 55:17
existing 67:21
exists 12:10
expanded 56:22
expanding 66:13
expansive 57:11
expect 36:21 98:9
expectation 17:14
expectations 10:21
expected 74:6
expedited 15:25
expeditiously 96:2
expense 85:1
expiration 57:9
expired 19:24 38:24

explain 59:11
explicit 42:6
explore 31:15 54:22
expressed 32:7
expression 10:18
extensive 76:10
  81:6,10
extent 9:24 12:3
  16:11 19:20 20:3
  22:9 26:11,21 30:22
  31:4 35:3 41:4 44:5
  46:15 51:24 58:23
  60:23 64:16 67:19
  70:22 69:3 70:3,13
  83:17,21 88:9 90:7
  91:24 95:1 96:16,17
  98:2,19
extraordinarily
  77:15
extraordinary
  88:23
extremely 76:2

## f

f 1:7 2:9 80:14
  104:1
fact 12:22 17:13
  18:4 31:15 36:11
  38:15 47:2 49:5
  60:25 61:7 63:8
  64:7,11 67:6 71:20
  73:17 74:10 78:13
  78:21 79:1 82:23
  83:11 87:4 95:9
  97:23
factor 46:24
factors 46:8 47:20
facts 27:22 28:8
  29:7 42:18 61:23
  78:1 92:16,23,25
  96:15
factual 66:13
fail 86:25 87:1
failed 101:13
failure 71:12 91:16
  93:9
fair 10:10 61:16

fairly 19:12 22:18
  22:22 42:21 78:25
  91:13
fairness 16:23 96:3
faith 97:14
familiarity 61:6
far 10:16 16:25
  27:19 31:19 38:19
  38:21 50:17 92:10
  93:5 94:17 96:25
  100:17 101:24
farmed 50:2
farnan 20:13
fashion 16:14 22:13
  64:5 66:21
fashioned 21:23
  93:17
fast 36:16 79:9
faster 36:17
favor 43:17 54:20
favored 43:21
fear 62:15 81:7
feder 8:5
federal 6:17 36:14
  67:16
feel 15:11 55:22
feeling 32:3
fees 20:21
feinberg 31:22 32:1
  32:4,5 39:14 40:1
  91:25 92:1
feld 5:10 84:4
feldman 63:21
felt 43:19
field 46:17 80:22
fifth 17:22
figure 29:6 30:24
  31:23 33:12 51:14
figured 84:8 101:23
figuring 10:3 53:4
  65:7
file 18:12 19:19
  23:21 24:24 25:9
  55:10,19 56:1,13,22
  85:16 100:15
filed 18:13 22:19
  31:2 39:21 40:15

09-50026-mg   Doc 14637-5   Filed 10/02/17   Page 914 of 128

**[filed - gm's]**

51:3 54:25 57:7,8
72:2 73:25 74:1,23
80:12 83:9 85:24
86:19 90:11 93:5
**files** 22:9
**filing** 24:3,9,19,23
79:15 80:17
**filings** 9:16
**fill** 28:16
**final** 60:7
**find** 21:9
**findings** 60:24
**fine** 24:1 79:12,13
79:22,24
**fineberg** 75:9,10
**fingers** 47:8
**fires** 11:10
**firm** 8:15 25:23
45:19,19 46:3 75:21
88:13 89:4,4,5
90:11
**firms** 12:23 13:4,7
55:13
**first** 12:8 13:10
14:11 15:20 20:25
43:17 47:23 59:12
59:17 60:6 65:24
73:6 81:14,16 82:20
84:2 85:25 88:22
97:18
**fit** 9:15 38:14
**fits** 38:9 101:25
**five** 45:9 57:20 67:3
98:24
**fix** 67:5
**fixed** 33:15,18,22
33:24 34:3,4 68:6,7
68:14
**fixers** 69:23
**fixing** 33:25 69:1
71:12 94:14
**flabbed** 94:5
**flaxer** 3:22 9:12
10:13 13:9 18:14,23
19:3 20:9 21:2,18
24:24 54:24 55:2
75:19,20 77:3,10,18

77:22 79:22 80:23
80:25 81:12 83:25
92:10,14,21 96:9
**flaxer's** 9:18 17:17
17:21 19:11
**flaxer's** 93:14
**flexible** 30:6
**flip** 58:4,11
**floor** 7:10 8:10
**flooring** 1:14
**flow** 80:20
**focus** 19:8 33:5
48:14 79:4 92:3
**focusing** 58:1,9
62:25
**folks** 13:21 69:15
77:19 101:4
**follow** 34:21 43:9
**force** 99:16
**forcing** 20:17
**ford** 46:18
**foreclose** 42:4
**foreclosed** 25:4
**foregoing** 104:3,10
**forgive** 24:8 49:10
50:5 67:17 90:22
**form** 56:16 68:9,15
68:17 99:25 101:6
**formal** 46:20
**formalities** 56:4
**formation** 99:15
**formed** 14:7 29:11
29:13,17
**forming** 19:10
**formulation** 21:15
23:12
**forth** 25:16
**forum** 26:10
**forward** 16:20
23:16,23 24:16 25:4
25:22,25 26:10,12
37:8,14,15,20 44:19
51:16 54:6 55:9
60:1 68:8 69:3 70:1
78:10 83:12 89:22
99:11

**four** 20:18 54:17
72:25 97:21
**fourth** 17:5
**frame** 88:22
**frankly** 20:19 34:8
39:9,11 55:1,8 60:6
63:8 83:4,13 86:2
90:24
**fraud** 14:11 21:18
21:25 22:1,6 27:16
39:6 43:11,16 44:4
48:20 58:19,25 59:5
62:8,12 63:14 64:2
65:1 66:14 76:12,18
77:4,6,14 78:6,18
92:15,19,23 96:8
97:6,9,16
**fray** 51:15
**free** 16:15 97:24
98:16
**front** 42:6 44:6
67:13
**full** 91:2 98:5 100:9
**fully** 29:21,23 30:22
30:25 91:5
**fundamental** 60:4
72:19 82:25
**further** 15:14 44:15
49:17 53:6,9 57:10
89:15 96:21 99:5
**furthermore** 86:7
**future** 16:8 74:7

**g**

**g** 9:1 103:3 104:10
**gaiting** 58:3,10
**gap** 28:18 42:21
**gaps** 28:16
**gather** 10:25 13:20
**gathering** 51:25
**gender** 63:15
**general** 1:7,22 3:3
17:1 19:16 28:3
30:9 38:17,18,19
40:3,24 47:6 96:25
**generally** 21:20
26:11 77:4

**generals** 60:14
**gentleman** 90:9
**gentlemen** 95:12
**gerber** 2:10
**getting** 10:10 12:14
26:21 39:20 41:20
51:11 54:20 61:19
99:20
**gibson** 4:1 81:19
**give** 9:13 28:14,15
29:19 62:24 64:14
64:14,15 70:20
90:15 101:19 102:3
**given** 30:3 71:13
75:6 88:22 95:11
**giving** 55:24
**glove** 11:13 32:17
37:21 38:21,23
**gm** 3:11 11:1,6,12
11:22,23 13:17
14:24 15:10 19:14
19:15,20,23 20:3
22:10,16 31:8,21
32:16,16,20,22
33:25 35:10,10,12
35:24 36:2,6,9,10
36:12,15,20,24 37:3
37:5,8,8,16,17
39:18 46:18 47:2,7
48:25 49:7 51:3
53:13 57:7 59:25,25
60:10 62:19,21 63:5
63:16,16,19,19
64:12 66:2 67:11,13
68:24 69:6,16,16,21
70:6,24 71:17,17,18
72:5,9,16,16 73:16
73:20 83:2,10,13,15
83:22 84:14 85:24
86:19 87:13 93:12
93:17,21 94:3,4,16
94:23 96:7 97:25
**gm's** 9:17 19:16
22:9 55:7 62:22,22
62:23
**gm's** 67:4 68:24
70:14,23,23 78:24

[gm's - honor's]

93:18

**go** 9:13 20:20 21:9
23:15 24:16 25:4,22
25:25 26:10,12
35:22 37:8 39:6
40:20 42:1 44:19
45:22 50:17 52:19
52:20 61:17 66:8,10
66:12,20 70:14 74:2
75:5 92:16,22 94:3

**goal** 12:21

**godfrey** 3:15 9:7,9

**godrey** 9:7,10

**goes** 53:23 78:20
89:5

**going** 9:14,22,23
10:1,3 17:15 18:3,4
20:25 23:23 25:16
26:10 28:8,8,18,23
30:7,8,11 32:8 33:9
34:3,4 35:1,1 37:7
37:14,15,19 40:4
42:1,2,3 44:22 45:4
47:17 50:9 51:14,17
53:3,23 55:14 60:21
61:12,14 63:17
64:21 66:20 69:3
70:1,20 72:22 74:16
76:7,23,24 77:11,12
78:10 79:10 85:21
86:21 90:23 91:23
94:7 95:22 96:3,25

**golden** 5:16 20:1
73:17,18 84:1,2,3,3
84:15,16,19 85:3,7
86:8,16 87:20 96:10
97:21

**golden's** 74:13

**golenbock** 3:17

**good** 9:2,10 11:18
13:4 19:10 23:15
28:15,17 35:22 36:2
44:20 45:2 46:11,15
46:21 81:18 92:14
97:14

**goodwin** 4:15

**gotten** 47:25 97:19

**government** 78:23

**grace** 41:12

**grease** 63:1

**great** 20:19 54:15

**greater** 53:11

**green** 2:2 97:19

**groman** 1:12

**ground** 79:2

**grounded** 95:9

**group** 26:19,19,20
29:11,14 30:4 45:25
48:3,5,25 72:18
73:5 75:24 88:7,10

**groups** 29:4,5,5,16
30:4 51:19

**grumet** 1:13

**guarantee** 95:17

**guc** 4:2 5:11 19:15
20:4 31:1,8,10
73:16 74:6,25 81:19
82:3,4 84:10,12
85:13,21 86:4,20,21
87:5,14 93:5 96:7
98:3,4,7,10,15

**guess** 12:3 19:2
24:11 51:6 55:3
57:20 82:16 83:19
87:25

**gump** 5:10 84:4

**guy** 20:15 62:25

**guys** 16:10 17:24
18:7 67:20 69:23
101:22

**h**

**haigins** 45:20

**half** 54:8

**hallway** 80:12

**halthenstein** 75:22

**hand** 26:8 65:10
79:8,9 87:24

**handle** 9:21 11:15
12:8

**handled** 59:2

**happen** 19:12 36:25
53:9 79:7 87:2

**happened** 35:21
60:24

**happens** 49:7 51:2

**happy** 66:18 78:14

**hard** 31:20 72:11

**harder** 12:7 29:6

**harley** 88:12

**harmonizing** 88:9

**harry** 63:21

**hasn't** 81:13

**hauer** 5:10 84:4

**haven't** 68:17 70:5
86:5,5

**head** 40:17

**hear** 10:17 11:17
13:3,9 20:25 21:2,3
57:3 84:2

**heard** 9:12,14 10:20
13:7 14:9 15:2
16:10 20:2,4 21:3
43:18 50:16 53:14
69:9,16 70:20,23
73:14 76:5 81:14
91:11,13,16 98:5,10
101:14 102:6

**hearing** 2:14 16:5
21:10 24:17 53:21
82:2,6 83:5 85:17
85:17 89:1,24 93:3
98:25

**hearings** 49:2

**heart** 54:16

**heat** 57:23 66:23

**held** 87:12

**help** 12:8

**helpful** 12:19 76:2
88:9

**here's** 95:22

**hey** 73:9

**he's** 93:19 95:3

**highway** 8:17 63:11

**hired** 31:21 39:14
40:1

**historically** 70:3

**history** 34:5 60:7,19

**histrionics** 10:22

**hit** 55:2

**hold** 16:14 24:11
70:6 87:11

**holders** 5:11 74:12
84:6 85:18 98:4,7
98:14

**holding** 18:20

**hon** 2:10

**honor** 9:7,10 21:5
21:11,16 22:18,24
23:17 24:13 25:16
26:14 27:3,25 28:19
28:25 29:13,15,23
29:25 30:19,24
31:21 32:7,13,14
35:9,10 37:6,7,22
38:25 39:9 40:20,21
40:22 41:13,24
42:11,14 44:20 45:3
45:15,20,25 46:7
47:16,22 48:1,12,21
49:3,10,24 50:16
51:8,10 52:5 53:1,7
54:3,10,16 55:1,7
57:20,21 58:5,12
59:10,19,21 61:1,3
61:4,18 62:1,10
64:3 65:1,12,25
66:4,5,10,18,19
67:8 68:3 69:25
70:12 71:6 72:3
73:16,19 75:7,14,20
75:23,25 76:5 77:1
81:12,18 82:1 83:17
84:3,7 85:7 86:7,16
87:2,10,12,20 88:3
88:11,15,17 90:10
91:23 93:2 94:11,13
94:15 95:10 101:16
102:7

**honor's** 25:1 33:1
42:12,17,20 44:12
44:14 51:11 52:13
53:8 54:23 57:18
59:12 61:9

**honor's** 65:22 66:7
67:14 68:5 69:7

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-cv-02543-JMF    Document 657-5    Filed 10/02/17    Page 516 of 128
Pg 637 of 728

[honor's - issues]

Page 11

70:2,10 72:6,12
**hope** 68:8 81:6
  97:13
**hopefully** 72:1
  95:13
**hoping** 68:6
**hours** 57:9 85:24
**howard** 5:8
**hundred** 84:21
  87:25
**hurt** 39:24

**i**

**ice** 53:16
**idea** 17:23 19:10
  20:10
**identical** 56:22
  77:16
**identification** 103:4
**identified** 21:11
  27:3 42:14 96:19
  97:19
**identifies** 11:21
**identify** 10:9 18:9
  27:14 30:17 42:16
  75:7 96:18 99:22
**identifying** 10:1
  76:3
**ignition** 11:2 33:9
  34:1,4,10,14 35:2
  35:12,13,22 36:1,7
  37:6 38:2 48:16
  62:20 65:19 68:14
  70:25 71:1,1,3,4,9
  71:11,13 94:15
**iii** 49:16
**il** 3:13
**imagine** 47:11
**imbedded** 25:17
**immediately** 94:17
**impact** 69:2 73:16
**impacted** 36:5
  48:16 74:17
**impacts** 51:16
**impermissible**
  71:10
**implicate** 71:20
  72:6

**importance** 17:3
**important** 40:16
  56:4 76:11 79:18
**impose** 17:10 95:18
**impossible** 97:15
**impression** 20:14
**imputed** 63:3,6
**inability** 72:25
**incidents** 11:8
  32:18
**inclinations** 10:19
**inclined** 14:17,19
  77:17 83:17
**include** 26:6 77:14
  89:17 100:12
**included** 43:11
**includes** 13:2
**including** 16:15
  74:13 80:21 82:11
  97:7
**inclusion** 43:21
**inclusive** 23:25
**inconsistent** 100:24
**indicated** 45:21
  46:16 70:15 84:13
  86:6
**indicating** 18:20
**indiscernible** 57:13
**individual** 11:1
  34:8 68:12,18
**individually** 74:3
**individuals** 64:18
  73:21
**inefficiencies** 10:14
**inferring** 61:13
**influence** 47:20
**information** 46:12
  46:19 62:19
**inherent** 42:9 92:2
  94:6
**inherently** 75:2
**injected** 85:21,25
**injunction** 13:18
  33:1 60:2 66:1
  67:11,13,14 70:16
  71:20 72:6,10,17,18
  73:23 74:19,22

99:18,21
**injunctive** 34:16
**injured** 20:20 39:20
  65:4
**injury** 11:8,10
  14:23 32:10,19,22
  34:25 40:6 60:8,11
  66:25
**inselbuch** 7:13 9:11
  10:13 45:24 87:24
  89:4
**inselbuch's** 11:21
**insofar** 14:15
**instance** 73:7
**insult** 66:21
**intend** 48:4 56:14
**intended** 100:21
**intensive** 97:23
**intention** 57:24
  79:16 84:13 86:6
**intentionally** 101:9
**interest** 17:4 46:9
  73:11 85:18
**interested** 17:18
  95:14
**interesting** 55:12
  60:3 84:11
**interests** 73:6
**interface** 16:25
**interfere** 16:4 50:9
  50:11 98:24
**interfering** 52:22
  52:22
**intermediary** 63:19
**internal** 47:7 78:24
**interplay** 80:4
**interpreting** 67:16
**interrupt** 60:21
**introduce** 9:6
**intuitions** 63:17
**investigation** 47:6,6
  47:8
**investigations** 47:4
  47:5,9,14 75:8
  78:23
**investment** 45:2

**invite** 56:12
**inviting** 55:10,25
**invoked** 11:19
**involve** 19:14,15
  55:12 59:4
**involved** 34:9 63:22
  85:8 94:19 97:22
**involves** 35:19
**involving** 20:3
**irrespective** 16:16
**irresponsibly** 94:23
**isn't** 67:18 73:6
**issue** 11:22 12:2,10
  12:23 19:2,18 20:9
  21:19 22:3,4,14,15
  22:24 23:1,6 24:4,5
  24:6 25:9 26:3,21
  27:3,10,16,23 29:19
  29:24 31:3,4,5
  32:22 34:13 35:9,12
  35:19 36:8,20,23
  38:25 39:7,8,9,10
  40:10,10,12,16,16
  43:11,14,15,20 44:4
  44:5,8 48:15,19
  54:13 55:6 56:13
  57:21 58:3,11,16
  59:8,18,20 60:3,4
  62:3,4,9 65:22
  66:14,14 68:11,19
  69:17 72:12,21 73:3
  73:10 74:16,18,20
  75:24 77:11,12 78:5
  78:14,19 82:4,14
  82:19,25 83:3,4,19
  83:19 84:14 85:9,10
  85:11,25 87:15,17
  88:19 91:6,8 92:15
  92:20,24 93:6,7,15
  93:19,23,25 94:6,8
  94:10,13,22,24 95:4
  97:7 101:2
**issued** 34:10 80:13
  91:3
**issues** 9:22,23,25
  10:1,9,11,15 13:5
  14:12,14,17,18,20

14:21 15:4,5,13,14
17:1,3,6,8,15 18:3
18:10 19:14 20:1,3
20:6,7,17 21:6,12
21:20 23:2,7,19
24:6 25:3,14,15,20
25:21 26:18,20 27:9
27:14,15 29:2 30:12
30:18,18,19 32:6
39:1,2,4 41:5,6,7,8
41:20 42:12 43:3,4
47:1,19,21 48:11
50:16 51:18 53:5,6
57:2,16 58:17,19,22
59:4,13,15 62:17
65:24 66:6,15 68:10
68:23 71:10 72:8,22
75:11,16 76:3 79:1
79:4 82:3,23 86:18
87:18 93:25 94:25
96:4,4,23 97:8,16
97:23 98:6,11,11,17
99:22 100:1,2,4,5,5
100:5,6,8
**issuing** 99:7
**item** 13:25
**items** 9:20
**iterative** 27:8
101:22
**it's** 65:8,17,18,22
66:4,7,9,12 67:9
69:8 70:24 71:8
72:15 73:19 76:15
77:5,6 82:24 83:13
84:13 86:1,5 87:25
88:23 89:12 90:4,5
92:19 94:6,20 98:22
**i'd** 65:12 72:20 81:6
84:8
**i'll** 81:17 82:15 84:2
95:17 96:20 101:14
**i'm** 66:13,18,20
68:5,17,23 70:20
72:22 73:13 75:7,12
75:21 76:7 77:10,17
77:22 78:14 79:14
81:16,25 82:6 84:22

85:3,9 88:12 90:3,9
90:23,24,25 91:11
91:15,23 93:15,24
96:13 97:7,13 98:18
100:17
**i've** 68:7 69:9 86:16
99:14,24 101:8

**j**

**j** 3:7 5:7
**jerk** 69:18
**jerks** 69:22,24 70:1
70:4
**jim** 63:21
**job** 20:15 29:3 53:4
**joe** 20:13 63:5
**john** 6:6
**join** 55:20
**joined** 57:16
**joining** 79:16
**joint** 49:15 50:11
100:12,13
**jointly** 1:7 19:7
96:19 100:11
**jomaka** 8:16
**jonathan** 3:22
**jones** 6:2,9 8:7
**jr** 4:13 8:21
**judge** 2:11 18:19,19
20:12,17 27:19
44:11 45:11,17 46:5
51:13 52:19,23 54:1
75:18 86:12 99:6
**judges** 20:18 49:16
**judge's** 103:5
**judgment** 18:23,24
**judicial** 10:2 12:24
16:6 49:22 52:4
58:23 77:13 99:1
**judicially** 10:11
41:22 74:1
**july** 11:11 22:20
41:11
**jump** 73:22 75:23
**juncture** 97:7
**june** 22:19 27:18
30:10 78:25

**jurisdiction** 50:14
67:12
**justice** 6:15

**k**

**k** 1:7 6:6
**katelyn** 1:15
**keep** 37:12 76:12
78:14
**keeping** 77:2 95:22
**keith** 4:6 81:18
**kelley** 8:1
**ken** 31:22 75:9
91:25
**kick** 78:19
**kind** 22:13 27:21
37:18,19 93:16,20
**kinds** 20:7 58:20
98:8
**king** 3:2
**kirkland** 3:10 9:8
**knew** 46:14 62:19
62:20 63:19,23
**know** 9:3,11 13:8
13:15,22 20:13 25:2
27:12,13 28:5,6,9
28:18 29:2,7,12,13
29:20,21 30:25
34:20 35:9 36:3
40:9 44:11,16 48:2
55:2 56:10,22 57:15
58:1,9 61:4 63:19
63:21 64:13 69:25
71:2,4,15,25 74:6
79:8,19,19 80:12,16
82:22,25 83:11,13
83:14 87:25 94:17
**knowing** 64:6
**knowledge** 60:23
61:6 62:22,23 63:2
63:5 65:16
**known** 19:23 31:22
63:23,25 64:1,11
**knows** 45:25 75:7
75:15
**kosha** 52:5
**kozyak** 88:13

**jurisdiction** heading...

**l**

**l** 7:20 90:14 103:3
**la** 8:19
**laboratory** 62:25
**lack** 51:14 71:21
72:18 74:18 76:15
78:14
**ladies** 95:12
**laid** 46:7
**land** 17:15
**laplace** 8:19
**larger** 26:21
**lasalle** 3:12
**lastly** 20:8
**late** 19:19 30:10
31:2 73:25 74:1,23
79:23 84:12 93:5
**law** 8:15 12:23 13:1
20:4 32:17 37:22,23
38:5,8,15 62:5
67:16 72:22 90:11
**laws** 11:14 12:11
36:14 38:1,8
**lawsuit** 34:11,15,19
**lawsuits** 32:14,24
33:5,6 38:11 52:10
88:23 92:3
**lawyer** 20:12 22:7,8
49:11,12 84:20 95:2
95:3
**lawyers** 20:14 69:10
73:12 78:1 86:10
88:1,23 90:21 91:5
**lay** 17:15 62:16
**lead** 21:14 24:14
26:1 50:25 51:15
89:14
**leads** 27:4
**leaned** 43:17
**leased** 65:15
**leave** 26:24 53:15
95:25
**led** 32:18,22
**left** 11:15,16 31:10
62:2 66:22 100:24
101:9

**legal** 11:18 14:20 23:2,7 27:23 31:24 32:6 39:8,9,10 66:14 76:6 91:8 92:25
**legitimate** 94:1
**lemon** 11:14 12:10 32:17 37:22,23 38:1 38:5,8,8,14 72:22
**length** 14:5
**lengthy** 15:8 95:13
**letter** 11:21,24 12:11 13:14,19 14:1 15:21,21,22 16:3 18:19 20:8 23:20 24:2 25:14 29:11 30:3,6,16 42:25 43:1 79:12,24 85:16 85:22,25 88:20 89:7 89:9,10 90:15,16,17 93:7
**letters** 9:19 12:1,13 14:8 15:9 24:15 25:8 99:12
**letting** 66:15
**let's** 73:21,24 77:25 78:19,20 84:1
**level** 46:19 87:3 88:25
**levels** 63:16
**lexington** 7:9
**liabilities** 33:2 40:7
**liability** 11:7 12:25 22:11 32:17,18 33:4 33:4 36:13,20 37:1 37:2,4 39:18 72:4 83:14 92:7
**liable** 72:17
**liaison** 29:16 50:25 87:23 88:7 89:8
**lie** 32:6
**life** 32:19 53:2 55:24
**lifland** 18:19
**lift** 83:9
**light** 25:7 76:1 79:1 97:19

**liked** 73:16
**likes** 94:22
**likewise** 98:14
**limitation** 77:5
**limited** 12:23 22:12 27:21 43:20 44:24 59:7,14 76:9 96:22 97:12,15
**limits** 9:14
**line** 12:21 14:19 43:1,3,6 76:4
**lines** 54:24
**liquidation** 1:6 4:2
**list** 14:12 37:6 94:19
**listed** 13:25
**listen** 52:21 53:25
**listening** 94:21 95:6
**litigate** 40:13 75:12
**litigated** 42:16
**litigating** 46:17
**litigation** 16:7,8 20:21 34:9 40:25 42:7 49:15,17,23 50:1 75:2 81:10 99:1
**litigations** 16:13
**little** 16:23 21:13 23:3,13 28:24 29:1 29:9 30:2 54:23
**live** 28:19
**livingston** 6:3
**llc** 1:22 3:3 8:15
**llp** 3:2,17 4:1,15 5:1 5:10 6:1,8 8:1 45:18
**load** 32:11
**lobotomy** 61:3,13
**locale** 50:1
**lockwood** 7:6
**logic** 23:5,12 44:7
**logical** 15:13
**long** 71:25
**longer** 28:24 29:1
**look** 52:21 53:25 73:19 93:11,21 94:7

**looking** 19:3 28:20 42:3 90:24,25
**looming** 85:9
**loose** 101:13
**lose** 33:18 55:15 62:3 81:5
**loss** 11:5,19 32:18 33:6,8,17 34:5,7
**losses** 34:21 92:2
**lost** 24:8 33:10 56:2
**lot** 28:3,11,13 44:16 44:24 59:16 62:19 67:4 71:8 76:1,21 78:25 79:1
**lots** 46:12,13 74:16
**louisiana** 90:12
**lowenstein** 6:1,8 88:17
**lowest** 26:22
**lumping** 21:20
**luxury** 63:4

**m**

**m** 5:22
**madison** 3:19
**mail** 96:12
**major** 77:21
**majority** 12:14,16 14:15 16:20 89:13 89:23 99:10
**making** 13:2 22:11 37:14 44:7 52:7 53:8 57:1 77:9,10 92:11
**management** 65:6 66:7 91:17 97:2
**manner** 66:17
**manufactured** 36:10,24 37:17
**marcus** 1:14
**maria** 8:13
**mark** 4:13 43:6 45:19
**marketplace** 47:17
**marona** 81:21
**martorana** 4:6 81:18,19,22,22,23 81:24 82:1,11,12,16

96:9 97:21
**massage** 102:2
**massaged** 43:2
**massive** 15:23
**masumoto** 6:22
**material** 14:13
**materiality** 96:20
**matt** 63:20
**matter** 1:4 14:13 18:13,17 24:20,21 32:1 47:2 49:5 53:2 55:18 57:19 59:15 59:25 62:5,23 65:22 66:7 67:11 72:19,21 74:10 77:13 80:5 92:12 96:25 97:4 98:13 100:11,18 101:1 104:12
**matters** 20:4 24:18 26:5 56:12 59:13 61:8 75:4 96:18,20 97:17,22 100:10
**matured** 44:13
**maximum** 96:16
**mdl** 16:13,16 24:4 24:10,11,12,19 25:9 25:25 26:6,9,9,11 26:11 37:9 41:9 49:4 50:13,17 51:13 53:9,15,21 79:6 98:24
**mdl's** 16:5
**mean** 17:12 22:19 33:17 35:15 39:19 41:17,25 50:12,19 57:8 79:14 91:9 92:5
**meaning** 50:5,6 69:11
**meaningful** 80:10
**means** 10:10 15:2 28:9 38:5
**meant** 82:12
**measly** 49:12
**measure** 67:9
**meat** 96:13

[mechanic's - notion]                                                    Page 14

mechanic's  63:5
mechanism  18:5
  51:16 55:6 56:19
mechanisms  56:15
mediate  75:11
mediation  20:9
  31:19,20 32:3 75:1
  75:4 81:3,7 83:23
  91:25 101:1
meet  40:17 96:15
  97:12 101:10
meeting  20:10
  47:24 58:21
melding  57:18
  92:10
member  16:2
mention  47:11 71:6
  81:1
mentioned  12:11
  80:11 88:5 101:7
merely  24:14
merit  86:15
merits  10:7 46:6
  51:19,20 62:16 65:7
messrs  96:9
metamorphous
  60:7
michael  6:13 88:17
michigan  50:13
mid  30:10 79:23
middle  60:15,17
miles  34:12 67:4
million  65:17
milstein  63:21
mind  17:20 22:5
  56:25 59:6 63:15
  76:12 78:15,16
mineola  104:22
minute  44:17 45:8
  84:9
minutes  45:2,4,5
  95:15
mistake  87:18
mistaken  90:9
misunderstand
  68:2

misunderstood
  68:4
mixed  67:6
modest  22:12
modification  14:2
modifications  14:10
modified  92:22
molton  5:7
moment  78:7
momentarily  10:17
  96:8
money  20:19 61:22
  75:9
monstrous  20:11
month  42:8
months  9:24
moon  84:23
morning  9:2,10
  53:14 80:11 81:18
morph  52:14
morphed  60:13
moss  5:15
motion  9:18 38:12
  55:7,20,20 57:7,14
  73:15 76:13 83:9
  92:5 99:15
motors  1:6,7,22 3:3
  4:2
move  32:25,25 46:6
  58:15 66:18 89:21
moved  83:12
moves  68:8
moving  51:16 54:5
  55:9 60:1 83:3
mspa  22:17 32:15
  33:2 36:12 37:23
multi  99:1
multidistrict  16:6
  16:15 49:15,17,23
multiple  50:1
multiplicity  52:10
  75:8

n

n  3:1 7:6 9:1 90:14
  103:1,3 104:1
name  46:6 84:8

names  10:8
naomi  5:15
narrow  49:8 53:5
  61:23 62:13
narrowed  51:12,18
narrowing  47:19
  57:24 66:15 71:10
narrowly  28:9,10
  92:17
national  63:11
nature  34:19
near  74:15
necessarily  17:12
  22:20 46:21 47:12
  48:22 54:19,19
  55:23 62:23 63:2,22
necessary  27:23
  46:2,4 72:14 89:18
  90:7
necessity  56:21 76:7
need  9:22,23 10:1,9
  11:15 13:3,5,7
  14:14 15:14,18
  16:13 17:5,8 18:15
  18:21 19:3,8 23:9
  27:22 28:5,6,9 29:8
  29:16 37:24 40:9
  53:6 54:21 64:25
  76:19 78:9,10 80:9
  86:19 88:1 91:8
  95:19 96:17 101:23
needed  30:2 41:6
  42:5 94:5
needs  13:22,24
  15:16 20:10,16
  23:10 62:4 71:7
  83:4 85:11 89:21
  97:12 101:10
negative  56:2
neglect  19:19 31:2
  31:11 82:23 87:8
negligence  95:2
negotiate  31:25
negotiated  32:8
negotiating  22:16
negotiation  20:17

never  53:3 74:19
  79:16 94:19
nevertheless  71:23
new  1:2 2:3,3 3:5,11
  3:20 4:4,17,19 5:4
  5:13,20 6:11,20
  7:11 8:3,11 9:17
  11:1,6,12,22,23
  13:17 14:24 15:9
  19:14 26:8 31:21
  32:16,16,22 33:25
  35:9,15,21 36:2,6
  36:12,15,24 37:3,8
  37:8,17 39:18 47:2
  47:7,25 48:25 49:7
  50:14 51:3 53:13
  54:24 55:7 56:1,13
  56:22 57:7 59:24,25
  60:10 62:21,23 63:4
  63:16,19 66:2 67:11
  67:13 68:24,24 69:6
  69:16,21,22 70:6,14
  70:22,24 71:1,3,17
  71:17,18 72:5,9,16
  72:16 73:20 74:8
  83:2,10,12,15,22
  84:13 85:24 86:19
  87:13 93:11,17,21
  94:16,23 97:25
newport  4:11
news  46:11,15,22
  46:23
night  86:17
nine  33:7 100:20
ninth  10:19
nj  6:4
noes  46:7
noise  72:14
non  21:1 31:24
north  3:12
note  16:1 44:18
  46:8 75:20
notes  40:20
notice  12:24 64:14
  64:15,15 93:9 96:11
notion  76:5

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-mc-02543-JMF    Document 4657-5    Filed 10/02/17    Page 120 of 128
Pg 641 of 728

**notwithstanding**
59:23 67:11 74:21
75:16 97:1
**nuance**  12:7 35:20
36:22 37:13,22
38:10
**nuanced**  93:24
**number**  10:17
13:25 23:18 31:9,9
49:6,9,14 57:20
65:15,16 72:25
78:23 88:22,23
**nw**  7:2
**ny**  3:5,20 4:4,19 5:4
5:13,20 6:11,20
7:11 8:3,11 104:22

**o**

**o**  2:9 9:1 104:1
**o'hagan**  4:22
**object**  23:22
**objection**  9:18
55:20 76:13
**objections**  55:19
**objectively**  62:17
**objector**  93:8
**observed**  78:23
**observers**  18:22
**obtained**  72:5
**obviate**  91:4
**obvious**  16:25 73:19
**obviously**  11:17
14:9 20:9 45:21
57:8,9 77:3
**occurred**  36:4
**occurrences**  11:9
**october**  34:2
**office**  6:17 63:6
**official**  104:11
**oh**  12:1 21:2 60:21
67:6 90:8 102:8
**okay**  9:9 12:1 14:4
16:24 26:13 35:18
40:12 41:24 43:25
44:9 45:6 50:22
54:12 60:20 61:16
80:2,24 81:11 82:16
83:24 87:19 88:14

90:8,13 102:5,8,11
**old**  19:15,16,20,23
20:3 22:10,16 31:8
32:20 33:8 35:10,12
36:1,9,10,20 37:5
37:16 62:22 63:16
63:19 64:12 67:3
70:23 71:1,5 73:16
93:18 94:3,3 96:7
104:20
**once**  16:1 38:3
50:17 55:7 67:14
85:11 92:15
**ones**  81:2
**ongoing**  53:17
78:24
**open**  53:15 58:16
78:15,16
**opening**  67:2
**opinion**  48:9 52:3
74:14 78:10
**opponents**  33:14
**opportunity**  9:13
20:2 23:10 29:19
55:19 91:10,16
93:20 98:5
**opposed**  52:8 59:10
59:19 76:9
**oral**  70:6
**order**  13:18 14:1
18:21 22:19 25:5
31:6,6 36:11 56:18
60:2,8 61:24 64:19
64:20,21 67:21,23
71:21 74:8 91:4,6
91:17,20 93:10 94:2
96:11 97:2,4 99:15
99:19,25 100:17
101:6,7 102:3
**orderly**  10:15,21
**orders**  11:24 91:9
**ordinary**  37:2,3
**organize**  29:3
**organized**  29:2,9,20
29:23 30:22,25
51:19

**original**  43:10
**originally**  60:9
**orms**  2:25 104:10
**otterbourg**  5:18
46:2 88:4
**ought**  48:2,10 55:17
55:18 59:14 61:19
61:21 65:2 73:3
74:19 77:24 78:8
**outlier**  29:16 48:2,2
48:6 64:9 73:3
**outliers**  29:14 48:18
**outline**  22:24
**outset**  82:2
**outside**  38:23 72:10
**overall**  32:6
**overalls**  63:1
**overflow**  45:1 91:3
**overly**  64:5
**overnight**  96:12
**owned**  65:15

**p**

**p**  3:1,1 4:13,21 9:1
**p.c.**  3:15
**p.m.**  95:20,20
**pachulski**  8:7
**page**  48:4 103:4
**pages**  9:16
**panel**  16:6,13,16,16
49:15,16,18,23
50:11,20 52:18
53:22 99:1
**panel's**  98:24
**paper**  70:4
**papers**  37:23 39:8
39:13 59:19
**paradigm**  38:9
**paragraph**  13:14
**paragraphs**  43:3
**pardon**  90:19
**park**  4:3 5:12,19
8:2
**parked**  34:11,17
**parse**  52:10 71:16
71:17 72:2
**part**  36:1,2,2 37:6,9
41:3,9 42:6 46:11

46:21,23 47:12
48:19 49:5,14 58:18
60:13 67:24 71:19
71:21 73:4,4 74:2
92:5 98:12
**partial**  11:3
**participate**  83:20
83:23 85:16,23
98:16 99:15
**particular**  38:10,15
94:24
**particularly**  82:22
**parties**  9:14 17:10
17:18 20:16 33:21
46:21,25 47:19
48:11,16 50:10
51:17 54:5,9,21
55:10,18 56:14 57:6
57:17,22 60:4 65:4
66:15 68:9 69:1
71:2 72:10 78:3
82:7,12 86:23 99:14
99:22 100:14
**partly**  56:2
**partner**  87:22 88:6
**parts**  11:2 49:5,13
85:4
**party**  83:16 97:24
99:5
**passed**  44:17
**pause**  33:13 37:11
49:20 51:21 61:11
69:13 70:19 76:8
84:15 86:8 90:13
**pay**  32:10
**paying**  32:11,12
**peace**  52:25
**pendency**  47:13
**pending**  11:1 16:13
88:18
**people**  19:8 20:20
20:22 22:16,17
23:11,20 24:1 26:22
28:7 29:4,5,5,8
32:10,12 34:21,24
39:16,19 40:5,7,23
42:23 44:25 55:25

**[people - presume]**

56:12,21 57:9 63:9
63:23 64:13,23
65:15,18,25 66:24
69:3,25 70:3 74:16
74:23 79:21 86:25
95:6,14 101:7,14
**perceived** 34:5,17
35:6 55:16 99:7
100:8
**period** 22:18 28:22
28:23 30:17 41:12
51:6,7
**permanently** 42:4
87:12
**permit** 16:6 98:25
**permitted** 67:10
97:16
**person** 31:22 35:23
63:2 83:10,12 91:19
93:6,7,13
**personal** 11:7 14:22
32:19 34:25 60:11
66:25
**perspective** 46:24
47:23 51:11 52:3
55:5 58:2,10 59:12
59:13 61:21 62:2,6
65:4 66:3 82:18
**persuasive** 19:13
**peskoe** 3:17
**peter** 7:6
**petition** 19:22 60:12
98:1
**ph** 45:20 46:2 52:5
52:6 63:21 75:22
94:5
**phase** 43:17,20
58:18
**philosophical** 76:4
**phone** 44:25 81:17
90:9 91:12,18,19
**phrase** 17:8
**pick** 50:12
**picking** 30:16 40:7
79:22
**piecemeal** 22:25

**piecemealing** 23:5
**pieces** 70:4
**pile** 84:7
**pin** 28:10
**pinto** 46:18
**pioneer** 87:7 93:25
97:22
**place** 11:10 15:14
26:7 31:6 32:20
37:5 47:25 53:19
65:20 100:14
**placed** 90:4
**places** 52:21
**plaintiff** 15:10 30:4
30:4 45:25 48:10
73:5 75:24 100:22
**plaintiff's** 22:7,8
**plaintiffs** 1:20 3:18
4:16 6:2,9 8:8
12:15,18,22 13:14
13:15,16 14:2,15
26:17 30:24 47:24
48:3,9,24 49:7
51:19 59:24 60:1
61:21 64:7 67:10
70:7,12 71:23 73:2
75:15 83:7 84:12
86:3,3 87:13 88:18
89:8,13,16,23 94:1
**plaintiffs'** 69:9
86:10 88:10,24 90:5
98:9
**plaintiff's** 69:12
84:20
**play** 89:11,25
**players** 15:9
**playing** 41:15
**plaza** 4:10
**pleading** 40:15
**pleadings** 38:20
79:19 83:11
**please** 9:2 12:12
21:2 26:13 33:13
37:11 42:24 49:10
51:21 58:15 61:17
68:1 69:13 81:15
84:15 86:8 87:22

90:13 95:21 101:5
**pled** 38:2
**plenty** 63:9
**plifka** 7:15 45:23
**plug** 69:16 102:2
**plus** 51:4
**pm** 102:13
**point** 13:3 16:17
17:21 18:14,14
19:11 24:14,15,22
38:24 43:8 53:11
56:24,25 57:16 70:9
75:1 76:11,16 77:14
80:9,25 83:5 89:6
92:7
**pointed** 88:5
**points** 54:16 57:4
88:1
**portion** 52:11 64:20
**position** 60:4 61:4
61:15 63:10 72:11
73:10 84:9 92:6
102:1
**positions** 10:8
**posner** 5:22 84:1,2
87:21 88:3,4,15,16
**possibility** 18:15
35:23 53:15 57:15
76:9 81:3 82:2 83:8
96:6
**possible** 23:8 48:13
66:17 75:4 96:1,16
97:6
**possibly** 64:9 66:21
66:24 93:11
**post** 11:23 19:22
33:4 35:20 36:4
60:12,12 61:7,8
70:11 97:25
**potential** 29:6 47:14
83:8 84:11
**potentially** 15:7
31:14 57:3 59:15
72:8
**power** 24:11
**practical** 39:11
58:24 74:17 101:5

**practicality** 74:11
**practice** 57:15
73:15
**practicing** 20:12
**prayers** 52:12
**pre** 92:7
**preclude** 57:12
**precondition** 69:4
**prefer** 43:22 59:5
72:7,20,20 75:11
84:23,24
**preferable** 97:5
**preference** 44:12
58:21 101:21
**preferred** 59:15
100:14
**prejudge** 31:12
**prejudice** 98:22
99:4 101:2
**preliminary** 9:15
14:7 99:17,21
**prep** 90:16
**prepare** 96:10
**prepared** 12:15
23:4 40:13,17 41:1
42:7 67:5 73:6
75:16 78:16
**preparing** 19:25
48:11 99:25
**prepetition** 19:21
39:16,20 97:25
**presale** 33:1,4
70:11
**present** 23:2,7 27:9
68:9 73:9 96:19
**presentation** 30:20
**presented** 21:7
29:25 68:14 75:13
100:6
**presenting** 22:17
48:12
**press** 63:13 94:21
**preston** 3:23
**presumably** 18:23
44:25
**presume** 48:6

[pretrial - receptivity]                                                    Page 17

**pretrial** 16:7 26:7
50:1,2 99:2
**pretty** 9:21 10:16
11:18 15:23 18:20
19:13 67:7
**preventing** 59:25
**primary** 10:4 40:1
**principal** 15:9
**private** 36:19
**pro** 1:15 85:10
**probable** 95:9
**probably** 23:9,10
42:9 82:21 87:14
95:3
**problem** 13:8 27:13
28:2 48:16 53:24
65:19 68:11 71:15
97:19
**procedural** 18:18
21:23 24:4,5 31:5
50:24 51:16 53:4,24
55:6,8,16,23 56:15
56:16,19 80:21 93:9
94:1
**procedurally** 19:7
29:22 51:5 55:14
**procedure** 23:2,23
52:15 74:2
**procedures** 13:14
14:1 89:18 92:10
**proceed** 10:20
12:15 15:24 16:8
54:14 77:25 86:18
87:13 96:2 99:3
**proceeding** 18:12
18:25 23:21 25:18
25:25 27:12 39:3
51:10 55:9,11,17,24
57:14,19 61:7 73:15
76:14 80:18 83:6
92:11 97:3 98:13
100:10
**proceedings** 16:7
26:7 49:4 50:1,2,13
53:15 56:1,11,13,23
79:15,17 80:5 85:22
86:1,2 96:22 99:2,5

102:13 104:4,12
**process** 10:15 15:8
21:24 31:5 41:15,17
48:17 51:5 53:8,16
62:15 64:18,24 66:1
66:5 68:6,7,8,24
71:19,24 72:11,19
73:21 74:2,5,18,21
76:16,23,24 77:11
77:20,25 78:5,14,20
80:2,15 92:22 93:9
94:2 101:22
**product** 64:11,12
64:13
**productive** 44:22
81:8
**products** 46:17
**professional** 18:9
96:17
**professionals** 22:16
**progress** 42:15 45:4
**prongs** 76:19
**proper** 21:15,25
40:12
**properly** 29:17
34:20 42:14 70:15
**property** 11:8 14:23
32:19 34:25 60:9,11
66:25
**proposal** 43:10
57:17
**propose** 27:4,21
**proposed** 9:20
16:21 17:25 99:12
99:23,25 100:17
101:8
**proposing** 28:12
**proposition** 30:9
51:11 64:10,10
**propositions** 28:3
**propriety** 54:18
**prospect** 20:10
**prospective** 13:16
**prove** 64:23 67:10
71:8 75:17
**proven** 12:24 64:11

**provide** 100:16
**provided** 23:22
**provides** 97:2
**providing** 96:14
**proving** 63:24
**provision** 35:4
**provisions** 67:23
**public** 46:12,14,20
62:19 65:10,14,17
84:5
**publically** 84:5,5
**pulled** 69:16
**punitive** 84:24,25
84:25
**purchase** 32:15
**pure** 23:7 39:8,10
**purely** 14:20 24:18
26:2 27:23 28:5
**purporting** 60:10
**purpose** 66:15
67:18,19 86:14
99:24
**purposely** 33:3
**purposes** 10:4
18:18 38:6 51:1,1
55:25 65:5 80:7
88:25 89:24
**pursue** 53:11 63:14
67:10
**put** 10:3 13:11,11
15:4,4 16:13 22:7
24:11 36:1,2 37:23
40:10 48:18 49:20
53:16 56:4 57:3
63:10 78:5,6 83:15
86:8,9,10 90:23
92:23 93:13,19
94:14
**putting** 96:13

**q**

**qualify** 38:5
**question** 12:7 33:13
67:15,18,19,21 68:2
72:25 84:23 85:4
89:7
**questions** 10:22,24
21:9 44:15 46:6,10

52:9 58:5,12 66:19
**quickest** 71:25
**quickly** 72:14 88:25
**quite** 41:25
**quote** 89:6

**r**

**r** 2:9 3:1 4:6 9:1
103:3 104:1
**raise** 12:2 40:12
70:8 81:2 101:2
**raised** 14:20 20:9
31:4,5 39:1,2,7
40:14 59:18 60:6,6
83:8,10 84:14 88:20
88:20 93:6,7
**raising** 13:5
**rare** 46:19
**rationales** 87:9
**ratzlaff** 4:9 5:2
**reach** 25:23 68:9
**read** 9:16,17,19
15:9,22 22:5 40:15
63:13 69:10
**readily** 57:5 70:13
**reading** 14:7 16:25
71:9
**ready** 20:24 88:10
**reality** 47:17 93:6
**really** 18:6,7 25:1
26:24 27:2 28:6
29:3 48:10 67:15
90:4,5
**realm** 89:1
**reargument** 101:12
**reason** 28:23 39:11
41:4 60:5 64:4 70:2
**reasons** 40:1 48:21
69:21
**recall** 33:9,11,25
34:6,14 35:3,4,14
35:19 36:4,14,15
46:13 68:13 69:5,24
70:25 77:5
**recalled** 71:4
**receives** 50:17
**receptivity** 28:13

[recess - room]

| | | | |
|---|---|---|---|
| **recess** 44:17 45:9,13 95:19 | **relating** 31:5 36:14 37:16,17 94:2 | **require** 22:2 51:2 59:16,21 82:20 87:6 97:10 | **resulting** 95:15 |
| **recessed** 95:20 | **relatively** 44:23 | **required** 31:15 59:21 | **results** 91:7 |
| **recitation** 24:24 36:22 | **relax** 41:13 | **requirement** 98:16 | **retained** 33:2,4 36:20 37:1 39:17 92:1 |
| **recognition** 41:3 | **releases** 70:7 | **requirements** 91:17 91:20 101:20 | **retaining** 92:6 |
| **recognize** 97:9 | **relevant** 27:14 46:9 46:24 94:20 | **requires** 16:23 40:18 | **retrospect** 59:18 |
| **recommend** 101:24 | **reliance** 60:2 | **reservation** 100:9 | **return** 91:12 |
| **recommendation** 17:9 | **relief** 34:16 52:12 99:21 | **reserve** 45:21 71:23 93:1 | **review** 70:5 |
| **recommended** 59:8 | **remain** 51:25 | **resolution** 31:25 32:8 47:1 48:12 53:17 57:15 66:16 | **reviewing** 25:8 |
| **reconvened** 95:20 | **remainder** 85:1 98:17 | **resolve** 59:13 74:17 75:10,16 77:24 | **revisit** 87:15 |
| **record** 12:24 17:24 23:15 26:15 27:1 30:12,14 45:17 51:9 62:19 63:10 70:5 88:4 104:4 | **remaining** 14:18 48:24 96:4 | **resolved** 48:25 53:7 71:7 83:22 85:11 | **revocation** 64:21 |
| **recording** 104:12 | **remarks** 21:1 | **resolving** 75:3 | **rhetorical** 85:5 |
| **recovery** 31:16,17 93:20 | **remedy** 21:22 31:7 31:8 48:17 73:22,24 74:21,22 76:19 86:21 93:10,11,17 94:8 | **respect** 11:2,8 12:10 13:25 16:8 58:17 67:17 89:3 99:2 | **ricardo** 3:23 |
| **referred** 12:18 58:2 58:10 | **remember** 60:19 | **respectfully** 65:2 91:10 | **richard** 3:15 9:7 |
| **refined** 15:15 | **remembering** 62:18 | **respective** 10:7 11:17 90:6 97:12 | **rid** 92:25 |
| **refinements** 95:24 | **remiss** 88:11 | **respects** 77:21 95:23 | **right** 15:12 35:17 36:19,22 39:25 41:21 45:4,24 48:15 54:13,20 55:5 60:18 66:8,9 69:14 71:24 73:22 74:21,22 75:19,23 76:17 77:23 79:10 82:16 87:21 90:8 93:1 95:12 101:2 102:8 |
| **reflect** 90:16 | **renewal** 98:22 | **respond** 57:7 58:6 58:13 | |
| **reflection** 57:10 | **reorganization** 61:7 | **response** 91:21 102:10 | |
| **reflexive** 27:10 | **repair** 35:2 37:25 | **responses** 57:11 | |
| **reg** 1:6,16 | **repaired** 33:11 34:18 35:23,24 38:3 38:4,4,21 | **responsibilities** 18:9 58:22 | **rightly** 11:6 12:17 |
| **regard** 12:9 15:12 17:21 19:10 26:14 30:1,14 37:21 38:25 47:18,21 53:11 54:17,17,24 60:11 62:12,20 72:24 73:14 77:18 88:11 94:12 | **repairing** 36:6 | **responsibility** 11:13 32:23 | **rights** 10:20 14:8 15:1 42:4 56:17 64:16 87:1,1 94:3 99:4 100:9 |
| **regarding** 46:12 | **repeat** 79:5 | **responsibly** 94:24 94:25 | **ripe** 87:8 |
| **regulate** 87:7 | **repetition** 10:22 13:2 | **rest** 10:16 40:20 42:13 | **rise** 88:19 |
| **regulatory** 47:4 | **repetitive** 21:1 | **restate** 23:24 68:1 | **rising** 102:6 |
| **reject** 15:19 | **replacing** 33:25 70:25 | **restructuring** 61:8 | **road** 72:15 104:20 |
| **relate** 27:15 72:5 | **replicate** 55:10 | **result** 18:3 22:22 | **robe** 20:15 |
| **related** 17:17 25:2 25:14,21 30:19 41:6 41:8 82:3 89:7 98:11,19 | **reply** 91:22 | | **robert** 2:10 |
| | **report** 63:13 78:24 | | **robin** 1:12 |
| | **represent** 86:4 | | **robinson** 4:8,8,13 45:18,19 46:16 |
| | **represented** 73:7 | | **rocter** 4:15 |
| **relates** 36:9,17 64:22 82:22 87:14 | **represents** 13:16 | | **role** 22:7 63:18 75:9 88:7 |
| | **request** 18:1 83:20 98:21 | | **rolled** 13:23 80:15 100:7 |
| | **requests** 18:5 | | **room** 52:24 63:3,7 77:19 |

**roseland** 6:4
**rostrum** 34:22
  42:23
**rudnick** 5:1 45:18
**rule** 16:7,12 17:16
  18:5 21:20 23:6
  39:3 44:5 59:23
  80:14 83:17 93:2
  99:1,16
**ruled** 19:20
**rules** 28:19
**ruling** 25:2 26:15
  30:16 59:22 87:15
  90:2,3 91:1,15 99:4
  103:5
**rulings** 13:23 28:25
  51:24 99:6,7 100:25
  101:9
**run** 28:14 47:8 80:8
**rush** 56:21 79:10
**rushing** 17:2 54:19

**s**

**s** 3:1,23 6:13 9:1
  103:3
**safety** 63:11
**sale** 11:11,23 12:6
  13:18 14:1 22:20
  25:5 31:6 32:20,21
  33:4 35:13,20 36:4
  36:11 60:2,8,12,17
  61:24 64:15,16,19
  64:20,21 67:21,23
  70:11 71:19,21 92:7
**salutary** 29:12
**sander** 7:20 45:23
  48:4
**sandler** 6:1,8 88:18
**satisfactorily** 88:2
**satisfactory** 100:19
**satisfy** 98:3
**satisfying** 11:13
**saxson** 1:15
**saying** 24:14 27:6
  31:7 36:14 56:4
  93:10
**says** 28:5 89:13

**scenario** 51:23
  86:13
**scenes** 22:10
**schedule** 102:1
**scheduled** 16:5
  98:25
**schedules** 29:6
**scheduling** 80:7
  99:19
**scientist** 95:3
**scope** 67:21
**scott** 3:8
**script** 21:9
**seats** 9:2 45:14
  95:21
**sec** 47:6
**second** 38:4,21
  40:19 42:16 43:13
  53:19 62:22 70:2,19
  89:3,6 92:4
**secondary** 44:8
**securities** 94:4
**see** 9:15 11:25
  23:11,19 24:2 28:15
  28:17 30:13 32:4,5
  40:2 46:19 58:16
  70:9 73:13 78:20
  84:1 86:12 97:11
  101:25
**seeing** 12:20
**seek** 14:3 86:4
**seeking** 81:9 85:16
**seemingly** 52:18
**seen** 68:17 70:5
**select** 26:10 50:25
**selected** 30:3
**selection** 26:1
**sends** 52:18
**sense** 11:18 12:14
  23:6 42:9 59:5
**sensitive** 82:23
**sensitivity** 47:12
**sent** 85:22
**sentence** 56:3
**sentiment** 32:6
  56:10

**separate** 15:5 19:5
  56:11,12,25,25
  57:13,14 76:15
  80:16
**separately** 26:19
**separating** 55:24
**september** 41:11
**serious** 17:1 29:1
**serve** 81:9
**serves** 66:14
**services** 46:3
**set** 10:15 15:16 17:6
  17:18 25:16 61:23
  67:7
**setting** 57:6 65:23
**settle** 102:3
**settled** 96:11 101:7
**seven** 5:3 19:14
  28:21 33:7 49:16
  67:3 85:24 99:22
**shapiro** 4:8
**share** 16:18 59:12
**shed** 76:1 78:25
**sheila** 2:25 104:10
**sherwood** 6:6
**she'll** 102:1
**shifted** 73:25
**shifting** 18:6 27:3
**shoes** 86:9,11 90:23
**shoot** 84:23
**shop** 55:3
**shops** 55:3
**short** 56:18 89:12
**shortened** 30:5
**shorter** 28:24
**show** 13:16 38:13
  41:2
**shown** 14:18 96:4
**shows** 71:3
**side** 10:8 15:12 23:9
  28:13 29:22 47:20
  59:14 60:22 69:11
  69:12 78:6 88:24
  97:15 98:9
**sides** 20:10 47:16
  62:6 78:2

**siganowski** 46:2
**sight** 81:5
**sign** 68:15
**signature** 104:18
**signed** 69:4 70:4
**significant** 22:21
  44:6 87:6
**significantly** 39:5
**signing** 69:2
**similar** 12:10 17:19
  19:3 55:4 77:15
  95:23
**similarly** 1:19
**simplest** 67:8
**simplistic** 64:5
**simply** 52:21 53:16
**single** 48:9 51:5,12
  52:4 100:15
**sit** 70:21
**sitting** 27:6 63:3
  94:4
**situated** 1:19
**situation** 91:4
**situations** 31:24
**six** 18:12 28:21 33:7
  67:3 99:9
**skepticism** 78:12
**skip** 72:22
**sleep** 94:3
**slip** 48:4
**small** 36:6
**sold** 36:25 60:12
  65:18
**solely** 60:11 65:6
  86:14
**soon** 78:25 101:5
**sooner** 58:24 59:2
**sorry** 60:16 79:15
  81:25 93:15
**sort** 52:8 58:4,11
  61:10,18 62:14
  66:18 76:4,7,18
  77:24 80:4,15,17
**sought** 69:6 72:5
**sound** 104:11
**sounds** 82:6

**south** 2:25 4:16
  104:3
**southern** 1:2
**spalding** 3:2
**span** 22:21
**speak** 48:5,6 52:24
**speaking** 14:5
**speaks** 13:13
**specific** 27:25 38:17
  65:18
**speculated** 19:25
**speed** 47:21
**spell** 42:1
**spend** 72:1
**spending** 61:19,22
  63:20
**spent** 45:16
**spoke** 77:19,19
**spoken** 40:24
**square** 5:3
**stage** 64:25 93:4
**stand** 29:15 40:25
  41:1,2 44:22 53:18
  73:9 82:1 84:9
  99:10
**standards** 87:7
**standing** 98:10
**stands** 14:2 52:14
  88:10
**standstill** 16:19
  54:18 99:17
**stang** 8:7
**star** 32:11
**start** 15:14 44:19
  52:7 64:9 67:22
  82:5
**started** 21:10 75:6
**starting** 10:24
  47:23
**starts** 46:21
**state** 11:14 67:16
  89:11,25 99:25
**stated** 56:9 100:20
**statement** 38:17,19
**statements** 83:11
**states** 1:1 6:15

**stating** 56:7
**status** 2:14 25:11,12
  25:13 26:4 27:18
  30:11,20,21 48:23
  51:8 56:18 78:11,19
  79:3 101:18
**statutory** 11:22
**stay** 27:17 41:13
  42:6 99:5
**stayed** 24:17
**steel** 5:8
**steering** 15:10 16:2
  100:23
**stein** 91:18
**steinberg** 3:7 9:3,5
  9:8 10:12 12:4,13
  18:18 20:24 21:4,5
  22:5,15 24:8,13
  26:9,14 33:16,20,23
  35:17,19 37:3,11,15
  37:19 39:22,25
  41:19,21,23 42:24
  43:7,10,23 44:1,3
  46:5 48:1 50:16
  53:14,18 54:3,10
  58:17 59:7 61:12
  62:14 67:2 70:15,19
  72:24 75:2 80:11
  91:22,23 96:9 99:12
  100:22 101:15,16
  101:21 102:4
**steinberg's** 79:12
  79:24
**step** 32:3 42:16 49:8
  49:9 76:22
**steps** 42:14,15 53:4
**steven** 1:12
**stipulate** 23:14
**stipulated** 17:24
  18:2 23:15 26:15
  27:1 30:12,14 78:5
  92:16,23 93:1
**stipulation** 27:17
  29:7
**stipulations** 42:18
  57:21,23 78:1,13,21

**stop** 52:21 53:25
  69:21,24
**stopped** 16:14
**story** 68:12
**strangers** 86:2
**strategy** 85:8
**strauss** 5:10 84:4
**streamline** 23:1
  39:5
**street** 6:18 7:16
**stress** 72:25
**strongly** 43:19
**struggling** 86:17
**studying** 32:2
**stuff** 18:25 53:23
**stutzman** 45:23
**stuzman** 7:15
**subject** 10:20 11:23
  14:8 15:1 46:13
  47:3,9 51:25 70:15
  73:8 77:4 96:7
  98:15
**submissions** 16:25
  42:19
**submit** 90:17
**subsequent** 49:1
  83:19
**subsequently** 13:23
**substance** 23:22
**substantial** 82:21
**substantive** 24:5,20
  28:6 53:20,24 55:23
  56:17 57:2
**subsumed** 55:18
  62:14
**subtleties** 62:10,11
**successful** 29:20,21
  97:13
**successor** 19:17
**suffered** 32:10 40:6
**sufficient** 78:13
**suggest** 29:10 30:15
  62:11 63:14 65:2
  76:16 93:24
**suggested** 12:17
  21:18 76:5 79:24
  82:2

**suggesting** 93:25
**suggestion** 17:17
  25:7 31:19 87:11
  92:15,21
**suggestions** 26:23
  26:23
**suggests** 62:14 71:9
**suit** 63:4
**suite** 6:19 7:3,17
  8:18 104:21
**suits** 63:9
**sullivan** 1:15
**sum** 101:20
**summarized** 40:22
**summons** 80:13
**superficially** 76:16
**supposed** 52:19
**sure** 14:12 23:9,25
  29:4 33:11,19 34:21
  42:2 53:10 55:8,22
  64:3 66:13 75:7,12
  85:24 89:24 91:11
  92:11 94:11 97:13
**survive** 25:21
**suspect** 101:12
**switch** 33:9 34:4,10
  34:14 35:2,12,13,22
  36:1 37:6 38:2
  48:16 62:20 65:19
  67:4 68:14 69:1
  70:25 71:1,2,3,4,5,9
  71:11,13,14 94:15
**switches** 11:3 34:1
  36:7
**system** 42:10

**t**

**t** 104:1,1
**table** 9:3,25 10:4
  15:16 17:7,11 23:10
  27:16 29:22 39:11
  39:12 48:19 57:2,3
  58:22 62:2 67:1
  87:18 96:23 97:17
**tables** 47:20
**tailored** 28:9,10
  92:17

take   10:16 12:24
26:7 29:1 44:19
47:16 51:6 53:19
54:16 59:17 61:4,5
61:15 73:18 76:21
84:7 90:1 93:3
95:13 97:16 101:4,8
taken   14:11 31:6
32:2 36:1 37:4
39:10,12 48:24
86:23
takes   71:24
talk   12:14 23:10
38:3 88:19 101:17
talked   24:3 35:11
49:3 67:3 76:8
talking   11:20 12:9
28:7 36:9 49:21
67:7
tangentially   27:15
team   99:24
tee   65:7 66:6
teed   10:2 58:23
59:8 72:12
teeing   10:15 13:14
telephonic   8:21
tell   14:10 27:19
29:11,15 38:13 55:1
58:6,13 60:22 61:1
69:19,21 71:16
82:17 100:25
101:23
temporary   16:19
50:19 99:10
ten   9:17 33:7 44:17
45:2,3,5,8 101:1
tentative   16:4 17:2
17:20 18:17 19:11
19:13 20:4,21 24:7
25:1 26:15 28:25
30:16 31:1 42:17
46:9 49:3 54:23
tentatively   34:1
tentatives   10:18
14:4,6 21:8 23:18
25:7 42:12,20 44:14
46:6 47:22 52:9

54:17 95:23
term   12:17 47:3
71:21
terms   41:18 46:18
47:1 57:24 58:21
65:23 66:11 67:9
70:22
test   62:25
texas   4:16 34:9
thank   9:9 21:5,6
44:2,9,11 45:11,12
45:15 68:3 75:18,19
75:20 81:11,12
83:24,25 84:3 87:19
87:20 88:15,16
102:4,7,11
that's   65:14 66:8
68:7,21 71:20 72:4
76:7,11,17 77:6
79:1,6 80:2,10
87:15 89:8,10 93:17
99:25 102:4
theories   11:18
24:25
theory   27:1 92:25
there's   73:5 76:23
78:9 80:9,13 82:7
86:13,19,24 89:20
93:20
they'll   75:16
they're   72:17 91:13
94:7 100:8
thing   21:16 25:6
31:21 37:13 49:11
59:3 69:7 71:25
95:4,5 101:17
things   11:9 18:1
19:3 24:6,23 25:6
25:11 26:1,1 27:13
29:1,24 39:14 50:24
53:2 63:11 65:8
71:18 76:6 87:2
think   9:21 10:6
12:18,23 16:5,22
17:5,25 18:15 20:14
21:18 22:11,20
23:18,24 24:4,5

25:3,22,23 26:9
27:22 28:12,23,24
30:7,9 31:2 33:23
34:2 35:3,10 36:19
36:20 37:10 38:7,13
38:25 39:9,10 40:9
40:11,18,21,22 41:2
41:10 42:7,8,11,17
42:20,22,25 43:15
43:18,23 44:21 45:1
45:2,3,16,24 46:8
46:24 47:16,23
48:15,22,23 49:5
50:8 53:1,5 54:7,13
54:21 55:13,14
56:14,17,19 57:5,8
57:17,22 59:23
60:22 62:15,21 63:4
63:17 64:4,5,8 65:5
65:22 66:7,9,12
67:6 69:15 71:7
72:23 75:14 76:1,11
76:22,24 77:1,15
78:3,4,8,9,9,25
79:11,17 80:1,6,10
80:14,19,25 81:3
84:11 85:8,14 86:1
87:10,18 88:5,23
89:20 91:15 92:10
92:12,14,24 93:8
94:8,11,13,16,25
100:20,24 101:10
101:16,21
thinking   15:20
16:24 22:10,13 25:8
43:6 76:2 79:2
thinks   13:4,6 42:3
44:20 64:6
third   8:9 83:15 92:9
thomas   7:2
thorny   74:16
thought   19:6 22:6,8
24:9,10 30:1 39:2
41:7,12,14,16,24
42:4 43:13,18,19
44:4,18 53:13,21
56:9,21 57:1 66:9

77:18,20 89:11 94:4
96:1
thoughtful   95:25
thoughts   44:13 76:1
three   12:23 13:4
16:18 46:1 54:17
63:15 73:7,12 80:1
89:22 93:15 96:11
97:5
threshold   14:12,14
14:17,21 15:4 20:6
21:12,19 22:4 25:15
30:12,18 39:1,3
41:5 42:12 43:4,11
43:14,15 44:4 48:10
48:15,19 58:19 62:3
73:4,5 74:18 76:3
77:11 78:18 79:4
82:4,9,14,19 83:3
83:18 85:9,10 87:17
92:20,24 93:14,23
93:24 96:4 97:8,17
97:23 100:1,4,6,8
throw   21:24
tie   63:4
ties   23:18
tilting   62:17
time   13:21 15:5
16:17,21,24 17:13
18:7 19:23 20:22
22:18,21 28:23 29:9
30:2,10,17 33:10
35:13 37:25 38:4,21
38:24 44:14,24
45:16 48:7 50:18
51:6,7 54:9,22
61:20,22 63:20
65:20 66:6 72:1
73:18 75:3 76:21
77:5 78:3 79:11,18
81:14 85:25 86:3
88:22 92:7 95:11,25
96:2 97:18 98:21,22
99:11 101:3,23
timely   87:1
times   4:17 5:3 21:21
28:4 84:18,19 86:24

[timing - views]

**timing** 42:19 47:1
47:18 49:1 53:2
**today** 9:22 10:5,6
19:25 23:23 45:20
48:22 60:22 62:4
75:12 77:25 78:9,11
78:17 80:7 82:6
88:13 89:12 95:11
**today's** 88:25 89:24
**told** 49:18 68:7,12
68:15,17,23 69:14
69:17,20 98:20
**top** 62:10,11
**tort** 12:25 49:11
**totally** 35:25
**touch** 73:15
**touching** 25:6
**toyota** 46:18
**track** 12:24
**trade** 23:1
**traded** 84:5,5
**transcribed** 2:25
**transcriber** 104:8
104:18
**transcript** 104:3,11
**transferee** 50:20
52:19,23 53:3,22
54:1 99:6
**transferred** 50:20
**transpire** 83:21
**transpired** 61:6
**treasury** 63:18
**treat** 74:23
**treated** 80:8
**trial** 60:15,17
**tried** 51:18 67:2
94:14
**tries** 31:22
**tro** 99:17,20
**tropin** 88:12,13
**trouble** 69:15
**troubled** 69:15
**true** 71:8 104:4
**trust** 4:2 5:11 19:15
19:16 20:4 31:1,8
31:10 73:16 74:6,8
74:25 81:20 82:3,4

84:5,10,13 85:13,18
85:19,21 86:5,20,21
87:5,14 93:5 96:7
98:3,4,4,7,8,11,14
98:15,20
**trustee** 6:16
**try** 18:8 23:14,25
24:25 25:13,15,19
27:8,9,13 28:10,14
30:11,23,24 31:16
31:24 41:23 42:15
84:23 101:19
**trying** 22:6 23:17
24:13,22 25:1 26:17
29:18 30:17 31:12
31:17 36:11 37:12
40:13 51:1 59:24
62:16 72:11 73:13
79:4,5 93:24 94:25
**turn** 10:23 42:22
62:8
**turning** 12:5
**turns** 39:4
**twice** 88:5
**two** 14:18 16:4
18:15 20:10 42:14
42:15 49:5,9,13
58:17 69:20 76:25
84:9 88:18 91:3
92:10 96:4,15
**tx** 7:18
**type** 22:23 38:8
59:7 88:7
**typically** 11:4 51:2
51:13

**u**

**u** 103:3
**u.s.** 2:1,11 6:16,17
**u.s.c.** 49:23
**ultimate** 50:13
**ultimately** 25:16
29:23 30:7 51:18
52:14 63:5 95:9
**unanimity** 49:6
**unavailable** 47:24
**uncomfortable**
86:12

**undergo** 61:3
**underlying** 61:25
69:9,22 99:3
**underscore** 12:16
**understand** 11:20
12:2 21:17 22:1
23:5,12 32:6 39:4
44:7 47:2,7 48:8
49:8,12,15 50:12,23
51:3 66:13 78:24
85:7,8 86:22 87:3
87:22 89:25 90:25
91:8
**understanding** 11:4
16:9,10 34:23 40:24
46:25 49:22 64:10
80:19 90:25
**understands** 10:6
16:11 37:8,22
**understood** 11:6,9
11:12 43:22 49:25
60:6,9
**undertaken** 11:12
22:14 59:8
**underway** 75:8
**undoubtedly** 91:13
**unenforceable**
67:24
**unfortunate** 62:3
86:24 87:2
**unfortunately**
59:18
**unidentified** 82:15
**unit** 84:5
**united** 1:1 6:15
**units** 5:11 74:12
98:4,8,15
**universe** 79:19
**unkosha** 52:6
**unlimited** 98:10
**unnecessary** 57:25
**unpack** 49:4
**unsecured** 19:16
**unwilling** 16:19
99:9
**upcoming** 9:24

**urge** 26:17 27:1
81:4
**urging** 31:12
**use** 12:16 44:23
45:2 60:23 62:24
69:18
**usefully** 45:1
**usual** 89:2 99:20
**usually** 21:24
**utilize** 46:3

**v**

**v** 1:21
**vain** 84:8
**value** 33:7,8,10,17
33:19 34:5,7,13
35:6 40:8
**values** 31:9
**van** 7:6
**variant** 17:25
**varick** 6:18
**various** 9:19 11:2
60:13
**vehicle** 32:21 36:25
36:25 37:5 52:7
72:13
**vehicles** 35:12
36:16 38:22,23 67:7
**venture** 55:3
**venue** 49:17 50:3,13
**verbally** 14:10
**veritext** 104:19
**versus** 21:13 26:19
28:24 35:10 41:11
42:18 70:23 71:19
73:15
**victims** 33:3 39:16
40:5 81:9 92:3,4,8
**view** 16:18 17:1
26:6 33:19 36:8
50:15 51:17 55:15
58:25 67:9 72:23
76:12 77:22 78:17
83:13
**viewed** 52:3 55:5
**views** 11:17 14:7,13
14:14 16:2 26:20
73:14

**violate** 52:13
**violating** 56:16
**violation** 76:23
  77:11 93:16
**violence** 52:13
**virtue** 33:24 34:14
  35:2,7 57:6
**vis** 11:19,19 16:15
  16:15 22:14,14
  52:21,22
**voluntarily** 11:7
**voluntary** 40:5

**w**

**wait** 41:9 62:21
  77:2 95:18
**waiting** 95:22
**waiver** 68:20
**walk** 28:13
**walked** 89:12
**walrath** 18:20
**want** 9:12 10:23
  13:2,9 17:14,22
  18:7 20:22 22:8
  23:24 27:5,10,11
  29:14 40:9,11 44:23
  45:7 46:5 51:9 57:3
  57:7,11,12 58:4,11
  60:22 61:10 63:22
  65:3,21 66:5 67:20
  69:7 72:25 79:8,10
  79:21 86:10 89:6,24
  91:25 92:23 93:1
  94:2 95:8,13,18,25
  96:2 99:23 101:19
**wanted** 16:10 18:24
  18:24 20:1 33:5
  41:13 42:1 43:16
  69:24
**wanting** 25:2
**wants** 26:24 62:7
**warranted** 30:13
**warranty** 11:13
  32:17 37:21 38:22
  38:24
**warren** 8:1
**washington** 7:4

**wasn't** 75:25 77:8
  94:11 95:2
**wasteful** 75:2
**watch** 91:7
**waving** 67:13
**wax** 56:16
**way** 11:3 14:9 16:12
  17:9 18:6 27:20
  30:2 32:25 39:6
  41:15 43:18 44:22
  49:20 60:21 61:18
  62:16,25 63:16 64:7
  64:8 66:8,10,12
  68:10 69:17 75:3,4
  83:14 85:21 94:23
  96:22 101:12 102:6
**ways** 13:3
**we've** 58:2,10
**wearing** 63:1,4
**week** 28:21
**weekend** 101:4
**weeks** 17:3
**weigh** 20:7
**weinberg** 11:25
**weinberg's** 11:25
**weintraub** 4:21
**weisfelner** 5:6 9:11
  10:13 12:13 13:21
  18:1 20:25 21:3
  39:8 43:2,5 44:10
  44:11,23 45:3,7,11
  45:15,17 49:24 50:4
  50:8,21,23 51:21,22
  52:2 53:1 54:13,15
  56:6,8 57:5 58:16
  59:10 60:16,18,20
  61:1,14,17,18 64:3
  65:12 67:18,25 68:3
  69:13,20 70:22
  78:22 80:4 82:25
  85:8,14 87:23 88:2
  88:5 89:5,13 91:12
  92:9 93:8 94:12
  95:1 96:9 99:12
**weisfelner's** 9:18
  14:18 24:2 53:19

**weisfelner's** 87:11
  88:20 89:7 96:5
**went** 54:14 68:13
  71:3 94:12
**west** 8:17
**we'd** 70:8 72:7 81:5
**we'll** 92:12 101:19
**we're** 65:13 67:6
  70:18 71:9 73:5
  75:13 77:12 79:10
  79:12,22 80:2,7
  81:2,9 86:1 93:1,3
  94:25 95:19,22 96:3
  96:25 98:11 102:1
  102:12
**we've** 66:9 76:8
  90:18,20 93:14
**whatever's** 72:2
**what's** 66:22 78:4
  96:21
**whey** 12:2
**white** 63:9
**whittle** 26:24
**wholly** 12:6
**who's** 88:13
**william** 4:21
**willing** 61:3 75:15
**wilmington** 98:4,7
  98:14,19
**wilson** 63:21
**win** 15:11
**wind** 77:12 79:10
  81:8
**wiped** 74:7
**wiser** 77:13
**wolf** 75:22
**won't** 65:21 69:5
  72:1 87:11
**word** 12:16 51:15
  63:25 76:17
**words** 56:3 66:23
  69:18 77:6
**wore** 63:9
**work** 15:15,16
  48:11 55:12 57:17
  57:22 68:16,19,21
  72:10 73:11 78:2

  90:6 92:13
**working** 32:1 45:22
  55:3 75:21 88:6,12
**worried** 40:8
**worth** 74:3
**wrecks** 11:9
**writing** 70:9
**wrong** 38:10 45:22
  65:17
**wrongful** 11:7 12:6
  60:8,10 66:25
**wrongly** 11:6 12:17
**wrote** 13:19 16:3
  42:25

**x**

**x** 1:3,11,24 103:1

**y**

**y** 1:13
**yeah** 12:1 60:19
**year** 34:3 67:3
**years** 33:8 46:17
  54:8 89:2
**yesterday** 47:25
  88:21
**york** 1:2 2:3,3 3:5
  3:20 4:4,17,19 5:4
  5:13,20 6:11,20
  7:11 8:3,11 26:8
  47:25 50:14
**you'll** 97:13
**you're** 80:20 82:10
  90:1 96:15,18 97:11
**you've** 73:14 84:17
  91:13 95:11 101:23

**z**

**ziehl** 8:7
**zone** 101:24

**à**

**à** 11:19 16:15 22:14
  52:22

Case 1:14-md-02543-JMF    Document 4657    Filed 10/02/17    Page 1 of 79

# Exhibit 6

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
|  | . | Case No. 09-50026-mg |
| IN RE: | . | Chapter 11 |
|  | . |  |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| et al., f/k/a GENERAL | . |  |
| MOTORS CORP., et al, | . | One Bowling Green |
|  | . | New York, NY 10004 |
| Debtors. | . |  |
|  | . | Wednesday, November 16, 2016 |
| . . . . . . . . . . . . . . . | . | 11:38 a.m. |

TRANSCRIPT OF CASE MANAGEMENT CONFERENCE (CC: DOCUMENT NUMBER
13786, RELATED DOCUMENT(S) 13373, 13775, 13697)
BEFORE THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            King & Spalding LLP
                          By:  ARTHUR STEINBERG, ESQ.
                               SCOTT DAVIDSON, ESQ.
                          1185 Avenue of the Americas
                          New York, New York 10036-4003
                          (212) 556-2158

For the Ignition Switch   Brown Rudnick LLP
plaintiffs and certain    By:  EDWARD S. WEISFELNER, ESQ.
non-Ignition Switch       7 Times Square
plaintiffs:               New York, New York 10036
                          (212) 209-4917

For Sesay, Bledsoe
and Elliott:              GARY PELLER, ESQ.
                          600 New Jersey Ave., NW
                          Washington, DC 20001
                          (202) 662-9122

APPEARANCES CONTINUED.

Audio Operator:           Jonathan, ECRO

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46038
                          (855) 873-2223
                          www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES (Continued):

For Personal Injury
Accident Plaintiffs:          Goodwin Procter LLP
                              By:  WILLIAM P. WEINTRAUB, ESQ.
                              The New York Times Building
                              620 Eighth Avenue
                              New York, NY 10018-1405
                              (212) 813-8839

For the GUC Trust
Administrator:                Gibson, Dunn & Crutcher LLP
                              By:  MITCHELL KARLAN, ESQ.
                              200 Park Avenue
                              New York, New York 10166-0193

For Participating
Unit Holders:                 Akin Gump Strauss Hauer & Feld LLP
                              By:  DEBORAH NEWMAN, ESQ.
                              One Bryant Park
                              New York, NY 10036-6745
                              (212) 872-1000

TELEPHONIC APPEARANCES:

For Bernard Pitterman:        Adelman Hirsch & Connors LLP
                              By:  JORAM HIRSCH, ESQ.
                              1000 Lafayette Boulevard
                              Bridgeport, CT 06604
                              (203) 331-8888

For Benjamin Pillars:         The Mastromarco Firm
                              By:  RUSSELL C. BABCOCK, ESQ.
                              1024 North Michigan Avenue
                              Saginaw, MI 48602
                              (989) 752-1414

For Corvette economic
loss plaintiffs:              Knapp, Petersen & Clark
                              By:  ANDRE E. JARDINI, ESQ.
                                   K.L. MYLES, ESQ.
                              550 North Brand Boulevard, Suite 1500
                              Glendale, CA 91203-1922
                              (818) 547-5000

For Pope plaintiffs:          Ledford Law Firm
                              By:  KRIS T. LEDFORD, ESQ.
                              1437 South Boulder Avenue West #820
                              Tulsa, OK 74119
                              (918) 376-4610



1          (Proceedings commence at 11:38 a.m.)

2               THE COURT:  All right.  The next is <u>Motors</u>

3    <u>Liquidation Company</u>, 09-50026.

4               Let's wait until everybody gets settled, Mr.

5    Steinberg, okay?

6               All right.  Let me get the appearances from those who

7    are going to speak.

8               MR. BABCOCK:  Your Honor, Russell --

9               THE COURT:  Okay.  Let me do the people in the

10   courtroom first, okay?

11              Go ahead, Mr. Steinberg.

12              MR. STEINBERG:  Arthur Steinberg and Scott Davidson,

13   King & Spalding, on behalf of New GM.

14              MR. WEISFELNER:  Good morning, Your Honor.  Edward

15   Weisfelner, Brown Rudnick, on behalf of the co-lead counsel and

16   the MDL, sometimes referred to as designated counsel for the

17   economic loss plaintiffs.

18              THE COURT:  Thank you.

19              MR. WEINTRAUB:  Good morning, Your Honor.  William

20   Weintraub of Goodwin Proctor, also as designated counsel for

21   the pre-closing ignition switch plaintiffs and for certain

22   post-closing non-ignition switch plaintiffs.

23              THE COURT:  Thank you.

24              MR. PELLER:  Good morning, Your Honor.  Gary Peller

25   for the Elliott, Sesay, and Bledsoe plaintiffs, who include pre

1  and post-sale economic loss and personal injury and property

2  damage plaintiffs.

3          THE COURT:  Thank you, Mr. Peller.

4          MR. KARLAN:  Good morning, Your Honor.  Mitchell

5  Karlan from Gibson, Dunn & Crutcher for the GUC Trust.

6          MS. NEWMAN:  Good morning, Your Honor.  Deborah

7  Newman from Akin, Gump, Strauss, Hauer & Feld on behalf of a

8  group of unaffiliated participating unitholders in the GUC

9  Trust.

10         THE COURT:  Thank you.  Anybody else in the courtroom

11 making an appearance?

12         All right.  Anybody on the phone making an

13 appearance?

14         MR. BABCOCK:  Yes, Your Honor.  Russell Babcock

15 appearing on behalf of creditor, Benjamin Pillars.

16         MR. JARDINI:  Good morning, Your Honor.  Andre

17 Jardini and K.L. Myles of Knapp, Petersen & Clark for the

18 Corvette economic loss plaintiffs.

19         MR. HIRSCH:  Good morning, Your Honor.  Joram Hirsch,

20 Adelman, Hirsch & Connors, for the plaintiff -- for the

21 Pitterman plaintiff.

22         MR. LEDFORD:  This is Kris Ledford of Ledford Law

23 Firm for the Pope plaintiffs, which were brought in under the

24 --

25         THE COURT:  Just say that again.  I'm sorry, I didn't

5

 1  hear you.

 2          MR. LEDFORD:  Kris Ledford for the Pope plaintiffs.

 3  We were brought in.

 4          THE COURT:  No, that, I heard.  I thought there was

 5  somebody after you, Mr. Ledford.

 6          MR. LEDFORD:  Okay.  I'm sorry.

 7          THE COURT:  Anybody else on the phone making an

 8  appearance?

 9          All right.  Mr. Steinberg.

10          MR. STEINBERG:  Your Honor, I'm -- I want to be able

11  to try to give you a little more background as to how this was

12  developed, and I'm going to try very hard not to try to argue a

13  position as compared to try to give you context because this is

14  set up for a briefing opportunity, and at that point in time,

15  I'll present my argument more formally, and if there's oral

16  argument, I'll be able to present it, as well.  And just -- if

17  you just leaf through the status report, you'll --

18          THE COURT:  I did that several times yesterday.

19          MR. STEINBERG:  -- you'll see that there is a number

20  of footnotes on the first couple of pages, which have

21  definitions.  And I think just Your Honor appreciates why that

22  has occurred.

23          When this matter was originally argued in front of

24  Judge Gerber, we used certain type of nomenclature.  In the

25  context of the MDL this year, the plaintiffs have tried to

6

1    introduce new nomenclature.  What you're getting on these

2    footnotes is our trying to stay with the original nomenclature,

3    and designated counsel for the economic loss plaintiff's trying

4    to introduce its new nomenclature and primarily relates to what

5    they call the second ignition switch -- second-stage ignition

6    switch plaintiffs.

7            And I understand what they're doing and I didn't want

8    to quarrel with it, but I wanted to explain to Your Honor why

9    you're seeing two sets of definitions.  Ultimately, when we --

10   if we get to the stage where we're drafting something, we'll

11   have to agree to a convention as to what the right terms are so

12   that Your Honor will have a clear record, but that's what you

13   see when you have it here.

14           You also see from the background section that we

15   originally started this process with the designated counsel,

16   Mr. Weisfelner and Mr. Weintraub, and then we broadened it to

17   what we call the core parties.  And to date, the people who

18   have gotten the status report, which is publicly filed, are the

19   core parties, and the core parties are in paragraph 3.  And you

20   could see there, it is not just the people who had

21   traditionally appeared before Judge Gerber, as well, but we

22   included all the parties that were subject to pending motions

23   to enforce, of which I think there are three.  And that's why

24   you have some of the counsel on the phone that have

25   participated or at least are listening to it.  So they -- some

7

1  of them presented issues and some of them have voiced their

2  views.

3        In paragraph 6, we try to -- to try to give Your

4  Honor a feeling of what's going on in other courts as they

5  relate to what we're asking you to decide here because there is

6  an overlap and we wanted to make sure that Your Honor

7  understood it, and I apologize because I think that because of

8  the flurry of activity that took place in the MDL at the very

9  end of the last week, I don't know whether we have given you,

10 as we normally do, some of the relevant pleadings in the MDL.

11 But on Friday, the -- New GM filed its brief, its opening

12 brief, on the successor liability issue.  So to the extent that

13 Your Honor has an interest in it, usually Your Honor collects

14 the paper, then we would be happy to do that, as well, too.  I

15 don't think we did that.

16        THE COURT:  Let me ask you this, Mr. Steinberg,

17 because on page 18 of this status report, in paragraph 6, you

18 say if there are any -- if there are unresolved issues after

19 Judge Furman has rendered his decision on the successor

20 liability issue, should this Court decide any successor

21 liability issues?  So what is it that's before Judge Furman?

22 What is he being asked to decide?

23        MR. STEINBERG:  The fourth amended consolidated

24 complaint before Judge Furman was filed by the economic loss

25 plaintiffs, so it doesn't have any accident component to it.

8

 1  The general thrust of the complaint that was filed says that

 2  for ignition switch plaintiffs, there should be successor

 3  liability based on the continuous enterprise exception to

 4  successor liability.  They don't argue fraud on the court or,

 5  you know, some kind of fraud in the transaction.  They don't

 6  argue that this was assumed.  They argue basically the

 7  continuous enterprise.  And then, there are 16 states that are

 8  being briefed.  New GM, in its opening brief, argued for

 9  federal choice of law and then saying that either Delaware or

10  New York applies.  I assume that when we see their responsive

11  brief, they will say that other laws apply.  And in the context

12  of those other lies, some of 16 jurisdictions have other

13  exceptions to successor liability.  I think one of them may

14  have something called a continuing enterprise exception.

15          THE COURT:  At some point, I read some -- a prior

16  decision by Judge Furman where I thought that he had dealt with

17  economic loss claims and focused on the law.  Several states --

18  I may am misremembering what I read.  It was some months ago.

19          MR. STEINBERG:  There was another decision by Judge

20  Furman, I think, and I'm sure someone will correct me if I'm

21  wrong.  I think it related to a motion to dismiss, so he

22  briefed -- people briefed it under a number of different

23  states, and it generally dealt with the issue as to whether

24  their theory of damages that --

25          THE COURT:  Yes, that was the decision I read.

9

1      MR. STEINBERG:  -- on a brand basis, would apply, and
2  then people briefed the brand damage issue under various states
3  and Judge Furman wrote a ruling on that.

4      THE COURT:  All right.  So what is the -- just to --
5  what's the successor liability issue that you think this Court
6  will be asked to decide?

7      MR. STEINBERG:  Well, Your Honor, we put it as a
8  deferred issue because it may not be anything, right, so -- but
9  in accident cases, compared to an economic loss case, they may
10 argue that in their particular jurisdiction that they are more
11 apt to be able to utilize something like the product line
12 exception.  And I think one of the arguments that we've made
13 before Judge Furman is that the product line exception does not
14 apply to an economic loss-type case.

15     THE COURT:  Okay.

16     MR. STEINBERG:  So there could be some fallout here,
17 but obviously people feel, as a general matter, that Judge
18 Furman's decision on successor liability on the continuing
19 enterprise exception will have a great deal of relevance of
20 what might happen here because if Your Honor -- because if
21 Judge Furman decides that there is no successor liability
22 finding, then some of the dispute, in our belief, with regard
23 to non-ignition switch plaintiffs as to whether they can
24 approve a due process violation -- if all you do by
25 accomplishing as a due process violation is to bring a

1  successor liability claim and Judge Furman has already ruled

2  that there is no such successor liability claim, then --

3          THE COURT:  So when's the briefing supposed to be

4  complete before Judge Furman?

5          MR. STEINBERG:  I think their brief is due in --

6  sometime in December, and then our reply brief is due sometime

7  in January.  So it's on a fairly fast track.  I think it'll be

8  fully submitted before February, and then the question is

9  whether they'll hear oral argument or not.

10          THE COURT:  All right.

11          MR. STEINBERG:  So you have the successor liability

12  issue, which we refer to in paragraph 6 of the status report,

13  which is going on in the district court.

14          Yesterday -- and we will send this to Your Honor, as

15  well, too -- the appeal of Judge Gerber's December judgment by

16  what I'll call the Adams plaintiffs was filed before Judge

17  Furman, as well.

18          THE COURT:  I got ECF notice of a filing of that

19  brief because it was an appeal from Judge Gerber.  So in

20  theory, I'm supposed to get automatically, and so I think I

21  actually printed out that brief.

22          MR. STEINBERG:  Okay.  So --

23          THE COURT:  It's only the one brief so far that's

24  been filed.

25          MR. STEINBERG:  That's correct.  And I think our

11

 1  brief is due sometime again in December, December 21, and then

 2  their brief, their reply would be due sometime in January.  So

 3  that also is on a fairly aggressive briefing schedule and -- to

 4  be resolved.  And the issue in that appeal, which I think is

 5  referenced in the status report, is they argue that they didn't

 6  get to file a proof of claim in the bankruptcy case because of

 7  some New GM conduct after the sale, and therefore they thought

 8  they had an independent claim or some type of claim related to

 9  that, and we're briefing that issue for Judge Furman.

10          THE COURT:  All right.

11          MR. STEINBERG:  The third issue which is referenced

12  in paragraph 6, which is not on an aggressive briefing

13  schedule, but I want to put that into context, is that Judge

14  Furman has set dates for when he will hear class certification

15  issues and summary judgment issues, and I think those dates

16  actually have their ending briefs sometime in the spring of

17  2018.  And the reason why I mention that -- those types of

18  procedures, because in the event that this Court will deal with

19  issues relating to a claim, then issues relating to class

20  certification of a late-filed claim, issues relating to the

21  merits of a claim, will overlap with some of that briefing that

22  is there.  So when I get to the --

23          THE COURT:  We'll come to the late-filed claim --

24          MR. STEINBERG:  Right.

25          THE COURT:  -- issue.

12

 1          MR. STEINBERG:  But I just wanted to put into context

 2   why we referenced that.

 3          THE COURT:  Let me deal first with an issue because I

 4   see there are -- there's disagreement, put it that way, as to

 5   who should be a part of any proceeding here.  And you've

 6   included, on page 8 of the status report, proposed language

 7   that you think should go into an order to show cause.  And, you

 8   know, I asked myself the question, is an order to show cause

 9   effective to compel parties to whom it -- assuming that

10   personal jurisdiction did not previously attach, to appear and

11   respond to the order to show cause.  So one of the things --

12   and some of the people have said, well, there needs to be an

13   adversary proceeding.  The plan has an injunction, correct?

14          MR. STEINBERG:  The sale order has --

15          THE COURT:  The sale order has an injunction.

16          MR. STEINBERG:  Correct.

17          THE COURT:  All right.  And Rule 7001(7) says a

18   proceeding to obtain an injunction or other equitable relief,

19   except when a chapter 9, chapter 11, et cetera, plan provides

20   for the relief.  So you don't need an adversary proceeding.

21   Does the plain incorporate by reference the sale order?

22          MR. STEINBERG:  I think it does.  I think it does.

23   But Judge Gerber actually ruled on this issue before as to

24   whether -- and I think the Second Circuit opinion actually

25   dealt with this issue as to whether, on a formalistic basis, we

13

1  needed to bring these actions by an adversary proceeding or

2  whether it could be done as an injunction to enforce an

3  existing order of this Court.  And Judge Gerber clearly held

4  that you can do this by contested matter and motion --

5        THE COURT:  What -- to me, the objections that

6  7001(7) really deals with this issue.  An adversary proceeding

7  is not required.

8        MR. STEINBERG:  Right.

9        THE COURT:  Okay.  Then the issue becomes, well, what

10 about people who claim they didn't get notice before, all

11 right, and they didn't participate in any of the prior

12 proceedings.  And I'll hear argument about it, but my reaction

13 is, okay, we're going to serve them now.  Okay.  And if the

14 issue whether the injunction in the sale order should be

15 enforced, if they're given -- if you serve them under Rule 7004

16 -- just had that argument before about what that requires,

17 right?  If you serve them under 7004, they can be brought in as

18 a party to a contested matter.  Ordinarily, it's triggered by a

19 motion, but can also -- an order to show cause has the same

20 effect.

21        MR. STEINBERG:  Your Honor, this procedure was

22 utilized by Judge Gerber in connection with the December

23 judgment.  He did it by a September 3, 2015 order to show

24 cause.

25        THE COURT:  And did you serve everybody?

14

1      MR. STEINBERG:  And we served everybody who had a

2  pending litigation.

3      THE COURT:  And some chose not to appear.

4      MR. STEINBERG:  And some chose not to appear.  And

5  one of the issues that they have a perfect right to argue is

6  that they're not bound by that judgment because they felt that

7  we did something wrong, and that's issue number two.  And they

8  could argue that.

9      We're prepared to defend what we have done, and the

10  language about binding everybody was the same type of language

11  that Judge Gerber had put into his order.  And one of the

12  issues that happens in this case and that we struggle with is

13  that notwithstanding the sale order and our interpretation of

14  the sale order, people continue to file litigation.  So even if

15  Your Honor had ruled on this issue, in 2017, someone may file

16  another complaint against GM and then say, I was never party to

17  the action before.  The --

18      THE COURT:  Well, I'll hear -- if people have

19  argument on that, I'll hear it, but my initial reaction is

20  exactly that.  If you serve them, they can be brought here, and

21  an issue will be are they bound by the prior rulings by Judge

22  Gerber or not.  That'll be an issue that -- and seems to me

23  that that is a threshold issue.

24      MR. STEINBERG:  That's correct.  And, Your Honor, we

25  want to serve, in effect, the entire litigation docket --

15

 1          THE COURT:  I'm sure you do.

 2          MR. STEINBERG:  -- to make sure that whatever Your

 3   Honor ruled will be binding on everyone because, to be candid,

 4   if Your Honor ruled against us, it's affirmative collateral

 5   estoppel against us.  If you ruled for us, if I hadn't served

 6   them, it's not necessarily the same type of effect the

 7   collateral estoppel.  So in order for me to get what I want to

 8   have, I need to serve as broad as possible.  And if someone

 9   thins we hadn't done it before, they will have that opportunity

10   to brief it to Your Honor as to why they should or should not

11   be subject to prior rulings, and we will also then decide

12   whether they still will nevertheless be subject to these

13   existing rulings.

14          THE COURT:  Okay.

15          MR. STEINBERG:  So the other thing that I just wanted

16   to mention, which I don't think is actually in the papers, is

17   that the GUC Trust actually made another distribution of its

18   funds in the last couple days.

19          THE COURT:  I think I got the report of it.

20          MR. STEINBERG:  Okay.  So -- and when we defined the

21   threshold issues, we were trying carefully not to have anything

22   to have -- that involves discovery, something that could be

23   teed up as, in effect, a straight legal issue to Your Honor,

24   and I think the -- at least the designated counsel, while maybe

25   quarreling with the way we phrased an issue, has endorsed the

16

1   notion of a threshold issue and a deferred issue primarily for

2   the reasons that I've talked about before, which is that

3   actions that are going on in the district court -- and these

4   rulings will then define who are the non-ignition switch

5   plaintiffs that may be able to take advantage of the Second

6   Circuit opinion and may or may not be bound by Judge Gerber's

7   December judgment.  So with that --

8           THE COURT:  Tell me -- focus on the non -- and maybe

9   -- I'll ask your view and then we'll hear from other counsel

10  about the non-ignition switch plaintiffs.  What is it that

11  you're asking me to decide as a matter of law without

12  discovery?  Because it did seem to me that the Second Circuit

13  opinion necessarily, with their remand and lack of decision

14  about non-ignition switch plaintiffs, in determining whether

15  they have a due process argument that they're not bound, isn't

16  that a fact-specific inquiry?

17          MR. STEINBERG:  There are two issues that we've

18  identified on non-ignition switch plaintiffs which we believe

19  are threshold issues, which defines the scope.  One was Judge

20  Gerber rendered the April 2015 decision, June judgment, which

21  was the decision that went up to the Second Circuit.  The

22  people who appealed that decision were specific parties.  There

23  was designated counsel for the ignition switch plaintiffs.

24  There was counsel for the pre-sale accident plaintiffs on the

25  ignition switch side.  And then, there was Mr. Peller, who had,

17

1   as part of his 12 clients, had one or two that had non-ignition
2   switch plaintiffs there.  So when the Second Circuit ruled
3   whatever it ruled and -- then the question was who was it
4   ruling on behalf of, was it ruling solely on behalf of the
5   appellants that were before it or was it making a broader
6   pronouncement that would be binding and for the benefit of all
7   non-ignition switch plaintiffs, and does a court of appeals get
8   to rule on something greater than the issues that were
9   presented before it?  That's one set of issues.

10          The second thing was that when Judge Gerber realized
11   that he was going to be retiring at the end of 2015, he had
12   said to the parties, I want to wrap up everything that you
13   think I may need to wrap up as part of the GM proceedings, and
14   what happened after he rendered his June judgment is that there
15   was this concept of -- where the parties believed they were
16   bound by that June ruling.  And so he was getting a flurry of
17   papers by people who said, I am not bound.  So he said, you
18   know what, stop with sending me papers, let's get it all
19   resolved at one time.  And then, that led to proceedings and
20   October 14th oral argument, November decision, December 3
21   judgment.  That was appealed by only a limited amount of
22   people.

23          And in that November decision, he had specific
24   rulings with regard to non-ignition switch plaintiffs,
25   basically saying, in our view, that they had their opportunity

18

1    to allege whatever due process violation.  They didn't allege

2    it, and therefore they can't assert independent claims.

3            THE COURT:  Let me ask you this.  So the Second

4    Circuit decides what it decided.  And would you agree that that

5    is a subsequent decision to what Judge Gerber decided and

6    reflects a change in the law from what he found with respect to

7    due process?

8            MR. STEINBERG:  That --

9            THE COURT:  Here's where I'm going, Mr. Steinberg.

10   Wouldn't those parties who hadn't -- who did not appear,

11   wouldn't they have an argument in this Court under Bankruptcy

12   Rule 9024, which incorporates Rule 60, and wouldn't this be a

13   60(b)(6), any other reasons that justify relief where there's

14   been a subsequent change in the law, so wouldn't -- I'm not

15   deciding it now, but I know you're -- you have set out in the

16   issues, are they bound, if I agree that's an issue?  Are those

17   who did not appeal bound by Judge Gerber's decision, which they

18   didn't appeal?

19           And it does seem to me that if the Second Circuit, to

20   the extent it pulls the rug out from under the prior decisions,

21   those people who didn't join in the appeal would have an

22   argument under 9024 that based on a subsequent change in the

23   law, they should be relieved from the judgment.  Do you agree

24   that would be an issue?  I'm not saying -- I'm not deciding it,

25   but you're putting a lot of weight on the argument that, well,

Case 1:14-md-02543-JMF    Document 4657    Filed 10/02/17    Page 20 of 79

19

1  hey, they didn't appeal, it's tough luck, they're out of luck,

2  even if there's a change in the law subsequently, it's too bad

3  for them because they didn't appeal it.

4          MR. STEINBERG:  Well, I think, Your Honor, that the

5  answer is not as simple as Your Honor has presented and that --

6          THE COURT:  I'm not deciding an issue.

7          MR. STEINBERG:  I understand, but to --

8          THE COURT:  You made it seem like it was crystal

9  clear that, of course, they can't --

10          MR. STEINBERG:  No, no.  All I tried to do was to say

11  what the issue was.

12          THE COURT:  Okay.

13          MR. STEINBERG:  I assume that the other side will

14  tell me that I'm wrong and Your Honor will -- ultimately will

15  have to decide.  I'm just trying to identify the issue for you,

16  which is that -- one issue is --

17          THE COURT:  I agree that an issue -- and I would

18  agree that it is a threshold issue whether parties who didn't

19  appeal are bound by the earlier decision and judgment.

20          MR. STEINBERG:  Right.  And there's --

21          THE COURT:  I'm not necessarily framing it exactly,

22  but I think that's an issue.

23          MR. STEINBERG:  And just to put the context that at

24  least I'd like you to think about, and I'm sure others will

25  tell me again why they think I'm wrong, the Second Circuit

20

1    ruling had nothing to do with the December judgment, and there

2    were other parties, not economic loss plaintiffs, that were

3    involved in the December judgment.  And their failure to

4    appeal, we think, has consequences.  And while the Second

5    Circuit said the non-ignition switch plaintiffs may have been

6    required an opportunity to also show -- that they can show due

7    process violation, the December judgment that Judge Gerber

8    ruled said they had another six months to say something and

9    they didn't say something and bring out to me, and so I would

10    argue and I will argue that the December judgment was something

11    totally different than what the Second Circuit was ruling on,

12    and they actually didn't have the benefit of what went on

13    there.

14            THE COURT:  That's fine.

15            MR. STEINBERG:  And the only other thing that I would

16    say is that -- and you will see it cited in papers and for and

17    against, is the application of the Supreme Court decision and

18    in the Travelers case, where they reversed one of the Manville

19    decisions and basically said that courts can exceed -- lower

20    courts can exceed their subject matter jurisdiction, and if

21    it's not appealed upon, it is the final order.  The only people

22    who preserve that are the people who have raised the due

23    process issue, and if they had the right to assert a due

24    process issue and they didn't do it, then they've waived that

25    right to --

21

```
 1        THE COURT:  Well, 9024 and Rule 60 would seem to run
 2  counter to that argument, potentially.
 3        MR. STEINBERG:  Except the Supreme Court in that case
 4  -- and again, I said I didn't really want to argue with that,
 5  but the Supreme Court said that there's a policy reason for
 6  finality of judgments and they look to enforce that.
 7        THE COURT:  All right.
 8        MR. STEINBERG:  And so Your Honor would have to
 9  decide whether, notwithstanding that precedent, this should be
10  approached in a different way.  And I'm sure others will try to
11  argue why that is wrong, but that's clearly an issue that we
12  need to have Your Honor look at because you need to define the
13  set, the universe of people who are non-ignition switch
14  plaintiffs who can assert whatever the rights that they want to
15  assert are.
16        So that is the -- one of the threshold issues that
17  people have identified.  Again, I think we've had the back and
18  forth on the procedure.  We're happy to do whatever the
19  procedure is, but we think the order to show cause is the most
20  efficient way.  I think designated counsels agree that that's
21  okay.  I think Mr. Peller has raised an issue about why that
22  shouldn't be the case, but he's been involved in these
23  proceedings since --
24        THE COURT:  Mr. Weintraub, on behalf of certain non-
25  ignition switch post-closing accident plaintiffs, he had --
```

22

1  this is on page 11 of the status report.  He thinks -- he

2  phrased an issue, are non-ignition switch plaintiffs barred

3  from asserting independent claims against New GM because they

4  purportedly did not appeal, et cetera.

5          MR. STEINBERG:  It's the same thing.  I think --

6          THE COURT:  Do you agree?  I mean, you seem to resist

7  listing that as an issue.  Why isn't that -- I mean, it seemed

8  to me that that is a genuine threshold --

9          MR. STEINBERG:  No, no, no.  I think it's the same

10  issue that I've read -- I've written right before the Goodwin

11  Proctor position.  I think, to be candid, what's happening here

12  is that people wanted to educate Your Honor as to how this

13  issue should be thought of, so they wrote a longer recitation

14  to it.  But when you look at the actual issue that they're

15  prepared to brief on, the designate --

16          THE COURT:  That's really a pretty concise statement

17  of the issue that Mr. Weintraub --

18          MR. STEINBERG:  Well, yeah, but I don't -- I think

19  ours is an equally concise statement, and I think designated

20  counsel also wanted to rewrite the issue on the appendix.  So

21  they have something else, as well, too.  But I think we're all

22  saying the same thing, and ultimately --

23          THE COURT:  I wish you did.  It would have made life

24  a lot easier.

25          MR. STEINBERG:  Well --

23

1          THE COURT:  I couldn't believe it took a 19-page
2     status report to identify issues that -- I don't know whether
3     you really agree or disagree or not.  I mean, just --
4          MR. STEINBERG:  Well, part of --
5          THE COURT:  All this is framing the issues and you're
6     going to brief -- besides, you're going to brief it and --
7          MR. STEINBERG:  I accept that --
8          THE COURT:  I'm expressing a bit of frustration.
9          MR. STEINBERG:  I accept that, Your Honor, but to
10    understand it from our side, I didn't want anybody saying that
11    we were not properly presenting their sentiment, and therefore
12    you get another five pages of this draft because people want to
13    frame the issue in the way that they want and some people
14    wanted to argue that these aren't even issues that you should
15    be thinking about.  And so I thought I needed to present that.
16    The other five pages was to explain what we did from the July
17    status conference, and I thought the record needed to reflect
18    that.  but I do recognize --
19         THE COURT:  I kept wondering what happened after the
20    July status conference because I thought I was being ignored.
21    I saw all these status reports before Judge Furman, and then I
22    saw the one that finally triggered my entry of the order
23    because you told Judge Furman what you were going to do here,
24    except you hadn't even told me about it yet.
25         MR. STEINBERG:  Well, Your Honor, the -- there was a

24

1  bellwether case that was before Judge Furman which was coming

2  up to a trial in September, and one of the issues that was

3  going to be in that bellwether trial was whether they can

4  assert a successful liability claim, and I think we actually

5  had written to Your Honor asking for a status conference before

6  that bellwether trial, which was never scheduled, and it so

7  happened that after we filed our brief on successor liability,

8  they withdrew the successor liability cap and the case was

9  ultimately settled.  But --

10         THE COURT:  All right.  Let me hear from other

11 counsel.

12         MR. STEINBERG:  Okay.  Do you want to hear about the

13 other issues or is it self-evident from --

14         THE COURT:  Let's see if we can get through this, and

15 then we'll -- then you can back up, okay?

16         MR. WEISFELNER:  Good afternoon, Judge.  Ed

17 Weisfelner, Brown Rudnick, on behalf of the MDL co-leads,

18 appearing principally on behalf of economic loss claimants.

19         Your Honor, look, I do think that there is very close

20 to dangerous agreement among us and New GM on what the

21 threshold issues ought to be.  We may frame them a little bit

22 differently, and I take Mr. Steinberg's contention to heart

23 that we chose to frame it a little bit differently because we

24 were looking to educate the Court a little bit more.

25         THE COURT:  You would never do that, would you?

25

1          MR. WEISFELNER:  We tend to want to avoid that

2     whenever we can.  But I do think it's important that we

3     highlight for you, in the context of this status conference and

4     going down the list of the comments that Mr. Steinberg made.

5          THE COURT:  I will have forgotten about this when I

6     get to read the briefs that are really going to be the basis

7     for the arguments.

8          MR. WEISFELNER:  I'm sure you will.

9          THE COURT:  So you're fencing about words here and

10    there.

11         MR. WEISFELNER:  No.  That's right, and I'll do this

12    quickly.  Mr. Steinberg talked about sets of definitions, and

13    that's why we had so many footnotes in the status report.  And

14    clearly, there is a difference between what they refer to as

15    "ignition switch plaintiffs," what we tend to refer to as

16    "first wave."  And the difference is the number of cars that

17    are involved.

18         Your Honor will come to learn, or you already know,

19    that in the first wave of recalls, the first few recalls that

20    GM did, there were approximately 2- to 3 million cars that were

21    the subject of that recall.  The second set of recalls, all

22    done within the same 30 or 45 days, ultimately brought the

23    number of recall vehicles up to 27 million.  Put that in

24    context, there were 70 million GM cars on the road.

25         THE COURT:  How does that make a difference in terms

26

1    of the issues I have?

2           MR. WEISFELNER:  Because we take the position that

3    the four threshold issues that were before Judge Gerber dealt

4    specifically and exclusively with the first set of recalled

5    vehicles, those being the first-wave ignition switch defect

6    vehicles.

7           Now, we come to the Second Circuit opinion, and in

8    our view -- and frankly, if you take a look at the procedural

9    background in Judge Gerber's decisions, he very rarely makes a

10   distinction, if ever, between first wave and second wave.  He

11   talks about 70 million cars.  He talks about 27 million cars.

12   Likewise, the Second Circuit, in its preamble to its ultimate

13   holding, talks about 27-odd million cars and 70 million cars.

14   There's never a distinction in the Second Circuit opinion

15   between first wave and second wave.

16          Then we have the last category, what we call the non-

17   ISD, non-ignition switch defect plaintiffs.  Mr. Steinberg and

18   New GM says your second wave are in the same boat as the non-

19   ISDs.  So there's only two categories, ISD, the 2 million cars,

20   and everything else, whether they involve a so-called ignition

21   switch or a seatbelt or a safety harness, you're all non-

22   ignition switch defect claimants.  And where we think this is

23   critically important is on what it is the Second Circuit

24   announced that we think has broad permutations.

25          The Second Circuit talked about two things, lack of

27

1  due process, whether you need prejudice or not, and a finding

2  that there, in fact, was prejudice.  We have a disagreement as

3  to whether or not that applies solely to the 2 million cars

4  that were in the first wave or whether it applies to all

5  ignition switch defect claimants.  To a large extent, I think

6  that that needs to be a deferred issue because Judge Furman, in

7  addition to all of the other things he's looking at, is also

8  going to consider what additional discovery, if any, are the

9  plaintiffs entitled to or do they need with regard to the issue

10 of whether or not their defect, like the defect -- and I don't

11 know what the difference is between an ignition switch defect

12 and an ignition switch defect, but what additional discovery do

13 they need in order to demonstrate that their defect was known

14 or should have been known to Old GM, therefore leading

15 presumably to the same conclusion that your due process rights

16 were violated and that has an impact on whether or not the sale

17 orders injunction is binding.

18      THE COURT:  Is that an issue that Judge Furman is

19 going to decide?

20      MR. WEISFELNER:  I think Judge Furman's going to

21 decide what, if any, discovery you're entitled to, and by

22 implication, that may resolve the issue one way or the other

23 from the perspective of those folks who may need to

24 demonstrate, where Your Honor is so inclined, that their rights

25 depend on whether or not there was a due process violation

28

1  relative to them.  But there's a second part of the Second

2  Circuit decision that I think is critical and is being

3  overlooked or was overlooked, probably not intentionally, by

4  Mr. Steinberg because he tends not to operate in that fashion,

5  and that's what happens to independent claims.

6          I think what the Second Circuit said, and it couldn't

7  have been clearer, is that regardless of what the bankruptcy

8  court did or thought it was doing, there is no jurisdiction for

9  a bankruptcy court to provide a get out of jail free card to a

10 buyer in a 363 sale with regard to its own independent post-

11 closing tortuous conduct or failure to act that gives rise to a

12 claim.  And as a consequence, everybody, the way we read it, be

13 they first wave, second wave, or non-ISD, continues to have the

14 right, always had the right notwithstanding what Judge Gerber

15 may have written, to pursue independent claims against New GM,

16 so long as it involves New GM's conduct and doesn't rely on

17 conduct by Old GM that would have been part of retained

18 liabilities, as that term is defined in the sale order.

19         So we'll brief it all, and the only issue we had

20 between their articulation of what they call the Pillars issue

21 and then the second issue that talked about the impact of prior

22 decisions and whether people appealed them or not and therefore

23 whether they have an entitlement to go forward, we thought

24 those two issues should be merged.  And in merging them, you

25 could articulate the issue much more clearly.  And again, I

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657    Filed 10/02/17    Page 30 of 79
Pg 679 of 728

29

1   think I --

2           THE COURT:  I think -- maybe I'm misunderstanding.  I

3   think it would be helpful to me if those issues were separately

4   identified as issues and the briefs treat them separate -- I

5   mean, to the extent you think that it's decided by some other

6   point in the argument.  I just think it would be helpful to me

7   to have the issues separately identified rather than folded

8   together.

9           MR. WEISFELNER:  And again, the only folding together

10  we were doing is they articulated the Pillars decision as

11  narrowly focused on what is an ignition switch defect

12  plaintiff.  They'll argue that an ignition switch defect

13  plaintiff, by reference to the agreed-upon findings that we all

14  stipulated to in advance of Judge Gerber determining the four

15  threshold issues, was, in fact, limited to those cars that were

16  in the first-wave recall.  There was no debating that.  That's

17  what the stipulation says.

18          So I'm not sure why we need to brief that separate

19  issue other than they want to then, it seems to me, expand that

20  and say the second-wave ISDs are therefore properly defined as

21  non-ISDs because they weren't in the first wave.  I don't know

22  why Your Honor needs briefing on that.  Pick up the stipulated

23  facts.

24          What flows from that is really contained in the

25  second issue, which we've all agreed on, and that is has anyone

30

1  lost rights by virtue of their failure to appeal or -- in

2  actuality, we all appealed.  It's a question of what issues did

3  we articulate on the appeal and to what extent did that failure

4  to appeal, in effect, get excused because of a change in the

5  law or -- it's kind of hard for me to stand here and tell you

6  that what the Second Circuit did was change the law.  I think

7  they followed Travelers-Manville, so I'm not sure how that fits

8  into a 60(d) context.  I don't think they changed the law.  I

9  think they rearticulated it.

10        THE COURT:  Well, they changed the law from what

11 Judge Gerber ruled.

12        MR. WEISFELNER:  They certainly changed the law as it

13 was articulated by Judge Gerber.  That's correct.

14        So, Your Honor, the only other points I would make,

15 because this is a procedural matter, is Mr. Steinberg made

16 reference to a lot of things that Judge Gerber said in

17 anticipation of his retirement about bringing people together.

18        THE COURT:  Easy for him to say when he was leaving.

19        MR. WEISFELNER:  Well, easy for him to say because I

20 was here and I didn't remember Judge Gerber suggesting that.  I

21 remember GM filing successive motions to enforce.

22        THE COURT:  Let me ask you this.  Do you -- are you

23 in agreement with Mr. Steinberg about this order to show cause

24 procedure to bring everybody here?

25        MR. WEISFELNER:  Your Honor, I understand the

31

 1 | concerns that have been expressed by some of my plaintiff

 2 | bankruptcy representative brethren.  I hear it, I understand

 3 | it.  I think it's overwrought, quite frankly.  I think the

 4 | procedure can, should, and ultimately will be designed in such

 5 | a fashion as to this is a case about due process to a very

 6 | large extent.  We're not going to make a due process mistake

 7 | collectively, and I think an order to show cause is sufficient

 8 | in that regard.

 9 |         THE COURT:  Okay.

10 |         MR. WEISFELNER:  Unless Your Honor has any other

11 | questions.

12 |         THE COURT:  We're separately going to talk about the

13 | late claim issue, but we'll get to that.

14 |         MR. WEISFELNER:  Thank you.

15 |         THE COURT:  Mr. Weintraub.

16 |         MR. WEINTRAUB:  Thank you, Your Honor.  William

17 | Weintraub for the ignition switch pre-closing accident

18 | plaintiff and certain post-closing non-ignition switch

19 | plaintiffs.  I'm going to stifle -- I think I have successfully

20 | stifled any urge to respond to a lot of the argument that was

21 | made by Mr. Steinberg.  That will be for another day, so I'll

22 | reserve right with respect to that.

23 |         The only point then that I want to make, in addition

24 | to also saying that I believe the order to show cause procedure

25 | is an appropriate procedure --

 1          THE COURT:  I mean, it does seem, to me, to work.
 2  When I read the objections that said adversary proceeding, that
 3  just is not right.
 4          MR. WEINTRAUB:  Right.  We always thought that it
 5  works so long as people actually receive it.
 6          THE COURT:  Yes, as long as they receive notice.
 7          MR. WEINTRAUB:  And it is clear what is going to
 8  happen, which was --
 9          THE COURT:  Service under Rule 7004.
10          MR. WEINTRAUB:  Exactly.  As you may recall, our
11  quibble with the September 2015 scheduling order -- not order
12  to show cause, but scheduling order -- was it was far less than
13  clear that people needed to appear or risk losing their rights.
14          The only point I'd like to make, Your Honor, is at
15  page 16 of the status report, I raised two additional -- what I
16  believe should be threshold issues that don't require
17  discovery.  I actually think that (2) is the independent claim
18  argument that Mr. Weisfelner was just making.  So -- and I
19  think Your Honor was in agreement with that, so I don't think
20  we -- any of us have an issue with (2) being an appropriate
21  threshold issue.  I also believe that (1), which also doesn't
22  require discovery, is an appropriate threshold issue.  Both of
23  these issues relate to post-closing accidents, which we believe
24  are in the nature of future claims.  So then you have a very
25  different due process issue than the one addressed by Judge

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-9    Filed 10/02/17    Page 84 of 99
Pg 683 of 728

33

1  Gerber, which is a known or unknown creditor of Old GM.

2          THE COURT:  Right.

3          MR. WEINTRAUB:  These are not yet --

4          THE COURT:  Judge Bernstein -- I can't -- what's the

5  name of this case that he wrote?

6          MR. WEINTRAUB:  Grumman Olson.

7          THE COURT:  Yes, Grumman Olson, he got affirmed in

8  the district court, just the future claim issue.

9          MR. WEINTRAUB:  Exactly, Your Honor, and I think that

10 would be ripe as a threshold issue, as well.

11         THE COURT:  Okay.  I may come to regret it, but it

12 seems to me that for the purpose of what we're gearing up to

13 do, certainly for this first round of briefing, to the extent

14 the parties agree that no discovery is required, I think the

15 issues should be included.  I, you know, doubt -- disagree

16 strongly about what the outcome ought to be and I don't think

17 that you all should spend weeks word smithing exactly how it

18 comes in.  You ought to frame them neutrally, but the way that

19 parties could understand what the issue is because ultimately,

20 it's going to -- you know, you're all going to brief it, and

21 I'm going to have to decide it.

22         The one thing I want to be careful about, I should

23 have said this before, is -- and I've had a few conversations

24 with Judge Furman.  He and I haven't spoken in a while.  I

25 actually put in a call to him yesterday.  I haven't heard back

34

1  from him yet.  I want to be very careful not to consider or

2  decide issues that he thinks properly belong before him.  And

3  to the extent that there does appear to be some overlap, I just

4  want to be sure that he knows what issues are being raised

5  here.  And if he has questions about why them not being raised

6  in -- you know, that they more appropriately should be raised

7  before him, that's fine with me.  But -- so, you know, Mr.

8  Steinberg has certainly filed on this docket copies of the

9  correspondence that go to Judge Furman, so I see some of that

10 and I do look at it, but I want -- that's what I -- I just -- I

11 want to be -- I got a little nervous when I read the status

12 report, but when I see that some of these issues seem to be

13 before Judge Furman, I don't want to get caught up in what

14 should he decide, what should I decide.

15        MR. WEINTRAUB:  And, Your Honor, that -- actually,

16 your comment triggers something that I had written down earlier

17 that I don't think we need to address today because Mr.

18 Steinberg described it as a "maybe later" issue, and that's the

19 successor liability issue.  I think that --

20        THE COURT:  That was what caught my attention when I

21 saw that in there.

22        MR. WEINTRAUB:  I think if this Court decides that

23 the successor liability bar is not enforceable, the question of

24 whether or not New GM is a successor should be something for

25 the trial court to determine and not the bankruptcy court.

35

1   Unless you have any questions for me, Your Honor.

2          THE COURT:  I think that's it for now.

3          MR. WEINTRAUB:  Thank you, Your Honor.

4          THE COURT:  Okay.  Come on up.

5          MR. PELLER:  Your Honor, Gary Peller for the Elliott,

6   Bledsoe, and Sesay --

7          THE COURT:  I keep reading your name in all the

8   papers, but this is the first time I've actually set eyes on

9   you, sir.

10          MR. PELLER:  Nice to meet you, Your Honor.

11          We believe that the -- we disagree about the need for

12   immediate discovery and believe that it's important to

13   distinguish two procedural aspects of the parties before you.

14   One part of the proceedings before you have to do with the

15   remand from the court of appeals, and that remand contained a

16   mandate.  That mandate reversed -- affirmed part and reversed

17   many parts of Judge Gerber's order, but only vacated and

18   remanded for one issue, and that's whether the non-Delta

19   ignition switch plaintiffs have a due process -- can make out a

20   due process violation that would enable them to proceed with

21   successor liability claims against New GM.  We believe that

22   that issue is -- should be the threshold issue for the remand

23   part of these proceedings.  It's specifically what the Second

24   Circuit remanded for, and we believe that there's nothing to be

25   gained by delaying discovery on that issue forthwith.

36

1          I believe that Mr. Steinberg might have mistaken when

2     he said that Judge Furman is considering discovery on that due

3     process issue in the MDL.  I'm not -- I've followed the MDL

4     proceedings quite closely, and I'm not aware of Judge Gerber

5     approving discovery on due process issue.

6               THE COURT:  Judge Furman.

7               MR. PELLER:  I'm sorry, Judge Furman approving

8     discovery on a judge -- on a due process issue.

9          Another aspect is that even -- there's no point, as

10    we see it, in awaiting Judge Furman's successor liability

11    rulings.  Those successor liability rulings will only apply to

12    the parties of the fourth amended consolidated complaint, which

13    includes a subset of the MDL plaintiffs, but of course, doesn't

14    include any of the state plaintiffs and the various --

15              THE COURT:  Well, you know, I have found many of

16    Judge Furman's decisions, not only in Motors Liquidation, but

17    in other cases, quite persuasive.  So whether one of his

18    decisions is binding, it may well be persuasive.  And if and to

19    the extent the issues are before me, I might -- you know, I

20    might well be inclined to follow him.  So the briefing is

21    underway before Judge Furman on the successor liability issue.

22    No briefing has occurred here yet.

23              MR. PELLER:  With due respect, Your Honor, the --

24    those issue will never be before you.  The question of whether

25    plaintiffs make out a successor liability claim against New GM

37

1  is always going to be for a trial court hearing the claims, not

2  for the bankruptcy court.  The issue before you is whether non-

3  Delta ignition switch plaintiffs --

4          THE COURT:  Well, I thought that the circuit said --

5  I don't have it -- didn't pull the opinion out with me today,

6  but I thought that Judge Chin made the point that -- which I

7  felt was the trend in authority, but not fully resolved in the

8  Second Circuit -- that a bar on successor liability claims is

9  proper -- can be proper.  The question was here whether

10 violation of due process prevented it from being enforceable,

11 but that a plan or a sale order may include a prohibition on

12 claims of successor liability.  Do you disagree with that?

13         MR. PELLER:  No, I don't, Your Honor.  I may have

14 misunderstood your earlier comment.  I thought that you were

15 saying that you would be asked to rule on the very same issue

16 that Judge Furman's about to rule on.

17         THE COURT:  No, I was concerned.  I saw the reference

18 in the status report to Judge Furman -- briefing going on

19 before Judge Furman on successor liability and the suggestion

20 that there were going to be issues before me, and that was what

21 I was concerned about because I saw -- I don't want to be in

22 the position of dealing with issues that are pending before

23 Judge Furman.

24         MR. PELLER:  Our only point, Your Honor, is that the

25 question of whether successor liability can be asserted under

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

38

 1  state law will not determine the question that is before you

 2  that's remanded by the Second Circuit mandate, and that is

 3  whether non-Delta ignition switch plaintiffs can make out a due

 4  process violation to assert any claims --

 5          THE COURT:  What's the discovery you want to

 6  undertake, Mr. Peller?

 7          MR. PELLER:  GM's -- Old GM's knowledge of and -- or

 8  questions of whether Old GM should have known, the same

 9  questions that Second Circuit ruled on with respect to the

10  Delta ignition switch with respect to non-Delta ignition switch

11  plaintiffs.  So for example, we assert a power steering defect,

12  and we alleged, you know, many, many paragraphs in our

13  complaint that show that Old GM knew and that when New GM came

14  into existence, it also knew of these defects.  So we would be

15  arguing that, for example, with respect to the non-Delta

16  ignition switch power steering defects, those plaintiffs also

17  ought to be able to assert successor liability claims against

18  New GM because they also were victims of a due process

19  violation with respect to the lead up to the sale order.

20          Your Honor, if I could now move to the order to show

21  cause questions.  And I've listened carefully to Your Honor's

22  exchange with counsel before me.

23          This is what I see the problem with that procedure.

24  There is a certain number of plaintiffs -- of parties who are

25  here before Judge Gerber litigating the four threshold issues.

39

1  Those parties aren't a secret.  They didn't include categorical

2  all ignition switch, all pre-accident [sic] accident

3  plaintiffs.  They included particular parties who were

4  represented by designated counsel through the co-lead counsel.

5  Those are particular parties that the co-lead counsel

6  represents.  The co-lead counsel do not, for those purposes,

7  represent all parties in the MDL, but more importantly, those

8  parties are just listed on the Judge judgment.  They're --

9            THE COURT:  May I ask you this, Mr. Peller?  Do you

10  agree that the Court can consider a contested matter in which

11  all parties are properly served that addresses the issue of

12  whether the injunction in the sale order is enforceable against

13  them?

14            MR. PELLER:  Your Honor, I believe that the

15  procedurally appropriate thing is GM did for all the parties --

16            THE COURT:  Could you answer my question?

17            MR. PELLER:  Yes, but I think procedurally

18  appropriate is the initiation of --

19            THE COURT:  Mr. Peller?

20            MR. PELLER:  Yes, sir?

21            THE COURT:  Let's deal first with my question, and

22  then I'll let you expand.

23            MR. PELLER:  Yeah.  Yes, Your Honor.

24            THE COURT:  You agree that an order to show cause

25  properly served on all parties that New GM seeks to bind is a

40

1  proper procedure to raise the issue in this court, bind under

2  the injunction in the sale order?

3          MR. PELLER:  No, I do not, Your Honor.

4          THE COURT:  Why not?

5          MR. PELLER:  Judge Gerber did rule, and it was not

6  appealed on the --

7          THE COURT:  I don't want to know about Judge Gerber.

8  I'm --

9          MR. PELLER:  Okay.  Your Honor --

10          THE COURT:  I may have the issue of whether Judge

11  Gerber's rulings -- to what extent are those enforceable

12  against, but even if I concluded they weren't, I may be able to

13  decide as a fresh proposition.  I may find Judge Gerber's

14  rulings to be persuasive.  It's the point I make about Judge

15  Furman.  His decisions may not be binding on parties in matters

16  before me, but I may find them persuasive.  I may find Judge

17  Gerber's decisions persuasive.  So if -- to the extent that

18  parties are given -- and I know this is disputed because Mr.

19  Steinberg says they were given proper notice, and I'm going to

20  have to decide that, but even if I assume that they weren't, if

21  they're properly served now, an order to show cause is a proper

22  method of raising the issues before me whether those parties

23  are bound by the injunction in the sale order.  Do you agree

24  with that?

25          MR. PELLER:  I don't, Your Honor.  I believe --

41

1          THE COURT:  Okay.  Tell me why.

2          MR. PELLER:  I believe that the appropriate procedure

3  -- we believe the appropriate procedure, because they're asking

4  for injunction, was the initiation of an adversary proceeding

5  --

6          THE COURT:  What about 7001(7), which specifically

7  seems to permit the procedure?  It's typically by motion, and

8  order to show cause is the same effect as a motion.  How do you

9  distinguish what 7001(7) provides?

10          MR. PELLER:  Because an order to show cause puts the

11  onus on the served party to come in and to prove, as if it were

12  presumed and the default was that they were --

13          THE COURT:  Oh, no.  New GM may have the onus of

14  proving, so an order to show cause doesn't set the burdens.  It

15  just says who's got to come before me.  And what I anticipate

16  is that a briefing schedule will have New GM going first and

17  parties having an opportunity to file objections and then New

18  GM filing a reply.  I'm not going to dictate.  I'm going to

19  leave it to counsel to try and work out an omnibus briefing

20  schedule, but you seem to be confusing -- an order to show

21  cause doesn't determine who has the burden.  It sets forth --

22  it brings before the Court a -- in this case, what I believe --

23  what is obviously a contested matter, and there will be a

24  scheduling order prepared.  It would include briefing, which I

25  expect counsel to work cooperatively, and I assume they will,

42

1  as to what the schedule is, but you haven't convinced me why

2  7001(7) doesn't -- the exception in that doesn't apply so that

3  it does not have to be by adversary proceeding.

4          MR. PELLER:  I don't -- I understand that it can be

5  by a contested matter, Your Honor, but I believe --

6          THE COURT:  And a contested matter can be triggered

7  by an order to show cause.

8          MR. PELLER:  We believe that --

9          THE COURT:  You disagree with -- do you have any

10  authority that says that a contested matter can't be triggered

11  by an order to show cause?

12          MR. PELLER:  No, I don't, Your Honor.  The -- we

13  believe that the appropriate procedure is the one that New GM

14  filed -- that was filed in the past, and that is to file a

15  motion to enforce that carries as a motion all the procedural

16  rights that are guaranteed under the Federal Rules of

17  Bankruptcy.

18          THE COURT:  I hear you.  I disagree with you.

19          MR. PELLER:  Okay.

20          THE COURT:  Okay.

21          MR. PELLER:  And I accept that, Your Honor.  So in

22  sum, Your Honor, we believe that the other problem with the

23  order to show cause procedure is that by that procedure, New GM

24  is just going to sweep in everyone who's filed kind of

25  complaints against New GM.

43

1          THE COURT:  They are.

2          MR. PELLER:  Yes, exactly.  And that is improper

3    given that the remand proceedings that involved the parties who

4    litigated the four threshold --

5          THE COURT:  I have --

6          MR. PELLER:  -- issues didn't involve all these other

7    parties out in the universe.

8          THE COURT:  Mr. Peller, Motors Liquidation is pending

9    before me.  Judge Gerber retired, the case got transferred to

10   me.  Whether it's strictly within the four corners of the

11   remand or whether it's a matter that's properly raised in the

12   pending matter before me in the Motors Liquidation, you know,

13   but I only want to decide these questions once, to the extent

14   that that's possible.  I want to give everybody a fair chance

15   to argue their positions, and it may be that not everything

16   that gets briefed to where the parties think can be resolved

17   without discovery, maybe it can't.  I don't know.  All right.

18   I'm not deciding any of that now.

19          But there -- I understand your objections.  There

20   seems to be a fairly substantial broad agreement that there are

21   a group of threshold issues that can properly be brought before

22   the Court using this OFC procedure.  I agree the procedure is a

23   correct one.  All right.  What the outcome of those issues, I

24   don't know.

25          MR. PELLER:  Of course, Your Honor, and I'll conclude

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

44

1   with this.  We also disagree with the identification of the

2   threshold issues in that we believe that the pressing threshold

3   issue is that identified by the court of appeals mandate in

4   that --

5           THE COURT:  You don't agree with the issues they did

6   identify.  You think that the one and only threshold issue

7   should be due process with respect to non-ignition switch

8   parties?

9           MR. PELLER:  Well, Your Honor, the question is how

10  much GM is going to be allowed to simply relitigate the court

11  of appeals decision over and over and over again.  They've got

12  listed one of the issues as whether used car purchasers are

13  precluded from suing under the sale order.  The Second Circuit

14  clearly ruled on that.  They have another issue of independent

15  claims, and I think that -- I think that this Court should --

16          THE COURT:  If you're right, Mr. Peller, it's going

17  to be a very short piece of an opinion, okay.

18          MR. PELLER:  Okay.  Thank you, Your Honor.

19          THE COURT:  But what I want to do is I want to get

20  before me, if possible at a single proceeding, all of the

21  relevant parties, and I think the relevant parties are well

22  beyond what you think are the relevant parties, and I want

23  briefing and I want, from the plaintiffs' side, I don't want 47

24  briefs.  I want -- you know, Judge Bernstein, in Madoff, has

25  entered some orders for an omnibus briefing.  I've usually not

45

 1  had a problem with this when I've had cases with lots of

 2  parties, so that there's one main brief, and if people have

 3  some specific issues they think are relating only to them, they

 4  can file short briefs, but I don't expect to get a separate

 5  brief from everybody who's conceivably involved.  I want to

 6  allow enough time in the briefing schedule, from the

 7  plaintiffs' standpoint, that they can try and get some

 8  coordination so that people will sign on to one main brief, and

 9  if there are some small briefs that deal with issues, fine.

10  But I'm not going to permit everybody who conceivably is

11  involved to be filing separate briefs on all the same issues.

12  I'm not going to read them all.

13          MR. PELLER:  Your Honor, you may be aware that the

14  plaintiffs' group has had quite a bit of conflict over what

15  issues to present, what legal theories to present, and so I

16  hope we can convince you, if need be, that at least we should

17  be permitted to file independent papers from designated

18  counsel.

19          THE COURT:  Well, you're not going to convince me,

20  all right.  To the extent there are common issues that are

21  going to be addressed, I don't -- you know, your paper is not

22  going to get read if that's -- if you're filing on the same

23  issues as everybody else.  So there ought to be enough time

24  built into the schedule that whether it's Mr. Weisfelner or Mr.

25  Weintraub, whoever's going to -- what group is going to take

Case 1:14-md-02543-JMF    Document 4657-8    Filed 10/02/17    Page 47 of 79

46

1  the lead, but they can circulate the draft, they can get

2  comments and try -- and if you've got separate issues that are

3  not in the common issues, that are identified as issues for

4  this first phase, fine.  They're going to be -- they're not

5  going to be 50-page briefs on those, all right.

6          All right.  Let me hear, any other counsel want to be

7  heard?

8          MR. PELLER:  Thank you, Your Honor.

9          THE COURT:  Anybody on the phone wish to be heard?

10         MR. BABCOCK:  Your Honor, Russell Babcock on behalf

11  of Benjamin Pillars.  I mean, obviously, you know, there's --

12  the segment which appeared on page 9 of the statement kind of

13  identifies New GM's take on what Judge Furman did.  Obviously,

14  I guess -- the only thing I guess I would add is there is

15  considerable disagreement about a lot of things, but one thing

16  Judge Furman was pointing out, at least with regards to the

17  Pillars issue, was that obviously depending on how the ultimate

18  outcome of the -- whether or not there is an application filed

19  with the Supreme Court and how that is resolved one way or the

20  other may shape the issue that pertained to my particular

21  client.  He identified three different scenarios at least that

22  he envisions.

23         I don't know how Your Honor wishes to proceed with

24  those issues.  Obviously, I think Judge Furman envisioning this

25  being an issue that would addressed once the dust has settled

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

47

1   on the appellate process on that issue.  So that's kind of

2   where we're at.  Obviously, Judge issued his ruling -- Judge

3   Furman did, at least, and that's kind of where we're at.

4           THE COURT:  Thank you, Mr. Babcock.

5           Anybody else on the phone?

6           MR. LEDFORD:  Your Honor, this is Kris Ledford on

7   behalf of the Pope plaintiffs.  I've set out, and I've tried to

8   be concise, my position on some of these issues, but I'm only

9   speaking up now, Judge, because of what you just expressed,

10  that you don't want a bunch of briefs.

11          Your Honor, some of these issues, while they may

12  appear common, they -- the argument for my clients is different

13  than it is for the economic loss, especially when we get into

14  discussing how we're going to define terms.  And I set that

15  out.  I won't make the argument now, but I set it out for you

16  how there was a specific definition of non-ignition switch

17  plaintiffs that now New GM wants to make my clients part of and

18  therefore be bound by these prior orders when we were never

19  part of that definition that was used by the Court.  And so I

20  would respectfully ask that when we -- while you may set out a

21  procedure that says there's going to be one lead brief that

22  please allow us, as easily as possible, especially those of us

23  that are not up there, that don't practice before you, allow us

24  to file some sort of supplement or some sort of paper to

25  protect our clients' interest and how we get treated.

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

48

1          THE COURT:  Mr. Ledford, as I said, to the extent

2    that you believe there are -- take that, for example, the issue

3    you identified.  You believe it's an individual issue as to

4    your client, may apply to others, as well.  I'm not precluding

5    a brief on that issue.  I don't -- you know, so let me make

6    clear.  I impose page limits on briefs.  I'm not going to set

7    the page limit today.  All right.  I think that the, you know,

8    New GM and the -- certainly, the co-lead counsel for the

9    plaintiffs -- and I hope I'm not insulting anybody with that

10   label, okay -- will confer about an appropriate page limit.  I

11   would -- you know, there are a lot of issues.  My normal 25-

12   page rule is not going to apply, but I don't want -- I really

13   would prefer to avoid 100-page briefs, okay.  But I want

14   counsel to confer about it.

15          On the point that Mr. Ledford raises, in cases where

16   I have had separate briefs because there are parties that

17   believe there are separate issues, I've more typically imposed

18   a 10 or 15-page limit on those briefs.  Shorter is better than

19   longer, okay.  I do read everything that comes before me, but

20   I'm not trying to preclude any party from making an argument.

21   If you believe you have a unique argument, I'll permit it, but

22   I'm not going to permit a 30-page brief on some, you know,

23   narrow issue that you think applies to yours.  There's a lot --

24   your client -- there's a lot of issues.

25          All right.  Let me -- anybody else wish to be heard

49

1  on the phone?

2          MR. LEDFORD:  Your Honor, I -- this is Kris Ledford

3  again -- I have one other issue that is listed on page 15.  And

4  it's the other party's position.  It's the Pope plaintiff item

5  number 1.  And I didn't get to express how that was stated.  I

6  just want to raise it with you.  Here's what that's all about,

7  Your Honor.  And I don't know if you want -- I'd like for this

8  to get resolved sooner rather than later, but when I received a

9  letter from New GM's counsel in May of this year that said, you

10 are violating the bankruptcy stay -- or the injunction, I took

11 it to heart.  I then got a motion filed against me in June, and

12 I stopped discovery.  I was ready to file a motion to compel on

13 a bunch of important issues, but I didn't file it because I was

14 threatened with all kinds of things if I proceeded.

15         Notwithstanding the fact that I stopped in the state

16 court, New GM, in the state court action, has taken additional

17 discovery.  They've taken depositions.  And I feel like it's

18 unfair.  I'm not close to trial, Judge.  I'm trying to get some

19 basic discovery done, and I'm going to have to file a motion to

20 compel to get it done.  And all I'm trying to do is get

21 permission to go forward on that and not be faced with the, oh,

22 there's the bankruptcy proceeding, therefore you can't do it.

23 That's what I'm trying to avoid.  I need to get my case moving

24 in the state court and not wait another year before I file a

25 motion to compel on some basic written discovery.

1          THE COURT:  What court is your action pending

2    innocent?

3          MR. LEDFORD:  It's in Oklahoma in Muskogee County.

4          THE COURT:  Okay.  I'm going to ask Mr. Steinberg

5    about it.  I take your point to heart, and I'm not ignoring it.

6    We'll -- any other points you want to make, Mr. Ledford?

7          MR. LEDFORD:  No, sir.

8          THE COURT:  All right.  Anybody else on the phone

9    wish to be heard?

10         All right.  Mr. Steinberg, and then Mr. Weisfelner.

11   Address this discovery issue because I'm reading on page 15,

12   and you say Pope plaintiffs are free to pursue any discovery

13   they choose in the trial court.

14         MR. STEINBERG:  Right.  We were trying to deal with

15   this issue in connection with the status report so we would

16   have one less paragraph in the status report.  New GM's

17   position is if he wants to take discovery -- because he's a

18   post-sale accident, so part of it, as an assumed liabilities,

19   always been entitled to take that type of discovery.  The issue

20   is, is that he's a non-ignition switch post-sale accident, and

21   he's asking for punitive damages.  So the -- to the extent that

22   some of the discovery that he wants to take is not related to

23   the accident, but is related to the type or the ability to pay

24   because of punitive damages, we were saying that he shouldn't

25   be able to go forward.

51

1          Our position that we set forth in the status report,

2   not to burden Your Honor with all the issues that we otherwise

3   have, is that he could argue whatever he wants in his state

4   court action before the Oklahoma judge, and we reserve our

5   right to tell the Oklahoma judge that he's pursuing punitive

6   damages in -- if the discovery that he wants is tailored to

7   just the punitive damage aspect, we reserve the right to tell

8   the Oklahoma judge that that's a violation of Judge Gerber's

9   December judgment, and then the Oklahoma judge will decide,

10  based on our presentation, whether that's correct or not.

11         So we were prepared to take this entire issue away

12  from Your Honor, but argue that --

13         THE COURT:  So you would -- let me just cut through

14  this.  You agree that New GM will -- is prepared to address the

15  issue before the state court judge in Oklahoma about the scope

16  of permissible discovery in the Pope action.

17         MR. STEINBERG:  That's correct.

18         THE COURT:  All right.  Are you satisfied that with

19  [sic], Mr. Ledford?

20         MR. LEDFORD:  Well, what I'm trying to get is them to

21  make -- they can make the argument that it's premature because

22  of the Second Circuit ruling.

23         THE COURT:  No.  Mr. Ledford, you want your judge to

24  be able to decide the issues.  As Mr. Steinberg said, he's

25  going to leave it to your judge to decide the issues.

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

52

1          MR. LEDFORD:  Okay.  That -- I had asked directly

2     whether or not they're going to argue premature versus

3     forbidden, and they wouldn't answer that.  What I heard him say

4     is --

5          THE COURT:  You ask in Oklahoma, not before me, Mr.

6     --

7          MR. LEDFORD:  -- they're just going to argue

8     premature.

9          THE COURT:  I'm not going to -- okay.  On the issue

10    of what's the permissible scope of discovery in your action in

11    Oklahoma, ti's out of my hands.  It'll be dealt with with the

12    judge in Oklahoma.  Is that right, Mr. Steinberg?

13         MR. STEINBERG:  That is correct, but we're going to

14    argue what happened in the bankruptcy court.

15         THE COURT:  Yes, but you're going to argue it before

16    the judge --

17         MR. STEINBERG:  In Oklahoma.

18         THE COURT:  -- in Oklahoma.

19         MR. STEINBERG:  That's correct.  He'll set what he

20    wants to.

21         THE COURT:  Okay.  All right.  So -- all right.

22    Anybody else on the phone wish to be heard?  No.

23         Go ahead, Mr. Steinberg.  Let's do --

24         MR. STEINBERG:  All right.  Your Honor has given us a

25    lot of time, and I don't really want to spend a lot more time

53

 1  because I guess Your Honor will give us guidance at the end as

 2  to how you want us to proceed.  I just want to highlight a

 3  couple of things that were said, just so it's clear.  The

 4  reason why -- and I think Your Honor had said that you wanted

 5  to see what I labeled the first issue, the Pillars issue, as a

 6  separate issue.  It's because there actually was a back and

 7  forth with Judge Furman.

 8            I'm not sure whether you -- whether we actually have

 9  given it to you, but we actually went through a briefing

10  schedule, letter briefs that were submitted by the Pillars'

11  counsel and by New GM in the MDL as to whether the Second

12  Circuit opinion impacted this appear because they were an

13  ignition switch or a non-ignition switch plaintiff.  So --

14            THE COURT:  This is on page 9 of the --

15            MR. STEINBERG:  That's right.  Judge Furman said,

16  either you're going to win because you convinced the Second

17  Circuit to reconsider, or if it gets down to the bankruptcy

18  court, I want to hear from Judge Glenn on that issue.  So

19  that's why that's a separate issue.  It's --

20            THE COURT:  I'd rather hear from Judge Furman on it,

21  but I don't know.

22            MR. STEINBERG:  But that's the reason why it's

23  separate, and we think it should be separately briefed.

24            THE COURT:  The issue, okay -- look, we still have to

25  deal with the late claim.  I'm going to deal with that in a few

54

1  minutes, but with respect -- what I want you to do is sit down

2  and provide me with a single list --

3          MR. STEINBERG:  I can do that.

4          THE COURT:  -- of the threshold issues.  And, you

5  know, I think you're all -- you all have a different agenda for

6  today, okay.  Stop word smithing it to this point.  Yeah, the

7  issues have to be fairly identified, but we're going to go

8  forward with -- and then negotiate proposed briefing schedule.

9  As I said, I think on the plaintiffs' side, because I don't

10 want separate briefs from everybody who's going to get served,

11 you need to build in enough time that they can circulate.  The

12 lead counsel who are going to -- I assume are going to take the

13 lead in putting the brief together can circulate it and

14 hopefully get comments.  That's a more time-consuming process

15 than you have on your side.  So take that into account when you

16 work out the schedule.

17         MR. STEINBERG:  Your Honor, to the extent that the

18 threshold issues have been numbered, I'm pretty sure that we'll

19 get to closure on identifying how the issues should be spelled

20 out in the order to show cause for one, two, and three.  The

21 fourth one --

22         THE COURT:  What page?

23         MR. STEINBERG:  One, two -- I'm on pages -- starting

24 on page 9 through 14.  I think we can fairly well, in talking

25 to designated counsel, work with the language we have and the

55

1  language that they've included in the report and in the

2  appendix to get to that.  I'm pretty sure we can get there.

3  Item four, we'll need some guidance on how you want to approach

4  the --

5          THE COURT:  We're going to do that now.

6          MR. STEINBERG:  -- the late proof of claim.

7          THE COURT:  Yes.

8          MR. STEINBERG:  The issue that Goodwin Proctor

9  identified on page 16 as two additional threshold issues, I

10 think that --

11         THE COURT:  Include them.

12         MR. STEINBERG:  I think we can include them --

13         THE COURT:  Include them.

14         MR. STEINBERG:  Okay.

15         THE COURT:  My view is if they -- I have no doubt

16 that Mr. Weintraub believes that these are threshold issues.

17 You may disagree.  You'll brief them.

18         MR. STEINBERG:  Okay.  The only thing that I would

19 say on those issues, because I wasn't going to quarrel about

20 briefing them, is that sometimes these two issues, the devil is

21 in the detail of what they're talking about.  And there, it

22 would almost be better to have a test case that illustrates

23 these two points so that we can then brief the issue with

24 regard to a test case.  Because inherent in these questions is

25 what is actually an independent claim and whether they're

56

1  really asserting something that's independent in the context of

2  what Judge Gerber said.

3          THE COURT:  Well, sit down with Mr. Weintraub and see

4  if you can work out the agreement.  Otherwise, it's going to --

5  we're going to include these issues.

6          MR. STEINBERG:  Okay.  Then I think -- then other

7  than that, the only other thing that I would just point out

8  just to -- so Your Honor had it, and I don't have it exactly to

9  the WestLaw cite, but in the Second Circuit opinion on this

10  issue that you've been talking about with Mr. Peller about

11  whether you can do this by order to show cause, there is a

12  specific reference.  The Court ruled on that.

13          THE COURT:  I'm satisfied I can do it by order to

14  show cause.

15          MR. STEINBERG:  And finally, just the final comment

16  I'll have is I think Mr. Peller attributed some comment to me

17  that was really something that Mr. Weisfelner said.  You should

18  -- Your Honor should understand that there is ongoing discovery

19  right now in the MDL on second wave discovery.  I mean, that is

20  happening.

21          THE COURT:  I addressed Mr. Peller's point, that he

22  believes the non-ignition switch plaintiffs are entitled to

23  discovery on the due process issue, which is not resolved by

24  the circuit, which is remanded here.  Why shouldn't that

25  discovery go forward?

57

```
 1              MR. STEINBERG:  The issue that he's referring to here
 2   -- he's -- I think he's talking about economic loss cases, and
 3   there, we say that if Judge Furman rules on successful
 4   liability in favor of either side, that will help decide
 5   whether you need to take discovery at all.  Also, the issue of
 6   discovery on ignition/non-ignition switch cases, whether you
 7   use my nomenclature or Mr. Weisfelner's nomenclature, is
 8   something that has been orchestrated and talked about in the
 9   MDL before Judge Furman with lead counsel.
10              What you have here is Mr. Peller, who is in -- who's
11   got 14 clients, who's not part of the executive counsel, who's
12   trying to use this court and this process to try to get
13   discovery when Judge Furman has tried to organize the discovery
14   around that situation.
15              THE COURT:  All right.  Okay.  Now, let's talk about
16   the --
17              MR. WEISFELNER:  Can I just comment very --
18              THE COURT:  Go ahead, Mr. Weisfelner.
19              MR. WEISFELNER:  -- briefly before we do that?  And
20   Arthur was correct.  Mr. Peller made reference to Mr. Steinberg
21   when I think he meant to make reference to me.
22              Here are the facts as best as I know them.  There is
23   discovery that's ongoing in the MDL between New GM and lead
24   counsel.  It does involve, to a very large extent, the second
25   wave ISDs and whether those defects were known at a point in
```

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657-8    Filed 10/02/17    Page 59 of 79
Pg 708 of 728

58

 1    time.  There will -- there has been and will no doubt continue

 2    to be disputes between New GM and lead counsel as to the scope

 3    of that discovery, how much more of that discovery is going to

 4    be allowed, all of which is before Judge Furman.

 5              THE COURT:  And I'm going to leave it before Judge

 6    Furman.

 7              MR. WEISFELNER:  And, Your Honor, just to sort of

 8    frame the issue as to why discovery in this Court is, from our

 9    perspective, terribly premature, start with the proposition

10    that the Second Circuit said for certain plaintiffs, and maybe

11    said it for everybody in the world, but the sale order is non-

12    effective because of a violation of due process.  Well, that's

13    a victory.

14              Now, what does one do with that victory?  If the sale

15    order is not binding, then presumably you can sue New GM on

16    account of Old GM's actions and conduct.  Well, under what

17    theory would you do that?  The one that comes to mind, and I

18    have a very narrow mind, is successor liability.  Well, if

19    Judge Furman decides in the context of the pending proposed

20    class action that successor liability is not available in the

21    16 states that are pending, it may very well be that from the

22    perspective of lead counsel in the MDL, we say, well, then, who

23    cares whether or not there's a due process violation for

24    anybody whose due process violation hasn't been determined

25    because even if we win, it's a pyrrhic victory.

59

1          THE COURT:  Believe it or not, Mr. Steinberg

2    convinced me that -- not to, at this stage, to have discovery

3    on the due process issue.

4          MR. WEISFELNER:  Okay.  The only other point that I

5    want to make, Your Honor, is one loves a challenge, even to the

6    point of having to hurt cats.  We have attempted in the past,

7    on multiple occasions, to work with Mr. Peller.  Sometimes

8    we're successful.

9          THE COURT:  I think you can leave this part out,

10   okay, but stay up there, Mr. Weisfelner because I want to talk

11   about the late proof of claim.

12         MR. WEISFELNER:  Yes, sir.

13         THE COURT:  And this is on page 14 of the status

14   report.  I've been surprised that you haven't filed -- you told

15   me a long time ago that you were going to file a motion for

16   leave to file a late proof of claim and you haven't yet.  I

17   wasn't enamored of what was suggested in the status report.  It

18   seems to me, file your motion for late proof of claim, let them

19   oppose it.  I mean, I thought that -- maybe I have to clearly

20   go back and read the second circuit opinion, but I thought they

21   reversed Judge Gerber on equitable mootness.  They specifically

22   talked about the accordion feature of the plan.  At this stage,

23   what's the amount of the allowed claims in the Old GM

24   bankruptcy?

25         MR. WEISFELNER:  Approximately -- someone will

1  correct me, I'm sure, if I'm wrong -- about $32 billion worth

2  of allowed claims.

3          THE COURT:  So close to the 35 billion threshold for

4  triggering the accordion?

5          MR. WEISFELNER:  Give or take, $3 billion.  That's

6  correct.

7          THE COURT:  That's real money to me, but you know,

8  okay.  So why don't you --

9          MR. WEISFELNER:  Here's the issue.

10          THE COURT:  Okay.

11          MR. WEISFELNER:  We'd be prepared to file a motion

12  for authority to file a late proof of claim virtually whenever

13  Your Honor directed us.  Here are the open issues.  On whose

14  behalf should the motion be filed?  And we've got a choice of

15  three potential groups, first wave, second wave, non-ISDs.

16          Second issue is class issues.  You heard Mr.

17  Steinberg tell you that certification in the MDL is a '20, '17,

18  '18, or '19 issue.  If the parties would concede that for

19  purposes of determining whether or not we're entitled to file a

20  late proof of claim, we'd be permitted to pursue them as class

21  claims consistent with the positions we've taken before Judge

22  Furman in the MDL, then that issue is gone.  We'll file our

23  motion, and people can have at it.  But it was not to get

24  caught up in our own collective underwear by filing a motion

25  and then arguing over who it is that we purport to represent

61

1    for purposes of that motion when class certification hasn't

2    happened yet.

3              THE COURT:  Right.  And that's not likely to happen

4    until when?

5              MR. WEISFELNER:  2018 is our collective best guess.

6              THE COURT:  I don't want to wait that long.

7              MR. WEISFELNER:  Neither do we.  Here's my

8    suggestion.

9              THE COURT:  Let me just -- so I think I've only had

10   one case where -- with the class proof of claim issue.  It was

11   a WARN Act claim -- or actually, it was the medical because

12   WARN Act is equitable.  Okay.  And there was going to be --

13   there was, you know, there was -- a claim had been filed, and

14   it was filed on behalf of named individuals and as

15   representatives of whoever.  The issue of certifying a class

16   was a different issue, and they ultimately stipulated to it,

17   and fortunately it all got settled, but maybe I don't -- and

18   maybe Mr. Steinberg will tell me what the issues are that he's

19   going to raise in opposition to a motion to file --

20             MR. WEISFELNER:  I'm not sure our opposition

21   primarily comes from New GM on this score.  And what I was

22   going to suggest is our concern really emanates from

23   discussions we've had with counsel to the GUC Trust, Gibson

24   Dunn, and counsel for the GUC unitholders, Ms. Newman's group.

25   I'm happy to work with them to see if we can't stipulate that

62

1 solely for purposes of getting to the next step, i.e. us filing

2 a motion for authority to file late claims, that without

3 prejudice to their position on class certification now or any

4 time in the future, that issue will not be raised in opposition

5 to the motion, then I think we can and should get on with the

6 late proof of claim issue.

7      THE COURT:  Okay.  I don't -- I'm not going to wait

8 until 2018, 2017, 2018 to deal with this issue.  And the way it

9 was described in the status report seemed -- it's -- you know,

10 Mr. Peller talked about the -- part of the issue on remand.

11 Well, they reversed Judge Gerber on equitable mootness.  It's

12 back, and let's get on with it.

13      MR. STEINBERG:  Except, Your Honor, I don't think the

14 Second Circuit reversed Judge Gerber on equitable mootness on

15 the merits.  It said there was not a case or controversy

16 because they had no motion for the filing of a late-filed

17 claim.  So that's why you see in the status report that if a

18 late file motion is filed, that will be the case or controversy

19 which triggers the Judge Gerber ruling on the substance of

20 equitable mootness.

21      THE COURT:  Well, look, I mean, I didn't bring out

22 Judge Gerber's ruling, but equitable mootness, he found, hey,

23 this is substantially consummated.  There is -- there's nothing

24 else.  Well, the Second Circuit said accordion feature.

25      MR. STEINBERG:  No.

63

```
 1                THE COURT:  They do talk about it.

 2                MR. STEINBERG:  They do.

 3                THE COURT:  Judge Chin talks about the accordion

 4  feature.

 5                MR. STEINBERG:  They do.

 6                THE COURT:  And that was why my question to Mr.

 7  Weisfelner, what's the allowed amounts of claims now?  Thirty-

 8  five billion triggers the accordion.

 9                MR. STEINBERG:  Yes and no.  Okay.

10                THE COURT:  Tell me why not.

11                MR. STEINBERG:  Thirty-five billion is correctly the

12  threshold number, but -- and you'll see this is one of the

13  deferred issues.  It's --

14                THE COURT:  We're not going to defer it.

15                MR. STEINBERG:  No, no.  I was describing where it is

16  in the status report.  I'm about to tell you.

17                THE COURT:  I know it is, and that's -- and I'm

18  telling you we're not going to defer it.

19                MR. STEINBERG:  No, no.  I understand.  Okay.  So

20  please trike the word "deferred."  Let me just explain to you

21  why I equivocated on the 35 billion.

22                Thirty-five billion is GM's position.  It's the

23  second phase of the purchase price.  It was -- they paid a

24  credit bid, some cash, some stock, and then if the claims pool

25  had exceeded a certain amount, it was additional consideration
```

64

```
 1   stocks and --

 2            THE COURT:  Stocks.

 3            MR. STEINBERG:  -- wants stocks to be provided.  That

 4   was conditioned upon New GM, as the purchaser, getting the

 5   benefit of the bargain that it contracted for.

 6            THE COURT:  Well, I understand you've got your

 7   arguments about benefit of the bargain.  Good luck.

 8            MR. STEINBERG:  And therefore, there's an issue.

 9   Well, I mean, there's an issue as to whether --

10            THE COURT:  Okay.  We'll deal with that issue.

11            MR. STEINBERG:  Right.  Okay.

12            THE COURT:  But we're going to move on and brief --

13   and it seemed to me that the best way to do that --

14            I think, Mr. Weisfelner, you should try to agree with

15   the GUC Trust because I'm not -- in deciding whether to allow

16   the late claim, I'm not going to decide the class certification

17   issue at this stage.  That's going to get deferred, all right.

18   But I think we ought to see whether the late claims can be

19   filed -- will be permitted, and I'll -- that seems to me to be

20   a threshold issue.

21            MR. STEINBERG:  I agree.  I agree.  That's -- it is

22   listed as a threshold issue.

23            THE COURT:  Well --

24            MR. WEISFELNER:  It's listed, but here's the problem.

25            MR. STEINBERG:  Yeah, let me just say that --
```

65

 1          THE COURT:  The procedure you proposed is not

 2  acceptable.

 3          MR. WEISFELNER:  You sort of get there, right?  You

 4  know, the --

 5          THE COURT:  I do.

 6          MR. WEISFELNER:  The proposal was we file our motion

 7  for authority to file a late proof of claim.  If Your Honor

 8  were to rule in our favor, then according to GM and the GUC

 9  Trust, the music stops and we certify your decision for appeal

10  to the Second Circuit.

11          THE COURT:  Probably not.

12          MR. WEISFELNER:  And that's where we sort of --

13          THE COURT:  It might go to Judge Furman, who has the

14  class certification, you know, is going to have to deal -- I

15  mean, he -- as I understand it, isn't he getting any appeals

16  from me in Motors Liquidation?

17          MR. WEISFELNER:  I think in fairness to their

18  position, their point is that if Your Honor would have

19  determined that we're entitled to file a late proof of claim,

20  it now makes ripe the question of whether or not the relief

21  that we're seeking is equitably moot, whereas the Second

22  Circuit said, interesting issue, but there's no case or

23  controversy --

24          THE COURT:  Right.

25          MR. WEISFELNER:  -- other than the one you made up on

66

1   your own.

2          MR. STEINBERG:  And, Your Honor, just to answer your

3   question, Judge Furman hears most, but not all, of the appeals

4   from you.  And --

5          THE COURT:  Yeah, I saw because one just got bounced

6   from Judge McMahon and got reassigned this morning.

7          MR. STEINBERG:  I don't know what's the judge --

8   Judge Abrams has one?  Did she have one?  Judge Abrams has one.

9          THE COURT:  Well, no, I think --

10         MR. STEINBERG:  She has the Chenault one, I thought.

11         THE COURT:  There was an appeal from my decision

12  about the funding of the trust.

13         MR. STEINBERG:  Okay.  But that's not something I was

14  involved in.  I think Judge Abram --

15         THE COURT:  No, 2:01:46.

16         MR. STEINBERG:  Yeah.  I think Abrams has Your

17  Honor's Chenault decision, where you had indicated that it was

18  with connection with tires and whether --

19         THE COURT:  Yeah, that one was good.

20         MR. STEINBERG:  So he's not getting them all.  But

21  Mr. Weisfelner has articulated what I think the Second Circuit

22  had ruled upon, which is that there was no case or controversy

23  so that if Your Honor was to allow a filing of the late-filed

24  claim -- and we would oppose that, but if Your Honor was to

25  allow that, then what?  Because if you then allowed the filing

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

09-50026-mg    Doc 14127-1    Filed 10/02/17    Entered 10/02/17 12:32:50    Exhibit A
Case 1:14-md-02543-JMF    Document 4657    Filed 10/02/17    Page 68 of 79
Pg 717 of 728

67

1    of a late-filed claim, are you going to determine the substance

2    of the claim?

3              THE COURT:  I don't know.

4              MR. STEINBERG:  Because that's what Judge Furman has,

5    and some of the decisions that Judge Furman will be making --

6              THE COURT:  He can withdraw the reference on that if

7    he --

8              MR. STEINBERG:  That's correct.  And some of the

9    issues that Judge Furman will be making on that issue includes

10   whether the brand theory of damages holds.  He's already held

11   that it doesn't hold in that context, and if it doesn't hold in

12   this context --

13             THE COURT:  Don't get nervous that if I allow the

14   filing of a late claim that I'm going to be the one to decide

15   the amount, you know, which claims are allowed and which not.

16             MR. STEINBERG:  Okay.

17             THE COURT:  Okay.

18             MR. STEINBERG:  But anyway, that's -- so our view was

19   --

20             THE COURT:  Because it should be one judge who

21   decides it, not two.

22             MR. STEINBERG:  So our view of the threshold issue

23   was that if they wanted to move the late-filed claims issue up

24   to a threshold issue, that would be fine.  But it seemed that

25   once they did it, you did have the case or controversy, and

68

1   then you had to try to figure out what to do next based on the

2   Second Circuit decision.

3            THE COURT:  Yes.  And we're going to do that.  We're

4   going to move that along.  Okay.

5            MR. STEINBERG:  That's fine.  We had identified that

6   as a threshold issue, and we had not said anything more that

7   once Your Honor rules on it, then it should go.  We had said

8   certified, but Your Honor's obviously correct.  It doesn't have

9   to be certified to the Second Circuit.  It can go to Judge

10  Furman, as well, too, or to Judge Furman because he's handling

11  the MDL.

12           THE COURT:  Yes.

13           MR. STEINBERG:  So I understand that, as well.  And

14  --

15           MR. WEISFELNER:  Or the third option is Your Honor

16  may decide what to do, short of determining the allowed amount

17  of the claims.  To the extent that Your Honor determines that

18  late claims are allowed and the GUC Trust or anybody else wants

19  to reassert equitable mootness, rather than take it up to Judge

20  Furman or the Second Circuit, Your Honor may decide as a

21  preliminary matter, based on what the Second Circuit has said

22  or Your Honor's own view, because in our view, Judge Gerber

23  didn't take into account the accordion feature when determining

24  equitable mootness, that Your Honor may decide you'll take a

25  crack at it yourself.

Case 1:14-md-02543-JMF    Document 4657-8    Filed 10/02/17    Page 70 of 79

69

1          THE COURT:  I might.

2          MR. WEISFELNER:  You might.

3          THE COURT:  I might well do that.

4          MR. WEISFELNER: There's a third option.  That's my

5   only point.

6          MR. STEINBERG:  The --

7          THE COURT:  And if it gets to the point of actually

8   having to decide what the amount, you know, who has an allowed

9   claim and what's the amount, to the extent that in a different

10  context and before Judge Furman, he may be the one most

11  appropriate to decide it.

12         MR. STEINBERG:  Right.  And Your Honor, the only

13  other thing I'll say is that whatever they file as a claim,

14  inherent in the issue -- we'll brief this -- inherent in the

15  issue of whether they can file a class claim is to whatever

16  extent Rule 23 reply, most of the cases on class claims

17  incorporate Rule 23, which is the issue that Judge Furman will

18  be tackling in the MDL.  So I think the purpose of this is to

19  sort of -- not to try to persuade you on anything today, but to

20  identify the issue.  I think you've given us some guidance.

21  I'm not sure if there's more guidance you want us to give as to

22  how to handle the issue and the drafting of the OCS, but that's

23  all I think I have to say on it.

24         THE COURT:  All right.  Juts bear -- hang on just one

25  second.

70

 1          MR. WEINTRAUB:  Your Honor --

 2          THE COURT:  Yeah, just a second, Mr. Weintraub.  Go

 3   ahead, Mr. Weintraub.

 4          MR. WEINTRAUB:  Of course, there are two additional

 5   wrinkles to the late-filed claim issue.  With respect to the

 6   pre-closing ignition switch accident plaintiffs, we don't

 7   believe that could be a class proof of claim.  We --

 8          THE COURT:  As to the accident plaintiffs, I Would

 9   agree it couldn't be a class proof of claim.

10          MR. WEINTRAUB:  We've been moving, timing-wise, in

11   lock step with the economic loss people.  We have a motion

12   ready to be filed whenever the Court says it should be filed

13   with respect to 200 proofs of claim.  The problem is we don't

14   know that that's all of the proofs of claim that might be

15   filed.  Through Mr. Hilliard, we have 200 proofs of claim for

16   his clients.  We suspect, but we don't know that there are

17   other plaintiffs attorneys with other clients, and one of the

18   challenges is to how to get notice to those potential people

19   that they should be filing a motion now, too.

20          THE COURT:  Mr. Weintraub, in an entirely different

21   context, this morning, I reviewed -- reasoned to review a prior

22   decision of mine where I denied leave to file a late claim, and

23   the argument was that they didn't have proper notices of bar

24   date, and I denied their leave to file a late claim because

25   once they had notice that they hadn't been -- you know, once

71

 1  they found out they hadn't been given proper notice of the

 2  bankruptcy, there was nothing to keep them from filing a motion

 3  for leave to file late claim, and they waited a year and I said

 4  no.

 5          All right.  So, you know, to the extent you're acting

 6  on behalf of others or other counsel here are acting on behalf

 7  of others, be mindful that as I understand -- I'm not deciding

 8  anything, but as I understand it and decided once before, the

 9  law on motions to file a late claim, you've got to act with

10  some diligence.  So if somebody turns around a year from now

11  and files a motion to file a late claim, good luck.

12          MR. WEINTRAUB:  And I agree with that, but my issue

13  is slightly different.  I don't know who knows and who doesn't

14  know that they now have the ability to file a late proof of

15  claim.

16          THE COURT:  Well --

17          MR. WEINTRAUB:  And we only represent the people that

18  we represent, and all I'm raising to the Court is there may be

19  other people out there, and we --

20          THE COURT:  I don't control that either.  All I'm

21  saying is that the issue of late claims Mr. Weisfelner raises

22  before you may have -- I was waiting to see where the motion

23  was.  It didn't come.  I see it listed on the issue list.  I

24  didn't particularly agree with the procedure that was proposed.

25  We've heard more -- I have a little better understanding of it

09-50026-mg   Doc 14127-1   Filed 10/02/17   Entered 10/02/17 12:32:50   Exhibit A
Case 1:14-md-02543-JMF   Document 4657-8   Filed 10/02/17   Page 73 of 79
Pg 722 of 728

72

 1  now in terms of the class issues.  The class issues are not

 2  going to get decided at this stage.  But I can't -- you know,

 3  people will do what they're going to do, and if they're

 4  sleeping on their rights, they're sleeping on their rights.

 5          MR. WEISFELNER:  Your Honor, the other thing that I

 6  think is important --

 7          THE COURT:  Let Mr. Weintraub finish.  Go ahead.

 8          MR. WEINTRAUB:  As I said, Your Honor, we're prepared

 9  to file our motion as quickly as possible.  What -- and now I'm

10  just thinking out loud.  There are procedures through the MDL

11  with the state court liaison.

12          THE COURT:  Right.

13          MR. WEINTRAUB:  And maybe through that state court

14  liaison, some kind of notice could be given to the great

15  unwashed that they have to do something.  So really, all I'm

16  asking is that there be built into whatever the next process is

17  some period of time to at least let that notice happen.

18          THE COURT:  Okay.  Thank you.

19          MR. WEISFELNER:  Your Honor, that was the exact --

20          THE COURT:  Mr. Weisfelner.

21          MR. WEISFELNER:  -- issue I was going to address.  It

22  seems to me that if Your Honor were to rule in favor of whoever

23  the moving parties are with regard to the authority to file

24  late claims, we might, at that point, then decide that the

25  general unwashed masses out there need to get some form of

73

1    notice.  I disagree with my brethren that it ought to be the

2    MDL or any part of the MDL.  I think the burden ought to fall

3    on either New GM or, quite frankly, the GUC Trust to give

4    appropriate notice because they're the ones with a fiduciary

5    duty to people who filed claims.  But put that aside.  I think

6    we can work out notice.

7            THE COURT:  I would be very happy if I didn't have

8    200 motions to file late claims, you know, next week or two

9    weeks from now, and you know, you want to raise the issue with

10   the GUC Trust, with New GM, and maybe some other constituencies

11   that you should about the notion that the issue of leave to

12   file a late claim will be raised in this -- as a threshold

13   issue through motions for leave to file a late claim as to

14   other potential parties.  They'll have, you know -- I don't say

15   a period, a deadline.  So they're not gonna going to be bound.

16           I agree, I don't want to -- I don't think there's a

17   need at this point to have a flood of motions, as long as

18   people have some assurance that, okay, if leave is granted,

19   they will --

20           MR. WEISFELNER:  And two points --

21           THE COURT:  -- have time.

22           MR. WEISFELNER:  -- two points in this regard.  You

23   never want to use the courtroom as a bargaining leverage, but

24   when we talked to the GUC Trust about class-type issues, to

25   they extent they're going to raise class-type issues in terms

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

74

1  of the validity of our motion, one would think that it then

2  puts leverage on this --

3          THE COURT:  Don't make any arguments now.

4          MR. WEISFELNER:  Okay.

5          THE COURT:  We'll hear the arguments when you --

6          MR. WEISFELNER:  The only other point I wanted to

7  make because Your Honor referenced it a couple times.  We have

8  a stipulation with the parties that, from their perspective,

9  excuses us form filing this motion until resolution of the

10  Second Circuit -- and by the way, GM's announced their

11  intention to seek to reverse and seek certification.

12          THE COURT:  Yes, I saw that so far.

13          MR. WEISFELNER:  And that'll be part of our briefing

14  discussion, as well, because as you might imagine, those on

15  this side of the table will also be involved in briefing

16  certification.  So -- and I'm sure we can work it out.

17          THE COURT:  Look, I can tell you right now that my

18  schedule is pretty full over the next few months.  Closing

19  argument in your other case, Mr. Weisfelner --

20          MR. WEISFELNER:  I've heard that.

21          THE COURT:  -- is going to be sometime in January,

22  and -- unrelated to Motors Liquidation, and there is a trial

23  that I scheduled for April 24th in the adversary proceeding of

24  JPMorgan and the others.  So my schedule is pretty full.  I --

25  you're all going to work out a briefing schedule, proposed

75

 1  briefing schedule, and it's -- I wish I could get to it

 2  immediately, but it's not likely to happen.

 3           MR. STEINBERG:  Your Honor, one comment and one

 4  suggestion on the late-filed claim issue.  If they're going to

 5  move that they satisfied the Pioneer factors, that actually may

 6  require discovery as to whether these people, whoever's moving,

 7  was aware of the bar date, was aware of the ignition switch

 8  recall and slept on their rights.  So --

 9           THE COURT:  Well, when you get the motion, you can

10  decide whether you -- you can raise --

11           MR. STEINBERG:  Right.

12           THE COURT:  You can ask them whether they'll agree to

13  discovery, and if not, you can arrange a conference call with

14  me and --

15           MR. STEINBERG:  What I was going to suggest on the

16  late-filed claim issue is that it may make sense that -- it

17  seems to me that the plaintiffs' side has to be the movant --

18  has the opening motion, opening brief on that.

19           THE COURT:  They do.

20           MR. STEINBERG:  And it would seem to me that after

21  that pleading is filed, when we actually see what is there and

22  we actually have an opportunity to talk a little, maybe before

23  we do the next stage of trying to respond to it, we have a

24  status conference --

25           THE COURT:  That's fine.

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

76

 1              MR. STEINBERG:  -- to Your Honor and identify --

 2              THE COURT:  I agree.  I agree.

 3              MR. STEINBERG:  -- all those issues because we have a

 4    lot else to brief and things are very fluid in this case.

 5              THE COURT:  I agree.

 6              MR. STEINBERG:  Okay.

 7              THE COURT:  Okay.  All right.  Anything else I need

 8    to deal with today?

 9              MR. STEINBERG:  No.  Just -- I think in the status

10    report, Mr. Weisfelner pointed out to me that I was rather

11    ambitious about when we would present a consensual presentation

12    -- consensual order to show cause, and I think I said probably

13    five business days --

14              THE COURT:  I think --

15              MR. STEINBERG:  -- and I think we probably need a

16    little more time.  Thanksgiving is coming up.

17              THE COURT:  I know it is.

18              MR. STEINBERG:  But I said business days, so --

19              THE COURT:  I want it by December 7th.

20              MR. STEINBERG:  December 7th is a good day.

21              THE COURT:  Okay.

22              MR. STEINBERG:  Thank you.

23              MR. WEISFELNER:  That's fine.  Thank you, Judge.

24              THE COURT:  All right.  Thank you.

25              MR. STEINBERG:  Is there anything else, Your Honor,

Case 1:14-md-02543-JMF   Document 4657-9   Filed 10/02/17   Page 78 of 79

77

1  for the status conference?

2          THE COURT:  Let me -- just let me quickly -- I have a

3  lot of notes in here, but I think I addressed my issues.  Yeah.

4          We're adjourned.  We're in recess.

5          MR. STEINBERG:  Your Honor, may I just say one --

6  just one thing.  Just so it's clear what we're going to be

7  doing, we're going to be trying to identify, through the order

8  to show cause process, the threshold issues that we've

9  identified plus the two issues that Mr. Weintraub has

10  identified.

11          THE COURT:  Those are threshold issues.

12          MR. STEINBERG:  Those are the threshold issues, and

13  that's what you're going to be getting as the order to show

14  cause.

15          THE COURT:  That's what I was expecting you to --

16          MR. STEINBERG:  What's in the deferred section, we're

17  not going to be addressing.

18          THE COURT:  We're not going to deal with now, and the

19  language that you proposed about people being bound, yes, I do

20  want that in there.

21          MR. STEINBERG:  Thank you.

22          THE COURT:  Thank you.  All right.  We're adjourned.

23          THE CLERK:  All rise.

24      (Proceedings concluded at 1:21 p.m.)

25                          * * * * *

78

1        **C E R T I F I C A T I O N**

2

3           I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9

10   

11   ALICIA JARRETT, AAERT NO. 428      DATE:  November 17, 2016

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25