UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | . | Case No. 09-50026-mg |
| IN RE: | . | Chapter 11 |
| | . | |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| et al., f/k/a GENERAL | . | |
| MOTORS CORP., et al, | . | One Bowling Green |
| | . | New York, NY 10004 |
| Debtors. | . | |
| | . | Tuesday, October 3, 2017 |
| . . . . . . . . . . . . . . . | . | 10:02 a.m. |

TRANSCRIPT OF HEARING REGARDING "PLAINTIFFS' ENFORCEMENT
MOTION" AND THE "FOREBEARANCE AGREEMENT APPROVAL MOTION."
(CC: DOC NOS. 14092, 14093, 14095, 14114, 14115, 14117)
BEFORE THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | King & Spalding LLP |
| | By:  ARTHUR STEINBERG, ESQ. |
| | SCOTT DAVIDSON, ESQ. |
| | DAVID M. FINE, ESQ. |
| | 1185 Avenue of the Americas |
| | New York, New York 10036-4003 |
| | (212) 556-2158 |
| | |
| For the Ignition Switch plaintiffs and certain non-Ignition Switch plaintiffs: | Brown Rudnick LLP |
| | By:  EDWARD S. WEISFELNER, ESQ. |
| | HOWARD S. STEEL, ESQ. |
| | 7 Times Square |
| | New York, New York 10036 |
| | (212) 209-4917 |
| | |
| Audio Operator: | Timothy Wilson, ECRO |
| | |
| Transcription Company: | Access Transcripts, LLC |
| | 10110 Youngwood Lane |
| | Fishers, IN 46038 |
| | (855) 873-2223 |
| | www.accesstranscripts.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
APPEARANCES (Continued):

For Personal Injury
Accident Plaintiffs:        Goodwin Procter LLP
                            By:  WILLIAM P. WEINTRAUB, ESQ.
                            The New York Times Building
                            620 Eighth Avenue
                            New York, NY 10018-1405
                            (212) 813-8839

For Participating
Unitholders:                Akin Gump Strauss Hauer & Feld LLP
                            By:  DANIEL GOLDEN, ESQ.
                                 DEBORAH NEWMAN, ESQ.
                                 NAOMI MOSS, ESQ.
                            One Bryant Park
                            New York, NY 10036-6745
                            (212) 872-1000

For Certain Personal
Injury/Death Plaintiffs: Hilliard Munoz & Gonzales LLP
                            By:  ROBERT HILLIARD, ESQ.
                            719 South Shoreline Boulevard #500
                            Corpus Christi, Texas  78401
                            (361) 882-1612

For JPMorgan Chase
Bank, N.A.:                 Wachtell, Lipton, Rosen & Katz
                            By:  HAROLD S. NOVIKOFF, ESQ.
                            51 West 52nd Street
                            New York, NY  10019-6150
                            (212) 403-1000

For New GM:                 Quinn Emanuel
                            By:  SUSHEEL KIRPALANI, ESQ.
                                 JAMES C. TECCE, ESQ.
                                 JULIA BESKIN, ESQ.
                            51 Madison Avenue, 22nd Floor
                            New York, NY  10010
                            (212) 849-7199
```

```
APPEARANCES (Continued):

For Motors Liquidation
GUC Trust:                 Gibson, Dunn & Crutcher LLP
                           By:  MITCHELL KARLAN, ESQ.
                                DAVID M. FELDMAN, ESQ.
                           200 Park Avenue
                           New York, NY 10166-0193
                           (212) 351-4000

For the Ignition Switch    Lieff, Cabraser, Heimann & Bernstein
Plaintiffs:                By:  ELIZABETH J. CABRASER, ESQ.
                           275 Battery Street, 29th Floor
                           San Francisco, CA 94111-3339
```

4

1       (Proceedings commence at 10:02 a.m.)

2            THE COURT:  All right.  Please be seated.  We're here

3  in Motors Liquidation Company, 09-50026.  I have a list of

4  appearances in front of me.  Let me make some preliminary

5  comments first.

6            I reviewed copies of the letters to me with respect

7  to the positions of the parties with respect to how to proceed

8  in connection with the plaintiffs in settlement and

9  participating unitholders' motion to enforce the unsigned

10 settlement agreement between the supporting parties and the GUC

11 Trust.  And I've read the -- sorry, I read those motion papers.

12 I read the proposed agreement, 9019, between the GUC Trust and

13 New GM.  I read the correspondence to me relating to the

14 suggestions of the parties how to proceed.

15           Judge Furman and I had a brief telephone conversation

16 last week, and he and I had a brief telephone conversation

17 yesterday.  I know that there's a hearing scheduled --

18 conference scheduled before Judge Furman tomorrow.  As is

19 usual, we didn't discuss the merits of the matter.  We

20 discussed what was pending before each of us.

21           I also had -- Judge Furman emailed me yesterday

22 copies of the letters -- the letters in response to the -- I

23 guess the Kirkland & Ellis letter to Judge Furman, so I saw

24 that yesterday, and I know I got a copy of it today, as well,

25 from Mr. Weisfelner.  So I've read those, as well.  So I think

5

1  I've read everything that relates to the issues before me.

2          At the last conference, I had indicated that it was

3  my desire to go forward with a single proceeding dealing with

4  both the motion to enforce the settlement and the new proposed

5  settlement between the GUC Trust and New GM.  And I'll listen

6  to the parties about it, but after reading all of the papers,

7  I've changed my view about it.  And I'm now of the view that we

8  should proceed first with the issue of enforcement of the --

9  whether there is an enforceable settlement between the

10 plaintiffs and participating unitholders and the GUC Trust and

11 defer the issue of whether the 9019 between New GM and the GUC

12 Trust should be approved.

13         The principal reason for my change of view is that if

14 the plaintiffs' settlement agreement with the GUC Trust is

15 approved, the 9019 between New GM and the GUC Trust would

16 terminate.  And so it seemed logical to me to proceed as the

17 plaintiff suggested.  I'll listen to further argument about it,

18 but that's my tentative view.

19         With respect to -- if I adhere to that view with

20 respect to discovery and briefing schedules, I guess I want --

21 it was unclear to me whether, if the matters were divided into

22 phase one and phase two, as suggested by the plaintiffs,

23 whether there was agreement -- what issues there were

24 agreement, what issues there were disagreement with respect to

25 discovery and briefing.

6

1        In reviewing everything, I -- so assuming we

2   proceeded in the phase -- with phase one and phase two, I did

3   have a question about the discovery time period that the

4   plaintiffs suggested.  They suggested the period August 7th,

5   2017 to August 17, 2017, and I question whether that -- the

6   early start -- the start date for August 7th is appropriate.

7   My question is when did the negotiations between the plaintiffs

8   and the GUC Trust begin, and it seemed to me that that starting

9   date may more appropriately be the start date for discovery.

10        For example, hypothetically, if during the

11   negotiations, on one or more occasions, the GUC Trust said to

12   the -- the representatives of the GUC Trust had said to the

13   plaintiffs, "We don't have a deal until it's signed by both

14   sides," that to me would be a relevant piece of evidence for

15   the hearing.  And so just starting it two days before New GM

16   was first informed of the settlement doesn't seem appropriate

17   to me.  It does seem to me that the discovery period should be

18   at least the start of the negotiations between the plaintiffs

19   and the GUC Trust.  Again, I'm giving you my thinking on it,

20   but I'm open to hear what the parties have to say about it.

21        With respect to the issue of New GM's standing, if

22   it's going to be an issue, it's going to have to be briefed by

23   both sides.  I also raise the issue about how many briefs I'm

24   going to get and how long they're going to be.  And so it's my

25   preference to limit the number of briefs and limit -- put page

7

1  limits on the number of briefs.  We can talk about that.  I'm

2  not setting what those limits are.  I mean, I would assume that

3  New GM alone, its counsel would brief the standing issue on New

4  GM's behalf, but, you know, I'm not sure that a proliferation

5  of briefs on the issue of whether or not the agreement is

6  enforceable is going to help me one way or the other.

7          I think that, as an example, it was very helpful to

8  the Court when we had the briefing on the 2016 threshold issues

9  that there was a limitation on the number of briefs.  That was

10 very helpful to me, and I was certainly open to adjusting what

11 -- my normal page limits are 25 pages each side, 10 pages on

12 replies.  That was certainly adjusted when we dealt with the

13 2016 threshold issues, and I'm open to hearing what each side

14 says about it.

15         The other things that would have to be included in

16 the scheduling order is a date for the joint pretrial

17 conference order following the usual template that I've used.

18 I think many of you -- or at least some of you on each side

19 have dealt with that before, and I would set a date for a final

20 pretrial conference and then a date for trial.  I think counsel

21 from both sides have been involved in trials before me, and I

22 think you know that my preference is to have written direct

23 with live cross-examination.  The exception to that is where,

24 if one side persuades me that credibility is a particular issue

25 and therefore they want live direct rather than written direct,

8

1    I'll certainly hear that, but ordinarily my preference is to

2    have written direct with live cross-examination.  And I would

3    assume that will give you a trial date shortly after the final

4    pretrial conference, so I'd like to get this resolved one way

5    or the other as soon as possible.

6            Let me hear from the -- Mr. Weisfelner, are you going

7    to speak?

8            MR. WEISFELNER:  Yes.

9            THE COURT:  Go ahead.

10           MR. WEISFELNER:  Your Honor, good morning.  For the

11   record, Ed Weisfelner, together with my partner, Howard Steel,

12   Brown Rudnick, as co-designated counsel for the economic loss

13   plaintiffs.  Your Honor, also in court this morning is

14   Elizabeth Cabraser, one of the MDL-appointed co-lead counsel.

15           THE COURT:  I'm going to ask some questions for her

16   when we get to -- a little further into the year based on her

17   letter to Judge Furman.

18           MR. WEISFELNER:  Steve Berman I believe is on the

19   phone.  Our co-co-designated counsel, Sandy Esserman, is in

20   court this morning, as well.

21           Your Honor, a couple comments following up on your

22   tentative observations.  And I want to, with all due respect

23   and cautiously, correct Your Honor's multiple

24   mischaracterizations of the agreement between the GUC Trust and

25   New GM.  Your Honor referred to --

9

1          THE COURT:  Don't get too hung up on this,

2  Mr. Weisfelner.

3          MR. WEISFELNER:  I understand.

4          THE COURT:  I'm just -- you know, it's all up in the

5  air.

6          MR. WEISFELNER:  Sure.  Your --

7          THE COURT:  I'm searching for the words.  I should

8  have written them down more carefully.  Go ahead.

9          MR. WEISFELNER:  Your Honor referred to it numerous

10  times, as did counsel at the last hearing, as a 9019 compromise

11  in settlement.  It's no longer framed that way.  I assume that

12  people on this side of the courtroom figured out that there was

13  nothing to compromise or settle as between those two parties,

14  and now it's being pitched as a motion for authority to enter

15  into a forebearance agreement, and Rule 9019 is not among the

16  enumerated bases for that motion.  So I just wanted to make

17  that clear.

18          THE COURT:  Is that the only mistakes I've made so

19  far?

20          MR. WEISFELNER:  Yes, Your Honor.

21          THE COURT:  Good.

22          MR. WEISFELNER:  It's the first time in the years

23  I've been before you that --

24          THE COURT:  Yeah, I'm sure.  I'm sure you really feel

25  that way.

10

1          MR. WEISFELNER:  Your Honor, obviously, as to your

2    first tentative ruling with regard to there being a single

3    proceeding, that being on the motion to enforce, obviously

4    you've read our position.  It's consistent --

5          THE COURT:  I read both sides' positions.

6          MR. WEISFELNER:  And it's consistent with our view

7    not only for the reason you enumerated, and that is that the

8    forebearance agreement by its terms becomes moot if the motion

9    to enforce is granted.  But you have a number of other what I

10   think would be gating issues if Your Honor were to ever again

11   reconsider having them together.  You know from our friends at

12   the GUC beneficiary level, 65 percent of the beneficiaries,

13   that were the forebearance agreement to go forward on the

14   merits, they intended to file a motion to remove, and I'm not

15   sure how one decides which goes first, the motion for authority

16   to enter into a forebearance agreement or the motion to remove

17   the party that's looking to enter into the forebearance

18   agreement.  So for those reasons, among others, we think Your

19   Honor's tentative ruling is the right ruling.

20         In terms of discovery and briefing, I'm going to take

21   the briefing part of it last.  Your Honor, with all due respect

22   to the folks back at the ranch that do the real lawyering, I'm

23   not sure how much more briefing Your Honor's going to see from

24   the plaintiffs' side.  I think we managed to shove it all --

25         THE COURT:  I'll be brokenhearted, Mr. Weisfelner.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

11

1          MR. WEISFELNER:  I think we managed to shove a lot of

2    it into the shoe of the original motion, but we obviously

3    reserve the right to beef up the briefing and to reply.  I

4    would also tell you, as difficult a set of personalities exist

5    among the personal injury plaintiff representatives, we've been

6    pretty lucky up to this point to be able to coordinate our

7    positions and present when, if possible, a single brief, and I

8    do anticipate that we'll be able to do the same in connection

9    with that briefing -- discovery.

10          Your Honor, the bid and the ask between the parties

11    had been, on our side, August 7th as the start date, and on the

12    other side, May 1st.  I've gotten authority from our client to

13    fall on our sword in light of Your Honor's commentary.

14          THE COURT:  Is May 1st when the -- roughly when the

15    negotiations started?

16          MR. WEISFELNER:  Roughly.  I mean, quite frankly, we

17    had discussions dating before Judge Gerber entered his mootness

18    opinion and while things were percolating at the Second

19    Circuit, but I do think it's fair to say that discussions began

20    relatively in earnest, perhaps as early as May, and if that's

21    the date that the parties on the other side of the courtroom

22    thinks is appropriate, so be it.

23          The only other discovery issues we have is who's

24    going to be the subject of discovery --

25          THE COURT:  Yeah.

12

1              MR. WEISFELNER:  -- on the motion to --

2              THE COURT:  I didn't say anything about that, but I

3    have some -- but go ahead and speak to that issue.

4              MR. WEISFELNER:  Look, on our side, our view -- and I

5    don't think that there is any disagreement, frankly -- is that

6    this was an agreement that was negotiated by counsel with

7    little, if any, participation on the plaintiffs' side by actual

8    plaintiff clients or putative class representatives.

9              THE COURT:  What's the little part of it?

10             MR. WEISFELNER:  I don't think there was any, so I

11   don't want to mince words with you, Judge.  This was a product

12   of our collective imaginations, if you will, and it was

13   intended ultimately to go out on notice to the world for their

14   consideration.

15             Now, the only place where I think we part company,

16   because I think the GM/GUC side doesn't disagree that the focus

17   of discovery, ought to be on the counsel that were involved in

18   negotiations.  But our side takes the position that in addition

19   to lead counsel, or the counsel that negotiated the agreement,

20   we ought to have an opportunity to discover Wilmington Trust

21   itself.

22             THE COURT:  Yeah.  I was going to ask.  It surprised

23   me about the draft scheduling order that you submitted because

24   in paragraph 4(b), you talked about discovery of the GUC Trust.

25   My question was doesn't discovery have to be taken of

1  Wilmington Trust.

2          MR. WEISFELNER:  Well, that's what we meant, Judge.

3  We meant the GUC Trust administrator, Wilmington Trust.  So

4  that appears to be the only --

5          THE COURT:  Tell me what your position is and, I

6  don't know, Mr. Tecce or Mr. Kirpalani will tell me what their

7  position is.

8          MR. WEISFELNER:  Yeah.  Look, I think it's important,

9  from our perspective, and perhaps even more so from the

10 perspective of the beneficiaries, that they are entitled to

11 discovery of their trustee, Wilmington Trust.  Some of the

12 underlying assertions that have been made in the responsive

13 papers we've seen so far and in the comments that were made

14 before Your Honor that Wilmington Trust was of the view that --

15 I want to use the right non-pejorative terms -- backing away

16 from the settlement agreement and entering into discussions

17 with New GM about a forebearance agreement was a fulfillment of

18 its view of its fiduciary duty.

19         And I think on that basis alone, we're entitled to

20 take both document and deposition testimony.  Let's remember

21 that we got a declaration from Wilmington Trust in support, and

22 I think we're entitled to speak to a 30(b)(6) witness most

23 knowledgeable about the thoughts that went into both the

24 original settlement and the subsequent decision to back away

25 from it.

14

1          THE COURT:  Well, what was unclear to me was whether

2     your view as to whether discovery -- your proposal for

3     discovery would encompass the meeting between New GM and

4     Wilmington Trust that was described to me at the last hearing,

5     that -- the two-hour meeting that resulted in Wilmington Trust

6     not going forward with the settlement with the plaintiffs.

7          MR. WEISFELNER:  Frankly, Judge, we were trying to

8     narrow the range of disagreements among the parties.  If I were

9     writing on a clean slate, I'd suggest that I want to talk to

10    New GM, as well, and a New GM principal.  But since it was

11    represented to us that this was all outside counsel on behalf

12    of New GM who participated, and since we will have an

13    opportunity, I believe, to talk to Wilmington Trust, we get

14    everything we need from their vantage point --

15         THE COURT:  I just wanted to be clear because that --

16    certainly at the last hearing, it certainly sounded as if you

17    fully intended to pursue --

18         MR. WEISFELNER:  And let me --

19         THE COURT:  And you may if we get to the next phase,

20    but -- that's all being reserved, but that's what I wanted to

21    be clear.

22         MR. WEISFELNER:  And that's the point, Your Honor.

23    It is all being reserved.  I think Your Honor understands from

24    our perspective that, you know, we believe that phase one is

25    decide whether or not we have an enforceable agreement and then

1  we move forward from there.  Moving forward from there may

2  include, but may not be limited to, the plaintiffs' view that

3  New GM's conduct in connection with interfering with the

4  settlement agreement may be actionable --

5            THE COURT:  Let's deal with --

6            MR. WEISFELNER:  -- on a variety of grounds.

7            THE COURT:  Let's deal with the first issues first.

8            MR. WEISFELNER:  I agree.  Your Honor, the last

9  discovery issue that I can think of, and it sort of leads into

10 the GM standing issue -- and let me sort of break down the

11 standing issue as we understand it.  There's the question of

12 GM's standing with respect to the enforceability of the

13 settlement agreement.  And in our view, they don't have

14 standing in connection with whether or not that agreement is

15 enforceable.  I know they've waited on it so far.

16           THE COURT:  Yeah.  Ms. Newman's letter set out that

17 position.

18           MR. WEISFELNER:  Now, things get complicated in terms

19 of discovery because the question is to what extent can GM

20 propound discovery in connection with the enforcement issue on

21 its own.  But perhaps even more insidious, we've got the GUC

22 Trust, by letter, by email request, putting all of us on notice

23 that it's their intent to share the fruits of discovery on the

24 enforcement action with New GM and that if we, on this side of

25 the table, have a problem with that, we better, as hell,

16

1   prosecute a protective order and do it fast.

2          Well, Your Honor, again that seems to sort of be

3   jumping the gun.  I don't know that I'm terribly concerned

4   about the fruits of discovery on the enforcement action being

5   shared with the world, including New GM.  We have nothing to

6   hide.  But the notion that New GM will be an active participant

7   in discovery and briefing on an enforcement action that has its

8   -- at its core an agreement that they're not a party to,

9   they're not a third-party beneficiary of, sort of strikes me as

10  odd.

11         The secondary question, should our motion to compel

12  the settlement agreement be approved by this Court down the

13  road, and we openly go to a trial or a hearing on the merits of

14  the settlement agreement and the claims estimation, to what

15  extent in that context does New GM have standing?  And I

16  believe the parties' positions have been laid out, but perhaps

17  not in as fulsome a way as Your Honor might require as part of

18  briefing.  So when Your Honor talks about New GM briefing their

19  standing issue --

20         THE COURT:  Well, I'm assuming you're going to brief

21  the standing issue, too.  I mean, Ms. Newman's letter cited a

22  bunch of authorities and briefly stated the position of your

23  side of the courtroom that they don't have standing.  And I

24  guess -- again, I'm not ruling one way or the other, but if I'm

25  putting aside the pure legal issues on standing, if the

17

1   estimation were to go forward, New GM is basically going to be

2   compelled to put up $1 billion in stock.  I just -- viscerally,

3   my reaction is if you're asking somebody to put up $1 billion

4   of stock and you're saying they don't have standing to object

5   to this, that --

6           MR. WEISFELNER:  And again, Your Honor, my --

7           THE COURT:  -- raises a question in my mind.

8           MR. WEISFELNER:  -- my focus was on the first

9   standing issue, and that is standing to participate in

10  discovery, briefing, or argument.

11          THE COURT:  Well, let me take the issue and I'll

12  listen to the other side.

13          MR. WEISFELNER:  Okay.  The only other points I

14  wanted to make, Your Honor, is -- and again I think we can work

15  out, hopefully without this Court having to be involved, the

16  number of briefs, the number of pages on the motion to compel.

17          The other thing I want to point out, Your Honor,

18  because I think it's worth putting on the table, as part of the

19  discovery that's already taken place between the parties, we

20  have received deposition notices for both myself and my

21  partner.  My guess is that there will be -- and there's also

22  been deposition notices I think served on Mr. Weintraub, as

23  well.

24          I can foresee a situation when our motion gets tried

25  on the merits where one or more of us may, in fact, be

18

1  witnesses, and I just want to put that on the table.  I don't

2  know that there's any way to avoid it, but to the extent that

3  Your Honor had an issue or a concern about it, I wanted to make

4  sure that would be flagged.

5          And other than that, Your Honor, unless you have any

6  questions of me, I'll yield the podium.

7          THE COURT:  Let me just see whether I -- now, is

8  there anybody -- let me ask is there anybody else on your side

9  of the table that wants to be heard?  Ma'am?

10          MR. WEISFELNER:  Your Honor, before I sit down,

11  obviously the issues that were raised in the Kirkland & Ellis

12  letter to Judge Furman have been responded to.

13          THE COURT:  And I read their letter, and I read the

14  responses to their letter.

15          MR. WEISFELNER:  I just didn't want my silence to

16  cause the Court any concern.  If you had any questions about it

17  or anything else, we're here to try and respond.

18          THE COURT:  No.  And I guess I -- the only other

19  thing I would add, I don't think it's of particular moment, but

20  when I spoke with Judge Furman yesterday, I certainly offered

21  to have his law clerk either present or if -- on CourtCall

22  because we arranged for CourtCall, and I assume that the law

23  clerk is listening in to our hearing today.  And, additionally,

24  I think one of my law clerks is going to listen in to the

25  hearing before Judge Furman tomorrow, so --

19

1          MR. WEISFELNER:  Thank you, sir.

2          THE COURT:  Thanks very much.  Anybody else on --

3 Mr. Weintraub, do you want to be heard?

4          MR. WEINTRAUB:  Yes, Your Honor.  I'll be extremely

5 brief.  With respect to the May 1 date, Mr. Weisfelner has

6 fallen on his sword, and that's a very long sword.  It's

7 impaled me, as well.  So we would also agree to the May 1 date.

8 With respect --

9          THE COURT:  Is that -- I guess my question, and I'll

10 hear from the other side about it, is it just seemed to me that

11 -- I don't know that it needs to cover the very first date, and

12 somebody said, well, what about sitting down and talking, but

13 when negotiations began that led to what you say is a binding

14 agreement, that seemed to me an appropriate date to deal with

15 the enforcement issue.

16          MR. WEINTRAUB:  I agree, Your Honor.

17          THE COURT:  Okay.

18          MR. WEINTRAUB:  Your point is well taken.  I don't

19 have the memory that I used to have, so I couldn't tell you if

20 it was May 1 or around that time, but we can figure out when

21 that date was.

22          And the only other point, Your Honor, Mr. Weisfelner

23 said that we're not writing on a clean slate so that we, at

24 phase one, if phase one remains the way the Court has

25 suggested, we don't need to take discovery of the meeting

20

1  between GM and the GUC Trust.  And I think that that presumes

2  what at least our side of the table believes that we had an

3  enforceable agreement before that meeting ever occurred.  But,

4  Your Honor, to the extent that in phase one, as possibly we

5  constituted, it becomes an issue because it's being relied upon

6  by the GUC Trust in some fashion, then I think it would be fair

7  game.  So we won't know if it's fair game until we really see

8  what they're going to be arguing.

9         THE COURT:  Well, I guess my -- what -- again, I want

10  to hear from the other side, but my view is that -- I'm not

11  categorically excluding the possibility that that discovery

12  would be relevant.  I would ask that the parties -- if one side

13  or the other believes it is, you ought to discuss it, and if

14  there's a disagreement, then come to me.  If there's no

15  disagreement, just go on your way and take the -- do this

16  discovery.  But that would be my view of that.

17         MR. WEINTRAUB:  That's fair.  I just -- my only point

18  was I don't know, as I stand here today, if it's going to be

19  relevant or not.

20         THE COURT:  Okay.  All right.

21         MR. WEINTRAUB:  Thank you.

22         THE COURT:  Anybody else on the plaintiffs' side?

23  Ms. Newman?

24         MS. NEWMAN:  For the record, Your Honor, Deborah

25  Newman, Akin Gump Strauss Hauer & Feld on behalf of the

21

 1  participating unitholders.  I will also be brief, Your Honor.

 2          We echo the comments made by both Mr. Weisfelner and

 3  Mr. Weintraub.  I rise only to note that we have now been

 4  served with discovery of both Akin Gump and each of the

 5  participating unitholders by New GM, and I would just reinforce

 6  the points that were made, which is the question of whether or

 7  not an enforceable agreement was reached between the GUC Trust

 8  and the plaintiffs is not -- you know, the question of whether

 9  -- what the participating unitholders were saying to other

10  people or were saying within their own institutions has no

11  bearing on that question.

12          THE COURT:  Well, let me ask that question because

13  your firm represents -- you represented 65 percent of the

14  unitholders.

15          MS. NEWMAN:  We do, yes.

16          THE COURT:  Lawyers need authority from their clients

17  to go ahead and settle.  And so why isn't it appropriate for

18  the GUC Trust to take discovery from not every one of the

19  unitholders, but at least some of the unitholders as to what,

20  if any, involvement they had, whether they gave your firm the

21  authority to negotiate on their behalf.  I mean, you don't --

22  lawyers just don't go off and negotiate settlements without

23  authority from their clients, at least I hope not.

24          MS. NEWMAN:  Well, I think that's fair.  We could

25  certainly stipulate, and I don't think that there's really any

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

22

1  question on this side of the table that Akin Gump was acting at

2  the behest and direction of its clients.  But this side of the

3  table, at least the GUC Trust, also is well aware that it is

4  counsel that was negotiating that agreement with no involvement

5  of plaintiffs.

6          THE COURT:  I understand, but counsel doesn't agree

7  to a settlement without their client's assent, would it?

8          MS. NEWMAN:  Uh-huh.

9          THE COURT:  Did you get -- let me ask it this way.

10 Did you have your clients' assent to entering into a settlement

11 with the GUC Trust?

12         MS. NEWMAN:  Well, let me make it clear the GUC Trust

13 was -- is a party to that agreement.  The participating

14 unitholders are not a party to the agreement.

15         THE COURT:  Okay.

16         MS. NEWMAN:  So we certainly were working very

17 closely with the GUC Trust in the efforts to bring about that

18 settlement, which I think was -- is favorable for all of the

19 beneficiaries and the GUC Trust, certainly far more favorable

20 than the agreement that the GUC Trust is now proposing with New

21 GM.  But the participating unitholders themselves are not a

22 party to that agreement.

23         THE COURT:  Let me ask the question again.  Did your

24 firm -- I don't want to know who said what to whom, but did

25 your firm -- because you did participate in the negotiations,

23

1  right?

2          MS. NEWMAN:  Akin Gump, yes.

3          THE COURT:  Yes?

4          MS. NEWMAN:  We did participate --

5          THE COURT:  Okay.

6          MS. NEWMAN:  -- in the negotiation.

7          THE COURT:  And did you receive authority from some

8  or all of your clients to go forward and negotiate the

9  settlement?

10          MS. NEWMAN:  Yes, we did.  And I don't believe that's

11  an issue that's in dispute.

12          THE COURT:  But why -- I'll hear from the other side

13  what it is they propose to do.  I don't -- we're not going to

14  go on a scorched earth discovery program that every

15  participating unitholder or every economic loss plaintiff or

16  personal injury plaintiff is deposed, but let me wait and hear

17  from the other side.

18          MS. NEWMAN:  Well, I would just add, Your Honor, that

19  I think that the applicable legal test is whether or not there

20  was conveyed amongst the parties to the agreement assent to be

21  bound.

22          THE COURT:  Well, I don't know.

23          MS. NEWMAN:  An intent to be bound.

24          THE COURT:  I hear you, but let me hear from the

25  other side.  Okay?  All right.  Anything else you want to

24

1  raise?

2          MS. NEWMAN:  No, Your Honor.

3          THE COURT:  Thanks very much.

4          MS. NEWMAN:  Thank you.

5          THE COURT:  Okay.  Anybody else on the plaintiffs'/

6  participating unitholders' side that wants to be heard?

7          Ms. Cabraser, let me ask the questions.  Why don't

8  you come on up to the podium.  Just identify yourself for the

9  record.  If you'd identify yourself for the record, I'd

10 appreciate it.

11         MS. CABRASER:  Yes.  Elizabeth Cabraser, Lieff,

12 Cabraser, Heimann & Bernstein, plaintiffs' co-lead counsel from

13 the multi-district litigation proceedings.

14         THE COURT:  And certainly I reviewed your letter to

15 Judge Furman.  Let's assume I conclude that there's a binding

16 agreement with the GUC Trust, the plaintiffs and the GUC Trust.

17 This works for your side only if the allowed claims are

18 estimated well north of the $35 billion figure, and it was

19 unclear to me from reviewing your letter to Judge Furman, how

20 can the Court estimate the allowed claims unless -- certainly,

21 the personal injury plaintiffs alone are not enough to get --

22 maybe it gets above the 35 billion, but not far north of the

23 35 billion.

24         As I understand the situation, all of the economic

25 loss plaintiffs' potential losses have to be included to arrive

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

25

1  at an estimation that would -- if approved, would require New

2  GM to put up approximately $1 billion of shares.  And so it was

3  unclear to me how -- you seem to be hedging about whether there

4  had to be class certification.  You made the point that the two

5  proposed late claims from economic loss plaintiffs were filed

6  as proposed class claims, but I want a better idea from you

7  about how you see this progressing.

8          Let's assume I find, yes, there was a binding

9  settlement agreement that's reached.  What am I supposed to do

10 with respect to estimation?  Does it depend upon certification

11 of plaintiff classes for the economic loss plaintiffs?  If not,

12 why not?

13         MS. CABRASER:  Your Honor, I don't believe that that

14 estimation depends upon certification of the economic loss

15 classes.  In fact, the sequence is probably the other way

16 around, at least with respect to the multi-district proceedings

17 in that nowadays, in order to obtain class certification for

18 trial purposes, one of the things that courts do is look at the

19 estimate of damages and the methodology for estimating damages.

20         And, of course, that's done through economic experts

21 that use various methodologies, but it all has to do with an

22 aggregate methodology for the claims because we're dealing with

23 large numbers of people that have been impacted economically so

24 that, rather than subject the members of that group or that

25 class to individualized damages process, the experts do it in

1  the aggregate.  So having an aggregate estimate of the claims

2  of that group wouldn't depend upon class certification.

3          The treatment of that group as a group, whether it's

4  a class or under bankruptcy procedure, would proceed from the

5  process of evaluating the claims, the economic impact of the

6  claims on the group, which is done by experts using various

7  methodologies.  It sounds like a chicken and egg, which came

8  first issue --

9          THE COURT:  Maybe to you it does, but not to me.

10          MS. CABRASER:  -- and the -- or the egg.

11          THE COURT:  Not to me.

12          MS. CABRASER:  And it can be done -- it can be and

13  has been done either way, but I don't think it's correct that

14  being able to estimate the claims of this group reliably for

15  bankruptcy plan purposes or settlement purposes would have

16  depended on certifying the group as a class.

17          THE COURT:  Well, I don't --

18          MS. CABRASER:  It's one way to do it.

19          THE COURT:  You know, I read the letters quickly

20  yesterday, but I have to go back and study again, and I'm sure

21  there will be further -- if there is an enforceable agreement,

22  there will be further briefing about this.  Sorry.  I certainly

23  understood New GM's position that the bankruptcy court would

24  not have jurisdiction over unnamed, uncertified class members

25  scattered all around the United States, and the response is,

27

1  oh, well, we propose a very broad notice program, and I'm not

2  sure where -- how far that gets you.  I mean, it -- and I'm not

3  ruling on this question, but I just -- I'm letting you know

4  right now I have real questions about this.  I have --

5           Sit down, Mr. Weisfelner.  Relax.

6           No, no, Ms. Cabraser, stay up there.  Stay up there.

7           MS. CABRASER:  Oh.

8           THE COURT:  Stay up there.  I'm just telling

9  Mr. Weisfelner that -- relax and sit down.

10          Certainly, if a class is certified and appropriate

11 notice is given, and I don't -- you know, I'm sure parties who

12 -- if they're determined to have standing on this would object

13 to class certification, but -- so sure, if the class is

14 certified, you know, whoever is a member of that class in the

15 United States could arguably -- if it's certified, could be

16 bound by the rule, but I'm -- you know, absent economic loss

17 plaintiffs, the strategy I think from reading the letters is

18 yes, you know, the design is to have a binding -- they're all

19 going to be bound by what's determined.

20          And how is it that you propose that economic --

21 people with economic loss -- potential economic loss claims who

22 haven't filed a late proof of claim, who are not part of a

23 certified class -- let's assume that I estimate the claims and

24 $1 billion comes in from -- in value from New GM stock.  How do

25 they get paid?  How is it -- what do they have to do to get any

1  recovery if they're not part of a class, they haven't filed a

2  proof of claim, they haven't filed any pleadings before me?

3  How is it that those people who argue that they've suffered

4  economic loss, how is it they get a recovery out of the New GM

5  stock that goes to -- comes in?

6          MS. CABRASER:  Your Honor, there would be a claims

7  process and a claims program, as there would be in any either

8  class action settlement or mass settlement or even pursuant to

9  a bankruptcy plan.  And I'm sure my bankruptcy counsel will

10 correct me if I start to go wrong here -- I'm not a bankruptcy

11 expert -- but it seems to me that --

12         THE COURT:  Claims in bankruptcy get paid to people

13 who filed claims.  Is there -- and today is not necessarily the

14 time to do this, but you believe there's authority that people

15 who haven't filed claims and are not part of a certified class

16 will, pursuant to an order I enter, get distributions?

17         MS. CABRASER:  Your Honor, that's what I understand

18 would happen in a plan of reorganization.  The problem here was

19 that these creditors -- in the multi-district litigation, we

20 think of them as members of a proposed or putative class.  Here

21 they are creditors.  The underlying --

22         THE COURT:  They haven't filed proof -- you know,

23 creditors have to file proofs of claim.  There's a bar date.

24 There's an issue about filing late claims.  Okay?

25         MS. CABRASER:  That's --

1            THE COURT:  So I don't have -- let's assume that --

2    and yes, I have permitted class claims in other cases.  Okay?

3            MS. CABRASER:  Yes.  And I don't think that's an

4    issue for us.  We understand that you've approved class claims,

5    and we understand there can be class action procedures in

6    bankruptcy under the rules.  The root problem here was the lack

7    of due process and the lack of adequate notice in the first

8    place to apprise this group of creditors of their claims.  So

9    this settlement and the notice that is being proposed, the

10   notice program that's being proposed, which is not technically

11   a class action notice -- it hasn't been presented that way, but

12   was designed to be the functional equivalent in terms of due

13   process -- enabling people to learn of the claim and to have

14   the ability to come forward and to make that individual claim.

15           THE COURT:  So what am I supposed to do?  If I

16   approve this settlement, I set a deadline for economic -- for

17   people with economic -- I understand the late claims filed on

18   behalf of the personal injury plaintiffs, and I'll decide

19   whether those late claims are going to be permitted or not, but

20   it's the economic loss plaintiffs that --

21           MS. CABRASER:  The --

22           THE COURT:  -- at least at this stage is raising the

23   most serious questions in my mind.  Okay?  Do I set -- if

24   there's no class, then there needs to be a piece -- I don't

25   know of any authority -- Mr. Weisfelner, maybe he does and

1  he'll tell me -- where people don't file a piece of paper

2  called proof of claim, where they don't -- they're not part of

3  a certified class on a class claim.

4        MS. CABRASER:  Your Honor, this settlement and this

5  notice of the settlement would give people the notice they did

6  not have before.  It would set deadlines.  It would set --

7        THE COURT:  Set a deadline for what?

8        MS. CABRASER:  To file a claim for the settlement

9  proceeds, if any.

10       THE COURT:  Okay.  So you contemplate that there will

11 be -- if this were to go forward, there would be a deadline by

12 which economic loss plaintiffs -- and I guess has Judge Furman

13 scheduled class certification proceedings?

14       MS. CABRASER:  We are in the process of setting a

15 process for class certification.  It's being done basically on

16 a bellwether basis where the parties are selecting particular

17 states to go forward with class certification for litigation

18 purposes.

19       THE COURT:  Okay.

20       MS. CABRASER:  But under any class or mass or group

21 settlement that creates or designates, you know, a fund, there

22 would also have to be a process for people to come forward and

23 make a claim for that fund.  And the deadlines would be set for

24 them in one or a series of notices.  The way it's usually done

25 now with large classes, particularly economic loss classes or

1  groups of consumers, is to get the initial notice out to give

2  them notice of the approval on subject matter and to have the

3  claims processes posted and developed on, for example, a

4  settlement website so that people can keep up with what's

5  happening in the particular court and at the appropriate time,

6  if there's approval, make their claims to the proceeds.

7          THE COURT:  Okay.  Let me -- and this is probably

8  more of an issue for Judge Furman than for me, but when I read

9  all these papers -- so I understand the Second Circuit's

10 opinion to say that, based on a due process violation as to the

11 ignition switch plaintiffs, the sale order was not binding on

12 them and they could assert the free -- the free and clear sale

13 provisions weren't binding on them and they could assert claims

14 against New GM.  Judge Furman has -- on successor liability

15 claims, he's gone through on a state-by-state basis.  I read

16 his one decision just deciding issues as to certain states, not

17 as to all states.

18          And what I was wondering, so if the Court permits

19 late claims either individually filed or class claims for

20 personal injury plaintiffs or economic loss plaintiffs, does

21 that mean they don't have claims against New GM?  I know your

22 letter said, no, they still have the claims against New GM.

23 But I couldn't -- I didn't understand why.  You know, if -- you

24 know, the problem with the due process violation was they lost

25 their ability to assert claims in the bankruptcy case against

32

1  Old GM.  And the issue now is are they going to be permitted to

2  assert their claims in the bankruptcy court against Old GM with

3  a billion dollars of value coming in from New GM.  And your

4  view is they still have claims against New GM?  Why?

5          MS. CABRASER:  They would still have claims against

6  New GM for -- these would be the independent claims against New

7  GM for New GM's --

8          THE COURT:  Oh, independent claims, different issues.

9          MS. CABRASER:  -- post-bankruptcy --

10          THE COURT:  Different issue.

11          MS. CABRASER:  Yes, Your Honor.

12          THE COURT:  Because I've already ruled on -- you

13  know, in a number of matters about independent claims, and I'm

14  not getting into that.  Okay?  But other -- do you agree that

15  other than independent claims, that either personal --

16  pre-closing personal injury plaintiffs or economic loss

17  plaintiffs, if they get allowed claims in the bankruptcy case,

18  they can't assert claims against New GM for that, only they --

19  maybe they have independent claims they can assert against New

20  GM, but they can't assert successor liability claims against

21  New GM based on the due process issue.  I'm short-handing that.

22          MS. CABRASER:  I think -- it's a complicated

23  question, but I think that's correct.  I certainly think if a

24  claim is paid and full value is given to a claim --

25          THE COURT:  Well, when we say full value, you know,

33

1  bankruptcy pays 10 cents on the dollar.  I'm using that as just

2  a hypothetical.  Full recovery doesn't usually -- it doesn't

3  usually happen in bankruptcy.  And, you know, the fact that you

4  don't recover -- that you recover ten cents on the dollar

5  against the debtor doesn't mean you can sue somebody else for

6  the 90 cents you didn't recover.  You agree with that?

7          MS. CABRASER:  Yes, Your Honor.  If the claim is an

8  Old GM claim, if it's a claim that the bankruptcy court has

9  jurisdiction over and is going to be determined and evaluated

10 and paid or not in the bankruptcy, that's the way it is.  The

11 claims that would remain are the non-bankruptcy claims against

12 New GM or for --

13         THE COURT:  Independent claims against New GM.

14         MS. CABRASER:  For New GM, we'd call them independent

15 claims.

16         THE COURT:  Okay.  All right.  Thank you.

17         Mr. Weisfelner, I -- you wanted to correct me on what

18 I said wrong this time.

19         MR. WEISFELNER:  No.  I did want to address a couple

20 of the bankruptcy aspects of the questions that you posed.

21 Your Honor, in the first place, jurisdiction.  Your Honor

22 properly raises the question of how does this Court have

23 jurisdiction over the unwashed masses of potential personal

24 injury or, for that matter, wrongful death claimants.

25         THE COURT:  Well, personal injury, those -- there

34

1  have been proposed late claims filed by a lot of personal

2  injury claimants.

3          MR. WEISFELNER:  Right.  But there are a lot of

4  potential personal injury/wrongful death claimants that aren't

5  represented by counsel at the table or in the courtroom.

6          THE COURT:  Okay.

7          MR. WEISFELNER:  So I want to address all of them.

8          THE COURT:  All right.

9          MR. WEISFELNER:  And I think from a jurisdictional

10 perspective, what we have to keep in mind is the so-called

11 accordion feature, whether it's triggered at the full

12 billion-dollar level or some lesser level, is part and parcel

13 of the purchase price that New GM paid to Old GM in connection

14 with the sale and confirmation of the plan back in 2009.  It is

15 denominated as additional purchase price to be triggered if and

16 only if the conditions are met.

17         THE COURT:  Allowed -- it has to be --

18         MR. WEISFELNER:  Let me --

19         THE COURT:  Isn't it allowed claims?

20         MR. WEISFELNER:  Let me sort of get there because

21 I'll address the allowed claim portion as well.  So from a

22 jurisdictional perspective, we view this as an in rem

23 proceeding.  Your Honor has jurisdiction over the property the

24 same way you had jurisdiction or would have had jurisdiction

25 over the initial portion of the sale price.  Likewise, you have

ACCESS TRANSCRIPTS, LLC        ⚖  1-855-USE-ACCESS (873-2223)

1  jurisdiction over the rem in connection with the accordion

2  feature.

3         Now, in a bankruptcy context, putting aside that

4  we're settling issues like late proofs of claim, in a

5  bankruptcy context under a 9019 compromise and settlement

6  between the debtor, who for all practical purposes is the GUC

7  Trust, they substituted for Old GM -- the GUC Trust is

8  distributing part of the purchase price.  Now, come all ye

9  claimants and tell me that you have an entitlement to a portion

10 of that purchase price.  And the way I perceive it gets done in

11 a bankruptcy -- and by the way, this is part and parcel of lots

12 of conversations we had with both the GUC Trust and the GUC

13 trust beneficiaries on just these same issues.

14        In our view, under a 9019 compromise and settlement,

15 you've got in rem jurisdiction over the corpus, or the

16 potential corpus represented by the accordion.  You give notice

17 sufficient to satisfy due process.  And at a $6 million price

18 tag, we thought we came up with the appropriate first stage

19 notice, first stage notice.

20        Now, Your Honor has asked a lot of questions about

21 what pieces of paper do people have to file.  Suppose you not

22 only grant the enforceability of this agreement, but you

23 approve the settlement portion and then you approve the

24 compromise and settlement, the claims estimation, here's where

25 I think, you know, we get to.

1          Understand that under the terms of the plan of

2     reorganization itself and all of the operative documents that

3     put the GUC Trust into its position of authority, they have the

4     exclusive and sole right -- and this is the key feature -- to

5     estimate claims.

6          The whole notion of estimating claims for allowance

7     purposes so as to share in the res is antithetical to the

8     notion that come all you people, file all ye claims, and now

9     I'm going to add them up after a multi-year process of figuring

10    out what the claim is worth, I'll come up with a dollar amount,

11    and that's the dollar amount we're going to use.  The wisdom,

12    we thought the elegance, of the 9019 is among the issues that

13    Your Honor would not have to cope with certainly in stage one

14    of this process is how do I add up all these claims, what is

15    the exact dollar amount I accord to Mary, Tom, Joe, Jane with

16    regard to their now many years late proof of claim.

17         There were lots of issues that are compromised and

18    settled as part of a claims estimation that the GUC Trust once

19    upon a time told us it was prepared to go forward with.  No

20    necessity for a Rule 23 class certification.  No necessity for

21    individual proofs of claim, late or otherwise.  No

22    consideration of the pioneer factors.  No consideration frankly

23    of due process violation beyond the capital -- initial capital

24    switch claimants.

25         But to the extent that there were arguments that said

1  that that due process violation applied equally as well to

2  non-ignition switch claimants as well as personal injury

3  claimants, we're settling the whole ball of wax.  From the

4  position of the bankruptcy court, lots of stuff that you would

5  otherwise have to do in terms of adjudicating late claims

6  motions already on file that could have taken years to finish

7  disappear.

8          THE COURT:  Well, let me --

9          MR. WEISFELNER:  And I think that was the

10 contemplation of the parties that negotiated, presented, and

11 had approved the plan and all the plan-related materials.

12         THE COURT:  So let me see.  Let's assume a billion

13 dollars comes into the GUC Trust and only a hundred economic

14 loss plaintiffs come and say, "Give me my slice of the pie."

15 What happens to the billion dollars?

16         MR. WEISFELNER:  Well, let me address that

17 specifically.  By the way, it's a billion plus the 15 million.

18         THE COURT:  I'm just --

19         MR. WEISFELNER:  So let me talk about how that gets

20 adjudicated.

21         THE COURT:  It's pocket change.

22         MR. WEISFELNER:  First of all, as Your Honor might

23 well imagine, there were discussions between economic loss

24 plaintiff types on the one hand and personal injury and

25 wrongful death types on the other hand who will tell you -- and

38

1   by the way, not to take issue with Your Honor's commentary, but

2   I'm sure there are people on the personal injury/wrongful death

3   equation that would say I don't need economic losses to make up

4   the $40 billion; I'll trigger it all by myself.  There are

5   people on the economic loss side that says I don't need

6   personal injury; I can get there on my own.  But combined we

7   get there.  But here's the process.  And the parties were wise

8   enough to go to Magistrate Judge Cott to --

9           THE COURT:  It's Cott.

10          MR. WEISFELNER:  Cott, to say we may very well need

11  your help not only in figuring out how to allocate the billion

12  dollars, but how do we determine now or any time in the future

13  who's eligible.  The good news is that we will have acquired

14  names and addresses of every single GM car owner that was the

15  subject of the recall, every single GM car owner who of record

16  bought the car.  And we have a $6 million notice procedure.

17          In that procedure, the long form, what people are

18  told is let's not knock ourselves out about how to distribute

19  nothing; let's knock ourselves out about how to distribute up

20  to a billion dollars.  And then your relative entitlement

21  versus someone else's relative entitlement, depending on the

22  facts and circumstances that relate to you specifically, will

23  be worked out with the help of the magistrate judge and, if

24  necessary, Judge Furman.  And an entire procedure will develop

25  probably under Rule 23 where notice goes out to the world with

39

1    an opportunity to object that says, here's your entitlement, if

2    you like it, get ready to get the check.  If you don't like it,

3    show up at the hearing --

4              THE COURT:  All right.

5              MR. WEISFELNER:  -- and tell us why you don't like

6    what you're getting.

7              THE COURT:  Well, just -- I think that was in the

8    letters I read.  To get the maximum shares from New GM, what do

9    allowed claims have to go up to?  It's 35 billion is the

10   bottom, but where do you hit the max?

11             MR. WEISFELNER:  I'm almost sure that the number is

12   42 billion, up from the current 33 billion depending, give or

13   take, on what happens with the avoidance action --

14             THE COURT:  Okay.  All right.

15             MR. WEISFELNER:  -- proceeding.

16             THE COURT:  Okay.  Thanks very much.

17             MR. WEISFELNER:  Thank you, Judge.

18             THE COURT:  Okay.  Who is going to speak -- are you

19   going -- are you --

20             MR. WEINTRAUB:  Just one point, Your Honor.

21             THE COURT:  I'm all set.  Go ahead.  Go ahead.

22             MR. WEINTRAUB:  And not wanting to get into an

23   extended colloquy, Your Honor.  Just for the record, the

24   personal injury plaintiffs do not concede that a claim against

25   the trust precludes a claim against New GM on successor

40

1  liability.  That's an issue for another day.

2         THE COURT:  And probably for another judge.

3         MR. WEINTRAUB:  I think so, Your Honor.

4         THE COURT:  Thank you.  Okay.  Who's going to speak

5  on this side of the drawbridge?

6         MR. KARLAN:  Good morning, Judge.  Mitch Karlan from

7  Gibson, Dunn & Crutcher for the GUC Trust, very quickly.  The

8  proposal that Your Honor has suggested this morning --

9         THE COURT:  Just pick up the microphone a little bit.

10        MR. KARLAN:  I'm sorry.

11        THE COURT:  That's okay.

12        MR. KARLAN:  The proposal that Your Honor has

13 suggested this morning that you will try just the issue of

14 whether the discussions between the GUC Trust and the

15 plaintiffs ripened into what the law recognizes as a

16 contract --

17        THE COURT:  It certainly resulted in a big stack of

18 paper that I got.

19        MR. KARLAN:  It did.  It did.  And you did -- you

20 wanted to try that first.  It was not our preference, but I'll

21 borrow the sword and fall on that.  We assume that means that

22 the scope of discovery that Your Honor wants to proceed at this

23 time, it will be appropriately cabined.

24        THE COURT:  Yes.

25        MR. KARLAN:  Yes.

41

1          THE COURT:  Is that a problem, Mr. Karlan?

2          MR. KARLAN:  No.

3          THE COURT:  Okay.

4          MR. KARLAN:  No.  I --

5          THE COURT:  All right.

6          MR. KARLAN:  I would hate to see it go a different

7   way.

8          THE COURT:  No, no, no.  We're going to -- yes, yes.

9          MR. KARLAN:  Okay.

10         THE COURT:  Discovery appropriate for the phase one

11  trial.

12         MR. KARLAN:  Thank you, Judge.  We have no problem

13  with the 25/10-page limits for further briefing.  We would like

14  to submit briefs after discovery is closed.

15         THE COURT:  Oh, yeah.  And I'd be very happy -- I

16  mean, Mr. WEISFELNER, they already submitted -- I don't

17  remember how many pages Mr. WEISFELNER's brief was.  I'd be

18  very happy if the page limit is the 20 -- 25/25/10.  If we get

19  to -- close to the deadline for the briefs to be submitted and

20  you think that, oh, we now need to go over those page limits, I

21  don't require a formal -- when you send -- you personally talk

22  to the other sides, get their agreement, and then you send a

23  letter to the Court and I -- look, you're all really good

24  counsel.  I try to, you know, keep it within limits, but --

25         MR. KARLAN:  I'm confident --

42

1          THE COURT:  -- say what you need to say.

2          MR. KARLAN:  I'm confident we will --

3          THE COURT:  Okay.

4          MR. KARLAN:  -- we will not, Judge.

5          THE COURT:  All right.  Okay.  All right.

6          MR. KARLAN:  There's about four Second Circuit cases

7  that --

8          THE COURT:  Okay.

9          MR. KARLAN:  That's it.  And with Your Honor's

10 permission, I think it will make sense if we submit those --

11 that 25-page brief at the same time that we submit our written

12 direct.  And we agree with you that written direct is what

13 makes sense.

14         THE COURT:  And I -- in principle, that's

15 satisfactory.

16         MR. KARLAN:  Okay.  Well, you haven't discussed trial

17 dates.

18         THE COURT:  No.  But let me ask you, by the way, on

19 discovery, what is your view about the GUC Trust taking the

20 depositions of personal injury plaintiffs or the economic loss

21 plaintiffs --

22         MR. KARLAN:  Right.  So --

23         THE COURT:  -- or the unitholders?

24         MR. KARLAN:  I'd like to find a way to avoid that

25 without prejudicing my client.  Your Honor, I took to heart

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

43

1  Your Honor's remark that lawyers do a lot of things because

2  they're super important.  But at the end of the day, if you're

3  going to settle something, it's only the client that can settle

4  it.  So if the position of the plaintiffs in their motion is

5  that there's a binding contract to settle, we have to go one of

6  two ways, Judge, and I'm indifferent as to which way we go.  I

7  either have to have depositions of both the two class

8  representatives and some manageable, modest select group of the

9  individual plaintiffs who are not class certified --

10         THE COURT:  Well, let me ask you this, Mr. Karlan --

11         MR. KARLAN:  -- or -- well, if I could just finish

12  responding --

13         THE COURT:  Go ahead.

14         MR. KARLAN:  -- to your question, Judge?

15         THE COURT:  Uh-huh.

16         MR. KARLAN:  Or I've got to have a stipulation.  And

17  it sounded like I was getting close to that stipulation a few

18  moments ago.

19         THE COURT:  Well, it struck me that the GUC Trust,

20  before it changed its mind, negotiated extensive documentation

21  and was prepared to sign an agreement with the lawyers only,

22  which says to me that that's all that's required in discovery.

23  If you were prepared -- if the GUC Trust was prepared to sign

24  an agreement that didn't require plaintiffs to sign, then I

25  don't understand -- I raise the question of then why isn't that

44

1  appropriate discovery.  But I raise for you the question why is

2  it appropriate discovery if -- I'm sorry, if the GUC Trust was

3  prepared to go ahead with an agreement that just had the

4  lawyers' signatures?

5           MR. KARLAN:  We were -- may I object to the form of

6  your question?

7           THE COURT:  Sure, you can.  Go ahead.

8           MR. KARLAN:  Okay.  So --

9           THE COURT:  Do it nicely, but that's okay.

10          MR. KARLAN:  There's no question that the draft

11  agreements did not have a signature line for clients.  Had the

12  agreement ever been signed and therefore become effective under

13  its terms, which said it's only effective when it's signed,

14  right, Section 3.1 -- and Your Honor will decide what the legal

15  implication of that provision is, but that's what it says.  Had

16  it been signed --

17          THE COURT:  Judge Chapman in <u>Lehman</u> certainly decided

18  there was an enforceable settlement agreement without

19  signatures, but we'll -- I'll have to get to that.

20          MR. KARLAN:  The Second Circuit's got a lot of

21  decisions.  There's a lot of permutations of that language that

22  are -- of that kind of a provision, and there's no question

23  that certain permutations of that language --

24          THE COURT:  We'll get to that.

25          MR. KARLAN:  -- are not good enough in a certain

45

1  order.

2          THE COURT:  We'll get to that.

3          MR. KARLAN:  Okay.  Had it been signed by the

4  plaintiffs' counsel and us, it would have been a representation

5  by both counsel, both sides, that they were doing so with the

6  authority of their clients.  The issue for Your Honor at this

7  phase one trial will be whether that draft is a legally

8  enforceable contract.  It can't be, I respectfully suggest,

9  unless both clients, both sets of clients, had given authority

10 to their lawyers to sign it.

11         I don't disagree -- there was some suggestion that

12 I'm resisting this, and I don't know why it was being

13 suggested.  I don't disagree that Wilmington Trust has to be

14 deposed in phase one of discovery, but they'll be at the trial.

15         THE COURT:  Here's what I suggest.  I said what I

16 said.  I'm not precluding you from seeking discovery from some

17 selected plaintiffs.  You're not going to take -- I can tell

18 you right now --

19         MR. KARLAN:  I don't want to take all 75.  I can't

20 afford it.

21         THE COURT:  You're not going to take all the personal

22 injury plaintiffs.

23         MR. KARLAN:  I can't afford it.

24         THE COURT:  You're not -- you know, there are two --

25         MR. KARLAN:  Two classes.

46

1            THE COURT:  -- economic loss plaintiffs who filed,

2   you know, class claims, putative class claims.  You should see

3   whether you can resolve the issue with the plaintiffs' side of

4   the room, either with a stipulation that's satisfactory or a

5   limited number of depositions.

6            MR. KARLAN:  Judge?

7            THE COURT:  I think -- let me just say, because I'm

8   not sure you have -- I think maybe you've been before me

9   before.  I can't remember.

10           MR. KARLAN:  I'm glad you don't remember it.

11           THE COURT:  Okay.

12           MR. KARLAN:  So let me just say that.

13           THE COURT:  All right.

14           MR. KARLAN:  I haven't forgotten it.

15           THE COURT:  The way I deal with discovery issues is

16  not with discovery motions.  The party seeking the assistance

17  of the court arranges for a conference call, usually at 4:00 in

18  the afternoon or so.  And I listen to you both and I generally

19  resolve it in a phone call.  I don't want a lot of -- I don't

20  want any -- on this issue, this is not, you know, a privilege

21  issue that I need briefing on or something like that.

22  Hopefully you'll be able to work this out.  If you can't, don't

23  wait.

24           MR. KARLAN:  Okay.

25           THE COURT:  You know, you meet and confer.  You try

47

1  and work it out.  If you can't, you -- because there are

2  discovery deadlines that are going to be set, you call, arrange

3  the call.  I usually have the call within a day or so, maybe

4  the same day, and we sort it out and work it out.  But in the

5  first instance, I'm hopeful that you will be able to work this

6  out with the other side.  Okay?

7           MR. KARLAN:  We will do that, Judge.  And just so I'm

8  confident I've been heard on this one issue.

9           THE COURT:  Sure.

10          MR. KARLAN:  I don't want to take these petitions.

11          THE COURT:  I heard that part.

12          MR. KARLAN:  I'd much rather get the stipulation.

13          THE COURT:  I heard that part of your --

14          MR. KARLAN:  Okay.

15          THE COURT:  -- statement.

16          MR. KARLAN:  So just finishing the checklist, Judge,

17 when you set the scheduling order -- unless Your Honor doesn't

18 wish us to do so, and if so, tell us -- I think having read the

19 plaintiffs' motion and the initial set of interrogatory answers

20 and responses to our requests for admission, that the

21 plaintiffs' motion can probably be resolved on a motion for

22 summary judgment.

23          THE COURT:  I'm not going to hear summary judgment

24 motions --

25          MR. KARLAN:  Okay.

                                                                                    48

1                THE COURT:  -- in this.  We're going to have a trial.

2                MR. KARLAN:  Okay.

3                THE COURT:  And my experience, Mr. Karlan, has been

4    that summary judgment, all it does it slow things down.

5                MR. KARLAN:  Very good, Judge.

6                THE COURT:  And if your presentation is such that you

7    ought to win as a matter of law, you'll win quickly at trial as

8    a matter of law.

9                MR. KARLAN:  Okay.

10               THE COURT:  And we're not -- we're going to get this

11   decided.

12               MR. KARLAN:  All right.

13               THE COURT:  So no summary judgment motions.

14               MR. KARLAN:  All right.  I'm glad I raised it.  I

15   think the only other issue that I'm supposed to respond to --

16   no, I think there are no other issues.  There was -- there's

17   the issue of New GM standing.  That's not my fight.  And

18   there's the issue of sharing discovery, which I think turns on

19   the issue of theirs.  If they have standing, I think I have to

20   share the --

21               THE COURT:  Well, let me just -- on sharing

22   discovery, as I sit here now, I don't see why any of the

23   information that's going to be -- first of all, this is a

24   matter of substantial public interest.  And 107(b) of the

25   Bankruptcy Code, which deals with sealing, sets a very high

49

1  threshold for sealing any information.

2       I permit parties in discovery to enter into, you

3  know, confidential agreements, but we have public trials.  And

4  so it's not at all clear to me why any of the discovery that

5  would be taken in this case would be sealed and not part of a

6  public -- it doesn't -- depositions don't get filed.

7       So my inclination is I don't understand why this

8  discovery can't be shared with counsel for New GM.  If there

9  are particular items where sealing is an issue and where the

10 plaintiffs feel that New GM shouldn't have access to it, it's

11 hard for me to concede, but I'll listen to that in a phone call

12 and get it resolved very quickly.

13      So my reaction is they may not -- you know, I don't

14 know how the issue of New GM's standing is going to come out.

15 I would hope that those opposing enforcement would join

16 together in a single set of requests.

17      MR. KARLAN:  But, Judge, these are the document --

18 I'm sorry, we may not have been clear.  The GUC Trust has made

19 a --

20      THE COURT:  Okay.  Well --

21      MR. KARLAN:  -- substantial document production to

22 the plaintiffs.

23      THE COURT:  Yes.

24      MR. KARLAN:  But has not given it to New GM because

25 we were concerned that New GM would object, and we wanted to

50

1   get clarity from Your Honor --

2              THE COURT:  Okay.

3              MR. KARLAN:  -- whether we're permitted to give it to

4   them or precluded from --

5              THE COURT:  I don't --

6              MR. KARLAN:  I don't care.

7              THE COURT:  You know, I'll listen to Mr. Weisfelner.

8   And again I'm not persuaded why New GM should be precluded from

9   seeing all this.  This is a matter of substantial public

10  interest.

11             MR. WEISFELNER:  Your Honor, that's not our concern.

12             THE COURT:  Okay.

13             MR. KARLAN:  Thank you.

14             THE COURT:  Thank you, Mr. Karlan.

15             MR. WEISFELNER:  Our concern is that --

16             THE COURT:  I'll remember you next time I hope.

17  Okay.

18             MR. WEISFELNER:  Up to today --

19             THE COURT:  Yes.

20             MR. WEISFELNER:  -- and assuming my binder is

21  accurate, we got 11 -- I'm sorry, we got certain requests from

22  the GUC Trust.  We got interrogatories, requests for admission,

23  notices of deposition of our co-leads --

24             THE COURT:  Uh-huh.

25             MR. WEISFELNER:  -- of our lead plaintiffs.  And then

51

1  a whole bunch of responses have been filed.  New GM, New GM on

2  the issue of the enforcement of the settlement agreement, has

3  noticed up interrogatories to both of our putative class

4  representatives, request for admissions to both of our class

5  representatives, notices of deposition of both of our class

6  representatives.

7        They're the only party that's noticed depositions of

8  myself, Elizabeth Cabraser, Howard Steel, Lisa Norman, Robert

9  Hilliard, Sandy Esserman, Steve Berman, William Weintraub.

10 They have requested production of documents to Akin Gump and

11 participating unitholders as well as requests for documents

12 from our putative lead plaintiffs.

13       Your Honor, we should get beyond the question of can

14 the GUC Trust share the fruits of its discovery with anyone

15 including New GM.  It doesn't sit right with me to suggest they

16 can do it when we have questions about New GM's standing.  But

17 again I think the sword is long enough that I could fall on

18 that issue, as well, subject to any specific confidentiality

19 concerns we've got, which we'll have the burden of raising.

20       But what I don't understand is how New GM, on its

21 own, without having established that they're a party with

22 regard to the motion to compel, is head and shoulders way out

23 ahead of everybody else in terms of discovery.

24       THE COURT:  Let me hear from New GM's counsel.

25       MR. KIRPALANI:  Good morning, Your Honor.  Susheel

52

1  Kirpalani from Quinn Emanual.  We're special counsel

2  parachuting in here for New GM.

3          THE COURT:  You've done that before, so --

4          MR. KIRPALANI:  Yeah.

5          THE COURT:  -- before me in other cases.

6          MR. KIRPALANI:  It doesn't get easier.  But I don't

7  have any slides, you'll be happy to hear.  With me in the

8  courtroom is my partner --

9          THE COURT:  Mr. Kirpalani has never appeared without

10  a PowerPoint deck.

11          MR. KIRPALANI:  My partner, Mr. Tecce, and my other

12  partner, Ms. Beskin, are here from Quinn Emanuel.  And just to

13  be clear, Mr. Steinberg is here from King & Spalding with his

14  colleagues, and they are still counsel to New GM.

15          I have to say that I really do applaud Mr. Weisfelner

16  and the plaintiffs' counsel for not doing what I thought they

17  would do, which would be hiding the ball.

18          THE COURT:  Let's just deal with what they did say --

19          MR. KIRPALANI:  Yes.

20          THE COURT:  -- and not what they didn't say.  Okay?

21          MR. KIRPALANI:   That's what I'm trying to say --

22          THE COURT:  Okay.

23          MR. KIRPALANI:  -- but I didn't say it correctly.

24          THE COURT:  So that's -- let's just deal with --

25          MR. KIRPALANI:  No one's hiding the ball.  You know,

53

1  and Your Honor and Ms. Cabraser got into a little bit of a

2  discussion about whether there's a chicken and egg issue, and

3  Your Honor said I'm not sure that there is one.  She said there

4  is one.  There's certainly not a chicken and egg issue because

5  those have no right answer.

6          What we have here is really a cart before the horse

7  situation the way I see it because what Mr. Weisfelner admitted

8  -- and again, in his candor, which I really did appreciate --

9  to the Court is that this settlement -- purported settlement

10 agreement or purported deal with the GUC Trust was the product

11 of what?  He said -- and I wrote it down -- "the collective

12 imagination of these very bright innovative plaintiffs'

13 counsel."  I don't begrudge them for that.  It is exactly the

14 case, but that doesn't make it --

15          THE COURT:  That's how most complicated cases get

16 settled --

17          MR. KIRPALANI:  That is true.

18          THE COURT:  -- Mr. Kirpalani.

19          MR. KIRPALANI:  That is true.  And but for the

20 plaintiffs' counsel to take the position that, well, New GM,

21 they're not a party in interest, they shouldn't have any role

22 here, this is a purported deal between the plaintiffs and the

23 GUC Trust, I would --

24          THE COURT:  They may be right.  We're going to have

25 briefing on that.

54

1          MR. KIRPALANI:  Yes.  And I'm happy to brief that.

2    The way Mr. Weisfelner said that we're not a third-party

3    beneficiary, and I hope that's the rubric that the Court

4    adopts, because if that's the rubric, then certainly being the

5    third-party payor should be an equal balance in the scales of

6    justice.

7          THE COURT:  New GM will be the beneficiary in my view

8    if the result, for hypothetically, is that economic loss claims

9    are resolved as part of the bankruptcy through the allowance of

10   late claims.  And the economic loss claims other than truly

11   independent claims can't go forward in the district court.

12         I remember seeing some time ago a letter brief

13   probably from Kirkland that took the position with Judge Furman

14   that that would be the result of allowing late claims in the

15   bankruptcy, that if the basis for -- putting aside independent

16   claims -- the basis for the successor liability claims was they

17   were denied due process.  They're not subject to the free and

18   clear sale provision.

19         And, you know, whether there are successful liability

20   claims is a matter of applicable non-bankruptcy law, but I

21   remember reading that in a letter.  So I'm -- obviously, that's

22   probably not going to be my call at the end of the day anyway.

23   It's probably Judge Furman's, but that's why I asked.  It did

24   strike me when I read these letters, and I asked Ms. Cabraser

25   about it.

55

1          If late claims are allowed for both personal

2    injury/wrongful death claims -- pre-closing personal

3    injury/wrongful death claims and economic loss claims, if

4    they're allowed in the Bankruptcy Court, you know, it pays in

5    bankruptcy dollars.  And, you know, it may be that there's a

6    substantial dispute in the estimation of what amount they ought

7    to be estimated at, putting that aside for a moment.

8          But there are some real potential benefits to New GM.

9    It'll decide what position you're taking in this Court about

10   it.  But that is something that struck me when I first read --

11   I don't know how many months ago, Mr. Steinberg, that letter --

12   I don't know -- I guess it must have been Kirkland because it

13   went to Judge Furman.

14         But I think I even commented about it at  a prior

15   hearing that, you know, it was like GM -- New GM doth protest

16   too loudly in this court when they're telling Judge Furman, oh,

17   by the way, if there are late claims in the bankruptcy case,

18   the claims before you, Judge Furman, are gone.  But we'll see.

19         MR. KIRPALANI:  Yeah.  And I agree with that, Your

20   Honor.  But the point is, whether we benefit or we suffer,

21   we're economically interested in the outcome and we're a party

22   in this --

23         THE COURT:  Oh, I understand the economic interest.

24   Whether that gives you legal standing or not is a different

25   issue.

56

1           MR. KIRPALANI:  Well --

2           THE COURT:  But let's talk about the discovery.

3           MR. KIRPALANI:  Sure.

4           THE COURT:  The briefing is going to be -- we're

5    going to have briefing.

6           MR. KIRPALANI:  Sure.  Okay.  With respect to the

7    discovery, Your Honor, whether or not -- I mean, I understood

8    Your Honor's tentative ruling at the outset not to consider the

9    competing motions at the same time, and obviously we respect

10   Your Honor's ruling on that.  In terms of why some of their --

11   maybe some of those issues leaking into the record, however, is

12   that it does go to what was happening in real time.

13          I understand that some parties want the Court to just

14   see kind of one-half of the conversations that were going on or

15   one-half of the emails.

16          THE COURT:  But Mr. Steinberg told me that, A, they

17   were cut out of the discussions, that he had a two-hour

18   meeting, and in the course of the two-hour meeting, Wilmington

19   Trust was persuaded not to go forward with the settlement.  And

20   Mr. Weisfelner and everyone on the other side of the courtroom

21   is saying what we're saying, Judge, is before that two-hour

22   meeting happened, there was a binding settlement agreement.

23          MR. KIRPALANI:  Right.  But when Mr. Steinberg

24   started that meeting, the first question out of his mouth was,

25   "Do you have a binding agreement or not?"  And it was only on

57

1  that predicate when my clients -- my co-counsel were advised,

2  no, we do not.  Well, let's talk about what you could do for

3  us.  Okay.  Here are out concerns, said the GUC Trust.

4           THE COURT:  Let's make a deal.

5           MR. KIRPALANI:  Right.  We've got some leverage on

6  you, right?  We've got a deal that we could go forward with the

7  plaintiffs.   Yeah, it has some execution risk, but if you're

8  not offering anything better, then maybe that's what we'll do.

9  And so that is the way the discussions unfolded.

10          And the fact is over this few-day period, a new deal

11 was born with New GM, which the GUC Trust determined in its

12 business judgment is a more appropriate one than doing one that

13 would, despite the innovative thoughts of counsel, which as you

14 said that's very often the way deals get done, raises some

15 serious constitutional questions.

16          There is a question about capacity.  I know Your

17 Honor said that one of your clerks will listen in to Judge

18 Furman's conference tomorrow, but there is a question about

19 capacity to enter into a deal.  You know, the first part of the

20 plaintiffs' motion to enforce the settlement agreement says,

21 "The parties had agreed."  But who are those parties?

22          THE COURT:  Well, let me ask, Mr. Kirpalani.  Let's

23 focus on the discovery.

24          MR. KIRPALANI:  Well, this is part of the discovery.

25          THE COURT:  No, no, no.  Let's -- why should I let

58

1   New GM take the depositions that you apparently noticed of

2   personal injury plaintiffs, putative -- economic loss putative

3   class plaintiffs, all of the lawyers on the other side of the

4   table?

5           MR. KIRPALANI:  Well, they are the parties that --

6   the parties that we're seeking depositions of are the ones who

7   propose to be able to sign the agreement.  Our position is your

8   agreement seeks to expose us to liability, seeks to cause a

9   purchase price adjustment to exist with the successor to our

10  counter-party to the purchase agreement.  The GUC Trust is a

11  successor to Old GM.  And the folks on my right here are saying

12  that they had an agreement, a binding agreement that they were

13  prepared to sign and authorized to sign on behalf of the

14  parties that they said they represented in the agreement.

15          THE COURT:  Okay.  So what I --

16          MR. KIRPALANI:  And as a result of that, my client

17  should pay a billion dollars in stock.

18          THE COURT:  I would like to see a list of each person

19  who you wish to depose.

20          MR. KIRPALANI:  Okay, sure.

21          THE COURT:  And a very short statement about the

22  reasons that you wish to depose them.  And what is it that you

23  want to depose Mr. Weisfelner about?

24          MR. WEISFELNER:  Your Honor, here's the list.

25          THE COURT:  Just wait a second, Mr. Weisfelner.

59

1          What is it you want to depose Mr. Weisfelner about?

2          MR. KIRPALANI:  The way the agreement was negotiated,

3 the contention that this agreement was believed by the

4 plaintiffs, by Mr. Weisfelner, to be binding.  There are emails

5 that no doubt went between Mr. Weisfelner or his partners and

6 counsel for the GUC Trust that may undermine that position.

7          We are the economically interested party and the only

8 one with really, I would say, the actual economic standing to

9 defend the position that there was no binding agreement here.

10 Yes, it might cost the GUC Trust $6 million, but as Your Honor

11 said, well, he was referring to 15 as pocket change, so I guess

12 this is pocket lint.  But for $6 million, that's some stake in

13 the dispute.  It's my client that has over a billion dollars of

14 stock at stake in this dispute.

15          And the motion to enforce the settlement agreement,

16 although it may make sense to have it bifurcated as to whether

17 or not that settlement agreement really should be approved by

18 the Court for a variety of execution risk issues -- presumably

19 we'd be able to participate in that aspect of it -- it doesn't

20 mean that we shouldn't be able to participate --

21          THE COURT:  Well, I'll see.

22          MR. KIRPALANI:  -- in the first --

23          THE COURT:  I'm not signing it now.

24          Mr. Weisfelner, do you have the list of the

25 depositions?

1          MR. WEISFELNER:  I do, Your Honor.  This was the list
2   as of yesterday.  The 26th of September, New GM served the
3   following discovery:

4          First set of interrogatories to Patricia Barker.  She
5   is one of the putative class representatives;

6          First set of interrogatories to Ivan James Bivins,
7   the other putative class representative.

8          Those were coupled with the first set of requests for
9   admissions to those two individuals.  Then we've got a cross-
10  notice of deposition.  I guess cross-notice based on the GUC
11  Trust deposition notice of Ms. Barker, James Bivins.  And then
12  we got for the first time notices of deposition -- all of that
13  was served on the 26th -- myself; Ms. Cabraser; my partner,
14  Howard Steel; Lisa Norman, who's another personal injury/
15  wrongful death representative; Bob Hilliard, who's in court;
16  Sandy Esserman, who is our co-designated bankruptcy counsel;
17  Steve Berman; William Weintraub.

18         And we also got requests for production of documents
19  to Akin Gump and participating unitholders.  And we got
20  requests for production of documents, again to our putative
21  class representatives.  I have a suggestion --

22         THE COURT:  Go ahead.

23         MR. WEISFELNER:  -- that my client may not like, but
24  I'm going to advance it anyway.  Your Honor has already
25  indicated that, given the public concern about this case and

1  the fact that there is a high burden to get information sealed,

2  that the GUC Trust can otherwise share the fruits of its

3  discovery with New GM.

4          THE COURT:  Has GUC Trust noticed your deposition?

5          MR. WEISFELNER:  GUC Trust has not.  But my guess is

6  that about a half hour after we leave today, depending on how

7  quickly Mr. Karlan can get back to his office, he'll notice up

8  the same depositions that New GM offered up.  Look, my guess

9  is, again as part of the cost-sharing, that the GUC -- I'm not

10 even going to speculate why the GUC Trust left it to New GM to

11 do the lion's share of discovery, but my guess is it's a cost

12 issue and they didn't want to have to look the GUC unitholders

13 in the face and say we're incurring all this expense.

14         I think they would rather say, look, we got New GM to

15 do the hard work for us.  So if Your Honor's going to generally

16 allow the GUC Trust to share the fruits of its discovery with

17 New GM, then let it be.  But let's get on with the briefing on

18 whether or not, for the purposes of compelling performance with

19 this agreement, whether the agreement's binding and

20 enforceable, let's get on with the briefing of whether New GM

21 in fact has standing, because it's one thing to participate in

22 discovery, it's quite another thing for them to lead the charge

23 at a deposition, quite another thing for them to have an active

24 role in briefing, quite another thing for them to have an

25 active role in the trial on the merits of whether this is an

62

1  enforceable agreement.  So it's a cart before the horse.

2         Discovery, let them share whatever the GUC Trust

3  decides to ask for.  Let's ask Your Honor for a very quick

4  briefing schedule on whether they've got standing.  The parties

5  will address it and ask Your Honor to rule on it, which we only

6  have to deal with as it comes up to trial, and maybe even

7  participation at depositions.  But I would think that lawyers

8  acting professionally, and with as much as courtesy as I can

9  ever muster for Susheel, all jokes aside, I think we can work

10  it out.

11         THE COURT:  Let me ask you, and it's probably too

12  early to really tell, how many witness do you anticipate

13  calling at the trial?

14         MR. WEISFELNER:  Oh, Your Honor, I would think it's

15  less than six and, if I have my way, we'd cut it down to three.

16  But, you know, I have a client that I report to, and my client

17  will direct me as to how to conduct the trial.

18         THE COURT:  Okay.

19         MR. KIRPALANI:  Your Honor?

20         THE COURT:  Yes.

21         MR. KIRPALANI:  Susheel Kirpalani again for the

22  record.  The issue of standing for New GM, we're happy to brief

23  it as soon as Your Honor would like it.  I would think it's --

24  in terms of the balance of scales, isn't it the exact same

25  issue for the unitholders?  They're the potential beneficiaries

63

1  of a deal that they're not a party to.  We're the potential

2  liable party on a deal that purportedly we're not a party to.

3  It's the exact same thing.  Somebody's going to get the

4  billion; somebody has to pay the billion.  I'm not sure I

5  understand --

6          THE COURT:  No.  That's not the standing issue that

7  the plaintiffs have raised, it's not at all.

8          I'm not going to permit interrogatories, document

9  requests, or requests for admissions to the personal injury

10  plaintiffs or the putative class representatives.  You can

11  discuss with plaintiffs' counsel taking a maximum of three

12  depositions not to exceed four hours in length each of

13  plaintiffs or putative class representatives.  I urge you

14  initially to try and work out a stipulation to avoid even that

15  number of depositions.

16          With respect to the depositions of the plaintiffs'

17  counsel --

18          MR. KARLAN:  Would Your Honor entertain a suggestion?

19          THE COURT:  Go ahead Mr. Karlan.  Go up to the

20  microphone.

21          MR. KARLAN:  I'm not interested in a hundred

22  depositions.  If we could know who the six witnesses at trial

23  are, to the extent any of them are lawyers for the movants,

24  that would be the --

25          THE COURT:  Well, here's what we're going to do.  I'm

64

1  not going rule now.  Why don't the sides -- because there may

2  be more two sides -- discuss -- what I have in mind, just to be

3  clear, is setting aside three days for trial, December 18, 19,

4  and 20.

5          What I propose is that joint pretrial order is due on

6  Tuesday, December 5th; final pretrial conference is on

7  December 11th; and three days of trial, December 18, 19, and

8  20.  I would like the direct in written narrative form and

9  declarations under oath with live in-Court cross-examination.

10         Let me ask the question, will the principal trial

11 lawyers, do any of you have plans on being on vacation on

12 December 18, 19, 20?  I do try to be mindful of that.  I know

13 it's really getting real close to the holidays.

14         MR. KARLAN:  I do not, Your Honor.

15         THE COURT:  Mr. Weisfelner?

16         MR. WEISFELNER:  Irrelevant.  We'll be here.

17         THE COURT:  Okay.  Anybody else?  Speak up because

18 I'm serious.  I really do try to accommodate -- I'm trying to

19 get this done quickly and not have it push in to the new year.

20 It'll be on my shoulders to get something out, but --

21         MR. HILLIARD:  Judge, good morning.  My name is Bob

22 Hilliard and I'm pro hac'd in.  I would like to say probably

23 not.  With the Court's permission, I didn't bring my

24 computer --

25         THE COURT:  Sure.

65

1          MR. HILLIARD:  -- because of a cab issue.  I would

2   like a chance to confirm that I can be here if it's necessary

3   that I am, maybe by the end of the day.

4          THE COURT:  Fair enough.

5          MR. HILLIARD:  Thank you, Judge.

6          THE COURT:  Just send, you know, a letter.  Post it

7   on ECF and send a letter to chambers.  You can email it to one

8   of my law clerks.

9          MR. HILLIARD:  Thank you, Your Honor.

10          THE COURT:  You know, I'm really not trying to

11   squeeze people with the holidays, but I'd like to get this

12   trial done, and it seemed to me that, particularly if the

13   direct is in written form, three days is enough to do that.  As

14   some of you who've been in trial before me know, with trials, I

15   conduct trials starting at 9:00 in the morning and, if

16   necessary, going late each day, usually try to break by 5:30.

17   But I've had trials that have gone on to 8:00 or nine o'clock

18   at night when that's been necessary.

19          But I'd like to get the evidence closed in those

20   three days.  If there are depositions of plaintiffs who are not

21   in the New York area, you know, their testimony can come in

22   through either declaration or deposition designations, counter-

23   designations, et cetera.  My pretrial order, I think people on

24   both sides have been involved in trials before me, you've got

25   to list all your witnesses, all your exhibits, exchange them.

66

1  I'm not saying the dates for that.  You'll work that out.  I

2  don't have any doubt that you'll be able to do that.

3          So subject to what Mr. Hilliard tells me, I'm

4  tentatively setting those dates of December 18, 19, and 20 for

5  trial.  And as I said, December 11th, I think at 10:00 a.m.,

6  for a final pretrial conference and the joint pretrial order

7  due on Tuesday, December 5th.  And I don't anticipate ruling on

8  the standing motion in advance of the trial, just to make that

9  clear.

10          I'm not suggesting that any of the counsel for New GM

11 would go on a blitzkrieg about discovery, but if they did, I

12 probably would crack down pretty tight on it just to make that

13 clear.  The dates that were in -- I'm looking at Exhibit A to

14 the Akin Gump letter, full bifurcation scheduling order.  The

15 other dates -- just so we're clear on the record, the other

16 dates that are in that letter I think are satisfactory.

17          I changed the date in Paragraph 4(a) for the

18 beginning of discovery.  Mr. Weisfelner said May 1, and I

19 didn't hear anybody suggest that that's not an appropriate date

20 for the discovery period, May 1, 2017, through August 17, 2017.

21          The references in Paragraph 4(b) to the GUC Trust

22 clearly includes Wilmington Trust.  I don't think there's any

23 disagreement about that.  The dates in Paragraphs 4(d), (e),

24 (f), and (g) are all satisfactory to me.  I didn't hear anybody

25 raise any objections about the proposed language in 4(g) on

67

1  categorical privilege logs.

2            I've given you the trial dates.  I've told you to

3  add -- and you have to revise this order accordingly -- add the

4  date for the joint pretrial order due, final pretrial

5  conference, and trial dates.

6            And I guess, Mr. Kirpalani, you answered one of my

7  questions.  King & Spalding remains co-counsel in terms of this

8  proceeding, so --

9            MR. KIRPALANI:  Thank you, Your Honor.  Can I just

10  ask a clarifying --

11            THE COURT:  Sure.

12            MR. KIRPALANI:  -- question?  Again, for the record,

13  Susheel Kirpalani for New GM.  So if we're going with what Your

14  Honor ruled at the outset, which is that phase one is just

15  going to be what is in the Akin Gump proposed order, whether

16  plaintiffs' settlement agreement is a binding agreement.

17            THE COURT:  Yes.

18            MR. KIRPALANI:  Okay.  Then New GM has been served

19  with discovery, as well.  And is it that that's not part of

20  phase one, because what New GM, or Mr. Steinberg --

21  Mr. Steinberg would sit for this deposition as part of this

22  phase one -- it seems like if it's not -- if --

23            THE COURT:  I think Mr. Weisfelner said you weren't

24  going to pursue that now.

25            Am I right, Mr. Weisfelner?

68

1          MR. WEISFELNER:  Yes, Your Honor, correct.

2          MR. KIRPALANI:  Okay.  Then I just didn't hear it.

3  Okay.  Thank you, Your Honor.

4          THE COURT:  So that -- you know, because some of the

5  letters dealt with what -- are all issues going to be dealt

6  with at one time, which is what I suggested at the last

7  hearing?  The Akin Gump proposal gave alternatives but

8  suggested that the plaintiffs' side thought it was more

9  appropriate to bifurcate -- a complete bifurcation.  I agree

10 with that.  That's the basis for going forward.  So

11 Mr. Steinberg's deposition is not going to be taken as part of

12 the phase one discovery.  If it becomes an issue as to -- you

13 know, raise it with me if you can't work it out.

14          I mean, look, if you all work out for some reason

15 that his deposition is going to be taken on some issue, if

16 there's no objection to it, you don't have to come back to me.

17 But if there is, you know, and New GM objects to it, you'll

18 come back and -- by telephone and promptly raise the issue.  I

19 want to keep on this schedule.

20          MR. KIRPALANI:  Okay.  So just to be clear, my

21 partner's asking me to be very clear on the record.  So

22 whatever documents and RFAs that New GM was served with, those

23 are going to be on hold until we get -- if we get to --

24          THE COURT:  I don't know what's in them.  If they

25 relate to phase one, they're not a -- is there anything,

69

1  Mr. Weisfelner, in the discovery of New GM you think is

2  appropriate for phase one?

3          MR. WEISFELNER:  Your Honor, frankly, I didn't

4  participate in the drafting of that.  My best --

5          THE COURT:  Okay.  So then who --

6          MR. WEISFELNER:  -- my best guess is --

7          THE COURT:  Who did?

8          MR. WEISFELNER:  Well, I don't want to blame Howie

9  Steel, but it's Howie Steel's fault.  Your Honor, my best

10 recollection --

11         THE COURT:  You know, he always comes to your defense

12 whenever he's here without you.

13         MR. WEISFELNER:  That's the reason why I'm the senior

14 partner.

15         Your Honor, I'm almost certain that all the discovery

16 that was aimed at New GM was in anticipation of a joint trial

17 and joint discovery.

18         THE COURT:  Here's what I want you to do.  Discuss

19 it.  If there's a disagreement that you can't resolve, you'll

20 call and we'll work it out.  Okay?

21         MR. WEISFELNER:  Understood, Judge.  All right.

22         THE COURT:  Mr. Kirpalani, anything else Mr. Tecce is

23 telling you have to raise?

24         MR. KIRPALANI:  Yeah.  As usual, yes.  Just the

25 deadline on the briefing for the standing issues.  No, I'm

70

1  being advised I know Your Honor said you're not going to rule

2  on it until we get to the trial, but --

3        THE COURT:  I want all the briefs at the same time as

4  the joint pretrial conference order --

5        MR. KIRPALANI:  Okay.  All right.  So everything

6  together.

7        THE COURT:  -- on Tuesday, December 5th.

8        MR. KIRPALANI:  Thank you.

9        THE COURT:  Okay.

10       MR. KIRPALANI:  Thank you, Your Honor.

11       THE COURT:  All right.  Anything else?  Mr. Hilliard?

12       MR. HILLIARD:  Your Honor, Bob Hilliard.  Thank you

13  for letting me say a few words.  I want to speak directly to

14  something that's in my wheelhouse.  My bankruptcy counsel's

15  very good in front of you, but this has to do with the

16  depositions of the personal injury and wrongful death

17  plaintiffs.  And I think I speak for all three sets of

18  attorneys who were willing to sign off on the GUC Trust

19  agreement on behalf of their plaintiffs.

20       I appreciate that if we don't reach a stipulation,

21  Judge, that the Court has ordered four hours of deposition.  I

22  am --

23       THE COURT:  Limited to issues relevant to the

24  settlement, not to what their claims are or anything like that.

25       MR. HILLIARD:  That's correct, and I'm here to

71

1  encourage the Court to perhaps reduce that even more with this

2  in mind.  If their case ever gets to trial in front of Judge

3  Furman, if they get a chance to go into the courtroom, the

4  depositions are six full hours.  I, as well as the other

5  counsel for the other injury and death plaintiffs, signed this

6  agreement on their behalf, so the question has to be does

7  Mr. Hilliard represent you in the ignition switch litigation?

8  The answer is yes.  Any other question is going to have a

9  privilege objection.  It's going to have details about my

10 conversations with my client or my client's conversations with

11 me.  And respectfully, to the economic loss side, these are

12 people who have lost loved ones, who have been injured or are

13 going to be presented on a GUC Trust question where they'll be

14 scratching their head, they'll be saying, you know, here's my

15 lawyer.

16        I would potentially hope that this Court would

17 recognize that on injury and death plaintiffs, if a stipulation

18 is not reached with what we will agree and stipulate to, that

19 this Court will at least let us be heard again through your

20 phone conference as to how long, if at all, they should give a

21 sit down, swear them in, and ask questions of them in

22 deposition.

23        THE COURT:  Where are your clients?  Scattered all

24 over the country?

25        MR. HILLIARD:  All over the country, Judge, you know,

72

1  from Ohio to Maine to --

2          THE COURT:  Just to be clear, if any of these

3  depositions take place, they'll take place where the plaintiffs

4  reside, unless they agree to go someplace else for it.  But,

5  Mr. Hilliard, see if you can work it out with the other

6  parties.  If you can't and you want to continue to raise an

7  issue about the length or the appropriate subject matter, I

8  will hear you by telephone.

9          MR. HILLIARD:  Thank you, Judge.

10         THE COURT:  Okay.  All right.

11         MR. WEINTRAUB:  You're looking at me, Your Honor.

12         THE COURT:  Well, you're getting up, so I assume you

13  want to be heard again.

14         MR. WEINTRAUB:  At the risk of elongating --

15         THE COURT:  Just identify yourself for the record.

16         MR. WEINTRAUB:  William Weintraub, Your Honor, for

17  the personal injury plaintiffs.  At the risk of elongating

18  today's festivities, Your Honor, at one point I thought you

19  were about to say something about the depositions of

20  plaintiffs' counsel and then you stopped, and I don't know if

21  you're going to go back to that or not.

22         THE COURT:  Well, I think what was going to -- the

23  reason I stopped was that I was going to have counsel confer

24  and see if they can resolve -- I'm not -- just to make it

25  clear, Mr. Kirpalani or Mr. Karlan, you've got to reduce the

73

1  number of the counsel who you're going to depose.  Find out

2  from Mr. Karlan who were the principal negotiators on their

3  side and, you know, I'm going to put limits on how many

4  depositions.  The list that Mr. Weisfelner read off to me was

5  too long in my view, but I'm going to -- I'm not going to rule

6  right now.  Okay.  See if you can all work it out.  Okay?

7        Anything else for today?  We're adjourned.  Thank you

8  very much.

9        UNIDENTIFIED:  Thank you, Your Honor.

10        THE COURT:  Somebody is going to submit a new

11  pretrial stipulation and scheduling order with the dates and

12  other changes that were made.  Okay.  Thanks very much.

13      (Proceedings concluded at 11:47 a.m.)

14                    *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25



74

# C E R T I F I C A T I O N

I, Ilene Watson, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

ILENE WATSON, AAERT NO. 447      DATE:  October 3, 2017

ACCESS TRANSCRIPTS, LLC



ACCESS TRANSCRIPTS, LLC      1-855-USE-ACCESS (873-2223)