Susheel Kirpalani
James C. Tecce
Julia Beskin
**QUINN EMANUEL**
  **URQUHART & SULLIVAN LLP**
52 Madison Avenue
New York, NY  10010

Arthur J. Steinberg
Scott Davidson
**KING & SPALDING LLP**
1185 Avenue of the Americas
New York, New York  10036

*Counsel to General Motors LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MOTORS LIQUIDATION COMPANY, et al.,<br>f/k/a General Motors Corp., et al.,<br><br>                                 Debtors. | Chapter 11<br>Case No. 09-50026 (MG)<br>(Jointly Administered) |

**MOTION OF GENERAL MOTORS LLC, PURSUANT TO 11 U.S.C. §§ 105(a) AND 1109(b), FED. R. BANKR. P. 2018 AND 3020, AND PRE-TRIAL ORDER, TO APPEAR AND BE HEARD WITH RESPECT TO PHASE 1 OF COURT'S CONSIDERATION OF PLAINTIFFS' MOTION TO ENFORCE UNEXECUTED AND UNDATED SETTLEMENT AGREEMENT**

# TABLE OF CONTENTS

**PAGE**

I.    PRELIMINARY STATEMENT ..................................................................1

II.   FACTUAL BACKGROUND ....................................................................2

    A.    OLD GM BANKRUPTCY AND SALE AGREEMENT......................................2

    B.    LATE-CLAIMS MOTION .......................................................................5

    C.    UNEXECUTED SETTLEMENT AGREEMENT ...............................................7

    D.    FORBEARANCE AGREEMENT BETWEEN NEW GM AND GUC TRUST ....................11

    E.    PLAINTIFFS' MOTION TO ENFORCE UNEXECUTED SETTLEMENT
        AGREEMENT; PRE-TRIAL ORDER ...........................................................12

III.  JURISDICTION & VENUE ..................................................................13

IV.  ARGUMENT ....................................................................................13

    A.    NEW GM IS A PARTY IN INTEREST WITH STANDING TO APPEAR AND BE
        HEARD IN PHASE 1 UNDER SECTION 1109(B) OF BANKRUPTCY CODE AND
        BANKRUPTCY RULES ...........................................................................13

    B.    NEW GM HAS CONSTITUTIONAL STANDING INDEPENDENT OF SECTION
        1109(B) AND BANKRUPTCY RULES .........................................................20

    C.    PLAINTIFFS HAVE CONCEDED NEW GM'S STATUS AS PARTY IN INTEREST ..........21

    D.    NEW GM SATISFIES PRUDENTIAL LIMITATIONS ON THIRD PARTY
        STANDING .........................................................................................23

V.   CONCLUSION ..................................................................................25

T<small>ABLE OF</small> A<small>UTHORITIES</small>

P<small>AGE</small>

C<small>ASES</small>

In re Amatex Corp.,
   755 F.2d 1034 (3d. Cir. 1985) ........................................................................................ 14

In re Blair,
   2016 WL 8608454 (D. Colo. Aug. 24, 2016) .................................................................. 20

In re Caldor Corp.,
   303 F.3d 161 (2d Cir. 2002) ........................................................................................... 20

In re Comcoach Corp.,
   698 F.2d 571 (2d Cir. 1983) ........................................................................................... 19

In re CP Hall Co.,
   750 F.3d 659 (7th Cir. 2014) ......................................................................................... 16

Elliott v. General Motors LLC (In re Motors Liquidation Co.),
   829 F.3d 135 (2d Cir. 2016) ............................................................................................. 3

In re Global Indus. Techs., Inc.,
   645 F.3d 201 (3d Cir. 2011) ........................................................................... 14, 15, 17, 23

In re Heating Oil Partners, LP,
   422 F. App'x 15 (2d Cir. 2011) ........................................................................... 15, 17, 19

Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n,
   747 F.3d 44 (2d Cir. 2014) ............................................................................................. 18

Kane v. Johns-Manville Corp.,
   843 F.2d 636 (2d Cir. 1988) ........................................................................................... 23

Lujan v. Defenders of Wildlife,
   504 U.S. 555 (1992) ........................................................................................................ 23

In re MF Global Holdings Ltd.,
   469 B.R. 177 (Bankr. S.D.N.Y. 2012) ...................................................................... 20, 23

In re Motors Liquidation Co.,
   529 B.R. 510 (Bankr. S.D.N.Y. 2015) .......................................................................... 3, 4

In re Residential Capital, LLC,
   2013 WL 6698365 (Bankr. S.D.N.Y. Dec. 19, 2013) .................................................... 14

In re Residential Capital, LLC,
   2015 WL 629416 (S.D.N.Y. Feb. 13, 2015) .................................................................. 15

In re Sapphire Development, LLC,
    523 B.R. 1 (D. Conn. 2014) .......................................................................... 16, 23

In re Standard Insulations, Inc.,
    138 B.R. 947 (Bankr. W.D.Mo. 1992).................................................................. 16

In re Stone Barn Manhattan LLC,
    405 B.R. 68 (Bankr. S.D.N.Y. 2009) .................................................. 14, 15, 16, 17

In re Suffolk Regional Off-Track Betting Corp.,
    462 B.R. 397 (Bankr. E.D.N.Y. 2011).................................................................. 18

In re Texaco Inc.,
    81 B.R. 820 (Bankr. S.D.N.Y. 1988) ............................................................... 14, 15

Shea v. Royal Enterprises, Inc.,
    2011 WL 43460 (S.D.N.Y. Jan. 6, 2011) ............................................................. 18

Tamir v. Bank of New York Mellon,
    2013 WL 4522926 (E.D.N.Y. Aug. 27, 2013)....................................................... 18

U.S. v. Veliotis,
    586 F. Supp. 1512 (S.D.N.Y. 1984)...................................................................... 19

## STATUTORY AUTHORITIES

11 U.S.C. § 105(a) ...................................................................................................... 14

11 U.S.C. § 1109(b) ................................................... 14, 15, 16, 18, 19, 22, 23

28 U.S.C. § 157.......................................................................................................... 13

28 U.S.C. § 1334........................................................................................................ 13

28 U.S.C. § 1408........................................................................................................ 13

## RULES AND REGULATIONS

Fed. R. Bankr. P. 2018............................................................................................ 14, 20

Fed. R. Bankr. P. 3020................................................................................................ 14

## OTHER AUTHORITIES

7 Collier on Bankruptcy ¶ 1109.02 ...................................................................... 19, 23

9 Collier on Bankruptcy ¶ 2018.04 ........................................................................... 20

General Motors LLC ("**New GM**") moves, pursuant to sections 105(a) and 1109(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"), Rule 2018 and Rule 3020 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and paragraph three (¶ 3) of the Pre-Trial Stipulation and Scheduling Order, dated October 11, 2017 (the "**Pre-Trial Order**") (Dkt. No. 14130), to appear and be heard in connection with any and all aspects of Phase 1 of the Court's consideration of Plaintiffs' Motion To Enforce Settlement Agreement By And Among Signatory Plaintiffs And GUC Trust (the "**Enforcement Motion**" (Dkt. No. 14092), and the purported unexecuted and undated settlement agreement, the "**Unexecuted Settlement Agreement**") and states as follows:

## I.    PRELIMINARY STATEMENT[1]

1.    Plaintiffs and the Participating Unitholders seek to compel New GM to fund an alleged $1 billion settlement without providing New GM an opportunity to protect its rights.  The centerpiece of the Unexecuted Settlement Agreement is the GUC Trust's commitment to support a purported Claims Estimate Order that quantifies the Allowed General Unsecured Claims in excess of $42 billion and directs New GM to deliver 30 million shares of stock—ostensibly under the Adjustment Shares provision of the Sale Agreement.[2]  New GM is therefore the primary target and party into whose pockets Plaintiffs are trying to reach to fund their supposed settlement.  New GM's standing arises out of its direct economic interest in the settlement and is entirely consistent with the Bankruptcy Code and Rules, the United States Constitution, and cases deciding analogous standing controversies.

---

[1]    Capitalized terms not defined in the Preliminary Statement are defined herein.

[2]    If this contested matter proceeds past Phase 1 (and New GM believes it should not), New GM reserves any and all rights to argue in Phase 2 that the Unexecuted Settlement Agreement does not trigger any of New GM's obligations under the Sale Agreement or the Adjustment Shares provision (§ 3.2), and nothing herein should be considered an admission or waiver with respect to any such defense.

2.     The fact that the litigation surrounding the Unexecuted Settlement Agreement has been bifurcated does not negate New GM's standing to participate in Phase 1, especially because the result of Phase 1 determines whether there will be a Phase 2.  As the entity whose pecuniary interests will be materially and negatively impacted by the relief granted in Phase 1, New GM has standing to oppose Plaintiffs' attempts to bind the GUC Trust to the Unexecuted Settlement Agreement.  In addition to its potential ten-figure pecuniary interest should the Court conclude in Phase 1 that the Unexecuted Settlement Agreement is binding on the GUC Trust, New GM has standing to challenge Plaintiffs' Enforcement Motion for several other independent reasons:

- *Forbearance Agreement.*  Under the terms of the Forbearance Agreement between New GM and the GUC Trust, if the Court finds the Unexecuted Settlement Agreement is binding, then the Forbearance Agreement terminates automatically. Thus, the outcome of Phase 1 will also dictate whether New GM's rights under an agreement it negotiated and entered into will be forfeited;

- *Unitholders.*  By inviting the Participating Unitholders to appear and be heard even though they are not signatories to the Unexecuted Settlement Agreement, Plaintiffs have conceded that having a financial stake in the outcome of this contested matter is sufficient for standing purposes.  New GM's much greater financial stake should therefore ensure its standing in the outcome of this contested matter; and

- *Plaintiffs' Admissions Regarding Late-Claims Litigation.*  The Plaintiffs' prior admission that New GM has standing to participate in litigation concerning the Late-Claims Motions should be dispositive because the Unexecuted Settlement Agreement would require the settlement of all Late-Claims issues.

3.     Accordingly, New GM satisfies the standing requirements under section 1109(b) of the Bankruptcy Code, the Bankruptcy Rules, the U.S. Constitution, and applicable law.

## II.     FACTUAL BACKGROUND

### A.     Old GM Bankruptcy and Sale Agreement

4.     On June 1, 2009, General Motors Corporation ("**Old GM**") and certain of its affiliates (collectively, "**Debtors**") filed for bankruptcy under chapter 11 of the Bankruptcy Code

with the United States Bankruptcy Court for the Southern District of New York (the "**Court**").

Old GM entered into an agreement to sell substantially all of its assets (the "**Sale Agreement**")[3]

to an entity that became New GM in exchange for, inter alia, New GM common stock and

warrants.[4]  The Sale Agreement has a feature requiring New GM to provide additional shares of

New GM common stock ("**Adjustment Shares**") to the GUC Trust in the event the Old GM

estate makes distributions with respect to allowed general unsecured claims in excess of a

threshold amount:

> Sellers may, at any time, seek an Order of the Bankruptcy Court (the 'Claims
> Estimate Order') . . . estimating the aggregate allowed general unsecured claims
> against Sellers' estates.  If in the Claims Estimate Order, the Bankruptcy Court
> makes a finding that the estimated aggregate allowed general unsecured claims
> against Sellers' estates exceed $35,000,000,000, then Purchaser will, within five
> (5) Business Days of entry of the Claims Estimate Order, issue additional shares
> of Common Stock (the 'Adjustment Shares') to Parent, as an adjustment to the
> Purchase Price, based on the extent by which such estimated aggregate general
> unsecured claims exceed $35,000,000,000 (such amount, the 'Excess Estimated
> Unsecured Claim Amount;' in the event this amount exceeds $7,000,000,000 the
> Excess Estimated Unsecured Claim Amount will be reduced to a cap of
> $7,000,000,000).[5]

Thus, if an order estimates the "aggregate allowed general unsecured claims" against the Old

GM bankruptcy estate in excess of $35 billion, section 3.2(c) provides for New GM to issue

Adjustment Shares in accordance with the formula set forth in the Sale Agreement.

---

[3]    See Second Amendment and Restated Master Sale and Purchase Agreement, by and among General Motors
Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers,
and NGMCO, Inc., as Purchaser, dated as of June 26, 2009, as amended as of July 5, 2009 (Dkt. No. 2968-
2).

[4]    See In re Motors Liquidation Co., 529 B.R. 510, 535 (Bankr. S.D.N.Y. 2015), aff'd in part, rev'd in part,
vacated in part sub nom. Elliott v. General Motors LLC (In re Motors Liquidation Co.), 829 F.3d 135 (2d
Cir. 2016).

[5]    See Sale Agreement at 124 (§3.2(c)) (Dkt. No. 2968-2).  This provision does not apply unless and until the
estates actually make distributions with respect to claims that equal or exceed $35 billion.  Since the estates
have not done that, and will not do that even if the Unexecuted Settlement Agreement is approved, it has no
application and will not be triggered.  New GM reserves any and all rights with respect to this issue, and
nothing herein should be deemed an admission with respect to the same.

5.      As of June 30, 2017, the total amount of allowed general unsecured claims against the Debtors' estates was $31,855,381,054, approximately $3.15 billion below the threshold for triggering the issuance of Adjustment Shares, and $10.15 billion below the amount necessary to trigger the issuance of the maximum amount of Adjustment Shares under the Sale Agreement.[6] As of this date, no Court order or written consent has been obtained for Plaintiffs' late-filed claims.  Nevertheless, the proposed Claims Estimate Order contemplated by the Unexecuted Settlement Agreement estimates the "aggregate allowed general unsecured claims" at $42 billion, such that New GM could be required to issue Adjustment Shares in the maximum amount of 30 million shares.[7]

6.      The Sale Agreement also contains a provision confirming specifically that New GM is a "party in interest" for purposes of that agreement, which would clearly cover the Adjustment Shares provision therein.[8]

7.      On July 5, 2009, the sale was approved by an Order of the Bankruptcy Court (the "**Sale Order**"), and on July 10, 2009 the sale closed.  See In re Motors Liquidation Co., 829 F.3d at 146-47.

8.      In September 2009, the Court established November 30, 2009 as the deadline for filing proofs of claim against Old GM.  See In re Motors Liquidation Co., 529 B.R. at 535.

---

[6]      See Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report And Budget Variance Report as of June 30, 2017, dated July 21, 2017, at 4 (Dkt. No. 13994).

[7]      See Enforcement Motion, Exhibit J (proposed Claims Estimate Order) at 2 (Dkt. No. 14093).

[8]      See Sale Agreement at 98-99 (§ 9.11) (Dkt. No. 2968-2) ("Parties in Interest.  This Agreement shall be binding upon and inure solely to the benefit of each Party hereto and their respective permitted successor and assigns …. Subject to the preceding sentence, nothing express or implied in this Agreement is intended or shall be construed to confer upon or give to any Person, other than the Parties … any legal or equitable claims, benefits, rights or remedies of any nature whatsoever under or by reason of this agreement").

9.      On March 29, 2011, the Court entered an order confirming the Second Amended Joint Chapter 11 Plan Of Liquidation (the "**Plan**"), which, among other things, authorized the creation of the Motors Liquidation Company GUC Trust (the "**GUC Trust**"). See id. at 535-36. The Plan was substantially consummated on March 31, 2011. Id. at 536.

10.     On September 23, 2011, the GUC Trust and Old GM entered into a letter agreement with New GM that deferred issues relating to the Adjustment Shares until the GUC Trust received more information such that it could determine, in good faith, that the allowed amount of unsecured creditor claims was "likely to exceed" the threshold amount.  That letter agreement is specifically referenced in the Unexecuted Settlement Agreement,[9] though the rationale and purpose of the letter agreement is entirely contradicted by the Unexecuted Settlement Agreement urged by Plaintiffs and the Participating Unitholders.

**B.      Late-Claims Motion**

11.     In February and March 2014, New GM issued a recall, NHTSA Recall Number 14V-047, relating to approximately 2.1 million vehicles with an ignition switch defect.

12.     New GM issued other recalls for unintended key rotation and other safety defects throughout 2014 affecting over 12.5 million vehicles, NHTSA Recall Numbers 14V-118, 14V-153, 14V-171, 14V-355, 14V-394, 14V-400, 14V-346 14V-540.

13.     Thereafter, certain owners and lessees of Old GM and New GM vehicles subject to the 2014 recalls filed lawsuits for alleged personal injuries and economic losses against New GM, many of which were consolidated in a multidistrict litigation (the "**MDL**") pending in the United States District Court for the Southern District of New York before the Honorable Jesse M. Furman.  Starting in 2014, New GM sought to enjoin certain of the lawsuits filed against it

relating to Old GM vehicles by filing motions to enforce the Sale Order with the Court (the "**Sale Order Motions**").[10]

14.     In December 2016, following two and a half years of litigation related to the Sale Order Motions, the Court issued an Order To Show Cause Regarding Certain Issues Arising From Lawsuits With Claims Asserted Against General Motors LLC That Involve Vehicles Manufactured By General Motors Corporation, dated December 13, 2016 (Dkt. No. 13802) (the "**Order to Show Cause**").  That Order to Show Cause required counsel to address, among other things, certain issues in briefing and oral argument, including whether "the Ignition Switch Plaintiffs and/or Non-Ignition Switch Plaintiffs satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust … ('**Late Proof of Claim Issue**')."[11]

15.     The procedures in the Order to Show Cause for resolution of the Late Proof of Claim Issue directed certain claimants to file the "**Late-Claims Motions**" by a specific date.[12] On December 22, 2016, two Late-Claims Motions were filed.[13]  In negotiating the Order establishing procedures for resolving certain threshold issues associated with the Late-Claims Motions, Plaintiffs expressly acknowledged that New GM was a Party to those proceedings, and

---

[9]     See Enforcement Motion, Exhibit H (Unexecuted Settlement Agreement) at 2 (Dkt. No. 14093).

[10]     See, e.g., Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, dated April 21, 2014 (Dkt. No. 12620); Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits, dated Aug. 1, 2014 (Dkt. No. 12807); Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions), dated Aug. 1, 2014 (Dkt. No. 12808).

[11]     See Order to Show Cause at 3 (Dkt. No. 13802).

[12]     See Order to Show Cause at 5 (Dkt. No. 13802).

[13]     See Motion for an Order Granting Authority to File Late Class Proofs of Claim, dated Dec. 22, 2016 (Dkt No. 13806); Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to

the Court's Order so found.[14]  Consistent with that Order, New GM filed briefs addressing the

threshold issues relating to the Late-Claims Motions identified in that Order.

### C.    Unexecuted Settlement Agreement

16.    Following the filing of the Late-Claims Motions, the GUC Trust engaged in

discussions with counsel claiming to represent Ignition Switch Plaintiffs,[15] certain Non-Ignition

Switch Plaintiffs,[16] and certain PIWD Plaintiffs[17] (collectively, the "**Plaintiffs**") regarding a

potential settlement of the Late-Claims Motions and the underlying claims against the GUC

Trust.

17.    According to Plaintiffs, the Unexecuted Settlement Agreement was negotiated

exclusively by attorneys without the input or involvement of any Plaintiffs.  Indeed, drafts of the

---

File Late Proofs of Claim for Personal Injuries and Wrongful Deaths, dated Dec. 22, 2016 (Dkt. No. 13807).

[14]    See Order Establishing, Inter Alia, Briefing Schedule for Certain Issues Arising from Late Claim Motions Filed by Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs, and Certain Ignition Switch Pre-Closing Accident Plaintiffs (Dkt. No. 13869).

[15]    According to counsel for Plaintiffs, the term "**Ignition Switch Plaintiffs**" refers to those plaintiffs asserting economic loss claims or alleging economic losses who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047.  See Enforcement Motion, Exhibit H (Unexecuted Settlement Agreement) at 4 (Preamble § S.a.) (Dkt. No. 14093).  Plaintiffs' counsel do not represent nearly all of those persons, have never been retained by them, and have no authority to speak or act for them.

[16]    According to counsel for Plaintiffs, the term "**Non-Ignition Switch Plaintiffs**" refers to those plaintiffs asserting economic loss claims or alleging economic losses who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags, or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540, 14V-119 and 14V-153.  See Enforcement Motion, Exhibit H (Unexecuted Settlement Agreement) at 4 (Preamble § S.b.) (Dkt. No. 14093).  Plaintiffs' counsel do not represent nearly all of those persons, have never been retained by them, and have no authority to speak or act for them.

[17]    According to counsel for Plaintiffs, the term "**PIWD Plaintiffs**" means "those certain Ignition Switch Pre-Closing Accident Plaintiffs represented by PIWD Counsel," and "**PIWD Counsel**" means "(i) Robert C. Hilliard of Hilliard Munoz Gonzalez, LLP and Thomas J. Henry of the Law Offices of Thomas J. Henry, but solely for the Pre-Closing Accident Plaintiffs represented by the two law firms; and (ii) Lisa M. Norman of Andrew Myers, P.C., but solely for the Pre-Closing Accident Plaintiffs represented by that law firm."  Enforcement Motion, Exhibit H (Unexecuted Settlement Agreement) at 9 (§§ 1.43, 1.44) (Dkt. No. 14093).

Unexecuted Settlement Agreement were never sent to their clients, their clients were not

informed of the particular terms of the Unexecuted Settlement Agreement, and their clients did

not express their consent to the Unexecuted Settlement Agreement in writing.[18]  The Unexecuted

Settlement Agreement did not contemplate that individual Plaintiffs would sign the agreement.

Rather, it anticipated that the agreement would be signed by counsel who in fact represented no

more than a small fraction of the potential plaintiffs that the agreement purports to cover and

bind.[19]

18.     Moreover, section 3.1 of the Unexecuted Settlement Agreement provides

unambiguously that the Unexecuted Settlement Agreement shall become "effective and binding

on the Parties on the date on which this Agreement is fully executed by each of the Parties."[20]

The Unexecuted Settlement Agreement is undated and unsigned and thus by its own terms

cannot be binding.  The Unexecuted Settlement Agreement also contains various deadlines that

---

[18]     See Economic Loss Plaintiffs' Supp. Resp. No. 1 ("Counsel did not expressly inform claimants that they
were negotiating these particular terms."); Economic Loss Plaintiffs' Supp. Resp. No. 2 ("Counsel did not
seek claimant's written consent to the terms of the contract or proposed settlement and no such written
consent was required to form a binding agreement."); Economic Loss Plaintiffs' Supp. Resp. No. 4
("Counsel did not send drafts of the contract or the proposed settlement to claimants."); PIWD Supp. Resp.
No. 12, 13 ("Counsel for HMG Claimants did not send drafts of the Settlement Agreement to HMG
Claimants."); PIWD Supp. Resp. No. 10 (stating attorney advised clients "regarding the negotiation of the
Settlement Agreement with the GUC Trust"); PIWD Supp. Resp. No. 11 (answering interrogatory request
about whether clients expressed their consent in writing to terms of contract by stating "the GUC Trust
never requested" their written consent).

[19]     See Letter to Judge Furman, In re: General Motors LLC Ignition Switch Litigation, No. 14-MD-02543-
JMF, (S.D.N.Y. September 26, 2017) (Dkt. No. 4639) ("[T]he unexecuted settlement agreement drafts
provided to New GM, this Court, and the Bankruptcy Court rely upon and make assertions regarding the
meaning of this Court's Order No. 8 appointing Plaintiffs Co-Lead Counsel in MDL 2543 and the authority
of Co-Lead Counsel to represent and settle he purported claims of millions of non party individuals based
on that order.").

[20]     Enforcement Motion, Exhibit H (Unexecuted Settlement Agreement) at 16 (§ 3.1) (Dkt. No. 14093).

are triggered once the Unexecuted Settlement Agreement is signed, including the filing of the

motion to approve the Unexecuted Settlement Agreement.[21]

19.    The Unexecuted Settlement Agreement, if enforced, would impose significant

burdens on New GM.  **First**, the purported agreement's self-styled "Key Objectives" include the

GUC Trust pursuing a purported "Claims Estimate Order" (annexed to the Unexecuted

Settlement Agreement as Exhibit C) that (a) stipulates Allowed General Unsecured Claims

exceed $42 billion (which includes millions of non-existent claims by persons with respect to

whom the Court cannot exercise jurisdiction and that have never been filed and never allowed)

and (b) directs New GM to deliver 30 million shares of stock pursuant to the Adjustment Shares

provision contained in the Sale Agreement.[22]  **Second**, the purported "Claims Estimate Order"

annexed to the Unexecuted Settlement Agreement as Exhibit C, if entered, would affirmatively

impose that obligation on New GM.[23]  **Third,** the Unexecuted Settlement Agreement would

---

[21]    See, e.g., Enforcement Motion, Exhibit H (Unexecuted Settlement Agreement) at 11(§ 2.2) (requiring parties to file settlement approval motion "[a]s soon as practicable following the execution of this Agreement"); id. at 14 (§ 2.9(a)) (same for seeking "Notice Order"); id. at 16 (§ 3.2(B)) (providing for termination event if Notice Order is not entered within 30 days of execution).

[22]    See Enforcement Motion, Exhibit H (Unexecuted Settlement Agreement) at 8 (¶ 1.29 "Key Objectives" definition)) (Dkt. No. 14093); id. at 6 (¶ LL ("The GUC Trust acknowledges the key objectives of the Signatory Plaintiffs in entering into this Agreement are to (i) achieve the funding of the Settlement Fund … and (iii) take or to cause to be taken all steps necessary to require New GM to issue the maximum amount of Adjustment Shares and to make the value of the Settlement Fund and the Adjustment Shares available to satisfy, in part, the Plaintiffs' claims …. [T]he GUC Trust, based upon its review of the expert report and proffer of evidence provided by Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs and the expert report and proffer of evidence provided by certain Pre-Closing Accident Plaintiffs, agrees to provide the cooperation and assistance provided for herein relating to the issuance of a Claims Estimate Order … and to seek to estimate for allowance purposes, and not dispute the amount of estimated claims thereunder.")).

[23]    See Enforcement Motion, Exhibit H (Unexecuted Settlement Agreement) at 2 (Dkt. No. 14093) (¶ D ("Pursuant to the AMSPA, if the Bankruptcy Court issues an order estimating the aggregate Allowed General Unsecured Claims against the Sellers (the 'Claims Estimate Order') at an amount exceeding … $35,000,000,000 … then New GM must … issue the Adjustment Shares.")); id. at 5 (¶¶ FF (GUC Trust counsel has been furnished with "expert reports and proffers of evidence indicating the amount of damages for the Ignition Switch Plaintiffs', certain Non-Ignition Switch Plaintiffs', and certain Pre-Closing Accident Plaintiffs' asserted claims, if ultimately determined to be Allowed General Unsecured Claims against Old GM and/or the GUC Trust, would be greater than the amount necessary to trigger New GM's obligations to

require New GM to provide, at its own expense, the names and addresses of millions of individuals to facilitate service of the settlement motion.[24]  **Fourth**, the proposed Claims Estimate Order provides that New GM's contribution of the Adjustment Shares will be without prejudice to any rights that Plaintiffs had against New GM.[25]  This finding would be contrary to New GM's legal position that the pursuit of or completion of any settlement of the Late-Claims Motions would be a separate legal basis to negate successor liability asserted by certain plaintiffs in the MDL.

20.    On August 16, 2017, the GUC Trust announced it did not intend to execute or agree to the terms of the Unexecuted Settlement Agreement.[26]  New GM understands the GUC Trust Administrator's decision was approved by FTI Consulting Inc.—the GUC Trust monitor. Two estate fiduciaries decided that the Unexecuted Settlement Agreement was not a proper path to follow.

---

issue the Adjustment Shares in the maximum amount under the AMSPA")); id. at 12 (¶ 2.4 ("[T]he GUC Trust, based on its review of the expert report and proffer of evidence provided … agrees that it shall support the entry of a Claims Estimate Order."); see also Enforcement Motion, Exhibit J (proposed Claims Estimate Order) (Dkt. No. 14093) (¶¶ 4-6 (confirming Allowed General Unsecured Claims exceed $42 billion, directing New GM to issue $30,000,000 Adjustment Shares—while preserving claims against New GM, and stating that "[w]ithin five (5) business days of entry of this Order, New GM shall issue 30 million shares of New GM common stock (the Adjustment Shares) or the value of the Adjustment Shares, to an account designated by the Signatory Plaintiffs")).

[24]    See Enforcement Motion, Exhibit P (Motion for Order Approving Notice Procedures with Respect to Proposed Settlement By and Among the Signatory Plaintiffs and the GUC Trust ("**Notice Procedures Motion**")), at Exhibit A (Proposed Order Approving Notice Procedures With Respect to Proposed Settlement By and Among the Signatory Plaintiffs and the GUC Trust ("**Proposed Notice Procedures Order**")), at 2 (Dkt. No. 14093) ("ORDERED that, no later than two (2) days after the entry of this Order, New GM shall turn over to the Parties the names and addresses of (A) all persons in the United States who, as of July 10, 2009, owned or leased a defective vehicle manufactured by Old GM included in the Recalls; and (B) all Pre-Closing Accident Plaintiffs who have filed a lawsuit against New GM as of the date of this Order.").

[25]    See Enforcement Motion, Exhibit J (proposed Claims Estimate Order) (¶ 6) (Dkt. No. 14093).

[26]    See Update on Matters Related to the Late Claim Motions and the Chambers Conference Scheduled for August 17, 2017 at 3:00 p.m. (Dkt. No. 14060).

21.    In fact and law, the Unexecuted Settlement Agreement has fundamental structural and execution flaws.  For example, the Unexecuted Settlement Agreement purported to resolve class proofs of claim without complying with Rule 23 of the Federal Rules of Civil Procedure.  The proposed Claims Estimate Order sought to make findings relating to allowed claims even though millions of proofs of claim were never filed, never authorized to be filed, never allowed, and Plaintiffs' counsel do not represent (and have no authority to speak or act, much less bind) the many millions of non-parties whose supposed claims they purport to estimate.  The Signatory Parties to the Unexecuted Settlement Agreement (lawyers) were never authorized by the few clients they actually have to settle their claims.  They also were never authorized by millions of non-parties to pursue, settle, and release claims that have never been filed.  The GUC Trust was being asked to estimate nonexistent claims of non-parties over whom the court has no jurisdiction based on flawed legal and economic analyses.

### D.    Forbearance Agreement Between New GM and GUC Trust

22.    On September 12, 2017, the GUC Trust administrator and New GM executed the Forbearance Agreement, and the GUC Trust filed a motion seeking its approval by the Court in which New GM joined.[27]  Under the Forbearance Agreement, the GUC Trust does not waive any substantive rights against New GM or the Plaintiffs.  The Forbearance Agreement is structured to preserve the GUC Trust's meritorious defenses to late-filed claims.  It also provides for the reimbursement of expenses that will be used to prosecute those defenses.  The Forbearance

---

[27]    See Motion of the Motors Liquidation Co. GUC Trust Administrator Pursuant to Bankruptcy Code Sections 105(a), 363(b), and 1142(b) and Bankruptcy Rule 3020(d) to Authorize Entry into Forbearance Agreement with General Motors LLC ("**Forbearance Agreement**") (Dkt. No. 14095); Joinder of General Motors LLC in Mot. of Motors Liquidation Co. GUC Trust Administrator Pursuant to Bankruptcy Code Sections 105(a), 363(b), and 1142(b) and Bankruptcy Rule 3020(d) to Authorize Entry into Forbearance Agreement (Dkt. No. 14096).

Agreement will enable the development of a more mature record based upon facts, and not

nonexistent claims of non-parties over which the Court cannot exercise jurisdiction.  From that

developed record, the parties and the Court can ultimately decide whether the Sale Agreement's

condition precedent necessary to trigger the payment of Adjustment Shares has been satisfied.  In

addition, New GM committed under the Forbearance Agreement to negotiate in good faith about

whether it will pay an appropriate rate of return on the principal amount of GUC Trust

distributions to compensate unitholders for any distribution delays solely caused by late-filed

claims litigation.  Absent agreement on an appropriate rate of return, the GUC Trust can

terminate the Forbearance Agreement.  Moreover, at any time, the GUC Trust reserves the right

to solely settle all claims asserted against it using GUC Trust assets and without seeking the

issuance of Adjustment Shares.

23.     Those benefits will be lost if the Court determines the Unexecuted Settlement

Agreement is binding.  Under the Forbearance Agreement, a finding by the Court that the

Unexecuted Settlement Agreement is "a binding agreement" constitutes an Automatic

Termination Event (as defined therein).[28]

**E.    Plaintiffs' Motion to Enforce Unexecuted Settlement Agreement; Pre-Trial Order**

24.     On September 11, 2017, Plaintiffs filed their Enforcement Motion, requesting an

order from the Court enforcing the Unexecuted Settlement Agreement.  On October 11, 2017,

the Court entered the Pre-Trial Order setting forth two "**Phase 1 Issues**":  "(a) whether Plaintiffs'

Settlement Agreement is a binding agreement; and (b) whether New GM has standing to be

---

[28]     See Forbearance Agreement at 7 (§ 4.1(a)) (Dkt. No. 14095).

heard on the issue."[29]  Phase 2 issues include, without limitation, whether the Forbearance

Agreement should be approved; whether the Unexecuted Settlement Agreement should be

approved under the Bankruptcy Code and applicable bankruptcy and non-bankruptcy law;

whether New GM interfered with the Unexecuted Settlement Agreement; and whether Plaintiffs

and the Participating Unitholders interfered with the GUC Trust's performance under the Sale

Agreement.[30]

## III.    JURISDICTION & VENUE

25.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and

1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).  Venue is

proper before this Court pursuant to 28 U.S.C. § 1408.  The statutory predicates for the relief

sought in this Motion are Bankruptcy Code sections 105(a), 1109(b), and Bankruptcy Rules

2018(a) and 3020(d).

## IV.    ARGUMENT

### A.    New GM Is A Party In Interest With Standing To Appear And Be Heard In Phase 1 Under Section 1109(b) Of Bankruptcy Code And Bankruptcy Rules

26.    Pursuant to 11 U.S.C. § 1109(b), "[a] 'party in interest,' including the debtor, the

trustee, a creditor's committee, an equity security holders' committee, a creditor,[31] an equity

security holder, or any indenture trustee, may raise and may appear and be heard on any issue in

a case under this chapter."  The parties specifically enumerated in section 1109(b) are non-

---

[29]    See Pre-Trial Order at 2 (¶ 1) (Dkt. No. 14130).

[30]    See Pretrial Order at 2 (¶ 2) (Dkt. No. 14130).

[31]    New GM filed a proof of claim in the bankruptcy cases, see Proof of Claim No. 71111, and the GUC Trust has ongoing obligations to New GM under the Sale Agreement.

exclusive.[32]  Although the Bankruptcy Code does not define "party in interest," the term is

interpreted broadly to allow parties affected by the chapter 11 case to be heard.[33]  In applying

section 1109(b), "courts must determine on a case by case basis whether the prospective party in

interest has a sufficient stake in the proceeding so as to require representation."  In re Texaco

Inc., 81 B.R. 820, 828 (Bankr. S.D.N.Y. 1988) (citing In re Amatex Corp., 755 F.2d 1034, 1042

(3d. Cir. 1985)).

27.    New GM is the target of the Unexecuted Settlement Agreement.  Plaintiffs intend

for New GM to be the primary funding source if the alleged agreement ultimately is approved

and enforced after Phase 2.  Under its terms—which Plaintiffs seek to impose as binding on the

GUC Trust in Phase 1—New GM would be required to contribute 30 million Adjustment Shares.

New GM has an undeniable and direct pecuniary interest in the Phase 1 litigation.  See, e.g., In re

Glob. Indus. Techs., Inc., 645 F.3d at 212 (liability insurers had standing under § 1109(b) to

contest plan that increased insurers' pre-petition liability exposure by more than 27 times:

"when a federal court gives its approval to a plan that allows a party to put its hands into other

people's pockets, the ones with the pockets are entitled to be fully heard and to have their

legitimate objections addressed.  In short, they at least have bankruptcy standing."); In re

Residential Capital, LLC, 2015 WL 629416, at *3 (S.D.N.Y. Feb. 13, 2015) ("[C]ourts in this

Circuit have held that a party in interest is one that has a sufficient interest in the outcome of the

---

[32]    See In re Residential Capital, LLC, 2013 WL 6698365, at *3 (Bankr. S.D.N.Y. Dec. 19, 2013) ("In the
context of chapter 11 cases, the Code provides a non-exclusive list of 'parties in interest'"); In re Global
Indus. Techs., Inc., 645 F.3d 201, 210 (3d Cir. 2011) (same).

[33]    In re Residential Capital, LLC, 2013 WL 6698365, at *3; see also In re Global Indus. Techs., Inc., 645 F.3d
at 210 ("The list of potential parties in § 1109(b) is not exclusive.  The section has been construed to create
a **broad right of participation** in Chapter 11 cases.") (emphasis added); In re Stone Barn Manhattan LLC,
405 B.R. 68, 74 (Bankr. S.D.N.Y. 2009) ("Although the term 'party in interest' is not defined by the
Bankruptcy Code or Rules, courts construe its meaning broadly to insure fair representation of all
constituencies impacted in any significant way by a Chapter 11 case.").

case that would require representation, or a pecuniary interest that will be directly affected by the

case."); In re Stone Barn Manhattan LLC, 405 B.R. at 74 (noting law is well-settled "that a

pecuniary interest directly affected by the bankruptcy proceeding provides standing under §

1109(b)"); In re Texaco Inc., 81 B.R. at 828 (party in interest includes any entity with "sufficient

stake in the outcome of the proceeding so as to require representation").

      28.    Proposed targets of an agreement—like New GM here—have standing to

challenge any and all aspects of that agreement, regardless of whether they are parties to it.  By

analogy, the Second Circuit has held that a debtor's insurer, AHA, was a party in interest with

standing to seek an order declaring a default judgment against the debtor void, even though AHA

was not itself named in the judgment.  See In re Heating Oil Partners, LP, 422 F. App'x 15, 16-

17 (2d Cir. 2011) ("AHA's pecuniary interest here is the default judgment … for which it will

indemnify [debtor] in full or in part.… Without a doubt, AHA, which has a personal stake in

whether the default judgment is void, is a party in interest pursuant to section 1109(b)").  See

also In re Stone Barn Manhattan LLC, 405 B.R. at 74 (debtors in separate chapter 11 case had

standing to object to settlement given their interest in escrow account from which settlement was

proposed to be funded); In re Sapphire Development, LLC, 523 B.R. 1, 5-6 (D. Conn. 2014)

(judgment creditor of trustee of sole owner of debtor was a "party in interest" under section 1109

when "[a]n outcome of the bankruptcy proceeding that distributed any part of the property or

proceeds therefrom to [debtor's] other creditors would … harm his interest[,]" and that interest is

not "purely derivative of another party's rights"); In re Standard Insulations, Inc., 138 B.R. 947,

950 (Bankr. W.D.Mo. 1992) (insurers exposed to claims against debtor were "parties in interest"

under section 1109(b) where "[d]ebtor's insurance [was] the only asset of consequence" and

"[t]he insurers [were] responsible for payment of injury claims caused by exposure to debtor's products during covered periods").

29.    The Seventh Circuit's <u>In re CP Hall Co.</u> decision is instructive.  While the Court declined to find an excess insurer had standing to object to the debtor's settlement with its primary insurer, it did so because the excess insurer argued only that the settlement might increase the likelihood the excess insurer would incur secondary-coverage obligations.  750 F.3d 659, 660-62 (7th Cir. 2014) (Posner, J.).  As Judge Posner explained in distinguishing the liability insurers in the Third Circuit's <u>Global Indus. Tech.</u> decision, the excess insurer's interests in <u>CP Hall</u> were not sufficiently direct because the excess insurer ***was not*** the "target[] of a scheme between the debtors and its creditors," but rather the "accidental victim[] of a scheme directed against others."  <u>Id.</u> at 662.

30.    Here, by contrast, ***New GM is the primary target*** of Plaintiffs' and the Participating Unitholders' scheme.  One of the purported agreement's specifically-delineated "Key Objectives" is to compel New GM to issue 30 million Adjustment Shares.  Without New GM's Adjustment Shares, the proposed Unexecuted Settlement Agreement would only provide Plaintiffs with a recovery of $15 million plus the cost of the notice.  Similarly, the alleged agreement and related motion papers seek an order compelling New GM at its own cost to compile and provide them with vehicle customer and owner lists so that Plaintiffs can send out their proposed notice to millions of non-parties whose nonexistent claims they are purporting to resolve and release.[34]  Here, New GM's pecuniary interest is "directly affected by the bankruptcy

---

[34]    <u>See</u> Enforcement Motion, Exhibit P (Notice Procedures Motion), at Exhibit A (Proposed Notice Procedures Order) at 2 (Dkt. No. 14093).

proceeding." <u>See, e.g.</u>, <u>In re Heating Oil Partners, LP</u>, 422 F. App'x at 17 (citing <u>In re Stone Barn Manhattan, LLC</u>, 405 B.R. at 74).

31.    It does not matter that New GM is not a party to the alleged settlement agreement. Notably, Plaintiffs do not impose a requirement of signatory status on the Participating Unitholders to be heard in Phase 1, notwithstanding that the only possible basis for the participation of the unitholders in Phase 1 is the same as New GM's:  an economic interest in the outcome of Phase 2.  It is inconsistent to maintain the Participating Unitholders should be granted standing, but not New GM—whose ten-figure interest in this matter is significantly greater than that of the unitholders.

32.    Nor does the Parties' decision to bifurcate the issues into two phases impact the standing analysis.  The presence of subsequent defenses in Phase 2 does not preclude a finding of standing in Phase 1.  <u>See, e.g.</u>, <u>In re Global Indus. Techs., Inc.</u> 645 F.3d at 213-14 (plan's creation of trust "led to a manifold increase in … claims," which "constitutes a tangible disadvantage to [the insurers who], ***despite having their coverage defenses available***, will be faced with coverage obligations to the [trust] in a world that recognizes the existence of over 4,600 … claims, as opposed to a pre-Plan world that recognized only 169") (emphasis added); <u>In re Suffolk Regional Off-Track Betting Corp.</u>, 462 B.R. 397, 413 (Bankr. E.D.N.Y. 2011) ("If Churchill Downs has standing to be heard on the issue of assumption or rejection of the Amended Term Sheet in this bankruptcy case, it has standing to be heard on the threshold issue of Suffolk OTB's entitlement to commence this bankruptcy case.").

33.    Plaintiffs likely will argue that New GM lacks standing in Phase 1 because New GM will have the opportunity to oppose approval of the Unexecuted Settlement Agreement in Phase 2.  But that is not the proper way to frame the legal question.  The relevant inquiry for the

Court is whether New GM has a sufficient stake in the Phase 1 issue—i.e., whether an agreement that on its face requires it to issue one billion dollars of equity is binding. That question answers itself. Plaintiffs cannot point to any authority denying party-in-interest status to an entity targeted by a purported settlement with a pecuniary interest of this magnitude, because there is none. Instead, their authorities are irrelevant and easily distinguishable.[35]

34.    New GM has other significant interests that could be affected by Phase 1, e.g., consummating the Forbearance Agreement it negotiated with the GUC Trust. Under the express terms of that agreement, if the Court determines at the conclusion of Phase 1 that the Unexecuted Settlement Agreement is a binding agreement, then the Forbearance Agreement will terminate automatically by its own terms. Thus, the Court's decision in Phase 1 may result in the forfeiture of New GM's rights under that agreement. See Forbearance Agreement § 4.1(a)(v). New GM also has an interest in its own common stock which clearly may be affected if the Court determines in Phase 1 that the Unexecuted Settlement Agreement is binding. See, e.g., U.S. v. Veliotis, 586 F. Supp. 1512, 1520 (S.D.N.Y. 1984) (observing that "due process rights are implicated when the exercise of a property interest [in stock] is curtailed").

---

[35]    The cases cited by Plaintiffs do not consider party-in-interest standing under section 1109(b). Moreover, the cases cited by Plaintiffs did not involve parties like New GM that are "targets" of the relevant agreements. See, e.g., In Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n, 747 F.3d 44, 48–49 (2d Cir. 2014) (finding landlord that had leased property to Washington Mutual before the 2008 financial crisis did not have standing to enforce the terms of a Purchase Agreement between JP Morgan and the FDIC whereby certain Washington Mutual assets were transferred to JP Morgan; landlord claimed JP Morgan had acquired the lease from the FDIC landlord was seeking lease payments from JP Morgan); Tamir v. Bank of New York Mellon, 2013 WL 4522926, at *3 (E.D.N.Y. Aug. 27, 2013) (plaintiff sought a declaration that the assignment of its mortgage from one bank to another was void; finding plaintiff did not have standing to challenge assignment because it would not "affect her obligation to repay her debt"); Shea v. Royal Enterprises, Inc., 2011 WL 43460, at *3 (S.D.N.Y. Jan. 6, 2011) (plaintiff suffered a brain injury when he hit his head at a bar; defendant landlord claimed under lease it was entitled to indemnification by another defendant, the bar owner and operator; court rejected argument by plaintiff that lease was unenforceable pursuant to Statute of Frauds because it had never been signed by bar owner/lessee: "Plaintiff is not a party to the Lease, he lacks standing to assert the Statute of Frauds as an affirmative defense").

35.     Granting New GM standing to participate in Phase 1 also comports with the

principles underlying section 1109(b) and generally furthers the purposes of the Bankruptcy

Code.  See In re Heating Oil Partners, LP, 422 F. Appx. at 17 ("When interpreting the meaning

of [party in interest under section 1109(b)], 'we are governed by the Code's purposes.'")

(quoting In re Comcoach Corp., 698 F.2d 571, 573 (2d Cir. 1983)); 7 Collier on Bankruptcy ¶

1109.04[2][b] ("A fundamental purpose of section 1109(b) is to grant any party with a financial

stake in the case the right … to participate with respect to the judicial determination of any issue

bearing on the ultimate disposition of his or her interest.").

36.     Conversely, there is no justification at all, much less a compelling one, to deny

New GM party in interest standing.  The justifications for restricting standing arise in

circumstances not present here, that is, when "[o]verly lenient standards may potentially over-

burden the reorganization process by allowing numerous parties to inject themselves into the

case on every issue, thereby thwarting the goal of a speedy and efficient reorganization …."  In

re MF Global Holdings Ltd., 469 B.R. at 188 (citation omitted).

37.     Alternatively, New GM may appear and be heard in Phase 1 pursuant to

Bankruptcy Rule 2018(a).  New GM's interests are not adequately represented.  And, New GM's

participation will not cause delay because New GM will not duplicate the GUC Trust's efforts.[36]

Moreover, since Phase 1 will be a bench trial, this Court can well manage the efficient

presentation of issues at trial.  See e.g., Fed. R. Bankr. P. 2018(a) (authorizing Court to "permit

any interested entity to intervene generally or with respect to any specified matter."); In re

---

[36]    In fact, delay may more likely result from denying rather than granting New GM party in interest standing,
because such an order constitutes a final judgment that must be appealed before the commencement of trial.
See In re Blair, 2016 WL 8608454, at *7 (D. Colo. Aug. 24, 2016) ("[A] litigant who is denied intervention
[under Fed. R. Bankr. P. 2018] cannot wait until the conclusion of the case to appeal; the litigant must treat
the denial as if it was a final judgment and appeal it within the prescribed time period.").

Caldor Corp., 303 F.3d 161, 172 & n. 9 (2d Cir. 2002) ("[Rule] 2018 governs permissive

intervention in a case …. [and] is not inconsistent with a broad interpretation of § 1109(b)

because [Rule] 2018 applies to entities that are not parties in interest and not entitled to intervene

as of right under § 1109(b)"); 9 Collier On Bankruptcy ¶ 2018.04[3] (noting cause justifying

Rule 2018(a) intervention includes "an economic or similar interest in the case or one of its

aspects … an entity's concern with precedential ramifications of an aspect of a case ... [or] no

other entity exists to adequately protect [the movant's] position and that intervention would not

result in undue delay or prejudice").[37]

### B.   New GM Has Constitutional Standing Independent Of Section 1109(b) And Bankruptcy Rules

38.     The Supreme Court has identified three aspects of Article III standing:  (1) an

injury in fact, which is an invasion of a legally protected interest which is (a) concrete and

particularized and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection

between the injury and the conduct complained of; and (3) that it is likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision.  In re MF Global Holdings

Ltd., 469 B.R. at 188 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

"[T]he general principles of standing limit the scope of section 1109(b)."  In re MF Global

Holdings Ltd., 469 B.R. at 188 (quoting 7 Collier on Bankruptcy § 1109.03).

39.     New GM has standing under Article III of the U.S. Constitution for the same

reasons New GM is a party in interest under section 1109(b).[38]  Under the terms of the

---

[37]     Similarly, under Bankruptcy Rule 3020(d), "[n]otwithstanding the entry of an order of confirmation, the
court may issue any other order necessary to administer the estate").

[38]     See In re Sapphire Development, LLC, 523 B.R. 1, 6 (D. Conn. 2014) (although "standing requirements of
11 U.S.C. § 1109 supplement rather than replace constitutional standing requirements[, …] where parties
… have a clear financial stake in the outcome of a bankruptcy proceeding, they also meet the constitutional

Unexecuted Settlement Agreement, New GM would issue common stock with a value in excess

of one billion dollars and bear the costs of putting together lists of customers and vehicle owners

to whom Plaintiffs seek to send their proposed notice.  Also, New GM's interest in the

Forbearance Agreement will be forfeited.  All these injuries would be traceable directly to any

finding by this Court that the Unexecuted Settlement Agreement is binding on the GUC Trust.

Therefore, New GM has Article III standing.

### C.    Plaintiffs Have Conceded New GM's Status As Party In Interest

40.    Plaintiffs have admitted New GM's significant interest in matters relating to the

Unexecuted Settlement Agreement.  Plaintiffs' preview of the Unexecuted Settlement

Agreement with New GM before the August 17, 2017 Status Conference, and their notice to

New GM to attend that Conference, evidence New GM's right to be heard in connection with all

phases of these proceedings.

41.    Moreover, as Judge Gerber observed in a July 16, 2015 hearing in discussing the

potential impact of a settlement between the GUC Trust and Plaintiffs that could trigger the

Adjustment Shares, while "[t]he principal attention that a judge gives to [a 9019 motion] is

whether the estate is giving away the store[,] … we also look to see whether parties while acting

in the interest of the estate are nevertheless inappropriately adversely affecting parties who aren't

at the table[. T]hat's the more significant concern here."  Jul. 16, 2015 Hr. Tr. 42:7-19 (Dkt. No.

13399).  Counsel for the Ignition Switch Plaintiffs conceded New GM "has an economic interest

---

requirements of an injury in fact that can be fairly traced to the challenged conduct and is redressible by a
favorable decision from the court"); In re Global Indus. Techs., Inc., 645 F.3d at 211 ("Persuasive authority
indicates that Article III standing and standing under the Bankruptcy Code are effectively coextensive."); 7
Collier on Bankruptcy ¶ 1109.04[4][a] ("In almost every instance, the outcome of any particular proceeding
in a chapter 11 case will have a sufficient effect on the interests of stakeholders generally so that their
participation in the proceeding will satisfy the standing aspect of the case or controversy requirement.").

in not having the accordion trigger[ed]."  Id. at 43:6-7; see also id. at 42:24-43:6 ("I think the only party that could stand up and say they're being adversely affected aside from plaintiffs … would be New GM.  It's New GM's stock that would have to be forked over ….").  Indeed, at this hearing, Plaintiffs' counsel expressed his "presum[ption]" that New GM would have "***all the time and due process it needs and wants in order to ensure that its rights are protected*** before it literally has to turn over 10 million shares of New GM stock."  Id. at 43:11-15 (emphasis added).

42.    New GM also has been granted standing to brief and appear and be heard on issues in connection with the Late-Claims Motions.[39]  Because New GM has such standing already, it clearly also has standing to appear and be heard in connection with the purported settlement of the disputes relating to the Late-Claims Motions.

43.    Similarly, Judge Gerber's 2011 Order authorizing New GM to appear and be heard in an earlier contested matter involving the GUC Trust, Green Hunt Wedlake, Inc., as trustee for General Motors Nova Scotia Finance Company, and the current and former noteholders of General Motors Nova Scotia Finance Company, underscores the fact that New GM is a proper party in interest in Phase 1.  In that matter, the GUC Trust objected to claims filed by the noteholders and their trustee.  Judge Gerber ruled that New GM had standing to appear and be heard because the claims objection had a potential impact on New GM's affiliate (GM Canada), and the theory of recovery being pursued by the GUC Trust could have had an effect on the Sale Order and Sale Agreement (to which New GM was a party), as the GUC Trust was seeking relief

---

[39]    See Order Establishing, Inter Alia, Briefing Schedule for Certain Issues Arising from Late Claim Mots. Filed by Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs, And Certain Ignition Switch Pre-Closing Accident Plaintiffs (Dkt. No. 13869).  New GM has previously filed briefs in connection with threshold issues arising from the Late-Claims Motions.

from the Sale Order pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.[40]  And, New

GM ultimately was a party to the settlement agreement that resolved the claims objection.[41]

44.    Finally, Plaintiffs' draft motion to approve the Unexecuted Settlement Agreement

expressly provides that New GM is intended to be a notice party.[42]  That acknowledgment of

New GM's status as a party in interest entitled to receive notice of these proceedings is an

admission that New GM has standing to participate in all phases of this contested matter.

### D.    New GM Satisfies Prudential Limitations On Third Party Standing

45.    New GM easily meets the prudential standing requirements of the third-party

standing doctrine.  The doctrine, self-imposed by federal courts, bars litigants "from asserting the

constitutional and statutory rights of others in an effort to obtain relief for injury to themselves."

Kane v. Johns-Manville Corp., 843 F.2d 636, 643 (2d Cir. 1988) (holding creditor with existing

asbestos claim lacked standing to assert the rights of future claimants).  "Third-party standing is

---

[40]    See Oct. 28, 2011 Hr. Tr. at 19:20-20:5 (Dkt. No. 11105) (Mr. Steinberg:  "[T]he committee's objection to claim embodies a Rule 60(b) motion or 60(b) allegation to upset the sale order which obviously is something that relates to [New GM].  A good portion of their theory of recovery with regard to disgorgement of the consent fee involves an avoiding power right which was, in effect, purchased by [New GM] as part of the sale order.  Their issues relating to the swap claim which is embedded in the Nova Scotia trustee's claim as against old General Motions, that was something that was purchased by [New GM] as part of the asset purchase agreement."); see also id. at 20:10-14 (Mr. Steinberg:  So we rise and we seek to participate in these proceedings to essentially protect our sale order, the assets that we purchased and to make sure that GM Canada is protected so that nothing that Your Honor does in relation to this claim undoes the release that's embedded in the lockup agreement.").

[41]    See Order Authorizing General Motors LLC to Appear and Be Heard in Nova Scotia Contested Matter (Dkt. No. 11092).

[42]    See Joint Motion Pursuant to Bankruptcy Code Sections 105, 363, 502(c) and 1142 and Bankruptcy Rules 3020 and 9019 to Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust, and to Estimate the Plaintiffs' Aggregate Allowed General Unsecured Claims Against the Debtors (Dkt. No. 14061-4 (Exhibit D)) ¶ 90 ("Notice of this Motion has been provided in accordance with the Court-approved notice procedures.  See [Order Approving Notice Procedures]."); Enforcement Motion, Exhibit P (Dkt. No. 14093) (Motion for Order Approving Notice Procedures with Respect to Proposed Settlement By and Among the Signatory Plaintiffs and the GUC Trust) ¶ 13.v. ("Pursuant to the Settlement Agreement, the Parties propose that they provide …notice of the 9019 Motion … pursuant to the below "**Notice Procedures**" … v. notice via ECF to all entities, *including New GM*, that receive electronic notice from the Court's ECF system.") (emphasis added) .

of special concern in the bankruptcy context where … one constituency before the court seeks to

disturb a plan of reorganization based on the rights of third parties who apparently favor the

plan." <u>Id.</u> at 644.

46.     New GM is not asserting a third-party's rights during Phase 1.  It has a direct stake

whether the Unexecuted Settlement Agreement is binding because the entry of an Order

compelling New GM to issue 30 million shares of its common stock, <u>i.e.,</u> the Adjustment Shares,

is the centerpiece of that agreement.  And, if that agreement is found to be binding, the

Forbearance Agreement terminates automatically, and New GM's rights under that agreement

will be lost.  Accordingly, prudential third party standing limitations do not apply here and pose

no barrier to New GM's standing.

## V.    CONCLUSION

WHEREFORE, New GM respectfully requests that the Court find that New GM has standing to participate in any and all aspects of Phase 1, and award such other relief as it considers appropriate.

Dated: New York, New York
November 13, 2017

Respectfully submitted,

By: **JAMES C. TECCE**

| | |
|---|---|
| Arthur J. Steinberg | Susheel Kirpalani |
| Scott Davidson | James C. Tecce |
| **KING & SPALDING LLP** | Julia M. Beskin |
| 1185 Avenue of the Americas | **QUINN EMANUEL URQUHART & SULLIVAN, LLP** |
| New York, New York  10036 | 51 Madison Avenue |
| Tel:  212-556-2158 | New York, New York  10010 |
| | (212) 849 7199 |

*Counsel to General Motors LLC*