# **EXHIBIT E**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
: 
In re:                                                            :     Chapter 11 Case No.
                                                                  :
MOTORS LIQUIDATION COMPANY, *et al.*,                             :     09-50026 (MG)
f/k/a General Motors Corp., *et al.*                              :
                                                                  :     (Jointly Administered)
                                    Debtors.                      :
                                                                  :
------------------------------------------------------------------x

### DECLARATION OF BETH ANDREWS IN SUPPORT OF THE JOINT MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363, 502(C) AND 1142 AND BANKRUPTCY RULES 3020 AND 9019 TO APPROVE THE SETTLEMENT AGREEMENT BY AND AMONG THE SIGNATORY PLAINTIFFS AND THE GUC TRUST, AND TO ESTIMATE THE PLAINTIFFS' AGGREGATE ALLOWED GENERAL UNSECURED CLAIMS AGAINST THE DEBTORS

I, Beth Andrews, declare:

1. I am a Vice President of Wilmington Trust Company ("**WTC**"), located at Rodney Square North, 1110 North Market Street, Wilmington, Delaware, 19890-1615, and am duly authorized to submit this declaration (the "**Declaration**") on behalf of WTC in its capacity as trustee for and administrator of the Motors Liquidation Company GUC Trust (the "**GUC Trust**").[1]

2. I submit this Declaration in support of the *Joint Motion Pursuant To Bankruptcy Code Sections 105, 363, 502(C) And 1142 And Bankruptcy Rules 3020 And 9019 To Approve The Settlement Agreement By And Among The Signatory Plaintiffs And The GUC Trust, And To Estimate The Plaintiffs' Aggregate Allowed General Unsecured Claims Against The Debtors* (the "**Settlement Motion**"), dated August [__], 2017, filed concurrently with this declaration.

---

[1] Unless otherwise defined in this declaration, capitalized terms shall have the meanings noted in the Second Amended and Restated Motors Liquidation Company GUC Trust Agreement, dated as of July 30, 2015 (the "**GUC Trust Agreement**") [ECF No. 13332].

3.      Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would competently testify thereto.

### Background

4.      I am a Vice President of WTC with over 5 years of experience in its financial services group, including in *In re General Motors Corporation.*

5.      WTC's initial role in the Old GM bankruptcy was serving as the successor Indenture Trustee for approximately $23 billion in U.S. dollar denominated unsecured notes, bonds and debentures issued by Motors Liquidation Company, formerly known as General Motors Corporation.  During the bankruptcy, WTC served as chair of the Official Committee of Unsecured Creditors of Motors Liquidation Company.

6.      I currently serve as the lead representative of WTC in its capacity as trustee for and administrator of the GUC Trust.

### The GUC Trust's Creation and Current State

7.      The GUC Trust was formed to implement the Plan.  The GUC Trust is a liquidating trust with the primary purpose of resolving disputed claims and distributing GUC Trust Assets and GUC Trust Units to the GUC Trust's defined beneficiaries (**"GUC Trust Beneficiaries,"** or **"Beneficiaries"**).  GUC Trust Beneficiaries include holders of Allowed General Unsecured Claims as of March 31, 2011, holders of disputed claims as of March 31, 2011 that were later allowed, and holders of freely transferable Units in the GUC Trust.

8.      The GUC Trust operates for the benefit of GUC Trust Beneficiaries and has a fiduciary duty to maximize the recoveries of the GUC Trust Beneficiaries.  Under the GUC Trust Agreement, which governs the Trust, the GUC Trust Administrator shall deliver distributions to unitholders "as promptly as practicable," and "not unduly prolong the existence of the GUC Trust."

2

9. Under the GUC Trust Agreement, the GUC Trust "shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Disputed General Unsecured Claims." Dkt. 13332 § 5.1(d). If the amount to be Allowed exceeds $10 million, then the GUC Trust Monitor must review and approve "[a]ny decision to settle or otherwise resolve any objections to Disputed General Unsecured Claims against the Debtors." *Id.* § 11.3(a)(i).

10. To date, creditors have filed [$31.854] billion in general unsecured claims that have been Allowed.

11. As of November 2016, the GUC Trust had distributed approximately 94% of its initial assets in the form of New GM stock, warrants, and cash, to holders of allowed claims and to holders of Units. As of June 30, 3017, the GUC Trust had distributed 137,330,481 shares of New GM common stock, 124,846,029 Series A warrants, 124,846,029 Series B warrants and $245,817,332 in cash on behalf of resolved allowed general unsecured claims and units.

### New GM's Recalls and Resulting Litigation

12. In 2014, New GM recalled more than 30 million vehicles, including millions of vehicles due to a defective ignition switch as part of NHTSA Recall Number 14V-047 (the "**Ignition Switch Defect**"), millions of vehicles due to other defects related to the ignition switch, and millions of vehicles due to defective side airbags, power steering, and other defects.

13. Hundreds of plaintiffs responded to the revelations by filing individual and putative class actions against New GM seeking damages, under various theories, for alleged economic loss, personal injury, and wrongful death. After filing motions to enforce the Sale Order's injunction, New GM suggested that plaintiffs look to the GUC Trust for recovery insofar as such claims allegedly constituted general unsecured claims.

3

14.     On a stipulated record related to the Ignition Switch Defect, the Bankruptcy Court found, *inter alia*, that Old GM knew or should have known about the Ignition Switch Defect and therefore gave inadequate notice to plaintiffs, but that any claims against the GUC Trust were nonetheless barred by the doctrine of equitable mootness.

15.     On appeal, the Second Circuit affirmed in part, reversed in part, and vacated in part. Most relevant for purposes of the joint motion, the Second Circuit held that plaintiffs had suffered a due process violation and thus were free from the Sale Order's injunction, and that the issue of equitable mootness was not ripe because no plaintiff had sought permission to file late claims.

### The Late Claims Motions

16.     Upon remand, the parties began addressing whether plaintiffs could satisfy the requirements for authorization to file late proofs of claim against the GUC Trust, and whether such claims are equitably moot.

17.     On December 22, 2016, counsel for certain Ignition Switch Pre-Closing Accident Plaintiffs filed a motion for authority to file late proofs of claim on behalf of 175 plaintiffs alleging personal injury and wrongful death claims arising from the Ignition Switch Defect. Separately, Designated Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs filed a motion for authority to file one late putative class proof of claim for economic losses on behalf of Ignition Switch Plaintiffs, and another for economic losses on behalf of certain Non-Ignition Switch Plaintiffs.

18.     On January 4, 2017 counsel for the *Groman* Plaintiffs and counsel for the Peller Plaintiffs filed a joinder to the late claims motions filed by Designated Counsel. On July 28, 2017 counsel for Additional Ignition Switch Pre-Closing Accident Plaintiffs filed a motion for authority to file late proofs of claim on behalf of 171 plaintiffs alleging personal injury and

4

wrongful death claims arising from the Ignition Switch Defect (collectively, the "**Late Claims Motions**").

19. Per the Bankruptcy Court's order, the GUC Trust received limited discovery from certain putative late claimants regarding when they knew or reasonably could have known that they potentially had claims against the GUC Trust. In addition, the parties briefed disputed questions about whether the plaintiffs would be required to show excusable neglect under *Pioneer Investment Services Co. v. Brunswick Associates Ltd.*, 507 U.S. 380 (1992) in order to obtain permission to file late claims, and the applicability of any agreements with the GUC Trust or other tolling arrangements to toll the time to file late claims (the "***Pioneer* Briefing**").

20. To date, the Court has not set a schedule for hearing argument or deciding the disputed issues raised in the *Pioneer* briefing. The Court also has not set a schedule for briefing, arguing, or deciding the merits of the Late Claims Motions.

### The Settlement

21. Based on consultation with counsel, and my experience with the many aspects of the complex and protracted litigations related to New GM's 2014 recalls, it is my view that it is substantially likely that, absent settlement, the GUC Trust will continue to be involved in litigating this complex and protracted case for the foreseeable future.

22. Given the litigation risk of having multiple disputed issues that remain to be resolved by the Bankruptcy Court, the likelihood that those issues would be subject to appeals, the corresponding risk of re-litigating those issues after an appeal, the corresponding uncertainty, and both the cost to operate the GUC Trust during the pendency of the litigation and the time-value of money lost while the GUC Trust cannot distribute funds to its beneficiaries, I believe that the GUC Trust has ample business reason and justification for seeking the relief requested in the Settlement Motion.

23. Specifically, litigation related to the disputed issues addressed in the *Pioneer* Briefing, and the fact-intensive and complicated legal questions implicated by the merits of Plaintiffs' Late Claims Motions, is likely to be complex and protracted. In addition, the ultimate resolution of the Late Claims Motions may be impacted by the overlay of multiple additional complex legal and factual questions that are at issue before the multi-district litigation that is currently pending before Judge Furman in the Southern District of New York that is related to New GM's 2014 recalls.

24. The GUC Trust believes that it has a strong position on both the *Pioneer* issues and the merits of the Late Claims Motions. But the ultimate outcome of those motions in the Bankruptcy Court is uncertain. And even if the GUC Trust were to prevail before the Bankruptcy Court, any decision would likely be subject to an appeal (if not multiple appeals), and thus would not likely be finally determined for the foreseeable future. Meanwhile the GUC Trust would be required to incur litigation costs and administrative costs to continue operating, and GUC Trust Beneficiaries would not be able to receive distributions of GUC Trust Assets and invest them as they see fit.

25. Moreover, plaintiffs have shown to be highly committed litigants represented by skilled and experienced counsel. The plaintiffs who filed the Late Claims Motion believe that they have a strong position on both the *Pioneer* issues and the merits of the Late Claims Motions. They have asserted late claims that, based on the evidence they have proffered and that WTC has reviewed in its capacity as GUC Trust Administrator, could be valued at tens of billions of dollars. As a result, if plaintiffs ultimately prevail in both obtaining permission to file late claims and having their purported multi-billion dollar claims allowed, then current GUC Trust

6

Beneficiaries could be forced to surrender rights to future distributions. Plaintiffs have also reserved the right to seek to claw back previously distributed funds.

26.     Due to the significant risks that the Late Claims Motions present to the GUC Trust Beneficiaries, and the fluid nature of this litigation, the GUC Trust agreed to enter settlement negotiations with certain Plaintiffs beginning in Spring 2017. Those negotiations have been at arms-length and in good faith. Notably, all parties to the negotiations were represented and advised by experienced counsel, and negotiations proceeded at a high level of intensity over multiple months, with the parties (or their attorneys) engaging in several in-person and teleconference meetings and exchanging numerous drafts of the Settlement Agreement and ancillary documents.

27.     The primary terms of the Settlement are essentially as follows: 1) the GUC Trust agrees to pay $15 million (the "**Settlement Amount**") to a settlement fund and up to another $[6] million for providing notice; 2) the GUC Trust agrees to support entry of a Claims Estimate Order estimating the aggregate Allowed General Unsecured Claims (including the claims of the Plaintiffs) in an amount that equals or exceeds $42 billion; 3) the GUC Trust Beneficiaries agree to waive any claim to the Settlement Amount and, if the Claims Estimate Order is entered, the Adjustment Shares, and any Adjustment Shares issued will be deposited into the settlement fund for the sole benefit of Plaintiffs; 4) all Plaintiffs agree (or will be deemed to agree) to waive all current and future claims against the GUC Trust, the Avoidance Action Trust and certain other parties, and instead seek satisfaction of such claims from the settlement fund.

28.     I believe that the Settlement is a prudent and reasonable exercise of business judgment because it presents the best option for the GUC Trust to maximize recovery for the

benefit of the GUC Trust Beneficiaries while minimizing the substantial risk posed by the Late Claims Motions.

29. The Settlement is in the best interests of the GUC Trust, the Old GM estates and the GUC Trust Beneficiaries because it provides such parties with substantial benefits. For example, the Settlement offers the concrete benefit of resolving a long-standing dispute related to the Late Claims Motions. Settlement eliminates the risk of claw-backs of previously distributed assets and potentially clears the way for future distributions to GUC Trust Beneficiaries in the near term. It eliminates substantial uncertainty and saves the GUC Trust from substantial litigation costs. It will foster the ability of the GUC Trust to expeditiously wind-down the affairs of the Debtors in accordance with the Plan. And it preserves the distributable assets for the GUC Trust Beneficiaries. In short, the Settlement maximizes recoveries for GUC Trust Beneficiaries, which is the primary function of the GUC Trust and the GUC Trust Administrator.

30. To be sure, Settlement comes at a cost to Beneficiaries. In the Settlement, the GUC Trust has agreed to pay up to $6 million to distribute notice of the Settlement and $15 million to establish the Settlement Fund, funds that would otherwise potentially be available to Beneficiaries if the GUC Trust ultimately prevailed in the Late Claim Motion litigation. But given the substantial benefits of the Settlement, these costs are reasonable and prudent.

31. In consideration of all these issues, it is my opinion that the Settlement falls within the range of reasonableness—well above the lowest point in the range of reasonableness—and provides the best outcome for the GUC Trust Beneficiaries.

32. Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

8

Dated: Wilmington, Delaware
　　　　August __, 2017

　　　　　　　　　　　　　　　　　　　　/s/ [Draft]
　　　　　　　　　　　　　　　　　　　　Beth Andrews

9