# **EXHIBIT O**

```
                     UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK


                                    .   Case No. 09-50026-mg
IN RE:                              .   Chapter 11
                                    .
MOTORS LIQUIDATION COMPANY,         .   (Jointly administered)
et al., f/k/a GENERAL               .
MOTORS CORP., et al,                .   One Bowling Green
                                    .   New York, NY 10004
             Debtors.               .
                                    .   Thursday, August 17, 2017
. . . . . . . . . . . . . . . .     .   3:05 p.m.


                   TRANSCRIPT OF IN COURT CONFERENCE
                       (CC: DOC NOS. 14053, 14056)
                   BEFORE THE HONORABLE MARTIN GLENN
                 UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:           King & Spalding LLP
                          By:  ARTHUR STEINBERG, ESQ.
                               SCOTT DAVIDSON, ESQ.
                          1185 Avenue of the Americas
                          New York, New York 10036-4003
                          (212) 556-2158

For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs:               Brown Rudnick LLP
                          By:  EDWARD S. WEISFELNER, ESQ.
                               HOWARD S. STEEL, ESQ.
                          7 Times Square
                          New York, New York 10036
                          (212) 209-4917




Audio Operator:           Timothy Wilson, ECRO


Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46038
                          (855) 873-2223
                          www.accesstranscripts.com

        Proceedings recorded by electronic sound recording,
           transcript produced by transcription service.
```

2

```
APPEARANCES (Continued):

For the Ignition Switch
plaintiffs and certain
non-Ignition Switch
plaintiffs and states
of California and
Arizona:                    Hagens Berman Sobol Shapiro LLP
                            By:  STEVE W. BERMAN, ESQ.
                            1918 Eighth Ave.
                            Suite 3300
                            Seattle, Washington 98101
                            (206) 623-7292

For Personal Injury
Accident Plaintiffs:        Goodwin Procter LLP
                            By:  WILLIAM P. WEINTRAUB, ESQ.
                                 GREGORY FOX, ESQ.
                            The New York Times Building
                            620 Eighth Avenue
                            New York, NY 10018-1405
                            (212) 813-8839

For Participating
Unitholders:                Akin Gump Strauss Hauer & Feld LLP
                            By:  DANIEL GOLDEN, ESQ.
                            One Bryant Park
                            New York, NY 10036-6745
                            (212) 872-1000

For Certain Personal
Injury/Death Plaintiffs:    Hilliard Munoz & Gonzales LLP
                            By:  BOB HILLIARD, ESQ.
                            719 South Shoreline Boulevard #500
                            Corpus Christi, Texas  78401
                            (361) 882-1612

For Plaintiffs'             Otterbourg
Executive Committee:        By:  MELANIE L. CYGANOWSKI, ESQ.
                            230 Park Avenue
                            New York, NY  10169
                            (212) 905-3622
```

3

```
APPEARANCES (Continued):

For Motors Liquidation
GUC Trust:                 Gibson, Dunn & Crutcher LLP
                           By:  KEITH R. MARTORANA, ESQ.
                           200 Park Avenue
                           New York, NY 10166-0193
                           (212) 351-4000

For Additional Ignition
Switch  Pre-Closing
Accident Plaintiffs:       Andrews Myers
                           By:  LISA M. NORMAN, ESQ.
                           1885 Saint James Place, 15th Floor
                           Houston, TX  77056-4110
                           (713) 850-4200

TELEPHONIC APPEARANCES:

For Takata Plaintiffs:     Stutzman, Bromberg, Esserman & Plifka
                           By:  SANDER L. ESSERMAN, ESQ.
                           2323 Bryan Street
                           Suite 2200
                           Dallas, TX  75201-2689
                           (214) 969-4900
```

1  Mr. Weisfelner was delivering his remarks to the Court?

2  MR. MARTORANA: Well, Your Honor, the reason why I
3  was smirking was because, frankly, I was at the meetings. And
4  to be totally candid with Your Honor, the only people that were
5  at the meetings were counsel for New GM and counsel for the GUC
6  Trust. There were no principals at the meeting, although we,
7  of course, spoke with principals afterwards.

8  The concept that any of this discovery, which, I
9  mean, to the extent we file a motion, which I think was
10 anticipated, certainly might be acceptable, I mean, with
11 reservation of --

12 THE COURT: What motion are you going to file?

13 MR. MARTORANA: We're -- our intention is to file a
14 9019 motion seeking approval of the deal, the proposed deal
15 with New General Motors. That deal, Your Honor, was outlined
16 in a letter that we filed yesterday.

17 THE COURT: I read the letter.

18 MR. MARTORANA: Okay. So just to get back to your
19 question, Your Honor, I was obviously -- I was at that meeting.
20 The concept that there was any untoward threats or anything
21 that was illicit that happened at that meeting, in my view, is,
22 I mean -- well, I guess the discovery will show it, if we have
23 discovery, but it just frankly didn't happen. So that is why I
24 was smirking, Your Honor. At the end of the day --

25 THE COURT: It didn't seem very funny to me, but you

1  seemed to think so.
2         MR. MARTORANA:  What's that?
3         THE COURT:  I was watching you as Mr. Weisfelner was
4  delivering his remarks, and you seemed to think it was funny.
5         MR. MARTORANA:  Well, Your Honor, I mean, I didn't
6  think -- I thought it was --
7         THE COURT:  This is a serious matter.
8         MR. MARTORANA:  I agree it's a serious matter, Your
9  Honor.  I definitely do not disagree with that.  I just did
10 not, frankly, understand.  I think that it's a stretch -- I
11 mean, obviously he wasn't there, but I think it's a stretch to
12 think that that --
13        THE COURT:  When was the meeting?
14        MR. MARTORANA:  The meeting was on, I believe,
15 Tuesday, Tuesday of this past week.
16        THE COURT:  And who was present?
17        MR. MARTORANA:  Mr. Steinberg, Mr. Davidson, myself,
18 Mr. Williams, and Mr. Gillette, who are over in the corner.
19 Those were the only participants in the meeting.
20        THE COURT:  And --
21        MR. MARTORANA:  Oh, and I'm sorry, there was someone
22 on the phone from Kirkland & Ellis, as well, Mark Nomellini
23 from Kirkland & Ellis.
24        So, Your Honor, the fact of the matter is, you know,
25 obviously we have -- I don't disagree with Mr. Weisfelner's

1  statements that we had been working with him --
2              THE COURT:  It just happened -- you know, as I said
3  earlier, I didn't read the proposed settlement agreement in
4  detail.  It's a very lengthy --
5              MR. MARTORANA:  It is.
6              THE COURT:  -- exhibit, but it would seem to have
7  reflected a very considerable amount of time in negotiating the
8  agreement in the various --
9              MR. MARTORANA:  It did.
10             THE COURT:  -- exhibits.  Can you tell me --
11             MR. MARTORANA:  It did.  I do not disagree with that.
12             THE COURT:  Can you tell me approximately how long
13 the negotiations were going on.
14             MR. MARTORANA:  Well, I think I would say that the
15 concept of negotiations had been going on for, I mean, probably
16 close to a year, I think.
17             THE COURT:  Well, without the concept.  These were
18 very --
19             MR. MARTORANA:  The actual true --
20             THE COURT:  Stop.  Wait until I finish my questions.
21             Attached to Mr. Weisfelner's letter as -- are various
22 exhibits, voluminous exhibits, but the settlement agreement is
23 -- and its immediate exhibits are quite voluminous.  Can you
24 tell me how long the negotiations and drafting of the actual
25 settlement documents went on for?

1          MR. MARTORANA:  I would say about two months I think
2  is probably accurate, but --
3          THE COURT:  And you had one meeting with New GM this
4  week that caused Wilmington Trust to abandon the settlement
5  agreement?
6          MR. MARTORANA:  We did, Your Honor.
7          THE COURT:  One meeting.  Okay.
8          MR. MARTORANA:  One meeting.  Yes, we did, Your
9  Honor.  In our view, as a fiduciary, we were initially willing
10 to go forward with the deal, with the settlement as presented.
11 Obviously it was --
12         THE COURT:  And what is it --
13         MR. MARTORANA:  -- never signed off on.
14         THE COURT:  And what is it that New GM said that
15 persuaded your client to abandon the deal that had been under
16 discussion for considerable time and negotiation of documents
17 for quite a long time?
18         MR. MARTORANA:  Well, certainly they reminded of many
19 of the things we already knew, which was the risk --
20         THE COURT:  Go ahead.  None of this is privileged, so
21 tell -- I want to hear what you have.
22         MR. MARTORANA:  Sure.  They reminded us of all the
23 risks that were associated with the proposed settlement, in
24 particular the execution risks, which I can get into if you'd
25 like.  But there were certainly numerous execution risks.

```
 1              THE COURT:  Well, there's going to be discovery, so I
 2  would like to hear now -- and it probably will inform the
 3  discovery.
 4              MR. MARTORANA:  Sure.
 5              THE COURT:  And I'm sure you'll be complete in
 6  telling me what was -- how long did the meeting last?
 7              MR. MARTORANA:  Maybe two hours --
 8              THE COURT:  Okay.
 9              MR. MARTORANA:  -- at most, I would say.
10              THE COURT:  And were documents circulated to you in
11  advance of the meeting?
12              MR. MARTORANA:  No, there were no documents
13  circulated.
14              THE COURT:  Was the decision to abandon the
15  settlement made at the meeting?
16              MR. MARTORANA:  The -- well, again, there were no
17  principals there, so there was no decision that could be made
18  at that meeting.  There was an offer that was floated, which
19  was tentative.  We followed up with our principals.  They
20  followed up with their principals.  And then, over the next day
21  or so, that proposal was boiled down to something more
22  concrete.
23              THE COURT:  And tell me what the proposals that New
24  GM made to you at the meeting.
25              MR. MARTORANA:  Well, the proposal that they made at
```

18

1   -- the first proposal that they made was continuing litigating
2   and we will pay your litigation costs against the plaintiffs.
3   That was the initial proposal that they made.  We ultimately
4   said, it's interesting, that sounds like something that we
5   might be able to work with, but at the end of the day, what our
6   two main concerns here are, that we're continuing a litigation
7   really for the benefit of New GM.  We feel like we've been
8   pulled into this, so obviously we're worried about spending
9   trust -- unitholder money for those purposes.
10          But then the -- a secondary or perhaps even bigger
11  issue is that at some point, probably after the term loan
12  litigation is fully and finally resolved, the GUC Trust will be
13  in a position to make a distribution to unitholders.  At this
14  point the GUC Trust cannot make a distribution to unitholders
15  until we figure out whether or not the 502(h) claim of the term
16  loan defendants is legitimate.  But at some point that will be
17  resolved, our mediation settlement or otherwise, and then we'll
18  be in a position to make a distribution.  And to the extent --
19          THE COURT:  Anybody who negotiates a settlement with
20  you better be careful because they may spend months doing it,
21  only to have you pull the rug out from under them at the last
22  hour.  You're smiling again.
23          MR. MARTORANA:  I'm sorry, I guess the question was I
24  didn't -- I don't understand --
25          THE COURT:  My comment was that anybody who

1  negotiates a settlement with you better be careful because you
2  may well pull the rug out from under them after months of
3  negotiation.  That was my comment as to which you had your big
4  grin on your face again.
5          MR. MARTORANA:  Well, I apologize, Your Honor.  But
6  at the end of the day, we are a fiduciary and we're going to
7  act in our fiduciary capacity.  And if that means abandoning a
8  proposal --
9          THE COURT:  And what other proposals did New GM make
10 to you that you considered in, I assume -- well, I won't ask
11 you what you recommended to your client.  What other proposals
12 did New GM make to you in the form of consideration for
13 abandoning the deal with the plaintiffs?
14         MR. MARTORANA:  Sure.  So again, getting back to the
15 point about a distribution, we said our two main concerns were
16 that we're continuing a litigation.  It's -- there's been a
17 number of costs that have been associated with that obviously.
18 It's continuing to pull down on trust assets.
19         And then the secondary aspect is that if we are in a
20 position to make a distribution and these claims continue to be
21 out there, there is no way that we're going to -- well, we
22 probably would not be able to make a distribution over the
23 existence of those claims.  And we would therefore -- currently
24 we're investing our assets -- required to invest our assets in
25 treasuries, and that is not really going to be a sufficient

1  rate of return that we could otherwise get if this deal were to
2  go forward, and this deal -- the plaintiffs' deal, and if we
3  were able to get the releases that we would be hoping for under
4  that -- under the plaintiffs' deal.
5         So the offer after further discussion that was made
6  was that New GM would be potentially willing to provide us with
7  a rate of return.  We don't know what that would be.  We've
8  agreed that we would enter into good-faith negotiations to
9  determine what that rate of return would be because, among
10 other things, we don't know what the corpus of the trust will
11 be at that time.  So it's hard to come to something -- to that
12 kind of agreement today.
13        But those -- we felt that those two things,
14 particularly given the fact that we believe on the merits we
15 have very strong arguments against the late claims, on Pioneer,
16 on equitable mootness, on tolling arrangements, that this offer
17 from New GM dealt with the main concerns that we were -- that
18 we had.  And as a fiduciary, we felt that we needed to do that.
19 We felt that you don't necessarily go for -- I understand that
20 hedge funds want to go for the absolute home run at the risk of
21 $21 million and everything else out there, but we represent
22 all --
23         THE COURT:  What's the $21 million?
24         MR. MARTORANA:  So the way that the plaintiffs'
25 proposal would work is that the GUC Trust would, up front, pay

1  $6 million for purposes of noticing.  So that would be out the
2  door before we even really get in front of Your Honor.  That
3  would just be a sunk cost for postcards.  And then it would be
4  followed by a $15 million payment and our agreement to support
5  a $10 billion claim as against New GM.  And we felt, among
6  other things, that there was a significant amount of execution
7  risk associated with that.  And, frankly, among other things,
8  that proposal, what we were really hoping to get out of it was
9  a release, get a true release from all the plaintiffs.
10            Given the fact that that proposal did not contemplate
11 and the plaintiffs would not agree to a Rule 23 settlement
12 certification, I think there's a potential execution risk
13 associated with actually accomplishing what it was that we
14 wanted to accomplish.
15            THE COURT:  Okay.  Anything else you want to tell me
16 now?
17            MR. MARTORANA:  No.  Thank you, Your Honor.
18            THE COURT:  All right.
19            Mr. Golden, I'd like to hear from you next.
20            MR. GOLDEN:  Yes.  Good afternoon, Your Honor.
21 Daniel H. Golden, Akin, Gump, Strauss, Hauer & Feld, counsel
22 for what's known as the participating unitholders.
23            Your Honor, this is really unfortunate that we find
24 ourselves in this situation where everybody now, in open court,
25 has to air their dirty laundry about a settlement that I think

**C E R T I F I C A T I O N**

I, Alicia Jarrett, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____

ALICIA JARRETT, AAERT NO. 428      DATE:   August 20, 2017

ACCESS TRANSCRIPTS, LLC

