| | | |
|---|---|---|
| Susheel Kirpalani<br>James C. Tecce<br>Julia Beskin<br>Jordan Harap<br>**QUINN EMANUEL**<br>  **URQUHART & SULLIVAN LLP**<br>52 Madison Avenue<br>New York, NY 10010 | Arthur J. Steinberg<br>Scott Davidson<br>**KING & SPALDING LLP**<br>1185 Avenue of the Americas<br>New York, New York 10036 | <u>**Hearing Date**</u>:  **December 18, 2017** |

*Counsel to General Motors LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MOTORS LIQUIDATION COMPANY, <u>et al.</u>,<br>f/k/a General Motors Corp., <u>et al.</u>,<br><br>                              Debtors. | Chapter 11<br>Case No. 09-50026 (MG)<br>(Jointly Administered) |

**JOINDER OF GENERAL MOTORS LLC IN MOTORS LIQUIDATION**
**COMPANY GUC TRUST'S OBJECTION TO PLAINTIFFS' MOTION**
**TO ENFORCE UNEXECUTED SETTLEMENT AGREEMENT**

**TABLE OF CONTENTS**

**PAGE**

I.   PRELIMINARY STATEMENT ....................................................................................1

II.  ARGUMENT ..................................................................................................................2

    A.   FACTOR 1: EXPRESS TERMS OF PURPORTED AGREEMENT REFLECT STATED INTENT THAT AGREEMENT WILL NOT BECOME BINDING UNLESS SIGNED BY ALL PARTIES ....................................................................................2

    B.   FACTOR 2: PARTIES DID NOT REACH AGREEMENT ON ALL MATERIAL TERMS ....................................................................................6

    C.   FACTOR 3: CONSISTENT WITH NEW YORK LAW, UNEXECUTED SETTLEMENT AGREEMENT IS TYPE THAT MUST BE REDUCED TO A SIGNED WRITING ....................................................................................10

    D.   FACTOR 4: PARTIES DID NOT PARTIALLY PERFORM ALLEGED AGREEMENT .........10

CONCLUSION ........................................................................................................................11

# TABLE OF AUTHORITIES

**CASES** **PAGE**

In re AMR Corp.,
   730 F.3d 88 (2d Cir. 2013) .................................................................................................. 4

Balaban-Krauss v. Exec. Risk Indem., Inc.,
   2014 WL 2927289 (N.D.N.Y. June 27, 2014) ................................................................ 3, 10

Blakney v. Leathers,
   867 N.Y.S.2d 145 (2d Dep't 2008) ...................................................................................... 8

Bonnette v. Long Island Coll. Hosp.,
   3 N.Y.3d 281 (2004) .......................................................................................................... 10

Ciaramella v. Reader's Digest Ass'n,
   131 F.3d 320 (2d Cir. 1997) ............................................................................... 2, 3, 6, 9, 10

Chesapeake Energy Corp., et al. v. Bank of N.Y. Mellon Trust,
   773 F.3d 110 (2d Cir. 2014) ................................................................................................ 4

In re DPH Holdings Corp.,
   553 B.R. 20 (Bankr. S.D.N.Y. 2016) .................................................................................. 4

Davidson Pipe Co. Inc. v. Laventhol & Horwath,
   1986 WL 2201 (S.D.N.Y. Feb. 11, 1986) ................................................................... 3, 4, 5

Defeo v. Civitano,
   756 N.Y.S.2d 879 (2d Dep't 2003) .................................................................................... 10

Delyanis v. Dyna-Empire, Inc.,
   465 F. Supp. 2d 170 (S.D.N.Y. 2006) ................................................................................. 6

Forcelli v. Gelco Corp.,
   109 A.D.3d 244, 251 (N.Y. App. Div. 2013) ................................................................... 10

In re Gaston & Snow,
   243 F.3d 599 (2d Cir. 2001) ................................................................................................ 8

Grgurev v. Licul,
   2016 WL 6652741 (S.D.N.Y. Nov. 10, 2016) .................................................................. 10

H&R Block Tax Servs., LLC v. Strauss,
   2016 WL 5107114 (N.D.N.Y. Sept. 20, 2016) ................................................................... 3

Henry L. Fox. Co. v. William Kaufman Org., Ltd.,
    74 N.Y.2d 136 (1989) .................................................................................................... 4

Johnson v. Nextel Commc'ns, Inc.,
    780 F.3d 128 (2d Cir. 2015) ............................................................................................ 8

Kaczmarcysk v. Dutton,
    414 F. App'x. 354 (2d Cir. 2011) ............................................................................. 2, 3

Kowalchuk v. Stroup,
    873 N.Y.S.2d 43 (1st Dep't 2009) .................................................................................. 6

Lamoille S. Supervisory Union v. Metro. Life Ins. Co.,
    2010 WL 5050560 (D. Vt. Nov. 24, 2010) .................................................................... 6

Langreigh v. Grenbaum,
    775 F. Supp. 2d 630 (S.D.N.Y. 2011) .......................................................................... 10

In re Lehman Bros. Holdings Inc.,
    2017 WL 3278933 (S.D.N.Y. Aug. 2, 2017) ................................................................. 6

Martin v. Harrington,
    47 Misc. 3d 1211(A) (N.Y. Sup. Ct. 2015) ................................................................... 8

Nieves v. Community Choice Health Plan of Westchester, Inc.,
    2011 WL 5531018 (S.D.N.Y. Nov. 14, 2011) ........................................................... 3, 6

R.G. Group, Inv. v. Horn & Hardart Co.,
    751 F.2d 69 (2d Cir. 1984) ................................................................................ 2, 3, 6, 10

RKG Holdings, Inc. v. Simon,
    182 F.3d 901 (2d Cir. 1999) ......................................................................................... 2, 3

Reprosystem, B.V. v. SCM Corp.,
    727 F.2d 257 (2d Cir. 1984) ......................................................................................... 2, 3

Rohm and Haas Elec. Materials, LLC v. Honeywell Int'l, Inc.,
    2009 WL 1033651 (D. Del. Apr. 16, 2009) .................................................................. 6

Smith v. Haag,
    2015 WL 866893 (W.D.N.Y Mar. 2, 2015) ............................................................. 3, 10

Springwell Corp. v. Falcon Drilling Co., Inc.,
    16 F. Supp. 2d 300 (S.D.N.Y. 1998) .............................................................................. 4

Sprint Commc'ns Co. v. Jasco Trading, Inc.,
    5 F. Supp. 3d 323 (S.D.N.Y. 2014) .......................................................................... 6, 10

Stetson v. Duncan,
  707 F. Supp. 657 (S.D.N.Y. 1988) .......................................................................................... 10

Stonehill Capital Mgmt., LLC v. Bank of the W.,
  28 N.Y.3d 439 (2016) ............................................................................................................. 6

Winston v. Mediafare Entm't Corp.,
  777 F.2d 78 (2d Cir. 1985) ............................................................................... 1, 2, 3, 5, 9, 10

Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,
  84 N.Y.2d 309 (1994) ............................................................................................................. 8

**RULES / STATUTES**

11 U.S.C. § 105(a) ........................................................................................................................ 1

11 U.S.C. § 1109(b) ..................................................................................................................... 1

Fed. R. Bankr. P. 2018 .................................................................................................................. 1

Fed. R. Bankr. P. 3020 .................................................................................................................. 1

Fed. R. Civ. P. 23 ......................................................................................................................... 8

N.Y. C.P.L.R. § 2104 .............................................................................................................. 3, 10

**OTHER AUTHORITIES**

22 N.Y. Jur 2d Contracts ............................................................................................................... 1

## I. PRELIMINARY STATEMENT[1]

1. When these highly-sophisticated counsel first began reducing their settlement negotiations to writing, the GUC Trust's lawyers purposely inserted § 3.1 into the Unexecuted Settlement Agreement as a clear expression of an intent that all parties must sign the agreement for it to become binding. All counsel unequivocally accepted and understood the import of § 3.1. Multiple drafts of the purported agreement were exchanged among and reviewed by all counsel, and the contract's signature requirement was never amended or removed. It also is undisputed that none of the parties ever signed or dated the purported agreement. Given these facts, New York law—often expressed through the four Winston[2] factors—requires that the objective intent appearing in the document be given full force and effect and compels the conclusion that the Unexecuted Settlement Agreement is not binding on any party. Rather than follow established New York law, however, plaintiffs and the unitholders advance an unsupported, post hoc litigation position that signatures were "ministerial," that the GUC Trust can be bound even though the parties never affixed their signatures to the agreement, and that the parties partially performed by simply drafting the documents and arranging the August 17 status conference. For these and other reasons set forth below, plaintiffs and the unitholders cannot satisfy their burden of establishing the Unexecuted Settlement Agreement is binding on any party.

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in New GM's Motion, Pursuant To 11 U.S.C. §§ 105(a) And 1109(b), Fed. R. Bankr. P. 2018 And 3020, And Pre-Trial Order, To Appear And Be Heard With Respect To Phase 1 Of Court's Consideration Of Plaintiffs' Enforcement Motion [ECF No. 14149], and exhibits referenced herein are annexed to the Declaration Of James C. Tecce filed herewith (the "**Decl.**").

[2] The parties agree the factors in Winston v. Mediafare Entm't Corp., 777 F.2d 78 (2d Cir. 1985), govern the analysis. See Enforcement Mot. ¶ 34; Ex. A (Unexecuted Settlement Agreement (without exhibits) § 3.16 (New York governs)). The result is the same under basic contract law. C.f. 22 N.Y. Jur 2d Contracts § 9 (enforceable agreement requires "an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound").

1

## II. ARGUMENT

### A. Factor 1: <u>Express Terms Of Purported Agreement Reflect Stated Intent That Agreement Will Not Become Binding Unless Signed By All Parties</u>

2. The GUC Trust inserted § 3.1 into the Unexecuted Settlement Agreement to ensure the agreement only would become "effective and binding" when all parties signed the contract.[3] The purported agreement was never signed,[4] is undated, contains a merger clause (§ 3.11), only can be amended "in a writing signed by all parties" (§ 3.12), provides for execution by delivery of signatures (§ 3.9), and contains performance obligations and termination rights that only are triggered if the agreement is signed by all parties (§§ 2.2, 2.9(a), 3.2(B)). All of these provisions reflect the parties' objective intent that the agreement cannot become binding unless and until all parties affix their signatures. When examining unsigned agreements containing nearly identical provisions, the Second Circuit has refused consistently to find the existence of a binding agreement. Each of <u>Ciaramella</u>, <u>Kaczmarcysk</u>, <u>RKG Holdings</u>, <u>R.G. Group</u>, <u>Reprosystem</u>, and <u>Winston</u> and myriad New York federal district court decisions have found (a) provisions mirroring § 3.1 reflect an unequivocal intent to require signatures and must be given full force and effect; (b) other contract provisions also present here, <u>e.g.</u>, merger clauses, provisions tying obligations to the signature date, and date provisions that are left blank, corroborate that intent and also must be enforced; (c) considerable weight must be given to the intent as reflected in the written contract; and (d) the failure to establish the first <u>Winston</u> factor alone should be outcome

---

[3] Decl. Ex. F (AG0005147, at 5177 (June 9 email inserting § 3.1: "[t]his Agreement shall become effective and binding on the Parties on the date on which this Agreement is fully executed by each of the parties")); Ex. G (Martorana Tr. 200:25-201:25 (explaining he added § 3.1 because "there were a number of provisions that it was unclear as to when they would, in fact, become effective and we determined that it should be clear that … nothing in the agreement would become binding and effective until it was executed")).

[4] <u>See</u> Decl. Ex. B (Weisfelner Tr. 22:13-16, 28:11-14, 30:5-17, 31:4-14, 34:3-5, 35:2-4, 65:23-66:5); Ex. C (Weintraub Tr. 13:12-15, 56:8-17); Ex. D (Steel Tr. 22:4-9, 28:1-11); Ex. E (Williams Tr. 191:21-193:20).

determinative.[5] The Second Circuit's emphasis on the first Winston factor derives from the strict requirement of New York law that settlements must be reduced to signed writings. That principle promotes the policy of fostering secure and candid settlement negotiations without fear that parties will become unwittingly or prematurely bound.[6]

3.     Plaintiffs, however, ask the Court to ignore settled New York law and to rewrite the purported agreement based on subjective notions of fairness. They also believe the subjective, unexpressed intent of some counsel can be used to (a) prove the existence of a binding written agreement, (b) amend or remove unambiguous provisions, e.g., §§ 3.1, 3.12, or

---

[5] See Ciaramella v. Reader's Digest Ass'n, 131 F.3d 320, 324 (2d Cir. 1997) (no binding agreement even though parties stated "we have a deal" when draft agreement would not become effective until "signed by [all parties];" that provision and merger clause were a clear indication "the parties did not intend to bind themselves until the settlement had been signed" and were given "considerable weight … [to] avoid frustrating the clearly-expressed intentions of the parties"); Kaczmarcysk v. Dutton, 414 F. App'x 354, 355 (2d Cir. 2011) ("[W]ording in a settlement agreement that places great significance on the execution date evinces an intent not to create a binding settlement until some formal date of execution;" noting merger clause and significance of first Winston factor); RKG Holdings, Inc. v. Simon, 182 F.3d 901, 901 (2d Cir. 1999) (draft agreement stated it would have "no binding force unless and until it was signed;" noting action "can be dismissed solely on the basis of [this] express reservation"); R.G. Group, Inv. v. Horn & Hardart Co., 751 F.2d 69, 75 (2d Cir. 1984) ("[C]onsiderable weight is put on a party's explicit statement that it reserves the right to be bound only when a written agreement is signed."); Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 262 (2d Cir. 1984) (mutual intent not to be bound was "conclusively establish[ed]" when parties accepted drafts of proposed contracts stating agreement would be binding when executed); H&R Block Tax Servs., LLC v. Strauss, 2016 WL 5107114, at *4 (N.D.N.Y. Sept. 20, 2016) (linkage of contractual obligations to execution date reflects intent to require signatures; "where there is a writing between the parties showing that one party did not intend to be bound, a court need look no further than the first [Winston] factor"); Smith v. Haag, 2015 WL 866893, at *5 (W.D.N.Y Mar. 2, 2015) (no intent to be bound when stipulation tied payment obligation to date agreement was "fully executed" and approved); Balaban-Krauss v. Exec. Risk Indem., Inc., 2014 WL 2927289, at *3 (N.D.N.Y. June 27, 2014) (merger clause persuasive evidence of intent to require signed writing); Nieves v. Cmty Choice Health Plan of Westchester, Inc., 2011 WL 5531018, at *2 (S.D.N.Y. Nov. 14, 2011) ("[If] … a party states its intent not to be bound until the agreement is fully executed, that fact is determinative;" merger clause indicated intent to not be bound); Davidson Pipe Co. Inc. v. Laventhol & Horwath, 1986 WL 2201, at *3 (S.D.N.Y. Feb. 11, 1986) (noting obligations were triggered by execution date).

[6] See N.Y. C.P.L.R. § 2104 (requiring settlements to be reduced to properly subscribed writings); Ciamarella, 131 F.3d at 323 ("Enforcing premature oral settlements against the expressed intent of the parties will not further a policy of encouraging settlements. People may hesitate to enter into negotiations if they cannot control whether and when tentative proposals become binding."); Winston, 777 F.2d at 80 ("Because of this freedom to determine the exact point at which an agreement becomes binding, a party can negotiate candidly, secure in the knowledge that he will not be bound until execution."); R.G. Group, 751 F.2d at 71 ("[W]hen experienced business[persons] and lawyers are told explicitly and clearly that a major and complex agreement will be binding only when put in writing, then they should be rather cautious about assuming something different.").

(c) prove a waiver of written provisions, such as § 3.1.[7] Even if the Court looks beyond the document's four corners, counsel's actions confirm they all expected signatures from all parties:

- ***No Intent To Waive Signature Requirement.*** The parties never expressed an intention to amend or waive § 3.1 or related provisions. Instead, the parties agreed to incorporate § 3.1 into the contract, and the purported settlement that plaintiffs seek to enforce still includes § 3.1. Tellingly, plaintiffs' counsel commented on a different part of § 3.1 but left the signature requirement unchanged;[8]

- ***Plaintiffs' Stated Intent Of Need To Obtain Signatures.*** Notwithstanding plaintiffs' counsels' after-the-fact characterization of the signature requirement as "ministerial," plaintiffs' counsel never used that term or took that position during negotiations. To the contrary, plaintiffs' counsel confirmed their belief that signatures are required by attempting, through written requests even after August 14 (the latest date they contend there was a binding agreement), to gather signatures and obtain a fully-signed copy of the agreement;[9]

---

[7] See Chesapeake Energy Corp., et al. v. Bank of N.Y. Mellon Trust, 773 F.3d 110, 114 (2d Cir. 2014) ("[T]he intent of the parties must be found within the four corners of [an unambiguous] contract."); In re AMR Corp., 730 F.3d 88, 98 (2d Cir. 2013) ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."); Springwell Corp. v. Falcon Drilling Co., Inc., 16 F. Supp. 2d 300, 309 (S.D.N.Y. 1998) ("[Oral] testimony cannot be used to create an agreement not found in writings."); Davidson, 1986 WL 2201, at *3 ("Subjective intent, including that of parties' counsel, is simply immaterial."); In re DPH Holdings Corp., 553 B.R. 20, 27 (Bankr. S.D.N.Y. 2016) ("[A] court is not free to alter the [unambiguous] contract to reflect its personal notions of fairness and equity"); Henry L. Fox. Co. v. William Kaufman, Org., Ltd., 74 N.Y.2d 136, 142 (1989) ("[Writing] establishing a contractual relationship between the parties, [must] bear the signature of the party to be charged …. Parol evidence is admissible only to connect the papers, not to establish missing terms of the agreement.").

[8] See Decl. Ex. H (GUC_0003887, at 3890 (July 10 email from plaintiffs' counsel proposing modifications to § 3.1 that would not change first sentence: "section 3.1 must be similarly modified to have all the releases and waivers triggered by entry of the Settlement Order")); Ex. E (Williams Tr. 98:21-99:5 (§ 3.1 was expression of GUC Trust intent that "document had to be signed before it was final"), 200:1-14 (no one ever communicated "that the agreement would become effective and binding on the parties even if was not signed")); Ex. B (Weisfelner Tr. 87:17-23 (team became "aware of the desired addition of section 3.1 on or about June 9"), 89:13-25 ("Q. … [§ 3.1 is] reflected in the final settlement agreement because … your team accepted it; correct? A. Everyone accepted all of the terms including that term, yes")); Ex. C (Weintraub Tr. 71:17-72:7 (witness never told anyone, and was not told by anyone that "the settlement agreement would become effective and binding before it was signed")); Ex. D (Steel Tr. 92:7-19 (Martorana never told Steel "he was waiving the requirement of section 3.1, that the document not become binding until it was fully executed")); Ex. B (Weisfelner Tr. 91:7-21 (parties never said agreement would become effective before being signed)); Ex. G (Martorana Tr. 202:11-203:3 (never told signing was "ministerial act" or that agreement would be effective without signatures)).

[9] Decl. Ex. B (Weisfelner Tr. 64:14-20, 47:2-4, 99:22-100:4 (unable to recall using phrase "ministerial step")). Compare Ex. D (Steel Tr. 17:18-24 (referring to signing as "ministerial")), with Ex. I (GUC_0001558 (Aug. 11 Steel email asking when "we can schedule signatures")); Ex. J (GUC_0001341 (Aug. 14 email stating "[w]e will update accordingly and send execution drafts as soon as possible")); Ex. K (GUC_0005638 (Aug. 14 email sending "proposed final execution versions")); Ex. L (GUC_0005630 (Aug. 16 email asking "[w]hen are we actually signing the agreement / would think before the conference")). Signatory counsel have different views as to the exact date when the agreement became binding. That inconsistency demonstrates the absence of a binding agreement at any

- ***GUC Trust Clearly Expressed Its Intent To Require Signatures.*** In addition to adding § 3.1 into the contract, the GUC Trust confirmed that it did not consider itself bound to the unsigned agreement when it stated in its draft August 16 letter to the Court—which it shared with plaintiffs' and the unitholders' counsel—that the "***Proposed Settlement is nearly final, but has not yet been executed by the parties and is not binding.***"  In reviewing the draft, plaintiffs' counsel did not object to the GUC Trust counsel's characterization of the agreement and instead remarked that their draft letter to the Court "says a lot of the same." Similarly, the GUC Trust's August 14 Form 10-Q reported no deal and stated only that negotiations were ongoing.  Had a binding agreement been reached, the GUC Trust would have disclosed it in the Form 10-Q;[10]

- ***Contemporaneous Correspondence Confirms No Agreement.*** All parties consistently described the agreement as "***proposed***" in correspondence with each other, including correspondence circulated on dates after plaintiffs now claim, as a litigation position, that an agreement was reached on material terms;[11] and

- ***Agreement To Form Of Documents—Not Underlying Deal.*** The GUC Trust's counsel communicated to the negotiating counsel the clear distinction between their agreement to the form of the documents and the GUC Trust's ultimate assent to the deal—the latter of which only would be provided by actually signing the document. And, the GUC Trust counsel told plaintiffs' counsel on August 14—after plaintiffs claim there was a binding agreement—that final client sign off had not been obtained.[12]  (August 14 was before the GUC Trust's lawyers met with New GM's counsel).

---

point in time. See Decl. Ex. B (Weisfelner Tr. 24:15-19 (August 12-13)); Ex. HH (Golden Tr. 130:13-20 (August 9)); Ex. D (Steel Tr. 51:15-52:2, 68:5-66:9 (July 28)); Ex. C (Weintraub Tr. 76:24-77:11 (August 12-14)).

[10] Decl. Ex. E (Williams Tr. 138:24-139:1 ("If we thought we had a binding deal, we would have put that in [the] 10-Q that we had a binding deal.")), Ex. M (Aug. 14 Form 10-Q (noting trust was "engaged in discussions … regarding … certain issues underlying the Late Claims Motions. Such discussions have meaningfully progressed and remain ongoing")); Ex. N (GUC_0000905 (Aug. 16 email attaching draft letter)); Ex. O (GUC_0000898 (Aug. 16 email from plaintiffs' counsel saying its letter "says a lot of the same")); Ex. JJ (GUC_0013946 (Aug. 16 email forwarding letter to unitholder counsel)).

[11] Decl. Ex. Q (BR005531 (Aug. 14 email (referring to "proposed settlement"))); Ex. K (GUC_0005638, at 5641 (Aug. 14 email sending "proposed final execution versions")); Ex. R (Aug. 17 letter from unitholder counsel to Court referring to "final proposed settlement"); Ex. S (GUC_0013900 (Aug. 16 email (same))); Ex. NN (Tr., Aug. 11 MDL 2543 Conf. 38:11-15 (plaintiffs' counsel referring to "proposed settlement")); Winston, 777 F.2d at 81 (use of "proposed settlement" and "proposed agreement" indicated agreements were "drafts or proposals" and not binding); Davidson, 1986 WL 2201, at *5 (same).

[12] See Decl. Ex. T (GUC_0003459, at 3462 (July 27 email stating "[s]ign-off, with respect to the three documents (Settlement Agreement, Settlement Order, Claims Estimate Order), will likely come tomorrow. We'll keep you posted. Note, however, that signoff on the settlement itself is subject to the finalization of all other document[s] in a satisfactory manner and receipt of final approvals")); Ex. K (GUC_0005638, at 5640 (Aug. 14 email stating "[a]t this point we do not have any further comments, but are obtaining final sign-off from our client"), 5638 (Aug. 14 email stating "[w]e are waiting for final approval from client, but unlikely to come tonight. You are, however,

-5-

The factual record confirms the parties' understanding—objectively expressed to each other—that there was no binding agreement unless and until all parties affixed their signatures.[13]  Thus, the undisputed facts and law compel the conclusion that the unsigned agreement is not binding.[14]

### B. Factor 2: Parties Did Not Reach Agreement On All Material Terms

4. Plaintiffs' counsel could not have agreed to any material terms—and the agreement is not binding—because plaintiffs' counsel did not have the authority from their purported clients to enter into a binding agreement with the GUC Trust.  Specifically, plaintiffs

---

authorized to send current versions to New GM this evening")); Ex. U (Andrews Tr. 108:12-15 ("My statement is that the GUC Trust is signed off on the form of the documents.  I am not giving him authority to sign the document.")); Ex. E (Williams Tr. 103:19-20, 104:22-24, 186:2-24, 187:21-188:6, 191:21-193:20, 200:15-201:9 ("Q.  To your mind, is there a difference between agreeing to the form of the documents and agreeing to transaction they may or may not reflect? … A.  Yes, you would agree to the transaction when we signed the documents indicating you're bound to it.")); Ex. G (Martorana Tr. 203:8-18 (never received client authority to sign), 79:15-80:14 (explaining signoff on documents versus "actual entire corpus of the settlement")).  See also Sprint Commc'ns Co. v. Jasco Trading, Inc., 5 F. Supp. 3d 323, 333-34 (S.D.N.Y. 2014) (no binding agreement: even if reservation of "right not to be bound" was "a mere formality … it was a reservation nonetheless"); Lamoille S. Supervisory Union v. Metro. Life Ins. Co., 2010 WL 5050560, at *3 (D. Vt. Nov. 24, 2010) (no binding agreement when counsels' email correspondence "indicates the parties were negotiating the final details of this written agreement and that the agreement would not be final absent client approval").

[13] See Ciaramella, 131 F.3d at 325 (noting no evidence of "an explicit waiver of the signature requirement"); R.G. Group., 751 F.2d at 76 ("There never was a written modification of the requirement that the contract be in writing" and no party ever "discussed dropping the writing requirement"); Nieves, 2011 WL 5531018, at *3-4 (rejecting argument that parties intended "to be bound by their oral and informal agreements … [as being] based on ex post facto evidence that attempts to divine the parties' intentions during the negotiations").

[14] Plaintiffs' cases are distinguishable because either (a) the parties reached agreement on all material terms *before* drafts of agreements containing clauses similar to § 3.1 were exchanged, (b) the parties did not expressly reserve their rights to require a signed writing before reaching their agreement on all material terms, (c) at least one party signed the contract, or (d) the parties reported their settlement to the court.  See In re Lehman Bros. Holdings Inc., 2017 WL 3278933, at *3 (S.D.N.Y. Aug. 2, 2017) (examining settlement of straightforward "clawback" action where "the agreement had been reached before the drafts formalizing the settlement were exchanged;" Lehman signed release provisions); Rohm and Haas Elec. Materials, LLC v. Honeywell Int'l, Inc., 2009 WL 1033651, at *2-4 (D. Del. Apr. 16, 2009) (parties advised court of settlement and filed two stipulations requesting adjournment of scheduling deadlines given settlement "in principle;" representations to court were "objective manifestations of assent"); Delyanis v. Dyna-Empire, Inc., 465 F. Supp. 2d 170, 174-75 (S.D.N.Y. 2006) (parties fully executed term sheet; counsel's email thereafter confirming mediator could contact court and advise court case had settled was considered acceptance of binding settlement); Stonehill Capital Mgmt., LLC v. Bank of the W., 28 N.Y.3d 439, 451–52 (2016) (finding "subject to" language in email did not clearly express intent not to be bound because it "was never made explicit before the bid was accepted"); Kowalchuk v. Stroup, 873 N.Y.S.2d 43, 46 (1st Dep't 2009) (parties agreed to all material terms settling arbitration before exchanging draft agreement, NASD was advised "the arbitration has been settled," and one counterparty actually signed settlement agreement).

cannot satisfy § 3.17, which requires that the parties have been "represented by an attorney with respect to this Agreement" who has "been duly authorized" by their clients to sign the agreement on their behalf. The record shows these purported clients[15] either were not aware of the settlement negotiations, were not sent drafts of the agreement, were not informed of its particular terms, never provided their written consent to the proposed settlement, or did not give specific authorization to sign.[16] Moreover, two of the proposed signatory counsel (Brown Rudnick LLP and Goodwin Procter LLP) did not represent individual plaintiffs and instead were retained to represent, and derived their authority from, other signatory counsel. Finally, certain PIWD Plaintiffs' Counsel recently filed a motion in MDL 2543 (under seal) to terminate their representation of certain plaintiffs, which the MDL Court granted and thereby changed the parties to the proposed agreement.[17] Under § 3.17 and applicable law, plaintiffs' counsel had no

---

[15] Counsel to the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs, Hagens Berman Sobol Shapiro LLP, Lieff Cabraser Heimann & Bernstein, LLP, and Brown Rudnick LLP represent only two individuals who filed proofs of claim. See Decl. Ex. V (Hagens engagement letters), Ex. B (Weisfelner Tr. 39:1-3 ("Q. Were you acting on behalf of a class that was certified? A. No")). See also Dkt. No. 14128-1 (Letter to Judge Furman (unexecuted agreement makes "assertions regarding the meaning of this Court's Order No. 8 appointing Plaintiffs Co-Lead Counsel in MDL 2543 and the authority of Co-Lead Counsel to represent and settle the purported claims of millions of non party individuals based on that order")).

[16] See Decl. Ex. W (Economic Loss Pl.'s Supp. Resp. No. 1 ("Counsel did not expressly inform claimants that they were negotiating these particular terms"), No. 2 ("Counsel did not seek claimants' written consent to the terms of the contract or proposed settlement"), No. 4 ("Counsel did not send drafts of the contract or the proposed settlement to claimants")); Ex. B (Weisfelner Tr. 44:20-24 (conceding no client authority and relying instead on notice procedures), 48:18-51:11, 79:13-80:21 (no discussions with, or authorizations from named plaintiffs)); Ex. X (PIWD Counsel Supp. Resp. No. 12, 13 (did not send drafts of agreement to HMG Claimants), No. 11); Ex. Y (Additional Ignition Switch Pre-Closing Accident Pl.'s First Supp. Obj. and Resp. Nos. 10-13); Ex. KK (Mosley Tr. 17:4-9 (never saw agreement), 25:8-16 (never told counsel to sign and gave only general authority)); Ex. LL (Barton Tr. 22:9-14 (gave counsel general authority when engaged)).

[17] See Decl. Ex. Z (Brown Rudnick engagement letter); Ex. B (Weisfelner Tr. 82:11-84:24 (authority derived from counsel)), Ex. C (Weintraub Tr. 10:11-23, 18:18-19:8 (needed co-counsel's authority to sign)); In re General Motors LLC Ignition Switch Lit., No. 14-MD-2543 (JMF) (S.D.N.Y. Oct. 26, 2017) (Dkt. No. 4769) (Mot. For Order Permitting Submission Of Supp. Decl. In Support Of Mot. To Withdraw Under Seal And In Camera, filed by Hilliard Martinez Gonzales LLP and Thomas J. Henry Injury Attorneys), (Dkt. No. 4840 (Order granting motion)).

authority to agree to any material terms or otherwise enter into a binding agreement with the GUC Trust.[18]

5.      Moreover, even though there was an undisputed meeting of the minds on § 3.1,[19] significant issues remained among all parties in the days leading up to the Bankruptcy Court August 17 conference.[20]  While the GUC Trust's counsel approved the form of the documents if it chose to go forward with the settlement, counsel decided to not sign the draft agreement—and thereby assent or bind the GUC Trust to the deal—until after the August 17 conference.  The GUC Trust's counsel wanted to obtain the Court's reaction to perceived infirmities in the settlement's substance, namely the use of the $10 billion claims estimate and the attempt to bind millions of unknown individuals or actual/potential claimants without the protections afforded by class certification under Fed. R. Civ. P. 23.[21]  The GUC Trust was not prepared to agree to the

---

[18] The Unexecuted Settlement Agreement was negotiated principally by attorneys located in New York, purported to resolve claims asserted in New York courts, and was intended for submission to the Bankruptcy Court.  New York law governs whether plaintiffs' counsel had authority to bind their respective clients and provides they did not because the undisputed record shows those clients did not provide settlement authority.  See Johnson v. Nextel Commc'ns, Inc., 780 F.3d 128, 141 (2d Cir. 2015) ("Where plaintiffs' claim rests on state law, we apply the choice-of-law rules of the state in which the federal district court sits."); In re Gaston & Snow, 243 F.3d 599, 601 (2d Cir. 2001) (in federal-question cases, choice of law rules of forum state applies); Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d 309, 317 (1994) (New York courts examine place of contracting, place of negotiation, place of performance, location of subject matter, and domicile or place of business of contracting parties); Blakney v. Leathers, 867 N.Y.S.2d 145, 146 (2d Dep't 2008) ("An attorney must be specifically authorized to settle and compromise a claim, as an attorney has no implied power by virtue of his general retainer to compromise and settle his client's claim."); Martin v. Harrington, 47 Misc. 3d 1211(A), at *1 (N.Y. Sup. Ct. 2015) (same).

[19] See Decl. Ex. E (Williams Tr. 98:21-99:5, 200:1-14); Ex. B (Weisfelner Tr. 87:17-23, 89:7-9, 89:13-25, 91:7-21); Ex. C (Weintraub Tr. 71:17-72:7); Ex. D (Steel Tr. 92:7-19) ; Ex. G (Martorana Tr. 202:11-203:3).

[20] Decl. Ex. AA (BR000001, at 7 (Aug. 3 email referring to "gating issue")); Ex. BB (GUC_0005846 (Aug. 9 email referring to open issue on notice costs)); Ex. J (GUC_0001341, at 1344 (Aug. 9 email referring to addition of new parties represented by Andrews Myers, P.C.), 1342 (Aug. 12 email referring to open issues between GUC Trust and unitholders)); Ex. CC (GUC_0001904 (Aug. 10 email stating "on the verge of being done")); Ex. DD (GUC0001792 (Aug. 11 email referring to "a walk away issue" being open)); Ex. EE (BR006032 (Aug. 15 email referring to class certification issue)); Ex. FF (GUC_0000904 (Aug. 16 email (same))); Ex. GG (GUC_0000888 (Aug. 16 email (same))).

[21] See Decl. Ex. E (Williams Tr. 186:2-15 (intended at conference to give deal overlay:  "[t]o the extent that the Judge had significant concerns about the deal, whether it be the $10 billion claim or whether it be the lack of the Rule 23 or any of myriad of issues that he might, depending on what the judge said about those we may or may not have signed that agreement")); 187:21-188:6 ("[T]o the extent … the [J]udge didn't raise any significant issues, we

-8-

deal until the status conference took place and it could assess whether these perceived infirmities would become major obstacles. Contemporaneous evidence corroborates that cautious position: emails dating back to July reflect the parties' intent to have the form of notice "blessed" before spending money to notice the settlement motion; the August 14 Form 10-Q made no mention of having reached agreement; the GUC Trust's draft August 16 letter to the Court—shared with plaintiffs' and the unitholders' counsel—confirmed the GUC Trust's view the agreement was not yet binding because it had not been executed; in emails dated August 16, GUC Trust counsel conveyed its concerns relating to class certification and notice to plaintiffs' counsel—concerns it would preview at the August 17 conference; and the unitholders' counsel told the Court on August 17 exactly what the GUC Trust says, i.e., that the original purpose of the conference was to "*preview* the settlement" with the Court and gauge its reaction.[22] In acting as it did, the GUC Trust exercised the right for which it purposely negotiated in § 3.1 to not be bound without all parties affixing their signatures.[23]

---

were intending to sign the agreement. To the extent the Judge raised huge issues and said you've got a Rule 23 problem here or you've got a $10 billion claim I'm never going to allow, at that time we didn't intend on signing."); 191:21-192:3 ("[O]ur intention was not to sign the agreement until after—even if we didn't have anything from [N]ew GM, if [N]ew GM had never shown up, our intention was at least to wait until after that status conference."); 193:15-20 (same)); Ex. U (Andrews Tr. 158:10-16 (same)); Ex. G (Martorana Tr. 204:7-23 (same)).

[22] Decl. Ex. II (GUC_0004498, 4502 (July 10 email: "[W]e need to have the form of notice blessed before we give it …. [T]his requires a separate motion re notice procedures and deadlines. Why spend the money on notice only to find out at the hearing that Judge Glenn does not like what we did")); Ex. M (Aug. 14 Form 10-Q at 42); Ex. N (GUC_0000905 (Aug. 16 email to plaintiffs' counsel attaching letter stating agreement was not binding)); Ex. FF (GUC_0000904 (Aug. 16 email requesting "update on class cert issue discussed the other day")); Ex. O (GUC_0000898 (Aug. 16 email: "We are gonna add 'and preview potential notice procedures' [to Court letter]" )); Ex. EE (BR006032 (Aug. 15 email referring to class certification issue)); Ex. FF (GUC_0000904 (Aug. 16 email (same))); Ex. GG (GUC_0000888 (Aug. 16 email (same))); Decl. Ex. OO (Tr., Hearing, Aug. 17 at 27:21-24 ([UNITHOLDER COUNSEL:] "[t]he purpose of scheduling a status conference … was to preview the settlement, not to argue the merits, but really to preview the noticing procedures"), 28:11-15 ("[W]e wanted to get a sense from Your Honor before we went out and spent $6 million whether Your Honor thought that would be an appropriate scope of notice.")).

[23] See Ciaramella, 131 F.3d at 325 ("By not signing, [Ciaramella] demonstrated that he withheld such consent."); Winston, 777 F.2d at 80-83 ("[I]f either party communicates an intent not to be bound until he achieves a fully

### C. Factor 3: Consistent With New York Law, Unexecuted Settlement Agreement Is Type That Must Be Reduced To A Signed Writing

6. New York law governs and requires that "[a]n agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered." N.Y.C.P.L.R. § 2104.[24]

### D. Factor 4: Parties Did Not Partially Perform Alleged Agreement

7. Despite plaintiffs' argument to the contrary, "preparing a written stipulation of settlement and/or mailing it … [do not] constitute[] partial performance." Smith, 2015 WL 866893, at *6. Additionally, the material terms of the parties' alleged agreement and the GUC Trust's acceptance of them were never announced in open court, and the GUC Trust declined to proceed with the purported settlement prior to the August 17 conference.[25]

---

executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract"); R.G. Group, 751 F.2d at 74 (same); Stetson v. Duncan, 707 F. Supp. 657, 665 (S.D.N.Y. 1988) (parties nor counsel "ever thought their agreement would be 'final' prior to their clients' signatures on it").

[24] See Ciaramella, 131 F.3d at 326 (agreement's complexity confirms parties would not bind themselves orally); Winston, 777 F.2d at 83 (settlement agreements should be in writing); R.G. Group, 751 F.2d at 77 (With $80 million "at stake[,] a requirement that the agreement be in writing and signed simply cannot be a surprise to anyone"); Bonnette v. Long Island Coll. Hosp., 3 N.Y.3d 281, 286 (2004) (§ 2104 "on its face" permits no exceptions); Defeo v. Civitano, 756 N.Y.S.2d 879 (2d Dep't 2003) (unsigned release not effective). Plaintiffs' case, Forcelli v. Gelco Corp., examined the unrelated issue of whether an email in which the author purposely signed its name constituted subscription to a settlement. See 972 N.Y.S.2d 570, 575-76 (2d Dep't 2013) (email message "contained [attorney's] printed name at the end … as opposed to an 'electronic signature'" which manifested "an intent that the name be treated as a signature"). See Decl. Ex. G (Martorana Tr. 206:19-207:4 (signature block is affixed automatically to all emails)).

[25] See Enforcement Mot. ¶¶ 38-39; Decl. Ex. C (Weintraub Tr. 91:9-92:17); R.G. Group, 751 F.2d at 75 (performance must be "accepted by the party disclaiming the contract"); Grgurev v. Licul, 2016 WL 6652741, at *5 (S.D.N.Y. Nov. 10, 2016) (partial performance requires "some actual performance of the contract"); Balaban-Krauss, 2014 WL 2927289, at *3 ("[T]he exchange of various proposals regarding the language in the settlement agreement and release was not performance of an existing contract, but rather was part of the negotiations concerning a written agreement which was by the terms binding only when executed by the parties."); Sprint, 5 F. Supp. at 333-34 (counsel informing court that "parties expected the signing of the Settlement Agreement" was not binding when "the terms of the agreement were not discussed or agreed on the record"); Langreigh v. Grenbaum, 775 F. Supp. 2d 630, 636 (S.D.N.Y. 2011) ("[I]f one of the parties sought to repudiate the agreement before partial performance, the fact that the other side persisted in performing would have little weight.").

-10-

## CONCLUSION

For the forgoing reasons, the Enforcement Motion should be denied.

Dated:  New York, New York
November 28, 2017

Respectfully submitted,

By: /s/ **JAMES C. TECCE**

| | |
|---|---|
| Arthur J. Steinberg | Susheel Kirpalani |
| Scott Davidson | James C. Tecce |
| **KING & SPALDING LLP** | Julia M. Beskin |
| 1185 Avenue of the Americas | Jordan Harap |
| New York, New York  10036 | **QUINN EMANUEL URQUHART & SULLIVAN LLP** |
| Tel:  212-556-2158 | 51 Madison Avenue |
| Tel:  212-556-2158 | New York, New York  10010 |
| | (212) 849-7199 |

*Counsel to General Motors LLC*

-11-