# Exhibit B

Page 1

1  UNITED STATES BANKRUPTCY COURT
   SOUTHERN DISTRICT OF NEW YORK
2  _____
3  In re:
4  MOTORS LIQUIDATION COMPANY, et al.,
   f/k/a General Motors Corp., et al.,
5
                    Debtors.
6
   Cast No.: 09-50026 (MG)
7  _____
8
                    November 8, 2017
9                   10:02 a.m.
10
11
12
13       DEPOSITION of EDWARD
14  WEISFELNER, held at the offices of
15  BROWN RUDNICK LLP, 7 Times Square, New
16  York, New York before Wayne Hock, a
17  Notary Public of the State of New York.
18
19
20
21
22
23
24
25

Page 18

1 more specific?
2   A.   Not as to each and every one
3 of the ancillary documents. I think it
4 was sometime during the period of my
5 best guess is --
6   Q.   Please don't guess.
7   A.   Well, then I don't know.
8   Q.   Are there documents you could
9 review that would enable you to answer
10 this question more specifically?
11   A.   My guess is I recall seeing a
12 series of transmittal e-mails that may
13 more specifically address the timing of
14 when all the parties signed off on all
15 of the documents that constitute
16 Exhibit 3.
17   Q.   Okay.
18       We may get to those in a
19 moment.
20       Let me ask you the same
21 question or same series of questions,
22 please, about Exhibit J to your
23 declaration.
24       What is that?
25   A.   Exhibit J appears to be the

Page 19

1 parties' agreement on the form of a
2 claims estimation order that they would
3 submit and ask the court to enter.
4   Q.   Was Exhibit J, the draft
5 proposed claims estimate order, an
6 exhibit to the settlement agreement?
7   A.   I believe it was.
8   Q.   When was the text of Exhibit
9 J finally agreed upon?
10   A.   The same answer as I gave you
11 for the preceding exhibit.
12   Q.   What is Exhibit K to your
13 declaration, please?
14   A.   This was the joint motion
15 between and among the signatory parties
16 to the settlement agreement in effect
17 asking the court to approve the
18 settlement agreement and to estimate
19 the aggregate allowed general unsecured
20 claims.
21       MR. GONZALES: Mitch, this is
22   Rudy Gonzales. Excuse me for just
23   one moment.
24       MR. KARLAN: Sure.
25       MR. GONZALES: Ask the

Page 20

1 videographer or the court reporter
2 to activate our screen. It's just
3 like you have to do it with a mouse
4 on your computer, sometimes it goes
5 to a blank screen on this.
6       There you go. Thank you very
7 much. I don't know if we can count
8 on your end when it does that, but
9 keep an eye. I'll try not to
10 interrupt.
11       MR. KARLAN: Are you good now?
12       MR. GONZALES: Yes, we are.
13 Thank you.
14   Q.   Was Exhibit K to your
15 declaration an exhibit to the
16 settlement agreement?
17   A.   I believe it was.
18   Q.   When were the -- when was the
19 text of Exhibit K finally agreed upon?
20   A.   Probably within the same time
21 frame as the other exhibits you've
22 asked me about, although my
23 recollection is that the text of this
24 particular exhibit may have preceded
25 text of the form orders. In other

Page 21

1 words, agreement on the exact text may
2 have come before agreement on what I'll
3 call some of the other ancillary
4 exhibits.
5   Q.   Now, on page thirty-one of
6 Exhibit K to your declaration begins
7 the signature block for the document.
8       Do you see that?
9   A.   No.
10       Where am I looking again?
11   Q.   Page thirty-one.
12   A.   Of?
13   Q.   Exhibit K to your
14 declaration.
15   A.   Exhibit K to my declaration
16 and now page thirty-one. This is the
17 motion itself. I see thirty-one, yes.
18   Q.   Do you see that the document
19 was to be at some point signed by you
20 or someone from your firm?
21   A.   I see that the signature
22 block is set up for either myself or
23 Mr. Steel from Brown Rudnick.
24   Q.   And on the copy of this
25 document that is attached to your

6 (Pages 18 - 21)

Page 22

1  declaration, the signature line says
2  slash S slash draft.
3      Do you see that?
4   A.  I see that.
5   Q.  What is indicated by that?
6   A.  I don't know.
7   Q.  What is it anticipated at
8  some point that document would be
9  signed?
10  A.  If it wasn't, in fact,
11 signed, the clear anticipation was that
12 it was going to be signed, yes.
13  Q.  Is it your testimony that it
14 was signed?
15  A.  No, I don't know if it was
16 signed or not.
17  Q.  Would you go back, please, to
18 Exhibit H which is what you've
19 described as the agreement itself.
20  A.  Exhibit H.
21  Q.  Yes, sir.
22  A.  Okay.  I'm there.
23  Q.  Would you turn to page
24 nineteen of Exhibit H, please.
25  A.  Yes, sir, I'm there.

Page 23

1   Q.  On the copy of this document
2  that is attached to your declaration,
3  all of the signature lines on pages
4  nineteen and twenty are blank; is that
5  right?
6   A.  On this version, yes.
7   Q.  Were these signature lines
8  ever filled in, that is did anybody
9  ever sign this?
10  A.  I can't respond for each and
11 every signature block.  The answer is I
12 don't know.
13  Q.  Did you ever sign it?
14  A.  I don't recall.
15  Q.  Did you -- have you looked
16 for any copies of this document that
17 have your signature on them?
18  A.  No, I have not.
19  Q.  Okay.
20     Do you know whether --
21     MR. KARLAN:  Withdrawn.
22  Q.  Did you ever see any
23 signatures of anybody else on this
24 document?
25  A.  Not that I can recall.

Page 24

1   Q.  Would you look at Exhibit P
2  to your declaration, please.
3   A.  I'm there.
4   Q.  Can you tell me what this is,
5  please.
6   A.  Yes, this was the agreed-upon
7  form of the motion seeking court
8  approval of the notice procedures that
9  the parties had otherwise agreed to.
10  Q.  Was this Exhibit P to your
11 declaration on exhibit to the
12 settlement agreement?
13  A.  I believe it was, although
14 I'm not certain.
15  Q.  When was the text of this
16 document finally agreed upon?
17  A.  The same time frame, early
18 August sometime before the I want to
19 say 12th or 13th of August.  But again,
20 it could have been among the latter
21 documents, the final wordsmithing of
22 which came after the more substantive
23 documents.
24  Q.  Does that mean that you can't
25 say whether this document was finalized

Page 25

1  before or after the 13th of August?
2   A.  I can't say with specificity
3  on exactly what date.  My best
4  recollection is that, as with all of
5  the documents constituting Exhibit 3,
6  they were done and signed off on I
7  think somewhere around the ninth,
8  tenth, eleventh, or twelfth, somewhere
9  in that time frame.
10  Q.  Would you turn, please, to
11 page -- let's look at page eleven,
12 please, of Exhibit P.
13  A.  I see it.
14  Q.  Was a signature ever placed
15 on the signature line on page eleven,
16 to your knowledge?
17  A.  I don't know but I don't
18 think so.
19  Q.  And then if you'd just flip a
20 few more pages on that same document,
21 there's a page that's blank but says
22 Exhibit A.
23     Do you see that?
24  A.  Yes.
25  Q.  And the next page has an

Page 26

1  order, a drafted order?
2  A. Yes.
3  Q. And then if we go to Exhibit
4  B, just keep flipping pages.
5  A. Exhibit?
6  Q. B.
7  A. Oh, B to this document.
8  Yeah.
9  Q. Do you see it says, "long
10 form notice?"
11 A. I do.
12 Q. Do you know where the long
13 form notice is?
14 A. Do I know where it is?
15 Q. Yes, sir.
16 A. I'm sure I could find it.
17 Q. You believe it exists?
18 A. Oh, yeah, I know it exists.
19 Q. Do you know why it's not
20 included in your declaration?
21 A. I just think -- the answer is
22 I don't know why it's not included in
23 the declaration.
24 Q. Okay.
25    Staying with Exhibit P on

Page 27

1  your declaration, would you look at
2  page two.
3  A. Of?
4  Q. Exhibit P.
5  A. I'm there.
6  Q. Do you see paragraph number
7  one on page two?
8  A. No.
9  Q. Let's see.
10    I'm on Exhibit P. The first
11 page is blank and just says Exhibit P
12 on it, nothing else.
13 A. Oh, I was in the wrong
14 exhibit. I'll try taking the clip off
15 this time.
16    MR. WISSNER-GROSS: Can you
17    restate what the question is?
18    MR. KARLAN: Let him get to
19    the page.
20    THE WITNESS: Let me get to P
21    and then I can better listen.
22    I'm at P.
23 Q. Would you look at page two of
24 P, please.
25 A. Okay.

Page 28

1  Q. Would you look at paragraph
2  number one on page two.
3  A. Yes.
4  Q. It reads, "on August," and
5  then there are brackets with a blank,
6  "2017, after good faith arm's length
7  negotiations, the signatory plaintiffs
8  and the GUC Trust entered into the
9  settlement agreement."
10 A. Yes.
11 Q. Did you ever see a version of
12 Exhibit P in which that date was filled
13 in?
14 A. I don't think so.
15 Q. Was there ever agreement with
16 anyone on GUC Trust's side as to what
17 date was going to be filled in in that
18 blank?
19 A. I believe the parties
20 contemplated that, once we got signoff
21 from Gibson Dunn on the final form of
22 all of the documents, whatever date
23 that was, that the brackets could be
24 filled in utilizing that date.
25    MR. KARLAN: Move to strike.

Page 29

1  Q. Let me ask you to try to
2  focus on the question that I'm asking.
3     MR. WISSNER-GROSS: Hold on,
4     he's giving you an appropriate
5     response --
6     MR. KARLAN: It's just a
7     motion, it's just a motion, I'm
8     not --
9     MR. WISSNER-GROSS: You don't
10    have to lecture me, sir.
11    MR. KARLAN: Well, then stop
12    talking.
13    MR. WISSNER-GROSS: You know
14    something? You can stop lecturing
15    me. I've been listening to all
16    your questions. I haven't
17    interposed objections. When I see
18    fit to interpose an objection, I
19    will.
20    MR. KARLAN: This isn't an
21    objection. I don't recognize this.
22    I have never seen it before.
23 Q. Did anyone from the GUC Trust
24 ever tell you what date they wanted to
25 go in that blank?

Page 30

1   A.  Tell me?  No.
2   Q.  To your knowledge, did anyone
3 from the GUC Trust ever tell you --
4       MR. KARLAN:  Withdrawn.
5   Q.  To your knowledge, did anyone
6 from the GUC Trust ever tell anyone
7 from your law firm what date should go
8 in that blank?
9   A.  I think the assumption among
10 all of the parties was that, once the
11 deal documents were final legal signed
12 off on, that was the date that could be
13 inserted into the brackets.
14  Q.  But no one from my firm ever
15 told you that; is that fair?
16  A.  No one from your firm ever
17 personally told me.
18  Q.  And to your knowledge, no one
19 from my firm ever told anyone from your
20 firm?
21  A.  I don't have any knowledge
22 one way or the other.
23  Q.  Can we go back, please, to
24 Exhibit H, to your declaration.
25  A.  I am there.

Page 31

1   Q.  Would you look at page one of
2 the exhibit.
3   A.  Yes.
4   Q.  Do you see the very first
5 line of text reads, "this settlement
6 agreement," which is defined as the
7 agreement, "dated as of August blank,
8 2017 among."
9       Do you see that?
10  A.  I see that.
11  Q.  Have you ever seen a version
12 of this document that has that date
13 filled in?
14  A.  I don't think so.
15  Q.  Did anyone representing the
16 GUC Trust ever tell you what date they
17 believed should go in that blank?
18  A.  The same answer to the
19 questions you've posed with regard to
20 the prior exhibit.  We all of us
21 assumed that the date that could go
22 into the agreement could be as early as
23 the date when all the parties signed
24 off on all of the operative documents.
25  Q.  But no one from Gibson Dunn

Page 32

1 ever told you that; is that fair?
2   A.  No one from Gibson Dunn ever
3 -- they told me exactly what I just
4 said they told me, but no one gave me a
5 specific date to fill in.
6   Q.  Who from Gibson Dunn made the
7 statement to you that you're
8 attributing to Gibson Dunn?
9   A.  All of them, every lawyer at
10 Gibson Dunn that worked on this deal
11 and everyone on our side had an
12 identical understanding that the
13 agreement would be dated as early as
14 the date when the final documentation
15 had all been signed off on.
16  Q.  And putting aside for the
17 moment any assumptions you may have
18 made about what other people were
19 thinking, did, for example, Mr.
20 Williams from my firm ever say to you
21 what date should go in that blank?
22  A.  Not to my recollection, no.
23  Q.  To your knowledge, did he
24 ever say it to anyone else from your
25 firm?

Page 33

1   A.  I couldn't tell you
2 specifically one way or the other.
3   Q.  Did Mr. Martorana ever tell
4 you what date he thought should go in
5 that blank?
6   A.  Not that I can recall.
7   Q.  To your knowledge, did he
8 ever say that to anyone else at your
9 firm?
10  A.  I don't know.
11  Q.  Would you look at page
12 fifteen of Exhibit H to your
13 declaration, please.
14  A.  I'm at page fifteen.
15  Q.  Would you look at section
16 3.1.
17      Would you follow along as I
18 read the first sentence?  The title is
19 Settlement Effective Date.  "This
20 agreement shall become effective and
21 binding on the parties on the date on
22 which this agreement is fully executed
23 by each of the parties."
24      Do you see that?
25  A.  I do.

9 (Pages 30 - 33)

Page 34

1  Q. What date is that?
2  A. What date is what?
3  Q. What date was this agreement
4  fully executed between the parties?
5  A. I don't believe so it was.
6  Q. Would you look at section
7  3.2(b) on page fifteen of Exhibit H to
8  your declaration which is entitled
9  Termination By the GUC Trust.
10 A. I'm there.
11 Q. Would you follow along with
12 me? I'm just going to read the first
13 few clauses.
14     "Termination by the GUC
15 Trust. This agreement shall be
16 terminable at the option of the GUC
17 Trust in the event that; A, the notice
18 order is not entered on or before
19 thirty days after execution of this
20 settlement agreement," and it goes on
21 from there.
22     Do you see that?
23 A. I do.
24 Q. What date was thirty days
25 after the execution of this settlement

Page 35

1  agreement?
2  A. This is pretty funny. As far
3  as I know, the agreement wasn't
4  executed.
5  Q. Thank you.
6     Who were you representing in
7  negotiating Exhibit H?
8     MR. KARLAN: Actually, I'm
9  sorry, let me withdraw the
10 question.
11 Q. Were you involved in the
12 negotiations of Exhibit H?
13 A. Yes, I was.
14 Q. And who else from Brown
15 Rudnick was involved?
16 A. Primarily Howie Steel.
17 Q. Anyone else?
18 A. We had some associate
19 assistance but not in the negotiations,
20 I'd say in the drafting.
21 Q. Okay.
22     Who were you and Mr. Steel
23 representing in the negotiations?
24 A. We together with the law firm
25 of Stutzman --

Page 36

1  Q. Bromberg Esserman and Plifka?
2  A. That's it.
3     Were designated bankruptcy
4  counsel for the economic loss co-lead
5  plaintiffs in the MDL.
6  Q. Let me see if we can do this
7  more swiftly, and I apologize that I'm
8  clumsy about this.
9     Can you look at page nineteen
10 of Exhibit H which is the signature
11 blocks.
12 A. I'm there.
13 Q. So under your firm's name, it
14 says on behalf of the plaintiffs.
15 A. Right.
16 Q. Who is that?
17 A. It's a defined term in the
18 agreement.
19 Q. Okay. Let's look at that
20 then.
21     Would you look at page nine
22 of Exhibit H, section 1.45.
23     Tell me when you're on that
24 page.
25 A. I'm at that page and at that

Page 37

1  definition.
2  Q. Can you follow along? I'm
3  going to read the first parts of it.
4     "Plaintiffs means the
5  ignition switch plaintiffs, the
6  non-ignition switch plaintiffs, and the
7  preclosing accident plaintiffs
8  including all plaintiffs, whether named
9  or unnamed, including unnamed members
10 of a putative class covered by any of
11 the late claims motions, all plaintiffs
12 represented by counsel that is
13 signatory hereto and any other party
14 who, one, as of July 10, 2009 suffered
15 an economic loss by reason of their
16 ownership or lease of an old GM vehicle
17 with an ignition switch defect included
18 in recall number 14V-047," and it goes
19 on from there to expand the definition
20 even more so.
21     Were you representing all of
22 the people I've just described?
23 A. No.
24     When you say you just
25 described, to the extent that you've

10 (Pages 34 - 37)

Page 38

1 included the balance of the
2 definition --
3   Q.   Yes.
4   A.   Then that -- the definition
5 of plaintiffs in 1.45 went beyond the
6 scope of the entities that I believe I
7 was representing.
8   Q.   Okay.
9       Then if we could please go
10 back to the signature page which is
11 nineteen, under yours and Mr. Steel's
12 name it says title Designated Counsel
13 For the Ignition Switch Plaintiffs and
14 Certain Non-Ignition Switch Plaintiffs
15 in the Bankruptcy Court.
16       Do you see that?
17   A.   Yes, I do.
18   Q.   How many such people are
19 there that you were representing in
20 that title?
21   A.   Many.
22   Q.   And were you hoping to act on
23 behalf of a class that had not yet been
24 certified?
25   A.   No.

Page 39

1   Q.   Were you acting on behalf of
2 a class that was certified?
3   A.   No.
4   Q.   With --
5   A.   Not for the purposes of this
6 settlement agreement.
7   Q.   Okay.
8       So were you acting on behalf
9 -- did you believe you were acting on
10 behalf of all the people described in
11 that title?
12   A.   No.
13   Q.   Can you tell me with any more
14 specificity than you've already had who
15 you thought you were representing in
16 negotiating this agreement?
17   A.   Sure.
18       To start with, I was
19 representing the economic loss co-lead
20 counsel in the MDL as I've previously
21 indicated, and beyond that I believed I
22 was through that representation
23 representing the interests of, at a
24 minimum, the named plaintiffs on the
25 economic loss side of the MDL.

Page 40

1   Q.   When you refer to the
2 economic loss co-lead counsel, and
3 please forgive me that I'm going to
4 little slowly here, is that Stutzman
5 firm or is that somebody else?
6   A.   No, it's the Hagens Berman
7 firm and the Lieff Cabraser firm.
8   Q.   In your understanding, is the
9 status of the Stutzman firm identical
10 to your status?
11   A.   Yes.
12   Q.   Do you have a written
13 engagement agreement with the Hagens
14 firm?
15   A.   The answer is I don't recall.
16   Q.   Okay.
17       Do you have a written
18 engagement agreement with anybody in
19 connection with the Motors liquidation
20 case?
21   A.   If it's not with Steve Berman
22 or Liz Cabraser's firm, then I don't
23 have one.  But  I just don't recall
24 whether we have a written engagement
25 agreement from either.  I think we do.

Page 41

1 In fact, now that I think about it, I'm
2 sure we do.
3   Q.   Okay.
4   A.   And again, the technical
5 detail, since, you know, it involved an
6 MDL and their co-lead position, I'm not
7 sure what the parties to that retention
8 agreement are but I know that it covers
9 our work and our entitlement at some
10 time to get paid.
11   Q.   When you say you don't know
12 who it's with, on one side it's with
13 Brown Rudnick?
14   A.   Correct.
15   Q.   And on the other side, is it
16 your testimony that it's either or both
17 of Hagens and Lieff?
18   A.   I can't be sure because
19 there's an entire organizational
20 structure on the plaintiff's side of
21 the MDL and I'm not sure if it's with
22 the executive committee, with the --
23 I'm just not sure who the other side of
24 the engagement letter it was with.
25   Q.   Do you know, and I don't mean

11 (Pages 38 - 41)

Page 42

1  to infer that you should, I'm just
2  trying to test so I know when we're
3  done, do you know who the Hagens firm
4  represents?
5      A.  I know that they were
6  appointed by Judge Furman as co-lead
7  counsel in the MDL.  I know that they
8  have or are involved in other
9  GM-related litigation that I think is
10 outside the MDL, and I've come to know
11 that they represent certain named
12 plaintiffs in litigation against GM.
13     Q.  Is either the Hagens firm or
14 the Lieff firm -- and I apologize if
15 I'm mispronouncing those firms' names
16 -- certified class counsel in the MDL?
17     A.  I don't know what that means
18 so I can't answer it.  They were
19 appointed co-lead counsel by Judge
20 Furman at a hearing that I was present
21 at.  Beyond that I don't know.
22     Q.  Do you understand that Judge
23 Furman gave them administrative
24 responsibilities only?
25     A.  No, I don't understand that.

Page 43

1      Q.  Do you believe that Judge
2  Furman created an attorney-client
3  relationship for them with people
4  they've never met?
5      A.  You're above my pay grade.
6      Q.  Fair enough.
7          Exhibit H, and it will take
8  me a minute to find it, has the
9  releases in it; does it not?
10     A.  I believe it does.  But I'd
11 appreciate being --
12     Q.  I'm looking for them myself.
13 Give me a moment.
14         Would you look at page
15 eleven.
16     A.  Yes.
17     Q.  There's a little paragraph B
18 towards the top of the page.
19     A.  Yes.
20     Q.  Maybe you need to have the
21 context here.  Turn back to page ten.
22     A.  I don't think I'll need it.
23 Ask the question.
24     Q.  Do you see in little B
25 there's language that describes what

Page 44

1  the terms of the settlement order are
2  supposed to be.
3          Do you see that?
4      A.  I believe so.
5      Q.  And one of the terms is that
6  it has to impose, "a complete and
7  irrevocable waiver and release on the
8  part of all plaintiffs with respect to
9  any and all rights."
10         Do you see that?
11     A.  I don't see that specifically
12 but if you give me a little bit
13 better --
14     Q.  I'm sorry, I apologize.  Line
15 four.
16     A.  Of paragraph B?
17     Q.  Correct.
18     A.  "Imposes a complete and
19 irrevocable waiver and release," yes.
20     Q.  Did you have authority from
21 any claimant to give such a release?
22     A.  No, the authority would stem
23 from all claimants getting notice and
24 an opportunity to be heard and the
25 authority would emanate from the

Page 45

1  court's entry of an order based on due
2  process afforded to all affected
3  parties.
4      Q.  In your understanding of the
5  terms of Exhibit H, would ignition
6  switch plaintiffs have the right to
7  object at the 9019 hearing?
8      A.  Absolutely.
9      Q.  What obligations did you
10 believe the GUC Trust was undertaking
11 if we assume for the moment the
12 settlement agreement was enforceable?
13     A.  They were undertaking any
14 number of obligations, more
15 definitively set forth in the agreement
16 itself.  But off the top of my head, I
17 can tell you they had the obligation to
18 make available $15 million in the event
19 that the settlement agreement were
20 approved, they had the obligation to
21 fund the cost of notice, which I know
22 was between five and six million and I
23 think we ultimately settled on six
24 million, they had the obligation to
25 support entry of the order approving

12 (Pages 42 - 45)

Page 46

1  the settlement agreement, they had the
2  obligation to support entry of the
3  claims estimation order, and then they
4  had any number of ancillary obligations
5  which they've subsequently breached.
6     Q.   Have you finished your
7  answer?
8     A.   Yeah, I think so.
9     Q.   Was it anticipated by you in
10 August of 2017 that manual ink
11 signatures would at some point be
12 placed on pages nineteen and twenty of
13 Exhibit H?
14    A.   To the extent I ever thought
15 about it, yes.
16    Q.   Why?
17    A.   Why what?
18    Q.   Why did you think that was
19 appropriate or necessary or desirable?
20         MR. WISSNER-GROSS: Objection.
21         MR. KARLAN: I'll withdraw the
22 question.
23    Q.   Did you think that was
24 appropriate, necessary, or desirable?
25    A.   Yes.

Page 47

1     Q.   Why?
2     A.   And the reasons were that
3  these were formal written pleadings
4  that were being filed with the federal
5  bankruptcy court on the docket for the
6  benefit of many hundreds of thousands
7  if not millions of potentially affected
8  parties and for any or all of that to
9  be a matter of record before the
10 bankruptcy court, I think that motions
11 and related papers including the
12 settlement agreement ultimately, as a
13 matter of record, as a ministerial act,
14 needed to be signed.
15    Q.   Thank you.
16         Bear with me one second.  I
17 need to get a document out.
18         Mr. Weisfelner, I'm going to
19 follow your lead for whenever you want
20 breaks; okay?
21    A.   Sure.
22         By the way, I don't know why
23 I'm bothering to do this, but we went
24 through a list of what I thought the
25 GUC Trust's obligations were and I

Page 48

1  think among them were significant ones,
2  was 3.6 which indicated in sum and
3  substance that none of the parties
4  directly or indirectly would proceed in
5  any manner against the other or take
6  any action inconsistent with the terms
7  of this agreement.  And I certainly
8  think that the GUC Trust violated that
9  provision of the agreement.
10    Q.   So while we're on 3.6 which
11 is entitled No Litigation, it, if it
12 were part of a final enforceable
13 contract, would have prohibited any
14 intended beneficiary of the agreement
15 from taking certain actions; correct?
16    A.   I believe that's what it
17 reads, yes.
18    Q.   Did you have the authority to
19 bind anybody to that agreement?
20    A.   Again, from my perspective
21 with regard to anyone other than the
22 signatory parties, only after the court
23 approved the settlement agreement.  But
24 with regard to the intended signatory
25 parties and in particular the GUC

Page 49

1  Trust, their agreement, as I understand
2  it, reached with General Motors
3  sometime around the 15th or 16th of
4  August was in direct violation of this
5  provision of the agreement, which I
6  think was enforceable as among the
7  parties once the final settlement
8  documents were all signed off on.
9     Q.   So is the following statement
10 correct?  Since you believe that
11 Exhibit H is presently a binding
12 contract, do you believe that all
13 intended beneficiaries of this contract
14 are now bound by 3.6?
15    A.   No, as I just said before, I
16 think the intended beneficiaries of the
17 settlement agreement, i.e. the
18 plaintiffs defined large, could only be
19 bound by the terms of the settlement
20 agreement upon the entry of an
21 appropriate order by the bankruptcy
22 court approving the settlement after
23 notice and an opportunity to be heard.
24 However, I do believe that the
25 signatory parties had different

Page 50

1  obligations under the terms of 3.6.
2  Q. Is there any -- I'm sorry,
3  were you done? I didn't mean to speak
4  over you.
5  A. Yes.
6  Q. Is there any particular
7  language in 3.6 that you're relying on
8  for your testimony that the intended
9  beneficiaries are not bound by 3.6
10 until after the court enters the notice
11 order?
12 A. I don't know that there's any
13 specific language in 3.6 that leads me
14 to that conclusion other than my
15 general knowledge of how people get
16 bound by bankruptcy court orders.
17 Q. So would you agree with the
18 following statement: Had Exhibit H
19 become a binding contract during the
20 period prior to the approval of the
21 notice order and perhaps thereafter,
22 the intended beneficiaries are not
23 bound by section 3.6?
24 A. I'll do it one more time.
25 Unless and until there is an entry of

Page 51

1  an order approving the settlement
2  agreement, I don't think that any of
3  the intended beneficiaries are bound.
4  And what they were becoming bound to
5  was the release and the waiver
6  provisions.
7       I think the no litigation
8  clause was specifically directed
9  towards the signatory parties with the
10 intended beneficiaries being
11 beneficiaries of that agreement.
12     MR. KARLAN: Could you mark
13   this as Exhibit 4, please.
14     THE WITNESS: Are we done
15   with three?
16     MR. KARLAN: Yes, sir.
17     (Whereupon, an e-mail dated
18   June 6, 2017 was marked Exhibit 4
19   for identification.)
20 Q. Do you have Exhibit 4 in
21 front of you, sir?
22 A. I do.
23 Q. So Exhibit 4 has an e-mail
24 transmittal cover e-mail and then a
25 document attached.

Page 52

1       Take as much time as you want
2  to look at any of this, but I'll just
3  give you my question so you can read it
4  with that in mind.
5       Have you ever seen the
6  attachment to this exhibit which is
7  entitled Settlement Agreement?
8  A. I presume that at or about
9  the time I saw the document that's
10 attached, yes.
11 Q. And did you play some role in
12 drafting it?
13 A. In drafting it?
14 Q. Yes, sir.
15 A. I can't recall. I certainly
16 played a significant role in
17 negotiating it and in formulating it
18 and passing it onto the Akin firm.
19 Q. Do you believe you reviewed
20 this draft before it was sent to the
21 Akin firm?
22 A. I can't recall but I'd be
23 surprised if I hadn't.
24     (Whereupon, an e-mail dated
25   June 9, 2017 was marked Exhibit 5

Page 53

1   for identification.)
2     THE WITNESS: Are we done with
3   this?
4     MR. KARLAN: I'm not going to
5   ask you any more questions about
6   it, but you may keep it in front of
7   you if you wish.
8  Q. Take as much time as you wish
9  to look at Exhibit 5. My question will
10 be: Did you receive this e-mail and the
11 attachment at or about the time it's
12 dated?
13 A. I can't specifically recall
14 but I don't have any reason to doubt
15 it.
16 Q. Okay.
17     Would it have been your --
18     MR. KARLAN: Withdrawn.
19 Q. Was it your practice to read
20 each iteration of the drafts as they
21 went back and forth?
22 A. Was it my practice to read
23 each iteration? I don't know how to
24 respond to that. I looked at -- it was
25 my practice to review most of it but

14 (Pages 50 - 53)

Page 62

1  fifteen of Exhibit H to your
2  declaration.
3    A.   You're doing thirteen
4  compared to fifteen?
5    Q.   Correct. Just one sentence.
6  This won't take long.
7         For the first sentence of
8  section 3.1 on Exhibit 6, which is the
9  June 15 markup, reads as follows: "This
10 agreement shall become effective and
11 binding on the parties on the date on
12 which this agreement is fully executed
13 by each of the parties."
14        Did I read that correctly?
15   A.   You certainly did.
16   Q.   All right.
17        The first sentence of section
18 3.1 in Exhibit H to your declaration
19 which you identified as the final
20 agreement reads, "this agreement shall
21 become effective and binding on the
22 parties on the date on which this
23 agreement is fully executed by either
24 of the parties."
25        Did I read that correctly?

Page 63

1    A.   You certainly did.
2    Q.   Can we agree that between
3  June 15 and whenever you believe in
4  August the agreement was finalized no
5  changes were made in that sentence in
6  any draft?
7    A.   I agree.
8         MR. KARLAN: Let's take a
9     five-minute break, please.
10        THE VIDEOGRAPHER: We're now
11    off the record at approximately
12    11:09.
13        (Whereupon a break was taken)
14        THE VIDEOGRAPHER: Back on the
15    record at approximately 11:22.
16   Q.   Sir, just before the break we
17 were looking at section 3.1 in what you
18 believe is the final binding agreement
19 and I read you the first sentence.
20        What did you believe that
21 sentence meant?
22   A.   I believe it meant that the
23 parties contemplated that, for the
24 reasons I indicated before, the
25 agreement would ultimately be executed.

Page 64

1  I think the execution date was also
2  relevant in terms of some of the
3  milestones that were contained further
4  on in the agreement with regard to the
5  timing of obtaining the various orders
6  that the parties were contemplating.
7    Q.   Would you agree with me that
8  section 3.1, among other things, says
9  that the agreement is not binding until
10 it's fully executed by each of the
11 parties?
12   A.   I agree that the language
13 says what it says.
14   Q.   What did you think that
15 language meant?
16   A.   I just told you, I thought it
17 was a ministerial step that the parties
18 had contemplated with regard to
19 specifying a date for the running of
20 our milestones within the agreement.
21   Q.   That's what you think the
22 word "binding" in that sentence means?
23        MR. WISSNER-GROSS: Asked and
24    answered.
25   Q.   Sir?

Page 65

1    A.   Yes.
2    Q.   Would you look, please, at
3  Exhibit 1 to today's deposition which
4  is the provisional set of your
5  interrogatories.
6    A.   I have Exhibit 1.
7         MS. NEWMAN: Can the people on
8     the phone mute their line, please?
9         THE WITNESS: Mitch, I have
10    Exhibit 1 in front of me.
11   Q.   Thank you, sir.
12        Would you look at
13 interrogatory number six which is on
14 page six and then the answer is on page
15 seven.
16   A.   I see it.
17   Q.   In responding to this
18 interrogatory, was your firm
19 interpreting the word "executed" to
20 mean something other than manually
21 signed in ink?
22   A.   I don't know.
23   Q.   Can you point to where the
24 signatory plaintiffs executed the
25 contract, that is can you point to the

17 (Pages 62 - 65)

Page 66

1  document on which that occurs, appears?
2    A.  I can't.
3    Q.  What about Mr. Martorana, can
4  you point to where he --
5    A.  I cannot.
6    Q.  Were you generally -- we're
7  done with that.  Thank you, sir.
8      Were you generally aware that
9  the GUC Trust units are publicly
10 traded?
11   A.  Yes.
12   Q.  Were you generally aware that
13 the GUC Trust trustee had reporting
14 obligations to the federal government?
15   A.  Yes.
16   Q.  Did you try to keep yourself
17 abreast of public filings by the trust?
18   A.  I believe I was kept abreast
19 of public filings, yes.
20   Q.  If the GUC Trust had entered
21 into a binding contract such as Exhibit
22 H to your declaration, do you have a
23 view as to whether it would have been
24 required to file either a K or a Q?
25   A.  I don't have a view one way

Page 67

1  or the other.
2    Q.  Do you know whether they did
3  ever file a disclosure with the federal
4  government stating that they had
5  reached a final agreement with your
6  clients?
7    A.  I don't remember the exact
8  language that they employed in their
9  public filings with regard to the
10 status of the negotiations among the
11 parties.  I believe that the last thing
12 I saw them publish was that they had
13 made -- and this is my words, not an
14 exact quote but they had made
15 substantial progress towards
16 finalization of the agreement.
17   Q.  And that filing to which
18 you're referring was made after the
19 date on which you believe the contract
20 was final; correct?
21   A.  I don't recall the dates of
22 their public filing relative to when I
23 think the agreements had been
24 finalized.
25   Q.  At some point did somebody

Page 68

1  tell you that the GUC Trust was not
2  going to sign any version of Exhibit H
3  to your declaration?
4    A.  I was told that they were
5  backing out of our agreement.
6    Q.  Approximately --
7      MR. KARLAN: Withdrawn.
8    Q.  What's your best recollection
9  as to when you were told that?
10   A.  Oh, boy.  I want to say it
11 was -- I'm sure you can refresh my
12 recollection but my guess it was
13 sometime on the fifteenth.
14   Q.  How did you learn that, that
15 is to --
16   A.  I got a phone call from
17 somebody at Gibson Dunn.
18   Q.  What can you recall was said
19 by either you or anyone else on the
20 phone during that conversation?
21   A.  My recollection is hazy other
22 than being told that the GUC Trust had
23 decided to renege, and I don't recall,
24 Mitch, I'm really guessing as to
25 whether they told us it was based on an

Page 69

1  agreement they had entered into with
2  new GM.
3    Q.  Just so the record is clear,
4  I understand and acknowledge your view
5  that this constituted a reneging but I
6  want the record to be clear nobody on
7  the phone used that word; correct?
8    A.  Oh, I don't know for sure.  I
9  think they may have said something like
10 we're backing out of the agreement.
11 They may not have used the word
12 "renege."  But what I took from that
13 conversation was we're backing out.
14   Q.  Again, you'll certainly have
15 the opportunity to tell everybody what
16 you took from it but I'm trying to find
17 out what you recall being said.
18   A.  I can't recall the specific
19 words.
20   Q.  Did you say to whomever from
21 my firm was on the other end of the
22 phone in words or substance we have a
23 binding contract, you can't back out?
24   A.  I can't recall specifically
25 what words I used in reaction to the

Page 78

1 bankruptcy, were you designated by
2 them?
3   A.  Yes.
4   Q.  Were you designated by any
5 individual plaintiff who may or may not
6 have been -- have had a lawsuit filed
7 or been a member of a putative class?
8   A.  My recollection is that the
9 phraseology "designated counsel" first
10 emanated from Judge Gerber, but
11 specifically the answer to your
12 question is other than potentially the
13 putative class representatives, the
14 answer to your question is no.
15   Q.  Okay.
16       And you testified in response
17 to one of Mr. Karlan's questions, I
18 think, that through the co-lead counsel
19 you were representing the interests of,
20 at a minimum, the named plaintiffs on
21 the economic loss side of the MDL; is
22 that your understanding?
23   A.  That's a fair
24 characterization of my prior testimony
25 and my understanding.

Page 79

1   Q.  That's consistent with your
2 understanding of who you were
3 representing?
4   A.  Yes, sir.
5   Q.  And when you said at a
6 minimum, were there additional -- were
7 the interests of additional plaintiffs
8 other than the named plaintiffs within
9 the scope of your representation, as
10 you understood it?
11   A.  Not that I was specifically
12 aware of at the time or since.
13   Q.  Did you ever have any
14 discussions with any of the named
15 plaintiffs?
16   A.  No.
17   Q.  Did you have any discussions
18 with any plaintiffs who weren't named
19 plaintiffs?
20   A.  Not that I'm aware of.
21   Q.  Did any of the named
22 plaintiffs ever authorize you to
23 conduct settlement negotiations on
24 their behalf or to sign a settlement
25 agreement on their behalf?

Page 80

1   A.  I hope you meant by that
2 question directly.
3   Q.  Yes.
4   A.  No.
5   Q.  Okay.
6       Did any plaintiffs other than
7 named plaintiffs ever authorize you to
8 conduct settlement negotiations on
9 their behalf and enter into a
10 settlement agreement on their behalf?
11   A.  And again you're asking
12 directly?
13   Q.  Correct.
14   A.  No.
15   Q.  You never had any
16 conversations whatsoever or received
17 any authorization whatsoever directly
18 from any plaintiff in any case;
19 correct?
20   A.  Not that they identifies
21 themselves as such.  I can't tell you
22 who I spoke to that may have owned a GM
23 car and gotten screwed as a
24 consequence.
25   Q.  All right.

Page 81

1       Mr. Karlan asked you a number
2 of questions about section 3.2(b) of
3 the settlement agreement.
4       And do you still have
5 Exhibit 3 in front of you?
6   A.  I do.
7   Q.  And I think it was Exhibit H
8 to --
9   A.  I'm sure it was.
10       And what part of it?
11   Q.  The questions were relating
12 to section 2.3(b) which is the --
13   A.  2.3(b)?
14   Q.  Yes, which is the release
15 language of the document.
16   A.  Yes.
17   Q.  Let me know when you're
18 there.
19   A.  "Contains a provision which."
20 Go ahead.
21   Q.  Yes.
22       And Mr. Karlan was asking you
23 specifically about -- I believe about
24 the form of the order that was to be
25 entered and he asked you, among other

21 (Pages 78 - 81)

Page 82

1 things, what authority you had to give
2 a release.
3    Do you recall those
4 questions?
5   A.  No.  Why don't you ask me a
6 direct new question.
7   Q.  What authority did you have
8 to enter into an agreement pursuant to
9 which plaintiffs --
10    MR. WERDER: Withdrawn.
11   Q.  You didn't have an
12 attorney-client relationship with any
13 individual plaintiffs who were members
14 of a putative class and not the named
15 plaintiffs; did you, sir?
16   A.  Not to my knowledge.
17   Q.  All right.
18    So who -- where did you
19 believe that you derived authority to
20 enter into an agreement that would
21 result in such plaintiffs giving a
22 release?
23   A.  I'm going to answer the
24 question but first I want to interpose
25 my own objection given my counsel's

Page 83

1 lack of familiarity with the
2 background.
3    Can you help me understand
4 how this is a phase one issue that's
5 relevant for phase one?  How your last
6 question is a phase one relevant
7 question as opposed to a phase two
8 relevant question?
9   Q.  Well, I don't think I have to
10 explain it.
11   A.  Okay.
12    Then I direct myself not to
13 answer.
14   Q.  Before you interrupted me, I
15 was going to explain it even though I
16 don't think I have to and the question
17 of whether persons who purported to
18 enter into a binding settlement
19 agreement had authority to do so is
20 clearly part of whether there is a
21 binding settlement agreement.
22    MR. WISSNER-GROSS: To the
23    extent you're getting into phase
24    two issues, and I thank the witness
25    for refreshing me, I'm instructing

Page 84

1   him not to answer a question that
2   is phase two-related.  You can ask
3   any and all questions relating to
4   the phase one issues.
5    THE WITNESS:  Let me see if I
6   can't answer your question as it's
7   relevant to phase one.
8   Q.  Good.
9   A.  The plaintiffs' side of this
10 equation believes that it had authority
11 to negotiate and enter into this
12 settlement agreement derived from any
13 number of sources, both the lead
14 counsel's direct relationship with
15 their underlying clients as well as
16 various orders that were entered by
17 judge fur plan in the MDL.  That's
18 where I thought I derived my authority
19 to negotiate and enter into the
20 settlement agreement.
21   Q.  So you derived your authority
22 derivatively from the co-lead counsel
23 in the MDL?
24   A.  I believe that's correct.
25   Q.  And no plaintiff ever

Page 85

1 requested directly that you negotiate a
2 settlement agreement that would
3 ultimately result in a release of their
4 rights; correct, sir?
5   A.  Me personally, the answer to
6 your question is no, no plaintiff ever
7 directed me or instructed me.
8   Q.  Let's take a look, if we
9 could, at Exhibit 6.
10   A.  I'm there.
11   Q.  And in particular if we look
12 at the top of the attached redline of
13 the settlement.
14   A.  Bates 968?
15   Q.  Correct.
16   A.  Yes.
17   Q.  And I think you testified
18 previously that you understood this to
19 be the redline that your firm was
20 sending back -- a redline that your
21 firm was sending back to Akin Gump and
22 to Gibson Dunn; correct?
23   A.  Yes.
24   Q.  And in the redline, and this
25 is using some standard Brown Rudnick

22 (Pages 82 - 85)

Page 86

1 redlining program; correct?
2  A.  I don't know.  I guess so.
3  Q.  And in the redline, is it
4 consistent with your understanding that
5 the title of the document Brown Rudnick
6 Comments 6/15/17 is replacing what
7 previously would have been on the
8 redline draft GDC and AGSHF Initial
9 Comments 6/9/17?
10  A.  I believe so.
11  Q.  So from that redlining, would
12 you infer that the comments that Mr.
13 Steel is sending back are comments on
14 the June 9, '17 draft that --
15  A.  I'd infer that but I couldn't
16 swear to it because again I'm uncertain
17 how the program works and whether there
18 were any intervening drafts and that
19 the redline just didn't reflect that
20 there were comments on the last draft.
21 I don't have any reason to doubt the
22 implication of your question, that
23 being that this reflects our comments
24 to the Gibson Dunn/Akin draft of six
25 days earlier.

Page 87

1  Q.  All right.
2      And that draft I think was
3 Exhibit 5.
4      Do you still have that in
5 front of you?
6  A.  There it is.  I have it, yes.
7  Q.  All right.
8      And I think, based on your
9 prior testimony in response to Mr.
10 Karlan's questions, we're all agreed
11 that section 3.1 as in the documents
12 that were ultimately submitted to the
13 court came into the draft pursuant to
14 the comments of Akin and Gibson Dunn on
15 June 9; correct?
16  A.  I think that's correct.
17  Q.  So your team became aware of
18 the desired addition of section 3.1 on
19 or about June 9; correct, sir?
20  A.  At or about the receipt of
21 this markup, there was inserted for the
22 first time the settlement effective
23 dated concept, yes.
24  Q.  Okay.
25      Do you recall when you

Page 88

1 personally became aware of that?
2  A.  No.  I don't think I -- I
3 don't think that the inclusion of that
4 provision was much of a moment to any
5 of us other than representing
6 boilerplate language.
7  Q.  So it wasn't very important
8 to you?
9  A.  No.
10  Q.  Did you personally have any
11 discussions of the language in section
12 3.1 with anyone from Akin or Gibson
13 Dunn?
14  A.  Ever?
15  Q.  Ever.
16  A.  In connection with this
17 litigation, yes.  But before the
18 litigation, not that I can recall.
19  Q.  And when you say before the
20 litigation, you're referring to
21 sometime after August 17?
22  A.  Yes, sir.
23  Q.  So at no time prior to
24 August 17 did you have any discussion
25 of section 3.1 with anyone from Akin or

Page 89

1 Gibson Dunn; correct?
2  A.  Not that I can recall, no.
3  Q.  All right.
4      And leaving aside
5 conversations that you personally
6 didn't have, are you aware of any
7 discussions concerning section 3.1
8 prior to the litigation using the
9 marker that we previously laid on that
10 between your team at Brown Rudnick and
11 anyone from Akin or Gibson Dunn?
12  A.  Not that I can recall.
13  Q.  And you agree, do you not,
14 that your team accepted the proposed
15 addition of section 3.1 into the
16 settlement agreement?
17  A.  3.1 is reflected in the final
18 settlement agreement, yes.
19  Q.  And it's reflected in the
20 final settlement agreement because,
21 among other things, after it was
22 proposed by Akin and Gibson Dunn, your
23 team accepted it; correct?
24  A.  Everyone accepted all of the
25 terms including that term, yes.

Page 90

1  Q. And that terms remained in
2 all subsequent drafts of the agreement
3 and was never changed; correct?
4  A. As best as I can recall,
5 correct.
6  Q. Did anyone ever tell you that
7 they intended a settlement agreement to
8 become effective and binding before it
9 was signed by all the parties?
10  A. In words or substance, sure.
11  Q. In words how about, first of
12 all, did anybody ever tell you in words
13 to the effect that I intend this
14 particular version of the settlement
15 documents to be effective and binding
16 despite the fact that it was not signed
17 by all the parties?
18  A. Rick, I don't think anybody
19 articulated it just the way you just
20 did, but we were clearly of the
21 impression given to us by lawyers at
22 Gibson Dunn and, for that matter,
23 lawyers at Akin that we were finished,
24 that we could go ahead and brief new
25 GM's counsel about where we were going,

Page 91

1 that we could arrange for a status
2 conference on a date specific, and that
3 we could get new GM a full set of the
4 documents in advance of that hearing.
5  Q. All right. We'll talk about
6 that exchange momentarily.
7     But the answer to my question
8 was nobody ever told you in words
9 approximating the words that I intend
10 this particular version of draft
11 settlement documents to become
12 effective and binding prior to the time
13 it was signed by all the parties;
14 correct, sir?
15  A. Again, I think we're mincing
16 words. No one ever used that
17 articulation, to my knowledge, in an
18 oral statement. But I think in writing
19 and in deeds they were communicating
20 that the settlement was final and
21 enforceable.
22  Q. And are you referring to the
23 communications on August 14 that
24 resulted in some of the draft
25 settlement documents being sent to

Page 92

1 counsel for new GM?
2  A. I'm referring to that among a
3 lot of other things, but I take issue
4 with how you articulated a question.
5     When the documents were
6 approved for submission or
7 communication to new GM, it was all the
8 documents, not some of the documents,
9 and we had gotten indication from the
10 GUC Trust preceding that, in particular
11 we got the signoff from Gibson Dunn
12 that we could go ahead and have a
13 conference call. When I say we, Danny
14 Golden and I could have a conference
15 call with Art and Andrew Bloomer.
16  Q. Okay.
17     And that was before
18 August 14; correct?
19  A. As far as I know, the
20 conversation we had with Arthur and
21 Andrew was on the ninth, so that was at
22 least one of the numerous indications
23 we got that we were done.
24  Q. Well, was it your
25 understanding then that, as of the time

Page 93

1 that you first picked up the phone or
2 got on the phone with counsel for new
3 GM on the ninth, that there was an
4 effective and binding settlement
5 agreement?
6  A. I think whether we had an
7 effective or a binding settlement
8 agreement is probably a matter of law.
9 The fact of the matter is that, as of
10 the ninth, we were -- my terminology --
11 virtually done. I think we had some
12 nits on a couple of open issues. There
13 was one open issue that remained
14 between Akin and Gibson. I can't even
15 recall off the top of my head what it
16 was. And I think, you know, people
17 wanted to go through one more page
18 turn, all-hands page turn, just to sign
19 off on all of the documents. But every
20 material term of the deal was done
21 before Danny and I got a green light
22 from everybody to talk to Art and
23 Bloomer.
24  Q. And no party had said prior
25 to that page turn meeting that you

24 (Pages 90 - 93)

Page 98

1  or no question?
2         MS. NEWMAN: Objection.
3         THE WITNESS: It's not a yes
4  or no question.
5         MR. WISSNER-GROSS: Asked and
6  answered.
7     Q.   Can you answer that question
8  yes or no?
9     A.   Let's hear it again.
10    Q.   Prior to the page turn
11  meeting on the eleventh --
12    A.   I have to interrupt you.
13  We're accepting the proposition that
14  the page turn was on the eleventh;
15  that's probably right.  But sitting
16  here today I'm certain it's right.  But
17  I'm going to accept that date as part
18  of the proposition of your question.
19    Q.   I'll withdraw the date.
20         Prior to the page turn
21  meeting or conference call that you
22  previously referenced, did anybody tell
23  you that they regarded the version of
24  the settlement documents that existed
25  at the start of that meeting to be

Page 99

1  binding and effective settlements
2  documents?
3         MS. NEWMAN: Objection.
4         THE WITNESS:  It's my belief
5     that the answer is yes.  And not in
6     so many words but yes, we were I
7     think all of us under the
8     impression that we had a final
9     binding deal subject to dotting and
10    I's and crossing the T's, so yeah,
11    in my view, as of the eleventh or
12    whenever that page turn was, we had
13    a final agreement that was being
14    flyspecked for commas and
15    semicolons and nothing substantive.
16    Q.   When you refer to all of us
17  in your prior language, are you
18  purporting to say what impression the
19  representatives of the GUC Trust were
20  under?
21    A.   Yes.
22    Q.   You used the phrase
23  "ministerial step" several times in
24  your deposition testimony.
25         Did you ever use that phrase

Page 100

1  in any discussions you had with the GUC
2  Trust?
3     A.   Not that I can recall
4  specifically.
5     Q.   The settlement agreement was
6  intended to be governed by New York
7  law; am I right?
8     A.   Yes.
9     Q.   And there was never any
10  debate over that; was there?
11    A.   Not to my knowledge.
12    Q.   And in fact, New York law was
13  specifically provided for in one of the
14  terms; correct?
15    A.   The best of my recollection,
16  yes.
17    Q.   Are you familiar with
18  CPLR 2014?
19        MR. WISSNER-GROSS: Now I
20    think that goes beyond the scope of
21    this deposition.
22        MR. WERDER: I don't think so.
23    Q.   Are you familiar with it?
24    A.   I think in connection with
25  trial preparation and in reviewing case

Page 101

1  law, I know I've seen reference to the
2  CPLR, the specific number, no, and I
3  don't purport to be an expert or have a
4  photographic memory as to what it
5  provides.
6     Q.   Thank you.
7         (Whereupon, an e-mail dated
8     July 28, 2017 was marked Exhibit 8
9     for identification.)
10        THE WITNESS: Can you identify
11    it for the people on the call?
12    Q.   Yes.
13        I've marked as Exhibit 9 --
14    A.   Actually, it's eight on mine.
15    Q.   I've marked as Exhibit 8 a
16  document that begins GUC 0003459 and
17  runs through 3519.  And the first
18  document in the chain is a July 28,
19  2017 e-mail from Mr. Martorana to
20  multiple people.  It's not the one that
21  I want to ask you about.
22        Review whatever you want on
23  this, Mr. Weisfelner.  What I want to
24  ask you about is the e-mail that begins
25  at the bottom of page Bates numbered

26 (Pages 98 - 101)