# Exhibit C

Page 1

1  UNITED STATES BANKRUPTCY COURT
   SOUTHERN DISTRICT OF NEW YORK
2  _____
3  In re:
4  MOTORS LIQUIDATION COMPANY, et al.,
   f/k/a General Motors Corp., et al.,
5
                    Debtors.
6
   Cast No.: 09-50026 (MG)
7  _____
8
                    November 9, 2017
9                   10:09 a.m.
10
11
12
13       DEPOSITION of WILLIAM P.
14  WEINTRAUB, held at the offices of BROWN
15  RUDNICK LLP, 7 Times Square, New York,
16  New York before Wayne Hock, a Notary
17  Public of the State of New York.
18
19
20
21
22
23
24
25

Page 6

1  Southern District of New York, case
2  number 09-50026 (MG).
3      The name of the witness is
4  William Weintraub.
5      At this time the attorneys
6  present in the room and attending
7  remotely will identify themselves
8  and the parties that they represent
9  after which our court reporter,
10 Wayne Hock representing Veritext,
11 will swear in the witness and then
12 we can proceed.
13     MR. KARLAN: Mitch Karlan,
14 Gibson, Dunn and Crutcher, for the
15 GUC Trust.  With me is John
16 Fortney.
17     MR. STEINBERG: Arthur
18 Steinberg, King and Spalding, new
19 General Motors.
20     MR. TECCE: James Tecce, Quinn
21 Emanuel, new General Motors.
22     MR. KANE: John Kane, Akin
23 Gump, representing the unit
24 holders.
25     MR. WEISFELNER: Ed

Page 7

1  Weisfelner, Brown Rudnick, for
2  certain of the plaintiffs.
3      MR. WEISS: Jordan Weiss,
4  Goodwin Procter, representing the
5  witness.
6      MR. KARLAN: Yes, could you
7  folks on the --
8      MR. GONZALES: Sure, Rudy
9  Gonzales on behalf of the
10 plaintiffs.
11     MR. STYANT-BROWN:  And Nick
12 Styant-Brown on behalf of the
13 signatory plaintiffs.
14 W I L L I A M  P.  W E I N T R A U B,
15    having been first duly sworn by a
16    Notary Public of the State of
17    New York, upon being examined,
18    testified as follows:
19 EXAMINATION BY
20 MR. KARLAN:
21     Q.  Good morning.
22     A.  Good morning.
23     Q.  You are one of the lawyers
24 whose signature appears on the motion
25 to enforce that brings us here today?

Page 8

1      A.  I believe my signature is on
2  there.
3      Q.  Actually, to be precise, your
4  signature's not on it.
5      Your name is in a signature
6  block?
7      A.  Yes.
8      Q.  On whose behalf did you
9  appear in connection with this motion?
10     MR. WEISS: Counselor, before
11 we proceed, I have one housekeeping
12 issue.
13     I just want to note for the
14 record that Mr. Weintraub is
15 sitting here voluntarily, he has
16 not been subpoenaed for this
17 deposition.  He's agreed to sit
18 here without waiving any rights.
19 And pursuant to the October 11,
20 2017 procedural -- pretrial
21 stipulation and scheduling order
22 limiting the issues in this
23 deposition the phase 1A issues,
24 specifically whether Plaintiffs'
25 settlement agreement is a binding

Page 9

1  agreement, and on that basis we
2  will proceed.
3      I'm sorry for interrupting.
4      MR. KARLAN: That's fine.
5      And my practice is not to --
6  is to try not to engage in
7  colloquy, so I'm not going to
8  respond to what you just said, I'm
9  just going to proceed, but I don't
10 necessarily agree with much of what
11 you said.
12     Q.  Do you need the question
13 again, sir?
14     A.  I think I have the question
15 in mind.
16     Q.  Thank you.
17     A.  My signature block is on that
18 document with respect to the ignition
19 switch preclosing accident plaintiffs
20 represented by the Hilliard firm and
21 the Henry firm.
22     Q.  And do you represent those
23 people as well?
24     A.  I represent the Hilliard firm
25 and the Henry firm and assist them in

3 (Pages 6 - 9)

Page 10

1  their representation of persons
2  mentioned.
3     Q.   All right.
4          May I infer from that answer
5  that you do not represent the
6  individuals but only the firms?
7          MR. WEISS: Objection.
8          THE WITNESS: I stand on what
9  I just said. I'm not sure how I
10 can elaborate on that.
11    Q.   Do you have an
12 attorney-client relationship with any
13 of the individuals in this case?
14    A.   Through the Hilliard firm and
15 through the Henry firm I believe that I
16 derivatively represent them.
17    Q.   Do you have any engagement
18 letters with anyone in connection with
19 this case?
20    A.   Yes.
21    Q.   With whom?
22    A.   With the Hilliard firm and
23 the Henry firm.
24    Q.   And no one else?
25    A.   There's a third firm that is

Page 11

1  on an engagement letter that dates back
2  to May of 2014 and I don't remember the
3  name of the firm.
4     Q.   Are they still active in the
5  case?
6     A.   I don't believe so.
7     Q.   Have you ever communicated
8  with any of the clients of the Hilliard
9  firm and the Henry firm on whose behalf
10 you're filing this motion?
11         MR. WEISS: You can answer yes
12 or no.
13         THE WITNESS: Yes.
14    Q.   And was it in connection with
15 the events of June, July, August, 2017?
16         MR. WEISS: Objection. Vague.
17         MR. KARLAN: I'll rephrase.
18    Q.   The case is a long case with
19 a long history and I don't know to what
20 extent you've been doing things for a
21 long time. The motion calls -- the
22 discovery that we're taking today calls
23 into question the events in June, July,
24 and August surrounding negotiations of
25 what the movants allege is a contract.

Page 12

1          Have you spoken to any of the
2  individual clients of Hilliard or Henry
3  on those topics?
4     A.   No.
5     Q.   To the best of your
6  knowledge, did anyone ever sign the --
7          MR. KARLAN: Let me pause for
8  a minute. I've got you at a
9  disadvantage.
10         So I withdraw the pending
11 question.
12    Q.   Sir, I'm handing you what was
13 marked yesterday as Exhibit 3 and I'll
14 represent to you that Mr. Weisfelner
15 identified it as the declaration that
16 is filed in connection with this
17 motion. It has a lot of exhibits.
18 Feel free to unclip it if that's
19 helpful for you.
20         And if you would turn to
21 Exhibit G of Mr. Weisfelner's
22 declaration?
23    A.   Okay.
24    Q.   At the end of Exhibit G there
25 are some signature lines, signature

Page 13

1  blocks.
2     A.   Are you sure you want G or H?
3          MR. WEISS: Exhibit G is an
4  e-mail.
5          Do you mean H?
6     Q.   I apologize. Thank you,
7  thank both of you. It's H. Thank you.
8     A.   So just so we're on the same
9  page, so to speak, I'm looking at pages
10 nineteen and twenty of Exhibit H?
11    Q.   Yes, sir.
12         To the best of your
13 knowledge, did anybody ever manually
14 sign any of these signature lines?
15    A.   I don't know.
16    Q.   Okay.
17         Did you?
18    A.   No.
19    Q.   Would you look at on the same
20 exhibit page fifteen.
21    A.   Okay.
22    Q.   There's a section 3.1.
23    A.   Uh-huh.
24    Q.   Could you just read to
25 yourself the first sentence of that

4 (Pages 10 - 13)

Page 14

1  paragraph which begins, "this
2  agreement." Let me know when you're
3  done.
4    A.  (Reviewing).
5       Okay.
6    Q.  What did you believe that
7  that sentence meant?
8       MR. WEISS: Objection.
9       I believe that question calls
10   for the witness to reveal what
11   would be work product and I'm going
12   to instruct him not to answer.
13   Q.  Were you prepared at any time
14  before August 15 to sign Exhibit H to
15  Mr. Weisfelner's declaration?
16   A.  Yes.
17   Q.  And did you believe you
18  understood the document before you were
19  ready to sign it?
20   A.  Yes.
21   Q.  What did you think section
22  3.1 in its first sentence meant?
23      MR. WEISS: Same objection.
24      Don't answer.
25   Q.  Did you ever have any oral

Page 15

1  conversations with Mr. Matt Williams of
2  Gibson Dunn about section 3.1?
3    A.  I don't recall.
4    Q.  Did you ever have any oral
5  conversations with Keith Martorana of
6  Gibson Dunn about section 3.1?
7    A.  Not that I can recall.
8    Q.  Did you ever have any
9  conversations prior to the making of
10  this motion with Mr. Golden of the Akin
11  firm concerning the first sentence of
12  section 3.1?
13   A.  Not that I can recall.
14   Q.  With Ms. Newman of the Akin
15  firm?
16   A.  Not that I can recall.
17   Q.  You may want to pause before
18  you answer this question. Your counsel
19  may not want you to answer it.
20      Did you give written comments
21  on any drafts of Exhibit H?
22      MR. WEISS: I appreciate the
23   courtesy.
24      You can answer that question
25   yes or no.

Page 16

1       THE WITNESS: Yes.
2    Q.  Did you give those comments
3  to, among other -- well, were any of
4  those comments shared with Matt
5  Williams or anyone from Gibson Dunn?
6    A.  I'm not sure how to answer
7  that.
8       MR. KARLAN: Let me try it a
9    different way. I'll withdraw the
10   question.
11   Q.  Did you ever send an e-mail
12  to Matt or anyone else from Gibson Dunn
13  saying here, here are some written
14  comments?
15   A.  I sent e-mails and I believe
16  those two individuals were copied on
17  those e-mails.
18   Q.  Before you -- again, pause
19  before you answer.
20      Before you shared those
21  comments, did you review them with
22  anyone from the Hilliard or the Henry
23  law firms?
24      MR. WEISS: You can answer yes
25   or no.

Page 17

1       THE WITNESS: I need to hear
2    the question again.
3       (Whereupon the requested
4    portion was read back by the
5    reporter)
6       THE WITNESS: What do you
7    mean by those comments?
8    Q.  Okay.
9       Let me come at this a
10  different way.
11      This isn't a question.
12      I have not found in the
13  document production any e-mail
14  correspondence from either the Henry
15  firm or the Hilliard firm in which they
16  say to Gibson Dunn or to Akin Gump
17  here's some comments on the draft. I
18  have seen e-mails from you where you
19  offer comments to a wide variety of
20  people and I'm trying to understand,
21  and I don't know whether your counsel's
22  going to let me get an answer, but I'm
23  trying to understand whether your
24  comments reflect input from the
25  Hilliard and Henry law firms or whether

5 (Pages 14 - 17)

Page 18

1  they were delegating to you the task of
2  working on the draft.
3      MR. WEISS: I'm going to
4  object.
5      MR. GONZALES: I'm sorry,
6  this is Rudy. The response
7  requires Bill to disclose
8  communications between the Hilliard
9  and Henry firm and his counsel will
10 instruct him, I'm sure.
11     MR. WEISS: I think we're
12 getting too close and I'm worried
13 about where it will end.
14     MR. KARLAN: Can you just say
15 on the record?
16     MR. WEISS: So I'm instructing
17 you not to answer that question.
18  Q. You mentioned a moment -- you
19 testified a moment ago that you were
20 ready to sign Exhibit H.
21     Did you require someone's
22 authorization to do that or did you
23 have authority to do it yourself?
24     MR. WEISS: You can answer.
25     THE WITNESS: I required

Page 19

1  authorization.
2   Q.  From whom?
3      MR. WEISS: You can answer.
4      THE WITNESS: Mr. Hilliard.
5   Q. And did you get that -- well,
6  I infer that you got that because you
7  said you were ready to sign.
8   A. Yes.
9      MR. KARLAN: And if I ask you
10 -- I'm just making a record here.
11 I assume you're not going to answer
12 this question.
13     But if I ask you did Mr.
14 Hilliard tell you that he had
15 received authority from any of the
16 individual clients, I assume
17 there's going to be an instruction
18 not to answer that question?
19     MR. WEISS: That is correct.
20  Q. Were you generally aware --
21     MR. KARLAN: Let me withdraw
22 the question. Go back one more
23 time on this other issue.
24  Q. Do you know the names of any
25 of the individual clients of the

Page 20

1  Hilliard and Henry firm whose interests
2  are at issue on this motion?
3   A. I know all of the names. I
4  don't have them memorized but I know
5  all of the names.
6   Q. Okay.
7      Have all of those persons
8  filed proofs of claim or requests to
9  file late proofs of claim?
10  A. Have all of which persons?
11  Q. Sorry, the individuals whom
12 the Hilliard and Henry firm represents
13 in connection with this motion.
14  A. I need to speak with counsel
15 for a moment.
16     MR. KARLAN: Sure.
17     THE VIDEOGRAPHER: We'll go
18 off the record?
19     THE WITNESS: Yes.
20     THE VIDEOGRAPHER: We're now
21 going off the record approximately
22 10:25.
23     (Whereupon a break was taken)
24     THE VIDEOGRAPHER: We're back
25 on the record approximately 10:26.

Page 21

1      MR. WEISS: Bill, are you
2  ready?
3      THE WITNESS: No.
4  I need to hear the question
5  again.
6      MR. KARLAN: Sure.
7      (Whereupon the requested
8  portion was read back by the
9  reporter)
10     THE WITNESS: I don't think I
11 can answer that question. I think
12 it's covered by privilege.
13  Q. Have you signed any proofs of
14 claim for any claimant or respective
15 claimant in this bankruptcy case?
16  A. I don't believe I signed any
17 proofs of claim for anybody in that
18 case.
19  Q. I'm sorry?
20  A. I don't believe that I signed
21 any proofs of claim for anybody.
22  Q. Has your firm filed any?
23  A. Yes.
24  Q. Has your firm filed proofs of
25 claim for any of the clients of the

6 (Pages 18 - 21)

Page 54

1  Q.  My name is James Tecce, Mr.
2  Weintraub.  I am an attorney for Quinn
3  Emanuel and we represent General Motors
4  LLC.
5      If I could ask you to take a
6  look again at -- I think you have the
7  interrogatory response in front of you.
8  That's Exhibit 20.  And I wanted to ask
9  you a question about interrogatory
10 number three, if you could just take a
11 look at that.  I'm going to ask you a
12 question about the last sentence.
13 A.  (Reviewing).
14 Q.  Do you have an understanding,
15 sir, as to whether or not it's the
16 position of the movants that there is,
17 in fact, an oral agreement?
18     MR. WEISS: You can answer
19 that question yes or no.
20     THE WITNESS:  Could I have
21 the question again?
22 Q.  Sure.
23     Is it the position of the
24 movants that, based on what it says
25 here on the paper, in the alternative,

Page 55

1  the contract is an oral agreement.
2      Is that the movants'
3  position?
4  A.  I believe it is.
5  Q.  And do you have an
6  understanding as to what date that oral
7  agreement came into existence?
8  A.  The same answer I gave
9  earlier, at least by August 14.
10 Q.  And there's not some date
11 before August 14 that you're aware of
12 whether you would take the position
13 that that's the date that the oral
14 agreement came into existence?
15 A.  I didn't say that.  I said
16 there could be an earlier date, there
17 probably is an earlier date, but my
18 testimony is August 14.
19 Q.  Can I trouble you to take a
20 look at Exhibit 3 again.  I believe
21 it's in front of you.  That's Mr.
22 Weisfelner's declaration.  And I think
23 you were on Exhibit H, which is the
24 agreement.  I have a question for you.
25 It's bound together so you have to open

Page 56

1  it up.
2      But the very first sentence
3  of that says, "this settlement
4  agreement, the agreement, dated as of
5  August blank, 2017."
6      Do you see that sentence,
7  sir?
8      Do you know whether this
9  agreement was ever dated?
10 A.  You mean other than August
11 blank, 2017?
12 Q.  That's correct.
13 A.  I don't know.
14 Q.  Have you ever seen a draft of
15 this agreement that actually has a date
16 put in that blank?
17 A.  I don't believe so.
18 Q.  Mr. Weintraub, do you recall
19 attending an in-person meeting with Mr.
20 Golden of the Akin Gump firm and Mr.
21 Hilliard at any point during the summer
22 of 2017?
23 A.  No, I do not.
24     MR. TECCE: I'd like to
25 mark --

Page 57

1      THE WITNESS:  My lawyer will
2  say don't answer things don't
3  asked.
4      MR. WEISS: Yes, I will.
5      THE WITNESS:  I was not at
6  that meeting.
7      MR. TECCE: Let me just show
8  you two documents and I want to
9  move this along for you.
10     I'd like to mark as
11 twenty-one -- I'll mark them both
12 at the same time to just kind of
13 move this along.  I'd like to mark
14 as Exhibit 21 a document Bates
15 AG 134.
16     MR. GONZALES: The Bates
17 number, please, if you have it.
18     MR. TECCE: Sure, it's AG 134.
19 That's Exhibit 21.
20     MR. GONZALES: Thank you very
21 much.
22     MR. WEISFELNER: Do you have
23 any additional copies?
24     MR. TECCE: I do, sir.  I do.
25     And I'm going to mark

15 (Pages 54 - 57)

Page 70

1  with the judge, you can do so. But
2  you don't have the document in
3  front of him and you're misstating
4  what it says.
5      MR. TECCE: Let's do that.
6  Let's do that.
7   Q.  Can I ask you to go back to
8  the exhibit.
9      Do you have the agreement in
10 front of you, sir? Page fifteen, 3.1.
11  A.  Yes.
12  Q.  The first sentence there
13 says, "this agreement shall become
14 effective and binding on the parties on
15 the date on which this agreement is
16 fully executed by each of the parties."
17      Do you see that sentence?
18  A.  Yes.
19  Q.  Did there ever come a time
20 when you recommended that that
21 provision be modified in any way, that
22 that sentence be modified in any way?
23  A.  I don't recall that.
24  Q.  Did you at any time ever tell
25 anyone that the agreement would be

Page 71

1  binding and effective absent the
2  signatures of the parties?
3      MR. WEISS: You can answer
4   that question as to people outside
5   of the attorney-client privilege
6   only.
7      THE WITNESS: Can I hear that
8   again?
9      MR. TECCE: Let me -- it was a
10  lousy question.
11     THE WITNESS: It was actually
12  a pretty good question. I just
13  want to make sure I answer it
14  properly.
15  Q.  Did there ever -- let me do
16 it this way.
17     Did there ever come a time
18 that you told anyone with whom you were
19 negotiating this agreement that the
20 settlement agreement would become
21 effective and binding before it was
22 signed?
23  A.  I don't think I ever said
24 anything about that one way or the
25 other.

Page 72

1   Q.  Did anybody ever say that to
2  you, that the settlement agreement
3  would become effective and binding on
4  the parties before it was signed, did
5  anybody ever say that to you with whom
6  you were negotiating the agreement?
7   A.  I don't recall that.
8   Q.  Can we go back to -- I'm
9  sorry to make you shuffle paper around
10 here.
11  A.  I actually do that for a
12 living.
13  Q.  I need to go back to your
14 e-mail, it's twenty-four, I believe.
15 And this is your GUC 4501 to 4502.
16 This is that e-mail that spans those
17 two pages. I'm going to ask you to
18 focus on the second to last paragraph.
19  A.  Of?
20  Q.  Your e-mail July 10, 2017,
21 9:46.
22  A.  The one that begins,
23 "perhaps?"
24  Q.  Yes, sir.
25     If you could read that

Page 73

1  paragraph, I want to ask you a couple
2  of questions.
3   A.  (Reviewing).
4   Q.  Have you read it?
5   A.  Not yet.
6   Q.  Sorry. Take your time.
7   A.  (Reviewing).
8      Okay.
9   Q.  The first sentence says,
10 "perhaps you've already thought of this
11 but it seems to me that we need to have
12 the form of notice blessed before we
13 give it. Otherwise," dot, dot, dot,
14 "well, you know the otherwise."
15     Can you elaborate for me on
16 what the otherwise is?
17  A.  Yeah, that was a poor attempt
18 at humor about what happened to new
19 General Motors as a result of giving
20 inadequate notice of the free and clear
21 provisions of the sale order.
22  Q.  And to -- the following
23 sentence is, "I think this requires a
24 separate motion re notice of features
25 and deadlines." And then you say, "why

19 (Pages 70 - 73)

Page 74

1  spend the money on notice only to find
2  out at the hearing that Judge Glenn
3  does not like what we did."
4      Do you see that?
5  A.  Yeah.
6  Q.  Was it -- were you
7  trying to convey to this group that the
8  notice procedure should be presented to
9  Judge Glenn in advance of the
10 settlement motion being approved in
11 this e-mail?
12 A.  Yes.
13     MR. WEISS: Bill, you've got
14     to let me wait.
15     And I was going to ask, if I
16     allow him to answer that, can we
17     agree it's not a waiver?
18     MR. TECCE: I agree it's not a
19     waiver.
20 Q.  Was it -- were you trying to
21 convey to this group your view that the
22 judge should bless, I believe is the
23 word you used, bless the procedures
24 before the motion was sent out for
25 approval?

Page 75

1  A.  Yes.
2  Q.  And was that the point of the
3  conference that took place on the 17th
4  of August to have the notice procedures
5  blessed before the motion was sent out?
6  A.  What conference?
7  Q.  You're aware that there was a
8  conference with Judge Glenn on the 17th
9  of August?
10 A.  Yes.
11 Q.  And was one of the purposes
12 of that conference to have the notice
13 procedures blessed before the motion
14 was sent out?
15 A.  Not at that conference.
16 Q.  Not at the conference on the
17 seventeenth?
18 A.  Right.
19 Q.  How did you envision having
20 Judge Glenn bless the notice procedures
21 before the motion went out at the time
22 you sent this e-mail?
23     MR. WEISS: Objection. Calls
24     for work product privilege and I'm
25     instructing you not to answer.

Page 76

1  Q.  Let me ask the question this
2  way.
3      Did you make the proposals to
4  the group negotiating this agreement on
5  how the notice procedures would be
6  blessed before the motion went out?
7  A.  Yes.
8  Q.  Who was the proposal?
9  A.  That there be a separate
10 motion to the court asking for approval
11 of the form of notice and the scope of
12 notice.
13 Q.  And is that a motion that you
14 proposed to the group to be filed in
15 advance of the settlement approval
16 motion?
17 A.  Timing-wise, either in
18 advance or contemporaneously with
19 filing the motion, but certainly notice
20 of the motion would not be given to the
21 world until, in my view, the court
22 approved the form of notice and the
23 scope of notice.
24 Q.  Did there come a point in
25 time in negotiations where the parties

Page 77

1  negotiating the agreement, all of them,
2  reached an agreement with respect to
3  the notice that would be provided in
4  connection with the settlement motion?
5  A.  I believe so.
6  Q.  When was that?
7  A.  Probably I would say no later
8  than August 14 and certainly probably
9  around the August 12 period. It may be
10 even earlier because several drafts had
11 gone back and forth.
12 Q.  Did anybody from Gibson Dunn
13 and/or Wilmington Trust communicate to
14 you that they were in agreement with
15 respect to the notice procedures that
16 were associated with the motion?
17 A.  I believe so, yes.
18 Q.  Who did that?
19 A.  I think it was Keith
20 Martorana, if I'm pronouncing his name
21 correctly, in e-mails.
22 Q.  What did he say?
23 A.  I think he said basically
24 these are fine with the GUC Trust.
25 Q.  These? Can you elaborate,

20 (Pages 74 - 77)

Page 78

1 these what?
2  A.  It was a list of documents
3 that was sent to him that was generated
4 by Brown Rudnick on the day of -- at
5 the end of the day of the final page
6 turn on the eleventh.  I think we had a
7 page turn on the eleventh and we
8 received an e-mail from Keith on the
9 twelfth.
10  Q.  Do you remember what that
11 e-mail said?
12  A.  Not specifically but
13 generally.
14  Q.  Generally what's your
15 recollection of what it said?
16  A.  These are fine with the GUC
17 Trust.
18  Q.  Apart from Keith commenting
19 on the documents attached to an e-mail,
20 was there any other way that, to your
21 mind, Keith communicated to you that
22 the form of notice associated with the
23 motion was acceptable?
24  A.  Yes, I think in numerous ways
25 over time as we sent drafts back and

Page 79

1 forth and the comments were narrower
2 and narrower and people really had no
3 more issues with the words of the
4 notice, we all came to mutual agreement
5 that we were done with tinkering with
6 the words in the notice.
7  Q.  I'm asking something more
8 than just the words in the notice.  I'm
9 asking whether the notice procedures
10 associated with the motion, whether
11 Keith communicated to you, apart from
12 drafts of documents, that the form of
13 notice associated with the motion was
14 acceptable to him and his client.
15     MR. WEISS: Objection.
16     You can try to answer it.
17     THE WITNESS:  Again, through
18  course of conduct in narrowing
19  issues and eliminating issues and
20  then in the e-mail of August 12 and
21  then again when everyone agreed to
22  send final documents to new GM on
23  August 14.
24     Can I freshen my coffee?
25     MR. TECCE: You want to stop

Page 80

1 for a minute?
2     THE WITNESS: I just want to
3  get a cup.
4     THE VIDEOGRAPHER: We're now
5  off the record approximately 11:44.
6     (Whereupon a break was taken)
7     (Whereupon, an e-mail dated
8  August 8, 2017 was marked Exhibit 25
9  for identification.)
10     THE VIDEOGRAPHER: Back on the
11  record at approximately 11:52.
12  Q.  Sir, I placed in front of you
13 a document BR 000001 and I wanted to
14 ask you a question about the last two
15 pages of the document, specifically
16 your e-mail dated Thursday, August 3,
17 2017 at 7:54 a.m.
18     Do you see that?
19  A.  Yes.
20  Q.  And can you just read that?
21 There's a list of things that you've
22 typed into that e-mail.
23  A.  Sorry, the list?
24  Q.  Yes, sir.
25  A.  Okay.

Page 81

1     (Reviewing).
2     Uh-huh.
3  Q.  Sir, do you recall whether
4 the list of considerations that you
5 raise in this e-mail were resolved to
6 your satisfaction?
7  A.  Yes, I do recall.
8  Q.  And do you recall at what
9 point in time they resolved to your
10 satisfaction as between August 3 and
11 today?
12  A.  I don't recall precisely.  I
13 believe it would have been before
14 August 12, probably before the page
15 turn on August 11, and other than that
16 I'd have to go back and look at
17 documents.
18  Q.  Were you prepared to sign the
19 agreement at the time you sent this
20 e-mail?
21  A.  Without those changes being
22 made?  I don't recall.
23  Q.  You don't recall whether you
24 were prepared to sign the agreement
25 without those changes being made; is

21 (Pages 78 - 81)

Page 90

1   Q.   I just want to ask you some
2  pretty basic questions about this
3  exchange which is July -- July 12,
4  July 14.
5         Do you see these e-mails?
6  Obviously we had a conversation earlier
7  about your July 10 e-mail which appears
8  at the back.
9   A.   Yeah.
10        Which page to you want me on
11 because the top of the page is --
12  Q.   Well, I'm going to ask you
13 about your July 14 e-mail.
14        MR. WEISS: Bottom of 3888.
15  Q.   The question I had for you
16 was whether --
17        MR. TECCE: Strike that.
18        I withdraw the question.
19  Q.   Do you recognize the
20 document?
21  A.   Yes.
22  Q.   Okay.
23        Do you have any reason to
24 believe you didn't get the e-mails that
25 were on this document?

Page 91

1   A.   No.
2        MR. TECCE: Let's move on.
3   Q.   At or about the time of this
4  e-mail exchange, July 18, were you in a
5  position to -- were you prepared to
6  sign the agreement?
7   A.   I don't recall as I sit here
8  today.
9   Q.   The settlement agreement, has
10 any part of the settlement agreement,
11 as you understand it, has any part of
12 that agreement been performed by any
13 party as of today?
14        MR. WEISS: You can answer.
15        What was that? We couldn't
16   hear you.
17        MR. GONZALES: Go right ahead.
18        MR. WEISS: You can answer if
19   you -- you can answer.
20        THE WITNESS: I think so.
21  Q.   What part?
22  A.   I think finalization of all
23 of the ancillary documents was part and
24 parcel of moving the settlement
25 agreement ahead. I think sharing the

Page 92

1  final documents with General Motors was
2  part of moving the settlement agreement
3  ahead. I think reporting the existence
4  of the settlement agreement with the
5  knowledge of the GUC Trust to Judge
6  Furman and setting the status
7  conference or scheduling the conference
8  with Judge Glenn was part of
9  implementation of the settlement
10 agreement.
11  Q.   Other than those events which
12 you just identified in your answer, are
13 there any other aspects of the
14 agreement which you believe have been
15 performed?
16  A.   Not that I can recall right
17 here right now.
18  Q.   I had asked you earlier if
19 the agreement had ever been dated.
20        Was there ever an intent by
21 the parties to the agreement to date
22 the agreement?
23  A.   I don't know.
24  Q.   Was there ever an intent by
25 the parties to the agreement to serve

Page 93

1  the settlement motion without a signed
2  copy of the agreement attached to it?
3        MR. WEISS: Objection.
4        You can answer.
5        THE WITNESS: I don't know.
6   Q.  You don't -- did you ever
7  discuss with the other parties to the
8  settlement agreement the prospect of
9  filing the settlement motion and
10 serving it with unsigned copies of the
11 settlement agreement?
12  A.   No.
13  Q.   I meant to look at your
14 biography before coming up here. I
15 know that you've been a bankruptcy
16 lawyer for a very, very long time.
17        Over the course of your
18 career, have you filed motions with the
19 bankruptcy court with settlement
20 agreements that are not executed?
21  A.   Because my career is so long
22 and so varied, my speculation would be
23 yes.
24  Q.   Do you know of a deal off the
25 top of your head -- do you know of a