# Exhibit D

Page 1

1  UNITED STATES BANKRUPTCY COURT
   SOUTHERN DISTRICT OF NEW YORK
2  _____
3  In re:
4  MOTORS LIQUIDATION COMPANY, et al.,
   f/k/a General Motors Corp., et al.,
5
                    Debtors.
6
   Cast No.: 09-50026 (MG)
7  _____
8
                    November 8, 2017
9                   2:01 p.m.
10
11
12
13        DEPOSITION of HOWARD S.
14  STEEL, held at the offices of BROWN
15  RUDNICK LLP, 7 Times Square, New York,
16  New York before Wayne Hock, a Notary
17  Public of the State of New York.
18
19
20
21
22
23
24
25

Page 14

1  MR. WISSNER-GROSS: I'm just
2  going to -- as in earlier today,
3  I'm going to keep my objections
4  limited but I take umbrage with the
5  suggestion that the witness is
6  giving a speech. The witness was
7  attempting to respond to your
8  question. So I suggest that you
9  limit the commentary and just ask
10 questions.
11     Q.  Did Mr. Martorana ever say to
12 you in these words at any time ever it
13 is no longer necessary to wait for
14 finalization of all other documents in
15 a satisfactory manner?
16     MS. NEWMAN: Objection.
17     MR. KARLAN: What's the
18 objection?
19     MS. NEWMAN: You've asked him
20 that already and the question when
21 you asked him the first and the
22 second time just now doesn't really
23 make any sense.
24     THE WITNESS: Yeah, I submit
25 on his communications that I

Page 15

1  referenced in my last answer there
2  was no such a caveat placed on the
3  signoffs.
4     Q.  So you're saying he said that
5  to you in writing?
6     A.  Well, he said on the twelfth
7  in writing, we have the e-mail from
8  Keith on the twelfth. On the eleventh
9  in the afternoon there was -- on
10 August 11 there was an all hands page
11 turn that Keith participated in and
12 said that the documents were final and
13 adequate without any such caveats. I
14 believe earlier than that, in
15 conjunction with the meeting called by
16 Mr. Golden, the same representation
17 that all the material terms of the
18 documentation were final and
19 satisfactory.
20     Q.  Tell me if this is a correct
21 statement, sir: Did you always
22 understand from July 27 until these
23 remarks that you say you received from
24 Mr. Martorana that you were waiting for
25 finalization of all the other documents

Page 16

1  in a satisfactory manner?
2     A.  No, that's entirely
3  incorrect. That's incorrect. I
4  believed that there was a meeting of
5  the minds assent on the critical terms
6  of the settlement as early as late July
7  when the settlement agreement, the
8  claims estimate order, the settlement
9  order had been fully documented. The
10 supporting documentation were finalized
11 no later than the twelfth.
12     Q.  What did you think that
13 sentence that we've been focusing on in
14 this e-mail meant when you got it?
15     A.  Even at that juncture I
16 viewed this as a ministerial or an
17 administrative cause because at that
18 juncture we had an agreement on the
19 settlement agreement and the settlement
20 order and the claims estimate order.
21     Q.  So tell me if this is a
22 correct statement, sir.
23     The agreement -- the contract
24 that the pending motion seeks to
25 enforce was entered into as not later

Page 17

1  than July 28; is that correct?
2     A.  Yeah, my view is that we had
3  a binding meeting of the minds on all
4  the key material terms of the contract
5  by late July.
6     Q.  And by late July, that
7  means --
8     A.  By late July, no later than
9  August 12.
10    Q.  But no later than July 28;
11 correct?
12    A.  You mean no earlier?
13    Q.  I mean no later.
14    Did you have an agreement --
15 did you have a binding contract on
16 July 28?
17    A.  My view is yes.
18    Q.  Thank you.
19    So when you got this e-mail
20 on July 28 and you read that sentence,
21 did you think it was meaningless?
22    A.  No. Like I said, I thought
23 it was a ministerial or an
24 administrative matter.
25    Q.  Can you tell me what that

5 (Pages 14 - 17)

Page 18

1 means? I don't understand those terms
2 in this context.
3    A.   The best way I can further
4 articulate is it that you need to give
5 one or another discussion or
6 administrative back office sort of
7 procedure. I really don't know how the
8 operations were set up between Gibson
9 Dunn and Wilmington.
10    Q.   What did you think Mr.
11 Martorana was referring to when he used
12 the expression "all other documents?"
13        MR. WISSNER-GROSS: Just for
14    -- to be specific, I think there's
15    an S missing.
16        MR. KARLAN: Yeah, there is.
17    I'm giving him the benefit of the
18    doubt.
19        THE WITNESS: The other
20    documents were the supporting
21    documents. He references the
22    settlement agreement, the
23    settlement order, and the claims
24    estimate order. We had also been
25    developing a 9019 motion to approve

Page 19

1    the settlement agreement. We had
2    also been developing a notice
3    procedure for the motion and a
4    motion to approve the notice and
5    later supporting declarations
6    including Wilmington supporting
7    declaration for the motion.
8    Q.   So you understood the
9 expression "all other documents" in
10 this e-mail to refer to -- tell me if
11 I'm correct, please -- to the 9019
12 motion, the notice procedure, the
13 motion to approve the notice, and the
14 supporting declarations; is that
15 correct?
16    A.   I don't know. He could be
17 referring to the settlement agreement,
18 settlement order, claims estimate
19 order.
20    Q.   I'm asking you what you
21 thought at the time you got the e-mail.
22    A.   I don't recall.
23    Q.   Do you see where he says,
24 "signoff with respect to the three
25 documents -- settlement agreement,

Page 20

1 settlement order, claims estimate
2 order -- will likely come tomorrow."
3        Do you see that?
4    A.   Yes.
5        (Whereupon Mr. Weisfelner
6    entered the proceedings)
7    Q.   Did you -- does that -- is it
8 still nonetheless your testimony that
9 you believed you had a binding
10 agreement on July 28?
11    A.   Well, if you look, he then --
12    Q.   It's just a yes or no
13 question.
14    A.   I don't have to do
15 anything --
16        MR. WISSNER-GROSS: You know
17    something, the witness answers his
18    best. We're not in court. He's
19    going to answer as he sees best.
20        MR. KARLAN: Actually, the
21    federal rules say that the
22    testimony is to be taken as if he
23    was at trial.
24        MR. WISSNER-GROSS: You cannot
25    instruct this witness how he should

Page 21

1    answer the question.
2        MR. KARLAN: You cannot litter
3    the record with remarks that are
4    not objections.
5    Q.   Sir, if you're able to
6 answer --
7        MR. KARLAN: I'm going to
8    withdraw the question.
9    Q.   Here's a new question.
10        I'd like you to tell me
11 whether you can answer this question
12 yes or no and, if you can, I'd like you
13 to answer yes or no and, if you can't,
14 I'll move on to something else.
15        Okay?
16        Having focused your attention
17 on that sentence, is it still your
18 testimony that you believed you had a
19 binding agreement on July 28?
20    A.   I believe we did have a
21 binding agreement at that time.
22    Q.   Even after you read this
23 e-mail?
24    A.   Yeah, Keith even sends to me
25 later in the same day updated versions.

6 (Pages 18 - 21)

Page 22

1  Certain of the documents haven't
2  changed. All the material terms were
3  agreed upon at this juncture.
4      Q.   Did you sign the settlement
5  agreement on July 28?
6      A.   Not that I recall.
7      Q.   Did you ever sign it?
8      A.   Me personally?
9      Q.   Yes, sir.
10     A.   No.
11     Q.   Why not? You had a binding
12 agreement. Why didn't you sign it?
13     A.   I mean, I was fully prepared
14 to sign it.
15     Q.   Why didn't you?
16     A.   Well, you guys -- the GUC
17 Trust capitulated and reneged on the
18 deal. We had everything set up on a
19 desk ready to roll and send to the
20 judge as agreed to between the parties
21 and then we got whipsawed.
22     Q.   I don't think you mean
23 capitulated, but I think we all know
24 what you mean.
25          Why didn't you sign the

Page 23

1  agreement on July 28?
2      A.   Frankly, I don't recall.
3      Q.   Why didn't you sign it on
4  July 29?
5      A.   I don't recall.
6      Q.   Why did you never sign it?
7      A.   Well, we definitely were
8  under the assumption that we were going
9  to sign the agreement. All the parties
10 had agreed to all the material terms
11 and the expectation was it would have
12 been signed.
13     Q.   Right, that's what's making
14 it hard for me to understand why it was
15 never signed.
16          Can you please answer my
17 question? Why did you never sign it?
18          MS. NEWMAN: Objection.
19          MR. WISSNER-GROSS: It's been
20     asked and answered now several
21     times.
22     Q.   Why did you never sign it?
23          MS. NEWMAN: Same objection.
24          THE WITNESS: Right, it was a
25     ministerial act that the parties,

Page 24

1  that me personally didn't get to
2  signing.
3      Q.   At no time between July 28
4  and August 14 did you believe it was
5  important to take care of that
6  administrative ministerial act?
7      A.   Well, you'll see through the
8  e-mails that there was an e-mail on the
9  sixteenth where we followed up and said
10 we're getting signatures because we
11 had, for a very long time, felt we had
12 a binding agreement, then the
13 ministerial act was one of the last
14 brush strokes of papering everything.
15     Q.   But why were you waiting so
16 long to sign?
17          MS. NEWMAN: Objection.
18          How many times are you going
19     to ask him the same question,
20     Mitch?
21     Q.   I understand you were
22 impatient getting GUC Trust's
23 signature.
24          Why didn't you sign your
25 signature?

Page 25

1           MS. NEWMAN: Objection.
2           THE WITNESS: I didn't think
3      it was necessary. We had
4      everything finalized and all the
5      terms agreed upon and that
6      ministerial act was something that
7      I assumed was done.
8      Q.   Was done meaning it had been
9  signed?
10     A.   Meaning that it was going to
11 be -- when we presented the documents
12 to the judge, we would gather the
13 electronic signatures affixed because
14 the parties had signed off on the
15 documentation.
16     Q.   Could you please take
17 Exhibit 1 out of the pile.
18          Do you recognize this
19 exhibit, sir?
20          MR. WISSNER-GROSS: Again,
21     take your time to review the
22     document.
23          MR. STEINBERG: Mitch, can I
24     ask you to raise your voice a
25     little?

Page 26

1    MR. KARLAN: I'm sorry. Will
2  do.
3    THE WITNESS: (Reviewing).
4    Sure.
5  Q.  And is that your signature on
6  the last page?
7  A.  Yes.
8  Q.  And that's something you
9  signed under penalty of perjury?
10 A.  Yes.
11 Q.  And it's also your signature
12 on page eleven?
13 A.  I was referring to eleven.
14    Now you want to talk about
15 twelve? It's on twelve and eleven.
16 Q.  Would you look, please, at
17 interrogatory number six which appears
18 on page six and then the response
19 appears on page seven.
20 A.  (Reviewing).
21 Q.  Have you read that?
22 A.  One second.
23 Q.  Sure. Let me know when.
24 A.  (Reviewing).
25    Got you.

Page 27

1  Q.  When did the signatory
2  plaintiffs execute the agreement?
3  A.  Well, we've been over this.
4  From the period of July 28 through
5  August 12, there are any number of
6  actions to execute or put into effect
7  or carry out the agreed terms. These
8  include the referenced page turn that
9  we discussed about Mr. Golden setting
10 up where Mr. Martorana signed off on
11 the documentation; this includes where
12 Mr. Martorana signed off that we could
13 communicate that we had reached a
14 settlement to Mr. Steinberg; this
15 includes presenting that agreement to
16 Judge Furman on the eleventh; this
17 includes the page turn thereafter; this
18 includes this signatory plaintiffs
19 signing off on August 12 and also the
20 signatory plaintiffs signing off on
21 sending the documents to GM on
22 August 14.
23 Q.  Have you finished your
24 answer?
25 A.  Yes, sir.

Page 28

1  Q.  When you signed these
2  interrogatories under penalty of
3  perjury, were you interpreting the word
4  "executed" in interrogatory number six
5  to mean something other than place a
6  manual signature on a piece of paper in
7  ink on the agreement?
8  A.  Yes, sir.
9  Q.  Because that never happened;
10 correct?
11 A.  Not that I'm aware of.
12 Q.  During the summer of 2017,
13 were you monitoring filings made by the
14 GUC Trust with the Securities and
15 Exchange Commission?
16 A.  We received -- you said with
17 the Securities and Exchange Commission.
18 Those are not the GUC Trust reports
19 filed with the bankruptcy court
20 generally.
21 Q.  Would you look, please, at
22 Exhibit 7 in the pile in front of you.
23    Have you ever seen Exhibit 7
24 before?
25 A.  Yes.

Page 29

1  Q.  Did you see it on or about
2  the date it was filed?
3  A.  I've got to find the filing
4  date here.
5  Q.  If you look at a few pages
6  from the end, 10617.
7  A.  It's dated August 14?
8  Q.  Yes, sir.
9  A.  I did not see it on that
10 date.
11 Q.  Did you see it on the
12 fifteenth?
13 A.  No.
14 Q.  The sixteenth?
15 A.  No.
16 Q.  What is your best
17 recollection of when you saw this?
18 A.  In the last few weeks.
19 Q.  Would you look, please, at
20 Exhibit 3 in the pile in front of you
21 which is Mr. Weisfelner's declaration
22 and all of the exhibits to it.
23    Can you -- and feel free to
24 unclip it if that's easier for you.
25    Can you turn to Exhibit G to

8 (Pages 26 - 29)

Page 50

1  A. Now. Well, no, I had seen
2  this document -- I had seen the
3  document yesterday, too.
4  Q. And that's the first time you
5  focused on this language?
6  A. Yes.
7     MR. KARLAN: Okay.
8     I don't think I have anything
9  further. Thank you.
10    MS. BESKIN: I'm going to have
11 a few questions, but can we take a
12 short break first?
13    MR. WISSNER-GROSS: Sure.
14    THE VIDEOGRAPHER: We're now
15 off the record at approximately
16 2:54.
17    (Whereupon a break was taken)
18    THE VIDEOGRAPHER: Back on the
19 record at approximately 2:59.
20 EXAMINATION BY
21 MS. BESKIN:
22 Q. Good afternoon, Mr. Steel.
23    You testified that there was
24 a meeting of the minds between the
25 parties to the purported settlement

Page 51

1  agreement on July 28.
2     Did I get that right?
3  A. Yes.
4  Q. Okay.
5     And would you agree -- you
6  said there was a meeting of the minds
7  as to all material terms; is that
8  correct?
9  A. If you're saying that's what
10 I testified to.
11 Q. Why don't I just ask the
12 question a different way.
13    Is it your testimony that --
14    MS. BESKIN: Strike that.
15 Q. Do you believe that there was
16 a meeting of the minds between all
17 parties to the purported settlement
18 agreement as to all material terms on
19 July 28?
20 A. Yeah, the material terms of
21 the settlement agreement were that the
22 GUC Trust would pay fifteen million and
23 pay for notice costs and in exchange
24 the plaintiffs would release callback
25 claims and claims to the GUC Trust res.

Page 52

1  These are the material terms. They
2  were agreed upon at that juncture.
3  Q. And the agreement to those
4  material terms was among all parties to
5  the purported settlement agreement as
6  of July 28?
7  A. To all parties? Yes.
8  Q. And was there also an
9  agreement as of July 28 as to who the
10 parties to that agreement would be?
11 A. You've got to run that by me
12 again.
13 Q. Sure.
14    As of July 28, you said that
15 there was an agreement as to all
16 material terms among all the parties;
17 correct?
18 A. Yes.
19 Q. And as of that date, was
20 there also an agreement as to who the
21 parties to the purported settlement
22 agreement would be?
23 A. Well, the signature blocks,
24 if that's what you're referring to,
25 were unchanged and agreed upon.

Page 53

1  Q. Let's take a look at --
2     MS. BESKIN: This will be
3  Exhibit 11.
4     (Whereupon, an e-mail dated
5  August 11, 2017 was marked Exhibit 11
6  for identification.)
7     MS. BESKIN: For the record,
8  this is a document with Bates
9  beginning GUC_0001558.
10    MR. WISSNER-GROSS: Excuse me
11 one second. They were handed out
12 but we didn't get a copy.
13 Q. Mr. Steel, this is an e-mail
14 exchange with several e-mails in the
15 chain. Take as much time as you need
16 to review it but I'll tell you I'm
17 going to focus your attention on the
18 second page with Bates number
19 ending 1559.
20 A. (Reviewing).
21    Okay.
22 Q. Okay.
23    So can you take a look at --
24 actually, just go back to the first
25 page, the Bates ending 1558. You'll

14 (Pages 50 - 53)

Page 66

1  Q.  There is.
2      And the question is: Do you
3  have any reason to doubt that this was
4  not the first time Ms. Norman's firm
5  was appearing on the signature block
6  given that it's clearly being inserted
7  into this blackline dated as of
8  August 11?
9  A.  I really don't know.
10     MS. NEWMAN: Objection.
11     MS. BESKIN: Let's take a look
12  at another document, and I guess
13  this will be marked as Exhibit 12.
14     (Whereupon, a letter dated
15  August 4, 2017 was marked Exhibit 12
16  for identification.)
17 Q.  I'm ready whenever you are,
18 Mr. Steel.
19 A.  Sure.
20 Q.  Do you recognize this
21 document?
22 A.  Yes.
23 Q.  And what is it?
24 A.  It's a letter to Judge Glenn
25 dated --

Page 67

1     MR. GONZALES: Hey, folks,
2  give me the Bates number, please,
3  on that?
4     MS. BESKIN: Sure.  Sorry.
5  GUC_0008633.
6     MR. GONZALES: Thank you,
7  ma'am.
8     THE WITNESS:  It's a letter
9  to Judge Glenn dated August 4,
10 2017.
11 Q.  And this is on your
12 letterhead; correct?
13 A.  Yes.
14 Q.  You signed it?
15 A.  My electronic signature it on
16 it.
17 Q.  You write on August 4, "dear
18 Judge Glenn, we write to inform the
19 court that negotiations have
20 meaningfully progressed between the
21 ignition switch plaintiffs, certain
22 non-ignition switch plaintiffs, certain
23 preclosing accident plaintiffs, and the
24 GUC Trust which may obviate the need
25 for scheduling a hearing on the initial

Page 68

1  late claims motion issues."  That's the
2  first sentence.
3     Did I read that correctly?
4  A.  I believe so.
5  Q.  And your testimony is that
6  there was a meeting of the minds on all
7  material terms as of July 28; right?
8  A.  I said as early as July 28,
9  yes.
10 Q.  And yet, when you wrote this
11 letter to Judge Glenn on August 4, you
12 didn't write, dear Judge Glenn, we have
13 an agreement in principle; did you?
14 A.  I did personally an earlier
15 draft and then I changed it.
16     MS. BESKIN: I'd like to ask
17 for production of that earlier
18 draft.
19     MR. WISSNER-GROSS: I take it
20 under advisement.
21 Q.  I'm asking a slightly
22 different question though.
23     Which is in this letter that
24 was actually sent to Judge Glenn, you
25 didn't inform Judge Glenn that an

Page 69

1  agreement had been reached in
2  principle, for example; correct?
3  A.  The letter says what it says.
4  Q.  Right.
5     And it doesn't say that, I
6  think we can agree on that?
7  A.  At that juncture we had
8  reached an agreement on all the
9  material terms of the documentation,
10 and it is actually on that same day
11 that this is again the meeting that Mr.
12 Golden called where he asked people
13 with binding authority to get together
14 and flip the pages and cross the T's
15 and dot the I's, so it was -- the
16 material terms were finalized by this
17 time.
18     MS. BESKIN: Motion to strike
19 that answer as nonresponsive.
20 Q.  I understand that --
21     MR. WISSNER-GROSS: Excuse me,
22 are you finished?
23     MS. BESKIN: I'm going to ask
24 another question.  I'm finished
25 interposing my motion, yes.

18 (Pages 66 - 69)

Page 90

1  If you could turn to page
2 fifteen, section 3.1.
3    A.   So this is Exhibit 3?
4    Q.   Correct.  And then Exhibit H
5 within there.
6    A.   Okay.
7    Q.   So as you know, section 3.1,
8 the first sentence of that section
9 reads, "this agreement shall become
10 effective and binding upon the parties
11 on the date on which this agreement is
12 fully executed by each of the parties;"
13 right?
14    A.   I've got to turn to it.
15    Q.   Did any representative --
16    A.   I've got to turn to it.
17         MR. WISSNER-GROSS: Just
18      little bit of a problem with the
19      way you're phrasing your questions.
20      Here you're just purporting to
21      recite what he set forth in the
22      first sentence of 3.1, is that the
23      point of your question?
24         MR. KARLAN: Yes.  I'm just
25      confirming that I read that

Page 91

1      correctly so that the record is
2      clear.
3         THE WITNESS: Okay.
4    Q.   Did any counsel for the GUC
5 Trust ever tell you that they were
6 waiving the requirement of section 3.1,
7 that the agreement will become
8 effective and binding on the date on
9 which it is fully executed by each of
10 the parties?
11    A.   No.
12    Q.   Did they ever tell you that,
13 contrary to what section 3.1 says, that
14 the agreement would become binding when
15 Mr. Martorana sent an e-mail without a
16 caveat that the draft remains subject
17 to client review?
18    A.   Can you repeat the question?
19    Q.   Sure.
20         Did any counsel for the GUC
21 Trust ever tell you that, contrary to
22 the requirement set forth in the first
23 sentence of section 3.1, the agreement
24 would become binding upon Mr. Martorana
25 sending you an e-mail that did not

Page 92

1 contain the caveat that it was subject
2 to client review?
3    A.   Keith said what he said in
4 that e-mail.
5    Q.   I'm asking a different
6 question though.
7         Did he ever tell you that, by
8 that e-mail, he was waiving the
9 requirement of section 3.1, that it
10 would not become binding until full
11 execution?
12    A.   He didn't use those words.
13    Q.   Regardless of whether he used
14 those words, did he ever convey that to
15 you in sum or substance, that he was
16 waiving the requirement of section 3.1,
17 that the document not become binding
18 until it was fully executed?
19    A.   No.
20         MS. BESKIN: I just have a
21      couple of more documents to get
22      through.  Bear with me for a
23      moment.
24    Q.   You mentioned a presentation
25 to Judge Furman.

Page 93

1         When was the date of that, if
2 you recall?
3    A.   Sorry, August 11.
4    Q.   Let's go back to your
5 August 4 letter to the court.  I
6 believe that's Exhibit 12.
7         So I understand that we have
8 a disagreement as to whether or not
9 this document is subject to privilege
10 including on the grounds that it's been
11 put at issue.  So that the record is
12 clear, as I discussed it your counsel,
13 I'm going to ask my question, you can
14 interpose your objections as you see
15 fit, and we'll have the issue preserved
16 for the court.
17         MR. WISSNER-GROSS: Just so
18      we're clear, I told you off the
19      record that -- and also on the
20      record, that our view is that the
21      underlying document referring to a
22      draft is privileged.  I had a
23      chance to briefly confer with the
24      witness off the record on that
25      topic.  I haven't had a chance to