# Exhibit E

Page 1

1  UNITED STATES BANKRUPTCY COURT
   SOUTHERN DISTRICT OF NEW YORK
2  _____
3  In re:
4  MOTORS LIQUIDATION COMPANY, et al.,
   f/k/a General Motors Corp., et al.,
5
                    Debtors.
6
   Cast No.: 09-50026 (MG)
7  _____
8
                    November 13, 2017
9                   10:03 a.m.
10
11
12
13         DEPOSITION of MATTHEW J.
14 WILLIAMS, held at the offices of
15 GIBSON, DUNN & CRUTCHER, LLP, 200 Park
16 Avenue, New York, New York before Wayne
17 Hock, a Notary Public of the State of
18 New York.
19
20
21
22
23
24
25

Page 94

1  what it is.  But all of the terms in
2  the document we agreed to.
3     Q.   And that was what then led
4  you to approve sharing the document
5  with a third party?
6     A.   No, no, that's not correct.
7     Q.   The fact that all the terms
8  had been agreed to?
9     A.   No.
10    Q.   Had you -- prior to all the
11 terms being agreed to, had you spoken
12 to a third party, GM in this case, new
13 GM, about --
14    A.   No.
15        MR. KARLAN:  Let him finish
16   the question.
17    Q.   -- about the settlement
18 agreement?
19    A.   No.
20    Q.   All right.
21       So at some point you decided
22 that it was okay to share the
23 settlement agreement with new GM;
24 correct?
25    A.   That's correct.

Page 95

1     Q.   And did that take place after
2  you had agreed to all of the terms of
3  the settlement agreement?
4        MR. KARLAN:  Objection to the
5    form of the question.
6        THE WITNESS:  It seems to be
7    that.  But the understanding, at
8    least my understanding of when we
9    were going to share it with new GM
10   was just as soon as possible.  So
11   my understanding of -- the idea was
12   we had the status conference coming
13   up and we wanted to get the
14   documents in new GM's hands as soon
15   as possible so they could review
16   them and we could obviate any
17   arguments that they didn't have
18   ample time to review them.  So I
19   personally -- again, this is me --
20   I never viewed having the documents
21   in completely final form as a
22   prerequisite to sending them over
23   to new GM.
24    Q.   Fair enough.
25       But in fact, that's what

Page 96

1  happened?
2     A.   It seems to be that the
3  latest draft of the document, which is
4  the draft that was filed by Mr.
5  Weisfelner with the court, is that
6  document that was shared with new GM.
7     Q.   So in fact, the document that
8  was shared with new GM was the final
9  document.  We had already covered this,
10 that had become final earlier like on
11 the twelfth; right?
12    A.   No, I didn't -- well, that
13 unsigned document, one of the terms of
14 that document is that for it to be
15 binding is that it was signed.
16    Q.   I understand that's your
17 position because that's what I've read
18 in the papers here.
19       But there's another side to
20 it; isn't there?
21       MR. TECCE:  Objection to form.
22       THE WITNESS:  Maybe there is.
23    Q.   You've heard about it?
24 You've heard about the side that says
25 that once the terms are agreed to that

Page 97

1  it's a binding document?
2     A.   I have heard that's an
3  argument that's being made.
4     Q.   Okay.
5        And that would have occurred
6  on August -- what did we say, August 11
7  or August 12?
8        MR. TECCE:  Objection to form.
9        THE WITNESS:  No.
10    Q.   In terms of all the terms
11 being agreed to by the GUC Trust?
12    A.   No, that's not correct.
13    Q.   Maybe I missed something.
14    A.   Maybe you are.
15    Q.   What terms were not agreed to
16 as of August 12?
17    A.   Well, apparently one of the
18 terms that wasn't agreed to is the fact
19 that it had to be signed in order for
20 it to be binding.
21    Q.   I understand that that's your
22 position, Mr. Williams.
23    A.   That is a term that there is
24 apparently not a meeting of the minds
25 on, so I was just answering your

Page 98

1 question.
2  Q. Let me ask you then, besides
3 the signing of the agreement, were
4 there any other terms?
5  A. Besides that section of the
6 agreement?
7  Q. Right.
8  A. Yeah, I believe there were.
9  Q. What other terms had not been
10 agreed to by August 12? I thought we
11 had covered this but maybe not.
12  A. No, apparently not.
13  Q. Okay.
14  A. Well, 3.1 was what we talked
15 about that when the agreement becomes
16 binding.
17  Q. By the way, let me ask you
18 this -- I'll just have you pause for a
19 second.
20  A. Sure.
21  Q. Do you recall ever expressing
22 that to anyone in the negotiations at
23 any time that the document had to be
24 signed before it was final?
25  A. Yes.

Page 99

1  Q. Who did you express that to?
2  A. I expressed it to everybody
3 on this e-mail list because it was in
4 the first markup of the document that
5 we had sent back.
6  Q. I'm saying that, when you
7 were talking and negotiating with the
8 other side, with all the -- everybody
9 on the copy list, did you ever say
10 something like, by the way, guys, you
11 do realize that this document is not
12 final until it's signed? Did you say
13 that verbally to anyone?
14   MR. KARLAN: Or orally.
15   THE WITNESS: Did I say it
16   orally? No, not that I recall.
17  Q. What other provisions of the
18 settlement agreement do you find
19 somehow are not clear?
20  A. 3.9, counterparts, facsimile
21 signatures.
22  Q. Okay.
23   What is it about that?
24  A. "This agreement may be
25 executed in any number of counterparts

Page 100

1 and by different parties to this
2 agreement in separate counterparts" --
3 this is the signature provision. It
4 says how signatures are delivered.
5 3.12, the amendment provision that
6 says, "except as otherwise specifically
7 provided in this agreement, no
8 amendment, modification, rescission,
9 waiver, or release of this agreement
10 shall be effective unless the same
11 shall be in writing by the parties."
12  Q. Well, this is in writing;
13 isn't it? There weren't any amendments
14 to it that you know of?
15   MR. KARLAN: Do you want him
16   to finish answering your question?
17   Wait a minute, stop, do you
18   not want him to finish answering
19   your question?
20  Q. Go ahead, Mr. Williams,
21 finish your answer.
22  A. My point being that, to the
23 extent that you wanted to amend 3.2
24 about the writing, apparently there
25 wasn't an agreement on 3.12.

Page 101

1  Q. Stop, stop, stop, stop. I'm
2 not understanding what you're doing.
3   Is it going to be your
4 testimony before Judge Glenn that all
5 the terms of the agreement had been
6 resolved and agreed to by August 12 or
7 not?
8  A. We thought that they had.
9  Q. Okay:
10  A. We thought that they had.
11  Q. Okay.
12   And you believe today that
13 they had?
14  A. No, I believe today that now
15 apparently the plaintiffs want to read
16 out certain provisions of the
17 agreement.
18  Q. Oh, and that's because your
19 belief is that you cannot have an
20 agreement that is not signed to be
21 effective; is that your testimony?
22  A. I didn't say that, no.
23  Q. Because you've read the case
24 law on that. I'm sure you have.
25  A. That was not my testimony.

Page 102

1 MR. KARLAN: I instruct the
2 witness not to answer the question.
3    Q.    Mr. Williams, have you or not
4 read the case law with --
5       MR. KARLAN: I instruct the
6 witness not to answer the question.
7    Q.    Is there anything in your
8 testimony that you have given so far
9 that you want to change?
10       MR. KARLAN: I object to the
11 form.
12    Q.    Or that you need to change.
13       MR. KARLAN: I object to the
14 form of the question.
15       THE WITNESS: No, not to my
16 knowledge.
17    Q.    Okay.
18       Everything that you have
19 answered under oath is true and you
20 answered it to the best of your ability
21 so far?
22    A.    Yes, absolutely.
23    Q.    All right. Thank you.
24       With regard to settlement
25 agreement to new GM, you understood

Page 103

1 that you were sharing this agreement
2 and you approved the sharing this
3 agreement with a third party, new GM,
4 correct, at some point?
5    A.    Yeah. At some point, yes.
6    Q.    And you believe that that
7 agreement occurred more or less at 7:29
8 p.m. on August 14; correct?
9    A.    To send the document to new
10 GM?
11    Q.    Yes.
12    A.    Yeah, I think that's right.
13    Q.    And you knew and you
14 understood, when it was being sent to
15 new GM, that all the terms of the
16 agreement had been agreed to by all
17 parties by that time?
18    A.    I think we've been over this
19 but we agreed to the form of the
20 documents, that's correct.
21    Q.    Including all the terms?
22    A.    Including all of the terms,
23 we believed that we had an agreement of
24 all the terms, yes.
25    Q.    By 7:29 p.m. on August 14 at

Page 104

1 a minimum?
2    A.    Whenever that -- I don't have
3 the e-mail in front of me but whenever
4 that date was.
5    Q.    And the authority that you
6 had derived from your client, that is
7 to belief that you had an agreement
8 with the parties by that time, that
9 derived from the GUC Trust? In other
10 words, you understood that at that time
11 the GUC Trust had agreed to the terms;
12 correct?
13       MR. KARLAN: Objection to the
14 form of the question.
15       Can we just ask one question,
16 please?
17       MR. GONZALES: Sure.
18    Q.    At the point that this
19 agreement was shared with new GM, the
20 GUC Trust had agreed to the terms of
21 the agreement; correct?
22    A.    At the time the agreement was
23 shared with new GM, we had agreed to
24 the final form of those documents.
25    Q.    Including the terms?

Page 105

1    A.    The terms and the documents,
2 yes.
3       MR. GONZALES: Okay.
4       (Whereupon, an e-mail dated
5 August 14, 2017 was marked Exhibit 34
6 for identification.)
7    Q.    Let me have you turn to or
8 look at Exhibit Number 34.
9       Have you seen this document
10 before, this e-mail?
11    A.    Me? I don't believe so, no.
12    Q.    This is the first time you're
13 looking at this?
14    A.    Maybe it was sent to me but I
15 don't recall.
16    Q.    In preparation for your
17 deposition, did you review this
18 document?
19    A.    No, I don't think so.
20    Q.    Take a second and read it,
21 please.
22    A.    (Reviewing).
23       Okay. I've read it.
24    Q.    Thank you, sir.
25       I want to -- this is an

27 (Pages 102 - 105)

Page 134

1  schedule a hearing with Judge Furman
2  where the terms of the agreement were
3  going to be discussed and a hearing
4  with Judge Glenn; is that true?
5      MR. KARLAN: Objection to the
6   form of the question.
7      THE WITNESS: No, that's not
8   true.
9   Q.  What hearing was contemplated
10 to be set with the court to basically
11 go over the terms of the agreement?
12  A.  With Judge Furman?
13  Q.  Well, I know that there was a
14 discussion --
15     MR. KARLAN: Sorry, I
16  apologize, were you asking a
17  question or were you testifying
18  just then?
19     THE WITNESS: I was asking a
20  question.
21  Q.  You're aware that there was a
22 discussion with Judge Furman on
23 August 11 at a hearing; correct?
24  A.  Yes, I'm aware of that.
25  Q.  You understand that Mr.

Page 135

1  Berman announced the agreement to Judge
2  Furman, the MDL judge?
3   A.  I'm aware that he announced
4  it. I was not aware that he was going
5  to announce it.
6   Q.  Okay.
7      But you became aware that he
8  did?
9   A.  Yes.
10  Q.  And he discussed the terms of
11 the agreement, he didn't read the
12 settlement agreement to the court but
13 in essence he discussed the terms of
14 the agreement?
15  A.  That's correct.
16  Q.  And that was at a hearing on
17 August 11; correct?
18  A.  That's correct.
19  Q.  And that was followed by a
20 Bloomberg report that same day, I
21 believe; correct?
22  A.  Yes, that's correct.
23  Q.  So that was one open
24 discussion with the MDL judge about the
25 agreement; correct?

Page 136

1   A.  About that agreement, about
2  the unsigned agreement, yes, but we
3  didn't know he was going to do that.
4   Q.  Right.
5      But you found out at the time
6  that he did?
7   A.  Yeah, we found out at the
8  time, I believe we had somebody on a
9  listen over.
10  Q.  Did you take any action, Mr.
11 Williams, between Mr. Berman's
12 statement to the MDL judge that an
13 agreement had been reached and your
14 meeting with Mr. Steinberg on
15 August 15, did you take any affirmative
16 action to say no, we do not have an
17 agreement because it's not signed?
18  A.  We consulted with --
19     MR. KARLAN: I don't know what
20  you're going to say.  Don't discuss
21  consultations with your other
22  counsel for the trust.
23     Is that what you're going to
24  do?  Don't do that.
25     THE WITNESS: We did not

Page 137

1  think it was appropriate to comment
2  on marketplace rumors, therefore we
3  did not do that.
4   Q.  Your testimony is the GUC
5  Trust did nothing?
6   A.  That's correct, we didn't do
7  anything.
8   Q.  If you thought that because
9  here is an agreement that's being
10 announced to not just any federal judge
11 but the judge managing the
12 multi-district litigation, an agreement
13 is being announced to that judge and
14 your testimony to Judge Glenn is the
15 GUC Trust did nothing between that
16 August 11 hearing where Mr. Berman
17 announced the settlement and until you
18 met with Mr. Steinberg on the
19 fifteenth; is that true?
20     MR. TECCE: Objection to the
21  form of the question.
22     THE WITNESS: We filed a 10-Q
23  on I believe the fourteenth that
24  said that we had made material
25  progress with the settlement but we

Page 138

1  still didn't have anything binding.
2  Q.  Oh, that's not what the 10-Q
3  said.
4  A.  Whatever the -- we filed the
5  10-Q.
6  Q.  Well, I assure you the 10-Q
7  does not say --
8      MR. KARLAN: Why don't we ask
9  questions instead of testifying.
10     THE WITNESS: Whatever the
11  10-Q says it says, but that's the
12  only thing we did.
13  Q.  I just want to ask you to be
14  a little bit careful here, Mr.
15  Williams, because I saw that both in a
16  letter and now you've testified under
17  oath that the 10-Q says it's not
18  binding and that's not what the 10-Q
19  says.
20  A.  The 10-Q says what it says.
21  Maybe I was under the misimpression
22  that it says it's not binding but I
23  know it said we had made material
24  progress.  If we had thought we had a
25  binding deal, we would have put in that

Page 139

1  10-Q that we had a binding deal.
2  Q.  I want to make sure that
3  we're clear on the record because I've
4  seen it twice now that you said that,
5  in a letter and now in sworn testimony
6  where you said the 10-Q represents that
7  the agreement is not binding and that
8  is not true, sir.
9      MR. KARLAN: Counsel --
10  Q.  And you will agree with that;
11  right?
12  A.  You know, I don't have the
13  10-Q in front of me but if that's what
14  it says, that's what it says.  And I
15  don't have the letter that you're
16  referring to either.
17  Q.  Well, I'll put them both in
18  front of you.
19     MR. KARLAN: Why don't you do
20  that instead of lecturing the
21  witness.
22     MR. STEINBERG: Turn to page
23  forty-two.  Why don't you put it in
24  front of him and let him read the
25  language.  And you don't have to

Page 140

1  debate.
2      MR. GONZALES: Well, it's not
3  debatable --
4      MR. STEINBERG: Put the
5  language in front of him.
6  Q.  Would you like to see the
7  language of the 10-Q and of your letter
8  where you said under oath just now that
9  you said the 10-Q says it's not binding
10  and you said in a letter that the 10-Q
11  said it's not binding and that neither
12  one of those is true?
13  A.  Yes.
14     MR. GONZALES: Let's go off
15  the record.
16     MR. KARLAN: Let's stay on the
17  record.  I don't want to -- I'm
18  tired of you --
19     MR. GONZALES: Let's go off
20  the record, please.
21     MR. KARLAN: We don't go off
22  the record unless all counsel agree
23  and I don't agree.
24  Q.  I'm going to hand you 10446.
25  It's an e-mail from you to Mr.

Page 141

1  Martorana and to Mr. Steinberg.  I
2  guess it's directed to Mr. Steinberg.
3      MR. KARLAN: Is there a copy
4  for counsel?
5      So what are we marking this
6  as?
7      (Whereupon, an e-mail dated
8  August 16, 2017 was marked Exhibit 35
9  for identification.)
10  Q.  First of all, let's start it
11  this way, Mr. Williams.
12     Does the 10-Q says that the
13  agreement is not binding?
14     MR. KARLAN: I thought we were
15  going to give him the 10-Q.
16  Q.  Let me just ask you, does the
17  10-Q say that the agreement is not
18  binding?
19  A.  I don't have the 10-Q in
20  front of me.
21  Q.  Have you reviewed before
22  coming here today?
23  A.  Yeah, I review it all the
24  time.
25  Q.  Does it say that it's not

Page 182

1  pending question.
2      MR. KARLAN: Fuck you.
3      MR. WEISFELNER: Is that
4  right?  No kidding.
5      Fuck me on the record; huh?
6      MR. KARLAN: Yes.
7      MR. WEISFELNER: We don't
8  agree to go off the record.  How
9  about that, Mitch?  Nobody's off
10 the record until everyone agrees to
11 be off the record.  Do you hear me?
12 No one agrees to be off the record
13 until everyone's off the record, so
14 we'll keep going.
15     MR. KARLAN: Keep going.
16     MR. WEISFELNER: A child and a
17 professional moron.
18     MR. KARLAN: On the record, I
19 hope.
20     MR. WEISFELNER: Absolutely on
21 the record.
22     I think maybe it's a good
23 idea to go off the record now.
24     THE VIDEOGRAPHER: We're going
25 off the record.  The time is 1:46.

Page 183

1      (Whereupon a break was taken)
2      THE VIDEOGRAPHER: We are back
3  on the record.  The time is 1:54.
4   Q.  Mr. Williams, I'm referring
5  to your e-mail to Mr. Danny Golden, the
6  attorney representing the unit holders,
7  dated August 17 at 12:37 p.m. and I'm
8  asking you whether or not you held the
9  opinion, prior to August 15 at 10:00
10 a.m., that the deal with the plaintiffs
11 was a, quote, flaming piece of shit,
12 closed quote?
13  A.  I think I was exaggerating a
14 bit there.  No, I did not, and I didn't
15 when I wrote this.
16  Q.  Okay.
17  A.  It was -- I was exaggerating.
18  Q.  All right, sir.
19     It's not an opinion -- it's
20 not a legal opinion that you held with
21 regard to Exhibit Number 28?
22  A.  No, I think it's fair to say
23 I had reservations about the deal but,
24 as I stated earlier, you know, we were
25 -- to the extent that the judge didn't

Page 184

1  have significant reservations at that
2  hearing, I think we were going to go
3  forward with that deal.  If I genuinely
4  thought it was, as this e-mail says, a
5  flaming piece of shit, we wouldn't have
6  put it forward.
7   Q.  Fair enough.
8      And the only reason that the
9  deal with the plaintiffs did not go
10 through because of the meeting that you
11 had with new GM on August 15; is that
12 correct?
13     MR. KARLAN: Objection to the
14 form of the question.
15     MR. TECCE: Objection to the
16 form of the question.
17     THE WITNESS:  No, that's not
18 correct.
19  Q.  Before the meeting with new
20 GM on August 15, had you put forward
21 any other suggestions regarding the
22 settlement agreement to the plaintiffs
23 or the unit holders?
24  A.  No, other than the Rule 23
25 issue that I discussed earlier.  But

Page 185

1  again, to be clear and candid, that was
2  not a prerequisite to the deal.  We
3  were very concerned that the judge was
4  going to have issues with it at the
5  status conference.
6   Q.  The GUC Trust and you, their
7  law firm, prior to the meeting with new
8  GM supported the settlement agreement,
9  had agreed to the terms, and were going
10 to sign the settlement agreement before
11 the meeting of August 15 at 10:00 a.m.
12 with new GM; is that correct?
13     MR. KARLAN: Objection to the
14 form of the question.
15     THE WITNESS:  That's not
16 correct.  Potentially --
17  Q.  And this is what I want to
18 know, and I'm going to write it down as
19 I'm prone to do.
20  A.  You're not going to need to
21 write a lot.  We wanted to --
22  Q.  I wouldn't think so.
23     MR. TECCE: Sorry, but you
24 keep cutting the witness off, sir.
25 He's trying to answer your

47 (Pages 182 - 185)

Page 186

1  question, please.
2      THE WITNESS: It was our
3  intention to go in front of the
4  court on I believe it's the
5  seventeenth at the status
6  conference and give the overlay of
7  the deal. To the extent that the
8  judge had significant concerns
9  about the deal, whether it be the
10 $10 billion claim or whether it be
11 the lack of the Rule 23 or any of
12 myriad of issues that he might,
13 depending on what the judge said
14 about those we may or may not have
15 signed that agreement.
16   Q.   Are you now representing
17 under oath that you were not intending
18 to sign the Exhibit Number 28 until
19 after the meeting with the judge, the
20 conference with the judge on the
21 seventeenth?
22   A.   I've been under oath the
23 whole time and yes, that was our
24 intent.
25   Q.   Did you ever express that

Page 187

1  intent to anyone?
2    A.   Yes.
3    Q.   Who did you express that
4  intent to?
5      MR. KARLAN: Let me instruct
6  you not to disclose, unless counsel
7  wants you to, conversations on that
8  subject that you had with Akin Gump
9  or obviously your client or Gibson
10 Dunn.
11     THE WITNESS: We did not have
12 any conversations about that with
13 the plaintiffs.
14   Q.   Is it your testimony that it
15 was only after Judge Glenn signed off,
16 so to speak, that what the plaintiffs
17 and the GUC Trust had agreed to?
18   A.   No.
19   Q.   Isn't that what you just
20 said?
21   A.   No, my testimony was that, to
22 the extent that we went forth with this
23 status conference on the seventeenth
24 and the judge didn't raise any
25 significant issues, we were intending

Page 188

1  to sign the agreement. To the extent
2  the judge raised huge issues and said
3  you've got a Rule 23 problem here or
4  you've got a $10 billion claim I'm
5  never going to allow, at that time we
6  didn't intend on signing.
7    Q.   Did you ever tell anybody
8  that?
9       MR. KARLAN: Asked and
10   answered.
11   Q.   Sir, did you ever tell the
12 plaintiffs that?
13   A.   No.
14      MR. KARLAN: Asked and
15   answered.
16   Q.   You kept that to yourself
17 that what you told -- let me make sure.
18      What you did was not to
19 disclose to the plaintiffs that it was
20 your intent to wait until the hearing
21 on the seventeenth with Judge Glenn and
22 then, depending on that -- how that
23 hearing came out, that you would then
24 sign the agreement if the judge didn't
25 have any major issues with it?

Page 189

1      MR. KARLAN: I object to the
2   form of the question.
3      THE WITNESS: I did not
4   understand that question.
5    Q.   Sure. I thought I was just
6  repeating what you said.
7      First of all, let's be clear.
8      Your testimony is the GUC
9  Trust and you on behalf of the GUC
10 Trust did not intend to sign Exhibit
11 Number 28 until after the hearing of
12 August 17 with Judge Glenn; is that
13 true?
14   A.   Yes.
15   Q.   Now my question is did you
16 ever tell anybody that that was your
17 intent?
18      MR. KARLAN: Asked and
19   answered.
20      You can answer it again but,
21   once again, exclude from your
22   answer conversations you had with
23   Gibson Dunn, with FTI, with
24   Wilmington Trust, and with Akin
25   Gump.

48 (Pages 186 - 189)

Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400

Page 190

1  THE WITNESS: We never told
2  the plaintiffs that.
3  Q. Okay.
4  Did you tell the GUC Trust
5  that that was your intent?
6  MR. KARLAN: I instruct the
7  witness not to answer the question.
8  MR. HILLIARD: Just so the
9  record's clear --
10  MR. KARLAN: That's privilege.
11  MR. HILLIARD: I just wanted
12  to know.
13  Q. Mr. Williams, when did the
14  GUC Trust decide not to sign Exhibit
15  Number 28?
16  MR. KARLAN: I object to the
17  form of the question. I don't
18  understand it.
19  But you may answer it if you
20  do.
21  THE WITNESS: Well, we
22  decided before the hearing because
23  we got what we viewed as a better
24  deal with new GM.
25  Q. And when is it that you --

Page 191

1  I'm trying to get the time. When is it
2  that you believe you got the better
3  deal with new GM and decided not to
4  sign Exhibit Number 28?
5  A. It's two questions. When did
6  we get to the deal with new GM? I
7  believe it was on the seventeenth, that
8  morning before the status conference,
9  whenever we wrote the letter. And
10  after that, from our perspective, it
11  became moot to signing the other
12  agreement.
13  Q. So your decision not to sign
14  Exhibit 28 occurred on more or less
15  August -- the morning of August 17
16  before the status conference when you
17  had, what, an agreement in principle
18  with new GM?
19  MR. KARLAN: Objection to the
20  form of the question.
21  THE WITNESS: But again, our
22  intention was not to sign the
23  agreement until after -- even if we
24  didn't have anything from new GM,
25  if new GM had never shown up, our

Page 192

1  intention was at least to wait
2  until after that status conference
3  before signing the agreement.
4  Q. But that opportunity never
5  occurred because new GM showed up and
6  convinced you not to enter into the
7  agreement?
8  MR. STEINBERG: Objection.
9  Q. Excuse me, not to sign
10  Exhibit 28; correct?
11  MR. TECCE: Objection to the
12  form.
13  MR. KARLAN: Objection to the
14  form.
15  You may answer.
16  Q. Go ahead, sir.
17  A. No, I don't think that's
18  correct. I don't --
19  Q. I need to get it straight.
20  A. Well, because, as I said
21  earlier, new GM didn't convince ups not
22  to sign it because -- well, it's a
23  couple of things. That hearing never
24  happened or it happened but it happened
25  in a different perspective.

Page 193

1  So the reason we didn't sign
2  is because we never got through the
3  status conference on this agreement at
4  all, we just decided not to sign it
5  because we had a deal with new GM.
6  I'm not sure if I'm answering
7  your question.
8  Q. I think that's it.
9  You didn't sign it because
10  you reached an agreement with new GM?
11  A. Yes, but to be clear, we --
12  MR. TECCE: I have an
13  objection to that question.
14  Go ahead.
15  THE WITNESS: To be clear, we
16  may have never signed it depending
17  on the outcome of that status
18  conference regardless of whether GM
19  had shown up or not. That was my
20  only point.
21  Q. But the intent was to sign it
22  at the status conference, at least
23  that's what you're saying now.
24  Your intent was to sign it at
25  the status conference of the

Page 194

1  seventeenth assuming that --
2      MR. KARLAN: Excuse me, I
3  object to the form of the question.
4  Mischaracterizes what the witness
5  has said.
6      You may answer it.
7      THE WITNESS: At or
8  immediately after that status
9  conference subject to what I had
10  said earlier to the extent that the
11  judge didn't have significant
12  reservations.
13      MR. GONZALES: All right, Mr.
14  Williams, thank you very much for
15  answering these questions. I
16  believe there may be some lawyers
17  who have some questions for you,
18  and I'll pass the witness.
19      MR. STYANT-BROWN: I have no
20  questions.
21      MR. WEISFELNER: I do.
22      MR. KARLAN: No, we've agreed
23  that you're not questioning the
24  witness.
25      MR. WEISFELNER: Excuse me?

Page 195

1      MR. KARLAN: You're not
2  questioning the witness.
3      MR. WEISFELNER: Why is that?
4      MR. KARLAN: Because we agreed
5  that you would not play the role of
6  trial counsel.
7      You're not questioning the
8  witness. Take it up with the
9  judge.
10      MR. WEISFELNER: Then we'll
11  take a break and we'll come back
12  and determine whether or not our
13  collective side has any questions.
14      But Mitch, I must ask you
15  this agreement that you're making
16  reference to, I apologize, but I
17  don't know that I was ever part of
18  it, can you help me better
19  understand when that agreement was
20  made?
21      MR. KARLAN: No.
22      Take a break.
23      MS. NEWMAN: No, no, no, I
24  would like to know, also, is there
25  an agreement?

Page 196

1      MR. KARLAN: There's an
2  agreement.
3      MS. NEWMAN: Among whom and
4  when was it made?
5      MR. KARLAN: Among me and Mr.
6  Weisfelner.
7      Guys, we're not going to
8  waste the witness' time with this.
9      MR. WEISFELNER: Okay.
10      So we'll take a five-minute
11  break and we'll come back.
12      THE VIDEOGRAPHER: Going off
13  the record. The time is 2:05.
14      (Whereupon a break was taken)
15      THE VIDEOGRAPHER: We are back
16  on the record. The time is 2:15.
17      MR. GONZALES: Folks, I have
18  passed the witness.
19      MS. NEWMAN: Nothing from the
20  participating unit holders.
21      MR. WEISFELNER: Is it your
22  position, Mitch, that I'm not
23  entitled to ask any questions?
24      MR. KARLAN: Yes, and I'm
25  going to move to disqualify your

Page 197

1  firm. I thought we had an
2  agreement that you were not going
3  to be participating as trial
4  counsel or questioning any of the
5  witnesses. If you now tell me we
6  don't have that agreement, then I
7  have to move to disqualify your
8  firm because you're the lead
9  witness in the case.
10      MR. WEISFELNER: We absolutely
11  never had that agreement.
12      MR. KARLAN: We'll move to
13  disqualify you. Fine.
14      MR. WEISFELNER: That's fine.
15      MR. KARLAN: Let's not waste
16  the witness' time with this now.
17      MR. WEISFELNER: Hardly a
18  waste of time.
19      If, for any reason, I have
20  misremembered and you have
21  something in writing that you'd
22  like to show me to refresh my
23  recollection, I'd appreciate it.
24      And by the way, I don't know
25  what the distinction is in your

Page 198

1  mind between trial counsel and
2  asking questions at a deposition,
3  but be that as it may, I look
4  forward to seeing your motion.
5      MR. KARLAN: Anybody else have
6  any questions?
7      MR. TECCE: I have questions.
8  Very quickly.
9  EXAMINATION BY
10 MR. TECCE:
11   Q.   Good afternoon, Mr. Williams.
12 My name is James Tecce.  I'm an
13 attorney at Quinn Emanuel.
14      Can I ask you to very quickly
15 take out Exhibit 28 that's in front of
16 you, the settlement agreement.  I'm
17 going to ask you to turn to page
18 fifteen, section 3.1.
19   A.   Okay.
20   Q.   Do you see that?
21   A.   Yes.
22   Q.   The first sentence there
23 says, "this agreement shall become
24 effective and binding on the parties on
25 the date on which this agreement is

Page 199

1  fully executed by each of the parties."
2      Do you see that sentence?
3   A.   I do.
4   Q.   And you're familiar with this
5  section of the agreement?
6   A.   I am.
7   Q.   Did anyone -- did you, Mr.
8  Williams, did you ever communicate to
9  anyone that, notwithstanding section
10 3.1 of the agreement, that it would be
11 effective and binding even if it was
12 not signed by the parties?  Did you
13 ever communicate that to anyone?
14   A.   No.
15   Q.   Did anyone ever communicate
16 that to you, Mr. Williams, that
17 notwithstanding section 3.1 of the
18 agreement, that it would be effective
19 and binding even if it's not signed?
20 Did anybody negotiating this agreement
21 with you ever communicate that to you?
22   A.   Yes, after when the Brown
23 Rudnick firm filed their papers, they
24 made some indications that it was
25 binding, but before then, no.

Page 200

1   Q.   At any point in time prior to
2  the Brown Rudnick filing its papers and
3  asserting a legal position, during the
4  parties' negotiation -- that's what I'm
5  asking you about.
6      During the negotiations of
7  the agreement --
8   A.   No.
9   Q.   -- did anybody ever
10 communicate to you that the agreement
11 would be become effective and binding
12 on the parties even if it was not
13 signed?
14   A.   No.
15   Q.   You testified earlier today
16 about agreement to the, quote, form of
17 the documents.  You said that several
18 times.
19      Can you tell me what you mean
20 by that?
21   A.   I guess I mean these
22 documents, the documents in front of
23 us.
24   Q.   To your mind, is there a
25 difference between agreeing to the form

Page 201

1  of the documents and agreeing to the
2  transaction that they may or may not
3  reflect?
4      MR. GONZALES: I object to
5    form.
6      THE WITNESS:  Yes, you would
7    agree to the transaction when we
8    signed the documents indicating
9    you're bound to it.
10   Q.   Did you have conversations
11 with persons other than the plaintiffs
12 about whether or not you would await
13 the outcome of the August 17 status
14 conference to sign the agreement?
15     MR. GONZALES: I'm sorry, let
16    me read that question or if you
17    could just repeat it for me.
18   Q.   Did you have conversations
19 with anyone other than Plaintiffs or
20 your clients about whether you would
21 await the out some of the August 17
22 conference to sign the document?
23     MR. KARLAN: Let me instruct
24    the witness to exclude from his
25    answer, unless he's given

51 (Pages 198 - 201)

Page 202

1  permission by Ms. Newman, to
2  exclude any conversations he had
3  with Akin Gump.
4       THE WITNESS: No.
5       MR. TECCE: Actually, I was
6  just confused on what happened
7  there.
8       Was he instructed not to
9  answer?
10      MR. KARLAN: I was instructing
11 the witness to exclude from his
12 answer any conversations he had
13 with Akin Gump.
14      MS. NEWMAN: Because they're
15 privileged.
16      MR. TECCE: And you're
17 asserting the privilege; right?
18      MS. NEWMAN: I believe that
19 both I and Gibson Dunn are
20 asserting the privilege.
21      MR. KARLAN: I'm happy to have
22 the witness answer the question if
23 Ms. Newman consents and everybody
24 agrees that his answer will not be
25 a waiver, any broader waiver than

Page 203

1  the question.
2       MS. NEWMAN: Plaintiffs, do
3  you agree to that?
4       MR. STYANT-BROWN: No.
5       MR. KARLAN: So that's what we
6  have.
7       MR. TECCE: Thank you very
8  much for your time, sir. I
9  appreciate it.
10      THE WITNESS: Thank you.
11      MR. KARLAN: Thank you,
12 everyone.
13      THE VIDEOGRAPHER: Going off
14 the record. The time is 2:21.
15      (TIME NOTED: 2:21 p.m.)
16 _____ (Signature of witness)
17 Subscribed and sworn to
18 before me this_____
19 day of_____,
20 2017.
21 _____
22
23
24
25

Page 204

* * *

I N D E X

| WITNESS | EXAMINED BY | PAGE |
|---|---|---|
| M. Williams | Mr. Gonzales | 8 |
|  | Mr. Tecce | 198 |

E X H I B I T S

| FOR ID | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 28 | Document entitled Settlement Agreement | 8 |
| Exhibit 29 | E-mail dated August 9, 2017 | 47 |
| Exhibit 30 | E-mail dated August 11, 2017 | 55 |
| Exhibit 31 | E-mail dated August 12, 2017 | 70 |
| Exhibit 32 | Document entitled Declaration of Beth Andrews In Support of the Joint Motion | 73 |
| Exhibit 33 | E-mail dated August 14, 2017 | 86 |
| Exhibit 34 | E-mail dated August 14, 2017 | 105 |

Page 205

I N D E X (continued)
E X H I B I T S (continued)

| FOR ID | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 35 | E-mail dated August 16, 2017 | 141 |
| Exhibit 36 | Document entitled Form 10-Q dated June 30, 2017 | 142 |
| Exhibit 37 | E-mail dated August 17, 2017 | 176 |

* * *