# Exhibit F

Message

| | |
|---|---|
| **From:** | Moss, Naomi [/O=AKINGUMP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MOSS, NAOMI937] |
| **Sent:** | 6/9/2017 9:00:16 PM |
| **To:** | Weisfelner, Ed (External) [/O=AKINGUMP/OU=AKINGUMP/cn=Recipients/cn=EdWeisfelner]; Steel, Howard S. [HSteel@brownrudnick.com] |
| **CC:** | Golden, Daniel [/O=AKINGUMP/OU=NY/cn=Recipients/cn=dgolden]; Newman, Deborah [/O=AKINGUMP/OU=AKINGUMP/cn=Recipients/cn=dnewman]; Williams, Matt J. [MJWilliams@gibsondunn.com]; Martorana, Keith R. [KMartorana@gibsondunn.com]; Gillett, Gabriel K. [GGillett@gibsondunn.com] |
| **Subject:** | GM |
| **Attachments:** | Redline_GM - GUC Trust Settlement Agreement - 102316378v1_GM - GUC Trust....pdf; 102316378_1 _GM - GUC Trust Settlement Agreement.docx |

SUBJECT TO FRE 408


Ed/Howie,


Attached please find a markup of the draft settlement agreement reflecting comments from Akin and Gibson. Please note that the attached markup remains subject to further review and revision in all respects.  Let us know if you would like to discuss.


Thanks,

Naomi


Naomi Moss

AKIN GUMP STRAUSS HAUER & FELD LLP

One Bryant Park | New York, NY 10036-6745 | USA | Direct:  <tel:1212.872.1044> +1 212.872.1044 | Internal:  <tel:31044> 31044
Fax: +1 212.872.1002 |  <mailto:nmoss@akingump.com> nmoss@akingump.com  | <http://www.akingump.com> akingump.com  | <http://www.akingump.com/nmoss> Bio



EXHIBIT
53
11/16/17 64

CONFIDENTIAL

AG0005147

GDC AND AGSHF INITIAL COMMENTS 6/9/17
DRAFT
SUBJECT TO FRE 408

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "**Agreement**"), dated as of _____, 2017 among:

Wilmington Trust Company, solely in its capacity as trustee for and administrator of the Motors Liquidation Company General Unsecured Creditors Trust (the "**GUC Trust**")

-and-

The Plaintiffs, as hereinafter defined (the Plaintiffs and the GUC Trust, the "**Parties**").

### PREAMBLE

**Background: The Old GM Bankruptcy.**

A.    Beginning on June 1, 2009 (the "**Petition Date**"), Motors Liquidation Company f/k/a General Motors Corporation, a Delaware Corporation ("**Old GM**"), and certain of its affiliated companies (together with Old GM, the "**Debtors**") commenced cases (the "**Old GM Bankruptcy Case**") under chapter 11 of the Bankruptcy Code (the "**Bankruptcy Code**");

B.    Also on the Petition Date, Old GM and certain other affiliated entities (collectively, the "**Sellers**") entered into a Master Sale and Purchase Agreement (the "**MSPA**") pursuant to which certain assets of the Sellers, including the brand "General Motors," were to be sold to NGMCO, Inc., n/k/a General Motors LLC, a Delaware corporation ("**New GM**");

C.    As of July 5, 2009, the MSPA, which had been previously amended and restated, was further and finally amended pursuant to a Second Amendment to the Amended and Restated Master Sale Purchase Agreement (the Master Sale and Purchase Agreement, as so amended and restated through the aforesaid Second Amendment, the "**AMSPA**") to, among other things, modify provisions in the AMSPA relating to the issuance by New GM of shares (the "**Adjustment Shares**") of New GM Common Stock in respect of General Unsecured Claims;

D.    Pursuant to the AMSPA, if the Bankruptcy Court issues an order estimating the aggregate Allowed General Unsecured Claims against Old GM (the "**Claims Estimate Order**") at an amount exceeding thirty-five billion dollars ($35,000,000,000), then New GM must, within five (5) business days of entry of the Claims Estimate Order, issue Adjustment Shares;

E.    On July 5, 2009, the AMSPA was approved pursuant to a Bankruptcy Code section 363 order (the "**Sale Order**");

F.    Pursuant to the Sale Order, New GM became vested in substantially all of the material assets of the Sellers;

[ PAGE  \* MERGEFORMAT ]

    AG0005148

CONFIDENTIAL DRAFT
ATTORNEY WORK PRODUCT
SUBJECT TO FRE 408

G.    On July 11, 2009 (the "**Closing Date**"), the Sale Order became effective and the transactions approved pursuant to the Sale Order were consummated (the "**363 Sale**");

H.    On September 16, 2009, the Bar Date Order was entered establishing November 30, 2009 (the "**Bar Date**") as the deadline to file proofs of claim against the Debtors;

I.    On March 29, 2011, the Bankruptcy Court issued an order (the "**Confirmation Order**") confirming the Debtors' Second Amended Joint Chapter 11 Plan (the "**Plan**");

J.    The Plan created the GUC Trust pursuant to an agreement, as it has been and may be further amended from time to time (the "**GUC Trust Agreement**"), as a post-confirmation successor to Old GM pursuant to Section 1145 of the Bankruptcy Code, to administer assets held by the GUC Trust (the "**GUC Trust Assets**");

K.    Pursuant to the Plan and a side letter (the "**Side Letter**"), attached hereto as Exhibit A, by and between the GUC Trust, the Debtors, New GM, and FTI Consulting (as trust monitor of the GUC Trust) dated September 23, 2011, the GUC Trust is authorized to seek the issuance of Adjustment Shares for satisfaction of Allowed General Unsecured Claims at any time; provided that it was the GUC Trust's then current intent to delay seeking the issuance of the Adjustment Shares until such time as the aggregate Allowed General Unsecured Claims were, in the GUC Trust's estimation, likely to exceed $35 billion;

L.    The Plan and GUC Trust Agreement provided the GUC Trust with the exclusive right to object to General Unsecured Claims;

M.    On March 31, 2011 (the "**Effective Date**"), the Plan was declared effective;

**The Recalls and the Multi-District Litigation.**

N.    In or around February and March of 2014, New GM issued a recall, NHTSA Recall Number 14V-047, pertaining to approximately [2.1][1] million vehicles with an ignition switch defect (the "**Ignition Switch Defect**");

O.    In or around June and July of 2014, New GM issued three additional recalls pertaining to approximately 10.4 million vehicles with defective ignition switches, NHTSA Recall Numbers 14V-355, 14V-394, and 14V-400;

P.    In or around March of 2014, New GM issued a recall, NHTSA Recall Number 14V-118, pertaining to approximately 1.2 million vehicles with defective side airbags;

Q.    In or around March of 2014, New GM issued a recall, NHTSA Recall Number 14V-153, pertaining to over 1.3 million vehicles with defective power steering;

---

[1]    [NTD – To be Verified]

[ PAGE ]

CONFIDENTIAL

AG0005149

CONFIDENTIAL DRAFT
ATTORNEY WORK PRODUCT
SUBJECT TO FRE 408

R.    Commencing after the issuance of the recalls, numerous lawsuits were filed against New GM, individually or on behalf of putative classes of persons, by, *inter alia*,:

a.    plaintiffs asserting economic loss claims who, as of November 30, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 (the "**Ignition Switch Plaintiffs**");

b.    plaintiffs asserting economic loss claims who, as of November 30, 2009, owned or leased a vehicle with defects in ignition switches, side airbags, or power steering included in NHTSA Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153 (the "**Non-Ignition Switch Plaintiffs**"); and

c.    plaintiffs asserting personal injury or wrongful death claims based on or arising from an accident involving an Old GM vehicle that occurred prior to the closing of the Section 363 Sale (the "**Pre-Closing Accident Plaintiffs**"), including a subset asserting claims involving an Old GM vehicle with the Ignition Switch Defect (the "**Ignition Switch Pre-Closing Accident Plaintiffs**");

S.    Many of the cases commenced against New GM were consolidated in a multi-district litigation (the "**GM MDL**") pending in the United States District Court for the Southern District of New York before the Hon. Jesse M. Furman (the "**District Court**");

**The Motions to Enforce Litigation.**

T.    In or around April and August of 2014, New GM sought to enjoin such lawsuits against New GM by filing motions to enforce the Sale Order with respect to: (i) Ignition Switch Plaintiffs; (ii) Ignition Switch Pre-Closing Accident Plaintiffs; and (iii) certain Non-Ignition Switch Plaintiffs (the "**Motions to Enforce**");

U.    Following the filing of the Motions to Enforce, the Bankruptcy Court identified initial issues to be addressed on the Motions to Enforce with respect to the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs;

V.    Following briefing and argument, the Bankruptcy Court issued its decision (the "**Decision**") on April 15, 2015, and a judgment implementing the Decision (the "**Judgment**") on June 1, 2015;

W.    In the Decision and the Judgment, the Bankruptcy Court ruled that "based on the doctrine of equitable mootness, in no event shall assets of the GUC Trust held at any time in the past, now or in the future (collectively, the 'GUC Trust Assets') (as defined in the Plan) be used to satisfy any claims of the Plaintiffs";

X.    On July 13, 2016, the Second Circuit issued an opinion on direct appeal of the Decision and Judgment, vacating the Bankruptcy Court's equitable mootness ruling as an advisory opinion;

[ PAGE ]

    AG0005150

CONFIDENTIAL DRAFT
ATTORNEY WORK PRODUCT
SUBJECT TO FRE 408

Y.    Following the issuance of the Second Circuit's mandate, the Bankruptcy Court identified initial issues to be addressed on remand, including whether "the Ignition Switch Plaintiffs and/or Non-Ignition Switch Plaintiffs [inclusive of the Pre-Closing Accident Plaintiffs] satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust and/or are such claims equitably moot";

Z.    On December 22, 2016, the Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Pre-Closing Accident Plaintiffs filed motions for authority to file late proofs of claim, including late class proofs of claim (the "**Late Claims Motions**"), the Bankruptcy Court, however, expressly stated that any decision relating to whether the putative class could be certified would be deferred to a later date;

AA.    On or around February 16, 2017, counsel for the GUC Trust served counsel for the Ignition Switch Plaintiffs and counsel for the Pre-Closing Accident Plaintiffs with interrogatories (the "**Late Claims Interrogatories**") in connection with the Late Claims Motions.

BB.    The Pre-Closing Accident Plaintiffs and the Ignition Switch Plaintiffs responded to the Late Claims Interrogatories on a rolling basis.

CC.    In or around March 2017, additional briefing occurred on issues raised by the proponents of the Late Claims Motions which included, among other things, a joint brief filed by the GUC Trust and certain unaffiliated holders of beneficial units of the GUC Trust in opposition to the Late Claims Motions;

DD.    [In or around April and May of 2017, counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs provided counsel for the GUC Trust with an expert report and a proffer of evidence indicating that the amount of damages for the Ignition Switch Plaintiffs' and Non-Ignition Switch Plaintiffs' claims, if ultimately determined to be Allowed General Unsecured Claims against Old GM and/or the GUC Trust, could be greater than that necessary to trigger New GM's obligation to issue Adjustment Shares in the maximum amount under the AMSPA;][2]

EE.    The Plaintiffs, on the one hand, and the GUC Trust, on the other hand, disagree regarding whether the proponents of the Late Claims motions satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust, and whether such claims are equitably moot;

FF.    The Plaintiffs, on the one hand, and the GUC Trust, on the other hand, disagree regarding whether any GUC Trust Assets currently in the GUC Trust could be used to satisfy Plaintiffs' potential claims;

---

[2]    [NTD – Need to consider and include evidentiary record for Pre-Closing Accident Plaintiffs.]

[ PAGE ]

**CONFIDENTIAL DRAFT**
**ATTORNEY WORK PRODUCT**
**SUBJECT TO FRE 408**

GG.    The Plaintiffs, on the one hand, and the GUC Trust, on the other hand, disagree regarding whether any GUC Trust Assets previously distributed are subject to claw-back or recapture by the GUC Trust and/or the Plaintiffs;

HH.    The Plaintiffs, on the one hand, and the GUC Trust on the other hand, disagree regarding the ultimate amount of Allowed General Unsecured Claims that would arise if the damages of the Ignition Switch Plaintiffs', Non-Ignition Switch Plaintiffs' and Pre-Closing Accident Plaintiffs' claims are ultimately determined to be Allowed General Unsecured Claims against Old GM and/or the GUC Trust;

II.    The GUC Trust desires to complete the distribution of the GUC Trust Assets held by the GUC Trust as soon as practicable and, to such purpose, desires to resolve the Late Claims Motions and the Plaintiffs' potential claims against the GUC Trust and Old GM;

JJ.    The GUC Trust acknowledges the key objectives of the Plaintiffs in entering into this Agreement are to (i) achieve the funding of the Settlement Fund; (ii) avoid the risk, delay, uncertainty and costs of litigation with the GUC Trust; and (iii) take or to cause to be taken all steps necessary to require New GM to issue the maximum amount of Adjustment Shares and to make the value of the Settlement Fund and the Adjustment Shares available to satisfy the Plaintiffs' claims and, in connection with those objectives, the GUC Trust agrees to provide the cooperation and assistance provided for herein relating to the issuance of a Claims Estimate Order, as provided for pursuant to Section 3.2(c) of the AMSPA and the Side Letter;

KK.    The Plaintiffs acknowledge the key objectives of the GUC Trust in entering into this Agreement are: (i) to minimize any delay in the distribution of any remaining GUC Trust Assets; (ii) avoid any claw-back or recapture of prior distributions of GUC Trust Assets; and (iii) otherwise avoid the risk, delay, uncertainty and costs of litigation.

## AGREEMENT

The GUC Trust and the Plaintiffs propose to resolve their dispute as follows:

**1.    DEFINITIONS.**  The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

**1.1    Adjustment Shares** shall have the meaning ascribed to such term in the Preamble.

**1.2    Allowed General Unsecured Claims** means General Unsecured Claims against the Debtors that have been allowed through the date of entry of the Claims Estimate Order.

**1.3    AMPSA** shall have the meaning ascribed to such term in the Preamble.

**1.4    Bar Date Order** means that *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim (Including Claims Under Bankruptcy Code Section 503(B)(9)) and Procedures Relating*

[ PAGE ]

CONFIDENTIAL DRAFT
ATTORNEY WORK PRODUCT
SUBJECT TO FRE 408

*Thereto and Approving the Form and Manner of Notice Thereof*, dated Sept. 16, 2009 [ECF No. 4079] entered by the Bankruptcy Court establishing the Bar Date.

    **1.5**    **Bar Date** shall have the meaning ascribed to such term in the Preamble.

    **1.6**    **Bankruptcy Code** means title 11 of the United States Code.

    **1.7**    **Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of New York and shall have the meaning ascribed to such term in the Preamble.

    **1.8**    **Claims Estimate Order** shall mean an order of the Bankruptcy Court estimating the aggregate Allowed General Unsecured Claims against the Debtors, excluding any Term Loan Avoidance Action Claims.

    **1.9**    **Co-Lead Counsel** means Steve W. Berman of Hagens Berman Sobol Shapiro LLP, Elizabeth Cabraser of Lieff, Cabraser, Heimann & Bernstein, LLP, and Robert C. Hilliard of Hilliard Muñoz Gonazlez, LLP, who were individually and collectively appointed to represent all plaintiffs in the GM MDL by Order No. 8, In re Gen. Motors LLC Ignition Switch Litig., No. 14-MD-2543 (S.D.N.Y. Aug. 15, 2014) [ECF No. 249], or any other or replacement counsel appointed to represent any Plaintiffs in the GM MDL.

    **1.10**    **Communication** shall have the meaning ascribed to such term in Section [3.15].

    **1.11**    **Confirmation Order** shall have the meaning ascribed to such term in the Preamble.

    **1.12**    **Debtors** shall have the meaning ascribed to such term in the Preamble.

    **1.13**    **Decision** means *Decision on Motion to Enforce Sale Order*, entered April 15, 2015 [ECF No. 13109] by Judge Robert E. Gerber in the Bankruptcy Court, published as In re Motors Liquidation Company, 529 B.R. 510 (Bankr. S.D.N.Y. 2015), as corrected in *Errata Order RE: Decision on Motion to Enforce Sale Order*, In re Motors Liquidation Co., No. 09-50026, dated July 13, 2015 [ECF No. 13290].

    **1.14**    **District Court** shall have the meaning ascribed to such term in the Preamble.

    **1.15**    **Effective Date** shall have the meaning ascribed to such term in the Preamble.

    **1.16**    **Final Order** has the meaning ascribed to it in the Plan.

    **1.17**    **General Unsecured Claim** has the meaning ascribed to it in the Plan.

    **1.18**    **GM MDL** shall have the meaning ascribed to such term in the Preamble.

    **1.19**    **GUC Trust** means the trust created by the GUC Trust Agreement in the form approved as Exhibit D to the Plan, as the same has been and may further be amended from time to time.

[ PAGE ]

**1.20    GUC Trust Agreement** means the *Second Amended and Restated Motors Liquidation Company GUC Trust Agreement*, by and among Wilmington Trust Company, as trust administrator and trustee of the GUC Trust, and FTI Consulting, as trust monitor of the GUC Trust, dated July 30, 2015, as it may be amended from time to time.

**1.21    GUC Trust Assets** means assets that have been held, are held, or may be held in the future by the GUC Trust.

**1.22    Ignition Switch Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.23    Ignition Switch Pre-Closing Accident Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.24    Judgment** means the Judgment, entered June 1, 2015 [ECF No. 13177] by Judge Robert E. Gerber in the Old GM Bankruptcy Case.

**1.25    Key Objectives** means the objectives of the Parties in entering into this Agreement as stated in Paragraph [JJ] and [KK] of the Preamble.

**1.26    Late Claims Motions** shall have the meaning ascribed to such term in the Preamble.

**1.27    Motions to Enforce** means, collectively, the (i) *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, dated April 21, 2014 [ECF No. 12620]; (ii) *Motion of General Motors LLC Pursuant to 11 U.S.C §§ 105 and 363 to Enforce this Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits*, dated August 1, 2014 [ECF No. 12807]; and (iii) *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)*, dated August 1, 2014 [ECF No. 12808].

**1.28    New GM** means General Motors LLC (F/K/A NGMCO, Inc.).

**1.29    New GM Common Stock** means the common stock of New GM.

**1.30    NHTSA** means the National Highway Traffic Safety Administration.

**1.31    Non-Ignition Switch Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.32    Notice Cost Cap Amount** shall have the meaning ascribed to such term in Section [2.8].

**1.33    Old GM** means Motors Liquidation Company, formerly known as General Motors Corporation.

[ PAGE ]

AG0005154

CONFIDENTIAL DRAFT
ATTORNEY WORK PRODUCT
SUBJECT TO FRE 408

**1.34    Old GM Bankruptcy Case** means those proceedings commenced on June 1, 2009 in the Bankruptcy Court captioned *In re Motors Liquidation Company, et al., f/k/a General Motors Corp.*, Bankr. No. 09-50026.

**1.35    Parties** means the Plaintiffs and the GUC Trust.

**1.36    Plaintiffs** means the Ignition Switch Plaintiffs, the Non-Ignition Switch Plaintiffs, and the Pre-Closing Accident Plaintiffs, including all plaintiffs (whether named or unnamed including unnamed members of a putative class) covered by any of the Late Claims Motions, and all plaintiffs represented by counsel that is signatory hereto; [it being understood however that the covenants and agreements to be performed by the Plaintiffs are to be performed by Co-Lead Counsel and the undersigned counsel and that no action or failure to act by any Plaintiff shall constitute a breach of this Agreement or shall excuse the performance of any other Party].[3]

**1.37    Plan** means Debtors' Second Amended Joint Chapter 11 Plan, filed March 18, 2011 [ECF No. 9836] by Motors Liquidation Company in the Bankruptcy Proceeding.

**1.38    Pre-Closing** means any time before July 5, 2009, the date certain on which the Bankruptcy Court entered an order approving the 363 Sale between Sellers and New GM.[4]

**1.39    Pre-Closing Accident Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.40    Recalls** means NHTSA Recall Numbers 14V-047, 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153.

**1.41    Sale Order** means the *Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief*, dated July 5, 2009 [ECF No. 2968] and the supporting *Decision on Debtors' Motion for Approval of (1) Sale of Assets to Vehicle Acquisition Holdings, LLC; (2) Assumption and Assignment of Related Executory Contracts; and (3) Entry into UAW Retiree Settlement Agreement*, dated July 5, 2009 [ECF No. 2967].

**1.42    Sellers** means Motors Liquidation Company, formerly known as General Motors Corporation, together with three of its debtor subsidiaries, Chevrolet-Saturn of Harlem, Inc.; Saturn, LLC; and Saturn Distribution Corporation.

**1.43    Settlement** means the settlement of the Parties' disputes as provided for by this Agreement.

**1.44    Settlement Amount** shall have the meaning ascribed to such term in Section [2.4] hereto.

---

[3]    [NTD: Explain the basis for this language.]

[4]    [NTD – is Pre-Closing any time before the date of entry of the order, or the date of the actual closing?]

[ PAGE ]

**1.45**    **Settlement Effective Date** shall have the meaning ascribed to such term in Section [3.1] hereto.

**1.46**    **Settlement Fund** shall have the meaning ascribed to such term in Section [2.4] hereto.

**1.47**    **Settlement Motion** shall have the meaning ascribed to such term in Section [2.3] hereto.

**1.48**    **Settlement Order** shall have the meaning ascribed to such term in Section [2.3].

**1.49**    **Term Loan Avoidance Action Claims** shall have the meaning ascribed to such term in the GUC Trust Agreement.

**1.50**    **Waiver** shall have the meaning ascribed to such term in Section [2.3].

**1.51**    **Waiver Provision** shall have the meaning ascribed to such term in Section [2.3].

**2.**    <u>**MUTUAL AGREEMENTS OF THE PARTIES.**</u>

**2.1**    The Preamble constitutes an essential part of the Agreement and is incorporated herein.

**2.2**    The Parties agree to act in good faith to achieve the Key Objectives and, subject to their fiduciary duties to which they are or may become subject to independently of this Agreement, agree to refrain from any act, course of conduct or statement, the reasonably foreseeable consequence of which would be to hinder, interfere with or unduly delay the achievement of the Key Objectives.

**2.3**    As soon as practicable following the execution of this Agreement, the Parties shall prepare and file a motion in the Bankruptcy Court (the "<u>**Settlement Motion**</u>") seeking entry of (i) an order (the "<u>**Settlement Order**</u>") substantially in the form of <u>Exhibit B</u> attached hereto approving the Settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, and (ii) a Claims Estimate Order substantially in the form of <u>Exhibit C</u> attached hereto. Notwithstanding anything to the contrary set forth herein, the Settlement Order shall contain a provision which imposes a complete and irrevocable waiver and release on the part of all Plaintiffs with respect to any and all rights, claims and causes of action, now existing or arising in the future, that any Plaintiff might directly or indirectly assert against the Debtors, their estates, the GUC Trust, GUC Trust Assets, and the Motors Liquidation Company Avoidance Action Trust, including but not limited to any Allowed General Unsecured Claims of the Plaintiffs arising under, or that may arise under, the Claims Estimate Order (the "<u>**Waiver Provision**</u>," and the waiver and release contemplated thereby, the "<u>**Waiver**</u>"), and shall otherwise be on terms acceptable to the GUC Trust and Co-Lead Counsel, each in their sole and absolute discretion.

[ PAGE ]

AG0005156

CONFIDENTIAL DRAFT
ATTORNEY WORK PRODUCT
SUBJECT TO FRE 408

**2.4**    Among other things, the Settlement Order will direct the GUC Trust to pay [_____] dollars ($[_____]) in cash (the "**Settlement Amount**") to a trust, fund or other vehicle (the "**Settlement Fund**") established and designated by the Plaintiffs (for purposes of administration of Plaintiffs' claims reconciliation and/or distributions to Plaintiffs under a subsequent allocation methodology) within five (5) business days of the Settlement Effective Date; provided that the amount of cash to be paid by the GUC Trust to the Settlement Fund shall be subject to adjustment pursuant to section [2.8] of this Agreement.

**2.5**    The Waiver Provision shall become immediately and automatically effective and binding on all Plaintiffs contemporaneously with the payment of the Settlement Amount by the GUC Trust to the Settlement Fund.

**2.6**    In addition, and in furtherance of the Key Objectives and as an inducement to the Plaintiffs' entry into this Agreement and willingness to be bound by the terms of Settlement Order, including but not limited to the Waiver Provision, the GUC Trust agrees that it shall support the entry of a Claims Estimate Order that contains a finding that the allowed amount of Plaintiffs' General Unsecured Claims against the Debtors and/or the GUC Trust, when combined with all of the other Allowed General Unsecured Claims against the Debtors (excluding any Term Loan Avoidance Action Claims), equals or exceeds $42 billion, thus triggering the issuance of the maximum amount of Adjustment Shares.

**2.7**    The Parties shall use their reasonable efforts to have the Claims Estimate Order entered on the same date as the Settlement Order, provided that, regardless of whether or not the Claims Estimate Order is entered on or after such date (and regardless of whether the request to enter the Claims Estimate Order is approved or denied), this Agreement (including, but not limited to Sections [2.3, 2.4 and 2.5] hereof) and the Settlement Order shall remain binding upon the Parties. The Parties shall use reasonable efforts to have the Claims Estimate Order:

    (a)    estimate and allow the General Unsecured Claims of the Plaintiffs against the Debtors and/or the GUC Trust pursuant to Section 7.3 of the Plan in an amount, when combined with all of the other Allowed General Unsecured Claims against the Debtors' bankruptcy estates (but excluding any Term Loan Avoidance Action Claims), equals or exceeds $42 billion;

    (b)    estimate the aggregate Allowed General Unsecured Claims (but excluding any Term Loan Avoidance Action Claims), including the Plaintiffs' estimated and Allowed General Unsecured Claims as set forth above, pursuant to Section 3.2(c) of the AMSPA and the Side Letter in an amount equal to or exceeding $42 billion and require New GM to issue the maximum amount of Adjustment Shares; and direct that any such Adjustment Shares issued as a result of a Claims Estimate Order, or the value of such Adjustment Shares, be delivered to the Settlement Fund.

**2.8**    The Plaintiffs and the GUC Trust shall be responsible for providing notice in connection with the Settlement Motion. The GUC Trust agrees to pay the reasonable costs and expenses for notice of the Settlement Motion in an amount not to exceed $[_____] (the "**Notice Cost Cap Amount**"). Such notice shall include (i) publication notice; (ii) notice by

[ PAGE ]

CONFIDENTIAL DRAFT
ATTORNEY WORK PRODUCT
SUBJECT TO FRE 408

postcard to: (A) all persons in the United States who, as of November 30, 2009, owned or leased a defective vehicle manufactured by Old GM included in the Recalls; and (B) all Pre-Closing Accident Plaintiffs who have filed a lawsuit against New GM as of the date of this agreement; and (iii) notice via DTC's LENSNOTICE system to holders of beneficial units of the GUC Trust. Any amount in excess of the Notice Cost Cap Amount spent by the GUC Trust in providing such notice shall be deducted from the payment made to the Settlement Fund. Immediately following execution of this Agreement, the Parties shall (x) request a Chambers conference with the Bankruptcy Court and (y) request that New GM provide the names and addresses of the individuals in categories (i) and (ii) at a status conference to be scheduled with the Bankruptcy Court prior to the provision of such notice.

**2.9**      The Parties agree that all of the value of the Settlement Fund shall be reserved for the exclusive benefit of the Plaintiffs, subject only to costs associated with the administration of the Settlement Fund.

**2.10**     The Plaintiffs or, in the alternative, an administrator appointed by the Plaintiffs, shall establish the Settlement Fund and the procedures for the administration and allocation to Plaintiffs of the Settlement Fund.

**2.11**     Nothing in this Agreement shall waive any claims that Plaintiffs may have against New GM, and the Settlement Fund shall not represent full and final satisfaction of any claims that Plaintiffs may have against New GM.

**3.      MISCELLANEOUS PROVISIONS
APPLICABLE TO THIS AGREEMENT.**

**3.1**      **Settlement Effective Date.**  This Agreement shall become effective and binding on the Parties on the date on which this Agreement is fully executed by each of the Parties. The Settlement set forth in this agreement (including but not limited to the required payment of the Settlement Amount and delivery of the Waiver as set forth herein) shall become effective on the date that the Settlement Order becomes a Final Order, provided that such date occurs on or before [___], 2017 (unless extended to a later date as agreed by the Parties) (the "**Settlement Effective Date**"), provided further, however, that from and after the date the Settlement Order is entered by the Bankruptcy Court, the GUC Trust may waive the requirement that the Settlement Order be a Final Order.

**3.2**      **Termination.**

(A) _Automatic Termination._  This agreement shall immediately terminate as to all Parties in the event that the Bankruptcy Court denies approval of the Settlement Motion (as it relates to the Settlement Order, but not as it relates to the Claims Estimation Order) or the Settlement Effective Date does not occur on or before [_____], 2017 (or such later date as may be agreed to by the Parties). In the event of such automatic termination, this Agreement shall be null and void, and each of the Parties' respective interests, rights, remedies and defenses shall be fully restored without prejudice as if this Agreement

[ PAGE ]

(except as set forth in Sections [3.3, 3.4, 3.5, 3.13, 3.15, and 3.19]) had never existed and the Parties shall be returned to their respective positions status quo ante.

(B) Termination For Cause. In the event of any material breach of the terms of this Agreement, the non-breaching Party may elect (in addition to any other remedies available to the non-breaching party hereunder or under applicable law) to terminate this Agreement by (i) providing a Communication to the breaching party as set forth in Section [3.15] below, and affording the breaching party a five (5) business day period in which to cure the purported breach, and (ii) absent such cure or the commencement of an action in the Bankruptcy Court with respect to the existence of any such breach, by providing a follow-up Communication to the breaching Party as set forth in Section [3.15] below, that declares the Agreement to be terminated. Following such termination for cause, the terms of the Agreement shall no longer be binding on the non-breaching Party (except as set forth in Sections [3.3, 3.4, 3.5, 3.13, 3.15, and 3.19]).

**3.3    Attorneys' Fees.**  Except as otherwise provided for herein, each of the Parties shall pay its own court costs, attorneys' fees, and all other expenses, costs, and fees incurred relating to this Agreement and any related litigation, including but not limited to the GM MDL and Motions to Enforce litigation. If any lawsuit or proceeding is required to enforce the terms of this Agreement, the prevailing party in any such lawsuit or proceeding shall be entitled to reasonable attorney's fees and costs.

**3.4    No Admission.**  Nothing in this Agreement shall be deemed an admission of any kind. To the extent provided by Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than in support of the Settlement Motion and proposed entry of the Settlement Order and Claims Estimate Order or in a proceeding to enforce the terms of this Agreement.

**3.5    Remedies.**  Each of the Parties retain all remedies available in law or equity for breach of this Agreement by any Party, including, without limitation, the right of a non-breaching Party to seek specific performance and injunctive or other equitable relief as a remedy for any such breach.

**3.6    No Litigation.**  Except as may be necessary to enforce the terms of this Agreement, the Parties and any other person who is an intended beneficiary hereunder, agree that she or he shall not commence or proceed with any action, claim, suit, proceeding or litigation against any other Party, directly or indirectly, regarding or relating to the matters described in this Agreement, or take any action inconsistent with the terms of the Agreement.

**3.7    Further Assurances.**  Each of the Parties covenant to, from time to time, execute and deliver such further documents and instruments and take such other actions as may be reasonably required or appropriate to evidence, effectuate, or carry out the intent and purposes of this Agreement or to perform its obligations under this Agreement and the transactions contemplated thereby.

[ PAGE ]

CONFIDENTIAL DRAFT
ATTORNEY WORK PRODUCT
SUBJECT TO FRE 408

**3.8    Cooperation.**  The Parties agree to reasonably cooperate with one another to effectuate an efficient and equitable implementation of this Agreement.

**3.9    Counterparts; Facsimile; Signatures.**  This Agreement may be executed in any number of counterparts and by different Parties to this Agreement on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement.  Any signature delivered by any of the Parties by facsimile or electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement, shall be deemed to be an original signature hereto, and shall be admissible as such in any legal proceeding to enforce this Agreement.

**3.10    Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective agents, partners, attorneys, employees, representatives, officers, directors, shareholders, divisions, subsidiaries, affiliates, transferees, heirs, executors, administrators, personal representatives, legal representatives, successors, and assigns, consistent with the other provisions of this Agreement.

**3.11    Integration.**  This Agreement constitutes the entire agreement and understanding among the Parties hereto relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements, representations and understandings between or among any of the Parties hereto relating to such subject matter.  In entering into this Agreement, the Parties and each of them acknowledge that they are not relying on any statement, representation, warranty, covenant or agreement of any kind made by any other party hereto or any employee or agent of any other party hereto, except for the representations, warranties, covenants and agreements of the Parties expressly set forth herein.

**3.12    Amendment.**  Except as otherwise specifically provided in this Agreement, no amendment, modification, rescission, waiver or release of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Parties.

**3.13    Interpretation.**  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, and the Parties agree to take any and all steps which are necessary in order to enforce the provisions hereof.

**3.14    Severability.**  The terms and conditions of this Agreement are not severable. However, if any provision or part of any provision of this Agreement is for any reason declared or determined by a court to be invalid, unenforceable, or contrary to public policy, law, statute, or ordinance, the validity of the remaining parts, terms, or provisions of this Agreement shall not be affected thereby and shall remain valid and fully enforceable, and such invalid, unenforceable, or illegal part or provision shall not be deemed to be part of this Agreement.

**3.15    Notices.**  Any notice, demand, request, consent, approval, declaration or other communication (a "**Communication**") under this Agreement shall be in writing and shall be given or delivered (i) by a nationally recognized private overnight courier service addressed as indicated in Schedule 1 annexed hereto or to such other address as such party may indicate by a notice delivered to the other Parties hereto in accordance with the provisions hereof; or

[ PAGE ]

CONFIDENTIAL DRAFT
ATTORNEY WORK PRODUCT
SUBJECT TO FRE 408

(ii) to the extent that such Communication has been filed with the Bankruptcy Court, via the electronic distribution means used by the Bankruptcy Court. Any Communication shall be deemed to have been effectively delivered and received, if sent by a nationally recognized private overnight courier service, on the first business day following the date upon which it is delivered for overnight delivery to such courier service.

**3.16    Choice of Law and Forum; Consent to Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to its conflict of laws principles. The District Court and the Bankruptcy Court shall have jurisdiction to resolve any dispute arising out of, related to or in connection with this Agreement to the exclusion of any other court, and the Parties hereby consent to the jurisdiction of the District Court and the Bankruptcy Court for resolution of such disputes and agree that they shall not attempt to litigate any such dispute in any other court.

**3.17    Advice of Counsel.** Each Party represents and acknowledges that it has been represented by an attorney with respect to this Agreement and any and all matters covered by or related to such Agreement. Each Party further represents and warrants to each other that the execution and delivery of this Agreement has been duly authorized by each of the Parties after consultation with counsel, that the persons signing this Agreement on their behalf below have been fully authorized by their respective Parties to do so, and that the undersigned do fully understand the terms of this Agreement and have the express authority to enter into this Agreement.

**3.18    Assignment.** No assignment of this Agreement or of any rights or obligations hereunder may be made by any party hereto without the prior written consent of the other Parties hereto, and any attempted assignment without such prior consent shall be null and void. No assignment of any obligations hereunder shall relieve any of the Parties hereto liable therefore of any such obligations.

**3.19    Waiver.** Except as otherwise specifically provided in this Agreement, any provision of this Agreement may be waived only by a written instrument signed by the Party against whom enforcement of such waiver is sought.

**3.20    Headings, Number, and Gender.** The descriptive headings of the sections of this Agreement are included for convenience of reference only and shall have no force or effect in the interpretation or construction of this Agreement. As used in this Agreement, the singular shall include the plural, and the masculine shall include the feminine and neutral genders, and vice versa.

**3.21    Waiver of Jury Trial.** Each of the Parties hereby irrevocably waives its rights, if any, to a jury trial for any claim or cause of action based upon or arising out of this Agreement.

[ PAGE ]

AG0005161

**CONFIDENTIAL DRAFT**
**ATTORNEY WORK PRODUCT**
**SUBJECT TO FRE 408**

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

| | |
|---|---|
| **BROWN RUDNICK LLP** | **GIBSON, DUNN & CRUTCHER, LLP** |
| On behalf of the Plaintiffs | On behalf of the GUC Trust |
| By: _____DRAFT_____ | By: _____DRAFT_____ |
| Name: Edward S. Weisfelner | Name: Matthew Williams |
| Name: Howard S. Steel | Name: Keith R. Martorana |
| | Name: Gabriel Gillett |
| Title: Designated Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the Bankruptcy Court | Title: Counsel for Wilmington Trust Company, as Administrator and Trustee of the GUC Trust |

**STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.**

On behalf of the Plaintiffs

By: _____DRAFT_____
Name: Sander L. Esserman

Title: Designated Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the Bankruptcy Court

**HAGENS BERMAN SOBOL SHAPIRO LLP**

On behalf of the Plaintiffs

By: _____DRAFT_____
Name: Steve W. Berman

Title: Co-Lead Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the MDL Court

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**

On behalf of the Plaintiffs

By: _____DRAFT_____
Name: Elizabeth J. Cabraser

Title: Co-Lead Counsel for the Ignition Switch

[ PAGE ]

CONFIDENTIAL DRAFT
ATTORNEY WORK PRODUCT
SUBJECT TO FRE 408

Plaintiffs and certain Non-Ignition Switch
Plaintiffs in the MDL Court

GOODWIN PROCTOR LLP

On behalf of the Plaintiffs

By: _____DRAFT_____
Name:  William P. Weintraub
Name:  Gregory W. Fox

Title: Counsel to Those Certain Post-Closing
Accident Plaintiffs Represented By Butler
Wooten & Peak LLP, Denney & Barrett, P.C.,
Hilliard Muñoz Gonzales L.L.P., and Turner &
Associates, P.A.

HILLIARD MUÑOZ GONZALES LLP

On behalf of the Plaintiffs

By: _____DRAFT_____
Name:  Robert Hilliard

Title: Lead Counsel in the MDL Court with
Primary Responsibility for Personal Injury
and Wrongful Death Cases

GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP

On behalf of the Plaintiffs

By: _____DRAFT_____
Name:  Jonathan L. Flaxer
Name:  Michael S. Weinstein

Title: Co-Counsel to Groman Plaintiffs

WOLF HALDENSTEIN ADLER FREEMAN
& HERZ LLP

On behalf of the Plaintiffs

By: _____DRAFT_____
Name:  Alexander H. Schmidt
Name:  Malcolm T. Brown

[ PAGE ]

AG0005163

**CONFIDENTIAL DRAFT**
**ATTORNEY WORK PRODUCT**
**SUBJECT TO FRE 408**

Title: Co-Counsel to Groman Plaintiffs

Gary Peller

On behalf of the Plaintiffs

By: _____DRAFT_____
Name:  Gary Peller

Title: Counsel to Sharon Bledsoe, Celestine
Elliott, Lawrence Elliott, and Dierra Thomas

[ PAGE ]

CONFIDENTIAL                                                  AG0005164

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "**Agreement**"), dated as of _____, 2017 among:

Wilmington Trust Company, solely in its ~~capacities~~capacity as trustee for and administrator of the Motors Liquidation Company General Unsecured Creditors Trust (the "**GUC Trust**") ~~and the Motors Liquidation Company Avoidance Action Trust (the "~~**~~Avoidance Action Trust~~**~~") and certain unaffiliated holders of beneficial units of the GUC Trust (the "~~**~~Participating Unitholders~~**~~," together with the GUC Trust and the Avoidance Action Trust, the "~~**~~Trust Parties~~**~~")~~

-and-

The Plaintiffs, as hereinafter defined (the Plaintiffs and the GUC Trust ~~Parties~~, the "**Parties**").

## PREAMBLE

### Background: The Old GM Bankruptcy.

A.    ~~On~~Beginning on June 1, 2009 (the "**Petition Date**"), ~~the~~ Motors Liquidation Company f/k/a General Motors Corporation, a Delaware Corporation ("**Old GM**"), and certain of its affiliated companies (together with Old GM, the "**Debtors**") commenced cases (the "**Old GM Bankruptcy Case**") under chapter 11 of the Bankruptcy Code (the "**Bankruptcy Code**");

B.    Also on the Petition Date, Old GM and certain other affiliated entities (collectively, the "**Sellers**") entered into a Master Sale and Purchase Agreement (the "**MSPA**") pursuant to which certain assets of the ~~Debtors~~Sellers, including the brand "General Motors," were to be sold to NGMCO, Inc., n/k/a General Motors LLC, a Delaware corporation ("**New GM**");

C.    As of July 5, 2009, the MSPA, which had been previously amended and restated, was further and finally amended pursuant to a Second Amendment to the Amended and Restated Master Sale Purchase Agreement (the Master Sale and Purchase Agreement, as so amended and restated through the aforesaid Second Amendment, the "**AMSPA**") to, among other things, modify provisions in the AMSPA relating to the issuance by New GM of shares (the "**Adjustment Shares**") of New GM Common Stock in respect of General Unsecured Claims;

D.    Pursuant to the AMSPA, if the Bankruptcy Court issues an order estimating the aggregate ~~allowed general unsecured claims~~Allowed General Unsecured Claims against Old GM (the "**Claims Estimate Order**") at an amount exceeding thirty-five billion dollars ($35,000,000,000), then New GM must, within five (5) business days of entry of the Claims Estimate Order, issue Adjustment Shares;

1

AG0005165

CONFIDENTIAL DRAFT
ATTORNEY WORK PRODUCT
SUBJECT TO FRE 408

E.    On July 5, 2009, the AMSPA was approved pursuant to a Bankruptcy Code Section~~section~~ 363 ~~Order~~order (the "**Sale Order**");

F.    Pursuant to the Sale Order, New GM became vested in substantially all of the material assets of the ~~Debtors~~Sellers;

G.    On July 11, 2009 (the "**Closing Date**"), the Sale Order became effective and the transactions approved pursuant to the Sale Order were consummated (the "**363 Sale**");

H.    On September 16, 2009, the Bar Date Order was entered establishing November 30, 2009 (the "**Bar Date**") as the deadline to file proofs of claim against the Debtors;

I.    On March 29, 2011, the Bankruptcy Court issued an order (the "**Confirmation Order**") confirming the Debtors' Second Amended Joint Chapter 11 Plan (the "**Plan**");

J.    The Plan created the GUC Trust pursuant to an agreement, as it has been and may be further amended from time to time (the "**GUC Trust Agreement**"), as a post-confirmation successor ~~under~~ to Old GM pursuant to Section 1145 of the Bankruptcy Code ~~to Old GM~~, to administer assets held by the GUC Trust (the "**GUC Trust Assets**");

K.    Pursuant to the Plan~~,~~ and a side letter (the "**Side Letter**"), attached hereto as Exhibit A, by and between the GUC Trust, the Debtors, New GM, and FTI Consulting (as trust monitor of the GUC Trust) dated September 23, 2011, the GUC Trust is authorized to seek the issuance of Adjustment Shares for satisfaction of ~~allowed general unsecured claims to the extent the aggregate allowed general unsecured claims exceeds $35 billion;~~ Allowed General Unsecured Claims at any time; provided that it was the GUC Trust's then current intent to delay seeking the issuance of the Adjustment Shares until such time as the aggregate Allowed General Unsecured Claims were, in the GUC Trust's estimation, likely to exceed $35 billion;

L.    ~~Pursuant to the~~The Plan and ~~the~~ GUC Trust Agreement~~,~~ provided the GUC Trust ~~has~~with the exclusive right to object to General Unsecured Claims;

M.    On March 31, 2011 (the "**Effective Date**"), the Plan was declared effective;

**The Recalls and the Multi-District Litigation.**

N.    In or around February and March of 2014, New GM issued a recall, NHTSA Recall Number 14V-047, pertaining to approximately [2.1][1] million vehicles with an ignition switch defect (the "**Ignition Switch Defect**");

O.    In or around June and July of 2014, New GM issued three additional recalls pertaining to approximately 10.4 million vehicles with defective ignition switches, NHTSA Recall Numbers 14V-355, 14V-394, and 14V-400;

---

[1]    [NTD – To be Verified]

2

AG0005166

CONFIDENTIAL DRAFT
ATTORNEY WORK PRODUCT
SUBJECT TO FRE 408

P.     In or around March of 2014, New GM issued a recall, NHTSA Recall Number 14V-118, pertaining to approximately 1.2 million vehicles with defective side airbags;

Q.     In or around March of 2014, New GM issued a recall, NHTSA Recall Number 14V-153, pertaining to over 1.3 million vehicles with defective power steering;

R.     Commencing after the issuance of the recalls, numerous lawsuits were filed against New GM, individually or on behalf of putative classes of persons, by, *inter alia*,:

a.     plaintiffs asserting economic loss claims who, as of November 30, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 (the "**Ignition Switch Plaintiffs**");

b.     plaintiffs asserting economic loss claims who, as of November 30, 2009, owned or leased a vehicle with defects in ignition switches, side airbags, or power steering included in NHTSA Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153 (the "**Non-Ignition Switch Plaintiffs**"); and

c.     plaintiffs asserting personal injury or wrongful death claims based on or arising from an accident involving an Old GM vehicle that occurred prior to the closing of the Section 363 Sale (the "**Pre-Closing Accident Plaintiffs**"), including a subset asserting claims involving an Old GM vehicle with the Ignition Switch Defect (the "**Ignition Switch Pre-Closing Accident Plaintiffs**");

S.     Many of the cases commenced against New GM were consolidated in a multi-district litigation (the "**GM MDL**") pending ~~before~~in the United States District Court for the Southern District of New York before the Hon. Jesse M. Furman (the "**District Court**");

**The Motions to Enforce Litigation.**

T.     In or around April and August of 2014, New GM sought to enjoin such lawsuits against New GM by filing motions to enforce the Sale Order with respect to: (i) Ignition Switch Plaintiffs; (ii) Ignition Switch Pre-Closing Accident Plaintiffs; and (iii) certain Non-Ignition Switch Plaintiffs (the "**Motions to Enforce**");

U.     Following the filing of the Motions to Enforce, the Bankruptcy Court identified initial issues to be addressed on the Motions to Enforce with respect to the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs;

V.     Following briefing and argument, the Bankruptcy Court issued its decision (the "**Decision**") on April 15, 2015, and a judgment implementing the Decision (the "**Judgment**") on June 1, 2015;

W.     In the Decision and the Judgment, ~~the Bankruptcy Court held that the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs were "known creditors" of the Debtors who were prejudiced by the failure to receive the notice due process required of the~~

3

AG0005167

CONFIDENTIAL DRAFT
ATTORNEY WORK PRODUCT
SUBJECT TO FRE 408

~~Bar Date, and that the remedy for this due process violation was leave to petition the Bankruptcy Court for authorization to file late proofs of claim against the Old GM bankruptcy estate;X. Further pursuant to the Decision and Judgment,~~ the Bankruptcy Court ruled that "based on the doctrine of equitable mootness, in no event shall assets of the GUC Trust held at any time in the past, now or in the future (collectively, the 'GUC Trust Assets') (as defined in the Plan) be used to satisfy any claims of the Plaintiffs";

X.    ~~Y.~~ On July 13, 2016, the Second Circuit issued an opinion on direct appeal of the Decision and Judgment, vacating the Bankruptcy Court's equitable mootness ruling as an advisory opinion;

Y.    ~~Z.~~ Following the issuance of the Second Circuit's mandate, the Bankruptcy Court identified initial issues to be addressed on remand, including whether "the Ignition Switch Plaintiffs and/or Non-Ignition Switch Plaintiffs [inclusive of the Pre-Closing Accident Plaintiffs] satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust and/or are such claims equitably moot";

Z.    ~~AA.~~ On December 22, 2016, the Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and ~~Ignition Switch~~ Pre-Closing Accident Plaintiffs filed motions for authority to file late proofs of claim, including late class proofs of claim (the "**Late Claims Motions**"), the Bankruptcy Court, however, expressly stated that any decision relating to whether the putative class could be certified would be deferred to a later date;

AA.    On or around February 16, 2017, counsel for the GUC Trust served counsel for the Ignition Switch Plaintiffs and counsel for the Pre-Closing Accident Plaintiffs with interrogatories (the "**Late Claims Interrogatories**") in connection with the Late Claims Motions.

BB.    The Pre-Closing Accident Plaintiffs and the Ignition Switch Plaintiffs responded to the Late Claims Interrogatories on a rolling basis.

CC.    ~~BB.~~ In or around March 2017, additional briefing occurred on issues raised by the proponents of the Late Claims Motions which included, among other things, a joint brief filed by the GUC Trust and certain unaffiliated holders of beneficial units of the GUC Trust in opposition to the Late Claims Motions;

DD.    ~~CC.~~ [In or around April and May of 2017, counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs provided counsel for the ~~Participating Unitholders and the~~ GUC Trust with an expert report and a proffer of evidence ~~substantiating~~indicating that the amount of damages for the Ignition Switch Plaintiffs' and Non-Ignition Switch Plaintiffs' claims, if ultimately determined to be Allowed General Unsecured Claims against Old GM and/or the GUC Trust ~~is sufficient~~, could be greater than that necessary to trigger New GM's obligation to issue Adjustment Shares~~;~~ in the maximum amount under the AMSPA;][2]

---

[2]    [NTD – Need to consider and include evidentiary record for Pre-Closing Accident Plaintiffs.]

4

EE. ~~DD.~~ The Plaintiffs, on the one hand, and the GUC Trust ~~Parties~~, on the other hand, disagree regarding whether ~~authority~~the proponents of the Late Claims motions satisfy the requirements for authorization to file late ~~proofs~~proof(s) of claim ~~should be granted~~against the GUC Trust, and whether such claims are equitably moot;

FF. ~~EE.~~ The ~~Trust Parties desire~~Plaintiffs, on the one hand, and the GUC Trust, on the other hand, disagree regarding whether any GUC Trust Assets currently in the GUC Trust could be used to satisfy Plaintiffs' potential claims;

GG. The Plaintiffs, on the one hand, and the GUC Trust, on the other hand, disagree regarding whether any GUC Trust Assets previously distributed are subject to claw-back or recapture by the GUC Trust and/or the Plaintiffs;

HH. The Plaintiffs, on the one hand, and the GUC Trust on the other hand, disagree regarding the ultimate amount of Allowed General Unsecured Claims that would arise if the damages of the Ignition Switch Plaintiffs', Non-Ignition Switch Plaintiffs' and Pre-Closing Accident Plaintiffs' claims are ultimately determined to be Allowed General Unsecured Claims against Old GM and/or the GUC Trust;

II. The GUC Trust desires to complete the distribution of the GUC Trust Assets held by the GUC Trust as ~~of the date hereof and to avoid claw-back or recapture of prior distributions of GUC Trust Assets, and~~soon as practicable and, to such purpose, ~~desire~~desires to resolve the Late Claims Motions and the Plaintiffs' potential claims against the GUC Trust and Old GM;

JJ. ~~FF.~~ The GUC Trust ~~Parties acknowledge~~acknowledges the key ~~objective~~objectives of the Plaintiffs in entering into this Agreement ~~is to~~are to (i) achieve the funding of the Settlement Fund; (ii) avoid the risk, delay, uncertainty and costs of litigation with the GUC Trust; and (iii) take or to cause to be taken all steps necessary to require New GM to issue the maximum amount of Adjustment Shares and to make the value of the Settlement Fund and the Adjustment Shares available to satisfy the Plaintiffs' ~~Allowed Claim (as defined herein)~~claims and, in connection with ~~that objective~~those objectives, the GUC Trust ~~Parties agree~~agrees to provide the cooperation and assistance provided for herein relating to the issuance of a Claims Estimate Order, as provided for pursuant to Section 3.2(c) of the AMSPA and the Side Letter;

KK. ~~GG.~~ The Plaintiffs acknowledge the key objectives of the GUC Trust ~~Parties~~ in entering into this Agreement are: (i) to ~~achieve the ability of the GUC Trust to distribute its remaining assets; (ii) to~~ minimize any delay in ~~this~~the distribution; ~~(iii~~ of any remaining GUC Trust Assets; (ii) avoid any claw-back or recapture of prior distributions of GUC Trust Assets; and (~~iv~~iii) otherwise avoid the risk, delay, uncertainty and costs of litigation.

## AGREEMENT

The GUC Trust ~~Parties~~ and the Plaintiffs propose to resolve their dispute as follows:

**1.    DEFINITIONS.** The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

5

**CONFIDENTIAL DRAFT**
**ATTORNEY WORK PRODUCT**
**SUBJECT TO FRE 408**

**1.1    Adjustment Shares** shall have the meaning ascribed to such term in the Preamble.

~~**1.2    Allowed Claim** shall have the meaning ascribed to such term in Section 2.6.~~

**1.2**    ~~1.3~~ **Allowed General Unsecured Claims** means General Unsecured Claims against the Debtors that have been allowed through the date of entry of ~~an order on the Settlement Motion~~ the Claims Estimate Order.

**1.3**    ~~1.4~~ **AMPSA** shall have the meaning ascribed to such term in the Preamble.

~~**1.5    Avoidance Action Trust** means the trust created by the Avoidance Action Trust Agreement in the form approved as Exhibit G to the Plan, as the same may have been amended from time to time.~~

~~**1.6    Avoidance Action Trust Agreement** means the *Second Amended and Restated Motors Liquidation Company Avoidance Action Trust Agreement*, dated as of August 25, 2016, by and among Wilmington Trust Company, as trust administrator and trustee of the Avoidance Action Trust, and Arthur J. Gonzalez, as trust monitor of the Avoidance Action Trust.~~

~~**1.7    Avoidance Action Trust Assets** means assets held by the Avoidance Action Trust.~~

**1.4**    ~~1.8~~ **Bar Date Order** means that *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim (Including Claims Under Bankruptcy Code Section 503(B)(9)) and Procedures Relating Thereto and Approving the Form and Manner of Notice Thereof*, dated Sept. 16, 2009 [ECF No. 4079] entered by the Bankruptcy Court establishing the Bar Date.

**1.5**    ~~1.9~~ **Bar Date** shall have the meaning ascribed to such term in the Preamble.

**1.6**    ~~1.10~~ **Bankruptcy Code** means title 11 of the United States Code.

**1.7**    ~~1.11~~ **Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of New York and shall have the meaning ascribed to such term in the Preamble.

**1.8**    ~~1.12~~ **Claims Estimate Order** shall mean an order of the Bankruptcy Court estimating the aggregate ~~allowed general unsecured claims~~ Allowed General Unsecured Claims against ~~Old GM~~.

~~**1.13    Communication** shall have the meaning ascribed to such term in Section 3.13.~~

~~**1.14    Confirmation Order** shall have the meaning ascribed to such term in the Preamble. **1.15** **Debtors** means Motors Liquidation Company, formerly known as General Motors Corporation, together with three of its debtor subsidiaries, Chevrolet-Saturn of Harlem, Inc., Saturn, LLC, and Saturn Distribution Corporation.~~ the Debtors, excluding any Term Loan Avoidance Action Claims.

6

                                                                  AG0005170

**CONFIDENTIAL DRAFT**
**ATTORNEY WORK PRODUCT**
**SUBJECT TO FRE 408**

**1.9**   ~~1.16~~ **Co-Lead Counsel** means Steve W. Berman of Hagens Berman Sobol Shapiro LLP, Elizabeth Cabraser of Lieff, Cabraser, Heimann & Bernstein, LLP, and Robert C. Hilliard of Hilliard Muñoz Gonazlez, LLP, who were individually and collectively appointed to represent all plaintiffs in the GM MDL by Order No. 8, *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (S.D.N.Y. Aug. 15, 2014) [ECF No. 249], or any other or replacement counsel appointed to represent any Plaintiffs in the GM MDL.

**1.10**   **Communication** shall have the meaning ascribed to such term in Section [3.15].

**1.11**   **Confirmation Order** shall have the meaning ascribed to such term in the Preamble.

**1.12**   **Debtors** shall have the meaning ascribed to such term in the Preamble.

**1.13**   ~~1.17~~ **Decision** means *Decision on Motion to Enforce Sale Order*, entered April 15, 2015 [ECF No. 13109] by Judge Robert E. Gerber in the Bankruptcy Court, published as *In re Motors Liquidation Company*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015), as corrected in *Errata Order RE: Decision on Motion to Enforce Sale Order*, *In re Motors Liquidation Co.*, No. 09-50026, dated July 13, 2015 [ECF No. 13290].

**1.14**   ~~1.18~~ **District Court** shall have the meaning ascribed to such term in the Preamble.

**1.15**   ~~1.19~~ **Effective Date** shall have the meaning ascribed to such term in the Preamble.

**1.16**   **Final Order** has the meaning ascribed to it in the Plan.

**1.17**   ~~1.20~~ **General Unsecured Claim** ~~means any Claim against any of the Debtors that is (i) not an Administrative Expense, Priority Tax Claim, Secured Claim, Priority Non-Tax Claim, Asbestos Personal Injury Claim, or Property Environmental Claim; or (ii) otherwise determined by the Bankruptcy Court to be a General Unsecured Claim~~has the meaning ascribed to it in the Plan.

**1.18**   ~~1.21~~ **GM MDL** shall have the meaning ascribed to such term in the Preamble.

**1.19**   ~~1.22~~ **GUC Trust** means the trust created by the GUC Trust Agreement in the form approved as Exhibit D to the Plan, as the same ~~may have~~has been and may further be amended from time to time.

**1.20**   ~~1.23~~ **GUC Trust Agreement** means the *Second Amended and Restated Motors Liquidation Company GUC Trust Agreement*, by and among Wilmington Trust Company, as trust administrator and trustee of the GUC Trust, and FTI Consulting, as trust monitor of the GUC Trust, dated July 30, 2015, as it may be amended from time to time.

**1.21**   ~~1.24~~ **GUC Trust Assets** means assets ~~held~~that have been held, are held, or may be held in the future by the GUC Trust.

7

AG0005171

CONFIDENTIAL DRAFT
ATTORNEY WORK PRODUCT
<u>SUBJECT TO FRE 408</u>

**1.22**    ~~1.25~~ **Ignition Switch Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.23**    ~~1.26~~ **Ignition Switch Pre-Closing Accident Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.24**    ~~1.27~~ **Judgment** means the Judgment, entered June 1, 2015 [ECF No. 13177] by Judge Robert E. Gerber in the Old GM Bankruptcy Case.

**1.25**    ~~1.28~~ **Key Objectives** means the objectives of the Parties in entering into this Agreement as stated in Paragraph [~~FF~~JJ] and [~~GG~~KK] of the Preamble.

**1.26**    ~~1.29~~ **Late Claims Motions** shall have the meaning ascribed to such term in the Preamble.

**1.27**    ~~1.30~~ **Motions to Enforce** means, collectively, the (i) *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, dated April 21, 2014 [ECF No. 12620]; (ii) *Motion of General Motors LLC Pursuant to 11 U.S.C §§ 105 and 363 to Enforce this Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits*, dated August 1, 2014 [ECF No. 12807]; and (iii) *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)*, dated August 1, 2014 [ECF No. 12808].

**1.28**    ~~1.31~~ **New GM** means General Motors LLC <u>(F/K/A NGMCO, Inc.)</u>.

**1.29**    ~~1.32~~ **New GM Common Stock** means the common stock of ~~General Motors Company (F/K/A NGMCO, Inc.) to be contributed to the GUC Trust under the Plan, including (i) any dividends declared in the form of New GM Common Stock, whether prior to or on or after the Effective Date; (ii) any Adjustment Shares; and (iii) any capital stock or other property or assets into which such New GM Common Stock may be converted or for which it may be exchanged (including by way of recapitalization, merger, consolidation, reorganization or otherwise)~~<u>New GM</u>.

**1.30**    ~~1.33~~ **NHTSA** means the National Highway Traffic Safety Administration.

**1.31**    ~~1.34~~ **Non-Ignition Switch Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.32**    <u>**Notice Cost Cap Amount** shall have the meaning ascribed to such term in Section [2.8]</u>.

**1.33**    ~~1.35~~ **Old GM** means Motors Liquidation Company, formerly known as General Motors Corporation.

CONFIDENTIAL                                                                    AG0005172

**CONFIDENTIAL DRAFT**
**ATTORNEY WORK PRODUCT**
**SUBJECT TO FRE 408**

**1.34** ~~1.36~~ **Old GM Bankruptcy Case** means those proceedings commenced on June 1, 2009 in the Bankruptcy Court captioned *In re Motors Liquidation Company, et al., f/k/a General Motors Corp.*, Bankr. No. 09-50026.

~~1.37    Participating Unitholders means certain unaffiliated holders of beneficial units of the GUC Trust.~~

**1.35** ~~1.38~~ **Parties** means the Plaintiffs and the GUC Trust ~~Parties~~.

**1.36** ~~1.39~~ **Plaintiffs** means the Ignition Switch Plaintiffs, the Non-Ignition Switch Plaintiffs, and the Pre-Closing Accident Plaintiffs ~~signatory hereto;~~ , including all plaintiffs (whether named or unnamed including unnamed members of a putative class) covered by any of the Late Claims Motions, and all plaintiffs represented by counsel that is signatory hereto; [it being understood however that the covenants and agreements to be performed by the Plaintiffs are to be performed by Co-Lead Counsel and the undersigned counsel and that no action or failure to act by any Plaintiff shall constitute a breach of this Agreement or shall excuse the performance of any other Party].[3]

**1.37** ~~1.40~~ **Plan** means Debtors' Second Amended Joint Chapter 11 Plan, filed March 18, 2011 [ECF No. 9836] ~~filed~~ by Motors Liquidation Company in the Bankruptcy Proceeding.

**1.38** ~~1.41~~ **Pre-Closing** means any time before July 5, 2009, the date certain on which the Bankruptcy Court entered an order approving the 363 Sale between ~~Debtors~~Sellers and New GM.[4]

**1.39** ~~1.42~~ **Pre-Closing Accident Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**1.40** ~~1.43~~ **Recalls** means NHTSA Recall Numbers 14V-047, 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153.

**1.41** ~~1.44~~ **Sale Order** means the *Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief*, dated July 5, 2009 [ECF No. 2968] and the supporting *Decision on Debtors' Motion for Approval of (1) Sale of Assets to Vehicle Acquisition Holdings, LLC; (2) Assumption and Assignment of Related Executory Contracts; and (3) Entry into UAW Retiree Settlement Agreement*, dated July 5, 2009 [ECF No. 2967].

**1.42** ~~1.45~~ **Sellers** ~~shall have the meaning ascribed to such term in the Preamble~~means Motors Liquidation Company, formerly known as General Motors Corporation, together with three of its debtor subsidiaries, Chevrolet-Saturn of Harlem, Inc.; Saturn, LLC; and Saturn Distribution Corporation.

---

[3]    [NTD:  Explain the basis for this language.]

[4]    [NTD – is Pre-Closing any time before the date of entry of the order, or the date of the actual closing?]

9

AG0005173

**1.43**    ~~1.46~~ **Settlement** means the settlement of the Parties' ~~dispute~~disputes as provided for by this Agreement.

**1.44**    **Settlement Amount** shall have the meaning ascribed to such term in Section [2.4] hereto.

**1.45**    **Settlement Effective Date** shall have the meaning ascribed to such term in Section [3.1] hereto.

**1.46**    ~~1.47~~ **Settlement Fund** shall have the meaning ascribed to such term in Section ~~2.3~~[2.4] hereto.

**1.47**    ~~1.48~~ **Settlement Motion** shall have the meaning ascribed to such term in Section ~~2.8 hereof.~~ [2.3] hereto.

**1.48**    **Settlement Order** shall have the meaning ascribed to such term in Section [2.3].

**1.49**    **Term Loan Avoidance Action Claims** shall have the meaning ascribed to such term in the GUC Trust Agreement.

**1.50**    **Waiver** shall have the meaning ascribed to such term in Section [2.3].

**1.51**    **Waiver Provision** shall have the meaning ascribed to such term in Section [2.3].

2.    **MUTUAL AGREEMENTS OF THE PARTIES.**

**2.1**    The Preamble constitutes an essential part of the Agreement and is incorporated herein.

**2.2**    The Parties agree to act in good faith to achieve the Key Objectives and, ~~consistent with~~subject to their fiduciary duties to which they are or may become subject to independently of this Agreement, agree to refrain from any act, course of conduct or statement, the reasonably foreseeable consequence of which would be to hinder, interfere with or unduly delay the achievement of the Key Objectives.

**2.3**    ~~Within five (5) business days of execution of the Agreement, the Trust Parties shall irrevocably pay Plaintiffs fifteen million dollars ($15,000,000~~As soon as practicable following the execution of this Agreement, the Parties shall prepare and file a motion in the Bankruptcy Court (the "Settlement Motion") seeking entry of (i) an order (the "**Settlement Order**") substantially in the form of Exhibit B attached hereto approving the Settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, and (ii) a Claims Estimate Order substantially in the form of Exhibit C attached hereto.  Notwithstanding anything to the contrary set forth herein, the Settlement Order shall contain a provision which imposes a complete and irrevocable waiver and release on the part of all Plaintiffs with respect to any and all rights, claims and causes of action, now existing or arising in the future, that any Plaintiff might directly or indirectly assert against the Debtors, their estates, the GUC Trust, GUC Trust Assets, and the Motors Liquidation Company

10

                                                                                   AG0005174

CONFIDENTIAL DRAFT
ATTORNEY WORK PRODUCT
SUBJECT TO FRE 408

Avoidance Action Trust, including but not limited to any Allowed General Unsecured Claims of the Plaintiffs arising under, or that may arise under, the Claims Estimate Order (the "**Waiver Provision**," and the waiver and release contemplated thereby, the "**Waiver**"), and shall otherwise be on terms acceptable to the GUC Trust and Co-Lead Counsel, each in their sole and absolute discretion.

**2.4**    Among other things, the Settlement Order will direct the GUC Trust to pay [_____] dollars ($[_____]) in cash (the "**Settlement Amount**") to a trust, fund or other vehicle (the "**Settlement Fund**") established and designated by the Plaintiffs (for purposes of administration of Plaintiffs' claims reconciliation and/or distributions to Plaintiffs under a subsequent allocation methodology) within five (5) business days of the Settlement Effective Date; provided that the amount of cash to be paid by the GUC Trust to the Settlement Fund shall be subject to adjustment pursuant to section [2.8] of this Agreement.

**2.5**    2.4 UponThe Waiver Provision shall become immediately and automatically effective and binding on all Plaintiffs contemporaneously with the Trust Parties' payment of the Settlement Amount by the GUC Trust to the Settlement Fund as provided by Section 2.3, the Plaintiffs shall waive, irrevocably, all rights and claims with respect to the GUC Trust's prior distributions and current GUC Trust Assets.

**2.6**    2.5 The Parties shall be bound by Sections 2.3 and 2.4 of the Agreement regardless of the Bankruptcy Court's decision on the Settlement Motion.2.6    The    In addition, and in furtherance of the Key Objectives and as an inducement to the Plaintiffs' entry into this Agreement and willingness to be bound by the terms of Settlement Order, including but not limited to the Waiver Provision, the GUC Trust agrees that the allowableit shall support the entry of a Claims Estimate Order that contains a finding that the allowed amount of Plaintiffs' claimsGeneral Unsecured Claims against Old GMthe Debtors and/or the GUC Trust (the "Allowed Claim"), when combined with all of the other Allowed General Unsecured Claims against the Old GM bankruptcy estatesDebtors (excluding any Term Loan Avoidance Action Claims), equals or exceeds $42 billion, thus triggering the issuance of the maximum amount of Adjustment Shares.

**2.7**    The Plaintiffs shall be entitled to their share of distributions, if any, of Avoidance Action Trust Assets as determined by the amount of the Allowed Claim pursuant to the terms of the Avoidance Action Trust Agreement. Any such distributions shall be delivered to the Settlement Fund.2.8    As soon as practicable following the execution of this Agreement, the Parties shall prepare and file a motion in the Bankruptcy Court (the "Settlement Motion") seeking an orderParties shall use their reasonable efforts to have the Claims Estimate Order entered on the same date as the Settlement Order, provided that, regardless of whether or not the Claims Estimate Order is entered on or after such date (and regardless of whether the request to enter the Claims Estimate Order is approved or denied), this Agreement (including, but not limited to Sections [2.3, 2.4 and 2.5] hereof) and the Settlement Order shall remain binding upon the Parties. The Parties shall use reasonable efforts to have the Claims Estimate Order:

(a)    approving the Settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedures;

11

AG0005175

(a)    ~~(b)    estimating the allowable amount of~~estimate and allow the General Unsecured Claims of the Plaintiffs'~~claims~~ against ~~Old GM~~the Debtors and/or the GUC Trust pursuant to Section 7.3 of the Plan in an amount, when combined with all of the other Allowed General Unsecured Claims against the ~~Old GM~~Debtors' bankruptcy estates, ~~equal to or exceeding~~ (but excluding any Term Loan Avoidance Action Claims), equals or exceeds $42 billion;

(b)    ~~(c)    estimating~~estimate the aggregate Allowed General Unsecured Claims (but excluding any Term Loan Avoidance Action Claims), including the Plaintiffs' estimated and Allowed ~~Claim~~General Unsecured Claims as set forth above, pursuant to Section 3.2(c) of the AMSPA and the Side Letter in an amount equal to or exceeding $42 billion and ~~requiring~~require New GM to issue the maximum amount of Adjustment Shares; and~~(d)    directing~~ direct that any such Adjustment Shares issued as a result of a Claims Estimate Order, or the value of such Adjustment Shares, be delivered to the Settlement Fund.

**2.8**    ~~2.9~~The Plaintiffs and the GUC Trust shall be responsible for providing ~~such~~ notice ~~as shall be required by the Bankruptcy Court~~ in connection with the Settlement Motion. The GUC Trust agrees to pay ~~all of~~the reasonable costs and expenses for notice of the Settlement Motion. ~~At minimum,~~ in an amount not to exceed $[_____] (the "**Notice Cost Cap Amount**"). Such notice shall include (i) publication notice ~~shall be given, as well as;~~ (ii) notice by postcard to: ~~(i)~~A) all persons in the United States who, as of November 30, 2009, owned or leased a defective vehicle manufactured by Old GM included in the Recalls; ~~(ii)~~and (B) all Pre-Closing Accident Plaintiffs who have filed a lawsuit against New GM as of the date of this agreement; and (iii) notice via DTC's LENSNOTICE system to holders of beneficial units of the GUC Trust. ~~The Parties shall~~Any amount in excess of the Notice Cost Cap Amount spent by the GUC Trust in providing such notice shall be deducted from the payment made to the Settlement Fund. Immediately following execution of this Agreement, the Parties shall (x) request a Chambers conference with the Bankruptcy Court and (y) request that New GM provide the names and addresses of the individuals in categories (i) and (ii) at a status conference to be scheduled with the Bankruptcy Court prior to the provision of such notice.

**2.9**    ~~2.10~~The Parties agree that all of the value of the Settlement Fund shall be reserved for the exclusive benefit of the Plaintiffs, subject only to costs associated with the administration of the Settlement Fund.

**2.10**    ~~2.11~~The Plaintiffs or, in the alternative, an administrator appointed by the Plaintiffs, shall establish the Settlement Fund and the procedures for the administration and allocation to Plaintiffs of the Settlement Fund.

**2.11**    ~~2.12~~Nothing in this Agreement shall waive any claims that Plaintiffs may have against New GM, and the Settlement Fund shall not represent full and final satisfaction of any claims that Plaintiffs may have against New GM.

**3.    MISCELLANEOUS PROVISIONS
APPLICABLE TO THIS AGREEMENT.**

12

**3.1**     **Settlement Effective Date.**  This Agreement shall become effective and binding on the Parties on the date on which this Agreement is fully executed by each of the Parties.  The Settlement set forth in this agreement (including but not limited to the required payment of the Settlement Amount and delivery of the Waiver as set forth herein) shall become effective on the date that the Settlement Order becomes a Final Order, provided that such date occurs on or before [     ], 2017 (unless extended to a later date as agreed by the Parties) (the "**Settlement Effective Date**"), provided further, however, that from and after the date the Settlement Order is entered by the Bankruptcy Court, the GUC Trust may waive the requirement that the Settlement Order be a Final Order.

**3.2**     **Termination.**

(A) Automatic Termination.  This agreement shall immediately terminate as to all Parties in the event that the Bankruptcy Court denies approval of the Settlement Motion (as it relates to the Settlement Order, but not as it relates to the Claims Estimation Order) or the Settlement Effective Date does not occur on or before [     ], 2017 (or such later date as may be agreed to by the Parties).  In the event of such automatic termination, this Agreement shall be null and void, and each of the Parties' respective interests, rights, remedies and defenses shall be fully restored without prejudice as if this Agreement (except as set forth in Sections [3.3, 3.4, 3.5, 3.13, 3.15, and 3.19]) had never existed and the Parties shall be returned to their respective positions status quo ante.

(B) Termination For Cause.  In the event of any material breach of the terms of this Agreement, the non-breaching Party may elect (in addition to any other remedies available to the non-breaching party hereunder or under applicable law) to terminate this Agreement by (i) providing a Communication to the breaching party as set forth in Section [3.15] below, and affording the breaching party a five (5) business day period in which to cure the purported breach, and (ii) absent such cure or the commencement of an action in the Bankruptcy Court with respect to the existence of any such breach, by providing a follow-up Communication to the breaching Party as set forth in Section [3.15] below, that declares the Agreement to be terminated.  Following such termination for cause, the terms of the Agreement shall no longer be binding on the non-breaching Party (except as set forth in Sections [3.3, 3.4, 3.5, 3.13, 3.15, and 3.19]).

**3.3**     ~~3.1~~ **Attorneys' Fees.**  Except as otherwise provided for herein, each of the Parties shall pay its own court costs, attorneys' fees, and all other expenses, costs, and fees incurred relating to this Agreement and any related litigation, including but not limited to the GM MDL and Motions to Enforce litigation.  If any lawsuit or proceeding is required to enforce the terms of this Agreement, the prevailing party in any such lawsuit or proceeding shall be entitled to reasonable attorney's fees and costs.

**3.4**     ~~3.2~~ **No Admission.**  Nothing in this Agreement shall be deemed an admission of any kind.  To the extent provided by Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than in support of the ~~Rule 9019 Motion~~ Settlement Motion and proposed

13

entry of the Settlement Order and Claims Estimate Order or in a proceeding to enforce the terms of this Agreement.

**3.5**    ~~3.3~~ **Remedies.**  Each of the Parties retain all remedies available in law or equity for breach of this Agreement by any Party, including, without limitation, the right of a non-breaching Party to seek specific performance and injunctive or other equitable relief as a remedy for any such breach.

**3.6**    ~~3.4~~ **No Litigation.**  Except as may be necessary to enforce the terms of this Agreement, the Parties and any other person who ~~accepts the benefits~~ is an intended beneficiary hereunder, agree that she or he shall not commence or proceed with any action, claim, suit, proceeding or litigation against any other Party, directly or indirectly, regarding or relating to the matters described in this Agreement, or take any action inconsistent with the terms of the Agreement.

**3.7**    ~~3.5~~ **Further Assurances.**  Each of the Parties covenant to, from time to time, execute and deliver such further documents and instruments and take such other actions as may be reasonably required or appropriate to evidence, effectuate, or carry out the intent and purposes of this Agreement or to perform its obligations under this Agreement and the transactions contemplated thereby.

**3.8**    ~~3.6~~ **Cooperation.**  The Parties agree to reasonably cooperate with one another to effectuate an efficient and equitable implementation of this Agreement.

**3.9**    ~~3.7~~ **Counterparts; Facsimile; Signatures.**  This Agreement may be executed in any number of counterparts and by different Parties to this Agreement on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement.  Any signature delivered by any of the Parties by facsimile or electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement, shall be deemed to be an original signature hereto, and shall be admissible as such in any legal proceeding to enforce this Agreement.

**3.10**    ~~3.8~~ **Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective agents, partners, attorneys, employees, representatives, officers, directors, shareholders, divisions, subsidiaries, affiliates, transferees, heirs, executors, administrators, personal representatives, legal representatives, successors, and assigns, consistent with the other provisions of this Agreement.

**3.11**    ~~3.9~~ **Integration.**  This Agreement constitutes the entire agreement and understanding among the Parties hereto relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements, representations and understandings between or among any of the Parties hereto relating to such subject matter.  In entering into this Agreement, the Parties and each of them acknowledge that they are not relying on any statement, representation, warranty, covenant or agreement of any kind made by any other party hereto or any employee or agent of any other party hereto, except for the representations, warranties, covenants and agreements of the Parties expressly set forth herein.

14

CONFIDENTIAL DRAFT
ATTORNEY WORK PRODUCT
<u>SUBJECT TO FRE 408</u>

**3.12** ~~3.10~~ **Amendment.** Except as otherwise specifically provided in this Agreement, no amendment, modification, rescission, waiver or release of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Parties.

**3.13** ~~3.11~~ **Interpretation.** Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, and the Parties agree to take any and all steps which are necessary in order to enforce the provisions hereof.

**3.14** ~~3.12~~ **Severability.** The terms and conditions of this Agreement are not severable. However, if any provision or part of any provision of this Agreement is for any reason declared or determined by a court to be invalid, unenforceable, or contrary to public policy, law, statute, or ordinance, the validity of the remaining parts, terms, or provisions of this Agreement shall not be affected thereby and shall remain valid and fully enforceable, and such invalid, unenforceable, or illegal part or provision shall not be deemed to be part of this Agreement.

**3.15** ~~3.13~~ **Notices.** Any notice, demand, request, consent, approval, declaration or other communication (a "**Communication**") under this Agreement shall be in writing and shall be given or delivered (i) by a nationally recognized private overnight courier service addressed as indicated in <u>Schedule 1</u> annexed hereto or to such other address as such party may indicate by a notice delivered to the other Parties hereto in accordance with the provisions hereof; or (ii) to the extent that such Communication has been filed with the Bankruptcy Court, via the electronic distribution means used by the Bankruptcy Court. Any Communication shall be deemed to have been effectively delivered and received, if sent by a nationally recognized private overnight courier service, on the first business day following the date upon which it is delivered for overnight delivery to such courier service.

**3.16** ~~3.14~~ **Choice of Law and Forum; Consent to Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to its conflict of laws principles. The District Court and the Bankruptcy Court shall have jurisdiction to resolve any dispute arising out of, related to or in connection with this Agreement to the exclusion of any other court, and the Parties hereby consent to the jurisdiction of the District Court and the Bankruptcy Court for resolution of such disputes and agree that they shall not attempt to litigate any such dispute in any other court.

**3.17** ~~3.15~~ **Advice of Counsel.** Each Party represents and acknowledges that it has been represented by an attorney with respect to this Agreement and any and all matters covered by or related to such Agreement. Each Party further represents and warrants to each other that the execution and delivery of this Agreement has been duly authorized by each of the Parties after consultation with counsel, that the persons signing this Agreement on their behalf below have been fully authorized by their respective Parties to do so, and that the undersigned do fully understand the terms of this Agreement and have the express authority to enter into this Agreement.

**3.18** ~~3.16~~ **Assignment.** No assignment of this Agreement or of any rights or obligations hereunder may be made by any party hereto without the prior written consent of the other Parties hereto, and any attempted assignment without such prior consent shall be null and void. No

15

AG0005179

**CONFIDENTIAL DRAFT**
**ATTORNEY WORK PRODUCT**
**SUBJECT TO FRE 408**

assignment of any obligations hereunder shall relieve any of the Parties hereto liable therefore of any such obligations.

**3.19**    ~~3.17~~ **Waiver.** Except as otherwise specifically provided in this Agreement, any provision of this Agreement may be waived only by a written instrument signed by the Party against whom enforcement of such waiver is sought.

**3.20**    ~~3.18~~ **Headings, Number, and Gender.** The descriptive headings of the sections of this Agreement are included for convenience of reference only and shall have no force or effect in the interpretation or construction of this Agreement. As used in this Agreement, the singular shall include the plural, and the masculine shall include the feminine and neutral genders, and vice versa.

**3.21**    ~~3.19~~ **Waiver of Jury Trial.** Each of the Parties hereby irrevocably waives its rights, if any, to a jury trial for any claim or cause of action based upon or arising out of this Agreement.

CONFIDENTIAL

AG0005180

IN WITNESS WHEREOF, the Parties have executed and delivered this ~~Settlement~~Agreement as of the date first written above.

BROWN RUDNICK LLP

On behalf of the Plaintiffs

By: _____DRAFT_____
Name:  Edward S. Weisfelner
Name:  Howard S. Steel

Title:  Designated Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the Bankruptcy Court

STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

On behalf of the Plaintiffs

By: _____DRAFT_____
Name:  Sander L. Esserman

Title: Designated Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the Bankruptcy Court

HAGENS BERMAN SOBOL SHAPIRO LLP

On behalf of the Plaintiffs

By: _____DRAFT_____
Name:  Steve W. Berman

Title: Co-Lead Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the MDL Court

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

On behalf of the Plaintiffs

By: _____DRAFT_____
Name:  Elizabeth J. Cabraser

GIBSON, DUNN & CRUTCHER, LLP

On behalf of the GUC Trust ~~Parties~~

By: _____DRAFT_____
Name:  Matthew Williams
Name:  Keith R. Martorana
Name: Gabriel Gillett

Title:  Counsel for Wilmington Trust Company, as Administrator and Trustee of the GUC Trust

~~AKIN, GUMP, STRAUSS, HAUER & FELD, LLP~~

~~On behalf of the Trust Parties~~

~~By: _____DRAFT_____~~
~~Name:  Daniel Golden~~
~~Name:  Deborah J. Newman~~
~~Name:  Naomi Moss~~

~~Title: Counsel for the Participating Unitholders~~

~~BINDER & SCHWARTZ LLP~~

~~On behalf of the Trust Parties~~

~~By: _____DRAFT_____~~
~~Name:  Eric B. Fisher~~
~~Name:  Neil S. Binder~~

~~Title: Counsel for the Motors Liquidation Company Avoidance Action Trust~~

17

AG0005181

**CONFIDENTIAL DRAFT
ATTORNEY WORK PRODUCT
<u>SUBJECT TO FRE 408</u>**

Title: Co-Lead Counsel for the Ignition Switch
Plaintiffs and certain Non-Ignition Switch
Plaintiffs in the MDL Court

GOODWIN PROCTOR LLP

On behalf of the Plaintiffs

By: _____DRAFT_____
Name:  William P. Weintraub
Name:  Gregory W. Fox

Title: Counsel to Those Certain Post-Closing
Accident Plaintiffs Represented By Butler
Wooten & Peak LLP, Denney & Barrett, P.C.,
Hilliard Muñoz Gonzales L.L.P., and Turner &
Associates, P.A.

HILLIARD MUÑOZ GONZALES LLP

On behalf of the Plaintiffs

By: _____DRAFT_____
Name:  Robert Hilliard

Title: Lead Counsel in the MDL Court with
Primary Responsibility for Personal Injury
and Wrongful Death Cases

GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP

On behalf of the Plaintiffs

By: _____DRAFT_____
Name:  Jonathan L. Flaxer
Name:  Michael S. Weinstein

Title: Co-Counsel to Groman Plaintiffs

WOLF HALDENSTEIN ADLER FREEMAN
& HERZ LLP

On behalf of the Plaintiffs

By: _____DRAFT_____
Name:  Alexander H. Schmidt

18

                                                    AG0005182

**CONFIDENTIAL DRAFT**
**ATTORNEY WORK PRODUCT**
**SUBJECT TO FRE 408**

Name:  Malcolm T. Brown

Title: Co-Counsel to Groman Plaintiffs

Gary Peller

On behalf of the Plaintiffs

By: _____DRAFT_____

Name:  Gary Peller

Title: Counsel to Sharon Bledsoe, Celestine Elliott, Lawrence Elliott, and Dierra Thomas

19

AG0005183

Document comparison by Workshare 9 on Friday, June 9, 2017 4:41:38 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\15609\Desktop\GM - GUC Trust Settlement Agreement.docx |
| Description | GM - GUC Trust Settlement Agreement |
| Document 2 ID | interwovenSite://NYDMS/AL/102316378/1 |
| Description | #102316378v1<AL> - GM - GUC Trust Settlement Agreement |
| Rendering set | GDCv9Rendering |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 263 |
| Deletions | 193 |
| Moved from | 7 |
| Moved to | 7 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 470 |

CONFIDENTIAL