# Exhibit G

Page 1

1   UNITED STATES BANKRUPTCY COURT

    SOUTHERN DISTRICT OF NEW YORK

2   _____

3   In re:

4   MOTORS LIQUIDATION COMPANY, et al.,

    f/k/a General Motors Corp., et al.,

5

                     Debtors.

6

    Cast No.: 09-50026 (MG)

7   _____

8

                  November 20, 2017

9                  10:11 a.m.

10

11

12

13        DEPOSITION of KEITH

14   MARTORANA, held at the offices of

15   GIBSON, DUNN & CRUTCHER, LLP, 200 Park

16   Avenue, New York, New York before Wayne

17   Hock, a Notary Public of the State of

18   New York.

19

20

21

22

23

24

25

Page 78

1 of that e-mail, "thanks, I'll revise
2 and recirculate with that one change.
3 I had a lengthy conversation with our
4 client today and they are discussing
5 internally. Signoff with respect to
6 the three documents -settlement
7 agreement, settlement order, claims
8 estimate order -- will likely come
9 tomorrow."
10      Do you see that?
11   A.  I do.
12   Q.   What did you mean by signoff
13 with respect to the three documents?
14   A.   I believe Mr. Steel was
15 asking me if we were, in his words,
16 signed off with respect to those
17 particular documents. I think at this
18 time there were other ancillary
19 documents that were -- either had not
20 been drafted or were much more in flux.
21 What I meant in my e-mail to Mr. Steel
22 was that, with respect to the form of
23 the documents, my expectation was that
24 we could expect client signoff with
25 respect to the form the next day.

Page 79

1   Q.   Okay.
2      And that included the
3 settlement agreement; correct?
4   A.   That is correct.
5   Q.   Then do you see that you go
6 on to say, "we'll keep you posted.
7 Note, however, that signoff on the
8 settlement itself is subject to the
9 finalization of all other document" --
10 I think that's meant to read documents
11 -- "in a satisfactory manner and
12 receipt of final approvals."
13      Do you see that?
14   A.   I see that.
15   Q.   What do you mean by signoff
16 on the settlement itself?
17   A.   What I meant is that we were
18 -- that on behalf of our client Gibson
19 Dunn was not going to be signing off on
20 the actual entire corpus of the
21 settlement. We were willing to, you
22 know, move forward with the form of the
23 documents. We could get to a point
24 where we could say the documents have
25 now stopped moving and we are fine with

Page 80

1 those form of the documents on behalf
2 of us and our clients. That is
3 something we would be capable of
4 getting to but we were not in a
5 position to be signing off on the
6 actual settlement itself.
7   Q.   Why not?
8   A.   Because at this time
9 certainly there were documents that
10 were moving and our client had not made
11 a final decision as to -- and Gibson
12 Dunn had not made a final decision as
13 to advising the client with respect to
14 the settlement.
15   Q.   Okay.
16      So did you contemplate then
17 that signoff on the settlement itself
18 was subject to the finalization of all
19 the other documents and receipt of
20 final approvals?
21   A.   I did.
22      I apologize.
23   Q.   Let me ask the question again
24 so the record's clear.
25      Did you contemplate that

Page 81

1 signoff on the settlement itself was
2 subject to the finalization of all the
3 other documents and receipt of final
4 approvals?
5   A.   Yes, in a satisfactory
6 manner.
7   Q.   And you contrasted that
8 signoff with the signoff on the three
9 documents which included the settlement
10 agreement which you have thought would
11 likely come the next day; correct?
12   A.   The form of the settlement
13 agreement, yes.
14      MR. STYANT-BROWN: I guess you
15   can put that to one side, please.
16   Q.   I'm going to hand to you
17 what's previously been marked as
18 Exhibit 34.
19      MR. STYANT-BROWN: Mitch, it
20   doesn't have the exhibit sticker on
21   it.
22      MR. KARLAN: It's thirty-four?
23      MR. STYANT-BROWN: It's
24   thirty-four.
25   Q.   Tell me when you've had a

21 (Pages 78 - 81)

Page 198

1  have no knowledge of whether he was
2  aware of it at that time or if he found
3  out afterwards as I did.
4      Q.   Okay.
5          So you don't know, sitting
6  here today, whether Mr. Williams was
7  aware that that e-mail would be sent in
8  advance of it being sent?
9      A.   Correct.
10     Q.   Do you know if Mr. Williams
11 and Mr. Gillett were having
12 conversations about Mr. Gillett's
13 conversation with new GM setting up the
14 meeting prior to Mr. Gillett sending
15 those e-mails to new GM?
16     A.   I don't know.
17     Q.   Have you heard from any unit
18 holders other than those that are
19 represented by Akin Gump about the GUC
20 Trust's decision to disavow the
21 plaintiffs' settlement and move forward
22 with the forbearance agreement?
23         MR. KARLAN: Objection to the
24     form of the question.
25         You may answer.

Page 199

1          THE WITNESS:  I have not.
2      Q.   Do you know if anyone at
3  Gibson Dunn has?
4      A.   My understanding -- I have no
5  knowledge of anyone at Gibson Dunn
6  having received those types of
7  communications.
8      Q.   Okay.
9          Do you know if anyone at
10 Wilmington Trust has those types of
11 communications with unit holders other
12 than the unit holders represented by
13 Akin Gump?
14     A.   I have no knowledge of anyone
15 at Wilmington Trust having received
16 those types of communications.
17         MS. NEWMAN: I have no further
18     questions.
19         MR. KARLAN: A few questions.
20 EXAMINATION BY
21 MR. KARLAN:
22     Q.   You testified earlier about
23 some notes that you took at the
24 August 15 meeting.
25         Do you recall?

Page 200

1      A.   I do recall that.
2      Q.   Do those notes reflect in any
3  way your mental impressions of what was
4  occurring at the meeting?
5      A.   They did.
6      Q.   Would you look, please, at
7  Exhibit H to Exhibit 3.
8      A.   I am there.
9      Q.   Would you look at section
10 3.1.
11         Take a moment and just
12 refresh yourself about that, please.
13     A.   (Reviewing).
14         I have read it.
15     Q.   As between the plaintiffs'
16 side of the negotiations and the GUC
17 Trust/participating unit holders' side
18 of the negotiations, if I can
19 oversimplify it that way, which side
20 first proposed this section?
21         MR. STYANT-BROWN: I object to
22     the form.
23         THE WITNESS:  The GUC Trust
24     did.
25     Q.   And who drafted, if you know,

Page 201

1  this section?
2      A.   I drafted it.
3      Q.   Why did you propose that this
4  section be added?
5      A.   I had a conversation with
6  Matt Williams regarding the first draft
7  of the document that had been received
8  from Brown Rudnick through Akin.  While
9  I believe that version had some
10 language in it saying that certain
11 aspects of the transaction would become
12 effective upon entry of an order, an
13 approval order of the court, we had
14 noted that there were a number of
15 provisions that it was unclear as to
16 when they would, in fact, become
17 effective and we determined that it
18 should be clear that the -- nothing in
19 the agreement would become binding and
20 effective until it was executed and
21 then certain aspects of the
22 transaction, such as the obligation to
23 make the payment of $15 million, would
24 not come until after entry of the
25 order.

51 (Pages 198 - 201)

Page 202

1    Q.   Did any lawyer representing
2  any of the proposed signatories to this
3  agreement ever tell you --
4        MR. GONZALES: Whoever is
5    speaking, would they speak up a
6    little louder?  I can't hear the
7    question.
8        MR. KARLAN: Sorry, Rudy.
9        I'll start the question
10   again.
11       MR. GONZALES: Thank you, sir.
12   Q.   Did any counsel for any party
13 to the proposed agreement ever tell you
14 that they viewed the addition of
15 signatures to the document to be a
16 merely ministerial act?
17   A.   No.
18   Q.   Did any counsel for any of
19 the proposed signatories ever tell you
20 that they believed the agreement could
21 become binding and effective without
22 signatures?
23   A.   No.
24   Q.   Did you ever tell any lawyer
25 for any of the parties that the GUC

Page 203

1 Trust was waiving the provisions of
2 section 3.1?
3    A.   No, we did not.  I did not.
4    Q.   Did you consider the
5 agreement to be binding prior to its
6 signature?
7    A.   No, I did not.
8    Q.   Did Beth Andrews ever
9 authorize you to sign the agreement?
10   A.   No, she did not.
11   Q.   Or anyone else from Gibson
12 Dunn?
13   A.   To my knowledge, no.
14   Q.   Did Beth Andrews ever direct
15 you to sign the agreement?
16   A.   No, she did not.
17   Q.   Or anyone else from Gibson
18 Dunn?
19   A.   To my knowledge, no.
20   Q.   Did the GUC Trust perform any
21 of its obligations under the draft
22 agreement?
23   A.   No, not in my view.
24   Q.   Did any plaintiff perform any
25 of its obligations under the agreement?

Page 204

1    A.   Not in my view, no.
2    Q.   What did you believe the
3 purpose of the chambers conference with
4 Judge Glenn was to be?
5        MR. WEISFELNER: I object to
6    the form of the question.
7        THE WITNESS:  My view of the
8    chambers conference, which became a
9    status conference, was to first and
10   foremost preview the concept of the
11   transaction to the judge in order
12   to get his preliminary views or
13   take his temperature as to see
14   whether he had any visceral
15   reaction to any of the provisions
16   that we were purporting to be
17   moving forward with.
18       As a secondary aspect, and I
19   think this came up later, we were
20   planning to preview the proposed
21   notice procedures which I
22   previously discussed in the
23   testimony.
24   Q.   I just want to make sure that
25 all counsel have had the opportunity to

Page 205

1 fully inquire into your conversations
2 -- into Gibson Dunn's conversations
3 with counsel for new GM in August.
4        Were you personally involved
5 in any meetings or telephone
6 conversations with any counsel for new
7 GM on August 16?
8        MR. STYANT-BROWN: I object to
9    the form.
10       MR. KARLAN: Let me fix the
11   question.
12       What have I done wrong?
13       MR. STYANT-BROWN: I object to
14   the colloquy.
15       MR. KARLAN: The question just
16   begins -- strike the rest of it.
17   Q.   The question just begins were
18 you personally involved.
19   A.   I was not.
20   Q.   Has Mr. Williams ever
21 described for you -- let's start with
22 just meetings -- meetings that he had
23 with counsel for new GM on the
24 sixteenth?
25   A.   In-person?

52 (Pages 202 - 205)

Page 206

1   Q.   In-person meetings?
2   A.   No.
3   Q.   Has he ever described to you
4 telephone conversations he had with
5 counsel for new GM on the sixteenth?
6   A.   Yes.
7   Q.   Can you please tell us about
8 what he told you?
9   A.   He told me -- on the
10 sixteenth we were in the process of
11 finalizing the letter agreement with
12 new GM.  He told me about the fact that
13 he had spoken to new GM about it.  He
14 told me that they had discussed how to
15 address what were likely to be
16 Plaintiffs' objections to this
17 agreement and how to present it to the
18 court.
19   Q.   When you send an e-mail from
20 your Gibson Dunn e-mail address, does
21 the Gibson Dunn e-mail system
22 automatically affix a signature for
23 you, signature block?
24   A.   Yes, yeah.
25   Q.   And that's to every e-mail

Page 207

1 you send?
2   A.   I think it does include ones
3 that come from my iPhone, I think the
4 answer's yes.
5       MR. KARLAN: I have no further
6   questions.  Thank you.
7       MS. BESKIN: I have a handful
8   of questions.
9 EXAMINATION BY
10 MS. BESKIN:
11   Q.   Good afternoon.
12   A.   Hi.
13   Q.   Can you take another look at
14 section 3.1 in Exhibit H to Exhibit 3?
15       MR. WEISFELNER: Can you try
16   speaking up?
17       MS. BESKIN: Of course.  I
18   just asked the witness to take
19   another look at section 3.1 in
20   Exhibit H to Exhibit 3.
21   Q.   And it says there, "this
22 agreement shall become effective and
23 binding on the parties on the date on
24 which this agreement is fully executed
25 by each of the parties."

Page 208

1       Do you see that?
2   A.   I do see that.
3   Q.   And I believe you testified a
4 few moments ago that you, yourself,
5 drafted this language?
6   A.   I did.
7   Q.   Did you understand executed
8 by each of the parties to mean other
9 than affix a signature to the signature
10 block?
11   A.   No, I intended a physical
12 signature.
13   Q.   Did any of the purported
14 signatories to this proposed agreement
15 ever tell you that they understood
16 executed as used in section 3.1 to mean
17 anything other than affixing a
18 signature to the signature page?
19   A.   No.
20   Q.   I believe you testified that
21 Gibson Dunn was not going to sign this
22 proposed settlement agreement before
23 August 17; correct?
24   A.   Correct.
25   Q.   Did you ever tell anyone at

Page 209

1 Akin Gump that Gibson Dunn was not
2 going to do so?
3       THE WITNESS: Mitch?
4       MR. STYANT-BROWN: Just hang
5   on a minute before.
6       MS. NEWMAN: I'm going to
7   instruct him not to answer that if
8   it's prior to the period the date
9   on which the common interest
10   agreement terminated which is
11   August 16.
12       MS. BESKIN: Is your position
13   that the fact that Gibson Dunn was
14   not going to sign before August 17
15   is privileged as conveyed to Akin
16   Gump?
17       MS. NEWMAN: If he was telling
18   Akin Gump that as part of a legal
19   strategy --
20       MR. WEISFELNER: Your question
21   went to did you tell Akin Gump.
22       MS. BESKIN: Correct, a fact.
23       MS. NEWMAN: If you tell a
24   legal strategy to your client, I
25   think that's privileged.  I think

53 (Pages 206 - 209)