# Exhibit U

Page 1

1  UNITED STATES BANKRUPTCY COURT
   SOUTHERN DISTRICT OF NEW YORK
2  _____
3  In re:
4  MOTORS LIQUIDATION COMPANY, et al.,
   f/k/a General Motors Corp., et al.,
5
                       Debtors.
6
   Cast No.: 09-50026 (MG)
7  _____
8
                       November 15, 2017
9                      10:17 a.m.
10
11
12
13       DEPOSITION of BETH ANDREWS,
14  held at the offices of GIBSON, DUNN &
15  CRUTCHER, LLP, 200 Park Avenue, New
16  York, New York before Wayne Hock, a
17  Notary Public of the State of New York.
18
19
20
21
22
23
24
25

| Page 106 | Page 108 |
|---|---|
| 1  understanding as to why the documents<br>2  were being sent to GM's counsel?<br>3     A.   There was a status conference<br>4  scheduled for later that week and we<br>5  did -- it would not have been fair to<br>6  have GM show up at that status<br>7  conference not having reviewed the<br>8  documents, the proposed settlement.<br>9     Q.   Okay.<br>10         And that's the status<br>11 conference of August 17 in the<br>12 bankruptcy court before Judge Glenn;<br>13 correct?<br>14    A.   That is correct.<br>15    Q.   Okay.<br>16         And then do you see that<br>17 later that evening, in fact about two<br>18 minutes later, after you received the<br>19 e-mail from Mr. Martorana we've just<br>20 been discussing, you send a response at<br>21 seven --<br>22         MR. STYANT-BROWN: I'm sorry,<br>23    when I said two minutes later, I<br>24    got that wrong.  I'm going to ask<br>25    the question again to clean up the | 1     Q.   And you're signed off on the<br>2  documents on behalf of the trust;<br>3  correct?<br>4     A.   That is correct.<br>5     Q.   And is it the case that, by<br>6  stating that, you were authorizing Mr.<br>7  Martorana to physically sign the<br>8  agreement?<br>9     A.   That is not correct.<br>10    Q.   Okay.<br>11         How is that not correct?<br>12    A.   My statement is that the GUC<br>13 Trust is signed off on the form of the<br>14 documents.  I am not giving him<br>15 authority to sign the document.<br>16    Q.   You said in your previous<br>17 testimony that your understanding was<br>18 that the documents would be signed on<br>19 August 15.<br>20         Do you recollect that?<br>21    A.   I do, on or about August 15,<br>22 assuming that there were no further<br>23 changes to the documents.<br>24    Q.   Okay.<br>25         Well, let's take a look at |

| Page 107 | Page 109 |
|---|---|
| 1  record.<br>2     Q.   Do you see that on August 14,<br>3  2017 at 7:16 you send your response to<br>4  Mr. Martorana to his question is the<br>5  GUC Trust prepared to sign off?<br>6     A.   I see that response, yes.<br>7     Q.   And your response was, "yes,<br>8  I took a look at these before I left<br>9  the office, signed off."<br>10         Do you see that?<br>11    A.   I do.<br>12    Q.   And you knew, did you not,<br>13 that the -- because you had seen<br>14 several iterations of the agreement<br>15 that the agreement was to be physically<br>16 signed by Gibson Dunn on behalf of the<br>17 GUC Trust; correct?<br>18    A.   I did see that, yes.<br>19    Q.   And did you regard your<br>20 statement to Mr. Martorana that the<br>21 agreement was signed off as a statement<br>22 made on behalf of Wilmington?  I'm<br>23 sorry, on behalf of the trust.<br>24    A.   My statement here is that I<br>25 am signed off on the documents. | 1  whether or not there was any question<br>2  about further changes to the document.<br>3         MS. NEWMAN: We're getting<br>4     some feedback on the phone.  Could<br>5     everyone please make sure that your<br>6     lines are muted?<br>7         (Whereupon, a transcript excerpt<br>8     dated November 13, 2017 was marked<br>9     Exhibit 44 for identification.)<br>10    Q.   Would you have a look at<br>11 what's been marked Exhibit 44, please.<br>12    A.   Yes.<br>13    Q.   Have you seen Exhibit 44<br>14 before?<br>15    A.   No.<br>16    Q.   Do you see, if you go to the<br>17 front page, that it's an excerpt of the<br>18 transcript of Matthew J. Williams held<br>19 November 13, 2017?<br>20    A.   Yes.<br>21    Q.   And then if you go to page<br>22 one hundred four, which is the next<br>23 page in Exhibit 44, go down to line<br>24 eighteen.<br>25         Do you see that? |

Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400

Page 154

1  A. Correct.
2  Q. I think you also testified a
3 few times today that you believe that
4 the forbearance agreement is superior
5 for the trust to the settlement with
6 Plaintiffs; is that correct?
7  A. That's correct.
8  Q. Okay.
9     And can you just remind me or
10 state for the record, please, what that
11 belief is based on?
12    MR. KARLAN: Objection. Asked
13 and answered.
14    You may answer it again.
15    THE WITNESS: That belief is
16 based on the fact that we do
17 believe that there would be
18 protracted litigation going forward
19 with the proposed settlement
20 agreement which would deplete --
21 well, not deplete but would take
22 away assets from the trust as we
23 paid legal expenses to support the
24 -- defend the late claims motion
25 versus having the legal expenses

Page 155

1 paid by new GM.
2  Q. So my question is if you
3 believe that having legal expenses paid
4 by new GM presents a more favorable
5 arrangement for the trust than the
6 plaintiffs' settlement, why didn't the
7 trust ever reach out to King and
8 Spalding or any other law firm
9 representing new GM to make that
10 proposal?
11  A. I can't answer that question.
12 I don't know.
13  Q. Okay.
14    Did the GUC Trust ever reach
15 out to new GM to suggest that
16 arrangement, to your knowledge?
17  A. I don't know. I cannot -- I
18 can't say with any certainty that they
19 did or they didn't.
20  Q. Did you ever recommend to
21 your counsel that they reach out to new
22 GM to make that proposal?
23  A. I don't recall making that
24 recommendation, no.
25    MS. NEWMAN: That's all I

Page 156

1 have. Thank you, Ms. Andrews.
2    MR. KARLAN: Do you think you
3 have more?
4    MR. STYANT-BROWN: No, I don't
5 have any further questions.
6    MR. KARLAN: I believe so?
7    I have just a few questions
8 for you, ma'am.
9 EXAMINATION BY
10 MR. KARLAN:
11  Q. Did you ever authorize Mr.
12 Williams to sign the draft settlement
13 agreement with the plaintiffs?
14  A. I did not authorize Mr.
15 Williams or Mr. Martorana to sign, no.
16  Q. You were asked some questions
17 about my friend about the conference
18 before Judge Glenn.
19    Do you recall --
20  A. Yes.
21  Q. -- that line of questions?
22    Do you, sitting here today,
23 recall what day that conference was
24 scheduled to take place?
25  A. That was to take place on

Page 157

1 Thursday, the seventeenth.
2  Q. At the time, that is the days
3 leading up to the seventeenth, did you
4 think that that court conference was
5 relevant to your decision whether or
6 not to authorize Mr. Williams to sign
7 the draft settlement agreement with the
8 plaintiffs?
9    MR. STYANT-BROWN: Objection.
10 Leading.
11  Q. Go ahead.
12  A. I'm sorry, could you restate?
13  Q. Sure?
14    MR. KARLAN: Let me ask Nick a
15 question.
16    If I ask questions, as you
17 did, that elicit communications
18 with Mr. Williams, will they be
19 subject to the same agreement?
20    MR. STYANT-BROWN: Yes. Let
21 me say this: I need to hear the
22 question.
23  Q. I'll ask the question and
24 don't answer the question until we hear
25 from him; okay?

40 (Pages 154 - 157)

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400

Page 158

1  In the days leading up to the
2 scheduled conference, did you have
3 conversations with Mr. Williams about
4 that conference?
5      MR. STYANT-BROWN: You can
6  answer.
7      THE WITNESS: Yes, I did.
8  Q.  Would you please share with
9 us what those conversations were.
10  A.  Those conversations had to do
11 with the fact that actually we weren't
12 going to sign or weren't going to --
13 they weren't going to seek authority to
14 sign the proposed settlement agreement
15 until after the conference with the
16 judge.
17  Q.  Did you discuss with Mr.
18 Williams why that was the case?
19  A.  Because they wanted to take
20 the judge's temperature on whether or
21 not he felt the settlement agreement
22 was appropriate.
23  Q.  Now, I want to tell you --
24      MR. KARLAN: Withdraw that.
25  Q.  Do you recall testifying

Page 159

1 earlier today that you expected the
2 agreement to be signed on or about the
3 15th of August?
4  A.  I did.
5  Q.  Do you wish to add or change
6 any of that testimony?
7  A.  Actually, it would have been
8 on or after the 17th of August.
9  Q.  Now, you were asked some
10 questions about the forbearance
11 agreement.
12      Do you recall that?
13  A.  I do.
14      (Whereupon, a document entitled
15   Motion of the Motors Liquidation
16   Company GUC Trust was marked
17   Exhibit 46 for identification.)
18  Q.  Take whatever time you need
19 to review this but my question will be
20 can you identify Exhibit 46.
21  A.  (Reviewing).
22      This appears to be the
23 forbearance agreement as well as the
24 motion.
25  Q.  And specifically if we turn

Page 160

1 about halfway through the document to
2 what is Exhibit A to the document, is
3 that -- what is that Exhibit A, please?
4  A.  That is the forbearance
5 agreement.
6  Q.  Okay.
7      Who signed the forbearance
8 agreement for the GUC Trust?
9  A.  David Vanaskey.
10  Q.  So you did not sign it?
11  A.  I did not.
12  Q.  And what is the date as of
13 which the forbearance agreement is
14 entered into?
15  A.  I just actually, Mitch, I
16 want to --
17  Q.  Take your time.
18  A.  Because my name is on here on
19 page thirteen.  I did see David's
20 signature on here.  Oh, that was the
21 letter, the side letter.  I signed the
22 forbearance agreement.
23  Q.  You signed the forbearance
24 agreement?
25  A.  Yes.

Page 161

1  Q.  These pages aren't numbered.
2  A.  On page thirteen of the
3 forbearance agreement or thirty-four of
4 fifty-four.
5  Q.  Right.  Okay.
6      Now back to my question.
7      If we look at the first page
8 of the forbearance agreement, what is
9 the date as of which the forbearance
10 agreement is entered into?
11  A.  September 12.
12  Q.  You gave some testimony on
13 direct or earlier in the day rather
14 about something being signed in advance
15 of the August 17 court conference.
16      Do you recall generally that
17 line of testimony?
18  A.  I do.
19  Q.  Was it the forbearance
20 agreement that was signed in that time
21 frame or something else?
22  A.  It must not have been the
23 forbearance agreement because that was
24 signed on September 12.
25      MR. KARLAN: I have nothing