**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-100
Facsimile:  (212) 872-1002
Daniel H. Golden
Deborah J. Newman
Jennifer L. Woodson

*Attorneys for the Participating Unitholders*

<u>Hearing Date</u>: **December 18, 2017**
<u>Objection Deadline</u>: **November 28, 2017**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:**<br><br>**MOTORS LIQUIDATION COMPANY,** *et al.*,<br>**f/k/a General Motors Corp.,** *et al.*,<br><br>**Debtors.** | Chapter 11<br><br>Case No. 09-50026 (MG)<br><br>(Jointly Administered) |

### JOINDER OF THE PARTICIPATING UNITHOLDERS IN
### THE MOTION TO ENFORCE[1]

Certain unaffiliated holders (the "<u>Participating Unitholders</u>") of approximately 65 percent

of the beneficial units of the Motors Liquidation Company GUC Trust (the "<u>GUC Trust</u>"), by and

through  their undersigned counsel, hereby join in the *Motion to Enforce the Settlement*

*Agreement By and Among the Signatory Plaintiffs and the GUC Trust* brought by the Ignition

Switch Plaintiffs, the Non-Ignition Switch Plaintiffs, and certain Pre-Closing Accident Plaintiffs

(collectively, the "<u>Signatory Plaintiffs</u>") and state as follows:

### RELEVANT FACTUAL BACKGROUND

1.      In or around May 2017, the Participating Unitholders, the Signatory Plaintiffs,

and the Wilmington Trust Company ("<u>Wilmington Trust</u>"), as trustee for and administrator of the

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in *Motion to Enforce the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust*, ECF No. 14092.

GUC Trust, began negotiating the contours of a potential settlement of the Signatory Plaintiffs'

motions seeking authority to file late claims against the GUC Trust, and similar claims that could

be brought against the GUC Trust by similarly situated potential claimants. *See* Golden Decl. ¶

3. The Participating Unitholders' impetus for such a settlement was plain—the GUC Trust could

not make final distributions until such claims were rejected pursuant to a final order or, if

granted, finally adjudicated, which, in either case, could take years. The proposed settlement

thus provided significant benefits to the Participating Unitholders and other GUC Trust

unitholders, as it limited the GUC Trust's exposure to potential claims, and ensured that the GUC

Trust would not be mired in years of litigation with the Signatory Plaintiffs and/or other similarly

situated potential claimants.

    2.    The salient terms of the settlement (the "Plaintiff Settlement") that were

ultimately agreed upon were that:

    (i)    the GUC Trust would fund up to $6 million in noticing costs (the "Noticing Costs") to ensure that, among other things, all parties subject to the recalls issued by General Motors, LLC ("New GM") in 2014 received notice of the Plaintiff Settlement;

    (ii)    the Signatory Plaintiffs and the GUC Trust would support the entry of a Settlement Order pursuant to which the GUC Trust would pay $15 million (the "Settlement Fund") to an account designated by the Signatory Plaintiffs, in exchange for a release by all Plaintiffs (as that term is defined in the agreement memorializing the Plaintiff Settlement (the "Settlement Agreement")) of any and all claims against assets currently held or previously distributed by the GUC Trust; and

    (iii)    the GUC Trust would support the entry of a Claims Estimate Order, pursuant to which the Court would estimate Plaintiffs' claims against the GUC Trust at an amount equal to or in excess of $10 billion, which would trigger New GM's obligation to issue shares of New GM stock (the "Additional Shares") to the GUC Trust. Such Additional Shares, and the Settlement Fund, would be used solely to fund Plaintiffs' claims.

Notably, under the terms of the Plaintiff Settlement, entry of the Settlement Order was not

conditioned in any way upon entry of the Claims Estimate Order.

3.      The negotiations between the Participating Unitholders, Wilmington Trust, and the Signatory Plaintiffs continued in earnest throughout June and July 2017.  By late July 2017, the parties had agreed upon all the material terms of the Plaintiff Settlement, and were close to finalizing the voluminous documentation that would be necessary to seek the Court's approval thereof under Rule 9019 of the Federal Rules of Bankruptcy Procedure ("Rule 9019"), including the Settlement Agreement.  *See* Golden Decl. ¶ 4.  At this point, the parties agreed that Edward Weisfelner of Brown Rudnick LLP ("Brown Rudnick"), Designated Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs, and Daniel Golden of Akin Gump Strauss Hauer & Feld LLP, counsel for the Participating Unitholders, would contact Arthur Steinberg of King and Spalding, LLP, counsel for New GM, to apprise New GM of the Plaintiff Settlement, and to inquire as to dates on which New GM's counsel would be available for a conference with the Court to apprise the Court of the Plaintiff Settlement.  *See* Golden Decl. ¶ 5.

4.      That call took place on August 9, 2017.  That same day, Mr. Golden emailed counsel for Wilmington Trust and the Signatory Plaintiffs as follows:

> I would like to see if [sic] can schedule an all hands call for tomorrow to finalize all of the settlement documentation and motions.  This morning Ed Weisfelner and I had a call with Arthur Steinberg and an attorney from Kirkland giving them a heads up on the proposed settlement and our desire to have a chambers conference with Judge Glenn for some day next week.  We committed to giving Steinberg and the Kirkland attorney a final set of the pleadings sufficiently in advance of a to be scheduled chambers conference.  ***It seems to me we need to have a final call to finalize the documents so we can schedule that chambers conference.  At this call please have the requisite people necessary to bind your respective clients***.

*See* Golden Decl. Ex. A (emphasis added).

5.      At or around the same time, counsel for the Participating Unitholders, acting on behalf and with the consent of Wilmington Trust and the Signatory Plaintiffs, scheduled a chambers conference for August 17, 2017 to apprise the Court of the Plaintiff Settlement and

discuss the noticing procedures proposed in connection therewith.  *See* Golden Decl. ¶ 6.

6.    The "all hands call" requested by Mr. Golden took place on Friday, August 11, 2017.  *See* Golden Decl. ¶ 8.  Counsel for the Participating Unitholders, Wilmington Trust, and the Signatory Plaintiffs all participated in the call.  Later that day, Howard Steel of Brown Rudnick circulated among the other Signatory Plaintiffs, the Participating Unitholders, and Wilmington Trust "updated docs per today's all-hands." *See* Golden Decl. Ex. B.  The next day, Saturday, August 12, 2017, Keith Martorana of Gibson Dunn LLP ("Gibson Dunn"), counsel for Wilmington Trust, responded ***"[f]rom the GUC Trust perspective, all of the documents sent over by Howie (subject to one item we are discussing with Akin in the Settlement Agreement) are fine***."[2] *See* Golden Decl. Ex. C (emphasis added).  Mr. Martorana also attached a draft declaration in support of the Plaintiff Settlement by Beth Andrews, a Vice President at Wilmington Trust and one of the Wilmington Trust representatives leading Wilmington Trust's engagement as trustee for and administrator of the GUC Trust, opining that "[t]he Settlement is in the best interests of the GUC Trust, the Old GM estates and the GUC Trust Beneficiaries."  *Id.*

7.    At 7:21 a.m. the following Monday, August 14, 2017, Ms. Andrews sent an email to other Wilmington Trust employees regarding the Plaintiff Settlement:

> I just wanted to alert you to an article that appeared on Bloomberg last Friday concerning the settlement the GUC Trust is about to sign with the Ignition Switch Plaintiffs.  We knew that New GM was not pleased that we were contemplating settling with the Plaintiffs and supporting their claim estimation order.  The approval of the claim estimation order would trigger the accordion feature under the Plan of Reorganization and would cause New GM to have to issue up to 30mm in new shares.  ***New GM will fight our settlement and the estimation order***.  ***We expect the Trust will be sued by New GM.  Entering into the settlement is not an action we have taken without a great deal of thought and guidance from our legal advisors.  We believe that settling with the plaintiffs is in the best interest of the Trust and will enable us to wind it down and make a final distribution to all of the unitholders sooner rather than later***.

---

[2] This "one item" related to the question of whether this Court or the District Court for the Southern District of New York would hear questions related to the allocation of Settlement proceeds.  *See* Golden Decl. Ex. F.

*See* Golden Decl. Ex. D (emphasis added).

8.     At or about the same time, before the stock market opened, Wilmington Trust

filed a Form 10-Q stating, among other things, that "[f]ollowing briefing related to the Late

Claims Motions, the GUC Trust has engaged in discussions with counsel for certain Ignition

Switch Economic Loss Action and Other Economic Loss Action plaintiffs and certain Ignition

Switch Pre-Closing Accident Plaintiffs regarding a potential settlement of certain issues

underlying the Late Claims Motions.  Such discussions have meaningfully progressed and

remain ongoing." *See* Golden Decl. Ex. E at 42.

9.     Shortly thereafter, at 10:09 am, Mr. Martorana followed up on his August 12

email to Mr. Steel about the "one item we are discussing with Akin." *See* Golden Decl. Ex. F.

Mr. Martorana wrote:  "Howie – I spoke to Akin and we are ok with this.  So I think the last

point is in the declarations it should read that 'counsel to the Participating Unitholders'

participated in negotiations." *See id.* Mr. Steel responded "ok, thanks.  We will update

accordingly and send execution drafts as soon as possible." *See id*.  At 1:32 p.m., Mr. Steel sent

counsel for the Participating Unitholders, Wilmington Trust, and Plaintiffs "proposed final

execution versions of the documents," and requested that the parties "let us know any comments

or questions and confirm when you are signed off." *See* Golden Decl. Ex. G.

10.     At 2:55 p.m. that same afternoon, before counsel for Wilmington Trust had

responded to Mr. Steel's latest email, Gabriel Gillett of Gibson Dunn notified counsel for the

Participating Unitholders that New GM's counsel had called him "a bit ago" asking for "one

more opportunity to persuade us not to sign the settlement agreement."[3]  *See* Golden Decl. Ex. I.

---

[3] While the Participating Unitholders do not know what was said during the phone call between New GM's
and Wilmington Trust's counsel, they do know that whatever it was led Wilmington Trust's counsel to suggest that
perhaps the Participating Unitholders' counsel should not be included in the meeting New GM had requested.
Indeed, although Mr. Gillett originally invited the Participating Unitholders' counsel to that meeting, he then

Shortly thereafter, notwithstanding that Wilmington Trust had *already* signed off on the

settlement documents without reservation earlier that day, Mr. Martorana responded to Mr. Steel

that "[a]t this point we do not have further comments, but are obtaining final sign-off from our

client."[4]  *See* Golden Decl. Ex. J; *see also* Golden Decl. Ex. K.

11.    The reason for Mr. Martorana's backtracking became clear on August 16, 2017,

when Wilmington Trust's counsel abruptly informed counsel for the Participating Unitholders

and the Signatory Plaintiffs that Wilmington Trust did not intend to move forward with the

Plaintiff Settlement, and had agreed instead to enter into an agreement with New GM (the

"Forbearance Agreement") providing that Wilmington Trust would not enter into any settlement

of Plaintiffs' claims that could implicate New GM's assets, or seek a Claims Estimate Order or

the issuance of Additional Shares.  *See* Golden Decl. ¶ 20.  Unlike the Plaintiff Settlement, which

ensured that the GUC Trust would not be liable to Plaintiffs for any amounts other than the

Noticing Costs and Settlement Fund, the Forbearance Agreement left the GUC Trust fully

exposed to potential liability for Plaintiffs' claims.  In fact, the only purported benefit that the

GUC Trust would receive under the Forbearance Agreement was New GM's agreement to pay

the GUC Trust's fees in defending against Plaintiffs' claims, and to engage in good faith

---

notified New GM that "if there is a reason that you would prefer to have it be just us and you – without unitholders, we can accommodate that. Whatever you prefer."  New GM's counsel responded that it "would prefer for this meeting to just be with you, and without the unitholders."  *See* Golden Decl. Ex. H.  Gibson Dunn subsequently notified counsel for the Participating Unitholders that "we just heard from ARTHUR [Steinberg] that he apparently just wants to speak with the guck [sic] trust representatives."  *See* Golden Decl. Ex. I (capitalization in original). Thus, the Participating Unitholders were disinvited to the meeting, and were not notified until after Wilmington Trust had disavowed the Plaintiff Settlement and agreed to enter into the Forbearance Agreement (as hereinafter defined) that the discussion at the meeting involved a potential agreement between Wilmington Trust and New GM. *See* Golden Decl. ¶ 16.

[4] It is unclear whether Wilmington Trust was aware during this time of its counsel's intentions to abandon the Plaintiff Settlement and enter into the Forbearance Agreement (as hereinafter defined) with New GM.  Indeed, David Vanaskey, an Administrative Vice President at Wilmington Trust, and another Wilmington Trust representative involved in the GUC Trust representation, appeared to believe that Wilmington Trust was still moving forward with the Plaintiff Settlement on August 15, 2017, when he wrote to others at Wilmington Trust that "we expect to share the settlement with New GM today," and "there is a chambers conference with Judge Glenn Thursday."  *See* Golden Decl. Ex. L.

discussions about whether New GM would pay an appropriate rate of return to Wilmington Trust

as compensation for any delay in making distributions.  *See* ECF No. 14095.

12.    Despite repeated questioning from the Participating Unitholders and their counsel

in the days and weeks that followed, Wilmington Trust was unable to provide a cogent

explanation as to why it had suddenly chosen to abandon the carefully negotiated Plaintiff

Settlement to which it had already agreed in lieu of the far less favorable Forbearance

Agreement, or why it concealed its negotiations with New GM over the Forbearance Agreement

from the Participating Unitholders before acquiescing to the agreement.  *See* Golden Decl. ¶ 21.

## ARGUMENT

### I.    Wilmington Trust Is Bound by the Settlement Agreement

13.    It is well settled that "Parties are free to enter into a binding [settlement] contract

without memorializing their agreement in a fully executed document."  *In re Lehman Bros.*

*Holdings Inc.*, No. 17 Civ. 03424, 2017 WL 3278933, at *2 (S.D.N.Y. Aug. 2, 2017) (quoting

*Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d. Cir. 1985)).  "Once reached by the

parties," such settlement agreements to end litigation are "binding and enforceable," "strongly

favored by courts," and "not lightly cast aside."  *Delyanis v. Dyna-Empire, Inc.*, 465 F. Supp. 2d

170, 173 (E.D.N.Y. 2006).  Moreover, "the settlement remains binding even if a party has a

change of heart between the time he agreed to [it] and the time those terms are reduced to

writing."  *Powell v. Omnicom*, 497 F.3d 124, 129 (2d Cir. 2007).

14.    "Whether parties have entered into a binding oral settlement agreement depends

upon the parties' intent to be bound."  *Alvarez v. N.Y.C.*, 146 F. Supp. 2d 327, 335 (S.D.N.Y.

2010).  Courts within the Second Circuit consider four factors—none of which is dispositive but

each of which provides guidance—to determine whether parties have demonstrated an intent to

be bound in the absence of an executed agreement:

(1) Whether there has been an express reservation of the right not to be bound in the absence of a signed writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon, and (4) whether the agreement at issue is the type that is usually committed to writing.

*Id.* (citing *Winston*, 777 F.2d at 80).

15.     These factors strongly militate in favor of a finding that the Plaintiff Settlement is binding on Wilmington Trust.  The record is clear that Wilmington Trust did ***not*** express a "reservation not to be bound in the absence of a signed writing" (factor 1), and that "all of the terms of the alleged [agreement] were agreed upon" (factor 3).  *Id.*  Specifically, on August 9, 2017, Mr. Golden, counsel for the Participating Unitholders, notified the parties, including Wilmington Trust, that "we need to have a final [all hands] call to finalize the documents so we can schedule that chambers conference.  At this call please have the requisite people necessary ***to bind your respective clients***."  *See* Golden Decl. Ex. A.  Wilmington Trust never expressed—in response to this email or at any other time—that it did not intend to be bound until it signed the Settlement Agreement.

16.     Quite the contrary, following the all hands call requested by Mr. Golden, Mr. Martorana, Wilmington Trust's counsel, notified the Signatory Plaintiffs that "[f]rom the GUC Trust perspective, all of the documents sent over by Howie (subject to one item we are discussing with Akin in the Settlement Agreement) are fine," and later confirmed that Wilmington Trust was "ok" with that one item it was "discussing with Akin."  *See* Golden Decl. Ex. C, F.  Wilmington Trust also consented to the scheduling of a chambers conference with the Court to apprise the Court of the Plaintiff Settlement; agreed that the Settlement Agreement and other Plaintiff Settlement documentation could be sent to New GM without reservation; and communicated internally that Wilmington Trust was moving forward with the Plaintiff Settlement.  *See* Golden Decl. ¶ 6; Golden Decl. Ex. D, K, L.  Wilmington Trust's

8

communications and actions thus amply demonstrate that it intended to be bound by the Plaintiff

Settlement, notwithstanding that the Settlement Agreement had not yet been formally executed.

17.     Section 3.1 of the Settlement Agreement, providing that "[t]his Agreement shall

become effective and binding on the Parties on the date on which this Agreement is fully

executed by each of the Parties," does not alter this analysis.  Such language "is simply

insufficient to be treated as an explicit reservation that the parties should not be bound by the

terms of the agreement until it is fully executed," especially where, as here, "there is no

indication that at any time in the course of arriving at the terms of the agreement was it proposed

that the parties not be bound until a written agreement was fully executed."  *Kowalchuk v.

Stroup*, 873 N.Y.S.2d 43, 48 (App. Div. 2009); *see also Lehman*, 2017 WL 3278933, at *3.

18.     The parties' expectation that the Settlement Agreement would ultimately be

executed also fails to demonstrate that Wilmington Trust did not intend to be bound absent such

execution.  "Discussing execution of a formal document . . . is not the same as reserving the right

not to be bound . . ."  *Lehman*, 2017 WL 3278933, at *2 (internal citations omitted); *see also

Kowalchuk*, 873 N.Y.S.2d at 46 ("That the written formulation of the agreement had not yet been

signed by plaintiffs at the time defendant sought to repudiate it did not in any way refute its

existence or its terms."); *Winston*, 777 F.2d at 80 ("[T]he mere intention to commit an agreement

to writing will not prevent contract formation prior to execution."); *Delyanis*, 465 F. Supp. 2d at

174 ("the parties' intent to record an agreement in the future does not prevent contract formation

before execution.").

19.     The remaining factors also weigh in favor of a binding agreement.  The parties

had already partially performed under the Plaintiff Settlement prior to Wilmington Trust's efforts

to repudiate it (factor 2), as they had (i) prepared extensive and complex documentation in

connection with the Settlement, including (a) the "Settlement Motion" seeking Bankruptcy Court

approval of the Settlement Order that was required by Section 2.2 of the Settlement Agreement

(which included Ms. Andrews' declaration that the GUC Trust had ample business reason and

justification for seeking the relief requested in the Settlement Motion), and (b) the motion

seeking Bankruptcy Court approval of the proposed noticing procedures as required by Section

2.9, and (ii) scheduled a conference with the Court to begin the process of seeking Court

approval of the Plaintiff Settlement. *See, e.g., Powell*, 497 F.3d at 130 (finding that the

preparation of a reference letter pursuant to the terms of a settlement agreement demonstrated

partial performance of the agreement).

20. Additionally, courts hold that the question of "whether the agreement at issue is

the type . . . that is usually committed to writing" (factor 4) weighs in favor of a binding

settlement agreement where, as here, "there was a written settlement agreement that was

substantially complete." *Alvarez*, 146 F. Supp. 2d at 335; *see also id.* at 337 ("While the written

agreement was not signed, the terms of the agreement had been largely reduced to writing.

Hence, this factor weighs in favor of enforcing the agreement."); *Conway v. Brooklyn Union Gas

Co.*, 236 F. Supp. 2d 241, 251 (E.D.N.Y. 2002) ("even if the agreement is the type that is

typically reduced to writing, the written draft of the settlement had essentially been finalized . .

."). As noted above, by August 14, 2017, Wilmington Trust and the Signatory Parties had agreed

not only to the terms of the Settlement Agreement, but also to the voluminous documentation

that would be filed with the Court in support of a request for its approval thereof. Thus, this

factor, like the others, favors enforcement of the Plaintiff Settlement.

## CONCLUSION

21. For the reasons set forth above and in the Motion to Enforce, the Participating

Unitholders respectfully request that the Court enter an order substantially in the form attached

as Exhibit A to the Motion to Enforce, and grant such other and further relief as the Court deems

just and proper.

Dated: November 13, 2017
New York, New York                            AKIN GUMP STRAUSS HAUER & FELD LLP

                                              By:    */s/ Deborah J. Newman*
                                                     Daniel H. Golden
                                                     Deborah J. Newman
                                                     Jennifer L. Woodson
                                                     One Bryant Park
                                                     New York, NY 10036
                                                     (212) 872-1000 (Telephone)
                                                     (212) 872-1002 (Facsimile)

                                                     *Attorneys for the Participating Unitholders*