UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
                                                               :
In re:                                                         :    Chapter 11 Case No.
                                                               :
MOTORS LIQUIDATION COMPANY, *et al.*,                          :    09-50026 (MG)
f/k/a General Motors Corp., *et al.*                           :
                                                               :    (Jointly Administered)
                            Debtors.                           :
                                                               :
---------------------------------------------------------------x

## DECLARATION OF BETH ANDREWS

I, Beth Andrews, declare:

1.   I am a Vice President of Wilmington Trust Company, located at Rodney Square North, 1110 North Market Street, Wilmington, Delaware, 19890-1615. I am duly authorized to submit this declaration on behalf of Wilmington Trust Company in its capacity as trustee for and administrator of the Motors Liquidation Company GUC Trust (the "GUC Trust").

2.   I submit this Declaration in connection with the evidentiary hearing that will be conducted by this Court beginning December 18, 2017, concerning a contested matter in which the "Signatory Plaintiffs" have moved to enforce a draft settlement agreement with the GUC Trust (the "Contested Matter"). Except where noted in this Declaration, I have personal knowledge of the facts stated.

### I.   Background

3.   I have over 30 years' experience in capital markets and have previously worked as a Vice President at JP Morgan Chase, The Bank of New York, and Citibank. I am currently a Vice President, Corporate Capital Markets at Wilmington Trust Company, and I have worked in its financial services group for over 5 years. During that time, my work has focused on matters related to the General Motors Corporation bankruptcy proceeding.

4.    Wilmington Trust Company's initial role in the General Motors Corporation bankruptcy proceeding was to serve as the successor Indenture Trustee. In that role, Wilmington Trust Company oversaw approximately $23 billion in U.S. dollar denominated unsecured notes, bonds, and debentures of Motors Liquidation Company, formerly known as General Motors Corporation ("Old GM"). During the bankruptcy, Wilmington Trust Company served as chair of the Official Committee of Unsecured Creditors of Motors Liquidation Company.

5.    When the GUC Trust was created in 2011 to distribute assets to holders of allowed general unsecured claims against the Old GM estate, Wilmington Trust Company was selected to be the administrator of and trustee for the GUC Trust. The GUC Trust has issued publicly traded units. The GUC Trust is a public reporting entity and files, among other things, an annual report, quarterly reports, and current reports with the Securities and Exchange Commission. Since its creation in 2011, the GUC Trust has distributed to holders of allowed claims and to holders of GUC Trust units approximately 94% of the GUC Trust assets in the form of New GM stock, warrants, and cash.

6.    I currently serve as the lead Wilmington Trust Company representative in its capacity as trustee for and administrator of the GUC Trust. I have served in this role since approximately February 2017. In this role, I am responsible for the GUC Trust's reporting obligations, claims resolution, investment of cash assets, and distributions. I also oversee the GUC Trust's day-to-day operations and administration of the firms that provide professional services to the GUC Trust. I serve as the principal interface for the GUC Trust in dealing with its hired professionals, including legal counsel. I possess signing authority on behalf of the GUC Trust, and I am responsible for authorizing those performing professional services for the GUC Trust to prepare, file, or sign documents on the GUC Trust's behalf.

7.  As lead representative, my ultimate focus is on accomplishing the efficient resolution of claims alleged against the Old GM estate in order to maximize distributions of assets held by the GUC Trust to holders of publicly traded units issued by the GUC Trust.

8.  Before assuming the role of lead representative in February 2017, I served as a relationship manager for Wilmington Trust Company in its capacity as trustee for and administrator of the GUC Trust, a role I had held since approximately 2012.

9.  Before February 2017, David Vanaskey, Administrative Vice President at Wilmington Trust Company, served as the lead representative of the GUC Trust, a role he had held from the inception of the GUC Trust in 2011. I worked closely with Mr. Vanaskey while he served as the lead representative, and I continue to work closely with Mr. Vanaskey to this day.

10. Mr. Vanaskey is my manager. I also report to (i) Lon LeClair, Mr. Vanaskey's manager, in Wilmington Trust Company's global capital markets division; (ii) John Beeson, Mr. LeClair's manager, in Wilmington Trust Company's institutional client services division; and (iii) Cynthia Corliss of Wilmington Trust Company's risk and compliance group. Mr. Vanaskey and I meet with Mr. LeClair, Mr. Beeson, and Ms. Corliss on a quarterly basis to discuss the GUC Trust's financial information and reporting.

11. FTI Consulting, Inc. ("FTI Consulting") serves as the GUC Trust Monitor. The GUC Trust Monitor's role is to oversee the activities of the GUC Trust, including but not limited to the review and approval of GUC Trust budgets, approval of any extensions to the duration of the GUC Trust, approval of any hold-backs from distributions to holders of Units and the reallocation of such amounts for use in funding the fees and expenses of the GUC Trust, and approval of any claim settlement equal to or in excess of $10 million. My principal contacts at FTI Consulting are Michael Cordasco and Connor Tully.

3

12. Gibson, Dunn & Crutcher LLP ("Gibson Dunn") serves as legal counsel to the GUC Trust. I principally deal with Matthew Williams and Keith Martorana. I occasionally deal with other attorneys at Gibson Dunn as well.

13. The GUC Trust relies on other outside entities to provide professional services, including AlixPartners LLP, Plante & Moran PLLC, Frazier Deeter LLC, and Crowell & Moring LLP.

14. In 2014, General Motors LLC ("New GM") issued recalls of millions of vehicles, including certain vehicles manufactured by Old GM prior to the sale of substantially all of its assets to New GM in 2009. In connection with New GM's recalls, the GUC Trust became involved in litigation concerning purported economic losses, personal injuries and/or deaths suffered by certain lessees and owners of vehicles manufactured by Old GM. Certain of the plaintiffs have filed lawsuits against New GM, filed motions seeking authority from this Court to file late claims against the GUC Trust (the "Late Claims Motions"), or may be members of a putative class covered by those actions. Litigating against the Late Claims Motions brought by certain plaintiffs would drain resources from the GUC Trust to pay for legal expenses, possibly prevent the distribution of assets, and, depending on the status of other litigation, could delay the GUC Trust's wind down.

15. I understand that holders of a large number of GUC Trust units are working together in connection with the Late Claims Motions and this Contested Matter, the so-called "Participating Unitholders," and are represented by attorneys from the law firm of Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"). I also understand that Akin Gump has worked with the GUC Trust's counsel in connection with the bankruptcy proceedings and opposing the Late Claims Motions.

4

## II. The Negotiation of the Proposed Settlement Agreement

16. At some point in 2016, I learned that counsel for certain plaintiffs inquired about the possibility of settling their client's potential claims against the GUC Trust. After some discussions among the parties, that inquiry did not meaningfully progress.

17. At some point in the spring 2017, I learned that counsel for certain plaintiffs had resumed their query about the possibility of a settlement of the Late Claims Motions.

18. Around May 25, 2017, the GUC Trust filed a Form 10-K for the fiscal year ended March 31, 2017. The 10-K accurately stated that "the GUC Trust has engaged in discussions with certain Ignition Switch Economic Loss Action plaintiffs and certain Ignition Switch Pre-Closing Accident Plaintiffs regarding a potential settlement of their alleged claims against the GUC Trust. The GUC Trust does not currently know whether the parties will ultimately reach an agreement." [DX-FFFFF at 27.]

19. In June, July, and August 2017, I received and reviewed various drafts of a proposed settlement agreement and supporting papers. My pattern and practice was to review the drafts and discuss them with Mr. Vanaskey, the GUC Trust Monitor, and counsel at Gibson Dunn.

20. In July 2017, I received a copy of a letter sent to Gibson Dunn by counsel for New GM. The letter stated that New GM would "vigorously contest" any settlement "that attempts to impose additional liabilities upon New GM." [DX-HHHHH at 2.] The letter did not surprise me, as I assumed that New GM would object to any settlement that implicated New GM. But I was concerned that New GM's objections to any settlement had the potential to prolong the life of the GUC Trust and unduly delay distributions of assets. I considered this to be a risk of any settlement.

5

21. In August 2017, I was asked to provide a draft declaration in support of the proposed settlement agreement. My draft declaration stated, among other things, that "[t]he [proposed] Settlement is in the best interests of the GUC Trust, the Old GM estates and the GUC Trust Beneficiaries." [DX-HHH at 159, ¶ 29]. At the time the draft declaration was prepared, I believe that was a true and accurate statement. My draft declaration was never finalized, and I never signed any version of that draft declaration.

22. I learned that, at an August 11, 2017 court conference, counsel for certain plaintiffs and counsel for New GM made statements about the proposed settlement and that counsel for New GM objected to such a settlement.

23. On the morning of August 14, 2017, I wrote to Mr. LeClair, Mr. Beeson, and Ms. Corliss to apprise them of the status of the settlement negotiations and let them know about certain public statements made regarding the GUC Trust. I stated that there had been news reports regarding "the settlement the GUC Trust *is about to sign* with the Ignition Switch Plaintiffs." [PX-066 at 1 (emphasis added).] I also stated that: "Entering into the settlement is not an action we have taken without a great deal of thought and guidance from our legal advisors." I was communicating that the GUC Trust was nearing a potential agreement with certain plaintiffs, and that Mr. Vanaskey and I had given a great deal of thought to and thoroughly vetted that proposed agreement. I also stated in the email that "[w]e expect the Trust will be sued by New GM," and by that I meant that New GM would oppose any settlement the GUC Trust might reach that implicated New GM.

24. At that time, the proposed settlement agreement had not yet been signed and the GUC Trust had not reached any agreement with counsel for Signatory Plaintiffs or their clients. No settlement agreement would be reached until I authorized Gibson Dunn to sign the agreement

6

on behalf of the GUC Trust, Gibson Dunn did so, and counsel for Signatory Plaintiffs did the same.

25. On the morning of August 14, 2017, the GUC Trust filed its Quarterly Report on Form 10-Q for the period ending June 30, 2017, with the Securities and Exchange Commission. That Form 10-Q accurately states that: "Following briefing related to the Late Claims Motions, the GUC Trust has engaged in discussions with counsel for certain Ignition Switch Economic Loss Action and Other Economic Loss Action plaintiffs and certain Ignition Switch Pre-Closing Accident Plaintiffs regarding a potential settlement of certain issues underlying the Late Claims Motions. *Such discussions have meaningfully progressed and remain ongoing.*" [DX-GG at 48 (emphasis added).]

26. Later on August 14, 2017, I reviewed a draft of the settlement agreement and supporting papers, and I was satisfied with the form of those documents. On the evening of August 14, 2017, Mr. Martorana forwarded me an email exchange regarding the sending of the draft papers to counsel for New GM, and Mr. Martorana asked "[i]s the GUC Trust prepared to sign off?" [PX-088 at 1.] I responded to Mr. Martorana that I had reviewed the papers and that I was "[s]igned off." *Id.* I was communicating to Mr. Martorana that the form of the documents was acceptable and could be sent to counsel for New GM. I was not communicating to Mr. Martorana that the GUC Trust was authorized to enter any agreement with Signatory Plaintiffs. At no point did I ever direct or authorize Mr. Martorana, Mr. Williams, or anyone at Gibson Dunn to sign the proposed settlement agreement. I did not intend to authorize the signing of the proposed settlement agreement until after the scheduled conference with this Court, set for August 17, 2017, at which I anticipated we might receive feedback from this Court regarding the structure of the proposed settlement. If this Court had not raised any issues at that conference

7

regarding the proposed deal, only then was I prepared to authorize Gibson Dunn to sign the proposed settlement agreement.

27. At my deposition, I became confused about the date of the court conference and thought that it was August 15, 2017 when it was instead August 17, 2017. I thus testified that I thought the proposed settlement agreement would be signed on or about August 15 when I meant it would be signed on or about the day of the court conference, which was held on August 17, 2017. After reviewing a transcript of my deposition, I corrected my testimony to reflect this. I also corrected this in testimony later in my deposition.

28. On August 15, 2017 counsel for New GM met with Gibson Dunn to discuss the proposed settlement agreement. I understand that it was agreed at my deposition that I would be permitted to answer limited questions in this proceeding regarding the August 15 meeting with New GM in order to facilitate these proceedings and that, by doing so, no one would argue waiver of any privileges.

29. I had discussions with Gibson Dunn regarding communications with counsel for New GM on August 15 and 16. On August 16, I learned of the terms of a proposed agreement offered by New GM—namely, that New GM would agree to cover the GUC Trust's litigation fees and costs associated with opposing the Late Claims Motions, agree to negotiate in good faith for a rate of return on GUC Trust assets should distributions to holders of units be delayed due to the Late Claims Motions, and agree that the GUC Trust could, but was not required to, terminate the agreement if New GM did not ultimately agree to pay a specific rate of return.

30. On August 16, I authorized Gibson Dunn to accept the proposed agreement offered by New GM, which was memorialized in a letter that I authorized Gibson Dun to sign and have filed with this Court. I agreed to the proposed agreement offered by New GM, because

I believe the deal with New GM is far superior to the proposed settlement offered by certain plaintiffs. My best judgment is that the agreement with New GM presents the best option for maximizing GUC Trust assets and the quickest path to distribution of those assets.

31. At no time before I authorized Gibson Dunn to sign and file the letter with this Court regarding the agreement with New GM did the GUC Trust ever enter an agreement with certain plaintiffs.

32. At no point did Mr. Vanaskey, myself, or anyone else at Wilmington Trust Company authorize or direct anyone at Gibson Dunn to sign the proposed settlement agreement with certain plaintiffs on behalf of the GUC Trust.

33. At no point did Mr. Vanaskey, myself, or anyone else at Wilmington Trust Company ever receive any signature pages from the proposed settlement agreement signed by any counsel for Signatory Plaintiffs.

34. At no point did Mr. Vanaskey, myself, or anyone else at Wilmington Trust Company communicate with any plaintiffs represented by counsel for Signatory Plaintiffs.

35. Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: Wilmington, Delaware
December 5, 2017

_____
Beth Andrews