UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re:

MOTORS LIQUIDATION COMPANY, *et al.*,
f/k/a General Motors Corp., *et al.*

Debtors.

-----------------------------------------------------------------x

Chapter 11 Case No.

09-50026 (MG)

(Jointly Administered)

## DECLARATION OF MATTHEW J. WILLIAMS

I, Matthew J. Williams, declare:

1.    I am a partner at Gibson, Dunn and Crutcher LLP ("Gibson Dunn"), counsel for

Wilmington Trust Company in its capacity as administrator of and trustee for the Motors

Liquidation Company General Unsecured Creditors Trust (the "GUC Trust") in the above-

captioned action.

2.    I submit this Declaration in connection with the evidentiary hearing that will be

conducted by this Court beginning December 18, 2017, concerning a contested matter in which

certain "Signatory Plaintiffs" have moved to enforce a draft settlement agreement with the GUC

Trust (the "Contested Matter"). Except where noted in this Declaration, I have personal

knowledge of the facts stated.

### I.    THE PARTIES INVOLVED IN THIS CONTESTED MATTER

3.    The GUC Trust resolves claims and makes distributions in respect of allowed

claims against debtor General Motors Company ("Old GM") and its affiliated debtors.  FTI

Consulting, Inc. ("FTI Consulting") serves as the "GUC Trust Monitor."  The GUC Trust

Monitor oversees the affairs of the GUC Trust in accordance with the terms and conditions of the

GUC Trust Agreement.

4. Gibson Dunn has served as counsel to Wilmington Trust Company in its capacity as administrator of and trustee for the GUC Trust in the above-captioned action since the inception of the GUC Trust in 2011, including in connection with events underlying the Contested Matter. I have served as the lead Gibson Dunn partner representing Wilmington Trust Company in its capacity as administrator of and trustee for the GUC Trust before this Court, including in connection with the events underlying the Contested Matter. I have also overseen the work of Keith Martorana, Of Counsel at Gibson Dunn, who often acted as the interface between Gibson Dunn and counsel for other parties in the above-captioned action, including in connection with many of the events underlying the Contested Matter.

5. General Motors LLC ("New GM") acquired substantially all of Old GM's assets in 2009 via a Master Sale and Purchase Agreement (as amended, the "AMSPA"), an agreement that (among other things) requires New GM to issue adjustment shares to the GUC Trust in the event this Court enters an order estimating the aggregate allowed claims against Old GM at an amount exceeding $35,000,000,000.

6. In 2014, New GM recalled millions of vehicles. Certain plaintiffs then filed recall-related lawsuits against New GM and sought authority to file recall-related bankruptcy claims against Old GM.

## II.   THE CONTESTED MATTER

### A.   Summer 2016—Gibson Dunn, Brown Rudnick, and Akin Gump Participate In Discussions of a Potential Settlement

7. In summer 2016, attorneys at Gibson Dunn, Brown Rudnick LLP ("Brown Rudnick"), and Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), counsel for certain holders of freely tradeable GUC Trust Units (the "Participating Unitholders"), participated in preliminary discussions about the potential for resolving certain plaintiffs' potential late claims

against the GUC Trust via a settlement. Those discussions involved a potential agreement

whereby the GUC Trust might receive a full release from plaintiffs with alleged late claims

provided that this Court issued an order estimating certain bankruptcy claims in an amount large

enough to trigger New GM's obligation to issue to the GUC Trust the full amount of additional

shares of New GM stock. Because, among other things, the release of claims against the GUC

Trust under what I understood the broad proposed settlement terms to be could only be secured

by a claims estimate order from this Court in excess of a specified amount over which the GUC

Trust had no ultimate control, the terms were not acceptable to the GUC Trust. To the best of

my recollection, the initial discussions in 2016 did not lead to any concrete proposals or an

exchange of draft settlement documents.

**B.      May 2017—Brown Rudnick and Akin Gump Resume Discussions of a Potential
          Settlement, which Are Conveyed to the GUC Trust**

        8.      At some point in or around May 2017, I understand that the discussions between

attorneys at Brown Rudnick and Akin Gump resumed. The resumed discussions involved a

potential agreement whereby the GUC Trust might receive a full release from certain plaintiffs

independent from whether or not this Court issued an order estimating the amount of Allowed

General Unsecured Claims in an amount that would trigger New GM's obligation to issue the

full amount of additional shares of New GM stock to the GUC Trust, provided that the GUC

Trust supported the entry of such an order. Because the release of claims against the GUC Trust

under the revised proposed settlement terms could potentially be secured regardless of the entry

of a claims estimate order from this Court in excess of a specified amount, the initial terms were

of interest to the GUC Trust, and I informed Akin Gump that I would be interested in seeing

such a proposal in writing from counsel for certain plaintiffs.

C.    **May 25, 2017—The GUC Trust Files Its Annual Report Disclosing Discussions Regarding a Potential Settlement**

9.    On May 25, 2017, the GUC Trust filed its Annual Report on Form 10-K for the period ending March 31, 2017. As relevant to this Contested Matter, the Annual Report disclosed that: "Following briefing related to the Late Claims Motions, the GUC Trust has engaged in discussions with certain Ignition Switch Economic Loss Action plaintiffs and certain Ignition Switch Pre-Closing Accident Plaintiffs regarding a potential settlement of their alleged claims against the GUC Trust. *The GUC Trust does not currently know whether the parties will ultimately reach an agreement.*" [DX-FFFFF at 27 (emphasis added).]

D.    **June through August 2017—The Parties Exchange Drafts of a Proposed Settlement Agreement**

10.    Beginning in June 2017 and continuing through mid-August 2017, counsel for the parties—including Gibson Dunn, Brown Rudnick, and counsel on behalf of certain pre-closing accident plaintiffs—exchanged multiple drafts of a proposed settlement agreement. During that timeframe, the parties also exchanged multiple drafts of supporting papers, such as proposed orders, draft motions, draft declarations, and forms of notice. I have now been shown copies of certain of those drafts and note that I was a recipient of the communications transmitting those drafts. Some communications and drafts I remember specifically and some I do not.

11.    As Gibson Dunn received revised drafts and comments from counsel for certain plaintiffs, Gibson Dunn ensured as a general practice that such drafts were provided to the GUC Trust. When Gibson Dunn circulated revised drafts and comments to Brown Rudnick and counsel for certain plaintiffs, as a general practice it communicated to them that the documents were subject to ongoing review and comment by the GUC Trust and its counsel, or words to that effect. When Gibson Dunn received revised drafts and comments from Brown Rudnick and/or

counsel for certain plaintiffs, such counsel often included similar statements that the documents were subject to ongoing review and comment, or words to that effect.

**E.     June 6, 2017 Draft—Brown Rudnick Circulates an Initial Draft of a Proposed Settlement Agreement, And Gibson Dunn and Akin Gump Revise It**

12.     On June 6, 2017, Gibson Dunn received from Akin Gump a draft of a proposed settlement agreement, which Akin Gump had in turn received from Brown Rudnick (the "June 6 Draft"). The transmittal email from Brown Rudnick to Akin Gump (which was subsequently forwarded to Gibson Dunn) stated that the June 6 Draft was "[s]till subject to internal and client review and sign off, but didn't want to delay". [DX-E at 1.] On or shortly after June 6, 2017, I read and revised the initial draft of the proposed settlement agreement from Brown Rudnick, and I then directed Mr. Martorana to further revise that draft.

**1.     Notable Provisions in the June 6 Draft**

13.     The initial draft of the proposed settlement agreement from Brown Rudnick (via Akin Gump) included several provisions of notable relevance to this Contested Matter.

14.     First, Section 3.7 titled "Counterparts; Facsimile; Signatures" (later Section 3.9) permitted execution of the agreement with "[a]ny signature delivered by any of the Parties by facsimile or electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement, shall be deemed to be an original signature hereto, and shall be admissible as such in any legal proceeding to enforce this Agreement." [DX-E at 12.] Second, Section 3.9 titled "Integration" (later Section 3.11) provided that "[t]his Agreement constitutes the entire agreement and understanding among the Parties hereto relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements, representations and understandings between or among any of the Parties hereto relating to such subject matter." [DX-E at 13.] Third, Section 3.10 titled "Amendment" (later Section 3.12) provided that "no

amendment, modification, rescission, waiver or release of any provision of this Agreement shall

become effective unless the same shall be in writing and signed by the Parties." [DX-E at 13.]

15.    The section numbers for these three provisions changed in later versions of the

draft proposed settlement agreement but the exact text of each of these three provisions appears

in the "Execution Version" that Movants submitted to this Court in support of their motion.

[DX-HHH at 84 (Weisfelner Decl., Ex. H §§ 3.9, 3.11, 3.12).]  At no point before August 17,

2017, did any party state orally or in writing to me or, to the best of my knowledge, anyone at

Gibson Dunn or the GUC Trust, that it intended for there to be an executed settlement agreement

absent a "signature" by each of the parties.  At no point before August 17, 2017, did any party

state orally or in writing to me or, to the best of my knowledge, anyone at Gibson Dunn or the

GUC Trust, that it did not intend for there to be an integration clause in the proposed settlement

agreement.  At no point before August 17, 2017 did any party state orally or in writing to me or,

to the best of my knowledge, anyone at Gibson Dunn or the GUC Trust, that it intended to

amend the terms of the draft proposed settlement agreement to permit an amendment to that

agreement absent a writing.

16.    The June 6 Draft from Brown Rudnick (via Akin Gump) included signature

blocks for the following:

a.    "On behalf of the Plaintiffs" for Brown Rudnick (Edward Weisfelner and

Howard Steel), Stutzman Bromberg (Sander Esserman), Hagens Berman (Steve Berman), Lieff

Cabraser (Elizabeth Cabraser), Goodwin Procter (William Weintraub and Gregory Fox), Hilliard

Munoz (Robert Hilliard); [DX-E at 15–16.] and

17.     "On behalf of the Trust Parties" for Gibson Dunn (Matthew Williams, Keith Martorana, and Gabriel Gillett), Akin Gump (Daniel Golden, Deborah Newman, and Naomi Moss), and Binder & Schwartz LLP (Eric B. Fisher and Neil Binder).  [DX-E at 15.]

**2.     Notable Omissions in the June 6 Draft and Corresponding Gibson Dunn and Akin Gump Revisions**

18.     The June 6 Draft from Brown Rudnick (via Akin Gump) failed to include several provisions that the GUC Trust considered to be essential to any settlement of potential claims against the GUC Trust.

19.     For example, the June 6 Draft contained no indication that the release of claims against the GUC Trust would be agreed to independent from the entry of any claims estimation order.  I worked, together with Mr. Martorana, to revise the document to ensure the agreed upon release was not tied to entry of a claims estimate order.

20.     As an additional example, the June 6 Draft did not address who would pay for notice costs or the expected amount of those costs.  I worked, together with Mr. Martorana, to revise the document to address these notice issues.

21.     As a further example, the June 6 Draft contained no indication as to when it would be considered executed and binding upon all parties to the agreement.  I directed Mr. Martorana to include a provision that specifically identified when the agreement would be considered executed and binding upon all parties.  Mr. Martorana drafted a provision in Section 3.1 that stated in relevant part that "This Agreement shall become effective and binding on the Parties on the date on which this Agreement is fully executed by each of the Parties."  [DX-F at 12, 31.]

22.     At no point did any party propose to me or, to the best of my knowledge, anyone at Gibson Dunn or the GUC Trust, to change that language, and all subsequent drafts of the

settlement agreement, including the "Execution Version" that Movants submitted to the Court in

support of their motion, contained that language.  [DX-HHH at 82 (Weisfelner Decl., Ex. H §

3.1).]

23.    At no point did any party tell me or, to the best of my knowledge, anyone at

Gibson Dunn or the GUC Trust, in sum or substance, that it did not intend to be bound by the

above quoted language from Section 3.1 in the draft proposed settlement agreement.

**F.    June 2017 Drafts—The Parties Exchange Drafts of the Proposed Settlement
Agreement**

24.    On June 9, 2017, Akin Gump sent a draft of the proposed settlement agreement

containing revisions from Gibson Dunn and Akin Gump to Brown Rudnick (the "June 9 Draft"),

and stated that the June 9 Draft "remains subject to further review and revision in all respects."

[DX-F.]  The June 9 Draft, in addition to the changes I describe above, removed the signature

blocks for Akin Gump and Binder & Schwartz LLP and added two signature blocks for two

additional sets of counsel for certain plaintiffs (which were later removed by Brown Rudnick in a

subsequent draft).  [DX-F at 17–18, 36–37.]

25.    On June 15, 2017, Gibson Dunn and Akin Gump received a revised draft of the

proposed settlement agreement from Brown Rudnick (the "June 15 Draft") and a transmittal

email stating that the June 15 Draft remained "subject to further review and revision in all

respects, including by Lead Counsel and Hilliard / Weintraub."  [DX-G.]  The June 15 Draft,

among the other changes, removed the two signature blocks for two additional sets of counsel for

certain plaintiffs (which had been added by Gibson Dunn and Akin Gump to the June 9 Draft).

[DX-G at 18–19, 38–39.]  The June 15 Draft contained one edit to Section 3.1 regarding the

"Settlement Effective Date", but otherwise accepted the addition of Section 3.1 that Gibson

Dunn and Akin Gump added in the June 9 Draft.  Specifically, Brown Rudnick gave the

"Parties," rather than just the "GUC Trust," the authority to "waive the requirement that the Settlement Order be a Final Order," for certain provisions of the settlement, such as payment of the settlement amount and delivery of the waiver, to "become effective." [DX-G at 15, 33–34.] Brown Rudnick did not edit the part of Section 3.1 governing when the settlement "become[s] effective and binding on the Parties." [DX-G at 15, 33–34.]

26.     On June 23, 2017, Gibson Dunn sent a draft of the proposed settlement agreement containing additional revisions from Gibson Dunn and Akin Gump to Brown Rudnick (the "June 23 Draft"), and noting that the June 23 Draft "remains subject to the ongoing review of GDC, AG and the Trust Administrator." [DX-GGGGG.]

27.     On July 3, 2017, Gibson Dunn (and Akin Gump) received a revised draft of the proposed settlement agreement from Brown Rudnick and Goodwin Procter LLP ("Goodwin Procter") (the "July 3 Draft") with the reservation that the July 3 Draft remained "[s]ubject to ongoing review of BR / GP / Berman, Cabraser, Hilliard." [DX-UUU.] The July 3 Draft, among the other changes, added a signature block for The Law Firm of Thomas J. Henry (Thomas Henry). [DX-UUU at 21–22, 41–42.] To the best of my knowledge, this was the first draft of the proposed settlement agreement that appeared to contain comments from Goodwin Procter.

## G.     July 6—Goodwin Procter Informs this Court that Settlement Discussions Are Ongoing

28.     On July 6, 2017, at a status conference before this Court in connection with the above-captioned action (the "July 6 Conference) at which I did not attend, I understand that Arthur Steinberg of King & Spalding LLP ("King & Spalding"), bankruptcy counsel for New GM, asked the Court to schedule argument on the *Pioneer* issues motions pending before the Court. Goodwin Procter (Mr. Fox) responded by stating, in sum and substance, that settlement discussions were ongoing between the GUC Trust and certain plaintiffs, but that no agreement

had been reached.  Before the July 6 Conference, Mr. Fox did not inform me or, to the best of my

knowledge, anyone at Gibson Dunn that he intended to make any statements to this Court

regarding the status of the proposed settlement.

**H.    July 2017 Drafts and Comments—The Parties Continue to Exchange Drafts of, and Comments on, the Proposed Settlement Agreement**

29.    On July 6, 2017, Gibson Dunn sent a draft of the proposed settlement agreement

containing additional revisions from Gibson Dunn and Akin Gump to Brown Rudnick and

Goodwin Procter (the "July 6 Draft"), and stated that the July 6 Draft remained "subject to the

ongoing review and comment of GDC, Akin Gump and the GUC Trust." [DX-DDDD.]

30.    On July 10, 2017, William Weintraub of Goodwin Procter forwarded an email

containing his "preliminary comments" on the draft of the proposed settlement agreement to

Gibson Dunn (the "July 8 Comments"). [DX-K.]

31.    On July 10, 2017, William Weintraub of Goodwin Procter sent by email "[a] few

thoughts" on the draft of the proposed settlement agreement to Gibson Dunn, Akin Gump, and

Brown Rudnick (the "July 10 Comments"). [DX-L at 4–5.] One of the July 10 Comments was

that: "Consistent with my comments in my email of 7/8/2017 (see items 12, 15, and 16), section

3.1 must be similarly modified to have all of the releases and waivers triggered by entry of the

Settlement Order." [DX-L at 4.] Another of the July 10 Comments was that: "Perhaps you have

already thought of this, but it seems to me that we need to have the form of notice blessed before

we give it.  Otherwise… well, you know the otherwise.  I think this requires a separate motion re

notice procedures and deadlines.  Why spend the money on notice only to find out at the hearing

that Judge Glenn does not like what we did?" [DX-L at 5.]

32.    On July 12, 2017, Gibson Dunn replied to Goodwin Procter's July 10 Comments

with a draft of the proposed settlement agreement containing additional revisions from Gibson

Dunn and Akin Gump to Brown Rudnick and Goodwin Procter (the "July 12 Draft"). The

transmittal email from Gibson Dunn stated that the July 12 Draft "is being sent simultaneously to

our clients and remains subject to ongoing review and comment." [DX-EEEEE.]

33.    On July 14, 2017, Goodwin Procter sent a draft of the proposed settlement

agreement containing additional revisions from Goodwin Procter and Brown Rudnick to Gibson

Dunn and Akin Gump (the "July 14 Draft"), and stated that the July 14 Draft "remains subject to

review and comment by Goodwin's and Brown Rudnick's respective clients and co-counsel."

[DX-CCCCC.]

34.    On July 17, 2017, Gibson Dunn sent a draft of the proposed settlement agreement

containing additional revisions from Gibson Dunn and Akin Gump to Brown Rudnick and

Goodwin Procter (the "July 17 Draft"), with the reservation that the July 17 Draft "is being sent

contemporaneously to our clients and thus remains subject to ongoing review and comment."

[DX-DDDDD.]

35.    On July 18, 2017, Goodwin Procter sent a draft of the proposed settlement

agreement containing additional revisions from Goodwin Procter and Brown Rudnick to Gibson

Dunn and Akin Gump (the "July 18 Draft"), noting that "[o]ur respective clients and co-counsel

are still reviewing these changes and the [July 18 D]raft remains subject to further comment and

changes." [PX-21.]

**I.    July 19, 2017 Letter—Counsel for New GM Informs Gibson Dunn It Will Contest any GUC Trust Settlement "that Attempts to Impose Additional Liabilities upon New GM"**

36.    On July 11, 2017, Gabriel Gillett of Gibson Dunn emailed Mr. Steinberg at King

& Spalding to ask for New GM's views on the settlement discussions referred to at the July 6

Conference. [DX-MMMMM at 1.]

37.      On July 19, 2017, Gibson Dunn received a letter from counsel for New GM stating that New GM had not received any details on a potential settlement but would "vigorously contest" any settlement by the GUC Trust that attempted to impose liabilities upon New GM.  [DX-HHHHH at 2.]  The contents of the letter were, in my opinion, not constructive but did not surprise me.  The letter accurately stated that the terms of a potential settlement had not yet been shared with New GM.  On July 19, 2017, I directed that a response be sent by Gibson Dunn, on behalf of the GUC Trust, to counsel for New GM encouraging them to assist in "attempting to resolve this long-running litigation" by engaging in constructive dialogue. [PX-24 at 1.]  To the best of my knowledge, counsel for New GM did not further comment on the potential settlement until after an August 9 call with Akin Gump and Brown Rudnick on which counsel for New GM learned of the terms of the proposed settlement agreement.

38.      On July 20, 2017, Gibson Dunn sent a draft of the proposed settlement agreement containing additional revisions, "which reflects the group's discussion yesterday," to Akin Gump, Brown Rudnick, and Goodwin Procter (the "July 20 Draft"), and stated that, "in the interest of time, the attached [July 20 Draft] is being sent contemporaneously to our clients and remains subject to their ongoing review and comment."  [DX-BBBB.]

39.      On July 27, 2017, Gibson Dunn sent by email comments on the draft of the proposed settlement agreement to Akin Gump, Brown Rudnick, and Goodwin Procter (the "July 27 Comments").  The email informed Akin Gump, Brown Rudnick, and Goodwin Procter that finalization of the documents was distinct from approval of the proposed settlement, the latter of which was subject to *both* the former *and* receipt of final approvals:  "Note, however, that sign-off on the settlement itself is subject to the finalization of all other document[s] in a satisfactory manner and receipt of final approvals."  [DX-BBBBB.]

40.    On July 28, 2017, Gibson Dunn sent a draft of the proposed settlement agreement containing additional revisions "with one change requested by BR" to Akin Gump, Brown Rudnick, and Goodwin Procter (the "July 28 Draft"). [DX-AAAAA.]

41.    On or about August 3, 2017, Gibson Dunn sent a draft of the proposed settlement agreement containing additional revisions, which "incorporates the comments of GP and minor clean-ups," to Akin Gump, Brown Rudnick, and Goodwin Procter (the "August 3 Draft"), along with drafts of certain supporting documents, and stated that each of the documents "remains subject to the ongoing review and comment of our clients". [DX-V.]

42.    On August 7, 2017, Gibson Dunn and Akin Gump received a revised draft of the proposed settlement agreement from Brown Rudnick and Goodwin Procter (the "August 7 Draft"), along with drafts of certain supporting documents. The cover email from Brown Rudnick asked recipients to "[p]lease let us know where {sic} we are final, and any comments / anything you would like to discuss." [DX-YYYY.]

43.    In early August, I became aware that Andrews Myers, P.C., through attorney Lisa Norman, agreed to be added as a Signatory Plaintiff on the draft proposed settlement agreement. On August 8, 2017, Gibson Dunn sent a revised draft of the proposed settlement agreement reflecting comments from Gibson Dunn and Akin Gump and from Brown Rudnick and Goodwin Procter (the "August 8 Draft"), along with drafts of certain supporting documents. The transmittal email from Gibson Dunn stated that "we have been engaged in discussions with Lisa Norman who is counsel to the 'Additional Ignition Switch Pre-Closing Accident Plaintiffs,' and we understand that they are amenable to becoming signatories to the Settlement Agreement. Accordingly the attached Settlement Agreement includes her firm as a PIWD Counsel." The transmittal also stated that the August 8 Draft "remains subject to the ongoing review and

comment of our clients." [DX-WWWWW.]  The August 8 Draft, among the other changes,

added a signature block for Andrews Myers, P.C.  [DX-WWWWW at 26–27, 50.]

**J.      August 2017 Scheduling—The Parties Coordinate to Schedule a Court Conference
to Preview the Proposed Settlement and Notice Procedure**

44.      In early August 2017, counsel for the Signatory Plaintiffs, the GUC Trust, and the

Participating Unitholders coordinated to schedule a conference with this Court, and the

conference was set for August 17, 2017 (the "August 17 Conference").  My understanding is that

the original purpose of the August 17 Conference was to request approval of the notice

procedures contemplated in the draft settlement agreement and supporting documents.  However,

as negotiations progressed, Gibson Dunn and, I believe, counsel for the other parties became

convinced that this Court would not approve the notice procedures at the August 17 Conference

without proper notice and a hearing.  Indeed, for that reason the Parties drafted an entirely

separate motion and proposed form of order relating to proposed notice procedures as part of the

documents attached to the Settlement Agreement.  Accordingly, Gibson Dunn and, I believe,

counsel for certain other parties planned to use the August 17 Conference to preview the draft

notice procedures, draft settlement agreement, and other draft supporting papers to this Court and

to see if any significant issues with any aspects of the proposed settlement agreement and

supporting papers were raised.

45.      If the Court did not raise any issues at the anticipated August 17 Conference, I

was intending to sign the proposed settlement agreement once authorized by the GUC Trust to

do so; to the extent the Court did raise significant issues, such as the $10 billion allowed claim or

the lack of class certification, then I did not intend to sign the proposed settlement agreement.  In

any event, I did not intend to sign the proposed settlement agreement on behalf of the GUC Trust

until after the August 17 Conference.

14

**K.**     **August 9, 2017 Call—Akin Gump and Brown Rudnick Inform New GM of the Terms of the Proposed Settlement**

46.     On August 9, 2017, I understand that attorneys at Akin Gump (Mr. Golden) and Brown Rudnick (Mr. Weisfelner) called counsel for New GM at King & Spalding (Mr. Steinberg) regarding the proposed settlement agreement (the "August 9 Call"). Although I was not on the call, I later learned that Mr. Golden and Mr. Weisfelner shared the broad terms of the draft settlement agreement with Mr. Steinberg on that August 9 Call. Although, prior to August 9, I had agreed it was appropriate to inform counsel for New GM of the terms of the proposed settlement, I did not authorize or consent to the August 9 Call being made by Akin Gump and/or Brown Rudnick without my participation, and I had not contemplated that the disclosure to New GM of the terms of the proposed settlement would be made absent the full participation of Gibson Dunn, as counsel for the GUC Trust.

**L.**     **August 11, 2017 MDL Conference**

47.     On August 11, 2017, I learned that counsel for certain plaintiffs in the MDL (Mr. Berman) informed Judge Furman at a status conference in the MDL on the morning of August 11, 2017 (the "August 11 MDL Conference") of certain—but not all—of the terms of the proposed settlement agreement, and counsel for New GM in the MDL, Kirkland & Ellis, indicated that it would oppose such a settlement. No counsel for the GUC Trust appeared at the August 11 MDL Conference, although a Gibson Dunn associate did monitor the conference via a "listen-only" telephone line without any speaking capability, and no counsel for the GUC Trust made any representations on the record or otherwise at the August 11 MDL Conference about the proposed settlement agreement or any of its terms. In advance of the August 11 MDL Conference, I did not know that Mr. Berman or counsel for New GM would be commenting on the unexecuted draft settlement agreement at that conference, and I certainly never gave

15

permission to any of the counsel for the Signatory Plaintiffs to make such remarks. I was not

pleased by the statements because I knew the August 11 MDL Conference was a public hearing

and that the GUC Trust is a public reporting entity, but I understand there is no obligation to

respond to or report on market rumors.

**M.     August 11 & 12, 2017 Comments, Call, & Drafts**

48.     On August 11, 2017, Hilliard Munoz Gonzales LLP (Mr. Hilliard) sent by email

comments on the draft of the proposed settlement agreement to Gibson Dunn, Akin Gump,

Goodwin Procter, and Brown Rudnick (the "August 11 Comments"). [DX-CC.] The email from

Hilliard Munoz identified certain language that "we can live with" and stated that "Berman

insists, once again, this is a walk away issue, but, you know how that goes." [DX-CC at 1.]

49.     On August 11, 2017, I participated in a conference call that involved a review of

the draft proposed settlement agreement and each of the supporting documents. To my

knowledge, most, but not all, of the intended signatories to the draft proposed settlement

agreement (and Akin Gump) were present on the August 11 Call. On that August 11 Call,

Gibson Dunn asked counsel for the Signatory Plaintiffs to present their views on why a certified

class was not necessary to effectuate the proposed settlement, and how they intended to address

the issue at the August 17 status conference in the event it was raised by the Court or any other

party. At least one counsel for certain plaintiffs on the call stated they would get back to Gibson

Dunn on that issue. Gibson Dunn did not condition execution and entry into the draft settlement

agreement upon receiving information regarding class certification issues.

50.     On August 11, 2017, Brown Rudnick sent a draft of the proposed settlement

agreement containing additional revisions "per today's all-hands" to Gibson Dunn, Akin Gump,

and Goodwin Procter (the "August 11 Draft"), along with drafts of certain supporting papers.

The transmittal email from Brown Rudnick stated that, "[h]oping these are final and we can schedule signatures." [DX-DD.]

51.     On August 12, 2017, Mr. Martorana wrote to Mr. Steel, copying counsel for the other intended signatories (and Akin Gump), that "all of the documents sent over by [Mr. Steel] (subject to one item we are discussing with Akin in the Settlement Agreement) are fine." [DX-FF.] At that time, Gibson Dunn was "fine" with the form of the documents as they then-existed.

**N.      August 14, 2017 Quarterly Report—The GUC Trust Files Its Quarterly Report, Disclosing that Settlement Discussions Have "Meaningfully Progressed"**

52.     On the morning of August 14, 2017, the GUC Trust filed its Quarterly Report on Form 10-Q for the period ending June 30, 2017.  As relevant to this Contested Matter, the Quarterly Report disclosed that:  "Following briefing related to the Late Claims Motions, the GUC Trust has engaged in discussions with counsel for certain Ignition Switch Economic Loss Action and Other Economic Loss Action plaintiffs and certain Ignition Switch Pre-Closing Accident Plaintiffs regarding a potential settlement of certain issues underlying the Late Claims Motions. ***Such discussions have meaningfully progressed and remain ongoing***."  [DX-GG at 45 (emphasis added).]  This language accurately disclosed the status of the potential settlement of purported claims against the GUC Trust and accurately disclosed that the GUC Trust had not yet reached a binding settlement agreement with any parties.  Had the GUC Trust entered a binding settlement agreement by the time of filing on the morning of August 14, 2017, the GUC Trust would have disclosed such an agreement in its Quarterly Report.

O.    **August 14, 2017 Drafts—Counsel for the Signatory Plaintiffs and the GUC Trust
Finalize Drafts of the Settlement Agreement and Supporting Papers in Order to
Send to New GM**

53.    On August 14, 2017, Mr. Steel sent the intended signatories and related counsel

the "proposed final execution versions of all of the documents" and stated: "[p]lease let us know

any comments or questions and confirm when you are signed off." [DX-II at 4.]

54.    On the afternoon of August 14, 2017, Mr. Martorana responded to Mr. Steel and

other counsel and stated: "[a]t this point we do not have any further comments, but are obtaining

final sign-off from our client." [DX-II at 3.] Mr. Steel subsequently emailed counsel and stated:

"[w]e can send [the documents] to [Mr. Steinberg] when everyone is signed off." [DX-II at 2.]

I understand that Mr. Martorana then followed up with Mr. Steel and stated: "[w]e are waiting

for final approval from client, but unlikely to come tonight. You are, however, authorized to send

current versions to New GM this evening." [DX-II at 1.] Later that evening, Mr. Steel sent the

draft settlement agreement and supporting documents to King & Spalding and requested that he

"keep confidential until it is filed." [DX-HHH at 64 (Weisfelner Decl., Ex. G).]

55.    At that time, I believe all parties had agreed to the form of the documents that

were sent to counsel for New GM on August 14, 2017. I do not believe that the parties had

reached a settlement agreement, only that the parties had agreed to the form of the documents. I

had no authorization from the client at that time, or any time after, to sign the proposed

settlement agreement on behalf of the GUC Trust. Counsel for Signatory Plaintiffs were aware

of this distinction at the time. Counsel for the GUC Trust had already communicated to Akin

Gump, Brown Rudnick, and Goodwin Procter the GUC Trust's clear distinction between, on the

one hand, its approval of "finalized" versions of the documents and, on the other hand, approval

to enter into the proposed settlement agreement. Specifically, counsel for the GUC Trust (Mr.

Martorana) had explicitly informed Akin Gump, Brown Rudnick, and Goodwin Procter that

"sign-off on the settlement itself is subject to the finalization of all other document[s] in a

satisfactory manner and receipt of final approvals." [DX-BBBBB.]

**P.    August 15, 2017 Letter—New GM Files a Letter with this Court Objecting to the
August 17, 2017 Conference**

56.    On August 15, 2017, counsel for New GM filed a letter to the Court objecting to

the August 17 conference.

57.    Gibson Dunn did not originally intend on submitting any response to the New

GM letter as we felt no such response was necessary.  However, after discussion with the other

parties, Gibson Dunn agreed to draft a responsive letter.  Accordingly, on August 15, 2017, Mr.

Martorana drafted a letter to the Court in response to New GM's letter that stated that the

purpose of the conference "was to update the Court on the status of a potential settlement

between the GUC Trust, the Economic Loss Plaintiff and the Pre-Closing Accident Plaintiffs,"

and that the "Proposed Settlement is nearly final, but has not yet been executed by the parties and

is non-binding." [DX-PP at 3.]

58.    I emailed the draft August 15 etter to Brown Rudnick (Mr. Steel) in the early

morning on August 16, 2017.  [DX-PP at 3.]  At 8:16 A.M. Mr. Steel replied, stating:  "Thanks.

will send you our draft shortly—says a lot of the same." [DX-SS.]  At no point did Mr. Steel

take issue with any of the language of the draft letter, including that the draft settlement

agreement was not executed or binding.  I then followed up on my early morning email to Brown

Rudnick (Mr. Steel) and stated:  "Also – do we have any update on class cert issue discussed the

other day?"  [DX-QQ.]  Mr. Steel replied:  "Will circle back on the class cert issue and looking

fwd to discussing".  [DX-TT.]

59.    I also emailed the August 15 Letter to Akin Gump (Mr. Golden, Ms. Newman,

and Ms. Moss) in the early morning on August 16, 2017.  [DX-ZZZ.]

60.    On August 16, 2017, this Court rendered New GM's letter moot by ordering the

August 17 Conference be held in open court, and the GUC Trust's draft letter in response to New

GM's letter was never filed.

**Q.    August 15, 2017 Meeting—Counsel for the GUC Trust Meets with Counsel for New
GM**

61.    I became aware that at some point on August 14, 2017, Mr. Steinberg of King &

Spalding on behalf of New GM asked for a meeting with Gibson Dunn. Gibson Dunn agreed to

meet with Mr. Steinberg and other of New GM's counsel.

62.    On August 15, 2017, at approximately 10:00 AM, myself, Mr. Martorana, and

Mr. Gillett of Gibson Dunn on behalf of the GUC Trust met with Mr. Steinberg and Scott

Davidson of King & Spalding on behalf of New GM at Gibson Dunn's New York offices (the

"August 15 Meeting"). An attorney from Kirkland & Ellis, counsel for New GM, also joined

that meeting via a conference call line.

63.    At the August 15 Meeting, Mr. Steinberg stated what I understand to be his and

his client's views of the potential infirmities with the draft settlement agreement, including that:

binding all plaintiffs from seeking to file late claims against the GUC Trust was impossible

without class certification; achieving the requested claims estimate amount was impossible

without aggregating claims through class certification; the proposed settlement was an illegal

Plan modification; and the Claims Estimate Order would be evaluated pursuant to Section 502(c)

of the Bankruptcy Code rather than Bankruptcy Rule 9019. Apart from Mr. Steinberg's

comment regarding Section 502(c) review of the Claims Estimate Order, I did not consider any

of these issues to be surprising or new.

64.    At the August 15 Meeting, Mr. Steinberg also stated what I understand to be his

and his client's view of the merits of the GUC Trust's defenses to the Late Claims Motions

brought by certain plaintiffs, including the lack of excusable neglect, lack of a tolling arrangement for the vast majority of claimants, and equitable mootness.

65.     Mr. Steinberg also stated at the August 15 Meeting that New GM had the ability and willingness to oppose the proposed settlement, and Mr. Steinberg stated what I understand to be his and his client's view that the execution of the proposed settlement agreement would, in effect, exchange weak claims against the GUC Trust by certain plaintiffs for potential strong claims against the proposed settlement by New GM.

66.     Near the end of the August 15 Meeting, Mr. Steinberg followed up on a point I raised about the costs of litigating against the Late Claims Motions depleting the GUC Trust's assets, and he queried whether the GUC Trust might be interested in having New GM pay for the GUC Trust's litigation costs in opposing the Late Claims Motions, but added to the query the reservation that he had no authorization to make any offer and would have to raise the issue with his client and secure New GM's approval before formally offering any such arrangement.

**R.     August 15 & 16, 2017 Discussions—Counsel for New GM and Counsel for the GUC Trust Discuss the Potential for an Agreement**

67.     At some point on August 15, 2017, Mr. Steinberg asked me, in sum or substance, whether the GUC Trust was bound by the proposed settlement agreement with certain plaintiffs. I responded to Mr. Steinberg that the proposed settlement agreement had not yet been signed, and that the GUC Trust was not so bound.

68.     On August 16, 2017, I informed Mr. Steinberg that he could look at the GUC Trust's Quarterly Report filed on August 14 for confirmation that the GUC Trust was not bound by the proposed settlement agreement.

69.    On August 15, 2017 and August 16, 2017, I continued discussions with Mr.
Steinberg regarding the potential for an agreement between New GM and the GUC Trust.  The
discussions took place primarily between Mr. Steinberg and myself via calls and emails.

70.    At some point on August 15, 2017, I asked Mr. Steinberg whether New GM
would consider not only paying for the GUC Trust's litigation fees in connection with the Late
Claims Motions, but also providing a rate of return on GUC Trust assets in the event that the
GUC Trust was unable to make distributions to Unitholders solely due to the Late Claims
Motions litigation.

S.    **August 16, 2017 Agreement—New GM and the GUC Trust Reach an Agreement,
Inform this Court in of the Agreement, and Gibson Dunn Informs Akin Gump and
Brown Rudnick of that Agreement**

71.    On the morning of August 16, 2017, I received an offer from Mr. Steinberg of an
agreement between the GUC Trust and New GM.  Mr. Steinberg informed me that, in light of
certain ongoing litigation related to GUC Trust assets, New GM did not have clarity as to the
amount of GUC Trust assets for which a rate of return would be payable under the terms of an
agreement, but that New GM was prepared to (a) agree to negotiate in good faith for payment of
a rate of return on GUC Trust assets upon the resolution of the underlying litigation over certain
GUC Trust assets, (b) agree to pay for the GUC Trust's litigation fees in connection with the
Late Claims Motions litigation, and (c) agree to permit the GUC Trust, in its sole discretion, to
terminate the agreement in the event that the GUC Trust and New GM did not ultimately agree
as to a specific rate of return.

72.    Late on the morning of August 16, 2017, both the GUC Trust and FTI Consulting
provided approval to enter into the framework of a settlement agreement with New GM.

73.    At some point on August 16, 2017, the GUC Trust and New GM reached an
agreement, the terms of which counsel for each of the parties negotiated to embody in a joint

22

letter to this Court from counsel for the GUC Trust and counsel for New GM, dated August 16, 2017 (the "August 16 Joint Letter"). [DX-PPPPP.]

74.     Before filing the August 16 Joint Letter, I requested and received authorization from the GUC Trust (Ms. Andrews) to finalize and file the Letter on the GUC Trust's behalf, which memorialized the terms of the GUC Trust's and New GM's agreement in principle.

75.     On August 16, 2017, I informed Akin Gump (Mr. Golden and Ms. Newman) that the GUC Trust intended to enter into an agreement with New GM, and not to enter into the proposed settlement agreement with the Signatory Plaintiffs. Later on August 16, 2017, I similarly informed counsel for certain of the Signatory Plaintiffs (Mr. Weisfelner).

**T.     August 16 & 17, 2017 Opposition—Counsel for Signatory Plaintiffs React to the Agreement Between New GM and the GUC Trust**

76.     On August 16, 2017, Counsel for Signatory Plaintiffs filed a letter to the Court that argued, to the best of my knowledge for the first time, that the draft settlement agreement was binding on the GUC Trust notwithstanding the fact that it had never been signed by any party. [DX-PPPPP.]

77.     Counsel for the Signatory Plaintiffs (and the Participating Unitholders) are not wrong that the parties completed the form of the documents to be sent to New GM and to be previewed with the Court at the August 17 conference, one agreed-upon term of which was Section 3.1's requirement that the document not be binding until executed.

78.     Counsel for Signatory Plaintiffs are wrong, however, that the draft settlement agreement was executed by all parties. At no point did I sign any version of the proposed settlement agreement. Indeed, Gibson Dunn did not have the authority to sign the proposed settlement agreement without explicit authorization from the GUC Trust. At no point did Beth Andrews, David Vanaskey, or anyone representing the GUC Trust authorize or direct myself or

anyone at Gibson Dunn to sign the draft settlement agreement on behalf of the GUC Trust.  At

no point did any party to the proposed settlement agreement manifest to me or, to the best of my

knowledge, anyone at Gibson Dunn or the GUC Trust, in sum or substance, that it intended to be

bound by an oral agreement.  At no point did I or, to the best of my knowledge, anyone at

Gibson Dunn or the GUC Trust, communicate with any of the plaintiffs represented by counsel

for the Signatory Plaintiffs.  At no point did anyone ever send me or, to the best of my

knowledge, anyone at Gibson Dunn or the GUC Trust, signature pages from the proposed

settlement agreement signed by any other counsel for Signatory Plaintiffs.

79.    Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge, information, and belief.


Executed on:   New York, New York
               December 5, 2017

                                        _____
                                           Matthew J. Williams