# <u>EXHIBIT B</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
                                             :

In re:                                        :           Chapter 11

MOTORS LIQUIDATION COMPANY, et al.,     :           Case No.: 09-50026 (MG)

           f/k/a General Motors Corp., et al.,          :

                                             :

                               Debtors.      :           (Jointly Administered)
-------------------------------------------------------------X

## PLAINTIFFS' AND PARTICIPATING UNITHOLDERS' CONTENTIONS

Plaintiffs' and Participating Unitholders' Contentions are organized as follows:

I.       Reservation Of Rights.

II.      Overview.

         A.       Phase 1(a) Issue.

         B.       Phase 1(b) Issue.

III.     Burden Of Proof.

         A.       Phase 1(a) Issue.

         B.       Phase 1(b) Issue.

IV.     Factual Contentions.

         A.       Initial Proceedings In The Bankruptcy Court And Second Circuit.

         B        Proceedings In The Bankruptcy Court On Remand.

         C.       The Settlement Negotiations.

                1.       June To July, 2017 Drafting History And Agreement On Material Terms.

                2.       Evidence In Support Of The Claims Estimate Order.

                3.       Pursuing A Staged Settlement And Binding Absentee Claimants.

         D.       Finalizing The Settlement Agreement And Informing New GM.

         E.       The GUC Trust Abandons The Settlement.

         F.       Representational Authority.

V.     The Settlement Is Binding On The GUC Trust.

     A.     The Parties Reached Agreement On All Materials Terms.

     B.     The GUC Trust Did Not Express An Explicit Reservation Of The
            Right Not To Be Bound Absent A Signature.

     C.     There Was Partial Performance Of The Settlement Agreement.

     D.     The Settlement Agreement Was Reduced To Writing And
            Enforcing The Settlement Agreement Does Not Run Afoul of CPLR 2104.

VI.    New GM Does Not Have Phase I Standing.

VII.   The Signatory Plaintiffs Are Entitled To Attorneys' Fees.

**I.     Reservation Of Rights.**

    1.     Set forth below is a non-exhaustive statement of the Signatory Plaintiffs' and

Participating Unitholders' contentions as to the ultimate issues of fact and law to be tried.  The

statement is not intended to waive any rights.

**II.    Overview.**

    **A.     Phase 1(a) Issue.**

    2.     Settlements are favored in bankruptcy, so much so that each Circuit pays homage

to the strong bankruptcy policy in favor of speedy, inexpensive, negotiated resolution of

disputes.  See, e.g., Tronox Worldwide LLC v. Kerr-McGee Corp. (In re Tronox Inc.), 855 F.3d

84, 106 (2d Cir. 2017); Munford v. Munford, Inc. (In re Munford, Inc.), 97 F.3d 449, 455 (11th

Cir. 1996).  "Settlement agreements to end litigation are strongly favored by courts and are not

lightly cast aside.  Once reached by the parties, settlement agreements are binding and

enforceable."  Delyanis v. Dyna-Empire, Inc., 465 F. Supp. 2d 170, 173 (E.D.N.Y. 2006)

(internal citations omitted).  Under New York law, the requirements for a binding settlement

agreement are "an offer, acceptance, consideration, mutual assent and intent to be bound."  Id.

Agreements are binding "when the parties have reached complete agreement (including the

agreement to be bound) on all the issues perceived to require negotiation." Id.  The only essential prerequisite for a valid settlement agreement is the parties' assent to the terms and conditions of the settlement, and the parties' intent to be bound by it.  Id.

3.    The Signatory Plaintiffs and the Participating Unitholders will establish at trial that the Settlement is binding on the GUC Trust, and that the GUC Trust's and New GM's contention that the Settlement is not binding because the Settlement Agreement was not signed must fail as it would require the Court to ignore the evidence of the parties' actions and intent. Likewise, the GUC Trust's contention, hidden from the Signatory Plaintiffs, that it was waiting for the Court to opine on the substance of the Settlement at the August 17 conference before it would sign is neither relevant nor credible.

4.    The evidence will show that all parties involved in the lengthy and extensive settlement negotiations agree that the form of the written Settlement Agreement and related documentation was agreed upon no later than August 14, 2017.  The Signatory Plaintiffs and Participating Unitholders contend that the following facts to be shown at trial, among other manifestations of mutual assent to be bound that will be introduced at trial, confirm the existence of a Settlement Agreement binding on the GUC Trust:

- On July 27, 2017, Keith Martorana of Gibson Dunn conveyed that the "Settlement Agreement, Settlement Order and Claims estimate order generally look fine from a GDC perspective" and that client sign-off on these three documents "will likely come tomorrow."[1]  The next day, Mr. Martorana recirculated the Settlement Agreement and Settlement Order without any reservation of rights,[2] and the contemplated client sign-off came on August 14, 2017.[3]

---

[1] Direct Testimony of Howard S. Steel ("Steel Testimony"), ¶ 25; PX-032 at BR003277; PX-032 at BR003277.

[2] Steel Testimony, ¶ 26; PX-034 at BR003354.

[3] PX-088.

- On August 9, 2017, with the permission of Gibson Dunn, Daniel Golden of Akin Gump and Ed Weisfelner of Brown Rudnick informed New GM about the Settlement.[4]

- On August 10, 2017, David Vanaskey of Wilmington Trust emailed Beth Andrews of Wilmington Trust an invite to a Corporate Trust Distressed Investing Roundtable regarding "Bankruptcy Rule 9019 settlements: What the indenture trustee needs to know." Vanaskey wrote: "In light of the Ig Switch settlement may be something worth considering attending. Also Debbie Newman [of Akin Gump] presenting."[5]

- On August 11, 2017, Co-Lead Counsel Steve Berman previewed certain terms of the settlement in open court at the status conference before Judge Furman in the MDL.[6] Gibson Dunn attended the MDL status conference telephonically and did not object to or complain about the preview of the Settlement after the status conference.[7]

- An "all hands call" was scheduled for August 11, 2017 "to finalize all of the settlement documentation and motions" by having on the call "the requisite people necessary to bind your respective clients."[8] On that call, Gibson Dunn conveyed that they were done with comments to the documents.[9]

- On August 12, 2017, after updated documents were circulating incorporating edits from the all hands call, Keith Martorana of Gibson Dunn confirmed that "[f]rom the GUC Trust perspective, all of the documents sent over by Howie [Steel] (subject to one item we are discussing with Akin in the Settlement Agreement) are fine." This email did not include any reservation that counsel's comments were subject to client review or approval.[10] On August 14, 2017, Mr. Martorana confirmed that resolution of that open item had occurred without any reservations.[11]

---

[4] Steel Testimony, ¶ 35; PX-047 at BR007012; Direct Testimony of Edward S. Weisfelner ("Weisfelner Testimony"), ¶ 45.

[5] PX-051.

[6] Aug. 11 Hr'g Tr. at 41:16-17.

[7] Steel Testimony, ¶¶ 38-40; Weisfelner Testimony, ¶ 47.

[8] Steel Testimony, ¶ 36; PX-047 at BR007012; Weisfelner Testimony, ¶ 46.

[9] Steel Testimony, ¶ 39; Weisfelner Testimony, ¶ 48.

[10] Steel Testimony, ¶ 43; PX-063 at BR005468.

[11] PX-072 at GUC_0007042-43.

- Matt Williams of Gibson Dunn and Beth Andrews of Wilmington Trust both testified in depositions that they had agreed to the terms of the settlement and form of the Settlement documents.[12]

- On August 12, 2017, Keith Martorana of Gibson Dunn circulated a draft of the declaration of Beth Andrews of Wilmington Trust in support of the motion to approve the Settlement Agreement.  The declaration states that "the Settlement is a prudent and reasonable exercise of business judgment because it presents the best option for the GUC Trust to maximize recovery for the benefit of the GUC Trust Beneficiaries while minimizing the substantial risk posed by the Late Claims Motions" and "[t]he settlement is in the best interests of the GUC Trust, the Old GM estates and the GUC Trust Beneficiaries."[13]

- On August 14, 2017, Beth Andrews of Wilmington Trust sent an email to other Wilmington Trust employees to alert them to an article about the Settlement, stating "Entering into the settlement is not an action we have taken without a great deal of thought and guidance from our legal advisors. We believe settling with the plaintiffs is in the best interest of the Trust and will enable us to wind it down and make a final distribution to all of the unitholders sooner rather than later."[14]

- On August 14, 2017, each party provided consent to circulate the Settlement documentation to New GM, including the GUC Trust, without reservation.[15] Before Keith Martorana of Gibson Dunn provided authorization to send the documents to New GM, he informed Wilmington Trust that "FTI has signed off. Is the GUC Trust prepared to sign off?  If at all possible, it would be better to send these documents to KS tonight," and Beth Andrews of Wilmington Trust responded, "yes, I took a look at these before I left the office, *signed off*."[16]

- The parties scheduled the August 17, 2017 conference before Judge Glenn to inform the Court about the existence of the Settlement and discuss the mechanics of the proposed notice procedures.[17]

5.    The evidence will show that the parties had reached a final agreement on the

Settlement no later than August 14, 2017.  The GUC Trust and New GM are left to rely

---

[12] M. Williams Dep. (Vol. 1) at 69:16-70:15, 104:18-105:2; B. Andrews Dep. at 110:2-111:7.

[13] Steel Testimony, ¶ 44; PX-063 at BR005477 ¶ 28.

[14] PX-066.

[15] Steel Testimony, ¶ 51; PX-077 at BR006006; PX-081 at BR005593; PX-085 at BR005790; PX-089 at BR005545.

[16] PX-088.

[17] Steel Testimony, ¶ 61; PX-105.

exclusively on, and significantly overstate the import of, the boilerplate language in the Settlement Agreement stating that the Agreement "shall become effective and binding on the Parties on the date on which this Agreement is fully executed by each of the Parties." Under the facts and law, this provision is insufficient to demonstrate an express reservation of rights not to be bound absent a signed, written agreement and is fully belied by the GUC Trust's objective and clear indication of intent that there was a binding Settlement as of August 14, 2017.

6.      The Plaintiffs and Participating Unitholders contend that this Court should find that the Settlement is binding on the GUC Trust under New York law.[18]

**B.      Phase 1(b) Issue.**

7.      On the Phase 1(b) issue of whether New GM has standing to be heard on the issue of whether the Settlement Agreement is binding, it is undisputed that New GM is neither a party to nor a third-party beneficiary of the Settlement Agreement. As a result, prudential standing limitations bar New GM's participation in Phase 1. In addition, no direct obligation will be imposed on New GM by any outcome of Phase 1. Accordingly, New GM also does not have constitutional or Bankruptcy Code Section 1109 standing.

8.      New GM falsely contends that it is a creditor entitled to standing under Section 1109 of the Bankruptcy Code having filed a proof of claim against the Debtors' estates. However, that claim was submitted as a contingent administrative claim and was withdrawn from the claims register, so New GM does not have standing under Section 1109. New GM also contends that it has an economic interest at stake in Phase 1 because the Settlement Agreement contemplates notice procedures that may require New GM to provide lists of Plaintiffs' names and addresses and provides for the parties to seek a Claims Estimate Order that, if approved,

---

[18] Plaintiffs and the Unitholders incorporate herein their briefing on the pending Motion to Enforce.

would obligate New GM to issue additional shares of New GM common stock.  However, neither of these interests is at stake until Phase 2 of the proceedings.  Such future, contingent economic interests are insufficient for Phase 1 standing.[19]

## III.    Burden Of Proof.

### A.    Phase 1(a) Issue.

9.    The party seeking to enforce the agreement bears the "burden of demonstrating that the parties had a 'meeting of the minds' as to all material terms of a settlement agreement." Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc., 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006).

10.    If a party takes the position that it did not intend to be bound until it signed a formal document, that party "must prove either that both parties understood they were not to be bound until the executed contract was delivered, or that the other party should have known that the disclaiming party did not intend to be bound before the contract was signed." Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 261 (2d. Cir. 1984).

11.    In cases arising under federal law, the scope of a lawyer's authority to settle is determined according to federal precedent.  In re Artha Mgmt., Inc., 91 F.3d 326, 328-29 (2d Cir. 1996).  "[B]ecause of the unique nature of the attorney-client relationship, and consistent with the public policy favoring settlements, [federal courts] presume that an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had authority to do so."  Id. at 329.  The party challenging an attorney's authority to settle bears the burden of proving by affirmative evidence that the attorney lacked authority.  Id. (citing U.S. v. Int'l Bhd. of Teamsters, 986 F.2d 15, 20 (2d Cir. 1993)).  "The burden of proving that an attorney entered into

---

[19] Plaintiffs and the Unitholders incorporate herein their briefing on the standing issue.

a settlement agreement without authority is not insubstantial." Int'l Bhd. of Teamsters, 986 F.2d at 20.

**B.** **Phase 1(b) Issue.**

12.     "The burden to establish standing remains with the party claiming that standing exists." Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir. 1995); see also FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990) (explaining that the party seeking standing bears the burden of alleging facts demonstrating that he is a proper party to the dispute).

## IV.    Factual Contentions.[20]

**A.** **Initial Proceedings In The Bankruptcy Court And Second Circuit.**

13.     Throughout 2014, New GM issued a multitude of recalls for safety defects, including, among others, recalls related to the Ignition Switch Defect and other defective ignition switches, side airbags, and power steering. After the issuance of these recalls, a number of owners and lessees of defective Old GM and New GM vehicles filed lawsuits against New GM.[21]

14.     Many of the cases commenced against New GM were consolidated in a multi-district litigation in the United States District Court for the Southern District of New York before Judge Furman (the "**MDL**"). Steve W. Berman of Hagens Berman Sobol Shapiro LLP, Elizabeth Cabraser of Lieff, Cabraser, Heimann & Bernstein, LLP, and Robert C. Hilliard of Hilliard Martinez Gonzalez, LLP were individually and collectively appointed as Co-Lead Counsel in the MDL on August 15, 2014.[22] Mr. Berman and Ms. Cabraser were instructed to

---

[20] The Participating Unitholders do not join in the factual contentions set forth in Sections IV.A and B and VII.

[21] Weisfelner Testimony, ¶ 3.

[22] See Order No. 8, dated Aug. 15, 2014 [MDL ECF No. 249].

focus on Economic Loss Plaintiffs[23] and Mr. Hilliard was instructed to focus on personal injury and wrongful death claimants.[24]

15.    New GM sought to enjoin these lawsuits by filing various motions to enforce the Sale Order in the Bankruptcy Court.[25]  Co-Lead Counsel retained Brown Rudnick LLP ("**BR**") and Stutzman, Bromberg, Esserman & Plifka, a Professional Corporation ("**Designated Counsel for the Economic Loss Plaintiffs**") to handle issues arising in the Bankruptcy Court.  Edward S. Weisfelner and Howard S. Steel were the primary partners at BR serving as Designated Counsel for the Economic Loss Plaintiffs.  Co-Lead Counsel retained William P. Weintraub of Goodwin Procter LLP to serve as Designated Counsel for the Pre-Closing Accident Plaintiffs with respect to the Four Threshold Issues briefing triggered by the motions to enforce the Sale Order.  Mr.

---

[23] "**Economic Loss Plaintiffs**" is used to collectively refer to the **Ignition Switch Plaintiffs** and **Non-Ignition Switch Plaintiffs**. The term "**Ignition Switch Plaintiffs**" refers to those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 (the "**Ignition Switch Defect**"). The term "**Non-Ignition Switch Plaintiffs**" refers to those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346, 14V-118, and 14V-153.

[24] See Order No. 13, dated Sept. 16, 2014 [MDL ECF No. 304].

[25] See *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, dated Apr. 21, 2014 [ECF No. 12620]; *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits*, dated Apr. 21, 2014 [ECF No. 12807].  New GM also filed a motion to enforce the sale order with respect to the Non-Ignition Switch Plaintiffs, but adjudication of this motion was deferred pending resolution of the motions to enforce with respect to the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs.  *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)*, dated Aug. 1, 2014 [ECF No. 12808]; In re Motors Liquidation Co., 529 B.R. 510, 523 (Bankr. S.D.N.Y. 2015).

Hilliard and his co-counsel Thomas J. Henry also retained Mr. Weintraub to pursue the rights of their individual clients to file late claims.[26]

16.     To resolve the various motions to enforce the Sale Order, the Bankruptcy Court first identified four threshold issues to be determined, including whether any of the claims asserted against New GM were claims against the Motors Liquidation Company GUC Trust (the "**GUC Trust**") and, if so, whether such claims should "nevertheless be disallowed/dismissed on grounds of equitable mootness . . . ."  In re Motors Liquidation Co., 529 B.R. 510, 539-40 (Bankr. S.D.N.Y. 2015) (the "**April 2015 Decision**").  The Bankruptcy Court tolled the Ignition Switch Plaintiffs' time to file late claims against the GUC Trust until final resolution of the four threshold issues, including appeals.[27]

17.     In April and June 2015, the Bankruptcy Court issued its decision and related judgment on these four threshold issues.  See In re Motors Liquidation Co., 529 B.R. 510; Judgment, dated June 1, 2015 [ECF No. 13177] (the "**June 2015 Judgment**").

18.     Among other things, the Bankruptcy Court held that the Ignition Switch Plaintiffs' and Ignition Switch Pre-Closing Accident Plaintiffs'[28] due process rights were

---

[26] On December 4, 2017, Goodwin Procter filed a *Notice of Withdrawal of Counsel of Record for Certain Movants Under Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths* [ECF No. 14179].  That Notice of Withdrawal informs the Court that Goodwin Procter no longer serves as counsel of record for certain former clients of Hilliard Martinez Gonzales LLP and the Law Offices of Thomas J. Henry and will no longer be pursuing the Late Claims Motion on their behalf.

[27] See *Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect thereto, and (III) Adversary Proceeding No. 14-01929*, dated May 16, 2014 [ECF No. 12697] at 3.

[28] The term "**Pre-Closing Accident Plaintiffs**" means those plaintiffs asserting personal injury or wrongful death claims or persons who suffered a personal injury or wrongful death arising from an accident involving an Old GM vehicle that occurred prior to the closing of the Section 363 Sale.  The Pre-Closing Accident Plaintiffs are comprised of a subset of plaintiffs

violated because Old GM failed to provide them with constitutionally adequate notice of the November 30, 2009 bar date and that failure prejudiced them in filing timely claims.  See In re Motors Liquidation Co., 529 B.R. at 525, 574.  The Bankruptcy Court recognized that the "obvious" remedy for this due process violation was permitting the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs to file late claims.  See id. at 583.  These bar date rulings were not appealed.

19.    However, the Bankruptcy Court further held that while "late claims filed by the Plaintiffs might still be allowed, assets transferred to the GUC Trust under the Plan could not now be tapped to pay them" pursuant to the doctrine of equitable mootness.   See id. at 528-29.  According to the Bankruptcy Court, the GUC Trust was "funded by discrete bundles of assets— that had been reserved for identified claims under Old GM's reorganization plan—with no unallocated assets left for additional claims."   Id. at 592.  The Court determined that permitting Plaintiffs' claims against the GUC Trust would frustrate unitholders' "legitimate expectations" that the universe of claims could not increase.  See id.

20.    The Bankruptcy Court certified the April 2015 Decision and June 2015 Judgment for direct appeal to the Second Circuit.[29]  Among the issues raised on appeal was whether "the Bankruptcy Court err[ed] in applying the doctrine of equitable mootness to the claims of the Ignition Switch Plaintiffs . . . ."[30]

---

asserting claims or who suffered an injury or death involving an Old GM vehicle with an Ignition Switch Defect (the "**Ignition Switch Pre-Closing Accident Plaintiffs**").   Collectively, the Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs, and Pre-Closing Accident Plaintiffs are the "**Plaintiffs**."

[29] See Order Pursuant to 28 U.S.C. § 158(d), Fed. R. Bankr. P. 8006(e), Certifying Judgment for Direct Appeal to Second Circuit, dated June 1, 2015 [ECF No. 13178].

[30] Appellants' Statement of Issues on Appeal and Amended Designation of Items to be Included in the Record on Appeal, dated July 14, 2015 [ECF No. 13299].

21.     Prior to and following the issuance of the April 2015 Decision and June 2015 Judgment, Designated Counsel and Co-Lead Counsel focused attention on issues related to the Ignition Switch Plaintiffs' and Non-Ignition Switch Plaintiffs' late claims against the GUC Trust, including (i) the allowance of late claims under the Plan,[31] the GUC Trust Agreement,[32] and the Late Filed Claims Order;[33] and (ii) the structure of Section 3.2 of the Sale Agreement (the "**Accordion Feature**").[34]

22.     The Accordion Feature obligates New GM to issue additional shares of New GM common stock (the "**Adjustment Shares**") if the Bankruptcy Court enters an order estimating the aggregate allowed general unsecured claims against the Old GM estate (a "**Claims Estimate Order**") at an amount exceeding $35 billion, with a maximum of issuing 30 million shares if the claims estimation is equal to or exceeds $42 billion.  See Sale Agreement § 3.2(c).[35]

23.     Recognizing this potential source of recovery for Plaintiffs' claims, Designated Counsel, with the approval of Lead Counsel in the MDL, began preliminary settlement

---

[31] See *Second Amended Joint Chapter 11 Plan*, filed Mar. 18, 2011 [ECF No. 9836].

[32] See *Second Amended and Restated Motors Liquidation Company GUC Trust Agreement, dated as of July 30, 2015, by and among Wilmington Trust Company, as trust administrator and trustee of the GUC Trust and FTI Consulting, Inc., as trust monitor of the GUC Trust*, dated as of July 30, 2015 (the "**GUC Trust Agreement**").

[33]  See *Order Approving Motion Pursuant to Bankruptcy Rule 3003 and Section 105(a) of the Bankruptcy Code for an Order Disallowing Certain Late Filed Claims*, dated Feb. 8, 2012 [ECF No. 11394] (the "**Late Filed Claims Order**").

[34] See Second Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers, and NGMCO, Inc., as Purchaser, dated as of June 26, 2009 (the "**Sale Agreement**").

[35] Weisfelner Testimony, ¶ 12.

discussions with the GUC Trust and Participating Unitholders[36] and informed the Bankruptcy Court of these discussions at a hearing on July 16, 2015.  See July 16, 2015 Hr'g Tr. at 30:6-9.

24.    As was explained to the Bankruptcy Court, Designated Counsel were contemplating a mechanism by which, if Plaintiffs' claims were of a sufficient amount to trigger the Accordion Feature, Plaintiffs would obtain exclusive rights to the Adjustment Shares and would release all claims to current GUC Trust Assets and past distributions of GUC Trust Assets.  See id. 38:19-39:13.[37]

25.    The parties to these discussions were also considering whether to wait to address class issues until after the Accordion Feature was triggered or pursue class certification for settlement purposes.  See id. at 44:23-46:6.  Ultimately, these discussions in 2015 ended without a settlement.[38]

26.    In June 2015, in an effort to preserve GUC Trust Assets for potential late claims, certain Plaintiffs sought to stay distributions of the GUC Trust's assets pending the appeal of the April 2015 Decision and June 2015 Judgment.[39]    Following an evidentiary hearing, the

---

[36] The "**Participating Unitholders**" are holders of approximately 65% of the GUC Trust Units outstanding.

[37] Weisfelner Testimony, ¶ 13.

[38] Weisfelner Testimony, ¶ 13.

[39] See *The Ignition Switch Plaintiffs' and Certain Non-Ignition Switch Plaintiffs' Request for a Stay of Distributions of GUC Trust Assets and Response to Motion of Wilmington Trust Company, as GUC Trust Administrator and Trustee, for an Order Granting Authority (A) to Exercise New GM Warrants and Liquidate New GM Common Stock and (B) to Make Corresponding Amendments to the GUC Trust Agreement*, dated June 24, 2015 [ECF No. 13246]; *Joinder of the Ignition Switch Pre-Closing Accident Plaintiffs to the Ignition Switch Plaintiffs' and Certain Non-Ignition Switch Plaintiffs' Request for a Stay of Distributions of GUC Trust Assets and Response to Motion of Wilmington Trust Company, as GUC Trust Administrator and Trustee, for an Order Granting Authority (A) to Exercise New GM Warrants and Liquidate New GM Common Stock and (B) to Make Corresponding Amendments to the GUC Trust Agreement and Request for Stay of Distributions of GUC Trust Assets*, dated June 24, 2015 [ECF No. 13248].

Bankruptcy Court ultimately granted the request for a stay, subject to the posting of a $10.6 million bond.   See *Decision and Order on Request for Stay*, dated Oct. 14, 2015 [ECF No. 13501].   However, because the Plaintiffs could not post the requisite bond, the stay was never effectuated.[40]

27.     In July 2016, the Second Circuit issued its opinion on the appeal of the April 2015 Decision and June 2015 Judgment.   See Elliott v. General Motors LLC (In re Motors Liquidation Co.), 829 F.3d 135, 166 (2d Cir. 2016).   Among other things, the Second Circuit vacated the Bankruptcy Court's equitable mootness ruling as advisory.   Id. at 169.[41]

**B.      Proceedings In The Bankruptcy Court On Remand.**

28.     Thereafter, the Bankruptcy Court entered an Order to Show Cause setting forth issues to be addressed by the Bankruptcy Court on remand (the "**2016 Threshold Issues**") and the procedures for resolving the 2016 Threshold Issues.[42]   One 2016 Threshold Issue is whether Ignition Switch Plaintiffs and/or Non-Ignition Switch Plaintiffs could satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust and whether such claims are equitably moot (the "**Late Proof of Claim Issue**").[43]

29.     With respect to the Late Proof of Claim Issue, the Bankruptcy Court ordered Brown Rudnick LLP and Goodwin Procter LLP, on behalf of their respective clients, to file motions seeking authority to file late proof(s) of claim (collectively, the "**Late Claim Motions**") with draft proofs of claim by December 22, 2016.   See *Order to Show Cause* at 5 ¶ 1.   The

---

[40] Weisfelner Testimony, ¶ 14.

[41] Weisfelner Testimony, ¶ 15.

[42] *Order to Show Cause Regarding Certain Issues Arising from Lawsuits with Claims Asserted Against General Motors LLC ("New GM") that Involve Vehicles Manufactured by General Motors Corporation ("Old GM")*, dated Dec. 13, 2016 [ECF No. 13802] (the "Order to Show Cause").

[43] Weisfelner Testimony, ¶ 16.

Bankruptcy Court instructed that the Late Claim Motions should only address the authority to file late proof(s) of claim and should not address other issues, such as whether a class proof of claim can be filed, class certification, discovery, or the merits of any late proof(s) of claim.  See id.  The Bankruptcy Court further instructed that briefing on the adjudication of any Late Claim Motions filed by Non-Ignition Switch Plaintiffs would be stayed pending resolution of the other 2016 Threshold Issues.  See id. at 5 ¶ 2.[44]

30.    As directed by the Bankruptcy Court, Brown Rudnick assisted Co-Lead Counsel, on behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs, in filing a Late Claim Motion on December 22, 2016, attaching proposed class proofs of claim asserted on behalf of proposed class representatives for the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs (the "**Proposed Class Claims**").[45]  Goodwin Procter also filed a Late Claim Motion on behalf of certain Ignition Switch Pre-Closing Accident Plaintiffs.[46/47]

31.    The Proposed Class Claims allege that Old GM knew of the Ignition Switch Defect, other ignition switch defects, defects in side airbags, and defects in power steering for years prior to the bar date and concealed the existence of these defects, causing Economic Loss Plaintiffs to overpay for defective vehicles and bear the costs of repairs while Old GM reaped the

---

[44] Weisfelner Testimony, ¶ 17.

[45] See Motion for an Order Granting Authority to File Late Class Proofs of Claim, dated Dec. 22, 2016 [ECF No. 13806] ("Plaintiffs' Late Claim Motion").

[46] See Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths, dated December 22, 2016 [ECF No. 13807] ("Pre-Closing Accident Plaintiffs' Late Claim Motion"). The Groman Plaintiffs and certain other plaintiffs represented by Gary Peller filed joinders to the late claims motions.  In July and August 2017, certain Ignition Switch Pre-Closing Accident Plaintiffs represented by Andrews Myers, P.C. filed late claims motions.

[47] Weisfelner Testimony, ¶ 18.

benefit of selling defective vehicles at inflated prices and avoiding the costs of recall.[48]  Based on

these allegations, the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs assert claims

against the GUC Trust/Old GM estate under the laws of each of the 50 states and the District of

Columbia for: (i) fraudulent concealment; (ii) unjust enrichment; (iii) consumer protection

claims; (iv) breach of implied warranty of merchantability; and (v) negligence.[49/50]

32.    Thereafter, the parties participated in two status conferences before the

Bankruptcy Court, engaged in preliminary discovery, and filed briefs addressing two preliminary

issues raised in the Late Claim Motions: (i) whether relief can be granted absent a showing of

excusable neglect under the so-called Pioneer[51] factors; and (ii) the applicability of any purported

agreements with the GUC Trust or other tolling arrangements to toll timeliness objections (the

"**Initial Late Claim Motions Issues**").[52/53]

33.    In connection with the filing of the Late Claim Motions and the briefing on the

Initial Late Claim Motions Issues, discussions to settle Plaintiffs' claims against the GUC Trust

---

[48] Exhibit A to Plaintiffs' Late Claim Motion ¶¶ 9-258, 332; Exhibit B to Plaintiffs' Late Claim Motion ¶¶ 9-146, 249.

[49] Proposed Ignition Switch Class Claim ¶¶ 316-418; Proposed Non-Ignition Switch Class Claim ¶¶ 233-337.

[50] Weisfelner Testimony, ¶ 19.

[51] Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993).

[52] See *Order Establishing, Inter Alia, Briefing Schedule for Certain issues Arising from Late Claim Motions Filed by Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Certain Ignition Switch Pre-Closing Accident Plaintiffs*, dated Mar. 2, 2017 [ECF No. 13869]; *Opening Brief by General Motors LLC with Respect to Initial Late Claim Motions Issues*, dated Mar. 6, 2017 [ECF No. 13871]; *The Ignition Switch Plaintiffs' Brief on the Initial Late Claim Motions Issues*, dated Mar. 6, 2017 [ECF No. 13872]; *Opening Brief of GUC Trust Administrator and Participating Unitholders on the Applicability of Pioneer and Tolling to Plaintiffs' Motions to File Late Claims*, dated Mar. 6, 2017 [ECF No. 13873]; *Brief on Applicability of Pioneer and Tolling Issues in Connection with Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Mar. 6, 2017 [ECF No. 13874].

[53] Weisfelner Testimony, ¶ 20.

were renewed.  Accordingly, at the May 17, 2017 hearing on the other 2016 Threshold Issues,

Designated Counsel conveyed to the Court that there were active settlement discussions between

certain Plaintiffs, the GUC Trust, and the Participating Unitholders that might obviate the need

for oral argument on the Initial Late Claim Motions Issues.  See Hr'g Tr. at 266:12-19.[54/55]  A

hearing on the Initial Late Claims Motions Issues has not been scheduled.

### C.    The Settlement Negotiations.

34.    Settlement discussions began between Designated Counsel and Co-Lead Counsel

on behalf of the Economic Loss Plaintiffs, on the one hand, and Akin Gump Strauss Hauer &

Feld LLP on behalf of Participating Unitholders, on the other.  After Designated Counsel created

the general settlement structure, Gibson Dunn & Crutcher LLP, on behalf of the GUC Trust, and

Hilliard Martinez Gonzalez, LLP, the Law Offices of Thomas J. Henry and Goodwin Procter

LLP, on behalf of certain Pre-Closing Accident Plaintiffs represented by those firms (the "**Initial**

**Pre-Closing Accident Plaintiffs**"), were brought into the settlement discussions.[56/57]

35.    In creating a settlement structure, Plaintiffs' Counsel relied upon the GUC Trust's

exclusive authority to object to, resolve and seek estimation of Plaintiffs' claims.[58]  In addition,

---

[54] Letters conveying that settlement discussions were ongoing and that a hearing on the Initial Late Claims Motions Issue should not be scheduled were filed on June 16, June 30, and August 4, 2017.  See Letter re: Status of Settlement Discussions, dated June 16, 2017 [ECF No. 13962]; Letter re: Status of Settlement Discussions, dated June 30, 2017 [ECF No. 13981]; Letter re: Status of Settlement Discussions, dated Aug. 4, 2017 [ECF No. 14027].

[55] Weisfelner Testimony, ¶ 21; PX-004 at BR002322.

[56] In August 2017, following discussions with the GUC Trust, certain Pre-Closing Accident Plaintiffs represented by Andrews Myers (the "**Additional Pre-Closing Accident Plaintiffs**") agreed to become signatories to the Settlement Agreement as written.

[57] Weisfelner Testimony, ¶ 22.

[58] See Plan § 7.3 ("[T]he GUC Trust Administrator . . . may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claims pursuant to section 502(c) of the Bankruptcy Code . . . ."); GUC Trust Agreement § 5.1(a) ("[O]bjections to, and requests for estimation of Disputed General Unsecured Claims against the Debtors may be

Plaintiffs' Counsel relied upon the GUC Trust's responsibility to request that New GM fulfill its obligation under the Sale Agreement to issue Adjustment Shares if the Accordion Feature were triggered.[59/60]

36.     The basic structure of the contemplated settlement to resolve contested issues between the Plaintiffs and the GUC Trust was for the Plaintiffs to waive their ability to: (i) stay distributions from the GUC Trust; (ii) obtain priority on future distributions from the GUC Trust; and (iii) claw-back prior distributions to Unitholders.  In exchange, the GUC Trust would pay a "Settlement Amount," pay reasonable costs and expenses for providing notice of the settlement, and support entry of a Claims Estimate Order that would trigger New GM's obligation to issue the maximum amount of Adjustment Shares.  The Settlement Amount and Adjustment Shares would be placed in a Settlement Fund for the exclusive benefit of Plaintiffs.[61]

37.     After reaching a consensus regarding the basic structure of the contemplated settlement, on June 6, 2017, Howard Steel of Brown Rudnick sent Naomi Moss of Akin Gump an initial draft of the Settlement Agreement.  Between June 6, 2017 (when the initial draft of the Settlement Agreement was sent to the GUC Trust) and August 14, 2017 (when the final Settlement Agreement was provided to New GM), the parties exchanged versions of the Settlement Agreement approximately twenty-one times.[62]  As discussed in detail below and as

---

interposed and prosecuted only by the GUC Trust Administrator."); GUC Trust Agreement §5.1(d) ("[T]he GUC Trust Administrator shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Disputed General Unsecured Claims against the Debtors . . . ."); GUC Trust Agreement § 5.1(e) ("The GUC Trust Administrator may at any time request that the Bankruptcy Court estimate any contingent claim, unliquidated claim or Disputed General Unsecured Claim pursuant to Section 502(c) of the Bankruptcy Code . . . .").

[59] See GUC Trust Agreement § 2.3(d).

[60] Weisfelner Testimony, ¶ 23.

[61] Weisfelner Testimony, ¶ 24.

[62] Weisfelner Testimony, ¶ 25; PX-005 at BR007564; Steel Testimony, ¶ 13.

the evidence will show, in the course of settlement negotiations, the parties focused on certain

key issues, such as the settlement amount, evidence supporting the claims estimate order, staging

the settlement, and binding the absentee claimants pursuant to a well noticed Bankruptcy Rule

9019 settlement.

38.     The evidence will show that at no point during the negotiation of the settlement

documents did the GUC Trust or its counsel indicate to any Plaintiffs' representative that the

GUC Trust's approval of the settlement would not be final or binding until the Settlement

Agreement was signed beyond inclusion of boilerplate language in an early draft of the

Settlement Agreement.   Nor did the GUC Trust or its counsel indicate to any Plaintiffs'

representative that the GUC Trust's approval of the settlement would not be final or binding until

the Settlement Agreement was previewed with the Bankruptcy Court.[63]

### 1.     June To July, 2017 Drafting History And Agreement On Material Terms.

39.     On June 9, 2017, Naomi Moss of Akin Gump provided Brown Rudnick with the

collective comments of Akin Gump and Gibson Dunn to the initial draft of the Settlement

Agreement.  This draft maintained the general structure of the Settlement.  The main revisions

included editing the definition of Plaintiffs to ensure the waiver provision would cover absentee

claimants, adding the concept of a notice cost cap over which Plaintiffs would cover the cost of

notice of the Settlement Motion, and expanding the waiver provision to include a waiver of any

claims to assets of the Motors Liquidation Company Avoidance Action Trust.[64]

40.     In this draft, Akin Gump and Gibson Dunn added boilerplate language that the

Settlement Agreement "shall become effective and binding on the Parties on the date on which

---

[63] Weisfelner Testimony, ¶ 26; Direct Testimony of William P. Weintraub ("Weintraub Testimony"), ¶ 15.

[64] Steel Testimony, ¶ 14; PX-006 at BR004584.

this Agreement is fully executed by each of the Parties." This language was never discussed by the parties and neither Gibson Dunn nor Akin Gump discussed with Plaintiffs any reservation, express or otherwise, that the Settlement Agreement could not be binding until signatures were placed on the document.[65]

41.     Over the next month, up to and including July 18, 2017, the parties exchanged approximately eight mark-ups of the Settlement Agreement attached to emails containing boilerplate reservations that the drafts were subject to the ongoing review of co-counsel and/or clients. None of the emails specified that signatures were required before the Settlement would be binding.[66]

42.     At this point, on July 18, Bill Weintraub of Goodwin Procter suggested that the parties "convene a call to discuss some of the points that seem stalled so we can discuss our respective concerns." That call took place the next day, July 19, 2017, after which, on July 20, 2017, Keith Martorana of Gibson Dunn circulated "revised versions of the settlement agreement which reflects the group's discussion yesterday" "being sent contemporaneously to our clients and remains subject to their ongoing review and comment."[67]

43.     By July 20, 2017, several key issues had been resolved. One key issue resolved was the Settlement Amount. The initial June 6 draft of the Settlement Agreement by Brown Rudnick proposed a Settlement Amount of $15 million. The July 5, 2017 version of the Settlement Agreement drafted by the GUC Trust and Participating Unitholders kept the $15 million proposal, but added brackets around the $15 million figure. The brackets were removed

---

[65] Steel Testimony, ¶¶ 15-16; PX-006 at BR004584.

[66] Steel Testimony, ¶ 17; PX-008 at BR004675; PX-009 at BR004761; PX-011 at BR003749; PX-013 at BR004460; PX-017 at BR002330; PX-019 at BR002573); PX-020 at BR002622; PX-021 at BR002669.

[67] Steel Testimony, ¶ 18; PX-021 at BR002669; PX-026 at BR002969.

in the July 20, 2017 version of the Settlement Agreement drafted by the GUC Trust and Participating Unitholders.[68]

44.    Another issue resolved was whether to require side letters from Gary Peller and Golenbock, Wolf, Holdestein stating that they would not object to the settlement.  By July 20, 2017, the parties had decided not to include a side letter requirement.[69]

45.    An additional issue discussed was the timing of the waivers in the Settlement Agreement.  By the July 20, 2017 version of the Settlement Agreement drafted by the GUC Trust and Participating Unitholders, the parties had agreed that the Plaintiffs' waiver of rights to current and past distributions of GUC Trust Assets and the GUC Trust's and related parties' waiver of rights to the Settlement Amount would be effective upon the Settlement Order becoming a final order and payment of the Settlement Amount.  The GUC Trust's and related parties' waiver of rights to the Adjustment Shares would be effective upon the Settlement Order becoming a final order, payment of the Settlement Amount, and entry of the Claims Estimate Order.  In addition, the GUC Trust had the ability to waive the final order requirement in these waivers.[70]

46.    The parties also discussed the amount of the notice cost cap (with proposals ranging from $6 million to $5 million) and whether amounts over the cap would be deducted from the Settlement Amount or covered by the Signatory Plaintiffs.  In connection with these discussions, on June 11, 2017, Brown Rudnick sent Akin Gump an email detailing preliminary views on the cost of sending postcard notice to Plaintiffs to be shared with Gibson Dunn.  About

---

[68] Weisfelner Testimony, ¶ 27; PX-005 at BR007564-7578; PX-013 at BR004491; PX-026 at BR003004; Steel Testimony, ¶ 19.

[69] Steel Testimony, ¶ 20; PX-021 at BR002669; PX-026 at BR003004.

[70]  Steel Testimony, ¶ 21; PX-013 at BR004460; PX-017 at BR002330; PX-019 at BR002573; PX-021 at BR002669; PX-026 at BR003004; PX-029 at BR003073.

a month later, on July 12, Brown Rudnick sent Akin Gump and Gibson Dunn illustrative notice plans with projected costs. On July 20, 2017, the notice cost cap amount was set at $5 million; however, this amount was increased during further negotiations in August.[71]

47.    Around this time, the parties began making progress on drafting: (i) the two orders to be attached to the Settlement Agreement—the Settlement Order and Claims Estimate Order; and (ii) the two motions referenced in and required to implement the Settlement Agreement—the Settlement Motion and the motion seeking approval of notice procedures. On June 27, 2017, Keith Martorana of Gibson Dunn circulated the initial draft of the Settlement Order. On July 19, 2017, Brown Rudnick circulated initial drafts of the Claims Estimate Order and Settlement Motion. A few days later, on July 25, 2017, Brown Rudnick circulated initial drafts of the motion seeking approval of notice procedures and accompanying proposed long- and short-form of notice to Plaintiffs.[72]

48.    On July 25, 2017, Brown Rudnick circulated a draft of the Settlement Agreement revising the notice provision to provide notice to individuals who owned or leased recalled vehicles on or before November 30, 2009 (the bar date), rather than July 10, 2009 (the closing date), and on July 26, 2017, Brown Rudnick circulated "light comments" to the Settlement Order and Claims Estimate Order.[73]

49.    In response, on July 27, 2017, Keith Martorana of Gibson Dunn conveyed that the "Settlement Agreement, Settlement Order and Claims estimate order generally look fine from a GDC perspective (and client sign-off is pending)," but inquired why the notice date was

---

[71] Steel Testimony, ¶ 22; PX-008 at BR004675; PX-013 at BR004460; PX-019 at BR002573; PX-020 at BR002622; PX-007 at BR004622; PX-016 at BR002323; PX-026 at BR003004.

[72] Steel Testimony, ¶ 23; PX-010 at BR004718; PX-025 at BR002908; PX-029 at BR003073.

[73] Steel Testimony, ¶ 24; PX-029 at BR003073; PX-030 at BR003211.

switched from the closing date to the bar date.  Brown Rudnick agreed to Gibson Dunn's one

edit, responding, "Please use 7/10," and asked whether Keith Martorana had obtained "client

sign off."  Keith Martorana circulated the Settlement Agreement "incorporating that change" of

using 7/10 and answered that:

> I had a lengthy conversation with our client today, and they are discussing
> internally.  Sign-off, with respect to the three documents (Settlement Agreement,
> Settlement Order, Claims Estimate Order) will likely come tomorrow.  We'll keep
> you posted.  Note, however, that sign-off on the settlement itself is subject to the
> finalization of all other document in a satisfactory manner and receipt of final
> approvals.[74]

50.     The following day, on July 28, 2017, Keith Martorana of Gibson Dunn

recirculated the Settlement Agreement with "one change requested by [Brown Rudnick]"

clarifying a factual issue in the preamble and circulated the Settlement Order adding one

sentence requested by Goodwin Procter reiterating that the Settlement was not intended to impair

claims that Plaintiffs may have against New GM.  This email contained no reservation of

rights.[75]

51.     After Bill Weintraub requested "a minor edit" to the definition of "PIWD

Plaintiffs" in the Settlement Agreement, on August 2, 2017, Keith Martorana of Gibson Dunn

agreed that "[t]his change is fine" and circulate a revised version of the Settlement Agreement

with this change, again with no reservation of rights.[76]

**2.     Evidence In Support Of The Claims Estimate Order.**

52.     To enable the GUC Trust to support entry of the Claims Estimate Order, the

Economic Loss Plaintiffs and Initial Pre-Closing Accident Plaintiffs provided the GUC Trust

---

[74] Steel Testimony, ¶ 25; PX-032 at BR003277.

[75] Steel Testimony, ¶ 26; PX-034 at BR003354.

[76] Steel Testimony, ¶ 27; PX-038 at BR006092.

with separate proffers of evidence and expert reports describing in detail the alleged viability of the asserted claims, the alleged violation of due process rights of Non-Ignition Switch Plaintiffs in connection with the bar date and the alleged amount of damages.[77]

53.    On May 9, 2017, Howard Steel of Brown Rudnick provided an initial proffer of evidence and an expert report on the Economic Loss Plaintiffs' claims to Akin Gump to be shared with Gibson Dunn and an updated version of the proffer of evidence to Akin Gump and Gibson Dunn on July 13, 2017.  The proffer of evidence sets forth the factual background for the Economic Loss Plaintiffs' claims, the violation of due process rights in connection with the Bar Date, and the amount of damages alleged.  The report by Stephen Boedeker, an expert on surveys and statistical sampling, analyzes the Plaintiffs' damages claims based on a conjoint analysis conducted by Mr. Boedeker as managing director of Berkley Research Group.[78]

54.    On July 11, 2017, Bob Hilliard of Hilliard Martinez Gonzalez, LLP provided materials describing the personal injury and wrongful death claims of the Initial Pre-Closing Accident Plaintiffs and demonstrating the alleged value of these claims based on exemplar verdict amounts.  The valuation of damages was assessed and approved by W. Mark Lanier, an experienced trial attorney recognized as a leader in the field.[79]

55.    The valuation of the Economic Loss Plaintiffs' and Initial Pre-Closing Accident Plaintiffs' claims set forth in the proffered evidence is well in excess of the amount necessary to

---

[77] Weisfelner Testimony, ¶ 28.

[78] Weisfelner Testimony, ¶ 29; PX-002 at BR001936; PX-018 at BR002373; Steel Testimony, ¶ 7.

[79] Weisfelner Testimony, ¶ 30; PX-015 at BR000359; Steel Testimony, ¶ 8.

trigger New GM's obligation to issue the maximum amount of Adjustment Shares under the Accordion Feature of the AMSPA.[80]

56.    As set forth in the Settlement Agreement, the GUC Trust's independent review of this evidence, among other things, formed the basis of its agreement to support entry of the Claims Estimate Order.[81]

### 3.    Pursuing A Staged Settlement And Binding Absentee Claimants.

57.    Another point of discussion among the parties concerned two related open issues raised by Akin Gump and Gibson Dunn that were resolved in the course of negotiations—creating a staged settlement process and binding absentee claimants.[82]

58.    The Settlement Agreement requires the parties to file a Settlement Motion seeking:  (i) a Settlement Order approving the Settlement, directing the GUC Trust to pay a Settlement Amount, and waiving Plaintiffs' claims to current GUC Trust Assets and past distributions of GUC Trust Assets (the "**Waiver Provision**"); and (ii) a Claims Estimate Order. The parties agreed early in negotiations that the payment of the Settlement Amount and the Waiver Provision would not be dependent on the outcome of the Claims Estimate Order.  This would enable a two-step process whereby the Settlement Order could be entered first and a Claims Estimate Order could be entered later following further proceedings.[83]

59.    The parties also agreed that the Signatory Plaintiffs would subsequently determine procedures for the administration and allocation of the Settlement Fund, subject to notice and an opportunity for all Plaintiffs to be heard.  This would enable issues related to eligibility and

---

[80] Weisfelner Testimony, ¶ 31; Steel Testimony, ¶ 9.

[81] Weisfelner Testimony, ¶ 32; PX-001 § 2.4 at BR005727-28.

[82] Weisfelner Testimony, ¶ 33.

[83] Weisfelner Testimony, ¶ 34; PX-001 §§ 2.2, 2.3, 2.4 at BR005726-5728.

allocation to be deferred until after the Accordion Feature was triggered and there was a significant *res* available to be allocated.[84]

60.    In connection with this staged settlement process, early in the negotiation process, the Participating Unitholders and the GUC Trust raised concerns about how to bind absentee claimants to the Settlement Order, in particular the Waiver Provision, and whether class certification for settlement purposes was necessary.  On May 9, 2017, Daniel Golden of Akin Gump asked Designated Counsel about how to include all plaintiff groups in the proposed settlement with the GUC Trust.[85]

61.    Designated Counsel and Co-Lead Counsel considered pursuing certification for a settlement class, but determined that class certification issues should not be dealt with until after the Accordion Feature had been triggered.  At that time, when there was a significant *res* to be distributed, the Signatory Plaintiffs could work with a magistrate judge to determine the details of the criteria for eligibility and allocation of the Settlement Fund.[86]

62.    Throughout the negotiations, Designated Counsel consistently took the position that class certification was not necessary and that reliance on Bankruptcy Rule 9019 would suffice, and made this position known to the GUC Trust and Participating Unitholders.  The GUC Trust continued to negotiate the settlement despite knowing and ultimately conceding that proceeding under Rule 9019 would suffice and that certification of a settlement class was not necessary or contemplated.  The GUC Trust did not demand that class certification be added to the Settlement Agreement,[87] and none of the twenty-one versions of the Settlement Agreement

---

[84] Weisfelner Testimony, ¶ 35.

[85] Weisfelner Testimony, ¶ 36; PX-002 at BR001936; Steel Testimony, ¶ 10.

[86] Weisfelner Testimony, ¶ 37.

[87] M. Williams Dep. (Vol. I) at 67:13-18.

circulated among the parties over the course of more than two months provide for class certification.[88]

63.     Instead, the parties focused on how to provide extensive notice of the Settlement Motion to Plaintiffs in order to bind them to the Settlement Order and the cost of such notice. The GUC Trust agreed to pay for notice to Plaintiffs and other parties impacted by the Settlement Agreement, but negotiated for a cap on notice costs, with the Signatory Plaintiffs to pay for notice costs, if any, above the cap.[89]

64.     To determine the cost of notice and create a fulsome notice program, Co-Lead Counsel obtained bids for a notice program and engaged a notice provider, Cameron R. Azari, Esq., the Director of Legal Notice for Hilsoft Notifications, a business unit of Epiq Systems Class Action and Claims Solutions.   Based on the bids received, the estimated cost of the contemplated notice ranged from $4 to $6 million.   On August 9, 2017, Howard Steel of Brown Rudnick provided Naomi Moss of Akin Gump and Keith Martorana of Gibson Dunn with notice proposals to support its offer to set the notice cost cap at $6 million.   After several back and forth exchanges, Gibson Dunn ultimately agreed to this amount in August.   The brackets were removed in the August 11, 2017 draft of the Settlement Agreement accepted by Gibson Dunn.[90]

65.     The parties decided to seek court approval of the proposed notice procedures in advance of incurring the cost of notice.   Accordingly, on July 25, 2017, Howard Steel of Brown Rudnick circulated initial drafts of a motion seeking approval of the notice procedures and forms

---

[88] Weisfelner Testimony, ¶ 38; Steel Testimony, ¶ 11.

[89] Weisfelner Testimony, ¶ 39; PX-006 at BR004613; PX-001 at BR005729; Steel Testimony, ¶ 12.

[90] Weisfelner Testimony, ¶ 40; PX-045 at BR006635; PX-001 at BR005729.

of notice for Plaintiffs and, on August 7, 2017, a declaration in support of the motion by the notice provider.[91]

66.    The evidence will show that at no point during negotiations or the finalization of the Settlement documentation did the GUC Trust or its counsel indicate to the Signatory Plaintiffs that the GUC Trust or its counsel would not sign the Settlement Agreement or any of its ancillary documents prior to previewing the proposed notice procedures or any of the Settlement terms with the Bankruptcy Court.[92]

### D.    Finalizing The Settlement Agreement And Informing New GM.

67.    In early August 2017, the parties were working to schedule a conference with the Bankruptcy Court to present the Settlement and preliminarily discuss notice issues.

68.    On August 3, in response to Brown Rudnick's inquiry regarding Judge Glenn's availability, Naomi Moss of Akin Gump informed Howard Steel and Keith Martorana of Gibson Dunn that the Judge is "out next week.  He is in the week after," *i.e.*, the week of August 14th.[93]

69.    Accordingly, on August 3, when Howard Steel circulated a draft letter providing the Bankruptcy Court with a status update regarding settlement discussions to Akin Gump and Gibson Dunn, he asked whether it should include that the parties "hope to be before the court week of 14th."  Keith Martorana of Gibson Dunn advised that the anticipated conference should not be made public "prior to speaking to New GM.  They will understandably go crazy."  The letter was filed without any reference to the anticipated conference.[94]

---

[91] Weisfelner Testimony, ¶ 41; PX-029 at BR003073; PX-044 at BR006376.

[92] Weisfelner Testimony, ¶ 42.

[93] Steel Testimony, ¶ 28; PX-037 at BR006091; Weisfelner Testimony, ¶ 44.

[94] Steel Testimony, ¶ 29; *Letter re: Status of Settlement Discussions Between the Ignition Switch Plaintiffs, Certain Non-Ignition Switch Plaintiffs, Certain Pre-Closing Accident Plaintiffs, and the GUC Trust*, dated Aug. 4, 2017 [ECF No. 14027].

70.    Also on August 3, Keith Martorana of Gibson Dunn circulated the Settlement documentation and described its edits as "minor clean-ups" or "slight changes," with the exception of Settlement Motion.  In addition, Mr. Martorana deleted the phrases "DRAFT," "SUBJECT TO FRE 408," and "GDC/AG COMMENTS 8/2" from the top of the Settlement Agreement and replaced them with the phrase "EXECUTION VERSION."[95]

71.    On August 7, Howard Steel sent combined Brown Rudnick and Goodwin Procter comments to all Settlement documents and asked "Please let us know where we are final, and any comments / anything you would like to discuss."  The edits included a proposal to increase the notice cost cap amount in the Settlement Agreement from $5 million to $6 million.  In addition, language was added to the Settlement Order and Claims Estimate Order clarifying that the Settlement was not intended to impact Plaintiffs' claims against New GM and several edits to the Settlement Motion were made.  Among the documents circulated was a draft of the joint declaration of Co-Lead Counsel in support of the Settlement Motion.[96]

72.    To substantiate the $6 million notice cost cap amount proposal, on August 8, 2017, Howard Steel sent Gibson Dunn and Akin Gump a notice proposal from Epiq.  Matt Williams of Gibson Dunn responded that "[a]nything over the ([$]5/6 [million]) cap needs to be paid directly by the plaintiffs, not out of the 15mm" Settlement Amount.[97]

73.    Also on August 8, Keith Martorana informed the Signatory Plaintiffs that Gibson Dunn was in discussions with Lisa Norman (who had filed a motion seeking authority to file late proofs of claim on behalf of certain Pre-Closing Accident Plaintiffs on July 28, 2017), and that

---

[95] Steel Testimony, ¶ 30; PX-041 at BR006164; Weintraub Testimony, ¶ 7.

[96] Steel Testimony, ¶ 31; PX-044 at BR006376.

[97] Steel Testimony, ¶ 32; PX-045 at BR006635; PX-049 at BR006977.

Lisa Norman was amenable to becoming a signatory to the Settlement Agreement.  Lisa Norman became a signatory without proposing any changes to the terms of the Settlement Agreement.[98]

74.     Keith Martorana of Gibson Dunn attached to this email the combined Gibson Dunn and Akin Gump comments to the Settlement documentation.  The edits to the Settlement Agreement included adding brackets around the proposed $6 million notice cost cap amount and adding that the failure to obtain the Notice Order approving the notice procedures contemplated in the Settlement Agreement would be an automatic termination event.  Edits to the other documents largely concerned adding clarifying language that Plaintiffs would have no further rights to payment from the GUC Trust other than the Settlement Amount and Adjustment Shares once the waiver was effective.[99]

75.     Gibson Dunn requested no further changes to the Settlement Agreement after August 8, 2017.

76.     Given that the Settlement Agreement was substantially finalized at this time, on August 9, 2017, Ed Weisfelner of Brown Rudnick and Danny Golden of Akin Gump called Arthur Steinberg of King & Spalding and Andrew Bloomer of Kirkland & Ellis, counsel to New GM.  Danny Golden of Akin Gump summarized the conversation in an email to the parties, explaining that they gave New GM "a heads up on the proposed settlement and our desire to have a chambers conference with Judge Glenn for some day next week" and committed to providing New GM "a final set of pleadings sufficiently in advance of a to be scheduled chambers conference."[100]

---

[98] Steel Testimony, ¶ 33; PX-046 at BR006651.

[99] Steel Testimony, ¶ 34; PX-046 at BR006651.

[100] Steel Testimony, ¶ 35; PX-047 at BR007012; Weisfelner Testimony, ¶ 45; Direct Testimony of Daniel H. Golden ("Golden Testimony"), ¶ 15.

77.     In his August 9 email, Danny Golden of Akin Gump further explained that "I would like to see if [we] can schedule an all hands call for tomorrow to finalize all of the settlement documentation and motions. . . . It seems to me we need a final call to finalize the documents so we can schedule that chambers conference.  <u>At this call please have the requisite people necessary to bind your respective clients</u>." (Emphasis added.)  The call was eventually scheduled to take place on Friday, August 11, 2017 following a status conference in the MDL.[101]

78.     Shortly thereafter, Akin Gump, acting on behalf and with the consent of Wilmington Trust and the Signatory Plaintiffs, reached out to chambers to schedule a conference.  The purpose of the conference was to apprise the Court of the Settlement, to discuss the noticing procedures proposed in connection therewith, and to enlist the Court's aid in obtaining the names and addresses of the parties that were subject to the New GM recalls or had pre-Sale accident and death claims, so that such parties could be provided with notice of the Settlement.  That conference was ultimately scheduled for August 17, 2017.[102]

79.     In advance of the all hands call, on August 10, 2017, Howard Steel sent Naomi Moss of Akin Gump, cc'ing Bill Weintraub of Goodwin Procter, an email with light wordsmithing and clarifying edits to the Settlement Motion, Settlement Agreement, and Claims Estimate Order, explaining "with hopes for an easy Friday for all – here are BR / GP final

---

[101] Steel Testimony, ¶ 36; PX-047 at BR007012; Weisfelner Testimony, ¶ 46; Weintraub Testimony, ¶ 8; Golden Testimony, ¶ 16.  Emphasizing the goal of finality, Naomi Moss of Akin Gump reiterated this point on August 10 in an email to Howard Steel of Brown Rudnick and Bill Weintraub of Goodwin Procter, stating that "[t]he objective here is to have this be the final call on all outstanding issues.  We would like everyone on the phone so we can close everything out."  PX-050 at BR007305.  Danny Golden of Akin Gump further noted that "there will be no reservation of rights saying you need to check with your clients."  PX-050 at BR007305.

[102] Golden Testimony, ¶ 17.

comments w/ commentary . . .  We pledge to use great efforts that if these are taken, no more ink to be shed from plaintiffs' side on the docs."[103]

80.    On August 11, 2017, Co-Lead Counsel Steve Berman previewed certain terms of the Settlement in open court at the status conference before Judge Furman in the MDL.[104] Gibson Dunn attended the MDL status conference telephonically and subsequently did not object to the preview of the Settlement.  At the conference, New GM made its objections to the Settlement clear and unmistakable, stating that "[t]his has got all the indicia of a collusive settlement."[105]  Several news outlets carried stories regarding the Settlement following this conference.[106]

81.    Following the conference, on August 11, 2017, the parties had the all hands call to finalize the documents.[107]  Mr. Berman's disclosure of the Settlement to Judge Furman was discussed, but Gibson Dunn did not raise any objections about such disclosure.  Gibson Dunn conveyed that they were done with comments to the documents.[108]  Indeed, after the status conference and associated news reports, no one on the Plaintiffs' side received a complaint from Gibson Dunn that a settlement had been announced at the status conference.[109]  Nor did counsel for the GUC Trust tell any party that they did not have authority on the all hands call to bind the GUC Trust.[110]

---

[103] Steel Testimony, ¶ 37; PX-052 at BR007488.

[104] See Aug. 11 Hr'g Tr. at 37:13-39:1.

[105] Aug. 11 Hr'g Tr. at 41:16-17.

[106] Steel Testimony, ¶ 38; Weisfelner Testimony, ¶ 47.

[107] Golden Testimony, ¶ 18.

[108] Steel Testimony, ¶ 39; Weisfelner Testimony, ¶ 48.

[109] Steel Testimony, ¶ 40; Weintraub Testimony, ¶ 9.

[110] Weintraub Testimony, ¶ 9.

82.     That same afternoon of August 11th, Howard Steel circulated "[u]pdated docs per today's all-hands.  Hoping these are final and we can schedule signatures."  In addition to various clean-up and wordsmithing edits in the Settlement documentation, Mr. Steel removed the brackets around the $6 million notice cost cap amount in the Settlement Agreement and clarified that the Settlement Agreement would not automatically terminate if the Bankruptcy Court entered a Notice Order that was reasonably acceptable to the Parties.[111]

83.     While minor changes were made to the ancillary settlement documents between August 11 and August 14, 2017, no further changes were made to the Settlement Agreement by any party after August 11, 2017.

84.     On August 11th and August 12th, initial drafts of Bob Hilliard's and Lisa Norman's declarations in support of the Settlement Motion were circulated.[112]

85.     On August 12, 2017, Keith Martorana of Gibson Dunn confirmed that "[f]rom the GUC Trust perspective, all of the documents sent over by Howie [Steel] (subject to one item we are discussing with Akin in the Settlement Agreement) are fine."  This email did not include any reservation that counsel's comments were subject to client review or approval.[113]

86.     In this same email, Keith Martorana of Gibson Dunn attached initial drafts of the notice and the Andrews Declaration.  The Andrews Declaration stated, *inter alia*, that "the Settlement is a prudent and reasonable exercise of business judgment because it presents the best option for the GUC Trust to maximize recovery for the benefit of the GUC Trust Beneficiaries while minimizing the substantial risk posed by the Late Claims Motions" and "[t]he settlement is

---

[111] Steel Testimony, ¶ 41; PX-056 at BR005064; Weisfelner Testimony, ¶ 49.

[112] Steel Testimony, ¶ 42; PX-058 at BR005329; PX-062 at BR005373.

[113] Steel Testimony, ¶ 43; PX-063 at BR005468; Weintraub Testimony, ¶ 11; Golden Testimony, ¶ 20.

in the best interests of the GUC Trust, the Old GM estates and the GUC Trust Beneficiaries."[114]

Gibson Dunn and Ms. Andrews worked jointly to draft the Andrews Declaration, about which

Ms. Andrews had "significant input."  And the GUC Trust gave Gibson Dunn authority to send

the Andrews Declaration.[115]

87.    On August 12, Howard Steel asked Keith Martorana, "what's [the] open item"

that he was discussing with Akin Gump.  In response, he explained that Akin Gump – not the

GUC Trust – had questions about which court (the Bankruptcy Court or the District Court)

would hear allocation proceedings regarding the Settlement Fund and that he "suspected they

will get over this issue, but since it was their comment i can't sign-off for them."[116]

88.    On Monday, August 14, 2017 Akin Gump had confirmed with chambers, and

relayed to Brown Rudnick, the Thursday, August 17, 2017 date for a conference.[117]

89.    Also on August 14, Keith Martorana of Gibson Dunn confirmed resolution of the

one open item they were discussing with Akin, stating that "I spoke to Akin, and we are ok with

this."  The GUC Trust's "last point" was to edit the declarations in support of the Settlement

Motion to "read that 'counsel to the Participating Unitholders' participated in negotiations,"

rather than stating that the Participating Unitholders participated in negotiations.[118]

90.    Howard Steel responded that "We will update accordingly and send execution

drafts as soon as possible."  He then circulated "proposed final execution versions of all of the

documents. . . . Please let us know any comments or questions and confirm when you are signed

---

[114] Steel Testimony, ¶ 44; PX-063 at BR005477 ¶ 28; Weintraub Testimony, ¶ 12; Golden
Testimony, ¶ 20.

[115] M. Williams Dep. (Vol. I) at 79:21-24.

[116] Steel Testimony, ¶ 45; PX-073 at BR005760.

[117] Steel Testimony, ¶ 46; PX-067 at BR005770.

[118] Steel Testimony, ¶ 47; PX-073 at BR005760; Weisfelner Testimony, ¶ 50; Golden
Testimony, ¶¶ 21-22.

off." These versions had all "draft" and "privileged and confidential" headings removed. The remaining changes were: (i) light edits by Brown Rudnick and Goodwin Procter to the Andrews Declaration and notice that had been circulated over the weekend; (ii) updating citations to the supporting declarations in the Settlement Motion; and (iii) Gibson Dunn's requested edit to clarify in the supporting declarations that counsel to the Participating Unitholders participated in negotiations.[119]

91.     In response, Keith Martorana of Gibson Dunn requested one change to the notice regarding the percentage of GUC Trust Units held by the Participating Unitholders and stated that "[a]t this point we do not have any further comments, but are obtaining final sign-off from our client."[120]  Matt Williams, counsel to the GUC Trust, testified that, at this point, "all the terms in the document [the Settlement Agreement] we agreed to."[121]  He further testified that "[a]t the time the agreement was shared with New GM, we had agreed to the final form of those documents"[122] and clarified that the GUC Trust had agreed to "the terms and the documents."[123]

92.     Next, Daniel Golden of Akin Gump asked, "Can someone please advise me who will be in a position to send the final documentation to Arthur [Steinberg] by cob today." Howard Steel responded that "[w]e can send to him when everyone signed off – please advise if you have not already."[124]

93.     Confirmation that each party was "signed off" came from:  (i) Co-Lead Counsel and Designated Counsel on behalf of the Economic Loss Plaintiffs; (ii) Hilliard Martinez

---

[119] Steel Testimony, ¶ 48; PX-073 at BR005760; PX-075 at BR005804.

[120] Steel Testimony, ¶ 49; PX-078 at BR006024.

[121] M. Williams Dep. (Vol. I) at 94:1-2.

[122] M. Williams Dep. (Vol. I) at 104:22-24.

[123] M. Williams Dep. (Vol. I) at 104:25—105:1-2.

[124] Steel Testimony, ¶ 50; PX-078 at BR006024; Weisfelner Testimony, ¶ 52.

Gonzalez, the Law Offices of Thomas J. Henry, and Goodwin Procter on behalf of the Initial Pre-Closing Accident Plaintiffs; (iii) Andrews Myers on behalf of the Additional Pre-Closing Accident Plaintiffs; (iv) Akin Gump on behalf of the Participating Unitholders; and (v) Gibson Dunn on behalf of the GUC Trust.[125]  At 7:26 p.m., Keith Martorana of Gibson Dunn wrote that "[w]e are waiting for final approval from client, but unlikely to come tonight.  You are, however, authorized to send current versions to New GM this evening."[126]  However, Beth Andrews had already communicated her "sign[] off" on behalf of Wilmington Trust Company to Keith Martorana nine minutes earlier at 7:16 p.m.[127]  When Howard Steel responded "want me to send now or wait? Want any language added to the note to Arthur," Martorana wrote that "[y]ou can send now.  Nothing to add in the note."[128]

94.      After receiving this response from Keith Martorana, Howard Steel emailed the group and confirmed that he "heard from everyone and going to send over to Arthur now, thanks."  In response, Danny Golden of Akin Gump asked that Mr. Steel "[s]end it but say it's confidential until it is filed; we are sending as a courtesy."[129]

95.      Accordingly, on August 14th, at 9:14 p.m., Howard Steel sent the final versions of the settlement documents to New GM's counsel, cc'ing counsel for the GUC Trust.[130]

---

[125]  Steel Testimony, ¶ 51; PX-077 at BR006006; PX-081 at BR005593; PX-085 at BR005790; PX-089 at BR005545.

[126]  Steel Testimony, ¶ 52; PX-089 at BR005545; Weisfelner Testimony, ¶ 53; Golden Testimony, ¶ 29.

[127]  PX-088.

[128]  Steel Testimony, ¶ 52; PX-089 at BR005545.

[129]  Steel Testimony, ¶ 53; PX-091 at BR005550; PX-090 at BR005601.

[130]  Steel Testimony, ¶ 54; PX-094 at BR005613.

96.     By this point, emails disclosed in discovery among the GUC Trust representatives and their counsel at Gibson Dunn demonstrate that the GUC Trust had signed off on the Settlement.

a.   On August 10, 2017, Wilmington Trust Vice President David Vanaskey emailed Wilmington Trust Vice President Beth Andrews an invite to a Corporate Trust Distressed Investing Roundtable invite.   Topic 1 was:   "Bankruptcy Rule 9019 settlements:   What the indenture trustee needs to know."   Vanaskey wrote:   "In light of the Ig Switch settlement may be something worth considering attending.  Also Debbie Newman [of Akin Gump] presenting."[131]

b.   On August 11, 2017, Gabriel Gillett at Gibson Dunn sent to David Vanaskey a link to an August 11 Bloomberg articled titled "GM Accuses Bankruptcy Trust of Secret $1 Billion Stock Plot."   The linked article reported on Steve Berman's August 11 disclosure of the settlement to Judge Furman.   Mr. Gillett did not state any objections that a settlement had not been reached and simply said to Mr. Vanaskey:   "This is going to be fun."[132]   The next day, David Vanaskey forwarded to the email to his family members, stating:   "See link on GM deal…."[133]

c.   On the morning of August 14, 2017, Mr. Vanaskey received an email regarding an August 11th Reuters article entitled, "GM Blasts $1 Billion Deal Between Ignition Switch Plaintiffs, Creditor Trust."   The first line of the article read, "plaintiffs suing General Motors Co. over faulty ignition switches and other alleged vehicle defects have reached a $1 billion settlement requiring the automaker to turn over that amount of stock. . ."[134]   Mr. Vanaskey did

---

[131] PX-051.

[132] PX-059.

[133] PX-060.

[134] PX-069.

not contest the public representation that the parties "[had] reached a $1 billion settlement," nor did he seek a retraction of the article's statements.

    d.   On August 14, 2017, Beth Andrews sent the Bloomberg article to other Wilmington Trust employees and left no doubt that a deal had been consummated:

> I just wanted to alert you to an article that appeared on Bloomberg last Friday concerning the settlement the GUC Trust is about to sign with the Ignition Switch plaintiffs. We knew that New GM was not pleased that we were contemplating settling with the plaintiffs and supporting their claims estimation order. The approval of the claim estimation would trigger the accordion feature under the Plan of Reorganization and would cause New GM to have to issue up to 30mm in new shares. New GM will fight our settlement and the estimation order. We expect the Trust will be sued by New GM. <u>Entering into the settlement is not an action we have taken without a great deal of thought and guidance from our legal advisors. We believe settling with the plaintiffs is in the best interest of the Trust and will enable us to wind it down and make a final distribution to all of the unitholders sooner rather than later</u>.  (Emphasis added.)[135]

    e.   On August 14, 2017, Keith Martorana forwarded to Beth Andrews and David Vanaskey Howard Steel's email asking "How's the trust looking on sign off?"[136]   Keith wrote: "David/Beth:  FTI has signed off.  Is the GUC Trust prepared to sign off? If at all possible it would be better to send these docs to KS [King & Spaulding] tonight[.]"   Ms. Andrews' response:  "Yes, I took a look at these before I left the office.  <u>Signed off</u>."  (Emphasis added.)[137]

    f.   On the morning of August 15, 2017, David Vanaskey sent an email to Lon LeClair at Wilmington Trust attaching Reorg Research report titled "GM GUC Trust Files Latest Quarterly Trust Report Amid Reports of Settlement With Plaintiffs that Could Trigger Accordion" and an August 12 Wall Street Journal article titled "Lawyers Seek $1 Billion from

---

[135] PX-066.

[136] PX-087.

[137] PX-088.

GM." Mr. Vanaskey informed Mr. LeClair: "A couple of follow ups on the GUC Trust. Note we filed our 10Q yesterday before the market opened. Also we expect to share the settlement with New GM today. Lastly, there is a chambers conference with Judge Glenn Thursday. Certainly will keep you updated."[138]

97.    Ms. Andrews claimed in her deposition that her communication to Gibson Dunn indicated "sign off" on the "form of the documents" only and that it did not authorize Gibson Dunn to sign the Settlement Agreement.[139] Ms. Andrews further testified, "When I have any of our partners sign on behalf of the trust, I give them explicit authority to take certain actions. So I would have expected that Keith would have come back to me and said everyone has signed off on this, there are no further changes, and I would have responded please use this e-mail as our authority to sign the document on behalf of the GUC Trust."[140] She also testified, "when I have any of our partners take any action on behalf of the trust, especially when I file my financial reports, the last thing I do is, before the filing is done, I send an e-mail saying -- instructing someone to go ahead, they have the authority to make the filing."[141]

98.    In response to this testimony, counsel for Plaintiffs requested that counsel for GUC Trust/The Wilmington Trust Company produce: "Beth Andrews' emails authorizing Gibson Dunn to execute (1) the August 16, 2017 letter to Judge Glenn signed by Matt Williams and Arthur Steinberg (Mr. Williams' authority to Mr. Steinberg to e-sign for him is attached);

---

[138] PX-099. Mr. Vanaskey also forwarded the same article to some of his family members with the explanation "More fun and games." PX-098

[139] B. Andrews Dep. at 119:19-24; 121:8-11; 156:11-15.

[140] Id. at 112:12-23.

[141] Id. at 152:16-24.

and (2) the written agreement between New GM and GUC Trust or Wilmington Trust Company that preceded the September 12, 2017 Forbearance Agreement."[142]

99.    In response, Gibson Dunn produced four email strings, each showing that Ms. Andrews does not (1) give "form of documents" approvals separately from authorization to file or sign; or (2) have a practice of expressly stating that signature is authorized.  Rather, the emails and resulting documents show that Ms. Andrews uses the words "signed off" to approve and direct the execution and filing of documents.   The emails produced by Gibson Dunn are summarized as follows:

   a.  In a June 16, 2017 email string regarding "draft status letter [to Judge Glenn] and settlement markup," Gabriel Gillett of Gibson Dunn wrote to Beth Andrews and others, "I have attached Plaintiffs' draft of a status letter to the court, due on Friday…."[143]  Matt Williams responded, "We (gdc) think the letter looks fine, as do the unit holders."[144]  Beth Andrews responded, "Yes, letter is fine."  The status letter was filed the following day with various Gibson Dunn attorney names appearing under the signature block.[145]

   b.  In an August 16, 2017 email string, which attached a draft letter to Judge Glenn announcing the settlement between GUC Trust and New GM, Matt Williams wrote to Beth Andrews and others, "Please confirm signoff on the above.  I expect to have New GM signoff shortly."  Mr. Williams followed-up, "Can Wilmington

---

[142] PX-142.

[143] PX-104.

[144] Id.

[145] Id.

sign off so we can file the letter?"  Beth Andrews responded, "Signed Off."[146]

The status letter was filed that same day with the following signature affixed: "/s/

Matthew J. Williams".[147]

c.   In an August 16, 2017 email, Keith Martorana wrote, "All – attached is a draft of

the 8-K announcing the settlement with New GM.  Currently, we plan to file the

joint letter this evening, which would meat [sic] we need to file the attached

tomorrow morning.  Accordingly, please review as soon as possible and provide

comments (or sign-off) as soon as possible."  Beth Andrews responded, "We are

signed off."[148]

d.   The following day, Keith Martorana circulated the resulting proof of the 8-K,

writing in an email to Beth Andrews and others, "Attached is the Edgar

proof…As mentioned previously, we will need to file this document this morning.

Please review and provide sign-off as soon as possible. Beth Andrews responded,

"We are signed off as well."[149]  The 8-K was subsequently filed with the

following signature affixed, "/s/ Beth A. Andrews".[150]

100.   Counsel for GUC Trust/Wilmington Trust Company has not produced a single

document wherein Ms. Andrews provided approval on the form of a document separate from her

authorization to sign or file the document.

---

[146] PX-125.

[147] See *Update on Matters Related to the Late Claim Motions and the Chambers Conference
Scheduled for August 17, 2017 at 3:00 p.m.*, dated August 16, 2017 [ECF No. 14060].

[148] PX-123.

[149] PX-129.

[150] PX-143.

101.     Counsel for GUC Trust/Wilmington Trust Company has not produced a single document wherein Ms. Andrews states, "please use this e-mail as our authority to sign the document on behalf of the GUC Trust" or "instructing someone to go ahead, they have the authority to make the filing" or similar statements or instructions.

102.     The GUC Trust will not be able to prove that during the negotiation of the settlement documents the GUC Trust or its counsel made explicit to any Plaintiffs' representative that the GUC Trust's approval of the Settlement would not be final until the Settlement Agreement was signed or that signatures would not be affixed to the settlement documents until after the scheduled conference with the Bankruptcy Court.

### E.     The GUC Trust Abandons The Settlement.

103.     Beginning on August 14, Gibson Dunn arranged a secret meeting with counsel for New GM ("Gibson Dunn-GM Meeting"), to the exclusion of the GUC Trust, Participating Unitholders and Plaintiffs.   Gibson Dunn suggested that the Participating Unitholders be excluded if New GM preferred, which it did.[151]

104.     The Gibson Dunn-GM Meeting occurred on August 15, 2017.   According to the counsel for the GUC Trust, this meeting lasted two hours "at most," consisting in large part of New GM reciting "execution risks" that the GUC Trust "already knew," including the potential to bind absentee claimants absent class certification.[152]

105.     At the Gibson Dunn-GM Meeting, counsel for New GM offered to pay Wilmington Trust Company's legal fees for defending against Plaintiffs' claims in exchange for its agreement not to proceed with its settlement with Plaintiffs.

---

[151] See PX-096; Golden Testimony, ¶ 28.

[152] See Aug. 17, 2017 Hr'g Tr. 16:14-21:14.

106.    On August 15, in a series of emails and a brief call late that afternoon, Mr. Williams told Mr. Golden that nothing much had happened at the meeting with New GM earlier that day.  Mr. Golden explains:  "The lawyers from Gibson Dunn did not tell me or anyone else at Akin Gump that New GM had proposed that the GUC Trust enter into an alternative settlement with New GM, or that Gibson Dunn was considering doing so."[153]

107.    On August 15, New GM filed a letter with the Bankruptcy Court requesting that the August 17 conference be cancelled, stating, among other things, that "the proposed settlement is legally improper, collusive and in bad faith."[154]

108.    Later that day, August 15, 2017, Naomi Moss of Akin Gump circulated to Brown Rudnick a draft letter in response to New GM's letter for the GUC Trust to file stating that:

> The purpose of scheduling the Conference was to apprise the Court of the existence of the Proposed Settlement, which, if ultimately approved, would resolve the outstanding disputes between the GUC Trust and Unitholders, on the one hand, and the Economic Loss Plaintiffs and Pre-Closing Accident Plaintiffs, on the other, and to discuss with the Court the contours of the proposed noticing procedures for the motion seeking approval of the Proposed Settlement.[155]

The draft letter further explains that the GUC Trust did not object to having the conference in open court and had no intention of seeking substantive relief at the conference.[156]   The Settlement is described as "proposed" because, until the Settlement Agreement is approved by the Court under Bankruptcy Rule 9019, it must be a "proposed" agreement.[157]

---

[153] Golden Testimony, ¶ 31.

[154] See New GM's Position on Chambers Conference Scheduled for August 17, 2017 at 3:00 p.m. Regarding Proposed Settlement of Late Claim Motions, dated Aug. 15, 2017 [ECF No. 14053].

[155] Steel Testimony, ¶ 61; PX-105 at BR006034.

[156] See id.

[157] Id.

109.    On August 16, 2017, after the secret Gibson Dunn-GM Meeting, Gibson Dunn

sent a draft letter at 3:37 a.m. in response to New GM's request to cancel the conference, stating

that:

> The GUC Trust has no objection to the Conference proceeding on the record in
> open Court, rather than Chambers.  The purpose of scheduling the Conference
> was to update the Court on the status of a potential settlement between the GUC
> Trust, the Economic Loss Plaintiffs and the Pre-Closing Accident Plaintiffs (the
> "Proposed Settlement"), which Proposed Settlement is nearly final, but has not
> yet been executed by the parties and is non-binding.  <u>There was never any
> intention of having a substantive discussion of the merits of the Proposed
> Settlement at the Conference, or seeking any substantive relief.</u>[158]

Despite its voluminous correspondence with Plaintiffs, this is the first time Gibson Dunn

or Wilmington Trust Company referred to the settlement with Plaintiffs as "non-binding."

110.    After reviewing the draft and seeing that it captured the key points (that the

conference should go forward in open court and no substantive relief was being sought), without

focusing on the language regarding the Proposed Settlement being purportedly non-binding,

Howard Steel of Brown Rudnick responded at 8:16 a.m. on August 16, 2017 that "will send you

our draft shortly – says a lot of the same," meaning no objection to proceeding in open court and

no substantive relief was being sought.[159]

111.    Before the parties had a chance to file responsive letters, on August 16, the

Bankruptcy Court entered an order keeping the August 17th date for the conference, to be held in

open court on the record.[160]

112.    At 9:40 a.m. on August 16, 2017, Mr. Martorana of Gibson Dunn requested a call

with Akin Gump that occurred at 11:30 a.m. that day.  On that call, Mr. Williams first asked Mr.

Golden if he was sitting down, and then told him that Wilmington Trust did not intend to move

---

[158] Steel Testimony, ¶ 62; PX-106 at BR006081 (emphasis added).

[159] Steel Testimony, ¶ 63; PX-111 at BR006071.

[160] <u>See</u> *Order re August 17, 2017 Court Conference*, dated Aug. 16, 2017 [ECF No. 14056].

forward with the Plaintiff Settlement, and had agreed instead to enter into an agreement with New GM.[161]

113.    That same day, Gabi Gillett of Gibson Dunn raised the issue of class certification, asking whether Plaintiffs had "thought more about" "the interplay between settlement and seeking class certification," which, without knowledge of the Gibson Dunn meeting with New GM, Brown Rudnick believed related to preparing to respond to New GM's objection to our Settlement Agreement based on class certification issues.[162]

114.    In the late afternoon on August 16, 2017, Beth Andrews sent a lengthy email to Lon LeClair and others at Wilmington Trust informing them of:  (i) the "proposed settlement" with the plaintiffs and its major terms; (ii) the meeting held between New GM and Gibson Dunn and the objections to the "proposed settlement" that New GM raised at that meeting; and (iii) New GM's offer and its terms.  A redacted portion suggests that Gibson Dunn recommended accepting the GM offer.  The email notes that the unitholders "are not pleased with these recent developments and have sent the Trust a strongly worded letter."[163]

115.    On the afternoon of August 16, 2017, the day before the August 17th status conference before the Bankruptcy Court, Designated Counsel received a call from Gibson Dunn informing that the GUC Trust was pulling out of the Settlement Agreement.[164]

116.    Also on August 16, 2017, New GM and the GUC Trust submitted a joint letter to the Bankruptcy Court explaining that the GUC Trust was backing out of the Settlement and

---

[161] Golden Testimony, ¶ 32.

[162] Steel Testimony, ¶ 59; PX-100 at BR006032.

[163] PX-109.

[164] Weisfelner Testimony, ¶ 56.

decided to enter into "a proposed settlement agreement with New GM that will be subject to this Court's approval."[165] The letter described the terms of the proposed agreement with New GM.

117.    Gibson Dunn provided a draft of the letter to Wilmington Trust and FTI Consulting prior to submission. In response, Beth Andrews of Wilmington Trust responded, "Signed off." No further client approval was required.[166]

118.    In response, that same day, Brown Rudnick filed the final Settlement documentation with the Bankruptcy Court.[167] The next day (August 17, 2017), Brown Rudnick filed a supplemental letter attaching relevant communications with the GUC Trust demonstrating the binding nature of the Settlement Agreement.[168]

119.    In the evening of August 16, 2017, Robby Tennenbaum at Golden Tree Asset Management emailed David Vanaskey and objected to Wilmington Trust's abandonment of the settlement. "We are a member of the ad hoc group of unitholders in the GUC Trust. Akin Gump has informed us that the GUC Trust will not be proceeding with the proposed settlement with the ignition switch plaintiffs and is instead considering entering into an alternative settlement with New GM in advance of tomorrow's hearing. We believe that abandoning a transaction that is supported by a group representing a majority of the outstanding units in favor of a deal that is likely to face a strident objection from unitholders would be both ill-advised and potentially contravene the GUC Trust Administrator's fiduciary duties, and reserve all rights in this regard.

---

[165] See *Update on Matters Related to the Late Claim Motions and the Chambers Conference Scheduled for August 17, 2017 at 3:00 p.m.*, dated August 16, 2017 [ECF No. 14060]; Weisfelner Testimony, ¶ 57.

[166] PX-126.

[167] See *Letter to Judge Glenn in Response to GM's Letter Update on Matters Related to the Late Claim Motions and the Chambers Conference Scheduled for August 17, 2017 at 3:00 p.m.*, dated August 16, 2017 [ECF No. 14061].

[168] See *Letter to Judge Glenn Supplementing Plaintiffs' Letter*, dated Aug. 17, 2017 [ECF No. 14062].

We hope that you will reconsider this path and immediately engage in a constructive dialogue with our group before entering into an alternative proposal that may trigger litigation to the detriment of everyone involved."[169]

120.    On August 17, 2017, Lon LeClair forwarded to David Vanaskey a link to WSJ Bankruptcy Alert titled "GM Reaches Deal With Old GM Trust on Ignition Switch Defense Costs."  LeClair expressed surprise:  "Just saw this headline below. The headline doesn't sound like it's accurate. Do you know anyone who can get the underlying article."[170]   In a separate email from the same day, Vanaskey explained:  "per your note on GM and the Wall Street there are some additional links below that are on point with the summary note that Beth has below. The deal discussed with you guys pre 10Q filing with the Ig Switch Plaintiffs is DOA. We are potentially entering into a deal with New GM based on advice of counsel. Unit holders are pissed.  All bets may be off pending status conference with Judge Glenn this afternoon. [I]F things move forward we intend to meet with the unit holder next week to discuss before we sign anything."[171]

121.    Also on August 17, 2017, David Pickering of Pentwater Capital Management sent an email to David Vanaskey protesting Wilmington Trusts' abandonment of the settlement with Plaintiffs:  "We are one of the largest holders of MTLQU units.  We have read the filings made in the bankruptcy court in the last 24 hours regarding the proposed settlement with New GM. Let me be explicit – you need to meet with Akin Gump before you sign anything with New GM. It is unfathomable to us how you as our fiduciary would ignore the wishes of 65% of the unit holders, refuse to at least meet with our representative to discuss where things stand and how the

---

[169] PX-124.

[170] PX-130.

[171] PX-131.

situation could be resolved, and move forward anyway with signing an agreement with New GM."[172]

### F.    **Representational Authority.**

122.    New GM has challenged the authority of Plaintiffs' counsel to enter into the Settlement, yet counsel was fully authorized to negotiate and enter into the settlement.

123.    Co-Lead Counsel Steve Berman, Elizabeth Cabraser, and Bob Hilliard have always been designated to represent the interests of defined groups of Plaintiffs in the Bankruptcy Court, along with Designated Counsel.  For instance, Judge Furman's Order No. 13 pertaining to the Organization of Plaintiffs' Counsel, Protocols for Common Benefit Work and Expenses (Dkt. No. 47) declared that, "[w]ith respect to the common benefit claims and coordinated pretrial proceedings, Lead Counsel must:  . . . (12) perform all tasks necessary to carry out the functions of Lead Counsel and to properly coordinate Plaintiffs' pre-trial activities; . . . (16) negotiate settlements subject to Court approval on behalf of Plaintiffs; . . . [and] (17) if there is a settlement, propose a plan of allocation . . . ."  Furthermore, Order No. 13 directed Plaintiff Liaison Counsel to "coordinate activities and information exchange between the MDL proceedings and the bankruptcy proceedings, including meeting and conferring with New GM to provide the Court joint written updates of the Bankruptcy proceedings as ordered by the Court about matters of significance, including hearings, schedules, and deadlines."

124.    The proposed class representatives' client agreements with Co-Lead Counsel provided them with authority to take action as Co-Lead Counsel saw fit.[173]  Co-Lead Counsel deemed they had authority to bind these clients subject to the clients having the right to object. Similarly, Mr. Hilliard's client testified during her deposition that she was aware of the

---

[172] PX-133.

[173] DX-A; DX-C.

Settlement prior to August 14, 2017 and gave her attorneys the authority to enter such an agreement upon hiring them.[174]

125.    Hagens Berman, Lieff Cabraser Heimann & Bernstein LLP and Hilliard Munoz Gonzales LLP (now known as Hilliard Martinez Gonzales) retained Brown Rudnick LLP to act as its counsel in the proceedings in the Bankruptcy Court pursuant to a letter dated October 3, 2014.  Subsequently, Brown Rudnick served as Designated Counsel for Economic Loss Plaintiffs in the Bankruptcy proceedings.  Co-Lead Counsel retained Mr. Weintraub of Goodwin Procter LLP to serve as Designated Counsel for the Pre-Closing Accident Plaintiffs with respect to, *inter alia*, the Four Threshold Issues briefing triggered by the motion to enforce the Sale Order.  Bob Hilliard and his co-counsel Thomas J. Henry also retained Mr. Weintraub to pursue the late claims of Hilliard's and Henry's individual clients.

126.    The foregoing Plaintiffs' counsel has been actively litigating claims against the GUC Trust in the Bankruptcy Court for years without objection from New GM or the GUC Trust.

127.    The Bankruptcy Court has recognized the proper role of Designated Counsel on multiple occasions, including in scheduling orders issued by the Bankruptcy Court.  Here are three examples:

> **May 16, 2014 Scheduling Order** (Bankr. ECF No. 12697) at 2 n.3: "Certain Plaintiffs designated the law firms Brown Rudnick LLP; Caplin & Drysdale Chartered; and Stutzman, Bromberg, Esserman & Plifka, PC (collectively 'Designated Counsel') to speak on their behalf at the Conference."
>
> **Sept. 14, 2014 Scheduling Order re Pre-Closing Accidents** (Bankr. ECF No. 12897) at 1 n.2: "Certain plaintiffs in the Ignition Switch Actions designated the law firms Brown Rudnick, LLP; Caplin & Drysdale, Chartered; and Stutzman, Bromberg, Esserman & Plifka, PC (collectively,

---

[174] M. Mosley Dep. at 18:24-19:10.

'Designated Counsel') to speak on their behalf in connection with the Ignition Switch Motion to Enforce."

**Sept. 15, 2014 Scheduling Order re Monetary Relief Actions** (Bankr. ECF No. 12898) at 1 n.2 (same).

128.   New GM did not object when Co-Lead Counsel informed the Bankruptcy Court that they were acting pursuant to Judge Furman's Order No. 13 to work with Designated Counsel in the Bankruptcy Court <u>and were doing so in their capacity as MDL Co-Lead Counsel</u>.  Indeed, Co-Lead Counsel informed the Bankruptcy Court in a December 2014 filing in the Bankruptcy Court:

> **Dec. 16, 2014 Threshold Issue Brief** (Bankr. ECF No. 13025) at 1, n.1: "Lead Counsel appointed in the General Motors LLC Ignition Switch Litigation Multidistrict Litigation ... have retained the undersigned Designated Counsel, pursuant to Lead Counsel's authority under *Order No. 13 (Organization of Plaintiffs' Counsel, Protocols for Common Benefit Work and Expenses)*, dated September 16, 2014 [MDL Proceeding ECF No. 304], to brief the Threshold Issues with respect to plaintiffs who have asserted actions consolidated for pre-trial purposes in the MDL Proceedings ('Plaintiffs')."

129.   At a May 17, 2017 hearing, New GM's bankruptcy lawyer acknowledged the role of Co-Lead Counsel and informed Judge Gerber that claimants would be bound by Co-Lead Counsel's actions in the Bankruptcy Court once claimants received notice (exactly as contemplated under the Settlement Agreement):

> MR. WEISFELNER:  I think Judge Gerber in an effort to streamline the process and make it more efficient recognized designated counsel as the primary spokesperson for both ignition switch and non-ignition switch economic loss parties, provided that other people who thought we weren't adequately addressing their concerns had the opportunity to independently address the court, but only after sort of assuring themselves that we were, to adopt the colloquial, screwing up.  May 17, 2017 Hr'g Tr. at 68:19-69:1.

> THE COURT: [I]s anyone other than the name plaintiffs represented by Berman and Cabraser, would they be bound by -- assuming -- and I know it's disputed, but would they be bound by an affirmative decision by Mr. Weisfelner not to raise the clue -- the non-ignition switch plaintiff due process issues in the September scheduling order?

MR. STEINBERG: I think those plaintiffs plus those people who either got notice of or were aware of the schedul[ing] order, they all would be bound. May 17, 2017 Hr'g Tr. at 208:4-12.

130.    Co-Lead Counsel filed pleadings in the Bankruptcy Court with the designation that they were doing so as MDL Co-Lead Counsel.[175]    New GM never objected to such a designation and indeed regularly forwarded such pleadings to Judge Furman in its status reports.

131.    In the Second Circuit, Co-Lead Counsel filed briefs with the same designation that New GM is just now challenging.[176]  New GM never questioned that Co-Lead Counsel were acting as Co-Lead Counsel in the MDL while successfully pursuing an appeal from a Bankruptcy Court order.

132.    New GM represented to the Bankruptcy Court, and the procedure has been, that plaintiffs in cases pending outside of the MDL are presumptively bound by positions taken by Co-Lead Counsel in the absence of separate pleadings.[177]

133.    Thus, through the many years of the bankruptcy New GM has known that:  (i) Co-Lead Counsel deemed it their obligation to protect the interests of plaintiffs in the Bankruptcy Court; (ii) Co-Lead Counsel designated counsel in the Bankruptcy Court to protect those interests; and (iii) Co-Lead Counsel directly participated in the Bankruptcy Court proceedings in their capacity as Co-Lead Counsel in the MDL.  During this entire process, New GM never questioned Co-Lead Counsels' authority—until now.

---

[175] See, e.g., *Opening Brief on Imputation Issue on Behalf of the Ignition Switch Plaintiffs, the Non-Ignition Switch Plaintiffs, the State of Arizona, the People of the State of California, the Post-Closing Ignition Switch Accident Plaintiffs and the Adams Plaintiffs*, dated Sept. 18, 2015 [ECF No. 13452].

[176] See *Letter re: Updated on Related Proceedings*, dated Oct. 2, 2017 [ECF No. 14127], Ex. 4 cover page, Ex. 4 p. 59.

[177] See May 17, 2017 Hr'g Tr. at 203:7-208:12 (Bankr. ECF No. 13943) (New GM arguing that all plaintiffs served with a scheduling order identifying certain issues to be briefed in the Bankruptcy Court were bound by the rulings on those issues).

134.     Furthermore, under the terms of the Settlement Agreement, no releases are given nor any plaintiff's rights affected until and unless the Bankruptcy Court approves the Settlement Agreement under Bankruptcy Rule 9019, after notice and an opportunity to object is provided to all potentially affected claimants.  And if the Court enters the Settlement Order, the subsequent administration of the settlement fund and determination of eligibility and criteria to obtain payment from the settlement fund (including potentially under Rule 23), and the amount of any potential payment from the fund to any individual plaintiff is subject to further notice and opportunity for plaintiffs to object.

## V.     The Settlement Agreement Is Binding On The GUC Trust.

135.     The Signatory Plaintiffs and Participating Unitholders contend that the Settlement is binding on the GUC Trust as of August 14, 2017 because:  (i) agreement was reached on all material terms; and (ii) the GUC Trust both failed to expressly reserve the right not to be bound in the absence of the signatures and conveyed its intent to be bound through, among other things: (a) reaching agreement on the form of the Settlement Agreement and all related documentation without any reservations; (b) drafting and signing off on motions and proposed orders required to be filed by the terms of the Settlement Agreement; (c) signing off on the documents without any reservations and permitting them to be sent to New GM; (d) seeking a conference with Judge Glenn to inform the Court about the existence of the Settlement and discuss the mechanics of the proposed notice procedures; (e) providing no objection or complaint to the preview of the Settlement before Judge Furman at the MDL status conference; and (f) Wilmington Trust communicated internally that there was a "settlement" and it was "in the best interest of the Trust."

52

136.    Under New York law, "[s]tipulations of settlement are judicially favored, will not lightly be set aside, and are to be enforced with rigor and without a searching examination into their substance as long as they are clear, final and the product of mutual accord." Forcelli v. Gelco Corp., 972 N.Y.S.2d 570, 573 (N.Y. App. Div. 2013).

137.    To determine whether parties intend to be bound by an unsigned settlement agreement, courts examine whether:  (i) there has been an express reservation of the right not to be bound in the absence of a writing; (ii) there was partial performance; (iii) all of the terms of the alleged contract have been agreed upon; and (iv) the agreement is the type of contract that is usually committed to writing.  See Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1985).  No single factor is decisive, each factor provides guidance to the Court.  See Delyanis, 465 F. Supp. 2d at 175.  In addition, the Court should consider a fifth factor, fundamental fairness.  See Walker v. City of New York, 2006 WL 1662702, at *9-10 (E.D.N.Y. June 15, 2006); Conway v. Brooklyn Union Gas Co., 236 F. Supp. 2d 241, 252 (E.D.N.Y. 2002).

## A.    The Parties Reached Agreement On All Materials Terms.

138.    An enforceable contract exists where objective manifestations of intent demonstrate that the parties had reached a definite and final agreement on all essential terms. See Stonehill Capital Mgmt. LLC v. Bank of the W., 28 N.Y.3d 439, 448-49 (N.Y. 2016).  Here, the Signatory Plaintiffs and Participating Unitholders contend, and the evidence will show, that the Signatory Plaintiffs and the GUC Trust agreed to all material terms and conditions of the Settlement Agreement no later than August 14, 2017.  Thus, this Winston factor weighs heavily in favor of finding that the Settlement Agreement is binding.  See The Guardian Life Ins. Co. of Am. v. Calkins, No. 12 Civ. 8863 (JGK), 2014 WL 61475, at *2 (S.D.N.Y. Jan. 6, 2014) (holding that this factor weighed in favor of enforcement where the settlement terms had been

reduced to writing and "[a]ll that remained to be done was for the parties to sign the documents").

139.   Between June 6, 2017 (when the initial draft was sent to the GUC Trust) and August 14, 2017 (when the final draft was provided to New GM), the parties exchanged versions of the Settlement Agreement approximately twenty-one times.   During this time, the evidence will show that agreement was reached on all materials terms of the Settlement, which entail Plaintiffs' release of rights and claims against the GUC Trust, Wilmington Trust, the Motors Liquidation Company Avoidance Action Trust, and Unitholders in exchange for the GUC Trust's (i) payment of the $15 million Settlement Amount; (ii) payment of notice costs up to $6 million; and (iii) agreement to support entry of a Claims Estimate Order that would trigger New GM's obligation to issue the maximum amount of Adjustment Shares.   Conversely, there is no witness testimony, document or course of dealing evidence that supports the GUC Trust's position there were "open" issues to the Settlement.

140.   Agreement was also reached on all non-material terms of the Settlement Agreement, as well as on the form of the numerous ancillary documents, specifically:

- the Settlement Order attached to the Settlement Agreement;

- the Claims Estimate Order attached to the Settlement Agreement;

- the motion to approve the Settlement Agreement and Claims Estimate Order pursuant to Bankruptcy Rule 9019 required by Section 2.2 of the Settlement Agreement;

- four supporting declarations from the Wilmington Trust Company and counsel to the Parties;

- the motion to approve notice procedures required by Section 2.9(a) of the Settlement Agreement;

- forms of notice to Plaintiffs and Unitholders; and

- a declaration in support of the notice plan.

141.    The GUC Trust contends that, although the Settlement Agreement contained all material terms and the GUC Trust signed off on the form of the documents, this <u>Winston</u> factor is not met due to the lack of written signatures or an execution date on the Settlement Agreement.  For the reasons set forth herein, and as the Signatory Plaintiffs and Participating Unitholders will show at trial, this contention fails as a matter of fact and law.  That the ministerial act of signing the Settlement Agreement after the GUC Trust expressly "signed off" on the Agreement did not occur has no bearing on whether agreement on the material terms has occurred and a binding contract was reached.  <u>See</u> <u>In re Lehman Bros. Holdings Inc.</u>, No. 17 Civ. 03424, 2017 WL 3278933, at *3-4 (S.D.N.Y. Aug. 2, 2017) (holding that all material terms—a sum of money in exchange for a release—had been agreed to, although open issues remained, such as the timing of payment); <u>cf.</u> <u>R.G. Grp., Inc. v. Horn & Hardart Co.</u>, 751 F.2d 69, 76 (2d Cir. 1984) (describing this factor as evaluating "whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to").

142.    New GM contends that the parties could not reach agreement on all material terms because Plaintiffs' counsel allegedly did not have authority from their clients to enter into the Settlement Agreement.  This issue was never raised in the course of negotiations.  Moreover, as set forth herein, the facts and law support Plaintiffs' counsel's authority.  Further, as Judge Furman and New GM have recognized, representational authority issues are premature in Phase 1.  <u>See</u> Oct. 4, 2017 MDL Hr'g Tr. at 4:18-6:15; Letter re Briefing and Discovery Dispute, dated Sept. 25, 2017 [ECF No. 14114], at 2.

143.    In any event, Plaintiffs' counsel had the authority to settle on behalf of their clients, as did Gibson Dunn for the GUC Trust.  New GM's bare assertion to the contrary is

insufficient to overcome the presumption that counsel had authority to enter into the Settlement

Agreement.  See In re Artha Mgmt., Inc., 91 F. 3d at 329 (explaining that courts "presume that

an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client,

had the authority to do so," and that "[i]n accordance with that presumption, any party

challenging an attorney's authority to settle the case under such circumstances bears the burden

of proving by affirmative evidence that the attorney lacked authority").  Courts in this Circuit

have consistently recognized that an attorney may bind his or her client to a settlement

agreement so long as the attorney has apparent authority.  See Conway, 236 F. Supp. 2d at 247.

Moreover, "[o]nce a court has determined that an attorney had apparent or actual authority to

settle a case, arguments insisting on a 'final ratification' by the parties are 'unavailing.'"  Febus

v. Guardian First Funding Group, LLC, 90 F. Supp. 3d 240, 247 (S.D.N.Y. 2015) (quoting Reich

v. Best Built Homes, Inc., 895 F. Supp. 47, 50 (W.D.N.Y. 1995)); see also id. at 246 ("Where an

attorney has apparent authority to settle a case, and opposing counsel has no reason to doubt that

authority, the settlement will be upheld regardless of later protestations by the party to the

contrary.") (internal quotations omitted).  The evidence at trial will show that Gibson Dunn had

both actual and apparent authority to enter the Settlement.  Wilmington Trust gave Gibson Dunn

actual authority to enter the Settlement when, among other things, Beth Andrews "signed off" on

the Settlement and cloaked her attorneys with apparent authority to enter the Settlement when

she approved the text and transmission of her Declaration, stating that the Settlement should be

approved because it was in the best interests of the GUC Trust.

144.    The GUC Trust and New GM also contend that a material issue remained open

because the GUC Trust allegedly wanted to obtain the Court's reaction to the Settlement at the

August 17th conference before signing it.  The evidence will show that this supposed intent was

never conveyed to the Signatory Plaintiffs and, thus, is irrelevant to the <u>Winston</u> analysis.  <u>See,</u>
<u>e.g.</u>, <u>Winston</u>, 777 F.2d at 80 ("To discern that intent a court must look to the words and deeds
[of the parties] which constitute objective signs in a given set of circumstances.").  Moreover,
once a party agrees to the settlement terms, that party's later change of heart will not frustrate the
agreement's enforceability. The actions of the GUC Trust and its counsel throughout these
proceedings demonstrate their objective intent to settle this matter, despite their later
protestations.  <u>See</u> <u>Walker</u>, 2006 WL 1662702, at *6-7 (in order to determine parties' intent to
settle a case, the court must look, "not to their after-the-fact professed subjective intent, but their
objective intent as manifested by their expressed words and deeds at the time") (citing
<u>Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC</u>, 2005 WL 1377853, at *6 (S.D.N.Y. June
9, 2005).

> **B.    The GUC Trust Did Not Express An Explicit**
> **<u>Reservation Of The Right Not To Be Bound Absent A Signature</u>.**

145.    Under this <u>Winston</u> factor, a party must give "forthright, reasonable signals" that
"remove[s] any doubt of the parties' intent not to be bound absent a writing."  <u>Stonehill Capital</u>
<u>Mgmt. LLC</u>, 28 N.Y.3d at 451.  The evidence will show that that did not occur here.

146.    The GUC Trust and New GM predominantly rely upon the introduction of
Section 3.1 of the Settlement Agreement in the June 9 draft of the Settlement Agreement, which
states that the Settlement Agreement "shall become effective and binding on the Parties on the
date on which this Agreement is fully executed by each of the Parties," to argue that the GUC
Trust did not intend to be bound by the Settlement Agreement until it was signed.

147.    The GUC Trust and New GM also identify other features of the Settlement
Agreement that purportedly demonstrate that the GUC Trust did not intend to be bound by the
Settlement Agreement until it was signed, such as that the Settlement Agreement:  (a) was

labeled "execution version" and left placeholders for the effective date and signatures; (b) contained a clause keying performance obligations to execution of the agreement; and (c) contained "integration" and "amendment" clauses.  These terms of the Settlement Agreement are insufficient as a matter of fact and law to demonstrate an express reservation of the right not to be bound after agreement on all material terms had been reached and the parties took steps reflective of their intent to proceed with the Settlement.

148.    The evidence will show that the boilerplate language of Section 3.1 does not operate as a reservation of rights not to be bound until the Settlement Agreement was signed. The language of Section 3.1 was added to the Settlement Agreement by Akin Gump and Gibson Dunn in their first set of comments to the Settlement Agreement on June 9, 2017.  The GUC Trust has presented no evidence that this language was ever discussed by the parties or that the GUC Trust ever highlighted, flagged, or announced to the Signatory Plaintiffs that they did not intend the Settlement Agreement to be binding until signatures were placed on the Settlement Agreement.   By August 14, 2017, all parties knew and accepted the settlement terms and communicated that acceptance amongst themselves, to Judge Furman and to New GM.  The settlement was reached no later than that date.   Given the strong indication that all parties intended to be bound as of that date, the existence of boilerplate language in the Settlement Agreement does not undermine the evidence that the parties intended to be bound by the Settlement.

149.    Indeed, the evidence will show that, as of August 14, 2017, signing the Settlement Agreement was only a formality.   There was literally nothing left to negotiate or settle; no indication that issues were left unresolved; that essential terms were omitted (all of the terms were committed to written documents); and no indication that the GUC Trust objected to any of

the terms. All that remained was for the parties to sign what had already been fully agreed to. At this time, the GUC Trust did nothing to notify the Signatory Plaintiffs otherwise. The absence of an express reservation by the GUC Trust at that time not to be bound without inking a signature is evidence there was a binding Agreement.

150.    The GUC Trust cannot now say they were waiting for this Court's commentary on the Settlement before signing. The GUC Trust will not be able to establish that they communicated that contention to the Signatory Plaintiffs at any time, nor is it plausible amongst sophisticated bankruptcy counsel. It is also inconsistent with the fact that the GUC Trust decided to abandon the Settlement before the August 17th court conference. Based on all of the foregoing, the Plaintiffs contend that the GUC Trust did not explicitly reserve the right not to be bound by the Settlement Agreement absent a signature.

151.    The Signatory Plaintiffs and Participating Unitholders contend that the Court must balance this boilerplate language introduced in June against all of the GUC Trust's objectively manifested actions at the time of contract formation in July or August. As the evidence will demonstrate, without exception, the GUC Trust took affirmative steps in August to reveal its true intent that it would be bound by the Settlement Agreement. The Signatory Plaintiffs and Participating Unitholders will show at trial through testimony, emails, and documents that: (i) Gibson Dunn agreed to inform New GM about the Settlement; (ii) Gibson Dunn participated on the August 11 all hands call with "the requisite people necessary to bind your respective clients" where Gibson Dunn conveyed that they were done with comments to the documents; (iii) Wilmington Trust "signed off" on the Settlement; (iv) Gibson Dunn signed off to send the Settlement documentation to New GM; and (v) Gibson Dunn sought a status conference with the Court to preview the Settlement and notice plan.

152.    In this context, the inclusion of Section 3.1 on June 9, 2017 failed to convey to the Signatory Plaintiffs that the GUC Trust would not be bound absent signatures on August 14, 2017 after the parties had reached agreement on all material and non-material terms of the Settlement Agreement and there was nothing left for future negotiation and settlement.

153.    Moreover, courts have held that near-identical language to Section 3.1 "is insufficient to be treated as an explicit reservation that the parties should not be bound by the terms of their agreement until the written agreement is fully executed." Kowalchuk v. Stroup, 61 A.D.3d 118, 124 (N.Y. App. Div. 2009) (holding that language in unexecuted agreement that agreement "is complete and binding upon its execution by all signatories" did not amount to a reservation of rights not to be bound); see also In re Lehman Bros. Holdings Inc., 2017 WL 3278933, at *3 (holding that language in unexecuted agreement that the agreement "shall become effective upon execution hereof by each of the Parties" did not amount to a reservation of rights not to be bound).  Contrary to the GUC Trust's contentions, these decisions were not based on the timing of insertion of the language.  Rather, they focused on the fact that like here, no correspondence highlighted an express reservation not to be bound without a signature when the Settlement was reached, and the parties subsequent actions indicated an intent to be bound absent a signature, so that the boilerplate language was insufficient to be treated as an express reservation.

154.    Similarly, New York courts have held that the inclusion in a written contract of the other provisions identified by the GUC Trust and New GM are not conclusive evidence of parties' intent not to be bound in the absence of signatures. See, e.g., Delgrosso v. City of N.Y., No. 11-CV-4876 (MKB), 2013 WL 5202581, at *7-8 (E.D.N.Y. Sept. 13, 2013) (finding that agreement was binding where there was "no express reservation of the right not to be bound in

the absence of a writing signed by the plaintiff," despite the inclusion of a merger clause and a provision stating that the plaintiff would "execute and deliver" the settlement documentation); Pearce v. Manhattan Ensemble Theater, Inc., No. 06 CV 1535 (KMW), 2009 WL 3152127, at *6 (S.D.N.Y. Sept. 30, 2009) (finding that the inclusion in a draft letter of agreement of a merger clause and signature lines did "not constitute express statements that the parties would only be bound by a written agreement").

155.    An express reservation not to be bound until signatures are affixed enables a party to "negotiate candidly, secure in the knowledge that he will not be bound until execution of what both parties consider to be [the] final document."  Winston, 777 F.2d at 80; see also R.G. Grp., Inc. v. Horn & Hardart Co., 751 F.2d at 75 (explaining that such provisions provide the "[f]reedom to avoid oral agreements" and pin down details in the process of drafting a written agreement "that are unnoticed or passed by in oral discussion").

156.    Here, as the GUC Trust acknowledges, the parties had reached agreement on all material terms and all of the final settlement documentation following over two months of painstaking negotiations.  There is no evidence to suggest during the negotiations, the GUC Trust refused to enter the Settlement Agreement.  Quite the opposite, throughout negotiations, the GUC Trust expressed its eagerness to settle, took necessary steps to achieve that end, and never implied its inability or unwillingness to settle absent a signature or preview with the Bankruptcy Court.  Permitting the GUC Trust to now back out of the Settlement based on boilerplate language that was never a point of discussion among the parties does not serve this purpose of encouraging candid negotiations.  Rather, adopting the GUC Trust's contention presents a host of inequitable and impractical consequences, with serious commercial risks.  It most certainly would erode the principles of finality and security of purpose when entering bankruptcy

settlements.    Conversely, enforcing the Settlement promotes the efficient use of judicial

resources and preserves the integrity of settlement as a meaningful way to resolve legal disputes.

157.    New GM's contention that the parties' references to the Settlement Agreement as

"proposed" is an admission that the Settlement Agreement was not binding is strained and

illogical.  The evidence will show that the Signatory Plaintiffs and Unitholders utilized the term

"proposed" because the Settlement Agreement was a settlement that was ready to be proposed to

the Bankruptcy Court for approval, a natural requirement under Bankruptcy Rule 9019, and a

common understanding among the parties represented by sophisticated bankruptcy counsel.

158.    New GM's further contention that Gibson Dunn's draft letter circulated on

August 16 provides evidence of an intent not to be bound absent signatures fails.  The letter—

circulated the day after its meeting with New GM—stating that the "Proposed Settlement is

nearly final, but has not yet been executed by the parties and is not binding" is at best an ex post

facto rationalization for its decision to abandon the Settlement Agreement and at worst a self-

serving trap as the Signatory Plaintiffs were in the dark about the Gibson Dunn-New GM

meeting and agreement in principle.

## C.    There Was Partial Performance Of The Settlement Agreement.

159.    The second factor under the Winston test is met when one party has partially

performed its obligations under the settlement, and that performance has been accepted by the

party disclaiming the existence of an agreement.  See Alvarez v. City of N.Y., 146 F. Supp. 2d

327, 336 (S.D.N.Y. 2001).  The Signatory Plaintiffs and Participating Unitholders contend that

this Winston factor is met because, as the evidence will show, the parties:  (i) prepared the

Settlement Motion as required by Section 2.2 of the Settlement Agreement; (ii) prepared a

motion seeking an order approving proposed notice procedures as required by Section 2.9(a) of

the Settlement Agreement; and (iii) started the process of securing Court approval by arranging

to present the Settlement to this Court and discuss notice issues.  See Powell v. Omnicom, 497

F.3d 124, 130 (2d Cir. 2007) (holding that there was partial performance of settlement where

employer drafted a reference letter as it had agreed to under the settlement with the only

remaining detail being whether the letter would describe the former employee's performance as

"fully satisfactory" or "exemplary").

160.    In addition, the Parties requested that the Court delay scheduling oral argument on

the Initial Late Claims Motions Issues while negotiations were ongoing.  See Searles v.

Pompilio, No. 02 Civ. 6567, 2010 WL 11507379, at *5 (S.D.N.Y. Jan. 28, 2010) (finding that

"partial performance of a settlement agreement exists where the parties 'relying on the apparent

settlement, did not resume active litigation of the case'").

161.    Further, the GUC Trust signed off on the final form of the Settlement Agreement

and all related documentation, consented to providing those documents to New GM, and did not

object to or comment on the announcement of the Settlement to Judge Furman at the MDL status

conference.  For these and other reasons that will be established at trial, there was partial

performance of the Settlement.  The factual evidence could not be clearer that the parties that

negotiated the Settlement Agreement intended it to move forward, and they conducted

themselves accordingly.

162.    The GUC Trust and New GM contend that drafting settlement documents does

not amount to partial performance.  However, the motions that were drafted are required under

the terms of the Settlement Agreement and do not document the Settlement itself.  Further, the

joint action to present the Settlement to the MDL Court, this Court and New GM and begin the

process of obtaining Court approval could not have been taken unless and until the parties had

reached agreement upon all terms of the Settlement.

### D. The Settlement Agreement Was Reduced To Writing And Enforcing The Settlement Agreement Does Not Run Afoul Of CPLR 2104.

163.    The evidence will be undisputed that the Settlement was reduced to a detailed and

carefully-negotiated final writing, and while the written Settlement Agreement was not signed,

the terms of the Agreement had been reduced to writing, and hence this Winston factor weighs in

favor of enforcing the Agreement.  See In re Lehman Bros. Holdings Inc., 2017 WL 3278933, at

*4 (enforcing written agreement that was unsigned due to party's own delay); Alvarez, 146 F.

Supp. 2d at 337 (enforcing unsigned agreement where the terms "had been largely reduced to

writing"); Delgrosso, 2013 WL 5202581, at *7 (enforcing unsigned agreement because, *inter

alia*, "the settlement was in fact reduced to a writing, all of whose terms were approved and

agreed upon entirely by [the parties] before there was any indication that the plaintiff had

changed his mind").  The evidence will show that the GUC Trust admits that it was signed off on

the final form of the Settlement Agreement and related documentation.

164.    However, the GUC Trust and New GM argue that this factor is not met because

the final writing was unsigned and, in their view, signatures are required by CPLR 2104.

165.    CPLR 2104 provides that:

> An agreement between parties or their attorneys relating to any matter in an
> action, other than one made between counsel in open court, is not binding upon a
> party unless it is in a writing subscribed by him or his attorney or reduced to the
> form of an order and entered.  With respect to stipulations of settlement and
> notwithstanding the form of the stipulation of settlement, the terms of such
> stipulations shall be filed by the defendant with the county clerk.

CPLR 2104.

166.    Contrary to the GUC Trust's and New GM's arguments, CPLR 2104 likely does not apply to the settlement of a federal action because "the CPLR only 'govern[s] the procedure in civil judicial proceedings in all courts of the state,'" not federal courts, and CPLR 2104 "is a rather narrow, limited exception to New York's general rules of contract . . . ." Mone v. Park East Sports Medicine and Rehab., P.C., No. 99 Civ. 4990, 2001 WL 1518263, at *4-5 (S.D.N.Y. Nov. 29, 2001); see also Alli v. Warden of A.R.N.D.C., 12 Civ. 3947, 2016 WL 7176979, at *2 (S.D.N.Y. Dec. 9, 2016), report and recommendation adopted, 2017 WL 118023 (S.D.N.Y. Jan. 10, 2017).

167.    Moreover, CPLR 2104 "is a rule 'of convenience, designed to relieve the courts from having to resolve embarrassing factual disputes between counsel . . . .'" Mone, 2001 WL 1518263, at *5.  That purpose is not served where, as here, it is undisputed that the settlement was reduced to a final writing.  See id.; see also Conway, 236 F. Supp. 2d at 251-52 (enforcing a settlement agreement where, although under CPLR 2104 "settlements of any claim are generally required to be in writing," "the written draft of the settlement had essentially been finalized . . . with the exception of the final dollar amount").

168.    In any event, emails with a counsel's signature block can satisfy the requirements of CPLR 2104.  See Scheinmann v. Dykstra, No. 16 CIV. 5446 (AJP), 2017 WL 1422972, at *5, n.6 (S.D.N.Y. Apr. 21, 2017).  The evidence will show that emails from Keith Martorana of Gibson Dunn containing his signature block, including the August 12th communication by Mr. Martorana that "[f]rom the GUC Trust perspective, all of the documents sent over by Howie (subject to one item we are discussing with Akin in the Settlement Agreement) are fine" and August 14th communication by Mr. Martorana that this issue had been resolved, comply with the requirements of CPLR 2104.

169.     Therefore, the Signatory Plaintiffs and Participating Unitholders contend that each and every one of the factors that courts use to determine whether a settlement is final under New York law show that the Settlement Agreement is binding on the GUC Trust.

## VI.     New GM Does Not Have Phase 1 Standing.

170.     The Signatory Plaintiffs and Participating Unitholders contend that New GM does not have Phase 1 standing.  The narrow Phase 1 issue before the Court is whether New GM has standing to be heard on whether the Settlement Agreement with the GUC Trust is a binding agreement.  The evidence will show that New GM had no role in the Settlement negotiations, is neither a party to, nor a third-party beneficiary of, the Agreement, and has no direct financial stake in Phase 1.  Thus, New GM lacks Phase 1 standing.

171.     In order to have standing in Phase 1, New GM has the burden of demonstrating: (i) prudential standing; (ii) constitutional standing; *and* (iii) Bankruptcy Code Section 1109 standing.  See Scott v. Residential Capital, LLC (In re Residential Capital, LLC), No. 14 CIV. 761, 2015 WL 629416, at *3 (S.D.N.Y. Feb. 13, 2015).   The Signatory Plaintiffs and Participating Unitholders contend that New GM cannot meet a single one of these three standards and thus lacks standing to be heard.

172.     It is well-settled that third-party, non-beneficiaries of a contract lack prudential standing to challenge the binding nature of that contract.  See Premium Mortg. Corp. v. Equifax Info Servs. LLC, 583 F.3d 103, 108 (2d Cir. 2009); Shea v. Royal Enters., Inc., No. 09 Civ. 8709, 2011 WL 43460, at *3 (S.D.N.Y. Jan. 6, 2011).  Moreover, third party non-beneficiaries may not adjudicate contractual issues even where a financial interest is at stake.  See, e.g., Premium Mortg. Corp., 583 F.3d at 108 (holding that plaintiff, alleging that it suffered financial harm when credit bureaus resold plaintiffs' data to plaintiff's competitors, lacked standing to

assert claims for breach of the contracts between credit bureaus and the competitors because it was not a party to the contracts); Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat'l Ass'n, 747 F.3d 44, 50 (2d Cir. 2014) (holding that lessor lacked prudential standing to litigate whether lessee's liabilities were assigned to bank under purchase and assignment agreement— and that, as result, the bank owed amounts due under the lease—because it was neither a party to nor a third-party beneficiary of the agreement).

173.    The evidence is undisputed that New GM is not a party to the Settlement Agreement or an intended third-party beneficiary of the Agreement.  New GM therefore lacks prudential standing in Phase 1.  The Signatory Plaintiffs and Participating Unitholders contend that such a finding alone settles the question of New GM's Phase 1 standing.

174.    New GM contends that it has a direct stake in Phase 1 sufficient to confer standing because the Settlement Agreement requires the parties to seek a Claims Estimate Order that would obligate New GM to issue additional shares of New GM common stock.  However, any financial interest New GM may have in the outcome of Phase 2 does not warrant Phase 1 standing.

175.    New GM also contends that its agreement with the GUC Trust that the Forbearance Agreement automatically terminates if the Settlement Agreement is held to be binding confers Phase 1 standing.  Not so.  Standing in contract disputes must be established by the express terms of the contract at issue.  Cf. Coal. of 9/11 Families, Inc. v. Rampe, No. 04 Civ. 6941, 2005 WL 323747, at *2 (S.D.N.Y. Feb. 8, 2005).  New GM cannot manufacture standing by claiming it will suffer an "injury" if the Forbearance Agreement terminates by operation of its agreed-upon terms.

176.     With respect to Bankruptcy Code Section 1109 standing, a proposed participant who does not fall within the enumerated categories in the statute must (1) have a direct financial stake in the proceeding; and (2) must be either be a creditor or have some equitable claim against the estate.  See Roslyn Sav. Bank v. Comcoach Corp. (In re Comcoach Corp.), 698 F.2d 571, 573-74 (2d Cir. 1983); In re Innkeepers USA Tr., 448 B.R. 131, 141-44 (Bankr. S.D.N.Y. 2011).

177.     The evidence will show that, if the Settlement Agreement is held to be binding, the only resulting obligation is on the parties to file a joint motion for approval of the Settlement Agreement and the Claims Estimate Order under Bankruptcy Rule 9019, after obtaining an order approving notice procedures for this motion.  See Settlement Agreement §§ 2.2, 2.9.  No direct obligation is imposed on New GM in any outcome of Phase 1.

178.     New GM contends that it has a direct stake in Phase 1 because if the Settlement Agreement is held to be binding, then the Forbearance Agreement automatically terminates and, in Phase 2, the Parties will seek a Claims Estimate Order and a notice procedures order requiring New GM's assistance in obtaining names of plaintiffs.  In other words, New GM is trying to prevent Phase 2, which may impact its financial interests.  That is not enough under controlling case law.

179.     New GM also contends that it is inconsistent for the Participating Unitholders to have standing but not New GM.  Not so.  The Participating Unitholders are third-party beneficiaries of the Settlement Agreement, were part of the negotiation process, and are fact witnesses regarding the issue of whether the Settlement Agreement is binding.

180.     In addition, New GM cannot meet the second factor for Bankruptcy Code Section 1109 standing because, as the evidence will show, New GM is neither a creditor of nor a holder of an equitable interest in the GUC Trust.  The only claim against the GUC Trust that New GM

points to—Proof of Claim No. 71111—was a contingent administrative claim that was withdrawn.

181.    Similar to Bankruptcy Code Section 1109 standing, constitutional standing does not exist where a third-party attempts to assert the rights of another on the grounds that the third-party may suffer tangential or future economic harm.  See In re Caldor, Inc.-NY, 193 B.R. 182, 186 (Bankr. S.D.N.Y. 1996) (bank that was lender to the landlord of a site leased to debtor lacked constitutional standing to contest debtor-in-possession's motion for order authorizing it to lease a new site).

182.    New GM contends it has constitutional standing for the same reason it has Bankruptcy Code Section 1109 standing.  However, any potential economic impact on New GM that may occur in Phase 2 based on future contingencies can hardly be understood as a direct interest and is insufficient to confer Phase 1 standing.  See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 401-402 (2013) (explaining that theory of future injury is "too speculative to satisfy the well-established requirement that threatened injury must be certainly impending").

183.    New GM cannot meet its burden to establish that it has Phase 1 standing. Accordingly, the Court should find that New GM has no standing to participate in Phase 1.

**VII.    The Signatory Plaintiffs Are Entitled To Attorneys' Fees.**

184.    The Signatory Plaintiffs are entitled to attorneys' fees and costs pursuant to Section 3.3, which provides that "[i]f any lawsuit or proceeding is required to enforce the terms of this Agreement, the prevailing party in any such lawsuit or proceeding shall be entitled to reasonable attorney's fees and costs."  This provision encompasses the litigation over the binding nature of the Settlement Agreement.

Dated: December 5, 2017
New York, New York

Respectfully submitted,

/s/ Howard S. Steel
Edward S. Weisfelner
Howard S. Steel
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
Tel: 212-209-4800
eweisfelner@brownrudnick.com
hsteel@brownrudnick.com

Sander L. Esserman
STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, A PROFESSIONAL
CORPORATION
2323 Bryan Street, Ste. 2200
Dallas, Texas 75201
Tel: 214-969-4900
esserman@sbep-law.com

*Designated Counsel for the Ignition Switch
Plaintiffs and Certain Non-Ignition Switch
Plaintiffs in the Bankruptcy Court*

Steve W. Berman (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel: 206-623-7292
steve@hbsslaw.com

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
Tel: 414-956-1000
ecabraser@lchb.com

*Co-Lead Counsel for the Ignition Switch
Plaintiffs and Certain Non-Ignition Switch
Plaintiffs in the MDL Court*

William P. Weintraub
Gregory W. Fox
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: 212-813-8800
wweintraub@goodwinlaw.com
gfox@goodwinlaw.com

*Counsel to Those Certain Pre-Closing Accident Plaintiffs Represented By Hilliard Muñoz Gonzales L.L.P. and the Law Offices of Thomas J. Henry*

Robert Hilliard, Esq.
HILLIARD MUÑOZ GONZALES LLP
719 South Shoreline
Suite 500
Corpus Christi, TX 78401
Tel: 361-882-1612
bobh@hmglawfirm.com

*Counsel to certain Pre-Closing Accident Plaintiffs*

Thomas J. Henry, Esq.
THE LAW OFFICES OF THOMAS J. HENRY
4715 Fredricksburg, Suite 507
San Antonio, TX 78229

*Counsel to Certain Pre-Closing Accident Plaintiffs*

Lisa M. Norman (admitted *pro hac vice*)
ANDREWS MYERS, P.C.
1885 St. James Place, 15th Floor
Houston, Texas 77056
Tel: 713-850-4200
Lnorman@andrewsmyers.com
*Counsel to Certain Pre-Closing Accident Plaintiffs*

Daniel H. Golden
Deborah J. Newman
AKIN GUMP STRAUSS
HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Tel: 212-871-1002
dgolden@akingump.com
djnewman@akingump.com

*Counsel to Participating Unitholders*